

**U.S. Department of Justice**

Environment and Natural Resource Division

*P.O. Box 7611*
*Washington, DC 20044*
*202-514-0180*
*Sarah.Himmelhoch@usdoj.gov*

September 3, 2013

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
  Eastern District of Louisiana
Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re: <u>MDL 2179—Opposition to BP's Motion to Strike Designation</u>
<u>of Dr. Nathan Bushnell from the Phase 2 Deposition Bundle List</u>

Dear Judge Shushan:

On August 23, 2013, BP moved to strike the United States' designation of the deposition
bundle of Dr. Nathan Bushnell.  In so doing, they unveiled for the first time a new interpretation
of the "relied upon" exception to the limitation on the number of experts to be permitted in Phase
II of the trial.  *See* August 22, 2013 Order Regarding Presentation of Evidence in Phase Two
Trial, Rec. Doc. 11087, pg. 10.  The United States, however, has complied fully with the
requirements of the Court's Order:  the reliance of the testifying experts of the United States on
Dr. Bushnell was fully identified and explained in their reports and deposition testimony.
Moreover, as demonstrated by its Motion *in Limine* to Strike the Expert Reports of Drs.
Dykhuizen and Griffith, BP will be challenging the flow rate estimates of the United States'
experts based on their methodology and uncertainty range.  The US experts must be permitted to
testify regarding their reliance on Dr. Bushnell's work both to fully explain their work, and to
respond to BP's lines of cross-examination.  The Court has discretion in this matter and should
not further restrict the United States, the party with the burden of proof, from putting on its case.

**Background**

On July 12, 2010, BP landed the capping stack over the flowing Macondo Well.  The following several days presented a unique opportunity to estimate the flow rate from the Macondo Well because pressure gauges showed the pressure drop inside the capping stack and the geometry of the capping stack was known.  Thus, fairly straightforward calculations could be made using established principles of fluid dynamics.  In fact, BP Vice-President Richard Lynch testified under oath that BP calculated a flow rate through the capping stack of 56,000 barrels of oil per day and stated he had no reason to doubt that straightforward calculation.[1]  On August 2, 2010, the United States made public its then best estimate of the flow rate on July 14 and 15, and the cumulative flow rate during the 87 days the well flowed.  Ex. 2 (August 2, 2010 press release).[2]  Since then, BP has criticized the United States' estimates on various grounds, including arguments that (1) federal scientists used a methodology that treated the flow like a homogeneous flow where oil and gas moved at similar velocities, instead of a flow where the oil and gas moved at different speeds; (2) the Dykhuizen methodology used "K" factors to represent resistance to flow through the pipes which were inappropriate for the complex geometry of the capping stack; and (3) Griffiths and Pooladi-Darvish used constant discharge coefficients to represent resistance to flow under varying pressures.[3]

The federal experts relied in part upon Dr. Bushnell's work to test their hypotheses, because his modeling is not subject to those criticisms.  Dr. Bushnell used a different computer model than the other United States' experts, called computational fluid dynamics or "CFD."  He first created a three-dimensional computer model of the flow path through the interior of the capping stack, using its known geometry, and then modeled the flow through the three-dimensional capping stack using various equations and mathematical approaches.  His models allowed for oil and gas to travel at different velocities and did not require used of K factors to represent flow resistance.  Ex. 7 (Bushnell Expert Report, pps. 9-11 "Overview of CFD").

Accordingly, when the United States produced its initial and rebuttal expert reports, three of its experts relied upon, among other things, the work of Dr. Nathan Bushnell to test and verify that their assumptions and methodologies were accurate and reasonable.  Contrary to BP's assertions, their reliance is clear in the four corners of their reports:

---

[1] Ex. 1, Deposition of Richard Lynch at 372.

[2] The United States shared these estimates with BP engineers in Houston prior to publicly releasing them. *See*, Ex. 3 (Ratzel Tr. at 104-105);  Ex. 4 (Saidi Tr. at 56).

[3] Ex. 5 (DEP 10338 (BP's Preliminary Response to the Flow Rate and Volume Estimates contained in Staff Working Paper No. 3, pps. 1-4); Ex. 6 (Johnson Expert Report Section 4.3.4, pg. 26).  Note that BP asserts confidentiality over Ex 5.

*First*, one of BP's experts, Dr. Adrian Johnson, criticized the calculations performed by US experts Dr. Stewart Griffiths and Dr. Mehran Pooli-Darvish on grounds that they used a constant discharge coefficient.[4] Dr. Bushnell performed modeling runs and generated a figure demonstrating that a constant discharge coefficient is appropriate when calculating the flow through the capping stack. Ex. 8 (Bushnell Rebuttal Report, Appx. 5, pps. 49-50). US Experts Drs. Griffiths and Pooli-Darvish both expressly relied upon Dr. Bushnell's modeling runs and the associated figure in their reports. Ex. 9 (Griffiths Rebuttal Report, pg. 9) ("I have since checked flow rates through the kill line based on a constant discharge coefficient against those obtained using a full two-phase model," citing Dr. Bushnell's work and incorporating figure); Ex. 10 ( Pooli-Darvish Rebuttal Report, pg. 36) ("Dr. Bushnell has used a more sophisticated model…and demonstrated that these equations are valid," pointing to graph in Dr. Griffith's Rebuttal Report).

*Second,* US expert Dr. Ronald Dykhuizen also explicitly relied on Dr. Bushnell's work. After explaining his use of a homogeneous approach and assumptions concerning the K factors in the capping stack piping,[5] which he terms "correlations," Dr. Dykhuizen then sets forth that he looked to Dr. Bushnell's multiphase flow modeling to evaluate whether the assumption that the flow could be treated as a homogeneous one was appropriate, and concluded that it was. Ex. 11 (Dykhuizen Expert Report pg. 6-7).[6] Similarly, Dr. Dykhuizen expressly states that he relied on Dr. Bushnell's three-dimensional modeling of flow through the capping stack to determine that what BP called the "complex geometry" of the capping stack could in fact be accurately modeled using the K factors, since the CFD modeling does not require use of K factors but arrived at approximately the same result. *Id.*[7]

---

[4] Ex. 6 above (Johnson Expert Report pg. 26). A discharge coefficient represents the mathematical relationship between the pressure drop and flow rate and is inversely related to the resistance offered by the system.

[5] A K factor represents the mathematical relationship between the pressure drop and the flow velocity and is proportional to the resistance offered by the system.

[6] Dr. Dykhuizen wrote in his report

> I have repeated the calculations within the DOE-NNSA Flow Analysis Report using the correlations of Chisholm, and found no significant change in the estimate when using multiphase correlations. In fact, the estimated flow *increased* by 4%. Another expert in this case, Bushnell (2013), used a multiphase flow computer simulation of the flow through the capping stack, and also found that the predicted flow rate with a multiphase calculation was 3% above what was predicted with a homogeneous single phase assumption.

[7] Dr. Dykhuizen's report contains the following passage:

> Another assumption that was made within the calculations presented in the DOE-NNSA Flow Analysis Report was that the individual flow elements (e.g., lengths of pipe, pipe contractions and expansions, elbows, tees, etc.) could be treated independently. The close proximity of those flow

Dr. Dykhuizen's deposition testimony makes clear that he relied upon Dr. Bushnell's work to formulate his opinion.  For example, he testified as follows:

> Q. (By Mr. Regan)And- and who did you rely upon for your assumption that there was homogeneous flow in a multiphase flow environment in all of the various geometries that were present at Macondo?

[objection omitted]

> A. Dr. Nathan Bushnell demonstrated that homogeneous assumption and a nonhomogeneous assumption yield equivalent results.  My experience shows that I would state that it would yield equivalent results.  There are very few pressure drop correlations that depend on the flow regime.

Ex. 12 (Dykhuizen Tr. at 99).  Apparently, BP's counsel understood at the deposition that Dr. Dykhuizen relied upon Dr. Bushnell's work:

> Q. … You testified earlier that you relied on the work of Dr. Bushnell in this litigation to help confirm to you that that [assumption about homogeneous flow at Macondo] was an appropriate assumption.  Do you recall the testimony?
> [objection omitted]
> A.  Yes.

*Id.,* Dykhuizen Tr. at 120; *see also*, Dykhuizen Tr. pps. 47 (Nathan Bushnell provides some significant work that I think supports my work and my conclusions); pg. 304 ( relied upon Dr. Bushnell's work to give confidence that assumption of homogeneous flow was appropriate); pg. 307 (found Dr. Bushnell's CFD analysis of the capping stack to be helpful as to assumptions for capping stack flow rate estimates).

BP clearly does not want any CFD modeling at the Phase II trial, because the results simply do not support BP's theory that using a multiphase model will materially alter the flow rate calculations for July 14 and 15, 2010, nor does it support its other arguments.  Indeed, BP produced an expert report from their own CFD modeler, Dr. Simon Lo, that provided uncannily

---

elements potentially could alter their impact on the pressure drop, and therefore reduce the accuracy of flow rate prediction. Computational fluid dynamics (CFD) modeling conducted by Bushnell (2013) explored this by simulating the multidimensional flow through the various elements. In this way they did not have to rely upon tabulated flow resistances (K factors) for the individual elements. Bushnell's results were very similar to the results found in the DOE NNSA Flow Analysis Report, which indicates that the components can indeed be treated independently. This provides additional confidence that our approach was correct.

similar mass flow rate estimates when similar inputs for temperature were used.[8]  BP earlier indicated to the Court that it would call Dr. Lo to trial, in order to persuade the Court to put the United States' summary judgment motion aside.  Ex. 15 (July 18, 2013 letter from Robert Gasaway to Judge Shushan re: Motion to Postpone Indefinitely the Response Deadline for Phase 2 "Dispositive" Motions Filed on July 15, 2013).  In fact, BP has not designated Dr. Lo as an expert for trial – the only expert from those initially designated and deposed that BP will not present to the Court.  Ex. 16 (August 10, 2013 email from  Joseph Eisert to Judge Shushan listing testifying experts for trial) .

It would be manifestly unfair to allow BP to pursue its unfounded theories and criticisms of the United States' flow rate estimates, but tie the US experts' hands by prohibiting them from pointing to important work on which they relied in testing and developing their opinions.

**Discussion**

I.       The United States has fully complied with the  Court's Order regarding designation of reliance experts.

The United States' experts fully complied with the requirements contemplated by the Court's Order for designation of relied-upon experts through deposition.   The Order merely provides that "[e]ither side may allow its testifying experts to rely on the calculations or analysis of another of its experts (*as set forth in the testifying expert's report)* without calling the relied-upon expert to testify at trial."  Order Regarding Presentation of Evidence in Phase Two Trial, ¶ 4.i, pg. 10. (Rec. Doc. 11087). As set forth above, the United States' experts relying on Dr. Bushnell clearly disclosed that they were relying on Dr. Bushnell's work and explained the relevance of his results to their opinion.

Paragraph 4.i. of the Order is primarily a case management tool.  Nonetheless, it is clear that the US experts' reliance also satisfies the requirements of Fed. R. Evid. 703.   Drs. Griffiths and Pooli-Darvish rely on Dr. Bushnell's work to rebut a specific criticism levied at them by an BP expert.  Dr. Dykhuizen relies on Dr. Bushnell to validate and confirm that use of "K" factors and an assumption of homogenous flow is appropriate for analysis of the flow rate through the Macondo capping stack.

---

[8]  Dr. Lo documented his results in kg/s ( i.e. a mass flow rate) as well as in stock tank barrels of oil per day ("stbopd").  His "slip"  or multi-phase model at 200°F showed a flow rate of 119.8  kg/s on the kill side of the capping stack.  Ex. 13 (Lo Expert Report, Table 3.5, pg. 19); Ex. 14 (Dep. Ex. 12010, chart of Lo's outputs in kg/s). Dr. Bushnell's baseline case showed a mass flow rate of 119.9 kg/s.  Thus, there was virtually no effect of the multi-phase model versus the homogeneous model looked at in isolation for the period of the CFD modeling. And, when expressed in kg/s and not in stbopd, there was only a 5.5% difference on the kill side modeling between Dr. Lo and Dr. Bushnell even using different temperatures and fluids properties.  Ex. 13 (Lo Report, Table 5.3 pg. 25).  (The equations used by the US and BP to convert to stbopd are different and amplify or increase the differences between the CFD modeling outcomes, so use of kg/s is preferable to compare the CFD modeling results.)

Indeed, it is good scientific practice to develop a computer model and then test the sensitivity of that model to changes in variables, inputs or assumptions.   That is precisely what the US experts did, except here, they chose to rely upon Dr. Bushnell to perform the highly specialized three-dimensional modeling.  Another court, on strikingly similar facts, was not troubled by a testifying expert's reliance on a non-testifying expert's CFD modeling to validate and evaluate his own analysis.  In United States Gypsum Company v. LaFarge North American, Inc., 670 F. Supp. 2d 748, 759 (N.D. Ill.  2009), the court considered a motion to strike a testifying expert on Daubert grounds.  The testifying expert did not have in-depth expertise in fluid dynamics and considered information from others in forming his conclusions.  The court found nothing surprising in the testifying expert's use of CFD modeling, included in the expert's report, to corroborate his own conclusions:

> A review of Morton's report makes it clear that Morton is not merely parroting the views of others.  Morton conducted independent analysis to arrive athis conclusions on agitation.  He then independently analyzed the computational fluid dynamics models constructed and used by the parties' non-testifying experts to corroborate his own conclusions on mixing and agitation [citing pages in Morton's expert report.]  As he conducted a fully independent analysis of the matter, the court concluded Morton is entitled to offer opinions resulting from that analysis, including shortcomings he recognizes in Defendants' expert analysis.

Nothing in this Court's Order says that the non-testifying expert must provide an *input*  to the testifying expert's computer model. Yet BP now takes the position that that is what the Court's Order says, advocating another last-minute limiting interpretation.   The United States has not located any earlier statement from BP expressing that narrow interpretation, which may have the unfair effect of allowing in *all* of BP's experts, but disqualifying some or all of Dr. Bushnell's opinions, the sole expert that the United States is designating through deposition.   It is not supported by the plain language of the order and should not be adopted at this late date.

BP complains that the United States is performing an "end run" around the Court's limit of eight Quantification expert witnesses per side.   The Court has made the procedures in Parragraph 4.i available to both parties, however.  And, in addition, the admitted evidence is severely restricted.  The Court's Order permits into evidence "only portions of the direct and cross-examination relating to the relied upon calculations or analysis" to be submitted to the Court.  Order, pg. 10 (Rec. Doc. 11087).  The United States' understanding is that the reliance experts' direct and rebuttal expert reports – which in Phase II serve as the direct examination  -- *do not* come into evidence under Paragraph 4.i.  Clearly, the burden on the Court is not great and certainly such deposition designation is not equivalent to or an "end-run" around the Court's limitation on the number of experts.  In any event, it is difficult to see how, on these facts, the US

use of the provisions for relied-upon experts is an "end-run" and BP's use of the same provisions for three times the number of "relied-upon" experts is not.

II.    Reference to Dr. Bushnell's Work is Critical So That the Experts Can Fully Explain Their Work and Address BP Arguments.

Astoundingly, BP also requests an order from the Court "precluding any United States experts from referencing Dr. Bushnell's reports and deposition testimony in connection with their testimony at trial." BP Motion, pg. 4. Nowhere in its Motion does BP waive its right to attack the United States' flow rates as deficient on grounds that (1) the US experts assume a homogeneous flow; (2) Dr. Dykhuizen uses "K" factors; or (3) Dr. Griffiths and Dr. Pooladi-Darvish use constant discharge coefficients. Indeed, all indications are that those arguments will be important themes in BP's cross-examination of Dr. Dykhuizen and the other US experts. Each of the US experts that relied upon Dr. Bushnell's work, however, factored those arguments into their final opinion, by relying, in part, upon the fact that a multiphase, three-dimensional model *arrived at the same results as their models* for the flow from the capping stack. Thus, it would be manifestly unfair to grant BP's request that the US not even be allowed to refer to Dr. Bushnell's work, while allowing BP to pursue its arguments against the well-founded flow rate calculations of the US experts.

III.    The Cases Cited by BP are Inapposite.

As set forth above, the United States' experts did reasonably rely on Dr. Bushnell's work to form their opinions. The deposition that BP objects to admitting into evidence represents their cross-examination of him after review of his expert disclosures. Given this context, the cases cited by BP, BP Motion, pg. 2, are inapposite.

First, BP cites to Huffman v. Turner Industries Group, LLC, No. 12-1061, 2013 WL 2297206 (E.D. La. May 24, 2013). In that case, the district court excluded a medical study relied upon by plaintiffs' expert from presentation to a jury. The court found that plaintiff failed as a factual matter to show its expert relied upon the study to form his opinions, and further held that the relied upon study should be excluded because "without a witness who has personal knowledge of the study, the study's probative value is substantially outweighed by a danger of prejudice." Slip op. at *4. Here, the US experts rely upon Bushnell's work to evaluate BP's arguments as explained above, and BP has been able to fully cross-examine him on that work.

The remaining two cases cited by BP simply address cases where, presumably in jury trials, experts apparently cited to other experts in their field who agreed with them simply to corroborate their views, and not, as here, to test their assumptions and to respond to known arguments of the opposing party. *See*, Merck Eprova AG v. Gnosis S.P.A., No. 07-5898, 2011

WL 10818492 (S.D.N.Y. June 8, 2011) (consultation with three other stereochemists ); United States v. Grey Bear et al., 883 F.2d 1382 (8th Cir. 1989) (agreement of two pathologist with expert pathologists).

BP also claims that, because it was not permitted to inquire into protected attorney-client communications, Dr. Bushnell's deposition designation should be stricken and references to his work precluded.   Dr. Bushnell testified that he did not meet with other testifying experts in this matter.  Ex. 17, Bushnell Deposition Tr. at 15.  BP also did not ask Dr. Bushnell about the graph and modeling runs upon which Dr. Griffith and Pooli-Darivsh rely.  The Court's order in this matter, moreover, provides that communications between attorneys for a party and experts retained on behalf of that party are not discoverable.  Order Regarding Non-Discoverability of Certain Expert-Related Documents (Rec. Doc. 4301), Paragraph 3.  Thus, where information upon which another expert relies is transmitted through counsel, it is protected.  Indeed, BP invoked privilege and instructed its testifying experts not to disclose communications with its relied upon experts.  *See*, Ex. 18, Deposition Tr. of Dr. Nesic at 52 (never spoke with relied upon experts Richardson or Vaziri); and Ex. 19, Deposition of Dr. Trusler at 28-29 (never spoke with BP testifying experts).  Thus, these arguments do not provide a basis to preclude references to Dr. Bushnell's work and deposition.

***

In sum, BP's Motion to Strike the Designation of Dr. Bushnell's deposition should be denied. The United States has complied with all of the Court's Phase II trial management orders.  To that end, we have pared down thirteen expert witnesses to eight, designated rebuttal experts prior to hearing BP's case, and limited fact witnesses and designated 20 depositions after taking and defending and designating testimony from over a hundred depositions in Phase II.  At the end of the day, however, the United States still must be permitted to present its case.  Additional last-minute limitations or restrictions on the presentation of evidence weigh more heavily on the government.  BP's motion is crafted simply to allow BP to pursue arguments and claims that its own, withdrawn, expert do not support, while imposing a gag rule so that the US experts cannot respond.  Their request does not aid the truth-finding function of the Court and the Federal Rules of Evidence.  The Court should not grant BP's Motion.[9]

**Conclusion**

BP's Motion to Strike the Designation of Dr. Nathan Bushnell from the Phase 2 Deposition Bundle List should be denied.

---

[9] The United States requests that the Court kindly docket BP letter and this Opposition when it issues its Order in this matter.  At this time, BP claims confidentiality over Exhibit 5 (BP Preliminary Response to Flow Rate and volume Estimates contained in Staff Working Paper # 6) as noted above.

Respectfully submitted,

/s/ Sarah D. Himmelhoch

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery

cc:      Liaison & Coordinating Counsel