# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig    "Deepwater Horizon" in the    Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179  SECTION: J |
| This document relates to all actions. | * * * * * * | HONORABLE CARL J. BARBIER  MAGISTRATE JUDGE SHUSHAN |

# BP'S OBJECTIONS TO THE CLAIMS ADMINISTRATOR'S PROPOSED 2013 FOURTH QUARTER BUDGET AND REQUEST FOR EVIDENTIARY HEARING

*COUNSEL FOR SUBMITTING PARTIES ARE LISTED AT END OF MEMORANDUM*

**INTRODUCTION**

The Court ordered BP—over its objections—to fund the $130.3 million Q3 budget requested by the Court Supervised Settlement Program ("CSSP"). In doing so, however, the Court recognized that BP had raised legitimate concerns regarding the CSSP's high costs and the Claims Administrator's failure to manage expenses. 8/7/13 Hr'g Tr. at 69:25–70:3 (attached as Exhibit A). Discussions regarding the Q4 budget have not only heightened these concerns but identified additional problems that further prove the Claims Administrator's proposed Q4 budget of $111.2 million is excessive and should not be approved.

The Q4 budget discussions have confirmed that the CSSP vendors, which spend the majority of the requested funds, have been unilaterally setting their own budgets. Indeed, the Claims Administrator's Office ("CAO") conceded that it does not manage the expenses of the CSSP vendors or take action when the vendors fail to meet their own inflated budgets. *See, e.g.*, Declaration of Todd Brents ("Brents Decl.") ¶¶ 25, 49 (attached as Exhibit B). And the limited efforts by other CAO personnel to manage CSSP vendors have not been well received and in some cases actively resisted. For example, Special Master Freeh concluded that CSSP vendor BrownGreer—which has been averaging more than $15 million in monthly fees—"resisted the CAO's efforts to control costs and create efficiencies" to "promote [BrownGreer's] own business and financial interests." *See* 9/6/13 Rpt. of Special Master Louis J. Freeh (Rec. Doc. 11287) ("Freeh Report") at 8, 74. When CSSP staff attempted to curtail its spending, BrownGreer "would push back and did not cooperate," claiming that it "reported only to [the Claims Administrator] and not to [CSSP staff]." *Id*. at 74, 76-77. Even the CAO acknowledges that the CSSP has been operating with inefficiencies and unwarranted costs. Ex. A, 8/7/13 Hr'g Tr. at 57:13–17.

These discussions also have revealed that the CAO has not maintained or required CSSP vendors to generate data necessary to prepare a reasonable budget. As a result, the Q4 budget is based on cost and productivity assumptions from self-interested CSSP vendors that are taken at face value. Not surprisingly, the resulting budget does not reflect reasonable and necessary costs that the CAO estimates it will incur during the fourth quarter. Rather, as the Claims Administrator acknowledges, it is a "worst case scenario." Brents Decl., Exhibit 6 (8/21 Meeting Minutes at 5).[1]

Despite the Court's admonitions regarding CSSP costs at the Q3 budget hearing, the CAO initially proposed a $131.2 million budget for the fourth quarter. This was even *higher* than the third quarter budget to which BP objected as excessive. BP identified more than $45.5 million in excessive, unreasonable and unsupported costs in the Q4 budget.[2] The Claims Administrator quickly agreed to reduce the Q4 budget by more than $20 million, leading to the current request of $111.2 million. The Claims Administrator, however, has refused for now to make the $25.5 million in minimum additional cuts that BP has identified.

Although the parties have failed to reach agreement on the Q4 budget, the Claims Administrator now agrees with BP that an operational review and examination is necessary to prepare a proper budget for the CSSP. The parties, however, remain sharply divided over the scope of the review and who should perform it.[3] The CAO cannot and should not review itself. While the CAO contends that it has begun hiring staff, it is simply unrealistic to assume that the CAO can identify, hire and train the additional staff needed to complete the operational review

---

[1] While BP agrees with those portions of the meeting minutes cited herein, it has proposed corrections to other portions of the meeting minutes to ensure their accuracy. BP is currently working with the CAO and Class Counsel to correct these non-cited portions of the meeting minutes.

[2] For example, after BP challenged certain fundamental elements of the CSSP's cost structure, the CAO conceded that it could eliminate hundreds of staff members in order to save millions of dollars *while increasing efficiency*. Brents Decl. ¶ 23.

[3] *See, e.g.*, Exhibit 1 to Declaration of Keith Moskowitz ("Moskowitz Decl.") (attached as Exhibit C) (9/4/13 Panel Tr. at 11:21-25).

and examination before the Q1 budget process commences.  BP lauds the Claims Administrator's suggestion that he now wants to begin managing the CSSP vendors, but the CAO is simply not prepared to undertake the time sensitive, intensive and thorough operational review and examination that is required.  Moreover, given Special Master Freeh's findings of "pervasive" conduct within the CSSP that was "improper, unethical, or not in accordance with the [CSSP] Code of Conduct," the operational review and examination should be conducted by an outside professional services firm.  Freeh Report at 8-9.

Accordingly, BP requests that the Court honor its right to have an operational review and examination performed of the CSSP, and that the review be conducted by an outside professional firm.[4]  BP has retained a firm that is skilled and experienced in conducting operational reviews and examinations that can begin immediately.  Alternatively, the Court also recently ordered Special Master Freeh to undertake additional duties including designing enhanced policies and procedures "to ensure the integrity of the CSSP;" investigating conflicts of interest, suspicious claims, and other issues; and recommending "additional business process procedures designed to promptly and fairly adjudicate claims in an efficient manner." 9/6/13 Order (Rec. Doc. 11288) at 2–3.  The issues that Special Master Freeh has identified within the CSSP to date show that the Court exercised sound judgment in appointing him and further expanding his role now.  The Court's Order appears to contemplate that Special Master Freeh perform the type of operational review and examination that BP believes is immediately necessary.  BP fully supports this expanded mandate and looks forward to working with the Special Master and the Court to ensure

---

[4] BP has the right to conduct an operational review and examination of the CSSP under the Settlement Agreement, vendor contracts, and common law.  First, the Settlement Agreement requires the Claims Administrator to "report and provide information to … BP … as may be requested" and entitles BP to review and approve the administrative expense budget.  EPD Agreement §§4.3.2; 5.12.1.4.  Second, the CSSP's contracts with its vendors entitle BP to, "with the approval of the Claims Administrator, … review and/or audit" the vendors.  *See, e.g.*, BrownGreer Vendor Contract § 10.1.  Finally, as a residual beneficiary of the Settlement Trust, BP has the right to inspect trust accounts and related documents.  *See* Restatement 2d of Trusts § 173.

3

that the review and examination is optimally designed in scope, substance and effectiveness. BP also reserves its right to comment on and seek to supplement the scope of the review and examination, and BP's full support of this expanded mandate is not meant to waive any of its rights asserted in this motion.

While this review and examination is ongoing, BP respectfully requests that the Court reduce the Q4 budget by at least $25.5 million to no more than $85.6 million. Although the CAO acknowledges that it cannot justify the bulk of the disputed amounts without an operational review and examination, it proposes to "defer" these cuts until that process concludes. The CAO is operating from the mistaken view that a budget item should be included unless BP can conclusively show it is not necessary. The proper presumption should be the exact opposite. Unless there is objective evidence that an expenditure is necessary, it should not be included in the budget. Put simply, budgets should reflect what should be spent, not what could be spent in a world without controls. Because CSSP vendors will spend whatever funds they are budgeted, the Court should err on the side of caution and require the CSSP to operate on the more reasonable budget proposed by BP—still more than $28 million per month—until the operational review and examination is completed. Should this amount prove insufficient, the CSSP has ready recourse to BP and, if necessary, this Court.

For these and other reasons discussed below and based on the evidence set forth in the accompanying declarations, BP requests that the Court reject the CAO's proposed budget of $111.2 million, approve BP's proposed budget of no more than $85.6 million, honor BP's right to have an operational review and examination performed of the CSSP, and hold an expedited evidentiary hearing.[5]

---

[5] A limited evidentiary hearing is necessary to address the remaining factual disputes regarding the Q4 budget as set forth in the Declaration of BP's claims administration and budgeting expert, Todd Brents. BP anticipates it

4

## DISCUSSION

I.  **There Has Been No Disciplined Budgeting Process Prior To The Fourth Quarter Budgeting Process.**

BP's fundamental objection to the Q3 budget was that it did not appear to be the result of a systematic and disciplined budgeting process consistent with a professionally run claims management process. 8/5/13 Travis Letter (attached as Exhibit D) at 1. The Q4 budgeting process, as well as Special Master Freeh's report, has heightened BP's concerns. Contrary to basic budgeting principles and management practices, the CAO has not been using projected future workloads to develop the Q3 or prior budgets. Brents Decl. ¶¶ 10–12. Until BP challenged the process, the budget was developed by simply taking the amount CSSP vendors had spent in a prior period, and projecting similar or higher spending levels going forward. *Id.* Indeed, as Special Master Freeh noted, CSSP vendors even resisted efforts by CSSP personnel to "control costs and to create efficiencies." Freeh Rpt. at 8.

II. **The Remaining Flaws In The Budget Process Have Resulted In An Excessive Proposed Fourth Quarter Budget.**

With BP's assistance, the CAO attempted to prepare a "bottom up" budget for the first time during the Q4 budget process. But flaws remain. For example, the Claims Administrator "does not currently believe that addressing the cause of a variance [from budgeted amounts] falls within the ambit of the CAO's responsibility, given the CAO's strict oversight role. Rather, the cause of a particular variance would be left to the respective Vendor itself to address." Brents Decl., Ex. 3 (9/14 Meeting Minutes at 6). Special Master Freeh's report also reflects that there were no repercussions when CSSP vendors "push[ed] back" and did "not cooperate" with efforts

---

would call the two experts who are submitting declarations and one or two witnesses from the CAO who were involved in the Q4 budgeting process. The Court will recall that the August 7, 2013, hearing on the Q3 budget was not noticed as an evidentiary hearing. But without notice, and over BP's objections, the Claims Administrator called witnesses to support his Q3 budget. It would be fundamentally unfair to deprive BP of the same opportunity (albeit with proper notice) to similarly take live testimony regarding the Q4 budget.

by CSSP personnel to control costs. Freeh Rpt. at 76–77. CAO staff likewise told Special Master Freeh that CSSP vendors are "generally unaccountable." *Id*. at 74. These and other flaws have resulted in a Q4 budget that even the CAO describes as a "worst case scenario" and does not reflect the reasonable and appropriate costs that the CSSP should incur during Q4.

      A.    **The Q4 Budget Is Based On Untested Assumptions Provided By CSSP Vendors.**

Accountant labor costs for processing Business Economic Loss ("BEL") claims represent the largest component of the Q4 budget. Brents Decl. ¶ 26. The budget attempts to project these costs through a series of formulas referred to as the Labor Model. *Id*. ¶¶ 27–28. But the CAO has not tracked any of the basic data necessary to populate the formulas and admits it cannot timely obtain reliable data given the constraints of the budgeting process. *Id*. ¶¶ 28–30. Instead, the CAO has generated the Q4 budget using estimates and assumptions for core variables (*e.g.*, how long it takes to complete each step of the claims process) provided by the CSSP vendors, which are accepted at face value. *Id*. ¶ 31. Compounding the problem, the CAO has indicated that Key Performance Indicators ("KPIs"), which are not presently in place and may impact CSSP vendor compensation, will be based on efficiency targets in the Q4 budget.[6] *Id*. ¶¶ 35–36. This not only creates a strong incentive for CSSP vendors to inflate their budget estimates, but may render the KPIs (and their associated penalties) meaningless.

Since beginning budget discussions on August 9, the CAO actually has *lowered* the productivity and efficiency goals in the Q4 budget from Q3 levels without any empirical justification.[7] *Id*. ¶¶ 46–49. For example, accounting vendors dramatically increased their estimates of the time it takes them to complete each step in the claims review process (*i.e.*, the

---

[6] KPIs are performance targets for CSSP vendors that carry financial penalties if they fail to meet them. Although they are contemplated under the vendor contracts, the Claims Administrator has never instituted KPIs.
[7] A complete history of the fluctuation of productivity goals and targets is provided in Ex. B, Brents Decl. ¶ 49.

"process duration"), which decreased accountant productivity from 1.7 to 1.1 BEL claims per accountant per week.[8] Thus, the Q4 budget assumes that the initial accountant claim review of a BEL claim—just one of 11 steps—will take over 17 hours. *Id.* ¶ 39. By comparison, accountant reviewers working with BP consultant Brian Gaspardo typically complete a similar review of a BEL claim file in approximately two to three hours. Declaration of Brian Gaspardo ("Gaspardo Decl.") (attached as Ex. E) ¶¶ 6–8 (average BEL claim review ranges from 1.92 to 2.75 hours). Even the most complicated BEL claim review typically takes a reviewer no more than 8 hours. *Id.* This comparison highlights the unreasonableness of the CSSP's unverified assumptions and the need for an operational review and examination.

Similarly, over a three-week period, the CSSP reduced its task utilization rate (the purported percentage of each hour a CSSP employee or vendor spends processing claims) from 87.6% to 80.1% for BEL claims and 75% for all other claim types—all without any empirical support for the adjustments. Brents Decl. ¶ 43–44. By reducing its task utilization rate, the CSSP is assuming that it will perform more slowly and less efficiently than it has in the past. *Id.* ¶ 40. This, of course, results in a higher budget. In fact, reducing the utilization rate by just 1% increases the Q4 budget by approximately $1.3 million. *Id.* ¶ 44.

All parties now agree that an operational review and examination is necessary to determine appropriate productivity and efficiency metrics for the CSSP budget. *See Id.*, Ex. 9 (8/28 Odom Letter at 5–6). Based on the data available today, there is no basis for the decreased productivity and efficiency estimates that form the basis for the Q4 budget. As set forth below,

---

[8] The process duration increased by *almost 50 percent*, from 32.5 to 48.4 hours per BEL claim; start-up BEL claim process duration increased by *over 60 percent*, from 30.8 to 50.1 hours per claim; and failed business BEL claim process duration increased by *almost 80 percent*, from 30.8 to 55.2 hours per claim. Brents Decl. ¶¶ 37–39. Despite these dramatic and unverified increases, the Claims Administrator has indicated these assumptions will be taken at face value. *Id.* ¶ 31.

until the review and examination is completed, the CSSP should be required to operate under BP's proposed budget to promote budget discipline and efficiency.

In addition to its assumptions that the CSSP will be less efficient and less productive than in the past, the CAO has added a contingency to the Q4 budget to avoid putting "forth a budget forecast that was not worst case scenario." Brents Decl., Ex. 6 (8/21/13 Budget Meeting Notes at 5). A proper budget, however, should not reflect a "worst case scenario." That approach is especially inappropriate here because the CAO can request additional funds from BP if an appropriate budget properly managed proves insufficient. In short, BP cannot consent to—and this Court should not approve—a "worst case scenario" budget based on ever-changing estimates and speculative assumptions generated by self-interested vendors.[9]

> **B.   BrownGreer And Garden City Group Refuse To Disclose The Independent Contractor Markups They Are Passing Through To The CSSP.**

BP does not believe it is appropriate for the Q4 budget to include unreasonable labor markups for temporary workers hired by CSSP vendors specifically to work on the program. BP questioned the CSSP vendors' independent contractor markups in its June 7 letter to the Claims Administrator (Brents Decl., Exhibit 11) and June 21 letter to the Court (attached as Exhibit F). Despite claims of "transparency," the Claims Administrator and the CSSP vendors—specifically BrownGreer and Garden City Group—steadfastly have refused to disclose the markups to BP, precluding BP from evaluating their reasonableness. Brents Decl. ¶¶ 50–52; *see also* Moskowitz Decl., Ex. 1 (9/4/13 Panel Tr. at 72:23-25). Indeed, it is not even clear if the vendors have disclosed their mark-ups to the Claims Administrator. In its Q4 budget response, the CAO argues that BP's concern is moot because "[n]either the CAO nor the Vendors were notified by BP prior to contract execution that BP would prefer for these contract labor costs to be passed

---

[9]   The Q4 budget contains other buried costs, high or unsubstantiated overhead or tasks that appear unnecessary under the circumstances. Brents Decl. ¶¶ 69–76.

8

through similar to Other Direct Costs." Brents Decl., Ex. 9 (8/28/13 Odom Letter to Travis) at 8. But it is not BP's responsibility to be the fiduciary of the Settlement Trust's assets and manage CSSP labor costs. That is the Claims Administrator's role. If these markups are excessive as BP suspects, the Court certainly has the power to prevent this windfall distribution of Trust assets to CSSP vendors.

### C. BrownGreer's Management And IT Fees Are Not Sufficiently Detailed To Allow Meaningful Evaluation of Those Costs.

The Q4 budget allocates millions of dollars to BrownGreer for management and IT costs but lacks sufficient detail to allow anyone to evaluate the appropriateness of those expenditures. BrownGreer's unsupported cost estimates are particularly suspect given Special Master Freeh's statement, among others, that BrownGreer has "resisted" efforts to "control costs and to create efficiencies." Freeh Rpt at 8. For example, BrownGreer's proposed Q4 budget includes $3.9 million for IT costs based on an estimated 17,743 programming development hours and another 17,743 hours for system maintenance during Q4. Brents Decl. ¶¶ 57–59. On their face, these costs appear excessive, but they are more troubling because BrownGreer has refused to provide BP with a projection of how many hours will be spent on particular projects. *Id.* ¶¶ 58–60. Similarly, the Q4 budget allocates $1.9 million to the BrownGreer Claimant Communication Center ("CCC"). *Id.* ¶ 53. This amount is based on an average call time of 30 minutes per call but, according to BrownGreer's own weekly reports, the average call time for the CCC is 6.9 minutes. *Id.* ¶ 54.

### III. BP's Minimum Proposed Revisions To The Q4 Budget.

BP presented the Claims Administrator with specific line item revisions that can and should be made to decrease the total Q4 budget to no more than $85,600,000. Brents Decl., Exhibit 12 (Minimum Proposed Revisions). The CSSP agreed to $20.07 million of these

revisions, reducing the proposed Q4 budget to $111,166,000. These reductions, while necessary, are not sufficient. For the reasons set forth above and in the attached Declaration of BP's claims administration and budgeting expert Todd Brents (Exhibit B), the revised Q4 budget still contains unreasonable labor costs driven by untested assumptions, low productivity targets and unnecessary costs and expenses.[10] Rather than adopt the proposed "worst case scenario" budget until an operational review and examination is completed, BP requests that the Court reduce the Q4 budget by at least $25,500,000 as proposed by BP's remaining revisions and honor BP's right to have a full operational review and examination performed of the CSSP.

## CONCLUSION

Although BP and the CAO now have agreed on a budget methodology, the Q4 budget remains deeply flawed. CSSP vendors are still setting their own budgets without accountability because the Claims Administrator does not believe he should manage the millions of dollars incurred by these vendors each week. The limited efforts by CSSP personnel to rein in the vendors have been met with active resistance, particularly by BrownGreer. Further, the CAO and CSSP vendors do not have the data necessary to prepare a proper budget. Instead, the CAO's proposed budget rests on cost and productivity assumptions from self-interested CSSP vendors, taken at face value, that assume the CSSP will be less productive and efficient than in the past. The CAO also added contingencies and other items so that the budget reflects a "worst case scenario." Not surprisingly, the Q4 budget is excessive. Accordingly, the Court should not approve it.

---

[10] The CAO also is incorrect that it cannot accept BP's proposed revision to the file auditing process, which would save $1.26 million, because the settlement agreement requires an audit of every GCCF file. There is no such requirement. As Garden City (the vendor performing these audits) admitted, BP's common sense proposal of auditing only those GCCF files that are the subject of a CSSP claim would result in only a short delay for claimants seeking to access their GCCF files. Moskowitz Decl., Ex. 1 (9/4/13 Panel Tr. at 38). Indeed, Garden City likewise recommended to the Claims Administrator that it only should audit a file upon receipt of CSSP claim as BP is now proposing. *Id.*

September 11, 2013

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

*OF COUNSEL*

Respectfully submitted,

  */s/ Richard C. Godfrey, P.C.*
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

  */s/ Don K. Haycraft*
S. Gene Fendler (Bar #05510)

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

*ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.*
*AND BP AMERICA PRODUCTION COMPANY*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 11th day of September, 2013.

/s/ Don K. Haycraft
Don K. Haycraft