# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | MDL NO. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| | * | |
| This document relates to all actions. | * | HONORABLE CARL J. BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |
| | * | |

## DECLARATION OF TODD BRENTS

I, Todd Brents, am over the age of 18 and the opinions, statements and conclusions expressed in this declaration are my own.

1.      I am a Managing Director and senior member of AlixPartners, LLP's Information Management Practice.  I have more than 23 years of professional experience in finance and accounting management.  Prior to joining AlixPartners, I held various positions in treasury, operations analysis, and credit at Frito-Lay, Inc. and was the Assistant Controller at Color Tile, Inc.  Before that, I was employed at Arthur Andersen, LLP in Dallas, TX.

2.      I received my Masters in Business Administration from Southern Methodist University and my Bachelors of Business Administration in accounting from the University of Texas at Arlington.  I am a Certified Public Accountant and a Certified Insolvency and Restructuring Advisor.

3.      I am a founding member of the Information Management Services practice of AlixPartners, a business unit with nearly 250 people globally, and have been employed there since 2001.  The Information Management Services practice is a well-established information

management consulting service for litigation, bankruptcy and corporate matters.  Among other things, we provide services related to settlement administration, electronic discovery, mass transaction and complex data analytics, and bankruptcy claims.

4.      My team and I have extensive claims management experience working on some of the most complex claims assignments in history.  I personally have worked as a claims administrator or manager in a number of instances, including:

        a.  Bernard L Madoff Investor Securities — My team and I reconstructed information from electronic, paper and microfilm records spanning a 30-year time frame and implemented a customized online claims management system allowing numerous parties to quickly and efficiently review and determine claims.  We also served as the claims and noticing agent for the Securities Investor Protection Act estate, facilitating claims filing, noticing and communication through internal and public-facing websites.

        b.  Genuity, Inc. — I resolved telecommunications vendors' claims on a circuit-by-circuit basis and managed the sale of the business to Level 3 Communications.  I also managed the distribution of over $700M to creditors during wind-down.

5.      I also worked on the following claims administration or litigation matters: Rotech Healthcare, The Scooter Store, Inc., Borders, Inc., Fairpoint Communications, Freedom Communications, The Readers Digest Association, New Century Financial Corporation, Refco, Inc., Exide Technologies, Motorola, and certain RMBS investor litigation.

6.      As a result, I have extensive experience managing and resolving complex claims efficiently.  In addition, I have provided testimony on numerous occasions, including in some of the matters above.

7.      Alix Partners was retained on behalf of BP America, Inc. ("BP") in connection with litigation stemming from the Deepwater Horizon drilling rig.   I have met with representatives from the Claims Administrator's Office ("CAO") on several occasions regarding the Court Supervised Settlement Program's ("CSSP") proposed fourth quarter 2013 budget ("Q4 budget") and I submit this declaration in connection with BP's opposition to that budget.

8.      Except as otherwise noted, I have personal knowledge as to all of the information set forth below.   All of the facts and opinions set forth in this declaration are based upon my personal experiences and knowledge, information supplied by the Claims Administrator, interviews of and information provided to AlixPartners by the CSSP Vendors, my review of other relevant information, and my knowledge of the Settlement Program and understanding of the Settlement Agreement.

**Development of the Q4 Budget**

9.      I have prepared numerous budgets for claims programs and organizations. Through this experience, I have gained a detailed understanding of what constitutes a reasonable budget.   My budgeting experience includes:

- Budget analysis and development of "bottom-up" budgeting and review methodology for the Deepwater Horizon Medical Settlement Program;

- Preparation of budgets for AlixPartners' clients regarding claims administration and wind-down costs for liquidating estates;

- Preparation of 13-week cash flow forecasts for numerous AlixPartners' clients;

- Preparation of projected accounts receivable cash collections for Frito-Lay, Inc.;

- Preparation of accounts receivable departmental budgets for Frito-Lay, Inc.; and

- Preparation of annual financial budgets for Color Tile, Inc.

3

10.     Systematically developing a reasonable financial budget is critical to understanding and managing the performance and costs of a large operation such as the CSSP. Budgets should be developed through a "bottom-up" approach by determining each component of the budget separately to derive the total projected budget.  In addition, the budget should tie projected production requirements to the labor and expenses that will be necessary to meet those requirements.

11.     A reasonable "bottom-up" budget includes four fundamental components: (i) projected work volume for each task and subtask; (ii) productivity rates across functional areas, per person and per vendor; (iii) the number of people required to meet the projected work volume, which requires a calculation that results from the first two requirements; and (iv) the costs of each person.

12.     As the CSSP has admitted during our budget meetings, the CSSP's Q3 Budget was not developed using a "bottom-up" approach. Contrary to basic budgeting principles and management practices, the Claims Administrator has not been using projected future workloads to develop the Q3 or any prior budgets.  Instead, the budget was developed by simply taking the amount CSSP Vendors had spent in a prior period, and projecting similar or higher spending levels going forward. The CAO also has not independently tracked detailed performance or productivity metrics regarding its accounting vendors.  As a result, the CAO cannot measure the accounting vendors' performance, except at the most generalized levels.  This means that with respect to accounting labor costs, which are the largest single category of costs incurred by the CSSP, the CAO could not track how long it was taking accountants to perform any particular task or how efficiently those accountants were operating.

13.     The CSSP's Q3 Budget also lacked a monthly performance measurement

methodology. An effective budgeting process requires a monthly review and investigation of, and accountability for, any variances between actual and budgeted amounts. This variance analysis enables a determination of the root causes for the variances, positive or negative, and an evaluation as to how to reduce or enhance the variances, as appropriate. During my discussions with the CAO, they acknowledged that no such measurement process existed at the beginning of the third quarter.

14. On August 9, 2013, I attended a meeting to discuss expectations and requirements for the Q4 Budget with representatives from BP, Class Counsel, and the CAO. A copy of the minutes from that meeting are attached as **Exhibit 1**.

15. On August 11, 2013, the CAO provided BP with a utilization model to be used in the formulation of the Q4 budget. A copy of the August 11, 2013 utilization model is attached as **Exhibit 2.**

16. On August 14, 2013, I attended a second meeting to discuss expectations and requirements for the Q4 Budget with representatives from BP, Class Counsel, and the CAO. During that meeting I was told that the Claims Administrator "does not currently believe that addressing the cause of a variance [from the budgeted amount] falls within the ambit of the CAO's responsibility, given the CAO's strict oversight role. Rather, the cause of a particular variance would be left to the respective Vendor itself to address." A copy of the minutes from that meeting are attached as **Exhibit 3.**

17. On August 16, 2013, the CAO submitted its initial Q4 budget, which totalled over $119,000,000. That budget is attached as **Exhibit 4** and the related August 16, 2013 CAO Narrative *Reviewer Cost Model and Budget Forecast Methodology* is attached as **Exhibit 5**.

18. On August 21, 2013, I attended a meeting with representatives from BP, Class

Counsel, and the CAO to discuss the August 16 Q4 budget proposal. A copy of the minutes from that meeting are attached as **Exhibit 6**.

19.     On August 23, 2013, BP sent the CAO a letter containing detailed comments and proposed revisions to the initial Q4 budget, and indicated the initial Q4 budget was excessive. That letter is attached as **Exhibit 7**.

20.     On August 28, 2013, the CAO provided a revised Q4 Budget of more than $131,000,000. The August 28 Q4 Budget proposal is attached as **Exhibit 8** and the August 28, 2013 Letter from D. Odom to M. Travis is attached as **Exhibit 9**.

21.     The Q4 Budget submitted on August 28, 2013, relied on new, material assumptions, and contemplated adding 99 new accountants at a cost of $10 million per quarter. These new assumptions and 99 new accountants were not included in the proposal submitted less than two weeks earlier on August 16.

**Analysis of the Q4 Budget**

22.     I have reviewed and analyzed each of the CSSP's two formal 2013 Q4 Budget proposals and supporting documents provided by the CAO.

23.     As a result of the recent meetings and discussions between BP and the CAO regarding the Q4 Budget, the CAO conceded that it could eliminate the entire second shift of BrownGreer reviewers (*i.e.*, 240 full time equivalent ("FTE") employees), reduce monthly expenses by approximately $1.8 million and increase the efficiency of the overall process. Similarly, Garden City recently closed its Sarasota call center, saving millions. The CAO has also established an improved methodology for developing budgets. This methodology was used in the creation of the Q4 Budget. The Q4 Budget now attempts to estimate costs in four categories: (1) variable labor costs associated directly with claims processing (*e.g.*, accountant

and reviewer labor); (2) other variable, non-modeled costs associated indirectly with processing claims (*e.g.*, management costs and IT development); (3) fixed costs not associated with processing claims (*e.g.*, facility costs, CAO salaries); and (4) expenses.

24. Despite the improved methodology used to create the Q4 Budget, the budget remains excessive and unreasonable, because, as described more fully below:

 a. the Q4 Budget is largely based on untested assumptions (*e.g.*, assumptions related to variable labor costs) provided to the CAO by the CSSP Vendors; and

 b. the Q4 Budget contains other excessive and unsupported costs related to overhead or unnecessary tasks.

25. In my opinion, these remaining flaws in the Q4 Budget result from the CAO's failure to manage the CSSP Vendors or to use the budgeting process to drive efficiency results. August 14, 2013 Budget Meeting Minutes, Exhibit 3, at 6.

<u>Variable Labor Costs</u>

26. The largest component of the proposed Q4 Budget (57%)[1] is variable cost related to claims processing.

27. The Q4 Budget attempts to estimate future variable labor costs based on a predictive model (the "Labor Model") that incorporates past experience and purports to link the projected volume of each particular task with the amount of labor necessary to complete each task.

28. Tasks required to process claims are broken down into 11 steps.  The Budget includes an estimated time to complete each step (the "process duration") and the estimated portion of time reviewers spend on claims processing versus other tasks related to claims review

---

[1] This calculation is based upon the Q4 Budget received by BP on August 28, 2013.

(the "task utilization").  For each task, the variable labor costs are projected using the following equation: (hourly labor cost for the task * (projected hours to complete task one time/ task utilization rate)) * number of repetitions of the task based on projected claims volume.

29.     In support of the Q4 Budget, the CAO has provided BP with data regarding the CSSP's productivity, including process duration measures and task utilization ratios.  But the CSSP also has acknowledged that it does not have data for all of these measures and that a reasonable budget process requires "a more in depth analysis than the CAO has been able to perform in this abbreviated budget revision process . . . ."  August 28, 2013 Letter from D. Odom, Exhibit 9, at 3.

30.     In contrast with best management practices, to date, the CAO has neither tracked (nor required the CSSP Vendors to track) sufficiently detailed information regarding productivity and costs at a task level in order to drive this type of model (*e.g.*, the duration of time that should be required to complete a particular task of the accounting review).

31.     In lieu of using actual historical data, the Q4 Budget model uses estimates and assumptions provided by the CSSP Vendors until more reliable data can be generated.  In addition, the CAO has indicated that it will take cost, process duration, and productivity estimates from the CSSP Vendors at face value. This allows the CSSP Vendors to effectively set their own budget because the assumptions materially drive the budget model.

32.     Despite not being able to meaningfully measure accountant productivity, the CSSP added approximately 100 accountants between April and June 2013.  Collectively, those staffing increases add more than $36,000,000 to the yearly cost of the CSSP.

33.      Since the addition of these accountants, the productivity of BEL claims processing, which is the primary focus of these accountants, has declined.   For example,

according to the Systems Performance – Claims Review report from August 28, 2013 (included in Exhibit 8), the CSSP reviewed 2.77 claims per reviewer per month in June 2013.   In comparison, the CSSP's Systems Performance – Claims Review report from June 14, 2013 (attached as **Exhibit 10**) reflected a rate of 3.83 claims per reviewer per month.   The CSSP's target as of June 14, 2013 was 5.39 claims per reviewer per month.   *Id.*

34.     Another example of declining productivity is the number of BEL determinations issued per accountant per week.   By comparing the total number of BEL determinations issued by the CSSP with the estimated BEL review hours billed by CSSP accountant vendors Postelthwaite & Netterville and PwC, I calculated rates of 2.0, 1.7, 1.7 and 1.9 claims per accountant per week for April, May, June and July 2013, respectively.   Using this same calculation, the Q4 Budget projects a decline in accountant productivity to 1.5 claims per accountant per week for the three months in Q4.

Key Performance Indicators

35.     Because the CAO has indicated that CSSP Vendors' Key Performance Indicators ("KPIs") will be developed from the efficiency targets established in the Q4 Budget, establishing these targets has implications, which extend beyond the Q4 Budget process.

36.     Depending on how the KPIs will be linked to financial rewards/penalties based upon performance, Vendor compensation in the fourth quarter could be affected.   As none of the previous task orders include KPI measures, it is not known how the CAO intends to link performance and compensation.   In addition, these KPIs will establish benchmarks upon which the Q1 2014 budget and future budgets will be compared.

Increasing Process Duration Times

37.     Based on information provided by its accounting vendors, the CAO has revised

upward the process duration times used in the Labor Model three times during the Q4 budgeting process: in the initial model provided on August 11, the formal model presented on August 16, and the revised model presented on August 28. These changes are summarized in the following table:[2]

**BEL Process Duration Times (hours)**

|  | 8/11 Model | | 8/16 Model | | 8/28 Model | |
|---|---|---|---|---|---|---|
|  | Total | Accountant | Total | Accountant | Total | Accountant |
| BEL | 32.5 | 26.6 | 43.4 | 37.5 | 48.4 | 40.8 |
| Failed BEL | 30.8 | 26.6 | 43.5 | 37.5 | 55.2 | 44.7 |
| Start-Up BEL | 30.8 | 26.6 | 43.5 | 37.5 | 50.2 | 41.5 |

38.     During the budgeting process, the overall process duration for Business Economic Loss ("BEL") claims has increased by 15.9 hours per claim, and the time allocated for accountants' tasks has increased 14.2 hours per claim.

39.     Similarly, the process durations for individual steps in the BEL process have increased. For example, the process duration for the "Claim Review/Preparation" step in the BEL process increased from 10 hours per claim in the August 16 budget to 17.41 hours per claim in the August 28 budget.

Decreasing Task Utilization Rates

40.     As explained in the CAO's August 16, 2013 narrative accompanying its initial Q4 Budget proposal, the task utilization rate is a factor used to account for inefficiency in the CSSP processes. August 16, 2013 *Reviewer Cost Model and Budget Forecast Methodology*, Exhibit 5, at 7. Task utilization is the estimated percentage of every hour billed that each person spends performing a specific claims task (as opposed to a task not directly related to processing a

---

[2] Business Economic Loss claims are segregated in the model between those of continuing businesses (including multi-facility), failed businesses (businesses that ceased operations or filed bankruptcy between May 1, 2010 and December 31, 2011) and start-up businesses (those with less than 18 months of operating history at the time of the DWH spill).

claim).   At a 75% utilization rate, the CAO estimates that each task will take 33% longer than it should due to task-related inefficiencies.

41.     The CAO has indicated that, with regards to the task utilization rate, it "is very important to note that this value does NOT attempt to capture the length of time a claim is in process." *Id.*   Instead, the task utilization rate purports to capture the amount of time that reviewers spend "off-task," *i.e.* not actively working on claims.   The CAO has described this time as downtime for "training, team meetings, travel, and waiting for screens to load in the claims system."   In the August 28 letter, CSSP CEO Mr. Odom expanded this description to include "…evaluating the claimant file; reviewing and validating previously entered values; and discussing work with previous reviewers."   August 28, 2013 Letter from D. Odom, Exhibit 9, at 5.

42.     These descriptions are not consistent, and are indicative of the fact that the CAO does not know with precision how the "off-task" time is spent or the actual task utilization rates, as this information is not tracked by the Claims Vendors.   I understand the CAO began requiring this information to be tracked beginning in August 2013.   Until such data exists, a budget based on these estimates should be subject to heightened scrutiny.

43.     In the three Labor Models presented with the three Q4 budget proposals, the CAO has used three different task utilization rates.   The chart below includes the varying rates used for the claim types.

**Task Utilization Rate (TUR)**

| Claims Category | 8/11 Model | 8/16 Model | 8/28 Model |
|---|---|---|---|
| Business Economic Loss (including Multi-Facility) | 87.6% | 75.0% | 80.1% |
|    Failed Business | 87.6% | 75.0% | 80.1% |
|    Start-Up Business | 87.6% | 75.0% | 80.1% |
| Coastal Real Property Damage | 75.0% | 75.0% | 75.0% |
| Individual Economic Loss | 75.0% | 75.0% | 75.0% |
| Individual Periodic Vendor and Festival Vendor Economic Loss | 75.0% | 75.0% | 75.0% |
| Real Property Sales Damage | 75.0% | 75.0% | 75.0% |
| Subsistence Damage | 75.0% | 75.0% | 75.0% |
| Seafood Compensation Program (Non Accountant) | | | |
|    Blue Crab / Other Seafood | 75.0% | 75.0% | 75.0% |
|    Finfish | 75.0% | 75.0% | 75.0% |
|    Oyster | 75.0% | 75.0% | 75.0% |
|    Shrimp | 75.0% | 75.0% | 75.0% |
|    Seafood Crew | 75.0% | 75.0% | 75.0% |
| Seafood Compensation Program (Accountant) | | | |
|    Blue Crab / Other Seafood (A) | 87.6% | 87.6% | 75.0% |
|    Finfish (A) | 87.6% | 87.6% | 75.0% |
|    Oyster (A) | 87.6% | 87.6% | 75.0% |
|    Shrimp (A) | 87.6% | 87.6% | 75.0% |
|    Seafood Crew (A) | 87.6% | 87.6% | 75.0% |
| Vessel of Opportunity (VoO) | 75.0% | 75.0% | 75.0% |
| Vessel Physical Damage | 75.0% | 75.0% | 75.0% |
| Wetlands Real Property Damage | 75.0% | 75.0% | 75.0% |

44.　　The CAO originally estimated the task utilization rate for BEL claims and Seafood (accountant) claims to be 87.6% and 75% for all other claim types in the August 11 version of its model.  Five days later, the CAO adopted a 75% utilization rate for all claims, except for Seafood claims.  Then, in the August 28 version, without providing any supporting analysis to justify the change, the task utilization rate changed again to 80.1% for BEL claims and 75% for all other claims, including Seafood.  Because adjusting the utilization rate impacts processing times of all tasks, this change materially impacts the budget.  By way of example, reducing the utilization rate by just 1% results in an overall increase of approximately $1.3 million to the proposed Q4 Budget.

45.　　Utilization rates should be increasing, not decreasing, given that the CSSP has

been operating for more than 14 months and its work force has matured and should be well trained.  The CAO cites "the complexity of the program" for the need to decrease the rates, but has not provided any analysis to support the changes to the existing levels.

Decreasing Productivity Targets

46.     Neither the downward revisions of task utilization rates nor the upward revisions of process task durations are supported by any empirical analysis.  However, these changing assumptions have a significant impact on the productivity targets and the overall budget.  In order to properly determine what the appropriate process duration times, task utilization rates, and productivity targets should be, and provide a sound basis for calculating future budgets, an operational review and examination should be conducted of the CSSP and its Vendors.

47.     In support of the Q4 Budget, the CAO has provided BP with data regarding the CSSP's productivity in meter charts.  Meter charts present targeted and actual numbers of claims processed per person per month across the various claim types.  The CSSP first provided meter charts in May 2013, and subsequently provided four revisions, most recently on August 28.[3]

48.     The CAO claims that the meter charts were developed to "evaluate the efficiency of the program" but has never used meter charts to establish performance goals or measure performance of the Vendors.  As the model was adapted to be used in the Q4 budgeting process, the targeted amounts contained in the August 12, August 16 and August 28 charts are the targets for the months of October, November and December 2013, while the actual amounts reflect the June 2013 actual results.

49.     Based on the meter charts that were provided, the CSSP's BEL productivity targets for Q4 are lower than previous targets.  A summary of the charts for overall claims and

---

[3] The CAO did not provide BP with supporting data for the first two meter charts, dated May 8 and June 14.  But the CAO recently provided supporting data for the August 12, August 16, and August 28 meter charts.

BEL claims indicates that even by the CSSP's own measures, the facility is consistently missing its own productivity targets. Because the CAO's role appears to be strictly limited to oversight—not management—the Vendors have consistently missed these review targets.

| Meter Chart Date | Monthly Amounts | | | |
|---|---|---|---|---|
| | Overall Review Target per FTE | Overall Actual Reviewed per FTE | BEL Review Target per FTE | BEL Actual Reviewed per FTE |
| May 8, 2013 | 10.75 | 5.00 | 7.80 | 1.80 |
| June 14, 2013 | 14.00 | 7.75 | 5.40 | 3.60 |
| August 12, 2013 | 13.00 | 7.77 | 5.39 | 3.83 |
| August 16, 2013 | 14.00 | 6.97 | 3.48 | 2.68 |
| August 28, 2013 | 14.00 | 7.65 | 4.59 | 2.77 |

Excessive and Unsupported Non-Modeled Variable Costs

Labor Rate Mark-ups

50.    At the start of the CSSP's operations, CSSP Vendors hired Gulf-based independent contractors with no previous direct experience or specific skill sets to carry out tasks necessary for claims review and processing for which the CAO could have hired at a fraction of the cost. In particular, BrownGreer and Garden City collectively hired more than two thousand independent contractors to work on claims review and, I believe, marked up by several multiples the direct costs they paid to these workers. On June 7, 2013, BP provided a letter to the CAO that presented a detailed analysis suggesting that the markup of the Vendors appears to approximate $14 million per month that is largely profit for the CSSP Vendors, with no value to the CSSP, the Class, or BP. June 7, 2013 Letter from K. Moskowitz to P. Juneau, attached as **Exhibit 11**. This letter encouraged the Claims Administrator to convert what BP assumed were independent contractors from contractors of the CSSP vendors at substantial markups to

contractors of the CSSP with no markups. Shortly thereafter, BrownGreer informed BP that it already had converted many of these workers to full-time employees, and Garden City stated that they intended to immediately convert all of these contractors to full time employees. P&N informed BP that it has not used independent contractors on this engagement. Based on my meetings with the CAO, neither BrownGreer nor Garden City expressed any intention or willingness to convert these workers to CSSP staff, thereby securing the windfall profits they are making on these workers at BP's expense.

51.     In sum, both BrownGreer and Garden City hired hundreds of independent contractors in the Gulf Region and marked-up the labor costs in its invoices to the CSSP—likely by several multiples. If the CAO had engaged in proper cost management, it would have insisted that these contractors be engaged by the CAO directly and avoided significant labor mark-ups or, at a minimum, insisted that the labor mark-ups were at a reasonable percentage.

52.     With respect to employee labor rates, the assumptions built into the Q4 budget related to rate and level changes of employees are not disclosed or explained, making it difficult to understand the driving factor behind these assumptions, other than that the assumptions are considered static based upon past performance. Because BrownGreer and Garden City have refused to disclose their mark-ups, we have estimated them. Based on our analysis of prevailing market rates and BrownGreer job postings, we believe that the mark-ups, on average, may be as high as 219% and that reducing these mark-ups to commercially reasonable rates could result in over $133 million in annual savings to the CSSP.

 Call Center Staffing

53.     The proposed Q4 budget allocates approximately $1.9 million to the BrownGreer Claimant Communication Center ("CCC").

54.     According to the supporting documents submitted with the Q4 Budget, this amount is calculated based on an average call time of 30 minutes per call (Tab "BG CCC Budget").  However, according to the BrownGreer Weekly Status Report #40, August 12, 2013, Table 27B, the average call time for the CCC is 6.9 minutes.  In the August 28, 2013 D. Odom Letter, the CAO states "Since the submission of the initially proposed budget, the CAO has received updated information on the CCC [*i.e.* BrownGreer] average call time and the Call Center average time, both of which have been budgeted at 10 minutes each…"  Exhibit 9 at 9.  However, no material revisions were made to the revised budget to reflect these reductions in time estimates.  The CAO has offered no credible justification to explain why the budget should include projected activity exceeding three times the current activity levels.

55.     Similarly, the proposed Q4 budget allocates approximately $1 million to the Garden City Group call center.  According to the supporting documents provided with the Q4 Budget, this amount is calculated based on an average call time of 30 minutes per call (Exhibit 8, GCG Outreach Model Assumptions.).   In its August 28 letter, the CAO stated "[s]ince the submission of the initially proposed budget, the CAO has received updated information on the CCC average call time and the Call Center average time, both of which have been budgeted at 10 minutes each…"  August 28, 2103 Letter from D. Odom, Exhibit 9, at 9.  However, no material revisions were made to the revised budget to reflect this reduction in time estimates.

56.     The proposed budget allocation for both the BrownGreer and Garden City call centers appear inflated by significantly overestimated activity levels and should be calculated based on the actual call times experienced at the CCC and Garden City Group call center.

Unnecessary, Unsupported and/or Excessive Fixed Costs

IT Design

57.     The Q4 Budget includes $3.9 million allocated to BrownGreer for IT costs.  The CAO has indicated that 48% of these budget dollars will be spent on system maintenance and 48% on further system development, with the remainder to smaller tasks.

58.     In response to requests for additional information regarding the IT development projects being funded, the CAO provided a summary of 9 development projects that make up the 17,743 hours planned for development, an average of almost 2,000 hours per project.  However, no detail has been provided about the level of effort required for each individual project in order to assess its reasonableness.  The projects mostly consist of modifications and enhancements to existing processes and systems, and do not appear to be for the construction of new modules or major modifications of existing modules.  This is to be expected given that the CSSP is a mature facility and the heavy costs related to IT development should already have been incurred.

59.     A similar amount is budgeted for maintenance activities for the quarter.  The CAO provided a cursory justification for these 17,743 hours, without providing a detailed explanation or breakdown of actual tasks performed.

60.     These estimates certainly appear to be excessive, particularly at this late stage in the program (*i.e.*, heavy development related IT costs should already have been incurred).  An operational review and examination, including an analysis of the continuing IT needs of the program for development and maintenance, is necessary to allow BP and the CAO some basis to evaluate the necessity of the IT projects BrownGreer is undertaking and the reasonableness of the associated budget.

File Audit

61.     The Q4 Budget includes a $1.3 million allocation for the Garden City Group's File Audit Process.

62.     The reported purpose of this process is to convert claim information submitted to the GCCF by Class Members into the CSSP for use in processing their CSSP claim.   However, these conversions are being performed on all GCCF claims, whether or not the claimant has filed a CSSP claim.   This step is inefficient, unnecessary, and has resulted in work being performed on over 600,000 GCCF claimants, when only approximately 10% of those claimants have filed claims in the CSSP to date.   Based on available data, it is estimated that currently less than 1,000 CSSP claims per month are being filed by previous GCCF claimants.   A reasonable practice would be to conduct the File Audit process only for newly filed CSSP claims.

Other Calculation Errors

63.     In the review of the budget models provided on August 16 and August 28, we noted numerous calculation and formula errors.   We have communicated these findings to the CAO.   A number of these resulted in a significant dollar impact on the budget, while others only impacted statistical or tertiary calculations.   The complete, detailed lists of calculation and formula errors identified by BP to date are found in the August 23 Letter from M. Travis (Exhibit 7) and BP's September 4, 2013 Proposed Budget Revisions, attached as **Exhibit 12**.

**IV.     Minimum Q4 Budget Reductions**

64.     On September 4, 2013, a Panel Meeting was held regarding the Q4 Budget where BP provided the CAO and PSC with a document detailing minimum reductions to the Q4 Budget.   BP's September 4, 2013 Proposed Budget Revisions, Exhibit 12.   The revisions BP suggested would lead to a total Q4 Budget reduction of at least $45,600,000.   This would result in a Q4 budget of no more than $85,600,000.

65.     At the Panel Meeting, the CAO agreed to make the following revisions to the Q4 Budget:

| CAO Accepted Q4 Budget Revisions | CAO Estimated Cost Impact on Q4 Budget |
|---|---|
| *Eliminate unsupported, 99 full-time equivalent (FTE) increase in accountants for BEL claims* | ($11.16)M |
| *Reduce projected Q4 Seafood claim staffing to reflect CAO's projected elimination of claim backlog* | ($5.47)M |
| *Reduce unallocated contingency fee from 5% to 2.5%, fix calculation errors and calculate off reduced proposed budget amounts* | ($3.44)M |

66.     The result of these CAO-accepted reductions is a Q4 Budget that totals approximately $111,600,000.  September 5, 2103 Letter from D. Odom, attached as **Exhibit 13**.

67.     However, even at $111,600,000, the Q4 Budget is still unreasonable and at least the following additional revisions should be made:

| | Minimum Required Q4 Budget Revisions | Estimated Cost Impact on Q4 Budget |
|---|---|---|
| 1. | *Increase BEL accountant productivity* | ($13.0)M |
| 2 | *Further reduce projected Q4 Seafood claim staffing to reflect CAO's projected elimination of claim backlog* | ($3.4)M |
| 3. | *Adjust task utilization rate for non-BEL claim types to equal BEL claim utilization rate* | ($1.3)M |
| 4. | *Only perform GCCF file audit activity for those GCCF claimants filing CSSP claims* | ($1.3)M |
| 5. | *Eliminate Brown Greer IT development spending until further requested information is provided* | ($2.0)M |
| 6. | *Adjust BG and GCG call center staffing levels based* | ($2.0)M |

| | | |
|---|---|---|
| | *on 10 minute call duration* | |
| 7. | *Reduce Q4 GCG administrative costs in line with budgeted Q4 labor costs* | ($1.3)M |
| 8. | *Reduce unallocated contingency fee from 2.5% to 1%, fix calculation errors and calculate based on reduced proposed budget amounts* | ($1.7)M |
| 9. | *Reduce labor rates to address the unknown and undisclosed mark-ups* | Currently unquantifiable because the Vendors refuse to disclose amount of mark-ups |
| 10. | *Reduce BG administrative budget* | Currently unquantifiable due to inability of CAO to provide sufficient detail |

68.     The rationale and calculation of the associated reduction for each of the proposed revisions listed in this chart are described above and in more detail below.

Increase BEL accountant productivity (1 above)

69.     A proposed adjustment has been made to increase BEL accountant productivity in the amount of $13.0 million.  As discussed above, the Q4 accountant productivity levels that drive the budget are based on unsupported estimates and assumptions.  The lack of empirical support for the key assumptions that impact the budget render it unreasonable.  As a result, the proposed adjustment was calculated at a level designed to restore productivity measures back to previously attained levels.

Further reduce Q4 Seafood claims staffing levels (2 above)

70.     The Q4 budget includes 205 FTEs for Seafood determinations.  While the CAO accepted reductions equivalent to the elimination of 100 BrownGreer FTEs, no justification has been provided for the remaining 105 FTEs included in the Q4 budget. Based on the projected

Seafood claim submittals and Q3 determinations, all Seafood claims are projected to be resolved prior to the start of Q4.   The estimated cost reduction leaves residual costs for estimated re-reviews, reconsiderations, and trailing incomplete responses. The tab [Measured Page] in the Q4 Budget erroneously projects determinations in excess of remaining Seafood claims throughout Q4, resulting in an overstatement of required claim reviewer hours.

Adjust Task Utilization Rates for non-BEL claims (3 above)

71.     The task utilization rate of 75% for non-BEL claim types is inconsistent with the BEL claim type utilization rate of 80.1%.   The proposed adjustment is supported by a best practice of maintaining consistency within the model unless specific data supports an alternative assumption. The estimated reduction represents the non-duplicative impact of the task utilization rate adjustment after the hours related to Seafood claim review are removed from the Q4 budget.

Reduce GCCF file audit activity (4 above)

72.     As discussed above, the practice of converting all GCCF claims, whether or not the claimant has filed a CSSP claim, is inefficient and unnecessary.   The proposed adjustment leaves costs for estimated conversions required based on historical activity of CSSP claims filed by GCCF claimants.

Eliminate BrownGreer IT development spending (5 above)

73.     As discussed above, an operational review and examination, including an analysis of the continuing IT needs of the program for development and maintenance, is necessary to allow BP and the CAO some basis to evaluate the necessity of the IT projects BrownGreer is undertaking and the reasonableness of the associated budget. The proposed adjustment eliminates Q4 budgeted IT development spending until this review and examination is complete.

Adjust BrownGreer and GCG call center staffing levels (6 above)

74.     The CAO's written response from 8/28 confirms that average call duration is 10 minutes as opposed to the previously assumed 30 minutes; however the Q4 budget fails to adjust the optimal staffing needs based on the new call duration assumptions.  Based on the inbound and outbound call volume at the BrownGreer call center in June, assuming a 30 minute call time, the utilization rate of the BrownGreer call center agents was 72%.  Adjusting for the more accurate average call duration of 10 minutes and assuming inbound and outbound call volume remains relatively constant through Q4, the BrownGreer call center staff should be reduced by at least 67% which translates to costs of approximately $1.34 million.  Based on the inbound call volume at the GCG call centers in July, assuming a 30 minute call time, the average daily utilization rate of the GCG call center agents was approximately 82%.  Adjusting for the more accurate average call duration of 10 minutes and using the daily call volumes projected by the CAO in the Q4 budget, no more than 7 full-time equivalent call center agents are required in order to meet the daily projected call volume and maintain a utilization rate of approximately 82%, as opposed to the 16 to 19 agents calculated in the Q4 budget.  The proposed adjustment accounts for this reduction in staffing and translates to approximately $670,000.

Reduce Q4 GCG administrative costs (7 above)

75.     The Q4 budget established that GCG administrative costs generally run between 15% and 18% of labor costs; however, the administrative cost projections are erroneously calculated off of Q2 actual labor costs as opposed to Q4 budgeted labor costs. The estimated reduction corrects for the calculation error and accounts for further reductions resulting from additional labor cost reductions related to Seafood claims review and call center staffing levels.

Reduce unallocated contingency fee from 2.5% to 1% (8 above)

76.     The CAO has agreed to reduce the contingency fee from 5% to 2.5%.  The CAO

claims that this contingency is needed because of the number of unverified assumptions driving the budget, the complexity of the claims process, and the pace at which the budget has been prepared.  In a well-functioning budget and performance review process, however, such large reserves are not needed, as any unexpected activities that cause budget overruns will be identified quickly, and can be addressed by evaluating the need for the activity, or requesting additional budget as needed.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Executed this 11th day of September, 2013.

_____

Todd Brents
AlixPartners, LLP

# Exhibit 1

# MEETING NOTES



**MEETING FOCUS:**   ADMINISTRATIVE BUDGET MEETING

**MEETING DATE:**   **AUGUST 9, 2013  9:30 AM CST**

**ATTENDEES:**

| Name | Company | DHECC |
| --- | --- | --- |
| Maria Travis | BP | David Odom |
| Todd Brents | Alix Partners | Kirk Fisher |
| Amy Boatman | KPMG | Bob Levine |
| Ramji Kaul | SNR Denton | |
| Steve Herman | Herman, Herman, & Katz | |
| John Creevy | Herman, Herman, & Katz | |
| Tommy Thomassie | Wright, Roy, & Edwards | |

**BP Presentation on Planned Budgeting Process**

- BP established a five part framework upon which its review of the Administrative Budget will be evaluated.
    - Determine Projected Work Volume by Claim Volume
        - This should include projections of new claims filed and should be projected down to the task level for each step in the claims process.
    - Productivity Rates for Each Task
        - These should be determined on a per FTE level to determine the hours required to complete each step in the claims process.
        - This should be calculated by the hours required to perform each task.
    - Staffing Levels
        - Projected staffing levels by function and location are determined using the two aforementioned parts of the framework.
    - Labor Costs
        - Developed by determining appropriate staffing levels and hourly rate for each necessary person for each function.  This figure is multiplied by the estimated number of individuals necessary from the previous step.
    - Expenses
        - Based on historical run rates with regular consideration of expenses that are no longer necessary.
            - (1)  Out of pocket expenses should be largely related to projected headcounts.
- Budget calculations should be made in an integrated model.
    - Connect the projected volumes to the cost and expense calculations.
- Actual results should be tracked against the budgeted volumes and hours with a variance analysis.

## MEETING NOTES *(CONTINUED)*



**Previous Requests for Information (RFIs) by BP**

- This section serves to establish the following: 1) the specific information previously requested by BP and 2) that the Claims Administrator's Office (CAO) has responded by providing to BP as requested all information currently tracked and maintained by the CAO.

  - The CAO has provided to BP all data that has been provided to it by the Vendors. Additionally, some information has not been provided to BP because it is not tracked at the certain micro-granular levels requested by BP. However, all information that is currently tracked by the CAO and was available to the CAO that has been requested by BP was subsequently provided to BP.

    ‣ As to the information that needs to be requested from the Vendors and the information that needs to be tracked at a very granular level, BP and the CAO agreed on August 9 that it will take a reasonable amount of time for the CAO to acquire this information from the Vendors and develop this level of tracking before the CAO is able to provide it to BP.

    ‣ Additionally, it was agreed to by BP and the CAO on August 9 that, given the time constraints of the budget development process, certain non-budgetary information requests will be given a lower priority than those information requests related to the budget development process. These instances are noted in the minutes.

  - A matrix of this information is attached in Exhibits A and B.

- May 1 Questions/RFIs for the CAO (Exhibit A)

  - Performance Metrics/Budgeting

    ‣ Updated Organization Chart, including headcounts for each area

    (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP on a high-level overview perspective.

      (a) It was acknowledged by BP and the CAO on August 9 that it is extremely onerous to provide this information on an "employee name" basis for the entire Program given the mere number of employees currently working for the Vendors.

    (2) In an effort to provide BP with employee information that can be correlated with the invoices, the CAO will provide more detailed organizational charts at the head count level for each Vendor employment position rather than at the individual employee name level.

    ‣ Operations Manual and Process Flow Map for the claims process; correlate headcounts to the process flow map

    (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

      (a) However, it was acknowledged by BP and the CAO on August 9 that the CAO did not receive information correlating head count to the process flow map from the Vendors. Therefore, the CAO was unable to provide this information.

    ‣ Management Reports and analysis performed to evaluate claims processing vs. costs/staffing

    (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP; however, the information provided correlated to volume.

      (a) It was acknowledged by BP and the CAO on August 9 that the CAO did not receive information evaluating claims on a cost/staffing basis from the Vendors. Therefore, the CAO was unable to provide this information.

# MEETING NOTES *(CONTINUED)*



‣ Schedule of amounts that vendors pay to each contractor

(1) It was acknowledged by BP and the CAO on August 9 the CAO does not have this information.

    (a) Based on discussions at the June 18 meetings, the CAO does not currently have authority to request this information from the Vendors as per the Vendor contracts.

    (b) The Vendors have provided which contractors are performing work on the Program and the rates that the Vendor is billing the Program for that labor.  However, as per Vendor Contracts, the Vendors are not obligated to provide the rates that they charge the contractors for this performed labor.

‣ Time in motion or velocity studies of the claims administration process

(1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP on a macro level within the Utilization Modeling.

    (a) This topic is covered in greater detail with the discussion of the Utilization Modeling and the raw data that is incorporated into producing those reports.

    (b) In July 2012, when the CAO began creating these models, several assumptions were initially made.  These assumptions were gradually removed as the model matured and data became available.

‣ Analysis of administrative costs incurred or budgeted on an average claim basis across status types (eligible, incomplete, denial, withdrawn, closed) - if possible broken down by vendor by task

(1) It was acknowledged by BP and the CAO on August 9 this is currently not tracked by the CAO.

    (a) The CAO currently measures the total system cost per damage category based on all notice types that are issued, but this is not tracked at the task sublevel.  This, along with information from the Utilization Modeling, can be married to the costs with accompanying reasonable assumptions to create the budget.

‣ Projections for the average administrative costs per claim type

(1) It was acknowledged by BP and the CAO on August 9 that this data has been provided to BP.

‣ Projections of the time and costs to resolve the claims with no notice backlog, approx. 70,000 claims with no notices issued

(1) It was acknowledged by BP and the CAO on August 9 that this data has been provided to BP.

‣ Projections of the time and costs to resolve the incomplete claims backlog, approx. 30,000 claims with incomplete notices

(1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

‣ Projections of the time and costs to process claims based upon the estimated number of new claims

(1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

‣ Key metrics to track each vendor. How are vendors being evaluated when contracts are not complete?

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

## MEETING NOTES *(CONTINUED)*



(1) It was acknowledged by BP and the CAO on August 9 that the CAO does not have this information.

(2) The key metrics to track Vendors are Key Performance Indicators (KPIs), which can be implemented as per the Task Orders of the Vendor contracts.

  (a) When the claims processing began, the CAO wanted flexibility in establishing the expectations of the Vendors.

    (i) The CAO decided that KPIs should not be established as the Program was still evolving.

  (b) The CAO envisions that as the Program reaches a steady state, KPIs will be a valuable tool used to track and evaluate Vendors.

  (c) The Task Orders, however, do currently establish FTE Allocation.

(3) The next Task Order will be agreed upon in October 2013.

‣ Description of the steps taken to evaluate continual administrative process improvements, including efficiency improvements

(1) This RFI relates to system optimization and process optimization efforts.

(2) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

  (a) An example of this would be the IEL Process Improvement provided to BP in Exhibit E of the May 22 Letter to BP.

(3) BP and the CAO acknowledged on August 9 that, because of the complexity of the Program, the continual administrative process improvements can only reasonably be performed on a macro level.

  (a) Given the complexity of the Program, it is virtually impossible to isolate and measure specific variables to determine the effect one process change has on the whole Program.

  (b) To date, the CAO has focused on tracking global throughput rather than the system optimization effect of individual process changes.

    (i) Rather than measuring the system processes on a micro level, the CAO uses Daily Notice Reports per Claim Type to measure daily productivity against previously set benchmark goals.

(4) BP and the CAO acknowledged on August 9 that times could exist when it is possible to measure the effect a single change had on the whole Program; however, these occurrences would be rare.

  (a) One August 9, BP suggested including key highlights that illustrate instances in which system optimization efforts have a quantifiable effect in the periodic reports the CAO distributes to BP.

    (i) However, the difficulty in quantifying this data was acknowledged by both BP and the CAO.

‣ Support for the decision to not consolidate BEL processes

(1) This topic was acknowledged by BP and at CAO on August 9 as having been discussed and resolved by BP, the CAO, and the Vendors at the Vendor meetings in June.

‣ Cause(s) for the disparate trending of GCG administrative cost reduction and BrownGreer's administrative cost increase since the Program inception

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

MEETING NOTES *(CONTINUED)*



       (1) It was acknowledged by BP and the CAO on August 9 that this issue had been resolved for the most part in June at the Vendor meetings and that anything currently unresolved will be resolved by the budgeting process itself.

- Document the underlying activities BrownGreer performs in the CSSP process vs. the GCCF process that gives rise to incremental CSSP costs for BrownGreer versus GCCF costs

       (1) It was acknowledged by BP and the CAO on August 9 that the CAO cannot comment as to the underlying activities performed by BrownGreer for the GCCF.

- Cost spent on training staff

       (1) It was acknowledged by BP and the CAO on August 9 that the CAO is not currently requiring this information from Vendors and therefore has not tracked this information to date as the CAO has focused more on trending.

          (a) Additionally, it is not likely that the CAO will be able to acquire this information from the Vendors on short notice.

          (b) BP requested on August 9, at a minimum, information concerning the out of pocket costs each Vendor incurs in hiring and training new employees.

             (i) The CAO acknowledged this request and will begin the process of acquiring the data from the Vendors.

- Turnover rate for project team members

       (1) This point is similar to the previous concerning "Cost spent on training staff."

          (a) It was acknowledged by BP and the CAO on August 9 that the CAO does not currently track this information because it does not currently require this information from the Vendors.

             (i) However, BrownGreer's turnover statistics were uploaded to the CAO SharePoint site on June 14, 2013.

             (ii) Additionally, as requested by BP, the CAO will contact the other Vendors to acquire this information and provide it to BP as soon as is practicable.

          (b) It was agreed between BP and the CAO on August 9 that information related to turnover is mainly of a processing concern rather than a budgetary concern. Therefore, it was agreed that the acquisition and delivery of this information will be treated with a lower priority than information related strictly to the development of the budget.

- Costs of re-training due to turnover

       (1) This point is similar to the previous two points.

          (a) It was acknowledged by BP and the CAO on August 9 that the CAO does not currently track this information because it does not currently require this information from the Vendors.

          (b) It was agreed between BP and the CAO on August 9 that information related to turnover is mainly of a processing concern rather than a budgetary concern. Therefore, it was agreed that the acquisition and delivery of this information will be treated with a lower priority than information related strictly to the development of the budget.

- Performance measures for project team members

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



(1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP in a satisfactory manner.

‣ Results of actions taken based on project team members' performance metrics

(1) It was acknowledged by BP and the CAO on August 9 that the CAO does not currently track this information because it does not currently require this information from the Vendors.

▫ Internal Audit and Vendor Self-Review Process

‣ Copies of all reports issued from internal quality assurance and vendor self-reviews

(1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

‣ Copy of the quality assurance work plan

(1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

‣ Copies of vendor self-review plans

(1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

‣ Documented process for performing quality review of claims for each claim type

(1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

‣ In relation to the previous four topics, BP requested at the August 9 meeting a copy of the second quarter internal audit report.

(1) The CAO will provide this report to BP.

▫ Fraud Detection Program

‣ Copies of any reports of the results of the fraud detection program

(1) It was acknowledged by BP and the CAO on August 9 that all reports of results of fraud detection have been provided to BP.

‣ Current fraud detection program data

(1) It was acknowledged by BP and the CAO on August 9 that the CAO provided all fraud data maintained by the CAO to BP.  This data identified the number of claims identified as fraudulent.

(a) The CAO does not track fraud detection from a volume throughput perspective.

(i) The CAO's tracking of fraud is less about efficiency and more about fraud detection itself.

(2) BP requested on August 9 more detail on the number of claims being reviewed by the Special Investigations Team.

(a) BP and the CAO agreed that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget.

‣ Update on the final resolution of the claims summarized on Handout #3 of the January 16, 2013 Fraud Process Overview report

(1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP on June 14 by BrownGreer.



# MEETING NOTES *(CONTINUED)*

- ‣ Analysis of the administrative cost impact of the presence of potential fraudulent claims in the system; percentage of administrative costs per claim and per claim type associated with fraud investigations
    - (1) It was acknowledged by BP and the CAO on August 9 that the CAO does not track the impact of potential fraudulent claims by administrative cost in this manner.
    - (2) It was acknowledged by BP and the CAO one August 9 that information contained in the Status Reports provided by BrownGreer have partially satisfied this request.
        - (a) BP requested on August 9 more detail on the number of claims being reviewed by the Special Investigations Team and, if permissible, the identity of the claims by Claim ID.
        - (b) The CAO is unsure at the moment whether the Settlement Agreement permits the disclosure of the identity of the claims that are under fraud review and will further research the topic.
- ‣ Results of the HUB investigations
    - (1) It was acknowledged by BP and the CAO on August 9 that it is unclear at the moment whether the Settlement Agreement permits the CAO to provide claimant specific information to BP.
- ‣ Analysis of fraudulent claim attributes and search of remaining claims for signs of those attributes
    - (1) It was acknowledged by BP and the CAO on August 9 that this is currently not tracked by the CAO.
- ‣ Correlation analysis of claims to identify repetitive patterns (i.e. amounts, class member, address/location, and attorney/representation)
    - (1) It was acknowledged by BP and the CAO on August 9 that this is currently not tracked by the CAO.
- ■ August 5, 2013, Letter from Maria Travis
    - □ Targeted claim determinations and payments by claim type and by person
        - ‣ It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP as encompassed within the Utilization Modeling and would be explored further in the discussion of that modeling.
            - (1) It was acknowledged by BP and the CAO on August 9 that the Utilization Modeling included targeted claim determinations by claim type and by person but did not include targeted payments by claim type and by person.
    - □ Call center activity and targeted metrics
        - ‣ It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP.
        - ‣ Given the familiarity the CAO has developed with this metric, it is likely the Erlang-C modeling will not be necessary in incorporating call center activity into the budget.
    - □ Targeted throughput analysis for each stage in the claim process
        - ‣ It was acknowledged by BP and the CAO on August 9 that this has been provided to BP as encompassed within the Utilization Modeling and would be explored further in the discussion of that modeling.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- Estimated progress of incomplete claim analysis, broken down by type of incompleteness, aging of claim, and action items to be undertaken to resolve
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP as encompassed within the Utilization Modeling and Incompleteness Outreach Reports and would be explored further in the discussion of the Utilization Modeling.
  - BP has identified this as a "choke point."
- Levels of quality assurance in relation to reasonableness thresholds
  - Prior to this August 9 meeting, the meaning of this Request for Information was unclear to the CAO. However, BP clarified its RFI on August 9 when it posed questions as to why varying claim types receive varying amounts of quality assurance.
    - (1) It was acknowledged by BP and the CAO on August 9 that the CAO has provided copies of its quarterly internal audit reports and data in relation to QA reviews.
  - It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.
- Projected fraud detection activity and bases for levels of efforts
  - As mentioned previously in relation to fraud detection, it was acknowledged by BP and the CAO on August 9 that the CAO has provided to BP all of the fraud data reports maintained by the CAO.
  - However, it was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget development date.
- FTE count by month, location, function, designation for employee vs. contractor, and claim type
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP as encompassed within the Utilization Modeling and would be explored further in the discussion of that modeling.
    - (1) It was acknowledged by BP and the CAO on August 9 that information related to designation of employee vs. contractor, claim type, and location of FTE for all Vendors is not currently available to the CAO.
- Fees and expenses broken down by month, Vendor, level, location, and expense type
  - It was acknowledged by BP and the CAO on August 9 that this information has been partially provided to BP within the monthly invoices.
    - (1) It was acknowledged by BP and the CAO that the CAO had not previously required this level of detail in the invoices of the Vendors.
    - (2) BP requests to see this level of detail within the budget.
- Turnover analysis: count of additions and subtractions of employees and contractors
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP, which consisted of turnover statistics as related to BrownGreer.

## MEETING NOTES *(CONTINUED)*



       (1) The CAO will contact the Vendors who have not provided this information to request this information, and the CAO will provide it to BP.

          (a) It was noted that Postlethwaite & Netterville's turnover rate is around 4% annually.

       (2) However, it was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

          (a) Additionally, BP proposed on August 9 including this in the previously mentioned periodic reporting that the CAO will provide to BP. Additionally, both BP and the CAO agreed that maintaining an open dialog about the issue of turnover rate would be beneficial to the productivity and efficiency of the Program.

- Turnover analysis: training requirements and costs given projected turnover
  - This point was encompassed in the discussion of the previous point.
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP.
    - (1) The CAO will contact the Vendors who have not provided this information to request this information, and the CAO will provide it to BP.
  - It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

- Turnover analysis: projected staffing level and hourly rate changes with justification/explanatory notes for any changes
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP.
    - (1) The CAO will contact the Vendors who have not provided this information to request this information, and the CAO will provide it to BP.
    - (2) No Vendor currently tracks or reports its projected staffing and hourly rate changes with explanatory notes.
  - It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

- Measure productivity in relation to costs using KPIs
  - Given that no KPIs exist within the current Task Orders, it was acknowledged by BP and the CAO on August 9 that this issue was not related to the immediate revision of this budget. However, BP and the CAO agreed to explore the use of KPIs to increase efficiency and productivity in the future.

- Data dictionary
  - It was acknowledged by BP and the CAO on August 9 that all information currently being tracked by the CAO has been provided to BP.
    - (1) However, BP requested on August 9 a data dictionary including every data field for the entire database currently maintained by the CAO in an effort to further determine any additional metrics that may be helpful.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



(a)  The CAO acknowledged this request and agreed to provide this information as soon as practicable.

(2)  It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

**Budget Process and the Utilization Modeling**

- The CAO will have a revised budget prepared within the time parameters set forth by the Court.
  - However, given the short time frame and the startup phase of this budgeting process, both BP and the CAO agreed that it is expected that certain reasonable assumptions will need to be established in order to provide the revised budget within the Court-established timeframe.
  - These assumptions will be modified over time in order to fine tune the projected budget to the level of granularity desired.
    - Assumptions such as these have been made in the CAO Utilization Modeling and were fine-tuned as the Program matured and grew towards steady state.
- The Utilization Modeling will be the main tool used to revise the CAO's budget.
  - The Utilization Model is updated on a monthly basis to provide a more or less real time forecasting tool.
    - This model was developed as a tool that the CAO uses to measure the efficiency and Claim throughout of the entire system.  It can now be modified and used to generate a budget.
  - This Model was initially developed in July 2012, as Claims began to be processed to determination notices, in an effort to measure the time spent in each of the various phases of the processing of a Claim.
    - The CAO has provided to BP a summation of all of this information in the Meter Charts.
      (1)  This provides monthly, backward-looking information on system capacity for a given month and actual final determinations as compared to that system capacity.
    - Initially, several assumptions were made with Vendor cooperation in building this model; however, over time, these assumptions have been replaced with data to increase the predictive accuracy of the Model.
    - Because this Model uses data collected from the BrownGreer system, it does not currently incorporate the offline aspects of review performed by P&N and PwC.
  - This Model does not granularly track time at the reviewer-specific level because of the complexity of the system, given that a reviewer may touch several different Claims in a single day because of incompleteness notices, pending policy, etc.
    - Not every hour of a FTE's workday is captured by the BrownGreer system because a small portion of that time is lost in offline, claim review related activities.
      (1)  This time is captured in a task utilization rate that measures off-task time that is inherent in the Claims processing system.
      (2)  The Utilization Modeling measures purely on-task touch time; however, it also backs into the information concerning the off-task time inherent in the system.
  - The Process Duration information on the Utilization Model will be used to revise the budget.
    - However, because this information was initially developed with a focus on projecting and measuring system efficiency, it will need to be adapted to be used to produce a budget.
      (1)  The challenge will be breaking down the information of the individual tasks.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

## MEETING NOTES *(CONTINUED)*

- ▫ BP and the CAO agreed on August 9 that this would be the main tool that would be used in revising the budget.
  - ‣ BP requested on August 9 the raw data that the CAO had used to create the Utilization Models previously provided to BP.  This was a one-time educational request for this information that would only be used to better understand the raw data of the Utilization Model for the purposes of revising the budget.
    - (1) The CAO was unsure whether the Settlement Agreement provided the CAO with the right to provide this information to BP.
  - ‣ After brief discussion with the Plaintiffs' Steering Committee, it was determined that the CAO would provide to BP the raw data used in creating the Utilization Models as a one-time provision for educational purposes relating to the revision of the budget.
    - (1) The PSC noted that it had objected to the distribution of the material in the past; however, it did not object to this one time provision solely for educational purposes relating to the revision of the budget.
    - (2) All raw data contained within the Model is data to which BP has already been granted access.  The Model itself, however, is a work product developed by the CAO and is constantly modified and updated to better predict the processing of Claims.

**Communications over the Next Week**

- ▪ It is preferred by BP and the CAO that the communication process be open and informal so as to keep the revision of the budget as transparent and collaborative as possible.
  - ▫ This will allow BP to better understand the process of the CAO in revising the budget.
- ▪ The tentative plan calls for a face-to-face meeting in New Orleans at the Claims Administrator's Office on Wednesday, August 14, 2013, at 10:00 AM.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)



**ACTION ITEMS:**

| TASK | RESPONSIBLE PARTY | COMPLETION DATE |
|---|---|---|
| The CAO will provide BP with more detailed organizational charts on the head count level. | CAO | As soon as possible.  This information has not been previously required from the Vendors.  Therefore, it will take a reasonable amount of time for the CAO to acquire this information. |
| The CAO will provide BP with information on out-of-pocket training costs of new employees for each Vendor. | CAO | As soon as possible.  This information has not been previously required from the Vendors.  Therefore, it will take a reasonable amount of time for the CAO to acquire this information. |
| The CAO will provide BP with a copy of the second quarter internal audit report. | CAO | As soon as possible. |
| The CAO will provide BP with more detailed information on the number of claims being reviewed for fraud detection. | CAO | BP and the CAO agreed on August 9 that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget. |
| The CAO will make a one-time provision to BP of the raw data drivers of the Utilization Model for the purpose of better understanding the mechanisms that the CAO will use to revise the budget. | CAO | As Soon As Possible.  As per objection by the PSC, BP and the CAO agreed on August 9 that this will be a one-time provision for the sole purpose of educating BP on the methods that will be used to revise the budget. |
| BP requested information concerning the turnover rates of the various Vendors. | CAO | BP and the CAO agreed that on August 9 that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget. |

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

## MEETING NOTES *(CONTINUED)*



| | | |
|---|---|---|
| BP requested a data dictionary of all data fields currently captured in the CAO system. | CAO | BP and the CAO agreed on August 9 that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget. |

*Please distribute internally as appropriate.*

# Exhibit 2

[Provided on Enclosed Disk]

## FILED UNDER SEAL

# Exhibit 3

# MEETING NOTES



**MEETING FOCUS:**   CSSP ADMINISTRATIVE BUDGET MEETING

**MEETING DATE:**    **AUGUST 14, 2013  10:00 AM CST**

**ATTENDEES:**

| Name | Company | DHECC |
|------|---------|-------|
| Maria Travis | BP | David Odom |
| Todd Brents | Alix Partners | Kirk Fisher |
| Amy Boatman | KPMG | Bob Levine |
| Gary Jackson | BP | Philip Ollendike |
| Keith Moskowitz | SNR Denton | |
| Ramji Kaul | SNR Denton | |
| Tommy Thomassie | Domengeaux, Wright, Roy, & Edwards | |

**Utilization Model Changes**

- The Claims Administrator's Office (CAO) is attempting to break out certain functions to a granular level in order to achieve greater detail in the budget model.
- Model Changes in Progress
  - Revaluation of claim processing times to incorporate accurate weighted average review times for the following additional determination notices:
    - Eligible;
    - Incompleteness Denial;
    - Opt Out/Duplicate/Withdrawn;
    - Denied/Suspended/Closed/Closure.
  - Incorporation of analyzed trends to project the following costs:
    - Vendor expenses;
    - Appeals panelist fees;
    - Wetlands title firm fees;
    - Subsistence specific vendor costs.
  - The largest expense of the Program is the labor expense associated with claim reviewers.
    - Our current state model looks at the system from a wide overview.
      - (1) Expenses are currently a static function within the model because the CAO does not presently have access to all data necessary to project these costs.
      - (2) Management functions are being distributed on a pro rata basis because the vendors do not at the moment prepare invoices with highly detailed information regarding the specific task being worked on.

# MEETING NOTES *(CONTINUED)*



**Vendor Requests for Information**

▪ Given the time constraints on the budget model revision process set forth by the Court, BP and the CAO have agreed to focus efforts on current RFIs related to the budget.  Non-budget related information will merely receive a lower priority until the revision of the budget model is complete.

▪ Budget Related RFIs

   ▫ Detailed Organizational Charts

      ‣ These will be provided broken down by function, task, and claim type for each of the Vendors.  These charts will be coded by job performed so that they will tie to the invoices.

   ▫ Out of Pocket Costs for Hiring and Training

      ‣ The format of this report has not yet been determined.

      ‣ This information will be a data driver in the future but will not be incorporated into the fourth quarter budget submitted on Friday, August 16, 2013, because Vendors will not be able to provide this information immediately.

   ▫ Retraining Costs Due to Turnover

      ‣ Similarly to the last point, the CAO is unable to attain this information from the Vendors immediately.  For this reason, retraining costs due to turnover will not be incorporated into the Fourth Quarter Budget submitted on Friday, August 16.  However, going forward, the CAO will be able to attain this information from the Vendors and incorporate it in the budget forecast model.

   ▫ Modified Vendor Invoices

      ‣ Similar to the Detailed Organizational Charts, these will be broken down by Vendor, location, and task.

      ‣ Some concern was expressed about the Claimant Assistance Centers (CACs), specifically the cross training of reviewers.

         (1) Once the employee time card system and invoicing are adapted to include this level of detail, the increased level of detail on CAC task hours will be incorporated into the budget forecast model.

         (2) It is not anticipated that this level of detail will be achieved for the fourth quarter budget.  The CAO will, however, be able to put the CAC employees in buckets for the purposes of creating the August budget.

▪ Process Related RFIs

   ▫ It was again reiterated that these are indeed priority items for the CAO.  However, given the time constraints surrounding the budget forecast model revisions, these will be given a lower priority than budget-related RFIs until the budget model revisions are complete.

   ▫ Turnover Rates for DWH

      ‣ As previously mentioned, the CAO is unable to attain information related to Turnover from the Vendors immediately.  Further, since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.

   ▫ Volume of Claims Reviewed by SIT

## MEETING NOTES *(CONTINUED)*



- ‣ This was recognized as an open-ended item.  Since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.
  - ▫ Detailed QA Thresholds
    - ‣ This was recognized as an open-ended item.  Since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.
  - ▫ Projected Staffing and Rate Changes
    - ‣ This is generally considered static because the rates charged by the Vendors are established in the Vendor contracts.
  - ▫ Data Dictionary
    - ‣ This request is being escalated through the Claims Administrator's Office.
    - ‣ It will initially only consist of a list of the data fields that the CAO tracks.  It will not initially include the actual data corresponding to those data fields.
    - ‣ According to BrownGreer, producing this data dictionary will take approximately three weeks.  Since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.

**Budget Methodology**

- ▪ Budget Forecast
  - ▫ The budget forecast model is based off the Utilization Modeling, developed to determine the system capacity necessary to prevent the backlog from growing any further.  System capacity required is based on the anticipated volume of claims filed for a particular month in addition to the backlog beginning that month.
  - ▫ The forecast model sums Modeled Reviewer Costs (which consist of static processes) and Expenses to reach a Forecast Cost for each Vendor.  A contingency cost is then added to this Forecast Cost figure to reach a Budget Forecast for each Vendor.
    - ‣ Reviewer costs are derived from the reviewer Utilization Model.
    - ‣ Costs for static Vendor processes are the previous month's actual costs.
    - ‣ Vendor expense cost is calculated as an average percentage of Vendor labor cost.
      - (1) Expenses are based on historic figures.
    - ‣ A five percent contingency is factored into the total forecast cost.
      - (1) The former budget did not contain a contingency.  However, the CAO wanted to make sure it modeled a sufficient budget given the assumptions required considering the time constraints and data limitations on this process.
- ▪ Basic examples of the anticipated budget methodology for each Vendor were illustrated for BP.
  - ▫ BrownGreer
    - ‣ Reviewer costs have been smoothed with non-reviewer costs.
    - ‣ The static processes (CAC and Subsistence Interviewers) will be continually analyzed and eventually become more easily predictable with additional data.
    - ‣ Expenses for BrownGreer will be forecast based on historic averages.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

## MEETING NOTES *(CONTINUED)*



□ Garden City Group

▸ The Sarasota call center has been closed, which has led to a significant decrease in costs.

▸ Expenses for Garden City Group will be forecast based on historic averages.

(1) These figures seemed somewhat high to BP; however, these expenses were covered in more detail later in the meeting.

(2) Mention was made of the CliftonLarsenAllen audit recommendation of increased fire suppression at the Dublin Ohio Center. The pass through cost on these expenses will be investigated by the CAO to determine what percentage of these costs is directly attributable to the Settlement Program.

▸ The contingency cost built in for Garden City Group is likely somewhat of an overestimation as Garden City Group arguably has less volatility.

□ Postlethwaite & Netterville

▸ The same methodology for the previous Vendor budgets was used for Postlethwaite & Netterville's budget forecast.

▸ The budget forecasts of the Accounting Firms present interesting challenges because accounting review is an offline function not tracked by the BrownGreer timestamp system.

(1) We do not currently have the exact on-task time figures for accounting review. The CAO will make assumptions for this information. These assumptions will be fine-tuned until actual data is available.

□ PricewaterhouseCoopers

▸ The same methodology for the previous Vendor budgets was used for PwC's budget forecast. Additionally, the same offline task challenges experienced with P&N are present with PwC. The on-task time data is not currently available. Assumptions will be made until accurate actual data can be used in the forecast model.

**Agreement on Framework**

■ The CAO established that the structure of this budget is merely anticipatory and not final. The CAO envisions a progressively expanding methodology based on a forecast of claims basis, an eligibility basis, etc.

□ The CAO believes that this structure is in alignment with what BP desires from the budget forecast. However, as the forecast model evolves and additional data becomes available, the model will become much more granular and detailed with respect to costs.

■ BP agreed that this is in the vicinity of the framework BP had in mind.

□ BP agreed with the CAO that the use of a modeled number of determinations to create the budget was the best approach to forecast the budget.

▸ This is why the task utilization rate and the system's capabilities are essential.

□ BP also expressed a desire that the CAO compare actual Program costs to the budget forecast costs to develop a variance analysis.

▸ Further, the CAO wishes to maintain neutrality in this process, remaining focused on steady throughput of claims processing to prevent the increase of claim backlog. The CAO will put forth as accurate a budget as possible while remaining focused on combatting claim backlog.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- The CAO anticipates submitting to the Parties and the Court a budget package like the one discussed in this meeting.  This budget package will include summary sheets that correlate costs based on projections over time.  In addition to these summary sheets, the raw data used to produce these budget results will be provided.  Further, an operational narrative will be provided.  Lastly, information on assumptions made by the Program will be included in this package.

- The CAO would also be open to dialog with BP in the future to discuss one off expenses.


**Questions and Discussion**

- The CAO has attempted to measure the amount of determinations being produced.

- The CAO has normalized the task utilization rate, using the BEL specific rate, essentially lowering the task utilization rate from 87% to 75%.  This task utilization rate is currently an assumption until the CAO has information on the true off-line rate.

  □ A task utilization rate of 75% does not mean that 25% of the time no work is being done.  It means that 25% of the time, there are other off-line activities associated with the processing of claims, such as waiting for screen loads, passing off a claim to another reviewer, downloading documents, etc.

  □ The offline review tasks and the associated times used for purposes of the budget forecast model have been derived from detailed conversations with the Vendors.

  □ BP and the CAO agreed that this task utilization rate is information that could be included in the quarterly budget reports.

- BP asked whether the CAC and CCC items for BG are included in the labor cost model.

  □ These are included but they are static costs.  As additional data is acquired on the function level for the CACs, the costs for the CACs will be parsed out on the functional level.

  □ There was some discussion about extrapolating CAC costs based on total hours and number of CAC visits.  The model basically already does this; however, the CAO expressed the desire to proceed cautiously with this tactic so as to not over-project by basing the extrapolation on a time period with an inordinate number of CAC visits.

  □ The main issue is that the information is not currently broken down at the task level because the reviewers at the CACs are cross trained on various tasks.  Once the CAO has this information, number of visits will be the best way to track it.

    ‣ BP expressed a desire to see some sort of extrapolation supporting the labor hours of the CAC reviewers.

- For the subsistence budget forecast, the amount includes reviewers and interviewers; however, it does not include any field visits in this figure as field visits are handled by another Vendor.

  □ The amount of time a subsistence review takes is based on data received from BrownGreer.

  □ No information has been maintained on how long subsistence interviews take.

    ‣ The CAO has information on how many notices are issued, but no information is available on the number of claims that will be processed on a per hour basis.

      (1) BP expressed an interest in attaining this level of detail in information.  The CAO stated it does not currently have a time in motion study of this data, but will attempt to gather more information to evaluate the system input.



## MEETING NOTES *(CONTINUED)*

- Since no subsistence notices are being issued while policy is pending, the data used in this budget forecast is somewhat skewed currently.  Once this hold is lifted, actual data will be available to be plugged into the budget forecast.

- BP desired to see a breakout of the IT costs incorporated into the model.
  - These costs are made up of system upkeep, development of new capabilities, and process enhancement; however, the breakout of the IT costs in terms of these sub functions is not data that the CAO currently maintains.
    - This is a reasonable way to incorporate this data and will be incorporated into the budget forecast as the information becomes available.

- BP asked about costs seemingly excluded from the GCG budget forecast model.
  - This is the result of similar cost groupings that were made.  BP requested more detail on these cost groupings and the detailed data behind them, specifically regarding document intake, data entry, release processing, handling claimant correspondence, call volume, and file audit review.

- BP asked about the analysis that will be done to compare actual and modeled results for each month.
  - The actual hours will represent the amount of time it actually took to perform a particular task; the modeled hours will represent the time the CAO thinks the amount of work for that particular task should take based on the model's assumptions.
  - The CAO will identify the existence of a variance on a monthly basis if any variance exists, but, because of its sole role in an oversight capacity, the CAO will not take actions to cure the cause of a variance.
    - The CAO would be open to a monthly discussion with the Vendors as to the cause of a particular variance.  However, the CAO does not currently believe that the addressing of the cause of a variance falls within the ambit of the CAO's responsibility, given the CAO's strict oversight role.  Rather, the cause of a particular variance would be left to the respective Vendor itself to address.

- BP questioned some high data capture hourly figures for IEL as compared to BEL.  For IEL, these are attributable to the general tediousness of the job function, particularly entering hundreds of paystub figures from hundreds of individually different pay stubs.  Additionally, the work associated with IEL is specific to BrownGreer, whereas the work associated with BEL is spread out over several different Vendors.

- Notice and Payment Data does not come from public reports.  Duplicates are removed, so the figures in the Notice and Payment Data will not match public report figures exactly.

- BP expressed interest in acquiring the entire model in an unlocked version.
  - Neither BP nor the PSC expressed any real reason to object to providing the entire model.
  - Additionally, the CAO believes this would help streamline the efficiency of the budget revision process.  The CAO will determine if the distribution of this information to the Parties is permitted by the Settlement Agreement.

**Communications over the Next Seventy-Two Hours**

- It is preferred by BP and the CAO that the communication process remains open and informal so as to keep the revision of the budget as transparent and collaborative as possible.

## MEETING NOTES *(CONTINUED)*



- □ This will allow BP to better understand the process of the CAO in revising the budget forecast model.

- □ All questions that the CAO has for BP or that BP has for the CAO will be routed through the Plaintiffs' Steering Committee and Keith Moskowitz.

- ▪ Items that Will Be Provided by Friday

  - □ As no objections were made to the framework of the modeled budget, the CAO will provide the forecasted budget on Friday, August 16 as presented to BP and the PSC at this meeting.

    - ‣ This will include supporting documentation with amended utilization modeling.

    - ‣ Additional information broken down at a more detailed level will be provided to the extent the information is currently available to the CAO. Any assumptions made in lieu of unavailable data will be noted.

      - (1) The main areas in which additional information was requested involve CAC staffing levels, costs of GCG job functions, and IT costs.

    - ‣ In preparing its fourth quarter budget, the CAO will be preparing a revised third quarter budget as well. BP noted its objection to the CAO's proposed third quarter budget but requested to see a revised third quarter budget if one is prepared by the CAO.

      - (1) The CAO will provide the six months covering quarters three and four of budget forecasts to BP.

    - ‣ Regarding turnover rates and the other process related information, the CAO is requesting this information from Vendors. However, it will receive a lower priority until the budget forecast model revisions are complete.

    - ‣ In requesting the data fields from the data dictionary, the CAO recommended to BP that it go through the proper channels to gain access to this. This will ensure that the PSC has no objections given the possible existence of Personally Identifiable Information in these data fields. Upon the completion of the process, the CAO will provide all information agreed to by BP and the PSC.

- ▪ It was decided that the continual and ongoing dialog between BP and the CAO has been very beneficial. Pursuant to this, a meeting has been scheduled for next Wednesday, August 21, 2013, at 10:00 AM, at the CSSP Office in New Orleans.

*Please distribute internally as appropriate.*

# Exhibit 4

[Provided on Enclosed Disk]

## FILED UNDER SEAL

# Exhibit 5



**<u>Reviewer Cost Model and Budget Forecast Methodology</u>**

As will be evident from the budget summary sheets for each Vendor, one aspect of the budget forecasting process that generally pertains to all Vendors is the Reviewer Cost Model. Reviewer labor is present across all Vendors and represents the largest expense of the Program. This model captures the projected costs associated with that labor and is therefore the largest component of the Forecast Budget. For these reasons, the Reviewer Cost Model will be discussed in detail prior to the individual Vendor narratives.

The Reviewer Cost Model was developed to forecast aspects of the administration of the Program with a specific focus around claims review. The results of the initial model described three products: claims processing throughput, cost of the claims review system, and the anticipated duration of the Program. Over time, the model has been adapted to include additional forecasting functionality as the needs of the Program have evolved. It is also important to note that this modeling was developed specifically for and around the Deepwater Horizon Settlement Program and is not a modification to, an adaptation of, or evolution to existing modeling developed for another purpose.

The Reviewer Cost Model is built on a three step process: 1) Model Drivers, 2) Calculations, and 3) Results. The process behind each of these steps in relation to the Reviewer Cost Model is detailed below.

**Step 1 – Model Drivers**



Model drivers form the foundation of all modeling.  Model drivers are the information that drives the calculations to generate results.  When available, model drivers have been derived from actual historic Program statistics.  When reliable or accurate historic information is not available, reasonable and educated assumptions are made.  These assumptions have been created by the CAO through discussion with the Vendors.  As the program matures and additional statistical information becomes available, these assumptions will be replaced with actual data.  Whether actual statistics or assumptions are used as model drivers, the results are collectively vetted to test the validity of the data point and perceived accuracy to create reliable calculations and results.

The model drivers used in the development of the Reviewer Model and the current origin of the data included in these drivers is detailed below.

<u>Process Percentages</u>: The Process Percentage data describe how many claims will go through each step in the claims processing sequence.  The majority of these drivers have been derived from actual historic Program statistics.

- *Review Factor*: This measures the percentage of claims submitted with complete information so that a review to determination can be completed.

  - No historic statistics for this step in the claims process are available.  An assumption was made across all claim categories that ninety-five percent of submitted claims contain enough information to be document complete and legitimately warrant a claim review.

- *Review Iteration / Pass 1*: This measures the percentage of claims that will be deemed "Incomplete" upon completion of the first review cycle and will require a second review.



- The percentage of claims proceeding through this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Review Iteration / Pass 2*: This measures the percentage of claims that will be deemed incomplete upon completion of Review Iteration/Pass 1 and will receive a third review.

  - The percentage of claims proceeding through this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Secondary Handling / Re-Review*: This measures the percentage of claimants who will request a re-review of their claim after a determination is made as offered by the Settlement Agreement.

  - The percentage of claims proceeding through this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Secondary Handling / Reconsideration*: This measures the percentage of claimants who will request reconsideration of the determination of their claim as offered by the Settlement Agreement.

  - The percentage of claims proceeding through this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Secondary Handling / Appeals*: This measures the percentage of claimants who will request an appeal of the final determination of their claim as offered by the Settlement Agreement.

  - The percentage of claims proceeding through this step in the claims processing sequence has been measured and reported through historic system statistics.

<u>Process Duration in Hours</u>: The Process Duration in Hours data describes the length of time required, on average, to process a claim through each step in the claims processing sequence.



- *Categorization*: This includes the process of identifying each piece of claimant provided documentation with its appropriate document category designation.

  - The duration of this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Claim Preparation / Data Capture*: This includes the process of interpreting and entering data from claimant-provided documentation into the system.

  - The duration of this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Claim Preparation / Causation*: This includes the process of testing claimant-provided data to ensure sufficient data has been provided to make a final determination regarding the claim.

  - The duration of this step in the claims processing sequence has been measured and reported through historic system statistics.

- *Claim Review / Preparation*: This includes the process of organizing and reviewing claim data to determine the final compensation outcome of the review.

  - The duration of this step in the claims processing sequence has been measured and reported through historic system statistics for all claim categories except Business Economic Loss and those Seafood Claims requiring accountant review.

  - No historic statistics are available for the Process Duration of the Claims Review/Preparation for Business Economic Loss or Seafood Claims. An assumption on the Process Duration has been made in these instances.



■   *Claim Review / QC (Quality Control)*: This includes the process in which a senior reviewer, within the same functional group, audits the work of previous reviewers to ensure the accuracy of the final compensation outcome of the Claim Review/Preparation.

- The duration of this step in the claims processing sequence has been measured and reported through historic system statistics for all claim categories except Business Economic Loss and those Seafood Claims requiring accountant review.

- No historic statistics are available for the Process Duration of the Claims Review/Quality Control for Business Economic Loss or Seafood Claims.   An assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

■   *Review Iterations / Pass 1*: This includes the process of evaluating a claim for a second time when the initial claim review results in a notice of incompleteness.

- No historic statistics are available for the Process Duration of Review Iterations. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

- This assumption varies by claim type complexity but is typically fifty percent of the Process Duration for the initial Claim Review / Preparation.

■   *Review Iterations / Pass 2*: This includes the process of evaluating a claim a third time when the Review Iteration / Pass 1 results in a notice of incompleteness.

- No historic statistics are available for the Process Duration of Review Iterations. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.



- □ This assumption varies by claim type complexity but is typically fifty percent of the Process Duration for the initial Review Iterations / Pass 1.[1]

- ■ *Audit*: This includes providing a comprehensive evaluation of a claim, by an alternate vendor, to determine the accuracy of the previous reviewer's findings.

  - □ No historic statistics are available for the Process Duration of the Audits. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

- ■ *Secondary Handling / Re-Review*: This includes the process of verifying the results of subsequent determinations to validate the findings at the request of the claimant.

  - □ No historic statistics are available for the Process Duration of the Secondary Handling / Re-Review. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

- ■ *Secondary Handling / Reconsideration*: This includes the process of verifying the results of subsequent determinations, with new supporting documentation, to validate the findings at the request of the claimant.

  - □ No historic statistics are available for the Process Duration of the Secondary Handling / Reconsideration. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

---

[1] On rare occasions, a claim may require more than three reviews (Claim Review/Preparation, Review Iteration / Pass 1, and Review Iteration / Pass 2) to provide a final determination. Given the infrequency of these occurrences, however, this modeling does not contemplate time requirements for those additional reviews.



▪ *Secondary Handling / Appeals*: This includes the process of verifying the results of subsequent determinations, in accordance with the appeals process prescribed by the Settlement Agreement, to validate the findings at the request of the claimant.

▫ No historic statistics are available for the Process Duration of the Secondary Handling / Appeals. Therefore, an assumption on the Process Duration for this step in the claims processing sequence has been made in these instances.

Task Utilization Rate: The Task Utilization Rate is a factor of efficiency in excess of total Process Duration required to process a claim file. For example, a task that requires ten hours to process at a seventy percent Task Utilization Rate would, in reality, require around thirteen hours of dedicated interaction to complete. It is very important to note that this value does NOT attempt to capture the length of time a claim is in the process. Rather, Task Utilization Rate attempts to determine the actual amount of interaction time that is dedicated to processing a claim as opposed to the length of time a claim is checked out for processing. This figure has been assumed for both accounting and non-accounting steps in the claim processing sequence.

Task Distribution: The Task Distribution includes the amount, by percent, each Vendor has dedicated to each review function for each claim category or sub-category. Assumptions have been made for these drivers.

Reviewer Shift Duration: The Reviewer Shift Duration is the determination of how many effective working hours each Vendor's reviewers are on-task. This value is calculated by subtracting hours dedicated to non-productive hours from the overall paid shift length. Assumptions have been made for these drivers.



<u>Claims Data</u>: Claims Data include historic claim submissions, processing rates, and resulting effective claims backlog. These data have been measured and reported through historic system statistics. Projected claims data have been developed by CAO.

<u>Vendor Cost Data</u>: Vendor Cost Data include historic invoicing information related to the processing and administration of the claims review process. These data have been measured and reported through historic system statistics.

**Step 2 – Calculations**

The next step in the modeling process is Calculations. During the calculation process, the Model Drivers are used in simple and straight-forward mathematical computations to determine a variety of useful program information. It is important to note that the modeling can be managed to derive various results as necessitated by the Program. The fixed and variable drivers that fuel the modeling are entered in different manners to achieve the desired management results.

In its most relevant form, this step is designed to determine the administration and support functions necessary to support the claims analysts and the reviewers required to process the modeled claims volume. The methodology used to forecast the administrative costs relies on historical invoice information. Historical invoices are analyzed to calculate the amount each administrative and support staff dedicates to the claims review process. These results are then multiplied by the modeled analysts and reviewers for the forecast four week period to determine the amount of hours required. The result of that calculation is then multiplied by the hourly billing rate of each function to determine the cost over the modeled period. These values are then summed to determine the total Vendor cost for the given time period.



**Step 3 – Results**

In this step, the results of Step 2 – Calculations are presented in digestible graphic format. Reports vary depending on the approach employed to create the model. The preferable format for a budget forecast is a Model Summary, which illustrates most relevantly the analyst and reviewer hours required and cost, all by Vendor.

**Conclusion**

Because reviewer labor is present across all Vendors and represents the largest expense of the Program, the Reviewer Cost Model is an integral part of the methodology used by the CAO to forecast the budget. Using this model, the CAO is able to accurately capture the projected costs of the reviewer labor of each Vendor. This information can then be incorporated into the forecast to reach a total budget figure.

# Exhibit 6

# MEETING NOTES



**MEETING FOCUS:**   CSSP ADMINISTRATIVE BUDGET MEETING

**MEETING DATE:**   **AUGUST 21, 2013  10:00 AM CST**

**ATTENDEES:**

| Name | Company | DHECC |
|------|---------|-------|
| Maria Travis | BP | David Odom |
| Todd Brents | Alix Partners | Kirk Fisher |
| Amy Boatman | KPMG | Bob Levine |
| Gary Jackson | BP | Philip Ollendike |
| Brad Spooner | Alix Partners | Henry Mitchell |
| Ramji Kaul | SNR Denton | Patrick Hron |
| John Creevy | Herman, Herman, & Katz | |
| Tommy Thomassie | Domengeaux, Wright, Roy, & Edwards | |

**Reviewer Model-Specific Questions**

- Meter Charts
  - □ The Meter Charts are real time measurements of system capacity over a period of time, usually a month. The spread between system capacity and actual notifications produced is identified as an opportunity for improvement.
  - □ Questions raised by BP and its representatives related mostly to why BEL and IEL targeted and actual numbers have decreased as compared to the Meter Charts from the August 14 meeting.
  - □ BEL Specific Meter Chart Discussion
    - ‣ One of the main reasons for this change in the Meter Chart was that this Meter Chart incorporated the most recent month's Vendor data.
      - (1) The chart is dynamic and changes with each measured period.
    - ‣ Another reason was that the task utilization rate has been modified since the August 14 meeting.
      - (1) The Claims Administrator's Office (CAO) is attempting to define the accuracy of the task utilization rate today. These figures must be derived from the data provided by the Vendors.
      - (2) Because this is extremely important and has such a significant impact, the CAO's goal is to use extremely detailed and accurate numbers provided by the Vendors. The updated task utilization rate will depend on the Vendor provided information. When the CAO is able to do finalize this, the confidence in the forecast model should be increased significantly.
    - ‣ Another reason was the changes made to task durations since the August 14 meeting.

# MEETING NOTES *(CONTINUED)*



(1) These task duration changes were made to increase the forecasting accuracy of the model. The CAO is continuing to tweak the task duration associated with individual claims per type per determination notice (Eligible Payable and Eligible No Payment, Denial and Closed, Duplicates and Opt Outs, and Incompleteness Denial) in order to increase the accuracy of the budget forecast model. The CAO will take a sample of 32 claims for each claim type for each determination notice type and calculate the task durations using a weighted average calculation. Currently, the CAO is actively working to update the task durations.

   (a) Two things have increased the claims processing the task durations – 1) the implementation of new, intricate policies and 2) the CAO is processing more complex claims.

      (i) As additional policies are agreed upon by the Parties and issued by the CAO, the processing of each claim becomes more complex.

      (ii) Further, whereas in the beginning of the Program claims deemed to be easier (Zone A claims, document complete claims, etc.) were processed first in an effort to get the Program running, the more complex and difficult claims are now being processed, which also increases task duration.

‣ The blue bar (actual performance) figures on the Meter Chart decreased as related to those of the August 14 meeting. This is due to the fact that the August 14 Meter Charts were comparing June labor to July production. Since July had more days of production than June, the determinations per reviewers were higher in the August 14 Meter Chart than the August 21 Meter Chart which compared June labor to June production.

‣ Red hash mark (targets per week) for BEL claims has decreased because it has begun to take a significantly longer time to process BEL claims for the reasons previously mentioned. We are currently meeting with BEL-processing Vendors to get the most accurate figures possible for the task durations associated with the processing of BEL Claims. Further, the larger 32 claims sample size for modeling task duration should produce more accurate results as well.

   (1) It is currently unclear how significant an effect these changes will have in the model.

   (2) It should also be noted that the same changes in task duration mentioned in reference to BEL Claims and the Accountants will apply to accounting-centric Seafood Claims and BrownGreer.

▫ IEL Specific Meter Chart Discussion

   ‣ Performance decreased while the target increased

■ Task utilization Rate and Reviewer Shift Duration

   ▫ The task utilization rate of 75% and the FTE 35.5 hours per week are used in different places in the model and are calculated apart from each other.

■ Differences between QC and Audit

   ▫ For BEL, five hours is allotted to each of these tasks on the task duration portion of the reviewer model.

   ▫ Some information in relation to Quality Control was provided prior to the June 18 meeting.

   ▫ The CAO will determine on a more detailed level exactly what function each of these tasks performs and any overlap between the two.

# MEETING NOTES *(CONTINUED)*



- Appeals as Related to the Review Process
  - Some concern was expressed over the five hours allotted to Appeals in the task duration section of the reviewer model.
    - The CAO will determine exactly what these five hours are spent on.
  - Questions were also raised as to the accuracy of the figure stating that 5.8% of claims go through the Appeals Process.
    - The CAO is working to update these figures, along with the First and Second Pass figures, by Friday, August 23.

**Questions Unrelated to the Reviewer Model**

- Subsistence
  - The model from the August 14 meeting had Subsistence costs layered on top of the model, whereas the model from the August 21 meeting had these costs, as well as those associated with GCG data entry, incorporated into the model.
    - Subsistence is an example of policy decisions affecting throughput, as all subsistence notices have been put on hold pending policy development.  Depending upon the outcome of the policy decision, the CAO may need to reevaluate its processing task durations.
      - (1) The Vendors are continuing to process subsistence claims even though no notices are being issued. Additionally, the CAO does not direct the Vendors on how to utilize their workforce.
        - (a) Some things clearly have to be halted if related to Court Orders, but the CAO does not interfere with the operational decisions of the Vendors as these are more business judgment decisions.
- BrownGreer IT Costs
  - Using estimations from BrownGreer, the CAO was able to break the IT costs out of the model to provide additional granularity as to the cost associated with the IT functions.
  - Some concern was expressed by BP and its representatives about the $700,000 budget for development activities.
    - The CAO does not have access to the development processes for BrownGreer, so the CAO relies on the data that BrownGreer provides.  However, because of the complexity of the system, adding to it requires significant time and manpower.  A single change in one line of code will require numerous additional changes in numerous other areas because it is all inter-related.
      - (1) The CAO will ask BrownGreer for more information on this in the future, but the CAO does not anticipate receiving more detailed information on this before August 28.
- GCG Overhead
  - IT Costs are labeled as Systems and Reporting.
    - GCG runs the servers for the database, network support, hardware support, fraud databases, internal IT processes, etc.

## MEETING NOTES *(CONTINUED)*



(1) This does not include much development work but more database maintenance and analytics.  GCG hosts the hardware infrastructure while BrownGreer runs the software system.

- BG Administrative Costs
  - It was noted that the BG Administrative Costs are decreasing.  However, no breakout was provided as to which specific administrative labor category is decreasing.
    - The CAO does not believe that a straight line pro rata reduction across all Administrative Cost expenses is appropriate.  As fewer claims come into the system, some expense categories will decrease while some will likely increase given the nature of those administrative functions.
    - The decision on staffing for each function performed by each Vendor is left to that Vendor itself.  Some Vendors do reduce staffing levels based on the models.  The CAO does not strong-arm the Vendors to staff at a level congruent with the model.  However, the CAO does discuss the results of the model with the Vendors and allows the Vendor the opportunity to justify appropriate staffing levels.  However, ultimately, the decisions on staffing is left to the Vendors.

- CLEAR
  - The CAO will determine exactly what this BG Overhead Cost represents.

- BG CCC vs. GCG Payment Outreach
  - Questions were raised as to the difference between the BG CCC and the GCG Outreach Program.
    - The BG CCC is in place to offer to claimants access to a representative specifically trained in each claim type, providing the claimant with an expert on each claim type, to handle issues specific to that particular claim type.
      (1) This team handles the outreach related to curing claim incompleteness, specifically with IEL, which has been a significant portion of IEL processing.  This team has a much higher level of expertise in this field than those performing Payment Outreach.
    - The GCG Payment Outreach is a team recently developed for the purpose of notifying claimants who have had eligibility notices issued that they need to submit a release in order to receive their compensation.
      (1) This is a new group because it requires a different skillset, one different from the skillset devoted to knowledge of the document requirements for specific claim types required at the CCC.

- GCG Administrative Costs of Claim
  - These costs represent the management labor directly associated with the document categorization, data entry, and data capture/claims review.  These costs variably related to the expected costs for Garden City Group claim review.

- GCG Call Center
  - The GCG Call Center is currently modeled at thirty minutes per call – twenty minutes of actual call time and ten minutes of wrap up time.
    - BP believes that when meeting with GCG, a figure closer to ten minutes per call was provided.
    - The CAO will follow up with GCG to determine the average time per call.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- ▫ It was noticed that GCG Call Center management costs were around 49% of GCG Call Center operator costs.
    - ‣ As the call volume decreases, the staff is eliminated; however, the permanent core and the individuals with subject matter expertise and institutional knowledge remain. These individuals are generally in a managerial capacity, so this currently represents a high percentage of the costs as related to those of the operators.

- ▪ File Audit
    - ▫ This function performs audits of GCCF claimant documents to be used in the CSSP Portal.
        - ‣ This includes removing PII and sensitive information unrelated to the claimant and the processing of the claim.
    - ▫ The CAO anticipates that the file audit will be complete by the end of the year.
    - ▫ BP questioned which files were being audited. The CAO will follow up with GCG to determine if all GCCF files were being audited regardless of whether the claimant filed claim with the CSSP.
        - ‣ The CAO will confirm the exact scope of this audit.

- ▪ Five Percent Contingency Fee
    - ▫ This contingency was implemented as a margin of error, given the timeframe set forth by Order of the Court in revising this budget.
        - ‣ The CAO anticipates that the process will be significantly refined and the budget will become more accurate over time. Upon the first revision, however, the CAO did not want to put forth a budget forecast that was not worst case scenario.
            - (1) It should be noted that this worst case scenario budget is assuming no magnanimous events, such as a Fifth Circuit Ruling overturning previous Eastern District rulings.

- ▪ Turnover and Staff Level Changes
    - ▫ The CAO has requested all information related to turnover and associated costs from the Vendors.
        - ‣ The CAO has not yet received anything other than a trending percentage which has been provided to BP through a previous data request.
        - ‣ This is still a priority to the CAO, but the CAO has not been able to acquire this information from the Vendors and incorporate it into the budget forecast model.
            - (1) Once the CAO has this information, it will be incorporated into the model.

- ▪ PricewaterhouseCoopers Travel Expenses
    - ▫ The CAO has asked PwC to come up with a transition plan to allocate a portion of their travelling employees to work on the Program remotely.
        - ‣ Because of this, the CAO anticipates the budget forecast submitted next Wednesday will contain a significant downward trend from the 6.84% used in the current model.

- ▪ The CAO does not currently model a high side, a low side, and a middle-of-the-road budget forecast.


**Current State of Affairs**

- ▪ BP acknowledged that the budget provided on August 16 contained the level of detail it desired in the budget forecast.

# MEETING NOTES *(CONTINUED)*

- BP expressed a desire to be able to make a variance comparison between the budget forecast and the actual costs of the Program for a particular month.
  - This would allow a comparison of actual costs to the budget and a comparison of the budget from one month to the budget of the next month to see where the forecast changed.
    - This can be done on a monthly basis.
- Data Dictionary
  - The CAO is compiling its data dictionary currently.  However, BP will submit a written request to the CAO for the information it would like included in the data dictionary, as the PSC may object to the sharing of some information contained in it.
- The CAO will begin to maintain a change log for the budget forecast model in an effort to assist BP and its representatives in tracking the changes the CAO makes to the model to increase its accuracy.


*Please distribute internally as appropriate.*

# Exhibit 7



23 August 2013

Mr. David Odom
Deepwater Horizon Settlement Program
935 Gravier Street
New Orleans, LA 70130

Dear Mr. Odom,

Pursuant to the Court's August 7, 2013, Order (Dkt. No. 10955), BP is providing its comments to the Court Supervised Settlement Program's ("CSSP") 4th quarter 2013 ("Q4") proposed budget provided to BP on August 16, 2013.[1]  Our response is organized into three parts:  (1) comments regarding the framework of the proposed budget model; (2) comments regarding the proposed budget amounts; and (3) comments regarding the documentation and information provided in support of the proposed budget.

As described in detail below, notwithstanding the improvements in the framework of the proposed budget model, the overall proposed Q4 budget is still excessive.  This appears, in large part, to be due to the willingness of the Claims Administrator's Office ("CAO") to take cost and productivity estimations from the CSSP Vendors, which drive the budget model projections, at face value without any managerial assessment or independent evaluation of the reasonableness of those assumptions and targets.

Since beginning our discussions on August 9, 2013, the CAO's uncritical acceptance of CSSP vendor estimates has led to a lowering of productivity goals.  The proposed Q4 budget now targets, for example, that accountants complete only 1.0 Business Economic Loss ("BEL") claim per accountant, per week.  As discussed below, these seem to be unreasonably low targets. The CAO has indicated that it does not view the budgeting process as a function to drive results  and accordingly, it appears that the CSSP Vendors have provided assumptions and estimates to bring the Q4 budget in line with actual prior productivity and cost results.

As a result, we believe an operational review and examination is required, including some analysis of the validity of the CSSP Vendors' assumptions, to allow BP and the CAO some basis to evaluate the reasonableness of the assumptions driving the budget.  Without an operational review and examination and a critical evaluation of these assumptions, even a well-designed budget model does nothing more than replicate CSSP Vendors' own assumptions and estimates to bring the Q4 budget in line with actual prior productivity and cost results.

## I.  Comments Regarding the Framework of the Proposed Budget Model

The methodology used by the CAO to develop the budget process is improved from the Q3 budget and attempts to estimate future costs based on a predictive model incorporating past experience and purports to link projected levels of tasks with the amount of labor necessary to complete each task. However, to date, the CAO has neither tracked nor required the CSSP Vendors to track sufficiently detailed information regarding productivity and costs at a task level as needed to serve as the input to drive this type of model (e.g., the duration of time that should be required to complete a particular

---

[1] The CAO and BP met on August 21, 2013, to discuss BP's preliminary observations regarding the CAO's August 16 budget proposal. The CAO has subsequently provided additional information that may respond to some, but not all of the issues raised in this letter.

task of the accounting review). In lieu of using actual historical data, the CAO has indicated it will use estimates and assumptions until more reliable data can be generated. While using assumptions as a stop gap until actual data becomes available is not per se unreasonable, here the CAO has simply asked its vendors to provide those assumptions and has done nothing to test those assumptions or estimates or apply standards.

BP has asked for the CAO's supporting documentation for these various assumptions and estimates and understands that the CAO does not possess an analysis necessary to validate the assumptions and estimates being provided by the CSSP Vendors as to the standards. As indicated by the CAO, the Claims Administrator will not "pass judgment" on the data drivers provided by the CSSP Vendors. As a result, the predictive model is driven by, in large part, assumptions and estimates regarding productivity and costs provided to the CAO by the CSSP Vendors. This is particularly concerning given the productivity targets from the Q4 budget, which targets are derived from these assumptions, will set the CSSP Vendors' Key Performance Indicators in the upcoming Task Orders. Hence, an operational review and examination to test all of the assumptions and unsupported cost estimates provided by the CSSP Vendors is necessary to allow BP to fully evaluate the budget.

Additionally, with respect to the mechanical calculations of the budget model, since our last meeting we have confirmed several calculation errors that should be corrected:
      (i)     Using June cost vs. July determination numbers to calculate June productivity:
- Tab [Vendor Time & Cost June], cells P98 – U98

      (ii)    QA Audit Total Required Hours appear to be improperly calculated resulting in fewer hours allocated to the BEL, FBEL, and SUBEL claims than needed based on projected determinations and process duration hours:
- Tab [4wk Past Model], cells AT13:AT35
- Tab [4wk Fwd Model July 2013], cells AT13:AT35
- Tab [8wk Fwd Model Aug. 2013], cells AT13:AT35
- Tab [12wk Fwd Model Sept. 2013], cells AT13:AT35
- Tab [16wk Fwd Model], cells AT13:AT35
- Tab [20wk Fwd Model], cells AT13:AT35
- Tab [24wk Fwd Model], cells AT13:AT35

      Additionally, we encountered other formula errors within the model that did not impact the final budget calculation but had an impact on certain variables that were used to assess the budget calculation.
      (iii)   BrownGreer Employer Verification Review Team hours allocated among claim types do not agree to total Employer Verification Review Team hours:
- Tab [June 13 Costs], sum of cells K35:T35 do not foot to cell I35

      (iv)   Garden City Group Document Categorization hours allocated among claim types do not agree to total Document Categorization hours:
- Tab [June 13 Costs], sum of cells K88:T88 do not foot to cell I88

      (v)   Inconsistencies between claim type allocations within hard coded numbers in cell formulas as compared to other claim type allocations within the model:
- Tab [Model Inputs], cells D11:J13 include hard coded numbers, representing claim allocation percentages. The hard coded numbers are not consistent with other claim allocation percentages used within the [Data Request v5] tab, cells M57:O57 and within the [Model Inputs] tab, cells O48, R48, U48, AA48, AD48, AI48, AL48, AO48, AT48, AW48, AZ48, BC48, BF48, BK48, and BN48.

      (vi)   Summary admin costs in Claims Review – Modeling Summary are calculated inconsistently amongst the firms:
- Tab [Model Summary], cell D20 does not flow with the formulas surrounding it.

    (vii)    Discrepancy between admin costs in two different cells:
- Tab [Vendor Time & Cost June], cells Q90, V90, and AA90 do not agree to the total costs for each vendor within AJ67, AJ82, and AJ92.

    (viii)    Discrepancy between BrownGreer hours FTE Reviewers & Analysts in two different cells:
- Tab [Vendor Time & Cost June], cell O101 does not agree to cell K64.

    (ix)    Allocation of BrownGreer FTE Reviewers & Analysts by Claim Category does not agree to Total FTE Reviewers & Analysts:
- Tab [Vendor Time & Cost June], cells P108:U108 do not agree to cell O108.

    (x)    Certain costs appear to have been improperly classified as overhead rather than included within the Reviewer Model:
- Tab [June 13 Costs], cell B62 appears to have improperly classified this cost as an "O" instead of an "R".

    (xi)  Garden City Group total hours and total dollars exclude Hammond Center Administration and Management:
- Tab [June 13 Costs], cells F102 and I102 improperly exclude cell references F80 and I80, respectively.

    (xii)  BrownGreer total timekeepers is hard coded and does not equal sum of timekeepers:
- Tab [Vendor Time & Cost June], cell AG45 is hard coded with 1,187.  The sum of timekeepers in cells AG9:AG44 equals 1,414.

Finally, as BP has previously noted, a critical component of evaluating a proposed budget is the ability to compare a projected quarterly budget against past actual performance in an "apples-to-apples" fashion.  BP requested that the Q4 budget include a comparison against actual past performance broken out in detail on the same task based level used to generate the Q4 budget.  The CAO has indicated that while it agrees that such a request is necessary and appropriate, it did not have time prior to the August 16, 2013 budget submission to perform this analysis.  BP again reiterates the need for this critical comparative metric in order to fully review and evaluate the budget.

## II.  Comments Regarding the Q4 Proposed Budget Amount

The proposed Q4 budget request of approximately $119,300,000 is excessive and unsupported by the documentation available and provided by the CAO.  In particular, BP has the following detailed comments and proposed revisions to the Q4 budget.

### A.     The Line Item "Contingency Fee" Should be Eliminated

The Q4 budget includes a "contingency fee" of nearly $5.7 million.  These are unallocated dollars which are not designated for any identifiable task or expense.  This represents 5% of the total proposed budget and is, in essence, a projected cost overrun by the CSSP Vendors that the CAO apparently expects to occur, but cannot identify how it will occur.  The CAO's explanation that the $5.7 million is needed because of the number of unverified assumptions driving the budget, the complexity of the claims process, and the pace at which the budget has been prepared is insufficient. The 5% fee is applied across the entire Q4 budget, not just the budget items based on assumptions, and includes fixed costs that do not have any unpredictability.  Moreover, the assumptions regarding costs and productivity are being set by the CSSP Vendors themselves and likely already include a cushion for the same "uncertainty" the contingency is purportedly being included to cover.  Finally, the 5% fee is static across all three months and does not reflect the CAO's stated view that the assumptions will be replaced with more reliable data over the course of the budget quarter.

### B.     The Task Utilization Rate is Too Low

The Q4 budget provides for a task utilization rate of 75%.  As explained in the CAO's narrative accompanying its Q4 proposal, "a task that requires ten hours to process, at a seventy-five percent

task utilization rate would, in reality, require around thirteen hours* to complete. (Reviewer Cost Model and Budget Forecast Methodology). Here, the CAO is estimating that every task will take, in reality, 33% longer than it actually should. Moreover, the CAO originally estimated the task utilization rate to be 87.6% for BEL claims in the August 9 version of its model and now, without supporting analysis to justify the change, has reduced the task utilization rate to 75%. This downward revision has a significant impact on the productivity targets and the overall budget. For example, since August 9, the CAO has revised its BEL productivity targets from 5.39 down to 3.48 claims per employee per month. Similarly, productivity targets for accountants have decreased from 1.6 to 1.0 BEL claims per accountant per week, a 37.5% decrease.

BP recognizes that the task utilization rate, in reality, cannot be 100%, but has no ability at this time to assess or propose what a reasonable percentage should be under the circumstances. An operational review and examination, including some analysis of a reasonable utilization rate, is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget. Without an operational review and examination, BP has no ability to assess whether the budgeted rate of program efficiency is reasonable under the circumstances.

### C.    There are Process Duration Changes for both BEL and IEL Claims Which are Unsupported

Since our budgeting process began on August 9, the CAO has increased the estimated duration of time to resolve a BEL claim from 32.5 hours to 43.4 hours, while the estimated time to process an IEL claim decreased from 25.1 hours to 13.6 hours. Our understanding is that these revisions are not supported by any data analysis completed by the CAO, but rather are based on assumptions and estimates being provided to the CAO by the CSSP accounting vendors, as the CAO does not possess sufficient historical information to create its own estimates or evaluate the assumptions given to it by its vendors. BP further understands that the CAO has not performed any analysis to assess the validity of the assumptions and estimates being provided by the accounting vendors as to the process duration standards. An operational review and examination including some analysis of the validity of the CSSP Vendors' assumptions regarding process duration is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget.

This budgeting issue is of particular concern given the Q4 budget takes into account costs resulting from the addition of 100 new accountants to the CSSP. As noted previously, this staffing proposal did not appear to be developed to meet any specific productivity goal and, as we have learned through this budgeting process, the CAO has limited visibility    into the process duration of the accounting function.  In its justification for the addition of 100 accountants, P&N stated its productivity goal for the new accountants was 1.5 reviews per accountant per week, with new accountants achieving this level of productivity within 60 days. In the proposed Q4 budget, the targeted productivity for BEL accountant reviews has dropped to 1.0 review per accountant per week.  Accordingly, it is of note that the addition of the 100 new accountants, which must be accounted for in the Q4 budget, corresponds with an estimated decrease in productivity levels for BEL claims which the accountants are responsible for handling.

### D.    Budgeted Information Technology (IT) Fees of BrownGreer Are Not Sufficiently Detailed to Assess Whether the Costs Are Reasonable

Brown Greer's proposed Q4 budget includes $3.9 million for IT costs. We have asked for a detailed breakdown of how the IT budget will be allocated and have only received a high level breakdown that 48% of the budget dollars will be spent on system maintenance and 48% on further system development, with the remainder to smaller tasks. We have requested, but have not received, any further breakdown of these costs including, for example, the list of IT development or maintenance tasks included in the estimate. Without these detailed breakdowns, these costs continue to appear excessive, particularly at this stage in the program (i.e., heavy development related IT costs should already have been incurred) and BP has no ability to evaluate their necessity. An operational review and examination, including some analysis of the continuing IT needs of the program, is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget.

**E.** **Primary and Secondary Handling Rate Assumptions are Not Calculated at Current Rates**

The Q4 budget uses February 2013 percentages for estimating the number of claims that will undergo claims processing for certain steps rather than current monthly percentages. BP recommends the most recent data be used in the budgeting process.

**F.** **The Budget Appears to Incorporate Excessive Labor Rates**

BrownGreer and Garden City Group collectively hired more than one thousand independent contractor employees to work at the CSSP, marked-up these labor costs, and passed them through to the CSSP and Settlement Trust. BP has requested, but has not received, information regarding the markups actually being charged by BrownGreer and Garden City Group so that it can evaluate whether those markups are excessive. Based upon BP's review of independent contractor rates available in the market, the independent contractor rates appear excessive. As stated previously, BP does not believe it is appropriate to pass through unreasonable markups to the CSSP and Settlement Trust on dedicated labor acquired specifically to work on the program, and these costs should not be included in the Q4 budget. Both BrownGreer and Garden City Group have actively converted contractors to company employees preserving these apparently excessive markups for these converted employees.

With respect to employee labor rates, the assumptions built into the Q4 budget related to rate and level changes of employees are not disclosed or explained, making it difficult to understand the driving factor behind these assumptions.

**G.** **The Budget Incorporates Excessive Levels of Accountant Travel Expenses**

The budget includes unreasonable and unnecessary travel fees related to having large numbers of accountants travel to New Orleans when there is no need for the vast majority of them to be physically present in New Orleans to accomplish their tasks. For example, PwC accountants perform the same work from other non-travel locations (e.g., San Francisco) without traveling to New Orleans. BP does not believe that it is appropriate to include these unreasonable and unnecessary travel fees in the budget.

**H.** **The Budget Estimates BrownGreer's Claimant Communication Center and Garden City Group's Call Center to Have Activity Levels Three Times Higher than Current Experience.**

The proposed Q4 budget allocates approximately $1.9 million to the BrownGreer Claimant Communication Center ("CCC"). According to the supporting documents, this amount is calculated based on an average call time of 30 minutes per call (Tab "BG CCC Budget"). However, according to BG Weekly Status Report #40, August 12, 2013, Table 27B, the average call time for the CCC is 6.9 minutes. No justification has been provided to explain why the budget should include projected activity exceeding four times the current activity levels and the estimated call time should be reduced accordingly.

Similarly, the proposed Q4 budget allocates approximately $1 million to the GCG call center. According to the supporting documents, this amount is calculated based on an average call time of 30 minutes per call (GCG Outreach Model Assumpt.). However, according to email correspondence from Kirk Fisher dated August 22, 2013, in response to BP's questions on the average call time, the average GCG call center call is 10 minutes. Again, no justification has been provided to explain the dramatic increase in estimate call times.

The proposed budget allocation for both the BrownGreer and Garden City call centers appear inflated by significantly overestimated activity and should be reduced accordingly.

The GCG budget also includes approximately $600,000 for Payment Outreach to class members who have received an Eligibility Notice but have yet to respond to the CSSP. Notwithstanding the issue of whether this process is required under the terms of the Settlement Agreement, this amount is based on an estimate provided by GCG, and no support has been provided as to the number of calls,

average time per call, or hours spent performing this task. This budget item requires additional detailed supporting documentation.

**I.      The Amounts Budgeted for BrownGreer's CCC and Garden City Group's Call Center Management Fees Are Excessive.**

Of the total hours attributed to the BrownGreer CCC in the Q4 budget, no explanation is provided for approximately 33% of the total hours, which presumably are management-related hours. Similarly, the GCG call center budget assumes that 49% of the overall budget is attributable to management costs. For experienced call center teams, these percentages are excessive and the budget should be reduced accordingly.

**J.      The Proposed Budget Does Not Adequately Address Impact of Policy Holds**

The Q4 budget does not account for the policy hold on the subsistence review claims, nor is there any explanation of whether current reviews are placed on hold until policy hold issues are resolved. It was stated to us that the CAO relies on recommendations from vendors about whether current reviews should be suspended until policy hold issues are resolved. No review processes are planned to be suspended in the Q4 budget. At a minimum, the effect that a policy hold would have on actual and budgeted performance should be evaluated and disclosed. During a policy hold, vendors should not be left without direction to continue performing work that may need to be redone or revised as a result of the policy resolution. To the extent the subsistence policy has to be revised or replaced based on the current investigation of corruption at the CSSP, the CSSP may need to re-perform the subsistence reviews. Accordingly, the CSSP's hold should extend to the review of subsistence claims until the conclusion of the corruptions investigations. The Q4 budget should be revised to reflect such a broader hold.

**K.      The Budget Appears to Double Count Costs of Claim Review Time Spent By BrownGreer Employees Located at Client Assistance Centers ("CAC")**

The CAO has indicated that BrownGreer employees located at CACs are cross-trained to perform claims review tasks in addition to their CAC related tasks. The proposed Q4 budget includes $5.4 million for the costs of running the CACs and, while the supporting budget material indicates that the $5.4 million only includes cost for CAC related tasks, the actual data suggests the non-CAC related costs have not been backed out of the calculation.

The "CAC Modeling Assumptions Tab" calculates a cost per visit of $107.71 and explains in footnote 1 that CAC reviewer costs are not included in the calculation. However, the support provided for the $5.4 million budget shows that number is calculated using an average cost per visit of $295.02. (Tab "BG CAC Budget"). Presumably the difference between the two average costs per visit is due to the latter including both the costs of claims review tasks and CAC related tasks in developing the average.

Finally, with respect to fixed costs associated with CACs, it is not clear where the approximately $110,000 per month in rent is included in the proposed Q4 budget. Additionally, we would recommend that the final narratives supporting the Q4 budget include any relevant discussion regarding the analysis for closing any CACs during Q4. Such an analysis would include the number of visits at each center, the fixed costs of each center, the geographic proximity of visitors to the center, the proximity of adjacent centers, and the cost/benefit of early lease termination, among other things.

**L.      There are Numerous Costs in the Budget Which Have Not Been Evaluated on a Cost/Benefit Basis**

The Garden City Group File Audit Process, budgeted for $2.4 million in Q4, appears to be an unnecessary use of resources and adds great expense to the Q4 budget without reason. The impetus for this process is to convert claim information submitted to the GCCF by Class Members into the CSSP for use in processing their CSSP claim. However, these conversions are being performed on all GCCF claims, regardless of whether or not the claimant has filed a CSSP claim. This step is unnecessary, and results in work being performed on claims that will never be filed in the CSSP. In addition, it is believed that currently less than 1,000 CSSP claims per month are being filed

by previous GCCF claimants. As a result, the budget for this activity should be reduced to provide only for the conversion of newly filed CSSP claims.

The BrownGreer budget includes $6.4 million for administrative costs. The support for this cost is based on the amount spent in June, with an assumed reduction to the overall level occurring during Q4. As a result, no support can be provided for precisely where these budgeted amounts will be spent. For example, some of the tasks in June are based on claims volume and activity, while others are fixed in nature. The CAO stated that it is up to the vendors to determine where these costs will be allocated in Q4. However, no allocation has been provided, preventing an evaluation of this item in the budget.

## III. Comments Regarding the Documentation and Information Supporting the Proposed Budget

As previously mentioned, the budgeted amounts for many areas in the Q4 budget are not supported by anything other than an extrapolation of historical costs. Moreover, the historical costs of the facility have not been tracked in sufficient detail for all Vendors in order to support the budgeted amounts, as cost and productivity levels at each task level is not tracked. In order to support future budgeted amounts, the CAO should require vendors to provide this appropriate level of detail on a monthly basis.

On a quarterly basis, BP should be provided with the following documentation to support future budgets: (i) budgeted amounts by Vendor/CAO by month; (ii) supporting narratives; (iii) a utilization model for the three month period, without any locked cells; (iv) a supporting analysis of non-model driven variable costs; (v) a supporting analysis of fixed costs; (vi) a current BrownGreer/Garden City Group weekly reporting package; (vii) historical performance of utilization model/metrics; (viii) vendor KPI metrics and proposed vendor Task Orders for the quarter; (ix) a current organizational chart, showing headcounts at each level correlated to the vendor invoices and task level; (x) an analysis of projected turnover, hiring and training costs; (xi) current settlement projections showing projections of claims forecast and claims through the life of the program; (xii) analysis supporting the hours needed to perform each task by process by claim type for each vendor; and (xiii) a listing of service levels for each function within the Program by vendor (including administrative Program levels managed by the CAO).

In addition to the quarterly budget supporting documentation, BP should be provided with the following supporting documentation on a monthly basis: (i) current invoices from each vendor; (ii) BrownGreer/Garden City Group invoices broken down into the same categories shown on the organizational chart and task level, with time entries broken down by time spent on claim activity, travel, training and other "off-task" time; (iii) P&N/PWC invoices broken down into the same categories of organizational chart and task level with time entries separated between time spent on travel, claim resolution, training and other "off-task" time, and further separated for time spent on each individual claim, including an identification of the claim number worked; (iv) a comparison of actual costs to budget costs at the same level of detail provided in quarterly budget; (v) a supporting narrative with discussion of variances to budget and highlights of efficiency initiatives (both procedural and systems initiatives); (vi) a utilization model comparing actual to budgeted performance for the month, including a breakdown of performance for each vendor's portion of the model; (vii) supporting analysis of performance of non-model variable costs; (viii) current BrownGreer/Garden City Group weekly reports; (ix) an analysis of turnover, hiring and training costs for the month; (x) an analysis of changes to billing levels and rates of all employees of all vendors; (xi) additional data/analysis as may be determined once complete data dictionary is received and reviewed by BP; (xii) copies of any internal audit/quality assurance reports issued during the month; (xiii) copies of the invoice audit results performed by the CAO; and (xiv) any changes in existing service levels or service levels for new activities, agreed to by the CAO with the vendors.

For any identified variances, the variance analysis should include an analysis of the variances, the cause for the variance, action items to address the variance (if the variance is unfavorable), and any impact those results have on future budgets.

We are happy to discuss any of our comments and recommendations with the CAO in advance of its final proposed Q4 budget.

Sincerely,

Maria Travis
Director of Claims - GCRO

80683462

Cc:     Mark Holstein

        Keith Moskowitz

        Kirk Fisher

        Patrick Juneau

        Bob Levine

# Exhibit 8

[Provided on Enclosed Disk]

**FILED UNDER SEAL**

# Exhibit 9



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

August 28, 2013

Maria Travis
BP America Inc., Director of Claims
Gulf Coast Restoration Organization
501 Westlake Park Blvd.
Houston, TX 77079

Dear Maria,

The Claims Administrator's Office (CAO) is in receipt of your August 23rd letter responding to the CAO's initial Q4 2013 budget forecast submittal. In your letter, you list several concerns raised by BP regarding the budget process, some of which had already been addressed by the CAO at the time of your letter (BP's August 23rd Budget Response, 1 n.1). The CAO has since worked diligently to ensure that all of your comments in the August 23rd letter have been addressed in this final budget forecast and supporting documentation.

Before we address each of your comments from the August 23rd letter, I would like to restate the constraints on the development of our model. First, as per the directive of the Claims Administrator, we have developed our budget with the constraint that there will be no increase in the backlog of claims that will receive final determination notice. In other words, our staffing levels within the model are adequate to process to final notice all claims that the Program is projected to receive on a daily basis over the next quarter. With this assumption, you will note that our model indicates that we need an additional 99 accounting Full Time Equivalents (FTEs) to maintain the current claim volumes and to prevent backlog from increasing. Conversely, the

August 28, 2013
Page 2

model shows that we are overstaffed in other areas, such as non-BEL analysts and reviewers, and therefore, we have a planned reduction in the budget forecast in these specific areas.

Secondly, as noted in your letter, the Claims Administrator's Office is largely dependent on Vendor-provided and historical data as inputs into the model, including task durations and other information. The CAO acknowledges that an increased level of effort is needed to complete the necessary studies and analyses, such as time and motion studies, as a next step to gathering additional data for the model. Within the time constraints of this budget request, there is simply not enough time to conduct the necessary studies and additional data collection. Therefore, Vendor-provided and historical data are necessary to complete the model. With this in mind, we see the budget process as a collaborative, continuously improving process whereby BP and the Plaintiffs' Steering Committee are able to work with the CAO to continue to develop an accurate, data driven budget forecast model incorporating new data as it becomes available.

Also note, in order to maintain full transparency, we have provided minutes for the August 9th, August 14th, and August 21st meetings conducted for the purpose of discussing our budget model and methodology. In our August 12th and August 15th letters, we asked that you provide any comments as to these minutes to ensure that we both have an accurate recollection of the meetings. Again, at our August 21st meeting, we asked that you review the minutes from those two meetings and provide feedback so that we could finalize those minutes. In that meeting, you stated that you would prefer to provide BP's comments the following day. As of this date, we have still not received any comments as to your understanding of the meetings in accordance with the minutes. We have attached the minutes for the August 9th, 14th, and 21st meetings as Exhibit A and ask that you provide BP's detailed comments as to your view of the accuracy of those minutes.

Our responses to each of your comments in the August 23rd letter are as follows:

## I.  Comments Regarding the Framework of the Proposed Budget Model

As the CAO has stated and BP has reaffirmed in its response to the Q4 budget proposed on August 16th, certain assumptions were required in order to project future expenses.  For some of these assumptions, it was necessary for the CAO to rely on data provided by the CSSP Vendors.  BP has duly noted that the CAO does not currently possess the analysis necessary to validate the estimates provided by the CSSP Vendors.  Nonetheless, the CAO has asked for additional information on the assumptions that were made.  In response, Postlethwaite & Netterville has provided support for the claims review duration estimates; BrownGreer has provided support for the estimated decrease in Information Technology (IT) labor hours and for the elimination of the second reviewer shift; PricewaterhouseCoopers has provided support for its decrease in travel expense; and Garden City Group has provided support for the average call time and File Audit reduction.  An example of this additional support is included as Exhibit B – Postlethwaite & Netterville Estimated Effort Memo.

With the understanding that future budget forecasts will require a more in depth analysis than the CAO has been able to perform in this abbreviated budget revision process, the CAO will be tracking the crucial data necessary to minimize the aforementioned assumptions.  This data, in conjunction with time and motion studies, will provide the CAO with the resources necessary to validate, modify, or reduce the CSSP Vendor provided assumptions.

Additionally, as previously noted, the CAO adapted the pre-existing utilization model to be used as a budget forecast model.  In performing this task on such a limited time frame, a small number of model miscodings occurred as disclosed in our August 21st meeting and as stated again in your August 23rd letter.  These miscodings have been corrected by the CAO, and these

model changes are reflected in the change log attached as Exhibit C – Budget Forecast Model Change Log.

Lastly, BP's response notes that a critical component of the budget is a comparison of actual past performance to the proposed Q4 budget. In formulating this comparison, the CAO has compared July's actual hours and labor cost to the fourth quarter projected hours and labor cost. As previously mentioned, the primary foundation for the proposed budget is the reviewer utilization model, which has been developed to project staffing levels required to combat backlog growth. As such, the comparison of actual performance to budgeted performance results in variances for each of the four Vendors. This additional support is included as Exhibit D – Fourth Quarter Labor Modeling Summary.

## II. Comments Regarding the Q4 Proposed Budget Amount

## A. The Line Item "Contingency Fee" Should Be Eliminated

Over the past weeks, the CAO's confidence level pertaining to the accuracy of the budget model has vastly increased. For the Q4 budget, the 5% contingency fee will be applied to only variable costs within the Program and will not be applied to fixed costs. Due to the budget submission time constraints that do not provide sufficient time to gather all historical data and perform time and motion studies to review and examine the Vendor assumptions, the CAO maintains that a 5% contingency fee for variable components of the Program is appropriate. After applying all of the recent modifications and corrections to the budget model, the contingency fee for only variable costs results in a change in the contingency fee from $6,260,737 to $6,022,783, a reduction of $237,954. As more data is obtained and as time and motion studies are performed to review the Vendor-provided assumptions, the CAO's confidence

August 28, 2013
Page 5

in the ability of the model to accurately forecast the budget will further increase, and the CAO anticipates that, as a result, the contingency fee will decrease for the Q1 2014 budget.

Keep in mind that a contingency fee is just that—a contingency. It does not imply that the actual fee will be expended. It merely provides a contingency in the case that an unforeseeable event occurs, such as an unanticipated spike in claims, which, in conjunction with our constraint to prevent an increase in the backlog of claims that will receive final determination notice, would require additional labor hours (straight time overtime) to process the additional claims.

## B. The Task Utilization Rate is Too Low

The CAO incorporated a Task Utilization Rate to accommodate the complicated nature of reviewing claims that are, to a large extent, incomplete for several review iterations. Because of the high level of incompleteness, claim reviewers must educate themselves on work that has been performed to date by evaluating the claimant file; reviewing and validating previously entered values; and discussing work with previous reviewers. All of this leads to time dedicated to the review process that occurs outside the window of when a claim is checked out for review, resulting in a lower Task Utilization Rate.

The CAO, however, takes note of BP's assertion that the 75 percent Task Utilization Rate[1] is too low, particularly for some claim categories that experience fewer incomplete claims and are less arduous to review. In the time between the Q4 budget submission and the Q1 budget submission, our team will perform an in depth operation review and examination; create a more sophisticated measurement for current task utilization rates; work closely with the Vendors

---

[1] It should be noted that for Business Economic Loss claims, Start-Up Business Economic Loss claims, and Failed Business Economic Loss claims, the CAO used a Task Utilization Rate of 80.12%. This figure is a blended rate calculated using the task utilization information provided by Postlethwaite & Netterville and PricewaterhouseCoopers.

August 28, 2013
Page 6

to define target Task Utilization Rates for each claim category and design programs to achieve those rates; and develop scorecards to measure success against objectives.

## C. There Are Process Duration Changes for Both BEL and IEL Claims Which Are Unsupported

In the response to the Q4 2013 budget, BP states "Our understanding is that these revisions are not supported by any data analysis completed by the CAO, but rather are based on assumptions and estimates being provided to the CAO by the CSSP accounting vendors…" At the time of the initial budget submission on August 16th, the CAO did not possess the raw data necessary to perform such an analysis. Since the original submission, this data has been obtained, and a complete duration analysis has been performed on the average time required to generate each of the following notices for each of the 12 claim types: Eligible Claims, Closed/Denied, Incompleteness Denial, and Withdrawn/Opt Out.[2]

It is relevant to note that the Q4 budget forecast does not arbitrarily choose a number of FTEs with which to populate the model. The Q4 2013 budget model forecasts that, given the current rate of claims processing and the projected number of claims filed over the next quarter, 99 additional accountant FTEs will be necessary in order to combat increasing backlog, which has been the goal of the CAO from the beginning of the Program. As previously stated, the chief model constraint is to prevent the increase of the backlog of claims that go to final determination notice. As such, our staffing levels in the model are determined to meet this constraint and achieve a final budget forecast number.

BP also raises a concern as to an unexplained decrease in accountant reviews per week for BEL Claims. There is a valid reason for the decrease in reviews per week based on the way

---

[2] For a complete description of the Modeling Duration process and an analysis of the results, please reference the attached "Reviewer Costs Model" and "Reviewer Cost Model and Budget Forecast Methodology" narrative.

August 28, 2013
Page 7

claims were selected earlier in the process in order to ramp up processing and demonstrate awards prior to the fairness hearing. In this early stage, claims that were complete, in Zone A, and were not subject to complex policy issues were selected. As the Program matured and claims were processed on a FIFO basis, a larger percentage of claims is subject to various issues which in turn slow down claim processing. With incomplete claims, the Program Accountants are now required to contact claimants in order to request additional information. Also, many claims are in Zones other than Zone A, which has presumed causation, and thus require significantly more time to process. Lastly, at the beginning of the Program, intricate and complex claims that were identified as having outstanding policy questions were placed on hold. As the Program has matured and hundreds of policies have been adopted to process these intricate and complex claims, the Program accountants must now not only process these complex claims, but also ensure that each claim review complies with the established Program policies. Program complexities such as these, rather than a decrease in reviewer productivity, are the reason that claim review times are increasing.

## D. Budgeted Information Technology (IT) Fees of BrownGreer Are Not Sufficiently Detailed to Assess Whether the Costs Are Reasonable

BrownGreer (BG) has provided a list of development and maintenance tasks for which the IT portion of the Q4 budget will be used. This list is attached as Exhibit E. However, the CAO notes that, given the time constraints of the budgeting process, an estimation of specific costs resulting from each programming task was not available from BrownGreer at the time of the Q4 budget submittal. The CAO has requested this information from the Vendor and, for future budget submittals, will include estimates of IT project costs that will tie to the IT budget. In the current budget forecast for the fourth quarter, the CAO utilized the labor assumptions provided by BG, resulting in a 24% reduction in IT costs.

August 28, 2013
Page 8

### E. Primary and Secondary Handling Rate Assumptions Are Not Calculated at Current Rates

The CAO recognizes that, given the rapid pace with which the CAO was required to revise the budget forecast model, the initially proposed Q4 2013 budget secondary handling rate (i.e. re-reviews, reconsideration, and appeals) was based upon February statistics. Since the submission of the initially proposed budget, the CAO has updated all secondary review statistics as of August 21, 2013. These model changes are reflected in Exhibit C – Budget Forecast Model Change Log.

### F. The Budget Appears to Incorporate Excessive Labor Rates

As the CAO previously stated in its July 1st Letter to Judge Barbier, contracts have been established with the Vendors whereby the Vendors charge the regular bill rate for contract labor employees (also known as 1099 employees). Neither the CAO nor the Vendors were notified by BP prior to contract execution that BP would prefer for these contract labor costs to be passed through similar to Other Direct Costs (ODCs). With these Contracts already executed with each Vendor, the CAO simply cannot request these contract labor rates and that these costs be passed through as with other ODCs. BP was involved in every step of the Vendor contract negotiations, which included onsite meetings with the Vendors. In those meetings, which were the proper forums for such discussions, BP should have raised its concerns, which could have been part of the final negotiations prior to contract execution.

### G. The Budget Incorporates Excessive Levels of Accountant Travel Expenses

As a result of ongoing discussions with PricewaterhouseCoopers (PwC), the CAO and PwC have agreed that the number of accountants traveling to the New Orleans office will progressively decrease each month within the fourth quarter. The CAO has obtained monthly

estimated travel expenses from PwC, which it has incorporated into the Q4 budget forecast. PwC's plan for decreasing its travel expenses over the fourth quarter is included in Exhibit F.

## H. The Budget Estimates BrownGreer's Claimant Communication Center and Garden City Group's Call Center to Have Activity Levels Three Times Higher than Current Experience

Because of the time constraints placed on the budget revision process set forth by the Court Order, call times presented in the initially proposed Q4 2013 budget were based on previously provided Vendor assumptions. Since the submission of the initially proposed budget, the CAO has received updated information on the CCC average call time and the Call Center average call time, both of which have been budgeted at 10 minutes each (8 minute call time and 2 minute wrap up time). These model changes are reflected in Exhibit C – Budget Forecast Model Change Log.

The CAO also disagrees with BP's assertion that the labor cost of the GCG Payment Outreach is an assumption provided by the Vendors. The July actual labor hours and costs were used as the basis for determining the Q4 budget. With only one full month of data available at the time of the budget creation, the CAO made the assumption that the labor hours and cost would remain constant throughout the fourth quarter.

## I. The Amounts Budgeted for BrownGreer's CCC and Garden City Group's Call Center Management Fees Are Excessive

The Q4 2013 budget is, in the opinion of the CAO, not excessive and reflects BrownGreer's CCC management costs as 22% of total cost. BrownGreer includes one senior counsel and seven special counsel employees under its management umbrella. These managers are responsible for overseeing 65 callers, making the staff to management ratio approximately 8:1. Similarly, the current Garden City Group call center ratio of operators to floor supervisors is

10:1. However, the Garden City Group budgeted call center managerial cost figure includes crisis managers, quality assurance personnel, and telecom support which results in a higher managerial cost.

## J.   The Proposed Budget Does Not Adequately Address Impact of Policy Holds

As the CAO has previously stated, it relies on Vendor recommendations to determine whether reviews should be suspended for claims on hold that currently have a pending policy decision.  In regards to the current Subsistence hold, the Vendor recommended, and the CAO agreed that, by continuing to process claims, value is still being added to the Subsistence review process.   While this value cannot currently be measured, claim reviewers are presently performing tasks that are essential to every Subsistence claim, regardless of pending policy outcome, which will ultimately assist in resolving the existing backlog of 23,000 claims.  In regards to projecting the effect a policy hold has on actual and budgeted performance, the CAO does not possess the ability to identify newly proposed and amended policies or the number of claims that will fall within the policy hold parameters for the projected quarter when it is required to submit the budget sixty days in advance of the quarter's commencement. Furthermore, too many external variables exist (e.g. the number of claims that fall within the policy hold parameters, the policy decision date, and ultimately the policy decision) for the CAO to accurately project when the value added for processing policy hold claims will be observed.

## K. The Budget Appears to Double Count Costs of Claim Review Time Spent by BrownGreer Employees Located at Claimant Assistance Centers (CACs)

The CAO recognizes that, due to the limited time constraints of the Court Order budget process, the initially proposed Q4 2013 budget inadvertently included "costs of claim review time spent by BrownGreer Employees" located at Claimant Assistance Centers (CACs) in the

August 28, 2013
Page 11

CAC Visitor-Specific Cost Model as well as in the Reviewer Cost Model, as indicated in BP's August 23rd letter. The CAC Visitor-Specific Model has since been revised to only include visitor-specific costs. The remaining portion of total CAC hours incurred that are not specific to claimant assistance are only included at the reviewer level in the Reviewer Cost Model. Removing the claim review task time from the Visitor-Specific Model reduced the 2013 CAC Visitor-Specific Q4 budget from $5,440,992 to $2,060,794.

In the proposed Q4 budget, the fixed monthly CAC lease payments are embedded in the expenses of BrownGreer. Due to the methodology used to calculate the proposed budget, breaking out the specific CAC lease payments and other fixed costs would have a limited benefit.

On December 1, 2013, the Apalachicola, Bay St. Louis, Biloxi, Cut Off, Lafitte, Clearwater, Fort Walton Beach, Mobile, Panama City Beach, Pensacola, and Orange Beach CAC leases expire and are up for renewal. No lump sum payments are required to renew the leases and only a portion of the CACs will see an increase in monthly lease payments. If all of the CACs were to renew their lease agreements, the monthly lease payments would increase from $75,709.77 to an estimated $76,480.58, a one percent increase in monthly costs. As such, it is still appropriate to consider the lease payments a fixed cost for each month in the fourth quarter.

Discussions between the CAO and the Vendors about closing CAC facilities have occurred; however, several reasons exist for why none of these facilities have been closed to date. First, these facilities have remained open because existing lease agreements remain in effect. The majority of CAC facility lease agreements are for a period of one year. Second, given BP and the PSC's desire that the Program maintain a presence in the Gulf Coast, the CAO has kept all CAC facilities open. It should be noted, however, that CAC staffing levels have decreased as CAC visitor traffic has decreased. This has had the effect of lowering labor costs

during the leasehold period while still maintaining a Gulf Coast presence. Further, CAC staff

has been cross-trained on different Program-related tasks in order to remain efficient when traffic

in the CACs is low. As the incoming claim volume and visitor traffic decrease at the CACs, the

CAO is considering the closing and consolidation of some centers and/or the reduction of hours

at centers. However, as of the forecasting of this budget, no plans have been developed to

consolidate centers or reduce hours, and the CACs have been budgeted at status quo.

## L. There Are Numerous Costs in the Budget Which Have Not Been Evaluated on a Cost/Benefit Basis

Since the Program inception, the Garden City Group File Audit team has worked on

performing audits on all GCCF files. Early in the Program, it was decided to audit all GCCF

files so that when a claim was filed, these files would be immediately available to the reviewer

and the claimant on the DWH portal, reducing delays in the system. The File Audit team

reviews each file to identify and remove documents that contain Personally Identifiable

Information that does not belong to the filing claimant.

The files currently being audited are taking longer to audit than the historical average

time because these claims are more complex and document-intensive. File Audit priority is

assigned using two criteria. First, priority is placed on reviewing files associated with claimants

who have filed a claim with the DWH Program. Second, smaller files receive priority over

larger files to ensure that as many claims as possible are reviewed as quickly as possible. Given

the size of the files remaining, it is currently estimated that File Audit of all GCCF files will be

complete in mid-November. This completion of File Audit is reflected in the Q4 budget

forecast.

## III. Comments Regarding the Documentation and Information Supporting the Proposed

### Budget

In accordance with the Court's August 7th Order, enclosed in this budget package is the CAO's budget for the fourth quarter and the supporting documentation used to compute the forecast. In its response to the CAO's preliminary budget forecast, BP has requested additional documentation to support future quarterly budget forecasts. Some of this information, where available to the CAO, has already been incorporated into this budget forecast. Other information, such as training costs due to turnover, has yet to be provided to the CAO by the Vendors. Also, bear in mind that the CAO may not be permitted to distribute some information to BP under the Settlement Agreement and will need to work with both Parties to determine what data is allowed for distribution. Within this constraint, however, the CAO is committed to working with BP to provide as detailed a quarterly budget package as possible.

BP has also requested supporting information on a monthly basis. As discussed in prior meetings between BP and the CAO, given the time constraints of this budget revision process, much of this requested information has been unavailable to the CAO simply because it has never been tracked by Vendors at such a detailed level. Again, the CAO will also face many of the same issues regarding the information requested on a quarterly basis, namely that the CAO may not be permitted to distribute certain information to the Parties under the Settlement Agreement. This information will, if allowed by the Settlement Agreement, be incorporated into future monthly reports and quarterly budgets, producing a more accurate forecast provided to BP as it becomes available to the CAO.

The CAO reiterates that these requests have not been the focus throughout this process. Pursuant to the August 7th Court Order, the development of an accurate revised budget forecast

August 28, 2013
Page 14

and its supporting documentation has been the CAO's primary priority.  The CAO will work

with the Vendors in the coming months to provide BP with the supporting documentation as

requested.

Sincerely,

David Odom
CEO

Cc:   Magistrate Judge Shushan
      Stephen Herman
      James Roy
      Keith Moskowitz
      Patrick Juneau
      Bob Levine
      Kirk Fisher

# Exhibit 10

# System Performance - Claims Review

BrownGreer, Garden City Group, Postlethwaite & Netterville, PricewaterhouseCoopers

Update as of June 14, 2013



Notes:
1. Based on reviews per reviewer per month
2. Red bar target represents average reviews completed per month per reviewer based on modeled durations
3. Dark blue represents actual reviews per reviewer per month
4. Subsistence actual reviews per reviewer should improve as the system matures

# Exhibit 11



| | Keith Moskowitz | keith.moskowitz@dentons.com | Salans FMC SNR Denton |
| | Partner | D +1 312 876 8220 | dentons.com |

Dentons US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606-6306 USA

T +1 312 876 8000
F +1 312 876 7934

June 7, 2013

**BY E-MAIL**

Mr. Patrick Juneau
Claims Administrator
935 Gravier Street
Suite 1905
New Orleans, LA 70112

Re:   Analysis of Immediate CSSP Cost Saving Opportunities

Dear Mr. Juneau:

Based on the information that BP has received from the Court Supervised Settlement Program ("CSSP") regarding the Court Supervised Vendors, it appears that BrownGreer PLC ("BG"), Garden City Group, Inc. ("GCG") and Postlethwaite & Netterville APAC ("P&N") (collectively the "CSSP vendors") rely on large numbers of independent contractors to staff their respective operations.[1]  Based on a review of billing records and other information, it also appears that the CSSP vendors are marking up the independent contractors' hourly rates and billing the Settlement Trust at two to three times the hourly rates that a local staffing agency would generally bill for those same independent contractors' services ("Vendor Markup"). While we do not know the exact amount of the Vendor Markups, as discussed below, based on available information and billing data, we estimate that the CSSP Vendor Markups may be accounting for as much as $14 million dollars per month in costs incurred by the Settlement Trust.  These Vendor Markups reflect pure profit for the CSSP vendors and provide no value to the CSSP, the Class or BP.

The Vendor Markups can be avoided by either requiring the CSSP vendors to pass through their direct costs of the independent contractors without any Vendor Markup or, as discussed below, by having the Settlement Trust contract directly with independent contractors (or respective staffing agencies) for the services the independent contractors are currently providing. Importantly, neither approach causes any impact on CSSP operations nor will it require you, in your capacity as Claims Administrator and Trustee of the Settlement Trust, to take on any additional responsibilities related to these independent contactors.

This letter summarizes our analysis of the Vendor Markups and also proposes a transition process, if necessary, to have the Settlement Trust contract directly with the independent contractors and/or staffing agencies.  As described below, under the proposed transition process, all human resource, administrative and other management responsibilities related to these independent contactors

_____

[1] It appears that some of the independent contractors are being provided by staffing agencies, but the CSSP vendors are directly contracting with independent contractors as well. BP does not know the ratio of independent contractors that are being directly retained versus those being provided through staffing agency agreements.



Mr. Patrick Juneau
June 7, 2013
Page 2

Salans FMC SNR Denton
dentons.com

will remain with the CSSP vendors that currently retain these contractors and the CSSP vendors will be compensated at fair market rates for continuing to perform those responsibilities.

Consistent with your fiduciary obligations as Trustee of the Settlement Trust, we anticipate that you will review the information in this letter and take steps necessary to eliminate any unnecessary Vendor Markups.

## I. CSSP Vendor Markups As Compared to Local Staffing Agency Rates

Based on the billing information you have provided us and our informed estimation of rates available in the market, BG, GCG and P&N appear to include average Vendor Markups of 200% to 231% on their independent contactor employees on top of the rates generally charged by local staffing agencies for those independent contractors.

The chart below summarizes the analysis:

| Vendor | Avg. Rate for Contractor As Billed by CSSP Vendor | Estimated Avg. Contractor Rate Charged by Local Staffing Agency[2] | Estimated CSSP Vendor Markup on top of Local Staffing Agency Rates ($) | Estimated CSSP Vendor Markup on top of Local Staffing Agency Rates (%) |
|---|---|---|---|---|
| BG | | | | 200% |
| GCG (excluding call center)[3] | | | | 219% |
| P&N | | | | 231% |

Based on our review of the billing information, the CSSP vendors do not appear to have any overhead related to these independent contractors and the Vendor Markups represent pure profit for the CSSP vendors (i.e., the Vendor Markup is not offsetting costs related to identifying potential contractors, screening applicants, administrating payroll, etc., which are being incurred by the staffing agencies). Absent some administrative function that CSSP vendors are performing warranting compensation for overhead that they are not already being compensated for, the markup of an independent contractor's rate solely to generate profit is wholly inappropriate under the circumstances.[4]

---

[2] Estimated actual average rates of independent contractors reflects the average rate of an independent contractor inclusive of the average markup percentages applied by local staffing agencies. The estimated average rates were determined by analyzing the types of positions for each CSSP vendor: low skill level, medium skill level, and high skill level. For each category, an analysis of rates paid to contractors and average markup percentages used by staffing agencies were used to calculate estimated rates.

[3] GCG has also subcontracted APAC Customer Services, Inc. ("APAC") to provide end-to-end resources for the CSSP call center operations (e.g., facility, technology infrastructure, call center staffing, management). GCG is billing the CSSP          per hour for APAC's call center representatives' time, regardless of the call volume. Because a market-based contract should charge $0.55 per minute of live call time, rather than an hourly rate, we address the call center contractors separately below.

[4] If for example, CSSP vendors are directly hiring independent contractors and are not otherwise billing for the administrative time necessary to identify and screen candidates, some Vendor Markup may be appropriate, but only



Mr. Patrick Juneau
June 7, 2013
Page 3

Salans FMC SNR Denton
dentons.com

## II. Estimated Cost Savings Created By Avoiding the CSSP Vendor Markups

To quantify the estimated opportunity for cost savings, we identified independent contractors employed by the CSSP vendors, projected a future contractor headcount and workload based on current trends, and then calculated future labor costs based on an estimated labor rate stripped of the CSSP Vendor Markup. Based on currently available information, the forecasted estimated cost savings are as follows:[5]

| Vendor | Forecasted Contractor Headcount | Forecasted Monthly Hours | Avg. Rate for Contractor As Billed by CSSP Vendor | Estimated Avg. Contractor Rate Charged by Local Staffing Agency | Monthly Potential Cost Savings[6] |
|---|---|---|---|---|---|
| BG | 1,320 | 180,000 | | | $7,400,000 |
| GCG (excluding call center) | 430 | 54,000 | | | $3,750,000 |
| P&N | 125 | 24,000 | | | $2,060,000 |

| | |
|---|---|
| **Subtotal:** | $13,210,000 |
| **Estimated Call Center Saving[7]:** | $760,000 |
| **Total:** | $13,970,000 |

The monthly potential cost savings above only reflect the elimination of the CSSP vendor markups and are not generated by comparing current costs against future projected costs.

## III. Proposed Process to Eliminate CSSP Vendor Markups By Transitioning Independent Contractors to Contract Directly With The Settlement Trust

### 1. Establish Team Workflow

The only change to the current organizational structure under this proposed process is that CSSP vendors will assign their respective independent contractor agreements and/or staffing agency agreements to the Settlement Trust. To minimize any impact on the claims processing operation, the CSSP vendors should continue to be responsible for all of the managerial and administrative functions

---

at a commercially reasonable market rate and not the extraordinary Vendor Markups apparently being charged by the vendors today.

[5] BP has requested, but has yet to receive, amounts that vendors pay each contractor. Projected savings could be significantly impacted if there are fewer independent contractors and more employees than estimated, or if the actual rates paid to contractors significantly differ than estimated amounts. Receiving this information will improve the accuracy of our analysis but we do not anticipate that the information will change our conclusions and recommendations.

[6] To be conservative, the Monthly Potential Cost Savings reflected in this column are reduced to account for any negative externalities associated with the transition process.

[7] The APAC contract provided to BP by GCG has redacted pricing information so it is unclear whether GCG is being billed by APAC on an hourly basis or on actual usage basis. If GCG is arbitraging the two pricing structures (i.e., charging CSSP based on hourly rates and paying APAC pursuant to a market-based per-use rate), employing APAC directly would result in an additional $760,000 in monthly savings to the Settlement Trust. In any event, transitioning to a market-based contract would yield significant savings.



Mr. Patrick Juneau
June 7, 2013
Page 4

Salans FMC SNR Denton
dentons.com

they currently perform. This includes, for example, interacting with contractors and/or staffing agencies, interviewing and hiring independent contractors, managing and overseeing contractor performance, managing administrative contracting issues, obtaining detailed timesheets from their respective contractors; preparing reports detailing time and contractor fees (without any Vendor Markup); submitting those reports to your Office for review and payment; maintaining payroll records as necessary, preparing and delivering payroll checks to their respective contractors and/or paying staffing agencies for independent contractors provided though those arrangements. Any new independent contractors hired by any CSSP vendor onto the project will, as a matter of legal technicality, contract with the Settlement Trust. Vendors will continue to be responsible for vetting potential new hires, making hiring decisions and facilitating the completion of all of the necessary paperwork that currently is required as part of the on-boarding process.

Because the CSSP vendors will be retaining all of the managerial and administrative burdens they currently are responsible for servicing, the CSSP vendors should continue to be allowed to bill the CSSP for time necessary to complete those tasks, as they are currently doing.[8] To the extent CSSP vendors have other administrative costs incurred not otherwise compensated through hourly fees (e.g., wire transfers, check stock, check printing and mailing; incremental fees associated with payroll systems, etc.), CSSP vendors should continue to receive reimbursement for those costs. However, we expect those costs to be very limited.

### 2. Confirm Banking Relationships

The Settlement Trust will be directly contracting with additional entities (i.e., APAC for call center services and possibly some staffing agencies), and those payees will need to be added to the Settlement Trust Administrative Expense Fund. These are relatively minimal adjustments to the current banking structure and should not impose any undue burden on the Settlement Trust or the CSSP vendors.

Because each CSSP vendor will receive funds for their own fees as well as any funds to cover the payroll of the independent contractors retained directly by the CSSP vendor, the Settlement Trust will need to confirm with the CSSP vendors that current banking relationships are sufficient to effectuate the process. By way of example, for ease of accounting, CSSP vendors may prefer separate accounts be established to receive wire transfers for independent contractor payroll. We are glad to assist you with respect to these issues.

### 3. Develop Communications Informing Independent Contractors and/or Staffing Agencies of the Transition

The Claims Administrator and Settlement Trust will need to inform the independent contractors and/or staffing agencies of the administrative change in the employment and/or retention agreements.

---

[8] For BrownGreer, we estimate total monthly administrative costs to be approximately $94,000. This is based on an estimated six full-time employees allocated to human resources administration and invoice/ payroll administration                         For Garden City Group, we estimate total monthly administrative costs to be approximately $45,000. This is based on an estimated three full-time employees allocated to human resources administration and invoice/ payroll administration
         For P&N, we estimate total monthly administrative costs to be approximately $29,000. This is based on an estimated two full-time employees allocated to human resources administration and invoice/ payroll administration

**DENTONS**

Mr. Patrick Juneau
June 7, 2013
Page 5

Salans FMC SNR Denton
dentons.com

This communication should include a straightforward explanation that the independent contractors' employer will change as a matter of legal technicality, but all other aspects of the existing employment relationship will remain the same. The communication should clearly articulate that the contractors' current supervisors at the respective CSSP vendors shall retain all the same authority they currently possess. To the extent that the independent contractors' contracts or the agency staffing agreements are not assignable, the communication will also need to inform them of the need to terminate their existing agreements with the CSSP vendors and to sign a revised contract amending the name of their employer. We are glad to provide you a proposed template for this communication piece.

### 4.     Sign New Contracts / Assign Existing Contracts

We expect that the CSSP vendors will be able to assign contractor and/or agency staffing agreements to the Settlement Trust. If not, the Settlement Trust may need to enter into new agreements with such contractors and/or staffing agencies. Preparing new contracts will not impose an undue burden on the Settlement Trust, and we are glad to assist you in preparing the necessary contracts.

As stated above, this proposal eliminates the excessive Vendor Markups currently being incurred by the Settlement Trust, compensates existing vendors for the administrative and human resource related services they will continue to provide and does not impact the CSSP's operations in any material way. We believe that eliminating these Vender Markups in the manner described in this letter are consistent with the terms of the Settlement Agreement and your fiduciary obligations owed as the Trustee of the Settlement Trust.

If you have any questions regarding this letter or our analysis, we can provide additional details as necessary.

Sincerely,

Keith Moskowitz

# Exhibit 12

## EXHIBIT A

### BP's Minimum Proposed Revisions to 2013 Fourth Quarter Budget
### Submitted at September 4, 2013 Panel Meeting

On August 16, 2013, the Claims Administrator's Office ("CAO") submitted its initial 2013 fourth quarter ("Q4") budget, which totalled over $119,000,000. On August 23, BP sent the CAO a letter indicating that the initial Q4 budget was unreasonable and excessive under the circumstances and provided detailed comments and proposed revisions to the budget proposal.

The CAO submitted a revised Q4 budget on August 28 totalling over $131,000,000.

BP maintains the Q4 budget is excessive and unreasonable for all of the reasons identified in its August 23 letter.[1] In particular, the budget relies on untested assumptions and contains unsubstantiated costs that BP cannot reasonably evaluate without a thorough operational review and examination (as BP is entitled to pursuant to the Settlement Agreement, the Settlement Trust, the CSSP contracts, and applicable law) including an analysis of the validity of the CSSP Vendors' assumptions. Notwithstanding this lack of information, BP has identified specific revisions to the Q4 budget as detailed in the following table.

|    | Minimum Required Q4 Budget Revisions | Estimated Cost Impact on Q4 Budget |
|----|--------------------------------------|-----------------------------------|
| 1. | *Eliminate unsupported, 99 full-time equivalent (FTE) increase in accountants for BEL claims* | ($11.14)M |
| 2. | *Increase BEL accountant productivity [2]* | ($12.97)M |
| 3  | *Dramatically reduce projected Q4 Seafood claim staffing to reflect CAO's projected elimination of claim backlog[3]* | ($8.55)M |
| 4. | *Adjust task utilization rate for non-BEL claim types to* | ($1.31)M |

---

[1] BP recognizes that the CAO appears to have corrected the double counting of claim review time spent by BrownGreer employees located at Client Assistance Centers, as well as other calculation errors BP had identified.
[2] Determining an appropriate productivity target requires an operational review and examination. BP requests the budget be reduced immediately to reflect the only target that has been presented by the Vendor's themselves -- 1.5 BEL determinations per accountant per week. (June 4, 2013 P&N Memorandum to P. Juneau regarding "BP Requested 'Performance Study -- BEL Claims/Accounting Costs'".) BP maintains its position that the BEL claims determinations process is inefficient and does not make any representations that the target of 1.5 BEL claim determinations per accountant per week is a reasonable target. This calculation was achieved by reducing the accountant hours in the process duration calculation to 28.3 for BEL claims, although other assumptions could be also be changed to achieve this productivity level.
[3] The current model projects 205 FTEs for Seafood determinations. Based on the projected Seafood claim submittals and Q3 determinations, all Seafood claims are projected to be resolved prior to the start of Q4. The estimated cost reduction leaves residual costs for estimated re-reviews, reconsiderations, and trailing incomplete responses. The tab [Measured Page] erroneously projects determinations in excess of remaining seafood claims throughout Q4, resulting in an overstatement of required claim reviewer hours.

| | equal BEL claim utilization rate[4] (after the impact of revision 3) | |
|---|---|---|
| 5. | Only perform GCCF file audit activity for those GCCF claimants filing CSSP claims | ($1.26)M |
| 6. | Eliminate Brown Greer IT development spending until further requested information is provided[5] | ($1.95)M |
| 7. | Adjust BG and GCG call center staffing levels based on 10 minute call duration[6] | ($2.01)M |
| 8. | Reduce Q4 BG and GCG administrative costs in line with budgeted Q4 labor costs (after the impact of revision 3 and 4)[7] | ($1.25)M |
| 9. | Reduce unallocated contingency fee from 5% to 1%, fix calculation errors[8] and calculate off reduced proposed budget amounts | ($5.23)M |
| 10 | Reduce labor rates to address the unknown and undisclosed mark-ups[9] | Unquantifiable because the Vendors refuse to disclose amount of mark-ups |
| 11 | Reduce BG administrative budget[10] | Unquantifiable |

---

[4] BP maintains its position that even an 80% task utilization rate is too low and an operational review and examination is required to determine an appropriate task utilization rate. The task utilization rate of 75% for non-BEL claim types is inconsistent with the BEL utilization rate of 80.1%. The proposed adjustment is supported by a best practice of maintaining consistency within the model unless specific data supports an alternative assumption. The estimated reduction represents the non-duplicative impact of the task utilization rate adjustment after the hours related to Seafood claim review are removed from the CAO's model.

[5] As explained in previous correspondence and meetings with the CSSP, BP does not have enough information to determine if these IT costs are necessary. BP will provide funding for BrownGreer IT development spending subject to (1) BrownGreer and/or the CSSP providing project-level budgets; (2) review and approval of those project-level budgets by Chris Reade of the CAO; and (3) BP's rights to review and consent to the project-level budgets under the Settlement Agreement.

[6] The CAO's written response from 8/28 confirms that average call duration is 10 minutes; however the model fails to adjust the optimal staffing needs based on the new call duration assumptions.

[7] The model establishes that GCG administrative costs generally run between 15% and 18% of labor costs; however, the administrative cost projections are calculated off of Q2 actual labor costs as opposed to projected Q4 labor costs. The estimated reduction corrects for the calculation error and accounts for further reductions resulting from additional labor cost reductions identified in proposals 3 and 4.

[8] The contingency fee calculation in the 8/28 Q4 budget contains a formula error in cells K42 and M42 of tab [Q4 CSSP], resulting in the inclusion of additional fixed costs in the calculation.

[9] See June 9, 2013Letter from K. Moskowitz to P. Juneau.

[10]The administrative budget is forecasted as a percentage of reviewer costs. As a result, a detailed description of these activities is not available. BP will provide funding BG Administrative costs subject to (1) BrownGreer and/or

These revisions amount to a total budget reduction of at least $45,600,000, resulting in a Q4 budget of no more than $85,600,000. BP believes that an operational review and examination will reveal further opportunities for budget reductions, while retaining or improving efficiency levels within the CSSP.

the CSSP providing task level budgets and (2) BP's rights to review and consent to the task-level budgets under the Settlement Agreement.

# Exhibit 13



September 5, 2013

Maria Travis
BP America Inc., Director of Claims
Gulf Coast Restoration Organization
501 Westlake Park Blvd.
Houston, TX 77079

Dear Maria,

The Claims Administrator's Office (CAO) is in receipt of BP's Proposed Revisions to the 2013 Fourth Quarter budget, a copy of which is attached as Exhibit "A," submitted at the September 4th, 2013, Panel Meeting which was assembled pursuant to Magistrate Judge Shushan's August 7th, 2013 Court Order "Regarding BP's Obligation to Fund Claims Administrator's Proposed 4th Quarter 2013 Budget".  In its submission, BP lists several proposed revisions to the CAO's fourth quarter budget submittal.  This letter will address the following: 1) the confirmation of the CAO's understanding of those proposed revisions, 2) the establishment of the CAO's position regarding each of those revisions, and, 3) where applicable, the documentation of the budgetary adjustments made by the CAO in the Panel Meeting pursuant to BP's recommendations along with the CAO's revised budget which is attached as Exhibit "B." Below are BP's Proposed Revisions to the Q4 2013 Budget and the CAO's response.

1.  **Eliminate unsupported, 99 full-time equivalent (FTE) increase in accountants for BEL claims (Estimated Cost Impact of $11.14M)**

The CAO agrees to remove funding for the 99 additional accountants from the Q4 2013 budget and will revisit this line item in the Q1 2014 budget pending additional analyses.  As discussed in the Panel Meeting, the CAO stands ready to perform Time and Motion studies and will share the results of these studies as appropriate with BP to further validate data in

the budget forecast model and in any adjustments to the 99 accountant figure for the Q1 2014 budget submittal.

This concession results in an $11.16 million reduction to the Q4 2013 budget.[1]

## 2. Increase BEL accountant productivity (Estimated Cost Impact of $12.97M)

While increasing the productivity of BEL accountants would possibly result in a decrease in claim backlog, this would have no impact on the fourth quarter budget forecast as submitted by the CAO.

As discussed in the Panel meeting, while increasing the productivity of the Program accountants would result in an overall savings to the Program, there would be no impact to the Q4 2013 budget as there is a significant backlog of claims to be processed. Savings will be achieved in future budgets as the backlog is decreased and an FTE reduction strategy is employed.[2]

The CAO will continue to gather detailed information and stands ready to perform Time and Motion studies on the accounting review process to validate the accuracy of current model drivers. The CAO will also continue to work with the Program accountants and drive towards a more efficient operation for more expedient claims processing and for cost savings to the Program.

There is no cost savings to the Q4 2013 budget associated with this strategy.

## 3. Dramatically reduce projected Q4 Seafood claim staffing to reflect CAO's projected elimination of claim backlog (Estimated Cost Impact of $8.55M)

The CAO agrees to reduce the number of FTEs performing Seafood reviews in the budget forecast from 205 FTEs to 100 FTEs.

---

[1] The figure presented by BP and presented as a concession in the Panel meeting was $11.14 million, but upon further analysis of the budget model, the number is actually $11.16 million.
[2] The CAO acknowledges that an increase in accountant reviewer productivity may help reduce the cost of the Program on a long term basis by lowering the claim backlog more rapidly and thus decreasing the overall duration of the Program. However, for purposes of the Q4 2013 budget forecast, BEL accountant productivity is not relevant.

The budget model forecasted that 205 Seafood reviewers were required to achieve desired Seafood processing targets.  Rather than increasing Seafood review staff as dictated by the budget model to 205 total FTEs, the CAO determined that maintaining the current staffing level of 100 FTEs would be sufficient.

Given that the processing of Seafood claims is nearing an end, continuous evaluations of the FTE count dedicated to Seafood processing will be performed as more detailed studies are conducted by the CAO, and reductions will be employed in future quarters as reasonably appropriate.

This concession results in a $5.47 million reduction to the Q4 2013 budget.[3]

**4.  Adjust task utilization rate for non-BEL claim types to equal BEL claim utilization rate (after impact of revision 3) (Estimated Cost Impact of $1.31M)**

The CAO does not currently have adequate information to determine at exactly what level the task utilization rate for each claim type should be set.  Given the effect on staffing levels and claim backlog, the CAO cannot unilaterally adjust task utilization rates without additional information and further discussion.

The CAO stands ready to perform Time and Motion studies in its operational review to determine the appropriate task utilization rates.   Once these additional analyses are performed and accurate information is gathered, the CAO will address the task utilization rate of each claim type as reasonably appropriate in the Q1 2014 budget submittal.

**5.  Only perform GCCF file audit activity for those GCCF claimants filing CSSP claims (Estimated Cost Impact of $1.26M)**

The decision to perform a file audit on all GCCF files was a decision made pursuant to Section 4.4.2 of the Settlement Agreement.

---

[3] The figure presented by BP and presented as a concession in the Panel meeting was $5.1 million, but upon further analysis of the budget model, the number is actually $5.47 million.

Per this Section, in November 2012, the CSSP sent each GCCF claimant a letter pursuant to Section 4.4.2 of the Settlement Agreement, discussing how the claimant could see all documents he or she had submitted previously in the GCCF and how to determine what additional documents the claimant needed to submit to the CSSP.  The letter explained that the claimant would have immediate access to all documents on file, as soon as he or she entered the GCCF claim number into the CSSP's online filing system.

The ability of the claimant to instantly access all previous GCCF information was viewed as preferable to other less favorable options.[4]

The CAO recommends continuing with the proactive conversion of these GCCF files, which will be complete in November of this year.

## 6.  Eliminate BrownGreer IT development spending until further requested information is provided (Estimated Cost Impact of $1.95M)

In reality, this proposed revision would downsize the BrownGreer IT development staff until a project-level budget has been produced by BrownGreer, submitted to the CAO, and finalized in discussions by BP at which point the BrownGreer IT staff would be required to "upsize" to perform the projects itemized in that budget.  This would have a largely adverse impact on the Program, as we have a continuing need to make modifications to the systems for policy and process changes, efficiency improvements, and IT security.

The CAO has requested information concerning the ongoing projects performed by the BrownGreer IT development department; however, given the time constraints of the budget revision process, BrownGreer has not been able to compile the detailed project-level budget forecasts at this point.

---

[4] The alternative to the approach adopted by the CAO included the examination of each GCCF claim and its associated files to determine what additional documentation that claimant was required to file in order to satisfy the requirements for each of the twelve claim types as dictated by the Settlement Agreement.  These additional documentation requirements would then be relayed to the claimant.  This alternative was viewed as inferior to the approach adopted by the CAO for two reasons: 1) it was significantly more labor-intensive and 2) it resulted in a delay between the time when the claimant filed with the CSSP and when that claimant could view his or her claim file online.

The CAO therefore recommends this issue be postponed until further discussions related to the Q1 2014 budget forecast, at which point the required information will be available to the CAO and provided to BP as appropriate.

## 7. Adjust BG and GCG call center staffing levels based on 10 minute call duration (Estimated Cost Impact of $2.01M)

Garden City Group Call Center average call time is currently at ten minutes, as indicated in the budget forecast model. These calls include standard inbound and outbound calls that involve similar dialog and skillsets for each call.

BrownGreer's Claimant Communication Center (CCC) handles additional functions beyond inbound and outbound calls to include claim research, claim status updates and summaries, Portal navigation assistance, and resolution of escalated claimant concerns. The CCC also collaborates with the Claimant Assistance Centers (CACs) to schedule claimant visits, facilitate claim filing and document submission, and resolve additional questions related to the claims process.

Unlike the Garden City Group Call Center budget forecast, the BG ten minute call time does not directly affect the budget because the BrownGreer CCC call staff is carrying out additional functions; therefore, no direct correlation exists between this ten minute call time and the BrownGreer CCC budget forecast.

The CAO believes that the budget forecast model accurately reflects the appropriate call activity for the Garden City Group Call Center and the BrownGreer Claimant Communication Center.

## 8. Reduce Q4 BG and GCG administrative costs in line with budgeted Q4 labor costs (after impact of revision 3 and 4) (Estimated Cost Impact of $1.25M)

Similar to previous Proposed Revisions related to these administrative costs, the CAO needs more information before it can reasonably make informed decisions related to the administrative costs of BrownGreer and Garden City Group.

August 28, 2013
Page 6

While its operational review is performed and additional information is gathered, the CAO recommends this issue be postponed until further discussions related to the Q1 2014 budget forecast at which time the results of the analysis will be available.

9. **Reduce unallocated contingency fee from 5% to 1%, fix calculation errors[5], and calculate off reduced proposed budget amounts (Estimated Cost Impact of $5.23M)**

The CAO maintains that some contingency is essential given the possibility that unforeseeable incidences, such as the Freeh investigation, will undoubtedly arise. These are particularly time and cost intensive from a management perspective. For these reasons, some contingency is necessary.

Despite this, the CAO has conceded to lowering the contingency from 5% of variable costs to 2.5% of variable costs in a good faith effort to compromise with BP.

This concession results in a $3.44 million budget reduction to the Q4 2013 budget.[6]

10. **Reduce labor rates to address the unknown and undisclosed mark-ups (Estimated Cost Impact : Unquantifiable)**

As stated in our August 28, 2013 letter, Contracts have been executed with the Vendors including labor rates for Vendor employees and 1099 contract employees. BP was present at these negotiations, which were the appropriate for such discussions. Prior to Contract execution, BP could have requested lower rates for these 1099 employees or to treat them as Other Direct Costs, which are pass-through expenses. We now must honor those Contracts and pay the rates therein. Therefore, there is no possible concession in this area.

11. **Reduce BG administrative budget (Estimated Cost Impact:  Unquantifiable)**

---

[5] The formula oversights in cells K42 and M42 of tab [Q4 CSSP] have been corrected so as to not include any additional fixed costs in the calculation of the contingency. This resulted in approximately a $45,000 (0.035%) decrease in the total budget forecast.

[6] The figure presented to BP in the Panel meeting was $2.62 million, but upon further analysis of the budget model, due to reductions in variable costs in other concessions, the number is actually $3.44 million.

Similar to Proposed Revision number 8, the CAO needs to conduct additional studies before it can reasonably make an informed decision related to the administrative costs of BrownGreer.

Until its full operational review is performed and additional information is gathered, the CAO recommends this issue be postponed until further discussions related to the Q1 2014 budget forecast.

In summary, and in response to BP's proposed revisions to the Q4 2013 budget, the CAO has made a total of $20.07 million in reductions to the Q4 2013 proposed budget, reducing the overall budget to $111.16 million.[7]  It should also be noted that this represents a reduction of $19.16 million from the Q3 2013 $130.32 million budget.   The remaining items with the exception of item 10, Labor Rate Reduction, will require further analysis, which could not be conducted in the timeframe allotted for the Q4 2013 budget revision process.

Indeed, the CAO has requested additional funding, as part of the Claims Administrator's line item in its Q4 2013 budget submittal (an increase of $1.44 million), to hire staff in order to conduct the Time and Motion studies referenced in this letter.  And as explained in the Panel Meeting, we anticipate that the first analysis will take 60 days to complete from the date we hire the additional staff.  In the Panel Meeting, Maria Travis stated that BP had no objection to this line item increase as part of our analysis.  While we understand that other items in the budget are still in dispute, we have sent an email yesterday asking BP to respond by email that BP does agree to this particular budget line item increase so that we may immediately add the necessary staff to meet the scope and schedule requirements of these studies.  We ask that BP respond quickly as the Q1 2014 budget submittal is in less than 60 days and delays in adding the required staffing will impact our ability to produce the studies needed for the Q1 2014 budget forecast.

Also, as discussed in the Panel meeting, the CAO continues to work with BP towards a more detailed budget process supported by further analysis including the Time and Motion studies as

---

[7] The reduction of $18.94 was presented at the Panel meeting but has increased to $20.07 million due to various factors as discussed in footnotes 1, 3 and 6.

August 28, 2013
Page 8

part of the ongoing operational review of the Program. As part of this process, we will work with

BP to identify additional studies and detailed data needed for future budget forecasts.

Sincerely,

David Odom
CEO

Cc:     Magistrate Judge Shushan
        Stephen Herman
        James Roy
        Keith Moskowitz
        Patrick Juneau
        Bob Levine
        Kirk Fisher