# Exhibit F

**bp**

**Mark Holstein**
Managing Attorney
BP Legal – Litigation

BP America Inc.
P.O. Box 3092
Houston, Texas 77253

501 WestLake Park Blvd.
Houston, Texas 77079-2607
Mail Code 17.130

Direct: 281-366-8895
Fax:     281-366-3491
Mark.Holstein@bp.com

June 21, 2013

**Via E-Mail**

The Honorable Carl J. Barbier
United States District Judge
United States District Court, Eastern District of Louisiana
500 Poydras Street, Room C-256
New Orleans, LA  70130

Re:     *Deepwater Horizon Court Supervised Settlement Program -- Request for Examination*

Dear Judge Barbier:

BP has been evaluating the administrative activities, policies, procedures and controls of the Court Supervised Settlement Program (the "CSSP"), for which BP provides all funding under the Settlement Agreement.  This ongoing review has included consideration of documents, data, claims, claim appeals and other information provided by the CSSP, as well as recent meetings with the Claims Administrator's Office (the "CAO") and CSSP vendors BrownGreer PLC ("BrownGreer"), Garden City Group, Inc. ("GCG"), PricewaterhouseCoopers LLP ("PwC") and Postlethwaite & Netterville APAC ("P&N").  Based on those meetings and our analysis of the information provided to us by the CAO, we question whether the CAO is exercising appropriate professional oversight and supervision of the CSSP.  Specifically, we have significant concerns regarding what appear to be (1) inadequate operational controls; (2) significantly higher than expected administrative costs and expenses; (3) substantially lower than expected claim processing efficiencies and productivity; and (4) inadequately funded, insufficient processes to detect and prevent fraud, waste and abuse.

BP's concerns about these management issues have been heightened by the troubling allegations that have recently come to light regarding misconduct by a senior CAO employee that *may have* impacted significant CSSP policy decisions, improperly influenced claims outcomes and resulted in the payment of fraudulent, excessive or improper claims.  At minimum however, these issues have resulted in an extremely costly and underproductive program.  Simply by way of comparison, the per claim administrative costs incurred by the CSSP are significantly higher than the per claim costs incurred by the Gulf Coast Claim Facility ("GCCF").  Furthermore, the rate of productivity of the CSSP appears to be lower than the productivity of the GCCF.

200597v1

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 2 of 11

Given these serious concerns and in light of the overall administrative complexity of the program, BP respectfully requests that a full examination of the CSSP be undertaken promptly to assess the efficacy of the CAO's entire management operation, including but not limited to the CAO's internal operating procedures and vendor governance protocols. The examination should identify any necessary recommendations for improvement as appropriate. We believe that an appropriate examination will lead to significant opportunities for improving the quality, efficiency and integrity of CSSP operations, reduction of disruptive staff turnover, greater consistency in claims determination, better decision making and, potentially, more expedited claims processing.

This proposed examination is not duplicative of the recent audit completed by CliftonLarsonAllen ("CLA").[1]  Unlike the proposed examination, which would provide an opinion, *inter alia,* on the effectiveness of operational processes of the CAO and the efficiencies of the entire CSSP, the recently completed CLA audit was limited to essentially testing whether CSSP processes were resulting in accurate claims evaluations. The CLA audit was not designed and did not attempt to evaluate the CAO's operational protocols, particularly those of the type that relate to the current allegations against a senior CAO employee, the CAO's overall management of the CSSP vendors, or the processes to mitigate fraud, waste and abuse. In short, the CLA audit does not address the issues raised by BP in this letter.

Notwithstanding its differing scope, the utility of the CLA audit is questionable, even as to its intended purpose. Either because of an inadequate scope caused by cost constraints imposed by the CAO or simply a flawed design, the CLA audit was conducted with such a high margin of error and deficient sample selection methodology that meaningful conclusions cannot be drawn from it, even as to the factors it purports to measure. Moreover, although the CLA report identifies a number of areas of potential concern, it does not perform any further investigation on those issues and presents an opinion of "minor improvements needed" that may be unfounded.

For all of the reasons set forth above and discussed in more detail herein, a complete examination (which may include as a component some level of accounting audit) of CAO management and its operational protocols, is necessary and should be initiated posthaste. This examination should benefit the CAO, the CSSP as well as the Class and BP.

I.      **The CSSP Is Operating With Extremely High Costs and Low Productivity.**

In its April 25, 2013, budget presentation, the CAO provided information showing the average monthly administrative cost of the CSSP of $39.74 million as compared to the average monthly administrative costs of the GCCF of $47.94 million. The statistic is somewhat misleading, however, because most of the difference between average program costs is simply attributable to the fact that the CSSP has virtually eliminated using a vendor dedicated to fraud analysis. When excluding the fraud costs from the GCCF figure, the average monthly CSSP costs are

---

[1] On May 17, 2013, CLA issued its report titled, *Deepwater Horizon Economic Claim Center Independent Evaluation of the Internal Control Environment*, describing the methodology and audit recently completed.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 3 of 11

running at 93% of GCCF costs.  In any event however, missing from the CAO presentation was any measure of productivity achieved by the program.

Based on our analysis of the information provided by the CSSP, on average, the CSSP has resolved 8,412 claims per month as compared to 22,325 claims per month by the GCCF.[2] Since its inception, the CSSP's most productive month was March 2013, when it began issuing Business Economic Loss ("BEL") denials for incompleteness, where it achieved a total of 15,467 resolutions.  In contrast, the GCCF's most productive month resolved 62,071 claims, excluding emergency payments.  In total, the GCCF experienced seven months where (non-emergency) resolutions exceeded the CSSP's most productive month.  These results are summarized below:

| Measure | Weighted GCCF Average | Weighted CSSP Average |
|---|---|---|
| Costs Per Paid Claim[3] | $3,030 | $11,975 |
| Costs Per Resolved Claim[4] | $1,972 | $5,032 |
| Claim Resolutions Per Month | 22,325 | 8,024 |

Once these productivity measures are considered, the nearly equivalent average monthly costs of the two programs is not a positive observation of the CSSP and rather highlights that the CSSP is significantly more costly than the GCCF overall.

**II.  The CAO Does Not Appear to Employ An Expense Management Plan.**

As discussed in detail below, our overall observation after having reviewed CSSP's information and meeting with the CSSP vendors is that the CAO does not appear to have any effective strategy regarding expense management and the vendors appear to be operating without meaningful direction from the CAO as to the most efficient way to operate as an integrated system.  As a complex program with four vendors attempting to work in concert, the overall management of the system is critical.  Instead, the management teams for each vendor are being left almost entirely to set their own goals and performance measures and appear to make collective ad hoc adjustments to processes without any holistic or empirical consideration of costs or efficiencies.

In order to properly manage a claims program of this magnitude, detailed budgets for cost and performance measures should be established.  Actual results should be measured against those budgets.  Periodic (e.g., monthly) performance reviews of budgeted vs. actual results

---

[2] This analysis controls for the increased number of "claims" a single claimant may have had under the GCCF (i.e., a single claimant may have an EAP claim, an interim payment and a final payment) by excluding emergency payments and by counting a claimant who may have received interim and/or final payments as a single claim.
[3] Costs incurred prior to the first claims resolutions (i.e., startup costs) have been excluded from the calculation.
[4] Resolved claims are comprised of claims that are either approved for payment, denied or withdrawn. Costs incurred prior to the first claims resolutions (i.e., startup costs) have been excluded from the calculation.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 4 of 11

should occur. These reviews identify problem areas and force an evaluation of how to address them. Budgets and performance measures should be established at detailed levels. High level or aggregate budgets and performance measures do not allow for the identification of specific, actionable items that can influence future performance. As discussed below, through its observations and inquiries, BP has been unable to confirm whether this level of review is occurring. As a result, it is necessary for an examination of the CSSP to occur in order to evaluate the program, identify and correct any shortcomings in its execution.

      **A.    Vendors Do Not Appear To Be Managed To Meet Quantitative Performance Goals.**

Based on our discussions and review of the documents, other than tracking and monitoring costs and expenses, the CAO does not appear to make any effort to actively manage expenses to any financial plan. The only comparative measure the CAO's office apparently uses to measure CSSP expenses is the GCCF experience, which as discussed above, does not provide a favorable assessment of CSSP expense management. The CAO measurement is simply a comparison of total monthly costs, which fails to consider that, at meaningfully lower production rates, the CSSP is expending much more per claim to accomplish all of its required tasks than the GCCF incurred.

As the vendors explained during our recent series of meetings, although each individual vendor may have its own internal standards, there do not appear to be any quantitative performance measures imposed by the CAO on the CSSP vendors to measure productivity at either the vendor or staff level. For example, the CAO has not set any production goals per full-time equivalent employee ("FTE") for any of the tasks or subtasks regularly performed by the vendors (e.g., each FTE accountant evaluating BEL claims is expected to process a specified number of claims per week; each FTE accountant evaluating IEL claims is expected to process a specified number of claims per week; each FTE performing document intake tasks is expected to process a specified number of documents per week; each accountant Q/A FTE is expected to process a specified number of Q/A reviews per week). Nor does it appear that the CAO has set any systematic performance expectations for the average time it should take to complete each stage of the claims evaluation process (e.g., claims should remain in a particular stage for less than a specified number of hours/days). None of the vendors' contracts or task orders that we have seen contain Key Performance Indicators or Service Level Agreement metrics associated with performance; they merely establish maximum staffing levels.

Establishing performance measures for such a complex and variable operation obviously is not a simple task, but any purported difficulty in establishing these measures does not obviate the need for them. Establishing performance goals is a best practice for any professionally run business or claims-processing operation, but they are particularly important given that the CSSP has four vendors that may each touch the same claim and may each be responsible for several stages of a multifaceted claims processing workflow. Without measuring performance, the CAO cannot evaluate the CSSP vendors relative to their respective costs, make empirically based staffing decisions, or assess whether the entire system is running as efficiently as possible.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 5 of 11

### B. The CAO Appears To Allow Process Changes to Be Implemented On An Ad Hoc Basis And Without Any Consideration of Cost/ Benefit Analysis.

CSSP Vendors also appear to be making ad hoc adjustments to processes without any empirical consideration of costs or impact on efficiency. One recent anecdotal example relayed by the vendors was that, as between PwC and P&N, the accounting firms decided it is better for each accounting firm to perform its own Quality Assurance ("Q/A") review of the claim files it is responsible for processing. Up until the recent change, PwC had been performing the Q/A of files processed by P&N. However, because taking on the Q/A process as to its own files created staffing pressures for P&N, it requested PwC to begin processing the Failed/Start-up Business claims that P&N was previously responsible for processing. PwC agreed and as a result, PwC now has 15 accountants working in some capacity to handle "Failed/ Start-up Business" claims.

We have no comment on whether these process changes are positive or negative with respect to overall costs or efficiencies. However, the "horse trading" approach giving rise to the process change highlights the lack of management scrutiny being applied by the CAO. Setting aside qualitative considerations, before authorizing such a change in process, we would have expected at least some level of analysis to have been completed by the CAO to determine whether P&N has the ability to meet or exceed the productivity of PwC accountants that had been previously performing Q/A review.

Another example demonstrating the lack of rigor in the management process is the recent proposal by the CAO to add 100 new accountants to the program. As confirmed by our discussions with PwC and P&N, the staffing proposal was not developed to meet any specific empirical goal. Instead, it was based on an untested hypothesis from the CAO that increasing the number of accountants was the most effective approach to reduce the backlog of outstanding BEL claims. Although the estimated cost to add these accountants is $39 million per year, no analysis appears to have been completed to determine, for example, the ability of additional accountants to actually impact the backlog (e.g., some unknown percentage of claims are simply waiting information from claimants); whether any part of that pending backlog could be reduced by using other, less costly staff; whether the beneficial impact of the accountants justifies the additional $39 million yearly cost (above and beyond the over $170 million already being spent on accounting services); or whether the same positive impact of adding accountants could be achieved by otherwise improving the efficiency of the current accounting workforce. Indeed, as the CAO presented during the vendor meetings, the CAO's only analysis appears to be a projection that adding the additional accountants will marginally reduce the length of the program, but at a dramatic increase in overall cost to the facility. Again, BP has not formed a judgment whether or not adding 100 accounts is reasonable or necessary. Our concern is that there seems to be little, if any, consideration being given to achieving CSSP objectives in a cost effective manner or to performing the analysis required to determine whether the additional accountants would achieve the intended goal cost-effectively.

Information technology costs are another area with minimal expense management. Currently, BrownGreer has approximately 90 individuals working on IT development at a cost of more than $1.7 million per month. As we understand it, with the exception of one or two modules, all of the programming necessary for the initial design build has been completed for each of the

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 6 of 11

twelve claim types. The bulk of the expenses related to current IT services are for the day-to-day operations of the system and ad hoc improvements to the claim system that are requested or proposed by the CSSP vendors. Our understanding is, with some exception, these are the "bells and whistles" being added to the claim system. There does not appear to be any attempt to measure whether a particular system change actually improves the efficiency of the process or whether the cost and expense of developing the computer code and training the staff on the system change are justified by the actual measurable benefit to the process.

   **C.**  **The CAO Does Not Appear To Proactively Manage Staffing Costs and Expenses.**

It does not appear that the CAO makes meaningful efforts to match staffing levels to workloads in order to manage staffing costs and expenses. Despite being a mature claims program, the total vendor headcount does not appear to be decreasing to reflect an improvement in efficiency as staff become more proficient completing their routine tasks. And while, given our limited access to CSSP information, we are not in a position to comment on whether there are unique circumstances preventing the expected reduction in headcount, we do observe that the CAO is not even holding vendors to its own headcount projections. For example, with respect to the Claim Assistance Centers and the call centers, information provided by the CAO shows that the office performs predictive modeling to forecast staffing levels needed to achieve desired service levels. However, despite the CAO modeling results the actual staffing levels established are well in excess of the model, presumably resulting in significant amounts of non-productive time for staff.

As explained during our vendor meetings, Garden City Group currently operates two call centers — one located in Ohio and another located in Florida, both operating Monday through Saturday. Despite dramatically reduced call volume, the CAO's own predictive modeling results and Garden City's stated view during the meeting that closing the redundant Florida facility and eliminating Saturday coverage is appropriate and would allow a further reduction in workforce, the CAO has not implemented these cost-saving staffing reductions at this time.

The CSSP is also incurring a significant expense and loss of efficiency from high monthly turnover. Based on the series of vendor meetings, BrownGreer is experiencing monthly turnover as high as 4%, or 48% annually. This has resulted in significant training costs and lost productivity as the facility has presumably had to replace over 700 staff per year at current turnover rates. Based on our understanding, the CAO has never identified this as an issue or attempted to address it with the vendor.

Nor does the CAO appear to be proactive in managing independent contactor pass through costs. BrownGreer and Garden City collectively hired more than a thousand independent contractor employees to work at the CSSP. These vendors marked-up the labor costs of their respective independent contactors and passed those markups along to the CSSP and Settlement Trust. The CAO appears to have given no consideration to the substantial cost savings the CSSP and Settlement Trust could have been achieved had the CAO identified this issue and explored opportunities to substantially reduce these markups. We understand that BrownGreer has been routinely converting its independent contactors to at-will employees thereby potentially impairing the ability of the CSSP to address these contractor markups.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 7 of 11

Furthermore, when we presented this issue to Garden City, it told us that it will be immediately moving to convert its independent contractors to at-will employees. Moreover, Garden City operates the Florida call center pursuant to a subcontract with a call center operator and, when asked about possible markups to its subcontractor rates, refused to disclose to us the amount they pay the subcontractor to run the facility. It would be expected that the direct costs would be passed through to the CSSP with no markup by Garden City. However, we have not been able to determine if a markup is being added.

With respect to expenses, there also seems to be minimal effort by the CAO to curb unnecessary expenditures. The CSSP is currently incurring approximately $400,000 in monthly travel expenses as a result of having PwC accountants travel from New York, Washington D.C., Dallas, Houston, Atlanta and Chicago to work in the New Orleans area. As explained by PwC, there is no substantive need from a qualitative standpoint for PwC accountants to be physically present in New Orleans, and indeed, accountants from four other PwC offices work on the project in the same capacity as their colleagues without ever traveling to New Orleans. Again, the CAO does not even appear to have considered whether it is necessary for the program to continuously incur monthly hotel, lodging, and transportation costs that do not appear to provide any benefit to the performance of the program.

A properly managed claims process should balance the precision achieved by the evaluation process, the time to complete a review (throughput), and cost. None of these attributes individually should determine how a particular process is established. Goals for these three attributes should be established and clearly communicated so all team members understand the objectives. This understanding of the intent of the project leader allows subordinate leaders to make decisions consistent with the objectives in the absence of specific guidance. An examination will identify areas to improve the balance between these considerations.

### III. The Effectiveness, if Any, of CSSP's Procedures To Detect and Mitigate Fraud, Waste and Abuse Is Not Apparent.

As set forth by the CAO during the April 25, 2013, budget presentation, the CSSP has reduced its fraud vendor costs to approximately $200,000 per month—down from approximately $5.3 million per month during the GCCF. This represents most of the difference in average monthly costs between the two programs. Indeed, when excluding the fraud costs from the GCCF costs, the average monthly CSSP costs are running at 93% of GCCF costs. While BrownGreer does perform some fraud investigations for the CSSP as it did with GCCF, even when considering only the CSSP costs, the CSSP still appears to be spending nearly 90% less on fraud detection than the GCCF.

Although the CAO and BrownGreer highlight this reduction in spending as evidence of cost savings, neither BrownGreer nor the CAO have provided any empirical support suggesting that the quality of the remaining CSSP fraud mitigation efforts are, in fact, as effective as the GCCF efforts. The information BP has been provided suggests that the efforts taken by the CSSP to detect fraud are relatively nominal in relation to the actions taken by the GCCF, which yielded numerous fraudulent claims. As described by the CAO, "BrownGreer relies on their claims evaluators to be sensitive to fraud and look for suspect documents . . . ."

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 8 of 11

The level of attempted fraud experienced by the GCCF was significant. Indeed, the GCCF's fraud detection system is currently featured in a pending appeal before the United States Court of Appeals for the Fifth Circuit, *Johnson v. BP*, No. 12-20512. In the Johnson case, the GCCF detected a fraudulent claim that otherwise would have been paid $2.7 million and denied it on that basis. The GCCF fraud mitigation vendor identified 9,130 claims containing potential fraud, of which more than two-thirds were multiple claimant schemes. Said differently, the GCCF was targeted by more sophisticated, institutional fraud rings. Accordingly, the CSSP fraud mitigation efforts should be, at minimum, equally robust. It is unclear at best whether BrownGreer's system of primarily relying on individual claims evaluators to detect fraud is the most cost effective method of identifying sophisticated fraud actors. In light of the enormous reduction in overall spending on fraud detection from the GCCF, an examination of the overall fraud detection process is both necessary and warranted.

## IV. The CSSP Appears To Lack Adequate Controls And Uniform Processes To Detect Errors In Claimant Submitted Profit and Loss Statements.

It does not appear that there are uniform processes in place to detect errors in claimant-submitted profit and loss statements, and there is significant risk of claims being paid based upon inaccurate or fraudulently submitted profit and loss statements.[5] According to the CSSP, claimant-submitted profit and loss statements are not audited and, instead, the CSSP simply takes these statements as they are submitted. PwC advises that the only scrutiny applied to claimant-submitted profit and loss statements is if a CSSP accountant identifies something that "looks unusual" or "inconsistent" or "wacky." Unless one of these subjective criteria is observed, there is no inquiry. PwC noted that errors in claimant-submitted profit and loss statements can be "hard to identify." BrownGreer has further advised us that a profit and loss statement generated for the purpose of filing BEL claim, rather than contemporaneously in the ordinary course of business, "does not raise any red flags" for the Settlement Program's screens for fraudulent conduct (this raises a significant concern as to the adequacy of the CSSP's anti-fraud processes as discussed above).

A professionally run claims administration charged with implementing compensation frameworks should be making those determinations using accurate and non-fraudulent data, and should not simply accept data "as given" by the claimant without question. Nor should there be what was described as an ad hoc system to question entries in profit and loss statements based on a "wacky" standard as opposed to a more appropriate, robust and uniform process.

In the context of BEL claims, there is significant opportunity for claimants to submit inaccurate or falsified profit and loss statements given the understanding that the Settlement Program takes this "hands off" approach with no audits of claimant-prepared financials. For example, the BEL compensation framework Step One, allows claimants the optionality to select three or more consecutive months from May to December 2010 as the compensation period. Absent any audit procedures or checks, it is possible for claimants to create financials in which revenue

---

[5] Given what we have observed with the BEL claims process, the other CSSP claims process should be similarly scrutinized in the examination.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 9 of 11

and expense entries are placed into months inaccurately yet tie with amounts reported on annual year-end profit and loss statements. Likewise, it is possible for claimants to submit profit and loss statements in which errors and inaccuracies were not corrected which then may cause it to appear a claimant experienced a loss of variable profit when, in fact, there was no such loss. Moreover, given that accountants in Louisiana and Alabama may pursue contingent fee arrangements with BEL claimants, there exists a financial incentive in which accountants may benefit from submission of inaccurate or invalid profit and loss statements.

For all of these reasons, an examination related to the processing of BEL claims is necessary to identify standardized processes and remedial steps related to the BEL claims process to insure that claims are considered using only accurate, non-fraudulent financial data. This is essential to establish the integrity of the CSSP claims process.

## V. The Proposed Examination of the CSSP Should Also Evaluate the Sufficiency of the CLA Audit To Determine Whether a Broader Audit Is Warranted.

As referenced above, the CLA audit was not designed to test the vendor governance measures, but rather only the internal controls of the CSSP, i.e., whether claims were being evaluated and calculated according to the terms of the settlement agreement. However, as detailed below, because of significant questions raised primarily by the small random sample (which results in a high margin of error in the findings) and the simple sampling methodology (which did not take into consideration the material differences between claim types), the CLA audit scope does not look sufficient and the proposed examination of the CSSP should take that into consideration.

### A. The Sample Size and Claims Selection Methodology Raise Significant Concerns Regarding the Validity of the Conclusions.

CLA indicates that its analysis of Paid Claims[6] is based on a test of 96 claims from 10 of the 12 claims categories and that the random sample was selected using a "sampling methodology [with] a confidence level of 95% with a 10% margin of error . . . ." (Report, p. 16.) Allowing for this margin of error in testing of a population of 15,894 paid claims (Report, p. 9.) means that up to 1,589 *paid* claims could have been calculated with errors and would not be identified by the CLA testing. Given the importance of the CSSP operations and the aggregate monetary value of CSSP awards, it is unclear why CLA would select such a high margin of error and/or why only 96 claims were reviewed (i.e., approximately 0.6% of paid claims subject to the audit). Materially improving the accuracy of the audit to a 3% margin of error would have only required a sample size of approximately 1,000 claims. This would appear to be an area where the increased cost of an expanded review would be justified given the dollars flowing from the CSSP.

---

[6] Unless otherwise defined in this letter, capitalized terms are used as they are defined in the Report.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 10 of 11

Similarly, the use of a random sample methodology also appears to undercut the validity of the report's findings. Rather than a simple random sample, which assumes that an exception (i.e., mistake) poses the same risk to the facility regardless of the claim type in which it occurs, we would have expected an experienced firm such as CLA to perform a more sophisticated dollar and risk weighted methodology (e.g., materiality based sampling). As a result of not weighting the sample based on claim value, 50% of the claims tested represented 1% of the dollar amount tested. A quarter of the entire sample was comprised of Coastal Real Property Claims which do not appear to present much risk to the program. This significantly draws the overall observations contained in the report into question.

> **B.    The Report Does Not Drill Down Into Any Exceptions Revealed by the Audit and Tellingly, Does Not Actually State An Opinion as to the Effectiveness of the Internal Controls.**

Although the CLA report does not highlight this statistic, the audit found 13% of the BEL claims reviewed were overpaid. This is a large percentage of overpaid claims, particularly in a claim type with one of the highest-dollar values. Similarly, of the sample claims tested for QA/QC reviews, CLA identified 8% of the claims contained irregularities. Notwithstanding these significant findings however, CLA made no recommendation to undertake further sampling or investigation to confirm whether or not these statistics are in fact actually reflective of the overall facility performance.

Similarly, the report contains only minimal analysis of appealed and denied claims except for some trending measures. A properly scoped process audit of the CSSP must include a meaningful review of both appealed and denied claims because the substance and results of the appealed claims would likely provide insight into any infirmity in the claims process and a review of denied claims would provide useful information relating to the filing of fraudulent claims.

In short, the scope of CLA's audit, even given its stated purpose, appears as being too superficial to give a meaningful insight into whether the CSSP internal controls are efficacious.

**VI.    A Full Examination of the CSSP Is Warranted And Necessary.**

Pursuant to the terms of the Settlement Agreement[7] and the Settlement Trust Agreement[8], Mr. Juneau is obligated, *inter alia,* to act as a fiduciary of the Settlement Trust, to "oversee and supervise the Claims Administration Vendors" and to pay "reasonable and necessary expenses incurred in connection with the operation of the Settlement Program."[9] As described in this letter, based on discussions with the CSSP vendors and materials provided by the CAO, the level of supervision and expense management applied to the vendors appears to be less than

---

[7] Originally filed in the United States District Court for the Eastern District of Louisiana on April 18, 2012, in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179 (Rec. Doc. 6726-1), as amended May 1, 2012.
[8] *Deepwater Horizon* Economic and Property Damages Trust Agreement, dated May 4, 2012.
[9] *See,* Settlement Agreement ¶¶ 4.3.2; 5.12.1.1.3; Settlement Trust Agreement ¶ 2.1.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 11 of 11

best practices. In addition, there are serious questions about the adequacy of control mechanisms as acutely demonstrated by the recent allegations against a senior CAO employee.

An examination, including improvement recommendations as appropriate, would aid the Claims Administrator in fulfilling his obligations under the Settlement Agreement and Settlement Trust Agreement and would further the CAO's fiduciary responsibility to operate an efficient and high quality claims facility. Our expectation is that the examination will create opportunities for the CSSP to improve claims processing performance, drive more consistent and accurate claims results and, possibly, increase the pace of claim determinations.

Sincerely,

Mark Holstein
Managing Attorney

cc:     Magistrate Judge Sally Shushan
        Patrick A. Juneau
        Michael J. Juneau
        Steve Herman
        James Roy