IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * | MDL No. 2179<br><br>SECTION: J<br><br><br>Judge Barbier |
| This Document Relates To: *All Cases* | * * * | Magistrate Judge Shushan |

## BP'S PHASE 2 PRETRIAL REPLY MEMORANDUM—SOURCE CONTROL

Don K. Haycraft (Bar No. 14361)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Barry E. Fields, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc. and BP America Production Company*

Relying on sound bites and misrepresentations and ignoring material facts, the Aligned Parties' voluminous pretrial statement fails to convey an accurate portrayal of the *Deepwater Horizon* response. While impossible to correct every material misrepresentation and omission, BP highlights in this Reply the most significant issues so as to reflect the actual merits of BP's preparedness and source control efforts. When the record is developed fully, as opposed to the out-of-context statements on which the Aligned Parties' rely from millions of pages of documents and dozens of transcripts, the Aligned Parties' tale falls flat.

**I.    The Aligned Parties Misrepresent The Record And Omit Critical Facts.**

The Aligned Parties misstate and omit material efforts of BP, the federal government, and the entire industry. Among the Aligned Parties' misstatements and omissions are the Aligned Parties' (1) omission of the critical role that the federal responders, including the Federal Science Team, and the industry played in the *Deepwater Horizon* response,[1] (2) omission of evidence establishing that BOP-on-BOP was not approved and ready for safe implementation before Top Kill, and (3) misrepresentation of both purported "industry warnings" and critical information regarding the adequacy of BP's spill response plan.

    **A.    The Federal Responders And Industry Played A Critical Role In The *Deepwater Horizon* Response.**

The Aligned Parties omit the fact that the federal government, through the Unified Command ("UC") and Federal On-Scene Coordinator ("FOSC"), was in charge of the *Deepwater Horizon* response. As the National Incident Commander, Admiral Allen, and the FOSC Admiral Landry have acknowledged, BP could not, and did not, execute source control

---

[1]   The Aligned Parties also ignore the critical role that the federal government, specifically the Minerals Management Service ("MMS"), played before the *Deepwater Horizon* incident in both setting the industry requirements for spill response preparedness and reviewing and approving BP's spill response plan. (*See* BP's Initial Pretrial Statement pp. 2-3.)

procedures without federal government approval.[2]  And federal responders were embedded in every step of the source control process, from brainstorming through final approval and implementation.[3]

For example, the federal responders understood the limits and risks associated with the Top Kill procedure upon which many of the Aligned Parties' source control claims are based.  Far from being a passive and uninformed observer as the Aligned Parties allege, the federal responders were fully involved in the evaluation and implementation of the Top Kill procedure, and even performed a post-operation independent assessment of the data collected.

Before its implementation, BP conducted an industry peer review of the procedure. It then specifically requested that the Federal Science Team provide a full review and analysis of the Top Kill procedure.  Members of the Federal Science Team met with BP on May 17, 2010 for a "Scientific Summit" at which BP and the Federal Science Team analyzed and discussed the options and risks associated with the Top Kill.[4]  BP and the Federal Science Team specifically discussed the potential flow rate limitation to the Momentum Kill portion of the Top Kill procedure and evaluated the risks associated with this potential limitation.[5] After this "Scientific Summit," the federal responders, who had access to flow rate estimates from both BP and its own scientists, not only agreed that the Top Kill procedure should be implemented as one—but

---

[2]  Adm. Allen Dep. Tr. 254:1-14 (BP did not execute any source control procedure that was not approved by the government); Id. at 281:16-282:2 (Federal Science Team reviewed source control plans before they were approved); Adm. Landry Dep. Tr. 76:8-17 (before any source control efforts were taken, the government, including MMS, reviewed and approved the plan); Chu Dep. Tr. 67:20-68:4 (all "major steps" were "vetted by the science and engineering teams.")

[3]  Brannon Dep. Tr. 48:16-49:5; Hunter 10/30/2012 Dep. Tr. 43:5-19 (Mr. Hunter had "full access" to information from BP); TREX 11305 (Secretary Chu and the Federal Science Team are "getting the [Top Kill] data at the same time as BP engineers, and conducting [their] own independent analysis of the data to understand well flow analysis and potential risks of future steps after each kill and junk shot attempt.").

[4]  TREX 9245 (discussing the risks of the Top Kill procedure); Brannon Dep. Tr. 58:22-59:1; 63:22-64:1 (the federal science team "review[ed] BP's [proposed Top Kill] procedures, and if they had anything to add or recommend, they would do so").

[5]  TREX 9245.

not the sole—source control option, but made material modifications to its implementation.[6] And as Federal Science Team co-Leader Tom Hunter testified, information about flow rate was not likely to have had any effect on the decision to proceed with Top Kill.[7] Moreover, the government had performed its own flow rate analysis by this time, which showed the rate would be in excess of 15,000 bopd.[8]

When the Top Kill procedure failed, the Federal Science Team performed its own analysis of why the procedure failed, concluded independently that there was a well integrity risk, and recommended that the UC put the BOP-on-BOP option aside until conditions in the well were better understood. Owing to the Federal Science Team's well integrity concerns, "the most conservative and reasonable assumption to be made" by the UC was to remove the BOP-on-BOP as an option.[9]

The Aligned Parties likewise omit that the federal responders and BP sought advice from key members of the oil and gas industry in the *Deepwater Horizon* response.[10] As source control options reached critical stages in development, the UC and BP obtained independent input from ExxonMobil, Shell, Chevron, and ConocoPhillips on methods to contain oil and shut in the well. As Admiral Allen recalled, the upshot was that leaders in other companies agreed with the direction being taken by BP and other participants in the UC.[11]

---

[6] TREX 140012 (Dr. McNutt email noting that federal scientists pushed for implementation of momentum kill procedure alone); *see also* Brannon Dep. Tr. 59:6-23; Initial Expert Report of Iain Adams at 12-15.
[7] Hunter 10/31/2012 Dep. Tr. 634:4-15.
[8] *See*, *infra*.
[9] Hunter 10/30/2012 Dep. Tr. 200:16-18.
[10] Allen Dep. Tr. 204: 10-18 (Admiral Allen made calls to the industry and spoke with the Chief Executive Officers of ExxonMobil and Halliburton); Hunter 10/30/2012 Dep. Tr. 96:16-97:3 (effort was "massive and collaborative").
[11] Allen Dep. Tr. 204:10-206:20, 320:2-321:10; s*ee also* TREX 3917(May 6, 2010 peer assist seeking the advice of twenty industry members, including ConocoPhilips, Shell, Chevron, ExxonMobil, and EMI on the junk shot procedure); TREX 140633 (May 13/14, 2010 PowerPoint showing the outcome of the Top Preventer peer assist regarding capping options, which was attended by ExxonMobil, Transocean, Cameron, Oceaneering, and the MMS).

### B.   BOP-on-BOP Was Not Ready for Implementation Before Top Kill.

The Aligned Parties ignore conclusive engineering evidence establishing that the BOP-on-BOP option was not ready for installation before Top Kill and could not meet the "don't make it worse" philosophy to be safely implemented at that time. Moreover, implementing Top Kill before BOP-on-BOP met another guiding principle during the response—do not take any option off the table. If BOP-on-BOP had been attempted before Top Kill, Top Kill could never have been performed because the LMRP would have to be removed; in contrast, implementing Top Kill did not take BOP-on-BOP off the table.

At the time of the Top Kill procedure, significant engineering work remained to be done on the BOP-on-BOP option, chief of which was work necessary to ensure that the additional BOP[12] had the ability to mitigate well integrity risks by having an option to vent hydrocarbons and manage pressure within the well and BOP.[13] This risk mitigation was essential to ensure that the UC could control the shut in process and avoid well integrity concerns.[14]

Relying on out-of-context characterizations of the purported readiness of the BOP-on-BOP solution before Top Kill,[15] the Aligned Parties ignore the BOP-on-BOP project schedules, work scope disclosing critical maintenance and repair work that Transocean had not yet

---

[12]   The capping stack deployed during the *Deepwater Horizon* response was not merely a smaller BOP as the Aligned Parties incorrectly assert. The capping stack that was installed on July 12, 2010 was primarily configured not to seal the well, like the intended function of a BOP, but to divert the flow of hydrocarbons through the side outlets to a collection vessel on the surface. Additionally, the *Deepwater Horizon* capping stack included pressure sensor instrumentation to evaluate well integrity, employed rams and valves engineered to minimize the risk of damage to the well system, and was uniquely designed to connect to the flex joint above the *Deepwater Horizon* BOP's LMRP. *See* Rebuttal Expert Report of Iain Adams at 3-5, 7-8.

[13]   Initial Expert Report of Iain Adams at 12-13; Rebuttal Expert Report of Iain Adams at 2-6.

[14]   Rebuttal Expert Report of Iain Adams at 2-6; Expert Report of Dan Gibson at 4.

[15]   The Aligned Parties attempt to distort Jim Wellings, David McWhorter, and Geoff Boughton's documents and testimony. Mr. Wellings explained in his deposition "we hadn't finished the work to install it." Wellings Dep. Tr. 161:1-2. Mr. McWhorter simply stated that he believed that the BOP-on-BOP option was "feasible and could be managed safely" as of May, 2010, not that it could be installed as of that time. *See* McWhorter Dep. Tr. 451:24-452:8. Finally Mr. Boughton recognized that there were well integrity concerns, not some nefarious plan by BP, that delayed the implementation of the BOP-on-BOP procedure. Boughton Dep. Tr. 77:1-2 ("everybody's concern was, well, we might breach the formation").

performed on the BOP stack, internal Transocean emails, and lack of approved procedures that establish that the BOP-on-BOP solution was not ready to be installed before Top Kill.[16]

### C. BP's Preparedness Was Consistent with Government and Industry Standards.

The Aligned Parties also misrepresent critical aspects of BP's preparations to respond to a deepwater blowout. The Aligned Parties argue that BP ignored "decades" of "industry warnings" indicating that BP should have had a prebuilt deepwater capping stack. These are the key points that the Aligned Parties omit:

The industry documents cited by the Aligned Parties in support of their "warning" theory do not recommend a prebuilt deepwater capping stack before Macondo, but instead questioned whether such an approach made sense, in light of the uniqueness of any deepwater blowout.

Whatever the Aligned Parties make of the documents they cite, it is indisputable that: (1) MMS did not require a prebuilt deepwater capping stack and (2) no entity in the oil and gas industry had a prebuilt deepwater capping stack anywhere in the world before Macondo.

Beyond the drilling of relief wells, no one in the oil and gas industry had a prebuilt source control solution to the Deepwater Horizon blowout in April 2010 based on a capping stack; if anyone did, they would have stepped forward immediately. Rather, the industry-standard and MMS-approved plan if a deepwater BOP failed was to drill a relief well and stand up a team of source control experts tasked with the mission of shutting in the well before a relief well could.

---

[16] TREX 11673 (On May 18, Transocean estimated that a venting solution to manage pressure for a BOP-on-BOP option was "about 10-14 days away"); TREX 4318 (On May 26, 2010—the day Top Kill began— Transocean circulated a list of "modifications / changes / enhancements that are currently being planned for the DDII stack to enable subsea venting"); TREX 141081 (A May 26 West Engineering daily report for Transocean's *DDII* BOP disclosed critical outstanding repairs and maintenance including an ongoing investigation of the BOP's Deadman system, which was not functioning as designed); *See also* TREX 142390; TREX 52520; *see also* Initial Expert Report of Iain Adams at 12-15.

5

BP's source control plan met industry standards, and was put into action during the Deepwater Horizon incident.

## II.     The Capping of the Macondo Well Was Not "Delayed" By BP's Conduct.

The Aligned Parties' pretrial statement's emphasis on flow rate modeling glosses over this key issue issue—they cannot establish any causal link between the misconduct they try to attribute to BP and the issues in this litigation.  The simple fact of the matter is that federal responders did not rely upon BP for flow rate estimates.  The federal leadership looked to the National Oceanic and Atmospheric Association ("NOAA"), and later, the federally-staffed Flow Rate Technical Group ("FRTG") for estimates of the actual daily flow rate from the Macondo well.  Knowing that all flow rate work in April and May was subject to tremendous uncertainty,[17] the UC consistently directed source control efforts based on the worst case scenarios and would not have changed response efforts based on higher flow rate estimates.[18] The Aligned Parties are unable to outline in 35 pages any causal nexus between their view of BP's acts and omissions with regard to Congressional staff and efforts of the UC to close the well, or any reliance by the federal responders on the misrepresentations they would attribute to BP.

### A.     The Federal Responders Did Not Rely Upon BP Flow Rate Estimates When Making Critical Decisions During the Response.

The Aligned Parties misleadingly suggest that the genesis of the early 5,000 bopd estimate was BP.  They ignore the indisputable fact that the basis for the 5,000 bopd flow rate estimate was a federal government study, based on data taken by federal responders, supervised by NOAA's Charlie Henry, Scientific Support Coordinator to the FOSC, and Bill Lehr, a NOAA

---

[17]   Hunter 10/31/2012 Dep. Tr.  751:3-19 (insufficient data from well to calculate flow rate as of May 2010); Hunter 10/30/2012 Dep. Tr. 165:9-18, 181:6-182:9; *see also* TREX 9710; TREX 9693.
[18]   Landry Dep. Tr. 335:5-19, 355:19-356:20.

scientist.[19] Henry conveyed NOAA's 5,000 bopd flow rate estimate to Admiral Landry, who publicly announced the figure during a press conference on April 28, 2010.[20] Admiral Landry advised BP of the number then stated at the conference that "NOAA experts believe the output can be as much as 5,000 barrels."[21]

The Aligned Parties also misleadingly suggest that BP's Doug Suttles withheld estimates from Admiral Landry; here again they ignore direct evidence to the contrary. On May 19, 2010, Mr. Suttles sent Admiral Landry an email attaching his "most recent work on flow rate estimation," and suggesting that she contact him with any questions.[22] Admiral Landry received and reviewed Suttles' email with attachments containing various estimates,[23] including a page of "Key Messages," with an "expected case" of 40,000 bopd, an "alternate case" of approximately 60,000 bopd and a worst case scenario where flow could reach 100,000 bopd.[24] However, as she testified, Admiral Landry did not rely on the estimates for any purpose.[25]

That same day, Admiral Thad Allen announced the formation of the FRTG "to speak with one voice" using the "best available science" to independently assess flow rate.[26] The FRTG was comprised of federal scientists, independent experts, and representatives from USGS, NOAA, DOE, the Coast Guard, MMS, the National Institute of Standards and Technology, the National Labs, UC Berkeley, Purdue University, and other academic institutions—but not BP.

---

[19] Henry Dep. Tr. 177:9-178:24, 313:6-316:10; Lehr Dep. Tr. 254:12-15; TREX 9619.
[20] Henry Dep. Tr. 424:13-425:10.
[21] TREX 9617; TREX 8899.
[22] TREX 9619. BP acknowledges that certain statements in this note formed the basis for its guilty plea in the criminal case to charges of Obstruction of Congress. However, although BP has accepted responsibility for the actions set forth in its guilty plea allocution, that allocution does not describe any misconduct by Mr. Suttles.
[23] Landry Dep. Tr. 345:3-19; Landry Dep. Tr. 681:6-21.
[24] TREX 9619; Landry Dep. Tr. 689:3-690:2.
[25] Landry Dep. Tr. 345:13-346:2.
[26] Allen Dep. Tr. 247:5-248:9.

Once the FRTG was formed, it gave the exclusive word on flow rate, and Admiral Landry looked to the FRTG—not the UC or BP—for flow rate estimates.[27]

Moreover, even before the UC approved Top Kill, Dr. Marcia McNutt received independent estimates of flow from the FRTG and NOAA in excess of 15,000 bopd; thus, any attempt to paint BP's alleged misrepresentations as the cause of Top Kill's authorization fails. As early as April 25, a government scientist estimated flow rate from the Macondo well to be as high as 64,000 bopd.[28] By May 23, Dr. McNutt was aware of government flow rate estimates as high as 80,000 bopd.[29] And by May 25, before Top Kill was executed, Dr. McNutt was aware that the FRTG Plume Team would announce a minimum flow rate of 14,000 to 20,000 bopd.[30] Notably, all of these estimates came out before Top Kill was approved and implemented. In any event, Tom Hunter, Co-Director of the Federal Science Team, confirmed that the 5,000 bopd estimate "did not make a significant difference in our engagement of the top kill, because … our conclusion was we didn't know what the flow was."[31]

To put it succinctly: owing to the substantial uncertainty associated with flow estimation,[32] the UC directed source control efforts based on the worst case scenario and did not rely on BP. Admiral Allen stated this guiding principle clearly—he was "skeptical" of early flow rate numbers because of the inherent uncertainty, and he instructed those involved in the response to "focus on the response, getting equipment out there, assuming the worst-case

---

[27] Landry Dep. Tr. 684:18-685:9 ("I was looking to the Flow Rate Technical Group to provide analysis of flow rate, yes."); see also Landry Dep. Tr. 62:2-6, 61:19-62:1, 365:13-20; Allen Dep. Tr. 300:8-16.
[28] TREX 8894; Henry Dep. Tr. 311:7-11.
[29] TREX 144748.
[30] TREX 9652.
[31] Hunter 10/31/2012 Dep. Tr. 683:23-684:14.
[32] Rebuttal Expert Report of Adam Ballard at 11-13 (too many uncertainties in April and May to estimate daily flow rate); Mason Dep. Tr. 48:8-14; Rygg Dep. Tr. 190:20-191:19; Herbst Dep. Tr. 192:1-193:14; Allen Dep. Tr. 688:20-691:25 (the estimates "weren't consequential in any decision-making").

scenario," counseling that "the numbers ultimately would take care of themselves."[33] Similarly, Admiral Landry testified that from day one, her efforts "were aimed at a worst case discharge" and that *she would not have changed the response effort in any way* if she had seen 90,000 bopd estimates of flow.[34]

Finally, the Aligned Parties have cited no competent evidence or opinion that BP concealed any data from federal responders needed to develop reliable flow rate estimates. Dr. John Wilson, the Aligned Parties' expert on BP's flow modeling, admitted that he "did not look at what data BP shared with the government at any point in time during the response to the blowout" when forming his opinions.[35]

### B.  There Is No Causal Nexus Between The Aligned Parties' Construction Of The Criminal Plea and the Timing Of The Well's Shut-In.

Finally, it is important to address the effort by Transocean and Halliburton to shift any blame for their conduct to BP's source control efforts. The Fifth Circuit has written that "fault in the abstract does not give rise to liability. Instead, the fault must be a contributory and proximate cause of the damage sustained."[36] And an alleged "superseding cause" that does not cause the alleged harm is not a superseding cause at all.[37] The Aligned Parties cannot demonstrate (1) any causal nexus between their flawed interpretation of the Plea Agreement and the timing of the well's shut-in, nor (2) any reliance by the federal government on the alleged misrepresentations by BP in making decisions about the selection or sequencing of source control procedures. As a

---

33  Allen Dep. Tr. 210:6-23.
34  Landry Dep. Tr. 335:5-356:20.
35  Wilson Dep. Tr. 94:2-10.
36  *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005).
37  *In re ALEX C Corp.*, 2011 A.M.C. 157, 174, 2010 WL 4292328 (D. Mass. Nov. 1, 2010) (alleged negligence by ship crew not a superseding cause of oil spill when it had no causal effect leading to the spill); *see also Doyle v. Graske*, 579 F.3d 898, 904 (8th Cir. 2009).

matter of law, because the Aligned Parties are unable to prove a key element of their claim, causation, their claim fails.

As discussed above (*see* pp. 1-3), the Top Kill procedure, as well as the selection and sequencing of source control procedures, was supervised and approved by the federal leadership in the UC.[38] The same federal responders who led the UC not only had access to the same data as BP, but also had obtained independent research, analysis and input from the Federal Science Team and the industry.[39] The Aligned Parties' claim that BP attempted to, or succeeded, in misleading the federal responders is contradicted by logic and the evidence.

Were BP truly interested in obscuring the well's flow rate, it would have advocated for the use of the BOP-on-BOP procedure that had no pressure gauges or other flow rate measurement device, and it would not have agreed to use the Top Hat collection device, which enabled the measurement of collected oil in real time and demonstrated a flow that exceeded the collection capacity of the *Discoverer Enterprise*.[40] No one wanted to close the Macondo well more quickly than BP, but BP was faithful to the key principles that guided the entire source control effort, which was to proceed with caution and to obey the direction of the federal leadership.

## Conclusion

Because the Aligned Parties lack not only the facts to substantiate their case, but also the legal framework upon which to weave it, the Aligned Parties' allegations are nothing more than loose thread.

---

[38] TREX. 11541; TREX. 9148; TREX 10557.
[39] Hunter 10/30/2012 Dep. Tr. 18:17-24, 28:2-10, 56:6-15; TREX 3916; Allen Dep. Tr. 204:10-206:20, 320:2-321:10.
[40] TREX 9490; Rebuttal Expert Report of Iain Adams at 11.

September 11, 2013                    Respectfully submitted,

By: /s/ Don K. Haycraft

Don K. Haycraft (Bar No. 14361)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Barry E. Fields, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc.
and BP America Production Company*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 11th day of September, 2013.

/s/  Don K. Haycraft

DC: 4995421-1