# EXHIBIT A

Exhibit No. _____
Worldwide Court
Reporters, Inc.
11583

# Jim Cunningham
# Egypt / Mediterranean Sea

## Loss of Well Control and Emergency Response

# Event: August 20, 2004 at 21:30 hrs

## Mediterranean District
## Eurafrican Unit



1

# Management Incident Review

- Summary of Incident
- Log of Events
- Supporting Factual Data
- Causation Analysis
- Remedial Actions and Accountability Issues



# Incident Summary

- Jim Cunningham (JIC) was drilling the Sienna Up-1 exploration well off the coast of Egypt in the Mediterranean for Rashpetco (BG / EGAS JV w/ Petronas as partner in well).
- Water depth 330m. 13-3/8" set at 1305m. BOP's tested, diverter functioned and LOT on casing shoe performed to 12.5 ppg emw. Drilling 12-1/4" hole at 1494m at 20-25 m/hr ROP with 11.3 ppg water based mud at time of blowout.
- Influx occurred during a connection, but was not observed prior to gas bubble reaching surface. (Bottoms up time was +/- 34 minutes)
- Excessive return flowrates observed at the shakers and flow rising above rotary table. Driller stopped rotation & pumps and attempted to close diverter, but did not have time to close in at the stack before the blowout occurred.
- An uncontrolled blowout occurred with resulting fire.

3



# Incident Summary (Continued)

- General alarm was sounded & personnel mustered.
- DP shear and LMRP disconnect functioned from remote OIM panel in preparation of a planned winch off of location. (5", 19.5 ppf, S-135 DP failed to shear due to tool joint position across shear rams. Subsequent LMRP disconnect released LMRP from stack, but DP kept LMRP aligned over stack. Planned winch off aborted after rig power was lost).
- All 106 personnel successfully evacuated within 2.5 hrs via crane to standby boat (with final 5 supervisors evacuating by lifeboat).
- Two injuries: 1 Schlumberger WL hand – minor burns to nose and ear (FAC). 1 Halliburton MWD hand – 3rd degree burns to hands (MTC).
- Environmental impact: Negligible
- Annulus apparently bridged off the flow of gas after +/- 3 hours.
- Gas leak began again via DP by the following morning. (DP leak began approximately 15' above the rig floor after the compensator bled off, causing the blocks and top drive to lower, creating a 90 degree bend in the DP. This gas leak increased as the DP crack washed out over subsequent days.)

4



# Incident Summary (Continued)

- Wild Well Control (WWC) was mobilized by Rashpetco (RP). WWC mobilized equipment from US with the plan to cut & cap the 5" DP above rig floor, and bullhead to kill. Logistical problems delayed the arrival of all the required equipment until Sept. 6 (17 days after blowout).
- Closed VBR's via ROV intervention as insurance against possible additional flows up annulus on August 24.
- Significant formation sediment flow from well started Sept. 2 and increased through Sept. 7. Window of opportunity to cap and kill the well ended at this point (unsafe to continue well control operations on rig floor).
- Result of this delay and ultimate aborting of the cap & kill operations was additional damage to rig (water cannon damage from boats, water damage to electronic equipment, equipment damage due to significant sediment flow), delay of recovery operation due to time required to remove tons of sediment from rig, and necessity to leave JIC's stack on wellhead to control well.
- Sheared DP via ROV intervention (1500 psi operating pressure) on Sept. 9. (Tool joint apparently had dropped 1-2' below shear rams due to slack off of compensator the first night.)

5



# Incident Summary (Continued)

- Winched rig off location on Sept. 9.
- Initiated cleaning of formation sediment, damage survey of rig and temporary establishment of key systems (electrical, air compressors, drawworks, riser tensioners, accommodation cleaning and services, etc.).
- POH w/sheared DP. Pulled riser and LMRP, pulled anchors, and initiated tow to Malta shipyard Oct. 2, 2004 @ 22:30.
- ROV reconnaissance after pipe shear shows minimal gas bubbling exiting from connecter mandrel above shear rams.
- Preliminary damage survey indicates a probable 3 month repair period at a cost of $10.8MM (including $3.1MM operating costs). Total impact on P&L including $7.5MM lost revenue = <u>$18.3MM</u>.
- Impact on client (Rashpetco): Delay of exploration program. Spread costs during repair period.

6



# Key Events Summary
# (Prior to Blowout)

- <u>19:50</u>: Driller made connection at 1432m w/o problems. Riser boost pump turned off during connection. Shaker hand goes to floor for connection (replacing floorhand working on other job), leaving shakers unattended.
- <u>20:10</u>: Driller noticed pit level change – called pump man (PM) who confirmed pit transfer was taking place (at mud engineer (ME) request). Night company man (NCM) discussed need to notify driller of transfers with PM.
- <u>21:00</u>: Night TP (NTP) relieves driller on floor. Depth 1484m.
- <u>21:06</u>: NTP is notified of another pit transfer.
- <u>21:07</u>: NTP back-reams stand and makes connection @ 1491m. Riser boost pump left on during connection. Shaker hand goes to floor for connection, again leaving shakers unattended.
- <u>21:15</u>: Pumps online again
- <u>21:20</u>: MWD crew confirms good survey / NTP starts drilling at 1491m.
- <u>21:22</u>: Driller returns to floor and NTP departs.
- <u>21:23</u>: Driller observes 120 psi pressure drop & checks pump strokes.



# Key Events Summary
# (Prior to Blowout)

- <u>21:25</u>: Shaker hand observes excessive flow at shakers. Due to poor English skills, decides to run up stairs to rig floor to warn driller (tells driller – "problems at shakers").
- <u>21:26</u>: Driller asks AD to go check problem at shakers.
- <u>21:27</u>: Mud logger calls driller to discuss pressure loss. Driller observes flow over rotary table.
- <u>21:28</u>: Driller stops rotation, chains brake & stops pumps.
- <u>21:30</u>: Driller functions diverter.
- <u>21:32</u>: Driller opens BOP panel when explosion on floor occurs. Driller evacuates floor.

8



# Key Events Summary
# (After Blowout)

- <u>21:32</u>: OIM hears blowout from office. NTP is alerted of event by AD, runs to pipe deck where he observes entire rig floor engulfed in fire. NTP goes to remote BOP panel in OIM's office.
- <u>21:34</u>: NTP closes shear rams (primary shear funchtion) and observes gallon counter moving. Moments afterward SS Engineer functions secondary shear function.
- <u>21:37</u>: OIM enters control room (emergency control center) & announces plan to winch off location. General alarm has sounded and mustering begins. Barge engineer (BE) and assistant BE start lining up winches.
- <u>21:39</u>: OIM joins Senior TP (STP), NTP & Subsea Engineer (SSE) in OIM office, and instructs team to unlatch LMRP and winch off location.
- <u>21:40</u>: OIM and team discuss possibility pipe may not have sheared (well still blowing), but OIM indicates he believes flow is residual gas in riser.
- <u>21:45</u>: OIM orders LMRP disconnect. SSE functions primary & secondary unlatch of connector.
- <u>21:46</u>:  NTP goes to pipe deck to assist fire fighting via deck monitors.
- <u>21:54</u>: Muster complete – all personnel accounted for.



9

# Key Events Summary
# (After Blowout)

- <u>21:55</u>: Power black out on rig. Rig goes on battery back up a short while and then emergency generator comes on line. 2nd "explosion" occurs on rig floor. (Power loss eliminated control of winches. Water supply on fire main lost soon afterward as loss of power to low pressure compressor causes pontoon skin valves to close shutting off SW). Work boat starts water cannons on rig floor area.

- <u>23:04</u>: Start evacuation to workboat via crane (101 PAX off by 23:59)

- <u>24:00</u>: Final 5 personnel launch lifeboat #1 (OIM / BE / Crane Op / Mech / asst BE).

- <u>00:30</u>: All 106 POB aboard workboat.



10

# Supporting Facts
# (Well Control Event)

1) Drilling program identifies 3 "medium risk hazards" in interval (gas fault, gas sand & bright seismic "pod"). Program risk assessment notes 3 zones create a risk of potential gas influx & consequence of well control problems (loss of section / loss of hole). Drilling program called for max pore pressure of 10.5 – 11.5 ppg through 12-1/4" interval.

2) RP Standing Instructions to Driller (SID) noted 3 hazard zones in interval.

3) RP reps on rig described Siena Up-1 well as "shake-down well" prior to drilling next HTHP well. Evidence of complacency on part of RP and TO personnel on rig (as indicated in items 4-7 below).

4) RP Day Company Man (DCM) repeatedly instructed that no pit transfers were to take place while drilling. However written RP Standing Instructions to Driller (SID) stated driller must be informed before transfers (indicating transfers were ok). NCM re-confirmed "no pit transfers" rule in meeting 2-1/2 hrs before event, although he was involved in several transfers just prior to the influx. (TO, NCM, mud engineer & mud loggers all were aware of transfers.)

**Transocean**

# Supporting Facts
# (Well Control Event)

5) Careful analysis of mudloggers PVT chart indicates +/- 10 bbl influx occurred during pit transfer & connection (21:06-21:20 hrs). Pit level change masked due to pit transfer and connection flow back. Flow was not observed on connection due to boost pump being left on.

6) Routine was to leave PVT audible alarm off, however warning light for high / low level alarm still in effect.

7) Procedures were not set up to effectively detect kicks. This might include restricted ROP through hazard intervals, periodic flow checks, flow checks on connections (or fingerprinting backflow if boost pump is left on), strict controls on pit transfers, tight coordination between all parties (RP / TO / mud loggers / mud engineer / pore pressure engineer), etc. This is responsibility of RP and TO.

8) Driller functioned diverter at first sign of well flow, but there is evidence that bag did not close and flowline/diverter line valves did not sequence. (Diverter checked at noon of same day.)

12



# Supporting Facts
# (Emergency Response)

1) Engines shut down likely due to fire damage to emergency shut down circuit on rig floor. Effect of power loss was loss of anchor winch motors. Also lost power to low pressure compressors, which caused pontoon skin valves to fail-safe close, shutting down SW to fire main. Also, this eliminated air pressure to start crane for evacuation, and crews had to rig up jumper hose to air receiver to start crane. Note that emergency generator bus does not feed low-psi compressors.

2) Shear rams (SR's) closed on tool joint as driller did not have time to space out pipe before blowout. Note: Primary shear function applied 1500 psi manifold operating pressure to 2 chambers of the dual chamber high pressure shear ram. Soon afterward, the secondary shear function was initiated, which bypasses manifold regulator and applies stack accumulator pressure to both chambers (roughly 3000 psi). These high pressure SR's require only 1200-1500 psi to cut 5", 19.5#, S-135 DP.

3) Key personnel did not determine that SR's did not shear pipe and close in well. Continued well flow up riser mis-identified as residual gas in riser.

13



# Supporting Facts
# (Emergency Response)

4)   LMRP disconnected +/- 10 minutes after SR's functioned. Obviously control of BOP lost after disconnect.

5)   Primary strategy was to shear pipe and winch off location.

6)   OIM / TP's did not attempt to close other rams or annulars after functioning SR's.

7)   Rig Emergency Response Manual is clear for blowouts: If pipe is sheared and flow is controlled there is no need to disconnect. If pipe shear is not successful, release drill string, disconnect LMRP and winch off.

14



# Causation Analysis

- Well Control Event and Emergency Response were evaluated separately utilizing REASON.

  – Asbjorn Olsen, Rick Deighton & John Mills performed the incident investigation, and team worked with Bob Alexander to analyze causation factors via REASON.

  – Additional information was gathered through interviews with key supervisors present on the rig during the event

15



# Simplified Causation Analysis
# (Loss of Well Control)

**Causation Factors - Loss of Well Control:**

1) JIC and Rashpetco team had a low perception of risk on this exploration well. Team did not heed warnings in drilling program and Rashpetco's Standard Instruction to Driller of possible zones of concern.

2) Team did not use disciplined, coordinated procedures to monitor for well influxes:
   - Riser boost pump not always shut off on connections.
   - No flow checks or "finger-printing" pit level trends on connections.
   - Written & verbal instructions from Rashpetco differed with respect to pit transfers during drilling & connections. However it is drillers ultimate responsibility to monitor the well (via flow checks & monitoring, coordination and control of pits, etc.).

The combination of the boost pump being left on during the connection, the lack of a proper flow check during the connection, and the pit transfer before and during the connection made it impossible to detect this influx.

16



# Simplified Causation Analysis
# (Loss of Well Control)

3)   Driller attempted to close diverter as opposed to annular per WC policies. (His reasoning was to protect roughneck. However, had the well been closed in at this point the flow would have been ultimately controlled and rig damage minimized.)

**Contributing Factors:**

- Experienced shaker hand helped on floor each connection, reducing our capability in identifying an influx.
- Shaker hand also had poor English skills which delayed his notification of driller of excessive flow at shakers.
- Mud logger used wrong bottoms up lag time (twice the actual 34 minutes), but our personnel did not cross check this. Effect was Rashpetco's pore pressure engineer was unable to identify increasing pore pressure as this made his analysis ineffective. (Note that this would have made well kill problematic had we used wrong bit to surface time in our calculations too).
- No preliminary kick sheet was maintained per policy. This would have allowed team to identify lag time error.

17



# Simplified Causation Analysis
# (Loss of Well Control)

- Rigs flow show was not accurate due to excess cuttings in flowline (plan was to clean out flowline next casing point). Mud logger did not supply a flow show device.
- Audible PVT alarms were turned off, although alarm light was still operational. Had this been on it could have provided a few moments of warning to allow driller to shut in before the bubble reached surface.
- Risks were identified in the planning stage, however this was not properly highlighted to the crews to ensure mitigation measures were put in place.

Note: These mitigation steps may include controlled ROP, flow checks on drilling breaks, flow checks on each connection, control & coordination of fluid in pits, etc. Additionally, the problem of shallow gas in deep water wells needs to be highlighted, as the lag time from bit to mudline is short. (Bubble reached surface in 13 minutes after pumps were turned on after connection.)

18



# Simplified Causation Analysis (Emergency Response)

- **Causation Factors - Emergency Response Problems:**

  1) Initial action by TP was to close Shear Ram (SR), which follows rig emergency response (E/R) plan for a blowout.  Unknown to team, DP did not shear as SR closed on tooljoint.

  2) Team did not attempt to close other preventer as back-up. Had this been done, this would have shut in well, which would have negated need to disconnect and winch off, and ultimately saved rig from more severe damage.

  3) E/R manual states if SR's are successfully closed and the well is controlled, there is no need to disconnect & winch off. However, LMRP was disconnected 8-10 min after functioning SR's with plan to winch off location. SR's were considered effectively closed by OIM (continued blow from well viewed as residual gas venting from riser). This was an error as we lost control of BOP after disconnect. The preferred option would have been to attempt to close another preventer.

19



# Simplified Causation Analysis (Emergency Response)

4)  Emergency response command and control was weak.
    - Obviously high stress from catastrophic blowout and fire was a factor.
    - OIM had not attended MEM training.

**<u>Contributing Factors:</u>**

- Power was lost on the rig 25 minutes after the start of the blowout and fire. The result was the immediate loss of power to anchor winches. Power loss to low pressure compressor also allowed sea chest valve to failsafe close, ending SW feed to the fire pumps.
- With the loss of power to key systems, loss of control of the stack after LMRP disconnect, and continued well flow after the shear rams were functioned, there was no option but to evacuate.



# Action Items
# (Well Control Event)

- ## Immediate Actions:

  1) Issue an alert:

     - Ensure rig management and drilling staff properly review all well programs to properly address known risks.

     - Remind OIM's, TP's & drillers of their fundamental responsibility to ensure procedures and systems are set up to monitor well stability at all times.

     - Highlight required drills and necessity to shut in well at first sign of problems.

     - Discuss required kick calculations that must be maintained (including bottoms up lag time, kick tolerances, etc.).



21

# Action Items
# (Well Control Event)

2)   Review well control training in light of this event.

   • Consider using this scenario in formal well control training, rigsite drills or as noted above, as a minimum, relay learnings in form of an alert. Ensure crews get guidance on initial choice of closing diverter, the decision to disconnect as opposed to attempting to close another preventer, etc.



22

# Action Items
# (Emergency Response)

- ## <u>Immediate Actions</u>:

1) Key personnel (OIM, barge captains, etc.) to successfully complete MEM training. This training not only confirms their ability to manage emergencies, but it teaches a systematic approach to handle these events. This includes setting up a proper Emergency Control Center, and procedures to effectively handle various emergencies. Drills will also be improved to train the supervisors and crews.

2) Review Emergency Response Plans for all rigs for this worst case blowout scenario to make sure they are viable. Initiate occasional drills to cover this potential event. (Consider possibility that shear rams may not cut pipe and review options like closing other preventers. Also, evaluate if 'pipe release' instruction is feasible in a blowout scenario.)

3) Confirm what critical equipment is lined up to run off the emergency generator bus for all rigs (like low pressure compressors, etc.) to ensure we have the capabilities required during a black out. (Check MAHRA for potential vulnerabilities in a black-out.)

23



# Accountability Review

- Roles, actions and inactions of all key players have been reviewed.

- Accountability Decision Tree has been used.

- Accountability calls being finalized at this time.

24





## BOP SCHEMATIC


BG - Jim Cunningham



26

# EXHIBIT B

**From:** Williams, Carter [mailto:Carter.Williams@sutherland.com]
**Sent:** Saturday, September 07, 2013 3:46 PM
**To:** Bartoszek, Peter; Pencak, Erica (ENRD) (Erica.Pencak@usdoj.gov); King, Rachel (ENRD); Appleman, Thomas; pthibodeaux@frilot.com; DDysart@frilot.com; Tamerlin.Godley@mto.com
**Cc:** Langan, Andrew; Gasaway, Robert R.; Nomellini, Mark J.; French, Yates
**Subject:** RE: TO and US Objections

Peter,

Transocean is willing to withdraw its objections to TREX-142886 and TREX-144662.  We are also willing to withdraw our FRE 802 objection to TREX-011583, and based on your representation that BP does not intend to use this exhibit for purposes prohibited by FRE 404, will also withdraw our FRE 404 objection.  However, we cannot agree to withdraw our relevance objections to TREX-11583.

TREX-11583 is a PowerPoint presentation regarding the results of an investigation into an August 20, 2004 well control event that occurred off the coast of Egypt while the *Jim Cunningham* was working for Rashpetco.  We struggle to see how the well control events described in TREX-11583 make any fact of consequence to the Phase 2 trial more or less likely.  TREX-11583 details the emergency response measures taken by the crew before they abandoned the rig.  Notably, the Key Events Summary ends 3 hours after the blowout with all crew successfully abandoning the rig.  Further, BP's statement that TREX-11583 expressly indicates a BOP-on-BOP was not used in the *Cunningham* response is incorrect.  Although the PowerPoint notes that a post-incident plan to "cut & cap the 5" DP above rig floor" was not attempted, this intervention technique is wholly separate from a BOP-on-BOP and is not relevant in any way to the Macondo response because it would have occurred from the rig floor.  TREX-11583 does not discuss source control efforts undertaken after the rig was moved off location.  If TREX-11583 were relevant to any phase of the Macondo trial, and Transocean posits that it is not, it would be Phase 1, not Phase 2.

Thanks and best regards,

Carter

**Carter Williams** | *Counsel* | 713.470.6126

**From:** Bartoszek, Peter [mailto:peter.bartoszek@kirkland.com]
**Sent:** Friday, September 06, 2013 12:30 PM
**To:** Pencak, Erica (ENRD) (Erica.Pencak@usdoj.gov); King, Rachel (ENRD); Williams, Carter; Appleman, Thomas; pthibodeaux@frilot.com; DDysart@frilot.com; Tamerlin.Godley@mto.com
**Cc:** Langan, Andrew; Gasaway, Robert R.; Nomellini, Mark J.; French, Yates
**Subject:** TO and US Objections

Dear Erica and Carter,

To follow-up on our meet-and-confer yesterday, BP requests that TO and the US withdraw their objections to these documents by 6:00 PM CDT today:

- TREX-142886 - Email from S. Tieszen to T. Hill, K. Wells, et al. re: FW:
- TREX-144662 - Email from M. McNutt to F. Shaffer re RE: Pending developments
- TREX-011583 - Transocean's Loss of Well Control and Emergency Response PowerPoint

First, regarding TO's hearsay objections to TREX 142886 and 144662, these documents are clearly non-hearsay admissions by the United States under Fed. R. Evid. 801(d)(2). Statements by government employees within the scope of their employment are non-hearsay. Further, these documents are records of regularly conducted activity ("business records") under Fed. R. Evid. 803(6), and therefore excepted from the rule against hearsay. Tellingly, the US has not objected to these documents as hearsay.

Second, regarding TO's hearsay objection to TREX-011583, this document is also not hearsay. It is a Transocean document bearing a Transocean logo summarizing a Transocean incident. It is a business record under Fed. R. Evid. 803(6), and it is also an admission under Fed. R. Evid. 801(d)(2).

With respect to TO's and the US's relevance objections to TREX-011583, this exhibit is undoubtedly relevant in Phase 2 because it "(a) has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." June 11, 2013 Order, Rec. Doc. 10346.  TREX-011583 expressly indicates that a BOP-on-BOP was not used to stop the flow of oil during the Jim Cunningham incident. The Aligned Parties have made the prior use and understanding of capping stacks and BOPs an issue in the source control trial. Just like the Court ruled that TREX-009088 (a 2009 email chain about a meeting between BP and MMS relating to industry preparations for deep water blowouts) was relevant, *id.*, we fully expect that the Court will find TREX-011583 to be relevant to the Source Control trial.

Lastly, with respect to TO's Rule 404 objection to TREX-011583, we emphasize that whatever evidence of Transocean's character exists in TREX-011583, BP is not planning to use that evidence to prove that TO acted in conformity therewith on some other occasion. Rule 404(b) expressly permits other uses, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." TO's Rule 404 objection is accordingly without merit.


Regards,
Peter

_____
**Peter Bartoszek**
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
+1-312-862-3279 (o)
+1-847-990-0904 (m)

************************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
************************************************************

CIRCULAR 230 DISCLOSURE: To comply with Treasury Department regulations, we inform you that, unless otherwise expressly indicated, any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the Internal Revenue Code or any other applicable tax law, or (ii) promoting, marketing or recommending to another party any transaction, arrangement, or other matter.

This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and

as such privileged and confidential. If you are not an intended recipient, you may not review, copy, or distr bute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

# EXHIBIT C

1

```
        UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL    )  MDL NO. 2179
BY THE OIL RIG       )
"DEEPWATER HORIZON" IN )  SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010     )  JUDGE BARBIER
             )  MAG. JUDGE SHUSHAN




             *******************
              VOLUME 1
             *******************


    Deposition of Edward Ray Ziegler, taken
at the Pan-American Building, 601 Poydras Street,
11th Floor, New Orleans, Louisiana, 70130, on the
24th day of July, 2013.
```

2

```
 1              A P P E A R A N C E S
 2
 3
 4   APPEARING FOR THE PLAINTIFFS STEERING COMMITTEE:
 5     Ms  Robin L  Greenwald
       WEITZ & LUXENBERG
 6     700 Broadway
       New York, New York  10003
 7     Mr  Matthew E  Lundy
       LUNDY, LUNDY, SOLLEAU & SOUTH, LLP
 8     501 Broad Street
       Lake Charles, Louisiana  70601
 9
10
     APPEARING FOR BP, INC :
11     Ms  Maureen F  Browne
       COVINGTON & BURLING
12     1201 Pennsylvania Avenue, Northwest
       Washington, D C  20004-2401
13
       Mr  Lee Rudofsky
14     KIRKLAND & ELLIS
       655 Fifteenth Street, NW
15     Washington, D C  20005-5793
16     Ms  Karen K  Gase
       Managing Attorney
17     BP AMERICA INC
       501 Westlake Park Boulevard
18     Houston, Texas  77079
19
20   APPEARING FOR TRANSOCEAN:
       Ms  Amelia L  B  Sargent
21     Ms  Tamerlin J  Godley
       MUNGER TOLLES & OLSON
22     355 South Grand Avenue, 35th Floor
       Los Angeles, California  90071-1560
23
24
25
```

3

```
 1   APPEARING FOR ANADARKO PETROLEUM CORPORATION:
       Mr. David H. Hardwicke
 2   KUCHLER POLK SCHELL WEINER & RICHESON
     1715 Northpark Drive, Suite A
 3   Kingwood, Texas 77339
 4
 5   APPEARING FOR HALLIBURTON:
       Ms. Gwen E. Richard
 6   GODWIN LEWIS
     1331 Lamar, Suite 1665
 7   Houston, Texas  77010-3133
 8   Mr. Prescott W. Smith
     Ms. Joni J. Ogle
 9   GODWIN LEWIS
     Renaissance Tower
10   1201 Elm Street, Suite 1700
     Dallas, Texas 75270-2041
11
12
     ALSO PRESENT:
13     Mr. Peter Jennings, Videographer
       Mr. Ray Aguirre, Case Manager
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1              INDEX
 2    VIDEOTAPED ORAL DEPOSITION OF
           EDWARD RAY ZIEGLER
 3           JULY 24, 2013
             VOLUME 1
 4
 5
 6   Appearances                    2
 7
     Direct Examination-Ms  Browne         11
 8   Examination-Ms  Sargent         295
 9
     Changes and Signature          299
10   Reporter's Certificate         301
11
12
13          EXHIBIT INDEX
14
15   Ex  No      Description       Marked
16   11578  Phase II Report - Source Control,
         Edward R  Ziegler, P E , C S P ,
17       dated May 1, 2013, marked as
         CONFIDENTIAL; 143 pages        14
18
     11579  Phase II Report - Source Control,
19       Rebuttal Report, Edward R
         Ziegler, P E , C S P , dated June
20       10, 2013; 50 pages           14
21   11580  LexisNexis Report titled Dave
         Barrett; Clean Harbors
22       Environmental Services, Inc ,
         Plaintiffs - Appellants, v
23       Rhodia, Inc , Defendant - Appellee
         dated April 12, 2010; nine pages   26
24
25
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

61

1     A. Well, I reference it.  I'm not sure what
2  you -- "rely" doesn't mean you agree with it, but
3  I do cite it, yes.
4     Q. Sure.  And their -- Wild Well Control are
5  blowout specialists, right?
6     A. Well, that's a good question.  BP, in
7  their Oil Spill Response Plan, calls them
8  firefighters.
9     Q. Okay.  The question, sir, was:  Is Wild
10  Well Control a blowout specialist?
11        MS. RICHARD:  Objection, form.
12     A. I -- I don't know what they call
13  themselves.  BP calls them firefighters.
14     Q. (By Ms. Browne) Sir, in your opinion,
15  because you're here --
16     A. Yeah.
17     Q. -- to issue your opinion, right?  Is Wild
18  Well Control a blowout specialist?
19        MS. RICHARD:  Objection, form.
20     A. That's -- that could be one thing that
21  they might do sometimes, yes.
22     Q. (By Ms. Browne) All right.  They're --
23  they're one of the biggest blowout specialist
24  companies around, aren't they?
25        MS. RICHARD:  Objection, form.

62

1     A. I don't -- I don't know.
2     Q. (By Ms. Browne) You -- you don't know?
3     A. No.
4     Q. You -- you're familiar with -- with
5  entities that operate in the Gulf of Mexico,
6  right?
7     A. Yeah, but I don't know what "biggest"
8  means.  I mean, do they have the most equipment?
9  Are they the best capitalized?  Do they have the
10  most employees?  I don't know the answer to that.
11     Q. Would -- would you expect Wild Well, as a
12  Company, to be knowledgeable about what to -- to
13  do to bring blowouts under control?
14     A. It would depend on the circumstances.
15  See, I -- I agree with Neal Adams in the DEA-63
16  Report --
17     Q. Oh, we're going get to that.
18     A. -- that wells --
19     Q. Yeah.
20     A. -- that as wells become more complex,
21  that the Operator actually has to be the Expert
22  rather than the -- even he calls them --
23     Q. I'm sorry, I'm going to interrupt you --
24     A. -- firefighters.
25     Q. -- sir.  I'm going to ask that you -- you

63

1  confine your answers to -- to my questions,
2  because I don't have a lot of time, and you will
3  have plenty of opportunity when Halliburton gets
4  up to -- to answer however you care to, okay?
5        MS. RICHARD:  And object to the
6  sidebar.
7     A. Well --
8     Q. (By Ms. Browne) Okay?
9     A. You'll have to excuse me, but if I didn't
10  think I was not -- if I didn't think I was
11  answering your question, I wouldn't be talking.
12     Q. Okay.  So why don't we turn to Tab 7?
13     A. M-h'm.
14     Q. Tab 7 is the deposition of David Barnett
15  from Wild Well Control.  And at Page 332, Line
16  19, the question is:  "All right.  Post-Macondo,
17  Wild Well Control has developed a capping
18  stack... --
19        "ANSWER:  Correct.
20        "QUESTION:  -- that's suitable for
21  deepwater usage, correct?
22        "ANSWER:  Yes.
23        "QUESTION:  Okay.  And as far as Wild
24  Well Control knows, no one in the world had
25  developed such a device prior to its development

64

1  during Macondo; is that correct?
2        "ANSWER:  That is correct."
3        Did I read that correctly?
4     A. Yeah, but he's wrong.
5     Q. Okay.  And then --
6     A. He's incorrect.
7     Q. And then Tab 6 is the deposition of
8  Patrick Campbell.  Do you know who Patrick
9  Campbell is?
10     A. I don't know his title, but I know who he
11  is.
12     Q. President of Wild Well Control.
13     A. Yes.
14     Q. And if you turn to Page 334, Line --
15        THE COURT REPORTER:  Are we marking
16  this?
17        MS. BROWNE:  No, we're not.
18     Q. (By Ms. Browne) -- Line 24 --
19        MS. RICHARD:  Oh, we're not marking
20  it?
21        MS. BROWNE:  No.
22     Q. (By Ms. Browne) -- Line 24, the question
23  is:  "As of April 20, 2010, did any operator in
24  the Gulf of Mexico have a deepwater capping stack
25  like what" -- "like what was used at Macondo on

16  (Pages 61 to 64)

65

1    the shelf and ready to go?
2         "ANSWER:  No."
3         Did I read that correctly?
4    A.  Yes, you did.
5    Q.  And then if you turn to Page 339, in that
6    same deposition, Line 8:
7         "QUESTION:  Is it fair to say that as of
8    April 20, 2010, no one in the industry, operators
9    or these well control service providers,
10   contemplated the need to have the deepwater
11   capping stack or source control devices that were
12   ultimately created for use with the Macondo well?
13        "...Objection, form.
14        "ANSWER:  I don't know if they
15   contemplated it.  I know they didn't execute on
16   it."
17        Did I read that correctly?
18   A.  Yes, and that's a very good -- very good
19   point.  His answer is exactly right.
20   Q.  And you -- you -- you don't have a basis
21   on which to disagree with that -- the blowout
22   specialist from Wild Well that no one in the oil
23   and gas industry had a prebuilt deepwater capping
24   stack prior to April 20th, 2010, do you?
25        MS. RICHARD:  Objection, form.

66

1    A.  Well, I -- I do have a basis.  I have a
2    factual basis.  First of all, in 2004 or 2005, a
3    well on the semisubmersible rig JIM CUNNINGHAM
4    was capped in the Mediterranean Sea, so that
5    was --
6    Q.  (By Ms. Browne) What was the depth?
7    A.  Around 2,000 feet, deep water.
8    Q.  And who was the Operator?
9    A.  I think it was BG.
10   Q.  And when did they have the dressed and
11   staged prebuilt deepwater capping stack
12   available?
13   A.  I -- I don't know.
14   Q.  Okay.  And --
15   A.  I don't know when -- I don't know when
16   they had it available, but they used -- they
17   capped the deepwater well.
18   Q.  And -- and where was it staged?
19   A.  I don't know.
20        THE COURT REPORTER:  45 seconds.
21        MS. BROWNE:  All right.  Why don't
22   we take a break?  Thank you.
23        THE VIDEOGRAPHER:  The time is
24   9:42 a.m.  We're off the record, ending Tape 1.
25        (Recess from 9:42 a.m. to 10:02 a.m.)

67

1         MS. BROWNE:  Are y'all ready?
2         THE COURT REPORTER:  Wow.  Did you
3    say "y'all"?
4         (Discussion off the record.)
5         THE VIDEOGRAPHER:  All set?
6         The time is 10:02 a.m.  We're back on the
7    record, beginning Tape 2.
8    Q.  (By Ms. Browne) Mr. Ziegler, on Page 37
9    of your initial Report, you suggest that Shell
10   and Senta had capping stacks available in Brazil.
11   Right?
12   A.  Which page?
13   Q.  37.
14   A.  (Reviewing document.)  The -- actually,
15   that's a typo.  It should be, Stena, S-t-e-n-a,
16   Drilling.
17   Q.  Okay.
18   A.  But if the -- they have an interesting
19   system that functions as a capping device.
20   Q.  Right.  We'll get to that in a second.
21        I did want to clarify something with you.
22   When -- when I use the term "capping stack," I'm
23   talking about a capping stack similar to what was
24   used in the DEEPWATER HORIZON incident.  I'm
25   not -- I'm not talking about just a BOP.  So when

68

1    I say "capping stack," that's what I'm referring
2    to.  Okay?
3         MS. RICHARD:  Object -- objection,
4    form.  And I think the witness has testified to
5    what he's talking about when he's talking about a
6    capping stack, and -- and he uses a certain
7    terminology.
8         MS. BROWNE:  Right.  He's equating
9    BOPs and capping stacks, and I'm not, and -- and
10   I just want to be clear that I'm not talking
11   about --
12   Q.  (By Ms. Browne) If -- if you're going to
13   talk about BOPs as opposed to a capping stack,
14   similar to the capping stack used in this
15   incident, I'd ask you to clarify that, please.
16        MS. RICHARD:  Well, he -- he already
17   has clarified it, Maureen.  He's already
18   clarified the capping stack is a type of BOP and
19   that he uses those terms interchangeably.
20        MS. BROWNE:  I -- I understand that,
21   but that's not what he says in his Report.  That
22   clarification isn't clear in the Report, and so
23   I'd like us to have a record that's -- that's
24   consistent with the opinions he's issued in
25   writing in his two Reports, so -- because that --

17 (Pages 65 to 68)

89

1    kitchen and you -- you have a Band-aid on hand in
2    case you slice your finger, that's a -- that's
3    not a preventative measure, right, the Band-aid?
4        A. Well, you're --
5            MR. SMITH:  Objection, form.
6            MS. RICHARD:  Objection, form.
7        A. You're wrong.
8        Q. (By Ms. Browne) I'm wrong?
9        A. You're -- you're wrong, because having
10   the Band-aid present is the preventative, that
11   would be like having a capping stack ahead of
12   time.  Actually, applying the Band-aid when you
13   need it would be the -- a -- a corrective or
14   recovery situation, so it's -- so the Band-aid is
15   both.  Having the Band-aid present, that you have
16   one in the first-aid kit in the kitchen, that's
17   the preventative measure, and then once you slice
18   your finger, you put the Band-aid on as a
19   recovery method, but if you don't have a
20   Band-aid, then you're not prepared, and your
21   finger bleeds for maybe 87 days.
22       Q. If I -- even if I have a Band-aid, I
23   still may cut my finger, right?
24       A. Oh, absolutely.  That's why --
25       Q. Okay.

90

1        A. That's -- but that's why you need to have
2    a Band-aid, because you know -- you can foresee
3    and know that, just like the well might blow out.
4    That's exact -- that's a very good analogy.
5        Q. Thank you very much.  On Page 25, you
6    state that:  Capping stacks -- "The use of
7    capping stacks has long been established" in
8    the -- "in the industry..."  Right?
9        A. I'm -- I'm sorry, which page?
10       Q. 25.
11       A. Yeah.  Could -- could -- could I ask you
12   something, please?
13       Q. Yeah.
14       A. These are very good questions, but if you
15   would direct me to the page number, and then ask
16   me the question, instead of asking the question
17   and then telling me the page, I can keep up
18   quick -- more quickly and save time --
19       Q. Fair enough.
20       A. -- save time.
21       Q. Fair enough.
22       A. So which -- which page?
23       Q. Page 25.
24       A. Okay.
25       Q. "The use of capping stacks has long been

91

1    established in the industry as a successful and
2    viable method of Source Control..."
3        Did I read that correctly?
4        A. Yes.
5        Q. You mean, surface, the use of surface
6    capping stacks has long been established in the
7    industry, right?
8        A. No.
9            MS. RICHARD:  Objection --
10   objection, form.
11       A. No.  I mean capping stacks, capping
12   devices.
13       Q. (By Ms. Browne) Capping stacks like what
14   was used in the BP DEEPWATER HORIZON incident?
15           MS. RICHARD:  Objection, form.
16       A. Capping devices.
17       Q. (By Ms. Browne) Right.  So --
18       A. Could -- could be like that, or something
19   different, but capping devices, yeah.  Capping
20   stacks, capping devices, BOPs have long been used
21   as a -- with success in the industry.  I'm -- I'm
22   only aware of one deepwater capping event
23   because, thankfully, we haven't had many
24   deepwater well control incidents, but the one
25   that I'm aware of where a capping stack was used,

92

1    so I guess of all the deepwater blowouts, capping
2    stacks have been used successfully on two out of
3    two events that I know of.  The JIM CUNNINGHAM in
4    the Mediterranean and Macondo.  So the
5    application of a capping stack, as far as I know,
6    has been a hundred percent in the industry to be
7    successful.
8        Q. Okay.  You cite to the deposition
9    testimony of Mr. McWhorter, who's Cameron's BP
10   and GM, in the -- in their Pressure Control
11   Business Unit, as support for your opinion that
12   the use of capping stacks has long been
13   established in the industry as successful,
14   correct?
15           MS. RICHARD:  Objection, form.
16       A. That's -- that's a particular cite I
17   happen to have here.  I can't cite everything
18   I've read.  I have thousands and thousands of
19   pages of documents, so I put -- I put a
20   representative cite.
21       Q. (By Ms. Browne) Right.
22       A. Yes.
23       Q. And -- and Mr. McWhorter, the testimony
24   that you're citing in support of -- of this
25   particular allegation is directed to the capping

23  (Pages 89 to 92)

97

1    A. But they're -- they're --
2    Q. And --
3    A. They have MMS permits.
4    Q. Right. And --
5    A. And they're in Federal waters.
6    Q. And on --
7    A. The -- at least the bottom of the wells
8  are in Federal waters.
9    Q. -- Page 695, third paragraph, "Well
10 capping is both compatible and feasible with all
11 drilling operations..."
12    A. I'm sorry. Where are you looking at?
13    Q. 695. We're still on Exhibit 9828 at
14 Tab 14.
15        MS. RICHARD: What -- are you -- I'm
16 sorry. I'm not seeing the page number.
17    A. I don't -- I don't see any page numbers.
18    Q. (By Ms. Browne) It's the -- it's the
19 Production number. 695.
20    A. Oh, the Bates number.
21        MS. RICHARD: Okay.
22    A. Bates number.
23    Q. (By Ms. Browne) Do you see that?
24    A. I -- I -- I will -- I will -- I'll get
25 there in a minute. 695. Got it. Thank you.

98

1    Q. The first sentence of the third
2  paragraph: "Well capping is both compatible and
3  feasible with all drilling operations as the
4  technology is applied at surface."
5        Did I read that correctly?
6    A. Yeah.
7    Q. Okay. And then at the page ending in
8  698, two pages away or so, there's a table,
9  "TABLE 4-21." Do you see that?
10    A. Yes.
11    Q. And -- and down next to "COMPATIBILITY,"
12 which is second from the bottom, there's a column
13 for "CURRENT METHOD: WELL CAPPING." Do you see
14 that?
15        Do you see that?
16    A. Yes, I see it.
17    Q. Okay. And it reads: "Technology is
18 compatible and applied at surface (no sensitivity
19 to well type)." Do you see that?
20    A. Right. And under "FEASIBILITY" in the
21 second column it says: "Prior proven success in
22 offshore environments."
23    Q. Yeah. Okay. My --
24    A. "Demonstrated success" --
25    Q. My question, sir, was: Do you see in

99

1  that -- in that column where it says:
2  "Technology is compatible and applied at surface
3  (no sensitivity to well type)." Do you see that?
4  That's my question.
5    A. Yeah, I do see that, and then down below
6  it says "offshore."
7    Q. And offshore doesn't mean subsea, does
8  it?
9    A. No, it -- offshore -- they -- they for
10 their database in here they use the all --
11 offshore Gulf of Mexico and the offshore North
12 Sea databases. They're -- they're studying all
13 kinds of wells. I agree with you it's for all
14 wells.
15    Q. Is --
16    A. It's -- it's the capping methodology. It
17 doesn't matter what kind of well it is. It's for
18 all wells.
19    Q. Yeah. Is it your opinion that something
20 that had never been used or even tested in deep
21 water prior to the DEEPWATER HORIZON incident
22 could have been considered Best Available and
23 Safest Technology?
24        MS. RICHARD: Objection, form.
25    A. Well, first of all, it had been used.

100

1  I -- I --
2    Q. (By Ms. Browne) That's not my question,
3  sir.
4        MS. RICHARD: Objection.
5    Q. (By Ms. Browne) My question is --
6    A. H'm.
7    Q. I just want you to answer my question.
8        MS. RICHARD: If your -- if your
9  question is saying something that isn't true,
10 then he doesn't have to agree to your question,
11 and you've -- you -- in setting out before the
12 deposition started you said --
13        MS. BROWNE: Right. And he can --
14        MS. RICHARD: -- make you understand
15 and agree with my question.
16        MS. BROWNE: No, I didn't say agree
17 with my question. He can say "No." If the
18 answer to my question is "No," he can say "No."
19        MS. RICHARD: No, that's -- he's not
20 agreeing with the premise in your question.
21 That's my objection. Objection, form.
22        You can answer the question.
23    Q. (By Ms. Browne) Is it your opinion that a
24 capping stack that's never been used or even
25 tested in deep water prior to the DEEPWATER

101

1  HORIZON incident could have been considered the
2  Best Available and Safest Technology?
3      MS. RICHARD:  Objection, form.
4      A.  Well, I can't under -- I can't answer
5  that question, because it's my belief that based
6  on at least the JIM CUNNINGHAM incident in the
7  Mediterranean Sea that capping devices had been
8  applied in deep water, but even if we throw out
9  that one event, yes, we're talking about the
10  technology of the capping device, and as you
11  pointed out earlier, in a document, plain vanilla
12  BOPs were used as capping devices on hundreds of
13  wells in Kuwait.  So the technology for using
14  capping devices was -- it's -- it's not even
15  BAST -- it's not even the Best Available
16  Technology, it's common technology in the oil
17  industry.
18      Q.  (By Ms. Browne) You -- you claim an
19  Operator needs to have BAST source control
20  equipment based on 30 CFR 250.107(c).  Is that
21  right?
22      A.  Well, do you want to refer me to where
23  I'm saying that so I can look at it, which page?
24      Q.  Do you know that -- that that is your
25  opinion or not?

102

1      A.  Well, it could be my opinion, but since
2  I'm not -- don't know where you're looking, I
3  don't know what you're looking at, but if -- if
4  that's the right section, that could be my
5  opinion.
6      Q.  Well, is there a different section that
7  covers BAST technology in the MMS Regulations?
8      A.  Well, there's three or four; and in the
9  Outer Continental Shelf Lands Act, there's
10  several sections that talk about BAST.
11      Q.  Right.  Well, I'm talking about the MMS
12  Regulations.  I'm wondering -- the -- the
13  agreement for an Operator-used BAST technology,
14  is that in any other section other than 250?
15      MS. RICHARD:  Objection, form.  If
16  you need to review your Report, you're -- you're
17  entitled to do that.
18      THE WITNESS:  Yeah.
19      A.  Where is that in my Report?
20      Q.  (By Ms. Browne) I'm just asking
21  generally.
22      A.  Oh.  Can you show me where it is in my
23  Report so I can look at it?
24      Q.  Well, I'm not asking about your Report
25  right now.  I just want to know, generally:  Do

103

1  you have an understanding that BAST is used in a
2  subsection other than 250?
3      MS. RICHARD:  Objection, form.
4      A.  I -- I -- as I'm sitting here right now,
5  I don't know.
6      Q.  (By Ms. Browne) Okay.  Do you understand
7  that -- that 30 CFR 250 applies to drilling and
8  incidents prior to a blowout?
9      MS. RICHARD:  Objection, form.
10      A.  That's not correct.
11      Q.  (By Ms. Browne) Okay.
12      A.  Because if -- otherwise, if that's what
13  it applied to, the Oil Spill Response Plan --
14  let's say, even for something like a skimmer --
15  would not -- would not be even talked about in
16  this case.
17      Q.  Do you have an understanding that Section
18  254 of 30 CFR 254 applies to Source Control
19  events?
20      A.  254?
21      Q.  Yes, sir.
22      A.  Yeah.  254.5(c) specifically says that
23  doesn't matter what you put in your Oil Spill
24  Response Plan, you have to abate a Source Control
25  as soon as possible.  So that -- that certainly

104

1  applies is to Source Control.
2      Q.  Yeah.  What is -- what is the definition
3  of "BAST," as you understand it?
4      A.  Well, I've -- I've read a number of
5  papers on BAST, et cetera; but it's Best
6  Available and Safest Technology.  So it applies
7  to procedures, it applies to equipment; but
8  it's -- it -- it's what's available.
9      For example, the plain-vanilla Cameron
10  BOPs would be BAST or sub-BAST, not even to the
11  level of BAST.
12      Q.  Sure, but what -- what's the definition
13  of "BAST"?  I know you've given an example of the
14  plain-vanilla Cameron BOPs.  I'm asking what your
15  definition of BAST is.
16      MS. RICHARD:  Objection, form.
17      A.  Well, it's a feasible and usable existing
18  technology that is at the limits of technological
19  innovation.  That's why I say in my Report that
20  BOPs and capping devices are sub-BAST.  They're
21  not -- you don't even have to argue about what
22  BAST is.  They're routine devices that have been
23  used in the industry for years and -- and in --
24  in hundreds, if not thousands, of applications.
25  So they're not even at the level of BAST where

26 (Pages 101 to 104)

---

129

1        MS. RICHARD:  Objection, form.
2     A.  I don't know.  He could be.
3     Q.  (By Ms. Browne) Let's take a look.
4     A.  I mean, I -- I know, but I don't recall.
5     Q.  I'm sorry, what did you --
6     A.  I know, but I don't recall.
7     Q.  You know what, but you don't recall?
8     A.  I know whether he's a member or not, but
9  I don't recall, as I'm sitting here right now.
10     Q.  So do you know that he's a member of the
11  IADC?
12     A.  I know that fact --
13     Q.  Okay.
14     A.  -- but I don't recall it right now.  I've
15  looked at it.
16        MS. BROWNE:  All right.  Why don't
17  we take our break?
18        THE VIDEOGRAPHER:  The time is
19  11:02 a.m.  We're off the record, ending Tape 2.
20        (Recess from 11:02 a.m. to 11:22 a.m.)
21        MS. BROWNE:  Are you ready?
22        MS. RICHARD:  Yes.  Thank you.
23        THE COURT REPORTER:  Let's go.
24        THE VIDEOGRAPHER:  All set?
25        The time is 11:22 a.m.  We're back on the

---

130

1  record, beginning Tape 3.
2     Q.  (By Ms. Browne) Mr. Ziegler, I think you
3  testified earlier that the JIM CUNNINGHAM was the
4  other incident in which a subsea cap was used; is
5  that right?
6     A.  Capping device, yes.
7     Q.  And that was used to -- to kill a blowing
8  out -- or -- or to cap a blowing out well, the --
9  the JIM CUNNINGHAM?
10     A.  Well, it was a -- a BOP-on-BOP
11  installation.  That's all -- that's all I know
12  about it.
13     Q.  Okay.
14     A.  There was a fire during the event, I
15  believe, but that's the information that I have
16  seen.
17     Q.  Where -- where did you get that
18  information?
19     A.  Well, I -- I saw in Bob Turlak -- Robert
20  Turlak's deposition where he testified about that
21  event in Year 2004, 2005, when he -- I believe,
22  at that time, he was an employee of Cameron
23  Ironworks.  And then in some offshore event
24  database, I've seen that event several times over
25  the years, that had the water depth and different

---

131

1  things.  It was in -- in the West Delta Deep
2  Concession, offshore Egypt, just -- just north of
3  Alexandria, and I -- I -- I was -- I drilled a
4  well in that area myself.  So I just happened to
5  run across it somewhere.
6     Q.  Okay.  I'm going to show you a document
7  that -- that we found on the Internet describing
8  the -- the JIM CUNNINGHAM incident.  The -- the
9  JIM CUNNINGHAM was a Transocean vessel, wasn't
10  it?
11     A.  Yes, it was.
12     Q.  And -- yeah.  Why don't we -- I'll hand
13  you this document.  And -- and we'll mark it.
14  We -- we just found it.  It's a publicly
15  available document that was just pulled off the
16  Internet.
17        MS. BROWNE:  And I -- what's the
18  next number?  I don't know.  1156 --
19        THE COURT REPORTER:  -- 83.
20        MS. RICHARD:  11583.
21        (Exhibit No. 11583 marked.)
22     Q.  (By Ms. Browne) Okay.  Terrific.  Do you
23  mind marking that, please?
24        MS. SARGENT:  I'm going to object to
25  this document since it's a -- but I'm not sure

---

132

1  what this document is.  It purports to be a
2  Transocean document.
3        MS. BROWNE:  Sure.
4     Q.  (By Ms. Browne) If you turn to Page 5 of
5  this document, which is entitled:  "Jim
6  Cunningham Egypt/Mediterranean, Loss of Well
7  Control and Emergency Response, Event: August 20,
8  2004 at 21:30" hours "Mediterranean District
9  Eurafrican Unit," and on Page 5, the -- first
10  paragraph reads:  "Wild Well Control...was
11  mobilized..."
12        That's -- that's the same "Wild Well
13  Control" that -- that we've been talking about
14  today, right?
15        MS. RICHARD:  Objection, form.
16     Q.  (By Ms. Browne) Do -- do you know?
17     A.  By the Company name, it could be.
18  I would -- it -- it probably was, yes.
19     Q.  (By Ms. Browne) Okay.  And it says Wild
20  Well Control "mobilized equipment from US with
21  the plan to cut & cap the 5" inch "DP above rig
22  floor..."
23        "DP" is drill pipe; is that right?
24     A.  Yes.
25     Q.  "...and bullhead to kill."

---

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

# EXHIBIT D

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL        )   MDL NO. 2179
BY THE OIL RIG           )
"DEEPWATER HORIZON" IN )   SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010           )   JUDGE BARBIER
                         )   MAG. JUDGE SHUSHAN




                    * * * * * * * * * * * * * * * * *
                         VOLUME 1
                    * * * * * * * * * * * * * * * * *


          30(b)(6) Deposition of Robert Joseph
Turlak, Transocean, taken at the Pan-American
Building, 601 Poydras Street, 11th Floor, New
Orleans, Louisiana, 70130, on the 6th day of
November, 2012.

190

1  the form.
2      A.  Quantif --
3      Q.  (By Mr. Williamson) Yeah.  It's a one
4  percent chance, it's a 50 percent chance, it's a
5  42.6 percent chance?  Had you ever done that sort
6  of analysis?
7      A.  No, sir.
8      Q.  Okay.  That sort of analysis is done in
9  Engineering design work, isn't it?
10         MR. BAAY:  Objection to the form.
11  Object, outside the scope of the Notice.
12      A.  I don't remember doing that in
13  Engineering design, no.
14      Q.  (By Mr. Williamson) Sir, did -- had
15  anyone in Management ever came to you and asked
16  you:  "Gee, should we -- given our institution
17  drilling deepwater and ultra deepwater wells,
18  should we upgrade the BOPs in our company?"
19         MR. BAAY:  Stop.
20      Q.  (By Mr. Williamson) Had they come to you
21  before April 20th, 2010 to discuss that issue
22  with you?
23         MR. BAAY:  Object to form.
24      Instruct you not to answer the question.
25      Q.  (By Mr. Williamson) Had anyone in the

191

1  company come to you and said:  "We're formulating
2  our Emergency Response Plan.  We need to know the
3  chance that our BOPs will fail"?
4      Did anyone from Management come to you
5  with those sorts of comments before April 20th,
6  2010?
7         MR. BAAY:  Objection to the form.
8      A.  No.
9      Q.  (By Mr. Williamson) All right.  Did
10  anyone come to you and say:  "We need to know
11  what resources we need to dedicate to a backup
12  system behind the blowout preventer.  Can you
13  help us with that?"
14      Did any Member of Management come to you
15  with those sorts of request?
16         MR. BAAY:  Objection to the form.
17      A.  No.
18      Q.  (By Mr. Williamson) Were you budgeted any
19  money to try to develop a capping stack before
20  April 20th, 2010?
21      A.  No.
22      Q.  Were you budgeted any money to develop a
23  capping stack after April 20th, 2010?
24      A.  I was asked to look into it, yes.
25      Q.  Okay.  Well, you were asked to look into

192

1  it.  Did they budget you money and say:  "This is
2  a budget and a Team for a capping stack"?
3      Has that ever happened after April 20th,
4  2010?
5      A.  No.
6      Q.  Okay.  Have you asked for it?
7      A.  No.
8      Q.  Okay.  Has anyone even asked you your
9  opinion on that subject?
10         MR. BAAY:  Object to form.
11      A.  No.
12      Q.  (By Mr. Williamson) Okay.  When you were
13  developing the capping stack, there were a number
14  of technological hurdles that had to be jumped,
15  correct?
16         MR. BAAY:  Objection to the form.
17      Q.  (By Mr. Williamson) I'll rephrase.
18      When you were developing and working on
19  the capping stack option, April to July 2010, you
20  had to solve some engineering issues, correct?
21         MR. BAAY:  Objection to the form.
22      A.  Yes.
23      Q.  (By Mr. Williamson) For example, you had
24  to figure out how -- whether to put the stack on
25  the LMRP or to put it on the flex joint, as one

193

1  example?
2      A.  We didn't do that, because we weren't
3  making the decisions.  We were --
4      Q.  Okay.
5      A.  -- merely doing what BP was telling us to
6  do, and if they wa -- were going to pull the --
7  the LMRP off, we would have attached it to the --
8  to the lower BOP stack.
9      Q.  Oh, you --
10      A.  If not --
11      Q.  All right.
12         MR. BAAY:  Keep going.  Don't --
13  don't let him interrupt you.
14         MR. WILLIAMSON:  I didn't interrupt
15  him.
16         MR. BAAY:  Go ahead with your --
17      A.  Or --
18         MR. BAAY:  -- answer.
19      A.  Or if -- or if they wanted to go onto the
20  flex joint, we could configure our -- our capping
21  stack to where it could be done that way, also.
22      Q.  (By Mr. Williamson) Okay.  Here I have a
23  little different question.
24      A.  Sure.
25      Q.  Had -- before this disaster, had you ever

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

194

1  thought about the problem of getting a BOP to
2  land on a BOP before?
3       A. No, I hadn't thought about it, because
4  we --
5       Q. Before --
6       A. -- because I've been involved in doing it
7  before.
8       Q. All right.  It -- you've done it before?
9       A. Yes.
10      Q. Okay.  How many times?
11      A. Once.
12      Q. Okay.  When?
13      A. 1988.
14      Q. Okay.  For what?  When you were at
15 Cameron?
16      A. Correct.
17      Q. Okay.  Let's talk at -- with Transocean.
18 Had anyone with Transocean ever talked to you
19 about putting a BOP on top of a BOP and how
20 difficult that would be --
21           MR. BAAY:  Objection to form.
22      A. It was not --
23      Q. (By Mr. Williamson) -- before -- before
24 the Macondo disaster?
25      A. It was not discussed in -- with me, but

195

1  it was done --
2       Q. Okay.
3       A. -- on the JIM CUNNINGHAM, off -- offshore
4  Egypt.
5       Q. Okay.  And the JIM CUNNINGHAM was a
6  blowout that happened in 2004 on a Transocean
7  rig, correct?
8       A. 2005.
9       Q. 2005.
10      A. (Nodding.)
11      Q. Right?
12      A. Correct.
13      Q. As a matter of fact, the -- there was a
14 Driller who was fired as a result of the JIM
15 CUNNINGHAM incident, correct?
16           MR. BAAY:  Objection to the form.
17      A. That's not to my knowledge.  I don't know
18 that.
19      Q. (By Mr. Williamson) Okay.  And there was
20 an OIM who was reassigned as a result of the JIM
21 CUNNINGHAM incident, correct?
22           MR. BAAY:  Objection to the form.
23           Instruct you not to answer.
24      Q. (By Mr. Williamson) You don't know?
25           MR. WILLIAMSON:  Oh, you're not

196

1  going to let him answer that?
2           MR. BAAY:  No.
3       Q. (By Mr. Williamson) Okay.  The -- here --
4  okay.  I'll ask you this question about the JIM
5  CUNNINGHAM incident.
6       A. (Nodding.)
7       Q. Okay.  I assume today you came to talk
8  about the Emergency Response Plan that Transocean
9  was using in connection with the Macondo Well,
10 right?
11      A. Yes.
12      Q. Okay.  Did anybody ever use the JIM
13 CUNNINGHAM incident, the blowout that happened in
14 2005, in order to alter the Emergency Response
15 Plan that Transocean had?
16           MR. BAAY:  Objection to the form.
17      A. Not aware of it.
18      Q. (By Mr. Williamson) Okay.  And I'm asking
19 you that question as a Corporate --
20      A. I --
21      Q. -- Representative.
22      A. -- understand.
23      Q. You correct that?  You understand that?
24      A. Yes, sir.
25      Q. Thank you.

197

1       All right.  You also had a blowout in
2  India, didn't you, in 2009?
3       A. Not aware of that one.
4       Q. Okay.  Do y'all have a rig called the
5  DWE?
6       A. DEEPWATER EXPEDITION?
7       Q. DEEPWATER EXPEDITION.  Do you have a
8  rig li -- does Transocean have such a rig?
9       A. Yes, sir.
10      Q. Okay.  Would that rig have been in India
11 in 2009?
12      A. Could have been.
13           MR. BAAY:  Objection to the form.
14      Q. (By Mr. Williamson) Okay.
15      A. Could have been.
16      Q. The -- there was a Well Control Event on
17 the DEEPWATER EXPEDITION in 2009.  My question to
18 you is:  Did anyone from Transocean use the
19 information from that deepwater incident on the
20 DEEPWATER EXPEDITION in order to alter, change,
21 or update the Emergency Response Plan that they
22 had?
23           MR. BAAY:  Objection to the form.
24      A. I don't know that they did.
25      Q. (By Mr. Williamson) And you're answering

50 (Pages 194 to 197)