## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

CHCA MAINLAND, LP and CHCA CLEAR
LAKE, LP D/B/A MAINLAND MEDICAL
CENTER

        Plaintiffs,

vs.

                                 CASE NO.: 13-02090 "J" (1)

BP EXPLORATION & PRODUCTION INC.,
BP AMERICA PRODUCTION COMPANY,
BP p.l.c., and HALLIBURTON ENERGY
SERVICES, INC.

        Defendants.

## FIRST AMENDED COMPLAINT

    Plaintiffs, CHCA Mainland, LP and CHCA Clear Lake, LP d/b/a Mainland Medical Center,

by and through undersigned counsel, sues Defendants, BP Exploration and Production, Inc., BP

America Production Company, BP p.l.c., and Halliburton Energy Services, Inc., for loss of revenue

and income and other damages, losses, and/or costs as a result of the oil spill following the sinking

of the oil rig *Deepwater Horizon* in the Gulf of Mexico on or about April 22, 2010, and alleges as

follows:[1]

### Introduction

    1.    This action arises out of losses suffered by Plaintiffs due to the release of millions

of gallons of hydrocarbons into the Gulf of Mexico from the oil well drilled in Mississippi

Canyon Block 252 (hereinafter referred to as the "Macondo Well") following the explosions and

---

[1] Plaintiffs are aware that certain Transocean entities commenced an action under the Limitation of Shipowners Liability Act. Subject to a determination as to the Transocean entities' ability to limit liability, Plaintiffs reserve the right to amend this Complaint to add additional claims and parties.

fire aboard the MODU *Deepwater Horizon* on or about April 20, 2010, that resulted in *Deepwater Horizon*'s sinking on or about April 22, 2010 and subsequent release of hydrocarbons (the "Spill").  Oil flowed into the Gulf of Mexico unchecked for months.  Millions of barrels of oil were discharged into the Gulf from late April through mid-July 2010.  Eventually, the oil made landfall on the shorelines of the Gulf Coast states of Texas, Louisiana, Alabama, Mississippi and Florida ("Gulf Coast States"), causing immense environmental and economic harm to the entire region.

2.     As a result, Plaintiffs have sustained, and will continue to sustain, significant and extensive economic losses.

### Jurisdiction and Venue

3.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1333 and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2717(b).

4.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendant state law claims because those claims are so related to the federal claims in the action that they form part of the same case or controversy.

5.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) (venue generally) and 33 U.S.C. § 2717(b) (OPA).

### Parties

6.     Plaintiffs are and were at all material times incorporated in the State of Delaware with its principal place of business in Texas City, Texas.  At all times material hereto, Plaintiffs were engaged in the business of providing healthcare services.

7.     BP Exploration & Production Inc. ("BPXP") is and was at all material times a business organized under the laws of Delaware with its principal place of business in

Warrenville, Illinois and with its principal purpose being oil and gas exploration and production. BPXP was designated a "Responsible Party" as that term is contemplated under the Oil Pollution Act, 33 U.S.C. § 2701(32) and under similar applicable laws of Gulf Coast States. BPXP does business in Louisiana, has an agent for service in Louisiana, and is subject to personal jurisdiction in Louisiana.

8.      BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.  BP America does business in Louisiana, has an agent for service in Louisiana, and is subject to personal jurisdiction in Louisiana. BP America contracted with Transocean Ltd. for the drilling of the Macondo Well by the MODU Deepwater Horizon.

9.      BP p.l.c. is and was at all material times a British multinational oil and gas company headquartered in London, United Kingdom.  BP p.l.c. does business in Louisiana and all other Gulf Coast States and is subject to personal jurisdiction in Louisiana.

10.      Halliburton Energy Services, Inc. ("Halliburton") is and was at all material times a Delaware corporation with its principal places of business in Houston, Texas and Dubai, United Arab Emirates. Halliburton does business in Louisiana, has an agent for service in Louisiana, and is subject to personal jurisdiction in Louisiana.  Upon information and belief, Halliburton was engaged in cementing operations aboard *Deepwater Horizon* at the Macondo Well.  Halliburton is and was at all material times in the business of designing and implementing cement mixes for use in various applications, including, but not limited to, deepwater oil exploration activities.

11.      At all times material hereto, *Deepwater Horizon* was a vessel and an offshore facility, capable of being used to drill offshore wells.

12.     At all times material hereto, *Deepwater Horizon* had as part of its operating equipment and appurtenances a Blowout Preventer ("BOP") and a Lower Marine Riser Package ("LMRP") (together the "BOP stack"), a marine riser and associated piping, and other equipment, all of which constitute, *inter alia*, "appurtenances" under Admiralty law.

### Factual Allegations

13.     On or about May 8, 2008, BPXP, as lessee, executed the document known as the "Oil and Gas Lease of Submerged Lands under the Outer Continental Shelf Lands Act," "Serial number OCS-G 32306" (hereinafter the "Lease"), pertaining to "All of Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10."

14.     On or about May 14, 2008, the United States, by and through the Minerals Management Service (hereinafter "MMS"), as lessor, executed the Lease, which became effective on June 1, 2008.

15.     As lessee of the Lease, BPXP at all material times was subject to, *inter alia*, the requirements of 30 C.F.R. § 250.400 and the regulations specified therein.

16.     On or about October 2009, drilling began at the Macondo Well.

17.     At all times material herein, the Macondo Well was an "offshore facility" within the meaning of OPA, 33 U.S.C. §§ 2701 *et seq.*

18.     Beginning in or about February 2010, the MODU *Deepwater Horizon* was utilized for the purpose of continuing the drilling of the Macondo Well.  Drilling of the Macondo Well using the *Deepwater Horizon* continued in February 2010 and through March and a portion of April 2010.

19.     *Deepwater Horizon* utilized a mud gas separator to remove hydrocarbon gas from the mud utilized for drilling purposes.  The mud gas separator is and was at all material times a

low-pressure system.  BPXP and Halliburton knew or should have known the design limits of the mud gas separator would have been exceeded by the expanding and accelerating hydrocarbon flow back to *Deepwater Horizon* and, in fact, were exceeded.

20.     The mud gas separator gas outlet vent was positioned in such a manner as to direct potentially concentrated levels of gaseous fumes onto or below the deck of *Deepwater Horizon* and possibly into confined spaces, allowing for the rig to be enveloped in a flammable mixture of gases.

21.     The first indications of the flow of hydrocarbons from the well were observable in the real-time data recorded on *Deepwater Horizon*.  BPXP and Halliburton either did not observe or did not recognize the indications of flow until after hydrocarbons entered the riser.

22.     On or about April 20, 2010, the Macondo Well experienced an uncontrolled well event and an uncontrolled blowout of hydrocarbons, including oil and natural gas.

23.     The loss of well control was due to the failure of mechanical and cement barriers to seal off the well against the influx of highly pressurized hydrocarbons from the reservoirs surrounding the bottom of the well.  The many indications that hydrocarbons were leaking into the well were misinterpreted and/or overlooked by BPXP and Halliburton prior to the blowout. Once the hydrocarbons reached the vessel decks, fire and gas prevention and alarm systems on the vessel failed to warn the crew and prevent ignition of a fire.  The vessel's subsea BOP also failed to seal the well and stop the flow of hydrocarbons fueling the fire, which exacerbated the disaster.

24.     After *Deepwater Horizon* sank, oil and gas gushed out of the damaged well and into the Gulf of Mexico for approximately 12 weeks, fouling the environment, damaging and

contaminating real and personal property, and doing immense and long-lasting damage to the environment and economy of Gulf Coast States and the Gulf of Mexico.

25.     Neither BPXP's nor Halliburton's protocols fully addressed how to respond to a high-flow emergency situation after the loss of well control.

26.     Halliburton was hired to design and implement a cement slurry mix or combination of mixes capable of properly sealing the Macondo Well at a depth of approximately 5,000 feet below the sea surface.

27.     The principal purpose of the cement slurry design mix that Halliburton was responsible for developing and implementing was to seal the Macondo Well to such an extent as to prevent the escape of hydrocarbons from the wellbore that could cause personal injury, death, property, and environmental damage.

28.     Halliburton designed a number of cement slurry mixes, including a foam cement slurry, to be used to seal the Macondo Well.

29.     Halliburton conducted numerous tests relating to the foam cement slurry design mix intended to be used to seal the Macondo Well.  The test results of the foam design slurry mix revealed, *inter alia*, an insufficient, non-representative nitrogen volume in the design slurry indicating that the foam cement slurry was likely unstable and would result in nitrogen breakout. Additionally, the test results revealed that the low yield point of the foam cement slurry mix could or would lead to difficulty in foam stability, that the use of a defoamer could or would lead to difficulty in foam stability, and that the lack of an additive controlling fluid loss could or would allow fluid to be lost at a rate greater than that recommended and accepted in industry practice.

30.     Despite the test results of the design slurry, Halliburton made no recommendations for changing, altering, or otherwise modifying the foam cement slurry mix design.

31.     Halliburton recommended and, in fact, utilized the foam cement slurry mix design that revealed the numerous aforementioned flaws during the testing protocol without changing, altering, or otherwise modifying the mix design prior to its implementation.

32.     As a result of the inadequate, insufficient, and demonstrably faulty mix design, the nitrified foam slurry suffered nitrogen breakout, nitrogen migration, and incorrect cement density, all of which contributed to the failure to properly achieve zonal isolation of hydrocarbons.

33.     Although the BOP was designed to automatically actuate in the event of a sudden loss of pressure, the automatic mode function failed to operate the BOP's blind shear ram upon the loss of hydrostatic control over the flow of hydrocarbons in the Macondo well.  The response teams were unable to manually activate *Deepwater Horizon*'s BOP to prevent the continuous flow of hydrocarbons from the Macondo well.

34.     The BOP utilized a series of 9-volt battery packs to operate the automatic mode function actuator in each pod and solenoids to relay signals to the various mechanical components of the BOP.

35.     At all material times, BPXP and Halliburton knew or should have known that the manufacturer recommended replacement of the batteries in the battery packs at least once per year or after 33 actuations, whichever occurred first.

36.     The maintenance records reveal that neither BPXP nor Halliburton replaced the batteries in the battery packs per the manufacturer's recommendations.

37.     The batteries had an insufficient charge to activate the automatic mode function and actuate the blind shear ram.  The failure to actuate the blind shear ram prevented the wellbore from being sealed at the location of the BOP.

38.     The BOP utilized solenoid valves to relay actuation of the various sealing methods in the BOP.

39.     Solenoid valve 103, which was required to operate the high-pressure blind shear ram close function, had a non-original equipment manufacturer electrical connector installed and was found to be defective.  Solenoid valve 3A, which was required to increase the upper annular preventer regulator pressure, was also found to be defective.

40.     BPXP and Halliburton knew or should have known that failing to properly maintain these essential elements of the BOP would render the BOP inoperative and/or unreliable.

41.     The failure of the solenoid valves identified herein prevented the closure of the blind shear ram and the activation of the upper annular preventer, thereby allowing hydrocarbons to continue to escape from the wellbore.

42.     As a result of the lack of hydrostatic control over the hydrocarbons and the failure of the BOP to activate, there were explosions and fires aboard *Deepwater Horizon* that led to the sinking of *Deepwater Horizon*.  As *Deepwater Horizon* sank to the seafloor, the attached riser bent and broke allowing hydrocarbons to escape from the broken end of the riser and two additional places along its length.

43.     The April 20, 2010, uncontrolled well event and uncontrolled blowout of oil and methane gas was not prevented by BPXP, Halliburton, or by *Deepwater Horizon* or its equipment and appurtenances, including, but not limited to, the BOP stack.

44.     In violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, BPXP and Halliburton failed, *inter alia*, to take necessary precautions to keep the Macondo Well under control.

45.     In violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, BPXP and Halliburton failed, *inter alia*, to use the best available and safest drilling technology to monitor and evaluate the Macondo Well's conditions and to minimize the potential for the Macondo Well to flow or kick.

46.     In violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, BPXP and Halliburton failed, *inter alia*, to fulfill its respective responsibilities to maintain well control of the Macondo Well.

47.     In violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, BPXP and Halliburton failed, *inter alia*, at times relevant herein to maintain continuous surveillance on the rig floor.

48.     In violation of federal regulations, including, but not limited to, 30 C.F.R. § 250.401, BPXP and Halliburton failed, *inter alia*, to maintain equipment and materials, including, but not limited to, the BOP stack, that were available and necessary to ensure the safety and protection of personnel, equipment, natural resources, and the environment.

49.     BPXP and Halliburton caused and/or contributed to the Spill by failing to assure well control of the Macondo Well through, *inter alia*, actions, corporate actions, and/or corporate practices of disregarding federal regulations, as evidenced by various safety and other audits of *Deepwater Horizon*, reflecting the known failure, prior to the Spill, to properly design, install, maintain, repair, and operate equipment intended to prevent personal injury, loss of life, harm to the environment, and disasters like the Spill.

50.     BPXP and Halliburton caused and/or contributed to the Spill by failing to assure well control of the Macondo Well through, *inter alia*:

a.     Failing to assure that well control was maintained by proper and adequate cementing of the Macondo Well;

b.     Failing to assure that well control was maintained by mechanical barriers, including, but not limited to, the BOP stack;

c.     Failing to assure that well control was maintained by proper and adequate inspection and maintenance of the BOP stack;

d.     Failing to assure that well control was maintained by proper and adequate pressure testing;

e.     Failing to assure that well control was maintained by the use of appropriate fluids to maintain hydrostatic pressure on the wellbore;

f.     Failing to assure that well control was maintained by proper and adequate well monitoring;

g.     Failing to assure that, once well control initially was lost, well control was regained by proper and adequate well control response;

h.     Failing to assure that, once well control initially was lost, well control was regained by proper and adequate surface containment and overboard discharge and diversion of hydrocarbons; and

i.     Failing to assure that, once well control initially was lost, well control was regained by proper and adequate BOP stack emergency operations.

51.     As a result of the discharge of oil and methane gas and the resulting multiple explosions and fires that occurred aboard *Deepwater Horizon*, equipment was damaged and/or

destroyed, which equipment could have prevented and/or limited further damage and injury, including the prevention and/or limitation of discharge of oil into and upon waters of the Gulf of Mexico and adjoining shorelines of the United States, including the Gulf Coast States.

52.     As a result of the Spill, Plaintiffs sustained and will sustain "damages," within the meaning of OPA, 33 U.S.C. § 2702(b).

53.     The Spill resulted from one or more of the following: acts, joint acts, omissions, fault, negligence, gross negligence, willful misconduct, and/or breach of federal safety and/or operating and/or construction regulations by BPXP, Halliburton, and/or their respective agents, servants, employees, crew, contractors and/or subcontractors with whom said Defendants had contractual relationships.

54.     To date, the Macondo Well has been capped to prevent the continued flow of hydrocarbons into the Gulf of Mexico.  However, the hydrocarbons that escaped prior to the well's capping made landfall along the Gulf coastline of all the Gulf Coast States, and much of it remains in the Gulf of Mexico and on the seafloor.

55.     The fire and explosion on *Deepwater Horizon*, its sinking, and the resulting release of hydrocarbons were caused by the combined and concurring improper acts and omissions of BPXP and Halliburton, which renders them jointly and severally liable to Plaintiffs for all of the damages suffered by Plaintiffs.

56.     BPXP and Halliburton knew or should have known of the dangers and risks associated with deepwater drilling and failed to take appropriate measures to prevent foreseeable damage to Plaintiffs.

57.     The pristine nature of the Gulf of Mexico and its surrounding marine and estuarine environments attract numerous visitors, customers, and patrons to the Gulf Coast States

and Gulf Coast States' businesses; however, the release of hydrocarbons has tainted the Gulf of Mexico and surrounding coastal, marine, and estuarine environments, thereby causing many of the would-be visitors to the Gulf Coast States to travel to and engage in commercial activities in other, less Gulf-oriented locales, if at all, decreasing commercial activity that would have positively impacted Plaintiffs' business.  Indeed, Plaintiffs rely on the pristine nature of the Gulf of Mexico for its subsistence, namely as the driver of commercial activity.

58.     As a result of the released hydrocarbons and their contamination of the Gulf of Mexico, Plaintiffs suffered a decrease in revenues.  Accordingly, Plaintiffs have lost substantial earnings and profits.  As the contamination of the Gulf of Mexico persists and/or worsens, Plaintiffs will suffer further lost earnings and profits in the future.  Additionally, the value of Plaintiffs' business enterprise has been diminished.

59.     There are many other potential effects from the released hydrocarbons that have not yet become known, and Plaintiffs reserve the right to amend this Complaint once additional information becomes available.

60.     Plaintiffs satisfied the claims presentment requirement under OPA, 33 U.S.C. § 2713.

### COUNT I
### (Strict Liability Under OPA, 33 U.S.C. §§ 2702(b)(2)(D) Against BPXP and BP p.l.c. for Lost Revenues)

61.     Plaintiffs reallege the allegations of paragraphs 1 through 60 of this Complaint and further alleges:

62.     BPXP was designated as a "Responsible Party" as that term is defined in OPA, 33 U.S.C. § 2701(32).

63.     BP p.l.c. publicly acknowledged that it would cover or otherwise make funds available for damages assessed against BPXP as a result of the Spill, including, but not limited to, damages under OPA.

64.     OPA is a strict liability statute with the "Responsible Party" liable for the removal costs and damages specified therein.  *See* 33 U.S.C. § 2702(a).

65.     Plaintiffs derive much of their revenue from economic activity related to the Gulf Coast States' natural resources, including its waters, estuarine environments, pristine beaches, and marine life.

66.     The Spill permitted oil to impact the Gulf Coast States' territorial waters and wash upon the Gulf Coast States' beaches, thereby causing would-be visitors to avoid the impacted areas.

67.     As a result of the Spill, Plaintiffs suffered the loss of income and revenues and will continue to suffer such losses in the future.  Such damages are recoverable under OPA, 33 U.S.C. § 2702(b)(2)(D).

**COUNT II**
**(Negligence Under Texas Law Against All Defendants)**

68.     Plaintiffs reallege the allegations of paragraphs 1 through 60 of this Complaint and further alleges:

69.     The explosions, fire, sinking of *Deepwater Horizon*, release of hydrocarbons, and damage to the environment were caused or contributed to by the joint negligence of Defendants in the following respects among others that will be revealed during further investigation and discovery:

  a.     Failing to properly maintain, equip, and/or operate *Deepwater Horizon*;

b.      Operating *Deepwater Horizon* in such a manner as to cause explosions and fires onboard, causing it to sink and result in the release of hydrocarbons;

c.      Failing to properly inspect and equip *Deepwater Horizon* with the appropriate equipment and personnel;

d.      Acting in a careless, reckless, and negligent manner;

e.      Failing to promulgate, implement, and enforce appropriate rules and regulations to ensure the safe operations of *Deepwater Horizon*, which could and would have prevented the disaster;

f.      Failing to take appropriate action to avoid, mitigate, or remedy the disaster;

g.      Carelessly, recklessly, and negligently implementing policies and procedures for safe conduct during offshore operations in the Gulf of Mexico;

h.      Failing to ensure that *Deepwater Horizon* and its equipment were in proper working order and/or were free from defects;

i.      Failing to timely warn;

j.      Failing to timely control the release of hydrocarbons from the Macondo Well;

k.      Failing to provide appropriate and effective disaster prevention equipment; and

l.      Acting with clear disregard for the life, personal property, real property, and/or environment in or around the Gulf of Mexico and its coastal, marine, and estuarine environments and the livelihoods of those who relied on the same.

70.     The injuries to Plaintiffs were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the damages associated with the release of hydrocarbons.

71.     Furthermore, the disaster would not have occurred had the Defendants exercised a high degree of care.  Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

72.     The negligence caused the release of hydrocarbons and damage to the environment directly and proximately causing Plaintiffs to suffer damages exceeding the jurisdictional requirements of this Court as can nearly be determined at this time, which are continuing to accrue.

73.     Plaintiffs are entitled to a judgment against Defendants jointly and severally for damages suffered as a result of Defendants' careless, reckless, and negligent acts and/or omissions in an amount to be determined by the trier of fact.

**COUNT III**
**(Negligence *Per Se* Against All Defendants under Texas Law)**

74.     Plaintiffs reallege the allegations of paragraphs 1 through 60 of this Complaint and further alleges:

75.     Defendants' conduct with regard to the manufacture, maintenance, operation, and/or utilization of drilling operations and oil rigs such as *Deepwater Horizon* is governed by numerous state and federal laws, and permits issued under the authority of these laws.

76.     These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs and others.

77.     Defendants' violations of these statutory standards constitute negligence *per se* under Texas law.

78.    Defendants' violations of these statutory standards proximately caused Plaintiffs damages, warranting an award of compensatory damages against Defendants jointly and severally.

## COUNT IV
### (Gross Negligence Under the General Maritime Law Against All Defendants)

79.    Plaintiffs realleges the allegations of paragraphs 1 through 60 of this Complaint and further alleges:

80.    Defendants owed a heightened duty to Plaintiffs to exercise reasonable care in the manufacture, installation, maintenance, and operation of *Deepwater Horizon* and its appurtenances.

81.    Defendants had a heightened duty of care to Plaintiffs because of the inherent risk and great danger associated with deepwater drilling and the cementing work such as that *Deepwater Horizon* was performing at the time of the explosions and fires.

82.    Defendants breached their legal duty to Plaintiffs and failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business of Plaintiffs in the negligent manufacture, installation, maintenance, and/or operation of *Deepwater Horizon* and its appurtenances.

83.    Defendants knew or should have known that their wanton or reckless conduct would result in a foreseeable blowout and release of hydrocarbons, causing personal injuries, deaths, property, and environmental damages.  Furthermore, it is and was at all material times foreseeable for the blowout and release of hydrocarbons to cause damage to the economic and business interests of Plaintiffs given its proximity to the area affected by the spill.

84.     As a direct and proximate result of Defendants' wanton or reckless conduct, Plaintiffs suffered legal injury and damages for which Defendants are liable jointly and severally, including but not limited to, loss of income, loss of profits, and other economic losses.

### COUNT V
### (Gross Negligence Under Texas Law Against All Defendants)

85.     Plaintiffs reallege the allegations of paragraphs 1 through 60 of this Complaint and further alleges:

86.     Defendants owed a heightened duty of care to Plaintiffs because of the inherent risk and great danger associated with deepwater drilling and the cementing work such as that *Deepwater Horizon* was performing in the vicinity of the Gulf Coast State's coast at the time of the explosions and fires.

87.     Defendants breached their legal duty to Plaintiffs and failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business of Plaintiffs in the negligent manufacture, installation, maintenance, and/or operation of *Deepwater Horizon* and its appurtenances.

88.     Defendants knew or should have known that their reckless conduct would result in a foreseeable blowout and release of hydrocarbons, causing personal injuries, deaths, property, and environmental damages.  Furthermore, it is and was at all material times foreseeable for the blowout and release of hydrocarbons to cause damage to the economic and business interests of Plaintiffs given its proximity to the area affected by the Spill.

89.     As a direct and proximate result of Defendants' reckless conduct, Plaintiffs have suffered legal injury and damages for which Defendants are jointly and severally liable, including but not limited to, loss of income, loss of profits, and other economic losses.

**COUNT VI**

**(Strict Liability for Abnormally Dangerous Activity Under Texas Law Against All Defendants)**

90.     Plaintiffs reallege the allegations of paragraphs 1 through 60 of this Complaint and further alleges:

91.     Defendants were engaged in abnormally dangerous and/or ultrahazardous activities.

92.     Defendants' activities resulted in explosions, fires, and release of hydrocarbons from the Macondo Well, which:

a.     Created a high degree of risk of harm to others, and particularly to Plaintiffs;

b.     Created a risk involving a likelihood that the harm threatened by Defendants' activities would be great and/or unwarranted;

c.     Were not a matter of common usage;

d.     Were inappropriate to the place that they were being carried on, in that they constituted an unnatural use of the waters of the Gulf of Mexico, which imposed an unusual and extraordinary risk of harm to Plaintiffs.

93.     As a direct and proximate result of Defendants' conduct in engaging in the abnormally dangerous and/or ultrahazardous activities as alleged herein, substantial quantities of hydrocarbons escaped from the Macondo Well.  This identified and realized harm to Plaintiffs is that type of risk that makes Defendants' activities abnormally dangerous and/or ultrahazardous.

94.     Plaintiffs are entitled to a judgment finding Defendants strictly liable for damages suffered as a result of Defendants' abnormally dangerous and/or ultrahazardous activities and awarding Plaintiffs adequate compensation in an amount to be determined by the trier of fact.

## COUNT VII
### (Punitive Damages Under the General Maritime Law Against BPXP and BP p.l.c.)

95.     Plaintiffs reallege the allegations of paragraphs 1 through 60 and 79 through 83 of this Complaint and further alleges:

96.     BPXP owned a leasehold interest in the Macondo Well and oversaw the drilling activities at the site.

97.     BPXP neglected to ensure the safety of its operations by, *inter alia*, failing to properly maintain the BOP stack, failing to monitor the wellhead pressures, and failing to prevent the unabated flow of hydrocarbons into the Gulf of Mexico.

98.     The foregoing allegations demonstrate wanton, reckless, and grossly negligent conduct.

99.     On or about November 16, 2012, BPXP pled guilty to certain criminal charges brought by the United States for actions leading up to, handling of, and arising out of the Spill.

100.    BPXP's guilty plea is *prima facie* evidence of its wanton, reckless, and grossly negligent conduct.

101.    BPXP's guilty plea demonstrates its acceptance of the allegations of wrongdoing against it.   The charges that BPXP pled guilty to warrant punitive damages such that future parties are dissuaded from engaging in the same or similar wanton, reckless, and grossly negligent conduct.

102.    Accordingly, under the General Maritime Law (including, but not limited to, by virtue of the Admiralty Extension Act), Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT VIII
## <u>(Punitive Damages Under the General Maritime Law Against All Defendants)</u>

103.    Plaintiffs reallege the allegations of paragraphs 1 through 60 and 79 through 83 of this Complaint and further alleges:

104.    BPXP and Halliburton owned leasehold or other financial interests in the Macondo Well.   BPXP oversaw and was responsible for the drilling activities at the site. Halliburton designed the foam slurry that was intended to maintain the wellhead integrity.

105.    BPXP neglected to ensure the safety of its operations by, *inter alia*, failing to properly maintain the BOP stack, failing to monitor the wellhead pressures, and failing to prevent the unabated flow of hydrocarbons into the Gulf of Mexico.

106.    Halliburton employed a faulty mix design that it knew was inadequate to maintain the integrity of the wellhead.

107.    The foregoing allegations demonstrate wanton, reckless, and grossly negligent conduct under the General Maritime Law.

108.    Due to the wanton, reckless, and grossly negligent conduct of the Defendants, Plaintiffs suffered irreparable harm, the extent of which can only be demonstrated through an award of punitive damages.

109.    Accordingly, under the General Maritime Law (including, but not limited to, by virtue of the Admiralty Extension Act), Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, CHCA Mainland, LP and CHCA Clear Lake, LP d/b/a Mainland Medical Center demand judgment against Defendants, jointly and severally, as follows:

A.    Economic and compensatory damages in amounts to be determined at trial;

B.      Pre-judgment and post-judgment interest at the maximum rate allowable by law;

C.      Punitive damages in an amount to be determined at trial;

D.      Attorneys' fees in those claims stated above that provide for such recovery;

E.      Costs; and

F.      Such other and further relief available under all applicable state and federal laws and any relief this honorable Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Under Fed. R. Civ. P. 38(b), CHCA Mainland, LP and CHCA Clear Lake, LP d/b/a Mainland Medical Center hereby demand trial by jury.

Dated:  July 10, 2013

_____
Louis B. ("Brady") Paddock
Louisiana State Bar No. 28711
**NIX PATTERSON & ROACH, LLP**
2900 St. Michael Drive, 5th Floor
Texarkana, Texas 75503-2388
Telephone: (903) 223-3999
Fax No: (903) 223-8520
bpaddock@nixlawfirm.com

*Counsel for Plaintiffs,* CHCA Mainland, LP and CHCA Clear Lake, LP d/b/a Mainland Medical Center