UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | : | MDL NO.  2179 |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | SECTION:  J |
| | : | |
| This Document Relates to: | : | JUDGE BARBIER |
| | : | |
| Civ. No. 10-4536 | : | MAG. JUDGE SHUSHAN |

. .   . .   . .    . .   . .   . .   . .   . .   . .   . .    . .   . .   . .   . .   . .   . .    . .   . .   . .   . .   . . . . . .

**UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO REVIEW
MAGISTRATE'S ORDER REGARDING MOTION TO STRIKE DR. NATHAN
BUSHNELL DEPOSITION DESIGNATION OR, IN THE ALTERNATIVE, MOTION
TO STRIKE BP "RELIED UPON" EXPERTS**

The United States seeks review of the September 12, 2013 Order of the Magistrate Regarding Motion to Strike Dr. Nathan Bushnell (Rec. Doc. 11352) ("Order to Strike") as a "relied upon" expert pursuant to the Order of this Court Regarding Presentation of Evidence in Phase Two Trial (Rec. Doc. 11087) ("Phase Two Trial Order").  BP/ Anadarko[1] moved to preclude any reference to Dr. Bushnell's work, as well as to strike designation of his deposition. BP Motion to Strike Designation of Dr. Nathan Bushnell from Phase II Deposition Bundle List, Rec. Doc. 11336 ("BP Motion").  The Magistrate Judge granted BP's motion, but unveiled for the first time in the Order to Strike additional requirements for the "relied upon expert" provision contained in the Phase Two Trial Order.

The Phase Two Trial Order contains a provision that allows a testifying expert to rely on another, non-testifying expert, provided that reliance is set forth in the testifying expert's report. BP proposed this new, case-specific expert rule after all of the Phase Two expert reports were served and two weeks into the expert deposition schedule.  BP's "relied upon expert" rule was

---

[1] The Motion was made jointly by BP and Anadarko but for brevity the United States will hereinafter refer to both parties as "BP."

1

adopted by the Court nearly three weeks after the completion of Phase Two expert depositions and was related to the expert witness cuts that are opposed by the United States. Only after the parties disclosed their "relied upon experts" did BP finally reveal BP's proposed interpretation of the rule in its motion to strike Dr. Bushnell. Not surprisingly, BP argued that Dr. Bushnell's designation should be stricken.

This Court should overrule the Magistrate Judge's Order to Strike and allow the United States to include Dr. Bushnell as a "relied upon expert" as defined in the Phase Two Trial Order. The United States fulfilled all the requirements of that provision contained in the Phase II Order: for each of the relevant United States' experts, his reliance on Dr. Bushnell is explicitly "set forth in the testifying expert's expert report." BP, who proposed the "relied-upon" exception, designated three of its experts as "relied-upon" experts. If the Order to Strike is allowed to stand and the same standard is not applied to BP, BP will be allowed to bring all of its Phase Two experts, save one, whereas the United States will have to drop nearly half of its experts (7 of 15). The United States was under the reasonable assumption that the "relied upon" experts provision rule was available to all parties – as in fact the Phase Two Trial Order provides – not just BP. But Dr. Bushnell's preclusion would further tie the hands of the US by preventing the US from presenting relevant evidence addressing a variety of challenges that BP will pursue at the Phase II trial.

**Factual Background:**

The factual background is set forth in the US Opposition to BP's Motion to Strike,[2] ("US Opposition"), pps. 2-5. Three of the US experts – Dr. Dykhuizen, Dr. Griffiths, and Dr. Pooladi-Darvish – explicitly relied on the work of Dr. Bushnell in their analyses. Simply put, each of

---

[2] Rec. Doc. 11337. The United States incorporates this Opposition herein in full.

these highly qualified experts performed sophisticated modeling of flow in the Macondo well in order to estimate the flow rate and cumulative flow during the 87 days after the explosion. The opinions of each of the testifying experts involves in some fashion the critical two days in July, 2010, when BP was inserting the Capping Stack over the well prior to shutting off the flow. *See*, US Opposition, pg. 2. Dr. Bushnell used another modeling technique, Computational Fluid Dynamics or "CFD," to model the capping stack flow, and each of the three experts relies upon the work of Dr. Bushnell, as well as on other authorities and sources, to establish the following:

(1) *Homogeneous and "slip" models attain similar results:* Dr. Dykhuizen used a methodology that treated the Macondo fluid as a homogeneous flow in which oil and gas moved at similar velocities, instead of a flow where the oil and gas moved at different speeds – i.e. there was "slip" between the oil and gas phases. He verified his assumption that the homogeneous model was appropriate in part through Dr. Bushnell, who performed CFD modeling runs that incorporated the "slip" between oil and gas, as well as modeling the fluids as a homogeneous flow, and showed that in fact the "slip" runs slightly increased the flow.

(2) *Use of K factors is appropriate for capping stack flows:* Dr. Dykhuizen relied in part on Dr. Bushnell's work to verify his assumption that use of K factors[3] was appropriate for flow through the capping stack because CFD modeling does not use K factors to represent resistance to flow through the pipes.[4]

(3) *Use of direct discharge coefficients for the Macondo Well is appropriate:* Drs. Griffiths and Pooladi-Darvish also turned to Dr. Bushnell's CFD modeling as one means to demonstrate that

---

[3] A K factor represents the mathematical relationship between the pressure drop and the flow velocity and is proportional to the resistance offered by the system.

[4] Since CFD modeling recreates the interior geometry of the flow path and then further subdivides it into meshes which are solved individually, there is no need to use K factors. *See*, US Opp. Ex. 7.

their assumptions regarding the constant discharge correlations[5] were sound. *See*, US Opposition, Exhibits 9, 10, and 11.

Each of the issues for which the three US testifying experts rely upon Dr. Bushnell have been explicitly raised by BP as a criticism of the United States' methodologies. In October, 2010, BP submitted a "White Paper" raising concerns about modeling the Macondo flow as a homogeneous fluid, in which BP expressly raised arguments about modeling of multi-phase flows and the K factors. *See*, US Opposition (Rec. Doc. 11337), Exhibit 5. In the litigation, BP expert Dr. Johnson took the position that use of the consent discharge coefficients was inappropriate. *Id.* Exhibit 6. Thus, Dr. Bushnell's work is highly relevant to Phase II issues.

It is hardly surprising that each of the three federal experts turned to Dr. Bushnell to perform CFD to evaluate their assumptions. CFD is a more complex computer software, broadly accepted in industry, that uses a different approach and high powered computers. The three US experts knew that CFD did not incorporate the same assumptions and was capable of more complex calculations. Each of the three experts is familiar with CFD modeling and capable of review of Dr. Bushnell's work. Ultimately, Dr. Bushnell's work confirmed for the testifying experts that none of BP's claims make a difference to the calculation of the flow rate or cumulative flow from the well.[6]

---

[5] A discharge coefficient represents the mathematical relationship between the pressure drop and flow rate and is inversely related to the resistance offered by the system.

[6] Dr. Bushnell's opinion and modeling is described in more detail in the US Opp. to BP's Motion to Exclude Opinions and Testimony of Dr. Nathan Bushnell (Rec. Doc. 11221), Exhibit 5, and his conclusions regarding the "slip" modeling results are found at Appx. VII pps. 70-73 in that Exhibit 5.

4

Good scientists and engineers will test their assumptions to ascertain the validity of their modeling and that is what occurred here. Although BP claimed in its Motion and Reply that Dr. Bushnell was merely corroborating the others' opinions, or that his work was simply cumulative of the opinions of the US testifying experts, BP's contentions are misleading and disingenuous—especially given the specific nature of its criticisms and Dr. Bushnell's relevance to them.

**Procedural Background:**

The Phase Two Trial Order limits the parties to eight experts each. The Phase Two Trial Order, Paragraph 4.i further provides in full:

> Experts Relying on Other Experts. Either side may allow its testifying experts to rely on the calculations or analysis of another of its experts (as set forth in the testifying expert's report) without calling the relied-upon expert to testify at trial. In doing so, however, the presenting party must designate the relied-upon experts' deposition as one of its 20 allotted deposition bundle submissions. Only portions of the direct and cross-examination relating to the relied upon calculations or analysis will be submitted to the Court.

Rec. Doc. 11087. Nowhere does the Phase Two Trial Order provide that the reliance involved must involve an input to a testifying expert's computer model nor does it even reference Federal Rule of Evidence 703 ("Rule 703"). This provision was proposed by BP after all of the expert reports were served and in the middle of Phase Two expert depositions,[7] but BP never articulated its current interpretation prior to moving to strike Dr. Bushnell's designation as a "relied-upon" expert.

After the United States designated its eight direct and rebuttal experts and Dr. Bushnell as a "relied upon" expert, BP moved to strike the designation of Dr. Bushnell. BP Motion (Rec.

---

[7] *See*, Exhibit A hereto (July 17, 2013 Email from Robert Gasaway to counsel re: Phase Two Motions, pre-filing consultation).

Doc. 11336). Overlooking clear statements from each of the three testifying experts, BP characterized the reliance of the US experts on Dr. Bushnell's CFD modeling as mere corroboration of their independent work, BP Motion, pg. 2, and sought an order from the Magistrate precluding any reference to the CFD modeling.

The United States opposed, explaining the nature of the testifying experts' reliance on the work of Dr. Bushnell. It cited a case, U.S. Gypsum Co. v Lafarge North American Inc., 670 F. Supp. 2d 748 (N.D. Ill. 2009) for the proposition that experts in technical areas do turn to CFD modeling to verify and confirm their own expert work, and distinguished BP's caselaw. US Opposition to BP's Motion, Rec. Doc. 11337.

The Magistrate ruled in favor of BP and granted its Motion in full. Rec. Doc. 11352. The Court rejected BP's contention that the testifying experts were using Dr. Bushnell's opinion only to corroborate their own results and opinion. Order to Strike pg. 3. The Court found, however, that to use Dr. Bushnell's analysis, the three US testifying experts would have had to independently analyze Bushnell's computation, Order to Strike fn 3, pg. 3, in order to rely on Bushnell's analysis in formulating their opinions within the meaning of Rule 703. Finding that the expert reports did not describe any independent analysis of Dr. Bushnell's modeling, and that the experts did not rely upon Dr. Bushnell, the Order granted BP's Motion to Strike Dr. Bushnell's deposition designation.

## STANDARD OF REVIEW

The standard of review for this appeal is *de novo*. Rulings on non-dispositive motions by magistrate judges are reviewed under a "clearly erroneous" or "contrary to law" standard. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). A magistrate's legal conclusions are reviewable *de novo*. *Borganelli v. Grand Isle Shipyard Inc.,* No. 04-2419, 2005 WL 1038104, at *1 (E.D. La.

6

April 22, 2005) (Barbier, J.) (magistrate order compelling functional capacity exam vacated). Mixed questions of law and fact, including the application of the law to the facts, are also reviewed *de novo*. *See Payne v. United States*, 289 F.3d 377, 381 (5th Cir. 2002) (describing standard of review for appellate court reviewing district court decision). The issues before this Court on appeal are the interpretation of the Phase Two Trial Order, whether and to what extent Rule 703 governs, and whether the legal requirements of the "relied-upon" expert provisions have been met – all questions of law or mixed questions of law and fact and therefore reviewable *de novo*.

## ARGUMENT

### I. Dr. Bushnell's CFD Modeling is Important to Contested Issues and Will Assist the Court.

As described above and in the US Opposition, evidence concerning Dr. Bushnell's CFD modeling will assist the Court in understanding the computer modeling performed by the US experts and evaluating BP's arguments. In its Reply, BP surprisingly argues that Dr. Bushnell's analysis "is no longer probative to contested issues" in the Phase II trial, and goes so far as to state that -- assuming the US deducts 20 percent from its calculations –the only open issue regarding the flow from the capping stack on July 14 and 15 is the conversion rate. BP Reply pg. 5. BP, however, does not offer to stipulate to the mass flow rate of 119.9 kg/sec which was Dr. Bushnell's expert conclusion as to the flow rate from the capping stack kill line on July 14 and 15, 2010. Nor does it offer to stipulate to the 54,100 stock tank barrels of oil per day he found once conversion factors were applied.[8] Nowhere in its letter briefs did BP offer to waive

---

[8] Presumably, as explained in the US Opp. to BP's Motion to Exclude Opinions and Testimony of Dr. Nathan Bushnell (Rec. Doc. 11221), BP wishes to eliminate all references to CFD modeling because its own expert calculated a mass flow rate of 119.8 kg/sec. when the correct inputs for the Macondo fluid and temperature are used, which is essentially the same result as Dr. Bushnell.

7

its arguments concerning (1) homogeneous versus "slip" flow; (2) use of the K factors; and (3) use of constant discharge coefficients, all of which are contradicted by CFD modeling.  Contrary to BP's position that the issue is "uncontested," BP is determined to eradicate any reference to CFD modeling from Phase Two, and not merely to simplify and streamline the trial:  CFD modeling debunks at least three of BP's arguments concerning the United States' experts' methodology. The US testifying experts Dykhuizen, Griffiths and Pooladi-Darvish have relied on Dr. Bushnell's work within the meaning of the Phase Two Trial Order and Rule 703.  They should be permitted to reference Dr. Bushnell's work and the United States should be allowed to designate his deposition testimony as a deposition bundle.

## II.     The United States' Expert Did Rely Upon the Computer Modeling of Dr. Bushnell as Contemplated Both by the Phase Two Trial Order and by Federal Rule of Evidence 703.

Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their  prejudicial effect.

As noted in the Order to Strike, 1972 Advisory Committee Notes expressly endorse reliance by the testifying expert on out-of-court data and state that the rule "is designed to broaden the basis for expert opinions" and to bring the judicial practice into line with the practice of the experts themselves when not in court.  Order to Strike, pg. 2, citing 1972 Advisory Committee Notes to Rule 703.   It is well established that testifying experts can rely on the opinions and work of non-testifying experts under this provision, provided it is of the type that experts in the field typically reply upon.  Moore v. Ashland Chemical, 126 F.3d 679, 690 (5th

Cir. 1997). In a jury setting, the trial judge as gatekeeper must determine whether the expert opinions are of the type customarily relied upon by experts in the field and whether such reliance is reasonable. *Id.* at 691.

The 2000 Advisory Notes to Rule 703 also address another scenario:

…Of course, an adversary's attack on an expert's basis will often open the door to a proponent's rebuttal with information that was reasonably relied upon by the expert, even if that information would not have been disclosable initially under the balancing test provided by this amendment. Moreover, in some circumstances the proponent might wish to disclose information that is relied upon by the expert in order to "remove the sting" from the opponent's anticipated attack, and thereby prevent the jury from drawing an unfair negative inference. The trial court should take this consideration into account in applying the balancing test provided by this amendment.

Here, of course, the Court's Order to Strike is so broad that it would have the effect of precluding any reference to the relied-upon expert's work at all – even if, as expected, BP opens the door in cross-examination.

Moreover, nothing in the record indicates that the Phase Two Trial Order requires strict adherence to Rule 703: the procedures in Paragraph 4.i already deviate from Rule 703 because the non-testifying expert's sworn deposition testimony – i.e. the opposing party's cross-examination -- are submitted to the Court. Therefore, under the unique procedures in place in this complex litigation, the concerns about the reliability of out-of-court evidence are not implicated, Rule 703 need not govern this Motion, and there is no need to preclude references Dr. Bushnell's work.

**A.  The US Experts Did Rely on the Work of Dr. Bushnell.**

As set forth in the US Opposition, pps. 2-5, the expert reports and rebuttal reports clearly set forth the fact that the three US experts relied upon Dr. Bushnell's work. US Experts Drs. Griffiths and Pooladi-Darvish both expressly relied upon Dr. Bushnell's modeling runs and the

associated figure in their rebuttal reports.[9] The fact that the two testifying experts relied upon Dr. Bushnell was fully disclosed, as was the content of their reliance, and therefore the requirements of Paragraph 4.i of the Phase Two Trial Order were met.

Dr. Dykhuizen similarly fully disclosed his reliance on Dr. Bushnell's work to confirm his assumptions regarding the homogeneous flow and the use of K factors in his expert report.[10] Thus the terms of the Phase Two Trial Order were satisfied.

Moreover, the deposition testimony of Dr. Dykhuizen removes any doubt concerning his reliance on Dr. Bushnell. For example, he testified as follows:

---

[9] US Opp., Ex. 9 (Griffiths Rebuttal Report, pg. 9) ("I have since checked flow rates through the kill line based on a constant discharge coefficient against those obtained using a full two-phase model," citing Dr. Bushnell's work and incorporating figure); Ex. 10 ( Pooladi-Darvish Rebuttal Report, pg. 36) ("Dr. Bushnell has used a more sophisticated model…and demonstrated that these equations are valid," pointing to graph in Dr. Griffiths's Rebuttal Report).

[10] US Opp., Ex. 11 (Dykhuizen Expert Report pg. 6-7). With respect to BP's criticism of methodologies using homogeneous flow, Dr. Dykhuizen wrote in his report

I have repeated the calculations within the DOE-NNSA Flow Analysis Report using the correlations of Chisholm, and found no significant change in the estimate when using multiphase correlations. In fact, the estimated flow *increased* by 4%. Another expert in this case, Bushnell (2013), used a multiphase flow computer simulation of the flow through the capping stack, and also found that the predicted flow rate with a multiphase calculation was 3% above what was predicted with a homogeneous single phase assumption.

With respect to BP's criticisms regarding use of the K factors, Dr. Dykhuizen's report contains the following passage:

> Another assumption that was made within the calculations presented in the DOE-NNSA Flow Analysis Report was that the individual flow elements (e.g., lengths of pipe, pipe contractions and expansions, elbows, tees, etc.) could be treated independently. The close proximity of those flow elements potentially could alter their impact on the pressure drop, and therefore reduce the accuracy of flow rate prediction. Computational fluid dynamics (CFD) modeling conducted by Bushnell (2013) explored this by simulating the multidimensional flow through the various elements. In this way they did not have to rely upon tabulated flow resistances (K factors) for the individual elements. Bushnell's results were very similar to the results found in the DOE NNSA Flow Analysis Report, which indicates that the components can indeed be treated independently. This provides additional confidence that our approach was correct.

> Q. (By Mr. Regan) And- and who did you rely upon for your assumption that there was homogeneous flow in a multiphase flow environment in all of the various geometries that were present at Macondo?

[objection omitted]

> A. Dr. Nathan Bushnell demonstrated that homogeneous assumption and a nonhomogeneous assumption yield equivalent results. My experience shows that I would state that it would yield equivalent results. There are very few pressure drop correlations that depend on the flow regime.

*See*, US Opposition, Ex. 12 (Dykhuizen Tr. at 99). Apparently, BP's counsel understood at the deposition that Dr. Dykhuizen relied upon Dr. Bushnell's work:

> Q. … You testified earlier that you relied on the work of Dr. Bushnell in this litigation to help confirm to you that that [assumption about homogeneous flow at Macondo] was an appropriate assumption. Do you recall the testimony?
> [objection omitted]
>
> A. Yes.

*Id.,* Dykhuizen Tr. at 120; *see also*, Dykhuizen Tr. at 47 (Nathan Bushnell provides some significant work that I think supports my work and my conclusions); *id.* at 304 ( relied upon Dr. Bushnell's work to give confidence that assumption of homogeneous flow was appropriate); at 307 (found Dr. Bushnell's CFD analysis of the capping stack to be helpful as to assumptions for capping stack flow rate estimates).

In its Reply, BP raised two additional points concerning the reliance of the US testifying experts. First, it implies that Dr. Griffiths could not have relied upon Dr. Bushnell's modeling runs through the capping stack because the BP expert's challenge to the constant discharge coefficients involved the relationship between flow in the wellbore and the BOP over time, not through the capping stack. BP Reply at 2-3. However, Dr. Griffiths explained in his deposition that the July 14 and 15 period spanned a "tremendous range of pressures" and flow rates and in

11

his opinion he did not need to seek out other times and conditions.[11]  Second, BP incorrectly implies that Dr. Dykhuizen did not rely on the CFD modeling "as a matter of simple chronology" because Dr. Dykhuizen initially performed flow rate calculations using similar assumptions in July 2010.  BP Reply at 3. Dr. Dykhuizen submitted his expert report in this litigation on March 22, 2013, however, and verified and refined his 2010 analysis as part of his work in the litigation and his expert report.

Thus, BP's points are misplaced.  The record clearly demonstrates that each of the three testifying experts relied upon Dr. Bushnell to evaluate their own assumptions and to rebut BP's technical objections to their work and satisfied the requirements of the Phase Two Trial Order by disclosing (1) the content of their reliance; and (2) the non-testifying expert on whom they relied.

**B. The Magistrate Incorrectly Interpreted the Phase Two Trial Order to Require that the Experts Describe their Independent Analysis of Dr. Bushnell's Work in Their Reports.**

The Order to Strike now not only reads a strict interpretation of Rule 703 into the Phase Two Trial Order, but also reads into it a requirement that *the expert report* had to describe the independent analysis of the testifying experts of the work of the relied-upon expert.   Order to Strike, pg. 4 (the report by Dr. Dykhuizen does not demonstrate any independent analysis of the CFD models).  Nowhere in the terms of the Phase Two Trial Order is that requirement set forth, nor did BP (who formulated this case-specific "relied upon expert" rule) advance that argument in its Motion.

A court may reject expert testimony under Rule 703 where the witness relies on the findings of an expert in a different field and can only parrot and not critically evaluate those findings, but otherwise the expert may base opinion on the opinion of another even if that other

---

[11]  Griffiths Tr. at 403, Ex. 3  to BP Reply, Rec. Doc. 11338.

witness does not testify and his testimony would be inadmissible. *See, e.g.,* 29 Federal Practice and Procedure, Section 6274; U.S. Gypsum Co. v Lafarge North American Inc., 670 F. Supp. 2d 748, 758-759 (N.D. Ill. 2009) (testifying expert was not merely parroting views of others but had performed his own analysis and corroborated that with CFD models). The US testifying experts each are experienced in computer modeling and highly credentialed in their fields and readily capable of the kind of review of the CFD modeling performed by Dr. Bushnell that is called for here. (In fact, Dr. Griffiths testified that he was qualified to testify as an expert witness in the field of CFD and that he has reviewed CFD work by other parties.[12]) During this bench trial, in their direct or cross examination, they can be expected to describe their work, including their reliance on and review of Dr. Bushnell's modeling. Indeed, Drs. Griffiths and Pooladi-Darvish rely upon Dr. Bushnell for only a few modeling runs pertinent to certain narrow issues. Thus, although Rule 703 does not allow a testifying expert to merely "parrot" the findings of the non-testifying expert, none of the three US experts present that risk.

BP deposed Dr. Bushnell and its cross-examination of him will be admitted through his deposition if the Order to Strike is reversed; thus the concerns under Rule 703 do not exist. In this bench trial, any remaining concerns can readily be addressed by the normal adversarial process of cross-examination of the three testifying experts.

**III. In the Alternative, If the Order to Strike is Affirmed, the United States Moves to Strike BP's Experts Richardson, Trusler and Vaziri.**

BP moved to strike the designation of Dr. Bushnell's deposition on grounds that his work was not a traditional input to a computer model. The Court correctly rejected BP's argument but

---

[12] Exhibit 3, Sept. 9, 2013 BP Reply, Rec. Doc. 11338.

imposed this new "independent analysis" requirement. Ironically, BP in its Motion did not point to any failure of the US experts to describe their independent review or analysis of Bushnell's work in their reports. This is not surprising, since none of the BP testifying experts describe – in their reports or elsewhere -- their "independent analysis" of the three non-testifying experts that BP designated. Unlike the three US testifying experts, at least some of the BP testifying experts are not qualified to perform such an analysis but can merely accept – or "parrot" – the conclusions of the non-testifying "relied upon" experts. In other words, if the requirement is that an expert must describe the relied-upon analysis in his expert report, BP's experts cannot meet that standard, and should not be allowed to rely on the work of BP experts Richardson, Trusler and Vaziri.

The record shows that BP testifying expert Dr. Nesic did not rely upon BP's designated relied-upon experts Drs. Richardson and Vaziri under the standard imposed by the Court . Dr. Nesic is a professor of chemical engineering at Ohio University and directs the Institute for Corrosion and Multiphase Flow Technology. Exhibit B (Nesic Report) at 5. Dr. Vaziri is a BP distinguished Advisor for Sand Management, "responsible for predicting sand production of drilling wells across the world and recommending mitigating actions." Exhibit B (Vaziri Appendix to Nesic Report) at 2. Nowhere in his report does Dr. Nesic state that he has experience in the areas of sand management or predicting sand production. Dr. Richardson's work consisted of a finite element analysis (FEA) of the blind shear ram (BSR). Exhibit B (Richardson Appendix to Nesic Report) at 2-3. Again, Dr. Nesic did not mention in his report any experience he has with FEA. Thus it is unlikely that Dr. Nesic can perform the kind of "independent analysis" the Order to Strike contemplates. Dr. Nesic stated that he had never met or spoken with Dr. Richardson or Dr. Vaziri. Exhibit C (Nesic Deposition) at 52:8-15.

14

According to Dr. Nesic, he "made assumptions about sand production using information provided by Dr. Vaziri (see Appendix E [to Dr. Nesic's Report])," Exhibit B (Nesic Report) at 12, see also *id*. at 7, but nowhere in his report does Dr. Nesic describe any "independent analysis" he performed to review Dr. Vaziri's work.[13] Dr. Nesic also claims that he "relied on information provided by Nigel Richardson (see Appendix F [to Dr. Nesic's Report]) about the BSR standoff." Exhibit B (Nesic Report) at 14, see also *id*. at 6. But again, he makes no mention of any independent analysis he conducted of Dr. Richardson's work. In fact, it is unclear whether Dr. Nesic relied upon Drs. Vaziri or Richardson at all.[14]

BP has designated Dr. Trusler as a relied upon expert for Dr. Gringarten and Dr. Blunt but neither of the testifying experts' reports satisfy the standard for "relied upon" experts set forth in the Order to Strike. Dr. Trusler's report provided his expert opinion regarding the

---

[13] Moreover, it is especially doubtful that Dr. Nesic conducted any independent analysis of Dr. Vaziri's work, given that Dr. Vaziri's work was conducted in ENHANS, proprietary software for which BP required the United States experts to take extreme measures in order to use. At no time during the parties' lengthy discussions with respect to ENHANS did BP indicate what measures it required Dr. Nesic to take in order to use ENHANS. The United States assumes that BP did not provide Dr. Nesic with ENHANS without requiring the same sort of "protections" they required of the United States' experts.

[14] Dr. Srdjan Nesic, who is the only BP expert who "relied on" Dr. Nigel Richardson, admitted in his deposition that he relied on the DNV report, not Dr. Richardson, for the value he input into his model for "sensitivity tests" concerning the blind shear ram (BSR) standoff distance, noting that he conducted that modeling "very early on before Dr. Richardson produced any numbers." Exhibit C (Nesic Deposition) at 64:3-18; *see also* Nesic Deposition at 61:12-17. However, he claimed the values he used were "consistent" with those developed by Dr. Richardson. Exhibit C (Nesic Deposition) at 64:3-65:1; 59:18-60:3.

With regard to Dr. Vaziri, who again, is only "relied upon" by Dr. Nesic, Dr. Nesic claimed to rely on Dr. Vaziri for the value for particle size that he input into his model. Dr. Vaziri concluded that the "sand particles produced at Macondo well likely ranged from 100 to 10,000 microns (about the size of a coffee bean) and that the average size of solids produced at the Macondo well was approximately 500 microns – about the width of wire from which staples are made." Exhibit B (Vaziri Appendix to Nesic Report) at 12-13. Claiming to rely on Dr. Vaziri, Dr. Nesic stated in his report that he assumed that the sand particles were a "uniform size" of 500 micrometers. Exhibit B (Nesic Report) at 12. However, Dr. Nesic only produced modeling files that used a particle size of 150 microns. Exhibit C ( Nesic Dep.) at 18:3-20; 20:4-13. Dr. Nesic and BP argued that this "inconsistency" did not matter, because his model was insensitive to particle size. *See* BP Opposition to Nesic MIL (Rec. Doc.11198) at 7-8. In fact, BP stated that "Dr. Nesic did not rely on the modeling runs" that used 500 microns as the value for particle size.

accuracy of the pressure measurements from the BOP and the capping stack. Dr. Gringarten used Dr. Trusler's adjustments to the BOP pressure readings from the PT-B pressure gauge to adjust his assumed flow rates to bottomhole pressure. Dr. Gringarten presents no "independent analysis" of Dr. Trusler's pressure adjustments. Rather, in his report he simply states "Pressure data was provided by Dr. Trusler." Exhibit D (TREX-011696R.116 -- Gringarten Report at Appendix F, Page 8). Similarly, in his deposition, Dr. Gringarten simply states that the adjustment to the PT-B pressures "was done by Professor Trusler." Exhibit D (Gringarten Dep.) at 171-72. There is no mention anywhere in Dr. Gringarten's report of an "independent" analysis of these pressure adjustments and, accordingly, Dr. Trusler cannot qualify as a relied upon expert for Dr. Gringarten.

Dr. Blunt also does not set forth in his report any independent analysis he performed of Dr. Trusler's work. Instead, he merely cites Dr. Trusler as a source of data for his work. *See*, *e.g.* Exhibit F (Blunt Report), pg. 5. Section 1.1 (Scope of Work); pg. 53, Table A-1, Appx. A-1; and pg. 123, fn. 234. Nor does he describe his independent review or analysis of Dr. Trusler's work in his deposition. *See*, *e.g.* Exhibit F (Blunt Dep.) at 65; 263-265.

Since BP's "relied upon" experts cannot meet the standard of Rule 703 and the Order to Strike, if the Order to Strike is affirmed, the United States moves to strike the "relied-upon" experts of BP on grounds that none of them revealed in their reports (or elsewhere, for that matter) their "independent analysis" of the relied upon experts' opinion.

For the foregoing reasons, the Court should reverse the Order to Strike and permit the United States to designate Dr. Bushnell's deposition and allow the US testifying experts to make reference to his work.

## CONCLUSION

The United States respectfully requests the Court to reverse the Magistrate's Order Regarding Motion to Strike Dr. Nathan Bushnell (Rec. Doc. 11352) and allow his deposition and expert work to be designated pursuant to the provisions for "relied upon" experts in Paragraph 4.1 of the Court's Order regarding the Presentation of Evidence in Phase 2 Trial (Rec. Doc. 11087).

Respectfully submitted,

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

## CERTIFICATE OF SERVICE

  I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  September 16, 2013          /s/ Steven O'Rourke
                    Steven O'Rourke