IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This document relates to All cases | * * * | HONORABLE CARL J. BARBIER |
| | * * | |
| | * * | MAGISTRATE JUDGE SHUSHAN |
| | * * | |

**CLAIMS ADMINISTRATOR PATRICK JUNEAU AND THE
SETTLEMENT PROGRAM'S RESPONSE TO BP'S OBJECTIONS
<u>TO THE PROPOSED 2013 FOURTH QUARTER BUDGET</u>**

*Counsel for submitting parties are listed at end of memorandum.*

**I.     INTRODUCTION**

The premise of BP's argument is that the Claims Administrator and the Court-approved Vendors who are charged with the implementation of this 1033-page multi-level Settlement Agreement have not done so with the financial efficiency that BP would expect of one of its business units. The theme that "more must be done with less" is apparent throughout BP's brief. What BP forgets in its analysis, however, is that BP is not the only party to the agreement, or the only person with an interest in this Program. Indeed, the other "party" to the CSSP is a class that includes well over 150,000 claimants who presently are barred from pursuing their claims against BP in return for a right to participate in the Program. They have no other recourse or remedy. Given this fact, and the countervailing interests of these claimants, BP's strident demands for immediate cuts in the CSSP staff or services so as to achieve financial "savings" must be weighed against the detriment to the tens of thousands of claimants who still await the processing of their claims, many of which are already backlogged. While more efficiency is always desirable, there must be a balance between cutting costs in claims processing and the ultimate goal of bringing this Program to a timely conclusion.

Another initial point deserves mention. It is essential that any action to reduce expenses to achieve savings in the budget not be viewed simply as a proxy for stalling out the very same Program that BP has unsuccessfully tried to stop by other means. As the Court and the public are acutely aware, and as BP itself regularly advertises, BP twice brought actions to enjoin all settlement program payments in the district court, and has done so once in the Court of Appeals. Moreover, one of the questions addressed by Judge Freeh was whether the Program should continue to pay claims in light of the various allegations brought by BP; Judge Freeh agreed that it should, adding yet a fourth failed attempt to halt the Program. The point will not be lost to any reasonable observer that "defunding" the Settlement Program can have effects almost as

devastating as stopping it. Simply put, the more attention that has to be diverted to efficiency studies and cost analysis, the less attention that can be devoted to claims review and claims payment. Particularly in an atmosphere where BP continues to ask courts to stop or undo the CSSP, even legitimate actions to curb expense and achieve more efficiency could be viewed as nothing more than an effort to "slow walk" claims payments while the court battles rage on. Thus, it is very important that the budget process not be viewed as a pawn in this larger dispute, or as a rush to judgment where cuts come first and the effects are judged later. While the Claims Administrator fully agrees that efficiency and cost reductions should be a regular part of the budgeting process, and has readily agreed to work with BP to achieve such efficiencies, they should not be done in haste or without reasonable assurance that they will not have a detrimental effect on the ability of the CSSP to process claims at a reasonable pace.

## II.     BACKGROUND

### A. Until recently, BP has, as a matter of course, funded all quarterly budgets submitted by the CAO without objection.

Pursuant to Section 5.12.1.4 of the Settlement Agreement, the administrative expense budget is "subject to the reasonable approval of the BP Parties and Lead Class Counsel." From the Program's establishment in early 2012, the CAO has submitted an administrative budget to BP and Class Counsel on a quarterly basis.[1] The submitted budgets provide the Parties with the projected costs that will be incurred by the CAO and each of the Vendors during each month of the fiscal quarter.[2] Those projected costs were based upon Vendor projections, CAO projections on claim trends, and CAO internal management discussions.[3] At no point during the history of the Program has BP questioned the format of or refused to fund any of the CAO's proposed

---

[1] Declaration of Bob Levine, Ex. A, at ¶¶ 4-5.
[2] *Id.* at ¶ 4.
[3] *Id.*

budgets until August of 2013.[4] Furthermore, the CAO has provided BP with all invoices submitted by the Vendors including detailed backup with individual timesheets, tasks performed, expense detail and receipts.[5] BP is then allowed "a reasonable amount of time to raise concerns or objections to such invoices prior to their payment." *See* § 5.12.1.4 of the Agreement. From the beginning of the Program until July 25, 2013, BP approved and paid approximately $593 million in administrative expenses and had raised very few and only minor concern regarding the invoices paid.[6]

Furthermore, early in the Program, the CAO proactively reached out to the Parties to confer and address many of the budgetary items with which BP now takes issue. In fact, the CAO scheduled a meeting on November 28, 2012 with BP and the PSC to discuss the administrative budget, administrative costs of the Vendors and the Program in general, financial audit review, quality assurance review, and the scope and progress of an external audit being conducted by CliftonLarsonAllen, LP ("CLA").[7] Due to BP's repeated scheduling conflicts, that meeting was cancelled several times and was not held until April 2013.[8] Thereafter, BP submitted additional questions concerning Program operations to the CAO. In response, the

---

[4] *Id*. at ¶ 5.
[5] *Id*. at ¶ 8.
[6] *Id*. From the Program's establishment in early 2012 through January 2013, when BP first appealed the CAO's January 15, 2013 BEL Policy Announcement, BP appeared to be entirely satisfied with the CAO, the Vendors, and the implementation of the Settlement Agreement. In fact, at the time of the Final Fairness Hearing in November 2012, BP had received and reviewed five months of the Program's budgets and expenses, and BP's attorney, Mr. Godfrey, requested that the Court issue a final approval order for the Settlement Agreement "so that Mr. Juneau can continue with his excellent work." *See* November 8, 2012 hearing transcript, p. 75.
[7] Declaration of Kirk Fisher, Ex. B, at ¶ 4. The CAO hired CLA to perform both a financial statement audit and a process audit. The process audit reviews the CAO's internal controls over claims processing, and the first of three process audit reports concluded that that "paid claims as a whole appear to be paid in accordance with the Settlement Agreement." *See* CLA's May 17, 2013 Process Audit, Ex. 5 to the Levine Declaration. While BP has criticized the scope of CLA's audit and now calls for an independent "operational review and examination," BP fails to acknowledge that the CAO gave BP an opportunity to provide input into the scope of the CLA audit and that BP declined that opportunity. Levine Decl. at ¶ 10.
[8] Fisher Decl., at ¶ 4.

CAO provided additional information and scheduled meetings for June 18, 2013, which were attended by BP, Class Counsel, the Court, and each of the Vendors separately.[9]

On June 21, 2013, BP submitted a letter *to the Court* requesting an "examination" of the Program and alleging that the CAO has inadequate operational controls, higher-than-expected administration costs and expenses, lower-than-expected claim processing efficiencies, and inadequately funded and insufficient processes to detect and prevent fraud, waste and abuse.[10] The CAO responded on July 1, 2013 with a detailed letter and extensive attachments that explained why each of BP's concerns and complaints regarding the Program were unwarranted.[11]

### B. In August 2013, BP abruptly refused to fund the CAO's Q3 Budget.

On July 17, 2013, the Program's CFO, Bob Levine, emailed BP and Class Counsel the proposed Q3 budget in the very same format that the proposed budget had been submitted on every other occasion.[12] Some three weeks later, on August 5, 2013, Maria Travis, Director of Claims for BP, wrote that "BP cannot approve a budget where the request does not transparently reflect the budgeting process, including performance targets that hold vendors accountable along with supporting analysis and metrics, particularly in light of the CSSP's historic performance in exceeding budgets and declining productivity as well as increasing costs that appear abnormally high."[13] Ms. Travis made no mention of the fact that BP had routinely approved budgets in the same format since the Program's inception. Because the CAO would not be able to pay staff and Vendors without the requested payment, the CAO notified the Court. After an expedited hearing

---

[9] Fisher Decl. at ¶ 8.
[10] Ex. 2 to Fisher Decl., BP's June 21, 2013 letter. The letter did not complain about any alleged deficiencies in the format or methodology of any of the CAO's proposed budgets.
[11] Ex. 3 to Fisher Decl., July 1, 2013 letter from Patrick Juneau to Judge Barbier. Contrary to BP's allegations that the CAO does not maintain appropriate oversight over the Vendors and that "CSSP vendors will spend whatever funds they are budgeted," the CAO has, throughout the life of the Program, worked with the Vendors to monitor and control Program costs and expenses. *See* Fisher Decl. at ¶ 3 and Ex. 3 to Fisher Decl., at pp. 7-14. Furthermore, the Vendors as a whole have been under budget in the majority of months. Levine Decl. at ¶ 7; Ex. 3 to Levine Decl.
[12] Levine Decl. at ¶¶ 4-5.
[13] Ex. 2 to Levine Decl., August 5, 2013 letter from Maria Travis to Bob Levine.

on August 7, 2013, Magistrate Judge Shushan ordered BP to immediately fund the entirety of the proposed Q3 budget. Rec. Doc. 10953.[14]

  C. **After revision and negotiation, BP still rejected the CAO's proposed Q4 budget.**

  Judge Shushan also ordered a process for the Parties to confer and resolve disputes with respect to the upcoming Q4 budget. Rec. Doc. 10955. Beginning August 8, the CAO and BP began to correspond and meet regarding BP's requests for additional information regarding the Program's costs and productivity, as well as the format of the Q4 budget. BP submitted a new "bottom-up" proposed framework for future budgets, relying on data such as: (1) projected work volume for each task; (2) productivity rates per person and per vendor; (3) the number of people required to meet the projected work volume, and (4) the costs of each person.[15] The CAO revised its budget model according to BP's requests, but explained that, because some of the basic data had never been previously tracked by the Vendors, the CAO, in consultation with the Vendors, would use estimates and make temporary reasonable assumptions within the budget model until the assumptions could be replaced with actual data.[16]

  On August 16, 2013, the CAO submitted to BP a proposed budget forecast for Q4 in the format recommended by BP, and continued to maintain an open dialogue with BP.[17] On August 23, 2013, BP, for the very first time, called for the CAO to perform an "operational review and examination" of the Vendors' assumptions and cost estimates used by the CAO in its budget forecast model.[18] On August 28, 2013, the CAO submitted a revised fourth quarter budget forecast that incorporated some of BP's comments and provided additional underlying data

---

[14] The Order was appealed by BP and affirmed by Judge Barbier on the same day. Rec. Doc. 10956.
[15] Ex. 5 to Fisher Decl., August 8, 2013 letter from Maria Travis to Bob Levine.
[16] Ex. 7 to Fisher Decl., August 12, 2013 letter from Kirk Fisher to Maria Travis.
[17] *See* Ex. 10 to Fisher Decl., August 16, 2013 cover letter from David Odom to Maria Travis.
[18] Ex. 14 to Fisher Decl., August 23, 2013 letter from Maria Travis to David Odom; Fisher Decl. at ¶ 51.

received from the Vendors.[19]  Furthermore, the CAO agreed that, prior to the 2014 Q1 budget submission, the CAO would perform an operational review and examination in order to verify Vendor-provided information regarding employee productivity.[20]

Pursuant to Judge Shushan's order, BP thereafter requested a panel meeting, which was held on September 4, 2013.  At the meeting, BP presented a list of proposed line-item revisions to the budget, which proposed to cut the CAO's Q4 $131 million budget request by $45.6 million, or 35%.[21]  The CAO's budget was based upon the CAO's fully-supported and reasonable estimate of the staffing levels necessary to keep the backlog rates of claims at present levels.[22] In order to come to a mutually-agreeable budget, however, the CAO proposed to (1) postpone the hiring of 99 additional accountants for BEL claims review, (2) eliminate the addition of employees to review Seafood claims, and (3) cut the budget's 5% contingency by half.[23]  These concessions would represent a $20 million (15%) decrease from the originally proposed Q4 budget.[24]  It should also be noted that this compromise-proposal represented a reduction of $19 million from the Q3 2013 $130 million budget.[25]  Nevertheless, BP rejected the CAO's proposal to revise the budget and instead filed formal objections.

---

[19] *See* Ex. 15 to Fisher Decl., August 28, 2013 letter from David Odom to Maria Travis and Exhibit 8 to the Declaration of Todd Brents (BP's Exhibit B).
[20] *Id*. at p. 5.
[21] *See* Exhibit 12 to Declaration of Todd Brents (BP's Exhibit B).
[22] Fisher Decl., ¶ 41.  As of September 12, 2013, 207,310 claims have been filed with the Program and 119,301 claims have been processed to a final determination, leaving a backlog of over 88,000 claims that have yet to be fully processed. Fisher Decl. at ¶ 2.
[23] *See* Ex. 21 to Fisher Decl., September 5, 2013 letter from David Odom to Maria Travis.  Delaying the hiring of additional accountants will almost certainly cause an increase in the backlog of BEL claimants, but the CAO proposed to remove this budget item from the Q4 budget and revisit it in the 2014 Q1 pending additional analysis. *Id*.
[24] *Id*. at p. 7.
[25] *Id*.

## III. ARGUMENT

### A. The CAO's proposed Q4 budget is reasonable, and any further cuts to it would negatively impact the CSSP's ability to efficiently process claims.

BP's proposal to cut the CSSP's Q4 budget by an additional $25.5 million, in addition to the $20 million reduction proposed by the CAO, is unreasonable and would immediately affect the CSSP's ability to timely and efficiently process claims.[26] To reach its additional $25.5 million reduction, BP proposes that an "increase in BEL accountant productivity" would have a $12.97 million impact on the Q4 budget.[27] In effect, BP proposes that the Program will save $12.97 million in Q4 *by reducing its accounting staff while simultaneously requiring the remaining accountants to process claims faster*.[28] Similarly, and without empirical support, BP proposes that the CAO should unilaterally adjust downward the task utilization rates provided by the Vendors for non-BEL claims.[29] BP also argues that, because BrownGreer allegedly has not provided sufficient detail to support its Management and IT costs (which level of detail has not previously been requested by BP), such costs should be severely reduced or eliminated.[30]

The CAO agrees that Program employees should be encouraged to work more efficiently where possible. To further that goal, the CAO has agreed to conduct an operational review and examination to determine how additional efficiencies in the Program can be attained.[31] But BP's

---

[26] Fisher Decl., ¶¶ 54-68.
[27] *See* Exhibit 12 to Declaration of Todd Brents, BP's Exhibit B.
[28] BP wrongly assumes that the efficiency of the accountants has decreased because it now takes, on average, longer for the CSSP accountants to process claims than it did during prior periods of the Program. As has been explained to BP, however, the reason for the increase in the average amount of time of processing BEL claims is due in part to the fact that, early in the Program during its ramp-up stages, claims that (a) had complete documentation, (b) were in Zone A, and (c) were not subject to complex policy issues were selected first for processing, whereas now more complex claims, which require more processing time, are being reviewed. *See* Ex. 15 to Fisher Decl., August 28, 2013 letter from David Odom to Maria Travis, at pp. 6-7; *See also* Ex. C, Declaration of Mark D. Staley at ¶ 13-14 (stating that claims reviewed since June 2013 require, on average, more claimant outreach than those reviewed in 2012, and that 75% of claims reviewed since June 2013 are from zones other than A, which on average require more review time than Zone A claims).
[29] BP's brief at p. 7; Exhibit 12 to Declaration of Todd Brents, BP's Exhibit B.
[30] BP's brief at p. 9; Exhibit 12 to Declaration of Todd Brents, BP's Exhibit B.
[31] Fisher Decl. at ¶ 51, 76.

proposal to simply reduce the number of accountants processing claims and BG's IT and management staff will be detrimental to the Program and only add to the growing backlog of BEL claims.[32] BP also does not have reliable data to support its conclusion that the productivity of the Vendors is lower than it should be.[33] Given the Program's mandate to efficiently process claims, any budgetary cut should be measured against the delay it will cause in claim resolution and the impact it may have on the accuracy of claims handling. Moreover, if personnel reduction is mistakenly mandated, it cannot be remedied overnight, given the time and resources required to locate and train new hires.[34] BP's proposed immediate funding reductions are simply unreasonable.[35]

### B. BP's proposed third-party operational review and examination is unnecessary.

Contrary to BP's unsupported assertion in its brief, the CAO did not "agree[] with BP that an operational review and examination is *necessary to prepare a proper budget* for the CSSP."[36] Instead, and quite differently, the CAO agreed to perform an operational review and

---

[32] *Id.* at ¶¶ 54, 60, 64.

[33] To support its claim that the accountants are processing claims too slowly, BP asserts that accountants retained by BP to review certain BEL files conduct their reviews on average six times faster than the Program's accountants. *See* Declaration of Brian L. Gaspardo, ¶ 8, BP's Ex. E. This is an apples-to-oranges comparison. The time included in the Program accountants' claim review includes an Initial Accountant Review, a Quality Assurance Review, and a Notice Quality Control Review. Ex. C, Declaration of Mark D. Staley, at ¶ 2. The Initial Accountant Review includes time-intensive document collection and review, file-building, and claimant outreach. *See Id.* at ¶¶ 3-7. In contrast, BP's review takes place with fully-completed files.

[34] BP also urges for cuts to other portions of the budget to achieve its $85 million target. *See* Ex. 19 to Fisher Decl., BP's brief, note 9 and Brents Decl. ¶¶ 69-76. For the reasons stated herein and as more fully explained in Ex. 21 to Fisher Decl., September 5, 2013 letter from David Odom to Maria Travis, and paragraphs ¶¶ 54-69 of Fisher Declaration, BP's other proposed cuts are also unreasonable.

[35] In its submissions to this Court, BP never addresses the extent to which its demands for budget cuts will affect the expected completion date of the Program. Obviously, maintaining or even reducing staff levels will not accelerate the claims processing rate, but rather, as a matter of logic, will very likely impair and reduce the rate of processing claims. The expected result will be that the completion date of the CSSP will be extended for some indeterminate period of time. Moreover, the notion that fewer people should accomplish more simply by processing claims faster and faster overlooks the obvious fact that such demands will increase the likelihood of human error, and decrease the ability of claims processors to detect questionable claims and review them more carefully. Yet, BP never reconciles its complaints on the one hand about the absolute need for claims handlers to detect any claim that could be fraudulent, with its demand on the other hand that claims handlers must work faster with fewer hands on deck.

[36] BP's brief at p. 2 (emphasis added).

9

examination *because BP requested one*.[37] Regardless, BP's request that an "outside professional firm" perform the review is entirely unnecessary. First and most importantly, the CAO already has commenced the operational review and "time and motion" studies that BP has recently requested.[38] As previously explained to BP, the CAO is already utilizing a number of members of its internal audit team who are intimately familiar with the Program's procedures to begin an operational review and time and motion studies.[39] Given the CAO employees' detailed knowledge of the Program, there is no better team to complete the review within the compressed timeline that BP desires.[40] Second, as part of its independent process audit, CLA also has been charged with reviewing CAO's internal controls over claims processing.[41] Third, and as acknowledged by BP, Special Master Freeh was ordered by the Court to "examine and evaluate the internal compliance program and anti-corruption controls within the CSSP," and to "recommend any additional business process procedures designed to promptly and fairly adjudicate claims in an efficient manner, and assist the Claims Administrator in the implementation of same." Rec. Doc. 11288. Accordingly, adding yet a *third* outside firm to perform another layer of review of the Program's internal controls is wasteful, time-consuming, and wholly redundant of the efforts of the CAO, CLA and Special Master Freeh.[42]

---

[37] Despite now proclaiming that an operational review is "necessary" to prepare a proper budget, until the Q3 2013 budget, BP approved every other budget without any such review.
[38] Fisher Decl. at ¶ 76.
[39] *Id*.; *see also* Ex. 23 to Fisher Decl., September 6, 2013 email from Bob Levine to Maria Travis.
[40] *Id*. The CAO anticipates this review will take sixty days to complete. Ex. 21 to Fisher Decl., September 5, 2013 letter from David Odom to Maria Travis at p. 7. Pursuant to its commencement, the CAO included a line item in the Q4 budget for additional funding to cover the additional resources necessary to perform these studies, which line item BP did not contest at the Panel meeting. *Id*.
[41] CLA already has issued its report on the first of three scheduled "Independent Evaluations of the Internal Control Environment over claims processing of the DHECC." CLA's first report identified a number of key strengths in the CAO's controls, and the CAO has addressed control enhancements that were identified. *See* Ex. 5 to Levine Decl., CLA's May 17, 2013 Process Audit.
[42] It should be noted that, to the extent Special Master Freeh recommends additional internal controls or fraud-detection procedures, the CAO may be required to increase its budget in future quarters to achieve and accommodate such recommendations.

C.  **BP's arguments regarding Vendor "markups" also miss the mark.**

BP criticizes BrownGreer, Garden City Group, and the CAO for allegedly refusing to disclose the rates that the Vendors pay to their independent contractors.[43] First, it is important to recall that these third-party Vendors were selected *by the Parties*. In fact, BP played a direct role in negotiating the Vendors' payment rates (and did not negotiate for the disclosure of the rates they would pay to independent contractors).[44] Moreover, the rates paid by BP for the work of Vendors' independent contractors are no more than the rates that the Vendors charge for their own employees, which are the rates to which BP has already agreed as reasonable.[45] More to the point, however, this informational dispute (as well as BP's other unfounded criticisms of the Vendors for allegedly failing to provide BP with documentation that will take time to collect and which BP only recently requested) has nothing to do with approving the Q4 budget.

IV. **CONCLUSION**

The CAO's original proposed Q4 budget is reasonable, and BP has failed to prove otherwise. Accordingly, the CAO requests that the Court order BP to fund the Q4 budget as originally proposed in the amount of $131,237,530. In the alternative, the CAO requests that the Court order BP to fund the CAO's revised budget in the amount of $111,166,000, which includes budget revisions that the CAO proposed in the interest of compromise, but will almost certainly lead to an increase in BEL claim backlog and extend the ultimate life of the Program.[46]

---

[43] BP's brief at pp. 8-9.
[44] Fisher Decl. at ¶ 69.
[45] *See In re Citigroup Inc. Securities Litigation*, 09 MD 2070 [07 Civ. 9901], 08/01/2013 (addressing a similar issue and noting that "[c]ourts routinely reject claims that contract attorney labor should be treated as a reimbursable litigation expense," and that "[t]he Court should no more attempt to determine a correct spread between the contract attorney's cost and his or her hourly rate than it should pass judgment on the differential between a regular associate's hourly rate and his or her salary." *Id*. at 37.
[46] It is the CAO's position that, given that (1) both BP and the CAO have submitted briefs with extensive supporting declarations and exhibits, and (2) there are no credibility determinations at issue, an evidentiary hearing is entirely unnecessary and will needlessly delay the resolution of this matter.

Respectfully submitted,

/s/ *Gina M. Palermo*
Richard C. Stanley, 8487
Jennifer L. Thornton, 27019
Gina M. Palermo, 33307
    Of
STANLEY, REUTER, ROSS
  THORNTON & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone:  (504) 523-1580
Facsimile:  (504) 524-0069

*and*

Phillip A. Wittmann, 13625
John M. Landis, 7958
Maggie A. Broussard, 33033
    Of
STONE PIGMAN WALTHER
  WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:  (504) 581-3361

*Attorneys for Deepwater Horizon Court Supervised Settlement Program and Patrick A. Juneau, in his capacity as Claims Administrator and Trustee*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of September, 2013, I electronically filed the foregoing Response with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Gina M. Palermo*