IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179<br><br>SECTION J |
| This document relates to<br>Civil Action No. 12-970 | * * * * * * | HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF BOB LEVINE

1. My name is Bob Levine, and I am a person of the full age of majority and am competent to make this Declaration. I am currently the Chief Financial Officer for the Claims Administrator's Office (CAO) for the Deepwater Horizon Economic and Property Damages Settlement Agreement.  I have extensive financial management experience, including over ten years as Chief Financial Officer for various companies in Louisiana with revenues varying between $20 million to over $450 million per year.  I earned a Bachelor of Science from Louisiana State University in accounting, and I have been a Certified Public Accountant since 1981.

### Budget Process

2. The Deepwater Horizon Economic and Real Property Claims Center began receiving and processing claims on June 4, 2012.  Pursuant to § 5.12.1.4 of Settlement Agreement, BP was required to initially fund the Program's Administrative Fund with $50 million, and thereafter is required to transfer additional amounts as may be required on a monthly basis in accordance with an administrative expense budget developed by the Claims Administrator, subject to BP's "reasonable approval." The Administrative Fund is used by the Claims Administrator to pay all reasonable and necessary expenses incurred in connection with the operation of the Settlement Program, except for the payment of claims. *See* § 5.12.1.1.3 of Settlement Agreement.

3. In July 2012, the CAO needed additional funding for the Administrative Fund.  BP requested that the CAO submit a three month budget for approval.  BP requested that this budget submission be made approximately ten days before funding was actually required (ten days before the Administrative Fund would be out of funds).

**EXHIBIT A**

4. On July 26, 2012, I submitted an initial Administrative Budget to BP and asked if the format was acceptable. The submitted budget provided the projected cost that would be incurred by the CAO and each of the Vendors during each month of the fiscal quarter. Those projected costs were based upon Vendor projections, CAO projections on claim trends, and CAO internal management discussions. On July 31, 2012, the budget was approved by both BP and the Plaintiffs' Steering Committee. On August 2, 2012, BP responded by email that the submitted budget was acceptable.[1]

5. Because BP first requested that quarterly budgets be submitted approximately ten days before funding would actually be necessary to avoid insufficient fund balances, the budgets were not necessarily submitted exactly ten days prior to the start of the fiscal quarters. Generally, however, the budgets were submitted quarterly and in the format that had been approved by BP. Before August 2013, BP had never questioned the format of or refused to fund any of the CAO's proposed budgets.

6. On July 17, 2013, I submitted a third quarter budget to BP in the same format that the proposed budgets have been submitted on every other occasion. At that time, the Administrative Fund balance was insufficient to pay invoices payable on July 25, 2013. BP did not respond until August 5, 2013, when I received a letter from Maria Travis, BP's Director of Claims, stating that BP did not approve the budget and objected to its framework.[2]

7. Contrary to BP's allegation in its brief that "CSSP vendors will spend whatever funds they are budgeted," data indicates that, in the majority of months, the Vendors as a whole have been under budget.[3]

## Vendor Invoices

8. Pursuant to the Settlement Agreement, the CAO has provided BP with all invoices submitted by the Vendors including detailed backup with individual timesheets, tasks performed, expense detail and receipts. Prior to the CAO's payment of any invoice, BP has had an opportunity to raise concerns or objections to such invoices. Between June 4th, 2012, and July 25th, 2013, the CAO paid Vendor invoices three times each month, approximately on the 5th, 15th and 25th. During this period, BP raised very few and only minor concerns regarding the Vendors' invoices, and the CAO paid 956 payment obligations on 47 processing days.[4] BP sent electronic notification to me that it had "No Issues" with the payments that have been processed.

## CLA Audit

9. In June 2012, the CAO solicited proposals for two separate external audits: (1) an audit of the Financial Statements of the BP Economic and Property Damages Settlement Trust, and

---

[1] Ex. 1, August 2, 2013 email from Amy Boatman to Bob Levine.
[2] Ex. 2, August 5, 2013 letter from Maria Travis to Bob Levine.
[3] *See* Ex. 3, charts comparing budget amounts to actual amounts spent by month by the CAO and the Vendors.
[4] The total payment obligations approved by BP between June 4th, 2012, and July 25th, 2013, is around $593 million.

(2) an audit of the claims process to ensure accurate, consistent and timely processing of claims. The CAO gave both Parties the opportunity to comment on the process audit scope that was included in the Request for Proposal ("RFP"), which was submitted to three independent firms for bidding: CliftonLarsonAllen LP ("CLA"), Reznick Group, and McGladrey. In August 2012, CLA submitted the lowest bid for each audit. In September 2012, BP and the PSC approved the Engagement Letters from CLA.

10. From November 2012 through January 2013, CLA performed field work and testing of claims to assess the conformance of the Program to the Settlement Agreement. On February 15, 2013, CLA requested the scope to be increased to include more file testing as well as more extensive field work due to the growing number of claims filed. At that point, the scope increase was presented to the Parties, who were asked for additional recommendations. BP requested the original audit scope of work and the revised scope of work for review, which I provided. On March 1, 2013, BP advised me via email that it had "no issue with the revised scope/fees for CLA."[5] Later on March 1, 2013, Maria Travis sent an email stating that "there are some further items which we want to recommend and will be providing something specific on this later next week."[6] I followed up with Ms. Travis' office approximately ten days later and was told that a decision on the scope of the CLA audit had not been made but that this issue was still being discussed. I did not hear anything further from BP regarding the scope of the audit.

11. CLA provided the CAO with the first of three process audit reports in May 2013, and the CAO circulated copies of the report to the Parties.[7] The scope of the remaining reports will provide a more in-depth review of the Program's processes.

I, Bob Levine, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on this 16th day of September, 2013.

Bob Levine

---

[5] See Ex. 4, March 1, 2013 email chain.
[6] *Id.*
[7] Ex. 5, CLA's May 17, 2013 Process Audit.

**From:** Boatman, Amy (KPMG) [mailto:Amy.Boatman@bp.com]
**Sent:** Thursday, August 02, 2012 2:01 PM
**To:** Bob Levine
**Cc:** Travis, Maria T
**Subject:** RE: Administrative Fund - Budget and Request for Funding

Bob,

Yes, this formal request meets the requirements of the settlement. We will begin working on our end for the fund transfer. Thanks!

*Amy Boatman*
Email: amy.boatman@bp.com
Cell: 832.338.4539

**From:** Bob Levine [mailto:blevine@dheclaims.com]
**Sent:** Wednesday, August 01, 2012 4:47 PM
**To:** Boatman, Amy (KPMG); Travis, Maria T
**Subject:** Administrative Fund - Budget and Request for Funding

Amy,

Let me know if this meets your requirements.

Thanks,
**Robert P. Levine**
*Chief Financial Officer*



**504-934-4999**

935 Gravier Street, Suite 1905
New Orleans, Louisiana 70112
blevine@dheclaims.com
Direct – 504 934-4919
Cell  -  504 813-8597

**EXHIBIT A-1**

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email

without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.



05 August 2013

Mr.Bob Levine

Deepwater Horizon Settlement Program

935 Gravier St

New Orleans, LA 70130

Dear Bob,

We reviewed your July 17, 2013, email (a copy of which is attached) containing the Claims Administrator's proposed 3rd quarter 2013 budget summarily requesting over $130,300,000 to fund administration fees for that period. Given our recent meetings and discussions on claims activity and processes, and recent execution of vendor contracts, we would expect that you provide us with any supporting analysis, metrics or explanatory notes providing any transparency into the budgeting process or justification for the $130,300,000 request. Other than the total amount requested, the email contains only a simple, 13 line chart generally identifying dollar amounts by vendor. As your email recognizes, pursuant to the Settlement Agreement, the Claims Administrator's budget is subject to BP's reasonable approval. Given the absence of whatever supporting analysis, metrics or explanatory notes the Claims Administrator relied upon to create this budget, BP cannot determine if the budget request is reasonable under the circumstances. Furthermore, based upon our review of recent actual claims processing and administration results, which show even further declines in productivity and increases in costs, we continue to have significant concerns about CSSP's poor productivity and excessive costs. It would be unreasonable to approve a budget that validates and incentivizes the various claims administration vendors to perpetuate their track record of poor productivity and excessive costs. Accordingly, we request that the CSSP re-submit its 3rd quarter 2013 budget with appropriate documentation, analysis, metrics and explanatory notes to support each item in the budget request. Upon receipt and review of a re-submitted budget BP will respond with its position pursuant to the terms of the Settlement Agreement.

The CSSP is a multi-billion dollar program with cumulative administrative spend to date in excess of $500 million. The proposed budget does not evidence a systematic, disciplined budgeting process. As examples, BrownGreer is simply budgeted for exactly $15,000,000 each month and Garden City is budgeted for exactly $7,500,000 each month. Moreover, vendor fees have increased in April and May by 7%; vendor expenses have increased in April by 41%; and the proposed budget seeks vendor costs that are an additional 7% over April and May and 14% over March. We have also calculated variances of 2nd quarter actual results in comparison to the 2nd quarter budget provided by the CSSP, which further demonstrates that the CSSP budgeting process is inadequate. As examples, BrownGreer and P&N were collectively in excess of $2 million over budget for the 2nd quarter. There does not appear to be effective management of the vendors, including the apparent absence of repercussions or corrective actions taken to address vendors that fail to meet their respective budgets.

Consistent with what would be expected of a professionally run claims management process, the CSSP needs to implement a systematic and disciplined budgeting process so that the Claims Administrator is able to provide a budget proposal, including detailed buildups of how the

**EXHIBIT A-2**

budget is developed in relationship to performance targets and past performance, that allows BP to meaningfully evaluate the proposed budget against actual past performance.[1]

In order to appropriately budget administrative costs and to drive improved productivities and efficiencies, the CSSP should develop and track the following metrics:

> Targeted claim determinations and payments by claim type and by person (e.g. BEL claims per week, per accountant)

> Call Center activity and targeted metrics

> Targeted throughput analysis for each stage in the claims process, i.e. how long is a claim in each status, how many claims complete each stage per month

> Estimated progress of incomplete claims analysis, broken down by type of incomplete, aging of claim, and action items undertaken to resolve

> Levels of quality assurance in relation to reasonableness thresholds

> Projected fraud detection activity and bases for levels of effort

> FTE count by month, location, function (as used by vendor), designation for employee vs. contractor, and claims type

The CSSP should also develop and track the following cost-related metrics:

> Fees and expenses broken down by month, vendor, level, location and expense type

> Projected staff turnover analyzes including

   • Count of additions, subtractions of employees and contractors

   • Training requirements and costs given projected turnover

   • Projected staffing level and hourly rate changes with justifications/explanatory notes for any changes

The CSSP should further develop and measure productivity in relation to costs using key performance indicators and tie the two sections above (productivity and costs) together to determine overall targeted performance and costs metrics.

These measures and an increased emphasis on budgeting are all necessary as there does not appear to be meaningful controls over what vendors are accomplishing and how much they are spending in order to accomplish those tasks. As referenced above, the CSSP April and May results show even further declines in productivity and increases in costs. Call center costs are now exceeding $1200 per hour per live calls. Excluding fraud detection, CSSP monthly costs now exceed GCCF monthly costs by approximately $1 million and the proposed budget pushes those CSSP costs even higher.

Productivity not only remains low, but is further decreasing and the turnover rate appears to be increasing. The number of claims resolved in May fell and was 6% lower than the average of the three prior months; the turnover rate increased 29% in May over the average of the prior three months. The CSSP is now only resolving approximately one claim per week per full-time equivalent (10,000 claims resolved per month by 2200 FTEs).

BP cannot approve a budget where the request does not transparently reflect the budgeting process, including performance targets that hold vendors accountable along with supporting analyses and metrics, particularly in light of the CSSP's historic performance in exceeding budgets and declining productivity as well as increasing costs that appear abnormally high. The CSSP needs to

---

[1] BP has on several occasions raised the need for the application of Key Performance Indicators ("KPIs") to the claims administration process. Such KPIs are essential to a well run claims operation, including the ability to appropriately budget claims administration costs and manage the claims administration. BP reiterates its request for KPIs.

immediately develop more effective budgeting and performance monitoring in order to run a well-managed operation and prepare credible budgets that hold vendors accountable.

To facilitate our review of future budgetary proposals, we further request a complete data dictionary for the CSSP claims system developed and managed by BrownGreer, including, but not limited to, the following information: (1) System / Database Name; (2) Table Name; (3) Field Name; (4) Field Description; (5) Data Type; (6) Data Length; and Nullable (Yes / No).

We look forward to receiving a new 3rd Quarter 2013 budget in line with our comments above.

Sincerely,

Maria T Travis
Director of Claims - GCRO

Cc:     Mark Holstein
        Dan Cantor
        James Roy
        Patrick Juneau
        David Odom



**EXHIBIT A-3**





Pricewaterhouse Coopers Expenses - Actual to Budget

| | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual | 1,700,942 | 1,780,695 | 2,064,648 | 2,348,866 | 3,783,421 | 7,932,661 | 7,257,723 | 5,336,773 | 7,649,763 | 7,484,880 | 7,372,164 | 7,339,527 | 7,176,449 | 6,703,459 | 7,069,115 | 8,660,240 | 7,858,400 |
| Budget | - | - | 2,100,000 | 2,100,000 | 2,100,000 | 9,336,900 | 10,297,000 | 10,297,000 | 7,600,000 | 7,600,000 | 7,600,000 | 7,400,000 | 7,400,000 | 7,400,000 | 8,289,320 | - | - |



Postlethwaite & Netterville Expenses - Actual to Budget

| | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual | 1,771,697 | 2,960,252 | 3,097,039 | 2,767,116 | 3,035,327 | 5,657,644 | 5,012,242 | 4,346,070 | 5,825,524 | 5,099,505 | 5,683,398 | 7,523,609 | 8,024,609 | 9,254,801 | 10,185,511 | 10,465,120 | 9,539,200 |
| Budget | - | - | 3,225,374 | 3,473,758 | 3,424,358 | 5,822,695 | 5,394,330 | 5,030,864 | 6,500,000 | 6,500,000 | 6,250,000 | 7,100,000 | 7,100,000 | 7,100,000 | 10,233,640 | - | - |



## Hub Enterprises - Fraud Expenses - Actual to Budget

| | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual | - | 601,167 | 559,348 | 172,114 | 141,378 | 188,573 | 159,031 | 162,978 | 215,353 | 214,981 | 254,714 | 300,312 | 266,734 | 268,459 | 377,410 | - | - |
| Budget | Jan-00 | - | - | 500,000 | 500,000 | 500,000 | 291,016 | 334,434 | 385,852 | 260,000 | 260,000 | 260,000 | 250,000 | 250,000 | 250,000 | 270,000 | 270,000 |

Hub asked to reduce
based on volume

Mobile CAC
Investigation

## Hub Enterprises - Security Expenses - Actual to Budget

| | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual | 43,857 | 473,305 | 282,350 | 259,426 | 211,444 | 231,298 | 264,380 | 209,704 | 221,443 | 233,857 | 229,847 | 265,115 | 250,092 | 206,247 | 186,261 | - | - |
| Budget | - | - | 500,000 | 500,000 | 500,000 | 230,000 | 230,000 | 230,000 | 240,000 | 240,000 | 240,000 | 220,000 | 220,000 | 220,000 | 240,000 | 240,000 | 240,000 |

Number of Officers
Cut from 2 to 1

Ft. Walton shut - 9 days
Grand Isle down to 2 days/week



JPMorgan/Chase Expenses - Actual to Budget

| | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual | - | 553,054 | 37,520 | 38,587 | 39,687 | 43,839 | 46,474 | 45,520 | 45,079 | 43,959 | 45,084 | 44,217 | 131,305 | 43,187 | 43,620 | - | - |
| Budget | - | - | 60,000 | 60,000 | 60,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 |

Set-up Fees          Annual Fee

Mississippi Center For Justice Grant Expenses - Actual to Budget

| | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual | - | - | 1,200,000 | - | - | - | - | - | 1,200,000 | - | - | - | - | - | 600,000 | - | - |
| Budget | - | - | 1,200,000 | - | - | - | - | - | 1,200,000 | - | - | - | - | - | 600,000 | - | - |



Legal Liaison Firm Expenses - Actual to Budget

| | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual | - | 117,719 | 26,624 | 15,975 | 17,880 | 10,026 | 3,565 | 5,870 | 2,280 | - | 1,840 | - | - | - | - | - | - |
| Budget | - | - | 100,000 | 100,000 | 100,000 | 18,000 | 18,000 | 18,000 | 6,000 | 6,000 | 6,000 | 1,500 | 1,500 | 1,500 | 1,000 | 1,000 | 1,000 |



Appeals Panel Expenses - Actual to Budget

| | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual | - | - | - | 77,292 | 10,719 | 8,663 | 3,338 | 26,751 | 59,169 | 67,117 | 109,685 | 255,323 | 574,379 | 537,121 | 492,782 | - | - |
| Budget | - | - | - | - | - | 20,000 | 20,000 | 20,000 | 50,000 | 25,000 | 25,000 | 100,000 | 100,000 | 100,000 | 525,000 | 525,000 | 525,000 |





**From:** "Travis, Maria T" <Maria.Travis@bp.com>
**Date:** March 1, 2013, 6:35:24 PM CST
**To:** "Boatman, Amy (KPMG)" <Amy.Boatman@bp.com>, <blevine@dheclaims.com>
**Cc:** "Hudler, Shirley" <Shirley.Hudler@bp.com>, "Burrell, Felecia (Contractor)"
<FELECIA.BURRELL@bp.com>, "Edie, Robbie (NextSource)" <robbie.edie@bp.com>
**Subject: RE: CLA Revised Scope**

Bob,

There is one item I would like to clarify specific to the scope.   In reviewing the scope there are some
further items which we want to recommend  and we will be providing something specific on this later
next week.

Thanks,

**EXHIBIT A-4**

2

*Maria*

Eldridge 3  6.145C
Tel: 281-366-5928
Cell: 281-935-4271

---

**From:** Boatman, Amy (KPMG)
**Sent:** Friday, March 01, 2013 4:24 PM
**To:** blevine@dheclaims.com
**Cc:** Travis, Maria T; Hudler, Shirley; Burrell, Felecia (Contractor); Edie, Robbie (NextSource)
**Subject:** CLA Revised Scope

Bob –

We have discussed, and have no issue with the revised scope/fees for CLA.

*Amy Boatman*
Email: amy.boatman@bp.com
Work: 713.323.2258
Cell: 832.338.4539

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.



CliftonLarsonAllen LLP
9339 Priority Way West Drive, Suite 200
Indianapolis, IN 46240
317-574-9100 | fax 317-574-9707
www.cliftonlarsonallen.com

Mr. Bob Levine
Chief Financial Officer
Deepwater Horizon Economic Claims Center
935 Gravier Street, Suite 1905
New Orleans, LA 70112

Dear Mr. Levine,

## Process Audit

We have conducted the first (Project I) of three 2013 scheduled Independent Evaluations of the Internal Control Environment over claims processing (Process Audit) of Deepwater Horizon Economic Claims Center (DHECC), as requested by the Claims Administrator's Office (CAO). This Process Audit Report (Report) covers the claims processing internal control environment from June 4, 2012 to March 31, 2013, and includes claims paid through December 31, 2012.

For the purposes of the Report:

- The CAO refers to the Claims Administrator (CA), Patrick Juneau, and his executive staff that comprise the CA's office
- DHECC refers to the CAO and the vendors tasked with claims processing implementation
- The vendors include BrownGreer (BG), Garden City Group (GCG), Postlethwaite & Netterville (P&N), PricewaterhouseCoopers (PwC), and HUB Enterprises (HUB)
- CA QA/QC refers to the Claims Administrator's Quality Control Department, which is an independent function within the CAO that provides quality control reviews
- BP refers to British Petroleum
- The Court refers to the United States District Court of the Eastern District of Louisiana
- The PSC refers to the Plaintiff's Steering Committee, who represents the individuals and businesses who suffered damages (i.e. the claimants)
- CLA refers to CliftonLarsonAllen LLP

The Report sets out the results of Project I fieldwork. CLA performed onsite and remote fieldwork procedures, including interviews, walkthroughs, documentation review, and testing of processed claims. CLA also evaluated whether claims were determined eligible and valued according to the Deepwater Horizon Economic and Property Damages Settlement Agreement (Settlement Agreement). These procedures, agreed to by the CAO, were applied solely to assist DHECC in evaluating its internal control environment over claims processing. The procedures performed and related observations and recommendations are described in the Report attached. CLA's work was performed from November 26, 2012 through April 26, 2013.

The subsequent scheduled fieldwork dates (Projects II and III) will reflect the internal control environment over claims processing from April 1, 2013 through September 30, 2013 for Project II and


An independent member of Nexia International

**EXHIBIT A-5**

October 1, 2013 through December 31, 2013 for Project III and will cover claims paid for the period through May 31, 2013 and October 30, 2013, respectively.

CLA fully appreciates the complexity of claims operations DHECC faced.   From the outset of the Process Audit, the CA stated clearly that DHECC's top priority was to compensate claimants that had been adversely affected by the Deepwater Horizon oil spill in a manner that was timely, accurate, and in accordance with the Settlement Agreement.  Methodologies, processes, and controls evolved during the time period through March 31, 2013.  DHECC made many adjustments and improvements as it gained a clearer understanding of the emerging challenges associated with its operations.  The CA communicated to CLA that DHECC strives to consistently apply its policies, procedures, and methodologies in accordance with the Settlement Agreement and undoubtedly during this process exceptions would occur due to the volume of claims processed in a short period of time.   Additionally the CA communicated that DHECC was committed to continue to enhance the internal control environment and to correct identified errors.

CLA has no responsibility to update or alter the Report for changes in the internal control environment subsequent to April 26, 2013.  If subsequent events are brought to our attention we will evaluate those events during Project II and III.

Throughout Project I, CLA had full and timely access to the CAO and DHECC vendor personnel for on-site meetings, conference calls, additional requests, and clarification and questions identified in a timely and transparent manner.  All personnel were collaborative and responsive throughout Project I.

CLA would like to thank the CAO and its vendors for their assistance, the education given on the complexities involved for our team, and efforts made during Project I.  From the initial kick-off meeting the CA pledged DHECC's full cooperation and commitment and that is exactly what CLA received.

*CliftonLarsonAllen LLP*

Indianapolis, Indiana
May 17, 2013

**Deepwater Horizon Economic Claims Center**

**Independent Evaluation of the Internal
Control Environment**

**(Process Audit)**

**May 17, 2013**

**Prepared By: CliftonLarsonAllen LLP**



NEXIA
INTERNATIONAL

An independent member of Nexia International



CliftonLarsonAllen LLP
9339 Priority Way West Drive, Suite 200
Indianapolis, IN 46240
317-574-9100 | fax 317-574-9707
www.cliftonlarsonallen.com

Mr. Bob Levine
Chief Financial Officer
Deepwater Horizon Economic Claims Center
935 Gravier Street, Suite 1905
New Orleans, LA 70112

We have conducted the first (Project I) of three 2013 scheduled Independent Evaluations of the Internal Control Environment over claims processing (Process Audit) of Deepwater Horizon Economic Claims Center (DHECC), as requested by the Claims Administrator's Office (CAO).  This Process Audit Report (Report) covers the claims processing internal control environment from June 4, 2012 to March 31, 2013, and includes claims paid through December 31, 2012.

For the purposes of the Report:
- The CAO refers to the Claims Administrator (CA), Patrick Juneau, and his executive staff that comprise the CA's office
- DHECC refers to the CAO and the vendors tasked with claims processing implementation
- The vendors include BrownGreer (BG), Garden City Group (GCG), Postlethwaite & Netterville (P&N), PricewaterhouseCoopers (PwC), and HUB Enterprises (HUB)
- CA QA/QC refers to the Claims Administrator's Quality Control Department, which is an independent function within the CAO that provides quality control reviews
- BP refers to British Petroleum
- The Court refers to the United States District Court of the Eastern District of Louisiana
- The PSC refers to the Plaintiff's Steering Committee, who represents the individuals and businesses who suffered damages (i.e. the claimants)
- CLA refers to CliftonLarsonAllen LLP

The Report sets out the results of Project I fieldwork. CLA performed onsite and remote fieldwork procedures, including interviews, walkthroughs, documentation review, and testing of processed claims. CLA also evaluated whether claims were determined eligible and valued according to the Deepwater Horizon Economic and Property Damages Settlement Agreement (Settlement Agreement).   These procedures, agreed to by the CAO, were applied solely to assist DHECC in evaluating its internal control environment over claims processing.   The procedures performed and related observations and recommendations are described in the Report. CLA's work was performed from November 26, 2012 through April 26, 2013.

The subsequent scheduled fieldwork dates (Projects II and III) will reflect the internal control environment over claims processing from April 1, 2013 through September 30, 2013 for Project II and October 1, 2013 through December 31, 2013 for Project III and will cover claims paid for the period through May 31, 2013 and October 30, 2013, respectively.

We performed this engagement, and formed our opinion for Project I, in accordance with the International Standards for the Professional Practice of Internal Auditing Standards (Standards). In addition, our procedures do not constitute an audit performed in accordance with auditing standards generally accepted in the United States of America; or an examination, review or agreed upon procedures performed under the attestation standards of the American Institute of Certified Public Accountants. As such, we do not express an opinion on any of the specified elements, accounts or items included in DHECC's financial statements or on the financial statements taken as a whole. If we had performed additional procedures, or if we had conducted an examination or review of the specified elements, accounts or items of the financial statements, or agreed upon procedures in accordance with professional standards, matters in addition to our observations may have come to our attention and been reported to you.

The sufficiency of the procedures and operations of internal controls is solely the responsibility of the CA and DHECC. Consequently, we make no representations regarding the adequacy of the procedures described in the attached document either for the purpose for which the Report has been requested or for any other purpose.

This report is intended solely for the use of the Claims Administrator and DHECC and is not intended to be used by anyone other than the specified parties.

CLA has no responsibility to update or alter the Report for changes in the internal control environment subsequent to April 26, 2013. If subsequent events are brought to our attention we will evaluate those events during Project II and III. In addition, CLA did not validate management's responses we will test changes and updates during Project II and Project III.

*Clifton Larson Allen LLP*

Indianapolis, Indiana
May 17, 2013

# Table of Contents

1.0 Summary of Results ...................................................................................................................... 8

1.1 Key Strengths ............................................................................................................................ 8

1.2 Key Opportunities for Improvement ...................................................................................... 10

1.3 Key Findings ............................................................................................................................ 11

2.0 Internal Audit Opinion .............................................................................................................. 12

3.0 Background ................................................................................................................................ 13

3.1 DHECC Background .................................................................................................................. 13

3.2 Named Vendors of Settlement Agreement ............................................................................ 13

3.3 Engagement Background ......................................................................................................... 14

3.3.1 Project 1 Background ........................................................................................................... 15

4.0 Project Objectives and Scope .................................................................................................... 16

4.1 Project Objectives ................................................................................................................... 16

4.2 Project Scope ........................................................................................................................... 16

5.0 Project Work Performed ............................................................................................................ 17

6.0 Detailed Observations and Recommendations ........................................................................ 20

6.1 Review of DHECC Policies and Procedures ............................................................................. 20

6.2 Claims Data Input .................................................................................................................... 21

6.3 User Access Rights ................................................................................................................... 22

6.4 Change Management Audit Trail ............................................................................................. 23

6.5 Claims Payment Disbursements .............................................................................................. 24

6.6 Claims Data Retention ............................................................................................................. 24

6.7 Claims Audited by CAO's Quality Control Department .......................................................... 25

6.8 Data Center .............................................................................................................................. 26

6.9 Individual Claims Testing ......................................................................................................... 27

6.9.1 Seafood Compensation ........................................................................................................ 30

6.9.2 Individual Economic Damage ............................................................................................... 31

6.9.3 Business Economic Loss ....................................................................................................... 31

6.9.4 Vessel of Opportunity Charter Payment ............................................................................. 32

6.9.5 Vessel Physical Damage ....................................................................................................... 32

6.9.6 Coastal Real Property Damage ............................................................................................ 32

6.9.7 Wetlands Real Property Damage ......................................................................................... 33

6.9.8 Denied Claims Statistics ...................................................................................................... 34

## Table of Contents

6.9.9 Appealed Claims Statistics ............................................................................... 34

Appendix A - Individuals Interviewed ....................................................................... 35

Appendix B - Claim Categories Not Included In Project I Testing  ......................................... 37

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Summary of Results

## 1.0 Summary of Results

As of March 31, 2013, CLA identified the following key strengths and opportunities for improvement.  It was communicated to CLA that DHECC had begun implementing changes during fieldwork to address the opportunities for improvement identified, and changes were implemented as early as March 6, 2013.

### 1.1 Key Strengths

#### *Claims Paid In Accordance With the Settlement Agreement*

DHECC disburses payments that are calculated in accordance with the Settlement Agreement.  CLA's review of paid claims revealed exceptions of less than 2%.  Based on the claims CLA reviewed, paid claims as a whole appear to be paid in accordance with the Settlement Agreement and the CAO is committed to correcting any errors identified.

#### *Open Communication between DHECC, the Court, the PSC, and BP*

The CAO manages all lines of communication between their vendors, the Court, PSC, BP, and themselves through weekly status meetings, ad hoc meetings to address emerging trends and issues, and weekly reports.

#### *Claims Processing with Transparency*

DHECC processes claims under the premise of complete transparency.  This is accomplished by showing each claimant, PSC, and BP how each claim outcome is reached, and if a payment is calculated, how the calculation was performed in accordance with the Settlement Agreement.

#### *Claims Processing with Due Process*

DHECC implements the provisions of the Settlement Agreement providing each claimant the right to elect one of the following outcomes once the claimant receives a notice stating they are eligible for payment:
- Accept calculated offer
- Request a re-review of their claim if they are not satisfied with the initial outcome at no additional cost to claimant
- Request for a reconsideration it they are not satisfied with the re-review outcome at no additional cost to claimant
- Appeal the decision of the reconsideration at no additional cost to claimant

#### *Consistent Application of the Settlement Agreement*

DHECC applies the Settlement Agreement consistently based on the results of claims testing across the different claim categories. All claims categories revealed exceptions of less than 2% which indicates that DHECC correctly applied the Settlement Agreement.

## Summary of Results

### *Number of Appeals*

As of December 31, 2012, DHECC processed 68,954 claims and paid 15,894 claims, totaling $1,063,262,525.  The difference between claims processed and claims paid is the result of claims processed being appealed, denied, or the need of additional information from the claimant to fully process the claim.  See 6.9 Individual Claims Testing for breakdown of claims processed, paid, appealed, and denied.  As of March 25, 2013, the total number of claims appealed by either BP or a claimant was 1,260, or 1.83% of total claims processed.  Of the appeals, BP appealed 897 (71% of total appeals) and claimants appealed 363 (29% of total appeals) and the results of 67% of total appealed claims are still awaiting a decision.

### *Ease of a Claimant Filing a Claim and Having Their Questions Answered*

DHECC has made available three ways to file a claim.  Claims can be filed on-line, at one of 18 DHECC established Claimant Assistance Centers (CAC), or through U.S. Postal Service mail.  Additionally, DHECC has created a call center for claimants to call to get answers to claims filing questions.

### *Quality Control*

The CAO has a quality control function, responsible for quality control over claims processed, paid, and appealed.  This allows the CAO to identify issues and exceptions real time and implement changes to positively impact future claims.  CA QA/QC uses formal disciplines in accordance with the International Standards for the Professional Practice of Internal Auditing Standards to conduct their reviews. These protocols ensure a consistent application and allow for timely and accurate reporting of results. The work is retained and evidenced in workbooks to allow for review.  In addition, the qualifications and experience of the CA QA/QC resources support a qualitative review. Having an in house quality control function given the complexities in the internal control environment is viewed as a leading practice.

### *Claims Processing Volume*

As of December 31, 2012, DHECC processed an average of 11,492 claims notices per month.  As of March 31, 2013 DHECC's monthly average had risen by 89% to an average of 21,657 claims notices processed per month, demonstrating increasing efficiency in the processing of claims.

### *Offsite Data Center Assessment*

The CAO outsources its data center operations to GCG.  The CAO and GCG regularly test and assess the physical controls of the data center to determine any control weaknesses.

### *Document Retention*

The CAO and GCG maintain paper documents in a secured storage area within the Mail Center, located in Hammond, LA.  In addition, GCG maintains electronic documentation at the Data Center, located in Dublin, OH (Data Center)  Both paper and electronic documentation are maintained in a secure area and can be located or recalled as needed.

## Summary of Results

### 1.2 Key Opportunities for Improvement

#### *Change Management Audit Trail*

BG performs approximately 300 – 400 IT system changes daily such as updating claim or claimant specific information and claims processing portal system edits.  While documentation is maintained to support the changes, a log of the changes is not maintained. As such, it is difficult for the CAO to monitor the nature and frequency of IT changes each day.  Maintaining a daily log will also assist management is determining if changes made were authorized, reasonable and tested before implementation.

#### *Excessive Remote User Access*

BG utilizes an IP address validation control to ensure access to the claims processing portal is restricted to users located at one of the DHECC approved locations.  Remote access to the portal has been granted to 829 (28%) individuals out of approximately 3,000 individuals involved in the claims administration process. Such access is usually limited to a smaller percentage, 2-3% (i.e. 50 to 100 users).   Additionally, criteria for allowing remote access has not been sufficiently reviewed and documented.

#### *Periodic User Access Review*

DHECC's vendors have a number of individuals (443 out of approximately 3,000) who have multiple user accounts with different permission rights and capabilities.  Users with multiple user accounts are not a control deficiency so long as monitoring over segregation of duties risks is performed. While management performs a 30 day review of static user accounts, user access is not periodically reviewed to determine if access level is appropriate and in alignment with job responsibilities.

#### *Execute Vendor Contracts for All Vendors*

The CAO is required to work with the four DHECC vendors in the Settlement Agreement.  Contracts have been executed and signed with two of the four vendors, P&N and GCG.  While the remaining vendors, BG and PwC, have not completed contracts, they were named in the Settlement Agreement and are required to perform claims processing responsibilities for the CAO as part of DHECC. In the absence of signed contracts, it is difficult for the CA to establish service level agreements and performance metrics for the vendors.

#### *Approval of Policies and Procedures*

DHECC appears to be operating in accordance with its policies and procedures.  However, five of the seven policies reviewed during Project I were draft and had yet to be finalized and approved by DHECC management.

*** The remainder of the page is intentionally left blank.  ***

10

## Summary of Results

### *Enhance CA QA/QC's Coverage Over Claims Processing*

CA QA/QC currently adheres to a sampling methodology that is in accordance with the Standards by using a 95% confidence interval with a 10% margin of error.  Enhancements to the sampling methodology through the use of data mining and trend analysis may increase the coverage of quality control reviews over DHECC's claims processing to identify anomalies and emerging trends.

### 1.3 Key Findings

The key finding noted during Project I is listed below. All other observations and recommendations relate to observations that are not considered high risk.  Upon communication and validation of our observations and recommendation, DHECC commenced to implement and to address the control enhancements identified.

BG performs 300 – 400 changes on average per day to either claims in process or the claims processing portal.  While documentation is maintained to support the changes, a daily log of the changes is not maintained to give the CAO insight into the changes made each day.  Maintaining a daily log would also assist management in determining if changes made were properly authorized and vetted before implementation.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Summary of Results

## 2.0 Internal Audit Opinion

CLA conducted Project I of the Process Audit in accordance with International Standards for the Professional Practice of Internal Auditing Standards.  The Standards require that we plan and perform the Process Audit to demonstrate a reasonable basis for our judgments and conclusions regarding DHECC's Internal Control Environment over claims processing.

Based on the work performed and the rating criteria established by DHECC, the internal control environment at DHECC merits a rating of "Minor Improvement Needed."  This rating indicates that, overall internal controls are in place and are operating as intended to provide reasonable assurance that management's objectives are met.

**Rating Criteria Definition:**

- A "***Satisfactory***" rating indicates the evaluated in-scope processes are performing as designed to adequately, appropriately, and effectively mitigate risks in order for management objectives to be met.

- A "***Minor Improvements Needed***" rating indicates the evaluated in-scope processes are performing to mitigate the assessed risks, but minor deviations from the intended design were identified and should be corrected.  The overall control framework in place is adequate and provides reasonable assurance that management objectives are met.

- An "***Improvements Required***" rating indicates the significant deviations from the control design were identified that open the applicable policies and procedures to an unacceptable level of risk.  The process controls are unlikely to provide reasonable assurance that management objectives are met.

- An "***Unsatisfactory***" rating indicates the evaluated in-scope processes were not implemented as designed and/or are not mitigating the assessed risks.  The controls in place are not adequate, appropriate, or effective to provide reasonable assurance that management objectives are met.

*** *The remainder of the page is intentionally left blank.* ***

## Background

## 3.0 Background

### 3.1 DHECC Background

In August 2010, lawsuits against BP and other defendants relating to the damages resulting from the spill by the oil rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010, were consolidated before the Court.  The Court serves as litigator of damages resulting from this oil spill. In advance of the trial, the parties to the litigation, namely, the PSC, and BP began settlement negotiations.

By Order dated May 2, 2012 the Court preliminarily approved the Settlement Agreement entered into by PSC and BP, dated April 18, 2012, as amended on May 1, 2012, for the purpose of settling all related claims against BP.

The Interim Class Counsel, the CA and J.P. Morgan Trust Company (the Directed Trustee), entered into the Deepwater Horizon Economic and Property Damages Trust Agreement (Trust Agreement) creating the Settlement Trust. The Settlement Trust's purpose is to establish a mechanism to disburse payments to claimants as defined in the Settlement Agreement.

A Claims Administrator was appointed by the Court to oversee the operations of the Deepwater Horizon Economic Claims Center (DHECC) as outlined in the Settlement Agreement. The Claims Administrator was also appointed as the Trustee of the Settlement Trust, which will disburse all administrative and claims funding for the Settlement Agreement.

The CA and DHECC's responsibilities, as set out in the Settlement Agreement include:
- Administering the Deepwater Horizon Economic Settlement in accordance with the Settlement Agreement and the Settlement Trust
- Resolving open issues with PSC and BP
- Reporting back to the Court on the Operations of DHECC
- Providing full transparency of DHECC's claims processing in accordance with the Settlement Agreement
- Overseeing execution of claims data inputting, processing, disbursing payments, and retaining data

### 3.2 Named Vendors of Settlement Agreement

The Settlement Agreement named four vendors who would have responsibility for the key processes of inputting claims data, processing claims data, disbursing payments, and retaining claims data. They are: BG, GCG, P&N, and PwC. Each vendor is under the oversight of the CAO as the vendors conduct the day to day aspects of managing DHECC's claims processing operations including inputting, processing, disbursing payments, and retaining data. Additionally, the CAO contracted with HUB to provide security at the CACs and aid in the investigation of claims or claimants suspected of committing fraud, waste, and abuse.  The four named vendors and their Settlement Agreement responsibilities are tabled on the following page:

****The remainder of the page is intentionally left blank. ***

13

## Background

| BrownGreer |
|---|
| • **Team Leader:** Orran Brown |
| • **Team Size:** 1,251 as of December 31, 2012 |
| • **Responsibilities:** Processing Claims Data |
|     • Specifically, constructing, maintaining, and supporting the claims processing portal; processing all claim categories with the exception of the business economic loss; monitoring claims processed and reporting to DHECC; staffing and maintaining 18 CACs |

| Garden City Group |
|---|
| • **Team Leader:** Neil Zola |
| • **Team Size:** 1,503 as of December 31, 2012 |
| • **Responsibilities:** Inputting Claims Data, Disbursing Payments, and Retaining Claims Data |
|     • Specifically, physical mail intake, including physical claim forms and supporting documentation; identifying supporting documentation, linking supporting documentation to the correct claimant, categorizing the supporting documentation, and capturing data electronically for the physical claims forms and supporting documentation; managing the stand alone call center; processing payment disbursements for the DHECC claims process; managing and maintaining the data center supporting DHECC; managing and maintaining all physical claim forms and supporting documentation received |

| Postlethwaite & Netterville |
|---|
| • **Team Leader:** Mark Staley |
| • **Team Size:** 201 as of December 31, 2012 |
| • **Responsibilities:** Processing Claims Data |
|     • Specifically, initial level claims processing of business economic loss claims; secondary reviewing and approving of seafood compensations claims over $250,000 prepared by BG |

| PricewaterhouseCoopers |
|---|
| • **Team Leader:** Charles Hacker Jr. |
| • **Team Size:** 170 as of December 31, 2012 |
| • **Responsibilities:** Processing Claims Data |
|     • Specifically, initial level claims processing of business economic loss claims; secondary reviewing and approving of business economic loss claims initially prepared by P&N |

### 3.3 Engagement Background

CLA was selected to perform an Independent Evaluation of the Internal Control Environment in place for DHECC's claims processing for the periods of March 31, 2013, September 30, 2013, and December 31, 2013. Additionally, the scheduled fieldwork will cover claims paid as of December 31, 2012, May 31, 2013, and December 31, 2013. Throughout the course of our three projects, CLA will render an opinion over the internal control environment over claims processing using the International Standards for the Professional Practice of Internal Auditing. CLA will:

- Perform an onsite and remote comprehensive and objective review of the internal control environment over claims processing to evaluate if claims were properly valued according to the Settlement Agreement
    - o Conduct an onsite and remote operational review of claims processing and review the payment system to verify compliance with the Settlement Agreement
    - o Evaluate if the claims infrastructure achieves structured goals of DHECC

14

## Background

- o Conduct claims testing to evaluate whether claimant eligibility is assessed in accordance with the Settlement Agreement
- o Conduct claims testing to evaluate whether claims are valued for all claims categories in accordance with the Settlement Agreement

- Perform a review of the internal control environment over claims processing in accordance with the Standards and evaluate the controls utilized by the DHECC to manage and control claims processing

- Perform a review of the internal control environment over claims processing with regard inputting data, processing data, disbursing payments, and retaining data in accordance with the Settlement Agreement

- Perform a review of the system's capacity and an evaluation of the Program's infrastructure for forecasted needs

Upon completion of the three scheduled projects CLA will have completed the services included in the Engagement Letter dated September 11, 2012 and amended March 5, 2013.

### 3.3.1 Project 1 Background

We have conducted the first of three 2013 scheduled projects.  Project 1 covers the claims operation environment from June 4, 2012 to March 31, 2013, and includes claims paid as of December 31, 2012 as the population for testing adherence to management's expectations.

We anticipated changes would be made to DHECC's claims processes to improve the processing of claims on a go forward basis.  The CAO and its vendors identified opportunities for improvement and implemented those opportunities throughout Project I of our Process Audit.  Over 60 system enhancements were implemented from quality assurance reviews of the claims process, including but not limited to metrics for progress reporting, additional system prompts to confirm with vendor employees processing the claims are entering the correct information, and standardization of data capture analysis for the different claim categories.

As potential exceptions were identified by CLA, the following protocols were established and followed:
- Vetted the exceptions with DHECC to obtain confirmation
- Worked with DHECC to determine root causes
- Assisted DHECC to determine if exceptions had implications for the remaining claims paid population

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Background

## 4.0 Project Objectives and Scope

### 4.1 Project Objectives

The objectives of Project I were to evaluate the internal control environment over claims processing and processed claims. The key objectives are summarized below:

- Gain an understanding of the internal control environment over claims processing utilized by the CAO and its vendors to manage or oversee the claims process
- Perform review of claims processed and evaluate key internal controls over claims processed including inputting data, processing data, disbursing payments to evaluate if claims were valued and paid in accordance with the Settlement Agreement
- Conduct claims testing to evaluate whether claimant eligibility is assessed in accordance with the Settlement Agreement
- Evaluate policy and procedures to determine if they are sufficient, adequate, and current

### 4.2 Project Scope

Fieldwork for Project I was conducted from November 26, 2012 through April 26, 2013.  The period under review for Project I was the internal control environment over claims processing from June 4, 2012 through March 31, 2013 and claims paid through December 31, 2012.  We evaluated the key processes covering the internal control environment over claims processing:

- Input
- Process
- Disbursement payments
- Data Retention

Further, Project I covered the following types of claims paid as of December 31, 2012.

- Paid Claims
  - o 10 of the 12 claim categories named in the Settlement Agreement were included in our testing population during Project I; however, not all 10 claim categories included in the population were selected through CLA's sampling methodology
  - o CLA did not include the two additional claim categories noted below due to the fact that they were not in production as of December 31, 2012
    - Individual Periodic Vendor or Festival Vendor Economic Loss
    - Subsistence Damage Claim
  - o CLA used our sampling methodology of a confidence level of 95% with a 10% margin of error to identify our sample size of 96 claims
  - o CLA tested 96 paid claims across the claim categories
  - o CLA did not test claims that had a status of "in-process" as of December 31, 2012

- Appealed claims
  - o CLA performed trend analysis on appealed claims as of March 25, 2013
- Denied claims
  - o CLA performed trend analysis on denied claims as of December 31, 2012

## Background

Information technology (IT) systems used in processing claims, including:
- IT system Change management
- Logical access
- Physical security

Onsite visits to 8 DHECC and vendor locations.

CLA did not interview or meet with any claimants, their counsel, or their accountants to address specific claims.  Nor did we assess or evaluate any operations pertaining to the Medical Benefits Class Action Settlement (Medical Settlement Trust) reached related to the Deepwater Horizon oil spill. The Medical Settlement Trust offers benefits to qualifying people who resided in the United States as of April 16, 2012.

## 5.0 Project Work Performed

The work performed is summarized below:

**Planning and High Level Risk Assessment**
- CLA performed an initial kick-off meeting on November 13, 2012 to confirm the scope and objectives of Project I
- CLA performed a high level risk assessment of the internal control environment over claims processing to determine which cycles to evaluate first
- CLA developed a workplan, which was amended to increase the claims sampling and internal control environment testing

**Interviews**
- Interviews on an as needed basis throughout Project I with 25 individuals, from the CAO, DHECC vendors in the Settlement Agreement, and HUB Enterprises. See **Appendix A** for listing of individuals interviewed

**Review of Documentation**
- CLA reviewed the following 7 available DHECC policies and procedures to gain an understanding of the internal control environment over the key controls governing claims processing:
  - Travel and entertainment
  - Internal audit
  - Internal audit of invoice review
  - Internal audit of process review
  - Internal audit of claims review
  - Documentation retention policy
  - Disaster recovery and continuity of operations

- CLA reviewed documentation provided by DHECC and its vendors, including but not limited to:
  - Organizational charts
  - Employee listings for user access
  - Training materials and manuals
  - Bank statements

## Background

- o Claims monitoring reports
- o Claims appealed reports
- o Claim forms
- o Eligibility notices
- o Claims processed documentation

**Walkthroughs**
- CLA conducted walkthroughs of the four key processes: inputting, processing, disbursing payments, and retention of data. During our walkthroughs we observed the process used to identify the key controls and any deviations from management objectives. We identified approximately 110 key controls governing the claims process, the responsible party for implementing the controls, and the CAO's role in oversight of the key controls.

**Evaluation of Internal Control Environment and Testing of Operational Effectiveness**
- CLA performed tests of internal controls governing claims processing, including evaluating:
  - o The determination of claim eligibility in accordance with the Settlement Agreement
  - o The calculation of claim payments in accordance with the Settlement Agreement
  - o Whether the claimant provided the appropriate documentation to receive the calculated payment, including a wet signature signed release
  - o Whether the disbursed payment was prepared and approved by employees with clearance to perform those responsibilities
  - o Whether the disbursed payment was recorded on the bank statement and in the general ledger
  - o Whether the employees performing the initial review and quality assurance review of claims paid had the appropriate training to perform those responsibilities
  - o Whether the claim had been flagged for potential fraudulent activity
  - o Whether the claim had been quality assurance reviewed by the CA QA/QC

- CLA performed controls testing on 10 of the 12 claims categories as 2 of the claims categories had not been put into production, as of December 31, 2012
  - o CLA randomly tested 96 claims and performed procedures analyzing key controls governing claim preparation, determination of causation, payment calculation, quality assurance review, and payment disbursement
  - o CLA obtained a listing of all claims appealed either by BP or a claimant as of March 25, 2013 to analyze appealed claims trends by claim category
  - o CLA obtained a listing of all notices issued, extracted the denial notices issued to analyze denied claims trends by claim category to determine which claim categories had the highest percentage of denied claims
  - o CLA selected a random sample of claims that had been quality assurance reviewed by the CA QA/QC. We reviewed the workbooks and supporting documentation and reviewed any exceptions and gaps noted during IA's review. Additionally, we verified that exceptions and gaps noted were reported to The CAO to ensure remediation occurred on a timely basis
  - o CLA reviewed a random sample of documentation used to support disbursement amounts through approval of sign-off and date

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Background

- CLA evaluated certain aspects of the IT control environment and interviewed four key IT management personnel from the CAO, BG, and GCG and evaluated the following:
  - o CLA evaluated system access users with remote user access
  - o CLA tested the number of users with multiple user accounts and how those accounts are monitored
  - o CLA evaluated claims reporting and evaluated if the "all claims file" included all claims processed to a notice

- CLA conducted 8 onsite visits to :
  - o **DHECC Home Office**, New Orleans, LA – Weeks of November 26, 2013 & February 4, 2013
  - o **BG Claims Processing Office**, New Orleans, LA – Weeks of November 26, 2013 & February 4, 2013
  - o **Mail Center**, Hammond, LA – November 28, 2012
  - o **GCG Disbursement Center**, New York City, NY  – December 17, 2012
  - o **Claim Call Center**, Sarasota Springs, FL  – December 21, 2012
  - o **Claimant Assistant Center**, Clearwater, FL – December 21, 2012
  - o **GCG Data Center**, Dublin, OH – February 27, 2013

*        ***The remainder of the page is intentionally left blank.  ***

19

## Detailed Observations and Recommendations

## 6.0 Detailed Observations and Recommendations

CLA conducted interviews with the CAO and the DHECC vendors of the Settlement Agreement (BG, GCG, P&N, and PwC), reviewed documents, tested claims processing, reviewed policies and procedures, compliance with protocols and methodology to enable us to gain an understanding of the operations and identified potential control weaknesses and opportunities for enhancement.

### 6.1 Review of DHECC Policies and Procedures

**Purpose:**
*The purpose of CLA's review of DHECC's policies and procedures was to evaluate them for sufficiency, consistency, adherence to the Settlement Agreement, and comprehension to support the internal controls that govern claims processing.  We performed internal control evaluations to evaluate that the policies and procedures were being implemented as intended.*

**Results:**
*We reviewed The CAO's policies and procedures for adherence to the Settlement Agreement and performed internal control evaluations to verify the policies and procedures were being followed.*

*We noted five of the seven policies and procedures have not been finalized and approved, as of March 31, 2013.*

| Policy and Procedure | Dated |
|---|---|
| Travel and Entertainment | Approved July 17, 2012 |
| Internal Audit | Drafted October 17, 2012 |
| Internal Audit of Invoice Review | Drafted October 17, 2012 |
| Internal Audit of Process Review | Drafted October 25, 2012 |
| Internal Audit of Claims Review | Drafted October 25, 2012 |
| Document Retention Policy | Drafted September 12, 2012 |
| Disaster Recovery and Continuity of Operations | Approved October 10, 2012 |

Subsequent to the period of the fieldwork, the remaining policies and procedures were finalized and approved by the CA, so no further action is required.

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.2 Claims Data Input

**Purpose:**
*The purpose of CLA's review of the input control environment was to perform controls testing to evaluate if controls are in place and operating as intended for claim input.  A claim can be filed in one of three ways:*

- *Visiting a CAC in person*
- *Mailing in paper documents*
- *Filing a claim electronically on-line*

**Results:**
*We reviewed data inputs into the accountant's calculation spreadsheet and reviewed the accuracy of claimant data received for each claim category.  We noted four data input exceptions pertaining to the accuracy of financial statement data input in the accountant's calculation spreadsheet used to calculate the claim payment see **6.9 Individual Claims Testing** for a breakdown of variances and exceptions.*
*Errors in the data input process can result from individuals not receiving enough training and human error in the quality assurance process.   Incomplete or inaccurate data captured may lead to errors in processing and calculating the claim in accordance with the Settlement Agreement.*

**Recommendations:**
*We recommend the CAO and BG refine its quality assurance review process over data input and data capture and continue to provide training to increase the effectiveness of the quality assurance process. This will assist individuals preparing and reviewing the claims data to meet the requirements of the Settlement Agreement more effectively and efficiently by reducing the potential for data input and data capture errors.*

**Management Response:**
*The vendors have discussed these findings with their staff.  They will continue to take the appropriate steps to reinforce the importance of accurate data input and quality assurance procedures.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.3 User Access Rights

**Purpose:**

The purpose of CLA's review of the user access rights control environment was to perform controls testing to evaluate if controls are in place and operating as intended for user access right over claim processing. BG is responsible for maintaining the claims processing portal and processing claims. All claims documentation is maintained on the claims processing portal, and with the exception of business economic loss (BEL) claims all claim categories are processed in the claims processing portal.

**Results:**

We noted that currently 829 out of the approximately 3,000 (28%) individuals that are part of the claims process have remote access. Remote access grants those individual the ability to sign into the BG claims processing portal from any location which presents them with the opportunity to misuse sensitive data.

In addition, 443 out of 2,439 (18%) individuals who have access to the BG claims processing portal have more than one user account. Monitoring exists to ensure that users can not process and approve a single claim all the way to payment; however, not monitoring the use of the user accounts on a periodic basis may result in unintended segregation of duties issues, including the ability to process and approve a single claim all the way to payment.

Though no instances of unauthorized access to the DHECC portal or instances of a user processing and approving a claim all the way to payment was detected, user accounts within the DHECC portal are not monitored to ensure only authorized individuals have access. Lack of monitoring user access accounts increases the risk of unauthorized access to the portal.

**Recommendations:**

We recommend access to the DHECC portal be periodically reviewed and corrective action taken to remove user access rights for personnel no longer employed and monitor users with multiple user accounts to identify any instances where a user processes and approves a claim all the way to payment.

**Management Response:**

Restricted IP Addresses: BG and the CAO have diligently reduced the number of DHECC personnel who can access the database by using an unrestricted IP address since February of 2013. Since the population of 829 unrestricted IP address users was identified, we have reduced that volume to 96 users as of 4/24/13 as follows: (a) 25 BG remote reviewers; (b) 25 CAO personnel (includes 10 CLA users); (c) 23 GCG intake personnel; (d) 17 P&N Accountants; and (e) four Louisiana property/title attorneys retained to assist on ownership issues for Wetlands claims. This reduced volume falls within the acceptable range of 2-3% as specified in Section 1.2 of the Report. BG and the CAO will continue to analyze whether this volume of users with access from an unrestricted IP address can be reduced further.

Monitoring of Roles and Access Rights for Claims Reviewers: The CAO will periodically test user access roles every 30 days by selecting a random sample of reviewers and analyzing their database access rights to the various review queues to ensure adherence to CAO policy and training certifications. The CAO will also run periodic audits to ensure that any personnel that disassociates from the DHECC program will have their login and passwords revoked.

# Detailed Observations and Recommendations

## 6.4 Change Management Audit Trail

**Purpose:**

*The purpose of CLA's review of IT change management processes as part of the claims processing control environment was to perform controls testing to evaluate if controls are in place and operating as intended for changes made to the IT environment. BG is the vendor responsible for maintaining and implementing changes to the claims processing portal.*

**Results:**

*BG performs 300 – 400 changes on average per day to either claims in process or the claims processing portal. While documentation is maintained to support the changes, a daily log of the changes is not maintained to give the CAO insight into the changes made each day. Maintaining a daily log would also assist management in determining if changes made were properly authorized and vetted before implementation.*

**Recommendation**:

*We recommend BG maintain a daily log of IT changes made to claims in process and the claims processing portal to assist management in determining if changes made were properly authorized and vetted before implementation.*

**Management Response:**

*Production Builds and System Enhancements: BG previously documented all new production builds for the DHECC database by archiving the existing production build before implementing the new system enhancements. To further document DHECC system enhancements, we created a Change Request Form template for the programmers and DBA personnel to complete when implementing new code. The Change Request Form indicates: (a) the date of the change; (b) a description of the change; (c) the affected tables; (d) the affected stored procedures; (e) who approved the changes; and (f) who implemented the changes to the DHECC system. BG has used the Change Request Form since 4/1/13.*

*Changes to Data Performed Outside of the Claims Review System: BG has recorded a daily log of data change requests to the DHECC database since 4/29/13. We track these data updates or manual movement of claims/claimants to various review queues when the database application cannot handle the request without direct intervention by a programmer. This daily log identifies: (a) the source and date of the request; (b) a description of the change or data updates; (c) the number of affected claimants/claims; (d) the Directly Responsible Individual who requested and authorized the data change; (e) the programmer who implemented the data change; and (f) the implementation date. We store this daily log in Excel format that tracks the changes by date and specific requests and upload a copy of this daily log to the CAO every week.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Detailed Observations and Recommendations

## 6.5 Claims Payment Disbursements

**Purpose:**
*The purpose of CLA's review of the payment disbursement control environment was to perform controls testing to evaluate if controls are in place and operating as intended for disbursements of claim payments.  Disbursements are prepared at the GCG Disbursement Center located in New York City, NY by GCG.*

**Results:**
*We noted payments disbursed to claimants were the same as the payments acknowledged as due to them and that segregation of duties were appropriate between check and wire preparation, approval, and disbursement.  Additionally, we noted the individuals responsible for check and wire preparation, approval, and disbursement was documented and maintained without exception in accordance with the Standards.*

**Recommendations:**
*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**
*No response necessary.*

## 6.6 Claims Data Retention

**Purpose:**
*The purpose of CLA's review of the retention control environment was to perform control testing to evaluate if controls are in place and operating as intended according to DHECC's policy for claim documentation retention.  The preservation policy applied by DHECC to all emails and other electronic files or databases; paper documents; notes; calendars; logs; forms; drawing; diagrams; schedule; photograph; video and other recordings; worksheets; computations; data storage media including hard drive; external hard drive; CDs; USB Drives; and DVDs is to maintain all the previously listed electronic and paper documentation for three years after the expiration of the lifetime of the final DHECC claim.*

**Results:**
*We noted that DHECC and GCG maintain paper documents in a secured storage area within the Mail Center located in Hammond, LA.  In addition, GCG has planned for the volume of documents based on the size of the current storage area observed and the additional subcontract with a document storage vendor in the circumstance that the current area will not store all paper files.*

*We noted that all electronic documentation is stored at the Data Center. All documentation is available and can be recalled as necessary.  We have performed a high level review to evaluate if environmental, physical security, and data backup and storage controls are in place at the Data Center, see results at section 6.8.*

**Recommendations:**
*We recommend that DHECC and GCG continue to monitor the capacity of the current paper document storage areas and determine when and if an expansion of the storage space is appropriate.*

## Detailed Observations and Recommendations

**Management Response:**

*GCG will continue to monitor the capacity of the current paper document storage areas and recommend expansion to the CAO when and if expansion is appropriate.*

### 6.7 Claims Audited by CAO's Quality Control Department

**Purpose:**

*The purpose of CLA's review of the claims quality control reviewed by CA QA/QC was to evaluate if controls are in place and operating as intended for CA QA/QC quality assurance controls. CA QA/QC is responsible for quality control reviewing claims processed, paid, and appealed under DHECC. This function is in addition to the quality control measures instituted by the DHECC vendors. This allows DHECC to identify issues and exceptions real time and implement changes to positively impact future claims. CA QA/QC uses workbooks to quality control review claims processed as well as to document their quality control review. Each vendor identified in the Settlement Agreement is responsible for performing quality control reviews on their own work and the CA QA/QC is back-up in addition to the vendors' quality control measures.*

**Results:**

*We noted that two instances out of our sample selection of 25 where CA QA/QC did not evidence their review on all parts of the workbook through initials and date. Not fully documenting the CA QA/QC review of the workbook may indicate only a partial or inadequate review of the workbook, even if a full review was performed. In each instance we noted CA QA/QC had partially signed-off and dated the workbook review, we noted that all steps of the workbook had been properly completed.*

*Additionally, we noted that during the Fourth Quarter of 2012, CA QA/QC completed workbooks for 206 claims processed across 10 claim categories. CA QA/QC's sampling technique uses a 95% confidence level and 10% margin of error to calculate the sample size for paid claims by claim category which is a methodology that meets the Standards. All CA QA/QC quality control reviews and workbooks are completed either after a claim has been processed and is waiting for notice of payment to be disbursed or payments have been disbursed to claimants.*

*CA QA/QC communicates its quality control review results on a quarterly basis to the CAO and the DHECC vendors and identifies the root cause for all exceptions noted. Exception trends are analyzed to evaluate whether an exception's root cause is a one-time event or an event that could affect the entire claims population. In addition, once exception trends are evaluated, employees processing claims are educated and trained on why the exception occurred and how to properly process a claim to avoid recurring exceptions going forward. This allows CA QA/ QC to continuously monitor and implement improvements to the claims processing environment as exception trends are identified.*

*It is a leading practice to have an in-house quality control function; however, currently CA QA/QC may enhance its coverage of claims processing through data mining and trend analysis for DHECC's operations in addition to the quality control measures performed by the vendors.*

**Recommendations:**

*We recommend that CA QA/QC continue to perform quality control review of claims processed and document its entire review of the workbook.*

## Detailed Observations and Recommendations

*We also recommend CA QA/QC consider enhancing the coverage of quality control reviews over DHECC's claims processing through the use of data mining methodologies and trend analysis.*

**Management Response:**

*To provide an independent assessment as to quality and consistency of claim reviews and payments, the CAO Quality Control Team has continued to randomly sample claims across all claim types. The random sample volume achieves a 95% confidence interval with a 10% margin of error. The scope of the Quality Control Team's reviews encompasses every aspect of a claim review from document categorization to payment distribution. Prior to publication of this report, the CAO Quality Control Team has begun testing live claims prior to distribution to notice, as well as performing data mining analysis on claim type databases. The CAO will continue to identify and report material and non-material exceptions (material exceptions affect causation or compensation) to the vendors on a weekly basis. The exceptions are reviewed with the vendors to allow them the opportunity to remediate incomplete and/or inaccurate claim determinations, identify processes that may benefit from additional training, identify opportunities to strengthen quality controls, and to identify trends and Program wide errors in need of attention.*

### 6.8 Data Center

**Purpose:**

*The purpose of CLA's review of the Data Center was to perform a high level review to evaluate if environmental, physical security, and data backup and storage controls are in place at the Data Center.*

**Results:**

*We noted that environmental, physical security, and data backup and storage controls were in place. Such controls included fire detection and suppression systems, temperature monitoring, uninterruptible power supply, backup power source, key card access system, security cameras, security personnel, and tape backup system.*

*We noted one opportunity for improvement in the replacement of the dry pipe sprinkler system inside the computer room of the Data Center with a chemical-based fire suppression system. In the event of a data center fire, use of the dry pipe system could result in a significant amount of hardware loss due to water damage. Additionally in the event of significant hardware loss, the Data Center does have a redundant offsite facility to ensure that operations stay up and running during such an event.*

**Recommendations:**

*CLA recommends the CAO evaluate the existing functionality and off-site back-up data center and consider the potential benefits of a chemical-based fire suppression system to assist in the mitigation of risk of hardware loss in the event of a data center fire.*

**Management Response:**

*Prior to receiving the draft audit report, GCG's head of systems had been investigating whether a chemical-based fire suppression system was necessary for GCG as a whole. We determined that the cost, approximately $75,000 - $100,000, wasn't necessary since GCG carries insurance on all of our equipment and because, as mentioned in the Process Audit Report, GCG maintains a redundant offsite facility to ensure operations stay up and running in the event of a data center fire. However, if the CAO wants to authorize that expense, GCG will proceed to have the system installed.*

# Detailed Observations and Recommendations

## 6.9 Individual Claims Testing

Through December 31, 2012, DHECC had processed and issued 68,954 claim notices.  A notice is the outcome of a particular claim being processed and each notice has one of four outcomes:

- Eligible – payment due
- Eligible – no payment due
- Incomplete
- Denial

As of December 31, 2012, 98,120 claims had been submitted and captured through the claims processing portal.  Of those claims submitted, 68,954 (70%) had been processed and a notice issued. Additionally, as of December 31, 2012, notices of eligibility and payment had been processed for 15,894 claims, totalling $1,063,262,525.  The table illustrates how DHECC has increased operations and the activity levels of the first full month of operations, the first six months of operations, and the first quarter of 2013.

| Metric | As of July 2012 | June 2012 – December 2012 | January 2013 – March 2013 |
|---|---|---|---|
| Total Number of Claims Processed* | 1,800 | 68,945 | 64,971 |
| Total Award Amounts Processed | $65,672,562 | $1,634,102,344 | $1,144,341,198 |
| Percentage of Total Awards Processed for Individuals | 43.42% | 32.61% | 25.58% |
| Percentage of Total Awards Processed for Individuals with Business | 0.00% | 9.91% | 13.91% |
| Percentage of Total Awards Process for Business | 56.58% | 57.48% | 60.52% |
| Average Number of Claims Processed Monthly | 1,800 | 11,492 | 21,657 |

*Each claim may have more than one notice generated for it throughout the process.*

*** The remainder of the page is intentionally left blank. ***

## Detailed Observations and Recommendations

The graph immediately below depicts the length of time (in days) on average to process the number of claims that had notices issued in a particular month.  The points on the graph are based on issuance of the first notice that is generated for a claim.  Claims may have additional notices or revised award amounts generated in a subsequent month based on the outcome of the first notice.  The increase in average number of days to process a claim to first notice is due the increase in volume of claims received by DHECC.  The second graph depicts the number of claims received on a monthly basis.



*Source: DHECC Notices File*



*Source: DHECC All Claims File*

28

## Detailed Observations and Recommendations

10 claim categories were included in the population of our testing during Project I, but not all 10 claim categories were selected. We used our sampling methodology of a confidence level of 95% with a 10% margin of error to identify our sample size of 96 claims. We tested 96 paid claims across the claim categories. We did not test claims that had a status of "in-process" as of December 31, 2012. The results of Project I are exhibited below.

| Program Review | # of Claims Sampled | Total $ of Sample | # of Claims with Variance | Total $ Of Over-payments | % of Over-payments | Total $ Of Under-payments | % of Under-payments |
|---|---|---|---|---|---|---|---|
| Seafood Compensation | 33 | $66,909,281 | 2 | $418 | 0.000% | $0 | 0.000% |
| Individual Economic Damage | 2 | $13,364 | 0 | $0 | 0.000% | $0 | 0.000% |
| Business Economic Loss | 15 | $26,737,487 | 2 | $2,494 | 0.008% | $0 | 0.000% |
| Vessel of Opportunity Charter Payment | 20 | $868,000 | 0 | $0 | 0.000% | $0 | 0.000% |
| Vessel Physical Damage | 1 | $12,778 | 0 | $0 | 0.000% | $0 | 0.000% |
| Coastal Real Property Damage | 24 | $141,352 | 0 | $0 | 0.000% | $0 | 0.000% |
| Wetlands Real Property | 1 | $15,750 | 0 | $0 | 0.000% | $0 | 0.000% |

*See Appendix B for breakdown and explanation of claim categories not tested during Project I.*

Instances were identified above where claimants were paid in excess of what they should have received as outlined in the Settlement Agreement. We were informed by the CAO throughout the course of our work, that any error identified resulting in a claimant being underpaid, would be corrected. Any instance identified resulting in a claimant being overpaid; DHECC would not request the claimant return the excess payment received. However, if a claimant received an overpayment for one claim category and was awarded an additional payment for another claim, the identified overpayment will be offset against any additional payments to that claimant.

In addition to our paid claims testing, we also performed trending on denied claims and appealed claims. A breakdown of the results by claim category is as follows:

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Detailed Observations and Recommendations

## 6.9.1 Seafood Compensation

**Purpose:**

*The Seafood Compensation Program covers damages suffered by Commercial Fishermen, Seafood Crew, or Seafood Vessel Owners that owned, operated, leased, or worked on a vessel that was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012. In addition, it covers damages suffered by Oyster Leaseholders and Individual Fishing Quota (IFQ) Owners. The Seafood Compensation Program does not apply to claims relating to fishing, processing, selling, catching, or harvesting of menhaden (or pogy) fish. The Seafood Compensation Program is capped at $2.3 billion.*

**Results:**

*CLA identified two calculated claim payment variances totaling $418 out of the 33 Seafood Compensation Program claims for which we performed procedures, and the exceptions are broken down as follows:*

- *The two claims with a variance in payment calculated between DHECC and CLA, totaling $418 in overpayments was due to an incorrect calculation of the amount of allowable accountant reimbursement in accordance with the Settlement Agreement*

*While CLA did identify exceptions during our Seafood Compensation Program claim analysis, the exceptions did not result in a change to eligibility determined by DHECC, meaning that all paid claims tested for this claim category were eligible to receive a payment.*

**Recommendations:**

*CLA recommends that DHECC strengthens its quality control reviews of claims processed including allowable accountant reimbursement calculations and educate those employees performing claims processing job responsibilities of the overpayments identified to assist in ensuring claims are processed and payments are calculated in accordance with the Settlement Agreement.*

**Management Response:**

*BG agrees there is a discrepancy in the Claimant Accounting Support calculation for the claims noted by the auditors. Apart and independent of the external auditor findings, BG found and corrected the Notice mapping that caused the overpayments prior to receiving the audit report. BG recorded the overpaid amounts and will offset the overpaid amounts from payments to any future claims (Claim ID 37202: $1,123,35; Claim ID 4379: $361.25).*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Detailed Observations and Recommendations

## 6.9.2 Individual Economic Damage

**Purpose:**

*Individual Economic Damage claims are claims submitted by Individuals, who shall be defined as (i) Natural Persons who (a) satisfy (or whose employers satisfy) the Class Definition and (b) whose losses are not excluded from the Class and (ii) who seek compensation for lost earnings from employment due to or resulting from the DWH Spill for claims that are not excluded from the Class.*

**Results:**

*We identified no exceptions for the two Individual Economic Damage claims for which we performed procedures.  The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

**Recommendations:**

*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**

*No response necessary.*

## 6.9.3 Business Economic Loss

**Purpose:**

*The Business Economic Loss framework sets forth the standards for evaluating claims and determining compensation for Businesses that suffered an Economic Loss as a result of the spill.*

**Results:**

*We identified two calculated claim payment variances totaling $2,494 in overpayments out of the 15 Business Economic Loss claims for which we performed procedures and the exceptions are broken down as follows:*

- *The two claims for which CLA noted an exception in that the calculated claim payment had input errors and/or expenses were not categorized as fixed or variable expenses in accordance with the Settlement Agreement resulting in $2,494 in overpayments*

*While CLA did identify exceptions during our Business Economic Loss claim analysis, the exceptions did not result in a change to eligibility determined by DHECC, meaning that all paid claims tested for this claim category were eligible to receive a payment.*

**Recommendations:**

*CLA recommends that DHECC strengthens its quality control reviews of claims processed and educate those employees performing claims processing job responsibilities of the overpayments identified to assist in ensuring claims are processed and payments are calculated in accordance with the Settlement Agreement.*

**Management Response:**

*It appears that the overpayment of $2,494 resulted from data input errors and expense misclassifications.  The vendors have discussed these findings with their staff.  They will continue to take the appropriate steps to reinforce the importance of accurate data input and quality assurance procedures.*

# Detailed Observations and Recommendations

## 6.9.4 Vessel of Opportunity Charter Payment

**Purpose:**

*Vessel of Opportunity (VoO) damage claim category addresses damages suffered by Natural Persons or Entities who registered their vessels to participate in BP's Vessels of Opportunity program, executed a VoO Master Vessel Charter Agreement with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as Charterer, and completed the initial VoO training program. VoO participants can make VoO Charter Payment Claims regardless of whether they were dispatched or otherwise asked to perform work under the program.*

**Results:**

*We identified no exceptions for the 20 VoO claims for which we performed procedures.  The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

**Recommendations:**

*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**

*No response necessary.*

## 6.9.5 Vessel Physical Damage

**Purpose:**

*A Vessel Physical Damage Claim is a claim for physical damage to a vessel resulting from the Deepwater Horizon Incident or certain response clean-up operations, including the cost of removal of equipment or rigging added to the vessel as part of the response activities.*

**Results:**

*We identified no exceptions for the Vessel Physical Damage claim for which we performed procedures. The claim's eligibility and valuation were in accordance with the Settlement Agreement.*

**Recommendations:**

*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**

*No response necessary.*

## 6.9.6 Coastal Real Property Damage

**Purpose:**

*Individuals and Entities who owned or leased coastal real property or boat slips located in the Coastal Real Property Claim Zone at any time from April 20, 2010 to December 31, 2010 can make Coastal Real Property Damage Claims for damage to that property.*

*In addition, owners of real or personal property located in the Coastal Real Property Claim Zone that was physically damaged in connection with the Deepwater Horizon Incident response cleanup operations can make claims for that physical damage to real or personal property.*

## Detailed Observations and Recommendations

**Results:**

*We identified no exceptions for the 24 Coastal Real Property damage claims for which we performed procedures.  The claims' eligibility and valuation were in accordance with the Settlement Agreement.*

**Recommendations:**

*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**

*No response necessary.*

### 6.9.7 Wetlands Real Property Damage

**Purpose:**

*Individuals and Entities who owned wetlands real property located in certain geographic areas at any time between April 20, 2010 and April 16, 2012, can make claims for Wetlands Real Property Damage. If an individual or entity has property located in the Wetlands Real Property Compensation Zone, person or entity could receive a Settlement Payment depending on whether the property is considered oiled or non-oiled and what the acreage is.*

*In addition, owners of real or personal property located in the Wetlands Real Property Compensation Zone that was physically damaged in connection with the Deepwater Horizon Incident response clean-up operations can make claims for that physical damage to real or personal property.*

**Results:**

*We identified no exceptions for the Wetlands Real Property Damage claim for which we performed procedures.  The claim's eligibility and valuation were in accordance with the Settlement Agreement.*

**Recommendations:**

*No exceptions were noted; therefore no management response is necessary.*

**Management Response:**

*No response necessary.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

## Detailed Observations and Recommendations

### 6.9.8 Denied Claims Statistics

**Purpose:**

*Denied claims are claims submitted to DHECC for processing under the Settlement Agreement by a claimant that are determined to not meet causation as defined in the Settlement Agreement. Causation dictates a claim's eligibility and if the claim can be processed for potential payment.*

**Results:**

*As of December 31, 2012 DHECC had processed and issued a notice of denial for 6,245 claims (9% of all notices issued).*

- *2,141 (34%) of the denial notices relate to the individual economic loss claim category.*

**Recommendations:**

*Denied claims were trended with statistics noted above; therefore no management response is necessary.*

**Management Response:**

*No response necessary.*

### 6.9.9 Appealed Claims Statistics

**Purpose:**

*Appealed claims are claims that are determined to be eligible for payment as processed by DHECC in accordance with the Settlement Agreement that are appealed by BP or the claimant.  BP can appeal any claim with a calculated payment of $25,000 or more.  The claimant can appeal the calculated award amount they receive and request that their claim be submitted for reconsideration.*

***Results:***

*As of March 25, 2013 DHECC had processed and issued a notice for 68,954 claims, totaling $1,063,262,525.  Of those claims processed, 1,260 had been appealed (1.83% of total notices issue), the breakdown between BP and Claimant appeals is as follows:*

- *BP appealed 897 (71%) claims, totaling $629,296,298*
- *Claimants appealed 363 (29%), totaling $3,699,307*

*As of our fieldwork date, March 31, 2013, there are currently 849 appealed claims with a status of pending with original calculated compensation amounts totaling $437,207,591.*

**Recommendations:**

*Appealed claims were trended with statistics noted above; therefore no management response is necessary.*

**Management Response:**

*No response necessary.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Appendix A

**Appendix A**

**Individuals Interviewed**

## Appendix A

### Individuals Interviewed During Project I Of The Process Audit

#### The Claims Administrator's Office

| | |
|---|---|
| Patrick Juneau | Claims Administrator |
| Michael Juneau | Special Counsel |
| David Odom | Chief Executive Officer |
| Bob Levine | Chief Financial Officer |
| Kirk Fisher | Director of Business Processes & Reporting |
| Chris Reade | Chief Information Officer |
| David Welker | Director of Fraud, Waste, & Abuse |
| Philip Ollendike | Reporting & Audit |
| Henry Mitchell | Reporting & Audit |

#### BrownGreer

| | |
|---|---|
| Orran Brown | Partner |
| Lynn Greer | Partner |
| Roma Petkauskas | Partner, New Orleans Claims Processing Center |
| Bob Staneart | Information Systems |

#### Garden City Group

| | |
|---|---|
| Stephen Cirami | Project Manager |
| Jennifer Keough | Call Center Lead |
| Shandarese Garr | Mail Center Lead |
| Drew Sommer | Senior Vice President, Systems & Technology |

#### HUB enterprises

| | |
|---|---|
| Chip Romero | President |
| Dwayne Regan | Vice President, Security |
| David Buchanan | Vice President, Fraud, Waste, & Abuse |

#### Postlethwaite & Netterville

| | |
|---|---|
| Mark Staley | Director |
| Robin Pilcher | Director |
| Corey Jambon | Consulting Manager |

#### PricewaterhouseCoopers LLP

| | |
|---|---|
| Charles Hacker Jr. | Partner |
| Theodore Martens | Partner |

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Appendix B

### Appendix B

### Claim Categories Not Included In Project I Testing

## Appendix B

The Following claims categories were not selected for Project I testing based on low dollar and number of claims volume.

| Claims Category | # of Claims Paid as of December 31, 2012 | $ Paid as of December 31, 2012 | % of Total Paid Claims as of December 31, 2012 |
|---|---|---|---|
| Subsistence Damage | 0 | $0 | 0.000% |
| Individual Periodic Vendor or Festival  Vendor Economic Loss | 0 | $0 | 0.000% |
| Real Property Sales Damage | 206 | $11,075,437 | 1.042% |
| Failed Business Economic Loss | 0 | $0 | 0.000% |
| Start-Up Business Economic Loss | 40 | $7,811,120 | 0.735% |

The purpose of each claim category not selected for Project I testing is listed below:

### Subsistence Damage

**Purpose:**

*Subsistence Damage is a loss of Subsistence use of natural resources arising from the Deepwater Horizon Incident. This includes damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume, or trade Gulf of Mexico natural resources (including Seafood and Game) in a traditional or customary manner, to sustain their basic personal or family dietary, economic security, shelter, tool, or clothing needs and who relied on Subsistence resources that were diminished or restricted due to the Deepwater Horizon Incident.*

### Individual Periodic Vendor or Festival Vendor Economic Loss

**Purpose:**

*Individual Periodic Vendor or Festival Vendor loss is for individuals who regularly provide the specific goods or services who meet the following criteria:*

1. *Regularly sold at retail during 2009 and 2010 any of the legal food, souvenir, art, tourist-related or water-related goods or services or substantially equivalent items ("Covered Sales") to CONSUMERS in Zones A,B or C during May through December 2009 and / or May through December 2010.*
2. *Made such Covered Sales, primarily to non-local CONSUMERS, except that water related Covered Sales, need not be primarily made to non-local CONSUMERS.*
3. *Did not maintain a permanent business location in a building at which the claimant made Covered Sales.*
4. *Held any licenses as required by law.*
5. *Was not employed by an employer in connection with such Covered Sales.*
6. *Does not have Tax Information Documents sufficient to support a claim under the Business Compensation Framework for this claimed loss.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

# Appendix B

## Real Property Sales Damage

**Purpose:**

*Real Property Sales Damage is economic loss suffered by sellers of residential property located in a specific geographic area, who sold their properties at a lower price because of the Deepwater Horizon Incident. In order to be eligible to file a Real Property Sales Damage claim, the claimant must have owned the property on April 20, 2010, and the sale of the property must have closed between April 21, 2010 and December 31, 2010. If the sales contract was executed prior to April 21, 2010, the property sales price must have been reduced because of the Deepwater Horizon Incident. Real Property Sales do not include transfers from borrowers to lenders as part of a foreclosure or a similar process.*

## Failed Business Economic Loss

**Purpose:**

*A Failed Business commenced operations prior to Nov. 1, 2008 and that on or after May 1, 2010 and prior to December 31, 2010 either, (i) Ceased operations and wound down, or (ii) Entered bankruptcy (through filing a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) Initiated or completed a liquidation of substantially all its assets. There are also guidelines for Failed Start-Up Businesses those commenced operations after Nov. 1, 2008. These claims have similar causation requirements as standard Failed Business Economic Loss Claims.*

## Start-Up Business Economic Loss

**Purpose:**

*A Business is considered a Start-Up Business if it began operations between November I, 2008 and April 20, 2010. The framework for Start-Up Businesses does not apply to (i) Failed Businesses, or (ii) claims covered under the Seafood Program.*

*\*\*\*The remainder of the page is intentionally left blank. \*\*\**

39