IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater | * | MDL NO. 2179 |
| Horizon" in the Gulf of Mexico, on April | * | |
| 20, 2010 | * | SECTION J |
| | * | |
| | * | |
| This document relates to | * | HONORABLE CARL J. |
| Civil Action No. 12-970 | * | BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | SHUSHAN |
| | * | |
| | * | |

## DECLARATION OF KIRK FISHER

1. My name is Kirk Fisher, and I am a person of the full age of majority and am competent to make this Declaration. I am currently the Director of Business Processes and Reporting for the Claims Administrator's Office (CAO) for the Deepwater Horizon Economic and Property Damages Settlement Agreement. In addition to earning an MBA from Louisiana State University in international studies and finance, I also am an adjunct faculty member at Louisiana State University in the E. J. Ourso College of Business, specifically in the Flores MBA program.

2. The Deepwater Horizon Economic and Real Property Claims Center has been receiving and processing claims since June 4, 2012. As of September 12, 2013, 207,310 claims have been filed with the Program. 119,301 of these claims have been processed to a final determination. Of the claims processed to a final determination, 56,299 of these claims are eligible to be paid and 46,490 of these claims have been denied. The backlog of claims yet to be processed to a final determination currently stands at 88,009 (with BEL claims accounting for 46,634 of these). Additionally, 4,038 claims have been appealed following an eligible or denial determination. 3,172 (78.6%) of these appeals have been filed by BP.

3. The CAO has exercised significant oversight regarding Vendor expenses and staffing levels since the inception of the Program. Since as early as July 2012, the CAO began to analyze and monitor each Vendor's productivity and efficiency. The CAO has employed utilization modeling to evaluate productivity, to identify areas where output is decreasing, and to analyze how full-time equivalents should be reduced as Program efficiencies are realized. Significant results have been achieved as a result of such oversight. For example, as call volume at the Garden City Group Call Center decreased, an opportunity to reduce staff was identified. Accordingly, staff reductions made in coordination with Garden City Group have resulted in an 87% decrease in Call Center expenses.

**EXHIBIT B**

4. The CAO has been proactive in attempting to resolve any issues that the Parties may have with the Program and the processes it utilizes in its oversight capacity. Particularly, the CAO scheduled a meeting on November 28, 2012 with BP and the PSC to discuss the administrative budget, administrative costs of the Vendors, administrative costs of the program in general, financial audit review, quality assurance review, benchmark comparisons of this Program and the GCCF, and the scope and progress of an external audit being conducted by CliftonLarsonAllen, LP ("CLA"). BP cancelled that meeting and requested a new date. The CAO subsequently attempted to reschedule that meeting three times. On each of these occasions, BP cancelled the meeting and requested a new date. The meeting finally took place on April 23, 2013. At the meeting, the topics scheduled to be discussed at the November 28th meeting were deliberated by the Parties. Further, at the conclusion of the meeting, BP was encouraged to submit any additional questions it had concerning CAO operations, and the CAO agreed to schedule additional meetings with the Vendors so that BP's questions could be answered.

5. On May 6th, the CAO sent Maria Travis via email a copy of the CAO's second quarter 2013 budget. Based on an increase in the volume of BEL Claims filed, it was determined by the CAO that an additional 100 accountants would be necessary to combat the increasing backlog of claims, the stated objective of the Claims Administrator. Funding for the additional 100 accountants was included in the second quarter budget as submitted to BP on this date.[1]

6. On May 8th, Maria Travis responded to Bob Levine's email stating that BP agreed to fund the proposed amount, despite "[taking] issue" with the hiring of an additional 100 accountants, citing a lack of proper explanation.[2] However, BP did not object to the format in which the budget was presented or to the supporting documentation for the remainder of the budget.

7. On May 22nd, Patrick Juneau submitted to Keith Moskowitz a letter responding to an information request sent by BP on May 1st. This letter detailed several operational aspects of the Program, including the CAO's risk management plan; metrics tracked; efficiency and utilization studies; daily production goals; efforts taken by the CAO to resolve incomplete claims; its quality control team; its information technology department; its fraud, waste, and abuse team; the attestation of CliftonLarsonAllen LLP, the Program's external auditor; and process enhancement strategies endorsed by the CAO. Additionally, a large volume of exhibits was attached to this letter. The letter also scheduled Vendor meetings for June 18th and invited BP to attend.

8. On June 18th, the Vendor meetings scheduled in Patrick Juneau's May 22nd letter were held. BP was present and afforded the opportunity to ask the Vendors any questions it had about the Program and the processes utilized by the Program.

---

[1] Exhibit 1 - May 6, 2013 Email chain between Bob Levine to Maria Travis.
[2] *Id.*

9.  On June 21st, the CAO received a copy of a letter from BP to Judge Barbier in which BP questioned whether the CAO had exercised "appropriate professional oversight and supervisions of the CSSP" and requested a full examination of the CSSP be undertaken to assess the CAO's management operations.[3]  Pursuant to this request, BP complained that the scope of CliftonLarsonAllen's external audit, a scope previously approved by BP, did not encompass the effectiveness of the operational processes of the CAO.  Further, BP questioned the utility of the CliftonLarsonAllen audit even for its intended purpose and expressed a desire that the proposed examination determine whether the scope of the CliftonLarsonAllen audit should be increased.  Further, BP alleged that the CAO was operating with low productivity and high costs; that the CAO was operating without an expense management plan; that the CAO apparently employed no procedures to detect and mitigate fraud; and that the CAO lacked adequate controls to properly detect errors in claimant-provided profit and loss statements.

10. On July 1st, Patrick Juneau submitted to Judge Barbier a letter in response to BP's June 21st letter.[4]  This letter expressed that BP's alleged concerns were unwarranted.  This letter stated the proactive nature with which the CAO has attempted to reach out to BP to schedule meetings between BP and the CAO.  This letter stated that the CAO operational oversight was significant and effective.  This letter defended the staffing costs and expenses of the Program, citing forecasting models to project the necessary staffing levels, and addressed several other similar alleged issues raised by BP.  This letter defended the fraud detection of the Program as robust and effective and maintained that the uniform processes used to detect errors in claimant-provided information were adequate.  This letter further reiterated that BP was given sufficient opportunity to dispute the CliftonLarsonAllen external audit and its scope but failed to do so.[5]  Finally, this letter restated the CAO's desire to maintain the transparency that it has advocated since the inception of the Program. As with similar correspondence, a large number of exhibits evidencing the positions of the CAO were attached to this letter.

11. On August 5th, 2013, I received a copy of a letter sent to Bob Levine from Maria Travis.[6] This letter expressed BP's disapproval of the CAO's third quarter (Q3) 2013 budget submission, stating that it was allegedly "unreasonable under the circumstances."[7]  Further, the letter expressed concerns about the Court Supervised Settlement Program's (CSSP) alleged "poor productivity and excessive costs."[8]  BP stated that it would not approve the budget as submitted by the CAO and requested "that the CSSP re-submit its 3rd quarter 2013 budget with appropriate documentation, analysis, metrics, and explanatory notes to support each written item in the budget request" so that BP could re-review the budget.[9]

---

[3] Exhibit 2 - June 21, 2013 Letter from Mark Holstein to Judge Barbier.

[4] Exhibit 3 - July 1, 2013 Letter from Patrick Juneau to Judge Barbier.

[5] BP expressed to the CAO a desire to meet with CliftonLarsonAllen to discuss the scope of its audit.  The CAO communicated to BP its willingness to accommodate this request.  To my knowledge, no response from BP regarding this request was received by the CAO.

[6] Exhibit 4 - August 5, 2013 Letter from BP to Bob Levine.

[7] *Id* at 1.

[8] *Id.*

[9] *Id.*

3

12. It was not until my receipt of the August 5th letter from Maria Travis that I had any knowledge that BP was dissatisfied with the budget format or its supporting documentation.

13. Given that BP disapproved of the third quarter budget thirty-six days into the third quarter, an expedited hearing was scheduled before Judge Shushan in order for BP to show cause as to why the CAO's third quarter budget should not be funded as submitted.[10] I testified at this hearing regarding the productivity of the Program as a whole[11] and the utilization modeling and time and motion studies employed by the Program to measure system performance and efficiency.[12] Further, I testified as to the volume of information previously provided to BP as requested in its July 21st letter and as included within various pipeline reports, utilization models, and other reports.[13] Additionally, I testified that some information requested by BP had not previously been tracked by the CAO or Program Vendors and therefore was not available to the CAO at the time of BP's request.[14]

14. After the hearing, Judge Shushan ordered BP to fully fund the CAO's proposed third quarter budget.[15] Additionally, Judge Shushan ordered representatives of BP and the CAO, including myself, to proactively meet in order to agree on a format and the documentation and analysis required to support the budget request for the fourth quarter of 2013.[16]

15. CAO representatives including myself met with BP representatives at the CSSP Office in New Orleans on August 9th to discuss the Q4 budget.

16. Prior to this meeting, I received a copy of a letter from Maria Travis to Bob Levine in anticipation of this meeting.[17] This letter reiterated the August 5th letter's highlighting of certain metrics that should be developed and tracked by the CAO.[18] This letter also suggested a framework around which to develop the budget methodology.[19] Further, it included previous requests for information by BP which had allegedly not been fulfilled.[20]

17. At the August 9th meeting, BP presented a brief PowerPoint presentation on the budgetary methodology it had suggested in its August 8th letter. The CAO went through BP's previous requests for information and established that all requested information available to the CAO had been provided to BP.[21]

---

[10] Rec. Doc. 10949.

[11] Transcript of the August 7, 2013 Rule to Show Cause Proceedings Heard before the Honorable Sally Shushan United States Magistrate Judge (BP's Exhibit A), at 47:24-25.

[12] *Id* at 48:9-19.

[13] *Id* at 54:7-10.

[14] *Id* at 57:2-3.

[15] Rec. Doc. 10953. This Order was immediately appealed by BP. Judge Barbier affirmed the Judge Shushan's ruling that same day. Rec. Doc. 10956.

[16] Rec. Doc. 10955.

[17] Exhibit 5 - August 8, 2013 Letter from Maria Travis to Bob Levine.

[18] *Id* at 1.

[19] *Id*.

[20] *Id* at 2.

[21] Exhibit 6 – August 9, 2013 Meeting Minutes.

18. At this meeting, BP and the CAO agreed that the Reviewer Utilization Model would be the main tool used by the CAO to revise the budget for the fourth quarter. This model was originally developed by the CAO as a tool to measure the efficiency and claim throughput of the entire system. This model had been used to forecast the staffing levels required to meet monthly claims processing goals based on claim processing task durations and the projected monthly volume of claims filed. This model also provided the CAO with monthly backward-looking productivity information by comparing the actual number of final claim determinations against the system capacity projected by the model.

19. Given the time constraints of the budget revision process set forth by the Court, it was not possible for the CAO to acquire accurate, historical data for all of the drivers of the budget forecast model. For this reason, reasonable Vendor assumptions would be required until time and motion studies could be completed that would yield this information.[22] BP expressed its understanding at the August 9th meeting that the CAO expected that reasonable assumptions would be required in the model until historic and accurate data was available.

20. BP requested at this meeting the raw data used to create the Reviewer Utilization Model that would serve as the basis for the budget revisions. The Plaintiffs' Steering Committee did not object to a one time provision of this information by the CAO to BP for the educational purpose of understanding the model. The CAO provided this data to BP on August 12th.

21. Lastly, at this meeting, BP and the CAO agreed to meet again on August 14th in order to continue the collaborative efforts of revising the budget forecast process.

22. On August 12th, I sent a letter to Maria Travis confirming our understanding of the August 9th meeting.[23] Particularly, this letter confirmed the scope of the budget model revisions, that the CAO had delivered to BP all information BP requested that the CAO was permitted and able to deliver, and that the CAO intended to deliver in the future the additional information BP had requested that the CAO had been unable to deliver because that information had been previously unavailable to the CAO. Additionally, this letter requested that BP review and comment on the August 9th meeting minutes, which were attached.

23. Prior to the August 14th meeting, our budget team began to adapt the Reviewer Utilization Model to be used as a budget forecasting tool. This included uniting the projected number of full-time employees ("FTEs") provided by the Reviewer Utilization Model to meet claim processing goals for the fourth quarter with Vendor employee invoiced costs associated with those FTEs. In order to introduce the cost and expense aspects of the CSSP into account, several adaptations to the model were required; however, none of these affected the overall means by which the model forecasts the budget.

---

[22] The CAO is currently in the process of performing these time and motion studies.
[23] Exhibit 7 - August 12, 2013 Letter from Kirk Fisher to Maria Travis.

24. On the morning of the August 14th meeting, I received an email from Maria Travis stating that BP disagreed with several of the CAO's characterizations regarding BP's requests for information and the CAO's responses to those requests.[24] Ms. Travis also expressed that BP disputed the accuracy of the August 9th meeting minutes and stated that BP would prepare a detailed response regarding these disagreements.

25. At the August 14th meeting,[25] the CAO provided BP with examples of the anticipated budget methodology for each Vendor. More particularly, the CAO explained how the budget forecast model utilized the reviewer cost model to forecast the costs associated with the reviewing of claims. The CAO further explained that the budget forecast for each Vendor would include administrative labor costs, expenses, and a contingency fee to reach a total budget forecast for that Vendor.

26. Further, at this meeting, the CAO discussed with BP several aspects of the budget methodology that had arisen as the CAO made revisions since the August 9th meeting. The CAO updated BP on changes the CAO had made to the budget model to increase the level of detail and accuracy of the forecast. The CAO, however, reiterated that the focus of the Program would continue to be combatting the backlog of claims as directed by the Claims Administrator.

27. At the meeting, the CAO expressed its intent to submit on August 16th a budget package that had been discussed. BP did not object to this format. Additionally, BP and the CAO agreed that the use of a modeled number of determinations was the best way to forecast the budget. Lastly, BP expressed a desire that the CAO compare the actual quarterly costs of the Program to those forecasted by the revised budget model in order to determine where any variances may exist, if any in fact do.

28. Additional discussions took place at the August 14th meeting between the CAO and BP about BP's previous requests for information. It was agreed by BP and the CAO that the CAO would continue to acquire the information not previously provided to it by the Vendors or not previously tracked; however, given the severe time constraints, the CAO would focus its efforts on acquiring the information relevant to the revisions of the budget model. Contrarily, process-related information, while acknowledged as important by the CAO, would receive a lower priority pending the finalization of the budget revisions.

29. BP had several observations and comments about the Reviewer Utilization Model. The majority of these questions were related to increasing the level of detail and accuracy of the budget forecast model. The CAO shared BP's desire to produce as accurate a budget forecast as possible; however, given the time constraints of the Court Order, the level of detail BP requested was simply unavailable at that time. The CAO would continue to request information with this level of detail from the Vendors and to perform the requisite

---

[24] Exhibit 8 - August 14, 2013 Email from Maria Travis to Kirk Fisher.
[25] Exhibit 9 - August 14, 2013 Meeting Minutes.

studies required to attain this information. BP also requested the entire Microsoft Excel budget forecast model in an unlocked format.[26]

30. Lastly, as no objections to the budget format were proposed by BP at this meeting, the CAO stated that it would provide to BP an initial budget forecast on Friday, August 16th as required by the August 7th Court Order. Further, the CAO would provide additional information broken down on a more granular level to the extent available at the time to the CAO.

31. On August 16th, the CAO submitted to BP its fourth quarter budget forecast pursuant to Judge Shushan's August 7th Court Order.[27] Included in this budget forecast was the following: 1) a total budget forecast summary sheet for the CSSP for the fourth quarter, 2) the Reviewer Cost Model, which served as the backbone for the budget forecast, including a narrative explaining this model, 3) a budget forecast summary sheet for each Vendor, 4) a narrative for each Vendor explaining any required modeling unique to that Vendor's budget forecast, and 5) volumes of data driving each budget model for each particular Vendor. Additionally, in the letter accompanying the budget, the CAO noted that, due to time constraints, it had been unable to acquire all information requested by BP from the Vendors. Vendors simply had not tracked this information prior to BP's budgetary requests and therefore needed additional time to track and acquire this information. The CAO would, however, incorporate this information into the budget forecast model once the CAO had acquired it.

32. BP and the CAO met on August 21st to discuss any recommendations or suggestions BP had concerning the August 16th submission.[28] Much of this discussion was specific to the Reviewer Cost Model. BP expressed concern about changes to the Task Utilization Rate[29] and the Task Durations used in the budget forecast model. These figures changed because the CAO had incorporated recently received information from the Vendors, which had been requested by BP to increase the forecasting accuracy of the budget model. The CAO explained that certain task durations have increased as the Program has matured for two reasons: 1) as additional policies are agreed upon by the Parties and issued by the CAO, the complexities involved in the processing of claims increases and 2) early in the Program during its ramp-up stage, claims that were document complete and submitted by claimants located in Zone A claims were being processed, whereas now, more demanding claims are being processed.

33. Moreover, BP expressed some concerns unrelated to the Reviewer Cost Model. These included concerns regarding: 1) the continued processing of subsistence claims pending policy development, 2) the functions performed by the Garden City Group File Audit team,

---

[26] It should be noted that no objection or mention was made by BP of the 5% contingency fee proposed by the CAO at this meeting.

[27] Exhibit 10 - August 16 cover letter from David Odom to Maria Travis enclosing budget package.

[28] Exhibit 11 - August 21, 2013 Meeting Minutes.

[29] Task Utilization Rate attempts to capture the percentage of time a reviewer is participating in claim processing-related activities other than working directly on a claim file. These activities include claimant management, claimant follow up, training, and meetings to discuss policy, among other things.

3) the difference between the BrownGreer Claimant Correspondence Center and the Garden City Group Payment Outreach, 4) the reason for including a contingency fee in the budget, 5) the increasing BrownGreer Administrative Costs, 6) what tasks are associated with specific budget forecast line items, such as Garden City Group IT Costs, Garden City Group Administrative Costs, and BrownGreer CLEAR, 7) PricewaterhouseCoopers' travel expenses, 8) Garden City Group Call Center management costs, 9) a request for updated data on Garden City Group Call Center call times, and 10) a request for additional detail in BrownGreer IT costs.

34. Also, in this meeting, similar to the previous meeting, BP expressed a desire to have the ability to make a monthly comparison between the budget forecast and the actual costs of the Program. BP requested the CAO include a change log in its budget forecast model so BP could track modifications made to the model as the revision process progressed. The CAO also requested that BP review the previous minutes and provide comment so that a mutually correct understanding of the previous meetings could be established.

35. On August 22nd, I received from Maria Travis an email[30] addressing a few specific points that were discussed at the prior day's meeting: 1) the difference between Quality Control and Audit, 2) the tasks performed during the Appeals step in the reviewer cost model, 3) the function of BrownGreer's CLEAR Team, 4) Garden City Group Call Center call time, 5) and the ability of the CAO to provide the markup rates of independent contractors employed by the Program Vendors.

36. Later on August 22nd, I answered Maria's email.[31] In this email, I provided a response to the questions posed by BP for which the CAO had received replies from the Vendors. At the time this email was sent, the CAO had not yet received information from the Vendors on the tasks performed during the Appeal step in the reviewer cost model. Further, this email addressed several areas mentioned by BP in the prior meeting but not mentioned in Maria's email, including the management costs at Garden City Group Call Centers and the File Audit performed by Garden City Group.

37. Additionally in this email, I provided to BP a list of items the CAO was currently working on in relation to the budget forecast revisions, including most relevantly refined task durations to increase budget forecast accuracy.

38. On August 23rd, pursuant to Judge Shushan's August 7th Order, the CAO received from BP a letter expressing BP's detailed comments and suggested revisions to the CAO's previously proposed budget forecast.[32] This letter stated that the overall budget as submitted on August 16th was purportedly "still excessive."[33] According to BP's letter, this alleged excess was the result of the CAO using Vendor-provided information as assumptions in its budget forecast model "without any managerial assessment or

---

[30] Exhibit 12 - August 22, 2013 Email from Maria Travis to Kirk Fisher.
[31] Exhibit 13 - August 22, 2013 Email from Kirk Fisher to Maria Travis.
[32] Exhibit 14 - August 23, 2013 Letter from Maria Travis to David Odom.
[33] *Id* at 1.

independent evaluation of the reasonableness of those assumptions."[34]  Pursuant to this alleged shortcoming, BP called for an "operational review and examination" of the assumptions used by the CAO in its budget forecast model.

39. Additionally in this letter, BP made the following comments regarding the budget over and above its general proclamation that the budget was unreasonable: 1) the contingency fee should be eliminated, 2) the task utilization should be increased, 3) the process duration changes made by the CAO were allegedly unsupported, 4) the BrownGreer IT Costs were not sufficiently detailed, 5) current rates were not used for primary and secondary handling, 6) the budget appeared to incorporate excessive labor rates, 7) the budget incorporated excessive travel expenses, 8) activity levels in the BrownGreer Claimant Communication Center and the Garden City Group Call Center were too high, and 9) that not everything in the budget forecast had been evaluated on a cost/benefit basis, including the handling of policy holds.

40. In addition to these comments and suggested revisions, BP requested a lengthy enumeration of supporting documentation that should be provided on a monthly basis and on a quarterly basis with the budget forecast.

41. On August 28th, the CAO responded to BP's August 23rd letter and submitted to BP its revised fourth quarter budget forecast.[35]  In the cover letter to this submission to BP, the CAO expressed the main goal of the Program as directed by the Claim Administrator—to combat the increase of claim backlog.  With this goal in mind, based on projected fourth quarter claim volume, the budget forecast model required the hiring of an additional 99 accountants.  Second, the CAO addressed the necessity that the CAO rely on Vendor-provided information in developing the assumptions used in the budget forecast model, given the time constraints of the budget revision process and the time required to institute time and motion studies to attain historical accurate data.  Third, the letter assured that the CAO would continue to work with the Parties and the Vendors to gather more accurate data and incorporate it into future budgets as it becomes available.  Further, this letter stated that as relevant data is tracked and time and motion studies are performed by the CAO, the CAO will be able to validate or modify model assumptions as appropriate.

42. Additionally, in this cover letter, the CAO addressed each purported issue raised by BP in its August 23rd letter.  As suggested previously by BP, the CAO applied its contingency fee to only variable costs rather than across the costs of the Program as a whole.

43. The letter addressed task utilization rates, specifically stating that because of the high level of claim incompleteness, task utilization rates had decreased.  Further, the CAO assured BP that the CAO would perform studies to determine with more accuracy the task utilization rates associated with each claim type of the Program for coming quarters.

---

[34] *Id.*

[35] Exhibit 15 - August 28 letter from David Odom to Maria Travis; Exhibit 8 to the Declaration of Todd Brents (BP's Exhibit B).

44. The letter addressed the process duration changes for the several claim types. It stated that the CAO had, since the previous budget submittal, performed a complete duration analysis of all claim types except for BEL and incorporated the results of these analyses into the model, thus greatly increasing its accuracy. Additionally, the decrease in accountant reviews per week for BEL claims was the result of an increase in claim complexity, as previously represented to BP.

45. The CAO had requested information on IT Costs from BrownGreer but had not received such information given the time constraints. Reasonable assumptions provided by BrownGreer were used until accurate information was provided. The letter further expressed that primary and secondary handling rates had been updated with current figures and that a PricewaterhouseCoopers plan to decrease travel costs had been incorporated into the budget forecast as requested by BP. Call times for the Garden City Group Call Center were updated as requested by BP. Management fees at the Garden City Group Call Center and BrownGreer Claimant Correspondence Center were explained as reasonable.

46. The letter stated that the CAO maintained its position that the rates of Vendor contract labor could not be disclosed by the CAO to BP. The CAO maintained that it relies on Vendor recommendations to determine whether claim review should be suspended pending policy determinations. The CAO also stated that it was initially decided by the Program that the Garden City Group would audit all the GCCF files so that these files would be immediately available for claimants to view. Garden City Group projected that the File Audit would be complete in mid-November, and this was reflected in the attached budget submittal.

47. In addition to this letter, the CAO included a number of Exhibits supporting its position on several of these issues, including supporting documentation from Postlethwaite & Netterville, BrownGreer, and PricewaterhouseCoopers. Further, a package similar to the one submitted with the initial budget revisions (summary sheet, narrative, model data drivers) for each Vendor was submitted.

48. As requested by BP, this fourth quarter budget submittal also included a backward-looking comparison to actual June hours. However, because this budget forecast used the staffing levels projected as required to combat fourth quarter backlog growth, some variance was present.

49. On August 29th, I received an email from Keith Moskowitz stating that BP requested a Panel Meeting pursuant to Judge Shushan's August 7th Order.[36] This meeting was scheduled for September 4th.[37] The CAO requested that BP submit a detailed list of issues that BP had with the budget as submitted so that the CAO could be prepared for discussion

---

[36] Exhibit 16 - August 29, 2013 Email from Keith Moskowitz to Patrick Juneau.
[37] Exhibit 17 - August 29, 2013 Email from David Odom to Keith Moskowitz.

prior to the Panel Meeting.[38]  BP replied that its comments submitted in its August 23rd letter were still applicable.[39]

50. The Panel Meeting requested by BP was held on September 4th as planned.  BP produced a list of proposed revisions.[40]  This list included the following: 1) the elimination of the 99 accountants that the budget model forecasted as necessary to combat the backlog, 2) an increase in BEL accountant productivity, 3) a reduction in Seafood claim processing staff which the budget model forecasted was necessary, 4) an adjustment of task utilization rates for non-BEL claim types to match that of BEL claim types, 5) a reduction on the number of files audited in the GCCF File Audit, 6) the elimination of BrownGreer IT development costs pending project-level budget approval, 7) the adjustment of GCG and BG Call Center call times to ten minutes, 8) the reduction of BrownGreer and Garden City Group administrative costs to reflect the reduction in labor costs, 9) a reduction of the contingency fee from 5% to 1% of the budget's variable costs, 10) a reduction of labor rates to reflect a pass through of the Vendor subcontractor rates, and 11) a reduction to the BrownGreer administrative budget.  BP purported that this would reduce the budget $45.6 million (35%) to $85.6 million.[41]

51. To my knowledge, at no point prior to its August 23rd letter has BP expressed to the CAO its purported desire that the CAO perform an operational review of the Program.  Since receiving this August 23rd letter, the CAO has commenced the operational review and time and motions studies requested by BP in its August 23rd letter to validate the Vendor-provided information used in the budget forecast.  As I expressed at the Panel Meeting, it was anticipated that these time and motions studies would take from commencement sixty days to complete.  Pursuant to this commencement, the CAO included in the budget forecast additional funding to cover the additional costs necessary to perform these studies.  This budget increase was identified and acknowledged by BP in the Panel Meeting, and BP did not object to this line item of the budget.

52. Following these discussions, a brief recess was called during which the CAO discussed with Vendors areas in the budget in which reasonable concessions could be made in an effort to produce a budget that met BP's approval.  Pursuant to these discussions, the CAO made several concessions in the fourth quarter budget.  It is worth noting and emphasizing that these concessions were not the product of excessive budget proposed by the CAO.  Rather, the majority of these reductions were made in areas in which the budget model required the hiring of additional claim-review staff necessary to combat the increase in claim backlog.  Therefore, these budget concessions will directly affect claim throughput.

---

[38] *Id.*

[39] Exhibit 18 - August 30, 2013 Email from Maria Travis to David Odom.

[40] Exhibit 19 - BP's September 4, 2013 Proposed Revisions to the 2013 Fourth Quarter Budget.

[41] BP also stated in the meeting that these are merely the items that can be addressed "without a full operational review and audit" and that BP believed that "the budget, even if we were to achieve these reductions, [would] still [be] too large."  *–See* Transcript from September 4 Panel Meeting, Exhibit 1 to the Declaration of Keith Moskowitz (BP's Exhibit C)

53. The fourth quarter budget concessions made by the CAO are as follows: 1) the temporary postponement of the hiring of the 99 accountants required by the budget model to combat the increase in BEL claim backlog, 2) a reduction in Seafood review staff required by the budget model, and 3) a reduction of the contingency fee from 5% to 2.5% of variable costs. These changes represented a $20.1 million (15%) reduction in the budget.

54. Elimination of the 99 additional accountants required by the budget model to combat backlog - The addition of 99 accountants was required according to the budget model forecast to prevent an increase in the current backlog of claims. Therefore, while the removal of these accountants from the fourth quarter budget will reduce the Q4 budget by over $11 million, the model indicates that this will also result in a significant increase in the backlog of claims, which will ultimately extend the life of the Program.

55. Elimination of additional Seafood claim review staff required by the Budget Model - Similar to the situation previously discussed regarding BEL accountants, while the elimination of these reviewers will reduce the budget by over $5 million, these Seafood reviewers were required according to the budget forecast model..

56. BP maintains that the CAO should reduce Seafood claim review staff even further than the CAO has already proposed. Contrary to BP's assertions, the CAO has provided justification for retaining Seafood staff. First, as BP highlights, re-reviews, reconsiderations, and responses to incomplete claims will be performed well into the fourth quarter. Additionally, BP fails to acknowledge the secondary Seafood distribution[42] which will require Seafood staffing levels remain at a reasonable level. For these reasons, it would be unreasonable to reduce Seafood staffing to the levels BP advocates.

57. Reduction of the contingency fee from 5% to 2.5% of Program variable costs - The CAO has proposed a reasonable reduction in its contingency fee from 5% to 2.5% of the Program's variable costs, resulting in a decrease of over $3 million in the budget. A contingency is reasonable and necessary given the possibility of unforeseeable events, such as the Freeh investigation, that may involve additional and substantial costs. Moreover, given the time constraints involved in the fourth quarter budget revision process, a 2.5% contingency is reasonable to account for any assumptions that have been made in the budget model in lieu of data currently being validated by the CAO.

58. BP maintains that the CAO should reduce its contingency fee further than already proposed, from 2.5% to 1%. In support of this, Todd Brents states in his declaration that a contingency of 2.5% is not necessary in an established budget process. However, given that this new budget methodology and framework was only recently requested by BP, additional reserves are required until the requisite time and motion studies are completed by the CAO and the resulting accurate data can be incorporated into the budget model by the CAO. Upon completion of this, the contingency will be reduced accordingly as confidence in the forecasting accuracy of the budget model increases.

---

[42] As per Exhibit 10 of the Settlement Agreement, "[i]n the event there are Seafood Compensation Program Amount funds remaining, such funds will be distributed to claimants that received compensation from the Seafood Compensation Program."

59. Additionally, the CAO addressed each of BP's other concerns as explained below.

60. Increase BEL accountant productivity - The productivity level of BEL accountants is irrelevant to the fourth quarter budget. An increase in the productivity of the BEL accountants may result in an overall savings to the Program in the form of an earlier completion date. However, given the current size of the BEL backlog (46,634 claims have yet to be processed to a final determination), this is not a benefit that would be realized within the fourth quarter. For this reason, the adjustment proposed by BP would not result in the $13 million fourth quarter budget reduction as purported.

61. Adjustment of non-BEL task utilization rates - The task utilization rate should not be unilaterally and arbitrarily adjusted as BP advocates. The task utilization rate for non-BEL claim types is different than that of BEL claim types for good reason. The processing of a BEL claim as compared to the processing of a Wetlands claim, for example, is completely different and therefore provides for a misguided comparison. For this reason, it would be unreasonable to fix the non-BEL task utilization rate at the same level as the BEL task utilization rate merely for consistency's sake.

62. The task utilization rate for BEL has been set at 80.1%. This figure is based on information provided to the CAO by the Vendors. Otherwise, the task utilization rate for all other claim types has been set consistently at 75%. This information is currently being validated by the CAO in its time and motion studies, the results of which will be incorporated into the budget model to increase its accuracy for future quarters.

63. GCCF File Audit - The decision to perform a File Audit on all GCCF claims was one made by the Claims Administrator in accord with the objective that every claimant have access to their file immediately. This option was viewed as preferable to other options forcing claimants to wait to access their file until it was audited. Pursuant to this, the CAO has continued with its proactive conversion of these GCCF files, which is projected to be complete in November of this year.[43]

64. Eliminate BrownGreer IT Development Spending - In reality, BP's suggestion would require the elimination of BrownGreer IT development staff in its entirety until a project-level budget has been produced by BrownGreer, submitted to the CAO, and finalized in discussions by BP. At this point, it is presumed that BrownGreer would be required to "upsize" its IT development staff to perform the projects itemized in that budget. BP's proposed elimination of BrownGreer's IT development spending is essentially an attempt to eliminate BrownGreer's IT development. A budget suggestion calling for such a "cut now, review later" course of action is unreasonable.

65. The CAO has requested information concerning the ongoing projects performed by the BrownGreer IT development department; however, given the time constraints of the budget

---

[43] Based on information from Garden City Group, 58% of the documents reviewed in the GCCF File Audit have been assigned to claimants who have filed with the Program.

revision process, BrownGreer has not been able to compile the detailed project-level budget forecasts at this point. Once this information is available, it will be incorporated into future budget forecasts, increasing budget accuracy.

66. Call center staffing levels – The staffing levels at the Garden City Group Call Center and the BrownGreer Claimant Correspondence Center are accurate and reasonable.

67. Garden City Group's Call Center budget is accurate as forecasted by the model. BP's calculations of the purported number of full-time equivalents necessary to staff the Call Center are misguided. According to Erlang-C modeling, staffing levels are set as reasonable and necessary to meet projected incoming call volume at the minimal wait time deemed satisfactory by BP at the inception of the Program.

68. BrownGreer's Claimant Communication Center handles additional functions beyond inbound and outbound calls, including claim research, claim status updates and summaries, Portal navigation assistance, and resolution of escalated claimant concerns. The CCC also collaborates with the Claimant Assistance Centers to schedule claimant visits, to facilitate claim filing and document submission, and to resolve additional questions related to the claims process. For these reasons, unlike the Garden City Group Call Center budget forecast, the BrownGreer ten minute call time does not directly affect the budget. No direct correlation exists between this ten minute call time and the BrownGreer CCC budget forecast.

69. Request to reduce labor rates - As has been explained to BP on several occasions, contracts with BrownGreer and Garden City Group have been executed. These contracts established the labor rates for Vendor employees and 1099 contract employees. BP was present at and was an integral part of the negotiation of these contracts, which was the appropriate forum for such discussion of 1099 contract employee rates.[44] Ample opportunity was available for BP to request lower rates for 1099 contract employees or to request that such employees be treated as pass-through costs.

70. At the Panel Meeting, BP did not consent to the budget as presented by the CAO with its proposed reductions.

71. Following the Panel meeting, I was copied on an email from Bob Levine to Maria Travis and Mark Holstein.[45] This email referenced the increase in the Claims Administrator's budget line item for the fourth quarter necessary for the CAO's operational review and the associated time and motion studies. As stated, the intent of this email was to confirm that BP had no objection to this budget line item, despite its dispute over other budget items, so that the CAO could begin to hire necessary staff.

---

[44] In fact, the Claims Administrator deferred to BP, allowing BP to negotiate labor rates with the Vendors directly. The labor rates charged by BrownGreer and Garden City Group were agreed to by BP following those negotiations. The rates paid by BP for the work of Vendors' independent contractors are no more than the rates that the Vendors charge for their own employees, which are the rates to which BP has already agreed as reasonable.

[45] Exhibit 20 - September 4, 2013 Email from Bob Levine to Maria Travis.

72. On September 5th, the CAO sent to BP a letter confirming the CAO's position on each of BP's proposed revisions to the Q4 budget and documenting the proposed concessions made by the CAO pursuant to BP's recommended revisions.[46] Additionally, this letter attempted to confirm BP's approval of additional CAO funding to perform the operational review and time and motion studies.

73. On September 6th, the CAO received a response from Maria Travis stating that BP did not object to an appropriate increase in the Claims Administrator's budget as it was reasonable and necessary to effectively manage the Program.[47] However, BP did not agree that the CAO should conduct the operational review. BP purported that the CAO could not conduct the operational review because it allegedly could not identify, hire, and train the staff necessary to conduct these studies. Further, BP expressed concern as to the CAO's ability to perform this operational review.[48] Rather, BP stated that it was prepared to retain an external firm to perform the operational review and examination and would fully share the findings with the CAO so that the CAO could incorporate that information into its budget and utilize the information in the "active management of the CSSP its vendors."[49]

74. On September 6th, Bob Levine replied to this email, stating that BP's concerns had been duly anticipated by the CAO.[50] Accordingly, a plan to meet the 60 day time and motion study schedule had been established by the CAO wherein existing, qualified CAO personnel with detailed knowledge of the claims review process and pre-existing relationships with the Vendors would perform the studies. The positions vacated by this existing personnel would then be backfilled with new staff members. In this manner, this plan should reasonably allay BP's concerns that the CAO cannot timely retain and train the staff appropriate for the time and motion studies.

75. Pursuant to its previous objections, on September 6th, BP provided the CAO with redlined versions of the minutes of the meetings held on August 9th, August 14th, and August 21st. BP and the CAO have not yet been able to agree on the minutes of the meetings.

76. The CAO has commenced its operational review, including time and motions studies, to validate and verify the assumptions used in its fourth quarter 2013 budget forecast. The CAO is utilizing existing, qualified staff with a detailed knowledge of the claim review process and pre-existing relationships with the Vendors to perform this review. Using the additional funding requested for the Claims Administrator as part of the fourth quarter budget proposal, the positions previously held by these existing employees will be backfilled with new personnel once the budget is approved. By these means, the CAO has been able to begin this operational review without the delay anticipated by BP.

---

[46] Exhibit 21 - September 5, 2013 Letter from David Odom to Maria Travis.
[47] Exhibit 22 - September 6, 2013 Email from Maria Travis to Bob Levine.
[48] *Id.*
[49] *Id*.
[50] Exhibit 23 - September 6, 2013 Email from Bob Levine to Maria Travis.

I, Kirk Fisher, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on this 17th day of September, 2013.

## Bob Levine

| | |
|---|---|
| **From:** | Bob Levine |
| **Sent:** | Thursday, May 09, 2013 11:16 AM |
| **To:** | 'Boatman, Amy (KPMG)'; Travis, Maria T; Holstein, Mark E; Keith Moskowitz; Daniel.Cantor@APORTER.COM; James Roy; Steve Herman |
| **Cc:** | Burrell, Felecia (Contractor); Patrick Juneau; David Odom; Kayla Frey |
| **Subject:** | RE: 2nd Quarter Administration Fund Budget Revision for Additional Accounting Staff |
| **Attachments:** | Admin Funding request 2Q13.pdf |

Amy,

Thank you for the clarification.  Steve, please approve the revised budget of $118M attached.

Thanks,

**Robert P. Levine**

*Chief Financial Officer*



**504-934-4999**

**935 Gravier Street, Suite 1905**
**New Orleans, Louisiana 70112**
**blevine@dheclaims.com**
**Direct – 504 934-4919**
**Cell    -  504 813-8597**

**From:** Boatman, Amy (KPMG) [mailto:Amy.Boatman@bp.com]
**Sent:** Thursday, May 09, 2013 9:44 AM
**To:** Travis, Maria T; Holstein, Mark E; Keith Moskowitz; Daniel.Cantor@APORTER.COM
**Cc:** Burrell, Felecia (Contractor)
**Subject:** RE: 2nd Quarter Administration Fund Budget Revision for Additional Accounting Staff

Bob –

I want to clarify – the amount approved by the PSC and in the funding request appears to be the *original* request for $115M and we have approved the revised budget funding of $118M. Please confirm which is correct, thanks!

*Amy Boatman*
Email: amy.boatman@bp.com
Work: 713.323.2258
Cell: 832.338.4539

**From:** Bob Levine [mailto:blevine@dheclaims.com]
**Sent:** Thursday, May 09, 2013 9:39 AM
**To:** Travis, Maria T; Holstein, Mark E; Keith Moskowitz; Daniel.Cantor@APORTER.COM; Steve Herman; James Roy
**Cc:** Patrick Juneau; David Odom; Kirk Fisher; Kayla Frey; Boatman, Amy (KPMG); Burrell, Felecia (Contractor)
**Subject:** RE: 2nd Quarter Administration Fund Budget Revision for Additional Accounting Staff

Maria,

**EXHIBIT B-1**

Attached is the formal request for the original version of the 2nd Quarter budget. You have received the PSC approval by separate email from Steve Herman at 9:23 this morning.

We are in the process of assembling the written documentation to support the request for 100 additional accountants and will provide this shortly.

Thanks,

**Robert P. Levine**

*Chief Financial Officer*



**504-934-4999**

**935 Gravier Street, Suite 1905**
**New Orleans, Louisiana 70112**
**blevine@dheclaims.com**
**Direct – 504 934-4919**
**Cell    -   504 813-8597**

---

**From:** Travis, Maria T [mailto:Maria.Travis@bp.com]
**Sent:** Wednesday, May 08, 2013 8:37 PM
**To:** Bob Levine; Holstein, Mark E; Keith Moskowitz; Daniel.Cantor@APORTER.COM; Steve Herman; James Roy
**Cc:** Patrick Juneau; David Odom; Kirk Fisher; Kayla Frey; Boatman, Amy (KPMG); Burrell, Felecia (Contractor)
**Subject:** RE: 2nd Quarter Administration Fund Budget Revision for Additional Accounting Staff

Bob,

On behalf of BP, we agree to fund the amount requested in the Q2 2013 Administrative Fund Budget; however, the recent decision to add 100 additional accountants has not been appropriately explained. BP is not aware of a basis to establish that adding these additional accountants is reasonable and necessary - indeed, we would have expected that less accountant time would be required now on BEL claims. Accordingly, BP takes issue with this retention subject to the CSSP presenting proper support and a full explanation for this retention. BP reserves its right to challenge this retention based on any support and further explanation presented by the CSSP.

Regards,

*Maria*

Eldridge 3  6.145C
Tel: 281-366-5928
Cell: 281-935-4271

---

**From:** Bob Levine [mailto:blevine@dheclaims.com]
**Sent:** Monday, May 06, 2013 4:51 PM
**To:** Travis, Maria T; Holstein, Mark E; Keith Moskowitz; Cantor, Daniel A. (Daniel.Cantor@APORTER.COM); Steve Herman; James Roy
**Cc:** Patrick Juneau; David Odom; Kirk Fisher; Kayla Frey; Boatman, Amy (KPMG); Burrell, Felecia (Contractor)
**Subject:** 2nd Quarter Administration Fund Budget Revision for Additional Accounting Staff

The 2nd Quarter Administration Fund budget is revised below for the additional accounting staff per the email below this one.  We are adding $3,842,000 to the April 24th request based on half the positions being filled by May 15th and the balance by June 1st.  The new request for the 2nd Quarter budget is $118,927,730

**2nd Quarter Claims Administrator's Budget**                    126,612,500

| | | |
|---|---|---|
| Less: April payments already made | | (4,332,425) |
| Less: Admin Fund Balance - 4/24/13 | | (3,352,346) |
| **Cash Required to Fund remaining 2nd Quarter Budget** | | **118,927,730** |

| | Budget - CA Apr-13 | Budget - CA May-13 | Budget - CA Jun-13 | Budget - CA 2-Q-13 |
|---|---|---|---|---|
| Claims Administrator's Office | 1,225,000 | 1,225,000 | 1,225,000 | 3,675,000 |
| Hub Enterprises Fraud | 250,000 | 250,000 | 250,000 | 750,000 |
| Hub Enterprises Security | 220,000 | 220,000 | 220,000 | 660,000 |
| JPMorgan Chase | 45,000 | 45,000 | 45,000 | 135,000 |
| Mississippi Center For Justice | - | - | - | - |
| Legal Liason Firms | 1,500 | 1,500 | 1,500 | 4,500 |
| Appeals Panel | 100,000 | 100,000 | 100,000 | 300,000 |
| Wetland Title Research Firm | 50,000 | 50,000 | 50,000 | 150,000 |
| Subsistence Specific Vendors | 32,000 | 32,000 | 32,000 | 96,000 |
| BrownGreer | 15,700,000 | 15,700,000 | 15,700,000 | 47,100,000 |
| Garden City Group | 8,800,000 | 8,800,000 | 8,800,000 | 26,400,000 |
| Pricewaterhouse Coopers | 7,400,000 | 7,400,000 | 7,400,000 | 22,200,000 |
| Postlethwaite Netterville | 7,100,000 | 7,100,000 | 7,100,000 | 21,300,000 |
| **Totals** | **40,923,500** | **40,923,500** | **40,923,500** | **122,770,500** |
| | | | | |
| **Revision for Accountant Increase:** | | | | |
| Pricewaterhouse Coopers | - | 216,000 | 900,000 | 1,116,000 |
| Postlethwaite Netterville | - | 551,000 | 2,175,000 | 2,726,000 |
| **Revision** | **-** | **767,000** | **3,075,000** | **3,842,000** |
| | | | | |
| **Revised Budget** | **40,923,500** | **41,690,500** | **43,998,500** | **126,612,500** |

Thanks,

**Robert P. Levine**

*Chief Financial Officer*

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**504-934-4999**

**935 Gravier Street, Suite 1905**
**New Orleans, Louisiana 70112**
**blevine@dheclaims.com**
**Direct – 504 934-4919**

3

**Cell - 504 813-8597**

**From:** David Odom
**Sent:** Thursday, May 02, 2013 5:07 PM
**To:** Keith Moskowitz
**Cc:** Patrick Juneau; Kirk Fisher; Bob Levine; Steve Herman; James Roy
**Subject:** Additional Accounting Staff

Keith,

Due to the increased Business Economic Loss Claim volume, the Claims Administrator is planning to hire 75 additional accountants from Postlethwaite Netterville and 25 additional accountants from PwC.

Thanks,

David

## David F. Odom

*Chief Executive Officer*



**504-934-4999**

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.



**Mark Holstein**
Managing Attorney
BP Legal – Litigation

BP America Inc.
P.O.Box 3092
Houston, Texas 77253

501 WestLake Park Blvd.
Houston, Texas 77079-2607
Mail Code 17.130

Direct: 281-366-8895
Fax:    281-366-3491
Mark.Holstein@bp.com

June 21, 2013

<u>**Via E-Mail**</u>

The Honorable Carl J. Barbier
United States District Judge
United States District Court, Eastern District of Louisiana
500 Poydras Street, Room C-256
New Orleans, LA  70130

Re:     *Deepwater Horizon Court Supervised Settlement Program -- Request for Examination*

Dear Judge Barbier:

BP has been evaluating the administrative activities, policies, procedures and controls of the Court Supervised Settlement Program (the "CSSP"), for which BP provides all funding under the Settlement Agreement.  This ongoing review has included consideration of documents, data, claims, claim appeals and other information provided by the CSSP, as well as recent meetings with the Claims Administrator's Office (the "CAO") and CSSP vendors BrownGreer PLC ("BrownGreer"), Garden City Group, Inc. ("GCG"), PricewaterhouseCoopers LLP ("PwC") and Postlethwaite & Netterville APAC ("P&N").  Based on those meetings and our analysis of the information provided to us by the CAO, we question whether the CAO is exercising appropriate professional oversight and supervision of the CSSP.   Specifically, we have significant concerns regarding what appear to be (1) inadequate operational controls; (2) significantly higher than expected administrative costs and expenses; (3) substantially lower than expected claim processing efficiencies and productivity; and (4) inadequately funded, insufficient processes to detect and prevent fraud, waste and abuse.

BP's concerns about these management issues have been heightened by the troubling allegations that have recently come to light regarding misconduct by a senior CAO employee that *may have* impacted significant CSSP policy decisions, improperly influenced claims outcomes and resulted in the payment of fraudulent, excessive or improper claims.   At minimum however, these issues have resulted in an extremely costly and underproductive program.  Simply by way of comparison, the per claim administrative costs incurred by the CSSP are significantly higher than the per claim costs incurred by the Gulf Coast Claim Facility ("GCCF").  Furthermore, the rate of productivity of the CSSP appears to be lower than the productivity of the GCCF.

**EXHIBIT B-2**

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 2 of 11

Given these serious concerns and in light of the overall administrative complexity of the program, BP respectfully requests that a full examination of the CSSP be undertaken promptly to assess the efficacy of the CAO's entire management operation, including but not limited to the CAO's internal operating procedures and vendor governance protocols.  The examination should identify any necessary recommendations for improvement as appropriate.  We believe that an appropriate examination will lead to significant opportunities for improving the quality, efficiency and integrity of CSSP operations, reduction of disruptive staff turnover, greater consistency in claims determination, better decision making and, potentially, more expedited claims processing.

This proposed examination is not duplicative of the recent audit completed by CliftonLarsonAllen ("CLA").[1]  Unlike the proposed examination, which would provide an opinion, *inter alia*, on the effectiveness of operational processes of the CAO and the efficiencies of the entire CSSP, the recently completed CLA audit was limited to essentially testing whether CSSP processes were resulting in accurate claims evaluations.  The CLA audit was not designed and  did not attempt to evaluate the CAO's operational protocols, particularly those of the type that relate to the current allegations against a senior CAO employee, the CAO's overall management of the CSSP vendors, or the processes to mitigate fraud, waste and abuse.  In short, the CLA audit does not address the issues raised by BP in this letter.

Notwithstanding its differing scope, the utility of the CLA audit is questionable, even as to its intended purpose.  Either because of an inadequate scope caused by cost constraints imposed by the CAO or simply a flawed design, the CLA audit was conducted with such a high margin of error and deficient sample selection methodology that meaningful conclusions cannot be drawn from it, even as to the factors it purports to measure.  Moreover, although the CLA report identifies a number of areas of potential concern, it does not perform any further investigation on those issues and presents an opinion of "minor improvements needed" that may be unfounded.

For all of the reasons set forth above and discussed in more detail herein, a complete examination (which may include as a component some level of accounting audit) of CAO management and its operational protocols, is necessary and should be initiated posthaste.  This examination should benefit the CAO, the CSSP as well as the Class and BP.

I.      **The CSSP Is Operating With Extremely High Costs and Low Productivity.**

In its April 25, 2013, budget presentation, the CAO provided information showing the average monthly administrative cost of the CSSP of $39.74 million as compared to the average monthly administrative costs of the GCCF of $47.94 million.  The statistic is somewhat misleading, however, because most of the difference between average program costs is simply attributable to the fact that the CSSP has virtually eliminated using a vendor dedicated to fraud analysis.  When excluding the fraud costs from the GCCF figure, the average monthly CSSP costs are

---

[1] On May 17, 2013, CLA issued its report titled, *Deepwater Horizon Economic Claim Center Independent Evaluation of the Internal Control Environment*, describing the methodology and audit recently completed.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 3 of 11

running at 93% of GCCF costs.  In any event however, missing from the CAO presentation was any measure of productivity achieved by the program.

Based on our analysis of the information provided by the CSSP, on average, the CSSP has resolved 8,412 claims per month as compared to 22,325 claims per month by the GCCF.[2] Since its inception, the CSSP's most productive month was March 2013, when it began issuing Business Economic Loss ("BEL") denials for incompleteness, where it achieved a total of 15,467 resolutions.  In contrast, the GCCF's most productive month resolved 62,071 claims, excluding emergency payments.  In total, the GCCF experienced seven months where (non-emergency) resolutions exceeded the CSSP's most productive month.   These results are summarized below:

| Measure | Weighted GCCF Average | Weighted CSSP Average |
|---|---|---|
| Costs Per Paid Claim[3] | $3,030 | $11,975 |
| Costs Per Resolved Claim[4] | $1,972 | $5,032 |
| Claim Resolutions Per Month | 22,325 | 8,024 |

Once these productivity measures are considered, the nearly equivalent average monthly costs of the two programs is not a positive observation of the CSSP and rather highlights that the CSSP is significantly more costly than the GCCF overall.


**II.      The CAO Does Not Appear to Employ An Expense Management Plan.**

As discussed in detail below, our overall observation after having reviewed CSSP's information and meeting with the CSSP vendors is that the CAO does not appear to have any effective strategy regarding expense management and the vendors appear to be operating without meaningful direction from the CAO as to the most efficient way to operate as an integrated system.  As a complex program with four vendors attempting to work in concert, the overall management of the system is critical.  Instead, the management teams for each vendor are being left almost entirely to set their own goals and performance measures and appear to make collective ad hoc adjustments to processes without any holistic or empirical consideration of costs or efficiencies.

In order to properly manage a claims program of this magnitude, detailed budgets for cost and performance measures should be established.   Actual results should be measured against those budgets.  Periodic (e.g., monthly) performance reviews of budgeted vs. actual results

---

[2] This analysis controls for the increased number of "claims" a single claimant may have had under the GCCF (i.e., a single claimant may have an EAP claim, an interim payment and a final payment) by excluding emergency payments and by counting a claimant who may have received interim and/or final payments as a single claim.

[3] Costs incurred prior to the first claims resolutions (i.e., startup costs) have been excluded from the calculation.

[4] Resolved claims are comprised of claims that are either approved for payment, denied or withdrawn. Costs incurred prior to the first claims resolutions (i.e., startup costs) have been excluded from the calculation.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 4 of 11

should occur.  These reviews identify problem areas and force an evaluation of how to address them.  Budgets and performance measures should be established at detailed levels.  High level or aggregate budgets and performance measures do not allow for the identification of specific, actionable items that can influence future performance.  As discussed below, through its observations and inquiries, BP has been unable to confirm whether this level of review is occurring.  As a result, it is necessary for an examination of the CSSP to occur in order to evaluate the program, identify and correct any shortcomings in its execution.

**A.      Vendors Do Not Appear To Be Managed To Meet Quantitative Performance Goals.**

Based on our discussions and review of the documents, other than tracking and monitoring costs and expenses, the CAO does not appear to make any effort to actively manage expenses to any financial plan.  The only comparative measure the CAO's office apparently uses to measure CSSP expenses is the GCCF experience, which as discussed above, does not provide a favorable assessment of CSSP expense management.  The CAO measurement is simply a comparison of total monthly costs, which fails to consider that, at meaningfully lower production rates, the CSSP is expending much more per claim to accomplish all of its required tasks than the GCCF incurred.

As the vendors explained during our recent series of meetings, although each individual vendor may have its own internal standards, there do not appear to be any quantitative performance measures imposed by the CAO on the CSSP vendors to measure productivity at either the vendor or staff level.  For example, the CAO has not set any production goals per full-time equivalent employee ("FTE") for any of the tasks or subtasks regularly performed by the vendors (e.g., each FTE accountant evaluating BEL claims is expected to process a specified number of claims per week; each FTE accountant evaluating IEL claims is expected to process a specified number of  claims per week; each FTE performing document intake tasks is expected to process a specified number of documents per week; each accountant Q/A FTE is expected to process a specified number of  Q/A reviews per week).  Nor does it appear that the CAO has set any systematic performance expectations for the average time it should take to complete each stage of the claims evaluation process (e.g., claims should remain in a particular stage for less than a specified number of hours/days).  None of the vendors' contracts or task orders that we have seen contain Key Performance Indicators or Service Level Agreement metrics associated with performance; they merely establish maximum staffing levels.

Establishing performance measures for such a complex and variable operation obviously is not a simple task, but any purported difficulty in establishing these measures does not obviate the need for them.  Establishing performance goals is a best practice for any professionally run business or claims-processing operation, but they are particularly important given that the CSSP has four vendors that may each touch the same claim and may each be responsible for several stages of a multifaceted claims processing workflow.  Without measuring performance, the CAO cannot evaluate the CSSP vendors relative to their respective costs, make empirically based staffing decisions, or assess whether the entire system is running as efficiently as possible.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 5 of 11

> **B.      The CAO Appears To Allow Process Changes to Be Implemented On An Ad
>          Hoc Basis And Without Any Consideration of Cost/ Benefit Analysis.**

CSSP Vendors also appear to be making ad hoc adjustments to processes without any
empirical consideration of costs or impact on efficiency.  One recent anecdotal example relayed
by the vendors was that, as between PwC and P&N, the accounting firms decided it is better
for each accounting firm to perform its own Quality Assurance ("Q/A") review of the claim files
it is responsible for processing.  Up until the recent change, PwC had been performing the Q/A
of files processed by P&N.  However, because taking on the Q/A process as to its own files
created staffing pressures for P&N, it requested PwC to begin processing the Failed/Start-up
Business claims that P&N was previously responsible for processing.  PwC agreed and as a
result, PwC now has 15 accountants working in some capacity to handle "Failed/ Start-up
Business" claims.

We have no comment on whether these process changes are positive or negative with respect
to overall costs or efficiencies.  However, the "horse trading" approach giving rise to the
process change highlights the lack of management scrutiny being applied by the CAO.  Setting
aside qualitative considerations, before authorizing such a change in process, we would have
expected at least some level of analysis to have been completed by the CAO to determine
whether P&N has the ability to meet or exceed the productivity of PwC accountants that had
been previously performing Q/A review.

Another example demonstrating the lack of rigor in the management process is the recent
proposal by the CAO to add 100 new accountants to the program.  As confirmed by our
discussions with PwC and P&N, the staffing proposal was not developed to meet any specific
empirical goal.  Instead, it  was  based on an untested hypothesis from the CAO that increasing
the number of accountants was the most effective approach to reduce the backlog of
outstanding BEL claims.  Although the estimated cost to add these accountants  is $39 million
per year, no analysis appears to have been completed to determine, for example, the ability of
additional accountants to actually impact the backlog (e.g., some unknown percentage of
claims are simply waiting information from claimants); whether any part of that pending backlog
could be reduced by using other, less costly staff; whether the beneficial impact of the
accountants justifies the additional $39 million yearly cost (above and beyond the over $170
million already being spent on accounting services); or whether the same positive impact of
adding accountants could be achieved by otherwise improving the efficiency of the current
accounting workforce.  Indeed, as the CAO presented during the vendor meetings, the CAO's
only analysis appears to be a projection that adding the additional accountants will marginally
reduce the length of the program, but at a dramatic increase in overall cost to the facility.
Again, BP has not formed a judgment whether or not adding 100 accounts is reasonable or
necessary.  Our concern is that there seems to be little, if any, consideration being given to
achieving CSSP objectives in a cost effective manner or to performing the analysis required to
determine whether the additional accountants would achieve the intended goal cost-effectively.

Information technology costs are another area with minimal expense management.  Currently,
BrownGreer has approximately 90 individuals working on IT development at a cost of more
than $1.7 million per month.  As we understand it, with the exception of one or two modules,
all of the programming necessary for the initial design build has been completed for each of the

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 6 of 11

twelve claim types.  The bulk of the expenses related to current IT services are for the day-to-day operations of the system and ad hoc improvements to the claim system that are requested or proposed by the CSSP vendors.  Our understanding is, with some exception, these are the "bells and whistles" being added to the claim system.  There does not appear to be any attempt to measure whether a particular system change actually improves the efficiency of the process or whether the cost and expense of developing the computer code and training the staff on the system change are justified by the actual measurable benefit to the process.

C.     **The CAO Does Not Appear To Proactively Manage Staffing Costs and Expenses.**

It does not appear that the CAO makes meaningful efforts to match staffing levels to workloads in order to manage staffing costs and expenses.  Despite being a mature claims program, the total vendor headcount does not appear to be decreasing to reflect an improvement in efficiency as staff become more proficient completing their routine tasks.  And while, given our limited access to CSSP information, we are not in a position to comment on whether there are unique circumstances preventing the expected reduction in headcount, we do observe that the CAO is not even holding vendors to its own headcount projections.  For example, with respect to the Claim Assistance Centers and the call centers, information provided by the CAO shows that the office performs predictive modeling to forecast staffing levels needed to achieve desired service levels.  However, despite the CAO modeling results the actual staffing levels established are well in excess of the model, presumably resulting in significant amounts of non-productive time for staff.

As explained during our vendor meetings, Garden City Group currently operates two call centers — one located in Ohio and another located in Florida, both operating Monday through Saturday.  Despite dramatically reduced call volume, the CAO's own predictive modeling results and Garden City's stated view during the meeting that closing the redundant Florida facility and eliminating Saturday coverage is appropriate and would allow a further reduction in workforce, the CAO has not implemented these cost-saving staffing reductions at this time.

The CSSP is also incurring a significant expense and loss of efficiency from high monthly turnover.  Based on the series of vendor meetings, BrownGreer is experiencing monthly turnover as high as 4%, or 48% annually.  This has resulted in significant training costs and lost productivity as the facility has presumably had to replace over 700 staff per year at current turnover rates.  Based on our understanding, the CAO has never identified this as an issue or attempted to address it with the vendor.

Nor does the CAO appear to be proactive in managing independent contactor pass through costs.  BrownGreer and Garden City collectively hired more than a thousand independent contractor employees to work at the CSSP.  These vendors marked-up the labor costs of their respective independent contactors and passed those markups along to the CSSP and Settlement Trust.  The CAO appears to have given no consideration to the substantial cost savings the CSSP and Settlement Trust could have been achieved had the CAO identified this issue and explored opportunities to substantially reduce these markups.  We understand that BrownGreer has been routinely converting its independent contactors to at-will employees thereby potentially impairing the ability of the CSSP to address these contractor markups.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 7 of 11

Furthermore, when we presented this issue to Garden City, it told us that it will be immediately moving to convert its independent contractors to at-will employees. Moreover, Garden City operates the Florida call center pursuant to a subcontract with a call center operator and, when asked about possible markups to its subcontractor rates, refused to disclose to us the amount they pay the subcontractor to run the facility. It would be expected that the direct costs would be passed through to the CSSP with no markup by Garden City. However, we have not been able to determine if a markup is being added.

With respect to expenses, there also seems to be minimal effort by the CAO to curb unnecessary expenditures. The CSSP is currently incurring approximately $400,000 in monthly travel expenses as a result of having PwC accountants travel from New York, Washington D.C., Dallas, Houston, Atlanta and Chicago to work in the New Orleans area. As explained by PwC, there is no substantive need from a qualitative standpoint for PwC accountants to be physically present in New Orleans, and indeed, accountants from four other PwC offices work on the project in the same capacity as their colleagues without ever traveling to New Orleans. Again, the CAO does not even appear to have considered whether it is necessary for the program to continuously incur monthly hotel, lodging, and transportation costs that do not appear to provide any benefit to the performance of the program.

A properly managed claims process should balance the precision achieved by the evaluation process, the time to complete a review (throughput), and cost. None of these attributes individually should determine how a particular process is established. Goals for these three attributes should be established and clearly communicated so all team members understand the objectives. This understanding of the intent of the project leader allows subordinate leaders to make decisions consistent with the objectives in the absence of specific guidance. An examination will identify areas to improve the balance between these considerations.

### III.    The Effectiveness, if Any, of CSSP's Procedures To Detect and Mitigate Fraud, Waste and Abuse Is Not Apparent.

As set forth by the CAO during the April 25, 2013, budget presentation, the CSSP has reduced its fraud vendor costs to approximately $200,000 per month—down from approximately $5.3 million per month during the GCCF. This represents most of the difference in average monthly costs between the two programs. Indeed, when excluding the fraud costs from the GCCF costs, the average monthly CSSP costs are running at 93% of GCCF costs. While BrownGreer does perform some fraud investigations for the CSSP as it did with GCCF, even when considering only the CSSP costs, the CSSP still appears to be spending nearly 90% less on fraud detection than the GCCF.

Although the CAO and BrownGreer highlight this reduction in spending as evidence of cost savings, neither BrownGreer nor the CAO have provided any empirical support suggesting that the quality of the remaining CSSP fraud mitigation efforts are, in fact, as effective as the GCCF efforts. The information BP has been provided suggests that the efforts taken by the CSSP to detect fraud are relatively nominal in relation to the actions taken by the GCCF, which yielded numerous fraudulent claims. As described by the CAO, "BrownGreer relies on their claims evaluators to be sensitive to fraud and look for suspect documents . . . ."

The level of attempted fraud experienced by the GCCF was significant.  Indeed, the GCCF's fraud detection system is currently featured in a pending appeal before the United States Court of Appeals for the Fifth Circuit, *Johnson v. BP*, No. 12-20512.  In the Johnson case, the GCCF detected a fraudulent claim that otherwise would have been paid $2.7 million and denied it on that basis.  The GCCF fraud mitigation vendor identified 9,130 claims containing potential fraud, of which more than two-thirds were multiple claimant schemes.  Said differently, the GCCF was targeted by more sophisticated, institutional fraud rings.  Accordingly, the CSSP fraud mitigation efforts should be, at minimum, equally robust.  It is unclear at best whether BrownGreer's system of primarily relying on individual claims evaluators to detect fraud is the most cost effective method of identifying sophisticated fraud actors.  In light of the enormous reduction in overall spending on fraud detection from the GCCF, an examination of the overall fraud detection process is both necessary and warranted.

## IV.   The CSSP Appears To Lack Adequate Controls And Uniform Processes To Detect Errors In Claimant Submitted Profit and Loss Statements.

It does not appear that there are uniform processes in place to detect errors in claimant-submitted profit and loss statements, and there is significant risk of claims being paid based upon inaccurate or fraudulently submitted profit and loss statements.[5]  According to the CSSP, claimant-submitted profit and loss statements are not audited and, instead, the CSSP simply takes these statements as they are submitted.  PwC advises that the only scrutiny applied to claimant-submitted profit and loss statements is if a CSSP accountant identifies something that "looks unusual" or "inconsistent" or "wacky."  Unless one of these subjective criteria is observed, there is no inquiry.  PwC noted that errors in claimant-submitted profit and loss statements can be "hard to identify."  BrownGreer has further advised us that a profit and loss statement generated for the purpose of filing BEL claim, rather than contemporaneously in the ordinary course of business, "does not raise any red flags" for the Settlement Program's screens for fraudulent conduct (this raises a significant concern as to the adequacy of the CSSP's anti-fraud processes as discussed above).

A professionally run claims administration charged with implementing compensation frameworks should be making those determinations using accurate and non-fraudulent data, and should not simply accept data "as given" by the claimant without question.  Nor should there be what was described as an ad hoc system to question entries in profit and loss statements based on a "wacky" standard as opposed to a more appropriate, robust and uniform process.

In the context of BEL claims, there is significant opportunity for claimants to submit inaccurate or falsified profit and loss statements given the understanding that the Settlement Program takes this "hands off" approach with no audits of claimant-prepared financials.  For example, the BEL compensation framework Step One, allows claimants the optionality to select three or more consecutive months from May to December 2010 as the compensation period.  Absent any audit procedures or checks, it is possible for claimants to create financials in which revenue

---

[5]  Given what we have observed with the BEL claims process, the other CSSP claims process should be similarly scrutinized in the examination.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 9 of 11

and expense entries are placed into months inaccurately yet tie with amounts reported on annual year-end profit and loss statements. Likewise, it is possible for claimants to submit profit and loss statements in which errors and inaccuracies were not corrected which then may cause it to appear a claimant experienced a loss of variable profit when, in fact, there was no such loss. Moreover, given that accountants in Louisiana and Alabama may pursue contingent fee arrangements with BEL claimants, there exists a financial incentive in which accountants may benefit from submission of inaccurate or invalid profit and loss statements.

For all of these reasons, an examination related to the processing of BEL claims is necessary to identify standardized processes and remedial steps related to the BEL claims process to insure that claims are considered using only accurate, non-fraudulent financial data. This is essential to establish the integrity of the CSSP claims process.

## V.    The Proposed Examination of the CSSP Should Also Evaluate the Sufficiency of the CLA Audit To Determine Whether a Broader Audit Is Warranted.

As referenced above, the CLA audit was not designed to test the vendor governance measures, but rather only the internal controls of the CSSP, i.e., whether claims were being evaluated and calculated according to the terms of the settlement agreement. However, as detailed below, because of significant questions raised primarily by the small random sample (which results in a high margin of error in the findings) and the simple sampling methodology (which did not take into consideration the material differences between claim types), the CLA audit scope does not look sufficient and the proposed examination of the CSSP should take that into consideration.

### A.    The Sample Size and Claims Selection Methodology Raise Significant Concerns Regarding the Validity of the Conclusions.

CLA indicates that its analysis of Paid Claims[6] is based on a test of 96 claims from 10 of the 12 claims categories and that the random sample was selected using a "sampling methodology [with] a confidence level of 95% with a 10% margin of error . . . ." (Report, p. 16.) Allowing for this margin of error in testing of a population of 15,894 paid claims (Report, p. 9.) means that up to 1,589 *paid* claims could have been calculated with errors and would not be identified by the CLA testing. Given the importance of the CSSP operations and the aggregate monetary value of CSSP awards, it is unclear why CLA would select such a high margin of error and/or why only 96 claims were reviewed (i.e., approximately 0.6% of paid claims subject to the audit). Materially improving the accuracy of the audit to a 3% margin of error would have only required a sample size of approximately 1,000 claims. This would appear to be an area where the increased cost of an expanded review would be justified given the dollars flowing from the CSSP.

---

[6] Unless otherwise defined in this letter, capitalized terms are used as they are defined in the Report.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 10 of 11

Similarly, the use of a random sample methodology also appears to undercut the validity of the report's findings. Rather than a simple random sample, which assumes that an exception (i.e., mistake) poses the same risk to the facility regardless of the claim type in which it occurs, we would have expected an experienced firm such as CLA to perform a more sophisticated dollar and risk weighted methodology (e.g., materiality based sampling). As a result of not weighting the sample based on claim value, 50% of the claims tested represented 1% of the dollar amount tested. A quarter of the entire sample was comprised of Coastal Real Property Claims which do not appear to present much risk to the program. This significantly draws the overall observations contained in the report into question.

> **B.    The Report Does Not Drill Down Into Any Exceptions Revealed by the Audit and Tellingly, Does Not Actually State An Opinion as to the Effectiveness of the Internal Controls.**

Although the CLA report does not highlight this statistic, the audit found 13% of the BEL claims reviewed were overpaid. This is a large percentage of overpaid claims, particularly in a claim type with one of the highest-dollar values. Similarly, of the sample claims tested for QA/QC reviews, CLA identified 8% of the claims contained irregularities. Notwithstanding these significant findings however, CLA made no recommendation to undertake further sampling or investigation to confirm whether or not these statistics are in fact actually reflective of the overall facility performance.

Similarly, the report contains only minimal analysis of appealed and denied claims except for some trending measures. A properly scoped process audit of the CSSP must include a meaningful review of both appealed and denied claims because the substance and results of the appealed claims would likely provide insight into any infirmity in the claims process and a review of denied claims would provide useful information relating to the filing of fraudulent claims.

In short, the scope of CLA's audit, even given its stated purpose, appears as being too superficial to give a meaningful insight into whether the CSSP internal controls are efficacious.

## VI.    A Full Examination of the CSSP Is Warranted And Necessary.

Pursuant to the terms of the Settlement Agreement[7] and the Settlement Trust Agreement[8], Mr. Juneau is obligated, *inter alia,* to act as a fiduciary of the Settlement Trust, to "oversee and supervise the Claims Administration Vendors" and to pay "reasonable and necessary expenses incurred in connection with the operation of the Settlement Program."[9] As described in this letter, based on discussions with the CSSP vendors and materials provided by the CAO, the level of supervision and expense management applied to the vendors appears to be less than

---

[7] Originally filed in the United States District Court for the Eastern District of Louisiana on April 18, 2012, in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179 (Rec. Doc. 6726-1), as amended May 1, 2012.

[8] *Deepwater Horizon* Economic and Property Damages Trust Agreement, dated May 4, 2012.

[9] *See,* Settlement Agreement ¶¶ 4.3.2; 5.12.1.1.3; Settlement Trust Agreement ¶ 2.1.

The Honorable Carl J. Barbier
United States District Judge
June 21, 2013
Page 11 of 11

best practices. In addition, there are serious questions about the adequacy of control mechanisms as acutely demonstrated by the recent allegations against a senior CAO employee.

An examination, including improvement recommendations as appropriate, would aid the Claims Administrator in fulfilling his obligations under the Settlement Agreement and Settlement Trust Agreement and would further the CAO's fiduciary responsibility to operate an efficient and high quality claims facility.  Our expectation is that the examination will create opportunities for the CSSP to improve claims processing performance, drive more consistent and accurate claims results and, possibly, increase the pace of claim determinations.


Sincerely,


Mark Holstein
Managing Attorney


cc:     Magistrate Judge Sally Shushan
        Patrick A. Juneau
        Michael J. Juneau
        Steve Herman
        James Roy



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

July 1, 2013

**_By Hand Delivery_**

The Honorable Carl J. Barbier
United States District Judge
United States District Court, Eastern District of Louisiana
500 Poydras Street, Room C-256
New Orleans, LA 70131

**Re:     Response to BP's June 21, 2013 Letter Requesting Examination**

Dear Judge Barbier:

The Claim's Administrator's Office ("CAO") is in receipt of a copy of the June 21, 2013 letter from Mr. Mark Holstein of BP to the Court requesting an examination of the Deepwater Horizon Court Supervised Settlement Program (the "Program") and alleging that the CAO has inadequate operational controls, significantly higher than expected administration costs and expenses, substantially lower than expected claim processing efficiencies and productivity, and inadequately funded and insufficient processes to detect and prevent fraud, waste and abuse. As explained in detail herein, BP's alleged concerns are unwarranted. The facts demonstrate that the CAO and BrownGreer PLC ("BrownGreer"), Garden City Group, Inc. ("GCG"), PricewaterhouseCoopers, LLP ("PwC") and Postlethwaite & Netterville APAC ("P&N") (collectively, "the Vendors") have worked and continue to work efficiently and effectively in processing claims, and that the CAO has, from the Program's inception, demonstrated proficient oversight and supervision over the Program.

Initially, however, the manner in which BP has placed its alleged concerns before the Court should be addressed. As the Court is aware, the Settlement Agreement sets forth a procedure for expressing such concerns to the CAO and for resolving any disagreements regarding the CAO's oversight and administration of the Settlement Agreement. Specifically, the Agreement provides that the Claims Administration Panel (consisting of the Claims Administrator, a representative of BP and a representative of Class Counsel) "shall address and attempt to resolve unanimously any issues or disagreements that arise regarding _the Claims Administrator's oversight responsibilities, Settlement administration, or any other issue involving the Settlement Program_." The Agreement further provides that only if the Panel is unable to unanimously resolve an issue should it be "referred to the Court for resolution." Settlement Agreement § 4.3.4. The concerns raised by BP in its June 21 letter are the precise kinds of issues that are required to be submitted to a Panel prior to seeking the Court's intervention; yet BP did not request a Panel prior to submitting its letter to the Court.

**EXHIBIT B-3**

The Honorable Carl J. Barbier
July 1, 2013
Page 2

Instead, BP bypassed the Agreement's process, which it helped devise, and improperly chose to raise these issues directly with the Court in what appears to be an attempt by BP to discredit publicly the work and efforts of the CAO. Indeed, less than one hour after we received a copy of BP's letter on the evening of June 21, the CAO received an inquiry from *The Financial Times*, a British news publication, asking for comment on issues addressed in the letter. This curious sequence of events is obviously of much concern to the CAO. We have always encouraged BP and Class Counsel (collectively, "the Parties") to approach us with any issues or concerns that may arise throughout the course of the implementation of the Settlement, and we have always been more than willing to meet with the Parties to address any concerns or problems that are brought to our attention. The CAO and the Vendors have endeavored to faithfully implement and administer the Settlement according to its terms as agreed to by the Parties, in an objective, fair, cooperative, and transparent manner, and have attempted to resolve any problems or disagreements in the manner set forth in the Settlement Agreement. BP, like the CAO and Class Counsel, should have to abide by those same processes it helped establish.

Regardless, as to the substance of BP's assertions, even a brief recitation of relevant facts demonstrates that BP's alleged concerns regarding the Program's operation and administration are unjustified. As you know, the Program has been extremely aggressive and efficient from its inception, effecting a complete transition from the Gulf Coast Claims Facility ("GCCF") in less than three months. During that transition period, we successfully transitioned staff, opened 21 facilities, developed and implemented new IT systems, established internal controls and back office systems, and opened our doors for business. To date we have adjudicated 91,489 claims with a total of \$3.78 billion in eligibility notices, which, within a one year timeframe, is an attestation to the effectiveness of the Program and the dedicated Program employees throughout the country. We have had an exception rate of less than 2% of the awards that have been calculated, and recently, the Program underwent an independent process audit by CliftonLarsonAllen, LP ("CLA"), which confirmed that "paid claims as a whole appear to be paid in accordance with the Settlement Agreement." In sum, the Program has been overwhelmingly successful in adjudicating claims accurately and in accordance with the Settlement Agreement.

As required by the Settlement Agreement, the CAO has always operated in an extremely transparent manner so that both Parties remain informed and have the opportunity to address concerns about the CAO's operations and internal controls as they arise. For example, as the claims systems were being developed during the transition period, both Parties were invited and encouraged to participate in the testing and certification of all calculators for the various claims types. Furthermore, as part of its Program oversight and in order to keep the Parties informed of the Program's actions, the CAO provides the Parties with detailed reports on various issues including claims intake and processing, claims backlog, incomplete and denial reasons, eligible notices and payments, Program updates, efficiency and utilization modeling, internal audit findings, and payment projections. *See* Exhibit A, Table illustrating various reports provided to the Parties and Program Metrics. Additionally, the Parties have received reports and documentation from the Vendors which include training materials, operational manuals, organizational charts, quality assurance reports, payment reports, and fraud analysis, and we

The Honorable Carl J. Barbier
July 1, 2013
Page 3

have always been willing to provide the Parties with any additional information they request, subject to the terms of the Settlement Agreement.

Furthermore, pursuant to Section 5.12.1.4 of the Settlement Agreement, the administrative expense budget is "subject to the reasonable approval of the BP Parties and Lead Class Counsel." To comply with this provision, the CAO submits its budget via email to BP and Class Counsel on a quarterly basis. The submitted budget contains enough detail to provide the Parties with the projected cost that will be incurred by each of the Vendors during each month of the fiscal quarter. In response to the proposed budgets, BP has at times made inquiries about a vendor's specific costs, but at no point within the history of the Program has BP or Class Counsel challenged or disapproved of the CAO's proposed budget. The CAO also provides BP with all invoices submitted by the Vendors and their subcontractors complete with detailed backup that includes individual timesheets, tasks performed, and expense detail and receipts, and BP is then allowed "a reasonable amount of time to raise concerns or objections to such invoices prior to their payment." *See* § 5.12.1.4 of the Settlement Agreement. Before its June 21 letter, BP had raised very few and only minor concerns regarding the invoices it has received and reviewed. Additionally, BP has responded by email that they have "no issue" for every invoice that has been paid by the CAO. [1]

From the Program's establishment in early 2012 through January 2013, when BP first appealed the CAO's January 15, 2013 Policy Announcement, BP appeared to be entirely satisfied with the CAO, the Vendors, and the implementation of the Settlement Agreement. For instance, at the Final Fairness Hearing held before this Court on November 8, 2012, BP voiced its approval of the ongoing claims process and the manner in which the Program was being administered. In fact, BP's attorney, Mr. Godfrey, requested that the Court issue a final approval order for the Settlement Agreement "so that Mr. Juneau can continue with his excellent work." [2] Furthermore, at the time of the Fairness Hearing, (1) the Settlement Program had already received more than 79,000 claims and had eligible payable award amounts of more than $1.3 billion to claimants, and (2) BP had received and reviewed five months of the Program's budgets and expenses.

The CAO also proactively reached out to the Parties approximately six months ago to meet and address many of the items BP now takes issue with in its June 21 letter. In fact, the CAO scheduled a meeting on November 28, 2012, with BP and the PSC to discuss the administrative budget, administrative costs of the Vendors, administrative costs of the program in general, financial audit review, quality assurance review, promotional fund, benchmark comparisons of this Program and the GCCF, and the scope and progress of the CLA external audit. BP cancelled the meeting and requested a new date. The CAO attempted to reschedule that meeting three additional times in January, but each time BP cancelled the meeting and requested a new date. The meeting was finally held on April 25, 2013, and all items of the

---

[1] As the Court is also aware, the four third-party vendors that the CAO oversees in the implementation of the Settlement, whom BP now questions, were selected *by the Parties* and appointed by the Court, and BP played a direct role in negotiating the Vendors' payment rates. While the CAO did not select the Vendors, we have been impressed with their work, expertise, and commitment.

[2] November 8, 2012 hearing transcript, p. 75.

The Honorable Carl J. Barbier
July 1, 2013
Page 4

original November 28, 2012 meeting agenda were discussed. At the conclusion of the meeting, BP was encouraged to submit any questions concerning Program operations to the CAO and was told by our office that subsequent meetings would be scheduled with each of the Vendors to provide answers to its questions.

BP submitted a list of questions on May 1 in the form of a detailed "Request for Information." My office responded with a letter on May 22 addressing many of the questions raised by BP and scheduled meetings for June 18 to further address BP's questions. Thereafter, in a June 7 letter, BP, for the first time, criticized the Vendors' use of independent contractors and alleged "vendor markup" and proposed a process to eliminate vendor markup. On June 18, meetings were conducted with BP, Class Counsel, the Court, and each of the Vendors separately. BP interacted directly with the Vendors regarding its questions and concerns.

The CAO heard nothing further from BP regarding any of the issues addressed in BP's June 21 letter, until it received a copy of the letter at 5:26 pm on June 21, 2013. Although we disagree with the manner in which BP has raised these issues directly to the Court instead of to the CAO, we nevertheless welcome the opportunity to respond to BP's allegations in the same spirit of transparency and cooperation that our office has always tried to foster. We address those allegations in the same order as they were raised by BP.

**I.    BP's comparison of the Program to the GCCF is misguided.**

BP attempts to discredit the Program's efficiency by stating that the GCCF resolved more claims per month than the Program does. However, for a number of reasons, the comparison of this Program to the GCCF is truly an apples-to-oranges comparison. The two programs simply do not align in their processing requirements or their statistical output.

This Program is responsible for implementing a 1,028 page Settlement Agreement, with 12 different claim types and, within each of those claim types, additional components requiring further analysis and processing. For example, the Seafood Compensation Program has 22 different claim types within it alone. This Program has substantially more requirements, nuances, technological support, quality assurance, layers of review, communications and notices to claimants, documentation, and claimant assistance than the GCCF had. Thus, BP's comparison of the costs and efficiencies of the Program and the GCCF is entirely misguided.

To understand the truly flawed nature of BP's comparison between the GCCF and the Program, we must recall the policies of the GCCF. The operations of the GCCF were divided into two phases.[3] Initially, the GCCF functioned in the Emergency Advanced Payment ("EAP") phase, during which claimants could receive compensation without signing a release. Notably, the EAP phase of the GCCF employed the so-called Claimant Verified Amount ("CVA") rule.[4] Under the CVA rule, losses alleged by claimants from certain industries were presumed to have been caused by the Spill, and the GCCF would pay the amount of losses claimed by the claimant

---

[3] BDO Consulting Independent Evaluation of the Gulf Coast Claims Facility, at 29.
[4] *Id.* at 51.

4

based on pre-Spill financial information without reviewing the underlying financial documents if that figure was higher than the GCCF-calculated amount.[5] As a result of this and other GCCF policies during the EAP phase, in excess of 169,000 claimants received a payment with minimal claim review.[6] While BP did not count these EAP claims separately in its assessment of claims resolved by the GCCF, it is significant that these paid EAP Claimants were eligible to participate in the expedited Quick Payment program that followed.[7]

The GCCF later announced the Interim and Final Payment phase, in which claimants had the option to receive an additional payment if they released all future claims against BP.[8] The Interim and Final Payment phase included an expedited Quick Payment option, which applied only to previously paid claimants.[9] Under the Quick Payment option, claimants who had received compensation during the EAP phase could receive an additional payment in exchange for only a signed release, without any further documentation of losses.[10] These Quick Payment claims necessitated limited processing by the GCCF, as the only document required on behalf of the claimant was a completed release.[11] Over the course of its administration, the GCCF processed a total of 134,637 Quick Payment releases.[12] That figure indicates that two-thirds of all the releases submitted to the GCCF were received under an expedited option that required very little processing.

In contrast, this Program does not include any such expedited option and employs no parallel to the CVA rule or the Quick Payment program. Instead, each claim requires full documentary support and a complete analytical review. For these reasons, BP's comparison of the efficiency and cost figures of the GCCF to those of this Program is tenuous at best.

We also note that, for the purposes of counting "resolutions" in the Program, BP includes only Denial and Eligibility Notices. This overlooks the instances in this Program where our review halts because the claim is incomplete. Indeed, 51% of the notices issued in this Program are Incompleteness Notices, each of which requires a follow-up with the claimant to obtain required documentation. In doing so, we are implementing the Settlement Agreement pursuant to its terms and consistently with BP's explicit requirements not to deviate from those terms. However, such a high rate of incomplete claims adversely affects the speed with which claims are resolved. Furthermore, the number of incomplete submissions underscores not only the significant documentary requirements for which BP negotiated, but also the diligence of the Program in faithfully administering the precise requirements of the Settlement Agreement.

Indeed, the examples below illustrate why the Program's claims-processing pace may be slower and costlier than BP apparently expects:

---

[5] *Id.*
[6] *Id.* at 34.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* at 36.
[12] Gulf Coast Claims Facility Overall Program Statistics (Status Report as of December 3, 2012).

5

The Honorable Carl J. Barbier
July 1, 2013
Page 6

1. The resolution of Coastal Real Property, Wetlands Real Property, and Real Property Sales Claims has been delayed because of factors solely outside of the Program's control. Most notably, there is a backlog of claims at the mapping companies which BP initially retained.

2. The Settlement Agreement is complex and lengthy, and before the Program even commenced, the CAO and the Vendors began raising questions to the Parties, seeking clarification of both minor and major points, all of which were necessary for the accurate development of software systems and implementation of the Agreement. Beginning in May 2012 and continuing today, my office has posed questions to the Parties, asking for their input on policy decisions. Often, the Parties do not agree, which then leads to further discussion, drafting of new policies to address the areas of disagreement, Administrative Panel meetings, and motions to the Court. Since the beginning of the Program, the CAO's office has raised 411 issues for clarification. This has resulted in 384 adopted policies and 27 issues that have not yet been resolved. We have met with the Parties numerous times to discuss policies, have sent countless emails seeking resolution, and still face new issues every day that must be clarified or resolved. While such debate and discussion is ongoing, our office must place holds on affected claims until the Parties agree on a resolution. Every time a hold is placed, the progress of the affected claims halts until the issue is resolved, thereby adversely affecting claim-processing speed.

3. The CAO advised BP that productivity would be affected and the claims process would be more costly if we adhered to the stringent document requirements that were potentially causing 51% of the current claim reviews to be incomplete. After presenting BP with several more cost-efficient alternatives, many of which were rejected, BP urged our office to continue conducting additional research to find required documents and insisted that we do outreach calls to try to obtain documents. We advised BP of the costs and time associated with such efforts, but BP nevertheless encouraged us to devote additional resources to this research and outreach.

4. BP's consultants have identified areas in our processes that they believe are redundant or unnecessary and have discussed those in our meetings. One example concerned the assignment of NAICS codes for BEL Claimants, which are codes the GCCF did not assign. At the June 18th meeting, BP's consultant asked BrownGreer why the Program spent the time looking beyond the tax return for confirmation of a NAICS code when we could simply take the NAICS code from of the tax return and proceed. At first blush, this may appear to be an efficient solution. However, as BrownGreer explained, the Settlement Agreement does not permit the Program to simply rely on tax returns, but instead insists that the Program look at several different sources for confirmation.

These are but a few examples of how the time and expense of this Program are, in large part, a result of the Settlement Agreement itself, which BP negotiated. And yet, in spite of its complexities, the Program's monthly administration costs are still less than those of the GCCF.

## II.     The CAO operational oversight is significant and effective.

As detailed below, BP's attack on the CAO's overall monitoring of expenses and its oversight of the Vendors is unwarranted.

### A. The CAO oversees the Vendors' productivity and output on both daily and long-term bases.

As early as July 2012, one month into the Program, the CAO met with each of the Vendors to begin a process designed to analyze and monitor each of the Vendors' individual productivity and the Program's productivity as a whole. The process looked at full-time equivalents, numbers of employees in each position, average time a claim was checked out and worked on, time spent in management, and oversight of each employee. It further measured output by the number of Eligibility and Denial Notices issued. The entire point of this utilization exercise, then and continuing today, is to evaluate productivity, identify areas that are moving too slowly, and analyze how full-time equivalents should be decreased as efficiencies are realized. This utilization process has achieved significant results, including an 87% reduction in GCG's call center expenses (a reduction made in coordination with GCG and with their agreement). It has also helped to ensure that employees in the Claimant Assistance Centers ("CACs") were cross-trained on aspects of claims review so that they could stay fully occupied when claimant traffic in a CAC waned.

Additionally, beginning in October 2012, the CAO directed that each of the Vendors participate in daily calls with the CAO to discuss output targets and processes in an effort to streamline processes and minimize costs to the Program. The goal of these "SWAT" team calls was to increase the volume of notices issued by establishing daily and monthly productivity goals and measure actual performance against these benchmarks. *See* Exhibit B, the Notice Target Report sent to BP on June 14, 2013. The CAO has reduced the frequency of these meetings as the Program has matured from a ramp-up stage to a normalized production stage, but the CAO continues to circulate reports every business day to each of the Vendors illustrating their progress compared to daily and monthly targets in order to ensure maximum output and efficiency.

### B. The CAO analyzes changes in process and does not implement changes on an "*ad hoc*" basis.

The CAO has charged each of the Vendors with constantly evaluating ways to streamline processes and reduce costs. The CAO oversees regular meetings to discuss ways to eliminate duplication and maximize efficiencies and then seeks to implement cost-saving measures. As one example, BrownGreer previously prepared the non-accounting aspects of each BEL Claim at lower billable rates than that of P&N and PwC ("the Accountants") and then fed the claim to the

Case 2:10-md-02179-CJB-DPC   Document 11401-2   Filed 09/17/13   Page 39 of 83

The Honorable Carl J. Barbier
July 1, 2013
Page 8

Accountants. BP suggested that all BEL Claim review work, including the non-accounting aspects, be performed by the Accountants. The CAO studied this suggestion and concluded that it would cost the Program significantly more each month and potentially diminish claims processing throughput.

In its letter, BP wrongly assumes that the CAO proposed to add 100 new accountants to the Program without any analysis of whether it would achieve desired results. The Accountants jointly recommended to the CAO that, due to the increasing backlog of BEL Claims, the hiring of an additional 100 accountants would be reasonable and appropriate. BP requested additional information from the Accountants regarding the basis for the engagement of these additional accountants. On May 10, 2013, the Accountants drafted a joint response to BP outlining the growing backlog of BEL Claims, which, at the time, totaled 37,510 and was increasing at a rate of 2,400 claims per month. *See* Exhibit C. In their response, the Accountants stated that with 100 additional accountants, the accounting firms should have the resources necessary to limit any further growth of the BEL Claims backlog.

After reviewing the Accountants' response, BP requested a Performance Study of BEL Claims processing. *See* Exhibit D. On June 4, 2013, the Accountants each prepared a response and submitted it to the CAO, who in turn provided it to BP. *See* Exhibits E and F. These responses explained that the Accountants' joint recommendation to the CAO was influenced by a P&N analysis that determined that the most significant factor in the backlog of BEL claims was the increase in new filings (a 17% increase in the three month rolling backlog between October 2012 and May 2013). These numbers clearly showed that, on a daily basis, the number of incoming BEL claims far surpassed the number of claims being processed to a determination notice. The Accountants opined that the most efficient way to combat this continually increasing backlog was to increase the number of accountants on staff, which would help to increase throughput, thus expediting overall final determinations.

The CAO also performed an independent analysis of projections of incoming claims and current claims' completion date, which demonstrated that all final determinations for BEL claims could be completed four months earlier if the additional accountants were hired. *See* Exhibit G. For these reasons, the hiring of 100 additional accountants was deemed necessary and justified.

Nevertheless, BP voiced its disagreement and requested further information on June 9. *See* Exhibit H. Following this exchange, the June 18 meetings between BP and the Vendors took place. At these meetings, BP had the opportunity to ask questions to the Accountants about the hiring of the additional accountants. The Accountants specifically responded to all of BP's questions, and unfortunately, the matter remains unresolved. We need to get this matter resolved so that claims can continue to be processed in a timely manner.

BP also criticizes the Program's information technology costs and suggests that the majority of the necessary computer programming has been completed and that all further programming is simply "bells and whistles." BP fails to recognize that the complexity of the Settlement Agreement has necessitated the design and development of a complex claims processing database. This database requires daily maintenance to ensure that it is working

8

properly and that all of its users, which include claims reviewers, the Vendors, the CAO, the Court, BP, Class Counsel, claimants, law firms, Appeal Panelists, the Guardian ad Litem, the Attorney Lien Adjudicator, the Documentation Reviewer, and the mapping companies, are able to access and use the system. The system requires Database Administrators to monitor the speed, reliability, security and storage capacity of the Program's database, which involves over 574 web pages in the interactive claimant Portal and claims review screens, over 93 separate Notice types to claimants, and over 1.1 million lines of code for the web pages and stored procedures.

Aside from the daily maintenance requirements, the Program continues to require programming changes because of different demands that are brought to light on a regular basis. Additionally, the CAO has received recommendations from CLA with regards to the IT system. For example, given the volume of changes made to the system by BrownGreer, the CLA audit suggested that a daily log be maintained in order to assist the CAO in monitoring changes that are made and ensuring that they are authorized, reasonable and tested before implementation. The CAO has since been monitoring BrownGreer's implementation of solutions for CLA's recommendations to improve security, minimize fraud and increase efficiencies.

Additionally, every week, the CAO's senior IT manager has conference calls with BrownGreer, reviews lists of programming needs, evaluates their necessity, and directs the priorities of the tasks. The following are examples of instances in which programming changes have led to increased efficiencies in the Program.

1. **Improve the efficient flow of information among all Parties and claimants.** This includes programming more descriptive statuses of claims to indicate whether a claim is on hold for a policy decision or in the appeals process, as well as, to identify with specificity the status of BEL Claims. This programming enhancement replaced the prior static status of "Under Review" to provide more transparent and meaningful information to claimants.

2. **Improve the process flows among all Vendors in the Program**. This includes not only routing claims more efficiently between the Vendors and specific review processes but also encompasses the creation of separate interactive Portals for the Court-appointed Guardian Ad Litem, the Court-appointed Attorney Lien Adjudicator, and the Documentation Reviewer. These communication tools foster the efficient transmission of data and documents so that these specialists can review the claims that they are charged with resolving.

3. **Meet a new need in the Program.** New procedures approved by the Parties necessitate programming changes to implement the directives of BP and Class Counsel. For example, the Wetlands Claims often involve complex, overlapping ownership issues where a potential claimant, as shown in the land records of a particular parish, has not submitted a claim seeking compensation. The Parties directed the Program to identify these absentee claimants, provide them notice of their potential Wetlands Claim, and stay the processing of the submitted claim for 30-

45 days so the owner/potential claimant has an opportunity to submit a claim. These steps require significant programming adjustments to route the claims accordingly and to provide a mechanism for issuing a notice to a potential, unregistered claimant. These changes will facilitate the orderly and accurate processing of all Wetlands Claims.

**4. Adjust to a change in policy.** The change in policy to not strictly enforce the January 22, 2013, deadline for submission of all Seafood Claims necessitated programming changes to achieve the following goals: (i) re-open the online Seafood Claim form submission process through the Portal; (ii) identify the potential population of claimants who could fall within the "relation-back" principle adopted by the Parties and the Seafood Neutral; (iii) design questions for claims reviewers to determine whether a claimant satisfies the specified relation-back criteria; (iv) design and code a new notice to notify a claimant of the potential Seafood Claims that could be submitted within this grace period; and (v) code the online Portal to only open up the specific claims to which the claimant is entitled among 22 possible Seafood Claims.

**5. Ensure accuracy of claim results.** To improve the accuracy of the claim reviews and foster confidence in claimants, the Program is implementing a change to the Portal's document intake system that will allow claimants to name their own documents when submitting them for review to ensure more accurate results and increase the efficiency of the claim review process. This endeavor requires changes to the interactive Portal screens, document intake queues, document categorization processes that name all documents, and data capture screens that prepare claims for analysis.

The characterization of these aforementioned changes as merely "bells and whistles," undertaken without any analysis, is simply inaccurate. These programming changes offer substantive and necessary improvements to the efficiency and cost-effectiveness of the claim processing system in this Program.

## C. BP's assumptions regarding staffing costs and expenses are flawed, and its conclusions are incorrect.

BP's assertions regarding the CAO's oversight of staffing costs and expenses are also unfounded and incorrect.

**1. Staffing levels *do not* exceed models.** The CAO has prepared staffing models that set forth goals of full-time equivalents ("FTEs") for the Program. Quarterly, the CAO monitors each of the Vendors and works with the Vendors to adjust staff to match claims volume. Our modeling, however, should not be misunderstood or confused with a pure headcount system of modeling. The number reflected in our models is an FTE number, which may be lower than a pure headcount of staff. This is because some workers are part-time, and many work a shorter second shift. For

example, we modeled that BrownGreer would need 700 FTEs in the Claims Reviewer position. They actually have 777 employees in this position, but this equates to 644 FTEs.

2. **Garden City Group's Call Center Operations.** When the Program initially launched, it established, in accordance with the Parties' expectations, a highly accessible communications network for claimants. BP played a role in determining how many dedicated operators would be required at the time of launch with numerous communications between GCG and BP discussing the ramping up and down of staffing. Since that time, GCG has closely monitored its call center staffing levels and proactively worked with the CAO's office to reduce operator levels when appropriate. GCG also suggested reduced hours when call volume decreased. The pricing for GCG's dedicated operators has been on the same sliding scale since GCG started its work three years ago on the GCCF project and has been provided on every invoice submitted to and reviewed by BP. The phrase "dedicated" operators is also on the Rate Chart as part of the Agreement executed between the Settlement Trust and GCG which BP reviewed and provided no objections prior to execution.

Moreover BP's recent criticism of the GCG call center staffing is at odds with GCG's staff reductions since the beginning of the program. GCG currently employs less than 60 total operators, down from the original 450 operators employed at the beginning of the Program, which was the number reached after discussion with the Parties in order to satisfy both Parties' desire to have sufficient staffing levels to ensure no wait time on any calls. This represents an 87% reduction in staff from the outset of the program.

Furthermore, there are valid reasons to have two sites for the call center. First, this allows GCG to keep a call center running in the event that severe weather or some other unforeseen problem shuts down one center. Second, the Sarasota center was established at the direct request of the Parties for GCG to have a call center presence on the Gulf. As it happened, GCG had a long-standing relationship with a call center partner in the Gulf that pre-dates this Program by more than ten years, which allowed GCG to quickly establish a Gulf-coast call center. Because of that relationship, GCG was also able to launch this center with minimal start-up costs. Finally, BP was well aware at the outset of the Program that GCG planned to operate two call centers, and BP approved that plan.

In any event, considering the low number of operators at this point, this cost relative to the entire process is minimal. On this score, BP also complains that GCG should simply pass along its call center vendor pricing instead of GCG's own pricing. BP, which has been paying GCG the same rates for call center work since 2010 without complaint, cannot argue that GCG misled BP in any way. During eight months of negotiations with respect to the current contract, which BP attended, GCG made it clear that in Sarasota it was using a long established call center partner and that this was not a pass-through expense. BP understood this and in fact had no issue with the

11

provision in the contract only requiring GCG to send a redacted copy of the pricing agreement between GCG and their Sarasota call center partner. It is thus surprising that BP has now taken issue with these redacted subcontractor agreements.

Lastly, the CAO opted to keep a call center open on Saturday to provide convenient accessibility to claimants who work during the week. We will certainly continue to evaluate the relative benefits and costs associated with running the call centers and will continue to take whatever actions are deemed appropriate to maintain quality claimant service while reducing costs.

3. **Turnover Issue.** BP also criticizes the CAO and the Vendors for high monthly turnover of staff, citing a 4% monthly turnover rate at BrownGreer and asserting that "the CAO has never identified this as an issue or attempted to address it with the vendor." We understand that in preparation for the launch of the Program, BrownGreer and other Vendors were expected to hire hundreds of workers in a short period of time to support various aspects of this Program. Inherent in any hiring process of such magnitude is the risk that there will be a certain percentage of turnover among workers.

But, from the beginning, the CAO and the Vendors have been concerned with retaining staff that produce efficient and correct claim outcomes. We had frequent discussions early on with BrownGreer setting forth our expectations, and BrownGreer implemented an employee testing program. BrownGreer's reviewers are continually monitored through their Quality Assurance program that involves accuracy metrics programmed into the system, supervisor feedback, and warning levels. If an employee is not able to perform actual reviews at an acceptable level pursuant to that Quality Assurance plan, the employee is terminated by BrownGreer.

Other reasons why employees leave are inherent in the nature of the work involved and the temporary nature of this assignment, factors that the CAO and its Vendors cannot control. The CAO has continued to monitor the issue of employee turnover, and the Vendors are taking measures, such as cross-training, to further reduce staff turnover. In sum, we are continuing to work with the Vendors on this issue to reduce turnover rates.

4. **The CAO is proactive in handling independent pass through costs.** BP's criticism of BrownGreer's and GCG's use of independent contractors is similar to its previous allegations that the mark up on contractor rates by the Vendors resulted in "pure profit." Initially, the calculations used to show the alleged "pure profit" are incorrect for many reasons, starting with BP's inflated estimate of the number of independent contractors at issue. Although BP estimated the independent contractor headcount for BrownGreer at 1,320, the actual number is merely 190. *See* Exhibit I, BP's June 7, 2013 letter.

Furthermore, BP fails to consider the Vendors' overhead costs. For example, of the 190 independent contractors at BrownGreer, 132 are located in Richmond, VA. Unlike the Gulf offices, BrownGreer is responsible for all rent and overhead costs associated with workers located in its Richmond office. Furthermore, GCG entered a ten year, $2.6 million lease to house the additional personnel required for this Program, a commitment that will surely extend beyond the life of this Settlement Agreement. Again, these overhead costs are fully absorbed by these vendors.

Additionally, both BrownGreer and GCG absorb overtime costs themselves and do not bill BP overtime rates. GCG has also provided a savings of nearly $5 million based on GCG's decision not to bill overtime on this Program, plus nearly $1.5 million in savings because GCG has capped its highest hourly rate to nearly half the rate normally charged by its executives.

Lastly, BP also complains that the Vendors should simply pass along subcontractor vendor pricing instead of billing at their own contracted rates. The CAO has involved BP in every step of the Vendor contract negotiations, including onsite meetings with the Vendors. In those meetings, which were the proper forum for such discussions, not once did BP propose passing through subcontract labor. It was not until after the contracts were negotiated and executed that these issues were raised.

5. **The CAO's review of expenses is routine and ongoing.** From the outset of the Program, the CAO has utilized several methods to oversee staffing costs and expenses.

First, all of the Vendors are required to comply with the CA Travel and Entertainment Policy. This policy lays out formal cost guidelines for travel (hotel and transportation) as well as the accepted per diem for meal expense comparable to the standard contractor amounts. All of the Vendors' invoices undergo a comprehensive review, and any potential exceptions are reported to the Vendors. In reviewing expense invoices, the CAO recalculates expenses based on the documentation provided and compares these expenses to the invoice summary provided by the vendor. These travel expenses are then compared to supporting documentation (receipts and invoices) to confirm that the expenses comply with the Policy.

In reviewing labor invoices, the CAO confirms that invoice hours agree with approved timesheets. Invoice billing rates are then confirmed by comparing the rates provided for in the executed contract against those billed for the title of person/job description. Invoices are inspected for duplicate entries and excessive hours charged per day or total invoice. It is confirmed that the work performed is within the Scope of Services identified in the executed contract. Lastly, the invoiced hours are compared to the hours charged in prior months to confirm that there is no duplicate billing.

> Furthermore, the need for travel is a necessity to meet the Parties' very explicit
> expectation that the Program have a significant local presence in New Orleans.
> Having a local presence of PwC accountants is also beneficial in that it provides for
> better integration between the two accounting groups, as they are in close proximity
> to each other and can share approaches and ideas. If the cost of this local presence is
> deemed by BP to now outweigh the benefits of a local presence, then we will
> certainly analyze this issue and evaluate ways to minimize associated travel expenses.

## III.   The Program's Procedures to Detect and Mitigate Fraud are Robust and Effective.

The allegation that information "suggests that the efforts taken by the CSSP to detect
fraud are relatively nominal in relation to the actions taken by the GCCF, which yielded
numerous fraudulent claims" is baseless, and the suggestion that the Program's fraud detection
and prevention efforts are left in the hands of claims reviewers who follow subjective,
undetermined criteria to detect potentially fraudulent claims is simply wrong. To the contrary,
the Program has utilized the experience of the same key personnel who directed the GCCF's
fraud detection efforts and has developed and implemented an improved, more robust, and more
efficient Fraud Detection Program as compared to that of the GCCF.

At the beginning of the Transition Process, the CAO coordinated with the Transition
Coordinator and with the head of BrownGreer's Audit Team to develop the fraud and detection
processes for the Program.[13] We listened to their suggestions for improvements to the process.
To help us coordinate the process, we engaged David Welker, a former Special Agent in charge
of the FBI's New Orleans Division, to serve as the Claims Administrator's Fraud, Waste, and
Abuse Director. We set up the Special Investigation Team ("SIT"), and, although managed by
essentially the same GCCF audit team, the process that it developed has not only resulted in
significant cost savings when compared with the GCCF, but also has surpassed the GCCF's
process in several ways.

BrownGreer does ask the Program's claims evaluators to identify suspect claims, because
these evaluators are most familiar with the claim, but this Program does far more to detect fraud
than just this. SIT also updates and provides reviewers with a "be on the look out" ("BOLO")
list that currently contains 394 businesses, employers, notaries, and tax preparers, all whose
involvement or preparation of claims is suspect.

---

[13] It should be noted that BrownGreer played a key role in developing and implementing the GCCF's fraud detection
and prevention program. BrownGreer's "audit team" implemented controls to verify the claimant's identity,
identified and prevented payments on duplicate claims, and developed criteria and instructions for reviewers to
identify suspect claims to submit for fraud review. The audit team's case managers analyzed individual claims,
performed database queries, and developed and reviewed statistical trend reports to detect multi-claimant schemes.
After identifying a suspect claim or a potential scheme, BrownGreer referred all claims to Guidepost Solutions, LLC
("Guidepost") for investigation. Guidepost's task was to return a finding on the presence or absence of fraud. BP's
assertion that the GCCF fraud mitigation vendor – Guidepost – had identified 9,310 claims containing potential
fraud is therefore incorrect. BrownGreer's audit team identified, while Guidepost confirmed, that these claims were
potentially fraudulent.

Furthermore, select SIT reviewers regularly analyze various statistical trend reports to detect claim abnormalities, including analyses of P&L and sales, and use tax variances for the BEL claims. SIT's reviewers and case managers have access to over 30 reports, including reports that identify claimants sharing the same address, email, and payment information. They review these reports both to identify suspect claimant groups as well as to identify overlaps with any suspect claims. SIT programmatically identifies claims that were found to be potentially fraudulent in the GCCF and tags them for SIT review if the same claimant files a claim in the Program. SIT case managers manage and monitor the multi-claimant schemes identified in the GCCF to detect the same or new claimants filing claims sharing the same characteristics. SIT case managers also routinely develop reports based on the unique characteristics of the multi-claimant scheme as they monitor its progression. It is not unusual to run several reports to define the characteristics of the scheme and continue refining the reports as the scheme evolves. Typically, SIT identifies approximately 10 new potentially fraudulent multi-claimant schemes weekly. SIT currently monitors over 520 different multi-claimant schemes, involving over 4,000 claimants that have submitted potentially fraudulent claims.

David Welker and Roma Petkauskas, the head of BrownGreer's SIT, have regularly met with representatives from the National Center for Disaster Fraud ("NCDF") and the U.S. Attorney's office throughout the Gulf. On September 7, 2012, we attended a meeting with Don Cazayoux (U.S. Attorney for the Middle District of Louisiana) and approximately 30 attendees from the FBI, Secret Service, DOJ, Postal Inspection, and the U.S. Attorneys and their staff from the five Gulf States. We gave an overview of the Program and SIT processes. The attendees commended the fraud detection processes and welcomed the level of increased cooperation this Program has had with those agencies as compared to the level of cooperation experienced with the GCCF. This cooperation continues with the exchange of information that the NCDF provides relating to the tips it receives through its hotline. The Program continues to refer potentially fraudulent claims to the DOJ.

The statement that the Program's fraud detection efforts are "nominal," the suggestion that these efforts follow some subjective standard or non-existent criteria relying solely on claims evaluators to detect fraud, and the allegations that BP has not received "any empirical support" regarding the Program's Fraud Detection Program and its findings are not only false but ignore the substantial efforts that the Program has undergone to meet with BP on numerous occasions to describe all of the aspects of the Fraud Detection Program.

The CAO's Fraud Detection Program representatives have met with BP to discuss the Program, its processes, and its findings on June 26, 2012, August 7, 2012, January 16, 2013, and again on June 18, 2013. As we explained in these meetings, we realized that the GCCF incurred significant costs from its requirement that every potentially fraudulent claim be referred to Guidepost for a full external investigation. SIT has since implemented "in house" investigative processes to review suspect claims to make findings of fraud at a substantially reduced cost when compared with the processes of the GCCF. SIT has established direct access services with the IRS to verify tax and other financial documents, developed standardized authorization forms to obtain information from other third party sources, increased efforts in contacting employers and other witnesses, and retained a forensic accountant. SIT can make a determination of fraud

resulting from any one of these processes. SIT refers claims to HUB Enterprises, Inc., an outside investigation firm, for a full investigation only in instances where an on-site interview or inspection are the most efficient and reliable methods. As we reiterated again in the meeting on June 18, these adjustments have resulted in a more efficient fraud detection process – whereas the GCCF referred all suspect claims to Guidepost for external review, the Program is able to handle two-thirds of all fraud findings internally, which, as BP acknowledges, has significantly reduced the cost to the Program.

## IV. The Accountants maintain uniform processes to detect errors in claimant-submitted information.

Contrary to BP's allegations, the Accountants follow uniform processes to detect potential errors in claimant-submitted information. First it is important to note that the Settlement Agreement does not call for the Accountants to perform auditing procedures on the claimant financial statements. The Accountants use professional judgment in reviewing and analyzing claimant submitted information.    BEL Claims are calculated using required documentation outlined in the Settlement Agreement and, in some cases, additional documentation is requested by a claims reviewer and utilized in the review process. Claimants are required to submit multiple sources of financial information, which are used collectively during the review process to evaluate the claim and produce a determination. Inconsistencies between the financial documentation and items of question identified during the review are assessed when producing a final determination. Upon completion of a thorough evaluation, a final determination is made once the claim satisfies the requirements of the Settlement Agreement and is in line with program policies.

Moreover, the Accountants perform additional analytic work on claims including, but not limited to: variance analysis between book and tax Profit & Loss results, reconciliation of claimant prepared calculations with accountant-prepared template results, categorization of expenses, understanding of business operations and industry dynamics, correction of claimant accounting and non-accounting errors, supporting source documentation where necessary, and research of financial anomalies and patterns. The Accountants' application of these guidelines typically results in direct telephone communications with claimants and their representatives in order to perform a thorough evaluation and to address any concerns or inconsistencies. These guidelines and others aid in producing accurate claim determinations.

## V. The CliftonLarsonAllen, LP External Audit Was Approved by BP.

BP complains about the scope of the CLA audit, but fails to acknowledge that BP was given every opportunity to influence the scope of that audit. *See* Exhibit J. In June 2012, and in an effort to provide complete Program transparency, the CAO proposed to the Parties that an external audit be conducted to address the claims process to ensure accurate, consistent, and timely processing of claims. The CAO gave both Parties the opportunity to comment on the audit scope that was included in the Request for Proposal ("RFP"), which was submitted to three independent firms for bidding: CliftonLarsonAllen LP, Reznick Group, and McGladrey. After careful deliberation, the CAO selected CLA.

From December 2012 through February 2013, CLA performed field work and testing of claims to assess the conformance of the Process to the Settlement Agreement. On February 15, CLA requested the scope to be increased to include more file testing as well as more extensive field work. At that point, the scope increase was presented to the Parties, who were asked for additional recommendations; *BP raised no issue with the revised scope of CLA's audit.* CLA provided the CAO with the first of three process audit reports in May 2013, and the CAO circulated copies of the report to the Parties. The scope of the remaining reports will provide a more in-depth review of the Program's processes.

BP complains that CLA's audit was performed at too high a margin of error (10%), but as BP acknowledges, the external audit was specifically designed to test the internal controls and processes of the Program. As of May 30, 2013, the CAO's internal Quality Control Team had audited 1,639 claims from an Eligible Notice population of 41,328. At a confidence interval of 95%, this sample size provides the Program with a margin of error of 2.38%, which is, in fact, less than the margin of error requested by BP for the external audit.

Additionally, as the internal claim audits have progressed each quarter, the CAO Quality Control Team has identified common trends within claim types that have allowed the Program to implement a risk-based approach for selecting samples. For example, the Program has observed that, as the Vendors have gained more experience using the Louisiana Wildlife and Fisheries Database for Louisiana Seafood Claims, the material exceptions for Louisiana Seafood Claims have significantly decreased. As a result, the CAO Quality Control Team now selects a smaller sample of Louisiana Seafood Claims (even though Louisiana accounts for 44% of all Seafood Claims) in order to focus on the higher risk claims submitted from Mississippi, Alabama, Florida, and Texas.

## VI. The CAO has been fully transparent and is operating in strict accordance with the Settlement Agreement.

The CAO has fostered a transparent environment focused on cooperation and teamwork, which requires our office, the Vendors, Class Counsel, and BP to recognize that every party has insights and suggestions that can benefit the Program as a whole. The CAO maintains this unwavering commitment to teamwork. BP's unfounded criticisms of the Program, its Vendors, and those who administer and implement the Agreement are not productive and do not benefit the Parties, the Court or the claimants. Our processes and operations have always been and continue to be transparent, as evidenced by our recent compliance with BP's requests for information and the recent Vendors' meetings set up by the CAO for BP's benefit. Rather than impose another audit or examination on the Program, we encourage BP to review the information that we have previously provided and allow us to work together to answer BP's questions and address its concerns in a manner contemplated by the Agreement.

Additionally, the CAO is providing oversight and supervision in full accordance with the Settlement Agreement and as directed by the Court. However, should the Parties take issue with the methodology that our office employs to oversee and supervise the Program, there is a process

The Honorable Carl J. Barbier
July 1, 2013
Page 18

for addressing such issues as specified in the Settlement Agreement. The CAO welcomes open discussions with the Parties regarding any issues of concern and is prepared to invoke an Administration Panel and, if necessary, raise any unresolvable issues to the Court.

Sincerely,

Patrick A. Juneau

cc: Magistrate Judge Shushan



05 August 2013

Mr.Bob Levine

Deepwater Horizon Settlement Program

935 Gravier St

New Orleans, LA 70130

Dear Bob,

We reviewed your July 17, 2013, email (a copy of which is attached) containing the Claims Administrator's proposed 3rd quarter 2013 budget summarily requesting over \$130,300,000 to fund administration fees for that period. Given our recent meetings and discussions on claims activity and processes, and recent execution of vendor contracts, we would expect that you provide us with any supporting analysis, metrics or explanatory notes providing any transparency into the budgeting process or justification for the \$130,300,000 request. Other than the total amount requested, the email contains only a simple, 13 line chart generally identifying dollar amounts by vendor. As your email recognizes, pursuant to the Settlement Agreement, the Claims Administrator's budget is subject to BP's reasonable approval. Given the absence of whatever supporting analysis, metrics or explanatory notes the Claims Administrator relied upon to create this budget, BP cannot determine if the budget request is reasonable under the circumstances. Furthermore, based upon our review of recent actual claims processing and administration results, which show even further declines in productivity and increases in costs, we continue to have significant concerns about CSSP's poor productivity and excessive costs. It would be unreasonable to approve a budget that validates and incentivizes the various claims administration vendors to perpetuate their track record of poor productivity and excessive costs. Accordingly, we request that the CSSP re-submit its 3rd quarter 2013 budget with appropriate documentation, analysis, metrics and explanatory notes to support each item in the budget request. Upon receipt and review of a re-submitted budget BP will respond with its position pursuant to the terms of the Settlement Agreement.

The CSSP is a multi-billion dollar program with cumulative administrative spend to date in excess of \$500 million. The proposed budget does not evidence a systematic, disciplined budgeting process. As examples, BrownGreer is simply budgeted for exactly \$15,000,000 each month and Garden City is budgeted for exactly \$7,500,000 each month. Moreover, vendor fees have increased in April and May by 7%; vendor expenses have increased in April by 41%; and the proposed budget seeks vendor costs that are an additional 7% over April and May and 14% over March. We have also calculated variances of 2nd quarter actual results in comparison to the 2nd quarter budget provided by the CSSP, which further demonstrates that the CSSP budgeting process is inadequate. As examples, BrownGreer and P&N were collectively in excess of \$2 million over budget for the 2nd quarter. There does not appear to be effective management of the vendors, including the apparent absence of repercussions or corrective actions taken to address vendors that fail to meet their respective budgets.

Consistent with what would be expected of a professionally run claims management process, the CSSP needs to implement a systematic and disciplined budgeting process so that the Claims Administrator is able to provide a budget proposal, including detailed buildups of how the

**EXHIBIT B-4**

budget is developed in relationship to performance targets and past performance, that allows BP to meaningfully evaluate the proposed budget against actual past performance.[1]

In order to appropriately budget administrative costs and to drive improved productivities and efficiencies, the CSSP should develop and track the following metrics:

> Targeted claim determinations and payments by claim type and by person (e.g. BEL claims per week, per accountant)

> Call Center activity and targeted metrics

> Targeted throughput analysis for each stage in the claims process, i.e. how long is a claim in each status, how many claims complete each stage per month

> Estimated progress of incomplete claims analysis, broken down by type of incomplete, aging of claim, and action items undertaken to resolve

> Levels of quality assurance in relation to reasonableness thresholds

> Projected fraud detection activity and bases for levels of effort

> FTE count by month, location, function (as used by vendor), designation for employee vs. contractor, and claims type

The CSSP should also develop and track the following cost-related metrics:

> Fees and expenses broken down by month, vendor, level, location and expense type

> Projected staff turnover analyzes including

   · Count of additions, subtractions of employees and contractors

   · Training requirements and costs given projected turnover

   · Projected staffing level and hourly rate changes with justifications/explanatory notes for any changes

The CSSP should further develop and measure productivity in relation to costs using key performance indicators and tie the two sections above (productivity and costs) together to determine overall targeted performance and costs metrics.

These measures and an increased emphasis on budgeting are all necessary as there does not appear to be meaningful controls over what vendors are accomplishing and how much they are spending in order to accomplish those tasks. As referenced above, the CSSP April and May results show even further declines in productivity and increases in costs. Call center costs are now exceeding $1200 per hour per live calls. Excluding fraud detection, CSSP monthly costs now exceed GCCF monthly costs by approximately $1 million and the proposed budget pushes those CSSP costs even higher.

Productivity not only remains low, but is further decreasing and the turnover rate appears to be increasing. The number of claims resolved in May fell and was 6% lower than the average of the three prior months; the turnover rate increased 29% in May over the average of the prior three months. The CSSP is now only resolving approximately one claim per week per full-time equivalent (10,000 claims resolved per month by 2200 FTEs)

BP cannot approve a budget where the request does not transparently reflect the budgeting process, including performance targets that hold vendors accountable along with supporting analyses and metrics, particularly in light of the CSSP's historic performance in exceeding budgets and declining productivity as well as increasing costs that appear abnormally high. The CSSP needs to

---

[1] BP has on several occasions raised the need for the application of Key Performance Indicators ("KPIs") to the claims administration process. Such KPIs are essential to a well run claims operation including the ability to appropriately budget claims administration costs and manage the claims administration. BP reiterates its request for KPIs.

immediately develop more effective budgeting and performance monitoring in order to run a well-managed operation and prepare credible budgets that hold vendors accountable.

To facilitate our review of future budgetary proposals, we further request a complete data dictionary for the CSSP claims system developed and managed by BrownGreer, including, but not limited to, the following information: (1) System / Database Name; (2) Table Name; (3) Field Name; (4) Field Description; (5) Data Type; (6) Data Length; and Nullable (Yes / No).

We look forward to receiving a new 3rd Quarter 2013 budget in line with our comments above.

Sincerely,

Maria T Travis
Director of Claims - GCRO


Cc:    Mark Holstein
       Dan Cantor
       James Roy
       Patrick Juneau
       David Odom



08 August 2013

Mr. Bob Levine
Deepwater Horizon Settlement Program
935 Gravier Street
New Orleans, LA 70130

Dear Bob,

I look forward to our meeting tomorrow morning and to providing you with BP's input on the Claims Administrator's development of a systematic and disciplined budgeting process. My August 5th letter highlighted some metrics that should be developed and tracked in connection with a well-run budgeting process. I suggest a framework below that encompasses these metrics and provides a budgeting structure methodology that can serve as the basis for all future CSSP budgets. This budget framework should not require any information that we have not already requested, although we hope to explore this information at a detailed level with you tomorrow.

I hope that this letter will help us all be well organized for our meeting so that we can get much accomplished tomorrow. Getting to an immediate agreement on the budget framework that I describe below will allow the Claims Administrator to focus on assembling the content that he needs to complete an effective budgeting process. I have also provided herein our previous information requests that have not been fulfilled and attempted to prioritize these requests

Budget Framework

There are five fundamental components that are necessary for preparing a reasonable bottoms-up budget, including: (i) projected work volume by claim type for each task and subtask; (ii) productivity rates by claim type across functional areas, per person and per vendor; (iii) the number of people required to meet the projected work volume, which requires a calculation that results from the first two requirements; (iv) the costs of each person; and (v) expenses such as out-of-pocket costs of the workforce and general operating expenses.

1. *Projected Work Volume*

**EXHIBIT B-5**

Projected work volume (i.e., productivity goals) by claim type should consider primary production requirements such as targeted claim determinations, payments on claims, and estimated call center activities while projecting the estimated number of new claims filed. These work volumes should be projected down to the task level for each step in the claims process.

### 2. Productivity Rates Per Person

Productivity rates per person should be measured by targeted throughput analysis by claim type for each step of the claims process in order to determine the hours required to complete each step.

### 3. Staffing Levels

Projected staffing levels by function and location are determined by the projected work volume and productivity rates per person that are developed in the first two steps above.

### 4. Labor Costs

Labor costs are developed by determining the appropriate level and hourly rate for each person necessary for each function multiplied by the number of people estimated in the Staffing Levels, as explained in the step above.

### 5. Expenses

Operating expenses are based on historical run rates with regular consideration of expenses that are no longer necessary (e.g. closing a facility that is no longer needed). Out-of-pocket expenses largely relate to vendor travel costs that should be a function of projected headcounts and initiatives to control unnecessary spending.

#### Information Requests

Attached as exhibits 1 and 2 are our May 1, 2013 and May 23, 2013 information requests, respectively. Each information request includes comments on under each point indicating whether or whether not the information has been provided. We suggest prioritizing the items highlighted in yellow.

As I mentioned I am looking forward to our meeting and progressing the budget process forward. .

Sincerely,

Maria Travis
Director of Claims – GCRO

cc:     Todd Brents
        Amy Boatman

Ramji Kaul
Keith Moskowitz

**Exhibit 1**

**May 1, 2013 Information Request**

**CSSP BUDGET MEETING**

**QUESTIONS/INFORMATION REQUEST FOR CSSP**

**June 5, 2013 Update**

**Performance Metrics/Budgeting**

*Documents*

- The last organization chart for the CSSP that was provided was dated October 15, 2012. Is there an updated organization chart, including headcounts for each area?NOT RECEIVED. Need to see a version with names of each staff.
- Can you provide an operations manual and a process flow map for the claims process along with supporting training materials?Can you correlate headcounts to the process flow map?NOT RECEIVED
- Provide copies of management reports and any analysis performed to evaluate claims processing performance vs. costs/staffing (e.g. claims received, calls received, notices issued, claims paid).RECEIVED BG 5/10/13 STATUS REPORT AND GCG 5/18/13 STATUS REPORT; REQUEST ALL PREVIOUSLY ISSUED STATUS REPORTS
- Please provide a schedule of the amounts that vendors pay to each contractor.NOT RECEIVED

*Questions*

- Provide a copy of, or present to us, your time in motion or velocity studies of the claims administration process. NOT RECEIVED
- Provide us with any analysis you have undertaken of the administrative costs incurred or budgeted on an average claim basis across status types.
    - Status types include:
        - Eligible
        - Incomplete
        - Denial
        - Withdrawal
        - Closed
    - Can this be broken down by vendor and task?

NOT RECEIVED

- Have you made projections regarding the trend in average administrative costs per claim type? If so, can we see those projections?NOT RECEIVED
- Have you made projections of the time and costs to resolve backlog:
    - Approx. 70,000 filed claims with no notices issuedRECEIVED – Exhibit C.
    - Approx. 30,000 incomplete notices issuedRECEIVED – Exhibit C.
    - Estimated number of new claimsRECEIVED – Exhibit C.
- What are key metrics to track each vendor? How are they being evaluated while the vendors' contracts and associated KPI's are yet to be completed?
    - BrownGreer
    - Garden City Group
    - PWC
    - P&N

    NOT RECEIVED. Per the cover letter, Exhibit C contains their response to this request, but it is not a full analysis. Exhibit D contains production goals for each claim type, but does not include cost or productivity information.
- What steps are taken to evaluate continual improvement of administrative processes, including efficiency improvements?Some descriptions provided by P&N. No improvements are quantified.

- At the April 25th meeting, the CA advised us that it was decided to not consolidate BEL processes. Please provide any study, analysis or other support for that decision.NOT RECEIVED
- Garden City costs have reduced over time, but BrownGreer is trending in the opposite direction? Have you evaluated the cause(s) of this disparate trending?NOT RECEIVED
- What are the underlying activities performed by BrownGreer in the CSSP process that were not performed in the GCCF process that gives rise to incremental CSSP costs for BrownGreer versus GCCF costs?NOT RECEIVED
- How much of the costs are spent on training staff? What is the turnover rate for project team members? What are the cost impacts of re-training from turnover? What performance measures are in place for project team members? What are results to date of actions taken based upon project team members' performance?NOT RECEIVED

### Internal Audit and Vendor Self-Review Process

*Documents*

- Can you provide copies of all reports issued from internal quality assurance (internal audit) results, as well as vendor self-reviews?
- Provide a copy of the quality assurance (internal audit) work plan.
- Provide copies of any vendor self-review QA plans.

RECEIVED – except for vendor self-review plans. Some information can be gleaned from P&N training materials, but need to clarify.

*Questions*

- What is the general process for performing quality review of claims for each claim type? Including both:
    - Internal quality assurance reviews
    - Claims vendors' reviews

RECEIVED

### Fraud Detection Program

*Documents*

- Provide copies of any reports or analysis of the results of the fraud detection program.
- Provide us with current fraud detection program data (i.e. number of claims flagged for potential fraud and amount of total associated claim demands, number of those claims denied for fraud and total associated claim demands, number referred to law enforcement and total associated claim demands etc.). RECEIVED

*Questions*

- What has been the final resolution of the claims summarized on Handout #3 of the January 16, 2013 Fraud Process Overview report?
- Have you analyzed the administrative cost impact of the presence of potential fraudulent claim in the system? What percentage of administrative costs per claim and per claim type is associated with fraud investigation?
- What are the results of the HUB investigations?
- Have you analyzed the attributes of identified fraudulent claims and searched remaining claims for signs of those attributes?
- Have you performed correlation analysis of claims to identify repetitive patterns re: amounts, class member, address/location and attorney/representative?

SOME ADDRESSED IN 5/22/13 MEMO and BG STATUS REPORT

**Exhibit 2**
**May 23, 2013 Information Request**

### Performance Study – BEL Claims/Accounting Costs
### June 5, 2013 UPDATE

#### Cost

Support for additional headcount requested: For each vendor to be the beneficiary of additional headcount, submit an analysis for the headcount to be added:
- Position / Title
- Rate
- Description of Tasks to be Performed
- Forecasted Daily / Monthly Hours
- Forecasted Daily / Monthly Billings
- Forecasted Daily / Monthly Expenses
- Forecasted Termination Date (e.g. – how long will they be on the project)

*Support received from P&N/PWC. PWC information silent on anticipated impact of additional accountants. Neither P&N nor PWC provide forecasted termination date to gauge the length of the new hires.*

#### Data

Cost to include in the analysis – based on daily activity:
- Total costs by accountant
- Headcount by Vendor by title
- Hours by Vendor by title

*Received and incorporated into analysis.*

Claims activity to include in the analysis – based on daily activity:
- Notices issued per day by accountant
- Determinations issued per day by accountant

*Received data from BG weekly report. Need to receive 27 additional reports. No information at the accountant level has been provided. Only available at the firm level.*

#### Specific Metrics to Evaluate BEL Claims Processing Performance

- Listing of project team members directly associated with resolving BEL claims for each vendor from October 2012 – current period. If time was split between other claim types, please submit breakout of hours into BEL and non-BEL.

    *Not received, but can make estimate based on monthly invoices.*

- Describe the organization of project team members, i.e. are they organized in teams focused on industry, claim size, complexity, etc. Provide a listing of project team members by these teams.

    *Training materials and org charts provided for P&N. Information not provided by PWC.*

- Business rules and Operations Manual associated with process and decision treatment of BEL claims / notices.

  *Training materials provided for P&N.  No Operations manual exists, but training materials provide insight into procedures.  Information not provided by PWC.*

- Average time from causation approval to claim determination from October 2012 – current period
  - Based on claim amount, stratified by claim range
  - Based on Zone of class member
  - Based on industry of class member

  *Not tracked in performance metrics.  Will need claims register with process dates to calculate.  Aging reports are included in performance metrics.[Are these are notes?  Do we want to share them with CSSP?]*

- Calculate statistics for the number of claims determined, so can they be evaluated as follows:
  - Determinations by week, to determine trend of the pace of claims processing
  - Determinations by week by accountant, to evaluate individual performance
  - Determinations by week for new accountants, to identify the pace by which new accountants become proficient
  - Determinations by week by accountant since the addition of 130 accountants in October 2012

  *Provided at the summary level.  No information provided at the accountant level.*

- Claims should be stratified by the length of time taken to reach claim determination.  For those claims above the average time, perform a root cause analysis to determine the cause for the additional time to resolve

  *Not tracked.  However, claim agings are utilized to track workflow.*

- Claims with Unresolved Incomplete Notices
  - Description for how incomplete BEL claims are handled throughout each stage of the process, including details on the length of time claims spend between the time of issuance of an incomplete notice and a response from the class member
    - Number of employees and levels involved in this process
    - Level of automation incorporated into this process
  - Average time from incomplete notice issued to resolution of incomplete status
  - Average age of claims in backlog from October 2012 – current period for claims with unresolved incomplete notices
  - Average number of notices issued per day per accountant from October 2012 – current period

  *Received at the summary level.  Not tracked at the accountant level.*

- Resolvable Claims (non-incomplete claims)
  - Average age of claims in backlog from October 2012 – current period for claims with no incomplete notices (e.g. – all information has been obtained and claim is able to resolved).
    *Current aging received.*
  - Targets for determinations issued per day per accountant for claims with complete information

    *Received*

- Integration plan for the proposed 100 additional accountants
  - Timing of hiring
  - Length of training period

- o Estimated impact on notices and determinations issued per day per accountant

  *Integration plan provided by P&N.  Information not provided by PWC.*

- Forecasted future effort to resolve claims
  - o Current backlog - *RECEIVED*
  - o Expected new BEL claims - *RECEIVED*
  - o Current claims determined per day per accountant - *RECEIVED*
  - o Calculate time and cost to process remaining claims  *NOT RECEIVED*

- Description of efficiency initiatives undertaken in the last six months with regard to BEL claims processing.  For example,
  - o Level of clerical work needed to accumulate and organize class member data versus that tasked to accountants
  - o Enhancements in the automation of the claims process

  *Received at summary level.  No statistics around initiatives provided.*

- Impact on the fraud program from the increase in BEL claims filed over the last few months

  *Not received.*

# MEETING NOTES



| | | |
|---|---|---|
| **MEETING FOCUS:** | ADMINISTRATIVE BUDGET MEETING | |
| **MEETING DATE:** | AUGUST 9, 2013  9:30 AM CST | |

**ATTENDEES:**

| Name | Company | DHECC |
|---|---|---|
| Maria Travis | BP | David Odom |
| Todd Brents | Alix Partners | Kirk Fisher |
| Amy Boatman | KPMG | Bob Levine |
| Ramji Kaul | SNR Denton | |
| Steve Herman | Herman, Herman, & Katz | |
| John Creevy | Herman, Herman, & Katz | |
| Tommy Thomassie | Wright, Roy, & Edwards | |

**BP Presentation on Planned Budgeting Process**

- BP established a five part framework upon which its review of the Administrative Budget will be evaluated.
  - Determine Projected Work Volume by Claim Volume
    - This should include projections of new claims filed and should be projected down to the task level for each step in the claims process.
  - Productivity Rates for Each Task
    - These should be determined on a per FTE level to determine the hours required to complete each step in the claims process.
    - This should be calculated by the hours required to perform each task.
  - Staffing Levels
    - Projected staffing levels by function and location are determined using the two aforementioned parts of the framework.
  - Labor Costs
    - Developed by determining appropriate staffing levels and hourly rate for each necessary person for each function.  This figure is multiplied by the estimated number of individuals necessary from the previous step.
  - Expenses
    - Based on historical run rates with regular consideration of expenses that are no longer necessary.
      - (1)  Out of pocket expenses should be largely related to projected headcounts.
- Budget calculations should be made in an integrated model.
  - Connect the projected volumes to the cost and expense calculations.
- Actual results should be tracked against the budgeted volumes and hours with a variance analysis.

**EXHIBIT B-6**

# MEETING NOTES *(CONTINUED)*



**Previous Requests for Information (RFIs) by BP**

- This section serves to establish the following: 1) the specific information previously requested by BP and 2) that the Claims Administrator's Office (CAO) has responded by providing to BP as requested all information currently tracked and maintained by the CAO.

  - The CAO has provided to BP all data that has been provided to it by the Vendors. Additionally, some information has not been provided to BP because it is not tracked at the certain micro-granular levels requested by BP. However, all information that is currently tracked by the CAO and was available to the CAO that has been requested by BP was subsequently provided to BP.

    - As to the information that needs to be requested from the Vendors and the information that needs to be tracked at a very granular level, BP and the CAO agreed on August 9 that it will take a reasonable amount of time for the CAO to acquire this information from the Vendors and develop this level of tracking before the CAO is able to provide it to BP.

    - Additionally, it was agreed to by BP and the CAO on August 9 that, given the time constraints of the budget development process, certain non-budgetary information requests will be given a lower priority than those information requests related to the budget development process. These instances are noted in the minutes.

  - A matrix of this information is attached in Exhibits A and B.

- May 1 Questions/RFIs for the CAO (Exhibit A)

  - Performance Metrics/Budgeting

    - Updated Organization Chart, including headcounts for each area

      (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP on a high-level overview perspective.

        (a) It was acknowledged by BP and the CAO on August 9 that it is extremely onerous to provide this information on an "employee name" basis for the entire Program given the mere number of employees currently working for the Vendors.

      (2) In an effort to provide BP with employee information that can be correlated with the invoices, the CAO will provide more detailed organizational charts at the head count level for each Vendor employment position rather than at the individual employee name level.

    - Operations Manual and Process Flow Map for the claims process; correlate headcounts to the process flow map

      (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

        (a) However, it was acknowledged by BP and the CAO on August 9 that the CAO did not receive information correlating head count to the process flow map from the Vendors. Therefore, the CAO was unable to provide this information.

    - Management Reports and analysis performed to evaluate claims processing vs. costs/staffing

      (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP; however, the information provided correlated to volume.

        (a) It was acknowledged by BP and the CAO on August 9 that the CAO did not receive information evaluating claims on a cost/staffing basis from the Vendors. Therefore, the CAO was unable to provide this information.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



‣ Schedule of amounts that vendors pay to each contractor

   (1) It was acknowledged by BP and the CAO on August 9 the CAO does not have this information.

      (a) Based on discussions at the June 18 meetings, the CAO does not currently have authority to request this information from the Vendors as per the Vendor contracts.

      (b) The Vendors have provided which contractors are performing work on the Program and the rates that the Vendor is billing the Program for that labor.  However, as per Vendor Contracts, the Vendors are not obligated to provide the rates that they charge the contractors for this performed labor.

‣ Time in motion or velocity studies of the claims administration process

   (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP on a macro level within the Utilization Modeling.

      (a) This topic is covered in greater detail with the discussion of the Utilization Modeling and the raw data that is incorporated into producing those reports.

      (b) In July 2012, when the CAO began creating these models, several assumptions were initially made.  These assumptions were gradually removed as the model matured and data became available.

‣ Analysis of administrative costs incurred or budgeted on an average claim basis across status types (eligible, incomplete, denial, withdrawn, closed) - if possible broken down by vendor by task

   (1) It was acknowledged by BP and the CAO on August 9 this is currently not tracked by the CAO.

      (a) The CAO currently measures the total system cost per damage category based on all notice types that are issued, but this is not tracked at the task sublevel.  This, along with information from the Utilization Modeling, can be married to the costs with accompanying reasonable assumptions to create the budget.

‣ Projections for the average administrative costs per claim type

   (1) It was acknowledged by BP and the CAO on August 9 that this data has been provided to BP.

‣ Projections of the time and costs to resolve the claims with no notice backlog, approx. 70,000 claims with no notices issued

   (1) It was acknowledged by BP and the CAO on August 9 that this data has been provided to BP.

‣ Projections of the time and costs to resolve the incomplete claims backlog, approx. 30,000 claims with incomplete notices

   (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

‣ Projections of the time and costs to process claims based upon the estimated number of new claims

   (1) It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

‣ Key metrics to track each vendor. How are vendors being evaluated when contracts are not complete?

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



(1)  It was acknowledged by BP and the CAO on August 9 that the CAO does not have this information.

(2)  The key metrics to track Vendors are Key Performance Indicators (KPIs), which can be implemented as per the Task Orders of the Vendor contracts.

    (a)  When the claims processing began, the CAO wanted flexibility in establishing the expectations of the Vendors.

        (i)  The CAO decided that KPIs should not be established as the Program was still evolving.

    (b)  The CAO envisions that as the Program reaches a steady state, KPIs will be a valuable tool used to track and evaluate Vendors.

    (c)  The Task Orders, however, do currently establish FTE Allocation.

(3)  The next Task Order will be agreed upon in October 2013.

‣  Description of the steps taken to evaluate continual administrative process improvements, including efficiency improvements

(1)  This RFI relates to system optimization and process optimization efforts.

(2)  It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.

    (a)  An example of this would be the IEL Process Improvement provided to BP in Exhibit E of the May 22 Letter to BP.

(3)  BP and the CAO acknowledged on August 9 that, because of the complexity of the Program, the continual administrative process improvements can only reasonably be performed on a macro level.

    (a)  Given the complexity of the Program, it is virtually impossible to isolate and measure specific variables to determine the effect one process change has on the whole Program.

    (b)  To date, the CAO has focused on tracking global throughput rather than the system optimization effect of individual process changes.

        (i)  Rather than measuring the system processes on a micro level, the CAO uses Daily Notice Reports per Claim Type to measure daily productivity against previously set benchmark goals.

(4)  BP and the CAO acknowledged on August 9 that times could exist when it is possible to measure the effect a single change had on the whole Program; however, these occurrences would be rare.

    (a)  One August 9, BP suggested including key highlights that illustrate instances in which system optimization efforts have a quantifiable effect in the periodic reports the CAO distributes to BP.

        (i)  However, the difficulty in quantifying this data was acknowledged by both BP and the CAO.

‣  Support for the decision to not consolidate BEL processes

(1)  This topic was acknowledged by BP and at CAO on August 9 as having been discussed and resolved by BP, the CAO, and the Vendors at the Vendor meetings in June.

‣  Cause(s) for the disparate trending of GCG administrative cost reduction and BrownGreer's administrative cost increase since the Program inception

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)



      (1) It was acknowledged by BP and the CAO on August 9 that this issue had been resolved for the most part in June at the Vendor meetings and that anything currently unresolved will be resolved by the budgeting process itself.

- Document the underlying activities BrownGreer performs in the CSSP process vs. the GCCF process that gives rise to incremental CSSP costs for BrownGreer versus GCCF costs

  (1) It was acknowledged by BP and the CAO on August 9 that the CAO cannot comment as to the underlying activities performed by BrownGreer for the GCCF.

- Cost spent on training staff

  (1) It was acknowledged by BP and the CAO on August 9 that the CAO is not currently requiring this information from Vendors and therefore has not tracked this information to date as the CAO has focused more on trending.

      (a) Additionally, it is not likely that the CAO will be able to acquire this information from the Vendors on short notice.

      (b) BP requested on August 9, at a minimum, information concerning the out of pocket costs each Vendor incurs in hiring and training new employees.

         (i) The CAO acknowledged this request and will begin the process of acquiring the data from the Vendors.

- Turnover rate for project team members

  (1) This point is similar to the previous concerning "Cost spent on training staff."

      (a) It was acknowledged by BP and the CAO on August 9 that the CAO does not currently track this information because it does not currently require this information from the Vendors.

         (i) However, BrownGreer's turnover statistics were uploaded to the CAO SharePoint site on June 14, 2013.

         (ii) Additionally, as requested by BP, the CAO will contact the other Vendors to acquire this information and provide it to BP as soon as is practicable.

      (b) It was agreed between BP and the CAO on August 9 that information related to turnover is mainly of a processing concern rather than a budgetary concern. Therefore, it was agreed that the acquisition and delivery of this information will be treated with a lower priority than information related strictly to the development of the budget.

- Costs of re-training due to turnover

  (1) This point is similar to the previous two points.

      (a) It was acknowledged by BP and the CAO on August 9 that the CAO does not currently track this information because it does not currently require this information from the Vendors.

      (b) It was agreed between BP and the CAO on August 9 that information related to turnover is mainly of a processing concern rather than a budgetary concern. Therefore, it was agreed that the acquisition and delivery of this information will be treated with a lower priority than information related strictly to the development of the budget.

- Performance measures for project team members

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)



       (1)  It was acknowledged by BP and the CAO on August 9 that this has been provided to BP in a satisfactory manner.

- Results of actions taken based on project team members' performance metrics
  - (1)  It was acknowledged by BP and the CAO on August 9 that the CAO does not currently track this information because it does not currently require this information from the Vendors.

□ Internal Audit and Vendor Self-Review Process

- Copies of all reports issued from internal quality assurance and vendor self-reviews
  - (1)  It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.
- Copy of the quality assurance work plan
  - (1)  It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.
- Copies of vendor self-review plans
  - (1)  It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.
- Documented process for performing quality review of claims for each claim type
  - (1)  It was acknowledged by BP and the CAO on August 9 that this has been provided to BP.
- In relation to the previous four topics, BP requested at the August 9 meeting a copy of the second quarter internal audit report.
  - (1)  The CAO will provide this report to BP.

□ Fraud Detection Program

- Copies of any reports of the results of the fraud detection program
  - (1)  It was acknowledged by BP and the CAO on August 9 that all reports of results of fraud detection have been provided to BP.
- Current fraud detection program data
  - (1)  It was acknowledged by BP and the CAO on August 9 that the CAO provided all fraud data maintained by the CAO to BP.  This data identified the number of claims identified as fraudulent.
    - (a)  The CAO does not track fraud detection from a volume throughput perspective.
      - (i)  The CAO's tracking of fraud is less about efficiency and more about fraud detection itself.
  - (2)  BP requested on August 9 more detail on the number of claims being reviewed by the Special Investigations Team.
    - (a)  BP and the CAO agreed that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget.
- Update on the final resolution of the claims summarized on Handout #3 of the January 16, 2013 Fraud Process Overview report
  - (1)  It was acknowledged by BP and the CAO on August 9 that this has been provided to BP on June 14 by BrownGreer.

# Meeting Notes *(Continued)*



- ‣ Analysis of the administrative cost impact of the presence of potential fraudulent claims in the system; percentage of administrative costs per claim and per claim type associated with fraud investigations

  (1) It was acknowledged by BP and the CAO on August 9 that the CAO does not track the impact of potential fraudulent claims by administrative cost in this manner.

  (2) It was acknowledged by BP and the CAO one August 9 that information contained in the Status Reports provided by BrownGreer have partially satisfied this request.

    (a) BP requested on August 9 more detail on the number of claims being reviewed by the Special Investigations Team and, if permissible, the identity of the claims by Claim ID.

    (b) The CAO is unsure at the moment whether the Settlement Agreement permits the disclosure of the identity of the claims that are under fraud review and will further research the topic.

- ‣ Results of the HUB investigations

  (1) It was acknowledged by BP and the CAO on August 9 that it is unclear at the moment whether the Settlement Agreement permits the CAO to provide claimant specific information to BP.

- ‣ Analysis of fraudulent claim attributes and search of remaining claims for signs of those attributes

  (1) It was acknowledged by BP and the CAO on August 9 that this is currently not tracked by the CAO.

- ‣ Correlation analysis of claims to identify repetitive patterns (i.e. amounts, class member, address/location, and attorney/representation)

  (1) It was acknowledged by BP and the CAO on August 9 that this is currently not tracked by the CAO.

- ▪ August 5, 2013, Letter from Maria Travis

  - ▫ Targeted claim determinations and payments by claim type and by person

    - ‣ It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP as encompassed within the Utilization Modeling and would be explored further in the discussion of that modeling.

      (1) It was acknowledged by BP and the CAO on August 9 that the Utilization Modeling included targeted claim determinations by claim type and by person but did not include targeted payments by claim type and by person.

  - ▫ Call center activity and targeted metrics

    - ‣ It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP.

    - ‣ Given the familiarity the CAO has developed with this metric, it is likely the Erlang-C modeling will not be necessary in incorporating call center activity into the budget.

  - ▫ Targeted throughput analysis for each stage in the claim process

    - ‣ It was acknowledged by BP and the CAO on August 9 that this has been provided to BP as encompassed within the Utilization Modeling and would be explored further in the discussion of that modeling.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)



- Estimated progress of incomplete claim analysis, broken down by type of incompleteness, aging of claim, and action items to be undertaken to resolve
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP as encompassed within the Utilization Modeling and Incompleteness Outreach Reports and would be explored further in the discussion of the Utilization Modeling.
  - BP has identified this as a "choke point."
- Levels of quality assurance in relation to reasonableness thresholds
  - Prior to this August 9 meeting, the meaning of this Request for Information was unclear to the CAO.  However, BP clarified its RFI on August 9 when it posed questions as to why varying claim types receive varying amounts of quality assurance.
    - (1) It was acknowledged by BP and the CAO on August 9 that the CAO has provided copies of its quarterly internal audit reports and data in relation to QA reviews.
  - It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.
- Projected fraud detection activity and bases for levels of efforts
  - As mentioned previously in relation to fraud detection, it was acknowledged by BP and the CAO on August 9 that the CAO has provided to BP all of the fraud data reports maintained by the CAO.
  - However, it was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget development date.
- FTE count by month, location, function, designation for employee vs. contractor, and claim type
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP as encompassed within the Utilization Modeling and would be explored further in the discussion of that modeling.
    - (1) It was acknowledged by BP and the CAO on August 9 that information related to designation of employee vs. contractor, claim type, and location of FTE for all Vendors is not currently available to the CAO.
- Fees and expenses broken down by month, Vendor, level, location, and expense type
  - It was acknowledged by BP and the CAO on August 9 that this information has been partially provided to BP within the monthly invoices.
    - (1) It was acknowledged by BP and the CAO that the CAO had not previously required this level of detail in the invoices of the Vendors.
    - (2) BP requests to see this level of detail within the budget.
- Turnover analysis: count of additions and subtractions of employees and contractors
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP, which consisted of turnover statistics as related to BrownGreer.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# Meeting Notes (Continued)



      (1) The CAO will contact the Vendors who have not provided this information to request this information, and the CAO will provide it to BP.

        (a)  It was noted that Postlethwaite & Netterville's turnover rate is around 4% annually.

      (2) However, it was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

        (a)  Additionally, BP proposed on August 9 including this in the previously mentioned periodic reporting that the CAO will provide to BP.  Additionally, both BP and the CAO agreed that maintaining an open dialog about the issue of turnover rate would be beneficial to the productivity and efficiency of the Program.

- Turnover analysis: training requirements and costs given projected turnover
  - This point was encompassed in the discussion of the previous point.
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP.
    - (1) The CAO will contact the Vendors who have not provided this information to request this information, and the CAO will provide it to BP.
  - It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

- Turnover analysis: projected staffing level and hourly rate changes with justification/explanatory notes for any changes
  - It was acknowledged by BP and the CAO on August 9 that all information available to the CAO has been provided to BP.
    - (1) The CAO will contact the Vendors who have not provided this information to request this information, and the CAO will provide it to BP.
    - (2) No Vendor currently tracks or reports its projected staffing and hourly rate changes with explanatory notes.
  - It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

- Measure productivity in relation to costs using KPIs
  - Given that no KPIs exist within the current Task Orders, it was acknowledged by BP and the CAO on August 9 that this issue was not related to the immediate revision of this budget. However, BP and the CAO agreed to explore the use of KPIs to increase efficiency and productivity in the future.

- Data dictionary
  - It was acknowledged by BP and the CAO on August 9 that all information currently being tracked by the CAO has been provided to BP.
    - (1) However, BP requested on August 9 a data dictionary including every data field for the entire database currently maintained by the CAO in an effort to further determine any additional metrics that may be helpful.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)



    (a) The CAO acknowledged this request and agreed to provide this information as soon as practicable.

    (2) It was acknowledged by BP and the CAO on August 9 that this was a process issue rather than a budgetary issue; therefore, it was agreed that discussion of this topic would be reserved for a later, post-budget date.

**Budget Process and the Utilization Modeling**

- The CAO will have a revised budget prepared within the time parameters set forth by the Court.
  - □ However, given the short time frame and the startup phase of this budgeting process, both BP and the CAO agreed that it is expected that certain reasonable assumptions will need to be established in order to provide the revised budget within the Court-established timeframe.
  - □ These assumptions will be modified over time in order to fine tune the projected budget to the level of granularity desired.
    - ‣ Assumptions such as these have been made in the CAO Utilization Modeling and were fine-tuned as the Program matured and grew towards steady state.
- The Utilization Modeling will be the main tool used to revise the CAO's budget.
  - □ The Utilization Model is updated on a monthly basis to provide a more or less real time forecasting tool.
    - ‣ This model was developed as a tool that the CAO uses to measure the efficiency and Claim throughout of the entire system.  It can now be modified and used to generate a budget.
  - □ This Model was initially developed in July 2012, as Claims began to be processed to determination notices, in an effort to measure the time spent in each of the various phases of the processing of a Claim.
    - ‣ The CAO has provided to BP a summation of all of this information in the Meter Charts.
      - (1) This provides monthly, backward-looking information on system capacity for a given month and actual final determinations as compared to that system capacity.
    - ‣ Initially, several assumptions were made with Vendor cooperation in building this model; however, over time, these assumptions have been replaced with data to increase the predictive accuracy of the Model.
    - ‣ Because this Model uses data collected from the BrownGreer system, it does not currently incorporate the offline aspects of review performed by P&N and PwC.
  - □ This Model does not granularly track time at the reviewer-specific level because of the complexity of the system, given that a reviewer may touch several different Claims in a single day because of incompleteness notices, pending policy, etc.
    - ‣ Not every hour of a FTE's workday is captured by the BrownGreer system because a small portion of that time is lost in offline, claim review related activities.
      - (1) This time is captured in a task utilization rate that measures off-task time that is inherent in the Claims processing system.
      - (2) The Utilization Modeling measures purely on-task touch time; however, it also backs into the information concerning the off-task time inherent in the system.
  - □ The Process Duration information on the Utilization Model will be used to revise the budget.
    - ‣ However, because this information was initially developed with a focus on projecting and measuring system efficiency, it will need to be adapted to be used to produce a budget.
      - (1) The challenge will be breaking down the information of the individual tasks.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)



- ▫ BP and the CAO agreed on August 9 that this would be the main tool that would be used in revising the budget.
  - ‣ BP requested on August 9 the raw data that the CAO had used to create the Utilization Models previously provided to BP.  This was a one-time educational request for this information that would only be used to better understand the raw data of the Utilization Model for the purposes of revising the budget.
    - (1) The CAO was unsure whether the Settlement Agreement provided the CAO with the right to provide this information to BP.
  - ‣ After brief discussion with the Plaintiffs' Steering Committee, it was determined that the CAO would provide to BP the raw data used in creating the Utilization Models as a one-time provision for educational purposes relating to the revision of the budget.
    - (1) The PSC noted that it had objected to the distribution of the material in the past; however, it did not object to this one time provision solely for educational purposes relating to the revision of the budget.
    - (2) All raw data contained within the Model is data to which BP has already been granted access.  The Model itself, however, is a work product developed by the CAO and is constantly modified and updated to better predict the processing of Claims.

**Communications over the Next Week**

- ▪ It is preferred by BP and the CAO that the communication process be open and informal so as to keep the revision of the budget as transparent and collaborative as possible.
  - ▫ This will allow BP to better understand the process of the CAO in revising the budget.
- ▪ The tentative plan calls for a face-to-face meeting in New Orleans at the Claims Administrator's Office on Wednesday, August 14, 2013, at 10:00 AM.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)

**ACTION ITEMS:**

| TASK | RESPONSIBLE PARTY | COMPLETION DATE |
|---|---|---|
| The CAO will provide BP with more detailed organizational charts on the head count level. | CAO | As soon as possible.  This information has not been previously required from the Vendors.  Therefore, it will take a reasonable amount of time for the CAO to acquire this information. |
| The CAO will provide BP with information on out-of-pocket training costs of new employees for each Vendor. | CAO | As soon as possible.  This information has not been previously required from the Vendors.  Therefore, it will take a reasonable amount of time for the CAO to acquire this information. |
| The CAO will provide BP with a copy of the second quarter internal audit report. | CAO | As soon as possible. |
| The CAO will provide BP with more detailed information on the number of claims being reviewed for fraud detection. | CAO | BP and the CAO agreed on August 9 that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget. |
| The CAO will make a one-time provision to BP of the raw data drivers of the Utilization Model for the purpose of better understanding the mechanisms that the CAO will use to revise the budget. | CAO | As Soon As Possible.  As per objection by the PSC, BP and the CAO agreed on August 9 that this will be a one-time provision for the sole purpose of educating BP on the methods that will be used to revise the budget. |
| BP requested information concerning the turnover rates of the various Vendors. | CAO | BP and the CAO agreed that on August 9 that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget. |

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



| | | |
|---|---|---|
| BP requested a data dictionary of all data fields currently captured in the CAO system. | CAO | BP and the CAO agreed on August 9 that because this documentation request is unrelated to the budget, this request will have a lower priority than the requests related to the Administrative Budget. |

*Please distribute internally as appropriate.*

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Patrick A. Juneau**
*Claims Administrator*

August 12, 2013

Maria Travis
BP America Inc., Director of Claims
Gulf Coast Restoration Organization
501 Westlake Park Blvd.
Houston, TX 77079

Dear Maria,

The Claims Administrator's Office (CAO) would first like to thank your team for meeting with

us here at our office on August 9, 2013, regarding your request for the revision of the Court

Supervised Settlement Program's (CSSP) administrative budget model including the underlying

datasets and algorithms used to prepare the budget model.   The meeting minutes are included

herein as Exhibit "A."  The meeting was a good first step in what we believe will be a

transparent, cooperative, and mutually beneficial process.  We look forward to collaborating with

your team in the coming weeks to revise the budget model.

The purpose of this letter following the August 9th meeting is to ensure the following: 1) BP and

the CAO (the "Parties") are in agreement on the scope of the CAO's budget model revisions; 2)

the CAO has previously submitted to BP all information requested by BP that the CAO was

permitted to deliver and capable of delivering; and 3) the CAO plans to deliver all information

requested by BP, that BP is entitled to according to the Settlement Agreement, that has not yet

been provided because it is currently unavailable to the CAO.

**EXHIBIT B-7**



**Patrick A. Juneau**
*Claims Administrator*

**Scope of the CAO's Budget Model Revision**

The scope of the CAO's budget model revision as requested by BP will consist of the development of an integrated model with the following components:

1) ***Projected Work Volume by Claim Type*** to include projections of new claims filed and broken down by task level for each step in the claims process;

2) ***Productivity Rates for Each Task*** on a per FTE level to determine hours required to complete each step in the claims process by claim type and function;

3) ***Staffing Level Projections*** allocated by function and location;

4) ***Labor Costs*** by determining appropriate staffing levels and the hourly rate for each necessary person for each function applied to the staffing level projections;

5) ***Expenses*** based on historical rates with consideration of expenses that have not been previously incurred and/or expenses that will decrease.

In order to accomplish this scope, the CAO will primarily use the data encompassed in its Utilization Modeling, Invoices, Pipeline Reports, Meter Charts, and other data that it tracks.

As discussed in the August 9th meeting, the CAO does not currently possess all of the data that will make up the budget model. Data not currently possessed by the CAO includes the following:

- Cost by Claim Type, Task, Personnel, and Location for all Vendors. Some Vendors are only providing hours by personnel rather than by task when that person works on more

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Patrick A. Juneau**
*Claims Administrator*

than one task, such as a CAC employee who is also working as a reviewer. We are
making this request of the various Vendors and will incorporate that data as received;

- Vendor out-of-pocket costs that are incurred in the hiring and training of new employees;

- Vendor retraining costs and requirements due to turnover;

- Detailed organizational charts at the head count level for each Vendor employment
  position.

As such, in the initial model and budget, the CAO will not have this data for the revision of the
budget model. Therefore, the CAO and BP acknowledge that the CAO will, after consultation
with Vendors, make temporary reasonable assumptions within the budget model. As the budget
model matures and reliable data becomes available, these assumptions will be replaced with the
actual data.

**Previous Submittal of Information by the CAO to BP**

As discussed in the August 9th meeting, the CAO has provided to BP, pursuant to its previous
Request for Information (RFI) and other similar requests, all requested information that the CAO
maintains and tracks. At the August 9th meeting between the Parties, all prior requests submitted
by BP to the CAO were reviewed point by point to ensure that the CAO had responded to each
individual information request with available data. The Parties acknowledge that in all cases
where the CAO is in possession of the requested data, the CAO has provided this data to BP.
Some of the information that has not been provided by the CAO is information that is not
currently maintained by the CAO and is being developed or requested of the Vendors.

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Patrick A. Juneau**
*Claims Administrator*

Additionally, some information has not been provided because the Settlement Agreement or Vendor Contracts prohibit the CAO from making available that information.   Please see Exhibit "B" for a listing of the data requests made in your August 5ᵗʰ letter, including whether these requests relate to the budget scope or to other claims processes.  Exhibit "C" lists the data requests in the May 1, 2013, Request for Information.

**Planned Submittal of Information that has not been Provided by the CAO**

Pursuant to the August 9ᵗʰ meeting, BP has subsequently requested additional, more detailed information that the CAO has not previously maintained and has not been able to provide.  BP further requested some information that the CAO has not previously required the Vendors to provide.  The following list serves to confirm those additional requested items that will assist BP and the CAO in revising the administrative budget model:

1) More detailed organization charts, with head counts at the Vendor and task-specific levels, including the location, position, and function of Vendor employees;

2) Out-of-pocket training costs and expenses associated with training new employees for each Vendor;

3) The raw data drivers of the Utilization Modeling to be used in understanding the mechanisms that the CAO will use in revising the administrative budget model;

4) Labor Cost by Vendor by Function by Location.

The CAO notes that, in relation to the raw data used to develop the Utilization Modeling and Meter Charts, prior to the August 9ᵗʰ meeting, the Plaintiffs' Steering Committee has objected to

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Patrick A. Juneau**
*Claims Administrator*

the distribution of such information by the CAO. However, in the interest of transparency and solely to assist BP in understanding the quantitative metrics the CAO will use in revising its budget model, the PSC has lifted its objection and will allow the CAO to provide this information to BP on a one time, educational basis.

The CAO also notes that, as per the August 9th meeting, additional process-related information was requested by BP, including information about Vendor turnover rates, information about fraud investigation claim volume, and a complete data dictionary. It was mutually agreed by the Parties that, given the current time constraints set forth by the Court Order associated with revising the administrative budget model, the delivery by the CAO to BP of these process-related items will for now receive a lower priority than that information relevant to revising the administrative budget model (see Exhibits "B" and "C").

The CAO looks forward to continuing to work together with BP to revise our administrative budget model as put forth by BP. The Parties expressed a desire to maintain open lines of communication in pursuing our mutual goals to foster a transparent and cooperative environment. With this in mind, the CAO invites BP to contact us with any questions BP has with the budgeting process over the coming weeks. As per the August 9th meeting, the Parties have tentatively agreed to meet again at the CSSP office in New Orleans on Wednesday, August 14, at 10:00 AM. An agenda of topics to be discussed at this meeting will be distributed to the



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Patrick A. Juneau**
*Claims Administrator*

Parties on Tuesday.  In advance of that meeting, please respond to this letter as to whether all

representations made herein are accurate and based on BP's similar understanding.

Sincerely,

Kirk Fisher

**From:** "Travis, Maria T" <Maria.Travis@bp.com>
**Date:** August 14, 2013, 9:35:17 CDT
**To:** Kirk Fisher <kfisher@dheclaims.com>
**Cc:** David Odom <dodom@dheclaims.com>, <keith.moskowitz@dentons.com>, <ramji.kaul@dentons.com>
**Subject: RE: Letter from the CAO on Revising the Administrative Budget Model with Attached Meeting Minutes**

Kirk,

Thank you for meeting with our team regarding BP's input on the Claims Administrator's development of a systematic and disciplined budgeting process. With respect to your August 12 letter, we respectfully disagree with some of the characterizations in your letter, including your characterization of BP's requests for information and the CAO's responses to date. We also respectfully disagree that the proposed Minutes, attached to your letter as Exhibit A, accurately reflect the substance of certain parts of our discussions. We are preparing a more detailed response to your letter and the meeting minutes. We look forward to meeting with you again today.

Regards,

*Maria*

Eldridge 3 6 145C
Tel. 281-366-5928
Cell. 281-935-4271

**From:** Kirk Fisher [mailto:kfisher@dheclaims.com]
**Sent:** Monday, August 12, 2013 8:49 PM
**To:** Travis, Maria T
**Cc:** David Odom
**Subject:** Letter from the CAO on Revising the Administrative Budget Model with Attached Meeting Minutes

Good evening, Maria,

Attached, as discussed in our meeting Friday, August 9th, is our letter to you confirming 1) the task set before the Claims Administrator's Office in revising its administrative budget model, 2) the acknowledgement of the Parties that responses by the CAO to BP's previous Requests for Information have been performed by the CAO to the best of the CAO's ability and in a manner adequate to BP, and

1

**EXHIBIT B-8**

3) the additional deliverables that BP requests for the purposes of the budget model revision process. We are excited to continue this revision process in a cooperative and transparent manner. We look forward to working with your team again in New Orleans at the Claims Administrator's Office this Wednesday morning, August 14, at 10:00 AM. Please advise of any additional accommodations that you will require.

Sincerely,

Kirk Fisher

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.