# MEETING NOTES



| MEETING FOCUS: | CSSP ADMINISTRATIVE BUDGET MEETING |
| MEETING DATE: | AUGUST 14, 2013  10:00 AM CST |

ATTENDEES:

| Name | Company | DHECC |
|------|---------|-------|
| Maria Travis | BP | David Odom |
| Todd Brents | Alix Partners | Kirk Fisher |
| Amy Boatman | KPMG | Bob Levine |
| Gary Jackson | BP | Philip Ollendike |
| Keith Moskowitz | SNR Denton | |
| Ramji Kaul | SNR Denton | |
| Tommy Thomassie | Domengeaux, Wright, Roy, & Edwards | |

**Utilization Model Changes**

- The Claims Administrator's Office (CAO) is attempting to break out certain functions to a granular level in order to achieve greater detail in the budget model.

- Model Changes in Progress
  - Revaluation of claim processing times to incorporate accurate weighted average review times for the following additional determination notices:
    - Eligible;
    - Incompleteness Denial;
    - Opt Out/Duplicate/Withdrawn;
    - Denied/Suspended/Closed/Closure.
  - Incorporation of analyzed trends to project the following costs:
    - Vendor expenses;
    - Appeals panelist fees;
    - Wetlands title firm fees;
    - Subsistence specific vendor costs.
  - The largest expense of the Program is the labor expense associated with claim reviewers.
    - Our current state model looks at the system from a wide overview.
      - (1) Expenses are currently a static function within the model because the CAO does not presently have access to all data necessary to project these costs.
      - (2) Management functions are being distributed on a pro rata basis because the vendors do not at the moment prepare invoices with highly detailed information regarding the specific task being worked on.

**EXHIBIT B-9**

# MEETING NOTES (CONTINUED)



**Vendor Requests for Information**

- Given the time constraints on the budget model revision process set forth by the Court, BP and the CAO have agreed to focus efforts on current RFIs related to the budget.  Non-budget related information will merely receive a lower priority until the revision of the budget model is complete.

- Budget Related RFIs
  - Detailed Organizational Charts
    - These will be provided broken down by function, task, and claim type for each of the Vendors.  These charts will be coded by job performed so that they will tie to the invoices.
  - Out of Pocket Costs for Hiring and Training
    - The format of this report has not yet been determined.
    - This information will be a data driver in the future but will not be incorporated into the fourth quarter budget submitted on Friday, August 16, 2013, because Vendors will not be able to provide this information immediately.
  - Retraining Costs Due to Turnover
    - Similarly to the last point, the CAO is unable to attain this information from the Vendors immediately.  For this reason, retraining costs due to turnover will not be incorporated into the Fourth Quarter Budget submitted on Friday, August 16.  However, going forward, the CAO will be able to attain this information from the Vendors and incorporate it in the budget forecast model.
  - Modified Vendor Invoices
    - Similar to the Detailed Organizational Charts, these will be broken down by Vendor, location, and task.
    - Some concern was expressed about the Claimant Assistance Centers (CACs), specifically the cross training of reviewers.
      - (1) Once the employee time card system and invoicing are adapted to include this level of detail, the increased level of detail on CAC task hours will be incorporated into the budget forecast model.
      - (2) It is not anticipated that this level of detail will be achieved for the fourth quarter budget.  The CAO will, however, be able to put the CAC employees in buckets for the purposes of creating the August budget.

- Process Related RFIs
  - It was again reiterated that these are indeed priority items for the CAO.  However, given the time constraints surrounding the budget forecast model revisions, these will be given a lower priority than budget-related RFIs until the budget model revisions are complete.
  - Turnover Rates for DWH
    - As previously mentioned, the CAO is unable to attain information related to Turnover from the Vendors immediately.  Further, since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.
  - Volume of Claims Reviewed by SIT

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

## MEETING NOTES (CONTINUED)



- ‣ This was recognized as an open-ended item.  Since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.
  - ▫ Detailed QA Thresholds
    - ‣ This was recognized as an open-ended item.  Since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.
  - ▫ Projected Staffing and Rate Changes
    - ‣ This is generally considered static because the rates charged by the Vendors are established in the Vendor contracts.
  - ▫ Data Dictionary
    - ‣ This request is being escalated through the Claims Administrator's Office.
    - ‣ It will initially only consist of a list of the data fields that the CAO tracks.  It will not initially include the actual data corresponding to those data fields.
    - ‣ According to BrownGreer, producing this data dictionary will take approximately three weeks.  Since this information is not directly budget-related, BP and the CAO agreed that it should be temporarily given a lower priority until the budget model revision process is complete.

**Budget Methodology**

- ▪ Budget Forecast
  - ▫ The budget forecast model is based off the Utilization Modeling, developed to determine the system capacity necessary to prevent the backlog from growing any further.  System capacity required is based on the anticipated volume of claims filed for a particular month in addition to the backlog beginning that month.
  - ▫ The forecast model sums Modeled Reviewer Costs (which consist of static processes) and Expenses to reach a Forecast Cost for each Vendor.  A contingency cost is then added to this Forecast Cost figure to reach a Budget Forecast for each Vendor.
    - ‣ Reviewer costs are derived from the reviewer Utilization Model.
    - ‣ Costs for static Vendor processes are the previous month's actual costs.
    - ‣ Vendor expense cost is calculated as an average percentage of Vendor labor cost.
      - (1) Expenses are based on historic figures.
    - ‣ A five percent contingency is factored into the total forecast cost.
      - (1) The former budget did not contain a contingency.  However, the CAO wanted to make sure it modeled a sufficient budget given the assumptions required considering the time constraints and data limitations on this process.
- ▪ Basic examples of the anticipated budget methodology for each Vendor were illustrated for BP.
  - ▫ BrownGreer
    - ‣ Reviewer costs have been smoothed with non-reviewer costs.
    - ‣ The static processes (CAC and Subsistence Interviewers) will be continually analyzed and eventually become more easily predictable with additional data.
    - ‣ Expenses for BrownGreer will be forecast based on historic averages.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# Meeting Notes (Continued)



- ▫ Garden City Group
  - ‣ The Sarasota call center has been closed, which has led to a significant decrease in costs.
  - ‣ Expenses for Garden City Group will be forecast based on historic averages.
    - (1) These figures seemed somewhat high to BP; however, these expenses were covered in more detail later in the meeting.
    - (2) Mention was made of the CliftonLarsenAllen audit recommendation of increased fire suppression at the Dublin Ohio Center. The pass through cost on these expenses will be investigated by the CAO to determine what percentage of these costs is directly attributable to the Settlement Program.
  - ‣ The contingency cost built in for Garden City Group is likely somewhat of an overestimation as Garden City Group arguably has less volatility.
- ▫ Postlethwaite & Netterville
  - ‣ The same methodology for the previous Vendor budgets was used for Postlethwaite & Netterville's budget forecast.
  - ‣ The budget forecasts of the Accounting Firms present interesting challenges because accounting review is an offline function not tracked by the BrownGreer timestamp system.
    - (1) We do not currently have the exact on-task time figures for accounting review. The CAO will make assumptions for this information. These assumptions will be fine-tuned until actual data is available.
- ▫ PricewaterhouseCoopers
  - ‣ The same methodology for the previous Vendor budgets was used for PwC's budget forecast. Additionally, the same offline task challenges experienced with P&N are present with PwC. The on-task time data is not currently available. Assumptions will be made until accurate actual data can be used in the forecast model.

**Agreement on Framework**

- ▪ The CAO established that the structure of this budget is merely anticipatory and not final. The CAO envisions a progressively expanding methodology based on a forecast of claims basis, an eligibility basis, etc.
  - ▫ The CAO believes that this structure is in alignment with what BP desires from the budget forecast. However, as the forecast model evolves and additional data becomes available, the model will become much more granular and detailed with respect to costs.
- ▪ BP agreed that this is in the vicinity of the framework BP had in mind.
  - ▫ BP agreed with the CAO that the use of a modeled number of determinations to create the budget was the best approach to forecast the budget.
    - ‣ This is why the task utilization rate and the system's capabilities are essential.
  - ▫ BP also expressed a desire that the CAO compare actual Program costs to the budget forecast costs to develop a variance analysis.
    - ‣ Further, the CAO wishes to maintain neutrality in this process, remaining focused on steady throughput of claims processing to prevent the increase of claim backlog. The CAO will put forth as accurate a budget as possible while remaining focused on combatting claim backlog.

# MEETING NOTES (CONTINUED)



- The CAO anticipates submitting to the Parties and the Court a budget package like the one discussed in this meeting. This budget package will include summary sheets that correlate costs based on projections over time. In addition to these summary sheets, the raw data used to produce these budget results will be provided. Further, an operational narrative will be provided. Lastly, information on assumptions made by the Program will be included in this package.

- The CAO would also be open to dialog with BP in the future to discuss one off expenses.

**Questions and Discussion**

- The CAO has attempted to measure the amount of determinations being produced.

- The CAO has normalized the task utilization rate, using the BEL specific rate, essentially lowering the task utilization rate from 87% to 75%. This task utilization rate is currently an assumption until the CAO has information on the true off-line rate.

  □ A task utilization rate of 75% does not mean that 25% of the time no work is being done. It means that 25% of the time, there are other off-line activities associated with the processing of claims, such as waiting for screen loads, passing off a claim to another reviewer, downloading documents, etc.

  □ The offline review tasks and the associated times used for purposes of the budget forecast model have been derived from detailed conversations with the Vendors.

  □ BP and the CAO agreed that this task utilization rate is information that could be included in the quarterly budget reports.

- BP asked whether the CAC and CCC items for BG are included in the labor cost model.

  □ These are included but they are static costs. As additional data is acquired on the function level for the CACs, the costs for the CACs will be parsed out on the functional level.

  □ There was some discussion about extrapolating CAC costs based on total hours and number of CAC visits. The model basically already does this; however, the CAO expressed the desire to proceed cautiously with this tactic so as to not over-project by basing the extrapolation on a time period with an inordinate number of CAC visits.

  □ The main issue is that the information is not currently broken down at the task level because the reviewers at the CACs are cross trained on various tasks. Once the CAO has this information, number of visits will be the best way to track it.

    ‣ BP expressed a desire to see some sort of extrapolation supporting the labor hours of the CAC reviewers.

- For the subsistence budget forecast, the amount includes reviewers and interviewers; however, it does not include any field visits in this figure as field visits are handled by another Vendor.

  □ The amount of time a subsistence review takes is based on data received from BrownGreer.

  □ No information has been maintained on how long subsistence interviews take.

    ‣ The CAO has information on how many notices are issued, but no information is available on the number of claims that will be processed on a per hour basis.

      (1) BP expressed an interest in attaining this level of detail in information. The CAO stated it does not currently have a time in motion study of this data, but will attempt to gather more information to evaluate the system input.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- Since no subsistence notices are being issued while policy is pending, the data used in this budget forecast is somewhat skewed currently. Once this hold is lifted, actual data will be available to be plugged into the budget forecast.
- BP desired to see a breakout of the IT costs incorporated into the model.
  - These costs are made up of system upkeep, development of new capabilities, and process enhancement; however, the breakout of the IT costs in terms of these sub functions is not data that the CAO currently maintains.
    - This is a reasonable way to incorporate this data and will be incorporated into the budget forecast as the information becomes available.
- BP asked about costs seemingly excluded from the GCG budget forecast model.
  - This is the result of similar cost groupings that were made. BP requested more detail on these cost groupings and the detailed data behind them, specifically regarding document intake, data entry, release processing, handling claimant correspondence, call volume, and file audit review.
- BP asked about the analysis that will be done to compare actual and modeled results for each month.
  - The actual hours will represent the amount of time it actually took to perform a particular task; the modeled hours will represent the time the CAO thinks the amount of work for that particular task should take based on the model's assumptions.
  - The CAO will identify the existence of a variance on a monthly basis if any variance exists, but, because of its sole role in an oversight capacity, the CAO will not take actions to cure the cause of a variance.
    - The CAO would be open to a monthly discussion with the Vendors as to the cause of a particular variance. However, the CAO does not currently believe that the addressing of the cause of a variance falls within the ambit of the CAO's responsibility, given the CAO's strict oversight role. Rather, the cause of a particular variance would be left to the respective Vendor itself to address.
- BP questioned some high data capture hourly figures for IEL as compared to BEL. For IEL, these are attributable to the general tediousness of the job function, particularly entering hundreds of paystub figures from hundreds of individually different pay stubs. Additionally, the work associated with IEL is specific to BrownGreer, whereas the work associated with BEL is spread out over several different Vendors.
- Notice and Payment Data does not come from public reports. Duplicates are removed, so the figures in the Notice and Payment Data will not match public report figures exactly.
- BP expressed interest in acquiring the entire model in an unlocked version.
  - Neither BP nor the PSC expressed any real reason to object to providing the entire model.
  - Additionally, the CAO believes this would help streamline the efficiency of the budget revision process. The CAO will determine if the distribution of this information to the Parties is permitted by the Settlement Agreement.

**Communications over the Next Seventy-Two Hours**

- It is preferred by BP and the CAO that the communication process remains open and informal so as to keep the revision of the budget as transparent and collaborative as possible.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- This will allow BP to better understand the process of the CAO in revising the budget forecast model.

- All questions that the CAO has for BP or that BP has for the CAO will be routed through the Plaintiffs' Steering Committee and Keith Moskowitz.

- Items that Will Be Provided by Friday

  - As no objections were made to the framework of the modeled budget, the CAO will provide the forecasted budget on Friday, August 16 as presented to BP and the PSC at this meeting.

    - This will include supporting documentation with amended utilization modeling.

    - Additional information broken down at a more detailed level will be provided to the extent the information is currently available to the CAO. Any assumptions made in lieu of unavailable data will be noted.

      (1) The main areas in which additional information was requested involve CAC staffing levels, costs of GCG job functions, and IT costs.

    - In preparing its fourth quarter budget, the CAO will be preparing a revised third quarter budget as well. BP noted its objection to the CAO's proposed third quarter budget but requested to see a revised third quarter budget if one is prepared by the CAO.

      (1) The CAO will provide the six months covering quarters three and four of budget forecasts to BP.

    - Regarding turnover rates and the other process related information, the CAO is requesting this information from Vendors. However, it will receive a lower priority until the budget forecast model revisions are complete.

    - In requesting the data fields from the data dictionary, the CAO recommended to BP that it go through the proper channels to gain access to this. This will ensure that the PSC has no objections given the possible existence of Personally Identifiable Information in these data fields. Upon the completion of the process, the CAO will provide all information agreed to by BP and the PSC.

- It was decided that the continual and ongoing dialog between BP and the CAO has been very beneficial. Pursuant to this, a meeting has been scheduled for next Wednesday, August 21, 2013, at 10:00 AM, at the CSSP Office in New Orleans.

*Please distribute internally as appropriate.*

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

August 16, 2013

Maria Travis
BP America Inc., Director of Claims
Gulf Coast Restoration Organization
501 Westlake Park Blvd.
Houston, TX 77079

Dear Maria,

Pursuant to the Court Order Regarding BP's Obligation to Fund the Claims

Administrator's Proposed Fourth Quarter 2013 Budget issued by the Court on August 7, 2013,

the Claims Administrator's Office is pleased to submit the Fourth Quarter Budget Package for

the Court Supervised Settlement Program to BP, the Plaintiffs' Steering Committee, and the

Court. The Claims Administrator's Office has worked with representatives from BP over the last

week to deliver a detailed budget forecast and looks forward to continuing these collaborative

efforts over the coming weeks.

Enclosed in Exhibit A of this packet is the total forecasted budget for the fourth quarter of

2013 in summary format. Exhibit B includes the Reviewer Cost Model, which serves as the

backbone of the budget forecast, and a narrative explaining this model. Exhibits C-F contain a

summary sheet for the budget forecast for each Vendor. Additionally, each exhibit contains a

narrative explaining any modeling unique to the budget forecast and identifying any reasonable

assumptions the Claims Administrator's Office was required to make when reliable or accurate

historic data was unavailable for that particular Vendor. Lastly, each of these exhibits contains a

**EXHIBIT B-10**

detailed set of supporting documents, including the data drivers used to calculate the projected budget forecast for each Vendor.

Given the time constraints set forth in the Court Order, the CAO was unable to acquire from the Vendors some of the items requested by BP for inclusion in the budget forecast in a timely manner. Specifically, the CAO was unable to obtain information on BrownGreer costs for the Claimant Assistance Centers on a function level basis, actual invoices from all Vendors on a task-specific level basis for July, IT Systems Costs from Garden City Group, and costs associated with training new employees or retraining employees following turnover. Previously, the Vendors had not been providing this level of detail in these areas and needed additional time to provide this data. However, it is anticipated that the CAO will be able to provide all of this data as part of the next Budget Forecast submittal on August 28th along with the considerations made from BP's responses received on August 25th.

The Claims Administrator's Office is confident that this revised budget forecast will satisfy the needs of BP and meet the expectations of the Court. We are committed to continuing full transparency into our financial processes on the Program and will continue an open dialog with BP, PSC and the Court throughout the process. If BP, the Plaintiffs' Steering Committee, or the Court has any questions regarding this budget forecast, please do not hesitate to contact us.

Sincerely,

David Odom
CEO

Cc:     Magistrate Judge Sally Shushan
        Keith Moskowitz
        Stephen Herman
        Jim Roy
        Patrick Juneau
        Bob Levine
        Kirk Fisher

# MEETING NOTES



| | | |
|---|---|---|
| **MEETING FOCUS:** | CSSP ADMINISTRATIVE BUDGET MEETING | |
| **MEETING DATE:** | **AUGUST 21, 2013  10:00 AM CST** | |

**ATTENDEES:**

| Name | Company | DHECC |
|---|---|---|
| Maria Travis | BP | David Odom |
| Todd Brents | Alix Partners | Kirk Fisher |
| Amy Boatman | KPMG | Bob Levine |
| Gary Jackson | BP | Philip Ollendike |
| Brad Spooner | Alix Partners | Henry Mitchell |
| Ramji Kaul | SNR Denton | Patrick Hron |
| John Creevy | Herman, Herman, & Katz | |
| Tommy Thomassie | Domengeaux, Wright, Roy, & Edwards | |

**Reviewer Model-Specific Questions**

- Meter Charts
  - The Meter Charts are real time measurements of system capacity over a period of time, usually a month.  The spread between system capacity and actual notifications produced is identified as an opportunity for improvement.
  - Questions raised by BP and its representatives related mostly to why BEL and IEL targeted and actual numbers have decreased as compared to the Meter Charts from the August 14 meeting.
  - BEL Specific Meter Chart Discussion
    - One of the main reasons for this change in the Meter Chart was that this Meter Chart incorporated the most recent month's Vendor data.
      - (1) The chart is dynamic and changes with each measured period.
    - Another reason was that the task utilization rate has been modified since the August 14 meeting.
      - (1) The Claims Administrator's Office (CAO) is attempting to define the accuracy of the task utilization rate today.  These figures must be derived from the data provided by the Vendors.
      - (2) Because this is extremely important and has such a significant impact, the CAO's goal is to use extremely detailed and accurate numbers provided by the Vendors.  The updated task utilization rate will depend on the Vendor provided information.  When the CAO is able to do finalize this, the confidence in the forecast model should be increased significantly.
    - Another reason was the changes made to task durations since the August 14 meeting.

**EXHIBIT B-11**

# MEETING NOTES *(CONTINUED)*



    (1) These task duration changes were made to increase the forecasting accuracy of the model.  The CAO is continuing to tweak the task duration associated with individual claims per type per determination notice (Eligible Payable and Eligible No Payment, Denial and Closed, Duplicates and Opt Outs, and Incompleteness Denial) in order to increase the accuracy of the budget forecast model.  The CAO will take a sample of 32 claims for each claim type for each determination notice type and calculate the task durations using a weighted average calculation.  Currently, the CAO is actively working to update the task durations.

    (a) Two things have increased the claims processing the task durations – 1) the implementation of new, intricate policies and 2) the CAO is processing more complex claims.

        (i) As additional policies are agreed upon by the Parties and issued by the CAO, the processing of each claim becomes more complex.

        (ii) Further, whereas in the beginning of the Program claims deemed to be easier (Zone A claims, document complete claims, etc.) were processed first in an effort to get the Program running, the more complex and difficult claims are now being processed, which also increases task duration.

- The blue bar (actual performance) figures on the Meter Chart decreased as related to those of the August 14 meeting.  This is due to the fact that the August 14 Meter Charts were comparing June labor to July production.  Since July had more days of production than June, the determinations per reviewers were higher in the August 14 Meter Chart than the August 21 Meter Chart which compared June labor to June production.

- Red hash mark (targets per week) for BEL claims has decreased because it has begun to take a significantly longer time to process BEL claims for the reasons previously mentioned.  We are currently meeting with BEL-processing Vendors to get the most accurate figures possible for the task durations associated with the processing of BEL Claims.  Further, the larger 32 claims sample size for modeling task duration should produce more accurate results as well.

    (1) It is currently unclear how significant an effect these changes will have in the model.

    (2) It should also be noted that the same changes in task duration mentioned in reference to BEL Claims and the Accountants will apply to accounting-centric Seafood Claims and BrownGreer.

- IEL Specific Meter Chart Discussion

    - Performance decreased while the target increased

- Task utilization Rate and Reviewer Shift Duration

    - The task utilization rate of 75% and the FTE 35.5 hours per week are used in different places in the model and are calculated apart from each other.

- Differences between QC and Audit

    - For BEL, five hours is allotted to each of these tasks on the task duration portion of the reviewer model.

    - Some information in relation to Quality Control was provided prior to the June 18 meeting.

    - The CAO will determine on a more detailed level exactly what function each of these tasks performs and any overlap between the two.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES *(CONTINUED)*



- Appeals as Related to the Review Process
    - Some concern was expressed over the five hours allotted to Appeals in the task duration section of the reviewer model.
        - The CAO will determine exactly what these five hours are spent on.
    - Questions were also raised as to the accuracy of the figure stating that 5.8% of claims go through the Appeals Process.
        - The CAO is working to update these figures, along with the First and Second Pass figures, by Friday, August 23.


**Questions Unrelated to the Reviewer Model**

- Subsistence
    - The model from the August 14 meeting had Subsistence costs layered on top of the model, whereas the model from the August 21 meeting had these costs, as well as those associated with GCG data entry, incorporated into the model.
        - Subsistence is an example of policy decisions affecting throughput, as all subsistence notices have been put on hold pending policy development.  Depending upon the outcome of the policy decision, the CAO may need to reevaluate its processing task durations.
            - (1) The Vendors are continuing to process subsistence claims even though no notices are being issued. Additionally, the CAO does not direct the Vendors on how to utilize their workforce.
                - (a) Some things clearly have to be halted if related to Court Orders, but the CAO does not interfere with the operational decisions of the Vendors as these are more business judgment decisions.
- BrownGreer IT Costs
    - Using estimations from BrownGreer, the CAO was able to break the IT costs out of the model to provide additional granularity as to the cost associated with the IT functions.
    - Some concern was expressed by BP and its representatives about the $700,000 budget for development activities.
        - The CAO does not have access to the development processes for BrownGreer, so the CAO relies on the data that BrownGreer provides.  However, because of the complexity of the system, adding to it requires significant time and manpower.  A single change in one line of code will require numerous additional changes in numerous other areas because it is all inter-related.
            - (1) The CAO will ask BrownGreer for more information on this in the future, but the CAO does not anticipate receiving more detailed information on this before August 28.
- GCG Overhead
    - IT Costs are labeled as Systems and Reporting.
        - GCG runs the servers for the database, network support, hardware support, fraud databases, internal IT processes, etc.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)



       (1) This does not include much development work but more database maintenance and analytics. GCG hosts the hardware infrastructure while BrownGreer runs the software system.

- BG Administrative Costs
  - It was noted that the BG Administrative Costs are decreasing. However, no breakout was provided as to which specific administrative labor category is decreasing.
    - The CAO does not believe that a straight line pro rata reduction across all Administrative Cost expenses is appropriate. As fewer claims come into the system, some expense categories will decrease while some will likely increase given the nature of those administrative functions.
    - The decision on staffing for each function performed by each Vendor is left to that Vendor itself. Some Vendors do reduce staffing levels based on the models. The CAO does not strong-arm the Vendors to staff at a level congruent with the model. However, the CAO does discuss the results of the model with the Vendors and allows the Vendor the opportunity to justify appropriate staffing levels. However, ultimately, the decisions on staffing is left to the Vendors.

- CLEAR
  - The CAO will determine exactly what this BG Overhead Cost represents.

- BG CCC vs. GCG Payment Outreach
  - Questions were raised as to the difference between the BG CCC and the GCG Outreach Program.
    - The BG CCC is in place to offer to claimants access to a representative specifically trained in each claim type, providing the claimant with an expert on each claim type, to handle issues specific to that particular claim type.
      - (1) This team handles the outreach related to curing claim incompleteness, specifically with IEL, which has been a significant portion of IEL processing. This team has a much higher level of expertise in this field than those performing Payment Outreach.
    - The GCG Payment Outreach is a team recently developed for the purpose of notifying claimants who have had eligibility notices issued that they need to submit a release in order to receive their compensation.
      - (1) This is a new group because it requires a different skillset, one different from the skillset devoted to knowledge of the document requirements for specific claim types required at the CCC.

- GCG Administrative Costs of Claim
  - These costs represent the management labor directly associated with the document categorization, data entry, and data capture/claims review. These costs variably related to the expected costs for Garden City Group claim review.

- GCG Call Center
  - The GCG Call Center is currently modeled at thirty minutes per call – twenty minutes of actual call time and ten minutes of wrap up time.
    - BP believes that when meeting with GCG, a figure closer to ten minutes per call was provided.
    - The CAO will follow up with GCG to determine the average time per call.

935 Gravier Street, Suite 1905
New Orleans, LA 70112
Tele. 504.934.4999

# MEETING NOTES (CONTINUED)



- ▫ It was noticed that GCG Call Center management costs were around 49% of GCG Call Center operator costs.
  - ‣ As the call volume decreases, the staff is eliminated; however, the permanent core and the individuals with subject matter expertise and institutional knowledge remain.  These individuals are generally in a managerial capacity, so this currently represents a high percentage of the costs as related to those of the operators.

- ▪ File Audit
  - ▫ This function performs audits of GCCF claimant documents to be used in the CSSP Portal.
    - ‣ This includes removing PII and sensitive information unrelated to the claimant and the processing of the claim.
  - ▫ The CAO anticipates that the file audit will be complete by the end of the year.
  - ▫ BP questioned which files were being audited.  The CAO will follow up with GCG to determine if all GCCF files were being audited regardless of whether the claimant filed claim with the CSSP.
    - ‣ The CAO will confirm the exact scope of this audit.

- ▪ Five Percent Contingency Fee
  - ▫ This contingency was implemented as a margin of error, given the timeframe set forth by Order of the Court in revising this budget.
    - ‣ The CAO anticipates that the process will be significantly refined and the budget will become more accurate over time.  Upon the first revision, however, the CAO did not want to put forth a budget forecast that was not worst case scenario.
      - (1) It should be noted that this worst case scenario budget is assuming no magnanimous events, such as a Fifth Circuit Ruling overturning previous Eastern District rulings.

- ▪ Turnover and Staff Level Changes
  - ▫ The CAO has requested all information related to turnover and associated costs from the Vendors.
    - ‣ The CAO has not yet received anything other than a trending percentage which has been provided to BP through a previous data request.
    - ‣ This is still a priority to the CAO, but the CAO has not been able to acquire this information from the Vendors and incorporate it into the budget forecast model.
      - (1) Once the CAO has this information, it will be incorporated into the model.

- ▪ PricewaterhouseCoopers Travel Expenses
  - ▫ The CAO has asked PwC to come up with a transition plan to allocate a portion of their travelling employees to work on the Program remotely.
    - ‣ Because of this, the CAO anticipates the budget forecast submitted next Wednesday will contain a significant downward trend from the 6.84% used in the current model.

- ▪ The CAO does not currently model a high side, a low side, and a middle-of-the-road budget forecast.

**Current State of Affairs**

- ▪ BP acknowledged that the budget provided on August 16 contained the level of detail it desired in the budget forecast.

# MEETING NOTES (CONTINUED)

- BP expressed a desire to be able to make a variance comparison between the budget forecast and the actual costs of the Program for a particular month.
  - □ This would allow a comparison of actual costs to the budget and a comparison of the budget from one month to the budget of the next month to see where the forecast changed.
    - ‣ This can be done on a monthly basis.
- Data Dictionary
  - □ The CAO is compiling its data dictionary currently.  However, BP will submit a written request to the CAO for the information it would like included in the data dictionary, as the PSC may object to the sharing of some information contained in it.
- The CAO will begin to maintain a change log for the budget forecast model in an effort to assist BP and its representatives in tracking the changes the CAO makes to the model to increase its accuracy.

*Please distribute internally as appropriate.*

Kirk,

Thanks for you and the teams time yesterday to further discuss the 4Q budget.   Below are a couple of items which we wanted to follow up  with you given our discussions.

- · What is the difference between QC review step and Audit step in BEL process duration model ?
- · What makes up the 5 hours for appeal time in the BEL process duration model?
- · BG Admin Costs – what is the CLEAR group and what does it do?
- · GCG Call Center – confirm call time is 20 minutes + 10 minutes of wrap up time.
- · Have you been able to confirm your ability to provide the mark up on independent contractors ?
- · Can you provide the PowerPoint presentations presented at our meeting August 9 and 15 ?

All the best,

*Maria*

**Maria T. Travis**
Director of Economic Restoration – GCRO
Eldridge 3 6.145C
Tel: 281-366-5928
Cell: 281-935-4271

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

3

**EXHIBIT B-12**

**From:** Kirk Fisher
**Sent:** Thursday, August 22, 2013 4:40 PM
**To:** Travis, Maria T
**Cc:** David Odom; Bob Levine; <keith.moskowitz@dentons.com>; ramji.kaul@dentons.com; Todd Brents; Philip Ollendike; Henry Mitchell; Patrick Hron
**Subject:** Re: Follow up

Maria,

Thank you again for meeting with us yesterday to discuss the Q4 budget forecast model. As a quick update, we are currently working to incorporate BP's suggestions into the model.

Items we are currently working on:

1. Refine the task durations for all claim types.
2. Determine the functions performed during the task duration hours allotted to Appeals.
3. Update model drivers in relation to the current statistics on number of appeals filed.
4. Obtain from BrownGreer a detailed list of programming changes and system development expected to be performed by the BrownGreer IT Department.
5. Provide an analysis of Meter Chart changes with each forecast model submission.
6. Include a change log with the budget forecast model to assist BP in tracking changes made by the CAO.

A follow up to the particular items mentioned in your prior email are addressed below.

1. What is the difference between QC review step and Audit step in BEL process duration model? - The QC review step in the BEL process duration model is a manager review of the processed claim performed before a claim is issued a notice. The Audit step, on the other hand, is a notice QC rapid assessment review. The task duration of this step has decreased drastically, currently around 0.13 hours.

2. What makes up the 5 hours for appeal time in the BEL process duration model? - The CAO has not yet received adequate information on this item.

1

**EXHIBIT B-13**

3. BG Admin Costs – what is the CLEAR group and what does it do? - CLEAR is an acronym for Claim Level Examination Analysis Remediation. The primary purpose of the CLEAR Team is to review and perform analysis on various reports to isolate and identify any claim or group of claims that appear to be stalled within the system for any reason. The team is also responsible for working with team leads for all damage categories and review types along with the programming team to determine the source of the issue stalling the claim and the resolution of the issue.

4. GCG Call Center – confirm call time is 20 minutes + 10 minutes of wrap up time. - Garden City Group's average call time, particularly the pre- and post-call work, has decreased considerably as the Program has matured and staff has been reduced. The average time per call is now approximately 10 minutes.

5. Have you been able to confirm your ability to provide the mark up on independent contractors? – We are unable to acquire this information from the Vendors as per prohibitions contained in the contracts the CAO has with the Vendors.

We have also acquired information regarding two other topics on which BP requested additional information in Wednesday's meeting, particularly regarding Garden City Group managerial costs and the GCCF File Audit.

1. The Garden City Group cost ratio between managers and operators is due to the fact that this managerial cost figure includes crisis managers, quality assurance personnel, telecom support, and other managerial staff.

2. File Audit is performed on all GCCF Files. The files currently being audited take longer to audit because these claims are more complex and document-intensive. Priority is placed on reviewing files associated with claimants who have filed a claim with the DWH Program. Smallest files are reviewed first to ensure that as many claims as possible are reviewed as quickly as possible. Given the size of the files remaining, we currently estimate that file audit will be complete in mid-November.

We will continue to revise the budget model over the coming days with additional information received from the Vendors. As changes are still being made to the forecast model, and particularly the task duration model, we will not be able to upload an updated version to SharePoint today. However, we anticipate the model will be uploaded some time tomorrow when these changes and other changes reliant on additional Vendor information are complete. Also, attached to this email are the minutes from Wednesday, August 21st and the PowerPoint presentations from the August 9th and 14th meetings as requested. We look forward to receiving BP's suggestions and comments on the current state of the budget forecast model tomorrow. Please do not hesitate to contact me if you have any additional questions or concerns.

With warm regards,
Kirk



23 August 2013

Mr. David Odom
Deepwater Horizon Settlement Program
935 Gravier Street
New Orleans, LA 70130

Dear Mr. Odom,

Pursuant to the Court's August 7, 2013, Order (Dkt. No. 10955), BP is providing its comments to the Court Supervised Settlement Program's ("CSSP") 4th quarter 2013 ("Q4") proposed budget provided to BP on August 16, 2013.[1]  Our response is organized into three parts: (1) comments regarding the framework of the proposed budget model; (2) comments regarding the proposed budget amounts; and (3) comments regarding the documentation and information provided in support of the proposed budget.

As described in detail below, notwithstanding the improvements in the framework of the proposed budget model, the overall proposed Q4 budget is still excessive. This appears, in large part, to be due to the willingness of the Claims Administrator's Office ("CAO") to take cost and productivity estimations from the CSSP Vendors, which drive the budget model projections, at face value without any managerial assessment or independent evaluation of the reasonableness of those assumptions and targets.

Since beginning our discussions on August 9, 2013, the CAO's uncritical acceptance of CSSP vendor estimates has led to a lowering of productivity goals.  The proposed Q4 budget now targets, for example, that accountants complete only 1.0 Business Economic Loss ("BEL") claim per accountant, per week. As discussed below, these seem to be unreasonably low targets. The CAO has indicated that it does not view the budgeting process as a function to drive results  and accordingly, it appears that the CSSP Vendors have provided assumptions and estimates to bring the Q4 budget in line with actual prior productivity and cost results.

As a result, we believe an operational review and examination is required, including some analysis of the validity of the CSSP Vendors' assumptions, to allow BP and the CAO some basis to evaluate the reasonableness of the assumptions driving the budget.  Without an operational review and examination and a critical evaluation of these assumptions, even a well-designed budget model does nothing more than replicate CSSP Vendors' own assumptions and estimates to bring the Q4 budget in line with actual prior productivity and cost results.

## I. Comments Regarding the Framework of the Proposed Budget Model

The methodology used by the CAO to develop the budget process is improved from the Q3 budget and attempts to estimate future costs based on a predictive model incorporating past experience and purports to link projected levels of tasks with the amount of labor necessary to complete each task. However, to date, the CAO has neither tracked nor required the CSSP Vendors to track sufficiently detailed information regarding productivity and costs at a task level as needed to serve as the input to drive this type of model (e.g., the duration of time that should be required to complete a particular

---

[1] The CAO and BP met on August 21, 2013, to discuss BP's preliminary observations regarding the CAO's August 16 budget proposal. The CAO has subsequently provided additional information that may respond to some, but not all of the issues raised in this letter.

**EXHIBIT B-14**

task of the accounting review). In lieu of using actual historical data, the CAO has indicated it will use estimates and assumptions until more reliable data can be generated. While using assumptions as a stop gap until actual data becomes available is not per se unreasonable, here the CAO has simply asked its vendors to provide those assumptions and has done nothing to test those assumptions or estimates or apply standards.

BP has asked for the CAO's supporting documentation for these various assumptions and estimates and understands that the CAO does not possess an analysis necessary to validate the assumptions and estimates being provided by the CSSP Vendors as to the standards. As indicated by the CAO, the Claims Administrator will not "pass judgment" on the data drivers provided by the CSSP Vendors. As a result, the predictive model is driven by, in large part, assumptions and estimates regarding productivity and costs provided to the CAO by the CSSP Vendors. This is particularly concerning given the productivity targets from the Q4 budget, which targets are derived from these assumptions, will set the CSSP Vendors' Key Performance Indicators in the upcoming Task Orders. Hence, an operational review and examination to test all of the assumptions and unsupported cost estimates provided by the CSSP Vendors is necessary to allow BP to fully evaluate the budget.

Additionally, with respect to the mechanical calculations of the budget model, since our last meeting we have confirmed several calculation errors that should be corrected:

      (i)     Using June cost vs. July determination numbers to calculate June productivity:
- Tab [Vendor Time & Cost June], cells P98 – U98

      (ii)    QA Audit Total Required Hours appear to be improperly calculated resulting in fewer hours allocated to the BEL, FBEL, and SUBEL claims than needed based on projected determinations and process duration hours:
- Tab [4wk Past Model], cells AT13:AT35
- Tab [4wk Fwd Model July 2013], cells AT13:AT35
- Tab [8wk Fwd Model Aug. 2013], cells AT13:AT35
- Tab [12wk Fwd Model Sept. 2013], cells AT13:AT35
- Tab [16wk Fwd Model], cells AT13:AT35
- Tab [20wk Fwd Model], cells AT13:AT35
- Tab [24wk Fwd Model], cells AT13:AT35

      Additionally, we encountered other formula errors within the model that did not impact the final budget calculation but had an impact on certain variables that were used to assess the budget calculation.

      (iii)   BrownGreer Employer Verification Review Team hours allocated among claim types do not agree to total Employer Verification Review Team hours:
- Tab [June 13 Costs], sum of cells K35:T35 do not foot to cell I35

      (iv)   Garden City Group Document Categorization hours allocated among claim types do not agree to total Document Categorization hours:
- Tab [June 13 Costs], sum of cells K88:T88 do not foot to cell I88

      (v)   Inconsistencies between claim type allocations within hard coded numbers in cell formulas as compared to other claim type allocations within the model:
- Tab [Model Inputs], cells D11:J13 include hard coded numbers, representing claim allocation percentages. The hard coded numbers are not consistent with other claim allocation percentages used within the [Data Request v5] tab, cells M57:O57 and within the [Model Inputs] tab, cells O48, R48, U48, AA48, AD48, AI48, AL48, AO48, AT48, AW48, AZ48, BC48, BF48, BK48, and BN48.

      (vi)   Summary admin costs in Claims Review – Modeling Summary are calculated inconsistently amongst the firms:
- Tab [Model Summary], cell D20 does not flow with the formulas surrounding it.

(vii)    Discrepancy between admin costs in two different cells:
*    Tab [Vendor Time & Cost June], cells Q90, V90, and AA90 do not agree to the total costs for each vendor within AJ67, AJ82, and AJ92.

(viii)    Discrepancy between BrownGreer hours FTE Reviewers & Analysts in two different cells:
*    Tab [Vendor Time & Cost June], cell O101 does not agree to cell K64.

(ix)    Allocation of BrownGreer FTE Reviewers & Analysts by Claim Category does not agree to Total FTE Reviewers & Analysts:
*    Tab [Vendor Time & Cost June], cells P108:U108 do not agree to cell O108.

(x)    Certain costs appear to have been improperly classified as overhead rather than included within the Reviewer Model:
*    Tab [June 13 Costs], cell B62 appears to have improperly classified this cost as an "O" instead of an "R".

(xi) Garden City Group total hours and total dollars exclude Hammond Center Administration and Management:
*    Tab [June 13 Costs], cells F102 and I102 improperly exclude cell references F80 and I80, respectively.

(xii) BrownGreer total timekeepers is hard coded and does not equal sum of timekeepers:
*    Tab [Vendor Time & Cost June], cell AG45 is hard coded with 1,187. The sum of timekeepers in cells AG9:AG44 equals 1,414.

Finally, as BP has previously noted, a critical component of evaluating a proposed budget is the ability to compare a projected quarterly budget against past actual performance in an "apples-to-apples" fashion. BP requested that the Q4 budget include a comparison against actual past performance broken out in detail on the same task based level used to generate the Q4 budget. The CAO has indicated that while it agrees that such a request is necessary and appropriate, it did not have time prior to the August 16, 2013 budget submission to perform this analysis. BP again reiterates the need for this critical comparative metric in order to fully review and evaluate the budget.

## II. Comments Regarding the Q4 Proposed Budget Amount

The proposed Q4 budget request of approximately $119,300,000 is excessive and unsupported by the documentation available and provided by the CAO. In particular, BP has the following detailed comments and proposed revisions to the Q4 budget.

### A.    The Line Item "Contingency Fee" Should be Eliminated

The Q4 budget includes a "contingency fee" of nearly $5.7 million. These are unallocated dollars which are not designated for any identifiable task or expense. This represents 5% of the total proposed budget and is, in essence, a projected cost overrun by the CSSP Vendors that the CAO apparently expects to occur, but cannot identify how it will occur. The CAO's explanation that the $5.7 million is needed because of the number of unverified assumptions driving the budget, the complexity of the claims process, and the pace at which the budget has been prepared is insufficient. The 5% fee is applied across the entire Q4 budget, not just the budget items based on assumptions, and includes fixed costs that do not have any unpredictability. Moreover, the assumptions regarding costs and productivity are being set by the CSSP Vendors themselves and likely already include a cushion for the same "uncertainty" the contingency is purportedly being included to cover. Finally, the 5% fee is static across all three months and does not reflect the CAO's stated view that the assumptions will be replaced with more reliable data over the course of the budget quarter.

### B.    The Task Utilization Rate is Too Low

The Q4 budget provides for a task utilization rate of 75%. As explained in the CAO's narrative accompanying its Q4 proposal, "a task that requires ten hours to process, at a seventy-five percent

task utilization rate would, in reality, require around thirteen hours* to complete. (Reviewer Cost Model and Budget Forecast Methodology). Here, the CAO is estimating that every task will take, in reality, 33% longer than it actually should. Moreover, the CAO originally estimated the task utilization rate to be 87.6% for BEL claims in the August 9 version of its model and now, without supporting analysis to justify the change, has reduced the task utilization rate to 75%. This downward revision has a significant impact on the productivity targets and the overall budget. For example, since August 9, the CAO has revised its BEL productivity targets from 5.39 down to 3.48 claims per employee per month. Similarly, productivity targets for accountants have decreased from 1.6 to 1.0 BEL claims per accountant per week, a 37.5% decrease.

BP recognizes that the task utilization rate, in reality, cannot be 100%, but has no ability at this time to assess or propose what a reasonable percentage should be under the circumstances. An operational review and examination, including some analysis of a reasonable utilization rate, is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget. Without an operational review and examination, BP has no ability to assess whether the budgeted rate of program efficiency is reasonable under the circumstances.

## C.    There are Process Duration Changes for both BEL and IEL Claims Which are Unsupported

Since our budgeting process began on August 9, the CAO has increased the estimated duration of time to resolve a BEL claim from 32.5 hours to 43.4 hours, while the estimated time to process an IEL claim decreased from 25.1 hours to 13.6 hours. Our understanding is that these revisions are not supported by any data analysis completed by the CAO, but rather are based on assumptions and estimates being provided to the CAO by the CSSP accounting vendors, as the CAO does not possess sufficient historical information to create its own estimates or evaluate the assumptions given to it by its vendors. BP further understands that the CAO has not performed any analysis to assess the validity of the assumptions and estimates being provided by the accounting vendors as to the process duration standards. An operational review and examination including some analysis of the validity of the CSSP Vendors' assumptions regarding process duration is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget.

This budgeting issue is of particular concern given the Q4 budget takes into account costs resulting from the addition of 100 new accountants to the CSSP. As noted previously, this staffing proposal did not appear to be developed to meet any specific productivity goal and, as we have learned through this budgeting process, the CAO has limited visibility   into the process duration of the accounting function.  In its justification for the addition of 100 accountants, P&N stated its productivity goal for the new accountants was 1.5 reviews per accountant per week, with new accountants achieving this level of productivity within 60 days. In the proposed Q4 budget, the targeted productivity for BEL accountant reviews has dropped to 1.0 review per accountant per week.  Accordingly, it is of note that the addition of the 100 new accountants, which must be accounted for in the Q4 budget, corresponds with an estimated decrease in productivity levels for BEL claims which the accountants are responsible for handling.

## D.    Budgeted Information Technology (IT) Fees of BrownGreer Are Not Sufficiently Detailed to Assess Whether the Costs Are Reasonable

Brown Greer's proposed Q4 budget includes $3.9 million for IT costs. We have asked for a detailed breakdown of how the IT budget will be allocated and have only received a high level breakdown that 48% of the budget dollars will be spent on system maintenance and 48% on further system development, with the remainder to smaller tasks.  We have requested, but have not received, any further breakdown of these costs including, for example, the list of IT development or maintenance tasks included in the estimate. Without these detailed breakdowns, these costs continue to appear excessive, particularly at this stage in the program (i.e., heavy development related IT costs should already have been incurred) and BP has no ability to evaluate their necessity. An operational review and examination, including some analysis of the continuing IT needs of the program, is necessary to allow BP and the CAO some basis to evaluate the reasonableness of the budget.

**E.     Primary and Secondary Handling Rate Assumptions are Not Calculated at Current Rates**

The Q4 budget uses February 2013 percentages for estimating the number of claims that will undergo claims processing for certain steps rather than current monthly percentages. BP recommends the most recent data be used in the budgeting process.

**F.     The Budget Appears to Incorporate Excessive Labor Rates**

BrownGreer and Garden City Group collectively hired more than one thousand independent contractor employees to work at the CSSP, marked-up these labor costs, and passed them through to the CSSP and Settlement Trust. BP has requested, but has not received, information regarding the markups actually being charged by BrownGreer and Garden City Group so that it can evaluate whether those markups are excessive. Based upon BP's review of independent contractor rates available in the market, the independent contractor rates appear excessive. As stated previously, BP does not believe it is appropriate to pass through unreasonable markups to the CSSP and Settlement Trust on dedicated labor acquired specifically to work on the program, and these costs should not be included in the Q4 budget.  Both BrownGreer and Garden City Group have actively converted contractors to company employees preserving these apparently excessive  markups for these converted employees.

With respect to employee labor rates, the assumptions built into the Q4 budget related to rate and level changes of employees are not disclosed or explained, making it difficult to understand the driving factor behind these assumptions.

**G.     The Budget Incorporates Excessive Levels of Accountant Travel Expenses**

The budget includes unreasonable and unnecessary travel fees related to having large numbers of accountants travel to New Orleans when there is no need for the vast majority of them to be physically present in New Orleans to accomplish their tasks. For example, PwC accountants perform the same work from other non-travel locations (e.g., San Francisco) without traveling to New Orleans. BP does not believe that it is appropriate to include these unreasonable and unnecessary travel fees in the budget.

**H.     The Budget Estimates BrownGreer's Claimant Communication Center and Garden City Group's Call Center to Have Activity Levels Three Times Higher than Current Experience.**

The proposed Q4 budget allocates approximately $1.9 million to the BrownGreer Claimant Communication Center ("CCC").  According to the supporting documents, this amount is calculated based on an average call time of 30 minutes per call (Tab "BG CCC Budget" ).  However, according to BG Weekly Status Report #40, August 12, 2013, Table 27B, the average call time for the CCC is 6.9 minutes.  No justification has been provided to explain why the budget should include projected activity exceeding four times the current activity levels and the estimated call time should be reduced accordingly.

Similarly, the proposed Q4 budget allocates approximately $1 million to the GCG call center. According to the supporting documents, this amount is calculated based on an average call time of 30 minutes per call (GCG Outreach Model Assumpt.). However, according to email correspondence from Kirk Fisher dated August 22, 2013, in response to BP's questions on the average call time, the average GCG call center call is 10 minutes. Again, no justification has been provided to explain the dramatic increase in estimate call times.

The proposed budget allocation for both the BrownGreer and Garden City call centers appear inflated by significantly overestimated activity and should be reduced accordingly.

The GCG budget also includes approximately $600,000 for Payment Outreach to class members who have received an Eligibility Notice but have yet to respond to the CSSP.  Notwithstanding the issue of whether this process is required under the terms of the Settlement Agreement, this amount is based on an estimate provided by GCG, and no support has been provided as to the number of calls,

average time per call, or hours spent performing this task. This budget item requires additional detailed supporting documentation.

**I.** **The Amounts Budgeted for BrownGreer's CCC and Garden City Group's Call Center Management Fees Are Excessive.**

Of the total hours attributed to the BrownGreer CCC in the Q4 budget, no explanation is provided for approximately 33% of the total hours, which presumably are management-related hours. Similarly, the GCG call center budget assumes that 49% of the overall budget is attributable to management costs. For experienced call center teams, these percentages are excessive and the budget should be reduced accordingly.

**J.** **The Proposed Budget Does Not Adequately Address Impact of Policy Holds**

The Q4 budget does not account for the policy hold on the subsistence review claims, nor is there any explanation of whether current reviews are placed on hold until policy hold issues are resolved. It was stated to us that the CAO relies on recommendations from vendors about whether current reviews should be suspended until policy hold issues are resolved. No review processes are planned to be suspended in the Q4 budget. At a minimum, the effect that a policy hold would have on actual and budgeted performance should be evaluated and disclosed. During a policy hold, vendors should not be left without direction to continue performing work that may need to be redone or revised as a result of the policy resolution. To the extent the subsistence policy has to be revised or replaced based on the current investigation of corruption at the CSSP, the CSSP may need to re-perform the subsistence reviews. Accordingly, the CSSP's hold should extend to the review of subsistence claims until the conclusion of the corruptions investigations. The Q4 budget should be revised to reflect such a broader hold.

**K.** **The Budget Appears to Double Count Costs of Claim Review Time Spent By BrownGreer Employees Located at Client Assistance Centers ("CAC")**

The CAO has indicated that BrownGreer employees located at CACs are cross-trained to perform claims review tasks in addition to their CAC related tasks. The proposed Q4 budget includes $5.4 million for the costs of running the CACs and, while the supporting budget material indicates that the $5.4 million only includes cost for CAC related tasks, the actual data suggests the non-CAC related costs have not been backed out of the calculation.

The "CAC Modeling Assumptions Tab" calculates a cost per visit of $107.71 and explains in footnote 1 that CAC reviewer costs are not included in the calculation. However, the support provided for the $5.4 million budget shows that number is calculated using an average cost per visit of $295.02. (Tab "BG CAC Budget"). Presumably the difference between the two average costs per visit is due to the latter including both the costs of claims review tasks and CAC related tasks in developing the average.

Finally, with respect to fixed costs associated with CACs, it is not clear where the approximately $110,000 per month in rent is included in the proposed Q4 budget. Additionally, we would recommend that the final narratives supporting the Q4 budget include any relevant discussion regarding the analysis for closing any CACs during Q4. Such an analysis would include the number of visits at each center, the fixed costs of each center, the geographic proximity of visitors to the center, the proximity of adjacent centers, and the cost/benefit of early lease termination, among other things.

**L.** **There are Numerous Costs in the Budget Which Have Not Been Evaluated on a Cost/Benefit Basis**

The Garden City Group File Audit Process, budgeted for $2.4 million in Q4, appears to be an unnecessary use of resources and adds great expense to the Q4 budget without reason. The impetus for this process is to convert claim information submitted to the GCCF by Class Members into the CSSP for use in processing their CSSP claim. However, these conversions are being performed on all GCCF claims, regardless of whether or not the claimant has filed a CSSP claim. This step is unnecessary, and results in work being performed on claims that will never be filed in the CSSP. In addition, it is believed that currently less than 1,000 CSSP claims per month are being filed

by previous GCCF claimants. As a result, the budget for this activity should be reduced to provide only for the conversion of newly filed CSSP claims.

The BrownGreer budget includes $6.4 million for administrative costs. The support for this cost is based on the amount spent in June, with an assumed reduction to the overall level occurring during Q4. As a result, no support can be provided for precisely where these budgeted amounts will be spent. For example, some of the tasks in June are based on claims volume and activity, while others are fixed in nature. The CAO stated that it is up to the vendors to determine where these costs will be allocated in Q4. However, no allocation has been provided, preventing an evaluation of this item in the budget.

## III. Comments Regarding the Documentation and Information Supporting the Proposed Budget

As previously mentioned, the budgeted amounts for many areas in the Q4 budget are not supported by anything other than an extrapolation of historical costs. Moreover, the historical costs of the facility have not been tracked in sufficient detail for all Vendors in order to support the budgeted amounts, as cost and productivity levels at each task level is not tracked. In order to support future budgeted amounts, the CAO should require vendors to provide this appropriate level of detail on a monthly basis.

On a quarterly basis, BP should be provided with the following documentation to support future budgets: (i) budgeted amounts by Vendor/CAO by month; (ii) supporting narratives; (iii) a utilization model for the three month period, without any locked cells; (iv) a supporting analysis of non-model driven variable costs; (v) a supporting analysis of fixed costs; (vi) a current BrownGreer/Garden City Group weekly reporting package; (vii) historical performance of utilization model/metrics; (viii) vendor KPI metrics and proposed vendor Task Orders for the quarter; (ix) a current organizational chart, showing headcounts at each level correlated to the vendor invoices and task level; (x) an analysis of projected turnover, hiring and training costs; (xi) current settlement projections showing projections of claims forecast and claims through the life of the program; (xii) analysis supporting the hours needed to perform each task by process by claim type for each vendor; and (xiii) a listing of service levels for each function within the Program by vendor (including administrative Program levels managed by the CAO).

In addition to the quarterly budget supporting documentation, BP should be provided with the following supporting documentation on a monthly basis: (i) current invoices from each vendor; (ii) BrownGreer/Garden City Group invoices broken down into the same categories shown on the organizational chart and task level, with time entries broken down by time spent on claim activity, travel, training and other "off-task" time; (iii) P&N/PWC invoices broken down into the same categories of organizational chart and task level with time entries separated between time spent on travel, claim resolution, training and other "off-task" time, and further separated for time spent on each individual claim, including an identification of the claim number worked; (iv) a comparison of actual costs to budget costs at the same level of detail provided in quarterly budget; (v) a supporting narrative with discussion of variances to budget and highlights of efficiency initiatives (both procedural and systems initiatives); (vi) a utilization model comparing actual to budgeted performance for the month, including a breakdown of performance for each vendor's portion of the model; (vii) supporting analysis of performance of non-model variable costs; (viii) current BrownGreer/Garden City Group weekly reports; (ix) an analysis of turnover, hiring and training costs for the month; (x) an analysis of changes to billing levels and rates of all employees of all vendors; (xi) additional data/analysis as may be determined once complete data dictionary is received and reviewed by BP; (xii) copies of any internal audit/quality assurance reports issued during the month; (xiii) copies of the invoice audit results performed by the CAO; and (xiv) any changes in existing service levels or service levels for new activities, agreed to by the CAO with the vendors.

For any identified variances, the variance analysis should include an analysis of the variances, the cause for the variance, action items to address the variance (if the variance is unfavorable), and any impact those results have on future budgets.

We are happy to discuss any of our comments and recommendations with the CAO in advance of its final proposed Q4 budget.

Sincerely,

Maria Travis
Director of Claims - GCRO

8068462

Cc:    Mark Holstein
       Keith Moskowitz
       Kirk Fisher
       Patrick Juneau
       Bob Levine

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

August 28, 2013

Maria Travis
BP America Inc., Director of Claims
Gulf Coast Restoration Organization
501 Westlake Park Blvd.
Houston, TX 77079

Dear Maria,

The Claims Administrator's Office (CAO) is in receipt of your August 23rd letter responding to the CAO's initial Q4 2013 budget forecast submittal. In your letter, you list several concerns raised by BP regarding the budget process, some of which had already been addressed by the CAO at the time of your letter (BP's August 23rd Budget Response, 1 n.1). The CAO has since worked diligently to ensure that all of your comments in the August 23rd letter have been addressed in this final budget forecast and supporting documentation.

Before we address each of your comments from the August 23rd letter, I would like to restate the constraints on the development of our model. First, as per the directive of the Claims Administrator, we have developed our budget with the constraint that there will be no increase in the backlog of claims that will receive final determination notice. In other words, our staffing levels within the model are adequate to process to final notice all claims that the Program is projected to receive on a daily basis over the next quarter. With this assumption, you will note that our model indicates that we need an additional 99 accounting Full Time Equivalents (FTEs) to maintain the current claim volumes and to prevent backlog from increasing. Conversely, the

**EXHIBIT B-15**

model shows that we are overstaffed in other areas, such as non-BEL analysts and reviewers, and therefore, we have a planned reduction in the budget forecast in these specific areas.

Secondly, as noted in your letter, the Claims Administrator's Office is largely dependent on Vendor-provided and historical data as inputs into the model, including task durations and other information. The CAO acknowledges that an increased level of effort is needed to complete the necessary studies and analyses, such as time and motion studies, as a next step to gathering additional data for the model. Within the time constraints of this budget request, there is simply not enough time to conduct the necessary studies and additional data collection. Therefore, Vendor-provided and historical data are necessary to complete the model. With this in mind, we see the budget process as a collaborative, continuously improving process whereby BP and the Plaintiffs' Steering Committee are able to work with the CAO to continue to develop an accurate, data driven budget forecast model incorporating new data as it becomes available.

Also note, in order to maintain full transparency, we have provided minutes for the August 9th, August 14th, and August 21st meetings conducted for the purpose of discussing our budget model and methodology. In our August 12th and August 15th letters, we asked that you provide any comments as to these minutes to ensure that we both have an accurate recollection of the meetings. Again, at our August 21st meeting, we asked that you review the minutes from those two meetings and provide feedback so that we could finalize those minutes. In that meeting, you stated that you would prefer to provide BP's comments the following day. As of this date, we have still not received any comments as to your understanding of the meetings in accordance with the minutes. We have attached the minutes for the August 9th, 14th, and 21st meetings as Exhibit A and ask that you provide BP's detailed comments as to your view of the accuracy of those minutes.

Our responses to each of your comments in the August 23rd letter are as follows:

## I. Comments Regarding the Framework of the Proposed Budget Model

As the CAO has stated and BP has reaffirmed in its response to the Q4 budget proposed on August 16th, certain assumptions were required in order to project future expenses. For some of these assumptions, it was necessary for the CAO to rely on data provided by the CSSP Vendors. BP has duly noted that the CAO does not currently possess the analysis necessary to validate the estimates provided by the CSSP Vendors. Nonetheless, the CAO has asked for additional information on the assumptions that were made. In response, Postlethwaite & Netterville has provided support for the claims review duration estimates; BrownGreer has provided support for the estimated decrease in Information Technology (IT) labor hours and for the elimination of the second reviewer shift; PricewaterhouseCoopers has provided support for its decrease in travel expense; and Garden City Group has provided support for the average call time and File Audit reduction. An example of this additional support is included as Exhibit B – Postlethwaite & Netterville Estimated Effort Memo.

With the understanding that future budget forecasts will require a more in depth analysis than the CAO has been able to perform in this abbreviated budget revision process, the CAO will be tracking the crucial data necessary to minimize the aforementioned assumptions. This data, in conjunction with time and motion studies, will provide the CAO with the resources necessary to validate, modify, or reduce the CSSP Vendor provided assumptions.

Additionally, as previously noted, the CAO adapted the pre-existing utilization model to be used as a budget forecast model. In performing this task on such a limited time frame, a small number of model miscodings occurred as disclosed in our August 21st meeting and as stated again in your August 23rd letter. These miscodings have been corrected by the CAO, and these

model changes are reflected in the change log attached as Exhibit C – Budget Forecast Model Change Log.

Lastly, BP's response notes that a critical component of the budget is a comparison of actual past performance to the proposed Q4 budget. In formulating this comparison, the CAO has compared July's actual hours and labor cost to the fourth quarter projected hours and labor cost. As previously mentioned, the primary foundation for the proposed budget is the reviewer utilization model, which has been developed to project staffing levels required to combat backlog growth. As such, the comparison of actual performance to budgeted performance results in variances for each of the four Vendors. This additional support is included as Exhibit D – Fourth Quarter Labor Modeling Summary.

## II. Comments Regarding the Q4 Proposed Budget Amount

### A. The Line Item "Contingency Fee" Should Be Eliminated

Over the past weeks, the CAO's confidence level pertaining to the accuracy of the budget model has vastly increased. For the Q4 budget, the 5% contingency fee will be applied to only variable costs within the Program and will not be applied to fixed costs. Due to the budget submission time constraints that do not provide sufficient time to gather all historical data and perform time and motion studies to review and examine the Vendor assumptions, the CAO maintains that a 5% contingency fee for variable components of the Program is appropriate. After applying all of the recent modifications and corrections to the budget model, the contingency fee for only variable costs results in a change in the contingency fee from $6,260,737 to $6,022,783, a reduction of $237,954. As more data is obtained and as time and motion studies are performed to review the Vendor-provided assumptions, the CAO's confidence

in the ability of the model to accurately forecast the budget will further increase, and the CAO anticipates that, as a result, the contingency fee will decrease for the Q1 2014 budget.

Keep in mind that a contingency fee is just that—a contingency. It does not imply that the actual fee will be expended. It merely provides a contingency in the case that an unforeseeable event occurs, such as an unanticipated spike in claims, which, in conjunction with our constraint to prevent an increase in the backlog of claims that will receive final determination notice, would require additional labor hours (straight time overtime) to process the additional claims.

## B. The Task Utilization Rate is Too Low

The CAO incorporated a Task Utilization Rate to accommodate the complicated nature of reviewing claims that are, to a large extent, incomplete for several review iterations. Because of the high level of incompleteness, claim reviewers must educate themselves on work that has been performed to date by evaluating the claimant file; reviewing and validating previously entered values; and discussing work with previous reviewers. All of this leads to time dedicated to the review process that occurs outside the window of when a claim is checked out for review, resulting in a lower Task Utilization Rate.

The CAO, however, takes note of BP's assertion that the 75 percent Task Utilization Rate[1] is too low, particularly for some claim categories that experience fewer incomplete claims and are less arduous to review. In the time between the Q4 budget submission and the Q1 budget submission, our team will perform an in depth operation review and examination; create a more sophisticated measurement for current task utilization rates; work closely with the Vendors

---

[1] It should be noted that for Business Economic Loss claims, Start-Up Business Economic Loss claims, and Failed Business Economic Loss claims, the CAO used a Task Utilization Rate of 80.12%. This figure is a blended rate calculated using the task utilization information provided by Postlethwaite & Netterville and PricewaterhouseCoopers.

to define target Task Utilization Rates for each claim category and design programs to achieve those rates; and develop scorecards to measure success against objectives.

## C. There Are Process Duration Changes for Both BEL and IEL Claims Which Are Unsupported

In the response to the Q4 2013 budget, BP states "Our understanding is that these revisions are not supported by any data analysis completed by the CAO, but rather are based on assumptions and estimates being provided to the CAO by the CSSP accounting vendors..." At the time of the initial budget submission on August 16th, the CAO did not possess the raw data necessary to perform such an analysis. Since the original submission, this data has been obtained, and a complete duration analysis has been performed on the average time required to generate each of the following notices for each of the 12 claim types: Eligible Claims, Closed/Denied, Incompleteness Denial, and Withdrawn/Opt Out.[2]

It is relevant to note that the Q4 budget forecast does not arbitrarily choose a number of FTEs with which to populate the model. The Q4 2013 budget model forecasts that, given the current rate of claims processing and the projected number of claims filed over the next quarter, 99 additional accountant FTEs will be necessary in order to combat increasing backlog, which has been the goal of the CAO from the beginning of the Program. As previously stated, the chief model constraint is to prevent the increase of the backlog of claims that go to final determination notice. As such, our staffing levels in the model are determined to meet this constraint and achieve a final budget forecast number.

BP also raises a concern as to an unexplained decrease in accountant reviews per week for BEL Claims. There is a valid reason for the decrease in reviews per week based on the way

---

[2] For a complete description of the Modeling Duration process and an analysis of the results, please reference the attached "Reviewer Costs Model" and "Reviewer Cost Model and Budget Forecast Methodology" narrative.

claims were selected earlier in the process in order to ramp up processing and demonstrate awards prior to the fairness hearing. In this early stage, claims that were complete, in Zone A, and were not subject to complex policy issues were selected. As the Program matured and claims were processed on a FIFO basis, a larger percentage of claims is subject to various issues which in turn slow down claim processing. With incomplete claims, the Program Accountants are now required to contact claimants in order to request additional information. Also, many claims are in Zones other than Zone A, which has presumed causation, and thus require significantly more time to process. Lastly, at the beginning of the Program, intricate and complex claims that were identified as having outstanding policy questions were placed on hold. As the Program has matured and hundreds of policies have been adopted to process these intricate and complex claims, the Program accountants must now not only process these complex claims, but also ensure that each claim review complies with the established Program policies. Program complexities such as these, rather than a decrease in reviewer productivity, are the reason that claim review times are increasing.

## D. Budgeted Information Technology (IT) Fees of BrownGreer Are Not Sufficiently Detailed to Assess Whether the Costs Are Reasonable

BrownGreer (BG) has provided a list of development and maintenance tasks for which the IT portion of the Q4 budget will be used. This list is attached as Exhibit E. However, the CAO notes that, given the time constraints of the budgeting process, an estimation of specific costs resulting from each programming task was not available from BrownGreer at the time of the Q4 budget submittal. The CAO has requested this information from the Vendor and, for future budget submittals, will include estimates of IT project costs that will tie to the IT budget. In the current budget forecast for the fourth quarter, the CAO utilized the labor assumptions provided by BG, resulting in a 24% reduction in IT costs.

## E. Primary and Secondary Handling Rate Assumptions Are Not Calculated at Current Rates

The CAO recognizes that, given the rapid pace with which the CAO was required to revise the budget forecast model, the initially proposed Q4 2013 budget secondary handling rate (i.e. re-reviews, reconsideration, and appeals) was based upon February statistics. Since the submission of the initially proposed budget, the CAO has updated all secondary review statistics as of August 21, 2013. These model changes are reflected in Exhibit C – Budget Forecast Model Change Log.

## F. The Budget Appears to Incorporate Excessive Labor Rates

As the CAO previously stated in its July 1st Letter to Judge Barbier, contracts have been established with the Vendors whereby the Vendors charge the regular bill rate for contract labor employees (also known as 1099 employees). Neither the CAO nor the Vendors were notified by BP prior to contract execution that BP would prefer for these contract labor costs to be passed through similar to Other Direct Costs (ODCs). With these Contracts already executed with each Vendor, the CAO simply cannot request these contract labor rates and that these costs be passed through as with other ODCs. BP was involved in every step of the Vendor contract negotiations, which included onsite meetings with the Vendors. In those meetings, which were the proper forums for such discussions, BP should have raised its concerns, which could have been part of the final negotiations prior to contract execution.

## G. The Budget Incorporates Excessive Levels of Accountant Travel Expenses

As a result of ongoing discussions with PricewaterhouseCoopers (PwC), the CAO and PwC have agreed that the number of accountants traveling to the New Orleans office will progressively decrease each month within the fourth quarter. The CAO has obtained monthly

estimated travel expenses from PwC, which it has incorporated into the Q4 budget forecast. PwC's plan for decreasing its travel expenses over the fourth quarter is included in Exhibit F.

## H. The Budget Estimates BrownGreer's Claimant Communication Center and Garden City Group's Call Center to Have Activity Levels Three Times Higher than Current Experience

Because of the time constraints placed on the budget revision process set forth by the Court Order, call times presented in the initially proposed Q4 2013 budget were based on previously provided Vendor assumptions. Since the submission of the initially proposed budget, the CAO has received updated information on the CCC average call time and the Call Center average call time, both of which have been budgeted at 10 minutes each (8 minute call time and 2 minute wrap up time). These model changes are reflected in Exhibit C – Budget Forecast Model Change Log.

The CAO also disagrees with BP's assertion that the labor cost of the GCG Payment Outreach is an assumption provided by the Vendors. The July actual labor hours and costs were used as the basis for determining the Q4 budget. With only one full month of data available at the time of the budget creation, the CAO made the assumption that the labor hours and cost would remain constant throughout the fourth quarter.

## I. The Amounts Budgeted for BrownGreer's CCC and Garden City Group's Call Center Management Fees Are Excessive

The Q4 2013 budget is, in the opinion of the CAO, not excessive and reflects BrownGreer's CCC management costs as 22% of total cost. BrownGreer includes one senior counsel and seven special counsel employees under its management umbrella. These managers are responsible for overseeing 65 callers, making the staff to management ratio approximately 8:1. Similarly, the current Garden City Group call center ratio of operators to floor supervisors is

10:1. However, the Garden City Group budgeted call center managerial cost figure includes crisis managers, quality assurance personnel, and telecom support which results in a higher managerial cost.

## J. The Proposed Budget Does Not Adequately Address Impact of Policy Holds

As the CAO has previously stated, it relies on Vendor recommendations to determine whether reviews should be suspended for claims on hold that currently have a pending policy decision. In regards to the current Subsistence hold, the Vendor recommended, and the CAO agreed that, by continuing to process claims, value is still being added to the Subsistence review process.    While this value cannot currently be measured, claim reviewers are presently performing tasks that are essential to every Subsistence claim, regardless of pending policy outcome, which will ultimately assist in resolving the existing backlog of 23,000 claims.   In regards to projecting the effect a policy hold has on actual and budgeted performance, the CAO does not possess the ability to identify newly proposed and amended policies or the number of claims that will fall within the policy hold parameters for the projected quarter when it is required to submit the budget sixty days in advance of the quarter's commencement. Furthermore, too many external variables exist (e.g. the number of claims that fall within the policy hold parameters, the policy decision date, and ultimately the policy decision) for the CAO to accurately project when the value added for processing policy hold claims will be observed.

## K. The Budget Appears to Double Count Costs of Claim Review Time Spent by BrownGreer Employees Located at Claimant Assistance Centers (CACs)

The CAO recognizes that, due to the limited time constraints of the Court Order budget process, the initially proposed Q4 2013 budget inadvertently included "costs of claim review time spent by BrownGreer Employees" located at Claimant Assistance Centers (CACs) in the

CAC Visitor-Specific Cost Model as well as in the Reviewer Cost Model, as indicated in BP's August 23rd letter. The CAC Visitor-Specific Model has since been revised to only include visitor-specific costs. The remaining portion of total CAC hours incurred that are not specific to claimant assistance are only included at the reviewer level in the Reviewer Cost Model. Removing the claim review task time from the Visitor-Specific Model reduced the 2013 CAC Visitor-Specific Q4 budget from $5,440,992 to $2,060,794.

In the proposed Q4 budget, the fixed monthly CAC lease payments are embedded in the expenses of BrownGreer. Due to the methodology used to calculate the proposed budget, breaking out the specific CAC lease payments and other fixed costs would have a limited benefit.

On December 1, 2013, the Apalachicola, Bay St. Louis, Biloxi, Cut Off, Lafitte, Clearwater, Fort Walton Beach, Mobile, Panama City Beach, Pensacola, and Orange Beach CAC leases expire and are up for renewal. No lump sum payments are required to renew the leases and only a portion of the CACs will see an increase in monthly lease payments. If all of the CACs were to renew their lease agreements, the monthly lease payments would increase from $75,709.77 to an estimated $76,480.58, a one percent increase in monthly costs. As such, it is still appropriate to consider the lease payments a fixed cost for each month in the fourth quarter.

Discussions between the CAO and the Vendors about closing CAC facilities have occurred; however, several reasons exist for why none of these facilities have been closed to date. First, these facilities have remained open because existing lease agreements remain in effect. The majority of CAC facility lease agreements are for a period of one year. Second, given BP and the PSC's desire that the Program maintain a presence in the Gulf Coast, the CAO has kept all CAC facilities open. It should be noted, however, that CAC staffing levels have decreased as CAC visitor traffic has decreased. This has had the effect of lowering labor costs

during the leasehold period while still maintaining a Gulf Coast presence. Further, CAC staff has been cross-trained on different Program-related tasks in order to remain efficient when traffic in the CACs is low. As the incoming claim volume and visitor traffic decrease at the CACs, the CAO is considering the closing and consolidation of some centers and/or the reduction of hours at centers. However, as of the forecasting of this budget, no plans have been developed to consolidate centers or reduce hours, and the CACs have been budgeted at status quo.

## L. There Are Numerous Costs in the Budget Which Have Not Been Evaluated on a Cost/Benefit Basis

Since the Program inception, the Garden City Group File Audit team has worked on performing audits on all GCCF files. Early in the Program, it was decided to audit all GCCF files so that when a claim was filed, these files would be immediately available to the reviewer and the claimant on the DWH portal, reducing delays in the system. The File Audit team reviews each file to identify and remove documents that contain Personally Identifiable Information that does not belong to the filing claimant.

The files currently being audited are taking longer to audit than the historical average time because these claims are more complex and document-intensive. File Audit priority is assigned using two criteria. First, priority is placed on reviewing files associated with claimants who have filed a claim with the DWH Program. Second, smaller files receive priority over larger files to ensure that as many claims as possible are reviewed as quickly as possible. Given the size of the files remaining, it is currently estimated that File Audit of all GCCF files will be complete in mid-November. This completion of File Audit is reflected in the Q4 budget forecast.

## III. Comments Regarding the Documentation and Information Supporting the Proposed Budget

In accordance with the Court's August 7th Order, enclosed in this budget package is the CAO's budget for the fourth quarter and the supporting documentation used to compute the forecast. In its response to the CAO's preliminary budget forecast, BP has requested additional documentation to support future quarterly budget forecasts. Some of this information, where available to the CAO, has already been incorporated into this budget forecast. Other information, such as training costs due to turnover, has yet to be provided to the CAO by the Vendors. Also, bear in mind that the CAO may not be permitted to distribute some information to BP under the Settlement Agreement and will need to work with both Parties to determine what data is allowed for distribution. Within this constraint, however, the CAO is committed to working with BP to provide as detailed a quarterly budget package as possible.

BP has also requested supporting information on a monthly basis. As discussed in prior meetings between BP and the CAO, given the time constraints of this budget revision process, much of this requested information has been unavailable to the CAO simply because it has never been tracked by Vendors at such a detailed level. Again, the CAO will also face many of the same issues regarding the information requested on a quarterly basis, namely that the CAO may not be permitted to distribute certain information to the Parties under the Settlement Agreement. This information will, if allowed by the Settlement Agreement, be incorporated into future monthly reports and quarterly budgets, producing a more accurate forecast provided to BP as it becomes available to the CAO.

The CAO reiterates that these requests have not been the focus throughout this process. Pursuant to the August 7th Court Order, the development of an accurate revised budget forecast

August 28, 2013
Page 14

and its supporting documentation has been the CAO's primary priority. The CAO will work with the Vendors in the coming months to provide BP with the supporting documentation as requested.

Sincerely,

David Odom
CEO

Cc:    Magistrate Judge Shushan
       Stephen Herman
       James Roy
       Keith Moskowitz
       Patrick Juneau
       Bob Levine
       Kirk Fisher

**From:** <Moskowitz>, Keith <keith.moskowitz@dentons.com>
**Date:** Thursday, August 29, 2013 11:18 AM
**To:** Pat Juneau <pjuneau@dheclaims.com>
**Cc:** David Odom <dodom@dheclaims.com>, Kirk Fisher <kfisher@dheclaims.com>,
"SHERMAN@hhklawfirm.com" <SHERMAN@hhklawfirm.com>, James Roy <JIMR@wrightroy.com>,
"'Holstein, Mark E'" <Mark.Holstein@bp.com>, "Moskowitz, Keith" <keith.moskowitz@dentons.com>,
Maria Travis <maria.travis@bp.com>
**Subject:** Proposed 4Q Budget/Request For Panel Meeting

Mr. Juneau,

We are in receipt of the Claims Administrator's August 28, 2013 submission containing revisions to its proposed budget and supporting documentation in response to the comments BP provided on August 23, 2013. Pursuant to the Court's August 7, 2013 Order (Doc. 10955), BP requests that a Claims Administration Panel be convened. BP is available to attend a Panel Meeting on September 3 or 4, 2013. Please let us know at your earliest convenience when the Panel Meeting can be convened.

Best Regards,

Keith



Keith Moskowitz

D +1 312 876 8220
M +1 312 758 9732
F +1 312 876 7934

Dentons US LLP
233 South Wacker Drive

**EXHIBIT B-16**

**From:** David Odom [mailto:dodom@dheclaims.com]
**Sent:** Thursday, August 29, 2013 2:12 PM
**To:** Moskowitz, Keith
**Cc:** Kirk Fisher; SHERMAN@hhklawfirm.com; James Roy; Holstein, Mark E; Travis, Maria T; Sally Shushan; Patrick Juneau
**Subject:** Re: Proposed 4Q Budget/Request For Panel Meeting

Keith,

The Claim's Administrator is in receipt of your request for a Panel Meeting.  As such, we have scheduled the meeting for 9 am, September 4th at the Claims Administrator's office.  Please submit by tomorrow, a detailed list of BP's issues concerning the budget for discussion at the meeting.

Best regards,

David Odom



**EXHIBIT B-17**

**From:** "Travis, Maria T" <Maria.Travis@bp.com>
**Date:** August 30, 2013, 18:57:01 CDT
**To:** David Odom <dodom@dheclaims.com>, "Moskowitz, Keith" <keith.moskowitz@dentons.com>
**Cc:** Kirk Fisher <kfisher@dheclaims.com>, <SHERMAN@hhklawfirm.com>, James Roy <JIMR@wrightroy.com>, "Holstein, Mark E" <Mark.Holstein@bp.com>, "Sally Shushan" <Sally_Shushan@laed.uscourts.gov>, Patrick Juneau <pjuneau@dheclaims.com>
**Subject: RE: Proposed 4Q Budget/Request For Panel Meeting**

David,

Thanks for scheduling the panel meeting. The Claims Administrator has BP's August 23, 2013 comments on the proposed 4Q budget which are still applicable to the final proposed budget that was issued by your office on Wednesday. BP is reviewing the final proposed budget. If we have further questions or comments in advance of the September 4th panel meeting we will direct them to your attention.

Regards,
*Maria*
Eldridge 3 6.145C
Tel: 281-366-5928
Cell: 281-935-4271

**EXHIBIT B-18**

BP's Minimum Proposed Revisions to 2013 Fourth Quarter Budget
Submitted at September 4, 2013 Panel Meeting

On August 16, 2013, the Claims Administrator's Office ("CAO") submitted its initial 2013 fourth quarter ("Q4") budget, which totalled over $119,000,000. On August 23, BP sent the CAO a letter indicating that the initial Q4 budget was unreasonable and excessive under the circumstances and provided detailed comments and proposed revisions to the budget proposal.

The CAO submitted a revised Q4 budget on August 28 totalling over $131,000,000.

BP maintains the Q4 budget is excessive and unreasonable for all of the reasons identified in its August 23 letter.[1] In particular, the budget relies on untested assumptions and contains unsubstantiated costs that BP cannot reasonably evaluate without a thorough operational review and examination (as BP is entitled to pursuant to the Settlement Agreement, the Settlement Trust, the CSSP contracts, and applicable law) including an analysis of the validity of the CSSP Vendors' assumptions. Notwithstanding this lack of information, BP has identified specific revisions to the Q4 budget as detailed in the following table.

|  | Minimum Required Q4 Budget Revisions | Estimated Cost Impact on Q4 Budget |
|---|---|---|
| 1. | *Eliminate unsupported, 99 full-time equivalent (FTE) increase in accountants for BEL claims* | ($11.14)M |
| 2. | *Increase BEL accountant productivity* [2] | ($12.97)M |
| 3 | *Dramatically reduce projected Q4 Seafood claim staffing to reflect CAO's projected elimination of claim backlog* [3] | ($8.55)M |
| 4. | *Adjust task utilization rate for non-BEL claim types to* | ($1.31)M |

---

[1] BP recognizes that the CAO appears to have corrected the double counting of claim review time spent by BrownGreer employees located at Client Assistance Centers, as well as other calculation errors BP had identified.
[2] Determining an appropriate productivity target requires an operational review and examination. BP requests the budget be reduced immediately to reflect the only target that has been presented by the Vendor's themselves -- 1.5 BEL determinations per accountant per week. (June 4, 2013 P&N Memorandum to P. Juneau regarding "BP Requested 'Performance Study -- BEL Claims/Accounting Costs'".) BP maintains its position that the BEL claims determinations process is inefficient and does not make any representations that the target of 1.5 BEL claim determinations per accountant per week is a reasonable target. This calculation was achieved by reducing the accountant hours in the process duration calculation to 28.3 for BEL claims, although other assumptions could be also be changed to achieve this productivity level.
[3] The current model projects 205 FTEs for Seafood determinations. Based on the projected Seafood claim submittals and Q3 determinations, all Seafood claims are projected to be resolved prior to the start of Q4. The estimated cost reduction leaves residual costs for estimated re-reviews, reconsiderations, and trailing incomplete responses. The tab [Measured Page] erroneously projects determinations in excess of remaining seafood claims throughout Q4, resulting in an overstatement of required claim reviewer hours.

**EXHIBIT B-19**

| | | |
|---|---|---|
| | *equal BEL claim utilization rate[4] (after the impact of revision 3)* | |
| 5. | *Only perform GCCF file audit activity for those GCCF claimants filing CSSP claims* | ($1.26)M |
| 6. | *Eliminate Brown Greer IT development spending until further requested information is provided [5]* | ($1.95)M |
| 7. | *Adjust BG and GCG call center staffing levels based on 10 minute call duration[6]* | ($2.01)M |
| 8. | *Reduce Q4 BG and GCG administrative costs in line with budgeted Q4 labor costs (after the impact of revision 3 and 4)[7]* | ($1.25)M |
| 9. | *Reduce unallocated contingency fee from 5% to 1%, fix calculation errors[8] and calculate off reduced proposed budget amounts* | ($5.23)M |
| 10 | *Reduce labor rates to address the unknown and undisclosed mark-ups[9]* | Unquantifiable because the Vendors refuse to disclose amount of mark-ups |
| 11 | *Reduce BG administrative budget[10]* | Unquantifiable |

[4] BP maintains its position that even an 80% task utilization rate is too low and an operational review and examination is required to determine an appropriate task utilization rate. The task utilization rate of 75% for non-BEL claim types is inconsistent with the BEL utilization rate of 80.1%. The proposed adjustment is supported by a best practice of maintaining consistency within the model unless specific data supports an alternative assumption. The estimated reduction represents the non-duplicative impact of the task utilization rate adjustment after the hours related to Seafood claim review are removed from the CAO's model.

[5] As explained in previous correspondence and meetings with the CSSP, BP does not have enough information to determine if these IT costs are necessary. BP will provide funding for BrownGreer IT development spending subject to (1) BrownGreer and/or the CSSP providing project-level budgets; (2) review and approval of those project-level budgets by Chris Reade of the CAO; and (3) BP's rights to review and consent to the project-level budgets under the Settlement Agreement.

[6] The CAO's written response from 8/28 confirms that average call duration is 10 minutes; however the model fails to adjust the optimal staffing needs based on the new call duration assumptions.

[7] The model establishes that GCG administrative costs generally run between 15% and 18% of labor costs; however, the administrative cost projections are calculated off of Q2 actual labor costs as opposed to projected Q4 labor costs. The estimated reduction corrects for the calculation error and accounts for further reductions resulting from additional labor cost reductions identified in proposals 3 and 4.

[8] The contingency fee calculation in the 8/28 Q4 budget contains a formula error in cells K42 and M42 of tab [Q4 CSSP], resulting in the inclusion of additional fixed costs in the calculation.

[9] See June 9, 2013 Letter from K. Moskowitz to P. Juneau.

[10] The administrative budget is forecasted as a percentage of reviewer costs. As a result, a detailed description of these activities is not available. BP will provide funding BG Administrative costs subject to (1) BrownGreer and/or

These revisions amount to a total budget reduction of at least $45,600,000, resulting in a Q4 budget of no more than $85,600,000. BP believes that an operational review and examination will reveal further opportunities for budget reductions, while retaining or improving efficiency levels within the CSSP.

---

the CSSP providing task level budgets and (2) BP's rights to review and consent to the task-level budgets under the Settlement Agreement.

**From:** Bob Levine [mailto:blevine@dheclaims.com]
**Sent:** Wednesday, September 04, 2013 5:59 PM
**To:** Travis, Maria T
**Cc:** Holstein, Mark E; Keith Moskowitz; James Roy; Steve Herman (SHERMAN@hhklawfirm.com); Patrick A. Juneau (PAJ@juneaudavid.com); David Odom; Kirk Fisher
**Subject:** Budget Line Item Request

Maria, Mark,

In our panel meeting today, Kirk Fisher indicated that it will take approximately 60 days to complete time and motion studies of the claims process as part of our operational audit. The 1ˢᵗ Quarter 2014 Budget is to be submitted by November 1ˢᵗ, which is less than 60 days from now. These studies will be part of our ongoing analysis of the claims process, which will drive all future budgets.

The Claims Administrator increased the Claims Administrator's line item in the 4ᵗʰ Quarter Budget from $3,570,000 to $5,007,159 (a $1,437,159 increase) to hire additional staff for these studies. In today's meeting, Maria Travis stated that BP had no objection to this line item increase as part of this analysis.

While we understand, that other items in the budget are still in dispute, please confirm that BP does agree to this particular budget line item increase so that we may immediately add the necessary staff to meet the scope and schedule requirements of these studies.

Thanks,
**Robert P. Levine**
*Chief Financial Officer*

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**504-934-4999**

935 Gravier Street, Suite 1905
New Orleans, Louisiana 70112
**blevine@dheclaims.com**
Direct – 504 934-4919
Cell    -  504 813-8597

**EXHIBIT B-20**



**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

September 5, 2013

Maria Travis
BP America Inc., Director of Claims
Gulf Coast Restoration Organization
501 Westlake Park Blvd.
Houston, TX 77079

Dear Maria,

The Claims Administrator's Office (CAO) is in receipt of BP's Proposed Revisions to the 2013 Fourth Quarter budget, a copy of which is attached as Exhibit "A," submitted at the September 4th, 2013, Panel Meeting which was assembled pursuant to Magistrate Judge Shushan's August 7th, 2013 Court Order "Regarding BP's Obligation to Fund Claims Administrator's Proposed 4th Quarter 2013 Budget". In its submission, BP lists several proposed revisions to the CAO's fourth quarter budget submittal. This letter will address the following: 1) the confirmation of the CAO's understanding of those proposed revisions, 2) the establishment of the CAO's position regarding each of those revisions, and, 3) where applicable, the documentation of the budgetary adjustments made by the CAO in the Panel Meeting pursuant to BP's recommendations along with the CAO's revised budget which is attached as Exhibit "B." Below are BP's Proposed Revisions to the Q4 2013 Budget and the CAO's response.

1.  **Eliminate unsupported, 99 full-time equivalent (FTE) increase in accountants for BEL claims (Estimated Cost Impact of $11.14M)**

The CAO agrees to remove funding for the 99 additional accountants from the Q4 2013 budget and will revisit this line item in the Q1 2014 budget pending additional analyses. As discussed in the Panel Meeting, the CAO stands ready to perform Time and Motion studies and will share the results of these studies as appropriate with BP to further validate data in

935 Gravier St., Suite 1905  I  New Orleans, LA 70112  I  TEL 504.934.4999  I  FAX 504.934.4998
www.deepwaterhorizoneconomicsettlement.com

**EXHIBIT B-21**

the budget forecast model and in any adjustments to the 99 accountant figure for the Q1 2014 budget submittal.

This concession results in an $11.16 million reduction to the Q4 2013 budget.[1]

## 2. Increase BEL accountant productivity (Estimated Cost Impact of $12.97M)

While increasing the productivity of BEL accountants would possibly result in a decrease in claim backlog, this would have no impact on the fourth quarter budget forecast as submitted by the CAO.

As discussed in the Panel meeting, while increasing the productivity of the Program accountants would result in an overall savings to the Program, there would be no impact to the Q4 2013 budget as there is a significant backlog of claims to be processed.  Savings will be achieved in future budgets as the backlog is decreased and an FTE reduction strategy is employed.[2]

The CAO will continue to gather detailed information and stands ready to perform Time and Motion studies on the accounting review process to validate the accuracy of current model drivers.  The CAO will also continue to work with the Program accountants and drive towards a more efficient operation for more expedient claims processing and for cost savings to the Program.

There is no cost savings to the Q4 2013 budget associated with this strategy.

## 3. Dramatically reduce projected Q4 Seafood claim staffing to reflect CAO's projected elimination of claim backlog (Estimated Cost Impact of $8.55M)

The CAO agrees to reduce the number of FTEs performing Seafood reviews in the budget forecast from 205 FTEs to 100 FTEs.

---

[1] The figure presented by BP and presented as a concession in the Panel meeting was $11.14 million, but upon further analysis of the budget model, the number is actually $11.16 million.

[2] The CAO acknowledges that an increase in accountant reviewer productivity may help reduce the cost of the Program on a long term basis by lowering the claim backlog more rapidly and thus decreasing the overall duration of the Program.  However, for purposes of the Q4 2013 budget forecast, BEL accountant productivity is not relevant.

The budget model forecasted that 205 Seafood reviewers were required to achieve desired Seafood processing targets. Rather than increasing Seafood review staff as dictated by the budget model to 205 total FTEs, the CAO determined that maintaining the current staffing level of 100 FTEs would be sufficient.

Given that the processing of Seafood claims is nearing an end, continuous evaluations of the FTE count dedicated to Seafood processing will be performed as more detailed studies are conducted by the CAO, and reductions will be employed in future quarters as reasonably appropriate.

This concession results in a $5.47 million reduction to the Q4 2013 budget.[3]

## 4. Adjust task utilization rate for non-BEL claim types to equal BEL claim utilization rate (after impact of revision 3) (Estimated Cost Impact of $1.31M)

The CAO does not currently have adequate information to determine at exactly what level the task utilization rate for each claim type should be set. Given the effect on staffing levels and claim backlog, the CAO cannot unilaterally adjust task utilization rates without additional information and further discussion.

The CAO stands ready to perform Time and Motion studies in its operational review to determine the appropriate task utilization rates. Once these additional analyses are performed and accurate information is gathered, the CAO will address the task utilization rate of each claim type as reasonably appropriate in the Q1 2014 budget submittal.

## 5. Only perform GCCF file audit activity for those GCCF claimants filing CSSP claims (Estimated Cost Impact of $1.26M)

The decision to perform a file audit on all GCCF files was a decision made pursuant to Section 4.4.2 of the Settlement Agreement.

---

[3] The figure presented by BP and presented as a concession in the Panel meeting was $5.1 million, but upon further analysis of the budget model, the number is actually $5.47 million.

Per this Section, in November 2012, the CSSP sent each GCCF claimant a letter pursuant to Section 4.4.2 of the Settlement Agreement, discussing how the claimant could see all documents he or she had submitted previously in the GCCF and how to determine what additional documents the claimant needed to submit to the CSSP.  The letter explained that the claimant would have immediate access to all documents on file, as soon as he or she entered the GCCF claim number into the CSSP's online filing system.

The ability of the claimant to instantly access all previous GCCF information was viewed as preferable to other less favorable options.[4]

The CAO recommends continuing with the proactive conversion of these GCCF files, which will be complete in November of this year.

**6.  Eliminate BrownGreer IT development spending until further requested information is provided (Estimated Cost Impact of $1.95M)**

In reality, this proposed revision would downsize the BrownGreer IT development staff until a project-level budget has been produced by BrownGreer, submitted to the CAO, and finalized in discussions by BP at which point the BrownGreer IT staff would be required to "upsize" to perform the projects itemized in that budget.  This would have a largely adverse impact on the Program, as we have a continuing need to make modifications to the systems for policy and process changes, efficiency improvements, and IT security.

The CAO has requested information concerning the ongoing projects performed by the BrownGreer IT development department; however, given the time constraints of the budget revision process, BrownGreer has not been able to compile the detailed project-level budget forecasts at this point.

---

[4] The alternative to the approach adopted by the CAO included the examination of each GCCF claim and its associated files to determine what additional documentation that claimant was required to file in order to satisfy the requirements for each of the twelve claim types as dictated by the Settlement Agreement.  These additional documentation requirements would then be relayed to the claimant.  This alternative was viewed as inferior to the approach adopted by the CAO for two reasons: 1) it was significantly more labor-intensive and 2) it resulted in a delay between the time when the claimant filed with the CSSP and when that claimant could view his or her claim file online.

The CAO therefore recommends this issue be postponed until further discussions related to the Q1 2014 budget forecast, at which point the required information will be available to the CAO and provided to BP as appropriate.

7. **Adjust BG and GCG call center staffing levels based on 10 minute call duration (Estimated Cost Impact of $2.01M)**

Garden City Group Call Center average call time is currently at ten minutes, as indicated in the budget forecast model.  These calls include standard inbound and outbound calls that involve similar dialog and skillsets for each call.

BrownGreer's Claimant Communication Center (CCC) handles additional functions beyond inbound and outbound calls to include claim research, claim status updates and summaries, Portal navigation assistance, and resolution of escalated claimant concerns. The CCC also collaborates with the Claimant Assistance Centers (CACs) to schedule claimant visits, facilitate claim filing and document submission, and resolve additional questions related to the claims process.

Unlike the Garden City Group Call Center budget forecast, the BG ten minute call time does not directly affect the budget because the BrownGreer CCC call staff is carrying out additional functions; therefore, no direct correlation exists between this ten minute call time and the BrownGreer CCC budget forecast.

The CAO believes that the budget forecast model accurately reflects the appropriate call activity for the Garden City Group Call Center and the BrownGreer Claimant Communication Center.

8. **Reduce Q4 BG and GCG administrative costs in line with budgeted Q4 labor costs (after impact of revision 3 and 4) (Estimated Cost Impact of $1.25M)**

Similar to previous Proposed Revisions related to these administrative costs, the CAO needs more information before it can reasonably make informed decisions related to the administrative costs of BrownGreer and Garden City Group.

While its operational review is performed and additional information is gathered, the CAO recommends this issue be postponed until further discussions related to the Q1 2014 budget forecast at which time the results of the analysis will be available.

9. **Reduce unallocated contingency fee from 5% to 1%, fix calculation errors[5], and calculate off reduced proposed budget amounts (Estimated Cost Impact of $5.23M)**

The CAO maintains that some contingency is essential given the possibility that unforeseeable incidences, such as the Freeh investigation, will undoubtedly arise.  These are particularly time and cost intensive from a management perspective.  For these reasons, some contingency is necessary.

Despite this, the CAO has conceded to lowering the contingency from 5% of variable costs to 2.5% of variable costs in a good faith effort to compromise with BP.

This concession results in a $3.44 million budget reduction to the Q4 2013 budget.[6]

10. **Reduce labor rates to address the unknown and undisclosed mark-ups (Estimated Cost Impact : Unquantifiable)**

As stated in our August 28, 2013 letter, Contracts have been executed with the Vendors including labor rates for Vendor employees and 1099 contract employees.  BP was present at these negotiations, which were the appropriate for such discussions.  Prior to Contract execution, BP could have requested lower rates for these 1099 employees or to treat them as Other Direct Costs, which are pass-through expenses.  We now must honor those Contracts and pay the rates therein.  Therefore, there is no possible concession in this area.

11. **Reduce BG administrative budget (Estimated Cost Impact:  Unquantifiable)**

---

[5] The formula oversights in cells K42 and M42 of tab [Q4 CSSP] have been corrected so as to not include any additional fixed costs in the calculation of the contingency.  This resulted in approximately a $45,000 (0.035%) decrease in the total budget forecast.
[6] The figure presented to BP in the Panel meeting was $2.62 million, but upon further analysis of the budget model, due to reductions in variable costs in other concessions, the number is actually $3.44 million.

Similar to Proposed Revision number 8, the CAO needs to conduct additional studies before it can reasonably make an informed decision related to the administrative costs of BrownGreer.

Until its full operational review is performed and additional information is gathered, the CAO recommends this issue be postponed until further discussions related to the Q1 2014 budget forecast.

In summary, and in response to BP's proposed revisions to the Q4 2013 budget, the CAO has made a total of $20.07 million in reductions to the Q4 2013 proposed budget, reducing the overall budget to $111.16 million.[7]   It should also be noted that this represents a reduction of $19.16 million from the Q3 2013 $130.32 million budget.   The remaining items with the exception of item 10, Labor Rate Reduction, will require further analysis, which could not be conducted in the timeframe allotted for the Q4 2013 budget revision process.

Indeed, the CAO has requested additional funding, as part of the Claims Administrator's line item in its Q4 2013 budget submittal (an increase of $1.44 million), to hire staff in order to conduct the Time and Motion studies referenced in this letter.   And as explained in the Panel Meeting, we anticipate that the first analysis will take 60 days to complete from the date we hire the additional staff.   In the Panel Meeting, Maria Travis stated that BP had no objection to this line item increase as part of our analysis.   While we understand that other items in the budget are still in dispute, we have sent an email yesterday asking BP to respond by email that BP does agree to this particular budget line item increase so that we may immediately add the necessary staff to meet the scope and schedule requirements of these studies.   We ask that BP respond quickly as the Q1 2014 budget submittal is in less than 60 days and delays in adding the required staffing will impact our ability to produce the studies needed for the Q1 2014 budget forecast.

Also, as discussed in the Panel meeting, the CAO continues to work with BP towards a more detailed budget process supported by further analysis including the Time and Motion studies as

---

[7] The reduction of $18.94 was presented at the Panel meeting but has increased to $20.07 million due to various factors as discussed in footnotes 1, 3 and 6.

August 28, 2013
Page 8

part of the ongoing operational review of the Program. As part of this process, we will work with

BP to identify additional studies and detailed data needed for future budget forecasts.

Sincerely,

David Odom
CEO

Cc:     Magistrate Judge Shushan
        Stephen Herman
        James Roy
        Keith Moskowitz
        Patrick Juneau
        Bob Levine
        Kirk Fisher

**From:** Travis, Maria T <Maria.Travis@bp.com>
**Sent:** Friday, September 06, 2013 11:52 AM
**To:** Bob Levine
**Cc:** Holstein, Mark E; Keith Moskowitz; James Roy; SHERMAN@hhklawfirm.com; PAJ@juneaudavid.com; David Odom; Kirk Fisher
**Subject:** RE: Budget Line Item Request

Bob,

BP does not object to an appropriate increase in the CAO budget to provide the CAO with funds that are reasonable and necessary to effectively manage the Court Supervised Claims Program (the "CSSP"). BP also fully agrees with the statements in the CAO's August 28, 2013 letter that a thorough operational review and examination is necessary to prepare an appropriate budget and to otherwise properly manage the CSSP. We do not, however, agree that the CAO should conduct the operational review and examination itself. First, as the CAO recognizes, an operational review and examination needs to commence immediately given the less than 60 day window before the 4th quarter budget submission is due. It is our understanding that the CAO will need to hire additional staff to perform the review, and that such staff would have to be identified, placed and appropriately trained. There is simply no way that could all occur so that the operational review and examination is completed within the 60 day window (which could have been easily avoided had the Claims Administrator simply consented to BP's request for an examination on June 21, 2013). Second, based on the Claims Administrator's longstanding resistance to conducting an operational review and audit-- which was confirmed in his comments at the panel meeting on Wednesday- and the lack of clarity as to the scope of the proposed review, BP has no confidence that the Claims Administrator would conduct an operational review and examination with the requisite scope and robustness. Accordingly, BP cannot support the CAO's request for funding to undertake the necessary operational review and examination itself. Instead, BP is prepared to immediately retain an outside professional services firm that will complete a thorough operational review and examination within 60 days. BP will fully share the findings of that operational review and examination with the CAO so that the CAO can promptly utilize the results in connection with its budgeting activities and what we hope will be the CAO's active management of the CSSP and its vendors.

Regards,

*Maria*

Eldridge 3  6.145C
Tel: 281-366-5928
Cell: 281-935-4271

**EXHIBIT B-22**

**From:** Bob Levine
**Sent:** Friday, September 06, 2013 2:50 PM
**To:** Travis, Maria T
**Cc:** Holstein, Mark E; Keith Moskowitz; James Roy; SHERMAN@hhklawfirm.com; PAJ@juneaudavid.com; David Odom; Kirk Fisher
**Subject:** RE: Budget Line Item Request

Maria,

Thanks for the response. We have anticipated the time constraints for the operational review and have developed a plan and schedule to execute on such short notice. We will utilize a number of the members of our seasoned audit team to drive this process and backfill with new individuals for our internal audit of claims, all the while, staffing our business processes group to meet these requirements. We have already identified personnel for backfilling the audit team and will initiate hiring Monday. We have structured the process such that we will still be able to conduct internal auditing at the same level of claims as before, but bring the necessary forces to immediately begin the Time and Motion Studies and fulfill the requirements of a robust operational audit. When Kirk mentioned the 60 days, this was our 60 day schedule to implement the plan I have just described. We will crash the schedule to meet the requirements of the Q1 budget submittal. We will start immediately and will work with BP throughout the process to ensure that the CAO and BP's needs are met for a more detailed and robust budget model, a complete understanding of all claims processing, and additional opportunities for improvement. With the detailed knowledge of the program and the business skills of these staff, there is not a more qualified team to fulfill the complete operational review.

Bob

**EXHIBIT B-23**