UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>No. 12-970 | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

CLASS COUNSEL'S RESPONSE TO
BP'S OPPOSITION TO THE 4TH QUARTER BUDGET
SUBMITTED BY THE CLAIMS ADMINISTRATOR
FOR THE COURT-SUPERVISED SETTLEMENT PROGRAM

The Economic & Property Damages Settlement Class, through undersigned appointed Class Counsel and the duly appointed Class Representatives, respectfully submit the following response to BP's Opposition to the 4th Quarter Budget submitted by the Claims Administrator for the Court-Supervised Settlement Program [Doc 11347]:

MAY IT PLEASE THE COURT:

The Settlement Agreement negotiated, presented and previously supported by BP provides that the BP Parties "shall" pay into the Administrative Fund "amounts as may be required on a monthly basis" in order "to assure that sufficient funds are on deposit in the Administrative Fund to cover the Administrative Expenses on a timely basis."[1]

---

[1] SETTLEMENT AGREEMENT, Section 5.12.1.4.

1

After routinely approving the budget submitted by the Claims Administrator for over a year, BP objected, at the last minute, to the 3rd Quarter Budget, and has now objected to the 4th Quarter Budget, despite the fact that:

- BP selected the Program Vendors, participated in the contractual negotiations with those vendors, and approved the final vendor contracts setting forth their terms and rates;

- BP has been provided with all Program Vendor invoices prior to payment;

- The Claims Administrator proposed a potential delay in the acquisition of additional accountants and other adjustments that would reduce the 4th Quarter Budget by 16%;[2]

- The Claims Administrator has agreed to provide, has started to provide, and will continue to provide, the type of budgetary information that BP has recently requested;

- Although not required to, the Claims Administrator proactively engaged an operational audit, by an independent expert, whose engagement was approved by BP;

- BP – claiming that it "needs" more information – has failed to establish that any part of the submitted Budget is "unreasonable" under the Settlement Agreement.[3]

It is clear that BP, having failed in its repeated efforts to enjoin the Settlement Program after realizing that its lawyers and consultants had under-estimated the projected settlement program pay-outs by several billion dollars, is engaged in yet another bad faith attempt to significantly slow down, if not shut down, the processing and payment of legitimate claims, by distracting the Claims Administrator and his staff with burdensome requests while depriving the Program of the administrative funds necessary to efficiently and effectively operate.

For these reasons, and for the reasons further provided below, Class Counsel respectfully submit that the Claims Administrator's Budget should be approved.

---

[2] The Claims Administrator and his staff believe that 99 additional accountants should be retained and utilized for the processing of BEL and other claims. While, in an attempt to work with BP, the Claims Administrator proposed to delay this, in order to achieve potential budgetary reductions, such delay will certainly result in a concomitant reduction of claims processing speed and productivity.

[3] *See* SETTLEMENT AGREEMENT, Section 5.12.1.4 (BP shall provide administrative funds as may be required in accordance with an Administrative Budget, subject to the "reasonable" approval of BP).

2

**BP's Recent Complaints About the Program Vendors Ignore the Fact that BP Insisted upon these Vendors, Participated in the Negotiations, Approved the Contracts, and Reviewed the Invoices Prior to Payment**

BP insisted that Brown Greer, Garden City, and PricewaterhouseCoopers – whom BP had been utilizing in its previous Gulf Coast Claims Facility – be named and appointed as Claims Administration Vendors, under Section 4.3.5 of the Settlement Agreement.[4]

It is Class Counsel's understanding, moreover, that BP was actively involved in the negotiations with these companies with respect to the services they would provide, and the rates at which they would be paid.

BP approved the contracts between the Claims Administrator and the Claims Administration Vendors.

BP received, and either implicitly or explicitly approved, all Program Vendor invoices prior to payment.

The bottom line is that BP never had a problem with the information provided by the Claims Administrator nor the expenses being charged by the Program Vendors until *after* BP realized that it had seriously under-estimated the projected BEL payouts and repeatedly had its attempts to enjoin the Settlement Program rejected by this Court and the U.S. Fifth Circuit Court of Appeals.

---

[4] The fourth named Vendor, Postlewaite & Netterville, was selected by both Parties as an independent accounting firm that had not provided services for either BP / GCCF or claimants / classmembers in association with the *Deepwater Horizon* Incident.

**The Claims Administrator Did NOT Agree that an Operational Review Was Necessary to Prepare a Reasonable Budget**

The Claims Administrator has *not* "agreed" with BP "that an operational review and examination is necessary to prepare a proper budget for the CSSP."[5] Undersigned Counsel, who were present during the Administrative Panel Meeting, do not recall this ever being said. The portion of the "transcript" that BP refers to is simply an acknowledgment by Mr. Fisher that he and BP's Maria Travis had *discussed* various information relating to *productivity* that might be gained through an operational audit.[6] The Claims Administrator, Mr. Juneau, never "agreed" that an operational audit was "necessary" to prepare a "proper *budget*."

**The Claims Administrator, On His Own Initiative, Engaged an Independent Expert to Conduct an Operational Audit – with the Approval of BP**

Although not required, Mr. Juneau, on his own initiative, engaged CliftonLarsonAllen ("CLA") to conduct a three-part Process Audit, which is still ongoing. After confirming the absence of any conflicts of interest with both Parties, the Claims Administrator circulated the proposed scope of the audit, which was approved by BP.

The first part of the audit was completed on or around May 17, 2013. The auditors found that "Key Strengths" associated with the Program included:

- **Claims Paid in Accordance with Settlement Agreement**: The auditors found that "claims as a whole appear to be paid in accordance with the Settlement Agreement," with an exception rate of less than 2%.
- **Open Communication between the DHECC, the Court, the PSC and BP**
- **Claims Processing with Transparency**
- **Claims Processing with Due Process**

---

[5] BP OBJECTIONS, p.2.

[6] *See* BP OBJECTION, p.2 fn.3; *citing,* Transcript from Sept. 4, 2013 Panel Meeting, at p.11, (attached as Exhibit 1 to BP Exhibit C).

4

- **Consistent Application of the Settlement Agreement**

- **Quality Control:** The Settlement Program "uses formal disciplines in accordance with the International Standards for the Professional Practice of Internal Auditing Standards to conduct their reviews" which "ensure a consistent application and allow for timely and accurate reporting" and "is viewed as a leading practice."

- **Claims Processing Volumes:** From December 31, 2012 to March 31, 2013, there was an increase from 11,492 claims per month to 21,657 claims per month, demonstrating increasing efficiency.[7]

It is Class Counsel's understanding that the second phase of this independent audit, focusing on IT issues, commences this week.

Notably, BP has failed to establish that an operational audit is necessary for *budgeting* purposes. Yet, the Claims Administrator has proactively undertaken this additional effort to which BP had no objection prior to its change in attitude towards the Claims Administrator and the Settlement over the BEL interpretation.

## BP Does NOT Have the Right to Conduct an Additional Operational Review of the Settlement Program

Neither the Settlement Agreement, not the Vendor Contracts, nor general Trust principles, give BP the right to conduct an operational audit of the Court-Supervised Settlement Program.

The Settlement Agreement provisions cited by BP[8] generically provide that: **(i)** the Claims Administrator shall "report" and "provide information" to the Court, BP and Lead Class

---

[7] The CLA Audit Report (previously provided by the Claims Administrator to the Parties and the Court) was admitted into evidence as Exhibit 4 during the Show Cause Hearing before Judge Shushan on Sept. 4, 2013.

[8] *See* BP Objections, p.3 fn.4.

Counsel, as may be requested "and/or as the Court directs";[9] **(ii)** BP will have the right, under the contracts with the vendors, to "receive invoices submitted by Claims Administration Vendors and subcontractors" with a reasonable amount of time to raise concerns or objections prior to payment;[10] and **(iii)** the Claims Administrator will provide a monthly Administrative Expense Report "in such detail as the BP Parties may *reasonably* request and a reconciliation of such payments in comparison to the Administrative Budget."[11]  Nowhere does the Agreement discuss the right of BP to conduct an "operational audit" nor does BP contend that the Claims Administrator has ever failed to provide BP with a monthly Administrative Expense Report or a copy of a Vendor Invoice in advance of the invoice being paid.

The Vendor Contract provision referenced by BP simply gives the *Claims Administrator* the right to audit the vendor at issue.[12] BP's right to audit the vendor is clearly vendor-specific and subject to "the approval of the Claims Administrator."[13]

Finally, BP fails to understand the nature of this Settlement Trust. BP is the *settlor;* the beneficiaries are the members of the Class.[14] Both the Claims Administrator and the Settlement

---

[9] *See* SETTLEMENT AGREEMENT, Section 4.3.2.

[10] SETTLEMENT AGREEMENT, Section 5.12.1.4.

[11] SETTLEMENT AGREEMENT, Section 5.12.1.4 (emphasis supplied).

[12] *See* BP OBJECTIONS, p.3 fn.4; *citing,* BrownGreer Vendor Contract, §10.1.

[13] *See* BrownGreer Vendor Contract, §10.1 ("*with the approval of the Claims Administrator,* BP and its agents, accountants, consultants and advisors, shall have the right to review and/or audit Vendor….") (emphasis supplied).

[14] *See, e.g.,* SETTLEMENT AGREEMENT, Section 4.3.1 ("The Claims Administrator shall … faithfully implement and administer the Settlement, according to its terms and procedures, *for the benefit of the Economic Class*") (emphasis supplied).

Program serve at the direction of the Court.[15]  Neither the Claims Administrator nor the Settlement Program are BP contractors, divisions, or instrumentalities.

**BP Admits that the Claims Administrator Provided a "Bottoms Up" Budget**

After routinely approving the submitted budget in the same summary format for numerous quarters, BP only recently started to complain that the Claims Administrator's Budget should have more details.

The Claims Administrator has provided an extremely detailed budget for the 4th Quarter,[16] and has agreed to obtain even more information for BP in the months to come.

**The Claims Administrator, in an Attempt to Work with BP, Proposed a Potential Reduction of Approximately 16% from the Budget**

As noted by BP, the Claims Administrator proposed to reduce the 4Q Budget by over $20 million[17] – including the delay of his standing request and recommendation for 99 additional accountants.[18]

---

[15] *See, e.g.,* SETTLEMENT AGREEMENT, Section 4.3.1 ("The Claims Administrator shall be selected and appointed by the Court, and shall be responsible to the Court, serve as directed by the Court, and faithfully implement and administer the Settlement … as approved by the Court"); Section 4.3.2 ("The Claims Administrator shall … report and provide information *to the Court,* BP, and/or Lead Class Counsel as may be requested on an ongoing basis *and/or as the Court directs*.… The Court shall retain ongoing and exclusive jurisdiction over the Settlement Program until the consideration and determination of all Claims is complete and the Settlement Program is terminated by the Court") (emphasis supplied); Section 5.12.1.4 ("Payment of administrative expenses by the Claims Administrator shall be subject to oversight by the District Court").

[16] Even BP admits that "the Claims Administrator's Office attempted to prepare a 'bottom up' budget for the first time during the Q4 budget process." BP OBJECTIONS, p.5.  The fact is that the Program provided BP with a detailed budget.  The fact that BP claims that different or additional information should have been provided does not make the 4Q Budget "*unreasonable*".  There is certainly more than one way to construct a reasonable budget.

[17] BP OBJECTIONS, p.2.

[18] While, in an attempt to work with BP, the Claims Administrator proposed this delay, in order to achieve potential budgetary reductions, such delay will certainly result in a concomitant reduction of claims processing speed and productivity.

BP's agreement to fund the Program at "no more than $85.6 million"[19] – a slashing of *over one-third* of the originally submitted budget – (while at the same time making numerous additional administrative demands without agreeing to pay for them) – is clearly a bad faith attempt by BP to compel layoffs that will slow down, if not cripple, the processing and payment of claims.

**Special Master Freeh Specifically Found that the Program should Continue to Process and Pay Legitimate Claims**

Summarizing the Freeh Report, the Court noted that:

> [T]he Special Master has not found any evidence that the Claims Administrator, Patrick Juneau, engaged in any conflict of interest, or unethical or improper conduct. The Special Master also did not find any evidence that Claims Administrator Office officials or employees manipulated the valuation of claims, although a comprehensive examination of this issue was not part of the Special Master's mandate. While the conduct of certain Claims Administrator Office employees and vendors described in the Report is problematic, the Special Master finds that should not prevent the CSSP from continuing to fairly and efficiently process and pay legitimate claims in a timely manner.[20]

Specifically, Special Master Freeh stated that the concerns regarding Brown Greer "should not prevent the DHECC from fairly and efficiently processing and paying honest and legitimate claims in a timely manner."[21]

Particularly given the expanded mandate of Special Master Freeh to "recommend any additional business process procedures designed to promptly and fairly adjudicate claims in an efficient manner, and assist the Claims Administrator in the implementation of same,"[22] it is clear that BP should fund the 4th Quarter Budget, and the Claims Administrator should continue

---

[19] BP OBJECTIONS, p.4.

[20] ORDER (Sept. 6, 2013) [Doc 11288], p.2.

[21] SPECIAL MASTER FREEH'S REPORT (Sept. 6, 2013) [Doc 11287], p.6.

[22] ORDER (Sept. 6, 2013) [Doc 11288], Additional Mandate No.3, p.3.

to work with Special Master Freeh, the Parties, and the Court, to explore ways in which the budget process might be improved, and the Program and its Vendors can process and pay legitimate claims with greater efficiencies.

**BP's Purported Complaints with "Productivity" Are Completely At Odds with BP's Demands Regarding the Program-Wide and Individual Review of Settlement Program Claims**

The last thing that BP wants is "accountant productivity."[23]

Ever since BP realized that its attorneys and accountants has seriously under-estimated the BEL payout under the Settlement Agreement, BP has done everything within its power to slow down, if not stop, the payment of claims.

Separate and apart from the massive public relations effort, and the *in globo* motions to stay or enjoin the processing or payment of claims, BP has delayed payment of individual claims with thousands of bad faith appeals that are almost always ultimately rejected or dropped, and has attempted to burden and distract the Program with these types of formal and informal demands, threats, objections, attacks and requests for information.

Yet, most notably in this regard, BP has consistently urged to compel the Claims Administrator and the Program Accountants to request and review additional documentation beyond what is required under the Settlement Agreement, to make numerous requests for additional information and clarifications from claimants, and to make accounting or other adjustments to the claims. All of these policies, to the extent adopted, will obviously make the Program less productive, and more costly, from an administrative standpoint.

BP, in this way, says one thing in the Policy Room, and in the Budget Room cries great big "Crocodile Tears" to the contrary.

---

[23] *See, e.g.,* BP OBJECTIONS, pp.6-7.

**An Evidentiary Hearing Would Seem to be Unnecessary**

While we of course defer to the Court in terms of whether the Court believes that a formal evidentiary hearing is necessary, it would seem to Class Counsel that, particularly given the thorough response by the Claims Administrator,[24] this issue can likely be decided based upon the written submissions.  (Frankly, Class Counsel question whether BP's request for a formal evidentiary hearing is simply another attempt at delay.)

**Conclusion**

For the above and foregoing reasons, BP should be compelled to fund the 4th Quarter Budget, and the Claims Administrator should continue to work with Special Master Freeh, the Parties, and the Court, to explore ways in which the budget process might be improved, and the Program and its Vendors can process and pay legitimate claims with greater efficiencies.

This 17th day of September, 2013.

Respectfully submitted,

| | |
|---|---|
| /s/   Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No.11511 |
| HERMAN HERMAN & KATZ LLC | DOMENGEAUX WRIGHT ROY & EDWARDS LLC |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Co-Lead Class Counsel* | *Co-Lead Class Counsel* |

---

[24] *See* Rec. Doc. 11401 (including Exhibits).

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing Response has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this <u>17th</u> day of <u>September</u>, <u>2013</u>.

<u>/s/  James Parkerson Roy and Stephen J. Herman</u>
