# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig
   *Deepwater Horizon* in the Gulf
   of Mexico, on April 20, 2010


**This document applies to:**
*ALL CASES*

MDL No. 2179

SECTION: J

JUDGE BARBIER

MAGISTRATE SHUSHAN

## ALIGNED PARTIES' PRE-TRIAL STATEMENT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION:  THE ALIGNED PARTIES' PHASE 2 CLAIMS ............................ 1

II.  BP'S FRAUD, AND ITS CONSEQUENCES ................................................................ 2

    A.  BP MISREPRESENTED AND CONCEALED THE FLOW RATE
    FROM GOVERNMENT SOURCE CONTROL DECISION-MAKERS. ............. 2

        1.  April 28: BP's Doug Suttles Misrepresents BP's Flow Rate Range
        To Admiral Landry. ....................................................................................... 3

        2.  May 10: Doug Suttles Writes To Admiral Landry And Other
        Federal Response Officials Labeling 5,000 BOPD The "Most
        Likely Model." ............................................................................................... 4

        3.  May 13-17: BP Fails To Disclose Its Concerns About The 5,000
        BOPD Estimate To Government Scientists ................................................. 6

        4.  May 19: BP Sends The "Rainey Memo" To Admiral Landry And
        Admiral Allen. .............................................................................................. 7

        5.  BP Intentionally Withheld Flow Rate Information. .................................... 8

    B.  BP'S FRAUD DELAYED THE CAPPING OF THE WELL ............................ 10

        1.  BP's Misrepresentations About The Flow Rate Misled
        Decisionmakers About The Top Kill's Likelihood Of Success. .............. 10

            a.  BP Learned That The Top Kill Would Not Succeed If The
            Flow Rate Was Above 15,000 BOPD And Thus Was
            Doomed To Fail. ................................................................................ 10

            b.  BP Misrepresented The Top Kill's Likelihood Of Success. ......... 12

        2.  After The Top Kill Failed, BP Misrepresented The Reasons For
        The Top Kill's Lack Of Success, Which Further Delayed The
        Capping Of The Well. ................................................................................. 14

            a.  BP Claimed Rupture Disks Were the Only Plausible
            Explanation For The Failure And That The BOP-on-BOP
            Could Cause Broaching. .................................................................. 14

            b.  BP's Representation That The Rupture Disks Were The
            Only Plausible Explanation For Top Kill's Failure Was
            False. ................................................................................................ 15

        3.  But For BP's Fraud, The Well Could Have Been Capped Weeks
        Earlier. ......................................................................................................... 16

            a.  The BOP-on-BOP Option Was Ready And Would Have
            Successfully Capped The Well. ........................................................ 16

# TABLE OF CONTENTS
## (continued)

**Page**

      b.     BP's After the Fact Attempts To Justify Its Failure to Implement the BOP-On-BOP Are Inconsistent With Contemporaneous Evidence....................................................... 17

  C.     BP'S FRAUD WAS A SUPERSEDING CAUSE OF OIL THAT SPILLED AFTER THE WELL SHOULD HAVE BEEN CAPPED.................. 18

III.    BP FAILED TO PREPARE FOR A DEEPWATER BLOWOUT, DESPITE KNOWING THE RISKS AND CONSEQUENCES OF A BLOWOUT. ........................ 19

  A.     BP IGNORED DECADES OF WARNINGS AND REFUSED TO SPEND MONEY OR TIME TO PREPARE FOR THE KNOWN AND FORESEEABLE RISKS................................................................................. 23

  B.     BP FAILED TO MEET THE REGULATORY REQUIREMENTS TO HAVE A SOURCE CONTROL PLAN DESIGNED TO IMMEDIATELY ABATE THE SPILL.......................................................................................... 30

  C.     BP FAILED TO MEET THE REGULATORY REQUIREMENT TO USE BEST AVAILABLE AND SAFEST TECHNOLOGY ...................................... 33

  D.     BP VIOLATED ACCEPTED STANDARDS OF RISK MANAGEMENT........ 34

## I.   INTRODUCTION:  THE ALIGNED PARTIES' PHASE 2 CLAIMS

The Plaintiffs and States will prove that BP, with the knowledge, direction and ratification of its corporate officers and management, acted with conscious disregard and its conduct was reckless, willful or wanton in two primary ways: (1) BP willfully, with the intent to deceive, misrepresented its knowledge of the flow rate causing it to eschew available source control methods that would have stopped the flow of oil weeks earlier and delayed the successful installation of the three-ram capping stack and (2) BP willfully ignored its obligation to prepare for an uncontrolled deepwater blowout, despite knowing the risks and consequences of a deepwater blowout.

Transocean and Halliburton will prove that BP's misrepresentations and omissions delayed the capping of the well, and that this fraud therefore is a superseding cause of any oil that spilled into the Gulf after the well would have been capped but for BP's fraud.  BP is solely responsible for oil that spilled because of its fraud, and Transocean and Halliburton's share of responsibility should be reduced in proportion to the delay caused by BP's misconduct.

Below, the Aligned Parties collectively outline the evidence that will prove our Phase Two claims.[1]  We begin with BP's cover-up of the flow rate because it pertains to all five Aligned Parties' Phase Two claims.

---

[1] This Court's Order Regarding Presentation of Evidence in Phase Two Trial provides that the PSC, the States, Transocean, and Halliburton are each allowed to file a 10-page brief. Rec. Doc. 11087 at 4-5.  That Order also instructs the Aligned Parties "to work together and arrive at joint decisions regarding pre-trial submissions."  *Id*. at 4.  The Court also stated its expectation that coordination extend to "all aspects of trial preparation and presentation."  *Id*. at 3.  Consistent with this instruction, and in order to avoid duplicative pre-trial briefs, the Aligned Parties are submitting this Pre-Trial Statement jointly (except where noted otherwise), rather than as four separate 10-page briefs.

II.   **BP'S FRAUD, AND ITS CONSEQUENCES**

After the Macondo blowout, BP repeatedly lied to key decision makers about the flow rate of the well.  BP told the Unified Command, the Coast Guard, Government scientists, and Congress that the well was flowing at 5,000 barrels per day, when BP's internal estimates showed rates as high as 96,000 barrels per day.  These lies and omissions delayed the capping of the well.

Weeks before the well was shut in, a capping strategy known as the "BOP-on-BOP" was ready to be deployed.  The BOP-on-BOP could and would have capped and sealed the well, avoiding millions of barrels of oil pollution in the Gulf of Mexico.

But at BP's urging, another option, known as the Top Kill, was prioritized over the BOP-on-BOP.  BP learned in May, but concealed from government decision makers, that based on BP's own internal flow rate estimates, the Top Kill was unlikely to succeed.

Then, when the Top Kill failed, rather than reveal the high flow rate estimates that would explain the lack of success, BP falsely claimed that the only plausible explanation for the Top Kill's failure was the supposed rupture of pressure relief disks in the well. No such rupture ever occurred.  Based on that false assessment, BP recommended that the BOP-on-BOP option be abandoned.  Lacking information about the flow rates and the likely explanation for the Top Kill's failure, the Unified Command accepted BP's spurious explanation as well as BP's advice to forego the capping method then at hand.

A.   **BP MISREPRESENTED AND CONCEALED THE FLOW RATE FROM GOVERNMENT SOURCE CONTROL DECISION-MAKERS.**

BP admitted in its guilty plea that, "BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified

Command."[2]   The record contains numerous instances of flow rate fraud by BP directed at government response officials charged with overseeing BP's source control decisions.  This section of the brief previews four key BP misrepresentations relating to flow rate.[3]

### 1. April 28: BP's Doug Suttles Misrepresents BP's Flow Rate Range To Admiral Landry.

A week into the spill, BP falsely represented to the lead federal response official that the flow rate from the Macondo well was only 1,000 to 5,000 BOPD.

From April 23 to June 1, Coast Guard Rear Admiral Mary Landry served as the Federal On-Scene Coordinator, the lead federal official for the response.[4]   Landry's counterpart at BP was Doug Suttles – Chief Operating Officer of BP Exploration & Production and BP's senior representative at Unified Area Command.[5]

One week into the Spill, Suttles told Admiral Landry that BP's flow rates ranged from 1,000 to 5,000 BOPD.[6]   Suttles told Landry that 2,500 BOPD was "our best estimate."[7]   Later that day, Admiral Landry publicly announced an official estimate of 5,000 BOPD, which Landry had been led to believe was at the high end of BP's flow rate estimates.[8]

In fact, BP's internal flow rate estimates at that time ranged far higher.  On the same day Suttles told Landry that flow ranged from 1,000 to 5,000 BOPD, a BP Vice President received a

---

[2] TREX-52673.17 at ¶ 5.

[3] As discussed in Section IV, *infra*, BP also misrepresented: (a) the likelihood of the Top Kill being able to stop the flow of oil from the well; and (b) the actual reasons for the Top Kill's failure.

[4] Stipulated Facts Concerning Source Control Events at ¶¶ 5, 10 (Rec. Doc. 7076).

[5] Suttles Dep. at 224:10-17; 398:19-24; 438:7-9.

[6] Landry Dep. at 23:16-19; 25:5-16; 25:20-21.

[7] Landry Dep. at 192:10-25.

[8] Landry Dep. at 193:20-23 ("I went with a number at the higher range that . . . BP had proffered.").

report in which BP engineers had "modeled the whole system from reservoir to sea in order to bound the answers on flowrate."[9]  The results, which the BP Vice President had been told to summarize for Suttles the day before,[10] showed a range of  2,523 to 65,171 barrels per day.[11]

Prior to the April 28 Suttles misrepresentation to Admiral Landry, BP had prepared a series of internal estimates, all with much higher rates:

- On April 22, BP generated a range of modeled rates from 64,000 to 138,000 BOPD;[12]

- On April 24, BP produced flow rates ranging from 8,600 to 69,500 BOPD;[13]

- On April 26, BP produced a forecast of future reservoir depletion that assumed a starting flow rate of 110,000 BOPD;[14]

- On April 27, BP calculated flow rates of approximately 5,000 to 22,000 BOPD;[15]

- That same day, on April 27, BP generated a range of flow rates ranging from 2,783 to 92,028 BOPD.[16]

### 2.    May 10: Doug Suttles Writes To Admiral Landry And Other Federal Response Officials Labeling 5,000 BOPD The "Most Likely Model."

On May 10, Suttles sent a letter to Admiral Landry and MMS's Unified Commander Lars Herbst that reaffirmed BP's baseless 5,000 BOPD estimate.  Suttles' letter attached a graph[17] titled "Macondo Reservoir Model," which labeled 5,000 BOPD as BP's "Most Likely Model."[18]

---

[9] TREX-05063.1.

[10] TREX-01626.2.

[11] TREX-05063.4.

[12] TREX-010483.2.

[13] TREX-010487.4.

[14] TREX-09274.7.

[15] TREX-09445.1; TREX-10180.1.

[16] TREX-03213.3.

[17] TREX-09155.2-3.

[18] TREX-09155.4.

BP's own flow rate expert, Adam Ballard, admits there was no BP hydraulic modeling that concluded 5,000 BOPD was a "Most Likely Model" of the flow rate.[19]  Moreover, the graph Suttles sent to Admiral Landry *omitted* the much higher flow rate information that BP had created for its internal use.  BP had an internal graph that contained *six* different modeled flow rates (including two that began above 100,000 BOPD) and that did not label 5,000 BOPD the "Most Likely Model."[20]  Rather than sending the chart that BP itself used, BP created a special chart for Admiral Landry with just *two* potential flow rates – the 5,000 BOPD "Most Likely Model" and a "Worst case model" of approximately 55,000 that BP claimed was based on "extremely rare" conditions and "represents a theoretical downside."[21]

Suttles' May 10 letter to Admiral Landry also failed to disclose numerous other BP internal flow rate modeling results.  For example, on May 9, a BP contractor informed BP of modeled blowout rates of 37,000 BOPD for annular flow, 55,000 for casing flow, and 74,000 for combined annular and casing flow.[22]  By May 8, BP engineers had modeled flow rates as high as 96,000 BOPD.[23]

But based on Suttles' May 10 letter, Admiral Landry and Lars Herbst understood 5,000 BOPD to be BP's most likely model of the flow rate.[24]  Because BP's flow rate representations to the government purported to rely on BP proprietary and confidential data, Landry and Herbst

---

[19] Ballard Dep. at 490:19 – 491:11.

[20] TREX-9157.2.

[21] TREX-9155.4.  These important edits to the graph that BP sent to Admiral Landry – which had the effect of making the flow rate seem lower than BP's internal estimates – were made by Jasper Peijs, an acting assistant to BP Exploration and Production CEO Andy Inglis.  TREX 11096.5-6.

[22] TREX-09266.2.

[23] TREX-09441.3.

[24] Landry Dep. at 583:15-18, 583:24-584:3; Herbst Dep. at 547:4-547:9.

had no ability to verify BP's calculations.[25]  Landry and Herbst had to approve BP's Top Kill recommendation, and in that critical oversight function, they relied upon BP to provide them with complete and accurate information.[26]

### 3.   May 13-17: BP Fails To Disclose Its Concerns About The 5,000 BOPD Estimate To Government Scientists

In the days leading up to BP's recommendation to attempt to kill the well with its doomed Top Kill procedure, Government scientists from the National Labs met with BP employees to discuss modeling issues.  BP failed to disclose numerous BP-internal flow rate models and analyses and continued to push 5,000 BOPD as BP's best flow rate estimate.  On May 13, a BP engineer recorded in meeting notes that BP and the Government scientists had agreed to use 5,000 BOPD as "the best starting point."[27]  On May 16, BP asked Government scientists to proceed on the assumption of "a constant flow rate of 5000 stock tank barrels (STB) of oil per day."[28]

At the same time, BP engineers and contractors were questioning BP's 5,000 barrel per day estimate.  BP's Technical Authority on Flow Assurance, Trevor Hill, no longer believed that 5,000 BOPD was the best estimate.[29]  By mid-May, Hill had generated an estimate of the flow rate from 20,000 to 25,000 BOPD.[30]  Hill failed to share his flow rate estimate with Government scientists.[31]

---

[25] Landry Dep. at 582:6-19; Herbst Dep. at 548:6-13.

[26] Landry Dep. at 618:17-619:4.

[27] TREX-10793.2.

[28] TREX-09131.2.

[29] Hill Dep. at 394:2-7.

[30] Hill Dep. at 394:18-21.

[31] Hill Dep. at 396:10-19.

Other BP employees and contractors were expressing concerns about BP's baseless 5,000 BOPD flow rate.[32]  On May 15, a BP Vice President emailed BP Exploration and Production's CEO, Andy Inglis, cautioning him against "standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd . . . ."[33]  On May 16, BP contractor Ole Rygg wrote to BP employees in connection with his Top Kill modeling efforts: "Be aware that we are working on the 5000 bopd case.  That could be too optimistic."[34]  On May 17, BP engineer Tim Lockett, who had been forwarded Rygg's May 16 email, wrote to his BP colleague that "[t]he apparent reliance in Ole's email on the 5 mbd [5000 BOPD] number, which has little if no origin, is concerning.  From all the different ways we have looked at flowrate, 5 mbd would appear to err on the low side."[35]

### 4.    May 19: BP Sends The "Rainey Memo" To Admiral Landry And Admiral Allen.

On May 19, Suttles sent Landry and Admiral Thad Allen, the National Incident Commander, a flow rate memorandum, this one authored by BP executive David Rainey ("Rainey Memo").  The memo had attachments that purported to provide BP's "most recent work on flow rate estimation."[36]  The Rainey Memo represented that BP's new "best guess" of flow from the well was 6,000 BOPD.[37]

Five days later, in response to an inquiry from Representative Edward J. Markey, Chairman of the House Subcommittee on Energy and Environment, BP submitted the same

---

[32] *See, e.g.*, Vargo Dep. at 131:23-138:25; 261:19-266:12; TREX 8544.

[33] TREX-03220.1.

[34] TREX-09250.3.

[35] TREX-09250.2.

[36] TREX-03218.1.

[37] TREX-03218.4.

fraudulent Rainey Memo to Congress.[38]  For that, BP has pled guilty.  In particular, BP admits: (1) it "withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD"; (2) it "withheld information and documents relating to internal flow-rate estimates [a former BP vice president] prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD"[39]; and (3) it "had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD **that it did not share with Unified Command.**"[40]

### 5.   BP Intentionally Withheld Flow Rate Information.

BP's own documents reveal that its failure to disclose higher flow rate estimates was the result of deliberate suppression – enforced by high-ranking BP officials – of flow rate information that would undermine BP's 5,000 BOPD public estimate.  From the earliest days of the response, BP management instructed its modelers to keep their work confidential.  Just two days after the blowout, BP's Rob Marshall informed his colleagues that "Alistair Johnston altered his Macondo well model to approximate open hole flowing conditions, and calculated a rate of 82,000 barrels per day."  BP's Gary Imm responded: "we already have had difficult discussions with the USCG on the numbers.  Please tell Alistair not to communicate to anyone on this."  Marshall concurred.[41]

---

[38] TREX-01651.

[39] TREX-52673.16 at ¶¶ 1-2.  BP obtained the 96,000 and 92,000 BOPD flow rate estimates long before BP sent the Rainey Memo – which failed to disclose those estimates – to Admiral Landry and Admiral Allen on May 19, 2010.  TREX-03213.3 (April 27, 2010); TREX-09441.3 (May 8, 2010).

[40] TREX-52673.17 at ¶ 5 (emphasis added).

[41] TREX-08656.1.

The day after Suttles' April 28 estimates to Admiral Landry, BP engineer Farah Saidi reported internally a flow rate three times higher than the maximum figure Suttles had shared with Landry.  One BP engineer wrote to another, asking him to "have a conversation with Farah to offer her the rational for NOT to MAXIMIZE rate from this well (riser)."[42]  Saidi admitted she was "instructed" by BP Vice President Richard Lynch "not to forward the rates to anyone."[43] "Anyone" meant even BP employees working on source control.  When Trevor Hill, working on the well control effort, asked Saidi for information about how much oil was being collected, Saidi responded, "Since the rates are confidential and I was told by Mike Brown not to write anything about it, he advises to call [BP executive] Paul Tooms."[44]

BP's internal emails confirm Saidi's testimony that Lynch was directing the withholding of flow rate information.  On May 17, Adam Ballard, a BP engineer and a BP expert, requested flow rate information from Saidi.  Ballard received a response directly from Lynch stating "at this point we are not releasing any information that can be related to rate."[45]  Lynch reiterated in a later email to Ballard: "We remain in a position where no flow related information can be released internally or externally."[46]

The policy Lynch stated in writing was enforced by high-level BP officers.  On May 15, BP's Mike Mason, whose group had performed work resulting in flow rates ranging from 14,000 to 96,000 BOPD, wrote to BP Exploration and Production CEO Andy Inglis and Inglis's acting

---

[42] TREX-08657.1 (emphasis in original).

[43] Saidi Dep. at 407:2-19; 408:2-8.

[44] TREX-09474.1.  Saidi testified that her understanding was that BP engineer Mike Brown had given her this instruction because BP Vice President Richard Lynch had requested that the flow rates be kept confidential.  Saidi Dep. at 405:3-16; 408:18-409:6.

[45] TREX-09475.4.

[46] TREX-09475.3.

assistant, Jasper Peijs, and warned that BP "should be very cautious standing behind a 5,000 bopd figure as our modelling shows that this well could be making anything up to ~ 100,000 bopd . . . ."[47] The very morning Mason sent this email, he was called into BP's offices for a meeting with Peijs. As Mason testified, Peijs told him that the next time Mason had a thought like the one he expressed in his email, they would appreciate it if he discussed it with them *in person*. When Mason asked what the problem was, Peijs responded, "It's the big number," which Mason understood to be a reference to the "~100,000 bopd."[48]

### B. BP'S FRAUD DELAYED THE CAPPING OF THE WELL

#### 1. BP's Misrepresentations About The Flow Rate Misled Decisionmakers About The Top Kill's Likelihood Of Success.

##### a. BP Learned That The Top Kill Would Not Succeed If The Flow Rate Was Above 15,000 BOPD And Thus Was Doomed To Fail.

On May 9, BP executives decided to give top priority to the so-called "Top Kill" – also sometimes referred to as "dynamic" or "momentum" kill.[49] One week later, BP executives recommended to cabinet-level officials that the response effort should move forward with a "Dynamic/Momentum Kill." BP claimed that recent events showed that "the likelihood of a successful dynamic or momentum kill increased significantly."[50] The BOP-on-BOP option was delayed until after Top Kill was attempted.

_____

[47] TREX-03220.1.

[48] Mason Dep. at 320:1-321:12.

[49] TREX-10516; Holt Dep. at 259:6-16.

[50] TREX-10512.13; TREX 10512.20. The phrase "Top Kill" was sometimes used by responders to refer to the pumping of both mud and junk shot; at other times, it was used to refer to only the pumping of mud. Responders also used the phrases "momentum kill" and "dynamic kill" to refer to the mud pumping operation.

In fact, contemporaneous modeling showed the Top Kill was unlikely to succeed.  Within hours of recommending the Top Kill to the government, BP learned from its experts at Add Energy that the Top Kill would likely fail if the flow rate from the well was 15,000 barrels per day or more.[51]  Charles Holt, BP's 30(b)(6) witness on the Top Kill procedure, testified that BP had learned that "anything above 15,000 barrels a day in the modeling that had been done, said that -- that it was going to be very difficult, if not impossible, to use the dynamic kill to kill this well."[52]

Internally, BP worried that proceeding with the Top Kill on the theory that the well was flowing at only 5,000 BOPD was problematic.  A BP modeler named Tim Lockett emailed a BP colleague that he was concerned about relying on the 5,000 BOPD estimate, because it had "little if no origin" and "appear[ed] to err on the low side."[53]  After receiving Lockett's message, another BP employee, Douglas Wood, providing flow assurance support to BP's well kill team,[54] wrote: "I spent some time in a review of the kill option today with the third parties and then had a 1:2:1 with Ole [whose model showed the Top Kill would not work if the flow was over 15,000 BOPD]."  Wood also wrote that "*Tim [Lockett]'s points* [that the 5,000 BOPD number could not be relied upon] *are valid and have an impact on the viability of the kill option working*."[55]  BP failed to share these concerns with the government.[56]

---

[51] TREX-08537.1.

[52] Holt Dep. at 197:23-198:11, 198:4-14; *see also* TREX 9132.2 (Summary points from the Kill the Well on Paper discussion, stating: "Modeling indicates that a dynamic kill cannot be successfully executed if the oil flow rate is 15000 STBpd.").

[53] TREX-09250.1-2.

[54] TREX-09250.1; Tooms Dep. at 388:23-389:7.

[55] TREX-09250.1 (emphasis added); Patteson, Dep. Vol. II at 264:3-13.

[56] Lockett Dep. at 404:15-405:4; Tooms Dep. at 259:9-12.

Dr. John Wilson, an expert modeler who examined BP's internal modeling, will testify that a significant majority of BP's internal flow rate estimates were well above the 15,000 BOPD threshold for a successful Top Kill.  BP thus knew that the Top Kill was unlikely to succeed.

### b.      BP Misrepresented The Top Kill's Likelihood Of Success.

Instead of informing the Government of its concerns that Top Kill would not work given the high flow rates for Macondo, BP vastly overstated the chances that the Top Kill would work. BP told Secretary Ken Salazar that the Top Kill had a "probability of success" of "80 percent."[57] On May 24, BP's CEO Tony Hayward claimed that the Top Kill's chance of success was 60-70%,[58] although BP had no data to support this claim.[59]  A BP spokesperson even told Secretary Steven Chu that the Top Kill was a "slam dunk."[60]  These spurious predictions had no basis.

At a May 17 "Kill the Well on Paper" discussion attended by government scientists, Add Energy explained that while "a dynamic kill cannot be successfully executed if the oil flow rate is 15000 STBpd," the "dynamic kill *can be achieved for a well flowing oil at a rate of 5000 STBpd …*"[61] Although BP employees in attendance at this meeting knew BP had many estimates far in excess of 15,000 BOPD, they kept silent.[62]  BP thus misled Government scientists to

---

[57] TREX-11317.1.

[58] TREX-150307; TREX-150050; TREX-150323; *see also* TREX 10532.2 (May 29, 2010 talking points on top kill failure, "there was a 60-70% chance of the top kill working.").

[59] Patteson Dep., Vol. II, at 196:9-11.

[60] Chu Dep. at 308:9-16.

[61] TREX-09132.2 (emphasis added).

[62]  BP also mislead its contractors hired to perform the Top Kill procedure.  Vargo Dep. at 90:16-91:15; 316:21-317:19 ("With the knowledge that the top kill could not have worked based on the 15,000 barrel per day limitation, then we shouldn't have moved forward with the top kill because it was going to put everybody at risk and the well at risk . . . If something came apart, you would have killed people . . . And if [BP] had the knowledge that that was the case, we shouldn't have moved forward.").

believe that, since the well was only flowing at 5,000 BOPD, the Top Kill option "can be achieved."[63]

BP also failed to disclose the 15,000 BOPD limit on the Top Kill to two officials who signed off on the Top Kill: Admiral Landry and the MMS's Unified Commander Lars Herbst.[64] BP's designated witness on the Top Kill conceded that BP was obligated to inform Admirals Allen and Landry of the 15,000 BOPD limit on a successful Top Kill.[65]

BP now argues that Add Energy's 15,000 BOPD limit on a successful Top Kill was inconsequential because BP was pumping not only mud into the well, but also "junk" to plug the leaking BOP. This is a red herring. For one thing, BP recommended and carried out efforts to shut in the well merely by pumping mud – something Add Energy's analysis showed would not work.[66] BP also knew that the so called "junk shot" seldom worked and was unlikely to do so at Macondo. BP contractors and industry representatives warned BP that the junk shot would not be effective.[67] BP knew that flow from the well demonstrated "a very generous flow path" through the BOP, which meant you "can't stop this with a junk shot."[68]

---

[63] TREX-09132.2.

[64] Landry Dep. at 446:24-447:4; 620:12-18; Herbst Dep. at 132:25-133:14.

[65] Holt Dep. at 174:14-25.

[66] TREX-10512.20, 22. As late as the day before the first Top Kill attempt, BP was still telling government scientists that "[t]he Junk shot is no longer on the flow sheet. It is not an option under consideration." TREX 9151.1.

[67] Campbell Dep., Vol. I, at 367:25-368:14; 368:15-369:2.

[68] Campbell Dep., Vol. I, at 368:15-369:2.

In fact, neither BP nor any of its contractors performed any formal analysis of the junk shot.[69]  BP had no modeling or basis for claiming that combining junk shot and Top Kill mud would be a "slam dunk" or that it would have a 60 to 80% chance of success.  In fact, the so-called junk shot failed and, as predicted by Add Energy's model, the mud pumped into the well had no effect against such a high flow.

### 2. After The Top Kill Failed, BP Misrepresented The Reasons For The Top Kill's Lack Of Success, Which Further Delayed The Capping Of The Well.

#### a. BP Claimed Rupture Disks Were the Only Plausible Explanation For The Failure And That The BOP-on-BOP Could Cause Broaching.

On May 29, the day after the last Top Kill attempt, BP presented three possible explanations for its failure.  But BP represented that *only one* of the explanations was "plausible" – that mud had been successfully pumped down into the well, but had flowed out into the formation through relief disks that had supposedly "ruptured" during the initial blow out.[70]  BP did not even mention the possibility that the Top Kill had failed because the flow of the well was too great.

Based on BP's misrepresentation that the only plausible explanation was the (incorrect) claim that the relief disks had ruptured and the well therefore lacked integrity, BP told the Government that "[s]hutting the well in (via BOP on BOP) is likely to lead to broaching" – i.e., a subsurface blow out with oil blowing out the supposedly ruptured disks.[71]  This false claim –

---

[69] TREX-10524.005 ("I have seen no analysis or decision tree for the junk shot and yet it is very probably going to be done"); Holt Dep. at 343:9-24 (noting only that procedures had been prepared for the Top Kill not the junk shot).

[70] TREX-09084; Herbst Dep. at 490:5-23; Hunter Dep. at 605:20-23; McNutt Dep at 459:18-460:12; Holt Dep. at 188:4-12, 190:18-191:13.

[71] TREX-09084.12.

itself a product of BP's deliberate concealment of flow rate information – led the source control

decision-makers to abandon a strategy ready to go to close the well –the BOP-on-BOP[72] – and

delayed the installation of the device that eventually stopped the flow – the three-ram capping

stack.[73]

> **b.**  **BP's Representation That The Rupture Disks Were The Only Plausible Explanation For Top Kill's Failure Was False.**

When BP claimed that the rupture disks were the only plausible explanation for Top

Kill's failure, it knew that the facts supported an alternative explanation.  BP's own expert has

opined that BP's supposedly "not plausible" Scenario #1 "reflects a realistic case that accounts

for all the evidence" and that acceptance of that explanation – instead of the incorrect "Scenario

#3" – could have led to quicker action to seal the well.[74]

BP knew from modeling that the Top Kill was likely to fail at a flow rate over 15,000

BOPD[75] and that the flow rate was likely well over 15,000 BOPD.[76]  For those like BP's Kurt

Mix, who knew BP's internal estimates showed far higher flow rates, the conclusion was

obvious.  As Mix explained to a colleague during multiple Top Kill attempts, the effort was

failing because there was "[t]oo much flowrate – over 15000 [BOPD]."[77]  BP received multiple

---

[72] Rec. Doc. 7076 (Stipulated Facts Concerning Source Control Events) at 13, ¶ 83; Holt Dep. at 209:2-209:7, 390:6-390:17; Wellings Dep. at 189:10-193:14; Landry Dep. at 635:18-636:5; Herbst Dep. at 495:9-496:3.

[73] TREX 9833 ("I have the 3 ram stack ready if you need it") (5/30/10).

[74] TREX-11613.40, 42.

[75] TREX-08537.1.

[76] *See* Part II.A, *supra*.

[77] TREX-09160.1.

analyses from its outside experts that contradicted its rupture disk theory[78] and that it failed to share with government officials.[79]

### 3. But For BP's Fraud, The Well Could Have Been Capped Weeks Earlier.

#### a. The BOP-on-BOP Option Was Ready And Would Have Successfully Capped The Well.

BP's Jim Wellings, who headed the BOP-on-BOP team, explained in writing that the BOP-on-BOP was ready to go both before and after Top Kill in late May: Wellings' BOP-on-BOP team was, in his words, "in a position early on to install a cap and the decision was made to do the top kill first.  After the top kill failed we were again going to install the cap then the decision was made to use the top hat and containment."[80] Wellings' admissions are corroborated by internal emails and schedules[81] and the testimony of other members of the team that the BOP-on-BOP was ready for installation in May.[82]

Moreover, when the well was finally shut in with a capping stack on July 15, 2010, it was shut in with blind shear rams manufactured by Hydril.[83]  The BOP-on-BOP was designed to shut

---

[78] *See* Barnett Dep. at 239:8-240:23 (testifying that Wild Well Control informed BP that the Top Kill failed not because of rupture disks, but because the size of the orifice in the BOP was too large); *see also* TREX-7270.13 (May 31 internal investigation draft report finding that "the initial flow path was through a leaking casing shoe and up inside the casing"); TREX-11410.

[79] Herbst Dep. at 491:14-492:19, 498:14-499:7, 500:3-5, 500:14-503:11; Hunter Dep. at 608:6-609:14, 614:22-616:19; Allen Dep. at 588:7-21; McNutt Dep. at 460:21-462:8; *see also* Holt Dep. at 201:16-202:4.

[80] TREX-08542.1.

[81] *See, e.g.*, TREX-11230.1.

[82] McWhorter Dep. at 451:24:452:13 (taken Nov. 16, 2012) (Cameron "definitely believe[s]" a BOP-on-BOP solution was feasible as of mid-May); Boughton Dep. at 79:1-13 (testifying that all the equipment was "ready to go" and the BOP-on-BOP could have been deployed in mid-May).

[83] Rec. Doc. 7076 at p. 17, ¶ 137.

in the well using the exact same rams.[84]  The BOP-on-BOP was ready and able to shut in the well and would have done so, but for BP's corruption of the decision making process.

> **b.**     **BP's After the Fact Attempts To Justify Its Failure to Implement the BOP-On-BOP Are Inconsistent With Contemporaneous Evidence.**

The contemporaneous records refute BP's after-the-fact claim that the BOP-on-BOP was rejected as too risky.  A BP-led peer assist team found that "the BOP on BOP operation is feasible and can be managed safely."[85]  Similarly, BP's HAZID team reported weeks before the Top Kill: "We've completed the HAZID for the well capping effort . . . We have mitigations for all the risks."[86]

BP now argues that its concerns about the rupture disks explain its failure to pursue the BOP-on-BOP option.  BP knew, however, that such a risk could have been addressed by using the BOP-on-BOP's venting capabilities to relieve excess pressure if necessary.[87]  Moreover, BP's claims today about its concerns in April and May 2010 are inconsistent with its actions at the time; BP pursued source control measures – including ROV intervention[88] and the Top Kill – that BP knew could result in a hard shut-in and present the same level of risk to the rupture disks.[89]

---

[84] TREX-05385.14.  The capping stack and BOP-on-BOP are so functionally similar that at times the engineers working on the BOP-on-BOP referred to the project as a "Capping Stack."  *See, e.g.*, TREX-05385.2 (using "Sub Sea Capping Stack" to describe BOP-on-BOP option).

[85] TREX-10505.5; Rec. Doc. 7076 at 11, ¶ 65.

[86] TREX-10535.1.

[87] McWhorter Dep. at 520:22-521:16; Holt Dep. at 477:23-478:16.

[88] Holt Dep. at 220:4-20; 590:22-591:6; 591:18-592:18; 593:1-594:5 ("closing the well [with ROVs] . . . would create similar pressures on the well").

[89] Before the Top Kill was implemented, BP believed there was little to no risk of rupture disk failure during a shut-in of the well.  TREX-0563.12 ("Burst Disk will not fail"); TREX-11408.2

### C.  **BP'S FRAUD WAS A SUPERSEDING CAUSE OF OIL THAT SPILLED AFTER THE WELL SHOULD HAVE BEEN CAPPED.**[90]

Under the superseding cause doctrine, "[t]he act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime."[91]

BP's fraud was an intentional tort.  Transocean and HESI did not realize and "should [not] have realized the likelihood" that BP would intentionally mislead the United States government about the flow rate – especially when that information was vital to the decisions being made about capping the well.  The superseding cause doctrine therefore prevents liability from being imposed on Transocean and HESI based on oil that spilled into the Gulf after the well would have been capped but for BP's fraud.

Any percentage of fault allocated to Transocean and HESI based on pre-April 20 conduct therefore should be reduced in proportion to the amount of delay caused by BP's fraud.  For example, if the Court were to find that the well could have been shut in by May 15, 2010 but for

---

("less than a 4% chance of burst disk failure if the well is shut-in and no other preventative actions are taken.").

[90] The Plaintiffs and the States of Louisiana and Alabama do not join in this section of the Pre-Trial Statement.

[91] *Skipper v. United States*, 1 F.3d 349, 354 n.6 (5th Cir. 1993) (quoting the Restatement (2d) of Torts); *see also Exxon Co., USA v. Sofec, Inc.*, 517 U.S. 830, 836-39 (1996); *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 367-68 (5th Cir. 2006) (citing 1 SCHOENBAUM, ADMIRALTY &MARITIME LAW 165 (2d ed. 1994)).  BP's intentional misconduct also is relevant to the allocation of comparative fault.  *See, e.g.*, *In re Omega Protein, Inc.*, 548 F.3d 361, 370 (5th Cir. 2008) ("In admiralty cases, federal courts allocate damages based upon the parties' respective degrees of fault."); *Stolt Achievement*, 447 F.3d at 370 (trial court must review "the number *and quality* of faults by each party" (emphasis added)).

BP's fraud, then the Court should reduce Transocean's and HESI's respective liability share by approximately 71%[92] and the remaining liability should be assigned to BP. In this scenario, if the Court had also assigned x% fault to Transocean, y% fault to HESI, and z% fault to BP for the April 20th blowout, then taking account of BP's fraud, Transocean's final share of liability would be 29% of x%, HESI's share would be 29% of y%, and BP's share would be increased accordingly.

BP prioritized its interest in lowering the perceived flow rate above informed source control decision-making. It should pay the price for its choices. BP should be held accountable for the lengthy delay caused by its fraud.

## III.   BP FAILED TO PREPARE FOR A DEEPWATER BLOWOUT, DESPITE KNOWING THE RISKS AND CONSEQUENCES OF A BLOWOUT.[93]

BP chose to lie about the flow from the Macondo Well, the probability of success of the Top Kill and the reasons for the failure of the Top Kill. Each of these lies extended the duration of the spill. Many of these lies were prompted by BP's conscious decision to refuse to prepare for a blowout in a deepwater well.

"This will play for a long while."[94]  BP knew from the beginning that it was not prepared to respond to the Macondo blowout and meet its obligations. For decades, it ignored its obligation to prepare.

---

[92] 87 days (actual length of spill) minus 25 days (length of spill absent fraud) equals 62 days (length of spill attributable to fraud); 62 days divided by 87 days equals 71.3%.

[93] Transocean does not join in this section of the Pre-Trial Statement.

[94] TREX 2433.12 (Text Message from Lamar McKay to Doug Suttles) (April 21, 2010) ("Try to understand who will be on the Unified Command in N.O. – operational?  If operational our presence should match.  Don't want to show up and have BP 'own' this too early by being viewed as 'corporate' in the room.  This will play out for a long while – need to think about layers and stages.  Thx, Lamar.")

Once disaster strikes, the time to prepare has passed.  BP was fully aware of the risks it faced in deepwater drilling, understood the enormous environmental and economic consequences of an uncontrolled deepwater blowout, and made the conscious decision to ignore the risks, and rely on the drilling of a relief well.  BP did no pre-planning[95] or training of any kind.[96]  The only written, pre-incident plan it had in place was to begin the planning process **after** such a blowout occurred.[97]  The result of such a gross failure played out for eighty-seven days, as millions of barrels of hydrocarbons flowed into the Gulf of Mexico.

BP knew decades before the blowout of the risks it faced drilling in deepwater – particularly the risks of a blowout and the loss of well control.[98]  BP was well aware of available

---

[95] Deposition Testimony of Tony Hayward at 255 ("We did not have a plan to intervene to prevent flow subsea until the relief well was there."); Deposition Testimony of James Wellings at 247 ("Q.  You personally knew that in a deepwater environment, if BP was facing a situation of a failed BOP, that it had no pre-built equipment or pre-approved plans other than drilling a relief well, correct?   A. That's correct.")

[96] Deposition Testimony of Jim Wellings at 82 ("Q. In any of the well-control training you had prior to Macondo, did any of that  well control training address a situation like Macondo where you had a failed BOP, other than drill a relief well?  A. No.  The well control training we had did not address the Macondo-type situation."); Deposition Testimony of Richard Morrison at 87 ("Q. Did these drills, at least the ones you participated in, ever involve deepwater blowouts? A. No."); Deposition Testimony of Mark Patteson at 66-67 ("Q. You didn't drill on how to shut-in a blown out deepwater well, did you? A.  We - - in my experience, we never conducted a full-fledged drill on a well that was flowing.")

[97] TREX 769.179 (BP's Regional Oil Spill Response Plan, section 6(c)); Deposition Testimony of Richard Lynch (one of BP's primary source control leaders during the response) at 183-184 ("No I didn't have a plan."); Deposition of Charles Holt at 64 ("To my knowledge, the only tools that were in place, the only plans that were in place by BP and the industry was drilling a relief well."); Wellings Dep. at 53-54 (The plan to drill a relief well was "the only plan that I'm aware of.").

[98] Morrison Dep. at 227-231 ("Loss of well control is one of the top risks"); Deposition of Anthony Hayward at 196 ("[Deepwater Blowouts] are one of the highest risks for the corporation.  It was the highest risk in the Gulf of Mexico and one of the highest risks for the Exploration and Production Unit."); Deposition Testimony of Andy Inglis at 125 ("[W]ith respect to deepwater drilling in the Gulf of Mexico two of the major risks are loss of well control and the riser failure and loss of containment.")

technologies to intervene and to stop such a blowout.[99] Relying upon response technologies

designed for shallow water applications and worst case discharges of hundreds of barrels a day,

BP did nothing to mitigate the consequence of blowouts in deepwater wells, like Macondo, with

a worst-case discharge of 162,000 barrels per day.[100] Without addressing potential post-blowout

source control issues, BP continued to advance into deeper and deeper waters and riskier

environments.[101]

      BP's only pre-Macondo source control plan reviewed by government was its Regional

Oil Spill Response Plan.  This Plan was nothing more than a plan-to-plan pertaining to source

control.[102]  It was specifically designed to:  1) allow a well to flow until such time as a relief well

could intersect and kill the well (90-150 days); 2) deploy containment equipment to try to

capture oil flowing from the well; and 3) assemble a team to **begin** the process of planning how

to kill the well.[103]  Untrained and inexperienced BP employees were asked to develop source

---

[99] TREX 11625; TREX 7353.

[100] TREX 768.98

[101] TREX 5053.1 ("As the industry advances into deepwater exploration, the risks of blow out increase, due to difficulties related to kick detection and control procedures under deepwater conditions.  There is very little blowout experience in deepwater from which to draw when evaluating countermeasures.")

[102] The OSRP is the very plan that referenced walruses, seals, seal lions and otters as sensitive biological species in the Gulf of Mexico.

[103] TREX 769; McKay Dep. at 49-50 ("I think the response plan worked."); Deposition Testimony of Earnest Bush at 148 ("I believe [the Plan] performed as is stated in the Oil Spill Plan of what it's supposed to do."); Deposition of James Rohloff (BP's 30(b)(6) designee for its 2009 Regional Oil Spill Response Plan at 275-276 ("Q.  So if we assume a nonoperational BOP, aside from drilling a relief well, the response plan called for teams to get together and try to figure out something else to do to control the flow; is that a fair statement? A. Yes."); Rohloff Dep. at 48 ("Q. And you would agree, sir, that none of the options set forth in the oil spill response plan identified any equipment that was immediately available to BP to respond to a deepwater blowout at Macondo subsea? A. I'm unaware of any specific equipment that was relative to subsea interaction, other than a relief well, and, again, our practice is to call upon the industry experts in well control.").

control measures in response to a deepwater blowout in the most stressful of situations.[104] They

were literally starting from scratch.[105]

As BP drilled into deeper and deeper, more productive reservoirs, it ignored the

development of any response technology.[106] BP's Risk Mitigation Policy actually allowed risks

to go unmitigated if they were "too expensive to mitigate."[107]   Instead, BP hoped that a blowout

could be avoided through the activation of the BOP – a piece of equipment known to fail.[108]   Its

only back-up was the use of ROVs to actuate the BOP  – another technique known not to work

on a flowing well.[109]

---

[104] Discussed supra at n.95.

[105] Holt Dep. at 44 ("Q. At the end of the day, BP was essentially creating plans on how to kill this well, true? A. Yes."); Lynch Dep. at 201 ("Q. Do you believe you had the tools necessary in your possession to deal with capping this well on April 23rd, or did you have to come up with something?  A. Because of the scenario, we had to create tools to do that."); Hayward Depo. at 343 ("we certainly didn't have all the tools . . . we didn't have a capping stack . . . we didn't have some of the things you would ideally want").

[106] Deposition Testimony of James Dupree at 114 ("Risk mitigation plans, that's correct.  Most of the mitigation plans were - - were of a preventative nature, you know prevention."); 183 ("You know, most of the risk management was prevention of such an occurrence."); Deposition Testimony of Andrew Frazelle at 219-220 ("I think when we look at it is, if you look at it from a – a barrier standpoint is that we were looking at well control training for people more on the prevention side of things versus the reactionary side of things.").

[107] TREX 120061.12

[108] TREX 3174; TREX 5051; TREX 7353; TREX 1300; TREX 5054; Deposition of Andy Inglis at 140-141; 144-146; Frazelle Dep. at 219-222; Hayward Dep. at 254-255, 277 ("We believed in the event of a blowout, the blowout preventer, as it name implies, would stop the blowout."); Lynch Dep. at 117.

[109] TREX 769; TREX 8886; TREX 10166; TREX 1166; TREX 4423; TREX 3624; TREX 7353.375; Hayward Dep. at 255-256.; Campbell Depo. at 156-157 (agreeing that no emergency ROV had been planned for or was immediately available after the ROV on the Deepwater Horizon was lost in the fire); Stringfellow Depo. at  153-154 (agreeing that ROVs are not a viable secondary intervention tool in a well control scenario because closing a ram BOP with a low volume hydraulic source while a well is flowing would almost certainly result in damage to the sealing components of the ram and not seal the wellbore).

BP knew devices like capping stacks (essentially a miniature BOP) existed and were considered Best Available and Safest Technology (BAST) in other drilling environments.[110]  It recognized that capping devices could be implemented effectively much quicker than relief wells.[111]  Yet, BP did nothing to develop this technology for the deepwater environment. Instead, it gambled on the worst event not happening.  When it did, it was clear that BP was not prepared for the largest and one of the most predictable risks it faced.[112]  As stated by United States 30(b)(6) witness Lars Herbst, "they were not prepared to respond."[113]

### A.  BP IGNORED DECADES OF WARNINGS AND REFUSED TO SPEND MONEY OR TIME TO PREPARE FOR THE KNOWN AND FORESEEABLE RISKS

BP spent no money on source control prior to Macondo.[114]  In contrast, BP was spending at least $17 billion per year on Exploration & Production and approximately $600 million per year on drilling technology research and development.[115]

A continual push into the deeper waters of the Gulf was a key BP business strategy.[116] This expansion was due to advances in technology that allowed BP to drill into "new deeper

---

[110] TREX 9346; TREX 9827; TREX 9828; McWhorter Depo. at 178 (illustrating that capping stacks have long been used in the industry as a successful and viable method of source control; for example, Cameron BOPs capped wells in Kuwait, which were basically the land version of what was used on Macondo).

[111] TREX 9346.4; TREX 9827.4; TREX 9828.

[112] TREX 9096; TREX 7354; TREX 5051; Hayward Dep. at 254-255 ("the ability to intervene in the subsea was not in any way, shape or form complete.")

[113] Deposition Testimony of Lars Herbst at 348.

[114] Deposition of Andy Inglis at 162 ("A. In terms of - - containment activities, that wasn't part of the plan.  I think money was spent on surface with companies like MSRC, but I think in terms of actual containment activities as you describe them, there wasn't any research going on.  Q. Meaning zero dollars? A. Zero dollars."); Rohloff Dep. at 102 ("Q. Can you point to me, sir, any funds that were allocated by B – BP, prior to April 20th of 2010 to identify other ways to shut in a well, a deepwater well subsea in the face of a blowout, other than a BOP?  I'm unaware of any funds."); TREX 9104; TREX 2296

[115] TREX 2295

water geography and new deeper geology."[117] Starting in 1975 with the first well in 1,000 feet of

water, BP, and other operators within industry, pushed out into deeper waters.[118]  By 1994,

operators were drilling wells in approximately 3,000 feet of water. By 1998, wells were drilled in

nearly 4,000 feet of water and this would expand to 5,000 feet by 2000.  BP itself pushed the

boundary to nearly 7,000 feet by 2003.  By 2010, BP ranked first in terms of net leases in the

Gulf of Mexico.[119]

Reservoirs in these waters created greater risk and technological drilling challenges and

required an extensive investment in time and resources.[120]  One of the risks fully understood by

BP was High Pressure High Temperature reservoirs:

> Future HPHT developments have increased technical, HSE, and reputation risks
> because of potential use of unproven or immature technology . . . Currently, BP
> and other operators are pushing the water depth out to 2200m.  As these fields are
> designed and built, the industry is finding numerous technical gaps or technology
> problems.  Further gaps and problems are expected as we move to the deeper
> prospects in our portfolio.[121]

BP was committed to "pushing the technology frontier to unlock the future as we go

deeper, with higher pressures and more challenged reservoir conditions."[122]  "[T]echnology will

be the key to the future and given BP's track record of successfully pushing the technology

---

[116] TREX 120172; TREX 120173

[117] TREX 120174.4

[118] TREX 9098.10

[119] TREX 120174.3; Deposition Testimony of Richard Morrison at 290 ("Q. And you would
agree that BP – well, with the statement that BP is the largest deepwater operator in the Gulf of
Mexico? A. Yes, from the standpoint of leasehold – and I think Production."); Deposition
Testimony of Lamar McKay at 42.

[120] TREX 120174.4 ("It is crucially important for the industry to succeed to deliver a return on
the very significant and high risk investments we are making.")

[121] TREX 120173.1

[122] TREX 120174.4

frontier we are confident that these challenges can be met."[123]  As BP's Lamar McKay testified before Congress in 2009, "Today's offshore oil drilling technology bears about as much resemblance to what was available in the 1960s as a rotary dial telephone does to an iPhone."[124] Its deepwater response technology, however, never advanced past the rotary phone.

BP's Macondo source control effort was a research and development project that should have been commenced decades earlier, especially considering the amount of money BP spent annually advancing drilling technology and the multiple warnings it possessed.  Indeed, BP's total cost to design, manufacture, install and operate the capping stack was $67 million.[125]  Had BP allocated this relatively small amount of resources prior to Macondo, the spill would have been stopped much earlier.

**1979:**  Since at least 1979, BP knew that source control measures were needed.  In June 1979, The Ixtoc I exploratory well blew out in the Bay of Campeche in 160 feet of water.[126]  It took ten months to drill a relief well to stop the flow of oil.[127]  This should have served as a wake-up call to BP as it pushed to drill in the deeper waters of the Gulf.   BP, however, ignored these lessons as the public watched the same methods that failed at Ixtoc – top kill, junk shot – also fail at Macondo.[128]

---

[123] TREX 120174.6

[124] TREX 120189.8

[125] TREX 11260.2

[126] TREX 1300.13; TREX 9099.118

[127] TREX 9099.118

[128] TREX 9099.118 - .119

**1991:**  In 1991, a Joint Industry Study referred to as DEA-63 was published and submitted to the MMS.[129]  The focus was subsea source control and containment devices.[130] Significantly, one of the directives of the study was "the development of vertical intervention and capping techniques for deepwater blowouts."[131]  BP's predecessor, Amoco, participated in the work.[132]

As noted in DEA-63, "[t]he most logical approach to controlling pollution from a subsea blowout is to contain and collect the blowout effluent at the source of the spill."[133]  Such a statement seems like common sense.  However, as of 1991 it was recognized that "[n]ew technology ha[d] not been developed . . . owing largely to the absence of a severe subsea blowout."[134]  Of course, in 1991 the maximum drilling depths were 1,500 feet.

DEA-63 forecast a nearly identical blowout to Macondo.  The Study diagrams a well with the BOP slightly leaning, a kink in the riser above the BOP leaking hydrocarbons, and a broken riser leaking hydrocarbons into the ocean.[135]  In response to such a situation, the study proposed that "[p]rocedures may be developed to 'strip' new BOP components over a subsea blowing well.  Capping stacks composed of BOPs, pump-in spools, hydraulically-operated valves and others devices are used routinely to kill onshore blowouts."[136]  The document even

---

[129] TREX 11625.2

[130] TREX 11625.14

[131] Id.

[132] TREX 11625.18

[133] TREX 11625.363

[134] Id.

[135] TREX 11625.401

[136] TREX 11625.403

offers a depiction of the installation of capping devices.[137]  Yet in the twenty years between the publication of DEA-63 and the Macondo blowout, BP did nothing to study or to develop these procedures.[138]

**1998:**  In 1998, the International Association of Drilling Contractors ("IADC") published its Deepwater Well Control Guidelines.[139]  The Guidelines advised operators to "identify, locate and negotiate for specialized well control equipment in advance" for both surface and subsea.[140,141]  The necessity of making such advance plans was specifically emphasized because the "industry has extended delivery schedules that make auxiliary equipment such as ram preventers and subsurface equipment a scarce commodity."[142]

The Guidelines went on to include the very diagrams from DEA-63 depicting the use of a capping intervention to stop a Macondo-type blowout.[143]  Specifically, the scenario depicted by the IADC was nearly identical to Macondo.[144]

---

[137] TREX 11625.414, .415

[138] Deposition Testimony of David Barnett (an employee of Wild Well Control contracted by BP during the response effort) at 202 ("Q.  Did you see any evidence that that DEA Study was incorporated by BP into BP's Governance Plans before Macondo?  A.  I couldn't say that I did, no.")

[139] TREX 7353

[140] TREX 7353.362

[141] BP had an existing contract with Wild Well Control at the time of the Macondo blowout. TREX 11467.  However, the contract expressly provided that "[BP] will have fully developed emergency response procedures (TREX 11467.66) and specified that capping stacks were optional and not included in the contract  (TREX 11467.89).  As will be seen throughout the evidence during Phase 2, BP refused to listen to the advice of its contracted well control specialist.

[142] TREX 7353.372

[143] TREX 7353.381, .385, .386

[144] McKay Dep. at 75 – 76.

The IADC even recommended that "blowouts on land and in shallow water can be reviewed to further develop the list of probable deepwater blowout scenarios."[145]  Ignoring these industry warnings and recommendations, BP's investments were limited to creating higher profits by drilling into riskier and more productive reservoirs.

**2003:**  In 2003, the Society of Petroleum Engineers ("SPE") and the IADC held a conference on Well Control Procedures.[146]  As part of that conference, the organizations recognized that virtually no work had been done regarding deepwater blowout control since the DEA 63 report - nearly 13 years before.[147]  In fact, the direct question was asked, "What about blowout containment procedures……Have they been keeping up with the current technology?"[148]  While it was acknowledged that an ultra-deep water (5,000 feet) blowout had yet to occur, "statistics show it is likely to happen."[149]  From the time the question "Are we ready to handle it?"[150] was posed in 2003 through the Macondo blowout in 2010, BP had done nothing to prepare for an event that was "likely" to occur.

**2005:**  The urgency to plan for such an event was repeated in 2005 in a paper by Dr. Ole Rygg, the same technical expert whom BP hired, relied upon and utilized for  the creation of flow modeling that BP hid from Unified Command.[151]  Dr. Rygg wrote:

> In evaluation of emergency response for a drilling operation, onshore or offshore, one essential element is the pre-evaluation of the possibility of regaining control

---

[145] TREX 7353.379

[146] TREX 6299

[147] TREX 6299.6

[148] Id.

[149] TREX 6299.11

[150] Id.

[151] TREX 9239

of a blowing well.  Even though the probability of a blowout might be small, the consequences with respect to safety, cost and pollution could be catastrophic.[152]

BP refused to heed his advice.

**2005:**  That same year, the SPE/IADC published "Modeling Ultra-Deepwater Blowouts and Dynamic Kills and the Resulting Blowout Control Best Practice Recommendations."[153]  This work further reinforced the need to advance intervention technology in deepwater drilling.  Specifically, the authors warned, "[i]n response to the drilling industry breaching new frontiers, specifically ultra-deep waters (5,000 ft or more of water depth), new blowout control measures are necessary."[154]  One of the blowout controls specifically referenced was capping.[155]  The paper went on to point out that "[w]hile drilling as whole may be advancing to keep up with these [ultra-deep water] environments, some parts lag behind.  An area that has seen this stagnation and resulting call for change has been blowout control in deep and ultra-deep waters."[156]  Again, BP did nothing.

From 1991 through 2005, BP was repeatedly warned that subsea source control technology was needed for deepwater drilling.  The consequences of a deepwater blowout were too great to rely solely upon a relief well, and closing in a failed BOP through use of ROV intervention was ineffective.[157]   Despite discussions of capping stacks and other vertical intervention techniques dating back to 1991, "research in this area is non-existent."[158]  But

---

[152] TREX 9239.1

[153] TREX 12002.

[154] TREX 12002.1

[155] TREX 12002.2

[156] TREX 12002.1

[157] TREX 1166; TREX 3624; TREX 7353.

[158] TREX 12002

financing source control technology was not consistent with BP's "every dollar counts" mantra.[159]   As a result, BP did not have the tools to control the source.[160]

**B.** **BP FAILED TO MEET THE REGULATORY REQUIREMENTS TO HAVE A SOURCE CONTROL PLAN DESIGNED TO IMMEDIATELY ABATE THE SPILL**

BP's responsibility as an operator in the Gulf of Mexico was to take "all appropriate actions necessary to immediately abate the source of a spill."[161]   The regulatory standard is a performance standard.[162]   In other words, BP was expected to be able to perform the task.   The exact manner was not prescribed.   By any standard, BP failed to meet the government's expectations.[163]

So what plan did BP actually have?   BP had a nearly 600 page Oil Spill Response Plan that was not designed or intended to serve as a source control plan.[164]   All but one page of this plan was devoted to oil clean-up and containment once the hydrocarbons reached the surface. Source control was specifically addressed solely on one page within the Plan at Section 6(c), and

---

[159] *See generally,* Plaintiffs' Proposed Findings and Conclusions [Rec. Doc. 10458].

[160] TREX 9099, Report of Admiral Papp, United States Coast Guard ("this incident exposed deficiencies in planning and preparedness for an uncontrolled release of oil form an offshore drilling operation."); TREX 9096 ("Industry representatives have admitted that they are not well-equipped to handle worst-case scenarios."); Hayward Dep. at 343 ("Q. And do you recall saying publicly that – that you did no – you meaning BP – did not have the tool that you would want to have in your tool kit? A. We certainly didn't have all of the tools that in – with the benefit of hindsight we could have had, yes.   We didn't have a capping stack that would go instantly into place.   We didn't have some of the things that you would ideally want.").

[161] 30 CFR 254(c); Herbst Dep. at 303 ("Q. In fact the regulations in place at the time of the Macondo incident requires a company to be prepared to handle such a blowout, correct? A. That's correct."); 315 ("Q. Their obligation under regulation is to abate the source as quickly as possible, correct? A. Yes.")

**[162]** Expert Report of Ed Ziegler at p. 20

[163] Herbst Dep. at 398 ("We expected them to be able to contain a deepwater blowout…they did not, obviously, contain it as quickly as our expectations were.")

**[164]** Bush Dep. at 17, 28.

only the third of three bullet points addressed what BP intended to do in the case of a loss of well control with a failure of the BOP:

> In the event the spill source cannot be controlled by the facility operator or remotely with a safety system, BP will activate the Oil Spill Response Plan and assemble a team of technical experts to respond to the situation.  The team will be comprised of personnel familiar with the facility including production superintendents, foremen, facility engineers, and production and/or drilling engineers.  The Deputy Incident Commander or Operations Section Chief will be responsible for monitoring information produced by the team, as well as their progress, and reporting the results to the Incident Commander.[165]

This was the extent of the Plan, and all it called for was to gather technical experts to begin the planning process.

Worse still, the technical experts within BP had no training or experience on what to do in the case of a deepwater blowout.[166]  Each of the intervention techniques attempted during Macondo (cofferdam, top kill, top hat, capping stack, etc.) were being considered by BP for the very first time.[167]  In short, there was no actual plan for source control.  BP did not even consider its Oil Spill Response Plan to be a source control plan.[168]

While BP's Oil Spill Response Plan was reviewed and approved by the MMS, the MMS did not review BP's internal policies and guidelines on how to intervene and stop a blowout.[169]

---

[165] TREX 769.180; see also TREX 170000.45 submitted to the states of Louisiana and Mississippi in which BP asserted that due to its response capabilities as represented in its OSRP, including but not limited to its source control capabilities, that no significant adverse impacts were expected to Louisiana and Mississippi's coastline and associated environmental resources.

[166] Wellings Dep. at 82-83; Frazelle Dep. at 219-220; Harland Dep. at 119-122 (as cited in Dr. Bea Rebuttal Report at 6).

[167] TREX 9098.7 ("None of the subsea containment strategies used had even been attempted in water depths similar to those of Macondo.")

[168] Bush Dep. (as BP's 30(b)(6) designee on the topic) at 17 ("The Plan is not – not about Source Control.  This Plan is about how to respond to an oil spill on the surface.").

[169] TREX 9099.38 ("The regulations do not, however, address subsea containment of oil, nor do they require discussions on spill abatement such as well intervention or drilling of relief wells.")

As acknowledged by BP, the OSRP was primarily a plan for responding on the surface. However, the regulatory requirement is that BP must be capable of immediately abating the source of a spill.[170]   The MMS did not review or approve BP's capability (or lack thereof) to immediately abate the spill at its source.  Rather, it solely reviewed and approved the OSRP on its face, and accepted BP's false certification in its Initial Exploration Plan that:

> BP Exploration & Production, Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge [162,000 barrels per day], or a substantial threat of such a discharge resulting from the activities proposed in our Exploration Plan.[171]

Had the government seen BP's internal plans and procedures, it would have found the absence of any material plan beyond the drilling of a relief well.[172]

It was not until after Macondo that the MMS required BP to prove it had the ability to meet the regulatory requirement and to specifically set out a plan to intervene in the subsea.[173] Importantly, the regulatory requirement itself did not change – this requirement pre-existed Macondo.[174]   BOEMRE simply decided that if BP was unwilling to develop procedures on its own, it would prescribe the necessary tools.

---

[170] TREX 51497 (30 CFR 254.5(c)).

[171] TREX 768.99

**[172]** TREX 9099.39 ("Response planning for the Macondo exploratory well did not adequately address the strategies, tactics, equipment, and resources needed to respond to an ongoing release of oil for a protracted period."); TREX 9096; TREX 9098

**[173]** TREX 12001

[174] TREX 11629.

C.    **BP FAILED TO MEET THE REGULATORY REQUIREMENT TO USE BEST AVAILABLE AND SAFEST TECHNOLOGY**

In addition to the responsibility to immediately abate, BP was also obligated to follow Best Available and Safest Technologies ("BAST").[175]  Mr. Ziegler, a former owner/operator of drilling rigs himself, will address BP's failures to achieve BAST in its deepwater source control.

BP recognized prior to Macondo that well capping is superior to the drilling of a relief well.[176]  In its Alaska operations, BP "believes well capping constitutes the [Best Available Technology] for source control of a blowout."[177]  "Historical evidence clearly indicates well capping has greater reliability and application for well control compared to that of relief well drilling.  Well capping response times account for an approximate 50 percent reduction in blowout durations to that of relief well drilling."[178]  While BP was discussing the use of capping stacks in environments other than deepwater Gulf of Mexico drilling, it recognized that capping stacks were an available technology that better performed its obligation to control the source.  Despite this recognition, and as set out above, BP did nothing to determine how to implement this technology in deepwater.

Indeed, most of the arguments BP makes in this connection are undermined by the fact that, shortly after Macondo, BP fabricated a capping stack using currently existing components

---

[175] Report of Ziegler at 20; TREX 51497 (30 CFR 250.105, 107).

[176] TREX 9346

[177] TREX 9346.4

[178] Id.

and technology.[179]  Further, BP goes so far as to boast in its advertisements that its possession of such a device makes it a safer oil and gas company.[180]

There is nothing technologically advanced about a capping stack.  It is nothing more than a miniature BOP.  Capping stacks have been used in the oil industry for decades.  The application of capping stacks was discussed in DEA-63 back in 1991.  BP simply ignored its responsibility to determine how to apply this Best Available Technology in deepwater.  It ignored this responsibility at the public's peril.

### D.     BP VIOLATED ACCEPTED STANDARDS OF RISK MANAGEMENT

In addition to failing to meet the above regulatory standards, BP violated generally accepted standards of risk management.  BP understood that drilling a deepwater well like Macondo was a high risk and dangerous venture, requiring that risks be managed to an As Low As Reasonably Practicable Condition.  Indeed, this was acknowledged within BP's own drilling policies:  "All risks shall be managed to a level, which is as low as reasonably practicable."[181] As will be addressed by Dr. Bea, BP made no effort to meet this standard, as its risk management focused solely on prevention and ignored the requirement to mitigate consequences.

BP knew that it did not have prevention measures in place that reduced the risk to zero and, given the magnitude of the consequences of a blowout, was required to implement mitigation (i.e., post-blowout controls and/or measures) to reduce the consequences of a blowout.  BP had no source control technology to mitigate the consequence of failure.  Had BP not ignored

---

[179] TREX 120102 - Gier Karlson, A Fully Air Deployable Well Capping Stack and ROV Tooling System for Worldwide Support (SPE 160409) 2012; TREX 160044 - Video - Safety Commercial - BP, plc - YouTube (Native) www.youtube.com/user/BPplc?v=LLBTT7Mvk2Q.

[180] TREX 160044 - Video - Safety Commercial - BP, plc - YouTube (Native) www.youtube.com/user/BPplc?v=LLBTT7Mvk2Q.

[181] TREX 93.

its obligations, a subsea intervention solution like a capping stack would have been available and ready to deploy.   They were considered Best Available and Safest Technology in nearly all other drilling environments prior to Macondo.  Of course, they are considered BAST in deepwater drilling now. Had BP had one available, the spill would have been stopped within a matter of weeks and possibly within a matter of days.[182]

DATED:  September 18, 2013

By: /s/ Brad D. Brian
Brad D. Brian
Michael R. Doyen
Daniel B. Levin
Susan E. Nash
MUNGER TOLLES & OLSEN, LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA  90071
Tel: (213) 683-9100
Fax: (213) 683-5180
Email:  brad.brian@mto.com
        michael.doyen@mto.com
        daniel.levin@mto.com
        susan.nash@mto.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY &
WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX  77002
Tel: (713) 224-8380

Respectfully submitted,

By: /s/ Steven L. Roberts
Steven L. Roberts
Rachel Giesber Clingman
Sean Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, TX  77002
Tel: (713) 4710-6100
Fax: (713) 354-1301
Email:  steven.roberts@sutherland.com
        rachel.clingman@sutherland.com
        sean.jordan@sutherland.com

By: /s/ Kerry J. Miller
Kerry J. Miller
FRILOT, LLC
1100 Poydras Street, Suite 3800
New Orleans, LA  70163
Tel: (504) 599-8194
Fax: (504) 599-8154
Email:  kmiller@frilot.com

**Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.**

---

[182] TREX 5059 (establishing a time to land and close in a capping stack at 18 days); TREX 9564 (providing an estimate of 24 days form onset of incident to install a capping stack); TREX 9345 (the time to land and close in a capping stack can be accomplished in one to three weeks)

/s/ Stephen J. Herman, La. Bar No. 23129
HERMAN HERMAN & KATZ LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax. No. (504) 569-6024
Email: sherman@hhklawfirm.com

/s/ Brian H. Barr
Brian H. Barr (PSC Member)
Levin Papantonio Thomas Mitchell Rafferty &
Proctor, PA
316 S. Baylen Street, Suite 600
Pensacola, FL  32502
Telephone:  (850) 435-7045
Fax No. (850) 436-6187
Email:  bbarr@levinlaw.com

/s/ James Parkerson Roy, La. Bar No.11511
DOMENGEAUX WRIGHT ROY
& EDWARDS, LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail:  iimr@wrightroy.com

**Plaintiffs Liaison Counsel**

LUTHER J. STRANGE
*Attorney General*
COREY L. MAZE
*Special Deputy Attorney General*
WINFIELD J. SINCLAIR
*Assistant Attorney General*
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
Phone:  (334) 242-7300
Fax:  (334) 242-4891
Email: lstrange@ago.state.al.us
cmaze@ago.state.al.us
wsinclair@ago.state.al.us

**Attorneys for the State of Alabama**

James D. "Buddy" Caldwell
*Louisiana Attorney General*
James Trey Phillips
*First Assistant Attorney General*
Megan K. Terrell
*Assistant Attorney General*

Allan Kanner
Elizabeth B. Petersen
Kanner & Whiteley, L.L.C.
701 Camp Street
New Orleans, LA 70130
Telephone: (504) 524-5777

1885 N. Third Street                         Facsimile: (504) 524-5763
Baton Rouge, LA 70802                        E-Mail: a.kanner@kanner-law.com
Telephone: (225) 326-6079

**Attorneys for the State of Louisiana**

Donald E. Godwin                             Bruce W. Bowman, Jr.
*Attorney-in-charge*                         State Bar No. 02752000
State Bar No. 08056500                       Bruce.Bowman@GodwinLewis.com
Don.Godwin@GodwinLewis.com                   Renaissance Tower
Renaissance Tower                            1201 Elm, Suite 1700
1201 Elm, Suite 1700                         Dallas, Texas 75270-2041
Dallas, Texas 75270-2041                     Telephone: (214) 939-4400
Telephone: (214) 939-4400                    Facsimile: (214) 760-7332
Facsimile: (214) 760-7332
Jenny L. Martinez                            Floyd R. Hartley, Jr.
State Bar No. 24013109                        State Bar No. 00798242
Jenny.Martinez@GodwinLewis.com               Floyd.Hartley@GodwinLewis.com
Renaissance Tower                            Renaissance Tower
1201 Elm, Suite 1700                         1201 Elm, Suite 1700
Dallas, Texas 75270-2041                     Dallas, Texas 75270-2041
Telephone: (214) 939-4400                    Telephone: (214) 939-4400
Facsimile: (214) 760-7332                    Facsimile: (214) 760-7332

Gavin E. Hill                                R. Alan York
State Bar No. 00796756                        State Bar No. 22167500
Gavin.Hill@GodwinLewis.com                   Alan.York@GodwinLewis.com
Renaissance Tower                            1331 Lamar, Suite 1665
1201 Elm, Suite 1700                         Houston, Texas 77010
Dallas, Texas 75270-2041                     Telephone: 713.595.8300
Telephone: (214) 939-4400                    Facsimile: 713.425.7594
Facsimile: (214) 760-7332

Jerry C. von Sternberg                       Misty Hataway-Cone
State Bar No. 20618150                        State Bar No. 24032277
Jerry.VonSternberg@GodwinLewis.com           Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665                        1331 Lamar, Suite 1665
Houston, Texas 77010                         Houston, Texas 77010
Telephone: 713.595.8300                      Telephone: 713.595.8300
Facsimile: 713.425.7594                      Facsimile: 713.425.7594

**Attorneys for Defendant Halliburton Energy Services, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2013, I electronically filed a PDF version of this document with the Court's CM/ECF system and service on all counsel of record by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

　　　　　　　　　　　　　　　　　/s/ Kerry J. Miller
　　　　　　　　　　　　　　　　Kerry J. Miller