**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | MDL No. 2179 |
| | SECTION J |
| **This Document Relates to:** | JUDGE BARBIER |
| 2:13-cv-5373 (*Baton Rouge City, Louisiana v. BP Exploration & Production, Inc. et a*) | MAGISTRATE SHUSHAN |

## FIRST AMENDED COMPLAINT

The Complaint of The City of Baton Rouge and Parish of East Baton Rouge, Louisiana (hereinafter "City of Baton Rouge"), a governmental political subdivision of the State of Louisiana, who has suffered loss of income and revenue, loss of resources, loss of tax revenue, loss of use, costs of public services, and/or other damages, losses and costs as a result of the oil spill caused by the sinking of the MODU *Deepwater Horizon* in the Gulf of Mexico on April 20, 2010, respectfully represents as follows.

The City of Baton Rouge adopts, by reference, as if copied in extenso, the "Local Government Entity Master Voluntary Complaint and Answer," Record Document 253 filed on March 4, 2011.

## THE PARTIES

1.      Appearing as Plaintiff herein is the City of Baton Rouge, Louisiana, a city founded in 1817, located in East Baton Rouge Parish, and the Parish of East Baton Rouge, a political subdivision of the State of Louisiana, which together form a consolidated local government, and as a result of the events described below, has suffered past, present, and future compensatory damages and is also entitled to punitive damages.

2.     Defendant, BP Exploration & Production, Inc., is a Delaware corporation, at all pertinent times registered to do and doing business in the State of Louisiana, and/or its territorial waters, whose principal business establishment and registered business office is 501 Westlake Park Boulevard, Houston, Texas 77079, and whose agent for service of process in Louisiana is C T Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, Louisiana 70808.

3.     BP Exploration & Production, Inc. was a holder of a lease granted by the former Minerals Management Service ("MMS"), allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated.

4.     BP Exploration & Production, Inc. was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. §2714.   Personal jurisdiction over Defendant, BP Exploration & Production, Inc., is proper under one or more provisions of La. R.S. §13:3201 as it has, *inter alia*, committed a tort, in whole or in part, in Louisiana and has caused Plaintiff to suffer damages.

5.     Defendant, BP America Production Company, is a Delaware corporation, at all pertinent times registered to do and doing business in the State of Louisiana and/or its territorial waters, whose principal business establishment and registered business office is 501 Westlake Park Boulevard, Houston, Texas 77079, and has a registered agent in Louisiana.  BP America Production Company was the party to the Drilling Contract with Transocean LTD for the drilling of the Macondo well by the *Deepwater Horizon* MODU drilling vessel.  Personal jurisdiction over Defendant-BP American Production Company is proper under one or more provisions of La. R.S. §13:3201 as it has, *inter alia*, committed a tort, in whole or in part, in Louisiana and has caused Plaintiff to suffer damages.

6.      Defendant, BP, P.L.C., is a foreign corporation with its corporate headquarters in London, England, at all pertinent times doing business in the State of Louisiana.  BP, P.L.C. is the global parent company of the worldwide business operating under the "BP" logo.  BP, P.L.C. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009.  BP, P.L.C. operates its various business divisions, such as the "Exploration and Production" division, in which BP Exploration & Production, Inc. and BP America Production Company fall, through vertical business arrangements aligned by product or service groups.  BP, P.L.C.'s operations are worldwide, including in the United States.  Defendants, BP Exploration & Production, Inc. and BP America Production Company (collectively "BP") are wholly-owned subsidiaries of BP P.L.C. and are sufficiently controlled by BP, P.L.C. so as to be BP, P.L.C.'s agents in Florida, Louisiana, and the United States.

7.      BP P.L.C. has submitted to Federal Court jurisdiction by responding to, among other acts, various Plaintiff's discovery requests in the MDL 2179 Federal Court.

8.      BP, P.L.C. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development.  A sampling of BP P.L.C.'s contact with the United States are as follows: (a) BP P.L.C.'s American Depository Shares are listed on the New York Stock Exchange and BP P.L.C. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP P.L.C. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP, P.L.C.'s fixed assets are located in the United States or the European Union; and (e) BP P.L.C. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

9.     This Court has jurisdiction over BP P.L.C. pursuant to Louisiana's long-arm statute (La. R.S. §13:3201), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.   BP P.L.C. does business in Louisiana and has had continuous and systematic contacts with Louisiana (and with the United States, more generally).

10.     Alternatively, this Court may exercise personal jurisdiction over BP P.L.C., pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because claims in this action arise under federal law, the exercise of jurisdiction over BP P.L.C. is consistent with the United States Constitution and Laws, and BP P.L.C. has been served with summonses in individual complaints that allege similar causes of action to those alleged in this Complaint.

11.     Plaintiff's causes of action arise out of wrongful conduct committed by BP P.L.C., directly or indirectly, by its agents that caused damage in Louisiana by an offense or quasi offense committed through acts or omissions inside and outside of Louisiana.   BP P.L.C. regularly does or solicits business, or engages in any other persistent courses of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.   These acts or omissions took place both before the blowout resulting in the Oil Spill and in the negligent, willful, wanton, and reckless conduct of BP P.L.C. after the blowout in attempting to contain the Oil Spill.

12.     In addition, this Court also has personal jurisdiction over BP P.L.C. under agency and alter ego principles, because BP P.L.C.'s agents, BP America Production Company and BP Exploration & Production, Inc., do business in Louisiana.   BP America Production Company and BP Exploration & Production, Inc. are both wholly-owned subsidiaries of BP P.L.C.   In BP P.L.C.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America Production Company and BP Exploration & Production, Inc., BP P.L.C.

states that it "controls" both BP America Production Company and BP Exploration & Production, Inc., among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities..."

13.     Moreover, BP P.L.C. undertook the duty to pay and/or gratuitously to clean up the Oil Spill and, as a result, is liable for its acts and omissions in the attempt to clean up the Oil Spill.

14.     BP Exploration & Production, Inc., BP America Production Company, and BP P.L.C. are generally referred to collectively as "BP."  As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the drilling contractors working on the various aspects of the well and the drilling operations.

15.     Defendant, Transocean LTD, is a Swiss corporation that maintains substantial U.S. offices at 4 Greenway Plaza, Houston, Texas 77046.  According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean LTD was an owner, managing owner, owner *pro hac vice*, and/or operator of the MODU *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.  Personal jurisdiction over Defendant, Transocean LTD, is proper under one or more provisions of La. R.S. §13:3201 because Transocean LTD has, *inter alia*, committed a tort, in whole or in part, in Louisiana and has caused Plaintiff to suffer compensatory and punitive damages.

16.     Defendant, Transocean Offshore Deepwater Drilling, Inc. (hereinafter "Transocean Offshore"), is a Delaware corporation with its principal place of business in Houston, Texas.  Defendant, Transocean Offshore, is an owner, managing owner, owner *pro hac*

vice, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.  Personal jurisdiction over Defendant, Transocean Offshore, is proper under one or more provision of La. R.S. §13:3201 as it has, *inter alia*, committed a tort, in whole or in part, in Louisiana and has caused Plaintiff to suffer damages.

17.     Defendant, Transocean Holdings, LLC (hereinafter Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas.  Defendant, Transocean Holdings, is affiliated with Transocean LTD and is a wholly-owned subsidiary of Transocean Offshore.  Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.  More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico.  On April 28, 2010, the United States Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the explosion aboard the *Deepwater Horizon*. Personal jurisdiction over Defendant, Transocean Holdings, is proper under one or more provisions of La. R.S. §13:3201 as it has, *inter alia*, committed a tort in whole or part in Louisiana and has caused Plaintiff to suffer damages.

18.     Defendant, Triton Asset Leasing GMBH (hereinafter "Triton"), is a Swiss limited liability company with its principal place of business in Zug, Switzerland.  Defendant, Triton, is affiliated with Transocean LTD. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

19.     Defendants, Transocean LTD., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton, are hereinafter referred to collectively as "Transocean."  At the Macondo site, Transocean provided the *Deepwater Horizon* MODU and personnel to operate it. At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its vessel control and operational systems.  Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervisors and support for those drilling activities at all times relevant to the Oil Spill.

20.     Defendant, Halliburton Energy Services, Inc., is a Delaware corporation with its principal place of business in Houston, Texas.  Halliburton Energy Services, Inc.  is licensed to do and does business in the State of Louisiana.  Halliburton Energy Services, Inc. provided cement engineering, design service, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations.  Halliburton Energy Services, Inc. was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well.  At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons to the surface.

21.     Defendant, Sperry Drilling Services (formerly Sperry Sun Drilling Services), is a division of Halliburton Energy Services, Inc., was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools.  Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.  Throughout this

Complaint for Damages, "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

22.     BP, Transocean, and Halliburton are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and other temporary well abandonment activities of the *Deepwater Horizon*, and thus their actions caused and/or contributed to the Spill.

23.     Each of these Defendants are jointly, severally, and/or solidarily liable under various principles of federal, maritime and/or applicable State tort law.

## JURISDICTION AND VENUE

24.     Plaintiff incorporates by reference, *verbatim*, the allegations in Paragraphs 1 through 23, above.

25.     This Court has jurisdiction over this action, pursuant to 28 U.S.C. §1332(a)(4), because this matter in controversy exceeds the minimum jurisdiction amount of $75,000.00, exclusive of interest and costs, and this case is between Plaintiff and citizens of a State or of different States.

26.     Jurisdiction is also proper under 28 U.S.C. §1331 because the claims asserted by Plaintiff arises under the laws of the United States of America, including the laws of various states which have been declared, pursuant to 43 U.S.C. §1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the Outer Continental Shelf from which the Oil Spill originated.   Federal question jurisdiction under 28 U.S.C. §1331 also exists by virtue of Plaintiff's claims brought herein, which arise under the Oil Pollution Act of 1990.

27.     In addition, this Court has jurisdiction over this action, pursuant to the Oil Pollution Act, 33 U.S.C. §2717(b) (the "OPA").

28.    Pleading in the alternative, jurisdiction also exists over this action pursuant to The Admiralty Extension Act, 46 U.S.C. §30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

29.    The claims presented invoke the Court's supplemental jurisdiction.  *See* 28 U.S.C. §1367.

30.    BP Exploration was designated as a "Responsible Party" by United States President Barack Obama and the United States Coast Guard under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §2701 and BP accepted that designation.

31.    This Court has personal jurisdiction over BP Exploration because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

32.    Plaintiff has complied with the suit prerequisite contained in OPA by satisfying the presentment requirement described in 33 U.S.C. §2713 and noting that more than ninety (90) days has passed since presentment was filed.  In fact, despite filing a presentment of claims under OPA, BP has failed to counter or formally respond to the damages claimed.

33.    Plaintiff hereby adopts by reference and incorporate herein, as if specifically pled in their entirety, the "Local Government Entity Master Voluntary Complaint and Answer," Record Document 253 filed on March 4, 2011.

34.    Venue is proper in the United States District Court for the Middle District of Louisiana, pursuant to 28 U.S.C. §1391(b).

35.    The Plaintiff reserves their right to seek a transfer of any and all issues and claims not resolved in the proceedings before the MDL Court back to the Middle District of Louisiana

for trial, if the subject lawsuit is transferred to MDL 2179, pending in the United States District Court for the Eastern District of Louisiana, entitled, "In Re: Oil Spill by the Oil Rig 'DEEPWATER HORIZON' in the Gulf of Mexico on April 20, 2010".

## NATURE OF THE ACTION

36.     Baton Rouge, Louisiana is a city located in East Baton Rouge Parish in southern Louisiana.  Baton Rouge is located on the Mississippi River, less than 50 miles from the Louisiana Gulf Coast, and is home to the Port of Baton Rouge, which is the ninth largest in the United States in terms of volume.  The city of Baton Rouge is the capital of the state of Louisiana and the second largest city in the state with a population of 802,484 in 2010.  Baton Rouge is a major industrial, petrochemical, medical, and research center of the South.

37.     Baton Rouge is known as a tourist and vacation destination for U.S. and international visitors.  The city has several designated arts & cultural districts and an array of arts and theatre venues.  Baton Rouge hosts many events throughout the year, the biggest of which is Mardi Gras.

38.     This claim for compensation and damages on behalf of Baton Rouge, Louisiana, a governmental political subdivision, is being made pursuant to the Oil Pollution Act of 1990, 33 U.S.C. 2701, et seq. ("OPA").  Strict liability, pursuant to the Louisiana Oil Spill Prevention and Response Act of 1991 (OSPRA), La. Rev. Stat. 30:2451 *et seq.*, Louisiana State law claims, and the General Maritime laws of the United States.  The claim is made as a result of the reckless spilling and dumping of oil by BP at their Macondo 252 well lease site into the navigable waters and adjoining shorelines of the Gulf of Mexico, as well as the States of Louisiana, Mississippi, Alabama, and Louisiana, in the days, weeks, and months following the explosion and sinking of the MODU, *DEEPWATER HORIZON*, on and after April 20, 2010.

39.     BP has been designated by the President of the United States as the "Responsible Party," pursuant to 33 U.S.C. §2714, for paying damages and removal costs, as defined by OPA, 33 U.S.C. §2701.  These damages, allowed by 33 U.S.C. §2701, include, but are not limited to, injury to (a) natural resources; (b) real or personal property; (c) subsistence use; (d) revenues, profits, and earning capacity; and, (e) public services.

40.     With respect to statutory defenses extended to responsible parties under this Act, pursuant to 33 U.S.C. §2702, BP has demonstrated that it is unable to prove by a preponderance of the evidence, that the discharge of oil from the Macondo 252 Well and the damages and removal costs which followed, were caused solely by a third party, other than those with whom BP had a contractual relationship for operation of the BP designed drilling program on the subject well.  Similarly, BP cannot prove that it "exercised due care with respect to the oil concerned, taking into consideration the characteristics of the oil and in light of all relevant facts and circumstances; and took precautions against  foreseeable acts or omissions of any such third party and the foreseeable consequences of those Acts or omissions or any combination above..." BP is further estopped from claiming a so-called "complete defense" pursuant to this Section in that it misrepresented, misled, and lied to Congress and other Federal regulators with respect to the cause(s), scope, and severity of the spill for which it has entered a plea of guilty in yet another felony crime involving the health and safety of human beings and the environment.  BP is, therefore, legally estopped from asserting these defenses under 33 U.S.C. §2702.

41.     Although OPA provides for "limits on liability" pursuant to 33 U.S.C. §2704, BP cannot avail itself to this limitation as the deaths, personal injuries, and damages to the environment, the people, and the government was caused by their gross negligence, willful misconduct, and violation of Federal law, pursuant to 33 U.S.C. §2704.

42.     On April 20, 2010, the *Deepwater Horizon*, at approximately 10:00 p.m., experienced a well blowout while on the Macondo 252 well, where hydrocarbons escaped to the surface of the rig, ignited, exploded, caught fire, killed eleven good men, injured many others, and sank to the bottom of the Gulf.

43.     As a direct result of the sinking of the *Deepwater Horizon*, the Macondo well began bleeding huge volumes of crude oil into the Gulf and marine environment, and later onto the beaches, waterways, coastal marshes, lands, and wetlands of the Gulf Coast states, including Louisiana.  As a further direct result of this human, environmental, ecological, and financial disaster, the public and private institutions, as well as citizens of the United States, responded to this disaster by severing its business, personal, commercial, and recreational activities with the Gulf Coast out of, among other things, fear of hydrocarbon exposure.

44.     The coastal communities and economies experienced cancelled vacations, conventions, sporting events, festivals, fairs, business meetings, political meetings, daytrips, and many other commercial adverse reactions, including cancellation and withdrawal from financial commitments, and commercial development along the Gulf Coast.

45.     For approximately ninety (90) days, until early August 2010, crude oil gushed into the Gulf Waters until the Macondo was officially capped.  In the hours after the sinking of the *Deepwater Horizon*, BP utilized various toxic dispersants intended to bind to and sink the crude oil to the bottom of the sea.  Latest crude oil spill statistics published estimate 200,000,000 gallons of oil contaminated the environment and 1,800,000 gallons of Corexit dispersant was sprayed on the oil.

46.     The news coverage coming from the Gulf Coast was mixed and confusing.  Oil was depicted on the beaches, in the Gulf waters, in the inland waterways, and in the wetlands and

coastal marshes.  Medical and health television interviews spoke of severe illnesses due to exposure to crude oil and the toxic chemical dispersants washing ashore and inland. Congressional hearings and U.S. Coast Guard hearing and investigations uncovered evidence of BP minimizing the volume of oil spilled and the detrimental effects to the sea, marine life, land and human beings.

47.   BP embarked upon a billion dollar, world-wide propaganda program which was reporting a Gulf Coast economic and environmental recovery.  The remaining 2010 fiscal year was wrought with resort cancellations and no new reservations.  This catastrophic loss of revenue due to the Oil Spill and the economic impact to the Gulf Coast destroyed the financial viability of the City.

48.   After 2010, the Gulf Coast experienced continued re-oiling in connection with normal ebb and tidal flow, as well as adverse weather, storms, and hurricanes.  Experts from the University of South Florida, as well as other marine and biological scientists, have reported the presence of oil, tar mats, and subsea plumes which lie on the sea bottom, from West Louisiana to the Western Coast of Florida, and as far south as Key West.  The future probability of re-oiling will exist as long as the oil plumes are present in the Gulf and the risk of future oiling and the need for future removal, cleanup, and restoration of the coastal lands and water is omnipresent.

49.   Currently, marine scientists from many Gulf Coast area universities cite to physical evidence of subsea damage, which produces uncertainties for the viability and health consequences for the food chain, including dead coral reefs, fish with lesions, and other birth and exposure abnormalities, such as dead dolphins, dead amoeba structures, death and absence of microscopic worms indigenous to the area, red snapper liver damage, more than 8,000 dead or

injured sea turtles, birds, and mammals, diseases in other fish, and miles of dead coral and sea bottom stretching eastward to Florida.

50.     Marine scientists opine that the subsea oil plumes travelled east from the Macondo well in and out of the DeSoto Canyon, and that large oil plumes remain in the Gulf, posing an imminent threat to the Gulf Coast for more than a century to come.

51.     Economic damages lost are to include, but not be limited to, loss of business, loss of profits, loss of revenue, loss of equity, loss of earnings and impairment of earning capacity, diminution of property and business value, cost of cleanup, response, removal, restoration, and remediation of oil contaminated properties and waters.

52.     Plaintiff reasonably estimates its compensatory damages, past, present, and future losses, under OPA, General Maritime law, and Louisiana State law, as provided and allowed under existing laws, in the future are in excess of Thirty-Five Million ($35,000,000.00) Dollars.

53.     The City has sustained financial losses and damages, excluding natural resource damages, to include compensatory and punitive damages cognizable under Louisiana State law, specifically, the Louisiana Oil Spill Prevention and Response Act of 1991 (OSPRA), La. Rev. Stat. 30:2451 *et seq.*, providing strict, joint, and several liability of "Responsible Parties" for the discharge of pollutants into or upon any coastal waters of Louisiana.

## DAMAGES

54.     Baton Rouge, Louisiana has sustained past, present and future financial and monetary losses and damages to include, but is not limited to, compensatory damages cognizable under the Oil Pollution Act of 1990, 33 U.S.C. 2701, *et seq.* ("OPA"), as follows:

    (a)     Natural resources;

    (b)     Real or personal property;

14

      (c)     Subsistence use;

      (d)     Revenues, profits, and earning capacity; and,

      (e)     Public services.

55.    The damages recoverable under the Louisiana Oil Spill Prevention and Response Act of 1991 (OSPRA), La. Rev. Stat. 30:2451 *et seq.*, Louisiana State law claims, and the General Maritime laws of the United States include, but are not limited to:

      (a)     Damages or destruction to real or personal property;

      (b)     Damage or destruction to all living things, excluding human beings;

      (c)     Reasonable attorney's fees;

      (d)     Expert witness costs; and,

      (e)     Punitive damages.

56.    The City of Baton Rouge specifically pleads the following tax and revenue compensatory losses and damages, past, present, and future, pursuant to the Louisiana Constitution and Statutes:

**NET LOSS OF TAXES:**

| | | |
|---|---|---|
| (a) | Gross Receipts Business tax | $ 2,836,277 |
| (b) | General Sales and Use tax | $ 8,060,134 |
| (c) | Occupancy tax | $ 162,474 |
| (d) | Gaming Admission Tax | $ 310,503 |
| (e) | Licenses and Permits | $ 570,195 |
| (f) | Fines and Forfeits | $ 147,888 |
| | Total | $ 9,007,731 |

# TAXES

## GENERAL PROPERTY TAX

57.     The authority to collect a General Property Tax is authorized by the following:

(a)     Article 6, Section 26 (A) of the Louisiana Constitution of 1974 authorizes the governing authority of a parish to levy annually an ad valorem tax for general purposes not to exceed four mills on the dollar of assessed valuation, and Section 27 (A) authorizes the governing authority of a municipality to levy annually an ad valorem tax for general purposes not to exceed seven mills on the dollar of assessed valuation.  These sections also provide that millage rates may be increased when approved by a majority of the electors voting thereon in an election held for that purpose.

(b)     Article 7, Section 18 (D) of the Louisiana Constitution of 1974 authorizes each assessor to determine the fair market value of all property subject to taxation within his or her respective parish or district. Article 7, Section 20 (A) provides for a homestead exemption from state, parish, and special ad valorem taxes to the extent of $7,500 of the assessed valuation. This exemption is not extended to municipal taxes.

(c)     Each year an ordinance is passed which adopts the ad valorem taxation to defray the expense of city-parish government and for all general parochial purposes on all taxable property within the Parish of East Baton Rouge and levy a tax on all taxable property within the boundaries of the City of Baton Rouge for the purpose of operating a three-platoon police system.

## GROSS RECEIPTS BUSINESS TAX

58.     The authority to collect a Gross Receipts Business Tax is authorized by the

following:

(a)     Article VI, Section 30 of the Louisiana Constitution of 1974 provides that a political subdivision may exercise the power of taxation for parish, municipal, and other local purposes strictly public in their nature.

(b)     Act 169, Section 20 of the 1898 Legislature and its subsequent amendments authorize the City Council to fix an excise tax for public utilities of the City of Baton Rouge.

(c)     LRS 45:781 B authorizes the parish governing authorities to grant franchises for the regulation of cable television outside municipalities.

(d)    Local: Ordinance 9027 of December 13, 1989, levies an annual excise license or privilege tax on all persons, associations of persons, firms, or corporations engaged in the public utility business in the City of Baton Rouge.

## GENERAL SALES & USE TAX

59.    The authority to collect a General Sales & Use Tax is authorized by the following:

(a)    Article VI, Section 29 (A) of the Louisiana Constitution of 1974 authorizes the governing authority of any local governmental subdivision or school board to levy and collect a tax upon the sale at retail, the use, the lease or rental, the consumption, and the storage for use or consumption, of tangible personal property and on sales of services, if approved by a majority of the electors voting thereon in an election held for that purpose. The rate thereof, when combined with the rate of all other sales and use taxes, exclusive of state sales and use taxes, levied and collected within any local governmental subdivision, may not exceed 3%.

(b)    Article VI, Section 29 (B) of the Louisiana Constitution of 1974 provides that the legislature may authorize the imposition of additional sales and use taxes by local governmental subdivisions or school boards, if approved by a majority of the electors voting thereon in an election held for that purpose.

(c)    L.R.S. 33:2711 authorizes any incorporated municipality of the state to levy and collect a sales and use tax not in excess of 2½% upon the sale at retail, the use, the lease or rental, the consumption, and the storage for use or consumption of tangible personal property and on sales of services in the municipality.

(d)    L.R.S. 33:2738.51 authorizes the levy of an additional ½ of 1% sales and use tax within East Baton Rouge Parish.

(e)    L.R.S. 33:2741 states that the governing body of the parish in which the state capitol is situated may levy and collect a tax of 2% on gross sales within the parish but outside of any incorporated municipality.

(f)    L.R.S. 47:303B (3) (b) states that the Vehicle Commissioner and the governing body of any political subdivision in which a sales and use tax has been imposed on the sale or use of motor vehicles shall enter into an agreement by which the Vehicle Commissioner shall collect such tax on behalf of the political subdivision.

(g)    L.R.S. 33:2721.6 states that the combined rate of all sales and use taxes, exclusive of state sales and use taxes levied and collected within any parish or municipality shall not exceed 5%.

(f)    Ordinance 10127 of December 14, 1994, levies a tax for general municipal purposes of 2% on the sale at retail, the use, consumption, distribution, storage, and the lease or rental of tangible personal property to be used or consumed within the City of Baton Rouge. It also levies a tax for general parochial purposes of 2% on the sale at retail, etc., of tangible personal property to be used or consumed within the Parish of East Baton Rouge, exclusive of municipal areas (the cities of Baker, Baton Rouge, Central, and Zachary). It also levies a tax of ½ of 1% on the sale, etc., of tangible personal property to provide revenues to pay the costs of constructing, acquiring, operating, maintaining, and administering sewers and sewerage disposal works and making all required payments in connection with bonds for such purposes, and a tax of ½ of 1% for the repair of public roads and streets.

(g)    Resolution 36035 of July 26, 1995, offers incentives for economic development within areas of EBR designated by the Louisiana Department of Economic Development as Enterprise Zone eligible based on demographic and economic factors.

(h)    Ordinance 12303 of April 24, 2002, amends Ordinance 10127 to re-levy the ½ of 1% road tax for the period July 1, 2002, through December 31, 2007, to be used 60% for road construction and 40% to continue the program of road repairs.

(i)    Resolution 44190 of June 8, 2005, called for a special election in which voters approved the ½ of 1% road tax for an additional 23 years to be used 70% for road construction, 27% to continue the program of road repairs, and 3% for road beautification projects.

(j)    Ordinance 14771 of August 27, 2008, created La Vie Economic Development District.

(k)    Ordinance 14533 of November 25, 2008, designated the 2% (City) local sales tax which is used to determine the initial local sales tax baseline tax collection rate and the monthly baseline sales tax rate within the La Vie Economic Development District.

### OCCUPANCY TAX

60.    The authority to collect an Occupancy Tax is authorized by the following:

(a)    Article VI, Section 19, of the Louisiana Constitution of 1974 authorizes the legislature to create special districts, boards, and commissions and

grant them such rights, powers, and authorities as it deems proper, including, but not limited to, the power of taxation.

(b)    Article VI, Section 30, of the Louisiana Constitution of 1974 authorizes a political subdivision to exercise the power of taxation for parish, municipal, and other local purposes strictly public in their nature.

(c)    L.R.S. 33:4574 (B) (6) provides for the creation of the Baton Rouge Area Convention and Visitors Bureau as a special district or commission, which is a body politic and corporate and a political subdivision of the state of Louisiana.

(d)    L.R.S. 33:4574.1.1 A (6) authorizes the Baton Rouge Area Convention and Visitors Bureau to levy and collect an occupancy tax of four percent.

(e)    L.R.S. 33:4574.1.1 L provides that the Baton Rouge Area Convention and Visitors Bureau shall distribute and use the proceeds derived from one percent of this occupancy tax for capital improvements and expansion of the Baton Rouge River Center. When all costs of such capital improvements and expansion have been paid, the occupancy tax will be reduced from four percent to three percent.

(f)    The Intergovernmental Agreement, City-Parish and BR Area Convention & Visitors Bureau, 7/1/96, provided for the collection of the 3% occupancy tax levied by the BRACVB. The First Amendment to the Intergovernmental Agreement, 1/1/99, provides for an additional 1% occupancy tax to be used for capital improvements and the expansion of the Baton Rouge River Center.

(g)    The Resolution of the BRACVB of 12/3/98 levied the additional 1% occupancy tax.

## OCCUPATIONAL LICENSE TAX

61.    The authority to collect an Occupational License Tax is authorized by the following:

(a)    Article VI, Section 28 of the Louisiana Constitution of 1974 provides that the governing authority of a local governmental subdivision may impose an occupational license tax not greater than that imposed by the state. Those who pay a municipal occupational license tax are exempt from a parish occupational tax in the amount of the municipal tax. The governing authority of a local government subdivision may impose an occupational license tax greater than that imposed by the state when authorized by law

enacted by the favorable vote of two-thirds of the elected members of each house of the legislature.

(b)     L.R.S. 47:341, et seq., authorizes any municipality or parish to impose a license tax on any person conducting any business within its jurisdiction at a rate no greater than that imposed by the state provided that the imposition of such license tax is approved by two-thirds of the council members and after affording the public an opportunity to comment at a minimum of three public hearings.

(c)     Ordinance 9537 of November 25, 1992, levies an occupational license tax on all persons, association of persons, firms and corporations pursuing any trade, profession, vocation, calling, or business in the City-Parish, who are subject to the payment of occupational license taxes under the Constitution and laws of Louisiana.

(d)     Ordinance 11561 of September 22, 1999, amends Title 9 of the Code of Ordinances to increase the license fee for rolling vendors and delete some of the exemptions.

(e)     Ordinance 11667 of February 23, 2000, amends and reenacts Title 9 of the Code of Ordinances relative to the definition of rolling vendors and provides for an exemption for non-profit organizations.

(f)     Ordinance 9026 of December 13, 1989, provides for the licensing of any itinerant or transient gold or silver merchant.

(g)     City Resolution 13115 of August 25, 1982, authorizes the Mayor-President on behalf of the City of Baton Rouge to enter into an agreement with the Sheriff of East Baton Rouge Parish providing for the collection by the Sheriff of all property taxes and all city occupational licenses. Although the Finance Department began collecting the occupational license tax itself as of July 1, 1992, the Sheriff continued to be compensated for that collection; in November 2007 the Sheriff and the City-Parish entered into an Agreement whereby, beginning in January 2008, this fee is no longer paid to the Sheriff.

(h)     Ordinance 9405 of March 11, 1992, levies a license tax on transient merchants.

(i)     Ordinance 8608 of February 24, 1988, provides for an exemption for exhibitions for trade shows when the promoter has paid the fee provided.

(j)     Ordinance 9407 of March 11, 1992, states licensing requirements and fees for pawnshop licenses and permits.

## GAMING ADMISSIONS TAX

62.     The authority to collect a Gaming Admissions Tax is authorized by the following:

(a)     Article VI, Section 30 of the Louisiana Constitution of 1974 authorizes a political subdivision to exercise the power of taxation for parish, municipal, and other local purposes strictly public in their nature.

(b)     Louisiana Revised Statute 4:552 A (1) provided that the local governing authority of the parish or municipality in which the licensed berth of a riverboat is located may levy an admission fee of up to two and one-half dollars for each passenger boarding or embarking upon a riverboat. For purposes of this statute, "licensed berth" means the berth, dock, facility, or boarding area from which a riverboat excursion is authorized to originate by the Louisiana State Riverboat Gaming Commission or from which a riverboat is authorized by the commission to operate.

(c)     L.R.S. 4:552 was re-designated to L.R.S. 27:93 by Acts 1996, 1st Ex. Sess., No. 7 § 3 eff. May 1, 1996. L.R.S. 27:93 A (11) authorizes the governing authority to levy a fee not exceed 4.5% of the monthly net gaming proceeds in lieu of the statutory admissions fee.

(d)     Ordinance 10014 dated August 24, 1994, established an admission fee of $2.50 for each passenger boarding or embarking upon a riverboat operating on a river, lake, or other waterway with a licensed berth in Baton Rouge and which is authorized to originate its excursions in Baton Rouge by the Louisiana State Riverboat Gaming Commission. The fee is due and payable when a passenger boards a riverboat. The operator of the riverboat is required to submit a report relative to the previous month's business on or before the 20th day of the following month. Interest at the rate of 1¼% per month and penalties equivalent to 5% per month, or fraction thereof, not to exceed 25% in aggregate, of the fee due may be assessed if payments of the fee are delinquent.

(e)     Resolution 35231 dated August 24, 1994 authorized the Belle of Baton Rouge to pay $1.25 to the City-Parish in addition to the $2.50 established by state law. This additional amount was required to be paid for two years, beginning from the date of riverboat gaming operations (9/30/94) or until construction of a convention-size hotel was begun.

(f)     Beginning in 2009, Resolution 46289 dated June 25, 2008, authorizes 15-year agreements through 12/31/2023 with Louisiana Casino Cruises and Catfish Queen Partnership in Commendum dba Belle of Baton Rouge, to remit a contractual fee of up to 4.5% of the monthly net gaming proceeds in lieu of the statutory admissions fee.  In addition this same resolution authorizes a 20-year agreement with PNK Baton Rouge Partnership

beginning on commencement date, which is anticipated to be September 2012, to remit a contractual fee not to exceed 4.5% of the monthly net gaming proceeds.

## LICENSES & PERMITS

### CLASSIFIED EMPLOYEES LICENSES, ABC DUPLICATE/ TEMPORARY LICENSES, WAITER/WAITRESS LICENSES, RETAIL CLERKS LICENSES, and ENTERTAINERS LICENSES

63.     The authority to issue Classified Employees Licenses, ABC Duplicate/Temporary Licenses, Waiter/Waitress Licenses, Retail Clerks Licenses, and Entertainers Licenses is authorized by the following:

(a)     Article VI, Section 30 of the Louisiana Constitution of 1974 authorizes a political subdivision to exercise the power of taxation under authority granted by the legislature for parish, municipal, and other purposes strictly public in their nature.

(b)     L.R.S. 26:493 authorizes the various subdivisions of the state to regulate, but not prohibit except by referendum vote, the business of wholesaling, retailing, and dealing in alcoholic beverages.

(c)     Ordinance 14472 (Wine, Beer and Liquor Ordinance) of August 27, 2008, states that any person employed or used in a class A or B licensed retail business who, as a function of his duties, dispenses, sells, or serves any alcoholic beverage must hold a permit. This includes, but is not restricted to, bartenders, barmaids, waiters, waitresses, cocktail waitresses, doormen, bouncers, disc jockeys, and managers, excepting persons holding a dealer's license. Any person employed or used in a Class B licensed retail business who, as a function of his duties, dispenses, sells, or serves any alcoholic beverages (including but not restricted to sales clerks, retail clerks, and check-out counter clerks) is required to hold a Retail Clerk Alcoholic Beverage Permit. Any person employed or used in a Class A licensed retail business whose primary function is to take orders for and serve alcoholic beverages in conjunction with serving meals is required to obtain a waiter/waitress alcoholic beverage permit. The ordinance also regulates the licensing of fashion models and exotic dancers, provides for duplicate and temporary licenses, and sets fees for the various licenses. This ordinance adds chauffeurs employed by a licensed limousine service who, as a function of their duties, dispense, sell, or serve alcoholic beverages to the list of persons required to obtain a classified employee license.

## LIQUOR & BEER LICENSES

64.     The authority to issue Liquor & Beer Licenses is authorized by the following:

(a)     L.R.S. 47:341 authorizes any municipality or parish to impose a license tax on any person conducting any business within its jurisdiction at a rate no greater than that imposed by the state provided that the imposition of such license tax is approved by two-thirds of the council members and after affording the public an opportunity to comment at a minimum of three public hearings.

(b)     L.R.S. 26:493 authorizes the various subdivisions of the state to regulate the business of wholesaling, retailing, and dealing in alcoholic beverages, provided that no parish or municipality regulates such business more than is necessary for the protection of the public health, morals, safety, and peace.

(c)     Ordinance 14472 (the Wine, Beer, and Liquor Ordinance) of August 27, 2008, requires all persons, firms, corporations, or associations of persons engaged in or employed for the purpose of furthering the manufacture, sale, dispensing, and/or serving for use or consumption of alcoholic beverages to obtain a license prior to engaging in business. In addition to this license, every retail and wholesale dealer is required to obtain an annual permit.

(d)     Ordinance 14991 of September 8, 2010, allows Sunday sales of alcoholic beverages at motels, hotels, restaurants, convention facilities, private clubs, and golf courses.

## RESTAURANT LICENSES
## AFTER HOURS CLEAN UP LICENSES
## RESTAURANT AFTER HOURS PERMITS

65.     The authority to issue Restaurant Licenses, After Hours Clean Up Licenses, and

Restaurant After Hours Permits is authorized by the following:

(a)     Article VI, Section 30 of the Louisiana Constitution of 1974 authorizes a political subdivision to exercise the power of taxation under authority granted by the legislature for parish, municipal, and other local purposes strictly public in their nature.

(b)     L.R.S. 26:493 authorizes the various subdivisions of the state to regulate, but not prohibit, the business of wholesaling, retailing, and dealing in alcoholic beverages as is necessary for the protection of public health, morals, safety, and peace.

23

(c)     Ordinance 14472 (Wine, Beer, and Liquor Ordinance) of August 27, 2008, states that a restaurant that holds a Class A beer and/or liquor license and that serves alcoholic beverages along with food, food items, and non-alcoholic beverages on Sunday is required to have a Restaurant License (Class R). The After-Hours Cleanup permit allows the holder to hire employees to be in or on the premises for the sole purpose of cleaning the premises, between 2:30 a.m. and 6:00 a.m., Monday through Saturday. The Restaurant After-Hours Permit (RAH) is issued to a restaurant that holds a Class R permit and is open after 2:30 a.m. for the sale of food, food items, and non-alcoholic beverages only. All alcoholic beverages must be locked up during this period (from 2:30 a.m. to 6:00 a.m.). Ordinance 15190 of October 12, 2011, amends Ordinance 14472 to change the percentage of food sales to alcohol sales required for classification as a restaurant from 60% to 51%.

## GAMING LICENSES

66.     The authority to issue Gaming Licenses is authorized by the following:

(a)     L.R.S. 33:4861.1, et seq., authorizes any incorporated municipality or the governing body of any parish to license bona fide veterans', charitable, educational, religious, or fraternal organizations, and civic and service clubs to hold raffles, bingo, or keno when the net proceeds of such games of chance are to be devoted to educational, charitable, patriotic, religious, or public-spirited uses.

(b)     Title 9, Chapter 10 provides for the licensing and regulation of charitable bingo by the Gaming Enforcement Division.

(c)     Ordinance 11160 of June 10, 1998, changes the renewal date of gaming licenses to July 1 to conform to the state gaming law.

## <u>GENERAL ALLEGATIONS</u>

### The Macondo Lease and BP's Exploration Plan and Drilling Permit

67.     On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the deepwater Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf forty-eight (48) miles off the coast of Louisiana.

24

68.     In the process of obtaining this lease, BP represented that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.

69.     BP represented that it was unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. In the event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount to which it assured the MMS that it was prepared to respond.  BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

70.     Based on these representations, the MMS approved BP's Initial Exploration Plan ("EP") for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.

71.     After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

**The Macondo Well**

72.     The Macondo prospect site is in the Northern Gulf of Mexico, an area known in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak and brittle rock formations.  At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet deep.  Drilling Defendants knew, or should have known, that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

73.     Defendants struggled with the Macondo well before the events of April 20, 2010. The problems included varying pressures, varying strengths of formation layers, brittle rock formations, and kicks of natural gas bursting into the well.

74.     As the drilling schedule fell farther behind due to these and other problems, Defendants, BP in particular, increased the pressure on the *Deepwater Horizon's* crew to speed up the drilling effort at Macondo in an effort to reduce costs.  Drilling Defendants repeatedly chose to violate industry guidelines and government regulations and ignore warnings from their own employees and contractors on the *Deepwater Horizon* to reduce costs and save time on the behind-schedule and over-budget Macondo well.

### The *Deepwater Horizon's* Poor Maintenance History

75.     The *Deepwater Horizon* was a dynamically-positioned, semi-submersible deepwater drilling vessel built for Transocean and put into service in February 2001.

76.     At all times relevant herein, the *Deepwater Horizon* was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998 Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D *Deepwater Horizon* ("Drilling Contract"), and later amendments to that agreement.

77.     Prior to the Spill, Defendants had actual and/or constructive knowledge that their safety performance during offshore drilling operations was poor.  Defendants also had actual and/or constructive knowledge of significant problems related to the *Deepwater Horizon's* equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant

deficiencies that could lead to loss of life, serious injury, or environmental damage as a result of inadequate use and/or failure of equipment.

### April 2010

78.     By April 9, 2010, BP and Transocean had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained.  In their rush to complete the well, Defendants made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

79.     BP chose a "long string" design for the Macondo well with fewer barriers against the risk of hydrocarbon blowouts because the safer "liner/tieback" option (which had been part of their original well design and was recommended by their contractors) would have taken longer to complete and would have added several million dollars in cost.

80.     BP used inferior well casings for the casing pipe material itself, in violation of BP's own safety policies and design standards.

81.     Drilling Defendants knowingly used too few centralizers on one or more pieces of casing pipe, with the knowledge or acquiescence of other Defendants.

82.     Drilling Defendants failed to circulate the drilling mud fully through the entire length of the well bore beginning the cementing job, thus failing to clean the well bore properly and prepare the annular space for cementing, and thus failing to take action that could have revealed other problems that contributed to the weaknesses of the Macondo well.

83.     Defendants knew the cementing work the *Deepwater Horizon* was performing was especially risky.  BP's mid-April plan review predicted cement failure, stating "[c]ement simulations indicated it is unlikely to be a successful cement job due to formation breakdown." Yet, Defendants made minimal efforts to contain the added risk.  To save time and money,

Defendants chose not to run a 9 to 12-hour procedure called a cement bond log to assess the integrity of the cement seal.  Defendants also failed to secure the wellhead with a lockdown sleeve, a critical apparatus that locks the wellhead and the casing in the seal assembly at the seafloor, before allowing pressure on the seal from below.

84.    Based on testing performed before the final cement job at the Macondo well, Halliburton knew that its cement slurry design was unstable.  In addition, Halliburton and BP had results in March 2010 showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data.

85.    In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms, the BOPs.  Defendants were aware of the risk of BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs.  BP and Transocean were also aware that the industry and government had major concerns about the reliability of BOPs, like the one installed on the *Deepwater Horizon*.

86.    Defendants, BP and Transocean, failed to ensure that the BOP present on the *Deepwater Horizon* possessed reasonably safe, adequate, functional technology to prevent blowouts.

87.    Defendants, BP and Transocean, could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deepwater drilling was present and available on the *Deepwater Horizon*, but did not do so.

88.    Defendants, BP and Transocean, could have installed a back-up acoustic trigger to activate the *Deepwater Horizon*'s BOP in the event that the main trigger failed to activate.

89.    Transocean, the vessel's owner, had a history of postponing and ignoring needed maintenance on the *Deepwater Horizon*.  In the weeks before the blowout, the *Deepwater*

*Horizon* suffered power outages, computer glitches, and a questionable propulsion system.  In some cases, Transocean officials purposely overrode or disabled vital safety mechanisms and alarms.  These events contributed to the cause of the disaster, or made it worse.

90.     BP was aware of Transocean's poor maintenance of the *Deepwater Horizon* and its practice of disabling or bypassing vital safety systems and alarms, but they continued to operate the vessel and did not report the safety-critical inadequacies.

91.     Upon information and belief, in addition to the examples set forth above, other non-exclusive examples of the Drilling Defendants' misconduct, negligence and/or wantonness include:

(a)     Utilizing a defective well casing that was prone to fail when under heavy pressure;

(b)     Failing to observe dangerous and recurring problems with highly flammable gaseous compounds and instituting risky cementing and drilling procedures hours before the *Deepwater Horizon* explosion;

(c)     Failing to institute common industry protective measures necessary to detect the buildup of highly flammable gaseous compounds before and during the cementing process;

(d)     Accelerating drilling operations in an effort to save money and pressuring employees hours before the *Deepwater Horizon* explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf's crust;

(e)     Using an improperly designed cement mixture ("slurry"), and failing to properly conduct and/or review the results of laboratory testing of the slurry;

(f)     Failing to deploy a casing hanger lockdown sleeve;

(g)     Displacing mud in the well with less-dense seawater before cementing had fully set;

(h)     Using non-standard spacer fluid mixture and volume;

(i)      Continuing to operate the Macondo Well after the well failed pressure tests;

(j)      Continuing to operate the Macondo Well without repairing the blowout preventer's annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers' protective measures against a blowout;

(k)      Failing to disclose or correct the fact that the battery on the blowout preventer was weak and one of its control pods was broken;

(l)      Consciously electing not to install an acoustically activated remote-control shutoff valve;

(m)      Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put into place in order to speed up the drilling process, thereby creating high pressure instability in the well;

(n)      Failing to install a deepwater valve to be placed nearly 200 feet under the sea floor;

(o)      Failing to recognize that pressure and flow data from the well were warning signs of a blowout;

(p)      Failing to develop sufficient well control procedures for vessel workers to handle larger influxes into the well - for a hydrocarbon influx as large as occurred, flow should have been diverted overboard, not to the mud-gas separator;

(q)      Failing to properly design, install, or maintain power supply to the blow-out preventer ("BOP"), including, without limitation, the use of only one blind shear ram, faulty maintenance, faulty post-market modifications, and other issues;

(r)      Failing to properly design, install, or maintain connections from the blow-out preventer's control panel to the blow-out preventer;

(s)      Failing to properly maintain and repair the BOP.  Drilling Defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the *Deepwater Horizon*'s BOP long before the April 20, 20910, but no action was ever taken to address the problems.  In addition to posing a significant safety risk, Drilling Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly; and

(t)     Failing to equip the vessel with sufficient safety equipment, including operational gas sensors and a gas alarm system.

92.     The Drilling Defendants all knew, or should have known, of the acts and omissions outlined above and were negligent, wanton, and reckless in continuing to drill in the face of these acts and omissions.

93.     In sum, Defendants knew of the dangers associated with deep water drilling, and they knew of unique problems and conditions in the Macondo Well and on the *Deepwater Horizon* MODU vessel.  Yet, Defendants failed to take appropriate measures to prevent harm and damage to the human beings, the natural resources, the environment and the ecology of the Gulf Coast, and to thousands of its citizens who are dependent upon the Gulf of Mexico to make a living for food and recreation.

**Crude Oil Environmental Contamination and Adverse Economic Impact**

94.     After the sinking of the *Deepwater Horizon*, the well began to release, leak, and/or discharge oil directly into the Gulf of Mexico due to the failure of the well's cement and/or casing and the concurrent failure of the blow-out preventers.  These actions also likely caused damage to the seafloor structure surrounding the well, causing unabated and continuing seepage of petroleum into the Gulf of Mexico which likely continues presently.

95.     Defendant, BP, recklessly, willfully and/or wantonly failed to ensure that oil would be quickly and fully contained within the immediate vicinity of the Macondo well in the event of a blowout.

96.     The well discharged an estimated 50,000 to 100,000 barrels of crude oil into the Gulf of Mexico on a daily basis for at least 87 days.  Discharge likely continues presently.

97.     The United States government has estimated that approximately 5,000,000 barrels (210,000,000 gallons) of oil gushed into the Gulf of Mexico during the months that the well was uncontained with others estimating that the well discharged upwards of 7,000,000 barrels.

98.     Defendant, BP, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled discharge from the Macondo Well into the Gulf of Mexico and to prevent damages to Plaintiff.

99.     This massive release of oil contaminated thousands of square miles of waters in the Gulf as the well flowed uncontained for three months resulting in the ban of recreational and commercial fishing by the government in many areas during that time period.  Contamination continues with fresh crude still flowing from the Macondo site.  Contamination occurs with each tropical weather system's effects.

100.     The oil discharged into the Gulf of Mexico from the Macondo Well contained hydrocarbon molecules, carcinogens and other toxic pollutants including heavy metals which are extremely hazardous to the marine ecosystem in the Gulf of Mexico including that found in the territorial waters and shores of Louisiana.

101.     In addition to the oil that was released by BP's Macondo well, BP directed over two million gallons of chemical dispersants to be sprayed, injected or otherwise released into Gulf waters including Louisiana territorial waters.  BP had injected at least 770,000 gallons of chemical dispersants directly into the damaged wellhead and otherwise directed its contractors to apply considerable amounts of chemical dispersants directly onto the territorial waters of Louisiana.  These negligent, reckless and wanton activities constitute tortious conduct which

occurred in the territory of Louisiana, and created new chemical moieties and physical states of the hazardous mixed chemicals.

102.     Upon information and belief, BP knowingly and willfully released toxic and harmful chemical dispersants and/or other toxic chemicals into the Territorial Waters of Louisiana, which alone and in combination with the Macondo crude oil began damaging the natural environment and threatening both marine and human life and thereby causing economic loss to the business and industry and to Plaintiff who is economically dependent on the safety and health of those waters.

103.     The chemical dispersants released into the Gulf and Louisiana territorial waters and shores at the direction of BP contain hazardous and toxic substances and have been reported to be harmful to both human health and the marine environment.   The chemical dispersants are designed to interact with spilled oil which then sinks below the surface, where these solubilized amalgams are more available for exposure to all marine environments.

104.     The use of chemical dispersants introduces toxic pollutants to a larger portion of the marine environment than when using mechanical oil collection methods, since the dispersant causes oil to become suspended in the water column available to be moved by subsurface currents and tides, and deposited in the seafloor sediment--all places where it is more likely to be encountered and more readily available to be contacted and absorbed by marine life.

105.     To date, BP and its contractors have used more than 2.0 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

106.     On or about May 19, 2010, the U.S. Environmental Protection Agency (EPA) Administrator directed BP within 24 hours of issuance to identify and to change to chemical

dispersants that are less toxic than those dispersants that BP had been using.  BP refused to comply and continued using dispersants of its choice.

107.    Defendant BP recklessly, willfully and/or wantonly failed to use ordinary care by electing to use chemical dispersants that are more toxic than others in the response efforts and thereby amplified the toxic effects on the marine environment and the damages to Plaintiff.

108.    Defendants knew or should have known that the chemical dispersants used would increase toxicity and marine environment exposure of the oil and increase damages to Plaintiff.

109.    The untested manner and unprecedented scale in which Defendants used dispersants on such a sheer volume of oil likely caused foreseeable negative consequences.  BP used the dispersants in a manner and quantity for which they were not designed, labeled or tested by injecting chemical dispersants directly at the wellhead approximately 5,000 feet below the surface.

110.    Defendants knew or should have known that injecting dispersants at the wellhead had not previously been tested or used in this manner and had not been tested under similar conditions.  Defendants failed to warn the public or ensure the safe use of these products.

111.    Defendants also failed to ensure the dispersants' design was appropriate for the extreme conditions expected to be encountered during use by BP at the wellhead.

112.    BP's decision to use chemical dispersants in such extreme conditions for which they were not designed likely resulted in the foreseeable negative consequence of preventing the oil from fully rising to the surface resulting in the formation of massive solubilized subsurface toxic plumes of amalgamated dispersed oil droplets and chemical dispersants at varying depths that are extremely slow to degrade due to their combined toxic effect on oil consuming microbes

in the marine environment.  It also likely caused more toxic chemicals to penetrate into the shores, beaches, wetlands, and coastal marshes of Louisiana in their dispersant solubilized state.

113.    Upon information and belief, BP knew or should have known, as basic science suggests, that the direct injection of large amounts of chemical dispersants into the damaged wellhead at a depth of 5,000 feet would likely cause the formation of massive, deep water, subsurface oil plumes that would be extremely slow to degrade, and subject to subsurface current movements to cause much greater exposure to the entire environment but BP continued with the application of dispersants in this manner to prevent the oil from reaching the surface in order to conceal the amount of oil being discharged from the Macondo well and obscure the true extent of the contamination being caused to the Gulf and marine environment.

114.    The number and magnitude of such plumes have been investigated and the severe environmental implications continue to be studied.  Large oil-dispersant plumes were confirmed at depths of 3,280 to 4,265 feet many miles from the wellhead of the *Deepwater Horizon*. Studies have shown that these dispersant-hydrocarbon plumes are not degrading as expected and continue their slow movement throughout the environment more than two years after BP's Macondo well was capped.  Fresh Macondo oil continues to be observed and detected to date.

115.    Since these deep oil-dispersant plumes and other related hydrocarbon accumulations on the seafloor are not degrading and will continue to periodically surface from depth in a difficult to predict manner, and because the fractured Macondo sea floor continues to seep fresh petroleum, it is probable that recurring significant damage to the marine environment and continued oiling of the marshes and estuaries will persist for many years to come.

116.    Such results have resulted in marine life kills and will likely have long term impacts on the commercial and recreational fishing industries.  The full extent of these impacts

has not yet been determined and may take years to assess, but preliminary evaluation suggests they will be severe.

117.    The amount of oil spilled, combined with the amount of dispersants applied in the Gulf of Mexico, immediately had significant acute effects on the entire marine ecosystems of the Gulf on which Plaintiff is economically dependent, and chronic negative effects are likely to be felt long after the oil and dispersants have degraded.  Likely impacts include direct mortality from the chemicals, and indirect impacts that include reduction in reproduction, genetic disorders, increased susceptibility to disease, and likely enhanced pathogenicity of marine disease organisms.

118.    Rowan Gould, Acting Director of the U.S. Fish & Wildlife Service, has stated that the *Deepwater Horizon* spill "is significant and in all likelihood will affect fish and wildlife across the Gulf, if not all of North America, for years if not decades . . . ."

119.    The oil and dispersants that were discharged and released are extremely hazardous to marine life in the Gulf of Mexico.  They are especially hazardous to marine life at the bottom of the food chain, including creatures such as plankton, shrimp, and crabs which are food for the finfish sought by fishermen.

120.    These plankton, shrimp, and other marine creatures are vital to the entire marine ecosystem, and the damage already sustained by these tiny marine creatures threatens the entire marine species throughout the Gulf.  The chemicals released into the Gulf have both direct and indirect impact to tourism and on the businesses of the Plaintiff.

121.    Due to impacts from the oil spill, Plaintiff has seen greatly reduced business and has suffered loss of income, loss of business value, and loss of value to their real property.

122.     In an effort to stay viable and economically survive this disaster, Plaintiff has been forced to take financial steps to limit the effects of the disaster.

123.     Due to the toxic effect of the oil spill and dispersants on the fisheries of the Gulf of Mexico, now and in the future, the tourism and sales upon which Plaintiff's business is dependent has been diminished, endangering the ability of Plaintiff to operate or maintain their business.

**Economic Impact**

124.     Despite increased business efforts combined with longstanding reputations for business savvy and competency, the stigma and effect of the spill has drawn fewer tourists and customers to the City of Baton Rouge.  More than a year after the well was capped, Gulf Coast communities and waters proximate to the City of Baton Rouge continued to be awash in fresh oil with ongoing harmful effects with no end in sight.  Recovery efforts to repair the physical and stigma damages to Gulf waters were inadequate and incomplete, causing economic loss to Plaintiff, who is in part financially dependent on healthy marine environments.

125.     Due to the oil spill disaster, tourists visiting the City of Baton Rouge visited other non-Gulf regions and consequently are unlikely to return to the Gulf Coast.  Former regular customers simply do not want to visit and spend their money in the City of Baton Rouge.

126.     Due to the unprecedented scope of the disaster and the as yet unknown impact on future marine generations of wildlife, it may take years to assess the full extent of the devastation to the marine life in the Gulf and it may be decades before the marine environment is able to completely recover.  Thus far, the impact of the oil and other chemicals discharged into the Gulf during the *Deepwater Horizon* oil spill disaster has been devastating to marine life upon which Plaintiff's business relies.

127.    The discharge of crude oil from the Macondo well and the spraying of dispersants into the Gulf of Mexico and Louisiana territorial waters has caused and will continue to cause a direct and proximate loss of revenue, profits and/or loss of earning capacity to Plaintiff.  The fact that the reputation of the geographic areas in which the City of Baton Rouge is located has been severely tainted, Plaintiff has experienced and continues to experience significant economic loss due to a significant decrease in tourists and increase in cancellations of business opportunity with the likely long term and possibly permanent loss of tourists.

**Health Effects**

128.    Exposure to chemicals in crude oil and chemical dispersants can cause a wide range of health problems. Crude oil has many highly toxic chemical ingredients that can damage every system in the body. Dispersant chemicals can affect many of the same organs. These include: respiratory system, nervous system (including the brain), liver, reproductive/urogenital system, kidneys, endocrine system, circulatory system, gastrointestinal system, immune system, sensory systems, musculoskeletal system, hematopoietic system (blood forming), skin and integumentary system and disruption of normal metabolism.

129.    Damage to these systems can cause a wide range of diseases and conditions. Some of these diseases and conditions may be immediately evident, and others can appear months or years later. The chemicals can impair normal growth and development through a variety of mechanisms, including endocrine disruption and direct fetal damage. They can cause mutations that may lead to cancer and multi-generational birth defects. Some of the chemicals are known carcinogens, such as benzene.

130.    Many of the chemicals in crude oil and the dispersants target the same organs in the human body, and this increases the risk and may also increase the severity of harm. In

addition, the dispersants currently used can increase the uptake (dose) of crude oil chemicals and movement of chemicals into critical organs.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Negligence, Gross Negligence, and Willful Misconduct of BP

131.    Plaintiff realleges and reavers each and every allegation set forth in all Master Complaints in MDL 2179 and the preceding paragraphs of this lawsuit, as fully set forth herein and further state:

132.    Plaintiff is financially dependent on the condition of the waters of Louisiana and the Gulf of Mexico and the marine life contained therein; thus when marine life and the quality of Gulf waters perish, so does Plaintiff's business and income.

133.    The BP Defendants owed the Plaintiff a duty to refrain from action that causes damage to the Gulf waters and the marine ecosystem upon which Plaintiff's property and income are financially and economically dependent.

134.    BP owed and breached duties of reasonable care to ensure the safety of their operations and guard against and prevent the risk of a blowout and oil spill and its effects in the Gulf, in Louisiana territorial waters and on Louisiana shores.

135.    BP owed and breached duties of ordinary and reasonable care with respect to the design and manufacture of the BOP and float collar used on the Macondo well.

136.    BP was injecting its dispersants at the wellhead and breached a duty of ordinary and reasonable care with respect to the design, manufacture and use of the chemical dispersants.

137.    At all times BP controlled and directed the response and recovery efforts and failed to exercise reasonable care in the operation, design, implementation and execution of the

response efforts, including the injection of dispersants at the wellhead.  Additionally, as the chemicals entered Louisiana territorial waters, BP owed a duty, and failed the duty, to exercise reasonable care in response efforts, including timely mitigating of the damage caused and stopping the spread of the oil onto and around Louisiana waters, shores and properties.

138.    Defendant BP recklessly, willfully and/or wantonly failed to use reasonably safe chemical dispersants in reasonably safe locations and quantities in response efforts and thereby exacerbated the contamination in the Gulf of Mexico and Louisiana and resulting damage to Plaintiff.

139.    The incidents described above that caused damage to Plaintiff          were a proximate result of the negligence, fault, gross negligence, and/or willful misconduct of BP through their agents, servants, employees, contractors and other persons or entities for whose conduct Defendant is responsible, which are more particularly described as follows:

(a)    Failing to operate the *Deepwater Horizon* in a safe manner;

(b)    Operating the *Deepwater Horizon* in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

(c)    Failing to properly inspect the *Deepwater Horizon* to assure that its equipment and personnel were fit for their intended purpose;

(d)    Failing to promulgate, implement, and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon*, which, if they had been promulgated, implemented, and enforced, would have averted the fire, explosion, sinking, and oil spill;

(e)    Failing to adhere to applicable safety, construction, and/or operating regulations, including, but not limited to, regulations designed to prevent the fire, explosion, and discharge of oil;

(f)    Failing to properly design and/or engineer the well, drilling program, cementing program, mud program and completion program;

(g)    Failing to take appropriate action to avoid or mitigate the blowout;

(h)     Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(i)     Failing to properly train their employees;

(j)     Failing to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

(k)     Failing to timely warn;

(l)     Failing to provide respiratory and dermal protective gear to Plaintiff;

(m)     Failing to provide all reasonable cooperation and assistance requested by the responsible officials in connection with the clean-up and removal activities;

(n)     Failing to ensure that adequate plans, equipment, safeguards, resources and technology were readily available to prevent and/or mitigate the effects of the loss of control of a well and unfettered discharge of oil into the Gulf of Mexico;

(o)     Failing to timely bring the oil release under control and to prevent the spill from migrating throughout the Gulf of Mexico;

(p)     Failing to provide appropriate accident prevention equipment;

(q)     Failing to ensure that the casing and float collar were properly designed and installed;

(r)     Providing BOP's that failed to properly function;

(s)     Failing to ensure that BOP's would work as intended;

(t)     Failing to test the BOP's to ensure that they would operate properly;

(u)     Recklessly altering the BOP's and failing to use them in a safe manner;

(v)     Failing to conduct well cementing operations properly;

(w)     Failing to employ alternative cementing operations in light of known problems with the actual cementing operations employed;

(x)     Failing to have a reasonably adequate well control plan and necessary equipment in case of a loss of the well;

(y)     Failing to exercise reasonable care in the design and implementation of both well control efforts and response and recovery efforts;

(z)     Failing to ensure that adequate plans, equipment, safeguards, resources, and technology were available to prevent or mitigate the quantity of hazardous chemical that would enter into and effect Louisiana territorial waters and Louisiana real property;

(aa)    Recklessly using dispersants so as to cause the greatest migration and widest potential for environmental toxic exposures and effects throughout the Gulf including Louisiana territorial waters and real property.

140.    Defendants were aware at all times relevant hereto that their operations and the acts and/or omissions described above created an unreasonable risk of harm and knew that catastrophic environmental destruction and economic loss would occur if the well being serviced by the *Deepwater Horizon* were to blow out.

141.    Defendants were indifferent to this risk of harm.  Defendants intentionally failed to perform the duties owed to Plaintiff in reckless disregard of the consequences their actions and/or omissions would have on Plaintiff.

142.    Moreover, Defendants acted intentionally with knowledge that their acts would probably result in damage or in such a way as to allow an inference of a reckless disregard of the probable consequences of their acts.  Therefore, Defendants are also liable to Plaintiff for gross negligence and/or willful misconduct.

143.    Plaintiff has suffered and will continue to suffer significant economic damages and loss of business due to the impacts and the stigma caused by the impacts, on the marine environment, fish and shellfish populations, as well as to the Gulf waters from the oil spill disaster and related response efforts.

144.     The oil spill and subsequent response and recovery efforts that have caused damage and continue to cause damage to Plaintiff were proximately caused by Defendants' negligence, gross negligence and/or willful misconduct.

145.     Further, upon information and belief, the oil spill was proximately caused by the Defendants' violation of applicable federal safety, construction, or operating regulations and/or by violations of such regulations by an agent or employee of the Defendants and/or a person acting pursuant to a contractual relationship with Defendants.

146.     Defendants had a duty to conform their conduct in such a manner as to assure that a blowout would not occur, that the *Deepwater Horizon* would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist in case of emergency pursuant to federal and Louisiana law.

147.     Defendants failed to conform their conduct to the appropriate legal standard, thereby breaching their duty to assure that a blowout would not occur, that the *Deepwater Horizon* would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist and be properly implemented in case of emergency pursuant to federal and Louisiana law.

148.     Defendants' substandard conduct in failing to prevent the blowout, the ensuing destruction and sinking of the *Deepwater Horizon*, and the uncontrolled discharge of oil from the Macondo well into the Gulf of Mexico and Louisiana waters pursuant to federal and Louisiana law was the cause-in-fact of the harm and damages suffered by the Plaintiff.

149.     Defendants' substandard conduct in failing to prevent and/or contain the blowout that resulted in the sinking of the *Deepwater Horizon* and the subsequent oil spill from the Macondo well was the legal cause of the Plaintiff's harm and damages.

150.     In addition, and/or in the alternative, the blowout, fire, explosion, destruction of the *Deepwater Horizon* and ensuing oil spill were caused by defective equipment and would have been prevented by non-defective equipment, including the BOP and float collar, which were in the care, custody, and control of the Defendants and over which the Defendants had *garde*. Defendants knew or should have known of these defects and Defendants are therefore liable for the defects.

151.     BP has taken responsibility for the oil spill and cleaning up the oil spill, as former BP Chief Executive, Tony Hayward, issued a statement on the BP website that BP is "… taking full responsibility for the spill and we will clean it up." BP has therefore admitted its liability for the oil spill.

152.     BP's duties are non-delegable.

153.     It was foreseeable that the Defendants' actions and/or omissions, resulting in the blowout of the Macondo well, the sinking and destruction of the *Deepwater Horizon*, and the ensuing uncontrolled oil spill from the Macondo well, would proximately cause the damages and harm that Plaintiff did suffer and will continue to suffer, as alleged herein.

154.     The damages to the Plaintiff is also caused by, or aggravated by, the fact that Defendants failed to take reasonably necessary actions to mitigate the dangers associated with their operations.

155.     As a direct and proximate result of the Defendants' negligence and gross negligence, Plaintiff has suffered and will continue to suffer significant physical, economic and other damages in excess of $75,000.00 and is entitled to recover monetary damages including, but not limited to, diminution of value to business, diminished value of real and personal property, loss of income and revenue, loss of business, good will, stigma damages, loss of natural

marine resources, and any incidental or consequential damages resulting from Defendants' conduct.

156.     The Defendants are liable jointly and severally for Plaintiff's damages resulting from Defendants negligence and gross negligence.  As a result of Defendants' gross negligence, Plaintiff is also entitled to punitive damages.

## SECOND CLAIM FOR RELIEF

### NEGLIGENCE

### (Plaintiff versus All Defendants)

157.     Plaintiff realleges each and every allegation set forth in all Master Complaints filed in the MDL 2179 and the preceding paragraphs, as if fully restated here.

158.     At all times material hereto, Drilling Defendants were participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.

159.     At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations on the *Deepwater Horizon* and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of an oil spill.

160.     The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

161.     Plaintiff, as owner lessor, lessee, and/or operator of real property at or near the coast of the Gulf of Mexico and/or business or employees of businesses that are dependent upon the Gulf of Mexico's marine and coastal environments for their livelihood and income, was

within an appreciable zone of risk and, as such, Drilling Defendants were obligated to protect them.

162.    The blowout and explosions on the *Deepwater Horizon*, its sinking and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly, severally, and solidarily liable to Plaintiff.

163.    Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiff and the Gulf of Mexico's marine and coastal environments and estuarine areas.

164.    Defendants were under a duty to exercise reasonable care while participating in drilling operations on the *Deepwater Horizon* to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

165.    Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the *Deepwater Horizon* in an expeditious manner.

166.    Defendants knew or should have known that the acts and omissions described herein could result in damage to Plaintiff.

167.    Defendants, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent oil spill did not occur, and thereby breached duties owed to Plaintiff.

168.    Defendants, respectively and collectively, failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout, and thereby breached duties owed to Plaintiff.

169.    Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiff.

170.    The conduct of the Defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the *Deepwater Horizon* and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit Plaintiff. One or more of the Drilling Defendants violated these statutory standards.

171.    The violations of these statutory standards constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama, Florida, and the general maritime law.

172.    At all times material hereto the *Deepwater Horizon* was owned, navigated, manned, possessed, managed, and controlled by Transocean.

173.    As the owner and manager of the *Deepwater Horizon*, Transocean owed duties of care to Plaintiff to, *inter alia*, man, possess, manage, control, navigate, maintain and operate the *Deepwater Horizon* with reasonable and ordinary care.

174.    Transocean breached its duties to Plaintiff by, *inter alia*, failing to properly manage, control, maintain and operate the *Deepwater Horizon* and its safety equipment, including the gas sensors, air intake valves, emergency shutdown systems, and BOP, and in disabling vital alarm systems on the *Deepwater Horizon* before the blowout.

175.    Transocean also breached its duties to Plaintiff by making and/or acquiescing to a series of reckless decisions concerning, *inter alia*, well design, the use of centralizers, mudding

operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

176.    Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety of Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

177.    At all times material hereto, the *Deepwater Horizon* was leased and operated pursuant to a contract between Transocean and BP. Together, Transocean, BP and other Drilling Defendants were responsible for design and well control.

178.    BP owed duties to Plaintiff to, *inter alia*, exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

179.    BP breached its duties to Plaintiff by, *inter alia*:

(a)    choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner/tieback design was a safer option;

(b)    using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;

(c)    using too few centralizers to ensure that the casing was centered into the wellbore;

(d)    failing to implement a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

(e)     failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

(f)     cancelling the cement bond log test that would have determined the integrity of the cement job;

(g)     failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

(h)     using an abnormally large quantity of mixed and untested spacer fluid;

(i)     failing to train drilling vessel workers and/or onshore employees, and to hire personnel qualified in risk assessment and management of complex systems like that found on the *Deepwater Horizon*;

(j)     requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore; and

(k)     causing property damage to the vessels involved in the clean-up and remediation program, and failing to properly administer and provide payment for work, time, and/or property damage to those entities and workers participating in the program.

180.     All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to Plaintiff's injuries and damages.

181.     At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

182.     At all times material hereto, Halliburton owed duties to Plaintiff to, *inter alia*, exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the *Deepwater Horizon*'s well.

183.     Halliburton breached its duties to Plaintiff by, *inter alia*, failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the *Deepwater Horizon*'s well. Halliburton was negligent by, *inter alia*, failing to use a full "bottoms-up"

circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards; failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective; cancelling, or acquiescing in the cancellation of, the cement bond log test that would have determined the integrity of the cement job; failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below, all of which proximately caused and/or contributed to Plaintiff's damages.

184.     In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by Plaintiff was caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiff, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants. The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Defendants satisfied the duty of care imposed on them and Plaintiff, therefore, plead the doctrine of *res ipsa loquitur*.

185.     In addition to the foregoing acts of negligence, Plaintiff avers that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and fault of Defendants in the following non-exclusive particulars:

(a)     Failing to properly operate the *Deepwater Horizon*;

(b)     Operating the *Deepwater Horizon* in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

(c)    Failing to properly inspect the *Deepwater Horizon* to assure that its equipment and personnel were fit for their intended purpose;

(d)    Acting in a careless and negligent manner without due regard for the safety of others;

(e)    Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon* which, if they had been so promulgated, implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

(f)    Operating the *Deepwater Horizon* with untrained and unlicensed personnel;

(g)    Negligently hiring, retaining and/or training personnel;

(h)    Failing to take appropriate action to avoid or mitigate the accident;

(i)    Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(j)    Failing to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

(k)    Failing to warn in a timely manner;

(l)    Failing to timely bring the oil release under control;

(m)    Failing to provide appropriate accident prevention equipment;

(n)    Failing to observe and read gauges that would have indicated excessive pressures in the well;

(o)    Failing to react to danger signs; and

(p)      Such other acts of negligence and omissions as will be shown at the trial

of this matter; all of which acts are in violation of the general maritime

law.

186.     Plaintiff is entitled to a judgment finding Defendants liable, jointly, severally, and

solidarily, to Plaintiff for damages suffered as a result of Defendants' negligence and awarding

Plaintiff adequate compensation therefor in amounts determined by the trier of fact.

187.     The damages to Plaintiff were also caused by and/or aggravated by the fact that

Defendants failed to take necessary actions to mitigate the danger associated with their

operations.

## Gross Negligence and Willful Misconduct

### (Plaintiff versus Drilling Defendants)

188.     Plaintiff realleges each and every allegation set forth in all Master Complaints in

MDL 2179 and all preceding paragraphs as if fully restated here.

189.     BP, Halliburton, and Transocean owed and breached duties of ordinary and

reasonable care to Plaintiff in connection with the maintenance of, and drilling operation on, the

*Deepwater Horizon*, and additionally owed and breached duties to Plaintiff to guard against

and/or prevent the risk of the Spill. The existence and breach of these legal duties are established

under the general maritime law and state law as deemed applicable herein.

190.     Drilling Defendants breached their legal duty to Plaintiff and failed to exercise

reasonable care and acted with reckless, willful, and wanton disregard in the negligent

manufacture, maintenance, and/or operation of the *Deepwater Horizon*.

191.    Drilling Defendants knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

192.    Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, disabling the gas alarm system aboard the *Deepwater Horizon*.

193.    BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a "bottoms-up" circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico.

194.    BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

195.    BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff

by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

196.    BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the *Deepwater Horizon*.

### THIRD CLAIM FOR RELIEF

### Claims Under The Oil Pollution Act

### Economic Loss

### (Plaintiff versus BP)

197.    Plaintiff realleges and reavers each and every allegation set forth in all Master Complaints in MDL 2179 and all preceding paragraphs, as fully set forth herein and further state:

198.    Under the Oil Pollution Act, 33 U.S.C. §2701, *et seq* ("OPA"), "each responsible party for a vessel or facility…from which oil is discharged…is liable for removal costs and damages", including "the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant." 33 U.S.C. §2702.

199.    A responsible party in the case of a vessel is any person owning, operating, or demise chartering the vessel. 33 U.S.C. §2701(32)(A). A responsible party for an offshore facility is the lessee or permittee of the area in which the facility is located. 33 U.S.C. 33 U.S.C. §2701(32)(C).  A lessee is any "person holding a leasehold interest in an oil or gas lease on lands beneath navigable waters (as that term is defined in section 1301(a) of Title 43) or on submerged

lands of the Outer Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.)."  33 U.S.C. §2701(16).

200.    For purposes of determining the responsible parties for a mobile offshore drilling unit, it is first deemed to be a tank vessel and then treated as an offshore facility for excess liability.  33 U.S.C. §2704(b) (1)&(2).

201.    At all pertinent times herein, BP chartered the *Deepwater Horizon* MODU. Defendant-BP held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the "Macondo lease"), an oil lease on lands beneath navigable waters, before and/or at the time of the spill.  As such, they were lessees of the area within which the well (an "offshore facility") was located at the time of the Spill and are responsible parties pursuant to Section 2701 (16) and (32) of the OPA.  BP was the designated operator for said lease.  As such, they are strictly liable pursuant to Section 2702 of the OPA for all damages resulting from the spill.

202.    The United States Coast Guard identified BP as a "responsible party."  Therefore, BP is liable pursuant to Section 2702 for all damages that result from the Oil Spill.

203.    Defendant, BP and Transocean are not entitled to limit their liability under Section 2704(a) of OPA because the oil spill disaster was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations as alleged above.  Additionally, in its "Statement of BP Exploration & Production, Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990" filed on October 19, 20120, BP explicitly waived the right to raise the statutory limitation on liability under OPA.

204.    As a result of the Spill and the resulting damages to natural resources in the Gulf of Mexico, Plaintiff has sustained and will continue to sustain a loss of profits and/or impairment of earning capacity, as alleged above.

205.    Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery for damages to real and/or personal property, including "[D]amages for injury to, or economic losses resulting from destruction of, real and/or personal property, which shall be recoverable by a claimant who owns or leases that property."

206.    As a result of the Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(C), which provides for recovery for "[D]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

207.    As a result of the oil spill and the resulting damage to the marine environment in the Gulf of Mexico, Plaintiff is entitled to damages pursuant to OPA, Section 2702(b)(2)(E), which allows for "[D]amages equal to loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

208.    It was foreseeable that a massive oil spill in the Gulf of Mexico would cause economic harm to Plaintiff's businesses in Louisiana.

209.    To the extent required by law, and/or by consent or stipulation by BP, Plaintiff has satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the submission of their claims to BP and/or its agents or designees.

210.    Plaintiff is entitled to recover from Defendants for economic damages occasioned as a result of the oil spill in amounts to be determined by the jury.

## FOURTH CLAIM FOR RELIEF

### Claims Under The Oil Pollution Act

### (Plaintiff versus BP, Halliburton and Transocean)

### Fraudulent Concealment

211.    Plaintiff realleges each and every allegation set forth in all the Master Complaints filed in MDL 2179 and all preceding paragraphs, as if fully restated here.

212.    To the extent available under state law, Plaintiff are entitled to recovery against Defendants BP, Halliburton and Transocean for their fraudulent concealment of material facts concerning the Spill.

213.    After the explosions, Defendant BP attempted to downplay and conceal the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

214.    Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.

215.    In addition, BP misrepresented its capabilities to respond to the Spill. BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

216.    In fact, BP did not have proven equipment and technology to respond to the Spill; instead, according to the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to

respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico." As noted further in that letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

217.   BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

218.   Despite its inability to respond and control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

219    BP did not in the aftermath of the blowout or since that time provide complete or timely announcements and warnings about the severity, forecast and trajectory of the Spill.

220.   The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to disclose.

221.   In addition, Defendant Halliburton misrepresented and concealed the stability of the cement used at the Macondo well, despite having performed three tests before the Spill, all of which demonstrated that the foam cement used at Macondo was unstable.

222.   The instability of the cement used at the Macondo well and the results of the testing performed before the Spill were material facts that Halliburton had a duty to disclose.

223.   Moreover, BP was aware, before the Spill, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

224.   For its part, Transocean misrepresented and concealed the condition of the *Deepwater Horizon* and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia*, its BOP.

225.    Transocean also misrepresented and concealed the maintenance record of the vessel, which was based on false data supplied by its personnel.

226.    Transocean misrepresented and concealed the condition of many key components, including, *inter alia*, the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury or environmental damage.

227.    The foregoing known hazards, poor condition, and maintenance and safety issues associated with the *Deepwater Horizon* and its appurtenances and equipment were material facts that Transocean had a duty to disclose.

228.    Defendants Halliburton, BP, and Transocean failed to disclose or concealed the foregoing material facts, and their failure to do so induced Plaintiff to act or to refrain from acting to protect their property, businesses, livelihoods and income.

229.    As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton, BP, and Transocean, Plaintiff suffered damage to the business, livelihood, income and damage to and diminution in value of the property, for which they are entitled to compensation.

230.    Moreover, the acts of misrepresentation and concealment of the foregoing material facts by Halliburton, BP, and Transocean were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, Plaintiff is entitled to an award of punitive damages.

### FIFTH CLAIM FOR RELIEF

### Negligence *Per Se*

**(Plaintiff versus All Defendants)**

231.    Plaintiff realleges each and every allegation set forth in all Master Complaints filed in MDL 2179 and all preceding paragraphs as if fully restated here.

232.    Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiff, including, but not limited to, those set forth in Section 311 of the Clean Water Act, 40 C.F.R. § 300 App. E, 30 C.F.R. Part 254 and the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

233.    One or more of Defendants violated these statutory and/or regulatory standards.

234.    Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama and Florida law.

235.    Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein which, in turn, caused Plaintiff's injuries, and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

236.    As a direct and proximate cause of Defendants' violation of statutory and/or regulatory standards, the Plaintiff has suffered physical injuries and/or property damage. Plaintiff is entitled to a judgment in their favor for damages suffered in an amount to be determined by the trier of fact, including, but not limited to, punitive damages.

## SIXTH CLAIM FOR RELIEF

### Nuisance under General Maritime Law

### (Plaintiff versus All Defendants)

237.   Plaintiff realleges each and every allegation set forth in all Master Complaints filed in MDL 2179 and all preceding paragraphs as if fully restated here.

238.   BP's oil disaster has significantly interfered with the public's right to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution.

239.   Prior to the *Deepwater Horizon* disaster, Plaintiff enjoyed the use of the Gulf of Mexico for fishing, boating, and other economic and recreational pursuits, including residing on the Gulf of Mexico.

240.   Plaintiff has no adequate remedy at law.

241.   There exists an imminent likelihood of irreparable harm if the injunction is not issued.

242.   The threatened harm to the Plaintiff outweighs any potential harm to Defendants.

243.   Granting the injunction does not contravene a substantial public interest.

244.   Plaintiff is entitled to judgment finding Defendants liable to Plaintiff for damages for the creation of a public nuisance and a judgment for injunctive relief to abate the nuisance.

### SEVENTH CLAIM FOR RELIEF

### Strict Liability Pursuant to Louisiana Oil Spill Prevention and Response Act of 1991 (OSPRA), La. Rev. Stat. 30:2451 et seq.

### (Plaintiff versus All Defendants)

245   Plaintiff realleges each and every allegation set forth in all Master Complaints filed in MDL 2179 and all preceding paragraphs as if fully restated here.

246.     At all relevant times, Defendants, BP, Transocean and Halliburton, had a statutory duty to Plaintiff to maintain and operate the *Deepwater Horizon* and the Macondo well so as to not create or sustain hazardous conditions due to the discharge of  pollutants as defined by the Louisiana Oil Spill Prevention and Response Act of 1991 (OSPRA), La. Rev. Stat. 30:2451 *et seq*.

247.     OSPRA defines "discharge of oil" broadly to include "an intentional or unintentional act or omission by which harmful quantities of oil are spilled, leaked, pumped, poured, emitted, or dumped into or on coastal waters of the state or at any place where, unless controlled or removed, they may drain, seep, run, or otherwise enter coastal waters of the state." La. R.S. 30:2454(7).  The OSPRA holds "Responsible Parties" liable for the discharge of pollutants in violation of its provisions.

248.     Pursuant to Section 30:2454(22)(a) and (c) of the OSPRA, BP is a "Responsible Party" and therefore liable under the OSPRA, because it was an operator of the *Deepwater Horizon* and a lessee of the area where the *Deepwater Horizon* and the Macondo well were located.  BP was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. §274.

249.     At all relevant times, Defendants breached its statutory duty to Plaintiff by discharging, or allowing to be discharged, crude oil and other pollutants and hazardous substances into the Gulf of Mexico and then negligently allowing or causing the massive oil spill to migrate into Louisiana's marine and coastal waters and shores in violation of the OSPRA.  Once present there, Defendants additional tortious misconduct added chemical dispersants onto the oil, creating and enlarging the pollutant hazards and their movement into Louisiana territorial waters and real property.

### The BP Exploration and Transocean Deepwater Plea Agreements

250.   Defendant, BP Exploration, has entered into a Guilty Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill.  In an exhibit to this Plea Agreement, BP Exploration admitted that if its case were to proceed to trial, the federal government could prove, beyond a reasonable doubt, that BP Exploration's negligence proximately caused the deaths of eleven men on board the *Deepwater Horizon* on April 20, 2010, and also proximately caused the discharge of large and harmful quantities of oil into the Gulf of Mexico, as well as a number of related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint.  *See* Exhibit A to Guilty Plea Agreement, Record Document 2-1 in Case Number 2:12-cr-00292 (E.D.La. Nov. 15, 2012).  The Court has accepted this Guilty Plea Agreement.  *See* Reasons for Accepting Plea Agreement, Record Document 65 in Case No. 2:12-cr-00292 (E.D.La. Jan. 30, 2013).

251.   Defendant, Transocean Deepwater has entered into a Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill.  In an exhibit to this Plea Agreement, Transocean Deepwater admitted that if its case were to proceed to trial, the federal government could prove that Transocean Deepwater, together with others, negligently discharged, or caused to be discharged, oil into the Gulf of Mexico, as well as a number of related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint.  *See* Exhibit A to Cooperation Guilty Plea Agreement, Record Document 3-2 in Case Number 2:13-cr-00001 (E.D.La. Jan. 3, 2013).  The Court has entered a judgment based on this Plea Agreement.  *See* Judgment, Record Document 31 in Case No. 2:13-cr-00001 (E.D.La. Feb. 14, 2013).

## Punitive Damages

252.     Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon*.

253.     Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiff, society and the environment cannot afford, and should never be exposed to, the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

254.     BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

255.     BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

256.    Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the *Deepwater Horizon* and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

257.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using a well design with too few barriers to gas flow.

258.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

260.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to run a "bottoms-up" circulation of the drilling mud prior to beginning the cement job.

261.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

262.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to run a cement bond log to evaluate the integrity of the cement job.

263.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

264.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

265.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

266.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOPs appurtenant to the *Deepwater Horizon*.

267.    BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

268.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

269.    BP and Transocean willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico.

270.    Defendants recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

271.    In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

272.    Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

    (a)    failed to properly maintain and/or operate the *Deepwater Horizon*;

    (b)    operated the *Deepwater Horizon* in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

    (c)    ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

    (d)    failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon*;

    (e)    violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

67

(f)     failed to take appropriate action to avoid or mitigate the accident;

(g)     failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(h)     failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order;

(i)     failed to provide appropriate disaster prevention equipment;

(j)     failed to have an appropriate emergency spill response plan or readily available spill response equipment.

273.    BP recklessly, willfully and/or wantonly failed to ensure that Plaintiff would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants, and other harmful chemicals resulting from the Oil Spill.

274.    Defendants willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

275.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

276.    Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihood, business, and property of Plaintiff; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it

has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

277.    Accordingly, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## DECLARATORY RELIEF: PUNITIVE DAMAGES

278.    The Plaintiff has a legitimate and legally protected interest, additional to and independent of the interest or entitlement to compensation, in punishment and deterrence of reprehensible and harmful conduct, and in imposing full and effective punishment and deterrence of such conduct. Punitive damages do not compensate for injury.  They are private fines, authorized by the General Maritime Law (and/or state law), to punish reprehensible conduct and deter its future occurrence. Punitive damages are specifically designed to exact punishment, in excess of actual harm, to make clear that the Defendants' misconduct is especially reprehensible, to embody social outrage and moral condemnation of such misconduct, and to assure that it is not repeated. Accordingly, Plaintiff seeks a judicial declaration against Defendants and in favor of the Plaintiff that any settlement provisions that purport, directly or indirectly, to release or to affect the calculation of punitive damages without a judicial determination of fairness, adequacy, and reasonableness are ineffective as contrary to law, equity and public policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants jointly, severally and solidarily, as follows:

(a)    Economic and compensatory damages in amounts to be determined at trial;

(b)    Punitive damages;

(c)     Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(d)     Attorneys' fees, costs of claims preparation, and litigation

(e)     Civil and or criminal penalties;

(f)     Declaratory and injunctive relief;

(g)     Any other and further general or equitable relief available under all applicable state, federal, admiralty, or maritime laws;

(h)     Any other and further relief the Court deems just and proper;

(i)     Plaintiff demands a jury trial on all claims and issues so triable.

Dated: September 18, 2013

Respectfully Submitted,

/s/ <u>Wesley J. Farrell, Esq.</u>

Wesley J. Farrell, Esq., FLBN 71783
Terry A. C. Gray, Esq., FLBN 100732
Farrell & Patel, Attorneys At Law
113 Almeria Ave.
Coral Gables, Fl.
Tel: (305) 798-4177
Fax:  (800) 946-6711

Sarah E. Spigener, Esq., LABN 31975
Farrell & Patel, Attorneys At Law
1515 Poydras St., Suite 1400
New Orleans, LA 70112
Tel:  (504) 233-8585
Fax: (504) 264-5953

Randolph Piedrahita, LABN 22595
Dué, Price, Guidry, Piedrahita & Andrews
8201 Jefferson Highway
Baton Rouge, LA 70809
Tel: (225) 929-7481
Fax: (225) 924-4519

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 18, 2013, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing is being served this day upon all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Sarah E.  Spigener, Esq.