**UNITED STATES DISTRICT OF COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL | § | MDL No. 2179 |
| RIG "DEEPWATER HORIZON" | § | |
| IN THE GULF OF MEXICO, | § | SECTION: J |
| ON APRIL 20, 2010 | § | |
| | § | |
| Relates to: No. 12-970 | § | JUDGE BARBIER |
| | § | |
| | § | MAG. JUDGE SHUSHAN |

**REPLY BRIEF IN SUPPORT OF MOTION
TO AUTHORIZE CLAIMS ADMINISTRATOR TO IMPLEMENT
THE SETTLEMENT AGREEMENT WITH RESPECT TO OIL & GAS SUPPORT
SERVICES INDUSTRY CLAIMS**

The Economic & Property Damages Settlement Class, through Lead Class Counsel, respectfully submits the following Reply Brief in response to BP's Opposition and in further support of Plaintiffs' Motion:

**MAY IT PLEASE THE COURT:**

Based on several meetings, discussions, and exchanges between and among Class Counsel, Counsel for BP, and the Claims Administrator since the inception of the Settlement Program, Class Counsel provided, on or around July 5, 2013, a revised good faith set of proposed guidelines for the review of potential "Moratoria Losses" for Oil & Gas Support Services Claims under Section 5.10.3 of the Economic & Property Damages Settlement Agreement.

Having delayed the next meeting for several weeks, BP ultimately responded during a follow-up meeting on July 31, 2013. While there remained some points of agreement between the Parties, it did not appear likely that complete agreement on a single comprehensive framework would be reached in the near future. Convinced that BP was attempting to delay the processing and payment of Oil & Gas Support Services claims as part of its overall attempt to

slow down and stop payments under the Settlement, Class Counsel decided that further discussions would likely not be fruitful at that time.

To the best of undersigned counsel's recollection, Lead Class Counsel engaged in pleasantries with BP Counsel as they were leaving to attend another meeting.[1]  Undersigned Counsel understand that Mr. Rice had further discussion with BP Counsel, during which BP Counsel indicated that they would never agree to any guidelines that were inconsistent with BP's (erroneous) position on appeal regarding the "matching" of expenses.[2]  In connection with this last point, BP insisted that any guidance contain new definitions of "revenue" and "expenses" that are not contained anywhere within the Settlement Agreement.  Mr. Rice, in response, suggested that there was no point in discussing anything further until the BEL Appeal pending before the U.S. Fifth Circuit was resolved.

Shortly thereafter, Class Counsel determined that the most appropriate course of action would be to ask the Court to direct the Claims Administrator to implement the Settlement Agreement with respect to Oil & Gas Support Services Claims.  It was Class Counsel's expectation, in this regard, that the Claims Administrator would consider all of the feedback and guidance that had been provided by the Parties over the past several months, develop a Proposed Policy, and then subject that Proposed Policy to further consideration and discussion, consistent with the Program's established "Policy Keeper" process and, if necessary, the Administrative Panel Hearing process set forth in Section 4.3.4.

---

[1] In particular, Undersigned Counsel do not recall indicating that "Class Counsel wanted to continue discussions" regarding the interpretation and implementation of Section 5.10.3 and Exhibit 16, (*see* BLOOM DECLARATION, ¶22), but simply indicated that Class Counsel would be seeing BP Counsel and/or talking to them – generally – in the near future.

[2] *See generally,* U.S. Fifth Circuit No. 13-30329.

With respect to the specific contractual interpretation issue surrounding the language and effect of Exhibit 16, Class Counsel believe that:

- Even though Class Counsel and BP cannot agree upon a single comprehensive framework, there is sufficient "agreed upon guidance" for the Claims Administrator to implement the Settlement Agreement;

- Indeed, several of the determinations to be made by the Claims Administrator under Exhibit 16 are "individual" determinations, left to "the judgment of the administrator";

- In the alternative, and in any event, the Parties specifically contemplated in the Settlement Agreement that, in the event, or to the extent, the Parties might disagree regarding the interpretation, implementation or application of the Settlement Agreement, such disputes would be resolved according to the Administrative Panel Hearing process, and/or otherwise by the Court;

- Under general rules of contractual enforcement and interpretation, the fact that the parties leave some terms unresolved is not fatal, where the Parties have specifically agreed to a mechanism for resolution;

- Exhibit 16, in this regard, should be interpreted *in pari materia* with the surrounding terms of the Settlement Agreement, (including, but not limited to, Sections 4.3.1, 4.3.4 and 18.1), and to give the agreement and its terms effect, rather than rendering them meaningless or ineffective;  and,

- BP itself previously took the position that the Claims Administrator was authorized to develop and implement a Moratoria Loss Review Policy for the implementation of Exhibit 16 in the absence of a complete agreement between the Parties.

For the reasons stated in Class Counsel's original Motion,[3] and for the reasons further outlined below, Class Counsel respectfully suggest that the Claims Administrator should be authorized and directed to interpret and implement the Settlement Agreement with respect to Oil & Gas Support Services Claims.

---

[3] Doc. 11156.

**BP Ignores the Distinction in the Settlement Agreement Between Causation and Compensation**

The sentence repeatedly quoted by BP for the proposition that the standard BEL Framework does not apply to Oil & Gas Support Services Claims relates solely to the issue of *compensation,*[4] while ignoring Exhibit 16's separate language regarding *causation.*

Specifically, Exhibit 16 provides that: "The standard business economic loss frameworks for *causation* *shall* *apply* to non-moratoria losses.  *Causation* shall be determined *prior* to the determination of the Moratorium Loss."[5]

Then, with respect to the issue of *compensation,* the Agreement provides that:

> In determinations of moratoria losses, the standard business economic loss framework shall not apply. Rather, the Claims Administrator's dedicated team shall be given parameters agreed upon by the parties that must be applied to distinguish among economic loss due to or resulting from (i) moratoria and (ii) non-moratoria economic loss.[6]

Hence, it was agreed that, (in the absence of exceptional circumstances), the general BEL Causation Framework would apply, followed by an exclusion of "Moratoria Loss" in the determination of an appropriate level of compensation.

---

[4] *See, e.g.,* BP'S OPPOSITION, at pp. 3, 7.

[5] *See* SETTLEMENT AGREEMENT, Exhibit 16, p.3, (emphasis supplied).  To be sure, there is an exception where: "in the judgment of the administrator, the result of this causation test is driven predominantly by the inclusion of the moratorium losses in the calculation, then the administrator shall conduct an individual review of the claim file to determine whether the non-moratorium portion of the loss was in whole or in part due to or resulting from the DWH Spill."

[6] *See* SETTLEMENT AGREEMENT, Exhibit 16, pp.3-4.

4

## There is Sufficient "Agreed Upon Guidance" for the Claims Administrator to Implement the Settlement Agreement

First, it should be noted that there is significant agreed-upon guidance contained within the Settlement Agreement itself. With respect to Oil & Gas Support Service Business / Employer Claims, the Settlement Agreement provides that:

> *In general, one of the parameters shall be that the Claims Administrator shall be directed to calculate the claimant's non-moratoria economic loss due to or resulting from the DWH Spill by isolating losses that occurred prior to imposition of the moratoria on May 28, 2010, and any continuation of such losses that might have been expected in the absence of the moratoria. The incremental impact of the moratoria on claimant's losses generally would not be recoverable in the settlement.*[7]

With respect to Individual / Employee Claims, the Settlement Agreement provides that:

> *In general, one of the parameters shall be whether individuals lost their job more than thirty (30) days after the May 28, 2010 moratorium, which will generally indicate that the individual incurred such economic losses as the result of the moratorium, not due to or as a result of the DWH spill.*

> *In general, one of the parameters shall be whether individuals experienced reduced hours prior the moratorium but did not lose their job, which will generally indicate that the full value of the lost earnings through December 2010 were losses due to the DWH Spill and not due to the moratorium*[8]

In addition, there are several principles upon which the Parties do agree.

---

[7] SETTLEMENT AGREEMENT, Exhibit 16, p.4.

[8] SETTLEMENT AGREEMENT, Exhibit 16, pp.7-8.

For example, the Parties agree:

- There should not be a "bright line" distinction between revenue (or losses) stemming from Onshore versus Offshore activities.

- To the use of an Annual, rather than Monthly, percentage Variable Profit Margin.

- To focus on revenue declines in May and June of 2010, as compared to Benchmark, (with extrapolation to Annual Variable Profit Margin, on some basis, over the appropriate Compensation Period).

- To reconciliation of the claimant's Benchmark and 2010 Profit & Loss Statements (P&Ls) to the claimant's Tax Returns.

Hence, even though Class Counsel and BP do not appear able at this point to agree upon a single comprehensive framework, there is sufficient "agreed upon guidance" for the Claims Administrator to implement the Settlement Agreement.

**<u>Several of the Determinations to be Made by the Claims Administrator for Oil & Gas Support Service Claims under Exhibit 16 are "Individual" Determinations, Left to "the Judgment of the Administrator"</u>**

With respect to the causation analysis, the Settlement Agreement provides that:

> The standard business economic loss frameworks for causation shall apply to non-moratoria losses. Causation shall be determined prior to the determination of the Moratorium Loss. However, if *<u>in the judgment of the administrator,</u>* the result of this causation test is driven predominantly by the inclusion of the moratorium losses in the calculation, then *the administrator shall conduct an <u>individual</u> <u>review</u>* of the claim file to determine whether the non-moratorium portion of the loss was in whole or in part due to or resulting from the DWH Spill.[9]

These determinations are clearly left to the discretion of the Claims Administrator on a claim-by-claim basis, and do not require any further guidance from the Parties.

---

[9] SETTLEMENT AGREEMENT, Exhibit 16, p.3 (emphasis supplied).

**The Parties Themselves Specifically Contemplated that there Would Be Disputes Regarding the Interpretation, Implementation, Administration and/or Application of the Settlement Agreement, and Agreed to a Mechanism for Dispute Resolution**

The Settlement Agreement, in Section 4.3.4, specifically contemplates that the Parties will have disagreements regarding various issues surrounding the implementation and administration of the settlement, and sets forth a mechanism whereby, in the absence of unanimous agreement, the dispute is ultimately resolved by the Court.[10]

Courts have generally held, in this regard, that the fact the parties leave some terms unresolved is not fatal, where the Parties have specifically agreed to a mechanism for resolution. S*ee, e.g.,* Brandt v. MIT Dev. Corp., 552 F.Supp.2d 304, 321 (D.Conn. 2008) (upholding settlement where court determined unresolved issue according to "baseball" method at a later date), *order clarified on reconsideration,* 2008 WL 2230152 (D.Conn. May 29, 2008); Lindsay v. Lewandowski, 139 Cal.App.4th 1618, 1622 (2006) (noting that "leaving an unresolved term for future agreement is not invariably fatal, since a settlement may be enforceable if the parties agree the remaining issue will be decided by arbitration").[11]

Exhibit 16, in this regard, should be interpreted *in pari materia* with the surrounding terms of the Settlement Agreement, (including, but not limited to, Sections 4.3.1, 4.3.4 and 18.1),

---

[10] *See also, e.g.,* SETTLEMENT AGREEMENT, Sections 4.3.1 ("The Claims Administrator shall … serve as directed by the Court, and faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court"); SETTLEMENT AGREEMENT, Section 18.1 ("the Court shall retain continuing and exclusive jurisdiction over the Parties and their Counsel for the purpose of enforcing, implementing and interpreting this Agreement.…  Any disputes or controversies arising out of or related to the interpretation, enforcement or implementation of the Agreement and the Release shall be made by motion to the Court").

[11] *See also, e.g.,* F.W.F. Inc. v. Detroit Diesel Corp., 494 F.Supp.2d 1342, 1359 (S.D.Fla. 2007), *aff'd,* 308 F.App'x 389 (11th Cir. 2009) ("Under general principles of contract law, a failure to locate explicit contractual language does not mark the end of proper judicial interpretation and construction.… When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court").

and to give the agreement and its terms effect, rather than rendering them meaningless or ineffective. *See, e.g.,* <u>Wilson v. M/V B911</u>, No. 10-3320, 2012 WL 519585 at *2 (E.D.La. Feb. 16, 2012) ("Each provision of a contract must be read in light of others so as to give each the meaning reflected by the contract as a whole. Further, each provision of a contract must be given a meaning that renders it, along with all other provisions, effective rather than meaningless"); <u>F.W.F. Inc. v. Detroit Diesel Corp.</u>, 494 F.Supp.2d 1342, 1358 (S.D.Fla. 2007), *aff'd,* 308 F.App'x 389 (11th Cir. 2009) (same).

In this particular case, moreover, the Settlement Agreement is not simply a private contractual agreement, but was actively promoted and supported by the Parties, accompanied by formal Class Notice, and ultimately approved, in full, by the Court.[12]  BP clearly intended that Oil & Gas Support Service businesses and employees be included within the Class Definition (and the Class Release),[13] and those Class Members who fall within the Oil & Gas Support Services Industry, as defined by Exhibit 19, have a right to expect that their claims will be processed in accordance with the general terms and principles set forth within the Economic & Property Damages Settlement Agreement.

BP's proffered interpretation of Exhibit 16 is that, in the absence of express agreement between the Parties on <u>*all*</u> issues, the Claims Administrator and Vendors are without the authority to process or pay any Oil & Gas Support Service Claims.  This would allow BP to delay the processing and payment of any and all such claims indefinitely, simply by refusing to agree, (even if such agreement were withheld in bad faith).  Particularly given BP's current

---

[12] *See* ORDER AND JUDGMENT GRANTING FINAL APPROVAL [Doc 8139] (Dec. 21, 2012); ORDER AND REASONS [Doc 8138] (Dec. 21, 2012).

[13] *See, e.g.,* <u>Spectrum Communication Specialists v. KMJ Services</u>, No. 09-159, 2011 WL 5878048 at *5 (E.D.La. 2011); <u>F.W.F.</u>, *supra*, 494 F.Supp.2d at 1357 ("The primary purpose and function of a court in the interpretation of a maritime contract is to ascertain the intention of the parties").

hostility to the Settlement Program, the Claims Administrator, Claimants, Class Counsel, and the Court, such an interpretation would frustrate the intent and purpose of the Settlement Agreement. *See* SETTLEMENT AGREEMENT, Sections 16.1 and 17.1 (Parties agree to support the approval and implementation of the Settlement Agreement); *see also,* F.W.F., supra, 494 F.Supp.2d at 1359 ("Every maritime contract imposes an obligation of good faith and fair dealing between the parties in its performance and enforcement…. The duty embraces, among other things, an implied obligation that neither party shall do anything to injure or destroy the right of the other party to receive the benefits of the agreement").

**BP Itself Previously Took the Position that the Claims Administrator Was Authorized to Develop and Implement a Moratoria Loss Review Policy for the Implementation of Exhibit 16 in the Absence of an Agreement between the Parties**

In the May 8, 2013 e-mail from BP Counsel to Christine Reitano, BP asked the Claims Administrator to implement the Proposed Policy he had developed regarding the application of Exhibit 16, despite the absence of agreement with Class Counsel.  Specifically, BP Counsel stated:

> It does not appear that Class Counsel are interested in meeting. So it does seem, then, the Claims Administrator must proceed to implement the absolute exclusion of recovery of Moratoria Losses consistent with the terms of Settlement Agreement and Exhibits 16 and 19.[14]

This is completely inconsistent with BP's current position that a complete set of guiding principles must be fully agreed to by the Parties.

---

[14] *See* EXHIBIT H to BP's Opposition.  (*Note* that BP's position on this issue was incorrect. The general "Exclusion" at the top of Exhibit 16 is applied to Class Members by and through Section 5.10.3 of the Agreement, whose scope is limited to a review of some Oil & Gas Support Service businesses, as identified in Exhibit 19.)

Similarly, on May 22, 2013, BP Counsel sent an e-mail to Mr. Juneau and his staff requesting that the Claims Administrator refrain from implementing any proposed policies:

> On behalf of Class Counsel and BP, I wanted to provide you an update with regard to the parties' discussions on implementation of the Settlement Agreement Moratoria Loss analysis. We had discussions today, and we are continuing those discussions next week on Wednesday. *We would ask the Settlement Program to please refrain from issuing any proposed implementation policies until after the parties have concluded discussions.*[15]

Implicit in this request is the recognition that Mr. Juneau was indeed authorized and empowered under the Settlement Agreement to issue and implement policies regarding the review and determination of Oil & Gas Support Service Claims even in the absence of complete agreement between the parties.

## Class Counsel Are Not Aware of Any Current "Draft Proposal" by the Claims Administrator

BP appears to assume that the Claims Administrator would simply revert to his initial draft protocol, ignoring all of the feedback and other input that the Parties have since provided. Class Counsel do not believe that there is currently a "draft protocol" and, indeed, have asked the Court to authorize and direct that a new Proposed Policy be developed by the Claims Administrator.

## BP's Procedural Objections

With respect to BP's argument that a formal Administrative Review Panel should have convened prior to the filing of Class Counsel's Motion, it is undersigned counsel's distinct recollection that this issue was discussed, without resolution, in at least one, if not multiple, Administrative Panel Hearings with the Claims Administrator. Yet, more importantly, and in the

---

[15] *See* EXHIBIT Q to BP's Opposition, (emphasis supplied).

event that Class Counsel are mistaken, there is currently no Proposed Policy for the Administrative Review Panel to discuss;  rather, Class Counsel were suggesting that the Claims Administrator be authorized to propose a Policy, based on the "agreed upon guidance", which would then be subject to the ordinary feedback process *via* the Program's "Policy Keeper" – likely culminating in (another) Administrative Panel Hearing, and, if necessary, ultimate resolution by the Court.

To the extent that Class Counsel should have styled the Motion as a contested motion, Class Counsel respectfully apologize to BP and to the Court.  Undersigned counsel believed that the authorization was an administrative formality, (which might thereafter lead to *contested* issues surrounding the substance of the Policy).[16]  Class Counsel are happy to re-file their Motion (and associated pleadings) in whatever form the Court directs or desires.

---

[16] Class Counsel further point out that BP's general position was related to the Court in Paragraph V of Class Counsel's Motion, and respectfully note that the distinction between a contested motion and an *ex parte* motion is somewhat diminished, as a practical matter, under Pre-Trial Order 15, as no response or hearing is triggered unless and until the Court, after reviewing the motion, requests an opposition.

**Conclusion**

For the above and foregoing reasons, and for the reasons set forth in Class Counsel's original Motion, the Class respectfully prays for an order authorizing and directing the Claims Administrator to interpret and implement the Settlement Agreement with respect to Oil & Gas Support Services Claims.

This 20th day of September, 2013.

Respectfully submitted,

| | |
|---|---|
| */s/ Stephen J. Herman* | */s/ James Parkerson Roy* |
| Stephen J. Herman, LA Bar No. 23129 | James Parkerson Roy, LA Bar No. 1511 |
| Herman Herman & Katz LLC | Domengeaux Wright Roy & Edwards LLC |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, LA 70113 | Lafayette, LA 70501 |
| Tel: (504) 581-4892 | Tel: (337) 233-3033 |
| Fax: (504) 569-6024 | Fax: (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Co-Lead Class Counsel* | *Co-Lead Class Counsel* |

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing Reply Brief will be filed into the record electronically *via* the Court's ECF system and served on All Counsel *via* the Lexis-Nexis File & Serve system in accordance with Pre-Trial Order No. 12, this 20th day of September, 2013.

/s/ Stephen J. Herman and James Parkerson Roy