UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>No. 12-970 | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

## CLASS COUNSEL'S COMMENTS ON THE FREEH REPORT

Appointed Class Counsel, on behalf of the duly appointed Class Representatives and the Economic & Property Damages Settlement Class, respectfully submit the following comments regarding the September 6, 2013 Report of Special Master Louis J. Freeh ("Freeh Report") [Doc 11287] in accordance with the Court's Order [Doc 11288]:

**MAY IT PLEASE THE COURT:**

As summarized by the Court, Special Master Freeh:

> ... has not found any evidence that the Claims Administrator, Patrick Juneau, engaged in any conflict of interest, or unethical or improper conduct. The Special Master also did not find any evidence that Claims Administrator Office officials or employees manipulated the valuation of claims, although a comprehensive examination of this issue was not part of the Special Master's mandate. While the conduct of certain Claims Administrator Office employees and vendors described in the Report is problematic, the Special Master finds that should not prevent the CSSP from continuing to fairly and efficiently process and pay legitimate claims in a timely manner.[1]

Class Counsel welcome the involvement of Special Master Freeh in continued recommendations to the Claims Administrator regarding the implementation of internal

---

[1] ORDER (Sept. 6, 2013) [Doc 11288], p.2.

1

compliance and anti-fraud procedures, as well as the recommendation of "any additional business process procedures designed to promptly and fairly adjudicate claims in an efficient manner, and assist the Claims Administrator in the implementation of same."[2]

Class Counsel respectfully comment on a few of the Report's observations, merely out of an abundance of caution, in an attempt to ensure that the Settlement Agreement continues to be correctly implemented and applied [3] :

1. While the Freeh Report is generally correct that the liability of an OPA Responsible Party may be limited to $75 million,[4] this statutory cap cannot be invoked by a company that is guilty of gross negligence, willful misconduct, or the violation of applicable federal safety or operating regulations. *See* 33 U.S.C. §2704(c)(1).  In this case, BP has, so far, plead guilty to eleven felony counts of Seaman Manslaughter  (18 U.S.C. §1115),  one felony count of lying to the Federal Government (18 U.S.C. §1505), criminal violations of the Clean Water Act (33 U.S.C. §1319(c)(1)(A) & 1321(b)(3)), criminal violation of the Migratory Bird Treaty Act (16 U.S.C. §§703 & 707(a)), and one count of lying to their stockholders and the SEC (15 U.S.C. §78m).[5]  In addition to the criminal guilty pleas, the existing trial record is replete with further evidence of willful misconduct and the violation of Federal Regulations.[6]  It is for this reason

---

[2] ORDER (Sept. 6, 2013) [Doc 11288], Additional Mandate Nos. 1, 3, at p.3.

[3] Class Counsel make no comment on the conduct of any particular attorney, nor the merits of any particular claim.

[4] FREEH REPORT (Sept. 6, 2013) [Doc 11287], at pp. 1, 16.

[5] *See* TREX-52673 (Criminal Guilty Plea); Rec. Docs. 8360-1 and 8360-2 (SEC Complaint and Consent).

[6] *See generally,* PSC POST-TRIAL BRIEF [Doc 10458], pp.1-26, 38-51; Plaintiffs PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], pp.129-169; PSC POST-TRIAL REPLY BRIEF [Doc 10714], pp.2-6, 15-17.

that BP likely decided to voluntarily waive the cap in 2010.[7]

2. The Freeh Report is likely correct that the Gulf Coast Claims Facility ("GCCF") was technically authorized to pay "claims for losses resulting from: (1) lost earnings or lost profits, (2) removal and cleanup costs, (3) damage to real or personal property, (4) loss of subsistence use of natural resources, and (5) physical injury or death."[8] However, as a practical matter, it is Class Counsel's understanding and experience that the GCCF only paid claims for lost earnings and to the families of rig workers who were injured or killed aboard the *Deepwater Horizon* on April 20, 2010. While there are likely some exceptions, the GCCF did not, as a general matter, routinely process or pay removal, clean-up, property damage, subsistence, or exposure injury claims.[9]

3. As noted in the Freeh Report, the Louisiana Rules of Professional Conduct generally require that a client agree to representation by all counsel sharing fees under a contingency fee arrangement in writing.[10] Class Counsel simply note that, as a general matter, the required notice

---

[7] *See* Rec. Doc. 559.

[8] FREEH REPORT, pp. 1, 16.

[9] *See, e.g.,* FINAL APPROVAL BRIEF (Economic Settlement) [Doc 7104] pp.48-49; REPLY BRIEF IN SUPPORT OF FINAL APPROVAL (Economic Settlement) [Doc 7727] pp.15-16; APPELLEE'S BRIEF ON THE MERITS (Medical Settlement), 5th Cir. No. 13-30221, at p.15 (*citing* KLONOFF DECLARATION [Doc 7116-2], ¶¶ 52, 54).

[10] *See* Louisiana Rules of Professional Conduct 1.5(c) and 1.5(e)(1). *See* FREEH REPORT, p.3 ("the Louisiana Code of Professional Conduct clearly requires that any such referral be in writing and signed by the client").

can arguably be provided, and the required consent can arguably be obtained, in separate documents, at different times.[11]

4.  The Freeh Report observes that a Business Economic Loss Claimant generally alleges that "economic harm had been caused to the business as a result of the *Deepwater Horizon* spill."[12]  Class Counsel respectfully suggest that, as a general matter, it would be more accurate to say that the filing of a BEL Claim alleges economic harm caused by the spill, "*as defined by the objective criteria contained within the BP Settlement Agreement.*"  The Settlement Agreement itself defines "losses caused by the spill" – not according to any abstract or subjective notions of causation, but – according to the transparent and objective criteria to which BP agreed.[13]

5. It is Class Counsel's experience and perception that BP frequently files numerous Settlement Program Appeals on the purported basis that "there appear to be 'significant

---

[11] Specifically, Louisiana Rule of Professional Conduct 1.5(c) requires that a contingency fee agreement be in writing and signed by the client; similarly, Rule 1.5(e)(1) requires that, where fees are divided by or between lawyers not in the same firm, the client agree to representation by all of the lawyers involved, in writing; Rule 1.5(e)(1) further requires that the client must be advised, in writing, as to the share of the fee that each lawyer will receive.  However, the Rule does not expressly indicate that the client must consent to the fee division, nor dictate specifically when the client must be so advised. *See, e.g., In re: Fewell,* No. 12-DB-048 (LADB Aug. 7, 2013).

[12] FREEH REPORT, p.46.

[13] *See generally,* CLASS COUNSEL'S IN CAMERA SUBMISSION IN OPPOSITION TO BP'S MOTION FOR RECONSIDERATION [Doc 8963-54]; *see also,* APPELLEE'S BRIEF ON THE MERITS, 5th Cir. No. 13-30315, at pp.30-32, 55;  *and,* APPELLEE'S BRIEF ON THE MERITS, 5th Cir. No. 13-30095, at pp.74-75 ("Fundamentally, the Bacharach Appellants fail to recognize how a "loss of income, earnings or profits suffered … as a result of the *Deepwater Horizon* Incident" is determined. The Settlement Agreement itself *defines* such losses according to the objective standards and frameworks set forth and "described in the attached Exhibits 1A-15" [*see* Section 1.3.1]  (specifically, Exhibits 4B and 4C)  [*see* Sections 5.3.2.1, 5.3.2.3, and 5.3.2.4].  Hence, whether a claimant suffered a loss as a result of the Spill is determined by objective, transparent, mathematical calculation…. The settling parties' separate and joint class experts opined in favor of this objective class definition, with objective frameworks for establishing entitlement to compensation").

inconsistencies and anomalies in the financial data provided by the claimant'"[14] either **(a)** as a temporary place-holder, to delay payment of the claim, while perhaps looking for some legitimate basis to appeal (if any), and/or **(b)** to evade the Court's Orders of April 9th and April 24, 2013.[15]

      6.    Without commenting on the specifics of any particular claim, Class Counsel respectfully note that the availability and reliability of data that may be found in the Louisiana Department of Wildlife and Fisheries Database, (which was not available to claimants or the Program when many Seafood Claims were originally submitted during the summer of 2012), has been frequently called into question.[16,17] A Court-Appointed Neutral designed the Seafood Program to allow for the use of either Trip Tickets *or* Income Tax Returns,[18] and the Claims

---

[14] FREEH REPORT, p.46.

[15] *See* Rec. Docs. 9232 and 9538.

[16] For example, the Seafood Neutral recently commented that: "In reporting this sales information, the dealer must identify by registration number the vessel that landed the catch. A number of claimants have indicated that the seafood dealers to whom they sold their catch entered the wrong registration number, and, therefore, reported the sale to the LDWF under the wrong vessel. This erroneous reporting creates a discrepancy in the Claims Administrator's reviews of the affected Louisiana-based commercial fishermen's claims in the Seafood Compensation Program." POLICY NO. 404 (Aug. 28, 2013); *see also, e.g.,* GO FISH PRELIMINARY OBJECTION [Doc 6353] p.9 (LDWF trip tickets are sometimes mis-identified because captains on some vessels work under the vessel owner's license and use that license to report catch at the docks, and trip ticket data often contains typographical errors); *see also, e.g.,* "Slidell Seafood Processor Arrested, Accused of Not Reporting Purchases from Commercial Fishers," *Times Picayune* (Oct. 30, 2012) (processor accused of failing to submit trip tickets for 178,215 pounds of blue crab, 104,489 pounds of shrimp, and over 2,000 pounds of finfish to the LDWF).

[17] *See* FREEH REPORT, pp.60-61 (regarding "The Use of Tax Returns Rather Than Trip Tickets to Determine Economic Loss").

[18] *See, e.g.,* SETTLEMENT AGREEMENT, Exhibit 10, Section I(B)(1), p.10. *See also,* SETTLEMENT AGREEMENT, Section 4.3.8 (agreeing that the claimant would be paid the maximum amount to which he or she was entitled based on the available information and documentation).

Administrator's current Policies favor the use of Tax Returns,[19] (presumably under the assumption that people aren't likely to report greater income to the IRS than they believe they actually earned from fishing).

7. The Freeh Report sometimes refers to the submission of a "moratorium claim" to the Settlement Program.[20] Just for clarification, Class Counsel respectfully note that claims for so-called "Moratoria Losses" (as defined by the Settlement Agreement) are excluded from Settlement Program Claims of "Oil & Gas Support Service" companies or employees,[21] and are Expressly Reserved.[22] (In point of fact, there is no such thing as a "Moratoria Loss" or a "Moratoria Claim"; this was simply an attempt by the Parties to define claims or losses that BP refused to acknowledge based on BP's erroneous contention that the Federal Government, and not BP, is responsible for those losses and claims. Class Counsel do not believe that any type of "Moratoria Defense" is available under either OPA's legal framework or under the facts. This continuing dispute between the Parties, as well as other issues surrounding the scope of OPA causation, will be fleshed out through the forthcoming litigation of OPA Causation Test Cases.)

---

[19] *See* POLICY NO. 262 (Oct. 8, 2012).

[20] *See, e.g.,* FREEH REPORT, p.62.

[21] *See* SETTLEMENT AGREEMENT, Section 5.10.3, and Exhibits 16 and 19.

[22] *See* SETTLEMENT AGREEMENT, Section 3.3.

Again, Class Counsel look forward to working with Special Master Freeh and the Claims Administrator to develop and implement additional methods or procedures designed to promptly and fairly adjudicate claims in an efficient manner.

This 20th day of September, 2013.

Respectfully submitted,

| | |
|---|---|
| /s/   Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No.11511 |
| **HERMAN HERMAN & KATZ LLC** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Co-Lead Class Counsel* | *Co-Lead Class Counsel* |

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing Comments have been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of September , 2013.

/s/  James Parkerson Roy and Stephen J. Herman