UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| ALL CASES | : | MAGISTRATE JUDGE SHUSHAN |
| | : | |

........................................................................................................................................

**RESPONSE OF THE UNITED STATES TO BP'S MOTION TO SUPPLEMENT THE
RECORD REGARDING HALLIBURTON'S POST-TRIAL GUILTY PLEA**

BP has pled guilty to obstruction of justice and criminal culpability for the deaths of eleven men.[1]  Halliburton now also stands convicted of criminal actions related to the BP Gulf Oil Spill.  BP's criminal conviction ranged from multiple counts of manslaughter to post-blowout falsehoods and obstruction concerning the amount of high pressure oil jetting into the Gulf from the Macondo Well. Halliburton's plea stems from its destruction of post-blowout computer modeling ("Displacement 3D" or "D3D") of the failed cement job of the well's production casing.

Were this dispute limited to BP seeking to punish Halliburton, one could be tempted to do no more than quote Shakespeare's Mercutio, "A plague on both your houses."  But BP now seeks to use Halliburton's guilty plea to prejudice the collective *plaintiffs* in the case (the United States, the States, and private plaintiffs) by seeking adverse inferences of fact that excuse BP's own role in the explosions, deaths, and blowout aboard the rig – and specifically, its decision to ignore the risk of a "SEVERE gas flow problem" in the event it were to use only seven centralizers for the well's production casing, rather than the twenty-one centralizers that demonstrated a far safer course.  OptiCem Report of April 18, 2010, TREX-00717A at 18 (caps in original).[2]

As the trial record reflects, BP used *only six* centralizers, even less than modeled in the seven centralizer OptiCem simulation that forewarned of a "SEVERE" problem.  *See*, United States' proposed Findings of Fact, Nos. 103-106.  At nearly the same time that BP's Houston-based Senior Drilling Engineer (Mark Hafle) determined that BP's six centralizer cement job on

---

[1] BP felonies for criminal behavior and other conduct committed prior to the BP Gulf Oil Spill were the subject of the Court's Order excluding from Phase One BP's prior convictions and other conduct.  *See*, Order and Reasons "… to Exclude Instances of Prior Alleged Improper Conduct and Prior Adverse Criminal, Civil or Regulatory Proceedings."  [Rec.Doc. 5634.]

[2] BP's dereliction concerning the number of centralizers is but one of BP's cementing-related failures in the design and operational implementation of the Macondo's cement job.  *See*, United States' proposed Findings of Fact, Nos. 77-143.

Macondo was on the "ragged edge" and that the jerry-rigged plan would result in a "shittie" cement job,[3] BP's priorities were summed up by its Senior Operation Engineer, who shrugged off the danger posed by the time and money-saving use of so few centralizers: "But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job. . . So [Macondo Wells Team Leader] Guide is right on the risk/reward equation."  TREX-01367.

In addition, BP's requested relief – a finding that the lack of centralization was not causal – is directly contradicted by the Phase One trial evidence.  The United States' cement expert, Glen Benge, unequivocally determined that "there was not adequate centralization" of the Macondo production casing, an opinion based on physical evidence concerning the well, including the caliper logs, the fact that the hole was washed out, and the extreme spacing of the centralizers.[4]  In short, the causal role of the centralizers in the blowout was based on evidence independent of computer modeling.  As Mr. Benge testified (Transcript at 2287:16-21):

> Q.  Mr. Benge, do you need a model to know whether there was adequate centralization at the bottom of the well?
>
> A.  I need a model to know what degree of centralization; but in looking at this, there was not adequate centralization.
>
> Q.  And that's based on?
>
> A.  That's based on 36 years of looking at wells like this.

Thus, even assuming that a HESI employee perceived no difference between the use of six or twenty-one centralizers in the D3D modeling, inadequate centralization and its causal role in the blowout stand on evidence independent of the OptiCem and D3D models.

---

[3] Trial Transcript (Benge) 2252:2-21; TREX-37031 at 94; TREX-04451 at 3.

[4] *See, e.g.*, Trial Transcript (Benge) 2291:15-2293:2, 2302:12–2306:5; Benge Expert Report, TREX-05990 at pp. 2, 3, 13-19, 22-24.  For further discussion of the centralizers' causal link to the blowout, *see* United States of America's Phase One Post-Trial Response Brief (Rec. Doc. 10733) at 20-22.

## BP's Motion and the Displacement 3D Modeling

BP's Motion stems from Halliburton's plea to the destruction of data related to its post-blowout D3D modeling.  Halliburton's destruction of the D3D modeling has been known to BP *since 2011* and, since that time, the issue has been the subject of numerous court-filings and Orders.[5]

The court record in Halliburton's criminal case establishes that the conviction was based simply on the fact that evidence was destroyed improperly.  Conversely, the conviction was *not* tethered: to proof of whether the "perceptions" of the D3D model's outputs objectively were valid; to the validity and accuracy of the data input/output of the D3D model itself; or to BP's rejection of the *pre-blowout* modeling that it dismissed as counter to its "risk/reward" scheme. We quote from the court record in the criminal case:

> The Task Force notes that, as indicated in the information in this matter, certain individuals conducting these simulations perceived that the simulations showed little difference between the use of 6 versus 21 centralizers. (*See* Rec. Doc. No. 1, ¶ ¶ 10 & 11; *see also* U.S.DOJ Office of Public Affairs, No. 130850, July 25, 2013, http://www.justice.gov/opa/pr/2013/July/13-crm-850.html (last visited 09/12/2013).) Whether their perceptions were objectively correct, whether the models they ran accurately represented the actual cementing job, and whether BP should have adopted HESI's original advice to use 21 centralizers (based on different computer modeling using a different program run prior to the blowout) is not a subject of the criminal resolution with HESI, and the Task Force has taken no position on those matters in connection with this resolution. (*Id.*)[6]

BP's motion also suffers from far deeper flaws.  In January 2012 the Court provided BP the opportunity to re-create the D3D modeling and discover for itself what the model did – or did

---

[5] The Court's Orders involving Halliburton's destruction of the D3D modeling data can be found at Rec.Doc 5307 ("Order re BP's Motion for Spoliation Sanctions"); Rec.Doc. 5562 (Order affirming Rec.Doc. 5307); and Rec.Doc. 7127 ("Order Regarding BP's Motion for Spoliation Sanctions").

[6] *United States v. Halliburton Energy Services, Inc.*, 13-cr-00165 (E.D. La.), Rec.Doc. 21 at p. 5, fn. 1.

not – demonstrate.  Order, Rec.Doc. 5307.[7]  Moreover, to assure the adequacy, impartiality, and admissibility of the re-creation, it was to have been performed under the auspices of the Court's Special Master.  BP fought the proffered opportunity and instead requested an Order – granted by the Court at Rec.Doc. 7127 – to *exclude* any evidence of the D3D modeling replication work.

Having actively worked to shield itself from impartial and court-supervised scrutiny of what the D3D model would show, as well as having precluded the laying of a proper, non-hearsay evidentiary foundation concerning the model itself, BP now is engaged in a skewed cherry-picking of models.[8]  *Prior* to the blowout and before litigation-driven concerns, BP's Engineering Team Leader (Greg Walz) candidly stated that despite reservations about the computer simulations, they should be honored:

> However, the issue, [sic] is that we need to honor the [OptiCem] modeling to be consistent with our previous decisions to go with the long string [liner]. Brett [Cocales] and I tried to reach you [Wells Team Leader Guide] twice to discuss things. [Operations Manager] David [Sims] was still here in the office and I discussed this with him and he agreed that we needed to be consistent with honoring the [OptiCem] model.

TREX-00796.  Following the blowout, BP commissioned *another* modeling job as part of its "internal" investigation.  As described in the expert report of Glen Benge, TREX-05990 at 19:

> The simulation work performed by Cementing Solutions, Inc. (CSI) in support of BP's internal investigation of the Macondo blowout demonstrates that more centralizers improved displacement, lowered ECDs, decreased the gas flow potential and lowered the predicted top of cement. [Footnote omitted.]  The decisions by BP's engineers to proceed with the cement job without adequate centralization added more risk to the job than simply requiring a remedial cement job at a later date. The lack of adequate centralization increased channeling, increased the risk of contamination of the slurries, and increased the risk of a barrier failure in the well.

---

[7] BP was offered access to the D3D software, the data inputs, and a Halliburton technician.  *See*, Rec.Doc. 5082 at 9-10.

[8] By way of example only, an underlying dispute exists as to the D3D model's relative accuracy *vis-à-vis* modeling foam cement jobs.  *See*, Rec.Doc. 4961 at 20.

BP's effort amounts to preference of a test that neither the Court nor the parties can examine -- either to examine BP's *or* Halliburton's faults.  BP's request also contradicts its prior arguments.  Halliburton's D3D modeling apparently was generated with the same inputs used for the pre-blowout OptiCem modeling that BP failed to "honor."[9]  But as an excuse for having ignored and failed to honor the OptiCem model's warnings in the days before the April 2010 disaster, BP argued at trial that Halliburton had input incorrect well data into the OptiCem model.  *See, e.g.*, Trial Transcript at 239:10-15.

So while BP argues on one hand that the OptiCem model should be ignored because of the incorrectness (according to BP) of the input data, BP argues from the other side of its mouth that the same data used in a different model (the D3D model) should be deemed reliable.  Moreover, when BP chose to reject the Court's offer to have the Special Master oversee a re-creation of the D3D model, it also discarded the opportunity to seek the input of whatever data BP felt was appropriate -- if indeed it claimed that Halliburton's original inputs were incorrect.

## Conclusion

The United States takes no position on what sanctions should be levied by the Court against Halliburton with respect to the facts stemming from its plea and conviction.  The primary result of BP's present motion, if granted, would be to prejudice – for BP's benefit – parties *other* than Halliburton, including the United States, the States, and private plaintiffs.  This result should be rejected, and not least for the reason that it suffers from insoluble evidentiary flaws that BP itself created through its rejection of the Court's offer of D3D modeling supervised by the Special Master.

---

[9] Rec.Doc. 4961 at 20: "The inputs used by [Halliburton] for this modeling [D3D modeling] consisted exclusively of data from the OptiCem modeling, which has already been provided to BP."

Dated: September 26, 2013.                         Respectfully submitted,

BRIAN HAUCK                                        ROBERT DREHER
Deputy Assistant Attorney General                  Acting Assistant Attorney General
Civil Division                                     Environment & Natural Resources Division

PETER FROST                                        SARAH HIMMELHOCH
Director, Torts Branch, Civil Division             Senior Litigation Counsel
Admiralty and Aviation                             SCOTT CERNICH
STEPHEN G. FLYNN                                   Senior Counsel
Assistant Director                                 ABIGAIL ANDRE
MICHELLE DELEMARRE                                 DEANNA CHANG
Senior Admiralty Counsel                           A. NATHANIEL CHAKERES
SHARON SHUTLER                                     RACHEL HANKEY
JESSICA SULLIVAN                                   Trial Attorneys
JESSICA McCLELLAN
MALINDA LAWRENCE
Trial Attorneys

/s/ R. Michael Underhill                           /s/ Steven O'Rourke
R. MICHAEL UNDERHILL, T.A.                         STEVEN O'ROURKE
Attorney in Charge, West Coast Office              Senior Attorney
Torts Branch, Civil Division                       Environmental Enforcement Section
U.S. Department of Justice                         U.S. Department of Justice
7-5395 Federal Bldg., Box 36028                    P.O. Box 7611
450 Golden Gate Avenue                             Washington, D.C. 20044
San Francisco, CA 94102-3463                       Telephone:  202-514-2779
Telephone:  415-436-6648                           Facsimile:  202-514-2583
Facsimile:  415-436-6632                           E-mail:  steve.o'rourke@usdoj.gov
E-mail:  mike.underhill@usdoj.gov

                                                   DANA J. BOENTE
                                                   United States Attorney
                                                   Eastern District of Louisiana
                                                   SHARON D. SMITH
                                                   Assistant United States Attorney
                                                   Eastern District of Louisiana
                                                   650 Poydras Street, Suite 1600
                                                   New Orleans, LA  70130
                                                   Telephone:  504-680-3000
                                                   Facsimile:  504-680-3184
                                                   E-mail:  sharon.d.smith@usdoj

                                                   Attorneys for the United States of America

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  September 26, 2013.                            /s/  R. Michael Underhill
                                                                       U.S. Department of Justice