## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : | MDL No. 2179 |
| | | SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER |
| …………………………………………………... | : | MAGISTRATE JUDGE SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO RULE 52(C) <u>WITH RESPECT TO THE SOURCE CONTROL SEGMENT</u>**

*COUNSEL FOR SUBMITTING PARTIES ARE LISTED AT END OF MEMORANDUM*

**TABLE OF CONTENTS**

Page

**TABLE OF AUTHORITIES** ................................................................................................. ii

**BACKGROUND** ......................................................................................................................1

**LEGAL STANDARD** ..............................................................................................................1

**ARGUMENT** ............................................................................................................................2

**I.**   **The Aligned Parties Have Not Proven That Any BP Conduct Was Negligent, Let Alone Grossly So.** ...................................................................................................2

    A.    BP's Source Control Plan Met All Industry And Regulatory Standards. ................3

    B.    BP Expeditiously Implemented Its Plan Under The Supervision Of The Federal Government ...................................................................................................4

    C.    In Light Of The Record, The Aligned Parties Have Not Proven Negligence, Let Alone More Serious Conduct. ..........................................................6

**II.**   **The Aligned Parties Have Not Proven That Superseding Causation Relieves Transocean Or Halliburton Of Liability.** ..................................................................7

    A.    The Aligned Parties Failed To Establish A Causal Nexus Between The Conduct To Which BP Pleaded Guilty And Any Actions Taken During The Response. ...........................................................................................................8

    B.    Transocean Has Pleaded Guilty To Being A Cause Of The Discharge, Which The Court Has Found Is Indivisible. ............................................................11

**III.**   **The Aligned Parties Have Not Proven That Additional Fault Should Be Allocated To BP Based On Its Preparations For Or Conduct Of The Response** ........................................................................................................................12

**CONCLUSION** .......................................................................................................................12

i

# TABLE OF AUTHORITIES

**Cases**

*Alcoa S.S. Co. v. Charles Ferran & Co.*,
  251 F. Supp. 823 (E.D. La. 1966) ....................................................................................... 11

*American River Transp. Co. v. Kavo Kaliakra SS*,
  148 F.3d 446 (5th Cir. 1998) ................................................................................................ 9

*Buckman v. Plaintiffs' Legal Committee*,
  531 U.S. 341 (2001) ............................................................................................................. 7

*Doyle v. Graske*,
  579 F.3d 898 (8th Cir. 2009) ................................................................................................ 9

*Exxon Co., U.S.A. v. Sofec, Inc.*,
  517 U.S. 830 (1996) ............................................................................................................. 7

*Gautreaux v. Scurlock Marine, Inc.*,
  107 F.3d 331 (5th Cir. 1997) ................................................................................................ 6

*Harper v. Zapata Off-Shore Co.*,
  741 F.2d 87 (5th Cir. 1984) .................................................................................................. 6

*In re Alex C Corp.*,
  2011 A.M.C. 157, 2010 WL 4292328 (D. Mass. Nov. 1, 2010) ........................................... 9

*In re Bandi*,
  683 F.3d 671 (5th Cir. 2012) ................................................................................................ 7

*In re Mid-South Towing Co.*,
  418 F.3d 526 (5th Cir. 2005) ................................................................................................ 8

*Jordan v. Kelly-Springfield Tire & Rubber Co.*,
  624 F.2d 674 (5th Cir. 1980) ................................................................................................ 6

*Michalik v. Hermann*,
  No. 99-3496, 2002 WL 1870054 (E.D. La. Aug. 12, 2002) .............................................. 11

*Nicor Supply Ships Assocs., Inc. v. Gen. Motors Corp.*,
  No. 85-1399, 1993 WL 262712 (E.D. La. July 7, 1993) ...................................................... 6

*Ritchie v. United States*,
  451 F.3d 1019 (9th Cir. 2006) .............................................................................................. 2

*Tubos de Acero de Mexico, S.A. v. Am. Int'l. Inv. Corp., Inc.*,
  292 F.3d 471 (5th Cir. 2002) ................................................................................................ 7

*Tullos v. Resource Drilling, Inc.*,
  750 F.2d 380 (5th Cir. 1985) ................................................................................................ 6

*United States v. Citgo Petroleum Corp.*,
    723 F.3d 547 (5th Cir. 2013) .................................................................................... 6

*United States v. Reliable Transfer Co.*,
    421 U.S. 397 (1975) ................................................................................................ 12

*United States v. Transocean Deepwater Inc.*,
    No. 13-001, Rec. Doc. 3-2 (Allocution) ¶ 15 (E.D. La.) ........................................... 11

*Weber v. Gainey's Concrete Prods., Inc.*,
    159 F.3d 1356 (per curiam) (5th Cir. 1998) ............................................................ 1

**Regulations**

30 C.F.R. § 254.1 .............................................................................................................. 4

**Rules**

Fed. R. Civ. P. 52(c) ..................................................................................................... 1, 2

## BACKGROUND

The Aligned Parties[1] have now had their opportunity to make an evidentiary presentation regarding their Source Control claims. As of the close of the Aligned Parties' case in chief, the evidence has demonstrated what BP's pre-trial memoranda anticipated it would demonstrate — namely, the Aligned Parties' inability to prove their case. *See* Rec. Docs. 11268 (BP Pre-trial Memorandum), 11349 (BP Pre-trial Reply). Accordingly, BP respectfully requests that the Court enter judgment based on partial findings pursuant to Federal Rule of Civil Procedure 52(c) and rule as a matter of law:

**(1)** that BP's conduct with regard to Source Control events as defined by this Court's orders, *see* Rec. Doc. 6592 at 2-3; Rec. Doc. 11087 at 2, was not negligent, let alone grossly so;

**(2)** that BP's conduct in this regard was not a superseding cause of any portion of the discharge; and

**(3)** that no additional fault should be allocated to BP based on BP's Source Control conduct, including spill preparedness.

## LEGAL STANDARD

Federal Rule of Civil Procedure 52(c) provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). "In a bench trial, the appropriate vehicle for dismissing a case as a matter of law at the close of plaintiff's evidence is a Rule 52(c) judgment on partial findings." *Weber v. Gainey's Concrete Prods., Inc.*, 159 F.3d 1356, 1356 n.1 (per curiam) (5th Cir. 1998).

---

[1] BP defines the term "Aligned Parties" to have the same meaning as it did in the Court's August 22, 2013 order. *See* Rec. Doc. 11087 ¶ (2)(a)(1).

Significantly, because the Court alone sits as finder of fact in a bench trial, Rule 52 permits this Court to weigh the evidence, rather than simply evaluating the evidence in the light most favorable to the non-moving party as it would in a jury trial. *See, e.g.*, *Ritchie v. United States*, 451 F.3d 1019, 1022-23 (9th Cir. 2006); Fed. R. Civ. P. 52(c) advisory committee note 2007 ("The standards that govern judgment as a matter of law in a jury case have no bearing on a decision under Rule 52(c).").

## ARGUMENT

The Aligned Parties entered the Source Control segment seeking to prove that BP "willfully ignored its obligation to prepare for an uncontrolled deepwater blowout, despite knowing the risks and consequences of a deepwater blowout," and "willfully, with the intent to deceive, misrepresented its knowledge of the flow rate causing it to eschew available source control methods that would have stopped the flow of oil weeks earlier and delayed the successful installation of the three-ram capping stack." Rec. Doc. 11411 (Aligned Parties' Pre-trial Statement) at 1; *see also, e.g.*, Rec. Doc. 1128 (PSC Amended Complaint) ¶¶ 478-486; Rec. Doc. 1872 (Alabama Amended Complaint) ¶¶ 71-73; Rec. Doc. 2031 (Louisiana Amended Complaint) ¶¶ 368-374; Rec. Doc. 8803 (Transocean Second Amended Answer) Affirmative Defenses ¶¶ 15-171; Rec. Doc. 8809 (Halliburton Supplemental Answer) ¶¶ 1-9. The Aligned Parties have now completed their case in chief. As explained below, the Aligned Parties have failed to prove what they said they would prove, and entry of judgment based on partial findings is appropriate.

**I.    The Aligned Parties Have Not Proven That Any BP Conduct Was Negligent, Let Alone Grossly So.**

BP's pre-trial memoranda explained that BP's conduct, both in preparing for the response and during the response itself, cannot be deemed negligent. *See* Rec. Docs. 11268 (BP Pre-trial

2

Memorandum), 11349 (BP Pre-trial Reply). BP's pre-spill planning met all industry and regulatory standards, and its specific Oil Spill Response Plan was approved by the Federal government. *See* Rec. Doc. 11268 (BP Pre-trial Memorandum) at 2-3. Once the spill occurred, BP implemented its pre-spill plan as expeditiously as possible under the Government's direct supervision and control, consistent with a number of unknown variables and an overarching concern not to make a fragile and developing situation worse. *See id.* at 3-5; Rec. Doc. 11349 (BP Pre-trial Reply) at 4; *see also* Allen Dep. Tr. at 69:23-70:14; Trial Tr. (Turlak) at 371:20-22. Although the Aligned Parties were on notice regarding BP's essential contentions, none of the evidence adduced by the Aligned Parties calls these important points into question.

### A. BP's Source Control Plan Met All Industry And Regulatory Standards.

Prior to the *Deepwater Horizon* incident, every major operator in the Gulf submitted to the Minerals Management Service ("MMS"), and received approvals of, response plans that were virtually identical to BP's plan. Under BP's plan, in the event of a sustained loss of well control — something no deepwater well had ever before experienced — BP planned for three overall approaches to recapture control of the well, under the supervision of the Unified Command. *First*, BP planned to employ ROV intervention in the short term to close the BOP rams subsea. Trial Tr. at 21:10-12 (PSC Opening). *Second*, BP planned to drill a relief well in order to intersect the wellbore close to the reservoir and permit the cementing of the well from the bottom. *Id.* *Third*, BP planned to develop a broad range of medium term options by quickly assembling a team of source control experts (including blowout response companies with which BP had pre-contracted) to assess specific blowout conditions and develop a range of options for closing in the flow from below before the relief well intersection. *Id.* at 19:13-18.

As of the close of the Aligned Parties' case in chief, there can be no dispute that BP's plans for short-tem, medium-term, and longer term Source Control interventions (1) met all

3

industry standards and (2) were approved by MMS as compliant with the requirement to "demonstrate that [the Operator] can respond quickly and effectively whenever oil is discharged from [its] facility." *See* 30 C.F.R. § 254.1(a); *see also* Trial Tr. at 20:18-25 (PSC Opening). Indeed, Aligned Parties expert Dr. Robert Bea agreed at trial that BP's plan met MMS requirements. There also can be no dispute that neither MMS regulations nor industry standards at the time of the blowout required the availability of a pre-built deepwater capping device, and Aligned Parties witness Robert Turlak admitted that no exploration company he was aware of had a prebuilt capping stack prior to April 20, 2010. *See* Trial Tr. (Turlak) at 412:12-16. Similarly, Dr. Bea admitted that Shell and Exxon did not have a capping stack as of April 20, 2010, and that the MMS did not require one. Nor is there a dispute at this juncture that the *Deepwater Horizon* spill was the first ever deepwater blowout to be shut in with such a device.

### B. BP Expeditiously Implemented Its Plan Under The Supervision Of The Federal Government.

As of the close of the Aligned Parties' case in chief, there also can be no dispute that BP marshaled enormous resources expeditiously in order to implement its pre-spill planning under the direct control and supervision of the federal government.

The Aligned Parties' trial presentation, which is now complete (subject to submission of deposition bundles already of record), failed to contradict the fact that, within hours of the incident, BP began implementing its MMS-approved response plan by assembling its team of source control experts — including well control specialists with whom it had pre-existing arrangements — to provide expertise and equipment in responding to the blowout and to begin work immediately on two different relief wells. *See* Trial Tr. at 20:1, 9-13 (PSC Opening). The Aligned Parties have failed to contradict that BP spent more than $1.6 billion on its source control effort. *See* Rec. Doc. 11268 (BP Pre-trial Memorandum) at 5; Trial Tr. at 27:17-18 (PSC

Opening).  And the Aligned Parties have adduced nothing to overcome the clear record evidence showing the Unified Command's prioritization of source control options was reasonable and would not have been altered by a decision to forgo attempting Top Kill, despite their raising issues in hindsight with the Unified Command's choice in late May 2010 to attempt Top Kill and not a BOP on BOP source control alternative at that time.

According to Admiral Allen's deposition, which is part of the Phase Two record, the "overarching concern" was that when the Deepwater Horizon lost control of the well, the wellbore might have been severely damaged, Allen Dep. Tr. at 54:22-55:9, and this risk, together with the sequence in which various options came on line and ready for use, largely dictated the sequence of source control options during the response.  All that Aligned Parties witnesses such as Perkin and Turlak could offer was that in this complex situation, they might have preferred that the BOP on BOP option have been implemented before Top Kill; but even they acknowledge the Unified Command and BP were evaluating the risks and benefits associated with numerous options including BOP on BOP.  *See, e.g.*, Trial Tr. (Turlak) at 377:4-10.  In the case of Turlak, he conceded he was not part of those charged with risk analysis of the options including the BOP on BOP alternative he had a role in developing.  *See* Trial Tr. (Turlak) at 375:11-14, 376:13-377:2, 385:21-25, 394:10-13.  Such a post hoc disagreement on the path chosen by the Unified Command (and BP) cannot support a claim of negligence, much less gross negligence.

In sum, the Aligned Parties have failed to produce evidence disputing that all spill response decisions were ultimately made by the Federal On-Scene Coordinator and not by BP, *see* Allen Dep. Tr. at 254:1-14 (BP did not execute any source control procedure that was not

approved by the government), and that BP provided the FOSC with the information it needed to evaluate and prioritize the various source control options.

### C. In Light Of The Record, The Aligned Parties Have Not Proven Negligence, Let Alone More Serious Conduct.

Given the state of the record as of the close of the Aligned Parties' case, the Aligned Parties have failed to meet their burden of proving even ordinary negligence. *See, e.g.*, *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997) (negligence exists where a person "fails to act as an ordinarily prudent person would act in similar circumstances"). Indeed, BP's undisputed compliance with industry and regulatory standards — while not dispositive as a matter of law — weighs heavily against a finding of even simple negligence. *See, e.g.*, *Jordan v. Kelly-Springfield Tire & Rubber Co.*, 624 F.2d 674, 676 n.1 (5th Cir. 1980); *Nicor Supply Ships Assocs., Inc. v. Gen. Motors Corp.*, No. 85-1399, 1993 WL 262712, at *10 (E.D. La. July 7, 1993).

The Aligned Parties fare even worse — given applicable law and the state of the evidence — in their attempt to prove any form of aggravated negligence. As BP has explained in other filings, the elements necessary to support an award of punitive damages under general maritime law include (1) an extreme departure from the standard of care; and (2) a mental state of *at least* conscious indifference to known risk. *See* Rec. Doc. 10466 (BP Phase One Post-trial Brief) at 2-12; *see also, e.g.*, *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985) (punitive damages under maritime law "require an element of bad faith") (quoting *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 90 (5th Cir. 1984)); *cf. United States v. Citgo Petroleum Corp.*, 723 F.3d 547, 554-55 (5th Cir. 2013) (gross negligence under Clean Water Act "tend[s] to merge" with willful, wanton, and reckless conduct").

Nor do the Aligned Parties have a viable "fraud" claim, as they do not claim that the alleged fraudulent statements or omissions were made to them or that they relied on them (as opposed to the US Government). The Aligned Parties' fraud allegations do not allege that any of the Aligned Parties themselves were defrauded. The Aligned Parties do not assert that they themselves relied on BP's statements. Accordingly, the Aligned Parties themselves may not maintain a fraud claim. *See Tubos de Acero de Mexico, S.A. v. Am. Int'l. Inv. Corp., Inc.*, 292 F.3d 471, 479 (5th Cir. 2002) ("Two elements essential to establishing fraud are (1) an intent to defraud or to gain an unfair disadvantage and (2) *a resulting loss or damage.*") (emphasis added); *In re Bandi*, 683 F.3d 671, 675 (5th Cir. 2012) (describing the "common-law standard of justifiable reliance for actual fraud"); *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) (no right of action for fraud on governmental decision maker leading to the government's approval of actions leading to alleged harms).

As explained above, the Aligned Parties' evidence provides nothing remotely sufficient to negate the fact that BP had every incentive to stop the flow of oil as quickly as possible. Nor do the Aligned Parties disagree that BP assembled and funded an enormous spill response effort and acted, as best it could under extremely trying circumstances, in accordance with these obvious incentives. In light of the record evidence, the Aligned Parties have failed to prove simple negligence by BP as to source control, much less any form of heightened negligence.

## II.  The Aligned Parties Have Not Proven That Superseding Causation Relieves Transocean Or Halliburton Of Liability.

The doctrine of superseding causation may relieve a negligent defendant of liability under maritime law "where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996). Seeking to stretch

7

that doctrine past its breaking point, the Aligned Parties contend that BP's "fraud" with respect to the flow rate was a superseding cause with respect to some component of the discharge.  *See, e.g.*, Rec. Doc. 11411 (Aligned Parties' Pre-trial Statement) at 18.[2]  That argument both fails on the record evidence and — at least with respect to Transocean — as a matter of law pursuant to the Court's February 2012 summary judgment ruling.  *See* Rec. Doc. 5809 at 12.

> A. **The Aligned Parties Failed To Establish A Causal Nexus Between The Conduct To Which BP Pleaded Guilty And Any Actions Taken During The Response.**

One of the Aligned Parties' essential themes at trial continues to be that BP's "fraud" — apparently directed at the U.S. government, not them — delayed the capping of the well by leading the Unified Command to select Source Control methods that had no chance of succeeding.  *See, e.g.*, Rec. Doc. 11411 (Aligned Parties' Pre-trial Statement) at 10; *see also* Trial Tr. at 16:9-16 (PSC Opening), 28:16-29:1 (Transocean Opening), 42:4-12 (Halliburton Opening).  But while there is no dispute that BP has accepted responsibility for making certain incorrect statements to Congress by pleading guilty to an obstruction charge, the Aligned Parties failed to establish any causal link or relevance between that conduct and BP's or the United States government's real-world spill response activities.

As noted above, the Aligned Parties do not have viable fraud claims of their own.  To the extent the Aligned Parties' "fraud" mantra is invoked under the claims the Aligned Parties do bring under maritime law, a defendant's "fault in the abstract does not give rise to liability."  *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005) (footnote omitted).  "Instead, the fault must be a contributory and proximate cause of the damages sustained."  *Id.*; *see also*

---

[2]  Transocean and Halliburton do not contend that any other BP conduct, such as its pre-spill preparedness, constituted a superseding cause.  *See* Rec. Doc. 11411 (Aligned Parties' Pre-trial Statement) at 18-19; Rec. Doc. 8803 (Transocean Second Amended Answer) Affirmative Defenses ¶¶ 15-171; Rec. Doc. 8809 (Halliburton Supplemental Answer) ¶¶ 1-9.

*American River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (same). Hence, a "superseding cause" that does not cause any harm is no superseding cause at all. *See In re Alex C Corp.*, 2011 A.M.C. 157, 174, 2010 WL 4292328 (D. Mass. Nov. 1, 2010) (alleged negligence by ship crew not a superseding cause of oil spill when it had no causal effect leading to the spill); *see also Doyle v. Graske*, 579 F.3d 898, 904 (8th Cir. 2009).

Viewed through the appropriate legal lens, the Aligned Parties have failed to establish the requisite factual support for superseding cause. *First*, as of the close of their case-in-chief, the Aligned Parties have adduced no evidence connecting the conduct to which BP pleaded guilty and any actual choices made during the response. Critical government witnesses have admitted in testimony that is part of the Phase Two record that no actual reliance was placed upon BP's statements about the flow rate, such that those statements are not relevant to the Phase Two trial. *See, e.g.*, Hunter 10/31/2012 Dep. Tr. at 683:23-684:14; Allen Dep. Tr. at 210:6-23, 300:8-16; *see also* Trial Tr. (Wilson) at 170:11:18 (Dr. Wilson has no opinion on "what the government would have done differently had they been properly informed").

*Second*, the evidence demonstrates that the government was aware of worst-case flow rate estimates before Top Kill was authorized. *See, e.g.*, Trial Tr. (Wilson) at 167:15-21 (agreeing that "[w]hen the United States government was making decisions with respect to source control, it knew or had information that the the worst-case discharge could be as high as 100,000 barrels"); *id.* at 166:2-6 (Wilson) (similar); *see also id.* at 162:18-163:4 (Wilson) (discussing information provided to the government on May 21); *id.* at 256:17-257:13 (Perkin) (on May 25, 2010, Dr. McNutt aware of evidence suggesting flow rate between 14,000 and 20,000 bopd). Yet the documentary record is clear that using another drilling rig's BOP, as opposed to a purpose-built capping stack, was simply too risky an option to win governmental

9

approval.  *See, e.g.*, Trial Tr. (Perkin) at 263:21-267:9, 269:6-10, 295:20-297:2; TREX 9146; *see also* Trial Tr. (Perkin) at 270:4-25 (discussing difficulties of attaching BOP with LMRP in place); *id.* 379:4-382:5 (Turlak) (similar); TREX 10522; TREX 10647; TREX 11677; TREX 142399; TREX 144989; TREX 145079.  Under those circumstances, Dr. Perkin's hindsight opinion that the Unified Command should have proceeded first with BOP on BOP is probative of very little, especially when another Aligned Parties witness (Turlak) testified he was aware of no discussion during the response about Perkin's idea of placing a new BOP on top of the LMRP without removing it first.  Trial Tr. (Turlak) at 378:16-379:3.

The United States itself could never mount a fraud case based on such flimsy evidence, and the Aligned Parties' claims fare no better.  To be sure, several government decision makers such as Secretary Chu, *see* Chu Dep. Tr. at 199:24-200:9, expressed a wish that BP had provided more of BP's internal flow rate modeling information during the spill response.  But not one United States witness has stated, specifically, what would have been done to cap the well sooner, or what source control steps would have been taken differently, if even more flow rate modeling had been shared.  The Aligned Parties should not be allowed to blame BP by pointing to conduct that had no concrete, causal impact on the real-world prioritization of spill response activities.

Nor, even if BP's statements about flow rate had in fact affected the response, would that suffice to demonstrate superseding cause.  Under common law principles, relevant considerations in evaluating whether an intervening event is a superseding cause include whether "its intervention brings about harm different in kind from that which would have resulted from the actor's negligence."  Restatement (Second) of Torts § 442(a), and whether "the intervening force is operating independently of any situation created by the actor's negligence," *id.* § 442(c); *see also id.* §§ 442A, 442B.  Here, the harm to which Transocean and Halliburton point —

discharged oil — is the same type of harm as was risked by their original negligence, and the intervening force did not operate independently of the situation created by that negligence. Accordingly, a superseding cause defense cannot succeed.

### B. Transocean Has Pleaded Guilty To Being A Cause Of The Discharge, Which The Court Has Found Is Indivisible.

Even if the facts could support a superseding cause argument — which they cannot — Transocean's guilty plea precludes it from making such an argument. As noted above, superseding causation is premised on a principle that a relevant chain of causation can be broken by an intervening event. But while Transocean now asserts that there is a portion of the discharge that it did not cause, it has pleaded guilty to being a "proximate cause of the blowout and the discharge of certain quantities of oil and natural gas from the Macondo well into the Gulf of Mexico." *See United States v. Transocean Deepwater Inc.*, No. 13-001, Rec. Doc. 3-2 (Allocution) ¶ 15 (E.D. La.).

Transocean apparently wishes to suggest that there is some portion of the discharge for which it is not responsible. The Court, however, has previously rejected the notion that the discharge may be "divided" into discrete slices under the doctrine of divisibility. *See* Rec. Doc. 5809 at 12 (rejecting argument that "liability under OPA is divisible").[3] Because Transocean has admitted that it was a proximate cause of the discharge, this Court's rulings preclude it from contending that it caused some, but not all, of the discharge. *See also Alcoa S.S. Co. v. Charles Ferran & Co.*, 251 F. Supp. 823, 832 (E.D. La. 1966) (a tortfeasor cannot avoid liability for

---

[3] As the Court is aware, BP's position is that a divisibility defense is available under both OPA and the Clean Water Act. *See, e.g.*, Rec. Doc. 10467 (BP's Phase One Proposed Findings of Fact and Conclusions of Law) ¶¶ 2698-2699. The Court has ruled otherwise, and unless its holding is disturbed on appeal it is law of the case. *See, e.g.*, *Michalik v. Hermann*, No. 99-3496, 2002 WL 1870054, at *7-8 (E.D. La. Aug. 12, 2002). In pointing out the consequences of the Court's rulings, BP does not waive its right to continue to contend in this Court, in a future appeal, or in other appropriate forums that such a divisibility defense is available to BP.

11

harm proximately caused by its negligent conduct by casting the subsequent events as independent torts).

### III. The Aligned Parties Have Not Proven That Additional Fault Should Be Allocated To BP Based On Its Preparations For Or Conduct Of The Response.

Under *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975), liability for a maritime accident "is to be allocated among the parties proportionately to the comparative degree of their fault." *Id.* at 411. For reasons discussed above, the Aligned Parties have proven no fault with respect to BP's preparations for, or conduct during, the response. For the same reasons that the Aligned Parties have failed to demonstrate that BP's conduct was negligent or otherwise culpable, they have failed to demonstrate that any additional fault should be allocated to BP based on its conduct in preparing for or conducting the spill response.

## CONCLUSION

For the reasons discussed above, BP respectfully requests that the Court enter judgment on partial findings in its favor.

| | |
|---|---|
| October 1, 2013 | Respectfully submitted, |
| | |
| Richard C. Godfrey, P.C. | */s/ Don K. Haycraft* |
| J. Andrew Langan, P.C. | Don K. Haycraft (Bar #14361) |
| Barry E. Fields, P.C. | R. Keith Jarrett (Bar #16984) |
| Matthew T. Regan, P.C. | LISKOW & LEWIS |
| Hariklia Karis, P.C. | 701 Poydras Street, Suite 5000 |
| KIRKLAND & ELLIS LLP | New Orleans, LA  70139-5099 |
| 300 North LaSalle Street | Telephone:  504-581-7979 |
| Chicago, IL  60654 | Facsimile:  504-556-4108 |
| Telephone:  312-862-2000 | |
| Facsimile:  312-862-2200 | Robert C. "Mike" Brock |
| | COVINGTON & BURLING LLP |
| Robert R. Gasaway | 1201 Pennsylvania Avenue, NW |
| Steven A. Myers | Washington, DC  20004-2401 |
| KIRKLAND & ELLIS LLP | Telephone:  202-662-5985 |
| 655 Fifteenth Street, NW | Facsimile:  202-662-6291 |
| Washington, DC  20005 | |
| Telephone:  202-879-5000 | |
| Facsimile:  202-879-5200 | |

*Attorneys for BP Exploration & Production Inc. and BP America Production Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 1st day of October, 2013.

/s/  Don K. Haycraft