# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010. | § § § | MDL NO. 2179 SECTION:  J |
| Applies to: No. 10-2771, and All Cases | § § § | JUDGE BARBIER MAG. JUDGE SHUSHAN |

**HALLIBURTON'S RESPONSE TO BP'S MOTION FOR LEAVE TO SUPPLEMENT RECORD AND FILE MEMORANDUM REGARDING HALLIBURTON'S POST-TRIAL GUILTY PLEA AGREEMENT**

_____

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF THE ARGUMENT ..................................................................1

II.    RELEVANT FACTUAL & PROCEDURAL BACKGROUND ........................................3

III.   ARGUMENT .........................................................................................7

     A.    Legal Standard for Re-Opening the Phase One Record...........................................7

     B.    The Record Should Not Be Reopened Because the Information Contained In the Plea Agreement is Neither "New" Nor Material.......................................................7

          1.    The number of unauthorized deletions. ........................................................8

          2.    The timing of the unauthorized deletions. ....................................................9

          3.    How the unauthorized deletions occurred.....................................................9

          4.    BP has had the D3D Modeling since June 2012.........................................10

     C.    The Record Should Not Be Reopened Because No Relevant "Evidence" Was Destroyed. .....................................................................................11

     D.    The Record Should Not Be Reopened Because the Criminal Information and the Press Release Parroting the Information Are Inadmissible. .................................12

     E.    Legal Standard for Adverse Inference Based Upon Spoliation. ...........................14

          1.    Relevant evidence was not destroyed. .......................................................15

          2.    The deleted D3D Modeling does not support the inferences sought by BP........................................................................................18

          3.    The deleted D3D Modeling is not favorable to BP, and BP has suffered no prejudice...................................................................................21

     F.    BP's Proposed Findings Are Disproportionate to Any Alleged Harm and Bear No Relationship to the Purpose of the D3D Modeling.............................................21

IV.   CONCLUSION.....................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alex v. Mgmt. & Training Corp.*,
No. B-10-304, 2012 U.S. Dist. LEXIS 68511 (S.D. Tex. Feb. 24, 2012) ..............................13

*Consol. Aluminum Corp. v. Alcoa, Inc.*,
244 F.R.D. 335 (M.D. La. 2006) ..................................................................................15, 21

*Dresser v. Ohio Hempery Inc.*,
No. 98-2425, 2011 U.S. Dist. LEXIS 62757 (E.D. La. June 13, 2011)..................................13

*Int'l Fid. Ins. Co. v. Marques*
(*In re Marques*), 358 B.R. 188 (Bankr. E.D. Pa. 2006)..........................................................8

*Martinez-Perez v. Gonzales*,
417 F.3d 1022 (9th Cir. 2005) ...............................................................................................12

*NLRB v. Jacob E. Decker & Sons*,
569 F.2d 357 (5th Cir. 1978) ...................................................................................................7

*PTSI, Inc. v. Haley*,
No. 684 WDA 2012, 2013 Pa. Super. LEXIS 751 (Pa. Super. Ct. 2013)...............................15

*Rochez Brothers, Inc. v. Rhoades*,
527 F.2d 891 (3d Cir. 1975)......................................................................................................7

*Silvestri v. Gen. Motors Corp.*,
271 F.3d 583 (4th Cir. 2001) ..................................................................................................22

*U.S. v. Avery*,
719 F.3d 1080 (9th Cir. 2013) ...............................................................................................12

*U.S. v. Swanberg*,
370 F.3d 622 (6th Cir. 2004) ...........................................................................................12, 13

*Yelton v. PHI, Inc.*,
279 F.R.D. 377 (E.D. La. 2011) (aff'd, 284 F.R.D. 374 (E.D. La. 2012))............14, 15, 21, 22

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971)...................................................................................................................7

### STATUTES

18 U.S.C. §1030(a)(5)(A) .........................................................................................................11

18 U.S.C. §1030(e)(2)(B) ........................................................................................................11

18 U.S.C. §1030(e)(8)...............................................................................................................11

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill By The Oil Rig | * | MDL NO. 2179 |
| "Deepwater Horizon" In the Gulf of | * | |
| Mexico on April 20, 2010 | * | SECTION:  J |
| | * | |
| Applies to: No. 10-2771, | * | JUDGE BARBIER |
| and All Cases | * | MAG. JUDGE SHUSHAN |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## HALLIBURTON'S RESPONSE TO BP'S MOTION FOR LEAVE TO SUPPLEMENT RECORD AND FILE MEMORANDUM REGARDING HALLIBURTON'S POST-TRIAL GUILTY PLEA AGREEMENT

Halliburton submits this Response to BP Exploration & Production Inc.'s and BP America Production Company's (together, "BP") Motion for Leave to Supplement Record and File Memorandum Regarding Halliburton's Post-Trial Guilty Plea Agreement (Rec. doc. 11005) (the "Motion"), and respectfully shows the Court the following:

## I.    SUMMARY OF THE ARGUMENT

BP seeks in its Motion to reopen an issue resolved more than a year ago.  On August 2, 2012, after BP declared that it was time for the Displace 3D modeling (the "D3D Modeling") saga to end, BP itself sought and obtained an order that excluded the use of the replicated D3D Modeling from the Phase One trial.  *See* Exhibit 1, August 2, 2012 BP Letter Brief, at 12.  BP made this declaration after exhaustive briefing, an objective forensic examination, and successful replication of the D3D Modeling by BP's experts, Elysium Digital, LLC ("Elysium").  The replication was performed under the direction of Captain Englebert with the "excellent" cooperation of Halliburton.  BP now reverses its position and requests unwarranted adverse findings against Halliburton – all to perpetuate its agenda of finger-pointing and blaming others for its own pre-incident conduct that caused the blowout.

Halliburton agreed to plead guilty to a misdemeanor violation of 18 U.S.C. § 1030(a)(5)(A) based upon the *unauthorized* deletion of records created *after* the incident.  BP claims in its Motion that Halliburton's Cooperation Guilty Plea Agreement (the "Plea Agreement") and a DOJ press release constitute "new" and "key" evidence of which it was somehow deprived during the Phase One trial.  But, there is no "new" or "key" evidence.  As set forth in detail below, the D3D Modeling is not relevant to any Phase One issue.  Regardless, BP has had possession of the D3D Modeling, which compares the use of 7 and 21 centralizers, since its replication in June 2012.

BP's Motion and its pending Motion for Sanctions (Rec. doc. 8977) should be denied because:

(1)     BP has known about the deletion of the D3D Modeling since December 19, 2011 – *i.e.*, there is no "new" information.  Rec. doc. 4961.

(2)     The D3D Modeling was successfully replicated, and it shows the same channeling that appeared in the modeling performed in 2010 – *i.e.*, BP was not deprived of its use.  *See* Rec. doc. 7127; *see also* Exhibit 4, August 8, 2012 Halliburton Letter Brief at 3.

(3)     BP made a tactical decision to exclude the use of the replicated D3D Modeling from the Phase One trial – *i.e.*, BP's deliberate choice.  *See* Exhibit 1, August 2, 2012 BP Letter Brief, at 12.

Halliburton did the right thing when an executive instructed its Cementing Technology Director to preserve materials related to the Macondo well.  The Allocution clearly shows that the deletion of the D3D Modeling was unauthorized, and the Court should reject BP's attempt to use a DOJ press release to get around the facts of the Allocution and to back door the inadmissible criminal Information into the record.  Like its reversal of position regarding the D3D Modeling, BP asks this Court to ignore yet another order that BP itself demanded.  BP sought and obtained an order excluding from evidence all prosecutorial documents associated

with BP's own plea allocution for conduct actually causing the incident.  In the words of BP, these ancillary prosecutorial documents are hearsay and "establish nothing."  Consistent with BP's prior emphatic arguments, the DOJ press release is inadmissible because it is simply a recitation of the inadmissible criminal Information and it contains double hearsay.

The Court should reject BP's attempt to maneuver around the orders it previously sought and utilize the Plea Agreement and the DOJ press release to obtain unwarranted findings that are both contrary to the evidence and unrelated to the deleted and replicated D3D Modeling.

## II.       RELEVANT FACTUAL & PROCEDURAL BACKGROUND

On December 5, 2011, BP filed its first Motion for Sanctions related to post-incident cement testing and D3D Modeling.  *See* Rec. doc. 4799.  On December 19, 2011, Halliburton disclosed both the circumstances surrounding the unauthorized deletion of the D3D Modeling and the fact that the modeling could be recreated:

> Sometime in May 2010, Anthony Badalamenti and Tommy Roth requested 3D-Modeling of the cement job on the production casing in the Macondo well to be performed utilizing HESI's Displace 3D software ('the Modeling').  The Modeling was performed by David Bedford and Mark Savery using inputs from the OptiCem report prepared by Jesse Gagliano.  The results were shown to Badalamenti and Roth.  The models were deleted from Bedford and Savery's computers, but can be replicated by using the same inputs that were originally used by Gagliano in his OptiCem report.

Rec. doc. 4961 at 14.

On January 4, 2012, Halliburton offered BP access to its proprietary Displace 3D software so that BP's experts could replicate the deleted models.  Rec. doc. 5058-1 at 10-11. Halliburton also offered to supply the inputs and a technician to assist BP with the re-creation. *Id.*

Following extensive briefing on BP's first Motion for Sanctions, *see* Rec. docs. 4961, 5024, 5058-1, 5123, Magistrate Judge Shushan ordered the forensic examination of the computers that ran the D3D Modeling and further ordered Halliburton and BP to meet-and-confer on whether the modeling could be replicated (the "Order").  Rec. doc. 5307.  After the Court overruled BP's objection to and appeal from the Order, BP, Halliburton, Special Master Captain Englebert, and BP's hand-picked expert, Elysium, negotiated and signed a Recovery Protocol.  Pursuant to the Recovery Protocol, Halliburton turned over Mark Savery's computer and two drive images of David Bedford's computer (together, the "Hardware") to Captain Englebert.[1]  Exhibit 2, July 18, 2012 Elysium Digital Report at ¶¶ 1.2, 1.3; *see also* Exhibit A, Recovery Protocol attached thereto.  Elysium received the Hardware from Captain Englebert on February 28, 2012, and thereafter forensically examined the Hardware under the oversight and supervision of Captain Englebert.  *Id*. at ¶¶ 1.3-1.4.

Halliburton fully cooperated and worked closely with Captain Englebert, BP, and Elysium during the forensic examination of the Hardware.  Captain Englebert facilitated consistent communication among the parties throughout the entire process:

> Each time new materials from Elysium were ready, Captain Englebert emailed [BP and Halliburton] to notify them of the new materials and to request they review them for relevance.  On several occasions, Captain Englebert, [BP, Halliburton], and Eysium held follow-up conference calls to discuss the results in greater detail, and to determine next steps.

*Id*. at ¶1.16.  Elysium was unable to retrieve the deleted modeling.  *Id*. at ¶1.12.  Thereafter, BP, Halliburton, and Elysium entered into a Recreation Protocol which allowed Elysium, under the

---

[1] Halliburton identified and turned over an additional Mark Savery drive image for inclusion in the examination on April 12, 2013.  Exhibit 2, Elysium Report at ¶1.12 (citing Exhibit G thereto).

oversight and supervision of Captain Englebert, to replicate the D3D Modeling.  *See id*. at ¶1.18; *see also* Exhibit L, Recreation Protocol attached thereto.

To assist Elysium with replicating the models, Halliburton provided Elysium with its D3D software, the software operator manual, and all inputs utilized by Savery and Bedford.  *Id*. at ¶¶ 1.19-1.21 (citing Exhibit M, chain of custody records, Exhibit N, inputs, and Exhibit V, the certification of the inputs).  Halliburton also made Savery readily available to Elysium "to ensure that the use of inputs and software operation procedures in the recreation process would be correct and consistent with [his] recollections."  *Id*. at ¶¶ 1.20-1.22 ("Extensive discussions with Mark Savery were essential to ensure the values from the input materials provided by Halliburton would be entered into Displace 3D in a manner consistent with his recollections.")

In June 2012, Elysium generated two Displace 3D models, one for each set of centralizer inputs.  Exhibit 2, Elysium Report at ¶1.22.[2]  Elysium then produced AVI screen-capture videos showing the D3D visualized results, PNG screen capture images, and PDF reports from the replicated modeling.  *Id*. at ¶1.22 (citing Exhibit P, outputs, and Exhibit U, certification of the

---

[2] With respect to the accuracy of the replication, Mark Savery declared:

> I reviewed Elysium's inputs that I believe are the same Displace 3D inputs that I used in May and/or June 2010 to model the cement job on the production casing of the Macondo well.  I believe these inputs would best reproduce my file(s) in question in 2010, to the best of my knowledge and recollection.  Any engineering assumptions or decisions made to create the inputs were, to the best of my recollection, the same engineering assumptions or decisions I made in 2010.
>
> ***
>
> Further, I reviewed the Displace 3D Software outputs generated by Elysium pursuant to the Stipulation and Agreement and certify, to the best of my recollection that the modeling output is a fair and accurate representation of the Displace 3D modeling produced in May and/or June 2010.

Exhibit 2, Elysium Report at Exhibit U, Mark Savery Certification.  Captain Englebert reviewed and commented on Mark Savery's Certification prior to its execution.

outputs).  Elysium's modeling replicated the D3D modeling performed by Savery and Bedford in mid-2010.[3]  Exhibit 2, Elysium Report at Exhibit U, Mark Savery Certification.

Elysium completed its examination on June 27, 2012 and issued its report on July 18, 2012.  Exhibit 2, Elysium Report at ¶1.15  At the end of the replication process, Captain Englebert commended Halliburton for its excellent cooperation and participation in the process.  *See* Exhibit 3, E-mail from Capt. Englebert to Judge Shushan (July 26, 2012 07:23 CST) ("Halliburton provided additional information readily . . . Their cooperation was excellent. . . Elysium . . . recreated the Displace 3D modeling per Halliburton's certified inputs.  Halliburton's expert also certified the output files").

Despite the considerable effort expended to replicate the deleted D3D Modeling, for reasons only known to BP, BP sought "an order precluding the introduction of the attempted replication modeling at trial...."  Exhibit 1, August 2, 2012 BP Letter Brief at 12.  After analyzing the models that compared 21 versus 7 centralizers, BP itself elected not to use the replicated models or Savery's certification during the Phase One trial and asked the Court to specifically exclude them from evidence.  In response to BP's request, Halliburton informed the Court that it did not intend to use the D3D Modeling during the Phase One trial.  *See* Exhibit 4, August 8, 2012 Halliburton Letter Brief at 2.  On August 16, 2012, the Court ordered that "evidence of the replication work is inadmissible at the trial of the action."  Rec. doc. 7127 at 2. BP neither appealed nor objected to this ruling.

---

[3] BP requested that Tommy Roth certify whether the output "replicates" the deleted D3D Modeling.  Rec. doc. 6449 at 3-4 ("have Roth certify whether the output 'replicates' the deleted Displace 3D output referenced in his July 25, 2010 e-mail.").  Halliburton provided BP with Roth's attorney's contact information.  Rec. doc. 6447 at  3. However, to Halliburton's knowledge, BP never contacted Roth's counsel.

### III.  ARGUMENT

**A.  Legal Standard for Re-Opening the Phase One Record.**

A motion to re-open the record after trial is committed to the sound discretion of the trial judge.  *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331 (1971); *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 891, 894 n.6 (3d Cir. 1975); *see also* 5/17/2013 Working Grp. Conf. Tr. 26:24-25 (Following the end of the Phase One trial and the final Marshaling Conference, the Court stated that the Phase One record was closed).  The court's decision is informed by the following factors: what burden is placed on the parties and their witnesses; what undue prejudice may result by not taking new testimony; and what consideration should be given to judicial economy.  *Id.*; *see also NLRB v. Jacob E. Decker & Sons,* 569 F.2d 357, 363-64 (5th Cir. 1978) (quoting *United States v. 41 Cases, More or Less,* 420 F.2d 1126, 1132 (5th Cir. 1970) ("newly discovered evidence must be evidence in existence of which a party was excusably ignorant, discovered after trial. In addition facts implying reasonable diligence must be provided by the movant. The evidence must be material, and not cumulative or impeaching, and it must be such as to require a different result").

**B.  The Record Should Not Be Reopened Because the Information Contained In the Plea Agreement is Neither "New" Nor Material.**

The Plea Agreement does not provide any new information related to the cause of the blowout.  In its Motion, BP identifies the following as "new" information: (1) the number of simulations "destroyed"; (2) the timing of the "destruction"; and (3) how the "destruction" occurred.  As set forth below, BP and the other parties had prior knowledge of this information, but even assuming *arguendo* that BP lacked specific details regarding the unauthorized deletions, BP certainly knew before the Phase One trial that simulations for both 7 and 21 centralizers were

performed and deleted, but chose not to call or question any witness about simulation comparisons during the Phase One trial.  The Court should weigh the probative value of what BP mischaracterizes as "new" information in deciding whether to reopen the record.  *Int'l Fid. Ins. Co. v. Marques* (*In re Marques*), 358 B.R. 188, 198 (Bankr. E.D. Pa. 2006) ("where the proffered 'new' evidence is insufficiently probative to offset the procedural disruption caused by the opening, trial courts act within their discretion to refuse to reopen the record").  The evidence that BP complains about is not new; rather, it is cumulative and irrelevant to anything that occurred at Macondo on April 20, 2010, as evidenced by BP's deliberate acts to seek and obtain an order excluding its use during the Phase One trial.

      1.    *The number of unauthorized deletions.*

The Court should reject BP's claim that it learned for the first time, in the Plea Agreement, that four simulations were deleted.  In its Response to BP's first Motion for Sanctions, Halliburton disclosed that Savery <u>and</u> Bedford ran and deleted simulations (*i.e.*, a minimum of two).  Rec. doc. 4961 at 14.  Moreover, Halliburton turned over hardware from both Savery's <u>and</u> Bedford's computers.  Exhibit 2, Elysium Report at ¶1.2.  Similarly, BP's assertion that the Plea Agreement reveals new evidence of "alternative predictions of the cement job" is nonsensical.  BP complained about the replicated 7 versus 21 centralizer modeling last year.  *See* Exhibit 1, August 2, 2012 BP letter brief at 3 ("Unbeknownst to BP, Halliburton provided Elysium with instructions to run not one model, but two.") (*i.e.,* two for both Savery and Bedford is four).  When Savery performed the D3D Modeling referenced in the July 25, 2010 email, he did so using both 7 and 21 centralizers, and Halliburton never represented anything to the contrary.  *See* Exhibit 2, Elysium Report at Exhibit U, Mark Savery Certification (Elysium's inputs were "the same Displace 3D inputs that I used in May and/or June 2010 to model the

cement job on the production casing of the Macondo well").   Accordingly, BP had direct knowledge, certainly no later than July 2012, that four simulations were deleted.  Again, if BP lacked any specific details, it had every opportunity to obtain such details during the modeling replication process and by calling and questioning witnesses during the Phase One trial.

> 2.    *The timing of the unauthorized deletions.*

BP now complains that it did not know that Savery and Bedford deleted their results at different times and pursuant to separate instructions.  Rec. doc. 11005-1 at 3.  BP argues that Halliburton should have disclosed that Savery and Bedford were told to delete their modeling at separate times.  The specific timing of the deletions is immaterial.  Halliburton clearly disclosed who requested the modeling and when, who created the modeling, who reviewed the modeling, and that the modeling was deleted from Savery's and Bedford's computers.  *See* Rec. doc. 4961 at 14.  If BP thought details regarding the exact timing of the deletions were material, it would have simply asked for such details during the replication process or during the Phase One trial.

> 3.    *How the unauthorized deletions occurred.*

BP argues that it learned, only via the Plea Agreement, that Halliburton's spoliation was "more deliberate than previously acknowledged."  Rec. doc. 11005-1 at 4.  This argument should be rejected because Halliburton has never stated or implied that the deletions were accidental or inadvertent (though they were certainly not authorized by Halliburton).  Halliburton itself reacted quickly in its efforts to preserve documents.  On April 26, 2010, only days after the Macondo Incident and before the issuance of any preservation order, Halliburton began issuing expansive legal holds relating to the Macondo project.  Rec. doc. 4961, at p. 8.  Halliburton's Cementing Technology Director himself was instructed by a Halliburton executive to preserve material

related to the Macondo well.  The deletion of the models was unauthorized.  Exhibit 6, Plea Agreement at Exhibit A ¶ 9.

BP, however, has consistently alleged that the unauthorized deletions constitute "purposeful destruction" and "malfeasance."  *See* Rec. doc. 5024-2 at 4; Rec. doc. 6449 at 3. Although the Plea Agreement may provide more details relating to the deletion of the modeling than BP may have previously known, it does not show that the unauthorized deletion was performed in a manner that was any "more deliberate" than previously acknowledged by Halliburton and alleged by BP.

>    4.    *BP has had the D3D Modeling since June 2012.*

Importantly, Elysium successfully replicated the Displace 3D Modeling.  *See* Exhibit 3, E-mail from Capt. Englebert to Judge Shushan (July 26, 2012 07:23 CST).  In full compliance with the Court's January 20, 2012 Order, Halliburton provided BP and Elysium with the tools to replicate the modeling and a certification that Elysium's modeling was an exact replication of the modeling performed in May or June 2010.  Although the channeling depicted by the D3D Modeling is irrelevant to any issues in this litigation, *see infra.* at Section III(E)1, it is clear that BP and its experts have been able to compare the channeling depicted in the 7 and 21 centralizer models since June of 2012.

After analyzing the replicated D3D models, BP requested and obtained an order excluding <u>any evidence</u> relating to the D3D Modeling from the Phase One trial.  *See* Rec. doc. 7127.  Because Halliburton disclosed the deletion of the D3D Modeling and because the D3D Modeling was replicated long before the Phase One trial, there is no "new evidence" to add to the Phase One trial record and no new evidence that would be admissible under the order BP requested and obtained from Magistrate Judge Shushan.

**C.      The Record Should Not Be Reopened Because No Relevant "Evidence" Was Destroyed.**

Contrary to BP's claim, Halliburton did not "agree to plead guilty to destroying evidence relating to its internal examination of the *Deepwater Horizon* incident."  *Compare* Rec. doc. 11005 *with* Exhibit 6, Plea Agreement.  The Plea Agreement is not an admission that the D3D Modeling constitutes relevant "evidence."  Rather, the Plea Agreement acknowledges the deletion of the D3D Modeling was an unauthorized "deletion of <u>records</u>."  *See* Exhibit 6, Plea Agreement at ¶1 (emphasis added).  That the information relates in some way to the Macondo well does not mean that such information constitutes relevant, material, and admissible evidence.  Obviously, BP did not think the D3D Modeling was evidence or BP would have sought to introduce the replicated D3D Modeling in the Phase One trial.

The Plea Agreement involves a misdemeanor violation of 18 U.S.C. §1030(a)(5)(A), which imposes criminal penalties against anyone who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage[4] without authorization, to a protected computer."[5]  The statute is data-driven, and it punishes the unauthorized deletion of <u>data</u>, not "evidence."  The Plea Agreement specifically states that Halliburton agrees to plead guilty to a misdemeanor violation "arising from the deletion of <u>records</u> created after the explosion on board the Deepwater Horizon in the Gulf of Mexico."  *See* Exhibit 6, Plea Agreement at ¶1 (emphasis added).

---

[4] "Damage" is "any impairment to the integrity or availability of data, a program, a system, or information.  18 U.S.C. §1030(e)(8).

[5] A "protected computer" is a computer "used in interstate or foreign commerce or communication."  18 U.S.C. §1030(e)(2)(B).

The Plea Agreement does not include any acquiescence on Halliburton's behalf – or even the Government's – that it destroyed evidence relevant to the MDL 2179 proceedings or otherwise.   The title of the criminal Information – which is hearsay – "Information for Destruction of Evidence," is purely argumentative and misleading, as it does not even recite the actual charges to which Halliburton pleaded guilty.   Indeed, the actual charged offense does not reference the "destruction of evidence" at all.   *See* Exhibit 6, Plea Agreement.   The Court should therefore reject any characterization of the D3D Modeling as "evidence" based upon the mere title of the Information.   The law is settled: the controlling language here is the Plea Agreement, not the Information.   *See U.S. v. Avery*, 719 F.3d 1080, 1084 (9th Cir. 2013) (where the language of the plea agreement differed from the broader language in the information, the plea agreement controls); *Martinez-Perez v. Gonzales*, 417 F.3d 1022, 1029 (9th Cir. 2005) (holding facts in the information could not establish the defendant committed an aggravated felony where defendant pled guilty to a different offense from the one charged in the information); *U.S. v. Swanberg*, 370 F.3d 622, 628-629 (6th Cir. 2004) (the language of the stipulation contained in the plea agreement supersedes the language of the information).

## D.     The Record Should Not Be Reopened Because the Criminal Information and the Press Release Parroting the Information Are Inadmissible.

BP seeks to supplement the evidentiary record with the DOJ's press release announcing the Plea Agreement.   BP's reliance on a press release as new evidence of Halliburton's conduct is improper and contrary to its own prior legal arguments before the Court.   Aside from the fact that the press release is pure hearsay, it is nothing more than a recitation of the Information against Halliburton, and in accordance with this Court's prior ruling and BP's prior arguments, should not be admitted into evidence.   The Court should reject BP's attempt to back-door the Information into the record via the DOJ press release.

The Court has previously excluded from evidence the Information and Indictments against BP and its employees (who were acting with BP's authorization), noting that in the Fifth Circuit, "[i]t is hornbook law that indictments cannot be considered as evidence."  Rec. doc. 8651 at 3 n.6 (citing *United States v. Cox*, 536 F.2d 65, 72 (5th Cir. 1976)).  BP admits that "[a] defendants' indictment or information is inadmissible hearsay in civil litigation," and that "[f]ew evidentiary rules are as well-established or clear cut."  Rec. doc. 8296-1 at 2.   In BP's own words:

> [i]ndictments, informations, and any other documents generated, or statements made, by prosecutors in a criminal proceeding are inadmissible hearsay under Rules 801 and 802.  They are mere assertions – allegations that certain conduct may have occurred. They establish nothing.

*Id*. at 4 (emphasis added).

Despite BP's previous emphatic statements, it now takes, once again, a directly opposite position – that a press release that does nothing more than embellish allegations contained in the criminal Information against Halliburton – should be admitted into evidence.  The Court should reject this position because the press release is replete with inadmissible hearsay of its own and that of the inadmissible Information.  Furthermore, any statements in the press release that recite the inadmissible Information constitute double hearsay.  The press release describes the DOJ's allegations against Halliburton and specifically notes that these allegations are "[a]s detailed in the information."  This double-hearsay is clearly inadmissible.  *See Dresser v. Ohio Hempery Inc.,* No. 98-2425, 2011 U.S. Dist. LEXIS 62757, at 29 (E.D. La.  June 13, 2011) (quoting *Federal Deposit Insurance Corp. v. Mmahat,* 907 F.2d 546, 551 n.6 (5th Cir. 1990)); *see also Alex v. Mgmt. & Training Corp*., No. B-10-304, 2012 U.S. Dist. LEXIS 68511, at 18 (S.D. Tex.

Feb. 24, 2012) (finding paragraphs of press release that recounted contents of court filings and DOJ statements were hearsay, if not double hearsay).

BP has also argued to this Court that the only evidence related to a guilty plea that *may* be admissible is the factual Allocution, and that every other document is hearsay and, therefore, inadmissible.  *See* Rec. doc. 8296-1; Rec. doc. 8381; Rec. doc. 8486.  More specifically, BP recently argued that "[t]he PSC and others must be content with the relevant facts BPXP admitted as set forth in the Allocution – these are the only potentially admissible facts established by BPXP's plea and subsequent conviction."  Rec. doc. 8486 at 3.  BP also recently argued that the PSC "has no basis to argue against excluding other documents, portions of documents, statements that are not factual admissions made by BP, *including any documents or statements made by prosecutors during or in connection with the Criminal Proceedings*."  Rec. doc. 8381 at 2-3 (emphasis added).  BP cannot, on one hand, seek to exclude its own criminal information and related documents, but, on the other hand, demand that the Court admit the DOJ press release.

Because the DOJ press release simply embellishes the inadmissible criminal Information and it contains double-hearsay, and because BP admits that all evidence of criminal proceedings other than the factual Allocution is inadmissible, the Court should not reopen the Phase One record to admit the press release.

## E.    Legal Standard for Adverse Inference Based Upon Spoliation.

To demonstrate that spoliation has occurred, BP bears the burden of proving the following two elements by a preponderance of the evidence:  First, that relevant evidence was destroyed after the duty to preserve arose.  *Yelton v. PHI, Inc*., 279 F.R.D. 377, 388 (E.D. La.

2011) (affirmed by J. Barbier, *Yelton v. PHI, Inc.*, 284 F.R.D. 374 (E.D. La. 2012)).  Second, BP must show that the evidence lost would have been favorable to BP.  *Id.*

Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence.  *Id.*  The "relevance" factor of the adverse inference analysis is generally broken down into three subparts: (1) whether the evidence is relevant to the lawsuit; (2) whether the evidence would have supported the inference sought; and (3) whether the complaining party has suffered prejudice from the destruction of evidence. *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 346 (M.D. La. 2006).  "Destruction of tangentially relevant information, or information that is duplicative and has been produced from other sources, does not constitute prejudice."  THE SEDONA PRINCIPLES 70, COMMENT 14.c (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 214 (S.D.N.Y. 2003)); *see also PTSI, Inc. v. Haley*, No. 684 WDA 2012, 2013 Pa. Super. LEXIS 751, at *35 n. 3 (Pa. Super. Ct. 2013).  Further, there must be a nexus between the proposed adverse finding and the information lost.  *Consol. Aluminum Corp.*, 244 F.R.D. at 346.

BP claims that Halliburton spoliated the D3D Modeling and, therefore, the Court should sanction Halliburton by finding that (1) its cement was unstable and a cause of hydrocarbons entering the wellbore; and (2) a lack of centralization did not cause the blowout.  BP's request for spoliation sanctions should be denied because relevant evidence was not destroyed, the deleted D3D modeling would not have been favorable to BP, and BP has suffered no prejudice.

      1.     *Relevant evidence was not destroyed.*

Post-incident D3D Modeling is not relevant to anything that occurred on April 20, 2010. Halliburton's Displace 3D software was under development in 2010, and tellingly no D3D modeling for the Macondo well occurred prior to the incident.  But, regardless of when the D3D

Modeling occurred, the limitations of Halliburton's Displace 3D software render such modeling irrelevant to any issue in this litigation. *See* Exhibit 7, Paul Osborne Aff., at ¶¶ 17-18. The D3D Modeling performed by Savery and Elysium has no bearing on whether Jesse Gagliano's pre-incident OptiCem modeling accurately predicted a likelihood of mud channeling due to insufficient centralization. *Id*. While Halliburton's OptiCem software and its Displace 3D software evaluate, among other things, the likelihood of channeling, each program executes a different type of channeling evaluation. *Id*. at ¶¶ 4, 6. OptiCem primarily evaluates whether mud channeling might occur in cement based on the static gel strengths of the drilling mud in the wellbore. *Id*. at ¶4. D3D, on the other hand, primarily evaluates whether channeling might occur due to the intermixing of fluids at their interfaces during the pumping operation and the corresponding changes in the fluids' rheologies. *Id*.

Taking the degree of pipe standoff/centralization into account, OptiCem predicts, among other things, whether channeling will occur during a cement job, due to the "erodability" of the drilling mud already in the wellbore. *Id*. at ¶7. OptiCem predicts the extent to which gelled drilling fluid is removed—literally "eroded"—from the wellbore's annulus during the pumping of a cement job. *Id*. at ¶8. The removal of gelled mud during a cement job is critical because, if not displaced, unremoved mud will contaminate the cement and stay behind as mud channels, which are pathways through which formation fluids could potentially flow. *Id*.

Halliburton's Displace 3D software, on the other hand, models fluid interfaces and the movement and growth of those interfaces through the inside of the casing and annulus. *Id*. at ¶9. Displace 3D analyzes fluid interfaces and, based primarily on the rheological properties of each fluid, predicts the extent to which the fluids intermix and how they move through the casing and annulus. *Id*. D3D evaluates the extent to which unevenly distributed interfaces, coupled with the

degree of pipe standoff/centralization, can create channels in the annulus.  *Id.*  Unlike OptiCem, D3D does not predict whether channeling will occur due to ineffective displacement of drilling mud already in the well prior to the cement job.  *Id.* at ¶11.  Displace 3D neither accounts for nor attempts to determine the likelihood of channeling due to the "erodability" of drilling mud already in the wellbore.  Further, the channeling shown in OptiCem incorporates a gas flow potential ("GFP") whereas Displace 3D does not.  *Compare id.* at ¶7 *with id.* at ¶9.

Another relevant limitation of Displace 3D is that it cannot representatively model a foamed cement job for a deepwater well.  To accurately model with D3D, the user must have numerous rheological inputs prior to running the model.  *Id.* at ¶12.  These rheological fluid properties are difficult (some say impossible) to know in an environment with a large range of temperature and pressure changes.  *Id.* at ¶15.  During a deepwater foam cement job, the foam slurry experiences widely varying temperatures and is continually compressed under greater and greater pressure.  *Id.* at ¶18.  The continual changes in the density and viscosity of the foam slurry make it very difficult (if not impossible) to obtain accurate rheological representations of the foam cement as it travels from the rig floor to the bottom of the well, which for Macondo is a distance of more than three miles.  *Id.*  Because accurate rheological representations of the cement slurry are necessary inputs, Displace 3D software cannot representatively model a deepwater foam cement job.[6]  *Id.*  This and the other foregoing Displace 3D software limitations

---

[6]  Additionally, accurate rheological representations cannot be obtained unless numerous lab tests are performed on the relevant fluid interfaces at various mix ratios and various temperatures.  *See id.* at ¶¶12, 13, 14, and 15.  These lab tests provide the key inputs for modeling with Displace 3D.  *Id.* at 13.  Performing these lab tests, which is standard protocol for Halliburton's engineers, typically takes two (2) days to complete and requires rig samples.  *Id.*  Mr. Savery and Mr. Bedford did not conduct <u>any</u> lab tests, nor did they direct anyone else to conduct such tests.  *Id.* at ¶18.  Accordingly, they (and in turn, Elysium) did not have the required inputs to create representative models of the Macondo production casing cement job, and their modeling was not run consistent with HESI's standard protocols.  *Id.*

render the D3D Modeling performed in 2010 (and replicated in 2012) irrelevant to anything that occurred on April 20, 2010.

       2.    *The deleted D3D Modeling does not support the inferences sought by BP.*

       a.    <u>D3D Modeling and pipe centralization do not relate to foam cement stability</u>: In its first Motion for Sanctions, BP stated that it "does not seek a factual finding that the Macondo slurry poured on April 19, 2010 was in fact unstable."  Rec. doc. 5024 at 6 (emphasis in original).  Now, with even less probative information, and after the Phase One trial before this Court, BP requests a finding that Halliburton's foam cement job was unstable and a cause of hydrocarbons entering the wellbore.  D3D software does not model whether a foamed cement slurry is stable or unstable.  *See* Exhibit 7, Paul Osborne Aff., at ¶14.

Further, an adverse finding that unstable cement <u>caused</u> hydrocarbons to enter the wellbore is wholly unsupported by the facts because unstable foam cement does not cause hydrocarbons to enter a wellbore; a pressure differential does.

BP's suggested sanction seeks to resurrect the stricken and errant expert opinion of Fred Sabins that unstable cement can become highly permeable due to nitrogen bubbles coalescing and rising through the base slurry.  No other testifying expert offers such opinion.  Indeed, the evidence does not support this opinion, which explains BP's motivation to obtain, only through adverse findings, what it has not proven and cannot prove.

The United States' expert, Glen Benge, explained exactly why Sabins' opinion is wrong.

    Q.    Now, Mr. Regan asked you a question about whether you thought the cement was permeable, do you recall that?

    A.    Yes, sir.

    Q.    And I believe you answered the question no?

    A.    That's correct.

Q.    Can you explain that answer?

A.    Well, I believe the question was if the cement is unstable, does that make it permeable, and if I look at one of these foam cement things or look at foam, if it's unstable and all of the nitrogen comes out or nitrogen starts coming out, the material that's left back in behind is the base slurry. So that – the movement of that nitrogen or the stability of that doesn't go to permeability. It goes to changes in density, changes in properties. But permeability is not -- that would not be a result.

Q.    What would be the result?

A.    Well, you wind up -- if I take the Macondo well, at the bottom of the well, you would have higher density. If you took all of the nitrogen out, you would have the tail cement.

Q.    And could that cement have provided a barrier in the bottom of the well?

A.    Yes, sir.

Exhibit 8, Trial Tr. 2579:11-2580:6 (Benge).    Additionally, evidence developed at trial contradicts the very finding that BP asks this Court to make.  First, even if the foam cement was unstable, it could have provided a barrier in the well.  *Id.* at 2579:16-2580:6 (Benge).  Second, the most relevant foam stability tests were conducted with actual rig samples by Halliburton in April 2010 (pre-incident) and by OTC on the MAC4 sample in 2011 (post-incident).  Both of those tests show a stable foam slurry. Exhibit 8, Trial Tr. 2436:17-2437:5, 2456:12-2458:10, 2458:24-2459:2 (Benge); *see also* Rec. doc. 10468 at 237, 252-254.   OTC's Greg Garrison agreed with Benge, testifying that the unset foam stability test on the MAC4 rig sample produced a *stable* result.  Exhibit 9, Garrison Dep. 207:2-13.   Accordingly, BP's requested inference is against the overwhelming weight of the evidence.

b.    Halliburton does not argue that the lack of centralization caused the blowout: BP's proposed finding that the lack of centralization did not cause the blowout incorrectly assumes that Halliburton argues to the contrary.  Halliburton does not claim that the

lack of centralization caused the blowout. *See* Rec. doc. 10468 at 144 (stating that using only six centralizers increased the risk of contamination and channeling, not blowout); *see also* Rec. doc. 10468 at 158 (stating "A cement job's inability to form a barrier or achieve zonal isolation does not foreseeably result in a blowout."); Exhibit 5, Trial Tr. 3136:9-3137:15 (Roth) (Tommy Roth trial testimony that channeling does not create a risk of blowout); Exhibit 10, Trial Tr. 7356:5-7357:15 (Beck) (Halliburton's expert, Frederick Beck, trial testimony that centralizers were not causal to the blowout). Rather, Halliburton has consistently argued that multiple BP decisions and cost cutting measures, including it's decision regarding centralizers, contributed to the blowout. In fact, Halliburton repeatedly and correctly argued that channeling does <u>not</u> create a safety risk. Exhibit 11, Trial Tr. 2969:12-2971:10 (Probert); Exhibit 12, Trial Tr. 6382:15-6383:17 (Chaisson); Exhibit 13, Trial Tr. 6610:17-6615:1, 6853:25-6854:7 (Gagliano). Instead, channeling creates the risk that there may be the need for a squeeze job. *See* Exhibit 12, Trial Tr. 6403:17-6404:12 (Chaisson); Exhibit 13, Trial Tr. 6704:7-6706:4 (Gagliano). BP's proposed finding is contrary to its clear understanding of the risk of channeling if an inadequate number of centralizers was utilized. BP accepted these risks when it chose to ignore Halliburton's advice in this regard. Rec. doc. 4961 at 25-26; *see also, e.g.,* TREX 1517 ("But, who cares, it's done, end of story, will probably be fine and we'll get a good cement job. I would rather have to squeeze than get stuck above the WH. So Guide is right on the risk/reward equation."). The deleted post-incident D3D Modeling bears no relation to and in no way invalidates the channeling and gas flow potential (GFP) predicted by the pre-incident OptiCem modeling.

Halliburton has consistently argued and proved at the Phase One trial that the cause of the blowout was the misinterpretation of the negative pressure test and the failure to control the well once hydrocarbons entered the wellbore. Had the negative pressure test been interpreted

correctly, the annular would not have been opened and the riser displaced to seawater, which put the well in an underbalanced position and caused the blowout.  Exhibit 11, Trial Tr. 3016:25-3017:13 (Probert); Exhibit 14, Trial Tr. 5014:21-5015:1 (Barnhill); Exhibit 10, Trial Tr. 7209:1-16, 7377:4-9 (Beck); Exhibit 15, Trial Tr. 7562:20-7563:12, 7792:11-14 (Bourgoyne); Exhibit 16, Trial Tr. 8938:9-8939:5 (Guide); *see also* Exhibit 17 Azar Dep. 305:25-306:14.   BP's proposed finding that the lack of centralization did not cause the blowout should also be rejected as improper because it misstates Halliburton's legal positions.

> 3. *The deleted D3D Modeling is not favorable to BP, and BP has suffered no prejudice.*

To demonstrate that spoliation has occurred, BP must prove by a preponderance of the evidence that the deleted D3D Modeling would have been favorable to BP and that it has suffered prejudice from the unauthorized deletion.  *Yelton*, 279 F.R.D. at 388; *Consol. Aluminum Corp.*, 244 F.R.D. at 346.   BP suffered absolutely no prejudice because an exact certified replication of the D3D Modeling was created well before the Phase One trial.  Additionally, if the modeling was favorable to BP, BP would have insisted upon its use during the Phase One trial.  Because BP had the replicated D3D Modeling well before the Phase One trial but chose not to use it, BP cannot show that the modeling would have been favorable or that it has been prejudiced by the unauthorized deletions.

## F.   BP's Proposed Findings Are Disproportionate to Any Alleged Harm and Bear No Relationship to the Purpose of the D3D Modeling.

BP's requested sanctions are not proportionate to the alleged harm incurred by the unauthorized deletion of D3D Modeling.  In the Fifth Circuit, the severity of a sanction for failing to preserve evidence must be proportionate to the culpability involved and the prejudice that results.  *Yelton*, 279 F.R.D. at 393.  The sanction should only be as harsh as needed to punish

or deter and to address the impact on discovery.  *Id.*  "The judge [imposing sanctions] should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms.  Whether deterrence or compensation is the goal, the punishment should be reasonably suited to the crime."  *Id.*  Granting BP's requested adverse inferences, which are unwarranted and unsupported by the facts and the law, would certainly slay the mouse with an elephant gun.

As shown herein, sanctions against Halliburton are not warranted.  Should the Court find otherwise, the measure of an appropriate sanction is whether it restores the prejudiced party to the same position it would have been in absent the spoliation.  *Yelton v. PHI, Inc.,* 279 F.R.D. at 393; *see also Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("[T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine").  Here, BP has not been prejudiced in any way by the deletion of the D3D Modeling.  The modeling was replicated and for reasons only known by BP, it chose not to use the modeling.  BP is in no different position than it was in June 2012.  If BP or its experts really believed that the D3D Modeling was relevant or that its lack of use at trial would prejudice BP, undoubtedly BP would have used the modeling at trial.  BP did not use the D3D modeling, and it should not be allowed to complain that it has been prejudiced by its unauthorized deletion.

## IV.   <u>CONCLUSION</u>

As a result of BP's conduct that caused the blowout, BP pled guilty to eleven felony counts of manslaughter, one felony count of obstruction of justice, and violations of the Clean Water Act and Migratory Bird Treaty Act.  And based upon these fourteen guilty pleas, BP agreed to pay $4 billion in criminal fines and other payments.   Unlike the post-incident

unauthorized deletion of irrelevant post-incident D3D Modeling, there is a direct causal link between BP's pre-incident misconduct and the blowout.  There is no such link between the blowout and the unauthorized post-incident deletion of the post-incident D3D Modeling.  BP's Motion is its latest attempt to escape the consequences of its own conduct that caused the blowout.

There is no new material evidence contained in the Plea Agreement, and BP admits that the Information and DOJ press release are inadmissible hearsay.  The Court should deny BP's request to reopen the Phase One trial record.  BP has suffered no prejudice by the unauthorized deletion of the D3D Modeling and its proposed adverse inferences are unrelated to the deleted D3D Modeling and contrary to the evidence.  Accordingly, BP's Motion for Sanctions should be denied.

Respectfully Submitted,

**GODWIN LEWIS PC**

**By:**  /s/ Donald E. Godwin
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Gavin E. Hill
State Bar No. 00796756
Gavin.Hill@GodwinLewis.com

1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
Jerry C. von Sternberg
State Bar No. 20618150
Jerry.VonSternberg@GodwinLewis.com
Misty Hataway-Coné
State Bar No. 24032277
Misty.Cone@GodwinLewis.com

1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this on this 3rd day of October, 2013.

        */s/ Donald E. Godwin*
        Donald E. Godwin

**HALLIBURTON'S RESPONSE TO BP'S MOTION FOR LEAVE TO SUPPLEMENT RECORD AND FILE
MEMORANDUM REGARDING HALLIBURTON'S POST-TRIAL GUILTY PLEA AGREEMENT**         **Page 25**

2293850 v5-24010/0002 PLEADINGS