# EXHIBIT 1

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

Andrew Langan, P.C.
To Call Writer Directly:
(312) 862-2064
andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

August 2, 2012

**Via Email (Sally_Shushan@laed.uscourts.gov)**

**Contains Confidential Information
Subject to the Protective Order**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
    Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130

Re: *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico, on April 20, 2010*, MDL No. 2179 – BP's Request for Further
Relief from Halliburton Pursuant to January 20, 2012 Order re Spoliation
Sanctions [Rec. Doc. 5307].

Dear Judge Shushan:

BP respectfully submits this letter requesting further relief under the Court's January 20,
2012 Order re Spoliation Sanctions. [Rec. Doc. 5307]. In short, despite the best efforts of
Special Master Captain Englebert and third-party vendor Elysium Digital, the modeling that was
the subject of the Court's January 20, 2012 Order was not recovered or recreated.

This letter brief begins by reviewing the history leading up to Elysium's July 18, 2012
report, and detailing the efforts undertaken to forensically recover and recreate the deleted
Halliburton modeling. The problems with the recovery and recreation efforts leading up to the
flawed recreation are addressed next. Last, BP addresses the appropriate relief in these
circumstances.

## INTRODUCTION

As the Court recalls, approximately one year ago, Halliburton admitted that it had deleted
a specific Displace 3D model for the Macondo Well sought by BP. Halliburton did not
voluntarily inform BP or the Court that it had destroyed evidence. Rather, BP discovered the
spoliation after reviewing and subsequently investigating a single reference in a single email
dated July 25, 2010 that Halliburton produced from Tommy Roth, Halliburton's Vice President

Hong Kong     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai     Washington, D.C.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 2

of Cementing, to Anthony Badalamenti, its Technology Director.  In that exchange, Mr. Badalamenti stated he had "thought about this from the other side of the desk" and challenged Halliburton's public stance: "I think one of the areas that we have to address is the following… 'Halliburton your computer simulator indicated channeling, which lead to mud and cement inter mixing.  However you still recommended foam cement.'" Mr. Badalamenti was referring to the pre-incident 7-centralizer OptiCem model that indicated there could be "channeling"—or mixing of the cement and drilling mud—causing contamination of the cement.  Halliburton has taken the position publicly and in this litigation that BP should have run 21 centralizers to prevent channeling based on Halliburton's 21-centralizer OptiCem model.  Mr. Badalamenti was particularly concerned about Halliburton's recommendation of foam cement in light of the 7-centralizer OptiCem model because drilling mud can destabilize foam cement.

In the email, Mr. Roth assured Mr. Badalamenti that Halliburton's recommendation of foam cement was not a problem: "Anthony good point.  Spacer volume was sufficient to sweep entire anulus [*sic*] volume.  As such, spacer was sufficient to sweep channel. ***Subsequent testing with 3D confirms statement that spacer was sufficient.***"  Exhibit A (HAL_1071448 (Rec. Doc. 4799-1, TREX-04352)) (emphasis added).  This last sentence described critical evidence: a Halliburton-generated model showing that the spacer used at the Macondo Well was "sufficient" to sweep or clean the annulus of the drilling mud.

This modeling evidence contradicts what Halliburton has proclaimed to the public and this Court: that BP's operational decisions to run fewer than 21 centralizers and to circulate less than a "bottoms up" before the cement job caused channeling and cement contamination.  Accordingly, BP vigorously pursued the production of this model.  After five months of meeting-and-conferring, moving to compel post-incident investigation work, and moving for spoliation sanctions, Halliburton finally conceded in its opposition brief to BP's motion for spoliation sanctions that it had deleted the model.  [Rec. Doc. 4961 at 9].

Rather than let Halliburton profit from its misconduct, BP proposed and the Court ordered a solution: (1) forensic inspection of Halliburton hard drives to see if the deleted Displace 3D model could be recovered; and (2) analysis to determine whether the deleted model could be replicated.  [Rec. Doc. 5307].  The Order further recognized BP's right to seek additional relief if these methods did not succeed.

Elysium was contracted to perform the forensic work under the supervision of the Special Master.  After Halliburton confirmed that the files located by Elysium were not the deleted modeling, the parties turned their attention to whether the Displace 3D model could be replicated.  After months of negotiations, the parties agreed to a process to ***attempt*** to recreate the destroyed model and put BP in the same position that it would have been in had Halliburton not

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 3

destroyed this key evidence. The parties and the Special Master agreed in advance that the scope of the exercise was the attempt to recreate the deleted model that BP sought, and issues relating to the admissibility and use of the recreated model would be addressed with the Court. With that understanding, the parties proceeded.

From the start, however, Halliburton refused to run the Displace 3D software, meaning Elysium would have to run the software. But Elysium did not know how. To enable Elysium to do so, Halliburton provided Elysium with the purported inputs from 2010 and detailed instructions on how to use those inputs in the Displace 3D software. Halliburton and Mark Savery (the Halliburton engineer that purportedly generated the original model) also had numerous conversations with Elysium—without BP's participation—discussing how to modify the inputs and run the software.

Unbeknownst to BP, Halliburton provided Elysium with instructions to run not one model, but two. In addition to running a model using data for a cement job with *7 centralizers* (the only model referenced in Mr. Roth's email, the only model BP believed to exist, and the only model that Halliburton ever acknowledged was deleted before the Court), Halliburton also instructed Elysium to run another model using *21 centralizers*. The results of this co-opted Halliburton process are at odds with what Mr. Roth described in his email, what BP sought to accomplish in its motion, and the relief granted by the Court.

First, the existence and potential deletion of a 21-centralizer Displace 3D model was completely unknown to BP. This second model was not the subject of Mr. Roth's email. It was not the subject of BP's briefing and request for relief. Halliburton had not disclosed the deletion of this additional modeling in its briefing. And, it was not the subject of the Court's January 20, 2012 order. Even after the order, Halliburton had never disclosed that a 21-centralizer model existed or may have been deleted during the parties' discussions. The recreation of this model was not the subject of the Court's January 20, 2012 order and should not have occurred. Second, the recreated 7-centralizer model is also flawed because the results do not match Mr. Roth's contemporaneous description from 2010. It does not show the spacer sweeping the annulus clean of mud. Instead, it shows that mud was left in the annulus.

The end result of this forensic exercise is a mockery of the Court's January 20, 2012 order. Instead of respecting the Court's order, it appears that Halliburton has attempted to turn its sanctionable conduct—destruction of evidence—into a tactical advantage by generating self-serving evidence after the close of discovery. In short, while Captain Englebert and Elysium discharged their duties, the mission failed to accomplish its objective due to Halliburton's actions.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 4

Based on the parties' agreement with the Special Master, the recreated models are not useable in this case absent a further order by the Court. BP does not intend to move for admission of the recreated models. While BP does not believe that Halliburton would introduce or refer to the recreated Displace 3D models at trial without the Court's prior consent, out of an abundance of caution BP requests that the Court issue an order excluding these Halliburton-engineered recreated Displace 3D models from use in any MDL 2179 proceeding. In the event Halliburton opposes this request, BP requests expedited discovery before the Court considers the admissibility of the recreated Displace 3D models. This discovery would cover Halliburton's destruction of the modeling (including the newly discovered 21-centralizer model that may have been destroyed) and the efforts to recreate the deleted modeling. As described in further detail below, Halliburton engaged Elysium during the recreation process in ways that excluded and effectively precluded BP from understanding the recreation process. Thus, BP would need discovery on Halliburton's interactions with Elysium to oppose any Halliburton request.

BP further requests that the Court order Halliburton to pay all costs of the failed attempts to forensically recover and replicate the Displace 3D modeling, and BP reserves its rights to seek further relief as necessary based on both Halliburton's spoliation and Halliburton's conduct during the course of the attempted forensic recovery work and attempted recreation of the deleted Displace 3D model.

## BACKGROUND

### A.      BP's Attempts to Obtain the Displace 3D Modeling in Discovery.

The history of BP's efforts to obtain the Displace 3D model referenced in Mr. Roth's July 25, 2010 email is detailed in BP's Motion for Spoliation Sanctions. [Rec. Doc. 4799-1 at 9-14]. Based on the failed efforts to obtain the Displace 3D model through the discovery process and Halliburton's revelation that the modeling was "gone," BP moved for spoliation sanctions on December 5, 2011. [Rec. Doc. 4799-1, Ex. 11]. BP sought, among other things, an order compelling Halliburton to provide the computer from which the Displace 3D modeling was deleted to the Special Master to attempt forensic recovery. BP also reserved the right to seek further remedies based on the outcome of the forensic work.

Although BP began seeking the Displace 3D modeling in August 2011 and prevailed on its motion to compel this information, Halliburton waited four months until its opposition brief (filed December 19, 2011) to BP's motion for spoliation sanctions to disclose for the first time that the "models were deleted from Beford [*sic*] and Savery's computers." Rec. Doc. 4961 at 9.

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 5

In its opposition brief, Halliburton did not mention that there were additional Displace 3D models relating to the Macondo Well that had also been deleted. *See* Rec. Doc. 4961. The Court and BP were unaware that Halliburton may have deleted additional Displace 3D modeling. As such, BP was not in a position to move to compel that information, and the Court's order did not address that additional modeling.

    **B.**    **During the Unsuccessful Forensic Recovery and Replication Attempts, BP Learns that Halliburton Potentially Deleted *Additional* Displace 3D Models.**

On January 20, 2012, the Court ordered Halliburton (1) to provide the computer from which the Displace 3D modeling had been deleted to Captain Englebert to attempt forensic recovery; and (2) to meet and confer with BP to determine whether the modeling could be replicated. [Rec. Doc. 5307]. The Order also stated that "BP's rights to seek further relief are reserved." *Id.*

The parties attempted both courses ordered by the Court—forensic recovery and model replication—to no avail.

During that process, however, BP discovered that Halliburton potentially deleted more than the one model referenced by Tommy Roth in his email. Exhibit B (Halliburton Reproduction Guide supplied to Elysium) at 19 ("Two simulations need to be run"; "Once you create and run the first simulation, you will need to . . . re-run the simulation to achieve your second."). As explained above, Halliburton instructed Elysium to create a 21-centralizer model that was not within in the scope of BP's briefing or the Court's January 20, 2012 Order. Although BP has had no opportunity for discovery on the apparent deletion of a second Displace 3D model relating to the Macondo Well, it appears that this additional modeling evidence was deleted because Halliburton directed Elysium to recreate it and Halliburton did not previously produce the model during Phase 1 discovery.

BP was not a party to these communications from Halliburton to Elysium and did not learn about the substance of the communications until the modeling was completed. Exhibit C (Elysium Report) at 1.20 ("Elysium also had phone conversations with Mark Savery... ***BP was not a party to these conversations with Mr. Savery.***) and 13.3 ("Elysium used the information/instructions and input values provided by HESI and entered them into Displace 3D. During this process, when Elysium had questions, Captain Englebert coordinated multiple conference calls with Mr. Savery and received additional information/clarifications via email from counsel. ***BP was not a party to any of these calls or email discussions.***") (emphasis added). Indeed, BP did not see nor was it even aware of the Halliburton Reproduction Guide until after Elysium had already completed the modeling.

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 6

### C.   Efforts to Forensically Recover the Deleted Displace 3D Modeling Fail.

Elysium reports that "At the conclusion of this [forensic recovery] process, Halliburton representatives determined that the files and file fragments were either not relevant or did not have information that was sufficient to recreate the relevant Displace 3D modeling." Elysium Report at 1.12, p.7. While BP does not have sufficient information to contest this finding, it notes the following questions with the forensic recovery efforts:

- First, Halliburton was in charge of determining what drives should be searched. Halliburton initially turned over a hard drive and two hard drive images on February 2, 2012. Elysium Report at 1.3. Elysium conducted its analyses on these drives. In the middle of the process, Halliburton identified an additional drive to search on April 12, 2012. *Id.* at 1.12, p.6. It is unclear what additional Halliburton drives may hold relevant information.

- Second, Halliburton worked with Elysium and provided it information that was not provided to BP. BP only learned of the scope of these interactions after the fact in Elysium's report. Some of this was material sought by BP but not provided. For example, BP requested but was not provided with Halliburton's prior forensic examinations. But, "Elysium received reports from Halliburton's related forensic examinations via email from Bruce Bowman, on behalf of Halliburton. ***Bruce Bowman [Halliburton counsel] instructed Elysium not to share these materials 'with BP or any other parties or persons.'***" Elysium Report at 1.7 (emphasis added). It is unclear what materials and other information was provided to Elysium without BP's knowledge.

- Third, Halliburton was in charge of determining whether the files and fragments recovered by Elysium were relevant. Elysium Report at 1.12, p.7 ("At the conclusion of this process, Halliburton representatives determined that the files and file fragments were either not relevant or did not have information that was sufficient to recreate the relevant Displace 3D modeling."). Halliburton's reasoning was for this conclusion is unclear.

Based on Halliburton's findings, the Special Master reported to the Court that Elysium could not forensically recover the modeling results that Halliburton deleted:

**THE COURT:** . . . Next up was the report from Captain Englebert relative to the Hal[l]iburton computer. She is not hopeful that the disks are going to yield any

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 7

useful information, and so I spoke to her yesterday and she has the next step kind of formulated for you all to talk about. (5/3/12 Tr. at 6:16-20).

Consequently, the parties resolved to attempt replication of the deleted Displace 3D modeling using the process outlined by the Special Master.

**D.      Efforts to Replicate the Deleted Displace 3D Modeling Fail.**

Under the direction of the Special Master, Elysium attempted to replicate the deleted Displace 3D model. Despite Elysium's best efforts, the 7-centralizer Displace 3D model referenced in Mr. Roth's email was not replicated. In the email, Mr. Roth's response to Mr. Badalamenti's challenge is firm: "Spacer volume was sufficient to sweep entire anulus [sic] volume. As such, spacer was sufficient to sweep channel. Subsequent testing with 3D confirms statement that spacer was sufficient." (Exhibit A.) The modeling results were so certain that Mr. Roth emphatically stated *three times* that the spacer swept the annulus. At his deposition, Mr. Roth confirmed again that this was a true and correct statement. Exhibit D (Roth Dep.) at 496:2-5 ("Q. Okay. Was that a correct statement when you made it? A. I would think that that -- *that statement is correct*.") (emphasis added). It goes without saying that the fluid in the annulus to be swept by the spacer is drilling mud. The deleted modeling thus decisively undermines Halliburton's public and litigation position that operational decisions out of its control caused there to be channeling (and thus leftover mud) in the annulus.

The recreated 7-centralizer model does not show what Mr. Roth described. Instead it shows mud left in the annulus. As such, there can be no serious dispute that the efforts to recreate the deleted model referenced by Mr. Roth failed.

In addition to the failure of the recreation *result* to match the deleted modeling, there are numerous unanswered questions raised by Halliburton's input into the recreation *process* that need to be addressed:

- First, Halliburton was in charge of instructing Elysium how to run the proprietary Displace 3D software. Elysium is not familiar with the Displace 3D software. Halliburton provided Elysium a Software Operator manual but, ultimately, Elysium ran the software based on a "Reproduction Guide" drafted by Halliburton for the purposes of this exercise. Elysium Report at 1.20 ("Elysium received these inputs, including . . . a 'Reproduction Guide' that provided instructions on the data entry and software operation in accordance with Mark Savery's recollections of his modeling in May and/or June of 2010."), 1.21 ("The 'Reproduction Guide' (see Exhibit N) and phone assistance provided by

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 8

Halliburton were sufficiently specific that Elysium did not need to rely on the Software operator manual in recreating the modeling."). BP was not provided with the "Reproduction Guide" until *after* Elysium's modeling was completed and has had no opportunity to question Halliburton regarding the instructions provided. BP requested but was not provided a copy of the Software Operator manual. Halliburton's refusal to produce the Software Operator manual raises the question whether Halliburton properly directed Elysium in the operation of the Displace 3D software.

- Second, Halliburton was in charge of providing the inputs to the Displace 3D model. Elysium reported that it received the inputs from Halliburton and at times was instructed to modify the inputs. Elysium Report at 1.22 ("In some cases, *Mark Savery instructed Elysium to modify values from the original spreadsheets* so they would work properly in Displace 3D"; "In some cases, notably the input of fluid-related values, the OptiCem and Displace 3D softwares work substantially differently, so *Mark Savery instructed us how to enter the values differently in Displace 3D than how they appeared in OptiCem.*") (emphasis added). BP was not provided the inputs until after the model was run and had no opportunity to question Halliburton on the genesis of the data inputs. This process raises questions about how Mr. Savery recalled what he did, what he communicated to Elysium (without BP's knowledge or involvement), and why he directed Elysium to change certain inputs when Halliburton had told the Court that the inputs were from the OptiCem report. Rec. Doc. 4961 (Halliburton Opp.) at 9 ("The Modeling was performed by David Bedford and Mark Savery using inputs from the OptiCem report prepared by Jesse Gagliano.").

- Third, Halliburton directed Elysium to run a second Displace 3D model for 21 centralizers that was also apparently deleted. Elysium faithfully ran the Displace 3D models as directed by Halliburton. Elysium Report at 1.23 ("On June 7, 2012, Elysium ran the D3D Software to recreate the analyses specified by Halliburton and Mark Savery, which it understands from Halliburton to be the analyses that are the subject of the Court's January 20, 2012 Order."). But Halliburton had never disclosed to the Court or to BP that there was a second deleted Displace 3D model relating to the Macondo Well. BP only learned of this after the modeling was completed. Halliburton's belated and indirect disclosure raises questions regarding whether there are additional undisclosed deletions of Displace 3D models, as well as Halliburton's knowledge and conduct in not disclosing those relevant models.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 9

- Fourth, Halliburton directed Elysium's work in numerous communications that excluded BP entirely. Elysium's report admits as much. Elysium Report at 1.20 ("Elysium also had phone conversations with Mark Savery, under the supervision of Captain Englebert, to ensure that the use of inputs and software operation procedures in the recreation process would be correct and consistent with Mark Savery's recollections of his modeling in May and/or June of 2010. BP was not a party to these conversations with Mr. Savery.") and 1.22 ("Extensive discussions with Mark Savery were essential to ensure the values from the input materials provided by Halliburton would be entered into Displace 3D in a manner consistent with his recollections."). BP requested but was denied participation on the calls with Mark Savery. The Special Master's July 26, 2012 communication to the Court confirmed that "during the D3D recreation process, BP was not included in discussions on technical input and detailed recreation discussions using the D3D software." This raises the question of what was communicated to Elysium by Halliburton outside of the presence of BP.

### ARGUMENT

Halliburton should not be able to put in this evidence of attempted recreation and thereby benefit from its spoliation. As a preliminary matter, the recreated models are not evidence until the Court has ruled on their admissibility. "Moreover, the proponent of evidence bears the burden of establishing that the evidence is admissible under the Federal Rules of Evidence by a preponderance of the evidence." *James v. Haven Homes S.E., Inc.*, No. 08–770–JJB–CN, 2011 WL 777971, at *3 (M.D. La. Feb. 11, 2011) (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)). The district courts are provided broad discretion to oversee and manage discovery. *Mayo v. Tri-Bell Indus., Inc.*, 787 F.2d 1007, 1012 (5th Cir. 1986). The district court's discretion in such matters is "considerable." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 569 (5th Cir. 1996) (citations omitted).

### A.    Halliburton Should Not Be Able to Benefit from Its Spoliation of the Displace 3D Modeling.

After deleting key evidence that supported BP's positions and then using Elysium to create two models based on a Halliburton employee's memory that now arguably support Halliburton's positions, Halliburton should be precluded from introducing this new modeling into evidence. *E.E.O.C. v. Res. for Human Dev., Inc.*, 843 F. Supp. 2d 670, 672-73 (E.D. La. 2012) (awarding costs and fees and striking party's attempted reconstruction of spoliated evidence that was self-serving and based on memory). Allowing Halliburton to utilize new

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 10

modeling after deleting the original modeling would contravene the well-settled principle that spoliators may not benefit from their spoliation.

Moreover, it is well-recognized that efforts to "replicate" or "recreate" lost or destroyed evidence are often unsuccessful. *Accord* Matthew J. Bester, *A Wreck On the Info-Bahn: Electronic Mail and the Destruction of Evidence*, 6 CommLaw Conspectus 75, 80 n.82 (1998) ("Restoring accuracy is not a solid basis on which to justify destruction of evidence sanctions because courts's [*sic*] reconstruction of evidence sometimes will be inaccurate, trumping the very goal of the doctrine. As a result, punishment is a much stronger justification for imposing penalties on spoliators of evidence than is accuracy.").

Despite the efforts of the Special Master and Elysium, the recreation process did not replicate the deleted Displace 3D modeling that BP sought and the failed results should not be admitted. First, as described above, the *result* of the recreated 7-centralizer Displace 3D model does not match Mr. Roth's contemporaneous observations on the deleted modeling. As such, its admission would not make whole BP, the party injured by Halliburton's spoliation. Second, in addition to the *result* being wrong, the *process* by which the recreation was accomplished was, at minimum, heavily influenced by Halliburton's *ex parte* communication of unverified and unchallenged information. The results should not be admitted for the additional reason that they lack legitimacy due to Halliburton's influence on the process and the use of unverified inputs.

In addition to controlling the process, Halliburton also unilaterally directed Elysium to recreate a second Displace 3D model outside the scope of the Court's January 20, 2012 order despite failing to ever mention—over the course of one year of disputes regarding the deleted model in Mr. Roth's email—that there might have been more than just one model. The recreation process and the flawed results raise the very real question of what Mr. Savery did to refresh his recollection. Did he refer to contemporaneous notes or files that were never produced in this litigation, or did he merely recall the inputs and their modification after consultation with Halliburton's attorneys and additional modeling efforts? BP's exclusion from the recreation discussions, coupled with the undeniably wrong model results, gives rise to the need for an adequate opportunity to investigate the modeling inputs, software directions and Halliburton discussions with Elysium. If Halliburton attempts to have these newly created models admitted, BP unquestionably deserves the opportunity for targeted, expedited discovery into these matters.

Therefore, this Court should issue a pretrial order precluding Halliburton from relying on the results of the Elysium modeling.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 11

**B.     Halliburton Should Be Required to Pay for the Attempted Recovery and
        Replication of the Displace 3D Modeling Halliburton Destroyed.**

As a result of BP's discovery that Halliburton had created, not produced, and ultimately
destroyed Displace 3D modeling, BP has incurred significant expenses over the past year. In
addition to the attorney fees required to move the Court to compel production of the modeling
and sanction Halliburton's spoliation once that was disclosed, the parties have spent over eighty-
thousand dollars through June to retain Elysium and the Special Master to attempt to recover and
replicate the deleted modeling.[1]  During this process, Halliburton instructed Elysium to recreate a
second 21-centralizer Displace 3D model that it never previously disclosed to the Court or BP.

Under these circumstances, it is appropriate to require Halliburton to pay BP's share of
Elysium's and the Special Master's fees. *See Rimkus Consulting Grp., Inc. v. Cammarata,* 688
F. Supp. 2d 598, 647 (S.D. Tex. 2010) ("Like an adverse inference instruction, an award of costs
and fees deters spoliation and compensates the opposing party for the additional costs incurred.
These costs may arise from additional discovery needed after a finding that evidence was
spoliated, the discovery necessary to identify alternative sources of information, or the
investigation and litigation of the document destruction itself."). BP therefore requests an order
requiring Halliburton to pay BP's share of the costs of the failed attempt to recover and replicate
the key evidence Halliburton destroyed.

**C.     If Halliburton Opposes BP's Request to Exclude the New Modeling, BP
        Should Be Permitted Expedited Discovery.**

In the event Halliburton or any party opposes BP's request to exclude evidence of the
failed replication of the destroyed modeling, BP requests expedited discovery before the Court
considers the issue. This discovery would cover subjects relating to Halliburton's destruction of
the Displace 3D modeling and the efforts to locate and recreate the destroyed models.  Among
other things, BP would need limited written discovery and the depositions of Mr. Roth[2], Mr.
Badalamenti, Mr. Savery, Mr. Bedford, and each individual that Mr. Savery consulted in
preparing materials for Elysium to replicate the model.  This discovery would cover, among

---

[1] The Special Master's invoices for the forensic work through June 2012 total $5,796.81.  Elysium's invoices for the
forensic work through June 2012 total $77,931.50.

[2] Mr. Roth's deposition is already needed for questioning on a page of hand written notes produced months after his
deposition relating to the spoliated post-incident cement tests. *See* TREX-07718 (HAL_1243816).

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
August 2, 2012
Page 12

other things, the creation of the original Displace 3D model, the circumstances of its destruction, the recreated Displace 3D model and the circumstances of its recreation. As described above, the information on how the modeling was destroyed and recreated is in the exclusive province of Halliburton. This discovery is needed so that BP can adequately rebut and discredit Halliburton's efforts to admit the recreated file. *See Yelton v. PHI, Inc.*, 279 F.R.D. 377, 394 (E.D. La. 2011) (noting that "costs may arise from additional discovery needed after a finding that evidence was spoliated"); *Nacco Materials Handling Grp., Inc. v. Lilly Co.*, 278 F.R.D. 395, 406 (W.D. Tenn. 2011) (ordering additional discovery following party's failure to preserve relevant information); *Res. for Human Dev.*, 843 F. Supp. 2d at 672 (ordering re-taking of depositions of employees responsible for spoliating evidence).

Last, BP reserves its further rights to seek sanctions as additional events or discovery may warrant.

## CONCLUSION

A year ago, BP discovered that Halliburton had performed Displace 3D modeling of Halliburton's failed cement job without producing the results. Since then, BP has had to participate in numerous meet-and-confers and move to compel before Halliburton would admit that this modeling evidence was "gone," and was required to again move for spoliation sanctions before Halliburton admitted that it had in fact "deleted" the evidence. Halliburton has fought every step of the way. Only after the Court ordered Halliburton to attempt recovery and replication of the modeling did Halliburton's actions reveal that it may have deleted more than the one model that was the subject of the parties' briefing to the Court. And now, after fighting BP's right to this model for so long, Halliburton has seized the opportunity to orchestrate the creation of modeling that contradicts the original, contemporaneous description of the deleted model by its own Vice-President of Cementing.

The time has come for BP's year-long quest for the Displace 3D modeling to end. BP respectfully requests an order precluding the introduction of the attempted replication modeling at trial, requiring Halliburton to pay BP's costs for the attempts to recover and recreate the Displace 3D evidence spoliated by Halliburton, and permitting BP expedited discovery in the event that Halliburton objects. BP also reserves its rights to seek further sanctions as necessary.

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
August 2, 2012
Page 13

Thank you for your consideration of this submission.

Respectfully submitted,

/s/ Andrew Langan

Andrew Langan, P.C.

# EXHIBIT 2
**(Filed Under Seal)**

# EXHIBIT 3

**From**: sue englebert [mailto:sueenglebert@sseeservices.com]
**Sent**: Thursday, July 26, 2012 07:23 PM
**To**: sally_shushan@laed.uscourts.gov <sally_shushan@laed.uscourts.gov>
**Cc**: mike_okeefe@laed.uscourts.gov <mike_okeefe@laed.uscourts.gov>; Bowman, Bruce; 'Redgrave, Jonathan' <jredgrave@redgravellp.com>; 'Gasaway, Robert R.' <rgasaway@kirkland.com>; Godwin, Donald; Paul Mattal <pjmattal@elys.com>; Jakob Wahlberg <Jakob@elys.com>
**Subject**: Forensic Exam regarding Halliburton Computers - MDL No 2179

Your Honor,
 As discussed, earlier today, your Order of 27 February 2012 (which considered the Order of January 20, 2012 – record Doc. No. 5307) has been completed.

In Summary:
 Elysium Digital, LLC had complete and unfettered discretion to determine the timing and extent to which further Forensic Examination was accomplished. The computers in your order along with an additional Halliburton Computer was identified and examined in the course of this work (Mark Savery's laptop (new) imaged on external USB s/n WXW1E31FWSU1).

 Halliburton provided additional information readily. Halliburton also gave additional assistance to Elysium to further this Forensic Examination whenever requested and with my involvement. Their cooperation was excellent.

 The forensic efforts were not able to recreate Displace 3D modeling from the fragments found on the laptop or hard drives. Elysium then recreated the Displace 3D modeling per Halliburton's certified inputs. Halliburton's expert also certified the output files. BP and Halliburton were involved in discussions throughout the process. One distinct exception was during the D3D recreation process, BP was not included in discussions on technical input and detailed recreation discussions using the D3D software on my direction.

 Elysium's final report has been delivered to both parties. I have received and taken into evidence storage all materials including 2 copies of the final report.

I would like to mention that although the process took longer than first estimated, I believe Elysium dispatched your order and acted with the utmost of professional decorum to meet the intent of your order. Halliburton and BP also provided me with information and were both professional as well as responsive to all requests.

V/R Capt E

# EXHIBIT 4



**DALLAS** HOUSTON

*Attorneys and Counselors*

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4400
800.662.8393
214.760.7332 Fax

GodwinRonquillo.com

DONALD E. GODWIN, SHAREHOLDER
BOARD CERTIFIED - CIVIL TRIAL LAW -
TEXAS BOARD OF LEGAL SPECIALIZATION
DIRECT DIAL:      214.939.4412
DIRECT FAX:      214.939.4803
DGodwin@GodwinRonquillo.com

August 8, 2012

**VIA EMAIL: Sally_Shushan@laed.uscourts.gov**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
Eastern District of Louisiana
500 Poydras Street, Room B-345
New Orleans, LA 70130

Re:   *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL-No. 2179 – HESI's Response to BP's Request for Further Relief from Halliburton Pursuant to January 20, 2012 Order re Spoliation Sanctions dated August 2, 2012

Dear Judge Shushan:

Like its original Motion for Spoliation Sanctions, BP's Request for Further Relief from Halliburton Pursuant to January 20, 2012 Order re Spoliation Sanctions (the "Request") is filled with material misrepresentations, and makes clear that BP will stop at almost nothing to shift onto others the blame for its reckless decisions that resulted in the April 20, 2010 tragedy. The Request, which is set forth in Andy Langan's August 2, 2012 letter, is attached hereto as Exhibit A. This latest finger-pointing exercise is particularly egregious, however, because BP also seeks to undermine the work of Captain Englebert and the process she put in place to effectuate the Court's January 20, 2012 order (the "Order"). That process yielded *an exact duplicate* of the 3D modeling that was previously performed, based on the creator's (Mark Savery) best knowledge and recollection, and BP should not be relieved of its cost obligations under the Order merely because it does not like the modeling results. HESI fully complied with the Order and all of Captain Englebert's associated directives concerning the 3D modeling.

**A.      HESI Does Not Intend To Use The Modeling That Was Deleted**

BP attempts to create an imaginary and sinister history regarding the deletion of the 3D modeling that is simply untrue and should be rejected. On at least eleven occasions, the Request unfairly characterizes the deletion of the fully recreatable modeling as the "destruction" of

**GODWIN RONQUILLO PC**

The Honorable Sally Shushan
United States Magistrate Judge
August 8, 2012
Page 2

evidence. Because the modeling could be and was recreated, no evidence was "destroyed" and BP has in no way been prejudiced by any previous deletion. Regardless of the foregoing, HESI has no plans to utilize the recreated modeling at trial and it has consistently said that the modeling is not relevant to any issue in this litigation.

**B.     The 2010 Modeling Used Both 7 and 21 Centralizers**

BP's allegation that the 21 centralizer model was not the subject of the Order is incorrect, and its allegation that HESI improperly generated this modeling for "self-serving" purposes is nonsensical. Had the BP attorney who cross-examined Mr. Roth during his full two day deposition asked the right questions, BP would have learned that the modeling was not limited to 7 centralizers. BP incorrectly claims that the July 25, 2010 email correspondence between Mr. Badalamenti and Mr. Roth "was referring to the pre-incident 7-centralizer OptiCem model" and that "the only model referenced" therein was the 7 centralizer model. Request, pp. 2 and 3. BP cites no basis for such far-fetched statements. To the contrary, the email says *nothing* about centralizers or how many models were created. *See* Request, Exhibit A.

HESI's opposition to BP's Motion for Spoliation Sanctions defined "Modeling" as the modeling requested by Mr. Badalamenti and Mr. Roth "of the cement job on the production casing in the Macondo well to be performed utilizing HESI's Displace 3D software." The definition says nothing about centralizers and HESI never represented anything about centralizers to BP or anyone else - BP is simply making up facts to suit its finger-pointing agenda.

In full compliance with the Order, HESI provided the modeling inputs to Elysium so that Mr. Savery's 3D modeling could be recreated. Accordingly, the data inputs provided by Mr. Savery to Elysium included both 7 and 21 centralizers. *See* Exhibit B, Recreation Protocol at ¶ (1)(b)("HESI shall make available for Elysium's inspection, review, and/or use the data inputs utilized by Mark Savery in or about May and/or June of 2010."). When Mark Savery performed the 3D modeling referenced in the July 25, 2010 email, he did so using both 7 and 21 centralizers; and HESI never represented anything to the contrary. *See* Exhibit C, Savery Certification (Elysium's inputs were "the same Displace 3D inputs that I used in May and/or June 2010 to model the cement job on the production casing of the Macondo well.").

BP's claim that it has had "no opportunity for discovery on the apparent deletion of a second Displace 3D model" is absurd. Mr. Roth was deposed for two full days. BP knew that 3D modeling had taken place prior to Mr. Roth's deposition and even questioned him about the July 25, 2010 email during its cross-examination. For tactical reasons, BP chose to limit its questions about the 3D modeling to a few limited topics and intentionally elected not to follow up on basic questions, such as, what Mr. Roth meant by his email. *See* Request, Exhibit D. BP had two full days to question Mr. Roth about the details of the modeling, including how many models were run and whether or not the modeling took into account the number of centralizers, but it chose not to. For reasons known only to BP and its attorney who examined Mr. Roth, they

**GODWIN RONQUILLO PC**

The Honorable Sally Shushan
United States Magistrate Judge
August 8, 2012
Page 3

made the decision not to obtain more detailed information about the modeling. BP should not be allowed to complain now that a model utilizing 7 centralizers was "the only model BP believed to exist". *See* Request, p. 3.

## C.   **The Models Were Correctly Replicated**

Because BP is disappointed with what the replicated modeling reveals, it wants the Court to believe that the modeling "was not replicated" and that the efforts to recreate the deleted model "failed." Request, pp. 1 and 7. The record and the evidence clearly show, however, that although Mr. Savery's prior modeling was not forensically recovered, Elysium successfully "recreated the Displace 3D modeling per Halliburton's certified inputs." *See* Exhibit D, E-mail from Captain Englebert. Per the agreed upon protocol, Mr. Savery certified as follows:

\*       \*       \*

> *I reviewed <u>Elysium's inputs</u> that I believe <u>are the same Displace 3D inputs that I used in May and/or June 2010</u> to model the cement job on the production casing of the Macondo well. I believe <u>these inputs would best reproduce my file(s) in question in 2010</u>, to the best of my knowledge and recollection. Any engineering assumptions or decisions made to create the inputs were, to the best of my recollection, the same engineering assumptions or decisions I made in 2010.*

\*       \*       \*

> Further, I reviewed the Displace <u>3D Software outputs generated by Elysium</u> pursuant to the Stipulation and Agreement and certify, to the best of my recollection that the modeling output <u>is a fair and accurate representation of the Displace 3D modeling produced in May and/or June 2010</u>.

Exhibit C, Savery Certification at 2 (emphasis added); *see also* Exhibit B, Protocol at ¶ 3. If Elysium's modeling output was in any way different than what he generated in 2010, Mr. Savery agreed to "explain the difference(s) between what he recall[ed] was generated in 2010 and [Elysium's] modeling output." *Id.* at ¶ 4. Mr. Savery did not explain any "difference(s)" because there are none. *See* Exhibit C, Savery Certification.

Captain Englebert represented to the Court that the "Order of 27 February 2012 (which considered the Order of January 20, 2012 – record Doc. No. 5307) has been completed." *See* Exhibit D, E-mail from Captain Englebert. HESI fully complied with the Order and all associated Protocols. And in doing so, HESI acted in good faith. *See id.* ("Halliburton provided additional information readily. Halliburton also gave additional assistance to Elysium to further

**GODWIN RONQUILLO PC**

The Honorable Sally Shushan
United States Magistrate Judge
August 8, 2012
Page 4

this Forensic Examination whenever requested and with my involvement. Their cooperation was excellent."). Further, "Elysium dispatched [the] order and acted with the utmost of professional decorum to meet the intent of [the] order." BP got exactly what it asked for and what the Court ordered. Accordingly, BP's allegations that the modeling results are "flawed" or inaccurate should be rejected.

**D.     Captain Englebert, Not HESI, Directed Elysium and the Parties**

Based upon its forensic work, Elysium became very familiar with the D3D software. Captain Englebert suggested that Elysium conduct the modeling, and contrary to BP's allegations, HESI was not "in charge of instructing Elysium how to run the proprietary Displace 3D software". *See* Request, pp. 7 and 9. As contemplated by the Order and associated protocol, Captain Englebert directed the process involved in recreating the 3D modeling:

> \*      \*      \*

> BP and Halliburton were involved in discussions throughout the process. One distinct exception was during the D3D recreation process, BP was not included in discussions on technical input and detailed recreation discussions using the D3D software <u>on my direction</u>.

> \*      \*      \*

> Halliburton <u>and BP</u> also provided me with information and were both professional as well as responsive to all requests.

Exhibit D, Email from Captain Englebert (emphasis added). Captain Englebert, not HESI, made all decisions regarding conference call attendees.

HESI never "instructed" Elysium to do anything. Rather, HESI made itself available to answer any technical questions that Elysium may have had. Exhibit B, Protocol ¶ 1(d). Elysium "had complete and unfettered discretion to determine the timing and extent to which further Forensic Examination was accomplished." *See* Exhibit D, E-mail from Captain Englebert. In fact, BP received every file that Elysium located and believed could be relevant. Elysium's discretion was also unlimited during the recreation process. Accordingly, any claim that HESI "directed" Elysium is wrong. The mere fact that BP did not participate in certain technical calls does not mean that BP was deprived of information or prejudiced in any way. Any suggestion to the contrary is an insult to Captain Englebert and the processes she employed in order to effectuate the Order.

**GODWIN RONQUILLO PC**

The Honorable Sally Shushan
United States Magistrate Judge
August 8, 2012
Page 5

**E.     BP's Request Fails to Acknowledge Different Types of Channeling**

        Prior to the tragic incident on April 20, 2010, BP engaged in a series of reckless acts, including ignoring the advice of Jesse Gagliano, HESI's cementing expert, to minimize channeling based on OptiCem modeling.  Now, in an effort to manipulate the facts and shift the blame for these reckless decisions onto HESI, BP mischaracterizes Displace 3D modeling as being the same as Jesse Gagliano's OptiCem modeling.  As explained below, channeling in the Displace 3D software modeling is not the same as channeling in the OptiCem software modeling.  By attempting to confuse this issue, BP is also attempting to mislead the Court – with the ultimate goal of covering up its own reckless pre-incident decisions.

        As noted in HESI's prior briefing, the OptiCem and Displace 3D software programs determine mud displacement or "channeling" differently.  Docket No. 4961 p. 9.  BP knows that the channeling shown in OptiCem is analyzed or calculated differently than the channeling shown in a Displace 3D model.  More importantly, the channeling shown in OptiCem also incorporates a gas flow potential ("GFP") whereas GFP is not a potential result in the Displace 3D program.  The OptiCem displacement algorithms take into account the rheological properties of the mud (mud that is mobile) and also looks at the static properties of the mud (filter cake) in evaluating fluid displacement and as a result, channeling.  The Displace 3D algorithms only consider the rheological properties (mud that is mobile) of the mud to understand how two fluids intermix, and the extent of that interface, as well as how one fluid displaces another.  Therefore, a Displace 3D model that shows spacer sweeping the annulus, which is evaluating displacement by use of the mud's rheological properties, can still have channeling in Opticem because Displace 3D is not taking into account the static properties of the mud (the mud filter cake).  BP ignores the fact that Displace 3D modeling cannot take into account mud filter cake, the presence of which can lead to the channeling shown in the OptiCem model provided to BP by Jesse Gagliano.

**F.     Conclusion**

        Because HESI will not use the recreated modeling at trial, BP's request for additional discovery is moot.  BP's request for costs should be denied because Mr. Savery's 3D modeling always included both 7 and 21 centralizers and BP had every opportunity to discover this fact, and any other details about the modeling, when it cross-examined Mr. Roth.  Accordingly, the recreation of the 21 centralizer model was indeed subject to the Order and properly occurred. Although the May and/or June 2010 modeling could not be recovered, identical modeling was recreated <u>at BP's request</u>.  BP's dissatisfaction with the results of the modeling is no reason to modify the Order, which provides that "[t]he costs of examination shall be shared equally by Halliburton and BP."  *See* Order p. 3.

**GODWIN RONQUILLO PC**

The Honorable Sally Shushan
United States Magistrate Judge
August 8, 2012
Page 6

Respectfully yours,

Donald E. Godwin

cc:     Plaintiffs' Liaison Counsel
        Defense Liaison Counsel
        Mike Underhill
        States' Coordinating Counsel

# EXHIBIT 5

```
1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  OIL SPILL BY THE OIL RIG    *    Docket 10-MD-2179
     DEEPWATER HORIZON IN THE            *
5    GULF OF MEXICO ON APRIL 20, 2010    *    Section J
                                         *
6    Applies to:                         *    New Orleans, Louisiana
                                         *
7    Docket 10-CV-02771,                 *    March 11, 2013
     IN RE:  THE COMPLAINT AND           *
8    PETITION OF TRITON ASSET            *
     LEASING GmbH, et al                 *
9                                        *
     Docket 10-CV-4536,                  *
10   UNITED STATES OF AMERICA v.         *
     BP EXPLORATION & PRODUCTION,        *
11   INC., et al                         *
                                         *
12   *  *  *  *  *  *  *  *  *  *  *  *  *  *

13

14                    DAY 9, AFTERNOON SESSION
                     TRANSCRIPT OF NONJURY TRIAL
15              BEFORE THE HONORABLE CARL J. BARBIER
                    UNITED STATES DISTRICT JUDGE
16

17   Appearances:

18

19   For the Plaintiffs:        Domengeaux Wright Roy
                                   & Edwards, LLC
20                              BY:  JAMES P. ROY, ESQ.
                                556 Jefferson Street, Suite 500
21                              Post Office Box 3668
                                Lafayette, Louisiana 70502
22

23   For the Plaintiffs:        Herman Herman & Katz, LLC
                                BY:  STEPHEN J. HERMAN, ESQ.
24                              820 O'Keefe Avenue
                                New Orleans, Louisiana 70113
25
```

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 08:39:35 1 | who is working on the file day in and day out on behalf of |
| 08:39:38 2 | Halliburton, would have been aware of it, correct? |
| 08:39:40 3 | A.    That would be my expectation. |
| 08:39:40 4 | Q.    You knew that BP's well design was challenging because it |
| 08:39:44 5 | limited the amount of cement that could be poured? |
| 08:39:49 6 | A.    Could be pumped? |
| 08:39:49 7 | Q.    Pumped?  Sorry. |
| 08:39:51 8 | A.    Correct. |
| 08:39:51 9 | Q.    You also knew from the OptiCem modeling there was a high |
| 08:39:59 10 | risk of a severe gas flow problem, correct? |
| 08:40:01 11 | A.    That was in the documents that I reviewed, yes, sir. |
| 08:40:03 12 | Q.    Okay.  What was the -- and you also knew, for example, |
| 08:40:08 13 | that Jesse Gagliano had warned BP that if the tube wasn't |
| 08:40:14 14 | centered, cement in the hole could go to one side more than the |
| 08:40:18 15 | other, creating a weakness? |
| 08:40:19 16 | MR. REGAN:  Objection, Your Honor. |
| 08:40:20 17 | THE WITNESS:  It could potentially create a channel. |
| 08:40:23 18 | THE COURT:  Wait, sir. |
| 08:40:23 19 | MR. REGAN:  I object to the question.  I think that |
| 08:40:26 20 | misstates the evidence. |
| 08:40:27 21 | You may be doing it casually, but it's not a |
| 08:40:30 22 | casual topic. |
| 08:40:33 23 | THE COURT:  All right.  Overrule the objection.  I'm |
| 08:40:37 24 | going to let the witness answer.  I think he did say.  He said, |
| 08:40:39 25 | we could potentially.  Is that your answer? |

**OFFICIAL TRANSCRIPT**

08:40:41  1          THE WITNESS:  Could you repeat the question, please?

08:40:43  2          MR. KANNER:  Sure.

08:40:46  3   BY MR. KANNER:

08:40:46  4   Q.   You knew that BP's well design was challenging -- I'm

08:40:52  5   sorry, strike that.  I asked that question.

08:40:55  6          You knew that Jesse Gagliano had warned BP that if

08:40:59  7   the tube wasn't centered, cement poured in the hole could go to

08:41:03  8   the wider side, leaving a weaker barrier on the other side?

08:41:07  9   A.   Actually, it would leave undisplaced mud or fluid on the

08:41:11 10   other side.  It was a channel is what the software had modeled.

08:41:15 11   Q.   That would create a risk of a potential blowout, correct?

08:41:23 12   A.   No, sir.

08:41:23 13   Q.   What would be the risk?

08:41:25 14   A.   There is no risk.  At the end of the cement job, the well

08:41:28 15   is hydrostatically dead.

08:41:31 16   Q.   Did Brian Morel tell -- so -- okay.

08:41:33 17          Now, you've been asked about the defoamers, and

08:41:38 18   you've been asked about the SCR-100, and I won't get into that.

08:41:43 19          You called a number of these items red flags for BP.

08:41:47 20   Do you recall that testimony?

08:41:48 21   A.   I do.

08:41:49 22   Q.   Why were they red flags?

08:41:52 23   A.   Because they were indicators that the cement placement was

08:41:57 24   going to be a job that would have a low probability of success.

08:42:02 25   It would take perfect conditions for a successful cement job

**OFFICIAL TRANSCRIPT**

# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA       :

      v.                 :       **CRIMINAL NO.**

HALLIBURTON ENERGY SERVICES, INC.   :

## COOPERATION GUILTY PLEA AGREEMENT

Under Rule 11(c)(1)(A) and 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and in compliance with the holding of Bryan v. United States, 492 F.2d 775 (5th Cir. 1974), the government and Halliburton Energy Services, Inc., the defendant, by and through its counsel, enter into the following guilty plea agreement. Any reference to the United States or the government in this agreement shall mean the United States Department of Justice, including, but not limited to, the Deepwater Horizon Task Force, the Criminal Division and all of its sections, and of all the United States Attorney's Offices for each judicial district of the United States.

1.      The defendant agrees to plead guilty to Count One of an information charging it with a misdemeanor violation of 18 U.S.C. §1030(a)(5)(A), subject to 18 U.S.C. §1030(c)(4)(G)(i), arising from the deletion of records created after the explosion on board the *Deepwater Horizon* in the Gulf of Mexico. The defendant agrees to the factual allocution contained in Exhibit A to this plea agreement.

2.      The defendant, and all affiliates and successors and assigns thereof, agree to continue to cooperate fully and truthfully with the Deepwater Horizon Task Force in any criminal investigation related to or arising from the *Deepwater Horizon* blowout, explosion, oil spill and

response, and further agree to cause any other present or future parent, affiliate, division or subsidiary of the defendant (collectively, "any other Halliburton entity" or "the other Halliburton entities") to continue to cooperate fully and truthfully as to the same matters. Cooperation shall continue to include but not be limited to: (a) promptly disclosing any and all criminal or potentially criminal conduct of which the defendant or any other Halliburton entity is currently aware relating to or arising from the *Deepwater Horizon* blowout, explosion, oil spill and response; (b) promptly producing documents to the Deepwater Horizon Task Force upon request; (c) promptly making current employees and agents available, and promptly making best efforts to make former employees and agents available, to the Deepwater Horizon Task Force upon request for interview or for testimony in any proceeding and subject to those current and former employees' and agents' own legal rights; and (d) making reasonable efforts to ensure that its current and former employees and agents provide full and truthful information upon request of the Deepwater Horizon Task Force and subject to those current and former employees' and agents' own legal rights; provided, however, that compliance with this paragraph shall not be construed as requiring or effecting a waiver of the attorney-client privilege or work product protections.

3.       The parties agree that this plea agreement is made pursuant to Fed. R. Crim. P. 11(c)(1)(A) and 11(c)(1)(C) and that the following specific sentence is the appropriate disposition of this case. If the Court rejects this plea agreement, it is further agreed that the defendant may withdraw its plea. The parties agree that because there is sufficient information in the record and because restitution is inapplicable, in accordance with Fed. R. Crim. P. 32 (c)(1)(ii) and 32(c)(1)B), respectively, a presentence investigation and report are not required. Accordingly, if acceptable to the Court, the parties agree to waive the presentence investigation and report

2

pursuant to Fed. R. Crim. P. 32(c), and ask that defendant be sentenced at the time the guilty plea is entered. This agreed-upon sentence is as follows:

      (a)    Payment of the statutory maximum criminal fine of $200,000, to be paid within five calendar days after sentencing.

      (b)    A term of three years of probation. Probation shall include the following mandatory and discretionary special conditions, pursuant to 18 U.S.C. § 3563(a) and (b):

          (i)    The defendant shall not commit another federal, state, or local crime.

          (ii)    The defendant shall notify the probation officer within seventy-two hours of any criminal prosecution against the defendant.

          (iii)    The defendant shall answer truthfully all inquiries by the probation officer.

          (iv)    The defendant shall provide to the probation officer full access to any of the defendant's business operating locations upon reasonable notice.

          (v)    The defendant shall give reasonable notice to the probation officer of any change in its principal business location or mailing address.

    4.    The defendant agrees to pay the Court-ordered special assessment in the amount of $125 immediately following sentencing and shall provide a receipt from the Clerk to the government following sentencing as proof of this payment.

5.     The defendant hereby waives any right to a trial as to the payment of the statutory-maximum criminal fine of $200,000, pursuant to 18 U.S.C. § 3571(c)(5).

6.     The defendant will acknowledge acceptance of this plea agreement by the signature of its counsel and shall provide to the Department, as Exhibit B hereto, a certified resolution of the Board of Directors of the defendant, authorizing the defendant to enter a plea of guilty and authorizing an agent to execute this agreement.  The defendant will further provide a certified resolution of the Board of Directors of the defendant providing as follows:

a.     The defendant shall be bound by those specific terms of this agreement that expressly apply to the defendant, and any other Halliburton entity shall be bound by those specific terms that expressly apply to other Halliburton entities.  Any legal successor or assign of defendant shall remain liable for the defendant's obligations in this plea agreement, and an agreement to remain so liable shall be included by the defendant in the terms of any sale of the defendant, acquisition of the defendant by another entity, or merger of the defendant into another entity.

b.     The defendant and any other Halliburton entity waive any applicable federal criminal statute of limitations as of the date of this agreement through the conclusion of the defendant's term of probation, during which the defendant is required to have satisfied all of its obligations under this agreement, with regard to any conduct relating to or arising from the *Deepwater Horizon* blowout, explosion, oil spill and response.

7.     The government agrees that, subject to paragraph 2 of this agreement, the government shall not further prosecute the defendant or any other Halliburton entity, including any predecessor, successor or assign of the above, for any conduct relating to or arising from events in connection with the *Deepwater Horizon* blowout, explosion, oil spill or response.  In the

4

event that the court that accepts the guilty plea pursuant to this agreement determines that the defendant has breached this agreement, the defendant will not be entitled to withdraw its plea of guilty, and the Department may prosecute the defendant and any other Halliburton entity, or any predecessors, successors or assigns of any of the above, for any conduct relating to or arising from the Deepwater Horizon blowout, explosion, oil spill and response notwithstanding the expiration of any applicable statute of limitations following the signing of this plea agreement. In the event of any such prosecution, the Department may use the defendant's statements in Exhibit A as admissible evidence against the defendant or any other Halliburton entity.

8.       The Department agrees that, if requested to do so, it will advise any appropriate suspension or debarment authorities that, in the Department's view, the defendant has accepted responsibility for the defendant's criminal conduct described in Exhibit A by virtue of this guilty plea, and that the defendant has provided significant and valuable cooperation during the course of the Deepwater Horizon Task Force's investigation and has agreed to continue to cooperate in any ongoing criminal investigation by the Department relating to the *Deepwater Horizon* blowout, explosion, oil spill and response. The Department acknowledges the defendant's voluntary and unconditional contribution of a total of $55 million on July 25, 2013, to the National Fish and Wildlife Foundation. Such contribution is not conditioned in any way on the terms of this plea agreement, nor are the terms of this plea agreement conditioned in any way on the contribution. Nothing in this agreement limits the rights and authority of the United States of America to initiate civil or administrative action against the defendant including but not limited to any listing or debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans and benefits from United States government agencies.

5

9.      In exchange for the undertakings made by the government in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

10.     The defendant waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney's fees and other litigation expenses arising from the investigation or prosecution of this matter.

11.     The defendant waives all rights, whether asserted directly or by a representative, to request to receive from any department or agency of the United States any records pertaining to the criminal investigation or prosecution of this criminal case that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a, and the United States reserves all rights and privileges it may have as to those records.

12.     The defendant is satisfied with the legal representation provided by the defendant's lawyers; the defendant and its lawyers have fully discussed this plea agreement; and the defendant is agreeing to plead guilty because the defendant admits that it is guilty of a misdemeanor violation of 18 U.S.C. § 1030(a)(5)(A), subject to 18 U.S. C. § 1030(c)(4)(G)(i),

13.     It is agreed that the parties' guilty plea agreement contains no additional promises,

agreements, or understandings other than those set forth in this written guilty plea

agreement, and that no additional promises, agreements, or understandings will be entered into

unless in writing and signed by all parties.


_Derek Cohen /ew_
_____
**JOHN D. BURETTA**
**Director, Deepwater Horizon Task Force**
**DEREK A. COHEN**
**Deputy Director, Deepwater Horizon Task Force**



_____
**BRACEWELL & GIULIANI LLP**
**COUNSEL FOR HALLIBURTON ENERGY SERVICES, INC.**
**BY:  MARC L. MUKASEY, ESQ.**

**Richard W. Beckler**
**Philip J. Bezanson**
**Kevin A. Ewing**
**Jonathan N. Halpern**
**Jason B. Hutt**
**OF COUNSEL**


Date:  July 25, 2013

<u>Exhibit A</u>

Defendant Halliburton Energy Services, Inc. (hereinafter, "HESI") agrees that, if the case were to proceed to trial, the government could establish beyond a reasonable doubt that:

1.  Defendant HESI employed hundreds of employees who worked throughout the Gulf of Mexico providing various services with respect to deepwater oil and natural gas drilling operations. Defendant HESI had offices in, and engaged in regular business throughout, the states bordering the Gulf of Mexico, including in the Eastern District of Louisiana, and maintained offices for Gulf operations in Houston, Texas.

2.  On or about May 2, 2008, BP Exploration and Production, Inc. ("BP") entered into a lease with the Minerals Management Service, granting BP the rights to oil and gas reservoirs at a site called Mississippi Canyon Prospect # 252 ("MC # 252") on the Outer Continental Shelf in the Gulf of Mexico.   A well drilled at MC # 252, which BP referred to as the Macondo well, lay approximately 48 miles from the Louisiana shoreline in approximately 5,000 feet of seawater.

3.  Defendant HESI was contracted to provide BP with cementing and other services with respect to BP's drilling plan for the Macondo well.

4.  On or about October 6, 2009, drilling commenced on the Macondo well using the *Marianas* drilling rig.   On or about November 9, 2009, work was halted due to Hurricane Ida.

5.  On or about January 31, 2010, the *Deepwater Horizon* drilling rig arrived at the Macondo well to resume drilling pursuant to BP's well design, drilling program, and instructions.   On or about April 9, 2010, drilling of the Macondo well was completed, at a total depth of approximately 18,360 feet below sea level.

6.  During the evening of April 20, 2010, a blowout occurred on the *Deepwater Horizon*.   Natural gas and oil that had entered the well rushed up the riser and onto the rig floor.   The natural gas ignited, causing multiple explosions, killing eleven men onboard.   A fire onboard the Deepwater Horizon burned for two days, and resulted in the *Deepwater Horizon* sinking on or about April 22, 2010.   Beginning at the time of the blowout, oil and natural gas flowed into the Gulf of Mexico.

7.  On April 27, 2010, the United States Departments of the Interior and Homeland Security announced investigations of the incident.   In the weeks following the blowout, more government investigations were launched.   Investigating agencies required that HESI preserve

and produce information, documents and other materials related to HESI's work on the Macondo well. HESI was under a legal obligation to preserve documents relating to the Macondo well.

8.   After the incident, HESI and others examined various technical aspects of the well's design and construction.   On or about May 14, 2010, HESI's Cementing Technology Director directed a HESI Senior Program Manager for the Cement Product Line ("Program Manager") to run two computer simulations of the Macondo well cementing job using HESI's Displace 3D simulation program to compare alternative predictions of the cement job in the production casing, which included different numbers of centralizers.   Displace 3D was a next-generation simulation program that was being developed to model fluid interfaces and their movement through the wellbore and annulus of a well.

9.   As directed, the Program Manager ran the simulations, which took over an hour to complete. Program Manager then showed the results, contained on his HESI laptop, to defendant HESI's Cementing Technology Director and possibly one other HESI senior manager.   HESI's Cementing Technology Director then directed Program Manager to delete the results even though the Cementing Technology Director and others had been instructed by another Halliburton executive to preserve material related to the Macondo well.   Program Manager felt uncomfortable deleting the simulations but nonetheless followed the direction of defendant HESI's Cementing Technology Director to delete the simulations by (1) entering his HESI computer, locating the relevant files within the computer (which files contained a ".d3d" identifier) and deleting those files, and then (2) entering the computer's "Recycle Bin," accessible through the user interface of the computer, and erasing the deleted files from that location as well.   Program Manager later acknowledged the deletion to another employee ("Employee 1") and stated, "I did what I was told."

10.   In or about May and June 2010, HESI's Cementing Technology Director asked Employee 1, who was more experienced than Program Manager at running Displace 3D simulations, to also run two simulations, which included different numbers of centralizers.   Employee 1 did so and then showed at least some of the results, contained on his HESI laptop, to defendant HESI's Cementing Technology Director and another manager.   Employee 1 was then directed to delete the simulations.   Because Employee 1 felt uncomfortable destroying the simulations, Employee 1 delayed destroying the simulations for some time but, ultimately, like Program Manager before him, deleted them from his HESI computer.   Employee 1 was not authorized to delete this data.

11.  During ensuing civil litigation and federal criminal investigation by the Deepwater Horizon Task Force, subsequent efforts to forensically recover the deleted Displace 3D computer simulations from May/June 2010 were unsuccessful.

12.  The HESI computers upon which the materials were stored and later deleted were used in and affecting interstate and foreign commerce and communication.

13.  The conduct of HESI's Cementing Technology Director, as described herein, was unauthorized but within the scope of the Cementing Technology Director's employment.   Accordingly, HESI acknowledges criminal responsibility for such conduct.

14.  The aforementioned conduct by defendant HESI includes the defendant's knowing transmission of a command and as a result of such conduct intentionally caused damage without authorization to a protected computer, to wit:   the deletion on HESI computers of Displace 3D simulations conducted in May/June 2010, in violation of 18 U.S.C. § 1030(a)(5)(A), subject to 18 U.S.C. § (c)(4)(G)(1).

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the | § | |
| GULF OF MEXICO, | § | SECTION: J |
| on APRIL 20, 2010 | § | |
| | § | JUDGE BARBIER |
| Applies to:    All Cases | § | |
| | § | MAG. JUDGE SHUSHAN |

**AFFIDAVIT OF PAUL M. OSBORNE**

| | |
|---|---|
| THE STATE OF TEXAS | ) |
| | ) |
| COUNTY OF HARRIS | ) |

BEFORE ME, the undersigned authority, on this day personally appeared, Paul M. Osborne, who, after being duly sworn, upon his oath did state the following:

1.        "My name is Paul M. Osborne. I am over the age of twenty-one (21). I am of sound mind, have never been convicted of a felony and am competent to make this Affidavit. I have personal knowledge of all of the facts stated in this Affidavit, and they are true and correct.

2.        I am currently employed as Halliburton Energy Services, Inc.'s ("HESI") Regional Technology Manager for Gulf of Mexico Cementing. I have been employed by HESI for approximately eleven (11) years, beginning in January 2002. During this time, I have served in various positions, including Associate Technical Professional, Technical Professional, Senior Technical Professional, Account Representative, Sr. Account Representative, and Cementing Technical Advisor.

3.        By virtue of my responsibilities and training while employed at HESI, I have personally used and am familiar with HESI's proprietary OptiCem and Displace 3D modeling software programs. I also have trained employees in the use of both software programs.

4.        Currently, HESI employs two different software models to predictively evaluate the performance of a cement job design. One software model, called OptiCem, is a two-dimensional hydraulics model that has been HESI's primary predictive model for approximately 13 years and continues to be so today. The other software model, called Displace 3D ("D3D"), is a computational fluid dynamics model that enhances a cement engineer's ability to predict fluid displacement. While both OptiCem and D3D evaluate, among other things, the likelihood of channeling, each program executes a different type of channeling evaluation. As further explained below, OptiCem primarily evaluates whether mud channeling might occur based on the static gel strengths of the drilling mud in the wellbore. Displace 3D, on the other hand,

Page 1

primarily evaluates whether channeling might occur due to the intermixing of fluids at their interfaces during the pumping operation and the corresponding changes in the fluids' rheologies.

5.    In April 2010, HESI employed OptiCem as the primary means of predicting certain performance parameters of a cement job design. In April 2010, D3D was a relatively new model in HESI field operations. The initial version of D3D was released in 2008, but it only modeled Newtonian fluids.[1] A second version of D3D (D3D v.2) was released nine months later. While this second version of D3D enhanced the software model's ability to predict the behavior of non-Newtonian fluids,[2] it was relatively new to HESI's field operations and was still encumbered by certain limitations. D3D v.2 was the D3D software available to HESI employees in April, May and June 2010.

6.    Among the important outputs of both OptiCem and D3D are their respective abilities to predictively model whether the cement job, as designed and modeled, will channel.[3] Both programs use the percentage of standoff (as determined by, among other things, the number and placement of centralizers) as an input. The percentage of standoff is the degree to which the casing is off-center in the wellbore, with a 100% standoff indicating that the casing is perfectly centralized and a 0% standoff indicating that the casing is touching one side of the wellbore. Generally, the lower the standoff percentage, the more likely the fluids will flow unevenly up the annulus. If the annulus is off-center, then the fluids—*e.g.*, the cement—will take the path of least resistance up the annulus, leaving a channel of fluids—*e.g.*, mud—in the narrower portion of the wellbore. Although both modeling programs use the percentage of standoff as an input, there are significant differences in how OptiCem and D3D evaluate and express channeling. Those significant differences also existed at the time D3D v.2 was in use.

**OptiCem Predicts Channeling Due to Erodibility**

7.    OptiCem predicts, among other things, whether channeling will occur during a cement job due the "erodibility" of the drilling mud *already in the wellbore*. Channeling, in turn, increases the height of the annular cement column, and this height is a key input into OptiCem's calculation of gas flow potential (GFP).

8.    OptiCem determines the likelihood that fluids pumped into the well (spacers, cements) will channel through the fluid that already exists in the well (drilling mud) by predicting the extent of "erodibility." The erodibility function in OptiCem is important because

---

[1] A Newtonian fluid is a fluid that has a constant viscosity at all shear rates at a constant temperature and pressure. In layman's terms, when a Newtonian fluid is pumped through a pipe, the pumping force applied at one end of the pipe to move the fluid through the pipe is approximately the same as the force exerted at the other end of the pipe; frictional shear forces are negligible.

[2] A non-Newtonian fluid is a fluid that does *not* have a constant viscosity at all shear rates. Again, in layman's terms, when a non-Newtonian fluid is pumped through a pipe, the pumping force applied at one end of the pipe to move the fluid through the pipe is *less* than the force exerted at the other end of the pipe; frictional shear forces create changing viscosities in the fluid.

[3] Channeling refers to a condition in which cement flows non-radially around casing, thereby leaving a non-cemented space on one side of the casing.

it predicts the extent to which gelled drilling fluid[4] is removed—literally "eroded"—from the wellbore's annulus during the pumping of a cement job (when the spacer fluid displaces the drilling mud, followed by the cement displacing the spacer fluid).  The removal of gelled mud during a cement job is critical because, if not displaced, unremoved mud can contaminate the cement and create mud channels, which are pathways through which formation fluids could potentially flow.  Taking into account the gel strengths of the drilling mud, the degree of pipe standoff/centralization, and the properties of the spacer and cement, OptiCem predicts whether the spacer and cement can effectively remove or displace the gelled drilling mud in the wellbore so that cement can be effectively placed without contamination and channeling.

### D3D Predicts Channeling Due to Rheological Changes Caused by Intermixing

9.      D3D, on the other hand, does not evaluate at all the possibility of mud channeling due to insufficient erosion of gelled drilling mud, nor does it model gas flow potential (GFP).  Rather, D3D models fluid interfaces and the movement and growth of those interfaces through the inside of the casing and annulus.  Whereas OptiCem assumes these interfaces to be clean, D3D specifically looks at the fluid interfaces and, *based primarily on the rheological properties of each fluid*, predicts the extent to which the fluids intermix and how they move through the casing and annulus.  As stated below in more detail, D3D evaluates the extent to which unevenly distributed interfaces, coupled with the degree of pipe standoff/centralization, can create channels in the annulus.

10.      D3D relies on the percentage of standoff/centralization and differences in fluid viscosity to determine how the various fluid stages in a cement job might intermix and displace each other.  In other words, it shows, in a 3D visual rendering, whether there is an uneven distribution of fluid flow up the annulus based primarily on the degree to which the casing is centralized and the viscosity of the fluids being pumped into the well.  So, in the case of cement, where a cement displaces unevenly up the annulus due to intermixing, the distance between the top of the cement on the "wide" side of the annulus and the top of the same cement on the "narrow" side of the annulus is often termed the "channel length."

11.      Unlike OptiCem, D3D does not predict whether channeling will occur due to ineffective displacement of drilling mud already in the well prior to the cement job.  D3D does not take into account the static gel strengths of the drilling mud in the wellbore.  That OptiCem and D3D execute different types of channeling evaluations is one reason why HESI recently

---

[4] When drilling mud is static in a wellbore, it develops gel strength.  Depending on the temperature at a particular depth of the well and the amount of time the mud sits static, different parts of the mud column can build different gel strengths.  It is critical to a successful cement job to break the gel strengths of these mud pockets in the mud column filling the wellbore.  Circulating the mud "bottoms up" (from the bottom of the well to the rig) assists in returning the mud column to a uniform viscosity, assisting in it being displaced by spacer and cement during a cement job.  Adding centralizers to the well casing will create a centralized casing which will allow for the creation of the best possible flow regime to promote optimal fluid displacement.

integrated the functionality of both programs into "iCem," the modeling software suite that HESI uses today.[5]

### Inputs Required for Accurate D3D Modeling

12.     Just like any other fluid dynamics model, the quality of the modeling output is dependent on the quality of the inputs.  To accurately model with D3D, the user must determine numerous rheological inputs prior to running the model.  These rheological inputs are derived from laboratory testing of all fluids to be used on a particular job.  For example, in the case of Macondo, the production casing cement design called for displacing drilling mud in the annulus by sequentially pumping the following fluids in the following order:  base oil; water-based cementing spacer with surfactants (high grade soaps); unfoamed cap cement; foamed cement; unfoamed tail cement; and water-based cementing spacer.  In order to accurately model this job in D3D according to standard HESI protocols, laboratory testing is required to ascertain the rheological properties of the following fluid interfaces—(1) drilling mud/base oil, (2) base oil/spacer, (3) drilling mud/spacer, (4) spacer/unfoamed cement, and (5) unfoamed cement/foamed cement.

13.     For each of these designed interfaces, fluid compatibility/ratio tests should be conducted to ascertain the rheology/viscosity of each fluid at the interface and for the fluids mixed in at least five (5) ratio mixtures—95/5, 75/25, 50/50, 25/75 and 5/95.  For example, with respect to the spacer/unfoamed cement interface, rheology tests would be run on 100% spacer and 100% unfoamed cement.  Then separate fluid compatibility tests would be run with: 95% spacer and 5% unfoamed cement; 75% spacer and 25% unfoamed cement; 50% spacer and 50% unfoamed cement; 25% spacer and 75% unfoamed cement; and 5% spacer and 95% unfoamed cement.  These same fluid ratio tests should also be conducted using the other fluids designed to interface—drilling mud/base oil, base oil/spacer, drilling mud/spacer, and unfoamed cement/foamed cement.  All of these tests should be conducted using at least three different temperatures in order to simulate the range of temperatures the fluids will encounter downhole.  Such testing likely would take at least two days and generally requires field/rig samples of mud, cement and water.  Even if D3D could accurately model a compressible foamed cement (which it cannot as set forth below), any attempt to model a cement job representative of the Macondo production casing cement job requires this rheological testing data to be used as key inputs.

### D3D Cannot Handle Compressible Fluids

14.     Even if the foregoing testing is performed and representative rheological profiles of the fluid interfaces are obtained, D3D's ability to representatively model a *foamed* cement job is impaired because the software programming does not handle fluid *compressibility*.  Foam cement is a compressible fluid, meaning its density and viscosity change significantly in response to temperature and pressure.  While at HESI, I have been trained that, notwithstanding D3D's inability to model a compressible fluid, a foam cement could be modeled if *an accurate rheological representation* of foam cement under the appropriate temperatures and pressures is

---

[5] The version of D3D integrated into iCem today is an even more enhanced than the D3D v.2 available to HESI engineers in April, May and June 2010.  For example, the newest version now accounts for fluid density by modeling gravitational forces, important functionality that was not included in D3D v.2.

known.  But obtaining an accurate rheological representation of foam cement at various temperatures and pressures is difficult (some might say, impossible) because the density and the viscosity of the compressible foam slurry are continuously changing in response to changing temperatures and pressures existing in a well.  Separate and apart from this limitation, D3D does not model whether a foamed cement slurry is a stable or unstable foam slurry.

15.    It may be possible to obtain a reasonably accurate rheological representation of foam cement in wells with minimal temperature and pressure changes—for example, shallow foam cement jobs.  However, in deepwater wells such as Macondo, where there are large temperature and pressure changes from the rig to the bottom of the well, it is very difficult to obtain an accurate rheological representation of the foam cement over a distance of more than three miles.  During such a cement job, because the foam slurry experiences widely changing temperatures and is continually compressed under greater and greater pressure, the density and viscosity of the foam slurry continually change until the slurry reaches the bottom of the well.

### D3D v.2 Did Not Account for Density/Gravity

16.    A further limitation of D3D v.2 is that it did not take into account fluid density when evaluating whether one fluid could effectively displace another, meaning that it could not model the effect of gravitational forces on the fluids as they were pumped and then displaced in the annulus.[6]

### Post-Incident D3D Modeling (by HESI and Elysium) Is Not Representative of the Macondo Cement Job

17.    I have reviewed both the input and output files of the D3D v.2 recreations performed by Elysium, as well as the Certification of Mark Savery regarding those recreations.  The modeling performed by Mr. Savery and Elysium after the incident has very limited bearing on whether the OptiCem modeling performed by HESI prior to the pumping of the Macondo production cement job accurately predicted a likelihood of mud channeling due to insufficient centralization.  D3D v.2 neither accounted for nor attempted to determine the likelihood of channeling due to the "erodibility" of drilling mud already in the wellbore.

18.    Moreover, the post-Incident D3D modeling performed by Mr. Savery and recreated by Elysium is not an accurate representation of the Macondo production casing job.  First, none of the critical compatibility testing at different mix ratios, which are the key inputs for the rheological D3D model, were performed and used for any of the five (5) fluid interfaces in the Macondo cement design.  Thus, these D3D models were not run consistent with the standard protocols on which HESI's engineers are trained to run the program and on which the model's calculations rely for an accurate result.  Second, because of its inability to handle compressible fluids (such as foamed cement), it is very difficult to obtain an accurate rheological representation of the foam slurry as it traveled more than three miles into the Macondo well experiencing wide temperature and pressure changes which continuously changed the slurry's density and viscosity.  Finally, the modeling performed by Mr. Savery and Elysium could not

---

[6] Because the densities of various fluids are important to the accuracy of modeling, the current version of D3D integrated into iCem today now accounts for fluid density effects by modeling gravitational forces.

account for the effects of gravitational forces on fluid densities due to limitations in D3D v.2. Each of these things individually, and all of them cumulatively, render the D3D v.2 modeling at issue unrepresentative of the actual foam cement job pumped on the Macondo production casing cement job.

Further, Affiant sayeth not."

PAUL M. OSBORNE

SWORN AND SUBSCRIBED TO BEFORE ME on this 2 day of October, 2013.

ROSEMARY S. MERCER
Notary Public, State of Texas
My Commission Expires
July 17, 2017

Notary Public in and for the
STATE OF TEXAS

Notary Seal:

# EXHIBIT 8

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4    *****************************************************************

5    IN RE:  OIL SPILL BY THE OIL
     RIG *DEEPWATER HORIZON* IN THE
6    GULF OF MEXICO ON APRIL 20,
     2010
7

8                        CIVIL ACTION NO. 10-MD-2179 "J"
                         NEW ORLEANS, LOUISIANA
9                        Thursday, March 7, 2013

10

11   THIS DOCUMENT RELATES TO:

12   CASE NO. 2:10-CV-02771,
     *IN RE:  THE COMPLAINT AND*
13   *PETITION OF TRITON ASSET*
     *LEASING GmbH, ET AL*
14
     CASE NO. 2:10-CV-4536,
15   *UNITED STATES OF AMERICA V.*
     *BP EXPLORATION & PRODUCTION,*
16   *INC., ET AL*

17
     *****************************************************************
18

19

20              **DAY 8 - MORNING SESSION**

21        TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

22    HEARD BEFORE THE HONORABLE CARL J. BARBIER

23              UNITED STATES DISTRICT JUDGE

24

25

OFFICIAL TRANSCRIPT

14:32 1  either you have a reduction in the volume of your -- a significant

08:44:35 2  reduction in the top of your sample or you got water that goes to

08:44:39 3  the top and creates a void, right?

08:44:42 4  A.  Yes, sir.

08:44:42 5  Q.  Visual signs of density segregation, indicated by streaking or

08:44:48 6  light to dark color change from top to bottom, that's just a visual

08:44:53 7  observation, correct?

08:44:53 8  A.  Yes, sir.

08:44:54 9  Q.  The bottom one, large variations in density from sample top to

08:44:56 10  bottom, that's something we primarily look at in the set test where

08:45:00 11  we measure the specific gravity of the set from top to bottom,

08:45:03 12  correct?

45:03 13  A.  Well, actually, you can run a tube and pull a sample, so you

08:45:06 14  can check the unfoamed density -- I'm sorry, the unset density, let

08:45:11 15  me correct myself, of the liquid sample and there's -- so you can

08:45:15 16  do both.

08:45:16 17  Q.  Fair enough.  Now, you understand that the unset foam stability

08:45:20 18  test that was run by OTC, that Mr. Garrison testified that none of

08:45:24 19  these indications of instability were observed in that slurry?

08:45:27 20  A.  That's right, Dr. Garrison did do that.

08:45:30 21  Q.  And you would trust his ability to actually make these physical

08:45:33 22  observations that are either based on physical artifacts you can

08:45:36 23  see or measurements you can physically take, right?

08:45:39 24  A.  Yes, sir.

08:45:39 25  Q.  So, sir, if you would agree that an unset foam stability test

2437

| | |
|---|---|
| ₅5:44 | 1 |
| 08:45:51 | 2 |
| 08:45:54 | 3 |
| 08:46:02 | 4 |
| 08:46:07 | 5 |
| 08:46:08 | 6 |
| 08:46:23 | 7 |
| 08:46:27 | 8 |
| 08:46:32 | 9 |
| 08:46:33 | 10 |
| 08:46:38 | 11 |
| 08:46:39 | 12 |
| 46:41 | 13 |
| 08:46:45 | 14 |
| 08:46:50 | 15 |
| 08:46:52 | 16 |
| 08:46:52 | 17 |
| 08:47:01 | 18 |
| 08:47:52 | 19 |
| 08:47:57 | 20 |
| 08:48:02 | 21 |
| 08:48:03 | 22 |
| 08:48:06 | 23 |
| 08:48:10 | 24 |
| 08:48:11 | 25 |

on a MAC 4 slurry, even if it was more than a year old, if it did

not demonstrate any signs of instability identified at API 10B-4,

that it's reasonable to consider that a stable foam stability test?

A.  Well, the data shows that the OTC sample was a stable foam

stability test.

Q.  Thank you.  So let's go to -- let's talk a little bit about the

Halliburton testing that you reviewed, okay.  You stated in your

report that you thought that the testing was incomplete.

A.  Yes, sir.

Q.  And you identified some of the tests that you thought should

have been run, correct?

A.  Yes.  Yes, sir.

Q.  And you also looked at Halliburton's contract with BP to

identify what tests BP had asked Halliburton to do with respect to

different types of cement jobs, right?

A.  That's correct.

Q.  I want to bring that up, it's TREX 4477, and let's go to page

ending Bates 5804.  That's not it.  It ends in 5809.  I gave you

the wrong number, my apologies.  5809.  I can't read my own

handwriting.  I apologize for the delay.  Can you bring up the box,

please, here.

        You looked at this, and I think in your report, you said

that the only test that you found that Halliburton didn't run was a

free water test, right?

A.  That's correct.

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 09:43 | 1 need to go into the blender in order to get the right proportions |
| 09:09:47 | 2 of slurry to one, correct? |
| 09:09:48 | 3 A. That's correct. |
| 09:09:49 | 4 Q. And that number was off? |
| 09:09:50 | 5 A. That number was wrong. |
| 09:09:51 | 6 Q. Now, if your in the lab and procedurally you know that there is |
| 09:09:55 | 7 a weigh up error, it's reasonable to retest, right? |
| 09:09:58 | 8 A. Yes, sir. |
| 09:09:59 | 9 Q. In fact, you would agree that that's an example of |
| 09:10:02 | 10 Halliburton's quality control in the lab actually doing its job? |
| 09:10:06 | 11 A. Yes, sir. |
| 09:10:07 | 12 Q. So when the retest happened, there was a 1.8/1.8 obtained and |
| 10:14 | 13 we saw that earlier, right? |
| 09:10:15 | 14 A. Yes, sir, we did. |
| 09:10:18 | 15 Q. Now, I want to make sure we're clear for the Court. You would |
| 09:10:21 | 16 agree that that's uniform top to bottom, passes that criteria foam |
| 09:10:24 | 17 stability test, right? |
| 09:10:25 | 18 A. That is correct, sir. |
| 09:10:26 | 19 Q. The second part about the Delta from target density is what I |
| 09:10:31 | 20 want to discuss with you. |
| 09:10:32 | 21 A. Okay. |
| 09:10:33 | 22 Q. This test result -- this test result, the slurry, if you |
| 09:10:38 | 23 calculate it out is 15 pounds per gallon, the slurry sample. |
| 09:10:41 | 24 That's half a pound per gallon greater than what's actually going |
| 09:10:45 | 25 to be injected on the rig, correct? |

2457

A.   That's correct.

Q.   Now, you understand that Halliburton has taken the position

that they will consider it an acceptable foam stability test

anywhere between zero and .5 pounds per gallon variance between the

set sample density and the target density, right?

A.   Yes, sir.

Q.   I understand you prefer a narrower margin, a .2?

A.   That's correct.

Q.   That .2, that is your personal preference?

A.   That is correct.

Q.   You understand that all of these people that you say you know

in the cement industry, that you guys all know each other, there's

even variation among you?

A.   Yes, sir, there is.

Q.   And API does not set any guidance for what the acceptable

variance between set density and target density is, does it?

A.   That is correct, API does not set any guidance.

Q.   If API doesn't set that variance, it basically leaves it to the

judgment or discretion of the API members or whoever is following

those API procedures, correct?

A.   It leaves it to the judgment of the user of that document.

Q.   Your .2 you have admitted is on the very conservative side,

correct?

A.   I have admitted that, yes, sir.

Q.   And of course, you acknowledge that there are different use in

|         |    |
|---------|----|
| 2:03    | 1  | the industry at large on what an acceptable variance should be,
| 09:12:05 | 2  | right?
| 09:12:05 | 3  | A.  That's correct.
| 09:12:06 | 4  | Q.  So if somebody in the industry told you, "Hey, I've looked at
| 09:12:09 | 5  | the Halliburton test, and I don't think the difference in that
| 09:12:12 | 6  | final foam stability test of .5 PPG between the sample density and
| 09:12:17 | 7  | the target density gives me concern over foam stability," you agree
| 09:12:20 | 8  | that that person isn't wrong, it's just a legitimate difference of
| 09:12:24 | 9  | opinion?
| 09:12:24 | 10 | A.  It's a legitimate difference of opinion.
| 09:12:26 | 11 | Q.  So I ask you, assuming that we're going to adopt Halliburton's
| 09:12:32 | 12 | variance, and others who agree that .5 PPG is an acceptable
| 12:37   | 13 | variance, you would agree that that's a stable foam stability test?
| 09:12:41 | 14 |         MR. REGAN:  Objection, your Honor.  That's a circular
| 09:12:43 | 15 | question.  He is asking him to assume the answer and asking if the
| 09:12:47 | 16 | answer is correct.
| 09:12:48 | 17 |         THE COURT:  Sustain the objection to the question.
| 09:12:51 | 18 |         MR. HILL:  I'm sorry.  I don't think I heard you.
| 09:12:55 | 19 |         MR. REGAN:  He sustained.
| 09:12:56 | 20 |         THE COURT:  I started to say I sustained the question,
| 09:12:58 | 21 | but I meant to say I sustained the objection.
| 09:13:01 | 22 |         MR. HILL:  I heard the first part.
| 09:13:03 | 23 | BY MR. HILL:
| 09:13:05 | 24 | Q.  You can't sit on the stand today and say that it's an unstable
| 09:13:09 | 25 | test result, can you?

09:13:10  1   A.  Actually, I stated in my report that that was a stable test

09:13:13  2   result.

09:13:14  3   Q.  Now, the Court's also going to hear testimony, and you've

09:13:23  4   actually reviewed this, that what was actually pumped at Macondo

09:13:26  5   was a slurry that contained .09 gallons per sack of retarder in it,

09:13:33  6   correct?

09:13:33  7   A.  That's correct.

09:13:34  8   Q.  And what was tested in the foam stability test was .08,

09:13:39  9   correct?

09:13:39 10   A.  That's correct.

09:13:39 11   Q.  That's a difference of .01 gallons per 100 sacks of cement,

09:13:45 12   right?

13:45 13   A.  No, that's a difference of one gallon per hundred sacks of

09:13:48 14   slurry.

09:13:49 15   Q.  A difference of .01 GPS --

09:13:52 16   A.  Is gallons per second, yes, sir.

09:13:53 17   Q.  -- which is gallons per 100 sacks?

09:13:57 18   A.  Right.

09:13:58 19   Q.  There is no smaller incremental change that can be done on

09:14:05 20   retarder in a field lab, is there?

09:14:06 21   A.  Not practically based on the equipment under it.

09:14:08 22   Q.  And I understand that you have stated that you weren't asked

09:14:12 23   and you don't express any opinion on whether or not Halliburton's

09:14:17 24   position that the difference in that retarder would make any

09:14:21 25   difference for the purpose of the foam stability test?

05:35   1   and the other one present.

12:05:36   2          THE COURT:  The contract itself is in evidence, so I

12:05:38   3   think the Court will be able to figure out what was required or not

12:05:41   4   required.

12:05:42   5          THE WITNESS:  Yes, sir, I think.

12:05:43   6          THE COURT:  Okay.  Thank you, sir.  I'm sorry, give me

12:05:47   7   the demonstrative number again.

12:05:50   8          MR. CERNICH:  6630.

12:05:51   9          THE COURT:  6630.  Thank you very much.

12:05:55   10   BY MR. CERNICH:

12:06:02   11   Q.  Now, Mr. Regan asked you a question about whether you thought

12:06:08   12   the cement was permeable, do you recall that?

06:10   13   A.  Yes, sir.

12:06:11   14   Q.  And I believe you answered the question no?

12:06:14   15   A.  That's correct.

12:06:15   16   Q.  Can you explain that answer?

12:06:16   17   A.  Well, I believe the question was if the cement is unstable,

12:06:21   18   does that make it permeable, and if I look at one of these foam

12:06:27   19   cement things or look at foam, if it's unstable and all of the

12:06:33   20   nitrogen comes out or nitrogen starts coming out, the material

12:06:36   21   that's left back in behind is the base slurry.  So that -- the

12:06:43   22   movement of that nitrogen or the stability of that doesn't go to

12:06:47   23   permeability.  It goes to changes in density, changes in

12:06:52   24   properties.  But permeability is not -- that would not be a result.

12:06:58   25   Q.  What would be the result?

07:00  1    A.  Well, you wind up -- if I take the Macondo well, at the bottom

12:07:04  2    of the well, you would have higher density.  If you took all of the

12:07:09  3    nitrogen out, you would have the tail cement.

12:07:11  4    Q.  And could that cement have provided a barrier in the bottom of

12:07:15  5    the well?

12:07:15  6    A.  Yes, sir.

12:07:16  7    Q.  Only if it was set?

12:07:19  8    A.  Only if it was set.

12:07:20  9    Q.  Mr. Regan used a term with you, do you recall, a discharged

12:07:32  10   responsibility?

12:07:32  11   A.  Yes, sir.

12:07:33  12   Q.  Did you understand the meaning of that term?

07:37  13    A.  Not really.  I asked that question twice, and I struggled with

12:07:44  14   that because I am not real familiar with that.

12:07:46  15   Q.  And I believe Mr. Regan asked you whether BP discharged its

12:07:50  16   responsibility on the cement job by relying on Halliburton?

12:07:54  17   A.  I don't know the legal definition for "discharge," I'm sorry.

12:07:57  18   Q.  Does that mean to you that BP absolved itself of responsibility

12:08:03  19   for the cement job by relying on Halliburton's services?

12:08:07  20   A.  No, sir, that does not.

12:08:08  21   Q.  Did BP absolve itself of responsibility for this cement job by

12:08:14  22   relying on Halliburton's services?

12:08:16  23   A.  No, sir.

12:08:17  24   Q.  And why not?

12:08:18  25   A.  Well, that's, first of all, that iterative technique back and

# EXHIBIT 9

1              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2

3    IN RE:  OIL SPILL        )    MDL NO. 2179
     by the OIL RIG,          )
4    DEEPWATER HORIZON in     )    SECTION "J"
     the GULF OF MEXICO,      )
5    April 20, 2010           )    JUDGE BARBIER
                              )
6                             )    MAG.  JUDGE
                              )    SHUSHAN
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22              Videotaped deposition of GREG
     GARRISON, taken at Pan-American Building, 601
23   Poydras Street, 11th Floor, New Orleans,
     Louisiana, 70130, on the 4th of November,
24   2011.

25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1        A.      Correct.
2        Q.      So I ask you again, can you
3   please tell me why you think that that --
4   that slurry is unstable?
5        A.      In this -- in the unset -- in
6   the unset, yes.  I -- it -- this is not
7   saying with -- with certainty that this one
8   test is saying that it's unstable.
9        Q.      Right.  But if we were to look
10  at just this one test, that indicates it's
11  actually stable, right, in the unset form?
12       MR. CHEN:  Objection, form.
13       A.      Yes, sir.
14       Q.      All right.  Now, let's talk
15  about -- let's talk about the set foam
16  stability test that you conducted.  And I
17  think -- well, there isn't any data because
18  you didn't finish the test.  But I'm looking
19  at page 39 of your report and that's
20  exhibit 5937 still.
21            Now, my understanding is -- just
22  forget about all the foam stability tests
23  above it.  I want to look at the MAC4.
24       A.      Okay.
25       Q.      Foam set -- foam stability test
```

**PURSUANT TO CONFIDENTIALITY ORDER**

**EXHIBIT 10**

7091

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF LOUISIANA

3

4    *****************************************************************

5    IN RE:  OIL SPILL BY THE OIL
     RIG *DEEPWATER HORIZON* IN THE
6    GULF OF MEXICO ON APRIL 20,
     2010
7

8                          CIVIL ACTION NO. 10-MD-2179 "J"
                           NEW ORLEANS, LOUISIANA
9                          Wednesday, April 3, 2013

10

11   THIS DOCUMENT RELATES TO:

12   CASE NO. 2:10-CV-02771,
     *IN RE:  THE COMPLAINT AND*
13   *PETITION OF TRITON ASSET*
     *LEASING GmbH, ET AL*
14
     CASE NO. 2:10-CV-4536,
15   *UNITED STATES OF AMERICA V.*
     *BP EXPLORATION & PRODUCTION,*
16   *INC., ET AL*

17
     *****************************************************************
18

19

20            **DAY 21 - AFTERNOON SESSION**

21         TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

22     HEARD BEFORE THE HONORABLE CARL J. BARBIER

23            UNITED STATES DISTRICT JUDGE

24

25

─────────OFFICIAL TRANSCRIPT─────────

7209

| | |
|---|---|
| 16:29:47 1 | Q.  What we do know, though, is that Mr. Vidrine, after that |
| 16:29:52 2 | conversation, went to the rig floor and instructed the crew to |
| 16:29:57 3 | continue with their displacement operations.  We know that, don't |
| 16:30:00 4 | we, sir? |
| 16:30:01 5 | A.  Yes, sir. |
| 16:30:01 6 | Q.  And that was wrong, wasn't it? |
| 16:30:03 7 | A.  It's my opinion that it was totally wrong, yes. |
| 16:30:06 8 | Q.  You offered some testimony today -- I think you talked about it |
| 16:30:15 9 | in your report -- about the so-called bladder effect.  Do you have |
| 16:30:18 10 | that in mind? |
| 16:30:19 11 | A.  Yes, sir. |
| 16:30:20 12 | Q.  I think you also said before, and I'll just ask you to confirm |
| 16:30:23 13 | it's your opinion, that you didn't find any evidence that led you |
| 16:30:26 14 | to conclude that the Transocean crew intentionally or maliciously |
| 16:30:30 15 | interpreted the negative pressure test, did you, sir? |
| 16:30:32 16 | A.  No, sir. |
| 16:30:33 17 | Q.  Now, you say in your report that this discussion of the bladder |
| 16:30:42 18 | effect originated with the Transocean crew, specifically with Jason |
| 16:30:45 19 | Anderson.  Do you recall that? |
| 16:30:46 20 | A.  Yes, sir. |
| 16:30:47 21 | Q.  Now, Mr. Anderson, of course, sadly died in the explosion that |
| 16:30:52 22 | night.  We know that, don't we, sir? |
| 16:30:55 23 | A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.) |
| 16:30:56 24 | Q.  That's yes? |
| 16:30:57 25 | A.  Yes, sir. |

7227

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE:  OIL SPILL BY THE OIL RIG   *   Docket 10-MD-2179
     DEEPWATER HORIZON IN THE           *
 5   GULF OF MEXICO ON APRIL 20, 2010   *   Section J
                                        *
 6   Applies to:                        *   New Orleans, Louisiana
                                        *
 7   Docket 10-CV-02771,                *   April 4, 2013
     IN RE:  THE COMPLAINT AND          *
 8   PETITION OF TRITON ASSET           *
     LEASING GmbH, et al                *
 9                                      *
     Docket 10-CV-4536,                 *
10   UNITED STATES OF AMERICA v.        *
     BP EXPLORATION & PRODUCTION,       *
11   INC., et al                        *
                                        *
12   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13

14                  DAY 22, MORNING SESSION
                  TRANSCRIPT OF NONJURY TRIAL
15             BEFORE THE HONORABLE CARL J. BARBIER
                  UNITED STATES DISTRICT JUDGE
16

17   Appearances:

18

19   For the Plaintiffs:        Domengeaux Wright Roy
                                   & Edwards, LLC
20                              BY:  JAMES P. ROY, ESQ.
                                556 Jefferson Street, Suite 500
21                              Post Office Box 3668
                                Lafayette, Louisiana 70502

22

23   For the Plaintiffs:        Herman Herman & Katz, LLC
                                BY:  STEPHEN J. HERMAN, ESQ.
24                              820 O'Keefe Avenue
                                New Orleans, Louisiana 70113

25
```

OFFICIAL TRANSCRIPT

7356

FREDERICK E. BECK - CROSS

| | | |
|---|---|---|
| 11:02 | 1 | **Q.**   So if you are looking at hook load or -- when you are |
| 11:02 | 2 | looking at hook load or weight on the bit, you have to take |
| 11:02 | 3 | into account some stretch issues; correct? |
| 11:02 | 4 | **A.**   Yes, you do. |
| 11:02 | 5 | **Q.**   Centralizers.  Dr. Beck, do you think the placement of the |
| 11:02 | 6 | centralizers was causal of the accident? |
| 11:02 | 7 | **A.**   No, I don't.  I -- once again, I know we've discussed this |
| 11:02 | 8 | at deposition before, and I'm trying to maintain -- the |
| 11:02 | 9 | centralizer placement, I don't think, was causal.  I think it |
| 11:02 | 10 | was more consistent with a decision that just increased the |
| 11:02 | 11 | overall risk in the well. |
| 11:02 | 12 | **Q.**   Have you seen -- you know that the OptiCem model on |
| 1.   2 | 13 | April 18th had centralizers placed in it by Mr. Gagliano; |
| 11:02 | 14 | correct? |
| 11:02 | 15 | **A.**   Correct. |
| 11:02 | 16 | **Q.**   And you are aware that the centralizers that he had in |
| 11:02 | 17 | this model were of the wrong size; correct? |
| 11:02 | 18 | **A.**   Correct. |
| 11:03 | 19 | **Q.**   And they were put in the wrong place; correct? |
| 11:03 | 20 | **A.**   Correct. |
| 11:03 | 21 | **Q.**   And would it surprise you that Halliburton, in its manual, |
| 11:03 | 22 | says when modeling a slim hole well in OptiCem, it is important |
| 11:03 | 23 | to input the collar and centralizer dimensions, as they can |
| 11:03 | 24 | have a significant impacts on the pressure/ECD profile? |
| 11:03 | 25 | **MR. REGAN:**  Let's just put up 2133.321.  Down at the |

OFFICIAL TRANSCRIPT

FREDERICK E. BECK - CROSS

| | | |
|---|---|---|
| 11:03 | 1 | bottom.  What I just read. |
| 11:03 | 2 | **BY MR. REGAN:** |
| 11:03 | 3 | **Q.**   It would not surprise you that Halliburton would say, when |
| 11:03 | 4 | you're running centralizing in OptiCem, slim holes, annular |
| 11:03 | 5 | clearance of 1.5 inches or less:  ". . . input the collar and |
| 11:03 | 6 | centralizer dimensions [correctly] as they can have a |
| 11:03 | 7 | significant impact on the pressure/ECD profile." |
| 11:03 | 8 | You wouldn't disagree with that? |
| 11:03 | 9 | **A.**   No, I have no disagreement with that. |
| 11:03 | 10 | **Q.**   So in terms of looking at the outputs of that April 18th |
| 11:03 | 11 | model, would you agree with me that having the wrong size |
| 11:03 | 12 | centralizers in the wrong place could impact the output of the |
| 4 | 13 | model? |
| 11:04 | 14 | **A.**   I think that's a fair statement.  I can't disagree with |
| 11:04 | 15 | that statement. |
| 11:04 | 16 | **Q.**   Channeling.  Do you have any opinion, Dr. Beck, about |
| 11:04 | 17 | whether there was channeling in the annulus cement at Macondo? |
| 11:04 | 18 | **A.**   My only opinion -- and I'm going to qualify this because |
| 11:04 | 19 | it's only an opinion -- I haven't seen direct evidence that |
| 11:04 | 20 | says there was channeling.  My opinion is that the condition of |
| 11:04 | 21 | the hole, with the centralization, with the washout in the |
| 11:04 | 22 | hole, okay, and the long sections of uncentralized pipe, those |
| 11:04 | 23 | are conditions that are conducive to channeling.  That's my |
| 11:04 | 24 | opinion. |
| 11:04 | 25 | So can I tell you there was channeling?  No.  We |

FREDERICK E. BECK, - REDIRECT

| | | |
|---|---|---|
| 11:28 | 1 | Q.   And that was about how many hours later? |
| 11:28 | 2 | A.   I think the number was 16 hours after they bumped the |
| 11:28 | 3 | plug, the negative pressure test was conducted. |
| 11:28 | 4 | Q.   All right.  Now, yesterday you testified that a blowout |
| 11:28 | 5 | doesn't occur unless a well was underbalanced; correct? |
| 11:28 | 6 | A.   Correct. |
| 11:28 | 7 | Q.   Who made the decision to underbalance the well at Macondo |
| 11:28 | 8 | on April 20th, 2010? |
| 11:28 | 9 | A.   BP.  BP made that decision. |
| 11:28 | 10 | Q.   Now, I don't want to put up a lot of demonstratives.  I'm |
| 11:28 | 11 | trying to be cognizant of the Court's time and yours.  But |
| 11:28 | 12 | there was discussion about the shear pins in the float collar, |
| :8 | 13 | and I think His Honor asked you some questions about it.  Do |
| 11:28 | 14 | you recall that? |
| 11:28 | 15 | A.   Yes. |
| 11:28 | 16 | Q.   Those shear pins, in your opinion, would packing off of |
| 11:28 | 17 | debris in and around the float collar equipment affect the rate |
| 11:28 | 18 | or the ability to shear those pins when properly -- when trying |
| 11:28 | 19 | to -- when attempting to properly convert the float collar? |
| 11:28 | 20 | A.   In my opinion and experience, when there's debris and |
| 11:29 | 21 | shear pins involved, you don't get the shearing -- you don't |
| 11:29 | 22 | get the results that you were hoping for from the shear pin. |
| 11:29 | 23 | Q.   Now, I wrote this down.  And I think your exact quote was: |
| 11:29 | 24 | "Once things are plugged up, all bets are off on performance of |
| 11:29 | 25 | shear pins." |

OFFICIAL TRANSCRIPT

# EXHIBIT 11

```
 1                UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE:  OIL SPILL BY THE OIL RIG   *   Docket 10-MD-2179
     DEEPWATER HORIZON IN THE           *
 5   GULF OF MEXICO ON APRIL 20, 2010   *   Section J
                                        *
 6   Applies to:                        *   New Orleans, Louisiana
                                        *
 7   Docket 10-CV-02771,                *   March 11, 2013
     IN RE:  THE COMPLAINT AND          *
 8   PETITION OF TRITON ASSET           *
     LEASING GmbH, et al                *
 9                                      *
     Docket 10-CV-4536,                 *
10   UNITED STATES OF AMERICA v.        *
     BP EXPLORATION & PRODUCTION,       *
11   INC., et al                        *
                                        *
12   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13

14                 DAY 9, AFTERNOON SESSION
                 TRANSCRIPT OF NONJURY TRIAL
15          BEFORE THE HONORABLE CARL J. BARBIER
                UNITED STATES DISTRICT JUDGE
16

17   Appearances:

18

19   For the Plaintiffs:          Domengeaux Wright Roy
                                     & Edwards, LLC
20                                BY:  JAMES P. ROY, ESQ.
                                  556 Jefferson Street, Suite 500
21                                Post Office Box 3668
                                  Lafayette, Louisiana 70502

22

23   For the Plaintiffs:          Herman Herman & Katz, LLC
                                  BY:  STEPHEN J. HERMAN, ESQ.
24                                820 O'Keefe Avenue
                                  New Orleans, Louisiana 70113

25
```

OFFICIAL TRANSCRIPT

TIMOTHY PROBERT  - CROSS

| | | |
|---|---|---|
| 14:47 | 1 | Q.   And you would agree with me that the greater the risk of |
| 14:47 | 2 | harm, such as a well blowout, the greater the need for |
| 14:47 | 3 | vigilance? |
| 14:47 | 4 | A.   I'm sorry, sir.  Could you repeat that again, please. |
| 14:47 | 5 | Q.   Yes.  The greater the harm, the more likely people would |
| 14:47 | 6 | die and the environment will get devastated, the greater the |
| 14:47 | 7 | need for vigilance? |
| 14:47 | 8 | A.   Yes. |
| 14:47 | 9 | Q.   And that would apply to Halliburton as well as to BP, |
| 14:47 | 10 | correct? |
| 14:47 | 11 | A.   It would apply to everyone. |
| 14:47 | 12 | Q.   Would you agree that when the centralizer issue was |
| 1 :7 | 13 | reported to BP and the statement "severe gas flow risk" was |
| 14:47 | 14 | used in it, would you agree that was a big red flag for BP to |
| 14:47 | 15 | stop? |
| 14:47 | 16 |           MR. REGAN:  Objection, foundation, Your Honor. |
| 14:47 | 17 |           THE COURT:  Well, I think -- the witness has already |
| 14:47 | 18 | said he is not an expert on these issues.  We have already had |
| 14:47 | 19 | a lot of testimony about this very issue, and I'm assuming we |
| 14:48 | 20 | are going to hear more before this trial is over.  So I don't |
| 14:48 | 21 | think we should be going down this trail with this witness, |
| 14:48 | 22 | Mr. Kanner. |
| 14:48 | 23 |           MR. KANNER:  Fair enough, Your Honor. |
| 14:48 | 24 | BY MR. KANNER: |
| 14:48 | 25 | Q.   Let me just ask you one last question.  As the head of |

OFFICIAL TRANSCRIPT

TIMOTHY PROBERT  - CROSS

14:48  1  health and safety at Halliburton, would you have expected your
14:48  2  workers to stop work when a severe health and safety and
14:48  3  environmental risk presented itself?
14:48  4  A.   I think that what I would say is I would expect our
14:48  5  workers to use their best judgment.  If they see a clear and
14:48  6  present danger -- and that may be a variety of things, a
14:48  7  suspended load or whatever -- they would use their best
14:48  8  judgment to escalate that or draw it to the attention of the
14:48  9  well owner, in this case, BP.
14:48  10  Q.   But your contract requires you to stop work as well,
14:48  11  correct?  And you would expect your workers to comply with the
14:48  12  contract, correct?
1   8  13  A.   I would expect my workers to fulfill the obligations which
14:49  14  are in the contract.  And the reality is that by stopping work,
14:49  15  it doesn't always -- it's not possible for people to simply
14:49  16  stop work because operation is ongoing.
14:49  17       What I would expect them to use is their best
14:49  18  judgment to draw it to the attention of the well owner, in this
14:49  19  case BP, who control the well and the decisions around the well
14:49  20  to make best use of that information, since our employees only
14:49  21  have a narrow slice of the knowledge around a given operation.
14:49  22  The well owner has all the knowledge from various inputs and
14:49  23  can integrate that together to make the best decision for them.
14:49  24  Q.   Is there anything about the centralizer -- the OptiCem
14:49  25  study on the 21 centralizers that would make it -- that once a

TIMOTHY PROBERT  -  CROSS

14:49  1   decision was made to use six centralizers, that the Halliburton
14:49  2   people were not immediately that there was a major disaster
14:49  3   about to happen at this well?
14:49  4   A.   The act of not running the centralizers themselves do not
14:50  5   necessarily create the risk of a major disaster.  The reality
14:50  6   is that BP would have known that the potential for the cement
14:50  7   job to be successful would have been minimized and; therefore,
14:50  8   they would need take other steps later, a backup plan, if you
14:50  9   like, to remediate or otherwise ensure that the cement bond was
14:50  10  effective.
14:50  11  Q.   You have said that Halliburton employees have been
14:50  12  retaliated against by operators for exercising stop work at
1  0    13  your deposition, correct?
14:50  14  A.   I said that what we did is we supported our employees by
14:50  15  ensuring that if they used a stop work authority where there
14:50  16  was a clear and present danger, that they had essentially been
14:50  17  supported fully by management to make sure that we continued to
14:50  18  promulgate that kind of behavior.
14:51  19  Q.   Under your theory, as head of health and safety,
14:51  20  Halliburton always does just a piece of the job.  If you are
14:51  21  saying that only the person who sees all of the pieces could
14:51  22  stop work, then you never can stop work, can you?
14:51  23  A.   Well, there are certain circumstances where you can, where
14:51  24  you have a colleague walking under a suspended load or about to
14:51  25  put their hand into some unprotected machinery.  Those kinds of

2904

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  OIL SPILL BY THE OIL RIG  *   Docket 10-MD-2179
     *DEEPWATER HORIZON* IN THE          *
5    GULF OF MEXICO ON APRIL 20, 2010  *   Section J
                                       *
6    Applies to:                       *   New Orleans, Louisiana
                                       *
7    Docket 10-CV-02771,               *   March 11, 2013
     *IN RE:  THE COMPLAINT AND*        *
8    *PETITION OF TRITON ASSET*         *
     *LEASING GmbH, et al*              *
9                                      *
     Docket 10-CV-4536,                *
10   *UNITED STATES OF AMERICA v.*      *
     *BP EXPLORATION & PRODUCTION,*     *
11   *INC., et al*                      *
                                       *
12   * * * * * * * * * * * * * * * * * *

13

14              DAY 9, AFTERNOON SESSION
              TRANSCRIPT OF NONJURY TRIAL
15       BEFORE THE HONORABLE CARL J. BARBIER
              UNITED STATES DISTRICT JUDGE
16

17   Appearances:

18

     For the Plaintiffs:        Domengeaux Wright Roy
19                                 & Edwards, LLC
                                BY:  JAMES P. ROY, ESQ.
20                              556 Jefferson Street, Suite 500
                                Post Office Box 3668
21                              Lafayette, Louisiana 70502

22

     For the Plaintiffs:        Herman Herman & Katz, LLC
23                              BY:  STEPHEN J. HERMAN, ESQ.
                                820 O'Keefe Avenue
24                              New Orleans, Louisiana 70113

25

OFFICIAL TRANSCRIPT

TIMOTHY PROBERT - CROSS

| | | |
|---|---|---|
| 16:06 | 1 | **Q.**   With respect to -- we talked earlier that it's clear that |
| 16:06 | 2 | there was a -- I think that might be your microphone. |
| 16:07 | 3 |         We can agree that there was clearly not zonal |
| 16:07 | 4 | isolation on the night of April 20, 2010, correct? |
| 16:07 | 5 | **A.**   As I said -- |
| 16:07 | 6 | **Q.**   We can also agree that -- |
| 16:07 | 7 | **A.**   We don't know why. |
| 16:07 | 8 | **Q.**   I didn't mean to talk over you. |
| 16:07 | 9 |         We can also agree that on that night there was a kick |
| 16:07 | 10 | that went undetected, developed into a blowout, and led to the |
| 16:07 | 11 | explosion and the fatalities that we are here about.  Is that |
| 16:07 | 12 | fair? |
| 1   17 | 13 | **A.**   There was a kick, yes. |
| 16:07 | 14 | **Q.**   Halliburton had involvement in the project with respect to |
| 16:07 | 15 | providing cement product, providing cement personnel, providing |
| 16:07 | 16 | mud logging personnel, who were a second pair of eyes on the |
| 16:07 | 17 | project, correct? |
| 16:07 | 18 | **A.**   Yeah.  I don't know whether or not Halliburton provided |
| 16:07 | 19 | the cement products.  That's not known to me.  They certainly |
| 16:07 | 20 | provided the personnel. |
| 16:07 | 21 | **Q.**   Now, in your deposition do you recall testifying that in |
| 16:07 | 22 | your view Halliburton was zero percent responsible for the |
| 16:07 | 23 | incident in Macondo? |
| 16:07 | 24 | **A.**   That's correct. |
| 16:07 | 25 | **Q.**   Is that still your testimony today, Mr. Probert, that in |

TIMOTHY PROBERT - CROSS

16:08  1   your view Halliburton has zero responsibility with respect to
16:08  2   that accident?
16:08  3   A.   Yeah, it still is, and I will tell you why.  My view is
16:08  4   this, is that if several things had happened -- if, for
16:08  5   example, the cement had been tested to establish whether or not
16:08  6   it was a barrier or not had taken place.  Number two, if BP had
16:08  7   correctly interpreted the negative test.  Number three, if BP
16:08  8   had not underbalanced the well to put it in such a dangerous
16:08  9   situation, not knowing whether or not the test was favorable or
16:08  10  not.  And number four, if, when there were the first signs of a
16:08  11  kick, BP and Transocean had acted on a timely basis, we
16:08  12  wouldn't be here today, and the tragedy would not have
1   )8  13  happened.
16:08  14  Q.   Can we add a number zero, that if Halliburton personnel in
16:09  15  Halliburton's lab using Halliburton's equipment had determined
16:09  16  that that cement was unstable and should be redesigned, that
16:09  17  that slurry would have never made it to the rig?  Will you add
16:09  18  that to the list?
16:09  19  A.   No, I won't, because basically what -- as you know, I'm
16:09  20  not a cementing expert.  I haven't been involved in the design.
16:09  21  I haven't been involved in the testing, and I don't understand
16:09  22  the testing protocols.  So from my perspective, I can't add
16:09  23  that.
16:09  24  Q.   So not understanding it, you are convinced it could not
16:09  25  have been Halliburton's fault?

# EXHIBIT 12

6273

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4   *****************************************************************

5   IN RE:  OIL SPILL BY THE OIL
    RIG *DEEPWATER HORIZON* IN THE
6   GULF OF MEXICO ON APRIL 20,
    2010
7

8                              CIVIL ACTION NO. 10-MD-2179 "J"
                               NEW ORLEANS, LOUISIANA
9                              WEDNESDAY, MARCH 27, 2013, 8:00 A.M.

10

11  THIS DOCUMENT RELATES TO:

12  CASE NO. 2:10-CV-02771,
    *IN RE:  THE COMPLAINT AND*
13  *PETITION OF TRITON ASSET*
    *LEASING GmbH, ET AL*
14
    CASE NO. 2:10-CV-4536,
15  *UNITED STATES OF AMERICA V.*
    *BP EXPLORATION & PRODUCTION,*
16  *INC., ET AL*

17
    *****************************************************************
18

19

20             **DAY 19  MORNING SESSION**

21        TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

22    HEARD BEFORE THE HONORABLE CARL J. BARBIER

23           UNITED STATES DISTRICT JUDGE

24

25

                  **OFFICIAL TRANSCRIPT**

6382

10:55:16  1    which is a 7:00 a.m. entry from your tally book.

10:55:21  2         Do you see that there?

10:55:22  3    A.   Yes, I do.

10:55:24  4    Q.   This is the reference that we talked about earlier in the

10:55:28  5    exam about the Dril-Quip load didn't shear properly.   That's

10:55:33  6    where you made the note that you added to your post-job report

10:55:38  7    on April 21st?

10:55:40  8    A.   That is correct.

10:55:40  9    Q.   Now you didn't raise on the morning of April 17th any

10:55:50 10    issues about BP's decision not to run the additional

10:55:54 11    centralizers, correct?

10:55:54 12    A.   No, I did not.

10:55:55 13    Q.   From April 16th, when you learned that BP was not going to

10:56:07 14    run -- well, let me rephrase that.

10:56:11 15         From April 16th, when you learned that BP was going

10:56:13 16    to run six centralizers through April 20th, did you ever file

10:56:19 17    an objection or state an objection to BP's use of the six

10:56:24 18    centralizers?

10:56:26 19    A.   I did not, outside of a phone call to Jesse Gagliano.

10:56:30 20    Q.   Thank you.

10:56:31 21         You didn't raise with anyone on the rig any concerns

10:56:34 22    about using six centralizers, did you?

10:56:36 23    A.   No, I did not.

10:56:38 24    Q.   And even after the job was finished on April 20, and

10:56:44 25    April 21, the next day when you were back onshore, you did not

**OFFICIAL TRANSCRIPT**

6383

10:56:49 1  communicate with anyone from BP about any concern with running

10:56:53 2  six centralizers, did you?

10:56:54 3  A.   No, I did not.

10:56:55 4  Q.   You didn't add that to your post job report as a matter of

10:57:01 5  significance, did you?

10:57:02 6  A.   Not that I can recall, no.

10:57:06 7  Q.   The document will speak for itself.

10:57:09 8       You don't recall adding that to the list of

10:57:13 9  significant events in the amended post-job report of

10:57:18 10 April 21st?

10:57:19 11 A.   No.  No, sir.

10:57:19 12 Q.   As you've said, that's because you didn't have any

10:57:25 13 concerns, safety concerns or issues with the number of

10:57:30 14 centralizers that were being used?

10:57:30 15 A.   Correct.  There was no safety concern.  I was completely

10:57:33 16 aware of the effect it may potentially have on the cement job,

10:57:38 17 but there were no safety concerns.

10:57:39 18 Q.   Good.  Thank you.

10:57:41 19      Now, if we could look quickly at TREX-711.1.2.

10:58:06 20      Do you see that this is your note to Jesse speaking

10:58:14 21 to the issue of the casing was currently being run and

10:58:18 22 projecting the cement job for around lunchtime on the 19th; do

10:58:23 23 you see that?

10:58:23 24 A.   Yes.

10:58:24 25 Q.   It says:  "We had a meeting yesterday to discuss the job,

**OFFICIAL TRANSCRIPT**

6403

| | |
|---|---|
| 11:30:06 1 | A.   Not to my knowledge.  Not that I can recall, no. |
| 11:30:08 2 | Q.   You didn't see any safety risk with the design and the |
| 11:30:37 3 | execution of the cement job at the Macondo well, did you? |
| 11:30:40 4 | A.   No, I did not. |
| 11:30:45 5 | MR. BROCK:  Thank you for your time. |
| 11:30:47 6 | THE WITNESS:  Thank you. |
| 11:30:48 7 | THE COURT:  Cameron? |
| 11:30:53 8 | MR. BECK:  We have no questions, Your Honor. |
| 11:30:54 9 | THE COURT:  Halliburton? |
| 11:30:56 10 | MR. BOWMAN:  May it please the Court, just a few |
| 11:31:24 11 | things. |
| 11:31:24 12 | REDIRECT EXAMINATION |
| 11:31:24 13 | BY MR. BOWMAN: |
| 11:31:26 14 | Q.   You were asked about, just a minute ago, no safety |
| 11:31:30 15 | concerns, and that's true, right? |
| 11:31:31 16 | A.   That's correct. |
| 11:31:32 17 | Q.   Let's explore that a little bit.  You did have concerns |
| 11:31:36 18 | over the centralizers, right? |
| 11:31:38 19 | A.   Yes, I did. |
| 11:31:39 20 | Q.   Bottoms up? |
| 11:31:41 21 | A.   Correct. |
| 11:31:41 22 | Q.   Other matters. |
| 11:31:43 23 | Why did that not equate to a safety concern with you? |
| 11:31:47 24 | A.   Well, lack of centralization or lack of circulating mud, |
| 11:31:53 25 | it may result in channeling.  It may possibly result in |

**OFFICIAL TRANSCRIPT**

6404

| | |
|---|---|
| 11:31:58 1 | remedial cement work having to be done.  None of which are |
| 11:32:03 2 | safety concerns. |
| 11:32:04 3 | Q.   What do you mean by *remedial cement work*? |
| 11:32:09 4 | A.   Remedial or secondary squeeze cementing where you may have |
| 11:32:15 5 | to go in and perforate the casing and pump more cement around |
| 11:32:17 6 | to actually achieve the zonal isolation that you were |
| 11:32:19 7 | attempting to achieve to begin with. |
| 11:32:22 8 |        But, as I previously stated, lack of centralization |
| 11:32:26 9 | or lack of circulating mud, those do not correlate to a safety |
| 11:32:30 10 | issue.  Those correlate to channeling, remedial cement work, |
| 11:32:37 11 | but that's about it. |
| 11:32:37 12 | Q.   Thank you. |
| 11:32:41 13 |        You were asked by someone about swapping, a little |
| 11:32:46 14 | bit about swapping.  If it swaps, it goes into, what, something |
| 11:32:50 15 | called a shoe track? |
| 11:32:51 16 | A.   Correct. |
| 11:32:51 17 | Q.   And what is the purpose of a shoe track? |
| 11:32:54 18 | A.   A shoe track is used to contain contaminated cement that's |
| 11:32:58 19 | being wiped down by the top plug. |
| 11:33:00 20 | Q.   Thank you. |
| 11:33:04 21 |        You were also asked about a crushed compressive |
| 11:33:09 22 | strength test. |
| 11:33:10 23 |        Do you remember that? |
| 11:33:10 24 | A.   Correct. |
| 11:33:11 25 | Q.   And a UCA test, right? |

**OFFICIAL TRANSCRIPT**

# EXHIBIT 13

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3

4   IN RE:  OIL SPILL BY THE OIL RIG   *   Docket 10-MD-2179
    *DEEPWATER HORIZON* IN THE           *
5   GULF OF MEXICO ON APRIL 20, 2010   *   Section J
                                        *
6   Applies to:                        *   New Orleans, Louisiana
                                        *
7   Docket 10-CV-02771,                *   April 2, 2013
    *IN RE:  THE COMPLAINT AND*          *
8   *PETITION OF TRITON ASSET*           *
    *LEASING GmbH, et al*                *
9                                       *
    Docket 10-CV-4536,                 *
10  *UNITED STATES OF AMERICA v.*        *
    *BP EXPLORATION & PRODUCTION,*       *
11  *INC., et al*                        *
                                        *
12  * * * * * * * * * * * * * * * * * *

13

14              DAY 20, MORNING SESSION
             TRANSCRIPT OF NONJURY TRIAL
15       BEFORE THE HONORABLE CARL J. BARBIER
             UNITED STATES DISTRICT JUDGE
16

17  Appearances:

18

19  For the Plaintiffs:        Domengeaux Wright Roy
                                 & Edwards, LLC
20                             BY:  JAMES P. ROY, ESQ.
                               556 Jefferson Street, Suite 500
21                             Post Office Box 3668
                               Lafayette, Louisiana 70502

22

23  For the Plaintiffs:        Herman Herman & Katz, LLC
                               BY:  STEPHEN J. HERMAN, ESQ.
24                             820 O'Keefe Avenue
                               New Orleans, Louisiana 70113

25

OFFICIAL TRANSCRIPT

JESSE GAGLIANO - DIRECT

08:43   1   A.   The intended role was to provide zonal isolation on the
08:43   2   back side of the well.
08:43   3   Q.   Was the cement intended by you, when it was designed, to
08:43   4   ultimately be a barrier there in the well?
08:43   5   A.   Yes.  It was a barrier to isolate the hydrocarbons on the
08:43   6   back side.
08:43   7   Q.   Okay.  When would, in your opinion, you and/or others be
08:44   8   able to rely upon the cement being a barrier?
08:44   9   A.   You could only rely on it after you test it.
08:44   10   Q.   When you say after it's tested, tell Judge Barbier what
08:44   11   you're talking about there insofar as you can rely upon it
08:44   12   after it's tested.
0   4   13   A.   Basically, once the cement's in place and it's set up, you
08:44   14   want to do a negative test on the back side to verify you have
08:44   15   isolation of the hydrocarbon-bearing zones.
08:44   16   Q.   Okay, sir.
08:44   17       Jesse, what are some of the things, if any, that can
08:44   18   lead to a cement job not achieving zonal isolation?
08:44   19   A.   It's got -- several things.  But some of them could be
08:44   20   channeling or mud contamination.
08:44   21   Q.   How about placement?  Would that have anything to do with
08:44   22   potentially not providing zonal isolation?
08:44   23   A.   Yes.
08:44   24   Q.   All right, sir.
08:44   25       And very briefly, when you say channeling is one of

OFFICIAL TRANSCRIPT

JESSE GAGLIANO - DIRECT

08:44  1  the things that could lead to not achieving zonal isolation,
08:44  2  just tell us briefly what you mean by "channeling" in this
08:44  3  context.
08:44  4  A.    Channeling's basically the failure to remove all the mud
08:45  5  in the back side where the cement is flowing.  You might have
08:45  6  some mud channels which actually leave a flow path of
08:45  7  hydrocarbons to the rig.
08:45  8  Q.    And the mud that is there, you say, could end up
08:45  9  contaminating the cement.  How would that mud be removed,
08:45  10  Jesse?
08:45  11  A.    Several things.  You can actually do a full bottoms-up to
08:45  12  break the gels and remove the mud.  And also, you pump spacer
0   5  13  ahead to remove the mud.
08:45  14  Q.    Okay.  And you mentioned contamination as being another
08:45  15  thing that could lead to cement not isolating the zones.  What
08:45  16  do you mean by contamination in that context, Jesse?
08:45  17  A.    Basically, contamination is when you have mud and cement
08:45  18  intermix, it can actually affect the compression or development
08:45  19  of the cement.
08:45  20  Q.    Thank you, sir.
08:45  21        Jesse, you also mentioned placement as being
08:45  22  something else that could create a risk for not achieving zonal
08:46  23  isolation.  Tell Judge Barbier what you mean by that.
08:46  24  A.    Basically, you want to try to target the top of the
08:46  25  cement, how high you want the cement to be.  And you want to

OFFICIAL TRANSCRIPT

JESSE GAGLIANO - DIRECT

| | | |
|---|---|---|
| 08:46 | 1 | try to get that -- I believe federal regulations are 500 feet |
| 08:46 | 2 | above the highest hydrocarbon-bearing zone, you need to have |
| 08:46 | 3 | cement coverage. |
| 08:46 | 4 | Q.   Okay.  Jesse. |
| 08:46 | 5 | Jesse, what relationship is there, if any, between |
| 08:46 | 6 | cement placement and zonal isolation? |
| 08:46 | 7 | A.   They're very close together.  They're very similar. |
| 08:46 | 8 | Q.   Okay, sir. |
| 08:46 | 9 | Jesse, what is -- or how is it determined whether |
| 08:46 | 10 | cement was placed in the intended location, dealing again with |
| 08:46 | 11 | placement as you have defined it? |
| 08:46 | 12 | A.   The only way to verify where you have cement and if |
| 0    6 | 13 | there's no channeling is by running cement bottom logs. |
| 08:46 | 14 | Q.   And who -- based upon your working on the Macondo well and |
| 08:46 | 15 | your experience in deepwater drilling, who would make the |
| 08:46 | 16 | decision as to whether a cement bottom log would be run? |
| 08:46 | 17 | A.   BP. |
| 08:47 | 18 | Q.   Okay.  Thank you. |
| 08:47 | 19 | Jesse, if BP were to come to you and inform you that |
| 08:47 | 20 | the cement job had failed to isolate zones as a result of |
| 08:47 | 21 | testing, what, if anything, could be done at that time to cure |
| 08:47 | 22 | the problem? |
| 08:47 | 23 | A.   We can do what we call remedial work or a squeeze job to |
| 08:47 | 24 | remediate the problem. |
| 08:47 | 25 | Q.   Okay.  Well, let's switch gears and talk about remedial -- |

JESSE GAGLIANO - DIRECT

| | | |
|---|---|---|
| 08:47 | 1 | remediating cement or squeeze jobs. |
| 08:47 | 2 | Jesse, what is a squeeze job, very briefly? |
| 08:47 | 3 | A.   Basically, a squeeze job is, if you have any channeling or |
| 08:47 | 4 | areas of cement voids, you can actually go down and squeeze |
| 08:47 | 5 | cement into those areas to isolate -- to provide zonal |
| 08:47 | 6 | isolation to the zones. |
| 08:47 | 7 | Q.   Have you, Jesse, in your career, been involved with |
| 08:47 | 8 | designing squeeze jobs? |
| 08:47 | 9 | A.   Yes, sir. |
| 08:47 | 10 | Q.   While you were working on the Macondo well, were you |
| 08:47 | 11 | involved in designing squeeze jobs? |
| 08:47 | 12 | A.   Yes. |
| 0   7 | 13 | Q.   How many -- if you can recall, how many times did you |
| 08:48 | 14 | perform a design of a squeeze job there on the Macondo well? |
| 08:48 | 15 | A.   I believe we did three. |
| 08:48 | 16 | Q.   Three jobs? |
| 08:48 | 17 | A.   Yes. |
| 08:48 | 18 | Q.   Okay.  And when it was determined that there was an issue |
| 08:48 | 19 | with the cement and a squeeze job was determined necessary, |
| 08:48 | 20 | which company was it that actually performed the squeeze job |
| 08:48 | 21 | there on the Macondo well? |
| 08:48 | 22 | A.   Halliburton provided it -- performed the service. |
| 08:48 | 23 | Q.   Thank you, sir. |
| 08:48 | 24 | Jesse, you mentioned earlier that cement jobs |
| 08:48 | 25 | sometime fail to achieve zonal isolation.  Did I understand |

JESSE GAGLIANO - DIRECT

| | | |
|---|---|---|
| 08:48 | 1 | that correctly? |
| 08:48 | 2 | A.   Yes. |
| 08:48 | 3 | Q.   What are the consequences, if any, if a cement job fails |
| 08:48 | 4 | to achieve zonal isolation? |
| 08:48 | 5 | A.   You would have to go down and remediate that work to |
| 08:48 | 6 | isolate the zones. |
| 08:48 | 7 | Q.   Okay.  Based upon your working there with those drilling |
| 08:48 | 8 | engineers for BP, did you come to conclude that they understood |
| 08:48 | 9 | that if there was an issue with a cement job after testing it, |
| 08:49 | 10 | that, in fact, it could be remediated or the problem could be |
| 08:49 | 11 | solved by doing a squeeze job? |
| 08:49 | 12 | A.   Yes, they understood that. |
| 0    9 | 13 | Q.   They understood that? |
| 08:49 | 14 | A.   Yes. |
| 08:49 | 15 | Q.   And you said that you had worked with those -- was it the |
| 08:49 | 16 | same individuals, the drilling team, that worked with you on |
| 08:49 | 17 | the three squeeze jobs there on the Macondo well? |
| 08:49 | 18 | A.   Yes. |
| 08:49 | 19 | Q.   Okay.  Mr. Hafle, Cocales, Morel, those gentlemen? |
| 08:49 | 20 | A.   Yes. |
| 08:49 | 21 | Q.   Thank you. |
| 08:49 | 22 | Jesse, in your mind, having worked on the Macondo |
| 08:49 | 23 | well, having been involved with a number of other deepwater |
| 08:49 | 24 | wells, if a cement job does not isolate hydrocarbons, do you |
| 08:49 | 25 | expect that to result in a blowout? |

OFFICIAL TRANSCRIPT

JESSE GAGLIANO - DIRECT

| | | |
|---|---|---|
| 08:49 | 1 | A.   No. |
| 08:49 | 2 | Q.   Jesse, let's switch gears, and let's talk about foam |
| 08:49 | 3 | cement. |
| 08:50 | 4 | What is foam cement, Jesse? |
| 08:50 | 5 | A.   Foam cement is basically cement that you inject nitrogen |
| 08:50 | 6 | or gas into, to lighten the weight of the cement. |
| 08:50 | 7 | Q.   And the nitrogen is injected there on the rig -- |
| 08:50 | 8 | A.   Yes. |
| 08:50 | 9 | Q.   -- prior to the time that the slurry is pumped? |
| 08:50 | 10 | A.   That's correct. |
| 08:50 | 11 | Q.   And is it injected under pressure? |
| 08:50 | 12 | A.   Yes. |
| 0    0 | 13 | Q.   Okay.  If you were going to try to test the slurry there |
| 08:50 | 14 | in the laboratory, would you use nitrogen for testing? |
| 08:50 | 15 | A.   No.  We actually use air for testing it in the lab. |
| 08:50 | 16 | Q.   Why is air used in the lab whereas nitrogen is used there |
| 08:50 | 17 | on the rig? |
| 08:50 | 18 | A.   Because the testing is not done under pressure in the lab. |
| 08:50 | 19 | Q.   Okay, sir. |
| 08:50 | 20 | Jesse, what is the purpose of using foam in a cement |
| 08:50 | 21 | job? |
| 08:50 | 22 | A.   I'm sorry.  I missed the question. |
| 08:50 | 23 | Q.   What is the purpose of using foam in a cement job? |
| 08:50 | 24 | A.   One of the main purposes is, if you have a low frac |
| 08:50 | 25 | gradient, you can actually adjust the weight of the cement to |

OFFICIAL TRANSCRIPT

JESSE GAGLIANO - CROSS

| | | |
|---|---|---|
| 10:55 | 1 | they can change the top cement.  Things can change as far as |
| 10:55 | 2 | volumes.  So I just documented that and sent it to BP. |
| 10:55 | 3 | Q.   But in terms of the design of the cement slurry itself, |
| 10:55 | 4 | from one document to the next, that never changed? |
| 10:55 | 5 | A.   From what I remember, I think they were pretty consistent |
| 10:55 | 6 | through all those versions. |
| 10:55 | 7 | Q.   Okay.  And you mentioned earlier that risk assessment, to |
| 10:55 | 8 | the extent it was done, would have been included in a |
| 10:55 | 9 | series of OptiCem reports. |
| 10:55 | 10 | A.   Yes. |
| 10:55 | 11 | Q.   Separate document? |
| 10:55 | 12 | A.   Yes. |
| 1    5 | 13 | Q.   And the risk that you identified in the OptiCem was gas |
| 10:56 | 14 | flow? |
| 10:56 | 15 | A.   Yes. |
| 10:56 | 16 | Q.   And that risk changed based upon number and placement of |
| 10:56 | 17 | centralizers? |
| 10:56 | 18 | A.   Yes. |
| 10:56 | 19 | Q.   So that's a very defined risk, that you may have gas flow |
| 10:56 | 20 | problems during the cement job if you use a certain number of |
| 10:56 | 21 | centralizers and put them in a certain location? |
| 10:56 | 22 | A.   Yes.  That affects it, yes. |
| 10:56 | 23 | Q.   Other than that defined risk of centralizers and their |
| 10:56 | 24 | relationship to gas flow, there is no other risk of this cement |
| 10:56 | 25 | job identified in the OptiCem report, is there? |

JESSE GAGLIANO - CROSS

| | | |
|---|---|---|
| 10:56 | 1 | **A.**   There's a schematic at the end of if that indicates the |
| 10:56 | 2 | channeling that takes place, and you can actually look at the |
| 10:56 | 3 | channeling that shows in the picture and correspond it to the |
| 10:56 | 4 | gas flow potential. |
| 10:56 | 5 | **Q.**   That's the one with the different colors in it? |
| 10:56 | 6 | **A.**   Yes. |
| 10:56 | 7 | **Q.**   Okay. |
| 10:56 | 8 | **A.**   Different colors indicate different fluids. |
| 10:56 | 9 | **Q.**   All right.  And channeling means you may have an area |
| 10:56 | 10 | where, for whatever reason, the cement, once it hardens, will |
| 10:57 | 11 | not cover a particular location you want it to cover and it may |
| 10:57 | 12 | leave a path for hydrocarbons to flow; is that fair? |
| 1    :7 | 13 | **A.**   Yes. |
| 10:57 | 14 | **Q.**   All right.  So you identified that too? |
| 10:57 | 15 | **A.**   Yes. |
| 10:57 | 16 | **Q.**   And you sent that to BP in a series of OptiCem reports? |
| 10:57 | 17 | **A.**   Yes.  When I sent them OptiCem reports, they all included |
| 10:57 | 18 | that information. |
| 10:57 | 19 | **Q.**   All right.  Those reports would represent the sum and |
| 10:57 | 20 | substance of what you did from the Halliburton side to assess |
| 10:57 | 21 | and identify risks associated with the production cement casing |
| 10:57 | 22 | job for BP; correct? |
| 10:57 | 23 | **A.**   I'm sorry.  Repeat the question. |
| 10:57 | 24 | **Q.**   Those OptiCem reports and what we just talked about -- |
| 10:57 | 25 | **A.**   Yes. |

OFFICIAL TRANSCRIPT

JESSE GAGLIANO - CROSS

| | | |
|---|---|---|
| 10:57 | 1 | **Q.**   -- would represent Halliburton's effort to identify and |
| 10:57 | 2 | inform BP of risks associated with this production casing |
| 10:57 | 3 | cement slurry job. |
| 10:57 | 4 | **A.**   That's the only way I communicated to BP about the issue. |
| 10:57 | 5 | **Q.**   All right.  There's no method in place, from Halliburton's |
| 10:57 | 6 | standpoint, as far as you were concerned back February, March, |
| 10:58 | 7 | April 2010, based on what you just told me, to report to them |
| 10:58 | 8 | increased risks that might be associated with the use of a foam |
| 10:58 | 9 | slurry with, say, for example, synthetic oil-based mud in the |
| 10:58 | 10 | hole?  That's not something that's regularly reported from |
| 10:58 | 11 | Halliburton to BP? |
| 10:58 | 12 | **A.**   I disagree with that.  I mean, that's the whole purpose of |
| 10:58 | 13 | me being in-house with BP, is for me to communicate those |
| 10:58 | 14 | things to BP. |
| 10:58 | 15 | **Q.**   So you told them that? |
| 10:58 | 16 | **A.**   Yes, I did. |
| 10:58 | 17 | **Q.**   Was that done in any document form? |
| 10:58 | 18 | **A.**   No.  It was on a conference call the weekend before the |
| 10:58 | 19 | job. |
| 10:58 | 20 | **Q.**   And you specifically raised the issue of using foam cement |
| 10:58 | 21 | and synthetic oil-based mud? |
| 10:58 | 22 | **A.**   Yes.  We had a discussion about putting spacer behind the |
| 10:58 | 23 | plug, and I think there was some e-mail discussion about it as |
| 10:58 | 24 | well.  But I recommended the pump spacer behind the plug; in |
| 10:58 | 25 | case the plug failed, they were able to pump around it. |

OFFICIAL TRANSCRIPT

6761

1     UNITED STATES DISTRICT COURT

2     EASTERN DISTRICT OF LOUISIANA

3

4 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

5  IN RE:  OIL SPILL BY THE OIL
   RIG *DEEPWATER HORIZON* IN THE
6  GULF OF MEXICO ON APRIL 20,
   2010
7

8        CIVIL ACTION NO. 10-MD-2179 "J"
        NEW ORLEANS, LOUISIANA
9        Tuesday, April 2, 2013

10

11  THIS DOCUMENT RELATES TO:

12  CASE NO. 2:10-CV-02771,
   *IN RE:  THE COMPLAINT AND*
13  *PETITION OF TRITON ASSET*
   *LEASING GmbH, ET AL*
14

   CASE NO. 2:10-CV-4536,
15  *UNITED STATES OF AMERICA V.*
   *BP EXPLORATION & PRODUCTION,*
16  *INC., ET AL*

17
  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
18

19

20     **DAY 20 - AFTERNOON SESSION**

21    TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

22   HEARD BEFORE THE HONORABLE CARL J. BARBIER

23     UNITED STATES DISTRICT JUDGE

24

25

15:40:45  1    A.   I have heard that, yes.

15:40:46  2    Q.   Now, the centralizer diameter is also an issue in terms of an

15:40:55  3    input that you would make?

15:40:57  4    A.   I've heard that, but the diameter and centralizer and the hole

15:41:02  5    size I stuck them in, yes, it works.  It's two separate hole sizes

15:41:07  6    in this well.

15:41:07  7    Q.   And base oil density would be a factor also, correct?

15:41:12  8    A.   Very minimal.

15:41:13  9    Q.   It's a smaller one?

15:41:15 10    A.   It's very minimal, yes.

15:41:16 11    Q.   What are the big ones?  The pore pressure and the location?

15:41:19 12    A.   The location of the centralizers would affect it.  I never knew

:41:25 13    where the location was.  It was never communicated to me by BP.

15:41:28 14    Q.   Well, did you ever say to BP, "I don't have the location of the

15:41:33 15    centralizers, I need to get that to input it into the model"?

15:41:37 16    A.   By the time I learned they ran six centralizers, they had

15:41:41 17    already run it in the hole so it was too late for them to move it

15:41:45 18    anyway.

15:41:45 19    Q.   But just in terms of making a prediction, if you knew where

15:41:48 20    they were, I'm just asking, did you ever ask for the information?

15:41:51 21    It's okay if you didn't.  I just want to know if you did.

15:41:53 22    A.   No, I didn't.  It was the area where they had run them in the

15:41:55 23    hole so at this point it was already too late to do anything about

15:41:58 24    it.

15:41:58 25    Q.   And as you've said, you did not in any way consider the issue

6854

15:42:03  1    of the number or the placement of the centralizers to be a safety

15:42:08  2    issue?

15:42:08  3    A.  No.

15:42:08  4    Q.  I think you've described it, it could be an issue in terms of

15:42:13  5    coming back and having the need to do what you've described as a

15:42:17  6    squeeze job, but it was not a safety issue to the men on the rig?

15:42:22  7    A.  No.

15:42:22  8    Q.  Now, do you recall that the model that you ran using six

15:42:44  9    centralizers predicted that the ECDs, that is the equivalent

15:42:55 10    circulating densities, would exceed the fracture gradient?

15:42:58 11    A.  I believe that's the first indication I got, yes.

15:43:00 12    Q.  And if the ECDs exceed the fracture gradient, then you would

:43:08  13    have losses, correct?

15:43:08 14    A.  Yes.

15:43:09 15    Q.  And for this particular well in terms of the cement job, there

15:43:14 16    were no losses, were there?

15:43:15 17    A.  There was reported to be no losses.

15:43:17 18    Q.  Well --

15:43:24 19            Are you okay?

15:43:24 20    A.  Yeah.

15:43:24 21    Q.  If you want to get a drink of water just like at any time --

15:43:29 22    A.  I've got a cough today.  Sorry.

15:43:35 23    Q.  You good?

15:43:35 24    A.  Uh-huh.

15:43:36 25    Q.  All right.  The model that you ran with six centralizers

# EXHIBIT 14

4882

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN RE:  OIL SPILL BY THE OIL
RIG *DEEPWATER HORIZON* IN THE
GULF OF MEXICO ON APRIL 20,
2010

                         CIVIL ACTION NO. 10-MD-2179 "J"
                         NEW ORLEANS, LOUISIANA
                         Wednesday, March 20, 2013


THIS DOCUMENT RELATES TO:

CASE NO. 2:10-CV-02771,
*IN RE:  THE COMPLAINT AND
PETITION OF TRITON ASSET
LEASING GmbH, ET AL*

CASE NO. 2:10-CV-4536,
*UNITED STATES OF AMERICA V.
BP EXPLORATION & PRODUCTION,
INC., ET AL*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*




**DAY 15 – MORNING SESSION**

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

HEARD BEFORE THE HONORABLE CARL J. BARBIER

UNITED STATES DISTRICT JUDGE



OFFICIAL TRANSCRIPT

5014

11:17:24  1  be consistent with the standard of care for that period of time,

11:17:27  2  correct?

11:17:28  3  A.  Right.  Given what they were trying to accomplish, yes.

11:17:32  4  Q.  And this test does have the ability to meet the definition that

11:17:41  5  we just looked at; that is, it would test the integrity of the shoe

11:17:47  6  track cement?

11:17:47  7  A.  It would.

11:17:48  8  Q.  Now, you agree that the negative pressure test performed at

11:17:57  9  Macondo did provide accurate information about the integrity of the

11:18:02 10  well?

11:18:02 11  A.  My opinion it did.

11:18:04 12  Q.  The negative test as it was set up and conducted on April the

:18:09 13  20th answered the question it was intended to answer?

11:18:13 14  A.  In my opinion it did, yes.

11:18:14 15  Q.  In fact, it answered the question repeatedly and consistently?

11:18:19 16  A.  It did.

11:18:19 17  Q.  And it provided information to the men on the crew that we've

11:18:25 18  talked about that would have signalled -- should have signalled to

11:18:29 19  them that the well lacked integrity?

11:18:31 20  A.  In my opinion, it did.

11:18:32 21  Q.  You agree that if the negative pressure test had been correctly

11:18:43 22  interpreted, you would have no criticism of the Temporary

11:18:47 23  Abandonment Procedure that was used at the Macondo well?

11:18:51 24  A.  I think if the negative test had been interpreted correctly,

11:18:57 25  you and I would not be having this conversation, so nobody would

OFFICIAL TRANSCRIPT

11:19:01  1    care whether I thought it was appropriate or not.

11:19:03  2    Q.   Right.   But I need to ask you some questions as the expert for

11:19:07  3    Transocean --

11:19:08  4    A.   I understand.

11:19:08  5    Q.   -- so if you'll just stay with me.   I am not fussing with you

11:19:14  6    about the comment, I just need an answer to the question.

11:19:17  7    A.   I understand.   I understand.

11:19:18  8    Q.   You agree that if the negative pressure test had been

11:19:23  9    interpreted correctly, you would have no criticism of the Temporary

11:19:27 10    Abandonment Procedure that was used at the Macondo well?

11:19:30 11    A.   I would not have a criticism of the procedure itself.   To me,

11:19:35 12    the procedure as implemented, I think given the history of the well

:19:42 13    and the procedure that was forthcoming, raised the level of risk

11:19:48 14    higher than you needed to raise it for a TA procedure.

11:19:51 15           But as far as the procedure, could it have been done

11:19:55 16    safely and properly assuming a good interpretation of the test,

11:20:00 17    yes, it probably could have.

11:20:02 18    Q.   Let me just show you one question and answer from your

11:20:07 19    deposition.

11:20:07 20    A.   Sure.

11:20:08 21           MR. BROCK:   If I can look at 671, lines 14 through 20.

11:20:08 22    BY MR. BROCK:

11:20:18 23    Q.   "If the negative test had been interpreted correctly," and you

11:20:21 24    nodded, "would you have any criticism of the Temporary Abandonment

11:20:28 25    Procedure that was used?"   Do you see that?

OFFICIAL TRANSCRIPT

# EXHIBIT 15

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF LOUISIANA

 3

 4    IN RE:  OIL SPILL BY THE OIL RIG   *   Docket 10-MD-2179
      DEEPWATER HORIZON IN THE           *
 5    GULF OF MEXICO ON APRIL 20, 2010   *   Section J
                                         *
 6    Applies to:                        *   New Orleans, Louisiana
                                         *
 7    Docket 10-CV-02771,                *   April 8, 2013
      IN RE:  THE COMPLAINT AND          *
 8    PETITION OF TRITON ASSET           *
      LEASING GmbH, et al                *
 9                                       *
      Docket 10-CV-4536,                 *
10    UNITED STATES OF AMERICA v.        *
      BP EXPLORATION & PRODUCTION,       *
11    INC., et al                        *
                                         *
12    * * * * * * * * * * * * * * * * * *

13

14              DAY 23, AFTERNOON SESSION
                TRANSCRIPT OF NONJURY TRIAL
15         BEFORE THE HONORABLE CARL J. BARBIER
                UNITED STATES DISTRICT JUDGE
16

17   Appearances:

18

19   For the Plaintiffs:        Domengeaux Wright Roy
                                   & Edwards, LLC
20                              BY:  JAMES P. ROY, ESQ.
                                556 Jefferson Street, Suite 500
21                              Post Office Box 3668
                                Lafayette, Louisiana 70502
22

23   For the Plaintiffs:        Herman Herman & Katz, LLC
                                BY:  STEPHEN J. HERMAN, ESQ.
24                              820 O'Keefe Avenue
                                New Orleans, Louisiana 70113
25
```

OFFICIAL TRANSCRIPT

ADAM BOURGOYNE - CROSS

13:35   1   A.   That's correct.

13:35   2   Q.   It's your opinion this should be a routine operation that

13:35   3   fits within their training, correct?

13:35   4   A.   That's correct.

13:35   5   Q.   The negative pressure test, by your own admission, is a

13:36   6   safety-critical test, right?

13:36   7   A.   It is.

13:36   8   Q.   No doubt about that?

13:36   9   A.   No doubt about it.  That's why everybody pays so much

13:36   10  attention to it.

13:36   11  Q.   If you botch it, you can have a blowout; rigs can catch

13:36   12  fire; rigs can blow up.  Yes?

1  .6    13  A.   Yes.  Assuming there's some additional mistakes made along

13:36   14  the way, but that's one of the mistakes that, by itself, won't

13:36   15  cause that, but, you know, it could be a contributing --

13:36   16  without that, you wouldn't have the blowout.  You know, it's a

13:36   17  proximate cause, I think is the word y'all use.

13:36   18  Q.   "Proximate cause" isn't an engineering term, is it?

13:36   19  A.   No, but it's been explained to me what it is.

13:36   20  Q.   If the crew had not proceeded after the unsuccessful

13:36   21  negative pressure test, it's your opinion that it's unlikely

13:36   22  that the blowout would have occurred, correct?

13:36   23  A.   Correct.

13:36   24  Q.   If the blowout hadn't occurred, the explosion and fire

13:36   25  wouldn't have occurred, right?

OFFICIAL TRANSCRIPT

ADAM BOURGOYNE - CROSS

13:36    1    A.    That's correct. If the kick had been caught after the

13:37    2    negative test was failed, then the blowout wouldn't have

13:37    3    occurred. And if the blowout preventers had worked after the

13:37    4    crew didn't catch the kick, then there's a good chance there

13:37    5    wouldn't have been a problem. And if the flow had been

13:37    6    diverted instead of sent into the mud-gas separator, there may

13:37    7    not have been -- there probably would not have been an

13:37    8    explosion and fire.

13:37    9         So, I mean, there's a lot of contributing causes to

13:37   10    this disaster.

13:37   11    Q.    Are you through?

13:37   12    A.    Yes.

1  ,7   13    Q.    The most common way in the industry to conduct a negative

13:37   14    pressure test is to pump water down to a certain depth, stop

13:37   15    the pumps, make sure there's no pressure in either the drill

13:37   16    pipe or the annulus, and make sure there's no flow from the

13:37   17    drill pipe or the annulus, true?

13:37   18         I've tried to read that out of your report. I'll

13:37   19    bring up the report if you need it.

13:38   20    A.    Yeah, that's generally true. You know, you may have to

13:38   21    have a downhole packer or something to --

13:38   22    Q.    I don't want to spend a lot of time on this. I just want

13:38   23    to point out you spend 16 lines in TREX-8173.51 to 52

13:38   24    describing what you believe to be the most common way for a

13:38   25    negative pressure test to be properly done, right?

OFFICIAL TRANSCRIPT

7732

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4   ******************************************************

5   IN RE:  OIL SPILL BY THE OIL
    RIG *DEEPWATER HORIZON* IN THE
6   GULF OF MEXICO ON APRIL 20,
    2010
7

8                         CIVIL ACTION NO. 10-MD-2179 "J"
                          NEW ORLEANS, LOUISIANA
9                         TUESDAY, APRIL 9, 2013, 8:00 A.M.

10

11  THIS DOCUMENT RELATES TO:

12  CASE NO. 2:10-CV-02771,
    *IN RE:  THE COMPLAINT AND*
13  *PETITION OF TRITON ASSET*
    *LEASING GmbH, ET AL*
14
    CASE NO. 2:10-CV-4536,
15  *UNITED STATES OF AMERICA V.*
    *BP EXPLORATION & PRODUCTION,*
16  *INC., ET AL*

17
    ******************************************************
18

19

20              **DAY 24  MORNING SESSION**

21       TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

22     HEARD BEFORE THE HONORABLE CARL J. BARBIER

23            UNITED STATES DISTRICT JUDGE

24

25


                   **OFFICIAL TRANSCRIPT**

09:14AM 1   Q.   Now, I'm not going to go back through the decisions and

09:15AM 2   your comments on the decisions.  You've testified to those

09:15AM 3   yesterday.  But I will ask you that in terms of increased risk

09:15AM 4   of blowout, the following questions:

09:15AM 5       If zonal isolation had been achieved in the bottom of the

09:15AM 6   well, would this accident, in your opinion, have occurred?

09:15AM 7   A.   No.

09:15AM 8   Q.   Is that independent of these decisions that were made by

09:15AM 9   BP that you were asked about yesterday?

09:15AM 10  A.   Yes.

09:15AM 11  Q.   Same question of the failure of the negative test.  If the

09:15AM 12  negative test had been properly interpreted, would this

09:15AM 13  accident have occurred?

09:15AM 14  A.   Not likely.

09:15AM 15  Q.   Is the failure to interpret the negative test properly

09:15AM 16  independent of the decisions that Mr. Roy asked you about

09:15AM 17  yesterday, numbers 2 through 13 here?

09:15AM 18  A.   Yes.

09:15AM 19  Q.   The failure to monitor the well, as you have discussed

09:16AM 20  today, in terms of the indications of flow at 9:01, 9:08 and

09:16AM 21  9:30, if any of those indications had been picked up and

09:16AM 22  reacted to in the proper way, would this accident have been

09:16AM 23  prevented?

09:16AM 24  A.   Yes.

09:16AM 25  Q.   Are those failures to monitor independent of the decisions

# EXHIBIT 16

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  OIL SPILL BY THE OIL RIG   *   Docket 10-MD-2179
     *DEEPWATER HORIZON* IN THE          *
5    GULF OF MEXICO ON APRIL 20, 2010   *   Section J
                                        *
6    Applies to:                        *   New Orleans, Louisiana
                                        *
7    Docket 10-CV-02771,                *   April 16, 2013
     *IN RE:  THE COMPLAINT AND*         *
8    *PETITION OF TRITON ASSET*          *
     *LEASING GmbH, et al*               *
9                                       *
     Docket 10-CV-4536,                 *
10   *UNITED STATES OF AMERICA v.*       *
     *BP EXPLORATION & PRODUCTION,*      *
11   *INC., et al*                       *
                                        *
12   * * * * * * * * * * * * * * * * *

13

14              DAY 28, MORNING SESSION
                TRANSCRIPT OF NONJURY TRIAL
15        BEFORE THE HONORABLE CARL J. BARBIER
              UNITED STATES DISTRICT JUDGE

16

17   Appearances:

18

19   For the Plaintiffs:        Domengeaux Wright Roy
                                   & Edwards, LLC
                                BY:  JAMES P. ROY, ESQ.
20                              556 Jefferson Street, Suite 500
                                Post Office Box 3668
21                              Lafayette, Louisiana 70502

22

23   For the Plaintiffs:        Herman Herman & Katz, LLC
                                BY:  STEPHEN J. HERMAN, ESQ.
24                              820 O'Keefe Avenue
                                New Orleans, Louisiana 70113

25

OFFICIAL TRANSCRIPT

JOHN GUIDE - CROSS

| | | |
|---|---|---|
| 08:37 | 1 | **Q.**   Okay, sir.  I want to ask you about that. |
| 08:37 | 2 | When you say you wish they had called you to talk |
| 08:37 | 3 | about it, why did you wish somebody there on the rig had called |
| 08:37 | 4 | you to tell you that there had been an issue with the first |
| 08:37 | 5 | negative pressure test and that a second one was going to be |
| 08:37 | 6 | performed, if you will, please, sir? |
| 08:37 | 7 | **A.**   Because maybe I could have given some input on how they |
| 08:37 | 8 | should further investigate what the anomalies are. |
| 08:37 | 9 | **Q.**   Had you been called, Mr. Guide, and told that there was |
| 08:37 | 10 | 1400 pounds of pressure on the drill pipe and zero on the kill |
| 08:37 | 11 | line, what, if anything, would you have done immediately upon |
| 08:37 | 12 | hearing that? |
| 0  ;7 | 13 | **A.**   Well, the first thing I would have said is -- I would have |
| 08:38 | 14 | asked for more information, but I would tell them not to |
| 08:38 | 15 | proceed; they need to figure out why that -- why that was |
| 08:38 | 16 | actually being seen. |
| 08:38 | 17 | **Q.**   "Stop and investigate," is that what you would have said? |
| 08:38 | 18 | **A.**   Yes, sir, I would have. |
| 08:38 | 19 | **Q.**   "Don't go any further." |
| 08:38 | 20 | You would not have allowed the displacement of the |
| 08:38 | 21 | heavier mud to be displaced with seawater had you known there |
| 08:38 | 22 | was an issue with the differentials in the pressure on the |
| 08:38 | 23 | drill pipe and kill line, would you? |
| 08:38 | 24 | **A.**   I would have asked them to stop and investigate. |
| 08:38 | 25 | **Q.**   You would not have allowed the displacement to go forward |

OFFICIAL TRANSCRIPT

JOHN GUIDE - CROSS

08:38　　1　until you had cleared up whatever that issue was, would you,

08:38　　2　sir?

08:38　　3　A.　Yes, sir.

08:38　　4　Q.　You would not, would you?

08:38　　5　A.　I would not.

08:38　　6　Q.　Thank you, sir.

08:38　　7　　　　Let me ask you this, fast-forwarding past the event,

08:38　　8　and then we'll go back briefly to some of the items.

08:38　　9　　　　After the event of the horrendous, horrific blowout

08:38　 10　on the 20th of April, did you speak with either Don Vidrine or

08:39　 11　Bob Kaluza, say, about anything pertaining to that negative

08:39　 12　pressure test?

0　 ɔ9　 13　A.　I spoke with Bob Kaluza.

08:39　 14　Q.　And how about Mr. Vidrine?  Did you talk to him after the

08:39　 15　event?

08:39　 16　A.　I did not.

08:39　 17　Q.　How long after the event did you talk -- and I don't mean

08:39　 18　to play it down when I say "event," the blowout.

08:39　 19　　　　How long after the blowout, the event, was it that

08:39　 20　you talked to Bob Kaluza?

08:39　 21　A.　It was about four or five days.

08:39　 22　Q.　Okay, sir.  Where was that?

08:39　 23　A.　It was -- I was in West Lake 4 in Houston.

08:39　 24　Q.　Yes, sir.

08:39　 25　A.　Mr. Kaluza was at his home in Las Vegas.

OFFICIAL TRANSCRIPT

# EXHIBIT 17

01-38832
TC/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )    MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on )    SECTION: J
APRIL 20, 2010 )
)    JUDGE BARBIER
)
)    MAG. JUDGE SHUSHAN
)

## *CONFIDENTIAL*

## *WorldwideVIEW*™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# J. J. Azar, Ph.D.
## VOLUME 1

DECEMBER 5, 2011

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

```
  1   run or other type of test run to determine that
  2   the cement job was good?  That was up to BP in
  3   the final analysis, was it not?
  4               MR. REGAN:  Object to the form.
04:58  5   Q.  (BY MR. GODWIN)  Wasn't it, sir?
  6   A.  Yes, it was.
  7   Q.  Thank you, sir.
  8       Okay.  Now, in terms of the Macondo well,
  9   prior to the time that it blew out in that
04:58 10   horrific event that we all feel so, so badly
 11   about, my client was not given an opportunity to
 12   go in and correct anything that might have been
 13   wrong with the cement job because the negative
 14   test was misinterpreted.  Isn't that a fact, sir?
04:59 15   A.  That was a fact.
 16   Q.  Thank you, sir.
 17   A.  That was misinterpreted.
 18   Q.  All by BP and Transocean, correct?
 19   A.  That is correct.  All of those --
04:59 20   Q.  And then -- I'm sorry, sir.
 21   A.  All of those were witnessing the test,
 22   they misinterpreted.
 23   Q.  BP and Transocean?
 24   A.  Yes, sir.
04:59 25   Q.  And if the negative test had been
```

**PURSUANT TO CONFIDENTIALITY ORDER**

306

correctly interpreted by BP and Transocean and a

determination was made that the cement job was

not a good job, remediation work could have been

done that would have resulted in this blowout not

04:59  occurring.  Would you agree with that?

A.  I agree with that, sir.

Q.  And if, in fact, that remediation work

was done and the blowout didn't occur, we

wouldn't be sitting here today and 11 men would

04:59  not have lost their lives.  Would you also --

A.  I --

Q.  Would you also agree with that?

A.  I agree with that.

Q.  Thank you, sir.

05:00       So, then, any responsibility for that

blowout should lie at the feet of the people, the

companies that interpreted the negative pressure

test, that is, BP and Transocean.  Would you

agree with that?

05:00            MR. REGAN:  Objection; form.

Q.  (BY MR. GODWIN)  Would you agree with

that, sir, based on what you just said?

A.  I cannot answer the question the way it's

stated, sir.

05:00  Q.  Sir, if the negative pressure test -- did

**PURSUANT TO CONFIDENTIALITY ORDER**