# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 13-cr-165-JTM-KWR** |
| **v.** | * | |
| | | **SECTION: H** |
| **HALLIBURTON ENERGY SERVICES, INC.** | * | **VIOLATION:** |
| | * | |
| | * * * | **18 U.S.C. §§ 1030(a)(5)(A) and (c)(4)(G)(i)** |

## JOINT MEMORANDUM IN SUPPORT OF HALLIBURTON ENERGY SERVICES, INC.'S GUILTY PLEA PURSUANT TO COOPERATION GUILTY PLEA AGREEMENT

**NOW INTO COURT**, through the undersigned attorneys, come the United States of America and the defendant, Halliburton Energy Services, Inc. ("HESI"), which respectfully request that this Court accept the defendant's guilty plea pursuant to Rule 11(c)(1)(A) and Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure on the terms set forth in the Cooperation Guilty Plea Agreement submitted to the Court on July 26, 2013 ("Plea Agreement") (Rec. Doc. No. 4).

As demonstrated below, the proposed Cooperation Guilty Plea Agreement imposes fair, just, and appropriate corporate punishment for HESI's offense conduct described below and in the Cooperation Guilty Plea Agreement. The Cooperation Guilty Plea Agreement appropriately reflects the nature and circumstances of the charged offense, HESI's history and characteristics, and its full, truthful and ongoing cooperation, which has been significant and valuable in the Deepwater Horizon Task Force's investigation of the events surrounding the blowout of the Macondo well on April 20, 2010, and the ensuing oil spill. The Cooperation Guilty Plea

Agreement also serves to deter and prevent future misconduct and protects the public from future offense conduct by HESI and others, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

Pursuant to the Cooperation Guilty Plea Agreement, HESI is prepared to plead guilty to intentionally causing damage without authorization to a protected computer in or about May and June 2010, in violation of 18 U.S.C. § 1030(a)(5)(A), subject to 18 U.S.C. § 1030(c)(4)(G)(1). Also pursuant to the Cooperation Guilty Plea Agreement, HESI has agreed to pay the statutory maximum fine of $200,000, and is subject to a three-year term of probation.

The criminal penalty agreed upon by the United States and HESI fairly and reasonably balances the seriousness of the offense conduct with other important factors. HESI's Cementing Technology Director, acting without HESI's authorization, intentionally ordered the deletion of computer-generated Displace 3D models related to the Macondo well created in the weeks following the blowout on April 20, 2010, despite having previously been directed by a HESI executive to preserve material related to the Macondo well. As soon as it discovered the deletion, HESI notified the Task Force. HESI was able to recreate the Displace 3D models, but the original models have not been recovered, notwithstanding HESI's considerable efforts to do so. HESI issued legal hold notices and took other preservation measures in connection with its obligation to preserve documents and other information relating to the Macondo well. In light of the deletion of the Displace 3D models and the significance of the Task Force and other government investigations, the imposition of the statutory maximum fine, as required under the Cooperation Guilty Plea Agreement, is appropriate. At the same time, the Cooperation Guilty Plea Agreement appropriately reflects HESI's full, truthful, significant and valuable cooperation with the Deepwater Horizon Task Force in its investigation to date, including that HESI voluntarily and promptly disclosed the offense conduct to the Task Force.

In arriving at the agreed-upon charge and admission of guilt, as well as the fine and terms of probation, the United States has considered a vast amount of complex factual and legal information developed over more than three years. From the United States' perspective, the fine and term of probation represent a just and appropriate negotiated resolution built on the work of numerous prosecutors, investigators, support staff members, and other personnel that began even before the oil well was capped. The Task Force's and HESI's work, both cooperatively and independently over the past three years, developed their respective understandings of the complex factual and legal issues presented by this case; that hard-earned understanding served as a foundation for the negotiation of the Cooperation Guilty Plea Agreement presently before the Court. The Task Force and HESI therefore respectfully request that the Court accept the Cooperation Guilty Plea Agreement as a fair and just application of the appropriate law to the charged conduct and as a reasonable product of vigorous arm's length negotiations and careful analysis of the relevant issues. *See United States v. C.R. Bard, Inc.*, 848 F. Supp. 287, 288 (D. Mass. 1994) ("When, as here, the joint sentencing recommendation is the result of arm's length negotiations between capable counsel, this court believes the agreement should be accepted if it is reasonable.")

## BACKGROUND AND TERMS OF THE COOPERATION GUILTY PLEA AGREEMENT

### I.   HESI'S FACTUAL ALLOCUTION

HESI's factual allocution, appended to the Cooperation Guilty Plea Agreement as Exhibit A, admits its offense conduct and provides the factual basis for the proposed plea. (Rec. Doc. No. 3.) In summary, the allocution states that HESI was contracted by BP to provide cementing and other services in connection with BP's drilling plan for the Macondo well. (*Id.* at ¶ 3.) As this Court knows, and as HESI acknowledges, the Macondo well blew out on April 20, 2010,

resulting in the deaths of eleven men on board the drilling rig *Deepwater Horizon*, and resulting in oil and natural gas flowing into the Gulf of Mexico. (*Id.* at ¶ 6.)

On April 27, 2010, the United States Departments of the Interior and Homeland Security announced investigations of the incident; thereafter, investigations by the Department of Justice and others were launched. (*Id.* at ¶ 7.) The agencies conducting these investigations required HESI to preserve and produce information, documents and other materials related to HESI's work on the Macondo well. (*Id.*)

Following the Macondo well blowout, HESI and others examined various technical aspects of the well's design and construction. (*Id.* at ¶ 8.) On or about May 14, 2010, HESI's Cementing Technology Director directed a HESI Senior Program Manager for the Cement Product Line ("Program Manager") to run two computer simulations of the Macondo well cementing job using a HESI computer simulation program named "Displace 3D." (*Id.*) Displace 3D was a next-generation simulation program that was being developed to model fluid interfaces and their movement through the wellbore and annulus of a well. (*Id.*) In this case, HESI's Cementing Technology Director instructed the Program Manager to run two models comparing alternative predictions of the Macondo cement job using different numbers of centralizers to keep the production casing centered within the wellbore. (*Id.*) Centralizers are metal devices that protrude from various intervals of the casing strings of a well, which can help keep the casing centered in the wellbore away from the surrounding walls as it is lowered and placed in the well. (*See* Rec. Doc. No. 1 ¶ 8.) Centralization can be significant to the quality of subsequent cementing around the casing. (*Id.*) Prior to the Macondo well blowout, HESI had recommended that BP use 21 centralizers in the well, based on a different simulation program, Opticem, which predicted the degree of channeling in a cement job associated with mud

4

displacement. Notwithstanding HESI's recommendation, BP opted to use only six centralizers. (*Id.*)

As instructed by the Cementing Technology Director, HESI's Program Manager ran Displace 3D computer simulations and showed the results, contained on his HESI laptop, to the Cementing Technology Director and possibly one other HESI senior manager. (Rec. Doc. No. 3 at ¶ 9.) HESI's Cementing Technology Director then directed the Program Manager to delete the results even though the Cementing Technology Director and others had been instructed by a HESI executive to preserve material related to the Macondo well. (*Id.*) The Program Manager felt uncomfortable deleting the simulations but nonetheless followed the direction of defendant HESI's Cementing Technology Director to delete the simulations by (1) entering his HESI computer, locating the relevant files within the computer (which files contained a ".d3d" identifier) and deleting those files, and then (2) entering the computer's "Recycle Bin," accessible through the user interface of the computer, and erasing the deleted files from that location as well. (*Id.*) The Program Manager later acknowledged the deletion to another employee ("Employee 1") and stated, "I did what I was told." (*Id.*) The Cementing Technology Director was not authorized by HESI to delete these files or to instruct anyone else to do so.[1]

---

[1] The Task Force notes that, as indicated in the information in this matter, certain individuals conducting these simulations perceived that the simulations showed little difference between the use of 6 versus 21 centralizers. (*See* Rec. Doc. No. 1, ¶¶ 10 & 11; *see also* U.S.DOJ Office of Public Affairs, No. 130850, July 25, 2013, http://www.justice.gov/opa/pr/2013/July/13-crm-850.html (last visited 09/12/2013).) Whether their perceptions were objectively correct, whether the models they ran accurately represented the actual cementing job, and whether BP should have adopted HESI's original advice to use 21 centralizers (based on different computer modeling using a different program run prior to the blowout) is not a subject of the criminal resolution with HESI, and the Task Force has taken no position on those matters in connection with this resolution. (*Id.*)

5

Moreover, in or about May or June 2010, HESI's Cementing Technology Director also asked Employee 1, who was more experienced than the Program Manager at running Displace 3D simulations, to run two Displace 3D simulations using the same inputs that were used by the Program Manager, which included different numbers of centralizers. (*Id.* at ¶ 10.) Employee 1 did so and then showed at least some of the results, contained on his HESI laptop, to defendant HESI's Cementing Technology Director and another manager. (*Id.*) Employee 1 was then directed by HESI's Cementing Technology Director to delete the simulations. (*Id.*) Because Employee 1 felt uncomfortable deleting the simulations, Employee 1 delayed deleting the simulations and retained the models for a period of time. Ultimately, however, like Program Manager before him, Employee 1 deleted them from his HESI computer. (*Id.*) The Cementing Technology Director was not authorized by HESI to instruct Employee 1 or anyone else to delete the data. (*Id.*)

During ensuing civil litigation and federal criminal investigation by the Deepwater Horizon Task Force, HESI undertook substantial efforts to forensically recover the deleted Displace 3D computer simulations, but the efforts to recover the deleted Displace 3D simulations ultimately were unsuccessful. (*Id.* at ¶ 11.) Nonetheless, pursuant to court order, a consulting company with technology expertise eventually recreated the Displace 3D models based on the same inputs that Employee 1 certified he believed were used in May/June 2010. Employee 1 certified that to his recollection the modeling output is a fair and accurate representation of the Displace 3D modeling that was produced in May and/or June 2010.

The HESI computers used by the Program Manager and Employee 1, upon which the materials were stored and later deleted, were used in and affecting interstate and foreign commerce and communication. (*Id.* at ¶ 12.) The conduct of HESI's Cementing Technology

Director, in directing the deletion of the Displace 3D computer simulations created by the Program Manager and Employee 1, was unauthorized by HESI but was within the scope of the Cementing Technology Director's employment. (*Id.* at ¶ 13.)

## II.   HESI'S COOPERATION

HESI has provided full, truthful, substantial and valuable cooperation during the Deepwater Horizon Task Force's investigation of the events at Macondo. HESI's cooperation was forthright, extensive and ongoing since the outset of the investigation. Counsel for HESI contacted the Task Force within days of its formation and provided continuous and meaningful cooperation. Overall, it is the Task Force's view that HESI's cooperation was exceptional. HESI promptly produced hundreds of thousands of documents to the Task Force and other agencies and made dozens of witnesses available for interview on a wide variety of topics. HESI proactively provided information, quickly responded to questions and made a team of lawyers available to immediately address any inquiry by the Task Force. Notably, in the course of providing this cooperation, HESI proactively disclosed the offense conduct giving rise to the charge in this matter as soon as it learned about it. It also undertook considerable efforts to attempt to recover and then recreate the Displace 3D models. As noted above, HESI, pursuant to the Cooperation Guilty Plea Agreement, must continue to cooperate in the Task Force's investigation.

## III.   HESI'S CRIMINAL HISTORY

HESI has not been subject to any criminal actions over the past ten years. HESI has also not entered into any Deferred Prosecution Agreements or Non-Prosecution Agreements during that period.

## IV.   THE COOPERATION GUILTY PLEA AGREEMENT

7

The Cooperation Guilty Plea Agreement provides for HESI to pay the statutory-maximum fine of $200,000 and to be subject to a term of three years' probation. HESI's Board of Directors has provided a resolution guaranteeing that any legal successor or assign of HESI, shall remain liable for the defendant's obligations pursuant to the Cooperation Guilty Plea Agreement.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 11(c)(1)(C) authorizes the government to enter into plea agreements with defendants in which, *inter alia*, the parties agree that a particular sentence is the appropriate disposition of the case. *See* Fed. R. Crim. P. 11(c)(1)(C); *see also United States v. BP Prods. N. Am., Inc.*, 610 F. Supp. 2d 655, 674-78 (S.D. Tex. 2009). In assessing a Rule 11(c)(1)(C) plea, the Court must make an "individualized assessment of the plea agreement," *BP Prods.*, 610 F. Supp. 2d at 674, to ensure that it constitutes a "reasonable disposition," taking into account, among other things, "'the exigencies of plea bargaining from the government's point of view,' including 'limited resources and uncertainty of result.'" *Id.* at 662 (quoting *United States v. Bundy*, 359 F.Supp.2d 535, 538 (W.D. Va. 2005)). In making this assessment, the Court should analyze the proposed plea agreement in light of 18 U.S.C. §§ 3553, 3563, and 3572, which govern the imposition of sentences, including fines and probation, in federal criminal cases. *See id.* at 727-28. Those statutory provisions require that all federal criminal sentences take into account a number of factors, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need to afford adequate specific and general deterrence to criminal conduct; and the need to protect the public. *See* 18 U.S.C. § 3553(a). Discretionary conditions of probation must be reasonably related to those same factors, and must "involve only such deprivations of liberty or property as

8

are reasonably necessary." 18 U.S.C. § 3563(b). Fines, meanwhile, must be imposed after consideration of the Section 3553 factors mentioned above, as well as additional factors, including the defendant's ability to pay, any burden imposed by the fine on third parties, and, in the case of organizational defendants, the size of the organization and any measures taken by it to discipline responsible employees and to prevent a recurrence.[2] *See* 18 U.S.C. § 3572(a).

The advisory Sentencing Guidelines' policy statements provide that when the parties agree to a specific sentence in a plea agreement under Rule 11(c)(1)(C), the district court may accept the plea agreement if it is satisfied that the agreed sentence is either within the applicable Guideline range or outside the Guideline range for justifiable reasons. *See* U.S.S.G. § 6B1.2(c); *see also Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (Kennedy, J., plurality op.) (noting that district court must "give due consideration" to the Guidelines when considering a binding plea agreement). U.S.S.G. § 2B1.1 is the applicable Guidelines section to determine the offense level for organizational defendants in connection with the offense of knowingly issuing a command to intentionally cause the deletion of data involving a protected computer without authorization. 18 U.S.C. § 1030(a)(5)(A), subject to the misdemeanor penalty provision of 18 U.S.C. § 1030(c)(4)(G)(i)). *See* U.S.S.G. § 8C2.1. The provisions of U.S.S.G. §§ 8C2.2 through

---

[2] As the Southern District of Texas has noted:

> A court may not reject a plea proposed under Rule 11(c)(1)(C) on the grounds that it fails to charge a sufficiently severe crime, provided that the government has not made its decision not to charge a higher offense contingent on the defendant's acceptance of the plea bargain. The government has wide prosecutorial discretion to bring appropriate charges, and the court must "defer to the government's position except under extraordinary circumstances."

*BP Prods.*, 610 F. Supp. 2d at 675 (quoting Thomas W. Hutchinson et al., Federal Sentencing Law and Practice § 6B1.2 (2009)).

8C2.9 apply to the instant offense to assist the Court in determining the applicable fine under the Guidelines. U.S.S.G. § 8C2.1. With respect to probation, the Guidelines' provision for organizational defendants, Section 8D1.1, requires a term of probation in various circumstances, none of which apply here. In this case, the government and HESI have agreed to a three-year term of probation, subject to Rule 11(c)(1)(C), in consideration of the nature of the offense and HESI's cooperation and remediation.[3]

## ANALYSIS

The proposed sentence under the Cooperation Guilty Plea Agreement provides just punishment, adequately deters both the defendant and others from engaging in similar offense conduct in the future, protects the public, promotes respect for the law and appropriately accounts for the nature and seriousness of the offense, and the history and characteristics of HESI.

## I. THE AGREED SENTENCE IS JUST, FAIR AND REASONABLE

The proposed sentence in this matter, entailing the statutory-maximum fine and a three-year period of probation, constitutes a fair, just and reasonable punishment for the charged offense, when considered in light of the factors identified above.

In May and/or June 2010, the Cementing Technology Director instructed two employees to create and then delete Displace 3D models from HESI's computer system despite the legal obligation to preserve materials relating to the Macondo well and despite HESI's legal hold notice and an executive's direction to preserve materials. The Cementing Technology Director's instruction to delete the Displace 3D models constitutes a violation of 18 U.S.C. § 1030(a)(5)(A) in the wake of a serious incident, and warrants imposition of the statutory maximum fine, as is

---

[3] Absent the Cooperation Guilty Plea Agreement, subject to Rule 11(c)(1)(C), the decision whether to impose probation in this case would have been entirely within the Court's discretion.

10

provided in the Cooperation Guilty Plea Agreement. In the same vein, the proposed sentence will place HESI on probation for a significant period of time – three years – during which time it will be subject to this Court's supervision. Pursuant to this sentence of probation, HESI will be expressly prohibited from committing any further crimes. Should HESI violate the conditions of its probation, it will face the prospect of further punishment, including, potentially, an extension of the term of probation to the statutory maximum of five years, and the imposition of additional, specific conditions imposed by this Court, at its discretion. As such, the Cooperation Guilty Plea Agreement and proposed sentence will specifically deter HESI from committing further offenses, and will protect the public from future misconduct.

The circumstances of the case also demonstrate that the combination of a statutory-maximum fine and three years of probation appropriately reflect HESI's extensive, significant and valuable cooperation. As noted above, HESI promptly and voluntarily disclosed the offense conduct to the Task Force. Moreover, while the original files containing these models turned out to be unrecoverable following the deletions charged in the Information, HESI did have the ability to generate new versions of the modeling, it undertook considerable efforts to do so and produced them to the Task Force.

Further, HESI has cooperated with the Department of Justice since the inception of the criminal investigation of the Macondo well blowout, explosion, oil spill, and response, and has agreed to continue cooperating in any ongoing criminal investigation related to Macondo. Indeed, as noted above, the offense conduct in the instant case was brought to the attention of the Task Force through HESI's own affirmative disclosures.[4] These factors as well are worthy of consideration in assessing the appropriateness of the proposed sentence. *See* 18 U.S.C. §

---

[4] Moreover, the plea agreement does not prohibit the United States from prosecuting any individual HESI employees.

11

3553(a)(1), (2)(B)-(C); *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (defendant's cooperation appropriately considered under 18 U.S.C. § 3553(a)(1) as part of defendant's "history and characteristics").

Moreover, the reasonableness of the proposed sentence should be viewed in light of the remedial and other measures that HESI has taken since the blowout of the Macondo well. For example, in order to prevent the occurrence of similar conduct in the future, HESI has made its legal hold policies and procedures more rigorous and extensive, with a particular focus on the preservation of potentially relevant information and materials on its computers and electronic networks relevant to the subject matter of the hold not only at the time the legal hold is initiated but also in the future. Along with these efforts, HESI has invested in software that improves the way legal hold notices are delivered to employees, and supplements its ability to collect and preserve media on its information systems. Additional technology enhancements have been added to improve HESI's ability to identify, collect and preserve physical materials that may have no direct relation to the well involved in an incident but may nevertheless be viewed as relevant to an inquiry about the incident. HESI has also transferred to the Law Department certain IT Department duties regarding the external delivery of data collection, improved its handling of any pre-existing preservation obligations in mergers and acquisitions and has hired several employees who are responsible for overseeing compliance with its discovery and preservation obligations. HESI also recently revised its Code of Business Conduct, of which all employees are required to certify (and re-certify regularly) their understanding and acceptance, and which, among other things, provides clear examples of employees' obligations to conduct themselves ethically and in compliance with the Code. *See* 18 U.S.C. § 3572(a)(8) (in assessing fine against organization, court should consider "any measure taken by the organization . . . to

prevent a recurrence of such an offense"); *see also BP Prods.*, 610 F. Supp. 2d at 677-78, 729 (in evaluating the reasonableness of the terms of plea agreement and fine, court may properly consider defendant's other expenditures and financial commitments).

Finally, in analyzing the adequacy of the fine under the Cooperation Guilty Plea Agreement, the Court may also "take into account ... 'uncertainty of result.'" *Id.* at 729-30 (quoting *Bundy*, 359 F. Supp. 2d at 538). The result of any negotiated compromise inherently incorporates the risk each side bears that it might not prevail if the case were to be fully litigated through trials and appeals. The outcome of any trial inherently involves some level of uncertainty, as all parties appreciate. That uncertainty supports the reasonableness of a Rule 11(c)(1)(C) plea negotiated at arm's length by active and vigorous litigants.

## II.   ADDITIONAL OBSERVATIONS BY HESI[5]

HESI respectfully submits that the proposed Cooperation Guilty Plea Agreement is a fair, just and reasonable resolution of the Department of Justice's investigation into matters arising from the Deepwater Horizon incident.

---

[5] This Section II consists of statements by HESI alone.

## CONCLUSION

For the reasons set forth above, the parties respectfully and jointly request that the Court accept the proposed guilty plea by the defendant pursuant to Rule 11(c)(1)(A) and 11(c)(1)(C) of the Federal Rules of Criminal Procedure on the terms set forth in the Cooperation Guilty Plea Agreement submitted to the Court on July 26, 2013.

New Orleans, Louisiana, this 12th day of September, 2013.

| | |
|---|---|
| JOHN BURETTA<br>Director<br>Deepwater Horizon Task Force | HALLIBURTON ENERGY SERVICES INC. |
| By: /s/ John D. Buretta<br>   /s/ William A. Pericak<br>   /s/ Scott M. Cullen<br>John D. Buretta, Director<br>William A. Pericak, Deputy Director<br>Richard R. Pickens, II, Trial Attorney<br>Colin L. Black, Trial Attorney<br>Rohan A. Virginkar, Trial Attorney<br>Scott M. Cullen, Trial Attorney<br>Deepwater Horizon Task Force | By: /s/ Marc L. Mukasey<br>Marc L. Mukasey, Esq.<br>Richard W. Beckler, Esq.<br>Jason B. Hutt, Esq.<br>BRACEWELL & GIULIANI LLP<br>Counsel for Halliburton Energy Services, Inc. |

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2013, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

/s/ Scott M. Cullen
SCOTT M. CULLEN
Trial Attorney, Deepwater Horizon Task Force