U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED  10-1-13
WILLIAM W. BLEVINS
CLERK

**Herbst, Lars (Vol. 01) - 10/10/2012**                                              (RUNNING 00:02:00.095)

HERBST

| HERBST | 3 SEGMENTS (RUNNING 00:02:00.095) |

**1. PAGE 239:23 TO 240:23 (RUNNING 00:01:12.789)**

```
        23   You
        24   mentioned that you were involved in an
        25   instance of the source control efforts where
00240:01   BP was not as forthcoming with information as
        02   quickly as you would have like.  Can you tell
        03   me, No. 1, what that pertained to?
        04        A.    In particular that -- that one
        05   incident -- and, really, that's the only
        06   incident I can -- I can recall -- was
        07   following top kill.  It made -- it made a
        08   request to participate in some other the
        09   discussion and ongoing analysis occurred
        10   immediately following those attempts.  I
        11   thought it would -- it would have been better
        12   to be in the same room hearing the discussion
        13   as it occurred.  They -- they had had the
        14   data -- we had access to data realtime as it
        15   was coming -- coming through, but as far as
        16   having the data to go back and -- and
        17   analyze, we didn't have that, and so I
        18   thought it would be better to participate
        19   with -- with them in that analysis or at
        20   least hear their -- their viewpoints as they
        21   were deliberating on that, and we were not
        22   allowed to participate in that -- in that
        23   particular meeting.
```

**2. PAGE 241:18 TO 242:07 (RUNNING 00:00:35.441)**

```
        18        Q.    You said yourself and
        19   Admiral Cook made that request; is that
        20   correct?
        21        A.    We attempted to sit in on a
        22   meeting that BP was having, and at that time
        23   we were -- we were not allowed to -- to enter
        24   that meeting.  I don't know exactly what was
        25   going on in that meeting at that time.  They
00242:01   may have been on a teleconference or
        02   whatever, but at that particular time they
        03   said no, we need -- we need to discuss the
        04   information and -- and that's really the last
        05   I heard of it until we -- we sat down at a
        06   briefing regarding their -- their results and
        07   their analysis of the results.
```

**3. PAGE 243:16 TO 243:21 (RUNNING 00:00:11.865)**

```
        16        Q.    And to the best of your
        17   recollection what specifically did they say
        18   when you asked to participate?
        19        A.    Basically, the -- that they
        20   needed their own time to assess the
        21   information.
```

## Herbst, Lars (Vol. 02) - 10/11/2012     9 CLIPS (RUNNING 00:09:11.332)

 **HERBST**

| HERBST | 1 SEGMENT (RUNNING 00:00:35.727) |
|---|---|



**1. PAGE 300:09 TO 300:22 (RUNNING 00:00:35.727)**

```
09      Q.    (BY MR. BARR)  Mr. Herbst, would
10 you agree with me that MMS regulations are
11 the minimum that has to be done by a -- by a
12 oil and gas company to get a permit to drill?
13      A.    I would say they're -- they're
14 at least a minimum.  In some cases they're
15 prescriptive.  In other cases they're
16 performance-based expectations.
17      Q.    But they're the floor of what
18 has to be done?
19      A.    At least, yes.
20      Q.    There is nothing that prevents a
21 company from doing more than the regulations?
22      A.    No, there's not.
```

 **HERBST**

| HERBST | 4 SEGMENTS (RUNNING 00:01:02.474) |
|---|---|



**1. PAGE 301:05 TO 301:09 (RUNNING 00:00:13.485)**

```
05      Q.    (BY MR. BARR)  Sure.  If a
06 company knows that more should be done to
07 operate safely, you would agree with me that
08 it had -- it has an obligation to do more
09 than the regulations require?
```

**2. PAGE 301:11 TO 301:12 (RUNNING 00:00:04.040)**

```
11      A.    As -- as regards to safety I
12 would say yes.
```

**3. PAGE 302:24 TO 303:08 (RUNNING 00:00:23.751)**

```
24          Q.    In fact, the regulations in
25 place at the time of the Macondo incident
00303:01 requires a company to be prepared to handle
02 such a blowout, correct?
03      A.    That's correct.
04      Q.    And you would agree that the
05 operator has the responsibility to control
06 the source, not the federal government,
07 correct?
08      A.    That is correct.
```

**4. PAGE 304:23 TO 305:04 (RUNNING 00:00:21.198)**

```
23          Q.    Okay.  So other than relief
24 wells and ROV intervention, you would agree
25 with me that BP didn't have any other methods
00305:01 prebuilt and worked out to respond to an
02 uncontrolled blowout, correct?
03      A.    In -- in particular this
04 particular blowout scenario, I would agree.
```

 HERBST

| HERBST | 3 SEGMENTS  (RUNNING 00:00:35.209) |



**1. PAGE 315:21 TO 316:03  (RUNNING 00:00:15.309)**

```
         21         Q.      Their obligation under
         22   regulation is to abate the source as quickly
         23   as possible, correct?
         24         A.      Yes.
         25         Q.      And if that technology either
    00316:01   exists or could have existed prior to the
         02   incident, they had an obligation to use that
         03   technology, right?
```

**2. PAGE 316:06 TO 316:08  (RUNNING 00:00:08.192)**

```
         06         A.      If the technology existed, yes,
         07   we would have expected that they'd be aware
         08   of that and implement it.
```

**3. PAGE 328:05 TO 328:10  (RUNNING 00:00:11.708)**

```
         05         Q.      (BY MR. BARR)  And the stuff
         06   that was done -- that's done today was
         07   technologically feasible on April 19th,
         08   correct?
         09         A.      I believe that would be a
         10   correct statement.
```

 HERBST

| HERBST | 6 SEGMENTS  (RUNNING 00:01:08.386) |



**1. PAGE 348:14 TO 348:17  (RUNNING 00:00:09.764)**

```
         14         Q.      Okay.  And the industry was not
         15   prepared to respond to -- let's just use 50
         16   as a number.  They weren't responding to --
         17   prepared to respond to 50,000, correct?
```

**2. PAGE 348:20 TO 348:25  (RUNNING 00:00:12.739)**

```
         20         A.      I would say that they were not
         21   prepared to respond to whatever the actual
         22   rate that was on this incident.
         23         Q.      (BY MR. BARR)  Fair enough.  So
         24   they certainly weren't prepared to respond
         25   for a worst-case discharge, correct?
```

**3. PAGE 349:03 TO 349:04  (RUNNING 00:00:02.588)**

```
         03         A.      I believe that's a fair
         04   assumption, yes.
```

**4. PAGE 360:22 TO 360:25  (RUNNING 00:00:10.859)**

```
         22                 Certainly capping stack as a
         23   form of equipment has been in existence in
         24   the oil and gas industry for quite awhile,
         25   correct?
```

**5. PAGE 361:02 TO 361:08  (RUNNING 00:00:19.428)**

```
         02         A.      Terminology may be different,
         03   but whether they're control -- control valves
         04   that -- that could be stabbed on top of a
```

```
          05    well or capping stack, it may not have always
          06    been referred to as capping stack, but some
          07    means of capping that is accumulation of
          08    valves or rams, yes.
```

**6. PAGE 363:23 TO 364:03  (RUNNING 00:00:13.008)**

```
          23          Q.     But the first time you're using
          24    something you shouldn't be during a crisis;
          25    should be -- you should be thinking about the
   00364:01    use of that technology prior to the crisis,
          02    correct?
          03          A.     I would agree with that.
```


# HERBST

| HERBST | 7 SEGMENTS (RUNNING 00:02:36.837) |
|---|---|



**1. PAGE 393:08 TO 393:24  (RUNNING 00:00:48.152)**

```
          08          Q.     But the point I'm making
          09    with this document is in 2001 BP is talking
          10    about capping stacks as a best available
          11    technology, right?
          12          A.     Yes.
          13          Q.     And as far as you know, BP made
          14    no effort from 2001 to 2010 to try to figure
          15    out how to use that best available technology
          16    in deepwater, correct?
          17          A.     From my knowledge, that'd be
          18    correct, yes.
          19          Q.     Okay.  Don't you agree that a --
          20    a prudent company that believes something is
          21    best available technology and could contain a
          22    blowout quicker than a relief well should try
          23    to figure out a way to use that technology in
          24    deepwater environments?
```

**2. PAGE 394:01 TO 394:09  (RUNNING 00:00:18.607)**

```
   00394:01          A.     I would agree, yes.
          02          Q.     (BY MR. BARR)  And that was not
          03    done in this case, was it?
          04          A.     As far as I know, it was not
          05    done.
          06          Q.     And we know today capping stacks
          07    are also considered best available technology
          08    in deepwater, correct?
          09          A.     This is correct.
```

**3. PAGE 394:15 TO 394:19  (RUNNING 00:00:15.954)**

```
          15          A.     (Continuing)  Just to clarify,
          16    there is specifically a requirement by notice
          17    to lessees for operators to demonstrate their
          18    capabilities, and capping stacks are one of
          19    those capabilities.
```

**4. PAGE 397:07 TO 397:09  (RUNNING 00:00:04.292)**

```
          07          Q.     Okay.  And that's because
          08    capping stacks are the best available
          09    technology, correct?
```

**5. PAGE 397:11 TO 397:13  (RUNNING 00:00:06.293)**

```
          11          A.     We believe it's part of -- of
```

```
           12   the best available technology to respond
           13   to -- to deepwater blowouts, yes.
```

### 6. PAGE 397:17 TO 398:13 (RUNNING 00:00:44.536)

```
           17                 This notice to lessees, it's
           18   based on the same regulations that were in
           19   place prior to April 20, 2010, correct?
           20        A.       It's based on 30 CFR 254, which
           21   is response regulations.
           22        Q.       Okay.  And did the regulations
           23   themselves change as a result of the Macondo
           24   incident?
           25        A.       No.
    00398:01        Q.       Okay.  So what the M -- what
           02   BOEMRE did was issue a notice to lessees
           03   saying this is how we interpret these
           04   regulations, correct?
           05        A.       It provided clarification of the
           06   existing regulations.
           07        Q.       This is what we expect you to be
           08   able to do, correct?
           09        A.       That is correct, that they must
           10   demonstrate this.
           11        Q.       Okay.  You actually expected
           12   them to be able to do this before Macondo,
           13   correct?
```

### 7. PAGE 398:15 TO 398:22 (RUNNING 00:00:19.003)

```
           15        A.       We expected them to be able to
           16   contain a deepwater blowout.
           17        Q.       (BY MR. BARR)  And you were,
           18   unfortunately, proven wrong in that
           19   expectation, correct?
           20        A.       In -- in that particular
           21   situation, they did not, obviously, contain
           22   it as quick as our expectations were.
```

# 🎬 HERBST

**HERBST**                    **2 SEGMENTS  (RUNNING 00:01:05.759)** 

### 1. PAGE 441:17 TO 441:25 (RUNNING 00:00:35.542)

```
           17        Q.       Were you ever told prior to the
           18   top kill that there was discussion within BP
           19   that the top kill would not work if the flow
           20   was more than 15,000 barrels per day?
           21        A.       I do not recall that discussion.
           22        Q.       Is that the type of information
           23   that you believe you should receive when
           24   you're making decisions of whether or not you
           25   would recommend such a procedure?
```

### 2. PAGE 442:02 TO 442:13 (RUNNING 00:00:30.217)

```
           02        A.       It would be very helpful in --
           03   in the discussion.  It wouldn't be the only
           04   item that I would look at.  We were looking
           05   at the entirety of -- of that effort.
           06        Q.       (BY MR. BARR)  But if I recall
           07   correctly, you're the person that signed off
           08   on the top kill procedure, correctly?
           09        A.       Yes.
           10        Q.       And you were not told that that
```

```
11  contingency existed, correct?
12       A.    As far as I know, that's
13  correct.
```

 HERBST

| HERBST | 5 SEGMENTS (RUNNING 00:00:42.855) |
|---|---|



**1. PAGE 490:05 TO 490:06  (RUNNING 00:00:03.646)**

```
05       Q.    I'd like to show you
06  Exhibit 9084.
```

**2. PAGE 490:07 TO 490:09  (RUNNING 00:00:07.156)**

```
07  Louisiana's Tab 4.  This is a May 29th, 2010,
08  PowerPoint presentation that was entitled
09  "Top Kill Analysis";
```

**3. PAGE 490:18 TO 490:23  (RUNNING 00:00:13.229)**

```
18       Q.    BP presented this PowerPoint to
19  you on or about May 29th of 2010; is that --
20       A.    That's correct.
21       Q.    And you understood it to be BP's
22  analysis of why the top kill had failed?
23       A.    That's correct.
```

**4. PAGE 491:07 TO 491:11  (RUNNING 00:00:15.356)**

```
07       Q.    Would you expect that the
08  responsible party would share with you, MMS'
09  representative at the Unified Area Command,
10  all of the relevant information it had about
11  the top kill's failure?
```

**5. PAGE 491:13 TO 491:13  (RUNNING 00:00:03.468)**

```
13       A.    Yes, I would.
```

 HERBST

| HERBST | 5 SEGMENTS (RUNNING 00:01:04.499) |
|---|---|



**1. PAGE 494:16 TO 494:21  (RUNNING 00:00:12.415)**

```
16       Q.    In fact, BP presented this
17  failed rupture disks scenario as the only
18  plausible scenario for explaining the top
19  kill's failure; is that right?
20       A.    From what I recall, that was the
21  only one, yes.
```

**2. PAGE 495:09 TO 495:16  (RUNNING 00:00:15.238)**

```
09       Q.    Did
10  BP inform the group that because the top kill
11  had likely failed because of the rupture
12  disks that shutting in the well through use
13  of a BOP on BOP method would likely lead to
14  broaching?
15       A.    Yes, that is one of the bullets
16  here.
```

**3. PAGE 495:22 TO 496:03  (RUNNING 00:00:16.450)**

```
         22        Q.    This conclusion that BP
         23   presented about the burst disks being
         24   responsible for the top kill's failure caused
         25   decision makers to turn away from the BOP on
    00496:01   BOP option at the end of May; is that right?
         02        A.    I believe that to be correct,
         03   yes.
```

**4. PAGE 496:15 TO 496:19  (RUNNING 00:00:09.365)**

```
         15        Q.    You had not had the opportunity,
         16   though, yourself, to analyze the top kill
         17   data files at the point of this May 29th
         18   presentation; is that right?
         19        A.    That's correct.
```

**5. PAGE 499:02 TO 499:05  (RUNNING 00:00:11.031)**

```
         02        Q.    Did anyone from BP share with
         03   you the view that the top kill had failed
         04   because the flow rate was too high because it
         05   was over 15,000 or words to that effect?
```

 HERBST

| HERBST | 3 SEGMENTS  (RUNNING 00:00:19.586) |
|---|---|



**1. PAGE 499:07 TO 499:07  (RUNNING 00:00:01.995)**

```
         07        A.    I do not recall that.
```

**2. PAGE 499:19 TO 499:25  (RUNNING 00:00:15.534)**

```
         19        Q.    (BY MR. DAVIS-DENNY)  Sure.
         20   Wouldn't it have been important to the
         21   government's analysis of whether to go
         22   forward with the BOP on BOP option to have
         23   known that a BP employee had concluded that
         24   the top kill was failing because the flow
         25   rate was over 15,000 barrels of oil per day?
```

**3. PAGE 500:02 TO 500:02  (RUNNING 00:00:02.057)**

```
         02        A.    Yes, that would be important.
```

> TOTAL: 10 CLIPS FROM 2 DEPOSITIONS (RUNNING 00:11:11.427)



TREX.9084.1.1.TO



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § § § § § § | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

THIS DOCUMENT RELATES TO ALL CASES

Phase II Deposition Summary for Lars Herbst

## I. Overview of Deponent

| | |
|---|---|
| Current Employer: | United States Bureau of Safety and Environmental Enforcement (19:20-19:23). |
| Current Job: | Regional Director for the Gulf of Mexico Region. (22:2-22:7). |
| Education: | Bachelor of Science in Petroleum Engineering in 1982. (20:7-20:12). |
| Work Experience: | Mr. Herbst began his career in 1982 with a division of Schlumberger doing well testing work. In 1983, Mr. Herbst joined the United States Mineral Management Service (predecessor to the Bureau of Safety and Environmental Enforcement). From 1983 to 1990, Mr. Herbst worked with the Program Office of Field Operations in Technical Assessment and Operations Support. From 1990 to 1991, Mr. Herbst became the Deputy Regional Supervisor for Field Operations, overseeing all District Offices, holding the position for 1.5 years. From 1991 to 2007, Mr. Herbst became the Regional Supervisor for Field Operations. In 2007, Mr. Herbst became the Deputy Regional Director for the Gulf of Mexico Operations and held that position for 6 months and then became the Regional Director for the Gulf of Mexico Operations in October, 2007 to 2011. In 2011, when the Mineral Management Service was re-organized and became the Bureau of Safety and Environmental Enforcement, Mr. Herbst became the Regional Director for the Gulf of Mexico Region. (20:13-22:7). |

| | |
|---|---|
| Role/Responsibility During Response: | Yes. Mr. Herbst represented the United States Mineral Management Service on the Unified Command during the Response. (126:1-126:4; 252:12-252:14). |
| Rule 30(b)(6) Designee: | Mr. Herbst was designated by the United States for the following topics: |

1. Your review and approval of BP's 2009 Regional Oil Spill Response Plan – Gulf.

2. Your knowledge on or before April 20, 2010, of any requirements that Oil Spill Response Plans, Exploration Plans, or any other regulatory submittal include provisions regarding how to respond to subsea oil well blow-outs (including deepwater oil well blow-outs) on the Outer Continental Shelf, by containing, capturing, controlling, capping or stopping the flow of oil and gas from the well.

3. Other than blow-out preventers, your knowledge of the state of the art within the industry as to any device, system, assembly, procedure or technology for response to subsea oil well blow-outs (including deepwater oil well blow-outs) by containing, capturing, controlling, capping or stopping the flow of oil and gas from the well.

4. The training of United States personnel, including but not limited to personnel of the United States Coast Guard prior to April 20, 2010, to respond to, or to participate in a response to, an offshore oil well blow-out relating to Source Control Efforts. (Limited to training for the Department of Interior).

5. Your knowledge of the Source Control elements of BP's offshore oil spill response programs, or emergency management training programs, for responses to offshore oil well blowouts, between January 1, 2005 and April 20, 2010, including any audits or approvals of such training programs. (Limited to training for the Department of Interior).

15. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the efforts used to activate the Deepwater Horizon blow-out preventer on or after April 20, 2010, through the use of remotely operated vehicles ("ROVs").

16. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of

the use of a pollution dome or cofferdam as a means to capture oil and gas from the MC252 Well.

17. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a riser insertion tube tool as a means to capture oil and gas from the MC252 Well.

20. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of Junk Shot(s) as a means to stop the flow of oil and gas from the MC252 Well. (Mr. Herbst designated to address topic on behalf of the U.S. except with respect to the Federal Labs and Department of Energy).

21. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of Momentum Kill(s) as a means to stop the flow of oil and gas from the MC252 Well. (Mr. Herbst designated to address topic on behalf of the U.S. except with respect to the Federal Labs and Department of Energy).

22. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of Top Kill as a means to stop the flow of oil and gas from the MC252 Well. (Mr. Herbst designated to address topic on behalf of the U.S. except with respect to the Federal Labs and Department of Energy).

24. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of the choke or kill line of the Deepwater Horizon blow-out preventer as a means to capture oil and gas from the MC252 Well. (Mr. Herbst designated to address topic on behalf of the U.S. except with respect to the Federal Labs and Department of Energy).

31. Your knowledge of any suggestion or proposal to utilize the Macondo wellbore or either relief well for future production from MC252.

32. Your knowledge of any delay in the drilling or either relief well due to the taking of samples in the wellbore.

36. Your efforts (including all communications, modeling, calculations and analysis of any kind) relating to all attempts to

quantify the release of hydrocarbons from the Macondo MC252 well after April 20, 2010, whether or not those efforts resulted in a finalized or public estimate. (Pre-Flow Rate Technical Group).