U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED 10-1-13
WILLIAM W. BLEVINS SK
CLERK

## Vargo, Richard F. (Vol. 01) - 08/22/2012

1 CLIP (RUNNING 00:04:07.999)



**10 SEGMENTS (RUNNING 00:04:07.999)**

**1. PAGE 11:08 TO 11:10 (RUNNING 00:00:03.018)**

```
08      Q.      Can you state your name for the
09  record?
10      A.      Richard Frank Vargo, Jr.
```

**2. PAGE 26:01 TO 26:03 (RUNNING 00:00:06.656)**

```
00026:01    Q.      Now, Halliburton was hired by BP
      02  to assist with the top kill, correct?
      03      A.      Yes.
```

**3. PAGE 59:04 TO 59:18 (RUNNING 00:00:40.088)**

```
04      Q.      So according to this document
05  from BP, the top kill could make the
06  situation worse by not killing the well and
07  more oil would flow primarily due to erosion
08  in the kink, correct?
09      A.      Yes.
10      Q.      And then "People, Pressure,
11  SIMOPS," correct?
12      A.      Yes.
13      Q.      Do you know what that risk is?
14      A.      The "People, Pressure, SIMOPS,"
15  certainly risks to people.  Obviously, doing
16  an operation like this is dangerous, and so
17  risk to people getting hurt, that was -- that
18  was definitely a top risk.
```

**4. PAGE 91:08 TO 91:19 (RUNNING 00:00:32.159)**

```
08      Q.      No.  I mean, you said that your
09  view of it changed between the date it
10  happened and today based upon your review of
11  documents.  So I'm asking which ones?
12      A.      I learned that BP -- that they
13  didn't believe the flow rate -- that the top
14  kill momentum kill could work with a flow
15  rate of 15,000 barrels per day.
16      Q.      And we went forward, anyway,
17  right?
18      A.      And, yes, we were instructed to
19  go forward, anyway.
```

**5. PAGE 98:11 TO 98:13 (RUNNING 00:00:04.644)**

```
11      Q.      (BY MR. BARR)  Does that
12  surprise you BP didn't tell people that it
13  wasn't going to work?
```

**6. PAGE 98:15 TO 98:21 (RUNNING 00:00:33.756)**

```
15      A.      Nothing surprises me right now.
16      Q.      (BY MR. BARR)  Do you want to --
17  do you want to take a break?
18      A.      No.
19      Q.      What's Halliburton's reaction to
20  that?
```

```
               21      A.    I'm pretty angry.
```

**7. PAGE 136:01 TO 136:19 (RUNNING 00:00:44.615)**

```
00136:01         Q.    Okay.  Was there ever a time in
      02   which you in person told BP employees that
      03   you believed it was 30,000 barrels per day?
      04         A.    Yes.
      05         Q.    When would that have been?  Or
      06   if it were multiple times, when would those
      07   times have been?
      08         A.    On the day that I sent out the
      09   program for what we were planning to do I
      10   made a point to not only e-mail it, but also
      11   to -- I believe I carried a hard copy to Mike
      12   Bednarz and the pumping team.  I think it was
      13   Mike.  It was -- whoever was on the pumping
      14   team that I was working with that day, and I
      15   specifically told them the assumptions that
      16   we were using.  And I also spoke to Erick
      17   Cunningham.  Erick Cunningham knew we were
      18   using 30,000 barrels a day and 50 million
      19   gas.
```

**8. PAGE 278:22 TO 279:05 (RUNNING 00:00:29.043)**

```
      22         Q.    Let me show you another document
      23   that is Tab 20 in the notebook and which we
      24   have marked as Exhibit 8553.
      25               It's a May 18th, 2010 document
00279:01   that's entitled "Summary points from the Kill
      02   the Well on Paper Discussion."  Have you seen
      03   that document before?
      04         A.    Only in preparation for my --
      05   for my deposition today.
```

**9. PAGE 279:12 TO 279:18 (RUNNING 00:00:15.868)**

```
      12         Q.    And you'll note that under the
      13   summary points, the third bullet says,
      14   "Modeling indicates that a dynamic kill
      15   cannot be successfully executed if the oil
      16   flow rate is 15,000 STB per day."
      17               Do you see that?
      18         A.    Yes.
```

**10. PAGE 280:06 TO 280:18 (RUNNING 00:00:38.152)**

```
      06         Q.    Would it have been helpful for
      07   Halliburton to have seen this before the top
      08   kill junk shot procedures were embarked upon?
      09         A.    Absolutely.
      10         Q.    Why is that?
      11         A.    Because -- because we knew we
      12   had done work that identified the flow rate
      13   as being 30,000 barrels per day, and if it
      14   wasn't -- this was 15,000 barrels, we
      15   couldn't get it to work with 15,000, and we
      16   had an understanding of it being 30, then we
      17   were about to put a lot of people at risk and
      18   the well at risk.
```

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:04:07.999)**



Summary points from the Kill the Well on Paper Discussion
18 May, 2010

**Summary Points**

- The need for accurate, low latency gauges and a system that permits rapid reaction of pumping operations to measured pressures was a point raised several times in discussion.
- Modeling indicates that a that a dynamic kill can be achieved for a well flowing oil at a rate of 5000 STBpd if the pressure in most of the flowing wellbore is above the bubble point
- Modeling indicates that a dynamic kill cannot be successfully executed if the oil flow rate is 15000 STBpd
- Knowledge of the flow rate is needed to form a view of the probability of success, as is knowledge of the position of flow restrictions.
- The dynamic kill operation is likely to put solids-laden fluid at a substantial rate through the BOP stack and riser, which may erode restrictions

CONFIDENTIAL
BP-HZN-2179MDL05991977
TREX 008132.0003

TREX.9132.2.1 also referred to in video as TREX.8553.2.1.TO

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | § § § § § § | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

THIS DOCUMENT RELATES TO ALL CASES

Phase II Deposition Summary for Richard Vargo

### I. Overview of Deponent

Current Employer:   Halliburton Energy Services, Inc

Current Job:   Senior Global Adviser for the Cementing PSL (146:22-23)

Education:

Work Experience:   At the time of the spill, Mr. Vargo was the Gulf of Mexico region manager for cementing. (147:3-4)

Role/Responsibility During Response:   Yes. Mr. Vargo was actively involved on behalf of Halliburton in the design and operation of the Top Kill effort (147:12-23)

Rule 30(b)(6) Designee:   Mr. Vargo was designated by Halliburton for the following topics:

1. For any and all attempts after April 20, 2010, to cap, control, contain, shut in, limit flow from, and/or kill the Macondo Well by each of the following methods: Top Kill or Junk Shot strategies, (hereinafter, collectively referred to as "Methods"):

    a. The total input that Halliburton had for each attempt and/or Method, including, but not limited to, labor, communications to contractors and/or other entities working on Halliburton's behalf, materials, overhead and components, parts, equipment, material, and/or supplies used on same;

    b. The communications and plans to implement each attempt and/or Method, including the identity of each person who gave input;

    c. A description of any manner and methodology discussed or suggested or recommended, including computer models for each attempt, idea, or Method;

    d. A description of the explanations and/or justifications for each attempt, suggestion or Method made, discussed or prepared;

    e. Dates when planning began for each attempt, suggestions and/or Method, including the length of time to plan;

    f. An explanation of and timeline for the steps involved in planning and implementing any attempt and/or Method;

    g. The identity of Halliburton employees and contractors who planned, managed, supervised or assisted in the implementation of any attempt and/or Method;

    h. A description of each office, department, or other organization at Halliburton that participated in planning, engineering, approval, supervision, coordination, and/or implementation of any attempt and/or Method; and

    i. For each Method in which Halliburton played a role, an explanation of and timeline for the steps involved in such actions, including the identity of Halliburton employees and contractors who performed each action, and the identity of custodians recording the actions.

3. For any and all attempts between January 1, 2008 and April 20, 2010, to cap, control, contain, shut in, limit flow from, and/or kill a flowing subsea Gulf of Mexico well by any Methods listed above or by any other method(s) used but not listed above:

    a. The input that Halliburton had to complete each attempt and/or Method;

    b. A description of the manner and methodology, including computer models, used to assess each attempt and/or Method;

    c. A description of the explanations and/or justifications for each attempt and/or Method within Halliburton;

    d. Dates when planning began for each attempt and/or Method, including the length of time to plan and budget;

    e. An explanation of and timeline for the steps involved in planning and implementing each attempt and/or Method;

    f. The identity of Halliburton employees and contractors who planned, managed, and supervised the implementation of each attempt and/or Method;

    g. A description of each office, department, or other organization at Halliburton that participated in the planning, budgeting, engineering, approval, supervision, coordination, and/or implementation of each attempt and/or Method; and

    h. For each Method actually performed in which Halliburton participated, the

       identity of Halliburton employees and contractors who worked on each Method, and the identity of custodians (with documents) recording the performance of each Method.

10. All knowledge or information pertaining to planning, preparations, discussions, evaluations and/or training with regard to a hydrocarbon discharge event, or an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico prior to April 20, 2010.

11. Costs, expenses, or expenditures incurred—including both out-of-pocket costs and/or internal costs—in association with the planning, preparations, discussions, evaluations and/or training for a) a well control/hydrocarbon discharge event or b) an uncontrolled subsea release of hydrocarbons into the Gulf of Mexico prior to April 20, 2010.

12. All planning, preparations, discussions, evaluations and/or training for a) a well control/hydrocarbon discharge event, or b) an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico after April 20, 2010.

16. All Source Control equipment, products, and/or materials presently identified, reserved, set aside, under construction / development, purchased, and/or developed by, or at the request of, Halliburton or its' customers for the use in an uncontrolled subsea blowout in the Gulf of Mexico.

25. Any information regarding efforts by others to control, stop or restrict the release of substances from the Macondo Well.