# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010<br><br>This document applies to:<br>*All Cases* | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## TRANSOCEAN AND HALLIBURTON'S OPPOSITION TO BP'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO RULE 52(C) WITH RESPECT TO THE SOURCE CONTROL SEGMENT

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................... 1

II.    RULE 52(C) STANDARD ......................................................................................... 1

III.   BP FAILED TO PLAN OR PREPARE FOR A BLOWOUT ............................................ 1

IV.   THE ALIGNED PARTIES HAVE PROVEN THAT MISREPRESENTATIONS
      AND OMISSIONS ABOUT THE FLOW DELAYED CAPPING THE WELL ............... 2

      A.    BP's Lies Delayed Capping the Well .................................................. 3

           1.    BP lied about the flow rate and the Top Kill's chances of success,
                which caused the decision to favor Top Kill over the BOP-on-BOP
                capping option ........................................................................... 3

           2.    After the Top Kill failed, BP concealed that the flow rate was a
                likely explanation, and falsely claimed that ruptured disks were the
                *only* plausible explanation ....................................................... 7

      B.    The Evidence Proves BP's Conduct Was a Superseding Cause of Oil that
           Spilled After the Well Should Have Been Capped .............................. 11

      C.    A Superseding Cause Defense Is Legally Available ........................... 14

V.    ADDITIONAL FAULT SHOULD BE ALLOCATED TO BP BASED ON ITS
      SOURCE CONTROL CONDUCT .............................................................................. 15

VI.   CONCLUSION ....................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Alcoa S.S. Co. v. Charles Ferran & Co.*,
251 F. Supp. 823 (E.D. La. 1966) ......................................................................... 15

*Breeland v. Security Ins. Co.*,
421 F.2d 918 (5th Cir. 1969) .................................................................................... 3

*Coffel v. Stryker Corp.*,
284 F.3d 625 (5th Cir. 2002) .................................................................................. 14

*Emerson Elec. Co. v. Farmer*,
427 F.2d 1082 (5th Cir. 1970) .................................................................................. 1

*Exxon Co. v. Sofec, Inc.*,
517 U.S. 830 (1996) ....................................................................................... 14, 13

*In re Alex C. Corp.*,
2010 WL 4292328 (D. Mass. Nov. 1, 2010) ......................................................... 13

*In re Enron Corp. Securities, Derivative & ERISA Litig.*,
2010 WL 9077875 (S.D. Tex. 2010) ...................................................................... 14

*In re Omega Protein, Inc.*,
548 F.3d 361 (5th Cir. 2008) .................................................................................. 15

*Int'l Union of Operating Eng'rs, Local Union 103 v. Ind. Constr. Corp.*,
13 F.3d 253 (7th Cir. 1994) ...................................................................................... 1

*Nunley v. M/V DAUNTLESS COLOCOTRONIS*,
727 F.2d 455 (5th Cir. 1984) .................................................................................. 12

*Skipper v. United States*,
1 F.3d 349 (5th Cir. 1993) ................................................................................ 12, 13

*Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*,
447 F.3d 360 (5th Cir. 2006) ............................................................................ 12, 15

*United States ex rel. Miller v. Bill Harbert Int'l Const. Inc.*,
608 F.3d 871 (D.C. Cir. 2010) .................................................................................. 3

*United States v. Reliable Transfer Co.*,
421 U.S. 397 (1975) ............................................................................................... 15

**TABLE OF AUTHORITIES**
(continued)

Page

FEDERAL RULES

Fed. R. Civ. P. 52(c) ........................................................................................................ 1

TREATISES

Restatement (Second) of Torts § 442 .............................................................................. 12

Restatement (Second) of Torts § 442(a) .......................................................................... 13

Restatement (Second) of Torts § 442(b) .......................................................................... 13

Restatement (Second) of Torts § 442(c) .......................................................................... 13

Restatement (Second) of Torts § 442(e) .......................................................................... 12

Restatement (Second) of Torts § 442(f) ........................................................................... 12

Restatement (Second) of Torts § 448 .............................................................................. 13

## I.    <u>INTRODUCTION</u>

BP's request for judgment on partial findings under Federal Rule of Civil Procedure 52(c) should be denied.  The evidence at trial showed that BP utterly failed to prepare in advance for the spill.  After the spill, BP compounded that failure by misrepresenting the flow rate to government decision-makers.   And although it may not have been BP's specific intent to derail or postpone all available capping options, BP's lies and omissions had the effect of delaying the capping of the well and were a superseding cause of oil that spilled into the Gulf after the well would have been capped but for BP's fraud.  In addition, even if this Court were to decide that BP's conduct did not amount to a superseding cause, BP's conduct in connection with planning and responding to the spill requires that additional fault be allocated to BP.

## II.    <u>RULE 52(C) STANDARD</u>

Federal Rule of Civil Procedure 52(c) allows the Court to enter judgment on a claim or defense "[i]f a party has been fully heard on an issue during a nonjury trial" or "the court may . . . decline to render any judgment until the close of the evidence."  *Int'l Union of Operating Eng'rs, Local Union 103 v. Ind. Constr. Corp.*, 13 F.3d 253, 257 (7th Cir. 1994).

BP moved under Rule 52(c) at the close of the Aligned Parties' case and renewed its motion after resting its case.  In considering a Rule 52(c) motion, the Court applies the same standard of proof and weighs all the evidence as it would in reaching its ultimate verdict.  *See Emerson Elec. Co. v. Farmer*, 427 F.2d 1082, 1086 (5th Cir. 1970).

## III.    <u>BP FAILED TO PLAN OR PREPARE FOR A BLOWOUT</u>

As set forth in the factual recitations contained in the PSC's brief, the evidence shows BP failed to prepare and plan for a blowout.  Accordingly, Transocean and HESI adopt and incorporate those factual recitations pertaining to BP's failure to adequately prepare for a deepwater blowout.  And as the evidentiary record on BP's failure to plan for a blowout is

clearly strong enough to prove the Aligned Parties' case-in-chief, it is more than sufficient to defeat BP's Rule 52(c) Motion.

## IV.   THE ALIGNED PARTIES HAVE PROVEN THAT MISREPRESENTATIONS AND OMISSIONS ABOUT THE FLOW DELAYED CAPPING THE WELL

BP's unforeseeable conduct in misrepresenting the flow rate to government decision-makers delayed capping the well.  There is no doubt that BP spent lots of money on source control and that many BP employees and contractors worked hard to cap the well, but as BP's Mr. Mazzella testified, "if your inputs are wrong, your outputs are wrong."  TR. 806:4.

BP executives lied about the inputs on the critical issue of flow rates. They repeatedly provided the government—and their own source control team – with unsupportable low flow estimates and withheld numerous higher flow rate estimates.  *See, e.g.*, TREX 9475.3 (BP Vice President instructing Adam Ballard on May 17: "We remain in a position where no flow related information can be released internally or externally.")  When Top Kill failed, as BP employees and consultants predicted, BP executives then told the government that collapse disks—not the high flow rate—were the *only plausible explanation* for the failure.  The truth, as BP had been warned before Top Kill, was that Top Kill failed because the flow path through the BOP,  and the resulting flow rate of hydrocarbons into the sea, were simply too large.

BP's  false and misleading inputs resulted in wrong outputs:  Decision-makers authorized and continued to push Top Kill with a vanishingly small chance of success; then, on May 29, on the basis of BP's false diagnosis of the Top Kill's failure, decision-makers abandoned the BOP-on-BOP option then ready to go—an option that could and would have successfully capped the well.  The result is a spill that dragged on unnecessarily for weeks.

Although BP argued that it doesn't  make common sense that it would do anything to prolong the spill, the point is that—regardless whether BP intended to prolong the spill—BP

clearly intended to lie about the flow rate and the reasons for Top Kill's failure.  Moreover, it had obvious public relations motives for minimizing the flow rate.  The consequences of that lie— and the further lies it engendered—was to prolong the spill.

**A.**     **BP's Lies Delayed Capping the Well**

**1.**     **BP lied about the flow rate and the Top Kill's chances of success, which caused the decision to favor Top Kill over the BOP-on-BOP capping option**

Despite BP's strenuous attempt to ignore the plain language of its guilty plea, BP has already admitted that its deception was not limited to Congress:  at the same time it was telling everyone that the well was flowing at 5,000 barrels per day, "BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that *it did not share with the Unified Command*."  TREX 52673.17 at ¶ 5 (emphasis added).

This binding admission establishes three facts as matter of collateral and judicial estoppel: (1) BP had *flow rate estimates*; (2) BP had multiple flow rate estimates "significantly greater" than 5,000 BOPD; and (3) BP withheld those flow rate estimates *from the Unified Command.  See, e.g.*, *Breeland v. Sec. Ins. Co.*, 421 F.2d 918, 922-23 (5th Cir. 1969) (defendant collaterally and judicially estopped from re-litigating admissions in support of guilty plea); *see also United States ex rel. Miller v. Bill Harbert Int'l Constr. Inc.*, 608 F.3d 871 (D.C. Cir. 2010) (district court found collateral and judicial estoppel from guilty plea admissions).

The evidence confirms that BP lied to the government about the flow rate: At the same time BP repeatedly told government officials its "best estimate" was 5,000 barrels per day, its own employees were warning that these estimates were unsupported, likely erroneous, and contrary to a variety of information.  For example:

| BP Representation | BP Internal Information |
|---|---|
| Doug Suttles told Admiral Landry on April 28 | BP email from April 28 "bound[ing] the |

| | |
|---|---|
| that BP's "best estimate" was just **2,500 BOPD** and that its range was **1,000-5,000 BOPD**.  Landry Dep. at 192:10-25 | answers on flowrate" internally at a range of **2,523 to 65,171 BOPD**.  TREX 05063.4. |
| Suttles sent to Adm. Landry a chart on May 10 labeling **5,000 BOPD** the "Most Likely Model" and deleting estimates that had appeared on BP's internal version of the chart.  TREX 09155.4. | BP expert and 30(b)(6) witness Adam Ballard admitted that although the May 10 chart was based on hydraulic modeling, **no hydraulic modeling supported calling 5,000 BOPD the "Most Likely Model."**  TR. 953:25-954:4; 957:21-958:6; D25011A (power point with animation showing alterations from original chart, TREX 9330, to chart submitted to Adm. Landry on May 10). |
| On May 19, Doug Suttles forwarded a memo to Adms. Landry and Allen, authored by David Rainey, which stated the "best guess" based on overflight data was **5707 BOPD**.  TREX 3218.1.1.TO; TREX 3218.15.1.TO.  This memo was subsequently attached to the May 24 BP Letter to Congressman Markey, TREX 1651.1.1.TO, that formed part of the basis for BP's guilty plea.  TREX 52673.17 at ¶ 5. | On May 15 Mike Mason emailed BPXP CEO Andy Inglis warning against "standing behind a 5,000 BOPD figure as our modeling shows that this well could be making **anything up to ~100,000 bopd**." TREX 03220.1; *see* TR. 998:15-20 (Ballard saw no evidence this was shared with Unified Command).  On May 17, Dr. Tim Lockett sent an email stating **5,000 bopd "has little if no origin" and "would appear to err on the low side."** TREX 09250.2  Dr. Wilson testified that "**the significant majority" of BP's flow rate scenarios "are higher than 5,000**." TR. 104:16-105:1  Mr. Dupree, leader of the BP response, acknowledged that he did not tell the Federal Science Team about the **86,600 BOPD** flow rate BP had calculated and that he had learned about on May 16. TR. 689:14-691:15. |

These misrepresentations were not an oversight or accident.  BP executives took

purposeful steps to conceal flow rate estimates.  *See* TREX 8656.1 ("tell Alistair not to

communicate to anyone on this"); Saidi Dep. at 407:2-19; 408:2-8 (BP engineer testifying she

was "instructed" by a BP Vice President "not to forward the rates to anyone."); TREX 09474.1

("rates are confidential and I was told … not to write anything about it"); TREX 09475.4 ("we

are not releasing any information that can be related to rate"); TREX 09475.3 ("We remain in a position where no flow related information can be released internally or externally."); Mason Dep. at 320:1-321:12 (testifying he was told by CEO's acting assistant to discuss thoughts like his "big number" – i.e., "~100,000 bopd" – in person).

These lies and omissions delayed the capping of the well by distorting decision-makers' understanding of the Top Kill's likelihood of success—both before and after its failure.  BP executives may not have intended to delay the capping of the well, but lies and concealment about the true state of the ongoing disaster ultimately corrupted the decision-making process.

BP knew that its Top Kill strategy was unlikely to succeed at a flow rate of 15,000 BOPD or more.  Indeed, BP's Mr. Dupree, the leader of response efforts, acknowledged that at 15,000 BOPD the momentum kill "was probably not going to work" and that there was no modeling of the junk shot.  TR. 712:8-20; *accord*  TREX 09250.1 (BP employee confirming that concerns about the 5,000 BOPD estimate "are valid and have an impact on the viability of the kill option working"); TREX 08537.1 (BP informed "with 15000 bopd, you can not kill it with 50 bpm"); *see also* TREX 8553 ("Modeling indicates that a dynamic kill cannot be successful if the oil flow rate is 15000 STBpd").  Nevertheless, BP falsely told government scientists that Top Kill would "struggle" only if flow rates were "significantly higher than current estimates" of 5,000 BOPD. TREX 140914.2.

BP's response at trial—that the "junk shot" portion of Top Kill made the flow rate irrelevant—was demonstrated to be false.  The "junk shot" procedure that BP submitted and the Unified Command approved states expressly that it is based on a 5,000 barrels per day flow rate. TREX 9148.5.3.TO (approved Junk Shot procedure); TREX 9675.12.3.TO; TR. 1122:3-1123:1 (Adams).  Based on that false low flow rate, the flow path through the BOP was estimated at

only ½ inch—a small hole that the "junk" might be hoped to plug. *Id.*; Campbell Dep., Vol. I, at 367:25-369:2 ("a very generous flow path" meant "can't stop this with a junk shot").

Disregarding internal flow rate estimates, BP falsely told government decision-makers and the public that the Top Kill was a "slam dunk" and had a 60-80% chance of success. Chu Dep. at 308:9-16 (told by BP that Top Kill was a "slam dunk"); TREX 11317.1 (80% chance); TREX 150307N (Tony Hayward announcing 60-70% chance); TREX 10532.2 (60-70% chance).

There was no basis for these claims. TR.712:24-713:3 (Dupree: "I certainly wouldn't have represented it in that way" when asked if he would have told someone not to represent that the Top Kill had a 60-70% chance of success); *id.* at 128:1-10 (Dr. Wilson: "I saw no evidence that it was a slam dunk. And, in fact, I would be quite worried about the Top Kill chance of success after reviewing the hydraulic modeling."); *see also id.* at 815:24-816:4 (Mazzella would not have supported "slam dunk" claim).

Government decision-makers actually and reasonably relied on BP's flow rate misrepresentations and BP's concealment of information about the connection between flow rate and the Top Kill in approving the decision to move forward with the Top Kill. As Secretary Chu testified, "if one knew earlier the amount of flow, things would have been different." Chu Dep. at 198:8-199:13; *id.* at 230:18-232:1 ("if BP gave us their estimates of flow … a week or two prior to top kill, we would have gotten into much more serious discussions about the feasibility"); *id.* at 188:17-21 (acknowledging that getting complete and accurate information from BP was important to Chu's ability to do his job); *id.* at 205:21-25 (Chu considered BP's internal estimates of the flow rate material to his analysis); *see also* Landry Dep. 230:7-15 ("they should be providing me with all information they have"); *id.* at 618:17-20 (acknowledging the importance of full and complete information from BP in order to perform her oversight

function); *id*. at 446:24-447:4 (Landry was not informed that the Top Kill would not work if the

flow rate was over 15,000 BOPD); *id*. at 493:23-494:3 (Landry would have expected BP to share

the 15,000 BOPD limit with her personally); Herbst Dep. at 441:17-442:13 (he was not informed

of the 15,000 BOPD limit, and knowing about it would have been "very helpful"); Lockett Dep.

at 404:23-405:4 (BP flow rate modeler testifying "I would not disagree with that statement" that

"it was important for decision-makers evaluating whether to go forward with the Top Kill, to

have the best information available about the flow rate").

Deposition clips of government officials' testimony BP played at trial were largely of

testimony from *before* those witnesses had been confronted with documents and emails showing

BP provided false information about the "best estimates" of flow.  Once shown that BP withheld

numerous significantly higher flow rates, government officials testified that they were unaware

of such information, that they should have been made aware, and that such information would

have made a difference.

> **2.      After the Top Kill failed, BP concealed that the flow rate was a likely explanation, and falsely claimed that ruptured disks were the *only* plausible explanation**

After Top Kill failed, BP failed to acknowledge the problem it knew about all along—

that the hole was too big and the flow too great—but instead falsely claimed that ruptured disks

in the well were the only "plausible" explanation.  That false diagnosis resulted in the decision to

abandon the BOP-on-BOP option.

BP told the Unified Command on May 29, the day after the Top Kill failed, that "massive

flow" through the BOP (Scenario 1) was "not plausible" and that ruptured disks (Scenario 3) was

the *only* plausible explanation.  TR. 716:21-717:7; TR. 1128:12-23; TREX 09084 (BP's May 29

Top Kill Analysis slide presentation).  Government officials who attended the May 29 meeting

remembered the presentation in the same terms:  BP claimed that the rupture disks were the only

plausible explanation.  Cook Dep. 573:13-574:2; Herbst Dep. at 494:16-21 ("Q.  In fact, BP

presented this failed rupture disks scenario as the only plausible scenario for explaining the top

kill's failure; is that right?  A. From what I recall, that was the only one, yes."); Hunter Dep. at

605:20-23; McNutt Dep. at 459:18-460:12; Holt Dep. at 188:4-12; 190:18-191:13.

 This claim was untenable.  First, as discussed above, BP's own modeling showed that (a)

Top Kill was likely to fail if the flow exceeded 15,000 BOPD and (b) that the flow likely

exceeded 15,000 BOPD.  When Top Kill failed, the most obvious and plausible explanation was

that it had failed as it was predicted to do, because the flow exceeded 15,000 BOPD.

 Second, BP employees Mark Mazella and Kurt Mix and consultants Wild Well Control

and Bob Grace all watched the Top Kill procedure and concluded that it failed because the flow

path through the BOP was too large.  *See* TREX 09160.1 (text message from BP engineer Kurt

Mix. "[t]oo much flowrate – over 15000 [BOPD] and too large an orifice"); TREX 9148.5.3.TO

(Junk Shot procedure, ¶2.1.1, junk shot based on ½ inch orifice and flow rate of 5,000 BOPD);

Barnett Dep. at 239:8-240:23; TR. 825:24-826:10 (Mazzella  testimony that Wild Well, Bob

Grace, and the "consensus of the whole forward team" was flow path was too large); TREX

9946.2.2 (May 31 memorandum from Wild Well Control to BP) .  BP thus knew full well of

another plausible, indeed likely, explanation for the Top Kill's failure.

 Third, BP's own experts agreed that "massive flow" through the BOP (Scenario 1) was

not only "the truth," but was, based on evidence available at the time, realistic.  TR. 1129:18-

1131:11, 1136:23-1137:7 (Adams).  BP's own experts conceded that, based on information

available to BP at the time, the massive flow scenario was consistent with *all the evidence*.  TR.

1137:24-1138:18, 1139:13-1140:15  (Adams); TREX 11614.4.  But BP falsely told the

government that the massive flow scenario was "not plausible" and was "not consistent" with the

evidence.  TR. 1140:16-1141:4 (Adams); *see* TREX 11614.6; 9084.6; Herbst Dep. at 499:2-7 (does not recall anyone from BP sharing view that Top Kill failed because flow rate was over 15,000 BPD); McNutt Dep. at 460:21-461:25 (answering "Oh, no" when asked if BP shared the view that the Top Kill was failing because the flow rate was too high); Allen Dep. at 588:7-21 ("I have no memory of such a conversation"); Hunter Dep. at 608:6-22 ("I recall no reference to Mr. Mix's work"); Holt (BP 30(b)(6) witness) Dep. at 201:4-202:4 (Mix's view "was not listed in the scenarios" BP presented on May 29).

In short, BP explicitly rejected the correct scenario—that Top Kill failed due to the massive flow rate—and falsely claimed that the only plausible explanation was the incorrect claim that the ruptured disks had failed.

In the concluding slide in BP's false and fateful May 29 presentation, BP recommended, based on its incorrect diagnosis of Top Kill's failure, that the BOP-on-BOP would have to be abandoned.  There is no dispute—all parties have stipulated—that that very day, May 29, the BOP-on-BOP was abandoned.  Rec. Doc. 7076 at 13, ¶ 83.  BP's own expert Iain Adams conceded the causal connection:  "[a]s a result of Scenario 3 [the ruptured disks scenario], the decision was made not to shut in the well but to move toward containing, catching the oil."  TR. 1128:21-24; *see* Herbst Dep. at 495:9-496:3 (BOP-on-BOP abandoned because of May 29 presentation); *accord* Holt Dep. at 209:2-7, 390:6-17; Wellings Dep. at 189:10-193:14; Landry Dep. at 635:18-636:5; TR. 715:25-716:9 (Dupree).  BP executives may have been focused on stock price or regulators or other concerns, and may not have *intended* to delay the capping of the well.  But delay was exactly the consequence of their lies and omissions.

There can be no doubt that if BOP-on-BOP had not been abandoned, it would have worked.  TR. 537:6-17 (Ziegler : BOP-on-BOP would have succeeded in shutting in the well if it

had been implemented in May) *id*. at 416:5-11 (Turlak: *DDII* BOP to be used in BOP-on-BOP option had blind shear rams like the blind shear rams that were used on the successful capping stack). BP told Admiral Landry in late May that the BOP-on-BOP option would be ready immediately after Top Kill, and the contemporaneous evidence demonstrated that the BOP-on-BOP was repaired and ready to be installed within days. Wellings Dep. 182:16-21 (James Wellings, leader of BP's BOP-on-BOP and capping stack teams: the BOP-on-BOP procedure was "done and ready to implement" by the end of May); TREX 11261N (BOP-on-BOP May 29 installation schedule); TREX 8542 (Wellings: "After the top kill failed we [were] again going to install the cap then the decision was made to use the top hat and containment."). BP's own expert conceded he had not disputed that the BOP was ready to be installed *as scheduled* on June 3 and to cap the well by June 6. TR. 1147:21-1148:8, 1150:7-1150:25 (Adams).

At trial, BP pointed to risks of the BOP-on-BOP option. But all source control methods were recognized as having risks. Those risks, including the ones emphasized by BP at trial, were identified and appropriately addressed. In fact, the contemporaneous BP-led Peer Assist, consisting of blowout experts from across the industry, identified the very risks BP emphasizes now. Those experts, with no ax to grind, concluded that "the BOP on BOP operation is feasible and can be managed safely." TREX 10505.5; TREX 10535.1 ("We've completed the HAZID for the well capping effort … We have mitigations for all the risks."); TR. 537:18-538:8 (Ziegler: "the technology and the application of setting a BOP-on-BOP in deeper water from a floating rig was achievable and existed as a technique in the industry"). BP expert Adams testified that the Peer Assist conclusion that the BOP-on-BOP option was feasible and could be managed safely "was a reasonable statement to make at the time." TR. 1153:14-20.

It is undisputed, for example, that the collapse disks that BP blamed for the Top Kill's

failure were in fact intact; thus, the BOP-on-BOP would not have caused an underground blowout. TR. 717:8-11 (Dupree). The BOP-on-BOP had *the same* blind shear rams and venting capabilities that allowed the capping stack to succeed many weeks later. TR. 327:6-329:5 (Turlak describing multiple venting options available on *DDII* BOP); *id.* at 351:12-19 (chokes attached to the same side outlet valves on the capping stack and on the BOP-on-BOP); *id.* at 214:1-10 (Perkin: "the BOP-on-BOP option could have been utilized to mitigate any concerns about the rupture disks. You could incorporate a venting option."); *id.* 1157:12-1158:3 (Adams).

The LMRP removal risks BP focused on at trial were similarly identified by the Peer Assist experts at the time and were viewed as subject to feasible and safe mitigation. BP had a plan in place as early as May 6 to cut any drill pipe found between the LMRP and BOP with an ROV saw. TR. 337:8-21 (Perkin). And the LMRP concerns were resolved by May 25, when BP and Unified Command *approved* the LMRP removal procedure. TREX 141123. As BP's expert conceded, this procedure included contingency plans in the event the LMRP initially became stuck when unlatched. TR. 1154:6-24 (Adams).

Finally, even if removing the LMRP was an obstacle, the Three Ram Capping Stack was ready to be deployed on June 4, 2010, and could have capped the well by June 10, 2010. TR. 898:22-900:4; 901:14-18 (T. Smith); TREX 143045 (email from Charles Curtis to Trevor Smith dated May 30, 2010: "Completion date ready to ship offshore Friday, June 4, 2010."). The truth is that the risks BP now asserts with respect to the BOP-on-BOP and capping stack options were well on the way to being resolved until BP's lies distorted the decision-making process.

### B. The Evidence Proves BP's Conduct Was a Superseding Cause of Oil that Spilled After the Well Should Have Been Capped

The doctrine of superseding cause "essentially asks whether a defendant 'is to be held liable for an injury to which he has in fact made a substantial contribution, when it is brought

about by a later cause of independent origin, for which he is not responsible.'" *Nunley v. M/V DAUNTLESS COLOCOTRONIS*, 727 F.2d 455, 464 (5th Cir. 1984) (quoting Prosser, Law of Torts, 4th Ed. 270); *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 367-68 (5th Cir. 2006) (similar).

Courts have recognized a number of factors relevant to determining "whether an intervening force [here, BP's misrepresentations] is a superseding cause of harm to another:"

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
>
> (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
>
> (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
>
> (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
>
> (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Nunley*, 727 F.2d at 464 (quoting Restatement (Second) of Torts § 442 ); *Skipper v. United States*, 1 F.3d 349, 354 n.6 (5th Cir. 1993) (same).

BP's misrepresentations to decision-makers during the source control efforts plainly constitute a superseding cause. These misrepresentations were "wrongful" and BP's culpability ultimately led to a felony guilty plea to obstruction of Congress. Restatement (Second) of Torts § 442(e), (f). BP argues the harm from its misrepresentations—weeks upon weeks of unnecessary oil discharge—were not "different in kind" from what would have resulted from the blowout, and were not independent of the conduct that led to the blowout. (BP Br. at 10.) BP is

wrong: nothing about the blowout caused BP to lie to decision-makers.  BP's misrepresentations and their  consequences—effectively doubling the length of the spill—were "extraordinary" and "not a normal result"; the harm from the spill was far different in kind than it would have been if BP had been not concealed its multiple flow rate estimates.  Restatement (Second) of Torts § 442(a), (b), (c).

The Fifth Circuit, following the Restatement, has recognized that "'[t]he act of a third person in committing an *intentional tort or crime* is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." *Skipper v. United States*, 1 F.3d 349, 354 n.6 (5th Cir. 1993) (quoting the Restatement (Second) of Torts § 448).  Transocean and Halliburton did not realize and "should [not] have realized" that BP would intentionally mislead the government about the flow rate—especially when that information was vital to the decisions being made about capping the well.

The evidence also amply proves that BP's lies *caused* a delay in capping the well.  As discussed above, BP is simply wrong in asserting that "no actual reliance was placed upon BP's statements."  (BP Br. at 9.)  To establish a superseding cause, the injury—here weeks and weeks of discharged oil—must have been "brought about" by BP's conduct.  *Sofec*, 517 U.S. at 837; *accord In re Alex C. Corp.*, 2010 WL 4292328 (D. Mass. Nov. 1, 2010) (rejecting superseding cause defense where there was *no* "causal link between [the allegedly negligent] omissions and the subsequent allision").  Even in the common-law fraud context, "[i]t is not necessary that the [false] representations were the sole inducement, but the representations relied upon must have

been a material factor in inducing the plaintiff's action." *Coffel v. Stryker Corp.*, 284 F.3d 625, 636 (5th Cir. 2002); *accord In re Enron Corp. Securities, Derivative & ERISA Litig.*, 2010 WL 9077875, at *45 (S.D. Tex. 2010) ("[T]he material misrepresentation or omission need not be the only inducer of the plaintiff's course of action, but it must have a material influence on the plaintiff's conduct and be a substantial factor in bringing about his action.").  There can be no doubt that BP's misrepresentations about flow were a substantial factor in inducing government decision-makers to approve the Top Kill and that BP's misrepresentation about why Top Kill failed were a substantial factor—indeed the critical factor—in inducing them to shelve the BOP-on-BOP option, guaranteeing the well would flow for many additional weeks.

  **C.**  **A Superseding Cause Defense Is Legally Available**

  BP finally argues a superseding cause defense fails as a matter of law because Transocean Deepwater Inc. has pleaded guilty to a negligent Clean Water Act violation and because this Court ruled that liability under OPA for responsible parties is joint and several, not divisible.  (Rec. Doc. 5809.)  This argument is meritless.

  First, Transocean and Halliburton have asserted the defense in connection with maritime law claims (Rec. Docs. 8803, 8809), and the superseding cause defense is well established in maritime law.  *Exxon Co. v. Sofec, Inc.*, 517 U.S. 830, 836 (1996) ("The doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable.")  Regardless what conduct proximately caused the April 20 blowout, Transocean and Halliburton should not be liable for discharge that was the result of BP's later wrongful conduct.  Second, this Court's OPA order (Rec. Doc. 5809) on which BP relies has nothing to do with a superseding cause defense.  The Court found that BP and Anadarko could be held jointly and severally liable to the United States as responsible parties for subsurface

discharge; it held Transocean was *not* a responsible party for that discharge and was only a responsible party for above surface discharge; and it did not address Halliburton at all. (*Id.* at 5-15.) To the extent the order applies joint and several liability and finds OPA liability is not "divisible," that indivisibility applies to BP and Anadarko, not Transocean or Halliburton.[1]

## V.   ADDITIONAL FAULT SHOULD BE ALLOCATED TO BP BASED ON ITS SOURCE CONTROL CONDUCT

BP does not dispute that the Court will ultimately have to make a fault allocation. *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975) (recognizing proportional fault); *In re Omega Protein, Inc.*, 548 F.3d 361, 370 (5th Cir. 2008) ("In admiralty cases, federal courts allocate damages based upon the parties' respective degrees of fault."); *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 370 (5th Cir. 2006) (trial court must review "the number and quality of faults by each party"). BP simply argues that it bears no fault for any of its source control conduct. For all of the reasons set forth above, however, BP bears the fault for the duration of the spill both because of its failure to prepare to respond to a spill and its lies during the response. Any fault allocation must take into account the consequences of BP's conduct in failing to plan for and then in responding to the spill.

## VI.   CONCLUSION

For the reasons set forth above, BP's Motion for Judgment on Partial Findings should be denied.

---

[1] The only support BP musters for its novel and incorrect theory is an inapposite 1966 decision discussing and applying the "avoidable consequences" doctrine. *Alcoa S.S. Co. v. Charles Ferran & Co.*, 251 F. Supp. 823, 832 (E.D. La. 1966). The decision has nothing to do with superseding cause, and if anything supports Transocean and Halliburton's position, as it holds that the initially negligent party may not be liable for damages that could have been avoided but for another party's negligence. *Id.* at 833.

DATED: October 7, 2013                    Respectfully submitted,


By: /s/ Brad D. Brian                     By: /s/ Steven L. Roberts
Brad D. Brian                             Steven L. Roberts
Michael R. Doyen                          Rachel Giesber Clingman
Daniel B. Levin                           Sean Jordan
Susan E. Nash                             SUTHERLAND ASBILL & BRENNAN LLP
MUNGER TOLLES & OLSON LLP                 1001 Fannin Street, Suite 3700
355 So. Grand Avenue, 35th Floor          Houston, TX  77002
Los Angeles, CA  90071                    Tel: (713) 4710-6100
Tel: (213) 683-9100                       Fax: (713) 354-1301
Fax: (213) 683-5180                       Email:  steven.roberts@sutherland.com
Email:  brad.brian@mto.com                        rachel.clingman@sutherland.com
        michael.doyen@mto.com                     sean.jordan@sutherland.com
        daniel.levin@mto.com
        susan.nash@mto.com


John M. Elsley                            By: /s/ Kerry J. Miller
ROYSTON, RAYZOR, VICKERY &                Kerry J. Miller
WILLIAMS LLP                              FRILOT, LLC
711 Louisiana Street, Suite 500           1100 Poydras Street, Suite 3800
Houston, TX  77002                        New Orleans, LA  70163
Tel: (713) 224-8380                       Tel: (504) 599-8194
                                          Fax: (504) 599-8154
                                          Email:  kmiller@frilot.com


**Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.**


**G**ODWIN **L**EWIS **PC**

/s/  Donald E. Godwin                     Bruce W. Bowman, Jr.
*Attorney-in-charge*                      State Bar No. 02752000
State Bar No. 08056500                    Bruce.Bowman@GodwinLewis.com
Don.Godwin@GodwinLewis.com                Renaissance Tower
Renaissance Tower                         1201 Elm, Suite 1700
1201 Elm, Suite 1700                      Dallas, Texas 75270-2041
Dallas, Texas 75270-2041                  Telephone: (214) 939-4400
Telephone: (214) 939-4400                 Facsimile: (214) 760-7332
Facsimile: (214) 760-7332


Jenny L. Martinez                         Floyd R. Hartley, Jr.
State Bar No. 24013109                     State Bar No. 00798242
Jenny.Martinez@GodwinLewis.com            Floyd.Hartley@GodwinLewis.com
Renaissance Tower                         Renaissance Tower

1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Gavin E. Hill
State Bar No. 00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Jerry C. von Sternberg
State Bar No. 20618150
Jerry.VonSternberg@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

Misty Hataway-Cone
State Bar No. 24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**Attorneys for Defendant Halliburton Energy Services, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2013, I electronically filed the foregoing with the Court's CM/ECF system and service on all counsel of record by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

   /s/ Kerry J. Miller
   Kerry J. Miller