**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** <br> **"DEEPWATER HORIZON" in the Gulf** <br> **of Mexico, on April 20, 2010** <br><br> **These Pleadings apply to:  *All Cases*** <br><br> (Including Nos. 10-2771 and 10-4536) | **MDL No. 2179** <br><br> **SECTION: J** <br><br> **JUDGE BARBIER** <br><br> **MAGISTRATE SHUSHAN** |

### PLAINTIFFS' OPPOSITION TO BP'S MOTION FOR PARTIAL JUDGMENT

**Relating to the Phase Two Limitation and Liability Trial**

Plaintiffs and Claimants-in-Limitation, including the State of Alabama and the State of Louisiana, through Plaintiffs' Co-Liaison Counsel, Co-Coordinating Counsel for the States, the Plaintiffs' Steering Committee, and the PSC Phase Two Trial Team, respectfully submit the following Opposition to BP's Motion for Partial Judgment [Doc 11559]:[1]

## MAY IT PLEASE THE COURT:

It was established at trial that BP consciously disregarded the need to prepare for an uncontrolled deepwater blowout and willfully extended the capping of the well by intentionally concealing material information and affirmatively misleading the U.S. Government and others regarding the volume of hydrocarbons escaping from the well.

---

[1] As the Court has recognized, there exists one single note of evidence with respect to the Limitation and Liability Trial, including both Phase One and Phase Two. *See* ORDER [Doc 11087] (Aug. 22, 2013).  Therefore, in addition to the Phase Two evidence, Plaintiffs respectfully incorporate the Phase One Trial Record, the PSC's Phase One POST-TRIAL BRIEF [Doc 10458], the Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], and the PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714].

However, this was not the Plaintiffs' burden.  The question, rather, is whether BP's overall conduct – as evidenced by not only the Phase Two issues of post-spill lying to the Government and pre-spill lack of preparedness, but also the Phase One issues of fast and reckless drilling, establishing and maintaining a dysfunctional leadership team, proceeding with the cement job without reliable test results, proceeding with the displacement despite a failed negative pressure test, refusing to correct known and persistent maintenance failures, and recklessly selecting, configuring, and refusing to upgrade the BOP – demonstrates a willful, wanton and reckless disregard for the environment, the property rights of others, and/or public health and safety.

As addressed in the Phase One Trial Briefs, a defendant's compliance with an industry or regulatory standard does not necessarily insulate the defendant from a finding of negligence or even willful or reckless conduct.  Yet, in this case, BP did not establish the existence of an "industry standard" regarding source control efforts and, in fact, violated the regulatory standards in place.

Contrary to BP's assertions, the evidence clearly demonstrates that BP marshaled no resources prior to the incident, and refused to "expeditiously" develop and implement the ultimately successful BOP-on-BOP / capping stack strategy.

While Plaintiffs have previously taken the position that BP's post-spill conduct is not a "superseding" or "intervening" factor with respect to the fault of other defendants, BP's wanton, willful and reckless Phase Two conduct should be considered in any fault allocation between and among the defendants that the Court might deem necessary.

For these reasons, and for the reasons further outlined below, BP's Motion should be denied.

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

Introduction   .   .   .   .   .   .   .   .   .   .   1

Table of Contents   .   .   .   .   .   .   .   .   3

A Finding of Willful, Wanton or Reckless Conduct Can Be
Based upon a Series or Accumulation of Negligent Acts or Omissions   .   .   5

BP Consciously Disregarded the Need to Prepare for an Uncontrolled
Deepwater Blowout Prior to Macondo   .   .   .   .   .   .   6

    *Despite the Fact That BP Had Actual Knowledge That Drilling the Macondo*
    *Well Was Particularly Dangerous, It Took No Additional Action to Ensure It*
    *Had an Adequate Source Control Plan*   .   .   .   .   .   7

    *Capping Devices Were Feasible and Readily Available*   .   .   .   10

    *BP Spent No Money Developing Source Control Prior to the Macondo Blowout*   12

    *BP Ignored the Source Control Experts and Specialists It Assembled*   .   13

BP Willfully Extended the Capping of the Well by Intentionally
Concealing Material Information and Affirmatively Misleading the
U.S. Government and Others Regarding the Volume of Hydrocarbons
Escaping from the Well   .   .   .   .   .   .   .   .   14

BP's Attempt to Confine Its Willful and Wanton Post-Spill Conduct to a
Simple "Reliance"–upon–"Fraud" Construct Ignores the Interaction of
BP's Intentional Misrepresentations and Omissions with Multiple Other
Causative Factors, including BP's Own Reckless Failure to Prepare for a
Blowout and Post-Spill Miscalculations and Mistakes   .   .   .   14

BP's Willful Misconduct in Lying to the U.S. Government (and Others)
After the Spill is Relevant to the Overall Question of BP's State of Mind,
Even If It Were Not Found to be a Direct Cause of Any Delay   .   .   .   15

As a Legal Matter, a Defendant's Compliance with an Industry or Regulatory
Standard Does Not Insulate the Defendant from a Finding of Negligence
or Even Willful or Reckless Conduct .   .   .   .   .   .   .   15

In this Particular Case, BP Was Responsible for Source Control Decisions,
Not the Government   .   .   .   .   .   .   .   .   15

BP Did Not Establish the Existence of an "Industry Standard"
regarding Source Control Efforts        .        .        .        .        .        .        17

BP Clearly Violated Regulatory Standards      .        .        .        .        .        .        17

BP Marshaled No Resources Prior to the Incident and Refused to
"Expeditiously" Develop and Implement the Ultimately Successful
BOP-on-BOP / Capping Stack Strategy       .        .        .        .        .        .        18

BP's Wanton, Willful and Reckless Phase Two Conduct Should be
Considered in Any Fault Allocation Between and Among the Defendants
that the Court Might Make        .        .        .        .        .        .        .        .        19

Conclusion        .        .        .        .        .        .        .        .        .        .        20

Certificate of Service .        .        .        .        .        .        .        .        .        23

**A Finding of Willful, Wanton or Reckless Conduct Can Be Based upon a Series or Accumulation of Negligent Acts or Omissions**

As set forth in Plaintiffs' Phase One Post-Trial submissions, an accumulation or series of negligent acts or omissions can and should be viewed together in order to determine whether the defendant has acted out of gross negligence, willful misconduct, or a wanton or reckless disregard.[2]

Hence, the burden is *not* on Plaintiffs to show that BP's pre-spill planning, in and of itself, rises to the level of wanton, willful or reckless disregard.  Nor to show that BP's post-spill intentional misconduct, in and of itself, caused or contributed to the uncontrolled flowing of the well for 87 days.

Rather, it is only Plaintiffs' burden to show that BP's **(i)** pre-spill failure to plan, *combined with* **(ii)** BP's post-spill intentional misrepresentations and concealment – *combined with* **(iii)** BP's fast and reckless drilling, with little or no regard for the safe kick margin, despite multiple kicks, and in violation of the MMS Regulations requiring a safe drilling margin; **(iv)** creating, maintaining and largely ignoring a dangerously dysfunctional leadership team, which embraced the corporate culture of cutting costs and maximizing profits; **(v)** proceeding with the cement job without a set of reliable test results confirming the slurry's stability; **(vi)** proceeding with the displacement despite a failed negative pressure test; **(vii)** selecting, configuring, sequencing, modifying, and refusing to upgrade the safety critical BOP, which was not sufficient or appropriate for the Macondo well; and **(viii)** knowingly refusing to correct the persistent

---

[2] *See* PSC's Phase One POST-TRIAL BRIEF [Doc 10458], pp.13-14 (*see also,* pp.14-18); Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], pp.23-24; *see also,* PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.2-4, 15-17.

maintenance failures of safety critical equipment on the DEEPWATER HORIZON[3] – evidences a willful and reckless disregard for the environment, the property rights of others, and/or public health and safety.

The Phase Two evidence, in this respect, cannot be untethered from the Phase One evidence, in making the overall determination of BP's state of mind, with respect to the damages and effects of the Macondo disaster.[4]

Nevertheless, the Phase Two evidence, standing alone, did establish that BP was wanton and reckless in both its pre-spill lack of planning and in its post-spill lying to the Government and others regarding the flow rate and source control.

## BP Consciously Disregarded the Need to Prepare for an Uncontrolled Deepwater Blowout Prior to Macondo

Based on the record in this case, there is no question that it was foreseeable to BP that a deepwater well in the Gulf of Mexico could experience a blowout.[5]  And the evidence presented at trial (much of which BP does not address in its Motion) clearly shows that BP's pre-spill preparation was nothing more than a plan to make a plan.[6]  Nowhere is this more evident than the fact that: (1) BP failed to spend even a single dollar on research and development for Source

---

[3] *See* Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], pp.129-158 (*see also,* pp.40-55, 75-90, 158-169); PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.4-6, 15-17.

[4] *See* ORDER [Doc 11087] (Aug. 22, 2013) ("The record has been held open pending the conclusion of Phase Two and any subsequent phases. All evidence admitted during Phase One is also part of the record of Phase Two and need not be re-introduced"). *See also, generally,* PSC's Phase One POST-TRIAL BRIEF [Doc 10458], pp.14-18 (*see also,* pp.10-14); PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.2-4.

[5] *See* Phase Two TRIAL TRANSCRIPT ("TRANSCRIPT"), pp.518:5-7.

[6] *See* TRANSCRIPT, pp.440:25-441:7.

Control plans, and (2) the Macondo well flowed for 87 days.[7]  If BP had taken proper measures both prior to and during the Incident, there is no doubt that the well would have been shut in far earlier.

*Despite the Fact That BP Had Actual Knowledge That Drilling the Macondo Well Was Particularly Dangerous, It Took No Additional Action to Ensure It Had an Adequate Source Control Plan.*

BP knew and recognized that an uncontrolled blowout in a subsea environment was a very significant risk long before the Macondo blowout occurred.[8]  In fact, BP considered an uncontrollable well blowout in deepwater to be the highest level process safety risk in the entire worldwide BP operation.[9]  Lamar McKay, former chairman and president of BP America, acknowledged that a subsea uncontrolled blowout was a very large foreseeable risk and that BP understood that risk prior to April 20, 2010.[10]  Andrew Frazelle, BP's Wells Operation Manager for the Gulf of Mexico at the time of Incident, acknowledged that there was a risk of a deepwater blowout prior to April 20, 2010, and that the consequences of such an event would be severe.[11]  BP identified a deepwater well blowout in the Gulf of Mexico as part of a group-wide risk assessment.[12]  In fact, the loss of well control was one of the top risks identified by BP's Gulf of Mexico business unit.[13]

---

[7]  *See* TRANSCRIPT, pp.447:24-448:6, 518:12-25.

[8]  *See* Phase One TRIAL TRANSCRIPT, pp.508:21-509:4.

[9]  *See, e.g.,* Phase One TRIAL TRANSCRIPT, pp.302:20-23; TREX-4171.

[10]  *See* DEPOSITION OF LAMAR MCKAY ("MCKAY DEPO.), pp.89:21-90:10, 90:22-91:1, 91:3-4, 594:18-19, 594:22-595:10.

[11]  *See* DEPOSITION OF ANDREW FRAZELLE ("FRAZELLE DEPO."), pp.11:17-12:7, 160:11-18, 219:8-15.

[12]  *See* DEPOSITION OF ANTHONY HAYWARD ("HAYWARD DEPO."), pp.234:16-23; DEPOSITION OF CHARLES HOLT, pp.45:25-46:2; 46:6-9.

Moreover, BP had actual knowledge that the risk of a blowout on this specific Macondo well was high.  Prior to the April 20, 2010 blowout, the Macondo well experienced a serious kick in March 2009 and was referred to by the Horizon crew as the "well from hell."[14]  Thus, BP had knowledge not only of a generalized risk of blowouts in the Gulf of Mexico, but it had warnings that the Macondo well was particularly dangerous.  Despite this, BP did nothing to ensure that it was prepared to handle a blowout or could adequately respond or mitigate the damage if it lost control of the Macondo well.

From a process safety and risk management perspective, the evidence shows that BP had countless signs that it was undertaking a high-risk operation with dire consequences and no meaningful measures in place to stop the uncontrolled flow of oil immediately after a deepwater blowout.  Specifically:

1. BP knew that drilling the Macondo well was a high-risk activity that was in the unsafe zone of its own Major Accident Risk Matrix.[15] **BP did not contest this evidence.**

2. BP's internal guidelines required it to seek upper management authority to proceed with an activity, like Macondo, whose risks are not As Low As Reasonably Practicable zone, or in the unsafe zone, before commencing the operation.[16] **BP did not contest this evidence.**

3. BP knew that a deepwater blowout was likely to occur and that the likelihood was increasing as BP drilled deeper and deeper into high temperature/ high pressure formations.[17] **BP did not contest this evidence.**

---

[13] *See* PHASE ONE TRANSCRIPT, pp.464:8-11.

[14] *See* PHASE ONE TRANSCRIPT, pp.437:25-438:2; TREX-41; TREX-45; TREX-4507.

[15] *See, e.g.,* D-20023; TRANSCRIPT, pp.429-431.

[16] *See, e.g.,* D-20022; D-20024; TRANSCRIPT, pp.426-427.

[17] *See, e.g.,* D-20026 - D-20036; D-20038 – D-20041; TRANSCRIPT, pp.433-440.

4.  BP knew as early as 1991 that source control technology was scarce and needed to be designed and built before a blowout event occurred.[18] **BP did not contest this evidence.**

5.  BP received warnings from industry groups and associations, such as the Drilling Engineering Association and the International Association of Drilling Contractors, from 1991 and periodically thereafter until the Macondo incident that vertical intervention, or capping devices, would be successful to control deepwater blowouts but that such technology should be studied, modified and built before a blowout event occurred.[19] **BP did not contest this evidence.**

6.  BP employed tried and true capping stacks for shallow water and land-based blowout source control technology and, in 2001, performed a study in which it concluded that capping devices were the Best Available Technology for stopping blowouts at their source.[20] **BP did not contest this evidence.**

7.  BP knew it had only the drilling of a relief well to stop the flow of oil from a deepwater well, an operation it knew takes between 90 and 150 days to complete.[21] **BP did not contest this evidence.**

8.  BP knew that a Blowout Preventer ("BOP") could not be relied on as a source control measure to stop a flowing deepwater well.[22] **BP did not contest this evidence.**

9.  BP knew that ROV intervention to activate a BOP could not be relied on as a source control measure to stop a flowing well.[23] **BP did not contest this evidence.**

10. BP admitted it had never conducted a deepwater source control blowout procedures drill or practice prior to April 20, 2010.[24] **BP could not refute this evidence.** (BP tried to repudiate this admission by its 30(b)(6) representative with TREX-8975, a document memorializing the results of an MMS surprise drill in 2009; however, that drill, among

---

[18] *See, e.g.,* D-20029; D-20035; TRANSCRIPT, pp.433, 437-40.

[19] *See, e.g.,* D-20026 - D-20041; TRANSCRIPT, pp.433-440.

[20] *See, e.g.,* D-20037; TRANSCRIPT, p.438.

[21] *See, e.g.,* D-20045; TRANSCRIPT, pp.429, 445-446.

[22] *See, e.g.,* D-20049; TRANSCRIPT, pp.443-444; PERKIN REPORT, pp.26-27; ZIEGLER REPORT, p.20.

[23] *See, e.g.,* TREX-4423; D-20050; D-20051; TRANSCRIPT, pp.444-445.

[24] *See, e.g.,* D-20056; TRANSCRIPT, p.447.

other things, did not train BP employees to prepare for or develop deepwater oil spill source control.[25])

11. BP did not train its employees in deepwater blowout source control procedures, despite having made that representation to the MMS in its Oil Spill Response Plan, Section 6(c).[26] **BP did not contest this evidence.**

12. BP admitted that its Oil Spill Response Plan for the Gulf of Mexico is not, nor is it intended to be, a *Source Control plan.*[27] **BP did not, and could not, contest this evidence.**

13. BP's only Gulf of Mexico deepwater well control guide, by its very terms, is intended to apply to only the first 48 hours after a blowout.[28] **BP did not contest this evidence.**

14. BP admitted it never spent any money on deepwater source control research, development or equipment prior to April 20, 2010.[29] **BP did not contest this evidence.**

*Capping Devices Were Feasible and Readily Available.*

There is nothing technologically advanced about a capping stack. Capping devices have been used in the industry for decades.[30] Even BP has acknowledged that the scientific principles and materials necessary for designing and creating capping stacks were available prior to April 20, 2010.[31] Additionally, Lamar McKay admitted that a capping stack was not new technology.[32]

---

[25] *See* TRANSCRIPT, pp.466, 504.

[26] *See, e.g.,* D-20043; D-20052 – D-20055; TRANSCRIPT, pp.446-447.

[27] *See, e.g.,* D-20044; TRANSCRIPT, pp.441-442.

[28] *See* TREX-2386, p.9.

[29] *See, e.g.,* D-20057-D-20059; TRANSCRIPT, pp.447-448.

[30] *See, e.g.,* TRANSCRIPT, pp.531:5-532:8, 535:1-9; DEPOSITION OF LARS HERBST ("HERBST DEPO."), pp.327:18-22, 328:1-10, 359:3-7, 359:11-23, 360:22-25, 361:2-17.

[31] *See* DEPOSITION OF ANDY INGLIS ("INGLIS DEPO."), pp.164:12-165:13.

[32] *See* MCKAY DEPO., p.20:3-8, 20:10-12.

Further, the following two capping-type operations had been previously conducted in deepwater: (1) a blowout in Malaysia in 1988, and (2) the Jim Cunningham incident in the eastern Mediterranean in 2004, where a BOP-on-BOP process was utilized.[33] These events demonstrate that years before Macondo, the technology and the application of setting a BOP-on-BOP in deeper water from a floating rig was achievable and existed as a technique in the industry.[34]  In discussing the availability and feasibility of capping devices, Lars Herbst testified "most of the equipment is established oilfield equipment and it is how you assemble that equipment."[35] The Macondo capping stack was assembled using current technology and "off-the-shelf" equipment.[36]  Capping devices were feasible and readily available to assemble.[37]  If BP had properly prepared for a deepwater blowout and considered the use of a capping device of some kind prior to April 20, 2010, it could have shut in the Macondo well in as little as seven days.[38] And contrary to its argument that the possession of a pre-built capping stack prior to Macondo was not worthwhile due to the unique nature of each blowout, BP now has several capping devices available for worldwide deployment in the event of another deepwater blowout.[39]

BP's head of the source control effort admitted that all of the technology that was ultimately employed in capping the well was existing technology, and confirmed that it would

[33] *See* TRANSCRIPT, pp.318:8-22,  537:18-538:8.

[34] *See Id.*

[35] *See* HERBST DEPO., pp.363:13-364:3.

[36] *See, e.g.,* TRANSCRIPT, pp.532:12-533:2; HERBST DEPO., p.360:22-25, 361:2-17.

[37] *See* TRANSCRIPT, p.544:13-20.

[38] *See Id.*

[39] *See* FRAZELLE DEPO. pp.225:13-14, 225:16-226:1, 226:3-6.

have been feasible to build one before the spill, without significant expense.[40]  Indeed, BP's own counsel conceded that capping devices were both feasible and practical prior to April 20, 2010.[41] "We didn't have the equipment to attack a Macondo-type event" said Mr. Dupree, summing up the principle reason why it took so long to cap the well. "That's why we had to engineer so many things simultaneously on the fly."[42]

*BP Spent No Money Developing Source Control Prior to the Macondo Blowout.*

BP claims that the Aligned Parties have failed to contradict that BP spent more than $1.6 billion on its response effort.  This is wholly irrelevant, particularly in light of the fact that a significant portion of this expense was for surface collection efforts.  The issue is not how much money BP was forced to spend in its disjointed and haphazard efforts to curb the worst offshore oil spill in U.S. history; the issue is that BP refused to spend any time or money preparing to stop a deepwater blowout at its source.[43]  Andy Inglis, the CEO of BP Exploration and Production, admitted that BP spent "zero dollars" in preparation for containment of a deepwater spill.[44]  BP admitted, through its Rule 30(b)(6) designee, James Rohloff, that it was unaware of any funds that had ever been allocated to identify ways to shut in a deepwater well subsea other than through the use of a BOP.[45]

---

[40] *See* TRANSCRIPT, pp.692-694.

[41] *See* TRANSCRIPT, pp.529-530.

[42] *See* TRANSCRIPT, p.707.

[43] *See, e.g.,* MCKAY DEPO., pp. 102:21-103:9, 104:22-105:11, 105:13; TREX-6021.

[44] *See* INGLIS DEPO., pp.162:9-21.

[45] *See* DEPOSITION OF JAMES ROHLOFF ("ROHLOFF DEPO."), pp.102:14-19, 102:23, 138:19-139:13, 139:16, 140:25-142:6.

BP has also admitted that it provided no training on how to conduct a Souce Control operation.[46]  Putting it simply, BP's employees were asked to do a job they had not been taught or trained to do.[47]  Further, the amount of money BP spent post-Macondo is evidence of why it needed to have a proper Source Control plan in the first place.[48]

*BP Ignored the Source Control Experts and Specialists It Assembled.*

BP claims that within hours of the Incident, BP began implementing its "MMS-approved response plan" by assembling its team of Source Control experts and specialists including Wild Well Control (WWC), a contractor for BP for well control events.  BP, however, fails to note in its Motion that it then chose to ignore these same Source Control experts and specialists it assembled.[49]  As of April 27, 2010, WWC had already provided BP with a well capping procedure involving a two-ram capping device using pre-existing technology and equipment.[50] Despite the fact that it was presented with this less than a week after the blowout, BP chose to de-prioritize this option in favor of other suggestions such as Top Kill.  Further, Pat Campbell, the CEO of WWC, testified that there were multiple additional times where BP ignored WWC's opinion on the proper course of action for the response.[51]

---

[46] *See, e.g.,* TRANSCRIPT, p.504:4-6; DEPOSITION OF EARNEST BUSH, p.31:13-17; FRAZELLE DEPO., pp.219:16-18, 219:20-220:2, 220:4; ROHLOFF DEPO., pp.26:23-27:5, 27:21-28:10, 30:8-31:3, 31:6-7, 104:17-104:24, 105:1; DEPOSITION OF JAMES WELLINGS, pp.82:19-83:6.

[47] *See* TRANSCRIPT, p.504:4-6.

[48] *See* TRANSCRIPT, pp.566:23-567:5.

[49] *See, e.g.,* TRANSCRIPT, pp.519:10-520:23; DEPOSITION OF DAVID BARNETT, pp.105:4-106:8, 112:9-113:16, 163:5-8, 163:10, 163:12-17, 175:24-176:2, 180:23-181:2; TREX-3918; TREX-10072; TREX-10611.

[50] *See, e.g.,* TRANSCRIPT, pp.542:3-543:24; TREX-3918.

[51] *See* DEPOSITION OF PAT CAMPBELL, p.40:18-23.

**BP Willfully Extended the Capping of the Well by Intentionally Concealing Material Information and Affirmatively Misleading the U.S. Government and Others Regarding the Volume of Hydrocarbons Escaping from the Well**

BP has conclusively admitted that it engaged in willful and intentional misconduct following the spill.[52]  The evidence in Phase Two establishes that such conduct contributed to the spill's severity and duration.[53]  Aligned Parties Transocean and Halliburton will be submitting a separate Opposition that sets forth more fully the ways in which BP's admittedly willful and intentional post-spill conduct extended the blowout, by contributing to the confusion and the delay.

**BP's Attempt to Confine Its Willful and Wanton Post-Spill Conduct to a Simple "Reliance"–upon–"Fraud" Construct Ignores the Interaction of BP's Intentional Misrepresentations and Omissions with Multiple Other Causative Factors, including BP's Own Reckless Failure to Prepare for a Blowout and Post-Spill Miscalculations and Mistakes**

One fallacy in BP's argument is the attempt to frame its post-spill lying to the Government in isolation.  Plaintiffs are not making a traditional "fraud" case against BP.  Rather, Plaintiffs allege that BP's intentional misconduct in concealing material facts, overtly misstating facts it knew were not true, and otherwise misleading the Government *combined with other factors,* including BP's own pre-spill failure to prepare for an uncontrolled blowout, as well as BP's (and/or the Government's) post-spill misjudgments and miscalculations, to delay the capping of the well by weeks, if not months.

---

[52] *See* TREX-52673 at pdf pp.16-18 (*U.S. v. BP Exploration and Production, Inc.,* No. 2:12-cr-00292 [Doc 2-1] (Nov. 15, 2012) (Exhibit A to the BP Guilty Plea Agreement, Factual Allocution, re violation of 18 U.S.C. §1505), at 16-18).

[53] *See generally,* PERKIN REPORT, pp.8, 10, 16-24; ZIEGLER REPORT, pp.10-11, 27.

**BP's Willful Misconduct in Lying to the U.S. Government (and Others) After the Spill is Relevant to the Overall Question of BP's State of Mind, Even If It Were Not Found to be a Direct Cause of Any Delay**

As set forth more fully in the Opposition filed by Aligned Parties Transcoean and Halliburton, BP's willful misconduct in lying to the Government after the spill extended the blowout by a number of weeks.  Yet, even assuming *arguendo* that there were no causal relationship between BP's lies and the length or extent of the spill, (which is denied), such intentional misconduct would nevertheless be relevant to the ultimate question of whether BP acted with a willful, wanton or reckless disregard. [54]

**As a Legal Matter, a Defendant's Compliance with an Industry or Regulatory Standard Does Not Insulate the Defendant from a Finding of Negligence or Even Willful or Reckless Conduct**

As set forth in Plaintiffs' Phase One Post-Trial submissions, compliance with industry or regulatory standards does not preclude a finding of gross or egregious conduct.[55]

**In This Particular Case, BP Was Responsible for Source Control Decisions, Not the Government**

Contrary to the arguments presented in BP's Motion, the evidence shows that the Government relied upon BP, and that BP—not the Government—was in charge of identifying and developing Source Control techniques.[56]

---

[54] *See* PSC's Phase One POST-TRIAL BRIEF [Doc 10458], pp.13-18; Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], pp.70-71, 180-182; and PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.3-4.

[55] *See* PSC's Phase One POST-TRIAL BRIEF [Doc 10458], pp.21-26.

[56] *See, e.g.,* MCKAY DEPO., pp.476:20-477:17, 478:12-479:21, 479:23-480:20, 480:22-481:7, 489:7-489:12, 489:14-15, 491:9 - 492:19, 492:21, 520:20-23, 646:21-647:1, 647:17-648:20, 651:24-652:2, 652:4-652; DEPOSITION OF DAVID MCWHORTER, pp.125:5-9, 456:12-16; TREX-7372.

As the federal on-scene coordinator recognized, subsea drilling systems are not an area of Coast Guard cognizance and expertise, and the federal on-scene coordinator was unfamiliar with the technology and capabilities of the deepwater drilling industry.  Neither the Coast Guard nor any other federal agency had experience with a massive deepwater spill.  Ultimately, Source Control had to be achieved through the responsible party, BP.[57]  The Coast Guard's Report on Preparedness echoes this statement: "The federal government has neither the skilled personnel nor the appropriate equipment to respond independently to an oil blowout in deepwater and must rely wholly on the responsible party."[58]

Within the Houston Incident Command Post, BP was giving active direction and establishing what steps were going to be taken at what time.[59]  The United States Government expected BP to take the reign; the Government had neither the expertise nor the equipment to respond to a deepwater blowout.[60]  "BP was driving the bus."[61]

---

[57] *See* TREX-9105.

[58] *See* TREX-9124.

[59] *See, e.g.,* GEOFF BOUGHTON DEPO. ("BOUGHTON DEPO."), pp.100:5-13.

[60] *See, e.g.,* TREX-5335 ("The USCG enters a response with the idea that they are there to assist the RP"); TREX-9105 ("Ultimately, source control had to be achieved through the Responsible Party"); TREX-9099 ("The Federal Government has neither the skilled personnel nor the appropriate equipment to respond independently to an oil blowout in deep water and must rely wholly on the responsible party to contain oil spills occurring from one of their facilities"); DEPOSITION OF MARY LANDRY ("LANDRY DEPO."), p.230 ("I would look to them [*i.e.* BP] … as the Responsible Party"); *see also,* LANDRY DEPO., pp.94:7-25, 95:1-14; *see generally,* ZIEGLER REPORT, pp.43-45 (BP is solely responsible for source control for the BP operated well).

[61] *See, e.g.,* BOUGHTON DEPO., pp.204:18-205:9, 390:16-21.

**BP Did Not Establish the Existence of an "Industry Standard" regarding Source Control Efforts**

First, it is significant to note that BP held itself out as the industry "leader" in deepwater drilling.[62]  BP was drilling the deepest wells, beneath the deepest waters, into the highest temperature and pressure zones.  So it seems strange that BP would have been sitting around waiting for others in the industry to "lead the way" in terms of developing methods for the control of a deepwater blowout.

In any event, BP failed to establish any "industry standard" regarding the use or non-use of a BOP-on-BOP, capping stack and/or other similar device for stopping an uncontrolled blowout.  Indeed, the industry repeatedly recognized the need for capping stack technology with respect to deepwater drilling, at least as far back as 1991.[63]

The fact that other companies in the industry submitted similar Oil Spill Response Plans that addressed provisions for *containment,* and <u>not</u> source control, does not establish that BP "complied with" an industry standard to make no source control provisions, and the fact that the MMS approved these response plans similarly fails to establish that BP "complied with" the Federal Regulations requiring BP to maintain source control.

**BP Clearly Violated Regulatory Standards**

BP had two independent regulatory duties to use the Best Available and Safest Technology (BAST) and to maintain control of the well at all times.[64]  BP failed on both counts.

---

[62] *See, e.g.,* TREX-120174 at pdf p.9 (BP is "operating on the frontier" with projects like Thunder Horse, "the biggest and most complex deepwater project in the world"); DUPREE TESTIMONY, p.599 ("we were the largest operator in the deepwater Gulf of Mexico, and a lot of the other operators didn't have near as much equipment as we had"); *see also,* BEA REPORT, pp.3-4.

[63] *See generally,* BEA REPORT, pp.4-5; PERKIN REPORT, p.7.

[64] *See* ZIEGLER REPORT, p.20, *citing,* 30 C.F.R. ¶¶ 250.107, 250.401 and 250.440.

The regulations concerning General Response Plan Requirements provide that: "Nothing in this part relieves you from taking all appropriate actions necessary to immediately abate the source of a spill." 30 C.F.R. ¶254.5(c).  Further, the evidence is uncontroverted that the MMS expected BP, according to the Federal Regulations, to be able to abate the source of oil as soon as possible.[65]

Moreover, BP certified to the Federal Government in its Initial Exploration Plan for the Madondo well that it was capable of responding at the source to a worst case discharge of up to 162,000 barrels of oil per day.[66]  BP was clearly not in compliance with respect to that regulatory certification.  BP also, as noted, did not comply with its representation to the MMS regarding the training of its employees in source control response.[67]

**BP Marshaled No Resources Prior to the Incident and Refused to "Expeditiously" Develop and Implement the Ultimately Successful BOP-on-BOP / Capping Stack Strategy**

Contrary to BP's assertions,[68] the Phase Two evidence establishes that BP did not marshal any resources prior to the incident,[69] and refused to "expeditiously" pursue the BOP-on-BOP / capping stack strategy.[70,71]

---

[65] *See* D-20046; TRANSCRIPT, p.442.

[66] *See* D-20047; TRANSCRIPT, pp.442-443.

[67] *See, e.g.,* D-20043; D-20052 – D-20055; TRANSCRIPT, pp.446-447.

[68] *See* BP MEMO IN SUPPORT [Doc 11559-1], at p.4 ("there also can be no dispute that BP marshaled enormous resources expeditiously").

[69] *See, e.g.,* INGLIS DEPO, p.162; ROHLOFF DEPO, p.102.

[70] *See generally,* PERKIN REPORT, pp.8, 10, 16-24; ZIEGLER REPORT, pp.10-11, 27.

[71] The Phase Two Trial evidence established that, from a technological standpoint, the BOP-on-BOP option and the Capping Stack option were functionally the same. *See, e.g.,* TRANSCRIPT, pp.359-362, 532-533.

**BP's Wanton, Willful and Reckless Phase Two Conduct Should be Considered in Any Fault Allocation Between and Among the Defendants that the Court Might Make**

While Plaintiffs have previously taken the position that BP's conduct is not a "superseding" or "intervening" factor with respect to the fault of Halliburton and/or Transocean,[72] BP's wanton, willful and reckless Phase Two conduct should be considered in any fault allocation between and among the defendants that the Court might deem necessary.[73]

---

[72] *See generally,* PSC Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.6-8.

[73] Plaintiffs note, in this regard, that the quantification of fault would be largely irrelevant to the recovery of compensatory damages, due to BP's Responsible Party status under OPA, as well as the effect of the indemnity agreements and releases contained within the Transocean Drilling Contract and the Halliburton Services Agreement.  Nor do Plaintiffs believe that a comparative fault analysis would be relevant to determining the appropriate *quantum* of punitive damages that might be assessed against a defendant found responsible for wanton, willful or reckless conduct.  Indeed, the only claims for which an allocation of fault appears to be relevant are the claims of the Economic & Property Damages Class for BP's first-party compensatory damages against Transocean and/or Halliburton as the assignee of BP.

## Conclusion

For the above and foregoing reasons, BP's Motion for Judgment on Partial Findings should be denied.

This 7<u>th</u> day of <u>October</u>, <u>2013</u>.


Respectfully submitted,


   /s/  Stephen J. Herman                                  /s/ James Parkerson Roy
**Stephen J. Herman**, La. Bar No. 23129          **James Parkerson Roy**, La. Bar No.11511
**HERMAN HERMAN & KATZ LLC**               **DOMENGEAUX WRIGHT ROY**
820 O'Keefe Avenue                               **& EDWARDS, LLC**
New Orleans, Louisiana 70113           556 Jefferson Street, Suite 500
Telephone: (504) 581-4892             Lafayette, Louisiana 70501
Fax. No. (504) 569-6024               Telephone: (337) 233-3033
Email: sherman@hhklawfirm.com       Fax No. (337) 233-2796
*Plaintiffs Liaison Counsel*                   E-Mail: jimr@wrightroy.com
                                      *Plaintiffs Liaison Counsel*


### PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU LLP
501 Broad Street

BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400

Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159

Telefax: (305) 476-7444                           Fax No. (843) 216-9290
E-Mail:  ervin@colson.com                          E-Mail:  jrice@motleyrice.com

## **ADDITIONAL PSC PHASE TWO TRIAL TEAM MEMBERS**

Frank Petosa
MORGAN & MORGAN, P.A.
600 N. Pine Island Road, Suite 400
Plantation, Florida 33324
(954) 318-0268
E-Mail:  fpetosa@forthepeople.com

Anthony Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Tel: (504) 525-1500
Fax: (504) 525-1501
E-Mail: airpino@irpinolaw.com

## **THE STATE OF ALABAMA**

The Honorable Luther Strange
*Attorney General*
Corey L. Maze
*Special Deputy Attorney General*
Winfield J. Sinclair
*Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL  36130
Phone: (334) 353-4336
E-Mail: cmaze@ago.state.al.us

*Counsel for the State of Alabama, and*
*Coordinating Counsel for the States*

## **THE STATE OF LOUISIANA**

The Honorable James D. "Buddy" Caldwell
*Attorney General*
James Trey Phillips
*First Assistant Attorney General*

Megan K. Terrell
*Assistant Attorney General*
*Section Chief –Environmental*
P.O. Box 94005
Baton Rouge, LA 70804-9005
Telephone: (225) 326-6708

Allan Kanner
Elizabeth B. Petersen
Douglas R. Kraus
Allison M. Shipp
KANNER & WHITELEY, LLC
701 Camp Street
New Orleans, LA 70130
Telephone: (504) 524-5777

T. Allen Usry
USRY, WEEKS, & MATTHEWS, APLC
1615 Poydras St., Suite 12
New Orleans, LA 70112
Telephone: (504) 592-4641

Henry T. Dart
Grady J. Flattmann
HENRY DART, ATTORNEYS AT LAW P.C.
510 N. Jefferson St.
Covington, LA 70433
Telephone: (985) 809-8093

*Counsel for the State of Louisiana, and*
*Co-Coordinating Counsel for the States*


## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Opposition has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of October, 2013.

/s/  Stephen J. Herman and James Parkerson Roy