

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 2, 2013

Lyle W. Cayce
Clerk

No. 13-30315

MD10-2179-J

IN RE: DEEPWATER HORIZON

-----------------------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON
SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY,
INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA
CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER
FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD
LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
behalf of themselves and all others similarly situated; HENRY HUTTO;
BRAD FRILOUX; JERRY J. KEE,

　　　　　　　Plaintiffs - Appellees

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP PIPE LINE COMPANY,

　　　　　　　Defendants - Appellants

-----------------------------------------------------------------------------

Consolidated with: 13-30329

IN RE: DEEPWATER HORIZON

-----------------------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON
SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY,
INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA
CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER
FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD

No. 13-30315 Cons. w/ 13-30329

LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
behalf of themselves and all others similarly situated; HENRY HUTTO;
BRAD FRILOUX; JERRY J. KEE,

    Plaintiffs - Appellees

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

    Defendants - Appellants

--------------------------------------------------------------------

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY

    Plaintiffs - Appellants

v.

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON
SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY,
INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA
CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER
FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD
LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
behalf of themselves and all others similarly situated; HENRY HUTTO;
BRAD FRILOUX; JERRY J. KEE,

    Intervenor Defendants - Appellees

DEEPWATER HORIZON COURT SUPERVISED SETTLEMENT
PROGRAM; PATRICK A. JUNEAU, in his official capacity as Claims
Administrator of the Deepwater Horizon Court Supervised Settlement
Program administering the Deepwater Horizon Economic and Property

2

No. 13-30315 Cons. w/ 13-30329

Damages Settlement Agreement, and in his official capacity as Trustee of the Deepwater

Defendants - Appellees

———————————

Appeals from the United States District Court
for the Eastern District of Louisiana

———————————

Before DENNIS, CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

BP Exploration & Production, Inc. ("BP") appeals the district court's decision upholding the Claims Administrator's interpretation of the settlement agreement between it and the class of parties injured in the *Deepwater Horizon* oil spill. BP also appeals the district court's dismissal of its action for breach of contract against the Administrator and denial of its motion for a preliminary injunction. We affirm the district court's dismissal of BP's suit against the Claims Administrator. We reverse the district court's denial of BP's motion for a preliminary injunction and the district court's order affirming the Administrator's interpretation of the Settlement and remand to the district court for further consideration.

## FACTS AND PROCEEDINGS

BP leased the *Deepwater Horizon* drilling platform from Transocean to drill its Macondo prospect off the Louisiana coast. On April 20, 2010, the exploratory well Transocean was drilling blew out. After the initial explosion and during the ensuing fire, the platform sank, causing nearly five billion barrels of oil to spill into the Gulf of Mexico. Eleven workers died; sixteen more were injured. Litigation followed.

3

No. 13-30315 Cons. w/ 13-30329

The Judicial Panel on Multidistrict Litigation centralized the non-securities federal lawsuits in the District Court for the Eastern District of Louisiana.  BP, as lessor of the rig, was named as a defendant in most of these suits.

BP waived its statutory limit of liability and committed to pay all legitimate claims, even those in excess of the $75 million liability cap under the Oil Pollution Act, 33 U.S.C. § 2704(a)(3).  BP initially established its own claims process and later funded the claims process administered by the Gulf Coast Claims Facility ("GCCF") to begin paying out claims immediately instead of at the conclusion of litigation.  Over approximately 18 months, the company paid out more than $6.3 billion to individuals and businesses with spill-related losses.

BP began negotiating a class settlement in February 2011.  In March 2012, the district court granted the parties' request to implement a process to transfer claims from the GCCF to a court-supervised program that the parties agreed to in principle.  The court appointed Patrick Juneau as Claims Administrator of this program.  The parties filed notice of their proposed settlement (the "Settlement") in April 2012, to which the district court gave preliminary approval in May and directed to begin processing claims in June.

Businesses' claims for economic loss are one type of claim covered by the Settlement.  Under the class definition, business economic loss ("BEL") claimants must have conducted commercial activities in the Gulf Coast region during the relevant period.[1]  In order to qualify as a class member, BEL

---

[1] Business claimants must have owned, operated, or leased property, or conducted certain business activities within Louisiana, Mississippi, Alabama, and certain coastal counties in eastern Texas and Western Florida, as well as specified adjacent Gulf waters and bays between April 20, 2010 and April 16, 2012.

No. 13-30315 Cons. w/ 13-30329

claimants also must have suffered loss of income, earnings, or profits as a result of the *Deepwater Horizon* accident.  This category of economic damage to a business is fully described in the attached Exhibit 4, which includes requirements for documenting losses (Exhibit 4A) and establishing causation (Exhibit 4B), as well as the compensation scheme (Exhibit 4C).

After a BEL claimant provides the documentation needed to submit a claim and evidence required that the oil spill caused its losses, the claimant is entitled to compensation for the difference between its actual profit "during a defined post-spill period in 2010 [and] the profit that the claimant might have expected to earn in the comparable post-spill period of 2010."  This amount includes "the reduction in Variable Profit," defined as "any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period."  The post-spill Compensation Period "is selected by the Claimant to include three or more consecutive months between May and December 2010."  It is compared to a pre-spill baseline, the "Benchmark Period," of the claimant's choosing: either 2009, the average of 2008-2009, or the average of 2007-2009.  Variable Profit "is calculated for both the Benchmark Period and the Compensation Period as follows:

1.  Sum the monthly revenue over the period.
2.  Subtract the corresponding variable expenses from revenue over the same time period."

As early as September 28, 2012, BP raised concerns about the varied accounting methods claimants used in the ordinary course of their record-keeping and the ways in which erroneously-stated expenses could cause erroneous variable profit calculations.  The district court held the final fairness hearing on November 8 and granted final approval on December 21, 2012.

5

No. 13-30315 Cons. w/ 13-30329

On December 5, 2012, BP requested that the Administrator convene a Claims Administration Panel to consider "the issue of the assignment of revenue to the proper months for purposes of the BEL causation framework and the proper matching of revenue and corresponding expenses for purposes of the BEL compensation framework."[2] BP asked to meet with the Administrator, Class Counsel, and the accounting vendors to discuss this issue, followed by a formal Panel, if necessary.

On December 16, Class Counsel requested a Policy Announcement addressing the issue. After reviewing both parties' written submissions, the Administrator issued a Policy Announcement on January 15, 2013. He stated that, for both calculation of Variable Profit and purposes of causation, he would "typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time," and would "not typically re-allocate such revenues or expenses to different periods," but would "however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates." The Administrator later explained that he did not believe he was authorized "to carve out specific types of claims for additional analysis as BP had proposed."

BP was not satisfied with the Policy Announcement. BP alleged that the Administrator's misinterpretation of the Settlement resulted in awards of

---

[2] As specified in the Settlement, a Claims Administration Panel is the first step in resolving a disagreement over how the Administrator is administering the Settlement Program. If the Panel, composed of the Administrator and representatives from each party, cannot reach a unanimous decision, the issue is "referred to the Court for resolution."

No. 13-30315 Cons. w/ 13-30329

hundreds of millions of dollars to BEL claimants with inflated losses or no losses at all. The parties convened a Claims Administration Panel. When the panel failed to reach a unanimous agreement, they presented the matter to the district court for resolution. Before the district court, BP contested the Administrator's interpretation of the meaning of several of the Settlement's terms: "revenue," "expenses," "corresponding," and "comparable." According to the company, revenue and expenses have generally accepted definitions among economists and accountants that do not permit the Administrator to calculate a BEL claimant's Variable Profit based only on cash receipts or cash disbursements. Rather, a claimant's expenses must be "matched" to corresponding revenue. In addition, the Settlement's requirement that the Administrator measure the difference between Variable Profit in the Compensation Period and the "comparable months of the Benchmark Period" requires that the Administrator compare Variable Profit in comparable months—in other words, when a claimant engaged in similar conduct—not necessarily the "same" months.

On January 30, the district court affirmed the Administrator's Policy Announcement. The district court acknowledged that the Administrator's interpretation "may sometimes cause apparent anomalies (in either direction) in claim determinations." But it noted that this consequence "appears to be the result of the objective, straight-forward mechanisms set forth in the Settlement." It found that "BP's proposed remedy does not appear to be based on any generally accepted accounting principle, and might only result in adding another level of complexity and subjective analysis to the BEL calculation."

BP filed a motion to reconsider, and the district court issued a written ruling on March 5 upholding the Administrator's interpretation and denying

7

No. 13-30315 Cons. w/ 13-30329

BP's motion. The district court reasoned that "[n]owhere does the Agreement state or indicate that revenue and expenses must be 'matched' or revenues 'smoothed,' nor does it state that one should inquire into when revenue was 'earned.'" The district court held that revenues and expenses need not be matched and that "the same months of the Compensation Period are to be compared with the months in the Benchmark Period" rather than "months where the claimant engaged in comparable activity."

In response to the district court's order, BP filed a breach of contract claim against the Administrator and an emergency motion for a preliminary injunction to enjoin the Administrator from implementing the Settlement in accordance with the March 5 order and instead to require the Administrator to implement BP's proposed interpretation. The Administrator filed a motion to dismiss BP's breach of contract claim, arguing that BP failed to state a claim. The district court granted the motion, concluding that the Administrator could not breach the Settlement by interpreting and implementing the agreement in compliance with the district court's order. It also denied BP's request for injunctive relief.

BP appeals the district court's March 5 order affirming the Administrator's interpretation of the Settlement, its order granting the Administrator's motion to dismiss, and its order denying a preliminary injunction.

## STANDARD OF REVIEW

A district court's interpretation of a settlement agreement is a question of law, which we review de novo. *Waterfowl L.L.C. v. United States*, 473 F.3d 135, 141 (5th Cir. 2006).[3] For a denial of a preliminary injunction, a "district court's

---

[3] We have jurisdiction over BP's appeal of the district court's March 5 order under the collateral order doctrine. The order conclusively determined the interpretation dispute, which is completely separate from the merits of BP's liability for the oil spill, and it will be effectively

No. 13-30315 Cons. w/ 13-30329

findings of fact 'are subject to a clearly-erroneous standard of review,' while conclusions of law 'are subject to broad review and will be reversed if incorrect.'" *Janvey v. Alguire*, 647 F.3d 585, 591-92 (5th Cir. 2011) (citations omitted).

## DISCUSSION

BP argues that the district court disregarded the plain text of the Settlement by interpreting it to permit recovery of fictitious and inflated losses. It contends that this misinterpretation also leads to absurd results and contravenes the purpose of the Settlement, which BP characterizes as "compensat[ing] for actual lost profits rather than . . . provid[ing] unjustifiable windfalls to uninjured claimants."

I.   *Artificial Claims*

We repeat the relevant language of Exhibit 4C:

**Variable Profit**: This is calculated for both the Benchmark Period and the Compensation Period as follows:

1.   Sum the monthly revenue over the period.
2.   Subtract the corresponding variable expenses from revenue over the same time period.

---

unreviewable on appeal from final judgment because, at that point, the improper awards will have been distributed to potentially thousands of claimants and BP will have no practical way of recovering these funds should it prevail. *See Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 766-67 (5th Cir. 1996).

Moreover, the procedures for resolving disputes concerning the Administrator's administration of the Settlement specify that a disagreement is "referred to the Court for resolution" if it is not resolved by the Claims Administration Panel. Based on its use throughout the Settlement, the term "the Court" appears to refer to the district court. Such an interpretation of the parties' agreement would render the district court's ruling final. However, the parties clearly intended a broader interpretation of the term – one that retained their right to appeal to this court – as shown by BP's appeal and Class Counsel's failure to object.

No. 13-30315 Cons. w/ 13-30329

BP contends that the district court's interpretation of "revenue" and "expenses" for the purposes of Exhibit 4C does not comport with the accepted economic and accounting meanings of those terms.   It also argues that "corresponding" necessarily implies matching variable expenses to the revenues with which they are properly associated.   Accordingly, BP argues the district court erred in concluding that "revenue" and "corresponding variable expenses" refer only to "cash received" and "cash disbursed" in the relevant period. We will explain why this language in Exhibit 4C cannot be interpreted so that it always means cash received and cash disbursed.   We leave open for remand whether it ever has that meaning.

To understand our interpretation of variable profit, we start with a discussion of some accounting concepts that are fundamental in understanding the meaning of the agreement.

## A. Revenue and Expense Recognition Principles

The purpose of financial record-keeping is to provide businesses with accurate and reliable information upon which to make decisions.   Principles of revenue and expense recognition vary based upon accounting judgment, regulatory or transactional requirements, or even internal management preferences. While an imperfect presentation of the broad array of accounting methods in the business world at-large, a delineation might be fairly made between cash and accrual accounting.   Depending on which of these methods a business chooses, the terms "revenue" and "expenses" take on widely variant meanings.

No. 13-30315 Cons. w/ 13-30329

Typically, only very small and fledgling businesses keep their primary financial records in accordance with cash accounting principles. *See* CPA Societies' Amicus Brief at 7-8 ("some small enterprises . . . use a strict or modified cash-basis approach"). That is, they recognize revenue when cash from a given transaction is received and expenses when cash is paid. *Id.* at 11-12. Class Counsel urged in a December 2012 memorandum: "[w]hen a business keeps its books on a cash-basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed." It argued further that "[t]he 'corresponding variable expenses' associated with monthly revenue are the expenses that are expended or incurred during the . . . months in question." These statements are consistent only with revenue and expense recognition principles of cash accounting. Cash accounting can be useful for many enterprises as a method of analyzing periodic cash needs, but this use is largely unrelated to the concepts of "revenue" and "expenses."

On the other hand, accrual accounting has as a fundamental principle the recognition of revenue when the entity becomes entitled to receive payment, as opposed to when the payment is actually received. *See Statement of Financial Accounting Concepts No. 6*, Fin. Accounting Standards Bd., ¶ 139. Expenses that can be readily traced to the recognized revenues are themselves recognized at the same time as those revenues. *Id.* at ¶ 146.[4] This correlation gives

---

[4] It should be noted that even those expenses that cannot be directly traced to certain revenues are often allocated over multiple time periods, even if the cash outlay occurs all at once. For example, a large advertising purchase may occur by a single cash payment, but the purchased advertising time or space may be utilized in multiple future periods. As such, the expense is recognized incrementally over those relevant future periods. *See Statement of Financial Accounting Concepts No. 6*, ¶ 147. Nonetheless, these are not often thought of as "variable" expenses.

11

No. 13-30315 Cons. w/ 13-30329

business decision-makers a real-time view of the net economic value of a transaction in the period most relevant to its overall economic significance. *Id.* at ¶ 140. This is sometimes referred to as "matching" revenues and expenses, but in any case this procedure is a fundamental aspect of day-to-day record-keeping on the accrual-basis. *See id.* at ¶ 144, 146.

BP argues extensively in its brief that these revenue and expense recognition principles were to apply to Exhibit 4C computations. Class Counsel argues that the agreement's language does not, in fact, permit such an interpretation because the settlement does not state that revenues and expenses must be matched or that revenues must be recognized according to any objective standard.

Business and Economic Loss ("BEL") claimants in the agreement are a broad spectrum of businesses throughout the Gulf region. Some claimants ("cash-basis claimants") will present cash-basis records because this is how they contemporaneously record their financial activities. Others ("accrual-basis claimants") will present accrual-basis records for the same reason. For many of the BEL claimants who are the focus of this appeal, their contemporaneously recorded financial records, absent mere bookkeeping errors, will contain "matched" revenues and expenses before they even submit their claims. In a December 2012 Memorandum, BP acknowledged that many claims presented data that "sufficiently match" revenue and expenses. This is because they apply the accrual accounting recognition and matching principles BP advances here as a matter of their ordinary record-keeping. On the other hand, cash-basis claimants might present records that are not so matched.

No. 13-30315 Cons. w/ 13-30329

The March 5 Order apparently adopted Class Counsel's interpretation of Exhibit 4C, holding that revenue and expenses referred only to cash payments and disbursements. The practical effect of this ruling is unclear in light of the different recognition principles under different accounting methods. We now turn to a more focused discussion of the district court's decision.

### B. Accrual-basis Claimants

Exhibit 4C directs the Administrator to "[s]um the monthly revenue over the period," and then "[s]ubtract the corresponding variable expenses from revenue over the same time period." In the March 5 order, the district court appears to have interpreted "revenue" as "cash received" and "expenses" as "cash disbursed," without reference to whether the holding was to apply to all claims or just those from cash-basis claimants. The order derives from a series of events that we briefly trace.

In December 2012, following unsuccessful attempts to raise the issue since September, BP requested a formal policy statement from the Administrator on matching. The Administrator responded by soliciting responses from BP and Class Counsel to help him make his policy determination. In the December 2012 memorandum to the Administrator, mentioned briefly above, Class Counsel urged an interpretation which could easily be read to interpret revenues and expenses under Exhibit 4C by their cash accounting meanings. Counsel also explicitly stated that "corresponding variable expenses" should be cash paid out during those periods, also a statement consistent only with cash accounting. Class Counsel's Memorandum was not clear whether its proposal applied to both cash and accrual records, despite discussing both. BP responded with its

No. 13-30315 Cons. w/ 13-30329

December 2012 memorandum, also referenced above, by explicitly rejecting Class Counsel's interpretation of "corresponding variable expenses," restating its insistence that the agreement requires matching, and presenting alternative frameworks for industries it thought were most problematic. The dissent treats this argument as an effort to modify the agreement. That conclusion seems too facile. The process for resolving disputes between the Administrator and BP was to be collaborative and cooperative. Consequently, it is not clear to us that BP was attempting to rewrite the agreement as much as it was attempting to resolve apparent anomalies without derailing the entirety of the claims process.

In his January 15, 2013 Policy Statement, the Administrator stated, in relevant part:

> In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time. The Claims Administrator will not typically re-allocate such revenues or expenses to different periods.

Given that "revenues" and "expenses" take on different meanings in the context of cash or accrual accounting, this statement is ambiguous at best as to how exactly the Administrator is processing accrual-basis claims. Further, this Policy Statement apparently rejects BP's proposal and adopts, at least in part, Class Counsel's interpretation.

As we understand the district court's March 5 order, it interpreted "corresponding" to mean that any cash disbursed within a given month should be deemed to "correspond" to cash received in that month, simply by virtue of the fact that the cash flowed in and out in the same month. This is consistent with Class Counsel's December 2012 memorandum. At one point, the district court

No. 13-30315 Cons. w/ 13-30329

said it agreed with Class Counsel as to the method of identifying revenue and expenses, though it is not entirely clear to what aspect of Class Counsel's argument the court was referring.  The district court determined that "in the same time period" would be deprived of meaning if "corresponding" were interpreted to connect expenses to the revenues with which they are directly related. The district court echoed Class Counsel's December 2012 memorandum, holding that "matching" would require the Administrator to look outside the claimant's chosen Benchmark and Compensation periods. Finally, the district court's only discussion of cash or accrual-basis regarded whether one or the other was required under Exhibit 4A's documentation requirements. The court said there was no such requirement, and the parties agree that claimants may submit documents using either method.

In light of the proposals and rulings we just discussed, we consider it possible (though unlikely) that the district court was holding that the cash-in, cash-out interpretation applied to all claims, including those supported by accrual accounting. If so, then the inherent matching that occurs as a matter of course would be undone. Regardless of whether Exhibit 4C *requires* matching when it has not been undertaken in the ordinary course of record-keeping, it cannot be said to permit ignoring sufficiently matched data from accrual-basis claimants. We conclude it would be error if the district court was stating that already-matched revenue and expenses could be ignored.

The Administrator has not made clear whether he is ignoring already-matched revenues and expenses in the manner the district court's interpretation appears to suggest. BP, though, has not explicitly complained to us that he is doing so.  Implicit in this silence is that accrual-based claims continue to be

15

No. 13-30315 Cons. w/ 13-30329

processed using the inherently matched revenue and expense figures. BP acknowledged, in its own December 2012 Memorandum, that "[m]any types of Business Economic Loss claims . . . sufficiently match revenue and corresponding variable expenses, and as a result, [the Settlement] is properly applying" Exhibit 4C." This would likely be the case with most accrual-basis claimants. We see no reason for the Administrator to be doing this, but there are a few contrary indications. Class Counsel's December 2012 Memorandum, the January 15, 2013 Policy Statement, and the March 5 order do not offer any assurance that the Administrator is not applying the cash-in, cash-out interpretation to claims that are presented with matched revenues and expenses.

The district court on remand should make certain that this is not occurring. The Administrator on remand should be able quickly to dispel any doubts about the handling of accrual-basis claims. We expect the dissent is correct that this is not occurring, but we wish to be assured of that point. Once that is done, the more serious work of the remand can commence. We explain that beginning in the next section.

### C. Cash-basis Claimants

Neither the Policy Statement nor the Order make any reference to the recognition principles discussed above. The district court's interpretation gives little weight to the terms "corresponding" and "variable," and the parties apparently agree that matching is required[5] and occurring with respect to the

---

[5] As to accrual-basis claimants, matching is "required" in the sense that claimants are not permitted to present statements which contain inconsistent methodologies. This means that if a claimant's records are already matched, it must submit them in that form.

No. 13-30315 Cons. w/ 13-30329

vast majority of accrual-basis claims.  For these reasons, BP's argument that matching applies to all claims warrants significant further consideration.

As noted above, the district court held that the words "corresponding" and "in the same time period" must be read to mean that expenses correspond to the time period in which they were recorded and further that "expenses" means "cash paid."  The court did not qualify its interpretation to state that this was not true of accrual-basis claimants, or to explain why one form of claims would be matched but not others.  The district court's interpretation would fit the language of Exhibit 4C better if the agreement had said this about the Benchmark and Compensation Periods:

1.    Sum the monthly revenue over the period.
2.    Sum the expenses over the same time period, and subtract.

Instead, step 2 says this: "Subtract the corresponding variable expenses from revenue over the same time period."

Had the words "corresponding" and "variable" been omitted, the district court's explanation would not be so difficult to accept, economic incoherence notwithstanding. The difficulty is that subtracting temporally-related revenues and expenses recorded by cash-basis claimants would not result in numbers that could fairly be said to represent actual economic losses or lost "variable profits." It is difficult to understand why some claimants would be compensated for lost "variable profits," while others would be compensated for negative cash flows, based solely on how claimants maintained their financial records. Though in our view the agreement fails to provide absolutely clear direction on processing claims based on cash-basis records, we conclude that the district court's holding

---

Furthermore, accrual-basis claimants are not allowed to adjust their records to the cash-basis, though the reverse is permitted. *See* October 8, 2012, Policy Statement on the matter.

too quickly dismissed the concept of matching, and did not deal with the inconsistent results the court's interpretation gives to claims presented on an accrual-basis and those on a cash-basis.

We suggest a more consistent interpretation of Exhibit 4C, one that fits both accrual- and cash-basis claims, is as follows. Such parol evidence as would assist the district court in deciding if this is correct can be presented on remand. After the heading "Variable Profit," Exhibit 4C reads "This is calculated for both the Benchmark Period and the Compensation Period." Then, part 1 references a "period," which seems reasonably to refer either to the Benchmark or to the Compensation designations set out immediately above, depending on which one is being calculated. Part 2 is where the "corresponding" expenses are subtracted from revenues "over the same time period." This reasonably could be interpreted to mean that the expenses to be subtracted must be those that "correspond" to the revenue earned and that the "same time period" refers to the Benchmark period on the one hand, and to the Compensation period on the other, whichever is being calculated. In other words, sum the monthly revenue over the [Benchmark or Compensation] period and then subtract *corresponding* expenses over the same [Benchmark or Compensation] time period. Such an interpretation seems amply supported by the language of Exhibit 4C and much more consistent with general accounting and economic norms.

Weight to such an interpretation comes from the fact that the agreement cannot be read to permit ignoring "sufficiently-matched" revenue and expenses from accrual-basis claimants. The fact that Exhibit 4C requires processing of claims supported by sufficiently-matched, accrual-basis accounting should inform but does not necessarily control how cash-basis claims are to be analyzed.

No. 13-30315 Cons. w/ 13-30329

In any case, it does not appear to us that the district court gave real meaning to "corresponding" and "variable" when interpreting Exhibit 4C. It also did not articulate a basis to distinguish between determining actual economic losses for those claimants whose records were maintained on an accrual-basis, but abandoning that purpose when cash-basis claims were presented, with such a distinction being supported by exactly the same words in Exhibit 4C.

BP has been arguing at least since September 2012 that treating cash-basis claims by their own terms, that is, treating cash inflows and outflows as revenues and expenses, violates the express language of the agreement. As we understand its contention, BP argues that Exhibit 4C represents an agreement on a specific accounting methodology, based loosely on accrual accounting revenue and expense recognition principles. Central to this argument is that the term "corresponding variable expenses," the detailed computation instructions, the detailed expense classifications, and extensive documentation requirements would be largely superfluous if all claims, but especially cash-basis ones, were meant to be treated on their own terms.

As discussed above, the district court held that "corresponding" referred to a temporal connection between cash inflows and outflows. That is, cash receipts and payments corresponded to one another because they flow in and out during a given month. In a literal sense, this is true. But cash accounting, by nature, ignores any significance that might be related to the timing of cash receipts and payments, beyond mere cash flow concerns. *See* CPA Societies' Amicus Brief at 7-8. Because cash accounting does not inherently recognize relationships between cash flows and their underlying transactions, the term

19

No. 13-30315 Cons. w/ 13-30329

"corresponding variable expenses" reasonably could imply an accrual-style framework inherent in Exhibit 4C.

BP argues that the detailed expense classifications and adjustments outlined in Exhibit 4C as well as the requirement of annual and tax financial statements in addition to monthly profit-and-loss statements in Exhibit 4A indicate that claims are to be adjusted to "match" revenue and expenses and then provide for the records necessary to doing. Exhibit 4A lists numerous documents a claimant must submit to make a claim. These documents presumably would allow accountants fairly, if at times imperfectly, to "match" revenues and expenses if such were required.

Class Counsel and the Administrator argue that BP fully agreed during negotiations in 2012 to the district court's March 2013 interpretation in order to achieve "global peace," and that it should not now be permitted to extract itself from its bargain. This analysis persuaded the dissent, which argues that BP's purpose here is to modify the agreement to require conversion of cash-basis claimants' records to the accrual-basis, even though it specifically agreed that such was not required. Our analysis finds different meaning in what was agreed. The difference is between what claimants had to present – either cash-basis or accrual-basis claims – and what the Administrator thereafter was to do. At least as to claims presented on an accrual-basis, not only did BP not assent to ignoring the need for matching revenues with expenses, it clearly insisted on it. In December 2012, the parties seemingly agreed that properly matched claims led to fair and proper results. We do not agree that the record of negotiations supports that BP was oblivious until quite recently to the desirability of matching; the record actually supports that both parties agreed all along that

20

No. 13-30315 Cons. w/ 13-30329

properly-matched accrual-basis claims should not be disturbed and indeed should not be converted to cash-basis claims precisely because of the risk of artificially-inflated or entirely fictitious losses.

The record creates a different perplexity, namely, why would parties who agree as to the propriety of matching for one set of claims reject it for other claims? Our doubt is particularly strong due to the fact that only matching provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for real losses. Furthermore, the only support for not matching seems to derive from the conclusion that cash-basis claimants' own books are not matched. It hardly seems conclusive to us that a claimant's idiosyncratically-maintained records dictate the way Exhibit 4C is applied to a claim, especially if Exhibit 4C is supposed to be an objective formula.

Class Counsel and the Administrator argue that significant parol evidence, including e-mails where BP counsel appears to accept the occasional false positive, shows BP's acquiescence. One form of a false positive discussed during negotiations would arise from the agreement to assume factual causation. Under Exhibit 4B, causation is generally assumed if economic loss can properly be shown. BP did agree that alternative causes of losses were irrelevant if the financial figures supported that a loss occurred. The false positives BP criticizes now are based on loss calculations produced under the district court's cash-in, cash-out approach. The approach could lead to false positives or false negatives, though negatives presumably would not lead to claims. In either event, the issue is whether it is permissible to allow the often economically meaningless temporal coinciding of cash received and paid to determine the value of a claim. BP never acquiesced to a cash accounting interpretation of "revenue" and

21

No. 13-30315 Cons. w/ 13-30329

"expenses" for *all* claims, *i.e.*, not for accrual-based ones.  It has argued consistently that the formula was intended to compensate for real economic losses, not artificial losses that appear only from the timing of cash flows.

The dissent concludes that the course of dealing outlined above, beginning with the September 28 correspondence between BP and the Administrator, shows that BP missed its opportunity to raise these objections.  Much has been made of an October 2 conference call, where the concerns BP raised on September 28 were to be resolved.  During that call, according to a number of affidavits, BP asked about the treatment of certain cash-basis claims and apparently left assured that they need not fear the way the Administrator was proceeding.  The dissent cites the affidavit of Charles Hacker, partner in the PriceWaterhouse accounting firm.  He states that he told BP that accountants were not converting cash-basis claims to accrual-basis for the purposes of the agreement.  According to the dissent, BP's apparent silence at that moment shows their assent to treatment of cash-basis claims by their own terms.  We do not find the dissent's interpretation of the limited factual matter from the October 2 conference call conclusive.  Hacker also asserted that "[w]ith respect to irregularly received revenue, the accountants' practice was to follow up with claimants to better understand significant outliers . . . the accountants were not auditing claimants' financial information but  .  .  .  were performing certain procedures to analyze the accuracy, validity, and authenticity of outlier items."

Perhaps whatever was specifically said in the October 2 conference call indicated to BP that the accountants were making Exhibit 4C calculations in accordance with the interpretation it advances here.  Thus, BP would have agreed to finalizing the agreement.  That possibility would support that BP

22

No. 13-30315 Cons. w/ 13-30329

thought the agreement was functioning properly, and then raised these issues later when BP came to believe that something was amiss.

After all the other arguments are considered, it remains of significance that the interpretation urged by the Administrator is completely disconnected from any reasonable understanding of calculation of damages. In interpreting a settlement, surely some weight has to be given to what damages recoverable in civil litigation actually are. If clear words in a settlement require the use of randomly associated numbers for calculating damages, even if there is little likelihood that, after subtracting one of those numbers from the other, the remainder will in fact show anything relevant to damages, then so be it. We do not perceive such clarity here.

Given the record before us, we cannot determine with an adequate level of certainty whether a matching principle should apply to all claims. Even with the interpretation we outlined above, it is not wholly clear that the words "corresponding" and "variable" unequivocally imply matching.   Given the divergent effects of differing recognition principles, we hold that Exhibit 4C is ambiguous as to whether claims that are not based on matched revenues and expenditures are to be matched for Exhibit 4C purposes. We have not discovered whether, before the agreement was signed, the parties discussed the divergent effects of cash- and accrual-basis accounting records on the Exhibit 4C formula. Furthermore, neither the January 15, 2013 Policy Statement nor the March 5 order mentions the inherent but crucial differences in these recognition principles. Instead, we remand to the district court to develop a more complete factual record regarding the meaning of Exhibit 4C or other relevant parts of the

No. 13-30315 Cons. w/ 13-30329

agreement and make relevant findings. The Administrator needs to assure the court that he is not ignoring already-matched accrual-basis accounting records.

We remand because the district court did not acknowledge the requirement of matching that is foundational for accrual-basis claims and it did not then explain why it was interpreting the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring the matching of cash-basis claims. This is particularly questionable when the agreement contains not only the terms "corresponding" and "variable," but extensive documentation requirements which would allow claims administration accountants to process claims in accordance with economic reality.

### D. "Comparable" Periods

BP further argues that "comparable" months of the Benchmark and Compensation period refer to months in which comparable activities took place. We find nothing in the record to support that interpretation.

The district court held that "comparable" refers to the same calendar months in both the Benchmark and Compensation period. We do not disturb this holding for two reasons. First, we conclude that this is the most natural reading of the word "comparable" in the context of the agreement. The agreement allows the claimant to pick as few as three months or as much as an average of nine months over three calendar years. This, along with the word "comparable," clearly indicate that the Benchmark and Compensation periods were referring to months of the same name, without any complex analysis of what type of business activities took place within those months. Second, we conclude that our holding as to cash and accrual-basis claimants will resolve

24

No. 13-30315 Cons. w/ 13-30329

some of the issues BP claims results from the district court's interpretation of "comparable."

BP's primary concern seems to be the uneven cash flows of certain types of businesses. We accept this possibility, but we see nothing in the agreement that provides a basis for BP's interpretation. Despite the potential existence of this kind of distortion, the parties may not have considered it, agreed to ignore it, or failed for other reasons to provide clearly for this eventuality. The district court was correct that BP's proposed interpretation is not what the parties agreed.

II.   *"Fictitious" claims*

BP alleges not only that the Administrator's interpretation of the disputed terms inflates awards to legitimate BEL claimants, but also that the interpretation results in awards to BEL claimants who admittedly either have suffered no loss at all or have suffered losses that were not caused by the oil spill. Such claimants would have no colorable legal claim. *See Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984) (defining a "colorable claim" as one with "some possible validity"). Absent a loss, a claimant has suffered no injury. Unless a claimant can colorably assert a loss, it lacks standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (noting that an injury is a required element of constitutional standing); *Jobe v. ATR Mktg., Inc.*, 87 F.3d 751, 753 (5th Cir. 1996) ("[T]he conventional tort elements in a negligence action are duty, breach of duty, proximate causation and injury."). Similarly, if a claimant has suffered a loss, but it has no colorable claim that the loss was caused by the spill, it also lacks standing and cannot state a claim. It lacks

25

No. 13-30315 Cons. w/ 13-30329

standing because it cannot allege "a causal connection" between its loss and the spill. *Lujan*, 504 U.S. at 560. Its injury is not "fairly traceable to the challenged action of the defendant;" rather, it is "the result of the independent action of some third party not before the court." *Id.* (citation, quotation marks, and alteration omitted). Moreover, it cannot state a claim because it is unable to plead the causation element of a negligence cause of action. *See Jobe*, 87 F.3d at 753. Therefore, such non-colorable claims do not constitute Article III cases or controversies and are not founded on any substantive right.[6]

The Supreme Court has cautioned that "Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'"[7] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613

---

[6] The dissent contends that it is hornbook law that standing is never an issue in the class action context so long as one class representative has standing. While the hornbook quoted does refer to a narrow use of the word standing, the same material also concedes that courts use the term in a broader context to address Article III constraints such as actual injury and traceability as well as Rule 23 requirements such as typicality and commonality. WILLIAM B. RUBINSTEIN, NEWBERG ON CLASS ACTIONS 2:1, 2:5 (5th ed.). This analysis utilizes this broader meaning of the term, validated by other auspicious courts with access to the hornbooks. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612 (1997) (referring to a class issue of uninjured plaintiffs as concerning "standing," even when some of the named plaintiffs in the case had actual injuries).

[7] The Supreme Court in *Amchem* considered the approval of a global settlement class in the asbestos litigation that consisted of individuals injured by asbestos and those who had been exposed to asbestos but not yet injured. *Amchem*, 521 U.S. at 597. Although concluding that the class could not be certified because it did not meet the requirements of Rule 23, the Court noted that, "[i]f certification issues were genuinely in doubt, however, the jurisdictional issues [concerning the ripeness of the exposure-only class members' claims] would loom larger." *Id.* at 613 n.15. The Court directed attention to Judge Wellford's concurrence in the court below that argued that there could be no standing for uninjured plaintiffs and emphasized again the importance of limitations imposed by Article III and the Rules Enabling Act. *Id.* at 611-13.

No. 13-30315 Cons. w/ 13-30329

(1997) (quoting 28 U.S.C. § 2072(b)); *see also id.* (quoting Fed. R. Civ. P. 82's mandate that "rules shall not be construed to extend . . . the [subject-matter] jurisdiction of the United States district courts" (alterations in original)); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 343 (3d Cir. 2011) (Jordan, J. dissenting) ("Rule 23 . . . is designed to efficiently handle claims recognized by law, not to create new claims."); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998) ("It is axiomatic that the procedural device of Rule 23 cannot be allowed to expand the substance of the claims of class members."); *cf. Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 312 (5th Cir. 1998) (concluding that the Rules Enabling Act mandates that "use of Rule 23(b)(3) . . . does not alter the required elements which must be found to impose liability and fix damages (or the burden of proof thereon) or the identity of the substantive law . . . which determines such elements).[8] By including claimants in the class definition that lack colorable claims, a court disregards this warning. It ignores the standing requirement of Article III and creates a substantive right

---

[8] In addition, "[Rule 23's predominance] inquiry trains on the legal or factual questions that qualify each class member's case as a *genuine controversy.*" *Amchem*, 521 U.S. at 623 (emphasis added). Thus, an interpretation of the Settlement that defines the class to include claimants who "have suffered no actual injury from [BP's] allegedly [tortious acts] on the basis of a much smaller group of [claimants] who have sustained such injury" also may call into question whether the settlement class satisfies the predominance test for certification. *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 85 (E.D.N.Y. 2007); *see also Sullivan*, 667 F.3d at 343-47 (Jordan, J. dissenting) (pointing out that including "putative class members who do not even have an arguable cause of action under applicable law" in the class definition also calls the related requirement of commonality into doubt, because it "requires plaintiffs to show that the elements of their claim are capable of proof at trial through evidence that is common to the class rather than individual to its members" and, "for plaintiffs who lack any claim, there are certainly no elements of a claim that are capable of proof, either common or individual" (citation and quotation marks omitted)).

No. 13-30315 Cons. w/ 13-30329

where none existed before. Allowing recovery from the settlement fund by those who have no case and cannot state a claim, the court acts *ultra vires*.

"To avoid dismissal based on a lack of standing, the court must be able to find that both the class and the representatives have suffered some injury requiring court intervention. The class must therefore be defined in such a way that anyone within it would have standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) (internal citations and quotation marks omitted). "In order to state a class action claim upon which relief can be granted, there must be alleged at the minimum (1) a reasonably defined class of plaintiffs, (2) all of who have suffered a constitutional or statutory violation (3) inflicted by the defendants." *Adashunas v. Negley*, 626 F.2d 600, 603 (7th Cir. 1980) (affirming the denial of a plaintiff class). A claimant "must actually have a legal claim before getting in line for a legal recovery. When objections are raised that persuasively demonstrate that a portion of a proposed class does not have any such claim, courts of law are obliged to follow the law." *Sullivan*, 667 F.3d at 347 (Jordan, J. dissenting); *see In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. Unit B 1982) ("Of course, had indirect purchasers been completely without any colorable legal claims against defendants, it would have been an abuse of the court's discretion to allow them to share in the settlement fund."); *see also In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 179, 184 (2d Cir. 1987) (approving a settlement distribution plan to class members who had "stated 'colorable legal claims against defendants'" because their claims "d[id] not entirely disregard traditional tort principles of causation" (citation omitted)). *But see Sullivan*, 667 F.3d at 310 ("[W]ere we to mandate

28

No. 13-30315 Cons. w/ 13-30329

that a class include only those alleging 'colorable' claims, we would effectively rule out the ability of a defendant to achieve 'global peace.'").

There is a distinction here between whether a claim is colorable and whether it is meritorious. A plaintiff's claim is colorable if he can *allege* standing and the elements necessary to state a claim on which relief can be granted – whether or not his claim is ultimately meritorious – whether he can *prove* his case. *See Sullivan*, 667 F.3d at 340 (3d Cir. 2011) (Jordan, J. dissenting) (explaining that the problem with the class "is not that it may include people with marginal or dubious claims" but that it "includes people who have no legal claim whatsoever" as is "clear on the face of the [applicable] statutory and decisional law"). Class settlements certainly can encompass unmeritorious claims, because such claims, successful or not, are based on existing substantive rights. Class settlements, however, cannot create new rights and then settle claims brought under them. *See id.* (dissenting because "the Majority has endorsed the fabrication of substantive rights where none before existed"); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012).[9]

---

[9] "At first glance, it would seem that Northshore is arguing . . . that certification must be denied because plaintiffs' proposed class contains members whose claims will fail on the merits. In actuality, however, Northshore is arguing that the class for which certification is requested is fatally overbroad because it contains members who could not have been harmed by any post-merger price increases . . . This distinction is critical for class certification purposes. As explained above, if a proposed class consists largely (or entirely, for that matter) of members who are ultimately shown to have suffered no harm, that may not mean that the class was improperly certified but only that the class failed to meet its burden of proof on the merits. If, however, a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Id.* (citations omitted).

No. 13-30315 Cons. w/ 13-30329

It makes no difference that a defendant may bargain for global peace by agreeing to allow claimants with no colorable legal claim to recover from the settlement fund. A class settlement is not a private agreement between the parties. It is a creature of Rule 23, which authorizes its use to resolve the legal claims of a class "only with the court's approval." FED. R. CIV. P. 23(e); *see also Amchem*, 521 U.S. at 620 (explaining in a related circumstance that the specifications of Rule 23 designed to "block[] unwarranted or overbroad class definitions . . . demand undiluted, even heightened, [judicial] attention in the settlement context"). In granting approval, the court must, as always, adhere to the precepts of Article III and the Rules Enabling Act.[10] While a "welcome byproduct" of deciding cases or controversies on a class-wide basis, the goal of global peace does not trump Article III or federal law. *Sullivan*, 667 F.3d at 355-56 (Jordan, J. dissenting). Courts do not have the authority to create a cause of action (and their corresponding subject-matter jurisdiction over it) and then give peace with regard to that cause of action.[11]

---

[10] This is particularly true here, as the district court, in its order approving the Settlement, "retain[ed] continuing and exclusive jurisdiction to interpret, implement, administer and enforce the Settlement Agreement, in accordance with its terms, and to implement and complete the claims administration and distribution process, in accordance with the Settlement Agreement."

[11] The dissent critiques as "unworkable" an approach that would require that class members have a colorable claim because it would require some analysis of harm at the certification stage. The Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) clarified that "Rule 23 does not set forth a mere pleading standard . . . certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied . . . . Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped . . . . Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation." *Id.* at 2251-52 (internal citations and quotation marks omitted). Preliminary matters such as whether broad swaths of the proposed class would have standing are no more

30

No. 13-30315 Cons. w/ 13-30329

Turning to the present case, the district court had no authority to approve the settlement of a class that included members that had not sustained losses at all, or had sustained losses unrelated to the oil spill, as BP alleges. If the Administrator is interpreting the Settlement to include such claimants, the Settlement is unlawful. Should BP's proposed interpretation of the Settlement exclude putative class members with no colorable legal claim, the district court should have rendered the Settlement lawful by adopting that interpretation, as long as the interpretation is reasonable and effective. *See Harvey v. Joyce*, 199 F.3d 790, 794 (5th Cir. 2000) ("A court must strive to reach an interpretation which gives a reasonable, lawful, and effective meaning to all the terms of an agreement.").

Moreover, if BP's counsel did negotiate a Settlement that included payouts to businesses whose losses were not caused by the oil spill, agreeing to pay a client's funds to claimants that concede that they have no causally related injury is counterintuitive and contradictory to common tenets of both tort and contract law—and to common sense. The fact that these claimants cannot show causation translates to a Settlement that lacks valid consideration. Why would BP pay to resolve claims that cannot be plead? The myth of "global peace" through payment of *admittedly* non-spill-related claims is a legal nullity that cannot remedy this deficiency. There is no need to secure peace with those with whom one is not at war. Total lack of consideration for non-recoverable claims would call into question the validity of the Settlement Agreement.

The class settlement cases the dissent cites to the contrary all involved classes that suffered actual economic loss that resulted from the conduct of the

difficult to ascertain.

31

No. 13-30315 Cons. w/ 13-30329

party agreeing to the settlement. In *Sullivan*, direct and indirect purchasers of diamonds settled a class action suit against the operator of a diamond cartel for violations of federal and state antitrust laws. 667 F.3d at 285-293. The *Sullivan* majority pointed out that while considering predominance, "commonality is informed by the defendant's conduct as to all class members and any *resulting* injuries common to all class members." *Id.* at 297 (emphasis added). Both the majority and the dissent recognized "that, well yes, there must be some limiting feature of the class and that feature is injury; class members must have been injured by De Beers's unlawful conduct." *Id.* at 343 (Jordan, J. dissenting). In *Sullivan*, the majority and the dissent sparred over whether or not this financial injury was legally cognizable, because the settlement proposed to settle claims in all 50 states whether or not the states had causes of action for these kinds of injury. What the *Sullivan* majority never approved was a class that consisted of people who had never purchased diamonds at all and thus suffered no losses. In *In re American International Group, Inc. Securities Litigation*, 689 F.3d 229 (2d Cir. 2012), three public pension funds sought class certification to settle a securities fraud claim against an issuer for violations of federal securities fraud that led to losses in their portfolios. *Id.* at 232-37. "All plaintiffs here claim injury that by reason of defendants' conduct . . . has caused a common and measurable form of economic damage." *Id.* at 240 (quoting *Sullivan*, 667 F.3d at 338 (Scirica, J., concurring)). Similarly, this case did not involve class approval of people who had never invested in the stock market and therefore never could have experienced traceable loss.[12] Surely, these cases do not stand

---

[12] The dissent also cites to *Kohen v. Pacific Investment Management Company LLC*, 571 F.3d 672 (7th Cir. 2009). In *Kohen*, buyers of short positions in ten-year Treasury notes filed suit against an investment firm which had taken long positions, seeking sums lost when the

No. 13-30315 Cons. w/ 13-30329

for the proposition that there is no judicial role to ensure that class definitions comply with statutory and constitutional strictures.

These issues are important in this case, and not just in future cases, because these legal principles further undermine an interpretation of the Settlement Agreement that includes businesses without colorable legal claims. Such an interpretation could imperil a final approval of the settlement and can be considered in evaluating the correct interpretation of possible ambiguities in this agreement.

## III.  *Preliminary Injunction*

"It takes time to decide a case on appeal.  Sometimes a little; sometimes a lot.  No court can make time stand still while it considers an appeal . . . and if a court takes the time it needs, the court's decision may in some cases come too late for the party seeking review." *Nken v. Holder*, 556 U.S. 418, 421 (2009) (internal quotations and citations omitted).  Despite the generally deferential standard accorded to a district court's denial of a preliminary injunction, "a decision grounded on erroneous legal principles is reviewed de novo." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

BP moved for a preliminary injunction and a stay pending appeal, arguing that the continued distribution of its assets under a potentially improper reading of the Agreement was causing it irreparable harm.  The district court denied the

---

firm allegedly cornered the market in violation of the Commodity Exchange Act.  571 F.3d at 674-77.  *Kohen* was not a settlement class action and did not raise causation concerns.  "If PIMCO is found to have cornered the market . . . then each member of the class will have to submit a claim for the damages it sustained *as a result of* the corner."  *Id.* at 676 (internal citations omitted) (emphasis added).

No. 13-30315 Cons. w/ 13-30329

motions from the bench and in a subsequent minute entry. The court believed that BP was asking it to enjoin an interpretation of the Settlement Agreement that the court itself had ordered on March 5. As such, the court viewed it as a request for reconsideration of an issue the court had considered.

"As to each element of the district court's preliminary-injunction analysis, the district court's findings of fact 'are subject to a clearly-erroneous standard of review,' while conclusions of law 'are subject to broad review and will be reversed if incorrect.'" *Janvey v. Alguire*, 647 F.3d 585, 591-92 (5th Cir. 2011) (citations and quotation omitted).

The conclusions the district court made here were conclusions of law. Contract interpretation, such as the meaning of the Settlement Agreement, is a question of law. *Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009). Proper claimants under a class are a question of law. *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2550-51. For this reason, errors in conclusions of law are subject to broad review and will be reversed if incorrect. The errors in conclusions of law involved are laid out in the preceding sections of this opinion. Because of these, the preliminary injunction should be granted while the judicial process takes its course.

The traditional four-factor test for a stay pending appeal is typically used to analyze requests for a preliminary injunction.[13] However, "where there is a serious legal question involved and the balance of the equities heavily favors a

---

[13] "Four factors must be considered by this Court in determining whether to stay the district court's order under Fed. R. App. P. 8. These are (1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest." *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983).

No. 13-30315 Cons. w/ 13-30329

stay . . . the movant only needs to present a substantial case on the merits." *Weingarten Realty Investors v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011). This case is one of the largest and most novel class actions in American history. As such, significant legal questions are involved that will affect the course of class action law in this country going forward, and the class action as a suitable vehicle for the resolution of conflict for businesses and litigants.

The balance of equities favors a tailored stay. The interests of individuals who may be reaping windfall recoveries because of an inappropriate interpretation of the Settlement Agreement and those who could never have recovered in individual suits for failure to show causation are not outweighed by the potential loss to a company and its public shareholders of hundreds of millions of dollars of unrecoverable awards. A stay tailored so that those who experienced actual injury traceable to loss from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments until this case is fully heard and decided through the judicial process weighs in favor of BP. We therefore REVERSE the denial of the preliminary injunction[14] and instruct the district court to expeditiously craft a narrowly-tailored injunction that allows the time necessary for deliberate reconsideration of these significant issues on remand.

---

[14] By way of example, BP's proposed tailored injunction read as follows: "The Claims Administrator and Settlement Program are ENJOINED from issuing or paying to claimants in the agriculture, construction, professional services, real estate, wholesale trade, manufacturing, and retail trade industries any determinations for business economic loss claims under the Economic and Property Damages Settlement Agreement ("Settlement Agreement"). The North American Industry Classification System ("NAICS") codes for these specified industries are all codes starting with 11 (except 114111, 114112, 114119, and 114210), 23, 31 (except 311711 and 311712), 32, 33, 42 (except 424460), 44, 45, 53, or 54."

No. 13-30315 Cons. w/ 13-30329

## CONCLUSION

We AFFIRM the district court's dismissal of BP's suit against the Claims Administrator.   We REVERSE the district court's order affirming the Administrator's interpretation of the Settlement and denial of a preliminary injunction and REMAND to the district court for further consideration while retaining jurisdiction.

No. 13-30315 Cons. w/ 13-30329

LESLIE H. SOUTHWICK, Circuit Judge, concurring:

I concur in Part I of the opinion, which analyzes why we are vacating and remanding for further consideration of the interpretation of Exhibit 4C of the Settlement Agreement. I also agree, as stated in Part III, that the district court should enter a narrowly tailored and potentially brief stay to allow the purposes of the remand to be realized.  I do not join the broader Rule 23 analysis that appears in Part II.  The discussion is logical in finding that constitutional infirmities would exist if certain corrections are not made to the interpretation of Exhibit 4C. There is, though, no briefing on the constitutional issues that are addressed.  I am concerned that those observations imply – though they may well not be intended to go that far – an invalidity to the Settlement Agreement's causation framework, which no one challenges.   I would not make the pronouncements that appear in Part II.  Instead, I would defer the issue and allow the parties on remand to give it the attention it deserves.

The Settlement Agreement resolved two separate issues by, in effect, combining them. One concerned loss *causation*, and the other loss *measurement*. If a BEL claimant could prove an economic loss, properly measured, that proof substituted for evidence of causation.  Improper measurement of losses under Exhibit 4C might compensate claimants without actual losses.  That potential raises the causation question in the sense that a party who suffered no loss regardless of cause certainly did not have a loss caused by the oil spill. Even so, the parties agreed by Exhibit 4B's causation framework to ignore alternative explanations for actual losses that occurred to claimants during the proper time

No. 13-30315 Cons. w/ 13-30329

period. The agreement simplified the claims process by making proof of loss a substitute for proof of factual causation.

The question of loss measurement is clearly before us. BP argues almost exclusively that the Administrator and the district court misinterpreted the formula for measurement of business and economic losses that appears in Exhibit 4C. Part I of the panel opinion identifies the crucial question for remand: should matching be required for *all* claims when it is clearly required for many? I agree to remand with instructions to reconsider the interpretation of Exhibit 4C for unmatched claims in light of the necessity of revenue and expense matching to realistic measurement of economic loss.

Part II of the opinion elaborates on a causation issue under Rule 23, which affects the class definitions. As noted already, causation was addressed by the parties in Exhibit 4B of the Settlement Agreement. BEL claimants within a defined geographic region closest to the Gulf do not need to present any evidence of factual causation. The same is true of BEL claimants in certain sensitive industries, such as seafood processors, regardless of geographic location. For those groups of BEL claimants, a mathematical loss as calculated under Exhibit 4C is compensated without any proof of the cause of the loss. BEL claimants operating further from the Gulf must show a mathematical loss under Exhibit 4C, subject to a requirement that the loss meet a certain percentage threshold, and must also provide documentation that the claimant lost revenues from certain classes of customers. As the last alternative to other forms of evidence, these more distant claimants could offer evidence of factual causation.

Thus, Exhibit 4B of the Settlement Agreement allowed causation to be supported simply by loss calculations under Exhibit 4C rather than by requiring

No. 13-30315 Cons. w/ 13-30329

the claimant to prove that the loss had any factual relationship to BP's actions. No one on appeal is challenging Exhibit 4B. BP is arguing that the erroneous variable profit decision endangers class certification by potentially allowing parties not harmed by BP's actions to recover from the settlement fund. That potential arises from miscalculating loss. Other than by the challenge to the application of the method of showing loss, BP has not argued that the Settlement Agreement is defective under Rule 23.

Given that we are remanding so that the interpretation of variable profit will be reconsidered, it is not apparent that we should reach any fundamental Rule 23 concerns at this time. I agree that parts of the analysis have been briefed. For example, if the methods of computing losses do not, at least for a large number of claimants, determine in any reasonable fashion whether a financial loss actually occurred, there are significant Rule 23 problems in the incoherence of the calculation method. Because proof of loss largely substitutes for proof of causation, to allow the means of showing loss to become disconnected from economic realities threatens to distort entry into the class and is a defect under Rule 23. There is no evidence yet presented that BP ever agreed to this. Because the Rule 23 problem BP raises is confined to the measurement of loss and not to questions of standing of claimants who cannot show their losses were caused by BP's actions, I would not at this time suggest there is a fundamental Rule 23 defect in the Settlement Agreement.

I do not minimize the concern about recognizing limitations for Rule 23. The opinion correctly notes that class actions are not meant to be vessels for achieving "global peace" by creating substantive rights that would not otherwise exist. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612-13 (1997). I

No. 13-30315 Cons. w/ 13-30329

would only have identified the relevant principles and authorities, then remanded for such consideration as the parties and the district court bring to the issue of causation as they address the measurement of loss.

No. 13-30315 Cons. w/ 13-30329

JAMES L. DENNIS, Circuit Judge, concurring in part and dissenting in part:

This case arises out of BP's proposal to the Administrator that he modify the consent decree and settlement agreement, or his interpretation of them, to provide that the Administrator must convert a claimant's cash-method accounting data into the accrual-method data proposed by BP before using the data to calculate the business economic loss of the claimant. The Administrator rejected BP's proposal and the district court affirmed the Administrator's decision. BP appealed to this court. The majority, instead of addressing the only question presented, whether conversion of cash-method data into accrual-method data is or should be required, declares the record confusing, intuits a different issue, whether the Administrator has been converting accrual-method data into cash-method data before processing claims, and remands for the district court to determine whether the Administrator has done so.

In my view, we should affirm the district court's judgment for the reasons assigned hereinafter. Moreover, the remand is unnecessary because the record clearly reflects that the dispute between the Administrator and BP is only about whether the Administrator must convert a claimant's cash-method data into BP's proposed accrual-method data before calculating a claimant's business economic loss. BP does not contend that the Administrator is mishandling claimants' accrual-method data claims.

In this opinion, I first explain why this appellate court must uphold the district court's judgments affirming the Administrator's rejection of BP's actions to force him to modify, or to revise his interpretation of, the district court's consent decree incorporating the parties' settlement agreement. Second, I explain how the majority misunderstands the record, sails past the only issue on

41

No. 13-30315 Cons. w/ 13-30329

appeal, and unnecessarily and prematurely remands the case to the district court. Finally, I respectfully disagree with Judge Clement's separate opinion, which expounds on class-action-law issues that are not presented to this panel but to a different three-judge panel scheduled to hear that appeal in November and which purports to instruct the district court to issue an injunction pursuant to her class-action-law declarations.

## I.

Having failed to convince the Administrator to modify the terms of the district court's consent decree, which approves and adopts the parties' settlement agreement, or to persuade the district court to reverse the Administrator's decision, BP appeals to this court. Because BP agreed to the settlement and, in fact, actively sought the district court's approval and adoption of it in its consent decree, BP cannot seek to modify the consent decree unless it demonstrates that there has been a significant change in circumstances or the law that warrants a revision of the decree by the district court. BP appears to acknowledge that it failed to carry this burden below, for it now argues that the parties' settlement agreement incorporated in the district court's consent decree has always required the Administrator to convert a claimant's cash-method data into BP's proposed accrual-method data before calculating a claimant's business economic loss. However, the Supreme Court, in *United States v. Armour & Co.*, 402 U.S. 673 (1971), and its progeny, has explained that a consent decree must be interpreted within its "four corners" and that an appellate court cannot add to or subtract from the consent decree or interpret it according to what the court thinks is the purpose of the agreement. This court, applying the four corners of

No. 13-30315 Cons. w/ 13-30329

*Armour*, must find that the decree does not contain the conversion and matching requirements that BP asks us read into it.

## A.

I start by reviewing background that highlights the true issue on these appeals. In this case, the settlement agreement and consent decree resolved all claims for business economic losses against BP resulting from the 2010 explosion and oil spill of the BP Deepwater Horizon rig. The settlement establishes formulas by which the Administrator is authorized to identify eligible claimants, calculate their business economic losses, and pay their claims. BP agreed to fund the settlement program without ceiling or limit (other than those limits inherent in the formulas for calculating loss) with respect to the amount that the Administrator may award to business-economic-loss claimants. Class counsel sought and obtained the district court's certification of a settlement-only class, and, in exchange, BP received a class- and region-wide release from liability for spill-related business-economic-loss claims.[1]

The Administrator began identifying, calculating, and paying business-economic-loss claims in May 2012 and continued to do so without any objection from the parties relating to his calculations or otherwise.[2] On September 28, 2012, BP requested a discussion regarding how the Administrator calculated

---

[1] The settlement also entitled BP to walk away from the parties' agreement prior to final approval if too many plaintiffs opted out. BP never availed itself of this right, instead actively seeking the district court's final approval.

[2] On May 2, 2012, the parties entered into a settlement agreement that was preliminarily approved by the district court. In its preliminary-approval order, the court ordered the Administrator to commence the settlement program under the terms of the settlement agreement. The substance, terms, and conditions of the May 2, 2012 preliminary settlement agreement are identical to those that the district court finally approved and made part of its consent decree on December 21, 2012.

No. 13-30315 Cons. w/ 13-30329

compensation with respect to business-economic-loss claimants that maintain their books using cash-basis accounting principles. On October 2, 2012, Charles R. Hacker, an accountant employed by the settlement program, participated in a conference call with the Administrator's staff and the parties to answer BP's questions. During the call, Mr. Hacker stated that "the Settlement Agreement does not specify a prescribed accounting methodology" and that "a claimant's accounting method needed to be applied on a consistent basis," in other words, that the Administrator and his team would consider revenue and expenses as they were booked by the claimant. R. 18336-37.[3] In other words, Mr. Hacker told the conference call participants that claims submitted with data from a claimant's books using cash-method accounting would be accepted by the settlement program so long as the claimant utilized that accounting practice consistently. *See* R. 18336-37. After the call, BP made no objection, did not file a complaint, or ask for an administrative panel hearing on the matters discussed.

On November 8, 2012, the district court conducted a hearing on final approval of the parties' class action and settlement agreement. By this time, the settlement program had received over 79,000 completed claims and authorized payment in excess of $1.3 billion. At the hearing, BP supported final approval

---

[3] The majority thus omits significant parts of Mr. Hacker's affidavit. A complete and accurate reading of his affidavit makes clear that the Administrator and his team were using the data provided by each claimant from its business records, regardless of whether it had been kept by cash-method or accrual-method accounting. Moreover, the fragment that the majority does quote demonstrates that the settlement program would "follow up with claimants to better understand significant outliers" and "analyze the accuracy, validity and authenticity of outlier items." R. 18336. It would have been unreasonable for BP to have taken from this any representation that "the accountants were making Exhibit 4C calculations in accordance with the interpretations [BP] advances here." *Ante*, at 23.

No. 13-30315 Cons. w/ 13-30329

of the settlement and, with class counsel, rebutted the objections of certain objectors. In fact, mere weeks after BP was told on the October 2, 2012 conference call that the Administrator and his accountants were accepting and processing claims based on claimants' cash-method accounting data, BP informed the court that, "[t]he settlement is working as we anticipated and as we negotiated." R. 8251. BP did not argue at the hearing, or in any filings submitted in connection with the hearing, that it had any objection or disagreement regarding the Administrator's use of claimants' cash-method accounting data to calculate the claimants' business economic losses. On December 21, 2012, the district court granted final approval of the settlement agreement and adopted it in its consent decree. In short, BP did not complain or object to the court in respect to the consent decree or ask for any provision that would allow it to change the decree after it became final.

It was not until December 5, 2012, almost a month after the final-approval hearing, that BP first expressed its concern to the Administrator that his use of claimants' cash-method data, particularly in connection with construction and professional-services firms' claims, might, according to BP, result in overcompensation of those claimants. *See* R. 18325. Several days later, on December 11, 2012, BP sent a follow-up email to the Administrator's special counsel, raising a number of questions and posing several hypotheticals involving claims by construction, professional-services, and agriculture-industry claimants. R. 18372-74. In particular, BP asked, "[i]f financial data submitted by a claimant does not accurately assign revenue to the months in which it was earned" (which, according to BP, occurs with cash basis accounting), "what steps do you take to obtain financial data that accurately reflects the earning of

45

No. 13-30315 Cons. w/ 13-30329

revenue by month?" R. 18372. Days later, on December 16, 2012, class counsel responded by asking the Administrator to issue a policy statement providing that, "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed." R. 18381.

BP's next move, on the 8th or 9th of January 2013, was to seek to have the Administrator modify the settlement's formula for compensating business economic loss or revise his interpretation of that formula.[4]  In a lengthy memorandum, BP expressed its opinion, based on its reading in isolation the terms "revenue," "earned," "corresponding," and "comparable," that the settlement requires the Administrator, before calculating business economic loss, to convert the books of *all* claimants using cash-basis accounting to accrual-basis accounting, displaying revenue in the months earned and matching it with the expenses that produced it, regardless of when the expenses may have been incurred.  BP, however, in an attachment to its memorandum labeled "Tab 1," proposed a compromise: "In a good faith effort to implement the [business-economic-loss] framework, BP proposes a simple[] and workable approach for each industry [construction, agriculture, and professional services] that is claimant-friendly and requires limited *additional* effort by the Settlement Program." R. 18399 (emphasis added).  BP then proceeded to set forth its proposed modifications to the business-economic-loss compensation formula for

---

[4] It is unclear from the record whether this response from BP was sent on January 8 or 9 of 2013. BP proposed these modifications as part of its response to the December 16, 2012 request for a policy statement, which, according to an email from the Administrator's special counsel establishing a briefing schedule, was due on January 8, 2012. *See* R. 18388. However, in a later piece of correspondence from BP, the company refers to its January 9, 2012 response. *See* R. 18402.

No. 13-30315 Cons. w/ 13-30329

claimants from the concerned industries. For construction claims, for instance, BP proposed the following:

> Alignment of revenue and corresponding variable expenses can be substantially improved in two steps:
>
> First, determine the ratio of claimant's annual revenue to annual variable expenses for 2010 and each of the Benchmark Period years.
>
> Second, match revenue to corresponding variable expenses by multiplying (i) variable expenses reported for a given month and (ii) the ratio of revenue to variable costs calculated on an annual basis.
>
> Last, adjustments should be made for irregular or extraordinary cost entries that can appear in monthly financial statements. . . .
>
> After undertaking these steps, the variable profit calculation in Step 1 of the [business-economic-loss] compensation formula and the revenue calculations of the causation formula can proceed as usual with the Settlement Program selecting the Compensation Period months and Benchmark Period year(s) that maximize the claimant's award.

R. 18399-400. Following this section, BP's Tab 1 sets forth similar detailed changes and additions with respect to farming firms' claims that it describes as a "proposed approach to improving the alignment of revenue to corresponding expenses for farm claims [that] generally tracks the two-step approach proposed . . . for construction firm claims." R. 18400. Finally, BP's Tab 1 outlines its proposals with respect to professional services firms, including a detailed "proposed approach to align revenue to corresponding expenses for professional services firms [that also] generally tracks the two-step approach proposed . . . for construction and farming claims." R. 18401.

No. 13-30315 Cons. w/ 13-30329

Having reviewed the parties' submissions, the Administrator, on January 15, 2013, issued a policy statement stating that, in performing the calculations under the business-economic-loss framework, he would typically consider both revenue and expenses in the periods in which the revenues and expenses were recorded at the time and would not typically reallocate such revenue or expenses to different periods, but he would reserve the right to adjust financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between the Benchmark and Compensation Periods, errors in previously recorded transactions, and flawed or inconsistent treatment of accounting estimates. R. 18327-28. Importantly, the Administrator's special counsel, in the cover letter transmitting the policy statement, made clear that the Administrator "d[id] not view it within his authority to carve out specific types of claims in the fashion" proposed by BP. R. 18326. BP appealed to the district court, complaining of the Administrator's refusal to either modify the settlement decree or revise his interpretation of the compensation formula so as to bring about the same result as a modification. The district court, however, upheld the decision of the Administrator, ruling that BP's proposed modification would both conflict with the terms of the parties' agreement and add substantive provisions thereto that had not been agreed to by the parties or approved of by the court during the final-approval hearing in which BP could have complained but did not. BP has now appealed to this court.

## B.

Because BP has not satisfied its heavy burden of showing that a change in circumstances or law warranted the modifications it sought, the district court correctly affirmed the Administrator's decision rejecting BP's argument and

48

No. 13-30315 Cons. w/ 13-30329

actions to modify the agreement to which the parties had agreed and which the district court had approved and adopted in its consent decree.

A party seeking to modify the substance of a district court's consent decree bears a heavy burden of establishing that revision of the decree is justified. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). In *Rufo*, the Supreme Court explained that,

> [a]lthough . . . a district court should exercise flexibility in considering requests for modification of a[] . . . consent decree, it does not follow that a modification will be warranted in all circumstances. Rule 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application," not when it is no longer convenient to live with the terms of a consent decree. Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.

*Id.*[5] Further, the Court said that, "[a] party seeking modification of a consent decree may meet its initial burden by showing either a *significant* change either in factual conditions or in law." *Id.* at 384 (emphasis added). "Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385 (citing *Twelve John Does v. District of Columbia*, 861 F.2d 295, 298-99 (D.C. Cir. 1988), and *Ruiz v. Lynaugh*, 811 F.2d 856, 862-63 (5th Cir. 1987)). But, "[i]f it is clear that a party anticipated changing conditions that would make

---

[5] *Rufo* articulated these principles in the context of institutional-reform consent decrees. *See id.* However, the same principles apply to all consent decrees. *See, e.g., Alexis Lichine & Cie v. Sacha A. Lichine Estate Selections, Ltd.*, 45 F.3d 582, 586 (1st Cir. 1995) ("While *Rufo* was a case involving institutional reform, we do not read it as being confined in principle to such cases.").

No. 13-30315 Cons. w/ 13-30329

performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Id.*

BP has failed to demonstrate that there has been a significant change either in circumstances or in the law since it entered into—and, in fact, affirmatively sought adoption of—the consent decree approving and incorporating the settlement agreement. As the record reflects, BP was fully aware that it would be required to pay claims by firms in the construction, agriculture, and professional-services industries that were supported by these businesses' cash-basis accounting data and yet, nevertheless, BP agreed to the settlement and actively sought the district court's approval of the eventual consent decree. Accordingly, it is this court's clear duty to affirm the district court's judgment rejecting BP's attempts to force the Administrator to modify the consent decree and the parties' settlement simply because it is no longer convenient for BP to live with the terms to which it agreed.

## C.

In its appeals to this court, BP conveniently forgets that it sought to have the Administrator modify the settlement agreement's formula for calculating business economic loss by adding the detailed provisions that it proposed in Tab 1, attached to its January 2013 memorandum. Now, BP argues, belied by its attempt to have the Administrator modify the settlement decree, that the parties intended all along to require the Administrator to convert each claimant's cash-basis data to accrual-basis data by restating revenue in the month in which it was earned and matching it to the expenses that generated it, regardless of

50

No. 13-30315 Cons. w/ 13-30329

when the expenses were incurred.  The words of the district court's consent decree, and the settlement agreement approved therein, however, do not support BP's proposed interpretation.

In reviewing a district court's consent decree, our primary rule of interpretation is the "four corners" doctrine, under which the decree is construed according to its terms, not on the basis of "what might satisfy the purpose of one of the parties to it." *See United States v. Armour & Co.*, 402 U.S. 673, 682 (1971).  In addition, certain "aids to construction" commonly employed in construing contracts may be referenced. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1972).  "Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." *Id.*  In so doing, we must not strain the decree's precise terms or impose other terms in an attempt to reconcile the decree with our own conception of its purpose. *See Armour*, 402 U.S. at 681-82.  A consent decree is the product of negotiation between the parties and embodies a compromise struck among various factors, including the parties' competing goals and the time, expense, and risk of litigation. *See id.* at 681.  In this way, "the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *Id.* at 681-82.[6]  By consenting to a decree, the parties have

---

[6] In this regard, the majority does what *Armour* directs us not to do, *viz.*, the majority defines the "purpose" of the settlement agreement from outside sources and then uses that "purpose" to interpret the consent decree.  Nothing within the four corners of the consent decree indicates that the overriding purpose of the agreement, as the majority assumes, was

No. 13-30315 Cons. w/ 13-30329

waived their rights under the Due Process Clause to litigate the issues raised by a complaint. *Id.* at 682. A court should not later modify the decree by interposing terms not agreed to by the parties or not included in the language of the decree. *See id.*; *see also United States v. Atl. Ref. Co.*, 360 U.S. 19, 23 (1959); *Hughes v. United States*, 342 U.S. 353, 357 (1952).

Exhibit 4C of the settlement and consent decree, which is the pertinent subject of these appeals, details the compensation framework for business economic loss.[7] By its terms, the framework "compares the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010." R. 4277. The framework includes two steps. Step one, which is at issue here, "[c]ompensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period" and "reflects the reduction in Variable Profit (which reflects the claimant's revenue less its variable costs) over this period." R. 4277. Step two, which is not at issue in these appeals, is intended to "[c]ompensate[] claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to sales from the Benchmark Period." R. 4277.

---

to perfectly match revenue to the expenses that generated it. *See Ante*, at 21.

[7] "The Settlement recognizes six categories of damage: (1) specified types of economic loss for businesses and individuals, (2) specified types of real property damage (coastal, wetlands, and real property sales damage), (3) Vessel of Opportunity Charter Payment, (4) Vessel Physical Damage, (5) Subsistence Damage, and (6) the Seafood Compensation Program." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 903 (E.D. La. 2012). Categories of damage other than business economic loss are not at issue in these appeals.

No. 13-30315 Cons. w/ 13-30329

With regard to step one, the Compensation Period is "selected by the claimant and may include three or more consecutive months between May and December 2010" (in other words, several months shortly after the oil spill began). R. 4277. The "Benchmark Period" is "the pre-[spill] period which claimant chooses as the baseline for measuring its historical financial performance"; for the Benchmark Period, "the claimant can select among the following . . . [p]eriods: 2009; the average of 2008–2009; or the average of 2007–2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes." R. 4277. Variable Profit is then defined as follows:

> **Variable Profit**: This is calculated for both the Benchmark Period and the Compensation Period as follows:
>
> 1.  Sum the monthly revenue over the period.
> 2.  Subtract the corresponding variable expenses from revenue over the same time period.

R. 4277. Having defined the relevant terms, the settlement finally prescribes "Step 1 Compensation" as follows: "Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period." R. 4277.

The majority states, and I agree, that the settlement permits a business-economic-loss claimant to select a comparison interval as short as three months (or as long as eight months). That is, claimants may choose income from any three consecutive months between May and December of 2010 to compare with income in a Benchmark Period of the same three to eight months in 2009, the average of 2008–2009, or the average of 2007–2009. This flexibility to choose a

53

No. 13-30315 Cons. w/ 13-30329

shorter comparison interval allows a claimant to take advantage of the natural variability in revenue over the course of a given year. Claimants may choose a three-month period in which their income was particularly bad in 2010, or particularly good in the Benchmark Period, and exclude from the calculation other months in which their 2010 income might have actually been quite good. The text of the settlement illustrates this feature (and others involving the settlement's causation framework) with three examples as follows:

Scenario 1:

1)    Claimant selected the months of May–July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008–2009 and 2007–2009;

2)    In determining Compensation, Claimant would be allowed to select the months of August through November 2010 as compared to the months of August through November in either 2009, 2008–2009 or 2007–2009 as the Benchmark years—whichever provides the highest compensation.

Scenario 2:

1)    Claimant selected the months of October–December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008–2009;

2)    In determining compensation, Claimant could select the months of May–September 2010 as compared to the months of May–September in either 2009 or 2008–2009—whichever provides the highest compensation.

Scenario 3:

No. 13-30315 Cons. w/ 13-30329

1)    Claimant selected the months of June–August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period year of 2009. In addition, Claimant selected the months of August–October 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2007–2009;

2)    In determining compensation, Claimant could select the months of May–December 2010 as compared to the months of May–December in either 2009 or 2007–2009—whichever provides the highest compensation.

R. 4283. Consequently, if this court were to interpret the settlement agreement to require the Administrator to convert each claimant's cash-method data into accrual-method data showing monthly revenue as earned matched with the expenses that generated it regardless of when the revenue and expenses were recorded on the claimant's books, we necessarily would be violating *Armour*'s four-corners rule: BP's proposed conversion and matching requirements, which would require the Administrator to restate the months in which claimants recorded their revenue and expenses, are not contained within the four corners of the decree and settlement. And, for the reasons already stated, we, in effect, would be modifying the terms of the consent decree without BP having satisfied its burden of showing a significant change in circumstances or law justifying that modification. Such a modification of the settlement decree would conflict with the clear examples in the settlement agreement and would require the Administrator go outside and perhaps far beyond the Compensation and Benchmark Periods selected by the claimant to trace the generative expenses to match with revenue earned in those periods. Further, even if such a

55

No. 13-30315 Cons. w/ 13-30329

reconstruction of the claimant's business history were possible, it would likely differ markedly from the cash-method claimant's records kept in 2009 and the first quarter of 2010 when the claimant had no inkling that an oil spill affecting his business would occur on April 20, 2010. The effect of our so interpreting the settlement agreement could be devastating to many claimants who are unable to translate or reconstruct their cash-basis data into revenue matched to the expenses that generated it under BP's proposed conversion and ultra matching requirements. Moreover, forced conversion of all cash-basis data into accrual-basis data would discriminate against the remaining cash-basis claimants by either thwarting their claims entirely or treating their claims less favorably than the cash-basis claims already resolved.

The plain wording of the settlement agreement read as a whole and with all of its supporting documents permits claimants to support their business-economic-loss claims using their own business records and does not require that these records be kept in any particular form. In fact, BP, jointly with class counsel, told the district court that "[t]he documents required to support Business Economic loss claims . . . are the documents that businesses either keep in the ordinary course or that may readily be prepared from a business's books and records." R. 8558 (jointly proposed findings of fact and conclusions of law filed in the district court by BP and class counsel in support of final approval); *see also In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010,* 910 F. Supp. 2d 891, 904 (E.D. La. 2012) (same) (final-approval order); CPA Societies' Amicus Br. at 1-14. This is the way the district court interpreted the settlement agreement and consent decree in its March 5, 2013 order upholding the Administrator's rejection of BP's attempt to modify the

56

No. 13-30315 Cons. w/ 13-30329

parties' agreement or change the Administrator's interpretation of it. R. 12550 ("[T]he documentation provisions contained within Exhibit 4A make it clear that the Program's analysis is to be based on revenue and expenses during the relevant periods chosen by the claimant, *as reflected in historical business records. . . .* Exhibit 4A does not require that accounting occur on an 'accrual' basis, as opposed to a 'cash' basis.") (emphasis added).   In other words, a claimant may support its claim with data recorded using cash-basis accounting if it has consistently used that method in the ordinary course of its business.[8] Further, the claimant may use records kept using accrual-basis accounting if that is what it has consistently applied in the ordinary course of its business. Likewise, the settlement does not instruct the Administrator to refrain from accepting and relying on claims supported by a claimant's own business records, whether cash basis or accrual basis, so long as the claimant's books have been consistently kept on the same method and in the ordinary course of business. Most important,  the settlement nowhere instructs the Administrator to restate or convert a claimant's claim submitted using cash-basis accounting data into accrual-basis accounting data, showing revenue only in the months in which it was earned, and matching the monthly earned revenue with the expenses that generated it, regardless of when the expenses were made or incurred.[9]  Simply

---

[8] For that matter, the federal government accepts, for tax purposes, submissions supported using a business's data recorded using cash-basis accounting so long as such accounting has consistently been used in the ordinary course of business. *See* 26 U.S.C. § 446(a) ("Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.").

[9] The April 18, 2012 version of the settlement contained a requirement that accounting professionals seeking reimbursement for their services certify that they submitted their reimbursement request "in compliance with generally accepted accounting principles" ("GAAP"), a requirement which was subsequently removed from the May, 2 2012 version that

No. 13-30315 Cons. w/ 13-30329

stated, none of the terms, conditions, and qualifications that BP proposes and argues for are stated or contained within the four corners of the consent decree and settlement agreement.

For these reasons, I respectfully conclude that the majority has unintentionally fallen into legal error by not recognizing that the four-corners rule of *Armour* and other teachings by the Supreme Court require that the district court's consent decree containing the settlement agreement be interpreted as written; that this appellate court may not add to or subtract from the district court's consent decree; that likewise we must not strain the decree's precise terms or impose other terms in an attempt to reconcile the decree with our own conception of its purpose; and that the district court's interpretation of its own consent decree was correct and should be affirmed. *See Armour*, 402 U.S. at 682; *see also United States v. Atl. Ref. Co.*, 360 U.S. 19, 23 (1959); *Hughes v. United States*, 342 U.S. 353, 357 (1952); *Walker v. U.S. Dep't of Hous. & Urban Dev.*, 912 F.2d 819, 825 (5th Cir. 1990) ("Nor are courts at liberty to redraft the obligations commanded by the decree absent consent of the parties.").

## II.

I respectfully disagree with the majority's reversal of the district court's decision and its remand of the case to the district court to determine whether the Administrator has been converting claims submitted with accrual-method accounting data into cash-method supported claims and processing them on that basis. The majority itself concedes that this scenario is "unlikely" and that BP

---

was approved by the district court. *Compare* R. 2445 (April 18, 2012 version), *with* R. 3955 (May 2, 2012 version). BP knew how to insist that claims abide by GAAP but failed to do so, suggesting that it understood that claims could be submitted based on documents prepared using cash-method accounting. *See* CPA Societies' Amicus Br. at 6.

No. 13-30315 Cons. w/ 13-30329

has not explicitly asserted this. *Ante*, at 15. That BP has not so argued in these appeals makes the majority's *sua sponte* raising of the issue highly irregular and contrary to our normal rule of addressing on appeal only the issues raised and argued by the appellant. Furthermore, careful inspection of the record in this case demonstrates that the majority's intuited scenario is not just unlikely; the record demonstrates that it is plainly not the case.

Neither BP nor class counsel has ever questioned whether the Administrator was properly applying Exhibit 4C's compensation requirements to use claimants' accrual-method accounting data to calculate and pay business-economic-loss claims. On December 5, 2012, BP expressed concern to the Administrator that he was overcompensating claimants by using their cash-method data in his calculations. On December 11, 2012, BP sent a follow-up email to the Administrator's special counsel asking, if financial data submitted by a claimant does not accurately assign revenue to the months in which it was earned, what steps would the Administrator take to obtain financial data that accurately reflect the earning of revenue by month. R. 18372. On December 16, 2012, class counsel responded by asking the Administrator to issue a policy statement providing that, "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed." R. 18381. On January 8 or 9, 2013, BP demanded that the Administrator revise his interpretation of the Exhibit 4C formula so as to require him to convert the books of *all* claimants using cash-basis accounting to accrual-basis accounting or to modify the formula to do so for construction, farming, and professional-services firms using cash-method accounting. The Administrator's refusal to do so and his January 15, 2013 policy

No. 13-30315 Cons. w/ 13-30329

statement, stating that he "will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time" and that he lacked authority to change the settlement agreement by carving out exceptions for certain categories of claimants, led directly to BP's appeal to the district court to reverse the Administrator's decision. Thus, nothing in the communications between the parties and the Administrator indicates that their dispute involved the conversion of accrual-based accounting data to cash-based accounting data. The district court affirmed the decision of the Administrator rejecting BP's demand that the Administrator either (a) interpret the settlement agreement to require the conversion of all claimants' cash-method accounting data to a particular kind of accrual-method data prior to calculating the claimants' business economic loss or (b) modify the settlement agreement in that way with respect to construction, farming, professional-services claims based on cash-method accounting data.

Consequently, the majority's notion that Administrator has ever converted any claimant's accrual-method accounting data to cash-method data has no support in the record or the briefs in this case. The majority's precipitous reversal of the district court's judgment and remand for unnecessary proceedings is erroneous and quite unfortunate for everyone concerned in this case.

## III.

### A.

I now turn to the discussion in the majority opinion of so-called "fictitious" claims (part II of the opinion), which is now supported by the vote of one judge. Like Judge Southwick, I do not join this section of the opinion and I respectfully dissent from it as well. These appeals arise from a dispute regarding BP's

No. 13-30315 Cons. w/ 13-30329

proposed modification or reinterpretation of the settlement agreement's text; a separate appeal addressing the district court's certification of this class action and acceptance of the settlement agreement has been docketed and calendared for oral argument on November 4, 2013 before a different panel of judges. *See In re Deepwater Horizon Appeals of the Economic and Property Damage Class Action Settlement*, No. 12-31155 (5th Cir. filed Nov. 19, 2012). The parties have not argued those certification and acceptance issues to this panel, and we may not properly decide them or pronounce upon them.

Judge Clement begins her discussion by expressing concern regarding whether the plaintiff class members have "colorable legal claims" which she defines as an "[ability] to plead" the elements of a claim. *See ante*, at 26; *see also ante*, at 29 (stating that a claim is "colorable" if the plaintiff "can *allege* standing and the elements necessary to state a claim on which relief can be granted"). I do not understand what that concern has to do with this case. Here, the district court held, in an opinion to which Judge Clement makes no reference, that "the class representatives—*like all class members*—allege economic and/or property damage stemming directly from the *Deepwater Horizon* spill." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d at 915 (emphasis added). And the district court went on to say that, under the class definitions, "persons with marginal or potentially worthless claims . . . [are] excluded." *Id.* at 917; *see also id.* at 917 (stating that the "class in this case consists exclusively of individuals and businesses that have already suffered economic loss"). Nobody has appealed from this finding that the class members here allege losses stemming directly from BP's conduct. Judge Clement's dicta are divorced from the facts and issues in this case.

No. 13-30315 Cons. w/ 13-30329

Turning, very briefly, to Judge Clement's legal pronouncements, I must say that I respectfully disagree with her statement that a court cannot allow a single person lacking a "colorable claim" against a class-action defendant to recover compensation in a class-action settlement because to do so would "ignore[] the standing requirement of Article III and create[] a substantive right where none existed before." *Ante,* at 27-28. This analysis confuses the relevant legal principles, is not supported by any law from our circuit or others, and would cause our circuit to split with at least three of our sister circuits if it were binding. First, although Judge Clement leans heavily on a dissenting opinion in the Third Circuit's *Sullivan* case, that dissent was joined by only a single other judge and its analysis was squarely rejected by the seven-judge majority. *See Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 305 (3d Cir. 2011) (en banc); *see also Rodriguez v. Nat'l City Bank,* No. 11-8079, 2013 WL 4046385, at *4 (3d Cir. Aug. 12, 2013) (Jordan, J.) ("*Sullivan* instructed that assessing whether individual class members have viable claims is inappropriate in the context of reviewing a proposed settlement class."). Second, although Judge Clement cites a decades-old Seventh Circuit decision, *see ante,* at 28, a more recent decision from that circuit rejects her analysis in no uncertain terms:

> [The class-action defendant] argues that before certifying a class the district judge was required to determine which class members had suffered damages. But putting the cart before the horse in that way would vitiate the economies of class action procedure; in effect the trial would precede the certification. It is true that injury is a prerequisite to standing. But as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied.

No. 13-30315 Cons. w/ 13-30329

*Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009). And third, the analysis also conflicts with the Second Circuit's. *See In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 243-44 (2d Cir. 2012).

And, for the reasons explained at length in *Sullivan*, requiring a district court to ensure that every class-action settlement beneficiary has a "colorable" cause of action against the defendant is unworkable in practice. Should the district court require that every settlement beneficiary file a separate complaint consisting of individual allegations and that BP file separate motions to dismiss each of the complaints? I do not think it wise to mandate such an unwieldy and expensive undertaking when the parties settled precisely to avoid that sort of costly litigation. *See* Fed. R. Civ. P. 1 (the civil procedure rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding"). Nor do I see how it is required by existing law.[10]

Lastly, Judge Clement's theory rests on a false premise: the idea that every individual who benefits from a class-action settlement must or is deemed to have an independent cause of action against the class-action defendant. I do not think that is the case. In a simple non-class-action lawsuit between a single

---

[10] I certainly do not see how it is required by the law of standing. It is hornbook law that, "[i]n class action cases, the standing inquiry focuses on the class representatives. The class representatives must have individual standing in order to sue. . . . [T]he representative need not prove that each member of the class has standing." WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 2:1 (5th ed.) (collecting cases in omitted footnotes); *see, e.g., Kohen*, 571 F.3d at 676 ("It is true that injury is a prerequisite to standing. But as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied."); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) ("We do not require that each member of a class submit evidence of personal standing.").

No. 13-30315 Cons. w/ 13-30329

plaintiff and a single defendant, I am not aware of any rule that would prohibit the litigants from reaching a settlement in which the defendant agrees to make payment not to the plaintiff he has allegedly wronged but rather to, say, a favored charity instead. Should that happen, neither the law nor common sense presumes that the charity has an independent cause of action against the defendant. *See, e.g., King v. Emp'rs Nat'l Ins. Co.*, 928 F.2d 1438, 1442 (5th Cir. 1991) (discussing third-party beneficiaries to settlement agreements). This basic principle seems no less applicable in the class-action context and to apply with no less force whether the settlement benefits a charity, one or more specifically enumerated individuals or entities, or a class of individuals or entities as defined by whatever characteristics the negotiating parties choose. *See id.* at 1442 ("In fact, there is no requirement that the third-party beneficiary even be specifically named in the contract."); *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) ("The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefitted thereby."). In short, whether a settlement agreement arises in the class-action context or not, there seems to me no requirement that every beneficiary of the agreement have a "colorable" cause of action against the defendant.[11]

A fundamental flaw in Judge Clement's analysis is that it conflates and fails to distinguish between, on the one hand, the legal requirements for *certifying a class*, *see ante*, at 27-28 (arguing that courts act unlawfully "[b]y including claimants in the class definition that lack colorable claims"), and, on

---

[11] This is not to say that the parties here intended to benefit third parties lacking viable causes of action; rather, the point is that there is no legal reason to inquire into whether the settlement benefits persons lacking viable causes of action.

64

No. 13-30315 Cons. w/ 13-30329

the other hand, those for *approving and enforcing a settlement agreement* in the class-action context, *see ante,* at 31 (arguing that a class-action settlement "is unlawful" and cannot be approved if it grants compensation to businesses "that had not sustained losses"), assuming without explication that the former are coterminous with the latter.  However, the distinction should not be elided: whether or not it is true that Rule 23 or another provision of law is violated by maintaining a class action including class members lacking "colorable" claims—one legal issue—it does not follow either way that the court's approval or enforcement of a settlement that benefits persons without "colorable" claims violates any law—a distinct legal issue. *See, e.g., Denney v. Deutsche Bank AG,* 443 F.3d 253, 268-76 (2d Cir. 2006) (addressing separately the class certification and settlement approval issues); *cf. Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 824 (7th Cir. 2012) ("[The class-action defendant] argu[es] that the class for which certification is requested is fatally overbroad because it contains members who could not have been harmed by any post-merger price increases . . . . This [issue] is critical *for class certification purposes*.") (emphasis added). Without embracing either of Judge Clement's propositions, because neither are presented to this panel for decision, any discussion of them will not be furthered by conflating one for the other as she does here.

## B.

BP twice sought a preliminary injunction from the district court and was twice denied.  Thereafter, BP sought both a stay pending appeal and a preliminary injunction from this court, which were also denied. I see no reason to reverse any of these decisions. The majority opinion, however, purports to reverse the district court's denial of a preliminary injunction and appears to

65

No. 13-30315 Cons. w/ 13-30329

"instruct the district court to expeditiously craft a narrowly-tailored injunction" that allows the claims of "those who experienced actual injury traceable to loss from the Deepwater Horizon accident" to proceed while staying the claims of "those who did not." *Ante*, at 35-36. Because the majority opinion's instruction to the district court regarding the injunction appears to be based on Judge Clement's separate opinion concerning class-action law, that instruction does not appear to be based on a majority vote of this panel. Moreover, for the same reasons I discussed in the foregoing sections of this opinion, this appellate court may not modify the terms and conditions of the district court's consent decree or order the district court to do so; and this court cannot use material outside of the four corners of the consent decree to reinterpret that decree. Consequently, it would be clear legal error for this court to assume that it has jurisdiction and authority to impose on the Administrator the requirement that, in addition to identifying a claimant as eligible and entitled to compensation for business economic loss under the consent decree encompassing the parties' settlement agreement, he must also find independently that the claimant is not one of "those who [did not] experience[] actual injury traceable to loss from the Deepwater Horizon accident" before paying the claim. Such an injunction would be broader than the alleged purpose of the remand and tantamount to modifying the consent decree for the benefit of one of the parties, BP, without that party carrying its burden to show a change in circumstances or law that warrants changing the decree; or else to interpreting the consent decree based on material or purposes not stated within the four corners of the consent decree.

No. 13-30315 Cons. w/ 13-30329

## CONCLUSION

For these reasons, I concur in the majority's affirmance of the district court's dismissal of BP's suit against the Administrator for failure to state a claim under Rule 12(b)(6) but I respectfully dissent from the majority opinion in all other respects.

A true copy
Attest:

Clerk, U. S. Court of Appeals, Fifth Circuit

By _____

Deputy

New Orleans, Louisiana