# United States' Phase Two Offer of Proof

# Exhibit 2

# Deposition of Charles Bondurant

01-37872
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### *WorldwideVIEW*™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Charles Hamilton Bondurant
**VOLUME 1**

AUGUST 23, 2011

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

1                UNITED STATES DISTRICT COURT

                 EASTERN DISTRICT OF LOUISIANA

2

3    IN RE:  OIL SPILL        )   MDL NO. 2179

     BY THE OIL RIG           )

4    "DEEPWATER HORIZON" IN )   SECTION "J"

     THE GULF OF MEXICO, ON )

5    APRIL 20, 2010           )   JUDGE BARBIER

                              )   MAG. JUDGE SHUSHAN

6

7

8

9

10

11

12

13

14

15

16

17              * * * * * * * * * * * * * * * *

                        VOLUME 1

18              * * * * * * * * * * * * * * * *

19

20

            Deposition of Charles Hamilton Bondurant,

21   taken at Pan-American Building, 601 Poydras

     Street, 11th Floor, New Orleans, Louisiana,

22   70130, on the 23rd day of August, 2011.

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1              A P P E A R A N C E S
2
3
4    APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
          Ms. Robin L. Greenwald
5         Ms. Erika Heyder
          WEITZ & LUXENBERG
6         700 Broadway
          New York, New York, 10003
7
8    APPEARING FOR BP, INC.:
          Mr. Christopher W. Keegan
9         KIRKLAND & ELLIS
          555 California Street
10        San Francisco, California   94104
11        Ms. Whitney Becker
          KIRKLAND & ELLIS
12        300 North LaSalle
          Chicago, Illinois   60654
13
14   APPEARING FOR TRANSOCEAN:
          Mr. Paul C. Thibodeaux
15        Ms. Mary K. Klinefelter
          FRILOT
16        1100 Poydras Street, Suite 3600
          New Orleans, Louisiana   70163
17
18   APPEARING FOR ANADARKO PETROLEUM COMPANY:
          Ms. Diane C. Hertz
19        BINGHAM MCCUTCHEN
          399 Park Avenue
20        New York, New York 10022-4689
21
     APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
22        Mr. Alex Roberts
          BECK, REDDEN & SECREST
23        One Houston Center
          1221 McKinney    Street, Suite 4500
24        Houston, Texas   77010-2010
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   APPEARING FOR WEATHERFORD:
          Mr. Wayne G. Zeringue, Jr.
 2        Mr. Matthew S. Lejeune
          JONES, WALKER, WAECHTER, POITEVENT,
 3        CARRERE & DENEGRE, LLP
          201 St. Charles Avenue
 4        New Orleans, Louisiana  70170-5100
 5
     APPEARING FOR DRIL-QUIP, INC.:
 6        Ms. Margaret Bryant
          WARE, JACKSON, LEE & CHAMBERS
 7        America Tower, 42nd Floor
          2929 Allen Parkway
 8        Houston, Texas  77019-7101
 9
     APPEARING FOR M-I SWACO:
10        Mr. Steven A. Luxton
          MORGAN, LEWIS & BOCKIUS, LLP
11        1111 Pennsylvania Avenue, NW
          Washington, D.C.  20004
12
13   APPEARING FOR HALLIBURTON:
          Mr. Gavin Hill
14        Mr. James E. Johanns
          GODWIN RONQUILLO
15        1201 Elm Street, Suite 1700
          Dallas, Texas 75270-2041
16
17   APPEARING AS OBSERVER FOR THE
     U.S. DEPARTMENT OF THE INTERIOR:
18        Ms. Sarah Doverspike
          U.S. DEPARTMENT OF THE INTERIOR
19        OFFICE OF THE SOLICITOR
          1849 C Street, N.W.
20        Room 6453
          Washington, D.C.  20240
21
22   APPEARING FOR THE UNITED STATES:
          Mr. Scott Cernich
23        U.S. DEPARTMENT OF JUSTICE
          601 D Street, N.W.
24        Washington, D. C.  20004
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        Ms. Abigail E. André
          U.S. DEPARTMENT OF JUSTICE
 2        ENVIRONMENTAL & NATURAL
          RESOURCES DIVISION
 3        Post Office Box 7611
          Ben Franklin Station
 4        Washington, D.C.  20044-7611
 5
     APPEARING FOR THE STATE OF LOUISIANA:
 6        Mr. Lambert J. "Joe" Hassinger, Jr.
          GALLOWAY, JOHNSON, TOMPKINS, BURR
 7        AND SMITH
          701 Poydras Street, 40th Floor
 8        New Orleans, Louisiana  70139
 9
     APPEARING FOR THE WITNESS, CHARLES HAMILTON
10   BONDURANT:
          Mr. Michael D. Monico
11        Mr. Theodore R. Eppel
          MONICO & SPEVACK
12        20 South Clark Street, Suite 700
          Chicago, Illinois  60603
13
14   ALSO PRESENT:
          Mr. Peter Jennings, Logistics Supervisor
15
16
17
18
19
20
21
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                          INDEX
 2            VIDEOTAPED ORAL DEPOSITION OF
                CHARLES HAMILTON BONDURANT
 3                   AUGUST 23, 2011
                       VOLUME 1
 4

 5

 6   Appearances.................................. 2
 7

     Direct Examination-Ms. Greenwald............. 12
 8   Examination-Mr. Cernich...................... 129
     Examination-Mr. Thibodeaux................... 208
 9   Examination-Mr. Hill......................... 232
     Examination-Ms. Hertz........................ 272
10   Redirect Examination-Ms. Greenwald........... 298
11

     Changes and Signature........................ 313
12   Reporter's Certificate....................... 315
13

14

15                     EXHIBIT INDEX
16

     Ex. No.   Description                    Marked
17

18   4588     April 20, 2010 E-mail from Charles
              Bondurant to David Rainey, Jay
19            Thorseth and others, Subject:
              Macondo update, marked as
20            Confidential; Bates No.
              BP-HZN-2179MDL00003765 - 03772       59
21

     4589     Annual Individual Performance
22            Assessment, marked as Confidential;
              Bates No. BP-HZN-2179MDL02038804 -
23            38809                                66
24

25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

| | | | |
|---|---|---|---|
| 1 | 4590 | Annual Individual Performance Assessment, marked as Confidential; | |
| 2 | | Bates No. BP-HZN-2179MDL02433569 – 33574 | 67 |
| 3 | | | |
| 4 | 4591 | August 24, 2009 E-mail string from Michael Wojcik to Stuart Gibb and others, from Charles Bondurant to | |
| 5 | | Michael Wojcik, from Michael Wojcik to Charles Bondurant, from Charles | |
| 6 | | Bondurant to Michael Wojcik, Subject: A SAD DAY FOR TENNIS... | |
| 7 | | marked as Confidential; Bates No. BP-HZN-2179MDL02466311 – 66312 | 71 |
| 8 | | | |
| 9 | 4592 | March 24, 2010 E-mail string from Gord Bennett to Martin Albertin, Serkan Arca and others, from Charles | |
| 10 | | Bondurant to Jonathan Bellow, Robert Bodek and others, from Robert Bodek | |
| 11 | | to Charles Bondurant, from Charles Bondurant to Robert Bodek, from | |
| 12 | | Robert Bodek to Charles Bondurant, Subject: Macondo Update 1 pm, marked | |
| 13 | | as Confidential; Bates No. BP-HZN-2179MDL00893604 – 93606 | 80 |
| 14 | | | |
| 15 | 4593 | Oct 22 and 23, 2009 E-mail string from Charles Bondurant to Pierre-Andre Depret, Gene Walton and others, from | |
| 16 | | Pierre-Andre Depret to Charles Bondurant, Gene Walton and others, | |
| 17 | | from Jasper Peijs to Pierre-Andre Depret, Charles Bondurant and others, | |
| 18 | | from Charles Bondurant to Jasper Peijs, Subject: 4 bottles, with | |
| 19 | | Attachments, marked as Confidential; Bates No. BP-HZN-2179MDL02732472 – | |
| 20 | | 32473 | 81 |
| 21 | 4594 | March 18, 2010 E-mails from Charles Bondurant to Jay Thorseth, from Jay | |
| 22 | | Thorseth to Charles Bondurant, Subject: Macondo Costs, with | |
| 23 | | Attachments, marked as Confidential; Bates No. BP-HZN-2179MDL00002084 | 97 |
| 24 | | | |
| 25 | | | |

**PURSUANT TO CONFIDENTIALITY ORDER**

| | | | |
|---|---|---|---|
| 1 | 4595 | Nov 23 and 24, 2009 E-mail string from Charles Bondurant to David Rainey, Jay Thorseth and others, from Charles Bondurant to Frederic Billette, Todd Boesiger and others, from Keith Everill to Charles Bondurant, from Charles Bondurant to Keith Everill, Subject: Macondo-Daily Update, marked as Confidential; Bates No. BP-HZN-2179MDL01969523 - 69533 | 100 |
| 7 | 4596 | April 14, 2010 E-mail string from Kelly McAughan to Robert Bodek and others, from Robert Bodek to Kelly McAughan and others, from Kelly McAughan to Robert Bodek and others, from Charles Bondurant to Kelly McAughan and others, from Robert Bodek to Charles Bondurant and others, from Kelly McAughan to Robert Bodek and others, Subject: Rotary Sidewall, marked as Confidential; Bates No. BP-HZN-2179MDL00891511 - 91512 | 105 |
| 14 | 4597 | March 7, 2010 E-mail from Charles Bondurant to 'IADirectSupport@ Halliburton.com', Subject: Macondo well, marked as Confidential; Bates No. BP-HZN-2179MDL02543376 | 109 |
| 17 | 4598 | March 31, 2010 E-mail from Charles Bondurant to Bill Hart and others, Subject: Landmark UNIX PC issues with Attachments, marked as Confidential; Bates No. BP-HZN-2179MDL00889046 | 111 |
| 20 | 4599 | April 1, 2010 E-mail from Charles Bondurant to Bryan Ritchie, Subject: Network Issues with Attachments, marked as Confidential; Bates No. BP-HZN-2179MDL00004037 - 04038 | 114 |
| 24 | | (Exhibit Nos. 4600 through 4689 intentionally skipped.) | |

**PURSUANT TO CONFIDENTIALITY ORDER**

| | | | |
|---|---|---|---|
| 1 | 4690 | March 6 and 7, 2010 E-mail string from Mark Hafle to Charles Bondurant and Bryan Ritchie, from Charles Bondurant to Mark Hafle, from Charles Bondurant to Mark Hafle, Subject: Macondo objectives, marked as Confidential; Bates No. BP-HZN-2179MDL00009494 | 120 |
| 2 | 4691 | April 15, 2010 E-mail string from Robert Bodek to Paul Chandler and others, from Charles Bondurant to Robert Bodek, Subject: Evaluation complete at Macondo, marked as Confidential; Bates No. BP-HZN-2179MDL00033128 | 123 |
| 3 | 4692 | April 6, 2010 E-mail from Christopher Casler to Robert Bodek and others, Subject: Prospect to discovery! Marked as Confidential; Bates No. BP-HZN-2179MDL01944331 | 123 |
| 4 | 4693 | Feb 16, 2010 E-mail string from Robert Bodek to Graham Vinson, from Robert Bodek to Graham Vinson, from Charles Bondurant to Robert Bodek and Graham Vinson, marked as Confidential; Bates No. BP-HZN-2179MDL00894687 | 125 |
| 5 | 4694 | March 23, 2010 E-mail string from Kate Paine to Gord Bennett and others, from Binh Van Nguyen to Kate Paine and others, from Charles Bondurant to Binh Van Nguyen, Subject: Seismic tie, marked as Confidential; Bates No. BP-HZN-2179MDL01953598 | 126 |
| 6 | 4695 | BP Macondo MC 252 #1 Pre-Drill Data Package, Issue Date: Sept 3, 2009, marked as Confidential; Bates No. BP-HZN-2179MDL00554375 - 54414 | 143 |

**PURSUANT TO CONFIDENTIALITY ORDER**

| 1 | 4696 | July 8 and 9, 2010 E-mail string |
| 2 | | from Charles Bondurant to Bryan Ritchie, from Charles Bondurant to |
| 3 | | Binh Van Nguyen and Frederic Billette, from Frederic Billette to |
| 4 | | Charles Bondurant, from Charles Bondurant to Frederic Billette, from |
| 5 | | Charles Bondurant to Frederic Billette, Subject: 100708_Macondo_4D_survey.ppt, |
| 6 | | marked as Confidential; Bates No. BP-HZN-2179MDL03291479 - 91480        164 |
| 7 | 4697 | May 26, 2010 E-mail from Bryan |
| 8 | | Ritchie to Kate Baker and others, Subject: DRAFT: MC252 Subsurface |
| 9 | | Technical Memo v1 with Attachments, marked as Confidential; Bates No. |
| 10 | | BP-HZN-2179MDL00335101 - 35139        165 |
| | 4698 | Series of E-mails, beginning May 28, |
| 11 | | 2010, from Cindy Yeilding to John Barton, others, Subject: INFO: MC 252 |
| 12 | | Subsurface support, ending with June 2, 2010 E-mail from Cindy |
| 13 | | Yeilding to David Rainey, others, Subject: INFO: Objectives and |
| 14 | | Delivery, MC 252 (Macondo), May 27th June 1st, 2010 with |
| 15 | | Attachments, marked as Confidential; Bates No. BP-HZN-2179MDL00660346 - |
| 16 | | 60359, 60365 - 60369        185 |
| 17 | 4699 | April 12, 13, 15, 16, 2010 E-mail |
| 18 | | string among Brian Morel, Sarah Dobbs, Francisco Pineda, Timothy |
| 19 | | Hopper, Charles Bondurant, others to Brian Morel, Subject Pip Tags, |
| 20 | | marked as Confidential; Bates No. BP-HZN-2179MDL00312717 - |
| 21 | | 12719        191 |
| 22 | | (Exhibit Nos. 4700 through 4772 intentionally skipped.) |
| 23 | 4773 | Check Shot Report, marked as |
| 24 | | Confidential; Bates No. BP-HZN-2179MDL03290169 - 90177        197 |
| 25 | | |

**PURSUANT TO CONFIDENTIALITY ORDER**

| | | | |
|---|---|---|---|
| 1 | 4774 | May 19, 2010 E-mail from Robert Merrill to Kate Baker and others, Subject: SIWHP-Draft with Attachments, marked as Confidential; Bates No. BP-HZN-2179MDL03289986 - 89992 | 199 |
| 4 | 4775 | BP Technical Assurance Memorandum, marked as Confidential; 17 pages | 202 |
| 6 | 4776 | BP Macondo MC 252 #1 Daily Geological Report, marked as Confidential; Bates No. BP-HZN-2179MDL00059483 - 59484, 59370 - 59371, 58504 - 58506, 58634 - 58636, 58326 - 58328, 58467 - 58468, 58918 - 58919, 58733 - 58734, 58539 - 58540, 59852 - 59853, 58665 - 58666, 58954 - 58955, 58450 - 58451, 58345 - 58346, 59185 - 59186 | 208 |
| 12 | 4777 | Various graphs, tables and charts, marked as Confidential; Bates No. BP-HZN-2179MDL03289733 - 89752 | 227 |
| 14 | 4778 | March 26, 2010 E-mail from Charles Bondurant to Brad Simpson and others, Subject: Macondo Reservoir Section, marked as Confidential; Bates No. BP-HZN-2179MDL00004548 | 229 |
| 17 | 4779 | March 18, 2010 E-mail string from Charles Bondurant to Jay Thorseth, from Jay Thorseth to Charles Bondurant, from Charles Bondurant to Jay Thorseth, Subject: Macondo Costs with Attachments, marked as Confidential; Bates No. BP-HZN-2179MDL00040649 - 40650 | 233 |
| 21 | 4780 | Table, marked as Confidential; one page, Bates No. BP-HZN-BLY00192196 | 271 |
| 22 | 4781 | BP Deepwater Horizon Accident Investigation Report dated Sept 8, 2010; two pages | 284 |

**PURSUANT TO CONFIDENTIALITY ORDER**

| | | | |
|---|---|---|---|
| 1 | 4782 | Jan 29, 2010 E-mail from Brian Morel to John Guide and others, Subject: Final Signed Macondo Drilling Program with Attachments, marked as Confidential; Bates No. BP-HZN-MBI 00100329 - 00437 | 288 |
| 4783 | | Macondo MC 252 #1 Drilling Basis of Design, June 2009, marked as Confidential; Bates No. BP-HZN-BLY00129389 - 29406 | 288 |
| 4784 | | Various tables and graphs, marked as Confidential; Bates No. BP-HZN-2179MDL00501763 - 01774 | 293 |
| 4785 | | Annual Individual Performance Assessment, marked as Confidential; Bates No. BP-HZN-2179MDL01777053 - 77059 | 295 |
| 4786 | | April 16, 2010 E-mail from Bryan Ritchie to Charles Bondurant, Subject: 2010 Objectives v2 with Attachments, marked as Confidential; Bates No. BP-HZN-2179MDL01915040 - 15042 | 303 |
| 4787 | | May 20 and 24, 2010 E-mail string From Cindy Yeilding to Jay Thorseth, others, from Cindy Yeilding to Lisa Antrim, from Lisa Antrim to Charles Bondurant and others, Subject: INFO: GoMX Priorities with Attachments, marked as Confidential; Bates No. BP-HZN-2179MDL01982479 - 82482 | 310 |

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. MONICO:  All right.  Everybody

2    ready?

3          THE VIDEOGRAPHER:  All set?  One

4    second.

5          Today is August 23rd, 2011.  This is the

6    deposition of Charles Bondurant, in re the

7    accident of the DEEPWATER HORIZON on April 20th,

8    2010.

9          The time is 8:32 a.m.  We're on the

10   record.

11          CHARLES HAMILTON BONDURANT

12   was called as a witness by the Plaintiffs and,

13   being first duly sworn, testified as follows:

14          DIRECT EXAMINATION

15   QUESTIONS BY MS. GREENWALD:

16    Q.  Good morning, Mr. Bondurant.  My name is

17   Robin Greenwald, and I represent the Plaintiffs

18   in the litigation here, and I'm with the

19   Plaintiffs Steering Committee.  And I wanted to

20   ask you some preliminary questions first before

21   we get into the details of the substance of your

22   testimony, okay?

23    A.  Okay.  Yeah.  Good morning.

24    Q.  Good morning.  Have you had your

25   deposition taken before?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.  No.  This is -- no.

2    Q.  Okay.  So then what I'm going to do is

3  I'm going to give you some preliminary sort of

4  rules of the trade, and I'm sure you've heard

5  some of these before, but I want to make sure on

6  the record that you understand them.

7        And anything I mention about the

8  procedures for the deposition, that you don't

9  understand, please ask me to repeat them so that

10  we understand sort of what the rules of the game

11  is, okay?

12    A.  Okay.

13    Q.  Terrific.  You understand that you were

14  just given an oath to tell the truth?

15    A.  Yes.

16    Q.  And do you understand that that oath

17  requires that you have to tell the truth to all

18  the questions that I ask you today?

19    A.  Yes.

20    Q.  Okay.  And during the course of today,

21  I'm going to ask you a number of questions.  I'm

22  not a Geologist.  I've never worked on an oil rig

23  before.  So I may very well ask questions that

24  you don't understand, or I may even phrase them

25  improperly.  Excuse me.  So if at any time I ask

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    you a question that you don't understand, please

 2    ask me to repeat it, because I don't want to have

 3    you answering a question that you don't

 4    understand, okay?

 5        A.   Okay.

 6        Q.   Terrific.   You also need to answer your

 7    questions audibly with a "Yes" or a "No."

 8    It's going to -- we're going to end up getting

 9    into a dialogue, and in regular life we'll nod

10    our heads.   We'll go like this (indicating).   But

11    the court reporter can't take that down.   So

12    "Yes" or "No" ques -- answers need to be audibly

13    stated as "Yes" or "No."   Okay?

14        A.   That's -- that's fine, yes.

15        Q.   Terrific.   And by the way, we'll forget

16    during the course of time.   So --

17        A.   Right.

18        Q.   -- I'll remind you.   I'm not trying to be

19    rude.   I just want --

20        A.   Sure.   No.   Thank you, thank you.

21        Q.   The other thing I want to mention is

22    that, again, with dialogue, sometimes people will

23    start talking before the other one realizes that

24    the other person hasn't finished a question or an

25    answer.   So if I do that, I apologize.   I don't

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    ever mean to cut you off.  Just say to me, "I'm
 2    sorry.  I haven't finished my question," and I'll
 3    stop and let you finish your question.
 4         Similarly, try to make sure that you let
 5    me answer my -- ask my question fully before
 6    you --
 7    A.  M-h'm.
 8    Q.  -- start answering, because the court
 9    reporter can't take down two of us at the same
10    time, okay?
11    A.  Okay.
12    Q.  Terrific.  So did you -- how long have
13    you taken -- spent preparing for your deposition
14    today?
15    A.  Been with my Counsel for approximately
16    three days.
17    Q.  Okay.  In -- here in New Orleans?
18    A.  One day in New Orleans.
19    Q.  Okay.  And during the course of that
20    preparation, did you review any testimony of any
21    other witness in this case?
22    A.  No.
23    Q.  Did you review any testimony from the
24    Coast Guard Hearings?
25    A.  No.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Okay.  Did you review documents in the

2  course of preparing for your deposition today?

3    A.   Yes.

4    Q.   And did any of those documents refresh

5  your recollection on events or details of the

6  events about which you're going to testify today?

7          MR. KEEGAN:   Objection to form.

8    A.   Yes.

9    Q.  (By Ms. Greenwald) Okay.  What type of

10  documents did you review in preparation for today

11  that you -- that helped you refresh your

12  recollection of the details of the testimony that

13  you will be asked about today?

14    A.   Sure --

15          MR. KEEGAN:   Objection to form.

16          MR. MONICO:   Objection to form.

17    A.   So being part of the Geologic Team

18  that -- or Subsurface Team that brought the

19  Macondo Prospect to -- to technical limit, I -- I

20  reviewed the documents that our Subsurface Team

21  prepared, to become more fa -- in order to

22  refresh my memory of the Macondo Prospect.  We

23  also looked at some E-mails.

24    Q.  (By Ms. Greenwald) Okay.  And before you

25  looked at those E-mails, did you remember the

**PURSUANT TO CONFIDENTIALITY ORDER**

1    substance of the contents of the E-mails that you

2    reviewed?

3              MR. KEEGAN:  Objection to form.

4        A.  Not all of them, no.

5        Q.  (By Ms. Greenwald) Okay.  So as you sit

6    here now, what documents do you recall that you

7    reviewed with Counsel that helped you refresh

8    your recollection on the details?  Can you

9    identify any specific documents?

10             MR. MONICO:  Objection to form.

11             MR. KEEGAN:  Objection to form.

12       A.  No specific documents.  There's --

13       Q.  (By Ms. Greenwald) M-h'm.

14       A.  -- really -- the documents I reviewed

15   were to refresh my memory of the subsurface input

16   that I put into getting the Prospect drill ready.

17       Q.  (By Ms. Greenwald) Okay.  How long have

18   you worked for BP?

19       A.  I've worked as an employee for BP since

20   2004.

21       Q.  I take it you worked for them before, not

22   as an employee?

23       A.  I -- I did contract with BP, yes.

24       Q.  And when did you do that?

25       A.  I st -- started in 2000.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   Who were you working for when you

2  contracted for BP?

3      A.   It was a company called Triton Data

4  Services.

5      Q.   And what do they do?

6      A.   Primary role is to manage seismic and

7  interpretation data and interpretative packages.

8      Q.   Now, when you worked for Triton -- you

9  worked for, what, four years for Triton?

10     A.   Yes.

11     Q.   And were you assigned out to BP the

12 entire four years that you worked at Triton?

13     A.   For the first roughly six months, I

14 worked in the Triton office, and after that, I

15 was moved over to BP, and I worked in the H&B

16 Building.

17     Q.   "H&B," what does that stand for?

18     A.   It was just one of our buildings on

19 the ca -- that we used to own on the campus.  It

20 was the old Vastar building.

21     Q.   What does "H&B" stand for?

22     A.   I -- I don't know.

23     Q.   Oh, okay.  And what Division or Group of

24 BP did you work with when you were with Triton?

25     A.   At that time I was part of the Data

1    Management Team.

2        Q.   Did you work on any particular well?

3        A.   No.

4        Q.   What did you do as part of the Data

5    Management Team?

6        A.   So during that time, I -- two primary

7    roles.  One, we converted data from a certain

8    package that Vastar used, which I believe was

9    Charisma and IESX, and brought it to Landmark.

10   So I was part of the data conversions.  My main

11   role during that time was to load seismic data.

12       Q.   Okay.  And so you changed the system.

13   You -- you -- you converted the system from

14   Charisma to Lincoln?

15       A.   To Landmark.

16       Q.   -- Land -- is that what BP uses today?

17       A.   Yes.

18       Q.   What's the difference between those two

19   systems, for purposes of the operations of BP, to

20   the extent you know?

21       A.   They're both systems that Scientists can

22   interpret seismic data in and store well

23   information.  As for the differences between the

24   two, I -- it's the programming style.  I --

25       Q.   M-h'm.  Do you know why BP made that

1    change?

2              MR. MONICO:   Objection to form.

3        A.  I -- I do not.

4        Q.  (By Ms. Greenwald)  And is that -- how

5    long did that conversion take?

6        A.  I don't recall the amount of time.

7        Q.  What else did you work -- what else did

8    you do for BP during the time you were with

9    Triton, besides this conversion from Charisma to

10   Landmark?

11       A.  So after the conversion process was over,

12   I -- I worked as a seismic data loader, and I

13   also assisted the Gulf of Mexico Exploration

14   Geoscientists and managing the horizon data,

15   renaming horizons, and occasionally I would

16   provide a little application support on stuff

17   that I knew about.

18       Q.  Okay.  When you say "managing horizon

19   data," what type of data are you referring to?

20       A.  So in the interpretation packages, you

21   have seismic data which you can -- Geoscientists

22   can interpret on, and they're essentially

23   creating a structure hi -- horizon based on the

24   seismic data.  And that is what I refer to as a

25   horizon.

1    Q.   Okay.  Not to be confused with the

2  DEEPWATER HORIZON, correct?  They're --

3    A.   Not --

4    Q.   -- totally separate terms?

5    A.   Totally separate, yes.

6    Q.   And is that what you did for the

7  remaining three years, managing the horizon data?

8    A.   Yes.

9    Q.   Okay.  What's your educational

10  background?

11    A.   So I went to school at Stephen F. Austin

12  State University.  I graduated with a Bachelor of

13  Science in Geology in 2000 -- I'm sorry, 1997.

14        I then continued my education at Stephen

15  F. Austin and graduated in 2000 with a Master's.

16    Q.   Okay.  And your Master's is in what?

17    A.   In Geology.

18    Q.   And your BS is a specialty in Geology,

19  also?

20    A.   Just Geology, yeah.

21    Q.   Just Geology.  For both BS and your --

22  and your Master's?

23    A.   Yes.

24    Q.   So what -- what were the circumstances

25  under which you left Triton and joined BP as an

1  employee in 2004?

2      A.  In 2004 I -- I had worked with the Gulf

3  of Mexico Exploration Business Unit for some time

4  and decided I wanted to pursue a career as a

5  Technologist with BP.

6      Q.  Now, you said you had worked for the Gulf

7  of Mexico Data Team for several years.  When you

8  first worked as a seismic data loader, managing

9  the horizon data, was that specific to the Gulf

10  of Mexico or was that BP-wide?  I mean,

11  worldwide?

12      A.  I'm --

13          MR. KEEGAN:  Objection to form.

14      A.  It was -- I'm glad you asked that

15  question.  I -- I could clarify.  I worked not

16  for just Gulf of Mexico Exploration, but with the

17  Deepwater Production Development and Lower 48.

18  So I was working for the Houston company to --

19      Q.  (By Ms. Greenwald) M-h'm.

20      A.  -- load the seismic data and manage the

21  interpretation.

22      Q.  Okay.  And then at some point during the

23  time when you were still with Triton, you

24  developed a specialty with Gulf of Mexico; is

25  that correct?

**PURSUANT TO CONFIDENTIALITY ORDER**

23

1    A.   There's no specialty development --

2 developed, but most of my time I was working with

3 Gulf of Mexico --

4    Q.   Okay.

5    A.   -- Exploration.

6    Q.   All right.  And why was it that you

7 wanted to become a Technologist for the Gulf of

8 Mexico for BP?

9    A.   It -- I saw it as an advancement in my

10 career.

11    Q.   M-h'm.

12    A.   (Nodding.)

13    Q.   And did you approach BP and ask for a

14 permanent job with them?

15    A.   I did.  I applied for a position there,

16 yeah.

17    Q.   There was an opening, and you applied for

18 it, or did you ask them to create a position for

19 you?

20    A.   There was an opening.

21    Q.   M-h'm.

22    A.   Yeah.  Yes.

23    Q.   So when you joined BP in 2004, how, if at

24 all, did your duties change?

25    A.   I was still managing seismic data, but I

1   was closer to the Geophysicist on the floor, who

2   had asked me to load data, so I had closer

3   contact to the -- to the employees.  I also did a

4   little more work with well data management in the

5   Open Works Database.

6       Q.  And what do you mean by "well data

7   management"?

8       A.  If a Scientist wanted to clean up certain

9   things in their -- pertaining to a certain well,

10  I could do that, whether it be renaming picks

11  and -- or cleaning up the log information that is

12  associated with the well.  Renaming any of the

13  metadata that's associated with the well.

14      Q.  Okay.  When you were with Triton, did you

15  have a person at BP to whom you reported?

16      A.  Yes.

17      Q.  And who was that?

18              MR. MONICO:  (Indicating.)

19      A.  I reported to Savanna Arnold.

20      Q.  (By Ms. Greenwald) All fo -- all four

21  years?

22      A.  Yes.

23      Q.  And did that change when you became an

24  employee of BP in 2004?

25      A.  It did.

25

```
 1        Q.  And who did you report to when you joined
 2   in 2004?
 3        A.  I reported to Keith Everill.
 4        Q.  Keith who?
 5        A.  Everill.
 6        Q.  Okay.  And what was his position?
 7        A.  His -- he was the Data Management Lead
 8   for the Gulf of Mexico.
 9        Q.  So let me ask you a little bit about this
10   loading of seismic data.  How -- I just --
11   explain to me, just if -- as you -- if you can,
12   in general sort of explanation of what -- where
13   you get the data from --
14        A.  Sure.
15        Q.  -- what it is you actually upload, and
16   the purpose for which you upload it.
17            If that's too broad of a question, I can
18   break it down.  It's up to you.  I want to give
19   you a --
20        A.  I'll try my best.
21        Q.  I want to give you --
22        A.  I'll --
23        Q.  -- an opportunity to explain it --
24        A.  Sure.  I --
25        Q.  -- as best as you can.
```

 1          A.   I'll -- I'll try my best.

 2                    MR. KEEGAN:   Objection to form.

 3          Q.   (By Ms. Greenwald) Okay.

 4          A.   The -- there's many different areas the

 5     data could come from.

 6          Q.   M-h'm.

 7          A.   It could come from within processing

 8     at -- at BP.  It could come from a seismic data

 9     vendor.  So we would receive this data, usually

10     on -- in the tape format, and it was digital data

11     at that time, and load it to SeisWorks Projects.

12               And it's -- upon loading of the data,

13     we'd QC it, make sure it's, you know,

14     geographically positioned properly, and then let

15     the interpreter know that this data was loaded.

16               And that process could occur multiple

17     times on this -- over a single area.  If there's

18     a reprocessing Project occurring over a prospect

19     per se --

20          Q.   M-h'm.

21          A.   -- you could receive multiple vintage --

22     vintages of the processing on that data.

23          Q.   So this would -- so your -- your

24     information that you would gather, the -- the

25     data that you would be working with to load would

1    be relating to prospects of BP, that BP was

2    considering?

3         A.   So the --

4              MR. KEEGAN:   Objection to form.

5         A.   It could be multiple things.

6         Q.   (By Ms. Greenwald) Can you --

7         A.   So --

8         Q.   -- give me an example of the type of

9    purposes for which you would be collecting data?

10        A.   So I -- I would load the data for

11   exploration purposes.  That data could be worked

12   by the interpreters and develop a prospect.  They

13   would then focus in on the prospect area, where

14   they would do a reprocessing at that area to get

15   a crisper image of the subsurface.

16        Q.   M-h'm.

17        A.   And, again, to answer a question

18   previously, the seismic data is a tool that is

19   used to gain a good image of the subsurface data.

20        Q.   And what does it mean to "load that

21   data"?  What is it that you do that --

22        A.   Simply, I took the -- I'm sorry, I -- I

23   didn't let you finish.

24        Q.   No, no, no, that's fine.

25        A.   I -- we receive the data on tape and --

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   M-h'm.

2      A.   -- it's in a binary format.  We then take

3  that data, and using Landmark software, we can

4  load the information on the tape into the

5  interpretive package, which then the users can

6  actually see the image of the subsurface through

7  the seismic data.

8      Q.   Do you actually do any of that

9  interpretation, or do you -- or -- or is it

10  more --

11      A.   At that time?

12      Q.   -- mechanical?  I'm trying to -- that's

13  what I'm trying to understand.

14      A.   Mechanical is putting the tape into the

15  tape, setting up the load job --

16      Q.   M-h'm.

17      A.   -- and then just taking a look at the

18  seismic data at the end of QC and make sure it's

19  in the right place --

20      Q.   Okay.  So --

21      A.   -- and it looks proper.

22      Q.   Sorry.  So am I correct to say that

23  during that time, when you were doing this --

24  this data loading, your -- you wouldn't have to

25  be a Geologist to do that uploading; is that

1   correct?

2       A.   That is correct.

3       Q.   Okay.  So you weren't doing any

4   interpretation of the Geology, you, yourself?

5       A.   Correct.

6       Q.   And would -- would someone in, for

7   example, Exploration come to you and say, "I need

8   data on this potential well or reservoir or

9   possible lease," and then you would get the data

10  and you would decide whether you would get it

11  from -- strike that.  That's way too complicated.

12  I'm sorry.

13          How would you -- how would the

14  information come to you that you needed to gather

15  certain data --

16      A.   Sure.

17      Q.   -- for a particular prospect for

18  Exploration purposes?

19      A.   Again, that was all at the business

20  level.

21      Q.   M-h'm.

22      A.   So they would just provide me the tape,

23  that -- so they're doing all that work above me,

24  and I just get provided a tape, and I load the

25  data.

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    Q.  You wouldn't even -- you didn't even make

 2  a decision at that time of which data to get for

 3  purposes of uploading it?

 4    A.  No, no, no.

 5    Q.  I understand.  All right.  Sorry.

 6        Now, what time did -- at some point in

 7  time, did your position change from what we

 8  were -- just been talking about?

 9    A.  Yes.  In 2006, I became a Geologist for

10  BP.

11    Q.  And how did your position change at that

12  point?

13    A.  So going from the Technology role of

14  which we have been talking about --

15    Q.  M-h'm.

16    A.  -- I became an interpreter.  To clarify,

17  I was an Exploration Geologist, looking for

18  prospects.

19    Q.  Who did you report to?

20    A.  I reported to Jasper Peijs.

21    Q.  Were on you a particular Team at that

22  time?

23    A.  Yes.

24    Q.  What was the name of the Team?

25    A.  The Team was called the Eastern

1  Mississippi Canyon Team in Gulf of Mexico

2  Exploration Business Unit.

3      Q.   And after you -- did your position change

4  from 2006 to today?

5      A.   No, I've been a Geologist for BP.

6      Q.   Are you still part of the Eastern

7  Mississippi Canyon Team?

8      A.   I am not.  I -- I'm not.

9      Q.   And at -- at what point did you change

10  from the Eastern Mississippi Canyon Team to --

11  well, what -- strike that.

12          What's your -- what Team are you with

13  today?

14      A.   So I'm -- I'm currently working with the

15  Brazil Team.

16      Q.   In Houston?

17      A.   In Houston.

18      Q.   And when did your -- when did you become

19  part of the Brazil Team?

20      A.   Within the last two months.

21      Q.   And how about before that, what Team were

22  you with?

23      A.   I continued to work in the Eastern

24  Mississippi Canyon Team.  The Team was renamed to

25  just the Eastern Gulf of Mexico Team.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Okay.  So from 2006 until -- what are we

2  in -- up until two months ago, you were with the

3  Eastern Mississippi Canyon Team with the

4  renaming?

5    A.   Yes.

6    Q.   Okay.

7    A.   Yes.

8    Q.   Okay.  So what -- what was sort of --

9  what -- what were your duties and

10  responsibilities as an Exploration Geologist with

11  the Eastern Mississippi Canyon Team?

12    A.   So my main role was to explore using the

13  seismic data that we were talking about

14  earlier --

15    Q.   M-h'm.

16    A.   -- to look for prospects in the

17  Mississippi Canyon area, or our -- our Team's

18  area of interest.  I worked with a number of

19  experts, Geophysicists, Reservoir Engineers,

20  Petrophysicists, to --

21    Q.   M-h'm.

22    A.   -- all work as a Team to, once we found

23  something that looked prospective, being a trap

24  with a reservoir in it, we would then work the

25  prospect up to a status which we could present to

**PURSUANT TO CONFIDENTIALITY ORDER**

1    management.

2         So to say it clear and clean, I was a

3    Prospect Geologist working with a Subsurface

4    Team.

5         Q.   And what other Teams -- what -- what

6    other Teams did you actually work with in that --

7         A.   So --

8         Q.   -- for context?

9         A.   Just a Subsurface Team.  What --

10        Q.   A Subsurface Team?

11        A.   Yeah.

12        Q.   Is a Tiger Team part of that Subsurface

13   Team?

14        A.   No, that's a totally separate Team.

15   They're more on the operations side.  I'm clearly

16   on the prospecting side, and the Tiger Team would

17   be operations.

18        Q.   You -- but you had some interaction with

19   the Tiger Team; is that right?

20        A.   Yes.  Yes, I did.

21        Q.   Okay.  But -- and does the prospecting

22   side or the Prospecting Teams that you've been

23   talking about frequently have interaction with

24   the Operations Team at BP, in the context of the

25   work that you did with the Eastern Mississippi

1    Canyon Team?

2           MR. KEEGAN:  Objection to form.

3       A.   There's a point in time if a prospect --

4    if the Management wants to drill a prospect and

5    it's a prospect you worked on --

6       Q.   (By Ms. Greenwald) M-h'm.

7       A.   -- you would hand that prospect over to

8    the Operations Team to drill the well, and that's

9    where we would --

10      Q.   That's when --

11      A.   -- communicate, yes.

12      Q.   Okay.  About how many people were on your

13   Eastern Mississippi Canyon Team --

14          MR. KEEGAN:  Objection to form.

15      Q.   (By Ms. Greenwald) -- during the course

16   of, let's say, in the 2009 to 2010 time period?

17      A.   I don't recall the exact number, but

18   roughly, around 10.

19      Q.   Did you work on the Mississippi Canyon --

20   the -- did you work on the Macondo Well Prospect

21   Team?

22          MR. KEEGAN:  Objection to form.

23      A.   So I -- I worked on the Subsurface Team

24   that described the prospect.

25      Q.   (By Ms. Greenwald) Did that Team have a

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    particular name?  It was just the Subsurface

 2    Team?

 3        A.   It's the Eastern Mississippi Canyon

 4    Team --

 5        Q.   Okay.  So --

 6        A.   -- and we'd call ourselves a part of the

 7    Subsurface Team.

 8        Q.   Okay.  So -- and you -- so you were part

 9    of that Group that you said -- I think you said

10    described the prospect of the Macondo Well; is

11    that correct?

12        A.   Well, yeah, to clarify, we described the

13    prospect --

14        Q.   Okay.

15        A.   -- the -- the central parameters of -- of

16    the prospect.

17        Q.   So did -- did you interpret the data that

18    was uploaded from the tapes that you testified

19    about earlier for purposes of the Macondo Well?

20        A.   So, yeah.  There was seismic information

21    that --

22        Q.   M-h'm.

23        A.   -- both I and the Geophysicist worked as

24    a Team interpreting over -- over the area and

25    over the Macondo prospect.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Okay.   And approximately when did you

2  work on the Macondo prospect?

3    A.   So we were working in the Eastern

4  Mississippi Canyon area starting in 2006, and --

5    Q.   M-h'm.

6    A.   -- roughly around 2007, we -- we saw the

7  Macondo prospect.

8    Q.   And what is it that you saw that led you

9  to believe that this was a prospect that was

10  worth pursuing?

11    A.   Sure.   We --

12              MR. KEEGAN:   Objection, form.

13    A.   We, after mapping the area -- we being me

14  and the Geophysicist and I -- found a -- a

15  trapping configuration, which we call a four-way,

16  and doing detailed mapping above the four-way, we

17  saw what we interpreted as a reservoir system

18  crossing over the four-way.   So we had a -- a --

19  a nice closure that could potentially pull

20  hydrocarbons and the reservoir that went over

21  that structure.

22              So at that point, we identified the area

23  as a lead to do further work

24    Q.   (By Ms. Greenwald) Now, you say "we,"

25  who -- who was part of your group besides

1  yourself?

2      A.  Well, earlier I mentioned we have the

3  Geologist --

4      Q.  M-h'm.

5      A.  -- Geophysicist.

6      Q.  M-h'm.

7      A.  Reservoir Engineer, Petroleum Systems

8  Analyst, and Petrophysicist.

9      Q.  And who were they for purposes of your

10  work on the Macondo system?

11     A.  Those five.

12     Q.  No.  But what -- what were their names?

13     A.  Oh, their names?

14     Q.  Who were they?  Who were they?

15     A.  Oh, I'm sorry.

16     Q.  I'm sorry.  No, my fault.

17     A.  So it was --

18     Q.  You're the Geologist --

19     A.  Yeah.

20     Q.  -- right?

21         Okay.

22     A.  Chuck Bondurant, Geologist; Binh Nguyen,

23  Geophysicist.

24     Q.  M-h'm.

25     A.  The Petroleum Systems Analyst was

**PURSUANT TO CONFIDENTIALITY ORDER**

1   Pierre-Andre Depret.  Our -- the Team's

2   Petrophysicist at that time was -- it was awhile

3   ago.  I'm trying to remember the names.  Donald

4   Charles was the Petrophysicist, and the Reservoir

5   Engineer was Tanner Gansert.

6       Q.  Okay.  Now, when you identify a prospect

7   and do the evaluation that you testified about,

8   do you write that up be -- and when you present

9   it to manage -- before you present it to

10  Management?

11      A.  It is -- so it's documented in the

12  database --

13      Q.  M-h'm.

14      A.  -- that we work in, and we do create a

15  PowerPoint Presentation to describe the

16  Project -- or I'm sorry, the prospect to

17  Management.

18      Q.  And what type of information do you -- at

19  that time would you have put into a presentation

20  to Management for purposes of -- well, let me

21  strike it.  Just stop it there.

22          What type of information would you put in

23  a PowerPoint?  What would Management want to

24  see --

25      A.  Sure.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   -- for purposes of deciding --

2              MR. MONICO:   Objection, form.

3      Q.   (By Ms. Greenwald) -- what to -- how to

4  handle a prospect that you've been working on?

5              MR. MONICO:   Objection, form.

6      A.   We would -- we'd describe the parameters,

7  what I call the parameters of the prospect, the

8  trap.

9      Q.   (By Ms. Greenwald) M-h'm.

10     A.   It's a reservoir.  So those would be

11  images on the PowerPoint.  The Petrophysicist

12  would give us potential porosity and permeability

13  of that potential reservoir.

14     Q.   M-h'm.

15     A.   And this is -- and the petroleum systems

16  analyst would al -- provide the -- a slide

17  showing the potential pathways of hydrocarbon

18  migration into a prospect.  So it would be a

19  number of slides from -- from the work we have

20  previously done to describe the prospect.

21     Q.   Now, at that juncture when you're

22  describing the prospect, do you also describe how

23  much oil is likely to be in the reservoir?

24              MR. KEEGAN:   Objection, form.

25     A.   Part of that is to describe the volume

**PURSUANT TO CONFIDENTIALITY ORDER**

1  potential in that -- in the reservoir.

2      Q.  (By Ms. Greenwald) Do you recall as

3  you're sitting here today what volume you

4  estimated would be in that reservoir?

5              MR. KEEGAN:   Objection to form.

6      A.  Originally, the original volume

7  calculation was around 80 million barrels.

8      Q.  (By Ms. Greenwald) Did that change at

9  some point?

10      A.  Yes, it did.

11      Q.  When did it change?

12      A.  This occurs with many prospects.  As you

13  work on them in more detail, you get better

14  information and understanding of it.  So just

15  throughout the next year working on the prospect,

16  we got a -- a more detailed understanding.

17      Q.  So --

18      A.  So it happened over a period of time.

19      Q.  So walk me through the process.  So

20  you -- you and your Team -- I think you mentioned

21  one, two, three, four, five -- five different

22  people?

23      A.  M-h'm.

24      Q.  Yourself being one of the five.

25          -- have been evaluating this well,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    potential well, and you now have made the

2    decision to identify it as a prospect and take to

3    it Management; is that --

4        A.   Yes.

5        Q.   -- correct?

6        A.   That is correct.

7              MR. KEEGAN:   Objection, form.

8        Q.   (By Ms. Greenwald)  Okay.  And do you

9    recall when you took that first to management?

10       A.   I --

11       Q.   Approximately.  I don't need an exact

12   date.

13       A.   Approximately, it was prior to the OCS

14   203 lease/sale, which -- was it 2007 -- 2008.

15       Q.   2008?

16       A.   Yeah.

17       Q.   Okay.  So you would have presented it

18   first in 2008?

19       A.   So just to clarify, during that time, we

20   would have peer reviews with other scientists on

21   the floor.  We'd take it to a group called

22   Exploration Excellence.  That would give us more

23   potential ways to bring the prospect to technical

24   limit.  Then prior to lease/sale, we would bring

25   it to Management, present the prospect to

**PURSUANT TO CONFIDENTIALITY ORDER**

1   Management, for them -- yeah.

2       Q.  And who -- who is Management that you

3   brought this to?

4       A.  It's a number of Team Leaders,

5   Performance Unit Leaders and -- that are part of

6   the Gulf of Mexico Exploration.

7       Q.  Okay.  Do you recall who they are as

8   you're sitting here today that you presented this

9   to?

10      A.  I do not recall everyone's name.

11      Q.  In addition to a -- an estimate of the

12  reservoir size, do you when you make this

13  presentation give an estimate of the length of

14  time it would take to extract the oil from the

15  well?

16              MR. KEEGAN:  Objection to form.

17      A.  That is out of my area of expertise.

18  That is more on the Reservoir Engineering side.

19  I do not recall if we had that in those early

20  presentations.

21      Q.  (By Ms. Greenwald) Okay.  That's not

22  something your Group typically does?

23      A.  I don't particularly do that.  People in

24  the Group do work on that, the --

25      Q.  M-h'm.

 1       A.   -- Reservoir Engineer.

 2       Q.   Do you put a dollar figure on the -- on

 3   reservoir when you make this presentation to

 4   Management?

 5               MR. MONICO:   Objection, form.

 6       A.   I do not.

 7       Q.   (By Ms. Greenwald) Does anyone in your

 8   Team put a dollar figure on the reservoir when

 9   you make the presentation to Management?

10               MR. KEEGAN:   Objection, form.

11       A.   I believe the Reservoir Engineer

12   Commercial Team would, and the Management level

13   would apply that information to a prospect.

14       Q.   (By Ms. Greenwald) So I'm just trying to

15   understand the process.  So I don't mean to be

16   beating this to the ground.  But when you make

17   your presentation to Management, are you with the

18   other team, then, the -- the Reservoir Engineer,

19   for example, or is it just your team that makes

20   your presentation and then you're finished and

21   the other group comes in after you?

22               MR. KEEGAN:   Objection to form.

23       A.   So when you make a presentation,

24   sometimes the entire team is not present,

25   sometimes they are.  But, yeah, the -- the

44

 1   Subsurface Team working on a particular prospect

 2   would provide the -- the information during the

 3   presentation.

 4        Q.  (By Ms. Greenwald) Okay.  Now, for the

 5   Macondo Well, do you recall how many

 6   presentations your team made relating to that

 7   prospect?

 8        A.  Probably over ten.

 9        Q.  And what was the nature of those; if you

10   can recall, just generally what the nature of

11   those presentations were?

12        A.  So they were peer reviews.

13        Q.  M-h'm.

14        A.  And the SX reviews that I referred to

15   earlier, the Management presentations.  And

16   post -- so the presentation was given to

17   management for a lease/sale.  If -- if the block

18   was acquired, there would be a subsequent

19   presentations as we further worked on that

20   prospect.

21        Q.  Are you part of the decision-making as to

22   whether to seek the lease for the reservoir?

23        A.  No.  That is done by Management.

24        Q.  Okay.  So and you say "peer reviews."

25   Can you explain what you mean by that?  Are those

**PURSUANT TO CONFIDENTIALITY ORDER**

1   people within your department, or are those

2   people outside of your department?

3       A.  So it's a group of Scientists,

4   Geologists --

5       Q.  M-h'm.

6       A.  -- geophysicists, other technical people

7   that I referred to earlier.  We try to pull

8   people from across the buildings.  So that would

9   be Gulf of Mexico -- Mexico Exploration, the

10  Development and Production Units, to provide a --

11  another insight to the prospect.  So we present a

12  presentation to them describing what we believe

13  we see in the subsurface, and they would provide

14  technical feedback for us to further work the

15  prospect.

16      Q.  And are -- these -- the peer reviews,

17  they're all people within BP; is that correct?

18      A.  Yes.

19      Q.  Okay.  So it -- once you -- once then --

20  now, the lease was acquired for Macondo; isn't

21  that right?

22      A.  That's correct.

23      Q.  So once the lease is acquired, what role

24  did you have with respect to the Macondo Well?

25      A.  With respect to the well, not a big role.

1   But what I did continue to do with the team is

2   work the prospect further.

3        Q.  And what did you do?

4        A.  So after the acquisition of the block, or

5   after we won the block --

6        Q.  M-h'm.

7        A.  -- in the lease/sale, the seismic data

8   that we had been interpreting on was reprocessed.

9   When we receive that --

10       Q.  Can I stop you for a minute?

11       A.  Sure.

12       Q.  What -- what do you mean by "the seismic

13  data was reprocessed"?

14       A.  The -- the seismic data that we had been

15  working on --

16       Q.  M-h'm.

17       A.  -- was a -- a certain vintage of data.

18  We sent the -- "we," as a group -- really that's

19  done by the Geophysicist, but he sends the data

20  to a -- a third-party contractor to reprocess the

21  seismic data in a smaller area, more confined

22  area.  When -- when they do that, there's more

23  detailed work that the processing company can do

24  on the smaller area.

25           From that, we usually provide a better

**PURSUANT TO CONFIDENTIALITY ORDER**

1   image of what the -- what we're seeing in the

2   subsurface --

3      Q.  Okay.

4      A.  -- through the seismic data.

5      Q.  Is that -- did you -- do you -- does BP

6   contract that work out?

7      A.  We -- we have the ability to send it to

8   people in-house.

9      Q.  M-h'm.

10     A.  We have a -- a processing group in-house.

11  And we also can send it to third-party

12  contractors.

13     Q.  Now, is that in-house processing group

14  the one that you originally worked for in 2004?

15     A.  No.  That was a data management group.

16     Q.  That's a different group, okay.

17     A.  That's a different group all together,

18  yeah.

19     Q.  You mentioned a few minutes ago, and I --

20  I lost track of where we were going -- I

21  apologize -- that the -- the original calculation

22  for the Macondo Well was 80,000 -- million

23  barrels, and that at some point that changed.  Do

24  you re --

25             MR. MONICO:  Objection --

**PURSUANT TO CONFIDENTIALITY ORDER**

48

1      Q.  (By Ms. Greenwald) I didn't go back to

2  that.

3               MR. MONICO:  -- form.

4      Q.  (By Ms. Greenwald) What -- at what point

5  did that estimate change?

6      A.  So earlier, I said the -- the volumes

7  were 80 million barrels --

8      Q.  M-h'm.

9      A.  -- most likely.  And it was after

10  lease/sale.  When we received the new data, we

11  worked the entire process over again, mapping and

12  analyzing the data.  At that point, we got a

13  better detailed description of -- of the aerial

14  extent of the prospect.

15      Q.  M-h'm.

16      A.  That's when the size starting coming

17  down.

18      Q.  How long -- how much further down did it

19  go?

20      A.  After the -- working with more peer

21  reviews and further XX reviews, we ended up at 64

22  million barrels, most likely.

23      Q.  Now, when that -- when that estimate is

24  rerun -- would that be a fair word to use --

25      A.  Yeah.

**PURSUANT TO CONFIDENTIALITY ORDER**

49

1    Q.  -- "rerun" or "recalculated"?

2    A.  So it -- working a prospect is an ongoing

3  living process --

4    Q.  M-h'm.

5    A.  -- so it's a -- it's a recalculation --

6    Q.  Yeah.

7    A.  -- of new -- new data.

8    Q.  Does that recalculation go to Management?

9    A.  Yes.

10   Q.  And were you part of the presentation to

11 Management of the recalculation?

12          MR. KEEGAN:  Objection to form.

13   A.  Yes.

14   Q.  (By Ms. Greenwald) Do you recall the

15 meeting or the -- the -- the presentation to

16 Management that occurred with respect to that

17 recalculation?

18   A.  I don't recall the exact meeting, no.

19   Q.  Do you recall who was at that meeting

20 from Management?

21          MR. KEEGAN:  Objection to form.

22   A.  I -- I do not recall all the members

23 there.  Well, if I could step back and -- and

24 clarify.

25   Q.  (By Ms. Greenwald) M-h'm.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.  The -- as we continued to work the

2  prospect, there's open dialogue across the Team,

3  including our -- our Team Leader, who can provide

4  information in our slides that we're -- we're

5  presenting or working on.  He can provide that to

6  Management at any time.  So I'm sure they knew

7  the reduction in volumes early on, you know, as

8  we were working the data.  As soon as we got a

9  new im -- idea of what the prospect may be --

10    Q.  M-h'm.

11    A.  -- they would be provided that

12  information.

13    Q.  Okay.  So you were explaining what --

14  what work you did once the lease was acquired.

15  You said you worked prospect further.  And so can

16  you tell me -- I think you started to tell me and

17  we moved to another area -- what was it you did

18  post acquisition with respect to the Macondo

19  Well?

20    A.  Again, I -- I started talking about the

21  reprocessing --

22    Q.  Right.

23    A.  -- of the data.

24    Q.  That's right.

25    A.  When we received the new seismic data --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  M-h'm.

2    A.  -- back in-house and loaded into our

3  software, we reinterpreted the data to do

4  analysis, a scientific analysis on -- on the --

5  what we believe was the reservoir and --

6    Q.  What type of analysis do you mean, like

7  scientific analysis?  What do you mean by that?

8    A.  Yeah.  So with the seismic data, as you

9  map this -- the structural events or these

10  wavelets on the data --

11    Q.  M-h'm.

12    A.  -- you can do attribute extractions on

13  the data to show you like the amplitude of the

14  data over a large area.  By doing that, you can

15  infer or interpret a potential reservoir system.

16  That's what I -- I'm referring to as --

17    Q.  Okay.

18    A.  -- analyzing the data.

19    Q.  All right.  And what else did you do

20  besides further analyze the data?

21    A.  We -- we can -- working as a team, we did

22  the same process as we did before the lease/sale.

23  So we had a few more peer reviews, and then we

24  had another XX, so we -- we just -- what we call

25  is bring in the prospect to technical limit.  We

52

1   do the best job at describing the potential

2   geology of the prospect.

3       Q.   And when you use the word "bringing it to

4   technical limit," what does "technical limit"

5   mean?

6       A.   And the end of my last statement was that

7   we -- we -- we do the best that we can do with

8   the data we have to get the best interpretation

9   of the subsurface.  So that would -- bringing it

10  to technical limit, for instance, would be

11  reprocessing the data to get a clearer image, or

12  we could have a better understanding of -- of the

13  potential prospect.

14      Q.   Is -- is the word "bringing a prospect

15  to," quote, "technical limit" a -- a term of art

16  at BP?

17      A.   It is.

18              MR. KEEGAN:  Objection to form.

19      Q.   (By Ms. Greenwald) And is it defined in

20  some manual or -- or protocol or guidance that

21  you know?

22      A.   I do not know.

23      Q.   Okay.  Is -- is the -- is that

24  information when you bring the prospect to

25  technical limit, is that then passed along to the

**PURSUANT TO CONFIDENTIALITY ORDER**

1    operations people who are actually going to work

2    on the drilling procedures for the well?

3              MR. KEEGAN:   Objection to form.

4        A.   If -- if at some point Management decides

5    to drill the prospect --

6        Q.   (By Ms. Greenwald) M-h'm.

7        A.   -- in -- in this case, we did, yeah.

8    There -- that final piece of technical

9    information of the prospect would be handed off

10   to operations.

11       Q.   Okay.  So you bring this prospect to

12   technical limit whether or not the well is going

13   to be drilled?

14       A.   That's not -- that's not always the case.

15   There -- there's a large number of prospects that

16   each Subsurface Team might be working on.

17       Q.   M-h'm.

18       A.   Like the Eastern Mississippi Canyon Team.

19   There's over -- there's a -- a large number of

20   prospects in the area.  A few of them are

21   deemed -- are put to the front to work on, so not

22   all prospects would -- would be brought to

23   technical limit.

24       Q.   But the Deep -- but the Macondo was; is

25   that right?

1    A.   That is correct, yes.

2    Q.   Okay.  Do you know whether it was brought

3  to technical limit because they had in -- because

4  BP had intended to drill it?

5                MR. KEEGAN:  Objection to form.

6    A.   That's up in the Management side.  I know

7  there was -- we were asked to bring the prospect

8  by Management to a technical limit to continue

9  working on it.

10    Q.   (By Ms. Greenwald) All right.  Now, once

11  you bring the prospect to technical limit, is

12  your role over, or do you continue working with

13  the Operations Group if it's -- if -- if the --

14  if the well is drilled?

15    A.   So there's a -- there's a handover

16  process --

17    Q.   M-h'm.

18    A.   -- and then --

19    Q.   What is that handover process?

20    A.   It's part of a pros -- process we call

21  "Beyond the Best" at BP, where we -- the

22  Subsurface Team would present the prospect to the

23  Operations Team, which is -- we referred to the

24  Tiger Team earlier, and the drill -- Drilling

25  Engineers.  We describe the geology of the

**PURSUANT TO CONFIDENTIALITY ORDER**

1    prospect at that point.  There's some

2    documentation that the Subsurface Team work on,

3    would put together during that time.  Once we get

4    that documentation together, we'd hand it over to

5    the operations to drill a well.

6          And at that point, I go back to my

7    original job as Drilling -- or I'm sorry.  As --

8      Q.   Changed your job today?

9      A.   Yeah.  Sorry.

10     Q.   That's okay.

11     A.   -- as working as a Prospect Geologist

12   with our -- the Subsurface Team.

13     Q.   On another -- on another prospect at that

14   point?

15     A.   Yeah.

16     Q.   Right.

17     A.   I mean, there's a number of prospects --

18     Q.   Right.

19     A.   -- in the area.  So we -- we continue to

20   do our day-to-day job.  I mean, that's 80 percent

21   of my -- my time.

22          However, I -- I did follow the Macondo

23   Well.  I did -- I wanted to, you know, do the

24   best I could do to help -- well, to -- to learn,

25   to continue learning.  I'm four or five years

56

1    into my geology career, so --

2        Q.  M-h'm.

3        A.  -- I tried to stay involved and listen as

4    much as possible to what goes on across the

5    floor, just to continue my learning curve.

6        Q.  Yeah, I was going to ask you about that,

7    because it seems as though you are -- and we'll

8    go over documents shortly.

9        A.  Right.

10       Q.  There are a number of documents where you

11   seem to be involved in the Macondo Well post

12   this "Beyond the Best" transfer that you just

13   testified about?

14       A.  Yes, yes.

15       Q.  Was there any other well besides the

16   Macondo that you have continued to follow in your

17   current position?

18       A.  No.

19       Q.  What was it about the Macondo that made

20   you -- what's the word I want to use -- add to

21   your otherwise normal work responsibilities?

22       A.  So I don't think I said it clearly

23   earlier.  The Subsurface Team --

24       Q.  M-h'm.

25       A.  -- had a lot of time invested in the

**PURSUANT TO CONFIDENTIALITY ORDER**

1  prospect, so parts of the Team would follow

2  the -- the drilling of the well just to see the

3  outcome, you know.

4      Q.  And what was it about the Macondo that

5  you decided to follow up with -- stay with the

6  Macondo versus --

7      A.  Sure.  Well --

8      Q.  -- the other prospects you were working

9  on?

10     A.  Macondo was going to be drilled, or was

11  in for talking and Drilling Operations now.

12     Q.  M-h'm.

13     A.  Since it was drilling, it was something I

14  could be a part of to -- to provide any support

15  that the Operations Team might need on the sub --

16  that we could provide support on the subsurface,

17  information that the -- that well might see.

18     Q.  Okay.  And what kind of support did you

19  provide during the course of the drilling on the

20  Macondo Well?

21     A.  I provided, honestly, very little,

22  because, again, the handover was -- had been

23  done, so the -- the Operations Team was doing

24  their job at that point.  Any kind of information

25  that I did provide would -- or we would provide

1   would be after they drill a certain hole section

2   and set casing --

3       Q.  M-h'm.

4       A.  -- we would provide a short prognosis of

5   what is expected in the next hole section.  And

6   it would be basic Geology in the area.

7       Q.  When you say, "What is expected in the

8   next hole area," what do you mean by that?

9       A.  So based off the work that our Subsurface

10  Team did to describe the Project -- prospect, we

11  would analyze the seismic data and offset well

12  information to try to highlight any potential

13  sand formations that they may see while they're

14  drilling the well, so we would provide context

15  around if sand or shale formations.

16      Q.  Do you get daily updates from the

17  Drilling Group?

18      A.  I did.  I -- I -- I did.

19      Q.  And how do -- how would you receive those

20  daily updates?

21      A.  Well, by the Daily Operation Report, or

22  the Morning Reports, sent out to -- that were

23  sent out, I'd have -- I'd have that daily update.

24  And then I could attend the morning call to see

25  what was going on in the past 24 hours of the --

1    Q.   Okay.

2    A.   -- of the drilling process.

3    Q.   Let me ask you to turn to document No. 26

4  in your book.  We'll mark this -- so document 26,

5  there's a very long number on the lower

6  right-hand corner of every document we'll go over

7  today.

8    A.   Okay.

9    Q.   Just for ease of numbers, I'm just going

10  to go over the last five numbers for the court

11  reporter so we have a clear transcript of the

12  document.  So Tab No. 26 is Bates number -- the

13  last five digits are 03765, and we'll mark that

14  as No. 4588.

15           (Exhibit No. 4588 marked.)

16              MS. GREENWALD:  I don't want to mark

17  it --

18           (Discussion off the record.)

19    Q.   (By Ms. Greenwald) Is this the -- do you

20  have that in front of you?

21    A.   Yes, I do.

22    Q.   Okay.  Terrific.  What is this document?

23  Is this the daily update that you were just

24  talking about?

25    A.   No.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   Okay.

2      A.   This is a document that Management -- or

3  this was something Management asked me to do, to

4  provide a -- a short snippet of what happened in

5  the past 24 hours and the upcoming 24 hours.

6      Q.   Yeah.  I thought the -- I -- so this is

7  prepared by you, right, Exhibit 4588?

8      A.   Yes.

9      Q.   Okay.  So now -- so the document you were

10  referring to before when you testified, what

11  doc -- what information was that?  You said a

12  daily update.  Is that something that came from

13  the Drilling Group?

14           MR. KEEGAN:  Objection to form.

15      A.   Yeah, that was the Morning Report that

16  was sent out from the Drilling Group.

17      Q.   (By Ms. Greenwald) Are those E-mails?

18      A.   They were documents that were attached to

19  the E-mails, yes, or attachments in E-mails.

20      Q.   And that would give the -- the activities

21  on the well from the day before?

22      A.   Yes.

23      Q.   And would you receive --

24      A.   And --

25      Q.   I'm sorry.

1      A.   Yes.

2      Q.   Would you receive those daily?  Were you

3   part of the -- were you part of the distribution

4   list for those?

5      A.   Yeah, being part of the Subsurface Team,

6   and the "Beyond the Best," yeah, people that were

7   involved in that would receive the daily updates

8   or the Morning -- Morning Reports, I should say.

9      Q.   What is this "Beyond the Best"?  Is that

10   something -- how does BP define this "Beyond the

11   Best"?

12      A.   It's a --

13           MR. KEEGAN:   Objection to form.

14      A.   It's the -- a procedure that has a

15   certain number of stage gates, that you can take

16   a prospect that is described by a Subsurface

17   Team, present it to the Operations folks, being

18   the Tiger Team and -- and the Drilling Engineers,

19   to bring that prospect to drill-ready status,

20   where the wellbore's designed, et cetera.

21      Q.   (By Ms. Greenwald) Is that term -- is

22   that "Beyond the Best" a term of art of BP?

23           MR. KEEGAN:   Objection to form.

24      A.   Yes.

25      Q.   (By Ms. Greenwald) Okay.  Is that defined

62

1  in any manual or guidance that you know of?

2      A.   Yes.

3      Q.   What is that guidance, do you know what

4  it's -- where -- where it appears?

5      A.   The "Beyond the Best"?

6      Q.   M-h'm.

7      A.   I believe we have a web -- website --

8      Q.   Okay.

9      A.   -- that describes the "Beyond the Best"

10  practice.

11      Q.   Let's go back to Tab 26.  You have it in

12  front of you.  This is -- the -- this one is

13  dated April 20th, 2010.  And it appears to be

14  a -- a Macondo update daily from you to a group

15  of people, and the last entry was October 6th,

16  2009.  And then it's -- it's not actually every

17  day, but -- but most days between that time

18  period; is that correct?

19      A.   (Reviewing document.)  Yes.  It was

20  almost every day.

21      Q.   And who asked you to compile this?

22      A.   Again, that would be our -- our

23  Management.  So my Team Leader asked -- asked me

24  to compile a -- a short note of daily operations

25  for Management purposes.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   And who -- who was your Team Leader

2  again, at this period of time?

3    A.   At this period of time, his name is Bryan

4  Ritchie.

5    Q.   And from -- where would you get this

6  information from, that you entered onto this

7  Exhibit No. 4588?

8    A.   The -- the Morning Reports would have --

9  would have that information.  So I'd simply

10 transfer the information on the Morning Report

11 into this document.

12   Q.   Okay.  That's what I -- so you -- so

13 really, the information that's on the exhibit

14 that you're looking at now, 4588, is really a

15 transfer of the information from the Morning

16 Report that you're getting from the drilling

17 Operators?

18   A.   Yes.

19   Q.   Okay.  So typically what you're reporting

20 on the day referenced in your Report is really

21 what happened the day before on the rig; is that

22 right?

23   A.   Yeah.  I'd provide a snippet of the

24 previous 24 hours, and at times I would also

25 provide the foreca -- the following today's

1   forecast, which I would pull off the Morning

2   Report.

3         Q.   Okay.  Was this done for all wells --

4              MR. KEEGAN:  Objection to form.

5         Q.  (By Ms. Greenwald) -- this type of Daily

6   Update Report?

7              MR. KEEGAN:  Objection to form.

8         A.   As far as I understand, yes.

9              THE COURT REPORTER:  Five minutes.

10        Q.  (By Ms. Greenwald) And -- okay.  Did you

11  do an entry for April 21st, 2010?  We -- I

12  couldn't find any entries after 4/20/2010.

13        A.   No, I did not.

14        Q.   Why --

15        A.   Actually, I -- I don't recall if there

16  was an entry on the 21st.  I would -- could you

17  repeat your last question?  I -- I'm --

18        Q.   No, I -- why did you not do one for the

19  21st?

20        A.   We were focused on -- on -- on the

21  incident, of course, and what we needed to do,

22  to -- well, to -- to provide the Operations Team

23  information they needed to -- to do their job at

24  that time.  There's more important things to do.

25        Q.   So am I correct that there were no more

1    entries for the Macondo Well on your Macondo

2    update after April 20th, 2010 --

3                    MR. KEEGAN:  Objection to form.

4        Q.  (By Ms. Greenwald) -- is that correct?

5                    MR. KEEGAN:  Objection to form.

6        A.  To my recollection.

7        Q.  (By Ms. Greenwald) If there were other

8    ones, they'd be in your file, would they not?

9                    MR. KEEGAN:  Objection to form.

10       A.  Yes.

11       Q.  (By Ms. Greenwald) Were you ever on the

12   DEEPWATER HORIZON Rig?

13       A.  Never.

14       Q.  Were you ever on the MARIANAS?

15       A.  I was on the MARIANAS.  When it was in

16   dry dock, we had a little field trip out there

17   to -- to see a big drilling rig.  First time

18   I've -- well, first time I've ever been on a

19   semisubmersible plat -- drilling rig.

20       Q.  I want to -- if you could look at Tab 50?

21       A.  Sure.  50?

22       Q.  50.  Sorry.  I always think I'm going to

23   go in a different order and then I end up not,

24   so -- the last numbers are 1777052.

25           (Discussion off the record.)

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        Q.   (By Ms. Greenwald) We'll mark this
 2   Exhibit No. 4589.
 3            (Exhibit No. 4589 marked.)
 4        A.   Again, that was document 77052?
 5        Q.   (By Ms. Greenwald) No.  It's -- it's No.
 6   50.  The bottom number should be 1777052.
 7        A.   Okay.
 8        Q.   Okay.  If you could -- this is your
 9   "Annual Individual Performance Assessment."  If
10   you could turn to -- on here it says that you
11   "...took charge of...Macondo BtB planning
12   including EP submission, SOR and PDDP
13   documentation and...became a seasoned vet at
14   delivering wells."
15            MR. MONICO:  Page, please?
16        Q.   (By Ms. Greenwald) On page -- sorry --
17   the second page, the -- sorry.  054 are the last
18   three numbers.  Towards the middle of the page.
19            MR. KEEGAN:  I think we have a
20   different version of this document.
21        A.   Yeah, I'm not --
22            MS. GREENWALD:  You do?
23            MR. KEEGAN:  The Bates number I have
24   on the Annual Performance is 2038804.
25            MS. GREENWALD:  For 2009?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        MS. HERTZ:  That's the same thing

2   that's on the disk, Counsel.

3        MR. KEEGAN:  Yeah, I'm on the disk,

4   too.

5        MS. GREENWALD:  H'm.  I'll just look

6   at the -- I'll look at the notebook.  That's

7   fine.  It doesn't make a difference.

8    Q.  (By Ms. Greenwald) It would on -- oh, it

9   is a different version.

10        THE COURT REPORTER:  One minute.

11        MS. GREENWALD:  Maybe we should

12   break now.  We've got to figure out the -- oh,

13   here.  It's -- h'm.  It's not in there.

14    Q.  (By Ms. Greenwald) Yeah, I'm sorry.

15   Okay.  So I apologize.  It's No. 53 --

16    A.  Okay.

17    Q.  -- in your tab.  I had the wrong number.

18   I apologize.  So it's number -- so we'll have to

19   mark -- this exhibit is -- 2433569 is the Bates

20   number, and we'll mark that 4590.

21        (Exhibit No. 4590 marked.)

22        MS. GREENWALD:  And I assume there's

23   no more time on the tape, right?  Okay.

24        THE VIDEOGRAPHER:  The time is

25   9:32 a.m.  We're going off the record, ending

PURSUANT TO CONFIDENTIALITY ORDER

 1   Tape 1.

 2          (Recess from 9:32 a.m. to 9:45 a.m.)

 3              MS. GREENWALD:  I'm ready.

 4              THE VIDEOGRAPHER:  All set?

 5          The time is 9:45 a.m.  We're back on the

 6   record, beginning Tape 2.

 7      Q.  (By Ms. Greenwald) Okay.  So I -- I made

 8   a mistake before.  So it was Tab 53, and we

 9   marked it 4590, and the -- I would like for you

10   to go to the second page.  The Bates number on

11   the bottom is 2433570.  Okay?

12      A.  Okay.

13      Q.  And if you could see "Bryan's comments"

14   about two-thirds of the way down, it says, the

15   second sentence is:  "Chuck took charge of the

16   Macondo BtB planning including EP submission, SOR

17   and PDDP documentation and delivered with no

18   supervision required."

19          Can you tell me what that means, "Macondo

20   BtB planning"?

21      A.  Yes.  So as part of the Subsurface Team,

22   I worked on the prospect.  In the early stages of

23   the B to B -- BtB process, we would handover the

24   prospect to the Operations Team, and document

25   certain or fill out certain documents in the

**PURSUANT TO CONFIDENTIALITY ORDER**

1   early stages of the process, and those are the

2   documents that are listed here.

3        Q.  Okay.  So the Bt -- what does "BtB" stand

4   for?

5        A.  "Beyond the Best."

6        Q.  Oh, that's the "Beyond the Best."  Sorry.

7   Okay.

8            And S -- what is "SOR"?  I couldn't it

9   find it on my acronym sheet.

10       A.  A Statement of Requirements.

11       Q.  Okay.  And what is that?

12       A.  It's a compilation of information about

13  the prospect, potential well location.  And --

14  and there's a number of items on there, but it --

15       Q.  You were in charge of -- of that

16  documentation, the SOR?

17       A.  The Subsurface Team was in charge of

18  that.  I took the role to facilitate information

19  and put it in the document to -- to complete it.

20       Q.  Okay.  And what about "PDDP"?

21       A.  That is something, again, that I -- I was

22  a part of and the Subsurface Team, and it's the

23  Pre-Drill Data Package.

24       Q.  Okay.  And that's all -- that's all part

25  of the Group that -- that the documentation that

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    then went to Management that you talked about

 2    earlier; is that correct?

 3        A.  This documentation was part of the

 4    "Beyond the Best" process.  I don't know where

 5    the documents -- all the documents end up per --

 6        Q.  Okay.  Are there other documents in the

 7    "Beyond the Best" besides the ones referenced in

 8    Exhibit 4590?

 9        A.  It's my understanding there are many

10    documents that are --

11        Q.  Okay.

12        A.  -- generated.

13        Q.  Are these two referenced in particular

14    because those are the two that you took

15    responsibility for managing and completing?

16                MR. KEEGAN:  Objection to form.

17        A.  Well, it's Bryan's comment, so he saw

18    that I -- I completed the documents and -- or

19    pulled the information together, so --

20        Q.  (By Ms. Greenwald) Okay.

21        A.  Yes.

22        Q.  Now, during the course of the drilling of

23    the Macondo, you had interaction with some of the

24    Drilling Team; is that correct?

25        A.  We would discuss -- yeah, we would have
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    discussions in the morning call.  I was there

2    really to listen.

3        Q.  But even beyond the morning call, didn't

4    you have, from time to time, phone conversations

5    or E-mail exchanges with some of the people who

6    were drilling, working on the drilling part of

7    the well, Drilling Operations for the well?

8        A.  I -- I know I was cc'd on some documents,

9    yes.

10       Q.  Okay.

11       A.  And to answer your question, yes.

12       Q.  M-h'm.  I just want to ask you one other

13   question.  Can you go to Tab No. 1, please.  It's

14   about your responsibilities.  It's Bates

15   No. 2466311.

16            MS. GREENWALD:  And we'll have that

17   as Exhibit 4591.

18        (Exhibit No. 4591 marked.)

19       Q.  (By Ms. Greenwald) The top line says:

20   "I am doing the road show on Macondo with farm

21   out after farmout presentations..."

22        What are you referring to?

23       A.  I'm referring to at some point, we --

24   we were looking for partners for the well.

25   Management asked us to provide a -- a geologic

1  description, a PowerPoint Presentation on the

2  prospect --

3      Q.  M-h'm.

4      A.  -- and deliver that to potential farm OP,

5  nonoperators.

6      Q.  So you were -- were you actually the

7  person who would go to some of these potential

8  investors in the Macondo Well and make a

9  Presentation --

10     A.  Well --

11     Q.  -- about the well?

12     A.  I -- I did give presentations on -- on

13 the Geology, the subsurface of the well.

14     Q.  Okay.  That was your part of the

15 Presentation, you would talk about the Geology?

16     A.  Yes.

17     Q.  And who would you make these

18 presentations with at BP?  Who from BP would make

19 these presentations with you?

20     A.  From my recollection, there was a -- a

21 geophysicist.

22     Q.  Who -- who was that?

23     A.  Binh.

24     Q.  Okay.

25     A.  Binh would help as --

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.   Okay.

2     A.   -- part of the Subsurface Team that would

3  provide the presentations.

4     Q.   Was -- you made a presentation to Mitsui;

5  is that right?

6     A.   That is correct.

7     Q.   Anyone else besides Mitsui?

8     A.   Yes.

9     Q.   Who else?

10     A.   I recall a few names.  There was a number

11  of them.  One was Anadarko, I believe Samson, and

12  I don't recall the other oil companies.

13     Q.   Did you identify which companies to make

14  the presentations to?

15     A.   No.  I was just asked to give the

16  Presentation.

17     Q.   And after the Presentation, did you do

18  any followup with those prospects?

19     A.   Could you rephrase your --

20     Q.   Well, sure.

21     A.   -- your question.

22     Q.   One -- I mean, once you would go -- for

23  example, I know there's an E-mail in here about

24  your meeting with Mitsui.

25     A.   Right.

**PURSUANT TO CONFIDENTIALITY ORDER**

1        MR. KEEGAN:  Objection to form.

2    Q.  (By Ms. Greenwald) After you made the

3  Presentation to Mitsui with -- I think you said

4  it was with Binh; is that right?

5    A.  Yes.

6    Q.  After that Presentation, would you

7  contact the people at Mitsui who you met with

8  again, or was that just the Presentation and then

9  your job was over with respect to that?

10    A.  My job was over with respect to that.

11    Q.  Okay.  Would you make a different

12  PowerPoint Presentation to each prospective

13  investor?

14    A.  From my recollection, we had one single

15  PowerPoint Presentation.

16    Q.  And you weren't involved in any of the

17  followup, if there was any?

18    A.  If there was followup questions, that

19  would be brought to me by Management.

20        MR. KEEGAN:  Robin, do you want to

21  mark that?

22        MS. GREENWALD:  Oh, I think I did.

23  I had marked it as 4591.

24        MR. KEEGAN:  Oh, sorry about that.

25        MS. GREENWALD:  That's okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  (By Ms. Greenwald) And do you recall any

2    followups?

3    A.  I don't recall -- I do recall having the

4    followups, but I don't recall what we were

5    specifically talking about in a followup

6    conversation.

7    Q.  Okay.  I'd like you to turn to Tab

8    No. 10, please.  This is a document previously

9    marked as Exhibit 1065.  This is a document -- a

10   conversation between you and Robert Bodek.

11        What was your relationship to Robert

12   Bodek during this time period of 2010?

13   A.  So I -- I'm the -- he was the Operations

14   Geologist --

15   Q.  M-h'm.

16   A.  -- for the well.

17   Q.  And what was your working relationship

18   with him?  Did you have regular meetings with

19   him?  Did you report to him?  Did he --

20   A.  So being part of the morning -- morning

21   call --

22   Q.  M-h'm.

23   A.  -- the Operations Team would be in the

24   room with me, as a Group.  We'd have discussions

25   about --

76

1    Q.   Okay.

2    A.   -- the day-to-day operations.

3    Q.   And he would be one of the people who

4  would get your daily updates on the Macondo Well;

5  is that right?   "He" meaning, I'm sorry, Robert

6  Bodek?

7    A.   At one point, he -- when I went out of

8  town for a couple of days, he provided the -- the

9  daily updates.

10    Q.   Okay.  Can you take a look at this?  And

11  I want to ask you a question about in sort of

12  the -- under where it says -- on March 7, 2010 at

13  5:09, it says:  Shat.  I hope I did not tell a

14  fib."

15    A.   Where is that exactly?

16    Q.   It's --

17                MR. KEEGAN:   (Indicating.)

18    Q.   (By Ms. Greenwald) -- about a third of

19  the way down, not even a third.  A quarter of the

20  way down, it says:  "Shat.  I hope I did not tell

21  a fib."

22    A.   Okay.

23    Q.   What should you have written based on --

24  as you sit here today, what did you understand

25  you should have written based on Bodek's E-mail?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1              MR. KEEGAN:  Objection to form.

2       A.  If you'd give me a second to re-read the

3  document.

4       Q.  (By Ms. Greenwald) Sure.

5       A.  It's been a while since I -- I've seen

6  all this.  (Reviewing document.)

7       Q.  I think you only have to read the one

8  from March 7th.  The other one --

9       A.  March 7th?  Okay.

10      Q.  Yeah.  The other ones go back all the way

11  to the beginning.

12      A.  Okay.  So in my Daily Update to

13  Management on March 7th, I -- I noted that we

14  performed a leakoff test.

15      Q.  M-h'm.

16      A.  Bobby, since he is in the Operations,

17  instructed me that it's not -- wasn't a leakoff

18  test.  It was a shoe integrity test, which is --

19  I mean, this is not my field of expertise, but

20  I -- I think that's -- that's what he was

21  referring to there.

22      Q.  Okay.

23      A.  So then I just responded --

24      Q.  M-h'm.

25      A.  -- with my joking comment.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Okay.   Now, Bobby responds that:   "Haha."

2    It's the very top line.   "I'mm sure they're not

3    looking at it that hard.   As long as no one get

4    hurt, and the rigs not on fire, I'm sure they

5    just glance over it!"

6         Do you see that?

7    A.   I do.

8    Q.   Is he referring there to your Daily

9    Updates?

10        MR. KEEGAN:   Objection to form.

11   A.   I don't know Bobby -- I think Bobby was

12   referring to my previous E-mail in a joking

13   manner, which is really in poor taste at this

14   time.

15   Q.   (By Ms. Greenwald) Well, but -- and they

16   say I'm not -- "I'mm sure they're not looking at

17   it that hard."

18   A.   Well --

19   Q.   Aren't they referring to -- isn't --

20   aren't you guys talking about your Daily Updates

21   that you provide to Management --

22        MR. MONICO:   Objection, form.

23   Q.   (By Ms. Greenwald) -- that you testified

24   about earlier?

25        MR. MONICO:   Objection, form.

**PURSUANT TO CONFIDENTIALITY ORDER**

         A.   So could you repeat the question one more

time?

         Q.   (By Ms. Greenwald) Well, what -- well,

you -- you -- we've talked already about your

Daily Updates that you do.

         A.   Right.

         Q.   What -- what's the -- what's the purpose

of them?

         A.   To update Management on the -- a quick

update of the operations of the -- of the well.

         Q.   Right.

         A.   Yeah.

         Q.   And so in Exhibit 1065 that you're

looking at now, Tab 10, isn't it true that Bobby

Bodek is correcting you on your entry for

March 7th?

         A.   Yes, he was.

         Q.   Okay.  And so on the -- on the top entry

of this document, 1065, when he says:  "I'mm sure

they're not looking at it that hard," isn't that

referring to the Daily Updates that you give on

the Macondo Well?

                  MR. MONICO:  Object -- objection,

form.

                  MR. KEEGAN:  Objection to form.

1      A.   That is something Bobby said.  I -- I

2  truly don't know what he was talking about.

3      Q.   (By Ms. Greenwald) You never had any

4  discussion with him after that E-mail?

5      A.   I did have a -- a discussion with him on

6  what a shoe integrity test to further my learning

7  on what -- you know, just to get a better

8  understanding of operations.

9      Q.   Okay.  If you could, go to Tab 16.  It's

10  Document 893604, Exhibit No. 4592.

11           (Exhibit No. 4592 marked.)

12      Q.   (By Ms. Greenwald) The entry that's a --

13  the second from the bottom on the first page, you

14  write -- I don't even know how to say it --

15  "Bitumen and reservoirs do not mix well.  One

16  thing we are thinking is that the mass transport

17  complex has remobilized this bitumen."

18           Do you see that?

19      A.   Yes, I do.

20      Q.   What -- can you explain that?

21      A.   So, again, this is the Subsurface Team --

22      Q.   M-h'm.

23      A.   -- doing Geology.  And we noticed an

24  increase of bitumen with --

25      Q.   M-h'm.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   -- in the reservoir, and we gave a

2  description of how we think the bitumen was

3  getting in place and --

4     Q.   What does this mean:   "One thing we are

5  thinking is that the mass transport complex has

6  remobilized this bitumen"?

7     A.   So a -- a mass transport complex most of

8  the times you can see clearly on the seismic

9  data.   So as a Subsurface Team, we could see that

10  there is a large what we would call a failure,

11  where a massive amount of material would slide

12  down a -- a slope at that time, which is referred

13  to as a "mass transport complex."

14     Q.   M-h'm.

15     A.   That could have brought in some of this

16  bitumen that --

17     Q.   Okay.   And why was this a concern?

18             MR. KEEGAN:   Objection to form.

19     A.   Bitumen is known to decrease permeability

20  in reservoirs.

21     Q.   (By Ms. Greenwald) Okay.   Can you look at

22  Tab No. 2, please, Bates No. 2732472.

23             MS. GREENWALD:   And that will be

24  Exhibit No. 4593.

25             (Exhibit No. 4593 marked.)

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  (By Ms. Greenwald) If you could turn to

2    the second page first, which is 2732473, what do

3    you mean by "Life summarized in 4 bottles"?

4    A.  I believe this was a -- an -- a joke that

5    came across in E-mail form.  I -- I did not write

6    "Life summarized in 4 bottles."

7    Q.  That's not from you?  It says "From:

8    Charles Bondurant"?

9    A.  Correct.

10    Q.  But you didn't write that?

11    A.  It was -- no.

12    Q.  Just -- who else has access to your

13    E-mails?

14            MR. KEEGAN:  Objection, form.

15    Q.  (By Ms. Greenwald) Does anybody else have

16    access to your E-mails --

17            MR. KEEGAN:  Objection, form.

18    A.  No.

19    Q.  (By Ms. Greenwald) -- at work?  No?

20    A.  No.

21    Q.  But this -- but this E-mail says it's

22    from you, right?

23    A.  Yes.

24    Q.  Do you know who wrote it?

25    A.  I do not know.  I -- I believe that it

**PURSUANT TO CONFIDENTIALITY ORDER**

1   was a joke that was sent to me that I forwarded

2   to other people.

3       Q.   Do you know what it meant?

4       A.   It's been so long since I've seen the

5   joke, I -- I don't recall.

6       Q.   Okay.   On the first page -- le -- let me

7   go back for a minute.   Did -- are these jokes

8   that -- that were regular or at least somewhat

9   common among you and some of the people you

10  worked with at BP?

11              MR. KEEGAN:   Objection, form.

12      A.   Occasionally people will send jokes in

13  through E-mail.

14      Q.   (By Ms. Greenwald) And why was it that

15  you forwarded this one?

16              MR. KEEGAN:   Objection to form.

17      A.   Well, I assume I saw some humor in the

18  E-mail, in the joke.

19      Q.   (By Ms. Greenwald) Did it -- it -- he --

20  but did -- I'm trying to understand what the joke

21  related to.   Did it relate to something going on

22  at BP?

23      A.   No.

24      Q.   Well, what do you think the recipients

25  were -- were understanding this to be as you

1  forwarded it?

2         MR. KEEGAN:  Objection to form.

3     A.  If I recall, there were some pictures

4  associated with the joke.

5     Q.  (By Ms. Greenwald) Oh.

6     A.  So it's not in full context.

7     Q.  Do you recall what the pictures are?

8     A.  I do not recall.

9     Q.  Okay.  If you can go to the first page of

10 the document, it says, second sentence:  "Macondo

11 drilling has been a bit snake bit."  What do you

12 mean?

13    A.  (Reviewing document.)

14    Q.  It's the first li -- first line.

15    A.  Yeah.  I'm reading the rest of --

16    Q.  Okay.

17    A.  -- of the E-mail, of that paragraph.

18 (Reviewing document.)  I believe I was referring

19 to what I stated in the next sentence, that

20 there's some downtime due to BOPs being worked

21 on.

22    Q.  Well -- right.  But under -- I want to

23 ask you about the BOP in a minute.

24         But are you referring in this E-mail to

25 any -- that the bit -- drilling has been a --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    what do you mean by "bit" -- by "bit snake bit"?

2    Does that -- does that expression mean something

3    that I don't understand?  I've never seen that

4    expression before, "bit snake bit."

5              MR. KEEGAN:  Objection to form.

6        Q.  (By Ms. Greenwald) Does that mean

7    something that you can explain to us?

8        A.  Sure.  It -- it means that there were --

9    there are certain issues occurring in the

10   Drilling Operations, which I'm not involved in,

11   but from reading the Operations Report, that

12   looked like -- it was -- they were having

13   difficulties with the BOP or a poor leakoff test

14   or a leakoff test.  So it -- it's the operations

15   side of things, and I was just probably trying

16   to -- to convey that it was taking some time.

17       Q.  Okay.  And when something takes time, it

18   costs more money; is that right?

19             MR. KEEGAN:  Objection to form.

20       A.  Again, on the Operations side now, but,

21   yes, it -- it does, yeah.

22       Q.  (By Ms. Greenwald) And it says:  "We are

23   trying to shake it but unsuccessful so far."

24   What were you doing -- I take it "we" means you

25   and others, correct?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   I was referring to the Subsurface and --

2  or Operations Team.   We have a Team concept.

3  But, again, this was in the Operations side of

4  things.

5     Q.   M-h'm.

6     A.   Drilling the well.

7     Q.   What were you trying to do "to shake it,"

8  as a Team?

9     A.   Again, that's on the Opera -- Operations

10 side, so the -- the Drillers were working to

11 their best of ability to drill the well.

12    Q.   Okay.   What -- do you know what the

13 problems were with the BOP?

14    A.   I do not recall.

15    Q.   And who is Ja -- I -- who's Jasper -- I

16 don't know how to say his name, "PIE-is"?   Is

17 that how you say his name?

18    A.   Jasper "PAY-is."

19    Q.   Peijs.

20    A.   Yes.

21    Q.   Who's Jasper Peijs?

22    A.   He was a Team Leader that I had in --

23 when I started as a Geologist in 2006.

24    Q.   Was he your Team Leader at this point?

25 He wasn't, right?

PURSUANT TO CONFIDENTIALITY ORDER

1     A.   No.

2     Q.   Why would you have sent this to him?

3     A.   He's also a Mentor.

4     Q.   And did you -- he -- so you were just

5  sharing with him some of your frustrations or

6  your concerns?  Is that why this is written to

7  him?

8          MR. KEEGAN:  Objection to form.

9     A.   I was giving Jasper an update on the

10  status of the well as I saw it.

11     Q.   (By Ms. Greenwald) And what was Jasper's

12  job responsibilities as of October twen -- 2009

13  when this was written to him?

14     A.   I --

15          MR. KEEGAN:  Objection to form.

16     A.   I don't know.

17     Q.   (By Ms. Greenwald) Did he have anything

18  to do with the operations of the Macondo Well?

19     A.   No.

20     Q.   Is he part of your Team?

21     A.   No.

22     Q.   So you -- so at the -- as you're sitting

23  here today, you forwarded this to him in his

24  capacity as your -- you thought of him as a

25  Mentor?  That's why you sent this to him?

**PURSUANT TO CONFIDENTIALITY ORDER**

1        MR. KEEGAN:  Objection to form.

2     A.  Yes.

3     Q.  (By Ms. Greenwald) Did you have any other

4  conversations with him about the context of --

5  the contents of what's in Exhibit -- I forget the

6  number of it.  I didn't write it down.

7        (Discussion off the record.)

8     Q.  (By Ms. Greenwald) -- 4593?

9     A.  I don't believe so, no.

10    Q.  All right.  If you could go to Tab 48,

11  please.  It's priorly -- it's previously marked

12  as Exhibit 1208.  You say about, h'm, little more

13  than halfway down the page:  "A new OW project

14  MC_2010 has been set up for the Relief Well

15  operation.  This OW project is a restricted

16  access project with two gate keepers.  The gate

17  keepers are Ross Benthien and Chuck Bondurant.

18  Users who will have access to this project are

19  CC'd on this email."

20        What was your function as a gatekeeper of

21  the relief well?

22        MR. KEEGAN:  Objection to form.

23    A.  I was a gatekeeper to the Open Works

24  Project.

25    Q.  (By Ms. Greenwald) And what -- what did

PURSUANT TO CONFIDENTIALITY ORDER

1    that entail?

2        A.  If -- so, again, this is a database that

3    the Subsurface Team worked the relief wells on.

4    And I -- at -- at BP, a -- a new Open Works

5    Project is created.  Someone takes ownership of

6    the Open Works Project.

7        Q.  So the rig explodes on April 20th, 2010,

8    and as I recall, that's the last date you made an

9    entry on your Daily Update.

10                   MR. KEEGAN:  Objection to form.

11       Q.  (By Ms. Greenwald) Is that right?

12       A.  Yes.

13       Q.  Okay.  At what point in time were you

14   assigned to work on the relief well?

15       A.  Pretty much we began working as a Team

16   the day of the incident.

17       Q.  21st?

18       A.  Yes.

19       Q.  Who was on your Team?

20       A.  On the -- the Subsurface Team was Terry

21   Fitzpatrick, myself.  That's -- that's who I

22   recall right now on the Subsurface side.

23       Q.  So there were -- there were two Relief

24   Well Teams, or was there just one team working on

25   both relief wells?

**PURSUANT TO CONFIDENTIALITY ORDER**

 1      A.   There were two --

 2            MR. KEEGAN:   Objection to form.

 3      A.   There were two Relief Well Teams.

 4      Q.   (By Ms. Greenwald) And you were on the

 5   Relief Well Team for Relief Well 2; is that

 6   correct?  I know they call it DDIII, but that was

 7   the second relief well; is that right?

 8      A.   Yes.

 9      Q.   Did you collaborate with the DDII Team?

10      A.   I did talk to their Geologist.  Yes, we

11   collaborated, yeah.

12      Q.   And can you describe that collaboration?

13            MR. KEEGAN:   Objection to form.

14      A.   Yes.  Being part of the Subsurface Team,

15   like describing the Prospect, in our day-to-day

16   job, we -- we described what we saw in the new

17   wellbore, to provide a clear subsurface

18   description of what the relief wells could

19   encounter during drilling.

20      Q.   (By Ms. Greenwald) M-h'm.

21      A.   (Nodding.)

22      Q.   When you were working on the Prospect for

23   the Macondo, is part of that work also -- strike

24   that.

25            Do you know when the -- the Operations

1    Team is coming up with its Drilling Plan, whether

2    it also does preliminary plans for relief wells

3    at the time it's considering the actual Drilling

4    Operations for the well itself?

5        A.   During this -- during the Macondo --

6        Q.   Right.  So --

7        A.   -- time?

8        Q.   Right.

9        A.   Not to my recollection.

10       Q.   Is that being done now?

11            MR. KEEGAN:  Objection to form.

12       A.   I do not know.

13       Q.   (By Ms. Greenwald) Would you think it

14   should be done now, based on what's happened?

15       A.   That's on the Operations side.  It's --

16   it's out of my area of remit.

17       Q.   Do you have an opinion?

18       A.   No.

19       Q.   No?  Well, do you think that if there had

20   been a design for a relief well on April 21st,

21   you could have started that work sooner than you,

22   in fact, did for the relief wells?

23       A.   Again --

24            MR. KEEGAN:  Objection to form.

25       A.   Again, that's on the Operations side.  I

**PURSUANT TO CONFIDENTIALITY ORDER**

1   don't know the intricacies of all -- all of that

2   design, et cetera.

3       Q.   (By Ms. Greenwald) So what is it you

4   actually did on the relief wells after April

5   20th?

6       A.   The -- the -- I worked with the other

7   Geologists, and we described, as we did for the

8   previous well, what we believed we'd see

9   geologically as we drilled through the -- the

10  ground.

11      Q.   Did you have to get updated tapes and

12  data?

13      A.   No.  We had a very good offset well,

14  being Macondo.  So we just took that information

15  and updated our previous prognosis of what we'd

16  see geologically.

17      Q.   How long did that process take you to

18  update that information?

19      A.   I don't recall the amount of time.

20      Q.   A day, two days, a week?

21      A.   No.  It was -- it's a week or -- about a

22  week, plus.

23      Q.   And -- I'm sorry.  Plus?

24      A.   It -- it took some time, yes.

25      Q.   And what -- what -- why?  Why did it take

PURSUANT TO CONFIDENTIALITY ORDER

1   so much time to do that?  I'm just trying to

2   understand it.

3       A.   Sure.  There's many Parties that were in

4   the process -- or providing information from the

5   original well.  There's wireline logs, LWD logs

6   coming in.  Many folks interpreting that data.

7   So it -- it takes me time to collect the data

8   from the folks and -- and put it into a

9   Presentation format to facilitate communication.

10      Q.   And did you actually put together a

11  package for the Operations Group for the relief

12  well?

13              MR. KEEGAN:  Objection to form.

14      A.   We would provide a -- a -- a PowerPoint

15  Presentation.

16      Q.   (By Ms. Greenwald) What -- what

17  was that --

18      A.   Yes.

19      Q.   -- PowerPoint Presentation?  Can you

20  describe it?

21      A.   Sure.  Again, it was what we saw in the

22  Macondo Well geologically.

23      Q.   Okay.

24      A.   (Nodding.)

25      Q.   Would it be like images of what you --

1    A.  Sure.

2    Q.  -- saw?  Okay.

3    A.  Sure, yeah.  It -- images.

4    Q.  When you say "PowerPoint Presentation" --

5    A.  Yeah.  I'm sorry.

6    Q.  -- I think of words.  Okay.  I have seen

7  them.  So you're talking about images so that

8  they can then use those images for purposes of

9  coming up with the Drilling Plan?

10              MR. KEEGAN:  Objection to form.

11    A.  I -- I believe they do use that

12  information.  That's handed over to the

13  Operations Team to design the wellbore.

14    Q.  (By Ms. Greenwald) So your work on the

15  relief well is actually somewhat similar to what

16  your work was early on before the Macondo Well

17  was drilled; is that correct -- in trying to

18  describe the Geology of the -- the area where the

19  drilling was being contemplated?

20    A.  Yes.

21    Q.  And there were only two people on your

22  Team --

23              MR. KEEGAN:  Objection --

24    Q.  (By Ms. Greenwald) -- for the DDIII?

25              MR. KEEGAN:  Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  (By Ms. Greenwald) I think you mentioned

2   yourself and one other person.

3                    MR. KEEGAN:   Objection.

4      A.   There was a -- a large number of people

5   helping at that time.   I couldn't give you the

6   number.   We had -- we had assistance from

7   outside.   There was a -- there was a -- there

8   was --

9      Q.  (By Ms. Greenwald) Well, approximately

10   how many people were helping you gather that

11   information that was necessary for them -- for

12   the Operations Team to start the relief well?

13                    MR. KEEGAN:   Objection to form.

14      A.   I -- I don't know the number.

15      Q.  (By Ms. Greenwald) Can you give me an

16   approximate number?

17                    MR. KEEGAN:   Objection.

18      A.   Again, there's so many different parties

19   working on the data that was collected, I -- I

20   don't have a -- rough idea, maybe 20.

21      Q.  (By Ms. Greenwald) Did BP use any outside

22   contractors for that work?

23      A.   I --

24                    MR. KEEGAN:   Objection to form.

25      A.   So the wireline information --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  (By Ms. Greenwald) M-h'm.

2    A.  -- that was collected were outside

3  contractors.  So, yes.

4    Q.  Can you go to Exhibit 24, please -- I

5  mean, sorry, Tab 24.  It's previously marked as

6  Exhibit 1230.

7       Now, this is an E-mail about someone

8  named Brad Simpson who handed in his resignation.

9          MR. KEEGAN:  Objection, form.

10    Q.  (By Ms. Greenwald) Have you seen this

11  E-mail down below before?

12    A.  (Reviewing document.)

13       Yes.

14    Q.  Okay.  What did Brad Simpson do at BP?

15    A.  Brad Simpson, he worked for the Pompano

16  Group.

17    Q.  Did he have anything to do with Macondo?

18    A.  That's a tough one to answer.  The --

19  the -- if Macondo was a discovery, it could have

20  been handed off to their team, the Pompano Team,

21  for Production.  So he was a Production --

22    Q.  Oh, okay.

23    A.  -- Engineer.

24    Q.  All right.  You make a comment on the

25  first page of Exhibit 1230:  "Yeah he did not

PURSUANT TO CONFIDENTIALITY ORDER

1    care about core" -- and then I can't read what

2    those -- bunch of code letters -- then it says:

3    "That is BP at its best."

4        What does that mean, "That is BP at its

5    best"?

6        A.  (Reviewing document.)

7            I don't recall.

8        Q.  Did Brad have a supervisory role, do you

9    know?

10       A.  Can you repeat the question?

11       Q.  Did Brad have a supervisory role?

12       A.  No.

13       Q.  And that "Yeah he did not care" -- the --

14   the same line that I was reading before:  "Yeah

15   he didn't care about core," and then do you know

16   what those letters are following that?  Is

17   that --

18       A.  No.

19       Q.  Okay.  All right.  If you could go to Tab

20   13, please.  It's Document 002084.

21           MS. GREENWALD:  Let me mark it 4594.

22       (Exhibit No. 4594 marked.)

23       Q.  (By Ms. Greenwald) Okay.  Who asked you

24   to do this calculation?

25           MR. KEEGAN:  Objection to form.

98

1      A.   What calculation?

2      Q.   (By Ms. Greenwald) Well, if you look at

3    the -- the middle E-mail from you to Jay, you're

4    doing some calculations, are you not, about what

5    it will cost to complete the Macondo Well?  Is

6    that correct?

7               MR. KEEGAN:   Objection to form.

8      A.   (Reviewing document.)

9           Yes.

10     Q.   (By Ms. Greenwald) Okay.  Did someone ask

11   you to prepare this?

12     A.   Yes.

13     Q.   Why?  I should say "who," I'm sorry.  Who

14   asked you to prepare it?

15     A.   Jay.

16     Q.   And do you know why?

17     A.   I -- I -- I don't know why he came to me

18   for this.

19     Q.   What did you use to calculate this

20   information?  What kind of data did you use?

21     A.   Again, I referred to the Morning Report.

22     Q.   Does the Morning Report have information

23   on how many more days are left for total depth?

24     A.   No.

25     Q.   So where would you have gotten that

**PURSUANT TO CONFIDENTIALITY ORDER**

1  information from?

2    A.  Probably talked to the Drilling

3  Engineers.

4    Q.  Do you know who?

5    A.  I don't recall.

6    Q.  Do you know why you were asked to do this

7  since you weren't working on the production of

8  the well --

9          MR. KEEGAN:  Objection --

10    Q.  (By Ms. Greenwald) -- in the drilling of

11  the well, excuse me?

12    A.  No.

13          MR. KEEGAN:  Objection to form.

14    Q.  (By Ms. Greenwald) How did you get the

15  information that the rig was $850,000 a day?  I

16  have not seen that in the Daily Update Reports.

17          MR. KEEGAN:  Objection to form.

18    A.  I believe I got it off the Morning

19  Reports.

20    Q.  (By Ms. Greenwald) Okay.  How about "the

21  remaining hole costs will be around $42,000,000,"

22  do you know where you got that information from?

23    A.  Most likely from the Drilling Engineers

24  who were doing the operations.

25    Q.  Okay.  There was a lot of concern at this

1  time, wasn't there not, about the cost of the

2  Macondo Well?

3          MR. KEEGAN:  Objection, form.

4     A.  I did not hear any concern.

5     Q.  (By Ms. Greenwald) So you have no

6  knowledge, as you sit here today, that there was

7  a concern about how much the Macondo Well was

8  costing to drill in and around March of 2010?

9     A.  No.  It was not my -- part of my

10  day-to-day job.  I'm back to prospecting at this

11  time.

12    Q.  Well, but you're also gathering data, are

13  you not, about how much certain things are going

14  to cost?

15    A.  At this point I did, yes.

16        (Discussion off the record.)

17    Q.  (By Ms. Greenwald) Can you go to Tab 3,

18  please.  That's Bates No. 1969523.

19        If you just look at the first page.

20          THE COURT REPORTER:  Do you want to

21  mark it?

22          MS. GREENWALD:  I'm sorry.  Yes.

23  Thanks you.

24        4595.  Thanks.

25        (Exhibit No. 4595 marked.)

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  (By Ms. Greenwald) Now, this is an E-mail

2   exchange when the MARIANAS is taken off the well;

3   is that right?

4            MR. KEEGAN:  Objection to form.

5    A.  I -- I don't know.

6    Q.  (By Ms. Greenwald) Well, Keith writes you

7   an E-mail on November 24th, and he says:

8   "...but...the only bright spot in my days were

9   the Macondo" daily -- "daily email updates!  What

10  will I do now??"

11       Is that because the MARIANAS has now left

12  the Macondo Well?

13            MR. KEEGAN:  Objection to form.

14   A.  I -- I don't know if they had left at

15  this time.  Don't recall.

16   Q.  (By Ms. Greenwald) But is this referring

17  to the MARIANAS?

18   A.  I don't know.

19   Q.  Well, look at the next line:  "And of

20  course...you know that your career is now in

21  ruins and your name will forever being tagged to

22  failure and," quote, "'that rig,'" close quote.

23   A.  H'm.  Again, this is Keith Everill.

24   Q.  Okay.  Let's -- let's go to your response

25  to that, then.  Okay?

PURSUANT TO CONFIDENTIALITY ORDER

1      A.   Yeah.

2           MR. KEEGAN:   Objection to form.

3      Q.   (By Ms. Greenwald) So up above is your

4  response to his E-mail; is that correct?

5      A.   Yes.

6      Q.   Okay.  And you say:  "I will keep working

7  this way until I am CEO."  What do you mean by

8  "this way"?

9      A.   I don't recall.  Keith and I are good

10 friends, and we're joking with each other over

11 E-mail.

12     Q.   But what way were you working on November

13 24th, 2009?

14          MR. KEEGAN:   Objection to form.

15     A.   Can you repeat the question?

16     Q.   (By Ms. Greenwald) You wrote this on

17 November 25th, 2009 --

18     A.   Right.

19     Q.   -- so what I want to know is:  What way

20 were you working?  You say:  "I will keep working

21 this way."  What way was that on --

22     A.   I --

23     Q.   -- November 24th, 2009?

24          MR. KEEGAN:   Objection, form.

25     A.   I don't recall.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   (By Ms. Greenwald) You have no idea what

2   you mean by that sentence:  "I will keep working

3   this way until I am CEO"?

4        How about the next line --

5    A.   I don't.

6    Q.   Pardon?

7    A.   No, I don't.

8    Q.   "I will spend Millions upon MILLIONS of

9   BP's & partners dollars and have nothing to show

10   for it."  What do you mean by that?

11             MR. MONICO:  Objection, form.

12    A.   Again, I was joking with a -- a friend

13   through E-mail.

14    Q.   (By Ms. Greenwald) Then you say:  "If I

15   can do this again in the next year or two I might

16   become TL material."  What is "TL"?

17    A.   That refers to Team Leader.

18    Q.   Oh, Team Leader.  Okay.

19    A.   (Nodding.)

20        Yeah.

21    Q.   So as you sit here today, you don't know

22   what you're talking about in this E-mail?

23    A.   I --

24             MR. KEEGAN:  Objection to form.

25    Q.   (By Ms. Greenwald) Is that your

1  testimony?

2          MR. KEEGAN:  Objection to form.

3     A.  Yes.  I was joking with a friend over

4  E-mail.

5     Q.  (By Ms. Greenwald) But what are you

6  joking about?  That's what I want to know.

7     A.  Well, we had a -- my friend Keith had a

8  running joke on how to get to Management is to

9  drill dry holes or something, and I was just

10  probably referring to that.

11     Q.  How to get to Management by drilling

12  dry --

13     A.  Yes.

14     Q.  -- holes?

15     A.  Yes.

16     Q.  And how to annoy Management, is that what

17  you mean by "how to get to Management"?

18          MR. KEEGAN:  Objection --

19     Q.  (By Ms. Greenwald) Or are you saying that

20  you actually -- the way -- that -- that

21  Management -- okay.  I understand what you're

22  saying.

23          So you're saying he has a joke -- he,

24  Keith, has a joke -- that you become a Manager of

25  BP by drilling dry holes.  Is that --

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        A.   Yes.

 2        Q.   -- what you mean?

 3             Okay.  Okay.  If you can -- do I have Tab

 4   24 yet?

 5             If you can look at Tab 23, please.

 6             (Exhibit No. 4596 marked.)

 7        Q.   (By Ms. Greenwald) That's Bates

 8   No. 891511, Exhibit 4596.

 9             Your E-mail is the third one down on that

10   page, and it says:  "I agree.  We had over 2

11   months of NPT time on this well."  It does not

12   make -- It -- "It does not make since to" --

13   sense -- "to blow off retrieving core plugs

14   because the tool is PoC.  We should at least

15   retrieve our minimum of 15 unless Galina demands

16   more."

17             Do you see that?

18        A.   Yes.

19        Q.   Okay.  And then above that, Robert Bodek

20   writes to you -- and I assume it's in response to

21   this, it has the same "Re" line and it's just a

22   few minutes after -- and he says in the second --

23   the third sentence:  "Please just keep in mind

24   the difference between 'must have' and 'would be

25   nice to have' data."
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    What did you understand that to mean?

2         MR. KEEGAN:  Objection to form.

3    A.  As a Geologist --

4         (Discussion off the record.)

5    A.  I -- I -- I don't know exactly what Bobby

6    is referring to there.

7    Q.  (By Ms. Greenwald) What did you

8    understand it to mean?

9    A.  Again, I -- I don't know what he's

10   specifically referring to.  I know he's referring

11   to -- well --

12        (Reviewing document.)

13        It looks like he's referring to data

14   collection.

15   Q.  And is he -- and he's talking about data

16   that you have to have versus that it would be

17   nice to have, meaning something that you don't

18   absolutely have to have because it would be an

19   extra time or cost?

20        MR. KEEGAN:  Objection to form.

21   Q.  (By Ms. Greenwald) Is that what you

22   understand this to mean?

23        MR. KEEGAN:  Objection to form.

24   A.  So this is on the Operations side --

25   Q.  (By Ms. Greenwald) M-h'm.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   -- of things, right?

2          And can you repeat your last question?

3     I'm --

4     Q.   Do you not understand this to be that --

5     because you follow -- look at the next sentence:

6     "So far the 7 core plugs we have have cost about

7     $175,000 each," and he goes on about the

8     materials.

9          So when he says, "Please keep in mind the

10    difference between 'must have' and 'would be nice

11    to have' data," did you not understand that to

12    mean that must have data -- I'm sorry, that would

13    be nice to have data you have to keep in mind the

14    extra cost and time for that data?

15    A.   I --

16              MR. KEEGAN:  Objection to form.

17    A.   I don't know what he was referring to

18    specifically.

19    Q.   (By Ms. Greenwald) Did you and Bodek ever

20    have conversations about the pressures -- strike

21    that -- about the concern about saving money and

22    time on Drilling Operations?

23              MR. KEEGAN:  Objection to form.

24    A.   I don't recall.

25    Q.   (By Ms. Greenwald) You don't recall ever

**PURSUANT TO CONFIDENTIALITY ORDER**

1   having a conversation with him about saving time

2   and money on Drilling Operations?

3        A.  (Shaking head.)

4        Q.  "No"?

5        A.  No.

6        Q.  How about anybody else at BP?

7        A.  I don't recall.

8        Q.  Did you feel that part of your annual

9   evaluation was saving the company money?

10               MR. KEEGAN:  Objection to form.

11        A.  I tried to do the best job at being a

12   Geologist and getting the proper information for

13   people to do good work on describing a prospect.

14   And I hope that's what Management looks at for

15   personal evaluation.

16        Q.  (By Ms. Greenwald) If I -- I recall in

17   one of your evaluations, you were praised for no

18   longer being member of a society, AA -- I forget

19   the acronym, I can pull it up -- because it saved

20   the company money, and you were praised for

21   saving the company that money.  Do you recall

22   that?

23        A.  I --

24               MR. KEEGAN:  Objection to form.

25        A.  Yes.

1    Q.  (By Ms. Greenwald) Okay.  And -- and

2    in -- and is it not the case that in your annual

3    evaluations -- at least the ones that we have, we

4    only have two years -- there's reference several

5    places giving you accolades because of your

6    saving of money for the company; isn't that true?

7                MR. KEEGAN:  Objection to form.

8    A.  I -- I don't recall the accolades.

9    Q.  (By Ms. Greenwald) Well, if we have time,

10   I'll go back over --

11   A.  Okay.

12   Q.  -- this.

13        Okay.  If you can go to -- if you can

14   look at Document No. 11.  I have a series of

15   documents that I want to show you about this

16   topic.  So first, No. 11, which is 2543376.

17                MS. GREENWALD:  And we'll mark that

18   4597?

19           (Exhibit No. 4597 marked.)

20   Q.  (By Ms. Greenwald) Do you see that?

21   There appears to be, from a number of E-mails

22   that I've seen, that you were having issues --

23   you and many people at BP in your Group were

24   having issues with databases and computer

25   systems; is that correct?

1        MR. KEEGAN:  Objection --

2    Q.  (By Ms. Greenwald) Around this time,

3  March of 2010?

4        MR. KEEGAN:  Objection to form.

5        MR. MONICO:  Objection to form.

6    A.  H'm, no.

7    Q.  (By Ms. Greenwald) Okay.  Why don't I

8  have you -- let's -- let's pull them all out.  So

9  there's also -- when you say -- four -- let's

10  stay on 4597 for a minute -- "I am unable to

11  access any data on the Macondo insite website,"

12  what is that referring to?

13    A.  INSITE is a third-party application

14  provided by a -- another contractor.  I believe

15  that the true name of the -- the program is

16  INSITE Anywhere.

17    Q.  So in this document, 4597, you're saying

18  that that third party vendor's system is having a

19  problem.  Is that what you mean by this one?

20        MR. HILL:  Object to form.

21        THE COURT REPORTER:  Who was that?

22        MR. KEEGAN:  A third-party vendor.

23    A.  I'm just stating that I can't access a

24  website.

25    Q.  (By Ms. Greenwald) The -- was that a --

PURSUANT TO CONFIDENTIALITY ORDER

1    an access problem on the BP database?

2        A.   It was on the INSITE Anywhere database.

3        Q.   It says:  "I can log in but there is no

4    data being fed to any of the displays."

5            Is that the display -- the BP displays,

6    or the INSITE displays?

7        A.   INSITE.

8        Q.   Okay.  If you go to number -- Tab 18,

9    which is 889046, Exhibit 4598.

10           (Exhibit No. 4598 marked.)

11       Q.   (By Ms. Greenwald) So maybe this is --

12   these are from March 31st, 2010.  And you say:

13   "I am currently documenting issues with both the

14   UNIX and PC platforms."

15           What were the issues you were

16   documenting?

17       A.   I do recall this.  There were times where

18   we would see -- I guess what would -- I'd term as

19   a lag on the -- on the network end.  So if I'm

20   interpreting data and interpreting horizon, I'd

21   interpret the horizon, and it'd take a few

22   seconds for the horizon to actually appear on the

23   seismic data.  So it was some sort of lag on the

24   system.

25       Q.   And that was causing a lot of problems,

1    wasn't it?

2              MR. KEEGAN:  Objection to form.

3       A.  No.

4       Q.  (By Ms. Greenwald) No?  Did you not

5    gather -- did you not take on the responsibility

6    of find -- of compiling everybody's complaints so

7    that you could let Management know about this

8    problem of lag time?

9              MR. KEEGAN:  Objection to form.

10      A.  I -- I did help compile complaints to

11   facilitate it, a conversation with Management and

12   the Data Management, or network staff at BP.

13      Q.  (By Ms. Greenwald) Do you feel that your

14   complaints were satisfactorily responded to?

15      A.  Yes.

16             MR. KEEGAN:  Objection to form.

17      Q.  (By Ms. Greenwald) H'm, in which --

18      A.  At this time, yes.

19      Q.  How long -- in a -- in a -- you say "at

20   this time," had they been in the past?

21      A.  Yes.

22      Q.  You say at the end:  "Thank you for

23   responding, if you choose not to, I totally

24   understand."

25             That's the last sentence.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   Yeah.

2    Q.   What do you mean you would totally

3  understand if they decide not to?  Why would

4  someone not want to share their problems with

5  their systems with you?

6              MR. KEEGAN:   Objection to form.

7    A.   I was just letting him know that certain

8  people don't want to do that type of work, and I

9  totally understand if they don't want to

10 participate in capturing information.

11   Q.   (By Ms. Greenwald) You mean they

12 don't want to -- you -- you -- but you're only

13 asking them to document problems they've been

14 having; isn't that right?

15   A.   (Reviewing document.)  Yeah.  Issues with

16 the UNIX and --

17   Q.   Right.

18   A.   -- PC platform, yes.

19   Q.   Which are problems, they're not issue --

20 I mean, your issues are problems you're having

21 with the system?

22             MR. KEEGAN:   Objection, form.

23   A.   Again, we're talking Data Management or

24 hard -- an area out of my expertise.  So I don't

25 know if they're --

1      Q.   (By Ms. Greenwald) What's out of --

2      A.   And --

3      Q.   -- your expertise, UNIX and the PC

4  platforms?  Is that what you mean?

5      A.   No, network support.

6      Q.   Can you go to exhi -- Tab 19, please, the

7  next one --

8      A.   M-h'm.

9      Q.   -- which is Bates 4037.

10          MS. GREENWALD:  And we'll make that

11  4599.

12          (Exhibit No. 4599 marked.)

13     A.   All right.

14     Q.   (By Ms. Greenwald) You say in the -- your

15  E-mail to Brian Ritchie, midway through:

16  "Talking with the users it seems that people have

17  given up trying to make things better and just

18  deal with what they are dealt."

19     A.   Yes.

20     Q.   "As for backup services users have little

21  faith in the PC backup system and a great deal of

22  faith in the UNIX backup system.  I will send

23  more responses as/if they come in."

24          You say "...people have given up trying

25  to make things better and just deal with what

PURSUANT TO CONFIDENTIALITY ORDER

```
 1    they are dealt."
 2          What did you mean by that?  Didn't that
 3    mean that there were problems that people would
 4    have with the systems?
 5                MR. KEEGAN:  Objection to form.
 6       A.  There had been problems with latency
 7    on -- or lag time while using certain
 8    interpretive packages.
 9                THE COURT REPORTER:  Five minutes.
10       Q.  (By Ms. Greenwald) And you had problems,
11    as well, didn't you, from time to time?
12       A.  I had frustrations.
13       Q.  Because they weren't handled quickly
14    enough and they weren't corrected?
15                MR. KEEGAN:  Objection to form.
16       A.  Yeah.  Yes.
17       Q.  (By Ms. Greenwald) Did that impact your
18    work?
19                MR. KEEGAN:  Objection to form.
20       A.  At times it could.
21       Q.  (By Ms. Greenwald) Right.  Because you're
22    in with realtime drilling, you need active
23    realtime information; isn't that right?
24                MR. KEEGAN:  Objection to form.
25       A.  That's not within context of -- of this
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    information here.

2        Q.  (By Ms. Greenwald) And this information

3    is dealing with what?

4        A.   The UNIX and -- and PC subsurface side of

5    things.

6        Q.  Right.  But you'd need access to that

7    information to be able to assist others working

8    on various Operations; isn't that right?

9                MR. KEEGAN:  Objection to form.

10       A.  Talking to the data does help, and -- and

11   we -- we did have access to our data.

12       Q.  (By Ms. Greenwald) So sometimes very

13   slow --

14       A.  Yes.

15       Q.  -- and sometimes it didn't work at all?

16                MR. KEEGAN:  Objection to form --

17       Q.  (By Ms. Greenwald) Is that true?

18                MR. KEEGAN:  -- multiple questions.

19       A.  That's true, yes.

20       Q.  (By Ms. Greenwald) Okay.  Okay.  If you

21   can look at Tab 9, please.  It's Bates No. 09494.

22   Mark Hafle is talking about looking for Macondo

23   objectives, and he's talking about, "Of the

24   secondary objectives, drilling below...target or

25   making this a keeper well, which would you rank

PURSUANT TO CONFIDENTIALITY ORDER

1   higher?"

2              MR. KEEGAN:  Objection to form.

3       Q.  (By Ms. Greenwald) Do you see that

4   question he asks on the bottom --

5              MR. KEEGAN:  Objection --

6       Q.  (By Ms. Greenwald) -- E-mail?

7              MR. KEEGAN:  Objection, form.

8       A.  Yes.

9       Q.  (By Ms. Greenwald) And you write:  "We

10  can still do both at this point, right?"

11          Right above that?  Do you see that?

12      A.  Yes.

13      Q.  And then he says:  "Yes Just looking in

14  my crystal ball for what might happen with" the

15  "next two liner setting points and how that

16  affects those pesky secondary objectives!"

17      A.  (Nodding.)

18      Q.  And then you answer:  "...I would say

19  keeper comes first."

20              MR. KEEGAN:  Objection --

21      Q.  (By Ms. Greenwald) -- on the top E-mail.

22  Do you see that?

23              MR. KEEGAN:  Objection to form.

24      A.  Yes.

25      Q.  (By Ms. Greenwald) Why were you having

**PURSUANT TO CONFIDENTIALITY ORDER**

1   this dialogue with Mark in March of 2010?

2       A.   Mark had asked me that question --

3       Q.   And why --

4       A.   -- and I gave him an answer.

5       Q.   Do you know why --

6              MR. KEEGAN:  Objection to form.

7       Q.   (By Ms. Greenwald) -- that question was

8   asked?

9              MR. KEEGAN:  Objection.

10      A.   I do not know.

11      Q.   (By Ms. Greenwald) How did you answer the

12  question if you didn't understand the purpose of

13  the question?

14             MR. KEEGAN:  Objection to form.

15      A.   I did understand the purpose.

16      Q.   (By Ms. Greenwald) What was the purpose?

17      A.   He asked me if -- he asked me if

18  "...drilling below the primary target or making

19  this a keeper" bill -- "well" are the two

20  options.

21      Q.   Why would -- did you have that option?

22  Why did -- why was that option being posed that

23  you could only have one or the other?

24             MR. KEEGAN:  Objection to form.

25      A.   I -- I do not know on the Operations side

1    of things.

2        Q.  (By Ms. Greenwald) Okay.  Why did you

3    choose -- what do you -- why did you choose "...I

4    would say keeper comes first"?

5                MR. KEEGAN:  Objection to form.

6        A.  Being part of the Subsurface Team,

7    drilling below the primary target, which was the

8    Macondo Reservoir, we did not see anything of

9    significance reservoir below there, so that was

10   the reason.

11       Q.  (By Ms. Greenwald) So you're saying there

12   was no reason to go further down, because there

13   wasn't anything -- any -- any geo -- geological

14   purpose to go down further?

15               MR. KEEGAN:  Objection to form.

16       Q.  (By Ms. Greenwald) Is that what you're

17   saying?

18               MR. KEEGAN:  Objection to form.

19       A.  Yes.

20               THE COURT REPORTER:  Time.

21               MS. GREENWALD:  Time?  Okay.

22               THE VIDEOGRAPHER:  The time is

23   10:45 a.m.  We're going off the record, ending

24   Tape 2.

25           (Recess from 10:45 a.m. to 10:46 a.m.)

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1            MS. GREENWALD:  Kym, while we're off
 2   the record, I didn't mark the last exhibit, so it
 3   will be -- and I understand we're skipping to
 4   4690.
 5            THE COURT REPORTER:  Yes, ma'am.
 6        (Exhibit No. 4690 marked.)
 7        (Recess from 10:46 a.m. to 10:56 a.m.)
 8            MS. GREENWALD:  I'm ready.
 9            THE VIDEOGRAPHER:  The time is
10   10:56 a.m.  We're back on the record, beginning
11   Tape 3.
12      Q.   (By Ms. Greenwald) I neglected to -- to
13   mark as an exhibit, 4690, Tab No. 9.
14        Okay.  I'd like to have you go to Tab
15   No. 58.  I think it might be the second to the
16   last tab.  This is an E-mail -- the lower E-mail
17   is an E-mail from Robert Bodek to a number of
18   people, you're cc'd on it, and it says:
19   "Evaluation complete at Macondo.  Macondo
20   Partners, Please be advised that all evaluation
21   is now complete on the Macondo Well."  And it
22   talks -- the rest of his E-mail talks about
23   what's been done on the well.
24        And your response above is:  "Adios
25   MF" -- I'm assuming MF is its typical meaning --
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   with two exclamation points and an arrow to

2   Macondo.

3           Why would you say "Adios MF" in response

4   to the Macondo being complete?

5               MR. KEEGAN:  Objection to form.

6       A.  So the -- the data collection was done,

7   so the Operations Team, specifically Bobby's part

8   of Operations, looked to be complete.  So I was

9   just saying the subsurface -- that the -- the

10  well is almost complete for us.

11      Q.  (By Ms. Greenwald) Okay.

12      A.  Saying good-bye to it.

13      Q.  Am I correct that MF stands for what we

14  all assume it means?  That's what you meant by

15  "MF"?

16      A.  It's actually referring to "My Friend,"

17  the Macondo.

18      Q.  "My Friend" is what you meant by MF?

19      A.  At the time, yes.  I was joking around.

20      Q.  Do you really believe that people who

21  receive this E-mail thought that MF meant "My

22  Friend," honestly?

23              MR. KEEGAN:  Objection -- objection

24  to form.

25      A.  Probably not.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.  (By Ms. Greenwald) Okay.  Why would you

2  refer to the Macondo in that context, assuming

3  that you and -- most readers would assume MF

4  meant what most of us thinks MF means?

5              MR. KEEGAN:  Objection to form.

6     A.  The well had -- took some time to drill,

7  it was complete, saying good-bye to finishing the

8  drilling of the well.

9     Q.  (By Ms. Greenwald) It was a problem well,

10  wasn't it?

11              MR. KEEGAN:  Objection to form.

12     A.  That would be more on the Operations side

13  to discuss all the issues with the well.

14     Q.  (By Ms. Greenwald) Right.  But you did

15  Daily Updates, right, the -- a Daily --

16     A.  I did.

17     Q.  -- Update Report?

18         And there were a lot of problems on that

19  well --

20     A.  Yes.

21     Q.  -- were there not, with the drilling?

22              MR. KEEGAN:  Objection to form.

23     A.  Well --

24     Q.  (By Ms. Greenwald) Kicks, losses; isn't

25  that right?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  I did observe those, yes.

2      Q.  Well, you wrote about them every day,

3  right?

4      A.  Yes.

5              MR. KEEGAN:  Objection to form.

6      Q.  (By Ms. Greenwald) So you were pretty

7  happy when this was completed?

8      A.  In many ways, yes, yeah.

9      Q.  So the "Adios," it was great to have it

10  behind you?

11     A.  It was good to see the well down, yes.

12     Q.  Okay.  If you would go to Tab No. 20,

13  Exhibit --

14         (Discussion off the record.)

15             MS. GREENWALD:  Did I not mark that?

16  I didn't mark 58.

17             MS. HEYDER:  It's 4691.

18             MS. GREENWALD:  4691.  Okay.  So 20

19  is 4692.

20         (Exhibit Nos. 4691 and 4692 marked.)

21     Q.  (By Ms. Greenwald) No, that's just for

22  the court reporter.

23     A.  Okay.

24     Q.  Okay.  This is to Robert Bodek and

25  yourself from Christopher Casler:  "I hear

 1    Macondo is a success!  Is it enough to cover all
 2    the headaches?"
 3              How would you answer that question?
 4        A.  I don't know how to answer that question.
 5    It's something that Chris was posing.
 6        Q.  (By Ms. Greenwald) Right.  But as you sit
 7    here today, how would you answer that question?
 8        A.  I'm sure he was referring to down time
 9    from a -- a hurricane hitting a rig and -- and
10    the other NPT time on the well.
11        Q.  Right.  So I -- I actually should have
12    asked my question differently.  Not as of today,
13    but as of April 6, 2010, how would you answer
14    that question?
15        A.  From the --
16        Q.  How would you have answered that question
17    on April 6, 2010?
18        A.  I just answered it.
19        Q.  "Is it enough to cover all the
20    headaches?"
21        A.  I just answered it.
22        Q.  What -- is it -- is it -- was it enough
23    to cover all the headaches?
24        A.  Oh, I -- I don't know how to answer that.
25    I don't know what he's referring to "enough to

1   cover."  I --

2       Q.  Okay.  If you can turn to Exhibit 6.

3   We'll make that --

4               THE COURT REPORTER:  Exhibit?

5               MS. GREENWALD:  I'm sorry.  Tab 6.

6   Excuse me.  Exhibit 4693.

7           (Exhibit No. 4693 marked.)

8       Q.  (By Ms. Greenwald) This is talking

9   about -- I wanted to ask you -- if you can just

10  take a quick look at this.  I want to ask you

11  what you are referring to when you say at the

12  end:  "A bunch of fracking NOISE!  This has been

13  going on for months now."

14              MR. KEEGAN:  That's at the end of

15  the top E-mail?

16              MS. GREENWALD:  Right.  The end of

17  the top E-mail.

18      A.  Let me read the --

19      Q.  (By Ms. Greenwald) If you can -- I want

20  to give you a chance to look at it, but I wanted

21  to ask you what you mean by those statements at

22  the end of your E-mail?

23      A.  (Reviewing document.)  I believe I was

24  referring to an option of -- of taking core or

25  not on the Macondo Well.  There was a lot of

1   meetings that took place.

2       Q.  And why would you not be talking about

3   core, if Ms. Nelson was going to be coming to the

4   meeting?

5               MR. KEEGAN:  Objection to form.

6       A.  (Reviewing document.) I honestly don't

7   recall.  (Reviewing document.) I don't know

8   Ms. Nelson.

9       Q.  (By Ms. Greenwald) You don't know her?

10      A.  (Shaking head.)

11      Q.  Did you -- well, okay.  If you can turn

12  to 15.  And then I'm going to reserve the rest of

13  my time --

14      A.  Okay.

15      Q.  -- for rebuttal.  If you can go to Tab

16  15, and we'll mark this as 4694.

17              (Exhibit No. 4694 marked.)

18      Q.  (By Ms. Greenwald) This E-mail is

19  referring to a kick.  And you say:  "Its amazing

20  that we never saw the sand that kicked us.!!"

21              MR. KEEGAN:  Objection to form.

22      Q.  (By Ms. Greenwald) On the top, do you see

23  that?

24              MR. KEEGAN:  Objection to form.

25      A.  I do.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  (By Ms. Greenwald) What did you mean by

2  that statement?

3          (Discussion off the record.)

4    A.  I'm trying to get familiar with the

5  time --

6    Q.  (By Ms. Greenwald) Okay.

7    A.  -- frame.  (Reviewing document.)

8    Q.  It's March 23rd.

9    A.  (Reviewing document.)  So I -- I believe

10  the Operations side had referred to a potential

11  zone in which we took a kick.

12    Q.  M-h'm.

13    A.  And when we drilled a sidetrack well, we

14  didn't see that zone, so I was referring -- I

15  personally was referring to a sand, I don't know

16  if it was a sand or not, but --

17    Q.  And what would you recommend to ensure

18  for the next time so that one would see the kick

19  coming?

20          MR. KEEGAN:  Objection to form.

21    A.  I don't think that's possible.

22    Q.  (By Ms. Greenwald) No?  What -- what --

23  when you say, "It's amaze" --

24    A.  I don't understand your question.  I --

25    Q.  When you say, "It's amazing that we never

 1   saw the sand that kicked us," I -- maybe I'm

 2   misinterpreting what you mean by that, but I --

 3       A.  I'm sorry.

 4              MR. KEEGAN:  Let her ask her

 5   question.

 6              THE WITNESS:  Yeah.  I'm sorry,

 7   yeah.  Go --

 8       Q.  (By Ms. Greenwald) I -- I read that, and

 9   I could be reading it wrong, but that -- that you

10   should have seen it coming.  Is that not what you

11   meant by that statement?

12       A.  That's not what I meant by that

13   statement.

14       Q.  And what did you say you meant by that

15   statement?

16       A.  So I believe we received a kick.

17       Q.  M-h'm.

18       A.  And then we bypassed.

19       Q.  Right.

20       A.  And when we drilled through that same

21   location, the potential sand that had been

22   flagged as the area we took the kick was not seen

23   in the second wellbore.  And that was amazing

24   that we were 50 feet away, approximately, from

25   the initial wellbore and we didn't see the -- the

1    potential sand that kicked us.

2        Q.  I see what you mean.

3            MS. GREENWALD:  All right.  I'm

4    going to reserve the rest of my time.  Thank you.

5    Thank you.

6            THE VIDEOGRAPHER:  The time is

7    11:06 a.m.  We're off the record.

8        (Recess from 11:06 a.m. to 11:15 a.m.)

9            MR. CERNICH:  I'm ready when y'all

10   are.

11           THE VIDEOGRAPHER:  All set?  One

12   second.

13       The time is 11:15 a.m.  We're back on the

14   record.  Beginning Tape 4.

15                EXAMINATION

16   QUESTIONS BY MR. CERNICH:

17       Q.  Good morning, Mr. Bondurant.  My name's

18   Scott Cernich from the Department of Justice,

19   representing the United States.  This is my

20   colleague, Abby André, also from the Department

21   of Justice.

22           If I could direct you, please, to Tab 48

23   in the -- in the Plaintiffs Steering Committee

24   binder in front of you.  This is a -- an E-mail

25   that was previously marked as Exhibit 1208, and

1 this is an E-mail from yourself to a number of

2 individuals, dated Wednesday, May 5th, 2010, at

3 the top.  But if I could direct you to the E-mail

4 below that which is discussing the Open Works

5 Project.

6          And I just wanted to understand what --

7 what exactly is in this Open Works Project.  Is

8 this a SharePoint site that is used inside of BP

9 to maintain the -- the -- a database of files

10 related to the well?

11     A.   No.

12     Q.   Can you tell me what -- what the --

13     A.   Sure.

14     Q.   -- Open Works Project is?

15     A.   It is a database that Landmark uses for

16 their seismic interpretation package.

17     Q.   And -- and what would be contained in

18 that database?

19     A.   So well information, surface location,

20 attribute information about the well, logs that

21 were take -- that were that were done in the

22 well.  There's also interpretive information,

23 such as picks that interpreters input into that

24 database.

25     Q.   Okay.  The -- the seismic data that's in

PURSUANT TO CONFIDENTIALITY ORDER

1   that database, what format is that seismic data

2   maintained in?

3      A.   For Landmark they refer to it -- there's

4   a number of formats that the seismic data can be

5   in.  One is 3DV, one is .bri, and one is .cmp.

6   There's different ways of storing the data in

7   their package.

8      Q.   Are you familiar with a format called SMT

9   Kingdom?

10      A.   No.  I know that's an interpretation

11   package.

12      Q.   Okay.  Do you ever use that

13   interpretation package?

14      A.   No.

15      Q.   What about SEG-Y?

16      A.   SEG -- SEG-Y, yes, I'm familiar with

17   SEG-Y format.

18      Q.   And do you ever used that --

19      A.   That --

20      Q.   -- format?

21      A.   Earlier in the -- today, I was talking

22   about loading the data into the Landmark package.

23   The data that we'd load would be in SEG-Y format.

24      Q.   Okay.  And so is data in SEG-Y format in

25   the Open Works database?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   H'm, no.   That SEG-Y data would be loaded

2   into a Size Works Project as a .bra -- .bri file

3   or a .cmp or --

4     Q.   And do you have the -- does -- do you --

5   does -- we'll -- we'll talk about the Macondo

6   Well here.

7     A.   Okay.

8     Q.   So for the Macondo Well, did BP have the

9   seismic data in SEG-Y format outside of the Open

10  Works database?

11          MR. KEEGAN:   Objection to form.

12    A.   Yes.

13    Q.   (By Mr. Cernich) And do they -- does BP

14  maintain that data on tapes or in some other

15  format outside of the Open Works database?

16          MR. KEEGAN:   Objection, form.

17    A.   The data that would be loaded into the

18  Size Works Project would be stored by BP in that

19  tape format.   We'd hold onto that information.

20    Q.   (By Mr. Cernich) And -- and who maintains

21  those tapes?

22    A.   I do not know.

23    Q.   Who -- when you were -- earlier today you

24  testified that you would be collecting that -- or

25  you -- you would be up loading that -- that data;

1     is that correct?

2         A.  Yes.

3         Q.  From the tapes.  Who did you -- who

4     provided you with the tapes so that you could do

5     that?

6         A.  It would be the Geophysicist probably

7     within the Subsurface Team working that area

8     would bring the tapes to me.

9         Q.  Okay.  Who was the Geophysicist on the

10    Subsurface Team working on the Macondo Well

11    during the time that you were working on the

12    Macondo Well Pre-Drill?

13        A.  Pre-Drill?  So Binh Nguyen was the

14    Geophysicist working with me, and we also had

15    another member, Frederick Billette who helped

16    with the seismic data.

17               THE COURT REPORTER:  What's his

18    name.

19               THE WITNESS:  Frederick Billette.

20               THE COURT REPORTER:  Thanks.

21               THE WITNESS:  We'll get it later.

22        Q.  (By Mr. Cernich) Okay.  And -- and Open

23    Works would -- would MWD and LWD data be

24    maintained in the Open Works database?

25        A.  Yes.

1    Q.   Wireline logging?

2    A.   Yes.

3    Q.   MDT data?

4    A.   I don't know if all MDT -- MDT data is in

5 Open Works.

6    Q.   Fluids data, like PVT data?

7            MR. KEEGAN:   Objection to form.

8    A.   I do not know.

9    Q.   (By Mr. Cernich) The results from core

10 analyses?

11   A.   We did not store that in -- as far as I

12 understand on -- on the Project I worked on, we

13 did not have any core analysis in our database.

14   Q.   GeoTap data?

15   A.   Yeah.  I don't know if GeoTap data was

16 loaded into the database --

17   Q.   Okay.

18   A.   -- to the Open Works database.

19   Q.   Are you familiar with the terms NMR and

20 FMI logs?

21   A.   Vaguely familiar with NMR.

22   Q.   What is an NMR log?

23   A.   I think it stands for magnetic resonance,

24 or I -- that's about the extent of my knowledge

25 on ML -- NMR logs.

**PURSUANT TO CONFIDENTIALITY ORDER**

 1     Q.  So you never -- you've never reviewed

 2  those types of logs?

 3            MR. KEEGAN:  Objection to form.

 4     A.  I may have looked at them, but I don't

 5  review them.

 6     Q.  (By Mr. Cernich) Okay.  And you

 7  wouldn't -- you wouldn't know how to interpret

 8  those types of logs?

 9     A.  Correct.

10     Q.  Okay.  I'm going to quickly show you -- I

11  don't have a copy of this -- but it's -- it's a

12  document that was produced by BP, and it is --

13  the Bates number is BP-HZN-2179MDL03289835.  And

14  this came from your custodial files as produced,

15  and it's --

16            MR. KEEGAN:  Objection to form.

17     Q.  (By Mr. Cernich) -- it's a photograph of

18  a -- of a CD or a DVD that's labeled "Deepwater

19  Open Works Backup," May 6, 2010.

20        Have you seen that CD before?

21     A.  I have.

22            MR. KEEGAN:  May I --

23     Q.  (By Mr. Cernich) And did that come from

24  your custodial files?

25            MR. KEEGAN:  Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1           (Tendering.)

2      A.   That came from actually backing up the

3   Open Works database, and a CD was -- I actually

4   received one of those CDs.

5      Q.   (By Mr. Cernich) And who -- who provided

6   you with that CD?

7      A.   Data Management.

8      Q.   And who -- who is -- can you tell me who

9   Data Management is?

10     A.   There's a number of people on our Data

11  manage -- Management staff.  I don't recall

12  who -- who made the backup of the Open Works

13  database.

14     Q.   All right.  Do you know why you were

15  provided with that CD?

16     A.   I actually asked for a snapshot of the

17  database -- I forgot what date -- but just to

18  make sure we had all the pertinent information

19  collected and -- and nothing would -- well, that

20  everything was there.

21     Q.   And on that CD are you referring to all

22  the pertinent information for the Macondo Well?

23     A.   I'm referring to the information that the

24  Subsurface Team used and the geologic description

25  of the Macondo prospect and any of the LWD logs

**PURSUANT TO CONFIDENTIALITY ORDER**

1   or -- that had been loaded into that Open Works

2   database at that time.

3       Q.  So everything that was in the Open Works

4   database up until the date that you asked for

5   that backup, that's what would be -- would have

6   been on that, for the Macondo Well, the MC 252

7   well?

8           MR. KEEGAN:  Objection to form.

9       A.  Could you rephrase that question?

10      Q.  (By Mr. Cernich) What -- so -- so all of

11  the -- all of the -- let's see, the geologic

12  description of the Macondo prospect and any logs

13  or additional data that had been collected during

14  the drilling of the well that had been put into

15  Open Works is what you were asking for to be

16  backed up or put on that CD for you?

17      A.  Yeah.  It was a snapshot of the -- the --

18  of the database at that particular time that

19  could -- could contain some of the LW lee -- LWD

20  logs that had been loaded into -- into there.

21      Q.  Would you expect all of the MWD and LWD

22  logs to be loaded into that at that point?

23      A.  Potentially not all at that point.

24      Q.  Okay.  What about the wireline logs?

25      A.  I -- I don't know if they had been loaded

1    into that database by that time.

2        Q.  Would you expect that at some point in

3    the -- in the normal course of updating and

4    maintaining the -- the Open Works database for a

5    well like the Macondo Well that all of that data

6    would eventually find its way into that database?

7                    MR. KEEGAN:  Objection to form.

8        A.  Not every single bit of data that is

9    collected would find its way into that particular

10   database.

11       Q.  (By Mr. Cernich) Would you expect all of

12   the MWD and LWD logs to find their way into the

13   database?

14       A.  No.

15       Q.  And -- and why not?

16       A.  Well, the -- the -- the Open Works

17   database is used by the Subsurface Team, and --

18   and as far as my role in -- in this, it would be

19   I need a small sample of the logs to work with

20   the Geophysicist to make sure we're tying

21   correctly to our seismic data.

22           There's many other inter -- databases

23   that are used by the other experts in our -- in

24   our team that would have all that information.

25   Like the Petrophysicist would have every single

1  log in her database, but she doesn't work in Open

2  Works, so --

3     Q.  Okay.  And do you know what she works in?

4     A.  I believe she uses Techlog.

5     Q.  Okay.  Now, I've heard that generally

6  Operators store all of the data related to -- to

7  the well with some sort of bar code or some way

8  to identify it so that it's all tied to that

9  well; so that all the data, whether it's your

10  data in Open Works or the Petrophysicist data in

11  Techlog is somehow organized so that someone

12  can -- can find that data from a library or a

13  database --

14     A.  Yes.

15     Q.  -- can you describe to me how BP

16  organizes its data with regard to a well?

17           MR. KEEGAN:  Objection to form.

18     A.  I don't know the entire system.  I know

19  we have someone on our floor that does that for

20  us.

21     Q.  (By Mr. Cernich) And who is that person?

22     A.  His name's Ray and -- Widrenski.

23     Q.  Okay.  And is he -- what -- what -- what

24  is his title?

25     A.  I -- I don't know his title.

1       Q.  Is he an Engineer?

2              MR. KEEGAN:  Objection, form.

3       A.  I don't believe so.

4       Q.  (By Mr. Cernich) Is he an Information

5   Technology person?

6       A.  That's fair to say, yes.

7       Q.  Okay.  And he does that for a particular

8   well, or does he do that for a variety of -- of

9   wells?

10              MR. KEEGAN:  Objection to form.

11      A.  To my understanding, he does it for the

12  wells in the Gulf of Mexico Exploration Unit.

13      Q.  (By Mr. Cernich) Okay.  And if you needed

14  a particular piece of data that was not in Open

15  Works, would you go to Mister --

16              MR. KEEGAN:  Ray.

17              MR. CERNICH:  Huh?

18              MR. KEEGAN:  Ray.

19      Q.  (By Mr. Cernich) -- would you go to Ray

20  and ask him for -- for that data?

21      A.  There's a number of places that we could

22  go to for well log information.  I believe that's

23  what we're talking about.  So if it was one of

24  our wells, it probably would already been in Open

25  Works.  If it wasn't one of our wells, we'd go to

 1   a third-party vendor and purchase the data.

 2       Q.  And when you talk about purchasing that

 3   data from a third-party vendor, you're talking

 4   about seismic data?

 5       A.  Well, at this point we're talking about

 6   Open Works that stores well data, and so I'm

 7   talking about well log information.

 8       Q.  So -- so there are -- there are

 9   third-party vendors who maintain well log

10   information?

11       A.  Yes.

12       Q.  Okay.  And -- and can you describe that

13   well log information?

14       A.  For instance, I know a vendor -- I don't

15   know if they're still in business -- but A2D that

16   has a database of many wells.  And I don't

17   know if it's Gulf of Mexico, lower 48, or the

18   world, but for each particular well, they would

19   have a set of -- of well log information that was

20   collected on that well.

21       Q.  All right.  Thank you.

22       A.  Yeah.

23       Q.  Do you know who Mr. Jay Thorseth is?

24       A.  Yes.

25       Q.  And can you tell me who Mr. Thorseth is?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   He's a Performance Unit Leader for the

2  Gulf of Mexico Exploration.

3     Q.   Okay.  And did you have any interactions

4  with Mr. Thorseth related to the Macondo Well?

5     A.   Yes.

6     Q.   Can you describe those to me?

7     A.   So the one interaction we spoke about

8  earlier, he asked me a question about, "Could you

9  give me the costs of the well at this point,"

10  which I fulfilled his request.

11       Every once in a while, he would walk by

12  to -- to see how the team was doing and see if we

13  were in good spirits, and --

14     Q.   And was -- is Mr. Thorseth a Geologist?

15     A.   I believe his background is geophysics.

16     Q.   And -- and can you describe to me what

17  his general role was with regard to the Macondo

18  Well?

19          MR. KEEGAN:  Objection to form.

20     A.   I -- all I can say is he is our

21  Exploration Manager.  His day-to-day roles on

22  Macondo, I -- I couldn't explain.

23     Q.   (By Mr. Cernich) So would he be -- in --

24  in that role, would he be overseeing a number of

25  wells?

1    A.   He's the -- he's the Exploration Manager.

2  As far as day-to-day roles, I don't -- I don't

3  fully understand them.

4    Q.   Okay.  Could I -- I ask -- we can put

5  away the black binder now.  Thank you.

6       Could I ask you to please turn to Tab 47

7  in -- in the white binder in front of you.

8    A.   (Complying.)

9    Q.   Have you seen this document before,

10  Mr. Bondurant?

11    A.   Yes.

12    Q.   This is a document that's titled "Macondo

13  MC 252 #1 Pre-Drill Data Package," and it has an

14  issue date of September 3rd, 2009.

15       MR. CERNICH:  I'm going to mark this

16  as Exhibit 4695.

17       (Exhibit No. 4695 marked.)

18    Q.   (By Mr. Cernich) And can you -- can

19  you -- can you tell me, in your words, what this

20  document is?

21    A.   So this document is part of the process

22  of "Beyond the Best."  One of the Stage Gate's

23  Subsurface Team requirement is to collate

24  information for the -- the subsurface information

25  and sampling requirements for drilling of the

PURSUANT TO CONFIDENTIALITY ORDER

1  well.  This packet would be handed off to the

2  Drilling Engineers and other folks that were

3  working the well.

4      Q.  And so if you'll turn to -- and is one of

5  these prepared for every well that BP drills in

6  the Gulf of Mexico?

7              MR. KEEGAN:  Objection to form.

8      A.  I do not know.

9      Q.  (By Mr. Cernich) Okay.  Have you prepared

10  other Pre-Drill Data pac -- Packages for other

11  wells?

12      A.  No, sir.

13      Q.  Have you seen a Pre-Drill Data Package

14  for any other wells?

15      A.  Yes.

16      Q.  Can you tell me which wells?

17      A.  For explor -- exploration well, a well

18  called Isabella.

19      Q.  And can you describe what your

20  involvement, if any, was with the Isabella Well?

21      A.  Isabella was a -- a prospect that was in

22  the Mississippi Canyon area.  It was drilled in

23  my first year as a Geologist at BP, so I was

24  following the well down with another Geologist

25  just to gain experience of the drilling process.

1      Q.   And it -- do I understand correctly that

2  the Isabella would be considered an offset well

3  to the Macondo Well?

4           MR. KEEGAN:   Objection to form.

5      A.   I don't -- I don't know the answer to

6  that.   It -- it would be a well that was in the

7  same geologic zip code, we could say, yeah, yeah.

8  So offset analog well is how I'd refer to it,

9  yeah.

10      Q.   (By Mr. Cernich) And you looked at the --

11  the Isabella Well in planning the Macondo Well;

12  is that right?

13           MR. KEEGAN:   Objection to form.

14      A.   I looked at the subsurface geology and

15  used the -- used that information for work in the

16  Macondo prospect.

17      Q.   (By Mr. Cernich) Okay.   If you will turn

18  to the second page of the Pre-Drill Package, it

19  says this was prepared by Charles Bondurant,

20  Geologist, and it goes on to list some other

21  individuals.   So is it correct that you helped

22  prepare this Pre-Drill Data Package?

23      A.   Yes.

24      Q.   And did you write portions of this

25  document?

PURSUANT TO CONFIDENTIALITY ORDER

1    A.   I believe I did, yes.

2    Q.   Do you recall which portions you wrote?

3    A.   Yeah.  If we could just look at the

4    "Table Of Contents," maybe --

5    Q.   Okay.

6    A.   -- I could -- the "FAST FACTS" document I

7    helped prepare with the rest of the Team, the

8    "STATEMENT OF REQUIREMENTS."  The Team provided

9    the location, and I provided the image of the

10   location.

11   Q.   Okay.

12   A.   The "POTENTIAL HAZARDS" was done by the

13   Operations Team, the Shallow Hazards Specialist,

14   and also information that the Subsurface Team

15   gleaned from offset well logs.

16   Q.   So you're saying you helped?

17   A.   Yeah.

18   Q.   You contributed to that portion of the --

19   of -- of the Report?

20   A.   Yes, the offset well information.

21   Q.   Okay.  Let's look at the next page, the

22   "Fast Facts" page, and down near the bottom,

23   third up from the bottom, there's a -- an entry

24   for "Net Reservoir Thickness" of "95 ft."  And

25   is -- is my understanding correct that the actual

PURSUANT TO CONFIDENTIALITY ORDER

 1   net reservoir thickness observed on this well was

 2   in that neighborhood, somewhere in the 90 --

 3   90-foot neighborhood for net reservoir thickness?

 4              MR. KEEGAN:  Objection to form.

 5      A.  Yes.

 6      Q.  (By Mr. Cernich) Okay.  If I could ask

 7   you to, please, turn to Page 23 in this document.

 8   And at the top of Page 23, it says, "Reservoir

 9   Fluid Sample Requirements," and then lists an

10   "Objective," and it says, "The Macondo

11   exploration well is different from most

12   exploration wells; it is being designed and

13   drilled as a 'keeper' to be used as a producing

14   well in the success case.  Therefore, the Fluid

15   Sampling Procedure and Analysis Program has been

16   designed to collect the key data necessary to

17   reach a development project sanction decision.

18   This includes:  Full PVT analysis for each major

19   hydrocarbon zone, geochemical analysis of oils

20   and isotopic analysis of gases, compositional

21   analysis for flow assurance work, and collection

22   of formation waters in contact with hydrocarbon

23   zones for compatibility tests."

24              So am I reading this correctly to say

25   that the -- the -- the fluid sample collection

1    work on this well was designed to be something

2    that was unusual or different from a normal

3    exploration well?

4              MR. KEEGAN:  Objection to form.

5        A.  This part of the document I didn't

6    create.  This was done by the Reservoir

7    Engineers, so I'd have to rely on their expertise

8    to answer that question.

9        Q.  (By Mr. Cernich) Okay.  Have you ever

10   read this part of the document before?

11       A.  In its entirety, no.

12       Q.  Okay.  And in the next section on that

13   page, there's a bold reference.  It says, "The

14   M56 reservoir is the primary target for this

15   well."

16          Did you contribute to -- to that

17   statement in this document?

18              MR. KEEGAN:  Objection to form.

19       A.  Part of the "Beyond the Best" practice,

20   the -- the Subsurface Team working with -- well,

21   as a -- the Macondo Core Team at that time,

22   defined the primary objectives of the well.

23       Q.  (By Mr. Cernich) And did you provide

24   information based on your geologic

25   interpretations that informed the team that the

1  M56 was the primary target for the well?

2           MR. KEEGAN:  Objection, form.

3      A.  Yeah.  Part of the subsurface

4  responsibility is to -- to describe the reservoir

5  that we would want to target.

6      Q.  (By Mr. Cernich) Okay.  And then if we go

7  on to the bottom of the page, "The M56 reservoir

8  could contain multiple pay sands as illustrated

9  in the following comparative logs from the Blind

10  Faith and MC522-1 wells:"  If we go on to the

11  next page, there are three what appear to be well

12  logs; is -- is that correct?

13      A.  That's correct.

14      Q.  And those are listed in "Figure 11"

15  beneath those as "Offset well logs," correct?

16      A.  That is correct.

17      Q.  And the three well logs are the "BLIND

18  FAITH," the "FOURIER," and the "ISABELLA."  Is

19  that right?

20      A.  Yes.

21      Q.  Do you know whether those were all BP

22  wells?

23      A.  I -- I believe they are all BP

24  exploration wells, yes.

25      Q.  Is the Isabella Well or any wells in

1   the -- the -- the vicinity of the Isabella Well

2   being produced?

3      A.  Yes, and there's numerous infrastructure

4   or platforms producing in the Eastern Mississippi

5   Canyon area.

6      Q.  In the formation into which the Isabella

7   was -- was drilled?

8      A.  Oh, particularly for Isabella, I do not

9   believe it is producing at this time.

10      Q.  Do you know whether the Blind Faith is

11   producing?

12      A.  I believe it is producing.

13      Q.  Okay.  And do you know whether the

14   Fourier is producing?

15      A.  I -- I don't know about this pers --

16   particular sand interval, but I know there are

17   producing wells in that field.

18      Q.  Okay.  Do you know the name of that

19   field?

20      A.  Fourier.

21      Q.  Okay.  And the -- the Blind Faith, to

22   your knowledge, are they producing out of the M56

23   sands?

24      A.  I -- I do not know.  It's operated by

25   another company.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Okay.  So BP drilled the well and then

2  sold the lease or passed it off to another

3  company?

4    A.  I -- I --

5            MR. KEEGAN:  Objection to form.

6    A.  I -- I don't know how they --

7    Q.  (By Mr. Cernich) Okay.

8    A.  -- did that.

9    Q.  Do you know what company is producing it?

10    A.  I believe it's Chevron.

11    Q.  Okay.  Have you ever heard of the -- the

12  Flow Assessment Technical Team?

13    A.  Yes, I've heard of a Team.

14    Q.  And -- and do you recall where you heard

15  of that Team?

16    A.  At BP.

17    Q.  Do you recall how you heard -- how you

18  learned of that Team?

19    A.  It was post incident, a flow rate team

20  was formed.

21    Q.  And how do you know that?

22    A.  I was invited to the initial meetings

23  or -- or meetings to provide geologic context of

24  the Macondo Well.

25    Q.  And do you recall when you first attended

1    one of those meetings?

2         A.   I don't recall the dates.

3         Q.   Would it have been in April?

4              MR. KEEGAN:   Objection, form.

5         A.   I don't recall the exact dates.

6         Q.   (By Mr. Cernich) Well, I'm not looking

7    for exact dates.

8         A.   Yeah.

9         Q.   I'm asking generally.

10        A.   There was a -- there was a lot going on

11   during that time.  Honestly, I was working on

12   planning -- working with the relief well effort,

13   and I don't rem -- recall if it was April, May,

14   or June time frame.

15        Q.   And so it was before -- but it was before

16   the well was shut in?

17        A.   Yes.

18        Q.   Okay.  Do you recall who -- who else

19   attended those meetings?

20        A.   There was a large number of people, and I

21   don't recall all the attendees.

22        Q.   All right.  Do you recall any of the

23   attendees?

24        A.   Someone who I worked with on my floor

25   attended the meeting, so I do recall one or two,

PURSUANT TO CONFIDENTIALITY ORDER

1    three people.

2       Q.   And who were those people?

3       A.   Kelly McCullough, I believe that's how

4    you pronounce her last name, Kate -- Mike Mason,

5    and Kate Baker.

6       Q.   Okay.  Mike Mason, is he a Reservoir

7    Engineer?

8       A.   I do not know his title at BP.

9       Q.   Okay.  Do you know what his -- do you

10   know what job he performs?

11      A.   I do not.

12      Q.   Okay.  You mentioned a Kelly.  Would that

13   have been Kelly McGowen?

14      A.   McGowen, yes.

15      Q.   Okay.  And do you know if Kelly is a

16   Reservoir Engineer?

17      A.   Yes, she is.

18      Q.   Okay.  And then you mentioned -- I'm

19   sorry --

20           (Discussion off the record.)

21      Q.   (By Mr. Cernich) -- Kate Baker.

22   Ms. Baker used to work for BP, and now is a --

23   left BP and is a contractor; is that correct?

24           MR. KEEGAN:  Objection, form.

25      A.   I don't understand her current position,

1    but I do understand that she had left BP and came

2    back as a contractor during the incident

3    response.

4        Q.  (By Mr. Cernich) Okay.  And do you recall

5    Ms. Baker's -- when she was at -- at BP, what her

6    title was?

7        A.  I do not, no.

8        Q.  Do you recall her function?

9        A.  I do not, no.

10       Q.  Let me provide you with a copy of a

11   document that was previously marked as

12   Exhibit 6192, and this is a -- a White Paper that

13   BP submitted to the Presidential Oil Spill

14   Commission regarding flow rate estimates.  Have

15   you ever seen this document before?

16       A.  I have not.

17              MR. HILL:  Do you have a tab?

18              MR. CERNICH:  Do --

19              MR. HILL:  Do you have a tab?

20              MR. CERNICH:  I actually have hard

21   copies of it here.

22              MR. HILL:  (Nodding.)

23       Q.  (By Mr. Cernich) Do -- were you -- were

24   you aware of its existence or the fact that this

25   was being prepared by BP?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   No.

2    Q.   So you mentioned these -- at least one

3  meeting, and it sounded like maybe there were

4  more meetings where you met with the Flow

5  Assessment Team.  And do you recall who invited

6  you to those meetings?

7              MR. KEEGAN:  Objection to form.

8    A.   I believe Kelly asked me to -- to go to

9  the meeting.

10    Q.  (By Mr. Cernich) Okay.  And did you --

11  and what -- what -- what occurred at those

12  meetings?

13              MR. KEEGAN:  Objection to form.

14    Q.  (By Mr. Cernich) So the meet --

15              MR. KEEGAN:  Can we go off the

16  record for just one second, please?

17              MR. CERNICH:  Sure.

18              THE VIDEOGRAPHER:  The time is

19  11:47.  We're going off the record.

20        (Recess from 11:47 a.m. to 11:52 a.m.)

21              MR. CERNICH:  Okay.  I'm ready.

22              THE VIDEOGRAPHER:  All set?

23        The time is 11:52 a.m.  We're back on the

24  record.

25    Q.  (By Mr. Cernich) All right.  Could you

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   turn to Tab 38 in your binder, please?  This is
 2   an E-mail from Bryan Ritchie dated May 26th,
 3   2010.  You're a recipient on this E-mail.
 4   "Subject" is "DRAFT:  MC252 Subsurface Technical
 5   Memo version 1," and this is -- who -- can you
 6   tell me who -- do you recall receiving this
 7   E-mail?
 8        A.  (Reviewing document.)  Yeah.
 9        Q.  Okay.  Who is Mr. Ritchie?
10        A.  He was my Team Leader.
11        Q.  And is Mr. Ritchie a Geologist?
12        A.  I -- I don't know his background.
13        Q.  Okay.  And your Team, does it have a
14   title?
15        A.  Again, this -- Bryan Ritchie was the --
16   the Team Leader for the Eastern Gulf of Mexico.
17        Q.  In what?  I'm -- I'm just trying to
18   understand the -- the Management structure and --
19        A.  Sure.
20        Q.  -- your -- how -- how -- the Team Leader
21   for what in the Eastern Gulf of Mexico?
22        A.  Exploration.
23        Q.  Exploration.  Okay.
24        A.  Yes.
25        Q.  Thank you.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  (Nodding.)

2      Q.  Thank you.  This E-mail, Mr. Ritchie, it

3  appears he's addressing it to Kate.  It says:

4  "Thank you to the" -- I'm looking at the second

5  paragraph.  "Thank you to the Macondo Subsurface

6  Team members...who helped to put this document

7  together while supporting the ongoing operations

8  including:  1.) Safe and successful execution of

9  Relief Wells; 2.) Subsurface support for Top

10  Kill; 3.) Geochemical support for spill analysis;

11  4.) Potential geophysical acquisition options;

12  and 5.) Additional documentation/requests."

13      Is this Macondo Subsurface Team, the Team

14  that you were talking about going to meetings --

15  or we discussed you attending meetings for in May

16  and June of 2010?

17      A.  Some of those Members would be on the

18  Subsurface Team.  Some may have changed roles or

19  positions by that time, so I --

20      Q.  So the mee -- the meetings we were

21  discussing earlier when I asked you about the

22  Flow Assessment Team, was that Team separate from

23  the Subsurface Team?

24          MR. KEEGAN:  Objection to form.

25      A.  I'm -- they were not part of the Gulf of

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    Mexico Exploration Subsurface Team.  May have

 2    been one or two Members who would attend those

 3    meetings at times.  It was a different Team.

 4        Q.  (By Mr. Cernich) Okay.  Well, let's look

 5    at the attachment to the -- to the E-mail.  This

 6    is a document titled "Technical Memorandum."  The

 7    "TITLE" is "Post-Well Subsurface Description of

 8    Macondo well (MC252)."

 9            Let me try to understand the -- the

10    various Teams here.  So there was a -- there was

11    a Gulf of Mexico Exploration Team that was headed

12    up by Mr. Ritchie; is that correct?

13        A.  Yes.

14        Q.  And that Team existed prior to the --

15    prior to the incident.  That was part of the BP

16    Gulf of Mexico structure for Exploration?

17        A.  Correct.

18        Q.  Okay.  And then earlier I was asking

19    about a Flow Assessment Team, and you said that

20    you attended some meetings related to that, with

21    Ms. McGowen and Ms. -- Ms. Baker, and Mister --

22    Mr. Mason; is that correct?

23            MR. KEEGAN:  Objection to form.

24        A.  I -- I recall attending a meeting with

25    them to describe the geology that we saw at the

**PURSUANT TO CONFIDENTIALITY ORDER**

1   Macondo Well.

2       Q.   (By Mr. Cernich) Okay.  What you see

3   before you is a memorandum which I believe --

4   which is a post-well subsurface description of

5   the Macondo Well.  And were these meetings

6   related to the prepos -- preparation of this

7   document, or were those meetings related to some

8   other effort or some other discussion?

9       A.   I believe this was a separate request --

10      Q.   Okay.

11      A.   -- maybe from that Team.

12      Q.   Okay.  And when you attended those --

13  that meeting, did you ever meet a Mr. Paul Tooms?

14      A.   The name doesn't ring a bell.

15      Q.   Cindy Yeilding?

16      A.   H'm.  I do know Cindy.  I don't know if

17  she was at the meeting that I attended.

18      Q.   Andy Hill?

19      A.   I don't believe he was at that meeting

20  that I attended.

21      Q.   You know Mr. Hill, though?

22      A.   I do know Andy Hill.

23      Q.   And can you -- can you tell me who

24  Mr. Hill is?

25      A.   I don't know his exact role in BP.  I do

**PURSUANT TO CONFIDENTIALITY ORDER**

1  know he worked in the Shallow Hazard Team.

2     Q.  And Mr. Hill was involved in -- am -- am

3  I correct that Mr. Hill was involved in

4  organizing or making decisions related to seismic

5  data acquisition post-incident?

6              MR. KEEGAN:  Objection to form.

7     A.  I -- I believe he was involved in -- in

8  some of those decisions.

9     Q.  (By Mr. Cernich) Did you ever -- did you

10 ever review any seismic data that was collected

11 post-incident?

12    A.  Yes.

13    Q.  Can you describe to me what seismic

14 datasets were collected post-incident?

15    A.  Yes.  So I was -- I was there to help the

16 USGS Team that had come to BP, and they were

17 provided -- there was a period of time where a 2D

18 line, or multiple 2D lines, were acquired in --

19 in the area of the Macondo incident.

20    Q.  Okay.

21    A.  That information, those 2D lines, were

22 reviewed by the USGS, and I supported their

23 efforts in making -- and helping them with the

24 Landmark work stations, so -- in case they

25 weren't familiar with that interpretative

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    package.

 2        Q.   Were those 2D lines you just described

 3    the only -- the only seismic data that was

 4    acquired by BP post-incident?

 5                   MR. KEEGAN:   Objection to form.

 6        A.   "Acquired" as in shot or --

 7        Q.   (By Mr. Cernich) Ah --

 8        A.   I believe we have acquired or -- or got a

 9    different survey over the Macondo area

10    post-incident, also, a 3D survey.

11        Q.   Okay.  And do you know who collected

12    that -- the -- that 3D survey data?

13        A.   I believe the -- that 3D survey was shot

14    by Western.

15        Q.   Okay.  WesternGeco, G-e-c-o?

16        A.   I believe, yeah, yes.

17        Q.   Okay.

18        A.   Seismic acquisition --

19        Q.   Okay.

20        A.   -- company.

21        Q.   Do you know whether the TGS Wide Azimuth

22    Justice seismic data includes the area of the

23    Macondo Well?

24        A.   I do not know if that is -- does.  I

25    don't know where that eastern boundary lies.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Did you -- did you work on any 4D

2    interpretations of -- of the seismic data in the

3    area of the Macondo Well?

4    A.  No.

5    Q.  (Tendering.)

6         MR. KEEGAN:  Thank you.

7    Q.  (By Mr. Cernich) I've handed you a

8    document --

9         MR. CERNICH:  Counsel, I have hard

10   copies of this document.  It's not in the -- the

11   binders.

12   Q.  (By Mr. Cernich) It's an E-mail with a

13   Bates No. BP-HZN-2179MDL03291479.  And the -- the

14   top E-mail in this E-mail string is an E-mail

15   from yourself to Frederic Billette dated

16   July 9th, 2010.  "Subject" is something that

17   appears to be the date of July 8th, 2010,

18   "Macondo_4D_survey.ppt," which I assume means

19   PowerPoint?

20   A.  Yes.

21   Q.  And it's a -- there's a series of E-mails

22   which starts with -- actually, at the bottom of

23   it, it's just an E-mail from yourself to Bryan

24   Ritchie with this "Subject," Macondo 4D Survey

25   PowerPoint.

1      Can you explain to me what this E-mail

2  conversation is discussing?  I -- I'll tell you,

3  I -- I searched through the -- through the

4  production and couldn't -- couldn't seem to find

5  this -- this PowerPoint.  Was there a PowerPoint

6  that someone prepared, titled "Macondo 4D

7  Survey"?

8           MR. KEEGAN:  Objection to form.

9      A.  It looks to me there was a PowerPoint

10  that was created, yes.

11      Q.  (By Mr. Cernich) Okay.  Did you create

12  that PowerPoint?

13      A.  Honestly, I -- I don't remember.

14      Q.  Did you ever see a PowerPoint related to

15  a Macondo 4D survey?

16      A.  I recall conversations regarding

17  potential 4D survey over in the Macondo area.

18  And the PowerPoint, if I'm re -- remembering

19  correctly, would just show the potential outline

20  or area of interest that that would -- that a 4D

21  acquisition would take place.

22      Q.  And do you know if that survey ever

23  occurred?

24      A.  I do not know.  Well, I'm sorry.  No,

25  there is no subsequent 3D acquisition over that

PURSUANT TO CONFIDENTIALITY ORDER

 1    area, that I'm aware of.

 2       Q.  Okay.

 3                 MR. CERNICH:  I'm going to mark this

 4    as Exhibit 4696.

 5           (Exhibit No. 4696 marked.)

 6           (Discussion off the record.)

 7                 MR. CERNICH:  I'll get there.

 8                 Joe, am I still going to -- good for

 9    some time for me?

10                 MR. HASSINGER:  Whatever you need.

11                 MR. CERNICH:  Okay.  Thank you.

12                 MR. KEEGAN:  How much time are you

13    taking?

14                 MR. CERNICH:  It could be up to --

15    I -- I -- I'm not out of time yet.  It could be

16    up to 45 minutes, the -- the full State

17    allotment.

18                 MR. KEEGAN:  Okay.

19                 MR. CERNICH:  So we can break for

20    lunch.

21                 MR. KEEGAN:  Joe, I'm sorry.  Who do

22    you represent?

23                 MR. HASSINGER:  Louisiana.

24                 MR. KEEGAN:  Ah.  Got it.

25                 MR. CERNICH:  But actually if --

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:  Why don't we break --
2    why don't we go through the --
3          MR. CERNICH:  We'll --
4          MR. KEEGAN:  -- end of the tape?
5          MR. CERNICH:  Okay.  That would be
6    fine.
7        Q.  (By Mr. Cernich) So going back to our --
8    our prior discussion, the -- I believe you said
9    that the effort to prepare this Technical
10   Memoranda -- Micorandum -- Memorandum, which we
11   were looking at as Tab 38 --
12          MR. CERNICH:  -- which I'm going to
13   mark as Exhibit 4697.
14        (Exhibit No. 4697 marked.)
15       Q.  (By Mr. Cernich) -- this effort was
16   separate from the effort that you were involved
17   with or at least attended a meeting for, related
18   to flow assessment; is that correct?
19          MR. KEEGAN:  Objection to form.  Are
20   you marking the entire Tab with the E-mail and
21   the Technical or just the Technical --
22          MR. CERNICH:  The entire Tab, yes.
23          MR. KEEGAN:  Okay.  And I'm
24   objecting to your question, too.
25       A.  Could you repeat it one more time?  It

**PURSUANT TO CONFIDENTIALITY ORDER**

1  was --

2      Q.  (By Mr. Cernich) Certainly.  The

3  effort -- I believe what you told me earlier was

4  that the effort to produce this Technical

5  Memorandum that we've just marked as an

6  exhibit --

7      A.  Yeah.

8      Q.  -- was separate from the effort or the --

9  the purpose of this meeting that you attended

10 related to flow assessment; is that correct?

11             MR. KEEGAN:  Objection to form.

12     A.  I -- I just recall that we were asked by

13 a Member of that Team to prepare this document,

14 Kate Baker.

15     Q.  (By Mr. Cernich) And the -- the -- that

16 meeting, did you -- do -- did you attend more

17 than one meeting?

18     A.  I recall attending that flow rate

19 meeting.

20     Q.  M-h'm.

21     A.  There were other meetings throughout this

22 whole process that I may have attended that may

23 have been a flow rate meeting.  I don't know if

24 that's what they were called, so --

25     Q.  All right.  And your -- your recollection

**PURSUANT TO CONFIDENTIALITY ORDER**

1    is that that meeting was sometime before July

2    15th, 2010?

3                    MR. KEEGAN:   Objection to form.

4        A.   I -- yeah, I don't recall the exact date.

5        Q.   (By Mr. Cernich) Ea -- earlier --

6        A.   It was one --

7        Q.   Go ahead.   I'm sorry.

8        A.   I believe it was a month or two, I

9    believe I said earlier, post-incident, that I --

10       Q.   And do you remember -- do you recall

11   your -- how you were -- how you were notified of

12   that meeting?

13       A.   I -- I don't exactly remember how I was

14   notified.   I -- I -- I do remember having

15   conversations with people attending the meeting,

16   and there was a request to present the geologic

17   information of the Macondo Reservoir, and that's

18   what I did.

19       Q.   And you made that Presentation to -- to

20   that group of people?

21       A.   Yes.

22       Q.   Do you recall the form of that

23   Presentation?

24       A.   I believe I used the actual seismic data

25   and maybe a -- live seismic data and a PowerPoint

PURSUANT TO CONFIDENTIALITY ORDER

1  Presentation, one or two slides.

2     Q.  Okay.  Did you provide that PowerPoint

3  Presentation -- did you provide any documents to

4  Counsel in advance of your deposition?

5              MR. KEEGAN:  Objection to form.

6     A.  I don't -- I know a lot of my -- my

7  computer was taken, and all the documents were

8  pulled off my computer, as far as I know on that.

9     Q.  (By Mr. Cernich) Do you know whether that

10  Presentation would have been on your computer?

11    A.  H'm, may -- it may have been, yes.  Yeah.

12    Q.  Do you recall who asked you to prepare

13  that Presentation specifically?

14    A.  I do not recall exactly the person who

15  asked me to prepare that.

16    Q.  Was Ms. Baker at that meeting?

17    A.  Yes.

18    Q.  Was Cindy Yeilding at that meeting?

19    A.  I don't think Cindy was there.  I don't

20  recall.

21    Q.  Was Jay Thorseth at that that -- at that

22  meeting?

23    A.  I don't remember seeing Jay at that

24  meeting.

25    Q.  Okay.  Was Galina Skripnikova at that

PURSUANT TO CONFIDENTIALITY ORDER

1    meeting?

2        A.   I believe she was.

3        Q.   Was Bryan Ritchie at that meeting?

4        A.   I don't believe Bryan was at the meeting.

5        Q.   Was Binh Nguyen at that meeting?

6        A.   I don't believe he attended the meeting.

7        Q.   Marty Albertin?

8        A.   I don't believe he was at that meeting.

9        Q.   Craig Scherschel?

10       A.   I don't believe he was at that meeting.

11       Q.   Travor Hill?

12       A.   Don't know.

13       Q.   Robert Merrill?

14       A.   I believe Robert was at that meeting.

15       Q.   Do you know Mr. Merrill?

16       A.   Yes, yes.

17       Q.   And do you know his title?

18       A.   I don't know his exact title.  I know

19   he's a Reservoir Engineer.

20       Q.   Was Chris Cecil at that meeting?

21       A.   No.

22       Q.   Farah Saidi?

23       A.   I don't know that name.

24       Q.   Okay.  Looking back at Tab 38, the --

25   actually, just one more -- one more question.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Were -- were -- were flow rates discussed at that

2    meeting?

3        A.   I only attended the beginning of the

4    meeting and provided the geologic context, and

5    then I went back to my Exploration Unit.

6        Q.   Was there an agenda for the meeting?

7        A.   I don't recall.

8        Q.   And so you -- you said you left early

9    from the meeting.  While you were at the meeting,

10   were any flow rates discussed?

11       A.   I don't remember.  I remember giving a

12   Presentation of a geologic context, and then I

13   went back to work on the relief well duties.

14   That was my main focus during that time, was

15   getting the relief wells down and providing any

16   geologic support I could provide to the staff.

17       Q.   But someone called you away from your

18   relief well operations to go to a meeting related

19   to flow rate?

20            MR. KEEGAN:  Objection to form.

21       A.   Yeah.  I was notified to present the

22   geologic description --

23            THE COURT REPORTER:  Five minutes.

24       A.   -- of Macondo.

25       Q.   (By Mr. Cernich) But you don't recall who

1    notified you?

2        A.   I don't remember the -- for sure.

3        Q.   Okay.  Finally, going back to Tab 38,

4    the -- the Technical Memorandum that we were

5    looking at, it says it was to Kate Baker, Cindy

6    Yeilding, Jay Thorseth, and Peter Carragher.  Do

7    you recall attending a meeting with any or all of

8    those individuals to discuss the preparation of

9    this Memo?

10       A.   With Cindy and Kate.

11       Q.   Okay.  But you don't recall Mr. Thorseth

12   or Mr. Carragher attending any meetings?

13       A.   Well, I -- I -- I don't know what

14   meetings they're attending, but they didn't

15   attend this meeting.

16       Q.   Okay.  If you would go to the -- actually

17   turn to the -- the attachment to that -- the Memo

18   itself.

19       A.   (Nodding.)

20       Q.   And it says it's written by a number of

21   individuals, including yourself.  Did you write

22   portions of this -- this Memo?

23       A.   I believe portions of previous written

24   statements taken from, I believe, the -- either

25   the PDDP or Technical Assurance Memorandum for

1    the Macondo Prospect were used in this.

2        Q.  But you didn't actually sit down and

3    write any of this document, is what -- is that

4    what you're telling me?

5        A.  There were excerpts from previous

6    statements that I have written in -- in the

7    Technical Assurance Memorandum and the PDDP.

8                MR. CERNICH:  We can go ahead and

9    break for lunch.

10               MR. KEEGAN:  Sounds good.

11               THE VIDEOGRAPHER:  The time is

12   12:14 p.m.  We're going off the record, ending

13   Tape 4.

14        (Recess from 12:14 p.m. to 1:05 p.m.)

15               MR. CERNICH:  Ready.

16               THE VIDEOGRAPHER:  Ready?

17               THE COURT REPORTER:  Yes, sir.

18               THE VIDEOGRAPHER:  The time is

19   1:05 p.m.  We're back on the record, beginning

20   Tape 5.

21        Q.  (By Mr. Cernich) Mr. Bondurant, we

22   were -- I believe when we broke we were looking

23   at the Technical Memorandum dated 25th of May

24   2010 and discussing your -- your involvement

25   in -- in writing this -- this Memo.  And you had

1    said -- I believe your -- your testimony was that

2    you had taken work that you had done and

3    essentially plugged it into this Memo.  Is

4    that -- is that an accurate representation of

5    your testimony?

6                MR. KEEGAN:  Objection to form.

7         A.  No.  I believe who -- whoever prepared

8    the document -- I -- I believe our Team Leader,

9    at the time -- really worked on pulling the

10   information together, so he just pulled the

11   information from the Technical Assurance

12   Memorandum and/or the PDDP.

13        Q.  (By Mr. Cernich) So you -- so unless it

14   was in -- unless the text that -- well, the --

15   the TAM, the Technical Assistance Men -- Memo,

16   you had written parts of that Memo; is that

17   correct?

18        A.  Yes.

19        Q.  And so to the extent that anything that

20   you wrote is contained in this Technical

21   Memorandum in front of us, it was cut and pasted

22   from your -- from the Technical Assistance Memo?

23                MR. KEEGAN:  Objection to form.

24        A.  Let me just double-check.

25        Q.  (By Mr. Cernich) Certainly.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        A.   (Reviewing document.)  So I recall the --

 2   the information on Page 3 looks to be -- I

 3   remember writing that.

 4        Q.   Uh -- help me -- yeah, le --

 5        A.   Yeah.

 6        Q.   Let's do that.  And let's walk through it

 7   slowly.  So that everything that's on Page 3, you

 8   recall writing?

 9        A.   The -- the text.  And then part of the --

10   as part of the Subsurface Team, we -- we

11   developed the image or --

12        Q.   Okay.  For this Memorandum?

13        A.   No.  This, too, was pulled out of the

14   predata drill package.

15        Q.   I see.  And this shows -- this shows

16   eighty-six and a half feet of hydrocarbon sands

17   in the M56D and M56E; is that correct?

18              MR. KEEGAN:  Objection to form.

19        A.   I -- I don't believe it would show

20   volumes.  It is a prediction of -- of thickness

21   of --

22        Q.   (By Mr. Cernich) Well thickness, right?

23        A.   Yeah, yeah, the --

24        Q.   There's a 22 feet for the M56D and a 64.5

25   feet for the M56E; is that right?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   I -- I can't read that on this document.

2     Q.   Oh.  I'm looking at the bottom paragraph.

3     A.   Oh, I'm sorry.

4     Q.   No problem.

5     A.   I was looking at the image.

6     Q.   I wouldn't have expected you to --

7     A.   Okay.

8     Q.   -- to read that.

9     A.   (Reviewing document.)  Okay.  So --

10    (Reviewing document.)

11         (Discussion off the record.)

12    A.   So, yeah, in 56 -- so can you repeat your

13    question one more time?  I'm sorry.

14    Q.   (By Mr. Cernich) So the M56D sands were

15    22 feet of sands, and the M56E were sixty-four

16    and a half feet of sands, according to this Memo?

17    A.   According to this Memo, yes.

18    Q.   And do you have any reason to believe

19    that that information is incorrect today?

20    A.   It sounds approximate, but I know there

21    was -- there was ongoing evaluation of the open

22    hole section for quite some time, so I don't know

23    if these numbers changed.

24    Q.   Okay.  Do you know who was conducting

25    that ongoing -- ongoing evaluation of the open

1  hole section?

2      A.   Yeah.   There was a number of Parties

3  involved, but particularly in the Subsurface

4  Group, the Petrophysicists were working on the

5  evaluation, interpreting their -- the log data.

6      Q.   And who would that be?

7      A.   I recall Galina Skripnikova, Bruce

8  Wagner, and Way -- Ray Widrenski.

9      Q.   Thank you.   And who outside of the

10  Subsurface Group was working on that evaluation?

11      A.   I know that the -- the third-party

12  vendors that do wireline logs or LWDs, I know

13  they send a final log to BP, and I don't know

14  what type of interpretation is always on that

15  log, but that's what I was referring to there.

16      Q.   And whi -- while you're mentioning

17  those -- those third-party logs, and going back

18  to some questions I asked you earlier today, if

19  you -- I know -- I know you said you wouldn't

20  necessarily be looking at all the data for the

21  well.   You were focused on sub -- certain

22  subsurface geological data.

23          But if someone at BP wanted to -- wanted

24  to obtain all of the data for the Macondo Well,

25  how -- how would that person ask for that?

1    Who -- or who would they go to, to find that

2    data?

3              MR. KEEGAN:   Objection to form.

4         A.   For all of the data, I -- I don't know

5    the answer to that.   There's so much data on this

6    well.   I don't know how many Parties you would

7    have to contact to get everything.

8         Q.   (By Mr. Cernich) Okay.   Is that -- is

9    the -- the data that you obtain, is it -- the --

10   the subsurface geological data or the seismic

11   data, is it somehow tagged with some

12   identification that tells you that it belongs to

13   or comes from the Macondo Well?

14        A.   How -- how we name our SeisWorks

15   Projects, that kind of gives the location in

16   which the area of the seismic data would be in

17   there, and then the seismic data naming

18   convention would refer to the type of processing

19   that was applied to the seismic and the vendor

20   who did the processing and the year it was

21   processed.

22        Q.   Okay.

23        A.   So that's how that's kind of organized.

24        Q.   Thank you.   All right.   Can we turn to

25   Page 4?   This is "Figure 2:   Sand identification

**PURSUANT TO CONFIDENTIALITY ORDER**

1    chart," according to the -- the caption here,

2    "for sands below the 9-7/8" -- "7/8 inch

3    liner..."

4         Is this depiction of a wireline log?

5    A.   So --

6              MR. KEEGAN:   Objection to form.

7    A.   -- this -- this product here would be

8    something that the Petrophysicist could produce

9    in her interpretation package or analys --

10   analyzing package, which at this point it was

11   either a what we -- Techlog or Geolog that was

12   being used at that time.

13   Q.   (By Mr. Cernich) And that would be the

14   software package?

15   A.   Yes.   Yeah.

16   Q.   All right.   And when I look at this,

17   there's a -- a -- over on the left side of this

18   figure, there's a gas that's identified in the

19   area -- looks like slightly above 17,500 feet.

20   Do you see that?

21   A.   I do.

22   Q.   Now, it's my understanding that this gas

23   was not identified until after the -- the

24   incident, this particular gas-bearing zone.   Are

25   you aware of that?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      MR. KEEGAN:  Objection.  Is it also

2  your understanding that that's not been

3  identified as a gas-bearing incident?  I'm not

4  going to let you mislead this witness.

5      Q.  (By Mr. Cernich) Okay.  Does this word

6  that says "gas" here indicate that there's a

7  gas-bearing zone on this log?

8      MR. KEEGAN:  Objection to form.

9      A.  So there potentially could be gas in --

10  in that sand.

11      Q.  (By Mr. Cernich) Do you know if the --

12  that potential gas zone was identified prior to

13  April 20th, 2010?

14      A.  I --

15      MR. MONICO:  Objection, form.

16      A.  I don't know the answer to that.

17      Q.  (By Mr. Cernich) Okay.  We can move on to

18  Page 5.  The top of this page says "M56 Depth and

19  Brine/Oil Dis" -- "Distribution Maps."  Were you

20  involved in the -- involved in preparing this

21  portion of the Report?

22      A.  No.  The Geophysicist put these maps

23  together.  Binh.

24      Q.  Okay.  Do you know why these were

25  included in this Memorandum?

 1      A.   I believe -- I believe there was a

 2  Memorandum on the subsurface, so that would be

 3  the -- the "M56" would refer to the reservoir

 4  level.

 5      Q.   Okay.  Understood.

 6           The -- the next section refers to the

 7  "Rigel field."  Were you involved in that --

 8  preparing that portion of this Memorandum?

 9      A.   I believe I was involved in this, along

10  with my Team Leader --

11      Q.   And that --

12      A.   -- in write -- developing this section.

13      Q.   And that would be Bryan Ritchie?

14      A.   Yes.

15      Q.   And -- and can you tell me why this Rigel

16  Field discussion was included in the Memorandum,

17  what it -- how -- how does it relate to the

18  Macondo Well?

19      A.   So it was the nearest offset well.  It's,

20  I think, part of the Ri -- Rigel or -- Field is

21  on -- on Block 252.  So it was just -- it was

22  clear information that could be provided in the

23  subsurface description in -- in the area.

24      Q.   Could I ask you to turn to Page 13,

25  please?  The top of this page says

**PURSUANT TO CONFIDENTIALITY ORDER**

1    "Petrophysics."  And do I understand correctly

2    that you were not involved in the petrophysical

3    analysis of the Macondo Well?

4        A.  That is correct.

5        Q.  Okay.  But I would like to ask you one

6    question related to this.  And if you work your

7    way down the page, just above the bold word "Data

8    base," there's a sentence there.  It says:

9    "Electrical properties, capillary pressure data

10   and thin section analysis will be incorporated

11   into the interpretation data when available."

12           Do you know if those electrical

13   properties, capillary pressure data, or thin

14   section analysis ever became available?

15       A.  I don't know the question to all -- each

16   aspect of that, but I -- I -- I did hear that the

17   thin section of data was finally available.

18       Q.  And do you know who performed that thin

19   section analysis?

20       A.  I do not.

21       Q.  All right.  Do you know -- did you ever

22   review that thin section analysis?

23       A.  No.

24       Q.  Do you know who would be the custodian of

25   that thin section analysis?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   I do not.

2      Q.   Would you expect that the Petrophysicist

3  would have that information?

4            MR. KEEGAN:   Objection to form.

5      A.   I don't know all the data they look at.

6      Q.   (By Mr. Cernich) Okay.   How did you learn

7  that the thin section analysis had been

8  completed?

9      A.   I believe it was through -- it was part

10  of the analysis of the core, core plugs or the

11  core, the individual samples that were taken.

12  And I heard that that analysis was complete, just

13  from word of mouth on the floor.   I believe it

14  was from the Petrophysicist.

15      Q.   Okay.   Okay.   Speaking of core analysis,

16  if we could go to Page 17, please, there's a

17  heading there that says "Routine Core Analysis."

18  Do you see that?

19      A.   Yes.

20      Q.   And in the second paragraph under that,

21  it says:   "M56D sand may be more heterogeneous

22  than M56E and its reservoir characteristics are

23  hardly described by the available samples.   More

24  core data will be necessary for rock typing

25  work."

**PURSUANT TO CONFIDENTIALITY ORDER**

1        Are you aware whether there was any more

2   core data done for rock typing work?

3       A.   I'm not aware.

4       Q.   Do you recall how you became -- became

5   involved in writing this Technical Memorandum?

6            MR. KEEGAN:  Objection to form.

7       A.   I believe we were asked by Kate Baker

8   to -- to do this.

9       Q.   (By Mr. Cernich) Okay.  And did Ms. Baker

10  explain to you the purpose of preparing this

11  document?

12      A.   I never got a clear understanding from --

13  from Kate Baker.

14      Q.   Did you ever get a clear understanding

15  from anyone?

16      A.   No.  At the time, the Team Leader, Bryan,

17  took charge of this and -- and delivered the

18  product.

19      Q.   So would you say that he -- so are you

20  saying that Mr. Ritchie led the effort on

21  preparing this Memorandum?

22            MR. KEEGAN:  Objection to form.

23      A.   I believe he helped collate the

24  information, yes.

25      Q.   (By Mr. Cernich) Were the other authors

**PURSUANT TO CONFIDENTIALITY ORDER**

 1   of the -- of this Memorandum -- Marty Albertin,

 2   Kelly McAughan, Binh Nguyen, Craig Scherschel,

 3   Galina Skripnikova -- were they reporting to

 4   Mr. Ritchie in the preparation of this Memo?

 5          (Phone ringing.)

 6                MR. HASSINGER:  Sorry.

 7      A.   I believe -- I believe they did have

 8   communication on -- on collating the information

 9   seen in the document.

10      Q.   Did Mr. Ritchie coordinate the efforts of

11   these other individuals on the "WRITTEN BY" --

12   under the "WRITTEN BY" designation in the title

13   of this Memorandum to prepare this Memorandum?

14      A.   I --

15                MR. KEEGAN:  Objection to form.

16      A.   M-h'm.  I don't know how he conducted

17   the -- the job of creating the Technical

18   Memorandum.  I'm -- I'm --

19      Q.   (By Mr. Cernich) Do you know whether he

20   was in charge of making sure that this Memorandum

21   was prepared and submitted to Kate Baker, Cindy

22   Yeilding, Jay Thorseth, and Peter Carragher?

23                MR. KEEGAN:  Objection to form.

24      A.   So, I believe he -- he took the lead on

25   getting the document to this status.  So I -- I

1    believe that would be "Yes."  Sorry.  Yeah.

2         Q.  (By Mr. Cernich) Thank you.

3         A.  Yeah.  Sorry.

4         Q.  Can I direct you to Tab 39?

5              MR. CERNICH:  And I'm going to mark

6    this as Exhibit 4698.

7              (Exhibit No. 4698 marked.)

8              (Discussion off the record.)

9         A.  No. 39?

10        Q.  (By Mr. Cernich) Yes.  The whole -- the

11   whole tab of 39.

12             The -- the cover E-mail here is an E-mail

13   from Cindy Yeilding dated June 2nd, 2010 to a

14   number of individuals.  I don't believe that

15   you're on this E-mail, but it has a number of

16   attachments to it.  And if you could turn -- and

17   probably the easiest way is to start from the

18   back of Tab 39.

19             MR. KEEGAN:  Back of the E-mail or

20   the whole tab?

21             MR. CERNICH:  The back of the whole

22   tab.

23             MR. KEEGAN:  Can you read the Bates

24   numbers?  The disc has just a whole bunch of

25   files.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. CERNICH:  Certainly.  The Bates

2    number on the cover E-mail is

3    BP-HZN-2179MDL00660346.

4          MR. KEEGAN:  We've got your -- your

5    code versions of the Bates numbers on this disc

6    as file names.

7          MR. CERNICH:  Oh, I understand what

8    you're saying.  The -- if you go to the

9    second-to-last -- where -- where I'm directing

10   Mr. Bondurant is to the second-to-last document

11   there, which is going to be BPD136-019525.

12         MR. KEEGAN:  525.  Got it.

13     Q.  (By Mr. Cernich) So it's the

14   second-to-last document -- yeah, I -- I believe

15   you found it.  It should be an E-mail from Cindy

16   Yeilding dated May 28th, 2010 to John Barton.  Is

17   that what you have in front of you,

18   Mr. Bondurant?

19     A.  Yes.

20     Q.  Okay.  Great.  Thank you.

21         And you -- you were not a recipient of

22   this E-mail, but your -- your name appears in it,

23   and I just want to walk through a couple of

24   items.

25         We have the first -- well, the -- the

1  E-mail says:  "Dear John, Below are the 9 MC 252

2  incident-related 'work fronts' we've been

3  supporting from..."

4         And then there -- there's a list of work

5  fronts in this E-mail, and I'm going to look at

6  the No. 1 there, "Relief wells."

7         Do you see that?

8     A.  I do.

9     Q.  And "Relief wells" says:  "Planning,

10  permitting & executing two MC 252 relief wells."

11         And it says "GOM staff" -- I assume

12  that's Gulf of Mexico staff -- and it has

13  "Full-time" a number of individuals, including

14  yourself.

15         Do you -- do you see that?

16     A.  Yes.

17     Q.  Okay.  And was it your understanding that

18  you were full-time staff on the relief wells, the

19  MC 252 relief wells?

20     A.  Yes.  That was my primary role.

21     Q.  Okay.  And then if you would turn to the

22  next page --

23         (Discussion off the record.)

24             MR. CERNICH:  Okay.

25     Q.  (By Mr. Cernich) -- Item 6 there lists

1    "Reservoir Engineering, modeling and pressure

2    analysis."  It says:  "In collaboration with EPTG

3    Base Management Team and D&C, multiple integrated

4    products have been analyzed and delivered.  These

5    include worst case discharge for all 3 MC 252

6    wells, shut-in wellhead pressure analysis for top

7    kill and other kill options, cross flow

8    potential."

9          And it lists "GOM staff Full-Time:  Kelly

10   McAughan," and "Debbie Kercho."

11         Do you know Ms. Kercho?

12   A.   Yes.

13   Q.   Do you know what her title is?

14   A.   She was a Reservoir Engineer working with

15   BP.

16   Q.   Okay.  And was she a Reservoir Engineer

17   on the Macondo Well pre-incident, to your

18   knowledge?

19   A.   Not to my knowledge.

20   Q.   Okay.  But she was working on the Macondo

21   Well post-incident?

22   A.   I -- I assume from this document, yes.

23   Q.   Okay.  And then "Part-time," it lists

24   David Epps.  Do you know Mr. Epps?

25   A.   Yes, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.  And do you know Mr. Epps' title?

2     A.  David Epps was also a Reservoir Engineer.

3     Q.  Okay.  And Walt Bozeman, do you know him?

4     A.  Yes, same.

5     Q.  A Reservoir Engineer?

6     A.  (Nodding.)

7     Q.  Okay.  And do you know whether he worked

8 on the Macondo Well pre-incident?

9     A.  I do not know the answer.

10     Q.  And you would assume from this document

11 that he was working on the Reservoir Engineering

12 modeling and pressure analysis post-incident?

13     A.  Yeah.

14     Q.  And then below that it says:  "Also

15 supporting RE work," I assume that's Reservoir

16 Engineering work, "but captured on other work

17 flows:  Pierre Andre Depret" -- is -- am I

18 pronouncing that correctly?

19     A.  Yes.

20     Q.  "Galina Skripnikova, Charles Bondurant,

21 Dave Grass," and "Tanner Gansert..."

22     So is it your understanding that you were

23 also supporting the Reservoir Engineering

24 modeling and pressure analysis on the -- the --

25 as described here in this document?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.  I believe we were just subsurface

2  support.  If they had any questions on the

3  Geology, we could help answer that.

4    Q.  Okay.  Thank you.

5        And then it lists "EPT staff" there,

6  "Full-Time:  Mike Mason."

7        I believe we discussed Mr. Mason earlier.

8  Is he a Reservoir Engineer; is that right?

9    A.  I -- I hon -- I don't know his exact

10  title.

11    Q.  Do you know Simon Bishop?

12    A.  I do not know Simon.

13    Q.  Do you know Tony Liao?

14    A.  I do not know Tony.

15    Q.  And I believe you said earlier you know

16  Bob Merrill?

17    A.  Yes.

18    Q.  And Mr. Merrill is a Reservoir Engineer,

19  to the best of your knowledge, correct?

20    A.  Correct.

21    Q.  Okay.

22        (Discussion off the record.)

23            MR. CERNICH:  What, this?

24        (Discussion off the record.)

25    Q.  (By Mr. Cernich) If I could direct you

**PURSUANT TO CONFIDENTIALITY ORDER**

1    back to the first page of the E-mail, please,

2    under "2).  Data Analysis and Integration," at

3    the end of that paragraph, there's a -- a

4    sentence that says:  "A first draft 'post-well'

5    document is currently being compiled as well."

6              Do you know what that first draft

7    post-well document is?

8         A.  No, I -- I do not.

9         Q.  Do you -- do you know whether that's the

10   Technical Memorandum of which you were a

11   co-author?

12                   MR. KEEGAN:  Objection to form.

13        A.  I do not know what Cindy was talking to

14   there.

15        Q.  (By Mr. Cernich) Okay.  Thank you.

16             Could I direct you to Tab 14, please?

17                   MR. CERNICH:  I'm going to mark this

18   as Exhibit 4699.

19             (Exhibit No. 4699 marked.)

20        Q.  (By Mr. Cernich) And this is an E-mail

21   from yourself dated April 16, 2010 to Brian Morel

22   is the top E-mail.  But if I could direct you

23   down to the E-mail just below that one,

24   April 15th, 2010 from Brian Morel, and it says --

25   Brian Morel wrote:  "Are you aware" that "they do

1  not intend on perforating the bottom sand?  If so

2  are you okay with this?  Has anyone forwarded

3  this information to the asset?"

4      Do you know why Mr. Morel was sending you

5  this E-mail?

6          MR. KEEGAN:  Objection to form.

7   A.  M-h'm.  I -- I do not know why I was sent

8  this E-mail.  I'm not part of the production

9  staff.

10   Q.  (By Mr. Cernich) And, I'm sorry, why --

11  why did you -- why did you reference the

12  production staff?

13   A.  Well, I assumed that the -- that they're

14  talking about perforations, then it would be a

15  production or development-type group that would

16  be working that.

17   Q.  Okay.  Or -- or could this be that --

18  that they're not actually drilling the well down

19  into the bottom sand?

20          MR. KEEGAN:  Objection to form.

21   A.  I don't -- I don't believe that was it,

22  no.

23   Q.  (By Mr. Cernich) Okay.

24   A.  (Reviewing document.)  April 15th.

25   Q.  And do you know what he means when he

1  says:  "Has anyone" forward "this" -- "forwarded

2  this information to the asset?"

3      A.  The asset would be the production folks

4  that I referred to earlier who would be taking on

5  the producing of the field, if -- if they wanted

6  to do so.

7      Q.  And -- and your response on April 16th

8  was:  "No problem.  Drink off the top of the

9  beer."

10          Can you explain what you meant by that?

11      A.  I can't explain that last half of it, but

12  the "No problem" was that I would make sure that

13  the production folks were aware, and probably

14  either communicated to my Management or to the

15  production folks upstairs about this E-mail, just

16  to make sure there's a flow of information.

17      Q.  So you don't know why you wrote "Drink

18  off the top of the beer"?

19      A.  It was a bad attempt at humor.

20      Q.  Could -- could it have related to the

21  fact that you would be producing the -- the same

22  reservoir from sands that are higher up in the

23  well?

24      A.  Again, that goes into the production and

25  connectivity of the sands, and I --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  So as a Geologist, you know -- you

2  don't -- you don't analyze the connectivity of

3  oil-producing sands at the bottom of a well?

4    A.  In --

5             MR. KEEGAN:  Objection to form.

6    A.  In -- in my role, I'm more of a Prospect

7  Geologist that identifies a prospect.  If -- if

8  the prospect is successful, then there's another

9  group at BP that would further analyze that, do a

10  more detailed production or development of a

11  field.  So other Geologists do do that job.  I do

12  not, in my role.

13    Q.  So this comment in this E-mail has -- has

14  absolutely nothing to do with the Geology or

15  the -- or the sands or the oil in the bottom of

16  this well?

17    A.  I mean, there's -- that's so long ago,

18  I -- I don't recall.  I thought it was a joke.

19    Q.  You -- I've -- I've looked at the E-mail

20  below it, and there -- there doesn't seem to be

21  any joke that runs through this E-mail.

22    A.  (Nodding.)  Correct.

23             MR. KEEGAN:  Objection.

24    Q.  (By Mr. Cernich) Do you have any

25  recollection of what the -- what the joke was

1    that you were making?

2        A.   Something about drinking beer.

3        Q.   But it -- so your testimony is if this

4    "Drink off the top of the beer" comment has

5    absolutely nothing to do with the drilling of a

6    well, or the Exploration of -- of the Macondo

7    Prospect, or the oil-producing sands in the

8    Macondo Prospect?

9               MR. KEEGAN:   Objection to form.

10       A.   There was a -- I was stating "No

11   problem."  I believe I was going to bring the

12   information to the Production Facility Group who

13   can handle that type of question.

14       Q.   (By Mr. Cernich) So you were going to

15   take this information that Mr. Morel sent you,

16   and you were going to take it to the Production

17   Group?

18       A.   Yeah, I would communicate, and I would

19   help facilitate communication whenever I could,

20   and I would take this information to either

21   Management or to the Production Group, I don't

22   recall.

23       Q.   Okay.  And so you don't recall who you

24   took this to?

25       A.   No.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1      Q.  And it was no concern to you about
 2  whether they were going to -- going to perforate
 3  the bottom sand?
 4      A.  Again, that's not my role or
 5  responsibility to produce a field.
 6      Q.  And you had no -- in analyzing the
 7  Macondo Prospect, before the well was drilled,
 8  you had no occasion to or you didn't consider at
 9  all the con -- connectivity of any of the -- of
10  the oil-producing zones in the Macondo Well?
11              MR. KEEGAN:  Objection to form.
12      A.  Pre-Drill, we didn't know what we would
13  encounter in the well.  Would it be one single
14  lobe like we've seen in offset wells, or in this
15  particular case, we saw multiple lobes.
16      Q.  (By Mr. Cernich) But you made
17  predictions --
18      A.  But --
19      Q.  -- about the -- the volume of the Macondo
20  Well, correct?
21      A.  Yes.  The -- the Team did produce
22  volumetrics based off of geophysical analysis at
23  the prospect.
24      Q.  And in doing that, you at no time
25  considered the connectivity of any of the sands?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        MR. KEEGAN:  Objection to form.

2     A.  From the offset well -- yes, we -- we

3  thought about what that reservoir might look like

4  as a Geologist, and --

5     Q.  (By Mr. Cernich) And whether the various

6  layers of sands might be connected in some way?

7        MR. KEEGAN:  Objection to form.

8     A.  Pre-Drill, I -- I saw my offset well

9  information that we would -- in this reservoir, I

10  thought it would be like Isabella, it'd be one

11  thick sand body.  So if it's one thick homogenous

12  sand, then we'd think lateral connectivity would

13  be okay.  We weren't analyzing if it'd be one

14  sand or three sands Pre-Drill, because we were

15  just exploring for a potential hydrocarbon

16  reservoir.

17     Q.  (By Mr. Cernich) Can you turn to Tab 16,

18  please.

19        MR. CERNICH:  We'll mark this as

20  Exhibit 4773.

21        THE COURT REPORTER:  Skipping to

22  4773.

23     (Exhibit No. 4773 marked.)

24     Q.  (By Mr. Cernich) This document has a

25  title of "Check Shot Report."  Have you seen this

1    document before, Mr. Bondurant?

2       A.  Not this particular version.

3       Q.  But you've seen other versions of this

4    document?

5       A.  I was shown the -- it was a large

6    printout of the Check Shot information that my

7    Geophysicist -- or our -- the Team's Geophysicist

8    was using.

9       Q.  Okay.

10          (Discussion off the record.)

11             MR. CERNICH:  Thank you.

12      Q.  (By Mr. Cernich) And is a Check Shot

13   Report something you would normally look at as a

14   Geologist on a well?

15      A.  No.  This would be more in the

16   geophysical realm of -- of making sure our

17   seismic depth prediction -- or my -- or our

18   seismic was accurately predicting the depth of

19   which we saw on the wellbore.

20      Q.  So are you saying the -- only the

21   Geophysicist would look at this information?

22      A.  No, there may be more people.

23      Q.  But the Geologist on the well wouldn't

24   look at this information?

25             MR. KEEGAN:  Objection, form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.  I -- I did not.

2     Q.  (By Mr. Cernich) Turn to Tab 15,

3  please -- actually, let me take that back.

4  Please turn to Tab 30.

5             MR. CERNICH:  I'm going to mark this

6  document Exhibit 4774.

7         (Exhibit No. 4774 marked.)

8             MR. KEEGAN:  You're marking the

9  whole tab?

10            MR. CERNICH:  H'm?  Yeah --

11            MR. KEEGAN:  The whole tab --

12            MR. CERNICH:  -- the whole tab.

13            MR. KEEGAN:  -- in the notebook?

14            MR. CERNICH:  The whole tab.

15            MR. KEEGAN:  Okay.

16    Q.  (By Mr. Cernich) It's an E-mail with an

17  attachment from Robert Merrill to -- dated May

18  19th, 2010, to a variety of individuals,

19  including yourself, with an attachment.  It says:

20  "Kate, Cindy:  I attach a draft report.  We had a

21  good discussion with Simon Bishop after you left;

22  we're" looking "at his model tomorrow morning

23  in...detail.  We are also waiting for the Olga

24  results."

25            Do you know what model this E-mail is

1    referring to with regard to Mr. Bishop's model?

2        A.   I -- I do not know.

3        Q.   Okay.  If you could please look at the

4    attachment behind the blue sheet to this E-mail.

5    This is a document titled "Macondo Technical

6    Note, Title:  Shut-in Pressures:  Range and

7    Likelihood."

8            There's a list of contributors including

9    yourself.  And this -- it says:  Issued by:  Bob

10   Merrill," dated May 19th, 2010, "Version:

11   A-DRAFT."

12           Have you seen this document before,

13   Mr. Bondurant?

14       A.   I -- yeah, I believe I have.

15       Q.   Okay.  Can you tell me what this document

16   is?

17       A.   No.

18       Q.   Okay.  What was -- accor -- according to

19   this -- the face of this document, you were a

20   contributor.  Can you tell me what you

21   contributed to this document?

22       A.   The contribution to -- would be a -- the

23   G and G description of the Macondo Reservoir

24   at -- I guess the meeting -- maybe from the

25   original meeting that we went to.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   What meeting is that?

2      A.   I'm sorry.  I'm referring back to the

3    initial meeting where I explained the geologic

4    description of Macondo to that initial -- I don't

5    know what the name of the meeting was called, but

6    we were talking about it earlier.

7      Q.   The -- the -- the meeting that you -- you

8    referred to as a "flow meeting"?

9           MR. KEEGAN:  Objection to form.  You

10   referred to it as that.

11     A.   It was that meeting I believe we were

12   talking about, yes.

13     Q.   (By Mr. Cernich) The meeting we discussed

14   earlier?

15     A.   Yes, yeah.

16     Q.   And so you provided that information at

17   the meeting, and then you never did -- did -- did

18   you ever see this Memo?  Did you ever read it?

19     A.   No.

20     Q.   So you --

21     A.   I do recall receiving E-mails, multiple

22   E-mails, throughout this from -- from these --

23   from people all throughout BP.

24     Q.   And you provided no other -- and you

25   provided no comments to this -- this Memo?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   (Reviewing document.)   I -- I don't

2  recall.

3     Q.   Have you ever read this Memo?

4     A.   No.

5     Q.   So you don't know whether the information

6  you provided was included or incorporated into

7  this Memo?

8     A.   Yeah, I -- I -- I don't recall.

9     Q.   Okay.   This is a document that I -- I

10  could get you the -- the Bates number for this

11  label.   This was produced in -- in native format,

12  and I -- I don't have the -- the native file

13  produced page for it.

14          MR. KEEGAN:   I think it's been

15  marked as an exhibit before, so --

16          MR. CERNICH:   Okay.

17          And I'm going to mark this as

18  Exhibit 4775.

19       (Exhibit No. 4775 marked.)

20          MR. KEEGAN:   Just note for the

21  record that the -- the printed date on the

22  bottom, 8/20/2011 [sic] is part of our discovery

23  process --

24          MR. CERNICH:   Yes, understood.

25          MR. KEEGAN:   -- just note for the

 1   record.

 2               MR. CERNICH:  Understood.

 3               MR. KEEGAN:  (Nodding.)

 4        Q.  (By Mr. Cernich) This is a document

 5   titled "Confidential Technical Assurance

 6   Memorandum."  And it's dated April 2009.

 7   "Region:  USA, Prospect:  Macondo, Operator, BP."

 8   And then on the front page, it lists a number of

 9   individuals it was prepared by.  And at the top

10   is "Chuck Bondurant, Geologist."

11        Have you seen this document before?

12        A.  Yes, I have.

13        Q.  And can you tell me what it is?

14        A.  This is a -- a Technical Description of

15   the -- a prospect prior to initiating "Beyond the

16   Best."  So this is -- yeah.

17        Q.  And what's the purpose of this document?

18        A.  This defines the parameters of -- of the

19   prospect.  So it talks about the trap, the Charge

20   acksha -- Access, Reservoir Engineering put into

21   this, the petrophysical information put into

22   this.  So it's a -- the full description of the

23   prospect in a single document.

24        Q.  Okay.  That's what it is.  Can you tell

25   me why it's prepared?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        A.   Part of a -- in part it -- in the Gulf of

 2   Mexico Exploration, before a -- a prospect goes

 3   to a -- a drill ready status or where it is taken

 4   into "Beyond the Best," that prospect goes

 5   through rigorous technical review with peer

 6   reviews, with local peers, and with the

 7   Exploration Excellence.

 8          When the Exploration Excellence Group

 9   comes to an Agreement that they -- and -- and

10   with the Subsurface Team, that we've done as much

11   work as possible to describe this prospect, the

12   Management of BP would like us to provide this

13   TAM to describe the prospect.

14        Q.   And is that so that -- is it your

15   understanding that's so that Management can make

16   decisions as to whether to explore the prospect?

17        A.   I believe this is for Management's

18   purpose to make decisions on what to do in -- in

19   the company.

20              THE COURT REPORTER:   Four minutes.

21              MR. CERNICH:   Thank you.

22        Q.   (By Mr. Cernich) If I could direct you to

23   Page 6, please.   There are -- there's a Section 5

24   there that says:   "Database, Seismic."

25        A.   M-h'm.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  And unfortunately, when this document

2    printed, those whole -- the process sections

3    there did not -- did not print all the way.  The

4    one that said -- and -- and you don't have to

5    take my representations as the -- as what it

6    actually says.  But what I got from looking at it

7    in native file format was, for example, the TGS

8    Revival at the bottom, 1999 Acquired, was RTM and

9    Kirchhoff 2009 proprietary processing with full

10   anisotropic reprocessing, including Kirchhoff and

11   RTM depth gathers?  Are you familiar with that --

12   that seismic dataset?

13   A.  Yes.

14           MR. MONICO:  Objection.

15   Q.  (By Mr. Cernich) And is that a dataset

16   that you looked at in preparing this Technical

17   Assurance Memorandum?

18   A.  Yeah, this --

19           MR. KEEGAN:  Objection.

20   A.  -- I'm -- I'm familiar with those types

21   of processing, and those processing parameters

22   were -- or those processing steps were applied to

23   the original TGS data in-house, and in our

24   seismic data library.

25   Q.  (By Mr. Cernich) Did you use any other

**PURSUANT TO CONFIDENTIALITY ORDER**

1    seismic datasets, besides these, after -- after

2    the incident, in your work on the Macondo Well?

3                MR. KEEGAN:  Objection to form.

4        A.  So, yes, earlier, I spoke to the

5    acquisition of the Western dataset that was

6    reprocessed.

7        Q.  (By Mr. Cernich) Okay.  And are you

8    familiar with something called "S-c-a-b-b

9    Enhancements"?

10       A.  H'm.

11       Q.  SCABB Enhancements?  In this comment

12   section --

13       A.  Oh.

14       Q.  -- again, I apologize.

15       A.  H'm, I --

16       Q.  I have read something that said a BP,

17   SCABB, S-C-A-B-B Enhancements.

18       A.  I --

19                MR. KEEGAN:  Objection to form.

20       A.  I've heard of that before.

21       Q.  (By Mr. Cernich) Do you know what it is?

22       A.  I do not know the processing steps that

23   go into that.  It's just a process that our

24   in-house Reprocessing Team applies to data.

25       Q.  Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   It's like RTM and Kirchhoff, and they

2   just call it "SCABB."

3      Q.   So you have an in-house Reprocessing Team

4   who repro -- processes seismic data for BP?

5      A.   We do.

6      Q.   And do you request that reprocessing?

7      A.   Yeah.  We would request it if we wanted

8   to use the in-house Team.

9      Q.   Okay.

10              THE COURT REPORTER:  Time.

11      Q.   (By Mr. Cernich) And aside from -- and --

12   that Western data you described earlier, was

13   there any other seismic data that you used,

14   post-event, to analyze the -- the --

15              MR. KEEGAN:  This is your last

16   question.

17              MR. CERNICH:  Okay.

18      Q.   (By Mr. Cernich) -- the Geology of the

19   Macondo Well?

20      A.   I particularly didn't really use it, but

21   there was the 2-D seismic lines that were shot,

22   and which the USGS were looking at, you know,

23   time lapse events of the seismic data.

24              MR. CERNICH:  Okay.  Thank you.

25              THE WITNESS:  Yeah.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          THE VIDEOGRAPHER:  The time is

2  1:53 p.m.  We're off the record, ending Tape 5.

3          (Recess from 1:53 p.m. to 2:01 p.m.)

4          MR. THIBODEAUX:  Let me go ahead and

5  premark that as our next exhibit.

6          (Exhibit No. 4776 marked.)

7          MR. THIBODEAUX:  Okay.  I'm ready.

8          THE VIDEOGRAPHER:  All set?  One

9  second.

10          It's 2:01 p.m.  We're back on the record.

11  Beginning Tape 6.

12                    EXAMINATION

13  QUESTIONS BY MR. THIBODEAUX:

14     Q.  Good afternoon, Mr. Bondurant.  My name

15  is Paul Thibodeaux, and this is Mary Kay

16  Klinefelter, and we represent Transocean.

17     A.  Good day.

18     Q.  All right.  Are you familiar with -- with

19  something called "max anticipated surface

20  pressure"?

21     A.  No, that's not out -- that's out of my

22  realm.

23     Q.  As -- as a -- as a Geologist on the

24  Macondo Well, did you provide any data that was

25  used in calculating the max anticipated surface

1    pressure on the Macondo?

2              MR. KEEGAN:   Objection to form.

3         A.   No.

4         Q.   (By Mr. Thibodeaux) Did you play any role

5    in determining the gas-to-oil ratio that would be

6    used in determining the max anticipated surface

7    pressure on Macondo -- on the Macondo Well?

8         A.   No, sir.

9         Q.   All right.   I've marked as -- as Exhibit

10   4776 a packet of Daily Geological Reports that

11   I've handed to you.

12              MR. HILL:   Are they --

13              MR. THIBODEAUX:   No.   They're -- I

14   passed them -- passed them out individually.

15        Q.   (By Mr. Thibodeaux) But they're --

16   they're Daily Geological Reports from April 1st

17   through 15th, and they include a string of Bates

18   numbers, which I'm going to go ahead and read out

19   because it's -- I compiled these together.   It's

20   BP-HZN-2179MDL00059483 through 484, 59370 through

21   371, 58504 through 506, 58634 through 636, 58326

22   through 328, 58467 through 468, 58918 through

23   919, 58733 through 734, 58539 through 540, 59852

24   through 59853, 58665 through 666, 58954 through

25   955, 58450 through 51, 58345 through 46, and

PURSUANT TO CONFIDENTIALITY ORDER

1    59185 through one eighty -- 186.

2         All right.  Mr. Bondurant, you're

3    familiar with these Daily Geological Reports,

4    right?

5         A.  Yes.

6         Q.  These are documents prepared by either

7    Gord Bennett or Stuart Lacy for BP and circulated

8    so the Subsurface Team of BP, correct?

9              MR. KEEGAN:  Objection to form.

10        A.  I -- I don't know the actual people who

11   created it, but they were the Well Site

12   Geologists and maybe some other people on the

13   rig.  I'm not certain.

14        Q.  (By Mr. Thibodeaux) Okay.  And those Well

15   Site Geologists for Macondo were -- you know Gord

16   Bennett was one of those Well Site Geologists,

17   right?

18        A.  I recall the name, yes.

19        Q.  And so was Stuart Lacy, right?

20        A.  I recall that name, too.

21        Q.  If you look at the first -- first Report

22   for April 1st on Page 2 at the bottom, there's an

23   indication, "Geologist Gord Bennett"?

24        A.  Yes.

25        Q.  Does that indicate that Gord Bennett

1   prepared this report?

2       A.   I do not know.   I'd assume so.

3       Q.   Okay.   Did you -- did you receive these

4   Daily Geological Reports on a daily basis for

5   Macondo?

6       A.   They were sent out in E-mail form I

7   believe to the Subsurface Team, and you could

8   also access these through Well Space --

9       Q.   Okay.

10      A.   -- which was a collection site for -- for

11  everyone to access data.

12      Q.   And who -- remind me again, who was on

13  the well -- on the Subsurface Team for Macondo?

14      A.   The -- I mean, it's -- there's an

15  operation side at this point, and then there's a

16  Subsurface Team that I was, you know, core

17  working with.   And I don't remember all the names

18  of the people at this particular time.

19      Q.   Okay.   Well, who do you remember?

20      A.   So we're in the end of the drilling.   So

21  the Reservoir Engineer at this time was Kelly.

22      Q.   Kelly McAughan?

23      A.   Yeah.

24      Q.   Okay.

25      A.   Our Petrophysicist at this time was

1   Galina Skripnikova, and the Geologist at this

2   time was me -- sorry, I was thinking

3   Geophysicist.  Geophysicist was Binh, and I

4   believe the Petroleum System Analyst was still

5   Pierre.  So that was the -- the Prospect Team.

6         The -- the Operations side, I -- that was

7   run out of the Tiger Team.  I -- I recall Bobby

8   Bodek was Operations Geologist.

9       Q.  Okay.  Anybody else from the Tiger Team?

10      A.  Marty Albertin was the -- working pore

11   pressure.

12      Q.  Okay.  What about Gord Bennett, was he

13   part of the Tiger Team?

14      A.  H'm, I do not know Gord Bennett's

15   relationship to who he reports to, but he is on

16   the Operations side of things.

17      Q.  What about Stuart Lacy?

18      A.  It would be the same.

19      Q.  Okay.  If you'd just look at the April

20   1st Report and turn to the second page.  You'll

21   see that there's a section for gas data.  Do you

22   know where the gas data comes from that's then

23   inputted into this report?

24      A.  I believe this is on the Operations side.

25   So it would be from a certain unit on the rig.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  And is that unit something that the --

2  the Well Site Geologist is monitoring?

3    A.  I -- I don't know if he monitors a unit.

4  It would be a third-party contractor that would

5  be probably hooked into the rig to measure gas.

6    Q.  And do you know who that was on Macondo?

7    A.  I -- I don't recall.

8    Q.  Let's take a look at the April 3rd

9  Report.  If you could look at the Bates numbers,

10  it's the one ending in 58504.

11    A.  Okay.

12    Q.  If you would turn to the second page of

13  that report.  In the gas section there's an

14  indication of total units of gas of 53 at a depth

15  of 17,531 feet.  That's an indication of a

16  permeable zone at 17,531 feet, correct?

17          MR. KEEGAN:  Objection to form.

18    A.  I don't know the answer to that.

19    Q.  (By Mr. Thibodeaux) Why don't you know

20  the answer to that?

21          MR. KEEGAN:  Objection, form.

22    A.  Because I don't know the answer.

23    Q.  (By Mr. Thibodeaux) Do you know what a

24  permeable zone is?

25    A.  As a reservoir, yes.  Yes.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   The permeable zone is one that -- that

2  will flow, correct?

3    A.   Yes.  It will flow hydrocarbons or water

4  through, yes.

5    Q.   Well, the flow of gas at a certain depth

6  in a production interval would indicate that that

7  section is permeable, correct?

8                MR. KEEGAN:  Objection to form.

9    A.   I do not know the answer to that.

10    Q.   (By Mr. Thibodeaux) All right.  Who would

11  know the answer to that that was on the BP

12  Subsurface Team?

13    A.   So the people who would analyze this type

14  of data would be the Petrophysicist.

15    Q.   Galina Skripnikova, then?

16    A.   Yes.

17    Q.   Okay.  If you turn to the April 4th

18  Report, which ends in the Bates No. 58634 -- are

19  you to that one yet?

20    A.   58634?  Yes, sir.

21    Q.   Yeah.

22    A.   Yeah.

23    Q.   If you look on the first page, there's a

24  column where it says "Well No.," and it's got

25  some information about the various shoe -- the

1  various shoes in the different intervals.  Do you

2  see that?

3       A.  Yes, sir.

4       Q.  Do you see at the bottom there's the

5  liner shoe for the nine and seven-eighths inch

6  liner?

7       A.  Yes.

8       Q.  And it indicates an "LOT = 15.98 ppg

9  surface."  Do you see that?

10      A.  I do.

11      Q.  Okay.  You know an LOT is a leakoff test,

12  right?

13      A.  I am familiar with -- with that, yes.

14      Q.  Okay.  Did you play any role on the

15  Macondo Well in the evaluation of the -- the

16  leakoff test at the nine and seven-eighths in

17  liner -- inch liner shoe?

18      A.  No, sir.

19      Q.  You didn't play any role in interpreting

20  the leakoff test?

21      A.  Correct.

22      Q.  If you turn to Page 2.  There's some

23  information about the gas where there's total gas

24  units of 525 at a depth of 17,835 feet.

25      A.  Yes, I see that.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.  If I ask you the same question about

2  whether that indicates a permeable zone, are you

3  going to tell me that -- that Galina -- I should

4  be talking to Galina?

5            MR. KEEGAN:  Objection to form.

6     A.  I would say that Galina would have the

7  proper tool to analyze the full suite of data

8  that was collected on the wellbore to analyze

9  these zones.

10    Q.  (By Mr. Thibodeaux) So you would defer to

11  Galina Skripnikova for the assessment and

12  determination of hydrocarbon bearing zones and

13  permeable zones in a production interval of the

14  Macondo Well?

15           MR. KEEGAN:  Objection to form.

16    A.  I know she was part of the Team that

17  analyzed the open hole section with the LWD and

18  wireline data.

19    Q.  (By Mr. Thibodeaux) Who else was on that

20  Team?

21    A.  Earlier I referred to the two other

22  Petrophysicists.  That was Bruce and Ray.

23    Q.  That's Bruce Wagner and Ray --

24    A.  Widrenski.

25    Q.  On the Macondo Well, did you play any

1    role in pore pressure fracture gradient

2    prediction or detection?

3        A.   No.   That was done by the Operations

4    Group.

5        Q.   By the Tiger Team?

6        A.   Yes.

7        Q.   Okay.   And who is responsible for pore

8    pressure fracture gradient prediction or

9    detection in the Tiger Team?

10               MR. KEEGAN:   Objection to form.

11       A.   Marty.

12       Q.   (By Mr. Thibodeaux) Mr. Albertin?

13       A.   Yes.

14       Q.   He was single point of accountability on

15   that -- for those issues --

16               MR. KEEGAN:   Objection to form.

17       Q.   (By Mr. Thibodeaux) -- is that right?

18               MR. KEEGAN:   Objection to form.

19       A.   I believe that's what he was referred to.

20       Q.   (By Mr. Thibodeaux) All right.   Earlier

21   this morning we looked at an E-mail where --

22   where you talked -- I'm paraphrasing -- but

23   you -- you used the word "snake bit" in referring

24   to the Macondo Well.   I believe the E-mail's from

25   October of 2009.   Do you remember that?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.   I do remember the E-mail.

2          Q.   And you mentioned, in -- in explaining

3    that E-mail, something about the BOP that was in

4    use at the time.  Do you recall that?

5          A.   I -- yeah, I do recall mentioning

6    something about the BOP, yes.

7          Q.   Okay.  So in October of 2009, the

8    MARIANAS was still on the Macondo Well, correct?

9          A.   Correct.

10          Q.   So any -- any reference to a snake bit

11    BOP, or -- or anything else that's snake bit,

12    regarding a BOP, would be with respect to the BOP

13    on the MARIANAS, not on the HORIZON, correct?

14          A.   If the date on the E-mail is what you

15    say, yes, yes.

16          Q.   All right.  Earlier we were talking a

17    little bit about the -- the Flow Assessment Team,

18    I think is what you called it?

19               MR. KEEGAN:  Objection.

20          Q.  (By Mr. Thibodeaux) Is that what you

21    called it, the Flow Assessment Team?

22               MR. KEEGAN:  Objection to form.

23          A.   I don't remember what I called it.  I

24    don't know their actual -- what they were called.

25          Q.  (By Mr. Thibodeaux) All right.  I just

**PURSUANT TO CONFIDENTIALITY ORDER**

1  want to see if I can understand what your

2  testimony was.

3      A.  Sure.

4      Q.  Are you saying that the only information

5  that you provided to the Flow Assessment Team was

6  the information set forth in the Technical

7  Memorandum that we went over earlier?

8              MR. KEEGAN:  Objection to form.  He

9  didn't testify about that Team.  That was the

10 Government's questions.

11             MR. THIBODEAUX:  I'm sorry, what?

12             MR. KEEGAN:  There's no Flow

13 Assessment Team.

14     Q.  (By Mr. Thibodeaux) Is there a Flow

15 Assessment Team?

16             MR. CERNICH:  Counsel, are you

17 testifying on the record?

18             MR. THIBODEAUX:  Yeah --

19             MR. KEEGAN:  I'm not.  I'm

20 clarifying a misrepresentation that was made

21 during your questioning.

22     Q.      (By Mr. Thibodeaux) Okay.  Well,

23 let's -- let's -- let's talk about --

24             MR. CERNICH:  He answered my

25 question.

PURSUANT TO CONFIDENTIALITY ORDER

1          MR. THIBODEAUX:  I'm sorry.

2      Q.  (By Mr. Thibodeaux) We talked -- you were

3  speaking earlier with the DOJ lawyer about the

4  Flow --

5      A.  Right.

6      Q.  -- Assessment Team, correct?

7          MR. KEEGAN:  Objection.

8      Q.  (By Mr. Thibodeaux) Who was on the Flow

9  Assessment Team?

10          MR. KEEGAN:  Objection.

11      A.  Again, I don't know the name of the Team,

12  but I -- I recall going to that meeting that

13  had -- I think we went through the names

14  earlier -- Kate Baker was there, Mike Mason were

15  the two main figures that I recall being there.

16          What they were called, I -- I do not know

17  for sure.

18      Q.  (By Mr. Thibodeaux) Okay.  But you heard

19  or you referred to them as the Flow Assessment

20  Team, correct?

21          MR. KEEGAN:  Objection to form.

22          MR. MONICO:  Objection, form.

23      A.  I don't recall saying that.

24      Q.  (By Mr. Thibodeaux) Okay.  Was it your

25  understanding that the people in the meeting that

1    you're referring to were there to assess the flow

2    rate of the Macondo Well at the time?

3        A.  I didn't have a full understanding of

4    what the Team's main goals were.  I was there to

5    provide geologic context about the Macondo

6    Prospect.

7        Q.  And were you aware that one of their

8    goals at least was to assess the flow rate of the

9    Macondo Well?

10              MR. KEEGAN:  Objection to form.

11              MR. MONICO:  Objection, form.

12        A.  Throughout time I could see that they

13    were trying to figure out the pressure, the

14    pressures in the well.

15        Q.  (By Mr. Thibodeaux) All right.  Is it

16    your understanding they were attempting to

17    determine what the flow rate was of the Macondo

18    Well?

19              MR. KEEGAN:  Objection to form.

20        A.  I -- I do not know that.

21        Q.  (By Mr. Thibodeaux) Okay.  What did you

22    think they were trying to determine using the

23    pressures in the geologic data that you were

24    providing?

25        A.  I think at that time there's one main

 1   focus, and that was to stop the flow of

 2   hydrocarbons into the Gulf of Mexico.  And I

 3   believe that's what we were all working for.  I

 4   was working to drill a relief well with a Team,

 5   and then there's another Team of Engineers, we

 6   had Engineers across the world, I think upstairs

 7   over 500, that's the count I've heard, trying to

 8   stop the flow of hydrocarbons in the Gulf of

 9   Mexico.

10       Q.  Of course.  And everybody knows that --

11   that y'all were trying to stop the flow.  But

12   what I'm asking you is:  Is it your understanding

13   that one of their goals was to determine what the

14   flow rate was of the Macondo Well?

15       A.  I -- I do not know that.

16       Q.  Okay.  You do know, though, that to stop

17   the Macondo Well, it would be important to know

18   what the flow rate was, correct?

19       A.  I do not know that.

20       Q.  Did you participate in any discussions as

21   early as April 21st, 2010 regarding the potential

22   flow rate of the Macondo Well?

23       A.  April 21st, I recall sitting in a large

24   room with multiple Parties in there rehashing the

25   events that occurred and organizing the strategy

 1    of getting some relief wells going.

 2        Q.   Okay.  And -- and who was in the room for

 3    that meeting?

 4        A.   I couldn't begin to tell you, it's so

 5    long ago, and there were so many people in there.

 6        Q.   Well, you don't recall anybody?

 7        A.   Well, I -- I do recall a few members of

 8    the Subsurface Team in there.

 9        Q.   And who were those people?

10        A.   That would be Kelly, myself, Pierre-Andre

11    Dupret.

12        Q.   Was Kate Baker involved in that meeting?

13        A.   She was not there.

14        Q.   What about Cindy -- is it Yeilding?

15        A.   She was present.

16        Q.   She was present?

17        A.   (Nodding.)

18        Q.   What about Jay Thorseth?

19        A.   I don't recall Jay being there.

20        Q.   Now, you're -- you're aware that as early

21    as April 21st, April 21st, 2010, BP made a

22    determination that the flow rate from the Macondo

23    Well was approximately a hundred thousand barrels

24    per day, correct?

25                MR. MONICO:  Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:  Objection to form.

2      A.  I have no knowledge of that.

3      Q.  (By Mr. Thibodeaux) At the meeting that

4  you participated in on April 21st, was a

5  determination made as to what the flow rate was

6  on the Macondo Well?

7      A.  No.  Again, that meeting was a lot of

8  Drilling Engineers and the small subset of the

9  Subsurface Team.

10     Q.  Which Drilling Engineers were involved?

11     A.  I -- I recall the members that were on

12  the Macondo Well, so that would be Mark and --

13  Mark Hafle and Brian Morel.  But there's also

14  numerous other Engineers from across our company,

15  and then Production or Development that were

16  there.

17     Q.  If you would, turn to Tab 2 in the

18  binder, please.  This is a -- it's a packet of

19  documents with Bates number marked

20  BP-HZN-2179MDL03289733 through 752.  Take the --

21  take a look at the first document.  It ends in

22  Bate No. -- Bates No. 733.  Do you recognize that

23  document, Mr. Bondurant?

24     A.  733?  I do recognize this document.

25     Q.  Okay.  Did you prepare this document?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   With the aid of the Subsurface Team, I

2  did collate some in -- information and prepare

3  this document.

4    Q.   And was that done pre or post April 20,

5  2010, or on April 20?

6    A.   It was post.

7    Q.   It's post-in -- so it's post-incident?

8    A.   Yes.

9    Q.   Okay.  And you made the determination

10 that the M57B sand should be labeled as a gas?

11   A.   No, sir.

12        MR. KEEGAN:  Objection to form.

13   Q.   (By Mr. Thibodeaux) Who made that

14 determination?

15        MR. KEEGAN:  Objection to form.

16   A.   Again, this would have been the group of

17 Petrophysicists analyzing the open hole section,

18 working on identification of lith -- lithology

19 and potential fluid types in the open hole

20 section, and also there were third-party vendors'

21 interpretations that were also brought in through

22 this lengthy process of analyzing the data.

23   Q.   (By Mr. Thibodeaux) And that group

24 collectively decided to label the M57B sand as a

25 gas; is that right?

1       MR. KEEGAN:  Objection to form.

2       A.   So there was a lot of discussion on this

3  particular sand, that I recall, between the

4  Petrophysicists, and one of the three had

5  identified a potential gas there.

6       Q.  (By Mr. Thibodeaux) And so the group

7  decided to label it a gas; is that right?

8            MR. KEEGAN:  Objection to form.

9       A.   So at this point of time when I -- I -- I

10  did set up this document, I -- either through

11  word of mouth or another document, I put "gas" on

12  the edge, yes.

13      Q.  (By Mr. Thibodeaux) Now, gas zone or gas

14  sand can also be defined as a permeable sand,

15  correct?

16            MR. KEEGAN:  Objection, form.

17      A.   I do not know.

18      Q.  (By Mr. Thibodeaux) Based on --

19            MR. THIBODEAUX:  Let's go ahead and

20  mark this as Exhibit 4777.

21            MR. KEEGAN:  The full tab or just

22  the page?

23            MR. THIBODEAUX:  Let's do the whole

24  tab.  Regarding that page, it ends in Bates

25  No. 733.

**PURSUANT TO CONFIDENTIALITY ORDER**

1       (Exhibit No. 4777 marked.)

2       Q.   (By Mr. Thibodeaux) Could you identify

3    for me the range of depths that the M57B sand is?

4            MR. KEEGAN:   Objection, form.

5       A.   M57B sand, I could not give you the exact

6    range of depths of that sand with the -- with the

7    information here.

8       Q.   (By Mr. Thibodeaux) Well, do the best you

9    can.

10           MR. KEEGAN:   Do you want him to

11   guess?

12           MR. THIBODEAUX:   I didn't ask him to

13   guess.   I asked him to do the best he can.

14           MR. KEEGAN:   Okay.

15       A.   Again, the Petrophysicists would have

16   the -- the exact number calculated, but

17   here, 86 -- 50 -- I can -- I can give you a range

18   from 1 to 3 feet.

19       Q.   (By Mr. Thibodeaux) Okay.   And what's the

20   top -- the top depth of that sand?

21       A.   I can't give you that exact figure.   If I

22   had the Petrophysicist's analysis who -- who does

23   this work, she could give me the exact values

24   of --

25       Q.   Okay.   Well --

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  -- the top and base.

2      Q.  -- based on this document which you --

3   which you compiled, can you tell me -- give me --

4   give me -- give me what you think the M57B depth

5   range is based on this graph?

6             MR. KEEGAN:  Objection, form.

7      A.  Again, I -- I -- I did not do the

8   interpretation of -- of all of this analysis

9   here.  This is way beyond my scope.  So to

10  provide the exact top of what Galina and the

11  other Petrophysicists were calling the top

12  of 57B, I would need to see their information.

13     Q.  (By Mr. Thibodeaux) Okay.  But you would

14  defer to Galina, then, on the range of depths of

15  the M57B sand?

16     A.  Yes.

17     Q.  "Yes"?

18     A.  Yes.

19     Q.  Okay.  Turn to Tab 3 in your binder,

20  please.  This document was previously marked as

21  Exhibit 4774.  On the first page under "Key

22  Conclusions," there's a reference to "SIWHP."

23  What is that an acronym for?

24     A.  Where is the reference?

25     Q.  Key Conclusion No. 1:  "The SIWHP is

**PURSUANT TO CONFIDENTIALITY ORDER**

1   expected..."

2        A.   I believe that stands for Shut-In

3   Wellhead Pressure.

4             MR. KEEGAN:   Paul, just for the

5   record, that 8/12/01 [sic] is obviously not a

6   date associated with the original document.

7             MR. THIBODEAUX:   Oh, yeah.

8             MR. KEEGAN:   Okay.

9        Q.   (By Mr. Thibodeaux) Were you -- did you

10  play any role in determining what the shut-in

11  wellhead pressure would be for the Macondo Well

12  on or around May 19th, 2010?

13       A.   No, sir.

14       Q.   Okay.   Who did do that analysis?

15             MR. KEEGAN:   Objection to form.

16       A.   I don't know the full team that -- that

17  worked on that.   My main role, again, was -- was

18  relief well, and this is not my area of

19  expertise.

20       Q.   (By Mr. Thibodeaux) Turn to Tab 5,

21  please.

22             MR. THIBODEAUX:   We'll mark this as

23  Exhibit 4778.

24       (Exhibit No. 4778 marked.)

25       Q.   (By Mr. Thibodeaux) And it's Bates No.

**PURSUANT TO CONFIDENTIALITY ORDER**

 1  BP-HZN-2179MDL00004548.  This is a document that

 2  you wrote on March 26, 2010, correct?

 3      A.  Yes.

 4      Q.  All right.  If we look at the -- the --

 5  the -- the main paragraph in the middle with --

 6  towards the end with the sentence beginning:

 7  "After drilling 10ft of new formation we will

 8  perform a leak off test.  If the LOT is over 15

 9  ppg the likelihood of drilling to the target

10  without setting another liner increases.  If the

11  LOT is below 15ppg, we will set the 9-7/8" liner

12  around 17,200ft MD and see the reservoir next

13  weekend."

14      A.  (Nodding.)

15      Q.  You wrote that, correct?

16      A.  Yes, sir.

17      Q.  All right.  Why would you set a liner if

18  the LOT was below 15 ppg?

19          MR. KEEGAN:  Objection, form.

20      A.  Again, that's not my role.  That -- that

21  would be within the Operations Team to make that

22  type of decision.

23      Q.  (By Mr. Thibodeaux) Well, then, where did

24  you get that information from, then?

25      A.  I probably collected this information

```
 1   from the Operations Team to get a heads-up of

 2   what the potential time would be cutting the

 3   reservoir would be, or could be.  So it would be

 4   a discussion with Marty or -- or other Drilling

 5   Engineers.

 6        Q.  So you're telling me you -- you played no

 7   role in making a determination as to whether or

 8   not -- or what the operations would be based on

 9   what the leakoff test in the nine and

10   seven-eighths inch shoe would be?

11        A.  That is correct.

12        Q.  Okay.  And so who -- who was making those

13   operations determinations?

14        A.  Again, that would be --

15            MR. KEEGAN:  Objection to form.

16        A.  That would be the Operations Team

17   drilling the well, so probably the Tiger Team and

18   the Drilling Engineers.

19        Q.  (By Mr. Thibodeaux) Okay.  And then

20   what -- what was the point of this E-mail that

21   you were sending?

22        A.  The point of this E-mail was to notify

23   the Pompano Team and the Subsurface Team of

24   potential -- the pential -- potential time in

25   which we could go through this reservoir.
```

1    Q.   Okay.  And why did the Pompano Team need

2  to know that?

3    A.   There was some discussion amongst the

4  Subsurface Group with the Pompano Team that if

5  they wanted to run a certain type of analysis in

6  the well, that they could do so, based on what we

7  found in the reservoir.  And so I was giving them

8  a heads-up of just a potential time when we

9  could -- when we might see that reservoir.

10              THE COURT REPORTER:  Five minutes.

11              MR. THIBODEAUX:  Okay.  That's all

12  the questions I have.  Thank you.

13              THE WITNESS:  Thank you.

14              MR. THIBODEAUX:  I'll reserve the

15  rest of my time for -- for Halliburton.

16              THE VIDEOGRAPHER:  The time is

17  2:32 p.m.  We're going off the record.

18        (Recess from 2:32 p.m. to 2:40 p.m.)

19              MR. HILL:  Okay.  I'm ready.

20              THE VIDEOGRAPHER:  All set?

21        We're on the record.  The time is 2:40

22  p.m.  We're back on the record, beginning Tape 7.

23                        EXAMINATION

24  QUESTIONS BY MR. HILL:

25    Q.   Good afternoon, Mr. Bondurant.  My name

PURSUANT TO CONFIDENTIALITY ORDER

1  is Gavin Hill.  I just introduced myself to you,

2  I think, for the first time a few minutes ago

3  before we went on, right?

4      A.  Yes, sir.

5      Q.  And with me, to my right, is Mr. James

6  Johanns.  We represent Halliburton, and we're

7  going to ask you some questions today, okay?

8      A.  Okay.

9      Q.  Appreciate your patience.  I know it's

10  late in the day.  I'll do my best to be

11  efficient.

12          You saw a -- an E-mail chain earlier

13  today, and I'm going to hand you a document that

14  I've already marked as Exhibit 4779.  This is a

15  continuation of that same E-mail chain related to

16  the cost of the Macondo.  You mind taking a look

17  at it real quick?

18              MR. KEEGAN:  What Tab are we

19  talking?

20              MR. HILL:  It's Tab 14 in the

21  binder.  Sorry.

22              MR. KEEGAN:  (Nodding.)

23      (Exhibit No. 4779 marked.)

24      Q.  (By Mr. Hill) What I'd like to talk to

25  you about is the bottom of the first page.

PURSUANT TO CONFIDENTIALITY ORDER

```
 1              MR. MONICO:  Are you --
 2          (Discussion off the record.)
 3              MR. HILL:  I'll give him his copy.
 4              MR. MONICO:  Great.
 5      Q.  (By Mr. Hill) All right.  I'd like to --
 6   you ready?
 7      A.  Bottom of the first page?
 8      Q.  Yes, sir.
 9      A.  Okay.
10      Q.  I'd like to direct your attention to an
11   E-mail that says it's from you, on Thursday,
12   March 18, 2010 at 11:01 a.m.  Do you see that?
13      A.  Yes, sir.
14      Q.  It says Sub -- "Subject," "Macondo
15   Costs."  The last sentence of that E-mail -- or
16   the last sentence of that first paragraph says:
17   "The Wireline logging program will add a bit more
18   to the bottom line, maybe another 3 million."
19   Did I read that correctly?
20      A.  Yes, sir.
21      Q.  Now, sitting here today, is it my -- is
22   it your understanding that's a good, reasonable
23   approximation for how much the wireline program
24   cost at -- at Macondo?
25              MR. KEEGAN:  Objection to form.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        A.   I believe that number was provided me to

2   the Op -- by the Operations Team.

3        Q.   (By Mr. Hill) Okay.

4        A.   And that -- I -- I don't know the true

5   numbers.

6        Q.   I'm not asking you to -- to, you know,

7   identify exactly how much it cost, but I --

8        A.   Right.

9        Q.   -- I want to give the Judge a sense if

10  this wireline logging program cost $100,000 or

11  several million.  And, to me, this looks like

12  around three million, give or take.  Fair?

13       A.   That's what I stated --

14             MR. KEEGAN:  Objection, form.

15       Q.   (By Mr. Hill) I'm sorry?

16       A.   That's what I --

17             MR. KEEGAN:  Objection -- oh, sorry.

18             MR. HILL:  I'm asking him.

19       A.   Yes, that's what is stated here.

20       Q.   (By Mr. Hill) Okay.  Thank you.

21            You also said something earlier I wanted

22  to follow up on.  You said that there was a lot

23  of discussion about the M57B sand and

24  specifically that one of the three

25  Petrophysicists, if I wrote this down correctly,

1    identified the M57B sand as a gas sand?

2        A.   As a potential gas-bearing sand.

3        Q.   Do you remember which of the three

4    Petrophys -- well, let me back up.

5            The three Petrophysicists you're

6    referring to is either Galina Skripnikova, Bruce

7    Wagner, or Ray Widrenski, right?

8        A.   Correct.

9        Q.   Do you remember which of those three

10   identified it as a potential gas sand?

11       A.   Ray.

12       Q.   Okay.  Were you involved in the

13   discussions where they were having discussions

14   about whether M57B was hydrocarbon-bearing?

15       A.   The M57B is the -- the sand at seventeen

16   five, just a --

17       Q.   Seventeen four sixty-seven.

18       A.   Seventeen four sixty-seven.  I -- I sat

19   in that meeting for maybe the -- five minutes and

20   then went back to relief well duties.

21       Q.   Okay.  Do you --

22       A.   That was my main objective.  Right.

23   Yeah.

24       Q.   Do you remember the basis on which

25   Mr. Widrenski was identifying M57B as potentially

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1  hydrocarbon-bearing?

 2      A.  I do not know.

 3              MR. KEEGAN:  Objection, form.

 4      Q.  (By Mr. Hill) Okay.  Do you remember what

 5  he said about the M57 sands that led you to

 6  believe that he was advocating it as potentially

 7  hydrocarbon-bearing?

 8      A.  I do not know what his comments were on

 9  that.

10      Q.  Okay.  Now, let's set that aside.  We'll

11  come back to that.

12          I'm going to give you -- it's -- it's Tab

13  36 in the binders, but this is an exhibit that's

14  been previously marked as Exhibit 3538.  Okay.

15      A.  All --

16      Q.  I'll hand you -- I'll hand them to you,

17  if you don't mind.

18      A.  Sure.

19      Q.  Just keeps -- helps us keep track of it.

20      A.  Okay.

21              MR. MONICO:  What Tab, again --

22              MR. HILL:  36.

23      Q.  (By Mr. Hill) Now, this is an E-mail

24  chain ostensibly between Robert Bodek and Galina

25  Skripnikova, but I've noticed that you, as well
```

1    as the Drilling Engineers on the Macondo, are

2    copied on several of them.  What I -- do you

3    remember this E-mail chain?

4              MR. KEEGAN:  Objection to form.

5         A.  (Reviewing document.)  I do recall seeing

6    this, yes.

7         Q.  (By Mr. Hill) All right.  I want to take

8    a look at the one from Galina Skripnikova, dated

9    April 13th, 2010 at 11:51 p.m., where she says --

10        A.  11:51 -- is that at the bottom?  Yeah.

11        Q.  Actually let's start at the bottom.

12   Let's make it easier.

13        A.  Yes.

14        Q.  Okay?  So Mr. Bodek asks Galina -- or

15   tells Galina:  "The drilling team, in their

16   cement procedure preparations, needs to know the

17   depth of the shallowest hydrocarbon-bearing

18   interval in the open hole."  Did I read that

19   correctly?

20        A.  Yes.

21        Q.  Okay.  "From your calculations, could you

22   provide the depth of the shallowest hydrocarbon

23   zone and 'reply all' to this E-mail."  Did I read

24   that correctly?

25        A.  Yes, sir.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Now, you were among the people to whom

2  she was Replying All to, correct?

3    A.   I was cc'd.  Yes, I was cc'd on the

4  E-mail.

5    Q.   Okay.  And then -- and her response, next

6  in the line in the E-mail chain, is -- is:  "I

7  think the shallowest hydrocarbon sand is at

8  17,803 measured depth," correct?  That's what she

9  says?

10    A.   Yes, yes.

11    Q.   Okay.  Now, I'm trying to find out --

12  you -- you've talked about your role as a

13  Geologist, and you've talked about

14  Ms. Skripnikova's role as a Petrophysicist.  I'm

15  trying to find out how you guys worked together.

16  You seem to be on a lot of the same E-mails such

17  as this, so I'm trying to find out what personal

18  knowledge you might have about the content of --

19  of the E-mails where she's responded directly,

20  okay?  So that -- that -- that's where I'm

21  headed.

22         At this time, what did you understand

23  Ms. Galina to be doing with respect to the

24  call-out of the sand at 17,803?

25    A.   Again, this was more on the Operations

1  side, but it looks like she had been doing her

2  analysis and was giving her feedback on her

3  analysis of the -- of the wireline and LWD data.

4      Q.  Okay.  So you understood that prior to

5  this, the Wireline Operations had been running

6  for a few days, correct?

7               MR. KEEGAN:  Objection to form.

8      A.  I do not know that for sure.

9      Q.  (By Mr. Hill) Okay.  Were you involved at

10  all in arranging for the Wireline Operations out

11  on the Macondo?

12      A.  No, sir.

13      Q.  Okay.  Did you have anything to do with

14  arranging for Ms. Galina Skripnikova to actually

15  go out to Macondo to witness the Wireline Logging

16  Operations?

17      A.  No, sir.

18      Q.  Do you know what a triple combo log is?

19      A.  I -- I know there's three tools on -- on

20  that, and I believe it's a wireline program, and

21  that's --

22      Q.  Do you know what -- do you know what the

23  gamma plot shows on a triple combo log?

24      A.  The what?

25      Q.  The gamma.

1      A.   The gamma log?

2      Q.   Yeah.

3      A.   The gamma ray, I -- I'm familiar with the

4  gamma ray and what it shows.

5      Q.   What is the purpose of the gamma ray?

6      A.   It helps to determine the type of

7  lithology you're drilling in.

8      Q.   Is it fair to say it helps identify sands

9  from shale?

10      A.   Yes, sir.

11      Q.   Okay.  How about a resistivity plot, do

12  you know what that does?

13      A.   Again, that would show a -- a resistance

14  within a certain formation --

15      Q.   And --

16      A.   -- which is --

17      Q.   (Indicating.)

18      A.   I'm -- go ahead.

19      Q.   No, no, please.  I didn't mean to --

20      A.   Oh.

21      Q.   -- step on you.

22      A.   -- which could be an indication of

23  anomalous -- of a -- of a hydrocarbon-bearing

24  reservoir.

25      Q.   So if you plot --

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  Or it could be calcareous lithology,

2 also --

3      Q.  Okay.

4      A.  -- on the resistivity.

5      Q.  So there are certain trends on this plot,

6 resistivity plot.  For example, if the trend is

7 right, you know if there's resistivity there,

8 there's at least the potential for

9 hydrocarbon-bearing fluid in whatever sand is

10 there, correct?

11      A.  That could be -- yes, that could be

12 correct.

13      Q.  Okay.  And then if you want further

14 confirmation, there's a third track on that log

15 called a -- I'm -- called a density neutron plot,

16 correct?

17      A.  Yes, sir.

18      Q.  Okay.  And sometimes that's referred to

19 as the "density neutron crossover," correct?

20      A.  I've heard that term before.

21      Q.  Okay.  And what is your understanding of

22 the meaning of when the density and the neutron

23 porosity pl -- plots actually intersect?

24           MR. KEEGAN:  Objection to form.

25      A.  My understanding is when they intersect,

1    that you -- and follow each other, depending on

2    how the logs are displayed, which is out of my

3    realm of understanding -- but if they're crossed

4    over, there could be a hydrocarbon-bearing phase

5    of oil in --

6         Q.  (By Mr. Hill) Okay.

7         A.  -- in the sand.

8         Q.  So it would essentially be a further

9    confirmation of what you may preliminarily have

10   detected in the resistivity track, correct?

11                MR. KEEGAN:  Objection to form.

12        A.  In a potential gamma ray resistivity log,

13   yes.

14        Q.  (By Mr. Hill) Have -- have you ever

15   actually seen a triple combo log?

16        A.  Yes, I have.

17        Q.  Have you ever read one and interpreted

18   its results?

19        A.  No.

20        Q.  Okay.  On any prior well, any well prior

21   to Macondo, have you ever taken part in

22   identifying what the high -- shallowest

23   hydrocarbon-bearing sand in the open well -- in

24   the -- in the production interval is?

25        A.  No, sir.

PURSUANT TO CONFIDENTIALITY ORDER

1      Q.  Okay.  Did you have any participation in

2   that determination at Macondo?

3      A.  I was involved, cc'd in E-mails, and my

4   participation would -- I would not be the one who

5   would describe the highest known

6   hydrocarbon-bearing sand.

7      Q.  As among the people on this E-mail chain

8   in Exhibit 3538, who is it that would have been

9   responsible ultimately for determining what the

10   hydrest -- what the highest hydrocarbon-bearing

11   sand is --

12            MR. KEEGAN:  Objection to form.

13      A.  I don't know who the --

14      Q.  (By Mr. Hill) -- in your understanding?

15      A.  I -- I do not know.

16            MR. KEEGAN:  Objection to form.

17      Q.  (By Mr. Hill) Okay.

18      A.  I do not know.

19      Q.  Do you know who Ms. Skripnikova

20   answered -- reported to?

21      A.  I -- I'm trying to remember her boss

22   during that time.  She reported to a Team

23   Leader --

24      Q.  Okay.

25      A.  -- in the Exploration Business Unit.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.  Was it Robert Bodek?

2     A.  No.

3             MR. KEEGAN:  Objection.

4     Q.  (By Mr. Hill) You don't remember the name

5  of the person she reported to?

6     A.  No.  I know it was a Team Leader.  I just

7  don't know the timing who was in that Team a year

8  ago.

9     Q.  Okay.

10    A.  Had a turnover.

11    Q.  Do you know why you were copied on this

12  E-mail?

13    A.  Being part of the Subsurface Team on the

14  well, I was cc'd on many, many E-mails, and this

15  just happened to be one of them.

16    Q.  Okay.  But you had no -- did -- did you

17  ever ask anybody, for example, "Are we sure that

18  that's the shallowest hydrocarbon-bearing zone?"

19    A.  I don't recall.

20    Q.  Was it your understanding from

21  Ms. Galina's response that she was calling out to

22  the Engineering -- to the Wells Engineers on

23  Macondo that seven -- that the sand at 17,803 was

24  the shallowest hydrocarbon-bearing sand?

25            MR. KEEGAN:  Objection.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   M-h'm.

2    Q.   (By Mr. Hill) I'm asking for your

3  understanding of what she was saying.

4            MR. KEEGAN:   Objection.

5    A.   I don't know what she was saying here for

6  sure.

7    Q.   (By Mr. Hill) Okay.

8    A.   I mean, I can read her E-mail.  I can

9  read her statement.

10    Q.   That's fair enough.

11        Let me ask you this:  Do you have

12  appreciation of the importance of identifying the

13  shallowest hydrocarbon-bearing sand in the

14  production interval as it relates to the cement

15  procedure that was referenced in the first

16  E-mail?

17    A.   No.  That's more on the Operations side.

18    Q.   I know it's on the Operations side.  I'm

19  wondering if you have an appreciation for the

20  importance of it?

21            MR. KEEGAN:   Objection.

22    A.   I do understand now, after going through

23  this, the reason for finding the highest known

24  hydrocarbon-bearing zone.

25    Q.   (By Mr. Hill) And what's the reason?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  It's something to do with cement

2  procedure.

3      Q.  Okay.  You understand that the Federal

4  Government through Regulation requires that

5  cement be placed at a minimum distance above the

6  shallowest hydrocarbon-bearing sand?

7              MR. KEEGAN:  Objection.

8      A.  I do not know -- I do not know the

9  Regulations.

10      Q.  (By Mr. Hill) Okay.  Did you know that

11  there was such a Regulation?

12              MR. KEEGAN:  Objection.

13      A.  No, sir.

14      Q.  (By Mr. Hill) Okay.  I'm going to hand

15  you an exhibit that's been previously marked as

16  3539.  And you can confirm this, but to me, it

17  looks kind of a branch of off the prior E-mail

18  chain where you and Mr. Bodek have a

19  conversation.

20              MR. KEEGAN:  What tab?

21              MR. HILL:  Tab 34.  Apologies.

22      Q.  (By Mr. Hill) Now, after --

23      A.  Yes.

24      Q.  Sorry.  After Mr. Bodek asked Galina the

25  same questions about ask -- you know, identifying

 1   the depth of the shallowest hydrocarbon-bearing

 2   sand, you respond to Mr. Bodek, cc'ing the same

 3   people, ask -- asking the question:  "The sand

 4   that we could complete or just hydrocarbon

 5   bearing sands."

 6           Is that correct?

 7       A.  Yes, sir.

 8       Q.  Okay.  And do I understand correctly that

 9   embedded in your question is essentially you're

10   asking whether or not what we need to cull out is

11   a pay sand, one that we would complete, or any

12   sand that actually bears hydrocarbon.  Is that a

13   fair characterization?

14       A.  Yes.

15       Q.  All right.  Now, as you read Mr. Bodek's

16   response, he says:  "Any sand deemed to be

17   hydrocarbon-bearing that we'd have to isolate

18   behind cement per MMS regs."

19           Correct?  Is that what he says?

20       A.  Yes.

21       Q.  And then he asks a question.  He says:

22   "...is" the "little 5" inch "sand like the one

23   at" about "17,820 with 4 ohms res..."

24           I assume that's resistance, right?

25       A.  Yes, I assume.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   Okay.  "...considered" hydrocarbon --

2  "considered a hydrocarbon-bearing zone.  In all

3  actuality, it's probably a bit of gassy water.

4  Would this something we'd need to put behind

5  cement??"

6          Did you have -- is that -- did I read

7  that correctly?

8                  MR. KEEGAN:  No.

9                  MR. HILL:  Where did -- where'd I go

10  wrong?

11                  MR. KEEGAN:  Five inches versus five

12  feet.

13                  MR. HILL:  Thank you.  So five inch

14  sand, like the one --

15                  MR. KEEGAN:  Five-foot sand.

16                  MR. HILL:  Otherwise that's correct,

17  right, Counsel?

18                  MR. KEEGAN:  No, five-foot sand is

19  correct.

20      Q.  (By Mr. Hill) All right.  Five-foot sand.

21      A.  (Nodding.)

22      Q.  Now let me ask you, did -- did you ever

23  receive an answer to this question?  Or did -- or

24  did anyone ever answer this question that you

25  were copied on?

**PURSUANT TO CONFIDENTIALITY ORDER**

 1                 MR. KEEGAN:  Objection to form.

 2     A.  I do not know.  That's on the Operations

 3 side.

 4     Q.  (By Mr. Hill) Okay.  So essentially, you

 5 understand this is the geo -- the operational

 6 Geologist doesn't understand what constitutes a

 7 hydrocarbon-bearing sand for MMS Regs purposes?

 8                 MR. KEEGAN:  Objection to form.

 9     A.  Again, I -- I don't know what Bobby was

10 trying to convey here.

11     Q.  (By Mr. Hill) What's Bobby's role on

12 Macondo Well?

13     A.  He --

14                 MR. KEEGAN:  Objection to form.

15     A.  He was a member of the Tiger Team and the

16 Operations Geologist.

17     Q.  (By Mr. Hill) Was he the Operations, the

18 Head Operations Geologist for the Macondo Well?

19                 MR. KEEGAN:  Objection to form.

20     A.  I believe there is two Operations

21 Geologists within the Tiger Team, and -- and may

22 have shared time on the -- on the drilling of the

23 Macondo Well.

24     Q.  (By Mr. Hill) All right.  Thanks.  I -- I

25 think that clarifies my confusion.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    So the Tiger Team doesn't just work for

2  the Macondo Well, right?  They're assigned to

3  other wells, as well?

4    A.  Yes.

5    Q.  Okay.  But the Operations Geologist -- at

6  least Mr. Bodek, who was an Operational Geologist

7  on the Tiger Team, is asking questions about what

8  constitutes the hydrocarbon-bearing sand for

9  purposes of MMS Regulations, correct?

10    MR. KEEGAN:  Objection to form.

11    A.  It -- it looks like there was a

12  discussion about it, yes.

13    Q.  (By Mr. Hill) And you're not aware of

14  whether this question was ever answered by

15  anybody who was copied on this E-mail?

16    A.  I don't know.

17    Q.  Okay.  Now, I'm a little bit -- I'm going

18  to ask you to -- by the way, those are already

19  part of the record.  You're -- we -- you can hand

20  them back if you want.  We don't need to gather

21  the ones that have been premarked.

22    Let me see.  Tab 66, please.  We're going

23  to be talking to you about Tab 66, and this is

24  a -- the Technical Memorandum that's already

25  premarked in another exhibit as Exhibit 3533.

**PURSUANT TO CONFIDENTIALITY ORDER**

1        THE COURT REPORTER:  Gavin, you can

2   just put them over here.

3        MR. HILL:  Yeah.  I don't think you

4   want them in your stack.

5   Q.  (By Mr. Hill) I guess I want -- here --

6   here's what -- this is a -- this Exhibit 3533 is

7   the Technical Memorandum dated 26th of July 2010,

8   which I understand to be the final version of the

9   Technical Memorandum.  Is that your

10  understanding?

11  A.  I do not know.

12  Q.  Okay.  And just to be clear, this is

13  something that is -- is written by a -- a group

14  of people, your name -- yourself included, at

15  least is what -- how it's acknowledged on the

16  front of the paper, right?

17        MR. KEEGAN:  Objection to form.

18  A.  There are many contributing parties to

19  this, yes.

20  Q.  (By Mr. Hill) Is -- is your name one of

21  those that is out to the right of "WRITTEN BY"?

22  A.  Yes, sir.

23  Q.  Okay.  Did you ever actually read this?

24  A.  The document, no.

25  Q.  Yeah.  You -- so your name is on it,

**PURSUANT TO CONFIDENTIALITY ORDER**

1   you've never read it?

2       A.   Correct.

3       Q.   Okay.  You -- and I think I understood

4   your testimony before to be you didn't understand

5   the purpose for which it was written?

6       A.   Yes, sir.

7       Q.   I'm correct, that you didn't understand

8   the purpose?

9       A.   Yes, it is -- yes.

10      Q.   Okay.  After you drill a -- or after a

11  well is drilled, and it's -- let's just say it's

12  temporarily abandoned successfully, okay?

13      A.   M-h'm.

14      Q.   Is it BP's normal practice to write a

15  Technical Memorandum about that well?

16              MR. KEEGAN:  Objection to form.

17      A.   I don't recall writing a Technical

18  Memorandum or seeing anyone else write a

19  Technical Memorandum on a previously drilled

20  well.

21      Q.   (By Mr. Hill) Okay.  Does it -- did it

22  surprise you when you were asked to or when you

23  found out that your name was being lent to this

24  Technical Memorandum?

25              MR. KEEGAN:  Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

254

1     A.   No.

2     Q.   (By Mr. Hill) It wasn't outside the norm?

3          MR. KEEGAN:   Objection.

4     A.   It was something that the Team Leader

5     asked us to do at the time.

6     Q.   (By Mr. Hill) Did your Team Leader tell

7     you your name was going to be on it?

8     A.   I don't recall.

9     Q.   Did you know your name was on it before

10    it was issued or -- in its final form?

11    A.   Again, I -- I provided information to my

12    Team Leader, which he actually pulled the

13    information out of the existing documents.

14    Q.   I understand.

15    A.   At -- at some point, he compiled the

16    information with other folks, and then sent out

17    an E-mail with this Techni -- Technical

18    Memorandum on it.  At that time, I probably saw

19    the front page of the document and witnessed my

20    name on it.

21    Q.   Okay.  And at that point, were you

22    concerned at all if your name was going to be on

23    it, that you ought to be familiar with what was

24    in it?

25    A.   No, sir.  My -- my main goal at this time

**PURSUANT TO CONFIDENTIALITY ORDER**

1    was relief well operations.

2         Q.   Okay.  I have a number of questions that

3    I could ask you, but I guess I'd like you to just

4    tell me one way or the -- you know, based on your

5    prior testimony, whether you have any knowledge

6    about the analysis in this document pertaining to

7    the neutron density crossover as it pertains to

8    the M57B sand?

9         A.   Again, I haven't read the whole document.

10        Q.   All right.  Then my question was:  Do you

11   have any knowledge about the neutron density

12   crossover analysis, whether in this document or

13   in conversations or what have you, as it pertains

14   to the M57B sands?

15        A.   I know that the Petrophysicist worked on

16   the open hole section which included that sand.

17        Q.   Okay.  And forgive me if I've already

18   asked you this.

19        A.   Sure.

20        Q.   On April 13th, did you understand that

21   Ms. Galina was looking at the triple combo log

22   when she culled out the sand at 17,803 as the

23   shallowest hydrocarbon-bearing sand?

24              MR. KEEGAN:  Objection to form.

25        A.   Again, I don't know.  I assume she was

```
 1    using all the relative or relevant information
 2    available at the time.
 3         Q.  (By Mr. Hill) Before --
 4         A.  That's her expertise.
 5         Q.  Fair enough.  Before the incident, did
 6    you ever see the triple combo log?
 7         A.  I don't recall.
 8         Q.  Do you know if you ever reviewed the
 9    triple combo log?
10         A.  The -- the actual triple combo log
11    provided by -- I -- I reviewed the information
12    from the tools that were being run.  Galina
13    showed it to me one day.
14         Q.  How did you review that?  In what form?
15         A.  Again, it was her petrophysical software
16    that she was using.
17         Q.  So it wasn't a printout like this, the
18    log?  And by "this," I'm holding up what's
19    previously been marked in depositions as
20    Exhibit 3540.  You've never seen it in this
21    format?
22         A.  I don't recall.
23         Q.  Okay.  Did Ms. Galina ever tell you in
24    what format she was reviewing the triple combo
25    log on April 13th?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   She was using her software or these.

2    Q.   She told you she was using her software?

3    A.   I know she uses her software to interpret

4  log data.

5    Q.   Okay.  Did she ever ask for your

6  assistance in helping to identify

7  hydrocarbon-bearing zones in the triple combo

8  log?

9    A.   No.

10   Q.   Okay.  So I want to make sure I'm very

11 clear.  Your testimony is that prior to the

12 incident, you, as a Geologist, never saw the

13 triple combo logs in paper form?

14   A.   I -- in paper form, prior, I don't recall

15 looking at the triple combo log.

16   Q.   But you did see the data in some computer

17 format, computerized format?

18   A.   I -- I did see in our -- in my -- in the

19 seismic interpretation package, we had the logs

20 loaded, which was what we referred to earlier as

21 a gamma ray and resistivity.  I saw the positive

22 response at the M56 reservoir.

23   Q.   Okay.  At the M56 reservoir?

24   A.   Yes.

25   Q.   Okay.  Did you see any positive response

**PURSUANT TO CONFIDENTIALITY ORDER**

1  at the M57B --

2      A.  No.

3      Q.  -- sand?

4      A.  (Shaking head.)

5      Q.  Did you look?

6      A.  No.

7      Q.  Okay.  And that data that you had

8  available to you, and with your seismic package,

9  did it also have the neutron density crossover

10 plot or data?

11     A.  I -- at some point in time, that data was

12 loaded into the interpretative package.

13     Q.  Well, was it loaded into the

14 interpretative package on April -- April 15th

15 when you notified the partners that the

16 evaluated -- the evaluation was available for

17 their review?

18     A.  I don't know.

19            MR. KEEGAN:  Objection to form.

20     Q.  (By Mr. Hill) You don't know?

21            MR. KEEGAN:  Objection to form.

22     Q.  (By Mr. Hill) Do you know if you saw

23 the -- the density-neutron crossover data prior

24 to April 20th?

25     A.  I don't recall.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   I'm going to ask, if you wouldn't mind,

2  sir, opening up to Page 36 of Exhibit 3533.

3      A.   Page 36?

4      Q.   Yes, sir.  At the bottom there is a

5  "Net/Pay summary" heading, and then there is a

6  Chart right below that.  Do you see where I'm at?

7      A.   Yes, sir.

8      Q.   Have you seen this Chart before?

9      A.   I have seen this Chart.

10      Q.   Okay.  Is it your understanding, sitting

11  here today, that this is an accurate

12  representation of all of the sands that were in

13  the production interval at Macondo?

14      A.   Again, this is a role of the

15  Petrophysicist, and I assume they do their job to

16  the best of their ability.

17      Q.   I'm asking, sir, if it's your

18  understanding that this is the most accurate

19  representation of what sands existed in the

20  production interval at Macondo.

21      A.   Yes.

22      Q.   Okay.  The sand names, do you have any

23  role in identifying what the sams -- sand names

24  are?

25      A.   I did help in identifying the -- the

1    names of the sand.

2        Q.   Okay.   So when I talk about M57B or M56A,

3    you have some familiarity with what those are,

4    right?

5        A.   Yes, sir.

6        Q.   Okay.   Now, the top sand in this chart,

7    is that 17467 to 17469, correct?   And that's

8    based on measured depth?

9        A.   (Reviewing document.)   Okay.

10       Q.   Is that correct?   Do you see where I'm

11   at?

12              MR. KEEGAN:   I can't --

13       A.   Yeah, I --

14              MR. KEEGAN:   -- read that box.

15       A.   -- can't read the measured depth or TVD

16   Subsea or -- but, yes, I see the numbers.

17       Q.   (By Mr. Hill) You can see the -- the --

18   the numbers below, correct?   Here, you can look

19   at mine if you want, if it helps.

20       A.   All right, I -- I see.   I see the 17467

21   to --

22       Q.   All right.

23       A.   -- 17469.

24       Q.   And at least based on those depths,

25   that's identified as the M57B sand, correct?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Yes.

2      Q.   And the fluid content is identified here

3  as probable gas; is that correct?

4      A.   Yes.

5      Q.   Okay.  Now, are you aware of the Prior

6  Drafts of this document that have been circulated

7  internally at BP?

8      A.   Of this Draft?

9      Q.   This Draft Report.

10      A.   I -- I'm sure there's multiple versions.

11      Q.   Okay.  Are you aware that the M57B --

12  until this Final Draft, the M57B sand had been

13  identified as gas, not probable gas?

14              MR. KEEGAN:   Objection to form.

15      A.   Yes.

16      Q.   (By Mr. Hill) You are aware of that?

17      A.   Yeah.

18      Q.   Okay.  Do you know what changed between

19  sometime in June and all -- so -- I -- I'll

20  represent to you that I've looked through the

21  Reports.

22      A.   Right.

23      Q.   And in May and through June, it had been

24  identified as gas.  That is -- in the July 26

25  version, it's identified as probable gas.  Do you

**PURSUANT TO CONFIDENTIALITY ORDER**

1   know what -- what happened that necessitated that

2   change?

3              MR. KEEGAN:   Objection to form.

4       A.   I do not.

5       Q.   (By Mr. Hill) Have you ever been part of

6   any conversations where it was discussed?

7       A.   Again, when I refer to the

8   Petrophysicists working as a Group on

9   interpreting the Open Hole Section, I was part

10  of -- of that conversation at the start.  And I

11  was aware that other -- there was an ongoing

12  process, we were still collecting data at the

13  time, and that they're still analyzing results

14  from third-party vendors, from -- from their

15  interpretation -- or from their -- from the data

16  that was acquired on the well.

17      Q.   Well, let me ask you, sir, to turn to

18  Page 27, if you would.

19      A.   Sure.   27?

20      Q.   M-h'm.

21      A.   (Complying.)

22      Q.   Right below the Charts there's a Figure

23  title, and then the next paragraph begins:

24  "Three further sands have been identified in the

25  TD hole section, which have a probable gas

**PURSUANT TO CONFIDENTIALITY ORDER**

1  signature on Neutron-Density logs: namely"

2  fifty -- "M57B, M56A and M56F."

3       Did I read that correctly?

4   A.  Yes, sir.

5   Q.  All right.  Does that indicate to you

6  that there was a gas signature on the -- on

7  the -- on Neutron-Density Logs at the M57B --

8            MR. KEEGAN:  Objection --

9   Q.  (By Mr. Hill) -- elevation?

10            MR. KEEGAN:  Objection to form.

11   A.  Again, that's -- this is out of my

12  day-to-day role, for sure.  And I know there is a

13  lot of discussion on the open hole section.  And

14  here it states that there was a probable gas

15  signature on those Logs.  I don't know if that's

16  confirming or not confirming.  That's not my

17  role.

18   Q.  (By Mr. Hill) Well, I -- your

19  understanding of a density-neutron crossover is

20  if there's a crossover, it's an indication of

21  gas, correct?

22            MR. KEEGAN:  Objection to form.

23   A.  I do understand that.

24   Q.  (By Mr. Hill) Okay.

25   A.  It could be an indication of gas.  There

**PURSUANT TO CONFIDENTIALITY ORDER**

1  may be other factors.  I -- I'm not --

2      Q.  Okay.

3      A.  -- a -- a Log Analysis Expert --

4      Q.  And, sir, if you would --

5      A.  -- by any means.

6      Q.  Fair enough.  I -- I -- did I step on

7  your answer?  I don't want -- go ahead and

8  finish.  I didn't mean to cut you off.

9      A.  Okay.  I was done.

10     Q.  Okay.  Turn to Page 32, please.  At the

11 top of Page 32 it says:  "During the initial

12 analysis at the well site, the M57B sand was not

13 interpreted as gas bearing.  The interpretation

14 was based on logs field print" pre -- "presented

15 in Figure 30, where the M57B lacks the pronounced

16 neutron-density cross-over as observed in the gas

17 bearing M56A sand."

18         Did I read that correctly?

19     A.  Yes.

20     Q.  Now, do I understand this to say that

21 it's not that M57B lacks density-neutron

22 crossover, it's just not as pronounced as that

23 that was indicated in an M56A sand?

24         MR. KEEGAN:  Objection to form.

25     A.  Yeah, I mean, I -- I don't interpret

**PURSUANT TO CONFIDENTIALITY ORDER**

1   these Logs.  I'm not a -- that's not my

2   day-to-day role, so I would not want to give an

3   opinion on whoever wrote this document.

4       Q.  (By Mr. Hill) Okay.  Would --

5       A.  Or their interpretation.

6       Q.  Look at the graph immediately below the

7   language there.

8       A.  Yes, sir.

9       Q.  Do you see the Fig -- I guess it's Figure

10   30 that we just referenced in the paragraph

11   above?  Do you understand -- do you know what

12   that graph is?

13       A.  This -- this graph right here?

14       Q.  Yeah.  This picture, right on the big

15   page.

16       A.  Yes.

17       Q.  What is it?

18       A.  The Triple Combo Field Print.

19       Q.  Okay.  And the gamma ray is that left

20   track, middle track is resistivity, and the

21   density-neutron crossover is the far right track,

22   correct?

23       A.  Yes.

24       Q.  All right.  Right there where it says

25   "M57B," do you see where I'm at?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   Yes, sir.

2     Q.   I want to ask you, sitting here right

3    now, do you think that those two plots intersect?

4              MR. KEEGAN:   Objection to form.   Is

5    there any reason you're not giving him a full

6    size plot so he can look at it?

7              MR. HILL:   Do you want to do that?

8              MR. KEEGAN:   Yeah, if you want to

9    insist on him interpreting something he doesn't

10   interpret.

11    A.   If you give me seismic data, I could talk

12   all day to it, but --

13    Q.   (By Mr. Hill) I don't know where it --

14    A.   -- log analysis.

15    Q.   -- I don't -- yeah, I don't know where

16   the seismic data is.

17    A.   All right.

18    Q.   I'll tell you what.   I want you to look

19   at -- I have already -- we have premarked this

20   exhibit as 3540.   I've taken the liberty of

21   going -- of identifying with this blue mark, the

22   elevation of 17467.

23    A.   Okay.

24    Q.   All right?   So I'd like you to look at

25   that, please.

PURSUANT TO CONFIDENTIALITY ORDER

1      MR. HILL:  There's one in there for

2  Counsel if you want to see it.

3      MR. KEEGAN:  (Nodding.)  At least

4  now we're not killing his eyes.

5      Q.  (By Mr. Hill) Now, sir, at some point,

6  this is going to be given to the Judge, and he's

7  going to be looking at this graph.  And I'd like

8  to know what your testimony is about whether the

9  blue plot and the right plot intersect on the --

10      MR. KEEGAN:  Objection --

11      Q.  (By Mr. Hill) -- density-neutron

12  crossover --

13      MR. KEEGAN:  -- to Counselor's

14  colloquy.  If you want ask him a question, ask a

15  question.

16      MR. HILL:  Your objection is

17  "Objection to form."

18      MR. KEEGAN:  My objection is that

19  your colloquy is unnecessary and inappropriate.

20      MR. HILL:  I'll ask my --

21      MR. KEEGAN:  If you want to ask --

22      MR. HILL:  -- questions.  If you

23  don't like it --

24      MR. KEEGAN:  -- a question, ask --

25      MR. HILL:  -- then you object --

**PURSUANT TO CONFIDENTIALITY ORDER**

1      MR. KEEGAN:  -- a question.

2      MR. HILL:  -- to form.  Otherwise,

3   you're violating PTOs, and you know it.

4      MR. KEEGAN:  Ask your question.

5      MR. HILL:  I did.

6   Q.  (By Mr. Hill) Go ahead.  Do you want me

7   to repeat it?

8   A.  I'm sor -- yes, please.

9   Q.  Okay.  I'd like you to look at the

10  density-neutron crossover where I've marked it.

11  And you can verify that I've identified the

12  location of the sand at 17467.

13  A.  Yes, sir.

14  Q.  Okay?  I want you to look at the

15  density-neutron crossover plot, and I want you to

16  tell me where the -- where the sand is located,

17  per -- right there, next to the resistivity plot.

18  A.  Yes.

19  Q.  If you think that the blue and the red

20  lines intersect.

21      MR. KEEGAN:  Objection to form.

22      MR. MONICO:  Objection to form.

23  A.  Looks like they touch each ta -- each

24  otha -- other, sorry.  Yes.

25  Q.  (By Mr. Hill) Even sitting here without

**PURSUANT TO CONFIDENTIALITY ORDER**

1    the aid of a magnifying glass or anything, does

2    it look like the blue plot goes to the right of

3    the red plot?

4              MR. KEEGAN:  Objection to form.

5       A.  Looking at the Log, yes.

6       Q.  (By Mr. Hill) Okay.  Thank you.

7            Do you know if BP has taken the position

8    that -- do you know if -- if it's BP's position,

9    sitting here today, whether or not there is a

10   di -- neut -- density-neutron crossover at 17486

11   on the Triple Combo Log?

12      A.  I do not know.

13      Q.  Okay.

14      A.  It's not in my realm.

15      Q.  I'm going to ask you --

16             MR. HILL:  I'm going to get Tab 55,

17   please.

18      A.  Do you want this document back?

19      Q.  (By Mr. Hill) Yeah.  It's been premarked,

20   so we don't really need it.  Thank you.

21             MS. HERTZ:  Is that Tab 55?

22             MR. HILL:  Yeah.

23      Q.  (By Mr. Hill) I'm going to hand you a

24   document which I believe was produced from your

25   custodial file.  If it wasn't, you don't

 1    recognize it, let me know.  But I'd like to just

 2    ask you about it.

 3                    MR. KEEGAN:  Counsel, this is -- has

 4    a Bly Bates number on it.

 5                    MR. HILL:  I'm sorry?

 6                    MR. KEEGAN:  The -- the document

 7    produced natively has a Bly Bates number, those

 8    were produced in January.  So I don't think --

 9                    MR. HILL:  Okay, so it wouldn't be

10    from his custodial file?  It's taken from --

11                    MR. KEEGAN:  That's my

12    understanding.

13                    MR. HILL:  Okay.

14                    THE VIDEOGRAPHER:  (Indicating.)

15        Q.  (By Mr. Hill) Have you ever seen that,

16    sir?

17                    MR. HILL:  Thanks.

18        A.  I don't recall seeing this.

19        Q.  (By Mr. Hill) Okay.  Well, the document,

20    I notice, has been reproduced in the July 26

21    Technical Memorandum, so I was just wondering if

22    that was part that you were actually responsible

23    for or part of putting together?

24        A.  No.

25        Q.  No?  All right.  (Indicating.)

1      A.   (Tendering.)

2            MR. HILL:   And if you would hand me

3   Tab 1, please.

4      Q.   (By Mr. Hill) I'm going to hand you --

5            MR. HILL:   I'm going to mark it as

6   4780.

7       (Exhibit No. 4780 marked.)

8      Q.   (By Mr. Hill) -- and hand you a document

9   that was produced natively bearing

10   BP-HZN-BLY00192197, and ask you to take a look at

11   that, if you would, please.

12      A.   (Reviewing document.)

13      Q.   And, sir, have you ever seen this

14   document before?

15      A.   I have not.

16      Q.   Have you ever seen -- looking at the

17   data, is there any data there in which you

18   believe that you, as a Geologist, or any

19   Geologist in your Group, would have been

20   responsible for providing as input to this

21   document?

22      A.   (Reviewing document.)   No, sir.

23      Q.   Okay.   Did you have any involvement at

24   all with identifying the pore pressures for any

25   of the sands that we identified in that Chart in

1    the July 26 Technical Memorandum?

2        A.  The Chart, no, sir, I -- that was not in

3    my day-to-day role.

4        Q.  Okay.  Did you have any role -- not just

5    in day-to-day, but did you have any role in

6    identifying pore pressures for the sands in the

7    Macondo production interval?

8        A.  No, sir.

9             MR. HILL:  Okay.  Thank you.  That's

10   all I have.  Thank you.

11             THE WITNESS:  Okay.

12             THE VIDEOGRAPHER:  The time is

13   3:14 p.m.  We're off the record, ending Tape 7.

14        (Recess from 3:14 p.m. to 3:23 p.m.)

15             MS. HERTZ:  I'm ready.

16             THE VIDEOGRAPHER:  All set?

17        The time is 3:23 p.m.  We're back on the

18   record, beginning Tape 8.

19                    EXAMINATION

20   QUESTIONS BY MS. HERTZ:

21        Q.  Good afternoon, Mr. Bondurant.  My name

22   is Diane Hertz.  I represent Anadarko Petroleum

23   Corporation.  And --

24        A.  Good day.

25        Q.  Good day.  And I'm going to be asking you

**PURSUANT TO CONFIDENTIALITY ORDER**

1  a series of questions today, again.  If you don't

2  understand them or if you feel like we're

3  miscommunicating, let's make sure we clear it up,

4  so we have a nice clear record.

5      A.  Okay.

6      Q.  You understand -- I'm going to call

7  Anadarko Petroleum Corporation just "Anadarko"

8  for short.  Does that work for you?  You

9  understand what I'm talking about?

10     A.  That's fine.

11     Q.  Okay.  You understand that Anadarko was a

12 nonoperating investor in the lease for the

13 Macondo Well?

14     A.  Yes.

15     Q.  Okay.  When was the first time you had

16 any communication with anybody from Anadarko

17 regarding the Macondo Well?

18     A.  I don't remember the exact date.

19     Q.  I don't need an exact date.

20     A.  It was --

21     Q.  Was it a meeting?

22     A.  Yeah.  It was when we were presenting the

23 prospect to potential --

24     Q.  Okay.

25     A.  -- investors.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   All right.   And you had not had any

2   direct communications with Anadarko regarding the

3   Macondo Prospect prior to that meeting?

4      A.   Correct.

5      Q.   Okay.   The Presentation, was this the one

6   in late July 2009, if you recall, around that

7   time?

8      A.   Roughly.

9      Q.   Okay.   And where was the Presentation

10   that you gave to Anadarko?

11      A.   I believe it was at BP.

12      Q.   And who attended that meeting on behalf

13   of BP, to the best of your recollection?

14      A.   Whew.   I know it would be Sharma, Binh,

15   myself.

16      Q.   Who's Sharma?

17      A.   He's a rock property specialist.

18      Q.   Oh, that's -- Okay.   Okay.   Binh.   Who

19   else?

20      A.   I don't know the -- the potential Team

21   Leader, at that time.

22      Q.   There was a potential Team Leader?

23      A.   Well, there was a -- a Team Leader

24   present.   I don't know if it was -- I don't know

25   who it was.

1      Q.   Okay.

2      A.   Don't recall.

3      Q.   So to the best of your recollection,

4 there were four of you?

5      A.   Yes.

6      Q.   All right.  Who on that Team would

7 discuss the financial aspects of the Macondo

8 prospect?

9      A.   That's all done, I think, with Management

10 or Lease Management.

11      Q.   So none of -- so there were no dollar

12 figures or discussions of that nature during the

13 Presentation that you gave to APC?

14              MR. KEEGAN:   Object to form.

15      A.   I don't recall.

16      Q.   (By Ms. Hertz) Okay.   Okay.   Do you

17 recall the names of anybody from Anadarko that

18 attended that meeting?

19      A.   No.

20      Q.   None at all?

21      A.   None.

22      Q.   You met them?

23      A.   Yes, I would have -- I would have met

24 them, yes.

25      Q.   Okay.   Have you met any of those

1   individuals since that meeting?

2       A.   No.

3       Q.   Okay.  So I just want to learn a little

4   bit about your Presentation.  How long was it?

5       A.   Oh --

6       Q.   The entirety of the Presentation, not

7   just your portion.

8       A.   I don't recall for sure.  Roughly an

9   hour.

10      Q.   And was this basically the same

11  Presentation that you were giving on the road

12  show, as you called it in the document we looked

13  at this morning?

14      A.   Yeah.  I call it a canned presentation.

15      Q.   Okay.  So it's the same one you'd made to

16  MOEX and to Sampson and the other companies that

17  you visited; is that correct?

18      A.   Yes, yes.

19      Q.   Okay.  And was -- are -- are you familiar

20  with a document called a shor -- a short pack,

21  excuse me, which was a Presentation that was

22  handed out to potential partners?

23      A.   I am familiar with a short pack, yes.

24      Q.   Okay.  Did you have any hand in creating

25  that document?

**PURSUANT TO CONFIDENTIALITY ORDER**

1        A.   I was essentially told by Management, at

2    the time, to provide certain slides to him, and

3    then that's the last I knew of it.

4        Q.   Who's the "him" that you're referring to?

5        A.   The Team Leader at the time.

6        Q.   And you don't recall who that was?

7        A.   I -- I don't recall the Team Leader at

8    the time.

9        Q.   Okay.  He would give you certain slides,

10   and then those -- you would give him, excuse me,

11   certain slides, and then he would provide those

12   to the pros -- to the potential partners, to the

13   best of your knowledge?

14       A.   I don't know who he would provide that

15   to.

16       Q.   Okay.  All right.  So what information

17   during the Presentation that you gave was given

18   to Anadarko, what physical -- was there physical

19   documentation shared at that meeting?

20       A.   Again, I don't recall.

21       Q.   Okay.  There was a PowerPoint

22   Presentation; is that right?

23       A.   I -- we presented a PowerPoint

24   Presentation, but we did not give out -- the G&G

25   staff did not give out any documents to Anadarko.

1    Q.   What's a G&G staff?

2    A.   I'm sorry.  Geologic and Geophysical, or

3  Subsurface staff doing the Presentation.

4    Q.   Are you aware if that PowerPoint was

5  later distributed to Anadarko?

6    A.   I'm not aware.

7    Q.   Okay.  Do you have any more information

8  regarding what was said at that July Presentation

9  other than what you've just told me about?

10    A.   Do I have -- I mean, we gave a full

11  description of --

12    Q.   M-h'm.

13    A.   -- of the prospect, and --

14    Q.   Are you aware of any other physical

15  information that was shared, documents, CDs,

16  anything like that?

17    A.   I -- I am not aware of any of that.

18    Q.   Okay.  Do you recall anything that

19  anybody from Anadarko said during that meeting?

20    A.   No.  It's so long ago.  We saw a number

21  of different --

22    Q.   M-h'm.

23    A.   -- Parties, so I don't --

24    Q.   So you have no recollection of anything

25  specific that anyone from Anadarko said during

PURSUANT TO CONFIDENTIALITY ORDER

```
 1    that Presentation?  Is that -- is that your

 2    testimony?

 3         A.  Yes.

 4         Q.  Okay.  Have you had any subsequent

 5    meetings with Anadarko or anyone from ama --

 6    Anadarko regarding Macondo preincident?

 7         A.  Preincident, I don't recall.

 8         Q.  So you don't recall meeting with anybody

 9    from APC?

10         A.  Meeting with them?  No.

11         Q.  Okay.  Have you had communications with

12    Anadarko between the July 2009 Presentation and

13    April 20th, 2010?

14         A.  I don't remember.

15         Q.  You may have, you may not have, you just

16    don't know?

17         A.  Yes.

18         Q.  Okay.  So you have no recollection of any

19    phone call with anybody from Anadarko?

20         A.  No.  No recollection.

21         Q.  And do you have any recollection of any

22    specific E-mails that you may have sent to

23    Anadarko?

24         A.  No recollection.

25         Q.  Okay.  I believe Mr. Bodek testified that
```

1   he was the one who primarily had the

2   communications with the Partners, and that if he

3   needed information, he would go to you, but you

4   would provide it to him as opposed to directly

5   the Partners.  Is that your recollection?

6           MR. KEEGAN:  Objection to form.

7       A.  So during Well Operations, yeah, he is

8   the Operations Geologist, and communication does

9   go through the Ops Geologist to Partners.

10      Q.  (By Ms. Hertz) Okay.  Because I am asking

11  you not just about the Presentation period, but

12  also all the way up to the incident, so that, of

13  course, would be the Operations period.

14      A.  Okay.

15      Q.  So my question to you --

16      A.  All right.

17      Q.  -- in case it wasn't clear is:  Do you

18  recall having any communications with Anadarko up

19  through April 20th, 2010, other than what you've

20  told me about?

21      A.  I have no recollection of any

22  conversations with Anadarko.

23      Q.  All right.  How about any communications

24  with Anadarko?

25      A.  Any communications?  No.

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.  You have no recollection?

2    A.  So during the Operations phase, I did not

3  have any communications with Anadarko.

4    Q.  All right.  Just so we -- we're clear --

5    A.  Yeah.  I'm trying to --

6    Q.  -- between the July 2009 --

7    A.  Yeah.

8    Q.  -- Presentation and April 20th, 2010, did

9  you have --

10    A.  Right.

11    Q.  -- any communications with Anadarko,

12  direct communications, whether meetings, or

13  E-mails, or whatever?

14    A.  So again, I do not recall during that

15  whole time span if I had meetings with or phone

16  conversations with Anadarko.

17    Q.  You just simply don't remember?

18    A.  No, I do recall there were certain -- I

19  do recall one with MOEX, but I don't recall any

20  other ones.

21    Q.  Okay.  All right.  Did you have any

22  involvement whatsoever in the design of this

23  well?

24    A.  No.

25    Q.  Okay.  Are you aware of any role that

1    Anadarko played in connection with the design of

2    this well?

3        A.   No.

4        Q.   Okay.  Did you have any role in the

5    Drilling Operations of the Macondo Well,

6    assisting -- other than what you've testified to

7    today?

8                 MR. HILL:  Objection, form.

9                 MR. MONICO:  Objection, form.

10       A.   Can you repeat the question?

11       Q.   (By Ms. Hertz) I can strike that.

12       A.   Okay.

13       Q.   Well, I'll get -- I'll get to that in a

14   bit.

15            To the best of your knowledge, no one

16   from Anadarko played a role in the Operations of

17   the Macondo Well; is that correct?

18       A.   I -- I don't know the answer to that.

19       Q.   I'm saying:  To the best of your

20   knowledge, are you aware of any --

21       A.   Again, that's the Operations side, so I'm

22   not aware of any communications.

23       Q.   Okay.  What communications have you had

24   with Anadarko, since April 20th, in connection

25   with the Macondo Well?

283

1    A.   I don't recall any communications with

2    Anadarko.

3        Q.   Okay.  So during the -- the cap and

4    containment period, you -- you didn't meet with

5    anybody at Anadarko at BP Headquarters, or

6    anything like that?

7        A.   Correct.

8        Q.   Okay.  So you're not aware of any, you're

9    not aware of the role that Anadarko played, if

10   any, in the containment efforts; is that correct?

11       A.   Correct.

12       Q.   Okay.  Are you aware of any information

13   that was shared with Anadarko between July 2009

14   and April 20th, 2010?

15       A.   Can you repeat the dates again?

16       Q.   Sure.  In between your Presentation --

17       A.   Yeah.

18       Q.   -- and the date of the incident --

19       A.   (Nodding.)

20       Q.   -- are you aware of the information that

21   was shared with Anadarko by BP, regarding

22   Macondo?

23       A.   I'm not aware of -- the communication

24   between BP and Anadarko.

25       Q.   So you don't know what sorts of Reports

**PURSUANT TO CONFIDENTIALITY ORDER**

 1     they were or were not getting; is that right?

 2         A.   Correct.

 3         Q.   Okay.  Have you read the Bly Report?

 4         A.   No.

 5         Q.   "No"?

 6         A.   No.

 7         Q.   All right.  I'm just going to mark --

 8     it's a portion of Exhibit 1, and I can mark it --

 9     well, I might as well -- Exhibit 4781.

10              (Exhibit No. 4781 marked.)

11         Q.   (By Ms. Hertz) It's just the first page

12     and Page 16, and this really is just a

13     fact-finding mission on my part.  I want -- want

14     to see if you can help me with something.

15         A.   Sure.

16         Q.   So that's the page.  And it talks -- it's

17     entitled "Well Planning and Design."

18              MR. KEEGAN:  You got copies for us,

19     or is it on your disk?

20              MS. HERTZ:  Oh, sorry, sorry.  I

21     only have a couple.  It's just Page 16.  There

22     you go.  There's one extra if anybody wants it,

23     but I'm going to read it.

24         Q.   (By Ms. Hertz) All right.  Page 16 of the

25     Bly Report is entitled "Well Planning and

1    Design," and the second paragraph says:  "The BP

2    Macondo well engineering team worked in

3    conjunction with the BP subsurface team and

4    selected specialist contractors to develop the

5    Macondo well design.  The team estimates pore

6    pressures and strengths of the geologic

7    formations and used these estimates in developing

8    the design basis for the well."

9         And then it goes on to say by:  By the --

10   "By late June 2009, a detailed engineering

11   design, a shallow hazard assessment and a design

12   peer review had been completed.  The original

13   well plan encompassed all elements of the well

14   design, including the well equipment and

15   operations, mud, drill bits, casing design,

16   cement plans and pressure testing."

17        Now, did I read that correctly?

18   A.   I believe you did.

19   Q.   All right.  Good for me.

20        So my question to you is:  Have you seen

21   the original Well Plan for Macondo?

22   A.   I have seen a wellbore schematic --

23   Q.   Okay.

24   A.   -- of it.

25   Q.   Okay.  Like a one-page schematic, is that

1   what you mean?

2       A.   Yes.

3       Q.   Okay.   Would that be to the best of your

4   understanding the Well Plan that encompassed

5   equipment, operations, mud, drill bits, casing

6   design, et cetera?

7               MR. KEEGAN:   Objection to form.

8       A.   No.   I believe there's a much more

9   expensive document that is generated in the

10  "Beyond the Best" --

11      Q.   (By Ms. Hertz) Okay.

12      A.   -- process.

13      Q.   Have -- have you seen it for Macondo?

14      A.   No.

15      Q.   Okay.   Have you seen well plans like that

16  that are generated in connection with "Beyond the

17  Best" for other wells?

18      A.   I've -- I've not seen the detailed well

19  plans that were designed.

20      Q.   Okay.

21      A.   I've not seen them.

22      Q.   If I showed you some documents, could you

23  tell me if it -- if they are what -- what you

24  believed to be the -- the June 2009 Well Plan for

25  this well?   Could you be able to do that?

1           MR. KEEGAN:  Objection to form.

2      A.  I --

3      Q.  (By Ms. Hertz) Well, let's give it a try.

4  How about that?

5      A.  Okay.

6      Q.  Let's look at Tab 5.  Do you under --

7  have you ever seen a Drilling Program document

8  for any well such as this?

9      A.  I've never looked through a Drilling

10  Plan.

11     Q.  Never looked through one.  Okay.

12          Would -- would you understand this to be

13  the -- a Well Plan, an original Well Plan for

14  Macondo?

15          MR. KEEGAN:  Objection, form.

16     Q.  (By Ms. Hertz) Or do you understand the

17  Well Plan to be something different than a

18  Drilling Program?

19     A.  I -- I -- I don't know that's on the

20  Operations side.

21     Q.  So you just have no knowledge one way or

22  the other.  Couldn't help me with that?

23     A.  No.

24     Q.  Okay.  Let's look at tab -- well, I guess

25  we should mark that.

**PURSUANT TO CONFIDENTIALITY ORDER**

1              MS. HERTZ:  I'm going to mark --

2   sorry about that -- Tab 5 as Exhibit 4782.

3          (Discussion off the record.)

4          (Exhibit No. 4782 marked.)

5      Q.  (By Ms. Hertz)  All right.  Let's look at

6   Tab 4 for a moment, please.

7              MS. HERTZ:  We're going to mark this

8   as 4783.

9          (Exhibit No. 4783 marked.)

10     Q.  (By Ms. Hertz) And this is a document

11  entitled "Drilling Basis of Design June 2009."

12  "M a c o n d o M C 252 # 1?"

13         Have you seen this document before?

14     A.  Some of these slides do look familiar.

15     Q.  Where do you believe that you've seen

16  some of these slides?

17     A.  So prior to spud of Macondo, and there

18  is -- there's a time where our drilling staff or

19  in the Operations folks would bring all the

20  contractors in to do a full peer review.

21     Q.  Okay.

22     A.  And this looks like part of that

23  presentation, if not -- not most of it.

24     Q.  Now, who in the Drilling staff or

25  Operations folks were involved with Macondo as

**PURSUANT TO CONFIDENTIALITY ORDER**

1    early -- you know, ba -- back during this time

2    when you were doing peer reviews?

3                    MR. KEEGAN:   Objection to form.

4        A.   I don't know who was involved at that

5    time.   During -- during this peer review --

6        Q.   (By Ms. Hertz) This is prespud.

7        A.   -- here?

8             Oh, this is prespud.   I'm sorry.

9             During this time, I believe the main

10   Drilling Engineers were Mark Hafle and Bryan

11   Morel.

12       Q.   Okay.   Did you ever discuss with Mark

13   Hafle or Bryan Morel the Temporary Abandonment

14   Procedures for the Macondo Well?

15       A.   No.

16       Q.   Never have?

17       A.   I don't recall.   That's on the Operations

18   side, so --

19       Q.   I understand it's on the --

20       A.   Yeah.

21       Q.   -- Operations side, but did you discuss

22   it with them?

23                    MR. KEEGAN:   Objection to form.

24       A.   No.   I'll go back to my fir -- I do not

25   recall.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   (By Ms. Hertz) So you might have, but you

2    just don't recall?

3                  MR. KEEGAN:   Objection, form.

4    A.   I don't recall.

5    Q.   (By Ms. Hertz) Okay.  Have you talked to

6    Bryan Morel since the incident on April 20th?

7    A.   Yes.

8    Q.   When did you just talk to him?

9    A.   The first time I talked to him was the

10   21st.

11   Q.   Have you talked to him recently, in the

12   last year?

13   A.   I haven't seen him in a while.

14   Q.   No?  How about Bryan -- Bryan -- excuse

15   me.  How about Mark Hafle?

16   A.   I've run into him occasionally at BP.

17   Q.   He comes into work?

18   A.   I see him on the premises.

19   Q.   Do you know if he's working?

20   A.   I do not know.

21   Q.   Have you ever discussed with him what

22   happened on April 20th?

23   A.   We had a talk about it, yeah.

24   Q.   What did he --

25   A.   The 21st, when we're in that big

1    meeting --

2         Q.  M-h'm.

3         A.  -- we had a discussion.

4         Q.  Other than that, have you discussed it

5    with him?

6         A.  No.

7         Q.  What did he say on the 21st?

8         A.  Again, they were -- it was the -- the

9    beginning meeting where there's a bunch of

10   Drilling Engineers in there.  So I believe he

11   is rehashing the operations prior to the

12   incident.

13        Q.  To the best of your knowledge, have you

14   ever seen the production casing operations for

15   the seven inch by nine and seven-eighths inch

16   interval on the Macondo Well?

17        A.  I've not seen it.

18             MR. KEEGAN:  Objection to form.

19             MS. HERTZ:  What's objectionable

20   about that question?  I asked him if he'd seen

21   something.

22             MR. KEEGAN:  "Production casing

23   operations" is vague, undefined, and --

24             MS. HERTZ:  That's what it's called.

25             MR. KEEGAN:  Well --

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MS. HERTZ:  Production casing

2    Operations.

3          MR. KEEGAN:  Can you tell me what

4    document you're looking at?

5          MS. HERTZ:  Sure, I did.  Tab 1.

6       A.  Oh, Tab 1?

7          MR. KEEGAN:  Yeah.

8       A.  I did not hear that, no.

9          MS. HERTZ:  Well, we still don't

10   know what's objectionable about the question.

11      Q.  (By Ms. Hertz)  But have you ever seen

12   this document before?

13         MR. KEEGAN:  You're calling this

14   entire document a "production casing operations"?

15         MS. HERTZ:  I'm calling --

16      Q.  (By Ms. Hertz) Have you ever seen this

17   document located at Tab 1 before?

18         There you go.  Oh, this has already been

19   marked.  We don't need to do it.

20         Have you ever seen the document in Tab 1,

21   which is entitled "GoM Exploration Well Macondo

22   Prospects" seven by nine and seven-eighths

23   interval dated April 15th, 2010?

24      A.  I have not seen this document.

25      Q.  You've not seen this?  Is this something

 1   that you would normally see in the course of

 2   your -- your position?

 3       A.   No.

 4       Q.   Okay.

 5                THE VIDEOGRAPHER:   Three minutes.

 6                MS. HERTZ:   Oh, man.   Okay.

 7       Q.   (By Ms. Hertz) Let's turn to Tab 3,

 8   please, and mark this as 4783 [sic].

 9            Can you tell me if you've seen this

10   document before?

11            (Exhibit No. 4784 marked.)

12       A.   Yes.

13       Q.   (By Ms. Hertz) What is this?

14       A.   This was a document that the

15   Petrophysicist put together to describe the

16   logging program for the well.

17       Q.   Okay.   Which Petrophysicist in particular

18   put this together, if you know?

19       A.   I believe this would have been Donald

20   Charles.

21       Q.   Donald Charles.   And was this -- it looks

22   like a slide deck to me.   Was this presented to

23   someone?

24       A.   Yes.   This would -- we would have

25   presented this to potential partners.

PURSUANT TO CONFIDENTIALITY ORDER

 1      Q.  Oh.  So these are part of the

 2  presentation that you made to potential partners.

 3  Is that what this is?

 4              MR. KEEGAN:  Objection to form.

 5      A.  This would have been in -- in that

 6  presentation.

 7      Q.  (By Ms. Hertz) Okay.  Did you create any

 8  of these slides?

 9      A.  Any of -- in -- in Section 4?

10      Q.  In Tab 4, Exhibit --

11              MR. KEEGAN:  Tab 3.

12      Q.  (By Ms. Hertz) Tab -- sorry.

13              MR. KEEGAN:  Yeah.

14      Q.  (By Ms. Hertz) Tab 3, sorry.

15      A.  Slide No. 4.

16      Q.  Macondo-Regional Content?

17              MR. KEEGAN:  Context.

18      Q.  (By Ms. Hertz) Context, excuse me.

19      A.  Yes.

20      Q.  Okay.

21      A.  A lot of blank slides in there.  Yeah,

22  that -- I did a lot of Section 4.  Yes, Page 4.

23      Q.  Okay.  Thank you.

24          One last -- one last series of questions.

25  If you could turn to page -- Tab 7, which is I

1   believe a different Annual Individual Performance

2   Assessment for you that we saw this morning.

3   We're going to mark this as Exhibit 4785.  This

4   is from the Year 2009.  You've seen this

5   document, I presume?

6           (Exhibit No. 4785 marked.)

7       A.  Yes.

8       Q.  (By Ms. Hertz)  Okay.  On the second page

9   at the very bottom, under "Bryan's comments," it

10  says:  "Chuck is the SPA for Macondo operations

11  which is a key role to ensure close integration

12  with the Drilling and Tiger teams."

13          What does that mean?

14              MR. KEEGAN:  Where are you reading?

15      A.  Where are you re -- yes.

16      Q.  (By Ms. Hertz) The bottom of the second

17  page, Tab 7, under --

18      A.  "Bryan's comments"?

19      Q.  -- "Bryan's comments."  Uh-huh.

20              MR. KEEGAN:  Second bullet.

21              THE WITNESS:  Yeah, I got it.

22      A.  So, again, as having the geologic

23  knowledge of the prospect working at -- you know,

24  with a team describing the prospect, I could

25  facilitate in the communication between the --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    the Tiger Team, the Operation Team, help them

2    become informed with what they were going to

3    drill.

4        Q.  (By Ms. Hertz) So you were basic --

5        A.  As the target interval.

6        Q.  Oh, I'm sorry.  Excuse me.

7        A.  At -- yes.

8        Q.  So you were the single point of

9    accountability basically for handing this off to

10   the Tiger Team and the Drilling Ops side?

11                MR. MONICO:  Objection, form.

12       A.  That's more of a -- the Subsurface Group

13   that does that as a team.

14       Q.  (By Ms. Hertz) So how does that differ

15   from what -- what Bryan is saying you are doing

16   here?

17       A.  I don't -- he says that I'm involved in

18   the -- the handover of the -- of the

19   integration of the information to the

20   Operations Team.  And I would state that it

21   wouldn't just been me, but it would have been the

22   whole Subsurface Team that described the

23   prospect.

24       Q.  Okay.  My last question.  It just says

25   that --

PURSUANT TO CONFIDENTIALITY ORDER

1          MR. MONICO:  I think time is up.

2          MS. HERTZ:  Just one more question,

3   please.

4     Q.  (By Ms. Hertz) It just says you're the

5   SPA for Macondo Operations.  It doesn't say the

6   Subsurface Team, so I'm just --

7     A.  Right.

8     Q.  -- trying to understand?

9     A.  That's -- that's Bryan's comment.  I

10  don't know exactly what he means.

11    Q.  You wouldn't agree -- you wouldn't

12  necessarily agree with that.  You think it was

13  the whole Subsurface Team?

14    A.  Yes.

15         MS. HERTZ:  Okay.  I have nothing

16  further.

17       I guess I'm out of time.

18         THE VIDEOGRAPHER:  The time is

19  3:45 p.m.  We're off the record.

20       (Recess from 3:45 p.m. to 3:50 p.m.)

21         MS. GREENWALD:  Okay.  I'm back, and

22  I'm ready to go when y'all are.

23         THE VIDEOGRAPHER:  All set?

24       The time is 3:50 p.m.  We're back on the

25  record.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          REDIRECT EXAMINATION

2   QUESTIONS BY MS. GREENWALD:

3       Q.  Mr. Bondurant, I just have a few more

4   questions to ask, and I'm going to jump around a

5   little bit, and then the day is over.

6          You just mentioned in your testimony with

7   Counsel for Anadarko that there was a meeting on

8   the 21st of April.  I don't recall any of us

9   asking you about that earlier today.  Can you

10  tell us what meeting you're referring to?

11      A.  Yeah.  I forgot who I'd talked to, but it

12  was the day after the incident, the 21st, and

13  I -- when I entered the workplace, there was a

14  large meeting going on, with a lot of Drilling

15  Engineers across the company just having a

16  brainstorm of what to do next.  And that was

17  earl -- that started early on in the morning.

18         And I walked in late to that meeting.

19  There was parts of the Subsurface Team there and

20  a lot of Engineers.

21      Q.  Is that the day you were given the job to

22  work on the DDIII relief well?

23      A.  I just began working right away with --

24  with anything I could do to provide assistance to

25  the planning of the wells.  I don't recall which

1  day that -- that official designation was --

2      Q.  Okay.

3      A.  -- given to me.

4      Q.  And when you say "planning of the wells,"

5  you're talking about the relief wells?

6      A.  Yes.

7      Q.  You didn't work on any other containment

8  efforts except for the relief wells; is that

9  correct?

10      A.  That's correct.

11      Q.  Okay.  As a member of the Subsurface Team

12  for the relief wells, what, if anything, did you

13  do differently in your analysis than you did for

14  the Macondo Well?

15      A.  Well, the main difference was we had a

16  great analog well really close by, so it was just

17  incorporating the geologic information that we'd

18  gained from the Macondo 252 No. 1, and

19  implementing that into our previous work.

20      Q.  And you didn't have that for the original

21  Macondo Well?

22      A.  Right.  We hadn't drilled a well yet,

23  so --

24      Q.  All right.  And what interactions, if

25  any, did you have with the Drilling Operations

1  for the relief well?

2     A.  The same roles that I had with the

3  drilling of the No. 1 Well, to -- brought -- to

4  provide subsurface support, geologic support.

5     Q.  Okay.  I see.  We -- we talked earlier

6  today.  If I have my notes correct, I believe you

7  said that you were in the Eastern Mississippi

8  Canyon Team, which I understand changed names at

9  some point, up until two months ago, when you

10  went to the Brazil Team; is that right?

11     A.  Yes.

12     Q.  H'm --

13     A.  I did go to one other Team in between

14  then, in the Gulf of Mexico.

15     Q.  Okay.  And what Team was that?

16     A.  The Western Team.

17     Q.  Okay.  And was that in and around the

18  middle of April of 2010?  If you want to --

19     A.  I don't --

20     Q.  -- turn to Tab 52 --

21     A.  Okay.

22     Q.  -- there's an E-mail from Bryan --

23     A.  Fifty --

24     Q.  52.  There's an E-mail from Bryan

25  Ritchie, and it says:  "Chuck, I have updated

**PURSUANT TO CONFIDENTIALITY ORDER**

1   your 2010 objectives to reflect your move to the

2   Western team."

3       A.   Yes.

4       Q.   What -- what was that move?

5       A.   So --

6       Q.   Is the Western Team part of the Eastern

7   Mississippi Canyon Team?  Is it a subset?

8       A.   No.  No.  The Western Team would be the

9   Western Gulf of Mexico Exploration Team.

10          So in the Gulf of Mexico Business Unit,

11  Exploration Business Unit, we have the -- an

12  Eastern Team, a Central Team, and a Western Team.

13      Q.   I see.

14      A.   So I just moved to the Western Team.

15      Q.   And would -- would -- did that mean you

16  were still working on Macondo at that time?  This

17  is a few days before the explosion.  It's April

18  16th, 2010.

19      A.   (Reviewing document.)

20      Q.   Was Macondo --

21      A.   Right.

22      Q.   -- part of the Eastern or the Western

23  Team?

24      A.   It's part of the Eastern Team.  And my

25  move was delayed until completion of the relief

1  wells.

2      Q.  Of course, that hadn't happened yet,

3  right?  The -- the explosion hadn't happened on

4  April 16th, so --

5      A.  Correct.

6      Q.  -- so you're saying you hadn't been moved

7  yet to the Western Team as of April 20th; is that

8  correct?

9      A.  Yeah.  I don't remember the exact date on

10 which I moved.

11     Q.  And why were you moving from the Eastern

12 to Western section of that Team?

13     A.  To continue my learning curve in the Gulf

14 of Mexico.  I was going to start exploring in

15 subsalt areas, so it's a little -- it's a

16 different type of geology and mapping in that

17 area.  You -- in the Eastern Mississippi Canyon,

18 you could -- there's not a lot of salt canopies

19 in the area.  In the Western Mississippi Canyon,

20 there's a large amount of salt canopies that make

21 it a little more challenging to bring prospects

22 to the -- to find prospects and to analyze them.

23     Q.  Did you ask for that move?

24     A.  I did.

25     Q.  Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              (Discussion off the record.)
 2       Q.  Oh, I'll mark that -- well, okay.  We'll
 3   mark that last exhibit 4786.
 4              (Exhibit No. 4786 marked.)
 5       Q.  (By Ms. Greenwald) Okay.  If I can ask
 6   you to turn back to Tab 7.  We talked about this
 7   earlier today.  At least we looked at it earlier.
 8   It's prior Exhibit 1062.
 9              THE COURT REPORTER:  Erika, would
10   you take that last exhibit out of the notebook,
11   please, when you get a chance?
12       Q.  (By Ms. Greenwald) This E-mail exchange
13   appears to be relating to broken down formation.
14   Is that correct?
15              MR. KEEGAN:  Objection, form.
16       A.  (Reviewing document.)
17       Q.  (By Ms. Greenwald) Is that what you
18   understand this E-mail dialogue to be about --
19       A.  Let me --
20       Q.  -- is broken down formation?
21       A.  Let me review it for a minute, please.
22              (Discussion off the record.)
23       A.  It looks like an E-mail communique
24   between the Operations folks.  Yeah.
25   Specifically on February 24th, they're looking
```

**PURSUANT TO CONFIDENTIALITY ORDER**

 1   down at a potential interval that the formation

 2   was broke down.

 3       Q.  Right.

 4       A.  Yes.

 5       Q.  And you're not initially on the E-mail

 6   exchange until -- it looks like February 24th, at

 7   4:43 p.m.  Is that right?  And then you're added

 8   then, and Mr. Bodek.  Is that correct?

 9       A.  Yes.  It looks like -- yes.

10       Q.  Why, in response to an E-mail exchange

11   about broken down formation, would you respond,

12   "I am Drunk?"

13       A.  Yeah.  So it was -- I was joking with my

14   friend, Bobby.  It was fairly late in the

15   evening.  I had -- I think I was at a concert

16   that night before, and I just came back in and

17   replied to an E-mail on my phone, and -- and that

18   E-mail happened to be this one here.

19       Q.  And you were responding to this E-mail

20   exchange, right?

21           MR. KEEGAN:  Objection to form.

22       A.  I -- I used that E-mail to respond to

23   Bobby, at the -- at my state that evening.

24       Q.  (By Ms. Greenwald) Did you ever respond

25   to this E-mail when you were not drunk?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:  Objection to form.

2          MR. MONICO:  Objection, form.

3     A.  This was the only response to the E-mail.

4     Q.  (By Ms. Greenwald) Okay.  If you can go

5  to Tab 22, please, which is prior Exhibit 1202.

6  If you can take a look at this E-mail exchange,

7  it's three pages, and it's, if I'm correct --

8     A.  I'm sorry.  No. 22?

9     Q.  Yes, m-h'm.

10          MR. KEEGAN:  It's only got --

11     Q.  (By Ms. Greenwald) It's prior Exhibit

12  1202.

13          MR. KEEGAN:  -- one page.

14     A.  Yeah.  I've got one page.

15     Q.  (By Ms. Greenwald) H'm.

16          (Discussion off the record.)

17          MS. GREENWALD:  Then I've got the

18  wrong number.  It's not 22.  Then what was 1202?

19  You only have one page, huh?  H'm.

20     Q.  (By Ms. Greenwald) Okay.  Well, then I

21  guess I'm only going to show you one page.

22          It's actually -- yeah, it's a multipage

23  document.  Can you tell from the one page that

24  you have, which is Bates 33054 --

25     A.  Yes.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  -- whether this document, this E-mail

2  exchange was about the need for having good

3  pressure points in a well?

4              MR. KEEGAN:  Objection, form.

5        Can you hand him the last two pages or

6  are you going to mark that?

7              MS. GREENWALD:  Sure.  I have no

8  problem with that at all.  I just want -- I

9  didn't see --

10             MR. KEEGAN:  I don't want my guy

11 asking -- answering questions without --

12             MS. GREENWALD:  No, no, no.  I

13 totally understand.  No problem.

14   Q.  (By Ms. Greenwald) I didn't give you the

15 first page, but you have that.

16   A.  (Reviewing document.) So can you repeat

17 your question?

18   Q.  Well, the E-mail exchange that I just

19 showed you on the last two pages, you were not

20 included; is that right?

21   A.  Correct.

22   Q.  Because you'll see on the -- on the first

23 page of Exhibit 1202 Kelly -- I don't know how to

24 say that -- Mc -- McAughan, says:  "Sorry, I

25 should have included you in this email."  So

1    she's including -- or he -- is including you at

2    this point.  "Thanks for chiming in.  Bobby was

3    making it sound like 'let's get what we can but

4    not waste too" much rig time -- "much rig time on

5    it.'"  And then it says, "Rum and coke" #21.

6                    MR. KEEGAN:  Objection.

7                    MR. MONICO:  I think it says "Rum

8    and coke No. 2" --

9                    MR. KEEGAN:  Yeah.

10                   MR. MONICO:  -- and then an

11   exclamation point.

12                   MS. GREENWALD:  Oh, okay.  "Rum and

13   coke No. 2!"

14                   MR. MONICO:  Yeah.  She is saying a

15   good time.

16                   MS. GREENWALD:  Oh, my goodness.

17        (Laughter.)

18                   MS. GREENWALD:  Okay.  I thought it

19   was 21.  Forgive the flaw in my reading.

20       Q.  (By Ms. Greenwald) What is -- what is she

21   referring to?  There seems to be quite a

22   discussion here about rum and Coke.

23                   MR. KEEGAN:  Objection to form.

24       Q.  (By Ms. Greenwald) All the E-mails going

25   above, except for the top one, are talking about

**PURSUANT TO CONFIDENTIALITY ORDER**

1   rum and Coke.

2           MR. KEEGAN:  Objection to form.

3       A.  (Reviewing document.)

4           THE VIDEOGRAPHER:  Five minutes.

5       A.  So -- can you repeat your question again,

6   just so I can be clear?

7           MS. GREENWALD:  Can you read it

8   back, please?  I don't remember what I asked.

9       (Requested portion was displayed and read as

10  follows:

11      QUESTION:  "As you'll see on the first

12  page of Exhibit 1202, Kelly McAughan says,

13  'Sorry, I should have included you on this

14  email.'  So she's including you at this point.

15  'Thanks for chiming in.  Bobby was making it

16  sound like 'let's get' -- and it's 'Rum and coke

17  #21?'")

18          MS. GREENWALD:  So -- okay.  So --

19          MR. KEEGAN:  Objection.

20          MR. MONICO:  Objection.

21      Q.  (By Ms. Greenwald) Why -- why is -- it's

22  No. 22 [sic], exclamation point.  You've already

23  corrected that I made a mistake on that.

24      Why is there a discussion about rum and

25  Coke in an E-mail about pressure?

**PURSUANT TO CONFIDENTIALITY ORDER**

1            MR. KEEGAN:  Objection to form.

2       A.  Again, I -- I don't know the full history

3   of this E-mail.  I was attached late to it.  It

4   looked like a discussion between Kelly and I,

5   another good friend, and she is saying that she

6   was having a rum and Coke at a certain time after

7   work.

8       Q.  Your -- in your E-mail back, you say, "I

9   hope bobby is talking with Marty???"  What's your

10  concern about Marty and Bobby speaking to one

11  another?

12            MR. KEEGAN:  Objection to form.

13      A.  Again, April 12th -- oh, Bobby is talking

14  with Marty there.  I don't recall.

15      Q.  (By Ms. Greenwald) Are they both

16  Drillers?

17            MR. KEEGAN:  Objection.

18      A.  No.

19      Q.  (By Ms. Greenwald) Is -- the E-mails

20  above talk about "I can't babysit the drillers."

21  That's what Kelly says.

22            And your response is:  "It's not your job

23  to baby sit the drillers."

24      A.  Correct.

25      Q.  Does that help refresh your recollection

1  of whether either Bobby or Marty are Drillers?

2            MR. KEEGAN:  Objection to form.

3      A.  No.  Bobby and Marty were a part of the

4  Tiger Team.

5      Q.  (By Ms. Greenwald) Okay.  So what do they

6  have to do with the -- with the comment "It's not

7  your job to babysit the drillers"?

8            MR. KEEGAN:  Objection to the form.

9      A.  I don't recall.

10     Q.  (By Ms. Greenwald) What do you mean by:

11  "...besides we have hurricane Galina on the rig"?

12     A.  She's another good friend of mine, and

13  that's the nickname I gave her.  She has a very

14  commanding presence, so --

15         (Discussion off the record.)

16            MS. GREENWALD:  Okay.

17     Q.  (By Ms. Greenwald) Can you go to

18  Exhibit 33, please -- I'm sorry.  Tab 33.

19  Forgive me.

20            MS. GREENWALD:  Okay.  This is Bates

21  No. 1982479, and we'll mark it 4787.

22         (Exhibit No. 4787 marked.)

23     Q.  (By Ms. Greenwald) This document is

24  post-explosion, and the third E-mail down on the

25  first page it says:  "Hi everyone, As you

1 probably know, the GOMX leadership team has

2 created a 4-box model for

3         "At the simplest...our priorities are:

4         "Support the MC 252 incident recovery" --

5         Which I assume you're part of that, as

6 the relief well, correct?

7     A.  Yes.

8     Q.  And then "...Deliver GoM business

9 priorities."

10     A.  (Nodding.)

11     Q.  Did you work on the second bullet there,

12 "Deliver GoM business priorities"?

13     A.  No.  My main focus was the relief well

14 assistance.

15     Q.  Were you part of any meetings or

16 discussions about this 4-box model and the dual

17 priorities of both supporting the incident

18 recovery and delivering GoM business priorities?

19     A.  This is all at the Management level, that

20 kind of discussion.

21     Q.  Well, you're -- you're sent this in the

22 very last E-mail.  It says:  "Prioritization for

23 the next 90 days from the leadership..."  That's

24 the top E-mail.  Do you see that?

25     A.  I do.

PURSUANT TO CONFIDENTIALITY ORDER

1          MR. MONICO:  Time is up.

2          THE VIDEOGRAPHER:  Time is up.

3          MR. KEEGAN:  Thank you.

4          MS. GREENWALD:  That's fine.

5          THE VIDEOGRAPHER:  The time is

6   4:05 p.m.  We're off the record, ending with

7   Tape 8.

8          (Deposition concluded at 4:05 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              CHANGES AND SIGNATURE

 2    WITNESS NAME:  CHARLES HAMILTON BONDURANT

 3    DATE OF DEPOSITION:  AUGUST 23, 2011

 4    PAGE LINE        CHANGE           REASON

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1

2        I, CHARLES HAMILTON BONDURANT, have read

3   the foregoing deposition and hereby affix my

4   signature that same is true and correct, except

5   as noted on the attached Amendment Sheet.

6

7

              CHARLES HAMILTON BONDURANT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL      )   MDL NO. 2179
     BY THE OIL RIG         )
 4   "DEEPWATER HORIZON" IN )   SECTION "J"
     THE GULF OF MEXICO, ON )
 5   APRIL 20, 2010         )   JUDGE BARBIER
                            )   MAG. JUDGE SHUSHAN
 6
 7
 8                REPORTER'S CERTIFICATION
          TO THE ORAL AND VIDEOTAPED DEPOSITION OF
 9                CHARLES HAMILTON BONDURANT
                        AUGUST 23, 2011
10                         VOLUME 1
11
         I, Emanuel A. Fontana, Jr., Certified
12   Shorthand Reporter in and for the State of Texas,
     hereby certify to the following:
13
         That the witness, CHARLES HAMILTON
14   BONDURANT, was duly sworn by the officer and that
     the transcript of the oral deposition is a true
15   record of the testimony given by the witness;
16       That the deposition transcript was submitted
     on           , 2011, to the witness or to
17   Attorney _____ for the witness to
     examine, sign, and return to Worldwide Court
18   Reporters, Inc., by             , 2011.
19       That the amount of time used by each party
     at the deposition is as follows:
20
         Ms. Greenwald - 2 Hours, 27 Minutes
21       Mr. Cernich - 1 Hour, 42 Minutes
         Mr. Thibodeaux - 31 Minutes
22       Mr. Hill - 34 Minutes
         Ms. Hertz - 22 Minutes
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1       I further certify that I am neither counsel
for, related to, nor employed by any of the
2   parties in the action in which this proceeding
was taken, and further that I am not financially
3   or otherwise interested in the outcome of the
action.

4

        SUBSCRIBED AND SWORN to by me on this 23rd
5   day of August, 2011.

6

7

8       _____

                Emanuel A. Fontana, Jr., RPR
9               Texas CSR No. 1232
                Expiration Date: 12/31/12
10              Worldwide Court Reporters
                Firm Registration No. 223
11              3000 Weslayan, Suite 235
                Houston, Texas  77027
12              (713) 572-2000

13

14

15

16

17

18

19

20

21

22

23

24

25