# United States' Phase Two Offer of Proof Exhibit 10 Volumes 1-2 of Deposition of Kevin Dennis Lacy

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF LOUISIANA
3
              IN RE:  OIL SPILL          MDL NO. 2179
4  BY THE OIL RIG
   "DEEPWATER HORIZON"      SECTION:  J
5  IN THE GULF OF
   MEXICO, ON APRIL        JUDGE BARBIER
6  20, 2010               MAG. JUDGE SHUSHAN
7
8
9
        15
        16                   Volume 1
        17
        18        Deposition of KEVIN DENNIS LACY, P.O.
        19  Box 7888, The Woodlands, Texas 77387, taken
        20  in the Pan American Life Center, Mardi Gras
        21  Room, 11th Floor, 601 Poydras Street, New
        22  Orleans, Louisiana 70130, reported on
        23  Wednesday, June 1st, 2011.
        24
        25
                   GAUDET, KAISER, L.L.C.
                Board-Certified Court Reporters
```

2

```
 1    APPEARANCES:
 2
 3    ON BEHALF OF THE PLAINTIFFS
      STEERING COMMITTEE:
 4
 5         WATTS GUERRA CRAFT
           (BY:  MIKAL C. WATTS, ESQUIRE)
 6              DAVID V. McLENDON, ESQUIRE)
            4 DOMINION DRIVE
 7         BUILDING 3, SUITE 100
           SAN ANTONIO, TEXAS 78257
 8
 9
           HENRY DART, ATTORNEYS AT LAW
10         (BY:  HENRY T. DART, ESQUIRE)
           510 NORTH JEFFERSON STREET
11         COVINGTON, LOUISIANA 70433
12              SPECIAL COUNSEL FOR THE LOUISIANA
                ATTORNEY GENERAL REPRESENTING THE
13              STATE OF LOUISIANA
14
           U.S. DEPARTMENT OF JUSTICE
15         TORTS BRANCH, CIVIL DIVISION
           (BY:  DEANNA J. CHANG, ESQUIRE)
16         POST OFFICE BOX 14271
           WASHINGTON, D.C. 20044-4271
17
                ATTORNEYS FOR THE UNITED STATES
18
19         OFFICE OF THE ATTORNEY GENERAL
           STATE OF ALABAMA
20         (BY:  MARGARET L. FLEMING, ESQUIRE)
           ASSISTANT ATTORNEY GENERAL
21         501 WASHINGTON AVENUE
           P.O. BOX 300152
22         MONTGOMERY, ALABAMA 36130-0152
23              ATTORNEYS FOR THE STATE OF ALABAMA
24
25
                 GAUDET, KAISER, L.L.C.
               Board-Certified Court Reporters
```

3

```
 1    APPEARANCES (Continued):
 2
 3         MITHOFF LAW FIRM
           (BY:  WARNER HOCKER, ESQUIRE)
 4         ONE ALLEN CENTER - PENTHOUSE
           500 DALLAS STREET
 5         HOUSTON, TEXAS 77002
 6              MDL 2185 SECURITIES PLAINTIFFS
                SUBCLASS
 7
 8         COHEN MILSTEIN
           (BY:  JOHN SIFTON, ESQUIRE)
 9         1100 NEW YORK AVENUE, N.W.
           SUITE 500 WEST
10         WASHINGTON, D.C. 20005
11              ATTORNEY FOR NEW YORK, ET AL
                SECURITIES
12
13         MUNGER, TOLLES & OLSON, LLP
           (BY:  JEROME C. ROTH, ESQUIRE)
14         560 MISSION STREET, 27TH FLOOR
           SAN FRANCISCO, CALIFORNIA 94105
15
                ATTORNEYS FOR TRANSOCEAN
16
17         HUGHES ARRELL KINCHEN, LLP
           (BY:  JOHN KINCHEN, ESQUIRE)
18         NORFOLK TOWER
           2211 NORFOLK, SUITE 1110
19         HOUSTON, TEXAS 77098
20              ATTORNEYS FOR TRANSOCEAN
21
           GODWIN RONQUILLO
22         (BY:  GAVIN HILL, ESQUIRE)
                LAUREN L. MITCHELL, ESQUIRE)
23         1201 ELM STREET
           SUITE 1700
24         DALLAS, TEXAS 75270-2041
25              ATTORNEYS FOR HALLIBURTON
```

```
1     APPEARANCES (Continued):
2
3         BINGHAM McCUTCHEN
          (BY:  PETER C. NEGER, ESQUIRE)
4              DAREN F. STANAWAY, ESQUIRE)
          399 PARK AVENUE
5         NEW YORK, NEW YORK 10022-4689
6              ATTORNEYS FOR ANADARKO PETROLEUM
               AND MOEX OFFSHORE 2007, LLC
7
8         BECK, REDDEN & SECREST
          (BY:  ERIC J.R. NICHOLS, ESQUIRE)
9         515 CONGRESS AVENUE, SUITE 1750
          AUSTIN, TEXAS 78701
10
               ATTORNEYS FOR CAMERON
11             INTERNATIONAL CORPORATION
12
          MORGAN, LEWIS, LLC
13        (BY:  LUCAS T. ELLIOT, ESQUIRE)
          1000 LOUISIANA STREET,SUITE 400
14        HOUSTON, TEXAS 77002-5006
15             ATTORNEYS FOR M-I SWACO, LLC
16
          WARE, JACKSON, LEE & CHAMBERS, LLP
17        (BY:  WENDY WARE BISHOP, ESQUIRE)
          AMERICA TOWER
18        2929 ALLEN PARKWAY
          HOUSTON, TEXAS 77019
19
               ATTORNEYS FOR DRIL-QUIP
20
21        JONES, WALKER, WAECHTER, POITEVENT,
          CARRHRE & DENHGRE, LLP
22        (BY:  BRETT S. VENN, ESQUIRE)
          600 JEFFERSON STREET, SUITE 1600
23        LAFAYETTE, LOUISIANA 70501
24             ATTORNEYS FOR WEATHERFORD
25
```

```
 1    APPEARANCES (Continued):
 2
 3         KIRKLAND & ELLIS, LLP
           (BY:  HARIKLIA KARIS, ESQUIRE)
 4              PATRICK M. CROOK, ESQUIRE)
           300 NORTH LASALLE
 5         CHICAGO, ILLINOIS 60654
 6              ATTORNEYS FOR BP
 7
           STANLEY, REUTER, ROSS, THORNTON &
 8         ALFORD, LLC
           (BY:  RICHARD C. STANLEY, ESQUIRE)
 9              THOMAS P. OWEN, JR., ESQUIRE)
           909 POYDRAS STREET, SUITE 2500
10         NEW ORLEANS, LOUISIANA 70112
11              ATTORNEYS FOR KEVIN DENNIS LACY
12
13
14    ALSO PRESENT:
15
           KAREN GACE, IN HOUSE COUNSEL
16         REPRESENTING BP
17
           TODD MEAUX, CLVS
18         DEPO-VUE, INC.
19
20
21    REPORTED BY:
22         DIANE TEWIS CLARK, RPR, RMR, CRR
           CERTIFIED COURT REPORTER
23
24
25
```

```
 1   *   *
 2
                         EXAMINATION INDEX
 3
 4                                               Page
 5   EXAMINATION BY MR. WATTS................ 15
 6   EXAMINATION BY MR. DART.................305
 7   EXAMINATION BY MS. CHANG................373
 8
 9                      *   *   *
10                   INDEX OF EXHIBITS
11
                                                 Page
12
     Exhibit No. 2798....................... 38
13      Drillers Report Strong Activity
     Despite Weakening Prices
14
     Exhibit No. 2799....................... 43
15      E-Mail - From: Lacy, Kevin Sent: Wed
     Nov 21 20:00:09 2007 - Subject:
16   Preliminary draft to discuss
     BP-HZN-CEC054946 - BP-HZN-CEC054958
17
     Exhibit No. 2900....................... 48
18      E-Mail - From: Lacy, Kevin Sent: Wed
     Nov 28 03:42:08 2007 - Subject: Your
19   copy of Monday's File
     BP-HZN-CEC055017- BP-HZN-CEC055034
20
     Exhibit No. 2901....................... 53
21      E-Mail - From: Lacy, Kevin Sent: Fri
     Dec 14 20:45:56 2007 - Subject:
22   Package for discussion
     BP-HZN-CEC055272 - BP-HZN-CEC055296
23
24
25
```

1    Exhibit No. 2902........................ 68
         E-Mail - From: Lacy, Kevin Sent: Thu
2    Nov 08 16:04:17 2007 - Subject: RE:
     Lead on Agenda and meeting with Neil
3    Shaw
     BP-HZN-CEC054745 - BP-HZN-CEC054746
4
     Exhibit No. 2903........................ 69
5      SEEAC pre-read for 24th March 2010 -
     E&P's Approach to US Regulatory
6    Compliance
     BP-HZN-2179MDL00085280 -
7    BP-HZN-2179MDL00085287
8    Exhibit No. 2904........................ 72
         E-Mail - From: Lacy, Kevin Sent: Mon
9    Jan 07 00:06:13 2008 - Subject: Draft
     Presentation and Appraise/Select White
10   Paper
     BP-HZN-CEC055532 - BP-HZN-CEC055558
11
     Exhibit No. 2905........................ 77
12     PRESENTATION BY KEVIN LACY - AUDIO
     TRANSCRIPTION
13
     Exhibit No. 2906........................ 82
14     E-Mail - From: Prevallet, Yvonne S
     Sent: Thu Apr 09 21:39:05 2009 -
15   Subject: Pfest Slides post discussion
     BP-HZN-2179MDL00110741 -
16   BP-HZN-2179MDL00110755
17   Exhibit No. 2907........................ 85
         E-Mail - From: Lacy, Kevin Sent: Mon
18   Oct 12 19:13:32 2009 - Subject: Pre
     Read for HSSE QPR - Tuesday, October
19             BP-HZN-CEC078875 - BP-HZN-CEC078901
20
     Exhibit No. 2908........................ 87
21     GulfofMexicoSPU - Operating Plan
     (OMS Handbook)
22   BP-HZN-2179MDL00333155 -
     BP-HZN-2179MDL00333195
23
24
25

1   Exhibit No. 2909........................ 92
        E-Mail - From: Kennelley, Kevin J
2   Sent: Wed Dec 15 12:54:59 2008 -
    Subject: FW: SPU Annual Engineering
3   Plans: ACTION
    BP-HZN-2179MDL01820483 -
4   BP-HZN-2179MDL01820518
5   Exhibit No. 2910........................ 96
        GulfofMexicoSPU - Annual Engineering
6   Plan 2009
    BP-HZN-2179MDL00346407 -
7   BP-HZN-2179MDL00346446
8   Exhibit No. 2911........................ 98
        E-Mail - From: Kraus, Malcolm D
9   Sent: Wed Apr 08 13:32:43 2009 -
    Subject: Updated Risk Register
10  BP-HZN-2179MDL01554443
11  Exhibit No. 2912........................100
        E-Mail - From: Ruehle, Steven A
12  Sent: Thu Sep 24 14:40:48 2009 -
    Subject: RE: SPU Top Risk Mitigation
13  Plans (Session 2 of 2)
    BP-HZN-CEC078761 - BP-HZN-CEC078789
14
    Exhibit No. 2913........................105
15    Risk Mitigation Plan
    BP-HZN-BLY00151043
16
    Exhibit No. 2914........................106
17    E-Mail - From: Eaton, Richard J
    Sent: Fri Oct 09 23:11:49 2009 -
18  Subject: OpCo risk review
    BP-HZN-2179MDL01443369 -
19  BP-HZN-2179MDL01443372
20  Exhibit No. 2915........................113
        Keynote Luncheon Speaker - Tuesday
21  5, October
22
23
24
25

```
 1    Exhibit No. 2916........................120
          E-Mail - From: Bodek, Robert Sent:
 2    Thu Nov 19 21:02:05 2009 - Subject:
      FW: SPU Top Risk Mitigation Plans
 3    (Session 2 of 2)
      BP-HZN-2179MDL01131955 -
 4    BP-HZN-2179MDL01131982
 5    Exhibit No. 2917........................125
          Drilling and Well Operations
 6    Practice - E&P Defined Operating
      Practice
 7    BP-HZN-IIT-0001177 - BP-HZN-0001288
      BP-HZN-2179MDL00057261 -
 8    BP-HZN-2179MDL00057372
 9    Exhibit No. 2918........................137
          E-Mail - From: Lacy, Kevin Sent: Thu
10    Oct 01 15:28:47 2009 - Subject: Safety
      Leadership
11    BP-HZN-2179MDL01808592
12    Exhibit No. 2919........................146
              Bp - Process Safety Planning 2010,
13    12 Jan 2010
      BP-HZN-2179MDL01109076 -
14    BP-HZN-2179MDL01109092
15    Exhibit No. 2920........................192
          E-Mail - From: Shaw, Neil Sent: Sat
16    Sep 05 20:37:58 2009 - Subject: Pfest
      prep
17    BP-HZN-CEC078446
18    Exhibit No. 2921........................197
          Kevin Lacy, BP head of discipline,
19    drilling and completions: Building a
      global career around a global business
20
      Exhibit No. 2922........................198
21       E-Mail - From: Sprague, Jonathan D
      Sent: Tue Sep 22 13:44:22 2009 -
22    Subject: DCRstaffing.ppt
      BP-HZN-2179MDL01797150 -
23    BP-HZN-2179MDL01797171
24    Exhibit No. 2923........................201
          THE MACONDO BLOWOUT - 3rd Progress
25    Report
```

1   Exhibit No. 2924.........................209
        E-Mail - From: Perez, Robert E Sent:
2   Tue May 05 15:55:11 2009 - Subject:
    CAPM Update for Kevin Lacy.ppt
3
    Exhibit No. 2925.........................215
4     E-Mail - From: Lacy, Kevin Sent: Mon
    Jun 29 22:39:39 2009 - Subject: D&C
5   Slide Deck
    BP-HZN-2179MDL00126073 -
6   BP-HZN-2179MDL00126099
7   Exhibit No. 2926.........................218
        E-Mail - From: Lacy, Kevin Sent: Tue
8   Jul 14 13:00:15 2009 - Subject: RE:
    Early Heads Up on the Marianas
9   Situation
    BP-HZN-2179MDL01819626 -
10  BP-HZN-2179MDL01819627
11  Exhibit No. 2927.........................226
        E-Mail - From: Lacy, Kevin Sent: Thu
12  Jul 16 22:27:47 2009 - Subject: RE: DW
    Horizon Rig Well Placement Vendor
13  Action
    BP-HZN-2179MDL01808137 -
14  BP-HZN-2179MDL01808138
15  Exhibit No. 2928.........................234
        GoM D&C RTOC STRATEGY WHITEPAPER
16  BP-HZN-2179MDL00575515 -
    BP-HZN-2179MDL00575560
17
    Exhibit No. 2929.........................237
18    E-Mail - From: Lenhoff, Diane A
    Sent: Mon Nov 09 21:24:19 2009 -
19  Subject: RE: November D&C ELT Meeting
                - Agenda
20  BP-HZN-2179MDL00352448 -
    BP-HZN-2179MDL00352460
21
    Exhibit No. 2930.........................244
22    E-Mail - From: Yeley, Ryan Sent: Tue
    Apr 13 14:12:04 2010 - Subject: RE:
23  Final Agenda for tomorrow's Suttle
    review
24  BP-HZN-2179MDL01124799 -
    BP-HZN-2179MDL01124933
25

1   Exhibit No. 2931........................246
        E-Mail - From: Sims, David C Sent:
2   Sat Oct 31 02:28:43 2009 - Subject:
    Re: Marianas
3   BP-HZN-2179MDL00356993
4   Exhibit No. 2932........................248
        E-Mail - From: Lacy, Kevin Sent: Mon
5   May 11 13:25:59 2009 - Subject: Re:
    Digital BoP Update
6   BP-HZN-2179MDL01843672
7   Exhibit No. 2933........................249
        E-Mail - From: Lacy, Kevin Sent: Wed
8   Nov 11 18:59:21 2009 - Subject: FW:
    Emailing: Dig_BOP_JIP_Info.ppt
9   BP-HZN-2179MDL01843420 -
    BP-HZN-2179MDL01843422
10
    Exhibit No. 2934........................251
11      E-Mail - From: Lacy, Kevin Sent: Tue
    Jul 15 14:48:50 2008 - Subject: RE:
12  Kaskida Bold Move Way Forward
    BP-HZN-2179MDL00107264 -
13  BP-HZN-2179MDL00107268
14  Exhibit No. 2935........................255
        E-Mail - From: Lacy, Kevin Sent: Thu
15  Jul 09 16:09:47 2009 - Subject: Org
    Changes in D&C
16  BP-HZN-CEC077885 - BP-HZN-CEC077887
17  Exhibit No. 2936........................256
        E-Mail - From: Howe, Kemper Sent:
18  Mon Dec 21 16:14:55 2009 - Subject: 1Q
    2010 Obligation Report
19  BP-HZN-2179MDL01843779 -
    BP-HZN-2179MDL01843780
20
    Exhibit No. 2937........................259
21      E-Mail - From: Lacy, Kevin Sent: Thu
    Aug 20 16:54:20 2009 - Subject: FW:
22  Aug 2009 D&C Rig Schedule - Revised
    BP-HZN-CEC078290 - BP-HZN-CEC078293[1]
23
24
25

1    Exhibit No. 2938........................260
       E-Mail - From: Morel, Brian P Sent:
2    Mon Apr 12 12:12:47 2010 - Subject:
     RE: Macondo times
3    BP-HZN-2179MDL00020934
4    Exhibit No. 2939........................
       Group Leader Performance Summary
5    Form for 2008
     BP-HZN-CEC061703 - BP-HZN-CEC061705
6    BPD107-061703 - BPD107-061705
7    Exhibit No. 2940........................293
       E-Mail - From: Sachan, Kim Sent: Thu
8    Jan 07 14:30:17 2010 - Subject:
     E-Expensive and More
9    BP-HZN-2179MDL00803916 -
     BP-HZN-2179MDL00803954
10
     Exhibit No. 2941........................297
11     E-Mail - From: McIntyre, Paul Sent:
     Fri Jan 08 23:09:46 2010 - Subject:
12   FW: Proposed Group Leader Exit
     Announcement
13   BP-HZN-2179MDL01154523
14   Exhibit No. 2942........................298
       E-Mail - From: Lacy, Kevin Sent: Fri
15   Jan 08 14:15:20 2010 - Subject: RE:
     Proposed Group Leader Exit
16   Announcement
     BP-HZN-2179MDL01155347
17
     Exhibit No. 2943........................299
18     E-Mail - From: Kevinlacy@juno.com
     Sent: Mon Jan 11 03:05:16 2010 -
19   Subject: Re: FW: Proposed Group Leader
     Exit Announcement
20   BP-HZN-2179MDL01160218
21   Exhibit No. 2944........................300
       E-Mail - From: Verchere, Christina C
22   Sent: Tue Jan 12 01:56:09 2010 -
     Subject: Group Leader announcement
23   BP-HZN-2179MDL01164902-
     BP-HZN-2179MDL01164903
24
25

1   Exhibit No. 2945........................301
        E-Mail - From: Employee
2   Communications Sent: Tue Jan 12
    14:00:07 2010 - Subject: Staff
3   Announcement - Kevin Lacy
    BP-HZN-2179MDL01153257
4
    Exhibit No. 2946........................302
5       E-Mail - From: Longo, Susan G Sent:
    Wed Jan 27 22:13:33 2010 - Subject:
6   FW: Email for scanned docs
    BP-HZN-2179MDL01158014 -
7   BP-HZN-2179MDL01158015
8   Exhibit No. 2947........................312
        The BP Operating Management System
9   Framework - Part 1 An overview of OMS
    BP-HZN-2179MDL00333196 -
10  BP-HZN-2179MDL00333154
11  Exhibit No. 2948........................397
        E-Mail - From: Shaw, Neil Sent: Thu
12  Jun 04 11:44:41 2009 - Subject: RE:
    Transocean Marianas Traveling Block /
13  Crown Collision HIPO Investigation
    Report
14  BP-HZN-CEC063970 - BP-HZN-CEC0
15
16
17
18
19
20
21
22
23
24
25

```
 1                S T I P U L A T I O N
 2
 3              It is stipulated and agreed by and
 4      between counsel for the parties hereto that
 5      the deposition of the aforementioned witness
 6      is hereby being taken pursuant to the Federal
 7      Rules of Civil Procedure;
 8
 9              All formalities, with the
10      exception of the reading and signing of the
11      transcript by the witness, are hereby waived;
12
13              All objections, except those as to
14      the form of the question and the
15      responsiveness of the answer, are hereby
16      reserved until such time as this deposition,
17      or any part thereof, may be used or sought to
18      be used in evidence.
19
20                        * * *
21
22              DIANE TEWIS CLARK, RPR, RMR, CRR,
23      Certified Court Reporter, State of Louisiana,
24      officiated in administering the oath to the
25      witness.
```

```
 1          THE VIDEOGRAPHER:
 2               This is the videotaped
 3     deposition of Kevin Lacy.  This deposition is
 4     taken in the matter of the oil spill by the
 5     Oil Rig DEEPWATER HORIZON in the Gulf of
 6     Mexico on April 20th, 2010.  This deposition
 7     is being held at 601 Poydras Street,
 8     New Orleans, Louisiana on June 1st, 2011 at
 9     the time indicated on the video screen which
10     is 8:31.
11               Will the court reporter please
12     swear in the witness.
13                         * * *
14          KEVIN DENNIS LACY,
15               After having been first duly
16      sworn by the above-mentioned court reporter,
17      Did testify as follows:
18     EXAMINATION BY MR. WATTS:
19          Q.    What is your name, please?
20          A.    My name is Kevin Dennis Lacy.
21          Q.    Mr. Lacy, my name is Mikal
22     Watts.  I'm a lawyer from San Antonio, Texas.
23     I'm here to ask you -- I would like to ask
24     you a few questions, but it's going to be a
25     while.
```

1

2          A.      Okay.

3          Q.      Have you ever had your

4    deposition taken before?

5          A.      No, sir.

6          Q.      Let me just tell you a little

7    bit about what we're doing.  We've got a

8    video man behind me making a movie of you as

9    we speak, a court reporter typing down every

10   word that anybody says.  The reason is at the

11   time of the trial of this case, I will either

12   get to read from the deposition transcript or

13   play the video as if you were in court

14   testifying.

15                 You understand that, right?

16         A.      Yes, I do.

17         Q.      Because of that, I want to have

18   a couple of little agreements with you.  If

19   for some reason you don't understand one of

20   my questions, either because of a poor Texas

21   accent or it's not a very smart question or

22   it didn't make any sense to you, just tell me

23   that, so that when you answer each one of my

24   questions, we can all safely assume that you

25   fully understood the question that was asked.

```
 1    Is that fair?
 2         A.    Yes, sir.
 3         MR. KINCHEN:
 4              Excuse me, Counsel, briefly, we
 5    can't hear back here.  I don't know if they
 6    usually have a speaker back here, but it's
 7    definitely --
 8         THE VIDEOGRAPHER:
 9              I will try to adjust it.
10         MR. KINCHEN:
11              If it is, it's not working.  I
12    apologize, but we just can't hear it.
13         THE VIDEOGRAPHER:
14              Go ahead, I will adjust it.
15         MR. WATTS:
16              Okay.
17    EXAMINATION BY MR. WATTS:
18         Q.    The second agreement I want to
19    have with you, nobody has the right to cut
20    you off.  Sometimes lawyers trip over each
21    other and start asking the next question, but
22    I don't think anybody in the group that I've
23    seen so far is going to try to do that, but
24    if you feel like that you've been cut off for
25    some reason, just tell us, and that way when
```

```
1    you finish each of your answers, we can
2    safely assume you that had a full and fair
3    opportunity to completely answer each of the
4    questions that was asked.  Okay?
5         A.     Okay.
6         Q.     All right.  One last time, if
7    you and I were talking about something on the
8    street, you know, the Miami Heat game last
9    night, or something like that, we'd do a lot
10   of head shakes up and down and uh-huhs and
11   uh-uhs, and she can't type any of that in.
12   So we need to speak a little more formally
13   with pronouns and yes and no's as opposed to
14   headshakes.  Okay?
15        A.     Very good.
16        Q.     All right.  Mr. Lacy, before we
17   begin, I want to get some background
18   information on you.  How old a man are you?
19        A.     I'm 53.
20        Q.     Okay.  And where were you born?
21        A.     I was born in Claremore,
22   Oklahoma.
23        Q.     And where were you raised?
24        A.     I was raised in Claremore,
25   Oklahoma.
```

1          Q.     Did you graduate from high
2     school there?
3          A.     I graduated from Claremore High
4     School, yes.
5          Q.     In what year?
6          A.     1980 -- I'm sorry, that was
7     1976.
8          **Q.     In 1976.  I take it from your**
9     **last answer, you graduated from college in**
10    **1980?**
11         **A.     I graduated from the University**
12    **of Tulsa in 1980.**
13         **Q.     With what degree?**
14         **A.     Bachelors of science in**
15    **petroleum engineering.**
16         Q.     Okay.  After graduating with a
17    bachelor of science in petroleum engineering,
18    what was your first job?
19         A.     My first job was as a drilling
20    representative for Chevron USA in
21    New Orleans.  It would be the same as a
22    drilling foreman.  Some people call it well
23    site leader.
24         Q.     Did you work at Chevron for the
25    next 26 years?

1        A.      That is correct.

2        Q.      Okay.  Just briefly, as I

3   understand it, between about 1980, and 1984,

4   you worked here in the United States?

5        A.      Many different places, actually.

6   I worked in China, I worked in West Africa, I

7   worked in Aberdeen, Scotland.  Many different

8   countries, short-term assignments, some

9   longer.

10        Q.      Okay.  In 1984, you actually

11   moved to China, is that right?

12        A.      I'm sorry, yes, from 1980 to

13   1984 I was in New Orleans.

14        Q.      Okay.  And then in 1984, you

15   were reassigned to China.  What did you do

16   there?

17        A.      I was a well site leader

18   offshore in China for a year.

19        Q.      All right.  And after that, what

20   did you do?

21        A.      I moved to San Francisco and I

22   was on the Chevron USA headquarters staff in

23   San Francisco.

24        Q.      Chevron's headquarters are in

25   San Francisco?

1          A.     Their corporate headquarters
2     used to be in San Francisco, yes.
3          Q.     You worked at the corporate
4     headquarters?
5          A.     Yes, I did.
6          Q.     How long were you in
7     San Francisco at the corporate headquarters?
8          A.     I was in San Francisco from 1985
9     until 1989.
10          Q.     What did you do at that time?
11          A.     I had two jobs.  At one point I
12     was part of the Chevron USA headquarters
13     staff.  I believe that role at that time was
14     called business analyst.  It was basically a
15     headquarters staff for engineers.  Then for a
16     year and a half, I worked on the Angola
17     business unit group in San Ramon, California,
18     which was their international E&P
19     headquarters.
20          Q.     All right.  And what year would
21     you have been working on the Angola business
22     group?
23          A.     I started that in 1988.  I
24     worked from mid-'88 until late 1989.
25          Q.     Did there come a time that you

1    actually moved for Angola for a while?

2         A.    I actually in early 1990,

3    started a rotational assignment in Angola,

4    where I worked four weeks on and four weeks

5    off and continued that until mid-1995.  I had

6    three different jobs while I was in Angola on

7    rotation.

8         Q.    Why don't you tell me about

9    those three jobs.  What was the first one?

10        A.    The first job I was the head of

11   the petroleum engineering staff in the --

12   what was called the Cabinda Gulf Oil Company.

13   I think in '92 I assumed the role of Takula

14   area superintendent and offshore area

15   superintendent and roughly -- slightly less

16   than a year later, I assumed the role of

17   production operations manager from that

18   point, which would have been about 1993 to

19   mid-1995.

20        Q.    When you say you were the

21   production operations manager, what were you

22   responsible for at that point in time?

23        A.    At that point, the scope for the

24   production operations manager was all

25   producing operations which included the

1    offshore platforms, gas compression

2    facilities, production wells, accommodation

3    facilities, LPG, gas compression, refining,

4    onshore tankage, the maintenance

5    organizations, for the offshore wells and

6    facilities.

7         Q.    So you were the production

8    manager over basically everything that

9    Chevron did in Angola?

10        A.    Over all the production

11   operations, yes.  There were roughly 700

12   employees under my responsibility.

13        Q.    All right.  And at some point, I

14   think it was in 1996, you moved from the

15   Angolan operation to Aberdeen, is that right?

16        A.    Just for one year and a half,

17   from the middle of 1995 until the start of

18   1997.  I had an assignment in San Ramon,

19   California, where I was one of two operations

20   sponsors.  My job was to have the

21   responsibility to move employees around the

22   world for operations assignments and then I

23   went to Aberdeen.

24        Q.    And what did you do in Aberdeen?

25        A.    In Aberdeen, I was the general

1    manager of operations in 1997, '98 and most

2    of 1999.

3         Q.     A when you say you were the

4    general manager of operations, what were you

5    the general manager over?

6         A.     At that point in time, the

7    operations consisted of the Alba platform

8    offshore, our joint interest in the Britannia

9    project with ConocoPhillips and some assets

10   in the Netherlands and in Norway.

11             My oversight role was for all of

12   the operations and technical disciplines that

13   were headquartered out of Aberdeen.

14        Q.     Okay.  I'm trying to

15   geographically get an idea.  Does that cover

16   the entire North Sea operation?

17        A.     That was the entire North Sea

18   operation for Chevron at that time.

19        Q.     I have a good idea about the

20   relative size of the North Sea operation for

21   BP.  How was it with Chevron, was it a major

22   part of the worldwide production effort at

23   Chevron?

24        A.     I think at that point, Chevron

25   had sold their Indian assets which was a

1    large production operation that they had
2    prior to my arrival.  I was sent in with the
3    new organization.  It would have probably
4    been in the top 15 in terms of production.
5    At that point, once Britannia came on, it
6    might have been in the top ten.
7          Q.     Same question I asked you in
8    Angola.  At the time that you were in this
9    position at Aberdeen, were you the production
10   manager in charge of everything that Chevron
11   did?
12         A.     I had full accountability for
13   all offshore operations.
14         Q.     How long did you have full
15   accountability for all offshore operations in
16   the North Sea?
17         A.     Almost three years.
18         Q.     You and I both talk fast, and we
19   jump over each other.  She's going to kill me
20   if we don't stop.  Let me see if I can slow
21   it down a little bit.
22                You said you did that for almost
23   three years, is that right?
24         A.     Until -- from the very start of
25   1997, all of '98 and through August of 1999.

```
 1          Q.      And in August of 1999, what new
 2     position did you take at that time?
 3          A.      I was asked to come back and
 4     lead the -- one of three positions in Chevron
 5     Technology Company after their
 6     reorganization.  I headed up the reservoir
 7     and production part of Chevron Production
 8     Technology Company.
 9          Q.      And what were your day-to-day
10     duties at that point?
11          A.      Primarily in that first year,
12     because of the changes in the organization,
13     it was setting up the new organization.  They
14     closed the lab in La Habra and were trying to
15     get people that had extensive field
16     experience to head up the technology group.
17          Q.      By about 2001, you had been the
18     production manager over all the Angolan
19     operations, over all the North Sea
20     operations, you did several posts in the
21     United States.  At some point in time were
22     you named a vice president of Chevron?
23          A.      Yes, I was.
24          Q.      What vice presidential position
25     were you given?
```

1          A.     In 2001 I was named the general

2     manager of strategic planning for roughly one

3     year.  It was at, day one of the Texaco

4     merger, I served in that capacity for one

5     year and after that role, I assumed the role

6     of vice president -- it originally did not

7     have the title of vice president, it was

8     called -- I think well engineering operations

9     adviser, but ultimately the job was retitled

10    as vice president, global drilling and

11    completions for Chevron Corporation.

12         Q.     All right.  In terms of your

13    position as vice president of global drilling

14    and completion operations at Chevron, what

15    were your day-to-day responsibilities?

16         A.      Initially it was creating a

17    global function, a global discipline, a

18    global technical organization for the

19    oversight of drilling and completion

20    operations worldwide for Chevron.  It was a

21    role that had not existed for a number of

22    years and as part of the Texaco merger it was

23    decided to reestablish that role.

24         Q.     So instead of having independent

25    business units doing things however they

1    chose to do it, the idea was to, in effect,

2    consolidate the process into one global

3    effort.  Would that be right?

4          A.    In the prior state, each

5    business unit would have done roughly what

6    they thought were their best practices.  This

7    was an attempt to create a global drilling

8    organization with an oversight

9    responsibility.

10         Q.    And in this effort that Chevron

11   undertook to create this global drilling

12   organization, you built that from scratch

13   because it didn't exist before, is that

14   right?

15         A.    That's correct.

16         Q.    How long did you stay in that

17   function as the vice president of global

18   drilling and completions?

19         A.    I believe that was from January

20   of 2001 until July of 2006.  It might have

21   been January of 2002, I'd have to think.  It

22   was four and a half years in that role.

23         Q.    Okay, so from 2002 till July

24   2006, you were the vice president of global

25   drilling and completions at Chevron?

```
 1          A.      Yes.
 2          Q.      At some point you left Chevron
 3   and went to BP.  Why did you leave?
 4          A.      At the time I left Chevron, it
 5   was basically on -- basis of two decisions,
 6   Chevron had merged with Unocal in late 2005.
 7   We had been building a fairly sizable
 8   drilling completion organization in that time
 9   frame.  The attrition was pretty much normal,
10   3 percent.  It grew to 5, it grew to 8, it
11   grew to 12.  And during those last months of
12   2006, I expressed some concerns about the
13   attrition and how we were going to be able to
14   manage the situation.  I was working hours
15   frequently until 8:00 or 9:00 at night and
16   didn't -- finally couldn't come to an
17   agreement on how to make the changes that we
18   needed to make.
19          Q.      Okay.  Was there a head count
20   reduction going on that you were concerned
21   about from the standpoint of safety or just
22   hours?
23          A.      Well, it was both.  I'd never
24   had major concerns about safety during that
25   attrition.  It was primarily meeting the
```

1       objectives of the merged companies, the

2       financial objectives, the operating

3       objectives because of that major loss in

4       people.

5               Q.      And so how did it come about

6       that you ended up with BP?

7               A.      At the time I made the decision

8       to take early retirement from Chevron, I had

9       not decided what I was going to do, I just

10      made that decision first.  When it became

11      known that I was taking early retirement and

12      I effectively was on the market, I was

13      contacted by a number of recruiters.  One of

14      those recruiters steered me towards BP and I

15      had a series of interviews with BP.

16              Q.      Keeping in mind that you had a

17      series of interviews, who hired you at BP?

18              A.      I would say the offer was

19      extended from Barbara Yilmaz who was the

20      technical vice president of drilling and

21      completion.

22              Q.      Was Barbara Yilmaz based in

23      Houston or in England?

24              A.      In Houston.

25              Q.      And what was your understanding

1    as to the function that you were going to be
2    serving at BP when you joined BP?
3          A.    The offer that was extended was
4    titled head of discipline, drilling and
5    completions, western hemisphere.
6          Q.    And what does the head of
7    discipline, drilling and completions mean?
8          A.    At that time, they had two
9    roles, one for western hemisphere and one for
10   eastern hemisphere and their role would have
11   been similar to the role I had at Chevron
12   except for half of the world, and those roles
13   both reported to Barbara Yilmaz as the
14   technical vice president of drilling and
15   completion.
16         Q.    In terms of the western
17   hemisphere, I'm going to ask a question and
18   you're going to laugh at me, but what all did
19   that include as opposed to not include?
20         A.    Well, it was more notional, when
21   they say western hemisphere.  It included the
22   offshore operations in Angola, it included
23   the offshore operations in the Gulf or
24   Mexico, it included the BP operations in
25   South America, in Trinidad, it included the

1      onshore U.S. operations, North America Gas

2      and BP operations in Alaska and also the

3      operations in the Far East which, at that

4      time, were in Vietnam and Indonesia.

5             Q.     What did it not include?

6             A.     It didn't include Azerbaijan and

7      the North Sea and the Middle East and North

8      Africa.

9             Q.     What about Russia?

10            A.     I did not have an association

11     with Russia.

12            Q.     Who was your immediate

13     supervisor in the corporate hierarchy when

14     you joined BP?

15            A.     That would have been Barbara

16     Yilmaz.

17            Q.     Did she continue to be the

18     person that was above you in the hierarchy

19     throughout your tenure at BP?

20            A.     No.  She would have been my

21     direct report or direct supervisor until

22     February of 2008 when I transferred into the

23     Gulf of Mexico business unit and then began

24     to report directly to Neil Shaw.  At that

25     point, then I would have had a -- what's

1    referred to as a dotted line relationship

2    back to Barbara Yilmaz.

3         Q.    Okay.  How long did you continue

4    in your capacity as the head of discipline

5    drilling and completions for the western

6    hemisphere?

7         A.    So I was in that role from July

8    of 2006 until I fully left the role, first of

9    February 2008.

10        **Q.    And in February of 2008, what**

11   **role did you assume at that point?**

12        **A.    The vice president of drilling**

13   **and completions for the Gulf of Mexico**

14   **business unit for BP.**

15        Q.    Was that sort of a lateral

16   transfer or was it kind of a result of a

17   reorganization or how did that work?

18        A.    It was -- I would best describe

19   that as -- it started as leading a review

20   team, a study team in summer/fall of '07.

21        Q.    Right.

22        A.    The business unit was in the

23   process of being reorganized and they wanted

24   to review the drilling completion operations.

25   During that time frame, I made a number of

```
 1    presentations to their business unit heads.
 2    The predecessor to Neil Shaw, which was Kenny
 3    Lang, Neil Shaw and ultimately in early
 4    December of 2007, Neil Shaw asked me if I
 5    would assume the role that we were describing
 6    in the -- for the state, the review state.
 7         Q.    What was the genesis of this
 8    study of the Gulf of Mexico drilling
 9    operations?
10         MS. KARIS:
11              Object to form.
12    EXAMINATION BY MR. WATTS:
13         Q.    Go ahead.  Let me tell you what
14    just happened.  If any one of these fine
15    lawyers doesn't like one of my questions for
16    any reason, they can object to form and they
17    preserve the ability to make an objection
18    later.  If they don't say object to form,
19    then they've got to kind of live with the
20    question that I asked.  But you still are
21    able to answer the question.  So she's not
22    meaning to interrupt or anything like that,
23    it's just that she's got a job to do and so
24    she's doing it.
25    EXAMINATION BY MR. WATTS:
```

```
 1          Q.     All right.  I think the
 2   question --
 3          A.     Can you restate it?
 4          Q.     -- no matter how objectionable
 5   it was, was what was the genesis, as you
 6   understood it, for this study of the Gulf of
 7   Mexico drilling operations?
 8       MS. KARIS:
 9             Object to form.
10       THE WITNESS:
11             The genesis, as I recall, was
12   that the drilling operations had had variable
13   performance in terms of operation, personal
14   safety, and they were looking as part of the
15   overall Gulf of Mexico reorganization, to
16   find an improved organization, ultimately
17   improved performance for the drilling and
18   completion operations in the deepwater.
19   EXAMINATION BY MR. WATTS:
20          Q.     You mentioned the phrase
21   personal safety.  Explain for the finder of
22   fact, whether it's the judge or the jury,
23   what the difference between personal safety
24   is and process safety?
25          A.     Personal safety is a term that I
```

1    would use to refer to injuries to individuals

2    and it could be anything as minor as a

3    first-aid Band-Aid, as serious as a fatality.

4              Process safety has a broad

5    definition in the E&P in the refining and

6    chemical world as it relates to drilling

7    operations.  It would primarily be reference

8    to well control in terms of process safety.

9         Q.    When we talk about a process

10   safety review, that's a review of well

11   control procedures?

12        A.    No -- oh, I'm sorry, so if you

13   wanted to do a process safety review within

14   drilling operations, well control would be a

15   major component of that review.

16        Q.    In 2008, when -- or 2007, 2008

17   when you were performing this study of the

18   Gulf of Mexico drilling and completions

19   processes, did that study include a review of

20   the process safety for BP's Gulf of Mexico

21   drilling and completion operations?

22        A.    At that time, I do not recall

23   any significant concern about well

24   control/process safety.  I do know that they

25   had had an incident of moving one of the rigs

1    from one location to the other and the BOP

2    nearly missed a live oil pipeline, which was

3    a major incident and they considered it a

4    significant event, which was one of the

5    things in the background.

6         Q.    You said "at that time."  Did

7    there come a time when you performed a review

8    of the process safety for BP's Gulf of Mexico

9    drilling and completion operations?

10        A.    Not a specific one.

11        Q.    Okay.  When you first arrived,

12   you mentioned that Neil Shaw's predecessor --

13   was it Kenny Lake?

14        A.    Kenny Lang, L-A-N-G.

15        Q.    Did you work for Kenny Lang

16   originally?

17        A.    No, I never reported to Kenny

18   Lang.  He was part of the organization that I

19   worked -- when I worked with the study, I was

20   initially working for Barbara and on behalf

21   of Kenny.

22        Q.    And then Neil Shaw came in and

23   took Kenny's place?

24        A.    That's correct.

25        Q.    And so you were working on

1   behalf of --

2          A.     That's correct.  Initially again

3   for Barbara on behalf of Neil.

4          Q.     You know, I've got two notebooks

5   in front of you.  I think there's 98 exhibits

6   in there.  They're numbered with a tab and

7   I'm just going to call it Tab 1 through 98,

8   and this guy is going to give me an exhibit

9   number that I will put into the record, but

10  it won't be in the document.  Okay?  I have

11  got a lot of documents that you've written.

12  I think I've -- I feel like I know you better

13  than I do my family right now because I've

14  read so much of what you have to say.  I have

15  watched your speech in Galveston.  I've done

16  a lot of studying up on you.

17             Let me see if we can start this

18  way, if you go to Tab 51 which is in

19  Volume 1.

20         A.     (Complying) 51?

21             (Exhibit No. 2798 marked for

22  identification.)

23  EXAMINATION BY MR. WATTS:

24         Q.     Yes, sir.  This is Exhibit 2798.

25  It is a report in "Exploration and Production

1   News," entitled "Drillers Report Strong

2   Activity Despite Weakening Prices."  It's

3   dated September 22, 2006.  That's shortly

4   after you joined BP, is that right?

5        A.     That's correct.

6        Q.     If you go to the second page,

7   you're quoted in this article and it's

8   talking about land-based deaths and offshore

9   drilling deaths, and then it says:  "Lacy

10  described the higher risk associated with

11  drilling as a," quote, "mess," close quote,

12  "that," quote, "took 20 years to create,"

13  close quote.

14             Do you recall saying this?

15       A.     Yes, I do.

16       Q.     What did you mean when you said

17  that "the higher risks associated with

18  drilling are a mess"?

19       A.     The industry started in a

20  downturn in the mid-1980s.  And there was a

21  continuous reduction in the total workforce

22  over that time frame.  The level of

23  competency began, in terms of total numbers

24  of people, as the oil prices dropped in

25  mid-'80s and then subsequently in the late

1    '90s there were major mergers,

2    reorganizations.

3              So effectively, what my

4    reference to was that the safety performance

5    had been impacted by the decrease in

6    experience levels and in terms of the total

7    population, experience of total population

8    within the drilling and organizations both in

9    the contractors and the operators.

10        Q.    Okay.  When you talk about the

11   industry, you're talking about offshore

12   drilling?

13        A.    I believe this comes from a

14   speech that I gave at the IDC conference, I

15   think, in February of 2006.

16        Q.    I think you're right.  My point

17   is that when you say that, you know, the

18   risks that we're seeing in -- are a mess,

19   these higher risks, you're talking about the

20   offshore drilling industry?

21        A.    I was referring primarily to the

22   offshore drilling industry and, in

23   particular, to the deepwater segment of the

24   offshore industry.

25        Q.    And the context of this mess

```
 1    that you were describing is that the
 2    deepwater offshore drilling industry, because
 3    of a reduction in price, beginning with the
 4    bust in the 1980s, there was a lot of
 5    contraction of experienced offshore drilling
 6    personnel.  Agree?
 7         MS. KARIS:
 8                   Object to form.
 9         THE WITNESS:
10                   So in giving this speech that I
11    gave, I believe it was from the forum where
12    we were talking about the demographics in the
13    drilling organizations and in terms of the
14    drilling contractors and the overall
15    workforce.  This reference in the speech was
16    around the challenges to rebuild the
17    competencies and the organization and the
18    numbers of people because the deepwater
19    industry was on the first step of a major
20    expansion.
21                   So I expressed concerns about
22    how we would meet the next two to three years
23    expansion when we had dropped off so many
24    people in the last 20 years.
25    EXAMINATION BY MR. WATTS:
```

```
 1          Q.      Sure.  This is in 2006.  The
 2     appetite for energy and, therefore, the price
 3     had begun to rise at this point, is that
 4     right?
 5          A.      I seem to recall that.
 6          Q.      And, therefore, the demand
 7     increased and the attempt to provide supply
 8     from offshore drilling operations increased
 9     as a result as well, right?
10          MS. KARIS:
11               Object to form.
12          THE WITNESS:
13               My perspective would be starting
14     in about 2001, 2002, just post the major
15     mergers in late 1990, there have been
16     significant directional expansions by major
17     oil companies into the deepwater expanding
18     the deepwater fleet through the contractors
19     and there was a serious need for people both
20     in the operators and contractors.
21     EXAMINATION BY MR. WATTS:
22          Q.      And your concern was this
23     explanation into the deep water was occurring
24     at a time where we had fewer people with less
25     experience?
```

```
 1            MS. KARIS:
 2                 Object to form.
 3       EXAMINATION BY MR. WATTS:
 4            Q.    And that was the mess you were
 5       referring to, right?
 6            MS. KARIS:
 7                 Object to form.
 8            THE WITNESS:
 9                 My attempt at that conference
10       was to highlight an issue of expanding fleet
11       in a limited pool of experience in both the
12       contractors and in the operators, to register
13       that concern, yes.
14       EXAMINATION BY MR. WATTS:
15            Q.    When you were expanding a fleet
16       of deepwater offshore drilling platforms and
17       you have a dearth of experienced talent, does
18       that make process safety management even more
19       important?
20            A.    Process safety management is
21       always vital at any point, any day, any time
22       of the cycle.
23                 (Exhibit No. 2799 marked for
24       identification.)
25       EXAMINATION BY MR. WATTS:
```

 1          Q.    If you go to Tab 2.  This is

 2     Exhibit 2799.  This is an e-mail that you

 3     wrote to Neil Shaw on November 21st of 2007.

 4     It attaches a PowerPoint entitled "XT Summary

 5     Neil Draft No. 1."

 6               Do you see that, sir?

 7          A.    Yes, I do.

 8          Q.    If you go to the second page,

 9     it's a PowerPoint entitled "Neil's e-mail."

10     This is a PowerPoint that you created for

11     Neil Shaw, right?

12          A.    Yes, it is.

13          Q.    If you go to the next page,

14     which is Page 2 of the PowerPoint, under the

15     title "Draft Revised Principles," there is a

16     number of bullet points and I think the 7th

17     bullet point says "Real Intensity on Drilling

18     Performance Management."

19               Can you describe what you mean

20     by that?

21          A.    At the time this was written, it

22     was a reference to the variability of

23     drilling performance within the BP Gulf of

24     Mexico wells in 2006 and 2007.

25          Q.    What does variability of

1     drilling performance mean?

2          A.     Many operators benchmark their

3     drilling performance externally or

4     internally.  They have a number of what they

5     call key performance indicators, measures.

6     In many cases there will be a measure --

7     common measure is days per 10,000 feet.

8     There's a measure of nonproductive time, a

9     number of other measures.  That reference to

10    drilling performance management and

11    variability would be as it relates to how

12    they benchmark externally and how they

13    benchmark relative to their annual plan, what

14    they had achieved relative to those key

15    performance indicators.

16         Q.     So is drilling performance

17    management important not merely for key

18    performance indicators, but is it also

19    important from the standpoint of safety?

20         A.     Drilling performance management

21    would be frequently used as a holistic term

22    to include personal safety, process safety,

23    which includes well control, cost management,

24    completions outcomes, production of the well,

25    et cetera.

```
 1          Q.     Now, the context of your saying
 2     we need real intensity of drilling
 3     performance management, this is part of the
 4     effort that you're undertaking at BP to
 5     implement process safety, among other things,
 6     while we're doing this expansion with a
 7     relative dearth of experienced talent?
 8          MS. KARIS:
 9               Object to form.
10     EXAMINATION BY MR. WATTS:
11          Q.     Is that right?
12          MS. KARIS:
13               Object to form.
14          THE WITNESS:
15               You will have to restate that
16     one more time.
17     EXAMINATION BY MR. WATTS:
18          Q.     Sure.  Let me try again.  The
19     previous year you talked about this mess that
20     we've already described.
21          A.     Correct.
22          Q.     Here you're saying we need real
23     intensity on drilling performance management.
24     That includes, as you've already told me,
25     process safety.  Right?
```

1      A.    That's -- so drilling

2  performance management, as I referred to

3  here, would be all encompassing, yes.

4      Q.    Now, it's all encompassing

5  including process safety with respect to a

6  workforce that you are concerned is not as

7  experienced as it used to be, right?

8      MS. KARIS:

9           Object to form.

10      THE WITNESS:

11           So I would say that at the time

12  from early 2000 through the time I gave that

13  speech and on into my full -- full tenure

14  with BP, I always had concern about

15  competencies in the workforce, in the

16  drilling contractors because of the expansion

17  of the fleet.

18  EXAMINATION BY MR. WATTS:

19      *Q.    And in addition to the*

20  *competency issue caused by the expansion of*

21  *the fleet, the place and the type of work*

22  *being done is deepwater highly technically*

23  *challenging work, agree?*

24      *A.    In the relation to what we were*

25  *attempting to do in my professional view,*

1    *deepwater is technically challenging to the*

2    *point that it is an outlier of -- far more*

3    *technically challenging than anything we've*

4    *historically done in our business, yes.*

5         *Q.     As a result of it being an*

6    *outlier, that deepwater is far more*

7    *technically challenging than anything else*

8    *we've done in our business, if the drilling*

9    *performance management is not handled*

10   *correctly, it can be far more dangerous than*

11   *anything you've done before?*

12        MS. KARIS:

13             Object to form.

14        THE WITNESS:

15             *I would state that because of*

16   *the technical challenges and any potential*

17   *competency gaps, the potential risk and*

18   *potential consequences are significantly*

19   *greater than any other area that we would*

20   *normally manage.*

21             *(Exhibit No. 2900 marked for*

22   *identification.)*

23   EXAMINATION BY MR. WATTS:

24        Q.     Following up on that.  Let me

25   take you to Tab 3 which is an e-mail you

1    wrote a week later, this is another draft of

2    the same PowerPoint, it's Exhibit 2900, and

3    we can see a PowerPoint entitled "Deepwater

4    Drilling and Completions Organizational

5    Redesign," dated November 26th of 2007.  Do

6    you see that, sir?

7         A.    Yes, sir.

8         Q.    Now, on the lower right-hand

9    corner there are Bates page numbers and I

10    won't read them all in, but the last three

11    digits, if you go to the one that ends 030.

12    Are you with me?

13         A.    Yes, the slide that says

14    "Appraise/Select Conclusions"?

15         Q.    Yes, sir.  The first bullet

16    point under that slide says:  "Industry

17    conditions are deteriorating and in turn

18    creating greater risk and significant

19    supplier performance issues."

20              Is that correct?

21         A.    That's correct, that's the way

22    it reads.

23         Q.    This is a PowerPoint that you

24    prepared, right?

25         A.    That's correct.

1          *Q.     In the speaker's notes below the*
2     *slide, you write:  "We need to remind*
3     *ourselves deepwater is a high risk, high*
4     *reward, and the most technically challenging*
5     *work in drilling and completions."*
6               *Correct?*
7          *A.     That's correct.*
8          *Q.     And that's something that you*
9     *believed at the time and you believe today,*
10    *right?*
11         *A.     That is correct.*
12         *Q.     And so the nature of what is*
13    *being done out in the deepwater is the most*
14    *high risk, high reward work that BP does,*
15    *true?*
16         MS. KARIS:
17              Object to form.
18         THE WITNESS:
19              *It is in my view, from a*
20    *drilling completions professional*
21    *perspective, deepwater is the highest risk*
22    *set of operations that I have managed in my*
23    *career.*
24    EXAMINATION BY MR. WATTS:
25         Q.     And it is the highest risk

```
 1    operations that you've managed in your career
 2    at a time when the industry has a mess as a
 3    result of this contraction of experienced
 4    workforce?
 5         MS. KARIS:
 6              Object to form.
 7         THE WITNESS:
 8              The reference to the mess, of
 9    course, was back in 2006, early 2006 relative
10    to the expansion in the fleet.  It is -- it
11    had been before that and was an ongoing
12    concern of mine about competencies in
13    deepwater.
14    EXAMINATION BY MR. WATTS:
15         Q.    As a result, further down the
16    page, you say:  "We need to focus on a
17    performance culture, excellent execution, no
18    surprises, no rationalizations, no excuses."
19              Did you write that?
20         A.    That's correct.
21         Q.    And you felt that that was
22    absolutely critical to the safe performance
23    of deepwater drilling operations, right?
24         MS. KARIS:
25              Object to form.
```

```
 1              THE WITNESS:
 2                   My reference at this time was
 3      specifically to the Gulf of Mexico deepwater
 4      D&C organization in BP.
 5      EXAMINATION BY MR. WATTS:
 6         Q.      You believed, in the end of
 7      2007, that BP's deepwater drilling operations
 8      were at such a state that they needed to be
 9      fixed.
10              MS. KARIS:
11                   Object to form.
12              THE WITNESS:
13                   In summer, fall of '07, I was
14      asked to conduct a review.  This is part of
15      that review on the state of the Gulf of
16      Mexico D&C operations which at the time was
17      under the direction of Harry Thierens.  I was
18      asked to assist Harry in this review and make
19      recommendations to Neil Shaw and Barbara
20      Yilmaz.
21      EXAMINATION BY MR. WATTS:
22         Q.      And you made recommendations on
23      how to fix B&P's -- I mean BP's drilling and
24      completion deepwater operations, right?
25         A.      At the time this was produced,
```

 1    these are my recommendations.

 2              (Exhibit No. 2901 marked for

 3    identification.)

 4    EXAMINATION BY MR. WATTS:

 5         Q.    Let me take you to Tab 4 which

 6    is an e-mail you wrote on December the 14th

 7    of 2007 to Neil Shaw.  It's Exhibit 2901.

 8              And in the e-mail you say:

 9    "I've summed up my discussion with Barbara on

10    Gulf of Mexico roles in the first slide

11    pack."

12              Do you see that, sir?

13         A.    Yes, sir.

14         Q.    If you go to the next page of

15    the document, it says:  "Neil/Kevin

16    discussion outline, December 15th, 2007."

17         A.    Yes.

18         Q.    The second bullet point talks

19    about a confirmation of priorities and the

20    first bullet point under that is:  "'Fixing'

21    Gulf of Mexico drilling and completions is

22    the most critical issue for drilling and

23    completions and the Gulf of Mexico."

24              Is that right?

25         A.    That's correct.

1          Q.      You had done this performance

2     review and assessment and, in effect, came up

3     with the conclusion that the drilling and

4     completion operations in the Gulf of Mexico

5     needed to be fixed, right?

6          MS. KARIS:

7                   Object to form.

8          THE WITNESS:

9                   I used the term, in quotations,

10    "fixing," yes.

11    EXAMINATION BY MR. WATTS:

12         Q.      How did you set about to try to

13    fix the drilling and completion operations

14    for BP in the Gulf of Mexico from a

15    standpoint of process safety?

16         A.      I don't recall that we had a

17    specific highlighted effort on process

18    safety.  It was an all-encompassing

19    reorganization, looking at all processes

20    which included process safety, well control.

21    Some areas were more obvious in need of

22    improvements and others were not as obvious.

23         Q.      What process safety areas were

24    in need of improvement in BP in the Gulf of

25    Mexico drilling operations in deepwater?

1          MS. KARIS:

2               Object to form.

3          THE WITNESS:

4               At the time, I don't recall a --

5     other than that one incident which I believe

6     was with the OCEAN CONFIDENCE, that they had

7     had any significant, obvious incident or that

8     there were any matrix or measures that showed

9     any extraordinary issues with well control

10    and process safety at the time.

11    EXAMINATION BY MR. WATTS:

12         Q.    When you joined BP, were you

13    made aware of past blowouts that BP had had

14    in its deepwater operations?

15         A.    I was -- I do not recall

16    discussions of any significant well control

17    event in BP with the exception of one that

18    occurred in Vietnam, which was -- I don't

19    believe a deepwater operation.

20         Q.    Do you recall learning of two

21    separate blowouts occurring on the OCEAN KING

22    in the Gulf of Mexico in 2002?

23         A.    I might have heard reference to

24    that, but I did not have any knowledge of it.

25         Q.    Were you given any knowledge

```
 1    with respect to a gas rupture that BP had on
 2    the Forties Alpha in the North Sea in 2003?
 3              A.    No, I was not.
 4         MS. KARIS:
 5                   Object to form.
 6                   Can I just ask the volume to be
 7    turned up because we're still having a hard
 8    time hearing because there's blowers right
 9    over our heads.
10    EXAMINATION BY MR. WATTS:
11              Q.    Were you made aware of a blowout
12    that occurred off the coast of Egypt on the
13    GSF ADRIATIC IV on a BP operation in 2004?
14              A.    No, I was not.
15         MS. KARIS:
16                   Object to form.
17    EXAMINATION BY MR. WATTS:
18              Q.    Were you made aware of an
19    incident that occurred in the North Sea on
20    the SCHIEHALLION where significant
21    hydrocarbons were released?
22              A.    No, I was not.
23              Q.    Were you made aware of an
24    incident that occurred in Angola in the
25    Plutonio Field in 2008 which caused them to
```

1    shut down the operations?

2         MS. KARIS:

3              Object to form.

4         THE WITNESS:

5              I might have heard reference to

6    that.  That was after I had responsibility

7    for that area.

8    EXAMINATION BY MR. WATTS:

9         Q.    Were you made aware of a problem

10   that BP had in 2008 in the Caspian Sea near

11   Azerbaijan with respect to a blowout?

12        MS. KARIS:

13             Object to form.

14        THE WITNESS:

15             I do not recall anything in

16   2008.  I seem to recall a problem in 2007 in

17   Azerbaijan.

18   EXAMINATION BY MR. WATTS:

19        Q.    With respect to process safety,

20   if you as the vice president of drilling and

21   completions were not made aware of these

22   blowouts that I just described, were they

23   communicated to the line workers in the Gulf

24   of Mexico?

25        MS. KARIS:

```
 1                    Object to form.
 2            THE WITNESS:
 3                    I did not see any compilation of
 4    major well control events or learnings from
 5    major well control events in my time at BP.
 6    My background knowledge on any significant
 7    event would have come from Harry Thierens
 8    while he discussed several well control
 9    events or issues that he had been involved
10    with.
11    EXAMINATION BY MR. WATTS:
12            Q.    If well control events are put
13    into a file cabinet and not communicated to
14    line workers, is that good process safety
15    management, in your view?
16            MS. KARIS:
17                    Object to form.
18            THE WITNESS:
19                    In my view, I would want to know
20    not only any company's well control
21    incidents, but those that are occurring in
22    the industry for learning purposes.
23    EXAMINATION BY MR. WATTS:
24            Q.    Sure.  With respect to the
25    company's well control incidents that I just
```

1    described, are you aware of any communication

2    to the line workers out on the rig, hey, we

3    had a blowout, here is what we learned, here

4    is how you prevent it in the future, with

5    respect to all these different well control

6    events that I described to you?

7         MS. KARIS:

8              Object to form.

9         THE WITNESS:

10             I'm not aware of any.

11   EXAMINATION BY MR. WATTS:

12        Q.    Now, at the time that you all

13   are in deepwater, you guys were going into

14   more and more technically challenging fields

15   as well, is that right?

16        A.    I -- at the time that I had the

17   Gulf of Mexico operations, you could define

18   some of the fields that we were attempting to

19   drill, explore and appraise as more

20   challenging than past years, yes.

21        Q.    I think you've been quoted in

22   some technical publications as saying that

23   we're drilling wells now that we can't even

24   complete?

25        A.    That is correct.  That would

1    have come from my speech in October of 2009,
2    yes.
3         Q.    In October of 2009 BP was
4    drilling into wells that were so technically
5    challenging, it lacked the technology to even
6    complete some of them?
7         MS. KARIS:
8              Object to form.
9         THE WITNESS:
10              The reference in that would
11    apply to many companies in that the bottom
12    hole pressures and the ability to complete
13    these wells, based on pressures and
14    temperatures, did not currently exist in
15    terms of completion equipment that would
16    have -- in reference to the BP wells at the
17    time, that would have been specific to the
18    Kaskida development and also the Will Kay
19    deep gas well as well.
20    EXAMINATION BY MR. WATTS:
21         Q.    But even with respect to
22    something like the Macondo that's not as
23    challenging technically as the Kaskida was
24    going to be, the bottom line is BP was
25    drilling deeper than it had in the past, into

1    higher pressures and higher temperatures that

2    it had in the past, is that right?

3         MS. KARIS:

4              Object to form.

5         THE WITNESS:

6              So the way I would -- the way I

7    would reference this is that there is a

8    significant difference being able to drill,

9    and safely drill, and ultimately complete for

10   production, and that was what that reference

11   referred to.

12   EXAMINATION BY MR. WATTS:

13        Q.    If you drill into higher

14   pressures, is that a more dangerous

15   situation?

16        A.    Not necessarily.

17        Q.    Can it be?

18        MS. KARIS:

19             Object to form.

20        THE WITNESS:

21             It can be.

22   EXAMINATION BY MR. WATTS:

23        Q.    How can drilling into higher

24   pressures be a more dangerous situation than

25   drilling into lower pressures?

1          A.     Inherently there is only one

2     difference in that the amount of the influx

3     could be greater per minute and, therefore,

4     be harder to establish well control.

5          Q.     Okay.  And when you say "harder

6     to establish well control," the higher the

7     pressure you're drilling into, the velocity

8     with which the hydrocarbons are coming up the

9     wellbore is increased and, therefore, your

10    margin of error is decreased.  Agree?

11         A.     The risk -- in terms of well

12    control, basic well control principles

13    established to minimize what's referred to as

14    the influx or kick size.  If you have higher

15    pressures, then the ability to respond to a

16    kick size is less because of the time factor,

17    yes, sir.

18         Q.     Okay.  So just looking at the

19    50,000 foot view of what we were doing out

20    there, BP was going into higher pressures,

21    higher temperatures with less margin of error

22    while the industry was in a state of mess

23    with fewer experienced personnel?

24         MS. KARIS:

25                Object to the form.

1       THE WITNESS:

2            The entire industry was ramping

3   up into the deepwater at a time that the

4   numbers of people with equivalent experience

5   levels on the deepwater rigs and in the

6   office of the operators were not equivalent

7   to previous years.

8   EXAMINATION BY MR. WATTS:

9       Q.    Okay.  So putting it succinctly,

10  we were going into higher pressures and

11  higher temperatures, more dangerous

12  situations potentially with less experienced

13  people?

14      MS. KARIS:

15           Object to form.

16      MR. STANLEY:

17           Asked and answered.

18  EXAMINATION BY MR. WATTS:

19      Q.    Go ahead.

20      A.    I'm sorry, can you --

21      MR. STANLEY:

22           Sure, go ahead.

23  EXAMINATION BY MR. WATTS:

24      Q.    Putting it succinctly, the

25  deepwater operations were going into higher

1    pressures, higher temperatures, higher

2    potential danger, with personnel who were

3    less experienced than they had been in the

4    past?

5          MS. KARIS:

6                Object to form.

7          MR. STANLEY:

8                Same objection.

9          THE WITNESS:

10               My -- my statement, and clearly

11   this was under my accountabilities, were

12   there were no inherent extraordinary risks

13   that could not be safely managed.

14   EXAMINATION BY MR. WATTS:

15         Q.    Provided they were managed.

16         A.    As in a well control onshore,

17   offshore shelf, et cetera.  These were, with

18   the right organization controls, manageable.

19         Q.    And what you're saying is that

20   even though we're going into higher

21   pressures, higher temperatures, higher

22   potential danger with less experienced

23   personnel, if we manage those personnel, you

24   can still effectively and safely complete the

25   operation?

1           MS. KARIS:

2                   Object to form.

3           THE WITNESS:

4                   I believed, and still do

5       believe, that under those conditions, you can

6       execute a well safely and maintain well

7       control.

8       EXAMINATION BY MR. WATTS:

9           Q.      But would you agree with me,

10      that if you have less experienced personnel

11      going into more potentially dangerous, higher

12      temperature, higher pressure wells, that the

13      need for good process management is even more

14      acute than it otherwise would be?

15          MS. KARIS:

16                  Object to form.

17          THE WITNESS:

18                  At any point, and I think it's a

19      critical point, is it's very difficult to

20      quantify risk at a given day or a given week

21      because of the dynamic nature.

22                  The appropriate risk approach is

23      that there is always a high likelihood of

24      well control incident regardless and,

25      therefore, good controls which include

```
 1    oversight, competency, assurance process are
 2    mandatory, whether it's deepwater, high
 3    pressure, high temperature, or onshore, lower
 4    48.
 5    EXAMINATION BY MR. WATTS:
 6         Q.    Now, establishing these
 7    controls, as you put it, is critical to being
 8    able to safely drill these challenging wells,
 9    agreed?
10         MS. KARIS:
11              Object to form.
12         THE WITNESS:
13              Appropriate processes and
14    controls are required to maintain well
15    control.
16    EXAMINATION BY MR. WATTS:
17         Q.    And in order to establish
18    appropriate processes and controls, one thing
19    that you were asked to do was to go out and
20    study the present processes and identify
21    gaps, if you will, in what needed to be
22    improved, is that right?
23         A.    I was asked to look at the Gulf
24    of Mexico organization and make my
25    recommendations on changes in organization or
```

1     roles or processes, yes.

2          Q.     But what I see in the documents,

3     this concept of gaps, you know what I'm

4     talking about, why don't you just describe

5     what you mean by identifying gaps?

6          A.     If -- I used the term "gaps" in

7     relation to 2007, BP's organization at the

8     time had different drilling teams in

9     different assets.  It was not a single

10    drilling completion organization.

11               In my experience, I had not

12    seen, and I believe I state here somewhere,

13    this was the only drilling completion

14    organization I had ever seen in that shape

15    for offshore operations, let alone deepwater.

16         Q.     What do you mean by gaps?

17         A.     Gaps could refer to anything

18    from are there consistent standards or

19    processes between the asset teams?  Is there

20    one way of doing things for a particular

21    procedure?  The gaps could also refer to the

22    benchmark drilling performance, failure to

23    meet plan.

24         Q.     Okay.

25         A.     The matrix.

```
 1                    (Exhibit No. 2902 marked for
 2       identification.)
 3       EXAMINATION BY MR. WATTS:
 4            Q.    Go to Tab 1 and let's follow up
 5       on this gap identification for a second.
 6       Tab 1 is Exhibit 2902.  This is an e-mail
 7       chain including you in November of 2008.  I
 8       want to refer you to the e-mail that you
 9       wrote at the bottom half of Page 1 on
10       November the 8th.  About six lines down you
11       write:  "I believe we should review the gaps
12       and needs of the current organization,
13       discuss the options in some detail and allow
14       your leadership team to express any concerns
15       and specify needs in the final design."
16                    Did I read that correctly?
17            A.    I'm not sure I found that one
18       yet.  This is Tab 1?
19            Q.    Tab 1.
20            A.    Tab 1, okay.
21            Q.    Down here, six lines down on
22       the --
23            A.    Okay.  "I believe we should
24       review the gaps and needs of the current
25       organization, discuss the options in some
```

```
 1    detail, and allow your leadership team to
 2    express any concerns and specify needs in the
 3    final design."
 4         Q.    All right.  Is that another way
 5    of saying basically, I need to do this
 6    review, we should identify these gaps in
 7    order to arrive at what the appropriate
 8    organizational design, controls ought to be?
 9        MS. KARIS:
10             Object to form.
11        THE WITNESS:
12             This statement refers to the
13    fact that we had completed the review.  We
14    had discussed it with the D&C professionals
15    on the team and were ready to discuss it with
16    Neil Shaw and his leadership team.
17             (Exhibit No. 2903 marked for
18    identification.)
19    EXAMINATION BY MR. WATTS:
20         Q.    Okay.  Let me fast forward with
21    you to Tab 92 in the second volume.  This is
22    Exhibit 2903.  It's -- the document is
23    entitled "SEEAC pre-read for March 24th,
24    2010, Exploration and Production's Approach
25    for U.S. Regulatory Compliance."
```

1                    Do you see that, sir?

2         A.      Yes, I do.

3         Q.      Of course, this document is

4    generated after you left the company, but we

5    will get to that later.  Go to Page 5 or

6    Bates page number ending 284.

7         A.      (Complying).

8         Q.      In this document, it says:

9    "Group S&O audits."

10                   What is S&O?

11        A.      Safety and operations, I

12   believe.

13        Q.      "Assessments of U.S. Exploration

14   and Production Regulatory Programs and

15   Compliance."

16                   It says:  "During the past three

17   years, nine audits have been conducted by

18   group safety and operation audit.  Gaps

19   identified were primarily in the area of

20   chemical/hazardous material management,

21   process safety and personal safety."

22                   Do you see that, sir?

23        MS. KARIS:

24                   Object to form.

25        THE WITNESS:

1                    Yes, I do.

2      EXAMINATION BY MR. WATTS:

3           Q.     These audits that were

4      conducted, were these audits conducted as

5      part of the process that you undertook to

6      study the drilling and completion operations?

7           MS. KARIS:

8                    Object to form.

9           THE WITNESS:

10                   I don't recall an S&O process

11     safety -- I don't recall an S&O audit on

12     drilling operations during my tenure in the

13     Gulf of Mexico.  I believe there was an S&O

14     audit on one of the assets at sometime

15     because I recall discussing that with Curtis

16     Jackson, the HSSE manager or director, and

17     the process safety, as it is -- was referred

18     to, process safety at the time I was there

19     primarily related to process facilities,

20     production facilities, loss of primary

21     containment, hydrocarbon releases.  It rarely

22     was applied into the drilling and completion

23     operations.

24     EXAMINATION BY MR. WATTS:

25          Q.     I'm sorry, your last answer, I

1    lost the end of it.

2         A.     The process safety reviews had

3    not been structured yet to cover drilling

4    completion operations.

5         Q.     Okay.  So there are plenty of

6    documents talking about the need to do that,

7    agreed?

8         A.     I couldn't say.

9         Q.     At the time that you left the

10   company at the start of 2010, had a process

11   safety review been conducted with respect to

12   BP's deepwater drilling and completion

13   operations in the Gulf of Mexico?

14        A.     I don't recall one.

15        Q.     Okay.  That's something that you

16   wanted to have happen, right?

17        A.     I don't recall specifically

18   requesting for a process safety audit of Gulf

19   of Mexico drilling completions.

20               (Exhibit No. 2904 marked for

21   identification.)

22   EXAMINATION BY MR. WATTS:

23        Q.     If you would go to Tab 5,

24   Exhibit 2904.  This is dated January 7th,

25   2008.  It's a draft presentation and

1    appraise/select white paper.  And, again, if
2    you go to the next page, it's another version
3    of this PowerPoint on the Gulf of Mexico
4    drilling and completion organizational
5    redesign.  Do you see that, sir?
6         A.    I do.
7         Q.    If you go to the Bates page
8    number ending 539.
9         A.    (Complying).
10        Q.    On this slide, it says:  "D&C,
11   drilling and completions project support
12   systematic issues."
13             The second bullet point says:
14   "BP drilling and completions has not
15   effectively implemented and standardized
16   project management from a discipline
17   perspective.  Gulf of Mexico drilling and
18   completions must do so."
19             Do you see that, sir?
20        A.    Yes.
21        Q.    This is something that you
22   wrote, right?
23        A.    Yes, I believe so.
24        Q.    What did you mean when you said
25   that Gulf of Mexico drilling and completions

```
 1     must effectively implement and standardize

 2     project management from a discipline

 3     perspective?

 4          A.     In this particular bullet, the

 5     term "project management" relates to the D&C

 6     component of major project management.  So,

 7     major capital projects.

 8          Q.     Now, you have written that with

 9     respect to the concept of managing a risk in

10     the drilling and completion, that begins with

11     well planning?

12          A.     That is correct.

13          Q.     Why is well planning important

14     to the ability of an organization like BP to

15     manage risk?

16          A.     In my professional judgment and

17     experience, every single well starts with a

18     risk assessment which leads to a well design

19     which leads to a well execution plan and

20     those are the three main components that

21     would be typical of a standardized well

22     design execution process.

23          Q.     Why is it important to follow

24     the well design plan as opposed to deviating

25     from it on an ad hoc basis?
```

1           MS. KARIS:

2                  Object to form.

3           THE WITNESS:

4                  In all cases, if you are not

5      following the plan, there is a high

6      probability of a negative outcome.  Plans do

7      change and there are frequently issues that

8      come up on the day or on the week that need

9      to be risk assessed and the plan changed

10     accordingly after the risks are assessed and

11     then the plan is endorsed for change.

12     EXAMINATION BY MR. WATTS:

13           Q.    If you change a plan without

14     doing an appropriate risk assessment, what is

15     that going to do to the likelihood of having

16     a negative outcome?

17           MS. KARIS:

18                  Object to form.

19           THE WITNESS:

20                  In a broad way, it would be hard

21     to tell.

22     EXAMINATION BY MR. WATTS:

23           Q.    Is it a good idea to change a

24     plan without doing an appropriate risk

25     assessment?

```
 1          MS. KARIS:
 2               Object to form.
 3          THE WITNESS:
 4               Every oil company struggles with
 5     the concept of risk assessment that is
 6     commensurate with all risk and each company
 7     has different requirements, different
 8     procedures for doing that.
 9     EXAMINATION BY MR. WATTS:
10          Q.    Is it a good idea to fail to
11     assess risks before you change a plan?
12          A.    Not in my view.
13          Q.    Okay.
14          MR. WATTS:
15               Let's take a break so we can
16     change the videotape.
17          THE VIDEOGRAPHER:
18               We're going off the record at
19     9:28.  This is the end of Tape 1.
20               (Whereupon, a brief recess was
21     taken.)
22          THE VIDEOGRAPHER:
23               We're back on the record at
24     9:39.  This is the beginning of Tape 2.
25     EXAMINATION BY MR. WATTS:
```

```
 1          Q.      Mr. Lacy, on October the 5th of
 2     2010, did you give a keynote luncheon address
 3     to the Society of Petroleum Engineers in
 4     Galveston, Texas entitled "Restoring
 5     Integrity to Deepwater"?
 6          A.      Yes, I did.
 7                  (Exhibit No. 2905 marked for
 8     identification.)
 9     EXAMINATION BY MR. WATTS:
10          Q.      I've watched that videotape and
11     I had a court reporter type up what you said.
12     I'm going to hand you that.  It's Tab 96,
13     Exhibit 2905, and I want to refer you to
14     Page 21, Lines 15 through 23.  And I have a
15     question for you.
16          A.      Which page?
17          Q.      Page 21.
18          A.      Okay.
19          Q.      Lines 15 through -- it will be
20     on the next page, before Page 22, 15 through
21     23.
22          A.      Okay.
23          Q.      On Line 15, you say:  "I do know
24     that what we currently do in terms of
25     company-by-company processes and
```

1     self-verification is inadequate and is wrong.

2                     "The drilling contractor has to

3     be accountable for the confidence of their

4     people, the integrity of their equipment and

5     they have to be able to hold each operator to

6     a standard.  Therefore, there must be a

7     standard so they can push back and say,

8     'stop.'"

9                     Do you see that, sir?

10        A.     Yes, I do.

11        Q.     That is something you said in

12    your speech to the Society of Petroleum

13    Engineers, right?

14        A.     Not exactly.  The term on Line

15    19, where it says "confidence" should be

16    "competence."

17        Q.     Competence.

18        A.     Competence.

19        Q.     Okay.  Thank you.  With that one

20    change on Line 19, is that what you told the

21    Society of Petroleum Engineers?

22    MS. KARIS:

23                     Object to form.

24    THE WITNESS:

25                     The -- starting with Line 18,

1    the line would read:  "The drilling

2    contractor has to be accountable for the

3    competence of their people, the integrity of

4    their equipment, and they have to be able to

5    hold each operator to a standard."  That's

6    correct.

7    EXAMINATION BY MR. WATTS:

8         Q.     "Therefore, there must be a

9    standard so they can push back and say

10   'stop.'"

11        A.     That is correct.

12        Q.     What I want to ask you is when

13   you say "there must be a standard so they can

14   push back and say 'stop,'" what are you

15   referring to there?

16        A.     In this particular speech and

17   when I use the term "industry standards," I

18   meant to say that there are no common

19   technical standards, design standards,

20   assurance standards for deepwater endorsed

21   and utilized by multiple companies.

22        Q.     And it's your view that there

23   should be?

24        A.     That is correct.

25        Q.     And the idea is if you had a

1    standard, that a contractor could push back

2    against an operator and say stop, because

3    you're violating a standard, in effect?

4         A.    My intent in this -- in these

5    sets of comments was it would be easier for

6    both the contractor and the regulator if

7    there was a common industry standard for any

8    type of questions or concerns to be

9    registered.

10        Q.    What is OMS within BP?

11        A.    It is the operational management

12   system, I believe.

13        Q.    Okay.  And what is that intended

14   to do?

15        A.    In my understanding, during

16   primarily 2009, the OMS standard was designed

17   to be a comprehensive personal safety and

18   process safety management system.

19        Q.    Did you play a role in the

20   development of the OMS system at BP?

21        A.    Not at BP.  In my role in the

22   Gulf of Mexico, I was part of the Gulf of

23   Mexico leadership team who was implementing

24   the framework of OMS for the Gulf of Mexico.

25        Q.    By the time you left in early

```
 1     2010, had the entirety of the OMS system been
 2     rolled out to the Gulf of Mexico drilling and
 3     completion operations?
 4          A.     I do not believe so.
 5          MR. STANLEY:
 6               I'm going to object to the form.
 7     I believe he left in late '09.
 8          MR. WATTS:
 9               I'm sorry.
10          THE WITNESS:
11               My departure in role was
12     December -- mid-December of 2009.
13     EXAMINATION BY MR. WATTS:
14          Q.     Let me reask the question and
15     take the assist.
16               When you left the company in the
17     middle of December 2009, had the entirety of
18     BP's operations management system been rolled
19     out with respect to the Gulf of Mexico
20     drilling and completion operations?
21          A.     I do not believe so.  I seem to
22     recall that was one of our -- the framework
23     had been established and one of the goals
24     that had been intended for 2010 was
25     implementation.
```

```
 1              Q.      Okay.
 2              A.      Which would include roll out.
 3              Q.      When we talk about "roll out,"
 4      what do we mean?
 5              A.      It would be a clear explanation
 6      to all members of that particular staff what
 7      OMS meant, how it related to the previous
 8      procedures, what was new, what was different
 9      and what was not.
10              Q.      Okay.  With respect to the roll
11      out of OMS, were you going to play a role in
12      that before you left the company?
13              A.      I certainly would have in a
14      leadership role as the VP.
15              Q.      Prior to the roll out of the
16      OMS, as part of the OMS system, was there a
17      risk prioritization and mitigation that was
18      to be undertaken?
19              A.      I'm not sure I understand the
20      question, so...
21              Q.      Let me just take you to Tab 16
22      and ask you about a document that references
23      that.
24              A.      Okay.
25                      (Exhibit No. 2906 marked for
```

```
 1    identification.)

 2    EXAMINATION BY MR. WATTS:

 3         Q.    Tab 16 is an e-mail from Yvonne

 4    Prevallet to a number of people including

 5    yourself, dated April the 9th of 2009.  The

 6    subject is "Performance of Pfest Slides Post

 7    Discussion."

 8              Do you see that, sir?

 9         A.    Yes, sir.

10         Q.    This is Exhibit 2906, for the

11    record.  We go to the 2009 performance pfest

12    slides, they're dated April 9, 2009, is that

13    right?

14         A.    Yes.

15         Q.    If you could go to Bates Page

16    No. 744.

17         A.    (Complying).

18         Q.    Under the slide HSSE -- by the

19    way, what is HSSE?

20         A.    Health, safety, security and

21    environment.

22         Q.    That's the organization at BP

23    that's in charge of safety, is that right?

24         MS. KARIS:

25              Object to form.
```

1          THE WITNESS:

2               At the time -- at my time in the

3     Gulf of Mexico, HSSE was the group that had

4     the functional responsibility for the safety

5     management systems which -- in the legacy

6     systems, yes.

7     EXAMINATION BY MR. WATTS:

8          Q.     Now, part of the safety

9     management system, there is a process safety

10    plan referred to in the lower right-hand

11    corner of the slide.  Do you see that?

12         A.     I do.

13         Q.     There's three bullet points, one

14    is safety equipment, maintain track record of

15    100 percent inspections.  Two is risk

16    prioritization and mitigation, update asset

17    risk registers and ensure follow through of

18    red risk mitigation plans.  And the third is

19    learning with continuous improvement the use

20    of process safety scorecard data and

21    management reviews to drive performance

22    improvements in process safety, improve root

23    cause analysis, action development, and

24    transfer of lessons learned.

25               Do you see, that, sir?

```
 1          A.      I do.
 2          Q.      So this process safety plan is
 3     kind of a three-pronged approach?
 4          A.      This slide indicates three major
 5     areas in the presentation.
 6          Q.      All right.  And the second area
 7     is risk prioritization and mitigation.
 8     Update asset risk registers and ensure follow
 9     through of red risk mitigation plans.
10                  What is a red risk mitigation
11     plan?
12          A.      I'm not certain in this context.
13          Q.      Did BP, as part of the creation
14     and implementation of the OMS, do a risk
15     assessment on all of its operations?
16          A.      If I recall, during the calendar
17     year 2009, as part of the -- I believe they
18     called it Gulf of Mexico pilot project for
19     OMS, they went through each asset facility
20     and looked at the risk registers, this, if I
21     recall correctly, was primarily aimed at the
22     producing operations, production platforms,
23     offshore facilities, marine, et cetera.
24                  (Exhibit No. 2907 marked for
25     identification.)
```

```
 1     EXAMINATION BY MR. WATTS:
 2          Q.     Now, if you go to Tab 26, this
 3     is an e-mail you wrote on the October 12th of
 4     2009 to Neil Shaw and others, it's
 5     Exhibit 2907.  This e-mail is written on
 6     October the 12th of 2009.  Do you see that,
 7     sir?
 8          A.     I do.
 9          Q.     If you go to Bates page number
10     ending 879, the slide with respect to safety.
11          A.     I'm sorry, which page again?
12          Q.     879.
13          A.     879.  Just give me a moment so
14     that I can look at the presentation.  879,
15     yes.
16          Q.     The lower left-hand corner with
17     respect to safety says:  "The Gulf of Mexico
18     is the only major SPU with a deteriorating
19     safety performance in 2009."
20               Do you see that, sir?
21          A.     That's correct.
22          Q.     Now, with respect to this
23     presentation, do you know who created the
24     HSSE 5th quarter plan, dated October the 13th
25     of 2009?
```

1        A.      I don't recall who would be
2    the -- the author and reviewer.  I recall
3    seeing this or recall some discussions with
4    Curtis Jackson on this presentation.
5        Q.      And you certainly are the one
6    that forwarded it to a large group of people,
7    do you see that, including Harry Thierens?
8        A.      Yes, that's correct.
9        Q.      Where it says "Gulf of Mexico is
10   the only major SPU with a deteriorating
11   safety performance in 2009," an SPU is a
12   business unit within the BP group, is that
13   right?
14       A.      SPU is -- stands for strategic
15   performance unit, correct.
16               **(Exhibit No. 2908 marked for**
17   **identification.)**
18   EXAMINATION BY MR. WATTS:
19       Q.      Now, in that regard, I want to
20   talk to you about this gap assessment and
21   risk management process that was undertaken.
22   If you can go to Tab 56, which I believe is
23   in the back of that.
24       A.      Okay (complying).
25       Q.      There was an OMS handbook

```
 1    created for the Gulf of Mexico SPU itself, is
 2    that right?
 3            A.     I believe there would have been
 4    a book referenced possibly LOMS or something
 5    along those lines or OMS for Gulf of Mexico,
 6    yes.
 7            Q.     Tab 56 is a document entitled
 8    "Gulf of Mexico SPU Operating Plan OMS
 9    Handbook."
10                  Do you see that, sir?
11            A.     I do.
12            Q.     If you go to the Bates page
13    ending 185.
14            A.     (Complying).
15            Q.     Under the heading "Continuous
16    Risk Reduction" it says:  "The Gulf of Mexico
17    major hazard and risk management policy
18    defines the framework for managing integrity
19    management and process safety risk within the
20    SPU."
21                  Were you involved with this
22    major hazard and risk management policy?
23            A.     I don't recall.
24            Q.     Go back up to 167, Bates page
25    number.
```

 1          A.      (Complying).

 2          Q.      Under 2.3, "OMS Essentials Gap

 3   Assessment Process," it says:  "One of the

 4   key risk assessment processes, the Gulf of

 5   Mexico SPU will use to inform the annual plan

 6   each year is the OMS essentials gap

 7   assessment.  This purpose -- the purpose of

 8   this self-assessment is to determine

 9   conformance and evaluate risks associated

10   with Gulf of Mexico business processes."

11              Did I read that correctly?

12          A.      Yes.

13          *Q.      Now, you were part of this gap*

14   *assessment process that was underway, is that*

15   *right?*

16          *A.      The -- my recall of my role*

17   *during the 2009 time frame is that there were*

18   *a series of meetings which were both to*

19   *understand the OMS system and guidelines, and*

20   *to do what was called the gap assessment*

21   *process you're referring to here, yes.  I*

22   *don't recall how many different meetings and*

23   *I was at some, but not all.*

24          *Q.      Okay.  If you go to the Bates*

25   *page number ending 192, I want to look at the*

1    *gaps that were identified as priority SPU*

2    *level gaps for 2009.*

3         *A.     Okay.*

4         *Q.     With respect to risk assessment*

5    *and management process safety, the gap that's*

6    *identified says:  "Risk assessment*

7    *processes/results are not integrated, and*

8    *need for stronger major hazard awareness."*

9              *Did I read that correctly?*

10        *A.     Yes.*

11        *Q.     Under the problem statement it*

12   *says:  "A significant number of risk*

13   *assessments are carried out by multiple*

14   *groups in the SPU which are not integrated or*

15   *planned and the outcomes and mitigation plans*

16   *are not linked up or visible.  As we have*

17   *started to more deeply investigate process*

18   *safety incidents, it's become apparent that*

19   *process safety major hazards and risks are*

20   *not fully understood by engineering or line*

21   *operating personnel.  Insufficient awareness*

22   *is leading to missed signals that precede*

23   *incidents and response after incidents, both*

24   *of which increases the potential for, and*

25   *severity of, process safety-related*

1      *incidents."*

2                      *Did I read that right?*

3           *A.       That's correct.*

4           *Q.       That is one of the gaps that BP*

5      *identified in the Gulf of Mexico that needed*

6      *to be fixed, is that right?*

7           MS. KARIS:

8                      Object to form.

9           THE WITNESS:

10                     *So in the context of this*

11     *review, that is correct.*

12     EXAMINATION BY MR. WATTS:

13          Q.       Now, with respect to the risk

14     assessment, is this basically saying, hey,

15     we're doing plenty of risk assessments, but

16     we're not making them available such that the

17     line operating personnel understand them?

18          A.       I think I would phrase this

19     as -- an important point would be that all of

20     this reference here was, as I mentioned

21     earlier, specifically aimed at the producing

22     facilities and the review of when they call

23     line, they meant production operations,

24     people in the production operations, people

25     onshore in engineering departments and that

1    was the context of these comments.

2          *Q.     Well, actually, and let me just*

3    *see if I can get you to agree to this.   I*

4    *think you all did it first with respect to*

5    *the production facilities and the next year*

6    *you did it with respect to the exploration*

7    *rigs.*

8                *Were you familiar with that?*

9    *One was done first and the other was done as*

10   *well?*

11         *A.     So if I recall correctly, we --*

12   *there was a global effort going on to take*

13   *the drilling well operations policy and to*

14   *revise or conform it to the new OMS system*

15   *and the technical, I believe it was called,*

16   *engineering technical practices, et cetera.*

17               *In the Gulf of Mexico, during*

18   *the 2009 time frame, there was a review done*

19   *in terms of our processes, on how we would go*

20   *about risk assessment.   I believe we had a*

21   *presentation around our new standard for risk*

22   *assessment in late November of 2009, just*

23   *before my departure.*

24               *(Exhibit No. 2909 marked for*

25   *identification.)*

```
 1    EXAMINATION BY MR. WATTS:
 2         Q.     Yeah.  Let me take you through
 3    that, if you go to Tab 57.
 4         A.     (Complying).
 5         Q.     Tab 57 is an e-mail from Kevin
 6    Kennelley to a number of people including
 7    yourself on December 17th of 2008.  It
 8    forwards an SPU annual engineering plan.  And
 9    I want to visit with you about that.
10         A.     Okay.
11         Q.     If you go to Bates page number
12    487, this is the annual engineering plan for
13    2008, is it not?
14         A.     Yes, I believe so.
15         Q.     Okay, and if you go to Bates
16    page ending 506 on this exhibit, which is
17    Exhibit 2909, Section 8 is the hazard and
18    risk register.
19         A.     That's correct.
20         Q.     It says:  "Hazard scenarios
21    plotting in the red portion of the risk
22    matrix for some assets are shown below, and
23    one of the examples is well blowouts."
24         A.     That's correct.
25         Q.     All right.  You remember the
```

1    previous document when we talked about risks

2    that were identified in red?

3           A.     Which --

4           Q.     Drawing a blank, let's stick

5    with this one.

6           A.     Okay.

7           **Q.     Well blowouts are one of the**

8    **risks that is in the red portion of the risk**

9    **matrix, is that right?**

10          **A.     In reference to this risk matrix**

11   **in the red quadrant, yes.**

12          **Q.     Go to the next page, it talks**

13   **more about major accident hazard well**

14   **blowouts.  And it states:  "Drilling and**

15   **completing wells at the two BP-owned drilling**

16   **rigs, Thunderhorse and Holstein, potentially**

17   **exposes the organization to blowouts and**

18   **environmental spills."**

19                 **Do you see that, sir.**

20          **A.     Yes, I do.**

21          **Q.     Another sentence down it says:**

22   **"Planned focused activities towards managing**

23   **blowout risks for all BP-owned risks are**

24   **detailed below.  The risks associated with**

25   **third-party drilling rigs will be assessed in**

1    *2009."*

2                    Do you see, that, sir?

3           A.      You will have to -- I'm still

4    not finding that.  This is --

5           Q.      Right here.

6           A.      -- 0507?

7           *Q.      (Indicating).  And my point is*

8    *that the risk assessment with respect to*

9    *blowouts first was done in 2008 with respect*

10   *to BP-owned rigs and then it was planned with*

11   *respect to third-party drilling rigs to be*

12   *done in 2009?*

13          *A.      That's what this says.*

14          Q.      Okay.  And that's where, you

15   know, a couple of minutes ago, I was telling

16   you I think you're correct, you started with

17   production facilities and BP-owned things,

18   but then you went into third-party rigs?

19          A.      Right.

20          Q.      And we can see that's true from

21   this document?

22          A.      Right.

23          *Q.      In any event, the major hazard*

24   *that is identified with respect to blowout is*

25   *a loss of well control during drilling with*

1    *the potential for significant environmental*

2    *spill?*

3         *A.      That is correct.*

4         *Q.      And the action plan basically*

5    *includes addressing well control for all BP*

6    *and contractor personnel.  Do you see that,*

7    *sir?*

8         *A.      In relation to the three assets,*

9    *Thunderhorse, Holstein and Mad Dog.*

10              *(Exhibit No. 2910 marked for*

11   *identification.)*

12   EXAMINATION BY MR. WATTS:

13        Q.      Now I want to fast forward you

14   to Tab 58, which is right behind it.  This is

15   the annual plan for the next year, 2009.  Do

16   you see that, sir?

17        A.      Yes, I do.

18        Q.      All right, and if you go to the

19   Bates page ending 433.

20        A.      (Complying).

21        Q.      This is Exhibit 2910.

22        A.      Yes.

23        *Q.      And here we have the major*

24   *accident hazard, loss of well control, and we*

25   *can see that, unlike the 2008 version, there*

1    *are actually assets that are not owned by BP,*

2    *including the HORIZON.  Do you see that?*

3          *A.     I see that, yes.*

4          *Q.     The same, whether it's owned by*

5    *BP or owned by a third party like Transocean,*

6    *by 2009 BP had identified a major accident*

7    *hazard as being the loss of well control*

8    *during drilling with the potential for*

9    *significant environmental spill.  Correct?*

10          *A.     That is correct.*

11          *Q.     Like 2008, the 2009 plan is*

12    *competency assurance plans addressing well*

13    *control for all BP and contractor personnel?*

14          *A.     That is correct.*

15          *Q.     And so basically the hazard is a*

16    *loss of well control, an environmental spill.*

17    *The way to try to prevent it is well control*

18    *training for BP and contractor personnel?*

19          MS. KARIS:

20                Object to form.

21          *THE WITNESS:*

22                *In this document authored by*

23    *Kevin Kennelley or endorsed by Kevin*

24    *Kennelley it says that the 2009 action plans*

25    *were competency assurance, and the 2009*

1    *actions completed were revalidated well*
2    *training and certification for all line D&C*
3    *personnel.*
4    *EXAMINATION BY MR. WATTS:*
5         *Q.     So that's another way of saying*
6    *we're making sure everybody goes to well*
7    *control school, right?*
8         *A.     That was -- that I believe is*
9    *the intent of that action plan, yes, sir.*
10         *(Exhibit No. 2911 marked for*
11    *identification.)*
12   EXAMINATION BY MR. WATTS:
13         *Q.     Okay.  Now, if you would go to*
14   *Tab 63, I want to look at this updated risk*
15   *register in April of 2009.  Tab 63 will be*
16   *Exhibit 2911.  This is an e-mail from Malcolm*
17   *Kraus to a number of individuals, including*
18   *yourself, on April 8th of 2009, attaching a*
19   *risk summary slide, is that right?*
20         *A.     I believe so.*
21         *Q.     If you go to the next page of*
22   *the exhibit, what we have here is an SPU risk*
23   *register for the first quarter of 2009.  Do*
24   *you see that, sir?*
25         *A.     Yes, I do.*

1          Q.     If you go down to the middle of
2     the page, the group risk No. 6.  Do you see
3     where it says legal or regulatory
4     noncompliance?
5          A.     Yes.
6          Q.     The specific entity risk is a
7     license to operate?
8          A.     Correct.
9          Q.     It says:  "Noncompliance with
10    internal and/or external guidelines, high
11    number of INCs, incidence of noncompliance,
12    or excess spills could result in BP's loss of
13    a license to operate in the Gulf of Mexico."
14              Did I read that correctly?
15         A.     You did.
16         Q.     And while it identifies that
17    risk, the risk impact as being high or high
18    for the group, the agreed response action and
19    the current status of response actions is
20    blank in this document.  Do you see that,
21    sir?
22         A.     I see the blank, yes.
23         Q.     The other risks identified have
24    kind of an agreed response action and then
25    many of them have a status of the -- current

1      *status of response actions, right?*

2            *A.      That is correct.*

3            *Q.      But with respect to the risk of*

4      *excess spills could lead to BP's loss of a*

5      *license to operate in the Gulf of Mexico,*

6      *there is no action identified and there is no*

7      *status that's written there, right?*

8            *A.      This is blank.*

9            *(Exhibit No. 2912 marked for*

10     *identification.)*

11     EXAMINATION BY MR. WATTS:

12           Q.     Now, if you would, I would like

13     to take you to Tab 24, just visit with you a

14     little bit more about this risk review.  This

15     is Exhibit 2912, Tab 24.

16           A.     (Complying).

17           Q.     It's an e-mail from Steven

18     Ruehle to a number of persons, including

19     yourself, on September 24th, 2009.  This is

20     about six weeks before you left the company,

21     right?

22           A.     That would be roughly six to

23     eight weeks before I left, yes.

24           Q.     It says:  "I've attached the

25     slides we will review at the SPU top risk

1    review Monday afternoon.  Hard copies are

2    being printed for all participants and will

3    be distributed today."

4              With respect to the people to

5    whom this is being distributed, how would you

6    categorize this group of people within BP

7    Gulf of Mexico?

8         A.    So the line shown as 2, I would

9    define that population as the SPU leadership

10   team, the engineering authorities, and the

11   asset managers for the various operated

12   assets.

13        Q.    This is a management level

14   communication within the SPU of the Gulf of

15   Mexico, right?

16        MS. KARIS:

17              Object to form.

18        THE WITNESS:

19              I cannot say, but I would say

20   that this was addressed to the primary

21   managers of the Gulf of Mexico at that time.

22   EXAMINATION BY MR. WATTS:

23        Q.    Yeah.  Down at the bottom it

24   says:  "Each asset and the logistics group

25   have recently updated their major hazard risk

```
 1    register.  Each entity is now developing
 2    mitigation plans to address their high risks
 3    in accordance with the Gulf of Mexico major
 4    hazard risk management policy.  The purpose
 5    of this meeting is to review the SPU high
 6    risks with the SPU leadership team."
 7              Do you see that, sir?
 8        A.    I see that.
 9        Q.    You were on the SPU leadership
10    team for the Gulf of Mexico, right?
11        A.    Yes, I was.
12        Q.    All right.  Now, I want to go in
13    and talk about these high risks for a second.
14    If you go to the Bates page number ending
15    770 --
16        A.    (Complying).
17        Q.    -- one of the risks that is on
18    the high risk list is a loss of well control,
19    right?
20        A.    That is correct.
21        Q.    If you go to the next page,
22    under "Loss of Well Control," the risk is
23    described as:  "Environmental, reputation,
24    safety.  Risk that uncontrolled flow during
25    drilling, completion of well intervention
```

1      *activities have the potential for a loss of*

2      *well control, release of hydrocarbons, and*

3      *potential environmental damage and could, if*

4      *ignited, lead to a fire and explosion."*

5              *Did I read that correctly?*

6          A.      *That is correct.*

7          Q.      All right.  Now, with respect to

8      this risk, can you and I agree that the Gulf

9      of Mexico SPU leadership team had been made

10     aware of the risk of fire, explosion, oil

11     spill causing environmental damage prior to

12     your exit from the company?

13         MS. KARIS:

14              Object to form.

15         THE WITNESS:

16              The purpose of this meeting was

17     to collect the efforts that had been going

18     throughout the year on risk assessments and

19     to present that to the Gulf of Mexico SPU

20     leadership team.

21     EXAMINATION BY MR. WATTS:

22         Q.      *Okay.  So as of September of*

23     *2009, the Gulf of Mexico leadership team had*

24     *had presented to it what the consequence*

25     *would be of a loss of well control in this*

1    *risk assessment, right?*

2         MS. KARIS:

3              Object to form.

4         THE WITNESS:

5              *The SPU leadership team was*

6    *provided with this summary of risks, major*

7    *action risk, major hazard risk, which shows*

8    *this one as a loss of well control.*

9    EXAMINATION BY MR. WATTS:

10        *Q.    Okay.  And the loss of well*

11   *control leading to a potential explosion, oil*

12   *spill, environmental damage, was all in the*

13   *risk as it was described to the safety*

14   *leadership team of the Gulf of Mexico SPU in*

15   *2009, right?*

16        *A.    That is correct.*

17        Q.    If you go to tab -- well, go to

18   the next page for a second, there is a risk

19   mitigation plan form on the next page.  Do

20   you see that, sir?

21        A.    Yes, sir.

22        Q.    Now, if you go over to Tab 27,

23   keep your finger on that form.

24        A.    Okay.

25        Q.    This is the form that actually

1    has been signed by yourself, right?

2         A.     That's correct.

3                *(Exhibit No. 2913 marked for*

4    *identification.)*

5    EXAMINATION BY MR. WATTS:

6         *Q.     As we go to Tab 27, this is*

7    *Exhibit 2913, it's the risk mitigation plan,*

8    *and again, under the description of risk it*

9    *says:  "Risk that uncontrolled flow during*

10   *drilling, completion and well intervention*

11   *activities have the potential for a loss of*

12   *well control, release of hydrocarbon and*

13   *potential environmental damage and could, if*

14   *ignited, lead to fire and explosion."*

15              *Do you see that, sir?*

16        *A.     I see that.*

17        *Q.     The risk that is identified in*

18   *this document is precisely what happened on*

19   *the Macondo several months later.*

20        MS. KARIS:

21              Object to form.

22   EXAMINATION BY MR. WATTS:

23        *Q.     Do you agree?*

24        *A.     The risk identified in this form*

25   *include loss of well control, fire and*

1    *explosion.  Macondo suffered loss of well*

2    *control, fire and explosion.*

3         *Q.     And caused environmental damage,*

4    *right?*

5         *A.     There was significant*

6    *environmental damage as a result of the*

7    *Macondo incident.*

8         Q.     Now, in addition to that risk

9    being communicated to the safety leadership

10   team of the Gulf of Mexico, the consequence

11   or the severity of the consequence of a loss

12   of well control had also been communicated,

13   true?

14        A.     I'm not sure in which vehicle

15   you're speaking.

16              *(Exhibit No. 2914 marked for*

17   *identification.)*

18   EXAMINATION BY MR. WATTS:

19        Q.     Let me show you Tab 82 for a

20   second.

21        A.     82?

22        Q.     Yes, sir.  Who is Richard Eaton?

23        A.     I'm not certain.

24        Q.     Do you know who Doug Suttles is?

25        A.     Yes, I do.

```
 1              Q.      He was the chief operating
 2     officer of exploration and production, right?
 3              A.      That's correct.
 4              Q.      Mike Daly, what position did
 5     Mike Daly hold?
 6              A.      I don't know the specific title,
 7     but he was the head of global exploration for
 8     BP.
 9              Q.      Paul Reed, what position did
10     Paul Reed hold?
11              A.      I don't recognize that name.
12              Q.      How about Bruce Price?
13              A.      Neither.
14              Q.      Jasper Peijs?
15              A.      I don't -- other than Doug
16     Suttles and Mike Daly, I don't recognize any
17     of the names.
18              Q.      Mike Daly's position again was
19     what?
20              A.      I would refer to it as the
21     global head of exploration for BP Exploration
22     and Production.
23              Q.      All right, so we have the chief
24     operating officer of exploration and
25     production and the global head of production
```

1    for exploration and production receiving this

2    e-mail, right?

3         MS. KARIS:

4              Object to form.

5         THE WITNESS:

6              According to the two, Doug

7    Suttles who was in that role and Mike Daly

8    received this e-mail.

9    EXAMINATION BY MR. WATTS:

10        Q.    And part of what the e-mail says

11   is it attaches something that includes the

12   risk impact levels used to evaluate the risk

13   taken from the Group Defined Practice for

14   management of risk.  Do you see that?

15        MS. KARIS:

16             Object to form.

17        THE WITNESS:

18             The read that I see is:  "Please

19   see the attached risk management pack for

20   review at OpCo on Monday.  Also attached as

21   backup are the Group and Segment risks

22   submitted by the SPU functions as part of the

23   plan feed and the risk impact levels used to

24   evaluate the risks taken from the Group

25   Defined Practice for management of risk."

1    EXAMINATION BY MR. WATTS:

2         Q.    Let's look at the impact levels

3    that were communicated to the chief operating

4    officer and the global head of production of

5    BP Exploration.  The next page has a severity

6    level of A, B, C, it goes all the way down to

7    H.  Do you see that, sir?

8         A.    I see A, B -- yes.

9         Q.    Severity level A would be:  "An

10   event that is comparable to the most

11   catastrophic health/safety incidents ever

12   seen in an industry.  The potential for 100

13   or more fatalities."

14             And then in terms of

15   environmental, it talks about:  "A future

16   impact, unintended release with widespread

17   damage to any environment which remains in an

18   unsatisfactory state for a period of greater

19   than five years."

20             Do you see that, sir?

21        A.    I see that.

22        Q.    In your speech to the Society of

23   Petroleum Engineers, you talked about a

24   number of past spills and lessons learned.

25   You said Piper Alpha, for example.

1        A.      Correct.

2        Q.      How many people died in the

3   Piper Alpha incident?

4        A.      167.

5        Q.      Was there widespread

6   environmental damage at the time?

7        A.      I don't recall the extent of the

8   environmental damage for Piper Alpha.

9        Q.      Did BP Gulf of Mexico management

10  understand that if you had a loss of well

11  control followed by an explosion, that you

12  could have an incident like the Piper Alpha

13  that could kill a hundred people or more?

14       A.      I can't attest to their level of

15  understanding.

16       MS. KARIS:

17              Object to the form.

18  EXAMINATION BY MR. WATTS:

19       Q.      Whoever got this document knows

20  that this is one of the risks that BP had, in

21  effect, assessed, right?

22       MS. KARIS:

23              Object to form.

24       THE WITNESS:

25              I believe the purpose of this

 1   document was to inform senior management of

 2   the highest level risk within the company.

 3   EXAMINATION BY MR. WATTS:

 4        Q.    Okay.  And if you go to the last

 5   page of the document, the consequence of

 6   something with severity A, of Piper Alpha

 7   type incident, for example, it says:

 8   "Nonfinancial impact, public or investor

 9   outrage on a global scale, threat of global

10   loss of license to operate, a financial

11   impact of greater than $20 billion."

12              Do you see that, sir?

13        A.    I do.

14        Q.    In your speeches, you have

15   talked about the financial impact of the

16   Macondo blowout, right?

17        A.    That's correct.

18        Q.    You've estimated that it's going

19   to exceed 40 or $50 billion?

20   MS. KARIS:

21              Object to form.

22   THE WITNESS:

23              My estimated range given in my

24   speech quoted a number of 40 or $50 billion,

25   yes.

1    EXAMINATION BY MR. WATTS:

2         *Q.      What happened at Macondo was a*

3    *risk that had been identified and*

4    *communicated to senior management within the*

5    *Gulf of Mexico SPU of BP, agree?*

6         MS. KARIS:

7              Object to form.

8         *THE WITNESS:*

9              *The possibility of a major well*

10   *control incident had been communicated via*

11   *these risk assessments to the Gulf of Mexico*

12   *leadership team and according to this e-mail,*

13   *which I've seen here for the first time, to*

14   *more senior management.*

15   EXAMINATION BY MR. WATTS:

16        *Q.      All right, now, I want to talk*

17   *to you about possibility versus consequence.*

18   *First of all, with respect to the*

19   *consequence, can we agree that BP understood*

20   *that the consequence of an uncontrolled well*

21   *blowout was deaths, oil spill, environmental*

22   *damage, investor outrage?*

23        *A.      According to these documents,*

24   *there indicates a presentation that*

25   *highlighted the possibility of an extensive*

1   *loss to several levels of senior management.*

2        Q.    Now, if you would go to Tab 95,

3   please, sir.

4        A.    (Complying).

5              *(Exhibit No. 2915 marked for*

6   *identification.)*

7   EXAMINATION BY MR. WATTS:

8        Q.    I tell you what I want to do.

9   This is Exhibit 2915.  This is the PowerPoint

10  of the presentation that you gave to the

11  Society for Petroleum Engineers, and let me

12  hand you a better copy because it's got your

13  speaker's notes as well.

14       A.    Thank you.

15       *Q.    As we look at this exhibit, this*

16  *is the PowerPoint that you presented in*

17  *Galveston, Texas on October the 5th, 2010,*

18  *right?*

19       *A.    If this is a copy from what was*

20  *provided to the SPU, yes.*

21       Q.    Now, with respect to this idea

22  of possibility -- if you go to slide 5.

23       A.    (Complying).

24       *Q.    In your speaker's notes, one of*

25  *the things that the speaker's notes say is:*

1      *"I've heard people say the HORIZON was a once*
2      *in 100- or 200-year event.  I believe if we*
3      *really deeply understood process safety and*
4      *reliability engineering, the frequency is*
5      *really every 5 to 10 years at about 250 to*
6      *300 deepwater wells.  Yet when we looked at*
7      *the event, it was imminently preventible with*
8      *current capabilities."*
9              *Is that what your speaker's*
10     *notes show for this speech?*
11     **A.      That is correct.**
12             Q.     Now, explain for me your
13     thinking when you say, hey, it's not a one in
14     100-year, 200-year event, it's really a one
15     in 5 to 10 year or every 250 to 300 wells,
16     deepwater wells.  What do you mean by that?
17             A.     The reference to a one or
18     200-year event would probably, in most
19     people's view, correspond to, as we call a
20     hurricane, one in a hundred year storm, et
21     cetera.  So my reference here would be in
22     order to make the point that I think many
23     people, in spite of risks, matrices,
24     presentations on potential risks, did not
25     fully appreciate the possibility of something

 1    like this in their tenure as something that

 2    could happen once in 10 years as opposed to

 3    once in 100 years.

 4         Q.     Sure.  In terms of the deepwater

 5    industry, we know it already happened with

 6    the Piper Alpha incident, right?

 7         A.     The industry has a number of

 8    well control events annually and there are

 9    a -- I don't have in front of me the accurate

10    numbers about the number of well control

11    incidents that happened worldwide offshore,

12    but there are more than single digits in most

13    cases.  The total loss of well control is a

14    fairly rare event, Piper Alpha wasn't

15    directly related to drilling operations, but

16    was a loss of primary containment and an

17    extensive catastrophe, yes.

18         Q.     Did you refer to the Piper Alpha

19    in your speech?

20         A.     I did.

21         Q.     If we go to slide 4.  One of the

22    things that your speaker notes refers to, it

23    says:  "The lessons from Piper Alpha, OCEAN

24    RANGER, MONTARA, all can be found here."

25         A.     That is correct.

1          Q.      Now, let's visit about that.

2    Piper Alpha is an event that occurred

3    offshore back in 1988, is that right?

4          A.      I believe that's the year, in

5    the North Sea, yes, sir.

6          Q.      When I asked you how many people

7    were killed in that incident, you knew to the

8    man?

9          A.      I know to the man, yes.

10         Q.      How many people was it again?

11         A.      I believe -- my recall is 167

12   people.

13         Q.      OCEAN RANGER, what happened

14   there?

15         A.      In a storm, the integrity of the

16   vessel, the drilling rig was compromised and

17   it sank with all hands on board.  I believe

18   the death toll was above a hundred.

19         Q.      MONTARA is an event that

20   happened the year before this Macondo

21   blowout, right?

22         A.      I believe it was a 2009, but I'm

23   not certain.

24         Q.      What happened in the MONTARA

25   incident off the coast of Australia?

```
 1          MS. KARIS:

 2               Object to form.

 3          THE WITNESS:

 4               I've only read a preliminary

 5     report, but my understanding was that during

 6     production operations there was a failure in

 7     one in the barriers from subsurface to

 8     surface.

 9     EXAMINATION BY MR. WATTS:

10          Q.     And there was a major oil spill

11     that was not controlled for many weeks?

12          A.     I believe the release eventually

13     caught fire and burned both production

14     platform and the rig, and was an uncontrolled

15     release for a number of weeks with severe

16     environmental damage.

17          Q.     Mr. Lacy, we've gone through the

18     fact that if you have an uncontrolled well

19     event, it can lead to the loss of life

20     through an explosion, it can lead to an oil

21     spill that causes major environmental damage,

22     all that is shown in the BP risk assessment

23     documents before the Macondo event ever

24     occurred, right?

25          A.     That's correct.
```

```
 1              Q.      Your point is, hey, this isn't a
 2      one in a 100-year event, it's an once every 5
 3      to 10 years, and we have got this history in
 4      the industry where it has been happening once
 5      every five to ten years, right?
 6              MS. KARIS:
 7                      Object to form.
 8              THE WITNESS:
 9                      Prior to Macondo, I'm not aware
10      of a significant deepwater uncontrolled well
11      blowout particularly at the ocean floor.
12      EXAMINATION BY MR. WATTS:
13              Q.      Okay.
14              A.      So the frequency of a similar
15      incident, I couldn't necessarily quote.  It
16      had not occurred before.
17              Q.      Where was MONTARA?
18              A.      MONTARA was off the coast of
19      Australia, yes, sir.
20              Q.      The year before?
21              A.      Correct.
22              Q.      Piper Alpha, where was it?
23              A.      In the North Sea.
24              Q.      That's three major events in 20
25      years right there, right?
```

1       *A.      There's --*

2       *Q.      More than that, right?*

3       *A.      The difference is, and my*

4    *specific reference is I'm not aware of a*

5    *deepwater loss of well control.*

6       Q.      Okay.

7       A.      Prior to the Macondo incident,

8    and the MMS would have accurate records, as

9    well as the authorities in, for example,

10   Australia and the UK and Norway, you can find

11   examples of probably a major loss of well

12   control, I would probably estimate once every

13   five years in a major offshore facility.

14      Q.      Your point in your speech is the

15   lessons from Piper Alpha and OCEAN RANGER and

16   MONTARA can all be found here in the Macondo

17   event, right?

18   MS. KARIS:

19             Object to form.

20   THE WITNESS:

21             That was my statement, yes.

22   EXAMINATION BY MR. WATTS:

23      Q.      What did you mean by that

24   statement?

25      A.      There's two parts to this.  One

1    in slide 4, as it relates to studies made of

2    all major catastrophes involving process

3    safety, be it chemical facilities, refining,

4    offshore platforms.  That this was my

5    paraphrase, if you will, of the learnings

6    from some of the experts who had studied

7    multitude of incidents across industries.

8         MR. NICHOLS:

9              Before you go on to another

10   exhibit, did you mark the presentation with

11   the speaker notes as 2915?

12        MR. WATTS:

13             Yeah, 2915.

14             (Exhibit No. 2916 marked for

15   identification.)

16   EXAMINATION BY MR. WATTS:

17        Q.    Let me take you to Tab 33.

18        A.    Okay.

19        Q.    This is an e-mail from Neil

20   Cramond to Ken DeJohn forwarding risk review

21   slides.

22        A.    33?

23        Q.    Yes, sir, Exhibit 2916.  And

24   below that e-mail there is an e-mail from

25   Steven Ruehle to a number of people,

1    including yourself.  Do you see that, sir?

2         A.    Yes, I do.

3         Q.    And the subject is "SPU Top Risk

4    Mitigation Plans," and then we've got the

5    attachment right behind it, the 2009 Gulf of

6    Mexico SPU major hazard risk review.

7         A.    Yes.

8         Q.    Now, if we could, I want to take

9    you through some of this.  If you could go to

10   Bates page number 959.  Now, it's hard to

11   read on this particular document, but every

12   time BP suffers an incident which is

13   classified as a major hazard, it goes into

14   this risk register and it's counted, right?

15        A.    I'm not sure without being able

16   to read this slide accurately.

17        Q.    Okay.

18        A.    Or the source of it.

19        Q.    Let's just go to the next page,

20   I think it will -- I agree that page is

21   illegible.  We have a nice summary on the

22   next page.

23        A.    Okay.

24        Q.    "Major Hazard Risk Summary by

25   Asset."  And, for example, it shows, and this

1    is the "2009 Gulf of Mexico SPU Major Hazard

2    Risk Review."  It shows number of risks are

3    18.  A total of all eight producing assets

4    that were categorized as topside hydrocarbon

5    releases, right?

6         A.     That's what this shows, yes.

7         Q.     A topside hydrocarbon release is

8    a major hazard recognized by BP, right?

9         A.     I believe that's correct.

10        Q.     And this shows it occurred 18

11   different times on all eight producing

12   assets?

13        MS. KARIS:

14              Object to form.

15        THE WITNESS:

16              Without seeing what this 18

17   refers to, I can only guess as to the

18   incident types, but it appears to show there

19   were 18 on eight different producing assets

20   in this time frame.

21   EXAMINATION BY MR. WATTS:

22        Q.     And so we don't have to guess

23   what they were, go to 964, an example of

24   these major hazards, we got at 964 identified

25   as a loss of well control, right?

```
 1            A.      Yes.
 2            Q.      And, again, the same risk
 3     description:  "Risks that uncontrolled flow
 4     during drilling, completion and well
 5     intervention activities have the potential
 6     for a loss of well control, release of
 7     hydrocarbons, and potential environmental
 8     damage and could, if ignited, lead to a fire
 9     and explosion."
10                    Right?
11            A.      That's correct.
12     MS. KARIS:
13                    Object to form.
14     EXAMINATION BY MR. WATTS:
15            Q.      Now, in your speech and in your
16     paper that you wrote after the speech, you
17     reached the conclusion that the industry had
18     blown it.  Right?
19            A.      That is the phrase that I used
20     in the presentation.
21            Q.      When you say the industry has
22     "blown it," what do you mean?
23            A.      That we had suffered a major
24     well control event in deepwater.
25            Q.      And men had lost their lives and
```

124

1    the environment had been damaged by a

2    consequent oil spill.

3         A.     So my term "blown it," meant

4    this Macondo incident.

5         Q.     Based upon your experience and

6    your know how and your investigation as to

7    what happened, you reached the conclusion

8    that it was entirely preventible with

9    technology then existing, right?

10        MS. KARIS:

11             Object to form.

12        THE WITNESS:

13             At the time I made the

14   presentation, and based on the public reports

15   that I had access to, my statement that it

16   was entirely preventible was made.

17   EXAMINATION BY MR. WATTS:

18        Q.     Were your familiar with the DWOP

19   that BP had for the Gulf of Mexico?

20        A.     The -- I'm -- there was a DWOP

21   which referred to the whole of BP drilling

22   and completions, and I believe we were taking

23   that into a document authored by Jon Sprague

24   and Dave Rich that was entitled "The Way We

25   Work."

```
 1              Q.    All right.  And I want to visit
 2    with you about those two documents for a
 3    second.
 4                   First of all, were you involved
 5    with Mr. Sprague in the formation of a new
 6    DWOP?
 7              A.    It would have been -- if Jon was
 8    working on it in 2009, yes.
 9              Q.    And what was the purpose of
10    coming up with a new DWOP?
11              A.    Again, I will have to use the
12    term, our intent in 2009 was to clearly
13    document the processes and procedures that we
14    intended to be common for all wells.  As Jon
15    was the engineering authority for drilling,
16    Jon would have been the primary author of
17    that document.
18                   (Exhibit No. 2917 marked for
19    identification.)
20    EXAMINATION BY MR. WATTS:
21              Q.    Now, let me take you to Tab 50,
22    which is the drilling and well operations
23    practice, so-called DWOP, GP10-00.
24              A.    And is there a date on this
25    version?
```

1        Q.      October 2008, Issue 1?

2        A.      Uh-huh (indicating

3    affirmatively).

4        Q.      Now, here is what I want to ask

5    you.  If you could go to Bates page number

6    275.

7        A.      (Complying).

8        Q.      This DWOP is Exhibit 2917.

9    MS. KARIS:

10              What tab did you say?

11   MR. WATTS:

12              2917, Tab 50?

13   MS. KARIS:

14              Thanks.

15   EXAMINATION BY MR. WATTS:

16       Q.      Bates page number 275.

17       A.      275.

18       Q.      What does this page show us?

19       A.      So on Page 275 it is a

20   representation that is attempting to show the

21   relationship and the primacy of the various

22   policies and standards that were being put

23   into place as part of the BP corporate OMS

24   framework, as well as the segment which would

25   refer to exploration, production, refining,

1    marketing, and then into some of the

2    functional areas such as drilling and wells.

3         Q.    Okay.  I notice it starts with

4    the OMS framework and then it goes through

5    defined practices like the DWOP, and the

6    engineering technical practices, and then it

7    goes down, when it gets to the SPU level, it

8    say LOMS.  What is that?

9         A.    That acronym stands for local

10   operating management system.

11        Q.    And then it says to site

12   practices, what is that?

13        A.    That would be a more specific --

14   specific written procedure or practice as it

15   relates to that individual location.

16        Q.    In the case of the Macondo, the

17   site would be the DEEPWATER HORIZON?

18        A.    The site in this particular

19   instance would be the DEEPWATER HORIZON, yes.

20        Q.    And so part of the OMS framework

21   is that we're going to create this DWOP, the

22   drilling and well operations practices, and

23   then if you need something more specific, you

24   will implement that through the site

25   practices, is that right?

1        A.     The way I would, I guess,

2    describe this is that there is a corporate

3    OMS framework.  It is related to engineering

4    technical practices that come from either the

5    group and/or individual defined functional

6    areas such as drilling of wells, and they

7    provide the guidance in terms of what the

8    references and standards that the local OMS

9    system should be written to and then in

10   conjunction with that, if there is something

11   unique about an individual site, then they

12   would append to that individual site

13   practices, site operating procedures.

14        Q.     Now, at the time that you left

15   the company in the middle of December of

16   2009, had the DWOP been rolled out yet?

17        A.     There was a -- I think they

18   called it either a DWOP refresh or something

19   to the effect -- I think beginning with this

20   effort in late 2008 and I believe there were

21   rounds of meetings during 2009.

22        Q.     Now, with respect to the site

23   practices, those had not yet been created at

24   the time that you left the company?

25        A.     To my knowledge, what was in

1    existence was the draft Gulf of Mexico LOMS.

2         Q.    Let me take you back to Tab 56,

3    which is the operating handbook, the OMS

4    handbook.  This is Exhibit 2908.  If you go

5    to Bates Page 162.

6         A.    (Complying).

7         Q.    At the bottom it says:  "The OMS

8    is being implemented in the Gulf of Mexico

9    SPU in a stepwise fashion as follows."

10             And, for example, in 2008, the

11   last bullet point says:  "The Management of

12   change the SPU, plus the eight assets and

13   facilities as of January 1, 2009."

14             Do you see that, sir?

15        A.    That's correct.

16        Q.    Go forward four pages to 166.

17        A.    (Complying).

18        Q.    Down at the bottom under

19   "Integrity Management and Control of Work

20   Standards, the Integrity Management

21   Standard," it says:  "By the end of 2008, the

22   Gulf of Mexico SPU will be in conformance

23   with the IM standard, with the exception of

24   an extension submitted for site operating

25   procedures.  The SPU will be in full

1      conformance by the end of the second quarter

2      of 2010.  The extension is further described

3      in Appendix 6."

4                   Do you see that?

5           A.     I see that.

6           Q.     Now, if you would, go to Bates

7      Page 188.

8           A.     (Complying).

9           Q.     And this is that Appendix 6.

10     "Formal request for extension.  The Gulf of

11     Mexico SPU requests an extension of the IM

12     standard conformance deadline for development

13     of site operating procedures, (Element 6),

14     from December 31, 2008, to July 31, 2010."

15                  And then under the plan, it

16     says:  "By July 1, 2010, all production,

17     drilling and maintenance procedures will be

18     complete."

19          A.     By July 1, 2010 -- yes.

20          Q.     At the time that you left the

21     company in the middle of December of 2009, it

22     is a fact that the site -- the site operating

23     procedures had not been rolled out?

24          A.     Not to my knowledge.

25          Q.     Now, here's my question, as we

1    go back to that diagram on the preceding

2    document, you don't have to go to it, here is

3    my question:  Are site operating procedures

4    at BP allowed to conflict with the DWOP?

5         MS. KARIS:

6              Object to the form.

7         THE WITNESS:

8              The site procedures would not

9    normally be allowed to conflict with DWOP.

10   If there was a conflict, there would have

11   been a request from an engineering authority

12   to a drilling and wells engineering

13   authority.

14   EXAMINATION BY MR. WATTS:

15        Q.    That request would have to be in

16   writing and approved in writing; right?

17        A.    That is my understanding of the

18   procedure.

19        Q.    If you go back to Tab 50, which

20   is the DWOP.  I want to ask you a specific

21   question about something on the Bates page

22   ending 337.

23        A.    337?

24        Q.    Yes, sir.  Now, this deals with

25   breaking containment, under Section 21.1, it

1    requires two independent mechanical barriers.

2    Do you see that, sir?

3         A.    Yes, if you just give me a

4    moment to read it.

5               Okay, I've read the page.

6         Q.    Why do we want two different

7    mechanical barriers?

8         A.    My experience with well control

9    as related to principles of process safety,

10   it's necessary to have a redundancy because

11   if you only have one barrier and it fails,

12   you have no further barrier to flow to

13   surface.  It is a practice -- it is a

14   practice that is normal for well control

15   procedures to ensure that you have two,

16   therefore, you have almost more than a 100

17   percent probability that you have one

18   effective well.

19        Q.    The idea of having two

20   independent mechanical barriers isolating the

21   flow from the reservoir to the surface is

22   textbook, basic stuff in good drilling

23   completions, agree?

24        MS. KARIS:

25              Object to form.

1          THE WITNESS:

2               I would say in my experience,

3     relative to well control, the principle of

4     two independent, confirmed barriers, is

5     fundamental.

6     EXAMINATION BY MR. WATTS:

7          Q.     Two independent confirmed

8     barriers is fundamental.  What do you mean by

9     "confirmed"?

10          A.     Two, self-explanatory.

11     Independent means they cannot rely on one

12     another for integrity.  Confirms means they

13     have been adequately tested to ensure that

14     they are effective.

15          Q.     Here is my question:  The

16     Macondo site operating procedures were not

17     yet out, regardless of what those procedures

18     say, did anybody on the DEEPWATER HORIZON

19     have the ability to violate the DWOP

20     requirement of two independent mechanical

21     barriers by virtue of some local rule, in

22     effect, of this is the way we do things on

23     the DEEPWATER HORIZON?

24          MS. KARIS:

25               Object to form.

1           THE WITNESS:

2                   I can only refer to -- up to the

3    point that I departed in referring to this

4    October 2008 version.  In my understanding of

5    -- if a -- well, first of all, if no site

6    practice existed, this is the reference

7    document for drilling wells worldwide for BP.

8    If a site practice existed that required a --

9    in my view, it would be temporary excursion

10   to go to either you couldn't test or they

11   were not independent or you only had one,

12   that would require an approval -- that would

13   require a risk assessment, an endorsement by

14   the local engineering authority and an

15   approval by an independent engineering

16   authority, which, at my tenure there, would

17   have been someone on Barbara Yilmaz's staff.

18        Q.     Approval in writing?

19        MS. KARIS:

20               Object to form.

21        THE VIDEOGRAPHER:

22               I'm sorry, I need to change

23   tape.

24               We're ongoing off the record at

25   10:39.  This is the end of Tape 2.

1          (Whereupon, a brief recess was

2     taken.)

3          THE VIDEOGRAPHER:

4               We're back on the record at

5     10:54.  This is the beginning of Tape 3.

6     EXAMINATION BY MR. WATTS:

7          Q.     Mr. Lacy, to deviate from the

8     DWOP requirement of two independent

9     mechanical barriers, isolating the flow from

10    the reservoir to the surface, does a local

11    site such as Macondo have to get an approval

12    in writing?

13         MS. KARIS:

14               Object to form.

15         THE WITNESS:

16               In my understanding of what I

17    expected while I was there would have been

18    that any time a well operation under my

19    responsibility deviated from the DWOP, it

20    required a written risk assessment, it

21    required an internal approval which in this

22    time frame would have been potentially the

23    engineering authority for well control, I

24    believe that was John Shaughnessy and the

25    overall drilling engineering authority, Jon

1    Sprague, would have then required an

2    endorsement from someone on the technical

3    vice presidential staff.

4    EXAMINATION BY MR. WATTS:

5         Q.    Okay.

6         A.    My understanding, while I was

7    there.

8         Q.    All right.  Now, I want to fast

9    forward to you and talk about the 2010 safety

10   plans that were being formulated in 2009.

11   First of all, we'll get into the

12   circumstances of your departure from the

13   company later, but you had planned on being

14   with BP in 2010, right?

15        A.    My expectation up until very

16   late in October of 2010 is that I -- or of

17   2009 is that I would be there in 2010.

18        Q.    So while you were working at BP

19   in the fall of 2009, you were preparing

20   safety plans for 2010, right?

21        A.    That would have been part of my

22   role, yes.

23        Q.    I want to talk to you about both

24   personal safety and process safety plans that

25   you had intended to implement in 2010.  If

1     you could go to Tab 81, sir.

2          A.     (Complying.)

3                 (Exhibit No. 2918 marked for

4     identification.)

5     EXAMINATION BY MR. WATTS:

6          Q.     It's going to be in this

7     notebook.  It's Exhibit 2918.  This is an

8     e-mail you wrote on October 1st, 2009 to a

9     number of people concerning safety

10    leadership, right?

11         A.     Right.

12         Q.     Harry Thierens, what position

13    did he hold?

14         A.     Harry Thierens was the drilling

15    and completions operations manager, I believe

16    that was his title, while I was there.

17         Q.     Steve Tink?

18         A.     Steve Tink would have been the

19    D&C HSE manager while I was there.

20         Q.     Ian Little?

21         A.     Ian Little would have been the

22    exploration appraisals drilling manager while

23    I was there.

24         Q.     Andrew Frazelle?

25         A.     Andrew Frazelle, I believe, at

1   this time, of this note, we had made changes

2   to the organization and I believe at this

3   time, Andrew -- Andy Frazelle was the

4   Thunderhorse drilling manager.

5          Q.     And Charles Holt?

6          A.     And I believe Charles Holt at

7   this point was the Atlantis drilling manager.

8          Q.     You also copy Curtis Jackson who

9   is the head of HSSE?

10         A.     That's correct.

11         Q.     Dennis Johnson, what position

12  did Mr. Johnson hold?

13         A.     Dennis Johnson if I recall

14  correctly, his title was special projects

15  HSE.

16         Q.     And Richard Morrison?

17         A.     Richard Morrison which -- who

18  was the vice president of producing assets, I

19  believe that was his title.

20         Q.     So this is the head of

21  discipline drilling and completions writing a

22  number of individuals who are high up in the

23  management chain of the Gulf of Mexico

24  drilling operations, right?

25         A.     At that time I was the vice

1    president of drilling and completions for the
2    Gulf of Mexico, yes.
3        Q.    And you're writing a number of
4    individuals who are upper level management
5    within BP Gulf of Mexico?
6        A.    So I'm addressing what I
7    commonly referred to as the drilling
8    completion leadership team.
9        Q.    Perfect.
10       A.    And cc'ing the HSE organization
11   and Richard Morrison.
12       Q.    Now, the subject is safety
13   leadership, and if you could go to about the
14   second half of the page, you write:  "You
15   have heard me use the phrase 'overwhelm' the
16   risks with effective leadership and safe
17   behaviors and that is how this has to work.
18   Without this effort, we are on a path for a
19   serious injury given our operating
20   environment and contractor challenges.  For
21   2010 the theme is better leadership,
22   different culture, different results.  When
23   we review the incidents this year, all have
24   elements of gaps and leadership or
25   supervision, personal responsibility and

```
 1    ineffective process implementation due to
 2    inexperience, competency, or poor hazard
 3    assessments."
 4              Did I read that correctly?
 5    A.    You did.
 6    Q.    All right.  Now, it says you're
 7    leading this effort with Curtis, that would
 8    be Curtis Jackson, the head of QH -- of HSSE,
 9    right?
10    A.    Yes.
11    Q.    So yourself as the vice
12    president of discipline drilling and
13    completion and Curtis Jackson who was in
14    charge of HSSE, were leading this effort to
15    reduce or to augment personal safety in 2010,
16    right?
17    A.    Yes.
18    Q.    Now, I'm curious, you had
19    mentioned that it was your plan to be at BP
20    in 2010, right?
21    A.    That is correct.
22    Q.    Curtis Jackson left the company
23    as well.
24    A.    I believe so.
25    Q.    Shortly after you did, right?
```

1          A.      I believe -- that's my
2     understanding.
3          Q.      If you could, describe for me
4     the circumstance that led one who is the vice
5     president of the discipline drilling and
6     completion and who expects to be at BP in
7     2010 into leaving the company?
8          A.      In -- I don't have the
9     approximate date, sometime in late November,
10    as in the second half of November, I had a
11    meeting on my calendar that said HR, human
12    resources.  I frequently have meetings that
13    my admin had set up that I didn't always know
14    exactly what the meeting was, et cetera, that
15    was the only thing on the subject line.
16              I arrived at the meeting, in the
17    meeting room was Barbara Yilmaz and Paul
18    McIntyre, who was the Gulf of Mexico head of
19    HR, and during that meeting I was informed
20    that they had reviewed the subsequent new
21    organization of the Gulf of Mexico and
22    were -- and had selected another individual
23    to take my role as vice president of Gulf of
24    Mexico and that in Barbara's view there were
25    no other roles for me left in BP.

1          Q.      So there was a reorganization,

2     your position or your role was eliminated by

3     BP, right?

4          MS. KARIS:

5               Object to form.

6          THE WITNESS:

7               So BP in the summer, fall of

8     2009 had begun to institute reorganizations

9     in all SPUs.  There were elements of what we

10    had done in the Gulf of Mexico that were

11    going to be a similar D&C organization in the

12    other strategic performance units.

13              They made -- what I refer to as

14    cascaded announcements, first the head of the

15    SPU.  So at that point, Neil Shaw was

16    announced to go to a new role.  I don't

17    recall the exact date.  A gentleman by the

18    name of James Dupree would take his place and

19    then there was going to be a next round of

20    announcements and I believe the announcement

21    that involved my role was made roughly

22    December 1st.  I was informed about 10 days

23    before that.

24    EXAMINATION BY MR. WATTS:

25         Q.      And you were told that in

1    addition to you no longer being the vice

2    president of drilling and completions, that

3    there was no other role in the company for

4    you?

5         MS. KARIS:

6              Object to form.

7         THE WITNESS:

8              If my recollection is correct,

9    what Barbara told me is that there had been

10   some -- that a selection had been made for

11   the vice president Gulf of Mexico, it had

12   been made, that someone else was going to

13   take my place and that she did not see an

14   opportunity or another role for me in the

15   rest -- in the remainder of BP.

16   EXAMINATION BY MR. WATTS:

17        Q.    Are you familiar with the

18   circumstances of the head of HSSE leaving the

19   company?

20        A.    At the time I left, I was not

21   certain about the decisions made below my

22   level, so up until the announcements that

23   were made which would have been referred to

24   as the SPU leadership team, those decisions

25   had not been made and I was not included in

1    those conversations.

2         Q.    Have you since learned what

3    happened to Curtis Jackson?

4         A.    My understanding is that Curtis

5    left the company sometime shortly after I

6    did.

7         Q.    You worked with Curtis on a

8    daily basis, right?

9         A.    Curtis and I worked -- if not

10   daily, several times a week.

11        Q.    And throughout the fall of 2009,

12   it was your impression that Curtis intended

13   to be at the company in 2010, wasn't it?

14        MS. KARIS:

15              Object to form.

16        THE WITNESS:

17              I was not aware of any intent

18   for Curtis to leave the company after 2009.

19   EXAMINATION BY MR. WATTS:

20        Q.    So the two guys who are leading

21   the effort jointly with respect to 2010

22   safety matters for the SPU leadership team,

23   both left the company before 2010 got going,

24   right?

25        MS. KARIS:

```
 1                    Object to form.
 2          THE WITNESS:
 3                    The -- my role as vice president
 4     of Gulf of Mexico D&C included the
 5     accountability to oversee the HSE efforts as
 6     well.  Curtis Jackson's role reported in to
 7     me, and so it would be an accurate statement
 8     that I had the oversight role responsibility
 9     for the SPU leadership team for HSSE.  I
10     departed in mid-December '10 and shortly
11     thereafter, the head of HSSE, Curtis Jackson,
12     departed as well.
13          MR. NICHOLS:
14                    You said 10, you meant 9.
15          THE WITNESS:
16                    I meant 9, sorry.
17     EXAMINATION BY MR. WATTS:
18          Q.    To put this bluntly, it was not
19     your idea to leave the company?
20          MS. KARIS:
21                    Object to form.
22          THE WITNESS:
23                    It had been my intent until the
24     point that I was informed that there was no
25     longer a role for me, I had intended to be at
```

```
1    BP, correct.
2    EXAMINATION BY MR. WATTS:
3         Q.    Curtis Jackson had intended to
4    be at BP as far as you knew?
5         MS. KARIS:
6              Object to form.
7         THE WITNESS:
8              Up until the departure date that
9    I left, I was not aware that Curtis would not
10   be at BP.
11   EXAMINATION BY MR. WATTS:
12        Q.    You two were in the midst of
13   leading the safety program for BP Gulf of
14   Mexico in 2010 when your departure was
15   announced?
16        MS. KARIS:
17             Object to form.
18        THE WITNESS:
19             We had that role accountability
20   up until my departure.
21             (Exhibit No. 2919 marked for
22   identification.)
23   EXAMINATION BY MR. WATTS:
24        Q.    I want to show you a document
25   that has a date after your departure.  This
```

1    is Tab 89, Exhibit 2919.  It's a PowerPoint

2    entitled "Process Safety Planning 2010."

3              You, as part of the safety

4    program in 2010, were going to have a role

5    with respect to process safety planning,

6    true?

7        A.     I would have maintained my role

8    with responsibilities for HSSE and as part of

9    a leadership team role for implementation of

10   the LOMS.

11       Q.     Now, if you could go to the

12   Bates page number ending 082.

13       A.     082.

14       Q.     It says:  "Process Safety 2010,

15   Plan Major Hazard Awareness."

16              Under the problems statement it

17   says:  "As we have started to more deeply

18   investigate process safety incidents, it's

19   become apparent that process safety major

20   hazards and risks are not fully understood by

21   engineering or line operating personnel.

22   Insufficient awareness is leading to missed

23   signals that proceed incidents and response

24   after incidents, both of which increases the

25   potential for, and the severity of, process

 1    safety-related incidents."

 2                Do you see that, sir?

 3        A.    Yes, I see that and it's a

 4    correct reading of that.

 5        Q.    If you go to the next page.

 6    Again, "Process Safety 2010 (Plan Major

 7    Hazard Awareness)."

 8                "Description," second sentence:

 9    "Historically, BP has had a sharp focus on

10    improving occupational safety.  We now need a

11    similar focus on frontline process safety

12    hazard recognition."

13                But down at the end of that

14    paragraph it says:  "The identification and

15    management of hazards is not being performed

16    consistently well throughout the SPU."

17                And then in the next bullet

18    point, second sentence --

19        A.    I'm sorry, which -- where are

20    you?  Okay, however, the identification has

21    not been performed consistently well

22    throughout the SPU.  That's correct.

23        *Q.    And the next bullet point,*

24    *second sentence:  "Gulf of Mexico is*

25    *experienced a number of serious and*

1    *potentially serious process safety incidents*

2    *as a result of insufficient identification*

3    *and management of major hazards.  This lack*

4    *of understanding has led to the disabling of*

5    *protective devices, insufficient knowledge of*

6    *the importance of maintaining protective*

7    *devices and verifying their reliability.*

8    *Considering loss of containment incidents as*

9    *minor environmental events and overlooking*

10   *the potentially serious process safety*

11   *consequences."*

12              *Do you see those, sir?*

13        MS. KARIS:

14              Object to form.

15        *THE WITNESS:*

16              *I see it.*

17   EXAMINATION BY MR. WATTS:

18        *Q.    Now, this, on the process safety*

19   *side, was going to be part of the safety plan*

20   *that you and Curtis Jackson were going to*

21   *tackle in 2010 before your exit of the*

22   *company, right?*

23        MS. KARIS:

24              Object to the form.

25        *THE WITNESS:*

1          *I cannot make that connection,*

2    *this is a plan or document that I was not*

3    *part of.  I would say that in Curtis' role*

4    *and my role as it was, prior to my departure,*

5    *I would have had an oversight role in the*

6    *development of the 2010 process safety plan,*

7    *the majority of the process safety plan still*

8    *resided around the producing assets.*

9    EXAMINATION BY MR. WATTS:

10          Q.     Now, go to Bates Page 088.

11          A.     I'm sorry?

12          Q.     088.  Again, "Major Hazard

13   Awareness, A-3."

14               The problem statement scope

15   says:  "Process safety major hazards and

16   risks are not fully understood by engineering

17   or operating staff."

18               Do you see that, sir?

19          A.     I see that.

20          Q.     Here's my question:  We have a

21   statement like that from back in 2008, we

22   have a statement here in January of 2010

23   where the problem statement is, you know,

24   major safety hazards and risks are not

25   understood by the engineering or operating

1   staff or the line operating personnel.  Why

2   is that a problem from a process safety

3   standpoint?

4       MS. KARIS:

5               Object to form.

6       THE WITNESS:

7               In the discussions in 2009 that

8   I participated from, this was a part of the

9   effort to generate awareness and

10   understanding that small releases or

11   shutdowns may signal other potential

12   problems.  And so the essence of process

13   safety is actually the absence of events and

14   you look for small things to indicate your

15   comprehensiveness and effectiveness, so, your

16   process safety system.

17   EXAMINATION BY MR. WATTS:

18       Q.    But if your line operating staff

19   and your engineering personnel do not

20   understand these major hazards and risks, why

21   is that a problem?

22       MS. KARIS:

23               Object to form.

24       THE WITNESS:

25               I can only offer a view that the

1    line sees these things first and, therefore,

2    must understand what these events or measures

3    or outcomes are indicating as it relates to

4    process safety because they're the first

5    responders, if you will.

6    EXAMINATION BY MR. WATTS:

7         Q.    Does good process safety

8    management require that the line personnel

9    fully understand the major risks?

10        MS. KARIS:

11              Object to form.

12        THE WITNESS:

13              Good process safety, in my view,

14   is required to be understood at multiple

15   levels.  Each is critical.  The line

16   understanding is more directly related to the

17   operating conditions and the potential for

18   escalation.

19   EXAMINATION BY MR. WATTS:

20        Q.    Now, I want to visit with you

21   again about some things that you said in that

22   speech.

23        A.    The October speech?

24        Q.    Yes, sir.

25        A.    Okay.

1      Q.     Slide 6.  Your speaker notes
2   say, on the third paragraph:  "The phrase
3   'trust us' will not work.  And our multiple
4   appearances in front of Congressional and
5   regulatory bodies has done little to improve
6   our situation.  All companies, not just BP,
7   are not trusted.  Second, we cannot expect to
8   continue to make risk based decisions in
9   deepwater involving well control and process
10  safety by using traditional risk analysis and
11  NPV or cost drivers.  It should have never
12  been that way to start with and that is where
13  company leadership must step up and
14  demonstrate a new approach.  We have to admit
15  we blew it."
16           Did I read that correctly?
17      A.     You did.
18      Q.     Now, here is my question:  With
19  respect to, we cannot expect to continue to
20  make "risk-based decisions" in deepwater
21  involving well control and process safety by
22  using traditional risk analysis and NPV or
23  cost drivers, what are you saying is wrong
24  with that?
25      MS. KARIS:

1                    Object to form.

2               THE WITNESS:

3                    My intent in this presentation

4        was to make the point that a static risk

5        matrix approach that used a quantitative risk

6        assessment of consequence versus risk was

7        inappropriate as it related to deepwater

8        because of the size of the consequence and

9        you could very easily estimate the

10       probability to be one in a million, and if

11       you used the quantitative risk assessment,

12       you may still make a decision based on that

13       quantitative risk assessment and the one in a

14       million chance could occur.

15       EXAMINATION BY MR. WATTS:

16            Q.     Your point, other places in the

17       speech, is not one in 100 years or one in a

18       million, it happens more frequently than

19       that.  It could be a one in five to 10-year

20       incident, right?

21            A.     That's correct.

22            *Q.     But your point is that when it*

23       *happens, the consequence is so great and so*

24       *severe that zero is the only probability that*

25       *you can afford to put into a risk assessment*

1     *analysis?*

2         MS. KARIS:

3             Object to form.

4         *THE WITNESS:*

5             *The intent, and the way I would*

6     *frame this that when it comes to process*

7     *safety in D&C, that's well control.  When it*

8     *comes to the possibility of a well control*

9     *event offshore particularly in deepwater, the*

10    *consequences are so high that everything*

11    *possible has to be done to have that*

12    *probability zero or as close to zero as*

13    *possible.*

14    EXAMINATION BY MR. WATTS:

15        Q.    Now, if we could get the

16    transcript of your speech, I want to visit

17    with you about some of the things that you

18    said.

19             First, we can start off at

20    Page 17, Line 22 through 24.  Page 17,

21    Line 22 through 24, you say:  "There's a lot

22    of things out there that worry me.  It's

23    competency, it's the model, the commercial

24    model and it's the relationship model.  So I

25    don't think it fits very well in the high

```
 1    reliability environment like what we need in

 2    deepwater."

 3                    What do you mean by being

 4    worried about competency?

 5         A.     This reference to competency is

 6    consistent with my stated concerns about the

 7    competency and the drilling contractor ranks

 8    offshore in the supervisory ranks for the

 9    operators offshore and in the office in terms

10    of well design and assurance of well design

11    in the operator ranks.

12         Q.     It's the model, the commercial

13    model.  What do you mean by that?

14         A.     In the -- in our industry, there

15    are behaviors that, as in any business, are

16    aligned to the commercial terms and

17    conditions.  For example, in the well

18    services side of the business, it is quite

19    easy to change a contractor such as a

20    Halliburton or Schlumberger for logging

21    operations.  Because of the competitive

22    nature of the business, they have to work

23    extremely hard to satisfy the operator

24    standards and preferences.

25                    In the drilling contracting
```

1    business, the drilling contractors are paid
2    almost regardless of what happens during that
3    day, the terms and conditions are such that
4    in some instances they may have a reduced
5    rate or a standby rate or a nonoperating
6    rate, but in the majority of time, you pay
7    for the rig while it's operating, whether
8    it's operating efficiently or inefficiently.
9    So there is not a commercial driver for
10   contractors that is as distinct and aligned
11   as there is in well services.
12        Q.    Now, further down the Page 18,
13   Line 5:  "This is the one the conference has
14   made some very pointed statements, it's
15   something we have to take on board, no matter
16   if you think it's fair or unfair,
17   congressional inquiry into the records, into
18   the e-mails, into the documents led them to
19   conclude that it was clearly dollars and
20   cents.  I don't believe that, as I said
21   earlier, that these risks were taken
22   ignorantly or unintentionally, but a process,
23   a procedure, some changes from routine
24   procedures were processed and received."
25                Did I read that correct?

1           MS. KARIS:

2                   Object to form.

3           THE WITNESS:

4                   That's read correctly, changes

5      from routine were -- I'm not recalling that

6      very last part of that statement.

7      EXAMINATION BY MR. WATTS:

8           Q.     Let me just ask you this:  When

9      you say you don't believe these risks were

10     taken ignorantly or unintentionally, you're

11     referring to the risks that were taken out

12     there on the Macondo by virtue of the work

13     that you did, with the papers that you wrote,

14     right, in the investigation that you did?

15          MS. KARIS:

16                  Object to form.

17          THE WITNESS:

18                  Based upon what has been

19     reported and many of these events,

20     discussions, decisions, would have been taken

21     after my departure, I see no evidence that

22     decisions were taken in light of clear -- I

23     didn't see any clear statements that

24     attributed to individuals making decisions

25     that it was clearly a dollars or cents risk,

```
 1    quantitative risk assessment.  That was my
 2    intent in that statement.
 3    EXAMINATION BY MR. WATTS:
 4         Q.     When you say that there was --
 5    you don't believe that the risks were taken
 6    ignorantly.  Ignorantly would be without
 7    knowledge of what's going to happen or what
 8    do you mean?
 9         A.     So my phrase there,
10    intentionally or ignorantly, was intended to
11    say, I believe that they probably used a
12    traditional risk assessment approach to
13    quantify some of the choices they had in
14    terms of the ultimate well design.
15         Q.     Lines 22, same page, and this is
16    the problem that BP now faces:  "Had they
17    been able to produce documents that really
18    indicated that the choices had absolutely no
19    bearing on the costs, they would not be in
20    this position right now."
21                Is that what you said in your
22    speech?
23         MS. KARIS:
24                Object to form.
25         THE WITNESS:
```

1                      If this is an accurate

2      transcript, yes.

3      EXAMINATION BY MR. WATTS:

4           Q.      When you say had BP been able to

5      produce documents that really indicated that

6      the choices had absolutely no bearing on

7      costs they would not be in this position

8      right now, what are you meaning to say?  What

9      are you getting at?

10           A.      What was reported that I read at

11      the time, this is back in the August,

12      September time frame, is that they had done

13      cost analysis on several of their decisions

14      regarding the well design.

15           Q.      Is doing cost analysis with

16      respect to well design something that is good

17      from the standpoint of process safety

18      management?

19           MS. KARIS:

20                  Object to form.

21           THE WITNESS:

22                  In all aspects of drilling

23      decisions, completion decisions, there will

24      be a cost -- in a cost analysis, there should

25      be a risk analysis, and the risk clearly

1    identified in terms of what the potential

2    outcomes could be and those get made

3    frequently every day in terms of a risk or a

4    cost trade-off.

5    EXAMINATION BY MR. WATTS:

6         Q.     Is what you're saying here that

7    risks should not be taken by virtue of

8    achieving lower costs?

9         MS. KARIS:

10             Object to form.

11         THE WITNESS:

12             My view is that in the area of

13    process safety well control, consistent with

14    our previous discussion, for example, on two

15    barriers, there has to be an approach that is

16    largely independent of cost decisions.  They

17    will be always connected to cost, but the

18    fundamental driver and I believe it states in

19    the DWOP policy, cost is actually fifth or

20    sixth in terms of priorities of decision

21    making.

22    EXAMINATION BY MR. WATTS:

23         Q.     In other words, just because you

24    can save money, you shouldn't violate a DWOP.

25         MS. KARIS:

```
 1                  Object to form.

 2          THE WITNESS:

 3                  DWOP, the intent, my

 4     understanding of a DWOP document or a similar

 5     document is that it is designed to be there

 6     so it overrides a decision that may be cost

 7     driven.

 8     EXAMINATION BY MR. WATTS:

 9          Q.      Now, later on, Page 19, Line 4:

10     "So in a business, the day in, day out, is a

11     million dollars a day, there is always going

12     to be pressure."

13                  Do you see that, sir?

14          A.      Page 19 which --

15          Q.      Yes, sir.  Page 19, Lines 4

16     through 6.

17          A.      Yes, uh-huh (indicating

18     affirmatively).

19          Q.      So in a business, the day in,

20     day out is a million dollars a day, there is

21     always going to be pressure.

22          A.      Yes.

23          Q.      What pressure are you referring

24     to?

25          A.      There will be pressure between
```

1    the desire to save money or complete wells as

2    fast as possible to put them on production or

3    to announce the discoveries, that is the

4    normal part of the business that you have to

5    manage and deal with.

6         Q.     Now, Line 14 of Page 19:  "It

7    follows the pattern, the incident follows the

8    pattern of what we learned in major incidents

9    that some pressure exceeded some barrier and

10   it penetrated that barrier.  There was a lack

11   of clear detection.  There was a lack of

12   clear response.  There was a lack of

13   emergency readiness and so it failed and

14   penetrated all the barriers to the event that

15   we have.

16             "Now back to the previous slide.

17   The pressure that I'm talking is not 15,000

18   psi, it's the pressure that occurs onshore.

19   It's the pressure that occurs in the board

20   room.  It's the pressure that occurs between

21   the VP of drilling and VP of assets.  That

22   pressure will remain, it will remain, but

23   we've got to insulate some of our decisions

24   from pressure from costs, from pressure from

25   scheduling and pressure from production

1    because if we don't, we will repeat this

2    incident."

3              That's what you told the Society

4    of Petroleum Engineers on October the 5th of

5    2010, right?

6         MS. KARIS:

7              Object to form.

8         THE WITNESS:

9              That is correct.

10   EXAMINATION BY MR. WATTS:

11        Q.    Now, what were you attempting to

12   communicate in delivering that message to the

13   Society of Petroleum Engineers on

14   October 2010?

15        A.    The points that I was trying to

16   make is that every organization, every D&C

17   organization, land, offshore, deepwater, will

18   consistently continuously, regardless of

19   company, be pressured on costs and schedule.

20   As it relates to the area of well control,

21   the people in the accountable positions for

22   the D&C discipline, have to be able to

23   withstand inordinate pressure or inadequate

24   appreciation for the risk and make decisions

25   that are correct according to either a

1    technical standard or a risk assessment.

2         Q.    As opposed to -- we're way over

3    budget on a well and we're behind time and we

4    got to finish this thing.

5         MS. KARIS:

6              Object to form.

7         THE WITNESS:

8              The decisions as regard to

9    maintaining well control have to be

10   independent of whether you are ahead of

11   schedule, behind schedule, ahead of

12   production, behind production, above costs.

13   EXAMINATION BY MR. WATTS:

14        Q.    And next you say:  "I would like

15   to offer that catastrophes are caused by

16   forces that penetrate barriers and these are

17   the things that we have got to take into

18   account because once it occurs, once we lay

19   down, it's almost too late."

20        A.    That's correct.

21        Q.    You have written an article

22   about the Macondo blowout, right?

23        A.    I have co-authored a paper with

24   David Pritchard which lifted my documents, my

25   comments, some of my pictorials into a joint

1    article, yes.

2           Q.     And who is David Pritchard?

3           A.     David Pritchard is an

4    independent consultant who I first met when I

5    worked at Chevron, who has worked

6    independently on a variety of projects for me

7    at Chevron, did not work for me at BP.

8           Q.     In writing this paper with David

9    Pritchard, you two went back and analyzed a

10   number of things that went wrong on Macondo,

11   true?

12          MS. KARIS:

13                 Object to form.

14          THE WITNESS:

15                 No, that's not correct.  In the

16   construction of this paper, David asked me if

17   he could take my speech and some of the

18   points that I made in the speech and put

19   those into his paper.  I agreed subject to

20   final review that my comments were accurate

21   and not misrepresented, and I had no serious

22   concerns with how he was presenting his

23   points.

24   EXAMINATION BY MR. WATTS:

25          Q.     Sure.  Okay.  And as a result

1    you were a co-author on the paper because

2    your material was in there and you did get

3    that final review and did sign off on the

4    paper.

5          A.    I did.

6          Q.    Now, with respect to this

7    pressure that you were talking about, when

8    you were advised by Barbara Yilmaz that you

9    had not been selected as the vice president

10   in the reorganization, there was no place for

11   you at BP, did you have a subsequent

12   communication with her where you communicated

13   safety concerns that you had?

14         A.    I had -- to my knowledge or

15   recall, I don't recall a subsequent

16   conversation with Barbara beyond that morning

17   or afternoon.

18         Q.    Did you communicate that morning

19   or that afternoon safety concerns that you

20   had?

21         MS. KARIS:

22               Object to form.

23         THE WITNESS:

24               In that conversation with

25   Barbara, I first expressed great surprise,

1      given our track record, our performance,

2      performance improvement, turnarounds, all the

3      things I had been asked to do and the

4      measures that we were measuring.  I had had

5      no prior significant idea that this was

6      occurring, so I expressed that surprise.  I

7      expressed my concern that the changes and the

8      processes that we were implementing would

9      take at least one more year to fully

10     implement and in my view be sustainable, that

11     they were very fragile at that point in time.

12     I also expressed my concern about her

13     selection of my replacement.

14     EXAMINATION BY MR. WATTS:

15          Q.     Who was your replacement?

16          A.     I was told that my replacement

17     would be Pat O'Bryan.

18          Q.     I need as much detail as you can

19     give me with respect to what was said.

20     You've told me about the great surprise that

21     you expressed with what was happening to you.

22     But you also said you expressed your concern

23     that the changes that you were implementing

24     in the safety process would take a year to

25     implement and were very fragile.  What

1    specifically was said to her in that meeting?

2        MS. KARIS:

3            Object to form.

4        THE WITNESS:

5            Given the amount of time, I am

6    sure I don't recall exactly, I can say

7    generally surprised and as indicated earlier,

8    I had expected to continue in the role.  I

9    was already aware that Harry Thierens was

10   being changed and had previously expressed

11   concerns to Barbara that that was a

12   significant change and I was not in agreement

13   with his replacement.

14           So in that final conversation

15   with Barbara, my concerns as it related to

16   the things we were doing had as much to do

17   with the decision that became apparent at

18   that morning that the intent was not only to

19   change and replace Harry Thierens, but also

20   myself within a month.

21           As I just mentioned, I believe,

22   I expressed concerns about the permanence --

23   we had just literally approved the risk

24   assessment process that Harry and I had

25   developed over the last year.  Harry was

1    departing, I was departing, I was very

2    concerned about the risk assessment process

3    and the implementation of that process, and

4    that's mostly what I recall of my concerns in

5    that meeting of the day.

6    EXAMINATION BY MR. WATTS:

7         Q.    Now, you and I have looked at

8    several documents where BP in its document

9    says that operating and line personnel do not

10   understand, do not have an appreciation for

11   the major risks that they face out there.  Do

12   you remember that?

13        A.    That's correct.

14        Q.    Part of your risk assessment

15   process was to remedy that lack of

16   understanding among line personnel with

17   respect to the major risks that are incumbent

18   or that exists in the drilling and completion

19   process, right?

20        MS. KARIS:

21            Object to form.

22        THE WITNESS:

23            I would say that's correct.

24   EXAMINATION BY MR. WATTS:

25        Q.    You and Harry Thierens spent a

1    great deal of time doing these risk

2    assessments that you and I have gone through

3    this morning, right?

4         A.     Harry was in the Gulf of Mexico

5    business unit a year before I arrived and

6    then we worked together for close to two

7    years.  We were very much aligned about

8    developing an effective risk assessment

9    process.  We believe, in the fall of 2009, we

10   had done a very good job and I believe it was

11   presented to Barbara Yilmaz and the rest of

12   the drilling managers as a best practice.

13        Q.     When was the risk assessment

14   best practice presented to Barbara Yilmaz?

15        A.     It would have been in November

16   of 2009, I believe.

17        Q.     How long after you presented

18   that risk assessment best practice were you

19   called into this meeting with human resources

20   and told that your position was -- you were

21   being replaced and there was no other place

22   for you in the company?

23        A.     I believe that would have been

24   somewhere between two and maybe eight days.

25   Somewhere in that time frame.

```
 1          Q.     Now, what I would like to do is
 2     visit with you about those days.  First of
 3     all, at the time that you presented the risk
 4     assessment best practice, it was early
 5     November 2010 (sic), right?
 6          A.     I believe it was presented to
 7     the D&C leadership team in November.  Barbara
 8     had what she called her DCL sometime in
 9     November which both Harry and I attended.  I
10     didn't attend the full meeting.  I believe I
11     recall making a presentation on the success
12     of the Gulf of Mexico transformation to
13     inform the other drilling managers who were
14     embarking on a similar effort in the other
15     SPUs, Harry did the presentation on the risk
16     assessment or risk management program and I
17     don't recall the exact day in November.
18          Q.     But what you do recall is that
19     you and Harry presented the risk assessment
20     program to the D&C leadership team, right?
21          A.     To the Gulf of Mexico -- it was
22     presented to us in the Gulf of Mexico
23     leadership team and then I believe shortly
24     thereafter, a matter of a few weeks, it was
25     presented to all the other drilling managers
```

1    for the BP organization.

2         Q.     In other words, the corporate

3    level, the BP group?

4         A.     It would have been both --

5    Barbara's staff plus the other drilling

6    managers in the other locations.

7         Q.     Now, how long did those

8    presentations last?

9         A.     I'd be guessing, the risk

10   assessment one was at most 15 to 30 minutes,

11   in that framework.

12        Q.     And the risk assessment one

13   included some of the assessments that you and

14   I have gone through about what the

15   consequences would be of an uncontrolled well

16   event?

17        MS. KARIS:

18             Object to form.

19        THE WITNESS:

20             I don't believe so.  I believe

21   what Harry presented at that time was the

22   risk assessment process tool and I don't

23   recall the actual slide.

24   EXAMINATION BY MR. WATTS:

25        Q.     I guess really what I was

```
1    getting at is when you all had these
2    meetings, there is a lot of prereads with
3    attachments and those kinds of things, right?
4          A.     Frequently there was prereads,
5    materials and presentation.
6          Q.     That's really what I was getting
7    at.
8          A.     Yeah.
9          Q.     The documents that you and I
10   have gone through in terms of risk
11   assessments and categorization and those kind
12   of things are documents that I found in those
13   prereads and what happens is in order to keep
14   the meeting going efficiently, before the
15   meeting all the attachments will be presented
16   as prereads and then there will be a short
17   verbal presentation, right?
18         MS. KARIS:
19                Object to form.
20         THE WITNESS:
21                That's correct.
22   EXAMINATION BY MR. WATTS:
23         Q.     Okay.
24         A.     I don't believe these documents
25   that we've looked at individually for the
```

1      Gulf of Mexico were ever presented at that
2      DCL.
3           Q.      In terms of your presentation in
4      the DCL, did you say anything controversial
5      that would get you fired?
6           A.      Not to my knowledge.
7           Q.      Was everything in your
8      presentation, a presentation with respect to
9      risk assessment, risk mitigation on matters
10     of safety?
11          MS. KARIS:
12               Object to form.
13          THE WITNESS:
14               If I recall correctly, and I
15     don't have the presentation, we, I presented
16     some of the key learnings about maintaining
17     safe operation while we were changing the
18     organizational structure in the Gulf of
19     Mexico to give the other drilling managers
20     some insights into what we did in the Gulf of
21     Mexico.
22     EXAMINATION BY MR. WATTS:
23          Q.      All right.  The 1st of
24     November 2010 (sic) is on a Monday.  Do you
25     recall with any more specificity when this

1    presentation was made?

2         A.    No, honestly, the only firm

3    dates I recall is that there was the

4    announcement, the public announcement that I

5    was not going to be the vice president in

6    December, I think December 1st.  The day

7    before that, because I was on Thanksgiving

8    vacation, I called a teleconference with my

9    direct reports and informed them.  Somewhere

10   prior to Thanksgiving, I was told by Barbara

11   and Paul McIntyre and somewhere between two

12   and ten days I believe that DCL meeting

13   occurred, which should have all been in the

14   month of November.

15        Q.    Right.  Let me ask you this:

16   Was Barbara Yilmaz at that DCL meeting?

17        A.    Yes, she was.

18        Q.    Did you make any other

19   presentations to her between the time of the

20   DCL presentation on risk assessment until the

21   time of your meeting with her in the human

22   resources?

23        A.    Not to my knowledge.

24        Q.    Was your presentation with

25   respect to risk assessment how to conduct the

```
1     operation safely over the next year while
2     it's being implemented, was that the last
3     time you talked to Barbara Yilmaz before she
4     told you that you had been replaced and that
5     there was no other place in the organization
6     for you?
7          MS. KARIS:
8                Object to form.
9          THE WITNESS:
10               To my recollection, my last
11    public appearance with Barbara would have
12    been that meeting and then the next time I
13    saw her or spoke with her would have been
14    when she informed me of -- that I was being
15    replaced.
16    EXAMINATION BY MR. WATTS:
17         Q.    You mentioned earlier that you
18    had previously expressed concerns about your
19    replacement.  Your replacement was Pat
20    O'Bryan?
21         A.    That is correct.
22         Q.    What were the concerns that you
23    expressed to Barbara Yilmaz about Pat O'Bryan
24    replacing you?
25         A.    I expressed two concerns.  One
```

```
 1     is in combination with the change of Harry
 2     Thierens' role and my role so close together,
 3     that gave me concerns about the organization
 4     being able to effectively manage, to use a
 5     broad term.
 6              I also questioned at the time
 7     that I wasn't sure Pat was a good fit for the
 8     role.
 9        Q.    Let me ask you about something
10     that you said in a speech, if you could go to
11     Page 22, Line 11, Page 22 Line 11 through 20
12     you say:  "Finally -- this is going to be
13     very unpopular in the board room -- dollar
14     consequences are not adequate.  I sincerely
15     believe that in a commercial market like we
16     have in the U.S., there has to be a process
17     that involves holding people personally
18     liable for serious mistakes available.  We
19     put CFOs in jail.  I think we have to
20     consider the process and the consequences
21     have to be severe enough to get people at all
22     levels to think deeply about what happens
23     when they do the wrong thing."
24              What made you put that in your
25     speech?
```

```
 1        MS. KARIS:
 2                Object to form.
 3        THE WITNESS:
 4                When I was briefed, I will go
 5   back to 1996, and assuming the role in the
 6   general manager of operations for Europe, in
 7   their -- as it was briefed to myself at the
 8   time, that under their regime, regulatory
 9   regime, should an individual offshore turn
10   the wrong valve, press the wrong button, make
11   a poor decision, their process initially
12   started with, in effect, bringing criminal
13   charges to the top person.
14                That is the first time I had
15   heard that I could be -- lose my personal
16   freedom.  It caused me to think very deeply
17   about how I could prevent a mistake being
18   made offshore, even though I might never meet
19   the individual, brief the individual, or
20   instruct the individual about how they were
21   to carry out their work.
22                So after a lot of deep thought
23   and working to understand how I would
24   discharge my responsibilities so that those
25   individuals offshore properly discharge their
```

1    responsibilities, so that's the genesis of

2    this comment.  The other part of this comment

3    is that in the learnings and my observations

4    as it related to the implementation of the

5    Sarbanes-Oxley legislation there was very

6    serious attention put in by my observation at

7    companies while at Chevron and while at BP to

8    the accuracy of financial documents because

9    of the threat of loss of personal freedom.

10   And also that there are learnings from Texas

11   City that indicated that BP prioritized where

12   there were fines and loss of privilege to

13   operate.

14           So my conclusion was that in the

15   challenging deepwater environment or the

16   regulators are handicapped to know fully what

17   they need to know, that it has to be the

18   operators to self-police, and in this

19   comment, I felt that in my experience, the

20   one thing that most caught my attention about

21   how I was to discharge my responsibilities

22   was the threat of loss of personal freedom.

23   EXAMINATION BY MR. WATTS:

24           Q.    Okay.  Later down the page, on

25   Page 24, Line 4, you said:  "The Genie is out

1      *of the bottle.  We can't put it back.  We*
2      *have cost 11 lives and $50 billion."*
3                  *Is it your view that after the*
4      *Macondo explosion and oil spill, that the*
5      *industry must remake the way it does process*
6      *safety in deepwater?*
7          MS. KARIS:
8                  Object to form.
9              *THE WITNESS:*
10                 *My perspective prior to Macondo*
11     *incident, post-Macondo incident, is that as*
12     *it relates to the understanding and*
13     *implementation of process safety, that the*
14     *exploration and production companies have to*
15     *do more than has been historically done in*
16     *the area of process safety if we want to*
17     *avoid a similar incident.*
18     EXAMINATION BY MR. WATTS:
19         Q.    Okay.  Later on Page 24,
20     Line 20, you say:  "The industry has failed
21     itself.  We failed the American public.  We
22     failed the citizens of the Gulf of Mexico.
23     We owe it to them and to ourselves to come up
24     with a better approach in deepwaters.
25                 "As I mentioned, it's a

```
 1    strategic asset.  It has to be developed, but
 2    it has to be developed safely.  I'm more than
 3    convinced that we have adequate technical
 4    capabilities.  I'm less convinced that we
 5    have got the partnership skills and the
 6    leadership skills."
 7                Is that the way you ended your
 8    speech to the Society of Petroleum Engineers
 9    on October 5th, 2010?
10        MS. KARIS:
11                Object to form.
12        THE WITNESS:
13                I believe so.
14    EXAMINATION BY MR. WATTS:
15        Q.    Now, were you ever told why BP
16    invited you out of the company as it did?
17        A.    No, I was not.  The statement
18    that Barbara used is the decision had been
19    taken and it was final.
20        Q.    Did she tell you who made that
21    decision?
22        A.    No, she did not.
23        Q.    Did she have the authority to
24    make that decision?
25        A.    I do not know.
```

1       Q.      In your speech, you made

2    repeated references to pressure overcoming

3    barriers, pressure from costs, pressure from

4    schedules.

5               What caused you to include that

6    in your speech with respect to the Macondo

7    failure?

8    MS. KARIS:

9               Object to form.

10   THE WITNESS:

11              The primary reason would be, as

12   I stated earlier, that in all instances of

13   any type of well the drilling completion

14   professionals are always asked to hurry or to

15   get -- save costs, or to do it faster, do it

16   cheaper, that's common.

17              As it relates to Macondo, it

18   more is related to the possibility that cost

19   pressures might have occurred.  I'm -- again,

20   with a four-month gap, I'm not privy to their

21   conversations relative to costs, et cetera.

22              I have some observations

23   relative to my time there during 2009 on cost

24   pressures, but they're not necessarily

25   relevant to the decisions that were made on

1    Macondo.

2    EXAMINATION BY MR. WATTS:

3        Q.      Before we get into documents in

4    2009 relating to cost, why don't you in your

5    own words give me your observations on what

6    you saw with respect to cost pressures

7    affecting drilling and completion operations

8    in the deepwater Gulf of Mexico?

9        MS. KARIS:

10               Object to form.

11       THE WITNESS:

12               While at BP?

13   EXAMINATION BY MR. WATTS:

14       Q.      Yes, sir.

15       A.      In a, I guess a shorter or broad

16   summary, I would say that in the rapid

17   increase of oil prices that occurred in 2008

18   and the rapid descent, there was significant

19   concern as oil prices fell that the Gulf of

20   Mexico operations would continue to be viable

21   and economic.  So there were a number of

22   conversations and efforts that took place

23   over the late 2008, probably through mid-2009

24   time frame around cost, cost reduction, staff

25   counts, organizations, et cetera.

```
 1              Q.      When you say there were a number
 2      of conversations, those conversations come in
 3      the form of direction from management?
 4           MS. KARIS:
 5                      Object to the form.
 6           THE WITNESS:
 7                      There were -- there were
 8      directions, there were documents that gave
 9      directives about what I would say modest to
10      minor items to save costs and general
11      directions about finding things that were
12      potential cost savings in 2009.
13      EXAMINATION BY MR. WATTS:
14              Q.      Were you on the exploration and
15      production segment leadership team?
16              A.      I don't believe so.  I'm not
17      sure.  I attended conferences where hundreds
18      of people were there, but nothing smaller
19      than that.
20              Q.      In attending the exploration and
21      production segment leadership team
22      conferences where there were a lot of people
23      there, were specific cost reduction
24      directives given to the management of the
25      Gulf of Mexico drilling and completions?
```

1          MS. KARIS:

2                    Object to form.

3          THE WITNESS:

4                    I do not recall any of those in

5     terms of directives.

6     EXAMINATION BY MR. WATTS:

7          Q.     Let me -- let me see if we can

8     go about it this way.  You mentioned

9     conversations about cost reductions and staff

10    reductions.  Who were those conversations

11    with?

12         A.     Most frequently, those would

13    have been between myself and Neil Shaw.

14         Q.     Okay.  And what would Neil Shaw

15    tell you about the need to reduce costs and

16    reduce staff?

17         MS. KARIS:

18                   Object to form.

19         THE WITNESS:

20                   Neil would -- I think the

21    conversations would primarily relate to two

22    general areas whether the D&C organization

23    was following through with some of the

24    cost-saving ideas or focus areas, and then

25    whether or not D&C was making progress on

1    saving costs during the 2009 time frame in

2    terms of our capital costs.

3    EXAMINATION BY MR. WATTS:

4         Q.    I talked to Doug Suttles a

5    couple of weeks ago.  Did you office in the

6    same building with Mr. Suttles?

7         A.    There was -- I was on the 20th

8    floor of Westlake 4.  I believe that there

9    was a period of time that Doug Suttles had a

10   temporary office, actually previously where

11   Neil Shaw sat for a period of a few weeks.  I

12   probably had one or two informal chats.

13        Q.    How many levels of hierarchy

14   were between you and Doug Suttles?

15        A.    There should -- to my knowledge,

16   I would think there was one, it was myself to

17   Neil Shaw, Neil Shaw, I believe, to Doug

18   Suttles but he may have reported to Andy

19   Inglis instead, I'm not clear.

20        Q.    Andy Inglis was the chief

21   executive officer of exploration and

22   production?

23        A.    That is correct.

24        Q.    Doug Suttles was the chief

25   operating officer of exploration and

```
 1    production?
 2           A.      That is correct.
 3           Q.      Neil Shaw held what position?
 4           A.      Neil Shaw was the -- I believe
 5    his title was the vice president of Gulf of
 6    Mexico's strategic performance unit.
 7           Q.      And then you as the -- I'm
 8    sorry, Gulf of Mexico strategic
 9    performance --
10           A.      Unit, yes.  SPU.
11           Q.      And then you as the vice
12    president of integrity --
13           A.      Of drilling completions.
14           Q.      -- drilling and completions,
15    received your direction immediately from Neil
16    Shaw?
17           A.      That's correct.
18           Q.      And in terms of the
19    conversations that you told me about that
20    were focused on cost reduction and staff
21    reduction, your recollection is that those
22    occurred between you and Neil Shaw in late
23    2008 and throughout 2009?
24           MS. KARIS:
25                   Object to form.
```

```
 1          THE WITNESS:
 2               Yes.  I would say that the
 3    issues around cost savings surfaced in
 4    late '08.
 5    EXAMINATION BY MR. WATTS:
 6          Q.     Right.
 7          A.     As the 2009 plans were being put
 8    together and were -- until oil prices climbed
 9    again were fairly -- that was a major focus
10    area, surely at least through April or July
11    of '09.
12          Q.     Now, let me see if we can go
13    about it this way without me having to take
14    you through all the documents I went through
15    with Mr. Suttles.
16          A.     Okay.
17          Q.     Were you shown documents where
18    Andy Inglis set forth cost reduction
19    criteria, thou shall reduce costs by
20    4 percent this year?
21          MS. KARIS:
22               Object to form.
23          THE WITNESS:
24               I was not shown any of those
25    documents.  What I was -- the way the process
```

1    worked is that Neil agreed his performance

2    contract and targets some matrix with Andy, I

3    believe.  I'm not sure what role Doug may

4    have played in that, and then Neil gave those

5    to us for us to develop our performance

6    contract for the year, for 2009.

7    EXAMINATION BY MR. WATTS:

8          Q.     And with respect to 2008, the

9    Gulf of Mexico reduced its costs in 2008

10   versus 2007 while holding production -- or

11   increasing production, right?

12         MS. KARIS:

13                Object to form.

14         THE WITNESS:

15                I seem to recall that was

16   correct.

17   EXAMINATION BY MR. WATTS:

18         Q.     And in 2009, after reducing

19   costs between 2008 and 2007, in 2009, the

20   Gulf of Mexico drilling and completion again

21   reduced its cost in 2009 relative to 2008?

22         MS. KARIS:

23                Object to form.

24         THE WITNESS:

25                I recall in 2009 in particular

1    when we had an extra focus on it, it was a

2    fairly exceptional effort, my recollection is

3    we saved 10 percent on our estimated costs

4    that year.

5    EXAMINATION BY MR. WATTS:

6         Q.    And the way that you all saved

7    10 percent on your costs included staff

8    reductions?

9         A.    I don't recall any staff

10   reductions in the D&C organization.

11        Q.    What about 2008?

12        A.    The staff reductions in 2008

13   occurred as a result of attrition, not

14   intentional cuts.

15        Q.    What about the safety

16   organization?

17        A.    There was a review of the safety

18   organization.  I don't recall -- I recall

19   some elimination of programs.  Neil had a

20   number of questions.  I don't recall any

21   distinction staff reductions in the GoM.

22        Q.    Do you recall the reorganization

23   that sent those jobs to England?

24        A.    No, I don't.

25        MR. WATTS:

1             Let's take a break, we're

2    running out of video.

3         THE VIDEOGRAPHER:

4             We're going off the record at

5    11:52.  This is the end of Tape 3.

6             (Whereupon, a lunch recess was

7    taken.)

8         THE VIDEOGRAPHER:

9             We're back on the record at

10    1:03.  This is the beginning of Tape 4.

11             (Exhibit No. 2920 marked for

12    identification.)

13    EXAMINATION BY MR. WATTS:

14         Q.    Before we begin housekeeping,

15    Tab 82, which we previously used as

16    Exhibit 2914.  But we're going to go to Tab

17    22, Mr. Lacy, which is Exhibit 2920.

18         A.    22?

19         Q.    22.  Tab 22, Exhibit 2920, is an

20    e-mail from Neil Shaw to several others,

21    including yourself, on September the 5th of

22    2009.  At this time, Neil Shaw was your

23    direct report within the company, is that

24    right?

25         A.    That's correct.

1          Q.     It's talking about the -- "we
2     have a very good pack for the performance
3     fest.  Some final areas for us to progress
4     early next week."
5               And I want to ask you about the
6     first two paragraphs.  Under 2010 production,
7     it says:  "The segment is short.  Expect
8     challenge given our continual over delivery
9     in 2009."
10               And then we go down to 2010
11     costs, it says:  "There is concern that three
12     SPUs are carrying very large overviews and
13     expect pressure for this to be spread around.
14     Need to ensure that we have next level of
15     detail on the action plan."
16               Do you see that, sir?
17          A.     I do.
18          Q.     You mentioned before the lunch
19     break that there were several conversations
20     that Kevin Lacy (sic) had with you about the
21     need for cost reduction, monitoring,
22     staffing, this kind of thing.
23               Did Mr. Shaw explain to you that
24     the Gulf of Mexico SPU was being called upon
25     to cut costs in order to cover for cost

1    overruns in other SPUs?

2         MR. NICHOLS:

3              I think you misspoke.  I think

4    you said several conversations Kevin Lacy had

5    with you.

6         THE WITNESS:

7              He meant Neil Shaw.

8         MR. WATTS:

9              It's lunch.  Objection to form

10   sustained.  Thanks.  Let me try again.

11   EXAMINATION BY MR. WATTS:

12        Q.    You had mentioned several

13   conversations that Neil Shaw had with you

14   with respect to costs.  Looking at this memo,

15   my question is:  Did Mr. Shaw explain to you

16   that the Gulf of Mexico needed to cut costs

17   in order to make up for other SPUs that had

18   exceeded their cost estimates?

19        MS. KARIS:

20             Object to form.

21        THE WITNESS:

22             So in the relation to this memo,

23   now that I've read it, I recall the memo,

24   there were -- I don't recall an individual

25   conversation at this time with Neil about

1    any -- anything extraordinary that we were

2    going to be expected to do in Gulf of Mexico

3    other than similar repeat of 2009

4    performance.

5    EXAMINATION BY MR. WATTS:

6         Q.    Okay.  When you say a similar

7    repeat of 2009 performance, that would be

8    from the standpoint of cutting costs relative

9    to the preceding year, right?

10        A.    Yes.

11        Q.    Okay.  We talked a little bit

12   about manpower and I want to visit with you

13   about that a little bit.  From the standpoint

14   of the manpower levels that existed within

15   BP's Gulf of Mexico drilling and completion

16   operations, was the number of wells actually

17   being drilled by BP greater than it used to

18   be in the Gulf of Mexico?

19        MS. KARIS:

20             Object to form.

21        THE WITNESS:

22             I'm fairly certain that there

23   had been a high activity level certainly

24   with '08 and '09 relative to previous years.

25   On the forecast for 2010, we were adding two

1    new rigs, two new Pride rigs, a couple of
2    rigs had gone away so, plus or minus one or
3    two rigs, so it was probably historically
4    high.
5    EXAMINATION BY MR. WATTS:
6         Q.    And when we're talking about
7    head count levels, if you keep a head count
8    the same, but you're doing a lot more
9    activity, does that present the same
10   challenge as doing the same amount of
11   activity and reducing head count?
12        MS. KARIS:
13             Object to form.
14        THE WITNESS:
15             In this particular case, the way
16   we projected our requirements in a number of
17   requests and documents, we managed our
18   organization on a rig line basis per rig.
19   There was a fairly clear requirement and the
20   numbers would be the same, the level of
21   competencies or qualifications might vary
22   because we would have to pull people in to
23   satisfy that demand from North America Gas or
24   other parts of BP.
25   EXAMINATION BY MR. WATTS:

 1          Q.     I've discussed with some other
 2    witnesses the number of offshore rigs across
 3    the industry rising dramatically from, say,
 4    2000 to 2010, you saw that, right?
 5          A.     Correct.
 6          Q.     And one of the concerns that you
 7    as a safety professional had is that when you
 8    go from a small number of rigs to a large
 9    number of rigs, you've got to populate those
10    rigs with qualified personnel to run them?
11          A.     Correct.
12          Q.     And you were concerned that
13    there was a personnel shortage in the
14    industry with respect to qualified personnel,
15    right?
16          A.     Yes, starting with the ramp up
17    beginning around 2006, I had concerns about
18    the ability to staff with equivalent
19    competencies offshore.
20                 (Exhibit No. 2921 marked for
21    identification.)
22    EXAMINATION BY MR. WATTS:
23          Q.     In fact, you gave speeches about
24    that, if you go to Tab 52, I think in the
25    Drilling Contractor magazine in September and

 1    October of 2007, you're quoted as saying:

 2    "The reality is that we're in a personnel

 3    shortage that will probably stay with us for

 4    a while."

 5              That's what you thought, right?

 6         A.    That's correct.

 7         Q.    By the way, Tab 52 is

 8    Exhibit 2921.  With respect to how to deal

 9    with personnel shortage and the fact that you

10    were running a lot more rigs as part of this

11    ramp up, did you propose that BP create a new

12    position of a manager for deepwater rigs that

13    could help manage this ramp up?

14         MS. KARIS:

15              Object to form.

16         THE WITNESS:

17              I don't -- if I recall any

18    recommendation, it was around how we managed

19    the relationship with the contractors, the

20    deepwater fleet, rig strategy.  Not an

21    operational role that I remember.

22              (Exhibit No. 2922 marked for

23    identification.)

24    EXAMINATION BY MR. WATTS:

25         Q.    Let me just point you to Tab 80,

1      if we could, it's probably in the second one.

2      This is Exhibit 2922.  This is an e-mail from

3      Jonathan Sprague to you and Harry Thierens on

4      September 22nd, 2009 on the subject of DCR

5      staffing.

6              A.      Correct.

7              Q.      Mr. Sprague asked you and Harry:

8      "Do you think we should 'dust' this off?"

9                      And then there's a PowerPoint

10     with respect to drilling and completion

11     resource readiness review, people, rigs,

12     plans, long leads.

13                     Do you see that, sir?

14             A.      I do.

15             Q.      And I want to take you to the

16     Bates page that ends 155.

17             A.      (Complying).

18             Q.      And it asks the question:  "How

19     did we get here?"

20                     And the first bullet point says:

21     "Although the central drilling and

22     completions team has surfaced efficiencies in

23     manpower resourcing, it was not originally

24     designed to handle the level of activity that

25     currently exists in our current rig

1    schedule."

2                    Do you see that, sir?

3         A.      I do.

4         Q.      This sounds suspiciously like

5    your words.  Did you write this?

6         A.      No.  This is Jon Sprague's.

7         Q.      Was it understood within BP's

8    Gulf of Mexico operation that this personnel

9    shortage that you had talked about and this

10   ramp up of the number of rigs created a real

11   manpower issue out there?

12        MS. KARIS:

13                    Object to form.

14        THE WITNESS:

15                    Based on conversations that I

16   had with Harry Thierens and Jon Sprague, I

17   believe we held a similar view about the

18   concerns of staffing capabilities,

19   competencies and potential impacts it might

20   have on us.

21   EXAMINATION BY MR. WATTS:

22        Q.      All right, and if you go to 170.

23   It looks like there's a proposed manager of

24   deepwater rigs that would report to the vice

25   president of deepwater Gulf of Mexico

1    drilling and completions.  And then on the
2    next page, the second-to-last dash, says:
3    "Secure Neil Shaw approval for rig management
4    organization, and fill TBN vacancies."
5         A.    That's correct.
6         Q.    And I guess, I don't want to ask
7    you whether this refreshes your recollection,
8    but what is this referencing?
9         A.    Now that you've referenced it to
10   this, I believe we had a gentleman by the
11   name Paul Sullivan that joined the Gulf of
12   Mexico business unit who came from Azerbaijan
13   and his role was designed to oversee the
14   building of either the company-owned rigs
15   and/or the delivery and start-up of the new
16   rigs, for example, the two Pride rigs that
17   were coming in 2010 and I'm fairly certain he
18   joined our organization in mid-'09 or
19   something in that time frame.
20              (Exhibit No. 2923 marked for
21   identification.)
22   EXAMINATION BY MR. WATTS:
23        Q.    Back to the personnel issue.  In
24   your paper with Mr. Pritchard, which is
25   Tab 97, this paper is the Macondo blowout

```
 1    third progress report from the DEEPWATER

 2    HORIZON study group, and it's dated

 3    December 5th of 2010, is that correct?

 4         A.    Yes, that's correct.

 5         Q.    And I marked it as Exhibit 2923.

 6    I want to just ask you about one thing that's

 7    in this paper.  If you go to the third page

 8    on Page 39.

 9         A.    (Complying).

10         Q.    Under the Macondo incident and

11    organizational issues, the second paragraph

12    says:  "The deep water rig fleet is increased

13    by 300 percent.  Has competency and

14    reliability is increased in the same manner?"

15              This is that personnel shortage

16    and lack of experienced personnel issue that

17    you were referencing before, right?

18         A.    This particular statement is

19    partially lifted from my presentation in

20    October, and I believe that last sentence

21    that says competency and reliability is

22    Dave's paraphrase of a point I made in my

23    speaker notes.

24         Q.    Now, having qualified personnel

25    was not nearly a performance issue, it's
```

1    potentially a safety issues that you were

2    concerned about?

3         A.    Qualified personnel would be

4    performance and safety, yes.

5         Q.    But with respect to performance,

6    as I understand it, BP will go out and rent a

7    rig like the DEEPWATER HORIZON on a day rate

8    and pay so many hundreds of thousands of

9    dollars a day and if you have what's known as

10   nonproductive time, that's time that BP is

11   paying for that it's not drilling, right?

12        A.    Nonproductive time by definition

13   is time where you're not making progress

14   toward the main objective and you're still

15   paying for it, that's correct.

16        Q.    Did you as part of your study of

17   the Gulf of Mexico operations attempt to

18   identify problems that were being seen out in

19   the deep water that were resulting in

20   nonproductive time as well?

21        A.    The efforts that we made in 2008

22   and 2009 to improve performance focused on

23   some of the more prevalent causes of

24   nonproductive time in the rigs and in the

25   wells, and that focused effort was both on

1    the drilling and completion side.  I believe

2    the nonproductive time improved by several

3    percentage points from 2008 to 2009.

4          Q.    Okay.  And that was something

5    that you were working on specifically, right?

6          A.    That's correct.

7          Q.    And now as we look at this

8    paper, back on Page 37.  The end of the

9    paragraph, the fourth paragraph that starts

10   with the drilling culture, you write or the

11   paper writes:  "Frequently culture is

12   called," quote, "'the way we work,'" close

13   quote, "and in that vein, the current

14   drilling culture is fundamentally flawed when

15   we impose a zero failure approach.

16              "It is further evident that in

17   some categories of deepwater wells,

18   Section 4.0, industry performance has become

19   worse and the final proof is the Macondo

20   catastrophe itself."

21              Did I read that correctly?

22         A.    You did.

23         Q.    Now, what I want to ask you

24   about is with respect to the causes of

25   nonproductive time.  If we go to Page 38 of

```
 1    this paper --
 2         A.    And just for the record, make
 3    sure all statements or text on Page 37 are
 4    Mr. Pritchard's.
 5         Q.    Fair enough.  But do you agree
 6    with that statement?
 7         A.    I approved this for publication.
 8         Q.    Okay, and the top of Page 38, it
 9    says:  "The discussions herein indicate that
10    in some categories of complex wells, wellbore
11    stability events are as high as 10 percent of
12    the total deepwater well time.  Blowout
13    prevention equipment was never intended to
14    become a routine execution tool and some of
15    the more complex deepwater wells, time spent
16    on BOPs has been increasing dramatically."
17              Is that a statement that you
18    agree with?
19    MS. KARIS:
20              Object to form.
21    THE WITNESS:
22              That is a statement based on the
23    information that Mr. Pritchard showed me that
24    I would agree with.
25    EXAMINATION BY MR. WATTS:
```

```
 1              Q.      And the information that you
 2      were shown that you agree with indicates that
 3      the number of wellbore instability incidents
 4      goes up dramatically as you get into deeper
 5      and more complex wells, right?
 6              A.      There's a -- I believe, there's
 7      a chart or pictorial in here that David uses
 8      to conclude that and I would say, in general,
 9      absent even that information, I would agree
10      with that premise.
11              Q.      On Page 48, under Section 5.0
12      there is a section entitled "Well Instability
13      Incident Trends," and for the purposes of
14      this paper, wellbore instability incidents
15      are considered as stuck pipe, fluid losses
16      and general instability.  And then it talks
17      about kicks.
18                      Those are all examples of well
19      instability events, right?
20              A.      A common definition for wellbore
21      instability would include kicks.
22              Q.      And then on the next page, 49,
23      we have that chart that you were referencing
24      and the text below it says:  "Analysis of
25      wellbore instability trends over the MRI
```

1     populations is revealing in that the trend

2     almost doubles from MRI 1 to MRI 5.  At the

3     minimum, these are clear indicators and

4     warning signs of problematic wells."

5               Is that a statement that you

6     agree with?

7          MS. KARIS:

8               Object to form.

9          THE WITNESS:

10              So the conclusion, in other

11    words, David's conclusion, I would agree

12    with.  I wouldn't agree completely that this

13    chart fully validates that conclusion.

14    EXAMINATION BY MR. WATTS:

15         Q.    If you go to Page 51.

16         A.    (Complying).

17         Q.    It says:  "Over four times as

18    much time is spent on the more complex wells

19    combating wellbore instability events.  Even

20    more revealing is that over four times as

21    much time is spent on the BOPs combating

22    kicks."

23              That's in your paper as well,

24    right?

25         MS. KARIS:

```
 1                    Object to form.
 2          THE WITNESS:
 3                    That's correct.
 4     EXAMINATION BY MR. WATTS:
 5          Q.    And then on Page 52, the text
 6     concludes:  "Any event of wellbore
 7     instability has the potential of becoming a
 8     well control event."
 9          A.    That's correct.
10          Q.    Now, here's my question:  The
11     paper that you are co-author of seems to
12     indicate that as the wells get deeper and
13     more complex, the number of wellbore
14     instability incidents is rising dramatically?
15          MS. KARIS:
16                    Object to form.
17          THE WITNESS:
18                    So that David's presentation of
19     the available data would indicate that there
20     is a causal trend of wellbore instability
21     with well complexity.
22     EXAMINATION BY MR. WATTS:
23          Q.    Okay.  Now, in terms of what is
24     causing this nonproductive time, inside of
25     BP, you all looked at that and attempted to
```

1    classify the causes of nonproductive time,

2    right?

3         A.    I'm sure that there would be

4    files, records, data indicating a review by

5    well by area of the predominant sources and

6    nonproductive time in 2008 and 2009, and

7    earlier, I'm sure we looked at that in the

8    study review I led.

9         Q.    I want to review a few of these

10   documents.  Tab 68.

11        A.    (Complying).

12              (Exhibit No. 2924 marked for

13   identification.)

14   EXAMINATION BY MR. WATTS:

15        Q.    This is Exhibit 2924.  This is

16   an e-mail from Robert Perez to yourself on

17   May the 5th, 2009 attaching a CAPM update for

18   Kevin Lacy.  What is CAPM?

19        A.    CAPM is controlled annular

20   pressure management.  That refers to a

21   project that we were working on jointly with

22   Transocean to implement what is often

23   referred to in the industry as managed

24   pressure drilling.  Closed annular pressure

25   management was an approach to this that

1    Transocean had been working on sometime --
2    actually, prior to my leaving Chevron and
3    then afterwards when I joined BP.  And we
4    were attempting to do a pilot in the
5    Thunderhorse Field.
6         Q.    If you go to the Bates page
7    ending in 847.
8         A.    (Complying).
9         Q.    There is a graph that tends to
10   tracked a pore pressure line and a frac
11   gradient line.  Do you see that, sir?
12        A.    Yes, I do.
13        Q.    What is the relationship between
14   those graphs in terms of pore pressure versus
15   frac gradient and why are they being tracked?
16        A.    Why they are being -- I'm sorry?
17        Q.    Why are they being tracked like
18   that, the pore pressure versus the frac
19   gradient, what's the import of that?
20        A.    So in the simplest terms I can
21   explain it, there is a -- there are pressures
22   at depths referred to as pore pressures, and
23   the key difference between deepwater
24   formations and other types of formations is
25   the difference between having an overburden

1       all consisting of a rock or one consisting of

2       a hydrostatic hit from the ocean plus rock.

3                     So in essence, the pore

4       pressures don't necessarily vary much between

5       those types of environments, but the frac

6       gradient differs because there is less room

7       between pore pressure frac gradient which

8       means as you get deeper, a weaker formation

9       above may not be able to withstand the pore

10      pressures from below.

11          Q.      Okay.  So the closer that the

12      pore pressure and frac gradient get, what

13      does that tell you?

14          A.      There -- it's referred to as the

15      -- commonly referred to as the drilling

16      window.  It gives you the range of pressure

17      that you can have the wellbore withstand in

18      terms of either losing circulation or taking

19      a kick.

20          Q.      When you have a small drilling

21      window, that's the same thing as kind of a

22      narrow margin?

23          A.      That's correct, that's referred

24      to as a narrow margin.

25          Q.      If you go to 850 in this CAPM

```
 1    update for Kevin Lacy, it asks the question,
 2    at 850:  "When do problems occur?"
 3                 And it says:  "Flat spots
 4    pushing into narrow margin, surging tight
 5    clearance casing into a narrow margin
 6    environment."
 7                 That narrow margin is that
 8    drilling window or the absence of space
 9    between the pore pressure line and the frac
10    gradient line?
11         A.    That's correct.
12         Q.    And so the tighter those two
13    lines get, the more narrow your margin is and
14    the more problems occur?
15         MS. KARIS:
16                 Object to form.
17         THE WITNESS:
18                 The more likely you are to have
19    problems, yes, sir.
20    EXAMINATION BY MR. WATTS:
21         Q.    Then it asks what problems
22    happen while drilling and it says:  "Kicks,
23    not if no pore pressure, and lost
24    circulation, not if have sufficient margins,"
25    and then it talks about mechanical failures?
```

213

1         A.      That's correct.

2         Q.      Now, kicks, why is a kick a bad

3    thing?

4         A.      A kick is, again, an influx of

5    either hydrocarbons or fresh or saltwater

6    into the wellbore which now creates

7    instability and a potential well control

8    situation.

9         Q.      Okay.  And lost circulation, why

10   is that a bad thing?

11        A.      Lost circulation means you have

12   the potential to lose fluids in the

13   formation, lose your hydrostatic head, which

14   is one of your barriers while you're

15   drilling.

16        Q.      So this CAPM update seems to

17   indicate that if you drill into an area where

18   a narrow margin or a smaller drilling window,

19   you're more likely to end up having kicks or

20   lost circulation?

21        MS. KARIS:

22              Object to form.

23        THE WITNESS:

24              This is, I think, consistent

25   with Dave's premise in the paper that in

1    deepwater wells the margins are narrower and,

2    therefore, the likelihood of wellbore

3    instability which includes kicks is higher.

4    EXAMINATION BY MR. WATTS:

5        Q.    Did BP have a policy that it

6    always monitored the margin between the pore

7    pressure and the frac gradient?

8        A.    Not that I recall.

9        Q.    Did it have any sort of internal

10   guideline as to how much margin should exist

11   when you're drilling?

12       A.    There -- there might have been

13   an engineering technical practice that

14   quoted, you know, somewhere between half a

15   pound per gallon or a pound per gallon, I

16   can't recall exactly.  There were engineering

17   technical practices in terms of pore pressure

18   prediction that I believe are in the DWOP.

19       Q.    Okay.  Did you all identify

20   nonproductive time being caused by cementing

21   issues?

22       A.    I don't recall a specific, or it

23   doesn't stand out in my mind that there was a

24   significant cementing issue in our view.

25   Cementing problems are actually quite common

 1    and zonal isolation is a significant issue in

 2    most wells with these issues in deepwater

 3    with the margins.

 4                  I'm pretty sure that the studies

 5    will show that there's a significant amount

 6    of well control incidents that occur during

 7    cementing operations.  I believe Mr. Garner

 8    from Boots & Coots made that in his

 9    presentation in October.

10                  (Exhibit No. 2925 marked for

11    identification.)

12    EXAMINATION BY MR. WATTS:

13        Q.    And I want to show you a

14    document that is Tab 18.  This is an e-mail

15    that you sent to the Gulf of Mexico SPU

16    leadership team on June 29th, 2009.  It's

17    Exhibit 2925.

18        A.    And which --

19        Q.    Tab 18?

20        A.    Tab 18.

21        Q.    It attaches a slide deck that

22    says you will work from tomorrow and then the

23    slide deck is a Gulf of Mexico SPU leadership

24    team meeting, drilling and completions

25    update, and it has got your name on it, dated

1    June 30th, 2009.  Do you see that?

2          A.     I see that, correct.

3          Q.     I just want to visit with you

4    just a little bit about some of the things

5    that are in here.  If you go to Bates page

6    number 088.

7          A.     (Complying).

8          Q.     Actually, let's go to 099 first

9    and I will bring you back to 088.

10         A.     099?

11         Q.     Yes, sir.

12         A.     Okay.

13         Q.     We have a list of major areas of

14   Gulf of Mexico nonproductive time.  Do you

15   see that?

16         A.     I do.

17         Q.     And then under the open hole, it

18   talks about leak-off tests, cementing and

19   pp/fg, that's that pore pressure frac

20   gradient, right?

21         A.     That's correct.

22         Q.     As is that another way of saying

23   that when the pore pressure and frac gradient

24   gets too tight that that results in

25   nonproductive time?

1          A.      That's correct.

2          Q.      And then on completions you have

3    downhole failures with debris and other

4    things?

5          A.      That's correct.

6          Q.      And then, as you mentioned, the

7    last one says zonal isolation, which you have

8    mentioned that cementing problems were quite

9    common and a failure to obtain zonal

10   isolation is quite common, correct?

11         A.      That's correct.

12         Q.      And when that occurs, how do you

13   remedy the failure of the cement to achieve

14   zonal isolation?

15         A.      In the -- simple common approach

16   is -- there is what's referred to as primary

17   cementing operations which would be your

18   first attempt at establishing adequate cement

19   and evenly zonal isolation.  If, either

20   because of how the job went or because of

21   your evaluation via a cement bond log, for

22   example, you saw something that concerns you

23   about the cement quality or zonal isolation,

24   you would then go into what's called remedial

25   cementing measures.

```
 1          Q.      You mentioned a cement bond log.
 2    What is it the purpose of the cement bond
 3    log?
 4          A.      Cement bond log is commonly used
 5    tool to assess the quality of the bond
 6    between the cement, the formation and the
 7    casing pipe.
 8                  (Exhibit No. 2926 marked for
 9    identification.)
10    EXAMINATION BY MR. WATTS:
11          Q.      If you go to Tab 74, it's
12    Exhibit No. 2926.
13          A.      74?
14          Q.      Yes, sir.  This is an e-mail
15    chain between you and others and if we start
16    on Page 2, there's an e-mail from Andrew
17    Frazelle to Harry Thierens, yourself and Ian
18    Little concerning early heads up on the
19    MARIANAS situation.  Do you see, that sir?
20          A.      I do.
21          Q.      About six lines down it says:
22    "The second issue is that there was no hard
23    cement in the shoe track which probably means
24    that there's not much chance that we will
25    have adequate cement zonal isolation.  The
```

```
 1    chances are not good to start with and this
 2    further diminishes the chance of a bond."
 3              Did I read that correctly?
 4         A.    Yeah.  Let me just read this
 5    clearly.  (Reading) okay.
 6         Q.    All right.  And so Mr. Frazelle
 7    is telling you and Harry Thierens and Ian
 8    Little, hey, we're not going to have any hard
 9    cement in the shoe track on the MARIANAS, not
10    much chance we're going to have adequate
11    cement zonal isolation.  Chances are not good
12    to start with, and this further diminishes
13    the chance for a bond.  Presented with that
14    scenario, what is Harry Thierens telling you
15    you ought to do?
16         MS. KARIS:
17              Object to form.
18         THE WITNESS:
19              So Harry's note to Andy said:
20    "We should at least run a CBL before coming
21    off the well."
22    EXAMINATION BY MR. WATTS:
23         Q.    CBL is the cement --
24         A.    Cement bond log.
25         Q.    Is running a cement bond log a
```

```
1    good way to figure out whether the cement job
2    has, in fact, achieved zonal isolation?
3         MS. KARIS:
4              Object to form.
5         THE WITNESS:
6              Cement bond logs are not
7    completely definitive.  They're a -- one tool
8    that you can use to assess the quality of the
9    cement job.  Their results are variable based
10   on interpretation and also the time after
11   which they're run from the cement being
12   pumped.
13   EXAMINATION BY MR. WATTS:
14        Q.     Regardless, your thought is
15   let's get the CBL run so we know what we're
16   facing, right?
17        A.     That would be correct.
18        Q.     And then Andrew Frazelle says, I
19   agree with everything you state and the plan
20   is to run the CBL before we do anything else.
21        A.     That's correct.
22        Q.     So I think what we can take from
23   this discussion that you and I have had is
24   that at least within the Gulf of Mexico
25   drilling and completion operation, it was
```

1    understood that cementing problems were quite

2    common and that the failure to achieve zonal

3    isolation was quite common, right?

4        MS. KARIS:

5            Object to form.

6        THE WITNESS:

7            So I would say that all drilling

8    professionals know that cement, primary

9    cementing is critical.  Assessing the cement

10   job is important to do prior to either

11   suspending the well or going into any

12   operation that would expose hydrocarbons to

13   surface.

14   EXAMINATION BY MR. WATTS:

15       Q.    But with respect to the Macondo

16   incident, for example, I've talked to a whole

17   lot of people who have told me, you know,

18   just by virtue of the fact that we know what

19   we know from the Bly report, this cement job

20   had to have failed.

21       MS. KARIS:

22           Object to form.

23   EXAMINATION BY MR. WATTS:

24       Q.    And my question is:  Is that

25   something that -- this is the first time in

 1    history that a cement job failed achieve
 2    zonal isolation or is that something that BP
 3    had seen quite commonly, as you put it?
 4        MS. KARIS:
 5            Object to form.
 6        THE WITNESS:
 7            I would say that cement failure
 8    or questionable cement jobs, particularly in
 9    deepwater, was not uncommon and in my view
10    should almost be assumed as the reality or
11    the norm.
12    EXAMINATION BY MR. WATTS:
13        Q.    Okay.  Now, the key is how you
14    react to what you know is not uncommon, a
15    failure to zonal isolation.  There are ways
16    that that doesn't have to turn into a
17    blowout, right?
18        A.    Correct.  There are -- there
19    are -- as we spoke earlier, your intent is
20    always to have two confirmed barriers and so
21    in this case if you have one that is suspect,
22    you have the decision to do either remedial
23    cementing and/or you can set a mechanical
24    packer in line with the casing and a second
25    plug.

1              So there are ways to mitigate

2     this as a potential problem.

3         Q.      Now, if you know that cementing

4     problems are quite common and that quite

5     common you won't get zonal isolation, does BP

6     do cement bond logs itself or does it hire a

7     contractor to do that for them?

8         A.      The cement bond logs are run by

9     a company such as Schlumberger, Baker Atlas,

10    Halliburton to evaluate the cement logs so

11    they would be called up by the operator, BP

12    or Chevron, to a service company to come to

13    the drilling rig and run the cement bond log.

14        Q.      Is running cement bond logs a

15    fairly frequent thing to do?

16        A.      It's a common thing, yes.

17        Q.      Is it industry practice to run

18    cement bond logs before you plug and abandon?

19    MS. KARIS:

20              Object to form.

21    EXAMINATION BY MR. WATTS:

22        Q.      Before you temporarily abandon?

23    Excuse me.

24        A.      Given there are no industry

25    standards, it would be my opinion that it is

1    a frequently done practice prior to

2    suspending a well.

3         Q.    And I use this as an example on

4    a different situation, but we have three

5    different people involved with safety that

6    says, well, if we think we got a problem with

7    the cement, let's run a CBL to see what we're

8    facing, right?

9         A.    That's correct.

10        Q.    That is just good practice to

11   run a CBL when you have any reason to believe

12   that your cement bond job may have failed to

13   give you zonal isolation, right?

14        MS. KARIS:

15             Object to form.

16        THE WITNESS:

17             Again, it's been a while since

18   I've seen this note, but in reading it today,

19   I would say this was -- this would have been

20   what I would have expected to occur during my

21   and Harry's tenure flagging a problem,

22   consulting Harry and then if it was a

23   problem, it would have been flagged to me and

24   we would have reinforced the decision.

25   EXAMINATION BY MR. WATTS:

```
 1          Q.     Of course, to run a cement bond
 2    log, you first have to wait for the cement to
 3    fully cure and harden, right?
 4          A.     The cement bond logs are most
 5    effective when there's adequate curing time
 6    for the cement.
 7          Q.     And then you have to expend the
 8    time that it takes to actually run a cement
 9    bond log?
10          A.     That's correct.
11          Q.     Do you know how long it takes to
12    run a cement bond log when you're down to
13    total depth in excess of 18,000 feet?
14          A.     There, you know, I would be
15    guessing.  Beyond waiting for the cement to
16    harden, which can be occurring while you're
17    running the hole, that a cement bond log
18    could be achieved anywhere from 12 to 36
19    hours time to bottom.
20          Q.     So 12 to 36 hours, if your rig
21    is costing you a million dollars a day is
22    somewhere between a half a million to 1.5
23    million in rig time plus whatever you are
24    paying to Schlumberger to run the cement bond
25    logs?
```

1          A.     That's correct.

2                 (Exhibit No. 2927 marked for

3     identification.)

4     EXAMINATION BY MR. WATTS:

5          Q.     Let me take you to Tab 75, which

6     is Exhibit 2927.  This is an e-mail chain

7     involving yourself at the top on July 16th of

8     2009.  Do you see that, sir?

9          A.     Yes.

10         Q.     Now, if you don't run a cement

11    bond log and you don't maintain two separate

12    barriers and you have a well control event,

13    do you all employ contractors to monitor data

14    from the well to predict if you're having a

15    kick, if you will, or to tell you when you're

16    having a kick?

17         MS. KARIS:

18                Object to form.

19         THE WITNESS:

20                It would be common practice and

21    I believe in conformance with the 2008 DWOP

22    that there would be two independent means to

23    measure surface flow.  There are other

24    technologies which can measure downhole

25    pressures while you're drilling, et cetera,

1    but primarily the measurements are taken

2    based on drill pipe pressures and surface

3    flows.

4    EXAMINATION BY MR. WATTS:

5         Q.    Now, does BP monitor that

6    surface flow itself or does it hire somebody

7    to do that as well?

8         A.    It's usually hired where it's

9    present on the rig and then often that

10   information is also brought back into the

11   office, on the 10th floor of Westlake 4 we

12   had what we called a realtime center where

13   that information would be brought back.

14        Q.    So in other words --

15        A.    For most wells.

16        Q.    -- you've got two sets of eyes

17   looking at it?

18        A.    The intent is that you would

19   have, much like the barrier concept, two

20   independent sets.  It's -- the intent is to

21   actually have two independent sets of eyes on

22   the rig looking at it because they would be

23   the first responders and actually the onshore

24   group would be what you call a third set,

25   which in the deepwater environment seems

```
 1    prudent.
 2         Q.     Now, in terms of the set of eyes
 3    that are looking at the data on the rig, does
 4    BP get to choose which contractor it chooses
 5    to have on its rigs to monitor this data?
 6         MS. KARIS:
 7              Object to form.
 8         THE WITNESS:
 9              In most cases that I would be
10    aware of, that answer would be yes, it would
11    be monitored both by a third-party services
12    contractor, some work for Schlumberger,
13    Halliburton subsidiaries, some are
14    independent and then you would probably have
15    part of the drilling crew monitoring that as
16    well.
17    EXAMINATION BY MR. WATTS:
18         Q.     Now, in Tab 75 we've got an
19    e-mail chain that starts on the bottom from
20    Brett Cocales to Ian Little, and it's with
21    respect to the DEEPWATER HORIZON rig well
22    placement vendor action.  Do you see that?
23         A.     That's correct.
24         Q.     The second paragraph says:  "We
25    reviewed the Sperry performance from Tiber.
```

1    In summary, they've had 11 total failures,

2    five of which caused trips out of the hole."

3              And then further down it says:

4    "The total estimated cost for this

5    nonproductive time is 5 and a half million

6    dollars and 7 days of rig time.  David Sims

7    and Nick Much have done a large amount of

8    work with Sperry to help them improve, but

9    the problems seem to be many and continue."

10              Do you see that, sir?

11        A.    I do.

12        Q.    And on Page 2 Cocales writes:

13    "Our recommendation is to replace Sperry well

14    placement, MWD, LWD services on the HORIZON

15    after the Tiber well."

16        A.    That's correct.

17        Q.    That recommendation was sent to

18    Ian Little who then sent it to you on

19    July 16th 2009 at 2:50 p.m., right?

20        A.    Yes.

21        Q.    Ian writes to you and to Harry:

22    "One of the barriers to delivering further

23    improved performance on the HORIZON has been

24    the number of downhole tool failures that we

25    have experienced with Sperry-Sun.  We

```
1     undertook an intervention last year with help
2     from EPT, and while this was openly accepted
3     by Sperry-Sun and action was taken, it has
4     not led to a significant improvement in
5     performance.
6                   "As you can see below, the
7     HORIZON team and my engineering team have
8     analyzed the recent performance on Tiber and
9     have come to the recommendation that we
10    approach Schlumberger and Baker to discuss
11    replacing Sperry-Sun on the HORIZON.  I
12    support the recommendation."
13                  That's what you were told,
14    right?
15        MS. KARIS:
16                  Object to form.
17        THE WITNESS:
18                  This e-mail was addressed to me
19    and that's what I was told, correct.
20    EXAMINATION BY MR. WATTS:
21        Q.     And then you write an e-mail to
22    Ian and to Harry Thierens, Kevin, meaning
23    Kevin Guerre I guess --
24        A.     Yes.
25        Q.     -- "Already briefed me, so, okay
```

1       to go ahead."

2               A.      That's correct.  That Kevin

3       referenced is Kevin Guerre.

4               Q.      All right.  I assume by virtue

5       of the materials you've seen since the

6       Macondo, that you know that Sperry-Sun was

7       still on the DEEPWATER HORIZON at the time of

8       the Macondo well blowout.

9               A.      Well, I want to make sure that

10      there's an important distinction.  This note

11      here is related to the MWD, LWD surfaces that

12      were being carried out on the HORIZON.

13      There's a separate set of surfaces that is

14      well monitoring.  So those two are different.

15      I honestly don't know who -- I know it's

16      Sperry-Sun, based on the public testimony

17      I've seen, was doing the well monitoring.

18      But I don't know who was doing LWD, which, if

19      I'm not mistaken, there was no LWD or MWD in

20      the hole at the time.

21              Q.      But I guess my point is that

22      this is an example of if BP chooses to kick a

23      contractor off of the rig, it can do so,

24      right?

25              MS. KARIS:

1                    Object to form.

2          THE WITNESS:

3                    The -- without reading the exact

4     terms and conditions, I am sure that the BP

5     standard contracts include causes of

6     termination for performance at any time.

7     EXAMINATION BY MR. WATTS:

8          Q.    All right.  And you know we've

9     got all these companies suing each other,

10    blaming each another, BP saying Sperry-Sun

11    didn't look -- didn't catch the data,

12    whatever.

13                   The bottom line is by virtue of

14    your experience, you know that if BP was

15    dissatisfied with a contractor for any

16    reason, it had the ability to pull them off

17    of a rig?

18         MS. KARIS:

19                   Object to form.

20         THE WITNESS:

21                   That would be my knowledge,

22    that's correct.

23    EXAMINATION BY MR. WATTS:

24         Q.    But over and above whether or

25    not the people watching the surface flow on

1      the rig are doing their job, you mentioned

2      that there is a second set of eyes, that

3      realtime data is sent from the rig to BP to

4      some facility on the 10th floor, right?

5           MS. KARIS:

6                Object to form.

7           THE WITNESS:

8                For some wells during my time

9      there.

10     EXAMINATION BY MR. WATTS:

11          Q.     Some wells.  Can you explain for

12     the Finder of Fact what a critical well is?

13          A.     I believe that was a term that I

14     helped institute within BP as part of the

15     performance management effort that we

16     identified a critical well, a critical well

17     meaning that it was either a challenging well

18     or it had significant impact on the next

19     year's production delivery.

20          Q.     In other words, it was a big

21     production target, right?

22          A.     The well would have outsize

23     importance to the BP portfolio.

24          Q.     We're going to talk about

25     Kaskida in a second.  But Kaskida was a

1    prospect that had outsized importance to the

2    BP portfolio, right?

3            A.      That's correct.

4            Q.      That would be an example of what

5    you would term a critical well?

6            A.      Yeah.  And to be clear, I would

7    have guessed that almost every well in the

8    deepwater portfolio would meet the

9    classification of critical relative BP's

10   portfolio.

11           Q.      All right.  Well, let's visit

12   about that.  If you could go to Tab 67.

13           A.      (Complying).

14                   (Exhibit No. 2928 marked for

15   identification.)

16   EXAMINATION BY MR. WATTS:

17           Q.      Exhibit 2928.  This is the Gulf

18   of Mexico drilling and completions RTOC

19   strategy white paper, is that right?

20           A.      That's correct.

21           Q.      It's dated May of 2009, right?

22           A.      Right.

23           Q.      RTOC is a realtime operating

24   center.

25           A.      That's correct.

1          Q.     All right.  And basically the
2     way this works is the Sperry-Sun data is
3     transmitted via realtime back to BP's offices
4     on land in Houston, Texas.
5          A.     That's the general concept, yes.
6          Q.     Now, the technology existed by
7     2009 and, in fact, that realtime data was
8     being sent back to Houston for BP to have a
9     second set of eyes on it, right, or someone?
10          A.     During the time I was there,
11     there was active monitoring in the 10th floor
12     RTOC on some wells.
13          Q.     Okay.  Now, as we look at this
14     document, on Bates page number 518.
15          A.     (Complying).
16          Q.     You can see the executive
17     summary for this central realtime operating
18     center, the drilling and completions RTOC
19     hub.
20          A.     Yes.
21          Q.     It's connected I guess via
22     satellite?
23          A.     The information is actually
24     could come either via satellite or through a
25     fiberoptic cable that was actually, I

1   believe, BP had in the Gulf of Mexico.

2           Q.     Now, that last paragraph of the

3   page, it says:  "Today, the realtime

4   operating center provides extended office

5   hour service support and 24 times 7 as needed

6   for critical operations to the D&C teams,

7   Tiger teams and asset teams.  The operation

8   hub currently resides in two conference rooms

9   on the WL4 10th floor, rooms 1094 and 1072.

10  The existing rooms are not purpose designed

11  for RTOC."

12          Did I read that correctly?

13          A.     Yes.

14          Q.     Now, let me see if I can paint

15  the picture of what we're talking about here.

16  With respect to so-called critical wells, BP

17  had a 10th floor realtime operating center

18  where 24/7 there was a second set of eyes on

19  the well data, right?

20      MS. KARIS:

21              Object to form.

22      THE WITNESS:

23              There could be a second set of

24  eyes.  The capability existed to monitor on

25  shore any well that was in a drilling mode or

1    completion mode with BP.

2    EXAMINATION BY MR. WATTS:

3         Q.    Now, I notice this says

4    "extended office hour support and 24/7."

5              That means you had the logistics

6    set up that if BP chose to have bodies there

7    24/7, you would have a second set of eyes,

8    right?

9         MS. KARIS:

10             Object to form.

11        THE WITNESS:

12             So the physical facilities

13   existed and well as the IT hardware/software

14   capabilities that the well could be monitored

15   at any point in time from either the office

16   or from an employee's laptop.

17   EXAMINATION BY MR. WATTS:

18        Q.    Now, I notice that this is

19   as-needed for critical operations.  That's

20   those so called critical wells, right?

21        A.    Right.

22             (Exhibit No. 2929 marked for

23   identification.)

24   EXAMINATION BY MR. WATTS:

25        Q.    Now, if we could go to Tab 29,

1     this is Exhibit 2929.

2          A.     Okay.

3          Q.     This is an e-mail from Diane

4     Lenhoff to a number of people, including

5     yourself.  The subject is the November D&C

6     ELT meeting agenda.  And the attachment is BP

7     well integrity review, DC ELT summary zip,

8     right?

9          A.     That's correct.

10         Q.     Now, you see the text, it

11    attaches a couple of pieces of information

12    pertaining to this meeting.  And then it says

13    the first is a list of the critical wells and

14    projects for delivery in 2010.

15         A.     That's correct.

16         Q.     Now, let's look at that

17    attachment, and if you would go to the third

18    page of the document or the first page of the

19    attachment at Bates page number 450, this is

20    the list of the critical wells and projects

21    for 2010, right?

22         A.     Yes, I believe so.

23         Q.     Macondo is not on it.

24         A.     I see Macondo -- I'm looking at

25    2450, 2009 potential exploration, Macondo.

1         Q.      I'm sorry, where are we?

2         A.      Critical wells and projects 2010

3    and 2009.

4         Q.      I see.  Okay.  2009 potential

5    exploration Macondo.

6         A.      Yes, I believe because the well

7    was started in 2009.  I wasn't sure if it was

8    going to be completed by that time.

9         Q.      So what this means is that it's

10   not on it for 2010, it's on it for 2009,

11   because it started in 2009, but it's on the

12   2010 list, right?

13        A.      At the time of this -- so, it

14   was carried -- I can't say exactly why it was

15   carried this way.  It would have been

16   classified as a critical well.  It was

17   spudded in 2009 with MARIANAS.  And assuming

18   when it was reentered in 2010, it would have

19   maintained its classification as a critical

20   well.

21        Q.      Now, if it maintained its

22   classification as a critical well, that means

23   according to the policy that we've talked

24   about, there should have been realtime data

25   transmission of the Sperry-Sun well data to

 1     the 10th floor of BP's offices in Houston,

 2     Texas, right?

 3          MS. KARIS:

 4               Object to form.

 5          THE WITNESS:

 6               No, that's not correct.  There

 7     was a capability.

 8     EXAMINATION BY MR. WATTS:

 9          Q.     All right.

10          A.     There was no standard.  The

11     paper that we looked at earlier I believe was

12     dated May, was the intent to push the concept

13     along.  I believe there was a slightly later

14     study which proposed that capability exists

15     for all wells and started to lead towards

16     implementation in 2010.  A key here is that

17     the exploration wells, the exploration teams

18     were on the third floor and they did not want

19     to use the 10th floor, RTOC because of the

20     confidential nature of their exploration

21     wells.

22          Q.     I'm a little lost here.

23          A.     Okay.

24          Q.     On the Macondo well that the

25     DEEPWATER HORIZON was drilling on April the

1     20th or completed -- strike that.

2                 On the Macondo well that the

3     DEEPWATER HORIZON was about to temporarily

4     abandon on April the 20th, the logistics

5     existed for Sperry-Sun realtime data to be

6     piped back to BP's offices in Houston, right?

7          A.     I can say as of December, it

8     existed.

9          Q.     All right.  Do you know whether

10    or not, in fact, realtime data was

11    transmitted to the Houston offices of BP on

12    April the 20th?

13         A.     No, I do not.

14         Q.     Was there any technological

15    impediment preventing that from happening?

16         A.     There should not have been.

17         Q.     Was there any internal personnel

18    reason that you couldn't have a second set of

19    eyes in Houston, Texas watching the same

20    Sperry-Sun realtime data as the people on the

21    rig?

22         MS. KARIS:

23                 Object to form.

24         THE WITNESS:

25                 The only issues I'm aware of

1    during my time frame was that the

2    confidential nature of the exploration wells,

3    the team located on three versus ten.  And

4    the second study which I referenced was my

5    attempt to converge those positions so that

6    going forward in 2010, we would have all

7    wells monitored consistently 24/7.

8    EXAMINATION BY MR. WATTS:

9         Q.    Okay.  That is an important

10   thing for safety, to have a second set of

11   eyes?

12        MS. KARIS:

13             Object to form.

14        THE WITNESS:

15             I would agree with that

16   statement.

17   EXAMINATION BY MR. WATTS:

18        Q.    Shell does it as a matter of

19   policy.  You're aware of that?

20        A.    I am.

21        Q.    Chevron does it as a matter of

22   policy.  You're aware of that?

23        A.    I am.

24        Q.    BP was the only one of the

25   majors that you were aware of that did not

1      have 24/7, a second set of eyes watching the

2      realtime well data?

3           MS. KARIS:

4                Object to form.

5           THE WITNESS:

6                I know that they did not have a

7      standard for either the realtime monitoring

8      or the surveillance.

9      EXAMINATION BY MR. WATTS:

10          Q.     And you were trying to change

11     that?

12          A.     That's correct.

13          Q.     It was your intent in 2010 in

14     the documents that you created --

15          A.     2009.

16          Q.     It was your intent in 2009 to

17     have in 2010 BP join all the other majors in

18     deepwater exploration in having a second set

19     of eyes on land 24/7 watching the realtime

20     well data?

21          MS. KARIS:

22               Object to form.

23          THE WITNESS:

24               So my intent, while I was there

25     in 2009 was to have a standard, have a

```
 1    consistent set of IT software kit.  In 2009 I
 2    do know that the Will K (phonetically) well
 3    was actively monitored 24/7 into the
 4    exploration offices because it was a very
 5    challenging well and I don't know what
 6    occurred after I left.
 7    EXAMINATION BY MR. WATTS:
 8         Q.    So the capability did exist?
 9         A.    Uh-huh (indicating
10    affirmatively).
11         Q.    Does that cost money?
12         A.    Yes, of course.  The staffing
13    for the onshore center, et cetera, as you
14    say, some companies do it as a role, 24/7,
15    all deepwater rigs.
16              (Exhibit No. 2930 marked for
17    identification.)
18    EXAMINATION BY MR. WATTS:
19         Q.    Now, I want to take you to
20    Tab 94.  This is going to be your second
21    notebook.  This is Exhibit 2930.
22         A.    94?
23         Q.    Yes, sir.  And this is a
24    document that you didn't see, I don't
25    believe, or you're not on it.  But I want to
```

 1    ask you a question about it.  This is a Gulf
 2    of Mexico overview for Doug Suttles in April
 3    of 2010, that would have been months after
 4    you left.  But if you would turn to Bates
 5    page number 866.  Presentation entitled
 6    "Subsea Operations by Dave Turner."
 7         A.    866?  Yes.
 8         Q.    And if you go four pages in, on
 9    870, focus areas for continuous improvement
10    of subsea operations, No. 3 is a 3D subsea
11    facilities management system, third bullet
12    point is realtime integrity
13    monitoring/failure prediction.
14              Do you know what this is
15    relating to?
16       MS. KARIS:
17              Object to form.
18       THE WITNESS:
19              I can only suppose.  And it
20    would be most logical that they were looking
21    to monitor onshore in a realtime manner the
22    condition of the production facilities.  I
23    don't think this relates to the drilling
24    operations.
25    EXAMINATION BY MR. WATTS:

1          Q.     And so basically onshore you
2     would be able to look at the condition subsea
3     of the production facilities?
4          A.     Of the subsea trees, pipelines,
5     manifolds, et cetera.
6          Q.     Did any of this capability exist
7     for the exploration platforms?
8          A.     Yes, it did.
9          Q.     Was it being deployed on the
10    DEEPWATER HORIZON?
11         A.     I honestly don't recall if we
12    had implemented the monitoring realtime for
13    the HORIZON while I was there.
14         Q.     Okay.
15         A.     I don't think so.
16         Q.     Let me ask you about Tab 28 when
17    we're talking about monitoring of subsea
18    equipment.  Tab 28.
19         A.     Oh, Tab 28.
20              (Exhibit No. 2931 marked for
21    identification.)
22    EXAMINATION BY MR. WATTS:
23         Q.     Now, Tab 28, is Exhibit 2931.
24    This is an e-mail exchange between you and
25    Ian Little on October 31st, 2009.  On the

1    bottom he says:  "It looks as if we're going

2    to have to pull the stack on the MARIANAS.

3    The rig cannot get the blind shear rams to

4    function from the yellow pod.  This combined

5    with a failed annular has led Transocean to

6    recommend pulling the stack."

7              When we talk about pulling the

8    stack, we're talking about pulling the BOP

9    stack out of the water, right?

10        A.    That's correct.

11        Q.    At these kinds of depths, when

12   you're in, you know, 5,000 feet of water, how

13   long does it take to pull the stack and do

14   work on it and get it back down?

15        A.    That could be as long as a week.

16        Q.    At a rig charge approaching or a

17   rig cost approaching a million dollars a day?

18        A.    That's correct.

19        Q.    It's expensive to pull a BOP

20   stack?

21        A.    Yes, it is.

22        Q.    You responded:  "Thanks for

23   letting me know.  Getting to be too routine."

24        A.    That's correct.

25        Q.    Anytime you have to pull a BOP

1    stack, it's a major interruption of drilling

2    operations and it costs a significant amount

3    of money?

4         A.    That's correct.

5         Q.    BP in 2009 instituted something

6    called digital BOP to help save that money,

7    right?

8         MS. KARIS:

9              Object to form.

10        THE WITNESS:

11             The intent was to be able to do

12   the required BOP pressure test as expediently

13   as possible, yes, sir, without sacrificing

14   the quality of the test.

15   EXAMINATION BY MR. WATTS:

16        Q.    Without pulling the stack?

17        A.    Well, you routinely test the BOP

18   without pulling --

19        Q.    Let's go to Tab 69.

20        A.    (Complying).

21             (Exhibit No. 2932 marked for

22   identification.)

23   EXAMINATION BY MR. WATTS:

24        Q.    This is Exhibit 2932.  This is

25   an e-mail exchange between you and Warren

1    Winters.  In the middle Mr. Winters tells

2    you:  "With respect to digital BOP, it's been

3    installed in three rigs including the

4    DEEPWATER HORIZON."

5            Right?

6        A.     Uh-huh (indicating

7    affirmatively).

8        Q.     Yes?  She can't type uh-huh.

9        A.     Oh, I'm sorry, yes, correct.

10       Q.     And then it says:  "Fourth

11    installation on PDQ is set for later this

12    month.  DEEPWATER HORIZON has used it

13    routinely since August 2008.  Typical time

14    savings on subsea test with synthetic base

15    mud are seven to eight hours per bi-weekly

16    use."

17            So this is informing you about

18    how much time is being saved by using a

19    digital BOP as opposed to the old way, right?

20        A.     That's correct.

21          (Exhibit No. 2933 marked for

22    identification.)

23    EXAMINATION BY MR. WATTS:

24        Q.     Now, if you go to Tab 85,

25    Exhibit 2933.  BP did an analysis of the cost

1    savings that would be achieved by digital BOP

2    testing before it implemented it?

3         A.    That's correct.

4         Q.    And you were told, the middle of

5    the page, that this would represent

6    potentially huge savings, right?

7         A.    Yes.

8         Q.    If we look at the attachment to

9    this e-mail, we can see that on the HORIZON

10   alone, it was going to save approximately

11   $3.2 million.

12        A.    That's correct.

13        Q.    And on the next page, if you

14   looked at the impact over the full fleet, BP

15   would save over $43.6 million by going to the

16   digital BOP testing, right.

17        A.    That is what this says, yes,

18   sir.

19        Q.    Now --

20        MR. WATTS:

21             Let's go ahead and take our

22   break and change the videotape.

23        THE VIDEOGRAPHER:

24             We're going off the record, it's

25   2:00.  It's the end of Tape 4.

```
 1                    (Whereupon, a brief recess was
 2        taken.)
 3            THE VIDEOGRAPHER:
 4                    We're back on the record at
 5        2:10.  This is the beginning of Tape 5.
 6                    (Exhibit No. 2934 marked for
 7        identification.)
 8        EXAMINATION BY MR. WATTS:
 9            Q.    Mr. Lacy, I want to visit with
10        you about Tab 54 which I'm going to mark as
11        Exhibit 2934.  This is an e-mail chain that
12        you're in on July 15th of 2008.  Do you see
13        that, sir?
14            A.    I do.
15            Q.    Now, what I would like to do is
16        start back on Bates page number 266.  I guess
17        the way these chains go, you have got to
18        start from the back and move up to
19        understand.  First of all, at the bottom of
20        266, there's an e-mail from Lauren Segal to
21        Neil Shaw.  Who is Lauren Segal?
22            A.    Lauren Segal would have been the
23        Kaskida, I believe the -- her title was
24        Kaskida project manager.  It could be vice
25        president of Kaskida asset.
```

```
 1          Q.     Now, when we were talking about
 2    critical wells, you were talking about
 3    prospects that could materially augment the
 4    production possibilities for the company.
 5    Kaskida was a find in the Gulf of Mexico that
 6    by all accounts within BP was a massive
 7    field.  Agree?
 8          A.     Kaskida was identified as a high
 9    potential field, it had many technical
10    challenges to ultimately make it commercial.
11          Q.     I think I've seem references
12    that with the Tiber and the Kaskida by
13    themselves it could increase production in
14    the Gulf of Mexico by 40 to 50 percent of all
15    of D&C.
16          MS. KARIS:
17               Object to form.
18    EXAMINATION BY MR. WATTS:
19          Q.     Is it your understanding it's
20    that big of a find?
21          A.     I believe the Tiber find and the
22    Kaskida Trend and similar leases were very,
23    very significant to BP.
24          Q.     If Neil Shaw was quoted in an
25    internal BP magazine as saying it may hold
```

1    3 billion barrels of oil, is that the kind of

2    size that we're talking about?

3         MS. KARIS:

4              Object to form.

5         THE WITNESS:

6              Yes.

7    EXAMINATION BY MR. WATTS:

8         Q.    Lauren Segal on July 9 says:

9    "Originally envisioned the Kaskida bold move

10   elements comprised," and then it says:  "File

11   an SOP by end of 2008 at Kaskida to get off

12   the clock."

13        A.    That's correct.

14        Q.    When a company like BP leases a

15   block from the MMS, they have to show

16   activity in certain time frames, the

17   so-called clock, right?

18        A.    There's a lease term that

19   expires if you haven't fulfilled your lease

20   commitments to retain the lease, correct.

21   And that would be the reference to "get off

22   the clock."  This bullet here would be file a

23   suspension of production by end of 2008 at

24   Kaskida to get off the clock, which meant

25   that once you have that approved, you don't

1    have to continually drill.

2         Q.    All right.  Now, if we go to the

3    first page of the document, this is what you

4    wrote and that is regarding Kaskida bold move

5    way forward.

6              "A key judgment we have to make

7    is since we are rig short and people short,

8    what are the compromises we are willing to

9    make on costs and performance as it relates

10   to others operating on our behalf.  Our own

11   performance has been at best inconsistent and

12   often high cost."

13             Did I read that correctly?

14        A.    That's correct.

15        Q.    In the middle of the second

16   paragraph, you write:  "Our past performance

17   in Gulf of Mexico caused us to make strategic

18   errors in failing to obtain rigs when they

19   were available.  As a result, we will have to

20   allow others to drill wells for us and give

21   up value in return."

22             Did you write that?

23        A.    I did.

24        Q.    Now, you all had made this

25   massive find, but you were on a certain

```
 1    clock, if you will, that you had to get to it
 2    and drill at to avoid losing the lease,
 3    right?
 4         A.    At this time frame, yes.
 5              (Exhibit No. 2935 marked for
 6    identification.)
 7    EXAMINATION BY MR. WATTS:
 8         Q.    If we could go to Tab 19 which
 9    is Exhibit 2935.  This is an e-mail from you
10    to Neil Shaw and David Rainey regarding
11    organizational changes in drilling and
12    completion, the e-mail's date is July 9 of
13    2009.
14              And part of what you write is:
15    "That there are a number of changes underway
16    at drilling and completion."
17              On the second line, you talk
18    about:  "New priorities such as Kaskida IFT."
19              What is the Kaskida IFT?
20         A.    I believe that stands for either
21    integrated or initial field trial.
22         Q.    Integrated field test?
23         A.    Field test, yes, yes, sir.
24         Q.    On the second page, third and
25    fourth line, you say:  "This" -- "these
```

1    changes account for the impact of

2    discontinued rig operations, elevating

3    Kaskida integrated field test, IFT, to a top

4    priority"?

5         A.    That's correct.

6         Q.    Given the size of the Kaskida

7    find in 2009, was the Kaskida IFT elevated to

8    a top priority at BP Gulf of Mexico drilling

9    and completions?

10        MS. KARIS:

11              Object to form.

12        THE WITNESS:

13              This would have been a top

14   priority project for two reasons, the

15   timelines and the complexity of the well.

16              (Exhibit No. 2936 marked for

17   identification.)

18   EXAMINATION BY MR. WATTS:

19        Q.    All right.  Now, if you go to

20   Tab 88.

21        A.    (Complying).

22        Q.    Different notebook?

23        A.    Right.  Okay.

24        Q.    This is Exhibit 2936.  This is

25   an e-mail dated December 21st of 2009 from

```
 1      Kemper Howe to the Gulf of Mexico SPU ELT.
 2      ELT is the leadership team?
 3          A.     I believe so.
 4          Q.     This e-mail would have been sent
 5      a couple of days after you left the company,
 6      right?
 7          A.     Approximately a week.
 8          Q.     A week after you left the
 9      company.
10               It says:  "Attached for your
11      review is the obligation report, summary of
12      key obligations in 2010.  No. 1 is well
13      activity, Kaskida must spud by May 16th."
14               Right?
15          A.     That's what it reads, correct.
16          Q.     What does the word spud mean?
17          A.     Spud would mean that the rig had
18      been moved on location, rigged up and the
19      initial top -- the initial set of pipe would
20      be run.
21          Q.     And then No. 4 is P&A, that's
22      plug and abandon, right?
23          A.     That's correct.
24          Q.     Nile, July 1?
25          A.     Yes.
```

1          Q.      Plug and abandon is required by

2     MMS after you have basically used up a field,

3     right?

4          A.      Well, once -- you have certain

5     different criteria.  The MMS establishes that

6     you have to take a well that's been

7     temporarily suspended and permanently abandon

8     it.

9          Q.      Now with respect to is these

10    2010 obligations, this document reflects that

11    you all needed to plug and abandon the Nile

12    by July 1 and you needed to spud the Kaskida

13    by May 16th, right?

14         A.      That's what this document

15    reflects.

16         Q.      Before you left, you saw

17    drilling schedules, that, in effect, said

18    that the DEEPWATER HORIZON was going to drill

19    the Macondo and then it was going to go to

20    the Nile and then it was going to spud the

21    Kaskida by May 16th, right?

22         MS. KARIS:

23              Object to form.

24         THE WITNESS:

25              I believe that's correct,

```
 1    without looking at them, I would not be
 2    certain.
 3                  (Exhibit No. 2937 marked for
 4    identification.)
 5    EXAMINATION BY MR. WATTS:
 6          Q.    Let me show you one, let's go to
 7    Tab 21.
 8          A.    (Complying).
 9          Q.    Tab 21 is Exhibit 2937.  Here we
10    can see the DEEPWATER HORIZON scheduled for
11    the Kaskida IFT drill for March the 1st, 2010
12    to mid-July.
13          A.    Right.
14          Q.    In 2010, right?
15          A.    Correct.
16          Q.    The Macondo well, although this
17    was after you left, began to have a series of
18    delays.  You've become aware of that, right?
19          MS. KARIS:
20                  Object to form.
21          THE WITNESS:
22                  I'm not aware of any of the
23    schedules or schedule issue after my
24    departure.  I believe there was a rig
25    planning meeting literally the day I
```

1    departed.

2                    (Exhibit No. 2938 marked for

3    identification.)

4    EXAMINATION BY MR. WATTS:

5        Q.    Let's go to Tab 93 which is an

6    e-mail from David Sims to Brian Morel on

7    April 11th, nine days before this explosion.

8    You see how they began operations on the

9    Macondo with the HORIZON on January 31,

10   expected to complete by March the 17th?

11       A.    (Nodding head affirmatively).

12       Q.    That's about the time the rig

13   schedule says it's going to go to the Kaskida

14   IFT, right?

15       MS. KARIS:

16                    Object to form.

17       THE WITNESS:

18                    Yeah.  Without seeing the rig

19   schedule, yes, sir.

20   EXAMINATION BY MR. WATTS:

21       Q.    But they got 38 days behind

22   schedule and now expected to finish on

23   April 24th of 2010.  Do you see that?

24       MS. KARIS:

25                    Object to form.

```
 1              THE WITNESS:
 2                   I see this.
 3      EXAMINATION BY MR. WATTS:
 4          Q.    It says we're working on a
 5      letter to the MMS justifying not getting to
 6      Kaskida before May 16th.  Let me just ask you
 7      this, Tab 93 is Exhibit 2938.  You have both
 8      spoken about and written about pressures
 9      coming from the board room and otherwise that
10      can result in decisions on a rig that should
11      not have been made, right?
12          MS. KARIS:
13                   Object to form.
14          THE WITNESS:
15                   Yes, on my presentation comments
16      reflect that.
17      EXAMINATION BY MR. WATTS:
18          Q.    With respect to the paper that
19      you wrote with Mr. Pritchard, Tab 97 on
20      Page 42.
21          A.    Yes, sir.
22          Q.    About five lines down, it says:
23      "Schedule driven decisions create a dynamic
24      characterized by a tendency to overlook or
25      possibly ignore central design requirements
```

```
1    to assure a safe drilling margin and properly
2    manage uncertainties and ancillary risks.
3    Like a virulent virus, as the contagion
4    spreads it can and has escalated into an
5    unhealthy, co-dependent relationship between
6    operators and regulators contaminating the
7    intended system of checks and balances in
8    favor of doing it cheaper and faster."
9              Did I read that correctly?
10      A.     You read that correct.  These
11   are fully attributable to Mr. Pritchard.
12      Q.     Now, further down the page, they
13   quote your speech that you had given in
14   October and, the second paragraph, you called
15   it "the elephant in the room"?
16      A.     That's correct.
17      Q.     "The elephant in the room is all
18   the mixed or unintended messages we send the
19   crews when we are behind schedule, over cost
20   or behind on production.  If we don't clearly
21   keep personal and process safety as an
22   unyielding value in our words and more
23   importantly visible behaviors and decisions,
24   we ultimately will not withstand the risk or
25   test of time, and we will certainly suffer
```

1    fatality or major incident."

2              Did I read that correctly?

3        A.    That's correct, and those are my

4    words.

5        Q.    In your speech, you use

6    scheduling as an example where you can get

7    pressure from the boardroom that causes

8    people on the rigs to do things that they

9    would otherwise not do?

10       A.    That's correct.

11       Q.    With respect to a scenario where

12   a rig is $40 million over budget, more than a

13   month behind schedule, you have to go plug

14   and abandon the Nile before you can get to

15   the Kaskida and you risk losing the Kaskida

16   if you don't spud it by May the 16th, is that

17   the kind of scheduling pressure that would be

18   an example of what you're referring to in

19   your speech?

20       MS. KARIS:

21              Object to form.

22       THE WITNESS:

23              In -- I prefer to, because of my

24   lack of knowledge of the direct conversations

25   and decision made on Macondo, I would say

1    that any time you have a well that is

2    significantly over AFE, given the cost and

3    the potential impact on subsequent projects,

4    there will be many concerns raised about how

5    quickly you can recover schedule from that

6    point, yes.

7    EXAMINATION BY MR. WATTS:

8         Q.    Do well design decisions that

9    are made in order to catch up on schedule or

10   save dollars have any place in good drilling

11   and completion operations?

12        MS. KARIS:

13             Object to form.

14        THE WITNESS:

15             My statement would be that every

16   one of these wells has a significant cost,

17   every hour has a significant cost involved,

18   and so there is a constant pressure by any

19   rig, any operator to carry out these wells as

20   quickly as possible, and that will have

21   sometimes natural conflicts with the ability

22   to maintain good working practices, safe

23   practices, and the responsibility of the

24   onshore management is to preclude any of the

25   decisions being made to compromise safety.

1   EXAMINATION BY MR. WATTS:

2        Q.    Well, while you were at BP, did

3   you firsthand witness that cost and

4   scheduling pressure being placed on rig

5   employees by onshore management?

6        MS. KARIS:

7             Object to form.

8        THE WITNESS:

9             I did not see overt pressure on

10  schedules or costs that I felt would directly

11  compromise safety or well control.

12  EXAMINATION BY MR. WATTS:

13       Q.    Whose job is it to keep that

14  from happening?

15       A.    In my view, that would, in the

16  organization that I was part of, that would

17  be the responsibility of the vice president

18  for D&C and the drilling manager for the rig.

19       Q.    In other words, while you were

20  the vice president of drilling and

21  completions, you did not allow cost and

22  scheduling considerations to put pressure on

23  your drilling employees that might impinge

24  upon safety?

25       A.    It was -- my definition of the

```
1    job that my -- a key role of mine was to keep

2    the cost and schedule pressures, which are

3    prevalent in the offshore environment, to

4    avoid compromising any technical decision or

5    risk decision.

6         Q.     After you left in December of

7    2009, do you have any firsthand knowledge as

8    to whether your successor succeeded as you

9    did in preventing onshore management from

10   applying cost and scheduling pressure to

11   drilling rig personnel?

12        A.     I do not have any firsthand

13   knowledge.

14        Q.     The speech that you gave makes

15   it clear that if that happens, if rig

16   personnel feel onshore pressure related to

17   costs or scheduling, that actions are going

18   to be taken that can lead to uncontrolled

19   well blowouts and a disaster.

20        A.     I believe that's -- that was the

21   essence of my speech, yes.

22        Q.     And you have read enough about

23   the decisions that were made out there on the

24   rig Macondo that that is precisely what

25   happened here?
```

```
 1          MS. KARIS:
 2               Object to form.
 3          THE WITNESS:
 4               I have read a number of reports
 5     indicating in my professional judgment that
 6     there were some basic errors made and there
 7     was a failure of oversight of some of the
 8     operations onshore and offshore.
 9     EXAMINATION BY MR. WATTS:
10          Q.    Let me ask you about some of
11     those.  Have you been made aware that there
12     were three different kicks and four different
13     instances of lost returns with this very well
14     before the incident happened?
15          A.    In the public records I've seen,
16     I know there were several instances of well
17     control events in terms of this particular
18     well.
19          Q.    Are you familiar with a
20     gentleman by the name of Bobby Bodek?
21          A.    No, I'm not.
22          Q.    Have you become familiar with
23     the fact that there were leaks identified on
24     the BOP where the stack was not pulled up and
25     instead the maintenance was scheduled once
```

```
 1      the well was done during the move?
 2           MS. KARIS:
 3                Object to form.
 4           THE WITNESS:
 5                I'm not aware of that.
 6      EXAMINATION BY MR. WATTS:
 7           Q.    If I told you that a surface
 8      test on a BOP would take at least four days,
 9      is that consistent with what you have told me
10      in terms of how long it takes to pull up a
11      stack?
12           A.    To fully pull the stack and do
13      inspection checks and run it back to bottom,
14      probably couldn't be any less than three
15      days, it could be as much as seven days.
16           Q.    Have you become familiar with
17      the fact that Halliburton had provided BP
18      with modeling showing how many centralizers
19      it would take in order for the cement job to
20      have a likelihood of success?
21           MS. KARIS:
22                Object to form.
23           THE WITNESS:
24                In the information that's been
25      made available, publicly either through BP's
```

1      inquiry reports and/or the Presidential

2      Commission report, I've seen records

3      indicating that there were questions and what

4      I would label as debates about the cement

5      design and the issue of centralizers.

6      EXAMINATION BY MR. WATTS:

7           Q.     And that at one point the plan

8      was to go with 21 centralizers, a gentleman

9      by the name of Daniel Oldfather is sent out

10     to the rig to install those centralizers and

11     stop collars, but it's going to take 48 hours

12     and he is literally pulled off the rig and

13     sent home and told the job is canceled.

14                 Were you familiar with that

15     fact?

16          MS. KARIS:

17                 Object to form.

18          THE WITNESS:

19                 Not that level of detail, no.

20     EXAMINATION BY MR. WATTS:

21          Q.     If somebody decided to use six

22     centralizers instead of 21 in order to save

23     the rig time and avoid the time penalty of

24     installing centralizers and stop collars,

25     would that be an example of scheduling

1    pressure and cost pressure leading to a bad

2    decision?

3         MS. KARIS:

4              Object to form.

5         THE WITNESS:

6              I could probably offer that

7    wouldn't necessarily be an uncommon practice.

8    I wouldn't necessarily describe it as, under

9    these conditions, a prudent practice.

10   EXAMINATION BY MR. WATTS:

11        Q.    Is a bottoms up circulation

12   before you do a cement job a common thing to

13   do in the industry?

14        A.    I would classify it as a common

15   thing to do for primary cementing, yes.

16        Q.    It is not only common, it is

17   prudent to do a bottoms up circulation prior

18   to a cement job to increase the chances of a

19   successful cement job?

20        MS. KARIS:

21              Object to form.

22        THE WITNESS:

23              That's the general view in the

24   industry by my perception.

25   EXAMINATION BY MR. WATTS:

1          Q.      Bottoms up circulations take

2    time?

3          A.      That's correct.

4          Q.      How much time does it take to do

5    a bottoms up circulation?  If you know.

6          A.      I would -- it depends on depth

7    and it depends on the volume that you can

8    pump which is going to be restricted by

9    pressure, so it could be a matter of hours,

10   it could be a matter of 24.

11         Q.      If somebody decided not to do a

12   bottoms up circulation in order to save time

13   and money, would that be a prudent decision

14   to make before doing a cement job?

15         A.      I would assume that the decision

16   would be couched based on whether there was a

17   greater risk of doing a full circulation

18   versus the normal practice to do a full

19   circulation and that there might have been

20   some other decision based on another risk.

21         Q.      But if somebody decided not to

22   do a bottoms up circulation just to save

23   time, that's not a good reason not to do it,

24   would you agree?

25         A.      Time savings to shortcut a

1    bottoms up circulation would be contrary to

2    typical primary cementing practices.

3         Q.    The reason it would be contrary

4    to primary cementing practices, it is well

5    known and understood in the industry that

6    when you do a bottoms up circulation, you

7    increase the chances of a good cement job

8    achieving zonal isolation, right?

9         MS. KARIS:

10             Object to form.

11        THE WITNESS:

12             That would be, I think, the

13    conventional view in the industry.

14   EXAMINATION BY MR. WATTS:

15        Q.    Does BP in its drilling and well

16   operations policy require that before it

17   pumps cement that it gets back cement slurry

18   tests from the supplier that's providing the

19   cement?

20        A.    My recollection of the DWOP at

21   the time I was there is that's correct.

22        Q.    If somebody chose to go ahead

23   and pump cement before Halliburton ever got

24   BP the cement slurry test, that would be a

25   violation of BP's own DWOP policy, right?

```
1              MS. KARIS:
2                    Object to form.
3         THE WITNESS:
4                    That would be nonconformance to
5    the DWOP policy.
6    EXAMINATION BY MR. WATTS:
7         Q.    Pumping cement before you
8    received a cement slurry test, if you did it
9    because you didn't want to wait around for
10   it, that is scheduling pressure that would
11   not be consistent with good drilling and
12   completions techniques, agree?
13        MS. KARIS:
14                   Object to form.
15        THE WITNESS:
16                   Without looking at the
17   individual incident and all the conditions at
18   one point, I don't make that categoric
19   conclusion.
20   EXAMINATION BY MR. WATTS:
21        Q.    Do you know what a
22   positive-pressure test is?
23        A.    My understanding or my
24   definition is it's a pressure test from top
25   down onto either a packer or cement plug
```

1    indicating integrity of the plug.

2         Q.    Is it a better or worse idea to

3    wait for the cement to cure before you do the

4    positive-pressure test?

5         A.    I would expect, in my

6    experience, that general procedure would be

7    to give the cement curing time prior to

8    applying pressure to it.

9         Q.    If someone initiated a

10   positive-pressure test before the cement had

11   completed its cure, would that be a good

12   drilling and completions practice?

13        MS. KARIS:

14             Object to form.

15        THE WITNESS:

16             It would -- it would be commonly

17   done in some cases, but whether it would

18   involve good practice, it would be hard to do

19   define that.

20   EXAMINATION BY MR. WATTS:

21        Q.    Not waiting for the cement to

22   cure before you do a positive-pressure test,

23   if you did that in order to save time, that's

24   not a good reason not to wait for the cure,

25   is it?

```
 1           MS. KARIS:
 2                   Object to form.
 3           THE WITNESS:
 4                   If saving time was the sole
 5      driver, I would say it's not a good reason.
 6      EXAMINATION BY MR. WATTS:
 7           Q.     What is a mechanical plug?
 8           A.     In a well such as this that
 9      doesn't have production tubing.  It would be
10      a packer of some type which would have a
11      metal -- basically a way to seal with rubber
12      elements from top to bottom.
13           Q.     Is installing a mechanical plug
14      a way to get a completely independent second
15      barrier from the cement?
16           A.     That is one method, yes.
17           Q.     Is installing a mechanical plug
18      a way to comply with the DWOP requirement for
19      two independent mechanical barriers before
20      you open the annular?
21           A.     That would be one way.
22           Q.     How long does it take to install
23      a mechanical plug?
24           A.     It could be, depending on depths
25      and the rig situation, a few hours to maybe
```

1    24 hours maximum.

2         Q.    Sure.  If you're -- the depths

3    we're talking about on the Macondo?

4         A.    It depends on the round trip,

5    you have to rip in and out with the pipe, so

6    it could be several days, actually.

7         Q.    If someone chose not to install

8    a mechanical plug thereby violating BP's own

9    DWOP policy in order to save time, is that

10   good drilling and completions practice?

11        MS. KARIS:

12             Object to form.

13        THE WITNESS:

14             The only reason that I would

15   understand the need to set a mechanical plug

16   is if you had a question on the integrity of

17   the cement plug itself.

18   EXAMINATION BY MR. WATTS:

19        Q.    And the way you solve that

20   question is to run a cement bond log, right?

21        A.    That would be one way, yes.

22        Q.    If someone chose to save

23   $137,000 and sent Schlumberger home in order

24   to save rig time, would that be good drilling

25   and completions practice?

1          MS. KARIS:

2                    Object to form.

3          THE WITNESS:

4                    I can see a decision that would

5     be based also on when they were able to run

6     it and whether or not the cement had adequate

7     curing time so that the cement bond log would

8     be an effective test.

9     EXAMINATION BY MR. WATTS:

10         Q.      When you began your circulation,

11    is it a good idea to be able to monitor the

12    pit volumes?

13         A.      When you begin circulation, it

14    is common practice to slowly watch the pit

15    volumes, and particularly to make sure that

16    the volumes, you're not losing circulation,

17    or you're not gaining volumes, which would

18    indicate an influx.

19         Q.      When you begin circulation and

20    you do not have a mechanical plug, you have

21    only one mechanical barrier from the

22    reservoir to the top and that's the cement,

23    right?

24         MS. KARIS:

25                   Object to form.

```
 1          THE WITNESS:
 2                If you displace the well with a
 3   fluid that does not have sufficient density
 4   to overcome the gradient to the subsurface
 5   reservoir, that would not be in compliance
 6   with my interpretation of DWOP.
 7   EXAMINATION BY MR. WATTS:
 8        Q.    And if you do so after not even
 9   running a cement bond log, you have one
10   mechanical barrier that you have not tested.
11        A.    The confirmed barrier would be
12   based on a positive-pressure test and/or a
13   cement bond log and then you would, based on
14   those results, determine whether -- you would
15   conclude, whether you had one confirmed
16   barrier.
17        Q.    But even if you confirm you have
18   one barrier, the DWOP requires that you have
19   two before you open the annular to begin your
20   circulation, right?
21        MS. KARIS:
22                Object to form.
23        THE WITNESS:
24                If I recall correctly, the DWOP
25   says when a hydrocarbon reservoir is exposed
```

```
 1    to surface, you must have two confirmed
 2    barriers before you displace to a fluid of
 3    less than a hydrostatic head for the
 4    reservoir.
 5    EXAMINATION BY MR. WATTS:
 6         Q.     If you begin your circulation
 7    with only one barrier, do you need to be ever
 8    vigilant to monitor the pit volumes to make
 9    sure you're not going to have a kick?
10         A.     Under all circumstances, you
11    should be closely monitoring the pit volumes
12    whenever you have a hydrocarbon reservoir
13    exposed.
14         Q.     But what if you're really in a
15    hurry and you want to start cleaning your
16    pits for your move over to the now P&A.  So
17    you bypass the Sperry-Sun active pits monitor
18    and you ship the mud overboard, is that good
19    drilling and completion practice?
20         MS. KARIS:
21              Object to form.
22         THE WITNESS:
23              Without more details on what the
24    operation was, I couldn't make that
25    assessment.
```

1    EXAMINATION BY MR. WATTS:

2         Q.    Does that sound like something

3    you would do when you're in a hurry?

4         MS. KARIS:

5              Object to form.

6         THE WITNESS:

7              I couldn't say.

8    EXAMINATION BY MR. WATTS:

9         Q.    If you're going to bypass the

10   pit monitors while you open the annular with

11   only one positive barrier between the

12   reservoir and the top of the well, is it a

13   good time to go ahead and put those second

14   set of eyes in Houston on the realtime

15   Sperry-Sun data?

16        MS. KARIS:

17             Object to form.

18        THE WITNESS:

19             At any point until you have two

20   confirmed barriers, I would expect it to be

21   common practice to have two independent

22   measures, two independent means of watching

23   the volumes and the drill pipe pressures.

24   EXAMINATION BY MR. WATTS:

25        Q.    We've gone through a number of

1    the decisions that were made in the last four

2    or five days.  All of those put together,

3    does that smell to you like a rig that is

4    getting cost and scheduling pressure from

5    somewhere?

6            MS. KARIS:

7                    Object to form.

8            THE WITNESS:

9                    I believe there are -- there

10   appears to be a number of decisions made on

11   the days or day leading to the blowout that

12   seems not to be in conformance with the

13   practices that were in place at the time of

14   my departure.

15   EXAMINATION BY MR. WATTS:

16           Q.    Mr. Lacy, you told me about

17   being called in to the human resources office

18   and being told by Barbara Yilmaz that you had

19   not been selected to maintain your position

20   during the reorganization and that there was

21   no other place in the company for you.  Did

22   you have communicated to you that the company

23   would be nice enough to allow you to announce

24   a voluntary retirement?

25           A.    The discussion on the public

1    view of my departure was saved for a later

2    date and when I discussed it with one of BP's

3    legal counsel.

4         Q.    And what did BP's legal counsel

5    tell you they would allow you to do?

6         MS. KARIS:

7               Object to form and assert

8    privilege.

9    EXAMINATION BY MR. WATTS:

10        Q.    Go ahead.

11        MS. KARIS:

12              I instruct him not to answer.

13   He was a BP employee at the time and speaking

14   with BP counsel.

15   EXAMINATION BY MR. WATTS:

16        Q.    Let me see if I can go about it

17   this way.  I don't care if you were speaking

18   with BP's counsel or not, were you there for

19   a lawyer or were you told something about

20   what your choices were?

21        MS. KARIS:

22              Same objection.  Instruct the

23   witness not to answer.

24   EXAMINATION BY MR. WATTS:

25        Q.    Do you choose to follow that

1    instruction?  You can if you want to, you

2    don't have to, if you don't want to.

3            A.      I have a subrogation agreement

4    with BP and I'm afraid I would violate the

5    terms of that agreement.

6            Q.      And I'm not mad at you for it.

7    I've got to ask you whether or not you're

8    going to answer the question to preserve the

9    issue.  I'm not even mad at her over there,

10   she's doing her job.  We have got a

11   magistrate that we'll call and ask about this

12   and she will make a ruling and then I can ask

13   you tomorrow probably, so nobody is sore at

14   each other, everybody has got their jobs to

15   do.

16           A.      I fully understand.

17           Q.      But the bottom line is that

18   after meeting with BP's legal counsel, you

19   made an announcement that you were

20   voluntarily leaving the company, right?

21           A.      I don't have the text that I

22   used with my staff.  I believe I used the

23   term that "I was leaving to pursue other

24   interests."

25           Q.      Which I guess is what you do

```
 1    when your interest at BP has been eliminated?
 2         MS. KARIS:
 3              Object to form.
 4         THE WITNESS:
 5              Without further opportunities at
 6    BP, I was forced to look to other
 7    opportunities.
 8              (Exhibit No. 2939 marked for
 9    identification.)
10    EXAMINATION BY MR. WATTS:
11         Q.    Now, let me take you through
12    just a couple of things.  If you could go to
13    Tab 52, please, sir.
14         A.    (Complying).
15         Q.    Exhibit 2939.  This is an
16    article in "Drilling Contractor" Magazine in
17    September and October of 2007, is that right?
18         A.    That's correct.
19         Q.    Barbara Yilmaz, the lady who
20    informed you about your position, says about
21    you in this article:  "Kevin's passion and
22    commitment to safety, people and performance
23    are making a demonstrable difference."
24              Do you recall her saying that to
25    "Drilling Contractor" Magazine about you?
```

```
 1           A.      Yes, I do.

 2           Q.      That's a nice thing to have said

 3     about you, isn't it?

 4           A.      Yes.

 5           Q.      It says:  "While you were at

 6     Chevron it went from mediocre to a leader in

 7     safety."

 8                   That, in fact, happened, right?

 9           A.      That is correct.

10           Q.      Mr. Mark Patterson, BP director

11     of technology for drilling and completion

12     says:  "And I've been impressed by the

13     efforts he's made to get to know the drilling

14     leadership within the company so quickly."

15                   And at the end of the article he

16     says:  "Kevin has a real passion for the HSE

17     agenda.  It's a real personal issue with

18     him."

19           A.      That's correct.

20           Q.      That was a nice thing to have

21     said about you by the director of technology

22     for drilling and completions, right?

23           A.      That's correct.

24           Q.      He is correct, that you have a

25     real passion for the HSE or safety agenda,
```

1      it's a personal issue with you?

2           A.     Those are correct statements.

3           Q.     During the time you were at BP,

4      did you do everything in your power to

5      augment the safety at BP?

6           A.     Yes, I did.

7           Q.     Exhibit 52 or Tab 52 is Exhibit

8      2921.  While you were at BP, there were --

9      there was a process where, in effect, you

10     were evaluated, performance evaluations,

11     right?

12          A.     That's correct.

13          Q.     Prior to your meeting in the

14     human resources office with Barbara Yilmaz

15     where you were told that you were being

16     replaced and there was no place for you in

17     the company, did you ever have a performance

18     evaluation that was less than stellar?

19          A.     All my performance evaluation

20     assessments in 2006, 7 and 8, which would

21     have been the full document cycle were

22     largely positive.

23          Q.     Did you have any reason to

24     believe whatsoever before November of 2009

25     that you were going to be invited to leave

1    the company?

2         A.     Absolutely not.

3         Q.     Let me show you Tab 99.  This is

4    -- it's not in there, this is going to be

5    Exhibit 2939.  This is a group leader

6    performance summary form for 2008 with

7    respect to you.

8         A.     That's correct.

9         Q.     With respect to this performance

10   evaluation dated January of 2009, was the

11   summary of it that you met all expectations,

12   strong meets expectations rating.

13        A.     That's correct.

14        Q.     Did they say with respect to

15   organizational capability that you

16   successfully addressed the attrition by

17   implementing a retention program that was

18   personally initiated in January and

19   ultimately approved by the segment?

20        A.     That's correct.

21        Q.     With respect to D&C

22   transformation, the second line says that:

23   "Primary deliverables achieved with improved

24   personal safety.  No well control or SIMOP

25   incidents.  Key wells delivered in

1        significantly less days than 10,000."

2                        Did I read that correctly?

3        A.      That correct.

4        Q.      What is an S-I-M-O-P incident?

5        A.      SIMOPs, would have been

6        simultaneous operations.

7        Q.      Did it say:  "You accepted

8        responsibility for team issues at mid year

9        and successfully managed them by year end via

10       changing personal behaviors and approach,

11       increasing one-to-one communication and

12       addressing individual concerns of the D&C

13       leadership team."

14       A.      That's correct.

15       Q.      Under self-assessment, did you

16       write that D&C had one of its safest years

17       ever while delivering significantly improved

18       performance?

19       A.      Yes, I believe so.

20       Q.      Now, there is not such a group

21       leader performance summary for you for 2009

22       because you were invited out of the company

23       before these took place, right?

24       A.      That's correct.

25       Q.      Let me just ask you:  To this

1    day, do you have any idea why you were

2    invited out of the company?

3           A.     No, I do not.

4           Q.     When you had your communication

5    with Barbara Yilmaz and you said that you

6    were concerned that the safety efforts that

7    you and Harry Thierens had initiated might

8    not be implemented after your departure, I

9    think you said it would take a year and it

10   would be very fragile without you and Harry,

11   did she promise to pass those safety concerns

12   along to anybody?

13        MS. KARIS:

14              Object to form.

15        THE WITNESS:

16              I do not recall that statement.

17   EXAMINATION BY MR. WATTS:

18           Q.     You mentioned that you had

19   concerns about your replacement, Pat O'Bryan

20   taking your spot.  What were the concerns

21   that you communicated?

22           A.     My association with Mr. O'Bryan

23   was primarily during my time frame as the

24   head of discipline for western hemisphere.

25   He would have been one of five, six, seven

1    individuals that I worked with at that time.

2    He was the head of the North America Gas

3    drilling completions organization and based

4    on my 18 months in that role, I had

5    observations on some intangibles that gave me

6    concern about Pat assuming my role in the

7    Gulf of Mexico.

8        Q.    What were those observations on

9    the intangibles?

10       A.    I had, as I mentioned earlier,

11   two concerns:  I was concerned about

12   replacement of Harry Thierens in a very

13   challenging role, in a technically very

14   complex role, coupled with that, replacing

15   myself as well.  And one of the intangibles

16   that I would be concerned about with Pat

17   would be the ability to withstand the

18   pressures of schedules, costs, et cetera.

19       Q.    In other words, while you were

20   the vice president of drilling and

21   completions, when pressure from scheduling

22   costs happened, you kept it from getting to

23   the drill floor and affecting decisions?

24       A.    You can conclude that.

25       Q.    You had concerns that knowing

1    those pressures concerned costs and
2    scheduling were going to continue to come
3    from BP management, you were concerned that
4    Pat O'Bryan would not keep those pressures
5    from reaching the drilling floor?
6         MS. KARIS:
7              Object to form.
8         THE WITNESS:
9              I did not state it in that form.
10   I had concerns with the changes in Harry and
11   my role simultaneously with -- and would have
12   expressed those concerns with many
13   individuals because of the timing and the
14   requirements of the role.
15   EXAMINATION BY MR. WATTS:
16        Q.    But back to my question.  While
17   you were the vice president of drilling and
18   completions, you received pressure from
19   management, both cost and scheduling that you
20   succeeded in isolating those from decisions
21   on the drilling rigs, right?
22        MS. KARIS:
23              Object to form.
24        THE WITNESS:
25              I believe I fulfilled my primary

1    role to conduct safe operations while there

2    was a major cost cutting effort going on in

3    2009.

4    EXAMINATION BY MR. WATTS:

5         Q.    And based upon what you saw

6    during your dealings with Pat O'Bryan, you

7    had a concern knowing that those costs and

8    scheduling pressures would continue to come

9    from management, that Pat O'Bryan would not

10   be able to keep those costs and scheduling

11   concerns from affecting decisions on the

12   drilling floor out on the rigs?

13        MS. KARIS:

14             Object to form.

15        THE WITNESS:

16             My objection to Barbara was that

17   I did not think that Pat in combination with

18   the change to Harry's job would be fully

19   capable of carrying out the full

20   responsibilities of the role, but I did not

21   state it as succinctly and as clearly as

22   that.

23   EXAMINATION BY MR. WATTS:

24        Q.    Regardless of how you stated it,

25   you had that concern that he was going to in

```
 1    effect be a yes man and allow those pressures
 2    to reach the drilling floor?
 3         MS. KARIS:
 4              Object to form.
 5         THE WITNESS:
 6              I can say I had concerns about
 7    Pat replacing me.
 8              (Exhibit No. 2940 marked for
 9    identification.)
10    EXAMINATION BY MR. WATTS:
11         Q.    If we could go to Tab 40.
12         A.    (Complying).
13         Q.    This is Exhibit 2940.  This is a
14    January 7 e-mail from Kim Sachan.
15         A.    Yes.
16         Q.    To everybody with respect, it
17    says "all" and then, open paren, (Lacy).  It
18    says:  "With all the changes in leadership,
19    please be sure to change your approver in
20    your e-Expense profile and double-check to be
21    sure your cost center is correct if you
22    happen to have moved groups.  Also, with all
23    the moves, take a peek at your chart to make
24    sure" -- "to be sure folks are in the right
25    place."
```

1                    Do you see that?

2          A.      I do.

3          Q.      If you go three pages in you

4     will see the deepwater D&C organizational

5     chart dated 2010, right?

6          A.      Yes.

7          Q.      And then the next page, under

8     the drilling and completion leadership team

9     it now says "Pat O'Bryan, vice president

10    drilling and completion," right?

11         A.      That's correct.

12         Q.      That is the gentleman that you

13    were concerned about being able to fulfill

14    the job that you had done with the pressures

15    that you had faced?

16         A.      That is correct.

17         Q.      Under him was Curtis Jackson,

18    the director of HSE, that's the safety group,

19    right?

20         A.      That's correct, yes.

21         Q.      Curtis Jackson left the company

22    shortly after this, right?

23         A.      That's correct.

24         Q.      If we go to Bates page number

25    953 we can see Curtis Jackson on top of the

1    HSSE team, all the safety people that are

2    under him and he would be right under Pat

3    O'Bryan in this new organizational scheme,

4    right?

5        A.    That's correct.

6        Q.    So in terms of process safety

7    risk management, you and Harry Thierens were

8    primarily responsible for working on that and

9    had presented that a few days before you were

10   invited out of the company, right?

11       MS. KARIS:

12           Object to the form.

13       THE WITNESS:

14           The presentations that we made

15   just prior to my being informed were related

16   to the risk management processes we were

17   implementing in the Gulf of Mexico and the

18   key lessons learned from transforming the

19   Gulf of Mexico D&C organization.

20   EXAMINATION BY MR. WATTS:

21       Q.    So risk management and key

22   lessons learned and those are communicated

23   and those were identified primarily by you

24   and Harry Thierens, right?

25       A.    That's correct.

```
 1            Q.     As of January 2010, neither of
 2     you was working on drilling and completions
 3     in the Gulf of Mexico anymore, right?
 4            A.     That's correct.
 5            Q.     The one person that you were
 6     working with on the 2010 safety plan was
 7     Curtis Jackson?
 8            A.     That's correct.
 9            Q.     And neither of the persons who
10     were leading the effort on the 2010 safety
11     plan were working in Gulf of Mexico drilling
12     and completion operations in the month or so
13     before the DEEPWATER HORIZON disaster?
14            MS. KARIS:
15                   Object to form.
16            THE WITNESS:
17                   Harry left, if I recall
18     correctly, December 1st, 2009, in that first
19     week, and I left approximately one week
20     later.
21     EXAMINATION BY MR. WATTS:
22            Q.     Harry left December 1, you leave
23     a week --
24            A.     December 15th, yes.
25            Q.     And sometime before this
```

 1    explosion, the director of HS&E has left the
 2    company as well?
 3         A.    My understanding is that Curtis
 4    left before the Macondo incident.
 5         Q.    Yourself, Harry Thierens and
 6    Curtis Jackson, can you identify for me
 7    anybody more important to the Gulf of Mexico
 8    drilling and completions safety effort than
 9    Harry Thierens, Kevin Lacy and Curtis
10    Jackson?
11         MS. KARIS:
12              Object to form.
13         THE WITNESS:
14              At that time, no.
15    EXAMINATION BY MR. WATTS:
16         Q.    All three of you were gone by
17    the spring of 2010?
18         A.    That's correct.
19         Q.    Go to Tab 41.
20         A.    (Complying).
21              (Exhibit No. 2941 marked for
22    identification.)
23    EXAMINATION BY MR. WATTS:
24         Q.    This is Exhibit 2941.  This is
25    an e-mail from Paul McIntyre, that's the head

1    of human resources that was in the meeting

2    with you and Barbara Yilmaz, right?

3          A.    That's correct.

4          Q.    He writes you and he says:  "Hi,

5    Kevin.  Happy New Year.  Hope you are well.

6    Below is my first draft of a proposed

7    announcement concerning your exit from BP.

8    It is generally consistent with many others

9    in situations like these."

10               What did you take that to mean?

11         A.    My interpretation was in

12   instances where individuals were not offered

13   the opportunity to continue in a role or

14   other role.

15         Q.    This smells a little bit like

16   the girl who dumps you and says "we want to

17   still be friends."

18               Is that the way you took that?

19   MS. KARIS:

20               Object to form.

21   THE WITNESS:

22               I didn't take it that way, no.

23               (Exhibit No. 2942 marked for

24   identification.)

25   EXAMINATION BY MR. WATTS:

```
 1           Q.     So many others in situations
 2      like these, he prepares a draft announcement,
 3      we can go to Tab 42.  Exhibit 2942.
 4                  He writes you at the bottom:
 5      "The message was S/MIME encrypted, but your
 6      device cannot decrypt it.  Please read your
 7      message on your desktop."
 8                  You respond:  "I do not have
 9      remote access with my laptop.  It stopped
10      working in mid-December.  Cannot open
11      encrypted mail on my BlackBerry.  So you need
12      to send it to my personal e-mail at
13      Kevinlacy@juno.com."
14           A.     That's correct.
15           Q.     By mid-December they had shut
16      your computers down, right?
17           A.     I no longer had access to the BP
18      systems, yes.
19                  (Exhibit No. 2943 marked for
20      identification.)
21      EXAMINATION BY MR. WATTS:
22           Q.     You respond in Tab 43, which is
23      Exhibit 2943.  On January 11th from your
24      private e-mail address, kevinlacy@juno.com,
25      and you say:  "No problem with the wording on
```

1     the announcement, just give me a heads up
2     prior to it going out."  You say:  "I'm out
3     of town until Wednesday.  Will be back in
4     touch to arrange for returning my laptop,
5     badge, phone, et cetera.  Thank you, Kevin."
6           A.    Yes.
7           Q.    Let's go to Tab 44.
8           A.    (Complying).
9                 (Exhibit No. 2944 marked for
10    identification.)
11    EXAMINATION BY MR. WATTS:
12          Q.    A day later on January 12th,
13    this is Exhibit 2944, this is from Christina
14    Verchere.  Did I pronounce that wrong?
15          A.    I'm not sure.
16          Q.    Do you know -- she seems to be
17    from over at BP, PLC in England?
18          A.    I believe so.
19          Q.    And she tells Mark Hammond and
20    Paul McIntyre:  "Mark, Happy New Year.
21    Please find attached a group leader
22    announcement.  Please, can it be distributed
23    at 2:00 p.m. London time tomorrow."
24                And then there's an
25    announcement, and it says:  "Following almost

1    four years with BP, Kevin Lacy, VP, drilling

2    and completions Gulf of Mexico will be

3    leaving BP to pursue other opportunities.

4    Kevin led several continuous improvement

5    efforts in Gulf of Mexico drilling and

6    completions which successfully impacted

7    performance results.  I want to take this

8    opportunity to thank him for this dedication

9    and commitment to improving the performance

10   of the Gulf of Mexico SPU.  Please join me in

11   wishing Kevin all the best in his future

12   endeavors.  James Dupree the safety -- I

13   mean, the SPU leader for the Gulf of Mexico."

14              Right?

15        A.    That's correct.

16        Q.    So London says:  Hey, can you

17   send it out tomorrow about 2:00 p.m."

18              (Exhibit No. 2945 marked for

19   identification.)

20   EXAMINATION BY MR. WATTS:

21        Q.    Let's go to Tab 45.  At 2:00 pm

22   and seven seconds, the staff announcement

23   concerning Kevin Lacy goes out over the

24   employee communications wire.  And it says

25   the exact words that London had approved the

1      day before, right?

2             A.      That is correct.

3             Q.      This is Exhibit 2945.

4                     (Exhibit No. 2946 marked for

5      identification.)

6      EXAMINATION BY MR. WATTS:

7             Q.      At some point in time, as we go

8      to Tab 46, Exhibit 2946, you were given the

9      permission to send a nice note to all the

10     people who used to work for you in the

11     drilling and completions leadership team,

12     right?

13            A.      No, I was not.  This letter --

14            Q.      How is that wrong?  I'm sorry.

15            A.      This letter was drafted to help

16     explain to my former employees the -- some

17     background to the situation and why I had

18     been silent for a long time frame.  The

19     employees found out about my replacement

20     roughly December 1st, and I believe that

21     announcement said Kevin's subsequent

22     assignment will be subject to a later

23     announcement.

24                    The purpose of this one in

25     January was to say he wouldn't be continuing

1    and I felt some obligation to my employees to

2    give some explanation of where I had been the

3    last few weeks since I believe it was

4    mid-December the last time I saw them.

5          Q.    Did you write this letter or was

6    it written for you?

7          A.    I wrote this letter and was told

8    it wasn't normal practice to distribute

9    something like this.

10         Q.    Were you allowed to distribute

11   it?

12         A.    No.

13         Q.    So this was a draft of what you

14   wanted to distribute, but were not allowed

15   to?

16         A.    My former admin had told me that

17   the HR advice would be that this wouldn't be

18   allowed.

19         Q.    If we can go to the letter you

20   drafted, the fourth paragraph, you start off

21   talking about family obligations, and you

22   say:  "I think the decision to leave BP at

23   this time is the right one for me personally

24   and for my family.  Trying to balance my

25   family obligations as a single father and my

1    old job responsibility became increasingly

2    difficult in the last six months.  It's an

3    opportunity -- or it's an opportune time for

4    a change and I am able to leave knowing the

5    D&C team is in great shape and in good hands.

6    I am also able to leave very satisfied that

7    what was accomplished over the last two years

8    was very important to the Gulf of Mexico, and

9    BP and set some great examples of team work

10   and leadership and was very enjoyable for

11   most of our drilling and completions staff,

12   especially myself."

13                Is that part of what you write?

14        A.     Yes, sir.

15        Q.     Were you trying to leave BP as

16   the class act that you were when you showed

17   up?

18        A.     In this letter, I was attempting

19   to encourage my former employees to be as

20   positive as possible about the changes.

21        Q.     To put it bluntly, this was not

22   a change that you wanted?

23        A.     At the time it was proposed, no.

24        Q.     But you were trying to exit as a

25   professional, on good terms with the people

```
 1     who had worked so hard under you?
 2          A.     That's what this letter was
 3     meant to be.
 4          MR. WATTS:
 5               Mr. Lacy, I'm going to take a
 6     break and allow other people to ask you
 7     questions.  I'm reserving a little of my time
 8     tomorrow.  We will have the question that
 9     counsel advised you not to answer, I am going
10     to get a court ruling on it, but, again, I'm
11     not mad at you for it, I will just ask you if
12     she allows me to ask it tomorrow, okay?
13               Thank you very much.  I
14     appreciate your time.
15          THE WITNESS:
16               Thank you, sir.
17          THE VIDEOGRAPHER:
18               We're going off the record at
19     3:00 p.m.  This is the end of Tape 5.
20               (Whereupon, a brief recess was
21     taken.)
22          THE VIDEOGRAPHER:
23               We're back on the record at
24     3:15.  This is the beginning of Tape 6.
25     EXAMINATION BY MR. DART:
```

1          Q.     Good afternoon, Mr. Lacy.  My

2     name is Henry Dart.  I'm special counsel to

3     the Louisiana Attorney General's office.  I

4     represent the State of Louisiana.

5          A.     Okay.

6          Q.     During your tenure at BP, who --

7     what corporation was your payroll employer?

8          A.     I believe by BP America, Inc.

9          Q.     Okay.  To the best of your

10     understanding, were all of the employees in

11     the Gulf of Mexico SPU, at least those under

12     your supervision, were they all employed by

13     BP America, Inc.?

14          A.     If they were BP employees, I

15     believe that's correct.

16          Q.     Now, you were talking about a

17     meeting with Barbara Yilmaz.

18          A.     Uh-huh (indicating

19     affirmatively).

20          Q.     At which you were terminated.

21     Was there an official date for your

22     termination?  Were you fired on the spot or

23     --

24          A.     No.  The discussion occurred a

25     date in November -- what I was informed was

```
 1    that the decision had been taken to replace
 2    me with Mr. Pat O'Bryan and the intended
 3    announcement date would be December 1st.
 4         Q.    Okay.
 5         A.    And I would be transitioning
 6    with Pat for some time frame and then be
 7    finished.
 8         Q.    When did you get your last
 9    paycheck?
10         A.    I believe it was sometime in
11    February of 2010.
12         Q.    Okay, so you were still on the
13    payroll through February of 2010?
14         A.    At least through possibly the
15    first few days of February 2010.
16         Q.    Okay.  Now, you had mentioned a
17    meeting with some BP lawyers and I'm not
18    going to ask you right now what they said.
19    Were you represented by counsel personally at
20    the time that you had those conversations
21    with the BP lawyers?
22         A.    No, I was not.
23         Q.    Okay.  Mr. Stanley, how long has
24    he represented you?
25         A.    Roughly four weeks.
```

```
 1              Q.      Was a lawyer representing you in
 2      the negotiation of your termination agreement
 3      with BP?
 4              A.      No, they were not.
 5              Q.      Okay.  And it was in the course
 6      of that negotiation that you were having
 7      discussions with BP's lawyers, is that right?
 8              A.      That's correct.
 9              Q.      You became the vice president of
10      the Gulf of Mexico SPU drilling and
11      completions central organization, right?
12              A.      That's correct.
13              Q.      And when was that, in April
14      of --
15              A.      The -- I believe it was February
16      of '08.
17              Q.      '08?
18              A.      That's correct.  I think the
19      April date comes from the effective
20      implementation of the new organization, so I
21      was enrolled in February and we began to make
22      the new changes in -- the first of April.
23              Q.      When was your, I guess,
24      promotion, when was your change in job in
25      relation to implementation of the OMS at Gulf
```

1    of Mexico SPU?

2        A.    Well, there would have been some

3    activity levels in '08, talking about

4    implementation of OMS, and then I think most

5    of the work I recall was part of the overall

6    business unit, Gulf of Mexico OMS

7    implementation 2009.

8        Q.    Was your change to vice

9    president related to the implementation of

10   OMS at the Gulf of Mexico?

11       A.    So my assuming that role was

12   part of the reorganization, OMS had been part

13   of a global plan or a BP plan for

14   implementation so they were connected, but

15   they weren't directly connected.

16       Q.    When did you first find out that

17   Gulf of Mexico SPU was going to transition to

18   OMS?

19       A.    I'm sure that would have been

20   sometime in 2008.

21       Q.    All right.  Do you know what the

22   operations academy is at MIT?

23       A.    Yes, I do.

24       Q.    Did you attend that?

25       A.    I think they had an executive

1    briefing -- yes, I did.

2          Q.    You did.

3          A.    And there was -- I believe it

4    was for, I think they called it an executive

5    briefing for OMS or something like that.  It

6    was a one- or two-day session, if I recall.

7          Q.    Did anyone else at the Gulf of

8    Mexico SPU attend that course at MIT?

9          A.    I don't recall.

10         Q.    Do you know what the operating

11   essentials course is?  Have you ever heard of

12   that?

13         A.    I have heard of it, but I don't

14   recall exactly the content.

15         Q.    So I take it that you did not

16   take any of those courses yourself?

17         A.    I don't recall taking operating

18   essentials.

19         Q.    Did anyone at Gulf of Mexico

20   SPU, to your knowledge, go through the

21   operating essentials course?

22         A.    I'm fairly certain that during

23   the 2009 time frame there were operating

24   essential courses or introductions.  I don't

25   recall exactly.

```
 1          Q.      Who would have been in charge of
 2    putting on those courses at the Gulf of
 3    Mexico SPU?
 4          A.      I believe there was an OMS
 5    manager implementation.  There was a woman by
 6    the name of Cindy Skelton, and she was
 7    assisted by another woman by the name of
 8    Tamara.  I don't recall her last name, Tammy
 9    or Tamara.
10          Q.      Joslin?
11          A.      I believe that's correct.
12          Q.      Okay.  And it was Cindy Skelton
13    who was in charge of implementing OMS?
14          A.      That was her primary role, as I
15    understood it.
16          Q.      Was she -- was she under your
17    direction?
18          A.      I believe she reported directly
19    to Richard Morrison, I believe.  She was not
20    under my direction.
21          Q.      As I understand it, the original
22    OMS framework was published in a document by
23    BP and sent out to all the business units for
24    implementation of local OMSs, is that right?
25          A.      That would be what I understood,
```

1    yes.

2         Q.    I'm going to show you on the

3    framework document which is Tab 4 on the

4    disc?

5         MR. DART:

6              I have one for you, if you want.

7         MS. Karis:

8              Thank you.

9              (Exhibit No. 2947 marked for

10   identification.)

11   EXAMINATION BY MR. DART:

12        Q.    I believe this document has

13   already been marked as an exhibit, but we

14   will mark it again as -- we're going to mark

15   this document, if you don't mind doing this

16   for me, 2947.  Put that sticker on there.

17   Down at the bottom or at the top, it doesn't

18   matter.

19              Have you seen that document

20   before, 2947?

21        A.    I believe so.  I am fairly

22   certain I read the document in its entirety

23   at some time frame as part of my role.

24        Q.    And this is the framework by

25   which all of the local business units and

```
 1    SPUs were to design their OMS, their local

 2    OMSs?

 3            A.      When this was published, that's

 4    correct.

 5            Q.      The one you have in front of you

 6    is Version 2 dated in November of 2008.  Was

 7    there a Version 1 that preceded it?

 8            A.      If there was, I don't recall

 9    seeing this one -- that one.

10            Q.      Okay.  But you do recall seeing

11    the one in front of you?

12            A.      The one in front of me, I do

13    recall, yes, sir.

14            Q.      Now the Gulf of Mexico SPU

15    prepared a local OMS document called the OMS

16    handbook and that is No. 1 on the disc and

17    I'm going to show you that document.  It has

18    already been marked as Exhibit 866 and we

19    will use the same number.

20            A.      Okay.

21            Q.      Are you familiar with that

22    document?

23            A.      Yes, I have seen this document

24    before.

25            Q.      This document is dated December
```

1    the 8th of 2008 and it shows the document

2    owner as T. Joslin and C. Skelton.

3         A.    Yes, those were the two

4    individuals I referred to earlier.

5         Q.    Cindy Skelton and Ms. Joslin?

6         A.    Yes, sir.

7         Q.    Another document which I'm going

8    to show you, it's No. 2 on the tab.  On the

9    CD, it's a document that was previously

10   marked as Exhibit 268.  I'm going to show you

11   that document and ask you if you have seen

12   that document before?

13        A.    Yes, I have.

14        Q.    And that was the document edited

15   by you for drilling and completions, right?

16   That's the local OMS manual for D&C?

17        A.    That would be correct -- without

18   looking through it, this would have been our

19   effort to translate the corporate and the

20   Gulf of Mexico into drilling completions.

21   That project effort was led by Mark Webster,

22   and I see his name on here.

23        Q.    Okay.  I'm curious why the Gulf

24   of Mexico SPU has two separate OMS documents,

25   one for the Gulf of Mexico SPU, which would

1    include D&C and a separate one for drilling

2    and completions?

3        A.    My explanation would be that

4    this corporate document was issued shortly

5    thereafter, then Ms. Skelton and Ms. Joslin

6    created a template for the 2009 plan and this

7    document for D&C reflects taking it to

8    another level of specific detail for drilling

9    and completions.  They should be consistent,

10    but this would be specific for drilling and

11    completions.

12        Q.    Was drilling and completions

13    required to follow the OMS -- the local OMS

14    for the SPU that Ms. Skelton drafted earlier?

15        A.    It was intended that they be

16    consistent and -- but with two different time

17    frames, I can't say if they were completely

18    consistent.

19        Q.    Is drilling and completions

20    considered an entity as defined by BP?

21        A.    I would say that would be

22    correct.  It would either be a geographical

23    entity or a -- what they described as a

24    function or discipline such as drilling and

25    completions or production operations, for

1       example.

2              Q.      So when the OMS framework,

3       issued by headquarters, says each entity

4       shall create its own local OMS, then you took

5       that to mean that drilling and completions as

6       a separate entity from production, for

7       example --

8              A.      Correct.

9              Q.      -- would enact its own local

10      OMS?

11             A.      Yes.  These two don't provide

12      adequate detail to completely inform the

13      standards and operations for drilling and

14      completions.

15             Q.      All right, look at the

16      framework, the larger corporate document.

17             A.      Okay.

18             Q.      And on Page 2 and 3, I think the

19      pages are paired, if you look at the very

20      top, do you see that?

21             A.      Yes.

22             Q.      It says in bold, in large

23      letters:  "The OMS has two purposes, to

24      reduce HSSE risks in BP's operating

25      activities and to continuously improve the

1    quality of those operating activities."

2              Do you see that?

3    A.     That's correct.

4    Q.     Do you agree with that as being

5    the two purposes of OMS?

6    A.     I would -- yes, I would agree.

7    Q.     Okay.  It also says to the right

8    on Page 3, quote:  "The operating management

9    system, paren, (OMS) close paren, is

10   fundamental to delivering safe and reliable

11   operating activities in BP."

12             Do you agree with that

13   statement?

14   A.     I agree.

15   Q.     It goes on to say that:  "OMS is

16   important.  It provides a set of requirements

17   and a systematic application of a performance

18   improvement cycle to continuously improve the

19   way we operate."

20             Do you agree with that

21   statement?

22   A.     I agree.

23   Q.     Okay.  And those were the

24   guiding principles by which you in Gulf of

25   Mexico were implementing your local OMS for

1    drilling and completions, correct?

2         A.    Yes, I would agree that I was

3    taking the guidance from the different levels

4    within BP, combined with my previous

5    experience of implementing OEMS inside of

6    Chevron drilling completions.

7         Q.    Okay.  So you had done similar

8    work at Chevron?

9         A.    Yes.  Chevron has an operation

10   excellent management system and we spent a

11   good part of my last several years as vice

12   president of drilling and completions

13   translating that into drilling and

14   completions operations.

15        Q.    Okay.  I'm going to show you

16   another document, it's No. 13 on the disc.

17   It's been previously marked as Exhibit 760.

18   That is called the Gulf of Mexico SPU

19   Drilling and Completions, The Way We Work.

20   Have you ever seen that document?

21        A.    Yes, I have.

22        Q.    What is the purpose of this

23   document?

24        A.    In the absence of a

25   comprehensive or a D&C operations -- OMS, we

1    constructed this as a part of the effort to

2    give guidance and clarity and standardization

3    to the way we conducted our business within

4    D&C operations in the Gulf of Mexico.

5         Q.    So this document, Exhibit 760,

6    was a precursor to the D&C LOMS?

7         A.    To the ultimate, yes, correct.

8         Q.    Once the D&C LOMS was published,

9    did that revoke The Way We Work?

10        A.    It should have superceded --

11        Q.    Or superceded, I think that's an

12   appropriate --

13        A.    -- and if I also recall

14   correctly, one of the things we were waiting

15   on some finalization of the DWOP and the

16   engineering technical practices and a number

17   of things which had to be then incorporated,

18   so there was several things going on

19   simultaneously, but this should have

20   superceded or succeeded that previous

21   document.

22        Q.    Now if you go to the Gulf of

23   Mexico, Ms. Skelton's document, and if you

24   look at Section 1.2 which is on page Bates

25   No. 3138 or 3158, I'm sorry.

1          A.      Yes.

2          Q.      You see under the heading --

3   well, Section 1.2 is "Vision" and it says:

4   "GoM, OMS Vision Simplification and

5   Standardization Through Consistent Operating

6   Requirements Across the SPU, paren, (one GoM

7   OMS manual), close paren."

8          A.      That's correct.

9          Q.      I'm looking at this manual and

10   I'm looking at the D&C OMS manual and I'm

11   seeing two manuals.  How does that -- how do

12   you reconcile having two OMS manuals in the

13   face of this statement in the --

14          A.      Well, my understanding and

15   explanation at the time is this which was

16   drafted and published in December, was

17   exactly what this was called, an operating

18   plan.

19               My understanding was by the end

20   2009, that there would a local OMS system in

21   place for the Gulf of Mexico, so this was a

22   plan, my understanding of this document, it

23   was a plan to implement and deliver a local

24   operating management system and this

25   basically described how that would be

1    implemented and conducted in 2009.

2         Q.    Okay.  So do I take it that

3    sooner or later, hopefully by the end of

4    2009, all of these OMSs would be all

5    integrated into one unified local OMS for the

6    Gulf of Mexico SPU?

7         A.    That would have been the intent.

8    Whether this document is just a chapter in

9    the local OMS or not, so this one was, as you

10   used earlier, the entity for drilling and

11   completions which could have been combined

12   with the others in a Local OMS for Gulf of

13   Mexico.

14        Q.    Okay, but the ultimate goal as

15   we have just read in the Skelton document was

16   that sooner or later there would be one

17   unified system that would manage all of the

18   Gulf of Mexico SPUs operations?

19        A.    That was my understanding.

20        Q.    Okay.  And that was your goal as

21   you were working through this?

22        A.    That would be correct.

23        Q.    And if you had stayed on,

24   presumably, you would have accomplished that

25   goal?

1          MS. KARIS:

2                 Object to form.

3          THE WITNESS:

4                 So this was my effort to create

5     a single document for drilling completions

6     which my intent had I remained is that it

7     would be combined into the Gulf of Mexico

8     LOMS system.

9     EXAMINATION BY MR. DART:

10         Q.    Okay.  And the third bullet

11    point under that GoM OMS Vision says:

12    "Integration of operating requirements as a

13    whole system that will be sustained rather

14    than fragments that keep changing."

15                And that sort of goes along with

16    what we were just talking about, right?  We

17    were trying to establish a unified system

18    that governs all operations in the Gulf of

19    Mexico SPU?

20         A.    Yes.  I believe that was my

21    interpretation of the intent of this comment.

22    The reference, I believe, would have been

23    prior to the implementation of OMS,

24    individual assets had done their

25    interpretations and processes unique to that

1     asset, for example, Thunderhorse, Atlantis.
2     This plan was to bring those under one single
3     umbrella set of standards that would be
4     consistent by -- irrespective of geography
5     and then if it had to have specifics for an
6     operation, either production operation or
7     drilling, those specifics would reside under
8     a single document, single system.
9          Q.     Let me ask you about that.  You
10    just used the term "assets" and I've seen
11    that word used throughout some of these
12    documents.
13         A.     Right.
14         Q.     How do you define asset?
15         A.     There's probably -- my
16    perspective is you see a common usage as it
17    relates to a filed asset.  And -- which in
18    some cases they will talk about production
19    assets, in other cases exploration assets,
20    which might be an exploration lease and that
21    would be what we commonly talked about as an
22    asset, either a lease or a producing field.
23         Q.     Was the Macondo well an asset?
24         A.     By that definition, it would be
25    an asset.

```
 1          Q.    Okay.  So if there's a reference
 2     in here to assets doing risk analyses or
 3     assets doing some function, then you would
 4     think that it would refer to the Macondo well
 5     equally as it would to the Atlantis or
 6     Thunderhorse?
 7          MS. KARIS:
 8                Object to form.
 9          THE WITNESS:
10                In this early -- in the 2008
11     document, I think it was very much on the
12     producing asset side of things and still not
13     completely clear how it pertained to
14     exploration assets.
15     EXAMINATION BY MR. DART:
16          Q.    Let me ask you about that,
17     because there seems to be a divide in the
18     Gulf -- or there was at least in the Gulf of
19     Mexico between production and drilling and
20     completions.  Was that your understanding
21     that, there were almost two separate
22     operating entities?
23          MS. KARIS:
24                Object to form.
25          THE WITNESS:
```

1              So in the Gulf of Mexico, in the

2     2008, 2009 time frame, there were three vice

3     presidents of producing assets.  One for

4     Thunderhorse, one for Atlantis and one for

5     all other assets.  So they were grouped as

6     producing assets.  There was also a vice

7     president for exploration, and there was a

8     vice president for projects and there was a

9     vice president for drilling and completions.

10    So you would say that there were at least six

11    entities, to use your term, that had

12    responsibilities to meet or comply with OMS.

13    EXAMINATION BY MR. DART:

14         Q.    Was there a difference between

15    exploration and drilling and completions,

16    those two vice presidents?

17         MS. KARIS:

18              Object to form.

19         THE WITNESS:

20              Well, they're two different

21    individuals, yes.

22    EXAMINATION BY MR. DART:

23         Q.    Right, but their function, I

24    mean, isn't drilling -- doesn't drilling and

25    completions include exploration?

```
 1              A.      Drilling completions provided
 2      drillings and completion services to all
 3      assets including exploration assets.
 4              Q.      What's the difference between an
 5      exploration asset and a drilling and
 6      completion asset?
 7              A.      I would not use the term
 8      drilling and completion asset.  So there
 9      was --
10              Q.      It's a service, a function?
11              A.      Yes.  It's a function,
12      absolutely.  In service of the assets.
13              Q.      I see.  When you were appointed
14      as vice president of drilling and
15      completions, was there some sort of
16      consolidation of all these vice presidencies
17      going on in the reorganization?
18              A.      There was a change in a number
19      of the senior management personnel and in the
20      organization itself starting in the late
21      2007, early 2008 time frame.  In the
22      subsequent time, I believe there were still
23      changes to some of the roles relative to the
24      Gulf of Mexico vice presidents.  I think the
25      primary -- during my time frame, the roles
```

1     that did not change directly would have been

2     the drilling completions vice president and

3     the exploration vice president.

4          Q.     We've taken the deposition also

5     of a couple of people whom you may know,

6     Cheryl Grounds.  Do you know Cheryl Grounds?

7          A.     The name is not familiar.

8          Q.     She was the manager of process

9     safety engineering.

10         A.     Okay.

11         Q.     For the Gulf of Mexico?

12         A.     Cheryl?

13         Q.     Cheryl Grounds, G-R-O-U-N-D-S?

14         A.     When did she leave?

15         Q.     She's still with them.  She was

16    there for at least eight or nine years, I

17    believe.  My question -- here's my question:

18    When I was asking her about the scope of her

19    responsibilities as manager of process

20    safety, and she said, "Well, it's everything

21    in Gulf of Mexico except for drilling and

22    completions."

23               And I asked her who was the

24    manager of drilling and completions process

25    safety?

1              And she said, "I don't know."

2              Can you explain, first of all,

3    why Cheryl Grounds as manager wasn't managing

4    process safety for drilling and completions

5    and -- let's start with that question.

6         MS. KARIS:

7              Object to form.

8         THE WITNESS:

9              The common approach to process

10   safety is usually around physical facilities,

11   producing assets.  The maturity of applying

12   process safety processes like OEMS or OMS, is

13   still relatively new into D&C organizations

14   and it primarily has resided historically as

15   well control procedures and process as

16   opposed to process safety.

17   EXAMINATION BY MR. DART:

18        Q.    Okay.

19        A.    And so it would not be

20   surprising to me that people would define it

21   as everything but D&C and then have some

22   unique definition somewhat because the

23   projects are carried out through third-party

24   drilling contractors as opposed to

25   company-owned assets.

1          Q.      I think Ms. Grounds did say that
2     everything above the surface was within her
3     ambit?
4          A.      That would be the conventional
5     thinking, yes, sir.
6          Q.      When you went down below the
7     seabed, seafloor, that's out of her realm?
8          A.      That would not surprise me.
9          Q.      Given that, was there anyone at
10    drilling and completions when you were there
11    who was in charge of process safety for
12    drilling and completions?
13         A.      So in the structure that we had,
14    the vice president of D&C would have ultimate
15    accountability for process safety procedures,
16    controls, effectiveness.  That was built
17    during the 2009 time frame with the
18    assignment of several engineering
19    authorities.  Jon Sprague for drilling
20    engineering authority, Dave Rich, it was to
21    be put together with alignment on some of the
22    DWOP engineering technical authorities,
23    technical practices, so I would say that the
24    four primary individuals that would have been
25    involved in the process safety framework

1    assurance and effectiveness would have been

2    the vice president, the operations manager

3    which was Harry Thierens, Jon Sprague and

4    Dave Rich as the engineering manager and the

5    completion engineering manager.

6         Q.     But as I understand it, there

7    was no single person who was a dedicated

8    process safety engineer?

9         A.     That's correct, that's correct.

10        Q.     Okay.

11        A.     We had a technical authority for

12   well control which would be commensurate for

13   the largest process safety risk.  That would

14   have -- I believe I said earlier John

15   Shaughnessy was in that role.

16        Q.     Same question with HSSE.  We

17   took the deposition of Ms. Skelton, Cindy

18   Skelton, and she was appointed as vice

19   president of HSSE, I think, in April 2010.

20   Before that she was the OMS manager?

21        A.     Right.

22        Q.     And had drafted the document

23   that we were looking at a minute ago.

24        A.     Right.

25        Q.     She basically told me the same

1    thing, that she was in charge of HSSE for all
2    of the Gulf of Mexico except for drilling and
3    completions.  And I think she might have
4    mentioned Curtis Jackson's name as --
5         A.    As her predecessor.
6         Q.    Well, or as the person in charge
7    of HSSE in drilling and completions.  Is that
8    right?
9         MS. KARIS:
10             Object to form.
11        THE WITNESS:
12             So prior to my departure Curtis
13   would have had overall responsibilities for
14   the existing processes, standards, as it
15   related to HSSE.  Cindy had the role of
16   implementation of OMS and it was just then
17   bringing in the concept of process safety to
18   the Gulf of Mexico via OMS, and drilling and
19   completions had an HSSE manager and his name
20   was Steve Tink and his full-time role was
21   primarily focused on personal safety for D&C
22   operations.
23   EXAMINATION BY MR. DART:
24        Q.    Was there a plan to incorporate
25   process safety with personal safety in

1    drilling and completions or in the SPU as a

2    whole?

3          A.     So what my intent would have

4    been is to continue to mature and define a --

5    let's call it holistic approach for OMS for

6    D&C, which would include personal safety and

7    process safety into the organization, that

8    may not have been a single defined role, but

9    it would have been a clearly defined system.

10         Q.     And the reason for that would be

11   to bring all of that into focus, if you will,

12   for the entire drilling and completions

13   framework.

14         A.     That would be the goal, yes,

15   sir.

16         Q.     You're familiar with the Baker

17   report from the Texas City disaster?

18         A.     Yes, very familiar.

19         Q.     Okay.  And Mr. Baker's report,

20   one of his findings was that process safety

21   was lacking at BP, correct?

22         MS. KARIS:

23              Object to form.

24         THE WITNESS:

25              That was one of the conclusions

1    in the Baker report, yes, sir.

2    EXAMINATION BY MR. DART:

3         Q.      And your goal, as you just

4    described it, your trying to integrate

5    process safety with HSSE would be to fulfill

6    Mr. Baker's recommendation to incorporate

7    process safety and actually inculcate it

8    within the operating system of drilling and

9    completions in the Gulf of Mexico, correct?

10        A.      My efforts were guided by

11   everything from the conclusions of the Baker

12   report as it related to BP.  The OMS efforts,

13   as I read and understood them, and then my

14   previous experience of developing OEMS and

15   OEMS for drilling completions in Chevron,

16   that was what I was -- those backgrounds or

17   understanding was what I was attempting to

18   do, yes, sir.

19        Q.      Those were your landmarks, your

20   guideposts?

21        A.      That's correct.

22        Q.      And had you stayed on at BP, you

23   would have tried to succeed at that goal of

24   integrating process safety into drilling and

25   completions; correct?

1          MS. KARIS:

2                Object to form.

3          THE WITNESS:

4                Had I remained in my goal -- had

5     I remained in my role, a primary objective

6     for 2010 was to implement and to assess

7     effectiveness of this system, correct.

8     EXAMINATION BY MR. DART:

9          Q.     Okay.  But as of the time you

10    left, process safety had not been fully

11    integrated into the drilling and completions

12    operation, correct?

13         A.     The date on this report is

14    11/1/2009, roughly six weeks before I

15    departed, so this was essentially six weeks

16    old when I left.

17         Q.     But the development of this

18    report, the local OMS is just the first step

19    in incorporating process safety or personal

20    safety or any operation under the OMS system,

21    right?

22         A.     That would be, in my view, an

23    accurate statement, yes.  First steps.

24         Q.     Right.  Because you have to

25    completely assess, reassess, evaluate, get

1    feedback and make sure that the system is

2    understood by the work force and that it is

3    operating as designed.

4          A.     That's correct.  And if you take

5    the milestone of initiating the efforts in

6    2008 and where we were in 2009, it would be

7    my view that we were about halfway through,

8    yes.

9          Q.     So the OMS is like the diet book

10   in my pantry.  I can read it, but I've got to

11   go on the diet, right?

12         MS. KARIS:

13               Object to form.

14         THE WITNESS:

15               It can be a book on the shelf --

16         MS. KARIS:

17               Object to form with respect to

18   the reference to Mr. Dart's diet book.

19         MR. DART:

20               Well, you want me to use

21   something else?  I can use an exercise book.

22   It works about the same way.

23         THE WITNESS:

24               Let me restate, there are as you

25   can imagine multitudes of copies of

1    procedures and processes published --

2    EXAMINATION BY MR. DART:

3         Q.    Sure.

4         A.    -- in most companies.  The --

5    the effectiveness depends upon the quality of

6    the documents and then the assurance of the

7    effectiveness of the systems.

8         Q.    Right.  And as of the time you

9    left, none of that had even had time to be

10   implemented.  You had just come out with the

11   manual.

12        A.    At the time of my departure, the

13   framework was just becoming clear enough that

14   the line could understand what was expected

15   so that ultimately we could assure the

16   effectiveness.

17        Q.    Now, in the framework, the

18   corporate framework document, there is an

19   element, No. 2, which is on Page 17, I think,

20   Part 2.  It's in Part 2, I think.  You're

21   going to get to turn the page, yeah, there

22   you go.

23        A.    Okay.

24        Q.    Page 17, Part 2.

25        A.    (Complying).

1        Q.        You're there?

2        A.        Uh-huh (indicating

3   affirmatively).

4        Q.        Element 2 is the organization

5   element of OMS, correct?

6        A.        That's correct.

7        Q.        And the underlying principle of

8   Element 2 is we have fit for purpose and

9   agile organizations staffed with competent

10  people and teams, correct?

11       A.        The principle, as I read it, is

12  that BP entities establish organizations that

13  allow them to deliver their planned business

14  objectives effectively and efficiently

15  through deployment, as you say, of competent

16  people and adequate resources.

17       Q.        Okay.  And there are sub

18  elements under that Element 2, correct?

19       A.        Yes, there are.

20       Q.        And under each sub element,

21  there are the group essentials which are the

22  48 or 49 essentials upon which you build the

23  local OMS, right?

24       A.        That would be correct.

25       Q.        All right.  And if you look

```
 1    under "Organization Structure," the sub
 2    element, it says:  "BP entities establish
 3    organizations that allow them to deliver
 4    their planned business objectives effectively
 5    and efficiently through the development of
 6    competent people and adequate resources."
 7                    Correct?
 8        A.     That's correct.
 9        Q.     And sub element 2.1.2 under that
10    says that:  "A goal is to establish clear
11    line reporting relationships ensuring leaders
12    have a manageable span of control and BP
13    employees have a clear understanding of their
14    roles, accountabilities and objectives."
15        A.     That's correct.
16        Q.     Now, you participated in a
17    reorganization of the drilling and
18    completions --
19        A.     Yes --
20        Q.     -- element.
21        A.     -- starting in the -- effective
22    start date was April 1st, 2008.
23        Q.     Okay.  At the time you left, had
24    that transition been complete?
25        A.     I would say that the major
```

1    changes in terms of the organization clarity

2    of roles, the majority of how we wanted to

3    conduct the business was fairly understood,

4    but not well documented.

5         Q.    Okay.  And I'm asking this

6    because effective April 1st of 2010, after

7    you left, there was another reorganization

8    within drilling and completions.  Was that

9    part of what you were doing or was that

10   something entirely different?

11        A.    No.  Anything that happened

12   after my departure was not -- could not have

13   been part of my plan.  So the -- there were

14   changes being made to the organization that

15   were not part of the previous transformation.

16        Q.    Okay.  Did you see any reason

17   for that?  In other words, in the

18   transformation that you were involved in, do

19   you believe that it was a good transformation

20   and the company, at least D&C, could have

21   operated and functioned well as you had

22   structured it?

23        MS. KARIS:

24             Object to form.

25        THE WITNESS:

1                    So in terms of meeting the

2       primary objectives of the transformation and

3       in most measures, effectively all measures

4       that I recall in regards to personal safety,

5       implementation of this OMS was a milestone

6       for 2009.

7                    We were on track for the changes

8       that had been prioritized and implemented in

9       the original transformation.  It is -- the

10      only -- there would have been a natural

11      succession of people coming and going from

12      roles subsequent to that, in my view.

13      EXAMINATION BY MR. DART:

14           Q.     Okay, but was there a reason to

15      further reorganization the structure of

16      drilling and completions after completion of

17      the transformation you were in involved with?

18           A.     I was not aware of any

19      significant problem requiring a change in the

20      organization.

21           Q.     All right.  Do you see any

22      reason for making such a change?

23           A.     No, I do not.

24           Q.     Do you see frequent changes in

25      organizational structure as a possible

1    impediment to the goals of the group
2    essentials that we just discussed?  For
3    example, establishing clear line reporting
4    relationships?
5         A.    I believe, and I can't cite the
6    exact place, but in both the OMS system and
7    in the DWOP, it specifically talks about
8    changes to key roles should be assessed, and
9    then adequately supported as regards to the
10   transition of individuals from key roles to
11   other roles and those roles even go as far as
12   to key roles at the rig site.
13        Q.    But the mere fact of several
14   changes, would that be disruptive to the
15   operation of an organization such as
16   drilling?
17        MS. KARIS:
18             Object to form.
19        THE WITNESS:
20             If you don't have the adequate
21   controls in place and you make changes to the
22   organization, either in key roles or too many
23   changes, it would certainly, in my view,
24   jeopardize what was in place at the time.
25   EXAMINATION BY MR. DART:

```
 1          Q.    Okay.  Because you want to do it
 2     right the first time, correct?  I mean, the
 3     transformation that you had set up, if it had
 4     gone as planned, you believe would have been
 5     sufficient to efficiently and effectively run
 6     the drilling and completions operations,
 7     correct?
 8          MS. KARIS:
 9               Object to form.
10          THE WITNESS:
11               In my view at that time, we
12     needed effectively about one more year of
13     time and a stable organization to fully
14     implement the intents of OMS and what we
15     tried to do with the D&C transformation.
16     EXAMINATION BY MR. DART:
17          Q.    Okay.  But you didn't envision
18     any further organizational changes in
19     leadership?
20          A.    The only change that I was aware
21     of and privy to was our intent to rotate
22     Harry Thierens out of the role and that had
23     been planned -- succession, if you will, but
24     no other changes.
25          Q.    Okay.  And if you would look at
```

1    the Skelton -- I'm going to call it the

2    Skelton document.

3            A.      Okay.

4            Q.      The GoM SPU LOMS.

5            A.      Right.

6            Q.      If you look at Section 1.4 on

7    page Bates No. 3159.

8            A.      Uh-huh (indicating

9    affirmatively).

10           Q.      1.4 deals with key strategies

11   and the third key strategy says:  "Sharpen

12   our execution machine."

13                   What does that mean?

14           A.      My understanding at the time

15   this came out was to improve the efficiency

16   which would be primarily measured by either

17   production up time or cost efficiency in the

18   Gulf of Mexico organization.

19           Q.      And the second bullet point

20   under that heading says:  "Centralize

21   drilling and completions, D&C."

22           A.      Correct.

23           Q.      To drive consistent performance

24   through standardization, learning, and

25   efficient utilization of scarce skills,

344

1    correct?

2          A.    That's correct.

3          Q.    Is that essentially what you

4    were doing in 2009 to come up with the D&C

5    LOMS?

6          A.    These efforts would be to

7    fulfill the intents of that bullet, yes.

8          Q.    And the last bullet point says:

9    "Foster an every dollar counts culture."

10               What does that mean?

11         A.    "Every dollar counts" was a

12   phrase that was coined by Neil Shaw in

13   providing a phrase that we could have in the

14   GoM relative to costs efficiencies, lowering

15   costs, and so this reference -- developing a

16   cost efficient or a better cost conscious

17   culture.

18         Q.    Look at The Way We Work document

19   for drilling and completions.

20         A.    Okay.

21         Q.    And attached to it, I think it's

22   Appendix 3, the last Bates numbers of 4994.

23   Do you see that?

24         A.    Yes, I do.

25         Q.    It's a DC&I risk management

345

```
1       plan?
2              A.      Right.
3              Q.      And you're shown as the
4       authority and Jonathan Sprague is shown as
5       the custodian.
6              A.      That's correct.
7              Q.      And it's -- well, I'm sorry,
8       that's for The Way We Work document, but the
9       risk management plan, who prepared that?  I
10      guess if you look on the next page, 4995.
11             A.      Yes.  The authority would be Jon
12      Sprague.
13             Q.      Sprague would be the authority,
14      so Sprague prepared this risk management
15      plan, right?
16             A.      Well, I'm not sure who actually
17      prepared it, but according to the designation
18      of Jon Sprague as authority, he would have
19      been the ultimate approver.
20             Q.      And if you go to Bates 4998,
21      Section 3, Mr. Sprague, or his document talks
22      about risk management overview, do you see
23      that?
24             A.      I do.
25             Q.      And it says:  "Risk management
```

```
 1     is one of the most important threads that run
 2     through a project or activity."
 3                 Do you agree with that
 4     statement?
 5           A.     I do.
 6           Q.     And the last sentence in that
 7     paragraph says:  "Risk management also" --
 8     can you read that for me?
 9           A.     Yes.  "Risk management also
10     ensures that activities are focused on
11     minimizing the negative and maximizing the
12     positive impacts of the well delivery risk."
13           Q.     Okay.  Do you agree with that
14     statement?
15           A.     Yes, I do.
16           Q.     Now, go on to the next page,
17     Bates 4999.
18           A.     (Complying).
19           Q.     And just under the Figure 1, it
20     says:  "The GoM drilling and completions team
21     has risk facilitation coordinators."
22                 Do you see that?
23           A.     Yes, I do.
24           Q.     Who were the risk facilitation
25     coordinators?
```

```
1          A.     I don't recall at that time who
2    the individual coordinators would have been,
3    but they would have been working for Jon
4    Sprague in the central engineering group.
5          Q.     Were those risk facilitation
6    coordinators -- was that a special job?  Were
7    they hired to do or were these engineers that
8    had a side job of being a facilitator of
9    risk?
10         A.     I would primarily describe it as
11   the latter, that they were D&C drilling
12   professionals, drilling engineer
13   professionals doing risk assessment.
14         Q.     Go to page -- Bates No. 5001.
15         A.     (Complying).
16         Q.     First of all, let me ask you
17   this.  After a project is started or after a
18   well has started drilling, you don't -- you
19   don't abandon risk assessment, do you?  You
20   keep --
21         A.     No.
22         Q.     -- you keep reassessing?
23         A.     You show -- in the dynamic
24   nature of the well, you're, in essence,
25   assessing the risk almost on a daily basis.
```

```
 1          Q.     Okay.  Well, let's read the
 2     third paragraph on that page together.
 3               It says:  "As the project passes
 4     into the execution phase, the project manager
 5     should be aware of the level of risk
 6     remaining in the project.  The project
 7     generally accepts a level of risk to
 8     continue.  These may be risks that can't be
 9     mitigated or mitigated as low as reasonably
10     practical or are more economically viable to
11     accept rather than eliminate."
12               What does that mean?
13          A.     This risk assessment verbiage
14     here is coming out of some of the project
15     principles and being applied to drilling a
16     well as a -- what we call a project.  I don't
17     believe it's adequately specific for risk
18     assessing an individual well.
19          Q.     It goes on to say:  "The project
20     team tries to minimize the failure of their
21     imaginations to envision total risk
22     exposure."
23          A.     Yes.
24          Q.     And then it says, skip a
25     sentence:  "Regular review of risk is highly
```

```
 1    recommended and the frequency of the review

 2    is based on project or activity needs and

 3    requirements."

 4              Do you agree with that

 5    statement, that regular risk review is highly

 6    recommended?

 7         A.    I agree that a regular review of

 8    risk which is required on almost a daily

 9    basis for wells.

10         Q.    Right.  And one of the major

11    accident risks for D&C is loss of well

12    control that you were discussing earlier

13    today, correct?

14         A.    The primary major accident risk

15    in drilling wells is loss of well control.

16         Q.    Okay.  So as a well is being

17    drilled with that major accident risk in

18    mind, it is critical that the drilling crew,

19    the engineers, everybody in charge of that

20    well constantly review and update their risk

21    assessment as they drill, as they work on the

22    well?

23         A.    That's true.

24         MS. KARIS:

25              Object to form.
```

1     EXAMINATION BY MR. DART:

2          Q.     In the next paragraph, starting

3     on the second sentence, it says:  "Poor risk

4     capture leads to a lot of painful learning

5     during the execution phase.  Poor risk

6     control leaves too many open risks that the

7     project manager is forced to accept in order

8     to go ahead with his development."

9                Is that true?  The project

10    manager is forced to accept risks?

11         MS. KARIS:

12               Object to form.

13    EXAMINATION BY MR. DART:

14         Q.     And keep going in spite of those

15    risks?

16         MS. KARIS:

17               Object to form.

18         THE WITNESS:

19               The risk term here is an all

20    encompassing risk.  So it could be small

21    risk.  It certainly would not be intended to

22    be proceeding with major accident risk.

23               I would -- I would offer some

24    clarification, most of this verbiage was

25    lifted out of existing documents.  It was

351

```
 1    intended to be delivered at the end of 2008
 2    as The Way We Work.  It was a late stage
 3    document that was finally pulled together in
 4    May.
 5              My dissatisfaction with the risk
 6    assessment process and combined with Harry
 7    Thierens led us to develop the risk
 8    assessment process tools that we introduced
 9    in November of 2009 for reasons as you cite.
10    This verbiage is very unclear and not very
11    specific.
12    EXAMINATION BY MR. DART:
13         Q.    Well, I don't know, it seems
14    very clear.  It seems to indicate that as a
15    project gets closer and closer to the end,
16    that the operators have a tendency to accept
17    more risk and just proceed to the end.
18         MS. KARIS:
19              Object to form.
20         THE WITNESS:
21              My interpretation of this is
22    that without ongoing risk assessment, you may
23    be -- you may arrive at a point where your
24    options to mitigate that risk are very
25    limited.  And so this refers to having to
```

1    proceed, which in my view would be very rare

2    if the risk was visible that you would

3    proceed on that course.

4    EXAMINATION BY MR. DART:

5         Q.    Okay.  Well, the visibility of

6    risk in well drilling, which is primarily

7    loss of well control --

8         A.    Right.

9         Q.    -- should be at the forefront,

10   shouldn't it?

11        A.    That's correct.

12        Q.    I mean, even though you're not

13   seeing gushers coming up out of the well, it

14   still should be forefront in the operators

15   mind, right?

16        A.    Right.  And I believe in some of

17   the documents that we looked at earlier, you

18   saw several subtexts that said the likelihood

19   of a deepwater loss of well control had not

20   occurred.

21        Q.    Okay.

22        A.    So this possibility of a

23   significant loss of well control in deepwater

24   was hard for people to imagine.

25        Q.    Yes, and I think you criticized

1      *that in your papers where you were saying*
2      *that the matrix weren't there to actually*
3      *properly assess the seriousness of the risk.*
4      *Just because a well hasn't blown up in the*
5      *last five years, doesn't mean --*
6           *A.      Correct.*
7           *Q.      -- it's really, really serious?*
8      MS. KARIS:
9              Object to form.
10     THE WITNESS:
11              *The consequence, the*
12     *catastrophic consequence of a deepwater well*
13     *blowout had not occurred, therefore, it was,*
14     *I think, difficult for many people to*
15     *appreciate that event and to use traditional*
16     *quantitative risk assessment approaches to*
17     *evaluate decisions that would be made in*
18     *light of the possibility of that event.*
19     EXAMINATION BY MR. DART:
20           Q.      I think the Presidential
21     Commission used the term "complacency."
22     Would you say that that might be a good
23     descriptor of the attitude, say, of the rig
24     operators on the Macondo well?
25           A.      I can't make a comment on the

```
 1    conditions of the Macondo well after I
 2    departed.  What I would say is that the
 3    learnings from major catastrophes are that in
 4    process safety it's the absence of events
 5    which we normally use to inform us of the
 6    effectiveness or the processes.  It's
 7    actually the absence of events which create
 8    complacency and give a distorted picture of
 9    the risk because there are an absence of
10    events, so you could call it complacency.
11    EXAMINATION BY MR. DART:
12         Q.    It's one of invincibility?
13         A.    Complacency is a very good term,
14    yes.
15         Q.    Okay.  And then the last
16    sentence at the bottom of that page, just the
17    very beginning of it is:  "Inadequate
18    operational" -- go on to the next page --
19    "risk management occurs when the interface
20    between an onshore planning team and an
21    offshore drilling team has broken down.  This
22    is to be avoided through the use of careful,
23    thorough and open risk management discussions
24    with offshore staff."
25                   Is that a good description for
```

1      risk management?

2           A.      So as it relates to drilling

3      wells, I would say the risk management

4      process has to include an effective

5      communication between the onshore and

6      offshore teams relative to the condition of

7      the well at the time and subsequent

8      operations or decisions.

9           Q.      And the breakdown of that

10     communication could lead to catastrophic

11     failure of the well?

12          A.      Breakdown of that communication

13     could lead to an influx or a kick or a well

14     control event, yes.

15          Q.      To the extent of leading to a

16     catastrophe such as the DEEPWATER HORIZON

17     disaster?

18          MS. KARIS:

19               Object to form.

20          THE WITNESS:

21               That could be an outcome, yes,

22     sir.

23          MR. DART:

24               We have to change tapes, let's

25     take a break.

356

```
 1          THE VIDEOGRAPHER:
 2                  We're going off the record at
 3      4:13.  It's the end of Tape 6.
 4                  (Whereupon, a brief recess was
 5      taken.)
 6          THE VIDEOGRAPHER:
 7                  We're back on the record at
 8      4:23.  This is the beginning of Tape 7.
 9      EXAMINATION BY MR. DART:
10          Q.      All right, Mr. Lacy, just before
11      the break we were looking at Exhibit 760,
12      which is The Way We Work document for
13      drilling and completions and if you refer to
14      page Bates No. 5005, it talks about tracking
15      risks, in Section 3.6, and the last sentence
16      of that paragraph says:  The RAT software
17      will be the tracking software for this
18      process, correct?
19          A.      At the time this was written,
20      the only available tool was the risk
21      assessment tool, RAT software.
22          Q.      And was that intended to be the
23      primary tracking tool for risk?
24          A.      At this time, in the work that
25      was done subsequent to this, there was
```

1    another tool developed that utilized the RAT

2    software and other software that was

3    developed for use specifically for drilling

4    completions.

5         Q.    What was that called?

6         A.    You know, I saw that

7    presentation literally a couple of weeks

8    before I left and I don't have it in front of

9    me.

10         Q.    There's a box in the middle of

11    Page 5005 that says:  "Note, this matrix and

12    Boston Square will be replaced when the D&C

13    configurations are complete in the RAT

14    software.

15         A.    Correct.

16         Q.    This indicates that there was a

17    transition from a plethora of other recording

18    media into RAT.

19         A.    So at this point in time, there

20    was no BP D&C risk assessment tool that had

21    been endorsed for use by the -- all D&C

22    operations within BP.  Our intent was to

23    develop an effective fit-for-purpose tool

24    during the rest of the year.  That's what was

25    developed and presented at the DC leadership

1    team meeting in November.

2         Q.     And, again, part of this goal is

3    for systematization and uniformity?

4         A.     Actually, these tools already

5    did that.  The primary difference was the

6    ability, as you alluded to earlier, to keep

7    current with the risk on as frequent a basis

8    as possible.

9              One of the more challenging

10   elements of risk assessment is this is what

11   we would refer to as a static risk

12   assessment, to try to keep that updated on a

13   live basis is actually challenging, and that

14   was the introduction of the subsequent

15   software.

16        Q.     Okay.  Look at of the Skelton

17   OMS, Exhibit 866, Bates No. 3165, and there's

18   a chart at the top of a whole bunch of risk

19   processes and further down the page, the text

20   that begins after the last box says that risk

21   assessment and management in the GoM was

22   defined as a key gap area during the 2008 SPU

23   gap assessment process.

24              As shown above, there are many

25   risk processes in action, but they have

359

```
 1     become too complicated and cumbersome to

 2     effectively manage.  Do you agree with that

 3     statement at the time?

 4          A.    At the time the statement was

 5     made, I do understand the -- what they were

 6     trying to say and I agree, yes.

 7          Q.    And then in your OMS document,

 8     Exhibit 268, the local OMS manual for

 9     drilling and completions, at Bates No. 4485,

10     Section 2, risk assessment, are you there?

11          A.    Which Bates page?

12          Q.    4485.

13          A.    I'm sorry, I'm there.

14          Q.    I don't think we're on the same

15     page.

16          A.    I'm sorry.

17          MR. STANLEY:

18               Actually, all of ours look --

19     EXAMINATION BY MR. DART:

20          Q.    Let's go to Page 22 of 71, if

21     you look in the little box there.  22 of 71.

22          A.    22 of 71, okay.

23          Q.    All right.  And there's a

24     Section 2.1 on risk identification, correct?

25          A.    That's correct.
```

360

1          Q.     And the last bullet point says:
2     "Irrespective of the tool used to identify
3     them, all risks shall be recorded in and
4     managed by the BP RAT which is the group
5     approved tool for risk management."
6                And at the end of 2009, was that
7     the intent was to manage all risks through
8     the RAT?
9          A.     So, this statement is correct
10    that at the time which, you know, literally
11    is the 1st of November, that was the only
12    approved tool.  I do believe literally three
13    weeks later our project work was completed
14    with the new tool, and so I don't know if
15    there was a subsequent document that updated
16    it relative to that new risk tool.
17         Q.     Okay.  And as we sit here, you
18    don't know the name of that tool?
19         A.     No, I know there was the
20    presentation made to the Gulf of Mexico D&C
21    leadership team and we approved it and
22    endorsed it for use going forward.
23         Q.     Did it have an acronym like RAT,
24    mouse, vermin?
25         A.     I'm sure it had an acronym and

```
 1    it would have been signed off by Harry
 2    Thierens and Cal Jessel would have been the
 3    authority.
 4         Q.    All right, I'm going to show you
 5    a document that's been previously marked, I
 6    believe, 1975.  It's No. 21 on the CD.  This
 7    is a document that's headed "Drilling and
 8    Completions Recommended Practice for Risk
 9    Management."
10              Is this the document that you
11    said you were working on just before you
12    left?
13         A.    So with Cal's name on it, I
14    would be fairly certain it was the
15    documentation of those presentations at the
16    end of November prior to my departure.
17         Q.    Right.  This document shows a
18    publication date of 20 January of 2010, which
19    was --
20         A.    After my departure.
21         Q.    Just a month or two after,
22    right?
23         A.    Correct.
24         Q.    So more than likely this is the
25    document you were working on?
```

```
 1            A.     Yes, I would be fairly certain.

 2            Q.     It's just Pat O'Bryan took the

 3     credit, right?

 4            MS. KARIS:

 5                   Object to form.

 6            THE WITNESS:

 7                   Pat O'Bryan approved it, yes.

 8     This would be the work that we were doing in

 9     the fall, correct.

10     EXAMINATION BY MR. DART:

11            Q.     Okay.  Now, the introduction on

12     Bates Page 2275 says:  "The need to

13     standardize the risk management process was

14     driven by the requirement to conform to OMS,

15     to increase the transparency and

16     manageability of risk also across GoM D&C and

17     to move away from the multiple approaches

18     that existed to manage risk."

19                   Was that --

20            A.     That's correct.

21            Q.     -- the intent?

22            A.     Uh-huh (indicating

23     affirmatively).

24            Q.     All right.  And at the bottom of

25     that introduction it says:  "This recommended
```

1    practice shall be used by GoM D&C teams to
2    manage all risks.  BP RAT is the standard
3    risk management tool and all identified risks
4    shall be entered into and managed through
5    this tool."
6              So as of January of 2010, the
7    RAT was still the tool?
8         MS. KARIS:
9              Object to form.
10        THE WITNESS:
11             This is the BP RAT.  So when you
12    were asking --
13    EXAMINATION BY MR. DART:
14        Q.    Oh, is that different?
15        A.    This would be the version that
16    was presented to us in November of 2009 and
17    appears to be subsequently documented for
18    implementation.
19        Q.    So RAT has now become BP RAT?
20        A.    Correct, yes, sir.
21        Q.    And if you go to Bates 2277, the
22    objective of this risk management process, it
23    says:  "There are two of them at bullet
24    points, one is it outlines a stepwise
25    approach to the management of risk throughout

364

```
1     the risk life cycle from initial risk
2     identification through closeout.  The process
3     follows the capital value process, CVP, stage
4     gate process."
5              Correct?
6         A.    That's correct.
7         Q.    And then the second bullet point
8     says it provides guidance on the use of BP
9     RAT, the tool of choice to manage risk within
10    GoM D&C, correct?
11        A.    That's correct.
12        Q.    So this feeds back on what we
13    were discussing earlier, that the risk
14    assessment process is a continuum from start
15    to finish of a project, right?
16        A.    That's correct.
17        Q.    And that the RAT is -- or now BP
18    RAT is now the tool of choice to manage that
19    process?
20        A.    Yes, this -- our intent from
21    this view of the document, would provide
22    guidance on how to do that.
23        Q.    Okay.  Now, go to Bates No.
24    2288, Section 12, and it talks about the BP
25    risk assessment tool, the BP RAT?
```

1          A.     Yes.

2          Q.     In the second paragraph, it

3    says:  "BP RAT application provides the risk

4    champion with a tool to ensure that all risks

5    are reported in a single place rather than in

6    multiple spreadsheets."

7                 First of all, who is the risk

8    champion?

9          A.     I would assume that that's a

10   designation that comes from the tool itself

11   and is identified as a role here in use of

12   assessing risks.

13         Q.     So that's essentially the person

14   in charge of the particular risk that's

15   entered into the RAT?

16         MS. KARIS:

17                Object to form.

18         THE WITNESS:

19                I believe those rolls are

20   defined in 2280.

21   EXAMINATION BY MR. DART:

22         Q.     And then if you go to page Bates

23   2295, Section 13, it deals with training and

24   support, Section 13.1 talks about the BP RAT

25   materials, and it describes a number of

1    materials that are available to train in the

2    RAT.

3              How does management ensure that

4    the line personnel actually look at this

5    stuff?  In other words, you post training

6    materials online.  What's the process by

7    which management determines whether anybody

8    in the line department even looks at this?

9         A.    So in the past, when you would

10   issue a recommended practice like this, you

11   would also have a training plan to make sure

12   that it had been introduced to people if it

13   was a new tool or new processes, new

14   software.  If I recall, the presentation

15   correctly, one of the abilities that this

16   tool would give us is that people in the role

17   I previously held or Harry Thierens or Jon

18   Sprague would be able to pull up and observe

19   the status of risk assessment of each well in

20   terms of the risk assessments.

21        Q.    Okay.  All right.  And on that

22   same page, under Section 13.2 there is a

23   section called TBD.  Is that to be

24   determined?

25        A.    Where?  I'm sorry.

```
 1            Q.      It's at the bottom of 2295,
 2      under Section 13.2.
 3            A.      Oh.
 4            Q.      It says TBD.
 5            A.      Yes, this was written after I
 6      was there, to be determined would be TBD in
 7      my experience.
 8            Q.      So there's some more training
 9      that hadn't been quite figured out, is that
10      what they're trying to tell us?
11            MS. KARIS:
12                    Object to form.
13            THE WITNESS:
14                    Somehow this appears to be
15      signed off on with an unknown location for
16      the material.
17      EXAMINATION BY MR. DART:
18            Q.      Okay.  Then on the next page,
19      2296, under Section 14, sustainability,
20      beginning in the first paragraph, second
21      sentence, it says:  "The RM team members,
22      project risk champions and the risk
23      coordinators will play a key role in ensuring
24      the process is worked as intended within
25      their respective teams.  However, they
```

```
 1   themselves cannot ensure consistency in the
 2   use of this process and BP RAT across the
 3   function."
 4            Then further down, beginning of
 5   the third paragraph, it says:  "To ensure
 6   sustainability of the system, consistency in
 7   application and adherence to a common
 8   process, two key roles need to be
 9   established."
10        A.    Uh-huh (indicating
11   affirmatively).
12        Q.    And the first bullet point is:
13   "The creation of a single point of
14   accountability, who conducts periodic process
15   on audits, and the second role is the system
16   administrator for BP RAT."
17            Correct?
18        A.    That's my read, yes.
19        Q.    Okay, now as of January of 2010,
20   these roles apparently had not yet been
21   created.  It says "to be created," right?
22   MS. KARIS:
23            Object to form.
24   THE WITNESS:
25            Yes, I couldn't say with
```

1    absolute inclusion.

2    EXAMINATION BY MR. DART:

3         Q.     Was there any sense of urgency

4    in drafting these documents or getting these

5    programs in place?

6         A.      In my time during 2009 this

7    particular effort was a significant one, a

8    priority for myself and Harry Thierens.  I

9    believe that Harry felt that this was one of

10   the -- in my conversation with Harry he

11   indicated this was a very important

12   deliverable for him to produce before he

13   left.

14        Q.     Don't you think that by January

15   of 2010 when this document was actually

16   published, that it would be complete, that

17   the SPAs be appointed and it be ready to go?

18        MS. KARIS:

19             Object to form.

20        THE WITNESS:

21             There was a lot of changes in

22   the organization.  That may have precluded

23   them finishing it.

24   EXAMINATION BY MR. DART:

25        Q.     And what changes were those in

```
 1      the organization?  You had already talked
 2      about the three of you leaving, you and Harry
 3      and Jackson, Curtis Jackson.
 4           A.    Yes, so the two people that
 5      would have overseen the follow-up on this was
 6      myself and Harry and Jon Sprague.  Those
 7      would be the three primary individuals.
 8           Q.    I'm now going to show you a
 9      document which was previously marked as 785.
10      It's No. 5 on the CD.  This is a 2010 SPU OMS
11      Gaps Ranking Matrix.
12                Have you ever seen this document
13      before?
14           A.    Not that I recall.
15           Q.    Do you know what the purpose of
16      this document is?
17           A.    I can infer.
18           Q.    Okay.  Why don't you give me
19      your best inference?
20           MS. KARIS:
21                Object to form.
22           THE WITNESS:
23                I would assume -- well, my
24      guess -- if it's titled 2010 OMS Gaps, that
25      this was an attempt to highlight the gaps
```

1     that had been assessed during 2009 for

2     closure in 2010.

3     EXAMINATION BY MR. DART:

4          Q.     So when we look at these gap

5     ranking matrixes, what we're doing is looking

6     at what you just said, a current assessment

7     to be done for the next year.

8          A.     With some approach to

9     prioritization.

10         Q.     Okay.  And then if you look, it

11    doesn't matter which one, if you flip through

12    the actual gap assessments there's in the

13    right-hand corner -- column, it says "area"?

14         A.     Yes.

15         Q.     SPU, HSSE, HUB.  What does that

16    indicate to you?

17         A.     That would refer to, again, as

18    an entity, I don't recognize how they've used

19    the term HUB or what that might indicate, but

20    the other areas seem to indicate a function

21    or discipline such as subsea, HSE, logistics.

22         Q.     Do you understand those

23    departments as being the ones responsible for

24    closing the gap that it's listed by?

25         MS. KARIS:

```
 1                  Object to form.
 2          THE WITNESS:
 3                  My look at this would be the
 4     area is either relative to the gap or
 5     relative to the role of closing the gap.
 6     EXAMINATION BY MR. DART:
 7          Q.     Okay.  What was the purpose of
 8     that gap closure, as you understand it?
 9          A.     This?
10          Q.     Yes.
11          A.     It's not a document or format I
12     recognize.
13          Q.     They seem to reference the group
14     essentials from the OMS framework document.
15     Would that be something that the SPU or D&C
16     would be wanting to do, is close any gaps
17     between the operating essentials and the
18     actual situation in D&C?
19          A.     The -- I would assume the
20     implementation, the further implementation of
21     OMS would be based on identified gaps,
22     prioritization of gaps and assigned roles to
23     close those gaps and that would apply to D&C.
24     Although I did not see D&C on this list.
25          Q.     Okay.  Did your termination
```

```
1    agreement with BP contain a confidentiality
2    clause?
3         A.    The term was "Separation
4    Agreement," and it included a confidentiality
5    clause.
6         Q.    Is that the reason why you're
7    reluctant to discuss it here today?
8         A.    Yes.
9    MR. DART:
10             I think that's all the questions
11   I have.  Thank you, sir.
12        THE VIDEOGRAPHER:
13             We're going off the record at
14   4:45.
15             (Whereupon, a brief recess was
16   taken.)
17        THE VIDEOGRAPHER:
18             We're back on the record at
19   4:49.
20   EXAMINATION BY MS. CHANG:
21        Q.    Good afternoon, Mr. Lacy, my
22   name is Deanna Chang, and I'm representing
23   the United States today.
24        A.    Okay.
25        Q.    Thank you for being here.
```

1        A.      Okay.

2        Q.      Let's go back to right before

3    you started working with BP.

4        A.      Uh-huh (indicating

5    affirmatively).

6        Q.      When you accepted the job, did

7    you have any particular objectives or goals

8    to achieve?

9        A.      In my discussions with Ms.

10   Yilmaz, my personal goals were to take some

11   of the success that I had had at Chevron and

12   to apply them to BP, and in my understanding

13   and discussions with Barbara Yilmaz, that was

14   her objective as well, to understand what

15   Chevron, you know, what I had done at Chevron

16   and how I could help at BP as well.

17       Q.      Because while you were at

18   Chevron, you had improved performance

19   significantly in drillings and completions,

20   correct?

21       A.      During the time frame that I was

22   the head of drilling completions, we had

23   significant improvement in safety and managed

24   many rigs successfully, many projects

25   successfully, yes.

1          Q.      And so when you came on to BP,
2     you had every intention of doing the same
3     thing, you wanted to repeat your success with
4     or at BP; correct?
5          A.      That was my intent and
6     understanding of their motivation to hire me,
7     yes.
8          Q.      When you interviewed with BP,
9     who did you interview with?
10         A.      I believe I had an interview
11    with Barbara Yilmaz and that was -- there was
12    one individual, I think it might have been a
13    teleconference, I had an in-person meeting
14    with Barbara Yilmaz that was attended by Tom
15    Chorba and Greg Mattson and then I also had,
16    I believe, video conference interviews with a
17    gentleman by the name of Ellis Armstrong, who
18    was Barbara Yilmaz's boss at that time and
19    also Andy Inglis.
20         Q.      Is Ms. Yilmaz still with BP?
21         A.      I'm not certain.
22         Q.      What about Mr. Chorba, is he
23    still with BP?
24         A.      I'm also not certain.
25         Q.      Do you know whether any of the

1    folks that you just referenced are, other
2    than Andy Inglis, are still with BP?
3         A.    Not with certainty.  I saw an
4    announcement on Andy Inglis departing BP.
5         Q.    At any point while you were
6    employed at BP, did your personal objectives
7    change?
8         A.    No.
9         Q.    At any point while you were
10   employed with BP, did you become aware that
11   BP's expectations with respect to your job
12   had changed?
13        A.    In the time frame, there were
14   some -- at best, I'll say clues or
15   indications over the 2009 time frame that
16   potentially some of the discussions that I
17   had had previously with Barbara might not be
18   consistent anymore with her goals and my
19   goals.
20        Q.    And what do you mean by that,
21   can you sort of relay some of those
22   discussions?
23        A.    When I initially talked to
24   Barbara, in the interview processes, I
25   inquired about what the job was, what the

1    career opportunities were.

2              She indicated that with my

3    background, that there were one of two

4    options after two to three years.  If I was

5    successful at performing, I would have an

6    option to become a business unit leader,

7    possibly or maintain my drilling completions

8    career.  Barbara told me at the time she

9    thought she might retire in two to three

10   years and so the possibility of succeeding

11   her was a possibility.

12        Q.    Were there any other clues you

13   got that the objectives of BP may not be as

14   aligned with your personal objectives?

15        MS. KARIS:

16              Object to form.

17        THE WITNESS:

18              The -- my career objectives,

19   when they switched from working for Barbara

20   to working for Neil, and then in terms of

21   when Neil left his post, I didn't have clear

22   indicators -- as I stated earlier today, my

23   assumption has -- up until late November was

24   that I was just going to continue in the vice

25   president D&C role for Gulf of Mexico for at

```
 1   least another year, particularly with Harry
 2   Thierens' departure.
 3          Q.      And I believe you said this
 4   earlier, but did you have any prior warning
 5   that this meeting in November of 2009 with
 6   Ms. Yilmaz was going to result in your
 7   termination?
 8          A.      No prior warning.  I may recall
 9   maybe one conversation some time in the
10   second half of 2009, that Barbara was
11   concerned, and I can't even recall the topic,
12   but nothing to a level that I was concerned
13   about my job or career path.
14          Q.      So as far as you were concerned,
15   it was completely out of the blue?
16          MS. KARIS:
17                  Object to form.
18          THE WITNESS:
19                  As I said this morning, it was a
20   complete surprise, yes.
21   EXAMINATION BY MS. CHANG:
22          Q.      When you started at BP, what did
23   you know about them?  What was their
24   reputation in your opinion?
25          MS. KARIS:
```

```
 1                  Object to form.
 2          THE WITNESS:
 3                  My perception at the time
 4    largely came from, as you have with, you
 5    know, you have external perspectives on
 6    companies and I would probably summarize my
 7    perspective as they were known to have very
 8    good people, they were known to take on
 9    technically challenging projects
10    successfully.
11                  At that time, they had just
12    suffered Texas City.  So I was -- I had done
13    some study on the Baker report, et cetera,
14    and then also BP was a partner with Chevron
15    in the, what we call the drilling training
16    alliance, so I was quite familiar with many
17    of the documents and the external
18    publications that BP supplied to their D&C
19    professionals via this drilling training
20    alliance between Chevron and BP.
21    EXAMINATION BY MS. CHANG:
22          Q.    Was it your opinion that BP
23    needed somebody with your type of focus on
24    health and safety improvement?
25          MS. KARIS:
```

1                    Object to form.

2          THE WITNESS:

3                    Probably about -- I can't be

4    precise on the time, but I do recall having a

5    meeting with Barbara Yilmaz's predecessor

6    when he approached me to ask what -- I'm

7    trying to remember the gentleman's last name,

8    Chris something, but he pressed me while I

9    was at Chevron and asked me about how Chevron

10   achieved their performance and what my

11   thoughts were, et cetera.  We met over lunch

12   and then I didn't have any other contact with

13   BP until about when I had announced my early

14   retirement with Chevron.

15         Q.    And that was Ms. Yilmaz's

16   predecessor who sought you out while you were

17   employed by Chevron?

18         A.    That's correct.

19         Q.    When you were at BP, did you

20   have any involvement in the selection of rigs

21   for particular wells?

22         A.    We had -- I worked on a -- what

23   was called a rig strategy document, set of

24   documents, set of discussions when I was

25   first there as the head of discipline, and

```
1     then I was also involved in what we'd call
2     rig selection decisions, negotiations, as it
3     involved rigs for the Gulf of Mexico, yes.
4          Q.     So the rig selection and
5     negotiations, that would be with contractors,
6     the rig owners?
7          A.     Correct, with a variety of
8     contractors that might have rigs that could
9     be utilized by BP, yes.
10         Q.     And you personally took place in
11    those -- those discussions and negotiations?
12         A.     Some of those discussions and
13    negotiations, not all, not every one.
14         Q.     Do you recall if you were
15    involved in the negotiations relating to the
16    MARIANAS and the Macondo well?
17         A.      You will have to be a little
18    more specific.  The MARIANAS was on contract
19    to Transocean.  We had a number of
20    discussions with Transocean during 2009
21    because the well itself or the rig was --
22    contract expired at the end of '09, and so
23    there was discussions back and forth with
24    Transocean during '09 about how to utilize
25    the rig.  We actually -- I believe, we gave
```

382

```
1     other operators the opportunity to farm it
2     out during the hurricane season and then we
3     would have subsequently had some negotiations
4     with Transocean about, you know, do we bring
5     the rig back after the hurricane damage, but
6     it had another contract by that time, yes.
7          Q.     So who ultimately makes the
8     decision that the MARIANAS was going to go to
9     the Macondo well?
10         A.     That decision of the MARIANAS
11    originally going to Macondo well would have
12    been involving myself in discussions with Ian
13    Little, the exploration appraisal drilling
14    manager and with the exploration vice
15    president, Dave Rainey.
16         Q.     And who would the -- who would
17    your counterpart be at Transocean?
18         A.     The gentleman that was the Gulf
19    of Mexico regional manager was a gentleman by
20    the name of Kelum Adamson and I'm sure he had
21    a couple of people involved in some of the
22    discussions on that.  Daun Winslow was the
23    BP -- the Transocean BP rig manager, if you
24    will, or fleet manager.
25         Q.     Do you recall speaking with
```

1      Mr. Winslow in these negotiations?

2            A.      He normally was not involved in

3      the commercial discussion negotiation.  He

4      was, I won't say exclusively, but largely

5      focused on the operations and the

6      relationship between BP and Transocean.

7            Q.      Now, when you're talking -- when

8      you were talking to Transocean about what rig

9      would be appropriate for the Macondo well, do

10     you provide them with certain information

11     regarding the well?

12           A.      In the case of the MARIANAS and

13     Macondo, it would be primarily internal

14     discussions because the rig was under a

15     contract duration.  Prior to going to the

16     well, you would provide the contractor,

17     Transocean or any other drilling contractor,

18     with the basic information about the well

19     plan, the objectives, the casing setting

20     depths, the program itself, yes.

21           Q.      What about expected pressures at

22     depth, would that information be provided?

23           A.      Those would normally be provided

24     to Transocean, yes.

25           Q.      Would you also normally provide

1    high temperature estimates?

2        A.      Anything that would involve

3    subsurface conditions, expectations about

4    unstable or instability, pore pressure

5    predictions.  Anything unique about the well

6    would have been provided to Transocean as the

7    drilling contractor, yes.

8        Q.      I've seen reference to high

9    temperature, high pressure wells.  What does

10   that exactly mean?

11       A.      The term gets used a fair

12   amount.  There's not necessarily a precise

13   industry definition.  It's kind of like deep

14   water.  What's deep water?  Usually if you

15   have bottom hole temperatures in excess of

16   15,000 psi, and 250 degrees Fahrenheit, that

17   would be considered high pressure, high

18   temperature.

19       Q.      Do you know what the estimated

20   bottom hole temperature at the Macondo well

21   was?

22       A.      I don't recall, no.

23       Q.      Do you recall whether it was

24   considered a high pressure, high temperature

25   well?

 1          A.     No, I don't.

 2          Q.     If a well is considered to be a

 3     high temperature, high pressure well, is

 4     there -- are there certain precautions or

 5     considerations that you have to keep in mind

 6     when finding a rig?

 7          A.     Certainly, the pressure would

 8     involve the specifications as it related to

 9     the rig equipment, that would include the

10     BOP, the riser and the piping on the rig

11     itself.  The operating temperatures, the

12     bottom hole temperatures, usually pertain

13     primarily to downhole tools which do involve

14     the drilling contractor, but primarily it

15     would be service companies such as

16     Schlumberger or Halliburton or the like.

17          Q.     Is it fairly common in the Gulf

18     of Mexico to -- for BP to be drilling high

19     temperature, high pressure wells?

20          A.     As I said, I'm not -- I don't

21     recall whether the Macondo well was

22     classified.  I do recall that the Kaskida

23     well would have been classified as at least a

24     high-pressure well and that the Will K well

25     would have been qualified as high pressure

```
 1    and high temperature.  Both of those wells

 2    were drilled while I was there.  Frequently,

 3    there will be additional specifications

 4    and/or well design assurance or procedures

 5    that are involved in those things, yes.

 6         Q.     Do you know what rig drilled the

 7    Kaskida?

 8         A.     I would have to go back --

 9    Kaskida had a well drilled actually by DEVON

10    with the WEST SIRIUS on behalf of BP, and I

11    can't recall whether there was -- I want to

12    say that the HORIZON drilled the Kaskida well

13    at some point, but I'm not certain.  I would

14    have to look at the 2008, 2009 schedules to

15    refresh my memory.

16         Q.     What about the Will K?

17         A.     The Will K was drilled actually

18    by a jack-up.  It was the BOB PALMER jack-up,

19    it was Rowan Drilling in that case.

20         Q.     Do you know if the BOP on the

21    BOB PALMER jack-up had elastomer, had high

22    temperature-rated elastomers?

23         A.     I would feel fairly certain that

24    on the BOB PALMER there was high temperature

25    ratings on the BOP components.  It was a very
```

1    challenging well.

2            Q.      Are you aware of any other BOP

3    components -- well, let's back up.  Do you

4    know whether the DEEPWATER HORIZON's BOP

5    components were rated for high temperature?

6            A.      No, I do not recall that.

7            Q.      Do you remember having any

8    discussions whether or not the temperature

9    ratings for the HORIZON BOP would be

10   adequate?

11           A.      I don't recall being involved in

12   any of those discussions, yes.

13           Q.      Do you recall or do you know

14   whether the BOP on the MARIANAS was rated for

15   high temperature conditions?

16           A.      High temperature beyond

17   250 degrees, I would have expected it to be

18   suitable for that rating.  Part of the

19   selection for, part of the decision to select

20   the MARIANAS would be that it had done

21   actually development wells and so had seen

22   service actually completing wells.  And so --

23   I can't say exactly what the specifications

24   were, but part of our logic and decision in

25   using the MARIANAS was it was well qualified

1    for a well like Macondo.

2         Q.    And development wells, do they

3    have higher temperature ratings?

4         A.    No.  The key difference is that

5    in the exploration appraisal wells, those

6    wells are most often drilled and suspended or

7    actually abandoned.  A development well is

8    one where you enter at the start of the well,

9    largely knowing that you will complete the

10   well with a production string, and so the

11   final well plan for Macondo was a development

12   well, a producing well arrangement where they

13   ran a long string of casing.  The MARIANAS

14   had historically done those type of

15   operations previously.  I don't recall if the

16   HORIZON had done that type of operation

17   before.

18        Q.    Do you recall, when you were

19   discussing with Transocean an appropriate rig

20   to drill the Macondo well, do you recall any

21   special challenges or any particular things

22   that were unique about the well?

23        MS. KARIS:

24             Object to form.

25        THE WITNESS:

```
 1                  I don't recall specifics about
 2      the Macondo well at this point without
 3      reviewing the original well plot, but I don't
 4      recall anything highlighting the well as
 5      extraordinary, unusual, relative to the well
 6      profile.  It certainly was no tougher than
 7      the Tiber well or the Will K well, and all of
 8      the discussions about the use of MARIANAS
 9      would have been primarily internal about it
10      was best available and best suitable rig.
11      EXAMINATION BY MS. CHANG:
12           Q.    Were you involved in the
13      decision to put the HORIZON on the Macondo?
14           A.    That decision was taken after I
15      left.
16           Q.    Did you know anything about the
17      HORIZON and its suitability for drilling a
18      well like the Macondo?
19           A.    The HORIZON had worked the
20      entire time I was there.  It had, if I'm not
21      mistaken, had been under BP operatorship with
22      Transocean since it came out of the shipyard,
23      I think possibly for eight or nine years, so
24      it was a fairly long-term rig that had worked
25      at least primarily exploration appraisal
```

1    wells for BP Gulf of Mexico.

2         Q.    In some of the talks and
3    interviews you've given in the past, you've
4    identified or indicated that the current
5    wells in the Gulf of Mexico are sort of
6    stretching current equipment to their limits?

7         A.    Uh-huh (indicating
8    affirmatively).

9         Q.    What do you mean by that?

10        A.    Back to your earlier reference
11   on terms of high pressures and high
12   temperatures, particularly the wells that are
13   drilled in the Wilcox Trend, the Paleogy
14   Trend, Kaskida would be that type of well.
15   So those are wells that are challenging to
16   drill for a variety of reasons, downhole
17   conditions, but also because the ability to
18   produce them, actually in some cases the
19   equipment is not rated to successfully bring
20   them back to surface under control for
21   completions.  But for drilling purposes, the
22   BOPs are all rated acceptably, yes.

23        Q.    The BOPs are all rated
24   acceptable?

25        A.    Yes.  They would be rated to be

```
 1    able to drill those wells with an adequate
 2    margin of safety margin for temperatures and
 3    pressures.
 4         Q.    Do you know what the highest
 5    temperature BOP rating there is?
 6         A.    No, I don't.  I would have to
 7    look that up.
 8         Q.    Is it your understanding that
 9    it's significantly higher than 250 degrees?
10         A.    I would imagine that their BOP
11    is rated, you know, up to 300 or something in
12    that neighborhood, yes, because they do have
13    to have an adequate margin for the surface
14    temperatures.
15         Q.    What about pressure ratings for
16    BOPs?
17         A.    The standard is either a
18    10,000-psi working pressure or 15,000-psi
19    working pressure, so that's fairly common in
20    the deepwater fleet and there have been
21    discussion about needs of something slightly
22    more, 17,000, 17,500, for some of the
23    Paleogy, Wilcox type trend wells, yes.
24         Q.    What is -- I think you said
25    earlier that high pressure somewhere around
```

1    15,000 --

2           A.      Beyond 15,000.

3           Q.      Beyond 15,000 --

4           A.      Would normally be considered

5    high pressure, yes.

6           Q.      So if the maximum high pressure

7    for BOP is 15,000 psi, how does that work?

8    How does that provide -- how does that make a

9    BOP safe?

10          MR. ROTH:

11                  Object to form.

12          THE WITNESS:

13                  The rating is based on the

14   maximum anticipated pressure at surface that

15   the BOP, and in this case at the mudline,

16   would have to contain and maintain integrity

17   or still stay in one piece, so to speak.  So

18   15,000 psi at the surface would be the

19   working pressure with -- and they're rated

20   for 15,000, but actually, you can exceed that

21   and still, as by design, maintain their

22   integrity, so...  It's manufacturer specs, so

23   to speak.

24   EXAMINATION BY MS. CHANG:

25          Q.      Did you have any involvement in

393

1    performing -- in the performance of rig

2    audits when you were at BP?

3         A.    There were -- rig audit would be

4    a broad term.  Transocean performed some of

5    their own rig audits.  In the HSSE

6    organization that worked for Steve Tink,

7    several of the people that worked for him

8    would go to the rigs, usually with one of the

9    drilling managers and do what we called a

10   walk-through or a spot check on the

11   Transocean systems and equipment.

12        Q.    Do you know the name Norman

13   Wong?

14        A.    Yes, I do.

15        Q.    What group is he with in BP?

16        A.    I think he is part of the EPT,

17   the exploration production technology group,

18   and if I -- he was, I believe, I think they

19   might have called him the engineering

20   authority here or the rig inspection manager,

21   et cetera.  I'm familiar that he would go and

22   help assess rigs prior to them starting up,

23   and if I'm not mistaken, he was involved with

24   Gulf of Mexico when we were bringing, I'm

25   trying to remember which rig it was that was

394

1     coming on as a new rig in 2009.  I would have

2     to go back and look at the rig schedule, but

3     the start up of a new rig toward the end of

4     2009.

5          Q.     Are you aware that Mr. Wong or

6     Mr. Wong's group performed a rig inspection

7     of the DEEPWATER HORIZON?

8          A.     No, I'm not aware of that

9     specific one.

10         Q.     Would somebody in your group

11    have received that if it were done?

12         A.     So if an inspection had been

13    done by Norman Wong's group of the HORIZON,

14    then that would have been given primarily to

15    the drilling manager that had responsibility

16    for the HORIZON.  At the time I was there,

17    that would have been Ian Little.  I would be

18    reasonably certain it would be copied to

19    Harry Thierens' role as well.

20         Q.     But you wouldn't receive a copy?

21         A.     Not as a matter of course, in

22    the previous role I had, no.

23         Q.     Now what about audits that were

24    conducted by Transocean, would you receive a

25    copy of those results typically?

1           A.      Not typically.   Transocean would

2    have their internal distribution.   They may

3    choose to not distribute it to the operator,

4    it was not a requirement of the contract.

5           Q.      It was not a requirement?

6           A.      No.

7           Q.      Even if there were safety

8    critical items identified on the audit?

9           A.      Well, their contract requires

10   them to keep their safety critical items in

11   conformance or in operating condition.   If

12   they had an audit that flagged one of those,

13   I don't think it's a contractual requirement.

14   I would hope they would alert us to that

15   problem.   That would be an expectation I

16   would have, so...

17          Q.      Are you aware of any instances

18   where there were safety critical items

19   identified in an audit and the contractor did

20   not identify you?

21          A.      No, I'm not aware of that.   That

22   came up later by us discovering it.   No, I'm

23   not aware.

24          Q.      Did you track or -- I guess

25   track, whether or not any of the audit

1    recommendations had been implemented?  Is

2    that something that would happen in your

3    group?

4         MS. KARIS:

5              Object to form.

6         THE WITNESS:

7              If an audit had been produced --

8    I honestly can't recall while I was there

9    seeing a -- I know we had a number of

10   discussions about Transocean, Transocean

11   HORIZON, I don't recall seeing an exact audit

12   report and a periodic closure of the items.

13   It could very well have been that Ian Little

14   and Harry were tracking some of those, but I

15   had no reason to have a -- they didn't flag

16   and extraordinary concern.  I do know that

17   they were -- that Transocean was in the

18   process in 20 -- late 2009 of developing an

19   audit protocol.  And I think they were going

20   to be spot checking some of their rigs.  And

21   that might have occurred just before I left.

22   EXAMINATION BY MS. CHANG:

23        Q.    Was that something that BP was

24   working with them on?

25        A.    This was an independent effort

 1     by Transocean.  They had had a series of

 2     fatalities and this was their effort to try

 3     and understand what they needed to do to

 4     change and check their systems.

 5          Q.     If you flip to Tab 14 in your

 6     binder.

 7          A.     (Complying).

 8               (Exhibit No. 2948 marked for

 9     identification.)

10     EXAMINATION BY MS. CHANG:

11          Q.     And if you wouldn't mind

12     sticking this on the corner.  It will be

13     Exhibit 2948.  Bates No. CEC063970.  And it's

14     a two-page string of e-mails between Neil

15     Shaw, you, Andy Frazelle, with a couple of

16     other people cc'd on it.  If you take a

17     couple of minutes, a couple of seconds to

18     look at these real quickly.  I want to ask

19     you some questions later about them.

20               Do you recall this incident?

21          A.     Yes, I do now.

22          Q.     Okay.  It's the Transocean

23     MARIANAS Traveling Block/Crown Collision.

24          A.     Yes.

25          Q.     Do you recall how you learned

1    about it?

2         A.    I'm sure that it was reported to

3    me either by Andrew Frazelle or Harry

4    Thierens at the time it occurred.  I don't

5    know the exact date of when it occurred, but

6    yeah, I do recall now the incident.

7         Q.    Had you had a concern with

8    contractor safety prior to this instance --

9    incident?

10        MR. ROTH:

11             Objection, form.

12        THE WITNESS:

13             I had concerns about contractor

14   safety performance irrespective of which

15   contractor it was.  Because of the nature of

16   the business, it has significant risk and as

17   I earlier said, there were an expansion of

18   fleet and concerns I had relative to

19   competency also in terms of consistency of

20   the effectiveness of their systems.

21   EXAMINATION BY MS. CHANG:

22        Q.    Did you have any specific

23   concerns about Transocean's safety record?

24        A.    I expressed concerns with

25   Transocean as early as 2007 and clearly as

1    they announced their acquisition of Global

2    Santa Fe, my concerns were stated that

3    historically, they had had difficulty of --

4    because of growth of fully implementing their

5    safety management systems consistently and

6    effectively across multiple rigs.  And there

7    was an effort launched in early '08, actually

8    focused on Transocean during that time frame

9    that I initiated.

10        Q.    And what did that initiative

11   entail?

12        A.    I believe there's a document

13   somewhere that outlines the steps that we

14   were going to take with Transocean that would

15   have been published in late '07 that said

16   subsequent to the Transocean Global Santa Fe

17   merger, here are recommended steps for

18   monitoring Transocean and collaborating with

19   Transocean on their safety performance.

20        Q.    Did Transocean stand out to you

21   as one of the contractors with a worse safety

22   record?

23        MR. ROTH:

24             Objection to form.

25        THE WITNESS:

```
 1              I would not define that they had
 2    a materially different safety performance or
 3    concerning.  My concerns would have been that
 4    they represented 50 percent of the fleet,
 5    therefore, they were a sizable portion of our
 6    risk exposure and more so in BP, they
 7    accounted for approximately 90 percent of the
 8    rigs that BP had under contract for floating
 9    rigs.  This e-mail reference here is the
10    effort that was attempted to be launched in
11    2008.
12    EXAMINATION BY MS. CHANG:
13         Q.    I'm sorry?
14         A.    You had asked about this special
15    Transocean, it's in the e-mail here, comments
16    from myself to Neil Shaw.  The second
17    paragraph.
18         Q.    Okay.  Yeah, I had a question
19    about that.  That's what you could not get
20    segment support for from Barbara or Haden?
21         A.    That's correct.
22    MS. CHANG:
23              We're out of tape so we're going
24    to end right here.
25              THE VIDEOGRAPHER:
```

```
 1                    We're going off the record at
 2      5:25.  This is the end of Tape 7.
 3                    (Whereupon, a brief recess was
 4      taken.)
 5           THE VIDEOGRAPHER:
 6                    We're back on the record at
 7      5:35.  This is the beginning of Tape 8.
 8      EXAMINATION BY MS. CHANG:
 9           Q.      When we left, Mr. Lacy, we were
10      looking at Tab 14, and an e-mail that you
11      sent to Mr. Shaw on Tuesday June 2nd, 2009
12      and the reference in there to an effort you
13      tried to get launched in 2008.
14                    Can you describe for me what
15      that effort was?
16           A.      Yes, I will.  In -- sometime, I
17      want to say mid to third quarter of 2007, the
18      announcement came out that Transocean was
19      acquiring Global Santa Fe.  At the time most
20      of the deepwater rigs that Transocean or that
21      BP utilized were either with Transocean or
22      with Global Santa Fe.  So the combination of
23      the two companies would leave them down to
24      one primary provider.
25                    Transocean is an exceptionally
```

1    deep company with good engineering talents,
2    good rig qualities, but they have in my
3    experience previously with Chevron and
4    initial experience with BP, some level of
5    inconsistency because of their growth, so
6    they were about to embark on a further growth
7    and I had concerns about the change from the
8    Global Santa Fe safety management system back
9    to the Transocean management system on rigs
10   in the BP portfolio, and initiated some plans
11   and effort to focus on Transocean globally
12   with BP while I was head of this discipline
13   for western hemisphere.  We had communication
14   to all the drilling managers during February,
15   we had a little role-like call in April of
16   2008 with a -- it was a joint Transocean/BP
17   call to all rigs relative to safety focus for
18   2008.
19           At that point, I handed over
20   that responsibility to Mr. Steve Haden, who
21   was the -- I believe at the time, the other
22   head of discipline for eastern hemisphere.
23       Q.    And what happened after that, do
24   you know?
25       A.    To my knowledge, nothing was

1    further done on that plan.

2         Q.    So when you say here that you

3    could not get segment support from Barbara or

4    Haden, what did you mean by that?

5         A.    There was not strong support

6    from Barbara for the approach or for the

7    effort to be global with Transocean, and I

8    had a number of conversations with Steve

9    Haden about the purpose and how to conduct

10   it, et cetera.  He didn't generally agree.

11        Q.    Barbara is Barbara --

12        A.    Barbara Yilmaz and Steve Haden.

13        Q.    So the way you had envisioned

14   this plan, did it consist of more than just

15   one joint BP Transocean phone call?

16        A.    We were asking that each rig

17   develop a plan for improving safety during

18   the 2008 time frame, and that be a joint

19   effort between BP and Transocean by rig.  And

20   that we would report back quarterly on the

21   progress of that effort to each other and to

22   senior management.

23        Q.    So you had an initial phone call

24   and then there was no follow-up that you're

25   aware of?

1          A.     We had the communications in

2     February.  We conducted the phone call in

3     April, and there were no further things along

4     those lines.

5          Q.     Do you know whether Transocean

6     did anything to develop the safety plan on

7     its own?

8          A.     I -- they, of course, had a

9     number of safety plans and did some things by

10     area, some things by rig.  At this point, I

11     had taken on my full role with Gulf of Mexico

12     and just assumed that my -- the best

13     effectiveness was to work directly with them

14     for Gulf of Mexico exclusively.

15          Q.     So at the time of this e-mail,

16     and the time of this incident, June 2009,

17     that's well over a year after you had

18     recommended that BP and Transocean develop --

19     jointly develop a safety plan for each rig,

20     is that right?

21          MS. KARIS:

22               Object to form.

23          THE WITNESS:

24               That's 14 months, correct.

25     EXAMINATION BY MS. CHANG:

1      Q.    You say in your e-mail that you
2    hope this gets the required refocus.  Did it?
3          MS. KARIS:
4              Object to form.
5          MR. ROTH:
6              Object to form.
7          THE WITNESS:
8              There was no subsequent effort
9    globally with Transocean and BP on a, let's
10   say, refreshed version of this.
11   EXAMINATION BY MS. CHANG:
12     Q.    Did you discuss your -- did you
13   discuss this incident with either Barbara
14   Yilmaz or Steve Haden?
15     A.    During this time frame, I
16   believe Steve Haden was working on some
17   safety improvement plans that we consulted on
18   back and forth with e-mails, I'm sure there's
19   several e-mails from the early '08 through
20   the mid-'09, third quarter '09 with Steve
21   about rig performance, safety with
22   Transocean.
23              I don't recall all of those
24   correspondence and I don't recall my last
25   discussion with Barbara.  The last discussion

```
 1          I would have had with Barbara relative to
 2     Transocean safety performance would have been
 3     after I made a presentation to Transocean in
 4     September of '09.
 5          Q.     Did you look into this incident
 6     at all, this traveling block crown collision
 7     incident?
 8          A.     This is referenced as a HIPO,
 9     which is a high potential incident and BP had
10     a protocol when anything was declared a HIPO
11     incident to have a formal root cause
12     investigation of the incident.  That was
13     conducted normally, if I recall correctly,
14     the incident would have been investigated
15     with -- in D&C we would have allowed
16     Transocean to lead the incident investigation
17     assisted by a D&C manager and then those
18     results would be summarized and presented
19     back to Neil Shaw and ultimately could be
20     published to the rest of the BP organization.
21          Q.     So on the bottom of that first
22     page, the e-mail from Andrew Frazelle to G
23     global SPU WD/WM.  What does G Global SPU
24     WD/WM stand for?
25          A.     That was a -- that would be a
```

1    list, a list of the wells directors or wells

2    managers, so that would be the senior most

3    position in the other strategic performance

4    units as it relates to drilling and

5    completions.

6         Q.    The senior most positions?

7         A.    That's correct.

8         Q.    And these root causes that were

9    identified as lack of management control and

10   inadequate engineering design?

11        A.    That's correct.

12        Q.    Those root causes would be the

13   result of the investigation that's conducted

14   by Transocean and BP together, is that

15   correct?

16        MS. KARIS:

17             Object to form.

18        THE WITNESS:

19             This note indicates that this is

20   the preliminary conclusions from the

21   investigation report for the HIPO.

22   EXAMINATION BY MS. CHANG:

23        Q.    Do you know who conducted the

24   investigation?

25        A.    No, I wouldn't recall who our

1    lead investigator on that incident would be.
2    It would have normally have been a wells team
3    leader or a wells manager level person, yes.
4         Q.    And would that person be working
5    together with a Transocean person?
6         A.    Transocean counterpart.  Her
7    practice was, in terms of incident
8    investigation, to contract her because it was
9    their safety management system would lead the
10   investigation assisted by a senior BP
11   representative.
12        Q.    And would the two investigators
13   have to agree on the root causes?
14        A.    They would.
15        Q.    So the root causes that are
16   identified here at least preliminarily would
17   have been agreed upon by both a BP and
18   Transocean investigator?
19   MR. ROTH:
20         Object to form.
21   MS. KARIS:
22         Object to form.
23   THE WITNESS:
24         Without seeing the report and
25   the documents itself, I do know that

1    frequently there was a Transocean incident

2    investigation form report and there was also

3    the BP investigation report.  They should

4    have been -- well, they should have been

5    consistent, but they weren't always in

6    agreement with the stated root causes.

7    EXAMINATION BY MS. CHANG:

8         Q.    Do you recall seeing the

9    underlying reports for this investigation?

10        A.    I would be fairly certain on

11   this one that I read the investigation report

12   because it was concerning to me.

13        Q.    Do you recall whether the

14   preliminary findings differed at all from the

15   final findings on the root cause?

16        A.    I couldn't say now without

17   seeing the documents.

18        Q.    Do you recall whether the

19   underlying report or the underlying report

20   from BP differed in terms of the root cause

21   from the report generated by Transocean?

22        A.    I think in -- if I recall

23   correctly in this particular incident, there

24   was a fairly strong alignment that there were

25   a number of human errors and some underlying

1     or existing conditions that were not

2     consistent with Transocean's policies and

3     procedures so I think the agreements were

4     fairly high in agreement or alignment.

5          Q.     If you look at that second

6     bullet in the e-mail, in the final sentence:

7     "The crews were testing in a manner as to

8     make it pass versus fully understanding what

9     constituted a failure of the system."

10             Do you have any reason to

11     believe that that is not true?

12         MR. ROTH:

13             Objection to form.

14         THE WITNESS:

15             In this incident, it is a -- as

16     a driller comes on tour or for his work

17     shift, they are -- they are supposed to check

18     the crown saver switch, in other words, there

19     are mechanical switches that are supposed to

20     prevent this from happening.  In this -- in

21     this case, if my recollection is correct, the

22     drillers have been informed that you had to

23     run the crown in the block at a certain speed

24     to make it actually activate and that the --

25     this references that their understanding,

```
 1    according to the investigation, was more to
 2    check off that it had been done as opposed to
 3    the ultimate goal was to avoid the crown
 4    hitting the block which is a very serious
 5    incident.
 6    EXAMINATION BY MS. CHANG:
 7        Q.    Was this idea of just doing it
 8    to check off the box, was this something you
 9    had encountered with Transocean before?
10        MR. ROTH:
11              Objection to form.
12        THE WITNESS:
13              I would say that one of the
14    challenges with all contractors are that
15    there are many types of processes, job safety
16    analysis, checklists, et cetera, and you
17    always have to be concerned that the
18    employees understand the purpose and the
19    intents of these procedures.
20              I would say, back to my earlier
21    comments, I wouldn't say that Transocean
22    stood out relative to their peers.  They had
23    a large number of rigs and so their
24    consistency or variability did stand out to
25    me.
```

```
 1    EXAMINATION BY MS. CHANG:

 2         Q.    On the next page there's a

 3    bullet reading:  "There's a

 4    cultural/behavioral issue with risk tolerance

 5    that allowed work arounds to get past

 6    equipment failures or poor engineering."

 7                Do you see that?

 8         A.    I do.

 9         Q.    Did I read that correctly?

10         A.    That's correct.

11         Q.    Do you agree that, or was it

12    your experience that there were cultural and

13    behavioral issues with risk tolerance that

14    allowed work arounds to get past equipment

15    failure or poor engineering?

16         MR. ROTH:

17                Objection to form.

18         THE WITNESS:

19                This comment relates

20    specifically to that crew on that rig and the

21    individuals involved and I believe that was

22    an accurate statement.

23    EXAMINATION BY MS. CHANG:

24         Q.    Had you seen the same type of

25    cultural/behavioral issues with other rig
```

1    crews?

2         MR. ROTH:

3              Objection to form.

4         THE WITNESS:

5              I would say in my time frame, I

6    probably have seen almost every contractor

7    have problems with this in some form or

8    fashion.  And it was, as I indicated earlier,

9    a concern of mine because of the expansion of

10   the fleet and the competency levels

11   particularly at the driller role, yes.

12   EXAMINATION BY MS. CHANG:

13        Q.    And then finally, the last

14   bullet:  "Full utilization and closeout of BP

15   rig audits.  The requirement for a redundant

16   system was identified as a deficiency in an

17   October 2007 audit and was never closed out."

18              Do you remember this?

19        A.    Yes, I actually remember quite

20   well being surprised that there was an

21   outstanding audit report and items had not

22   been closed out.  I was not aware of that

23   2007 audit, which was prior to my arrival in

24   the Gulf of Mexico, nor that it had had

25   remaining items unclosed.

1          Q.      You just didn't expect that
2     there would -- a year later, or eight months
3     later, that there would still be open items
4     from an audit report?
5          A.      Well, this occurred in --
6     MR. ROTH:
7               Objection to form.
8     THE WITNESS:
9               So my surprise was that a BP rig
10    audit conducted by, I believe, Norman Wong's
11    group had left behind a closeout or an audit
12    report and that there was failure to close
13    those items out in a timely manner, yes.
14    EXAMINATION BY MS. CHANG:
15         Q.      What is considered a timely
16    manner to you?
17         A.      That could be a day and that
18    could be a week, it could be several months.
19    So the -- a good audit will indicate those
20    things that have to be closed right away and
21    those things that are acceptable to close, as
22    some items have to wait until either a
23    routine or scheduled maintenance.
24         Q.      Do you know if there were -- if
25    any disciplinary action was taken as a result

 1    of this incident?

 2         A.    I recall the driller involved in

 3    this either resigned or was terminated by

 4    Transocean, yes.

 5         Q.    And how about for -- okay.

 6    Prior to Transocean taking over Global Santa

 7    Fe, what was Global Santa Fe's safety record

 8    like?

 9         MR. ROTH:

10              Object to form.

11         THE WITNESS:

12              My comments would relate to my

13    association while I was at Chevron.  They

14    were defined as our primary core jack-up rig

15    contractor.  I would say that their -- their

16    personal safety performance was consist --

17    very consistent across rigs and very

18    outstanding.

19              We routinely had zero lost time

20    incidents and in many cases zero recordables

21    for an entire rig -- for an entire year for

22    an entire rig.  So I would say it was -- it

23    did appear to me better than their peers.

24    EXAMINATION BY MS. CHANG:

25         Q.    Do you know whether that changed

1    after Transocean acquired the company?

2         MR. ROTH:

3              Object to form.

4         THE WITNESS:

5              I don't know that I ever saw

6    comparison on former Global Santa Fe rigs

7    before and after.  I know that in the -- in

8    all cases, the Transocean safety management

9    system was implemented in place of the Global

10   Santa Fe management -- safety management

11   system and I think that they had maybe a year

12   implementation plan or something to that

13   effect, but ultimately they became the

14   Transocean safety management system.

15   EXAMINATION BY MS. CHANG:

16        Q.    What is a fast track well?

17        A.    That would be a well that would

18   be delivered from start to finish faster than

19   the average well.  I would say a good rule of

20   thumb for deepwater is that it normally takes

21   12 to 24 months from start to finish of well

22   design to execution.  A fast track well in my

23   view would be something completed in 6 to 12

24   months versus 12 to 24.

25        Q.    And what determines whether a

1    well is appropriate to be fast tracked?

2         A.    I would say, in my view, that

3    fairly good known subsurface conditions would

4    be conducive to a fast track well.  I would

5    not generally consider an exploration or

6    appraisal well a candidate for fast track.

7    More in line with a well that had offset

8    wells to it and a fairly known subsurface

9    environment, and no extraordinary risk.

10        Q.    Based on what you know of the

11   Macondo well, would it have been an

12   appropriate fast track well?

13        A.    No, because it was an

14   exploration appraisal well.  I believe the H2

15   well that was completed by MARIANAS just

16   prior to this was classed or titled a fast

17   track well.

18        Q.    If a well is a fast track well,

19   are there certain planning steps that are

20   omitted?

21        A.    No, actually not.  In my

22   experience with the H2 well, we limited the

23   revisions to approvals and documents to three

24   or four versus 20 or something like that.  So

25   it was really focusing on the absolute

1    essentials to deliver the well from start to

2    finish.

3        Q.      But there was no sacrifice as

4    far as you were concerned in terms of the

5    amount of study or the amount of design that

6    went into the well?

7        A.      No, in the -- in my experience,

8    in the H2 well, it was primarily management

9    financial review which was different in the

10   fast track case.  It was not the technical or

11   the risk assessment or the designs.

12       Q.      And what is a train wreck well?

13   Have you heard that phrase before?

14       A.      People will often label wells

15   that have fourth quartile performance as

16   train wrecks because of the -- the cost,

17   generally speaking.  Not normally referred to

18   as a situation like a blowout or lost well

19   control, but a well that is finished, but

20   extremely over budget or over schedule.

21       Q.      When you were at BP, did you

22   work with Cindy Skelton?

23       A.      Yes.

24       Q.      What was her position when you

25   -- during your four years there?

1          A.     I believe when I first arrived,

2     she might have had a position that I don't

3     clearly recall, but the majority of my

4     experience with Cindy and/or dialogues with

5     her would have been as she was leading the

6     implementation of the OMS project or process

7     within the Gulf of Mexico.

8               Cindy knew that I had had a lot

9     of experience with that at Chevron and so we

10    had conversations about the implementation,

11    both my role, but in general.

12         MS. CHANG:

13               Let's go off the record for a

14    minute.

15         THE VIDEOGRAPHER:

16               We're off the record at 5:59.

17               (Whereupon the deposition was

18    recessed.)

19

20

21

22

23

24

25

```
1                    WITNESS' CERTIFICATE
2
3                     I have read or have had the
4    foregoing testimony read to me and hereby
5    certify that it is a true and correct
6    transcription of my testimony with the
7    exception of any attached corrections or
8    changes.
9
10
11
12        _____
             KEVIN DENNIS LACY
13
14
15
16   PLEASE INDICATE
17   ( ) NO CORRECTIONS
18   ( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED
19
20
21
22
23
24
25
```

```
 1                     REPORTER'S CERTIFICATE
 2
 3           I, Diane Tewis Clark, RPR, RMR, CRR,
 4      Certified Court Reporter, State of Louisiana,
 5      do hereby certify that above-named witness,
 6      after having been duly sworn by me to testify
 7      to the truth, did testify as hereinabove set
 8      forth;
 9           That this testimony was reported by me
10      in the stenotype reporting method and
11      transcribed thereafter by me on computer, and
12      that same is a true and correct transcript to
13      the best of my ability and understanding;
14           That I am not of counsel, nor related to
15      counsel or the parties hereto, and in no way
16      interested in the outcome of this matter.
17
18
19      _____
20           Diane Tewis Clark, RPR, RMR, CRR
21              Certified Court Reporter
22
23
24
25
```

```
 1              UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF LOUISIANA
 3
                IN RE:  OIL SPILL        MDL NO. 2179
 4  BY THE OIL RIG
    "DEEPWATER HORIZON"      SECTION:  J
 5  IN THE GULF OF
    MEXICO, ON APRIL         JUDGE BARBIER
 6  20, 2010                 MAG. JUDGE SHUSHAN
 7
 8
 9
15
16                         VOLUME 2
17
18        Deposition of KEVIN DENNIS LACY, P.O.
19  Box 7888, The Woodlands, Texas 77387, taken
20  in the Pan American Life Center, Mardi Gras
21  Room, 11th Floor, 601 Poydras Street, New
22  Orleans, Louisiana 70130, reported on
23  Thursday, June 2nd, 2011.
24
25
              GAUDET, KAISER, L.L.C.
            Board-Certified Court Reporters
```

```
 1    APPEARANCES:
 2
 3    ON BEHALF OF THE PLAINTIFFS
      STEERING COMMITTEE:
 4
 5         WATTS GUERRA CRAFT
           (BY:  MIKAL C. WATTS, ESQUIRE)
 6               DAVID V. McLENDON, ESQUIRE)
            4 DOMINION DRIVE
 7         BUILDING 3, SUITE 100
           SAN ANTONIO, TEXAS 78257
 8
 9
           HENRY DART, ATTORNEYS AT LAW
10         (BY:  HENRY T. DART, ESQUIRE)
           510 NORTH JEFFERSON STREET
11         COVINGTON, LOUISIANA 70433
12             SPECIAL COUNSEL FOR THE LOUISIANA
               ATTORNEY GENERAL REPRESENTING THE
13             STATE OF LOUISIANA
14
           U.S. DEPARTMENT OF JUSTICE
15         TORTS BRANCH, CIVIL DIVISION
           (BY:  DEANNA J. CHANG, ESQUIRE)
16         POST OFFICE BOX 14271
           WASHINGTON, D.C. 20044-4271
17
                 ATTORNEYS FOR THE UNITED STATES
18
19         OFFICE OF THE ATTORNEY GENERAL
           STATE OF ALABAMA
20         (BY:  MARGARET L. FLEMING, ESQUIRE)
           ASSISTANT ATTORNEY GENERAL
21         501 WASHINGTON AVENUE
           P.O. BOX 300152
22         MONTGOMERY, ALABAMA 36130-0152
23             ATTORNEYS FOR THE STATE OF ALABAMA
24
25
                 GAUDET, KAISER, L.L.C.
               Board-Certified Court Reporters
```

```
 1    APPEARANCES (Continued):
 2
 3         MITHOFF LAW FIRM
           (BY:  WARNER HOCKER, ESQUIRE)
 4         ONE ALLEN CENTER - PENTHOUSE
           500 DALLAS STREET
 5         HOUSTON, TEXAS 77002
 6              MDL 2185 SECURITIES PLAINTIFFS
                SUBCLASS
 7
 8         COHEN MILSTEIN
           (BY:  JOHN SIFTON, ESQUIRE)
 9         1100 NEW YORK AVENUE, N.W.
           SUITE 500 WEST
10         WASHINGTON, D.C. 20005
11              ATTORNEY FOR NEW YORK, ET AL
                SECURITIES
12
13         MUNGER, TOLLES & OLSON, LLP
           (BY:  JEROME C. ROTH, ESQUIRE)
14         560 MISSION STREET, 27TH FLOOR
           SAN FRANCISCO, CALIFORNIA 94105
15
                ATTORNEYS FOR TRANSOCEAN
16
17         HUGHES ARRELL KINCHEN, LLP
           (BY:  JOHN KINCHEN, ESQUIRE)
18         NORFOLK TOWER
           2211 NORFOLK, SUITE 1110
19         HOUSTON, TEXAS 77098
20              ATTORNEYS FOR TRANSOCEAN
21
           GODWIN RONQUILLO
22         (BY:  GAVIN HILL, ESQUIRE)
                LAUREN L. MITCHELL, ESQUIRE)
23         1201 ELM STREET
           SUITE 1700
24         DALLAS, TEXAS 75270-2041
25              ATTORNEYS FOR HALLIBURTON
```

```
 1    APPEARANCES (Continued):
 2
 3         BINGHAM McCUTCHEN
           (BY:  PETER C. NEGER, ESQUIRE)
 4              DAREN F. STANAWAY, ESQUIRE)
           399 PARK AVENUE
 5         NEW YORK, NEW YORK 10022-4689
 6              ATTORNEYS FOR ANADARKO PETROLEUM
                AND MOEX OFFSHORE 2007, LLC
 7
 8         BECK, REDDEN & SECREST
           (BY:  ERIC J.R. NICHOLS, ESQUIRE)
 9         515 CONGRESS AVENUE, SUITE 1750
           AUSTIN, TEXAS 78701
10
                ATTORNEYS FOR CAMERON
11              INTERNATIONAL CORPORATION
12
           MORGAN, LEWIS, LLC
13         (BY:  LUCAS T. ELLIOT, ESQUIRE)
           1000 LOUISIANA STREET, SUITE 400
14         HOUSTON, TEXAS 77002-5006
15              ATTORNEYS FOR M-I SWACO, LLC
16
           WARE, JACKSON, LEE & CHAMBERS, LLP
17         (BY:  WENDY WARE BISHOP, ESQUIRE)
           AMERICA TOWER
18         2929 ALLEN PARKWAY
           HOUSTON, TEXAS 77019
19
                ATTORNEYS FOR DRIL-QUIP
20
21         JONES, WALKER, WAECHTER, POITEVENT,
           CARRHRE & DENHGRE, LLP
22         (BY:  GARY J. RUSSO, ESQUIRE)
           600 JEFFERSON STREET, SUITE 1600
23         LAFAYETTE, LOUISIANA 70501
24              ATTORNEYS FOR WEATHERFORD
25
```

```
 1    APPEARANCES (Continued):
 2
 3         KIRKLAND & ELLIS, LLP
           (BY:  HARIKLIA KARIS, ESQUIRE)
 4               PATRICK M. CROOK, ESQUIRE)
           300 NORTH LASALLE
 5         CHICAGO, ILLINOIS 60654
 6               ATTORNEYS FOR BP
 7
           STANLEY, REUTER, ROSS, THORNTON &
 8         ALFORD, LLC
           (BY:  RICHARD C. STANLEY, ESQUIRE)
 9               THOMAS P. OWEN, JR., ESQUIRE)
           909 POYDRAS STREET, SUITE 2500
10         NEW ORLEANS, LOUISIANA 70112
11               ATTORNEYS FOR KEVIN DENNIS LACY
12
13
14    ALSO PRESENT:
15
           KAREN GACE, IN HOUSE COUNSEL
16         REPRESENTING BP
17
           AARON PALMER, CLVS
18         DEPO-VUE, INC.
19
20
21    REPORTED BY:
22         DIANE TEWIS CLARK, RPR, RMR, CRR
           CERTIFIED COURT REPORTER
23         LOUISIANA CERTIFICATE NO. 73005
           ARKANSAS CERTIFICATE NO. 672
24
25
```

```
1    *   *
2
                          EXAMINATION INDEX
3
4                                                Page
5    EXAMINATION BY MS. CHANG................430
6    EXAMINATION BY MS. FLEMING.............440
7    EXAMINATION BY MR. ROTH................474
8    EXAMINATION BY MR. HILL................494
9    EXAMINATION BY MR. NEGER...............565
10   EXAMINATION BY MR. NICHOLS.............633
11   EXAMINATION BY MS. KARIS...............699
12   EXAMINATION BY MR. WATTS...............765
13
14                        *   *   *
15                      INDEX OF EXHIBITS
16
                                                Page
17
     Exhibit No. 2949.......................552
18     E-mail from Ian Little to Harry
     Thierens sent Tue Dec 16 17:41:32
19   2008, BP-HZN-2179MDL01843947 -
     BP-HZN-2179MDL01843955
20
     Exhibit No. 2950.......................576
21     "Deepwater Well Complexity -- The
     New Domain," Deepwater Horizon Study
22   Group, Working Paper -- January 2011
23   Exhibit No. 2951.......................591
       "Final Report on the Investigation
24   of the Macondo Well Blowout,"
     Deepwater Horizon Study Group, March
25   1, 2011
```

```
 1   Exhibit No. 2952........................691
         GOM-D&C Major Hazard and Risk
 2   Management
 3   Exhibit No. 2953........................712
         E-mail from Kevin Lacy to Harry
 4   Thierens sent Wed Dec 02 20:47:01
     2009, BP-HZN-2179MDL01797716 -
 5   BP-HZN-2179MDL01797720
 6   Exhibit No. 2954........................729
         "Turning to the Right," A Quarterly
 7   Newsletter for GoM SPU Drilling &
     Completion
 8
     Exhibit No. 2955........................744
 9     E-mail from Kevin Lacy to Michael J.
     Leary sent Thu Feb 04 19:35:27 2010
10
     Exhibit No. 2956........................751
11     E-mail from Kevin Lacy to G GOM SPU
            LT sent Mon Dec 14 14:08:03 2009
12
     Exhibit No. 2957........................797
13     E-mail from Kevin Lacy to Richard
     Morrison, Andrew Frazelle sent Thu Jan
14   29 13:33:59 2009,
     BP-HZN-2179MDL01004839 -
15   BP-HZN-2179MDL01004840
16   Exhibit No. 2958........................816
         Separation Agreement,
17   BP-HZN-2179MDL02212123 -
     BP-HZN-2179MDL02212127
18
19
20
21
22
23
24
25
```

```
 1                S T I P U L A T I O N
 2
 3              It is stipulated and agreed by and
 4    between counsel for the parties hereto that
 5    the deposition of the aforementioned witness
 6    is hereby being taken pursuant to the Federal
 7    Rules of Civil Procedure;
 8
 9              All formalities, with the
10    exception of the reading and signing of the
11    transcript by the witness, are hereby waived;
12
13              All objections, except those as to
14    the form of the question and the
15    responsiveness of the answer, are hereby
16    reserved until such time as this deposition,
17    or any part thereof, may be used or sought to
18    be used in evidence.
19
20                        *  *  *
21
22              DIANE TEWIS CLARK, RPR, RMR, CRR,
23    Certified Court Reporter, State of Louisiana,
24    officiated in administering the oath to the
25    witness.
```

```
 1          THE VIDEOGRAPHER:
 2               This is day two of the
 3     videotaped deposition of Kevin Lacy.  The
 4     date is June 2nd, 2011, the time on the video
 5     screen is 8:50.  This is the beginning of the
 6     Tape 1.  We're back on the record.
 7               Off the record.  The time is now
 8     8:50.
 9               KEVIN DENNIS LACY,
10     after having been first duly sworn by the
11     above-mentioned certified court reporter, was
12     examined and testified as follows:
13          THE VIDEOGRAPHER:
14               Back on the record.  The time is
15     8:52.
16     EXAMINATION BY MS. CHANG:
17          Q.    Good morning, Mr. Lacy.  Again,
18     Deanna Chang for the United States.  I just
19     have a couple of questions for you.
20               Were you aware that BP used to
21     have HSE personnel on each rig?
22          A.    I had heard that.  I did believe
23     at one time when I arrived in the Gulf of
24     Mexico, yes.
25          Q.    So when you arrived at the Gulf
```

1    of Mexico, that was the practice?

2         A.    I can't say --

3         MS. KARIS:

4               Object to form.

5         THE WITNESS:

6               I can't say if that was the

7    practice.  I had heard at one time that they

8    had individual HSE coordinators on each rig,

9    yes.

10   EXAMINATION BY MS. CHANG:

11        Q.    Do you know why that practice

12   was discontinued?

13        A.    No, I don't.

14        Q.    Was that a practice that Chevron

15   used when you were at Chevron?

16        A.    We considered one of the top ten

17   practices -- best safety practices to have a

18   dedicated HSE rep on each rig, yes.

19        Q.    Did you ever suggest that there

20   be a dedicated HSE person on the BP rigs?

21        A.    I recall talking about that as

22   an option, and at the time we had had several

23   people leave -- resign in the ranks, and we

24   weren't really able to do that with the staff

25   that we had.

1          Q.     Were there any other

2     recommendations or suggestions you had made

3     during your tenure as VP at -- VP drillings

4     and completion at BP that you did not get

5     support for from your management?

6          MS. KARIS:

7                    Object to form.

8          THE WITNESS:

9                    I would say that the majority of

10    things that fell under my direct

11    responsibility within the Gulf of Mexico, I

12    was able to initiate, ensure it was in place,

13    et cetera.

14                    I think the majority of the

15    things that I debated or recommended that

16    didn't get followed through had to do more

17    with the D&C, HSE effort, specifically

18    dedicated resources on the Gulf of Mexico --

19    or on the headquarter staff to coordinate the

20    global HSE programs for D&C.

21                    The performance management plan

22    for Transocean during 2008 was a fairly broad

23    significant program that didn't get carried

24    forward.  I think we did a few things in the

25    Gulf of Mexico different than some of the

```
 1    other business units, but I never pushed
 2    those practices regarding to go further
 3    outside the Gulf of Mexico business unit.
 4    EXAMINATION BY MS. CHANG:
 5         Q.    Were there any other suggestions
 6    that you can recall that were not followed
 7    through, suggestions that you made?
 8         MS. KARIS:
 9              Object to form.
10         THE WITNESS:
11              I can't think of any off the top
12    of my head.  Those two I mentioned were
13    probably the -- the two bigger, more
14    outstanding ones, that there were ongoing
15    discussions.  I know we spoke a fair amount
16    about creating a review or audit process
17    specifically for D&C, which would've been
18    more like what I was accustomed to at
19    Chevron, but there was not much appetite to
20    create another review structure.
21    EXAMINATION BY MS. CHANG:
22         Q.    Do you recall what time frame
23    that was in?
24         A.    That would've been pretty much
25    from the time I arrived all the way through
```

1    probably mid-'09.

2              Q.    And what would that audit, as

3    you envisioned it, entail?

4              A.    What I was accustomed to at

5    Chevron is we had at least four levels of

6    review in our processes that fit within OEMS.

7    There would be a corp level review that would

8    occur every three to five years.  That was

9    what was called level one.

10             Level two would be an annual

11   review led by an independent review team, and

12   they would look at the OEMS systems as it

13   related to D&C.  We did that every two years

14   for each business unit.

15             And then we had what we call

16   level three and level four reviews; level

17   three being those where we would periodically

18   go out and spot check, and we tried to

19   replicate those in the Gulf of Mexico with

20   Steve Tink's group.  And then level four just

21   real basically refers to the expectation that

22   the well site leader or the drilling rep

23   would make a daily to weekly walk-through and

24   check things, spot check.

25             Q.    In your role as VP at BP, did

1    you meet regularly with the well site

2    leaders?

3         A.    The well site leaders had an

4    every six-month meeting when I arrived, and

5    we would have one group meet.  And then two

6    weeks later, their off-site leader would

7    meet, and they did that -- I believe, we did

8    a couple of meetings in -- I think it was in

9    Biloxi.  I know it was a -- it was a fairly

10   long drive to get there and we had to meet

11   the guys.  And then, also, we had, I think,

12   one meeting, possibly my last -- either my

13   last meeting or next-to-last meeting was in

14   Sugarland with the well site leaders.  And we

15   debated back and forth about going to

16   annually versus semiannually.  And I -- I

17   don't recall where we -- what the last

18   meeting was.

19        Q.    Were those full day meetings?

20        A.    Oh, yes.  They were full day

21   meetings.  And in some cases, they used them

22   for the -- the whole D&C for the Gulf of

23   Mexico, and then for the individual teams,

24   the rig managers, so...

25        Q.    Was there a mechanism for the

1    well site leaders to give you feedback

2    directly on operations?

3         A.    The only mechanism would've been

4    the formal mechanisms, either, you know,

5    responding to e-mail or sending a note.  The

6    process that I had in place was to make sure

7    that the drilling managers themselves got

8    offshore.

9              The -- the goal was monthly,

10   but, you know, once a month or once every two

11   months.  Harry Thierens would then also try

12   to get out once a quarter to each rig and

13   talk to the well site leaders.

14             So the general expectation is

15   that they had a comfort level of speaking up

16   to -- to the drilling manager.  Their direct

17   boss was the superintendent, but this was a

18   way to make sure they were comfortable with

19   raising an issue to the drilling manager, to

20   Harry Thierens, which is basically two levels

21   up.

22             My role primarily was working

23   with them in the well site meetings and

24   making sure that they were comfortable with

25   my leadership role.  I think my last rig

1    visit would've been on the BOB PALMER with
2    Ian Little.
3         Q.    Do you recall any concerns
4    raised by the well site leaders during your
5    tenure at BP?
6         MS. KARIS:
7              Object to form.
8         THE WITNESS:
9              Generally, the issues they would
10   raise would be about the company's direction.
11   They raised many of the same issues that the
12   onshore staff, about in the late '08, 2009
13   time frame, what I would call expected
14   questions about cost cutting and the issues
15   around, you know, how does this impact jobs
16   and staffing, et cetera.
17             And so my job was to make sure
18   that I gave them, you know, honest answers
19   and told them that they should be concerned
20   about their jobs or concerned that there
21   would be anything that we would do that would
22   create an unsafe environment.
23        Q.    Do you recall any of the well
24   site leaders raising concerns with you about
25   the adequacy of training programs for them?

```
 1            A.     I think there might've come up
 2   in the questions and answers of one of the
 3   well site leader meetings, questions about
 4   training.
 5            They had -- BP had a one-week
 6   safety leadership course for well site
 7   leaders that I thought was very good, and I
 8   usually attended the closeout meetings for
 9   that.  It focused on leadership behaviors,
10   basic communication, and risk assessment.
11            And, so I know they were
12   attempting to look into more training, and I
13   think they had what they called a ten-year
14   plan, because they were concerned about the
15   overall demographics for the well site
16   leaders.
17       Q.     What about qualifications of rig
18   employees, do you recall any of the well site
19   leaders mentioning concerns about the
20   qualifications or the competence?
21       A.     Not any major complaint or any
22   large volume of complaints.  I think it was a
23   general concern that we all shared about the
24   qualifications and -- usually --
25   qualifications were basic.  You had to have
```

1    certain things, but it was more along the

2    lines of the experience levels, and many of

3    the incidents such as the MARIANAS crown

4    block could trace back to, you know,

5    experience and knowledge with -- particularly

6    with the drillers.

7         Q.    Do you recall any of the well

8    site leaders mentioning concerns with the

9    performance of specific contractors?

10        A.    It would've all been -- with the

11   exception of the BOB PALMER, all of our rigs

12   were with Transocean and Pride.  So at one

13   time, I know we had concerns with Pride on

14   the Thunderhorse rig, and we made some

15   changes with some of their individuals.  The

16   Pride had also been on the Mad Dog rig, but

17   that rig was lost in the storm in '08, I

18   believe.

19             So predominantly, it was the

20   general comments about what we were trying to

21   do with Transocean.

22             As I said yesterday, the well

23   site leaders were in the call in April of '08

24   when we talked about, you know, jointly

25   managing the -- kind of having a safety

1    management committee, if you would, on each

2    rig.

3          MS. CHANG:

4                I have nothing further.  Thank

5    you very much for your time.

6          THE VIDEOGRAPHER:

7                Off the record.  The time is now

8    9:02.

9                (Whereupon, a brief recess was

10   taken.)

11         THE VIDEOGRAPHER:

12               We're now back on the record.

13   The time is 9:04.

14   EXAMINATION BY MS. FLEMING:

15         Q.    Mr. Lacy, my name is Margaret

16   Fleming, and I'm an Assistant Attorney

17   General for the State of Alabama.

18         A.    Yes, ma'am.

19         Q.    I'm here to ask you some

20   questions on behalf of the people of State of

21   Alabama.

22                If there is any -- at any time

23   you don't understand a question that I ask,

24   I'd ask that you simply ask me to repeat it.

25         A.    Yes, ma'am.

1          Q.      Otherwise, I will -- I'll assume

2     that you understand what I'm asking.

3          A.      Okay.

4          Q.      Yesterday I heard you testify

5     about process safety, and I understood you to

6     say that as it relates to drilling

7     operations, process safety is primarily a

8     reference to well control, is that correct?

9          A.      Yes, that's my view.

10          Q.      How important is accurate pore

11     pressure, prediction, and detection in

12     process safety?

13          MS. KARIS:

14                    Object to the form.

15          THE WITNESS:

16                    Pore pressure, modeling

17     prediction, and realtime assessment in my

18     view is vital to deepwater drilling because

19     of the narrow margins that we discussed

20     yesterday.

21     EXAMINATION BY MS. FLEMING:

22          Q.      Now, does deepwater exploration,

23     in particular, pose some problems with

24     respect to pore pressure?

25          A.      All exploration wells are at

1    best a guess at the subsurface pressures.  We

2    do -- professionals do a lot of work to

3    assess and to predict.  But practically

4    speaking, there are ranges to the

5    predictions, there's uncertainties to the

6    predictions, and so one of the challenges of

7    an exploration well is that you have to be

8    wary of, as you drill, that your prediction

9    or your model may be inaccurate, and you will

10   run into pressures higher than expected.

11        Q.    And deepwater drilling,

12   particularly, the deeper you drill, do you

13   encounter or expect to encounter higher pore

14   pressure?

15        A.    Natural physics say the deeper

16   you drill, the higher the pressures are.  The

17   key difference with deepwater drilling is you

18   are faced, as we discussed yesterday, with

19   this margin, drilling margin, which, most

20   drilling engineers are comfortable with a

21   pound per gallon margin, that, you know,

22   where you have a pound per gallon extra

23   hydrostatic head over what you need without

24   failing a shallower formation that's weaker.

25   So that's one of the challenges to deepwater.

1                Sometimes your margin may only
2       be half a pound per gallon.  It's a very
3       tenuous balance to keep from losing returns
4       versus taking in a high kick.
5            Q.     With the increased psi that you
6       encounter in deepwater drilling, does that
7       make a kick harder to respond to?
8                The deeper you go, would you
9       say --
10           A.     Well --
11           Q.     -- the higher the pressure,
12      would the kick occur quicker?
13           A.     So as -- as indicated yesterday,
14      that -- it's a combination of the pressure
15      and the flow rate.  So the productivity of
16      the formation that's flowing, the larger the
17      kick, the more difficult it is to return it
18      to a stable state, particularly if it's gas.
19           Q.     And so would you say that --
20      that with a deep -- with deepwater
21      exploration, the deeper you go, the more
22      important it is to have realtime monitoring?
23           A.     My professional experience and
24      in my base case would be to monitor every
25      deepwater well in a realtime sense as an

 1    extra set of eyes for monitoring, but also

 2    for the ability to remodel as you drill

 3    what's actually happening.

 4         Q.    If there are communication

 5    problems between, for example, someone on the

 6    rig who is doing monitoring, if the person on

 7    the rig doing monitoring is having trouble

 8    communicating with people onshore, does that

 9    pose any particular problems?

10         A.    It could.

11    MS. KARIS:

12              Object to form.

13    THE WITNESS:

14              It could.

15    EXAMINATION BY MS. FLEMING:

16         Q.    What are those?

17    MS. KARIS:

18              Object to form.

19    THE WITNESS:

20              The general principle is that

21    the people on the rigs have the primary

22    responsibility of managing the well.  And so

23    the communications onshore would be, in most

24    cases, a secondary assistance.  It's

25    certainly not to give instructions or to tell

1   them to do an action on the rig.  It's
2   primarily as a -- an additional set of eyes
3   to monitor and an additional resource to
4   consult to give better understanding of what
5   may be happening.
6   EXAMINATION BY MS. FLEMING:
7        Q.    I'm -- and I'm speaking
8   particularly -- the communication between the
9   geologists on the rig and geologists onshore
10  who are trying to understand the sands and --
11  and the material that is being drilled
12  through.
13            If there is a breakdown in that
14  communication, would you say there's a
15  potential for trouble?
16       MS. KARIS:
17            Object to form.
18       THE WITNESS:
19            The -- any time that there would
20  be either a misunderstanding or a
21  disagreement between onshore and offshore,
22  that has a potential to create a problem that
23  may grow or may -- may have, you know, a nil
24  consequence or a major consequence.  So you
25  do your best to keep that communication open

1    and healthy, so...

2              Realtime centers -- realtime

3    capabilities help you do that because you

4    both see the same picture, instead of trying

5    to describe over the phone what's happening

6    or interpretations.  It makes it much easier

7    to communicate.

8         Q.    That was my next question.  If

9    someone is -- if someone onshore is having a

10   hard time understanding what is try -- what

11   the person on the rig is trying to

12   communicate, can the people onshore simply go

13   to the realtime transmission center and look

14   at the data?

15        A.    Yes.  Yes.  To my knowledge, at

16   the time I left, our engineers -- the

17   engineers that were part of my organization

18   at BP had the capability to do that on the

19   10th floor realtime center or at their

20   desktop on three or on their laptops at home.

21   So there was -- there -- there

22   was capability.  I can't testify to how often

23   or who, when, particularly after I left.

24        Q.    Can you talk to me a little bit

25   about the speed of drilling as it relates to

```
 1    deepwater exploration wells?
 2                 Is there a speed at which
 3    drilling -- you might determine drilling is
 4    too fast and would you want to slow down?
 5                 Is there a benefit to slowing
 6    down drilling as it relates to pore pressure
 7    detection?
 8       MS. KARIS:
 9                 Object to form.
10       THE WITNESS:
11                 Rate of drilling has a number of
12    factors that influence it, and -- and the
13    primary factor would be watching the hole
14    conditions, a variety of measures that come
15    back to the surface, weight on bit, drill
16    pipe torque, pressures, flow returns, and all
17    those provide insights to how fast you should
18    drill or should you slow down.
19    EXAMINATION BY MS. FLEMING:
20       Q.    Now, if a geologist is trying to
21    come up with an effective method of
22    predicting changes in pore pressure, might it
23    be helpful to slow down the rate of drilling?
24       MR. KARIS:
25                 Object to form.
```

```
 1              THE WITNESS:
 2                   It wouldn't be uncommon if
 3       something is looking different than your
 4       predicted model, to even stop and circulate
 5       and to take the time to say something doesn't
 6       quite seem to fit our predictions.  So it
 7       would be a common practice to watch those
 8       parameters that I just discussed and make a
 9       decision to either continue, slow, or stop.
10       EXAMINATION BY MS. FLEMING:
11            Q.    Who would make the determination
12       of when to slow down in that circumstance?
13            A.    During the drilling operations,
14       if there was a question about the subsurface
15       conditions, it kind of falls into two things:
16       If the drilling parameters are starting to
17       get out of an acceptable envelope, it would
18       be the -- the onsite well site leader in
19       consultation with the superintendent.
20                   If there was a question or
21       concern about the -- let's say, earth --
22       earth model prediction, that would probably
23       be between the well site geologist and the
24       onshore geologist and discussions about
25       what's best for the well.
```

```
 1    EXAMINATION BY MS. FLEMING:
 2         Q.     Are you familiar with the Tiger
 3    team?
 4         A.     Tiber or Tiger.
 5         Q.     Tiger?
 6         A.     Tiger team, yes, ma'am.
 7         Q.     And what is that?
 8         A.     Tiger team is a label that BP
 9    Exploration in the Gulf of Mexico used for
10    their -- their pore pressure experts.  They
11    had a small team of people who did the pore
12    pressure, fracture predictions, the -- what
13    we referred to as the reservoir and
14    everything above.  Everything above is the
15    overburden, and they were the experts about
16    modeling the overburden, about how it would
17    drill, and then communicating those to the
18    drilling engineers who did the well design.
19              And, so, in my view, I saw a
20    similar model in the Unocal organization for
21    exploration wells.  It's a very -- best
22    practice.  I considered the Tiger team for
23    the Will K well and the Tiger team that did
24    the exploration wells to be some of the best
25    people I had worked with.
```

```
1          Q.     Are you familiar with the Tiger
2    team at BP that were responsible for the
3    Macondo well?
4          A.     I can't say who was doing the
5    work after I left.  I would recall several
6    names of people that I had worked with prior
7    to my departure.  There was a gentleman by
8    the name of Pinkie Vincent and another
9    gentleman by the name of J. P. Blongey, who
10   would've been the two primary people leading
11   the different Tiger teams.
12         Q.     Do you have an opinion about
13   Graham Pinkie Denson and his -- his expertise
14   or his competence?
15        MS. KARIS:
16              Object to form.
17        THE WITNESS:
18              His second-hand observations and
19   the prior work seemed to be very good.
20   EXAMINATION BY MS. FLEMING:
21         Q.     Would it concern you to hear
22   that a member of the Tiger team expressed --
23   expressed a concern to others that they were
24   drilling like a "bat out of hell" in the
25   Macondo well?
```

```
 1          MS. KARIS:
 2                   Object to form.
 3          THE WITNESS:
 4                   Things get said everyday and a
 5     variety of opinions.  I would have to take
 6     that -- that comment on the day and the
 7     source.  So depending upon what my
 8     professional view of the indicators were and
 9     what the source was, I would give it some
10     merit, as any time somebody raises a concern
11     and then I would have to validate it.
12     EXAMINATION BY MS. FLEMING:
13          Q.     You spoke just a moment ago
14     about creation of a review or audit
15     structure, were you in the process of doing
16     that at BP when you left?
17          A.     Basically, yes.  The answer
18     would've been yes.  It was my intent, as OMS
19     system became better understood, then it
20     would've been easier to then take the next
21     step for auditing.
22                   For example, the discussion
23     yesterday on the D&C OMS system, that
24     would've been the next step to audit the
25     effectiveness of that in the various teams.
```

```
 1          Q.      You mentioned that when you
 2    worked at Chevron, there were, in fact, four
 3    different levels of review --
 4          A.      Yes, ma'am.
 5          Q.      -- that existed there?
 6          A.      Yes, ma'am.
 7          Q.      And one that you mentioned was
 8    an annual review by an independent review
 9    team?
10          A.      Yes.
11          Q.      I'm -- why do you call that team
12    independent?
13          A.      The team consisted of six team
14    members.  We had two individuals who did
15    nothing but reviews for their full-time job.
16    And so they were familiar with what we were
17    looking for, how to put the reports together,
18    and how to conduct the interviews.  They
19    would be joined by four D&C professionals
20    from a location other than the location that
21    we were going to.
22                  And so the independence was:
23    They weren't from that location, they didn't
24    work in that organization, they were peers,
25    D&C professionals that were familiar with
```

1    similar operations, and also familiar with

2    our audit protocol.  And we did that once

3    every two years for each one of the 15

4    business units.

5         Q.    When you worked at Chevron, did

6    they employ a performance incentive or a

7    bonus compensation system?

8         A.    They had -- at certain levels,

9    there were bonuses that applied to -- I'd

10   have to think to -- to think of the

11   equivalent levels.  But, yes, they had an

12   annual bonus system that was based on meeting

13   performance metrics.

14        Q.    You say at certain levels.  Were

15   those at the higher, upper levels of the

16   management?

17        MS. KARIS:

18             Object to form.

19        THE WITNESS:

20             At the time I departed, which

21   would've been 2006, the performance

22   incentives probably didn't come in of any

23   significance until you were at a drilling

24   manager or above level.  At the level below

25   that, it was less -- less or none at that

1    time.  I don't know what they do now.

2    EXAMINATION BY MS. FLEMING:

3         Q.    Now, back to the -- the

4    independent review team.  The six team

5    members whose job it was -- whose full-time

6    job it was to review from a safety

7    perspective or conduct safety audits, were

8    those people compensated with

9    performance-enhanced bonus to your knowledge?

10        MR. KARIS:

11             Object to norm.

12        THE WITNESS:

13             Probably not, because the --

14    there were two full-time members, and then

15    the individuals themselves -- the other four

16    came from other organizations.  They might

17    have been in a role that got a performance

18    incentive, but nothing relative to -- to what

19    you're rating.

20    EXAMINATION BY MS. FLEMING:

21        Q.    Could you -- do you see a

22    potential problem with people on a safety

23    review team, who are supposed to be

24    independent, receiving production-enhanced

25    bonuses for the region where they're supposed

1    to be doing reviews?

2         MR. KARIS:

3              Object to form.

4         THE WITNESS:

5              It could be a potential conflict

6    or an influence, yes.

7    EXAMINATION BY MS. FLEMING:

8         Q.    So ideally, you would want your

9    independent review -- safety review team not

10   to have their own compensation at stake when

11   they're doing the safety review?

12        MR. KARIS:

13             Object to form.

14        THE WITNESS:

15             I believe it's in -- in the --

16   in the performance process we put in place in

17   the D&C transformation, we actually did

18   implement a program that was balanced between

19   one-third results, one-third personal or team

20   behaviors, and one-third individual

21   development.  And the intent was to give the

22   employee largely most of the control.

23   Two-thirds of their performance assessment

24   was in their hands, their behaviors, and

25   their development, and then you left

```
 1    one-third to results, which I found in my
 2    experience kept things from becoming out of
 3    balance.
 4    EXAMINATION BY MS. FLEMING:
 5         Q.    What did you know about Pat
 6    O'Bryan and his education?
 7         A.    I don't think I've ever seen a
 8    risumi from Pat's background.  My
 9    association -- my direct association with Pat
10    was primarily when I was the head of
11    discipline up through the early '08 time
12    frame when he was the head of NAG,
13    North American Gas, drilling and completions.
14         Q.    Do you know about his deepwater
15    experience or the extent of it?
16         A.    I seem to recall that in the
17    discussions that I might've had either with
18    Harry Theirens or Tim Tucker that Pat had had
19    some time in the ARCO Gulf of Mexico
20    deepwater organization at some point.
21         Q.    Do you know how long he had
22    about with BP at the time he took your
23    position?
24         A.    Not exactly, no.
25         Q.    With respect to your separation
```

```
1    agreement with BP, excluding the financial

2    terms, what can you tell us about the terms

3    of that agreement?

4         MS. KARIS:

5              Object to form.  I make an

6    objection.  I think this was the subject of

7    this morning's hearing.  I remind you the

8    Court has ordered that that agreement is

9    disclosable.  So subject to the Court's

10   ruling and without waiving any right to seal

11   this portion of the transcript and deem it

12   confidential and withdrawn, I will allow the

13   questions to proceed.

14        MR. STANLEY:

15             You can answer.

16        THE WITNESS:

17             Okay.  I'm sorry.  Will you

18   restate the question?

19   EXAMINATION BY MS. FLEMING:

20        Q.    Other than the financial terms

21   of your separation agreement with BP, what

22   can you tell us about that agreement?

23        A.    I was told it was --

24        MS. KARIS:

25             Object to form.
```

```
 1          THE WITNESS:
 2                  -- it was a relatively standard
 3     document that incorporated the agreement
 4     between the departing employee and BP, that
 5     there were certain rights and protections.
 6     Primarily, it was around confidentiality of
 7     any information or any duties that were
 8     discharged while under BP's employ and not to
 9     disclose any of that if I was, I think,
10     subject to an approach or in a lawsuit, or
11     that I would notify BP relative to being
12     contacted by an inquiry or legal authority
13     prior to revealing any -- any -- any
14     information about my private -- previous
15     employment, and then some terms relative to
16     them providing legal counsel at BP's expense
17     should I be called forward.
18     EXAMINATION BY MS. FLEMING:
19          Q.    Is it your understanding that
20     you were an at will employee at BP; that you
21     could be terminated for any reason?
22          A.    I think in these levels, that's
23     generally the case, yes.  And I -- I -- that
24     would've been my understanding.
25          Q.    Yesterday, you said that you
```

```
 1    met -- you had a meeting -- after your
 2    meeting with HR, you had a meeting with BP's
 3    legal counsel.  What can you tell us about
 4    that meeting?
 5         A.     They had drafted the separation
 6    agreement, reviewed it with me.  I think, if
 7    I recall correctly, all of the discussions
 8    were over the phone up until the time that I
 9    brought it in for a final signature.  So I
10    don't recall an actual meeting up until when
11    I brought it in for execution.
12              And, you know, the discussions
13    were, in my view, them outlining what these
14    clauses meant; and that it was -- in their
15    view, it was a standard and it was a routine,
16    and they were just explaining it to me.  And
17    then the rest of my conversations would've
18    been with a senior HR member about, you know,
19    about the departure, et cetera.
20         Q.     In the discussions with the
21    legal counsel for BP, was anything said about
22    the reason for your being asked to leave the
23    company?
24         A.     No.
25         Q.     I believe you've answered this
```

1    already.  But have you ever been provided any

2    explanation for why your performance was

3    deemed not to be --

4         A.    The only -- the meeting with

5    Barbara Yilmaz and Paul McIntyre would have

6    been the comments that Barbara had made in

7    that meeting and then a short meeting

8    afterwards with Paul McIntyre, where he

9    explained his view of about what I should do,

10   not what happened.

11        Q.    And my understanding is, in

12   those conversations, nothing was ever said

13   about any deficiency in your job performance?

14        A.    I think Barbara made a comment

15   that she didn't consider me to be a team

16   player in support of her agenda or something

17   like, and that I think that was -- I remember

18   asking why?  And I think that was the comment

19   I got.

20        Q.    Do you have any understanding of

21   what Barbara Yilmaz meant by not being a team

22   player or not responding to her agenda?

23        MS. KARIS:

24             Object to form.

25        THE WITNESS:

```
 1                I -- other than that's what I

 2      heard, and, you know, I can only surmise,

 3      because there were no -- really no other --

 4      you know, the performance assessments were

 5      positive in hers or Neil Shawl's assessments.

 6      All the measures, the employees surveys,

 7      everything was positive.  So I wasn't aware

 8      of any kind of lingering or ongoing concern

 9      or problem in Barbara's -- she had not

10      brought it forward to me before.

11      EXAMINATION BY MS. FLEMING:

12           Q.    And I appreciate that you can

13      only speculate or surmise, but I'm interested

14      in your -- in this particular point about

15      your speculation or what you might surmise

16      about her agenda and your not complying with

17      that?

18           MR. KARIS:

19                Object to form.

20           THE WITNESS:

21                We had numerous ongoing

22      conversations about the management of how --

23      not the importance of safety but how to

24      effectively manage it.  We had very

25      numerous --
```

```
 1    EXAMINATION BY MS. FLEMING:
 2         Q.    And --
 3         A.    I'm sorry.
 4         Q.    Pardon my interruption.  When
 5    you say safety, do you mean personal safety
 6    or process safety or both?
 7         A.    Primarily personal safety.  That
 8    is, in my view, a daily, daily risk with lots
 9    of exposure for fatalities, and so that would
10    be a preeminent conversation that I would be
11    pushing.
12              Process safety would also be one
13    I was concerned about based on things I saw,
14    but less -- again, those are less obvious
15    and, so, harder to engage in the conversation
16    on except when there are specific issues.
17         Q.    When you tried to engage Barbara
18    Yilmaz in discussions about safety, did you
19    encounter any difficulties?
20         MS. KARIS:
21              Object to form.
22         THE WITNESS:
23              The -- my view was that Barbara
24    had very sincere desires about being safe.
25    My personal view is that, because she was not
```

1    a drilling professional, she had some lack of

2    experience firsthand of working as a drilling

3    foreman, working as a drilling

4    superintendent, long-term experience.  And so

5    I felt it was primarily not in her comfort

6    zone in terms of feeling very capable in

7    those discussions.

8            She also, I think, had a

9    different perspective on what a headquarters

10   group would do and how the models worked in

11   BP.  And it was very much "let the business

12   units figure it out" in my terms.

13   EXAMINATION BY MS. FLEMING:

14       Q.    Yesterday, you spoke about the

15   deepwater exploration as -- as being a high

16   risks, high rewards activity.

17       A.    Uh-huh (indicating

18   affirmatively).

19       Q.    With respect to the high risks,

20   are you talking about risks to -- that would

21   involve well control?

22       A.    It would be two-fold.  It would

23   be the -- the possibility of a major well

24   control event and, therefore, the financial

25   consequences and damage of that.  It would

1    also be the significant investments that

2    required -- which actually could end up in a

3    failed wellbore that was never producible or

4    a dry hole that might cost a hundred or

5    hundred and fifty million dollars.  So it was

6    very high risk in both the process safety

7    standpoint, but also in terms of the

8    financial consequences, yes.

9         Q.    And the high rewards, tell me

10   about high rewards.

11        A.    So --

12   MR. KARIS:

13             Object to form.

14   THE WITNESS:

15             In my statement, the meaning of

16   that is that there are few available

17   geological regions that provide such a large

18   resource base, such a high producibility for

19   wells.

20             And so for small to medium

21   companies, a major discovery could make the

22   company, could break the company.  For

23   majors, it's -- it has to be part of their

24   portfolio to keep their resource ads flat or

25   growing.  So a -- and it's a very strategic

1    resource for the United States.

2    EXAMINATION BY MS. FLEMING:

3        Q.    With respect to the risks and

4    the process safety risks involved in

5    deepwater drilling, do your experienced

6    staff, in your opinion, have a better

7    understanding or appreciation for those risks

8    than people who have not been in the

9    industry?

10        MR. KARIS:

11            Object to form.

12        THE WITNESS:

13            The experience levels -- I would

14    couch it in two ways.  Most things about well

15    control are -- are basic or standard,

16    regardless of the environment.  There are

17    certain things you do independent of whether

18    it's deepwater or land.  And then there is

19    deepwater environment, which makes things

20    more difficult to understand.

21            And probably, as you were

22    implying earlier, the criticality of making

23    good decisions or mistakes, it's a very -- so

24    experience, as with any field would be

25    valuable, and it had been one of my concerns

1    since 2006.

2    EXAMINATION BY MS. FLEMING:

3         Q.      And particularly with respect to

4    Barbara Yilmaz, her, as a -- I assume she has

5    a business background?

6         MR. KARIS:

7                 Object to form.

8         THE WITNESS:

9                 No, ma'am.  My understanding is

10   she has a geology or a geophysics background.

11   Yes, ma'am.

12   EXAMINATION BY MS. FLEMING:

13        Q.      But not a drilling background?

14        A.      No, ma'am.

15        Q.      Do you think she was in a

16   position to fully appreciate the process

17   safety risks associated with deepwater

18   drilling?

19        MR. KARIS:

20                Object to form.

21        THE WITNESS:

22                In my opinion, I do not.

23   EXAMINATION BY MS. FLEMING:

24        Q.      What about Neil Shaw?

25        A.      Question?

```
 1          MS. KARIS:
 2               Object to form.
 3     EXAMINATION BY MS. FLEMING:
 4          Q.    Was Neil Shaw, in your opinion,
 5     in a position to appreciate the process
 6     safety risks associated with deepwater
 7     drilling?
 8          MR. KARIS:
 9               Object to form.
10          THE WITNESS:
11               Neil's background as an
12     engineer, I think, led it to have a deeper,
13     maybe more insightful conversation.  I found
14     all of my conversations through about
15     mid-'09, generally Neil listened very well
16     and took advice quite well, and if we didn't
17     agree, we could have a second conversation
18     and he was willing to change his mind.
19     EXAMINATION BY MS. FLEMING:
20          Q.    What happened in mid-'09 that
21     caused a shift in that perception?
22          MR. KARIS:
23               Object to form.
24          THE WITNESS:
25               I'm not so sure it is as much as
```

1    a shift.  It's at that time that started this

2    major reorganization, and Neil wasn't around

3    very much from about July '09 until my

4    departure.

5    EXAMINATION BY MS. FLEMING:

6         Q.     Was he still your supervisor on

7    paper?

8         A.     I believe he was for several

9    months.  I don't know when the official

10   handover to James Dupree was.  I don't recall

11   that date.  But he -- he was my direct

12   supervisor for a number of months while he

13   was working on this other project.

14        Q.     And after Neil Shaw, were you --

15   did you report to James Dupree?

16        A.     When that -- whenever that was

17   effective, and I don't recall whether that

18   was two weeks or six weeks.  I do recall two

19   meetings with James and one phone call.  I

20   believe it was -- that's the phone call over

21   the Labor Day weekend that we had a -- we had

22   a well control issue on Thunderhorse at that

23   time.

24        Q.     What was James Dupree's

25   background?

```
 1          A.     I believe James Dupree was an
 2    engineer as well, but I -- I can't tell you
 3    with certainty.
 4          Q.     Was he receptive when you -- or
 5    did you ever attempt to talk with James
 6    Dupree about process safety issues?
 7          A.     No.  I would say that we had
 8    some very preliminary discussions as he was
 9    just coming on board.  I think he had a
10    family medical condition he was trying to
11    deal with at the same time he was coming in
12    the job.  And so I -- my two conversations,
13    if I recall correctly, was primarily around
14    where things stood with D&C in general, and
15    then it was going to be when he got on board,
16    we would have deeper conversations.
17              And then the second
18    conversation, he -- this was after they made
19    the decision, and he just said, you know,
20    good luck.
21          Q.     Was James Dupree -- James Dupree
22    was not involved in the meeting that you had
23    with Barbara Yilmaz about your termination?
24          A.     He was not in the meeting.  I
25    don't know what his level of involvement in
```

1    the decision was.

2         Q.     Tell me, if you will, just a

3    little bit about your successes or

4    accomplishments in the industry.

5               I know that you received an

6    award from your alma mater.

7         A.     I was named to the University of

8    Tulsa Engineering Hall of Fame in 2002.

9         Q.     Have you received any other

10   awards or recognitions?

11        A.     In 2007, I received the

12   International Association of Drilling

13   Contractors Exemplary Service Award.  They're

14   given out annually to someone who's made a

15   long-term contribution to the drilling

16   industry.

17              Those would be -- it's probably

18   the two, you know, most recent relevant

19   recognition awards.

20              I'm asked to speak frequently as

21   keynote speaker to technical conferences with

22   drilling contractors on the issues of safety

23   and/or performance improvements.  That would

24   be what I would describe as maybe public

25   recognitions.  And then the majority, I would

1    say, since about 1990 or '92, my career has

2    been largely spent going to organizations

3    that are facing challenges and helping fix

4    the what's were not working and then probably

5    fixing them in a sustainable way and then

6    moving on to the next challenge or the next

7    problem, so...

8         Q.    The award you received in 2007,

9    that would've been when you were employed by

10   BP, is that correct?

11        A.    Yes, ma'am.

12        Q.    Was that a national award?

13        A.    It's the International

14   Association of Drilling Contractors, so...

15        Q.    International award?

16        A.    It's an international award,

17   yes, ma'am.

18        Q.    I heard you testify yesterday

19   that -- especially, I think, with respect to

20   deepwater drilling, that the industry is

21   expanding and there is a lack of experienced

22   people within that industry.  Is that

23   correct?

24        A.    It is my view, yes, borne out by

25   my experience, yes.

1          Q.      That being the case, do you know

2    any reason why BP would choose to terminate

3    your employment, given your extensive

4    experience with deepwater drilling?

5          MR. KARIS:

6                  Object to form.

7          THE WITNESS:

8                  I -- my perspective on that is

9    it's not very logical.

10   EXAMINATION BY MS. FLEMING:

11         Q.      The increased psi that you

12   encounter in deepwater drilling, is that

13   relevant at all to issues of regaining

14   control of a well once well control has --

15   has been lost?

16         A.      So the -- the higher pressures

17   create a couple of more unique risks:  One,

18   as we talked about, the size of the influx,

19   which then creates more difficulty with

20   regaining control.

21                 The other part, which is not so

22   much pressure related, but, as we spoke

23   yesterday, this relies on a BOP stack that's

24   on the ocean bottom, which then has a riser

25   connected back to the surface.  And not only

```
 1    is that mechanically more complicated, but
 2    should there be a failure in the riser, you
 3    are really left with problems to maintain
 4    control when hydrostatic hits.
 5              So it's -- it's more risky
 6    that -- you can just say because of the
 7    subsurface context, the margins, the
 8    pressures, sometimes the temperatures, it's a
 9    riskier environment; and, therefore, requires
10    a higher vigilance in standard than other
11    operations.  And in my view, it several
12    orders of magnitude more challenging.
13         MS. FLEMING:
14              That's all I have.
15         THE VIDEOGRAPHER:
16              Going off the record, the time
17    is now 9:41.
18         THE VIDEOGRAPHER:
19              Back on the record.  The time is
20    now 10:01.
21         MS. FLEMING:
22              I'm told by the videographer
23    that I have 23 minutes remaining, and I will
24    cede the balance of the time to the PSC.
25         THE VIDEOGRAPHER:
```

```
 1                    Off the record.  The time is
 2      10:01.
 3                    (Whereupon, a brief recess was
 4      taken.)
 5           THE VIDEOGRAPHER:
 6                    Back on the record.  The time is
 7      10:01.
 8      EXAMINATION BY MR. ROTH:
 9           Q.    Good morning, Mr. Lacy.  My name
10      is Mr. Jerry Roth.  Sitting next to me is
11      John Kinchen, and we represent Transocean.
12                    We're going to have a very few
13      number of questions for you and hope to be
14      getting up from the seat in just a few
15      minutes.
16           A.    Okay.
17           Q.    And there are no documents that
18      I will be showing you.
19           A.    Okay.
20           Q.    Let me start by asking you:  Are
21      you familiar with the phrase
22      negative-pressure testing?
23           A.    Yes, I am.
24           Q.    Were you aware of whether
25      there -- BP had a protocol for determining
```

1   what constitutes a successful

2   negative-pressure test?

3        A.     I don't recall seeing a standard

4   procedure.

5        Q.     So to your knowledge, was there

6   a standard procedure that BP had during the

7   time that you were at BP?

8        A.     To my knowledge, I can't say I

9   saw one or that I was aware of one.

10       Q.     How about any kind of protocol

11  with respect to negative-pressure testing?

12  Did BP have a protocol with respect to

13  negative-pressure testing while you were at

14  BP?

15       A.     I don't recall seeing a detailed

16  procedure for one while I was there.

17       Q.     While you were at BP, did you

18  ever discuss negative-pressure testing with

19  anyone?

20       A.     No.  It had not been flagged as

21  a concern.  We -- to my knowledge, I'm sure

22  we ran numerous ones during the time I was

23  there.  If an issue had come up during a

24  negative-pressure test, it would have been

25  flagged first from the superintendent to the

```
 1    wells manager, which, in most cases, would
 2    have been in the Atlantis or Thunderhorse or
 3    central group where we were doing production
 4    wells because that's normally what the
 5    negative-pressure test would -- would be done
 6    on is a well that was being completed.
 7              So I'm not aware that that was
 8    raised from a superintendent to Charlie Holt
 9    or Andy Frazelle.  And then if there had been
10    any concerns, either with the test or how we
11    were doing it, then it would have been
12    flagged by Harry Thierens to me.
13         Q.    Were you aware of any -- or are
14    you aware of whether BP had any protocols or
15    procedures while you were with BP for when
16    the well site leader or the well teams
17    leader -- the wells team leader should be
18    consulting with onshore personnel regarding
19    negative-pressure testing?
20         A.    I -- relative to that topic, I
21    don't recall seeing any documents, guidance.
22    I would expect in the individual well
23    plans -- for the well execution plan, there
24    should be some guidance about when to --
25    should results or should something cause
```

1    concerns, then a subsequent conversation

2    should be held with the onshore staff.

3           Q.     You would expect that to be

4    written somewhere?

5           A.     I would expect that, as part of

6    the well execution plan, that there are

7    points in time where, you know, there's --

8    there's decisions that have to be made,

9    branches in decisions, and those would be

10   noted as communicate with the superintendent,

11   confirm with the superintendent, discuss with

12   the wells manager.  That would be pretty

13   normal.

14          Q.     And at any point -- you

15   discussed yesterday, reviewing various BP

16   procedures, procedural documents.  You also

17   talked yesterday about having been involved

18   in drafting some, I recall.

19          A.     Right.

20          Q.     Is that right?

21          A.     Right.

22          Q.     At any point in either your

23   review of those documents or in your drafting

24   of the documents that you drafted, or

25   participated in drafting, do you recall any

1    written reference to negative-pressure

2    testing?

3          A.    No.  Our efforts at that point

4    had been to collect the various procedures

5    that had existed in the Gulf of Mexico and

6    the subsequent efforts in 2010 would have

7    been to standardize or to document what the

8    preferred practices would have been.

9          Q.    Had you gotten to the point of

10   collecting procedures relating to

11   negative-pressure testing?

12         A.    I can't say with certainty.

13   John Sprague would have been the one that

14   would have been gathering those from the

15   various groups and starting to collate those

16   procedures, yes.

17         Q.    But you didn't -- you were not

18   aware of that?

19         A.    No, I was not aware of that.

20         Q.    And you didn't see any such

21   procedures?

22         A.    No.

23         Q.    Yesterday you mentioned a lack

24   of industry standards regarding well design,

25   I believe.

```
 1           A.      Uh-huh (indicating
 2      affirmatively).
 3           Q.      Do you recall that?
 4           A.      Yes, I do.
 5           Q.      Are you aware of industry
 6      standards regarding negative-pressure
 7      testing?
 8           A.      Not that I'm aware of, no.
 9           Q.      Let me change subjects to
10      something called blind shear rams.  You're
11      familiar with that --
12           A.      Yes.
13           Q.      -- phrase?
14           A.      Uh-huh (indicating
15      affirmatively).
16           Q.      Were you -- are you aware
17      whether BP had a requirement with respect to
18      the number of blind shear rams on deepwater
19      rigs?
20           A.      I seem to recall.  But without
21      access to the document that -- in the DWOP
22      guide, possibly the BP well control, there
23      would have been reference to Class 1 stacks,
24      Class 2 stacks, some designations about, you
25      know, what the right number of rams were,
```

1      what the configuration would be, what was

2      allowable, et cetera.  But I probably read

3      some of those documents when I first arrived,

4      but I don't -- now, it's been several years

5      probably since I've seen those.

6           Q.      So you don't recall, as you're

7      sitting here right now, what any of those

8      documents say about -- and I'm focusing in

9      particular on blind shear rams?

10          A.      No, I don't recall.

11          Q.      Do you remember whether or not

12     you recall what the number was -- if there

13     was such a reference, do you recall seeing

14     anything in those documents in particular

15     about blind shear rams?

16          A.      I don't recall.  My view on

17     industry standard practice would be one blind

18     shear ram -- probably one set of blind rams

19     was a pretty normal requirement, in addition

20     to, you know, redundant annulars and several

21     pipe rams.

22          Q.      But in terms of recalling

23     whether you saw that in a BP --

24          A.      No.

25          Q.      -- procedure or protocol?

```
 1              A.     I can't recall.  So I can't say
 2       it existed or didn't exist.
 3              Q.     Let me change subjects on you
 4       one more time.  I want to see if you recall a
 5       meeting with -- first of all, are you
 6       familiar with Robert Saltiel?
 7              A.     I know Rob very well, yes.
 8              Q.     He was the executive vice
 9       president of performance at Transocean?
10              A.     Yes.
11              Q.     Do you recall meeting with
12       Mr. Saltiel, and perhaps others, in or around
13       February of 2009, where you discussed with
14       him Transocean's safety record as of that
15       time?
16              MS. KARIS:
17                     Object to form.
18              THE WITNESS:
19                     Would this have been a meeting
20       in the Gulf of Mexico specifically or a
21       separate -- I -- know I had a couple of
22       lunches with Rob.  I know we had at least one
23       meeting relative to the Gulf of Mexico rigs
24       between BP and Transocean.  There was a
25       global business review that would have
```

1    occurred in possibly May of '09.

2    EXAMINATION BY MR. ROTH:

3         Q.    This was actually a meeting at

4    which you gave some feedback about

5    performance, and Mr. -- Mr. Neil Shaw was

6    present as well.

7         A.    Okay, yes.  Okay.

8         Q.    You have a --

9         A.    So now I remember, that Neil had

10   asked that -- he did not know Rob, and Rob

11   would have been the primary person to

12   discuss -- if we had concerns about

13   performance.  So I think I facilitated that

14   meeting so Neil would have an introduction to

15   Rob, and we would have discussion.

16        Q.    Do you recall telling

17   Mr. Saltiel during that meeting that you were

18   happy with the strong safety results as of

19   that time on the Transocean rigs?

20        A.    At what date was that?

21        Q.    In February 2009, February 25th

22   in particular?

23        A.    Oh, if -- if -- if it was

24   specific to the Gulf of Mexico rigs, I

25   absolutely would have.  We had not had a

1    lost-time incident since February of '08.

2        Q.    And you recall indicating that

3    the best safety year was 2008?

4        A.    In the Gulf of Mexico, probably

5    so.

6        Q.    Do you recall referencing the

7    strong efforts -- the strong recovery efforts

8    on the MARIANAS rig at that meeting?

9        A.    Absolutely, yes.

10       Q.    And do you recall mentioning, in

11   particular, the strong consistent performance

12   with respect to safety on the Deepwater

13   Horizon?

14       A.    Yes, it had not had a personal

15   safety incident during my time there.

16       Q.    And did all of those statements

17   you just recalled, making to Mr. Saltiel,

18   reflect what your views were at the time --

19   at the time of that meeting?

20       A.    They reflected my view of the

21   combined efforts between Transocean and the

22   Gulf of Mexico D&C organization, yes.

23       Q.    You and I have not net before

24   this morning, is that right?

25       A.    No, not that I'm aware of.

```
 1          Q.     Have you -- since you left BP,
 2     have you spoken to anyone at BP -- employed
 3     by BP?
 4          A.     So the -- I had one meeting, a
 5     social chat, after work one day with one of
 6     the senior members of the Gulf of Mexico
 7     leadership team.
 8          Q.     Who was that?
 9          A.     That was Pete Zwart.
10          Q.     And about when was that?
11          A.     I would say that was March of
12     2010.
13          Q.     And at that meeting, was that
14     purely a social meeting?
15          A.     Yes, it was -- it was -- I had
16     been a good friend with Pete while I worked
17     there and was just seeing how Pete was doing.
18          Q.     So you didn't discuss anything
19     substantive?
20          A.     The intent was not to discuss
21     anything, yeah, substantive, so.
22          Q.     And if that was the intent, was
23     that the actuality?
24          MR. STANLEY:
25                 Excuse me one second.
```

 1                    (Conferring with counsel).

 2          THE WITNESS:

 3                    That was the intent.  Several

 4     things came up relative to how things were

 5     going in the Gulf of Mexico.

 6     EXAMINATION BY MR. ROTH:

 7          Q.     With respect to what?

 8          A.     The deepwater rigs.

 9          Q.     And who made the statements

10     about what was going on in the Gulf of

11     Mexico?

12          A.     Pete offered the comment that

13     things were not going well with the deepwater

14     rigs.

15          Q.     Did he explain why?

16          A.     He didn't allude to why.  He

17     said that -- if I recall the statement

18     accurately, he said five out of six of the

19     rigs were not working and having problems.

20          Q.     And this was -- I'm sorry, the

21     date of this was?

22          A.     I would say this was mid-March.

23     I probably was back for spring break with my

24     daughter.

25          Q.     So this was before the -- the

1    incident and later that year?

2         A.    I would guess somewhere between

3    three and five weeks.

4         Q.    Okay.  Did he -- and was that

5    the extent of the conversation?

6         A.    Yes, because, given the

7    circumstances -- yeah.  We -- I wasn't

8    supposed to be talking about my departure,

9    and I wanted to keep it social.  I consider

10   Pete a class professional and a really good

11   friend.

12        Q.    Have you spoken to BP counsel in

13   connection with preparing for this

14   deposition?

15        A.    We had a -- I've had a number of

16   phone calls where they alerted me to request

17   from the Chemical Safety Board for

18   interviews.  They asked me for dates of

19   availability of this deposition, and then we

20   had a teleconference -- I don't know the

21   date -- to actually discuss the process as

22   they saw it for the Chemical Safety Board.

23             But not relative to these

24   depositions, no.

25        Q.    Who was the BP lawyer that -- or

1    lawyers that you were speaking with?

2        A.    BP counsel, I don't recall.  I

3    have the names written down in my file.

4    There were six representatives from BP in the

5    call and Mr. Stanley and Mr. Owens

6    representing myself.

7        Q.    Were these six representatives

8    of BP all lawyers?

9        A.    I believe they were.

10       Q.    Were they in-house counsel or

11   outside counsel?

12       A.    Both, I believe.

13       Q.    And were the outside counsel

14   with the law firm of Kirkland and Ellis?

15       MR. STANLEY:

16            Do you know?

17       THE WITNESS:

18            I can't recall.  I'd have to

19   refer to my notes.

20   EXAMINATION BY MR. ROTH:

21       Q.    You said that there was

22   discussion about protocol or procedures and

23   also dates; is that right?

24       A.    That teleconference, they asked

25   questions about the papers that I delivered

1    in October and in the deep -- DEEPWATER

2    HORIZON study group references, et cetera,

3    and then some discussion about the Chemical

4    Safety Board was different than a deposition

5    and things.  I don't know.  It was an

6    hour-long call or something like that.

7          Q.    I'm sorry.  I missed that last

8    part.  There was something about a difference

9    between the Chemical Safety Board and the

10   depositions?

11         A.    The format that that would be --

12   it was on the record, and that it was more of

13   a -- an interview as opposed to a -- well,

14   what I would have considered a more classical

15   process like this, so.

16         Q.    What questions were you asked

17   about the -- your paper, the paper that you

18   had written?

19         A.    I think the majority of the

20   questions actually came back to the use of my

21   paper in the DEEPWATER HORIZON study group,

22   because my -- my name was also shown as an

23   author on the -- the larger conclusive

24   report.

25         Q.    So what were you being asked

1    about that by the BP lawyers?

2         A.    If my recall is correct, they

3    were seeking clarification on my level of

4    involvement with the DEEPWATER HORIZON study

5    group.

6         Q.    And what did you tell them?

7         A.    I told them my involvement was

8    limited strictly to a couple of phone calls

9    with Dr. Bob Bea who had asked general

10   questions about the industry; the time I had

11   been with Chevron and their OEMS system; and

12   that all of my contribution to the DEEPWATER

13   HORIZON study group had been limited to the

14   paper I delivered for the SP conference; that

15   content had been lifted and inserted into a

16   paper that Dave Pritchard and I co-authored

17   and that I had reserved final approval.

18              I did say that I was surprised,

19   when I saw the way my name was published,

20   that it could be inferred that I had approved

21   the whole report or had been part of the

22   whole report.

23        Q.    And this was the paper that

24   we -- that you discussed yesterday?

25        A.    That's correct.  That's the

1    individual working papers, as they called it,

2    which I did co-author and then the -- the

3    full report, which I had not read until just

4    recently.

5         Q.    Were you asked any other

6    questions by the BP lawyers during the

7    meeting?

8         A.    Oh, I'm sure I was, but I don't

9    recall any other ones that stand out.

10        Q.    And were these questions about

11   your anticipated testimony on various issues?

12        A.    Not that I -- it was mostly

13   clarification questions about the -- what I

14   had said publicly up until that point.

15        Q.    What kinds of things were --

16   were they asking you about things you had

17   said publicly in terms of clarifications?

18        A.    Well, I think they were -- were

19   beginning to ask, you know -- primarily it

20   was around my role with the DEEPWATER HORIZON

21   study group paper and whether I had been an

22   active participant or, et cetera.

23        Q.    And so, I don't mean to press

24   you --

25        A.    No.

1          Q.     -- but when you say "et cetera,"
2     what's the et cetera?  What -- what was it
3     that they were asking you with respect to
4     your involvement in those -- in those
5     activities?
6          A.     Just, you know, had I read the
7     whole document?  Did I know that I had been
8     listed as an author with, I don't know, 25 or
9     30 other people?
10               And actually, the answer was no.
11    I had only focused myself on the joint paper,
12    and I didn't -- as I said, I hadn't even read
13    the full report.
14         Q.     And when you say the joint
15    paper, that, again, is the paper that you did
16    with -- with David Pritchard?
17         A.     The working paper, the joint
18    author with David Pritchard.  I -- I don't
19    recall any questions that had to do with the
20    upcoming depositions or any questions about
21    views or possible responses or anything to
22    that regard.
23         Q.     That was going to be my next
24    question.  Did the BP lawyers offer anything
25    or say anything with respect to any of the

    1    testimony that you were anticipating

    2    providing in either of the proceedings that

    3    you were discussing?

    4         A.    I felt at no time that any of

    5    the questions were an attempt to influence or

    6    guide my view.  I previously had an e-mail

    7    exchange regarding my separation agreement

    8    and was instructed -- I believe I have the

    9    e-mail -- that, you know, I should give full

   10    and honest disclosure relative to any of my

   11    duties or responsibilities or actions or

   12    decisions at BP.

   13         Q.    And other than that discussion

   14    that you've just described for us, the one on

   15    the telephone conference, did you have any

   16    other conversations with BP lawyers?

   17         A.    No, other than the phone calls

   18    to say "you're on a list of people that the

   19    CSB wants to interview" and those exchanges.

   20    I've -- I've been fairly diligent about

   21    saving those e-mails and generally made a

   22    note of the phone calls.  But I can't say

   23    I've logged all the phone calls or things

   24    like that.

   25         Q.    When was the teleconference you

1    were describing?

2         A.    It would have been ahead of the

3    CSB, just a few days.  Yeah.  The CSB

4    interview was a week ago -- right -- no, two

5    weeks ago.

6         Q.    Well, whenever it was, it was a

7    few days before the Chemical Safety Board

8    hearing?

9         MR. STANLEY:

10             If you want Counsel's

11    representation, it was May 18th.

12    EXAMINATION BY MR. ROTH:

13         Q.    May 18th.  Does May 18th sound

14    right to you?

15         A.    Yes.

16         Q.    Give me one moment.

17         MR. ROTH:

18             I don't have any further

19    questions.  Thank you.

20             We will be ceding our time to

21    Mr. Watts which I believe is -- that, I don't

22    know.

23         THE VIDEOGRAPHER:

24             Going off the record, the time

25    is now 10:21.

```
 1                (Whereupon, a brief recess was
 2      taken.)
 3           THE VIDEOGRAPHER:
 4                Back on the record.  The time is
 5      now 10:27.
 6      EXAMINATION BY MR. HILL:
 7           Q.    Good morning, Mr. Lacy.
 8           A.    Good morning.
 9           Q.    My name is Gavin Hill.  I
10      represent Halliburton, and I'm going to
11      asking you some questions today on their
12      behalf, if that's okay.
13           A.    Okay.
14           Q.    I appreciate your being here.
15      Thank you.  I tend to talk quickly, so I'm
16      going to try to slow down.  Feel free to ask
17      me to clarify or slow down.  If she's -- I
18      know she's asked that question several times.
19                I want to make sure I
20      understand.  Sitting here through your
21      testimony yesterday, I found -- I heard
22      fragments of things.  I'm just trying to get
23      a holistic picture.  So I apologize if I'm
24      covering ground that was covered yesterday,
25      but I want to make sure the court understands
```

1      your background.

2            A.      Okay.

3            Q.      Because there's been a lot of

4      talk about your focus, and I think you said

5      yesterday you had a passion for safety

6      issues.  Fair?

7            A.      Absolutely.  Yes.

8            Q.      But that's not the sole area of

9      your expertise, is that right?

10           MS. KARIS:

11                   Object to form.

12           THE WITNESS:

13                   I don't -- I believe I have a

14     broad set of experiences, yes.

15     EXAMINATION BY MR. HILL:

16           Q.      Well, at least with respect to

17     the time that you were the vice president of

18     Gulf of Mexico drilling and completions at

19     BP --

20           A.      Right.

21           Q.      -- safety was not the only -- I

22     guess, not the only issue within your

23     purview, right?

24           MS. KARIS:

25                   Object to form.

```
 1          THE WITNESS:
 2               I covered a broad variety and
 3     things, and I've worked simultaneously on
 4     many things to make improvements.
 5     EXAMINATION BY MR. HILL:
 6          Q.    Okay.  Well, within your
 7     organization, you had the wells director
 8     reporting to you, correct?
 9          A.    That's correct.
10          Q.    You had the performance manager
11     reporting to you?
12          A.    Yes.
13          Q.    Okay.  You had a projects
14     manager reporting to you?
15          A.    Yes.
16          Q.    You had rig and well services
17     managers reporting to you?
18          A.    That's correct.
19          Q.    You had a technology manager
20     reporting to you?
21          A.    Yes.
22          Q.    And you had the HSSE director
23     reporting to you as well, correct?
24          A.    For the Gulf of Mexico.
25          Q.    For the Gulf of Mexico.  Thank
```

1    you.

2              Now, the wells director, do well

3    site leaders, do they fall under the well

4    directors organization?

5         A.    You would say, yes, and the

6    day-to-day responsibilities fall to the wells

7    director.

8         Q.    Okay.  So you had an interest,

9    at least in developing well site leaders and

10    making sure that they had the competencies

11    necessary to execute their jobs on the rigs

12    while you were, right?

13         A.    In my view, they're the most

14    critical position --

15         Q.    Okay.

16         A.    -- in a drilling organization,

17    because they're the front line.

18         Q.    Now, you also said that -- you

19    familiarized yourself with at least the

20    public record regarding this case, even after

21    your departure from BP, is that correct?

22         A.    It was important in my current

23    role to -- to fully understand, with any big

24    major blowout, what some of the learnings

25    were and to double-check whether we might

1   have any gaps ourselves in my current

2   organization.

3        Q.    Okay.  So have you read the Bly

4   Report?

5        A.    I read the Bly Report.

6        Q.    Have you read the National

7   Commission's report?

8        A.    That's the one that's called the

9   Presidential, 460 pages?

10       Q.    Yeah.

11       A.    Yes, I've read that.

12       Q.    Okay.  And there was another one

13  that was actually issued called the Chief

14  Counsel's Report.  Have you read that?

15       A.    I don't recall that one.

16       Q.    Okay.  And so you're not

17  unfamiliar with some of the allegations

18  between the parties in this case?

19       A.    The extent of my knowledge would

20  be the two reports that you've just described

21  and whatever has made it into the industry

22  publications, public press, et cetera.

23       Q.    Okay.  And I think you testified

24  yesterday, we looked at -- and I was -- you

25  don't have to look at it, unless you want to.

```
 1                     But I think when we talked about
 2      Exhibits 2918, and there was another one, you
 3      talked about one of your goals at BP was to
 4      try to change the culture on the rig?
 5                     Is that a fair assessment?
 6          MS. KARIS:
 7                     Object to form.
 8          THE WITNESS:
 9                     The -- so my goal, I would best
10      state, that -- that improving the safety
11      culture, particularly the safety leadership
12      culture, was a goal and a consistent goal for
13      me for the past 20 years, yes.
14      EXAMINATION BY MR. HILL:
15          Q.    Okay.  If you wouldn't mind
16      turning to Exhibit 2918.
17          A.    (Complying).  Okay.
18          Q.    I'm looking at the last
19      paragraph there that -- that leads off with a
20      bold sentence that starts:  "For 2010, the
21      theme is better leadership, different
22      culture, different results."
23                     Do you see that?
24          A.    That's correct.
25          Q.    And is that a reference to what
```

 1      you just said, what -- one of your focuses
 2      was on changing the safety culture?
 3          MS. KARIS:
 4                  Object to form.
 5          THE WITNESS:
 6                  That would be consistent, yes.
 7      EXAMINATION BY MR. HILL:
 8          Q.      Okay.  And when you say safety
 9      culture, are you speaking specifically about
10      the cultures on the deepwater rigs or the
11      rigs in the Gulf of Mexico, rather?
12          A.      So this reference would have
13      been to the SPU.  And so in my capacity, not
14      just from the D&C organization, but relative
15      to the entire Gulf of Mexico organization, I
16      had -- had been asked by Neil Shaw to
17      formulate a plan for 2010 and to attempt to
18      put the plan in action early enough in '09
19      that we had an effective use of the plan for
20      the whole year in 2010.
21          Q.      Okay.  So what -- what was your
22      characterization -- at the time you started
23      this initiative, what would your
24      characterization be of the safety culture on
25      the rigs in the Gulf of Mexico?

1          MS. KARIS:

2                    Object to form.

3          THE WITNESS:

4                    I was satisfied with the safety

5     culture that we had on the rigs at the time

6     and our efforts in improving the safety

7     culture.  It's a -- it's a daily issue.  So,

8     you know, at any given point in time, you get

9     up and say:  What's the worse that can happen

10    today?  And on a drilling rig, frankly,

11    there's a lot of potential for fatalities and

12    serious incidents.  So you can't be

13    complacent.

14                   You can -- I think I've used the

15    term here, you have to daily overwhelm the

16    risks.  And so you have to actually do more

17    than you think you have to do, and that's the

18    fundamental question.

19    EXAMINATION BY MR. HILL:

20        Q.    Okay.  One of the things I'm

21    going to ask your help with, and understand

22    that the reason is, the lawyers coming into

23    this case, we hear these terms, "safety

24    culture."

25        A.    Right.

```
 1          Q.    I don't know necessarily where
 2    it begins and ends.  So I'd like to talk to
 3    you a little bit about -- about that.
 4          A.    All right.
 5          Q.    But before we do that, I would
 6    like you to turn to Exhibit 2919.
 7          A.    (Complying).
 8          Q.    I think -- yeah, the very next
 9    one.  This is the process safety planning
10    document that's dated 12 January 2010.
11                So if I understand your
12    testimony yesterday, this -- the date on this
13    document, actually, is after your departure;
14    is that correct --
15          A.    That's correct.
16          Q.    Okay.  Did you have any
17    participation in preparing this document?
18          A.    Not that I'm aware of.
19          Q.    Okay.  When you -- you looked
20    through it yesterday, and I don't care if you
21    want to take a minute to do it now.
22                Are you familiar with the themes
23    and the initiatives that are set forth in
24    this document?
25          MS. KARIS:
```

1                    Object to form.

2          THE WITNESS:

3                    Without some shorthand, et

4    cetera, I really couldn't comment.

5    EXAMINATION BY MR. HILL:

6          Q.    Okay.  Let's be specific.  Why

7    don't you turn to Page 7.

8          A.    (Complying).

9          Q.    With respect to process -- by

10   the way what is your understanding of what

11   this document is?

12         MS. KARIS:

13                   Object to form.

14         THE WITNESS:

15                   As it occurred after I left, I

16   can't tell you.

17   EXAMINATION BY MR. HILL:

18         Q.    Okay.  I'd like to ask you to

19   read the quote on -- look at the quote on

20   Page 7.

21         A.    (Complying).

22         Q.    And it identifies a problem

23   statement with respect to process safety

24   under a 2010 plan.  It says -- and I want you

25   to know if I read -- tell me if I read this

504

1     correctly.

2              "As we have started to" -- "as

3     we have started to more deeply investigate

4     process safety incidents, it's become

5     apparent that process safety major hazards

6     and risks are not fully understood by

7     engineering or line operating personnel."

8              Did I read that correctly?

9        A.    Yes.

10       MS. KARIS:

11             Object to the form.

12   EXAMINATION BY MR. HILL:

13       Q.    "Insufficient awareness is

14   leading to missed signals that precede

15   incidents and response after incidents, both

16   of which increases the potential for and the

17   severity of process safety-related

18   incidents."

19             Did I read that correctly?

20       MS. KARIS:

21             Object to form.

22       THE WITNESS:

23             Yes.

24   EXAMINATION BY MR. HILL:

25       Q.    All right.  While you were at BP

1    and you were basically formulating your

2    safety initiatives before your departure, is

3    this problem statement consistent with your

4    observations?

5        MS. KARIS:

6            Object to form.

7        THE WITNESS:

8            If -- if I looked at -- if I

9    read this problem statement and connected it

10   to my previous experience, I would have

11   concluded that this was solely addressing the

12   producing assets, the production platforms,

13   particularly given the bullet that talks

14   about pilot assets.

15            But, again, that's just a guess

16   on my part.

17        Q.    Fair enough.

18            With respect to rigs, during

19   your -- while you were at BP and you were

20   assessing cultures on the rig, the rigs

21   generally in the Gulf of Mexico, do you

22   believe that the engineering and line

23   operators were properly assessing risks?

24        MS. KARIS:

25            Object to form.

```
 1          THE WITNESS:
 2                I was comfortable during my --
 3     most of my tenure.  Certainly, after I had
 4     been there a while, that we had made clear at
 5     all levels that personal safety or process
 6     safety wouldn't be compromised, irrespective
 7     of where we were on the well and the efforts
 8     we made were at all levels.  Expectations
 9     very clear, expectations of the -- the
10     drilling managers and particularly Harry
11     Thierens' role and to reinforce that it
12     wasn't just words, but making decisions,
13     countering, debating with people, making sure
14     people felt comfortable to raise issues.
15                So I would say that my
16     perspective was -- I had high confidence in
17     the drilling managers that were under -- with
18     one exception, had a high degree of
19     confidence in my drilling managers.
20                I had absolute confidence in
21     Harry Thierens.  He is the best drilling
22     professional I've worked with in the
23     industry, and he demonstrated time and time
24     again that we were highly aligned.  And so I
25     was very confident in his alignment and his
```

```
 1    approach to things and, in particular, with
 2    Ian Little in the exploration and appraisal
 3    group and the three of us lined up in our --
 4    all of these wells were challenging.
 5               But particularly in the area
 6    where I probably would have had most concerns
 7    for well control process safety -- those,
 8    myself, Harry, and Ian Little, I had full
 9    confidence in.  Were our standards as
10    documented as I liked?  Were they
11    systemically and sustainable?  Absolutely
12    not.
13               That -- I felt that was going to
14    take at least another year.
15    EXAMINATION BY MR. HILL:
16         Q.    And you didn't have time to
17    implement that part of it because of your
18    early departure, right?
19         A.    There's -- there's things to do
20    the day one and things that take a year or
21    two.
22         Q.    All right.  You said with one
23    exception, you didn't have -- you had
24    confidence with all drilling managers with
25    one exception.  Who was that exception?
```

1          A.     Harry and I had discussions

2     several times with some concerns about

3     Charlie Holt, who was initially the

4     Thunderhorse/Atlantis drilling manager, and

5     then ultimately he was moved to just the

6     Atlantis drilling manager.

7          Q.     Okay.  Why was that?

8     MS. KARIS:

9               Object to form.

10    EXAMINATION BY MR. HILL:

11         Q.     Why did you have concerns?

12         A.     The -- on a couple of occasions

13    Harry -- and he reported directly to Harry.

14    So these would have been conversations

15    initiated by Harry.  I did meet with Harry's

16    direct reports at least once a month, and

17    with Ian Little, I met once a week to make

18    sure I was plugged into the things that were

19    going on.

20               My observations and -- and

21    personal experience with Charlie gave me

22    concerns.  Sometimes he didn't always

23    prioritize his focus, and in some cases he

24    wasn't around when we would have expected him

25    to be around.

```
 1    EXAMINATION BY MR. HILL:

 2         Q.     Okay.

 3         A.     And that was, I believe,

 4    documented in his performance assessment, at

 5    least for '08.

 6         Q.     All right.  I'd like to go back

 7    to the culture.

 8                You understand the concept of

 9    stop-work, I'm sure?

10         A.     Absolutely.

11         Q.     And stop-work authority is --

12         A.     Yes.

13         Q.     And you have a very good

14    understanding of it, because it was

15    integrated in the safety initiatives you were

16    undertaking, correct?

17         A.     Yes.

18         Q.     And when I read through your

19    documents, you know, the ones that were

20    produced in this case, prior to your

21    deposition, there were e-mails and safety

22    incidents, and they all pertained to things

23    like somebody's hand getting cut or a toe

24    getting cut off or falling and hurting or a

25    dropped object in the vicinity, those types
```

1    of things.

2         A.    Uh-huh (indicating

3    affirmatively).

4         Q.    And I think I have a fairly good

5    understanding of the stop-work authority in

6    those.  Personal safety type incidents make

7    sense.  It's logical.  Its application is

8    pretty clear.  Okay?

9         A.    Uh-huh (affirmative).

10         Q.    What I don't have a good feel

11    for and what I would like your help with is

12    understanding what else the stop-work

13    authority applied to.  Okay?

14         A.    Uh-huh (indicating

15    affirmatively).

16         Q.    And particularly in the

17    process -- and, I guess, in the process

18    safety route.

19         A.    Okay.

20         Q.    Okay.  So I want to ask you a

21    question:  A bottoms-up circulation, if --

22    you testified yesterday that a bottoms-up

23    circulation is -- is fundamental.  It's

24    generally understood as being something that

25    is -- is a proper and prudent thing to do to

```
1    increase the chances of a good cement job,
2    correct?
3         MS. KARIS:
4              Object to form.
5         THE WITNESS:
6              I believe what I said was that
7    most people would consider relative to
8    primary cementing, bottoms-up is a standard
9    practice.
10   EXAMINATION BY MR. HILL:
11        Q.    Okay.
12        A.    There are occasions or
13   reasons -- valid reasons not to do it.
14        Q.    Okay.  Well, let me ask you
15   this:  If a cement contractor is on the rig,
16   and he learns that a decision's been made not
17   to circulate bottoms-up prior to that cement
18   job, do you think that he should execute a
19   stop-work authority?
20        MS. KARIS:
21              Object to form.
22        THE WITNESS:
23              What I would believe his
24   responsibility would be, to flag it to the
25   well site leader, that what they are
```

1    proceeding to do would not be good practice,

2    and to have a responsibility to get a -- a

3    fair response.  And if he didn't agree with

4    that response, to then bring it up one more

5    level.

6    EXAMINATION BY MR. HILL:

7         Q.     Well, let me ask you as someone

8    who has well site leaders in your direct down

9    line in terms of the area of your

10   responsibility.

11              Would you expect your well site

12   leaders to know the importance of a

13   bottoms-up circulation as it relates to a

14   cement job?

15      MS. KARIS:

16              Object to form.

17      THE WITNESS:

18              So I -- at the level of

19   proficiency or experience we would expect of

20   a well site leader on a deepwater rig, and

21   given that my definition of a bottoms-up is a

22   common basic practice, the expectation would

23   be they would know that.

24   EXAMINATION BY MR. HILL:

25         Q.     Okay.  So in that instance, the

```
1     contractor likely wouldn't be telling BP, in

2     this case, anything it didn't already know?

3          MS. KARIS:

4               Object to form.

5          THE WITNESS:

6               I -- I would agree with that

7     perception.

8     EXAMINATION BY MR. HILL:

9          Q.    How about decisions about the

10    number of centralizers to use in a prior --

11    you know, in the casing string prior to the

12    cement job?

13         A.    Can you --

14         Q.    Yeah.

15         A.    Can you make that a question?

16         Q.    Absolutely.  I'm just getting us

17    in the right direction.

18         A.    Okay.

19         Q.    All right.  If a cementing

20    contractor recommends a certain number of

21    centralizers and tells BP that if you use X

22    number of centralizers that you're going to

23    get channeling, but BP decides to use X

24    number of centralizers, is that an instance

25    where the cement contractor should exercise
```

```
 1    stop-work authority?
 2         MS. KARIS:
 3              Object to form.
 4         MR. STANLEY:
 5              Let me just interpose an
 6    objection, also, as to I think you're -- he's
 7    not yet -- he's not qualified yet as an
 8    expert witness, and you're kind of getting
 9    into some expert testimony.  I'm not going to
10    stop it, but --
11         MR. HILL:
12              No.
13         MR. OWEN:
14              -- I just -- you know.  You can
15    answer.
16         MS. KARIS:
17              I'm going to object to form.
18         THE WITNESS:
19              So, again, restate.
20    EXAMINATION BY MR. HILL:
21         Q.   Okay.  If a cement contractor --
22    let's -- let's put it within your area of
23    experience because you were the vice
24    president of drilling and completions at BP
25    until the time of your departure, right?
```

```
 1            A.      Right.

 2            Q.      And in that -- in your area of

 3    responsibility was the competency and the

 4    training of well site leaders; correct?

 5            A.      Uh-huh (indicating

 6    affirmatively).

 7            Q.      And you've already indicated

 8    that you have some familiarity with the

 9    operational decisions that are made by well

10    site leaders on the rig, correct?

11            A.      Uh-huh (indicating

12    affirmatively).

13            Q.      All right.  And one of those

14    operational decisions -- I'm sorry.

15                    Not only well site leaders, but

16    the engineering teams that support them

17    onshore, correct?

18            A.      Yes.

19            Q.      Okay.  So there is a decision

20    made about the number of centralizers to use

21    in a cement job.  If that -- if the number of

22    centralizers -- the decision is made to use a

23    different number of centralizers than what is

24    recommended by your cementing service

25    contractor, do you think that the service --
```

```
 1      the cement contractor ought to exercise
 2      stop-work authority?
 3          MS. KARIS:
 4                  Object to form.
 5          MR. STANLEY:
 6                  Object to form.
 7                  If you have all the information
 8      you need, you can answer.
 9          THE WITNESS:
10                  Well, the -- so you're giving me
11      kind of a situation without the -- all the
12      factors involved.  What I can --
13      EXAMINATION BY MR. HILL:
14          Q.     Based on those facts?
15          A.     So what I can say, it is not
16      uncommon to either debate and/or question the
17      number of centralizers or placement or the
18      validity or the effectiveness of the
19      centralizers.  That's one that I do know
20      occurs a lot in -- different views of our
21      perspective.
22                  Pipe centralization is -- is a
23      fundamental to primary cementing
24      effectiveness.  It would be something that I
25      would expect there could be a challenge or a
```

1    debate on in that -- in that particular

2    topic.

3         Q.    Okay.  And whether it's a

4    challenge or a debate or a discussion about

5    the number of centralizers, that discussion

6    ought to be informed by modeling; correct?

7         MS. KARIS:

8              Object to form.

9         THE WITNESS:

10             Well, I would -- I would hope it

11   always has a technical modeling basis, which,

12   of course, has, you know, ranges in

13   precisions, uncertainties, et cetera.

14   So it -- so it will be objective -- it would

15   be subjective in terms of that discussion,

16   yes.

17   EXAMINATION BY MR. HILL:

18        Q.    Okay.  In your experience as the

19   vice president of drilling and completions at

20   BP, have you ever seen a situation where BP

21   decided to go ahead with the cement job, even

22   though the only modeling available predicted

23   channeling?

24        MS. KARIS:

25             Object to form.

1           THE WITNESS:

2                   I don't recall.  It -- it could

3      likely have come up in my tenure there.  I

4      don't recall that debate or that particular

5      situation.

6      EXAMINATION BY MR. HILL:

7           Q.    Well, does it cause -- would it

8      cause you any concern that a cement job went

9      ahead, even though that the most current

10     modeling suggested that the cement job would

11     channel?  Is that uncommon?

12          MS. KARIS:

13                  Object to form.

14          THE WITNESS:

15                  All the -- all the modeling

16     would be taken into account, and a decision

17     would have to be made on the day.

18     EXAMINATION BY MR. HILL:

19          Q.    You understand -- you have an

20     appreciation of what channeling is, right?

21          A.    Yes, I do.

22          Q.    And by definition, if some

23     channels, it's not going to isolate hydro --

24     the cement job's not going to isolate

25     hydrocarbons, correct?

```
 1          MS. KARIS:
 2                  Object to form.
 3          THE WITNESS:
 4                  If you have channeling, your
 5      isolation is compromised.
 6      EXAMINATION BY MR. HILL:
 7          Q.    All right.  So would you expect
 8      if a well owner went ahead and decided to
 9      execute a cement job, even though channeling
10      was predicted, would you expect the cement
11      contractor to exercise stop-work authority
12      order?
13          MR. OWEN:
14                  Same objection as before and to
15      form.  You can answer, if you can.
16          THE WITNESS:
17                  So, let's be precise about
18      the --
19      EXAMINATION BY MR. HILL:
20          Q.    Sure.
21          A.    -- definition of stop-work
22      authority.
23          Q.    Yeah, that's what I'm trying to
24      get to, frankly.
25          A.    So if -- if a drilling
```

1     contractor employee or third-party service

2     contractor employee has a concern, it is

3     frequently quoted or stated that they not

4     only have the right, they have the obligation

5     to raise the issue.

6              Ultimately, it is my perspective

7     that the operator has the ultimate

8     responsibility to make the final decision,

9     and it is not uncommon to make a decision

10    counter to an advice or a disagreement on the

11    day.

12        Q.    Okay, you keep saying that a

13    service contractor ought to raise an issue or

14    discuss it.  But I -- am I wrong that that's

15    different than actually exercising stop-work

16    authority?

17        A.    Well, I mean, this is -- you

18    know, people say stop work.

19        Q.    Yeah.

20        A.    And you have to have -- you have

21    to raise the issue, and someone has to comply

22    with the request to raise the issue.

23        Q.    Okay.

24        A.    So there's two steps to

25    stop-work.

```
 1            Q.      Okay.
 2            A.      So first thing, it has to get
 3     raised, and then the person who has the
 4     authority to stop-work, has to stop work.
 5            Q.      All right.  Well, let's assume
 6     that in the bottoms-up circulation issue, if
 7     the issue was raised --
 8            A.      Right.
 9            Q.      -- but has been overruled by the
10     well owner.
11            A.      Correct.
12            Q.      Okay.  Is exercising stop-work
13     authority at that point, essentially,
14     refusing to execute the cement job?
15            A.      My interpretation would be the
16     contractor is -- is faced with one of two
17     decisions:  To agree to proceed in light of
18     that concern or debate, or to walk off the
19     job.
20            Q.      Okay.  And would you fault the
21     service contractor for agreeing to execute
22     the job?
23            MS. KARIS:
24                    Object to form.
25            THE WITNESS:
```

```
 1                    If the contractor had serious
 2     concerns and didn't walk off the job, I would
 3     have a problem with that.
 4     EXAMINATION BY MR. HILL;
 5          Q.     Okay.  Well, let's talk about
 6     cement that doesn't isolate hydrocarbons.  A
 7     cement job's failure to isolate hydrocarbons
 8     is not an all together uncommon occurrence in
 9     the Gulf of Mexico, is it?
10          A.     I'm not sure what the percentage
11     of failure in primary and cement a job.  But
12     they're -- they're not insignificant.  So
13     you -- particularly in deepwater, you would
14     probably be safest to assume that there's
15     generally a problem or a likelihood of lack
16     of zonal isolation.
17          Q.     Okay.  Is that something that
18     BP, when you were there, taught their well
19     site leaders and their -- their well team
20     engineers?
21          A.     I can't say with certainty in
22     terms of what their -- I think they
23     ultimately brought in a cementing authority
24     to start establishing some guidelines.  I
25     think they had some high-level language in
```

1    the DWOP, but no specific, you know,

2    technical practices or -- or standards

3    anywhere.

4         Q.    Okay, but -- sorry, I didn't

5    mean to cut you off.

6         A.    No.

7         Q.    So in your opinion, though, it

8    would be prudent to assume that you're going

9    to have channeling or other issues that tend

10   to lead to a lack of zonal isolation when you

11   do a cement job until you can confirm

12   otherwise.  Fair?

13        MS. KARIS:

14             Object to form.

15        THE WITNESS:

16             So in relation to -- so as

17   yesterday, once you have a hydrocarbon zone

18   uncovered --

19   EXAMINATION BY MR. HILL:

20        Q.    Right.

21        A.    My perspective and I believe my

22   interpretation of the DWOP is that you must

23   have two confirmed barriers between you and

24   the surface before you allow any relaxation

25   of the hydrostatic head.

1          Q.      Okay.

2          A.      So as -- as we spoke yesterday,

3     they have to be two independent confirmed

4     barriers.

5          Q.      And when you --

6          A.      And there are different methods.

7          Q.      Okay.  And when you say

8     confirmed -- let's say, we're talking about a

9     cement job as a barrier.  Okay.  When you say

10    confirm, what do you have to do to confirm a

11    cement job?

12         A.      Well, there would be one of

13    several ways which would be a

14    positive-pressure test.  There would be the

15    cement bond log, and then there would be

16    interpretation of how the cement placement

17    went and displacement and returns and

18    pressures, modeling, if it matched up with

19    what was expected.

20         Q.      All right.  I want to make sure

21    we're clear.  Do you think that full returns

22    and an indication of lift pressure, even if

23    slight, are sufficient indications to confirm

24    a cement job as a barrier to flow?

25         A.      That's too general for me to

1    really comment on today.

2         Q.    You said one of the ways of

3    confirming a cement job is the barriers

4    running in the cement bond log, correct?

5         A.    That's correct.

6         Q.    Okay.  And, in fact, we looked

7    at an exhibit yesterday -- and you're free to

8    look at it again, it's 2926.  And this was

9    the one where -- it had to do with the

10   MARIANAS and, I believe, the Kaskida.

11              2926, do you have it?

12        A.    Uh-huh (indicating

13   affirmatively).

14        Q.    And the part of this e-mail in

15   the middle that you wrote, I think, Harry,

16   Thierens -- am I pronouncing that correct?  I

17   don't want to --

18        A.    Harry Thierens.

19        Q.    Thierens.  I want to do it

20   justice.

21        A.    Yes.

22        Q.    Okay.  He's given -- he's

23   forwarding on to you information -- excuse

24   me, regarding -- the subject is early heads

25   up on the MARIANAS situation.  And he's

1    recommending that you run a cement bond log

2    because of concerns that there may not be

3    hard cement in the shoe track; correct?

4         A.    That's correct.

5         Q.    And this is at the Na Kika H2

6    well?

7         A.    That's correct.

8         Q.    And one of the things you say

9    is:  "Get the CBL run so we know what we are

10   facing."

11             And in this instance, CBL is the

12   cement bond log, correct?

13        A.    That's correct.

14        Q.    Okay.  Now, I notice you didn't

15   e-mail or call -- or maybe you did -- the

16   cement contractor that actually performed

17   that cement job and ask them whether or not

18   to run a cement bond log?

19        A.    No.

20        Q.    Is that because you felt, as the

21   VP of drillings and completions, that you

22   were completely capable of making a decision

23   as to when a CBL would be run?

24        MS. KARIS:

25             Object to form.

 1          THE WITNESS:

 2                  In this case, there were

 3     indications, based on the placement, that

 4     there was an inadequate cement job.  And,

 5     therefore, the CBL would have been run to

 6     help add information about what we -- well,

 7     the term, what we were facing, and then to

 8     inform -- the next set of decisions, would we

 9     do a remedial cement effort.

10                  It's storm season.  You have to

11     make sure the well's secure.  There's a

12     number of things that you have to be prepared

13     for.  You may have to evacuate the rig in 24

14     or 72 hours.  So the well has to be secure.

15     EXAMINATION BY MR. HILL:

16          Q.     Would you expect your well site

17     leaders or your engineering people supporting

18     those well site leaders, during the time that

19     you were at BP, to have the competency to

20     determine when a CBL should be run?

21          A.     I think the decision to run a

22     CBL would primarily reside with a

23     consultation with the onshore staff and not

24     left entirely with the well site leaders.

25          Q.     Fair enough.  Okay.

```
 1                    And that onshore staff would
 2    help determine if a CBL was appropriate,
 3    correct?
 4         A.     There would be a number of
 5    discussions, yes.
 6         Q.     I mean, you've read the Bly
 7    Report.  I mean, you understand the
 8    situations that occurred -- that were
 9    occurring at Macondo.
10                    Do you have any opinion as to
11    whether or not, given the situations that had
12    occurred, up to the time -- up to the time
13    the cement job -- or just after the cement
14    job occurred, whether or not it would have
15    been prudent in those circumstances to run a
16    CBL?
17        MS. KARIS:
18                    Object to form.
19        MR. STANLEY:
20                    Object to form.
21        THE WITNESS:
22                    In those circumstances, I -- I
23    can't comment because -- you asked me
24    questions about the H2, I would have had deep
25    knowledge of exactly on the day, on the weeks
```

1    preceding.

2            In the case of Macondo, my

3    information is strictly limited to these

4    external reports, which are quite detailed

5    but inadequate to form a firm judgment.

6    EXAMINATION BY MR. HILL:

7        Q.    All right.  Well, I mean, you

8    remember reading that there was some concern

9    about whether or not the float collars had

10   actually converted, right?

11       A.    Yes.  I do.

12       Q.    And you remember reading that

13   the OptiCem modeling that Halliburton had

14   provided to BP predicted channeling, correct?

15       MS. KARIS:

16            Object to form.

17       THE WITNESS:

18            I do recall seeing that, yes.

19   EXAMINATION BY MR. HILL:

20       Q.    And you recall -- you recall

21   that there was no full bottom -- full

22   bottoms-up circulation immediately prior to

23   the cement job, correct?

24       A.    I do.

25       MS. KARIS:

1                    Object to form.

2    EXAMINATION BY MR. HILL:

3         Q.     Given just these three things,

4    would it have been prudent to at least -- or

5    is there at least a question in your mind as

6    to whether or not the cement job was going to

7    effectively isolate hydrocarbons?

8         MS. KARIS:

9                    Object to form.

10        THE WITNESS:

11                   So the only way I can respond is

12   that -- and as much as I did in my

13   presentation, there -- the learnings from

14   blowouts, major catastrophes is always there

15   are some basic mistakes made.

16                   You may conclude in this Macondo

17   case the three things you just alluded to are

18   basic mistakes.  I can't conclude that

19   without detailed interviews, discussions, et

20   cetera.

21                   So my -- my comment would be

22   general nature.  When you have a blowout,

23   there is usually several basic mistakes that

24   are made.

25   EXAMINATION BY MR. HILL:

```
 1            Q.     Somebody with your drilling
 2    experience, with all your awards and, you
 3    know -- it's impressive.
 4                   I'm just trying to figure out,
 5    is there at least a question in your mind
 6    that when a cement job is pumped, it is
 7    predicted to channel, that even that one fact
 8    alone raises a question as to whether or not
 9    you've effectively isolated hydrocarbons?
10         MS. KARIS:
11                   Object to form.
12         THE WITNESS:
13                   On the strict question, if a --
14    if the cement modeling says the cement job is
15    likely to fail, that would raise a question
16    in my mind at that point.
17    EXAMINATION BY MR. HILL:
18            Q.     And at that point, it would be
19    prudent to run a CBL, wouldn't it?
20         MS. KARIS:
21                   Object to form.
22         THE WITNESS:
23                   I wouldn't necessarily agree
24    with that.
25    EXAMINATION BY MR. HILL:
```

```
 1          Q.     Okay.  What would you do to
 2    confirm the cement job?
 3          A.     That would be one option.  The
 4    other alternative is to save the cement --
 5    CBL and set another plug on top of the bottom
 6    plug.
 7          Q.     Okay.
 8          A.     So there are -- there are
 9    several remedies, that depending upon the
10    well conditions and available equipment, that
11    certainly you could try and see.
12          Q.     Okay.
13          A.     CBL would be one option.
14          Q.     Okay.  Fair enough.
15                 But you would agree that you
16    wouldn't rely on the cement at that point as
17    an effective barrier to flow until you've
18    done some confirmation process?
19          MS. KARIS:
20                 Object to form.
21          THE WITNESS:
22                 So there's two parts to that.
23    You -- you've had someone say modeling
24    predicts this.  That alone wouldn't make me
25    make a conclusion about cement integrity.  I
```

1    would have to take all the factors involved

2    and then make a decision, which frankly

3    wouldn't be deterministic.  It would be one

4    based on risk and, say, what's the most

5    prudent course forward?

6    EXAMINATION BY MR. HILL:

7            Q.     Well, let's talk about how you

8    make that decision, because -- I'm going to

9    have two documents.  So I'm going to just

10   tell you what they are.  Because I want to

11   compare them because I'm confused about

12   something.

13           One of them is previously marked

14   Exhibit 760, and it's in your binder at

15   Tab 31.  And this is "The Way We Work"

16   document that was discussed yesterday.

17       MS. KARIS:

18           Did you say Tab 31?

19       MR. HILL:

20           Our Tab, yeah, 31.

21   EXAMINATION BY MR. HILL:

22           Q.     The other one is our Tab 30, but

23   it was previously marked as Exhibit 268, and

24   that's the one that is the local OMS manual

25   that was discussed yesterday.

```
 1                    All right.  I under -- I thought
 2     I understood something.  I'd like you to
 3     confirm that Exhibit 760, "The Way We Work,"
 4     was a document that you actually had
 5     significant input in; correct?
 6          A.     Let me look into it.  Is this
 7     the one that's Jon Sprague and it's dated
 8     May?
 9          MR. STANLEY:
10                    This is at Tab 31.
11          THE WITNESS:
12                    Okay.  So, no, I wouldn't say
13     significant input.  This was -- this was
14     Jon's fulfillment of Harry's and my request
15     to produce at least a starting document to
16     collect the practices, et cetera.
17                    There are, you know, a multitude
18     of collection of things that existed, not all
19     of which did I fully endorse as clear enough
20     or adequate enough.
21     EXAMINATION OF MR. HILL:
22          Q.     All right.  Fair enough.  But
23     you approved this document?
24          A.     Yes.  I believe -- believe so.
25          Q.     Okay.  On the front page, I
```

1    think, down near the bottom right-hand

2    corner?

3         A.    Yes.

4         Q.    And the purpose of this document

5    was to consolidate practices and procedures

6    that were going to apply to operations in the

7    Gulf of Mexico, is that correct?

8         A.    This was the first document

9    effort to attempt to have central standards.

10        Q.    Now, some -- do I understand

11   correctly that some, but not all, of what

12   it's in here then carried forward and became

13   part of the local OMS manual that is marked

14   as Exhibit 268?

15        A.    The intent --

16   MS. KARIS:

17              Object to form.

18   THE WITNESS:

19              -- and I would say I -- I would

20   probably have looked closer at that

21   subsequent document than this other one,

22   because I knew the incompleteness and the

23   quality of it.

24   EXAMINATION BY MR. HILL:

25        Q.    Okay.  What I'd like you to do

```
 1     is, there -- there are appendices to
 2     Exhibit 760, "The Way We Work" document.
 3             A.      Okay.
 4             Q.      And one of those appendices is
 5     Appendix 3, and I will give you a Bates
 6     number, because it would probably be easier
 7     to find it.  It ends in 5010.  It's about
 8     three-quarters of the way back.
 9             A.      Yes.
10             Q.      Are you there?
11             A.      Uh-huh (indicating
12     affirmatively).
13             Q.      And there is a Section 6.4
14     there, decision tree/flow charts.  Do you see
15     that?
16             A.      5003?
17             Q.      5010.
18             A.      5010, okay.
19             Q.      Okay.  Are we on the same page?
20             A.      Uh-huh (indicating
21     affirmatively).
22             Q.      Okay.  After the bullet points,
23     there is a paragraph that says:  "The result
24     of the decision tree must be understood.  You
25     can choose the option that offers the maximum
```

1    possible benefit or the option with the

2    maximum guaranteed benefit in wells

3    operation.  We will always be interested in

4    the option with the maximum guaranteed

5    benefit, the low risk result.  In other

6    words, we choose the strategy for which

7    expected value of the payoff is best."

8               Did I read that correctly?

9        A.    Yes.

10       Q.    Do you agree with this statement

11   as it pertains to the use of decision trees

12   for engineering decisions?

13       MS. KARIS:

14              Object to form.

15       THE WITNESS:

16              No, I do not.

17   EXAMINATION BY MR. HILL:

18       Q.    Why?

19       A.    Because I believe that there was

20   a more comprehensive risk assessment process

21   required, which is why one was developed and

22   that was the one that was presented in

23   November.

24       Q.    Okay.  I'm not talking about

25   comprehensive risk assessment.  I'm talking

1    about the use of decision trees themselves,

2    as a tool for making engineering decisions.

3          A.     Right.

4          Q.     Okay.  Do I understand

5    correctly, that a decision tree basically is

6    used when you don't understand what the --

7    what the outcome necessarily is going to be,

8    or you have to make a decision that's based

9    on more than one possible occurrence?

10         A.     The decision trees are commonly

11   used to attempt to provide some guidance on a

12   decision with uncertainty, and you have

13   estimated probabilities.  There are some

14   circumstances where I don't believe they're

15   appropriate.

16         Q.     What circumstance would those

17   be?

18         A.     Primarily in the areas of well

19   control.

20         Q.     Okay.  And would you -- is a

21   decision regarding whether or not you have an

22   effective barrier to isolation a well control

23   related issue?

24         MS. KARIS:

25               Object to form.

539

```
 1              THE WITNESS:
 2                   It could be related.
 3      EXAMINATION BY MR. HILL:
 4          Q.    Okay.  Would you use a decision
 5      tree to make a decision about whether or not
 6      to run a cement bond log?
 7          MS. KARIS:
 8                   Object to form.
 9          THE WITNESS:
10                   The tool itself could be used
11      in -- in that type of decision.
12      EXAMINATION BY MR. HILL:
13          Q.    Okay.
14          A.       And you would have to decide
15      that -- the critical part is the assignment
16      of probabilities and the assignment of
17      consequences.
18          Q.    Okay.  And so this tool, your
19      opinion, standing alone, is not a robust
20      enough risk analysis to make a decision?
21          MS. KARIS:
22                   Object to form.
23          THE WITNESS:
24                   A simple decision tree in
25      isolation would not be.
```

```
 1   EXAMINATION BY MR. HILL:
 2        Q.     Are you familiar that the
 3   decision at -- in your reading, the decision
 4   to -- as to whether or not to use a cement
 5   bond log was decided with the use of a
 6   decision tree?  Do you remember that?
 7        MS. KARIS:
 8             Objection.
 9        THE WITNESS:
10             No, I don't recall reading that
11   yet for fact.
12        MR. HILL:
13             We need to change the tape.  It
14   will only take a minute.
15        THE VIDEOGRAPHER:
16             We're going off the record.  The
17   time is now 11:02.  This is the end of
18   Tape 2.
19             (Whereupon, a brief recess was
20   taken.)
21        THE VIDEOGRAPHER:
22             Back on the record.  The time is
23   now 11:13.
24   EXAMINATION BY MR. HILL:
25        Q.     Mr. Lacy, prior to the break, we
```

1      were talking about stop-work authority.  I
2      just want to go back to that for a minute.
3                     During any of your safety
4      initiatives at BP, in any of your study
5      groups, did you ever look at whether or not
6      the idea of stop-work authority is well
7      understood and properly executed on rigs, not
8      for personal safety type situations, but in
9      the area of operational decision making?
10         A.     No.
11         Q.     Okay.  Based on our
12     conversation, is it possible that some
13     ambiguity, in terms of the understanding of
14     whether or not stop-work authority is
15     appropriate in this -- in operational
16     decision situations?
17         MS. KARIS:
18                     Object to form.
19         THE WITNESS:
20                     That's possible.  The part that
21     I would add is that in the -- in the area of
22     process safety, there's a lot of subjective
23     issues or conversations or decisions, so that
24     it would be difficult.  Stop-work authority
25     in and of itself is difficult.

1                    People hesitate because they're
2      not sure.  If you're in an area that you're
3      even less sure, it's even more likely that
4      you're going to have difficulty with an
5      effective stop-work authority.  So you have
6      to facilitate that process.
7      EXAMINATION BY MR. HILL:
8          Q.    And -- that's an interesting
9      point.  And to the extent that you've got a
10     service contractor, who is a bit part player
11     on the rig, looking at a particular operation
12     and having visibility only to a part of it,
13     that may, I assume you'd agree, contribute to
14     his hesitancy, not knowing the totality of
15     the operation?
16         MS. KARIS:
17                    Object to form.
18         THE WITNESS:
19                    In -- yeah, I would see that as
20     a possibility of happening.
21     EXAMINATION BY MR. HILL:
22         Q.    We -- we, the lawyers, deposed a
23     man named Paul Anderson who said that when he
24     was on the rig, his understanding or his
25     expectation was had he refused to execute the

```
 1    cement job because BP decided not to
 2    circulate full bottoms up, his expectation
 3    was he would have been dismissed from the
 4    rig, and I think he said:  "I'd be on the
 5    first helicopter back to shore."
 6                  Does that surprise you?
 7         MS. KARIS:
 8                  Object to form.
 9         THE WITNESS:
10                  I -- I really can't say what his
11    view -- I mean, if you're asking me the
12    question, surprise?  Possibly.
13    EXAMINATION BY MR. HILL:
14         Q.    No.  Let's -- would it surprise
15    you if a contractor on the rig had that type
16    of reaction?  Is that consistent or
17    inconsistent with your understanding of how a
18    stop-work authority should be understood?
19         A.    I think those are two very
20    different questions.
21                  Every contractor on location has
22    concerns about saying something and the
23    ramifications of saying something.  I think,
24    as I stated the other day, I believe the well
25    services contractor actually have a fairly
```

```
 1   exceptional safety culture to raise issues.
 2                Grant it, in the area of, you
 3   know, downhole issues that are subjective,
 4   it's -- more difficult.
 5        Q.    And when you say downhole
 6   issues, we're talking about operational
 7   decisions relating to what's going to happen
 8   downhole, right?
 9        A.    The -- yes.
10        Q.    Okay.  And part of that would be
11   whether or not you follow a particular
12   contractor's recommended best practice.
13   Fair?
14        A.    Yes.
15        Q.    Okay.  And so there is some
16   ambiguity as to when in those situations
17   stop-work authority may or may not apply?
18        MS. KARIS:
19                Object to form.
20        THE WITNESS:
21                Again, there is always ambiguity
22   in -- in applying stop-work.
23   EXAMINATION BY MR. HILL:
24        Q.    Do you think it would be worth
25   the industry's effort to create clarity in
```

```
 1    that area?
 2         MS. KARIS:
 3              Object to form.
 4         THE WITNESS:
 5              So in my paper, the intent of
 6    having clear standards is then that anyone --
 7    a well site leader, a regulator, a service
 8    company, a drilling contractor -- can point
 9    to it and say to the other party, this isn't
10    standard.  So it -- it reinforces and, as I
11    say, facilitates the stop-work authority.
12    EXAMINATION BY MR. HILL:
13         Q.   Okay.  Yesterday, you
14    testified -- and I wrote this down.  So I
15    hope I got it accurate.  Tell me if it's not.
16              You said that based on your
17    reading about events at Macondo, decisions
18    were made that were not in conformance with
19    practices and standards that were in place
20    when you were there.
21              Excuse me.  I assume you mean
22    there at BP?
23         MS. KARIS:
24              Object to form.
25    EXAMINATION BY MR. HILL:
```

```
1        Q.     Do you recall saying that?
2        A.     I don't directly remember that
3   quote.  I'm sorry.  The -- if what I can
4   state is that the perspective that I've seen
5   and what's on record is I would say -- and
6   this is where I don't have all the
7   information -- my knowledge of the DWOP as of
8   late 2008 and my interpretation of -- as
9   reported.
10       MR. STANLEY:
11            You mean 2009.
12       THE WITNESS:
13            Well, no.  The DWOP version, the
14  last version I had was 2008.
15            So that version is the one I
16  probably was most familiar with.  So I don't
17  know if it was superceded or if there was
18  another version.
19            But my recall of that and the
20  displacement, without two independent
21  confirmed barriers, that would be my biggest
22  concern of how events unfolded.
23  EXAMINATION BY MR. HILL:
24       Q.     And you're talking about
25  displacing down -- displacing mud down to the
```

1     3,000 feet below mud level?

2          A.     Before setting the second plug.

3          Q.     Okay.  So displacing to

4     seawater?

5          A.     To a hydrostatic head lighter

6     than the reservoir pressure.

7          Q.     Fair enough.  Okay.

8                 And your understanding is, at

9     least according to the DWOPs that were in

10    effect at the type that you were at BP, that

11    that was not compliant with the DWOP?

12         MS. KARIS:

13                Object to form.

14         THE WITNESS:

15                Without it in front of me, I

16    couldn't recall.  This is -- you know, it's a

17    combination of my recall of the DWOP and it's

18    a combination of my industry experience that

19    it's two independent confirmed barriers.

20    EXAMINATION BY MR. HILL:

21         Q.     Okay.

22         A.     There's lots of subjectivity to

23    confirm.

24         Q.     Right.

25         A.     So that's where I think there's

```
1     lots of debate.
2          Q.    Okay.  And you're talking about
3     confirming the integrity of the cement
4     barrier?
5          A.    Correct.
6          Q.    Okay.  All right.
7                You said that you believed that
8     a bottoms-up circulation was a -- was a
9     standard.  Did you mean an industry standard
10    or is that a BP standard?
11         MS. KARIS:
12               Object to form.
13         THE WITNESS:
14               I think the term I used is a
15    common practice --
16    EXAMINATION BY MR. HILL:
17         Q.    Okay.
18         A.    -- found in primary cementing
19    basics.
20         Q.    Do you know if BP had any such
21    best practice or codified best practice about
22    how much mud to circulate prior to the cement
23    job?
24         A.    I recall there was a section in
25    DWOP about zonal isolation and I -- but I
```

549

1    don't recall if there was a specific section
2    on -- on the procedures.
3        Q.    All right.  I wanted to --
4    yesterday, you were ask questioned about a
5    document related to Sperry-Sun.  I think I
6    got it here.  Yeah.  If you'd look at
7    Exhibit 2927.
8        MS. KARIS:
9            Is it attached?
10       MR. HILL:
11           Yeah, it is.  Tab 16.
12       THE WITNESS:
13           Okay.
14   EXAMINATION BY MR. HILL:
15       Q.    Go ahead, if you need to, feel
16   free to take a minute to refresh yourself on
17   it.
18       A.    Okay.
19       Q.    And I think you testified
20   yesterday, or you clarified for us yesterday
21   that the issues addressed here pertain to
22   failures of particular equipment that
23   Sperry-Sun was providing, correct?
24       A.    Specifically, downhole
25   measurement and well drilling, logging and

1    well drilling tools.

2         Q.     Okay.  And this is not the

3    monitoring --

4         A.     No.

5         Q.     -- well monitoring services;

6    correct?

7         A.     That is correct.

8         Q.     All right.  Now, were you around

9    when the GBR, the global business review

10   between Halliburton and -- yeah, Halliburton

11   and BP occurred at the end of 2009?

12        A.     Which -- we had a -- if you're

13   talking about the global business review, I

14   would have to know the date of that.

15        Q.     Well, were you involved in any

16   discussions between the parties at a high

17   executive level regarding this particular

18   issue?

19        MS. KARIS:

20             Object to form.

21        THE WITNESS:

22             Again, without knowing which

23   dates they were discussing.  I mean, this --

24   this particular, what would be referred to

25   as, product service line, measurement while

1    drilling and logging while drilling, was

2    always a topic with all three primary

3    companies -- Schlumberger, Halliburton, Baker

4    Hughes.

5    EXAMINATION BY MR. HILL:

6         Q.    Okay.

7         A.    It's a common problem, and,

8    frankly, none of the companies distinguish

9    themselves in terms of service quality.  They

10   vary a fair amount.

11        Q.    Okay.  But you don't know -- you

12   don't even know if contractual provisions and

13   agreements were made in order to resolve this

14   issue?

15        A.    I can't say that.

16        Q.    Okay.  But what you do know is

17   this has nothing to do with the monitoring

18   services that Sperry provided on the

19   DEEPWATER HORIZON; correct?

20        A.    This e-mail has nothing to do

21   with monitoring, yes.

22        Q.    Okay.  Could you please turn

23   to -- this is Tab 37 in my binder.

24        A.    2937?

25        Q.    It's not going to be -- it's

```
 1     actually going to be -- he'll hand it to you.
 2     It's 37 in your binder.
 3                    (Exhibit No. 2949 marked for
 4     identification)
 5          MR. HILL:
 6                    I'm going to mark this as
 7     Exhibit 2949, and pass that over to you.
 8     EXAMINATION BY MR. HILL:
 9          Q.     And feel free to look at it.
10     What I'd like to do is just ask you quickly
11     about one of the bullet points on the Puma 4
12     Key Risks page, which is about five -- it's
13     on 3950.
14          A.     Okay.  And 3950?
15          Q.     Yeah.
16          A.     Okay.  If you'll just give me a
17     moment to look.  3950?
18          Q.     Yeah.
19          A.     Okay.
20          Q.     But before we do that, let's
21     make sure the Court understands what the
22     document is.
23                    This is an e-mail chain that was
24     kicked off by Harry Thierens and sent to
25     several people.  And it was eventually
```

1    forwarded to you by Ian Little; correct?

2         A.      That's correct.

3         Q.      And dated December 16th, 2008,

4    and has an attachment, 2009, GOM ENA risk.

5    It looks to be a PowerPoint file, correct?

6         A.      That's correct.

7         Q.      Okay.  And it says:  "Attached

8    is the summary of the key risks for my 2009

9    plan presentation."

10              What is your understanding of --

11   of what information is being conveyed in the

12   PowerPoint that's attached here?

13        A.      The origination of Harry's

14   request was part of an ongoing dialogue he

15   and I about having sight of the primary risks

16   and having approaches to mitigate those risks

17   and know that they were visible to himself

18   and myself.

19        Q.      Okay.

20        A.      And this presentation is one

21   from Ian Little that I'm sure he collaborated

22   on relative to the wells that would be under

23   his -- Harry's responsibility for 2009.

24        Q.      I want to ask you, just because

25   I've seen this before, I'd like to understand

1    what it means.

2              On the page that ends in 3950,

3    it says:  Puma 4 key risks.  One of the

4    things it says, the second bullet point

5    there, is pressure regression --

6         A.    Yes.

7         Q.    -- and potential for incorrect

8    11 by 7/8th casing point; right?

9         A.    Right.

10         Q.    Can you explain what pressure

11    regression is?

12         A.    This would be a downhole

13    pressure profile that would be increasing,

14    and then the regression you referred to, as

15    you went deeper, you're incurring -- you're

16    incurring a reversal or a regression of

17    pressure.

18              So you could drill into a

19    formation that then you would lose returns.

20    Because the hydrostatic head -- the pore

21    pressure or the frac gradient pore pressure

22    would be less than what you had just drilled

23    through.

24         Q.    Okay.  So let me make sure I

25    understand this.

```
 1                 So, for example, when you drill
 2      into an area and as you go deeper -- say, for
 3      example, we got to the end of the production
 4      interval, as you go deeper, the pore
 5      pressures for the sands in that interval
 6      actually decrease in pore pressure?
 7           A.     The -- yes.
 8           Q.     Okay.
 9           A.     That would be pressure
10      regression, yes.
11           Q.     Okay.  And what -- what risk
12      does that present other than -- are there
13      other risks other than what you said, the
14      potential for loss returns?
15           A.     So the risk is to drill into
16      this zone of lower pressure to lose returns,
17      which effectively loses your -- what is --
18      what is referred to as your active barrier
19      during drilling, which would be the
20      hydrostatic column of the drilling mud, and
21      that could risk a shower formation flowing, a
22      kick.  So you could lose returns, lose your
23      column, and take a kick.
24           Q.     So the risk would be that the
25      higher pressured sands higher in the interval
```

1    would flow?

2         MS. KARIS:

3              Object to form.

4         THE WITNESS:

5              If you had a formation that was

6    higher, capable of flowing, either fresh

7    water or saltwater hydrocarbons, that would

8    be a risk.

9    EXAMINATION BY MR. HILL:

10        Q.    And for purposes of well

11   control, it doesn't matter if the formations

12   that you're drill -- or the sands that you're

13   drilling through are hydrocarbon bearing;

14   does it?

15        MS. KARIS:

16             Object to form.

17        THE WITNESS:

18             For -- no.  That wouldn't be

19   correct.  The difficulty of handling an

20   influx varies greatly on whether it's a fluid

21   or a gas.

22   EXAMINATION BY MR. HILL:

23        Q.    Okay.  But let's say a brine or

24   a water.

25        A.    Freshwater, a brine water, dead

1    oil, low gas oil, ratio oil would behave

2    much the same in terms of handling the

3    calculations and the -- the well control,

4    stabilization.

5         Q.    So for determining well control,

6    you wouldn't ignore higher pressure sands in

7    a production interval just because they are

8    brine, would you?

9         A.    No --

10   MS. KARIS:

11            Object to form.

12   THE WITNESS:

13            -- absolutely not.

14   EXAMINATION BY MR. HILL:

15        Q.    All right.  And you said, so

16   there's a risk of loss -- with respect to

17   pressure regression, There's a risk of loss

18   returns.  There's a risk of shallower

19   formations flowing or kicking.

20            Any other risks?

21   MS. KARIS:

22            Object to form.

23   THE WITNESS:

24            Well, it's -- it's -- the risk

25   is not just the incident, but your degree of

1     probability of success to control the

2     incident.

3     EXAMINATION BY MR. HILL:

4          Q.     Okay.

5          A.     Because if you have two

6     formations of greatly different pressure

7     exposed at the same time, as you try to

8     control the higher pressure one, you lose

9     returns in the lower pressure one.  And

10    effectively, it's very difficult to kill.

11         Q.     I wish I had the realtime

12    transcript because what you just said -- what

13    does it mean?  I mean how big of a magnitude

14    of difference between those two -- those two

15    pore pressures matter?

16                I mean, is there -- is there a

17    standard?

18                For example, is it one ppg?  Is

19    it one and a half ppg?  Does that variation

20    between sands, in this pore pressure

21    regression, matter for purposes of

22    determining how to -- how to control any kick

23    that arises out of it?

24         MS. KARIS:

25                Object to the form.

```
 1          THE WITNESS:
 2                  Well, it's really too general.
 3     I mean, it's -- it's -- there have been cases
 4     where these situations are managed safely,
 5     because this is always a possibility.  It's
 6     not a common one, but it's a possibility
 7     and -- and they can be managed.
 8     EXAMINATION BY MR. HILL:
 9          Q.     Is a pore pressure regression of
10     1.5 ppg in a production interval considered
11     severe?
12          MS. KARIS:
13                  Object to form.
14          THE WITNESS:
15                  I would say that that would be
16     one that I would pay close attention to, for
17     lack of a better term.
18     EXAMINATION BY MR. HILL:
19          Q.     Thank you.  Just give me one
20     second.  I may be able to wrap up here.
21                  We were talking about the
22     decision tree, and I just want to make sure I
23     understand your testimony.
24                  I asked you if you agreed with
25     the statement, and you said you didn't,
```

```
 1    right?

 2         A.     Uh-huh (indicating

 3    affirmatively).

 4         Q.     Why -- the statement basically

 5    says, and I'm paraphrasing:  That given two

 6    alternatives, we prefer the lowest risk

 7    alternative.

 8               Is that a fair statement of --

 9    of the summary?

10         A.     Lowest risk, assuming you can

11    assess the risk.

12         Q.     Okay.  So I just want to make

13    sure that -- when you said, I don't agree

14    with that statement, were you saying that you

15    don't agree with the use of the decision tree

16    as the risk assessment tool for a particular

17    decision, necessarily, or are you saying --

18    or you're just not -- you're not agreeing

19    with that statement if you decide to use a

20    decision tree?

21         MS. KARIS:

22               Object to form.

23         THE WITNESS:

24               Okay.  To clarify --

25    EXAMINATION BY MR. HILL:
```

1          Q.     Yeah.

2          A.      -- a decision tree is a -- is a

3     fairly simplistic tool.  And you -- it relies

4     on accurate estimations of risk, which is

5     probability and consequence.

6               Not all situations are

7     appropriate to apply an estimate of

8     probabilities, because you want, you know,

9     zero risk, and there are challenges to

10    people -- I believe one of the learnings from

11    Texas City is it's very difficult to apply

12    quantitative risk assessment to certain

13    situations where you just have to assume no

14    risk is acceptable.

15               So it's in -- my statement about

16    this tool wouldn't always be appropriate, as

17    there are some situations where quantitative

18    risk assessment and decision trees would not

19    be appropriate.

20    EXAMINATION BY MR. HILL:

21         Q.    Okay.  Fair enough.  Now, I

22    think I understand.

23               Now, I'd like to take you to a

24    decision where there's actually a decision to

25    use the decision tree.  All right.

1              So let's assume you're using the

2    decision tree.  In the use of that tree,

3    would you agree that you want to choose the

4    least risky alternative?

5         MS. KARIS:

6              Object to form.

7         THE WITNESS:

8              So, the decision tree is a tool

9    I would start with, and the end point would

10   commonly be called, you know -- the preferred

11   end point would be the least risky

12   alternative.  But least risky is very

13   subjective.  Therefore, I don't know if

14   that's the correct answer --

15        Q.     Right.

16        A.     -- based on the risk assessment.

17        Q.     So you might want to do a more

18   robust risk assessment other than just the

19   decision tree?

20        A.     The decision tree would be where

21   I'd start and then, depending on the

22   situation, certain level of expertise,

23   debate, et cetera.

24        Q.     Okay.  When you were at BP, one

25   of the things that you were trying to do, I

1    think I understand, is collecting written

2    procedures and -- and things that would help

3    operationally out on the rig, correct?

4         A.    That was the end goal.

5         Q.    And one of those -- would I

6    assume that that effort, had you continued at

7    it, would have been actually writing --

8    getting written documentations for critical

9    procedures that are conducted on the rig?

10        A.    My intent would be ultimately to

11   have identified what we considered critical

12   procedures and then to write a common

13   standard, which you also have to take into

14   account the wide variety of wells.

15        Q.    Sure.

16        A.    So, there's -- you know, there's

17   different well types, even within deepwater.

18   But that would have been an intent.

19        Q.    Would you consider a negative

20   test a critical procedure?

21   MS. KARIS:

22             Object to form.

23   THE WITNESS:

24             Yes, I would.

25   EXAMINATION BY MR. HILL:

1          Q.     And is that -- why?  Why is

2     that?

3          A.     It's part of a confirmation of a

4     barrier.

5          Q.     Okay.  And, in fact, most

6     negative tests intentionally under-balance a

7     well; correct?

8          A.     With well control in place.

9          Q.     Right.  How about operational

10    decision, such as how much mud to circulate

11    prior to the cement job?

12         MS. KARIS:

13              Object to form.

14         THE WITNESS:

15              I would expect that to be a --

16    you know, a recommended practice, and

17    differentiate from, say, a critical practice

18    where some things would be mandatory and some

19    things would be advisable.

20    EXAMINATION BY MR. HILL:

21         Q.     Okay.  And to the extent it's

22    mandatory, you'd have to get -- you'd have to

23    get some type of dispensation to deviate from

24    it?

25         A.     Or approach.  And I believe this

1    was what BP was attempting to achieve, was

2    establishing defined independent engineering

3    authorities.  And so in the case of failure

4    to comply with an agreed procedure, there

5    would be an independent review by an

6    engineering authority.

7              In our case, we utilized Jon

8    Sprague in that role.  And then -- and

9    ultimately, Harry Thierens would be the final

10   authority to judge if John's decision was

11   good or not, if the person didn't agree with

12   it.

13        Q.    All right.  Very good.

14        MR. HILL:

15              That's all the questions I have.

16   I appreciate your time.

17        THE VIDEOGRAPHER:

18              Going off the record, the time

19   is now 11:35.

20              (Whereupon, a brief recess was

21   taken.)

22        THE VIDEOGRAPHER:

23              I back on the record.  The time

24   is now 11:41.

25   EXAMINATION BY MR. NEGER:

```
 1          Q.     I think there's still a few
 2     minutes left in the morning.  So good
 3     morning, Mr. Lacy.
 4          A.     Good morning.
 5          Q.     My name is Peter Neger and,
 6     together with Daren Stanaway, I represent
 7     Anadarko Petroleum Corporation.
 8          A.     Okay.
 9          Q.     And one of the problems with
10     going at this point in the -- in the
11     proceeding is that many of the questions or
12     most of the questions have already been
13     asked, and so I've got to jump around a
14     little bit sometimes.
15          A.     Okay.
16          Q.     And so please bear with me.
17                 Now, sir, you understand that
18     Anadarko Petroleum Corporation and MOEX
19     Offshore 2007, LLC, were nonoperating
20     investors in the lease for the Mississippi
21     Canyon 252, is that right?
22          A.     I'm aware of that.
23          Q.     Okay, good.  And prior to the
24     explosion and fire at the Macondo well in
25     April 2010, is it fair to say that you had no
```

1    communications with Anadarko personnel

2    regarding the Macondo well?

3         A.     That would be correct.

4         Q.     And to your knowledge, sir, did

5    he Anadarko play any role in the design of

6    the Macondo well?

7         A.     I don't believe so, but I can't

8    say with certainty.

9         Q.     To your knowledge, is it fair to

10   say that Anadarko made no decisions regarding

11   the design of the Macondo well?

12        MS. KARIS:

13             Object to form.

14        THE WITNESS:

15             Again, I --

16   EXAMINATION BY MR. NEGER:

17        Q.     To your knowledge?

18        A.     The original design occurred

19   while I was there; the subsequent design,

20   not.  And I -- I'm not sure of Anadarko's

21   involvement in either one of those.

22        Q.     But you're not aware --

23        A.     No, I'm not.

24        Q.     -- that Anadarko participated in

25   the design of the Macondo well; is that

568

1      right.

2             MR. STANLEY:

3                    You got to wait till he finishes

4      the question and then you answer.

5      EXAMINATION BY MR. NEGER:

6             Q.     That's both for your purposes

7      and also for the court reporter who's got to

8      take it down.  If we speak simultaneously, it

9      becomes a jumble.

10                   And you had never heard anybody

11     tell you that Anadarko was involved in any

12     way in the design of the Macondo well, have

13     you?

14            A.     No, I have not.

15            Q.     And to your knowledge, did

16     Anadarko play any role in the operation of

17     the Macondo well?

18            A.     To my knowledge, no.

19            Q.     And similarly, to your

20     knowledge, is it fair to say that Anadarko

21     played -- made no decisions in respect of the

22     operation of the Macondo well?

23            A.     To my knowledge, no.

24            Q.     And have you ever heard anyone

25     say that Anadarko was in any way involved in

```
1        the operation of the Macondo well?

2             A.     I don't recall that.

3             Q.     Now, did you, while you were at

4        BP, participate in any discussions concerning

5        the nature or extent of the information to be

6        supplied to Anadarko or MOEX by BP regarding

7        the Macondo well?

8             A.     No, I did not.

9             Q.     And do you recall any -- hearing

10       anything about any discussions regarding the

11       nature and extent of information to be

12       supplied to Anadarko or MOEX regarding the --

13            A.     No --

14            Q.     -- well?

15            A.     -- I don't recall any.

16       MS. KARIS:

17                   Object to form.

18       EXAMINATION BY MR. NEGER:

19            Q.     Do you recall any discussion

20       regarding the nature or extent of any

21       information to be provided to Anadarko or

22       MOEX regarding damages sustained by the

23       MARIANAS rig in November of 2009?

24            A.     I recall discussions of

25       estimates, but I don't recall who would be
```

1    involved, et cetera.  I seem to recall

2    knowing that one of the partners signed up

3    right at the time of the storm or something

4    like that.  I would have had a conversation

5    with Dave Rainey and Jay Thorseth relative to

6    the storm costs and so forth.

7         Q.    What do you recall about those

8    conversations, if anything?

9         A.    All I recall is making the

10    operational decisions to suspend the well,

11    getting the information from Transocean on

12    the extent of the damage to the MARIANAS, and

13    concluding that it was not likely that we

14    could bring the well back -- or the rig back

15    in time to restart the well before the

16    contract ended.  And then all the

17    communication with partners would have been

18    handled through the exploration group.

19         Q.    I'm going to shift topics.  We

20    talked a little bit this morning and

21    yesterday extensively about your departure

22    from BP.  And forgive me if these questions

23    have been asked already.  I'm not sure that

24    they have been.

25              But as I understand it,

1    subsequent to your conversation with

2    Ms. Yilmaz and Mr. McIntyre, the only other

3    people who you spoke to at BP regarding the

4    circumstances of your departure were a brief

5    conversation with Mr. Dupree, is that right?

6         A.    So the first conversation about

7    a departure would have been with

8    Ms. Yilmaz -- Ms. Yilmaz and Paul McIntyre.

9         Q.    Right.

10        A.    Then there was this subsequent

11   conversation with James Dupree shortly

12   thereafter.  So there was maybe a span of

13   three weeks between their meeting and my

14   ultimate departure.  So that discussion would

15   have occurred probably somewhere -- it was

16   after I came back from the Thanksgiving

17   break.

18        Q.    Okay.  And you never had any

19   conversation with Mr. Inglis about it?

20        A.    No.

21        Q.    Circumstances?

22        A.    No.

23        Q.    Or with Mr. Suttles?

24        A.    No.

25        Q.    How about Mr. O'Bryan himself?

    1           A.      I had --

    2           Q.      A transition discussion?

    3           A.      So I had a brief telephone

    4    conversation with Pat, setting up a schedule

    5    or a plan for hand-over discussion in my last

    6    week at BP.  And I believe we had a -- I'm

    7    going to say it's a one-hour meeting where I

    8    handed over my materials and files and gave

    9    him what I thought were the most significant

   10    in priorities.

   11           Q.      And what did you tell him were

   12    the most significant priorities?

   13           A.      I don't have that document in

   14    front of me.  I listed, you know, the things

   15    that I was either most concerned about

   16    because of urgency or decisions that had to

   17    be made, or the most impactful issues that

   18    he'll have to deal with.

   19           Q.      And were these specific,

   20    issue-action items, if you will, that

   21    required immediate attention or were

   22    these more in the nature of broad concepts?

   23           A.      They would have been both.  They

   24    would have been both.

   25           Q.      And was the discussion -- did

1    you discuss the topic of process safety with

2    Mr. O'Bryan during the course of that

3    meeting?

4         A.    I'm sure safety was on one of

5    the ten bullet points.  It would -- it would

6    be unlike me not to have a conversation on

7    that.

8         Q.    That's what I kind of figured.

9               And do you recall anything more

10   specific about the nature of that portion of

11   the conversation?

12        A.    No, I don't.

13        Q.    Did you get the impression that

14   Mr. O'Bryan, during that conversation, was --

15   believed that process safety was as important

16   a concept as you?

17        MS. KARIS:

18               Object to form.

19        THE WITNESS:

20               I -- I would not have gotten

21   that from that conversation.  It was of a

22   short duration, and the topic of process

23   safety or well control, I don't believe, came

24   up.  Most of my views of Mr. O'Bryan come

25   from my previous association when I was the

1    head of discipline.

2    EXAMINATION BY MR. NEGER:

3         Q.    Did you ever form a judgment as

4    to whether or not Mr. O'Bryan felt as

5    strongly about the concept of process safety

6    within BP as you did?

7         MS. KARIS:

8              Object to form.

9         THE WITNESS:

10             I couldn't form an opinion on

11   process safety without discussion with him on

12   process safety.  We did have conversations

13   around personal safety in my -- in my

14   previous role.

15   EXAMINATION BY MR. NEGER:

16        Q.    But none --

17        A.    None directly in the hand-over

18   part.

19        Q.    And none specifically about

20   process safety as opposed to personal safety?

21        A.    Uh-huh (indicating affirmative).

22        Q.    I realize that there was a --

23        A.    Right.  No.

24        Q.    -- a blurred line between them,

25   but --

```
 1            A.      No.  Correct.
 2            Q.      Okay.  Did you have any
 3    discussion with any executives in BP's London
 4    offices regarding the circumstances of your
 5    departure?
 6            A.      No, I did not.
 7            Q.      And I think that -- again, I
 8    apologize if this is a repetitive question.
 9                    Is it fair to say that there was
10    nothing about your separation agreement with
11    the company which limits your ability to
12    comment or testify freely and truthfully
13    regarding your experiences at BP and your
14    judgments regarding BP's commitment to
15    process safety?
16            A.      No, there's no -- nothing I
17    would interpret in the separation agreement
18    nor guidance that I've gotten.
19            Q.      Okay.  In volume one of the
20    binders in front of you, I'd ask you to turn,
21    please, to Tab 2?
22            A.      (Complying).
23            Q.      And this is a version, I think,
24    of your -- the paper you co-authored with
25    Mr. Pritchard, is that right?
```

```
 1            A.    That's correct.
 2       MR. NEGER:
 3            And I know that another version
 4  of it was marked yesterday, but because this
 5  is the one that I had, and this is the one
 6  that's in our binder, I'm going to mark it
 7  again as Exhibit 2950.
 8       THE WITNESS:
 9            Okay.
10            (Exhibit No. 2950 marked for
11  identification.)
12  EXAMINATION BY MR. NEGER:
13       Q.    You can look at the one that's
14  in the binder.
15       A.    Okay.
16       Q.    Now, if you would, turn, please,
17  to Page 3, the very first paragraph, the
18  report states that:  "There is an industry
19  need to better assess risks and monitor well
20  operations, in addition to standardizing the
21  design of complex deepwater wells."
22            Do you see that?
23       A.    I read that correctly.
24       Q.    Okay.  Do you believe that the
25  Macondo incident resulted, at least in part,
```

1    from a failure of risk assessment?

2         MS. KARIS:

3              Object to form.

4         THE WITNESS:

5              All I can say is that the words

6    here are Mr. Pritchard's words, and I would

7    agree with these words.

8    EXAMINATION BY MR. NEGER:

9         Q.    Okay.

10        A.    I can't -- this is in light of

11   the blowout.  I can't say with certainty

12   about the Macondo blowout.

13        Q.    Okay.  Do you believe that the

14   Macondo incident resulted, at least in part,

15   from a failure to monitor well operations?

16        MS. KARIS:

17              Object to form.

18        THE WITNESS:

19              The -- what I can say is that I

20   have in -- in what's been published, there

21   are questions about their monitoring well

22   operations.

23   EXAMINATION BY MR. NEGER:

24        Q.    And what questions do you have

25   in your mind about the failure to monitor

```
 1    well operations at Macondo?
 2          A.    I have tried not to form an
 3    opinion on Macondo, to have more of a forward
 4    looking view and it's -- because I'm just not
 5    privy to enough details.
 6          Q.    Why is it that you've made a, I
 7    guess, decision in your own mind not to form
 8    a judgment about what happened at Macondo?
 9          A.    Well, I -- the judgment or, I
10    guess, the decision not to form a firm
11    judgment is because I have incomplete
12    information.
13          Q.    You've read the Bly Report?
14          A.    Uh-huh (indicating
15    affirmatively).
16          Q.    You've read the Presidential
17    Commission Report?
18          A.    Correct.
19          Q.    You have -- do you follow -- did
20    you follow the stories in the media regarding
21    the incident?
22          A.    Yes, I did.
23          Q.    And you've got obviously several
24    years of involvement and experience within BP
25    itself, correct?
```

1          A.     Uh-huh, that's true.

2          Q.     And many, many years of

3     experience in the drilling industry --

4     deepwater drilling industry, right?

5          A.     Right.

6          Q.     So I would assume that there's

7     some natural curiosity in your own mind as to

8     what happened and judgments that -- or

9     impressions that you formed about what

10    happened in this incident.  No?

11         MS. KARIS:

12              Object to the form.

13         MR. STANLEY:

14              Object to the form.

15         THE WITNESS:

16              Yes.  As a drilling

17    professional, and regardless of who the

18    blowout occurs, as an operator, I have a

19    responsibility to respond to my management to

20    assure them that similar issues have been

21    dealt with and those things under my

22    accountability.

23    EXAMINATION BY MR. NEGER:

24         Q.     Okay.  And have you had

25    discussions with your own management, the

1    management of your current employer,

2    regarding the circumstances of the Macondo

3    blowout?

4         A.    Not the exact circumstances.

5    We've had general discussions by taking

6    what's been published and having a discussion

7    about the -- those insights, be it from the

8    Bly Report or the Presidential Commission.

9         Q.    And what discussions have you

10   participated in with your management

11   regarding that subject?

12        A.    We've -- we've talked about our

13   well control policies, our practices and

14   expectations of our well site leaders, the

15   certifications of blowout preventers,

16   everything we could think of that we wanted

17   to verify or assure so that there's the least

18   possible risk that we may have any exposures.

19        Q.    What lessons have you learned

20   from what you've read concerning Macondo that

21   you have sought to apply to your current

22   position?

23        MS. KARIS:

24             Object to the form.

25        THE WITNESS:

1                The -- again, I -- I know what's
2      published, and I can take that information in
3      a very generic way, because there are -- I
4      would say there's two common areas.  One
5      would relate to well control, and one would
6      relate to, you know, organizational, personal
7      behaviors that have common themes and
8      catastrophes.
9      EXAMINATION BY MR. NEGER:
10          Q.    And what have you learned
11     about -- from the published literature and
12     from the -- your own experience about well
13     control at Macondo that has informed what you
14     have done at your current employer?
15          MS. KARIS:
16                Object to the form.
17          THE WITNESS:
18                I have learned nothing new,
19     nothing that I wasn't already aware of, and
20     my efforts have been, because I'm in a new
21     company, to just validate and verify what I
22     know is good practice and assure that we have
23     that in place.
24     EXAMINATION BY MR. NEGER:
25          Q.    And what about personal

1   behavior?  Is there any -- is there anything
2   that you've observed from the literature and
3   from your own experience at BP that you
4   believe is instructive in terms of making
5   sure that your own -- your current employer
6   doesn't experience a similar catastrophe?
7         MS. KARIS:
8               Object to form.
9         THE WITNESS:
10              From the Macondo blowout, I
11  can't say there's a direct learning.
12  Because, again, these would have been -- I
13  would have had to have been subject to
14  conversations, all the e-mails, you know.  So
15  I -- that's an area I certainly can't
16  conclude and then say, this is a direct
17  learning from Macondo.
18  EXAMINATION BY MR. NEGER:
19        Q.    But are there things that you
20  have -- have learned from reading the Bly
21  Report or reading the Presidential Commission
22  Report or reading other media reports
23  concerning what happened at Macondo that you
24  have said in your own mind, gee, these are
25  things that I want to make sure we do not

1    replicate in our new -- in our company?

2         A.    I've not seen -- I can't even

3    recall seeing definitive statements about

4    personal actions or decisions or behaviors to

5    take learning from.  So I just apply what I

6    know in my experience and, frankly, use

7    Macondo more as a reinforcement of a

8    possibility as opposed to here's bad

9    practice.

10        Q.    Here's what -- here's something

11   bad that can happen if we don't --

12        A.    Correct.

13        Q.    -- if we're not vigilant?

14   MS. KARIS:

15             Object to form.

16   THE WITNESS:

17             It is -- it's extremely helpful

18   to sensitize management to the possibility.

19   EXAMINATION BY MR. NEGER:

20        Q.    Again, at page three of the

21   document in front of you, Exhibit 2950 -- I'm

22   sorry.  Page 4, the second paragraph there.

23             The report states that:  "In

24   hindsight, there is absolute evidence many

25   decisions were not consistent with the true

1    risks and the potential consequences."

2              Do you see that?

3         A.    Yes, I do.

4         Q.    Okay.  Are you aware of any

5    decisions made at Macondo that were not

6    consistent with the true risks and the

7    potential consequences?

8    MS. KARIS:

9              Object to form.

10   THE WITNESS:

11             This statement says, in

12   hindsight, and absolute evidence means a

13   blowout has occurred, and in the public

14   record there are many statements and many

15   reports about a multitude of decisions which

16   one can conclude didn't work.

17             So in light of that, you can

18   state having a blowout -- a blowout's

19   occurred.  That's evidence.

20   EXAMINATION BY MR. NEGER:

21        Q.    Right.

22        A.    That there was -- as I stated

23   yesterday, in all major catastrophes, there

24   will be evidence of basic mistakes.  I don't

25   have direct knowledge of --

585

```
 1          Q.      What those mistakes --
 2          A.      What those mistakes would be.  I
 3   can conclude, given what we know about major
 4   disasters in process safety, there were --
 5   there were likely basic mistakes.
 6          Q.      If you'd turn to Page 7.
 7          A.      (Complying).
 8          Q.      I think this was the topic that
 9   was discussed a bit yesterday.
10                  The -- the paper advises that
11   complex deepwater drilling operations must
12   not be schedule driven.
13                  Do you see that in the third
14   paragraph?  It's the second sentence --
15          A.      Oh, yes.
16          Q.      -- of the third paragraph.
17          A.      Yes, yes.
18          Q.      And did I read that correctly?
19          A.      Yes.  I believe that's
20   attributable to Mr. Cunha, I believe.
21          Q.      I believe that the footnote
22   may well --
23          A.      It doesn't look like it's there.
24   I believe that comment --
25          Q.      Actually, it is at the back --
```

```
 1    actually it's Mr. Pritchard at the back.
 2         A.    Okay.  It's either Mr. Pritchard
 3    or Mr. Cunha.
 4         Q.    Okay.  But we discussed
 5    yesterday about the impact of schedule on --
 6    on drilling operations, right?
 7         A.    Right.
 8         Q.    Do you believe that drilling
 9    operations at the Macondo well were schedule
10    driven, based upon your experience before you
11    left BP?
12         MS. KARIS:
13              Object to the form.
14         THE WITNESS:
15              I can't conclude that.
16    EXAMINATION BY MR. NEGER:
17         Q.    Now, you stated in your
18    presentation at the SPE conference, which is
19    quoted in the report at Page 8, that:  "The
20    'elephant in the room' is all the mixed or
21    unintended messages we send the crews when we
22    are behind schedule, over costs, or behind on
23    production."
24              Do you recall that?
25         A.    I do.
```

```
 1          Q.     Okay.  And you discussed this
 2     excerpt yesterday, I think, with Mr. Watts.
 3                Do you believe that managers at
 4     BP gave mixed or unintended messages to the
 5     crew of the DEEPWATER HORIZON to rush the
 6     completion of the Macondo well, because the
 7     well was behind schedule and over costs?
 8          A.     I cannot conclude or state to
 9     that effect.  That was --
10          Q.     You don't --
11          A.     -- after my departure.
12          Q.     Are you aware of any instances
13     in which managers at BP gave mixed or
14     unintended messages to the crew of a
15     deepwater rig to rush the completion of the
16     well on which they were engaged because the
17     well was behind schedule or running over
18     anticipated costs?
19                That's setting Macondo aside in
20     your experience.
21          A.     In -- in my tenure and during my
22     time frame, it's unlikely a week went by
23     where we didn't have a discussion about
24     schedules, particularly rig schedules, and
25     staying on schedule.
```

1          And so this statement and my

2     view is that we will also have those

3     conversations.  It's important to make sure

4     that the crews don't misinterpret the fact

5     that schedules are important or cost

6     important and that they take precedent.

7          Q.     And can you think of any

8     specific instances in which those unintended

9     messages may, in fact, have been conveyed and

10    resulted in, if not a blowout, in some other

11    result which was inconsistent with risk?

12         MS. KARIS:

13               Object to form.

14         THE WITNESS:

15               I cannot recall having that

16    concern in my time there.  There, again, are

17    always conversations about costs, and my role

18    would have been to keep those from being

19    misinterpreted or distracting.

20    EXAMINATION BY MR. NEGER:

21         Q.     You further stated in your

22    presentation, SPE, that:  "If we don't

23    clearly keep personal and process safety as

24    an unyielding value in our words and, more

25    importantly, visible behaviors and decisions,

```
 1    we ultimately will not withstand the risk or
 2    test of time and will certainly suffer a
 3    fatality or a major incident."
 4              Right?
 5       A.    That's correct.
 6       Q.    Okay.  Do you believe that
 7    managers at BP who were responsible for the
 8    Macondo well failed to keep personal and
 9    process safety as unyielding values in their
10    words and their visible behaviors and
11    decisions?
12       A.    Yeah, I cannot.  I can't answer
13    accurately.
14       Q.    Because -- because --
15       A.    It occurred after I left.
16       Q.    Well, the well was spudded while
17    you were still at BP, right?
18       A.    Correct.
19       Q.    And so between the time that the
20    well was spudded or, for that matter -- let
21    me take a step back.
22              Planning for the well occurred
23    long before it was spudded, correct?
24       A.    That's correct.
25       Q.    Do you remember when planning
```

1    for the Macondo started?

2         A.    Yeah.  I would have said it

3    probably started in early '09, if not, before

4    then.

5         Q.    So you were present at BP and in

6    a managerial position for at least a year,

7    almost two years during which --

8         A.    Almost two years.

9         Q.    -- work on Macondo was ongoing,

10   right?

11        A.    I was there from February 2008

12   to December of '09, yes.

13        Q.    And what personal involvement

14   did you have in the planning for the well?

15        A.    In -- in no detailed

16   conversations.  My role would have been on

17   the decisions of which rig to fit into the

18   rig schedule, which were the options to use,

19   which rig.  There was a -- it was referred to

20   as a one-pager that would have been a summary

21   of the well AFE, costs, primary risks, et

22   cetera, that I would have signed off on.

23             The technical details on the

24   well planning would have been largely with

25   Ian Little and his organization, and

1    potentially -- likely reviewed my Harry

2    Thierens and signed off on the web link.

3         Q.    And did any of the well planning

4    or design or engineering decisions make their

5    way up to you for review or approval?

6         A.    No.

7         Q.    Put Volume 1 aside and let's

8    turn to -- I think it's Volume 3, Tab 59.

9         A.    (Complying).

10        Q.    I believe that this is also a

11   document that has not yet been marked as an

12   exhibit, so we're going to label this

13   Exhibit 2951.

14              (Exhibit No. 2951 marked for

15   identification)

16   EXAMINATION BY MR. NEGER:

17        Q.    And let me ask you if you -- if

18   you recognize this document?

19        A.    I do.

20        Q.    And can you tell me what it is?

21        A.    I think this is the full report

22   from the DEEPWATER HORIZON study group.

23        Q.    Right.  And this is the document

24   in which your name appears as a member of the

25   study group, if you would turn to Page 99.

1          A.     Yes.

2          Q.     And I think that you mentioned a

3     little bit earlier that your involvement with

4     the study group was limited in some fashion?

5          A.     Yes.  Let me make sure it's

6     clearly defined.  I was contacted by David

7     Pritchard, who was an active member of the

8     study group, to utilize my presentation that

9     I made for a joint paper.  And so then he

10    proceeded to draft it.

11               The remainder of the report,

12    I -- I didn't realize that this would be how

13    my name would be presented, as connected

14    with, I guess, the full report.  And I didn't

15    have the opportunity to review it before it

16    was published or my name was published, and

17    I've read parts of it for the first time on

18    Tuesday, this week.

19         Q.     Okay.  And is there anything in

20    the parts that you've read with which you

21    disagree?

22         A.     There are a couple of conclusive

23    statements that I -- I don't know how you

24    could conclude that at the point this paper

25    was published.

```
 1          Q.     Okay.  Have you read any of the
 2    interim or progress reports issued by this
 3    group?
 4          A.     No, I haven't.
 5          Q.     Let's go through some of the --
 6    the things that are in this report.
 7                 First of all, do you know what
 8    the purpose of the DEEPWATER HORIZON study
 9    group was or is?
10          A.     Not specifically.  I know it's a
11    collection of a variety of professionals from
12    all different disciplines.  And there's a
13    Dr. Bea, who I'm familiar with some of his
14    works, and I don't know what -- if he's an
15    active lead in the role, et cetera.
16          Q.     Okay.  How are you familiar with
17    Dr. Bea?
18          A.     I've had a couple of
19    conversations with him as part of my
20    connection with this paper.
21          Q.     With the paper that you
22    co-authored with Mr. Pritchard?
23          A.     That's correct.
24          Q.     Okay.  And were those
25    conversations that you had with Dr. Bea
```

1    substantive in nature, or were they more in

2    the process?

3           A.     I think the -- the major

4    substantive nature is when I quoted him in my

5    presentation, I gave him the opportunity to

6    review my presentation before I gave it.

7           Q.     Okay.  If you would turn to

8    Page 9 of this exhibit.

9           A.     (Complying).

10          Q.     And you will see there in the --

11   one, two, it looks like -- at the end of the

12   second full paragraph on the page, that the

13   group concluded that BP's -- I'm pointing you

14   to the wrong place.

15               Oh, I'm sorry.  I am in the

16   right place.  It's in the -- it is in the

17   second paragraph on the page.

18               BP's organizations and operating

19   teams did not possess a functional safety

20   culture.  Their system was not propelled

21   toward the goal of maximum safety in all of

22   its manifestations, but was rather geared

23   toward a trip-and-fall compliance mentality

24   rather than being focused on the big picture.

25               Do you see that statement?

 1          A.     I see that statement.

 2          Q.     Okay.  And do you agree with it?

 3     MS. KARIS:

 4               Object to form.

 5     THE WITNESS:

 6               Well, I cannot -- I cannot agree

 7     or dispute, because this is a reference to

 8     the BP organization after my departure.

 9               I can say that that does not

10     describe the BP D&C organization while I was

11     there.

12     EXAMINATION BY MR. NEGER:

13          Q.     Okay.  At the end of that

14     paragraph, the statement is made:  "The

15     Macondo well disaster was an organizational

16     accident whose roots were deeply embedded in

17     gross imbalances between the systems

18     provisions for production and those for

19     protection."

20               Do you agree with that

21     conclusion?

22     MS. KARIS:

23               Object to form.

24     THE WITNESS:

25               Which statement is this?

```
 1    EXAMINATION BY MR. NEGER:

 2         Q.     It's the last sentence in the

 3    second paragraph.

 4         A.     Okay.  I -- I cannot give you an

 5    honest statement, because that's a statement

 6    that's very subjective.

 7         Q.     Thank you.

 8              Further down on that page in the

 9    third full paragraph, there is a statement:

10    "There were multiple opportunities to

11    properly assess the likelihoods and

12    consequences of organizational decisions,

13    i.e. risk management" -- "assessment and

14    management that were ostensibly driven by BP

15    management's desire to," quote, "'close the

16    competitive gap,'" close quote, "and improve

17    bottom line performance.  Consequently,

18    although there were multiple chances to do

19    the right things in the right ways at the

20    right times, management's perspective failed

21    to recognize and accept its own

22    fallibilities, despite a record of recent

23    accidents in the U.S. and a series of

24    promises to change BP's safety culture."

25              Did I read that correctly?
```

1          A.      Yes.

2          Q.      Okay.  And do you agree with

3    that statement?

4          MS. KARIS:

5               Object to form.

6          THE WITNESS:

7               I can only say that an author

8    has made a statement on their inferences at

9    that time.  So I -- I can't agree, because I

10   don't have the background that this author

11   has.

12   EXAMINATION BY MR. NEGER:

13         Q.      Well, there were recent

14   accidents in the U.S. in BP's history; right?

15         A.      That's correct.

16         Q.      Okay.  And there were many

17   promises to change BP's safety culture that

18   started around the time that you were hired

19   by BP, isn't that right?

20         A.      That's correct.

21         Q.      And was it your view that while

22   you were there, management's perspective

23   failed to recognize and accept its own

24   fallibilities, in spite of those accidents

25   and the promises?

```
 1          MS. KARIS:
 2                 Object to form.
 3          THE WITNESS:
 4                 I can't -- I would have to say
 5     no.  I can't take that statement and apply it
 6     to my time there.
 7     EXAMINATION BY MR. NEGER:
 8          Q.    Okay.  And that's because,
 9     during your time there, you were engaged --
10     actively engaged in trying to promote a
11     safety culture that was -- that resulted
12     from, at least in major part, the Texas City
13     accident and the like?
14          A.    All of my efforts at the time I
15     was at BP took into account all the learnings
16     that I could take from an industry and
17     experience and understanding my new company
18     and -- and applying that to make the
19     organization as low risk as possible.
20          MR. NEGER:
21                 We have to change the tape.
22          THE VIDEOGRAPHER:
23                 Off the record.  The time is now
24     12:15.
25                 (Whereupon, a recess was taken
```

1      for lunch.)

2             THE VIDEOGRAPHER:

3                    Back on the record.   The time is

4      now 1:18.  This is the beginning of Tape 4.

5      EXAMINATION BY MR. NEGER:

6             Q.     Mr. Lacy, when we broke for

7      lunch, I was going to shift topics.  And I

8      want you to focus for a moment -- you can put

9      that binder aside.

10                    And let me ask you, should

11      accident investigations include process

12      safety analysis as a rule?

13             MS. KARIS:

14                    Object to form.

15             THE WITNESS:

16                    There are accident investigation

17      protocols that can cover process safety.  So

18      if it's a process safety event, it should

19      cover that, yes.

20      EXAMINATION BY MR. NEGER:

21             Q.     And would you consider the

22      Macondo incident to be, at least in part, a

23      process safety event?

24             A.     Yes, I would.

25             Q.     Okay.  Did you read the Bly

1    Report?  I think you said you did.

2          A.    I did when it was first

3    published.  That was some months ago.

4          Q.    Okay.  And do you recall, sir,

5    that there was no process safety analysis in

6    it?

7          MS. KARIS:

8                Object to form.

9          THE WITNESS:

10               I don't recall seeing one.

11   EXAMINATION BY MR. NEGER:

12         Q.    And, in fact, do you recall that

13   the report specifically avoided any process

14   safety analysis; in other words, that there

15   was a -- the report included a statement that

16   there was a dispensation which allowed them

17   not to do a process safety analysis.  Do you

18   recall seeing that?

19         MS. KARIS:

20               Object to form.

21         THE WITNESS:

22               I don't recall seeing that.  I

23   recall a statement saying it was an early

24   report, there were more things to come.  And

25   that's how I took it.

```
1    EXAMINATION BY MR. NEGER:
2         Q.    To your knowledge, has the Bly
3    Report or the Bly team ever performed a
4    process safety analysis?
5         A.    To my knowledge, no.
6         Q.    Now, sir, you were hired in
7    2006, isn't that right?
8         A.    July 2006.
9         Q.    By BP, right.  And that was in
10   the wake of the Texas City refinery
11   explosion, is that right?
12        A.    I believe that occurred in 2005.
13        Q.    Right.
14        A.    Yes.
15        Q.    And what impact do you believe
16   that the Texas City refinery incident had on
17   BP's approach to risk management and training
18   personnel to deal with risks and potential
19   situations of that nature?
20        MS. KARIS:
21             Objection.  Form.
22        THE WITNESS:
23             The things that I saw in
24   immediate response to the Baker report, the
25   internal reports, were the BP's six-point
```

1    plan, which had six specific areas of focus.

2    I saw evidence of some of those.  I don't

3    recall six being worked on in a variety of

4    places and forms, and I do believe it was the

5    initiating event for the genesis of BP to

6    begin to create OMS.

7    EXAMINATION BY MR. NEGER:

8         Q.    And when you on arrived at BP,

9    was it your understanding that one of your

10   principal focuses, if that's a word, was to

11   be -- to follow on with the work that had

12   been initiated in the aftermath of the Texas

13   City refinery explosion?

14        A.    I interpreted my role to

15   understand what BP's primary intents were

16   and, in particular, as they started to

17   initiate and develop OMS, to figure out how

18   to implement that in drilling completions.

19        Q.    When you were hired, was there a

20   specific discussion about your taking on

21   responsibility for process safety management

22   for the company?

23        A.    No, there was not.

24        Q.    Now, you said that you had read

25   the Baker report?

1          A.      That's correct.

2          Q.      Did you read that before or

3     after you started work at BP?

4          A.      Actually, both.  When it was

5     first published and then when I started again

6     at BP.

7          Q.      Why did you read it when it was

8     first published, before you started at BP?

9          A.      It was -- as I do with all

10    reports on significant incidents, whether

11    they're related to E&P incidents, I feel in

12    my role and the accountabilities I have, I

13    need to understand any learnings that I might

14    be able to utilize.

15         Q.      So when you first read it, you

16    were still employed at Chevron?

17         A.      That's correct.

18         Q.      And was there learning that you

19    took from that report that you applied at

20    Chevron?

21         A.      I looked at the Baker report,

22    asked myself questions.  Could I see -- could

23    the possibility of similar issues arise, and

24    actually attempted to translate what had

25    happened in a refinery to what might happen

 1     on a drilling rig.  So those -- take those

 2     insights and transform them into something

 3     that would be applicable.

 4          Q.     And did you do anything at

 5     Chevron based upon your learning from

 6     reviewing the Baker report?

 7          A.     I can't say I recall directly

 8     doing it.  It would have probably been more

 9     of understanding and reinforcing what we were

10     doing.

11          Q.     Now, the Baker report was a

12     pretty big deal for BP, wasn't it?

13          A.     I think the Texas City incident

14     was a big deal, yes.

15          Q.     And the report itself included,

16     you know, some fairly pointed language about

17     BP's existing safety processes?

18          A.     I recall that, yes.

19          Q.     Okay.  And as a result of that,

20     BP supposedly overhauled its safety

21     processes; right?

22          MS. KARIS:

23               Object to form.

24          THE WITNESS:

25               They had a stated goal, which I,

 1    as -- as I just stated, what I saw evidence
 2    of was the six-point plan, which was an
 3    immediate response, and then the evolution of
 4    OMS.
 5    EXAMINATION BY MR. NEGER:
 6         Q.    And did you have any role in
 7    drafting the six-point plan, or -- I can't
 8    recall whether you said yesterday that you
 9    had any role in drafting OMS?
10         A.    The -- the only role that I
11    would have had in the OMS prior to its
12    publication would have been conversations
13    with John Mogford and also conversations with
14    Mark Bly relative to my learnings from
15    Chevron and their OEMS system.
16         Q.    Do you recall any specific
17    conversations that you had with Mr. Mogford
18    regarding the subject?
19         A.    We talked, oh, probably for an
20    hour shortly after my arrival when he had
21    visited Chevron in San Ramon and met with
22    their people to get an explanation of their
23    OEMS system, and then we kind of -- I gave
24    him my insights of how it was developed and
25    my experience with it.

```
1            Q.     What was Mr. Mogford's position

2    at the time?

3            A.     I believe he was the group head

4    of HSE or something along those lines.

5            Q.     And do you have a specific

6    recollection of the hour conversation that

7    you spent with him?

8            A.     No.  No, that would have been

9    2006, probably summer or fall.

10           Q.     And I'm sorry, you said you also

11   spoke with Mr. Bly?

12           A.     Yes.  As part of my onboarding,

13   I met with a number of business unit leaders,

14   and, at the time, Mr. Bly was in the North

15   America Gas business unit leader role.

16           Q.     And did your conversation with

17   Mr. Bly at that time touch on issues related

18   to process safety?

19           A.     It would have largely been

20   around OMS and, you know, questions he had

21   about the Chevron safety culture and

22   things along that.  I don't recall having

23   conversations about the BP safety culture.

24           Q.     Is Mr. Bly the person

25   principally responsible for drafting OMS?
```

```
 1          MS. KARIS:

 2              Object to form.

 3          THE WITNESS:

 4              I don't recall exactly when he

 5      came into his role.  I think that was part of

 6      his responsibilities at -- certainly now, but

 7      at some point, he came in to this role, yes.

 8      EXAMINATION BY MR. NEGER:

 9          Q.    Do you have a recollection of

10      who else at the company would have been

11      responsible for preparing OMS?

12          A.    It was a large group of people

13      that worked on it.  But I -- you know, other

14      than those conversations, I don't recall any

15      other direct conversations prior to the Gulf

16      of Mexico when -- and working with Cindy

17      Skelton.

18          Q.    Was Ms. Skelton involved in the

19      preparation of the OMS?

20          A.    I'm not certain what her role

21      was before, but with the Gulf of Mexico local

22      OMS, yes.

23          Q.    Right, and I understand.

24              Do you recall the -- you said

25      that there were a bunch of people who were
```

```
 1    involved in preparing OMS.  Do you recall any
 2    of those names?
 3         A.    No, I don't.  But I think they
 4    had a group in various locations drafting it
 5    up.
 6         Q.    And was there a team that was
 7    formed to do this, drawing on personnel from
 8    various business units, or was there a
 9    particular --
10         A.    I can't --
11         Q.    -- group within the company?
12         A.    I can't say with certainty.  I
13    recall it -- the framework being published
14    and some -- so I have very limited knowledge
15    of it prior to being at -- being produced.
16         Q.    What about the group defined
17    operating practice entitled Assessment
18    Prioritization And Management Of Risk.  Do
19    you recall that document?
20         A.    No, I don't recall that
21    document.  That term is familiar.
22         Q.    If that was a document that was
23    called -- I think denominated GDP 3:1-0001,
24    published in January of 2009.  Does that ring
25    a bell?
```

```
 1          A.     Not really.  And I possibly read
 2     it, but I -- I can't recall directly.
 3          Q.     Do you recall -- you say that
 4     the -- that the title of the document rings a
 5     bell for you?
 6          A.     I'm sure that I saw a
 7     presentation or some documentation that
 8     listed significant group practices, which is
 9     probably where I saw it.
10          Q.     Do you recall any particular
11     policy or procedure that required the
12     adoption of formal risk management processes,
13     including established accountabilities or
14     risk register, mitigation actions, risk
15     matrices, emergency risk response, and the
16     like?
17          A.     I believe when we were working
18     on our D&C, risk management tool in the Gulf
19     of Mexico, we did look at the group practice
20     as -- so that we were aligned to conform with
21     that.
22          Q.     And we talked about the OMS
23     which was published, I guess, around December
24     of 2008.  Does that ring -- does that sound
25     right to you?
```

```
 1            A.      The three documents we looked at
 2      yesterday, there was one that was, I believe,
 3      dated December of '08, yes.
 4            Q.      And then there was the DWOP also
 5      published sometime in 2008, is that right?
 6            A.      By -- the version I've referred
 7      to, I think, has a late 2000 date.
 8            Q.      Right.
 9            A.      2008 date.
10            Q.      And there were ETPs, engineering
11      technical practices, is that right?
12            A.      That's correct.
13            Q.      And were those also, in your
14      mind, part of the risk -- the process safety
15      risk management practices?
16            A.      There were two levels of
17      engineering technical practices.  I know
18      there were ones that were defined as
19      engineering technical practices, group
20      engineering technical practices, and then
21      there were sub technical practices that
22      might -- that would have related directly to
23      D&C.
24                    There were working committees, I
25      believe, led by Steve Haden, and I don't
```

1    recall the -- the active working member, but

2    I believe it was part of his responsibilities

3    to -- to develop and implement the ETPs for

4    drilling and completions.

5         Q.    Okay.  Some of the titles that I

6    found are things like HSSE, review of

7    projects.  Would that have been more of a

8    safety oriented ETP?

9         A.    Possibly.  Possible.

10        Q.    Hazard and operability study?

11        A.    Uh-huh (indicating

12   affirmatively).

13        Q.    Would that have been, to your

14   mind --

15        A.    Again, I don't --

16        Q.    Don't know that one?

17        A.    -- specifically recall that one.

18        Q.    Okay.  Do you recall one

19   entitled "Inherently Saver Design"?

20        A.    I do seem to recall that one.

21        Q.    And would that have been within

22   the -- the group that --

23        A.    I would have said -- that would

24   have been in the group, engineering technical

25   practice.

612

```
1          Q.     Okay.  And what about layers of
2     protection analysis?
3          A.     I recall, again, probably from a
4     list of those.
5          Q.     And the last one I wanted to
6     bring to your attention is one called "Major
7     Accident Risk Process."  Do you recall that?
8          A.     I can't say certainly if I do.
9          Q.     Do you recall the acronym, MAR?
10          A.     Yes, absolutely.
11          Q.     And that stood for major
12     accident risk?
13          A.     Major accident risk, yes.
14          Q.     And was there a process
15     developed for analyzing MARs?
16          A.     I believe, if my recollection is
17     correct, in the 2009 time frame, there was an
18     effort to collect each asset in view of major
19     accident risks and to collate and collect
20     those up to a Gulf of Mexico level.
21               I do seem to recall a meeting
22     where we reviewed the major accident risks
23     for the Gulf of Mexico.  I couldn't tell you
24     a date in 2009 that we looked at that.  I
25     seem to recall Neil Shaw was still there.  So
```

1    it would have been sometime in the first half

2    of 2009.

3         Q.    Was that done on a regular

4    basis, or was this an ad hoc meeting?

5         A.    It was a new process.  So I

6    can't say it was done on a regular basis.  It

7    was the culmination of the first attempt.

8         Q.    And was that the -- the one and

9    only time that you met to discuss major

10    accident risks, or were there subsequent ones

11    after that first meeting?

12         A.    Beyond drilling and completions,

13    that would have been the only one I recall.

14    Yes.

15         Q.    I'm sorry, beyond drilling?

16         A.    We had weekly discussions of

17    where our wells stood, what our risks were,

18    you know, not necessarily documented, but a

19    lot of discussions on it.

20         Q.    This was the first formal

21    meeting --

22         A.    Yes.

23         Q.    -- for the purpose of

24    discussing --

25         A.    Right.

1          Q.      -- the MARs?

2          A.      Right.

3          Q.      As a group?  As a group, okay.

4                  And are you familiar with a

5    policy called Beyond "The Best Common

6    Process"?

7          A.      Yes, I am.

8          Q.      And tell me about that.  What

9    was the purpose of that document?

10         A.      The simplest description I can

11   give is it was the companion to the DWOP,

12   which was more operationally orientated.

13   This described the project management for

14   wells, which would incorporate well design,

15   processes, discussions with subsurface

16   disciplines, et cetera.  They had a number of

17   sub areas with it that were incorporated in

18   "Beyond The Best."

19         Q.      Do you recall that there were --

20   there were risk management procedures set out

21   in the "Beyond The Best Common Process"

22   document that dealt with things such as stage

23   gates, the MOC process, lessons learned, the

24   definition of rules and responsibilities?

25                 Are those all things that, to

1    your recollection, were part of that "Beyond

2    The Best Common Process" document?

3         A.    The combination of the "Beyond

4    The Best" document and the DWOP were -- are

5    guidelines, so to speak, that we had from a

6    drilling wells standpoint.

7         Q.    And during what period of time

8    were those two documents, if you will, the

9    operative documents within --

10         A.    I would say the entire time I

11    was there, the effort to develop the ETPs, I

12    believe, were a part of the global D&C effort

13    to conform "Beyond The Best" and DWOP into

14    the framework of OMS for the D&C function.

15    But I would say that -- that wasn't in

16    existence when I was there.

17         Q.    Were they precursors to OMS?

18         A.    They were the -- they were --

19    for drilling and completions, they were the

20    precursors to what ultimately OMS was trying

21    to do.

22         Q.    Okay.  Great.  And do you recall

23    that one of the procedures set forth in

24    "Beyond The Best" or any of the other

25    documents, for that matter, was the

```
 1     establishment of a risk register?
 2          A.     I do -- I do recall that.
 3          Q.     What was the risk register
 4     supposed to do?
 5          A.     It would -- and if I recall
 6     correctly, it would have been to highlight
 7     for a particular well or a group of wells the
 8     significant risks in a priority basis.
 9          Q.     And was the risk register a
10     static document or was it a dynamic document?
11          A.     I can't recall the exact
12     description of how to use it.  I would have
13     defined it, which was why we developed our BP
14     RAT tool.  It was commonly used as a static
15     document and infrequently updated.
16          Q.     Infrequently updated?
17          A.     In my experience while I was
18     there.
19          Q.     Was -- was that a prudent use of
20     the tool?
21          MS. KARIS:
22               Object to form.
23          THE WITNESS:
24               "Beyond The Best" common process
25     and some of the guidance in the DWOP used
```

```
1    terms like "should," sometimes "shall."

2    EXAMINATION BY MR. NEGER:

3         Q.    Right.

4         A.    It wasn't always clear exactly

5    what you were supposed to use.  And so in

6    those cases, you know, it -- it was left

7    often to the practitioners to decide when to

8    update, when to use, when to -- how far to

9    use.

10        Q.    Well, what was the purpose of

11   the risk register?

12        A.    It was to identify the primary

13   risks in terms of well delivery.

14        Q.    And if additional -- and if

15   after the -- a risk register was created,

16   additional risks were identified, or the

17   risks that had been previously identified had

18   changed in some way, was it a requirement of

19   the BP policy that the risk register be

20   updated to reflect the changed conditions?

21        A.    I can't -- without the document,

22   I can't recall whether it was a requirement.

23   I don't recall seeing frequent updates of the

24   risk register while I was there.

25        Q.    Did you ever suggest to anyone
```

1    that the risk register be updated more

2    frequently?

3         A.    Not in that regard.  In our

4    effort to develop the risk tool, it was my

5    view and Harry Thierens' view that the

6    guidance we had existing at the time was not

7    fully adequate for our needs.

8         Q.    That the -- that the risk

9    register was not adequate to your needs and

10   that some --

11        A.    The existing processes and

12   procedures needed to be improved and/or

13   clarified and/or standardized, which was our

14   presentation in November of 2009.

15        Q.    And that was the -- and that was

16   the evolution to the BP RAT process?

17        A.    So the document that we looked

18   at yesterday from the Gulf of Mexico on that

19   BP RAT tool --

20        Q.    Okay.

21        A.    -- was that effort to

22   standardize, clarify.

23        Q.    While you were at BP, where the

24   various policies and procedures that we've

25   just discussed -- the "Beyond The Best," the

```
 1    ETPs, the group-defined operating practices,
 2    DWOP, et cetera, were they supposed to be
 3    implemented across the company, or were they
 4    implemented on a segment-by-segment basis?
 5         A.    The things that were appropriate
 6    by segment was intended to be implemented by
 7    segment.  Those that would apply broadly
 8    across things like refining, marketing,
 9    drilling, production -- more broadly
10    interpreted to be, yeah.
11         Q.    At the time that you left in
12    December 2009, were there any segments of the
13    business for which process safety policies
14    had not been implemented?
15         A.    I -- I don't recall.  There were
16    existing practices that were supposed to be
17    in place as precursors to ultimately the
18    engineering technical practices and the OMS
19    system.
20         Q.    And were there -- well, let's
21    get to the OMS system -- were there segments
22    of the business for which the OMS system had
23    not yet been implemented at the time that you
24    left in December of 2009?
25         A.    I'm certain in the E&P
```

620

1    organization that only some of the business

2    units had begun to implement OMS, because

3    I -- if I recall correctly, there was going

4    to be -- they called it wave one, wave two of

5    implementation.  There were going to be some

6    business units go first and then take those

7    learnings back to the other business units

8    before they implemented it.

9         Q.    What about the Gulf of Mexico

10   business unit?

11        A.    Gulf of Mexico was in wave one,

12   which meant they were supposed to be one of

13   the first business units, and I believe there

14   were goals for 2008 and goals for 2009.  So

15   it was a staged implementation.

16        Q.    And had each of the practices

17   and policies that we've discussed actually

18   been implemented in the Gulf of Mexico in

19   December 2009?

20        A.    There was -- there

21   were implementation because it has stages.

22   In my knowledge, at the time I departed, the

23   Gulf of Mexico had met their goals for OMS

24   implementation as of the time I left.

25        Q.    Who had overall responsibility

```
 1      for process safety at BP during the period
 2      October 2009 through the date of the Macondo
 3      incident, to your knowledge?
 4           MS. KARIS:
 5                Object to form.
 6           THE WITNESS:
 7                I can't answer that.  I don't
 8      know.
 9      EXAMINATION BY MR. NEGER:
10           Q.    Well, between -- at the time
11      that you left in December 2009, who -- was
12      there one person who had overall
13      responsibility for -- companywide for process
14      safety?
15           A.    I don't know.  I don't recall.
16           Q.    At the time that you left, who
17      in BP had process safety management
18      responsibility for the Gulf of Mexico SPU?
19           A.    I don't recall that as a
20      specific role.  There could've been someone,
21      but I don't recall.
22           Q.    So there was no person, at least
23      as to your recollection, who was -- had
24      overall responsibility for process safety
25      within the Gulf of Mexico SPU?
```

```
1            MS. KARIS:
2                 Object to form.
3            THE WITNESS:
4                 I don't recall that specific
5       position.  They had a Gulf of Mexico
6       engineering authority, a gentleman by the
7       name of Kevin Kenelley.  At the time I
8       departed, Cindy Skelton and Tamara Joslin
9       were implementing OMS, and they were also in
10      the midst of making many changes to the
11      organization.  So I can't honestly say.
12           Q.    And can you tell us who had
13      overall responsibility for process safety
14      with respect to the Macondo project at the
15      time that you left the company?
16           A.    No, I cannot.
17           Q.    Were there technical experts
18      responsible for process safety for the
19      Macondo well in 2009 and early 2010?
20           A.    At the time, prior to my
21      departure, the definition of the drilling
22      engineering authority, the completions
23      engineering authority, and the well control
24      authority had been established.
25      Respectively, those individuals were Jon
```

1    Sprague, Dave Rich, and John Shaughnessy, I
2    believe.
3          Q.    Mr. Shaughnessy's position,
4    again?  I'm sorry.
5          A.    He was a senior drilling
6    engineer and on Jon Sprague's staff and
7    assumed the role of, I believe, well control
8    technical authority.
9          Q.    Were these technical experts
10   overseen by anybody?
11         A.    In the organization, John
12   Shaughnessy would have been overseen by Jon
13   Sprague.  Jon Sprague and Dave Rich would
14   have been overseen by Harry Thierens prior to
15   his departure.  At that point, then Dave Rich
16   would have moved into Harry's role.
17         Q.    Are you familiar with a
18   gentleman by the name of Gordon Burrell?
19         A.    Yes, I seem -- I recognize the
20   name, but I know he had several roles while I
21   was there.
22         Q.    And did any of those roles
23   involve oversight of the technical experts in
24   charge of process safety?
25         A.    I'm not -- I'm not sure.

1          Q.     What about Ms. Yilmaz, did she
2     have any role -- oversight role with respect
3     to the technical experts?
4          MS. KARIS:
5                 Object to form.
6          THE WITNESS:
7                 As related to the engineering
8     technical practices and engineering
9     authorities who were designated on her staff,
10    yes.
11    EXAMINATION BY MR. NEGER:
12         Q.     And who were the engineering
13    authorities on her staff?
14         A.     I believe there was a gentleman
15    by the name of Scott Sigurdson, and I believe
16    there was also a gentleman by the name of
17    Mike -- she had three people.  Steve Haden
18    was the VP, and I don't know if he had a
19    technical authority responsibility.  I know
20    Scott Sigurdson at some point got named an
21    engineering authority or VP of engineering,
22    and -- I don't recall.  Mike starts with a
23    "Z." -- Zhangi, Mike Zhangi, were those
24    three.
25         Q.     Mr. Sigurdson, Mr. Haden and --

```
 1            A.     Mr. Haden and Mr. Zhangi were
 2    the primary drilling professionals --
 3    drilling professionals.  I believe there was
 4    a completion expert also on Barbara's staff.
 5            Q.     And who was that?
 6            A.     I -- it changed a couple of
 7    times while I was there.  At one point it was
 8    Ian Cavanagh.
 9            Q.     Now, the DWOP requires BP
10    entities to follow a structured risk
11    management process, right?
12            A.     Without seeing it, the term
13    requires -- would be -- I'd be -- not sure.
14            Q.     I know it was in one of the
15    documents.  Well, you know what -- Exhibit
16    93.  It's going to be in Volume 3?
17                   (Discussion off the record.)
18         MR. STANLEY:
19                   93?
20         MR. NEGER:
21                   93.
22         MS. STANAWAY:
23                   The DWOP?
24         MR. NEGER:
25                   Yes.
```

```
 1              MS. STANAWAY:
 2                    It was originally 93.  It was
 3      re-marked yesterday as well.
 4              MR. NEGER:
 5                    It's Exhibit 93.  I'm not going
 6      to take the time to search for the binders.
 7      We'll move on.
 8              MS. STANAWAY:
 9                    It should be Tab 19.
10              MR. NEGER:
11                    Tab?
12              MS. STANAWAY:
13                    19 in the binder.
14              MR. NEGER:
15                    Of our binder, Tab 19?
16              MS. STANAWAY:
17                    Yes, behind the e-mail.
18              MR. STANLEY:
19                    I think it's Volume 2, the first
20      one.
21              MR. NEGER:
22                    It's in Volume 2, the first one.
23      EXAMINATION BY MR. NEGER:
24          Q.    Okay.  And where would you look
25      in here to find out whether the structured
```

1     risk management practice is a required

2     procedure?

3               I guess we have to look at

4     each -- you know what, Mr. Lacy, I only have

5     a few minutes left.  So I'm not going -- I'm

6     not going to ask you to do this.  I'm going

7     to move on.

8          A.    It's 6279, 3.4, risk management:

9     "All D&C operations shall follow a documented

10    and auditible" --

11         Q.    There you go.

12         A.    -- "risk management process to

13    include identification, assessment,

14    prioritization, action.  The process will

15    include all risks with either an HSE or

16    significant financial impact."

17         Q.    Okay.  And, as I say, I've only

18    got a couple of minutes left.  So I'm going

19    to move on to a different topic, if you don't

20    mind.

21              You talked a little bit earlier

22    about some concerns that you had about

23    Mr. O'Bryan's ability to serve in your

24    position after you left, and I think that you

25    testified that you were concerned about his

```
 1    ability to balance the schedule demands and
 2    the demands of ensuring process safety, is
 3    that correct?
 4         MS. KARIS:
 5              Object to form.
 6         THE WITNESS:
 7              Let me restate what I attempted
 8    to communicate.  First of all, my direct
 9    exposure with Mr. O'Bryan was dated during
10    the time frame that I first arrived until I
11    moved in February of 2008.  At that time, he
12    was one of six wells managers that I worked
13    with.
14              My observations at the time was
15    that Pat was the person I had least success
16    with engaging in a deep conversation about
17    safety and about operations, and that was
18    relative to his five peers in Alaska, work,
19    et cetera.  So that was the culmination of my
20    assessment during that time frame.  He did
21    not report directly to me.  It was a -- you
22    know, kind of an oversight role.  And so I,
23    you know, nothing more than formed an
24    opinion.
25              In relation to assuming the Gulf
```

1   of Mexico job, my concerns would have been,

2   as I tried to state yesterday, twofold:  That

3   would have been two significant changes in

4   the two most senior leadership roles at the

5   same time.  I would have had concerns -- I

6   had concerns with the first change, as I've

7   indicated.

8          Q.    That was Mr. Thierens'

9   departure?

10          A.    Mr. Thierens replacement with

11   Mr. Rich.  I raised that concern a number of

12   times with different people.  Then the

13   announcement that Mr. O'Bryan would take my

14   place, I raised my concerns with the number

15   of changes, which at that point were two --

16   not many -- and also whether, in my view, a

17   person that has a weak -- in my view, the

18   North America Gas job required a kind of weak

19   management, because the teams were disbursed.

20   They ran themselves.

21              The central Gulf of Mexico

22   deepwater organization required a very strong

23   approach to the operations management day in

24   and day out and the ability to work with the

25   vice presidents as a peer, and I -- I did not

1    believe Mr. O'Bryan fully met those

2    requirements.  That's my perspective on that.

3         Q.    Let me jump back to a comment

4    that you made just a moment ago about

5    Mr. Rich.  What was -- what were your

6    concerns about Mr. Rich's replacement of

7    Mr. Thierens that you articulated to?

8         A.    So I believe I stated, either

9    yesterday or today, that my assessment of

10    Harry Thierens was that he was the best

11    drilling professional I had worked with in my

12    career.  So you are trying to replace what --

13    not just the best, in my estimate, in BP, but

14    the best in the industry, with another

15    person.

16              So my concerns with Dave is Dave

17    was -- and Dave had worked for Harry and for

18    my organization for the time I was there in

19    the Gulf of Mexico.  Dave was an exceptional

20    completion engineering manager, did an

21    exceptional job in that role, but completions

22    engineering competence is not equivalent to

23    drilling competence, and primarily in the

24    areas of exposure to well control would have

25    been my primary concern.

1          Q.     Were you concerned -- I know
2     that you said that you thought that
3     Mr. Thierens shared your -- your passion for
4     process safety management?
5          A.     We were very aligned on issues
6     like development of the risk assessment tool
7     and how critical that was.  How we discharged
8     our responsibilities, how we worked together,
9     and particularly -- the term I would use is,
10    he took nothing for granted.  He was never
11    complacent.  He was -- had been in a number
12    of well control situations and -- and
13    understood the criticality of that.
14         Q.     And I know that Mr. Rich did not
15    live up to Mr. Thierens' standards in your
16    view, but were you at all concerned that he
17    did not share the same level of commitment to
18    process safety that you and Mr. Thierens
19    shared?
20         A.     In my view, Dave shared
21    exceptional leadership on safety in his area
22    of experience, as he understood process
23    safety, which he was actually quite limited
24    in the completion work.  He was in that area.
25    My concerns would have been that he didn't

```
 1    share that mindset, as he didn't have the
 2    experience.
 3            Q.     In the drilling area --
 4            A.     In the drilling.  Particularly
 5    in roles of drilling that one significant
 6    risk envelope with that many deepwater rigs
 7    and then the possibility of a well control
 8    situation.
 9            Q.     And let me now talk for a
10    moment -- the few moments that I have left,
11    about Ms. Yilmaz.  I think you said that you
12    believed that discussions regarding safety,
13    and particularly in the drilling area, were
14    not in her comfort zone.
15                   Did -- were you concerned that
16    Ms. Yilmaz was not able to withstand the kind
17    of pressures that might be put on her
18    regarding things such as schedule and cost
19    cutting and juxtaposition of those priorities
20    on the one hand with safety issues on the
21    other?
22        MS. KARIS:
23                   Object to form.
24        THE WITNESS:
25                   I didn't see those areas in her,
```

1    you know, domain.  She worked removed from

2    those daily pressures.  So I -- that was not

3    an area that I would have expressed a concern

4    about how she dealt with those things.

5         MR. NEGER:

6              I think that my time is just

7    about up.  So I'm going to thank you for your

8    time and pass the witness.

9         THE VIDEOGRAPHER:

10             Off the record.  The time is now

11   1:56.  This is the end of Tape 4.

12             (Whereupon, a brief recess was

13   taken.)

14        THE VIDEOGRAPHER:

15             We're back on the record.  The

16   time is now 2:05.  This is the beginning of

17   Tape 5.

18   EXAMINATION BY MR. NICHOLS:

19        Q.    Mr. Lacy, good afternoon, I

20   appreciate your patience through this

21   process, as we talked about off the record.

22        A.    Okay.

23        Q.    Mr. Lacy, during your testimony

24   over the last day and a half, you've

25   testified to a number of the provisions of

```
 1      BP's drilling and well operations practice,
 2      GP10-00 that was in effect as of the time you
 3      left BP, correct?
 4           A.     I've been referencing to a
 5      version that I believe was November of 2008,
 6      yes.
 7           Q.     And if you would, turn to the
 8      first binder, I put in front of you, Tab 1 is
 9      a copy of an exhibit marked previously as
10      Deposition Exhibit 93 and is this the DWOP
11      that you've been referring to during your
12      testimony?
13           A.     I believe it's a copy of the
14      October of '08, yes.
15           Q.     I know that you were asked some
16      questions earlier about the dates and so
17      forth and when it was in effect.  But for
18      purposes of the questions I'm going to ask
19      you today, I will represent to you that we've
20      had a corporate representative for BP testify
21      this was the version of the DWOP that was in
22      effect as of the time of the DEEPWATER
23      HORIZON tragedy.
24           A.     Okay.
25           Q.     In April 2010, so obviously it
```

1    was in place during the time that you were

2    still employed through your employment

3    through the end of 2009?

4         A.    I don't recall a subsequent

5    document, so that would be my understanding.

6         Q.    So we do know that this DWOP

7    appears to have been issued in October of

8    2008, correct?

9         A.    Correct.

10        Q.    And if you look over at the

11   issuing authority for this DWOP, is the

12   issuing authority Ms. Yilmaz whom you've

13   testified about as being one of your

14   supervisors at BP?

15        A.    During one of my two roles

16   there, yes.

17        Q.    And if you look at the page that

18   ends with Bates No. 7267?

19        A.    Yes.

20        Q.    You see that this is issued

21   under the authority of Ms. Yilmaz on November

22   23rd, 2008?

23        A.    That's correct.

24        Q.    Now, it's your understanding,

25   Mr. Lacy, that the DWOP contained certain

1    provisions that are mandated within BP for

2    all drilling and well operations including

3    well drilling, and testing?

4         A.    My understanding was this was

5    the guide in place at the time and whenever

6    there was a term used "shall," the intent was

7    that was mandatory.

8         Q.    And if you turn just to make

9    sure that we're sticking close to the record,

10   if you look to the page that ends in 7276?

11        A.    Yes.

12        Q.    Is there a provision 1.3 that

13   says:  "The practice applies to all drilling

14   and well operations including drilling and

15   testing"?

16        A.    Yeah, I'm sorry, refer again,

17   this is 1.3?

18        Q.    Yes, sir.

19        A.    "The practice applies to all

20   drilling well operations comprising well

21   construction, drilling, testing, completion,

22   workover, well operations, intervention

23   activities, relating to wells performed under

24   the control or supervision of BP, on or on

25   behalf of BP as the operator."

1          Q.    Yes, sir.  And so the provision
2     there includes application to all drilling
3     and testing operations by BP personnel,
4     correct?
5          A.    That is my understanding.
6          MS. KARIS:
7               Object to form.
8     EXAMINATION BY MR. NICHOLS:
9          Q.    And it also includes, as you
10    just read, all drilling and testing
11    operations performed under the control or
12    supervision of BP, is that correct?
13         MS. KARIS:
14              Object to form.
15         THE WITNESS:
16              That is my understanding.
17    EXAMINATION BY MR. NICHOLS:
18         Q.    And it also applies to all
19    drilling and testing operations performed on
20    behalf of BP as the operator, correct?
21         MS. KARIS:
22              Object to form.
23         THE WITNESS:
24              That is my interpretation.
25    EXAMINATION BY MR. NICHOLS:

```
 1          Q.      And, furthermore, the DWOP is
 2     required through use of the word "shall" to
 3     form part of the contractual relationship
 4     between BP and its service providers, is that
 5     correct?
 6          MS. KARIS:
 7                 Object to form.
 8          THE WITNESS:
 9                 The Section 1.4 says:  "All
10     staff and contractor personnel engaged in
11     managing BP drilling wells shall be
12     knowledgeable of all elements" and below,
13     1.6, it defines the term "shall" is used
14     where provision is mandated and a minimum
15     requirement.
16     EXAMINATION BY MR. NICHOLS:
17          Q.      Yes, sir, and I appreciate your
18     answer.  I think you skipped a little bit
19     ahead of me, though.  If you look at the end
20     of 1.3, is it true that this practice, that
21     is, the drilling and wells operations
22     practice for BP, GP10-00 is required to form
23     part of the contractual relationship between
24     BP and its service providers?
25          A.      That is an accurate read of this
```

1    document.

2         Q.    Okay.  Now, you discussed

3    yesterday, I believe, that deviations from

4    these mandatory provisions, that is, the

5    "shall" provisions of the DWOP that any such

6    deviations must be in writing, correct?

7         A.    My understanding in how this was

8    intended to be applied was in the provision

9    of the area where it says "shall."  If there

10   was an operation that you were either

11   precluded from following or decided to not

12   follow, there would be an engineering

13   authority endorsement and a subsequent

14   engineering authority endorsement from

15   Ms. Yilmaz's staff.

16        Q.    And those endorsements, by their

17   nature, would be in writing, correct?

18        MS. KARIS:

19             Object to form.

20        THE WITNESS:

21             That is my understanding.

22   EXAMINATION BY MR. NICHOLS:

23        Q.    Okay.  Now, and as you just

24   said, and consistent with your prior answer,

25   any such deviations from the DWOP, the

```
 1      mandatory "shall" provisions would be
 2      required to go through a formal approval
 3      process, correct?
 4           MS. KARIS:
 5                 Object to form.
 6           THE WITNESS:
 7                 That would be my understanding,
 8      but, I don't see it on this --
 9      EXAMINATION BY MR. NICHOLS:
10           Q.    Well, if you look at
11      Section 1.7.
12           A.    Okay.
13           Q.    Beginning on Page 7276.
14           A.    Right.
15           Q.    You see that there is an
16      explicit provision concerning exception to
17      practice statements.  Do you see that?
18           A.    Yes, I do.
19           Q.    And you see that that language
20      provides for the process by which these
21      deviations from the "shall" provisions of the
22      DWOP must be pursued, correct?
23           MS. KARIS:
24                 Object to form.
25           THE WITNESS:
```

1          That's correct.

2   EXAMINATION BY MR. NICHOLS:

3          Q.     And consistent with your

4   testimony, Mr. Lacy, does this provide that

5   with respect to deviations from the DWOP, the

6   "shall" provisions, the mandatory provisions,

7   that the deviation authority, that is, the

8   person who is required to approve that, is

9   the wells engineer authority?

10         MS. KARIS:

11             Object to form.

12         THE WITNESS:

13             So my read and interpretation of

14   the table on 7277 outlines the -- in the

15   columns designated "deviation authority," it

16   designates a well EA, and a well EA SETA

17   endorsement required.

18   EXAMINATION BY MR. NICHOLS:

19         Q.     And the wells EA that's listed

20   in that diagram showing who is required to be

21   the approver for deviations, that shorthand

22   there is wells EA, is that correct?

23         A.     It is wells EA, yes, correct.

24         Q.     And that stands for wells

25   engineering authority?

```
 1           A.      That's correct.
 2           Q.      And you understand that for the
 3     Gulf of Mexico as of the time you left, the
 4     wells engineering authority was Jon Sprague?
 5           A.      That is correct at the time I
 6     departed.
 7           Q.      And so under this deviation
 8     authority set forth in the DWOP, could a
 9     wells team leader authorize a deviation from
10     the DWOP?
11           MS. KARIS:
12                   Object to form.
13           THE WITNESS:
14                   The only provision I see here is
15     the statement on Page 7276:  "In critical
16     situations, urgent verbal approval shall be
17     backed up with a written confirmation as soon
18     as practical."
19                   Otherwise, this table on 7277
20     would apply and a formal written request for
21     deviation would have been intended to be
22     submitted to the wells EA.
23     EXAMINATION BY MR. NICHOLS:
24           Q.      Right, not the wells team
25     leader, correct?
```

```
 1          MS. KARIS:
 2               Object to form.
 3          THE WITNESS:
 4               That's correct.
 5     EXAMINATION BY MR. NICHOLS:
 6          Q.    Now, even with respect to that
 7     language concerning urgent critical
 8     situations on 7276, such verbal
 9     communications would be -- needed to be
10     followed up with written confirmation as soon
11     as practicable, correct?
12          MS. KARIS:
13               Object to form.
14          THE WITNESS:
15               That is my read of that
16     sentence.
17     EXAMINATION BY MR. NICHOLS:
18          Q.    And that sentence doesn't change
19     who the ultimate approver is, it merely says
20     that in critical situations, you can first
21     get verbal approval backed up by written
22     approval, correct?
23          MS. KARIS:
24               Object to form.
25          THE WITNESS:
```

```
 1                    That is my understanding of that
 2         sentence.
 3         EXAMINATION BY MR. NICHOLS:
 4              Q.    Okay.  And further, Mr. Lacy,
 5         from your experience as a vice president at
 6         BP, you understand that the DWOP provides
 7         that deviations from its requirements will
 8         only be considered exceptional circumstances,
 9         correct?
10              MS. KARIS:
11                    Object to form.
12         EXAMINATION BY MR. NICHOLS:
13              Q.    And if you look back and 1.7?
14              A.    So I would have to -- so 1.7?
15              Q.    Yes, sir, just look a the first
16         sentence.
17              A.    Right, so I understand that.
18              Q.    Now, one subject you talked
19         about with reference to the DWOP, and the
20         other BP policies, procedures and practices
21         concerns pore pressure and fracture
22         gradients.  Do you recall discussing those
23         issues?
24              A.    I recall it being a -- I believe
25         it's in the DWOP section, yes, sir.
```

1          Q.     And if you -- is there a section
2     of the DWOP, that's why I want to put it in
3     front of you, is there a section of the DWOP
4     that relates specifically to the issues on
5     monitoring pore pressure?  I direct your
6     attention to Section 16.
7          A.     Okay.  16 is pore pressure and
8     you want me to go to 16?
9          Q.     Yes, sir.  It's on the page that
10    ends 7320, if that helps.
11         A.     Okay.
12         Q.     And are these the provisions of
13    the DWOP concerning pore pressure that you
14    were referencing in your earlier testimony?
15         A.     I don't recall that earlier
16    testimony relative to pore pressure.
17         Q.     Well, one subject that was
18    talked about was the ongoing assessment of
19    pore pressure and fracture gradients.  Do you
20    recall that testimony?
21         A.     I recall that we discussed
22    whether monitoring pore pressure or pore
23    pressure prediction was critical.
24         Q.     Does the DWOP, in fact, provide
25    in Section 16 that BP personnel must engage

1      in an ongoing assessment of pore and fracture

2      pressures during drilling operations?

3              A.      If you tell me which section?

4      It's been a long time since I read this.

5      What section?

6              Q.      If look down at Section 16.1.6.

7      Let's start there.  Do you see under 16.1.6:

8      "Every well operated by BP is required to

9      have a pressure profile, including pore, sand

10     fracture, shale fracture and overburden

11     pressures."

12             A.      That's correct.

13             Q.      And then if you turn over to

14     16.2, next page, you also see that subsequent

15     to this initial pressure profile, that under

16     16.2.5:  "Every well operated by BP shall

17     have an ongoing assessment of the pore and

18     fracture pressures during drilling

19     operations."

20             A.      Yes, I read that.

21             Q.      And that's a "shall," correct?

22     MS. KARIS:

23                     Object to norm.

24     EXAMINATION BY MR. NICHOLS:

25             Q.      16.2.5?

1          A.     "Shall," yes, I see that.

2          Q.     Mandatory?

3          A.     Every well operated by BP shall

4     and the definition of "shall" is "mandatory."

5          Q.     Now, does the DWOP and other BP

6     policies and procedures and guidance, do they

7     concern something called "kick tolerance"?

8          A.     Again, I would expect there

9     would be a provision here around casing

10    design, kick tolerance in this document.

11         Q.     And are there also in addition

12    to the DWOP, I think you've testified before

13    that there are also other general practices

14    and procedures at BP that relate to well

15    control, is that correct?

16         A.     I'm not sure I would call that

17    exactly.

18         Q.     Well, my point is that the DWOP

19    was not the only policy, procedure and

20    guidance that was out there that governed

21    issues of well control while you were at BP,

22    correct?

23         A.     I believe there was a Gulf of

24    Mexico well control manual that should have

25    cross-referenced to the requirements of the

1    BP drilling well operations and practice.

2         Q.     In terms of the general concept

3    of kick tolerance, can you describe what that

4    means?

5         A.     Kick tolerance is defined as

6    the -- generally speaking, the amount of

7    influx and the type of influx that you can

8    tolerate and successfully maintain well

9    control.

10        Q.     And are there policies,

11   practices and procedures at BP with respect

12   to the calculation of kick tolerance?

13        A.     I would assume they are.  I

14   don't have them in front of me.

15        Q.     Now, another topic that you

16   testified about, or have been asked to

17   testify about in the day and half of your

18   testimony, are BP policies, procedures and

19   practices relating to cementing.

20             Do you recall those questions?

21        A.     I seem to recall that I said

22   there were probably cementing technical

23   practices being developed.  I don't recall

24   seeing a final document on cementing

25   practices.

 1          Q.     Well, let's just start with the

 2     DWOP.

 3          A.     And there are, I'm sure,

 4     sections here involving zonal isolation and

 5     cementing.

 6          Q.     Yes, sir.

 7                 And if you turn specifically to

 8     Section 7292, is there a Section 10 of the

 9     DWOP that is dedicated to issues concerning

10     cementing?

11          MS. KARIS:

12                 Object to form.

13          THE WITNESS:

14                 Oh, 7 -- I'm sorry -- 72?

15     EXAMINATION BY MR. NICHOLS:

16          Q.     It's the page that ends in 7292,

17     but it's Section 10 of the DWOP.

18          A.     Okay.  I was getting that

19     confused with Section 10.  Yes, okay.

20                 The question again?

21          Q.     And under these provisions in

22     the DWOP, is it true that the predicted

23     pressures, surface and downhole during

24     cementing, should be reviewed, assessing any

25     risk of overpressuring surface equipment,

```
 1    initiating losses, or underbalancing the
 2    well?
 3          A.    That is a full, accurate read of
 4    Section 10.5.
 5          Q.    And Section 10 then makes
 6    reference to something called GP10-60; is
 7    that correct?  If you look up at 10.1.
 8          A.    Yes, I see the reference, zonal
 9    isolation.
10          Q.    So if you would then turn to the
11    small black binder that is right in front of
12    you.
13          A.    (Complying.)
14          Q.    You see that under Tab 5.
15                Do you recognize that could be a
16    copy of the group practice 10-60 that bears
17    the date -- this particular document bears
18    the date of March 31st, 2010?
19          A.    I recomme -- I recognize the
20    page as a group practice 10-60, which was
21    issued after my departure.
22          Q.    But do you recall that there was
23    a 10-60 at the time that you were at BP?
24          A.    I do not recall that.
25          Q.    And if you would turn, then, in
```

1    this document to the page ending --

2              I want to ask you about -- do

3    you recall whether or not when you were at

4    BP, whether there was any group practice

5    document that provided that cement evaluation

6    logs should be used to determine zonal

7    isolation?

8         A.    I don't recall that document.

9         Q.    And do you recall if there was

10   any practice at the time that you were at BP

11   that would require a cement evaluation log to

12   be used to determine zonal isolation?

13        A.    I don't recall that.  My

14   recollection would be primarily with this

15   DWOP document dated October 2008.  I know we

16   engineering technical practices were under

17   development in 2008 and 2009.

18        Q.    And do you see at the bottom of

19   the page that ends 1037, it's Page 8 of 16,

20   there's a Section 5.3.1 which says "Cement

21   Evaluation Logs"; you see that?

22        A.    I do.

23        Q.    And do you see that it reads:

24   "To accurately assess TOC and zonal isolation

25   cement, sonic and ultrasonic logs should be

1    used"?

2           A.     I do.

3           MS. KARIS:

4                  Object to form.

5    EXAMINATION BY MR. NICHOLS:

6           Q.     And do you recognize that to be

7    a reference to a cement evaluation log or

8    cement bond log?

9           MS. KARIS:

10                 Object to form.

11          THE WITNESS:

12                 The reference to sonic or

13   ultrasonic logs would be commonly referred to

14   as a CBL, and the operative term here is

15   "should be used."

16   EXAMINATION BY MR. NICHOLS:

17          Q.     Sure.

18                 And was that, such a provision,

19   in place as of the time that you were still

20   at BP up through November or December of

21   2009?

22          A.     This document came out after my

23   departure.  I don't recall the document prior

24   to that.

25          Q.     Fair enough.

```
 1                  Now, going back to the DWOP,

 2      it's true, is it not, that during drilling,

 3      Mr. Lacy, drilling fluids are to be used by

 4      BP as a primary well control barrier?

 5           A.      Which section?

 6           Q.      9.1.

 7           A.      (Complying.)

 8                   89.1?

 9           Q.      Yes, sir.

10           A.      And you're specifically speaking

11      to the first -- first sentence?

12           Q.      Yes, sir.

13           A.      Okay.

14           Q.      And is it true that under the

15      DWOP, during drilling, drilling fluids are to

16      be used by BP as a primary well control

17      barrier?

18           A.      The -- my interpretation of this

19      document, drilling fluids are the primary

20      well control barrier.

21           Q.      Okay.  And, obviously, if those

22      fluids are removed from the well at any point

23      in time, such as during displacement

24      operations, that barrier is gone, right?

25           MS. KARIS:
```

```
 1                  Object to form.
 2           THE WITNESS:
 3                  The -- not in every situation.
 4      This refers to well drilled.  Specifically
 5      and during drilling operations, there would
 6      be another provision to cover things after
 7      production casing would be run.
 8      EXAMINATION BY MR. NICHOLS:
 9           Q.     Sure.
10                  But my point is, if -- if -- if
11      the mud's not in the well, it's not serving
12      as any kind of a barrier, correct?
13           A.     That is an accurate statement.
14           Q.     All right.  And you also were
15      asked questions yesterday, and asked again
16      about what happens after drilling during
17      displacement operations, and I think that a
18      lawyer earlier referred you to Section 21.
19      So why don't you go back over there.
20           A.     (Complying.)
21                  Breaking Containment,
22      Section 21?
23           Q.     Yes, sir.
24           A.     Uh-huh (indicating
25      affirmatively).
```

1          Q.     And Section 21 contains

2     provisions that are relevant to a situation

3     in which well control equipment, such as a

4     BOP, is being removed following displacement

5     of the riser, correct?

6          A.     Would you restate?

7          Q.     Yes, sir.

8                 Section 21 of the DWOP contains

9     provisions that are relevant to what needs to

10    be done during removal -- operations -- let

11    me start again.

12                Mr. Lacy, does Section 21

13    contain provisions that are related to the

14    situation in which a riser is being displaced

15    and the BOP equipment is to be removed from

16    the sea floor?

17       MS. KARIS:

18                Object to form.

19       THE WITNESS:

20                My read of that document,

21    specifically 21.1.1 says:  "Prior to breaking

22    containment of any well control equipment,

23    which would be such as the removal of the

24    tree BOP, there shall be two independent

25    mechanical barriers to flow fitted in all

1    wells capable of sustaining flow to surface."

2    I believe that's what you're asking.

3    EXAMINATION BY MR. NICHOLS:

4        Q.    And -- and that is what I was

5    asking, and that is a requirement -- what you

6    just read is a requirement of the DWOP,

7    correct?

8        A.    This is from DWOP, and it does

9    use the term "shall."

10        Q.    Okay.  Mandatory?

11        A.    "Shall" is defined as mandatory.

12        Q.    Now, during your deposition,

13    Mr. Lacy, you've also talked about certain

14    issues relating to well control, correct?

15        A.    We -- the topic, well control,

16    has come up numerous times, so I'm not

17    sure --

18        Q.    And while --

19        A.    -- specifically which one you're

20    referring to.

21        Q.    Yes, sir.

22              While we're on the DWOP, why

23    don't you turn to Section 50.

24        A.    One five?

25        Q.    Yes, sir.  And it's the page

1    that ends 7305.

2         A.    (Complying.)  Okay.

3         Q.    And do you see that there is a

4    section of the DWOP that relates specifically

5    to well control?

6         A.    I see Section 15 titled "Well

7    Control."

8         Q.    And does section, consistent

9    with your earlier testimony, require that all

10   BP drilling and well operations personnel,

11   and personnel acting on behalf of BP and

12   contractor personnel who may take control of

13   well activities, such as toolpushers and

14   drillers, are required to get well control

15   training and certification every 24 months?

16        MS. KARIS:

17             Object to form.

18        THE WITNESS:

19             Sections 15.1, 15.1.1, 15.1.2

20   outline the requirement for well control

21   certifications relative to the roles you've

22   just discussed every 24 months.

23   EXAMINATION BY MR. NICHOLS:

24        Q.    And that includes all the

25   persons that I just mentioned, that all well

1    operations personnel, personnel acting on

2    behalf of BP, and contractor personnel who

3    may take control of well activities, such as

4    toolpushers and drillers; correct?

5         A.    That is an accurate read of this

6    classification of all contractor personnel

7    with examples, yes.

8         Q.    And the DWOP also requires the

9    business unit to be prepared to remediate any

10   well control event through the use of BP's

11   well control response guide and the BP well

12   control manual; is that correct?

13        A.    That is an accurate read of

14   15.1.3.

15        Q.    Now, you testified a little

16   earlier today that it was the practice that

17   the drilling managers needed to go after the

18   rigs once a month, more or less, to talk to

19   the well site leaders?

20        A.    My statement earlier today meant

21   to infer that my personal expectations and

22   part of their performance contracts were

23   expectations that they would travel to the

24   rigs at least once every one to two months.

25        Q.    And as part of your supervis --

1    supervisory responsibilities at BP while you
2    were still there, did you make sure that
3    there were efforts in place to make sure that
4    the -- that the drilling managers did that?
5         A.    We kept a track of the visits
6    per rig.  I believe Steve Tink kept an Excel
7    spreadsheet of the numbers of trips and who
8    went, and if someone couldn't go, we would
9    send an alternative.
10        Q.    And when you say "drilling
11   managers," that's the term you used in your
12   answers, would that include or would that
13   mean the so-called well's team leaders?
14        A.    Well's team -- so when I say
15   drilling manager, at the time I was there,
16   there were effectively three drilling
17   managers:  Mr. Enlow (phonetically),
18   Mr. Charlie Holt and Mr. Andrew Frazelle.  So
19   my expectation would have been that those
20   gentlemen traveled to the rig one -- once
21   every one to two months.  Their direct
22   reports were often referred to as the well's
23   team leaders.  Individuals Gavin Kidd, John
24   Guide, would be referred to as wells team
25   leaders.

1            Q.      And so would that requirement of
2     going to the rig, would that apply to the
3     well's team leaders?
4            A.      I think we had -- I seem to
5     recall we had an expectation of their
6     frequency to go to the rig.  I don't recall
7     specifically, but they would have been
8     tracked in that spreadsheet that Steve Tink
9     kept track of.
10           Q.      Now, we've mentioned the topic
11    of kick tolerance, and you've defined that
12    for us.
13                   Is it true that in the Gulf of
14    Mexico, BP frequently operated without the
15    DWOP-required kick tolerance due to the low
16    pore pressure fracture gradient margins and
17    the nature of deepwater well control systems?
18    MS. KARIS:
19                   Object.
20    THE WITNESS:
21                   I -- I -- I can't -- I can't say
22    with certainty that statement is accurate.
23    EXAMINATION BY MR. NICHOLS:
24           Q.      And do you recall whether, with
25    respect to the guidance in effect for the

1    Gulf of Mexico, that the -- the kill

2    techniques that would be used in the event of

3    a detected influx into the well provided that

4    the first decision to be made was to evaluate

5    if the flow was real or from a ballooning

6    formation?

7         A.    I would need to see the guide

8    that was in place while I was there.

9         Q.    You don't recall that at all?

10        A.    Not that speci -- I -- that very

11   specific wording.  I would need to see the

12   document.

13        MR. NICHOLS:

14             Let's go off the record for just

15   a second.

16        THE VIDEOGRAPHER:

17             Off the record.  The time is

18   2:36.

19             (Whereupon, an off-the-record

20   discussion was held.)

21        THE VIDEOGRAPHER:

22             Back on the record.  The time is

23   now 2:38.

24   EXAMINATION BY MR. NICHOLS:

25        Q.    Mr. Lacy, during the break, we

1     put before you what's been marked previously

2     as Exhibit 2200, and do you recognize that to

3     be a set of policies, procedures and guidance

4     that were in effect at BP during the time

5     that you were a vice president at that

6     company?

7          A.     I don't recognize this document.

8     It's dated August 2004.

9          Q.     Okay.  And so this would not

10    have been one of the documents that ever

11    would have been brought to your attention

12    that you can recall while at BP?

13         A.     I don't recall seeing this

14    document in my time there.  There's only one

15    name I recognize, John Shaughnessy.  There

16    are no signatures, no dates.

17         Q.     Okay.  So if you would turn now

18    to the Bates page that -- Bates-numbered page

19    that ends in 4011.

20         A.     (Complying.)

21         Q.     You with me?

22         A.     Yes.

23         Q.     And is there a provision on that

24    page that talks about in the event that a --

25    a gain in mud is detected, that a decision is

```
 1    to be made as to whether the flow is, quote,

 2    real, close quote, or from a ballooning

 3    formation?

 4         MS. KARIS:

 5              Object to the form.

 6         THE WITNESS:

 7              I'm sorry.  You said 4011?

 8    There's two 4011s.

 9    EXAMINATION BY MR. NICHOLS:

10         Q.   Oh.  Let me have it.  I'll take

11    it back from you.

12              If you look at page -- it's

13    actually Page 4 of the document.

14              At the bottom, is there a

15    section that talks about kill technique?

16         MS. KARIS:

17              I don't know what exhibit you're

18    looking at.

19         MR. NICHOLS:

20              We've referred to the --

21         THE WITNESS:

22              2200.

23         MR. NICHOLS:

24              -- 2200

25         MS. KARIS:
```

```
 1                    Is that the 2004 document?
 2          MR. STANLEY:
 3                    Yes.
 4          MS. KARIS:
 5                    I have an objection to form.
 6     It's a document he's never seen.
 7          THE WITNESS:
 8                    There is a Section 2 labeled
 9     "Kill Technique."
10     EXAMINATION BY MR. NICHOLS:
11          Q.    Okay.  And do you see that there
12     is provision in there that talks about, in
13     the event of a gain in the pits, a decision
14     is to be made as to whether the gain -- the
15     flow is real or from a ballooning formation?
16          MS. KARIS:
17                    Object to form.
18          THE WITNESS:
19                    I -- I read the paragraph where
20     it says several factors will be considered:
21     size of influx, shut-in pressures, fracture
22     pressure in the open hole, whether the first
23     decision evaluating flow is real or from a
24     ballooning formation, and I --
25     EXAMINATION BY MR. NICHOLS:
```

```
 1            Q.     Slow down a little bit.  That
 2      section I want you to focus on is where it
 3      says "the first decision."
 4                   What does it say?
 5            A.     "The first decision is
 6      evaluating if the flow is real or from a
 7      ballooning formation."
 8            Q.     Is that what that document
 9      provides?
10         MS. KARIS:
11                   Object to form.
12         THE WITNESS:
13                   This document reads this, but
14      I'm not sure I understand the question.
15      EXAMINATION BY MR. NICHOLS:
16            Q.     I'm just asking, if first of
17      all, is that what the document provides?
18         MS. KARIS:
19                   Object to form.
20         THE WITNESS:
21                   That's my reading of the
22      document.  I'm not sure of the relevance of
23      the document.
24      EXAMINATION BY MR. NICHOLS:
25            Q.     And were you ever aware of this
```

1    guidance that was out there, that the first
2    decision that was to be taken was to decide
3    whether the influx was real or whether it was
4    caused by ballooning?
5         MS. KARIS:
6              Object to form.
7         THE WITNESS:
8              I can say with certainty I was
9    not.
10   EXAMINATION BY MR. NICHOLS:
11        Q.    And would you consider a
12   procedure of deciding whether an influx of
13   flow is real or from a ballooning formation,
14   making that decision before instituting
15   efforts to shut in the well, in your view
16   from a process safety perspective, would that
17   be prudent?
18        MS. KARIS:
19              Object to form.
20        THE WITNESS:
21              That's too general a question
22   without specifics to make a determination.
23   EXAMINATION BY MR. NICHOLS:
24        Q.    Did you understand, Mr. Lacy,
25   that under the DWOP, when a -- someone on the

1     rig detected or suspected an influx, the
2     requirement was to take efforts immediately
3     to shut that well in?
4          A.     Are we talking about this
5     document or DWOP?
6          Q.     I just referenced DWOP.
7          A.     Which section?
8          Q.     Mr. Lacy, under 15.2 of the
9     DWOP, does it provide for provisions on well
10    control practices?
11         A.     In -- in the October 2008, Issue
12    1, of the DWOP, Section 15.2 is well control
13    practices, and it's labeled "General
14    Requirements," yes.
15         Q.     Okay.  And then does the DWOP
16    require that there be procedures for shutting
17    a well in in the event that an influx or kick
18    is detected?
19         MS. KARIS:
20              Object to form.
21         THE WITNESS:
22              Which -- I'm -- I'm looking for
23    the wording you're using in the section here.
24    EXAMINATION BY MR. NICHOLS:
25         Q.     I'm -- I'm asking -- I'm just

1    asking in general, is there a requirement --

2         A.    Well, it can't be in general; it

3    has to be specific to the DWOP if you're

4    asking me a question about DWOP.

5         Q.    Well, I'm just asking in general

6    in the DWOP, is there a requirement set

7    out -- or let me ask you in general:  Under

8    BP general policy, were there guidelines that

9    mandated that if a kick was detected into a

10   well, that BP personnel and rig crew, that

11   they needed to take efforts to shut that well

12   in?

13        A.    I don't recognize the term "BP

14   general policy."

15        Q.    Were there any policies,

16   practices or procedures instituted at BP

17   while you were there that called for rig

18   personnel to shut a well in if a influx into

19   the well, a kick, was detected or suspected?

20        MS. KARIS:

21             Object to form.

22        THE WITNESS:

23             The -- the procedures that I am

24   familiar with exist here in the DWOP, and

25   there should be a document that is labeled

669

```
1       "The Gulf of Mexico Well Control Manual,"
2       which I don't have in front of me.
3       EXAMINATION BY MR. NICHOLS:
4            Q.     Well, actually, you do.  If you
5       look at the big binder in front of you.
6            A.     Okay.
7            Q.     Go ahead and pick the big binder
8       up.
9            A.     (Complying.)
10           Q.     And do you recall something
11      called the "Well Control Manual" at BP?
12           A.     I recall a BP well control
13      manual.
14           Q.     And if you go to Volume 1, which
15      is under that first tab, Tab A in that big
16      binder, it is also been marked previously as
17      Exhibit 2389, and go to Page 6073.
18           A.     (Complying).  Okay.
19           Q.     Do you see under Section 4.1 a
20      reference to a gain in pit volume?
21           A.     The first sentence in
22      Section 4.1 starts with, "A gain in pit
23      volume."  Yes, I see that.
24           Q.     And so you see that it provides
25      there that:  "A gain in pit volume that was
```

1    not caused by the movement of mud stocks at

2    surface is confirmation that a kick is

3    occurring or has occurred"?

4            A.    I see that.

5            Q.    And do you still have that

6    section from Exhibit 2200 in front of you?

7            A.    This document?

8            Q.    Yes.

9            A.    Yes, sir.

10           Q.    So I want you to put this

11   language, that a gain in pit volume is

12   confirmation that a kick is occurring or has

13   occurred.

14                You see that?

15           A.    Yes.

16   MS. KARIS:

17                Object to form.

18   EXAMINATION BY MR. NICHOLS:

19           Q.    And I want you to compare that

20   to the language that we just read about the

21   determination -- the first determination as

22   to whether an influx was real or was caused

23   by ballooning.

24                Remember that language?

25           A.    I remember the language.  I'm

```
 1     not clear on what you're wanting me to do.
 2          Q.    I'm just asking you right now
 3     just to compare -- look at those two standing
 4     together.
 5          MR. STANLEY:
 6                I'm sorry, Counsel, I'm
 7     confused.  We're not looking at the DWOP;
 8     we're going back to that 2004 document?
 9          MR. NICHOLS:
10                We're looking right now at the
11     first volume of the BP well control manual,
12     which is Exhibit 2389.
13          MR. STANLEY:
14                Got that.
15          MR. NICHOLS:
16                And we're also looking at
17     Exhibit 2200, which is that page that we just
18     referred to earlier.
19          THE WITNESS:
20                And which section?
21          MR. NICHOLS:
22                Page 4 of the 2004 document.
23          MR. STANLEY:
24                It's --
25          THE WITNESS:
```

1            Okay.

2      EXAMINATION BY MR. NICHOLS:

3            Q.     All right.

4            A.     Okay.  And -- and the question

5      is?

6            Q.     The question is:  Do you see the

7      language, on the one hand, from the well

8      control manual that says that a gain in pit

9      volume is confirmation that a kick is

10     occurring or has occurred?  See that?

11           A.     I see the "gain in pit volume,"

12     from the 2000 document, "that was not caused

13     by the movement of mud stocks to surface is

14     confirmation that a kick is occurring or has

15     occurred."

16           Q.     And then you see the language

17     that -- from the Exhibit 2200 that I showed

18     you, that talks about in the event that

19     there's influx, that a decision is going to

20     be made.  The first decision is whether the

21     flow is real or caused by ballooning,

22     correct?

23           MS. KARIS:

24                 Object to form.

25           THE WITNESS:

```
 1                    I see that statement in the
 2     document dated 2004, yes.
 3     EXAMINATION BY MR. NICHOLS:
 4          Q.    So my question to you is:
 5     Putting those two things side to side, are
 6     those two pieces of guidance consistent?
 7          MS. KARIS:
 8                    Object to form.
 9          THE WITNESS:
10                    The wording is inconsistent, but
11     as far as I see, neither of these documents
12     are, in effect, there they dated.  I don't
13     know.
14     EXAMINATION BY MR. NICHOLS:
15          Q.    Well, let me just run that to
16     ground.
17                    Sitting here today, do you know
18     whether the well control manual that I put in
19     front of you, 2389, was in effect as of the
20     date of the Macondo tragedy in April of 2010?
21          MS. KARIS:
22                    Object.
23          THE WITNESS:
24                    No, I do not know that.
25     EXAMINATION BY MR. NICHOLS:
```

1          Q.     Do you know if Exhibit 2200 was

2     likewise in effect as of time of the Macondo

3     tragedy in April of 2010?

4          A.     No, I do not know that.

5          Q.     Just don't know one way or the

6     other?

7          A.     I can't -- I wasn't there.  It's

8     impossible to know.

9          Q.     Okay.

10         MS. KARIS:

11               Please go off the record.  I

12     understand an hour and 15, but I believe

13     there's an order by the court giving you

14     45 minutes.

15         MR. NICHOLS:

16               You want to show me the order?

17     I'll be happy to talk about it, on the order.

18               Off the record.

19         THE VIDEOGRAPHER:

20               Off the record -- off the

21     record.  The time is 2:51.

22         MS. KARIS:

23               I believe, for the record,

24     Cameron's time is up.

25         THE VIDEOGRAPHER:

```
 1                    Back on the record.  The time is
 2        2:52.
 3        EXAMINATION BY MR. NICHOLS:
 4             Q.     Mr. Lacy, I again appreciate
 5        your patience during this process.
 6             A.     Okay.
 7             Q.     I want to turn you back now to
 8        the DWOP, which is Exhibit 93, which is in
 9        that small white binder.
10             A.     (Complying.)
11             Q.     And the DWOP also provides the
12        "shalls" as to what BOP equipment is to be
13        used for BP's deepwater drilling, is that
14        correct?
15             A.     Which section?
16             Q.     Yes, sir.  It's section -- I
17        refer you to Section 15.3.35.
18             A.     Okay.
19             Q.     And you see under
20        Section 15.3.35, there is language, mandatory
21        language, shall language, concerning the
22        configuration of BOP stacks that are to be
23        used in subsea drilling where a wellhead
24        pressure of over 5,000 psi is possible?
25             A.     I am sorry.  Which Bates page?
```

```
 1          Q.      Well, I thought I referred you
 2     to the section which is 15.3.35.
 3          A.      I'm sorry.  3.5 -- okay.  I'm
 4     sorry.
 5          MR. STANLEY:
 6               That's okay.  Take your time.
 7     Right here.
 8          THE WITNESS:
 9               15.3.35, yes.
10     EXAMINATION BY MR. NICHOLS:
11          Q.      Yes, sir.  Bates ending 7312.
12     Are we on the same page?
13          A.      Yes.
14          Q.      So my question to you, sir, was:
15     Is it true that the DWOP contains mandatory
16     language concerning the configuration of a
17     BOP stack for application in subsea drilling
18     where a wellhead pressure of over 5,000 psi
19     is possible?
20          A.      Sec --
21          MS. KARIS:
22               Object to form.
23          THE WITNESS:
24               Section 15.3.35 refers to, as a
25     range from top to bottom, the minimum BOP
```

```
1    configuration shall be required for wells
2    where wellhead pressure of over 15,000 psi is
3    possible, and then goes on to list two
4    annular preventers, four ram-type preventers,
5    outlets for choke and kill valves, and
6    minimum number of inlets, outlets.
7    EXAMINATION BY MR. NICHOLS:
8         Q.    And, again, this is a shall
9    provision, a mandatory provision?
10        A.    The wording "shall" is there,
11   yes.
12        Q.    And so the DWOP actually
13   provides for a specification that includes,
14   among other things, two annular preventers,
15   one which is retrievable on the lower marine
16   riser package, correct?
17        A.    That is my interpretation.
18        Q.    Provides for -- BP's mandatory
19   provision provides for four ram-type
20   preventers, correct?
21        MS. KARIS:
22              Object to form.
23        THE WITNESS:
24              That is my understanding.
25   EXAMINATION BY MR. NICHOLS:
```

```
 1          Q.     And BP's mandatory practice
 2   document provision provides for outlets for
 3   choke and kill lines, correct?
 4          MS. KARIS:
 5                  Object to form.
 6          THE WITNESS:
 7                  That is my understanding of this
 8   provision.
 9   EXAMINATION BY MR. NICHOLS:
10          Q.     And if you go to the next
11   provision, the BP mandatory requirements
12   provide that, quote:  "A sealing shear ram
13   shall be required."
14                  Did I read that correctly?
15          A.     That's correct.
16          Q.     And is this consistent with your
17   earlier testimony about the use of a single
18   shearing ram in BOP stacks?
19          MS. KARIS:
20                  Object to form.
21          THE WITNESS:
22                  I'm not sure.  You'll have to
23   read that back so I know if I'm accurate.
24   EXAMINATION BY MR. NICHOLS:
25          Q.     You -- you recall that lawyers
```

1        was asking you about whether it was BP's

2        practice to include a single shearing ram in

3        BOP stacks; do you recall those questions?

4               A.     I -- I recall stating that it

5        was my understanding that a single shear ram

6        was required.

7               Q.     And this confirms that under the

8        DWOP, right?

9               A.     That's correct.

10              MS. KARIS:

11                     Object to form.

12       EXAMINATION BY MR. NICHOLS:

13              Q.     AND did you also testify that in

14       your experience, using a single shear ram was

15       also consistent with industry practice

16       generally?

17              A.     Yes.

18              Q.     And does the DWOP also provide

19       that:  "The limitations of the shear ram

20       shearing capacity should be known and

21       understood, and a documented risk assessment

22       shall be in place to address any such

23       limitations"?

24              A.     The DWOP states that exactly as

25       you've stated.

```
 1          Q.     And that is a BP mandatory
 2     requirement, correct?
 3          MS. KARIS:
 4               Object to form.
 5          THE WITNESS:
 6               There's -- there's a "should"
 7     and "shall" in the same sentence.
 8     EXAMINATION BY MR. NICHOLS:
 9          Q.     Sure.
10               But the part that's a "shall" is
11     that "a documented risk assessment of any
12     limitations of shearing capacity shall be in
13     place to address any such limitations,"
14     correct?
15          MS. KARIS:
16               Object to form.
17          THE WITNESS:
18               Documented risk assessment shall
19     be in place, correct.
20     EXAMINATION BY MR. NICHOLS:
21          Q.     With respect to the -- to the
22     shear ram, correct?
23          MS. KARIS:
24               Object to form.
25          THE WITNESS:
```

```
 1                    With respect to the limitations
 2      on the shearing capacity.
 3      EXAMINATION BY MR. NICHOLS:
 4           Q.    Now, if you turn the page, you
 5      see that in the 15.3.38, there are further
 6      specifications concerning the type of pipe
 7      ram that's to be included in BOP stacks used
 8      in BP operations, correct?
 9           A.    15.3.38?
10           Q.    Yes, sir.
11           A.    Okay.
12           Q.    You see that?
13           A.    "The BOP stack shall contain a
14      pipe ram that can close on every size of
15      drill pipe and tubing that comprises a
16      significant length of the total string,"
17      correct.
18           Q.    And that there are other
19      specifications here in the DWOP concerning
20      the type of blowout prevention equipment that
21      is be used on subsea applications in
22      connection with BP drilling operations,
23      correct?
24           MS. KARIS:
25                    Object to form.
```

1          THE WITNESS:

2                  I'm not sure I understand that

3     statement.

4     EXAMINATION BY MR. NICHOLS:

5          Q.     It's a general question.

6                  Do you understand that there are

7     other provisions within this section that

8     provide additional specification for the type

9     of BOP equipment that is to be used in subsea

10    applications on BP drilling operations, just

11    generally?

12         A.     The section we've just gone over

13    is titled, "Configuration Subsea Drilling

14    Completion Work over BOP Stacks."

15         Q.     Okay.  And do you recall that

16    the BP well control manual actually sets out

17    a diagram of the equipment that should be

18    included on a deepwater subsea stack?

19         A.     I don't recall which manual

20    you're referring to.

21         Q.     You're going to go to that big

22    binder in front of you.  You're going to go

23    under Tab B.

24         A.     (Complying.)

25         Q.     And please go to -- and

```
 1    that's -- for the record, that's
 2    Exhibit 2890.  And if you turn to the page
 3    that ends in the Bates number 6679.
 4         A.    (Complying.)
 5         Q.    It's pretty far back.
 6         A.    6 -- I'm sorry?
 7         Q.    6679.
 8         MR. STANLEY:
 9              6679.  Last four digits.  If you
10    look at the front of the document --
11         THE WITNESS:
12              And the question, I'm sorry?
13    EXAMINATION BY MR. NICHOLS:
14         Q.    Yes, sir.
15              The question that was pending,
16    does this help refresh your recollection that
17    the BP well control manual actually set out a
18    schematic or a diagram of the type of BOP
19    equipment that was required to be used in
20    connection with BP's deepwater drilling
21    operations?
22         A.    My memory can't be refreshed on
23    a document that I don't recognize.
24         Q.    So just so that I understand,
25    Mr. Lacy, we -- you read in the DWOP that
```

```
 1    there was something called the Well Control
 2    Manual, correct?  It's referred to in the
 3    DWOP?
 4         A.     The BP well control manual?
 5         Q.     Yes, sir.
 6         A.     Is referred to?
 7         Q.     Yes, sir.
 8         A.     Where is that?  I'm sorry.
 9         Q.     You recall that we talked about
10    Section 15, Page 7305?
11         A.     Yes.
12         Q.     There is a reference in 15.1.3
13    that:  "Business unit shall be adequately
14    prepared to remediate any well control event
15    through its use of a well control response
16    guide and the BP well control manual"?
17         A.     That's -- that's correct.
18         Q.     So you are familiar with the
19    DWOP?
20         A.     I'm familiar with DWOP.
21         Q.     And the DWOP, on its terms,
22    makes reference to -- and I'll represent to
23    you, there's more than this one, but this is
24    an example of a reference to a well control
25    manual; you see that?
```

1          A.     I see the reference.

2          Q.     And do you -- are you telling us

3     that as part of your work in the job that you

4     held at BP, that you would not have reviewed

5     at any time the well control manual for --

6     that was applicable to the Gulf of Mexico?

7          A.     That's not correct.

8          Q.     So now let's go back to 2890,

9     the document --

10         A.     So let's be -- you said Gulf of

11    Mexico well control manual.  That's a

12    separate document.

13         Q.     Yes, sir.

14         A.     Okay.

15         Q.     Yes, sir.

16         A.     All right.  This is not that

17    document.

18         Q.     Good point.

19               The document that I put in front

20    of you has been testified to by a corporate

21    representative of BP as being the BP general

22    well control manual that was in effect as of

23    April 2010.

24               Do you recognize that document?

25         A.     No, I do not.

1          Q.     Okay.  So just for purposes of
2     today's discussion so that we can close the
3     loop on that, I've referred you to a page,
4     and do you see a diagram that is contained in
5     2390?
6          A.     I do.
7          Q.     And does that diagram depict a
8     BOP stack that, under its legend, is defined
9     as being used in deepwater applications?
10         MS. KARIS:
11              Object to form.
12         THE WITNESS:
13              The legend on the -- the graphic
14    says:  "For inland outlet 10/15 million" --
15    "15,000 subsea BOP stack," yes.
16    EXAMINATION BY MR. NICHOLS:
17         Q.     Subsea BOP stack?
18         A.     That's correct.
19         Q.     And does it contain a
20    configuration of several pipe rams or
21    variable bore rams?  Working from the bottom
22    of the stack?
23         A.     It shows four ram-type graphics,
24    one of which is designated blind shear ram.
25    The other three are pipe rams.

1          Q.     And does it also show two
2     annular preventers?
3          A.     An upper and lower, yes.
4          Q.     And just in general terms, did
5     you understand while you were at BP,
6     Mr. Lacy, that for BP drilling and well
7     operations, that BP was going to specify what
8     type of BOP equipment was going to be used in
9     connection with those operations?
10         MS. KARIS:
11              Object to form.
12         THE WITNESS:
13              My understanding would be in --
14    in the rig contract, that there would be a
15    specification for BOP in the rig contract,
16    yes, sir.
17    EXAMINATION BY MR. NICHOLS:
18         Q.     In other words, the contract
19    that BOP -- that BP had with the rig
20    operator, correct?
21         A.     That would be standard, yes.
22         Q.     And those would be set out in
23    contract?
24         MS. KARIS:
25              Object to form.

```
1          THE WITNESS:
2                They should be in the
3     contract -- in the appendix regarding
4     equipment specifications, yes.
5          MR. NICHOLS:
6                Okay.  We need to change the
7     tape.
8          THE VIDEOGRAPHER:
9                Off the record.  The time is
10    3:04.  This is the end of Tape 5.
11                (Whereupon, a brief recess was
12    taken.)
13         THE VIDEOGRAPHER:
14                We're back on the record.  The
15    time is now 3:07.
16    EXAMINATION BY MR. NICHOLS:
17         Q.    Mr. Lacy, these specifications
18    that would go into the rig contracts
19    concerning BOP equipment, in general terms,
20    would they include specifications in terms of
21    pressure and temperature ratings?
22         A.    I would believe it would be
23    common practice to include pressure and
24    temperature ratings and any extraordinary
25    downhole conditions, such as sour service, in
```

1    those specs.

2         Q.    And I believe that you've

3    testified previously that in these types of

4    subsea applications, that a common pressure

5    rating for this equipment would be

6    15,000 psi, correct?

7         A.    Common pressure rating in

8    deepwater is often 15,000.  But in some

9    circumstances, 10,000 could be acceptable.

10        Q.    Sure.

11              But as I understand it, from

12   your earlier testimony, Mr. Lacy, you were

13   involved in scheduling the DEEPWATER HORIZON

14   as outfitted for use at the Macondo well, is

15   that correct?

16        A.    That's not correct.

17        Q.    Okay.  Were you involved in the

18   scheduling of the DEEPWATER HORIZON for use

19   at a prior well?

20        A.    In terms of scheduling --

21        Q.    Yes, sir.

22        A.    -- the -- discussing which wells

23   it went to?  Yes.

24        Q.    And would you take into

25   consideration in scheduling those wells

1    whether the rig was appropriately outfitted

2    to do that work, to do that job?

3         A.    Not in my level of

4    conversations.  The specifications, as the

5    rig was on contract long term, were well

6    known for what was on the rig.  So those

7    planning the well and ultimate sign-off of

8    the well plan would be with the well's

9    manager, depending on which area it was.  But

10   the HORIZON has worked primarily for

11   exploration appraisal.  During my time, that

12   would be Ian Little.

13        Q.    And -- but, certainly, no one at

14   BP during your time there would have

15   scheduled a rig for operations at a well if

16   it wasn't appropriately outfitted in terms of

17   its design to conduct those drilling

18   operations, correct?

19        A.    There -- I'm not aware of

20   anybody doing that.

21        Q.    And just so that I'm clear, were

22   you ever involved in scheduling the DEEPWATER

23   HORIZON for projects?

24        A.    Rig schedule discussions was a

25   primary part of my role as VP of D&C, and we

```
 1    would have discussions internally with D&C
 2    and within the VPs of assets, VP of
 3    exploration, on use of the various rigs.
 4          Q.    Including the DEEPWATER HORIZON?
 5          A.    Including the DEEPWATER HORIZON.
 6          Q.    And so during those discussions,
 7    were you ever aware of a situation which the
 8    DEEPWATER HORIZON was being scheduled for a
 9    job for which it was not appropriately
10    outfitted as designed?
11          A.    No, not at all.
12          Q.    One last topic.  Would you turn
13    to Tab 8, which is in the smaller black
14    binder.
15          A.    (Complying.)
16          Q.    I put before you a document that
17    we're going to mark as our next exhibit,
18    which is 2952.
19                (Exhibit No. 2952 marked for
20    identification)
21       MS. KARIS:
22                I believe, for the record,
23    Cameron's time is up.
24       THE COURT REPORTER:
25                I couldn't hear you.
```

```
 1          MS. KARIS:
 2                  Sorry.
 3                  I believe, for the record,
 4     Cameron's time is up.
 5          MR. NICHOLS:
 6                  All right.  I still have not
 7     seen a court order, and I'm going for it.
 8          MS. KARIS:
 9                  I will hand it to you.  I can
10     help you out there.
11          MR. HAYCRAFT:
12                  Are you disputing that Cameron
13     has more than 45 minutes plus 15 minutes that
14     were ceded to you on the spot?  Is that your
15     perception?
16          MR. NICHOLS:
17                  I have been operating under
18     working -- let's go off the record.
19          THE VIDEOGRAPHER:
20                  Off the record.  The time is now
21     3:12.
22                  (Whereupon, an off-the-record
23     discussion was held.)
24          THE VIDEOGRAPHER:
25                  Back on the record.  The time is
```

1    now 3:13.

2         MS. KARIS:

3              I would like to state for the

4    record that we have raised the issue of time

5    allocation from day one in these depositions.

6    I think it's inappropriate for Cameron's

7    counsel to come here and contend that he

8    doesn't know that there is an order limiting

9    his time to 45 minutes.  It's one thing to

10   say that you got time from others, but to

11   dispute that you have 45 minutes, and then to

12   demand that I provide you with an order that,

13   presumably, you have an obligation to be

14   familiar with and aware of is inappropriate.

15        MR. NICHOLS:

16             Are you done?

17        MS. KARIS:

18             I am.

19        MR. NICHOLS:

20             All right.  Let's go on with the

21   deposition.

22             And just for the record, I'd

23   like to state that I've been sitting through

24   a number of depositions, and I believe firmly

25   that more time is wasted in talking about

```
 1    time than we ever save by enforcing time
 2    limits.
 3    EXAMINATION BY MR. NICHOLS:
 4         Q.    Exhibit 2952 is our next
 5    exhibit, and this was a document that was
 6    provided in -- I believe in native format by
 7    BP, so it doesn't have a Bates number.
 8               So my question to you, sir, is,
 9    it's PowerPoint?  Is that what it appears to
10    be to you?
11         A.    Yes, it is.
12         Q.    And your name is listed within
13    the document.
14               Do you recognize this -- this
15    PowerPoint?
16         A.    I'm -- I'm looking for a date,
17    which would help me with the --
18         Q.    Well, I tell you, on the
19    documents provided to us, there was no date
20    listed at the bottom.  However, I will tell
21    you that there are a couple of references to
22    the years 2008, if that helps.
23         A.    This is not a 2008 document.
24         Q.    Okay.
25         A.    This -- this is, at best, a
```

 1    November 2009 document.

 2          Q.    Okay.  And -- and all I'm trying

 3    to do right now is just to identify it.

 4                And I think, from your testimony

 5    yesterday, you said that you had presented BP

 6    management with some ideas concerning risk

 7    management that you intended to work on and

 8    implement in the future and get in place in

 9    2010, is that correct?

10          A.    The comments yesterday were

11    referencing the risk tools that were

12    developed by Kal Jessel and presented to the

13    drilling completions leadership team in the

14    Gulf of Mexico, subsequently presented, I

15    believe, by Harry Thierens to the -- the

16    other drilling managers in the conference in

17    November of 2009.

18          Q.    Okay.  And this document I put

19    in front of you, 2952, you recognize as being

20    a document that dates, roughly, from the era

21    of November 2009?

22          A.    I am --

23          BY MS. KARIS:

24                Object to form.

25          THE WITNESS:

1                      -- guessing, in terms of -- I --

2        my name is on it, and given the number of

3        people, I don't know if this is a document

4        that David Porter put together or if this is

5        part of the document that -- so I -- I can't

6        recall exactly when this document was

7        presented.

8        EXAMINATION BY MR. NICHOLS:

9            Q.    Okay.  Looking through the

10       document --

11           A.    Uh-huh (indicating

12       affirmatively).

13           Q.    -- does it contain a discussion

14       of the types of major hazard and risk

15       management issues that you were discussing

16       with BP management up through November of

17       2009?

18           A.    I didn't have a discussion with

19       BP management at 2009, November 2009.  Again,

20       what I said is that we developed a risk

21       management tool for the use of Gulf of

22       Mexico.  That tool was presented by Harry

23       Thierens, not myself, to the other drilling

24       managers.

25           Q.    Okay.  So let me amend my

 1    question.

 2              Does Exhibit 2952 contain some

 3    of the discussion of the concepts that you

 4    were advancing in the BP hierarchy as of

 5    November 2009?

 6        A.    I -- I can't say that it is.

 7    This is a -- this is not the document -- or

 8    the same document.  This is a -- this is an

 9    integrity management presentation that would

10    have been developed with Mick Leary and Dave

11    Porter, and I can't recall -- that -- that

12    was separate from the presentation of May and

13    November.

14        Q.    Okay.  So looking at this

15    Exhibit 2952, first of all, did you

16    contribute any of the content of this

17    document?

18        A.    I'd have to look through every

19    page.

20              I do not see anything in here

21    that I would recall or that I think I

22    contributed.

23        Q.    Okay.  And so -- but looking at

24    the content, again, identify for me the

25    persons within BP that you think would be

1    most likely to work on this type of -- these
2    type of issues?
3         MS. KARIS:
4              Object to form.
5         THE WITNESS:
6              This document, which has a
7    reference to plan for April 2008, the
8    individuals I think would be most familiar
9    with the production of the document would
10   have been of Mick Leary, the D&C performance
11   manager who reported to me at the time; and
12   there is a reference to a gentleman by the
13   name of David Porter, who was the drilling
14   completions IM lead.  That meant I --
15   integrity management lead.
16   EXAMINATION BY MR. NICHOLS:
17        Q.    And do you recall this
18   presentation ever being made to you?
19        A.    I vaguely recall this
20   presentation, but I couldn't tell you the
21   date.
22        Q.    Okay.
23        MR. NICHOLS:
24              Thank you.  That's all I have.
25   I appreciate your patience.

```
1          THE WITNESS:
2                Okay.
3          THE VIDEOGRAPHER:
4                Off the record.  The time now is
5     3:20.
6                (Whereupon, a brief recess was
7     taken.)
8          THE VIDEOGRAPHER:
9                Back on the record.  The time is
10    now 3:30.
11    EXAMINATION BY MS. KARIS:
12         Q.    Good afternoon, Mr. Lacy.
13    Carrie Karis for BP.
14                I'm going to ask you some
15    questions.  I'm going to try not to go back
16    over all the subjects that have been
17    previously covered or even the questions, but
18    from time to time we'll have to refer back
19    just to orient ourselves.
20                I want to first begin with
21    discussions relating to the Macondo well
22    itself.
23                Did you have any direct
24    involvement in connection with the Macondo
25    well after November of 2009?
```

700

```
 1          A.      Well, I didn't depart until

 2    December.

 3          Q.      Fair enough.

 4          A.      So at -- after my departure

 5    date, I could say conclusively, no.

 6          Q.      Okay.  So let's move that date

 7    to December, and I'll ask the question.

 8                  Did you have -- again, did you

 9    have any involvement in connection with

10    decisions made on the Macondo well after

11    December of 2009?

12          A.      After -- not after my departure,

13    no.

14          Q.      At any time from April 20th

15    through today, have you interviewed any BP

16    employees who were involved with the Macondo

17    well?

18          A.      No, I have not.

19          Q.      Have you interviewed any

20    Transocean employees who were involved with

21    the Macondo well?

22          A.      No, I have not.

23          Q.      Have you interviewed any

24    Halliburton employees?

25          A.      No, I have not.
```

1          Q.     Okay.  Have you interviewed any
2    government employees in connection with their
3    approval process or anything else in relation
4    to the --
5          MR. DART:
6                 Object to the form.
7    EXAMINATION BY MS. KARIS:
8          Q.      -- in relation to the Macondo
9    well?
10         A.     No, I have not.
11         Q.     Have you reviewed -- have you
12   gone back and reviewed any BP documents that
13   pertain to the Macondo well, other than, of
14   course, what you've been shown here over the
15   last two days in connection with your
16   deposition?
17         A.     I had no access or saved any
18   documents relative to Macondo.
19         Q.     Okay.  And did you go out and do
20   any research of your own to find out -- or to
21   find BP documents from other sources?
22         A.     No.
23         Q.     And is the same true, that is,
24   you haven't reviewed any Halliburton or
25   Transocean documents relating to the Macondo

1    well?

2         A.    My -- my information has come

3    from whatever the published sources have

4    been.

5         Q.    Okay.  And by "published

6    sources," you mean the reports that were

7    referenced earlier today, newspaper articles

8    and things of that sort?

9         A.    Yes, that's correct.

10        Q.    Okay.  Have you ever inspected

11   any physical evidence associated with the

12   Macondo well, the BOP --

13        A.    No.

14        Q.    -- or anything else?

15        A.    No.

16        Q.    Have you ever done any work to

17   compare the safety performance of BP's Gulf

18   of Mexico operations with that of its

19   competitors after you left BP?

20        A.    Not after I left.

21        Q.    Okay.  And have you ever done

22   any work to compare the designs -- the design

23   of the Macondo well with the design of other

24   competitors' wells in the Gulf of Mexico?

25        A.    No.

1          Q.     Okay.  Is it fair to say that
2     given you've had no involvement with the
3     Macondo well after December 2009, and you
4     haven't done any of the things we just walked
5     through, that you have not done anything to
6     determine what the cause of the blowout in
7     connection with the Macondo well is?
8          A.     I -- I would say, I'm not
9     qualified to determine the cause, the root
10    causes of the Macondo well, with lack of
11    access to detailed information.
12         Q.     Okay.  And is it also fair,
13    then, to say that the DEEPWATER HORIZON study
14    group work that you did and you talked about
15    earlier, you did not do that work in
16    connection with determining what the cause of
17    the Macondo well blowout was, correct?
18         A.     No.  I took the general
19    information I had and formed forward-looking
20    recommendations for the industry.
21         Q.     Okay.  And I apologize, because
22    we have two negatives there.  So let me ask a
23    better question.
24         A.     Okay.  I'm sorry.
25         Q.     Have -- in connection with the

1    work that you did for the DEEPWATER HORIZON

2    study group, did you attempt to determine

3    what the cause of the Macondo well blowout

4    was?

5         A.    That's where it's not clear.

6    The -- I took the public information I had

7    and formed a presentation.

8         Q.    You didn't do any investigation

9    or anything like that to determine what the

10   cause of that incident was, fair enough?

11        MR. ROTH:

12             Object to the form.

13        THE WITNESS:

14             I did re -- I did research in

15   investigation.  When you say "cause," I'm --

16   it's unclear what that looks like.  I'm

17   sorry.

18   EXAMINATION BY MS. KARIS:

19        Q.    Okay.  You have not performed

20   any investigation of your own to determine

21   who or what caused the blowout of the Macondo

22   well?

23        A.    I have not had access to

24   information that would allow me to conclude

25   relative to individual decisions or actions.

```
 1          Q.     Fair enough.  Let's talk about a
 2    different topic now.
 3                 You were asked yesterday by
 4    various counsel about certain safety issues
 5    in connection with your work at the -- in the
 6    Gulf of Mexico D&C operations.
 7                 Do you recall those generally,
 8    just to orient ourselves?
 9          A.     That topic came up several
10    times, yes.
11          Q.     Okay.  Do you believe that as a
12    result of the work that you did in the Gulf
13    of Mexico, that you improved the safety
14    record of D&C operations in 2008?
15          A.     The work that I did, as in the
16    leadership role of the deepwater -- of the
17    deepwater Gulf of Mexico was part of a team;
18    and, yes, I believe both my leadership
19    efforts, personal efforts and the team
20    efforts led to an improvement in personal
21    safety and development of a number of
22    procedures relative to process safety.
23          Q.     Who were the team members that
24    assisted in the efforts to improve the safety
25    record of GoM D&C in 2008?
```

```
 1          A.     I don't have a 2008 organization
 2     chart, so this would be purely by memory.
 3     But, of course, it would have been Harry
 4     Thierens and the -- the individuals who
 5     represented the wells team leaders, the well
 6     site leaders and the -- the wells managers,
 7     as I stated earlier, Andy -- Andrew Frazelle,
 8     Ian Little and Charlie Holt.
 9          Q.     Is it fair to say that it was an
10     organizational effort; that is, the D&C
11     organization worked together to improve
12     safety in 2008?
13          A.     It's always an organizational
14     effort.  The changes that were made in 2008
15     were made in two primary areas, which is in
16     the leadership and in the organization.
17          Q.     And as a result of the efforts
18     that you and your team undertook, did the
19     safety record in the Gulf of Mexico improve
20     in 2008, in your opinion?
21          A.     So the personal safety records
22     improved.  If I recall correctly, we went
23     from four lost-time incidents, by that
24     measure, to two lost-time incidents, which
25     actually occurred very early in February '08,
```

1    and we had none after that.

2        Q.    I want to ask you the same

3    questions in connection with 2009.

4            Do you believe that the safety

5    record of GoM D&C improved in 2009?

6        MR. NICHOLS:

7            Objection.

8        THE REPORTER:

9            Who said objection?

10       MR. NICHOLS:

11           That was me.

12       THE WITNESS:

13           The Gulf of Mexico personal

14   safety record remained lost-time incident

15   free until, I believe, October; just prior to

16   my departure in December.

17           So we maintained roughly the

18   same incident-free performance during -- just

19   before I departed.

20   EXAMINATION BY MS. KARIS:

21       Q.    Okay.  And you mentioned

22   personal safety.

23           What about the process safety

24   record?

25       A.    We had no loss of primary well

1    control while I was there.  We had a number

2    of influxes and kicks and well control

3    responses with no extraordinary negative

4    outcomes.

5         Q.    You've been called a safety

6    expert by several of the people in this -- in

7    this room.

8              Based on your experience and

9    background, you believe that the Gulf of

10   Mexico D&C operations in 2009 had a good

11   process and personal safety record?

12        MR. DART:

13             Objection to the form.

14        THE WITNESS:

15             That really would require me to

16   say two parts.  In regards to personal

17   safety, I felt we had had adequate personal

18   efforts, processes in place with -- within

19   the resources that were required.

20             Process safety, as I stated

21   earlier, we had no significant loss of well

22   control while I was there.  So you have to

23   form your conclusion about is that good or

24   better or not.  It was the absence of

25   significant incidents.

1   EXAMINATION BY MS. KARIS:

2          Q.      Based on your involvement and

3   experience with D&C organization in 2009, did

4   you believe that those operations had a good

5   process safety record?

6          A.      Safety record --

7          Q.      Process safety record in 2009?

8          A.      You'll have to define "process

9   safety record."

10         Q.      Sure.  All right.  Let me ask

11  another question.

12                 You were asked earlier about

13  personal safety as well as process safety,

14  correct?

15         A.      Uh-huh (indicating

16  affirmatively).

17         Q.      And process safety, I think you

18  defined, in part, as including well control?

19         A.      That's correct.

20         Q.      Okay.  Based on your direct

21  involvement in the Gulf of Mexico D&C

22  operations in 2009, do you believe that the

23  operations in 2009 in the Gulf of Mexico had

24  a good safety record, process safety record?

25         A.      I would --

1          Q.      If you have an opinion.

2          A.      I would say the absence of a

3    significant well control event, but that

4    occurs as normal.  So all I can say is we had

5    no loss of well control.  You can label that

6    as good.  I'm not quite sure how to frame

7    that as process safety record.

8          Q.      Fair enough.

9                  You were asked about various

10   cost-cutting efforts that were in place in

11   2008 and 2009.

12                 Do you recall that early

13   yesterday?

14         A.      I recall that topic coming up,

15   yes.

16         Q.      Okay.  Based on all of the

17   involvement that you had in the Gulf of

18   Mexico in 2008, did you ever cut costs at the

19   expense of safety?

20         A.      I did not.

21         Q.      And did anyone in BP's

22   management ever tell you to choose cost over

23   safety in 2008?

24         A.      No, they did not.

25         Q.      In 2009, as the VP of drilling

1  and completions, did you ever sacrifice

2  safety for cost?

3       A.     No, I did not.

4       Q.     Did anyone in BP's management

5  ever tell you to choose cost over safety in

6  2009?

7       A.     Not explicitly.

8       Q.     Did you ever direct anyone in

9  your leadership team or your engineering

10  teams to choose riskier activities at the

11  sacrifice of safety?

12       A.     No, absolutely not.

13       Q.     And to your knowledge, did your

14  leadership team practice engineering in a way

15  that chose safety over costs?

16       A.     I had full confidence in my

17  engineer -- in my D&C organization that they

18  were doing proper well design and proper risk

19  assessment commensurate with the risks that

20  we had at the time up until my departure.

21       Q.     And that would include any

22  decisions that were made on the Macondo well

23  up until your departure; correct?

24       A.     Those would have, of course,

25  included anything that -- that happened prior

 1    to my departure relative to Macondo, yes.

 2        Q.    Okay.  I'm going to hand you --

 3              (Whereupon, an off-the-record

 4    discussion was held.)

 5    EXAMINATION BY MS. KARIS:

 6        Q.    I'm going to hand you what we've

 7    marked as Exhibit 2953.

 8

 9              (Exhibit No. 2953 marked for

10    identification.)

11    EXAMINATION BY MS. KARIS:

12        Q.    And this is a document bearing

13    Bates stamp BPP-HZN-2179MDL01797716 through

14    720, and this is a cover e-mail from you to

15    Mr. Thierens, and an e-mail below from

16    Mr. Shaw to the GoM SPU leadership team.  And

17    attached to that is a document entitled "2009

18    GoM D&C Performance Summary, VP D&C, Kevin

19    Lacy."  Do you see this?

20        A.    Yes, I do.

21        Q.    Have you seen this document

22    previously?

23        A.    Yes.  I prepared this document

24    as a summary of the -- the GoM D&C

25    performance for 2009 to document what had

1    been accomplished prior to my departure.

2          Q.    Okay.  And so this is a review

3    that you put together yourself, is that

4    accurate?

5          A.    I -- I collated this with

6    assistance from Mick Leary and from a number

7    of other sources and presented that to Neil

8    Shaw, yes.

9          Q.    You were asked yesterday about

10   any staff reductions as a result of any cost

11   cutting.

12               Do you recall those questions

13   generally?

14         A.    There were general questions

15   about staff reductions and cost cutting, yes.

16         Q.    Okay.  And under "People," can

17   you read to us what you wrote in your

18   performance summary in 2009.  The first two

19   sentences, please.

20         A.    Under People, yes.

21               "Built staff in key areas of

22   completions, projects and well site leaders

23   by 47 net employees, while reducing contract

24   staff by 30 people."

25         Q.    Go ahead.  Next sentence, too.

1    I'm sorry.

2         A.     "This was the largest contractor

3    reduction in Gulf of Mexico and had no

4    visible impact on safety or operational

5    performance."

6         Q.     Okay.  So was it the case that

7    in 2009, you built a staff of 47 -- you

8    increased your staff by 47 BP employees in

9    the D&C GoM operations?

10        A.     That's accurate, yes.  It's --

11   it would be a net, because we reduced 30

12   contract staff.  So the net would have been a

13   total of 17 in terms of head count.

14        Q.     Okay.  So you cut 30 contract

15   employees, but you increased 47 BP employees,

16   correct?

17        A.     Yeah, if I recall reading this

18   in terms of when we said, net employees, yes.

19        Q.     Okay.

20        A.     Net -- net would have referenced

21   to transfers in and out to other business

22   units, and so there would have been 47 names,

23   and then a re -- commensurate reduction of 30

24   contract staff.  We were under guidance to

25   cut contract staff because of costs.

```
 1          Q.     Okay.  But as a result, you
 2    increased the number of BP employees,
 3    correct?
 4          A.     That's correct.  The BP head
 5    count increased, yes.
 6          Q.     And was it your view that the
 7    contractor reduction had no visible impact on
 8    safety or operational performance?
 9          A.     No visible?
10          Q.     I'm sorry.  Those are the words
11    here, "had no visible impact on safety or
12    operations."
13          A.     That's correct, uh-huh
14    (indicating affirmatively).
15          Q.     In 2009, in the year where there
16    was reference to cost cutting, was the total
17    number of people -- BP employees who were
18    working in the D&C operations more than had
19    been previously employed in that group in
20    2008?
21          A.     Yeah, I don't have -- I think
22    that's what this referenced.  And earlier,
23    there would have been a -- that point in
24    time, versus 2008, that's what these --
25    reference is made to, in terms of the total
```

1    net head counts.

2         Q.    Are you aware of what the net

3    head count was, in 2010 prior to this

4    incident, in the D&C operations?

5         A.    No, I'm not.

6         Q.    Fair to say you're not aware of

7    any head count reduction in 2010 in D&C,

8    correct?

9         A.    No, I'm not.

10        Q.    Go to the next page, please,

11   718.

12        A.    (Complying.)

13        Q.    There is a section here titled,

14   "Other Notable D&C Accomplishments"; do you

15   see that?

16        A.    I do.

17        Q.    And are these the

18   accomplishments that you identified as part

19   of your performance evaluation?

20        A.    Yes.

21        Q.    The first accomplishment noted

22   here is:  "Fully implemented OMS and

23   completed gap analysis and LMOS

24   documentation."

25                Do you see that?

```
 1            A.      That's correct.

 2            Q.      Okay.  Were you the only person

 3    at BP responsible for implementing OMS?

 4            A.      No.

 5            Q.      Was there a team of folks that

 6    were working on implementing OMS?

 7            A.      Yes.

 8            Q.      Who would that team of folks

 9    have been?  Just name some if you can.

10            A.      Are you speaking in regards to

11    D&C?

12            Q.      Yes.

13            A.      The -- this -- this reference

14    here references the completion of the -- the

15    D&C document that was dated November of 2010

16    (sic), and then there would have been the

17    following 2010 implementation, and there

18    would have been a number of people involved

19    with that.  But I don't know who was.

20            Q.      Okay.  You said November 2010

21    document.

22                    Did you mean the November 2009

23    document?

24            A.      That's correct, sorry.  Yes.

25            Q.      Okay.  Do you know what efforts
```

1    were undertaken in 2010 in connection with
2    implementing -- further implementing OMS in
3    the GoM D&C organization?
4          A.    No, I do not.
5          Q.    You go on to reference here a
6    gap analysis.
7                Do you see that?
8          A.    Yes, I do.
9          Q.    Do you know what efforts were
10   undertaken in 2010 in connection with the gap
11   analysis for OMS?
12         A.    No, I do not.
13         Q.    Okay.  Do you have any knowledge
14   or information to suggest that the gap
15   analysis that was part of the program in 2008
16   was somehow abandoned in -- excuse me, start
17   over again.
18                Do you have any information that
19   the gap analysis that you were working on in
20   2009 was somehow dropped and abandoned in
21   2010 after you left?
22         A.    I have no knowledge of anything
23   that would have been dropped nor completed.
24         Q.    You don't know either way, fair
25   enough?

```
 1          A.     I -- I would have no way of
 2     knowing what was continued or what was
 3     dropped.
 4          Q.     Okay.  And do you have any
 5     information to suggest that LOMS, local
 6     operating management system implementation,
 7     was somehow abandoned because you left in --
 8     at the end of 2009?
 9          A.     I do not --
10     MR. NICHOLS:
11               Object to form.
12     THE WITNESS:
13               I'm sorry, restate.
14     EXAMINATION BY MS. KARIS:
15          Q.     Do you have any information or
16     knowledge that the implementation of the
17     local operating management system was somehow
18     dropped or abandoned as a result of your
19     departure?
20     MR. NICHOLS:
21               Object to the form.
22     THE WITNESS:
23               If "knowledge" is -- is -- can
24     be defined as "concerns," yes.
25     EXAMINATION BY MS. KARIS:
```

```
 1            Q.     No.
 2                   Do you have any information to
 3       suggest that it was, in fact, dropped?
 4            MR. NICHOLS:
 5                   Object to form.
 6            THE WITNESS:
 7                   No.
 8       EXAMINATION BY MS. KARIS:
 9            Q.     Okay.  Do you know what
10       responsibilities the new vice president of
11       drilling completions had in connection with
12       implementation of OMS?
13            A.     I don't know if his
14       responsibilities changed af -- relative to
15       the ones I had, no.
16            Q.     And do you know what -- what, if
17       any, efforts were undertaken by Mr. Pat
18       O'Bryan after he succeeded you in connection
19       with implementing OMS?
20            MR. NICHOLS:
21                   Object to the form.
22            THE WITNESS:
23                   No, I do not.
24       EXAMINATION BY MS. KARIS:
25            Q.     Under your other notable
```

1    accomplishments, there's a reference to "New

2    risk tools and protocols now being adopted by

3    D&C discipline as best practice."

4              Do you see that?

5              What risk tools and protocols

6    are you referring to there?

7         A.    This is reference to the

8    presentations that were made in November to

9    the Gulf of Mexico D&C leadership team

10   reference to the BC.  I believe we saw a

11   document yesterday in terms of a practice

12   that this reference is to, and that is the --

13   the risk assessment presentation that Harry

14   Thierens made in the November DCL meeting.

15        Q.    Okay.  The risk tools that were

16   referenced in the presentation that

17   Mr. Thierens made in November of 2009, do you

18   have any knowledge that any of those risk

19   tools were not adopted by the D&C

20   organization?

21        MR. NICHOLS:

22              Objection.  Form.

23        THE WITNESS:

24              Again, I have no way of knowing

25   whether they were or they weren't.

```
1    EXAMINATION BY MS. KARIS:

2         Q.    Okay.  And there's a reference

3    here to the risk tools being adopted by the

4    D&C discipline as best practice; do you see

5    that?

6         A.    Yes.

7         Q.    And when you say, "adopted by

8    the D&C discipline as best practice," tell us

9    what you mean there.

10        A.    I was informed by Harry Thierens

11   that as a result of his presentation, that it

12   had been endorsed that this was going to

13   become the standard for D&C for BP.

14        Q.    So after Mr. Thierens gave his

15   presentation, he was informed that the risk

16   tools and protocol he was suggesting were, in

17   fact, going to be adopted; correct?

18        MR. NICHOLS:

19             Object to form.

20        THE WITNESS:

21             My -- he relayed a -- a

22   presentation and conversation I was not

23   present at.

24   EXAMINATION BY MS. KARIS:

25        Q.    Fair enough.
```

```
 1                   You were relying on what
 2      Mr. Thierens was telling you, correct?
 3           A.      That's where this statement
 4      comes from, yes.
 5           Q.      Okay.  So you put in your -- in
 6      your performance evaluation, the information
 7      that it was being adopted as a best practice
 8      based on the presentation Mr. Thierens had
 9      had, and then the information communicated
10      back to you?
11           A.      Yeah.  This is a performance
12      summary.  It's not a performance evaluation.
13           Q.      Fair -- fair clarification.
14                   In your performance summary, you
15      were reporting that D&C was adopting the risk
16      tools and protocol that Mr. Thierens had
17      presented in November of 2009; is that
18      correct?
19           MR. NICHOLS:
20                   Object to form.
21           THE WITNESS:
22                   So as reported by Harry, his
23      summary of the presentation which he gave,
24      his conclusions and feedback to me is that
25      these being adopted as a best practice.
```

1    EXAMINATION BY MS. KARIS:

2        Q.    Did you believe that those risk

3    tools and protocols were, in fact, best

4    practice?

5        A.    In -- in my experience, the work

6    that had been carried out that year under

7    Harry's leadership primarily, and

8    conversations we had several times, this was

9    a best practice and the best in this

10   particular area that I had seen, yes.

11       Q.    If I heard you correctly, you

12   did not present to management those risk

13   tools or the risk protocol that are suggested

14   here; is that correct?

15       A.    I was not at the full meeting.

16   I made one presentation at that meeting.

17       Q.    Okay.  There was a suggestion

18   yesterday that you were let go eight or

19   ten days after that presentation was made; do

20   you recall that?

21       A.    No.  The -- the references

22   yesterday is that sometime between two and

23   ten days after my presentation, I had my

24   meeting with Ms. Yilmaz and Mr. McIntyre,

25   when I was informed that -- that I was being

1    replaced.

2         Q.    So after Mr. Thierens gave his

3    presentation, did you give a subsequent

4    presentation?

5         A.    I don't know which order.  It

6    was the same meeting; it was a multi-day

7    meeting.  I don't recall if I was on day 2 or

8    day 3, and he was on day 2 or day 3.  You

9    would have to get the agenda, and it should

10   be clear.

11        Q.    Did anybody say anything in the

12   meeting what you participated in that led you

13   to believe that somehow, because of your

14   presentation, you were going to be let go?

15        A.    No one said anything, no.

16        Q.    At any time, did anyone suggest

17   to you that the reason you were let go was

18   because of the presentation you had made

19   eight to ten days prior to being informed of

20   your termination?

21        A.    No.  The -- I could not draw any

22   inferences between that presentation -- but

23   I -- at the same time, I don't have any idea

24   on -- on the pur -- on the reason or the --

25   who made the decision.

```
 1          Q.     Okay.  But it's fair to say that
 2     nobody ever told you, because of your
 3     presentation, you were somehow being let go?
 4          A.     No, no one said that.
 5          Q.     Under your other notable
 6     accomplishments in Exhibit 2953, there's a
 7     reference two bullets down to:  "Beyond the
 8     best audit, confirmed D&C progress on
 9     transformation and found no major gaps."
10                 Tell us what that's about.
11          A.     Without seeing the document,
12     there is -- there was a -- beyond the best
13     audit, which was a audit team that came in --
14     I don't know when; I want to say somewhere
15     between May and June -- they published a
16     report with findings.  We responded to the
17     findings.  We had a certain number of
18     deadlines for those findings to give them a
19     response that they would be satisfied with,
20     that we had closed their findings and the
21     gaps, and I don't have a copy of that
22     reporting, but should be -- yes.
23          Q.     Were the audit findings, from
24     beyond the best audit, closed to your
25     satisfaction?
```

1          A.     The -- it -- there was several
2    timelines, and we had met the timelines, but
3    there was -- it was not closed; it was only
4    responded to with timelines.
5          Q.     Fair enough.
6                 So there was an audit conducted,
7    and then there was a timeline for following
8    up to certain items that were raised in that
9    audit; is that fair?
10         A.     The -- I'm sorry.
11         Q.     There was an audit performed,
12    and then with respect to any findings, there
13    was a timeline for responding to those
14    findings?
15         A.     That's correct.
16         Q.     And was the timeline that was
17    set to which you were responding satisfactory
18    to -- in your opinion?
19         A.     I was -- I was involved in
20    establishing the timelines, some of which I
21    am fairly certain were to occur during 2010.
22    MR. NICHOLS:
23                Do you have a time check?
24    MS. KARIS:
25                I have an hour and 15, so we'll

```
 1    gladly have any --
 2         MR. NICHOLS:
 3              Just checking.
 4         MS. KARIS:
 5              Sure.
 6         THE VIDEOGRAPHER:
 7              28.
 8         MR. NICHOLS:
 9              Sorry?  28 minutes left?
10         MS. KARIS:
11              Yep.  No, 28 minutes taken.
12         MR. NICHOLS:
13              Oh, okay.  You've got a long way
14    to go.  Just checking.
15    EXAMINATION BY MS. KARIS:
16         Q.    Mr. Lacy, do you know what, if
17    any, work was done in connection with process
18    safety after you left in December of 2009?
19         A.    No, I do not.
20         Q.    Have you had any discussions
21    with anyone at BP after 2009 in connection
22    with BP's process safety implementation in
23    2010?
24         A.    No.
25         Q.    Have you had any discussions
```

```
 1    with anyone who suggested to you prior to
 2    appearing for your deposition that the reason
 3    you were let go had anything to do with the
 4    risk tools or risk protocol that you had
 5    suggested to BP's leadership?
 6         A.     I did not suggest the risk tools
 7    to BP leadership.
 8         Q.     Sorry.  Let me restate that
 9    then.
10         A.     Okay.
11         Q.     Have you had any discussions
12    with anyone who suggested, at any time prior
13    to you showing up for your deposition, that
14    your termination had anything to do with the
15    presentation that you gave to BP in November
16    of 2009?
17         A.     No.
18         MS. KARIS:
19              I'm going to mark this document
20    as Exhibit 2954.
21              (Exhibit No. 2954 marked for
22    identification.)
23    EXAMINATION BY MS. KARIS:
24         Q.     I hand you a copy of
25    Exhibit 2954.
```

```
 1          MS. KARIS:

 2                  And, Mr.  Stanley, a copy as

 3     well.

 4          MR. STANLEY:

 5                  Thank you.

 6     EXAMINATION BY MS. KARIS:

 7          Q.    Mr. Lacy, I've handed to you an

 8     article titled, "Turning to the Right" dated

 9     October of 2009.

10                  Do you recognize this document?

11          A.    Yes, I do.

12          Q.    And can you tell us for the

13     record what this document is?

14          A.    This is the newsletter that was

15     developed for the Gulf of Mexico drilling and

16     completions organization, and this appears to

17     be Issue 3.

18          Q.    And was this -- the cover page

19     of these, was this an article that you put

20     into that magazine?

21          A.    Yes.  This is my -- I authored

22     this article.

23          Q.    And the date on this is October

24     of 2009.

25                  Is that around the time that you
```

1    authored this article?

2            A.      Yeah, it would have been either

3    late September or October, yes.

4            Q.      So that would have been a month

5    or two before your departure from BP; is that

6    correct?

7            A.      So I departed in December.  When

8    this was published in October, I don't know

9    the exact date, so that's the time frame.

10           Q.      Okay.  I want to refer you to

11   the fourth paragraph of this article.

12           A.      Uh-huh (indicating

13   affirmatively).

14           Q.      You begin by saying:  "Earlier

15   this year, we were confronted not only by our

16   normal challenges in safety and operations,

17   but by some significant changes to the low

18   ga -- low oil prices and high costs."

19           MR. REDDEN:

20                   Objection, form.

21           MR. NICHOLS:

22                   Object to the form.

23   EXAMINATION BY MS. KARIS:

24           Q.      Why don't I have you read into

25   the record the first sentence of the fourth

1    paragraph.

2         A.      I'm sorry, you're asking me?

3         Q.      Yes, please.

4         A.      Oh.

5         Q.      So I don't get an objection that

6    I misread it.

7         A.      "Earlier this year, we were

8    confronted not only with our normal

9    challenges in safety and operations, but by

10   some significant challenges due to low oil

11   prices and high costs."

12        Q.      And if you can read the next

13   sentence as well, please.

14        A.      "It was a classic urgent versus

15   important dilemma that required clear

16   responses without losing focus on safe and

17   reliable operations."

18        Q.      Can you explain to us what you

19   meant by that second sentence?

20        A.      The "classic urgent versus

21   important"?

22        Q.      Correct, and then go -- when you

23   go on to say "without losing focus on safe

24   and reliable operations."

25        A.      In the latter part of 2008 and

1    2009, there was significant directives on

2    reducing costs in the Gulf of Mexico.  That

3    would have been what I would refer to as

4    "urgent," because of the immediacy of the

5    need to cut costs.  The reference to

6    "important" would be in reference to

7    maintaining safety in terms of process safety

8    and -- and personal safety, and not losing

9    focus or being distracted by the cost

10   reduction request.

11        Q.    And can you read the next

12   sentence into the record.

13        A.    "I am very proud that D&C's

14   excellent effort by all employees has managed

15   to greatly reduce capital and operating

16   costs, hundreds of millions of dollars,

17   without losing focus on our safety or

18   operational goals.  That is doing the right

19   thing."

20        Q.    And as of October of 2009, did

21   you believe that D&C had successfully reduced

22   costs without losing focus on safety and

23   operational goals?

24        A.    I believe that we had delivered

25   on management's request to reduce costs

1    without any compromise or distraction

2    relative to the focus on the safety and

3    operational goals.

4        Q.    And that would have been true as

5    of October of 2009, correct?

6        A.    As of -- as of my entire tenure

7    there, which would have gone through

8    December.

9        Q.    So is it fair to say then that

10   through -- for your entire tenure at BP, it

11   was your belief that, even if costs had been

12   reduced, there had not been a loss of focus

13   on safety and operational goals?

14       MR. NICHOLS:

15            Object to form.

16       THE WITNESS:

17            I'm sorry.  Is this a question

18   or...

19   EXAMINATION BY MS. KARIS:

20       Q.    Sure.  Let me -- it is, but a

21   poor one, so let me see if I can restate it.

22       A.    Okay.

23       Q.    You referenced throughout your

24   enti -- entire tenure in response to my prior

25   question; do you recall that?

```
1              A.      Yes, just now, yes.

2              Q.      Okay.  Was it your belief that

3      throughout your entire tenure, you had --

4      while you may have reduced capital and

5      operating costs, you had not lost focus on

6      safety and operational goals?

7              A.      So it was my -- it is my

8      position that throughout the time frame of

9      February 2008 and to December of 2009, in

10     spite of significant reorganizations, changes

11     in personnel and cost reduction efforts, we

12     had not the personal safety or process safety

13     standards or requirements in our operations.

14             Q.      Different topic.

15                     You have testified throughout

16     the last couple of days regarding Mr. Harry

17     Thierens, is that correct?

18             A.      That's correct.

19             Q.      Mr. Thierens left in December of

20     2009?

21             A.      I -- yeah, I believe it was

22     early December.  It might have been the 10th,

23     somewhere in that time frame.

24             Q.      And when we say Mr. Thierens

25     left, did he leave BP?
```

```
 1        A.      No, he left his role in the Gulf
 2   of Mexico as the wells director or wells
 3   operations manager.
 4        Q.      Do you know whether Mr. Thierens
 5   was in his role as an ex-pat?
 6        A.      I -- I belie -- I'm not -- I
 7   believe he was an ex-pat.  I'm -- I -- I
 8   think so.
 9        Q.      And can you tell us what an
10   ex-pat is in connection with somebody that
11   comes over to the D&C operation?
12        A.      Well, an ex-pat is someone
13   that's not working in their home country.
14        Q.      Do you know why Mr. Thierens
15   left the Gulf of Mexico in December of 2009?
16        A.      I -- I do know why Mr. Thierens
17   left, yes.  That was part of a succession
18   plan.
19        Q.      And do you know whether
20   Mr. Thierens leaving was as a result of his
21   request to return back home to Scotland
22   rather than remain in the Gulf of Mexico?
23        A.      Mr. Thierens had requested to
24   return in -- actually, before the start of
25   2009.  That request had been overruled by
```

1    Ms. Yilmaz and Mr. Shaw.

2         Q.    And did Mr. Thierens then remain

3    on in 2009 to assist with the operations in

4    the Gulf of Mexico in 2009?

5         A.    Yes, he did.  He did.  And we

6    had agreed in exchange that he would not go

7    beyond December of 2009.

8         Q.    That's right.

9               Mr. Thierens had requested to

10   leave in 2008 to return back home?

11        A.    That's correct.

12        Q.    He then agreed to stay on for

13   year in 2009, correct?

14        A.    Correct.

15        Q.    And that was subject to an

16   agreement by the organization, including

17   yourself, that he would not have to stay on

18   past December of '09 and that he can go back

19   home?

20        A.    That's correct.

21        Q.    Do you know what position he

22   took after he left?

23        A.    No, I'm not clear what role he

24   was given.  I -- I -- I think it might have

25   been a new role.  I'm not sure.

```
 1          Q.     Do you know whether Mr. Thierens
 2     was then assigned to work on special projects
 3     as part of the global organization?
 4          MR. DART:
 5                 Object to form.
 6          THE WITNESS:
 7                 The only thing I can say about
 8     my knowledge of Mr. Thierens situation is, he
 9     wasn't moved back to Aberdeen, he was moved
10     to Sunbury, still on a bachelor status
11     assignment, and was not happy with that.
12     EXAMINATION BY MS. KARIS:
13          Q.     Sunbury in England?
14          A.     Sunbury's England.  His -- his
15     home and wife was in Aberdeen.
16          Q.     Okay.  Do you know whether
17     Mr. Thierens continued to report to
18     Ms. Yilmaz in his new capacity?
19          A.     I don't -- don't know what the
20     organization was set up after I left.
21          Q.     You referenced earlier some of
22     your views regarding Ms. Yilmaz's technical
23     expertise.  Do you recall that?
24          A.     Yes, I do.
25          Q.     And you testified Ms. Yilmaz is
```

1     a geologist by education?

2          A.    I -- I -- I said I believe her

3     background is geology and geophysicist based

4     on her comments to me that she started her

5     career in that area.

6          Q.    Do you know what experience

7     Ms. Yilmaz had had in drilling operations?

8          A.    I -- I don't recall her ever

9     saying that she worked in drilling

10    operations, no.

11         Q.    Okay.

12         A.    Other than the TVP role.

13         Q.    As part of being a technical

14    vice president, did she have certain

15    engineers that worked with her, drilling

16    engineers?

17         A.    She had a -- people on her staff

18    who were drilling engineers, yes.

19         Q.    Okay.  And you referenced three

20    earlier today; I believe Mr. Sigurdson,

21    Mr. Zhangi and Mr. Haden?

22         A.    That's correct.

23         Q.    Okay.  Do you know what drilling

24    experience and background Mr. Sigurdson, who

25    worked with Ms. Yilmaz, had?

```
 1              A.      To my knowledge, Scott had his
 2      entire career worked as a drilling engineer
 3      or in -- in a drilling capacity.
 4              Q.      Do you know whether he had
 5      almost 30 years of experience working in a
 6      drilling capacity?
 7              A.      I'm assuming he did.
 8              Q.      And what about Mr. Zhangi, who
 9      worked with Ms. Yilmaz, do you know what his
10      drilling background was?
11              A.      I -- I know he had extensive
12      time in drilling.  I don't know if his entire
13      career was in drilling.
14              Q.      Do you know whether he had over
15      two decades of experience in drilling?
16              A.      I would -- I would say that's
17      probably correct.
18              Q.      And Mr. Haden, do you know what
19      his experience was in drilling?
20              A.      His was less certain.  I know
21      that he came into that role as an asset
22      manager, and it was not clear what his
23      drilling -- he never discussed it, and it
24      wasn't very clear.
25              Q.      Fair to say you don't know one
```

1    way or the other what his drilling experience
2    is?
3         A.    I never saw his risumi, and he
4    never discussed it with me.
5         Q.    Okay.  Did you question the
6    technical competency of Mr. Zhangi,
7    Mr. Sigurdson, Mr. Haden in connection with
8    drilling?
9         A.    I would say that in several
10   occasions, I had questions about both
11   Mr. Haden's and Mr. Sigurdson's assessments
12   of drilling situations and
13   drilling engineering problems.
14        Q.    And had you expressed those
15   concerns to Ms. Yilmaz?
16        A.    I believe we had conversations
17   about Mr. Haden and several things that we
18   did not agree on, particularly on safety.
19        Q.    You -- you didn't agree with
20   Mr. Haden, is that correct?
21        A.    Mr. Haden and I didn't agree.
22        Q.    Okay.  And you also didn't agree
23   with certain decisions of Mr. Sigurdson's, is
24   that correct?
25        A.    Mr. Sigurd -- I had no -- I sat

1    next to Mr. Sigurdson for a number of months,

2    and we discussed a number of issues, which is

3    where I drew my conclusions about

4    Mr. Sigurdson's drilling capabilities.

5         Q.    And how about Mr. Zhangi, did

6    you have any issues with Mr. Zhangi's

7    technical abilities?

8         A.    Not his technical abilities.

9         Q.    Mr. Lacy, would you agree with

10   me that part of performance, as a leader or

11   as a manager, would include a leader's

12   ability to get along with their team members?

13        A.    Can you define "team members"?

14        Q.    Sure.

15             The people that report to them,

16   your leadership team.

17        A.    Yes.  The people that report to

18   the leader, yes.

19        Q.    And would you degree with me

20   that part of being a good leader includes

21   being perceived by your leadership team as

22   somebody who is open to the ideas of others?

23        A.    That would be correct.

24        Q.    And would you agree with me that

25   part of being a good leader would include

```
 1    having open discussions and dialogs with
 2    people, even if those don't result in you
 3    agreeing ultimately with their conclusions?
 4         A.    I -- I believe an essential of
 5    leadership is to offer open dialogue
 6    opportunities, the ability to disagree and to
 7    continue to work, yes.
 8         Q.    Would you agree that your
 9    leadership team should feel comfortable
10    expressing differences of opinions with you?
11         A.    I would agree.
12         Q.    And they certainly shouldn't
13    feel like if they raise differences of
14    opinion with you, that somehow they're going
15    to be criticized for those differences; is
16    that fair?
17         A.    I'm sorry, state that again.
18         Q.    Sure.
19               Would you agree with me that as
20    part of being a leader, you would want your
21    leadership team, people that report to you,
22    to feel comfortable expressing differences of
23    opinion with you?
24         A.    That would be a desire.  It's
25    a -- not a hundred percent outcome because of
```

1    difference of opinions.

2         Q.    But you would at least want them

3    to be comfortable coming to you with their

4    opinions and views, correct?

5         A.    That is a desire in a leadership

6    role.

7         MS. KARIS:

8              I'm going to mark Exhibit 2955.

9    I'm sorry, 2955, and we're handing it out.

10             (Exhibit No. 2955 marked for

11   identification.)

12        MS. KARIS:

13             Mr. Stanley.

14        MR. STANLEY:

15             Thank you.

16   EXAMINATION BY MS. KARIS:

17        Q.    I've handed you what we've

18   marked as Exhibit 2955, and this is an e-mail

19   from yourself to Michael Leary with an

20   attachment.  It's dated January 27, 2010.  I

21   believe Mr. Watts used the attachment

22   yesterday during his examination of you.

23             Do you recall you were asked

24   whether you ever sent your letter dated

25   January 27th, which you told us you drafted,

1    to anyone after you left BP?

2         A.     I sent this letter to my former

3    admin, Susan Longo, and asking her to

4    contribute it just to my direct reports.

5         Q.     To your direct reports?

6         A.     To my direct reports, yes.

7         Q.     And that would have been who?

8         A.     That would have been anyone

9    remaining at the time at the -- so Mick

10   Leary, Kevin Guerre.  Harry Thierens was no

11   longer there.  I assume Ian little was still

12   there, and Ian Little wasn't a direct report.

13   So there -- there would have been Michael

14   Edwards, Bill Curtain -- you know, I'd have

15   to look at the org chart.

16        Q.     Okay.  So anybody that reported

17   to you basically?

18        A.     Direct reports, that's correct.

19        Q.     Okay.  And I've been given a

20   note here that our videotape is about to run

21   out, so why don't we stop, and we'll come

22   back.

23            THE VIDEOGRAPHER:

24               Off the record, the time is now

25   4:17.  This is the end of Tape 6.

```
 1              (Whereupon, a brief recess was
 2     taken.)
 3          THE VIDEOGRAPHER:
 4              We're back on the record.  The
 5     time is now 4:26.  This is the beginning of
 6     Tape 7.
 7     EXAMINATION BY MS. KARIS:
 8          Q.    Mr. Lacy, just before the break,
 9     we were talking about Exhibit 2955, which is
10     an e-mail from you to Mick Leary, and then it
11     attaches the January 27th, 2010, letter that
12     you prepared.
13              You state on the cover:  "Mick,
14     here is the note I sent to HR.  They asked
15     that it not be distributed through the normal
16     distribution system since I know longer work
17     there, but it was okay for me to send it
18     individually.  I will stay in touch, Kevin."
19              Did HR inform you that if you
20     wanted to send this individually, that that
21     was okay?
22          A.    Mr. Paul McIntyre did, in
23     person, by phone.
24          Q.    Okay.  And did you, in fact,
25     then send this January 27th letter to various
```

1    members of your leadership team?

2         A.    I -- I -- I may have sent it to

3    two or three, I don't know.  Because at the

4    time when it came back that it couldn't be

5    distributed, I don't think I sent it to more

6    than one or two people.

7         Q.    Okay.  But at least we can see

8    from here that one of the people you did send

9    it to was Mr. Leary?

10        A.    That's correct.

11        Q.    Okay.  And was Mr. Leary

12   somebody that had worked for and reported to

13   you?

14        A.    Mick had reported directly to me

15   as the performance manager, yes.

16        Q.    And if you could turn to the

17   next page.  You begin by saying:  "Since the

18   announcement of my leaving BP, I am sure some

19   of you may have wondered about my long

20   absence and silence over the last six weeks.

21   I'm writing this note to explain the gap both

22   in staying in touch and discussing my plans

23   with you."

24        A.    That's correct.

25        Q.    Were you trying to communicate

1    to your leadership team in this letter

2    basically the reason that you had been gone

3    for the past six weeks?

4         A.    Not gone, but basically not been

5    in contact at all with these individuals.

6         Q.    Okay.

7         A.    That was -- they knew I -- I was

8    no longer in role by the time I left in

9    December.

10         Q.    Okay.  So by the time you left,

11    your leadership team was aware of your

12    departure, is that fair?

13         A.    There was a teleconference with

14    them, I believe, the day before December 1st,

15    2009.  And then the public announcement came

16    out, I think as we described yesterday,

17    December 1st.

18         Q.    Okay.  And in the next

19    paragraph, you go on to describe some of your

20    personal circumstances and the reason that

21    you had been out for six weeks, is that fair?

22         A.    This is explaining why I had not

23    been in contact for six weeks.

24         Q.    Okay.  And then the following

25    paragraph, you say:  "I went to thank each of

1    you for your effort last year as 2009 was a

2    great success for D&C."

3          A.    That's correct.

4          Q.    Did you believe that your

5    leadership team contributed to the success of

6    D&C in 2009?

7          A.    Those that were in place at that

8    time, yes.

9          Q.    And then in the next paragraph,

10   you say, a couple of sentences in:  "I think

11   that the decision to leave BP at this time is

12   the right one for me personally and for my

13   family.  Trying to balance my family

14   obligations as a single father and my old job

15   responsibilities became increasingly

16   difficult in the last six months.  It was an

17   opportune time for a change, and I'm able to

18   leave knowing the D&C team is in great shape

19   and in good hands."

20                Did I read that correctly?

21         A.    You did.

22         Q.    Okay.  And was that the message

23   that you sent to your leadership team, or at

24   least proposed to send to your leadership

25   team, as of January 27th of 2010?

1          A.      That was my intent.

2          Q.      Okay.  And did your tell your

3     leadership team in this letter that you were

4     leaving, knowing that the D&C team was in

5     great shape and in good hands?

6          A.      The letter states that I said:

7     "It is opportunity time for a change.  I am

8     able to leave knowing the D&C team is in

9     great shape and in good hands."

10         Q.      At the time that you said the

11    D&C team was in great shape and in good hands

12    on January 27th of 2010, were you aware that

13    Mr. Thierens had left his role?

14         A.      Yes, I was.

15         Q.      And at the time that you said

16    that the D&C team was in great shape and in

17    good hands on January 27th of 2010, were you

18    aware that Pat O'Bryan had taken your

19    position?

20         A.      Yes, I was.

21         Q.      And at the time that you said

22    that the D&C team was in great han -- great

23    shape and in good hands, were you aware that

24    James Dupree had taken Neil Shaw's position?

25         A.      Yes, I was.

```
 1          Q.      And at the time that you said
 2     that the D&C team is in good -- great shape
 3     and in good hands, were you aware that
 4     Ms. Barbara Yilmaz remained as the technical
 5     vice president?
 6          A.      Yes, I was.
 7          Q.      You go on to state that:  "I'm
 8     also able to leave very satisfied that what
 9     was accomplished over the last two years was
10     very important to GoM and BP.  Set some great
11     examples of teamwork and leadership and was
12     very enjoyable for most of our D&C staff,
13     especially myself."
14          A.      That's correct.
15          Q.      Did you believe that at the time
16     that you wrote it?
17          A.      As it relates to the Gulf of
18     Mexico, yes.
19          Q.      Okay.  I'm going to hand you
20     what we're marked as Exhibit 2956.
21               (Exhibit No. 2956 marked for
22     identification.)
23     EXAMINATION BY MS. KARIS:
24          Q.      Exhibit 2956 is an e-mail from
25     you to G GoM SPU LT.
```

```
 1                    Can you tell us what G GoM SPU
 2    LT is?  What does that upon?
 3         A.    That would be the direct reports
 4    of James Dupree.
 5         Q.    Would that include the team that
 6    reported to you?
 7         A.    No, it would not.
 8         Q.    Okay.  And the title of this is
 9    "VP D&C Handover"?
10         A.    That's correct.
11         Q.    And is this discussing the
12    handover between you and Pat O'Bryan, who was
13    going to succeed you as the vice president of
14    drilling and completions in the Gulf of
15    Mexico?
16         A.    That's correct.
17         Q.    You state:  "All" -- "effective
18    today, Pat has the DOA for VP D&C, and I am
19    removed from all decisions and LT meetings
20    going forward."
21                    What is DOA?
22         A.    Delegation of authority for that
23    role.
24         Q.    Okay.  And so did you end your
25    duties and responsibilities on December 14th
```

1    of 2009?

2         A.      That's -- yes, correct.

3         Q.      Okay.  You go on to write --

4         A.      Well, it would be -- so it --

5    this note says "effective today," and I would

6    have left the offices on the 15th, I believe.

7         Q.      Okay.  And then after the 15th

8    is when you were out the six weeks that we

9    had seen previously?

10        A.      Yes.  I -- I was instructed that

11   I had no reason to be back at the Westlake

12   office, no requirements by BP, but I was

13   still on payroll.

14        Q.      Okay.  You go on to write:

15   "Harry Thierens is also out starting this

16   week as well, returning to Aberdeen."

17             You see that?

18        A.      Yes, I do.

19        Q.      Did you know what position

20   Mr. Thierens was going to be taking in

21   Aberdeen as you reference here?

22        A.      No.  He was returning to

23   Aberdeen for the holiday break.

24        Q.      Okay.  And then you say:  "Last

25   Tuesday, Pat and I met with the full D&C ELT

1     and reviewed each area in detail, so I am

2     confident he has been given a complete

3     picture of the 2010 priorities."

4               Correct?

5          A.     That's correct.

6          Q.     As of December 14th of 2009, is

7     it accurate to say that you believed that Pat

8     had been given a complete picture of the 2010

9     priorities for the drilling and completions

10    team in the Gulf of Mexico?

11         A.     I had gone to great effort to

12    summarize, organize, and provide Pat with as

13    much information as possible to take over the

14    role, and that's what this state -- this

15    statement is referencing to.

16         Q.     And is it accurate to say that

17    you don't know what efforts Pat undertook in

18    2010 to implement any of the priorities that

19    you identified for him since you were gone

20    all of 2010?

21         A.     No, I did not.

22    MR. NICHOLS:

23               Object to form.

24    EXAMINATION BY MS. KARIS:

25         Q.     I'm sorry?

1          A.    I -- I do not know what he did
2     after -- after these meetings.
3          Q.    You were asked numerous
4     questions over the last couple of days about
5     certain drilling engineering practices, such
6     as bottoms up, centralizers, CBLs.
7               Do you recall those questions
8     generally?
9          A.    There were a number of questions
10    on various practices, yes.
11         Q.    Okay.  And as the VP of drilling
12    and completions, did you become involved in
13    decisions regarding whether or not to perform
14    a bottoms up on a well?
15         A.    There could have been occasions
16    where there was a conversation about that, I
17    don't recall.  Normally, those conversations
18    would have been carried out between Harry
19    Thierens.  On a -- on a standard procedure,
20    it wouldn't even get to Harry.  But the
21    protocol would have been, if there was any
22    concern or any unusual nature of anything,
23    that would have been discussed with Harry,
24    and Harry would have also cons -- consulted
25    me.

```
1              Q.      And was it standard procedure,
2       if there wasn't unusual circumstances, for
3       the drilling engineering team and the
4       operations manager to address well design
5       issues?
6              A.      Restate that?
7              Q.      I'm sorry.
8                      Was it standard protocol, while
9       you were the VP of drilling and completions,
10      that for well design issues, those were
11      primarily dre -- addressed by the drilling
12      engineers and the operations manager,
13      correct?
14             A.      When you say "issues," you're --
15      I mean, there --
16             Q.      Putting together a design plan
17      and deciding, for example, if you're going to
18      do a bottoms up.
19             A.      So be very specific.  Well
20      design decisions --
21             Q.      Yes.
22             A.      -- would have always started
23      with a set of drilling engineers, in
24      consultation with the wells manager.  It may
25      or may not have involved consultation,
```

1     depending on the well, with the central group
2     that Jon Sprague had in his area.  And it may
3     involve consultation with Jon Sprague and/or
4     Harry Thierens in the well design.
5                  So you say issues --
6          Q.     Okay.
7          A.     -- design issues.  That's -- now
8     I'm clear.
9          Q.     Fair enough.  "Well design
10    decisions" is probably a better -- better
11    term.  Thank you for that.
12                 I'm going to identify a handful
13    of wells, and if you could tell me whether
14    you had any involvement in decisions
15    regarding either bottoms up, number of
16    centralizers or CBLs for any of these well.
17                 Are you familiar with the
18    Freedom well?
19         A.     I recognize the name.
20         Q.     Do you know whether that was a
21    well that was drilled during your tenure as
22    VP of drilling and completions?
23         A.     I'm fairly certain it was.
24         Q.     Okay.  The Kodiak No. 1 well?
25         A.     I recall a Kodiak sidetrack.  I

```
 1    don't recall the time frame of Kodiak 1 well.
 2         Q.    Okay.  Are you familiar with the
 3    Kodiak 2 well?
 4         A.    Was that the sidetrack?
 5    MR. NICHOLS:
 6              Object to form.
 7    EXAMINATION BY MS. KARIS:
 8         Q.    I don't believe it was.
 9         A.    Well, then --
10         Q.    If -- strike that.
11         A.    Yes.
12         Q.    Strike that.  I'm not -- I'm not
13    supposed to testify, so...  If you don't
14    know, you don't know.  That's fair enough.
15         A.    Yes.  I don't recall.
16         Q.    Okay.  How about Cortez Bank,
17    are you familiar with -- with that well?
18         A.    No.
19         Q.    How about the Tiber?
20         A.    Yes.
21         Q.    Okay.
22         A.    But your question, again, I'm --
23    you're asking -- so state again.
24         Q.    Let's just start with if you're
25    familiar with those wells?
```

```
 1              A.      I am familiar with that well,
 2       yes, absolutely.
 3              Q.      Okay.  And do you know whether
 4       on any of those wells, whether a full bottoms
 5       up was done?
 6              A.      No, I can't say.
 7              Q.      Okay.  And do you know whether,
 8       on any of those wells, how many centralizers
 9       were used?
10              A.      No, absolutely not.
11              Q.      And do you know, with respect to
12       any of those wells, whether a cement bond log
13       was performed?
14              A.      No, I -- I wouldn't know.
15              Q.      Is it fair to say that the
16       decisions, at least with respect to those
17       wells on bottoms up, centralizers, CBLs, that
18       those decisions were made by people that were
19       junior to you in the D&C organization?
20              A.      They would be made by someone
21       more junior, and if a problem occurred, that
22       would be elevated, potentially, to my level.
23              Q.      And to the extent that a problem
24       was elevated to your level, did you then
25       defer to the judgement of the team, the
```

1    engineering team that was working on those

2    wells, to design those wells?

3          A.    Well, there was never an issue

4    that would generally come up in design.  It

5    would be the issues that would elevate when

6    the design didn't meet the operating

7    conditions.

8          Q.    Okay.  So at least with respect

9    to execution of those wells --

10         A.    Yes.

11         Q.    -- is it fair to say that the

12    execution of those wells and any decisions

13    relating to execution, were made by people

14    that were junior to you?

15         A.    Not necessarily.

16         Q.    Do you remember having

17    involvement in any of those wells --

18         A.    No.

19         Q.    -- in terms of execution of the

20    design?

21         A.    No -- well, you're -- now you're

22    saying execution of the well or execution of

23    the design?

24         Q.    Execution of the well, of the --

25    executing the drilling plan.

```
 1          A.      In any of those wells, there --
 2   the ones that I certainly recognize during my
 3   time frame, there could have been a
 4   conversation about a problem during execution
 5   in -- in those wells, yes.
 6          Q.      Okay.  I guess what I'm trying
 7   to understand, Mr. Lacy, is, did you
 8   generally defer to the judgement of the
 9   people that reported to you in order to
10   design a well?  Let's start with that.
11          MR. HILL:
12                  Object to form.
13          THE WITNESS:
14                  So "defer" is not -- would not
15   be a correct term.  So the --
16   EXAMINATION BY MS. KARIS:
17          Q.      Did you rely on the judgment of
18   the people who worked for you to design the
19   well?
20          MR. HILL:
21                  Same objection.
22          THE WITNESS:
23                  The -- the -- the well designs
24   had a process, as -- as indicated in The Way
25   We Work documents, which had roles and
```

1   approval authorities, and that was the

2   reliance on that process should a

3   disagreement in the well design and/or in the

4   execution of the well, that could easily be

5   elevated to my level.

6   EXAMINATION BY MS. KARIS:

7        Q.    In connection with any of the

8   wells that I just identified, did you or

9   anyone on your team that you're aware of make

10  any decisions that you believe were

11  compromising safety for cost?

12       A.    Again, which wells?

13       Q.    The Tiber, Freedom, Kodiak,

14  Cortez, any well drilled while you were vice

15  president of drilling and completions.

16       A.    And restate that again.

17       Q.    Sure.

18            For any of the wells that were

19  drilled while you were the vice president of

20  drilling and completions, did you, or to your

21  knowledge, anyone on your teams, make any

22  decisions that sacrificed safety for cost?

23       MR. NICHOLS:

24            Objection.  Form.

25       THE WITNESS:

```
 1                 While I was there, I do not
 2     recall an incident -- well, I can't attribute
 3     the motives that people made decisions.
 4     There were mistakes made.  There were bad
 5     decisions made.  And in some cases, it was
 6     the drilling contractor; in some cases it's
 7     well site leaders; in some cases our drilling
 8     engineers.  I -- you know, those -- those
 9     things do occur.
10     EXAMINATION BY MS. KARIS:
11          Q.    I guess my question isn't
12     whether there were mistakes made; it was
13     whether you ever made any decisions that
14     sacrificed safety for cost in connection with
15     any of those wells?
16          A.    Did I personally make any of
17     those decisions?
18          Q.    Yes.
19          A.    To knowingly --
20          Q.    Yes.
21          A.    -- sacrifice safety for cost?
22          Q.    Yes.
23          A.    Absolutely not.
24          Q.    And to your knowledge, did any
25     of the drilling engineers that worked in your
```

```
 1      organization who worked on any of those wells
 2      make decisions that sacrificed -- knowingly
 3      sacrificed safety for cost?
 4           A.    I can't --
 5      MR. HILL:
 6                Object to form.
 7      MR. NICHOLS:
 8                Objection to form.
 9      THE WITNESS:
10                I can't answer that accurately,
11      because I wasn't involved in every single
12      conversation every single decision.
13      EXAMINATION BY MS. KARIS:
14           Q.    Fair enough.  That's why I said
15      "to your knowledge."
16                Were you aware of anyone making
17      a decision that sacrificed safety for cost --
18      MR. HILL:
19                Objection to form.
20      EXAMINATION BY MS. KARIS:
21           Q.    -- in connection with any of
22      these wells?
23      MR. NICHOLS:
24                Objection.  Form.
25      THE WITNESS:
```

1                    No.

2          MS. KARIS:

3                    I have nothing further for you.

4     Thank you.

5          THE WITNESS:

6                    Okay.

7          THE VIDEOGRAPHER:

8                    Off the record.  The time is now

9     4:45.

10                   (Whereupon, a brief recess was

11    taken.)

12         THE VIDEOGRAPHER:

13                   We're back on the record.  The

14    time is now 4:50.

15    EXAMINATION BY MR. WATTS:

16         Q.    Mr. Lacy, Mikal Watts from the

17    PSC again.

18                   Over the last day since I

19    stopped talking to you, I've been keeping

20    notes of various things that have come up,

21    and I want to follow through -- follow up

22    with you on some of those, and then I want to

23    visit with you about that one subject where

24    we had the hearing with the Court this

25    morning.  Fair?

1          A.     Yes, sir.

2          Q.     Should be about a half an hour.

3          A.     Okay.

4          Q.     Yesterday, you were asked a

5    question, and part of the answer that you

6    gave was, quote, "in matters of process

7    safety, I was," quote, "'concerned about

8    based on things I saw.'"

9                And I wrote that down because I

10   though it was interesting.

11               And my question is:  When you

12   told the lawyer yesterday that there were

13   matters of process safety that you were

14   concerned about based on things that you saw,

15   do you recall what you were referring to in

16   that matter?

17      MS. KARIS:

18               Object to form.

19      THE WITNESS:

20               No, I really don't recall

21   that -- which conversation, which topic in

22   terms of that.  If you wrote that down, I'm

23   sure that's accurate.  If -- the only thing I

24   can say is that under -- in a role such as I

25   had with anywhere from six to ten deepwater

```
 1    rigs running simultaneously, daily I was
 2    concerned about process safety.  So did I --
 3    there are -- so, you know, things that I saw
 4    were documents that were years old.  And --
 5    EXAMINATION BY MR. WATTS:
 6         Q.    And I think the conversation --
 7    I'm sorry, I didn't mean --
 8         A.    No, go ahead.
 9         Q.    I think the conversation that
10    you were describing when I wrote that down
11    was the conversation that you had with
12    Barbara Yilmaz --
13         A.    Uh-huh (indicating
14    affirmatively).
15         Q.    -- when she informed you that
16    there was no longer a position in the
17    company, and there's two things that I wrote
18    down.
19         A.    Uh-huh (indicating
20    affirmatively).
21         Q.    One is that you expressed
22    concerns about process safety, that you were
23    concerned about based on things that I saw;
24    and the next, you had a difference of
25    perspective with respect to the model.  She
```

1    was more of, let business units figure it

2    out.

3              A.     Okay.

4              Q.     Okay?  So that's the

5    conversation that I'm referring to.

6              A.     Okay.

7              Q.     And -- and I guess what I'd like

8    to do is, this conversation that you had with

9    Barbara Yilmaz --

10             A.     Uh-huh (indicating

11   affirmatively).

12             Q.     -- to the extent that my notes

13   are correct -- and I think they are -- that

14   you told her that -- that there were concerns

15   you that you had about process safety based

16   on the things that you saw.

17                    What do you recall telling

18   Barbara Yilmaz about that in that

19   conversation?

20             A.     I don't recall in that

21   conversation using the term "process safety."

22             Q.     Okay.

23             A.     So if I had concerns -- well, so

24   the concerns that I had started with the

25   replacement of Harry Thierens with Dave

1    Rich --

2         Q.    Right.

3         A.    -- as I indicated earlier today

4    because, Dave's experience was primarily

5    completions.  That decision was taken in

6    spite of objections that I made to a number

7    of people in that decision to replace Harry.

8    It was a known the fact that Harry was

9    moving, and I had other candidates I thought

10   were better qualified.

11        Q.    I thought that it was

12   interesting that BP's lawyer took you through

13   some of the achievements that you and

14   Mr. Thierens and Mr. Jackson accomplished in

15   2008 and 2009 in matters of safety.

16        A.    Uh-huh (indicating

17   affirmatively).

18        Q.    When Mr. Thierens was

19   transferred back home, you were told you were

20   leaving the company?

21        A.    Right.

22        Q.    Did that cause you concern that

23   the progress that you all had made in matters

24   of safety might be interrupted or were

25   halted?

1          MS. KARIS:

2                Object to form.

3          THE WITNESS:

4                It did cause me concern, and

5     those were the concerns I attempted to

6     register is when -- when I was informed at

7     that point that not only was Harry leaving

8     and that my -- my recommendations on the

9     people to replace Harry had been overruled,

10    and my intent to stay, and now I was not

11    going to be allowed to stay, the concerns

12    that I registered is, as I -- I believe I

13    said yesterday, that the things we had put in

14    place may not be continued, sustained.  They

15    were "fragile," which I believe is the term I

16    used.

17    EXAMINATION BY MR. WATTS:

18         Q.    And I think in a publication

19    that BP distributes to its employees, you

20    said safety is a very fragile thing, right?

21         A.    I believe I probab -- I've used

22    that statement several times.

23         Q.    And if you have a safety problem

24    in the aftermath of the Baker report in Texas

25    City, and you bring in some hotshot QSE guy

 1    from Chevron to fix the Gulf of Mexico

 2    operations, and he works his tail off,

 3    together with Harry Thierens and Curtis

 4    Jackson, and achieves progress in safety,

 5    were you concerned that if you eliminated

 6    that whole team that fixed the progress in

 7    the first place, that you might go back to

 8    where it was --

 9         MS. KARIS:

10              Object to the form.

11    EXAMINATION BY MR. WATTS:

12         Q.    -- with problems in progress

13    safety?

14         MS. KARIS:

15              Object to form.

16         THE WITNESS:

17              I had that concern immediately

18    when I understood I was not going to continue

19    at that time.  I was not aware of the other

20    changes as well.

21    EXAMINATION BY MR. WATTS:

22         Q.    Okay.  So the communication that

23    you had with Barbara Yilmaz that -- that I

24    just quoted to you was about the leadership

25    team over matters of safety that had achieved

1    these improvements was now disappearing from

2    the standpoint of Thierens going back to

3    Europe, you're not with the company, and you

4    were concerned about that?

5          MS. KARIS:

6                Object to the form.

7          THE WITNESS:

8                My concerns, which obviously

9    arose at that moment, was the information --

10   the revelation that I wasn't going to be

11   allowed to continue to try and manage the --

12   the changeover of -- particularly with the

13   loss of Harry.

14   EXAMINATION BY MR. WATTS:

15         Q.    Now, yesterday, I showed you

16   some quotes in a publication about these

17   other vice presidents saying what a stellar

18   job you had done in matters of safety and --

19   and HSE; you remember that?

20         A.    Yes, sir.

21         Q.    You kind of had a reputation

22   within Gulf of Mexico drilling and

23   completions as somebody that cared about

24   safety a lot?

25         MS. KARIS:

```
1                    I object to form.
2          THE WITNESS:
3                    I would -- I would agree with
4     that statement.
5     EXAMINATION BY MR. WATTS:
6          Q.     When you -- and Harry Thierens
7     had that same reputation, didn't he?
8          A.     Harry had an exceptional
9     reputation, yes.
10         Q.     And when the safety leadership
11    for Gulf of Mexico's drilling and completion
12    is wiped out through a transfer or through a
13    job elimination, does that send a message to
14    the people that used to work under those
15    people about priorities?
16         MS. KARIS:
17                   Object to form.
18         THE WITNESS:
19                   It could send a number of
20    messages, yes.
21    EXAMINATION BY MR. WATTS:
22         Q.     Well, and in terms of these
23    message that could be sent, one message that
24    had happened in 2008 and 2009 is that you
25    received management directives from Andy
```

1    Inglis and others that thou shalt cut costs?
2    That happened?
3         A.     Yes.
4         Q.     That's a fact?
5         A.     There were directives from Neil
6    Shaw, which also were taken from Andy Inglis,
7    yes.
8         Q.     And from the time that you got
9    there -- we had already gone through these
10   documents -- in 2008, you-all spent less
11   money than you did in 2007, but increased
12   production?
13        A.     That's correct.
14        Q.     In 2009, you spent less money
15   than you did in 2008, and dramatically
16   increased production?
17        MS. KARIS:
18             Object to form.
19        THE WITNESS:
20             We saved against plan.  I don't
21   know the absolute amounts.  The spin could
22   have been up because of more rigs.  But your
23   conclusion was, we calculated that we saved
24   somewhere between 250 and $350 million on the
25   2009 program.

1     EXAMINATION BY MR. WATTS:

2          Q.     Sure.

3                 And so this directive from

4     management to save money led to a reduction

5     in expenditures in 2009 alone of somewhere

6     between 250 million and $300 millions in the

7     Gulf of Mexico drilling and completion

8     operations, right?

9          MS. KARIS:

10                Object to form.

11         THE WITNESS:

12                That's my recollection, yes.

13    EXAMINATION BY MR. WATTS:

14         Q.     And the plan for 2010 was to

15    continue to cut costs relative --

16         MS. KARIS:

17                Object to form.

18    EXAMINATION BY MR. WATTS:

19         Q.     -- to 2009?

20         A.     There -- I'm -- I -- I'm pretty

21    sure there were, you know, e-mails requesting

22    that the original plan needed to be further

23    reduced.

24         Q.     Now, despite the fact that BP's

25    lawyer is quoting you as saying, I'm proud of

```
 1     the work that we did, you were being asked to
 2     do more with less resources?
 3          MS. KARIS:
 4               Object to form.
 5          THE WITNESS:
 6               Not with less resources.  I -- I
 7     actually had the discussion earlier today
 8     about the addition of staffs.  I had
 9     initiated many efforts to add staff that I
10     thought were required so that we could carry
11     out our work.
12     EXAMINATION BY MR. WATTS:
13          Q.     Well, you needed to do that
14     because your rig count was up 300 percent,
15     and your production up 54 percent between
16     2009 and 2008; you were doing more work, more
17     drilling than you had been in the past,
18     right?
19          MS. KARIS:
20               Object to form.
21          THE WITNESS:
22               Our -- our productivity per
23     drilling day was well up, and our costs were
24     down, yes.
25     EXAMINATION BY MR. WATTS:
```

1          Q.     All right.  Now, with respect to
2     the second thing that you talked to Barbara
3     Yilmaz about, and, that is -- or, apparently,
4     described a difference in respect -- with
5     respect to the model.  And -- and -- and I
6     wrote down that you said, quote, "her idea
7     was to let the business units figure it out,"
8     close quote.
9          A.     Uh-huh (indicating
10    affirmatively).
11         Q.     And your ideas, I take it, was
12    to standardize safety process across the
13    business units?
14         A.      There -- in the areas
15    particularly of personal safety, there were
16    no global D&C resources, no clear standards,
17    or no clear priorities.  There were, you
18    know, expectations that each business unit --
19    and there were a number of communications
20    when there was a problem, and we would focus
21    on that, so in terms of personal safety.  The
22    conversations on process safety rarely came
23    up with Barbara.
24         Q.      But with respect to the
25    conversation that you had with her where she

1    says, we want to let the different business

2    units figure it out, you had come from

3    Chevron, where after being in Angola and

4    being in the North Sea and being, you know,

5    in Aberdeen and all these different units --

6          A.    Uh-huh (indicating

7    affirmatively).

8          Q.    -- you became the vice president

9    of drilling and completions worldwide, right?

10         A.    That's correct.

11         Q.    And you led a standardization of

12   process and personal safety effects at

13   Chevron?

14         A.    Yes.  The Chevron business unit

15   model is -- is a distributive model very

16   similar to the BP model.  And what I did at

17   Chevron was to take the very same business

18   unit model and implement a global D&C set of

19   standards and -- and processes.

20         Q.    And -- and that's what you

21   wanted to do at BP?

22         A.    I was -- I recall being asked by

23   Barbara to do that.

24         Q.    Okay.  But her strategy was --

25   she had a perspective with respect to the

1    models, that we need to let the business

2    units figure it out?

3         MS. KARIS:

4              Object to form.

5         THE WITNESS:

6              That comment would have come

7    from the closeout of my pro -- prior, it

8    was -- there would have been two sets of

9    conversations, and it would primarily have

10   been at the end of '07, when I expressed a

11   lot of concern with the inability in the head

12   of discipline role to actually influence or

13   drive decisions from the headquarters group

14   into the organization.

15   EXAMINATION BY MR. WATTS:

16        Q.    Let me ask you a question:

17   While you were at Chevron -- of course,

18   nobody wants a well control incident, you try

19   to mitigate against the likelihood of that

20   happening, right?

21        A.    Uh-huh (indicating

22   affirmatively).

23        Q.    Yes?

24        A.    Yes, I'm sorry.

25        Q.    But did Chevron make

1    preparations that if, for some reason, there

2    was an uncontrolled well event, you would try

3    to mitigate the damage that was caused

4    thereby?

5        MS. KARIS:

6            Objection to form.

7        THE WITNESS:

8            That would be the standard

9    logic, yes, sir.

10   EXAMINATION BY MR. WATTS:

11       Q.    It's always puzzled me that we

12   have a well that is spilling oil for almost

13   100 days, why didn't we just pump cement down

14   into this hole after two days and -- and plug

15   the hole?

16       A.    There was no -- there was no

17   rig.  There was no way to do that.

18       Q.    Uh-huh (indicating

19   affirmatively.)

20            There was also a casing program

21   that wouldn't allow the cement in there?

22       A.    I --

23       MS. KARIS:

24            Object to the form.

25       THE WITNESS:

```
 1                   -- I can't -- I can't say that
 2      with certainty, sir.
 3      EXAMINATION BY MR. WATTS:
 4           Q.     Do you know what a casing design
 5      is that is -- that is an intermediate casing
 6      with a tieback back to surface?
 7           A.     Yes, I do.
 8           Q.     What does that allow you to do?
 9           A.     It's -- you know, it would be
10      a -- one of several ways to complete a well.
11      In terms of -- I'm assuming -- excuse me --
12      you're talking a liner tieback completion of
13      a well?
14           Q.     Sure.
15                  That -- that has certain safety
16      advantages over what was used here?
17           MS. KARIS:
18                  Object to the form.
19           THE WITNESS:
20                  I can't say that.  It is an
21      option that, I believe I understand, was
22      considered.
23      EXAMINATION BY MR. WATTS:
24           Q.     If you have a casing design, if
25      it's an intermediate casing with a tieback to
```

```
 1    surface, you can plug the well with cement if
 2    you can reattach it, right?
 3        MS. KARIS:
 4              Object to form.
 5        THE WITNESS:
 6              The -- I believe in the Macondo
 7    well, given the circumstances, there were
 8    lots of complication to reentering the well.
 9    EXAMINATION BY MR. WATTS:
10        Q.    Oh, yeah.
11              Because of a casing design
12    decision that was made?
13        MS. KARIS:
14              Object to form.
15        THE WITNESS:
16              I can't conclude that.
17    EXAMINATION BY MR. WATTS:
18        Q.    All right.  Now, you said,
19    quote:  "In deep water, there's generally a
20    problem or a likelihood of a lack of zonal
21    isolation that's known."
22        A.    Cementing is -- primary
23    cementing, as I said yesterday, has a -- not
24    an insignificant failure rate.  Cementing at
25    these pressures and depths, particularly with
```

```
 1     a very small volume of cement, would be --
 2     is -- is technically challenging.  There's
 3     not enough examples of things being done that
 4     you can say statistically what are the odds.
 5     So all you can go on is the modeling and --
 6     and -- and how the job went.
 7          Q.     The bottom line is at BP, the
 8     drilling and completion executives understood
 9     that empirically, cement jobs failing to
10     achieve zonal isolations were not uncommon?
11          MS. KARIS:
12               Object to form.
13          THE WITNESS:
14               That's a broad statement.  I --
15     I would say in my view, individuals such as
16     Harry Thierens and Ian Little would have that
17     type of judgment.
18     EXAMINATION BY MR. WATTS:
19          Q.     Okay.
20          A.     But that's my information.
21          Q.     And if you push cement down the
22     hole before you get laboratory testing back,
23     or you do nitrogen injections based on the
24     service -- I mean, surface tests instead of
25     downhole tests where you don't do a -- a
```

1     cleanout of the well before you pump it down,

2     all those factors that can increase the

3     likelihood of not achieving zonal isolation?

4          MS. KARIS:

5               Object to form.

6          MR. HILL:

7               Object to form.

8     EXAMINATION BY MR. WATTS:

9          Q.     That are known?

10          A.     In -- in the first case of -- of

11     a cement test, I did state that it appeared

12     to be not in conformance with the DWOP.

13          Q.     Sure.

14          A.     In the -- in the second and

15     third example, as I think I said yesterday,

16     there are situations where full bottoms up, a

17     number of things, sometimes are not done for

18     other overriding reasons.

19          Q.     Yeah.

20               Because you've run down the well

21     and you've lost all sorts of returns, and you

22     don't want to fracture the formation?

23          MS. KARIS:

24               Object to form.

25          THE WITNESS:

```
 1                    Lost circulations would be a
 2      consideration.
 3      EXAMINATION BY MR. WATTS:
 4           Q.    Lost circulation means you want
 5      to save your well at the expense of whatever
 6      benefit you had through the downhole
 7      circulation, right?
 8           BY MS. KARIS:
 9                    Object to form.
10           THE WITNESS:
11                    That's too broad a statement.  I
12      can't --
13      EXAMINATION BY MR. WATTS:
14           Q.    But that's the other reason you
15      would to do it, right?  You know you've got a
16      problem with lost returns, and so you make a
17      judgment that, hey, we don't want to lose
18      returns, and so let's not do a bottoms-up
19      circulation?
20           MS. KARIS:
21                    Object to form.
22           THE WITNESS:
23                    Loss of returns could be a
24      factor in deciding what the circulating
25      pressures and volumes would be, as I -- I
```

1    said yesterday.

2    EXAMINATION BY MR. WATTS:

3         Q.    All right.  Now, with respect to

4    the questions to you about your personal

5    knowledge of the cause of the Macondo

6    blowout, you said that you have read a great

7    many of the publicly available documents,

8    right?

9         A.    The Bly Report and the

10   Presidential Commission and a number of

11   articles that have come out in the press.

12        Q.    Okay.  So not only the

13   conclusions of the Presidential Commission,

14   but you've also read BP's own conclusions in

15   the Bly Report, right?

16        A.    Yeah, in the Bly Report, yes, I

17   have.

18        Q.    And you can look at BP's own

19   conclusions in the Bly Report and reach the

20   conclusion that this explosion occurred after

21   a number of process safety failures out

22   there?

23        MS. KARIS:

24             Object to form.

25        THE WITNESS:

1          I believe the Bly Report

2     indicated a number of mistakes were made, if

3     I -- if I paraphrase that correctly.

4     EXAMINATION BY MR. WATTS:

5          Q.     Sure.

6                 Now, Ms. Karis asked you about

7     the 2009 safety record.

8                 Do you remember the document

9     that I showed you that said that the GoM is

10    the only major SPU with a deteriorating

11    safety performance in 2009?

12         A.     Yes, I do.

13         Q.     It is a fact that you and

14    Mr. Jackson were successful in reducing the

15    number of personal safety incidents between

16    2008 and 2009, agree?

17        MS. KARIS:

18                Object for form.

19        THE WITNESS:

20                The -- we were part of the team,

21    and I want to be clear that that reference in

22    that comment, I believe, was taken on the

23    recordables for the Gulf of Mexico, and there

24    was -- had been a trend.

25    EXAMINATION BY MR. WATTS:

```
 1          Q.      Okay.

 2          A.      From a drilling completion

 3     perspective, our safety was improving both

 4     years.

 5          Q.      But you said that, "We had taken

 6     a number of kicks over those years."

 7                  Right?

 8          A.      I -- I would not have an exact

 9     number, but I know in my time there, I would

10     easily say there had -- you know, there --

11     there could have been half a dozen influxes

12     of various volumes, none of which -- the on

13     -- only one I was concerned about was shortly

14     before my departure because it was during a

15     hurricane.

16          Q.      Uh-huh (indicating

17     affirmatively).

18                  And what well was that on?

19          A.      I don't recall the specific

20     well.  It was on the Thunderhorse PDQ.  And

21     at the time, we were trying to manage a -- an

22     influx, a well control situation, and we --

23     we lost power twice because of an operator --

24     a control room operator.

25          Q.      Were you told about the kick
```

1    that happened in the fall of 2009 on this

2    very well when the MARIANAS was drilling it?

3        A.    I'm sure if -- if we had a kick,

4    then I would have discussed it with Harry.

5    And at that time that would have been Andrew

6    Frazelle --

7        Q.    Uh-huh (indicating

8    affirmatively).

9        A.    -- and John -- not John Gray --

10    but George Gray would have been responsible

11    for that, and so possibly.

12        Q.    If you had still been around the

13    week before the Macondo explosion and had

14    become aware that in one well, there were

15    three different kicks and four different

16    instances of lost returns, massive loss of

17    returns, would that have concerned you?

18        MS. KARIS:

19            Object to form.

20        THE WITNESS:

21            I think you -- you kind of have

22    to take it more abstract for me to give a

23    judgment on it, so I -- I -- again, I can't

24    say on the Macondo situation.  If you phrase

25    the question differently, I might be able to

1    answer.

2    EXAMINATION BY MR. WATTS:

3         Q.     If you -- if one of your tiger

4    team geologists is sending out e-mails, we've

5    got to slow down our rate of drilling because

6    we don't have enough time to identify the

7    signs that are preceding these kicks, these

8    loss returns, because our margins are so

9    tight, is that something you would have

10   wanted to know about as the vice president of

11   drilling and completions?

12        MS. KARIS:

13             Object to form.

14   EXAMINATION BY MR. WATTS:

15        Q.     If you'd still been there?

16        A.     So if a member of the Tiger team

17   expressed that concern, and it was not

18   responded to, I would want to know about

19   that.

20        Q.     If a member of the Tiger team

21   expressed that concern and it was not

22   responded to, that is not acceptable safety

23   behavior at BP, agree?

24        MS. KARIS:

25             Object to form.

1          THE WITNESS:

2                Someone would have to explain

3     their lack of response and the lack of

4     agreement.  Not everyone agrees at the same

5     time on a situation.

6     EXAMINATION BY MR. WATTS:

7          Q.     Now, when you say somebody

8     "would have to explain their lack of

9     response," remember the messages discussion

10    we had about, get rid of your safety team, at

11    the same time you're pushing cost reduction,

12    you're pushing for more production.

13                You answered a question about in

14    2009, were you ever instructed by your

15    management to choose costs over safety, and I

16    noticed you paused for about six seconds, and

17    then you answered to this fine lawyer, "Not

18    explicitly"?

19                Do you remember giving that

20    answer?

21          A.     Yes, I do.

22          Q.     All right.  Now, I want to visit

23    with you about the frame that led to that

24    six-second pause and the words "not

25    explicitly."

```
 1              In 2008 and 2009 while you were
 2    at BP, clearly, you had received management
 3    directive to shed hundreds of millions of
 4    dollars of costs from the operations of
 5    drilling and completions in the Gulf of
 6    Mexico, agree?
 7         MS. KARIS:
 8              Object to form.
 9         THE WITNESS:
10              I was assigned performance
11    targets that indicated we would have to save
12    several hundreds of millions of dollars in
13    order for me to satisfactorily meet my
14    performance targets.
15    EXAMINATION BY MR. WATTS:
16         Q.    You had what was known as an
17    IPC, which is a performance contract that set
18    forth objectives or criteria where you would
19    get exceptional performance, right?
20         A.    Yes.  We -- they had instituted
21    a -- a tiered system where both the
22    individual and the specific business unit,
23    bonuses would be dependent on the individual
24    and business unit performance.
25         Q.    And -- and we're going to get to
```

```
 1     your sep -- separation agreement here in a
 2     minute, but I notice that you did hit bonuses
 3     in 2008 and in 2009 --
 4          A.     The -- the --
 5          Q.     -- under your IPC contract?
 6          A.     I met all the -- I met or
 7     exceeded all targets.
 8          Q.     Sure.
 9                 So in 2008 and again in 2009,
10     you were given management directive through
11     your performance contract that you needed to
12     cut hundreds of millions of dollars of costs
13     from the Gulf of Mexico drilling and
14     completions budget, right?
15          MS. KARIS:
16                 Object to form.
17          THE WITNESS:
18                 That -- that was an agreed goal,
19     yes.
20     EXAMINATION BY MR. WATTS:
21          Q.     And you met that goal; you shed
22     250 to $300 millions in costs between 2008
23     and 2009?
24          MS. KARIS:
25                 Object to form.
```

```
 1              THE WITNESS:
 2                   In -- in the -- in the calendar
 3         year of 2009, that was my estimate.
 4         EXAMINATION BY MR. WATTS:
 5              Q.    In same calendar year, we've
 6         already talked about documents that showed
 7         that your production went up 54 percent?
 8              A.    We had an exceptional delivery
 9         performance that year in terms of production.
10              Q.    And one of the ways that you
11         increased production is to more successfully
12         and quickly drill productive wells, right?
13              A.    The -- more suc -- in less days
14         with less incidents.
15              Q.    When you said "not explicitly,"
16         there was pressure from the boardroom that
17         you have talked about in your speeches to
18         achieve more successful wells in less time,
19         agreed?
20              MS. KARIS:
21                   Object to form.
22              THE WITNESS:
23                   My reference, when I said
24         boardroom, was forward looking and taken in
25         the context of all boardrooms are looking to
```

1    achieve that.

2    EXAMINATION BY MR. WATTS:

3         Q.    Sure.  But I want to talk about

4    BP's boardroom.

5         A.    Yes, sir.

6         Q.    What caused your six-second

7    pause in the words, "not explicitly"?

8         MS. KARIS:

9              Object to form.

10        THE WITNESS:

11              I was never given a directive

12   to -- to cut corners or to deliver something

13   not safely.  But there was tremendous

14   pressure on cost.

15   EXAMINATION BY MR. WATTS:

16        Q.    All right.  And let's visit

17   about that for a second.

18              That tremendous pressure on cost

19   was a tremendous pressure to reduce costs,

20   right?

21        A.    That's correct.

22        Q.    That tremendous pressure on cost

23   reduction existed in 2008 while you were at

24   BP?

25        MS. KARIS:

1                    Object to form.

2          THE WITNESS:

3                    In -- in all years, but it was

4     particularly acute in the latter part of 2008

5     and first half of 2009.

6     EXAMINATION BY MR. WATTS:

7          Q.     And it continued through the

8     second half of 2009 and the planning for

9     2010, that there were going to be further

10    cost reductions?

11         MS. KARIS:

12                   Object for form.

13         THE WITNESS:

14                   They -- I believe I -- I stated

15    earlier, the initial business plans, as is

16    often the case, were sent back for revisions

17    and further reductions.

18    EXAMINATION BY MR. WATTS:

19         Q.     And when you say "further

20    reductions," that meant greater cost

21    reductions?

22         A.     Yeah.

23         MS. KARIS:

24                   Object to form.

25         THE WITNESS:

1              Yes, that's correct.

2      EXAMINATION BY MR. WATTS:

3          Q.    You all were rushing wells, by

4      your own words?

5          MS. KARIS:

6              Object to form.

7          THE WITNESS:

8              No, not by my words.  We had --

9      we had debates upon -- I particularly

10     remember a lot of discussions on the H2 well

11     in particular.

12     EXAMINATION BY MR. WATTS:

13         Q.    Sure.

14             Go to Tab 14 real quick of the

15     first notebook.  This is an e-mail that you

16     wrote in January of 2009, it's Exhibit 2957.

17             (Exhibit No. 2957 marked for

18     identification.)

19     EXAMINATION BY MR. WATTS:

20         Q.    You write to Andrew Frazelle and

21     Richard Morrison; you see that?

22         A.    Yes, I do.

23         Q.    And third line of this e-mail

24     you say:  "All three wells are a rush, which

25     is not good progress" -- or "process"; is

1    that right?

2         A.    That's correct.

3         Q.    So let me -- let me rephrase it

4    just so I don't butcher the word.

5              You wrote:  "All three wells are

6    a rush, which is not good process."

7              Right?

8    MS. KARIS:

9              Object to form.

10   EXAMINATION BY MR. WATTS:

11        Q.    That -- that's in your e-mail;

12   right?

13        A.    Yeah, I'm trying to find that

14   line here.  I'm sorry.

15        Q.    On third line, I'm sorry, sir.

16        A.    Third line.

17        Q.    "All three wells are a rush,

18   which is not good process."

19              You see that?

20        A.    That's correct.  At this time, I

21   was being asked to simultaneously plan three

22   wells with only prospects of drilling one.

23        Q.    Now, you said that there was

24   incredible pressure with respect to cost

25   reduction during 2008 and 2009, right?

```
1            MS. KARIS:
2                 Object to form.
3         THE WITNESS:
4                 That's correct.
5    EXAMINATION BY MR. WATTS:
6         Q.     That same pressure existed with
7    respect to increasing production?
8         MS. KARIS:
9                 Object to form.
10        THE WITNESS:
11                There were significant
12   production improvement targets as well.
13   EXAMINATION BY MR. WATTS:
14        Q.     The significant production
15   improvement target in 2009 was not only met,
16   it was exceeded with a 54 percent increase in
17   production at the time that you're cutting
18   costs?
19        MS. KARIS:
20                Object to form.
21        THE WITNESS:
22                We significantly exceed
23   production targets.
24   EXAMINATION BY MR. WATTS:
25        Q.     All right.  So in terms of the
```

1    boardroom pressures that you were feeling --

2         A.    Uh-huh (indicating

3    affirmatively).

4         Q.    -- one of them was what you

5    called an incredible pressure with respect to

6    cost reduction, true?

7         MS. KARIS:

8               Object to form.

9         THE WITNESS:

10               I used that term, yes.

11   EXAMINATION BY MR. WATTS:

12         Q.    The second was, there was

13   pressure from the boardroom to increase your

14   production at the same time you're achieving

15   these cost reductions, right?

16         MS. KARIS:

17               Object to form.

18         THE WITNESS:

19               I can't see -- I -- the pressure

20   and the dialogue I had was from Neil Shaw.

21   EXAMINATION BY MR. WATTS:

22         Q.    Well, how about your IPC

23   contract, it had pressure to increase

24   production while you were reducing costs,

25   right?

```
 1          A.     That was a mutually agreed goal
 2     with Neil Shaw.
 3          Q.     There were directives that you
 4     were familiar with all the way from London
 5     about the reduction of head count?
 6          A.     Yes, I was familiar that there
 7     were instructions about head count reductions
 8     that had originated in London.
 9          Q.     You knew that in 2008, the BP
10     plus contractor head count was more than a
11     thousand people lower than it had been
12     before?
13          MS. KARIS:
14               Object to form.
15          THE WITNESS:
16               I -- I recall several
17     discussions of very large head count
18     reductions, but not in -- not necessarily my
19     area, and we had a number of meetings to
20     negotiate or request higher numbers.
21     EXAMINATION BY MR. WATTS:
22          Q.     All right.  And then in 2008,
23     there had been a reduction in head count of
24     1,500 from 2007?
25          A.     That's possible.
```

```
 1           Q.     Let me -- let me show you
 2    Tab 83.  I'll just put it across the page
 3    there.
 4                  You see where it talks about a
 5    reduction of 1,500 from 2007?
 6           A.     Yes, I see that.
 7           Q.     And the other page that I was
 8    talking about, in 2009, you reduced it by
 9    another thousand from 2008.  You see that?
10         MS. KARIS:
11                  Objection to form.
12         THE WITNESS:
13                  Yes, I do.
14    EXAMINATION BY MR. WATTS:
15           Q.     Now, the fact of the matter is,
16    is because you were achieving greater
17    production, you did better than other SPU
18    units in terms of mitigating the head count
19    reduction direction that everybody was being
20    given, right?
21         MS. KARIS:
22                  Object to form.
23         THE WITNESS:
24                  When I arrived, the business
25    unit had been ranked 15 -- 15.  My
```

1    understanding was that the business unit was

2    ranked first out of 15 both for 2008 and

3    2009.  And a big part of my role was to

4    ensure I had adequate people and resources to

5    meet our objectives.

6    EXAMINATION BY MR. WATTS:

7         Q.     You-all not only had an

8    objective, you had a dividend level that you

9    had to participate in creating, right?

10        MS. KARIS:

11             Object to form.

12        THE WITNESS:

13             I'm sorry, I'm not --

14    dividend -- I believe the Gulf of Mexico

15    business unit had -- had targets on head

16    count.  They had what they referred to as a

17    control point that had to be revised with

18    Andy Inglis' authority.

19    EXAMINATION BY MR. WATTS:

20        Q.     All right.  With respect to your

21    conversation in late 2009, how long had you

22    been at BP when Barbara Yilmaz summoned you

23    in to the human resource office?

24        A.     That would have been the time

25    frame from July of '06 to November of '09.

```
 1            Q.     So three years and three months?
 2            A.      Three years and -- and some
 3      number of months, yes.
 4            Q.      All right.  During that point in
 5      time, as the vice president of drilling and
 6      completions for the Gulf of Mexico --
 7            A.      Uh-huh (indicating
 8      affirmatively).
 9            Q.      -- you had taken the Gulf of
10      Mexico SPU from ranked number 15 to number 1
11      across the BP group, right?
12            A.      That's correct.
13            Q.      You had slashed hundreds of
14      millions of dollars in costs and increased
15      production, right?
16            A.      I participated, and those were
17      the outcomes in our -- in our goals, yes.
18            Q.      And -- and despite the fact that
19      you were producing more with less money, you
20      yourself made it your personal mission to try
21      to do so in a safe working environment by
22      improving process and personal safety?
23            A.      I would -- I would agree with
24      that statement.
25            Q.      When Barbara Yilmaz told you
```

1    that you didn't make it in the reorganization

2    and there was no place for you in the entire

3    company, did you know that you were not able

4    to get along with other team members?

5              A.    Barbara made that statement.

6              Q.    That you were not open to the

7    ideas of others?

8              A.    I don't recall her making that

9    statement.

10             Q.    That you didn't participate or

11   allow open discussions and dialogue?  Was

12   this some reputation you had that was known

13   to you before Yilmaz gave you those three

14   reasons for getting rid of you?

15             A.    In all supervisory leadership

16   positions at any given point in time, there

17   will be employees that do not necessarily

18   agree or do not necessarily agree with their

19   decisions or your -- their perspective.  We

20   had 15 people on our D&C leadership team, and

21   I would say they had various opinions of me.

22             Q.    And you were outspoken about

23   safety, weren't you?

24             A.    I -- I believe that I was at all

25   times diplomatic.  I was always outspoken

```
 1    about safety in areas that I -- concerned
 2    good operating procedures, and I would not
 3    compromise in the areas of safety.
 4         Q.    Well, that's really what I
 5    wanted to ask you about.
 6              Is it worth it to you to be the
 7    squeaky wheel, to be accused of not getting
 8    along with other team members if it means
 9    you're not willing to compromise on safety?
10       MS. KARIS:
11              Object to form.
12       THE WITNESS:
13              It is -- it is important, as was
14    asked by the previous counsel, that you
15    create an open environment where people are
16    willing to speak up, are not intimidated, and
17    you always have to assume that you can be
18    misunderstood or you can be intimidating;
19    and, therefore, you have to work very hard to
20    keep an open environment.
21    EXAMINATION BY MR. WATTS:
22       Q.    You told me yesterday that
23    despite these incredible pressures for cost
24    reduction, an increased production in wells
25    that are being drilled faster, you did
```

1    everything you could to keep that pressure

2    from the boardroom away from the drilling

3    floor.  You remember that?

4         MS. KARIS:

5              Object to the form.

6         THE WITNESS:

7              So in my earlier statement, when

8    I said "not explicitly," I spent great deal

9    of time translating the business unit

10   directives on cost reduction into achievable

11   targets for drilling so that it did not

12   compromise safety.

13   EXAMINATION BY MR. WATTS:

14        Q.    Now, it wasn't a mystery to the

15   drilling and completions operation in the

16   Gulf of Mexico that you were headstrong in

17   matters of safety.  Agreed?

18        MS. KARIS:

19              Object to form.

20        THE WITNESS:

21              That -- that I was

22   uncompromising would be an accurate

23   statement.

24   EXAMINATION BY MR. WATTS:

25        Q.    Was it known to the drilling and

1    completions operation in the Gulf of Mexico

2    that Harry Thierens was uncompromising in the

3    matters of safety?

4         A.    Yes, I would agree with that

5    statement.

6         Q.    And all of a sudden in the

7    middle of December, the guy who has led them,

8    who has been uncompromising in matters of

9    safety, is axed from the company and can't

10   talk to anybody.

11              That's kind of what happened,

12   right?

13        MS. KARIS:

14              Object to form.

15        THE WITNESS:

16              The announcement came out that I

17   had been replaced, and there was no public

18   explanation of the -- of what I was doing

19   next.

20   EXAMINATION BY MR. WATTS:

21        Q.    Well, we talked about the fact

22   that in matters of risk management, the plan

23   for 2010 that you were co-spearheading that

24   with Harry Thierens?

25        A.    That's correct.

```
 1          Q.      And the personal safety program,
 2     you were co-spearheading that with Curtis
 3     Jackson?
 4          A.      That's correct.  I had been
 5     requested to do that by Neil Shaw.
 6          Q.      Both in matters of process
 7     safety and matters of personal safety, was it
 8     known within the drilling and completions
 9     organization of the Gulf of Mexico that you
10     were in charge of spearheading the safety
11     plans for 2010 in the Gulf of Mexico?
12          MS. KARIS:
13               Object to form.
14          THE WITNESS:
15               I initiated efforts relative to
16     2009-2010 plan prior to my departure, yes.
17     EXAMINATION BY MR. WATTS:
18          Q.      Now, when you said "not
19     explicitly," when you have people working in
20     the Gulf of Mexico, that for three and a half
21     years have been under a man that he knew was
22     headstrong with respect to safety, together
23     with Harry Thierens, that they knew was
24     headstrong in matters of safety, and the
25     director of QHS&E no longer is in the company
```

810

1    by the spring of 2010, does that send a
2    message, at the same time you're having
3    boardroom pressure of increased production
4    with lower costs?
5        MS. KARIS:
6            Object to form.
7        THE WITNESS:
8            As I stated earlier, there could
9    be multiple messages and interpretations of
10   those outcomes.
11   EXAMINATION BY MR. WATTS:
12       Q.    And even though you had done a
13   good job before the ax came, in matters of
14   safety, you have to focus on it every day and
15   overwhelm risks with good safety management?
16       MS. KARIS:
17           Object to form.
18       THE WITNESS:
19           Those are statements that I've
20   used in terms of it's a daily, and a concern,
21   and it's -- needs to be overwhelmed, yes.
22   EXAMINATION BY MR. WATTS:
23       Q.    If somebody takes a quarter
24   off -- you know, you fired your drilling and
25   completions vice president who led safety

```
 1    efforts with Harry Thierens, the head of
 2    HSS&E mysteriously leaves the company as
 3    well, if you take a quarter off on process
 4    safety, can that lead to accidents?
 5         MS. KARIS:
 6              Object to form.
 7         THE WITNESS:
 8              Any relaxation or distraction
 9    could potentially lead to a significant
10    incident.
11    EXAMINATION BY MR. WATTS:
12         Q.    Can mixed messages sent by
13    company management lead to disaster?
14         MS. KARIS:
15              Object to form.
16         THE WITNESS:
17              There are examples where
18    employees have been distracted, I would say.
19    There were a number of examples in Texas City
20    along the lines of what you described.
21    EXAMINATION BY MR. WATTS:
22         Q.    You know, you mentioned Texas
23    City.
24              Do you know what a carbon copy
25    is?
```

```
 1          A.      Carbon copy?

 2          Q.      Yes.

 3          A.      Well, it's the old kind, yes.

 4          Q.      Do you remember in your speech,

 5     the lessons learns are the same ones we saw

 6     in Piper Alpha, the same ones we saw in Texas

 7     City?

 8          A.      That's correct.

 9          Q.      The process safety failures that

10     you've read about in the Presidential

11     Commission report and the Bly Report, do they

12     read like a carbon copy to what we saw after

13     Texas City in 2005?

14          MS. KARIS:

15               Object to form.

16          THE WITNESS:

17               The presentation that I made

18     indicated that there were common elements in

19     terms of all major disasters, and I believe

20     that Macondo classified as a major disaster

21     and shared common elements, which included,

22     and I believe, as we said earlier, were part

23     of the Bly statement that basic mistakes were

24     made.  There was problems with assurance.

25     There were problems with identifying
```

1    potential dangerous situations, and some

2    equipment failures and/or responses were

3    ineffective.

4    EXAMINATION BY MR. WATTS:

5         Q.    And all that happened at a time

6    that you knew, at least at the time that you

7    left, that there was incredible management

8    pressure on cost production while we needed

9    to increase production?

10        MS. KARIS:

11             Object to form.

12        THE WITNESS:

13             I can only -- I can only state

14   that during my time there in -- there was --

15   and I will use the term, in my personal

16   opinion, incredible pressure on reducing

17   costs.

18        MR. WATTS:

19             Okay.  Let's take a break and

20   change the tape.  I'm almost done.

21        THE VIDEOGRAPHER:

22             Going off the record, the time

23   now is 5:27.

24             (Whereupon, a brief recess was

25   taken.)

1          THE VIDEOGRAPHER:

2                  We're back on the record.  The

3     time is now 5:33.

4     EXAMINATION BY MR. WATTS:

5          Q.    Mr. Lacy, yesterday I asked you

6     some questions about conversations you had

7     dealing with termination, and you recall you

8     were instructed not to answer, and we agreed

9     politely to wait for another day.  And then

10    we had a hearing this morning, and the Judge

11    ordered the production of the separation

12    agreement, which she designated -- I think it

13    was called "highly confidential," which is a

14    status of document.

15         A.    Uh-huh (indicating

16    affirmatively).

17         Q.    I need to ask you some questions

18    about it, but we certainly understand and

19    respect your desire not to have numbers being

20    thrown out all over everywhere, and so I

21    think we have an agreement in the room that,

22    whereas, the deposition is normally being

23    piped to a whole bunch of people that can

24    subscribe it to, Ms. Karis, on behalf of BP,

25    is concerned that maybe the protective order

1     says that's not allowed with respect to some

2     of the people that may be watching this

3     deposition.

4          A.     Certainly.

5          Q.     So with your permission, and I

6     think with the agreement of BP and everybody

7     else in the room, we're going cut the feed,

8     but keep shooting video at this time.

9          MR. WATTS:

10               Is that -- is everybody agreeing

11    with that?  And -- and nobody is going to

12    file a motion against me or anything like

13    this?  Okay.  Cool.

14               (Whereupon, an off-the-record

15    discussion was held.)

16         MR. WATTS:

17               All right.  Yeah.  Let's go off

18    the record and cut the feed, and I'm sorry to

19    anybody who's watching it, but I -- I haven't

20    read this order yet, and I'm not going to

21    violate it.

22         THE VIDEOGRAPHER:

23               Off the record.  The time is now

24    5:34.

25               (Whereupon, an off-the-record

1    discussion was held.)

2         THE VIDEOGRAPHER:

3              Back on the record.  The time is

4    now 5:35.

5    EXAMINATION BY MR. WATTS:

6         Q.    Mr. Lacy, I've got before you a

7    document I've marked as Exhibit 2958.

8              (Exhibit No. 2958 marked for

9    identification.)

10   EXAMINATION BY MR. WATTS:

11        Q.    It's entitled "Separation

12   Agreement."  It says "January 28th, 2010,

13   Final."

14              Do you see that, sir?

15        A.    I do.

16        Q.    During the break, you explained

17   to me that, in fact, it is not the final

18   final agreement, there is another one that

19   was entered in February of 2011, but that the

20   only practical change is it changed your last

21   day of employment, as stated in this

22   document, from March 31, 2010, to sometime in

23   February, is that right?

24        A.    I believe that would -- that's

25   correct.

1           Q.      Okay.  With the understanding
2     that we're dealing with the second-to-last
3     final agreement or the -- you know, the one
4     before the final, we'll go through this one
5     and just prove up that it's basically the
6     same.
7           A.      Yes.
8           Q.      Okay.  As I understand it, where
9     we were yesterday is, you walk into the human
10    resources office where the vice president of
11    human resources and Barbara Yilmaz are in the
12    meeting, right?
13          A.      It was a conference room on the
14    20th floor where my office resided, just a
15    general conference room.
16          Q.      Got you.
17          A.      Present were the Gulf of Mexico
18    HR manager, Paul McIntyre an Barbara Yilmaz.
19          Q.      How long did that meeting last?
20          A.      Fifteen minutes possibly.
21          Q.      Okay.  I suspect that in the
22    first two minutes, you're told there's a
23    reorganization, and you're being replaced,
24    and there's no room for you in the
25    organization?

```
1              MS. KARIS:

2                     Object to form.

3              THE WITNESS:

4                     Yeah.  If I recall correctly, I

5     walked in, sat down between Barbara and Paul,

6     puzzled as to the purpose.  It was unusual to

7     see those two together.

8     EXAMINATION BY MR. WATTS:

9              Q.     Sure.

10             A.     And Barbara started the

11    explanation that in -- that I was going to be

12    replaced.  That's -- to paraphrase her

13    statement.

14             Q.     All right.  And did you then

15    ask, "Is there another position for me?"  Or

16    how did that come up?

17             A.     I think my two questions were,

18    "What -- what happens to me?"  Or something

19    to that effect, and "Why?"

20             Q.     Okay.  In terms of the "what

21    happens to you," what was the answer you got

22    back from Barbara Yilmaz?

23             A.     That there was no other role

24    remaining in the company for a person of my

25    seniority.
```

1      Q.     Okay.  In terms of your question
2   about why, is that when she told you that you
3   did not get along with other team members?
4      A.     I -- I believe she used the term
5   that "there were problem with your peers,"
6   and basically her -- her one example was with
7   Mr. Haden.
8      Q.     Okay.  And then, I think the way
9   I stubbed my toe yesterday is, is you
10   mentioned you had a subsequent conversation
11   with GM legal counsel.
12         When did that meeting happen?
13      A.     Actually, there were a couple of
14   phone calls with a Mr. Jeffrey Heller, who I
15   believe is the Chief Counsel with -- with BP.
16   He explained the process, what would be done,
17   the separation agreement.  I believe we
18   exchanged the e-mails where he had the draft
19   forms.  I did not have an actual meeting with
20   him until the time I went to execute the
21   document, in which I don't recall -- it would
22   have been in January sometime, I think.
23         So all conversation with him
24   would have been by phone and up to the last
25   meeting.  I did not meet with him in person

1    prior to that.

2        Q.    Now, this version is executed by

3    you on January 26th of 2010; do you see that?

4        A.    That's correct.

5        Q.    And the lawyer who executed it

6    is associate general counsel; is that Jeffrey

7    Heller?

8        A.    Yes, it is.

9        Q.    Okay.  And I got the impression

10    yesterday from your discussions with the

11    lawyer from the State of Alabama, that this

12    was a form that he said he'd used before, and

13    he provided it to you as -- as a starting

14    point, is that right?

15        A.    The way he explained it to me is

16    that this was a standard separation agreement

17    with terms and conditions designed to explain

18    the employees responsibilities after

19    employment and waiving certain protections

20    relative to wrongful termination, et cetera.

21        Q.    And here's my question:  From

22    your perspective, it's clear to you that you

23    were terminated, right?

24        A.    Yes, that's correct.  I would --

25    I would -- yes.

```
 1          Q.     And -- and without saying
 2    everybody created a lie or anything like
 3    that, you were invited to create a scenario
 4    where you announced to the -- your -- your --
 5    your co-employees that you were resigning
 6    voluntarily, right?
 7          MS. KARIS:
 8                 Object to form.
 9          THE WITNESS:
10                 In the discussion that I had
11    with Mr. Heller, it was agreed that in
12    everyone's best interest relative to the
13    organization, I was leaving behind my own
14    professional reputation.
15    EXAMINATION BY MR. WATTS:
16          Q.     Sure.
17          A.     It doesn't help to advertise
18    you've been terminated.
19          Q.     Sure.
20          A.     And so in the best interest of
21    all parties, that -- and I believe the
22    question I said relative to a letter of
23    reference, a letter relative to public
24    discussion when -- I know hundreds of people,
25    how do I explain this?
```

1          Q.     Okay.

2          A.     And we agreed that the public

3    explanation would be, we mutually agreed to

4    part ways.

5          Q.     Okay.  Now, let's go into the

6    agreement for a minute.

7                 And, basically, as I understand

8    this, you're -- you're to be paid the sum of

9    $875,000, and then there are certain

10   conditions in this contract about what you

11   can and cannot do, is that right?

12         A.     That's a -- a general -- that

13   was a before tax sum and a -- and general

14   sets of conditions of what I had to do to

15   comply with this, yes.

16         Q.     Okay.  In terms of what you got

17   from BP, you got the $875,000, and you got to

18   keep the stock grants that you had already

19   earned or been awarded in 2007 and 2008, and

20   the ones you were entitled to in 2009?

21         A.     The best way to define this is

22   there was a lump sum, which you've indicated,

23   and then there was retention of rights to

24   future stock options that would vest after my

25   departure, which under a resignation, you

1    would not be --

2         Q.    Sure --

3         A.    -- priv -- you wouldn't be

4    allowed to have.

5         Q.    So in other words, even though

6    the agreement was that it was, in effect,

7    a -- a resignation or a mutual parting of

8    ways, contractually, you wanted to make sure

9    that because you were, in fact, being

10   terminated, you didn't lose all those stock

11   bonuses that -- that you had already been

12   given, but wouldn't vest until after your --

13   your departure from the company, right?

14        A.    Yeah.  So this allowed for a

15   lump sum and also retention for bonuses,

16   which were due for when I was there.

17        Q.    Sure.  Okay.

18              Oftentimes in companies, bonuses

19   will be earned in one calendar year, but they

20   won't be paid until future calendar years as

21   kind of an employee retention program?

22        A.    That's correct.

23        Q.    Okay.  And so because you were

24   being terminated, you said, well, we'll keep

25   all those bonuses as if you're still there?

1        A.        Correct.

2        Q.        Okay.  Let's go to Page 2 of the

3  document.

4        A.        (Complying.)

5        Q.        Paragraph 5, it says:  "In

6  exchange authorize the payments" -- and I'm

7  going paraphrase this -- "executive releases

8  and waives any claim related to his

9  employment with BP."

10                 That's the crux of what that

11  paragraph does; right?

12       A.        Yes, it is.

13       Q.        In other words, there won't be

14  any lawsuit for wrongful termination?

15       A.        That was my understanding of

16  this -- this paragraph, yes.

17       Q.        Now, let's go to the next page,

18  Paragraph 8.

19       A.        (Complying.)

20       Q.        It says:  Executive

21  acknowledges -- and, again, I'm

22  paraphrasing -- that he's come into

23  possession of confidential and sensitive

24  information regarding BP which has not been

25  made public by BP.  Executive, therefore,

```
 1    agrees to maintain such information

 2    confidential and to disclose it to no one

 3    except as set forth herein.  If executive is

 4    requested to provide such information, he

 5    will not disclose the information without

 6    first advising BP that he has been requested

 7    to provide such information and either, A,

 8    receiving BP's written leave to disclose such

 9    information; or, B, upon receipt of court

10    order to do so.

11              Did I read that correctly?

12        A.    Yes, you did.

13        Q.    The next sentence says you're

14    going to give back any proprietary or

15    confidential information you got from your

16    time at BP?

17        A.    That's correct.

18        Q.    And then if we go to

19    Paragraph 10, it kind of brings up the

20    situation we're in here.

21              It says:  "In the event that

22    executive is made a party to a lawsuit in the

23    future, or is in any other way requested to

24    provide assistance, whether voluntarily or

25    under compulsion of a subpoena in any other
```

1    legal proceeding," and it says, basically,

2    you're going to -- "the executive will

3    contact BP's legal group immediately before

4    responding to the request or claim, and will

5    be fully covered by BP's applicable corporate

6    bylaws pertaining to the defense and

7    indemnification of employees and corporate

8    officers from matters pertaining" -- I think

9    it's supposed to say to any activities to his

10   previous BP employment.

11               Is that effectively what that

12   paragraph says?

13        A.     That's -- that's my

14   understanding.

15        Q.     All right.  Now, with respect to

16   what we're doing here today, it became known

17   to you that you were going to be deposed, and

18   so under this obligation, you were required

19   to notify BP's legal counsel so they could

20   provide you with a lawyer, right?

21        A.     In the sequence of events, they

22   notified me initially of the request by the

23   Chemical Safety Board.

24        Q.     Sure.

25        A.     Subsequently notified me of

1    these des -- depositions, asked for date

2    ranges, and then we discussed getting counsel

3    to represent me.

4          Q.    Okay.  And that's really my

5    question.  I mean, I don't think there's

6    anything wrong with it, but, I mean, he's

7    being paid by BP, your lawyer?

8          A.    That's correct.

9          Q.    Okay.

10         A.    His -- his fees are covered by

11   BP as part of the separation agreement.

12         Q.    All right.  Now, on

13   Paragraph 13, we have a little bit more about

14   confidentiality.

15              It says:  "Executive agrees that

16   as a material condition of this agreement,

17   the terms and provisions of this agreement

18   are to remain strictly confidential."

19              And down at the bottom it says:

20   "Executive agrees that in the event he

21   breaches this confidentiality covenant, BP

22   will be irreparably harmed, and executive

23   will be liable for BP's litigation costs,

24   including it's reasonable attorneys' fees

25   incurred in action to enforce this covenant?"

1                 Is this paragraph the reason you

2       were concerned about answering my questions

3       yesterday?

4           MS. KARIS:

5                 Object to form.

6           THE WITNESS:

7                 That's correct.

8       EXAMINATION BY MR. WATTS:

9           Q.    Okay.  In other words, you

10      weren't, you know, dodging the question; but

11      there's financial penalties if you don't --

12      if you make a disclosure that's in a -- in a

13      manner different than what's required in this

14      agreement?

15          A.    If -- my understanding and my

16      response yesterday was under the possibility

17      that I would be in breach; and, therefore,

18      this last sentence would apply.

19          Q.    Now, when Ms. Karis asked you

20      about this e-mail, I think there was some

21      suggestion that, well, maybe you left for

22      family reasons in the letter.

23                At the time that you wrote that

24      letter -- that's on January 26th?

25          A.    January -- it was dated

1   January 27th, so probably in that time frame,

2   yes.

3        Q.     That's one week after you signed

4   an agreement that BP gave you that required

5   you couldn't tell anybody about this

6   separation agreement, right?

7        A.     Right, that's correct.

8        Q.     All right.  So if you had

9   written a letter and said, you know, guys, I

10  really got fired, but I got paid $875,000,

11  and I've got a separation agreement, you

12  would have been in breach of the agreement;

13  right?

14       MS. KARIS:

15            Object to form.

16       THE WITNESS:

17            That -- I -- I could not tell

18  anyone of this separation agreement outside

19  those people that were involved with it.

20  EXAMINATION BY MR. WATTS:

21       Q.     And -- and despite, you know,

22  whatever you thought about the decision BP

23  made, were you making an effort to go out in

24  class?

25       A.     This letter was written,

1    roughly, for two reasons:  To help provide

2    some closure or explanation about my sudden

3    departure.  I believe my staff expected me to

4    continue, and it was a big surprise.  And the

5    second part was, I -- I felt it would be

6    detrimental to what they were trying to do --

7         Q.    Sure.

8         A.    -- to cast any aspersions as to

9    what happened.

10        Q.    Now, an agreement like this, it

11   kind of hamstrings you in terms of being able

12   to say what actually happened; it's basically

13   got to be under a court order or in a

14   deposition like this where you can't say it,

15   right?

16        MS. KARIS:

17             Object to form.

18        THE WITNESS:

19             My interpretation was I could

20   not publicly describe the -- I -- I could not

21   be accurate as to the reasons for my

22   departure without being in breach of the

23   separation agreement.

24   EXAMINATION BY MR. WATTS:

25        Q.    There's a lawyer that was in

1    this room that's with a law firm that filed a

2    securities class action in Houston, Texas,

3    and said that you quit the company because of

4    matters of safety.

5              You -- you've seen those

6    references; right?

7         A.    I have seen those references.

8         Q.    When I Googled you, I think

9    there's a hundred and something pages all

10   talking about that article and then that

11   speech.

12        A.    Yes.

13        Q.    But despite the fact that

14   hundreds and hundreds of pages of Googles all

15   say that you resigned in a dispute over

16   safety, you are not free under this

17   separation agreement to correct that record

18   in a public forum, are you?

19        MS. KARIS:

20              Object to form.

21        THE WITNESS:

22              I'm not sure I understand.

23   The -- that -- that statement has been made

24   that I resigned?

25   EXAMINATION BY MR. WATTS:

1      Q.      Yeah.

2      A.      I knew fully that I had been

3    terminated.

4      Q.      Yes, sir.

5      A.      And without breaching my

6    separation agreement, I couldn't correct the

7    impression that I had resigned for whatever

8    reason.

9      Q.      But when you showed up

10   yesterday, under a subpoena and a court order

11   with permission of BP, you raised your right

12   hand and swore to tell the truth, the whole

13   true and nothing but the truth, and you've

14   tried to do that, right?

15     A.      Yes, I have.

16     Q.      And you've done that in a way

17   that it both complies with your contractual

18   obligations under the separation agreement

19   and your duty to tell the truth?

20     A.      I've -- I've spoken as

21   truthfully as I can possibly do without

22   withholding or -- or any other -- any other

23   means.  I've been completely honest.

24     Q.      In retrospect, do you wish you

25   were still the vice president of drilling and

```
 1    completions on April the 20th of 2010?
 2         MS. KARIS:
 3                 Object to form.
 4         THE WITNESS:
 5                 I can't say that conclusively at
 6    the treatment that I received.  I think I
 7    concluded it was not the company I wanted to
 8    remain at.
 9         MR. WATTS:
10                 Those are all my questions, sir.
11    Thank you for your time.
12         THE VIDEOGRAPHER:
13                 Off the record.  The time is now
14    5:49.
15                 (Whereupon the deposition was
16    concluded.)
17                      *  *  *
18
19
20
21
22
23
24
25
```

```
 1                  WITNESS' CERTIFICATE
 2
 3                    I have read or have had the
 4    foregoing testimony read to me and hereby
 5    certify that it is a true and correct
 6    transcription of my testimony with the
 7    exception of any attached corrections or
 8    changes.
 9
10
11             _____
              KEVIN DENNIS LACY
12
13
14
15
16    PLEASE INDICATE
17    ( ) NO CORRECTIONS
18    ( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED
19
20
21
22
23
24
25
```

```
 1                    REPORTER'S CERTIFICATE
 2
 3           I, Diane Tewis Clark, RPR, RMR, CRR,
 4    Certified Court Reporter, State of Louisiana,
 5    do hereby certify that above-named witness,
 6    after having been duly sworn by me to testify
 7    to the truth, did testify as hereinabove set
 8    forth;
 9           That this testimony was reported by me
10    in the stenotype reporting method and
11    transcribed thereafter by me on computer, and
12    that same is a true and correct transcript to
13    the best of my ability and understanding;
14           That I am not of counsel, nor related to
15    counsel or the parties hereto, and in no way
16    interested in the outcome of this matter.
17
18
19    _____
20      Diane Tewis Clark, RPR, RMR, CRR
21         Certified Court Reporter
22
23
24
25
```