# United States' Phase Two Offer of Proof
# Exhibit 19
# Deposition of Jay Thorseth

1           UNITED STATES DISTRICT COURT

            EASTERN DISTRICT OF LOUISIANA

2

3   IN RE:  OIL SPILL          )   MDL NO. 2179

    BY THE OIL RIG             )

4   "DEEPWATER HORIZON" IN     )   SECTION "J"

    THE GULF OF MEXICO, ON     )

5   APRIL 20, 2010             )   JUDGE BARBIER

                               )   MAG. JUDGE SHUSHAN

6

7

8

9

10

11

12

13

14

15

16

17            * * * * * * * * * * * * * * * * * *

                       VOLUME 1

18            * * * * * * * * * * * * * * * * * *

19

20      Deposition of JAY THORSETH, taken at Kirkland

21   & Ellis International, 30 St. Mary Axe, 22nd

22   Floor, London EC3A 8AF, England, United Kingdom,

23   on the 20th of September, 2011.

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                     A P P E A R A N C E S
 2
     APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
 3        Mr. Ervin A. Gonzalez
          Mr. Jeff J. Keiser
 4        COLSON, HICKS EIDSON
          600 Carondelet Street, Rm 810
 5        New Orleans, Lousiana 70130
 6
     APPEARING FOR BP, INC.:
 7        Mr. Christopher W. Keegan
          KIRKLAND & ELLIS
 8        555 California Street
          San Francisco, California  94104
 9
          Ms. Leslie S. Garthwaite
10        KIRKLAND & ELLIS
          300 North LaSalle
11        Chicago, Illinois  60654
12
     APPEARING FOR THE WITNESS, JAY THORSETH:
13        Mr. Jim E. Lavine
          Mr. Kyle Sampson
14        ZIMMERMANN, LAVINE, ZIMMERMANN
               & SAMPSON, P.C.
15        770 South Post Oak Lane, Suite 620
          Houston, Texas 77056
16
17   APPEARING FOR TRANSOCEAN:
          Mr. Daniel Johnson
18        Ms. Stephany LeGrand
          Mr. Steven L. Roberts
19        SUTHERLAND ASBILL & BRENNAN
          1001 Fannin, Suite 3700
20        Houston, Texas  77002-6760
21
     APPEARING FOR ANADARKO PETROLEUM COMPANY:
22        Mr. Tony Forte
          BINGHAM MCCUTCHEN
23        399 Park Avenue
          New York, New York 10022-4689
24
          Warren Anthony Fitch
25        BINGHAM MCCUTCHEN
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          2020 K Street, Northwest
            Washington, D.C. 20006-1806
 2
 3     APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
            Mr. Thomas Ganucheau
 4          BECK, REDDEN & SECREST
            One Houston Center
 5          1221 McKinney Street, Suite 4500
            Houston, Texas   77010-2010
 6
 7     APPEARING FOR WEATHERFORD:
            Mr. Joseph J. Lowenthal, Jr.
 8          JONES, WALKER, WAECHTER, POITEVENT,
               CARRERE & DENEGRE, LLP
 9          201 St. Charles Avenue
            New Orleans, Louisiana   70170
10
11     APPEARING FOR M-I SWACO:
            Mr. John C. Funderburk
12          MORGAN, LEWIS & BOCKIUS, LLP
            1000 Louisiana Street, Suite 4000
13          Houston, Texas 77002-5006
14
       APPEARING FOR HALLIBURTON:
15          Mr. Donald E. Godwin
            Ms. Stefanie K. Major
16          Mr. James E. Johanns
            GODWIN RONQUILLO
17          1331 Lamar, Suite 1665
            Houston, Texas   77010-3133
18
19     APPEARING FOR DRIL-QUIP, INC.:
            Mr. C. Dennis Barrow, Jr.
20          WARE, JACKSON, LEE & CHAMBERS
            America Tower, 42nd Floor
21          2929 Allen Parkway
            Houston, Texas   77019-7101
22
23     APPEARING FOR THE UNITED STATES:
            Mr. A. Nathaniel Chakeres
24          U.S. DEPARTMENT OF JUSTICE
            ENVIRONMENTAL & NATURAL
25          RESOURCES DIVISION
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        601 D Street, N.W.
          Washington, D.C.  20004
 2
          Ms. Malinda Lawrence
 3        U.S. DEPARTMENT OF JUSTICE
          TORT BRANCH, CIVIL DIVISION
 4        1425 New York Avenue, N.W.
          Suite 10100
 5        Washington, D.C.  20005
          Post Office Box 14271
 6        Washington, D.C.  20044-4271
 7
   APPEARING FOR THE STATE OF LOUISIANA:
 8        Mr. Douglas R. Kraus
          KANNER & WHITELEY
 9        701 Camp Street
          New Orleans, Louisiana  70130-3504
10
          Ms. Phyllis E. Glazer
11        Mr. Michael Keller
          Assistant Attorney General
12        Litigation Division
          LOUISIANA DEPARTMENT OF JUSTICE
13        400 Poydras Street, Suite 1600
          New Orleans, Louisiana  70130-3220
14
15 APPEARING FOR MOEX:
          Mr. Jack Reynolds
16        PILLSBURY WINTHROP SHAW PITTMAN
          2 Houston Center
17        909 Fannin, Suite 2000
          Houston, Texas  77010-1018
18
19
   ALSO PRESENT:
20        Mr. Peter Jennings, videographer
21
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                        INDEX
 2            VIDEOTAPED ORAL DEPOSITION OF
                     JAY THORSETH
 3               SEPTEMBER 20, 2011
                      VOLUME 1
 4
 5
     Appearances.............................   2
 6
 7   Examination-Mr. Gonzalez.................   8
     Examination-Mr. Chakeres................. 135
 8   Examination-Ms. Lawrence................. 186
     Examination-Mr. Kraus.................... 227
 9   Examination-Mr. Godwin................... 241
     Examination-Ms. LeGrand.................. 302
10   Examination-Mr. Fitch.................... 324
     Examination-Mr. Reynolds................. 356
11   Examination-Mr. Lowenthal................ 363
     Examination-Mr. Ganucheau................ 367
12   Examination-Mr. Keegan................... 379
     Further Examination By Mr. Gonzalez...... 382
13
     Changes and Signature.................... 411
14   Reporter's Certificate................... 412
15                 EXHIBIT INDEX
16
     NO.      DESCRIPTION                    PAGE
17
     6330     E-mail dated July 13, 2009
18            Bozeman to Rainey and others     67
19   6331     Supplemental Financial Memorandum
              BP Exploration & Production Inc.-
20            Gulf of Mexico Exploration
              Macondo Exploration Well        103
21
     6332     E-mail dated April 13, 2010
22            Thorseth to Walz                105
23   6333     E-mail dated April 14, 2010
              Ritchie to Thorseth             113
24
     6334     E-mail dated April 23, 2010
25            Thorseth to Hafle               117
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   6335        Approved Determination of
                Exploration Well (ADEW)          124
2
    6336        E-mail dated September 20, 2010
3               Thorseth to Ritchie              128
4   6337        E-mail dated April 11, 2011
                Leach to Thorseth                131
5
    6338        Technical Memorandum dated
6               25th May 2010                    131
7   6339        Macondo Technical Note dated
                July 21, 2010                    131
8
    6340        E-mail dated September 29, 2010
9               Dempsey to Tate and others       138
10  6341        E-mail dated November 8, 2010
                Ritchie to Thorseth              155
11
    6342        E-mail dated August 2, 2010
12              Ritchie to Thorseth              165
13  6343        E-mail dated July 26, 2010
                Ritchie to Yeilding and others   166
14
    6344        E-mail dated April 26, 2010
15              Guide to Thorseth                169
16  6345        E-mail dated June 14, 2010
                Liu to Robbins and others        174
17
    6346        Supplementary Agreement for
18              License of Geophysical Data      179
19  6347        E-mail dated December 9, 2009
                Wardlaw to Thorseth              181
20
    6348        E-mail dated April 16, 2010
21              Rainey to Daly and others        188
22  6349        E-mail dated November 24, 2009
                Thorseth to Illingworth and
23              others                           197
24  6350        E-mail dated March 17, 2010
                Sewani to Hafle and others       199
25

**PURSUANT TO CONFIDENTIALITY ORDER**

| | | |
|---|---|---|
| 6351 | E-mail dated March 22, 2010<br>Hafle to Sewani and others | 202 |
| 6352 | E-mail dated March 23, 2010<br>Sewani to Thorseth and others | 203 |
| 6353 | E-mail dated March 24, 2010<br>Walton to Hafle | 206 |
| 6354 | E-mail dated March 24, 2010<br>Hafle to Walton | 208 |
| 6355 | Second Supplemental Authorization<br>For Expenditure | 210 |
| 6356 | E-mail dated April 9, 2010<br>Hafle to Thorseth and others | 214 |
| 6357 | E-mail dated April 14, 2010<br>Thorseth to Rainey and others | 223 |
| 6358 | E-mail dated May 21, 2010<br>Yeilding to Yeilding and others | 268 |
| 6359 | E-mail dated April 14, 2010<br>Pfau to O'Leary and others | 313 |
| 6360 | (Withdrawn) | 320 |
| 6361 | E-mail dated November 1, 2007<br>Thierens to Thorseth and others | 342 |
| 6362 | E-mail dated January 23, 2008<br>Sims to Rainey | 344 |
| 6363 | E-mail dated February 8, 2008<br>Little to Thorseth | 346 |
| 6364 | E-mail dated March 17, 2008<br>Sims to Thorseth | 348 |
| 6365 | E-mail dated August 15, 2007<br>Thorseth to Sims | 351 |

**PURSUANT TO CONFIDENTIALITY ORDER**

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | THE VIDEOGRAPHER:  Today is September |
|       | 2  | 20th, 2011.  This is the deposition of Jay |
|       | 3  | Thorseth regarding the oil spill of the oil rig |
|       | 4  | DEEPWATER HORIZON on April 20th, 2010.  The time |
| 08:38 | 5  | is 8:38 a.m., and we're on the record. |
|       | 6  | JAY THORSETH, |
|       | 7  | having been first duly sworn, testified as |
|       | 8  | follows: |
|       | 9  | E X A M I N A T I O N |
|       | 10 | BY MR. GONZALEZ: |
|       | 11 | Q.  Good morning. |
|       | 12 | A.  Good morning. |
|       | 13 | Q.  Please tell us your name. |
|       | 14 | A.  Jay Thorseth. |
| 08:39 | 15 | Q.  What do you do for a living? |
|       | 16 | A.  I'm the vice president for exploration and |
|       | 17 | appraisal for Angola, based in the London area. |
|       | 18 | Q.  For BP? |
|       | 19 | A.  For BP. |
| 08:39 | 20 | Q.  How long have you held that capacity? |
|       | 21 | A.  Since June 1st of 2011. |
|       | 22 | Q.  Prior to that, what were you doing? |
|       | 23 | A.  I was the exploration manager for the |
|       | 24 | deepwater Gulf of Mexico based out of Houston. |
| 08:39 | 25 | Q.  How long did you have that position? |

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.   Approximately four years.

2       Q.   So what years would those be?

3       A.   I think '07 to '11, approximately.

4  Beginning date, I'm -- I can't know for sure,

08:39  5  but...

6       Q.   Did those responsibilities include the

7  Gulf of Mexico?

8       A.   Deepwater Gulf of Mexico, yes.

9       Q.   And prior to that, tell us what you did.

08:40  10      A.   Yeah.  So the preceding -- well, from --

11  so I was in Cairo, Egypt, from '92 to '97.  And

12  then from '97 -- or, excuse me.  Sorry.  So from

13  '97 to 2003, I was in Cairo, Egypt.  Sorry about

14  that.

08:40  15      Q.   That's okay.

16      A.   And then from 2003 to 2007, I was in the

17  Gulf of Mexico, and I was the team leader for the

18  Western Gulf of Mexico team for exploration

19  deepwater.  So -- so for Gulf of Mexico, it was

08:40  20  kind of like '03 to '07.  Then I switched jobs

21  into the exploration manager role from '07 to

22  2011.

23      Q.   What was your role in Cairo?

24      A.   I was -- I started the first -- I was

08:40  25  there for six and a half years.  The first four

**PURSUANT TO CONFIDENTIALITY ORDER**

1    years, I was a geophysicist; and then the last two

2    years, I was a team leader for the central and

3    southern Gulf of Suez exploration.

4         Q.  Where did you obtain your degree?

08:41  5         A.  University of Utah.

6         Q.  In what area?

7         A.  I got two degrees.  I have a Bachelor of

8    Science in geophysicists and I have an M.B.A.?

9         Q.  In what, business?

08:41  10         A.  Business, yes.

11         Q.  From -- also from Utah?

12         A.  Yes.

13         Q.  What years?

14         A.  I was there from '82 to '88.

08:41  15         Q.  And would your -- what I meant with

16    respect to a specialty in M.B.A., do you have a

17    subspecialty within --

18         A.  Oh, I'm sorry.  It was kind of a

19    concentration in finance.

08:41  20         Q.  And once you graduated with your M.B.A.,

21    where did you work?

22         A.  Right.  So in '88, I started with Amoco in

23    Denver, Colorado.  And so I was -- I was in Denver

24    with Amoco from '88 to '92.  And then we moved to

08:41  25    Houston in '92, and I was in Houston from '92 to

**PURSUANT TO CONFIDENTIALITY ORDER**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | '97 before we went to Cairo.                                 |
|       | 2  | Q.  And during that time, Amoco and BP --                    |
|       | 3  | A.  So when I was in Cairo, that was when the                |
|       | 4  | merger occurred, 2000, yeah.                                 |
| 08:42 | 5  | Q.  Okay.  And you stayed on?                                 |
|       | 6  | A.  Yes.                                                      |
|       | 7  | Q.  Are you happy with BP?                                    |
|       | 8  | A.  Uh-huh.                                                   |
|       | 9  | Q.  Working for BP, I mean.                                   |
| 08:42 | 10 | A.  Yes.  Very much so.                                       |
|       | 11 | Q.  Currently you're working out of London?                  |
|       | 12 | A.  Yeah.  I work in the Sunbury office.                     |
|       | 13 | Q.  Have your responsibilities changed, other                |
|       | 14 | than the location that you're --                             |
| 08:42 | 15 | A.  Yeah.                                                     |
|       | 16 | Q.  -- focusing on?                                           |
|       | 17 | A.  Yeah, I mean a bit.  My core job is still                |
|       | 18 | very similar to -- to what I had in -- in the Gulf           |
|       | 19 | of Mexico, but there's -- there's a bit more                 |
| 08:42 | 20 | responsibilities as -- as a vice president.  But             |
|       | 21 | it -- the core job, like I said, is -- is similar.           |
|       | 22 | Q.  When you were in the Gulf of Mexico, who                 |
|       | 23 | was your immediate supervisor?                               |
|       | 24 | A.  Yeah.  So I -- I had --                                   |
| 08:42 | 25 | Q.  The second time, when you were the manager              |

**PURSUANT TO CONFIDENTIALITY ORDER**

           1    for deepwater.

           2         A.   Yeah.  So it was Larry Archibald, and then

           3    it became Dave Rainey.

           4         Q.   What were their positions?

08:43      5         A.   Larry Archibald -- well, the second

           6    position, it was really Dave Rainey.  Dave was the

           7    vice president, and I was the ex- -- exploration

           8    manager for deepwater reporting to him.

           9         Q.   And who was immediately underneath you?

08:43     10         A.   Right.  So I had three team leaders doing

          11    exploration.  So Brian Ritchie was working the

          12    east, and Rob Satter, and kind of switched out.

          13    So Steve Chappell and Rob Satter were working the

          14    central, and then Jacek Jaminski -- Eric Dixon and

08:43     15    then Jacek Jaminski were working the western area.

          16              And then up until kind of the end of

          17    March 2011 -- or excuse me -- 2010, Pinky Vinson

          18    reported to me as the Tiger team leader, so he was

          19    under me.  And then I had some individual

08:44     20    contributors who were advisors:  Terry Fitzpatrick

          21    and Walt Bozeman, and Bill Hart and Frederic

          22    Billette.

          23         Q.   How did you interact, if at all, with

          24    Jon -- Jonathan Sprague or Jon Sprague?

08:44     25         A.   I didn't interact much with Jonathan.

**PURSUANT TO CONFIDENTIALITY ORDER**

            1    Q.  How did your roles differ?  I know at one
            2  point he was the GoM drilling manager.
            3    A.  Yeah.  But he -- he wasn't really doing
            4  much in the exploration arena, so I didn't
08:44       5  interact.  And I wouldn't even be able to tell you
            6  what his title was.
            7    Q.  Okay.
            8    A.  But I know -- I know Jon.
            9    Q.  Sure.  Now, tell us so we can all
08:44      10  understand what you do as exploration manager.
           11    A.  Yeah.  Yeah.  Very good.  So I -- the way
           12  I would summarize it is that I managed a portfolio
           13  of -- of opportunities or prospects in -- in the
           14  deepwater Gulf of Mexico at that time.  And so the
08:45      15  teams would interpret seismic data and well
           16  information and other geologic information and
           17  mature prospects, from -- all the way from ideas
           18  to -- to fully mature prospects that -- that I
           19  would take to the exploration forum, which is a
08:45      20  worldwide body headed by Mike Daly, and recommend
           21  those for -- for drilling, when -- when they are
           22  mature and when they've gone through kind of
           23  the -- the internal BP insur- -- assurance
           24  process.  And so that -- that was really my core
08:45      25  job, was managing that portfolio and then

**PURSUANT TO CONFIDENTIALITY ORDER**

1    recommending wells.

2              The teams, when -- when a well was

3    drilling, they did do some subsurface support --

4    technical support for the wells organization or

08:45  5    the drilling -- the drilling organization.  And

6    also, we would participate in lease sales twice a

7    year.  And so I wasn't in charge of those lease

8    sales, but my teams were interpreting seismic

9    data -- or excuse me -- interpreting prospects to

08:46  10    say Hey, we like this lease or -- or not.

11              Furthermore, I think that -- you

12    know, several other things.  We -- I was involved

13    in commercial -- commercial negotiations with

14    other oil companies on trading acreage or farming

08:46  15    into wells or prospects or farming -- or us

16    farming out.  I was also -- a lot of my time spent

17    on people issues, on people development.  And --

18    and then another big part of my time, the last

19    thing I would say would be technology, and so just

08:46  20    making sure that we were utilizing the last --

21    latest technology.

22              And really, the big focus on the

23    technology side of things was -- was really around

24    seismic imaging and -- and running a seismic

08:46  25    budget and making sure we have the right data.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  How did you make a determination as to

2 what sites would be appropriate for further

3 exploration and drilling?

4              MR. KEEGAN:  Objection to form.

08:47 5    A.  So could you repeat the question?

6    Q.  (BY MR. GONZALEZ)  Yes, how did you make

7 determinations as to what sites would be

8 appropriate for drilling?  And I'm referring to

9 the Gulf of Mexico.

08:47 10              MR. KEEGAN:  Objection to form.

11    A.  Yes.  So what -- what happens is -- is

12 working on prospects, as I -- as I mentioned.

13 That's kind of a core -- core aspect of -- of the

14 teams.  And it -- it really -- it's an intensive

08:47 15 amount of work.  It can take up to three, four

16 years to develop a prospect from concept to

17 maturation, meaning it's gone through all the

18 assurance.

19              So a typical prospect would be a team

08:47 20 would be working on it for maybe a year or two or

21 some period of time, and they would start to go

22 through peer assist within the Gulf of Mexico, so

23 they're -- they would ask to have peer meetings

24 to -- to check on the risk -- the risk evaluation

08:48 25 of a particular prospect, get views on the trap

**PURSUANT TO CONFIDENTIALITY ORDER**

1    and -- and the seal and the reservoir and -- and

2    technical things like that, the things that build

3    up a prospect.

4              And then they would go through the --

08:48  5    kind of the robust assurance process, what we call

6    through exploration excellence within -- within

7    BP.  And that's a real important pro -- process to

8    mature a prospect.

9              And exploration excellence is managed

08:48 10    by a manager, and they travel around the world

11    looking at different prospects in the BP

12    portfolio.  And so then when a prospect is

13    starting -- becoming mature and kind of looking

14    from a portfolio standpoint of, Hmm, that's

08:48 15    looking pretty good -- it's a judgment call that,

16    Yeah, this looks to be a quality prospect, they

17    would be going through the assurance process.  And

18    it could be multiple meetings with this -- what we

19    call "XX," for short, for exploration excellence.

08:49 20    So they would have multiple meetings with XX.  And

21    it could be over a year, maybe longer, maybe

22    shorter timeframe of having these multiple

23    meetings.

24              So then once it -- once it kind of --

08:49 25    it looks good to me and -- and my team leaders and

1    then if it -- if it's endorsed by exploration

2    excellence and ex- -- exploration excellence would

3    take a look at the prospect and assure what size

4    it is and what the risk description was.

08:49    5              So then once that -- once they're

6    endorsed it and everything looks like it's -- it's

7    a good fit in -- in the portfolio, then I would

8    take it to the worldwide exploration forum and

9    say, Here's a prospect that we recommend that --

08:49   10    that BP drills at -- at some point.  And it's this

11    size, and we recommend drilling this prospect.

12    And then we'd have a debate at the exploration

13    forum, and Mike Daly would make the final decision

14    whether we're going to put this on -- on the drill

08:50   15    schedule to -- to drill a well.

16              So kind of a long answer, but I think

17    it's important to kind of go through that -- that

18    process.

19        Q.   (BY MR. GONZALEZ)  Thank you.  That's what

08:50   20    I was looking for.

21              And who is Mr. Daly?

22        A.   So Mike Daly is -- is the -- the head of

23    worldwide exploration and appraisal for BP.

24        Q.   Where is that based out of?

08:50   25        A.   He's based here in London at St. James.

**PURSUANT TO CONFIDENTIALITY ORDER**

18

```
 1          Q.  Does he work for BP, PLC?

 2          A.  I'm not sure.  I think so, but I'm not

 3     sure of the exact nomen- -- nomenclature.

 4          Q.  Okay.  What factors are considered in

08:50 5     determining whether a well like the Macondo Well

 6     252 should be drilled?

 7          A.  Right.  So -- so I think I need to first

 8     go over the technical factors, and I'll -- I'll do

 9     that.

08:50 10         Q.  And I'd please ask you to say it in terms

11     that I can understand with a political science

12     degree and no science background.

13         A.  Yeah.  So what I'll do, then, I'll -- I'll

14     summarize the technical aspect and then we can

08:51 15     talk about --

16         Q.  Sure.

17         A.  -- the commercial side of things.

18         Q.  We're generally familiar with the topics,

19     having been involved with the case.  But I -- I

08:51 20     would like it to be explained in people talk --

21         A.  Yeah.

22         Q.  -- rather than geophysics/scientist talk.

23         A.  Okay.  Very good.

24              MR. KEEGAN:  Ervin, he's going to

08:51 25     have to answer it as he answers it, but...
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              MR. GONZALEZ:  Oh, I -- I understand.
 2     But just if he can make it a little easier so I
 3     can --
 4              MR. KEEGAN:  I get it.
08:51  5              MR. GONZALEZ:  -- understand him a
 6     little better would help me.
 7        A.   Yes.  I -- I mean, I can go over -- I'll
 8     start on the technical.  And there -- there's six
 9     aspects:  And so that is, do you have a source?
08:51 10     So do you have a -- a layer of rock that generates
11     oil or gas.  So that's No. 1.
12              And then it's a combination -- the
13     second thing is a combination of the migration
14     pathway and timing of those hydrocarbons emanating
08:51 15     from the source and then where those hydrocarbons
16     go.  Yeah.  So timing --
17        Q.   (BY MR. GONZALEZ)  Yes?
18        A.   -- timing and access, that -- that's
19     No. 2.
08:51 20              Then you need to have a reservoir.
21     So we determine, do we have a reservoir?
22              And -- and then if we think we have a
23     reservoir, then the fourth thing is, do we have a
24     quality reservoir?  What is the quality of that
08:52 25     reservoir?  So that's the -- that's the fourth
```

**PURSUANT TO CONFIDENTIALITY ORDER**

20

                                   thing.

                                           The fifth thing is then we have to

                                   have trap.  Okay.  We have to have some type of

                                   geometry that traps the hydrocarbons.

08:52                                      And then the sixth thing is, do we

                                   have a seal?  So it gets up into the reservoir.

                                   You have some kind of structure that traps it, but

                                   then it's got to stop right there, and that's the

                                   seal.

08:52                                      So we evaluate those six basic

                                   elements from a -- from a technical standpoint.

                                   So then we assess a size, an estimate on a size,

                                   and most likely then it has a P10 to a P90 range,

                                   around that.  So it's a range of potential size or

08:52                              volumes associated with this prospect.  And then

                                   for each of those elements I -- those six

                                   elements, we assign a risk to each one of those

                                   six elements.  And then we multiply out those

                                   risks, and then we get a chance of success for the

08:52                              overall prospect once we multiply out all those

                                   risks.

                                           And so, for example, I may have a

                                   prospect for -- I think most likely it's 200

                                   million barrels at a 1 in 3 chance of success.

08:53                              Okay?  So that's -- that's the technical aspect.

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
|       | 1  | And then, of course, we -- we have to |
|       | 2  | look at the commercial aspects.  And so our |
|       | 3  | engineer would -- reservoir engineer would work |
|       | 4  | with the -- with the team and the commer- -- the |
| 08:53 | 5  | finance team and do an estimate on, okay, if -- if |
|       | 6  | we did drill this well and it worked as |
|       | 7  | progressed, what's it going to produce?  What's |
|       | 8  | the most likely -- and then how would we develop |
|       | 9  | it in kind of a base case.  And so we would come |
| 08:53 | 10 | up with a -- a concept on how we would develop |
|       | 11 | this particular prospect if it had oil or gas. |
|       | 12 | And then what -- what kind of production profile |
|       | 13 | would it generate.  And then, of course, you can |
|       | 14 | put what the terms are, the commercial terms, and |
| 08:53 | 15 | put a -- a view on what your net present value is |
|       | 16 | and return on your -- your investment. |
|       | 17 | And so taking all those different |
|       | 18 | things in place and -- then the third thing then |
|       | 19 | is the overall strategy of the company.  Does this |
| 08:54 | 20 | prospect -- from a technical basis and a |
|       | 21 | commercial basis, does it fit in with the |
|       | 22 | worldwide BP strategy and portfolio.  And one of |
|       | 23 | the catch phrases that we have is -- at BP is |
|       | 24 | looking at a portfolio and exercising "quality |
| 08:54 | 25 | through choice." |

**PURSUANT TO CONFIDENTIALITY ORDER**

1           And so what we like to have is more

2    prospects in the hopper and drill the best things,

3    and then drill the things that are most strategic

4    for -- for the company.  And then, of course,

08:54  5    we -- we hope they -- they make money, as well.

6    So that -- that kind of takes you through the --

7    the process to how we make a decision.  For

8    example, that would have been how we -- how we did

9    Macondo.

08:54  10       Q.  Understood.

11           With the assessment, I'm sure you're

12    using certain diagnostic tools to be able to get

13    the information you need to make the -- those risk

14    factors?

08:54  15       A.  Yes.  We use different tool programs,

16    hardware, software, and just obviously the skill

17    of interpreters, geologists and geophysicists,

18    yes.

19       Q.  Can you please tell us what those

08:55  20    diagnostic tools are?

21       A.  Yes.  I think that, in -- in general, the

22    basics that the company uses is -- is the Landmark

23    suite of interpretation programs.  And that's

24    for -- that's what we use for our seismic

08:55  25    interpretation.  And -- and then various programs

to -- to look at wells for -- Geolog is -- is one

of the ones we use for looking at well information

and -- and petrophysics.  So -- but Landmark is

kind of the key -- the key interpretation

08:55  software.

Q.  Now when you use the term, "risk

elements," does that mean a risk in terms of

potential hazards or risk in terms of potential

chance of failure in terms -- by "failure," I mean

08:55  it may not pan out to be a productive well or may

not be economically efficient for us to go

forward.

A.  Yeah.  So when I'm talking about those

different risk elements, it's all about the chance

08:56  of finding oil or gas in this prospect.  That's

what it's focused on.

Q.  Is there a difference between the factors

involved in looking at a deepwater well as opposed

to a -- an ultra deepwater well?

08:56       MR. KEEGAN:  Objection to form.

A.  So regarding the prospect evaluation,

there's -- there's no difference.  A prospect is a

prospect whether it's onshore, shallow water,

deepwater.

08:56  Q.  (BY MR. GONZALEZ)  How involved were you

PURSUANT TO CONFIDENTIALITY ORDER

1    in making the decision to drill the Macondo Well

2    252?

3         A.   The -- the decision to drill it?  Yeah.

4    So my --

08:56  5         Q.   How involved were you in that process?

6         A.   So my main part -- my main participation

7    was I -- I rec- -- I took it to the exploration

8    forum and recommended the -- the well to the

9    forum.  So that -- as far as the decision to

08:57  10   drill, that was kind of the main -- main aspect.

11        Q.   And going through those six factors, did

12   it meet the criteria you were looking for to make

13   that recommendation that it should be drilled?

14                  MR. KEEGAN:  Objection to form.

08:57  15        A.   It -- it met the factors that it was a

16   high-quality prospect and -- and what we would

17   call our ILEX portfolio.  And "ILEX" stands for

18   Infrastructure Led Exploration, and that means

19   it's a prospect close to -- close to

08:57  20   infrastructure.  And so, yes, it -- it met the

21   criteria.

22        Q.   (BY MR. GONZALEZ)  Did it present any

23   challenges, as far as you were concerned at that

24   point, early on when you were analyzing the six

08:57  25   elements you discussed with us?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          A.  So as far as --
 2                  MR. KEEGAN:  Objection to form.
 3          A.  So specifically talking about the prospect
 4    risk in the six elements, no.  There -- there --
 5    it was a -- what I would call a high-quality
 6    prospect.
 7          Q.  (BY MR. GONZALEZ)  What else did you do
 8    with respect to -- if any, with respect to making
 9    recommendations that the Macondo 252 was
10    appropriate for drilling?
11                  MR. KEEGAN:  Objection to form.
12          A.  What do you mean by "appropriate for
13    drilling"?  What -- what do you...
14          Q.  (BY MR. GONZALEZ)  You recommended it to
15    the worldwide group --
16          A.  Yeah.
17          Q.  -- This is a prospect.  It meets our
18    criteria.  We should consider further exploring
19    it.
20          A.  Yeah.
21          Q.  Did you do --
22          A.  So I would say --
23          Q.  Did you do anything else?
24          A.  I would say it -- that summed it up.
25          Q.  Okay.  Now, once the drilling begins, what
```

08:57    5
08:58   10
08:58   15
08:58   20
08:58   25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    role do you have?

 2         A.   Right.  So once operations starts.  So, in

 3    my role -- my teams look after the -- the

 4    subsurface aspect of a prospect.  And it's a very

08:58  5    clear authority or -- or accountability, for the

 6    actual operations and the drilling lie in the

 7    drilling organization, the wells organization,

 8    which is a different organization than -- than I

 9    look after.

08:58 10              And so my subsurface team, for

11    example, on Macondo, would be supporting the --

12    from a subsurface standpoint, the geology and

13    geophysics of any -- any help the drillers

14    might -- might need.

08:59 15         Q.   And what does that mean in actuality?

16         A.   Well, they -- they help predict from

17    the -- the surface down to proposed total depth

18    what -- what the geology -- the geologic scenario

19    will be in a prog- -- prognosed sense and also

08:59 20    help with the -- the pore pressure prediction.

21         Q.   How is that determined?

22         A.   What?

23              MR. KEEGAN:  Objection to form.

24         A.   What?

08:59 25         Q.   (BY MR. GONZALEZ)  The pressure
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    prediction.

2         A.  Well, I mean, it's a -- it's a complex --

3    we'd have to get into some -- some pretty major

4    geophysics and things.  But in general terms, the

08:59   5    pore pressure prediction is used using nearby

6    wells.  So offsetting well information to

7    understand what the geology is in the area.  And

8    then it's a detailed look at the seismic data and

9    seismic interpretation.  And so -- and then, the

09:00  10    third thing would be looking at the seismic

11    velocities that are used in the seismic processing

12    and also the -- kind of the geologic parameters of

13    each of the intervals that are predicted there.

14              And so when you take all of these

09:00  15    together, you put together what we would call a

16    "basin model" for -- for that area.  And then --

17    then you can invert the data and come up with a

18    pore pressure prediction.

19         Q.  Do wells in the Gulf of Mexico that are

09:00  20    deepwater wells have greater pore pressure?

21              MR. KEEGAN:  Objection to form.

22         Q.  (BY MR. GONZALEZ)  Than shallow wells, for

23    example?

24              MR. KEEGAN:  Objection to form.

09:01  25         A.  It -- it really -- it really varies.  You

**PURSUANT TO CONFIDENTIALITY ORDER**

1    can have high pore pressure wells in the shallow

2    water.  You can have very, very high pore pressure

3    wells onshore U.S.  Oklahoma, Louisiana, Texas

4    have high pore pressure wells.  All over the world

09:01  5  you can have it.  So, no, it -- it can be in many

6    different scenarios.

7         Q.  (BY MR. GONZALEZ)  What challenges do high

8    pore pressure wells bring?

9              MR. KEEGAN:  Objection to form.

09:01 10       Q.  (BY MR. GONZALEZ)  To the drilling

11    operations?

12             MR. KEEGAN:  Objection to form.

13       A.  Yeah.  I mean, I'm -- I'm not an expert

14    in -- in the challenges for the operations side of

09:01 15  things, so...

16       Q.  (BY MR. GONZALEZ)  Do you generally know?

17       A.  Do I generally know --

18       Q.  The answer to the question.

19       A.  For the pore pressure?

09:01 20       Q.  Yes.

21       A.  Yeah.  I mean, you just -- it's just

22    something that you have to -- you have -- the

23    drilling organization has to be concerned about,

24    you know, where -- where the pore pressure

09:02 25  changes, where you're going to have increases in

**PURSUANT TO CONFIDENTIALITY ORDER**

|  |    |                                                                   |
|-------|----|-------------------------------------------------------------------|
|       | 1  | pore pressure and where you're going to have                      |
|       | 2  | reduction -- reductions in pore pressure.                         |
|       | 3  | Q.  How is increased pore pressure managed --                     |
|       | 4  | MR. KEEGAN:  Objection to form.                                   |
| 09:02 | 5  | Q.  (BY MR. GONZALEZ)  -- by a drilling team?                     |
|       | 6  | MR. KEEGAN:  Objection to form.                                   |
|       | 7  | A.  So say that again.                                            |
|       | 8  | Q.  (BY MR. GONZALEZ)  Yeah.  How does a                          |
|       | 9  | drilling team manage increases in pore pressure as                |
| 09:02 | 10 | those are going down?  For example, you provide                   |
|       | 11 | information -- geologic information that says at                   |
|       | 12 | these different levels, you're going to find these                |
|       | 13 | different things -- predictions with reasonable                   |
|       | 14 | degrees of probability.  And now you have to be                   |
| 09:02 | 15 | ready to manage this situation you're about to                    |
|       | 16 | encounter.  How does that go about?                               |
|       | 17 | MR. KEEGAN:  Objection to form.                                   |
|       | 18 | A.  Yeah.  So let's -- that was a lot of                          |
|       | 19 | stuff.  So could you simplify your -- your                        |
| 09:02 | 20 | question now?                                                     |
|       | 21 | Q.  (BY MR. GONZALEZ)  I'll try.                                  |
|       | 22 | A.  Yeah.                                                         |
|       | 23 | Q.  What considerations does a drilling team                     |
|       | 24 | take into account when working with predicted pore               |
| 09:03 | 25 | pressure increases --                                            |

PURSUANT TO CONFIDENTIALITY ORDER

```
 1        A.   Yeah.

 2        Q.   -- in drilling?

 3                  MR. KEEGAN:   Objection to form.

 4        A.   Yes.   I -- I really have to say on that,

 5   I'm -- I'm not involved in -- in the operations.

 6   I'm more -- you know, I'm not involved in

 7   day-to-day decisions on how they manage the pore

 8   pressure, so I guess I'd have to say I -- I can't

 9   really get into detail or specifics or even a

10   whole lot of generics on that.

11        Q.   (BY MR. GONZALEZ)   What determines pore

12   pressure?

13        A.   Well --

14                  MR. KEEGAN:   Objection to form.

15        A.   -- there's -- there's lots of factors, and

16   I don't know if I could give you good technical

17   explanation for pore pressure in -- in general.

18        Q.   (BY MR. GONZALEZ)   What is "pore

19   pressure"?

20        A.   Well, it's the pressure in -- in the pores

21   in a geologic unit.

22        Q.   Okay.   And your group makes reasonable

23   estimates of what those pore pressures are going

24   to be?

25        A.   Not -- not -- not my group.   So they --
```

**PURSUANT TO CONFIDENTIALITY ORDER**

31

```
 1    yeah, the -- well, the Tiger team makes those.
 2    They -- they help the -- they support the
 3    operations team on the pore pressure prediction.
 4         Q.  Right.  And the Tiger team is part of the
 5    team that you oversee --
 6         A.  Yeah.
 7              MR. KEEGAN:  Objection.
 8         Q.  (BY MR. GONZALEZ)  -- and you actually
 9    mentioned Mr. Pinky?
10         A.  Yeah.  Pinky Vinson, yeah.
11         Q.  Right.  So the Tiger team is coming up
12    with pore pressures that the drilling team may be
13    able to experience so that they can prop- -- so
14    that the drilling team can properly plan for that,
15    correct?
16              MR. KEEGAN:  Objection to form.
17         A.  The pore pressure is important in -- in
18    the planning for -- for well operations.
19         Q.  (BY MR. GONZALEZ)  And if there's a
20    greater -- greater pore pressure, then there has
21    to be greater safeguards involved, correct?
22              MR. KEEGAN:  Objection to form.
23         A.  Not necessarily.
24         Q.  (BY MR. GONZALEZ)  Tell me what you mean
25    by that.  A low pore pressure well versus a high
```

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    press- -- pore pressure well, would it be treated

 2    exactly the same way?

 3         A.   It -- it's possible.   I -- I don't know

 4    the exact answer because -- to that.   It would

09:05 5    depend on many different factors.

 6         Q.   Are you telling me you're -- you're not

 7    the person that would have the best answer for

 8    that and someone else would?

 9         A.   Yeah.   Correct.

09:05 10         Q.   And who would -- if I needed answers to

 11    those questions, who would I need to talk to?

 12         A.   Well, the petrophysicist or a -- or, you

 13    know, in BP it's Marty Albert or Pinky Vinson.

 14    They're experts in pore pressure prediction.

09:05 15         Q.   Pinky Vinson.   Is that his nickname,

 16    Pinky?

 17         A.   Graham.

 18         Q.   Graham --

 19         A.   Graham Vinson.

09:05 20         Q.   -- is his first name?

 21         A.   Yeah.

 22         Q.   Now, tell us, with respect to your job in

 23    your group, the type of subsea assistance that you

 24    provided for the Macondo Well 252 once drilling

09:05 25    operations began.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:   Objection to form.

2      A.  So what the team did or I did?

3      Q.  (BY MR. GONZALEZ)  Including.  And in your

4  answer, you can tell me what you personally did

09:06  5  versus what the team did.

6      A.  So for myself specifically, again, as --

7  as I mentioned, I'm not involved in the drilling

8  of the well.  So that -- that's me.  And the team

9  that was the subsurface team, geologists and

09:06  10  geophysics -- geophysicists, they would -- they

11  would be in on the -- the -- maybe a morning call

12  or something for the operations.  And -- so again,

13  I don't -- I'm not in those wells -- or, excuse

14  me, in those calls.  So I don't really know for

09:06  15  sure what -- what happens.

16      Q.  I got it.

17          The feeling I'm getting -- and I'm

18  going to use a very colloquial example -- is that

19  your job would be if you were working for

09:06  20  Starbucks, the coffee company, and you're looking

21  for new sites for potential success for Starbucks

22  and you would look for population, interest in

23  coffee, the city, the economics of the city, the

24  government of the city, and then you'd make

09:07  25  recommendations to worldwide operations for

PURSUANT TO CONFIDENTIALITY ORDER

34

```
 1    Starbucks on this may be a potentially good site
 2    for our new Starbucks coffee shop.
 3         A.   Uh-huh.
 4         Q.   Is that generally what your role would be,
 5    scoping out areas that may have success with
 6    respect to drilling?
 7                   MR. KEEGAN:   Objection to form.
 8         A.   Yeah.   Yeah.   My -- my -- I don't know
 9    about Starbucks.
10         Q.   (BY MR. GONZALEZ)   I said it was very
11    close.
12         A.   It was a good -- good -- but, yeah.   My
13    job is to, you know, one liner is to manage the
14    portfolio and -- and recommend prospects for --
15    for the portfolio for drilling.
16         Q.   How do those properties get in the
17    portfolio, those leases --
18         A.   Yeah, that --
19         Q.   -- to begin with?
20         A.   Yeah.   No, I -- I understand that, and
21    that -- that's an important part of -- of the
22    business.   And there's really two major ways that
23    would be good to summarize.   I think the first one
24    are through these federal lease sales, and they're
25    in -- in deepwater.   What I worked on, there
```

09:07  5
09:07 10
09:07 15
09:07 20
09:08 25

**PURSUANT TO CONFIDENTIALITY ORDER**

1    was -- there were two a year, March and August.

2    And so that's No. 1.

3              And No. 2 are through commercial

4    deals or trades with other oil and gas companies.

09:08  5    Q.   And are you scoping them out from before

6    they're put on -- I'm going to say the market,

7    although it's technically not put on the market.

8    But do you look at them, saying, These -- these

9    are interesting pieces.  We should consider

09:08  10   leasing these when they go on or trading out with

11   other companies or buying them from other

12   companies?

13        A.   It's --

14              MR. KEEGAN:  Objection to form.

09:08  15        A.   So -- so just to -- to -- how -- how we do

16   that, it -- usually in an ideal world, we like

17   to -- like I -- I told you, I've got teams working

18   all over the deepwater Gulf of Mexico.

19        Q.   (BY MR. GONZALEZ)  Right.

09:08  20        A.   And they're looking at the seismic data

21   and then building this prospect inventory that --

22   that I manage.  And -- and we look at the best

23   prospects around or the things -- the new ideas,

24   and then we look at what the acreage situ- --

09:09  25   situation is for a particular area that we might

**PURSUANT TO CONFIDENTIALITY ORDER**

1    be interested in.  And then it comes down to these

2    two ways.  So if -- if on a particular prospect

3    that we like it's got open acreage on it, that

4    means we have to wait for a lease sale to

09:09  5    potentially bid on it in a competitive environment

6    through the federal system, yeah.  Or if another

7    company might have that acreage, then we could

8    potentially think about, Hey, can we -- is there

9    something we could have to -- to trade to get in.

09:09  10    So we go into their -- become a partner on -- on

11    that block we like, and we give them something in

12    return.  Or we could farm in -- what we call a

13    "farm-in," is another way of doing it, where we

14    just would say, We -- are you interested in

09:09  15    drilling this prospect?  And if they are, maybe we

16    could just do it from a financial standpoint, pay

17    up -- promote -- what we call "promote" -- on a

18    potential well.

19              So there -- there are several

09:10  20    different ways to -- to do that.  But, yes, I

21    do -- we do like to -- we do like to map the data

22    beforehand.

23        Q.   Macondo 252, that was a Federal -- that

24    was obtained through a Federal lease?

09:10  25        A.   Yes.

       1      Q.  And it -- was that through one of the

       2   auctions?

       3      A.  It was through a lease sale.

       4      Q.  With the U.S. Government?

09:10  5      A.  Yes.

       6      Q.  What made the Macondo 252 a good prospect?

       7      A.  As -- you know, as I -- as I mentioned

       8   previously, it -- it had all of the -- the

       9   elements, and it had a very good chance of

09:10 10   success, about a 2 in 3 chance of success, what --

      11   in the oil industry, that would be considered a

      12   very high-quality prospect.  And so, yeah, that's

      13   what -- that was the bottom line.

      14      Q.  Now, after the recommendation was made to

09:11 15   drill Macondo 252 and once the drilling operations

      16   were under way, do you monitor the well in any

      17   way, you personally?

      18      A.  Yeah, I -- I understand.  So there's --

      19   there's a couple of different ways.  There's one

09:11 20   major way that I did.  So I would get a -- I asked

      21   for -- to get a one liner -- one-line summary

      22   E-mail in -- in the morning from one of the

      23   geologists on the team.  And so he would send me

      24   pretty much every day kind of a quick one liner so

09:11 25   I could take 30 seconds and know kind of what the

**PURSUANT TO CONFIDENTIALITY ORDER**

38

1    basics -- what was happening, what the well --

2    what depth it was, etc...

3              And then there's morning reports that

4    I had access to.  And I would say on an infrequent

09:11  5    basis, I would -- I would just check in on the

6    morning report and -- and see the basics of -- of

7    what the op- -- current operation was.

8         Q.  What's the purpose of your monitoring the

9    well?

09:11 10         A.  Just for my own benefit, really.  But then

11    also in case upper management asks, Hey, what's

12    going on with the -- the Macondo Well?  Then I

13    would be ready for, Hey, they're at 10,000 feet

14    and they're doing such-and-such.

09:12 15         Q.  But you're looking at it for a specific

16    purpose and a specific role that you have, right?

17              MR. KEEGAN:  Objection to form.

18         A.  I'm looking at that data to just see where

19    the well is for my own benefit.  And then also

09:12 20    potentially, if I -- if I was asked where the well

21    was, I would be able to say, Well, the well is at

22    10,000 feet.  That -- that's -- that's why I did

23    that.

24         Q.  (BY MR. GONZALEZ)  Right.  And -- and my

09:12 25    point is you're not in operations, you're not

39

```
         1    actually running the drilling.  Your role is as a

         2    financial portfolio manager, in essence.  So

         3    you're looking at what factors?

         4                    MR. KEEGAN:  Objection to form.

09:12    5         Q.  (BY MR. GONZALEZ)  Once the drilling is

         6    going on and you're getting these notifications,

         7    what's your interest in it?

         8                    MR. KEEGAN:  Objection to form.

         9         A.  Yeah.  It's as simple as I said.  I'd just

09:12   10    repeat myself.

        11         Q.  (BY MR. GONZALEZ)  Okay.

        12         A.  That's really the basics, just for my own

        13    view on where the -- where the well was at.

        14         Q.  You were aware that that well had a number

09:12   15    of kicks, right?

        16         A.  What do you mean by "a number"?

        17         Q.  Several.

        18         A.  I don't think there were several.  I don't

        19    think there were several kicks.

09:13   20         Q.  Have you reviewed the depositions that

        21    have been taken in this case?

        22         A.  No.  I think -- I think there were two,

        23    but I'm not -- I'm not sure on that.

        24         Q.  You're aware of two kicks?

09:13   25         A.  I -- I believe so.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

40

```
 1          Q.   What causes a kick?

 2               MR. KEEGAN:  Objection to form.

 3          A.   The -- my understanding is -- is if your

 4     pore pressure is greater than -- than the -- the

09:13 5     mud weight.  That's my basic --

 6          Q.   (BY MR. GONZALEZ)  And are you familiar

 7     with how to manage a kick?

 8          A.   I don't know the details of -- of -- it's

 9     a complex operation, and I'm -- I don't know the

09:13 10     details.

11          Q.   What defense does the drilling team have

12     to handle kicks in terms of equipment available?

13          A.   I don't know.

14               MR. KEEGAN:  Objection to form.

09:13 15          Q.   (BY MR. GONZALEZ)  Not your area?

16          A.   Correct.

17          Q.   Were you involved in all -- at all in well

18     control planning for the Macondo 252?

19          A.   No.

09:14 20          Q.   Were you consulted about well control,

21     other than giving a pore pressure analysis through

22     your team -- through Tiger?

23               MR. KEEGAN:  Objection to form.

24          A.   Yes, I -- yeah.  I didn't give that

09:14 25     analysis.  The Tiger team certainly helped out,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

|       |    |                                                      |
|-------|----|------------------------------------------------------|
|       | 1  | supported the -- the drilling team.  So, no.  No,    |
|       | 2  | I wasn't consulted on it, on a technical basis for   |
|       | 3  | sure.                                                |
|       | 4  | Q.   (BY MR. GONZALEZ)   Are you responsible for     |
| 09:14 | 5  | Tiger?                                               |
|       | 6  | A.   At the -- yeah.  It would be good to --         |
|       | 7  | the Tiger team?                                      |
|       | 8  | Q.   Yeah.                                           |
|       | 9  | A.   Yeah.  So just to clarify that --               |
| 09:14 | 10 | Q.   As opposed to the Detroit Tigers --             |
|       | 11 | A.   Yeah, yeah.                                     |
|       | 12 | Q.   -- or the LSU Tigers.  Yeah.  I'm               |
|       | 13 | talking -- when I say Tiger, I mean the Tiger team   |
|       | 14 | that was involved with the Macondo Well Project      |
| 09:15 | 15 | 252 during the years in question.                    |
|       | 16 | A.   Yeah.  So Pinky -- I need to clarify that.       |
|       | 17 | Q.   Yes, please.                                    |
|       | 18 | A.   Pinky worked for -- the Tiger team              |
|       | 19 | reported up to me to kind of April 1st of 2010,      |
| 09:15 | 20 | and then they reported at that point to -- I think   |
|       | 21 | it was April 1st, but to Dave Rainey.  So Pinky      |
|       | 22 | Vinson, Graham Vinson, reported to Dave Rainey       |
|       | 23 | in -- in April of 2010.                              |
|       | 24 | Q.   Were you informed of the kicks the well         |
| 09:15 | 25 | had?  You're -- you're aware of two kicks, so        |

**PURSUANT TO CONFIDENTIALITY ORDER**

1    let's talk about those two kicks.  Were you

2    informed of the kicks?

3                MR. KEEGAN:  Objection to form.

4        A.  I -- I don't recall specifically.  They

09:15 5    could have been in the -- the one liner.

6        Q.  (BY MR. GONZALEZ)  Right.  That's what I

7    mean, in those daily E-mails.

8        A.  Yeah.  Yeah, I -- I believe so, but I

9    don't recall for sure.

09:15 10        Q.  And when you -- when you see something

11    that's telling you there was a kick, what do you

12    do?

13                MR. KEEGAN:  Objection to form.

14        A.  So basically I -- I let the operations

09:16 15    guys handle it.  Bottom line.

16        Q.  (BY MR. GONZALEZ)  Are you in a position

17    to tell someone what to do with respect to a kick?

18        A.  No.

19        Q.  Who was the operations guy at that time?

09:16 20        A.  What do you mean by "the operations guy"?

21        Q.  For BP that would be in charge of having

22    the responsibility of making sure that the

23    appropriate actions were taken with respect to

24    kicks.

09:16 25                MR. KEEGAN:  Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

        1          A.   Yeah.   I -- that would be -- because it

        2    was -- it was a team of -- of engineers.   And so I

        3    really don't have an answer on who specifically

        4    would -- would have had the -- the responsibility

09:16   5    for that.   It was -- it was a -- it was a team.

        6          Q.   (BY MR. GONZALEZ)   Other than the one

        7    liners that you would get on a daily basis

        8    regarding the Macondo 252, did you get detailed

        9    information at any point with respect -- prior to

09:16  10    the blowout on April 20th, advising you of

       11    complications or concerns about the well?

       12                MR. KEEGAN:   Objection to form.

       13          A.   So I -- I didn't really get detailed

       14    information.   I did have access to the -- the

09:17  15    daily drilling report.   That doesn't -- you know,

       16    I didn't study those.   I did have the one liner.

       17    So, yeah, I didn't -- didn't have a whole lot of

       18    the details.

       19          Q.   (BY MR. GONZALEZ)   All right.   With

09:17  20    respect to the daily -- daily drilling reports,

       21    you said you had access to them, meaning if you

       22    needed to look at -- look at it, no one would

       23    prevent you from looking at it.   But was it your

       24    responsibility to read the daily drilling reports

09:17  25    and comment on them or assess them or in any way

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    do anything with respect to what you read in the
 2    daily drilling reports?
 3                MR. KEEGAN:  Objection to form.
 4         A.  No.  It was not my responsibility.
 5         Q.  (BY MR. GONZALEZ)  When would you access
 6    the daily drilling reports, if at all?
 7         A.  That's what I mean.  There wasn't any
 8    consistent time that I would.  It was, I would
 9    say, rather infrequent, and I would look at it
10    every now and then.  But it wasn't something that
11    I consulted because I had -- I had my one liner.
12         Q.  Did anything ever give you a concern about
13    the Macondo 252 prior to April 20th, 2010?
14         A.  Did anything give me a concern?  Not
15    really.  I would say that -- yeah, not -- not
16    really.
17         Q.  Based on the information you were given by
18    the company, it looked like it was an uneventful
19    drilling?
20         A.  Well --
21                MR. KEEGAN:  Objection to form.
22         A.  -- yeah.  So --
23         Q.  (BY MR. GONZALEZ)  That's -- that's a
24    question.
25         A.  Yeah.  So, you know, obviously there
```

**PURSUANT TO CONFIDENTIALITY ORDER**

were -- there were kicks and there were losses.

But in general, that wasn't, you know, my -- my

area.  And the operations folks were -- were

working it.

09:19  Q.  There was a lot of mud that was being

lost, right?

MR. KEEGAN:  Objection to form.

A.  I don't know how much mud was being lost.

Q.  (BY MR. GONZALEZ)  But there was mud being

09:19  lost, and you were aware of that?

A.  I -- I did know of -- of some mud being

lost in -- in lost zones, yeah.

Q.  Did you know the reasons for mud loss?

A.  Well, it's the opposite of -- of the -- of

09:19  the kick, and so the mud weight is a bit higher

than -- than the rock pore pressure.

Q.  And what causes the loss to be -- what

causes the mud to be lost if its weight is greater

than the pressure in the well?

09:19  A.  Well, it breaks down the rock and -- and

the mud, then goes into the formation.

Q.  Rather than circulating back up?

A.  Yeah.  I guess that would be pretty much

it, basically.

09:19  Q.  Are you familiar with this area, or is

**PURSUANT TO CONFIDENTIALITY ORDER**

1    this something that's outside of your expertise?

2            MR. KEEGAN:  Objection to form.

3        A.  So, what?

4        Q.  (BY MR. GONZALEZ)  Mud loss.

09:19   5        A.  Yeah, I don't -- I know in general terms

6    what causes a mud loss or a kick, but that --

7    that's about it as far as, as we talked about

8    earlier.  About how in detail and what tools to

9    deal with either of those, yeah, I'm not -- I'm

09:20  10    not involved in that.

11        Q.  Okay.  So you were aware of the two kicks

12    you talked to us about, and you were aware of the

13    mud loss.  And what, if anything, did that tell

14    you about the well?

09:20  15        A.  You know, it told me that this is similar

16    to drilling other wells in the deepwater Gulf of

17    Mexico, in the Gulf of Mexico.  In other wells

18    that, you know, I was involved in, we have -- you

19    have kicks.  You may have to sidetrack.  You have

09:20  20    losses.  And so this was -- you know, that's

21    what -- yeah, that -- that's what it told me; that

22    this was kind of the -- the way it is in -- that's

23    what BP operated wells or other ones that other

24    companies have drilled.

09:21  25        Q.  Was this an ultra-deep well, Macondo 252?

**PURSUANT TO CONFIDENTIALITY ORDER**

|     |                                                                    |
| --- | ------------------------------------------------------------------ |
| 1   | MR. KEEGAN:  Objection to form.                                    |
| 2   | A.  What do you define as "ultra deep"?                            |
| 3   | Q.  (BY MR. GONZALEZ)  I think the cutoff is                       |
| 4   | 5,000 feet?                                                         |

09:21 5    A.  I'm not sure if -- if that's the cutoff.

6    And I can't --

7    Q.  What's your understanding?

8    A.  And I can't remember -- I can't remember

9    what the well depth or the water depth was at that

09:21 10    Macondo, specifically.  Ultra-deep water, I

11    thought was greater than that.  But I'm not sure.

12    I thought it was more 8- to 10,000 feet, but I'm

13    not sure on that.

14    Q.  Are you consulted with respect to the type

09:21 15    of well control devices and procedures that should

16    be used?

17    MR. KEEGAN:  Objection to form.

18    A.  Like I mentioned before, I'm not consulted

19    on -- on those tools or how to do it or what to

09:21 20    do.  It's clearly, clearly in the -- the realm of

21    operations and the engineers, drilling engineers.

22    Q.  (BY MR. GONZALEZ)  Did you work at all on

23    the response plan?

24    MR. KEEGAN:  The oil spill response

09:22 25    plan?

**PURSUANT TO CONFIDENTIALITY ORDER**

                      MR. GONZALEZ:  Yes, sir.

     A.  So the oil spill --

     Q.  (BY MR. GONZALEZ)  The oil spill response

plan.

     A.  So it's -- let me just clarify.  So the

oil spill response plan kind of that's put

together predrilling for a prospect or for

Macondo?

     Q.  Yes, sir.

     A.  Yeah.  No, I -- I'm not involved in

putting that together.

     Q.  Are you consulted?

     A.  Not usually.  I can't remember being

consulted for -- for that particular one.

     Q.  And you weren't -- you're generally not

consulted, correct?

     A.  Correct.

     Q.  And you were not consulted for the Macondo

252?

     A.  I don't recall.  I don't remember.

     Q.  Okay.

     A.  Yeah.

     Q.  And if you had been consulted, what would

your role have been?

                      MR. KEEGAN:  Objection to form.

PURSUANT TO CONFIDENTIALITY ORDER

1      A.  I -- I don't know.  And the reason I say

2   that is because I don't really know the details of

3   what's in an oil response plan.  I don't review

4   those in -- in detail.  That's done by a different

09:23  5   group that's -- that's not under me.  And so I --

6   I really don't have an answer to this question on

7   what I would have done.

8      Q.  (BY MR. GONZALEZ)  Well, the response plan

9   that I'm talking about is the one that says, Well,

09:23 10   if something goes wrong and we have a blowout,

11   this is what we're going to do and this is how

12   we're going to handle it?

13      A.  Yes.  I -- I don't know how I

14   would have -- what I would have done or -- or how

09:23 15   I would have been involved in that.

16      Q.  Do you know what tools are available to

17   handle kicks and blowouts?

18      A.  No, I -- I don't.  Like I mentioned, I --

19   I don't know -- I do not know the tools that --

09:23 20   that the drillers use in -- in detail on -- on

21   that.

22      Q.  Do you know what a blowout preventer is?

23      A.  Yeah.

24      Q.  How are you familiar with a blowout

09:23 25   preventer?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Just in general, drilling in the deepwater

2   Gulf of Mex- -- Mexico.  I know that there's a

3   BOP.

4      Q.   Other than a BOP, do you know of any other

09:24  5   well control equipment onboard the drilling rig,

6   which in this case was the DEEPWATER HORIZON?

7      A.   Yeah.  So, what -- what I would say -- two

8   things:  You've got mud.  And -- and then you

9   have, you know, things like LCM to -- to clog up

09:24 10   the -- to put down the -- the wellbore to -- to

11   clog up the pore space in case of -- of losses.

12   So I guess those were kind of what you were

13   talking about, tools.

14      Q.   Yes, sir.

09:24 15      A.   Then -- then -- then I guess that's what I

16   would -- I would reference.  But, you know, the

17   operations and how the decisions are made and how

18   that all happens, I'm -- I'm not sure.

19      Q.   If there's a blowout and the blowout

09:24 20   preventer fails to contain the blowout, what's the

21   next option?

22          MR. KEEGAN:  Objection to form.

23      A.   I don't know what the next option is after

24   that, specifically.

09:24 25      Q.   (BY MR. GONZALEZ)  I just want to make

51

1    sure I understand your answer.  You don't know

2    because it's not your area of expertise, or it is

3    your area of expertise generally and you don't

4    know of anything else that you had?

09:25  5        A.  Oh, yeah.

6            MR. KEEGAN:  Objection to form.

7        A.  It's definitely not my area of ex- --

8    expertise, what would be the procedure to -- to

9    follow up something like that.  I do not know what

09:25 10    the next step is because it's outside my area.

11        Q.  (BY MR. GONZALEZ)  Were you involved at

12    all in the actual response after the Macondo Well

13    252 blowout on April 20, 2010?

14        A.  So just -- yeah.  So kind of the -- you

09:25 15    said the response?

16        Q.  And let me set the scene:  April 20th,

17    2010, in the evening, at some point I'm sure you

18    found out that there had been a blowout at the

19    Macondo Well 252; there was an explosion?

09:25 20        A.  Uh-huh.

21        Q.  Where were you, and how did you find out?

22        A.  Yeah.  Okay.  So I found out that about

23    6:45 in the morning the -- the next day when I

24    came into the office.

09:26 25        Q.  What were you told?

```
 1        A.  I was -- based on my recollection, I was
 2   told that they were -- there was a fire on the rig
 3   and that 11 men were missing.
 4        Q.  Who told you?
 5        A.  I believe there was a group of three
 6   talking in the hall.  And again I -- I don't know
 7   for sure, but I think there was Jonathan Bellow.
 8   I'm not sure on that.
 9        Q.  What was your reaction?
10        A.  Just disbelief and -- and shock.
11        Q.  Did you have a role at that point to play
12   for the company?
13        A.  Okay.  So -- so my role at that point
14   was -- so right at that point?  Yeah.  So it
15   was -- so I got with Dave Rainey, who is the
16   exploration vice president, and -- and basically
17   asked him what he needed.  And I put together
18   what -- he said he wanted a one-page fact sheet.
19   And I said, "Well, what do you mean by a fact
20   sheet?"
21             And he said, "Well, just, you know,
22   where is" -- "what's the location and what was" --
23   "what was the depth and exploratory well."  Just
24   kind of some basic par- -- kind of parameters
25   on -- on the well.  Very, very basic.  Location,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    things like that.

2         Q.   Location, depth, what else?

3         A.   Name -- you know what was the name of the

4    well, but then also the -- the OCS block name,

09:27  5    things like that.

6         Q.   Macondo Well 252?

7         A.   Yeah.  I think -- yeah.  And then

8    there's a -- yeah, pretty much.  And then there

9    was some other information, but I -- I can't

09:27 10    remember what it was.

11         Q.   And that's a memoranda that you prepared

12    for Mr. Rainey?

13              MR. KEEGAN:   Objection to form.

14         A.   Yeah, I wouldn't call it a memo.  It

09:28 15    was -- I called -- he called it a fact -- I'd say

16    a fact sheet or a data sheet.  And so I got that,

17    and I -- I gave it to him.  And I don't know what

18    he did with it.

19         Q.   (BY MR. GONZALEZ)  You just indicated, by

09:28 20    gesture, almost handing it over to him.  Did you

21    give it to him personally, or did you E-mail it to

22    him?

23         A.   I believe I -- my recollection is that I

24    handed it to him.  But I don't know if I E-mailed

09:28 25    it.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  Did you create it yourself, or did you

2   have someone do it for you?

3      A.  I asked some of the team -- because I

4   didn't have all the information.  And -- so it was

09:28   5   a bit of both.

6      Q.  Other than this very basic information,

7   did you provide any other data --

8                   MR. KEEGAN:  Objection to form.

9      Q.  (BY MR. GONZALEZ) -- to Mr. Rainey at that

09:28   10   time?

11      A.  Not -- not that I can remember

12   specifically.

13      Q.  What else did you do, if anything?

14      A.  So, shortly thereafter, I -- within the

09:29   15   next day or two, then Dave Rainey went off to

16   Robert, Louisiana, to be on the -- in the command

17   center there.  And so then for about three days or

18   so, I sat in for him on the leadership team on the

19   BS team, the business strategy team.  And so for

09:29   20   those kind of -- I think it was three days, might

21   have been four -- I'm not sure of the length of

22   time -- I was on -- on that team, and we were kind

23   of given specific duties.  And -- and my main duty

24   was to keep the partners, Anadarko and Mitsui kind

09:29   25   of up to date on what -- what was happening to the

**PURSUANT TO CONFIDENTIALITY ORDER**

1   best of our knowledge and what BP was -- was

2   doing.  So that's kind of the role I played for

3   those three days.

4       Q.  Like liaison?

09:29   5       A.  Yeah.  Kind of -- kind of a calling -- you

6   know, I'd get with -- from Anadarko.  I -- I

7   called Anadarko.  I can't remember the gentleman's

8   name.  I think he was the VP for operations or

9   production.  I think he's since retired from

09:30   10  Anadarko.

11      Q.  Uh-huh.

12      A.  And so I talked to him on a daily basis

13  for those few days.  And then I worked with Kirk

14  Wardlaw within BP, who owned the Mitsui

09:30   15  relationship, and so I -- we -- we had a daily

16  phone call to Mitsui as well, to just update them

17  on basic information as -- as the days -- for

18  those few days.

19      Q.  Who was giving you the information to

09:30   20  provide to them?

21      A.  Yeah.  I couldn't pin down one person.  It

22  was just kind of various, because there was so

23  much -- so much -- so many people involved at that

24  point and lots of information flowing.  And so we

09:30   25  would -- we would get information from -- from

1    different areas as best we could.  I was on the

2    BST, so they were obviously getting updates and --

3    and talking about things.  And -- and then, Kirk

4    had information.  And so then we would get

09:31   5    together and talk about the current situation, and

6    then we would -- we would make the phone call.

7         Q.  So would this role that you had in

8    informing Anadarko and MOEX of what was going on,

9    on a daily basis, was that an official position

09:31   10    that you were asked to take, or was that something

11    you did on your own?

12         A.  Yeah.  It was -- like I said, when I was

13    on the leader- -- on the leadership team, it was

14    kind of divvied out to the kind of roles and --

09:31   15    and some --

16         Q.  That -- and that was your role?

17         A.  That's correct.

18         Q.  Okay.  And who -- was there a

19    determination made by someone at BP regarding,

09:31   20    This is the information we're going to be giving

21    out, and we'll all divvy up how we'll send it out?

22         A.  I don't know.

23         Q.  How did you make a determination on a

24    daily basis of what to told Anadarko and MOEX?

09:31   25         A.  Yeah.  It was -- it was more finding out

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   what they wanted to know.  So it was getting
 2   information, then Hey -- we would give them
 3   updates the best we could.  There was no defined
 4   process at that point in time.  And -- and then if
 5   they had questions, I would try to get information
 6   to answer those questions best -- best I could.
 7   But it was -- I would have to say it was pretty
 8   general and basic information at the time.
 9        Q.  How long were you in the role of
10   communicator?
11        A.  Just three or four days.
12             MR. KEEGAN:  Objection to form.
13        A.  Three of four days.  Well, what do you
14   mean -- well, communicator for --
15        Q.  (BY MR. GONZALEZ)  For that role.
16        A.  -- for those -- for the part- -- the two
17   partners?
18        Q.  Yes.
19        A.  Three or four days.
20        Q.  Okay.
21        A.  Yeah.
22        Q.  Did your role change after that?
23        A.  Yeah.  So --
24        Q.  How?
25        A.  At that time, then, had a -- a meeting.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    And I -- I recall that Dave might have been back.

2    He came back from New Orleans to get a change of

3    clothes.

4        Q.   Dave Rainey?

09:32  5        A.   Dave Rainey, yeah.  And I believe it was a

6    face-to-face.  So Dave, myself, and Cindy

7    Yeilding.  So Cindy and I were peers reporting

8    to -- to Dave.  And so we met and kind of said,

9    All right.  How -- Dave's in Robert, and how are

09:33  10    we going to run our organization, the exploration

11    organization.  And then, so that -- that time, we

12    made the determination that Cindy would sit in

13    for -- for Dave as the vice president, so she

14    would be his delegate as vice president for the

09:33  15    Gulf of Mexico exploration teams.

16                And then since she would focus on

17    that, and then also the response.  And then -- and

18    then I would focus on working with people who

19    aren't explorers -- I would focus on explorers who

09:33  20    were not on the response, kind of doing their --

21    their normal -- their -- their normal business as

22    best they could, and then being safe and staying

23    focused on whatever -- whatever they were doing.

24                So that's how we decided to kind of

09:33  25    split things out.  And so Cindy was then going to

**PURSUANT TO CONFIDENTIALITY ORDER**

1    take -- take on the relief wells and -- and the

2    response, and -- and I was -- I was looking after

3    other business.

4        Q.  All right.  So Cindy is doing Spud 2 and

09:34  5    Spud 3 relief wells?

6        A.  That's correct.

7        Q.  Who made the decision to run two relief

8    wells at the same time?

9            MR. KEEGAN:  Objection to form.

09:34 10        A.  I don't know.

11            THE VIDEOGRAPHER:  Four minutes left

12    on the tape.

13            MR. GONZALEZ:  Okay.  Thanks.

14        Q.  (BY MR. GONZALEZ)  Do you know the

09:34 15    estimated time for a relief well to effectively

16    shut off the Macondo Well?

17            MR. KEEGAN:  Objection to form.

18        A.  I -- I don't know the -- the details on

19    that, or the estimated time.

09:34 20        Q.  (BY MR. GONZALEZ) Cindy would be a better

21    person to ask?

22        A.  I don't know.  But, yes, Cindy was -- was

23    from the subsurface side of things and involved

24    in -- in the two relief wells.

09:34 25        Q.  Tell me her last name again?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
  1         A.   Yeilding.
  2         Q.   Thank you.  And when you said you went
  3    back to other business, managing portfolios, is
  4    that what you were doing?
  5         A.   Yeah.  I mean, we had -- yeah.  I mean,
  6    basically manage- -- managing the portfolio, yeah.
  7                   MR. GONZALEZ:  Do you want to change
  8    tape?
  9                   THE VIDEOGRAPHER:  The time is
 10    9:35 a.m.  We're going off the record, ending Tape
 11    1.
 12                   (Break from 9:35 a.m. to 9:48 a.m.)
 13                   THE VIDEOGRAPHER:  The time is 9:48
 14    a.m.  We're back on the record, beginning Tape 2.
 15         Q.   (BY MR. GONZALEZ)  Mr. Thorseth, were you
 16    involved in the decision to use a capping stack
 17    after the blowout?
 18         A.   No.
 19         Q.   Were you consulted with respect to
 20    potential fracture issues involving the use of a
 21    capping stack?
 22                   MR. KEEGAN:  Objection to form.
 23         A.   No.
 24         Q.   (BY MR. GONZALEZ)  After your -- you said
 25    you went back to your regular business after a few
```

09:34  (line 5)
09:35  (line 10)
09:48  (line 15)
09:48  (line 20)
09:48  (line 25)

**PURSUANT TO CONFIDENTIALITY ORDER**

1    days or weeks after the blowout.  Did you go back

2    to working on any response issues on the blowout

3    matter?

4         A.  So again, I'm -- I'm on Macondo response?

09:49    5         Q.  Yeah.

6         A.  You know, I was called in every now and

7    then to -- to meetings when they were meeting with

8    the subsurface team and wanted information

9    about -- about the prospect and the subsurface

09:49   10   interpretation.  And -- and then also, I was

11   involved in -- involved in some meetings and

12   conversations about once -- once confidential --

13   once information was going to be provided to

14   different parts -- aspects of the government or

09:49   15   whoever -- I was consulted on, Hey, is this

16   seismic data, is this interpretation information

17   confidential?  Or is this -- this map in

18   confidential -- confidential document for BP.  And

19   so I was -- I was involved in that over the --

09:49   20   over the months of the -- of the summer.

21        Q.  Did you have any decision-making

22   responsibilities?

23             MR. KEEGAN:  Objection to form.

24        A.  Regarding -- regarding what, I guess?

09:50   25        Q.  (BY MR. GONZALEZ)  This is what we're

|   |   |
|---|---|
| 1 | going to do, or this is what we should be doing? |
| 2 | A.  For -- for what? |
| 3 | Q.  For the response after the blowout. |
| 4 | A.  But you mean the -- I'm sorry.  Just to -- |
| 09:50 5 | just to -- clarify something.  The response was |
| 6 | incredibly complex. |
| 7 | Q.  It was -- |
| 8 | A.  So I'm just trying to -- what do you -- |
| 9 | Q.  The field -- I'm sorry.  You finish? |
| 09:50 10 | A.  No, I'm just thinking what decision-making |
| 11 | responsibilities I had for -- for the response, |
| 12 | and I can't really think of anything specifically |
| 13 | in that the things that I told you about on, Hey, |
| 14 | this is confidential or not.  I guess -- I guess |
| 09:50 15 | that was my advise or -- or my view.  And then it |
| 16 | went into legal and then also some of the response |
| 17 | team.  So they took my advi- -- I guess, my |
| 18 | suggestion, whether -- I guess I wouldn't call |
| 19 | that decision-making responsibilities. |
| 09:51 20 | Q.  All right.  Generally speaking, we had an |
| 21 | attempt to get the blowout preventer to work. |
| 22 | A.  Yeah. |
| 23 | Q.  We used the ROV.  Then they used |
| 24 | cofferdam -- |
| 09:51 25 | A.  Yeah. |

**PURSUANT TO CONFIDENTIALITY ORDER**

        1          Q.   -- and they used the shot kill --

        2          A.   Okay.

        3          Q.   -- or the choke kill and then the top hat.

        4   Then the -- the inner tube to collect --

09:51   5                    MR. KEEGAN:   Objection.

        6          Q.   (BY MR. GONZALEZ) -- all sorts of things

        7   to try to either stop or mitigate the flow of oil.

        8                    Were you involved in any of those

        9   projects?

09:51  10          A.   Right.  So to clarify that, if that --

       11   I -- I -- I had no real involvement in those, and

       12   I had no decision-making rights in -- in -- in any

       13   of those projects.

       14          Q.   And you've also -- you've already told us

09:51  15   about the capping stack project.  You were not

       16   involved in that?

       17          A.   Correct.  Correct.

       18          Q.   Were you involved in the -- with Cindy

       19   Yeilding on the relief wells at all?

09:51  20          A.   So -- so Cindy sent out messages quite

       21   frequently updating the -- to kind of -- a list, a

       22   long list of folks updating what was going on in

       23   the relief wells and so I got those messages.  I

       24   didn't -- I didn't really read them a whole lot.

09:52  25   And so I -- I would be asked a question every now

64

 1    and then on -- on maybe talking with Brian

 2    Ritchie, who was doing one of the wells, or Steve

 3    Walton.  These are team leaders for the subsurface

 4    on those wells, and I may be asked a question

09:52  5    every now and then.  Hey, what do you think about

 6    the interpretation, the seismic interpretation or

 7    the geologic interpretation?  But very -- very

 8    infrequently and -- so in general, I was not

 9    involved in -- in either of those wells, drilling

09:52 10    them.  Just an outsider.

11         Q.  Understood.

12              Were you involved at all with the

13    decision as to where the -- how far the cementing

14    should go for the Macondo Well 252?

09:53 15              MR. KEEGAN:  Objection to form.

16         A.  So I was not involved in -- in deciding

17    the cement or where it should go or how far it

18    should go.

19         Q.  (BY MR. GONZALEZ)  Were you involved at

09:53 20    all in establishing or making recommendations

21    regarding where the casing and cementing --

22    regarding what the casing and cementing

23    requirements for the Macondo Well 252 should be?

24         A.  No.

09:53 25         Q.  Are you familiar with a CFR section -- 30

1    CFR section 250421, and I'll quote it.  It says,

2    "In the production, you have to use enough cement

3    to cover or isolate all hydrocarbon-bearing zones

4    above the shoe.  As a minimum, you must cement the

09:53  5    annular space at least 500 feet above the casing

6    shoe and 500 feet above the upper most

7    hydrocarbon-bearing zone."

8              Are you familiar with that

9    regulation?

09:54  10       A.   I am not familiar with the specifics of

11   that regulation.  I don't think I've ever read it.

12       Q.   And I take it, then, it was not your

13   responsibility to determine whether it was

14   followed or not?

09:54  15       A.   That's correct.

16       Q.   And who -- whose responsibility would that

17   be at BP, as it relates to the Macondo Well 252?

18              MR. KEEGAN:  Objection to form.

19       A.   Yeah, I don't know specifically who was

09:54  20   responsible for following that regulation.

21       Q.   (BY MR. GONAZLEZ)  What -- what area of BP

22   would that fall under?

23              MR. KEEGAN:  Objection to form.

24       A.   Yeah.  I --

09:54  25       Q.   (BY MR. GONALEZ)  Drilling operations?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          A.  He would be -- he would be in operations,

 2    yeah.

 3                MR. GONZALEZ:  Mr. Keiser, can you

 4    get the book to him?

 5                MR. KEISER:  It's right here.

 6          Q.  (BY MR. GONZALEZ)  If you can turn to

 7    Tab 12, please.

 8          A.  Well, this isn't aimed very well.  Going

 9    to smaller sections to get across this lumping.

10          Q.  It might have gotten a little damaged

11    coming across the pond.

12          A.  Yeah.  You said 12, yeah?

13          Q.  Yes, please.

14                MR. KEEGAN:  I'm not making it any

15    better.

16                MR. KEISER:  This one is a little

17    better.  You might want to use this one.

18                THE WITNESS:  See if that one works

19    better.  I'm at 12 now.  Maybe you can see if that

20    one's better.

21                MR. KEEGAN:  I can switch with him

22    after this.

23          Q.  (BY MR. GONZALEZ)  I'm showing you what

24    BP-HZN-2179MDL01825685, and we'll mark it as

25    Exhibit 6330.
```

09:54  5
09:55 10
09:55 15
09:55 20
09:55 25

**PURSUANT TO CONFIDENTIALITY ORDER**

         1              (Marked Exhibit No. 6330.)

         2         Q.  (BY MR. GONZALEZ)  And it starts with --

         3    at the very top "From Walt Bozeman," sent Monday,

         4    July 13, 21:58:06 2009 to David Rainey and JC

09:56    5    Thoreseth.  That would be yourself?

         6         A.  That is me.

         7         Q.  Okay.  So the first line says, "Dave, we

         8    are asked to update the GoMX worst case discharge

         9    protection for our regulatory team to file with

09:56   10    the MMS along with a spill response plan for the

        11    situation.  The new rate is 250,000 barrels of oil

        12    per day (BOPD), which is 50,000 BOPD less than our

        13    prior estimates made six years ago."

        14              Did you receive this?

09:56   15         A.  Yes, I -- I believe I did.

        16         Q.  And did you provide any information?

        17         A.  Not that I can recall.

        18         Q.  Now, what does that tell us, 250,000

        19    barrels of oil per day?  Is that meaning that, if

09:57   20    there's a worst case scenario with the blowout,

        21    the worst case scenario that we can expect is

        22    250,000 barrels of oil per day?

        23              MR. KEEGAN:  Objection to form.

        24         A.  Yeah.  I didn't --

09:57   25         Q.  (BY MR. GONZALEZ)  That's what it seems to

**PURSUANT TO CONFIDENTIALITY ORDER**

say, right?

A.   It does.   Worst case discharge.   And all
the factors going into that, I'm sure -- I'm not
sure.   But, yeah, it looks as though it has to do
with the worst case discharge calculation.

Q.   And based on your understanding, that's
something that BP should be planning for in case
it happens?

MR. KEEGAN:   Objection to form.

A.   Well, yeah, I mean, I don't -- I don't
know the regulations on -- in detail on what you
have to do regarding the documentation or what the
regulations are for worst case discharge, what BP
is called to do.   I -- I just don't have the depth
or the details on that.

Q.   (BY MR. GONZALEZ)   Right.   But if you're
making a projection of something that might
happen, 250,000 barrels of oil per day as a worst
case scenario, and you're asked to come up with a
response plan, then you should be planning to be
able to deal with a $250,000 (sic) barrel-per-day
problem, right?

MR. KEEGAN:   Objection to form.

A.   It all goes into the worst case discharge
and -- and -- and response plan and -- and the

PURSUANT TO CONFIDENTIALITY ORDER

```
 1   details of, you know, how -- how we do that or

 2   plan for that or work with the government on that.

 3   I'm not sure of the -- of the details.

 4       Q.  (BY MR. GONZALEZ)  I know you're not sure

 5   of the details.  I'm just asking whether you agree

 6   with me that, if that worst case scenario is

 7   250,000 barrels of oil per day, the company that

 8   is going to be involved in drilling should have a

 9   plan to accurately deal with that problem?

10               MR. KEEGAN:  Objection to form.

11               MR. LAVINE:  Objection; form.

12       A.  Yeah.  Again, I'm just not familiar with

13   the plan or the regulations on that.

14       Q.  (BY MR. GONZALEZ)  55,000 barrels of oil

15   per day or 57,000 barrels of oil per day is

16   significantly less than 250,000 barrels of oil per

17   day, right?

18               MR. KEEGAN:  Objection.

19       A.  So you're saying how it came down from 250

20   in this E-mail?

21       Q.  (BY MR. GONZALEZ)  My understanding of the

22   Macondo Well oil spill was it was around 55- or

23   57,000 barrels of oil per day.  Based on the

24   latest calculations.

25               MR. KEEGAN:  One side's calculations.
```

09:58   5
09:58  10
09:58  15
09:59  20
09:59  25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
  1        Q.  (BY MR. GONZALEZ)  You would agree with me

  2   that's significantly less than 250,000 barrels of

  3   oil per day, correct?

  4             MR. KEEGAN:  Objection to form.

  5        A.  I mean, I can't comment on what's

  6   "significant."  I have no idea what calculations

  7   are currently.  I have no idea of what the well

  8   flow -- I really -- I don't know.

  9        Q.  (BY MR. GONZALEZ)  Well, let's talk math.

 10   You're certainly good at math, right?

 11        A.  I can do a little math.

 12        Q.  All right.  You would agree with me that

 13   55,000 or 57,000 is less than 250,000?

 14        A.  I'll agree with that.

 15        Q.  In fact, it is --

 16             MR. KEEGAN:  We'll stipulate.

 17        Q.  (BY MR. GONZALEZ)  It is, what, 12

 18   percent?

 19        A.  Yeah, I don't know.  But it's -- it's

 20   less.

 21        Q.  All right.  And if you have a good plan to

 22   handle 250,000 barrels of oil per day spilling,

 23   you should have a pretty good plan for 50 to --

 24   55- to 57,000 barrels of oil per day, right?

 25             MR. KEEGAN:  Objection to form.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              MR. LAVINE:  Objection; form.
 2         A.  I can't comment on plans because I wasn't
 3    involved in -- understanding -- knowing the
 4    regulations, the plans, or anything.  So I can't
10:00 5    comment on what's in place or should be in place.
 6         Q.  (BY MR. GONZALEZ)  Do you agree with me
 7    that safety is important?
 8         A.  Safety is -- is very important.
 9         Q.  Do you agree with me that a responsible
10:00 10   company should have plans that are appropriate to
11    handle any foreseeable problem?
12              MR. KEEGAN:  Objection to form.
13         A.  Yeah.  I -- the company's -- you know
14    it -- again, I don't have -- I don't know what the
10:00 15   company's capabilities are to an oil spill, and I
16    don't know what -- what the plans were in place or
17    the regulations.  I really can't say much more
18    than that.
19         Q.  (BY MR. GONZALEZ)  I appreciate that and
10:01 20   that's not what I'm asking. It's very general.
21              Do you agree with me that a plan --
22    that a company should have a reasonable plan to
23    deal with foreseeable problems?
24              MR. KEEGAN:  Objection to form.
10:01 25        A.  I think we need to -- needs to -- well,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    again, it -- it's kind of a "what if" question

2    and --

3        Q.  No, it's not.  My question is this:  Do

4    you agree with me that a company should have --

10:01  5    should have a reasonable plan to deal with

6    foreseeable problems?

7              MR. KEEGAN:  Objection to form.

8        A.  Yeah.  I -- I think the company needs to

9    have, you know -- know the regulations and follow

10:01  10    the regulations.

11        Q.  (BY MR. GONZALEZ)  And have a good plan to

12    follow them?

13        A.  And have a plan in place for regulations.

14              MR. KEEGAN:  Objection to form.

10:01  15        Q.  (BY MR. GONZALEZ)  Which takes into

16    consideration foreseeable risks, right?

17              MR. KEEGAN:  Objection to form.

18        A.  Well, takes into account risks, yeah.

19        Q.  (BY MR. GONZALEZ)  I mean, even using your

10:01  20    job, you wouldn't recommend drilling an oil well

21    where there would be little chance of success,

22    would you?

23              MR. KEEGAN:  Objection to form.

24        A.  It depends, actually, on that.

10:02  25        Q.  (BY MR. GONZALEZ)  Well, you have to go

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    through your six-point analysis --
 2         A.  I do.
 3         Q.  -- right?
 4         A.  But in some areas, we may be able to take
 5    a whole lot of risk on a prospect if it has a
 6    large upside.  That's all I'm trying to say it.
 7    It depends.  I can go with a low chance of
 8    success -- and some cases, we have -- if -- for
 9    that to fit into the portfolio.  That's what I
10    mean.  There's just a broad range of -- of, you
11    know, outcomes and how -- how we would do that.
12         Q.  You wouldn't take unnecessary risk, would
13    you?
14              MR. KEEGAN:  Objection to form.
15         A.  What do you mean by "unnecessary risk," I
16    guess?
17         Q.  (BY MR. GONZALEZ)  What do you mean by
18    "unnecessary risk"?  That's what I --
19              MR. LAVINE:  Objection; form.
20         Q.  (BY MR. GONZALEZ)  Risks that are not
21    necessary.
22              MR. LAVINE:  Objection to form.
23         A.  I -- I can comment on -- on exploration
24    and -- and managing the portfolio and how we do
25    our risk analysis and make those decisions.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  If you do your risk analysis, the

2  six-point that you told us about, and it shows

3  something you should get into, you recommend you

4  get into it, right?

10:03  5              MR. KEEGAN:  Objection to form.

6    A.  It depends.  I mean, it depends on, you

7  know, many factors.

8    Q.  (BY MR. GONZALEZ)  Okay.  If the factors

9  show you shouldn't do it, you won't do it, right?

10:03 10              MR. KEEGAN:  Objection -- objection

11  to form.

12    A.  Yeah, I --

13    Q.  (BY MR. GONZALEZ)  If I told you you were

14  going to walk out the door --

10:03 15    A.  If I put all the factors together and it

16  doesn't fit with our strategy or whatever, then,

17  yeah, I won't recommend it.

18    Q.  All right.  Because it's good to have --

19  you agree with me it's good to have a plan to deal

10:03 20  with the scenario you're going to be faced with,

21  correct?

22              MR. KEEGAN:  Objection to form.

23              MR. LAVINE:  Objection to form.

24    A.  Again, I just -- I don't know the

10:03 25  scenario.  And there's a lot of factors into it,

1    and I don't know the regulations.

2        Q.  (BY MR. GONZALEZ)  You think it's a good

3    idea to follow regulations?

4        A.  Yeah.  I think -- I think that's

10:04  5    important.

6        Q.  Do you think it's a good idea to have

7    common sense?

8              MR. KEEGAN:  Objection to form.

9        A.  Yeah, I mean, common sense is a good

10:04  10   thing.

11       Q.  (BY MR. GONZALEZ)  Do you think it's a

12   good idea to follow safety regulations?

13       A.  It's important to follow safety

14   regulations, yeah.

10:04  15       Q.  And if people don't follow those common

16   sense things, they generally get into trouble,

17   don't they?

18              MR. KEEGAN:  Objection to form.

19       A.  Yeah, it depends on many factors.

10:04  20       Q.  (BY MR. GONZALEZ)  How many hours did you

21   spend preparing for this deposition, sir?

22       A.  I don't know.  I spent over the -- over

23   the weekend.  I don't know how many hours.

24       Q.  Over which weekend?

10:04  25       A.  This past weekend.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              Q.   How many days?  Friday, Saturday, Sunday?
 2              A.   Friday, Saturday, Monday.
 3              Q.   And when did you start and when did you
 4       stop each day?
10:04  5              A.   On Friday, I think it was -- I don't know.
 6       It's all a blur now.  It might have been -- it
 7       might have been 11:00 to 6:00 and then Saturday,
 8       it might have been 9:00 to 4:00.  And yesterday
 9       might have been about 9:00 to 4:00.
10:05 10              Q.   That's 21 hours, roughly?
11              A.   I think.  Yeah, if that's what that adds
12       up to.
13              Q.   With counsel?
14              A.   Yes.
10:05 15              Q.   Did you review documents?
16              A.   We reviewed some documents, yes.
17              Q.   How often did you interact when you were
18       in Houston, Texas, on the Gulf of Mexico projects
19       with London, BP?
10:06 20              A.   Do you have any specifics on what you mean
21       by "London"?
22              Q.   Yeah.  Anyone in London's -- BP's London
23       office.  And by "communicate," I mean interacting
24       and communicating by E-mail, phone call, letter,
10:06 25       memoranda, or other communicating device?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Not very --

2            MR. KEEGAN:   You're referring

3   specifically to London as opposed to London in

4   Sunbury?

10:06  5      A.   We have St. James in London and then we

6   have Sunbury outside of London.

7      Q.   (BY MR. GONZALEZ)   Yeah, I meant London.

8      A.   So the St. James office, not -- not very

9   often.

10:06 10      Q.   And what about Sunbury?

11      A.   Not -- not very often.

12      Q.   How often on a monthly basis?

13      A.   I don't know for sure.   But it seems less

14   than -- less than once a week, I would say.   But I

10:06 15   don't know for sure.

16      Q.   Who was your supervisor in England for BP?

17      A.   Currently?

18      Q.   No, then; when you were in the Gulf of

19   Mexico.

10:07 20      A.   I reported to Dave Rainey.   So I didn't

21   have a supervisor in London.   Dave was in Houston.

22      Q.   And when you said you made your -- your

23   presentations to the -- the world group --

24      A.   The forum?

10:07 25      Q.   Yeah, the world forum.

**PURSUANT TO CONFIDENTIALITY ORDER**

|    |                                                           |
|----|-----------------------------------------------------------|
| 1  | -- would that be through Mr. Rainey?                      |
| 2  | Or would that be directed to BP's offices in              |
| 3  | England?                                                   |
| 4  | A.  Yes.  So a little bit of background on                 |
| 5  | that.  So four times a year, the exploration forum        |
| 6  | gets together and -- and meets around the world.          |
| 7  | And exploration -- all the vice-presidents from           |
| 8  | each of the different countries come to that              |
| 9  | meeting.  And so, four times a year, we -- we              |
| 10 | would -- we would meet.                                    |
| 11 | Q.  You personally would be there?                         |
| 12 | A.  Yes.  And Dave would be there and --                   |
| 13 | from -- Cindy would usually be there as well.              |
| 14 | Q.  How long were the other managers in the               |
| 15 | respective areas in the world?                             |
| 16 | MR. KEEGAN:  Objection to form.                            |
| 17 | A.  That -- there would be other                           |
| 18 | vice-presidents and explorations managers.  Mostly        |
| 19 | vice-presidents at the meeting --                          |
| 20 | Q.  (BY MR. GONZALEZ)  When did --                         |
| 21 | A.  -- representing their different countries             |
| 22 | or....                                                     |
| 23 | Q.  When did you reach the title of                        |
| 24 | vice-president with BP?                                    |
| 25 | A.  June 1st of this year.                                 |

The time stamps in the left margin: 10:07 (line 5), 10:07 (line 10), 10:08 (line 15), 10:08 (line 20), 10:08 (line 25).

**PURSUANT TO CONFIDENTIALITY ORDER**

        1         Q.   Are there different levels of VPs?

        2         A.   Yeah.   I mean, I think there's VP and then

        3   there's executive vice-president.   I'm not sure of

        4   the details on that.

10:08   5         Q.   Is there more than one executive BP?

        6         A.   Yeah.   I believe -- I believe there are

        7   but I don't know for sure.   I -- for example, Mike

        8   Daly, I think he's an executive VP, but I'm not

        9   totally sure -- and he has peers.

10:08  10         Q.   I'd like you to turn to Tab 14, please.

       11              MR. KEEGAN:   Here, let's switch

       12   binders.

       13              THE WITNESS:   That's easy to get to.

       14              MR. KEEGAN:   All right.

10:08  15              MR. GONZALEZ:   Yeah, the rest should

       16   be easy to get to.

       17         Q.   (BY MR. GONZALEZ)   This is

       18   BP-HZN-2179MDL01974038.   It is a supplemental

       19   financial memorandum, BP Exploration and

10:09  20   Production, Inc., Gulf of Mexico Exploration,

       21   Macondo Exploration Well.   And it is two pages

       22   long.   A second page has a signature line for you,

       23   "Jay Thorseth, Exploration Manager DWX, Project

       24   SPA."   Can you tell us what "DWX" means?

10:09  25         A.   Deepwater exploration.

**PURSUANT TO CONFIDENTIALITY ORDER**

         1       Q.   And what does "Project SPA" mean?

         2       A.   Yeah.  So I'm -- on this, it's kind of the

         3   financial SPA.  So I'm kind of tracking the cost

         4   and -- and if there was need for more money, then

10:09    5   I would go back to give the technical case for

         6   why -- why we would need more funds.

         7       Q.   Did you prepare this document?

         8       A.   The -- no, I would have edited, you know,

         9   helped with this, but the major folks who would

10:10   10   have put it together would have been in the

        11   finance team, headed by Xuemei Liu.

        12       Q.   The date on this is March 24, 2010?

        13       A.   Uh-huh.

        14       Q.   How long -- is that correct?

10:10   15       A.   I don't know.

        16       Q.   On the bottom, where it says

        17   "Confidential" --

        18       A.   Yeah, March 24, 2010, yeah.

        19       Q.   This is an authority requested to commit

10:10   20   an additional $17 million net of additional NTE

        21   capital to complete the Macondo exploration well,

        22   correct?

        23       A.   Yes.

        24       Q.   So they were asked -- you were asking for

10:10   25   more money to complete the well, right?

**PURSUANT TO CONFIDENTIALITY ORDER**

          1          A.   To -- to finish up, that's correct.

          2          Q.   Was the project over budget at this point?

          3          A.   Yeah, this is a supplemental FM, and so,

          4     yes, therefore, we -- we had to go back to ask

10:10     5     for -- for additional funds.  Correct.

          6          Q.   And who made the determination to ask for

          7     an additional 17 million?

          8          A.   Yeah, I would -- that would -- probably a

          9     combination of -- I don't recall specifically -- a

10:11    10     combination of myself and Dave Rainey.

         11          Q.   Got it.

         12               If you can go to the third bullet

         13     point, please.

         14          A.   Yeah.

10:11    15          Q.   It states, "The DEEPWATER HORIZON rig was

         16     mobilized on January 31, 2010, to complete well.

         17     Currently, the Macondo Well is drilling at 15,114

         18     MD in the 12-and-a-quarter times 14-and-a-half

         19     inch open hole and preparing to run 11

10:11    20     seven-eighth inch liner.  The actual spent to date

         21     is about 118 million gross, including the

         22     hurricane impact.  Lost circulation and well

         23     control events have resulted in earlier than

         24     planned setting of the 18-inch, 16-inch, and

10:11    25     13-and-five-eighths inch casing strengths.  The

well now requires 11 seven-eighths inch and nine

seven-eighth inch contingency liners to reach the

planned TD."

Now, can you tell us what your

understanding was of the loss circulation and well

control events that are referenced herein?

A.   Yeah.   It's -- it's -- it's just what we

talked about previously.   There were -- there were

a couple of kicks and -- and some -- some mud

losses in loss -- loss -- loss zones.

Q.   Why was the project over budget

$17 million at this point?

MR. KEEGAN:   Objection to form.

A.   Well, the -- due to -- as it says here,

the total cost of the well was dependent on, for

sure, the hurricane that took out the Marianas

rig.   And so that -- that cost a lot of money.

And then, for one of the kick events, we had to

side track.   And those were the two major things

was the side track and the hurricane.   So that --

those are really the two main reasons why it was

over -- over budget.

Q.   (BY MR. GONZALEZ)   How much delay did the

side track because of the kicks cause?

MR. KEEGAN:   Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

83

```
 1          A.  I don't remember how many days.

 2          Q.  (BY MR. GONZALEZ)  And how much of the

 3    increase was related to the kicks?

 4          A.  I don't remember.

10:13 5      Q.  How about the mud loss?

 6          A.  I don't remember.

 7          Q.  And the hurricane?

 8          A.  I don't remember specific dollar numbers

 9    on those.

10:13 10     Q.  Was the $17 million the first request to

11    go over budget?

12                MR. KEEGAN:  Objection to form.

13          Q.  (BY MR. GONZALEZ)  Or had there been

14    others?

10:13 15               MR. KEEGAN:  Objection to form.

16          A.  So just to -- just -- just to clarify

17    asking for more funds, I think -- I think we had

18    the original FM.  We had one supplement and this

19    was the second and -- second supplement.  So I

10:13 20   think there was one previously.

21          Q.  (BY MR. GONZALEZ)  Do you know what the

22    first request for additional funds was?

23          A.  I don't remember.

24          Q.  You have no idea?  Or can you give me a

10:13 25   range, somewhere between X and X?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.   Maybe between 20 and 50.

2       Q.   Million?

3       A.   Yeah, but I'm -- I'm not sure of that

4   number.

10:14   5       Q.   And did any requests come after the

6   $17 million financial memorandum for additional

7   funds?

8       A.   Yeah, no, I understand.  I don't recall.

9   I think this was the last supplemental FM but --

10:14   10  that -- that's my belief, but I -- I don't know

11  for absolute sure.

12      Q.   Were you required to sign off on the

13  request for additional funds?

14      A.   Yeah.  I mean, just -- just like here, I

10:14   15  would have -- I would have signed off on -- on

16  those finances, saying that's my recommendation.

17  And then Mike would have been checked into and

18  would have said Mike is -- does he support or not.

19  And then Dave -- Dave would have approved it

10:14   20  because the 17 million would have been in his

21  authority.

22      Q.   Were you also consulted on the first

23  financial -- request for additional funds?

24      A.   Yeah.  Yeah.  Absolutely.

10:14   25      Q.   Did you approve it on both occasions?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.   Yes.

2          Q.   And I'm sorry, I know you answered the

3     question but was there a third one?

4          A.   I don't think so.   I don't recall.   I

10:15  5     think this was it.

6          Q.   And if there had been a third one, would

7     you have also been consulted?

8          A.   It -- it -- it depends on -- it depends on

9     the reasons.   And so we -- we talk about the

10:15 10     technical reasons and -- and what needs to be

11     done.   And so, it -- it -- it would depend.

12          Q.   What reasons would require your approval?

13          A.   So it's -- you know, there's two -- two

14     key things.   One is safety, and so talk with

10:15 15     the -- the drilling engineers and -- and can the

16     well be continued -- or whatever the funds are

17     going to be used for for an operation, is -- is it

18     safe?   And are they onboard, from -- from a safety

19     and drilling planning standpoint?   And then --

10:15 20     also, then, the technical reason for the need for

21     the new funds.   So we -- for -- so for example, we

22     haven't tested the objective yet.   And -- and that

23     would be a major -- major technical consideration

24     that, you know, we hadn't got down to the

10:16 25     prospective horizons.

**PURSUANT TO CONFIDENTIALITY ORDER**

Q.  Are you involved in the safety
consideration?

A.  The -- so that comes from the drilling
engineers.

Q.  Not you?

A.  No.  It's -- it's from the drilling --
because it's operational.  What I'm referring to
there is the operational safety.  So, for example,
if the technical case is, Hey, we need to get down
to -- to this level to test the sands, then it
would be into the operations team to say, This is
what we -- we need to do.  We need funds to do
this.  Can -- can we do it safely?  That's what
I'm referring to.

Q.  Do you have to sign off on that one
though?

A.  Not specifically.  There isn't anything
specifically that I -- I know about.

Q.  So if the request for additional capital
was related to safety issues, would you have to
sign off on a financial memorandum like that?

A.  I -- yeah, I'm -- I'm not sure.  It
would -- I would have to see what the case would
be, because it's all considered.  It's all in one.
So in -- in signing off here, you -- you are

87

1    looking at what the funds are, what the objective

2    is, and can it be done safely.  So I mean, I

3    guess -- that's what would be going into the

4    consideration.

10:17  5        Q.  Yeah --

6        A.  To sign it.

7        Q.  -- but my question really was a lot more

8    simple, and I don't think I asked it the right way

9    so let me try it again.

10:17  10       A.  Okay.

11       Q.  It's my fault.

12            Do you have to sign off on every

13   memorandum -- financial memorandum requesting more

14   funds for the Macondo Well?

10:17  15       A.  For FMs, yes.

16       Q.  Okay.  Irrespective of the reason?

17       A.  Yeah -- yeah -- if there's an FM for

18   expenditure on the exploration portion, yeah, I --

19   I would need to be involved in that.

10:17  20       Q.  Okay.  And then the -- the memorandum must

21   include the reasons why the additional funds are

22   necessary?

23            MR. KEEGAN:  Objection; form.

24       A.  Typically -- typically, there is a

10:18  25   description of that in -- in the FM of why the

**PURSUANT TO CONFIDENTIALITY ORDER**

1    funds are being needed.  Absolutely.

2        Q.  (BY MR. GONZALEZ)  All right.  This is

3    about a month before the blowout roughly, right?

4        A.  Correct.

10:18   5        Q.  Was there any indication here with this

6    statement loss circulation and well control events

7    to make people concerned about safety issues?  And

8    I mean BP people.

9        A.  Not that I can recall.  You know,

10:18  10    everything, the discussion was that, no, we can

11    get down to test this zone, the M56 sands, and --

12    and -- and do it in a safe manner.

13        Q.  Were you aware at this point that there

14    had been gas found at 17,476 feet?

10:18  15                MR. KEEGAN:  Objection to form.

16        A.  Well -- the well is at 15.  So -- so we

17    hadn't got to that point yet.

18        Q.  (BY MR. GONZALEZ)  Was -- was there any

19    diagnostics that would have been shown that at

10:19  20    that point?

21                MR. KEEGAN:  Objection to form .

22        A.  No.  No.

23                Well, let me just clarify that.

24        Q.  (BY MR. GONZALEZ)  Yeah.  Please.

10:19  25        A.  Do you have the -- I just want to make

PURSUANT TO CONFIDENTIALITY ORDER

1    sure I'm -- I'm correct on that.  The -- the

2    17- --

3         Q.   467.

4         A.   17,467 -- do you have a -- a level name to

10:19  5    that?

6         Q.   Yeah.  MD --

7              MR. KEISER:  M57 B.

8         Q.   (BY MR. GONZALEZ)  M57 B.

9         A.   Yeah, so the M57 B, absolutely not.  There

10:19 10    was no indication at that well.

11        Q.   Let me clarify that.

12        A.   Okay.

13        Q.   You did not have the data at that time?

14    Or you did not have -- you personally had not been

10:19 15    given that information, as opposed to others may

16    have been?

17              MR. KEEGAN:  Objection to form.

18        A.   Okay.  So just based on my knowledge that

19    there is -- there's no data that I knew of or know

10:20 20    of that would have predicted anything at M57 B or,

21    you know, in that -- in that particular area.

22              MR. GODWIN:  Object to form.

23        Q.   (BY MR. GONZALEZ)  Had you spoken to

24    Ms. -- or Dr. Skripnikova?

10:20 25              MR. KEEGAN:  Objection.

PURSUANT TO CONFIDENTIALITY ORDER

 1      A.  I'm sorry -- I'm sorry, can you say that

 2  again?

 3      Q.  (BY MR. GONZALEZ)  Had you spoken to -- I

 4  don't know if I have the name right.

10:20  5      A.  Galena?

 6      Q.  Galena Skripnikova.

 7      A.  Yeah.

 8      Q.  Had you spoken to her about her diagnostic

 9  examinations relating to the existence of gas or

10:20 10  nonexistence of gas at the different levels?

11              MR. KEEGAN:  Objection to form.  Are

12  you talking about at the time of this FM?

13              MR. GONZALEZ:  Yeah.

14      A.  At this FM?

10:20 15      Q.  (BY MR. GONZALEZ)  Yeah.

16      A.  No.  No.

17      Q.  Did that -- did you have that discussion

18  with her at any point later?

19      A.  You know, I'm -- you mean just sometime

10:20 20  later?

21      Q.  Yeah.

22      A.  Yeah, I mean, in general, possibly talked

23  with -- talked with Galena.

24      Q.  When?

10:20 25      A.  I don't remember.

91

1        Q.   What did you talk to Galena about?

2        A.   I don't -- I don't recall specifically

3   but, you know, just there was -- there was debate

4   on -- on some of the intervals and so talking in

10:21  5   general terms about -- about that.

6        Q.   Was there -- did she discuss M57 B with

7   you?

8        A.   Possibly.

9        Q.   What did she say, to your recollection?

10:21  10        A.   I don't remember specifically.

11        Q.   Well, let me see if I can refresh your

12   recollection.   I'm looking for the following:   At

13   17,467 feet, there's data that indicates there was

14   a 2-foot patch of gas there --

10:21  15             MR. KEEGAN:   Objection to form.

16        Q.   (BY MR. GONZALEZ)   -- of hydrocarbons.

17   Did that discussion occur?

18        A.   Okay.   So specifically --

19             MR. KEEGAN:   Objection to form.

10:21  20        A.   So I -- I can't recall specifically

21   talking about not -- I -- I know that Galena feels

22   that -- her interpretation was that it is water.

23        Q.   (BY MR. GONZALEZ)   Did you read her

24   deposition?

10:21  25        A.   No.

**PURSUANT TO CONFIDENTIALITY ORDER**

92

        1       Q.   Would you be surprised that she didn't say
        2    it was water; that it was gas?
        3                   MR. KEEGAN:   I read her deposition.
        4    I would be surprised.
10:21   5                   MR. GONZALEZ:   Counsel, that's
        6    inappropriate.
        7                   MR. KEEGAN:   It's inappropriate to
        8    misrepresent what's in the deposition.
        9                   MR. GODWIN:   Objection to sidebar.
10:22  10       Q.   (BY MR. GONZALEZ)   You may answer my
       11    question.
       12                   MR. KEEGAN:   Objection to form.   I'm
       13    not going to allow you to misrepresent facts in
       14    this case when you ask questions.
10:22  15       Q.   (BY MR. GONZALEZ)   You can answer my
       16    question, sir:   Did you read --
       17                   MR. ROBERTS:   I post an objection to
       18    sidebar colloquy.   The counsel for BP is deemed
       19    completely inappropriate and contrary as ordered
10:22  20    by the Court.
       21                   MR. GONZALEZ:   Is that an objection
       22    to form?
       23       Q.   (BY MR. GONZALEZ)   Did you read -- did you
       24    read her deposition?
10:22  25       A.   Absolutely not.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        Q.  Would you agree she was a consultant hired

 2   by BP?

 3                  MR. KEEGAN:  Objection to form.

 4        A.  Galena?

 5        Q.  (BY MR. GONZALEZ)  Yes.

 6        A.  She's a BP employee.

 7        Q.  And she is a what?

 8        A.  Petrophysicist.

 9        Q.  Do you work with her?

10        A.  Galena works on one of the teams -- Bryan

11   Ritchie's team that reported to me.  So I didn't

12   work with Galena on a day-to-day basis.

13        Q.  Were you aware that the -- there had been

14   a determination that, at M57 B at 17,467, there

15   was a 2-foot patch of gas?

16                  MR. KEEGAN:  Objection to form.

17        A.  I am -- I'm aware that there's a 2-foot

18   zone there that is -- that's tight and I feel that

19   it's water.  It's wet.

20        Q.  (BY MR. GONZALEZ)  What do you base that

21   on?

22        A.  Just information that I've -- I've read in

23   the team's report.

24        Q.  What information did you read?

25        A.  I'd need to review the report.  But we can
```

10:22   5
10:22   10
10:23   15
10:23   20
10:23   25

1    go -- we can go over the report.

2         Q.  Did you look at it in a professional

3    capacity?

4         A.  Yes.

10:23  5         Q.  Or a casual capacity?

6         A.  No.  It would have been in my -- in my

7    role.  Because it was sent to Kate Baker,

8    specifically, but they also sent it to me, and I

9    did look at the report, yes.

10:23  10        Q.  When?

11        A.  I looked at it during -- during those

12   months, I think, kind of May, June, July.

13        Q.  Of what year?

14        A.  I'm sorry, of 2010.

10:24  15        Q.  Oh, after the blowout?

16        A.  Yes.

17        Q.  Not before?

18        A.  The report was written after the -- after

19   the incident.

10:24  20        Q.  But the data was available prior to the

21   incident?

22              MR. KEEGAN:  Objection to form.

23        A.  It was -- what data were you -- were you

24   referring to?

10:24  25        Q.  (BY MR. GONZALEZ)  The data that indicates

1   that patch at 14 -- 17,467 was available before

2   April 20th.

3              MR. KEEGAN:  Objection to form.

4        A.  Well, there's -- there's quite a bit of

10:24  5   data, and some was before and -- my

6   understanding -- and then there was some after --

7   processed data afterwards as well.  It is my

8   understanding, but I don't know for sure.

9        Q.  (BY MR. GONZALEZ)  Well, the "after" part

10:24 10   comes in trying to figure out what happened and

11   what, if anything, was missed, correct?

12             MR. KEEGAN:  Objection to form.

13        A.  Well, what I'm -- what I'm referring to is

14   processing of logs continues on for some time.

10:24 15        Q.  (BY MR. GONZALEZ)  Correct.  What I'm more

16   interested in right now is the information that

17   was available prior to April 20, 2010, regarding

18   that 17,467 spot referenced as M57 B?

19        A.  Yeah.  So my answer to that is:  I don't

10:25 20   know specifically what was available prior to that

21   date.

22        Q.  And it wasn't your role to make that

23   determination for this project, correct?

24             MR. KEEGAN:  Objection to form.

10:25 25        A.  Make what determination?

PURSUANT TO CONFIDENTIALITY ORDER

       1      Q.  (BY MR. GONZALEZ)  What the status of the
       2   substance was at 17,467 M57 B?
       3      A.  Yeah.  It was not my specific role,
       4   correct.
10:25  5      Q.  And whose role would that be?
       6      A.  The team's, the subsurface team working
       7   together.
       8      Q.  And would that be Galena's role?
       9      A.  She had -- she was on that team.
10:25 10      Q.  And if she thought there was gas there, it
      11   would be her responsibility to report it, correct?
      12          MR. KEEGAN:  Objection to form.
      13      A.  Yeah.  Report it to?
      14      Q.  (BY MR. GONZALEZ)  Someone that would keep
10:26 15   it as a secret to herself.
      16          MR. KEEGAN:  Objection to form.
      17      A.  Yeah, I mean, that -- she -- they shared
      18   it.  They talked as a team as to their and her
      19   interpretation for well planning, yeah.
10:26 20      Q.  (BY MR. GONZALEZ)  And if there is gas at
      21   17,467, what would be the appropriate procedure?
      22          MR. KEEGAN:  Objection to form.
      23          MR. LAVINE:  Objection to form.
      24      A.  Yeah, I don't -- I don't know the details
10:26 25   on that.

PURSUANT TO CONFIDENTIALITY ORDER

```
 1          Q.  (BY MR. GONZALEZ)  Who would?

 2          A.  Well, you would have to talk to that team

 3     and then the drilling engineers because they --

 4     they then -- yeah.

10:26  5          Q.  What's the name of that team?

 6          A.  Just the -- the drilling operations team

 7     and the -- and the subsurface team.

 8          Q.  And Galena works for which one?

 9          A.  The eastern team.

10:26 10          Q.  And the eastern team is part of the

11     technical team?

12          A.  Yes.  The subsurface team that reports

13     to -- to me.

14          Q.  When was the first time you heard about

10:26 15     the possibility of there being gas at M57 B 17,467

16     feet, the first time?

17          A.  Yeah.  I don't -- I don't recall

18     specifically.  Probably in the -- yeah, I don't

19     recall specifically.

10:27 20          Q.  Do you --

21          A.  May timeframe probably.

22          Q.  May 2010?

23          A.  Yeah.

24          Q.  But in any event, it was certainly after

10:27 25     the blowout?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

98

 1          A.  Yes.

 2          Q.  What did you do when you heard about it?

 3          A.  I don't recall.  I don't -- I didn't have

 4     any action.

10:27  5          Q.  Well, at some point, you asked for the

 6     data?

 7          A.  I didn't ask for any -- I didn't ask for

 8     the data because the data was in -- in the report

 9     that I read.  So I didn't have any specific

10:27 10     actions.

11          Q.  Did there come a point in time when you

12     reviewed the data?

13          A.  Yes.

14          Q.  When was that?

10:27 15          A.  May to July timeframe.  When the -- when

16     the report was being written.

17          Q.  Why did you review the data?

18          A.  Because it was sent to me.

19          Q.  By whom?

10:27 20          A.  The -- the team.  So I -- Bryan Ritchie

21     and him -- his team sent it to me.

22          Q.  Were there requests that you review?

23          A.  Yeah.  To -- they assumed.  I don't

24     think -- yeah, I don't remember what the kind of

10:28 25     lead E-mail was, whether please review or

**PURSUANT TO CONFIDENTIALITY ORDER**

                1   whatever, but it was sent with the understanding,

                2   I think, of reviewing it.

                3        Q.   For what purpose?

                4        A.   As a -- kind of a technical input from a

 10:28          5   subsurface standpoint.

                6        Q.   So they wanted your technical input from a

                7   subsurface standpoint?

                8        A.   To -- to have a look at the -- have a look

                9   at the report, yeah.

 10:28         10        Q.   And tell them whether it was gas or water

               11   or something else?

               12        A.   No.  I mean, that wasn't -- that wasn't --

               13   it was a long report and there was no specific

               14   request to look at this, this, or that.  It was

 10:28         15   just the report and it was a draft report.  Came

               16   to me, and I actually didn't look at it

               17   immediately.  And then I think it was a little

               18   bit -- while, maybe later in May, when I -- when I

               19   first took a look at it then.  So there was no

 10:28         20   specific request to say, Jay, I need to you look

               21   at this.  It was just the report showed up and

               22   they expected me to have a look at the whole

               23   report.

               24        Q.   Did you prepare a response?

 10:29         25        A.   I -- I don't think that -- I don't recall

PURSUANT TO CONFIDENTIALITY ORDER

editing and -- and sending a response back.  I --

I may have had verbal communication to say, you

know, suggestions.  But I don't -- I don't

remember E-mailing it or sending it back in

10:29   writing.

Q.  So as far as you know, there's no writing

with respect to your findings or suggestions as to

what was being shown at MD 57 B -- I'm sorry, M57

B at 17,467 feet?

10:29   A.  You know, I -- I don't recall.  I don't

recall there being any.  But that -- I -- don't

know for sure.

Q.  All right.  So we're clear:  Right now,

you don't think there was one, but you don't know

10:29   for sure?

MR. KEEGAN:  Objection.

A.  About my response, about a written

response?

Q.  (BY MR. GONZALEZ)  Yes, sir.

10:29   A.  Yes, correct.

Q.  Since then, have you prepared a written

response with respect to your opinions related to

what is at M57 B 17,467 feet?

A.  No.

10:30   Q.  What data did you consider in reaching

PURSUANT TO CONFIDENTIALITY ORDER

1    your opinion that it's water?

2        A.  Just the -- the data that's in the report

3    and then -- and then some understanding of the

4    relief well efforts as well.

10:30    5        Q.  Did you actually go to the raw data

6    yourself?  Or did you rely on the report?

7        A.  Just the report.  I may have looked at

8    a -- a printout of a -- of a log that the team

9    had, but I didn't go to the raw -- the raw data,

10:30   10    the actual digits or anything like that.

11        Q.  As a geophysicist, if you were told that

12    there was gas -- hydrocarbons at -- a 2-foot patch

13    of hydrocarbons at 17,467, what is your

14    recommendation?

10:30   15            MR. KEEGAN:  Objection to form.

16        A.  What do you mean "my recommendation"?

17        Q.  (BY MR. GONZALEZ)  Yeah, what do you tell

18    the team to do, the drilling team?

19        A.  So -- I'm sorry, so can -- can you repeat

10:31   20    the question?

21        Q.  You look at the data.  You say, Oh, 17,467

22    feet, you're going to find a 2-foot patch of

23    hydrocarbons, probably gas.  Here's the

24    information.

10:31   25        A.  Yeah, so I --

PURSUANT TO CONFIDENTIALITY ORDER

1          MR. KEEGAN:  Objection to form.

2      A.  That's not part of my -- part of my role.

3  I don't -- I don't work with the drilling

4  department in that capacity at all.  Interpreting

10:31  5  logs, number one, and number two, saying what to

6  do with it.  That is the team's decision and --

7  and the drilling team's decision at the end of the

8  day.

9      Q.  When you were a geophysicist for BP --

10:31  10      A.  Yeah.

11      Q.  -- prior to becoming more of a team leader

12  and an executive, did you do that kind of work?

13          MR. KEEGAN:  Objection to form.

14      A.  Regarding well log interpretation?

10:31  15      Q.  (BY MR. GONZALEZ)  Yes, sir.

16      A.  No.

17      Q.  Do you know how to do it?

18      A.  No.

19      Q.  Are you an expert in that?

10:31  20      A.  No.

21      Q.  So you would have to defer to someone that

22  is an expert in an area, right?

23          MR. KEEGAN:  Objection to form.

24      A.  I know -- I know general -- general

10:32  25  concepts and -- but I would -- I would definitely

PURSUANT TO CONFIDENTIALITY ORDER

1    defer to petrophysicists and -- and experts.

2              MR. KEISER:  Mark that.

3              MR. GONZALEZ:  Yeah, we're going to

4    mark the last exhibit, the financial memorandum,

10:32  5    Bates Stamp number 197038 as Exhibit 6331.

6              (Marked Exhibit No. 6331.)

7         Q.  (BY MR. GONZALEZ)  And if you can please

8    turn to Tab 15, please.  This is

9    BP-HZN-2179MDL00310063.  It is from JC Thorseth,

10:32 10    dated April -- Tuesday, April 13, 2010, to Gregory

11    Walz.  It states, "Greg, could you rethink a bit

12    on Maui prespud intangibles regarding shirts,

13    activities, miscellaneous gifts, team building

14    costs 30- to 40,000.  Does not look too good in an

10:33 15    'Every Dollar Matters' environment and the belt

16    tightening we have been doing here."

17              What was the purpose of your E-mail?

18         A.  Yeah.  So I was -- I was telling Greg that

19    I thought those were bad costs and they weren't --

10:33 20    they weren't required.

21         Q.  Okay.  Does this include the Macondo Well?

22         A.  It's Maui.  It's for the work that's been

23    doing on -- they're doing on Maui, which is a

24    prospect that hadn't been drilled yet, and it was

10:33 25    some planning work that they were doing.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  So you felt that spending $30- to $40,000

2  on these types of things was a waste of money?

3                  MR. KEEGAN:  Objection to form.

4      A.  Correct.  Yeah, I didn't like the shirts

10:33  5  and -- and all this business.

6      Q.  (BY MR. GONZALEZ)  Were you at all

7  involved in deciding whether the safety man would

8  stay on the DEEPWATER HORIZON or not --

9                  MR. KEEGAN:  Objection to form.

10:34 10      Q.  (BY MR. GONZALEZ)  -- for the Macondo

11  Well?

12                  MR. KEEGAN:  Objection to form.

13      A.  I -- I don't know what your reference

14  is -- referencing, and I wasn't involved, that I

10:34 15  can remember.

16      Q.  (BY MR. GONZALEZ)  Do you know what a

17  "safety man" is?

18      A.  Just the -- what do you -- I mean, do you

19  have a title?  What do you mean by the "safety

10:34 20  man"?

21      Q.  BP had a safety man on the DEEPWATER

22  HORIZON for the Macondo Well 252 --

23      A.  Un-huh.

24      Q.  -- he was in that position until roughly

10:34 25  August of 2009, when he was removed.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:  Objection to form.

2     A.  So I -- I don't know about that, and I was

3  not involved.

4     Q.  (BY MR. GONZALEZ)  That was my question.

10:34  5  Thank you.

6          Let's go ahead and mark that one for

7  clarity, 6332.

8          (Marked Exhibit No. 6332.)

9     Q.  (BY MR. GONZALEZ)  If you can turn to the

10:34 10  next tab, please, No. 16.  This is

11  BP-HZN-2179MDL0008835.  At the very top, there is

12  an E-mail from Bryan Ritchie dated April 14, 2010,

13  at 20:59 to you, Mr. Thorseth.  It says, "FYI,"

14  for your information, and it attaches an E-mail

10:35 15  underneath from Michael Beirne or Burn,

16  B-E-I-R-N-E, dated April 14, 2010.  And the E-mail

17  that is being forwarded states, "This E-mail will

18  evidence Anadarko's approval to conclude the

19  drilling of the MC 252 No. 1 BP 01 well, Macondo,

10:35 20  at its current TD of 81,360 MD, even though the

21  well has not reached any of the objective depth

22  criteria defined in the well participation

23  agreement."

24          And then attached to it -- or

10:35 25  actually, the next page at 8836, includes the

following from an E-mail from Michael Beirne,
April 13th, 2010.  It states.  "Gentlemen, due to
safety concerns and wellbore integrity issues, BP,
as operator, has deemed the Macondo exploratory
well as achieving objective depth at 18,360 feet
MD.  Having both loss zones and comparatively over
pressured sands in the open hole provided for
little to no margin to continue drilling."

       Do you remember receiving this?

       MR. KEEGAN:  And for the record,
reading excerpts of the E-mail.

    Q.  (BY MR. GONZALEZ)  Question is:  Do you
remember receiving this?

    A.  Yeah, I don't specifically recall
receiving this, but I -- I'm not denying that
it -- it -- didn't come to my E-mail.  I just
don't recall it.

    Q.  Now, the target depth initially had been
what for this well?

    A.  The target depth or the total depth?

    Q.  Bottom line -- the bottom depth?

    A.  The -- the -- I -- I believe that it was
deeper than the 18,360.

    Q.  Yeah.  That's my question:  Do you know
what it was?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.   I don't remember specifically.   I'd have

2     to....

3          Q.   And the decision was made to stop at

4     18,360 due to safety concerns and wellbore

10:37    5     integrity issues, according to this E-mail, right?

6          A.   According to this E-mail, that was Mike

7     Beirne's view of it, it looks like.   But I don't

8     know.   I didn't write the E-mail.   I didn't help

9     him write it.   He wrote the E-mail, and so I don't

10:37   10     know what he was for sure thinking.

11          Q.   You know what "wellbore integrity issues"

12     mean, right?

13          A.   In general, yes.

14          Q.   What does it mean to you?

10:37   15          A.   Well, that the wellbore doesn't have the

16     integrity to potentially move on, to drill ahead.

17     But again, I -- I don't make -- you know, I don't

18     describe wellbore integrity issues and I don't

19     know the details of that.

10:38   20          Q.   You're generally familiar what "safety

21     concerns" mean?

22          A.   Yeah.

23          Q.   What do they include?

24               MR. KEEGAN:   Objection; form.

10:38   25          A.   Well, I mean, it's a broad topic

**PURSUANT TO CONFIDENTIALITY ORDER**

1    obviously.  So we would have to -- it's, in

2    general, can a well get down to a TD in a safe

3    manner.

4         Q.  Without blowing out?

10:38  5         A.  Does the drilling -- does the drilling --

6    do the drilling engineers feel there's a good,

7    safe plan to get down to TD.

8         Q.  And "safety" would include making sure

9    that a well doesn't blow up?

10:38  10         A.  Absolutely.

11         Q.  And lives aren't lost?

12         A.  Absolutely.

13         Q.  And the environment isn't destroyed with

14    blowouts?

10:38  15         A.  Absolutely.

16         Q.  We should always try to prevent that,

17    right?

18         A.  Absolutely.

19         Q.  If there's a doubt, you have to go with

10:38  20    safety, correct?

21         A.  Safety is most important thing.  It trumps

22    everything.

23         Q.  How did you react -- let me go back.

24              You don't remember receiving this?

10:38  25         A.  I -- I -- like I said, I don't deny that I

**PURSUANT TO CONFIDENTIALITY ORDER**

1    got it, but I don't remember specifically getting

2    it.

3         Q.   What do you normally do when you receive

4    something like this --

10:39  5              MR. KEEGAN:   Objection to form.

6         Q.   (BY MR. GONZALEZ) -- in your professional

7    capacity?

8              MR. KEEGAN:   Objection to form.

9         Q.   (BY MR. GONZALEZ)  Meaning, April 14,

10:39 10   assuming you get this E-mail, what would you do

11   with it?

12        A.   So this, I would say, Great.   Anadarko

13   agrees to stop -- to TD.

14        Q.   And then what?   It goes in your file?

10:39 15        A.   I don't know for sure.   It could go into

16   my E-mail file or -- or not.   I'm not -- I should

17   clarify:   I'm not responsible for tracking

18   Anadarko's concurrence in this E-mail.   So that

19   would be Mike and his boss' job to then for sure

10:39 20   track this and then file it.   For me, it's kind of

21   like it says here, FYI.   I might have deleted it.

22   I might have filed it.   I'm -- I'm not sure.

23        Q.   When you read something that says that

24   there's safety concerns and wellbore integrity

10:39 25   issues, do you go any further in figuring out what

**PURSUANT TO CONFIDENTIALITY ORDER**

1    those problems are?

2             MR. KEEGAN:  Objection to form.

3        A.  So on this particular decision, for me, it

4    was -- it was already a -- a moot point because it

10:40  5    was a technical decision that there was nothing

6    deeper in this well that was worth going for.  So

7    anything -- everything that Mike put in here --

8    Mike Beirne that is, put in here, I -- you know,

9    it is what it is.  I had already recommended to TD

10:40 10    the well for technical reasons.  So I don't know

11    anything about the -- the comments on the safety

12    and everything.  I have no idea where that came

13    from or why they keep bringing it up.  I had made

14    a decision from a technical basis to -- to TD the

10:40 15    well.

16        Q.  Right --

17        A.  That was my -- I'm sorry, that was my

18    recommendation and that was approved by upper

19    management.

10:40 20        Q.  (BY MR. GONZALEZ)  Would you normally go

21    into figuring out what the safety concerns and

22    wellbore integrity issues are?

23             MR. KEEGAN:  Objection to form.

24        A.  So I -- that's not my job, okay.  So I

10:40 25    would think that the team school that's job --

1  that's their job, they would have done that.

2  Absolutely.  If -- if we would have said, We want

3  to drill further, then this would have been a

4  detailed team work on, Can we do this safely or

10:41  5  not?

6  Q.  (BY MR. GONZALEZ)  But not from you?

7  A.  Absolutely.  So then I'm not involved in

8  that work.  They go do that work, and then they --

9  if they come to a -- so we're kind of "what if"

10:41 10  here.  They would come to a decision and say,

11  Yeah, we can -- we can do it and then move forward

12  safely, and we could have decided, Yeah, to move

13  forward or not for whatever reason.

14  Q.  And for -- and for other reasons, you had

10:41 15  decided to TD the well at 18,360?

16  A.  I'm not sure if that's -- yeah.  I think

17  so.  Yeah, 18,360 as he requires -- as he writes

18  here.  Yeah, I -- I had already recommended to

19  stop there for technical reasons because there --

10:41 20  I felt there was prospectivity down deeper.  So no

21  reason to go deeper from a technical basis.

22  Q.  So you thought you were in the pay zone of

23  18,360?

24  A.  Below the pay zone and that there was no

10:42 25  other prospective zones below so I recommended,

1    and like I said, upper management agreed with me

2    to say, Stop, we'll stop here.

3          Q.   And when we say "pay zone," we're talking

4    about the -- the area where the hydrocarbons would

10:42  5    be sufficient to allow the drilling team to have a

6    good production well?

7          A.   Yeah.

8                 MR. KEEGAN:   Objection to form.

9          A.   What I'm talking about is prospective

10:42 10   exploration targets below this -- below this zone.

11         Q.   (BY MR. GONZALEZ)  Right.  Meaning you

12   felt there was no reason to go any deeper because

13   you were already in a good area where the

14   production team would be able to have a successful

10:42 15   well?

16         A.   No, I wouldn't -- I wouldn't say it that

17   way.

18         Q.   How would you say it?

19         A.   So like I said, I'm saying that, It is

10:42 20   what it is, what we found to date at 18,360, yeah.

21   And then, so what I'm -- what I'm saying --

22   referring to is, then, anything deeper between

23   18,360 and, say, 20,000 feet, whatever, kind of,

24   the recorded initial total depth was --

10:43 25         Q.   Uh-huh.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   -- I said there's no reason to go from

2    18,360 deeper to any other depths because the

3    prospectivity is -- is not good enough to go down

4    there.

10:43  5    Q.   Was the prospectivity good enough at

6    18,360?

7    A.   To -- to date, it -- it was fine.  It came

8    in fine.  And then there was -- and it wasn't good

9    enough to -- to -- to go deeper -- to spend any

10:43 10   money to go deeper.

11   Q.   In fact, we -- we now know there was

12   plenty of oil there, right?

13   A.   I don't know.

14             MR. KEEGAN:   Objection; form.

10:43 15   A.   What do you mean by -- there was oil in

16   the M56 sands certainly.

17   Q.   (BY MR. GONZALEZ)  Have you made

18   calculations on the amount of the oil spill on a

19   daily basis?

10:43 20   A.   No.

21             MR. GONZALEZ:   We're down to 5

22   minutes already?

23             The last one is 6333.

24             (Marked Exhibit No. 6333.)

10:44 25             THE VIDEOGRAPHER:   Five minutes on

1    tape.

2              MR. GONZALEZ:  Five minutes on the

3    tape?

4              Okay.  We have to break.  There's

10:44  5    only five more minutes on the tape.

6              THE VIDEOGRAPHER:  The time is 10:44

7    a.m.  We're off the record, ending Tape 2.

8              (Break from 10:44 a.m. to 10:58 a.m.)

9              THE VIDEOGRAPHER:  The time is

10:59  10   10:58 a.m.  We're back on the record, beginning

11   Tape 3.

12       Q.  (BY MR. GONZALEZ)  If we can go to Tab 19,

13   please.  This is Bates Stamp No.

14   BP-HZN-2179MDL00427720; and it's an E-mail starts

10:59  15   from you, Mr. Thorseth, dated April 23, 2010, to

16   Mark Hafle, RE:  Drilling days approximate.

17              Can you tell us who Mark Hafle is?

18       A.  Mark Hafle is a drilling -- drilling

19   engineer who is working Macondo.

10:59  20       Q.  Thank you.  And underneath that, there's

21   an E-mail from Mr. Mark Hafle to you,

22   Mr. Thorseth:  Drilling days approximate.  And it

23   says "Pmean - 70 days."  Is that an estimate of

24   the number of days it will take to have the relief

10:59  25   well completed?

PURSUANT TO CONFIDENTIALITY ORDER

1      A.  Relief well, Pmean -- yeah.  It looks as
2  though it's kind of a most likely that -- that
3  they had calculated for that.
4      Q.  And if you go down to the E-mail beneath
5  that, it's an E-mail from you to, again, Mark
6  Hafle dated April 22nd, 2010; and it says:  "Mark,
7  Yvonne is doing some scenario planning and needs a
8  ballpark total days for drilling a relief well."
9            And I guess the answer to that is
10  70 days?
11      A.  Yes.
12            MR. KEEGAN:  Objection to form.
13      A.  It -- what Mark is saying here is that for
14  planning purposes from Yvonne, I guess -- yeah,
15  Yvonne asked me a question, and I said, Well,
16  okay.  I can help out on that.
17            And then, so, the quick estimate
18  of -- of how much it would -- how long it would
19  take for a relief well, Mark says "70 days."
20      Q.  (MR. GONZALEZ)  So according to this, if
21  the relief well had been started at or around that
22  date indicated in these E-mails, April the 23rd,
23  roughly around the end of June of 2010, the relief
24  well should have successfully intersected and shut
25  off the Macondo Well flow, correct?

**PURSUANT TO CONFIDENTIALITY ORDER**

116

1          MR. KEEGAN:  Objection to form.

2      A.  All -- all I can speak of is -- and this

3  is very early on, April 23rd and Yvonne Prevallet,

4  she's -- she's a finance person, and she is in the

11:01 5  commercial team and so evidently for planning

6  purposes, she needed some information, and we got

7  her a quick estimate.

8      Q.  (BY MR. GONZALEZ)  Right.

9      A.  That's all I can say.

11:01 10     Q.  Yes.

11     A.  I don't know any other -- I don't know

12  anything else.

13     Q.  But based on that quick estimate, that

14  would put the relief well intersection at or about

11:01 15  the last few days of June.

16          MR. KEEGAN:  Objection to form.

17     Q.  (BY MR. GONZALEZ)  Right?

18          MR. KEEGAN:  Objection to form.

19     Q.  (BY MR. GONZALEZ)  You may answer.

11:01 20         MR. KEEGAN:  Objection to form.

21     A.  Well, if -- if -- if it started when?

22     Q.  (BY MR. GONZALEZ)  April the 23rd.

23     A.  Yeah.

24     Q.  Okay.  It actually took 153 days, didn't

11:01 25  it?

**PURSUANT TO CONFIDENTIALITY ORDER**

1       MR. KEEGAN:  Objection to form.

2       A.  I don't know.

3       Q.  (BY MR. GONZALEZ)  Were you aware that the

4   relief well actually intersected with the Macondo

11:01   5   Well on September the 19th, 2010?

6       MR. KEEGAN:  Objection to form.

7       A.  I don't know --

8       MR. KEEGAN:  That's simply --

9       A.  I don't know the exact date.

11:02   10      MR. GONZALEZ:  Tab 22, please.  Oh,

11   we're going to mark that last one, Exhibit 6334.

12   I'm sorry.  That's Exhibit 6334, Bates Stamp

13   No. 427720.

14          (Marked Exhibit No. 6334.)

11:02   15      Q.  (BY MR. GONZALEZ)  And now we're going to

16   go to Tab 22, please.  This is Bates Stamp

17   No. BP-HZN-2179MDL03722613, and it's titled

18   "Approved Determination of Exploration Well

19   (ADEW)."  And the proposal includes your name for

11:02   20   signature, "Jay Thorseth, GoM CoreX Manager."

21          Can you tell us what this is?

22      A.  This is the determination of an

23   exploration well, an ADEW, as we call it, for

24   Macondo.

11:03   25      Q.  Now, it indicates Horizon Incident date,

April 20th, 2010.

     A.  Yes.

     Q.  And Spud date, October 6th, 2009.

Estimated well cost, 151 million.

11:03          Can you tell us what the purpose of

this is?

     A.  Yeah.  For wells that we drill, it's a

required document for any exploration well that we

drill and where you say whether it's a dry hole,

11:03 or it's a discovery and then if it's discovery, do

you say is it -- do you feel, at least at this

point, is it a commercial or a noncommercial

discovery.

     Q.  When was this prepared?

11:03     A.  I don't -- I don't know the date on it.  I

don't know the exact date.

     Q.  What's -- based on the "Forward plan for

well," it seems that it was prepared after the

blowout, right?

11:04     A.  Yes.

     Q.  And the floor -- "Forward Plan For Well"

states:  "The response continues on the Macondo

incident.  The main focus is on stopping the

uncontrolled flow from the blow-out preventer, and

11:04 the ultimate solution hinges on the relief wells

PURSUANT TO CONFIDENTIALITY ORDER

1    currently being drilled."

2            Did I read that accurately?

3        A.  Yes.

4        Q.  So between the blowout preventer failing,

11:04  5    nothing seemed to work and the hope was that the

6    relief wells would be the ones that would stop the

7    well?

8            MR. KEEGAN:  Objection to form.

9        Q.  (BY MR. GONZALEZ)  When this was written?

11:04 10            MR. KEEGAN:  Objection to form.

11        A.  I don't know the details of -- of what the

12    plans were on -- on the -- on the response.  I can

13    just go by what's written here.

14        Q.  (BY MR. GONZALEZ)  Right.  And this is

11:04 15    something you helped write?

16        A.  Yes.

17        Q.  And so this is your statement?

18        A.  Yeah.

19        Q.  Your statement is:  "The main focus is on

11:04 20    stopping the uncontrolled flow from the blow-out

21    preventer, and the ultimate solution hinges on the

22    relief wells currently being drilled."

23        A.  Yeah.  The -- the -- and I'll -- I'll --

24    that's being said there is that the ultimate

11:05 25    solution -- hopefully things can happen before

1    then, but the ultimate solution is to get that

2    wellbore intersected and get some cement down that

3    wellbore.  And that's all that last phrase is

4    referring to.  It's pretty straightforward.

11:05  5        Q.  And that occurred when the Spud Well 2 was

6    successful in intersecting with the Macondo Well?

7        A.  Yeah.  That's correct.

8        Q.  The next statement says:  "After the well

9    is under control, the exploration team will

11:05  10   conduct the RAM/RROS process, and the Macondo

11   discovery board will recommend whether the field

12   should remain in exploration for resource

13   appraisal or be handed over to the Pompano team

14   for development."

11:05  15             So at this point, there was still

16   consideration of using the Macondo Well for

17   production process; is that right?

18       A.  No.

19             MR. KEEGAN:  Objection to form.

11:05  20       Q.  (BY MR. GONZALEZ)  Tell me what this

21   means?

22       A.  No.  Yeah.  This is standard language for

23   describing our process after we drill a well.  If

24   we have a discovery, then the process is we put

11:06  25   together a discovery review board to determine

```
 1    what are the volumes of the discovery and what is

 2    the size of the -- well, size, volume, same

 3    thing -- what is the quality and then what should

 4    be done next and should it stay within exploration

 5    for an appraisal well, if needed, or should there

 6    be a hand-over to the Pompano team, which is an

 7    asset.  It's a field nearby for them to think

 8    about appraisal or development.

 9         Q.  Of the same well?

10         A.  No, of the field.  It's not of the well.

11    This is not talking about that wellbore.  This is

12    talking about Macondo prospect/field.

13         Q.  Not Macondo 252?

14         A.  Not that wellbore but the -- but the --

15         Q.  The area?

16         A.  The area, the field itself.

17         Q.  Somewhere else?

18         A.  So to -- would we want to develop it in

19    what timeframe.  That's what this would be about.

20         Q.  Okay.  So, not necess- -- not using the

21    actual well that blew, but somewhere else where

22    you could tap into the same well field?

23         A.  Some --

24             MR. KEEGAN:  Objection to form.

25         A.  Yeah, sometime down the road, to -- if --
```

**PURSUANT TO CONFIDENTIALITY ORDER**

122

1    if BP or someone else decided to develop the

2    field -- and you're exactly right -- would require

3    drilling other wells in -- into the field to be

4    developed and produced.

11:07  5            Q.  (MR. GONZALEZ)  And that's --

6            A.  That's what that's referring to, so that

7    whole planning.  So it hadn't even gotten to that

8    point yet, it's just more about should we get the

9    discovery review board put together to do that

11:07 10    type of analysis.

11            Q.  Was it done?

12            A.  No.

13            Q.  Why not?

14            A.  Yeah.  So none of this work was done.

11:07 15    This was never signed.  It just sat on my

16    computer, didn't do -- didn't do anything with it

17    just because of the -- we just didn't feel it was

18    appropriate now, and it still sits there.  We

19    still do not have an ADEW on it.  We just feel

11:07 20    it's not appropriate at this time.

21            Q.  Under this draft, though, it was written

22    that "It is recommended that Macondo - 1 be

23    classified a commercial discovery," right?

24            A.  Yeah.  And -- I think that would -- that

11:08 25    it's important to kind of clarify as well, is

1    that, you know, taking everything else aside, it

2    is what it is and the well came in on prognosis

3    from a subsurface standpoint.  It is an oil field

4    in the United States and so all -- all we're

11:08    5    saying here, which did not go any further, never

6    got signed or we didn't do anything with it.  But

7    just in this one document, it would -- you know,

8    it -- it's possible that it could be deemed a

9    commercial discovery within BP.  But, again, that

11:08   10    would be open to debate and levels of review and

11    approval on this and what to do.  This is just a

12    document that really didn't go any further.  We --

13    we -- we -- I just stopped it, and we stopped it.

14        Q.   Due to sensitivity issues involving the

11:08   15    tragic losses?

16             MR. KEEGAN:  Objection to form.

17        A.   It's just -- it's just not appropriate to

18    continue on this work at this time.

19        Q.   (BY MR. GONZALEZ)  Because of the

11:09   20    sensitivity issues involving the losses?

21             MR. KEEGAN:  Objection to form.

22        Q.   (BY MR. GONZALEZ)  Damage to the

23    environment, the lost lives?

24        A.   Yeah.  I mean, it's -- it's uncertain as

11:09   25    to, you know, what's to be done with -- with

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Macondo, yeah, and so, we -- we didn't move it any

2    further.

3         Q.  All right.  Is it still on the drawing

4    board?

11:09  5         A.  It's not even on my computer anymore.  So

6    I don't know who's got -- where it was.  It's

7    probably gone.  It's -- it's kind of a moot --

8    moot piece of paper, actually.

9         Q.  Now, under the -- I believe under the --

11:09 10              MR. GONZALEZ:  Is it the metadata?

11              MR. KEISER:  Yes.

12         Q.  (BY MR. GONZALEZ)  The metadata, the date

13    of this document appears to be May 18th, 2010,

14    which would be roughly a month after the blowout.

11:09 15         A.  I don't know the date.

16         Q.  You do agree with me that May 18th, 2010,

17    is roughly a month after the blowout?

18         A.  Yes, yes.  Meaning I don't know the date

19    of the document, not that -- not that your

11:09 20    calculation was incorrect.

21              MR. GONZALEZ:  Let's mark that one as

22    Exhibit 63 --

23              MR. KEISER:  35.

24              MR. GONZALEZ:  -- 35, 6335.

11:10 25              (Marked Exhibit No. 6335.)

**PURSUANT TO CONFIDENTIALITY ORDER**

1       Q.   (BY MR. GONZALEZ)  Tab 25, please.  This

2   is Bates stamped BP-HZN-2179MDL01208180.

3                   MR. KEISER:  We have an issue here.

4                   MR. GONZALEZ:  Apparently, it's

11:10  5   different in my book.

6                   MR. KEEGAN:  What's the Bates number

7   you're looking for?

8                   MR. GONZALEZ:  208180.

9                   MR. KEISER:  Look at Tab 26.

11:10  10                  MR. GONZALEZ:  That's your 26.

11      Q.   (BY MR. GONZALEZ)  It starts at the very

12   top.  It's an E-mail from you, Mr. Thorseth, dated

13   September 20, 2010, to numerous people and the

14   statement is:  "Well said Bryan.  Super job team."

11:11  15   And it's in response to an E-mail below that says:

16   "The Macondo Well has been permanently sealed via

17   the relief well that you have all played a

18   significant role in making happen."  And that's

19   dated -- that E-mail is from Bryan Ritchie, and

11:11  20   it's dated Sunday, September 19th, 2010.

21                  My question is:  What were you

22   congratulating the team for a super job about?

23      A.   Can I just read the other -- or just have

24   a view of what started this E-mail chain?

11:11  25      Q.   Yeah.

1      A.  Right.  So earlier on Pete Zwart

2  starts it.  He's our chief financial officer, and

3  then Cindy picks it up, as she was -- like I said

4  earlier, she was the head of -- well, she was --

11:12  5  she was the acting vice president, and she was

6  looking after the relief wells from a managerial

7  standpoint.

8          And then -- under her was Bryan

9  Ritchie, who was looking after this particular

11:12  10  well that ended up doing the intersection of the

11  damaged well, and then I was on that -- on that

12  E-mail train cc'd from -- from Bryan.

13          And so all I'm doing here is -- is

14  kind of just adding my congratulations to the team

11:12  15  that I'm close to that -- in saying, great job for

16  getting this well down and intersecting the well.

17  Nothing more than that.

18      Q.  Were you concerned that it took 153 days

19  to do it?

11:12  20          MR. KEEGAN:  Objection to form.

21      A.  Absolutely, positively, no.  That wasn't

22  even a thought in my mind.

23      Q.  (BY MR. GONZALEZ)  You were just happy

24  they stopped it?

11:13  25      A.  Absolutely.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          Q.  That you weren't --
 2               MR. KEEGAN:  Objection to form.
 3          Q.  (BY MR. GONZALEZ) -- telling them that it
 4     was acceptable to have a five-month delay having
11:13 5     the relief flow work, right?
 6               MR. KEEGAN:  Objection to form.
 7          A.  I have no comment on that, only that thank
 8     you for getting that -- getting that wellbore
 9     intersected and sealing the well, the incredible
11:13 10    hard work they did.  Hard nights, long nights,
 11    weekends, everything that they put into doing as
 12    best they could.
 13         Q.  (BY MR. GONZALEZ)  You agree with me that
 14    the sooner you can stop a well from flowing, the
11:13 15    better off we all are, right?
 16              MR. KEEGAN:  Objection to form.
 17         A.  Let me restate that.  The -- the faster
 18    that you can -- you can drill an intersecting well
 19    like that, the better.
11:13 20              MR. GONZALEZ:  Tab 27, is that going
 21    to be Tab 28 now?
 22              MR. KEISER:  No.  No.
 23              MR. KEEGAN:  You got Bates No. 6390.
 24              MR. GONZALEZ:  I'm sorry.  Let's mark
11:14 25    that last one.  6336 will be the last one, which
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    is 8180.

2                  (Marked Exhibit No. 6336.)

3                  MR. GONZALEZ:   37163900?

4                  MR. KEISER:   27.

11:14   5        Q.   (BY MR. GONZALEZ)   Yeah, that's right.

6    Tab 27, please.   Bates Stamp No.

7    BP-HZN-2179MDL03716390 dated April 11th, 2011, to

8    you, Mr. Forcep --

9        A.   Yes.

11:14   10       Q.   -- Mr. Thorseth.   And this E-mail is

11   talking about a blowout preventer with the

12   capability of having a 20,000 psi rated BOP.

13       A.   Okay.

14       Q.   Why were you involved with that?

11:14   15       A.   We -- let me just read the E-mail here.

16   Yeah.   So the previous year there was a conference

17   that was -- was postponed.   It was going to be in

18   San Antonio, and I was leading the deepwater

19   session for that just because of my expertise in

11:15   20   deepwater exploration.

21                  And so then Howard, who was -- who

22   was putting together the agenda for the

23   exploration division for the upcoming Athens

24   Conference, which was held this year, he asked me

11:15   25   again, Hey, can you -- can you run a break-out

PURSUANT TO CONFIDENTIALITY ORDER

1    session on exploration and -- and then have, you

2    know, some other types of topics to get speakers

3    in for?

4        Q.  But my question is:  Why were you involved

11:15  5    in the discussion of a 20,000 K stack of BOP?

6        A.  Oh, okay.

7            MR. KEEGAN:  Objection.

8        Q.  (BY MR. GONZALEZ)  Specifically, the

9    blowout preventer with the 20,000 K stack.

11:16  10           MR. KEEGAN:  Objection to form.

11       A.  Yeah.  So --

12       Q.  (BY MR. GONZALEZ)  That's the second

13   paragraph, third sentence.

14           MR. KEEGAN:  Objection to form.

11:16  15       A.  But I don't see anything about the --

16   yeah, so the 20K stack?

17       Q.  (BY MR. GONZALEZ)  Right.

18       A.  So all the background on -- on that is --

19   is simply that there is going to require a change

11:16  20   in technology for some deepwater worldwide

21   drilling that requires 20K technology, and so all

22   we've done within BP is looked at the portfolio

23   and said, Hey, how many of the prospects are

24   affected by this?  And so, it's an important issue

11:16  25   for the industry and also BP to have that

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    technology.
 2                 And so he's just saying, Can you
 3    organize something on that specifically?  And we
 4    had a short little section on that.
11:16  5         Q.  Do you know what the BOP was rated, the
 6    one that was used on the DEEPWATER HORIZON for the
 7    Macondo Well?
 8         A.  I don't know for sure.
 9         Q.  Do you believe it was 15,000?
11:17 10         A.  I think it was 15K.
11         Q.  Do you think 20,000 would have made a
12    difference and would have stopped the well from
13    blowing?
14                 MR. KEEGAN:  Objection to form.
11:17 15         A.  I don't -- I don't know.
16         Q.  (BY MR. GONZALEZ)  Was 20,000 state of the
17    art at the time --
18                 MR. KEEGAN:  Objection to form.
19         Q.  (BY MR. GONZALEZ) -- the 20,000 K?
11:17 20         A.  Yeah, the 20K stack?
21         Q.  Yeah.
22         A.  It doesn't exist.
23         Q.  It still doesn't?
24         A.  That's correct.  It's technology to come.
11:17 25         Q.  I would like you to turn to Tab 34,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

         1    please.

         2         A.  Uh-huh.

         3              MR. GONZALEZ:  That last one is

         4    marked 6337.

11:17    5              (Marked Exhibit No. 6337.)

         6              MR. GONZALEZ:  Now, we're going to

         7    turn to Tab 34, which will be 6338 and we are also

         8    going to talk about Tab 35, which will be 6339.

         9              (Marked Exhibit Nos. 6338 and 6339.)

11:17   10              MR. GONZALEZ:  Tab 34,

        11    BP-HZN-2179MDL00335102 titled "Technical

        12    Memorandum."  On the top, it says "Gulf of Mexico

        13    SPU."  It's to you, Mr. Thorseth, along with Cindy

        14    Yeilding and others dated May 25, 2010.

11:18   15         A.  Yeah.

        16         Q.  And if you can look at Bates stamp

        17    numbered page --

        18         A.  If I could just add one thing for the

        19    record.

11:18   20         Q.  Yeah.

        21         A.  That it's labeled "Draft."

        22         Q.  Okay.

        23         A.  That's important just because -- just

        24    because it's not a final document.

11:18   25         Q.  Mine doesn't say "Draft."

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  It says "Draft" in gray across there.

2      Q.  Of course.

3      A.  It's so big, you looked right by it.

4      Q.  Turn to Page 30, please, or Bates Stamp

11:18  5  No. 335131.

6      A.  Right.

7      Q.  And under "Fluid Typing," there's a little

8  graph.  Right above the graph, it says:  "M57B

9  sand is approximately 2 feet thick and likely to

11:18 10  be below log resolution for accurate fluid

11  determination, but based on its position above the

12  thermogenic front it is likely to be gas."  You

13  see the word "gas"?

14      A.  Yes.

11:18 15      Q.  The drawing indicates "M57B," and it says

16  "Gas above thermogenic front."  You see that?

17      A.  Yes, I do.

18      Q.  You didn't prepare this, did you?

19      A.  No, I did not.

11:19 20      Q.  Did you receive it?

21      A.  I did.

22      Q.  And the graph says what it says?

23      A.  Yes.

24      Q.  Is this the -- one of the reports that you

11:19 25  reviewed prior to your deposition?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   This -- well, I looked at this report, you

2 know, back in May or May/June timeframe, and it's

3 not -- it's not -- it's Version 1, and there's

4 versions that -- that are subsequent to this.

11:19  5      Q.   Okay.  And this was prepared by the

6 post well -- I'm sorry -- was prepared by BP

7 employees -- correct? -- Marty Albertin, Chuck

8 Bondurant, Kelley McAughan, Binh van Nguyen, Bryan

9 Ritchie, Greg Scherschel, and Galina Skripnikova.

11:19 10      A.   They are BP employees.

11      Q.   And they work for what team?

12      A.   They work for Bryan -- Bryan Ritchie,

13 lead -- well, Chuck, Kelly, Binh, and Galina are

14 on Bryan's team; and Craig and Marty are on Graham

11:20 15 Vinson's team.

16      Q.   If you turn to Page 33, please, of the

17 same document, BP-HZN, Page 335134, and you look

18 at the bottom graph underneath "Net Pay Summary,"

19 if you go to 17,467 and you track that over, it

11:20 20 indicates the fluid content to be gas, correct?

21      A.   It does.

22      Q.   If we can go to Tab 35, please, which --

23           MR. KEEGAN:  I think you were on Tab

24 36.

11:20 25           MR. GONZALEZ:  Our numbers are off.

**PURSUANT TO CONFIDENTIALITY ORDER**

134

1   Well, maybe not.

2                   MR. KEISER:  6339.

3                   MR. GONZALEZ:  This will be

4   Exhibit 6339.  It's my Tab 35.

11:20  5                   MR. KEEGAN:  It is Tab 35, sorry.

6                   MR. GONZALEZ:  Okay.

7       Q.  (BY MR. GONZALEZ)  And I'm looking at

8   Bates Stamp No. 2 -- BP-HZN-2179MDL609318.

9       A.  18.  I got 16 here.

11:21  10                   MR. KEISER:  Third page.

11       Q.  (BY MR. GONZALEZ)  Third page.

12       A.  Can I -- can I just review those first two

13   pages?

14       Q.  Yeah.  I'm sorry.  The reason I'm rushing

11:21  15   is because I'm down to my few last minutes and I

16   want to get my question in, but you absolutely

17   have the right to do so.

18       A.  Okay.

19       Q.  If we go to Bates Stamp No. -- Page 609318

11:21  20   and we track down the "Reservoir Properties" graph

21   and we look at 17,467 feet and run it over to the

22   fluid content, it also states gas, correct?

23       A.  It's hard to read on here, but it looks

24   like it tracks over to gas, yes.

11:21  25       Q.  And if you go further, like, to the third

**PURSUANT TO CONFIDENTIALITY ORDER**

column after that one, it indicates 2 feet,

correct?

    A.  Yes.

    Q.  Okay.

          MR. GONZALEZ:  Thank you, sir.  I'm

going to keep my time for rebuttal if I have any

left.

          THE VIDEOGRAPHER:  The time is

11:22 a.m.  We are going off the record, ending

Tape 3.

          (Break from 11:22 a.m. to 11:29 a.m.)

          THE VIDEOGRAPHER:  The time is 11:29

a.m. We're back on the record, beginning Tape 4.

          E X A M I N A T I O N

BY MR. CHAKERES:

    Q.  Good morning, Mr. Thorseth.  My name is

Nat Chakeres.  I'm with the United States

Department of Justice.

          I'd like to turn a little to your

educational background and training.  You have a

degree in geophysics?

    A.  Correct.

    Q.  Okay.  And your first job out of -- out of

school, what were -- what was that job, and what

were your responsibilities?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.  I was a geophysicist, and I focused mostly

2  on processing and acquiring seismic data,

3  reflection seismic data.

4    Q.  Okay.  And how long have you -- let me ask

11:30  5  that again.

6            How long did you work in that job?

7    A.  I had that job for the first two or three

8  years -- three years.

9    Q.  Okay.

11:30  10    A.  In Denver, Colorado.

11    Q.  And subsequent to that, have you been

12  involved in interpreting seismic data?

13    A.  Yes.  So after the first three years moved

14  from a big concentration in -- in acquisition and

11:31  15  processing to more interpretation.  Now, it kind

16  of started in the fourth year and continued on.

17    Q.  Okay.  Are you aware of BP acquiring any

18  seismic data relating to the M56 reservoir beneath

19  MC252 since the blowout?

11:31  20            MR. KEEGAN:  Objection to form.

21    A.  So, post-incident, yeah?  Just kind of

22  on -- an outsider, I believe we acquired a couple

23  of 2D seismic lines, but, again, I'm not sure.

24  I'm vague on that, but I believe there was some --

11:31  25  some acquisition that occurred post-incident.

**PURSUANT TO CONFIDENTIALITY ORDER**

1     Q.  Was that acquisition relating to shallow

2  hazards and seeps in the vicinity of the wellbore?

3     A.  Yeah.  The -- the objective of the

4  acquisition, I'm not totally sure.  I never saw it

11:32  5  written down.  This is of the -- objective of that

6  acquisition program because I wasn't involved, but

7  it could have included what you -- what you say.

8     Q.  Okay.  And you just said there you're not

9  involved and in your previous answer, you said as

11:32  10  an outsider.  You're saying because this was

11  related to the response effort of which you were

12  primarily not a part.  Is that accurate?

13     A.  That is accurate.

14     Q.  Okay.  In your role prior to moving to

11:32  15  Egypt, in your role in the Gulf of Mexico, were

16  you aware of any seismic covering MC 252 that was

17  acquired after the -- after the incident?

18          MR. KEEGAN:  Objection to form.

19     A.  Yeah.  I'm -- could you -- I'm not sure I

11:32  20  followed your question.  I'm sorry.

21     Q.  (BY MR. CHAKERES)  Okay.  Was any

22  seismic acquired to cover any -- aside from the 2D

23  seismic that was acquired during those talks, are

24  you aware of any seismic that's been acquired

11:33  25  relating to the M56 reservoir since the incident?

              1        A.   Yeah.   Not that I can recall.

              2        Q.   Okay.   Thanks.   I'd like you to flip to --

              3   I'd like you to flip to Tab 9, I believe -- Tab 9

              4   in the binder in front of you.

    11:33    5             MR. CHAKERES:  We're going to mark

              6   this as Exhibit 6340.

              7             (Marked Exhibit No. 6340.)

              8        Q.   (BY MR. CHAKERES) And the top E-mail here

              9   is an E-mail from Bryan Dempsey to Marty Tate,

    11:33   10   Mike Hebert, Randy Hebert, and cc'ing a number of

             11   individuals including yourself.   Do you see that?

             12        A.   Uh-huh.

             13        Q.   Okay.   And the subject is "RE:  TGS BP

             14   settlement"?

    11:34   15        A.   Yes.

             16        Q.   And there are a number of attachments to

             17   that?

             18             MR. KEEGAN:  Counsel, I'm going to

             19   need a second to look at this.

    11:34   20             MR. CHAKERES:  Okay.

             21             MR. KEEGAN:  It's got counsel's

             22   advice on it.   It's marked attorney/client

             23   privileged.

             24             MR. CHAKERES:  I believe it includes

    11:34   25   correspondence with other parties, but if you want

         1   to go off the record and look at it for a while,

         2   go for it.

         3                MR. KEEGAN:  All right.

         4                MR. CHAKERES:  Bryan Dempsey doesn't
11:34    5   work for BP.  He works for TGS.

         6                MR. KEEGAN:  Okay.

         7        Q.  (BY MR. CHAKERES)  So were you involved in

         8   negotiations with TGS regarding claims TGS had

         9   against BP stemming from the blowout?
11:34   10        A.  Yeah, I did work with Marty on that.

        11        Q.  Okay.  As part of that settlement, did BP

        12   agree to obtain seismic data from TGS?

        13        A.   Yeah.  I'd have to go back on what was

        14   fully agreed, and I'd have to -- I'd have to read
11:35   15   that.

        16        Q.  Okay.  But you don't remember?

        17        A.   It was a bit detailed and complex, and we

        18   agreed to -- to purchase some data from TGS, but,

        19   again, I'm foggy on the final -- the final
11:35   20   agreement.

        21        Q.  Okay.  And true to form, I think I

        22   neglected to include the agreement.  So I'll see

        23   if I can't get a copy of that because I wanted to

        24   ask you some questions to see if that would
11:35   25   refresh your recollection as to what blocks you

1    acquired data for.

2           But I have one other question.

3    A.   Uh-huh.

4    Q.   It seemed to me from the agreement -- and

11:35  5    again, we'll be able to look at it later on --

6    that you were acquiring data in SEG-Y format.

7    A.   Yes.

8    Q.   Is that --

9    A.   Possibly.  I'd have to check.

11:35  10    Q.   Fair enough.  Is that typically the format

11    in which you acquire seismic data?

12           MR. KEEGAN:  Objection to form.

13    A.   It's one -- it is one of the formats that

14    seismic data comes in, SEG-Y.

11:36  15    Q.   (MR. CHAKERES)  Do you also acquire it in

16    SMT KINGDOM format?

17    A.   I've never heard of that.  So I don't know

18    about that.

19    Q.   What other formats does BP require seismic

11:36  20    data in in the Gulf of Mexico?

21    A.   Yeah.  A lot of times it's SEG-Y, and then

22    it's also Landmark format, so a format that can be

23    loaded directly onto the workstation.  That's kind

24    of my naive information on that subject.

11:36  25    Q.   Okay.  Well, you said your naive

PURSUANT TO CONFIDENTIALITY ORDER

     1    understanding.  Is that not the -- within your

     2    realm of expertise, then?

     3         A.  Yeah.  I'm sorry.

     4         Q.  The formatting of the seismic data?

11:36  5         A.  That's correct.  Yeah.  Frederic Billette,

     6    who's on here, that's his expertise on how the

     7    data comes in and gets loaded.  I don't know the

     8    details.

     9         Q.  And so you wouldn't know if you obtained

11:36 10    something from TGS in SEG-Y, if that might be able

    11    to be turned into something that can be read on a

    12    Landmark platform?

    13         A.  Yeah.  It would depend on what kind of

    14    data it is, whether it's pre-stack data or

11:37 15    post-stack data or migrated data.  That's

    16    what it -- it would depend on what kind of seismic

    17    data it is and could it go onto Landmark or not

    18    after a conversion or -- yeah, I -- I just don't

    19    know the details of the formats.

11:37 20         Q.  And you don't know the details of which of

    21    those kinds of data can be migrated and which

    22    can't?

    23         A.  Yeah, I do not.  I do not.

    24         Q.  Okay.  Thank you.

11:37 25              I'd like to go back to a discussion

**PURSUANT TO CONFIDENTIALITY ORDER**

1    you had earlier today about the decision to call

2    TD for the well.

3         A.   For Macondo --

4         Q.   The Macondo 252 well.

11:38  5         A.   Okay.

6         Q.   And I want to see if I can accurately

7    summarize your testimony, and if I don't, I'll

8    leave that to you to correct me.

9              I believe you stated that you gave a

11:38  10   recommendation that the technical information you

11   had did not support spending extra money to go

12   down to the M54 SEMs, and, thus, you gave a

13   recommendation to -- to -- before proceeding down

14   to those ends?

11:38  15             MR. KEEGAN:  Objection to form.

16        A.   The recommendation was based on some

17   recent seismic interpretation that the team had

18   done in between when the well was recommended

19   because when I recommended the well to the

11:38  20   exploration forum, we talked about a secondary

21   target at the M -- at the M54 level.

22             So, Mike Daly, as head of the forum,

23   would remember that and maybe some of the other

24   members of the forum would remember that.

11:39  25             Indeed, after the 56, the secondary

**PURSUANT TO CONFIDENTIALITY ORDER**

1    target 54, and then going deeper.  Okay?

2             In between that time and then to --

3    and the date that we called the final TD, there

4    was some further work that the team had done and

11:39  5    so that -- that work and that interpretation

6    deemed the M54 to be not very prospective

7    whatsoever to have potentially mass transport

8    complexes that are shelly nonreservoir-type rock.

9             And so, therefore, after reviewing

11:39 10    that work and talking about do we want to drill

11    further or not, after reviewing the new technical

12    work, it was my recommendation to say it is not

13    worth to go down and test those intervals in the

14    M54 series and we should call TD right here.

11:39 15             So I made that recommendation to my

16    boss, Dave Rainey, and eventually Mike Daly, and

17    they both agreed with my recommendation.  So we

18    stopped the well.

19        Q.  Whose decision was it to stop the well?

11:40 20        A.  Yeah, it's combination.  It's probably --

21    well, it's Dave -- Dave Rainey's decision and --

22    but Mike was consulted.  Obviously, Mike, being

23    the head of Worldwide Exploration, can veto that

24    but -- because he has that authority, obviously,

11:40 25    but he -- he agreed with this assessment.  And so,

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    we -- we called him.

 2              So I recommended to Dave, Let's TD

 3    the well, and Dave agreed.

 4         Q.  So it wouldn't be James Dupree's decision?

 5         A.  No.

 6         Q.  It would be primarily Dave Rainey's?

 7         A.  Yes.

 8         Q.  And your recommendation to Dave Rainey, as

 9    you just stated, was don't continue drilling?

10         A.  That's correct.

11         Q.  And the basis for that recommendation was

12    the technical interpretation suggested that it was

13    not financially worthwhile to keep drilling?

14              MR. KEEGAN:  Objection to form.

15         A.  I need to clarify that point because it's

16    important.  It -- you know, the money is one

17    aspect of it, yeah, but the overriding principle

18    here is that it was not prospective from an

19    exploration point of view, meaning it was just the

20    chance of success of finding hydrocarbons in

21    commercial quantities M54 were so low that we

22    said, We don't want to drill further.  So...

23         Q.  (BY MR. CHAKERES)  Okay.  I'm trying to

24    summarize.  So the basis for Dave Rainey's

25    decision was that there was a low chance of
```

11:40  5
11:40  10
11:41  15
11:41  20
11:41  25

```
 1    finding a potential reservoir in the M54 sand

 2    based on late acquired technical interpretations?

 3                    MR. LAVINE:  Objection to form.

 4                    MR. KEEGAN:  Objection to form.

11:41  5       A.  All I can say is I described my

 6    recommendation.

 7       Q.  (BY MR. CHAKERES)  Okay.  I'd like to ask

 8    a few more questions also about the pre-drill

 9    process.  I believe you described two stages in

11:42 10    that process earlier today.  You described --

11                    (Brief interruption.)

12       Q.  (BY MR. CHAKERES) I'll start my question

13    over.  Earlier today you described something

14    called XX or exploration excellence?

11:42 15       A.  Yes.

16       Q.  And then Worldwide Exploration forum?

17       A.  Correct.

18       Q.  And I am curious to know, there's some

19    technical assurance memoranda that correspond to

11:42 20    this well.

21                    Were those memoranda produced for the

22    purpose of -- of the XX process or for the World

23    Exploration forum or neither?  Just -- I'm just

24    trying to figure out where those memoranda fit

11:43 25    into this process.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   So you're speaking of the TAM, Technical

2   Assurance Memorandum?

3      Q.   Yes.

4      A.   So the TAM is a standard document that is

11:43   5   put together for the subsurface -- from the

6   subsurface team for all of the prospects that we

7   bring forward to the exploration forum, and it is

8   basically a document that summarizes the

9   description and the work to date.  And so it is

11:43  10   posted on a website for the exploration forum to

11   look at and refer to in -- in the days leading up

12   to the recommendation for the prospect.

13            And so, yeah, it's -- it's just --

14   it's -- it's a document that's used for multiple

11:44  15   parties to reference.  It's also used for us to

16   document historically where we were at in the

17   prospect, and then we can go back to that after

18   the drilling to compare how the prospect came in.

19   So, it's a -- it's an important technical

11:44  20   document.

21      Q.   Is it updated?  For instance, a few

22   minutes ago, you mentioned that there had been a

23   subsequent seismic interpretation of the M54

24   sands.  And would subsequent work go into an

11:44  25   amended TAM, or is it never changed?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   The TAMs can be updated based on further

2    technical work.   Whether this was one updated, I

3    don't know.

4    Q.   Okay.   I'd like now to shift over to the

11:45 5    response, and I think first if you could flip to

6    Tab 24.   This document was previously marked as --

7    as Exhibit 5241.   This should be at top an E-mail

8    from Kelly McAughan to you dated April 2nd, 2010.

9    Is that what you have in front of

11:45 10   you?

11   A.   Yeah, and the document ends 963?

12   Q.   Yes.

13   A.   Yeah.

14   Q.   Okay.   And then I'd like to focus first on

11:45 15   the E-mail from you to Ms. McAughan and Walt

16   Bozeman on the bottom half of that page where you

17   state:   "Kelly, we need to have a flow rate which

18   you-all have calculated but also production and

19   pressure profiles in case this goes on for a

11:45 20   while.   Thanks, Jay."

21   A.   Could I just see that?   Are there other

22   attachments in here?   Can I just kind of look?

23   Q.   You can review the document, yeah.

24   A.   Hard to see.

11:45 25   MR. KEEGAN:   You're not planning on

PURSUANT TO CONFIDENTIALITY ORDER

1    asking about these slides, are you?

2        A.  I can't see the --

3            MR. CHAKERES:  No, I'm going to ask

4    about his E-mail.

11:46  5            MR. KEEGAN:  Okay.

6        A.  Right.  Okay.  So those the attachments

7    are -- you can't see them.  Right, so -- so, could

8    you repeat your question?

9        Q.  (BY MR. CHAKERES)  All my question was

11:46 10  whether you asked Ms. MacCon:  "We need to have a

11   flow rate, which you-all have calculated, but also

12   production and pressure profiles in case this goes

13   on for a while.  Thanks, Jay."

14       A.  Yes, I did ask her that.

11:46 15       Q.  Who was the "we" that you refer to there?

16       A.  Yeah.  So -- good question.  So this was

17   April 22nd, and -- as I have mentioned previously

18   in those first three, four days, I was on the BST.

19   So the -- sitting in for Dave Rainey on the GoM

11:46 20  leadership team for the response so, again, three,

21   four days.

22            And a gentleman on that leadership

23   team, Pramod Singh, who is the vice president of

24   resource, asked me if we had done calculations

11:47 25  for -- for the production profile at Macondo, if

PURSUANT TO CONFIDENTIALITY ORDER

1    it were to be -- you know, if it was a discovery

2    and if it was, you know, developed, the previous

3    work.

4              And I said, yes, we've done that.

11:47  5    And so, then I went back down to my office and

6    sent an E-mail to Kelly and Walter Kelly who had

7    done that work, the production profile, and said,

8    Hey, we -- and I was referring to myself and

9    Pramod.  I didn't specifically name Pramod here or

11:47  10   ask him for this information, and she went out and

11   gathered them.

12             So it was previous work.  It was

13   previous work done before even the spudding of the

14   well.

11:47  15   Q.  What would the production profile have

16   told the group?

17   A.  So all I can say is that Pramod asked me

18   for this information because he knew that my teams

19   worked on the prospect.  I went and got the

11:48  20   information, and what he was going to use it for,

21   he didn't tell me.  And I never discussed it again

22   with him after that.  So I don't know what he used

23   it for.

24   Q.  And Pramod also asked for a flow rate?  We

11:48  25   need to have a flow rate that was transmitting a

            1     request from the BST?

            2         A.   Yeah, flow rate that you can get from the

            3     production profiles and from -- from the prework.

            4     That's the way I interpreted the discussion.

11:48       5              And I gave him our development

            6     scenario and production profiles and he took it

            7     and I assume he was satisfied because I didn't

            8     hear about it again.

            9         Q.   And you never remembered hearing anything

11:48      10     about what was going to be done with that number

           11     you provided?

           12         A.   That's correct.

           13         Q.   And the flow rate that was requested, this

           14     was a worse-case discharge number that would have

11:49      15     been calculated prior to blowout?

           16         A.   That's not the way I interpreted Pramod's

           17     question.

           18         Q.   Okay.

           19         A.   So something different than the worst-case

11:49      20     discharge.  And so the way I interpreted the

           21     question was go get as I stated and -- just

           22     previously is that, go get the production curves

           23     from the development scenario for what would be as

           24     to how -- what would be the flow rate in the

11:49      25     production profile under the development scenario

PURSUANT TO CONFIDENTIALITY ORDER

151

1     that we did pre-spud for the prospect.

2                And like I said -- you know, I'm just

3     repeating myself.  I gave him that information,

4     and he took it.  But it was not the worst-case

11:49  5     discharge was my interpretation, and I assume

6     I'm -- I was right on that.

7          Q.  Okay.  What does "BST" stand for?

8          A.  I think it's the Business Segment Team or

9     Business Strategic Team.

11:49  10          Q.  Okay.  Thanks.  Who sits on it?

11          A.  For this particular team, it was the GoM

12     leadership team that Dave Rainey would have

13     normally been on as vice president of exploration.

14     And so James Dupree would have been on it -- but I

11:50  15     think he was out -- and the vice president of

16     operations and vice president of resource, vice

17     president of exploration, the CFO, chief financial

18     officer, and so -- not all of them were in that

19     meeting.  It was kind of various -- various folks

11:50  20     were in and out, not the meeting but in that

21     group.

22          Q.  Okay.  Were you involved in any other

23     requests for subsurface data relating to the

24     Macondo Well?

11:50  25                MR. KEEGAN:  Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

152

1      A.   What do you mean by "subsurface data"?

2      Q.   (BY MR. CHAKERES)   Reservoir properties,

3   fluid properties.

4      A.   Okay.  So I may have been -- I may have

11:51  5   been involved in tracking down or going to Walter

6   Kelly for fluid information.

7            I do know that I was -- I was

8   asked -- as I testified earlier, I was asked about

9   confidentiality of seismic data and

11:51  10   interpretations of seismic data and also

11   interpretations that led to maps, contour maps,

12   were these proprietary or not.  So I was asked

13   about that and gave my opinion to -- to the

14   response team.

11:51  15      Q.   Did you -- strike that.

16            Do you remember who asked you for the

17   information that you sought from Walter Kelly?

18            MR. KEEGAN:  Objection to form.

19      A.   So -- oh.  You -- meaning.  Yeah.  I don't

11:51  20   remember.  It -- I don't remember specifically

21   who -- who asked for that, if it happened.  I

22   did -- I'm not sure of any timing or who might

23   have asked for it.

24      Q.   (MR. CHAKERES)  Okay.  I think you

11:52  25   testified earlier Cindy Yeilding was primarily the

**PURSUANT TO CONFIDENTIALITY ORDER**

1   person involved in the subsurface aspect of the

2   response.

3        A.   That's correct.

4        Q.   Okay.  You were not involved in

11:52  5   calculating shut-in wellhead pressures for either

6   the top kill or the capping stack shut-in?

7        A.   That is correct.

8        Q.   And were you ever involved at any time in

9   calculating the rate of flow of oil out of the

11:52 10   well?

11        A.   Post -- post-incident?

12        Q.   Yes.

13        A.   No.  I -- yeah.  So there was very early

14   on in the response when they were -- there were --

11:52 15   there was a group of folks that were just being

16   put together to start thinking about what the flow

17   right -- flow rate could be, and I was in on maybe

18   the first one or two meetings.  This -- this was

19   early on.

11:53 20            And then I quickly realized that this

21   is not -- you know, I was asked to be in the

22   meeting.  So I went to the meetings and quickly

23   realized that this is not what I'm working on and

24   so I -- I didn't attend any more meetings, and

11:53 25   then these -- the teams kind of went on for quite

**PURSUANT TO CONFIDENTIALITY ORDER**

1    some time after that through the summer.

2        Q.  Do you remember who else was in those

3    meetings?

4        A.  Yeah.  I know that Cindy was there and,

11:53   5    you know, all the -- the other folks were

6    engineers that I didn't know and possibly -- I

7    could be wrong on this, but possibly Bob Merrill

8    was in the meeting and the other engineers, I

9    didn't know them.

11:53  10        Q.  Do you know Trevor Hill?

11        A.  I don't know if Trevor was in the meeting

12    or not.  I don't know Trevor well.

13        Q.  Gordon Borrel?

14        A.  These meetings, Gordon was not in there.

11:54  15        Q.  Mike Mason?

16        A.  Mike, I don't think he was in those kind

17    of -- first one or two meetings I was in, but I

18    could be wrong on that, but I don't believe Mike

19    was there.  But like I said, I'm not sure.

11:54  20        Q.  Tony Leal?

21        A.  I don't know Tony.

22        Q.  Okay.  And you said this was early on.

23    So, May?

24        A.  It could have been, yeah.

11:54  25        Q.  Okay.  I'd like you to look at Tab 14.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. CHAKERES:  And we're going to

2    mark this as Exhibit 6341.

3               (Marked Exhibit No. 6341.)

4          Q.  (BY MR. CHAKERES)  And the top E-mail

11:54  5    should be a forward from Bryan Ritchie to yourself

6    sent Monday, November 8th, 2010?

7          A.   Uh-huh.

8          Q.   And the Bates number on the bottom, the

9    last four digits are 3723?

11:55 10         A.   Uh-huh.

11         Q.   Is that what you have in front of you?

12         A.   Yes.  723?

13         Q.   Yes.

14         A.   Yes.

11:55 15         Q.   And first I'll ask:  Do you remember

16    receiving this E-mail?

17         A.   Yeah.

18         Q.   Yeah, to clarify, the -- I did not include

19    the attachment as part of this exhibit.

11:55 20         A.   Right.  So -- yeah.  I -- I don't recall

21    specifically reading -- receiving the E-mail, but

22    I'm sure I must have, it come across my desk.  So

23    I'm not denying that.  I don't specifically

24    remember this E-mail, though.

11:56 25         Q.   Okay.  And you see this is a forward of an

**PURSUANT TO CONFIDENTIALITY ORDER**

156

1    E-mail that Cindy Yeilding sent to Bryan Ritchie

2    on Sunday, November 7th?

3         A.   That's right.

4         Q.   And the first sentence says:  "Hi, Bryan,

11:56  5   The flow rate team is meeting with an expert panel

6    on Tuesday, November 9th."

7         A.   Yes.

8         Q.   Did I read that correctly?

9         A.   Correct.

11:56 10       Q.   You were not part of whatever flow rate

11   team is referenced there?

12        A.   That is correct.

13        Q.   Okay.  And you don't know anything more

14   about what the flow rate team may or may not have

11:56 15  been doing?

16        A.   That is correct.

17        Q.   Okay.

18        A.   Bryan would have forwarded this to me

19   because he was my direct report and Bryan had two

11:56 20  reports.  He reported to Cindy for the response

21   and the relief wells, and then he reported to me

22   on other business.  So that's why he's FYI'ing me,

23   it looks like.

24        Q.   Okay.  Are you familiar with the present

11:57 25  oil spill commission?

**PURSUANT TO CONFIDENTIALITY ORDER**

1        A.   Yeah.   Vaguely, yeah.

2        Q.   Okay.   Did you contribute to any comment

3    or letter that was submitted by BP to that

4    commission?

11:57   5        A.   Yeah.   I -- there was -- there was one --

6    there was one letter -- one letter.   I can't

7    recall if it -- what commission it was or what

8    group or if it was Congress, or whatever.   There

9    was one thing I contributed to, but I wasn't sure

11:57  10    if it was for this or not.

11        Q.   Do you remember the subject matter of that

12    letter?

13        A.   No.

14        Q.   Okay.

11:57  15        A.   I was asked to comment on some technical

16    aspects that were in the letter from a subsurface

17    standpoint, and I think I provided some edits and

18    that was the end of it.

19        Q.   Okay.   And do you have any idea of when

11:58  20    that was?

21        A.   It was, I think, during the summer

22    sometime.

23        Q.   Okay.   I'd like to go back to the

24    subsurface technical report that I think you

11:58  25    already looked at today.   We're going to look at

**PURSUANT TO CONFIDENTIALITY ORDER**

1    this again.  Let's go to Tab 26.

2           And this document has already been

3    marked as 4697.  It should be an E-mail from Bryan

4    Ritchie to Kate Baker, Cindy Yeilding, yourself,

11:58  5    and Peter Carragher.

6           A.  Yes.

7           Q.  And it says:  "Kate, please find attached

8    the technical memorandum that you requested

9    regarding the postwell-subsurface description of

11:59 10    the Macondo Well."

11           Did I read that correctly?

12           A.  Yes.  I think so.

13           Q.  All right.  Then you can flip back and

14    look at the attachment.  To my understanding, this

11:59 15    is the same mini version of that subsurface report

16    that you were looking at earlier.

17           A.  This is another draft version labeled as

18    Version 1 in May, yeah.

19           Q.  Okay.  Do you know who Kate Baker is?

11:59 20           A.  I know Kate, yes.

21           Q.  What is her role at BP?

22           A.  Well, I'm not sure.  I -- I thought Kate

23    had potentially retired, was my recollection.  And

24    she may have come back to -- to help with the

11:59 25    response.  And what her specific role was, I'm not

**PURSUANT TO CONFIDENTIALITY ORDER**

1    sure what -- what her role was in this.  I think

2    she's got an engineering geoscience background,

3    though.

4         Q.  Do you know what she did before retiring?

12:00    5         A.  She was a -- a senior advisor for the

6    company, maybe a distinguished advisor for the

7    company on any kind of engineering, petroleum

8    engineering, reservoir engineering.

9         Q.  Kind of a hot topic, petroleum

12:00   10    engineering, reservoir engineering?

11         A.  That's what I mean, I don't know

12    specifically what she did because she did many

13    different things.  She had a broad background that

14    I know of.  She can dabble in geology and

12:00   15    geophysics, reservoir engineering and petroleum

16    engineering.

17              My recollection is is that her core

18    competency is more on the reservoir or petroleum

19    engineering, but I don't know for sure.

12:00   20         Q.  Do you know if she's still advising BP?

21         A.  I don't know.

22         Q.  Okay.  And were you aware, prior to

23    receiving this E-mail, that she had requested this

24    technical memorandum?

12:01   25         A.  Yeah, I don't know.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:  Objection to form.

2     A.  I'm not sure on the date of when I -- when

3  I learned of Kate's request for the memorandum or

4  not.  Whether it was before this date or after,

12:01  5  I -- I don't recall.

6     Q.  (BY MR. CHAKERES)  Let me be clear:  Is it

7  your understanding that Kate requested the

8  technical memorandum be prepared?

9     A.  It is my understanding, yes.

12:01  10     Q.  I'll represent to you that last week Walt

11  Bozeman, who has testified he was not involved in

12  drafting this document but said that typically

13  after drilling an exploration well, there might be

14  a technical memorandum of a few pages in length.

12:01  15  Is that something -- does that sound accurate to

16  you?

17          MR. KEEGAN:  Objection to form.

18     A.  I don't know what Walt -- this was

19  testimony for Walt?

12:02  20     Q.  (BY MR. CHAKERES)  Yeah, that was my

21  representation.

22     A.  I don't know what he testified for or what

23  he might have specifically been referring to on a

24  technical report.

12:02  25     Q.  Are you aware of any normal practices in

PURSUANT TO CONFIDENTIALITY ORDER

161

1    the Gulf of Mexico regarding the drafting of

2    subsurface technical memos after the completion of

3    exploration wells?

4       A.  Yeah.  So there would be a couple of

12:02  5    different things.  On a -- there would be a

6    post-well review report that would be a lot longer

7    than the several pages that you talked about.  And

8    so it would be quite detailed on lots of different

9    aspects of the well and what was found.

12:02 10            And then, as we talked about earlier,

11   I think in one of the submitted documents it was

12   mentioned about the RROS and the RAM document

13   and -- so that document is really important for

14   when you have a discovery, and you're talking

12:02 15   about volumes in a discovery.  And so that would

16   be a very lengthy report as well.

17            So there's a couple different

18   documents out there that -- that -- that would --

19   that we would do.

12:03 20      Q.  Okay.  Let's take those in turn.  The

21   first document that you mentioned, what is that

22   called?

23      A.  The BP acronym on that one is escaping me,

24   but it would be more -- it would be a post-well

12:03 25   review and report on -- on what was found.

**PURSUANT TO CONFIDENTIALITY ORDER**

1       Q.   And you said that that's typically fairly

2   lengthy?

3       A.   Yeah.  It's a good-size report, got a lot

4   of PowerPoints and some verbiage in it.

12:03  5       Q.   And what are -- strike that.

6            What's the purpose of that report?

7       A.   To document what was found in the well and

8   how the well was drilled.

9       Q.   And then the RROS/RAM?

12:03  10       A.   Yeah.  So that's about resource

11  assessment, and that's a documentation of

12  specifically around the reservoirs and the fluids

13  and the volumes that -- that have been found, and

14  that's what the documents that.

12:04  15       Q.   Do you know what RROS stands for?

16       A.   I can't recall right now.

17       Q.   Okay.  Do you know what RAM stands for?

18       A.   I can't recall that acronym, either --

19       Q.   All right.

12:04  20       A.   -- on the spot.  Sorry about that.

21       Q.   No problem.

22            You testified earlier that there was

23  no RROS/RAM?

24       A.   RAM is -- I think RAM is Resource

12:04  25  Assurance Memorandum.  Anyway, sorry to interrupt

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    you.

 2         Q.   Nope.

 3              So, do you know if any -- I'm sorry.

 4    Let me rephrase that.

12:04  5              You testified earlier that there, to

 6    your knowledge, has been no RROS/RAM report

 7    written for the reservoir discovered in the MC 252

 8    No. 1 well.

 9         A.   That's correct.

12:05 10         Q.   And are you aware of any other subsurface

11    memorandum that has been drafted aside from the

12    memorandum, one draft of which you have seen

13    today?

14         A.   Yeah.  Not that I know of.  I mean, that's

12:05 15    the -- there have been lots of PowerPoints and

16    things like that but not put into kind of a report

17    format.  This is -- this was -- this was different

18    than those kinds of two things that I talked

19    about, yeah, because it was a special request from

12:05 20    Kate, I believe.

21              But, yeah, nothing else has been done

22    that -- that I can recall.

23         Q.   How is this different from those other

24    reports?

12:05 25         A.   Well, it was done early on and quickly;

and I think we'd have to -- you know, Kate had

some -- some reason why she requested, which I'm

not quite -- I'm not totally sure on why she

requested it.

12:06    And it was not the report that's

either one of those, yeah, because that -- that

report -- those reports take some time and they're

more wider ranging and more encompassing, and then

we would finalize them.  This is not -- this is

12:06  not finalized as a draft.

Q.  So if we could flip to Tab 11.  Okay?  And

this is going to be a little confusing, but this

cover E-mail from Bryan Ritchie to you, I don't

believe has been marked as an exhibit.  But the

12:06  attachment to it -- and I realize it has a

different Bates number I did not include but I --

I have included a different version under a

different Bates number that it was previously

marked as an exhibit.

12:07    MR. KEEGAN:  So why don't we treat

them as two different separate exhibits?

MR. CHAKERES:  That's what I was

going to say we were going to do.  This cover

E-mail we're going to mark as Exhibit 6242, and

12:07  I'm going to represent that I -- it's my

165

         1    understanding that the attachment is the

         2    attachment here, and if it turns out not to be the

         3    case, we can deal with that.

         4        Q.  (BY MR. CHAKERES) This cover E-mail from

12:07    5    Bryan Ritchie to yourself on August 2nd, 2010, do

         6    you recall receiving this E-mail?

         7                  (Marked Exhibit No. 6342.)

         8        A.  So it's just this and then the report,

         9    yeah?

12:07   10                  MR. KEEGAN:  We don't know that the

        11    report was attached.

        12                  MR. CHAKERES:  That's my

        13    understanding.

        14        A.  Yeah.  Vaguely, I remember Peter

12:08   15    responding to -- to something in there, but I

        16    didn't really take it any further than that.

        17        Q.  (BY MR. CHAKERES) Okay.  Well, do you

        18    recall in the late July, early August time frame

        19    receiving an updated version of the report?

12:08   20        A.  Yeah, there were -- I definitely recall

        21    seeing updated versions.  I don't know if it was

        22    this particular version that you've got here, but,

        23    yeah, there were, I think, other updated versions.

        24        Q.  Okay.  Are you aware of any updates that

12:08   25    occurred after late July, 2010?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:  Objection to form.

2      A.  I don't know the specific dates.  So I'm

3  not sure.  I'm not sure if there was an August

4  version or not.  I would have to go back and

12:08  5  check.

6      Q.  (BY MR. CHAKERES)  Okay.  And I think you

7  testified earlier you never commented on this

8  document?

9      A.  I don't believe.

12:09  10     Q.  In writing?

11     A.  I don't believe I did.  I may have, but I

12  don't remember.  Comments were more verbal.

13     Q.  Okay.  I'd like to go to Tab 8.  All

14  right.

12:09  15          MR. CHAKERES:  And this we're going

16  to mark as Exhibit 6343.

17              (Marked Exhibit No. 6343.)

18     Q.  (BY MR. CHAKERES)  And this should be an

19  E-mail from Bryan Ritchie to Cindy Yeilding and

12:09  20  yourself dated Monday, July 26th, 2010.  Text

21  E-mail being "FYI."

22     A.  Uh-huh.

23     Q.  Is that what you have in front of you?

24     A.  Yeah.

12:09  25     Q.  Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

167

```
 1              And as I ask these follow-up
 2     questions, if you say "uh-huh," you can't pick it
 3     up on the court reporter transcript?
 4         A.  I'm sorry.
12:10  5     Q.  And if you flip to the attachment to
 6     this --
 7         A.  Uh-huh.
 8         Q.  -- there should be another document with a
 9     watermarked draft, but this one dated 23rd July,
12:10 10    2010?
11        A.  Uh-huh.  Yes.
12        Q.  And there's some comments on the side?
13        A.  Yes.
14        Q.  Okay.  Do you remember receiving this
12:10 15    E-mail?
16        A.  I don't recall specifically receiving this
17    E-mail, but, again, I'm sure I did receive it.
18        Q.  Okay.  I'd like if you could -- well,
19    strike that.
12:10 20            Do you recall reviewing Kate Baker's
21    comments on the memorandum?
22        A.  Yeah.  I -- on -- I do not recall
23    specifically commenting or reviewing Kate's
24    comments.
12:10 25    Q.  So you didn't go through and read Kate's
```

**PURSUANT TO CONFIDENTIALITY ORDER**

168

```
 1    comments?

 2         A.  Not that I can remember.  That's -- well,

 3    I don't -- are they Kate's or -- are all these

 4    little --

12:11  5         Q.  That's what I was hoping you could answer

 6    for us.

 7         A.  Yeah.  I don't know whose comments those

 8    are.

 9         Q.  Okay.  This is an E-mail from Kate to

12:11 10    Bryan, but it's forwarded to you.

11         A.  Yeah.  So, I -- it could be Kate's, but I

12    don't know.

13         Q.  The commenter, you know, hopefully is only

14    named "B."  So it could be Bryan or Kate Baker?

12:11 15         A.  Right.

16         Q.  So --

17         A.  Yeah.  I can't help.  I don't know.

18         Q.  Okay.  I will not ask you about those

19    comments, then.

12:11 20              MR. KEEGAN:  Did you mark that one?

21              MR. CHAKERES:  I think we did.  We're

22    going to mark the whole thing together as 6343.

23         Q.  (BY MR. CHAKERES)  I'd like you to go down

24    to Tab 27 in your binder.

12:11 25              MR. CHAKERES:  And this we're going
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   to mark as 6344.

2                 (Marked Exhibit No. 6344.)

3         Q.   (BY MR. CHAKERES)   And you should have in

4   front of you an E-mail from John Guide to yourself

12:12   5   sent Monday, April 26th, 2010.

6         A.   Yes.

7         Q.   Is that what you have there?

8         A.   Yes.

9         Q.   Okay.   The Subject line saying "Recap - DW

12:12   10   Horizon."   Is that the E-mail?

11         A.   "Recap DW Horizon," yes.

12         Q.   Okay.   Thanks.   Do you recall requesting a

13   recap from John Guide about events on the HORIZON?

14         A.   Yes.

12:12   15         Q.   Okay.   What did you request from

16   Mr. Guide?

17         A.   I requested a summary of -- of what

18   happened from him.

19         Q.   What happened in terms of rig operations

12:12   20   prior to the blowout?

21         A.   So the -- what this was for is that I was

22   going to the exploration forum, and I was

23   traveling to the exploration forum here in London.

24   And so I needed to kind of give the exploration

12:13   25   forum an update on kind of what was happening,

**PURSUANT TO CONFIDENTIALITY ORDER**

         1   because Dave Rainey and Cindy Yeilding were not

         2   going to that forum.  I was.

         3            So I needed to give the exploration

         4   forum an update of what possibly happened and --

12:13    5   and what was going on.

         6            And so this is what John provided me

         7   with and then so I -- I kind of, in general,

         8   highlighted, using some of these points to the

         9   exploration forum to let them know, because

12:13   10   everyone was obviously -- you know, this was the

        11   26th, and, you know, it was when it happened.

        12        Q.  Okay.  Actually, I have one more question

        13   going back to the subsurface memorandum before I

        14   forget.  Do you know if that document was either

12:14   15   requested by or shared with the Bly team?

        16        A.  The -- the one that Kate -- memorandum

        17   that Kate Baker requested and I'm on?

        18        Q.  Yeah.

        19        A.  I do not know on that.

12:14   20        Q.  You don't know either way, whether it was

        21   shared or whether it was requested?

        22        A.  I don't know for sure.  I don't know for

        23   sure.

        24        Q.  Okay.  If you could go to Tab 10.  This

12:14   25   document I'm not going to mark as an exhibit.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Check it but it was marked by prior counsel as

2    Exhibit 6335, and this is the draft ADEW.

3              Is that what you testified to

4    earlier?

12:15  5         A.  Yes.

6         Q.  Okay.  And a few follow-up questions here.

7    What -- what is the time frame within BP to

8    conduct the RAM/RROS process?

9                   MR. KEEGAN:  Objection to form.

12:15  10        A.  Yeah.  So that RAM process, that -- that

11   goes on for quite some time when -- so, you know,

12   this is a months-to-a-year type process to -- when

13   you have a discovery.

14        Q.  (BY MR. CHAKERES)  And it's your

12:15  15   understanding that that process has not begun?

16        A.  Yeah.  It never got followed through to

17   the best of my knowledge.

18        Q.  And you're not aware of any plans to begin

19   the process?

12:16  20        A.  I don't know of any plans.

21        Q.  Is BP -- do you know if BP is required to

22   account for all of its proven oil reserves?

23        A.  Worldwide?

24        Q.  Yes.

12:16  25        A.  Yes.  It -- I -- I do know that; and,

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    again, BP does have to report proven reserves.
 2        Q.  Would -- if you know, would the reservoir
 3    discovered under the MC 252 block be a proven
 4    reserve?
 5        A.  I don't know, and I don't think it's been
 6    reported.  There's no further work that's been
 7    done on it for it -- for that RAM/RROS process
 8    would really need to be done and in place to -- to
 9    put it, you know, I think, to report it.  But, you
10    know, I'm not an expert on the reporting so I
11    don't know for sure how that's taken into account.
12        Q.  Do you take -- do you or have you ever
13    participated in the RAM/RROS process?
14        A.  Yeah, definitely.
15        Q.  So you are somewhat familiar with the
16    process?
17            MR. KEEGAN:  Objection to form.
18        Q.  (BY MR. CHAKERES) And during that process,
19    the size of a discovery is assessed?
20        A.  Yes.
21        Q.  And that sort of process would be in place
22    for BP to be able to accurately determine the size
23    of its reserves?
24            MR. KEEGAN:  Objection to form.
25        A.  If it's world -- are you talking about
```

12:16  5
12:17 10
12:17 15
12:17 20
12:17 25

**PURSUANT TO CONFIDENTIALITY ORDER**

1    discoveries around the world, or whatever?  Yeah,

2    that type of process is important to have in

3    place.

4         Q.  (BY MR. CHAKERES)  Okay.  And are you

12:17  5    aware of any plans regarding development of this

6    reservoir?

7         A.  No, I'm not.

8         Q.  You -- either way?

9         A.  I am not aware of any plans to develop it

12:18  10   or what the next -- what's next.

11        Q.  Okay.

12              MR. CHAKERES:  How much time do we

13   have on this tape?

14              THE VIDEOGRAPHER:  About 12 minutes.

12:18  15             MR. CHAKERES:  12 minutes.  Okay.

16              Counsel, I have a question I want to

17   ask you about off the record.

18              MR. KEEGAN:  Sure.

19              THE VIDEOGRAPHER:  The time is

12:18  20   12:18 p.m.  We're going off the record.

21              (Break from 12:18 p.m. to 12:19 p.m.)

22              THE VIDEOGRAPHER:  The time is

23   12:19 p.m.  We're back on the record.

24        Q.  (BY MR. CHAKERES)  Okay.  Mr. Thorseth, if

12:19  25   you can turn to Tab 15, do you have in front of

PURSUANT TO CONFIDENTIALITY ORDER

174

1       you an E-mail from Xuemei Lui to several

2       individuals with yourself cc'd sent Monday,

3       June 14, 2010?

4            A.  Yes.

12:20   5       Q.  And the last three digits of the Bates

6       number at the bottom are 4016?

7            A.  Yes.

8            Q.  Okay.

9                 MR. CHAKERES:  We're going to mark

12:20  10       that as Exhibit 6345.

11                 (Marked Exhibit No. 6345.)

12            Q.  (BY MR. CHAKERES)  And I'd like, if you

13       can, to look over that E-mail chain and then tell

14       me if you remember receiving this E-mail.

12:20  15            A.  Okay.

16            Q.  Do you remember receiving this E-mail?

17            A.  Yes.

18            Q.  Okay.  What was -- what was being

19       discussed here?

12:21  20            A.  I'm not sure.  I have to say -- let's see.

21       Yeah.

22            Q.  Okay.  Well, let's -- let's try and break

23       it down.

24            A.  Yeah.

12:21  25            Q.  If you flip the page, the original E-mail

**PURSUANT TO CONFIDENTIALITY ORDER**

             1    was sent from a -- I don't know you pronounce his

             2    name, Vincent Marrot, M-A-R-R-O-T, to Katherine

             3    Robbins?

             4        A.  Yeah.

    12:21    5        Q.  Do you know Ms. Robbins?

             6        A.  I don't know any of these people.

             7        Q.  Okay.  And you see at the bottom, Vincent

             8    Marrot works for, it appears, AquaTerra Adjusters?

             9        A.  Yeah.  So, it -- yeah.

    12:22   10        Q.  Okay.  And I'll just ask you the -- in the

            11    first two sentences, this E-mail says:  "Refer to

            12    our television" -- excuse me.  Strike that.

            13            He says:  "I refer to our telephone

            14    conversation yesterday regarding the potential

    12:22   15    redrill of the Macondo MC 252 well.  I order -- in

            16    order to ascertain whether or not the well is

            17    likely to be redrilled, I would contact BP's

            18    reservoir engineering division to obtain their

            19    point of view on this subject."

    12:22   20            Did I read that correctly?

            21        A.  Yes.

            22        Q.  And then if we go up to the next E-mail

            23    from Ms. Robbins still -- you're not cc'd yet.

            24        A.  Uh-huh.

    12:22   25        Q.  The first line of Ms. Robbins' E-mail is:

1      "Xuemei & Claudia, We had asked Vincent to send

2      this note so we could have the specific request in

3      writing and in his own words."

4                And then that E-mail -- the response

12:23  5      to that E-mail appears to have you as a cc?

6           A.   Uh-huh.

7           Q.   Does that refresh your recollection of the

8      subject matter of this correspondence?

9           A.   Yes.  So like I said, I don't know how

12:23 10      this emanated from Vincent and other folks.  I do

11      know Xuemei, though.  Xuemei is commercial in

12      finance, and it does look to do -- something to do

13      with insurance, which I'm not sure of any of the

14      details.  I wasn't involved in that whatsoever.

12:23 15                And then this paragraph came through

16      and I was asked to have a look at it and so, I did

17      from a technical point of view and Kelly as well.

18      Kelly is a GoM reservoir engineer, and so she

19      looked at it as a technical review.

12:23 20                And as I remember, I looked at it,

21      not sure if I made any edits or not.  Maybe I

22      said, This looks fine, and then I said, You need

23      to send this over to legal.  And that was the last

24      I ever heard of this particular subject.

12:24 25           Q.   And the technical input that you gave was

PURSUANT TO CONFIDENTIALITY ORDER

         1   regarding the quality of the reservoir?

         2        A.  No, no, no.  It was more on this paragraph

         3   that's up here, about finding hydrocarbons deemed

         4   viable based on well data, and it was just

12:24    5   providing -- this was the -- this sentence -- or

         6   this paragraph came to me and said this is fine.

         7   I said, Well, from a technical point of view,

         8   it's -- it looks fine but check with legal.

         9        Q.  And are you in a position to comment on

12:24   10   why BP's insurer was asking about whether the

        11   reservoir could be developed?

        12             MR. KEEGAN:  Objection to form.

        13        A.  Yeah.  I'm not -- I don't know.  Yeah, I'm

        14   not in a position to know what this came from.

12:25   15   I'm not sure.

        16             MR. CHAKERES:  Okay.  I think it's

        17   probably a good time to break for lunch.

        18             MR. KEEGAN:  Sure.

        19             MR. CHAKERES:  No objections.

12:25   20             THE VIDEOGRAPHER:  The time is

        21   12:25 p.m.  We're going off the record, ending

        22   Tape 4.

        23             (Break from 12:25 p.m. to 1:29 p.m.)

        24             THE VIDEOGRAPHER:  The time is

13:29   25   1:29 p.m.  We're back on the record, beginning

PURSUANT TO CONFIDENTIALITY ORDER

1    Tape 5.

2         Q.  (BY MR. CHAKERES)  Good afternoon,

3    Mr. Thorseth.

4         A.  Good afternoon.

13:29  5         Q.  Has BP ever appraised how much oil it has

6    in the reservoir underneath MC 252?

7              MR. KEEGAN:  Objection to form.

8         A.  What do you mean, "appraised"?

9         Q.  (BY MR. CHAKERES)  Has BP attempted to

13:30 10    quantify post blowout how much oil is in the

11    reservoir underneath MC 252?

12              MR. KEEGAN:  Objection to form.

13         A.  Not that I was under the direction of that

14    I know about.

13:30 15         Q.  (BY MR. CHAKERES)  Are you aware if BP

16    ever attempted to quantify how much oil has been

17    lost as a result of the blowout --

18              MR. KEEGAN:  Object --

19         Q.  (BY MR. CHAKERES)  -- from the reservoir?

13:30 20              MR. KEEGAN:  Objection to form.

21         A.  I -- I don't know.

22         Q.  (BY MR. CHAKERES)  Okay.  I've got here a

23    document that I'm handing to you.  It is an

24    attachment -- one of the attachments to -- it was

13:30 25    Tab 9 in the binder.  This was marked as Exhibit

**PURSUANT TO CONFIDENTIALITY ORDER**

1    6340.

2              MR. CHAKERES:  We're going to go

3    ahead and mark it as 6346.

4              (Marked Exhibit No. 6346.)

13:31 5    Q.  (BY MR. CHAKERES)  You can go ahead and

6    look at this in relation to the E-mail there at

7    Tab 9.  And I have a couple of questions about

8    the -- the settlement with -- with PGS.  So I'll

9    give you a second to look at this document --

13:31 10   A.  Okay.

11         Q.  -- and let me know when I can ask the

12    question.

13         A.  Okay.

14         Q.  If I could direct you to Provision No. 1

13:32 15    of this draft agreement.  Sort of right in the

16    middle, I'm going to pick up mid-sentence.  It

17    says:  "Licensor offers to license to Licensee and

18    Licensee agrees to license and pay for 69 OCS

19    blocks from the Justice Non-Exclusive 3D Wide

13:33 20    Azimuth Program (Justice Data).  Licensee Justice

21    Data commitment area shall be selected by licensee

22    on or before December 15, 2010."

23              Did I read that correctly?

24         A.  Yes.

13:33 25   Q.  Is that referring to an agreement by BP to

1    license certain seismic data from TGS?

2              MR. KEEGAN:  Objection to form.

3         A.  Yeah, I believe so.

4         Q.  (BY MR. CHAKERES)  Do you know if BP has,

13:33  5    in fact, obtained the seismic data that it was

6    going to agree to -- to obtain from TGS as part of

7    the settlement?

8         A.  Yeah.  I -- I believe so, but I'm not sure

9    on that.

13:33  10        Q.  And do you know if among those 69 OCS

11   blocks referred to in this provision, MC 252 would

12   have been in those blocks?

13        A.  I don't think so.  I think it's data

14   elsewhere.

13:34  15        Q.  Okay.  Thank you.

16              And if you could look at Provision 2

17   --

18        A.  Uh-huh.

19        Q.  -- and Provision 3.

13:34  20        A.  Yes.

21        Q.  And I think Provision 2 includes various

22   post stack deliverables, and then Provision 3

23   provides a list of tape deliverables?

24        A.  Uh-huh.

13:34  25        Q.  Do you see that?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.  Yes.

2          Q.  And it looks like a lot of the information

3     in Provisions 2 and 3 are in Segue format?

4                 MR. KEEGAN:  Objection; form.

13:34  5          A.  Yes.

6          Q.  (BY MR. CHAKERES)  Okay.  And I just want

7     to verify.  You testified earlier, but you weren't

8     sure.  You thought that seismic data acquired from

9     TGS would likely be in Segue format, and I wanted

13:35 10    to see if this refreshed your recollection as to

11    that?

12          A.  It does look that way, yes.

13          Q.  Okay.  Thank you.

14                I'd like you to go to Tab 5 in the

13:35 15    binder in front of you.  And at the top of this --

16                MR. CHAKERES:  We're going to mark

17    this as Exhibit 6347.

18                (Marked Exhibit No. 6347.)

19          Q.  (BY MR. CHAKERES)  The top of it should be

13:35 20    an E-mail from Kirk Wardlaw to yourself, dated

21    Wednesday, December 9th, 2009.  Is that what you

22    have in front of you?

23          A.  Yes.

24          Q.  Okay.  Do you remember this E-mail

13:35 25    exchange?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        A.  Let me read this bottom one here.

 2        Q.  Go ahead.

 3        A.  Okay.

 4        Q.  Do you recall this E-mail exchange?

13:36  5  A.  Vaguely, now that I read it.

 6        Q.  Okay.  Do you -- were you involved in the

 7   acquisition of Devon?

 8            MR. KEEGAN:  Objection to form.

 9        A.  I was involved in the evaluation of Devon

13:37 10  deepwater Gulf of Mexico lease box.

11        Q.  (BY MR. CHAKERES)  Okay.  I'm just going

12   to go through a couple of things you wrote.  The

13   initial E-mail from yourself to Dave Rainey on

14   Wednesday, December 9, 2009.  You say:  "Dave, we

13:37 15  need clarity on operatorship for Koala and Gila.

16   Devon appears to be rig driven with the West

17   Sirius and may need to drill Koala in April/May to

18   keep the rig busy.  We are absolutely and totally

19   against this for several reasons:  the prospect is

13:37 20  not ready, not enough time to plan a well, their

21   teams are totally distracted and it will most

22   likely be a train wreck, and we will be the

23   operator when they exit the GoM."

24            Did I read that correctly?

13:37 25  A.  Yes.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Do you remember what your concerns were

2  with respect to Devon drilling Koala?

3             MR. KEEGAN:  Objection to form.

4    A.  Yes.  It's pretty well summarized right

13:38  5  there, that that was just read.

6    Q.  (BY MR. CHAKERES)  Okay.  What was the

7  distraction that the -- that their drillers were

8  faced with?

9    A.  It was my view or opinion at the time that

13:38 10  they were distracted with the whole -- their

11  assets being up for sale and leases being up for

12  sale in the GoM, and so I was quite worried that

13  their -- their concentration and work would be not

14  on this task; it would be somewhere else.  That

13:38 15  was -- that was my opinion.

16    Q.  And just to flush that out:  So with their

17  concerns as to -- with their concerns focused on

18  their assets being up for sale, they might be

19  concerned about their future position?

13:38 20    A.  It was -- it was my opinion that they

21  would be worried about their jobs with Devon.

22  Yeah, that was kind of what was driving my

23  thinking.

24    Q.  Okay.

13:38 25    A.  The -- the assets were sold, and they may

1    not have a job or get moved, and it's just a

2    distraction.

3        Q.  Okay.  And the train wreck that you

4    referred to there, was that a -- the well may not

13:39  5    be drilled carefully, or what -- what exactly are

6    you worried about?

7        A.  Yeah.  I'm worried about the well not

8    coming in on -- you know, within budget or maybe

9    even not reaching the objective.

13:39  10       Q.  Okay.  And then you say "and we will be

11   the operator when they exit the GoM."  So you

12   would be inheriting the problems that are created

13   by that well?

14       A.  We would --

13:39  15           MR. KEEGAN:  Objection to form.

16       A.  Yeah.  We would -- what I'm saying there

17   is that, yeah, these -- many of these blocks if

18   this purchase went through and this acquisition of

19   lease blocks went through, then we would become

13:39  20   the operator on potentially many of these blocks.

21   And then if we're in a situation, we're under

22   contract, we are then obliged under contract to go

23   drill a prospect that's not ready, then I was very

24   worried about not only Devon, but then BP

13:40  25   potentially not being ready to safely drill a

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   prospect in a -- in a very -- not a good

 2   situation.

 3       Q.  (BY MR. CHAKERES) Okay.  And then briefly,

 4   Kirk Wardlaw replies to you.  And he says:

13:40  5   "Bummer - train wreck would be the best outcome,

 6   it could be worse!!!!"

 7           What did that mean to you?

 8       A.  I don't know what Kirk meant by that.

 9   It's kind of -- I don't know what he means.

13:40 10       Q.  Okay.  Safe to say he shared your

11   concerns, but you couldn't put any more thoughts

12   into this other than that?

13           MR. KEEGAN:  Objection to form.

14       A.  Yeah.  I shared what I thought in my

13:40 15   E-mail.  I don't know what Kirk was thinking.

16           MR. CHAKERES:  Okay.  I think at this

17   point, my colleague Malinda Lawrence, is going

18   to -- going to ask some questions.  So I think

19   we'll probably stop the tape so we can switch

13:41 20   spots.

21           THE VIDEOGRAPHER:  The time is

22   1:41 p.m.  We're going off the record.

23           (Break from 1:41 p.m. to 1:42 p.m.)

24           THE VIDEOGRAPHER:  The time is

13:42 25   1:42 p.m.  We're back on the record.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

                      E X A M I N A T I O N
BY MS. LAWRENCE:
     Q.  Good afternoon, Mr. Thorseth.  We spoke
briefly off the record.  But again, my name is
13:42  Malinda Lawrence.  I'm also with the Department of
Justice, and like it or not I represent the people
of the United States in this litigation.
               I have some additional questions for
you.
13:42      A.  Okay.
     Q.  You testified this morning about having
signed documents related to the Macondo Well.  In
your capacity as SPA.  Do you recall that?
     A.  Yes.
13:42      Q.  What does the acronym "SPA" stand for?
     A.  Single Point Accountability.
     Q.  And were you, in fact, the SPA or single
point accountability within BP for the Macondo
Well?
13:43      A.  I was the single point accountability
for -- within the financial memorandum.  And the
financial memorandum outlines the amount spent
that we are authorized to do.  And so that's what
my SPA was for, was to keep track of -- of the
13:43  cost in a general nature.  And then if we needed

to go back to the company for more money, then

I would -- I would need to bring that

recommendation forward.  So that -- that's what

the SPA stands for in that case.

13:43     Q.  Was there more than one SPA or single

point accountability within BP for the Macondo

Well?

A.  So then you have operational

accountability for -- for the well.

13:43     Q.  And who would have been the SPA for

operational accountability for the well?

MR. KEEGAN:  Objection to form.

A.  Yeah.  I'm not -- I'm not sure it would be

in the drilling organization, and I'm not totally

13:44 sure on how they did their accountability for

delivering the well.  But it would clearly be in

the wells organization.

Q.  (BY MS. LAWRENCE) What aspects of the

drilling process, if any, required your approval?

13:44     A.  The -- so early on when we go through our

stage gate process in planning the well, my

approval was needed for the early stages in -- in

the planning to make sure the subsurface technical

description is okay.  And -- and in the like, it's

13:44 kind of what we go through, appraise to select.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    And then that accountability then changes over to

2    the drilling organization when we do our define,

3    execute and operate stages.  It's what we call

4    our -- beyond the best process.  So then it

13:45  5    switches over.  So I -- I do need to be -- I'm

6    accountable for that early on planning and then it

7    switches over.

8         Q.  Okay.  And I think you also just testified

9    as to the financial memorandum of that has to be

13:45  10    visited or additional funds need to be

11    appropriated.  That's also something you have to

12    approve?

13         A.  That's correct.

14         Q.  Okay.  Anything else that you can think

13:45  15    of?

16         A.  If there's a -- if there's a major change

17    of scope in -- in the program, then I would need

18    to be advised of it, as well.

19         Q.  If you could turn to Tab 31, please, in

13:45  20    the binder.  It's an E-mail that has not

21    previously been marked, which we will label as

22    Exhibit No. 6348.

23              (Marked Exhibit No. 6348.)

24         Q.  (BY MS. LAWRENCE)  And I just want to

13:46  25    read -- it's Bates No. BP-HZN-2179MDL00015260.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    And I just want to read you the top paragraph.

2            It's an E-mail from David Rainey to

3    Mike Daly, dated April 16th of 2010.  It begins:

4    "One other thing - I misspoke when I said that Jay

13:46  5    and Cindy had agreed that Cindy would chair the

6    Macondo Discovery Review Board.  In fact, they had

7    agreed that Jay would chair as he drilled the well

8    and the most likely outcome is immediate handover

9    to CDO."

13:46  10            Do you have an understanding of what

11    Mr. Rainey means when he says Jay drilled the

12    well, in the common vernacular used within your

13    company?

14            MR. KEEGAN:  Objection to form.

13:47  15      A.   Yeah.  He's -- he's referring to that

16    between Cindy and I, Cindy had absolutely nothing

17    to do with the drilling of the well, Macondo,

18    subsurface description, nothing whatsoever.  I was

19    the one who had the teams under that were in

13:47  20    charge of developing the prospect and then, from a

21    subsurface standpoint, supporting the pore

22    pressure prediction and that.  So that's what --

23    that's what he's referring to there.  And so

24    instead of Jay and Cindy, why would it be Cindy?

13:47  25    Jay has been involved with Macondo, and so Jay

**PURSUANT TO CONFIDENTIALITY ORDER**

1    should be in charge of -- or chairing the

2    Discovery Review Board.

3         Q.   (BY MS. LAWRENCE)  Okay.  And how would

4    you describe the accountability you had for the

13:47  5    Macondo Well within BP?

6         A.   Right.  So the -- again, the financial

7    aspects, the FM clearly states me as the

8    accountable person to track the finances and go

9    back to the company, as I mentioned.  And then, I

13:48 10    was also a part of, you know, the team that's --

11    like I said, the -- Bryan Ritchie's team that

12    helped the subsurface interpretation in support of

13    the drilling.  They reported to me.  Bryan's team

14    reported -- Bryan reported to me.  And so,

13:48 15    therefore, I was -- I was a part of -- of that

16    chain of command on the subsurface description.

17         Q.   Okay.  The discovery -- the Macondo

18    Discovery Review Board that's referred to in this

19    E-mail, was it ever convened?

13:48 20         A.   No, it was not.

21         Q.   Was the Tiber well also a well or a

22    prospect that was developed that was under your

23    sort of area of authority?

24              MR. KEEGAN:  Objection to form.

13:49 25         A.   Yes, it was.

1    Q.  (BY MS. LAWRENCE)  Do you recall if more

2  or less time was spent planning the Macondo Well

3  than the Tiber well?

4           MR. KEEGAN:  Objection to form.

13:49  5    A.  I -- I don't know for sure, because

6  both -- both started -- yeah, I don't know for

7  sure.

8    Q.  (BY MS. LAWRENCE)  Do you have a sense of

9  whether more or less time was spent planning the

13:49  10  Macondo Well than the average well you were

11  involved -- you've been involved with in your

12  experience in the Gulf of Mexico for BP?

13           MR. KEEGAN:  Objection to form.

14    A.  Yeah.  I -- I don't know the -- whether it

13:49  15  was more or less or -- or average.

16    Q.  (BY MS. LAWRENCE)  You testified this

17  morning about -- and I'm paraphrasing, but

18  essentially the process of calling TD, I think as

19  they call it, or calling total depth or concluding

13:49  20  the drilling process of the Macondo Well at a

21  depth of approximately 18,000, I think it

22  was -363.  T-363 or something in that area.

23           I want to ask you if you recall,

24  however during the drilling process any

13:50  25  discussions within the drilling team or any

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    discussions within BP about abandoning the well

 2    prior to that?

 3                    MR. KEEGAN:  Objection to form.

 4         Q.  (BY MS. LAWRENCE)  Which is to say

13:50  5    abandoning the well without reaching any of the

 6    objective depths?

 7                    MR. KEEGAN:  Objection to form.

 8         A.  So can you -- can you state your question

 9    a little bit shorter?

13:50 10         Q.  (BY MS. LAWRENCE)  Yes.  Basically walking

11    away from the well, pulling the plug, if you will.

12    Abandoning the well --

13         A.  Before -- before --

14         Q.  -- before reaching any of the objectives,

13:50 15    deciding not to go any further with it?

16                    MR. KEEGAN:  Objection to form.  One

17    question at a time, please.

18         A.  So your one question is?

19         Q.  (BY MS. LAWRENCE)  Do you recall any

13:50 20    discussion prior to reaching TD about abandoning

21    the Macondo Well prior to reaching any of the

22    objectives?

23         A.  Discussions with --

24                    MR. KEEGAN:  Objection to form.

13:51 25         A.  -- among who and --

**PURSUANT TO CONFIDENTIALITY ORDER**

        1          Q.   (BY MS. LAWRENCE)   Anyone.   Any discussion

        2    at all.   That you were a part of, that you

        3    overheard, anything.

        4                    MR. KEEGAN:   Objection to form.

13:51   5          A.   Not that I can remember.

        6          Q.   (BY MS. LAWRENCE)   Okay.   And can you

        7    please turn to Tab 32.   This has previously been

        8    admitted as Exhibit 1090.

        9                    MR. KEEGAN:   It's previously been

13:51  10    marked.

       11                    MS. LAWRENCE:   Okay.

       12          Q.   (BY MS. LAWRENCE)   It's an E-mail from

       13    Robert Bodek dated March 29th, 2010, to a number

       14    of other individuals.   Are you familiar who Robert

13:51  15    Bodek is?

       16          A.   Yes.

       17          Q.   Who is Robert Bodek?

       18          A.   He is the operations geologist in that

       19    Tiger team.

13:51  20          Q.   And you indicated that the Tiger team was

       21    headed by Mr. Pinky Vinson?

       22          A.   Correct.

       23          Q.   And Mr. Vinson reported to you up until

       24    August -- April 1st of 2010?

13:51  25          A.   Yeah, April 1st or 15 -- somewhere in

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    there.  But, yes, that is correct.

 2        Q.  I just want to read the first sentence of

 3    the E-mail.  Mr. Bodek writes -- I'm sorry, the

 4    subject of the -- of the E-mail is "RE:  Macondo"

13:52  5    --

 6        A.  Uh-huh.

 7        Q.  -- "bp1" --

 8        A.  Uh-huh.

 9        Q.  -- and then "Mar 29 model."

13:52 10            And the first sentence says:  "If we

11    really believe that sand PP at 17,200 feet could

12    be as high as 14.4 ppg, then we need to start

13    having some serious discussions about pulling the

14    plug early."  End of sentence.

13:52 15            Did I read that correctly?

16        A.  Yes.

17        Q.  Okay.  Do you recall hearing anything

18    about this?

19            MR. KEEGAN:  Objection to form.

13:52 20        A.  Not that I can recall.

21        Q.  (BY MS. LAWRENCE)  And if you can turn,

22    please, to Tab 33, which has previously been

23    marked as Exhibit No. 1087.  It's an E-mail, also

24    from Robert Bodek.  The date is March 27, 2010, to

13:53 25    Pinky Vinson.  And the title is "Subject RE:  Kira

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Tushman - Macondo ops visit."  And the sen- -- the

2    first sentence of the E-mail reads:  "If they want

3    to push this next hole-section to TD, it'll all be

4    in God's hands."

13:53  5              Have you seen this E-mail prior to

6    today?

7         A.  No.

8         Q.  Did Mr. Vinson ever mention to you any

9    discussions of this nature, concerns about

13:53 10    continuing on drilling the well --

11              MR. KEEGAN:  Object --

12         Q.  (BY MS. LAWRENCE)  -- before reaching the

13    objective depth?

14              MR. KEEGAN:  Objection to form.

13:53 15         A.  I don't recall any discussions about that.

16         Q.  (BY MS. LAWRENCE)  Okay.  Are you aware of

17    any other wells that BP abandoned prior to

18    reaching any of their objective depths?

19         A.  Yes, I -- I do.

13:54 20         Q.  What -- what wells?

21         A.  I believe the Diamondback Well in Almeda

22    Canyon, we stopped with still objectives yet to

23    go.

24         Q.  And in that well, had -- had BP achieved

13:54 25    any of the objectives?

**PURSUANT TO CONFIDENTIALITY ORDER**

         1        A.   It -- we had -- we had hit some of the top

         2   objectives.

         3        Q.   And do you recall any wells in which BP

         4   abandoned the -- the well drilling effort

13:54    5   altogether without achieving any objective?

         6        A.   I don't -- I don't recall either way on

         7   that, either.

         8        Q.   Do you recall the -- if one of the Kodiak

         9   wells, if that was the situation?

13:55   10              MR. KEEGAN:   Objection to form.

        11        A.   You said Kodiak.  No, I don't -- not that

        12   I can recall.

        13        Q.   (BY MS. LAWRENCE)  Okay.  Do you recall

        14   what the original projected budget or the original

13:55   15   total cost of drilling the Macondo Well was?

        16              MR. KEEGAN:   Objection to form.

        17        A.   So you -- what they most likely --

        18        Q.   (BY MS. LAWRENCE)  Right.  When --

        19        A.   -- cost.

13:55   20        Q.   When you started out basically with the

        21   Macondo Well, what it was projected to cost, the

        22   total cost.

        23        A.   Yeah, I don't recall the numbers

        24   specifically.

13:55   25        Q.   Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  I'd have to --

2      Q.  Could you turn please to Tab 34, which has

3  not previously been marked, so we will mark that

4  as Exhibit 6349.

13:56  5      A.  M-hm.

6              (Marked Exhibit No. 6349.)

7      Q.  (BY MS. LAWRENCE)  This is an E-mail from

8  yourself, dated November 24, 2009, to a number of

9  individuals, entitled "Macondo update and budget."

13:56  10  And Paragraph No. 2 -- I'm sorry.  The Bates

11  number is BP-HZN-2179MDL00266805.  And I just want

12  to read the first two sentences of the second

13  paragraph.

14              You write:  "We have spent about

13:56  15  47.5M to date.  New projected total cost for the

16  well is $131M, (AFE $96M)."

17              Did I read that correctly?

18      A.  Yes.

19      Q.  Okay.  Does this indicate that you had --

13:56  20  as of that date BP had expended approximately 47.5

21  million on the Macondo?

22              MR. KEEGAN:  Objection to form.

23      A.  Yes.

24      Q.  (BY MS. LAWRENCE)  And does it indicate

13:56  25  that the -- as of that date, the projected total

1    cost for the well was 131 million?

2         A.   Yeah.   The new projection was 131-.

3         Q.   So if it is a new projection, does that

4    indicate there had been a prior projection?

13:57  5         A.   Yeah.   Now that I see this, I would say

6    that the AFE of 96 million was the prior

7    predic- -- projection, so that --

8         Q.   Okay.   Well, you anticipated my next

9    question, which was:   What does "AFE" refer to?

13:57  10         A.   Yeah.   For approved financial expenditure,

11    approval for financial expenditure.

12         Q.   Okay.   And do you recall the amount that

13    had been spent on the well -- well, first of all,

14    let me ask you:   In paragraph one of the same

13:58  15    E-mail, you say:   "The MARIANNAS rig is de-mooring

16    and will be headed to shore-base to be fixed.

17    Most likely scenario is that we do not see this

18    rig back on Macondo, because the rig contract

19    expires on December 30."

13:58  20              Did I read that correctly?

21         A.   Yes.

22         Q.   And to your knowledge, did the MARIANAS

23    return to the Macondo Well site?

24         A.   It did not.

13:58  25         Q.   Okay.   And what rig, to your knowledge,

**PURSUANT TO CONFIDENTIALITY ORDER**

1 is -- did another rig commence in 2010; commence

2 drilling Macondo?

3     A.   The DEEPWATER HORIZON.

4     Q.   Okay.  Do you recall the amount that had

13:58 5 been spent on the well by mid-March of 2010?

6     A.   No, I don't recall.

7     Q.   Okay.  Can you turn, please, to Tab 35,

8 which is an E-mail that has not been previously

9 marked, so we will label that Exhibit 6350.

13:59 10              (Marked Exhibit No. 6350.)

11     Q.   (BY MS. LAWRENCE) It's an E-mail from

12 Samina Sewani.  The date is March 17, 2010.  It's

13 to Mark Hafle, Bryan Ritchie and David Sims, and

14 carbon copied or cc'd to yourself.  The subject is

13:59 15 "Macondo Spend."  The Bates number is

16 BP-HZN-MBI00111839.  And the first sentence of the

17 E-mail reads:  "Our current spend on the Macondo

18 Well is approximately 108M, against an FM of 96.1M

19 performance target and 139.5M NTE."

13:59 20         Did I read that correctly?

21     A.   Yes.

22     Q.   Okay.  Does this -- is this an indication

23 that the current amount spent on the Macondo Well

24 as of that date, March 17th, 2010, was

13:59 25 approximately 108 million?

**PURSUANT TO CONFIDENTIALITY ORDER**

 1      A.   Yes.

 2      Q.   Okay.  And when it says "against an FM of

 3  96.1 million," what does that mean?

 4      A.   The 96.1 in the FM refers to the

14:00  5  performance target that was in the FM.

 6      Q.   Okay.  And the number 139.5 million NTE,

 7  what does that refer to?

 8      A.   So the 139.5 refers to the "not to exceed"

 9  number in the financial memorandum.

14:00 10      Q.   And what does the "not to exceed" number

11  mean?  What it sounds like?

12      A.   Not to --

13      Q.   This is the number --

14      A.   Not to exceed.

14:00 15      Q.   -- we don't want to exceed?

16      A.   So, as the SPA --

17      Q.   Yes.

18      A.   -- I'm -- I -- that's where I've got to

19  say, you know, if this is projecting greater than

14:00 20  that, we need to start thinking about a

21  supplemental FM.

22      Q.   And the last line of the E-mail text:  "If

23  such is the case we need to put together a

24  supplement FM pretty soon as this FM needs to be

14:01 25  approved by Andy Inglis."

**PURSUANT TO CONFIDENTIALITY ORDER**

201

```
 1              Did I read that correctly?

 2       A.  Yes.

 3       Q.  Who is Andy Inglis?

 4       A.  He was the CEO at the time for exploration

 5  and production.

 6       Q.  And why would, as of March 17th, 2010, a

 7  supplemental FM for the Macondo Well need to be

 8  approved by Andy Inglis?

 9              MR. KEEGAN:  Objection to form.

10       A.  Yeah.  The -- so Samina is -- is checking

11  on -- Hey, we need to start potentially -- do we

12  need to fart -- start thinking about a

13  supplemental FM?  And based on the numbers, she's

14  saying Andy will have to sign it because of the

15  authorization amount.  That's -- that's what I

16  believe here.  I -- I don't -- I should add I

17  don't know for sure what Andy's authorization

18  amount is or what triggers it having to go to Andy

19  but --

20       Q.  (BY MS. LAWRENCE)  Okay.  And do you

21  recall what the, quote, unquote, "current spend"

22  on the Macondo Well was as of March 22nd, 2010?

23       A.  No.

24       Q.  Okay.  Could you please turn to Tab 37,

25  which I also don't believe has previously been
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1     marked, so we will label that as Exhibit 6351?

2                  (Marked Exhibit No. 6351.)

3          Q.  (BY MS. LAWRENCE) The Bates number is

4     BP-HZN-2179MDL03074183.  This is an E-mail from

14:02  5     Mark Hafle.  The date is March 22nd, 2010, to a

6     number of individuals.

7                  It begins -- the first line is:

8     "All, current spend to date (all spend from

9     MARIANAS and HORIZON, including MOB, Mooring, lost

14:03  10    tools, etc.) is," a little squiggly line, "116MM."

11                 What does that indicate to you?

12         A.  Current spend is about 116 million.

13         Q.  Okay.  The next line reads:  "Projection

14    to finish the drilling portion of this well now

14:03  15    stands at ~ 38 days and $35MM."

16                 Did I read that correctly?

17         A.  Yes.

18         Q.  And what does that --

19         A.  And the squiggly means "approximately."

14:03  20         Q.  Okay.  And so what does -- what does that

21    sentence mean to you?

22         A.  It means probably need about another 38

23    days to -- to finish the well.  The drilling -- he

24    says the drilling portion of the well.

14:04  25         Q.  Okay.  And then the last line of that

**PURSUANT TO CONFIDENTIALITY ORDER**

1    E-mail reads:  "Total well cost approximately

2    $151MM, and running through end of April."

3              Is that an indication that as of the

4    day of this E-mail, March 22nd, 2010, the

14:04  5    projected total well cost is now up to 151

6    million?

7         A.  Yes.

8         Q.  Okay.  Thank you.

9              Can you please turn to Tab 38.  Also

14:04 10    an E-mail which I don't believe has previously

11    been marked.  So we'll label that as Exhibit 6352.

12              (Marked Exhibit No. 6352.)

13         Q.  (BY MS. LAWRENCE)  The Bates number is

14    BP-HZN-MBI00114418.  It's an E-mail dated

14:04 15    March 23rd, 2010, from Samina Sewani to yourself

16    and Gene Walton.  Who is Gene Walton?

17         A.  Right.  So Gene Walton is -- he's a -- I'm

18    just trying to think back on what position he had

19    at this particular time.  So Gene is a -- a

14:05 20    geoscientist in the deepwater GoM, and I can't

21    recall -- because he moved in -- the reason I'm

22    hesitating is that he was an interpreter, a

23    geoscientist.  And we moved him into a team leader

24    role, and I'm not sure of the timing on -- on that

14:05 25    in this particular document on why -- why it was

**PURSUANT TO CONFIDENTIALITY ORDER**

1    targeted towards him.

2        Q.  The text of the E-mail reads:  -- Samina

3    Sewani is writing:  "Just wanted to emphasize the

4    urgency of this request.  We are at 116M of actual

14:06  5    spend.  Our AFEs to co-owners is approved for 124M

6    and we need to give them 48 hours for any

7    supplemental approval.  We need to get the AFE out

8    to our partners so that we are not exposed if the

9    spend goes over 124M.  Thanks!  Samina."

14:06  10            Did I read that accurately?

11        A.  Yes.

12        Q.  Thank you.

13            Do you know what the reference is

14    to -- to an AFE to our partners?

14:06  15            MR. KEEGAN:  Objection to form.

16        Q.  (BY MS. LAWRENCE)  What does that mean?

17        A.  Yeah.  To get -- get a new estimate of

18    what it's going to take to finish the well.  And

19    so that's a document that goes within the AFE, and

14:06  20    we send that out to partners.

21        Q.  And who are the partners referred to here?

22        A.  The Anadarko and Mitsui.

23        Q.  Okay.  Did contributions of capital from

24    Mitsui and Anadarko assist with the drilling of

14:06  25    the Macondo Well?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              MR. KEEGAN:  Objection to form.

 2              MR. FITCH:  Objection to form.

 3              THE COURT REPORTER:  Who was that

 4    over there?

 5              MR. FITCH:  Fitch for Anadarko.

 6         A.  They're -- they were both paying partners

 7    in the well with BP.

 8         Q.  (BY MS. LAWRENCE)  And the -- the

 9    contributions of capital that came as a result of

10    their being paying partners in the Macondo Well,

11    did they assist with --

12         A.  Yeah, they were --

13              MR. FITCH:  Same objection to form.

14         Q.  (BY MS. LAWRENCE)  -- the drilling of the

15    well?

16         A.  Yes.  They were -- they were paying

17    partners under contract for -- for -- for the

18    well.

19         Q.  Do you think that the well would have been

20    drilled at the time that it was drilled without --

21    had BP not had the benefit of capital

22    contributions from its partners?

23              MR. FITCH:  Objection to form.

24              MR. KEEGAN:  Objection to form.

25         A.  I don't know.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

                    MR. KEEGAN:   A tableful of objections

that time.

        Q.   (BY MS. LAWRENCE)   Okay.

        A.   I don't know, I said.

14:08   5   Q.   Did the AFE that Samina Sewani refers to

in her E-mail need to be approved by the partners,

Anadarko and Mitsui?

        A.   Yes.

        Q.   Okay.  Can you please turn to Tab 39, an

14:08   10   E-mail that also, I believe, has not previously

been marked, so we will label that with Exhibit

No. 6353.

                    (Marked Exhibit No. 6353.)

        Q.   (BY MS. LAWRENCE)   The Bates number is

14:08   15   BP-HZN-MBI00114413, and the date is March 24 of

2010 at the top, although it is an E-mail chain,

containing several E-mails on different dates.

                    The second E-mail down in the chain

is an E-mail from yourself, dated March 23rd,

14:09   20   2010, to Gene Walton and Samina Sewani.  And I

just want to read the text of the E-mail.  It

says:  "Gene, we need to keep the NTE (not to

exceed) at or below 165M.  Going above this would

need SET approval.  Don't want to do that.

14:09   25   Thanks, Jay."

1          Did I read that accurately?

2          A.  Yes.

3          Q.  Okay.  Is this an indication that as of

4    March 23rd, 2010, you wanted the NTE amount to

14:09  5    stay at or below 165 million?

6          A.  Yes.

7          Q.  When you say, "Going above this would need

8    SET approval," what does that mean?

9          A.  The -- the SET is the Senior Executive

14:09  10   Team, and so -- what I'm referring to here is that

11   it goes through a whole long chain and it just

12   takes a lot longer to -- to get the FM and the AFE

13   through.  And if -- if people agree that 160- is

14   -- 165- is fine for an NTA, that's what -- and

14:10  15   NTE, that's what I would prefer it.

16         Q.  Okay.  And why -- when you write, "Don't

17   want to do that," why didn't you want to do that?

18              MR. KEEGAN:  Objection to form.

19         A.  Yeah.  Just -- just because of the timing.

14:10  20   That -- that's all.

21         Q.  (BY MS. LAWRENCE)  Okay.

22         A.  It just takes a long process to -- because

23   they only meet at certain times, and I don't know

24   how we -- it would have been difficult to get it

14:10  25   through in a timely fashion and because we were in

1    drilling at the time.

2         Q.  (BY MS. LAWRENCE)  Okay.  The top of the

3    E-mail -- the top of the E-mail chain is an E-mail

4    forwarding the E-mail you've written.  Gene Walton

14:11  5    forwards the E-mail you've written to Mark Hafle

6    on March 24th of 2010 and asks in one line of

7    text:  "Is the 1" -- "the $165M" -- 165 million --

8    "NTE OK?"

9              Did I read that accurately?

14:11 10         A.  Yes.

11         Q.  Why would Gene Walton ask Mark Hafle if

12    the 165 million NTE number was okay?

13              MR. KEEGAN:  Objection to form.

14         A.  Mark is the drilling engineer and is

14:11 15    following the costs.

16         Q.  (BY MS. LAWRENCE)  Okay.  Can you please

17    turn to Tab 40.

18              (Marked Exhibit No. 6354.)

19         Q.  (BY MS. LAWRENCE)  The Bates number is

14:11 20    BP-HZN-MBI00114433.  It's not previously been

21    marked, so we've labeled it Exhibit 6354.  This is

22    basically a continuation of the E-mail chain you

23    saw in Tab 39.  And we see one, two, three, four

24    E-mails down, Gene Walton's E-mail of March 24th

14:12 25    to Mark Hafle, asking:  "Is the 165M NTE OK?"

1          The next E-mail above it is one from

2    Mark Hafle to Gene Walton on March 24th, 2010,

3    apparently containing his answer.  Can you tell

4    us, please, what he says?

14:12  5               MR. KEEGAN:  Objection to form.

6         A.  So which one?  I'm sorry.

7         Q.  (BY MS. LAWRENCE)  The -- Mark Hafle's

8    response on -- also on March 24th, 2010, to Gene

9    Walton, in response to Gene Walton's question, "Is

14:12 10   the 165 million NTE OK?"

11        A.  He says, "I guess it will have to be

12   okay."

13        Q.  And then above that, there's an E-mail

14   from Gene Walton to Mark Hafle with one line on --

14:12 15   also on March 24th, 2010, with one line of the

16   text.  It says:  "Sabina says you can go to 167-

17   NTE" -- or "$167 NTE."

18               Is that an indication that as of

19   March 24th, 2010, the NTE amount is now

14:13 20   167 million?

21        A.  I don't know.

22        Q.  Okay.  Who is Sabina?

23        A.  It's a misspelling.  It should be Samina.

24        Q.  And who is Samina?

14:13 25        A.  She's a -- in the finance team under

**PURSUANT TO CONFIDENTIALITY ORDER**

        1   Xuemei Liu.  Is a financial analyst, and she

        2   quits -- she helps put together the FM's.

        3       Q.  Can you please turn to Tab 41, which is a

        4   document I also don't believe has previously been

14:13   5   marked as an exhibit.  The Bates number is BP --

        6                   MR. KEEGAN:  It probably has.

        7                   MS. LAWRENCE:  It probably has.  I

        8   don't know about this one or this version.  So,

        9   unfortunately, I'm just going to label it.  It's

14:14  10   BP-HZN-MBI00117224, and its title is Second

       11   Supplemental Authorization for Expenditure.  So

       12   it's now we're labeling this particular version as

       13   6355.

       14                   (Marked Exhibit No. 6355.)

14:14  15       Q.  (BY MS. LAWRENCE) Are you familiar with

       16   this document?  Do you recognize it?

       17       A.  Yes.

       18       Q.  What is it, generally speaking?

       19       A.  Well, it's the authorization for

14:14  20   expenditure of -- of -- basically, it says:

       21   "...includes additional funds to finish the

       22   drilling, evaluation, and abandonment of the

       23   Macondo exploration well as provided in the

       24   Original AFE and supplemental."  So it's asking

14:14  25   for authorization to expend more money to finish

the well.

Q.  Okay.  In the top left-hand portion of the document, does it indicate the date it was prepared?

14:14  A.  Yes.

Q.  What's that date?

A.  It looks like March 22nd, 2010.

Q.  Okay.  In the Project Description/Comments, I want to read the second -- two

14:15  sentences:  "The first Supplemental AFE was exceeded due to unexpected lost circulation and well control events resulting in earlier than planned setting of the 16 inch and 3 and five-eighths inch casing strings."

14:15       MR. KEEGAN:  13.

Q.  (BY MS. LAWRENCE)  13 and five-eighths casing string.

       Did I read that accurately?

A.  With the correction, yes.

14:15  Q.  And does that -- sorry.

       Does that sentence comport with your recollection of what happened with regard to the well?

       MR. KEEGAN:  Objection to form.

14:15  A.  Yeah.  I mean, that -- that's a summary

PURSUANT TO CONFIDENTIALITY ORDER

212

1  that they put into the -- into the -- into the

2  document.

3      Q.  (BY MS. LAWRENCE)  Did you have any reason

4  to disagree with it?

14:16  5      A.  I can't remember.

6      Q.  The next sentence reads:  "The well will

7  now require both the risked contingency liner

8  (11-7/8 inch) and one additional contingency liner

9  (9-7/8 inch) to reach planned TD."

14:16  10          Did I read that accurately?

11      A.  Yes.

12      Q.  Okay.  And again, did you have any reason

13  to disagree with that description included in this

14  document?

14:16  15      A.  No.

16      Q.  Okay.  Maybe 2 inches below that language

17  in the document, there's another section of the

18  document where it says "Partner Approval" and has

19  a check for "Yes" or "No."  Do you see that line?

14:16  20      A.  Yes.

21      Q.  And is it checked "Yes" or "No"?

22      A.  It's checked "Yes."

23      Q.  Thank you.

24          And it says "Company

14:16  25  Name/Nonoperator, MOEX Offshore 2007 LLC."

**PURSUANT TO CONFIDENTIALITY ORDER**

1                    Do you know what that's a reference

2        to?

3            A.   Mitsui.

4            Q.   Okay.  And what was your understanding of

14:17  5     the connection between MOEX Offshore 2007 LLC and

6        Mitsui?

7                         MR. KEEGAN:  Objection to form.

8            A.   I don't even -- I don't know the details

9        of that business relationship or entity.

14:17  10           Q.   (BY MS. LAWRENCE)  But --

11           A.   I don't know the details.

12           Q.   But you understood them to be essentially

13       well affiliated with Mitsui?

14                        MR. REYNOLDS:  Objection; form.

14:17  15           A.   Yeah.  Again, I do not know the business

16       relationship between those entities and -- and how

17       they're -- how they're put together.  My feeling

18       is they are signing for that partnership, though.

19           Q.   (BY MS. LAWRENCE)  Okay.  And then does

14:17  20     your name and signature also appear on this

21       document?

22           A.   It does.

23           Q.   Okay.  And do you recall, as you sit here

24       today, what the total spend, if you will, on the

14:18  25     Macondo Well was as of the date of April 8th,

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   2010?

 2        A.  I do not recall.

 3        Q.  Will you turn to Tab 42, please.

 4        A.  Yes.

 5              MS. LAWRENCE:  Which we'll label

 6   Exhibit 6356.

 7              (Marked Exhibit No. 6356.)

 8        Q.  (BY MS. LAWRENCE)  The Bates number is

 9   BP-HZN-MBI00123277.  It's an E-mail from Mark

10   Hafle to yourself, dated April 9th, 2010.  And

11   I'll read the first line of text.  It says:

12   "Through 4/8, the well has spent 130.9MM, of which

13   63MM was in 2010."

14              Does that refresh your recollection

15   as to what the total spend was on the Macondo Well

16   as of April 9th, 2010?

17        A.  Yeah.  I mean, based on Mark's estimation

18   it does refresh my recollection.

19        Q.  And how much?

20        A.  It looks like about 130.9 million.

21        Q.  Okay.  And does it indicate what the total

22   well cost expected is now as of April 9th, 2010?

23              MR. KEEGAN:  Objection to form.

24        A.  It says here the total well cost expected

25   is 146 million.
```

14:18  5
14:18  10
14:18  15
14:19  20
14:19  25

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  (BY MS. LAWRENCE)  Okay.  On the next line

2    of text below that, it reads:  "These costs assume

3    we TD today without further losses and we finish

4    logging around April 17.  There are four

14:19  5    additional days for TA work, including stack pull.

6    Completion specific work will be on Pompano's

7    AFE."

8              In a sense, "These costs assume we TD

9    today without further losses and we finish logging

14:19  10   around April 17," what does TD refer to?

11   A.  That means total depth.

12   Q.  Okay.  And do you know if the well -- if

13   they achieved total depth in the well without

14   further losses after that?

14:20  15   A.  I -- I don't know.  I -- I can't remember

16   where we were at on Friday, April the 9th, so I'm

17   not sure on that question.

18   Q.  Okay.  And he writes:  "...and we finish

19   logging around April 17.  There are four

14:20  20   additional days for TA work, including stack

21   pull."

22              So if they had finished or

23   anticipated finishing logging around April 17th,

24   four additional days would have taken us to what

14:20  25   date?

**PURSUANT TO CONFIDENTIALITY ORDER**

|  | |
|--|--|
| 1 | MR. KEEGAN:  Objection to form. |
| 2 | A.  17 plus 4 would be April 21st. |
| 3 | Q.  (BY MS. LAWRENCE)  When he says, |
| 4 | "Completion specific work will be on Pompano's |
| 14:20 5 | AFE," what does that mean? |
| 6 | MR. KEEGAN:  Objection to form. |

```
         1              MR. KEEGAN:  Objection to form.
         2         A.  17 plus 4 would be April 21st.
         3         Q.  (BY MS. LAWRENCE)  When he says,
         4   "Completion specific work will be on Pompano's
14:20    5   AFE," what does that mean?
         6              MR. KEEGAN:  Objection to form.
         7         A.  That means that this well was -- was
         8   designed to be a keeper well.  And if there's any
         9   work on -- I did -- don't know what the plan was,
14:21   10   but if there was any completion work com- --
        11   completing through the production casing to -- to
        12   produce the well, in a development case,
        13   Pompano -- the Pompano asset, which is a field
        14   within BP, as we talked about earlier today, they
14:21   15   would be -- the finances would be under Pompano
        16   and they would do the AFE's and the FM's and all
        17   of that.
        18         Q.  (BY MS. LAWRENCE)  Okay.  And was the
        19   Pompano -- was Pompano within Mark Hafle's area of
14:21   20   responsibility or authority?
        21              MR. KEEGAN:  Objection to form.
        22         A.  I don't know.
        23         Q.  (BY MS. LAWRENCE)  And was it within
        24   yours?
14:21   25         A.  So -- say that again.  So what was within
```

PURSUANT TO CONFIDENTIALITY ORDER

1      mine?  Sorry.

2          Q.  The Pom- -- what -- that -- what he refers

3      to, the Pompano.  Pompano's AFE --

4          A.  Pompano, yeah --

14:21  5    Q.  -- what you just described.

6          A.  Definitely not.

7          Q.  And could you turn, please, to Tab 43,

8      which is an E-mail.  It was actually admitted --

9      marked as an exhibit this morning and numbered

14:22  10   6332.  So I won't mark it again, but I did want to

11     ask you just a couple of additional questions

12     about it that were not asked this morning.

13         A.  Uh-huh.

14         Q.  The date of the E-mail appears to be April

14:22  15   13th of 2010; is that correct?

16         A.  Yes.

17         Q.  You write:  -- it's an E-mail from

18     yourself to Greg Walz.  "Greg" -- you write:

19     "Greg, could you rethink again on the Maui

14:22  20   pre-spud intangibles regarding shirts, activities,

21     misc" -- miscellaneous -- "gifts, team building

22     costs of 30-40K.  Does not look too good in an

23     'Every Dollar Matters' environment and the belt

24     tightening we have been doing here."

14:22  25             Did I read that accurately?

218

1      A.   Yes.

2      Q.   Okay.   What were you referring to when you

3  said in "Every Dollar Matters environment"?

4      A.   Yeah.   That was a -- that was a term that

14:23   5  was used in the Gulf of Mexico leadership up from

6  Neal Shaw, who was -- who was looking after --

7  well, I need to check.   I'm not sure Neal was

8  still there on April 13th.   But, anyway, it was --

9  it was a phrase that was being used to watch --

14:23  10  watch our spend and make sure that we had good

11  cost management in -- in the Gulf of Mexico.

12      Q.   Okay.   And then you refer to "the belt

13  tightening we have been doing here"?

14      A.   Yeah.

14:23  15      Q.   What belt tightening had been going on

16  that you're referring to there?

17      A.   Yeah.   That's -- that's really about

18  making sure that we don't have any silly costs and

19  bad costs, you know.   Because there are some costs

14:23  20  that are really good for your business that --

21  that you need to do and -- and spend wisely.   And

22  then there's some costs that are just not good.

23  And we need to drive those out of our business and

24  to -- to get -- to help maximize value for our

14:24  25  shareholders.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Okay.  And obviously in this E-mail,

2  you're referring to the Maui pre-spud, which is

3  not related to Macondo, correct?

4    A.  That is correct.

14:24  5           MR. KEEGAN:  Objection to form.

6    A.  That is correct.

7    Q.  (BY MS. LAWRENCE)  Okay.  But a different

8  project?

9    A.  That is correct.

14:24  10   Q.  But Gregory Walz, to whom you write the

11 E-mail, did he have any connection to the Macondo

12 project as far as you know?

13           MR. KEEGAN:  Objection to form.

14   A.  At this time, I don't know.

14:24  15   Q.  (BY MS. LAWRENCE)  Okay.  Thank you.

16           Could you turn please to Tab 44,

17 which has been previously marked as Exhibit 3227.

18 Also an E-mail chain.  The bottom E-mail is one

19 from yourself to David Rainey on -- dated

14:25  20 Wednesday, April 7th, 2010.  The subject is

21 "Macondo plan forward."  And the first paragraph,

22 you write:  "Dave, our recommendation is to drill

23 another 100 to 135 feet than TD, log and run

24 7-inch production casing.  We are not interested

14:25  25 in deepening to the secondary M54 target for the

```
 1   following reasons," which you proceed to list.

 2        A.  Yeah.

 3        Q.  Above that E-mail is a reply E-mail from

 4   David Rainey to yourself, also dated Wednesday,

 5   April 7th, 2010.  Same subject, "RE:  Macondo plan

 6   forward."  It states -- has one line of text,

 7   which states:  "Jay - you will need to be up front

 8   and clear with this at ops meeting tomorrow,

 9   Dave."

10             Did I read that correctly?

11        A.  Yes.

12             MR. KEEGAN:  The top E-mail.

13             THE VIDEOGRAPHER:  Five minutes.

14             MS. LAWRENCE:  All if it.

15             MR. KEEGAN:  You didn't read the

16   whole bottom E-mail.

17        Q.  (BY MS. LAWRENCE)  Well, the portions that

18   I read, did I read them correctly?

19        A.  Yes.

20             THE VIDEOGRAPHER:  Five minutes left

21   on the tape.

22             MS. LAWRENCE:  Thank you.

23        Q.  (BY MS. LAWRENCE)  Did you understand why

24   David Rainey advised you you would need to be up

25   front and clear with this opinion at the ops
```

14:25  5
14:25  10
14:26  15
14:26  20
14:26  25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
  1   meeting tomorrow?

  2               MR. KEEGAN:  Objection to form.

  3        A.  I -- I can't remember explicitly what Dave

  4   was referring to in -- in that one liner there.

14:26  5        Q.  (BY MS. LAWRENCE)  What is the -- do you

  6   know what the ops meeting is a reference to?

  7        A.  Yeah.  I believe it's the -- the Gulf of

  8   Mexico operations meeting that meets weekly.  I

  9   believe, it's weekly.

14:26 10               MS. LAWRENCE:  And we can take a

 11   break there and change the tape.

 12               THE VIDEOGRAPHER:  The time is

 13   2:26 p.m.  We're going off the record, ending

 14   Tape 5.

14:27 15               (Break from 2:26 p.m. to 2:40 p.m.)

 16               THE VIDEOGRAPHER:  The time is

 17   2:40 p.m.  Back on the record, beginning Tape 6.

 18        Q.  (BY MS. LAWRENCE)  Mr. Thorseth, when we

 19   left off, we were talking about Exhibit 3227, an

14:40 20   E-mail from David Rainey to yourself, dated April

 21   7, 2010, in which he states, "Jay, you will need

 22   to be upfront and clear with this at ops meeting

 23   tomorrow" -- a reference to your opinion expressed

 24   below in the E-mail -- "We are not interested in

14:41 25   deepening to the secondary M54 target for the
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1 following reasons."

2          I want to ask you:  Did you agree

3 with Mr. Rainey that you needed to be upfront and

4 clear with regard to your opinion on that at the

14:41 5 ops meeting the next day?

6      A.  I --

7          MR. KEEGAN:  Objection to form.

8      A.  Yeah, I -- I just don't remember, you

9 know, the context of his one-liner there or what I

14:41 10 was thinking at the time.

11      Q.  (MS. LAWRENCE)  So you don't recall why it

12 would have been necessary for you to be upfront

13 and clear with this particular opinion?

14          MR. KEEGAN:  Objection to form.

14:41 15      A.  I -- I'm just not sure.

16      Q.  (MS. LAWRENCE)  Did you attend the ops

17 meeting the following day?

18      A.  I don't remember.

19      Q.  So I suppose, then, you don't remember if

14:41 20 you, in fact, expressed this opinion at that

21 meeting?

22      A.  Yeah.  I -- I don't remember.  Correct.

23 Correct.  I don't remember.

24      Q.  Can you turn to Tab 45, also an E-mail I

14:42 25 don't believe was previously marked so we will

**PURSUANT TO CONFIDENTIALITY ORDER**

223

1    label it as Exhibit 6357.  The Bates number is

2    BP-HZN-2179MDL00014402.  It's an E-mail from

3    yourself to David Rainey, dated April 14, 2010.

4    The subject is "Macondo Deepening Recommendation,"

14:42  5    and I just want to read the first line of the

6    E-mail.  You write, "Dave, I do not recommend

7    deepening the Macondo Well for the M54 package or

8    O90."

9                    (Marked Exhibit No. 6357.)

14:43  10         Q.  (BY MS. LAWRENCE)  Did I read that

11    accurately?

12                    MR. KEEGAN:  No.

13                    MS. LAWRENCE:  No?

14                    MR. KEEGAN:  O90.

14:43  15                    MS. LAWRENCE:  It's O90.  It's not

16    zero. Sorry.

17         Q.  (BY MS. LAWRENCE)   "I do not recommend

18    deepening the Macondo Well for the M54 package or

19    the O90."

14:43  20                    Did I read that accurately?

21         A.  Yes.

22         Q.  Do you recall why, on April 14, seven days

23    after the date of your last E-mail to Dave Rainey

24    on this topic, you are still arguing to him your

14:43  25    opinion that you do not recommend deepening the

1    Macondo Well for the M54?

2              MR. KEEGAN:  Objection to form.

3         A.  Yeah.  There was -- there was a lot of,

4    still, questions out there as to the reason to --

14:43  5    to stop drilling.  And as testified or talked

6    about earlier, when I recommended the well at the

7    exploration forum, we had talked about this M54 or

8    down to the O90 level about TD past M54, maybe

9    into the O90.  So it -- from what I remember is

14:44 10    it -- there were some questions came up and people

11    were asked, Hey, why don't you have a peer assist?

12    Why don't you have XX take a look -- Exploration

13    Excellence take a look at it.  And so I think

14    over -- I believe over those days that you're

14:44 15    talking about there was -- people came in and had

16    a look, to have an independent view to kind of

17    say, Hey, is this the right thing to do?

18              And so, indeed, that -- that's what

19    happened.  There's XX's summary there.  Terry

14:44 20    Fitzpatrick is a senior explorer.  Mick Casey is

21    another senior explorer.  So they came in and did

22    a peer assist -- what we call a peer assist, look

23    at it from a technical standpoint.  And they --

24    they basically are saying, Yeah, you know, it

14:44 25    doesn't look like the right thing to do from a

 1    subsurface technical basis to continue this well

 2    on down.

 3         Q.   (BY MS. LAWRENCE) And can you turn to

 4    Tab 47, please, which was marked this morning as

14:44  5   Exhibit 6333, so I will not mark it again.  But I

 6    want to ask you a couple of additional questions

 7    about it.  I want to direct your attention to the

 8    E-mail three E-mails down in the chain.  So just

 9    below -- just beyond halfway down the page.  The

14:45 10   text -- it's an E-mail from Nick Huch, whose

11    E-mail address is nick.huch@anadarko.com.  Do you

12    know who he was -- is?

13         A.   I believe he's a land person for Anadarko.

14         Q.   It's also cc'd to Naoki Ishii.  Do you

14:45 15   know who he is?

16         A.   He's the Mitsui representative in -- in

17    Houston.

18         Q.   The text reads:  "This E-mail will

19    evidence Anadarko's approval to conclude the

14:45 20   drilling of the MC 252 No. 1 BP 01 well (Macondo)

21    at its current TD of 18,360 feet MD, even though

22    the well has not reached any of the 'objective

23    depth' criteria defined in the well participation

24    agreement between BP and Anadarko/Kerr McGee and

14:46 25   in Well AFE, attached as Exhibit 'B' to said

**PURSUANT TO CONFIDENTIALITY ORDER**

1    agreement.  However, in the event BP concludes

2    that it is safe and prudent to continue drilling

3    to original objective depth, Anadarko would not

4    oppose to BP doing so."

14:46  5              Did I read that correctly?

6         A.   Yes.  Yes.

7         Q.   Was it your impression that Anadarko would

8    have preferred for BP to continue drilling to a

9    greater depth?

14:46 10              MR. FITCH:  Objection to the form.

11        A.   I -- I don't know.

12        Q.   (BY MS. LAWRENCE)   You didn't have an

13   opinion -- or an -- you didn't form an impression

14   of that view one way or the other?

14:46 15              MR. FITCH:  Objection to form.

16        A.   I don't -- I don't know what Anadarko's

17   internal position was for sure.

18        Q.   (BY MS. LAWRENCE)  Did any representatives

19   from Anadarko or Mitsui discuss this topic with

14:47 20   you?

21              MR. FITCH:  Objection to form.

22        A.   Not that I can recall.

23        Q.   (BY MS. LAWRENCE)  How -- when this E-mail

24   was ultimately forwarded to you, how did you

14:47 25   interpret this passage, if at all?

PURSUANT TO CONFIDENTIALITY ORDER

```
 1          A.   From -- from Nick Huch?

 2          Q.   Yes.

 3          A.   That they agreed to TD the well and saying

 4     that, you know, if we wanted to, they -- they

 5     potentially would support drilling deeper.

 6          Q.   If I can have just a moment.

 7               MS. LAWRENCE:  Thank you,

 8     Mr. Thorseth, I appreciate your time.  I don't

 9     have any other questions for you, and the U.S.

10     will cede any of our remaining time to Anadarko.

11               THE VIDEOGRAPHER:  The time is

12     2:47 p.m.  We're off the record.

13               (Break from 2:47 p.m. to 2:59 p.m.)

14               THE VIDEOGRAPHER:  The time is

15     2:59 p.m.  We're back on the record, beginning

16     Tape 7.

17               E X A M I N A T I O N

18     BY MR. KRAUS:

19          Q.   Mr. Thorseth, my name is Doug Kraus.  I

20     represent the State of Louisiana in this matter

21     and I just have a few questions for you.  I'm

22     going to be jumping around though, based upon some

23     answers that you gave previously.

24               First, I'd like to show you what's

25     previously been marked has Exhibit No. 6355.  You
```

14:47 5
14:47 10
14:59 15
14:59 20
15:00 25

**PURSUANT TO CONFIDENTIALITY ORDER**

1    just looked at it a few minutes ago.  It's a

2    "Second Supplemental Authorization For

3    Expenditure," dated March 22, 2010.

4        A.   Okay.

15:00    5        Q.   You're familiar with that document.  You

6    just looked at it a few moments ago.  Do you know

7    why Anadarko is not on that?

8        A.   No, I don't know.

9        Q.   Okay.  That's all I have for that one.

15:00   10             Next, if -- well, let me go -- this

11   morning, you testified as to six technical

12   aspects, and I think that was related to whether

13   to move forward with the prospect; is that

14   correct?

15:00   15        A.   Yeah.  It -- it's about the evaluation of

16   a prospect, yes.

17        Q.   And I tried to write all six down, but I

18   don't think I was quick enough.  Could -- can you

19   go over those just real briefly?

15:01   20        A.   Sure.  Yes.

21             So source presence.

22        Q.   Uh-huh.

23        A.   And then a combination of source migration

24   pathway and what we call access to the source.

15:01   25        Q.   Is that one or two?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        A.   It's one.

 2        Q.   It's one?

 3        A.   Yeah.

 4             So source presence and then -- and

 5     then access or migration pathways, same thing.

 6             And then reservoir presence.

 7        Q.   Okay.

 8        A.   And then reservoir quality.

 9        Q.   Okay.

10        A.   And then trap.

11        Q.   Okay.

12        A.   And then seal.

13        Q.   All right.  Is there any factor related to

14     the potential risks that developing that -- that

15     well might lead to, like a risk of a blowout or --

16     well, for instance, a risk of a blowout?

17             MR. KEEGAN:   Objection to form.

18        A.   Yeah.  The -- from those risks?

19        Q.   (BY MR. KRAUS)   Yeah, from you -- the six

20     technical aspects that you gave me as to whether

21     or not to go forward with the prospect, does risk

22     of developing the well, a risk of complications in

23     developing the well, play into any of the -- any

24     of those aspects?

25        A.   Those --
```

**PURSUANT TO CONFIDENTIALITY ORDER**

          1            MR. KEEGAN:  Objection to form.

          2       A.  Those six risks in the context that I'm

          3   referring to them --

          4       Q.  (BY MR. KRAUS)  Six aspects?

15:02     5       A.  -- those -- those six risk elements --

          6       Q.  Okay.

          7       A.  -- I'm referring to are focused on the

          8   prospect itself.

          9       Q.  Okay.

15:02    10       A.  And they're -- it's not -- the context is

         11   not focused on drilling safety or -- or

         12   operational risks or operational safety.

         13       Q.  Okay.  If I understood your testimony

         14   earlier today, you were never involved in any

15:02    15   calculations of flow rate; is that correct?  Post

         16   4-20-10?

         17       A.  Yeah.  That -- you know, I -- I -- I did

         18   not work on flow rate calculations.

         19       Q.  Okay --

15:03    20            MR. KEEGAN:  Just for the record --

         21   for the record today, the client -- the witness

         22   has had a tendency to -- to start his answers with

         23   "yeah" and then give the answer to that.  I don't

         24   want any dispute later on when we go back into the

15:03    25   record, if he gives a complete, multi sentence

       1   answer, that that "yeah" is any kind of

       2   affirmative answer.

       3               MR. GODWIN:  Well, the transcript is

       4   going to read --

15:03  5               MR. KRAUS:  The record will speak for

       6   itself.

       7       Q.  (BY MR. KRAUS)  Do you know Dave Epps?

       8       A.  Yes.

       9       Q.  And what is his -- is he a BP employee?

15:03  10      A.  Not anymore.  He retired.

      11       Q.  Okay.

      12       A.  But he -- he's formerly a BP employee, a

      13   wells bore engineer.

      14       Q.  Okay.  Do you -- are you aware one way or

15:03  15   another whether he ever did any calculations of

      16   flow rate?

      17       A.  So what -- what flow rate -- there's

      18   lots --

      19       Q.  Yes.

15:03  20      A.  -- of different types of flow rates and

      21   everything.  So I -- I -- I think I need to be

      22   really clear --

      23       Q.  Okay.

      24       A.  -- on what you're referring to as "flow

15:03  25   rate."

PURSUANT TO CONFIDENTIALITY ORDER

1      Q.  Okay.  I'm referring to the amount of oil

2  that's coming off of that -- that came out of the

3  Macondo Well post 4-20-10?

4      A.  Yeah, okay.  And -- okay.  So I don't

15:04  5  know.  And to clear up my own response, I was not

6  involved in anything like that.

7      Q.  Okay.  You also testified earlier today

8  that you were involved and recommended calling

9  total depth on the Macondo Well at -- I wrote down

15:04 10  18,360 feet, even though I just heard somebody

11  else use a different calculation --

12      A.  665?

13      Q.  -- or a different figure?

14          What is it?

15:04 15          MR. KEEGAN:  Objection to form.

16      A.  Yeah, I'm not sure of the exact depth.

17  But, anyway, yes, I was involved definitely in --

18  in calling TD.

19      Q.  (BY MR. KRAUS)  Do you recall the

15:04 20  approximate date that you called -- that you

21  recommended that TD be called?  It was in April of

22  2010?

23      A.  Yeah.  Yeah, it was in April.  I don't

24  know the exact date.

15:04 25      Q.  And you -- did you -- were you -- did you

233

1    have the ultimate decision-making authority in

2    that regard to call total depth?

3         A.  I was a rec- --

4              MR. KEEGAN:  Objection to form.

15:05 5         A.  I was a recommender.

6         Q.  (BY MR. KRAUS)  Okay.  And you recommended

7    to who?

8         A.  To Dave Rainey.

9         Q.  And Dave Rainey recommended to Mike Daly;

15:05 10   is that right?

11        A.  Well, I think Dave alerted Mike Daly, and

12   then Mike Daly came back with a response saying,

13   Let's check out some more work potentially.

14              But Dave -- Dave -- I recommended to

15:05 15   Dave.

16        Q.  Okay.  And I think you kind of went to

17   where I want to go.  Did -- did Mr. Daly

18   originally agree with your recommendation to call

19   total depth when you first recommended it?  Or did

15:05 20   he ask that more work go into that decision?

21              MR. KEEGAN:  Objection to form.

22        A.  Yeah, see, I don't recall because Dave had

23   the conversation with Mike, which I don't think I

24   was a part of.  So I don't -- I'm not sure how

15:05 25   that interaction -- interaction went.

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.  (BY MR. KRAUS)  Okay.

2    A.  So I'm not --

3    Q.  Were you ever aboard the DEEPWATER

4    HORIZON?

15:05  5    A.  Yes, I have been on -- on the DEEPWATER

6    HORIZON.

7    Q.  When were you on the DEEPWATER HORIZON?

8    A.  I can't remember specifically.

9    Q.  Were you on the DEEPWATER HORIZON when it

15:06  10   was drilling the Macondo Well?

11   A.  I don't think so.

12   Q.  Do you remember in what context or in what

13   circumstance you were on the -- on the DEEPWATER

14   HORIZON?

15:06  15   A.  Excuse me.  So when I -- when I was on the

16   DEEPWATER HORIZON, I would go with a -- a drilling

17   engineer or a drill- -- drilling manager, and

18   we -- we would go out there to talk about safety

19   and, you know, what -- and I would usually

15:06  20   communicate what, kind of, was the plan for some

21   of the wells down -- down the road.  And then

22   sometimes, when I was out there, thanked them for

23   their -- for their efforts.

24   Q.  Okay.  Do you know where the DEEPWATER

15:06  25   HORIZON was headed after -- after 4-20-10?  After

**PURSUANT TO CONFIDENTIALITY ORDER**

         1    it completed drilling the Macondo?

         2         A.   I -- I believe it was going to Kaskida,

         3    but I'm not certain on that.

         4         Q.   Okay.  And that's obviously a well in the

15:07    5    Gulf of Mexico?

         6         A.   That's a field --

         7         Q.   Okay.

         8         A.   -- in -- in the Gulf of Mexico.

         9         Q.   Okay.  Do you know when it was scheduled

15:07   10    to arrive at that well?

        11              MR. KEEGAN:  Objection to form.

        12         A.   I -- I don't remember.

        13         Q.   (BY MR. KRAUS)  Okay.  Were you

        14    interviewed related to the Bly -- preparation of

15:07   15    the Bly report?

        16              MR. KEEGAN:  Objection to form.

        17         A.   Yeah.  Not -- not -- not specifically for

        18    the Bly report that I can -- that I can recall.

        19         Q.   (BY MR. KRAUS)  Did you prepare any

15:07   20    portion of the Bly report?

        21         A.   No.

        22         Q.   When you say that you weren't specific --

        23    you said that you weren't specifically interviewed

        24    related to the Bly report.  Were you interviewed

15:07   25    in -- in any capacity after 4-20-10 related to --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    I guess -- I guess I'm trying to figure out

2    what -- you're saying not specifically related to

3    the preparation of the Bly report.

4         A.   Yeah.

15:08  5         Q.   What do you mean?

6         A.   All I mean is that someone from the Bly

7    team didn't come over and sit down with me and say

8    officially, You are -- this is an interview for

9    the Bly report, Jay Thorseth, go.  And here's

15:08  10   questions and answers.

11              But did I -- I have conversations

12   with drilling engineers and things like that.  And

13   whether they took any of my information and put it

14   in there, I don't know.  So that' -- that's why I

15:08  15   was -- I was kind of trying to -- to clarify.

16        Q.   Okay.  Who -- do you recall who the

17   drilling engineers were?

18        A.   Yeah.  I've -- I've talked to -- well,

19   lots of -- lots of drilling engineers.

15:08  20        Q.   Specifically related to the Macondo

21   incident -- or the DEEPWATER -- explosion on the

22   DEEPWATER HORIZON?

23        A.   Yeah, I don't know -- I don't know exactly

24   who -- who did the -- was on the Bly team and --

15:09  25   and was leading the report.  But....

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  Okay.  Who -- tell me who you recall

2  being -- or who you recall these conversations

3  with, the individuals?

4      A.  So -- yeah.  You know, shortly thereafter,

15:09  5  I -- I had conver- -- about -- about what?  So I'm

6  sorry.

7      Q.  About the -- the incident of 4-20-2010?

8      A.  So, drilling engineers?

9      Q.  Yes.

15:09  10      A.  So I had -- you know, I talked to Mark

11  Hafle.  I talked to John Guide, David -- this is

12  all post, you know.

13      Q.  Okay.

14      A.  David Sims, Mike Zangy, Scott Siegerton,

15:09  15  Steve Hayden and people like that.

16      Q.  Was anybody taking notes at these meetings

17  or interviews?

18      A.  Well, they weren't -- I wouldn't call them

19  interviews.

15:09  20      Q.  Okay.

21      A.  They weren't interviews.  They were all

22  conversations --

23      Q.  Okay.

24      A.  -- around the water cooler, informal

15:10  25  meetings, you know, just like that.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Okay.

2    A.   Just --

3    Q.   Did you work in the same office as those

4  gentlemen?

15:10    5    A.   In the same building, yeah, as some of

6  them.

7    Q.   And what's that, Westlake?

8    A.   Westlake 4.

9    Q.   Westlake 4, okay.

15:10    10           And I know you've been asked this

11  question a number of times.  I just want to be

12  clear:  You do not know anything about what BP's

13  intentions, related to the Macondo 252, are?

14           MR. KEEGAN:  Objection to form.

15:10    15    Q.   (BY MR. KRAUS)  Future intentions of

16  exploring it or developing it?

17    A.   That's correct.

18    Q.   Okay.  Have you read the Bly report?

19    A.   I -- I have gone over the Bly report.

15:10    20  Yeah.

21    Q.   And you've read it word for word?

22           MR. KEEGAN:  Objection to form.

23    A.   Well, I've -- I've -- I've read the

24  report.

15:10    25    Q.   (BY MR. KRAUS)  Okay.  Do you agree with

**PURSUANT TO CONFIDENTIALITY ORDER**

239

```
 1    all of its findings?
 2         A.  I -- I think it's a very robust report.
 3         Q.  Do you agree with all of it's findings?
 4         A.  I think -- yeah, I think -- yeah, I --
 5    I -- I agree with its findings.  It's a good
 6    report.
 7         Q.  Okay.  Were there any members of your team
 8    that were aboard the DEEPWATER HORIZON as it
 9    drilled the Macondo Well?
10         A.  So, my team --
11         Q.  The geologists.  You -- you -- you said
12    that you had a team of geologists that worked
13    under you?
14         A.  Well, I have team leaders.
15         Q.  Okay.
16         A.  And then they have folks under --
17    underneath them.
18         Q.  Okay.
19         A.  So are you referring to my team or the
20    managers --
21         Q.  I'm --
22         A.  -- or just anyone in, kind of, my
23    organization.
24         Q.  Anyone in your -- well, we can start with
25    your -- the team leaders that worked underneath
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    you.
 2         A.  Yes.  I -- I can't recall if Brian Ritchie
 3    had made a visit out there.  I -- i don't think he
 4    did, but I'm not --
 5         Q.  And what's Brian's position?
 6         A.  Brian was the team leader for the eastern
 7    team that matured the Macondo prospect.
 8         Q.  Okay.
 9         A.  So I don't believe Brian got out there but
10    I'm not sure.  I don't think Rob Satter, who is in
11    the central team, I don't think he went out there.
12    And Jacek Jaminski didn't.  The other team members
13    that directly -- that reported to me, I don't
14    believe, went out to the rig.
15         Q.  And then you -- you can correct me if I'm
16    wrong -- did Tiger team work under you; is that
17    correct?  In some capacity?
18         A.  Yeah.  It's -- it's a bit complicated and
19    I tried to clarify that earlier.  The Tiger team
20    reported to me up to first part of April and
21    then --
22         Q.  April 2010?
23         A.  Yeah, sorry, April 2010, yeah.
24              And then at that point, they reported
25    to Dave Rainey, vice-president.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        Q.   Okay.
 2        A.   Pinky -- Pinky Vinson reported on his team
 3   then.
 4        Q.   Okay.  Were any of the members of the
15:13  5   Tiger team ever aboard the DEEPWATER HORIZON, to
 6   your knowledge?  As of -- when it was drilling the
 7   Macondo Well?
 8        A.   Any time during that?
 9        Q.   Yeah.
15:13 10        A.   I don't know.  May- -- potentially, Bobby
11   Bodek.
12             MR. KRAUS:  Well, I think those are
13   all the questions I have.  I thank you very much
14   for your time.
15:13 15             THE WITNESS:  Okay.
16             MR. KEEGAN:  Thank you.
17             THE VIDEOGRAPHER:  The time is
18   3:13 p.m.  We're going off the record.
19             (Break from 3:13 p.m. to 3:21 p.m.)
15:19 20             THE VIDEOGRAPHER:  The time is
21   3:21 p.m.  We're back on the record, beginning
22   Tape 8.
23                  E X A M I N A T I O N
24   BY MR. GODWIN:
15:21 25        Q.  Good afternoon, Mr. Thorseth.  How are
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    you, sir?

2         A.   I'm fine, thanks.

3         Q.   Good.   We met a few moments ago here just

4    before the start of your deposition, did we not?

15:22  5       A.   Yes.

6         Q.   Or my part of it.

7              And my name is Don Godwin, and I do

8    represent Halliburton.   And I'm accompanied here

9    this afternoon, in your deposition, by my

15:22  10   associate Stephanie Majors seated to my right.

11             You've never discussed any part of

12   any of the matters pertaining to the DEEPWATER

13   HORIZON and the Macondo Well with Stephanie and/or

14   me, have you?

15:22  15      A.   Correct, I have not.

16        Q.   We have never met before?

17        A.   Correct.

18        Q.   Okay.   As I understand it, at the time --

19   and you correct me if I'm wrong.   At the time of

15:22  20   the blowout, you were Exploration manager for the

21   Deepwater GoM; is that correct?

22        A.   That is correct.

23        Q.   Okay.   And during the drilling of the

24   well, the Macondo Well, did you receive daily --

15:22  25   daily updates about the well, including pore

**PURSUANT TO CONFIDENTIALITY ORDER**

1    pressure determinations?

2         A.   I don't know specifically.   I got daily

3    updates --

4         Q.   Okay.

15:22  5         A.   -- on these one-liners.

6         Q.   All right.

7         A.   And whether sometimes those included pore

8    pressure updates, it's possible, but I don't

9    remember.

15:23 10         Q.   Well, you did from time to time receive

11    reports that included pore pressure information,

12    did you not?

13              MR. KEEGAN:   Objection to form.

14         A.   Well, that's what I mean.   I'm -- I --

15:23 15    possibly, but I don't remember specifically

16    E-mails, or whatever, to say that issue.

17         Q.   (BY MR. GODWIN) Do you remember at any

18    time prior to the blowout while you served as the

19    Exploration manager for the Deepwater GoM

15:23 20    receiving any reports from anyone at BP that

21    included reports that contained information about

22    pore pressure and the Macondo Well?

23         A.   It's possible.

24         Q.   Okay, sir.   And -- and I believe you

15:23 25    testified earlier that you were aware that there

```
 1   were two kicks there on the well prior to the

 2   blowout, correct?

 3        A.  Correct.

 4        Q.  Okay.  And I understood you to say that

 5   while you didn't know exactly how many barrels of

 6   mud had been lost, you knew there were losses of

 7   mud there in the well during the drilling of the

 8   well.  Did I understand that correctly?

 9        A.  That is correct.

10        Q.  And do you remember, Mr. Thorseth, about

11   how early in the year of, say, 2010 was it that

12   you learned in that year that the well was

13   experiencing losses of mud?

14             Was it in the January, February,

15   March time frame, in 2010 only?

16             MR. KEEGAN:  Objection.

17        A.  I do not remember specifically.

18        Q.  (BY MR. GODWIN)  Okay.  Did you hear from

19   anyone with BP prior to the blowout that the

20   Macondo Well had lost thousands of barrels of mud

21   during the drilling of it over the life of the

22   well prior to the blowout?

23        A.  Yeah.  I don't -- I don't remember.

24        Q.  If I were to tell you the testimony has

25   been elicited and offered that there was -- the
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
  1   losses of at least 15,000 barrels of mud prior to

  2   the blowout, would that refresh your memory about

  3   the number of barrels of mud that were purportedly

  4   lost?

  5              MR. KEEGAN:  Objection to form.

  6        A.  Yeah, I don't remember specific numbers.

  7        Q.  (BY MR. GODWIN)  Okay.  Do you know

  8   general -- do you remember general numbers?

  9              MR. KEEGAN:  Objection to form.

 10        Q.  (BY MR. GODWIN) Was it in the thousands of

 11   barrels or hundreds, if you recall?

 12        A.  Yeah, I don't know.

 13        Q.  Okay.  You just don't recall?

 14        A.  I don't -- I don't remember.

 15        Q.  Did you ever receive any information from

 16   anyone at BP that would set forth the losses of

 17   mud that the well was experiencing?

 18        A.  It's possible, but I don't remember

 19   specifically getting any E-mail or correspondence

 20   regarding that.

 21        Q.  Regarding the losses of mud?

 22        A.  Correct.

 23        Q.  Did you receive any E-mails from anyone at

 24   BP regarding one or both of the kicks?

 25        A.  Yeah.  I believe that in the -- you know,
```

15:25  (line 5)
15:25  (line 10)
15:25  (line 15)
15:25  (line 20)
15:25  (line 25)

**PURSUANT TO CONFIDENTIALITY ORDER**

| | |
|---|---|
| 1 | in that one-liner update -- |
| 2 | Q.  Yes, sir. |
| 3 | A.  -- that I would get, I believe there was |
| 4 | references in -- in those regarding -- because |
| 15:26  5 | they would have let me know on, hey, there are |
| 6 | losses occurring.  I don't know about the number. |
| 7 | Q.  Right. |
| 8 | A.  But losses and kicks, yeah. |
| 9 | Q.  Okay.  And the one liner that you |
| 15:26  10 | received, was that something you received by |
| 11 | E-mail? |
| 12 | A.  Yes. |
| 13 | Q.  Okay.  And -- and those E-mails, were they |
| 14 | all saved onto your computer, where they all came |
| 15:26  15 | into your computer there at BP? |
| 16 | A.  Yeah.  They came on the computer.  In |
| 17 | fact, they were kind of on top of each other so |
| 18 | there was a whole history -- |
| 19 | Q.  Okay. |
| 15:26  20 | A.  -- of one. |
| 21 | Q.  Who sent those E-mails to you? |
| 22 | A.  That was Chuck Bondurant. |
| 23 | Q.  And -- B-O-N-D-U-R-A-N-T, Bondurant? |
| 24 | A.  I think so, Chuck Bondurant. |
| 15:26  25 | Q.  Okay. |

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.   Charles Bondurant.

2          Q.   All right.  And what -- did he report to

3      you?

4          A.   He reported to Bryan Ritchie.

15:26  5          Q.   And Mr. Ritchie reported to you?

6          A.   That is correct.

7          Q.   Okay.  What was the purpose of your

8      receiving on a daily basis the one liner regarding

9      the Macondo Well?

15:26  10          A.   Yeah.  As I think I had testified early --

11      earlier today, is that it was nice having that

12      30-second summary.  I could -- I could look at it

13      and have a quick view of what -- what the status

14      of the well was, for example, what depth it was

15:27  15      at, and then the basics of -- excuse me -- what

16      operations might be occurring if it was in the

17      E-mail.

18              And then if I were asked by

19      superiors, Dave Rainey or -- or Mike Daly or

15:27  20      whatever, say, Hey, what -- what -- what's the

21      latest depth on Macondo, then I would have

22      something very quick to go back to.  I'd have -- I

23      would have a depth recollection, and I could say,

24      Well, they're at 10.1.

15:27  25          Q.   Prior to the blowout, the day of the

PURSUANT TO CONFIDENTIALITY ORDER

1    blowout, did you ever have any discussions with

2    John Guide regarding the -- the Macondo Well?

3         A.   Yeah.  I -- I don't recall specifically

4    the conversations, but, yeah, I would guess that I

15:28 5    had conversations with John.

6         Q.   Did -- at any time when you visited with

7    Mr. Guide prior to the day of the blowout, did he

8    ever express to you any concerns that he had about

9    the -- about the Macondo Well?

15:28 10         A.   What do you mean by "concerns"?

11         Q.   What -- kicks, losses, problems with the

12    well, pore pressure.  Did he discuss anything with

13    you that you perceived as a concern on his part

14    about the operations and the drilling there of the

15:28 15    Macondo Well?

16         A.   About --

17              MR. KEEGAN:  Objection to form.

18         A.   About potentially going -- drilling ahead

19    or -- continuing on?

15:28 20         Q.   (BY MR. GODWIN)  Yes, sir.

21         A.   Yeah, I don't recall the -- any

22    conversation.

23         Q.   All right.

24         A.   I don't know for sure.

15:28 25         Q.   I'm sorry, sir.  I apologize.  Had you

1    finished?

2         A.   Yeah, not for -- not sure.

3         Q.   Okay.  I apologize for overstepping you.

4         A.   No problem.

15:28  5         Q.   Now, with regard to prior to the blowout,

6    the day of the blowout, did you have any

7    conversations with David Sims about any issues

8    that he perceived there on the Macondo Well?

9         A.   It would be the same as Mr. Guide.

15:29 10         Q.   Did you learn at any time prior to the

11   blowout that there were issues between David Sims

12   and John Guide and their working relationship?

13              MR. KEEGAN:  Objection to form.

14        A.   I don't -- I don't know about the

15:29 15   relationship.

16        Q.   (BY MR. GODWIN)  You weren't aware that

17   there were issues between them?

18              MR. KEEGAN:  Objection to form.

19        A.   I have no idea about any issues.

15:29 20        Q.   (BY MR. GODWIN) Nobody ever discussed that

21   with you?

22        A.   No.

23              MR. KEEGAN:  Objection to form.

24        Q.   (BY MR. GODWIN)  Okay, sir.

15:29 25        A.   Not that I can recall.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          Q.   (BY MR. GODWIN)  All right, sir.  Thank

2     you.  You said you read the Bly report and you

3     agreed with all of its findings.

4               MR. KEEGAN:  Objection to form.

15:29    5          Q.   (BY MR. GODWIN)  Is that correct?

6          A.   That -- that I can remember, yes.

7               MR. GODWIN:  What's the objection,

8     Counsel?

9               MR. KEEGAN:  Mischaracterizes his

15:29   10    testimony about --

11              MR. GODWIN:  That's exactly what he

12    said, was that he read the Bly report --

13              MR. KEEGAN:  It was the

14    recommendations.

15:29   15              MR. GODWIN:  -- and all -- okay.

16         Q.   (BY MR. GODWIN)  Did you also agree with

17    all the findings of the Bly report?

18         A.   Well, it was -- it was a long report, and

19    I'm -- you know, I should say I'm not qualified as

15:29   20    an engineer.  I didn't do the investigation and --

21    and I'm not qualified to agree or disagree with

22    the Bly report, all of the aspects of it.  For me,

23    the Bly report was more of a learning of -- of

24    what -- what happened.

15:30   25         Q.   Did you read any part of the Bly report,

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1    and did you disagree with anything you read in
 2    that report?
 3                    MR. KEEGAN:  Objection to form.
 4         A.  Not that I can recall.
 5         Q.  (BY MR. GODWIN)  Thank you, sir.  Other
 6    than what you read in the Bly report -- to the
 7    extent you did -- about the cement job my client
 8    performed there, Halliburton, did you have any
 9    knowledge about the design of the foam cement
10    slurry there on the Macondo Well?
11         A.  No.
12         Q.  Did you have any -- any knowledge about
13    the execution by Halliburton of the foam cement
14    slurry there on the Macondo Well?
15         A.  No.
16         Q.  Did you have any knowledge of the mud
17    logging services provided by Halliburton-Sperry on
18    the Macondo Well other than what you read on the
19    Bly report?
20         A.  It just described the services.
21         Q.  The mud logging services.
22         A.  Right, but what about them?
23         Q.  Yeah.  In other words, did you know
24    anything about the mud logging services my client
25    was providing there on the Macondo Well other than
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    what you read in the Bly report?

2         A.  Or knowing that, yeah, Halliburton was out

3    there doing the mud logging, yeah.  So, other than

4    that, no.

15:31  5     Q.  Okay, sir.  And how about the negative

6    test?  Did you have any knowledge or -- strike

7    that.

8              Do you have any knowledge, other than

9    what you read in the Bly report, about the

15:31 10   negative test or tests that were performed there

11   on the Macondo Well before the blowout?

12        A.  No, I did -- I wasn't aware of any issues

13   or -- or -- about that.

14        Q.  Did you, after the blowout, discuss with

15:31 15   anyone with BP whether or not one or both of the

16   negative tests that were performed prior to the

17   blowout were, in fact, a good test?

18        A.  So -- yeah, I -- I don't --

19        Q.  After the -- after the blowout.

15:32 20        A.  Yeah.  Yeah.  About whether they were good

21   or -- or not, yeah.

22        Q.  Right.  You understand the question?

23        A.  Yes.  So I did -- before I went to the

24   exploration forum, I did have a conversation with

15:32 25   Mr. Hafle.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Mark Hafle?

2    A.   Mark -- Mark Hafle.  And I believe he was

3  just kind of going over what -- what was -- you

4  know, what the -- what the operations were on --

15:32  5  on the rig and then he may have talked about that,

6  but I can't remember specifically your -- you

7  know, whether it was right or wrong, or whatever.

8           I just -- I'm just trying to be, you

9  know, clear on what I'm recalling.  I did have a

15:32 10  conversation with Mark, but I can't remember the

11  details of it.

12    Q.  Do you recall in the Bly report there

13  being a finding that a -- that the negative test

14  was misinterpreted there on the Macondo Well?

15:33 15    A.  Yeah.  I don't -- you know, I don't have a

16  detailed recollection of --

17    Q.  The question is:  Do you recall reading

18  that?

19    A.   Yeah, I do -- I do recall reading about

15:33 20  the negative test, but what I was trying to

21  confirm was the details of, you know, what was --

22  what was interpreted or was it not interpreted,

23  that's what I'm saying.  I don't remember the

24  exact details of that.

15:33 25    Q.  As you sit here today, do you have an

PURSUANT TO CONFIDENTIALITY ORDER

1    understanding from whatever source as to whether

2    or not the negative tests there on the Macondo

3    Well was misinterpreted --

4                    MR. KEEGAN:  Objection; form.

15:33  5        Q.  -- prior to --

6                    MR. GODWIN:  May I finish the

7    question, Counsel?  I didn't finish, Chris.

8                    MR. KEEGAN:  I didn't realize you

9    were still talking.  I'm sorry about that.

15:33  10                   MR. GODWIN:  Let me start over.

11       Q.  (BY MR. GODWIN)  Sir, do you have an

12   understanding, as you sit here today, from

13   whatever source as to whether or not the negative

14   test was misinterpreted there on the Macondo Well

15:33  15   prior to the blowout?

16       A.  Yeah, so --

17                   MR. KEEGAN:  Objection to form.

18       A.  Yeah.  So, again, like I said, I do not

19   have the expertise to -- to describe, get into a

15:34  20   conversation on the negative test, whether it was

21   correctly called or not.  I just don't have that

22   depth of expertise.

23       Q.  (BY MR. GODWIN)  And I'm not asking you

24   about the details or the mechanics.  I'm going to

15:34  25   ask you this:  Has anyone at BP said in your

       1    presence -- either to you or others, but in your

       2    presence -- since the blowout that the negative

       3    test was misinterpreted there on the Macondo Well?

       4         A.  I don't -- I don't remember.

15:34  5         Q.  Okay, sir.  Have you ever been involved

       6    with the performance of a negative test?

       7         A.  No.

       8         Q.  Okay.  Do you have any knowledge as to

       9    whether or not the interpretation of a negative

15:34 10    pressure test is critical to determine the success

      11    of a cement job?

      12              MR. KEEGAN:  Objection; form.

      13         A.  Yeah.  That's -- that's not my expertise

      14    and --

15:34 15         Q.  (BY MR. GODWIN)  Do you have any knowledge

      16    is my question.

      17         A.  Well, I'm --

      18              MR. KEEGAN:  Let him finish his

      19    answer.

15:35 20         A.  I think --

      21              MR. GODWIN:  I thought he had.

      22              THE WITNESS:  No, I was continuing

      23    on.

      24         A.  You know, it -- having the expertise does

15:35 25    matter in these, and so, I don't -- I don't recall

PURSUANT TO CONFIDENTIALITY ORDER

1      having an opinion on that.

2          Q.  (BY MR. GODWIN)  Okay, sir.  Do you know,

3      as you sit here today -- strike that.

4                  Have you talked to Don Vidrine since

15:35   5      the blowout?

6          A.  Absolutely not.

7          Q.  How about Mr. Bob Kaluza?

8          A.  No.

9          Q.  Have you ever spoken with anyone at

15:35  10      Halliburton prior to the blowout regarding any of

11      the services that Halliburton was going to perform

12      there on the Macondo Well in the final days before

13      the blowout?

14          A.  Not that I can recall.

15:35  15          Q.  Do you know Mr. Jesse -- Jesse Gagliano?

16          A.  I do know who he is.

17          Q.  Okay.  And you office there in Houston.

18                  Did you office there at the same

19      building as where Mark Hafle and Greg Walz officed

15:36  20      and Brian Morel?

21          A.  I did.

22          Q.  Did you -- at any time while officing

23      there and going to and from work, did you meet

24      Jesse Gagliano?

15:36  25          A.  So, the only -- I just know who he is

257

1    by --

2         Q.  Yes, sir.

3         A.  -- by seeing him.  And as far as meeting,

4    it might have been a "hi" going by in the hallway.

15:36  5         Q.  Okay.

6         A.  But other than that, any deep conversation

7    or even any little conversation, I didn't really

8    have much with Jesse.

9         Q.  Okay, sir.  You know Greg Walz, do you

15:36  10   not?

11        A.  I know Greg.

12        Q.  Okay.  And prior to the blowout, did you

13   and Greg Walz have any discussions about the

14   drilling of the Macondo Well?

15:36  15        A.  Yeah, possible.  Yeah.

16        Q.  Okay.  Was Mr. Greg Walz -- when you

17   possibly had those conversations, was he one of

18   the drilling engineers there on the Macondo Well?

19        A.  I can't -- I can't remember because Greg

15:37  20   changed positions.  So, I can't remember Greg's

21   specific position; and that's why I was saying

22   possible conversations --

23        Q.  Right.

24        A.  -- because I can't remember Greg's --

15:37  25   Greg's position at that time.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Okay, sir.  I took Greg Walz' deposition

2  and in his deposition he testified that on the

3  morning of April the 19th, 2010, he had a meeting

4  with Jesse Gagliano about some concerns Jesse had

15:37  5  about the number of centralizers and the potential

6  for gas flow.

7         Have you read all or any part of Greg

8  Walz' deposition in preparation for your

9  deposition?

15:37  10         MR. KEEGAN:  Objection to the form of

11  the question.

12    Q.  (BY MR. GODWIN)  Go ahead, sir.

13    A.  So -- so the question, as I understand it,

14  is have I read any --

15:37  15    Q.  Yes, sir.

16    A.  -- of Greg Walz' deposition.

17    Q.  All or any part of it.  Have you read all

18  or any part of it?

19    A.  Not that I know of.

15:38  20    Q.  Okay, sir.  And have you, since the

21  blowout, visited with Greg Walz in any respect

22  regarding the Macondo Well?

23    A.  Possibly because -- I mean possibly I

24  talked with Greg about the Macondo.

15:38  25    Q.  Okay.  Did Greg Walz -- had you finished,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    sir?

2         A.  Yes.

3         Q.  Okay.  Thank you.

4              Did Greg Walz -- in any of those

15:38  5    possible conversations you had with him

6    post-blowout, did he tell you that on April the

7    19th of 2010, he had met with Jesse Gagliano at

8    Mr. Gagliano's request to discuss the issues

9    concerning the number of centralizers to be used

15:38 10    there on the casing stream?

11              MR. KEEGAN:  Objection to form.

12         Q.  (BY MR. GODWIN)  Go ahead, sir.

13         A.  Not -- not that I can recall.

14         Q.  Did he tell you of any -- after the

15:38 15    blowout, has he said anything to you about any

16    meeting he had with Jesse Gagliano to discuss gas

17    flow potential there on the Macondo Well?

18              MR. KEEGAN:  Objection -- objection

19    to form.

15:39 20         A.  Not that I recall.

21         Q.  (BY MR. GODWIN)  Okay, sir.  Do you

22    know -- immediately prior to the blowout, do you

23    know who Greg Walz reported to?

24         A.  No.  That's what I mean, I can't remember

15:39 25    his position at the time.

PURSUANT TO CONFIDENTIALITY ORDER

1    Q.   Okay.  All right.  You -- you, as the

2  Exploration manager for the deepwater GoM, you had

3  a level of responsibility for the Macondo Well in

4  connection with your job, did you not, prior to

15:39  5  the blowout?

6              MR. KEEGAN:   Objection to form.

7    A.   Yeah.  As I testified several times, it

8  was focused more on the financial aspect within

9  the FM.

15:39  10    Q.   (BY MR. GODWIN)  Okay.

11    A.   And then I think the other part, as I

12  mentioned earlier, is the -- Bryan -- Bryan

13  Ritchie reported to me.

14    Q.   Yes, sir.

15:40  15    A.   And his team did the subsurface

16  interpretation on the geology --

17    Q.   Right.

18    A.   -- and had done that.  So, those were the

19  two aspects.

15:40  20    Q.   Okay.  I understood you to say that for

21  some period of time prior to the blowout that the

22  Tiger team reported ultimately to you?

23    A.   That's correct.

24    Q.   Okay.  And tell us a little bit, if you

15:40  25  will -- were the members of the Tiger team -- were

1    they considered to be the very best of the best

2    within -- within BP as to the job functions they

3    performed?

4             MR. KEEGAN:  Objection to form.

15:40  5    A.  I mean, that's hard to say.  I don't

6    know -- I don't know.

7    Q.  (BY MR. GODWIN)  Did you consider -- the

8    Tiger team members that reported to you, did you

9    consider them to be very well-qualified for the

15:40 10   work they were performing?

11            MR. KEEGAN:  Objection to form.

12   A.  Yes.  They're -- they're good.

13   Q.  (BY MR. GODWIN)  Very good?

14            MR. KEEGAN:  Objection to form.

15:40 15   Q.  (BY MR. GODWIN)  Would you say "very

16   good"?

17            MR. KEEGAN:  Objection to form.

18   A.  Did good teamwork.

19   Q.  (BY MR. GODWIN)  Okay.  Thank you, sir.

15:40 20            Did any member of the Tiger team --

21   strike that.

22            Which member of the Tiger team or

23   which members reported directly to you prior to

24   the blowout?

15:41 25   A.  Graham, or Pinky, Vinson.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
         1          Q.   Okay.

         2          A.   Oh, well --

         3          Q.   Anybody else --

         4          A.   So --

15:41    5          Q.   -- other than Mr. Vinson?

         6          A.   No, but -- so Mr. Vinson up until that

         7     first part of April --

         8          Q.   Yes, sir.

         9          A.   -- and then he reported to Dave Rainey.

15:41   10          Q.   Okay.

        11          A.   And then the whole team reported to Dave

        12     Rainey.

        13          Q.   Right.  And you reported to Mr. Rainey as

        14     well?

15:41   15          A.   That is correct.

        16          Q.   Why was it that in early April of 2010 the

        17     Tiger team quit reporting direct to you, if you

        18     know, and started reporting direct to your boss?

        19               MR. KEEGAN:   Objection to form.

15:41   20          A.   Yeah.  It was -- it was purely a

        21     reorganization of -- reorganization of the GoM,

        22     and the reason is, is that Pinky's team was also

        23     looking at other aspects in the GoM and then in

        24     other exploration areas outside of the GoM.  And

15:41   25     so, Dave viewed that, yet, the remit was broader
```

**PURSUANT TO CONFIDENTIALITY ORDER**

than just the GoM.  So it really needed to

report -- the overall team's goals were broader

than the GoM.  So, then, Pinky and the team should

report to him.

15:42    Q.  Okay.

A.  That's how the basis for it -- but, you

know, the details, I don't know because Dave made

the final decision and I don't know the -- what he

was thinking exactly, but in general that was kind

15:42  of the conversation.

Q.  And you gave your background earlier

today.  I believe you said you have a master's in

business?

A.  That is correct.

15:42    Q.  An M.B.A.  And do you hold any engineering

degrees?

A.  I do not.

Q.  From any college or education, institution

of higher learning?

15:42    A.  I do not.

Q.  Okay.  Have you taken any engineering

courses?

A.  I've taken some electrical engineering

courses.

15:42    Q.  Okay.  Nothing to do, though, with

1    drilling of a deepwater well?

2        A.   No.

3        Q.   Okay.  Would you say that you were

4    qualified to understand the mechanics of drilling

15:42  5    a deepwater well in the Gulf of Mexico?

6              MR. KEEGAN:  Objection to form.

7        A.   What do you mean by "mechanics," just --

8        Q.   (BY MR. GODWIN)  Understand the drilling

9    aspects, if you will, of drilling a well in the

15:43 10    deepwater -- in the Gulf of Mexico?

11              MR. KEEGAN:  Objection to form.

12        A.   I understand the -- the basic issues; but

13    the details and the real operations, yeah, no, I

14    need to -- I rely on experts.

15:43 15        Q.   (BY MR. GODWIN)  And those would be

16    members of the Tiger team when they reported to

17    you?

18        A.   Uh-huh.

19        Q.   Correct?

15:43 20        A.   Some of them would have -- would have more

21    understanding of operations than -- than others.

22        Q.   And you would rely upon people like Greg

23    Walz and other drilling engineers there within the

24    Gulf of Mexico?

15:43 25        A.   The drilling engineers working Macondo,

**PURSUANT TO CONFIDENTIALITY ORDER**

265

1    absolutely.

2         Q.   Okay, sir.  Do you know what pore pressure

3    is?

4         A.   In -- in general.

15:43  5         Q.   Tell us what pore pressure is.

6         A.   Yeah, it's the -- it's the pressure of --

7    of the rock in the subsurface.

8         Q.   What does "fracture gradient" mean to you,

9    if anything?

15:44 10         A.   Yeah.  In general, it's -- it's the point

11   of pressure that the rock is going to break down.

12        Q.   Okay, sir.  And did you learn from any

13   source at any time that a member of the Tiger team

14   had said that he thought that the Macondo Well was

15:44 15   being drilled too fast or too quickly?

16              Did you hear --

17              MR. KEEGAN:  Objection.

18              MR. GODWIN:  May I finish?

19        Q.   (BY MR. GODWIN)  Did you hear that at any

15:44 20   time prior to my question?

21              MR. KEEGAN:  Objection to the form of

22   the question.

23        A.   Who are you referring to?

24        Q.   (BY MR. GODWIN)  A member of the Tiger

15:44 25   team.  I want to first ask you --

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:  Objection.

2          MR. GODWIN:  May I, Chris?

3          MR. KEEGAN:  Don, I'm sorry.  I keep

4     thinking you're done.

15:44  5          MR. GODWIN:  Yeah.  Let me finish,

6     please.

7       Q.  (BY MR. GODWIN)  Did you --

8          MR. GODWIN:  Because you had said

9     earlier that your witness sometimes starts

15:44 10     answering, and realizing that, I'm trying to go

11     slow with the questions so I allow him to get his

12     answer out so that we don't cross each other.

13          I'm doing my best to do that,

14     Mr. Thorseth.

15:44 15       Q.  (BY MR. GODWIN)  Again, my question, sir,

16     is:  Have you learned at any time, as we sit here

17     today, through any source other than a lawyer --

18     I'm not asking about a privileged communication,

19     but have you heard from any source that any member

15:45 20     of the Tiger team said that he believed that the

21     Macondo Well was being drilled too quickly at too

22     fast a pace?  Have you heard that?

23          MR. KEEGAN:  Objection.

24       A.  Yeah.  Not that I can recall.

15:45 25       Q.  (BY MR. GODWIN)  Have you heard from any

PURSUANT TO CONFIDENTIALITY ORDER

| | |
|---|---|
| 1 | source other than a lawyer at any time up to and |
| 2 | including today that a member of the Tiger team |
| 3 | said that he thought that the -- that the drilling |
| 4 | of the Macondo Well was being drilled like a "bat |
| 15:45  5 | out of hell"? |
| 6 | Have you heard that from any source? |
| 7 | A.  Do you want -- |
| 8 | MR. KEEGAN:  Objection to the form. |
| 9 | A.  Do you want -- |
| 15:45 10 | Q.  (BY MR. GODWIN)  Have you, sir? |
| 11 | MR. KEEGAN:  Objection. |
| 12 | A.  I need to clarify what you're asking.  Are |
| 13 | you -- are you specifically asking about the |
| 14 | phrase "bat out of hell"? |
| 15:45 15 | Q.  (BY MR. GODWIN)  Yes, sir.  I want to know |
| 16 | if you have heard, up to and including today, from |
| 17 | any source -- except lawyers, of course -- if |
| 18 | anyone reported to you that a member of the Tiger |
| 19 | team said that the Macondo Well was being drilled |
| 15:46 20 | like a "bat out of hell"? |
| 21 | Have you heard that statement? |
| 22 | A.  Not that I can recall. |
| 23 | Q.  Or words to that effect? |
| 24 | A.  Not that I can recall. |
| 15:46 25 | Q.  Thank you, sir. |

**PURSUANT TO CONFIDENTIALITY ORDER**

                          Let me refer to Tab 7 in the

materials.

                          (Marked Exhibit No. 6358.)

       Q.   (BY MR. GODWIN)  Sir, I'm going to hand

you what we have marked as Exhibit 6358.  You have

a copy there.

                          This is an E-mail from Cindy

Yeilding, is it not?

       A.   Yes.

       Q.   And the date of it is what date, sir?

       A.   Friday, May 21st.

       Q.   And what year?

       A.   2010.

       Q.   And it was sent to a number of people,

which included Ms. Yeilding sending it to herself

again:  David Rainey, Jay Thorseth, Greg Walz,

Doug -- Doug K. -- Doug Chester and James Grant

and Peter Zwart, was it not?

       A.   Correct.

       Q.   And with a number of carbon copies there

that -- I'm not going to read all the cc's; but

one of which was Mr. Pinky Graham, one of the many

recipients of the copy of the E-mail, correct?

       A.   Correct.

       Q.   And the subject was what, sir?

PURSUANT TO CONFIDENTIALITY ORDER

```
 1          A.   Subject.

 2          Q.   Is it "objectives"?

 3          A.   Oh, there it is.  "INFO:  Objectives and

 4     Delivery, MC 252 (Macondo), May 18th [to the]

15:47  5     21st, 2010."

 6          Q.   And it -- if you will, I'd like for you

 7     to -- and it shows as an attachment,

 8     "110518_Macondo_M56_sands," does it not, as well

 9     as other matters there which were attached?

15:48 10          A.   Yes.

11          Q.   Okay.  Turn over, if you will, please, to

12     what is -- what is shown there as Bates No. 5733

13     being the last four digits there.  It's the one

14     there with the "Macondo Sand Identification" title

15:48 15     at the top of the page.  Do you see that?

16          A.   Yes.

17          Q.   Okay.  Now, let me go back -- if you'll

18     hold that page and go back to the first page of

19     the E-mail --

15:48 20          A.   Uh-huh.

21          Q.   -- that Ms. Yeilding sent, on the date you

22     received this E-mail of May 21, what was

23     Ms. Yeilding's position at BP?

24          A.   Cindy was sitting in for Dave Rainey --

15:49 25          Q.   Okay.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

     1          A.   -- as the vice president for Gulf of

     2     Mexico Exploration.

     3          Q.   Okay.

     4          A.   And then she was also -- in that -- in

15:49 5     that role was also kind of the Exploration

     6     representative, the top Exploration representative

     7     for the response, which included the relief well.

     8          Q.   And -- and from looking at the names of

     9     the people who the E-mail was sent to -- not the

15:49 10    carbon copies but the "To" line -- do you know why

     11    she chose to send the E-mail to you, Mr. Greg

     12    Walz, Mr. Chester, Mr. Grant, and Mr. Zwart?

     13         A.   I don't know why Cindy picked those names.

     14         Q.   Do you know why she chose to send it to

15:49 15    Mr. Greg Walz?

     16         A.   No.

     17              MR. KEEGAN:   Objection to form.

     18         Q.   (BY MR. GODWIN)  And Mr. James Grant, do

     19    you know what his title was or position he held at

15:49 20    BP on May 21, 2010?

     21         A.   Yeah, he -- Jim is the -- yeah, his exact

     22    title, I'm not sure; but he's kind of a liaison --

     23    he's a team leader and liaison between BP and kind

     24    of the -- formerly the MMS.

15:50 25         Q.   Okay.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1         A.   Was one of -- one of his roles.

 2         Q.   Okay.  And Mr. Peter Zwart, same question.

 3         A.   Pete -- Peter Zwart --

 4         Q.   Zwart.

 5         A.   -- is the CFO for GoM.

 6         Q.   Okay.  And Doug Chester?

 7         A.   (No response.)

 8         Q.   If this is -- if you don't know his title,

 9    what was his job role or function at that date?

10         A.   I'm not sure about Doug.

11         Q.   You don't -- you don't know?

12         A.   Yeah, I don't know.

13         Q.   Okay.  You're smiling.

14         A.   Well, I think he's a drilling engineer

15    now; but I just -- I should just say I'm not sure.

16         Q.   Was Mr. Doug Chester involved with the

17    drilling of the Macondo Well?

18              MR. KEEGAN:  Objection to form.

19         A.   Well, the -- the relief wells that this is

20    about or the original well?

21         Q.   (BY MR. GODWIN)  I'm talking about the

22    Macondo Well.

23         A.   I don't know.

24         Q.   Okay.  Thank you.  All right.  Turn over

25    if you -- and turn over, if you will, please,
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1       again, to the "Macondo Sand Identification" page,

2       which is -- Bates No. 5733 being the last four

3       digits.

4            A.  Uh-huh.

15:51  5            Q.  You see that?

6            A.  Yes.

7            Q.  Do you recall receiving this attachment to

8       the E-mail of May 21, 2010?

9            A.  No.

15:51 10            Q.  It shows here that -- it shows that it

11      is -- when you look at the pages, the first page

12      ends with 5730, 5731, 5732; and then this is 5733.

13      Those are in sequence, are they not, those

14      numbers -- those Bates numbers?

15:51 15            A.  Yes.

16            Q.  Okay.

17            A.  It appears to be, yes.

18            Q.  All right.  You said earlier that your

19      understanding was the M57 B zone was a -- was a

15:51 20      water -- water zone or a contained water-bearing

21      sand, did you not?

22            A.  My -- my opinion is is that it -- it very

23      well could be wet.

24            Q.  Very well could be wet.

15:51 25                 Are you leaving the possibility that

 1     it could be something other than wet?

 2              A.  Yeah.  I -- I don't know for sure.

 3              Q.  You just don't know for sure.

 4                       Well, it says here, out to the left

15:52  5     of the identification of the zone, as being a gas

 6     sand, does it not?

 7              A.  It does indeed.

 8              Q.  It does say that.

 9                       When you received -- do -- or strike

15:52 10     that.

11                       Do you recall -- do you recall

12     receiving a copy of this Macondo sand

13     identification page at any time in any form?

14                       MR. KEEGAN:  Objection to form.

15:52 15              A.  So this -- this -- this particular

16     attachment in one of Cindy's E-mails or....

17              Q.  (BY MR. GODWIN)  In her E-mail --

18              A.  Yeah.

19              Q.  -- as it is right here and it is -- as it

15:52 20     is shown here on -- on the page there, "Objectives

21     and Deliveries," May 18 through 21 and of course,

22     when you look over at the page itself, the Macondo

23     sand identification, it's dated May 18, 2010, over

24     in the right-hand corner, is it not?

15:52 25              A.  Yeah.  I don't -- I don't recall getting

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    this particular attachment or -- or looking at it.

 2         Q.  Okay.  In -- in either hard copy or E-mail

 3    form?  Do you remember seeing it in either --

 4         A.  That -- that -- that's correct.  I don't

15:53  5    recall that.

 6         Q.  All right.  Prior to me showing you this

 7    exhibit, with this attachment here, this Macondo

 8    sand identification page, have you seen any form

 9    of writing at BP which show that the M57 B zone or

15:53 10    sand was, in fact, considered to be a gas sand?

 11              MR. KEEGAN:  Objection to the form.

 12         A.  The -- there is a technical memorandum --

 13         Q.  (BY MR. GODWIN)  Yes, sir.

 14         A.  -- that Kate Baker wanted team to put

15:53 15    together and I do recall seeing -- seeing that in

 16    that report.

 17         Q.  Okay.  That it was considered to be a gas

 18    sand?

 19         A.  Well, I'm not sure what the -- what --

15:53 20    what the phrase was because there was also

 21    "probable gas" and other types of descriptions.

 22    So I'm not.

 23         Q.  We'll go over that in an a little bit.

 24         A.  Okay.

15:54 25         Q.  But my question to you is -- and I believe

1    you've answered it.  I just want to make sure I

2    understand it correctly -- that you do recall

3    seeing in some form, at some time after the

4    blowout, a writing at BP which showed that the

15:54  5    M57 B zone did, in fact, contain gas.  Is that

6    your testimony?

7            MR. KEEGAN:  Objection to form.

8        A.  Yeah.  It's -- we'll -- we'll have to look

9    at the report that I'm talking about because

15:54 10    it's -- it's very uncertain as it's written in the

11    form.

12        Q.  (BY MR. GODWIN)  Okay.

13        A.  In the -- in the memo.

14        Q.  My question again, sir, is:  At any time

15:54 15    after the blowout, have you seen any writing at BP

16    wherein it is shown that the M57 B zone was

17    characterized as a gas sand or containing gas?

18            MR. KEEGAN:  Objection to the form.

19        A.  Possible gas.

15:55 20        Q.  (BY MR. GODWIN)  Okay.  Possible gas?

21        A.  Possible gas.

22        Q.  All right.  When you look here at Bates

23    Page No. 5733, Macondo sand identification, it

24    doesn't say anything about "possible" there before

15:55 25    the word "gas," does it?

**PURSUANT TO CONFIDENTIALITY ORDER**

276

1          A.   That's correct.

2          Q.   It says "gas" --

3          A.   That's correct.

4          Q.   -- as identifying the M57 B zone, does it

15:55  5   not?

6          A.   That -- that's correct.  It says gas.

7          Q.   And when I refer to it as "the M57 B

8     zone," is that the proper way to refer to it?  Or

9     would you refer to it as an M57 B zo- -- sand?

15:55 10                MR. KEEGAN:  Objection to form.

11         Q.   (BY MR. GODWIN)  Would you refer to it as

12    a "zone" or a "sand"?  Or are they both correct?

13         A.   Well, you don't know if it's a sand or

14    not.  So "zone" would probably be more accurate.

15:55 15        Q.   Okay.

16         A.   That's just my opinion.

17         Q.   All right.  And I appreciated that.

18              Whenever you saw a writing at BP

19    which identified the M57 B zone as containing gas,

15:56 20   did you discuss that with anyone at BP to

21    ascertain why it was considered to be a gas zone

22    and not a water zone?

23                MR. KEEGAN:  Are you done?

24                Objection to the form.

15:56 25        Q.   (BY MR. GODWIN)  Go ahead.

**PURSUANT TO CONFIDENTIALITY ORDER**

                    MR. KEEGAN:  Misstates what he said

before.

                    MR. GODWIN:  I'm just asking a

question.

15:56          MR. KEEGAN:  Well, what's your

question?

                    MR. GODWIN:  All you got to do is

make your objection to form.  I've asked him my

questions and I'm doing it respectively of the

15:56  witness.

     Q.  (BY MR. GODWIN)  My question was:

Whenever you saw any writing at BP, which showed

that the M57 B zone contained gas, did you discuss

that with anybody at BP?

15:56          MR. KEEGAN:  Objection to the form.

     Q.  (BY MR. GODWIN)  Go ahead, sir.

                    MR. KEEGAN:  Objection to the form.

     A.  So, you know, I don't know what the

context is, but I did have conversations with

15:56  people -- people at BP about whether there's gas

in there or not.  So I don't -- I'm not sure

about, you know, the stipulations you got on your

question, but my -- my testimony is is that I did

have conversations with people at BP whether there

15:57  was gas or whether this was wet.  I did have those

1    kind of conversations.

2        Q.  (BY MR. GODWIN)  Did you talk with Galina

3    Skripnikova at any time?

4        A.  Possibly.  I -- I didn't have a lot of

15:57  5    conversations with -- with Galina.  I -- I may

6    have discussed it with her, but I don't recall.

7        Q.  Do -- who -- who were the people -- who

8    was the person or persons at BP with whom you

9    spoke that said, he or she also -- he or she

15:57  10   thought that the M57 B zone contained gas?

11             MR. KEEGAN:  Objection to the form of

12   the question.

13       Q.  (BY MR. GODWIN)  You said that possibly.

14   You talked with some folks there at BP that said

15:57  15   that.

16             MR. KEEGAN:  Objection.

17       A.  No.  No.  So I need to clarify:  I didn't

18   talk to anyone at BP who said definitively that

19   this was gas.  Just to clarify my --

15:57  20       Q.  You said possibly.

21       A.  Yeah.  It's possible or the word could be

22   probable.  You need to go back and check the

23   language.  Could be "probable" as well or

24   "possible."  I think it may be "probable."

15:58  25             So no one at BP that I talked to said

PURSUANT TO CONFIDENTIALITY ORDER

1    it's gas.

2         Q.  Okay.  Well, who at BP did you talk with

3    that told you that he or she thought that it was

4    probable gas in the M57 B zone?  Name or --

15:58  5              MR. KEEGAN:  Objection.

6         Q.  (BY MR. GODWIN)  Give me the name or

7    names, please.

8              MR. KEEGAN:  Objection.

9         A.  Yeah.  So I -- I did -- I did talk to a

15:58  10   petrophysicist, Pinky.

11        Q.  Okay.

12        A.  Talked to Pinky and Bruce Wagner.

13        Q.  Okay.  And did Pinky tell you that he

14   thought there was gas or probable gas there in

15:58  15   the -- in the M57 B zone?

16        A.  I don't remember the exact word that he

17   used but he said it's -- I'm not sure.  Because

18   he -- we talked about -- that I can't remember

19   what word he used to -- to describe it.  Whether

15:58  20   it was possible or probable or most -- some other

21   word, I don't know.

22        Q.  When you learned of the M57 B zone

23   possibly or probable, as you've said, containing

24   gas, did you ask anyone at BP if he -- he, she, or

15:59  25   they knew about that zone containing gas prior to

**PURSUANT TO CONFIDENTIALITY ORDER**

1    April 20, 2010?

2               MR. KEEGAN:  Objection to the form.

3         A.  Yeah, I don't -- I don't recall that

4    discussion.

15:59  5         Q.  (BY MR. GODWIN)  Okay.  Let me ask it

6    so -- I want to make sure you understand the

7    question very specifically.

8               When you learned that there was, as

9    you said, probable gas, at least shown on a

15:59 10    document --

11         A.  I -- yeah, I don't agree with that.

12         Q.  Wait a minute.  I'm not asking whether or

13    not you agreed?

14         A.  Just what I've seen in a document.

15:59 15         Q.  When you saw a document at BP prepared by

16    BP that showed that there was probable gas there

17    in the M57 B zone, did you undertake to ask anyone

18    at BP if he, she, or they, knew about that

19    probable gas zone prior to April 20, 2010?  Did

16:00 20    you do so, sir?

21         A.  Not -- not that I can recall.

22         Q.  Thank you, sir.

23               Let's turn over to Tab 8 in the

24    materials, please.  And this has been previously

16:00 25    marked as -- as what number?  3540?  Okay.  You've

**PURSUANT TO CONFIDENTIALITY ORDER**

1   got one marked?

2           MR. GODWIN:  I'm just going to hand

3   you this one, give you guys that.

4       Q.  (BY MR. GODWIN)  Sir, I've handed you what

16:00  5   previously we've marked as Exhibit 3540, and it

6   appears to be a Schlumberger document for a

7   company, BP Exploration and Production, Inc.

8   And my question to you is is:  Prior to me showing

9   you this document, which is previously marked as

16:01  10   Exhibit 3540, have you seen it at any time prior

11   to just now?

12           MR. KEEGAN:  Don, just for the

13   record, this is not the document that was marked

14   as 3540.  That's a full-color, full-sized report.

16:01  15           MR. GODWIN:  Okay.  Well, this would

16   be, then, a part of that exhibit.

17           MR. KEEGAN:  Or a copy of it.

18           MR. GODWIN:  Or a copy of it.

19           MR. KEEGAN:  Black and white copy of

16:01  20   it.

21           MR. GODWIN:  And is that -- I'm not

22   asking it be put in the record.  I'm just

23   referring to 3540.

24           MR. KEEGAN:  Yep.

16:01  25           MR. GODWIN:  And this would be a part

        1    of that.

        2         Q.  (BY MR. GODWIN)  Have you seen -- prior to

        3    just now -- this document which was a part of a

        4    previously marked document as No. 3540?

16:01   5         A.  It's possible but I don't know

        6    specifically if I have seen this exact log or --

        7    or this exact exhibit.

        8         Q.  Okay.  And if you will there, on the first

        9    page of it -- and there are no Bates numbers

16:02  10    because it's in metadata -- or no metadata, just

       11    part of a prior exhibit.

       12              If you look there at the logging

       13    date -- and forgive me for pointing but I'll show

       14    it here, help you find it.

16:02  15              You see the logging date?

       16         A.  Yes.

       17         Q.  Which date is shown as the logging date,

       18    as reported Schlumberger?

       19         A.  April 10, 2010.

16:02  20         Q.  Okay.  And if you will -- and it shows --

       21    go on down to the next -- third line down where --

       22    or second line down.  It says a depth of the

       23    driller and it shows 18,360 feet?

       24         A.  Yes.

16:02  25         Q.  Did -- did I understand you to say earlier

PURSUANT TO CONFIDENTIALITY ORDER

1  that you had recommended that the total depth

2  be -- or TD -- be called at 18,360?

3      A.   Yeah.   There are -- yeah, it was 60 or 65,

4  somewhere in there.

16:02  5      Q.   Somewhere in that range?

6      A.   Yeah.

7      Q.   If you will, go back over to the page --

8  and again, forgive me.   It doesn't have page

9  numbers on it, no Bates numbers, but as a part of

16:03  10  the -- a part of the document, it shows logs there

11  at different depths within the well.

12      A.   Yeah.

13      Q.   Forgive me for pointing but I'm going to

14  show you the page that begins with 17,200?

16:03  15      A.   Yes.

16      Q.   And when you get there let me know.   Do

17  you have it?

18      A.   Yes.

19      Q.   Go down, if you will, to the bottom part

16:03  20  there in the page where it appears to be -- in the

21  handwritten part, the letter or words M57 B.   Do

22  you see that?

23      A.   Yes.

24      Q.   Do you know who made that note here on

16:03  25  this document?

         1        A.  No.

         2        Q.  You ne- -- whenever you saw -- do I

         3   understand you to say -- again, did you say you

         4   had seen all or any part of the form?

16:03    5        A.  I don't -- I don't know if I have or not.

         6        Q.  Okay.  Do you remember seeing a document

         7   like the one you have there with that handwritten

         8   notation on it of M57 B?

         9        A.  Yeah, I -- I don't remember --

16:04   10        Q.  Okay, sir.

        11        A.  -- if it had that -- any notation or not

        12   or whether I've seen that in the past or not.

        13        Q.  All right.  Okay.

        14             Let's turn over to Tab 21 -- let's

16:04   15   see.  Not Tab 21 -- yeah, Tab 21 in the materials.

        16   I want to ask you here one last --

        17        A.  So we're done with this?

        18        Q.  Yes, sir.  That's not an exhibit if you

        19   would like to just give that back.

16:04   20             This was previously marked as

        21   Exhibit 6344, and I'm -- I'm not going to ask you

        22   about the details of the E-mail from John Guide to

        23   you dated April 26.  You've already testified

        24   about that.

16:04   25        A.  Uh-huh.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  "Call if you need anything else.  Thanks."

2    And signed "John Guide."

3              Following your receipt of the E-mail

4    from John Guide on or about April 26, did you call

16:04   5    him to seek clarification or more information than

6    what he had included in this E-mail?

7    A.  Not -- not that I -- not that I can

8    recall.  I don't think so, but I'm not sure.

9    Q.  Did you at any time -- at any time after

16:05  10   the day of -- or the night of the blowout, did you

11   visit with John Guide concerning the negative test

12   in any respect as to whether or not there had been

13   one performed or two or more?

14   A.  Not that I can recall.

16:05  15   Q.  How many negative tests were performed

16   there on the Macondo Well?

17             MR. KEEGAN:  Objection; form.

18   A.  I don't remember.

19   Q.  (BY MR. GODWIN)  At -- prior to the time

16:05  20   of the blowout?

21             MR. KEEGAN:  Objection to the form.

22   Q.  (BY MR. GODWIN)  Do you know?

23   A.  I -- I don't remember.

24   Q.  And as you sit here today, you're telling

16:05  25   the Court -- that is, the person there who was the

1   manager of the deepwater GoM, that after the

2   blowout, you never asked anybody how many negative

3   tests were performed there on the Macondo Well

4   prior to the blowout?

16:05  5               MR. LAVINE:  Objection to the form.

6               MR. KEEGAN:  Objection to the form.

7        Q.  (BY MR. GODWIN)  Did you, sir?

8               MR. KEEGAN:  Objection to the form.

9        A.  I don't remember.

16:06  10       Q.  (BY MR. GODWIN)  Thank you, sir.

11              Now, let's turn over to Tab 23 in the

12   materials.  This was previously marked as Exhibit

13   4697.  4697.

14              And this is a document prepared by --

16:06  15   or at least an E-mail prepared by Mr. Bryan

16   Ritchie, is it not?

17       A.  Correct.

18       Q.  And you said earlier Mr. Ritchie reported

19   to you up until the time that you started

16:06  20   reporting to Mr. Dave Rainey?

21              MR. KEEGAN:  Objection to the form.

22       A.  Well, what I testified earlier is that --

23   I believe, that Bryan -- Mr. Ritchie, Bryan had

24   kind of dual -- he had dual reporting.  He

16:07  25   reported to me after the incident.

PURSUANT TO CONFIDENTIALITY ORDER

1      Q.  (BY MR. GODWIN)  Yes, sir.

2      A.  Or reported to me for kind of non Macondo

3   issues.

4      Q.  Okay.

16:07  5      A.  And then he was reporting to Cindy for,

6   kind of, the response and the relief wells.  So

7   just to clarify that.

8      Q.  Okay.  And I don't remember you saying

9   that earlier, but I do appreciate that information

16:07  10   and perhaps clarification.

11           But anyway, Exhibit 4697, what's the

12   date of the document?

13           MR. KEEGAN:  E-mail or the report?

14           MR. GODWIN:  The E-mail -- the E-mail

16:07  15   I'm looking at right now.

16      A.  The E-mail was Wednesday, May the 26th.

17      Q.  (BY MR. GODWIN)  Of 2010?

18      A.  Yes.

19      Q.  And it shows that it's going to Kate

16:07  20   Baker, an unknown business partner; Cindy

21   Yeilding, Jay Thorseth, and a number of other

22   people there as either recipients or carbon copy

23   recipients, does it not?

24      A.  Correct.

16:07  25      Q.  And -- and one of the carbon copy

 1    recipients was Ms. Galina Skripnikova, correct?

 2         A.   Correct.

 3         Q.   Okay.  And this shows that the subject --

 4    it was a draft MC 252 subsurface technical memo

16:08  5    and a P v. 1.  Does that indicate to you version

 6    1, the v. 1?

 7         A.   PV?  Yeah, the version, v. 1 for

 8    version 1.

 9         Q.   Okay, sir.

16:08 10              And it goes on and says, "Kate,

11    please find attached the technical memorandum that

12    you requested regarding the post well subsurface

13    description of the Macondo Well."

14              Did I read that correctly?

16:08 15         A.   Yes.

16         Q.   And it has several other lines there and

17    then it's, "Many thanks, Bryan."

18         A.   Yeah.

19         Q.   And it shows Bryan as being an exploration

16:08 20    team leader, eastern GoM, does it not --

21         A.   Yes.

22         Q.   -- describing his title.

23              Turn over to the next page, if you

24    will, please, in Exhibit 4697, and the Bates

16:08 25    numbers end with 5102, the last four digits.  And

1     it's entitled Technical --

2          A.  I'm sorry, you lost me on that one.

3          Q.  You have it there.  Bates No. 5102.

4          A.  Yeah.  Got it.

16:09  5    Q.  It's the last four digits.  Do you have it

6     there, sir?

7          A.  Yes.

8          Q.  Okay.  It's entitled, is it not,

9     "Technical Memorandum"?

16:09 10    A.  Yes.

11         Q.  And it's titled "Post Well Subsurface

12    Description of Macondo Well," and it's sent to

13    Kate Baker, Cindy Yeilding, Jay Thorseth, and

14    Peter Carragher, correct?

16:09 15    A.  Correct.

16         Q.  And it was written by a number of people,

17    one of whom was Galina Skripnikova, correct?

18         A.  Correct.

19         Q.  And also written -- coauthored by Chuck

16:09 20   Bondurant as well as Marty Albertin and others,

21    correct?

22         A.  Correct.

23         Q.  And the date of the technical memorandum

24    was what, sir?

16:09 25    A.  May 25th, 2010.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Okay.  Do you know why you were -- you

2    received a copy of this technical memorandum?

3    A.  I'm -- I'm not -- well, I'm not totally

4    sure.  They -- they were writing it on, I believe,

16:09  5    Kate Baker's request.  But since I was involved in

6    the Macondo prospect and Bryan had that dual

7    reporting relationship, I think he -- he wanted me

8    to be included as well.  That's my understanding.

9    Q.  Okay, sir.  All right.

16:10  10    Are you aware of a MMS requirement

11    regarding the top of cement being at least 500

12    feet above the highest hydrocarbon zone in a well?

13    Are you aware of such a -- such a requirement by

14    the MMS?

16:10  15    A.  Yeah.  I'm not -- you know, I have never

16    read the requirements or the regulations from the

17    MMS on this particular topic.

18    Q.  Okay.  Well, whether you've read it or

19    not, let me ask you this:  As the person who was

16:10  20    the manager, the exploration manager for the

21    deepwater GoM, do you know what the MMS

22    requirement was regarding how many feet there must

23    be between the highest hydrocarbon zone and the

24    top of cement?

16:11  25    MR. KEEGAN:  Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          Q.  (BY MR. GODWIN)  Do you know?
 2               MR. KEEGAN:  Objection.
 3          A.  So first of all, as a manager, I'm not in
 4     charge of operations --
16:11 5          Q.  (BY MR. GODWIN)  I'm not asking that,
 6     sir --
 7               MR. KEEGAN:  Let him answer the
 8     question, Don.
 9          A.  Well, now, I think it's important to
16:11 10    qualify.
 11         Q.  (BY MR. GODWIN)  Again, I'm not asking you
 12    that.  You're just using up my time.
 13              MR. KEEGAN:  Let him answer the
 14    question.
16:11 15         A.  I'm definitely not trying to do that.
 16              I'm not in charge of operations, and
 17    therefore, I don't know the exact regulations
 18    because the reason -- the only reason I put that
 19    in because I know how these regulations can be and
16:11 20    how they stipulate the -- if it is 500 and then
 21    what is -- what do they mean by the top -- the
 22    hydrocarbon-producing zone -- you know, the top of
 23    hydrocarbons.  That's all I'm saying.
 24         Q.  (BY MR. GODWIN)  Okay, sir.
16:11 25         A.  It's just -- I don't know the specific
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   regulations, and that's why I hesitate to -- to

2   answer, you know, 500 or not.

3       Q.  And -- and whether or not you have the

4   technical expertise or not, I just want to know:

16:12   5   Has anybody at BP ever said to you or in your

6   presence as to how many feet the top of cement

7   must be, according to the MMS, from the highest

8   hydrocarbon zone?  Has anybody ever said that in

9   your presence?

16:12   10      A.  Yeah.  I mean, they -- they have mentioned

11   500 feet.

12      Q.  Okay, sir.  Thank you.

13           And if the M57 B zone was at 17,467

14   feet --

16:12   15      A.  Are you -- are you looking at the --

16      Q.  Yeah, I'm look back over here to exhibit.

17           If the M57 B zone was 17,467, that

18   would mean that the top of cement would have to be

19   at 16,967 feet, would it not?

16:12   20           MR. LAVINE:  Objection; form.

21           MR. KEEGAN:  Objection to the form.

22      A.  I don't know.

23      Q.  (BY MR. GODWIN)  You don't know?

24      A.  I don't know.

16:13   25      Q.  Has anybody since the blowout discussed

 1   with you -- at your request or otherwise -- what

 2   the top of cement was there in the Macondo Well?

 3        A.   No.

 4        Q.   You don't know.  Okay, sir.

16:13 5             MR. KEEGAN:  The answer was no.

 6             MR. GODWIN:  He said no, I think.  I

 7   think that's what he said was no.

 8        A.   Yeah.

 9        Q.   (BY MR. GODWIN)  Let's go now, if we can,

16:13 10  please, back to Exhibit 4697?

 11       A.   Make sure I got that right.  Can you

 12  repeat that last question on -- on what did anyone

 13  ask me about the --

 14       Q.   Has -- has anybody since the blowout said

16:13 15  in your presence what he or she believed the top

 16  of the cement was there in the Macondo Well?

 17       A.   Okay.  So, that is -- rather than no, I'd

 18  like to correct that.  That is possible.

 19       Q.   Okay.

16:13 20       A.   I don't recall but I would just like to

 21  say it -- it is possible.

 22       Q.   It is possible?

 23       A.   Yeah.

 24       Q.   Second question, now that you've said

16:14 25  that -- and thanks for clarifying -- was:  Has

PURSUANT TO CONFIDENTIALITY ORDER

```
 1    anybody said in your presence at any time since
 2    the blowout what the top of cement should have
 3    been there in the Macondo Well, based upon the
 4    finding of the M57 B zone?
 5         A.   Not -- not that I can recall.
 6              MR. KEEGAN:  Objection; form.
 7         Q.  (BY MR. GODWIN)  Okay, sir.
 8              Has anybody said in your presence
 9    that the M57 B zone was not -- was not a zone that
10    was covered -- well, by cement there in the
11    Macondo Well?  Meaning there was no zonal -- no
12    zonal isolation of that zone?
13         A.   Not --
14              MR. KEEGAN:  Objection to form.
15         A.   Not that I can recall.  That there was no
16    cement whatsoever over that zone?
17         Q.  (BY MR. GODWIN)  Over the M57 B zone.
18              Have you heard that there was no
19    cement over that zone?
20         A.   I -- yeah, I don't know and I don't recall
21    having that conversation.
22         Q.  If, in fact, it was a, quote -- as one or
23    more documents at BP says -- a "probable gas
24    zone," you would expect it to be covered by
25    cement, would you not?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:  Objection to form.

2          MR. LAVINE:  Objection to form.

3     A.  Yeah, I -- I -- I can't answer that

4  because of the regu- -- lack of knowledge of the

16:15  5  specific regulation -- regulations.

6     Q.  (BY MR. GODWIN)  Thank you, sir.

7          And if you will, please, let's turn

8  over now to Bates No. 5105 of Exhibit 4697 you

9  have there.  And it shows there the M57 B zone,

16:15  10  does it not?

11     A.  It does, yes.

12     Q.  And this was on the technical memorandum

13  dated May 25, 2010.  That's the date of the

14  document over here, sir?

16:15  15     A.  Yeah.  Draft and version 1.

16     Q.  Yeah.  Right.

17          And it shows there that it was -- at

18  least on the face of the document -- a gas zone,

19  does it not?

16:15  20     A.  It says "gas" there.

21     Q.  Okay, sir.

22          Out to the left of the M57 B zone?

23     A.  Yes.

24     Q.  Okay.  Let's turn over now quickly to the

16:16  25  last exhibit I want to go over and that's -- and

**PURSUANT TO CONFIDENTIALITY ORDER**

296

1    that's in Tab 24 of the materials.  And this is

2    Exhibit 3533, previously marked.

3              You have Exhibit -- what was

4    previously marked as Exhibit 3533 in front of you?

16:16  5    A.  Yes.

6    Q.  Okay.  And this is a document entitled

7    "Technical Memorandum," is it not?

8    A.  Yes.

9    Q.  The title was "Post Well Subsurface

16:16  10   Description of Macondo Well," and it's to Kate

11   Baker, Cindy Yeilding, Jay Thorseth, and Peter

12   Carragher, correct?

13   A.  Correct.

14   Q.  And the date of it -- and it's several

16:16  15   people there, including Galina Skripnikova as well

16   as Chuck Bondurant and Marty Albertin who

17   received -- or who wrote this report here.  They

18   co-wrote it, according to the report, correct?

19   A.  Correct.

16:16  20   Q.  I show that it's dated July 26, 2010?

21   A.  Yes.

22   Q.  This is about two months later than the

23   one we just discussed, which was the technical

24   memorandum which was attached to Mr. Ritchie --

16:17  25   Bryan Ritchie's E-mail to you dated May 26,

1    correct?

2         A.  Correct.

3         Q.  Okay.  And if you will -- do you know why

4    you received a copy of the report dated July 26,

16:17  5    2010?

6         A.  As I said before, that I reported -- or

7    Bryan Ritchie had a dual reporting relationship,

8    one to Cindy Yeilding for the response and the

9    relief well, and to me for any other business.  So

16:17  10    I felt he -- he -- he probably felt to just keep

11    me -- to send it to me because I was involved with

12    the prospect of Macondo.

13         Q.  Okay.  And when you received this -- this

14    document, Exhibit 3533, which was in the form of

16:18  15    a -- what appears to be an E-mail from -- or

16    report -- technical memorandum from Marty Albertin

17    and Galina Skripnikova and others, did you call or

18    ask any of them any questions about the document,

19    any of the authors?

16:18  20         A.  About this specific document?

21         Q.  Yes, sir.  The technical memorandum dated

22    July 26, 2010.

23         A.  Yeah.  I -- I had conversations with Bryan

24    Ritchie.

16:18  25         Q.  Mr. Ritchie about it?

**PURSUANT TO CONFIDENTIALITY ORDER**

1           And tell us what were the nature of

2      those conversations with Mr. Ritchie about this

3      technical memorandum dated July 26, 2010.

4           A.  I don't remember the specific

16:18  5      conversation.

6           Q.  Okay.  Turn over, if you will, please,

7      to -- it's about the fourth page in, the Bates

8      number at the bottom is 2877 being the last four

9      digits of the long Bates number.

16:18  10          A.  Yes.

11          Q.  Do you have it?

12          A.  Yes.

13          Q.  Okay.  This shows here a number of

14     different zones there within the well, does it

16:19  15     not?

16          A.  Yes.

17          Q.  And one of the zones up near the top is

18     the M57 B zone, is it not?

19          A.  Correct.

16:19  20          Q.  And how does BP characterize this M57 B

21     zone and this technical memorandum dated July 26,

22     2010?

23               MR. KEEGAN:  Objection to the form.

24          Q.  (BY MR. GODWIN)  Go ahead, sir.

16:19  25          A.  Yeah, so I don't -- you said BP.

**PURSUANT TO CONFIDENTIALITY ORDER**

         1          Q.   BP -- all these writers work for BP, don't

         2    they?

         3                    MR. KEEGAN:   Let him answer the

         4    question, Donald.

16:19    5          A.   I think it's really important to say that

         6    it's not BP as a company, and that it is indeed --

         7    I just want to clarify that it is indeed that this

         8    draft document written on the 26th of July, 2010,

         9    by this team, they did, in fact -- they did, in

16:19   10    fact, on this draft document use the language

        11    "probable gas" for M57 B.   That's what I would

        12    like to clarify.

        13          Q.   (MR. GODWIN)  Yes, sir.   And it's there on

        14    BP stationary, this technical memorandum report

16:20   15    that you received?

        16                    MR. KEEGAN:   Objection to form.

        17          Q.   (BY MR. GODWIN)  Is it not?

        18                    MR. KEEGAN:   Objection to form.

        19          A.   It says -- it says "BP confidential."

16:20   20          Q.   (BY MR. GODWIN)  Okay, sir.   And it's

        21    technical memorandum.   And are you suggesting that

        22    Marty Albertin, Chuck Bondurant, Kelly McAughan,

        23    Binh van Nguyen, Bryan Ritchie, Craig Scherschel

        24    and Galina Skripnikova did not have the authority

16:20   25    on behalf of BP to say that this was probable gas

PURSUANT TO CONFIDENTIALITY ORDER

          1    next to the N57 -- M57 B zone in Exhibit 3533?  Is

          2    that what you're telling us?

          3                    MR. KEEGAN:  Objection to the form.

          4         Q.  (BY MR. GODWIN)  Go ahead, sir.

16:20     5         A.  I'm saying this is in a draft document

          6    that's not final, that hasn't been finalized.  It

          7    is their opinion, at this particular time with

          8    more information that's still could come.

          9         Q.  How do you know -- I'm sorry, sir.  Go

16:20    10    ahead.

         11         A.  So -- so their interpretation possibly

         12    could change, since it's still in draft format.

         13         Q.  Well, do you know whether it changed or

         14    not?

16:21    15         A.  And so -- I don't know.

         16         Q.  Okay, sir.

         17         A.  I don't know.

         18         Q.  So you don't know whether or not

         19    Exhibit 3533, which was written by Marty Albertin,

16:21    20    Galina Skripnikova, and the others, you don't know

         21    whether any single word was ever changed, do you,

         22    sir?

         23         A.  What do you mean, in -- in the document?

         24         Q.  Yes, sir.  In the technical memorandum,

16:21    25    you don't know that it was ever changed in any

PURSUANT TO CONFIDENTIALITY ORDER

1    respect, do you?  From the way you received it on

2    July 26th, 2010?

3         A.  I don't recall if -- if there was a

4    further draft after the one you're showing right

16:21  5    here or not with -- with some edits or not.

6    Because I am a bit concerned -- I am a bit concern

7    how it says "v. 3" up top but it still says

8    "Version 1" down here at the bottom.  If you go

9    back to the beginning of the document --

16:22  10        Q.  Yes, sir.

11        A.  -- see how it says v. 1, Version 1, down

12    at the bottom and "v. 3" at the top?

13        Q.  Yes, sir.

14        A.  And I -- I just don't recall that being

16:22  15    like that, this being kind of their -- their

16    latest version of the draft.

17             So in answer to your question, then,

18    do I recall any language being changed subsequent

19    to this particular draft, V 3 but Version 1 down

16:22  20    at the bottom, it's possible --

21        Q.  You don't know?

22        A.  -- and I just don't know.

23        Q.  Did you ever see a document, after you

24    received this document on July 26th, which

16:22  25    referred to the M57 B zone as anything other than

**PURSUANT TO CONFIDENTIALITY ORDER**

         1   containing probable gas?

         2        A.   I don't know.

         3             MR. GODWIN:   Thank you.   Pass the

         4   witness.

16:22    5             THE VIDEOGRAPHER:   Time is 4:22.   Off

         6   the record, ending Tape 8.

         7             (Break from 4:22 p.m. to 4:36 p.m.)

         8             THE VIDEOGRAPHER:   The time is

         9   4:36 p.m.   We're back on the record, beginning

16:36   10   Tape 9.

        11             E X A M I N A T I O N

        12   BY MS. LeGRAND:

        13        Q.   Good afternoon, Mr. Thorseth.   My name is

        14   Stephany LeGrand.   I'm here representing

16:36   15   TransOcean, and I have a few questions for you.

        16             Earlier, I believe you testified that

        17   you visited the DEEPWATER HORIZON.   Did you spend

        18   the night on the rig when you were there?

        19        A.   I believe -- I believe I spent the -- I

16:36   20   think I did spend the night on the HORIZON once.

        21        Q.   And you realize that BP employees and BP

        22   subcontractors' employees not only work on the

        23   rig, but they actually live on the rig, as well,

        24   when they're on a hitch, correct?

16:37   25        A.   Yes.

1       Q.   When you arrived on the rig, did you

2   receive a safety orientation?

3       A.   Yes.

4       Q.   Did you find the safety orientation to be

16:37  5   comprehensive?

6       A.   I thought it was a good overview.

7       Q.   It included evacuation processes and

8   procedures, correct?

9       A.   Yes.

16:37 10       Q.   Are you aware that the DEEPWATER HORIZON

11   achieved seven years with no lost time incidents?

12       A.   Yes.

13       Q.   Are you aware that in September 2009, the

14   DEEPWATER HORIZON contract was extended for a

16:37 15   period of three years to commence in 2010?

16       A.   Yes.

17       Q.   And that the value of that contract was

18   approximately half a billion dollars?

19            MR. KEEGAN:   Objection.

16:37 20       A.   I don't know.

21       Q.   (BY MS. LeGRAND)  At any time during the

22   drilling of the Macondo Well, did you observe or

23   learn of any malicious acts towards human safety

24   or environment by the crew of the DEEPWATER

16:38 25   HORIZON?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Not that I can recall.

2      Q.   At any time during the drilling of the

3 Macondo Well, did you observe or learn of any

4 willful or intentional misconduct towards human

16:38  5 safety or the environment on the part of the

6 TransOcean rig crew?

7           MR. KEEGAN:   Objection to the form.

8      A.   So during -- during the Macondo Well or

9 before or after?

16:38 10    Q.   (BY MS. LeGRAND)   At any time that -- that

11 you were either onboard the rig or that the -- the

12 rig was on contract to BP.   Any intentional and

13 willful misconduct on the part of TransOcean crew

14 members that would have affected human safety and

16:38 15 the environment?

16     A.   No.

17     Q.   Are you familiar with the -- and I'll step

18 back a minute.

19           MMS has recently changed its name to,

16:38 20 BOEMRE, B-O-E-M-R-E.   I may use those terms

21 interchangeably, but just so that we're on the

22 same page, that's the governmental organization

23 that I'm talking about.

24           Are you aware that the MMS

16:38 25 regulations require that when drilling, you have

**PURSUANT TO CONFIDENTIALITY ORDER**

1    to maintain a safe drilling margin as identified

2    in an approved Application for Permit to Drill?

3        A.   Yeah.  I know there's -- I know there's

4    language regarding that.  I don't know the

5    specifics of those regulations.  I -- I haven't

6    read them.

7        Q.  Do you know generally that you have to

8    suspend drilling operations if you're not within

9    that safe drilling margin?

10                MR. KEEGAN:  Objection to the form.

11       A.   Again, I don't know -- I don't know the

12   details around the regs to -- to say, hey, when do

13   you need to suspend and, you know, what are --

14   what are the margins you have to be in.  I don't

15   know those specifically.

16       Q.  (BY MS. LeGRAND)  You don't know the

17   specific margins in terms of maybe the actual ppg

18   numbers, but you know that there is a safety

19   margin; and when you are not in that safety

20   margin, drilling needs to cease, correct?

21                MR. KEEGAN:  Objection to the form.

22       A.   I -- I do -- I do know -- to clarify, I do

23   know that there is a margin that you work with

24   MMS on.

25       Q.  (BY MS. LeGRAND)  Are you aware that pore

1    pressure and fracture gradient predictions must be

2    provided to the MMS?

3                    MR. KEEGAN:  Objection to the form.

4        A.  I -- I'm not sure what needs to go to the

16:40  5    MMS or not.

6        Q.  (BY MS. LeGRAND)  And you may have already

7    addressed this, but just -- just for the sake of

8    being clear on the record, have you heard that or

9    are you aware, based on your experience, that the

16:40 10    safe drilling margin is typically a half pound per

11    gallon or .5 ppg?

12        A.  Yes.

13        Q.  Do you know whether the drilling margin at

14    Macondo fell below .5 ppg at any point?

16:40 15                    MR. KEEGAN:  Objection to the form.

16        A.  Yeah.  I -- I -- I do think there -- there

17    was a -- yes.  I -- I do -- I do remember that.

18        Q.  (BY MS. LeGRAND)  Do you know if the MMS

19    was notified when the drilling margin fell below

16:40 20    .5 ppg?

21                    MR. KEEGAN:  Objection to the form.

22        A.  I don't know for a fact, but I -- I

23    believe so, yes.

24        Q.  (BY MS. LeGRAND)  Did you personally

16:40 25    instruct anyone to notify the MMS when it fell

PURSUANT TO CONFIDENTIALITY ORDER

1    below .5 ppg?

2                   MR. KEEGAN:   Objection to the form.

3         A.   Yeah.   Just based on my previous work

4    as -- I did not do that because I -- I'm not

16:41 5    work -- in charge of the operations.   And no, I --

6    I didn't -- I wasn't the one who directed that

7    or -- or made the call.

8         Q.   (BY MS. LeGRAND)   Okay.   I'm going to show

9    you what's been previously marked as Exhibit 3227.

16:41 10        A.   Uh-huh.

11        Q.   And this is on a CD, BP-HZN-2179MDL-

12    00010504.   And we've talked about this document a

13    little bit before.

14        A.   Uh-huh.

16:41 15        Q.   This was an E-mail between yourself and

16    David Rainey.   And I know that you have testified

17    that you weren't certain as to what he meant by

18    "up front and clear."

19                   Do you have any idea what portion of

16:41 20    your E-mail he was referencing with "up front and

21    clear"?

22                   MR. KEEGAN:   You said this was

23    previously marked as 3227?

24                   MS. LeGRAND:   Yes.   That's what I

16:42 25    have.   Or maybe --

**PURSUANT TO CONFIDENTIALITY ORDER**

1        MR. KEEGAN:  Okay.

2        A.  I think what he's referring to is the

3    recommendation to -- to drill another 100-135

4    feet, then TD, and then -- and then log and run 7

16:42  5    production and the -- and the reasons behind that.

6        Q.  (BY MS. LeGRAND)  And the reasons behind

7    that.

8            And is it accurate to say -- I know

9    you've kind of testified to this several times,

16:42  10   but just to be clear again --

11       A.  Uh-huh.

12       Q.  -- is it accurate to say that your

13   recommendation not to drill deeper at Macondo was

14   based on the low -- low prospectivity level?

16:42  15           MR. KEEGAN:  Objection to the form.

16       A.  Yeah.  That -- that's correct.  I didn't

17   get to the costs or can we go deeper.  I -- I

18   stopped it at there's no even reason to go any

19   further because of the prospectivity; that is

16:42  20   correct.

21       Q.  (BY MS. LeGRAND)  And does that correlate

22   to a financial incentive for BP if the prospect --

23   well, quality -- does the --

24       A.  So what's the question?

16:42  25       Q.  Does the prospectivity level correlate to

1   a financial incentive for BP?

2            MR. KEEGAN:  Objection to the form.

3       A.   Absolutely not.  It was -- it was --

4       Q.   (BY MS. LeGRAND)  So --

16:43  5       A.   The decision was absolutely based on

6   technical and lack of prospectivity deeper.  That

7   was the only consideration.  That's why I made the

8   recommendation to -- to stop the well there.

9       Q.   So would a low prospectivity well yield a

16:43 10  significant financial return to BP?

11            MR. KEEGAN:  Objection to the form.

12      A.   All -- all I'm saying is that I have to

13  base the decisions on probability of -- of

14  success, of finding the prospect.  I mean, that's

16:43 15  my job.

16      Q.   (BY MS. LeGRAND)  Right.

17      A.   And so, therefore, if -- if -- yeah, if

18  you've got a prospect that is -- I'm just going to

19  make a number up, not referring to this.

16:43 20      Q.   Sure.

21      A.   But it's a 1 in 10 chance of success.  10

22  percent chance of success of finding hydrocarbons

23  down there.  That would be a very low chance of

24  success, and I would say -- no matter where it is,

16:44 25  I would say I probably wouldn't recommend going

1    further --

2        Q.  And that's because with a low --

3        A.  -- in most cases.

4        Q.  And that's because with a low chance of

16:44  5    success, there's a low chance of financial return

6    for BP, correct?

7                    MR. KEEGAN:  Objection to the form.

8        A.  There -- there is a -- with -- with a low

9    chance of pros -- chance -- there -- there is a --

16:44  10   I lost my train of thought now.

11                  So when -- when there's a low -- when

12   there's a low chance of success on that, then --

13   yeah, then there -- it also translates into a low

14   chance of having a commercial -- a commercial

16:44  15   find.

16       Q.  (BY MS. LeGRAND)  Thank you.

17                  And when we were also talking about

18   this E-mail earlier, you mentioned that there was

19   an ops meeting.  And I -- I know that you

16:44  20   testified that you weren't certain if you

21   described your opinion in that ops meeting.

22                  Do you recall whether anyone else

23   expressed an opinion about whether to drill deeper

24   at Macondo or whether to call total depth?

16:45  25                  MR. LAVINE:  Objection to the form.

**PURSUANT TO CONFIDENTIALITY ORDER**

 1              MR. KEEGAN:  Objection to the form.

 2         A.  Yeah.  I -- I don't recall.

 3         Q.  (BY MS. LeGRAND)  Okay.

 4         A.  You're talking about this ops meeting in

16:45  5  this -- in this -- in this E-mail?

 6         Q.  Correct.

 7         A.  Yeah.  I'm just -- I'm not sure if I was

 8  at that ops meeting or -- or what happened at that

 9  ops meeting.

16:45  10        Q.  Okay.  So then, you also don't know who

11  would have been at that ops meeting?

12         A.  Correct.

13         Q.  Okay.  Move on.  Earlier you were talking

14  about the XX team, which is the exploration

16:45  15  excellence group; is that correct?

16         A.  Ex- -- yes.

17         Q.  Who are the members of that group?

18         A.  Well, it -- it changes.  And it -- it is a

19  bit dynamic.  The -- the head of exploration

16:45  20  excellence is Geoff Hill.  And so -- right now or

21  back then or what do you --

22         Q.  Let's look --

23         A.  -- what are you looking for?

24         Q.  -- at the time of Macondo.

16:45  25        A.  So I -- I can't recall who -- who was on

**PURSUANT TO CONFIDENTIALITY ORDER**

312

 1    it then.  I believe Geoff Hill was leading the

 2    team, and.  And John O'Leary was -- was on the

 3    team and Gerchard Pfau was on the team.  But

 4    again, I'm not sure.  I'd -- I'd have to go back

16:46  5    and check.

 6         Q.  How are the members of that group

 7    selected?

 8              MR. KEEGAN:  Objection to the form.

 9         Q.  (BY MS. LeGRAND)  If you know.

16:46 10         A.  Yeah.  I -- there's various ways they

11    could be selected.  So specifically on -- on how

12    they were selected, I'm -- I'm not sure.

13         Q.  Was any single person assigned to perform

14    their evaluation for Macondo from the XX team?

16:46 15         A.  The XX team reviews prospects all over the

16    world.  And there's -- for something like Macondo

17    or other prospects within BP, they have multiple

18    technical meetings through the life of the

19    prospect.  And on -- it's -- it's a lot dependent

16:46 20    on who's available a lot, at a -- at a particular

21    time and then what may be the subject matter that

22    is being presented.

23              So, for example, if it was a major

24    seismic issue and imaging issue, then Gerchard

16:47 25    Pfau would need to be there.  So on whose -- how

1    that works, it does change on availability and

2    what the subject matter might be.  So it -- it

3    kind of varies.

4          Q.  And do you remember who was predominantly

16:47  5    involved with Macondo?

6          A.  I don't remember.

7          Q.  I'm going to hand you a document, which we

8    saw a variation of this earlier, but it's a

9    slightly different thread --

16:47  10          A.  Uh-huh.

11          Q.  -- and it's got a few additional E-mails.

12          A.  Yes.

13          Q.  It is BP-HZN-2179MDL00032500.

14          A.  Uh-huh.

16:47  15          Q.  And I'm going to mark it as Exhibit 6359.

16                (Marked Exhibit No. 6359.)

17          Q.  (BY MS. LeGRAND)  I'd like to draw your

18    attention to the second page of the E-mail, where

19    we have the E-mail from yourself to David Rainey.

16:48  20    And you've copied several people, some of whom

21    you've just mentioned -- Mr. Pfau, Mr. O'Leary and

22    Mr. Hill.

23          A.  Uh-huh.

24          Q.  And then we've talked previously or you've

16:48  25    explained previously who Mr. Fitzpatrick and

314

<pre>
  1    Mr. Vinson, Mr. Ritchie and Ms. Yeilding are.

  2         A.  Uh-huh.

  3         Q.  This is the E-mail where you're making the

  4    recommendation to Mr. Rainey not to drill deeper;

16:48  5    is that correct?

  6              MR. KEEGAN:  Objection to the form.

  7         A.  Yeah.  I'm -- I'm giving him -- I'm giving

  8    him background as to -- and -- and what my

  9    recommendation is.

16:48 10         Q.  (BY MS. LeGRAND)  And the date that you

 11    submitted this recommendation is April the 14th;

 12    is that correct?

 13         A.  Yes.  My -- my note to Dave is Wednesday,

 14    April 14, 2010.

16:48 15         Q.  Okay.  And in the first paragraph, you

 16    outline, as you said, the reasons that you would

 17    not recommend proceeding, correct?

 18         A.  Yes.

 19              MR. KEEGAN:  Objection.

16:49 20         Q.  (BY MS. LeGRAND)  And that's again largely

 21    because of low prospectivity.  In sum, is that an

 22    accurate statement?

 23         A.  Yeah.  It's -- it's really important about

 24    some of the -- the work that they've done, yeah.

16:49 25    Some recent work, yeah.
</pre>

**PURSUANT TO CONFIDENTIALITY ORDER**

 1          Q.  And in particular, the phrase, perhaps the

 2     second line towards the end, where they do not see

 3     any evidence for significant reservoir development

 4     or hydrocarbons at this M54 location; is that

16:49  5     accurate?

 6          A.  Based on the -- based on the seismic data,

 7     that is correct.

 8          Q.  In the second paragraph, if you would read

 9     that second paragraph for us, actually, that would

16:49 10     be great.

11          A.  "From a drilling perspective, the Macondo

12     Well could be deepened based on the" pore pressure

13     prediction work -- "PPP work completed by the

14     Tiger team.  We need to make the decision very

16:49 15     quickly as drill pipe would need to be ordered,

16     planning completed and MMS contacted."

17          Q.  Okay.  Does that paragraph reflect a

18     concern for stopping drilling as a result of

19     safety concerns?

16:50 20          A.  Actually, no.  What I'm saying here is

21     that my recommendation from a technical point of

22     view, as I stated many times, was not to go

23     further.  What I'm saying here is that if you --

24     if you do decide to go further, then this decision

16:50 25     needs to happen now because my conversation with

PURSUANT TO CONFIDENTIALITY ORDER

```
 1   the drilling engineers is that drill pipe needs to
 2   be ordered, planning would need to get underway,
 3   and we need to get with the MMS.  So it's -- it's
 4   more about if yes to drill further, then we need
 5   to get after this quickly is what the -- what the
 6   drillers told me.
 7       Q.  Did any members of the Tiger team, as you
 8   reference here, indicate to you that it was unsafe
 9   to drill the Macondo Well deeper?
10       A.  Not that I can recall.
11       Q.  Okay.  If we look down kind of -- it -- it
12   appears that you've kind of summarized some of the
13   findings of various people you've spoken with or
14   various teams you've spoken with in making your
15   recommendation.
16       A.  Yes.
17       Q.  If we just take a look at those, "Bryan
18   and Team" is Bryan, Bryan Ritchie?
19       A.  Yes.
20       Q.  And he says again, "There's little chance
21   of finding economic resource in the M54 in O90
22   zones, and we do not recommend deepening."
23           That does not express a concern for
24   safety, does it?
25           MR. KEEGAN:  Objection to form.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

         1          A.   It is focused on -- on the technical

         2     case -- the subsurface technical case of

         3     prospectivity.

         4          Q.   (BY MS. LeGRAND)  And then if we look at

16:51    5     the next paragraph, which is the XX Team summary,

         6     the first bullet point reveals that:  "The review

         7     team agrees that the most likely result of

         8     deepening Macondo is that we will find several

         9     discontinuous 10-15 foot thick pay zones."

16:51   10               Again does this reflect a concern for

        11     safety?

        12          A.   No.

        13          Q.   If we look at Terry Fitzpatrick, whose

        14     comments are next, who I believe you testified was

16:51   15     a senior explorer?

        16          A.   Yes.

        17          Q.   He concurs "with the team's recommendation

        18     that there is very little top down support to

        19     deepen the Macondo Well.  A deeper M54 to O90

16:52   20     section exists just to the west of the wellbore.

        21     Seismic" -- and I is it --

        22          A.   Facies.

        23          Q.   -- "fascies in this isopach thick is

        24     chaotic suggesting a sand poor interval with

16:52   25     possibly thin discontinuous sand."

**PURSUANT TO CONFIDENTIALITY ORDER**

                        Does this reflect a concern for

safety?

        A.  No.

        Q.  If we move on to Mick Casey, who I believe

16:52   you also said was a senior explorer?

        A.  Yes.

        Q.  If we look at the first sentence:  "After

sitting down and reviewing the Macondo data with

Chuck and Binn, I would have to conclude that

16:52   there is very little chance for good Miocene sand

development below the current TD of the well.

What I see are three stacked chaotic zones which

likely represent muddy mass transport complexes

(MTCs) similar to the M54 'Brown Chaotic Zone' of

16:52   Thunder Horse field, which corresponds to a thick

shaley zone overlying the main reservoir."

                        Is this reflecting a concern for

safety?

        A.  No.

16:53   Q.  At any point in time, did anyone convey a

concern for safety associated with drilling the

Macondo Well deeper --

                        MR. KEEGAN:  Objection to the form --

        Q.  (BY MS. LeGRAND)  -- to you?

16:53                   MR. KEEGAN:  -- of the question.

**PURSUANT TO CONFIDENTIALITY ORDER**

319

```
 1    Objection.
 2               THE VIDEOGRAPHER:  Three minutes.
 3         A.  Not that -- not that I can recall.  Only
 4    in those E-mails from Michael Boerne that -- that
 5    went out saying -- regarding safety concerns.
 6         Q.  (BY MS. LeGRAND)  Because safety concern
 7    was the basis relayed to the co-owners of the
 8    well, correct?
 9         A.  In his --
10               MR. KEEGAN:  Objection to the form of
11    the question.
12         A.  In his E-mail, he talked about safety
13    concerns.
14         Q.  (BY MS. LeGRAND)  Let's see here.  I'm
15    going to hand you another document, which is again
16    kind of a variation on a theme of a document that
17    we've seen previously.  And I apologize.  This one
18    I have -- it's two pages long.  And I'll hand you
19    a copy, and then I'll just kind of pass it down to
20    everybody else.  This one is not on a CD, so I
21    have copies for everyone.
22               MR. KEEGAN:  You have a bunch of
23    copies here.
24               MS. LeGRAND:  Yeah, I can just pass
25    them on down.  Here's an extra.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1                      This is B-HZN- 2179MDL03716673,

2       which I'll mark as Exhibit 6360.

3                      (Marked Exhibit No. 6360.)

4                      MR. KEEGAN:  Counsel, if you can just

16:54  5       give me one second.  I'm not going to count this

6       against your time.

7                      MS. LeGRAND:  Sure.

8                      MR. KEEGAN:  I want to find out if we

9       know who NTS is.

16:54  10                      MS. LeGRAND:  Okay.

11                      MR. KEEGAN:  This is an inadvertently

12       produced privileged document, so we're not going

13       to allow any questions on it.

14                      MS. LeGRAND:  Okay.  I will move

16:54  15       along.

16                      MR. KEEGAN:  Thank you.

17            Q.  (BY MS. LeGRAND)  Are you eligible to

18       receive bonuses from BP?

19            A.  Am I personally?

16:54  20            Q.  Yes.

21            A.  Yes, I am -- I am eligible.

22            Q.  All right.  Is any portion of your bonus

23       tied to success of a given prospect or prospects?

24                      MR. GODWIN:  This is called wanting

16:55  25       to fall back.

PURSUANT TO CONFIDENTIALITY ORDER

1    A.  Not -- I mean, I would say, in general,

2  not specifically tied to -- you know, if -- if a

3  well came in -- a discovery, I -- I could

4  sometimes get a -- what's called a "spot award"

16:55  5  for that.  But the overall kind of bonus package,

6  that annual review, it's not specifically tied to

7  what you refer -- reference.

8    Q.  (BY MS. LeGRAND)  Was any portion of your

9  bonus in 2009 or 2010 tied to the Macondo

16:55  10  prospect?

11    A.  Not -- not that I know of.  Because I

12  don't -- I don't make the decisions on my bonus.

13    Q.  And just revisiting kind of the safety

14  discussions we had, it sounds like the Tiger team

16:55  15  did not convey safety concerns to you, the people

16  that were noted in the --

17    A.  Not -- not that I can --

18    Q.  Not that you recall.

19    A.  Not that I can recall.

16:55  20    Q.  The people that were cited in your E-mail

21  did not relay safety concerns in those excerpts?

22    A.  In -- in the --

23    Q.  In that --

24    A.  In that recommendation E-mail?

16:56  25    Q.  Right.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        A.  Correct.

 2        Q.  Who at BP is ultimately responsible for

 3   the "Is it safe" -- answering the "is it safe to

 4   drill" question?

 5             MR. KEEGAN:  Objection to form.

 6        A.  It's -- it's pretty much in the -- the

 7   drilling organization, the operations team.

 8        Q.  (BY MS. LeGRAND)  Is there a particular

 9   title or a particular person's name that you can

10   pinpoint as being responsible for that?

11        A.  Yeah.  I mean, it's -- it's a team of

12   folks.  And I hesitate, because I'm not sure of

13   who the -- who would -- who would be the ultimate

14   accountable there.  So I would hesitate to say

15   that.

16        Q.  Okay.

17             MS. LeGRAND:  How much time do I

18   have?

19             THE VIDEOGRAPHER:  You're out of

20   time.

21             MS. LeGRAND:  Okay.  That will end

22   it.

23             THE WITNESS:  All right.

24             MS. LeGRAND:  Thank you very much,

25   Mr. Thorseth.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

THE VIDEOGRAPHER:  The time is
4:56 p.m.  We're off the record, ending tape -- no
continuing.  We're off the record.

(Break from 4:56 p.m. to 5:02 p.m.)

THE VIDEOGRAPHER:  The time is
5:02 p.m.  We're back on the record.

MR. KEEGAN:  Before we start
Anadarko's questioning, just to clarify what
happened during TransOcean's -- Bates No. BP-HZN-
2179MDL03716673 appears to be an inadvertently
produced privileged document.  BP asserted the
privilege.  Everybody kindly returned the
documents to me.  And the exhibit that was marked
6360 is now not a part of the record here.

MR. GODWIN:  Agreed on behalf of
Halliburton.

MR. GONZALEZ:  Agreed on behalf of
PFC.

MR. CHAKERES:  Agreed on behalf of
the U.S.

MR. GANUCHEAU:  Agreed on behalf of
Cameron.

MR. LOWENTHAL:  Agreed on behalf of
Weatherford.

MR. REYNOLDS:  MOEX.

PURSUANT TO CONFIDENTIALITY ORDER

1                     MR. FUNDERBURK:  M-I.

2                     MS. GLAZER:  State of Louisiana.

3                     MS. LeGRAND:  TransOcean.

4                     MR. FITCH:  Likewise, Anadarko.

17:03  5                     MR. KEEGAN:  And does anybody not

6    agree?  I think we got everybody, but just to have

7    a clear record.

8                          Hearing no one, thank you all.

9                     E X A M I N A T I O N

17:03  10   BY MR. FITCH:

11        Q.  Mr. Thorseth, I'm Tony Fitch, as I

12   mentioned to you a moment ago.  And along with,

13   amazingly enough, another Tony F., Tony Forte, we

14   represent Anadarko, a company that you're familiar

17:03  15   with, I assume?

16        A.  Yeah.

17        Q.  Let me ask you to turn to Tab 2.

18        A.  Tab 2?

19        Q.  Yeah.  It's previously been marked as

17:03  20   Exhibit 1533.  And you see it's a --

21        A.  1533 or 32?

22        Q.  Tab 2, which was previously marked as

23   1532.  You're -- you're right.  And it's

24   Engineering Technical Practices from BP, correct?

17:04  25        A.  Yeah, that's what it says on the first

```
 1    page.
 2         Q.  Yeah.  It deals with pore pressure
 3    prediction, right?
 4         A.  Correct.
 5         Q.  Okay.  And pore pre- -- pressure
 6    predictions on wells to be explored were done by
 7    the Tiger team; is that right?
 8         A.  Yeah.  Part of it was, yeah.  By the Tiger
 9    team, yes.
10         Q.  Okay.  The Tiger team was, in 2009 and
11    2010, reporting to you, correct?
12                   MR. KEEGAN:  Objection.
13         A.  That -- as I stated previously, that
14    changed in April of 2010, yeah, to amend reported
15    to Dave Rainey.
16         Q.  (BY MR. FITCH)  But in -- in 2009, for
17    example, they were reporting to you, correct?
18         A.  Correct.
19         Q.  Okay.  Turn over to what's Page 3 of -- of
20    19.  It's -- the Bates number ends in 126.
21         A.  Yes.
22         Q.  You see there's a section up toward the
23    top called "Description of Risk"?
24         A.  Yes.
25         Q.  It says, doesn't it, "The prediction of
```

The timestamps in the left margin: 17:04 at line 5, 17:04 at line 10, 17:04 at line 15, 17:05 at line 20, 17:05 at line 25.

```
 1   pore and fracture pressures in wells is considered

 2   a zero tolerance activity..."?

 3            Have I read that part of the -- of

 4   the sentence correctly?

 5        A.  Yes.

 6        Q.  What does the phrase "zero tolerance

 7   activity" mean to you?

 8            MR. KEEGAN:  Objection.

 9        A.  I don't -- I don't know what it refers to

10   in this document.  I -- just for the record, I've

11   never seen this document before and haven't

12   studied it.

13        Q.  (BY MR. FITCH)  Okay.  You see a little

14   further down, it says -- there's a section called

15   "What is the Pore Pressure Prediction Recommended

16   Practice"?

17            And then it goes on to say:  "This

18   PPP Practice is intended to ensure that there is a

19   formal approach to managing the risks associated

20   with predicting pore and fracture pressure in BP

21   operated wells, that these risks are identified,

22   assessed and controlled in a methodical way so

23   that they can be removed or reduced to an

24   acceptable level."

25            Do I seem to have read that
```

17:05  5
17:05  10
17:05  15
17:05  20
17:06  25

**PURSUANT TO CONFIDENTIALITY ORDER**

1    correctly?

2         A.   You -- I believe you have read that

3    correctly, yes.

4         Q.   Okay.  And so is it your understanding

17:06 5    that -- that this GP-1015 E- -- ETP is BP's

6    efforts to establish a standard protocol for

7    conducting the pore pressure prediction process?

8              MR. KEEGAN:   Objection.

9         A.   Yeah.  I mean, I -- based on -- again,

17:06 10   like I said, I have not studied this or -- or read

11   it.  Based on the title, it says "Group Practice,"

12   but, you know, I don't -- I don't know for sure.

13        Q.   (BY MR. FITCH)  But going back --

14        A.   If this -- if this -- if this is the

17:06 15   latest document, if this is the most up-to-date

16   document, if this is our current group practice, I

17   -- I just don't know that.

18        Q.   Well, you see up at the top, it's dated 9

19   July 2008.  So you would understand it to -- to

17:07 20   have been in effect for some period at -- at least

21   beginning with 8 July 2008, correct?

22             MR. KEEGAN:   Objection.

23        A.   Correct.  And then if it was changed or

24   updated or something came into place after that, I

17:07 25   don't -- I don't recall.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1        Q.  (BY MR. FITCH)  Have you heard the term

 2    "zero tolerance activity" in any context during

 3    your employ with BP?

 4        A.  "Zero tolerance," yeah.  I mean, that's

 5    a -- that's a broad question during my entire

 6    career at BP.  What -- what's going through my

 7    mind is that there was zero tolerance regarding

 8    kind of drugs and alcohol and things like that.

 9    But regarding pore pressure prediction, not that I

10    can recall.

11        Q.  Would you consider -- strike that.

12             Do you consider pore pressure

13    prediction to be a safety critical task?

14             MR. KEEGAN:  Objection.

15        A.  I -- I consider pore pressure prediction

16    as -- as an important consideration when -- when

17    drilling wells.

18        Q.  (BY MR. FITCH)  Okay.  For what reasons?

19        A.  To -- to help with the -- with the

20    drilling prediction and -- and making plans to --

21    to drill the well on casing positions and -- and

22    putting together the plan.  It's -- it's -- it's

23    important.

24        Q.  Okay.  Would -- would you -- strike that.

25             Do you -- do you understand this to
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1      -- to be an attempt to standardize BP's approach

 2      to a safety critical process like pore pressure

 3      prediction?

 4                      MR. KEEGAN:  Objection; form.

17:09  5                      MR. LAVINE:  Objection; form.

 6          A.  I -- I don't know the ultimate objective

 7      and whether this is the standard or whether it's

 8      even the latest standard or not.  So I -- I don't

 9      know.

17:09 10        Q.  (BY MR. FITCH)  Okay.  Well when it says

11      the PP Pra- -- PP -- "This PPP Practice is

12      intended to ensure that there is a formal approach

13      to managing the risks associated with predicting

14      pore and fracture" -- "fracture pressure in BP

17:09 15    operated wells...," isn't that -- that saying that

16      there's a concern to establish a standard way of

17      doing it?

18          A.  Yeah.

19                      MR. KEEGAN:  Objection:

17:09 20        A.  Again, I don't know the context behind the

21      document, how it's used with -- within BP.  And

22      then without having studying the whole  con- --

23      the whole details and context of the document, I

24      really can't comment on that.

17:09 25        Q.  (BY MR. FITCH)  Well, are you -- are you
```

1   saying that you simply are unable to interpret

2   those words that are sitting there before you?

3        A.   Because I would need the entire context of

4   our corporate practice and this document, in

17:10   5   general, and the details of this document, yeah,

6   that's -- yeah, that's right.

7        Q.   Do you have any reason to -- to doubt that

8   when it states here that the "...PPP practice is

9   intended to ensure that there is a formal approach

17:10  10   to managing the risks associated with predicting

11   pore and fracture pressure...," do you have any

12   reason to doubt those words?

13             MR. KEEGAN:   Objection to form of the

14   question.

17:10  15        A.   Again, I'm just kind of restating my -- my

16   position in that it's very difficult to just take

17   one line out and understand the real -- you know,

18   what -- what the current practice is at -- at BP

19   --

17:10  20        Q.   (BY MR. FITCH)   Do you have --

21        A.   -- and at the time in 2009, 2010 and --

22   and 2011.

23        Q.   Do you have any -- any reason to doubt

24   that this is an effort to create and establish and

17:11  25   maintain a standard protocol for conducting PPP

**PURSUANT TO CONFIDENTIALITY ORDER**

1    procedures?

2               MR. KEEGAN:  Objection to the form.

3        A.  I just repeat myself.

4        Q.  (BY MR. FITCH)  Okay.  Do you have any

17:11  5    reason -- do you have any reason to think that --

6    that it would have been impossible for BP to

7    establish a similar standard procedure for a

8    negative pressure test?

9               MR. KEEGAN:  Objection to the form.

17:11 10              MR. LAVINE:  Objection to form.

11       A.  I -- I don't know.

12       Q.  (BY MR. FITCH)  Turn over to -- if you

13   would, please, sir, to Page 11 of 19.  You see

14   there's a -- you see there's a Section 6.1,

17:11 15   "Minimum Requirements"?

16       A.  Yes.

17       Q.  And you -- you see there's that term

18   "single point of accountability" that you've

19   testified about in a different context, correct?

17:12 20       A.  Yes.

21       Q.  "A Single Point of Accountability shall be

22   defined for the preparation and uptake of a pore

23   and fracture gradient prediction for any given

24   well and its associated uncertainties."

17:12 25              Do you know who was the SPA for the

PURSUANT TO CONFIDENTIALITY ORDER

| | |
|---|---|
| 1 | PPP for the Macondo Well? |
| 2 | MR. KEEGAN:  Objection to form. |
| 3 | A.  No. |
| 4 | Q.  (BY MR. FITCH)  Look at Tab 4 real fast -- |
| 17:12   5 | I'm sorry, Tab 3 with me real fast, please. |
| 6 | A.  Okay. |
| 7 | Q.  You see it also deals with pore pressure, |
| 8 | correct? |
| 9 | A.  Yes. |
| 17:12  10 | Q.  And this is -- this is Exhibit 1533 as |
| 11 | well as Tab 3. |
| 12 | A.  Uh-huh. |
| 13 | Q.  And this one deals, however, with pore |
| 14 | pressure detection during well operations, |
| 17:12  15 | correct? |
| 16 | A.  Okay.  Yes. |
| 17 | Q.  Do you, by any chance, know who was the |
| 18 | single point of authority for the Macondo Well for |
| 19 | pore pra- -- pore pressure detection? |
| 17:13  20 | A.  Like the other one, I don't recall who was |
| 21 | the S- -- or the -- the SPA for that. |
| 22 | Q.  Would it have been someone on the Tiger |
| 23 | team in each -- each instance? |
| 24 | MR. KEEGAN:  Objection to form. |
| 17:13  25 | A.  Yeah.  It's -- I'm not sure.  It's an |

**PURSUANT TO CONFIDENTIALITY ORDER**

1    operational thing and -- and, like I said, I

2    wasn't involved in -- in the operations of the

3    well and -- and so I'm -- I'm not sure.

4        Q.  (BY MR. FITCH)  Well, the document behind

17:13  5    Tab 2 is not an operational document, correct?

6        A.  No.  But I'm talking about this one right

7    in here --

8        Q.  Right.

9        A.  -- the -- the operations.  And you asked

17:13  10    me about this one, about who during -- during the

11    well.  And, like I, you know, said before, I'm not

12    involved in the operations, and I'm not sure how

13    they set up accountability for pore pressure

14    detection.

17:13  15        Q.  But within the exploration and appraisal

16    stage that you're responsible for, with respect to

17    pore pressure prediction, who would know who was

18    the SPA for the Macondo Well?

19                    MR. LAVINE:  Objection; form.

17:14  20                    MR. KEEGAN:  Objection to form.

21        A.  Yeah, I -- I don't know.

22        Q.  (BY MR. FITCH)  Would it be someone on the

23    Tiger team?

24                    MR. KEEGAN:  Objection to form.

17:14  25        A.  I don't know.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.   (BY MR. FITCH)  You were asked some

2  questions about the financial memoranda, which

3  became early this morning our first exhibit, 6331.

4  I -- I assume you recall.  You've been over that

17:14  5  several times now.

6      A.   Well, I would have to see -- are you

7  talking about an FM?

8      Q.   Yeah.  The FM.

9      A.   If you're -- well, if you're going to talk

17:14  10  about it, we probably should just pull it out just

11  in case.

12              MR. FITCH:  Okay.  Can I have 6331?

13      Q.   (BY MR. FITCH)  I'm tendering you 6330 --

14  31.

17:14  15      A.   Okay.  Thank you.

16      Q.   And you also were involved in the process

17  of submitting AFEs to Anadarko, correct?

18      A.   So regarding the process, no, I -- I look

19  over the AFE, and I'd -- I would sign the AFE, but

17:15  20  as far as the process to submitting it to

21  Anadarko, no, I'm -- I'm not involved in that.

22  That -- that goes into the land department

23  regarding the process of actually getting it in --

24  in -- in Anadarko's hands to the right person.

17:15  25      Q.   Okay.  Let me ask you to look at Tab 4 --

**PURSUANT TO CONFIDENTIALITY ORDER**

          1         A.   Yeah.

          2         Q.   -- in our binder --

          3         A.   Uh-huh.

          4         Q.   -- which is previously marked as -- in

17:15     5    some other deposition as 2370.  And go to the --

          6    the last two pages, if you would.  It's page --

          7    the Bates number ending in 6309.

          8         A.   Yes.

          9         Q.   Okay.  Now, that's a supplemental

17:16    10    financial memorandum, correct?

         11         A.   Yeah.  I think it's the same one that you

         12    gave me here in front of me, yeah.

         13         Q.   Yeah.  It's -- it's dated March 24, 2010.

         14    At the bottom is who saw the report, correct?

17:16    15         A.   Yes, yes.

         16         Q.   And this one is signed by -- by you --

         17         A.   Yes, yes.

         18         Q.   -- on -- in late March, correct?

         19         A.   Correct.

17:16    20         Q.   You -- you testified, didn't you, that

         21    there were two supplemental AFEs submitted to

         22    Anadarko?

         23         A.   I don't know if I testified that, but I --

         24    I believe there were -- there was the original

17:16    25    AFE --

1      Q.  Okay.

2      A.  -- and then -- and then I think there

3  were -- I believe there were two supplemental.

4      Q.  Okay.  And Anadarko signed the original

17:17  5  AFE and the two supplementals and returned them,

6  correct?

7      A.  I don't know becau- -- and the only reason

8  I don't know is because I'm not involved in that

9  process.

17:17  10      Q.  In the paper pushing part of it?

11      A.  Yeah.  I don't -- I don't get them back.

12  I don't see them so -- so that's the only reason I

13  don't.

14      Q.  And in Anadarko's processing of -- of

17:17  15  the consideration of processing of the AFE and the

16  supplemental AFEs, you're not aware, are you --

17  are you, of -- of any material operational changes

18  that Anadarko requested, correct?

19              MR. KEEGAN:  Objection to form.

17:17  20  Objection.

21      A.  So you're -- you're talking -- you're

22  asking about any changes in the operations --

23      Q.  (BY MR. FITCH)  Right.  In the drilling

24  plan, for example.

17:17  25      A.  Coming from Anadarko?

1      Q.   Anadarko.

2            MR. CHAKERES:   Object to form.

3      A.   Not -- not that I can remember.

4      Q.   (BY MR. FITCH)   Okay.

17:17   5      A.   I don't know.

6      Q.   Look at Tab 9 with me, please, sir,

7  previously marked as Exhibit 572.   This is a -- a

8  March 26, 2010, E-mail from -- from Rainey

9  to Mr. Guide and Mr. Sims and Mr. Morel and some

17:18  10  of the other Macondo 252 team, correct?

11            MR. KEEGAN:   Objection to the form.

12      A.   So can you -- so can you repeat that?   I'm

13  sorry.

14      Q.   (BY MR. FITCH)   Yeah.   Do you need a

17:18  15  minute to read it?

16      A.   I was -- I was still kind of --

17      Q.   I'm sorry.

18      A.   -- looking it over.

19      Q.   That's fair -- that's fair enough.

17:18  20      A.   So -- so one second here.

21      Q.   Sure.

22      A.   Okay.

23      Q.   This is a -- a March 26, 2010, E-mail from

24  Mr. Rainey to Sims and Guide and Hafle and some of

17:19  25  the Macondo 252 team, correct?

PURSUANT TO CONFIDENTIALITY ORDER

338

1          A.  Correct.

2          Q.  And you're -- you're copied on it, right?

3          A.  Yes.

4          Q.  And do you recall receiving this?

17:19   5          A.  I -- I don't re- -- I don't recall.  I'm

6     not -- again, I'm not denying I did, but I don't

7     recall --

8          Q.  Okay.  You don't have any doubt that you

9     received it?

17:19  10          A.  No.

11          Q.  Okay.  You see he -- he wrote:  "I know

12     this" well -- "that this well has demanded more

13     than it's fair share of your time and attention."

14                    Have I read that part of that

17:19  15     sentence correctly?

16          A.  Correct.

17          Q.  And -- and -- and was that your

18     understanding of -- of the status and progress of

19     the well as of May -- March 26, 2010?

17:19  20                    MR. KEEGAN:  Objection.

21          A.  Yeah.  I -- I don't remember -- I don't --

22     I'm not sure what day was -- was referencing there

23     specifically regarding the -- the time and

24     attention.

17:20  25          Q.  (BY MR. FITCH)  Was it your under- --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    regardless of what he was specifically referring

2    to in -- in detail, was it your impression that

3    the well was involving substantial time and

4    attention beyond the norm?

5         A.   Yeah.   I -- it possibly could have been at

6    the time.   I can't remember because it says here

7    that I recognize the team as with Ian and Pinky in

8    a staff meeting.   I don't re- -- rec- -- recollect

9    doing that specifically and -- but, yeah.

10        Q.   You see you wrote, "Thank you for your

11   commitment to remaining by far the highest

12   performing exploration Wells Team in the Gulf of

13   Mexico."

14             Was that, in fact, the -- the

15   reputation of the Macondo team at this point in

16   time?

17        A.   I -- I don't know.   I mean, Dave -- Dave

18   wrote it there.   So he was -- he was thinking

19   something along those lines.   You know, I -- like

20   I think I testified before -- well, I think

21   someone asked around the Tiger team, and I think

22   they're good, and I think these -- these guys were

23   -- were a good team.

24        Q.   Do you have any knowledge of -- of how

25   high his performing exploration Wells Team was

1    evaluated or measured?

2              MR. KEEGAN:  Objection to the form.

3         A.  Yeah.  I'm not sure what Dave was

4    referencing there, what -- what metric.

17:21 5    Q.  (BY MR. FITCH)  Turn with me to -- if you

6    would, please, sir, to Tab 11.  Do you need a

7    minute to look that over?

8         A.  Okay.

9         Q.  This is a memo that -- that you wrote,

17:23 10   correct?

11             MR. KEEGAN:  Objection.

12        A.  This was written by Ian -- Ian in the

13   drilling -- in the wells operations organization

14   led -- led this.

17:23 15   Q.  (BY MR. FITCH)  It went -- it went out to

16   the team under his name and your signature as

17   well, correct?

18        A.  Yeah.  Who it -- who it went out to, I'm

19   not sure because I didn't send it.  But it is --

17:23 20   it is possible that it went out under both our

21   names, yes.

22        Q.  Well, when you say it's possible, that is

23   your signature there over your printed name,

24   correct?

17:23 25   A.  No, no.  Possible -- I didn't send it.

1   That's all I'm saying.  So if it did go out, then

2   it's very possible that -- that both of our names

3   are on there.  I'm -- I'm not sure -- I think it

4   was followed through, but I'm -- I'm just not

17:23  5   absolutely positive because I didn't lead it, I

6   didn't send the -- send the note.

7       Q.  You -- you have no doubt that after you

8   signed this, that it was distributed, do you?

9       A.  I'm just not sure, but most likely did.

17:24  10   Yeah, probably did.  I don't know beyond a shadow

11   of a doubt.

12       Q.  Okay.  Do you recall that, in fact, a

13   discretionary incentive award program was

14   initiated with respect to the drilling of the --

17:24  15   the forthcoming drilling of Macondo 252 on or

16   about September 28, 2009?

17           MR. KEEGAN:  Objection to the form of

18   the question.

19       A.  Yeah.  I -- I don't recall specifically.

17:24  20   I do know that the drilling teams used this type

21   of program on -- on -- on other wells as well.

22       Q.  (BY MR. FITCH) Do you have -- leaving

23   aside your specific recollection, do you have a

24   general recollection that a discretionary

17:24  25   incentive program was at this point in time

 1   instituted for the drilling of the Macondo 252?

 2       A.   Yeah.   I -- I -- now that I see the -- the

 3   E-mail, it -- it is -- is a reminder.   But I

 4   don't -- I don't remember putting it together, for

17:25  5   example.

 6       Q.   Turn with me, please, to Tab 12.   And

 7   we'll mark this as Exhibit No. 6361.

 8               (Marked Exhibit No. 6361.)

 9       Q.   (BY MR. FITCH)   Let me know when you've

17:25 10   had a chance to digest it.

11       A.   So this is 2007, yeah?

12       Q.   Yep.

13       A.   Okay.

14       Q.   Let me -- the bottom E-mail, the first

17:26 15   E-mail chronologically in this string, was from

16   Mr. Sims to Mr. Little and to you, correct?

17       A.   That is correct.

18       Q.   And the next E-mail purports to be from

19   you to Mr. Sims and Mr. Little, correct?

17:26 20       A.   That is correct.

21       Q.   And do you have any doubt that -- that you

22   had this E-mail exchange?

23       A.   No.

24       Q.   Okay.   Mr. Sims wrote, did he not, in the

17:26 25   last sentence of his E-mail:   "We presented this

at the bi-weekly lessons learned meeting today but

to me this is a perfect example of the HORIZON

team's can-do attitude and a willingness to try

new things even if there is a possibility of

17:27     failure"?

              Do you recall that that was their

reputation at the time?

    A.  No.

          MR. KEEGAN:  Objection to the form.

17:27     A.  No.

    Q.  (BY MR. FITCH)  You don't recall one way

or the other; is that your --

          MR. KEEGAN:  Objection; form.

    A.  Correct.

17:27     Q.  (BY MR. FITCH)  Okay.  You see that you

wrote:  "The willingness to try new things and

excellent critical thinking tells me that we are

going in the right direction"?

    A.  Correct.

17:27     Q.  Do you recall writing that?

    A.  No.

    Q.  Okay.  Well, you -- do you recall why you

would have said that "we are going in the right

direction" --

17:27           MR. KEEGAN:  Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      Q.  (BY MR. FITCH) -- at this point -- why you

2   would have said at this point in time those words?

3                   MR. KEEGAN:  Objection.

4      A.  I don't remember.

17:27  5      Q.  (BY MR. FITCH)  Turn, please, sir, to

6   Tab 13.  We'll mark that as Exhibit 6362.

7                   (Marked Exhibit No. 6362.)

8      Q.  (BY MR. FITCH)  Give me a high sign when

9   you've had a chance to read it.

17:28 10                   MR. KEEGAN:  6362?

11                   MR. FITCH:  Yes, that's right.

12      A.  Okay.

13      Q.  (BY MR. FITCH)  Now, the -- within this

14   E-mail string on the -- on the second page that

17:29 15   ends in Bates No. 1021, there's a January 22nd,

16   2008, E-mail from Mr. Rainey to you and others,

17   correct, including Mr. Guide and Mr. Sims?

18      A.  Yes.

19      Q.  You see that?

17:29 20      A.  Yes.

21      Q.  And he wrote, did he not:  "Don't want to

22   get too carried away with numbers this early in

23   the year, especially when I know we have some

24   serious safety issues to deal with but, dot, dot,

17:29 25   dot, dot."

                        You see that?

          A.   Yes.

          Q.   Do you recall receiving this E-mail?

          A.   No.

17:29     Q.   Okay.  Do you have an understanding of
     what he was saying when he tailed off that
     sentence with the "but, dot, dot, dot, dot"?

          A.   I don't know what he was referencing with
     regarding the serious safety issues.

17:29     Q.   Okay.  Do you -- do you have an
     understanding that he was -- by using that "but,
     dot, dot, dot, dot" that he was saying that there
     was not really a safety issue running around to
     worry about?

17:30               MR. KEEGAN:  Tony, for the record,
     there's three sentences after the "dot, dot, dot,
     dot."

                    MR. FITCH:  You're right.

                    MR. KEEGAN:  Okay.  Just don't want
17:30     to make it sound like that's all the E-mail says.

                    MR. GODWIN:  We call that optional
     completeness.

          A.   Yeah.  I --

          Q.   (BY MR. FITCH)  Ignore the lawyers, all of
17:30     us, including myself.

PURSUANT TO CONFIDENTIALITY ORDER

 1      A.   I'm -- I'm not sure.  I -- I don't

 2   remember the E-mail.  I'm not sure what day it was

 3   referencing there.

 4      Q.   Okay.  Let's go to -- to Tab 14, why don't

17:30  5   we?  And this is another one we need to mark as

 6   Exhibit 6363.

 7               (Marked Exhibit No. 6363.)

 8      A.   Okay.

 9      Q.   (BY MR. FITCH)  This is a -- this E-mail

17:31 10   string includes at the bottom of the Bates page

11   ending in 1518 an E-mail from Mr. Garner to a

12   number of people in- -- including you, correct?

13      A.   Yes.

14      Q.   And then above that, there's a -- a

17:31 15   response from you to at least Mr. Little and

16   Mr. Sims, correct?

17      A.   Correct.

18      Q.   Okay.  And in Mr. Gar -- who's Mr. Garner,

19   incidentally?

17:31 20      A.   Stan Garner worked in the HSSE team.

21      Q.   I just didn't hear you.

22      A.   Yeah.  Sorry my voice is going.  The --

23   I'm getting a little frog there.  But --

24      Q.   He worked within the what team?

17:31 25      A.   I believe he's in the HSSE health and

1  safety team.

2      Q.  Oh, okay.  Okay.  And he's got a section

3  in here in his E-mail called "GoM SPU Safety Pulse

4  Check Process," correct?

17:32  5      A.  Yes.

6      Q.  And he wrote:  "The GoM SPU Safety Pulse

7  Check process is now ready for implementation

8  within your operating entity per the Safety

9  Improvement Plan.  The pulse check process will be

17:32 10  conducted on all offshore assets, rigs, marine

11  installation vessels, and at the PMF facility."

12          Did I read that correctly?

13      A.  Yes.

14      Q.  Do you recall the implementation and

17:32 15  application of the safety pulse check process?

16      A.  I recall vaguely about the program, the

17  safety pulse check program.

18      Q.  Okay.  And do you recall receiving or

19  participating in this E-mail exchange?

17:32 20      A.  I do recall, yes.

21      Q.  And do you recall that -- that since

22  the -- the process was basically conducted on all

23  offshore assets, including rigs, was the process

24  implemented on the DEEPWATER HORIZON?

17:33 25          MR. KEEGAN:  Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1          A.   I -- I don't know.   It looks as though --

2     as I -- as I recall, Ian -- Ian was talking with

3     TransOcean specifically on -- on safety pulse

4     checks, maybe under TransOcean leadership.   And so

17:33   5     this kind of shows Ian is in -- is in -- you know,

6     in charge of the operations.   He's kind of my

7     equivalent here, and he's saying, you know, hold

8     off.   We've basically got that under control.

9     We're going to work with TransOcean on checking --

17:33  10     checking the safety pulse check.

11          Q.   (BY MR. FITCH)   Okay.   And I need to ask

12     you to look at Tab 15, please, which I'll

13     represent to you are some more E-mails on this

14     same topic.

17:33  15          A.   Okay.

16          Q.   And we need to mark this one as Exhibit

17     6364.

18                    (Marked Exhibit No. 6364.)

19          A.   Okay.

17:34  20          Q.   (BY MR. FITCH)   Do you -- do you see that

21     in this E-mail stream that the first one

22     chronological at the bottom of the page is -- is

23     from Mr. Jackson of HSSE --

24          A.   Yeah.

17:34  25          Q.   -- to a number of individuals, including

1    you, correct?

2         A.   Correct.

3         Q.   And then there's a -- an E-mail above that

4    that you sent to Mr. Little and Mr. Sims, correct?

17:34  5         A.   Correct.

6         Q.   Okay.  And do you recall that --

7    participating in this E-mail exchange as reflected

8    in this document?

9         A.   Yeah.  I don't -- I don't recall

17:34  10   specifically, but it -- it looks as though

11   obviously I -- I did.

12        Q.   Okay.  Do you see in Mr. Sims' E-mail

13   to -- that Mr. Sims sent you an E-mail with a copy

14   to Mr. Little on March 17, 2008?

17:35  15        A.   Yeah.

16        Q.   You see that at the top?

17        A.   Yeah.

18        Q.   And you see he wrote:  "Horizon:

19   Questionnaires have been filled out and a set of

17:35  20   more pointed questions/topics has been developed."

21   We're "going" -- "We are going to be conducting

22   interviews and small group discussions on the rig

23   on Wednesday and Thursday of this week.  Next

24   week, Ian Little, John Guide, Jake Skelton, Dave

17:35  25   Rainey?, et al, will be going to the rig on March

**PURSUANT TO CONFIDENTIALITY ORDER**

1    27-28 to deliver the findings and rollout actions

2    based on all the  feedback"?

3              Did I read that correctly?

4         A.  Yes.

17:35  5    Q.  Okay.  And you see there is a specific

6    reference, of course, there to HORIZON, correct?

7         A.  Yes.

8         Q.  Okay.  Do you recall that -- that there

9    was a safety pulse check process implemented on

17:35  10   and with respect to the DEEPWATER HORIZON?

11        A.  Yeah.  Based on that previous E-mail, I

12   kind of recall.  I wasn't -- I wasn't remembering

13   this specifically, but it looks as though this is

14   right in line with that; and that, in fact, David

17:36  15   and Ian are getting after it and working with

16   TransOcean and doing a safety pulse check on the

17   rig, and they're going to be talking about the

18   findings and having a chat with the different

19   crews.

17:36  20   Q.  Do you know to whom the -- the results of

21   the safety pulse check would have been

22   distributed?  Would they have come to you, for

23   example, since you're involved in all this?

24        A.  I -- I may have seen them, but I -- I

17:36  25   don't know the full distribution list on -- on the

**PURSUANT TO CONFIDENTIALITY ORDER**

 1    findings.

 2        Q.  Okay.

 3                 THE VIDEOGRAPHER:  Five minutes left

 4    on the tape.

17:36  5                 MR. FITCH:  Okay.  Let me mention

 6    to -- to BP counsel that although I could well be

 7    mistaken, we have seen a -- THUNDERHORSE safety

 8    pulse documents.  We have never seen, and we've

 9    looked very hard for the -- the DEEPWATER HORIZON

17:36 10    safety pulse documents, and so I do need to ask

11    you to -- you and your colleagues to -- to look

12    for them.

13                 MR. KEEGAN:  We will take that under

14    counsel.  And off the record, you can send us a

17:37 15    letter and jump through all the discovery hoops.

16                 MR. FITCH:  We know the hoops, and

17    we'll jump through them.

18                 MR. KEEGAN:  If, in fact, it hasn't

19    been produced.  Who knows?

17:37 20        Q.  (BY MR. FITCH)  Exhibit -- Tab No. 16,

21    please, sir, if you'll turn to that.  And we're

22    marking that one as Exhibit 6365.

23                 (Marked Exhibit No. 6365.)

24        A.  Okay.

17:38 25        Q.  (BY MR. FITCH)  Now, this is an E-mail

PURSUANT TO CONFIDENTIALITY ORDER

         1    summary between -- an exchange between you and

         2    Mr. Sims regarding some personnel issues.  Is that

         3    a fair characterization?

         4         A.  Yes.

17:38    5         Q.  And you -- you made some comments about

         6    somebody named Trent and someone named Josh.  You

         7    see that in your E-mail?

         8         A.  Yes.

         9         Q.  And you see that Mr. Sims reported to you,

17:38   10    among other things, that -- that John Guide was

        11    going to be George's replacement and would be in

        12    transition in mid-September?  You see that?

        13         A.  Yes.

        14         Q.  Similar to your comments about Trent and

17:38   15    Josh, going forward from this August 2007 date,

        16    did -- did you participate in any discussions with

        17    Mr. Sims or anyone else about John Guide and his

        18    approach to performance of his duties?

        19                   MR. KEEGAN:  Objection to the form.

17:38   20         A.  So specifically regarding John -- John

        21    Guide and his kind of year-end appraisal or

        22    performance?  Is that the question?

        23         Q.  (BY MR. FITCH)  Either his year-end

        24    appraisal, or account, at that formal stage or

17:39   25    level --

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          A.   Yeah.

 2          Q.   -- or just other conversations as issues

 3     arose.

 4               MR. KEEGAN:   Objection to the form.

 5          A.   Yeah.  I don't remember any specific

 6     conversations with David regarding John.

 7          Q.   (BY MR. FITCH)  How about with anyone

 8     else?

 9          A.   No, not -- not that I can recall.

10          Q.   Did you come between August 2007 and April

11     of 2010 to have any understanding of John Guide's

12     reputation as a member of the -- of the deepwater

13     team and the Macondo team in particular?

14          A.   I don't have any comments on reputation or

15     know about the reputation one way or another.  I

16     don't know what you're referring to.

17          Q.   When you say you don't have any

18     comments --

19          A.   I don't know what you're referring to.

20          Q.   Okay.  When you say you don't have any

21     comments, are you -- are you saying that you don't

22     want to discuss it or you don't have any

23     knowledge?

24          A.   What do you mean regarding his reputation?

25     What do you -- what do you mean in your question?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   Q.   Information, knowledge, or observations

2   among other people about the way he handled

3   himself, the way he discharged his

4   responsibilities, his ability to get the job done,

17:40   5   his ability to work with other people.  All the

6   kinds of things that people normally talk about

7   other people in an organization when you're trying

8   to evaluate them or just see how things are going.

9        MR. KEEGAN:  Objection to the form.

17:40   10   A.   Yeah.  I don't -- I don't recall any

11   specific conversations.  But the one specifically

12   I do recall is that, you know, when he was coming

13   into the team with -- with David, I did ask

14   David -- because I didn't know -- didn't know

17:40   15   John.

16   Q.   (BY MR. FITCH)  Okay.

17   A.   And I think he was coming maybe from Mad

18   Dog or somewhere else in -- in the Gulf of Mexico,

19   and I asked David specifically, "Has John worked

17:40   20   the GoM?  And how is he?"

21        And -- and David said, "Yeah,

22   he's" -- it's my recollection and it could --

23   could be incorrect, but I -- I recall the

24   conversation going that John has experience and --

17:41   25   and he's good, and he'll get the job done.

**PURSUANT TO CONFIDENTIALITY ORDER**

    1        Q.   Okay.   And subsequent to that initial

    2   conversation during his transition there in 2007,

    3   did you participate in or learn of or overhear any

    4   further conversations about the discharge by

17:41   5   Mr. Guide of his responsibilities and his manner

    6   of doing so?

    7                    MR. KEEGAN:   Objection to the form.

    8        A.   The dis- -- the discharge, you mean just

    9   on --

17:41  10        Q.   (BY MR. FITCH)   Well, we all have

   11   responsibilities and discharge -- we discharge

   12   them.   We -- we -- we carry them out.

   13        A.   Yeah.   I -- yeah.   Oh, I -- I -- I don't

   14   know.   Yeah.   I don't know about the -- the

17:41  15   discharging of his responsibilities.

   16                    THE VIDEOGRAPHER:   Running out of

   17   tape.

   18                    MR. FITCH:   I have no further

   19   questions.   Thanks.

17:41  20                    THE VIDEOGRAPHER:   The time is

   21   5:41 p.m.   We're off the record, ending Tape 9.

   22                    (Break from 5:41 p.m. to 5:54 p.m.)

   23                    THE VIDEOGRAPHER:   The time is

   24   5:54 p.m.   We're back on the record, beginning

17:54  25   Tape 10.

**PURSUANT TO CONFIDENTIALITY ORDER**

                   E X A M I N A T I O N

BY MR. REYNOLDS:

        Q.   Mr. Thorseth, my name is Jack Reynolds.

I'm from the firm of Pillsbury, Winthrop, Shaw,

Pittman.  We represent MOEX Offshore and related

MOEX entities.

             For the purposes of my questions

today, I'll refer to them collectively as "MOEX."

Do you understand that?

        A.   Yes.

        Q.   Okay.  You understand that there was a

joint operating agreement, a JOA, governing the

relationship among BP, Anadarko and MOEX Offshore,

correct?

        A.   Yes.

        Q.   Okay.  You understand that under that JOA,

BP was designated as the operator of the Macondo

Well, correct?

        A.   Correct.

        Q.   You also understand that MOEX Offshore was

designated as a non-operating party, correct?

        A.   Correct.

        Q.   As a operator, you understood that BP had

the exclusive right and duty to conduct or cause

to be conducted all activities or operations under

PURSUANT TO CONFIDENTIALITY ORDER

```
 1   the JOA, correct?
 2              MR. KEEGAN:  Objection to form.
 3        A.  Yeah.  I'm -- I'm not sure of that one
 4   exactly.  I can't remember.  It's been awhile
 5   since I -- I looked at the JOA, so...
 6        Q.  (BY MR. REYNOLDS)  Okay.  So you're --
 7        A.  I'm not denying it.  I just don't recall.
 8        Q.  Yeah.  You just don't know?
 9        A.  Yeah.
10        Q.  Okay.  That's fine.
11              To your knowledge, MOEX Offshore did
12   not have those rights or duties; is that correct?
13        A.  Yeah.  You're probably right, but I'm --
14   I'm not a hundred percent sure.
15        Q.  Okay.  As operator, you understood that BP
16   was to contract for and employ any drilling rigs,
17   tools, machinery, equipment, materials, supplies
18   and personnel, correct?
19              MR. KEEGAN:  Objection to form.
20        A.  Yeah.  Again, I'm -- I'm just not sure --
21   I mean, are you reading it like it says it in
22   the -- in the JOA?
23        Q.  (BY MR. REYNOLDS)  Yes.  I've got --
24        A.  Okay.
25        Q.  -- quotes there, and I can tell you where
```

17:55  5
17:55 10
17:55 15
17:56 20
17:56 25

**PURSUANT TO CONFIDENTIALITY ORDER**

         1    I'm quoting and stopping --

         2         A.  Yeah.

         3         Q.  -- if you want me to, if that will help.

         4         A.  No, I'm not denying it.  It's -- it's not

17:56    5    the case.  I just -- I -- I -- I don't know.

         6         Q.  And that's fine.

         7         A.  Yeah.

         8         Q.  If you don't know, then that's -- that's

         9    fine.

17:56   10              To your knowledge, MOEX Offshore did

        11    not have the right to contract and employ drilling

        12    rigs, et cetera?

        13         A.  Yeah.  Not sure.

        14         Q.  Not sure.

17:56   15              Did you have any personal contact or

        16    communications with MOEX or any of its

        17    representatives in connection with the Macondo

        18    Well?

        19         A.  I did.

17:56   20         Q.  Okay.  Can you tell me who, where, when,

        21    what?

        22         A.  Yeah.  The -- right.  So the -- the names,

        23    not sure.  Did have post incident, Kirk -- as I

        24    mentioned earlier, Kirk Wardlaw -- Kirk Wardlaw

17:57   25    and I called Mr. Ishii like two or three times to

**PURSUANT TO CONFIDENTIALITY ORDER**

1   update him post -- post the incident, post April

2   the 20th.  And so I had -- had contact with him.

3              Had a business meeting with MOEX at

4   the Houstonian Country Club restaurant one time,

17:57   5   as well.  I do not remember who was there.  But,

6   quite frankly, I'm not sure if -- if that was --

7   if that even had to do with Macondo.  It might

8   have been just the business relationship in

9   general.

17:57   10             Also had contact with them, a dinner

11   meeting at Lynn's Steakhouse, if I remember right,

12   and I'm not -- again, Macondo or -- or at the time

13   not the drilling, but just the Macondo prospect,

14   might have been -- might have been discussed, but

17:58   15   I'm not sure.

16             And then I know we -- we met with

17   MOEX representatives in Westlake 4, BP's office,

18   and, again, the context of that conversation with

19   whether Macondo getting into that prospect was

17:58   20   discussed, I can't recall.  But those are the --

21   kind of the key meetings that I remember talking

22   with MOEX representatives.

23       Q.  Okay.  Now, these business meetings, if

24   I'm counting correctly, you listed three of them.

17:58   25   Were those -- those were prior to the incident?

360

1      A.  Yes.

2      Q.  Okay.

3      A.  Yes.

4      Q.  But the other conversations that you told

17:58  5  me about were post incident?

6      A.  They were phone calls to -- to kind of

7  update after -- yeah, post incident.

8      Q.  And if I'm understanding you correct,

9  these three pre-incident ones may or may not have

17:59  10  discussed Macondo, may or may not have been

11  general business relationship meetings; is that

12  correct?

13      A.  That's correct.  That's correct.

14      Q.  Any other communications with MOEX or any

17:59  15  of its representatives pertaining to Macondo?

16      A.  Pertaining to Macondo, not that I recall.

17  There could have been E-mails that I was on, cc'd,

18  or whatever.  But not -- not that I can think of

19  at the moment.

17:59  20      Q.  Okay.  Did you have any discussions with

21  MOEX or its representatives in connection with any

22  technical matters related to the Macondo Well?

23      A.  So regarding the -- for Macondo

24  considering coming into the prospect and in

17:59  25  looking at the prospect description or the -- the

**PURSUANT TO CONFIDENTIALITY ORDER**

 1   drilling of the well?

 2        Q.   The drilling of the well.

 3        A.   Okay.   So regarding the drilling of the

 4   well, I don't believe so, but I don't know for

18:00  5   sure.

 6        Q.   Okay.   Did -- did you provide any

 7   technical information to -- to MOEX in connection

 8   with the Macondo Well?

 9        A.   The drilling of the well?

18:00 10        Q.   Yes.

11        A.   Again, not -- not that I can remember

12   right now.

13        Q.   To your knowledge, did BP as the operator

14   ever consult with MOEX or its representatives with

18:00 15   respect to any health, safety or environmental

16   obligations of the operator?

17        A.   I don't know.

18        Q.   To your knowledge, did MOEX or its reps

19   provide any technical input related to the

18:00 20   production casing that was used for the Macondo

21   Well?

22        A.   I don't know.

23        Q.   To your knowledge, did MOEX or its

24   representatives provide any technical input

18:00 25   related to the type or number of centralizers used

 1   for the Macondo Well?

 2        A.   I don't know.

 3        Q.   To your knowledge, did MOEX or its reps

 4   provide any technical input related to the

18:01  5   determination that the float collar had converted

 6   on the Macondo Well?

 7        A.   I don't know.

 8        Q.   To your knowledge, did MOEX or its

 9   representatives provide any technical input

18:01 10   related to decisions about the cement job for the

11   Macondo Well?

12        A.   I don't know.

13        Q.   To your knowledge, did MOEX or its

14   representatives provide any technical input

18:01 15   related to the decision to accept the results of

16   the negative pressure test in the Macondo Well?

17        A.   I don't know.

18        Q.   To your knowledge, did MOEX or its

19   representatives provide any technical input

18:01 20   related to the Temporary Abandonment Procedure for

21   the Macondo Well?

22        A.   The procedure?

23        Q.   Yes.

24        A.   I don't know.

18:01 25        Q.   To your knowledge, did MOEX or its

**PURSUANT TO CONFIDENTIALITY ORDER**

1   representatives provide any technical input

2   related to the use of heavy spacer material in

3   connection with the displacement process in the

4   temporary abandonment process in the Macondo Well?

18:01   5        A.  I don't know.

6        Q.  To your knowledge, did anyone from MOEX

7   ever visit the DEEPWATER HORIZON in connection

8   with the drilling or the attempt to temporarily

9   abandon the Macondo Well?

18:01   10       A.  Say that one more time.

11       Q.  Sure.  To your -- to your knowledge, did

12  anyone from MOEX ever visit the DEEPWATER HORIZON

13  in connection with the drilling or the attempt to

14  temporarily abandon the Macondo Well?

18:02   15       A.  I don't believe so.

16            MR. REYNOLDS:  Thank you, sir.

17  That's all I have.

18            THE WITNESS:  Okay.  Thank you.

19            THE VIDEOGRAPHER:  The time is

18:02   20  6:02 p.m.  We're off the record.

21            (Break from 6:02 p.m. to 6:03 p.m.)

22            THE VIDEOGRAPHER:  The time is

23  6:03 p.m.  We're back on the record.

24                 E X A M I N A T I O N

18:03   25  BY MR. LOWENTHAL:

PURSUANT TO CONFIDENTIALITY ORDER

1   Q.  Good afternoon, Mr. Thorseth.  My name is

2   Joel Lowenthal.  I represent Weatherford.  I only

3   have a few very brief questions for you.

4                First, were you involved in the

18:03  5   selection of the float collar used on the

6   long-string on the Macondo Well?

7   A.  No.

8   Q.  Do you have any expertise, training,

9   experience or personal knowledge regarding the

18:04  10  design, manufacture or use of float collars?

11  A.  No.

12  Q.  Do you have any personal knowledge

13  regarding the conversion of the float collar on

14  the Macondo Well?

18:04  15  A.  No.

16  Q.  Have you discussed or overheard anyone at

17  BP talking about the conversion of the float

18  collar on the Macondo Well?

19  A.  Yeah.  I -- I might have been into some

18:04  20  kind of informal -- or, you know, conversations or

21  overheard conversations regarding the float collar

22  and -- and whether it converted or -- or not, yes.

23  So I --

24  Q.  Was this pre-April 20th or

18:04  25  post-April 20th?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Post-April 20th.

2      Q.   Okay.   What type of discussion or meeting

3  or group?   Was this a -- a -- something in the

4  hallway or a more formal meeting?

18:05   5      A.   It was more -- it was a more informal

6  meeting.

7      Q.   Do you recall who was present?

8      A.   I'm trying to think.   It was -- you know,

9  who -- who the conversations were.   It could have

18:05  10  been with Mike Zangi or David Sims.

11      Q.   Okay.

12      A.   You know, drilling engineers.

13      Q.   Did you ask them any questions or were you

14  simply listening to a conversation they were

18:05  15  having?

16           MR. KEEGAN:   Objection to the form.

17      A.   I might have asked them -- you know,

18  because I don't -- as you previously found out, I

19  don't have any expertise in this area.   So it was

18:05  20  more they were giving me some information.   I

21  might have asked clarifying questions about how

22  does this work or how -- what could have happened,

23  but -- but that would have been it.

24      Q.   (BY MR. LOWENTHAL)   What do you recall

18:06  25  their description or testimony or information

**PURSUANT TO CONFIDENTIALITY ORDER**

1    provided to you to be?

2         A.   Yeah.   The -- all I recall is that -- that

3    something happened for the -- for the flow to have

4    gone up the -- up the casing; that something broke

18:06  5    down in -- in that region of the float collar

6    and -- and some...

7         Q.   Did they suggest or imply or state to any

8    degree of certainty whether or not the float

9    collar had malfunctioned or didn't perform the way

18:06  10   it was supposed to perform in connection with the

11   Macondo Well?

12              MR. KEEGAN:   Objection to form.

13        A.   Yeah.   I don't -- I don't -- I'm not sure

14   if they said, "Hey, there was a malfunction," or

18:06  15   not.   It was -- it was more of, "Hey,

16   something" -- "something happened" and, you know,

17   that -- that we had flow up through -- up through

18   the collar into the -- into the casing.

19        Q.   (BY MR. LOWENTHAL)   Okay.   But did they

18:07  20   suggest in any way, shape or form that the float

21   collar failed to perform the function for which it

22   was designed and manufactured?

23        A.   No, not -- not that I can recall.

24              And then -- and then the only other

18:07  25   thing that I -- I learned about the float collar

PURSUANT TO CONFIDENTIALITY ORDER

was through the Bly report.

Q.  Okay.  Would it be fair to say that you have not heard since the explosion anyone at BP -- and I'm putting aside the Bly Report -- but anyone at BP where you have been in a conversation or seen -- been in a meeting where anyone has criticized or testified or -- or -- or addressed the issue of the float collar's performance on the Macondo Well prior to April 20th, 2010?

MR. KEEGAN:  Objection to form.

A.  Correct.  Yeah, I haven't been involved in that.

MR. LOWENTHAL:  Okay.  That's all the questions I have.  Thank you.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  The time is 6:08 p.m.  We're off the record.

(Break from 6:08 p.m. to 6:10 p.m.)

THE VIDEOGRAPHER:  The time is 6:10 p.m.  We're back on the record.

E X A M I N A T I O N

BY MR. GANUCHEAU:

Q.  Good afternoon, sir.  My name is Tom Ganucheau.  I represent Cameron.

A.  Okay.

1      Q.  By the time we get to me, usually very few

2   questions left.  I'm going to try to be very

3   brief.

4           In your position as executive -- I'm

18:11  5   sorry.

6      A.  Exploration manager.

7      Q.  -- exploration manager of Gulf --

8   Deepwater Gulf of Mexico, what do you mean by

9   "exploration" in that position, that title?

18:11  10      A.  Good question.  Not development, not

11   appraisal, but, no.  So what we mean by

12   exploration is looking for new fields, new --

13   new oil and gas fields in -- in the Deepwater Gulf

14   of Mexico.

18:11  15      Q.  Not appraisal, not development.  How are

16   those different?

17      A.  Yeah.  So exploration is something new.

18   And -- and so in -- in my capacity as that, it was

19   exploration and appraisal.  And so what we mean by

18:12  20   exploration is to try to find new fields never

21   found before and to -- to establish those as

22   discoveries.  That -- that's our main objective.

23   And then I'm also a part of -- to do the resource

24   appraisal, which is early appraisal after you have

18:12  25   made a discovery of the first well or two to kind

**PURSUANT TO CONFIDENTIALITY ORDER**

1    of start to see how big it might be and what

2    the -- what the limits of the field might be.

3         Q.   Once the prospect is identified --

4         A.   Uh-huh.

18:12  5         Q.   -- by you guys and evaluated by your team,

6    is it then handed off to the drilling group to go

7    and do the operations side of that exploration?

8         A.   So what happens is it is -- it -- it does

9    work in the team kind of all the way through, but

18:12  10   it is -- it is a handover from kind of the

11   exploration to the operations to kind of leading

12   the -- the op -- the well drilling, right.  But I

13   should say that the subsurface staff stays as a

14   support team and individuals to help the -- the

18:13  15   drillers in the operations.  So it turns from kind

16   of a lead into a support role during -- during the

17   operations.

18        Q.   And I've heard you use the term "drilling

19   group" or "wells group."

18:13  20        A.   Yeah.

21        Q.   Are they one in the same?

22        A.   Same thing.  Yeah.  I'm sorry.  I -- I

23   have interchanged those.  Before at BP they were

24   called D&C Drilling and Completions Group.  In

18:13  25   today's -- in today's vernacular, they're called

370

the wells organization.  So I'm sorry if I've

mixed those, but they are -- I do mean to -- mean

them for being the same thing.

Q.  And that group's expertise is the drilling

18:13  side of the business, correct?

A.  The wells organization is absolutely the

experts in -- in the drilling of the well.

Q.  Your side is the identification and

evaluation of the prospect?

18:14  A.  That's correct.

Q.  How many other wells would fall under you,

for instance, at the time that the Macondo was

being drilled that were being drilled under your

group?

18:14  A.  Yeah.  I don't -- I don't re- -- I don't

think we were drilling any other BP operated well.

I was involved in the Moccasin well, but Chevron

was operating that so we were a nonop in that.

That's -- that was going down.  But other than

18:14  Macondo, that was the -- that was the only one at

-- at the time.

Q.  So even if you were a nonoperator, your

group was still evaluating exploration potential

for other prospects?

18:14  A.  Yes, absolutely.

**PURSUANT TO CONFIDENTIALITY ORDER**

Q.  How many different prospects were being
evaluated in your group at the same time that
Macondo was being drilled?

A.  Yeah.  I -- I don't have an exact number
on -- on how many prospects were being evaluated,
but numerous.

Q.  Can you give me a ballpark?

A.  You know, 10 -- 10 to 15, potentially.

Q.  How much time would you actually spend on
Macondo issues on any given day?

A.  Yeah.  Not -- not very much.  I would --
as I -- as we talked about today, I would get the
one-liner, have kind of the headline as to what
was going on, and the rest of my day was spent
doing other things.

Q.  Generally, what would the rest of your day
be spent doing?

A.  I -- I think it is captured in my opening
statement of saying what was my normal job.  So
it's -- it's doing strategy work, doing -- looking
at technical evaluations of -- of the prospects,
doing people work, doing budgeting, doing
technology, those -- those kind of things,
meetings with -- with potential partners or
commercial deals, things like that.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Have you worked on the operations side, or

2    have you always been the exploration evaluation

3    side?

4    A.  I'm -- I'm -- I'm an explorer almost in my

18:16  5    entire career.

6    Q.  You don't have any expertise in the

7    drilling side of the business?

8    A.  That is not my expertise.

9    Q.  Okay.  I asked about this before we got

18:16 10    started here, and I want to call your attention --

11    this is Exhibit 3540, and this is just for my

12    personal information about how this document

13    should be read.  And this is a Schlumberger log;

14    is that correct?

18:16 15    A.  Yeah.  It looks like a Schlumberger suite

16    of logs.  It's got more than -- more than one,

17    more than one log on there.

18    Q.  Are you familiar with reviewing these --

19    the logs such as 3540 that's in front of you?

18:16 20    A.  Yeah, in general.

21    Q.  And the data that's presented in those

22    logs?

23    A.  Yes, in -- in general, yes.

24    Q.  Okay.  And I -- and -- and forgive my

18:17 25    pointing.  It's the only copy of the document that

373

1    I have.

2        A.   No problem.

3        Q.   But if you look, starting right here, it

4    talks about depth -- or driller depth, SLB depth,

18:17  5    and bottom log interval.

6             Do you see that?

7        A.   Yes.

8        Q.   And the driller depth is 18,360; is that

9    correct?

18:17  10        A.   That's correct.

11        Q.   The Schlumberger -- or the SLB depth is --

12    is that 18,280?  Is that how that reads?

13        A.   I don't -- it looks like it possibly,

14    yeah.

18:17  15        Q.   Why would --

16        A.   I don't know for sure.

17        Q.   Why would there be a difference?

18        A.   Yeah, I don't -- I don't know the details

19    on that, but I know there is -- you need -- you

18:17  20    need rat hole, what they call "rat hole" in --

21    in -- in the hole in order to get your -- your

22    tools down to the -- to near the bottom, and then

23    the measurements are -- are up on the tool a bit.

24             So, you know, they're -- there's

18:18  25    just -- you just can't get the measurement all the

374

1    way down to the absolute base of the open hole.

2        Q.  It then goes to bottom log interval at

3    18,270.  Do you see that?

4        A.  Yes.

18:18  5        Q.  Is -- would that be where they started

6    logging the hole?

7              MR. KEEGAN:  Objection; form.

8        A.  Yeah.  I -- I'm not sure.  I'm not sure.

9        Q.  (BY MR. GANUCHEAU)  Okay.

18:18 10        A.  I'm not sure.  And I'm not sure I got that

11    description right on why there's that gap on

12    the -- in between total driller depth and the

13    Schlumberger depth, either.  But anyway...

14        Q.  Sure.  You were not involved in the

18:18 15    day-to-day operations and maintenance of the

16    DEEPWATER HORIZON, correct?

17        A.  Definitely not.

18        Q.  And, likewise, you weren't involved in the

19    day-to-day operations and maintenance and testing

18:18 20    and inspection of the blowout preventer that was

21    on the HORIZON?

22        A.  That's correct.

23        Q.  You weren't involved in the specifications

24    for what blowout preventer was going to be used on

18:18 25    the HORIZON or the particular components of the

**PURSUANT TO CONFIDENTIALITY ORDER**

1    blowout preventer used on the HORIZON, correct?

2         A.  That is correct.

3         Q.  Are you involved in deciding which rig

4    will be used on which prospect?

18:19  5         A.  So, yeah, I'm in- -- I'm involved in

6    giving input into the rig schedule decision.  So,

7    the rig schedule is owned by the well's

8    organization, the drilling organization.  They

9    lead it.  They do own it, but I am in on some

18:19  10    meetings that provides input into their scheduling

11    decisions.

12              And so, therefore, I may say, Hey,

13    Prospect A, B, and C, potentially, could be ready

14    on these particular dates and they need -- they'll

18:19  15    need this planning time so they could spud,

16    potentially, in this range.  And so, I'm providing

17    that input to them; but the actual decision on

18    which rig, it -- it more stands with the well's

19    organization.

18:20  20         Q.  And who is it that makes the final

21    decision as to which rig would be used on which

22    well?

23              MR. KEEGAN:  Objection; form.

24         A.  Yeah, I -- I'm not sure on -- on the final

18:20  25    decision-maker on that.

PURSUANT TO CONFIDENTIALITY ORDER

1     Q.  (BY MR. GANUCHEAU)  Do you -- since you

2  have been in some of these meetings, do you know

3  what criteria are used to determined which rig is

4  used on which well?

18:20  5     A.  No, not -- I mean, in general, I -- I -- I

6  know some things but not -- not specifically, and

7  I'm not involved in that final decision.

8     Q.  Back to the -- the blowout preventer.  If

9  I were going to ask questions about the operation

18:20  10  of the blowout preventer, its capabilities, its

11  design, its performance, you would defer those

12  questions to others?

13     A.  I would absolutely defer those questions

14  to others.

18:20  15     Q.  And any questions about the performance of

16  the blowout preventer on April 20th -- or after

17  April 20th, you have no personal knowledge,

18  correct?

19     A.  Other than, say, the Bly report and kind

18:20  20  of --

21     Q.  What you've read?

22     A.  Yeah.

23     Q.  Okay.  Otherwise, as to what -- the

24  operation of the BOP on or -- on or at April 20th

18:21  25  or thereafter, again, you would defer to others?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   Yes.

2    Q.   Have you been to well control school?

3    A.   I have not.

4    Q.   Did the group that you were over start

18:21  5  doing anything different as a result of the

6    Macondo in your day-to-day activities?

7    A.   As a result of Macondo, did we start doing

8    anything different?  I don't know.  I would have

9    to think about that and -- and think of if -- if

18:21  10  there's anything that's been changed specifically

11    for exploration.

12         I know that now we're -- we're

13    thinking of -- we're working with the well's

14    organization in, you know, having double -- dual

18:22  15  shear rams on location, having capping stacks in

16    place.  That affects -- you know, I'm -- I'm in

17    on -- on those meetings, going 24/7 on -- on

18    well -- well -- following the wells.  Those are

19    kind of the basic things.

18:22  20  Q.   The -- the dual blind shear ram, the

21    shearing blind rams, you understood that not all

22    the BOPs that were employed in the BP fleet had

23    shear rams?

24    A.   Yes, that's right.

18:22  25  Q.   Some did, some didn't?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          A.   That's correct.
 2          Q.   You didn't play any part in deciding which
 3     BOP would be used on which rig or which well,
 4     correct?
18:23  5          A.   Correct.
 6          Q.   The 24/7 monitoring, that was not in place
 7     prior to Macondo, correct?
 8          A.   On -- on the rig it was, but just thinking
 9     about how -- should be -- should be done in -- in
18:23 10    the office.  And I don't know where that's at.
11    I've left the GoM, and I'm not sure where that's
12    at.
13          Q.   And that was my next question:  Do you
14    know where that stands now?
18:23 15          A.   Yeah, I don't know.
16          Q.   Have there been any changes in, for
17    instance, pore pressure evaluation or analysis as
18    a result of what you found and what happened with
19    the Macondo Well?
18:23 20          A.   I -- I don't know specifically.  I don't
21    know.  I'm not sure.
22          Q.   Any other changes that come to mind?
23          A.   Not that I can recall.
24               MR. GANUCHEAU:  That's all I have for
18:23 25    you.  Thank you, sir.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1    THE WITNESS:  Okay.

2    THE VIDEOGRAPHER:  The time is

3    6:23 p.m.  We're off the record.

4    (Break from 6:23 p.m. to 6:25 p.m.)

18:24  5    THE VIDEOGRAPHER:  The time is

6    6:25 p.m.  We're back on the record.

7    E X A M I N A T I O N

8    BY MR. KEEGAN:

9    Q.  Just a couple questions, Jay, and then we

18:25  10   should be heading out pretty quick after that.

11    Do you know when the DEEPWATER

12   HORIZON drilled to total depth on the MC 252 No. 1

13   well?

14    A.  I don't recall the specific date.

18:25  15   Q.  Can you take a look at Exhibit 3540?

16    A.  (Witness complies.)

17    Q.  What's the logging date for this wire line

18   log run?

19    A.  April -- April 10th.

18:25  20   Q.  And what's the drilling depth identified

21   on that document?

22    A.  18,360.

23    Q.  In looking at that, do you know whether

24   the DEEPWATER HORIZON rig had drilled to a depth

18:26  25   of 18,360 prior to April 10th, 2010?

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          A.  Yes.

 2          Q.  Okay.  Can you take a look at

 3   Exhibit 6359, please?

 4          A.  (Witness complies.)

18:26 5      Q.  Do you recall prior -- your prior

 6   testimony about that exhibit?

 7          A.  Yes.

 8          Q.  And what's the date of the E-mails in that

 9   exhibit?

18:26 10     A.  The top one is April 14th.  Next one is

11   April 14th -- April 14th.  And the next one is --

12   all April 14th.

13          Q.  As of April 14th, had the DEEPWATER

14   HORIZON rig safely drilled to a total depth of

18:26 15  18,360 feet?

16          A.  Yes.

17          Q.  And as of April 14th, what was your

18   recommendation about deepening the Macondo Well?

19          A.  For technical reasons and lack of

18:26 20  prospectivity, that we should not deepen.

21          Q.  And was there any actual deepening of the

22   Macondo Well after April 14th, 2010?

23          A.  Not that I know of.

24          Q.  If there had been a decision or

18:27 25  recommendation from you to deepen the MC 252 No. 1
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1  well, would there have been a discussion about

2  safety?

3      A.  Absolutely.

4      Q.  Earlier today, I noticed that you have a

18:27  5  tendency to answer questions with a "yeah" and

6  then give your answer.

7      A.  Sorry about that.

8      Q.  Do you intend that "yeah" to be an

9  affirmative response to the question that's asked?

18:27  10          MS. LeGRAND:  Object to the form.

11      A.  No, not the -- not the final answer to the

12  question.

13      Q.  (BY MR. KEEGAN)  What do you intend by

14  those "yeahs"?

18:27  15      A.  That I'm understanding the question as

16  it's coming along.

17      Q.  Mr. Thorseth, can you take a look at

18  Exhibit 3533, which is the July 26th, 2010,

19  technical memorandum.

18:27  20      A.  Okay.

21      Q.  Turn to the top of Page 32 for me, please.

22      A.  Yes.

23      Q.  Let me see that real quick, Jay.

24          (Witness tenders document.)

18:28  25      Q.  (BY MR. KEEGAN) Can you read that

PURSUANT TO CONFIDENTIALITY ORDER

 1    paragraph at the top of Page 32 in the --

 2         A.   "During the initial analysis at the well

 3    site, the M 57 B sand was not interpreted as

 4    gas-bearing.  The interpretation was based on logs

18:28  5    field print presented in Figure 30, where the M 57

 6    B lacks the pronounced neutron density crossover

 7    as observed in the gas-bearing M 56 A sand.  In

 8    addition, there was no mud gas response over

 9    M 57 B."

18:28 10         Q.   As you sit here today on September 19th --

11    September 20th, 2011, do you have any reason to

12    believe that anyone at BP thought that the M 57 B

13    was anything other than water prior to the blowout

14    on April 20, 2010?

18:29 15         A.   Not that I know of.

16              MR. KEEGAN:  That's all the questions

17    I have.

18              THE VIDEOGRAPHER:  The time is

19    6:29 p.m.  We're off the record.

18:29 20              (Break from 6:29 p.m. to 6:30 p.m.)

21              THE VIDEOGRAPHER:  The time is

22    6:30 p.m.  We're back on the record.

23                   E X A M I N A T I O N

24    BY MR. GONZALEZ:

18:30 25         Q.   I just want to clarify a few things

1    regarding some of the questions that had been

2    asked so far.  And one of them relates to the

3    technical memorandum, which is Exhibit No. 3533.

4    And that's the one that refers to, at Page 31, as

18:31  5    there being "probable gas at M 57 B."

6              Are you with me?

7         A.  Page 31, yes.

8         Q.  Okay.  That section does not say that this

9    is a draft, correct?

18:31 10         A.  Yeah, I -- I don't see -- I see

11    "Version 1" on here.

12         Q.  Right.  But the words --

13         A.  I don't see "draft."

14         Q.  Right.  The words "draft" are nowhere to

18:31 15    be found on this?

16         A.  Not that I can see.

17         Q.  And with respect to that statement,

18    "probable gas," you have not seen any version that

19    contradicts that in a similar report?

18:31 20         A.  "Probable gas" on Page 31?

21         Q.  Yes.

22         A.  Okay.  So, let me just make sure we

23    clarify here.  So, you're talking about where it

24    said "probable gas" in that particular figure --

18:31 25         Q.  Yes.

**PURSUANT TO CONFIDENTIALITY ORDER**

         1      A.  -- or about the words up above it?  Or....

         2      Q.  Well, that figure says:  "M 57 B, probable

         3   gas."

         4      A.  It does.  But the words up above it say

18:32    5   quite a bit more.

         6      Q.  I understand.  But we're looking at the

         7   graph.

         8      A.  Yes.

         9      Q.  It says:  "M 57 B, probable gas."

18:32   10              Right?

        11      A.  It says:  "Probable gas above the

        12   thermogenic front."  I think that's important

        13   language to be included.

        14      Q.  That's fine.

18:32   15              And that -- you said this is

        16   Version 1, and you have not seen any other

        17   version -- Version 2, 3, 4, 5, or 6 -- that says

        18   anything different than that graph?

        19              MR. KEEGAN:  Objection to form.

18:32   20      A.  Yeah, I -- I -- I don't recall.

        21      Q.  (BY MR. GONZALEZ)  Okay.  You don't recall

        22   seeing anything that contradicts that, right?

        23      A.  I -- yeah, I -- I don't remember one way

        24   or the other.

18:32   25      Q.  All right.  As far as you know, that

**PURSUANT TO CONFIDENTIALITY ORDER**

1   language -- "probable gas above thermogenic

2   front" -- was written by somebody interpreting

3   this graph, right?

4               MR. KEEGAN:  Objection to form.

18:32   5   A.   Yeah.  I'm -- I'm not sure who wrote --

6   who wrote those words.

7   Q.   (BY MR. GONZALEZ)  This memorandum was

8   prepared by the BP team responsible for preparing

9   such technical memorandas, right?

18:33   10   A.   Yes.  Yes.

11               MR. KEEGAN:  Objection to the form.

12   Q.   (BY MR. GONZALEZ)  And the word "probable"

13   means "more likely than not," correct?

14               MR. KEEGAN:  Objection to form.

18:33   15   A.   We'd need to -- we'd need to ask the team

16   what they meant by "probable gas above thermogenic

17   front."  Also, with all the language that is above

18   that says it's approximately 2 feet thick below

19   log resolution; and then if hydrocarbons were

18:33   20   present, based on that, it was above the

21   thermogenic front.

22               So, that -- that -- that's what --

23   it's important language to understand what they

24   were trying to say.

18:33   25   Q.   (BY MR. GONZALEZ)  If I tell you we will

**PURSUANT TO CONFIDENTIALITY ORDER**

| | | |
|---|---|---|
| | 1 | probably be done soon in this deposition, does |
| | 2 | that mean to you we are going to be done quickly? |
| | 3 | MR. KEEGAN:  Objection to the form. |
| | 4 | MR. SAMPSON:  Not from a lawyer. |
| 18:33 | 5 | A.  I don't want to -- I -- I'm not sure. |
| | 6 | Q.  (BY MR. GONZALEZ)  Well, you agree with me |
| | 7 | that the word "probable" means "more likely than |
| | 8 | not," correct?  Just in its general, everyday |
| | 9 | language, its meaning. |
| 18:33 | 10 | MR. KEEGAN:  Objection; form. |
| | 11 | MR. LAVINE:  Object to form. |
| | 12 | A.  Yeah, I -- I don't know what, for sure, |
| | 13 | they were meaning by that. |
| | 14 | Q.  (BY MR. GONZALEZ)  But you agree -- |
| 18:33 | 15 | A.  Because in -- in the context -- |
| | 16 | Q.  Well, here's my question -- |
| | 17 | A.  -- in the context of the entire document |
| | 18 | of what I know, also, that comes on pages after |
| | 19 | this, I'm not sure what they mean by "probable gas |
| 18:34 | 20 | above the thermogenic front" for sure. |
| | 21 | Q.  All right.  Listen to my question because |
| | 22 | it's very specific. |
| | 23 | A.  Okay. |
| | 24 | Q.  The word "probable," do you know what it |
| 18:34 | 25 | means in English? |

1      A.   Correct.  I -- I do -- I mean, I have a

2    general feel for what "probable" means.

3      Q.   Okay.  And it means "more likely than

4    not," right?

18:34   5           MR. KEEGAN:  Objection to form.

6      Q.  (BY MR. GONZALEZ)  Just the word.

7      A.   Yeah, I -- I mean, I think we would have

8    to -- we should get a dictionary out and look it

9    up but --

18:34  10      Q.   All right.  Well, will you agree with me

11    that the dictionary's definition of "probable" is

12    the appropriate definition?

13           MR. LAVINE:  Objection; form.

14      A.   I -- I don't know.

18:34  15      Q.  (BY MR. GONZALEZ)  You don't know that --

16    you don't know --

17      A.   I don't --

18      Q.   -- if the definition of "probable" --

19      A.   Well --

18:34  20      Q.   -- is properly --

21      A.   I don't know --

22      Q.   -- stated in an English language

23    dictionary?

24           MR. KEEGAN:  Objection.

18:34  25           MR. LAVINE:  Object to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.  I -- I just -- I mean, just to repeat

2   myself, I don't know what the team is -- is saying

3   for -- what they mean by it.  You would have to

4   ask them.

18:34   5      Q.  (BY MR. GONZALEZ)  Oh, I understand that;

6   but I'm asking you what your understanding of the

7   word "probable" means in the English language.

8                MR. LAVINE:  Object to form.

9      A.  It could be meaning different things.  I

18:35  10   don't know.

11      Q.  (BY MR. GONZALEZ)  What could it mean?

12      A.  I don't know.

13      Q.  Well, tell me what you think it means.

14      A.  I don't know.  I'd have to do research.

18:35  15      Q.  On the word "probable"?

16      A.  Well, I think it's important.  So, we

17   would need to -- we would need to understand

18   whether it's, like you say, greater than a most

19   likely chance, average, or not.  I think we would

18:35  20   need to check on that.

21      Q.  And you would be willing to do that?

22                MR. KEEGAN:  Objection to form.

23      Q.  (BY MR. GONZALEZ)  Because you think --

24   would you be willing to do that?

18:35  25                MR. LAVINE:  Objection to form.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              MR. KEEGAN:  Objection; form.
 2         A.  The -- the -- my feeling is, is that --
 3    well, anyway.  There's nothing more to say on
 4    that.  I think we've covered it.
18:35  5         Q.  Well, we really haven't.  I mean, I want
 6    to know why you're having such a hard time telling
 7    me what you think the word "probable" means --
 8    what you think the word "probable" means.
 9         A.  Because --
18:35 10         Q.  Plain language.
11         A.  Because "probable" means different things
12    in different contexts --
13         Q.  Tell me what it means to you.
14         A.  -- and -- and it -- it matters what the
18:35 15    context is for any -- any word in the English
16    language.
17         Q.  Right.  We're talking about the word
18    "probable."  What does it mean to you?
19         A.  It means "possible."
18:36 20         Q.  It means "possible"?  They're the same to
21    you?
22         A.  It means "similar."
23         Q.  You have an M.B.A. degree?
24         A.  I do.
18:36 25         Q.  And you're an executive with BP?
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:  Objection.

2     A.  I am a vice-president with BP.

3     Q.  (BY MR. GONZALEZ)  And you are an English

4  speaker?

18:36  5     A.  Yes.

6     Q.  Born in the United States of America?

7     A.  Yes.

8     Q.  Working in England?

9     A.  Yes.

18:36  10    Q.  Do you speak any other languages?

11    A.  Not -- not fluent.

12    Q.  Okay.  It would be safe to say that

13  English is your primary and only language?

14    A.  Pretty much.

18:36  15    Q.  What dictionaries do you find credible?

16         MR. LAVINE:  Object to form.

17    Q.  (BY MR. GONZALEZ)  Webster's?

18    A.  I don't know.  I'm not an expert in

19  dictionaries.

18:36  20    Q.  Do you have one?

21    A.  Not with me.

22    Q.  Have you ever had one?  Have you ever

23  owned a dictionary?

24         MR. KEEGAN:  Objection.

18:36  25    A.  Yes.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  (BY MR. GONZALEZ)  Which ones do you feel

2  are appropriate to look at?

3    A.  I've owned Webster's.

4    Q.  Okay.  We were talking about

18:37  5  Ms. Skripnikova and her deposition testimony.  You

6  did not read it, correct?

7    A.  Her -- that is correct.

8    Q.  Were you aware that she said on Pages 210,

9  211 and 212 and 213 that the finding at 17,467

18:37  10  feet known as the section we're talking about

11  here, M57B was probably gas?

12        MR. LAVINE:  Objection; form.

13        MR. KEEGAN:  Objection to the form of

14  the question.  If you want to show him the

18:37  15  transcript, that's fine.

16    A.  I don't -- I don't know what she

17  testified.

18    Q.  (BY MR. GONZALEZ)  What she said was --

19  and I'll start on Page 210, the E-mail of

18:38  20  April 13, Line 16, is:

21        "When I answered Mr. Bodek about the

22  shallowest hydrocarbon bearing sand, 17,807 is

23  where I interpreted them from, printed out.  I had

24  them that week.

18:38  25        "So, when I came back to the office,

PURSUANT TO CONFIDENTIALITY ORDER

there was more information available and we put

the logs in zone and into those to fit a sand and

we had several engineers looking at this because

of the challenge issue."

18:38    Question:  "Sure."

        Answer:  "Such a tiny small zone.  We

decided to highlight it as a probable gas."

        Were you aware that she had said

that?

18:38    A.  No.

        Q.  She's an expert in this area, isn't she?

            MR. KEEGAN:  Objection to the form.

        A.  She's a petrophysicist.

        Q.  (BY MR. GONZALEZ)  And an expert in that

18:38 area?

            MR. KEEGAN:  Objection; form.

        A.  She is -- she is an experienced

petrophysicist in interpreting logs.

        Q.  (BY MR. GONZALEZ)  Then later on,

18:38 Page 212, Line 4, she was asked the following

question and she gave the following answer, still

speaking about Ms. Skripnikova.

        Question:  "So, here's my question:

When -- when was -- when was this more data

18:39 available such that this analysis which caused

PURSUANT TO CONFIDENTIALITY ORDER

1   you-all to highlight as probable hydrocarbon zone,

2   the one at 14,467, that -- the analysis --

3               Answer:  "The analysis was done on

4   the day of the incident."

18:39  5               Question:  "The day of the incident?"

6               Answer:  "Yes."

7               Question:  "After the cement job was

8   done?"

9               Answer:  "Yes."

18:39  10              Were you aware that that was her

11  position?

12      A.  No.

13               MR. LAVINE:  Objection; form.

14               MR. KEEGAN:  Objection.

18:39  15      Q.  (BY MR. GONZALEZ)  The wireline logging

16  was done before cementing, correct?

17      A.  Yeah.  The -- so, the cementing of --

18  yeah, the wireline was done in open hole.

19      Q.  If M57B is accurate and it is gaseous and

18:40  20  there is a requirement that cement -- the

21  cementing go -- the top of the cement be 500 feet

22  over 17,467, that would cause there to be a delay

23  in the project, wouldn't it?

24               MR. KEEGAN:  Objection to the form.

18:40  25      A.  I don't know.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  (BY MR. GONZALEZ)  Well, you would have

2  to -- you'd have to change the top cement,

3  wouldn't you?

4            MR. KEEGAN:  Objection to the form.

18:40  5    A.  So, say the question again.

6    Q.  (BY MR. GONZALEZ)  Yeah.  The top of the

7  cement was initially set out to be significantly

8  deeper than seventeen thousand -- than 17,200,

9  which would have been 500 feet over the 17,467.

18:40  10            Let me get you the right numbers.

11            If -- if -- if the shallowest area

12  with hydrocarbons is the 17,467, and we use that

13  CFR regulation that requires cementing -- top of

14  cement to be 500 feet over the most shallow part

18:41  15  finding of hydrocarbons, that would be 17,260

16  feet, right?

17            MR. KEEGAN:  Objection to form.

18            MR. LAVINE:  Object to form.

19    A.  I don't know, and I'm not familiar with

18:41  20  the regulation and what it states in the

21  regulation.

22    Q.  (BY MR. GONZALEZ)  Well, you -- we just

23  went over that with at least two different

24  lawyers.

18:41  25    A.  Exactly.  And I think my -- my testimony

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   was consistent in that I don't know the regulation

 2   and I can't comment on -- on -- on the regulation.

 3        Q.  I'll show it to you.

 4            MR. KEEGAN:  If only it were that

 5   easy.

 6        Q.  (BY MR. GONZALEZ)  Right here it says:

 7   "As a minimum, you must" -- "as a minimum, you

 8   must cement the annulus space at least 500 feet

 9   above the casing shoe and 500 feet above the

10   uppermost hydrocarbon-bearing zone."  Right there

11   (indicating).

12        A.  Okay.  So, I'm not sure --

13            MR. LAVINE:  Object to form.

14        A.  Yeah, I'm not sure --

15            MR. LAVINE:  No question.

16        A.  I'm not sure what they mean.

17            MR. KEEGAN:  This is the version

18   that's -- that's the one dated a year and -- a

19   year --

20            MR. GONZALEZ:  It's the same thing.

21            MR. KEEGAN:  -- a year and two months

22   after the incident.

23            MR. GONZALEZ:  It's the same thing.

24            MR. KEEGAN:  Well, you're showing him

25   and asking him to interpret it.
```

18:41 5
18:41 10
18:42 15
18:42 20
18:42 25

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Anyway, I'm not familiar with the

2  regulation.   I'm not familiar with what MMS

3  terms -- what the regulations are regarding the

4  hydrocarbon-bearing zone, what they mean by that.

18:42   5  There's just lots of unknowns in -- in the

6  regulation, from my perspective, because I'm not

7  an expert in it.

8      Q.   (BY MR. GONZALEZ)   Gas is -- is a

9  hydrocarbon, right?

18:42  10      A.   Gas is a hydrocarbon.

11      Q.   And if gas is found at 17,467 feet, then

12  if we were to say 500 feet over that, you would

13  agree with me just on plain math, that that's

14  17,260 feet, right?

18:42  15      A.   Yeah --

16           MR. KEEGAN:   Objection to form.

17           MR. LAVINE:   Objection; form.

18      A.   It's an "if" statement, and we don't know

19  if it's hydrocarbons and -- and again, just rely

18:42  20  on the regulation on -- on abiding by that.   I'm

21  not sure of the regulations.

22      Q.   (BY MR. GONZALEZ)   Math.   I'm just asking

23  you math.

24           MR. KEEGAN:   So ask him the math.

18:43  25      Q.   (BY MR. GONZALEZ)   500 feet less than

PURSUANT TO CONFIDENTIALITY ORDER

1      17,467 gives you what?

2          A.   Is sixteen nine or something.

3          Q.   Okay.   Top of the cement means the

4      highest -- shallowest level of cement?

18:43  5               MR. KEEGAN:   Objection to the form.

6          Q.   (BY MR. GONZALEZ)   Right?

7               MR. KEEGAN:   Objection to the form.

8          A.   Yeah, I'm -- again, I'm not -- I don't

9      what -- know how they do -- they calculate it;

18:43  10     but, yeah, that seems reasonable to me.

11         Q.   (BY MR. GONZALEZ)   Were you aware that

12     kicks were documented in the Macondo Well 252 on

13     October 26th, 2009, at the depth of 8,970 feet?

14               MR. KEEGAN:   Objection; form.

18:43  15         A.   I don't -- I don't recall the specific day

16     or -- or depth.   I'm not -- I'm not totally sure.

17         Q.   (BY MR. GONZALEZ)   Were you aware that a

18     kick was detected on the Macondo Well on

19     October 27th, 2009, at 9,071 feet?

18:44  20               MR. KEEGAN:   Objection to the form.

21         A.   Yeah, again -- as I testified earlier, I

22     do know that there were a couple of kicks; but as

23     far as specifically on -- on the depth and -- and

24     the date, I don't know for sure.

18:44  25         Q.   (BY MR. GONZALEZ) Were you aware there was

**PURSUANT TO CONFIDENTIALITY ORDER**

1   another kick noted on March 8th, 2010, at 13,250

2   feet?

3           MR. KEEGAN:  Objection to the form.

4     A.  Again, I don't remember the actual date

18:44  5   and depth.

6     Q.  (BY MR. GONZALEZ)  And you're aware of the

7   kick that was noted on April 20th, 2010, at 18,360

8   feet, right?

9           MR. KEEGAN:  Objection to form.

18:44 10     A.  Yeah.  Again, the depth and -- and date.

11     Q.  (BY MR. GONZALEZ)  And that would be four

12   kicks, then?

13           MR. KEEGAN:  Objection to form.

14     A.  Yeah.  I -- I'd have -- I don't know.  I

18:44 15   don't remember specifically.

16     Q.  (BY MR. GONZALEZ)  All right.  And I'm

17   referencing Exhibit 3498 and Exhibit 3384 from

18   prior depositions.

19           MR. KEEGAN:  Do you have copies of

18:45 20   them?

21           MR. GONZALEZ:  No.  I actually got it

22   from Ms. Skripnikova's deposition.

23           MR. KEEGAN:  I would love to see four

24   kicks on this well somewhere.

18:45 25           MR. GONZALEZ:  I just gave you the

**PURSUANT TO CONFIDENTIALITY ORDER**

1    reference, sir.

2              MR. LAVINE:  Prior to the --

3    objection to form.

4              MR. KEEGAN:  Objection --

18:45  5              MR. LAVINE:  -- to the comment of

6    counsel.

7              MR. KEEGAN:  -- to form.

8              MR. GONZALEZ:  You're right.  There

9    should be no sidebar comments.

18:45 10              MR. KEEGAN:  Or lawyers.

11        Q.  (BY MR. GONZALEZ)  Were you aware that

12    there were numerous documented loss-of-mud

13    accounts in the logs?

14        A.  I don't know what you mean by "numerous."

18:45 15    I do know that there were some losses.

16        Q.  One of the logs indicate on April 6, 2010,

17    that throughout the course of the well, we have

18    lost about 15,000 barrels.

19              Were you aware of that?

18:45 20              MR. KEEGAN:  Objection to the form.

21        A.  Again, I think we talked about this

22    earlier; and -- and I'm not sure.  I knew -- I

23    know there were some losses; but as far as the

24    total amount, I don't know.

18:45 25        Q.  (BY MR. GONZALEZ)  Is 15,000 a lot?

**PURSUANT TO CONFIDENTIALITY ORDER**

1          MR. KEEGAN:  Objection to the form.

2     A.  I -- I don't know if that's a lot or not,

3 that's typical, if it's average.

4     Q.  (BY MR. GONZALEZ)  You don't know?

18:46  5     A.  I don't know.

6     Q.  So, if one of your employees were to tell

7 you, "Yeah, we lost 15,000 barrels of mud on this

8 well," you wouldn't be able to tell them whether

9 it's a lot or not?

18:46  10          MR. KEEGAN:  Objection to the form.

11     A.  That's correct.  I -- I don't know for

12 sure if that amount is a lot over the course of

13 the well or -- or not.

14     Q.  (BY MR. GONZALEZ)  Let me show you what

18:46  15 we'll mark as the next exhibit number.

16          MR. GONZALEZ:  Do you have exhibit

17 stickers?

18          MR. KEISER:  6366.

19     Q.  (BY MR. GONZALEZ)  This will be 6366, and

18:46  20 it's BP-HZN-MB-100170548.

21          MR. KEEGAN:  Doesn't that already

22 have an exhibit sticker on it?

23          MR. GONZALEZ:  Prior Exhibit

24 No. 7098, but I don't know whose depo.  So, I'm

18:46  25 not comfortable just using that number.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1         Q.  (BY MR. GONZALEZ)  Your name is on the

 2   second page of this, and it purports to be an

 3   incentive program for the Macondo Well?

 4              MR. KEEGAN:  You just have the one

 5   copy of this?

 6              MR. GONZALEZ?  Sorry?

 7              MR. KEEGAN:  You just have the one

 8   copy of this?

 9              MR. GONZALEZ:  Yeah.  It's not my

10   exhibit.

11              MR. KEEGAN:  Can you just tell me

12   where it was?

13              MR. GANUCHEAU:  It was just used.

14              MR. FITCH:  It's tabbed in

15   Anadarko's.

16              MR. KEEGAN:  What's the number?

17              THE WITNESS:  We talked about this

18   previously.

19              MR. GONZALEZ:  Has it been marked

20   today?

21              MR. KEEGAN:  It's Anadarko's?

22              MR. GONZALEZ:  Yeah.

23              MR. FITCH:  Yeah.

24              MR. GONZALEZ:  It's been marked?

25              MR. FITCH:  Yes.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

           1              MR. GONZALEZ:  Okay.  I'll withdraw

           2     it.  I will withdraw the number, too.  Let's use

           3     Anadarko's.

           4         Q.  (BY MR. GONZALEZ)  Is it typical to have

18:47      5     a -- an incentive program like this where

           6     individuals get a bonus for working fast?

           7              MR. KEEGAN:  Objection to the form of

           8     the question.

           9         A.  I wouldn't -- I wouldn't --

18:47     10              MR. FITCH:  Tab 11.

          11         A.  I wouldn't term it the way -- the way you

          12     did.  The -- I disagree with the form of your

          13     question.

          14         Q.  (BY MR. GONZALEZ)  Okay.  So, you can

18:47     15     answer it.

          16         A.  The -- it is -- there are performance

          17     incentives for -- for the rig for safety and --

          18     and performance.  That -- that does -- that --

          19     that is pretty typical.

18:47     20         Q.  Yeah.  I -- I remember you talking about

          21     the safety portion, but I'm looking here.  It

          22     says:  If you do it less than 52 days, there's an

          23     award of $4,525 per person.

          24              That's what it says, right?

18:48     25              MS. LeGRAND:  Object to the form.

```
 1                   MR. KEEGAN:  Objection to the form.
 2        A.  It does say there is an incentive of
 3   fifty two.
 4        Q.  (BY MR. GONZALEZ)  And if you're not that
 5   fast, but it takes you 52 to 75 days --
 6        A.  But --
 7        Q.  -- then it's -- the incentive award is
 8   4,525 to $500, right?
 9        A.  Yeah --
10                   MS. LeGRAND:  Object to the form.
11                   MR. KEEGAN:  Objection to the form.
12        A.  I think it's -- it's important to look at
13   the whole -- the whole E-mail and how it's tied to
14   safety.  Safety trumps everything.
15        Q.  (BY MR. GONZALEZ)  Yeah.  Well, please
16   answer my question.  This square here says 52 to
17   75 --
18        A.  I did -- I did answer your question.
19        Q.  Well, let's answer it now.
20        A.  Okay.
21        Q.  52 to 75 days' savings means an award of
22   $4,525 to $500.
23        A.  What do you mean --
24                   MS. LeGRAND:  Object to form.
25                   MR. KEEGAN:  Objection; asked and
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   answered.

 2        A.   What do you -- what do you mean 52 to 75

 3   savings?  I don't understand what you mean by

 4   that.

 5        Q.   (BY MR. GONZALEZ)   Performance award,

 6   total days:  52 to 75.

 7             MS. LeGRAND:  Object to form.

 8        A.   Yeah.  And then you said "savings," and I

 9   don't -- I don't know what you mean by "savings."

10        Q.   (BY MR. GONZALEZ)  Well, if you look at --

11   if it takes more than 75 days, you get nothing --

12             MR. KEEGAN:  Objection to the form.

13        Q.   (BY MR. GONZALEZ)  -- right?

14             MS. LeGRAND:  Objection; form.

15        Q.   (BY MR. GONZALEZ)  I'm just looking at

16   this.  It says:  Above 75 days, award, zero.

17             MR. KEEGAN:  You're just looking at

18   one part of the incentive program.  He's tried to

19   explain it several times.

20             MR. GONZALEZ:  That's inappropriate.

21   You can object to form.  That's it.

22             MR. KEEGAN:  Don't yell at this

23   witness because he's trying to explain that.

24             MR. GONZALEZ:  The record is clear.

25   I never yell.
```

18:48
18:49
18:49
18:49
18:49

PURSUANT TO CONFIDENTIALITY ORDER

1      Q.  (BY MR. GONZALEZ)  I'm simply showing

2   above 75 -- this is the question, sir.

3                   MR. KEEGAN:  Do you want him to tell

4   you what's in the box?  He can tell you what's in

18:49  5   the box.  Do you want him to explain the program?

6   He can explain the program.

7                   MS. LeGRAND:  Object to sidebar.

8                   MR. KEEGAN:  You can't have --

9                   MR. GONZALEZ:  Would you like to ask

18:49 10   more questions?  Because you can.  I would like to

11   use my time with the witness and not with you.

12                   MR. KEEGAN:  Proceed.

13                   MR. GONZALEZ:  Here.  Okay.

14      A.  So, in -- in the box --

18:49 15      Q.  (BY MR. GONZALEZ)  Let me phrase the

16   question.  Above 75, each employee gets zero,

17   right?

18                   MR. KEEGAN:  Objection to the form.

19                   MS. LeGRAND:  Object to form.

18:49 20      A.  Yeah.  I'm not -- I'm not sure of the

21   details of the program, who -- who gets what.  It

22   does say in the box above 75 to zero, but I'm not

23   sure exactly how -- how the awards -- if there

24   would be any awards.

18:50 25      Q.  (BY MR. GONZALEZ)  And if it's -- and if

**PURSUANT TO CONFIDENTIALITY ORDER**

       1    it's between 52 to 75 days, then there's an award

       2    of 4,400 -- $525 to $500, right?

       3                 MS. LeGRAND:  Object to form.

       4                 MR. KEEGAN:  Objection to the form.

18:50  5         A.  In the box, it says 52 to 75 or -- and

       6    then 4525 to 500.  Yeah, I -- I agree with that.

       7         Q.  (BY MR. GONZALEZ)  All right, sir.

       8                 And -- and you've actually signed off

       9    on that agreement, right?

18:50 10                 MS. LeGRAND:  Object to form.

      11         A.  So, on the agreement --

      12         Q.  (BY MR. GONZALEZ)  You signed it?

      13         A.  Yeah.  So, I signed it here and just --

      14    just to make sure that we're all on the same page,

18:50 15    that there is a significant safety override

      16    that -- that is -- that is the most important

      17    thing here that comes next.  And so, the

      18    things are -- the two things are very, very tied

      19    together.  If the crew performs in a safe manner,

18:50 20    then -- the whole idea behind this, if the crew

      21    performs in a safe manner, then they're eligible

      22    to get a performance award with -- with good

      23    drilling performance.  That is the bottom line of

      24    this type of program that's used at BP in the --

18:51 25    in the industry.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                  MR. GANUCHEAU:  Object, response.

 2          Q.  (BY MR. GONZALEZ)  And then -- and then

 3     you get award payments minus the required taxes

 4     and withholdings, right?

 5                  MS. LeGRAND:  Objection to the form.

 6                  MR. KEEGAN:  Objection to the form.

 7          A.  I -- I don't know.

 8          Q.  (BY MR. GONZALEZ)  Look at the

 9     administration.  I'm reading right from it.

10          A.  Award payments will be -- we may less --

11     required --

12          Q.  Will be made --

13          A.  -- taxes and -- yeah, that's what it says

14     there.

15          Q.  Right.  And --

16          A.  I don't know how that works for each

17     individual and -- and TransOcean and the taxes.  I

18     don't know the details.

19          Q.  It would allow TransOcean to administer

20     the award for their employees and their catering

21     personnel, right?

22                  MS. LeGRAND:  Object to form.

23          A.  I don't know.

24          Q.  (BY MR. GONZALEZ)  You wrote it.  That's

25     what it says.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1        MR. KEEGAN:  Objection to the form.

2        A.  I didn't write it.

3            MS. LeGRAND:  Object to form.

4        Q.  (BY MR. GONZALEZ)  You signed it.

18:51  5        A.  I did sign it, but -- but Ian wrote it.  I

6    did not -- I did not write it.

7        Q.  All right, sir.  And that's what it says:

8    TransOcean will administer --

9        A.  And he's -- he's the lead on this, the

18:51  10   wells organization, the lead on this.

11       Q.  Okay.  It says:  TransOcean will

12   administer the award for their employees and

13   catering personnel, right?

14           MS. LeGRAND:  Object to form.

18:52  15       A.  It does say that TransOcean

16   will administer -- yes.  Yes, that's correct.

17       Q.  (BY MR. GONZALEZ)  Catering personnel are

18   the people that provide food?

19       A.  Yes.  That's the way I understand it.

18:52  20       Q.  Did you speak with Ms. Skripnikova before

21   your deposition in preparation for your

22   deposition?

23       A.  No.  No, I did not.

24           MR. GONZALEZ:  Thank you, sir.

18:52  25   That's all I have.

PURSUANT TO CONFIDENTIALITY ORDER

409

1                    THE VIDEOGRAPHER:   The time is

2     6:52 p.m.   We're off the record.

3                    (Deposition concluded at 6:52 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              WITNESS CORRECTIONS AND SIGNATURE.

 2    Please indicate changes on this sheet of paper,

      giving the change, page number, line number and

 3    reason for the change.  Please sign each page of

      changes.

 4

 5    PAGE/LINE       CORRECTION     REASON FOR CHANGE

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23

24            _____

25            JAY THORSETH
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1       I, JAY THORSETH, have read the foregoing
deposition and hereby affix my signature that same
2  is true and correct, except as noted above.

3

4       _____

JAY THORSETH

5

6

7  STATE OF _____   *

COUNTY OF _____   *

8

        Before me, _____, on
9  this day personally appeared JAY THORSETH, known
to me, or proved to me under oath or through
10 _____ (description of identity card or
other document), to be the person whose name is
11 subscribed to the foregoing instrument and
acknowledged to me that they executed the same for
12 the purposes and consideration therein expressed.
13      Given under my hand and seal of office on
this, the _____ day of _____, 2011.

14

15

16      _____

Notary Public, State of _____

17

18

My Commission Expires: _____

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   THE STATE OF TEXAS   )
 2   COUNTY OF HARRIS     )
 3
 4         I, Donna L. Garza, Certified Shorthand
     Reporter in and for the State of Texas, do hereby
 5   certify that the above and foregoing contains a
     true and correct transcription of all portions of
 6   evidence and other proceedings in the above-styled
     and numbered cause, all of which occurred and were
 7   reported by me.
           I further certify that I am neither
 8   counsel for, related to, nor employed by any of
     the parties or attorneys in the action in which
 9   this proceeding was taken, and further that I am
     not financially or otherwise interested in the
10   outcome of the action.
           GIVEN UNDER MY HAND AND SEAL OF OFFICE,
11   on this, the _____ day of September, 2011.
12
13
14         DONNA L. GARZA
           TEXAS CSR NO. 4785
15         Expiration Date:
           12-31-11
16
17
18   WORLDWIDE COURT REPORTERS, INC.
     Firm Registration No. 223
19   3000 Weslayan, Suite 235
     Houston, Texas  77027
20   (800) 745-1101
21
22
23
24
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**