# United States' Phase Two Offer of Proof Exhibit 30
# Rebuttal Expert Report of Glenn Benge

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF LOUISIANA


IN RE: OIL SPILL BY THE OIL RIG MDL NO. 2179

"DEEPWATER HORIZON" IN THE

GULF OF MEXICO, ON APRIL 20, 2010


REBUTTAL REPORT OF GLEN BENGE

TO THE ANDREAS MOMBER REPORT

"EROSION OF WELL CEMENT DUE TO HYDROCARBON FLOW"


ON BEHALF OF

THE UNITED STATES OF AMERICA


June 7, 2013


DATED:  June 7, 2013

Signature:  Glen Benge

11916

Exhibit No. ─────

Worldwide Court
Reporters, Inc.

## Table of Contents

Executive Summary................................................................................................2

Background and Credentials .................................................................................3

Discussion..............................................................................................................5

   1.    Introduction .................................................................................................5

   2.    The cement was not set at the time of the negative test...............................6

   3.    The Momber Report misrepresents key differences in construction concrete and oil field cement...........................................................................................7

   4.    Table 4.1 of the Momber report is irrelevant to erosion .....................................8

   5.    Momber grossly underestimates the fluid velocities at Macondo.....................10

   6.    The Calculations in Appendix A are Misleading........................................11

      6.1.  Flow Rates and Channel Size: .............................................................11

      6.2.  Pressure Drops.....................................................................................12

      6.3.  Appendix A Summary ...........................................................................12

   7.    No supporting data is offered for any conclusions ...........................................12

Conclusion ...........................................................................................................13

Appendix A - Information Required by Federal Rules of Civil Procedure ..14

Appendix B - Curriculum Vitae of Glen Benge.............................................15

Appendix C - Statement of Compensation ...................................................19

Appendix D - Documents Considered............................................................20

## Tables

Table 1 - Flow Velocities in 7" Casing.............................................................11

Table 2 – Corrected Downhole "Channel" Velocities ......................................12

TREX 011916.0002

## Executive Summary

I have been asked to respond to the expert report of Dr. Andreas Momber titled "Erosion of Well Cement Due to Hydrocarbon Flow." Dr. Momber makes **4 key statements** that are core to his opinions:

- Statement 1: The initial assumption made by Dr. Momber is there was set cement at the bottom of the well which would have provided resistance to flow.

  **Response**: Evidence presented in Phase 1 of the case clearly shows the cement in the Macondo well was **not set** at the time of the negative test. As such, it was acting as a fluid and not a set material, and therefore could not have provided resistance to flow. For the unset cement to have acted as any sort of barrier to flow in the well, as implied by Dr. Momber, is clearly in error.

- Statement 2: Momber contends the cement in the well would have impeded flow dramatically, and as flow continued over time, the cement would have been degraded.

  **Response:** As noted above, without the presence of set cement, there is no impediment to flow. The cement slurry used in the Macondo well was incapable of providing an impediment to flow.

- Statement 3: Momber contends that the United States' expert reports ignore or misjudge the importance of cement erosion.

  **Response**: The expert report of Dr. Griffiths addresses barriers in the well, and specifically notes that if the cement were to have been set, or other barriers present in the well (like the float collar) they would not have provided a barrier for any appreciable length of time. Dr. Momber ignores any other potential barriers to restrict flow in the well like the float collar, and incorrectly assumes the only barrier would be due solely to the cement.

- Statement 4: Dr. Momber concludes the cement underwent a *4-step degradation scenario.*

  **Response**: The erosion process proposed by Dr. Momber depends on work performed with concrete and not oil field cements. There is a significant and important difference in the two materials. Concrete has cement as a component of the blend, but also contains various aggregates that are quite large. Oil field cement slurries do not contain aggregates as they cannot be pumped by the equipment used to cement wells. The concrete data referenced by Dr. Momber shows compressive strengths thousands of psi stronger than any cement in the Macondo well.

TREX 011916.0003

## Background and Credentials

In April 2011, I retired from ExxonMobil and began consulting in oil field cementing. Over my 36 year career, I have worked in every aspect of oil field cementing from shallow onshore wells to deep water applications globally. I served on the client advisory boards for Schlumberger and Halliburton. I have worked extensively with foamed cementing. I designed and managed the initial offshore application of foamed cement in Mobile Bay in 1995 and published a paper on the well in 1996.

I received a B.S. degree in chemistry from Southwestern Oklahoma State University in 1976. I also completed one year of graduate school coursework in Analytical Chemistry at Oklahoma State University.

In 1977, I began working for Dowell, a division of Dow Chemical, in the technical services lab in Tulsa, Oklahoma. In this position, I analyzed the composition of field samples of cement blends and was a liaison between the research lab and field operations. I later moved to the technical engineering and development group in Tulsa. In 1981, I transferred to Houston and worked as a regional cementing specialist. In 1986, I moved to New Orleans to become a division marketing specialist. In that position, I was in charge of the division laboratory and all cementing technical operations for the Gulf of Mexico.

In 1988, I moved to Mobil Oil in New Orleans and was part of the fluids team that managed drilling fluids, cementing, NPDES compliance and toxicity testing for the Gulf of Mexico drilling organization. I transferred to the Mobil E & P Technical Center group in Dallas in 1992 and served as a global cementing advisor. While at Mobil, I introduced foamed cementing technology to projects in Qatar, Angola, Germany and the east coast of Canada.

With the merger of Exxon and Mobil, I moved to Houston in 2000 to become the Senior Technical Advisor for cementing for ExxonMobil's global drilling operations. In 2009, I became the Drilling Training Manager for ExxonMobil and served in that position until my retirement in 2011.

Throughout my career I have attended over 30 industry schools covering cementing, drilling fluids, lost circulation, drilling practices and well control. I have authored over 20 technical papers, several of which have appeared in peer reviewed journals. While in New Orleans, I was on the board of directors of the American Association of Drilling Engineers (AADE) from 1989 until 1992 and served as AADE President from 1991 until 1992.

I have been a member of API Subcommittee 10 on Oil Well Cements since 1980 and served as its chairman from 2002 until 2005. I have served on and chaired numerous task groups on centralizers and completion fluids testing. I received the API Citation for Service in 2005. I chaired the task group on foamed cement for the ISO Technical Committee 67, Work Group 2 on cementing. ISO 10426-4 and its companion document, API RP 10B-4, are the results of this work.

TREX 011916.0004

I have been a member of the Society of Petroleum Engineers since 1977, and served as program and session chair for the SDPE/IADC International Drilling Conference from 1995 through 2004. I served as technical editor for the Journal of Petroleum Engineering for three years and have served as a technical editor for Drilling and Completion Journal since 2005. I received the SPE Outstanding Technical Editor Award for four years from 2007-2010.

I serve as a technical advisor for the Department of Energy, National Energy Testing Laboratory for evaluations of cement systems for $CO_2$ sequestration and for current research into foamed cement. I am also a charter member of the Wellbore Integrity Work Group for the International Energy Association, Greenhouse Gas R & D Program (IEAGHG). I have presented papers at the Greenhouse Gas Technology Conferences in Washington, D.C. and Amsterdam. Most recently I have given invited papers and presentations to the Groundwater Protection Council on wellbore integrity and industry best practices.

In the last four years I have been a witness in the Phase 1 of the Macondo case.

I understand that fact discovery in this case is ongoing. In light of that, or should relevant information otherwise become available to me, I reserve the right to revise or supplement these conclusions.

TREX 011916.0005

## Discussion

## 1.   INTRODUCTION

This report is an evaluation of the expert report of Andreas Momber with respect to the erosion of the primary cement placed on the 9 7/8 x 7" production string on the Macondo well.

The Momber expert report begins with the following key statement:

> "The evidence suggests that before the Macondo incident the bottom of the wellbore was filled with cement; cement filled much of the casing up to the float collar, and more cement filled part of the annulus around the lower portion of production casing."[1]

The entirety of Dr. Momber's report hinges on the validity of this assumptive statement.  Without the presence of set cement at the bottom of the wellbore, none of the statements made in the Momber report are valid, and the entire premise of the report is without merit.

Considering the cement as placed in the Macondo well was **NOT SET** at the time of the negative test, the arguments put forth by Dr. Momber are moot.  The evidence from Phase 1 demonstrated there was no set cement in the Macondo well to be eroded.

As stated in my expert report issued in Phase 1[2] as well as in the expert report of David G. Calvert,[3] BP's cement expert, the Macondo well cement was not set at the time of the negative test. **This is further confirmed by the testimony of Mr. John Guide, the BP Wells Team Leader for the Macondo well, that the cement "obviously didn't set up."[4]**

Dr. Momber goes on to state:

> "At the start of the blowout, this column of 189 feet of cement in the bottom hole would have impeded the flow of oil dramatically. As flow continued over time, this cement would have been degraded through multiple processes, including cement erosion."[1]

At the start of the blowout, for the cement in the shoe track (the bottom 189 feet of pipe in the well) to have impeded the flow of the oil, the cement must have been set with measurable strength.  Evidence in Phase 1 clearly established that the cement was not set and had not formed a barrier in the well.

---

[1] Andreas Momber Expert Report, page 2

[2] TREX 05990 - Expert Report of Glen Benge

[3] TREX 22791 - Expert Report of David Calvert

[4] Testimony of John Guide, Page 8950 line 17 to 8951, line 10

TREX 011916.0006

In reviewing the Government's expert reports, Dr. Momber opines:

> "In fact, for the government experts' assumptions to be true, it would require one to believe that erosion rates at Macondo were many times greater than the highest reported rates for the erosion of cement mixtures."[5]

Dr. Momber states that for the government reports to be valid, erosion rates for set cement would be much higher than for the construction concrete mixtures noted in Dr. Momber's report. The high rates characterized in the government reports, however, are not due to erosion, but the simple fact there was no set cement in the bottom of the Macondo well.

Finally, Dr. Momber attempts to justify his alternative multi-step erosion process based on comparative data with construction concretes. Dr. Momber incorrectly selects cement strengths from the Chevron report that are not representative of the actual Macondo well, and of equal importance uses concrete erosion rates based on testing at flow rates that are *markedly lower* than those found at Macondo.

Based on my review of Dr. Momber's expert report, <u>actual data</u> on the cement from the well, and evaluation of the "data" reported by Dr. Momber, **it is my expert opinion the conclusions drawn by Dr. Momber are without merit and have no scientific basis.**

## 2.   THE CEMENT WAS NOT SET AT THE TIME OF THE NEGATIVE TEST

As reported in my Phase 1 expert report, the foamed and unfoamed cement placed in the Macondo well did not have an opportunity to set before the negative test was performed. Laboratory data collected after the blow out demonstrated the sensitivity of the cement slurry to temperature, and showed the cement was not set at the time of the negative test.

Cement strength testing by Oilfield Testing and Consulting[6] showed the following results for the series of tests performed for the Joint Investigation Team:

| Slurry UCA-2 | | Slurry UCA-2B | |
|---|---|---|---|
| Conditioning ramp - 83 min to 135 | | Conditioning ramp - 230 min to 135 | |
| 50 psi | 15:22 | 50 psi | 16:32 |
| 500 psi | 16:33 | 500 psi | 17:42 |
| 12 hr. psi | 0 | 12 hr. psi | 0 |
| 24 hr. psi | 2,762 | 24 hr. psi | 2,794 |

---

[5] Andreas Momber Expert Report, page 2

[6] Report by Oilfield Testing and Consulting, August 1, 2011 TREX 5937

The conditioning ramp used by OT&C for the testing ramped to 135 F in 83 minutes and has a total of 293 minutes or 4:53 of conditioning time prior to being placed in the Ultrasonic Cement Analyzer (UCA).   (The UCA is used for determination of cement strength.)  Likewise, the sample using the 230 minute heat up ramp would have a total of 450 minutes or 6:30 of total conditioning time prior to being placed in the UCA.

This means from the time the cement was initially mixed until it reached 50 psi of strength was over 20 hours for each of the tests. (20:15 and 23:02 respectively).

The Halliburton UCA testing performed at 210° F with the sample of cement containing 0.09 gallons per sack of SCR-100 retarder showed the following:[7]

| | |
|---|---|
| 50 psi | 8:12 |
| 500 psi | 8:40 |
| 12 hr. psi | 2,301 |

In the same laboratory report from Halliburton, tests on the foamed cement show **ZERO** compressive strength development until 48 hours.

For the cement to be considered set and acting as a barrier, it must be tested.  It is certain the cement was not acting as a barrier due to the failed negative test on the Macondo well.  The only logical explanation offered in this case is the cement was not set.[8]

## 3.    THE MOMBER REPORT MISREPRESENTS KEY DIFFERENCES IN CONSTRUCTION CONCRETE AND OIL FIELD CEMENT

Throughout his report, Dr. Momber sites a number of examples of erosion testing performed on various blends of concrete.[9]  This is trying to compare apples and oranges.  There is a key and critical difference in concrete used for construction purposes and oil well cement.

Oil well cements do not contain aggregate (large particle size rocks or sand) where construction concretes will contain these additives.  On pages 12 and 13 Dr. Momber identifies the Macondo cement system as containing sand, and concludes, through no testing at all, that the resulting slurry "must be considered pre-damaged."  Dr. Momber offers no testing, references or indeed any other information to support his statement.

Dr. Momber fails to note that the sand used for construction purposes has a very course particle size.  Construction sand is commonly divided into five categories depending on the size, ranging from very find sand of approximately 0.125 mm diameter to very course sand at 2mm.  The most common construction sand is medium sand with an average sand size of 0.5 mm.  The silica sand used in the Macondo slurry design is sold as "Oklahoma #1" which has an average particle size of less than 0.15 mm.  This difference of over 3 times in particle size has a significant impact on the properties of the final set material.

---

[7] HAL_0028709 - 0028710

[8] See TREX 05990 - Expert Report of Glen Benge, TREX 22761, Expert report of David Calvert and Testimony of John Guide, Page 8950 line 17 to 8951, line 10

[9] See, e.g., Momber Expert Report, page 13

TREX 011916.0008

To compare concrete testing of erosion rates to an oil well cement that is in the confined environment of a casing is without merit. None of the references sited in Dr. Momber's report relate to the situation in the Macondo well. Further Dr. Momber presents no calculations at all to support his theory.

Dr. Momber cites to the Chevron testing report and states typical compressive strength numbers for cement are 3,918 to 4,575 psi. This is a gross overstatement of reality.

Dr. Momber has selected the two highest **final** strength tests found in the entirety of the Chevron testing. Dr. Momber fails to note that three of the tests *in the same data table* showed **final** strengths less than 1,500 psi.[10] Dr. Momber also fails to mention the Chevron strength results were obtained after the samples had been tested for 73 to 108 hours instead of less than 18 hours which would be representative of the actual conditions in the Macondo well.

By selecting the highest values reported by Chevron for any testing, and ignoring any data relevant to the actual time of the Macondo blow out, Dr. Momber has attempted to justify using his selected concrete references to compare erosion rates of concrete to oil well cements.[11] Such a comparison is unjustified and unreliable.

## 4.   TABLE 4.1 OF THE MOMBER REPORT IS IRRELEVANT TO EROSION

In section 6 of Dr. Momber's report, he attempts to opine on the condition of the cement in the shoe track of the Macondo well. At the top of page 6, Dr. Momber states:

"The existence of flow channels in **deteriorated** cement is an established phenomenon in well systems." (emphasis added)

It is unclear, and goes unexplained, how Dr. Momber can determine that a cement system that was correctly mixed and placed in the well[12] could have deteriorated in under 24 hours.

Momber depends on the Bly report for potential faults in the Macondo cement.[13] The Bly report quotes testing performed by Cementing Solutions Incorporated (CSI). None of the CSI testing was done with any material from the Macondo well, or materials from Halliburton. None of this data should be considered conclusive at all.

---

[10] See Table 4 - Chevron Report - October 26, 2010

[11] See, e,g, Momber Expert Report - Page 12

[12] Benge Expert Report, page 25

[13] Momber Expert Report, Page 6

TREX 011916.0009

Reproduced below, Table 4.1 in the Momber report is actually an excerpt from a paper on $CO_2$ impacts on cement and the resulting potential flow paths.

| Situation | | Image | Importance |
|---|---|---|---|
| 1 | Between cement and casing | | Contact stresses; interface shrinkage; deteriorated bond |
| 2 | Between cement and casing | | Contact stresses; interface shrinkage; deteriorated bond |
| 3 | Through the cement | | Insufficient mixing; unfinished hydration; pore system; high permeability; degradation |
| 4 | Through the casing | | Casing erosion (solid particle/slurry erosion) |
| 5 | Through fractures in cement | | Cracked cement |
| 6 | Between cement and formation | | Contact stresses cement/ rock, developed during cement slurry setting |

*Table 4.1: Possible flow paths in a deteriorated well; note situations 3 and 5[13]*

Dr. Momber has "adapted" this figure from a publication by Dr. Mike Celia in 2010 to illustrate potential flow paths. The figure by Dr. Celia is in fact from presentations that represent a core taken from a $CO_2$ flood where the well was exposed to the gas for over *30 years.* The figure has been in use since 2004, with versions published in 2005.[14]  Dr. Momber has added the third column to the table to justify his theory.

Of particular concern is his statement regarding situation 3 where he states the cause could potentially be "unfinished hydration."   The reference actually describes the situation as gas diffusion through the cement.  To claim a failure mechanism in a cement that is over 30 years old could be due to unfinished hydration is irrational and inapplicable to the Macondo well cement program.

The cement used on the Macondo production casing had been in place less than 24 hours prior to the blow out.  Situation 3 in the Momber report would have us believe that the cement had insufficient mixing, high permeability and degradation. This is simply not true.

The cement slurry used on the Macondo well was properly mixed as per the job design, and showed no indications of improper or insufficient mixing.[15]  I have reviewed the

---

[14] "Scherer, G. W., et al, "Leakage of $CO_2$ Through Abandoned Wells: Role of Corrosion of Cement." 2005, Elsevier Publishing

[15] HAL_0028665

TREX 011916.0010

actual Halliburton performance on location and can find no issues whatsoever with the mixing and pumping of the cement job on the Macondo well.[16]

Finally there has been no data presented on the permeability of the Macondo cement system, nor any work to show any degradation of the cement after it was in place. To claim these mechanisms as faults in the Macondo well cement is unfounded.

## 5. MOMBER GROSSLY UNDERESTIMATES THE FLUID VELOCITIES AT MACONDO

On page 12, Dr. Momber notes he has investigated erosion of concrete materials at high-speed slurry rates at velocities of 180 ft./min. For the Macondo well, this equates to a daily flow rate of 9,400 barrels per day. There are no credible calculations that would put the flow rate anywhere near such a low rate. There was no indication Dr. Momber considered the much higher flow velocities at the Macondo well in his analysis.

BP Phase 1 expert Morten Emilsen[17] opines at 21:42, the flow rate was approximately 26 to 27 stock tank barrels per minute (or approximately 38,000 stock tank barrels per day).

In his report, Emilsen[18] uses a conversion factor of 2.14 reservoir bbl / stock tank bbl. This means for every 1 bbl (42 gallons) at surface, at the reservoir, and of equal importance also in the shoe track, there would be a flow of 2.14 bbl. Using this conversion factor, the flow at the reservoir would be 74,900 bbl/day.

To perform a comparison of velocities with more realistic information, I took the Emilsen flow rates in reservoir barrels and determined a fluid velocity for each case. The calculations use the full casing ID (inner diameter) of 6.094 inches, which is the ID of the 7" casing in the Macondo well.

The ID was converted into bbl/ft by using the equation[19]:

Capacity (bbl/ft) = ID$^2$ / 1029.4

Where ID is in inches.

This calculation gives the capacity of the 7" casing as 0.036 bbl/ft.

**Table 1** lists the calculations of flow velocities at the reservoir. To ease reading, the velocities in ft/min have been converted to miles/hour using the equation:

Velocity (miles/hour) = Velocity (ft/min) * 60 (min/hr) / 5280 (ft/mile)

---

[16] Benge Expert Report, page 25

[17] TREX 40003 - Morten Emilsen Expert Report, October 17, 2011, Figure 3.33

[18] TREX-00001 Bly Report, Appendix W - Page vi

[19] Lapeyrouse, N. J.: Formulas and Calculations for Drilling, Production and Workover, Gulf Professional Publishing, Second Edition, 2002

TREX 011916.0011

| Flow (bbl/day) in stock tank barrels | Flow (bbl/day) at the reservoir | Fluid Velocity (ft/min) [at the reservoir] | Velocity (miles/hr) |
|---|---|---|---|
| 38,000 | 74,900 | 1,442 | 16.4 |
| 50,000 | 107,000 | 2,060 | 23.4 |
| 60,000 | 128,400 | 2,471 | 28.1 |

**Table 1 - Flow Velocities in 7" Casing**

By way of comparison, a flow rate of 180 ft/min, as noted in the Momber report, is a comfortable walking pace which is approximately 2 miles per hour. The flow velocity in the Emilsen report of 38,000 stb/day (1442 ft/min) gives a flow velocity of 16.4 miles/hr. This means the *minimum* flow velocity in the shoe track of the Macondo well *was over 8 times* that used by Dr. Momber for justifying the comparison with erosion rates in concrete.

It is also noted the above velocities are for flow across the *entire* area inside the 7" casing. There are no corrections for any reduction in flow area due to restrictions of any kind. As seen in the following section, any reduction in area dramatically increases the calculated velocities.

## 6.    THE CALCULATIONS IN APPENDIX A ARE MISLEADING

### 6.1.    Flow Rates and Channel Size:

In Appendix A of his report, Dr. Momber goes through a series of calculations to solve a flow channel size based on assumptions of fluid viscosities, pressure drops and flow rates. On page 23, Dr. Momber uses a conversion factor of 2.36 reservoir barrels per stock tank barrel. Even with this conversion in hand, he continues to use the stock tank barrel flow rate to under estimate the flow at the bottom of the well, where clearly the rates would be much higher.

Momber further alters terms in his calculations to adjust the productivity index (PI) for his calculations. To determine the pressure drop from Darcy flow, he assumes the entire reservoir is open for flow. He then changes to a different PI for calculation of pressure bottom hole pressures. The confusing part of the calculation is both of these PI calculations are made for the exact same point in time (21:30).

Even assuming the flow rate is correct, which it is not, the calculated flow area through the cement reported by Dr. Momber was 2.17 inches at 12 stb/min and 2.64 inches at a flow rate of 27stb/min. Using the same calculations to calculate the flow velocities above, I applied Dr. Momber's conversion factor of 2.36 reservoir bbl / stock tank bbl, to determine the flow velocities through the channels calculated by Dr. Momber in Appendix A. The results are shown in **Table 2** below. The data shows flow velocities exceeding 100 miles/hour.

TREX 011916.0012

| Flow Rate (stb/min) | Flow Rate (Reservoir bbl/min) | Channel Size = 2.17 inches | | Channel Size = 2.64 inches | |
|---|---|---|---|---|---|
| | | Velocity (ft/min) | Velocity (mph) | Velocity (ft/min) | Velocity (mph) |
| 12 | 28.3 | 6,191 | 48 | | |
| 27 | 63.7 | | | 9,411 | 107 |

**Table 2 - Corrected Downhole "Channel" Velocities[20]**

## 6.2.    Pressure Drops

Dr. Momber assumes the entirety of the pressure drop in the well is due solely to a cement channel in the shoe track. He fails to consider the restrictions provided by the float collar or any other down hole equipment. He further assumes no pressure drop in the annulus of the well.

Additionally Dr. Momber does not acknowledge the increase in reservoir exposed pay that was postulated by Emilsen[21] from an increased pressure drop resulting from a pump shut down, not simply an erosion process.

The Emilsen report notes between 21:08 and 21:14 there was a pressure increase of 200 psi with the pumps shut down, which required flow through the casing shoe to model. Momber does not acknowledge this event in his report or state how this would have impacted the supposed erosion in the shoe track cement.

## 6.3.    Appendix A Summary

Appendix A simply applies the assumed flow rates and pressure drops to calculate a channel size. There is no attempt in the appendix to provide any calculation on erosion rates. The appendix is simply a calculation of flow diameter based on assumed flow rates from Emilsen, and further assuming the full pressure drop in the well occurs in the 189 ft. shoe track. This is equivalent to simply calculating the size of a 189 foot long pipe that would give a pressure drop equivalent to his assumptions.

## 7.    NO SUPPORTING DATA IS OFFERED FOR ANY CONCLUSIONS

Dr. Momber gives three calculations in the body of his report, one for the volume of cement and two to calculate the apparent erosion rate from review of the two expert reports for the United States. These calculations are presented merely to illustrate the erosion rates are higher than those found in construction concretes which were tested at flow rates considerably lower than those in the Macondo well.

---

[20] Momber Expert Report – Appendix A

[21] See Emilsen - page viii

TREX 011916.0013

Nowhere does Dr. Momber opine as to the impact on flow rates based on the "alternative multi-step scenario," in which Dr. Momber introduces an alternative scenario consisting of four steps.[22]

In the alternative scenario, Dr. Momber introduces a "threshold period" that apparently relates to an initial 20 bbl influx taken at the time of the negative test. This is quickly followed by an "initial period" which is defined "*by a rapid increase in flow-path area*". He does not discuss or even reference the *2,000 bbl* of flow taken during the next 41 minutes or its impact on the erosion rate.

Dr. Momber has done no testing, nor offered any scientific rigor to support his alternate scenario or conclusions.

**Dr. Momber has misrepresented the following to make his conclusions:**

- The cement in the Macondo well was set at the time of the negative test. **It was not.**

- Compressive strengths of the cement were on par with construction concrete samples that had been cured for 28 days. **They are not.**

- Potential flow paths of $CO_2$ are representative of the Macondo well. **They are not.**

- Failure mechanisms of a 30 year old well include incomplete hydration of the cement. **They do not.**

- Flow velocities of 180 ft/min are comparable to those from *eight to fifty times higher.* **They are not.**

## Conclusion

Based on my review of Dr. Momber's expert report, the <u>actual data</u> on cement from the well, and evaluation of the "data" reported by Dr. Momber, **it is my expert opinion the conclusions drawn by Dr. Momber are without merit and have no scientific basis.**

---

[22] See Momber Expert Report, page 16

TREX 011916.0014

## Appendix A - Information Required by Federal Rules of Civil Procedure

The following is a list of the items required by the Federal Rules of Civil Procedure:

1.  This report contains my opinions, conclusions and the reasons therefore;

2.  A statement of my qualifications is contained in Appendix B;

3.  My compensation for the preparation of this report is included in Appendix C;

4.  The data or other information I considered in forming my opinions is listed in the Documents Reviewed and References sections of Appendix D.

5.  I have testified as an expert at deposition and trial only in the current case, In Re: Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010, MDL NO. 2179.

TREX 011916.0015

## Appendix B - Curriculum Vitae of Glen Benge

### GLEN BENGE

**Employment Overview:**

- Involved with all aspects of the development, coordination and implementation of oil field cementing services for global drilling operations for ExxonMobil.
- Subject matter expert in all facets of oil field cementing including laboratory and job design, equipment and field operations, and cement logging evaluation.
- Authored numerous technical papers on oil field cementing.

**Employment Experience:**

**April 2011 - Present**               Consultant - Oil Field Cementing

**January 2009 - March 2011**               Drilling Training Manager, ExxonMobil – Houston, TX

- Manage training curriculum and schools for global drilling organization.
- Coordinate and develop schools to address current and future business needs, assuring sufficient personnel are trained for specific future operations.  Identify and mentor future technical trainers.
- Develop competency framework to assimilate new hire personnel into drilling throughout the global organization, including partner affiliates (UAE, Qatar, Angola and others).
- Serve as ExxonMobil Drilling representative for $CO_2$ – Carbon Capture and Sequestration issues.

**January 2000 - January 2009**               Senior Technical Advisor, ExxonMobil – Houston, TX

- Subject matter expert for ExxonMobil's global drilling operations in cementing. Responsibilities included global operations support, and the development of internal technical standards, reference documents and training materials.
- Senior Technical Advisor for cementing to Drilling Management.  Served as client advisor to the three major cementing Service Companies.  Set ExxonMobil expectations for cementing Service Providers, provided direction for procurement of cementing services and materials, and evaluated tenders for drilling and production.
- Served as corporate contact for cementing related issues on industry and government committees.  Acted as technical advisor to the industry and government groups.

TREX 011916.0016

**July 1992 - January 2000**        Engineering Advisor - Fluids Team Lead, Mobil – Dallas, TX

- Coordinated fluids group in Well Construction and Completions for Mobil Exploration & Production Technical Center.
- Provided technical expertise in fluids for Mobil worldwide drilling operations.
- Managed internal and external cementing research and development projects.
- Coordinated cement system design and evaluation, equipment selection and cement job performance for Mobil drilling.
- Functioned as a liaison between cementing Service Companies and Mobil.
- Designed and executed first offshore foamed cement job for Mobil in Gulf of Mexico, Mobile Bay operations.
- Introduced foamed cement use on wells in Germany and HTHP (high temperature high pressure) wells for offshore operations in Qatar and Nova Scotia.

**February 1988 - July 1992**   Senior Drilling Fluids Specialist, Mobil - New Orleans, LA.

- Managed the cementing business for Mobil, Gulf of Mexico Drilling.
- Developed Mobil operational and laboratory guidelines and cementing policies.
- Monitored EPA requirements for NPDES discharges and mud toxicity compliance testing.  Coordinated efforts with environmental groups internal and external to Mobil.

**1977 - 1988**                 Dowell Schlumberger, New Orleans, Houston and Tulsa

- Division Technical Specialist for offshore Gulf of Mexico and inland water cementing operations.
- Manager of the offshore division testing laboratory.  Coordinated research and marketing plans to address the technical needs of the offshore and inland marine cementing operations.
- Developed cementing marketing plans for Southern Region of Dowell Schlumberger, which covered the Gulf Coast and all offshore operations. Responsibilities included trend analysis, equipment and personnel deployment and market share evaluation.
- Worked in laboratory and engineering functions with Dowell in Tulsa.  Managed introduction of new cementing materials and services to field operations. Coordinated efforts in technical writing of internal and client training schools and sales literature.  Evaluated equipment and technical requirements for new services and developed ultra lightweight cementing capabilities for Dowell.

**Education:**

BS, Chemistry, Cum Laude, Southwestern Oklahoma State University, Weatherford, OK

Course work toward Masters, Analytical Chemistry, Oklahoma State University

Continuing education through industry, Mobil and ExxonMobil.  (25 + schools)

TREX 011916.0017

**Professional Activities:**

President, New Orleans Chapter, American Association of Drilling Engineers, 1991 - 1992,

Board of Directors, 1989 - 1992

Member, American Petroleum Institute (API) Committees 10 & 13 - 1980 to present

Chairman, API Sub-Committee 10 on Oil Well Cements - 2002 - 2005

Chairman, Task Group on Centralizers - API Spec 10 B

Chairman, Work Group on Completion Fluids - API RP 13J

API Citation for Service - 2005

Member, ISO Subcommittee 3, Technical Committee 67, Work Group 2

Member, Society of Petroleum Engineers (SPE) – 1978 to present

Member, Program Committee and Session Chairman, SPE/IADC Drilling Conferences, 1995-2004

Technical Editor - Journal of Petroleum Technology - 2003 - 2005

Technical Editor - SPE Drilling and Completion - 2003 to present

SPE Outstanding Technical Editor Award - 2007, 2008, 2009 and 2010

**Publications:**                                     **\* Denotes Peer Reviewed Journal**

Bannister, C. E. and Benge, O.G.: "Pipe Flow Rheometry: Rheological Analysis of a Turbulent Flow System for Cement Placement," SPE 10216, 1981.

Benge, O. G., Jones, R. R. , Dresher, T. D., and Dolan, R. T.,: "A New Low Cost Permafrost Cementing System," SPE 10757, 1982.

Benge, O. G., Spangle, L. B. and Sauer, C. W. : "Foamed Cement - Solving Old Problems with a New Technique," SPE 11204, 1982.

Abbott, R., Benge, G., Elbel, J., Jeffrey, R., Klarfeld, D. and Naylor, J. : "Deep Well Evaluation and Completion," Drilling, July 1983.

Edmondson, T. D. and Benge, O. G. : "A Case Study of Ultralightweight Cementing Practices in the Northeastern United States," SPE 12318, 1983.

Cementing Technology, Nova Communications LTD, London, Dowell Schlumberger copyright 1984, co-author and co-editor.

Bannister, C. E, Marcinew, R. P. and Benge, O. G., : "Critical Design Parameters to Prevent Gas Invasion During Cementing Operations," CIM Paper No. 84-35-106, 1984.

Benge O. G., "Field Study of Offshore Cement Spacer Mixing," SPE 19864, 1989. Published in **SPE Drilling Engineering\***, September 1990.

TREX 011916.0018

Tilghman, S. E., Benge O. G. and George, C. R., : "Temperature Data for Optimizing Cementing Operations," IADC / SPE 19939, 1990.  Published in **SPE Drilling Engineering***, June 1991.

Benge, O. G., "A New Technique for Evaluating Field Cement Mixing," IADC / SPE 27522, 1994.  Published in **SPE Drilling & Completion***, June 1995.

Benge, O. G. and Webster, W.W., "Evaluation of Blast Furnace Slag Slurries for Oil Field Application," IADC/SPE 27449, 1994.

Benge, O. G. and Webster, W. W., "Blast Furnace Slag Slurries may have limits for Oil Field Use," Oil & Gas Journal, July 18, 1994.

Benge, Glen, McDermott, Jim R., Langlinais, Joey C. and Griffith, James E., "Foamed cement job successful in deep HTHP offshore well," Oil & Gas Journal, March 11, 1996.

Judge, Robert A, and Benge, Glen, "Advances in Metering and Control Technology Improves Design and Execution of Foamed Cement Jobs," IADC / SPE 47831, 1998.

Deeg, Wolfgang, Griffin, James, Crook, Ron and Benge, Glen, "How foamed cement advantages extend to hydraulic fracturing operations," World Oil, November 1999.

Ron Crook, Ronnie Faul, Glen Benge, and Richard Jones, "Eight Ways to Help Ensure a Successful Cement Job," World Oil, July, 2001.

Benge, Glen and Dew, Ed, "Meeting the Challenges in Design and Execution of Two High Rate Acid Gas Injection Wells," SPE / IADC 91861, 2004.  Published in **SPE Drilling & Completion***, Sept. 2006.

Benge, Glen and Poole, David, "Use of Foamed Cement in Deep Water Angola," SPE/IADC 91662, 2004.

Benge, Glen, Carruthers, Bill, Gardner, Craig, "New program enhances API monogram," Oil & Gas Journal, September 2004.

Benge, G., Darby, J., Peroyea, M., Aguilar. T, Mueller, D and Doherty, D., "Deep Gas-Well Cementation: A Review of Risks and Design Basis for Use of a Liquid Cement Premix for Large Offshore Cementing Operations" SPE/IADC 98970, 2006.

Benge, Glen, "Improving Wellbore Seal Integrity in $CO_2$ Injection Wells," Greenhouse Gas Technology Conference - 9, Washington D.C., 2008.

Benge, Glen, "Improving Wellbore Seal Integrity in $CO_2$ Injection Wells," SPE / IADC 119267, 2009.

Benge, Glen, Khatri, Deepak and Lockwich, Brian, "Design Process for Sustainable Long-Term Wellbore Integrity" Groundwater Protection Council, Annual Forum, September 2012

TREX 011916.0019

## Appendix C - Statement of Compensation

I have been compensated at a rate of $225 per hour for my services to the United States Department of Justice (USDOJ) in this matter.  For any deposition or trial testimony the USDOJ will compensate me at a rate of $375 per hour.

TREX 011916.0020

## **Appendix D - Documents Considered**

The information reviewed for the development of this report includes:

Expert Report of Andreas Momber, May 1, 2013

Expert Report of Stewart K. Griffiths, March 22, 2013

Expert Report of Ronald C. Dykhuizen, PhD., March 22, 2013

Report by Oilfield Testing and Consulting, August 1, 2011

Expert Report of Morten Emilsen, October 17, 2011

Trial Testimony of Morten Emilsen

Trial Testimony of John Guide

Expert Report of Glen Benge, August 26, 2011 (TREX-05990) (including Consideration Materials)

Expert Report of David Calvert, October 14, 2011 (TREX-22761)

Halliburton Post Job Report, April 20, 2010

*Deepwater Horizon* Accident Investigation Report, BP, September 8, 2010 (TREX-00001 and TREX-00002)

Duiguid, Andrew and Tombari, John, "Technologies for Measuring Well Integrity in a $CO_2$ Field, "Sixth annual conference on Carbon Capture and Sequestration, May 2007

Guthrie, George, "Science-Based Risk Assessment of Wellbores in a $CO_2$ Storage System," American Geophysical Union, Fall Meeting 2008

Benge, Glen, McDermott, Jim R., Langlinais, Joey C. and Griffith, James E., "Foamed cement job successful in deep HTHP offshore well," *Oil & Gas Journal*, March 11, 1996

Benge, Glen, "Improving Wellbore Seal Integrity in $CO_2$ Injection Wells," Greenhouse Gas Technology Conference - 9, Washington D.C., 2008.

Benge, O. G., Spangle, L. B. and Sauer, C. W., "Foamed Cement - Solving Old Problems with a New Technique," paper SPE 11204, 1982

Economides, M. J., Watters, L. T., and Dunn-Norman, S., Petroleum Well Construction, West Sussex, England, John Wiley & Sons Ltd., 1998

Halliburton Redbook™ Engineering Tables, 2001

Lapeyrouse, N. J.: Formulas and Calculations for Drilling, Production and Workover, Gulf Professional Publishing, Second Edition, 2002

Nelson, E. B. and Guillot, D, Well Cementing, Second Edition, Sugarland Texas, Schlumberger, 2006

Stewart, R. B. and Schouten, F. C., "Gas Invasion and Migration in Cemented Annuli: Causes and Cures," SPE Drilling Engineering, March 1998

Scherer, George W. et.al., "Leakage of $CO_2$ Through Abandoned Wells: Role of Corrosion of Cement," Carbon Dioxide Capture for Storage in Deep Geologic Formations, Volume 2, D. C. Thomas and S. M. Benson (Eds.) 2005, Elsevier Ltd.

TREX 011916.0021