IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * | MDL NO. 2179 |
| | * | SECTION "J" |
| | * | HONORABLE CARL J. BARBIER |
| THIS DOCUMENT RELATES TO 12-970 | | |
| | * | MAGISTRATE JUDGE SHUSHAN |

* * * * * * * * * * * * * * * * * * * * * * * * *

## MOTION AND BRIEF BY JON ANDRY TO PROVIDE DISCOVERY

NOW INTO COURT, comes Jon Andry and moves as follows:

1.

Despite a good faith request from other counsel and the Federal Rules of Civil Procedure requiring broad discovery for potentially relevant evidence, the Special Master acting as advocate has denied to Andry any meaningful discovery.

2.

For example, the Special Master has ignored statements made by Andry's own personnel, failed to include helpful facts and edited and redacted relevant information. The Special Master has refused to produce Andry a copy of his own sworn statement as well as that of his partner, Glen Lerner.

3.

Andry is informed, believes and alleges that exculpatory evidence clearing his name exists in the discovery possessed by the Special Master and that the Special Master for his own purposes decided not to present that information to the Court.

4.

Andry specifically advises, as follows, in regard to why full discovery must occur:

    a)    The Special Master should know based on his investigation that no one on behalf of Andry Lerner, nor Andry, received any preferential treatment.

    b)    Jon Andry did not have any reason to expect or require preferential treatment because Lionel Sutton could not, would not and did not provide such.

    c)    Jon Andry has nothing to do with the Special Master's imaginary and flatly wrong conclusions of any effort by Jon Andry to "corrupt the claims process."

    d)    Christine Reitano never discussed nor requested any referral fee. She sent the Casey Thonn case to a different firm, not Andry Lerner. Her conversation with Andry Lerner was solely and only to get the necessary documents she had retained so as to complete the claim. These documents, including tax returns, had been created during Mr. Thonn's GCCF claim. (See Mancuso Affidavit, Exhibit 1.) All of the allegations regarding misconduct in the Thonn claim and Andry are factually and legally dead wrong.

    e)    Andry Lerner brought the Thonn case issue of how to handle the shrimp percentage deduction between boat captains and vessel owners to BP's attention. Thonn appealed, not BP. This is based on the good faith belief that the settlement agreement requires all discretionary interpretations be made in favor of the claimant. Doing so opened up the Thonn claim to scrutiny by BP and an appeals judge.

    f)    There is not now, nor will there ever be any evidence the Jon Andry or Andry Lerner in any way exaggerated, manipulated, or inflated the Thonn claim. There is not now, nor will there ever be any proof of any "fraudulent characteristic" by any clear eyed review of the Thonn matter. All of the allegations on pages 58-61 of The Freeh Report are **factually** wrong. Emphasis supplied.

    g)    There was never any conversation between Reitano and Andry or anyone on his behalf about Reitano getting a referral fee.

5.

An example of how the decision to deny discovery to Andry fails to give the full facts to the Court occurs on page 21:

The Special Master writes:

> "In an email to Mr. Sutton dated January 29, 2013, Mr. Lerner answered his own question as to how best to use Ms. Reitano's access, Mr. Lerner wrote to Mr. Sutton not only about Ms. Reitano helping to move Mr. Lerner's claims to the front of the line ,but also about how getting claims paid would benefit Mr. Sutton himself: "Can you ask Chris what I need to do get my BP claims in some sort of priority.  We have over a thousand claims and hundreds on file and yet only trickling in a check or two per week.  I need my claims expedited.  More money coming in means I start getting my sea legs and can keep us going in other areas."  Emphasizing this point, Mr. Lerner wrote to Mr. Sutton on February 15, 2013: "I'd be on easy street if Mr. Andry could settle some BP claims!"  At this time Mr Sutton was receiving a $10,000 per month Crown salary from Mr. Lerner, and over $40,000 in Thonn referral fee payments from Mr. Lerner and Mr. Jon Andry."

The truth is: (See Exhibit 2)

> "From: glenlerneresq@aol.com
> \> Subject:
> \> Date: Tue, 29 Jan 2013 08:38:10-0700
> \> To: lhs3law@hotmail.com
> \>
> \> Can you ask Chris what I need to do to get my BP claims in some sort of priority.  We have over a thousand claims and hundreds on file and yet only trickling in a check or two per week.  I need my claims expedited.  More money coming in means I start getting my sea legs and can keep us going in other areas."

> "From: Sutton Lionel (lhs3law@hotmail.com)
>   Sent:  Tue 1/29/13 11:19 AM
>   To:     Glen Lerner (glenlerrerresq@aol.com)
>
> **You can't**.  Yours are going pretty fast.  The process will get faster on its own as grey areas are resolved and applied across the board.

>What you can do is make sure that any incomplete notices are responded to asap.  Previously, responses to incomplete notices were sent to the back of the line but we will be streamlining that process very soon." (Emphasis supplied)

There is nothing in the report that educates the Court about this clearly exculpatory response by Sutton.

Knowing that the above quote was the response on January 29th, the Special Master selectively excluded that fact from this Court and now fights discovery.  If this was not an accident, a fair-minded Special Master will want to correct it and clarify the assumptions drawn.  If it was left out on purpose, that strategy is questionable at best.

5.

On May 9th (Tr. 40), the Special Master makes note of the fact that Sutton responded to Lerner about the status of DHECC Lerner Claims.  This summary from Sutton was in accordance with the law and the rules of the Claims Office. It was available to Andry Lerner on their claims portal.  This proof of misconduct was information on the desk of the Andry Law Firm employees the same day, May 9th.  (See Exhibit 3, "Analysis of Submissions from Andry Law Group/Andry Lerner, LLC (as of 5/9/13) and email Sutton to Lerner.).  If you look at the box on the top page, and you look at the Sutton transmittal, they are the same facts.  This was all available information on May 9th, nothing secret.  Had Glen Lerner called his office instead of communicating with Sutton, he would have received the same facts.

This was explained in detail to the Special Master.  The Special Master transfers innocent acts from the claims office into conspiratorial misconduct.  The website states on Section 4.3.7 the following:

    a)    The Claims Administrator is charged with the duty to implement and administer the settlement for the benefit of the economic class members.

    b)    The Claims Administrator is charged with the responsibility to work with the claimants to facilitate a symbol and submit claim forms including all supporting documentation.

    c)    The Claims Administrator is charged with the responsibility to provide claimants with assistance, information, opportunities, and notice so the claimant has the best opportunity to receive the payment to which the claimant is entitled.

Section 4.3.7 of the Settlement Agreement written by BP mandates that the Administrator consider the best interests of the claimant at all times. Again these errors demonstrate why full discovery is necessary. The selective decision making of the Special Master in his advocacy role is not the neutrality required by Rule 53.

The actions by Sutton will be handled by his attorney. Sutton told Freeh the reasons he took the actions that he did. He wanted to prevent his wife from knowing about the Thonn fee. He wasn't trying to undermine the claims office. He wasn't holding up Andry Lerner, he wasn't giving Andry Lerner any special treatment, and he wasn't conspiring with anybody except himself to avoid marriage problems.

The need for complete discovery is necessary as counsel is informed and believes that a review of Sutton's deposition will show that he exonerates Jon Andry. The limited discovery provided by Glen Lerner's deposition reflects an exoneration of Jon Andry. Nowhere in the report to the Court are these facts reflected.

The need for discovery is further buttressed by the truth of the email of May 9th (Exhibit 3). Sutton and Andry had suffered a breach of friendship and they were trying to fix it. When Sutton writes to Lerner on May 9th and ask that the information (the public information in the

claims office) be kept between the two of them, it is because Lerner is upset that the claims are not being effectively filed due to poor management by Jon. Sutton does not want to "rat out Jon" to Lerner, Jon's partner. So he wants the fact of the communication kept from Jon. The facts in the communication are not secret at all. At the same time, he is explaining to Lerner what Lerner's own office already knows and what is his duty under the settlement agreement and his job at the claims office to provide.

8.

Counsel believes the discovery that Freeh redacts helps tell the full truth. The charts Freeh creates are either the result of lack of diligence to detail or failure to know the facts. Full discovery would prove the falsity of the allegations. At page 35 of the Freeh Report, in the chart written by the Special Master, he references a circuitous transfer of money and ultimately comes to the "money laundering" allegations. The facts are:

    a)     The Old Crown account Sutton kept was a separate account due to his marriage issues. The Thonn fee was a direct request by Sutton to Lerner. Andry paid nothing out of that fee, and never agreed to it. Lerner did not send the money to some secret account. His wire transfer say "Thonn referral fee." The choice of the account was not made by Lerner, but rather by Sutton who told Jeff Cahill, Lerner's accountant, to make the transfer in that fashion. Cahill had previously transferred money to Sutton into that account as the result of the business relationships, non-lawyer related, between Lerner and Sutton.

        Nobody told Jon Andry any of this.

        The Lerner internal records showed that the fee was recorded and paid out as a referral to Sutton. Sutton recorded it as a legal fee on his taxes. All of this was explained to Freeh. Nowhere are these facts given to the Court, nor provided in the redacted discovery.

    b)     A serious error was made under the allegation of "fraudulent characteristics of the Casey Thonn claim." Pages 59-60 included the

>   allegation "the escalation of Mr. Thonn's claims evidencing suspicious and fraudulent characteristics are summarized in the following chart." This was either based on a complete misunderstanding of the rules and the law, or a demonstrable refusal to see clear facts. The facts are:
>
>   1. Casey Thonn's claim was based on his 2009 tax return. That tax return was correct. It was filed by his accountant. Tax returns were not acceptable to Feinberg. The use of tax returns was substituted as acceptable. At the time Reitano provided her information to Feinberg, he erroneously continued to rely on trip tickets. The trip ticket idea was discredited as potentially inaccurate and unfair. (See Exhibit 1, Mancuso Affidavit.)

The claims process exhaustively went over the trip tickets issue (BP's position) versus the tax return issue, the DHECC and PSC position. The Special Master can't hijack established rules to please BP. Declaring tax returns as fraudulent, and the trip ticket as sacrosanct misrepresents the entire seafood claims process.

Freeh cannot be allowed as Special Master to go back to the GCCF's discredited method, employ it, and yell fraud. There is nothing that links any action by the Andry office to any effort to exaggerate the Thonn claim.

9.

Not only was Thonn's tax return valid, but the people Freeh degrades as presenting poor evidence and fraudulent actions have come out to support their good names and are providing affidavits in direct contradiction to his allegations on page 58. Freeh denergrates the "purchaser" and says the income as estimates cannot be traced. Well it has, it can and it is. (See Exhibit 4, as example). Again, this information was available to Freeh and counsel is informed and believes that complete open discovery process would show his selective facts failed to give the whole picture to the Court.

The chart and the allegations regarding fraud on the Thonn claim are based on a fundamental failure to understand and accept the claims process. As is reflected (Exhibit 5), the computer at the claims office would automatically go to "trip ticket calculations." The claimants or their attorneys would then have to file for reconsideration and ask for the tax returns. Once the tax return information was digested, a new and different formula would apply. This was all in accordance with the written policies and rules agreed to by BP. Every time a trip ticket is used as the basis of a fisherman's claim, it is likely to be below actual value and create a distorted and inaccurate picture of the person's work. Tax returns were considered better. Thus the sworn written statement and tax return rule was created. All Freeh had to do was listen to Christina Mancuso, Kaleigh LeBoeuf, or anybody at the claims office, who dealt with seafood claims and he would know that his allegations on page 58, 59, 60 and through 61 are wrong. Of course, shrimpers have cash sales. Of course, most of the claimants will not have matching trip ticket data bases. All of this has been decided, litigated and explained multiple times. That the Special Master is late to the party, doesn't understand the rules, or chose to ignore them is no excuse. Full discovery was given to him. He should disclose it so the Court will know the true picture, and the Andry interests can clear their name.

10.

The Special Master cites his rules regarding the duty of candor to the Tribunal (page 86). He identifies "a material fact is one whose existence or non-existence is essential to the resolution of the matter." He notes that candor and honesty are a lawyers stock and trade and that truth "is not a matter of convenience." All well said. Let's apply it to these facts. In an email to Sutton dated January 29th, Lerner asks how his friendship with Reitano can benefit his claims.

> "Can you ask Chris what I need to do to get my BP claims in some sort of priority ... I need my claims expedited."

That sounds possibly incriminating as to Lerner's hopes for special treatment. But what the Special Master doesn't tell this Court in "candor" is the answer that comes back from Sutton and never changes.

> "You can't. Yours are going pretty fast. The process will get faster on its own as grey areas are resolved and applied across the board. What you can do is make sure that any incomplete notices are responded to ASAP. Previous responses to incomplete notices were sent to the back of the line, but we will be streamlining that process very soon."

Of course, if the Special Master provided this in the discovery, then the Court, all counsel and the world would have known about this email and could not have been mislead. This type of effort would have eliminated any dispute about the role of the Special Master in his "neutral role of fact gathering." It would also have resulted in a single finding of possible misconduct, Sutton's referral fee, not an attack on honest lawyers and fair claims.

This is serious. On pages 21 and 22, Freeh discusses the longstanding relationships between the parties and then uses his editing as evidence of some kind of secret agreements, including the Andrys. But he ignores the most relevant evidence.

That Freeh has abandoned all pretense of the neutrality required of a Special Master is clear in his opposition to Lerner's Motion for Production of Documents. The obvious question: What and why does Freeh care? That is hard to answer. He's not BP's attorney. He is not the Claims Administrator. He is not working for any governmental entity. He is not in charge of the Louisiana Bar Association. Since he has **no client**, why is he adversarial?

The resolution of that fundamental question will be raised and answered in other pleadings, but the choice for combat is relevant to the discovery dispute. In the Lerner opposition, Freeh admits three things:

a) The entire investigative record **is not** before the Court.

b) The record before the Court is the evidence that **supports the statements and findings** in the Special Master's Report.

c) He is willing to rely on his conclusions on the Thonn case, which he says was "closely examined" and proves evidence of "fraudulent characteristics" as the springboard to investigating all claims.

This memorandum and attachments shed light on all three of these arguments. The adversarial stance by Freeh violates Rule 53, and his response to Lerner's request places his position squarely before the Court.

Freeh has made mistakes. They are substantial. They have caused great damage, but these errors are fixable once all the facts come out.

The above information is provided to explain to the Court why full discovery is required. These are just a few examples of how partial disclosure leads to half-truths and error. If the regular, required discovery rules are applied, then many more examples that get to the real truth will emerge. There is no reason for delay, nor for denial of reasonable requests.

By Attorneys:

/s/Lewis O. Unglesby
LEWIS O. UNGLESBY (#12498)
LANCE C. UNGLESBY (#29690)
UNGLESBY LAW FIRM
246 Napoleon Avenue
Baton Rouge, LA 70802
Telephone: (225) 387-0120
Facsimile: (225) 336-4355

**CERTIFICATE OF SERVICE**

      I hereby certify that on 16th day of October, 2013, a copy of the foregoing Motion was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

      */s/Lewis O. Unglesby*
      _____
      LEWIS O. UNGLESBY