### AFFIDAVIT

**STATE OF LOUISIANA**

**PARISH OF** Orleans

BEFORE ME, the undersigned Notary Public, personally came and appeared,

### CHRISTINA E. MANCUSO

Who, after being first duly sworn did state as follows:

1) I am an attorney employed by the Andry Lerner L.L.C. law firm ("AL") in New Orleans, Louisiana. I make this Affidavit. The statements contained in this Affidavit are within my personal knowledge, and, if called upon to testify, I could and would testify competently thereto.

2) I attended Baylor University in Waco, Texas (B.A., 1982) and Baylor Law School (J.D. 1984). I was admitted to the State Bar of Texas in 1984 and practiced at several firms from 1984 – 1990. I worked at Baron & Budd, P.C. in Dallas, Texas from 1990 until 2007 in Mass-Tort/Multi-Party Toxic Tort litigation. I hold an AV® Preeminent™ Rating by Martindale-Hubbell.

3) I am the senior AL staff attorney handling claims for property and economic damages resulting from the BP "Deepwater Horizon" Oil Spill in the Gulf of Mexico on April 20, 2010 ("Oil Spill"). My responsibilities include the preparation, filing, and processing of our clients' Oil Spill claims. I am knowledgeable about AL's Oil Spill client files.

4) In the normal course of business, AL uses various contracts and agreements to set forth the terms of AL's representation of its clients. These forms include:
   a. Attorney-Client Contract – When AL is contacted by a prospective client about representation, AL sends a proposed Attorney-Client Contract to the prospective client.
   b. Attorney Referral Agreement – When AL is contacted by another attorney regarding representation of a client, AL sends a proposed Attorney Referral Agreement to the attorney.

5) Casey Thonn ("Thonn") is a commercial fisherman that suffered losses as a result of the Oil Spill. AL filed five claims on his behalf. To date, Thonn has received three settlement checks - A VoO settlement check in the amount of $49,400.00, A Seafood Vessel Owner settlement check in the amount of $166,652.10 and Boat Captain settlement check in the amount of $190,350.25 – a total of $406,402.35. To my


EXHIBIT 1

knowledge, the Thonn claims were processed in the regular course of business and in a normal manner according to the applicable DWHCC procedures, Policies and Appellate decisions. Thonn was awarded and paid less settlement funds on both his Boat Captain Claim and his Vessel Owner claim than the sums requested in the initial DWHCC filings.

6) I was interviewed by the Freeh Group Investigative Team ("Investigators") on August 7, 2013. My understanding of the Report of Special Master Louis J. Freeh, dated September 6, 2013[1] ("Report") is that any references therein to statements made by me are taken from the notes of the Freeh Group Investigative Team related to my interview ("Interview Report"), a copy of which was provided pursuant to an Order of the Court[2] as bates range SM-01-TALF-00386-00388.[3] That document states:

> *"The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product."*

As such, it is necessary to clarify certain misconceptions reflected in the Interview Report.

7) I had an initial conversation with a Ms. Christine Reitano ("Reitano") by telephone in which she indicated to me that she was sending to AL a DWHCC claim – that of a commercial shrimper named Casey Thonn. During this call, Reitano inquired of me whether our firm would honor and maintain the Attorney-Client Contract percentage of 20%, to which she and Mr. Thonn had previously agreed. I confirmed that AL would certainly honor that Attorney-Client Contract percentage.

8) The only sum mentioned in our conversation was that of the 20% Attorney-Client Contract. At no time during this conversation did we discuss an Attorney Referral Agreement. After that call in the regular course of business, after contacting Jonathan Andry, I sent to Reitano a proposed, unsigned Attorney Referral Agreement.

---

[1] [Rec. Doc. 11287]
[2] [Rec. Doc. 11442]
[3] See Exhibit A

2

9) There is a discrepancy in the Report regarding my interview. The Report states "but that Ms. Reitano also requested a referral fee."[4]

Explanation: Reitano did not request a referral fee from me during this call or during any other calls which I had with her.

10) There is a discrepancy in the Report regarding my interview. The Report states: "Ms. Mancuso also stated that Ms. Reitano asked AndryLerner honor the *percentage referral fee* (italics added) that was contained in the Thonn disc"[5] as described to the Freeh Investigators.

However, the Interview Report indicates: "Ms. Mancuso said that Ms. Reitano requested she have Andry Lerner honor the *attorney percentage* [italics added], for Ms. Reitano in the Thonn contract, as set forth as a fee agreement in that contract."

It was my understanding that Ms. Reitano asked me if Andry Lerner would honor the *Attorney-Client Contract percentage fee*. To my knowledge there was not then, and there is not today, any Attorney Referral Agreement on the Reitano/Thonn disc, only the Attorney-Client Contracts - that is contracts between attorneys Smith Stagg and Casey Thonn and attorney Reitano and Casey Thonn.

11) There is an ambiguity in the Interview Report which states: "requested she (Mancuso) have AndryLerner honor the attorney percentage, for Ms. Reitano, in the Thonn contract, *as set forth as a fee agreement in that contract* (italics added)."[6]

The wording is clear up to "Thonn contract". The wording of "as set forth as a fee agreement in that contract" I believe references the Attorney-Client Contract, not an Attorney Referral Agreement.

12) The Interview Report states: "Ms. Mancuso recalled that she sent Ms. Reitano an attorney referral contract packet."[7]

Explanation: I sent Ms. Reitano an Attorney Referral Agreement. I did not send her a "contract packet."

13) The Interview Report states: "Ms. Mancuso also recalled that she sent an Andry Lerner claimant attorney referral contract to Mr. Thonn with the same percentage requested by Ms. Reitano."[8]

Explanation: I recall that I sent an Andry Lerner claimant Attorney-*Client* Contract to Mr. Thonn with the same percentage requested by Ms. Reitano.

---

[4] Report Page 26, 3rd Paragraph
[5] Report Page 26, 4th Paragraph
[6] Interview Report Page 2, line 2
[7] Interview Report Page 2, lines 2 & 3
[8] Interview Report Page 2, lines 3 & 4

3

14) The Interview Report reads: "Ms. Mancuso was unaware if Ms. Reitano ever returned the signed referral *contract* [Italics added]."[9]

   Explanation: I have no present knowledge if Ms. Reitano ever returned an executed Attorney Referral Agreement. However, the Attorney-Client Contract signed by Thonn was received by AL.

15) The Report states: "Ms. Mancuso remembered communications with Ms. Reitano about the referral and the fee."[10]

   Explanation: I only recall discussing with Ms. Reitano the Attorney-Client Contract and the exchange of client information to process the claims.

16) Reitano did provide information along with a CD disc containing numerous documents and client information to AL. Reitano worked on the Thonn claim with the Gulf Coast Claim Facility and AL relied on this work and information and it was validated in the subsequent meetings and contact with Thonn.

17) In my interview I explained the standard option in the Settlement Agreement in conjunction with the DWHCC Policies which permit a Claimant to use the annual Tax Return income to confirm commercial fishing income as opposed to the use of trip tickets, as stated in DWHCC Policy No. 262[11]:

   *"Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. UPDATE: The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel hearing:*

   *On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, **the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:***

   *(a) **Single Catch/Single Vessel Claimants:** If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is **submitting a claim for only one vessel and one catch type:***
   *(1) **The Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form**, subject to the following.*
   *(2) The revenues shall be **limited to those shown in the applicable tax returns**.*
   *(3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the*

---

[9] Interview Report Page 2
[10] Report Page 25
[11] See Exhibit B

4

> *documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.*
> *(b) **SWS-1 Claimants:** If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns:*
> *(1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation:*
> *a) The Claims Administrator will rely upon the SWS-1 allocation and will not consider trip tickets or other documents for that purpose, subject to the following.*
> *b) The revenues shall be **limited to those shown in the applicable tax returns.***
> *c) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the assertions in the SWS-1. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.*
> *(2) If the claimant has indicated in the SWS-1 that the Claims Administrator is to use the claimant's trip ticket allocations if they result in a higher award than the SWS-1 allocation:*
> *a) The Claims Administrator will determine the claimant's trip ticket allocation under Subsections (c) or (d) below and will compare the resulting award to that determined using the SWS-1 allocation. The Claims Administrator will base the resulting Eligibility Notice on the higher award.*
> *b) If the award is based upon the SWS-1 allocation, the revenues shall be limited to those shown in the applicable tax returns."*

18) From my work I know that the Louisiana Department of Wildlife and Fisheries ("LDWF") Trip Tickets Database is not always an accurate source of complete information on the landings of commercial fishermen, mainly due to human error in data entry, as well as the failure to submit trip tickets.[12] From my work I know trip tickets are used generally by the State for conservation, regulation, and the review of the gear and area specific catch information that will improve the accuracy of stock assessments from the Louisiana waters which aid the LDWF to oversee fishing limits, fishing boundaries, management of public waters, and regulation enforcement.

19) The Thonn Expert Economic Report filed with the Boat Captain Claim indicated that the settlement sum should be in the amount of $259,459.00. An initial Eligibility Notice was issued in the amount of amount of $885.58.

20) Pursuant to the Settlement Agreement, the DWHCC has an affirmative duty to provide the claimant with the highest possible settlement value from the submitted documents[13]:

> *"The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting*

---

[12] See Exhibit C, DWHCC Policy No. 404
[13] Settlement Agreement (Section 4.3.8)

5

> *documentation under the terms in the Economic Damage Claim Process to produce the greatest ECONOMIC DAMAGE COMPENSATION AMOUNT that such information and supporting documentation allows under the terms of the ECONOMIC DAMAGE CLAIM FRAMEWORK."*

21) Per my conversation with our DWHCC firm liaison it was my understanding that DWHCC does often initially issue an Eligibility Notice using trip tickets as the basis of calculation due to the software of the DWHCC computer. An AL attorney in fact sent an email dated January 22, 2013 to the firm liaison inquiring as to why the DWHCC often initially uses trip tickets in calculating loss instead of using the submitted documents which request the use of Tax Returns.[14]

22) Per the terms of the Settlement Agreement and Policies, AL filed a Request for Reconsideration, requesting the DWHCC to use Tax Returns instead of trip tickets in the DWHCC calculation. A Post-Reconsideration Eligibility Notice was then issued for $189,647.64 per terms of the Settlement Agreement. Upon review, it was determined that the Eligibility Notice sum was *incorrect in that the DWHCC should not have deducted Shrimp Cost Percentage from his Boat Captain claim in the calculation loss,* that such a deduction in the loss calculation is only done on the Vessel Owner claim per the terms of the Settlement Agreement. On this good faith basis, AL then filed an Appeal on this Eligibility Notice due to the manner in which the Settlement Agreement was written regarding the Shrimp Cost Percentage deduction, and requested the amount of $648,648.00 per the language in the Settlement Agreement and DWHCC Policies as of that date. *Please see Settlement Agreement Shrimp Compensation Plan[15] which states:*

> *"If the Claimant is a Boat Captain and Benchmark Revenue was calculated based upon his earnings, such as from tax return or financial information, then no Shrimp Cost Percentage is applied, skip to step 5."*

23) AL filed the Appeal due to "error calculation", "error in reviewing submitted documentation" and "error in Prior Payment Offer."[16] The filing of this Appeal then opened up to BP the entire DWHCC claim file to oversight review by an appellant Judge with the possibility of such Appeal eventually going to Judge Barbier.

24) The Thonn appeal documents received by AL show that BP's Initial Proposal Regarding Claim No. 19691[17] attached a copy of Thonn's 2009 Tax Return and Economic Expert Report BP and states on Page 1:

> *"BP agrees with the Settlement Programs calculation of Claimant's Compensation Amount. BP therefore, submits an Initial Proposal*

---

[14] See Exhibit D
[15] [Rec. Doc. 6430-22]
[16] See Exhibit E, Coastal Claims Group Letter, Dated January 7, 2013
[17] See Exhibit F

6

*Compensation Amount $22,932.00, the amount Claimant is entitled to according to the terms of the Settlement Agreement Seafood Compensation Framework."*

25) AL also received BP's Final Proposal filed Feb 4, 2012[18] which states:

   *"As BP explained in its Initial Proposal, the Settlement program correctly calculated both Claimant's Compensation Amount and the Claimant's prior payment offset"* and *"BP, therefore, submits a Final Proposal Compensation Amount of $22,932.00 and Final Proposal Prior Offset Payment of $72,500.00."*

26) The Notice of Appeal Panel Decision was issued March 28, 2013[19] which awarded claimant $189,189.00, the amount of BP's Final Proposal. The Appeal Panel stated:

   *"The Appeal Panel's decision will stand as the Settlement Program's final determination on this claim."*

   The Appeal and the appeal fee were lost by Thonn. The Post-Appeal Eligibility Notice was issued on April 9, 2013. BP did not seek judicial review of the Appellate Panel's decision which is permitted under the terms of the DWHCC Appeal process. In fact, during the Appeal process, a new DWHCC Policy, No. 342, had been issued on February 8, 2013, which interpreted and clarified the Agreement as written and addressed this very issue of shrimp cost percentage deduction for an individual who is both a Vessel Owner and a Boat Captain.[20]

27) The Thonn Expert Economic Report indicated that the Vessel Owner Claim should be $327,272. A DWHCC Eligibility Notice for Thonn's Vessel Owner Claim was issued in the amount of $864.78. Per the terms of the Settlement Agreement, AL filed a Request for Reconsideration, requesting the DWHCC to use Tax Returns instead of trip tickets in the claim calculation. The Post-Reconsideration Eligibility Notice was then issued for $238,636 ($166,136.13 after the offset of prior seafood payments). However, the Notice inadvertently omitted accounting fee reimbursement pursuant to the Settlement Agreement. Upon review, it was determined that the Eligibility Notice sum was correct in that the Thonn Vessel Owner Economic Expert Report was in error, as the *calculations omitted to subtract the Shrimp Cost Percentage* in the loss calculation. AL then filed an Appeal on this Post-Reconsideration Eligibility Notice to obtain the allowed reimbursement for accounting fees *only*, pursuant to the terms of the Settlement Agreement.

28) The filing of the Appeal opened up to BP the claim file on this claim. Working through our DWHCC firm liaison, pursuant to DWHCC procedure, the issue was resolved, the accounting fees reimbursement was added to the Claim and a Post-

---

[18] See Exhibit G
[19] See Exhibit H
[20] See Exhibit I

Reconsideration Eligibility Notice dated January 28, 2013 was issued listing $515.97 as reimbursement for accounting fees. AL then withdrew the Appeal.

29) The suggestion that the chart shown in the Report on Page 60 reflects "suspicious and fraudulent characteristics" is misleading, as the Chart simply reflects that the claims were processed according to the Settlement Agreement and the DWHCC process and Policies. The Settlement Agreement and the DWHCC Policies provide for and allow a commercial fisherman to request the use of Tax Returns instead of trip tickets to calculate loss.[21]

30) The Report states on Page 58 the title "Unsubstantiated Increases in the Value of Mr. Thonn's Claim..."

Mr. Thonn's Federal Internal Revenue filings for 2009 and 2010 do substantiate his income for those years in accordance with the Settlement Agreement and approved DWHCC Policies.[22]

31) I have met with claimant Thonn and spoken with him on numerous occasions. I reviewed the documents he provided to Reitano. In working with him, my impression of his character is that of a diligent and hard-working individual.

32) At no time during the course of filing claims with the DWHCC was I told, it was implied, suggested or intimated that any claims filed by AL would receive special attention or treatment or would be treated in any other manner other than through the known DWHCC claim procedure process. No individual or entity requested me to perform any kind of action in the processing and filing of Thonn's claims which was outside of the usual DWHCC claim processing procedure.

33) Exact claim status information can be obtained on the firm's filed claims as well as unfiled but registered claims on the DWHCC Website, the various reports, claim files, Notices, definitions and claim filing summaries which are available for view and are reached through the attorney portal for AL permits AL to keep current on the following:

   a) The number of claims filed on behalf of what number of claimants
   b) The number of claims which have submitted a signed claim form.
   c) The number of claimants who have started a Registration Form but did not complete it, completed a Registration Form and filed a claim and completed a Registration Form but have not completed the claim form.
   d) Which claims have Eligibility Notices and the amounts.
   e) The number of offers and amounts which have been accepted, paid and how many are pending payment.
   f) The number of claims in accounting.

---

[21] See Exhibit B
[22] See Exhibit B

8

      g) The number of claims which are eligible but no payment is warranted due to prior Oil Spill payment(s).
      h) The claims which are designated Incomplete, those designated Incomplete and waiting for a Response, those claim designated Incomplete in which a Response has been sent and is again in Review.
      i) The number of claims in which Responses have been sent but not yet processed.
      j) The number of claims which have been excluded from the Class, closed, withdrawn, on appeal and / or denied.
      k) The number of claims which are still In Claim Review and In Claims Review but with no Notice yet issued.
      l) The overall statistics of the submissions to the DWHCC.

34) Status Reports filed routinely by DWHCC Claims Administrator Patrick Juneau in the Multi-District Litigation also help in monitoring the flow of claims by the DWHCC in order to compare firm filings to the filings submitted to the DWHCC.[23]

35) The type of information contained in the email dated May 9, 2013, between Lionel Sutton and Glen Lerner, which I was only recently shown, is made available to any firm filing DWHCC claims through the Attorney Claim Portal website's Reporting tab and other sources as described in Paragraphs 33 and 34, above.[24]

**SWORN TO AND SIGNED** below before me, Notary Public, after reading the whole, on _October 13_, 2013, in the jurisdiction mentioned above:

AFFIANT:

CHRISTINA E. MANCUSO

Witness 1: _Christine Hay_
Printed Name: _CHRISTINE HAY_

Witness 2: _Jerry P. Alleman_
Printed Name: _Jerry P. Alleman_

Notary Public
Printed Name: LEWIS SCOTT JOANEN
Notary Public
Bar No. 21431, ID No. 59231
Parish of Orleans, State of Louisiana
My commission is for life
My Commission Expires: _at death_

---

[23] See Exhibit J, Claims Administrator Status Report of May 13, 2013
[24] See Exhibit K, dated May 9, 2013, reflecting AL's claim portal statistics

9