UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions …………………………………………….. | : : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |

## BP AND ANADARKO'S FURTHER OBJECTION AND OFFER OF PROOF OF EXCLUDED TESTIMONY FROM DRS. CURTIS WHITSON AND ROBERT ZIMMERMAN

This submission is made to respectfully restate, and seek remedies for, BP and Anadarko's continuing objection to the substance and consequences of certain of the Court's evidentiary rulings regarding the scope of expert testimony.

Certain of the Court's rulings to date have effectively produced a situation in which the United States — and only the United States — enjoys the opportunity to present expert testimony on hotly contested issues. Specifically, at the close of the presentation of evidence, there is a risk that the Court will have heard only from United States experts Drs. Aaron Zick, Jean-Claude Roegiers, and Alan Huffman regarding opinions and analyses offered for the first time in these three experts' rebuttal reports. Unless the Court reverses course and devises a remedy for the current state of affairs, the end of the trial will arrive without BP and Anadarko experts Drs. Curtis Whitson and Robert Zimmerman ever having had an opportunity to defend their opinions against the criticisms of those opinions leveled by Drs. Zick, Roegiers, and Huffman. As a result, the Court will be deprived of the opportunity to assess the various experts' competing opinions in a properly adversarial posture.

Accordingly, BP and Anadarko respectfully submit this further objection to the Court's exclusion of BP/Anadarko expert testimony that defends existing expert opinions in light of new criticisms. BP and Anadarko offer for the Court's consideration proofs of the substance of this excluded testimony pursuant to Federal Rule of Evidence 103(a)(2). Finally, in light of the legal error that otherwise would be injected into these proceedings, BP and Anadarko respectfully request that the Court fashion an appropriate remedy for the erroneous exclusionary rulings that have occurred in the trial to date.

## BACKGROUND

The Court's exclusion of Dr. Whitson's and Dr. Zimmerman's expert testimony occurred in the context of a significant body of legal authority and procedural background.

### A.    The Permissible Scope of Expert Opinions

Courts universally agree that experts should be allowed to join issue on disputed questions that require expert testimony. *See, e.g.*, *United States v. Riddle*, 103 F.3d 423, 430 (5th Cir. 1997) (finding an abuse of discretion for preventing defense experts to testify in light of "extensive leeway" provided to the plaintiffs); *United States v. Alexander*, 816 F.2d 164, 169 (5th Cir. 1987) (finding an abuse of discretion for allowing "casual lay witness opinion testimony" to go unrebutted by excluded expert witnesses).

Indeed this Court itself has recognized, in this very trial, that an expert witness may testify that additional information received since the submission of his or her expert report has not dislodged the expert's confidence and belief in the opinion previously offered. This practice, as the Court has highlighted, is something "which all of the experts do":

> MR. BOLES: There are several thousand documents listed in his consideration materials; I don't think that qualifies as the definition of a four corners.

> THE COURT: Well, it's not -- as I understand it, this is not a different opinion, this is just additional information that he says he believes validates the numbers that he used, correct?
>
> MS. ENGEL: That's right, your Honor.
>
> THE COURT: And it's no different than an expert, *which all of the experts do*, sitting in court and listening to the testimony and then are asked did you sit in and did you hear this, does that change your opinion or whatever. So I am going to overrule the objection.

Phase 2 Trial Tr. 1853:18-1854:9 (Kelkar) (emphasis added). Nonetheless, BP and Anadarko have been deprived of this right by the rulings that have occurred to date. *See, e.g.*, Rec. Doc. 11544; Phase 2 Trial Tr. 2425:15-2427:15; 2338:3-20; 2531:17-22.

### B. Opinions Offered On Converting Hydrocarbons to Stock Tank Conditions

The United States is the plaintiff in this case and, accordingly, it is the United States that bears the burden of proof. Because the United States through Dr. Zick did not advance an ocean-separator method of conversion in its initial expert reports — either through Dr. Zick or any other expert — Dr. Zick should not be permitted to use rebuttal expert opinion to insert expert evidence into the United States' case-in-chief.

The Court has now heard Dr. Zick testify, and has been able to confirm for itself, that Dr. Zick is offering an ocean-separator conversion method for converting fluids to the relevant measure of stock tank barrels. Phase 2 Trial Tr. 1756:23-1757:6 (Zick). As the Court knows, Dr. Zick's initial report instead presented a four-stage separation method of conversion — and only the four-stage method. Zick Initial Report at 14-16 (TREX-011490R.0024-.0027). Indeed, Dr. Zick has admitted that, at the time of his initial expert report, he considered presenting an ocean separation model that attempted to replicate the actual conditions confronted by the hydrocarbons released, but he consciously rejected putting forward such a model in his initial

report for fear it would be too vulnerable to criticism. Zick Dep. at 278:22-279:8, 280:1-11 (attached at Exhibit 1).

Dr. Whitson, BP/Anadarko's competing fluids expert, timely provided his expert report after the submission of Dr. Zick's report. Dr. Whitson's report presents both a single-stage separation method and an ocean-separator method of the kind that Dr. Zick consciously chose to omit from his own report. Dr. Zick, after reviewing Dr. Whitson's ocean-separator model, offered a rebuttal report presenting an ocean-separator model of his own and recommending this method — found nowhere in his initial expert report — as the appropriate conversion method. Zick Rebuttal Report at 12 (TREX-011491R.0017) ("In light of the calculations presented in this section, my current recommendation is to use my oceanic separation process to make the conversions.")

In short, Dr. Zick did not limit his rebuttal report to defending his four-stage separation method of conversion or to critiquing Dr. Whitson's work. Instead and improperly, he used the opportunity of his additional report to offer an entirely new analysis and to explain why that new analysis is allegedly preferable to Dr. Whitson's. Subsequently, Dr. Whitson appropriately testified at his deposition, subject to cross examination by United States counsel, that his opinions remained unchanged, even in light of Dr. Zick's late-raised opinions. Whitson Dep. Tr. 392:10-428:1 (attached as Exhibit 2).

Nonetheless, the Court has permitted only Dr. Zick to testify about and critique the competing ocean-separator models that have been discussed at trial. Dr. Whitson, by contrast, has been precluded by rulings — both by written Order and from the bench — from even defending his original ocean-separator theory from Dr. Zick's rebuttal-opinion critiques.

4

Likewise, Dr. Whitson has been precluded from criticizing Dr. Zick's untimely new opinion. *See* Rec. Doc. 11544; Phase 2 Trial Tr. 2338:3-20.

    **C.**    **Opinions Offered on Rock Compressibility**

The United States, as the party bearing the burden of proof, failed to present *any* scientific analysis of rock compressibility in its initial expert reports or in its case-in-chief. Both in its initial reports and again at trial the United States relied solely on strained interpretations of BP presentations and emails. The United States may not now use a rebuttal case to bolster this deficiency.

As the Court is also aware, United States expert Dr. Mohan Kelkar's initial expert report elected to present a material balance analysis using a value of 12 microsips for rock compressibility. This rock compressibility value was drawn exclusively from a single BP document and came unaccompanied by any supporting scientific analysis. Kelkar Initial Report at 27 n.37 and 28 nn.40-41 (TREX-011549R.0027-.0028).

The parties now dispute at trial both the accuracy of the 12 microsips value used by Dr. Kelkar and the legitimacy of offering expert testimony on the basis of a single document. But what cannot be disputed is that the documentary evidence on which the United States relies reflects — at a minimum — a clear disagreement as to whether 12 microsips is, in fact, the proper measure of the compressibility of the Macondo reservoir sandstones. The United States nonetheless still has not submitted any scientific analysis to support this decision.

After the submission of Dr. Kelkar's report, BP and Anadarko presented a material balance analysis by Dr. Martin Blunt that relied on the careful scientific analysis of rock compressibility in the expert report of Dr. Robert Zimmerman. Blunt Report at 30-32 (TREX-011553-R-NoHC.0030-0032). In response, the United States presented its very first scientific opinions on that subject from "rebuttal" experts Dr. Roegiers and Dr. Huffman. Both reports

raised for the first time a scientific analysis of the data available to bolster the United States' unscientific choice to use 12 microsips, together with technical issues about the testing procedures employed by the experienced oilfield services company Weatherford.  Both reports also alleged issues with reliability problems in using industry-standard rotary side wall cores. Roegiers Rebuttal Report at 2-11, 14-24 (TREX-011698R.0005-.0014, .0017-.0027); Huffman Rebuttal Report at 36-40 (TREX-011515R.0036-.0040).

The Court then struck from these reports opinions improperly attempting to bolster the United States' failure in its case-in-chief to provide any scientific defense of its choice of 12 microsips.  Rec. Docs. 10477, 10683.  The Court specifically held, "Roegiers may criticize the sidewall v. core data used by Zimmerman, but he may not make affirmative calculations supportive of Kelkar's estimate of 12 microsips contained in his initial affirmative report. The expert report of Roegiers will be revised to eliminate such material."  Rec. Doc. 10477, at 4. Regarding Dr. Huffman, the Court similarly ordered, "As with Roegiers, the criticism of the core tests is a valid rebuttal opinion.  However, the affirmative opinion supporting 12 microsips is not."  *Id.* at 5.  Certain late-breaking rebuttal opinions remained, however, and Dr. Zimmerman testified at his deposition, again subject to cross examination by the United States, that his opinions were unchanged even in light of these newly raised criticisms.  Zimmerman Dep. 418:11-440:14, 468:23-474:8 (attached as Exhibit 3).

As with Dr. Whitson, Dr. Zimmerman has nonetheless been precluded both by written Order and rulings from the bench from defending his original rock compressibility analysis in the face of the rebuttal-opinion critiques leveled by United States experts.  Rec. Doc. 11544; Phase 2 Trial Tr. 2425:15-2427:15.  Tellingly, and contrary to the Court's ruling quoted above, Dr. Zimmerman was not permitted to answer the simple question:  "Do any of the criticisms he's

heard change his opinions about the level of compressibility of the reservoir.  Yes or no answer." Phase 2 Trial Tr. 2427:10-15.

Against this backdrop, legal error has now infected these proceeding.  Parties unquestionably have the right to ask their experts to testify regarding criticisms of their expert opinions that are known as of the time those opinions are put forward at trial.  Accordingly, BP and Anadarko respectfully offer under Federal Rule of Evidence 103(a)(2) proof of the testimony from Drs. Whitson and Zimmerman the Court has erroneously excluded and respectfully request an appropriate remedy before BP and Anadarko conclude their case-in-chief.

## PROFFER

This proffer is made out of an abundance of caution.  When ruling on the United States' motion *in limine*, the Court had before it — as attachments to the related briefing — excerpts from the depositions of both Drs. Whitson and Zimmerman that fairly describe the substance of the excluded testimony.  Rec. Doc. 11060-3, 11060-11; Rec. Doc. 11224-9, 11224-10. Additionally, the Court stated during the September 11, 2013 Phase 2 Pre-Trial Conference that any proffers would not involve the Court and, alternatively, could simply be filed in the record. Pre-Trial Tr. 48:8-12, 51:10-18 (Sept. 11, 2013).  Accordingly, a fully effective offer of proof was already completed through the contemporaneous submission of materials during motion *in limine* briefing.  *United States v. Ballis*, 28 F.3d 1399, 1406-07 (5th Cir. 1994); *McQuaig v. McCoy*, 806 F.2d 1298, 1301-02 (5th Cir. 1987).

BP and Anadarko nevertheless re-describe below the testimony excluded in order to further clarify the nature, extent, and importance of evidence that has erroneously been excluded thus far.

7

### I.     Dr. Whitson's Excluded Testimony

Dr. Curtis Whitson was precluded from responding to a new opinion offered by Dr. Aaron Zick, the United States' expert, for the first time in his rebuttal report recommending an ocean-separator method of conversion.  Dr. Zick initially proposed in his opening report that a four-stage separator process was appropriate.  *See* Zick Rebuttal Report at 1–2 (TREX-011491R.0005-.0006).  Then, in his rebuttal report—issued after Dr. Whitson's expert report—Dr. Zick changed his opinion and advocated an oceanic separation process he developed and presented in the report. *Id.* at 12 (TREX-011491R.0017) (served June 10, 2013); Whitson Report (TREX 011496) (served May 1, 2013).)  Had Dr. Whitson been allowed to respond to the opinions found in Dr. Zick's rebuttal report, Dr. Whitson would have testified that it does not alter his opinion that Dr. Whitson's ocean-separator model is the most realistic model presented in the case and that Dr. Zick's ocean separator is flawed in at least two ways that make it unrealistic.  Whitson Dep. 393:4–395:14, 397:9–20.

*First*, Dr. Zick admits that solubility is an "undeniable" aspect of hydrocarbons interacting with sea water.  Phase 2 Trial Tr. 1827:25–1828:3.  Nonetheless, Dr. Zick's ocean-separator process ignores this critical interaction between the hydrocarbon fluid and the water. *Id.* at 1827:19–21.  There is no disagreement that solubility is a realistic process that would have taken place, so any realistic ocean-separator model must take into account that process.  Phase 2 Trial Tr. 1827:25–1828:3 (Zick); Trial Tr. 2343:3–9 (Whitson).  Instead, Dr. Zick takes into account the effect of the ocean water only when it leads to additional stock tank oil — for instance by considering how the ocean water might interfere with the oil and gas to separate them (*e.g.*, Phase 2 Trial Tr. 1826:19–23) as well as the ocean temperatures and pressures that allow gradual separation of oil from gas (*e.g.*, Phase 2 Trial Tr. 1826:7–13) — but selectively ignores the ocean water when it would decrease the amount of liquid oil that reaches stock tank

8

conditions through a realistic ocean separator (Whitson Dep. 17:4–18:5). When Dr. Zick's ocean model is analyzed while including solubility effects, it yields the same 43 stock tank barrels for every 100 reservoir barrels that Dr. Whitson's model and the single-stage flash method yield. Whitson Dep. 16:5–17:3, 20:3–13, 395:15–396:14.

*Second*, Dr. Zick's ocean-separator process assumes that the oil and gas will flow together to the surface. Yet he assumes the water acts as a selective barrier between the oil and gas as they flow to the surface. According to Dr. Zick's model, oil from one side of this hypothetical water barrier will cross that barrier to mix with oil from the other side of the hypothetical barrier, and gas from one side of the hypothetical water barrier will cross that barrier to mix with gas from the other side of the barrier. But Dr. Zick's model does not permit oil from one side of this hypothetical water barrier to mix with *gas* from the other side of the selective barrier, and vice versa. This "selective mixing" — oil only with oil, gas only with gas — is non-physical behavior that does not exist in nature and artificially increases the amount of stock tank oil calculated by Dr. Zick's ocean-separator process. Dr. Whitson found that, if you remove the selective barrier and allow full mixing of oil and gas as they rise to the surface, the resulting stock tank oil volume will be about 43 barrels for every 100 reservoir barrels — even if you disregard the effect of solubility. Whitson Dep. 16:5–20:13, 396:15–397:8. Thus, if you remove *either one* of Dr. Zick's two flawed assumptions, the resulting stock tank oil volume is approximately equal to the result of the single-stage flash method of conversion and Dr. Whitson's ocean separator model.

## II. Dr. Zimmerman's Excluded Testimony

Dr. Zimmerman is one of the world's foremost experts on rock mechanics and specifically on sandstones. His expert report and trial testimony demonstrated that the best data available show that the sandstones in the Macondo reservoir have a compressibility of

9

approximately 6 microsips, and that the estimate of 12 microsips used by the United States is inconsistent with any available data. Zimmerman Report at 6-7(TREX 011497.0006-.0007); Phase 2 Trial Tr. 2398:12-2400:5. United States rebuttal experts Drs. Roegiers and Huffman are expected to testify in the United States' rebuttal case to certain technical criticisms of Dr. Zimmerman. Dr. Zimmerman was nevertheless precluded from testifying at trial that Drs. Roegiers's and Huffman's attempts to sow confusion do not change his scientific opinion that rock compressibility of the sandstones in the Macondo reservoir is approximately 6 microsips. Rec. Doc. 11544; Phase 2 Trial Tr. 2425:15-2427:15.

Had Dr. Zimmerman been permitted to address the opinions found in the reports of Drs. Roegiers and Huffman, he would have testified to the following:

- After having read and considered the rebuttal expert reports of Drs. Huffman and Roegiers, nothing in those reports would have changed his view that the best estimate of average uniaxial pore volume compressibility of the Macondo Reservoir is approximately 6 microsips.

- "Creep" (time-dependent inelastic deformation) did not occur at the Macondo reservoir during the spill. Creep only occurs in a reservoir when the differential stress is high enough to cause microfracturing in the sandstone, and the Weatherford testing data shows that the differential stress level at Macondo during the spill was not high enough to cause microfracturing in the Macondo sandstone. At all times during the spill, the stress regime stayed in the elastic (*i.e.*, not inelastic) regime.

- Dr. Roegiers's criticism that the uniaxial compression testing was performed too fast is incorrect. Laboratory testing on core samples is, by necessity, always conducted at a faster rate than depletion occurs in the field; otherwise, lab data would not be available until after the data was needed. The loading and depletion rates used by Weatherford during the uniaxial compression test were well within the range that is acceptable for such testing. Furthermore, because creep did not occur in the Macondo reservoir during the spill, Dr. Roegiers's suggested uniaxial compression test protocols of slower sample loading, slower depletion, and holding pressures constant at the end of depletion would not have yielded different results.

- Drs. Roegiers and Huffman are incorrect in suggesting that the tested core samples are not representative of the reservoir as a whole. Acoustic speed

measurements obtained during logging runs show that the entire sandstone reservoir interval exhibits acoustic speeds well above 10,000 ft./s. That value is consistent with the acoustic speeds measured on the tested cores samples, and is also consistent with a consolidated reservoir.

- Dr. Roegiers's criticism that "Professor Zimmerman did not calculate [the Poisson Ratio] to compare to Weatherford's triaxial compressive test data as a means to quality control the UPVC data" is irrelevant and disingenuous. Dr. Zimmerman made the "readily calculated" comparison (which Dr. Roegiers failed to do) and found that the Poisson Ratio for the cores tested in the uniaxial compression test had a Poisson ratio of 0.2 — consistent with the measured data as well as with the range used in Dr. Zimmerman's report. Moreover, Dr. Huffman's assertion that the log-derived Poisson Ratio for the Macondo reservoir is 0.25 is irrelevant to Dr. Zimmerman's calculations. In situ logging measures something called the "undrained" Poisson Ratio, not the "drained" Poisson Ratio needed for Dr. Zimmerman's calculations. It is well known empirically and theoretically that the "undrained" Poisson Ratio is slightly higher than the "drained" Poisson Ratio. It is also well documented that the "drained" Poisson Ratio is the Poisson Ratio relevant during depletion (*i.e.*, draining) of a reservoir that is releasing fluids.

- There is no direct evidence that any of the eight sidewall core samples that were analyzed in Dr. Zimmerman's report were damaged as a result of drilling or coring. Moreover, if any samples were damaged, the resulting cracking could only lead to the reservoir UPVC being *lower* than the UPVC estimated from measurements on the damaged core.

- Dr. Roegiers is simply wrong when he claims that the Macondo sandstone would have exhibited "much higher compressibility" at reservoir temperature than it did during room-temperature laboratory testing. Both empirical data and theory support the conclusion that the compressibility of the Macondo sandstone would be at most about 5% higher at reservoir temperature than was measured at room temperature.

## **CONCLUSION**

BP and Anadarko provide this offer of proof to preserve the record for a potential future appeal of the Court's order excluding from evidence the testimony described above. In addition, BP and Anadarko respectfully request that the Court fashion an appropriate remedy for these erroneous exclusionary rulings that have occurred to date.

October 16, 2013

Warren Anthony Fitch
Ky E. Kirby
Bingham McCutchen LLP
2020 K Street NW
Washington, DC 20006
Telephone: (202) 373-6000

James J. Dragna
Bingham McCutchen LLP
355 S. Grand Avenue, Suite 4400
Los Angeles, California 90071
Telephone: (213) 680-6400

Deborah D. Kuchler, T.A. (Bar No. 17013)
KUCHLER POLK SCHELL
WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112
Telephone: (504) 592-0691

*Attorneys for Anadarko Petroleum Corporation*

Respectfully submitted,

By: /s/ Don K. Haycraft

Don K. Haycraft (Bar No. 14361)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Barry E. Fields, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc. and BP America Production Company*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 16th day of October, 2013.

/s/  Don K. Haycraft