# AFFIDAVIT

**STATE OF LOUISIANA**

**PARISH OF** Orleans

**BEFORE ME,** the undersigned Notary Public, personally came and appeared,

**CHRISTINA E. MANCUSO**

Who, after being first duly sworn did state as follows:

1) I am an attorney employed by the Andry Lerner L.L.C. law firm ("AL") in New Orleans, Louisiana. I make this Affidavit. The statements contained in this Affidavit are within my personal knowledge, and, if called upon to testify, I could and would testify competently thereto.

2) I attended Baylor University in Waco, Texas (B.A., 1982) and Baylor Law School (J.D. 1984). I was admitted to the State Bar of Texas in 1984 and practiced at several firms from 1984 – 1990. I worked at Baron & Budd, P.C. in Dallas, Texas from 1990 until 2007 in Mass-Tort/Multi-Party Toxic Tort litigation. I hold an AV® Preeminent™ Rating by Martindale-Hubbell.

3) I am the senior AL staff attorney handling claims for property and economic damages resulting from the BP "Deepwater Horizon" Oil Spill in the Gulf of Mexico on April 20, 2010 ("Oil Spill"). My responsibilities include the preparation, filing, and processing of our clients' Oil Spill claims. I am knowledgeable about AL's Oil Spill client files.

4) In the normal course of business, AL uses various contracts and agreements to set forth the terms of AL's representation of its clients. These forms include:
   a. Attorney-Client Contract – When AL is contacted by a prospective client about representation, AL sends a proposed Attorney-Client Contract to the prospective client.
   b. Attorney Referral Agreement – When AL is contacted by another attorney regarding representation of a client, AL sends a proposed Attorney Referral Agreement to the attorney.

5) Casey Thonn ("Thonn") is a commercial fisherman that suffered losses as a result of the Oil Spill. AL filed five claims on his behalf. To date, Thonn has received three settlement checks - A VoO settlement check in the amount of $49,400.00, A Seafood Vessel Owner settlement check in the amount of $166,652.10 and Boat Captain settlement check in the amount of $190,350.25 – a total of $406,402.35. To my

EXHIBIT
B

knowledge, the Thonn claims were processed in the regular course of business and in a normal manner according to the applicable DWHCC procedures, Policies and Appellate decisions. Thonn was awarded and paid less settlement funds on both his Boat Captain Claim and his Vessel Owner claim than the sums requested in the initial DWHCC filings.

6) I was interviewed by the Freeh Group Investigative Team ("Investigators") on August 7, 2013. My understanding of the Report of Special Master Louis J. Freeh, dated September 6, 2013[1] ("Report") is that any references therein to statements made by me are taken from the notes of the Freeh Group Investigative Team related to my interview ("Interview Report"), a copy of which was provided pursuant to an Order of the Court[2] as bates range SM-01-TALF-00386-00388.[3] That document states:

> *"The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product."*

As such, it is necessary to clarify certain misconceptions reflected in the Interview Report.

7) I had an initial conversation with a Ms. Christine Reitano ("Reitano") by telephone in which she indicated to me that she was sending to AL a DWHCC claim – that of a commercial shrimper named Casey Thonn. During this call, Reitano inquired of me whether our firm would honor and maintain the Attorney-Client Contract percentage of 20%, to which she and Mr. Thonn had previously agreed. I confirmed that AL would certainly honor that Attorney-Client Contract percentage.

8) The only sum mentioned in our conversation was that of the 20% Attorney-Client Contract. At no time during this conversation did we discuss an Attorney Referral Agreement. After that call in the regular course of business, after contacting Jonathan Andry, I sent to Reitano a proposed, unsigned Attorney Referral Agreement.

---

[1] [Rec. Doc. 11287]
[2] [Rec. Doc. 11442]
[3] See Exhibit A

9) There is a discrepancy in the Report regarding my interview. The Report states "but that Ms. Reitano also requested a referral fee."[4]

Explanation: Reitano did not request a referral fee from me during this call or during any other calls which I had with her.

10) There is a discrepancy in the Report regarding my interview. The Report states: "Ms. Mancuso also stated that Ms. Reitano asked AndryLerner honor the *percentage referral fee* (italics added) that was contained in the Thonn disc" [5] as described to the Freeh Investigators.

However, the Interview Report indicates: "Ms. Mancuso said that Ms. Reitano requested she have Andry Lerner honor the *attorney percentage* [italics added], for Ms. Reitano in the Thonn contract, as set forth as a fee agreement in that contract."

It was my understanding that Ms. Reitano asked me if Andry Lerner would honor the *Attorney-Client Contract percentage fee.* To my knowledge there was not then, and there is not today, any Attorney Referral Agreement on the Reitano/Thonn disc, only the Attorney-Client Contracts - that is contracts between attorneys Smith Stagg and Casey Thonn and attorney Reitano and Casey Thonn.

11) There is an ambiguity in the Interview Report which states: "requested she (Mancuso) have AndryLerner honor the attorney percentage, for Ms. Reitano, in the Thonn contract, *as set forth as a fee agreement in that contract* (italics added)."[6]

The wording is clear up to "Thonn contract". The wording of "as set forth as a fee agreement in that contract" I believe references the Attorney-Client Contract, not an Attorney Referral Agreement.

12) The Interview Report states: "Ms. Mancuso recalled that she sent Ms. Reitano an attorney referral contract packet."[7]

Explanation: I sent Ms. Reitano an Attorney Referral Agreement. I did not send her a "contract packet."

13) The Interview Report states: "Ms. Mancuso also recalled that she sent an Andry Lerner claimant attorney referral contract to Mr. Thonn with the same percentage requested by Ms. Reitano."[8]

Explanation: I recall that I sent an Andry Lerner claimant Attorney-*Client* Contract to Mr. Thonn with the same percentage requested by Ms. Reitano.

---

[4] Report Page 26, 3rd Paragraph
[5] Report Page 26, 4th Paragraph
[6] Interview Report Page 2, line 2
[7] Interview Report Page 2, lines 2 & 3
[8] Interview Report Page 2, lines 3 & 4

14) The Interview Report reads: "Ms. Mancuso was unaware if Ms. Reitano ever returned the signed referral *contract* [Italics added]."[9]

Explanation: I have no present knowledge if Ms. Reitano ever returned an executed Attorney Referral Agreement. However, the Attorney-Client Contract signed by Thonn was received by AL.

15) The Report states: "Ms. Mancuso remembered communications with Ms. Reitano about the referral and the fee."[10]

Explanation: I only recall discussing with Ms. Reitano the Attorney-Client Contract and the exchange of client information to process the claims.

16) Reitano did provide information along with a CD disc containing numerous documents and client information to AL. Reitano worked on the Thonn claim with the Gulf Coast Claim Facility and AL relied on this work and information and it was validated in the subsequent meetings and contact with Thonn.

17) In my interview I explained the standard option in the Settlement Agreement in conjunction with the DWHCC Policies which permit a Claimant to use the annual Tax Return income to confirm commercial fishing income as opposed to the use of trip tickets, as stated in DWHCC Policy No. 262[11]:

> *"Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. UPDATE: The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel hearing:*
>
> *On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation,* ***the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:***
>
> *(a)* ***Single Catch/Single Vessel Claimants:*** *If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is* ***submitting a claim for only one vessel and one catch type:***
> *(1) The Claims Administrator* ***will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form,*** *subject to the following.*
> *(2) The revenues shall be* ***limited to those shown in the applicable tax returns.***
> *(3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the*

[9] Interview Report Page 2
[10] Report Page 25
[11] See Exhibit B

*documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.*
*(b)* ***SWS-1 Claimants:*** *If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns:*
*(1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation:*
*a) The Claims Administrator will rely upon the SWS-1 allocation and will not consider trip tickets or other documents for that purpose, subject to the following.*
*b) The revenues shall be* ***limited to those shown in the applicable tax returns.***
*c) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the assertions in the SWS-1. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.*
*(2) If the claimant has indicated in the SWS-1 that the Claims Administrator is to use the claimant's trip ticket allocations if they result in a higher award than the SWS-1 allocation:*
*a) The Claims Administrator will determine the claimant's trip ticket allocation under Subsections (c) or (d) below and will compare the resulting award to that determined using the SWS-1 allocation. The Claims Administrator will base the resulting Eligibility Notice on the higher award.*
*b) If the award is based upon the SWS-1 allocation, the revenues shall be limited to those shown in the applicable tax returns."*

18) From my work I know that the Louisiana Department of Wildlife and Fisheries ("LDWF") Trip Tickets Database is not always an accurate source of complete information on the landings of commercial fishermen, mainly due to human error in data entry, as well as the failure to submit trip tickets.[12] From my work I know trip tickets are used generally by the State for conservation, regulation, and the review of the gear and area specific catch information that will improve the accuracy of stock assessments from the Louisiana waters which aid the LDWF to oversee fishing limits, fishing boundaries, management of public waters, and regulation enforcement.

19) The Thonn Expert Economic Report filed with the Boat Captain Claim indicated that the settlement sum should be in the amount of $259,459.00. An initial Eligibility Notice was issued in the amount of amount of $885.58.

20) Pursuant to the Settlement Agreement, the DWHCC has an affirmative duty to provide the claimant with the highest possible settlement value from the submitted documents[13]:

*"The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting*

[12] See Exhibit C, DWHCC Policy No. 404
[13] Settlement Agreement (Section 4.3.8)

> *documentation under the terms in the Economic Damage Claim Process to produce the greatest ECONOMIC DAMAGE COMPENSATION AMOUNT that such information and supporting documentation allows under the terms of the ECONOMIC DAMAGE CLAIM FRAMEWORK."*

21) Per my conversation with our DWHCC firm liaison it was my understanding that DWHCC does often initially issue an Eligibility Notice using trip tickets as the basis of calculation due to the software of the DWHCC computer. An AL attorney in fact sent an email dated January 22, 2013 to the firm liaison inquiring as to why the DWHCC often initially uses trip tickets in calculating loss instead of using the submitted documents which request the use of Tax Returns.[14]

22) Per the terms of the Settlement Agreement and Policies, AL filed a Request for Reconsideration, requesting the DWHCC to use Tax Returns instead of trip tickets in the DWHCC calculation. A Post-Reconsideration Eligibility Notice was then issued for $189,647.64 per terms of the Settlement Agreement. Upon review, it was determined that the Eligibility Notice sum was *incorrect in that the DWHCC should not have deducted Shrimp Cost Percentage from his Boat Captain claim in the calculation loss,* that such a deduction in the loss calculation is only done on the Vessel Owner claim per the terms of the Settlement Agreement. On this good faith basis, AL then filed an Appeal on this Eligibility Notice due to the manner in which the Settlement Agreement was written regarding the Shrimp Cost Percentage deduction, and requested the amount of $648,648.00 per the language in the Settlement Agreement and DWHCC Policies as of that date. *Please see Settlement Agreement Shrimp Compensation Plan[15] which states:*

> *"If the Claimant is a Boat Captain and Benchmark Revenue was calculated based upon his earnings, such as from tax return or financial information, then no Shrimp Cost Percentage is applied, skip to step 5."*

23) AL filed the Appeal due to "error calculation", "error in reviewing submitted documentation" and "error in Prior Payment Offer."[16] The filing of this Appeal then opened up to BP the entire DWHCC claim file to oversight review by an appellant Judge with the possibility of such Appeal eventually going to Judge Barbier.

24) The Thonn appeal documents received by AL show that BP's Initial Proposal Regarding Claim No. 19691[17] attached a copy of Thonn's 2009 Tax Return and Economic Expert Report BP and states on Page 1:

> *"BP agrees with the Settlement Programs calculation of Claimant's Compensation Amount. BP therefore, submits an Initial Proposal*

---

[14] See Exhibit D
[15] [Rec. Doc. 6430-22]
[16] See Exhibit E, Coastal Claims Group Letter, Dated January 7, 2013
[17] See Exhibit F

*Compensation Amount $22,932.00, the amount Claimant is entitled to according to the terms of the Settlement Agreement Seafood Compensation Framework."*

25) AL also received BP's Final Proposal filed Feb 4, 2012[18] which states:

*"As BP explained in its Initial Proposal, the Settlement program correctly calculated both Claimant's Compensation Amount and the Claimant's prior payment offset"* and *"BP, therefore, submits a Final Proposal Compensation Amount of $22,932.00 and Final Proposal Prior Offset Payment of $72,500.00."*

26) The Notice of Appeal Panel Decision was issued March 28, 2013[19] which awarded claimant $189,189.00, the amount of BP's Final Proposal. The Appeal Panel stated:

*"The Appeal Panel's decision will stand as the Settlement Program's final determination on this claim."*

The Appeal and the appeal fee were lost by Thonn. The Post-Appeal Eligibility Notice was issued on April 9, 2013. BP did not seek judicial review of the Appellate Panel's decision which is permitted under the terms of the DWHCC Appeal process. In fact, during the Appeal process, a new DWHCC Policy, No. 342, had been issued on February 8, 2013, which interpreted and clarified the Agreement as written and addressed this very issue of shrimp cost percentage deduction for an individual who is both a Vessel Owner and a Boat Captain.[20]

27) The Thonn Expert Economic Report indicated that the Vessel Owner Claim should be $327,272. A DWHCC Eligibility Notice for Thonn's Vessel Owner Claim was issued in the amount of $864.78. Per the terms of the Settlement Agreement, AL filed a Request for Reconsideration, requesting the DWHCC to use Tax Returns instead of trip tickets in the claim calculation. The Post-Reconsideration Eligibility Notice was then issued for $238,636 ($166,136.13 after the offset of prior seafood payments). However, the Notice inadvertently omitted accounting fee reimbursement pursuant to the Settlement Agreement. Upon review, it was determined that the Eligibility Notice sum was correct in that the Thonn Vessel Owner Economic Expert Report was in error, as the *calculations omitted to subtract the Shrimp Cost Percentage* in the loss calculation. AL then filed an Appeal on this Post-Reconsideration Eligibility Notice to obtain the allowed reimbursement for accounting fees *only*, pursuant to the terms of the Settlement Agreement.

28) The filing of the Appeal opened up to BP the claim file on this claim. Working through our DWHCC firm liaison, pursuant to DWHCC procedure, the issue was resolved, the accounting fees reimbursement was added to the Claim and a Post-

[18] See Exhibit G
[19] See Exhibit H
[20] See Exhibit I

Reconsideration Eligibility Notice dated January 28, 2013 was issued listing $515.97 as reimbursement for accounting fees. AL then withdrew the Appeal.

29) The suggestion that the chart shown in the Report on Page 60 reflects "suspicious and fraudulent characteristics" is misleading, as the Chart simply reflects that the claims were processed according to the Settlement Agreement and the DWHCC process and Policies. The Settlement Agreement and the DWHCC Policies provide for and allow a commercial fisherman to request the use of Tax Returns instead of trip tickets to calculate loss.[21]

30) The Report states on Page 58 the title "Unsubstantiated Increases in the Value of Mr. Thonn's Claim…"

Mr. Thonn's Federal Internal Revenue filings for 2009 and 2010 do substantiate his income for those years in accordance with the Settlement Agreement and approved DWHCC Policies.[22]

31) I have met with claimant Thonn and spoken with him on numerous occasions. I reviewed the documents he provided to Reitano. In working with him, my impression of his character is that of a diligent and hard-working individual.

32) At no time during the course of filing claims with the DWHCC was I told, it was implied, suggested or intimated that any claims filed by AL would receive special attention or treatment or would be treated in any other manner other than through the known DWHCC claim procedure process. No individual or entity requested me to perform any kind of action in the processing and filing of Thonn's claims which was outside of the usual DWHCC claim processing procedure.

33) Exact claim status information can be obtained on the firm's filed claims as well as unfiled but registered claims on the DWHCC Website, the various reports, claim files, Notices, definitions and claim filing summaries which are available for view and are reached through the attorney portal for AL permits AL to keep current on the following:

a) The number of claims filed on behalf of what number of claimants
b) The number of claims which have submitted a signed claim form.
c) The number of claimants who have started a Registration Form but did not complete it, completed a Registration Form and filed a claim and completed a Registration Form but have not completed the claim form.
d) Which claims have Eligibility Notices and the amounts.
e) The number of offers and amounts which have been accepted, paid and how many are pending payment.
f) The number of claims in accounting.

[21] See Exhibit B
[22] See Exhibit B

g) The number of claims which are eligible but no payment is warranted due to prior Oil Spill payment(s).
h) The claims which are designated Incomplete, those designated Incomplete and waiting for a Response, those claim designated Incomplete in which a Response has been sent and is again in Review.
i) The number of claims in which Responses have been sent but not yet processed.
j) The number of claims which have been excluded from the Class, closed, withdrawn, on appeal and / or denied.
k) The number of claims which are still In Claim Review and In Claims Review but with no Notice yet issued.
l) The overall statistics of the submissions to the DWHCC.

34) Status Reports filed routinely by DWHCC Claims Administrator Patrick Juneau in the Multi-District Litigation also help in monitoring the flow of claims by the DWHCC in order to compare firm filings to the filings submitted to the DWHCC.[23]

35) The type of information contained in the email dated May 9, 2013, between Lionel Sutton and Glen Lerner, which I was only recently shown, is made available to any firm filing DWHCC claims through the Attorney Claim Portal website's Reporting tab and other sources as described in Paragraphs 33 and 34, above.[24]

**SWORN TO AND SIGNED** below before me, Notary Public, after reading the whole, on October 13, 2013, in the jurisdiction mentioned above.

**AFFIANT:**

______________________________
**CHRISTINA E. MANCUSO**

Witness 1: [signature]
Printed Name: CHRISTINE HAY

Witness 2: [signature]
Printed Name: TERRY P. ALLEMAN

______________________________
Notary Public
LEWIS SCOTT JOANEN
Notary Public
Bar No. 21431, ID No. 59231
Parish of Orleans, State of Louisiana
My commission is for life
Printed Name: Lewis Scott Joanen
Notary No./Bar No.: 21431
My Commission Expires: at death

---

[23] See Exhibit J, Claims Administrator Status Report of May 13, 2013
[24] See Exhibit K, dated May 9, 2013, reflecting AL's claim portal statistics

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Christina Mancuso |
| Title: | Toxic Tort Litigation Attorney |
| Office: | AndryLerner |
| Date/Time: | August 7, 2013 9:00 AM |
| Attendees: | Walt Donaldson, Steve Tidwell, Laure Kirk, David Courcelle (attorney for Mancuso) |
| Location: | 935 Gravier S., New Orleans, La. 70112 |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Christina Mancuso.

On the above date and times, Christina Mancuso was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Mancuso was advised concerning the need for truthfulness and honesty and was further advised concerning the penalties for perjury under Title 18 USC section 1001. She was further advised that she would not be adjourned as a witness and could be recalled.

Regarding the Casey Thonn claim, Ms. Mancuso said that the first time she became involved with this claim based on a telephone call from Christine Reitano. During the call, Ms. Reitano told Ms. Mancuso she was sending two claims on a disc for referral to Andry Lerner. She does not recall if there was actually another claim, other than Mr. Thonn's, on the disc. Ms. Mancuso said that Ms. Reitano



CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

requested she have Andry Lerner honor the attorney percentage, for Ms. Reitano, in the Thonn contract, as set forth as a fee agreement, in that contract. Ms. Mancuso recalled that she sent Ms. Reitano an attorney referral contract packet. She also recalled that she sent an Andry Lerner claimant attorney referral contract to Mr. Thonn with the same percentage requested by Ms. Reitano. When asked if a contract is always sent to the claimant, Ms. Mancuso said that some lawyers do and others do not. Ms. Mancuso was unaware if Ms. Reitano ever returned the signed referral contract. In the Andry Lerner process, that would not be a role she would handle.

Ms. Mancuso confirmed again that she had never known or met Mr. Sutton. Regarding Ms. Reitano, she did recall she had two or three conversations with Ms. Reitano, generally regarding whether Ms.

2

SM-01-TALF00387

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Reitano had or had not sent the disc with the claims and there were no conversations after that.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

3

SM-01-TALF00388





EXHIBIT
B

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-262 | CLAIMS ADMINISTRATOR'S APPROVED POLICY | | |
|---|---|---|---|
| **I. Profile - EXTERNAL** | | | |
| **Subject** | Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. | | |
| **Active Date** | 10/8/12 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| **Type of Decision** | | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | | Exhibit 10 |
| **Affected Claim Types and/or Review Processes** | | | Seafood |
| **Superseding Information** | | | Policy 262 supersedes Policy 257 on 10/08/2012<br>Policy 262 supersedes Policy 241 on 10/08/2012<br>Policy 262 supersedes Policy 212 on 10/08/2012 |

## II. Summary

Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. UPDATE: The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel hearing:

On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:

(a) Single Catch/Single Vessel Claimants: If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is submitting a claim for only one vessel and one catch type:
(1) The Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, subject to the following.
(2) The revenues shall be limited to those shown in the applicable tax returns.
(3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.
(b) SWS-1 Claimants: If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns:
(1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation:
a) The Claims Administrator will rely upon the SWS-1 allocation and will not consider trip tickets or other documents for that purpose, subject to the following.
b) The revenues shall be limited to those shown in the applicable tax returns.
c) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the assertions in the SWS-1. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.
(2) If the claimant has indicated in the SWS-1 that the Claims Administrator is to use the claimant's trip ticket allocations if they result in a higher award than the SWS-1 allocation:
a) The Claims Administrator will determine the claimant's trip ticket allocation under Subsections (c) or (d) below and will compare the resulting award to that determined using the SWS-1 allocation. The Claims Administrator will base the resulting Eligibility Notice on the higher award.
b) If the award is based upon the SWS-1 allocation, the revenues shall be limited to those shown in the applicable tax returns.
(c) Louisiana Trip Ticket Database: If the claimant is not subject to Subsections (a) or (b) and the Claims Administrator is able to determine the claimant's Benchmark Period revenues using the trip ticket data received by the Claims Administrator from the Louisiana Department of Wildlife and Fisheries, the Claims Administrator will rely on such data to determine such revenues and their allocation by vessel and catch type and will not consider trip tickets other document for that purpose. The Claims Administrator will not consider tax return revenues on such claims.
(d) Specific Trip Tickets or Equivalent: If the Claimant is not subject to Subsections (a), (b) or (c), the Claims Administrator will determine the claimant's Benchmark Period revenues and their allocation using trip tickets or their equivalent.

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-404 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

**I. Profile - EXTERNAL**

| | | | |
|---|---|---|---|
| **Subject** | Seafood Program: Handling Errors in Vessel Registration Information Reported in the LDWF Trip Ticket Database | | |
| **Active Date** | 8/28/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | | Clarified by Seafood Neutral |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | | Seafood |

**II. Summary**

The Claims Administrator prepared and sent a memorandum to the Seafood Neutral explaining the substance and procedural history of the announced policy and requesting his opinion on how to resolve the issue. At the Seafood Neutral's request, the Claims Administrator then provided the Seafood Neutral – with a copy to the Parties – certain claims information germane to the issue. After considering that information alongside the announced policy, the Seafood Neutral advised the Claims Administrator that he agreed with the proposed approach. Accordingly, after thorough consideration of the Parties' responses and the Seafood Neutral's opinion, the Claims Administrator announces the final policy as originally announced, repeated verbatim below:

In Louisiana, seafood dealers are required to report the seafood they purchase from commercial fishermen to the Louisiana Department of Wildlife and Fisheries ("LDWF"). In reporting this sales information, the dealer must identify by registration number the vessel that landed the catch. A number of claimants have indicated that the seafood dealers to whom they sold their catch entered the wrong registration number, and, therefore, reported the sale to the LDWF under the wrong vessel. This erroneous reporting creates a discrepancy in the Claims Administrator's reviews of the affected Louisiana-based commercial fishermen's claims in the Seafood Compensation Program. If a claimant believes that his landings were reported to the LDWF under the wrong vessel and wishes to have the revenue associated with those misreported sales considered as part of the claimant's Seafood Compensation Program claim, the claimant must submit (1) a sworn written statement describing the discrepancy in detail and (2) sworn written statement from the dealer who incorrectly reported the landings confirming and explaining the dealer's reporting error.

EXHIBIT
C

EXHIBIT
D

**Chris Mancuso**

**Subject:** FW: General Question regarding Eligibility Notices under the Seafood Compensation Program - Trip Tickets v. Income Tax Returns

**From:** Nikeita Ashe [mailto:nashe@dhecc.com]
**Sent:** Tuesday, January 22, 2013 2:10 PM
**To:** Kailey LeBoeuf
**Cc:** Mary Rubio
**Subject:** RE: General Question regarding Eligibility Notices under the Seafood Compensation Program - Trip Tickets v. Income Tax Returns

Kailey,

I just wanted to inform you that we have implemented a new Re-Review process in addition to Reconsideration. You may seek a Re-Review if you have additional supporting documentation. I don't think that is your case here, but I wanted to inform you of that update for future references. I can seek clarification for you on the use of Trip Tickets vs. Income Tax Returns, however, without having an actual CID, receiving clarification may be difficult. Please let me know how you'd like me to move forward.

Thanks,
Nikeita

---

**From:** Kailey LeBoeuf [mailto:KLeboeuf@andrylawgroup.com]
**Sent:** Tuesday, January 22, 2013 2:58 PM
**To:** Nikeita Ashe
**Cc:** Mary Rubio
**Subject:** General Question regarding Eligibility Notices under the Seafood Compensation Program - Trip Tickets v. Income Tax Returns

Niketia,

I have a question regarding eligibility notices that I would appreciate your input on. My question is limited to claimants under the seafood compensation program. We have received many eligibility notices from the claims facility regarding several claimants in which the claims facility used trip tickets to calculate the claimants loss in lieu of the claimants Income Tax Return. I understand that we can upload the SWS 1 to request that the claims facility use either the claimants trip tickets OR income tax returns to calculate the loss. In some of these instances, we have uploaded the SWS 1 with the claim form (requesting that the claims facility use Income Tax Returns), and the claims facility still uses trip tickets to calculate the loss. In other circumstances, we may have not uploaded a SWS 1 requesting that the facility use Income Tax Returns to calculate a loss, and the claims facility uses the trip tickets to calculate the loss.

ALL of the claimants that I am referring to would have received eligibility notices in a higher amount if the claims facility would have used Income Tax Returns. This is despite the fact that we have either uploaded the SWS 1 requesting that the facility use Income Tax Returns and despite the fact that Section 4.3.8 provides that the claims administrator shall process the information completed to produce the greatest economic damage compensation amount.

The problem that this causes is that we have to request for reconsideration to request that the claims facility use Income Tax Returns (which should have been done anyway considering the SWS 1 and/or Section 4.3.8). 1. This really holds up the entire process. 2. We then receive a post reconsideration eligibility notice and sometimes the amount is still incorrect. 3. This means we now have to appeal, which causes even more delays and involves paying fees.

I just do not understand how this keeps happening.  I do not have a list of clients that this has happened to, but this has definitely been going on.  Is there any way you can look into this for me?  Any assistance would be greatly appreciated.  Thank you for your time.

Sincerely,

Kailey

Kailey L. LeBoeuf Esq.
Andry Lerner, L.L.C.
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-525-5535
Facsimile: 504-586-8933
E-Mail: kleboeuf@andrylawgroup.com

CONFIDENTIALITY NOTICE:  This e-mail transmission (and the documents accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege.  It is intended only for use by the person(s) to whom it is addressed.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution of or the taking of any action in reliance on the contents of this information is strictly prohibited.  If you have received this transmission in error, please notify us immediately by telephone to arrange for the return of the documents.

Kailey L. LeBoeuf Esq.
Andry Lerner, L.L.C.
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-525-5535
Facsimile: 504-586-8933
E-Mail: kleboeuf@andrylawgroup.com

CONFIDENTIALITY NOTICE:  This e-mail transmission (and the documents accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege.  It is intended only for use by the person(s) to whom it is addressed.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution of or the taking of any action in reliance on the contents of this information is strictly prohibited.  If you have received this transmission in error, please notify us immediately by telephone to arrange for the return of the documents.



800 Mariner's Plaza Drive, Ste. 821
Mandeville, LA 70448
985-778-2016 (Main Office)
www.CoastalClaimsGroup.com

January 7, 2013

Jonathan B. Andry, Esq.
Andry Lerner, LLC
610 Baronne Street
New Orleans, LA 70113

Re: Casey Thonn, Claimant ID No. 100051739
Boat Captain Claim ID No. 19691

Dear Mr. Andry:

Per your request, we have reviewed the Post-Reconsideration Eligibility Notice for the above referenced claim. We have found that the Claims Center has incorrectly calculated this loss for the following reasons:

1. The adjuster incorrectly calculated a Shrimp Cost Percentage resulting in a lower Base Loss even though this claim was based on Tax Return information, as per the Settlement Agreement (relevant Pages Attached for your review).
2. They also incorrectly calculated the Base Compensation for this claim as the Base Compensation was supposed to equal the Base Loss.

I have attached our revised calculations based upon the terms of the Settlement Agreement. Mr. Thonn's Boat Captain Claim should have results in a Final Compensation Amount of $648,648. If you have any additional questions, please let me know.

With kindest personal regards, I remain

Very truly yours,

*Leslie M. Butler*

Leslie M. Butler
Director of Operations

/lbt
Enclosure

PDF created with pdfFactory Pro trial version www.pdffactory.com
PDF created with pdfFactory Pro trial version www.pdffactory.com

**Historical Shrimp - Casey Thonn**

Claimant ID No. 100051739, Claim No. 19691

| Vessel Size | Additional Catch Factor | Shrimp Cost Percentage | Vessel Owner/ Commercial Fisherman Vessel Lessee Share | Boat Captain Share |
|---|---|---|---|---|
| < 30 feet | [illegible] | [illegible] | [illegible] | [illegible] |
| 30-44 feet | [illegible] | [illegible] | [illegible] | [illegible] |
| 45-74 feet (Ice) | [illegible] | [illegible] | [illegible] | 30% |
| 45-74 feet (Freezer) | [illegible] | [illegible] | [illegible] | 30% |
| 75+ feet (Ice) | [illegible] | [illegible] | [illegible] | [illegible] |
| 75+ feet (Freezer) | [illegible] | [illegible] | [illegible] | [illegible] |
| RTP | | | 8.25 | 7.25 |

| Key | |
|---|---|
| | Enter Raw Data |
| | Selected Data |

**Boat Captain**

Trip Ticket Summary

| 2007 | 2008 | 2009 |
|---|---|---|
| | | 156,000 |

| Averages | | |
|---|---|---|
| 2007-2009 | 2008-2009 | 2009 |
| 156,000 | 156,000 | 156,000 |

Tax Return Summary

| 2007 | 2008 | 2009 |
|---|---|---|
| | | 156,000 |

| Averages | | |
|---|---|---|
| 2007-2009 | 2008-2009 | 2009 |
| 156,000 | 156,000 | 156,000 |

| | Trip Ticket | | Tax Return | | |
|---|---|---|---|---|---|
| 1 Gross Revenue Benchmark Period | 156,000 | a | 156,000 | a | |
| Additional Catch Factor | 1.20 | [illegible] | 1.20 | [illegible] | Based on vessel size from above |
| 2 Additional Catch Adjusted | 187,200 | c=a*b | 187,200 | c=a*b | |
| Adjustment for change in prices 10-11 | 1.2 | d | 1.2 | d | For all size vessels |
| 3 Total adjusted Benchmark Revenue | 224,640 | e=c*d | 224,640 | e=c*d | |
| 4 Benchmark shrimp cost | 60,840 | [illegible] | SKIP | | |
| 5 Base Shrimp Loss | 57,330 | g=(e-f)*.35 | 78,624 | f=e*.35 | |
| 6 Base compensation | 22,932 | [illegible] | 78,624 | g=f | |
| RTP | 7.25 | i | 7.25 | h | |
| 7 Final compensation | 189,189 | j=h+(h*i) | 648,648 | i=g+(g*h) | |

PDF created with pdfFactory Pro trial version www.pdffactory.com

PDF created with pdfFactory Pro trial version www.pdffactory.com

3. Calculate Total Adjusted Benchmark Shrimp Revenue by multiplying the Additional Catch Adjusted Benchmark Shrimp Revenue by 1.2, the Adjustment for Changes in 2010-11 Prices.

Total Adjusted Benchmark Shrimp Revenue = (Additional Catch Adjusted Benchmark Shrimp Revenue * Adjustment for Changes in 2010-11 Prices).

4. If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Benchmark Revenue was calculated using trip tickets or their equivalents, calculate Benchmark Shrimp Cost. Benchmark Shrimp Cost is calculated by multiplying Benchmark Shrimp Revenue by the Shrimp Cost Percentage. The Shrimp Cost Percentage, presented in Table 12, is expressed as a percentage of revenue and reflects standard industry non-labor variable costs. If the Claimant is a Boat Captain and Benchmark Revenue was calculated based upon his earnings, such as from tax return or financial information, then no Shrimp Cost Percentage is applied, skip to step 5.

Benchmark Shrimp Cost = (Benchmark Shrimp Revenue * Shrimp Cost Percentage) = $0

**TABLE 12**

| VESSEL SIZE | SHRIMP COST PERCENTAGE |
|---|---|
| <30 feet | 42% |
| 30-44 feet | 39% |
| 45-74 feet Ice | 39% |
| 45-74 feet Freezer | 42% |
| 75+ feet Ice | 54% |
| 75+ feet Freezer | 52% |

5. Calculate the Base Shrimp Loss using the Shrimp Loss Percentage of 35%.

a. If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Total Adjusted Benchmark Shrimp Revenue was calculated using trip tickets or their equivalents, the Base Loss is calculated as follows:

Base Shrimp Loss = (Total Adjusted Benchmark Shrimp Revenue – Benchmark Shrimp Cost) * 35%

PDF created with pdfFactory Pro trial version www.pdffactory.com

b. If the Claimant is a Boat Captain and Total Adjusted Benchmark Shrimp Revenue was calculated using a different source than trip tickets or their equivalents, the Base Loss is calculated as follows:

Base Shrimp Loss = Total Adjusted Benchmark Shrimp Revenue * 35%

6. Determine Base Compensation by multiplying Base Shrimp Loss by the appropriate Vessel Owner/Commercial Fisherman Vessel Lessee or Boat Captain share. Vessel Owner and Boat Captain shares differ by boat size and type and are presented in Table 13.

a. Base Compensation for Vessel Owners/Commercial Fisherman Vessel Lessees is calculated as:

Base Compensation = Base Shrimp Loss * Shrimp Vessel Share

b. Base Compensation for Shrimp Boat Captains is calculated as:

i. If Shrimp Boat Captain Compensation is calculated based on trip tickets then the Base Compensation for Shrimp Boat Captains is calculated as:

Base Compensation = Base Shrimp Loss * Shrimp Boat Captain Share

ii. If Shrimp Boat Captain Compensation is calculated based on tax returns and financial records, then the Base Compensation for Shrimp Boat Captains is calculated as:

Base Compensation = Base Shrimp Loss

**TABLE 13**

| VESSEL TYPE AND SIZE | SHRIMP VESSEL OWNER/COMMERCIAL FISHERMAN VESSEL LESSEE SHARE | SHRIMP BOAT CAPTAIN SHARE |
|---|---|---|
| <30 feet | 45% | 45% |
| 30-44 feet | 45% | 40% |
| 45-74 feet Ice | 45% | 30% |
| 45-74 feet Freezer | 45% | 30% |
| 75+ feet Ice | 45% | 25% |
| 75+ feet Freezer | 45% | 25% |

PDF created with pdfFactory Pro trial version www.pdffactory.com

CC: "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM>,
"jandry@andrylawgroup.com" <jandry@andrylawgroup.com>
Subject: BP's Initial Proposal - Claim No. 19691 - Casey Thonn
Date: Thu, 24 Jan 2013 20:18:56 -0500
To: "DDuval@dheclaims.com" <DDuval@dheclaims.com>, "jgoodwin@browngreer.com"
<jgoodwin@browngreer.com>,
"ClaimForms@deepwaterhorizoneconomicsettlement.com"
<ClaimForms@deepwaterhorizoneconomicsettlement.com>
From: "Warlick, Sarah E." <Sarah.Warlick@aporter.com>
Transaction Date (UTC): 2013-01-25 01:20:05
Original Requestor: Sarah.Warlick@aporter.com

RECEIVED - HAMMOND
JAN 2 4 2013
GARDEN CITY GROUP

Mr. Duval,

Please find enclosed BP's Initial Proposal with respect to the appeal of claim number 19691 - Casey Thonn.

Kind regards,
Sarah

Sarah E. Warlick
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: +1 202.942.6409
sarah.warlick@aporter.com<mailto:sarah.warlick@aporter.com>
www.arnoldporter.com<http://www.arnoldporter.com>

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com



BP'S INITIAL PROPOSAL REGARDING CLAIM NO. 19691

INTRODUCTION

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of Its Initial Proposal with regard to the appeal of Claim No. 19691 (Claimant Casey Thonn). The Settlement Program issued its original Eligibility Notice awarding the Claimant a Compensation Amount of $83.10 on November 6, 2010. Following the Claimant's Request for Reconsideration, the Settlement Program revised its calculation and issued a Compensation Amount of $22,932.00. The Claimant then filed this Appeal on January 7, 2013.

In his appeal, Claimant argues that (1) the Settlement Program incorrectly applied the Seafood Compensation Framework's Shrimp Compensation formula, (2) the Settlement Program deducted Claimant's prior seafood-related payment twice, and (3) the Settlement Program did not accurately calculate the Claimant's Accounting Support Reimbursement.

The Settlement Program properly calculated Claimant's Award Amount. BP, therefore, submits an Initial Proposal Compensation Amount of $22,932.00 and Initial Proposal Prior Payment Offset of $72,500. Although BP agrees that the Settlement Program miscalculated the Claimant's Accounting Support Reimbursement, the Claimant is only entitled to $1,000, not the more than $10,000 it is requesting.

EXPLANATION OF BP's POSITION

The claim at issue is a Seafood Program shrimp boat captain claim for the vessel Boss Hoss (Hull ID LAZ62111E101). This claim is governed by the Seafood Compensation Framework's Shrimp Compensation Plan (the "Plan"). Settlement Agreement, Exhibit 10.

A. The Settlement Program Correctly Calculated Claimant's Compensation Amount

The Plan requires a vessel owner seeking compensation under the Historical Revenue Method, like this Claimant, to provide evidence to demonstrate his or her commercial shrimping revenue during the selected Benchmark Period. Settlement Agreement, Ex. 10 at 18-19. The Settlement Agreement is clear that a claimant must substantiate its claimed losses by submitting, among other things, (a) "[t]rip tickets or their equivalents" or (b) "[f]ederal or state tax and financial information . . . to identify components of gross revenue derived from commercial shrimp harvesting by vessel for the Benchmark Period for each vessel for which the Claimant submits" a claim. *Id.* at 19. The Settlement Program uses this financial data to determine the claimant's Benchmark Shrimp Revenue, which is the basis for determining the Claimant's claimed losses resulting from the Spill. *Id.* at 21.

The Benchmark Shrimp Revenue can be based on either a Claimant's gross revenue or a Claimant's earnings. According to the Plan, "[t]he Claims Administrator may determine the *gross vessel revenue* or Boat Captain *earnings* from shrimp landings in the Gulf Coast areas based on the Claimant's tax returns...." *Id.* (emphasis added). The Benchmark Revenue figure is then inputted into a formula to arrive at a Total Adjusted Benchmark Shrimp Revenue. *Id.* at 21-22.

The Settlement Program must then determine the amount of costs, if any, to deduct from a claimant's revenue. If the Settlement Program used a claimant's *gross revenue* as its Benchmark Revenue, then it must calculate a Claimant's Benchmark Costs. *Id.* at 22. The Shrimp Cost Percentage is used to determine a Claimant's Benchmark Shrimp Cost. *Id.* According to the Plan, the Shrimp Cost Percentage is "expressed as a percentage of revenue and reflects standard industry non-labor variable costs." The resulting Benchmark Shrimp Cost is then subtracted from the Claimant's gross revenue. However, if a claimant's earnings are used

for Benchmark Revenue, the Program does not need calculate or subtract any additional costs. *Id.* This makes economic sense. Gross revenue is a claimant's revenue before any deductions for variable costs are applied. A claimant's earnings, on the other hand, already include deductions for these costs and do not need to have additional costs subtracted from them.

The Claimant is arguing that simply because he is a Boat Captain and he used tax returns for his financial data that the Shrimp Cost Percentage should not be used to calculate and then deduct Benchmark Costs for his claim. This is contrary to the plain language of the Settlement Agreement. The Settlement Agreement states that the Benchmark Cost calculation should only be skipped if, "the Claimant is a Boat Captain **and** Benchmark Revenue was calculated based upon his **earnings**, such as from tax return[s] or financial information." *Id.* (emphasis added). Here, the Settlement Program used Claimant's *gross revenue* of $156,000, indicated on his 2009 federal tax return as "Gross receipts," to calculate Claimant's Benchmark Revenue. Claimant's 2009 Form 1040, Schedule C, attached hereto as Exhibit 1. The Settlement Program, therefore, properly applied the Shrimp Cost Percentage to Claimant's Benchmark Revenue to determine and then subtract Claimant's Benchmark Costs from his gross revenue.[1]

B. The Settlement Program Properly Deducted Claimant's Prior Seafood Spill-Related Payments

According to the Seafood Compensation Framework, "[c]ompensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments...." Settlement Agreement, Ex. 10 at 3. In order to apply this requirement, the Settlement Agreement instructs that "[t]he Claims Administrator shall offset any compensation under the Seafood Compensation Program by the total of the Seafood

[1] The accounting report submitted with Claimant's original claim is also in agreement with the Settlement Program's calculation. *See* Coastal Claims Group Report at 8, attached hereto as Exhibit 2.

Spill-Related Payment amount." *Id.* at 85. The Agreement defines Seafood Spill-Related Payments as "compensation paid to a claimant through the OPA Process, by BP, the GCCF, or through the Transition Facility for economic loss claims relating to Seafood." *Id.* at n. 3.

In his Appeal, the Claimant asserts that the Settlement Program applied his prior payment offset twice. Indeed, the Eligibility Notices for Claimant's Boat Captain Claim (No. 19691) and Vessel Owner Claim (No. 19690) both include a prior payment offset of $72,500. BP agrees that this offset should only apply once. BP notes that the Settlement Program has corrected this error in the Claimant's Post-Reconsideration Eligibility Notice for Claim 19691. According to the "Summary of All Eligible Seafood Compensation Program Claims," the prior payment offset has only been applied once.[2]

C. The Claimant is Only Entitled to Accounting Support Reimbursement of $1,000

The Settlement Agreement provides for Accounting Support Reimbursements to reimburse claimants for "reasonable and necessary accounting fees related to Claims preparation." Settlement Agreement § 4.4.13. The calculation of a Claimant's reimbursement depends on whether the Claimant is a business or an individual. *Id.* at §§ 4.4.13.7-8. A Business Claimant's reimbursement, "may not exceed 2% of the total Economic Damage Compensation Amount (excluding RTP) for business Claims over $50,000 with all other Claims limited to $1000." *Id.* at 4.4.13.8. A Business Claimant is defined as, "an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member Claiming Economic Damage allegedly arising out of…the Deepwater Horizon Incident." *Id.* at § 38.15.

[2] If the offset of $72,500 has been applied to a prior Award received by the Claimant, BP agrees that it should not be applied here. However, if it has not been applied to any prior Award, BP submits that the offset should apply to this claim.

The Claimant asserts that he is a Business Claimant, because he filed a Form 1040 Schedule C for his shrimping business. The record evidence indicates that Claimant filed a Schedule C and is, therefore, entitled to accounting support reimbursement as a Business Claimant. According to the Claimant's Memorandum in Support of its Appeal, it is seeking reimbursement of $10,562.50 in fees for claim preparation work for Claimant's Boat Captain claim. *See* Coastal Claims Invoice, attached hereto as Exhibit 3. In its Post-Reconsideration Eligibility Notice, the Settlement Program identified $1,161.25 in reimbursable fees for this claim. As a Business Claimant with a pre-RTP Compensation Amount of less than $50,000, reimbursement is capped at $1,000. Therefore, BP submits that Claimant is eligible for an Accounting Support Reimbursement Payment of $1,000.

***

In light of the above, BP agrees with the Settlement Program's calculation of Claimant's Compensation Amount. BP, therefore, submits an Initial Proposal Compensation Amount of $22,932.00, the amount the Claimant is entitled to according to the terms of the Settlement Agreement's Seafood Compensation Framework. Additionally, BP agrees that Claimant's Prior Seafood Spill-Related Payments should only be deducted once, but without evidence that these payments have been deducted from other Claims for which the Program has issued payment, BP submits an Initial Proposal Prior Payment Offset of $72,500. Finally, BP submits that Claimant is entitled to Accounting Support Reimbursement of $1,000.

BP'S FINAL PROPOSAL REGARDING CLAIM NO. 19691

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of Its Final Proposal with regard to the appeal of Claim No. 19691 by the Claimant (Casey Thonn). The Claimant is appealing that (1) the Settlement Program incorrectly applied the Seafood Compensation Framework's Shrimp Compensation formula, (2) the Settlement Program deducted Claimant's prior seafood-related payment twice, and (3) the Settlement Program did not accurately calculate the Claimant's Accounting Support Reimbursement.

As BP explained in its Initial Proposal, the Settlement Program correctly calculated both Claimant's Compensation Amount and the Claimant's prior payment offset. BP also explained that it agrees that the Settlement Program miscalculated the Claimant's Accounting Support Reimbursement, but that the Claimant is only entitled to $1,000, not the more than $10,000 it is requesting. BP, therefore, submits a Final Proposal Compensation Amount of $22,932.00 and Final Proposal Prior Payment Offset of $72,500.

EXPLANATION OF BP's POSITION

A. The Settlement Program Correctly Calculated Claimant's Compensation Amount

The claim at issue is a Seafood Program shrimp boat captain claim for the vessel Boss Hoss (Hull ID LAZ62111E101). This claim is governed by the Seafood Compensation Framework's Shrimp Compensation Plan (the "Plan"). Settlement Agreement, Exhibit 10. As part of the calculation of a Claimant's Compensation Amount, the Settlement Program must determine the amount of costs, if any, to deduct from a claimant's revenue. If the Settlement Program used a claimant's *gross revenue* as a claimant's Benchmark Revenue, then it must calculate Benchmark Costs. *Id.* at 22. The claimant's Benchmark Revenue is multiplied by a Shrimp Cost Percentage to determine a claimant's Benchmark Shrimp Cost. *Id.* According to

the Plan, the Shrimp Cost Percentage is "expressed as a percentage of revenue and reflects standard industry non-labor variable costs." *Id.* The resulting Benchmark Shrimp Cost is then subtracted from the Claimant's gross revenue. However, if a claimant's *earnings* are used for Benchmark Revenue, the Program does not need to calculate or subtract any additional costs. *Id.* This makes economic sense. Gross revenue is a claimant's revenue before any deductions for variable costs are applied. A claimant's earnings, on the other hand, already include deductions for variable costs and do not need to have additional costs subtracted from them.

According to the Claimant, however, he should not have any Benchmark Costs deducted from his gross Benchmark Revenue. In his Initial Proposal, the Claimant argued that simply because he is a Boat Captain and he used tax returns for his financial data that the Shrimp Cost Percentage should not be used to calculate and then deduct Benchmark Costs from his gross revenue. Claimant's Memorandum in Support of Appeal at 1. The Claimant has misinterpreted the Settlement Agreement. The Agreement states that the Benchmark Cost calculation should only be skipped if, "the Claimant is a Boat Captain **and** Benchmark Revenue was calculated based upon his **earnings**, such as from tax return[s] or financial information." *Id.* (emphasis added). To be exempt from the Benchmark Cost calculation, therefore, a claim must satisfy a two-part test: (1) it must be a Boat Captain claim and (2) Benchmark Revenue must be based on a Claimant's *earnings*.

The Claimant's Boat Captain claim does not satisfy this test. The Program used Claimant's *gross revenue* -- not its earnings -- as Claimant's Benchmark Revenue. Specifically, the Settlement Program used Claimant's 2009 gross revenue of $156,000, indicated on his federal tax return as "Gross income." Claimant's 2009 Fsorm 1040, Schedule C, attached to BP Initial Proposal as Exhibit 1. The Settlement Program, therefore, properly applied the Shrimp

Cost Percentage to Claimant's Benchmark Revenue to determine and then subtract Claimant's Benchmark Costs from his gross revenue.[1]

B. <u>The Settlement Program Properly Deducted Claimant's Prior Seafood Spill-Related Payments</u>

According to the Seafood Compensation Framework, "[c]ompensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments…." Settlement Agreement, Ex. 10 at 3. In order to apply this requirement, the Settlement Agreement instructs that "[t]he Claims Administrator shall offset any compensation under the Seafood Compensation Program by the total of the Seafood Spill-Related Payment amount." *Id.* at 85. The Agreement defines Seafood Spill-Related Payments as "compensation paid to a claimant through the OPA Process, by BP, the GCCF, or through the Transition Facility for economic loss claims relating to Seafood." *Id.* at n. 3.

The Settlement Agreement has only applied the prior payment offset once. Although the Eligibility Notices for Claimant's Boat Captain Claim (No. 19691) and Vessel Owner Claim (No. 19690) both include a prior payment offset of $72,500, the "Summary of All Eligible Seafood Compensation Program Claims" on these Eligibility Notices only apply the offset once.

C. <u>The Claimant is Only Entitled to Accounting Support Reimbursement of $1,000</u>

The Settlement Agreement provides for Accounting Support Reimbursements to reimburse claimants for "reasonable and necessary accounting fees related to Claims preparation." Settlement Agreement § 4.4.13. A Business Claimant's reimbursement, "may not exceed 2% of the total Economic Damage Compensation Amount (excluding RTP) for business Claims over $50,000 with all other Claims limited to $1000." *Id.* at 4.4.13.8. A Business

[1] The accounting report submitted with Claimant's original claim is also in agreement with the Settlement Program's calculation. *See* Coastal Claims Group Report at 8, attached to BP Initial Proposal as Exhibit 2.

Claimant is defined as, "an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member Claiming Economic Damage allegedly arising out of...the Deepwater Horizon Incident." *Id.* at § 38.15.

The record evidence indicates that Claimant filed a Schedule C and is, therefore, entitled to accounting support reimbursement as a Business Claimant. As a Business Claimant with a pre-RTP Compensation Amount of less than $50,000, reimbursement is capped at $1,000. Therefore, BP submits that Claimant is eligible for an Accounting Support Reimbursement Payment of $1,000.

***

In light of the above, BP agrees with the Settlement Program's calculation of Claimant's Compensation Amount. BP, therefore, submits a Final Proposal Compensation Amount of $22,932.00, the amount the Claimant is entitled to according to the terms of the Settlement Agreement's Seafood Compensation Framework. Additionally, BP agrees that Claimant's Prior Seafood Spill-Related Payments should only be applied once, but without evidence that this offset has been applied to other Claims for which the Program has issued payment, BP submits a Final Proposal Prior Payment Offset of $72,500. Finally, BP submits that Claimant is entitled to Accounting Support Reimbursement of $1,000.

RECEIVED - HAMMOND
FEB 04 2013
GARDEN CITY GROUP

CC: "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM>, "jandry@andrylawgroup.com" <jandry@andrylawgroup.com>
Subject: BP's Final Proposal - Claim No. 19691 - Casey Thonn
Date: Mon, 4 Feb 2013 21:14:54 -0500
To: "DDuval@dheclaims.com" <DDuval@dheclaims.com>, "jgoodwin@browngreer.com" <jgoodwin@browngreer.com>, "ClaimForms@deepwaterhorizoneconomicsettlement.com" <ClaimForms@deepwaterhorizoneconomicsettlement.com>
From: "Warlick, Sarah E." <Sarah.Warlick@aporter.com>
Transaction Date (UTC): 2013-02-05 02:15:08
Original Requestor: Sarah.Warlick@aporter.com

Mr. Duval,

Please find enclosed BP's Final Proposal with respect to the appeal of claim number 19691 - Casey Thonn.

Kind regards,
Sarah

Sarah E. Warlick
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: +1 202.942.6409
sarah.warlick@aporter.com<mailto:sarah.warlick@aporter.com>
www.arnoldporter.com<http://www.arnoldporter.com>

---

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

---

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com





DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

# NOTICE OF APPEAL PANEL DECISION
## DATE OF NOTICE: March 28, 2013

## I. CLAIMANT AND CLAIM INFORMATION

| | Last/Name of Business | | First | Middle |
|---|---|---|---|---|
| **Claimant Name** | THONN | | CASEY | |
| **Claimant ID** | 100051739 | **Claim ID** | 19691 | |
| **Claim Type** | Seafood Compensation Program | | | |
| **Law Firm** | Andry Law Group/Andry Lerner, LLC | | | |
| **Vessel Name** | | **Hull ID** | | |

## II. APPEAL PANEL DECISION

The Economic and Property Damages Settlement Agreement ("Settlement Agreement") written by Class Counsel and BP requires the Claims Administrator to designate an Appeals Coordinator to coordinate the Appeals Process. This Notice is an official communication from the Appeals Coordinator and relates to the claim identified in Section I. BP or the claimant appealed this claim, and the Appeals Coordinator submitted the claim for Appeal Panel review. The Appeal Panel has completed its review of the Appeal and has reached a final decision on the claim. The details of the Appeal Panel's decision are below:

| | | Proposal Chosen |
|---|---|---|
| **Compensation Amount** | $189,189.00 | BP |
| **Risk Transfer Premium Multiplier** | 0.00 | BP |
| **Prior Payment Offset** | $72,500.00 | BP |

The Compensation Amount awarded by the Appeal Panel will appear in Section 2, line 1 of your Post-Appeal Eligibility Notice. We will increase this Compensation Amount by the applicable Risk Transfer Premium, if any, and also decrease this Compensation Amount by any applicable offsets to determine your Award Amount. If this was a Claimant Appeal of a Post-Reconsideration Eligibility Notice and the claimant prevailed upon appeal, the pre-Risk Transfer Premium Compensation Amount will be increased by 5%. If we have received notice of any outstanding lien, we will also deduct that applicable amount from your Award Amount.

The Appeal Panel's decision will stand as the Settlement Program's final determination on this claim.

## III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

For questions about this Notice of Appeal Panel Decision or the status of your other claim(s), contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com.** If you are a law firm or claims preparation company, you should call or email your designated DWH Contact for help or assistance. You may also visit a Claimant Assistance Center for help. For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com.**

EXHIBIT
H

## IV. SUMMARY OF OTHER SUBMITTED CLAIMS

We received one or more additional Claim Forms from you that are not included or addressed in this Notice. This chart summarizes the status of those claims as of the date of this Notice. You will receive or have already received separate Notices for each additional claim. You may monitor the status of your other claims by using the DWH Portal. If you do not use the DWH Portal, contact us by one of the methods listed in Section III of this Notice to find out the current status of your other claims or use the "Check My Status" feature located on the homepage of the official Settlement Program website at **www.deepwaterhorizoneconomicsettlement.com.**

| | Claim Type | Claim ID | Claim Status |
|---|---|---|---|
| **1.** | Seafood Compensation Program | 19690 | Payment Received |
| **2.** | VoO Charter Payment | 20741 | Payment Received |
| **3.** | Subsistence | 97550 | Claim Form Submitted |



APR - 2 2013

DWH0337392288

CASEY THONN
C/O: ANDRY LAW GROUP/ANDRY LERNER, LLC
610 BARONNE STREET
NEW ORLEANS, LA 70113

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-342 | CLAIMS ADMINISTRATOR'S APPROVED POLICY | | |
|---|---|---|---|
| **I. Profile - EXTERNAL** | | | |
| **Subject** | Seafood Program: Calculation of Boat Captain Income on Claims by Owner/Operators | | |
| **Active Date** | 2/8/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | | Clarified by Seafood Neutral |
| **Settlement Agreement Reference** | | | Exhibit 10 |
| **Affected Claim Types and/or Review Processes** | | | Seafood |

**II. Summary**

Under Exhibit 10, Class Members who owned or leased and captained their own vessel during the qualifying time period have both (1) a Vessel Owner and (2) a Boat Captain claim in the Seafood Compensation Program. The Historical Revenue Compensation Method, which is available for all of the Seafood species types, uses revenues in past Benchmark Years to calculate an award amount that differs by operator type. When a claimant who is both Boat Captain and Vessel Owner/Lessee has submitted a Schedule C to support the Boat Captain claim, the Claims Administrator will use the gross revenues in Line 1 of the Schedule C as the revenues in past Benchmark Years and then will apply the Exhibit 10 Cost Percentage, the Loss Percentage and the Boat Captain share set by Exhibit 10 to derive the number multiplied by the RTP to get the award amount for the claimant on the Boat Captain claim. The Claims Administrator will not use Schedule C Line 29 net profits number (or the net profits number shown on any line in other tax forms) on the Boat Captain claim of a claimant who is both Boat Captain and Vessel Owner/Lessee, for doing so would eliminate the premise for an award to that claimant on a Vessel Owner/Lessee claim. The Seafood Neutral has informed the Claims Administrator that he agrees with this policy.

EXHIBIT I





UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**

**MDL NO. 2179**

**SECTION J**

**Applies to:** ***All Cases***

**JUDGE BARBIER**
**MAGISTRATE JUDGE SHUSHAN**

# REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW

| STATUS REPORT NO. | 9 | DATE | May 13, 2013 |
|---|---|---|---|

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2012**

**MDL NO. 2179**

**SECTION J**

**Applies to:** ***All Cases***

**JUDGE BARBIER**
**MAGISTRATE JUDGE SHUSHAN**

**REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW**

**STATUS REPORT NO. 9, DATED MAY 13, 2013**

The Claims Administrator of the Deepwater Horizon Economic and Property Settlement Agreement (the "Settlement Agreement") submits this Report to inform the Court of the current status of the implementation of the Settlement Agreement. The Claims Administrator will provide any other information in addition to this Report as requested by the Court.

## I. STATUS OF THE CLAIMS REVIEW PROCESSES AND CLAIM PAYMENTS

### A. Claim Submissions.

#### 1. Registration and Claim Forms.

The Claims Administrator opened the Settlement Program with needed functions staffed and operating on June 4, 2012, just over 30 days after the Claims Administrator's appointment. We have received 147,920 Registration Forms and 164,758 Claim Forms since the Program opened, as shown in the Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement ("Public Report") attached as Appendix A. Claimants have begun but not fully completed and submitted 11,866 Claim Forms. The Forms are available online, in hard copy, or at Claimant Assistance Centers located throughout the Gulf. Of the total Claim Forms submitted, 14% of claimants filed in the Seafood Program, 20% filed Individual Economic Loss

(IEL) Claims, and 32% filed Business Economic Loss (BEL) Claims (including Start-up and Failed BEL Claims). *See* App. A, Table 2. DWH staff at the Claimant Assistance Centers assisted in completing 30,119 of these Claim Forms. *See* App. A, Table 3. The nineteen Claimant Assistance Centers also provide other forms, including Personal Representative Forms, Subsistence Interview Forms and Sworn Written Statements and Authorizations.

**2. Minors, Incompetents and Deceased Claimants.**

The table below describes the claims filed on behalf of minors, incompetents and deceased claimants in the Settlement Program.

**Table 1. Minors, Incompetents and Deceased Claimants**

| | | Minor Claimants | | Incompetent Claimants | | Deceased Claimants | |
|---|---|---|---|---|---|---|---|
| | | Total | Change Since Last Report | Total | Change Since Last Report | Total | Change Since Last Report |
| **1.** | **Claims Filed** | 45 | +2 | 61 | +5 | 224 | +16 |
| **2.** | **Referred to GADL** | 30 | +6 | 16 | 0 | N/A | N/A |
| **3.** | **Eligible for Payment** | 6 | +5 | 26 | +2 | 93 | +8 |
| **4.** | **Approval Orders Filed** | 3 | +3 | 21 | +3 | 73 | +16 |

**3. Third Party Claims.**

Court Approved Procedure Order No. 1 (as entered September 9, 2012, and amended March 11, 2013) ("CAP") defines the process by which the Claims Administrator will receive, process and pay the claims and/or liens asserted by attorneys, creditors, governmental agencies, or other third parties against the payments to be made by the Claims Administrator to eligible claimants under the Settlement Agreement ("Third Party Claims"). The Amended CAP streamlines the enforcement documentation requirements to support a Valid Third Party Claim and provides that the Court will adopt a Third Party Claim dispute resolution process for attorney fee liens and Third Party Claims other than those asserted by a state or federal agency. On April

9, 2013, the Court appointed Judge Jerry Brown as the Attorney Liens Adjudicator. On April 15, 2013, the Court approved the Rules Governing the Third Party Claims Dispute Resolution Process as to Attorney Fee Liens. We issued Alerts about the Amended Court Approved Procedure, Judge Brown's appointment and the Court's approval of the Attorney Fee Lien Dispute Resolution Rules on April 22, 2013.

We now require a Third Party Claimant to send us enforcement documentation soon after the initial Third Party Claim assertion. We notify the affected Settlement Program claimant about an Enforced Third Party Claim against a potential Settlement Payment as soon as we receive sufficient documentation, regardless of where the underlying Settlement Program Claim is in the review process. The claimant may, but does not have to, object to the Third Party Claim at this time. After we send an Eligibility Notice to the affected Settlement Program claimant against whom an Enforced Lien has been asserted, we send the claimant/claimant's attorney and the Third Party Claimant a Notice of Valid Third Party Claim and provide the claimant 20 days to notify us of any objection to the Third Party Claim. We also updated the Third Party Claims Frequently Asked Questions on the DWH Settlement website to explain all of these changes.

We continue to process and pay Third Party Claims as reflected in Table 2 below.

**Table 2. Third Party Claims**

| | Type of Third Party Claim ("TPC") | TPCs Asserted | TPCs Asserted Against Claimants With a DHCC ID | TPCs[1] Asserted Against Payable Claims | Valid TPCs Asserted Against Payable Claims | TPCs Paid/ Ready for Payment (TPClmt) | Claims with TPCs Paid/ Ready for Payment (Clmt) |
|---|---|---|---|---|---|---|---|
| 1. | Attorney's Fees | 2,340 | 1,882 | 325 | 174 | 119 | 279 |
| 2. | IRS Levies | 448 | 422 | 39 | 40 | 29 | 33 |
| 3. | Individual Domestic | 257 | 148 | 75 | 59 | 46 | 53 |

[1] The streamlined enforcement requirements allow us to assess validity earlier in the process, although we will not know if a valid TPC is asserted against a payable claim until the Eligibility Notice goes out.

| Table 2. Third Party Claims | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Support Obligations | | | | | | |
| 4. | Blanket State-Asserted Multiple Domestic Support Obligations | 4 states | N/A | N/A | N/A | 0 | 0 |
| 5. | 3rd Party Lien/Writ of Garnishment | 542 | 233 | 13 | 7 | 4 | 3 |
| 6. | Claims Preparation/ Accounting | 831 | 643 | 29 | 10 | 1 | 6 |
| 7. | Other | 25 | 21 | 1 | 0 | 0 | 0 |
| | **TOTAL** | **4,443** | **3,349** | **482** | **290** | **199** | **374**[2] |

To date, we have removed 1,392 lien holds due to parties releasing their claims or resolving disputes.

**B. Claims Review.**

We completed our first reviews and issued our first outcome notices on July 15, 2012, and Payments on July 31, 2012. There are many steps involved in reviewing a claim so that it is ready for a notice.

**1. Identity Verification.**

The Tax Identity Number (TIN) Verification review is the first step in the DWH claims review process. The table below contains information on the total number of claimants reviewed in the Program, the outcome of those reviews, and the percentage of claimants that receive Verification Notices after review.

[2] If the TPC amount is in dispute, we pay the Claimant the undisputed portion of his/her/its Settlement Payment. A Third Party Claim can be asserted against one or more Settlement Program Claims.

| Table 3. Identity Verification Review Activity. | | | | | |
|---|---|---|---|---|---|
| | Outcome | Claimants Reviewed Since Last Report | Monthly Percentage | Total Claimants Reviewed | Total Percentage |
| 1. | Verified During Review | 4,017 | 84.4% | 41,398 | 78.4% |
| 2. | SSN Notice Issued | 73 | 1.5% | 2,307 | 4.4% |
| 3. | ITIN Notice Issued | 10 | .2% | 398 | .8% |
| 4. | EIN Notice Issued | 661 | 13.9% | 8,683 | 16.4% |
| 5. | Total Reviewed | 4,761 | 100% | 52,786 | 100% |

The table below contains information on the number of TIN Verification Notices issued, how many have been cured after the claimant responded to the Notice, and the average time to cure in days.

| Table 4. Identity Incompleteness Activity. | | | | | |
|---|---|---|---|---|---|
| | Notice Type | Notices Issued | Number Cured | Percentage Cured | Average Time to Cure in Days |
| 1. | SSN Notice | 2,307 | 1,846 | 80% | 137 |
| 2. | ITIN Notice | 398 | 334 | 84% | 160 |
| 3. | EIN Notice | 8,683 | 7,467 | 86% | 80 |
| 4. | Total Issued | 11,388 | 9,647 | 85% | 125 |

**2. Employer Verification Review ("EVR").**

The EVR process ensures that all employees of the same business are treated uniformly and that each business is placed in the proper Zone. The review also walks through the intricate analysis necessary to assign the right NAICS code to a business. The EVR team has completed the EVR analysis for over 150,000 businesses and rental properties.

From April 11, 2013, through May 10, 2013, the team completed the EVR step for 13,072 businesses and properties. We identified an average of 429 new businesses and properties to review each day and completed the EVR review for an average of 436 businesses

and properties each day. We continue to review new businesses and rental properties on a first-in, first-out basis.

**3. Exclusions.**

The Exclusions review process ensures that claims and claimants excluded under the Settlement Agreement are appropriately denied. The Exclusions team guides the reviewers and the EVR team when questions arise during the exclusion determination. Table 5 below shows the number of Denial Notices issued to date for each Exclusion Reason and the team responsible:

**Table 5. Exclusions**

| | Exclusion Reason | Team Responsible | Denial Notices Since Last Report | Total Denial Notices |
|---|---|---|---|---|
| 1. | GCCF Release | Exclusions | 1,313 | 6,164 |
| 2. | BP/MDL 2179 Defendant | | 13 | 198 |
| 3. | US District Court for Eastern District of LA | | 0 | 22 |
| 4. | Not a Member of the Economic Class | Claims Reviewers | 14 | 154 |
| 5. | Bodily Injury | | 0 | 2 |
| 6. | BP Shareholder | | 0 | 6 |
| 7. | Transocean/Halliburton Claim | | 0 | 0 |
| 8. | Governmental Entity | Claims Reviewers/ EVR | 66 | 611 |
| 9. | Oil and Gas Industry | | 73 | 353 |
| 10. | BP-Branded Fuel Entity | | 3 | 27 |
| 11. | Menhaden Claim | EVR | 1 | 10 |
| 12. | Financial Institution | | 30 | 160 |
| 13. | Gaming Industry | | 58 | 549 |
| 14. | Insurance Industry | | 22 | 116 |
| 15. | Defense Contractor | | 62 | 247 |
| 16. | Real Estate Developer | | 37 | 39 |
| 17. | Trust, Fund, Financial Vehicle | | 5 | 12 |
| 18. | Total Denial Notices from Exclusions | | 1,697 | **8,670** |

**4. Claimant Accounting Support Reviews.**

A special team handles Claimant Accounting Support ("CAS") reviews. CAS reimbursement is available under the Settlement Agreement for IEL, BEL, and Seafood claims. After a claim is returned from the Accountants or BrownGreer's reviewers as payable and the Compensation Amount is known, the CAS team reviews accounting invoices and CAS Sworn Written Statements. Table 6 includes information on the number of CAS reviews we have completed to date, whether the Accounting Support documentation was complete or incomplete, and the amounts reimbursed.

**Table 6. Claimant Accounting Support Reviews**

| | Claim Type | CAS Review Result | | | | Total CAS Reviews | | CAS $ Amount Reimbursed | |
|---|---|---|---|---|---|---|---|---|---|
| | | Complete | | Incomplete | | | | | |
| | | Since Last Report | Total to Date | Since Last Report | Total to Date | Since Last Report | Total to Date | Since Last Report | Total to Date |
| 1. | **BEL** | 729 | 6027 | 68 | 590 | 797 | 6617 | $1,760,236.88 | $8,230,892.82 |
| 2. | **IEL** | 43 | 804 | 19 | 168 | 62 | 972 | $9,530.93 | $51,897.92 |
| 3. | **Seafood** | 214 | 3182 | 28 | 481 | 242 | 3663 | $144,823.59 | $1,137,210.36 |
| 4. | **TOTAL** | **986** | **10,013** | **115** | **1,239** | **1,101** | **11,252** | **$1,914,591.40** | **$9,420,001.10** |

**5. QA Review.**

The Quality Assurance ("QA") process addresses three fundamental needs of the Settlement Program, which are to: (a) ensure that all claims are reviewed in accordance with the policies of the Settlement Agreement by targeting anomalous claims results through data metrics analysis; (b) provide a mechanism to monitor reviewer performance and the necessary tools to efficiently and effectively provide feedback to reviewers; and (c) identify areas of review resulting in high error rates that require retraining or refined review procedures and data validations.

We have implemented a reviewer follow-up process for all claim types. We provide daily follow-up to reviewers whose claims resulted in different results after a QA review the day before. We also have a report that identifies specific reviewers who require re-training, and reveals whether there are issues that warrant refresher training for all reviewers. Table 7 shows, by Claim Type, the number of claims identified for QA review through the database QA process, as well as how many QA reviews have been completed, how many are in progress, and how many are awaiting review.

**Table 7. Quality Assurance Reviews**

| | Claim Type | Total Claims Needing QA To Date | QA Reviews Completed | % Completed | QA Reviews in Progress | Claims Awaiting QA | QA Reviews Completed Since Last Report |
|---|---|---|---|---|---|---|---|
| 1. | Seafood | 19,574 | 17,554 | 90% | 1,301 | 719 | 4,282 |
| 2. | IEL | 15,432 | 9,571 | 62% | 726 | 5,135 | 2,050 |
| 3. | BEL | 8,783 | 6,778 | 77% | 406 | 1,599 | 1,895 |
| 4. | Start-Up BEL | 830 | 624 | 75% | 32 | 174 | 128 |
| 5. | Failed BEL | 1,330 | 1,201 | 90% | 20 | 109 | 101 |
| 6. | Coastal Real Property | 14,704 | 14,504 | 99% | 120 | 80 | 1,989 |
| 7. | Real Property Sales | 626 | 622 | 99% | 0 | 4 | 24 |
| 8. | VoO Charter | 7,241 | 7,227 | 100% | 10 | 4 | 151 |
| 9. | Subsistence | 9,271 | 2,322 | 25% | 155 | 6,794 | 752 |
| 10. | Wetlands | 2,262 | 2,057 | 91% | 93 | 112 | 322 |
| 11. | Vessel Physical Damage | 507 | 313 | 62% | 9 | 185 | 229 |
| 12. | **TOTAL** | **80,560** | **62,773** | **78%** | **2,872** | **14,915** | **11,923** |

### 6. Claim Type Review Details.

Table 8 provides information on the number of claims filed, how many claims have been reviewed to Notice, the claims remaining to review, and how many claims were reviewed to

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

either a Notice or "Later Notice" to date, by claim type. Table 8 splits the claims reviewed to a "Later Notice" into separate sections distinguishing claims receiving Notices after we conduct a Reconsideration review from claims reviewed for additional materials submitted by a claimant in response to an Incompleteness Notice.

**Table 8. Throughput Analysis of Claims Filed and Notices Issued**

**A. Claims Reviewed to First Notice**

| | Claim Type | Status of All Claims Filed | | | | | Productivity Since Last Report on 4/11/13 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total Claims Filed To Date | Reviews Completed to Notice | | Claims Remaining to Review | | New Claims Filed | Avg Daily Claims Filed | Reviews Completed to First Notice | Avg Daily Reviews to First Notice |
| 1. | Seafood | 23,862 | 19,998 | 84% | 3,864 | 16% | 245 | 8 | 2,890 | 96 |
| 2. | IEL | 29,946 | 23,857 | 80% | 6,089 | 20% | 984 | 33 | 2,599 | 87 |
| 3. | IPV/FV | 232 | 212 | 91% | 20 | 9% | 11 | 0 | 14 | 0 |
| 4. | BEL | 46,424 | 21,895 | 47% | 24,529 | 53% | 4,576 | 153 | 1,941 | 65 |
| 5. | Start-Up BEL | 3,226 | 1,986 | 62% | 1,240 | 38% | 298 | 10 | 148 | 5 |
| 6. | Failed BEL | 2,519 | 1,777 | 71% | 742 | 29% | 146 | 5 | 166 | 6 |
| 7. | Coastal RP | 23,841 | 22,031 | 92% | 1,810 | 8% | 1,981 | 66 | 2,597 | 87 |
| 8. | Wetlands RP | 5,234 | 2,855 | 55% | 2,379 | 45% | 895 | 30 | 363 | 12 |
| 9. | RPS | 1,142 | 951 | 83% | 191 | 17% | 95 | 3 | 77 | 3 |
| 10. | Subsistence | 18,947 | 2,605 | 14% | 16,342 | 86% | 2,838 | 95 | 1,290 | 43 |
| 11. | VoO | 8,292 | 8,111 | 98% | 181 | 2% | 100 | 3 | 142 | 5 |
| 12. | Vessel | 1093 | 860 | 79% | 233 | 21% | 128 | 4 | 111 | 4 |
| 13. | **TOTAL** | **164,758** | **107,138** | **65%** | **57,620** | **35%** | **12,297** | **410** | **12,338** | **411** |

**B. Claims Reviewed to Later Notice**

| | Claim Type | Initial or Preliminary Incompleteness Response | | | Follow-Up Incompleteness Responses | | | Requests for Reconsideration | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total Responses | Claims with Later Notice | Remaining Claims | Total Responses | Claims with Later Notice | Remaining Claims[2] | Total Requests | Claims with Later Notice | Remaining Claims[2] |
| 1. | Seafood | 4,409 | 2,402 | 2,007 | 961 | 421 | 540 | 1,384 | 624 | 760 |
| 2. | IEL | 11,297 | 6,353 | 4,944 | 2,698 | 1,190 | 1,508 | 1,513 | 582 | 931 |
| 3. | IPV/FV | 74 | 66 | 8 | 22 | 9 | 13 | 15 | 2 | 13 |
| 4. | BEL | 11,276 | 6,794 | 4,482 | 3,637 | 1,844 | 1,793 | 1,756 | 587 | 1,169 |
| 5. | Start-Up BEL | 1,066 | 723 | 343 | 497 | 209 | 288 | 171 | 36 | 135 |
| 6. | Failed BEL | 568 | 366 | 202 | 279 | 141 | 138 | 237 | 92 | 145 |
| 7. | Coastal RP | 3,529 | 2,964 | 565 | 818 | 577 | 241 | 907 | 587 | 320 |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Table 8. Throughput Analysis of Claims Filed and Notices Issued | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 8. | Wetlands RP | 175 | 128 | 47 | 21 | 15 | 6 | 266 | 101 | 165 |
| 9. | RPS | 157 | 148 | 9 | 36 | 34 | 2 | 121 | 88 | 33 |
| 10. | Subsistence | 613 | 112 | 501 | 25 | 1 | 24 | 29 | 5 | 24 |
| 11. | VoO | 831 | 810 | 21 | 333 | 305 | 28 | 536 | 372 | 164 |
| 12. | Vessel | 508 | 438 | 70 | 183 | 135 | 48 | 79 | 42 | 37 |
| 13. | **TOTAL** | **34,503** | **21,304** | **13,199** | **9,510** | **4,881** | **4,629** | **7,014** | **3,118** | **3,896** |

### C. Claim Payments.

#### 1. Notices and Payments.

We issued our first payments to claimants on July 31, 2012. Tables 4 and 5 of the Public Report attached at Appendix A provide detail on the notices and payments issued to date. As of May 10, 2013, we have issued 40,459 Eligibility Notices with Payment Offers totaling $3,224,375,803 billion. As of that date, we also have made over $2.14 billion in payments on 31,980 claims.

#### 2. Claimants in Bankruptcy.

Since the Claims Administrator approved the procedures for making Settlement Payments to claimants in bankruptcy on February 20, 2013, we have issued Bankruptcy Notices to approximately 60 claimants who had previously received Eligibility Notices. We continue to review these claim files to determine if the claimants submitted the documents necessary to remove the bankruptcy hold so the claims can be paid. For claimants who have not submitted all of the requested documentation, we continue to reach out to those claimants to let them know what needs to be submitted to so they can receive payment on their claims.

### D. Re-Reviews, Reconsiderations and Appeals.

#### 1. Re-Review Reviews and Outcomes.

The Claims Administrator implemented a Re-Review process beginning on January 18, 2013, that provides claimants with the opportunity to request a Re-Review of their claim within

30 days after an Eligibility or Denial Notice if they have additional documents not previously submitted to support their claim. This Re-Review leads to a Post Re-Review Notice, from which claimants may then request Reconsideration if they wish. To date, there have been 30,727 Eligibility and Denial Notices issued from which claimants can seek Re-Review. Of those, 5,017 are still within the 30 day window to seek Re-Review and have not yet done so, leaving 25,710 that have passed the window for seeking Re-Review. Of those, claimants have asked for Re-Review of 1,326 claims. Thus, the rate of Re-Review from all final determinations is 5.2%. The rate of Re-Review from Eligibility Notices is 4% and the rate of Re-Review from Denial Notices is 10%.

Table 9 summarizes the Re-Reviews Reviews we have completed, the number of Post-Re-Review Notices we have issued, and whether the outcome of the Re-Review review resulted in an award that was higher (↑), lower (↓),or the same (↔). The table also includes information showing whether an original Exclusion Denial was confirmed or overturned on Re-Review. The number of Notices issued is fewer than the reviews completed because there is a 36 hour lag time between when the review is completed and when the Notice is issued.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Table 9. Re-Reviews**

**A. Re-Review Requests and Reviews**

| | Claim Type | Requests Received To Date | Reviews Completed To Date | | |
|---|---|---|---|---|---|
| | | | Total | Completed Since Last Report | Average Weekly Reviews |
| 1. | Seafood | 330 | 111 | 24 | 6 |
| 2. | IEL | 116 | 15 | 2 | 1 |
| 3. | IPV/FV | 7 | 0 | 0 | 0 |
| 4. | BEL | 381 | 130 | 4 | 7 |
| 5. | Start-Up BEL | 16 | 5 | 0 | 0 |
| 6. | Failed BEL | 38 | 34 | 0 | 2 |
| 7. | Coastal | 242 | 182 | 16 | 10 |
| 8. | Wetlands | 137 | 113 | 0 | 7 |
| 9. | Real Property Sales | 10 | 10 | 0 | 1 |
| 10. | Subsistence | 11 | 0 | 0 | 0 |
| 11. | VoO | 34 | 34 | 2 | 2 |
| 12. | Vessel | 4 | 1 | 0 | 1 |
| 13. | TOTAL | 1,326 | 635 | 48 | 37 |

**Table 9. Re-Reviews**

**B. Re-Review Notices Issued**

| | Claim Type | Notices Issued | | Outcome of Review | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Total Issued to Date | Weekly Average | Compensation Amount for Eligible Claims | | | Exclusion/Denials | |
| | | | | ↑ | ↓ | ↔ | Confirmed | Overturned |
| 1. | Seafood | 101 | 5 | 53 | 4 | 38 | 5 | 1 |
| 2. | IEL | 4 | 0 | 0 | 0 | 0 | 4 | 0 |
| 3. | IPV/FV | 6 | 0 | 0 | 0 | 0 | 6 | 0 |
| 4. | BEL | 130 | 7 | 56 | 8 | 18 | 45 | 2 |
| 5. | Start-Up BEL | 4 | 0 | 3 | 0 | 0 | 1 | 0 |
| 6. | Failed BEL | 25 | 1 | 0 | 0 | 0 | 25 | 0 |
| 7. | Coastal | 88 | 5 | 21 | 1 | 16 | 51 | 1 |
| 8. | Wetlands | 21 | 1 | 2 | 0 | 0 | 20 | 1 |
| 9. | Real Property Sales | 4 | 0 | 0 | 1 | 0 | 3 | 0 |
| 10. | Subsistence | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11. | VoO | 30 | 2 | 7 | 5 | 12 | 8 | 2 |
| 12 | Vessel | 1 | 1 | 0 | 0 | 0 | 1 | 0 |
| 13. | TOTAL | 414 | 22 | 142 | 19 | 84 | 169 | 7 |

**2. Reconsideration Reviews and Outcomes.**

To date, there have been 68,114 Eligibility, Denial and Incompleteness Denial Notices issued from which claimants can seek Reconsideration. Of those, 7,989 are still within the 30 day window to seek Reconsideration and have not yet done so, leaving 60,125 that have passed the window for seeking Reconsideration. Of those, claimants have asked for Reconsideration of 6,972 claims. Thus, the rate of Reconsideration from all final determinations is 11.6%. The rate of Reconsideration from Eligibility Notices is 6% and the rate of Reconsideration from Denial and Incompleteness Denial Notices is 22%.

Table 10 summarizes the Reconsideration Reviews we have completed, the number of Post-Reconsideration Notices we have issued, and whether the outcome of the Reconsideration review resulted in an award that was higher (↑), lower (↓),or the same (↔). The table also includes information showing whether an original Exclusion Denial was confirmed or overturned on Reconsideration. The number of Notices issued is fewer than the reviews completed because there is a 36 hour lag time between when the review is completed and when the Notice is issued.

| Table 10. Reconsideration | | | | | |
|---|---|---|---|---|---|
| B. Reconsideration Requests and Reviews | | | | | |
| | Claim Type | Requests Received To Date | Reviews Completed To Date | | |
| | | | Total | Completed Since Last Report | Average Weekly Reviews |
| 1. | **Seafood** | 1,377 | 846 | 56 | 60 |
| 2. | **IEL** | 1,502 | 1014 | 76 | 72 |
| 3. | **IPV/FV** | 15 | 4 | 0 | 0 |
| 4. | **BEL** | 1,744 | 1337 | 96 | 96 |
| 5. | **Start-Up BEL** | 170 | 139 | 13 | 10 |
| 6. | **Failed BEL** | 232 | 196 | 7 | 14 |
| 7. | **Coastal** | 902 | 789 | 51 | 56 |
| 8. | **Wetlands** | 267 | 262 | 17 | 19 |

**Table 10. Reconsideration**

**B. Reconsideration Requests and Reviews**

| | Claim Type | Requests Received To Date | Reviews Completed To Date: Total | Completed Since Last Report | Average Weekly Reviews |
|---|---|---|---|---|---|
| 9. | Real Property Sales | 120 | 117 | 0 | 8 |
| 10. | Subsistence | 28 | 10 | 0 | 1 |
| 11. | VoO | 537 | 507 | 18 | 36 |
| 12. | Vessel | 78 | 63 | 9 | 5 |
| 13. | TOTAL | 6,972 | 5,284 | 343 | 377 |

**B. Reconsideration Notices Issued**

| | Claim Type | Notices Issued: Total Issued to Date | Weekly Average | Outcome of Review: Compensation Amount for Eligible Claims ↑ | ↓ | ↔ | Exclusion/Denials: Confirmed | Overturned |
|---|---|---|---|---|---|---|---|---|
| 1. | Seafood | 628 | 16 | 333 | 44 | 162 | 86 | 3 |
| 2. | IEL | 687 | 17 | 97 | 6 | 29 | 559 | 1 |
| 3. | IPV/FV | 4 | 0 | 0 | 0 | 0 | 4 | 0 |
| 4. | BEL | 623 | 16 | 213 | 19 | 107 | 262 | 23 |
| 5. | Start-Up BEL | 36 | 1 | 7 | 0 | 5 | 23 | 1 |
| 6. | Failed BEL | 92 | 2 | 0 | 0 | 0 | 92 | 0 |
| 7. | Coastal | 595 | 16 | 62 | 12 | 212 | 299 | 10 |
| 8. | Wetlands | 104 | 3 | 11 | 1 | 17 | 75 | 0 |
| 9. | Real Property Sales | 94 | 2 | 0 | 0 | 2 | 90 | 2 |
| 10. | Subsistence | 5 | 0 | 0 | 0 | 0 | 5 | 0 |
| 11. | VoO | 462 | 12 | 58 | 2 | 109 | 252 | 41 |
| 12 | Vessel | 46 | 1 | 25 | 1 | 7 | 13 | 0 |
| 13. | TOTAL | 3,376 | 87 | 806 | 85 | 650 | 1,760 | 81 |

**3. Appeals.**

**(a) *BP Appeals.***

To date, we have issued 13,311 Eligibility Notices that meet or exceed the threshold amounts rendering them eligible for BP to appeal. Of those, 430 are still within the time for BP to appeal, leaving 12,881 that have passed the window for BP to consider whether to appeal. Of

those 12,881, BP has appealed 1,377, or only 10.6%. However, out of the 1,377 claims BP has appealed, they have subsequently withdrawn 142 appeals, and another 34 have been resolved for the same amount of the Eligibility Notice. Thus, out of the 1,377 claims BP has appealed, 176 have either been withdrawn or resolved, confirming that the outcome of the review was correct. If we remove those 176 from the 1,377 BP has appealed to arrive at a more realistic "rate of disagreement" BP has with our results, that leaves 1,201 claims out of 12,881, or a 9.3% rate of disagreement.

Table 11 provides summary information on the status of BP's appeals.

| Table 11. Status of BP Appeals | | | | |
|---|---|---|---|---|
| **A. Appeal Filing/Resolution** | | | | |
| | **Status** | **As of 4/11/13** | **Since Last Report** | **Total** |
| **1.** | **BP Appeals Filed** | **1,020** | 357 | **1,377** |
| **2.** | **Appeals Resolved** | **349** | 224 | **575** |
| **(a)** | **Withdrawn** | 103 | 39 | 142 |
| **(b)** | **Panel Decided** | 40 | 117 | 157 |
| **(c)** | **Settled by Parties** | 171 | 39 | 210 |
| **(d)** | **Remanded by Panel** | 0 | 19 | 19 |
| **(e)** | **Administratively Closed** | 7 | 0 | 7 |
| **(f)** | **Closed for Reconsideration Review** | 28 | 12 | 40 |
| **B. Pending Appeals** | | | | |
| **3.** | **In Pre-Panel Baseball Process** | 549 | | |
| **4.** | **Currently Before Panel** | 252 | | |
| **5.** | **TOTAL PENDING** | **801** | | |

**(b) *Claimant Appeals.***

Before a claimant may appeal, he must seek Reconsideration and receive a Post-Reconsideration Notice. To date, we have issued 3,376 Post-Reconsideration Notices. Of those, 745 are still within the time for the claimant to appeal, leaving 2,631 that have passed the window for the claimant to consider whether to appeal. Of those 2,631, claimants have appealed

431, or 16.3%. Of the 431 Claimant Appeals, 264 are appeals of Post-Reconsideration Denial Notices and 166 are appeals of Post-Reconsideration Eligibility Notices.

Table 12 provides summary information on the status of Claimant Appeals:

| Table 12. Status of Claimant Appeals | | | | |
|---|---|---|---|---|
| **A. Appeal Filing/Resolution** | | | | |
| | **Status** | **As of 4/11/13** | **Since Last Report** | **Total** |
| **1.** | **Claimant Appeals Filed** | **384** | 47 | **431** |
| **2.** | **Appeals Resolved** | **111** | 87 | **198** |
| **(a)** | Panel Decided | 66 | 84 | 150 |
| **(b)** | Settled by Parties | 26 | -2 | 24 |
| **(c)** | Remanded by Panel | 0 | 1 | 1 |
| **(d)** | Administratively Closed | 4 | 0 | 4 |
| **(e)** | Withdrawn | 15 | 4 | 19 |
| **B. Pending Appeals** | | | | |
| **3.** | **In Pre-Panel Baseball Process** | 51 | | |
| **4.** | **In Pre-Panel Non-Baseball Process** | 71 | | |
| **5.** | **Currently Before Panel** | 111 | | |
| **6.** | **TOTAL PENDING** | **233** | | |

**(c)** ***Resolved Appeals.***

As reported in the tables above, 773 Claimant and BP Appeals have been resolved. Table 13 provides a summary of these resolved appeals, by Claim Type.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| | Claim Type | Table 13. Outcome After Appeal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Appeals Settled or Decided by Panel | | | | | | Withdrawn | Admin. Closed | Closed Because Claimant Asked For Recon. | Total |
| | | Award Amount after Appeal, Compared to Original Notice | | | | | | | | | |
| | | Higher | Lower | Same | Denial Upheld | Denial Over-turned | Remand | | | | |
| 1. | Seafood | 10 | 76 | 7 | 5 | 0 | 1 | 39 | 3 | 8 | 149 |
| 2. | BEL | 65 | 156 | 7 | 34 | 5 | 12 | 89 | 5 | 31 | 404 |
| 3. | Wetlands Real Property | 0 | 1 | 2 | 2 | 0 | 0 | 2 | 0 | 0 | 7 |
| 4. | Coastal Real Property | 0 | 2 | 4 | 5 | 0 | 1 | 4 | 0 | 0 | 16 |
| 5. | Real Property Sales | 0 | 2 | 2 | 13 | 0 | 0 | 2 | 1 | 0 | 20 |
| 6. | VoO Charter Payment | 17 | 29 | 14 | 22 | 9 | 2 | 17 | 2 | 0 | 112 |
| 7. | IEL | 5 | 8 | 2 | 19 | 2 | 1 | 4 | 0 | 1 | 42 |
| 8. | VPD | 10 | 6 | 0 | 0 | 0 | 3 | 4 | 0 | 0 | 23 |
| 9. | **Total** | **107** | **280** | **38** | **100** | **16** | **20** | **161** | **11** | **40** | **773** |

## II. Claimant Outreach Efforts

We have continued our Claimant Outreach efforts since the previous Court Status Report:

### A. Law Firm Contacts.

The Law Firm Contacts team continued to increase their outreach efforts related to Identity Verification Incompleteness Notices, in addition to continued outreach efforts across several damage categories related to incompleteness reasons. Firm Contacts continued to facilitate conference calls held in collaboration with the accountants to efficiently address documentation requirements and resolve outstanding Program questions. Firm Contacts also continued outreach efforts regarding incomplete payment documentation.



**B. Communications Center (CCC).**

The CCC continues to enhance Claimant Outreach efforts by working directly with each damage category. Continued outreach campaigns included calls to claimants who emailed the Program with questions or status inquiries, incomplete claims, Identity Verification issues, and to claimants with incomplete payment documentation. The CCC continuously seeks self-improvement. By increasing the frequency of structured and informal Agent feedback, the CCC is improving Agent competency and realizing an increase in positive feedback from Claimants.

**C. Claimant Assistance Centers (CACs).**

The Claimant Outreach Program (COP) continues at the CACs. To date, the COP has completed over 42,500 outreach calls to claimants. The CACs continued outreach efforts to claimants with incomplete claims across all damage categories. In addition to these outreach efforts, the team called claimants who filed claims of all claim types in a CAC.

**D. Summary of Outreach Calls.**

The table below summarizes some of the Claimant Outreach Program efforts:

| Table 14. Outreach Call Volume (As of 5/10/13) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Row** | **Location** | **Calls Made** | **Incomplete Claims Affected** | **Claims With New Docs After Call** | **% of Claims With New Docs After Call** | **Claimants Visiting CAC After Call** | **% of Claimants Visiting CAC** |
| **1.** | BrownGreer | 42,506 | 16,221 | 12,142 | 75% | 6,068 | 37% |
| **2.** | Garden City Group | 39,485 | 6,257 | 4,354 | 70% | 408 | 7% |
| **3.** | P&N | 10,967 | 3,115 | 2,404 | 77% | 91 | 3% |
| **4.** | PWC | 738 | 298 | 264 | 89% | 9 | 3% |
| **5.** | **Total** | **93,696** | **25,891** | **19,164** | **74%** | **6,576** | **25%** |

## III. POLICY KEEPER

On May 7, 2013, we added 242 additional policies to Policy Keeper. With the addition of these new policies, Policy Keeper now has 306 policies for the public to review. The Parties agreed to publicize these policies because they affect how claims are processed in the Settlement Program and inform claimants and the public about policy decisions not explicitly delineated within the Settlement Agreement. By providing these policies to the public, they help claimants and Appeals Panelists understand what policy was in place when the Claims Administrator reviewed a particular claim. Further, to provide transparency in how the Settlement Program reviews claims, we included superseded policies. Several policies have a long history and have changed significantly over time, thereby changing the review steps and criteria for certain Claim Types. For these reasons, we provided claimants and the public with any policy that may have affected the review of their claims.

## IV. CONCLUSION

We offer this Report to ensure that the Court is informed of the status of the Program to date. If the Court would find additional information helpful, we stand ready to provide it at the Court's convenience.

/s/ Patrick A. Juneau
PATRICK A. JUNEAU
CLAIMS ADMINISTRATOR

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/EDF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 13th day of May, 2013.

/s/ Patrick A. Juneau
Claims Administrator

# Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement

May 11, 2013

Claims Administrator Patrick Juneau has announced that the Settlement Program began issuing payments on July 31, 2012, and has been issuing outcome Notices since July 15, 2012. The Program will issue Notices on a rolling basis as we complete reviews, and they will include Eligibility Notices, Incompleteness Notices, and Denial Notices. Each Notice will provide information explaining the outcome. We will post Notices on the secure DWH Portal for any law firm or unrepresented claimant who uses the DWH Portal. We will notify firms and unrepresented claimants by email at the end of each day if we have posted a Notice that day. Firms and unrepresented claimants may then log onto the DWH Portal to see a copy of the Notice(s). Law Firms or claimants who do not use the DWH Portal will receive Notices in the mail. Claimants who receive an Eligibility Notice and qualify for a payment will receive that payment after all appeal periods have passed, if applicable, and the claimant has submitted all necessary paperwork, including a fully executed Release and Covenant Not to Sue.

| Table 1 | Filings by State of Residence | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | State | Registration Forms | | | | Claims | | | |
| | | Form Begun | Form Submitted | Total | % | Form Begun | Form Submitted | Total | % |
| 1. | Alabama | 821 | 27,279 | 28,100 | 18% | 1,592 | 30,769 | 32,361 | 18% |
| 2. | Florida | 1,968 | 50,849 | 52,817 | 34% | 5,010 | 51,164 | 56,174 | 32% |
| 3. | Louisiana | 1,627 | 35,288 | 36,915 | 24% | 2,578 | 44,835 | 47,413 | 27% |
| 4. | Mississippi | 549 | 17,995 | 18,544 | 12% | 917 | 19,344 | 20,261 | 11% |
| 5. | Texas | 244 | 8,306 | 8,550 | 6% | 673 | 7,106 | 7,779 | 4% |
| 6. | Other | 1,068 | 8,203 | 9,271 | 6% | 1,096 | 11,540 | 12,636 | 7% |
| 7. | **Total** | **6,277** | **147,920** | **154,197** | **100%** | **11,866** | **164,758** | **176,624** | **100%** |

Chart 1: Filings by State of Residence

| Table 2 | Number of Claims by Claim Type | | | | | |
|---|---|---|---|---|---|---|
| | Claim Type | Claims | | | | Unique Claimants with Form Submitted |
| | | Form Begun | Form Submitted | Total | % | |
| 1. | Seafood Compensation Program | 422 | 23,862 | 24,284 | 14% | 10,244 |
| 2. | Individual Economic Loss | 6,225 | 29,946 | 36,171 | 20% | 29,918 |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 143 | 232 | 375 | <1% | 232 |
| 4. | Business Economic Loss | 2,500 | 46,424 | 48,924 | 28% | 41,051 |
| 5. | Start-Up Business Economic Loss | 260 | 3,226 | 3,486 | 2% | 2,931 |
| 6. | Failed Business Economic Loss | 252 | 2,519 | 2,771 | 2% | 2,372 |
| 7. | Coastal Real Property | 845 | 23,841 | 24,686 | 14% | 16,745 |
| 8. | Wetlands Real Property | 211 | 5,234 | 5,445 | 3% | 1,745 |
| 9. | Real Property Sales | 181 | 1,142 | 1,323 | 1% | 918 |
| 10. | Subsistence | 672 | 18,947 | 19,619 | 11% | 18,940 |
| 11. | VoO Charter Payment | 93 | 8,292 | 8,385 | 5% | 5,925 |
| 12. | Vessel Physical Damage | 62 | 1,093 | 1,155 | 1% | 958 |
| 13. | **Total** | **11,866** | **164,758** | **176,624** | **100%** | **120,034** |

Chart 2: Number of Claims by Claim Type

DEEPWATER HORIZON CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

Appendix A



## Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement
May 11, 2013

| Table 3 | Claimant Assistance Center | Filings by Claimant Assistance Center | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Registration Forms | | | | Claims | | | |
| | | Form Begun | Form Submitted | Total | % | Form Begun | Form Submitted | Total | % |
| 1. | Apalachicola, FL | 26 | 1,256 | 1,282 | 5% | 37 | 1,750 | 1,787 | 6% |
| 2. | Bay St. Louis , MS | 9 | 529 | 538 | 2% | 31 | 633 | 664 | 2% |
| 3. | Bayou La Batre, AL | 21 | 849 | 870 | 3% | 50 | 973 | 1,023 | 3% |
| 4. | Biloxi , MS | 36 | 1,247 | 1,283 | 5% | 59 | 1,503 | 1,562 | 5% |
| 5. | Bridge City, TX | 2 | 332 | 334 | 1% | 15 | 575 | 590 | 2% |
| 6. | Clearwater, FL | 73 | 2,092 | 2,165 | 8% | 357 | 1,594 | 1,951 | 6% |
| 7. | Cut Off, LA | 13 | 425 | 438 | 2% | 24 | 574 | 598 | 2% |
| 8. | Fort Walton Beach , FL | 12 | 1,207 | 1,219 | 5% | 52 | 1,655 | 1,707 | 6% |
| 9. | Grand Isle, LA | 5 | 142 | 147 | 1% | 6 | 215 | 221 | 1% |
| 10. | Gretna/Harvey, LA | 38 | 1,949 | 1,987 | 8% | 50 | 1,981 | 2,031 | 7% |
| 11. | Gulf Shores, AL | 20 | 1,826 | 1,846 | 7% | 60 | 2,430 | 2,490 | 8% |
| 12. | Houma, LA | 25 | 787 | 812 | 3% | 42 | 1,018 | 1,060 | 4% |
| 13. | Lafitte, LA | 4 | 286 | 290 | 1% | 12 | 387 | 399 | 1% |
| 14. | Mobile, AL | 61 | 5,671 | 5,732 | 23% | 184 | 6,086 | 6,270 | 21% |
| 15. | Naples, FL | 24 | 1,195 | 1,219 | 5% | 35 | 1,090 | 1,125 | 4% |
| 16. | New Orleans – CBD BG, LA | 15 | 332 | 347 | 1% | 22 | 346 | 368 | 1% |
| 17. | New Orleans East, LA | 45 | 1,877 | 1,922 | 8% | 108 | 2,189 | 2,297 | 8% |
| 18. | Panama City Beach, FL | 23 | 1,619 | 1,642 | 7% | 95 | 2,346 | 2,441 | 8% |
| 19. | Pensacola, FL | 25 | 1,206 | 1,231 | 5% | 64 | 1,471 | 1,535 | 5% |
| 20. | **Total** | **477** | **24,827** | **25,304** | **100%** | **1,303** | **28,816** | **30,119** | **100%** |

**Chart 3: Number of Claims by Claimant Assistance Center**



## Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement
May 11, 2013

| Table 4 | Claim Type | Notices Issued | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Eligible - Payable | Eligible - No Payment | Incomplete | Denial | | | | | Opt-Outs | Withdrawn | Closed | Total Claims Issued Notice |
| | | | | | Exclusion Denials | Prior GCCF Release | Causation Denials | Other Denials | Incomplete Denials | | | | |
| 1. | Seafood Compensation Program | 6,475 | 983 | 5,767 | 41 | 2,217 | 0 | 202 | 882 | 1,164 | 1,915 | 394 | **20,040** |
| 2. | Individual Economic Loss | 1,280 | 360 | 11,766 | 1,904 | 1,753 | 28 | 504 | 4,893 | 511 | 240 | 973 | **24,212** |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 4 | 0 | 56 | 4 | 22 | 0 | 37 | 69 | 2 | 28 | 10 | **232** |
| 4. | Business Economic Loss | 7,266 | 141 | 8,264 | 387 | 438 | 1,201 | 32 | 2,750 | 555 | 319 | 619 | **21,972** |
| 5. | Start-Up Business Economic Loss | 299 | 11 | 934 | 22 | 34 | 29 | 21 | 440 | 66 | 47 | 86 | **1,989** |
| 6. | Failed Business Economic Loss | 8 | 6 | 552 | 34 | 83 | 136 | 408 | 368 | 60 | 33 | 96 | **1,784** |
| 7. | Coastal Real Property | 15,526 | 19 | 1,947 | 4 | 516 | 0 | 2,167 | 719 | 141 | 139 | 924 | **22,102** |
| 8. | Wetlands Real Property | 1,482 | 1 | 74 | 6 | 48 | 0 | 819 | 8 | 9 | 120 | 297 | **2,864** |
| 9. | Real Property Sales | 383 | 0 | 35 | 4 | 38 | 14 | 349 | 28 | 3 | 19 | 85 | **958** |
| 10. | Subsistence | 472 | 0 | 979 | 9 | 964 | 0 | 6 | 1 | 125 | 31 | 27 | **2,614** |
| 11. | VoO Charter Payment | 6,804 | 14 | 122 | 9 | 0 | 0 | 526 | 544 | 25 | 41 | 45 | **8,130** |
| 12. | Vessel Physical Damage | 460 | 9 | 217 | 4 | 0 | 0 | 38 | 78 | 12 | 10 | 35 | **863** |
| 13. | **Total** | **40,459** | **1,544** | **30,713** | **2,428** | **6,113** | **1,408** | **5,109** | **10,780** | **2,673** | **2,942** | **3,591** | **107,760** |

| Table 5 | Claim Type | Payment Information | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Eligibility Notices Issued with Payment Offer | | Accepted Offers | | Payments Made | | |
| | | Number | Amount | Number | Amount | Number | Amount | Unique Claimants Paid |
| 1. | Seafood Compensation Program | 6,475 | $919,549,076 | 4,742 | $812,053,996 | 4,249 | $794,466,992 | 2,726 |
| 2. | Individual Economic Loss | 1,280 | $14,893,090 | 1,035 | $11,611,461 | 939 | $10,281,963 | 939 |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 4 | $14,396 | 3 | $7,961 | 3 | $7,961 | 3 |
| 4. | Business Economic Loss | 7,266 | $1,726,213,863 | 6,363 | $1,494,475,895 | 5,306 | $889,361,558 | 5,140 |
| 5. | Start-Up Business Economic Loss | 299 | $72,948,962 | 258 | $42,432,057 | 226 | $31,595,190 | 215 |
| 6. | Failed Business Economic Loss | 8 | $1,218,046 | 3 | $589,357 | 3 | $589,357 | 3 |
| 7. | Coastal Real Property | 15,526 | $95,823,321 | 13,829 | $86,345,130 | 12,530 | $74,554,747 | 10,004 |
| 8. | Wetlands Real Property | 1,482 | $84,341,416 | 1,344 | $65,752,707 | 1,269 | $55,089,828 | 568 |
| 9. | Real Property Sales | 383 | $21,730,196 | 365 | $20,996,749 | 349 | $20,912,824 | 324 |
| 10. | Subsistence | 472 | $4,317,052 | 383 | $3,456,000 | 330 | $2,914,641 | 330 |
| 11. | VoO Charter Payment | 6,804 | $274,543,232 | 6,620 | $268,186,886 | 6,415 | $262,089,805 | 4,917 |
| 12. | Vessel Physical Damage | 460 | $8,783,152 | 401 | $7,146,264 | 361 | $5,105,595 | 347 |
| 13. | **Total** | **40,459** | **$3,224,375,803** | **35,346** | **$2,813,054,463** | **31,980** | **$2,146,970,462** | **25,516** |

**Legend:**

1. Form Begun - Includes electronically filed registration or claim forms for the period of time between the moment a claimant or his attorney has initiated the submission of a form and moment they complete that filing by submitting the electronic signature. This definition also includes hard copy registration or claim forms where the DWH Intake Team is in the process of linking the scanned images and has not yet completed the data entry on that form.

2. Form Submitted - Includes electronically filed registration or claim forms after the claimant or his attorney completes the electronic signature and clicks the submit button. This definition also includes hard copy registration or claim forms where the DWH Intake Team has completed both the linking of scanned images and the data entry on that form.

3. Unique Claimants with Form Submitted - Counts the unique number of claimants with at least one Claim Form Submitted for each Claim Type. Because claimants may file claims for more than one Claim Type, the sum of all Claim Types will not equal the count of total unique claimants.

4. Notices Issued - The count of Notices Issued in Table 4 counts each unique claim issued a Notice only once. For claims issued multiple Notices, this report uses the following hierarchy when counting the claim: (1) Eligible – Payable; (2) Eligible – No Payment; (3) Denial; (4) Incomplete; (5) Withdrawn; (6) Closed.

5. Payment Information - The timing of payment can be affected by a number of factors. Even after the DHECC receives a Release, delay in receipt of a W-9, or in receipt of the Attorney Fee Acknowledgment Form can delay payment. In addition, any alterations or omissions on the Release Form, or an assertion of a third-party lien against an award amount, can delay payment. As a result, this report will show a higher number of Accepted Offers than Amounts Paid.

6. Note: The Claims Administrator continually monitors the status of all claim filings. Through this process, the Claims Administrator may find duplicate claims from the same claimant. In such cases, the Claims Administrator will close the duplicate claim and only process the remaining valid claim. This report excludes duplicate claims from all counts of claims filed.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

DWH 8127

## Analysis of Submissions from Andry Law Group/Andry Lerner, LLC
(As of 5/9/13 )

| | Table 1: Firm Representation[1] Category | Total | % |
|---|---|---|---|
| 1. | Registration Form Begun | 88 | 22% |
| 2. | Registration Form Signed w/o Claim Form | 66 | 16% |
| 3. | Claim Form Begun | 2 | <1% |
| 4. | Claim Form Signed | 246 | 61% |
| 5. | **Total Number of Claimants Represented by Firm** | **402** | **100%** |

EXHIBIT
K

| | Table 2: Claims Filed Claim Type | Total | % |
|---|---|---|---|
| 1. | Seafood Compensation Program | 151 | 32% |
| 2. | Individual Economic Loss | 79 | 17% |
| 3. | IPV or Festival Vendor Economic Loss | 0 | 0% |
| 4. | Business Economic Loss | 89 | 19% |
| 5. | Start-Up Business Economic Loss | 8 | 2% |
| 6. | Failed Business Economic Loss | 3 | 1% |
| 7. | Coastal Real Property Damage | 9 | 2% |
| 8. | Wetlands Real Property Damage | 10 | 2% |
| 9. | Real Property Sales Damage | 1 | <1% |
| 10. | Subsistence Damage | 38 | 8% |
| 11. | VoO Charter Damage | 62 | 13% |
| 12. | Vessel Physical Damage | 16 | 3% |
| 13. | **Total Claims Filed** | **466** | **100%** |

Table 3: Notices Issued

| | Claim Type | Eligible Payable | Eligible No Payment | Incomplete | Denial: Exclusion Denials | Prior GCCF Release | Causation Denials | Other Denials | Incomplete Denials | Withdrawn | Closed | Total Claims Issued Notice |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Seafood Compensation Program | 34 | 18 | 57 | 0 | 0 | 0 | 0 | 1 | 6 | 4 | 120 |
| 2. | Individual Economic Loss | 4 | 0 | 34 | 6 | 0 | 0 | 3 | 0 | 1 | 2 | 50 |
| 3. | IPV or Festival Vendor Economic Loss | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4. | Business Economic Loss | 14 | 1 | 26 | 1 | 0 | 3 | 0 | 2 | 2 | 0 | 49 |
| 5. | Start-Up Business Economic Loss | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 6. | Failed Business Economic Loss | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| 7. | Coastal Real Property Damage | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 8. | Wetlands Real Property Damage | 0 | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 4 |
| 9. | Real Property Sales Damage | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| 10. | Subsistence Damage | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 11. | VoO Charter Damage | 46 | 0 | 5 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 58 |
| 12. | Vessel Physical Damage | 4 | 0 | 4 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 10 |
| 13. | **Total** | **106** | **19** | **131** | **7** | **1** | **5** | **15** | **3** | **10** | **6** | **303** |

Table 4: Payment Information

| | Claim Type | Eligibility Notices Issued with Payment Offer: Number | Amount | Accepted Offers: Number | Amount | Payments Made: Number | Amount |
|---|---|---|---|---|---|---|---|
| 1. | Seafood Compensation Program | 34 | $2,669,564 | 26 | $2,291,956 | 26 | $2,508,336 |
| 2. | Individual Economic Loss | 4 | $41,499 | 0 | $0 | 0 | $0 |
| 3. | IPV or Festival Vendor Economic Loss | 0 | $0 | 0 | $0 | 0 | $0 |
| 4. | Business Economic Loss | 14 | $4,480,471 | 11 | $3,495,447 | 9 | $1,703,287 |
| 5. | Start-Up Business Economic Loss | 1 | $54,830 | 0 | $0 | 0 | $0 |
| 6. | Failed Business Economic Loss | 0 | $0 | 0 | $0 | 0 | $0 |
| 7. | Coastal Real Property Damage | 3 | $17,370 | 3 | $17,370 | 3 | $17,370 |
| 8. | Wetlands Real Property Damage | 0 | $0 | 0 | $0 | 0 | $0 |
| 9. | Real Property Sales Damage | 0 | $0 | 0 | $0 | 0 | $0 |
| 10. | Subsistence Damage | 0 | $0 | 0 | $0 | 0 | $0 |
| 11. | VoO Charter Damage | 46 | $1,817,400 | 46 | $1,817,400 | 46 | $1,823,818 |
| 12. | Vessel Physical Damage | 4 | $26,198 | 3 | $20,842 | 2 | $18,159 |
| 13. | **Total** | **106** | **$9,107,332** | **89** | **$7,643,014** | **86** | **$6,070,970** |

**Chart 1: Registration and Claim Form Filings by Day**

Registration Forms
Claim Forms

[1]Andry Law Group/Andry Lerner, LLC has confirmed representation of an additional 28 claimants, but the firm has not yet begun any Registration or Claim Forms as of the date of this report. The report does not count these claimants, because they are not in the DWH Program yet.

DEEPWATER HORIZON
CLAIMS CENTER



DWH 8127

## Analysis of Submissions from Andry Law Group/Andry Lerner, LLC
(As of 5/9/13 )

**Table 5: Status of Claim Processing**

| | Category | Seafood Compensation Program | Individual Economic Loss | IPV/FV Economic Loss | Business Economic Loss | Start-Up Business Economic Loss | Failed Business Economic Loss | Coastal Real Property | Wetlands Real Property | Real Property Sales | Subsistence | VoO Charter Payment | Vessel Physical Damage | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1.** | **Claims Not Under Review** | **0** | **6** | **0** | **5** | **0** | **0** | **0** | **0** | **0** | **0** | **4** | **0** | **15** | **4%** |
| | (a) Claim Form Not Submitted | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1% |
| | (b) Claimant Editing Claim Form | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| | (c) Claim Closed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 1% |
| | (d) Claim Closed - Claimant Opted Out of Settlement | 0 | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 2% |
| | (e) Claim Form Untimely Submitted | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (f) Claim Withdrawn | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| **2.** | **Claims Not Yet Issued Notice** | **38** | **36** | **0** | **7** | **2** | **1** | **6** | **6** | **0** | **34** | **0** | **6** | **136** | **32%** |
| | (a) Claim Form Submitted | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 3 | 0 | 8 | 0 | 0 | 13 | 3% |
| | (b) Claim Processing Awaiting Policy Decision | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (c) Under Timeliness Review | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1% |
| | (d) In Claims Review | 2 | 31 | 0 | 4 | 1 | 0 | 6 | 3 | 0 | 25 | 0 | 6 | 78 | 19% |
| | (e) Claim Closed – Parcel included in Claim Zone after Parcel Eligibility Review | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (f) In QA Review | 20 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 26 | 6% |
| | (g) In Accountant Review | 12 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 4% |
| **3.** | **Claims with Notice Sent** | **40** | **18** | **0** | **13** | **0** | **0** | **0** | **4** | **1** | **4** | **4** | **2** | **86** | **21%** |
| | (a) Notice Issued after Claim Form Review: Signature Incomplete | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (b) Notice Issued After Claim Review: Field Visit Required | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (c) Notice Issued After Parcel Eligibility Review: Claim Eligible | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (d) Notice Issued after Parcel Eligibility Information Requested | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (e) Notice Issued After Preliminary Claim Review: Claim Incomplete | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| | (f) Notice Issued After Claims Review: Payable Claim or Claim Eligible But No Payment Due Determination | 5 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 2% |
| | (g) Notice Issued After Claims Review: Claim Incomplete | 8 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 16 | 4% |
| | (h) Notice Issued After Follow-Up Review: Claim Incomplete | 15 | 5 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 27 | 6% |
| | (i) Notice Issued After Claims Review: Claim Denied | 0 | 7 | 0 | 2 | 0 | 0 | 0 | 4 | 1 | 0 | 1 | 1 | 16 | 4% |
| | (j) Notice Issued After Claims Review: Claim Denied After Failure to Cure Incompleteness | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| | (k) Notice Issued After Claimant Request: Claim Withdrawn | 6 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 10 | 2% |
| | (l) Notice Issued After Review: Duplicate Claim | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 1% |
| | (m) Notice Issued After Review: Reclassified Claim | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (n) Notice Issued After Review: Claim Closed | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| **4.** | **Claims with Responses to Notice** | **41** | **19** | **0** | **20** | **0** | **0** | **0** | **0** | **0** | **0** | **8** | **5** | **93** | **22%** |
| | (a) Response to Preliminary Incompleteness Notice Received | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| | (b) Response to Incompleteness Notice Received | 2 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 1% |
| | (c) Response to Follow-Up Incompleteness Notice Received | 4 | 1 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 16 | 4% |
| | (d) In Claims Review after Notice Issued | 9 | 10 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 24 | 6% |
| | (e) In QA Review after Notice Issued | 13 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 4% |
| | (f) In Accountant Review after Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (g) Claimant Requested Re-Review After Payable Claim or Claim Eligible But No Payment Due Determination | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1% |
| | (h) Claimant Withdrew Re-Review Request after Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (i) Notice Issued after Follow-Up Claim Form Review: Signature Incomplete | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (j) Notice Issued After Re-review: Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (k) Notice Issued After Re-review: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (l) Offer Accepted / Claimant waives right to request Re-Review / Reconsideration | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| | (m) Offer Accepted / Claimant waives right to request Reconsideration | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (n) Offer Accepted / Claimant waives right to request Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (o) Claimant Requested Re-Review After Claim Denied | 9 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 11 | 3% |

DEEPWATER HORIZON
CLAIMS CENTER

DWH 8127

**Analysis of Submissions from Andry Law Group/Andry Lerner, LLC**
**(As of 5/9/13 )**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (p) Claimant Requested Reconsideration After Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (q) Claimant Requested Reconsideration After Claim Denied | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| | (r) Claimant Requested Reconsideration After Claim Denied for Failure to Cure Incompleteness | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (s) Claimant Withdrew Reconsideration Request After Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (t) Claimant Withdrew Reconsideration Request After Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (u) Claimant Withdrew Reconsideration Request After Claim Denied for Failure to Cure Incompleteness | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (v) Deadline to Request Reconsideration for Eligibility Notice Expired | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| | (w) In Claims Review after Reconsideration Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (x) In QA Review after Reconsideration Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (y) In Accountant Review after Reconsideration Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (z) Notice Issued After Reconsideration: Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (aa) Notice Issued After Reconsideration: Claim Incomplete | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 | 1% |
| | (ab) Response to Post-Reconsideration Incompleteness Notice Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ac) Notice Issued After Reconsideration: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ad) Claimant Requested Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ae) Notice Issued After Claimant Request: Appeal of Eligible Claim | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (af) Notice Issued After Claimant Request: Appeal of Denied Claim | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 6 | 1% |
| | (ag) Appeal Payment Processed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ah) Claimant Withdrew Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ai) BP Requested Payment Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (aj) BP Withdrew Payment Appeal Request | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ak) BP Waived Right to Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (al) Claimant's Initial Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (am) BP's Initial Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (an) Notice Issued After Appeal: Initial Proposal Submitted | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ao) Claimant's Final Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ap) BP's Final Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (aq) Notice Issued After Appeal: Final Proposal Submitted | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| | (ar) Claimant's Compromise Amount for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (as) BP's Compromise Amount for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (at) Notice Issued After Appeal: Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (au) Notice Issued After Appeal Panel Review: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (av) Notice Issued After Appeal: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| **5.** | **Payments** | **28** | **0** | **0** | **9** | **0** | **0** | **3** | **0** | **0** | **0** | **46** | **3** | **89** | **21%** |
| | (a) Release Sent to Claimant | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (b) Claim Payment Documentation Accepted | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 1% |
| | (c) Claimant Elects 5% Reduction in Compensation Amount to Pay for Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (d) Appeal Payment Processed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (e) Final Payment Processing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (f) Payment Issued on Claim | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| | (g) Payment Received | 24 | 0 | 0 | 9 | 0 | 0 | 3 | 0 | 0 | 0 | 46 | 2 | 84 | 20% |
| **6.** | **Total** | **147** | **79** | **0** | **54** | **2** | **1** | **9** | **10** | **1** | **38** | **62** | **16** | **419** | **100%** |

DEEPWATER HORIZON
CLAIMS CENTER