# October 23, 2013
# Notice of Filing Exhibit I.2.D

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | MDL NO. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| | * | |
| This document relates to all actions. | * | HONORABLE CARL J. BARBIER |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |
| | * | |
| | * | |

## DECLARATION OF BRIAN L. GASPARDO

I, Brian L. Gaspardo, declare and state as follows:

1.       I am over the age of 18 and am a resident of the State of Illinois.  Unless otherwise stated, I have personal knowledge of the facts set forth herein and, if called to do so, could testify truthfully thereto.

2.       I am the Managing Member of O'Neill & Gaspardo, LLC, a Consulting and CPA firm located in Mokena, Illinois.  I am a Certified Public Accountant and have over 20 years of professional experience performing audit, tax, accounting, business valuation, financial analysis and consulting services for clients throughout the United States.  I received a B.A. in economics from Harvard University in 1991 and an M.B.A. from the University of Chicago in 2001.  I serve on the Boards of Old Plank Trail Bank and La Rabida Children's Hospital in Chicago.  I have testified and submitted reports as an expert witness on a variety of topics, including business performance, business valuation, accounting, and financial reporting.

3.       BP retained me to assist in the review of the accounting records and claim files for numerous BEL claims filed with the Court Supervised Settlement Program

("CSSP").  To date, my firm has reviewed in excess of one thousand BEL offers made by the CSSP and the claim files associated with those claims.

**Background**

4.      In its opinion reversing the District Court's March 5, 2013 Order, the United States Court of Appeals in *In re Deepwater Horizon*, Nos. 13-30315, 13-30329 (5th Cir. Oct. 2, 2013) ("Slip op."), held that "Exhibit 4C requires processing of claims supported by sufficiently-matched, accrual basis accounting..." (Slip op. at 18)  Based on my 20 years of accounting experience and review of large numbers of claim files for BEL claims submitted to the CSSP, many Profit and Loss statements ("P&Ls") and other financial records that bear the label "accrual" do not properly match monthly revenues and corresponding variable expenses.[1]  Thus, the label "accrual" on a profit and loss statement in and of itself does not establish that sufficient matching has occurred.

5.      The Court of Appeals also stressed the importance of limiting awards to "those who experienced  actual injury  traceable to loss from the Deepwater Horizon accident. . . ." (*Id* at 35)  I have reviewed claim files for numerous BEL offers where either (i) it is apparent from information in the claim file that there is a high likelihood that the BEL claimant experienced no actual economic loss or (ii) the information in the claim file indicates that any actual injury to the BEL claimant was caused by a factor other than the *Deepwater Horizon* spill.

---

[1] My team and I also have reviewed numerous Multi-facility, Start-Up and Failed Business claims. Because the Settlement Agreement frameworks for analyzing those claims also require the use of monthly financial statements to evaluate causation and compensation, the issues addressed in the Fifth Circuit's opinion and the points addressed in this declaration also are applicable to analysis of those types of claims by businesses alleging economic damage as a result of the spill.

**BEL Claimants Submit Accrual Basis Monthly P&Ls In Which Monthly Revenue And Corresponding Expenses Are Not Sufficiently Matched**

6.      Exhibit A is a list of 73 examples of BEL claim files that I have reviewed in which the claimant purported to submit "accrual basis" financial information, but the monthly revenues and expenses recorded in the P&Ls submitted by the claimant exhibit strong indicia of not being "sufficiently matched".

7.      Accurate monthly accrual basis P&L statements require the consistent application of accrual basis principles on a timely basis across all financial transactions.

8.      There are large numbers of businesses that use some form of accrual-basis accounting but do not maintain properly matched, monthly accrual basis P&Ls.  Over twenty years working with hundreds of small businesses, and having reviewed over one thousand claim files of BEL claimants, I have observed that many businesses do not consistently and accurately maintain monthly accrual basis P&Ls.  Many businesses forego full, accurate accrual basis P&Ls on a monthly basis because they do not require them to operate their business.  As a result, monthly P&Ls are often inaccurate and/or contain "idiosyncrasies" such as lack of inventory tracking, error corrections, cumulative adjustments, inconsistent cut-off dates and other accounting inaccuracies.   Those inaccuracies are not addressed until books are closed at the end of a longer reporting period -- typically a quarter-end or year-end -- and cumulative adjustments are made at the end of that reporting period to correct cumulative errors occurring over various months so that the reporting period financial statements are accurate, even though the monthly P&Ls are not.  So, even where BEL claimants purport to follow accrual basis accounting, and where the claimant's annual P&Ls are accurately prepared on the accrual basis, the monthly P&Ls will frequently be inaccurate and unreliable.  In short, the label

"accrual basis" on a P&L submitted by a BEL claimant in and of itself does not mean the P&L is "accurate and reliable" or "sufficiently matched" as the Fifth Circuit confirmed is required by Exhibit 4C, particularly on a monthly basis.

9.      Where accrual basis P&Ls are consistently and accurately prepared, in many cases "margins" (the profit from each dollar of revenue) tend to remain relatively consistent over time.  This makes sense as most businesses operate similarly from month-to-month, and generally show consistent operating results and profits from those operations. There can be longer-term trends as markets change, but the relationship between revenues and profits is unlikely to change significantly on a monthly basis. Thus, when one graphs a business's variable profit percentage from month to month, a relatively consistent pattern is an indicator of properly matched revenues and expenses. Significant variations in variable profit percentage, on the other hand, are a strong indicator there may be a lack of sufficient matching.  Of course, an inquiry into the nature of the claimant's specific circumstances is required because unusual circumstances might lead to significant fluctuations in monthly variable profit percentage, but in my experience that is rare (and generally relates to an important or memorable change) or would happen consistently on a seasonal basis.

10.     There are many different reasons why monthly P&Ls labeled "accrual basis" and submitted by a BEL claimant might not be properly matched.  Inconsistently or idiosyncratically applied accrual-basis principles either on a temporal (month-to-month) or account-by-account basis create mismatching distortions similar to cash basis statements.  BEL claimants frequently do not accurately apply accrual principles on a monthly basis even where those same claimants file accrual basis tax returns, prepare accurate year-end accrual basis P&Ls, or record certain transactions on an accrual basis.

Where such mismatching occurs, a qualified CPA can apply standard methodology to fairly and sufficiently match related activities. While there may be an endless variety of claimant or industry-specific circumstances, certain patterns have emerged across the numerous BEL claim files that I have reviewed.

11.     Some of the most common distortions in monthly P&Ls (that is, deviations from accurate financial statement reporting) that I have found in claim files of BEL claimants purporting to use accrual-basis principles include those listed below. Not all inaccuracies that I have observed in the monthly P&Ls submitted by BEL claimants fall neatly into the categories described below, and BEL claimants often display more than one of these distorting anomalies.

### (a)     Inconsistent/Inaccurate Application of Accrual Accounting:

12.     This is perhaps the most common distortion and relates to BEL claimants who may present accurate annual accrual basis P&Ls at year-end, but do not maintain accurate accrual basis accounting records during the year. The monthly P&Ls submitted by BEL claimants often will not reflect cost of inventory sold, will not contain proper accruals for payroll bonuses, will not update estimates, will contain cut-off errors, will maintain certain accounts on the cash basis, or will include other inaccuracies where accrual principles are not followed on a monthly basis. These monthly P&Ls will often display wildly irregular variable profits on a monthly basis, which indicate that monthly results likely are not properly matched. For example, consider claimant XXXX63, an internet retailer which purports to use accrual basis accounting:



13.     This BEL claimant showed similar annual variable profit percentages of 11%, 14% and 13% each year between 2009 and 2011.  Nevertheless, monthly data, as shown in the chart, reflects extreme fluctuations in variable profit.  In the month of May, for example, the 2009 profit margin is +60% and then goes to 0% in June 2009, and in May 2010 the margin is -40%.  All this fluctuation happens on a month-to-month basis even as the annual profit margins remain essentially constant.  This contrast between reliable annual data and haphazard monthly data shows that accurate and reasonably matched P&Ls on an annual basis do not imply accurate and reasonably matched P&Ls on a monthly basis.  Many BEL claimants submitting monthly P&Ls or annual tax returns labeled "accrual" display a similar pattern where inventories or other balances are not accurately maintained or matched on a monthly basis.

### (b)     Cumulative Adjustments and Corrections:

14.     Most often seen as year-end corrections or "true-ups," these are large adjustments to P&Ls entered in a single month but which capture and correct activity improperly or imprecisely recorded over a period of several months.  These errors are most obvious for BEL claimants with large inventory or bad debt adjustments recorded in a single month during the year, and this category also includes BEL claimants with audit adjustments or other corrections provided by their accounting professional at year-end.

Page 6 of 12

This category can also include corrections reflected in audited statements or tax returns prepared by professionals but omitted from the monthly P&Ls. For example, consider claimant XXX07, a jewelry store located in Zone A:



15.     This BEL claimant admitted that its accounting convention is **not** to maintain accurate monthly records of inventory. Instead, the claimant records a fixed percentage of revenue as an assumed proxy for inventory costs on a monthly basis and then, once a year, reconciles its actual inventory and records a single adjustment to inventory at year-end to accurately reflect annual profits for tax purposes. The claimant recorded this "true-up" in July 2009 and August 2010. This means that every month throughout the year was misstated in the monthly P&Ls submitted by the claimant despite the claimant filing accrual basis annual tax returns and attesting the submitted financial statements were on the accrual basis. In this case, the claimant had 15% higher variable profit in 2010 than in the Benchmark Period, but, as a result of failing to accurately match revenues and expenses, the CSSP, comparing the months of August-October (and therefore including the cumulative correction in the benchmark year but not 2010), found a loss and computed a BEL offer for this claimant of $289,646 (pre-RTP).

16.     In Claim XX37, an audit performed by the claimant's accountant in 2010 revealed that the claimant's 2009 P&Ls (pre-spill), which purported to use the accrual method, understated the claimant's expenses by more than $1.4 million.  Although the claimant's 2009 tax returns and audited 2009 annual financial statements reflect these expenses, the 2009 monthly P&Ls submitted by the claimant did not include these amounts.  CSSP identified the distortion through the book-to-tax reconciliation but did not correct the error.

<div align="center">(c)     <b>Unusual Transactions & Error Corrections:</b></div>

17.     Incorrect or unusual accounting entries can be made at any time, either because circumstances change, time constraints exist, or through simple human error, an error in one month may then be corrected in a second, later month.   When those transactions are not properly matched, two months in the period become incorrectly stated.   So even where BEL claimants may otherwise properly follow accrual basis accounting for their operating transactions, specific error corrections or other unusual transactions may not be properly matched.  For example, claimant XXX51 was able to claim a large Step 2 compensation based on an erroneous entry in March 2010 which was subsequently corrected in December 2010.   As a result, two monthly P&Ls were misstated: March due to the original error and December as a result of the correction artificially placed in that month.  Even after identifying the error, the claimant's March and December P&Ls were not corrected, thereby inflating the CSSP's BEL offer to this claimant by $1,153,572 post-RTP under the terms of the Settlement.

<div align="center">(d)     <b>Identified Errors Go Uncorrected By CSSP:</b></div>

18.     Additionally, in addition to the examples cited above, I have observed in my review of BEL claim files numerous instances in which the CSSP accountant or the

BEL claimant itself has identified an error in the monthly P&Ls submitted as part of the claim, including errors caused by year-end "true ups," yet the CSSP computes the BEL compensation offer without correcting the error.  For example, in response to a CSSP inquiry regarding unusual activity in the "bad debt expense" account, claimant XXXX02 explained a June 2010 journal entry to record bad debt expense of $41,622 was inadvertently repeated in July 2010.  The duplicate entry was then reversed in September 2010 during the quarterly review of the claimant's outside accountant.  The CSSP, however, left all amounts in the monthly P&Ls (with the error in July and the error correction in September).  As the measurement period in the claim calculation was May to August 2010, the July error inflated the award to this claimant.

### BEL Offers To Claimants With No Indication of Spill-Related Economic Loss

19.     The Fifth Circuit decision also addressed BEL claims for "fictitious" losses.  These BEL claims include both claimants who "either have suffered no loss at all or have suffered losses that were not caused by the oil spill."  (Slip op. at 25)  In reviewing over one thousand BEL claims, my team has frequently found claimants receiving payments for non-existent "losses" or for losses that objective data demonstrate could not have been caused by the *Deepwater Horizon* spill.

20.     Exhibit B lists 37 examples of BEL claims in which review of the BEL claim file suggests it is likely the claimant did not incur a spill-related economic loss. While each BEL claimant comes with its own specific set of facts and circumstances, there are two general categories of "fictitious" claims.

21.     For the first category of BEL claims, a specific event or circumstance distinct from the spill can be identified as creating the loss.  Examples of such BEL claimants include businesses (or segments of businesses) which were sold prior to the

spill and therefore could not have produced (or been expected to earn) variable profit in 2010, businesses that were not operational due to fire, loss of license or other reason, businesses damaged or benefiting from specific, nonrecurring events such as Hurricane Ike, and still others who had contracts cancelled prior to the spill. This category also includes businesses so far removed from the spill, whether geographically, economically or both, that "such claimants would have no colorable legal claim." (*Id* at 25)

22.     For the second category of BEL claims, the CSSP has issued awards to BEL claimants that appear to have suffered no May to December 2010 economic loss. Where a claimant earned higher variable profit during this post-spill period, there is a high likelihood the claimant suffered no economic loss related to the spill. When reviewing BEL claim files, my team compares the claimant's total Variable Profit in the Benchmark Period with the implied 2010 variable profit (i.e., actual 2010 variable profit plus the Settlement Program calculated Exhibit 4C Step 1 and Step 2 awards designed to compensate lost profits). In addition, we compare the estimated lost variable profit attributable to the eight months of 2010 (May-Dec) potentially affected by the spill, to the Step 1 award designed to compensate for lost variable profit.

23.     One example of a BEL offer to a claimant with no post-Spill economic loss is claimant XXX21, a farm purporting to maintain "accrual basis" P&Ls located approximately 300 miles from the Gulf. Per the "Total Calculated Loss" computed by CSSP, the BEL claimant had total operating revenues of $161,285 and *negative* annual variable profit of ($138,070) in 2009 compared to operating revenues of $2,013,483 and *positive* variable profit of $463,846 in 2010. Because the related variable expenses were not matched to revenues, and because the 2010 crop sale took place almost entirely in December 2010 and was excluded from the equation, this was the net result:

Page 10 of 12



This claimant did not incur an actual loss. Yet the lack of sufficient matching resulted in a CSSP offer of $1,193,743 despite variable profit already *increasing* $601,916 prior to any award.

**Numerous CSSP Policies Implicated By The Fifth Circuit's Opinion**

24.    Mr. Juneau's Declaration attached to the Court's October 3, 2013 Order lists only Settlement Program Policy 464 as being implicated by the Fifth Circuit's ruling. However, Policy 464 is by no means the only CSSP Policy implicated by the Fifth Circuit's ruling. There are over 100 CSSP policies relating to BEL implementation (including for start-up businesses and failed businesses). It is my view that all BEL-related policies should be reviewed during the remand process for compliance with the Fifth Circuit's opinion.

25.    As examples and not by way of limitation, Exhibit C is a non-exhaustive list of CSSP policies which require re-evaluation in light of the Fifth Circuit's opinion. Each of these CSSP Policies is publicly released by the CSSP, and available on the CSSP web site; however, I have attached a copy of each policy within Exhibit C.

26.     The list of twelve CSSP policies in Exhibit C are not intended to be a complete list of all CSSP policies implicated by the Fifth Circuit's opinion, and should not be taken to imply that other, non-listed BEL polices are any less problematic in light of the Fifth Circuit's decision.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Executed this 9th day of October, 2013.


Brian L. Gaspardo
O'Neill & Gaspardo, LLC

Page 12 of 12

# EXHIBIT A

1. **Claim XXX18.**  Claimant is an advertising firm that received a $3.6 million award even though it had a banner year in 2010.  According the Claimant's P&Ls, Claimant purports to use the accrual method of accounting.  However, in one month post-spill, the Claimant recorded $2 million dollars of Cost of Sales against only $30,000 in revenue.  Annual gross profit was relatively stable, at 25%, 25%, 24% and 35% for 2007, 2008, 2009 and 2010, respectively, while monthly gross profit percentages range from negative 594% to 83% in 2009 and negative 6700% to 86% in 2010.

2. **Claim XX49.**  Claimant is a Zone D construction company.  The Settlement Program awarded Claimant $615,983 in pre-RTP lost profit ($775,286.71 post-RTP).  Claimant purports to use the accrual basis of accounting per its tax returns, verified by its P&Ls.  The Claimant explains that accrual basis "percentage of completion" adjustments are only recorded annually and not monthly.  Significant fluctuations in monthly variable profit % show the infrequent and inconsistent recording of accrual basis "percentage of completion" revenue. Claimant's yearly variable profit percentage ranges constantly between 14% and 15% while monthly variable profit percentages range from negative 99% to 48% in 2008; negative 24% to 240% in 2009; and negative 29% to 281% in 2010.

3. **Claim XXX45.**  Claimant is a Zone C automobile sales business.  The Settlement Program awarded Claimant $322,460.12 in pre-RTP lost profit ($404,318.15 post-RTP).  Claimant's P&Ls are marked accrual.  However, monthly cost of goods sold does not appear to be accurately maintained on accrual basis.  There are multiple months with negative gross profit, including, for example, March, April, August, September, November and December of 2009; and January, May, July, October and December 2010.  Further, significant fluctuations in gross profit percentage are indicative of infrequent and inconsistent recording of accrual basis cost of goods sold as the monthly percentage ranged from negative 607% to 69% in 2009 and negative 36% to 1,335% in 2010.

4. **Claim XXX56.**  Claimant is a Zone C home remodeling construction company.  The Settlement Program awarded the Claimant $200,384.91 in pre-RTP lost profit ($250,481.14 post-RTP), notwithstanding that from 2009 to 2010, the year of the Spill, Claimant's revenue increased by $304,228 and variable profit increased by $121,585.  Claimant's tax returns and P&Ls purport to be accrual basis accounting.  However, monthly cost of sales does not appear to be accurately maintained on accrual basis.  There are multiple months with negative gross profit, including, for example January, February, June and July 2008; January, August and November 2009; March and July 2010.  Also fluctuations in gross profit indicate matching inconsistencies as the percentage ranged from negative 87% to 35% in 2008; negative 49% to 44% in 2009; and negative 12% to 47% in 2010.

5. **Claim XXX82.**  Claimant is a Zone C construction contractor.  The Settlement Program awarded Claimant $95,747 in pre-RTP lost profit ($119,684 post-RTP), which amounts to a finding that in the absence of the Spill, Claimant's 2010 variable profit margin would have more than doubled over its actual performance in 2010 and would have increased nearly 40%

over the average of its 2008 and 2009 performance.  Claimant's P&Ls purport to be accrual basis accounting.  However, it does not appear the monthly statements reflect accurate accrual basis.  Between June 2009 and August 2009 gross margins fluctuated from negative 93% to 77% to negative 18,412% while the annual gross margin for 2009 was 38%.  In addition, gross margins in 2010 fluctuated significantly from 82% in Nov 10 to negative 935% in Dec 2010.  The annual gross margin for 2010 was also 38%.

6.  **Claim XXXX44.**  Claimant is a Zone D parts supplier for secondary schools.  The Settlement Program awarded Claimant $542,876.92 in pre-RTP lost profit ($683,413.65 post-RTP).  Claimant's tax returns were prepared on a cash basis, while its P&Ls purport to be prepared based on an accrual method of accounting.  However, monthly cost of sales does not appear to be accurately maintained on an accrual basis.  There are multiple months with negative gross profit including,   for example, January, March, June and July 2007; January, February, April, July and December 2008; February April, May, June, September and November 2009; March, May, June and December 2010.  Also fluctuations in gross profit indicate infrequent and inconsistent recording of accrual basis cost of sales as the percentage ranged from negative 103% to 99% in 2007; negative 414% to 90% in 2008; negative 332% to 93% in 2009 and negative 144% to 88% in 2010.

7.  **Claim XXX38.**  Claimant is a Zone C boutique women's clothing store.  The Settlement Program awarded Claimant $92,683.14 pre-RTP lost profit ($279,903.08 post‑RTP).  Claimant purports to be on the accrual basis of accounting.  However, monthly cost of goods sold does not appear to be accurately maintained on the accrual basis.  There are multiple months with negative gross profit, including, for example, February, June and October 2009 and February September and November 2010.  Further, significant fluctuations in gross profit percentage are indicative of infrequent and inconsistent recording of accrual basis cost of goods sold as the percentage ranged from negative 509% to 99% in 2009 and negative 139% to 89% in 2010.

8.  **Claim XXX16.**  Claimant is a Zone B retailer of limestone and related equipment.  The Settlement Program awarded Claimant $1,090,648.63 in pre-RTP profit ($2,468,839.42 post-RTP).  Claimant purports to be on the accrual basis of accounting, but its records include indications of matching errors.  Monthly cost of goods sold does not appear to be accurately maintained on the accrual basis.  There are multiple months with negative gross profit, including, for example February and December 2007 and December 2009.  Also, December 2009 recorded zero sales and $306,039 in cost of goods sold.  In December 2010 the claimant recorded $74,749 in sales and zero cost of goods sold.  Significant fluctuations in gross profit percentage indicative of infrequent and inconsistent recording of accrual basis cost of goods sold as the percentage ranged from negative 168% to 100% in 2007; 30% to 96% in 2008; 0% to 100% in 2009 and 8% to 100% in 2010.

9.  **Claim XXXX00.**  Claimant is a Zone D designer and installer of warehouses and warehouse loading docks.  The Settlement Program awarded Claimant $136,752.15 in pre-RTP lost profit ($173,104.89 post-RTP).  Claimant purports to be on the accrual basis of accounting, but its records include indications of matching errors.  Monthly cost of sales does not appear to be accurately maintained on the accrual basis.  There are multiple months with negative

gross profit, including, for example, September, November and December 2007; March, May, August, September and December 2008; October, November and December 2009 and May, July, August, October, November and December 2010. Significant fluctuations in gross profit percentage indicative of infrequent and inconsistent recording of accrual basis revenue measurement as the percentage ranged from negative 516% to 78% in 2007; negative 1,086% to 350% in 2008; negative 93% to 95% in 2009 and negative 515% to 68% in 2010.

10. **Claim XXX21.** Claimant is a Zone A construction company. The Settlement Program awarded Claimant $92,555.75 pre-RTP lost profit ($231,389.38 post-RTP), even though Claimant earned 11 times more revenue in 2010 ($1,627,228) than it did in 2009 ($137,659). Claimant's P&Ls are marked accrual. Claimant did not match revenues and expenses throughout the year or correctly follow any method of accrual accounting. For example, Claimant's financial data show that in March 2010 (outside the compensation period), Claimant completed a large project in Destin, Florida. However, Claimant's P&Ls from March 2010 show zero revenue recorded in that month, and instead this revenue was recorded in December 2010 (inside the compensation period).

11. **Claim XXX11.** Claimant is a Zone D construction company. The Settlement Program awarded Claimant $446,270.09 in pre-RTP lost profit ($560,247 post-RTP). Claimants P&Ls purport to be based on accrual accounting. However, monthly revenues and expenses do not appear to be accrual basis. There are multiple months with negative gross profit, including, for example, January, June, August and December 2008; January, March, April, May, August and October 2009; and June, August, September and October 2010. Further, costs of sales are recorded in January 2008 and August to October 2010 with zero revenue recorded. Claimant's 2010 revenue was the highest of any year from 2007 through 2011 and Claimant's variable profit also increased from 2009 to 2010. Claimant's monthly variable profit percentages fluctuate significantly.

12. **Claim XXX03.** Claimant is a Zone A window and shutter building contractor. The Settlement Program awarded Claimant $547,269.34 in pre-RTP lost profit ($1,375,585.35 post-RTP). Claimant P&Ls purport to be on the accrual basis of accounting. Monthly financial statements do not appear to be maintained on accrual basis. There are multiple months with negative gross profit, including, for example, March, September and December 2008; September and December 2009; and August and November 2010. Also, significant fluctuations in gross profit percentage measurement ranged from negative 205% to 238% in 2008; negative 85% to 183% in 2009 and negative 6,315% to 100% in 2010. Also claimant reports negative revenue in September and December 2008 and December 2009.

13. **Claim XXX15.** Claimant is a Zone C concrete construction business. The Settlement Program awarded the Claimant $109,303.28 in pre-RTP lost profit ($137,993.10 post-RTP). Claimant's P&Ls indicate the accrual basis of accounting was used, and although Claimant said this was a typo, he later says that the cash basis P&Ls were "adjusted to accrual basis at year end" in 2010. As such, the claim contains inconsistencies and lack of matching on a monthly basis.

14. **Claim XXXX14.**  Claimant is a Zone D construction company.  The Settlement Program awarded Claimant $716,157.41 in pre-RTP lost profit ($900,106.76 post-RTP).  Claimant's tax returns and P&Ls state that the accrual accounting method was used.  However, monthly statements do not appear to be accrual basis.  There are multiple months with negative gross profit, including,  for example, April, May and September 2008; January, February, April and July 2008; and January, March, June, July, October and December 2010.  Also, significant fluctuations in gross profit percentage are indicative of matching errors.

15. **Claim XXX19.**  Claimant is a Zone D contractor located in Decatur, Alabama.  The Settlement Program awarded Claimant $754,405 pre-RTP lost profit ($943,005 post-RTP).  Claimant purports to be on the accrual basis per the tax returns, but its P&Ls are unmarked.  There is a significant cumulative adjustment as claimant recorded Bad Debt expense of $1,903,702 in December 2008 exclusively but which was not matched to the related revenue.  Indications of inaccurate monthly accrual statements include negative gross profit in December 2009 and fluctuations in monthly gross profit percentage.

16. **Claim XXXX76.**  Claimant is a Zone D flooring cover retailer located in located in Prattville, Alabama.  The Settlement Program awarded Claimant $201,488.30 in pre-RTP lost profit ($253,290.38 post-RTP).  While Claimant's tax returns purport to be on the accrual basis, the P&Ls are marked "cash basis", however, a statement from the claimant states they are accrual basis.  Claimant's P&Ls have data corrections recorded in months other than when the error occurred; for example, Claimant deposited income in a money market account for Jan 2009- May 2009 but did not record the income or transactions on the general ledger until June 10, 2009.

17. **Claim XXX62.**  Claimant is a Zone C appliance sales and repair store.  The Settlement Program awarded Claimant $37,491.23 pre-RTP lost profit ($46,864.04 post-RTP).  Claimant's tax returns purport to be on an accrual basis; most P&Ls are unmarked but the 2011 P&Ls indicate that the accrual basis of accounting was used.  Monthly statements do not appear to be on accrual basis.  There are multiple months with negative gross profit, including, for example:  December 2007, February and August 2009; and September 2010.  Significant fluctuations in gross profit percentage as the percentage ranged from negative (31%) to 60% in 2007, 5% to 73% in 2008, negative (11%) to 63% in 2009 and negative (26%) to 57% in 2010.

18. **Claim XXX39.**  Claimant is a Zone C drywall contractor.  The Settlement Program awarded Claimant $429,365.83 in pre-RTP lost profit ($542,289.79 post-RTP).  While Claimant's tax returns indicate that they use the accrual basis, the P&Ls are unmarked.  Monthly statements do not appear to be on accrual basis.  There are multiple months with negative gross profit, including, for example: July and November 2007; April, May, June, August, September and December 2008; February, April, June, August and October 2009; and February, March, June, July and August 2010.  Significant fluctuations in gross profit percentage as the percentage ranged from negative (97%) to 64% in 2007; negative (62%) to 497% in 2008; negative (62%) to 84% in 2009 and negative (138%) to 62% in 2010.

19. **Claim XXX21.**  Claimant is a Zone C boat sales and service company.  The Settlement Program awarded Claimant $63,002.61 pre-RTP lost profit ($78,753.26 post-RTP).  Claimant's tax returns are marked as using accrual basis; P&Ls are unmarked.  Monthly statements do not appear to be on accrual basis.  There are multiple months with negative gross profit including August 2009 and December 2010.  Further, there are significant fluctuations in gross profit percentage as the percentage ranged from negative (41%) to 85 in 2009 and negative (30%) to 66% in 2010.

20. **Claim XXX32.**  Claimant is a Zone D electrical supplies and equipment company.  The Settlement Program awarded Claimant $439,424.05 in pre-RTP lost profit ($554,157.06 post-RTP).  While Claimant's P&Ls state "Income Tax Basis", according to Claimant's tax returns it uses the accrual method of accounting.  Claimant's monthly variable profit percentages fluctuated from a low of negative 203% to a high of 87% in 2009 and from a low of negative 70% to a high of 72% in 2010.

21. **Claim XXX18.**  Claimant is a Zone D highway paving contractor.  Claimant purports to be on an accrual basis of accounting.  Notwithstanding that 2010 was the Company's best year on record (gross profits were $1.3 million greater than any other year), the Settlement Program awarded the claimant $7.7 million in pre-RTP compensation.  The award amounts to a finding that in the absence of the spill, Claimant's 2010 profit margin would have doubled over its actual record 2010.  Annual gross margin was very consistent, ranging from 22.2% to 25.4% from 2007-2010, but there are significant variations on a monthly basis ranging from negative -125.2% to 56.4%, which indicates that monthly financial statements are not accurately kept on accrual basis.

22. **Claim XXX03.**  Claimant is a Zone B alligator farm that purports to use the accrual method of accounting, per its tax returns.  The Settlement Program awarded Claimant $7.3 million pre-RTP ($16.6 million post-RTP).  Jan-Mar 2009 records very high Cost of Goods Sold, which results in negative gross profit for those months of over $5.5 million.  These costs were not matched with revenue recorded later in the year.  Inventory adjustments are only recorded in December, which caused December 2009 to report negative Costs of Goods Sold and December 2010 to report negative Gross Profit.

23. **Claim XXX11.**  Claimant is a Zone D steel products fabrication business.  The Settlement Program awarded Claimant $428,924.05 in pre-RTP lost profit ($536,155.06 post-RTP).  Claimant purported to maintain monthly P&Ls using percentage of completion accrual basis accounting.  Annual gross margin is very consistent, ranging from 22.3% to 26.8% from 2008-2010, but there are significant variations on a monthly basis, ranging from negative -158.4% to 77.8%.  This indicates that monthly financial statements are not accurately maintained on a percentage of completion basis, a conclusion further supported by claimant only recording "Jobs in Progress" revenue adjustments in a few months: December of 2008; September and December of 2009; and June and December of 2010.

24. **Claim XXX98.**  Claimant is a Zone B limestone retailer.  The Settlement Program awarded Claimant $259,932.39 pre-RTP ($584,847.88 post-RTP).  Claimant purports to be on the accrual basis of accounting.  However, monthly P&Ls do not appear to be maintained on

accrual basis.  Claimant regularly recorded large fiscal year-end adjustments to revenue and/or Cost of Goods Sold in June, which is claimant's fiscal year-end and not in compensation/benchmark periods.  Every June from 2007-2010 reported negative gross margins, and were the only months in those years that reported negative gross margins.  For example, Claimant reported $1,999,185 in cost of goods sold in June 2008, but only $1,158,666 in revenue for a negative gross margin of negative $840,519.  Also, payroll in June from 2007-2010 was typically over double the amount recorded in other months.

25. **Claim XXX99.**  Claimant is a Zone A construction company.  The Settlement Program awarded Claimant $1,104,952 in pre-RTP profit ($2,767,701 post-RTP).  Claimant purports to use the accrual basis of accounting per its tax return.  However, monthly P&Ls do not appear to be maintained on accrual basis, as there are significant fluctuations in variable profit percentage and significant year-end adjustments in September of each year (as evidenced by negative expenses in that month of each year).  Annual gross margin percentages are consistent, ranging from 7.0% to 10.5% for fiscal years 2008-2010 (fiscal year ends in September), but there are significant variations on a monthly basis, ranging from negative 91.5% to 72.6%, which indicates that monthly financial statements are not accurately kept on accrual basis.

26. **Claim XXX81.**  Claimant is a Zone C new home construction builder.  The Settlement Program awarded the Claimant $260,448.45 in pre-RTP lost profit ($326,143.56 post-RTP).  Claimant's tax return records the completed contract method, yet the financial data contains accounting errors that do not follow this process, including recording significant negative revenues in December 2008 and 2009.  Claimant's data also showed several months of negative variable and gross profit margins despite being profitable in each of those years.

27. **Claim XXX89.**  Claimant is a Zone D mobile home dealer.  The Settlement Program awarded Claimant $558,208.14 pre-RTP lost profit ($697,760.18 post-RTP).  Claimant's tax returns and P&Ls are marked as using accrual basis.  Nonetheless, Claimant's financial records raise red flags for matching issues, including significant fluctuations in variable profit.  Annual gross margin percentages are consistent, ranging from 8.8% to 17.5% for 2007-2010, but there are significant variations on a monthly basis, ranging from negative -328.8% to 117.2%, which indicates that monthly financial statements are not kept on accrual basis.

28. **Claim XXX35.**  Claimant is a Zone A clothing and beach supply retailer.  The Settlement Program awarded the Claimant $675,852.75 pre-RTP, and a total award of $2,369,188.59.  Claimant appears to have used cash basis accounting during Benchmark Period, but accrual basis accounting during its Compensation Period.  In 2009, purchases were recorded only in March, Sept and December (indicative of cash basis accounting), but in 2010 there are amounts in every month.  In the benchmark period (May 09 to August 09), there were no "Purchases" Expenses (indicating the items sold were obtained free of charge by the claimant), but in the compensation period (May 10 to Aug 10) there was $822,808 of "Purchases" expense.  Revenue actually increased in those months of 2010 by $271,396 over the benchmark period, so this inconsistent accounting for "Purchases" is causing the compensation.

29. **Claim XXX58.** Claimant is a Zone D steel fabricator located in Vandiver, Alabama, more than 250 miles from the Gulf of Mexico. The Settlement Program awarded Claimant $2,851,484.65 in pre-RTP lost profit ($3,564,355.81 post-RTP). The P&Ls and tax returns purport to be on an accrual basis, but Claimant described accounting policies inconsistent with accrual basis accounting. Claimant's financial data show dramatic fluctuations in Variable Profit percentage. For example, Claimant's Variable Profit percentage jumped from negative 2% in June 2008 to 85% in July 2008. Similarly, in 2009, Claimant's Variable Profit percentage jumped from negative 454% in July 2009 to 90% in August 2009. In 2010, Claimant's Variable Profit percentage fell from 18% in June 2010 to negative 197% in July 2010.

30. **Claim XXX07.** Claimant is a Zone D funeral home operator. The Settlement Program awarded Claimant $335,810.37 in pre-RTP lost profit ($426,479.17 post-RTP). Claimant purports to be on the accrual basis of accounting per its tax returns, verified by the Transaction Detail by Accounts submitted by Claimant. However, monthly statements do not appear accurately stated on accrual basis. Large purchases appear misaligned with their associated revenues and variable profits indicate a matching problem (monthly variable profit varies between 17.59% and 88.74% in 2009 and between negative 28.63% and 95.61% in 2010).

31. **Claim XXX59.** Claimant is a Zone C pharmacy. The Settlement Program awarded Claimant $86,203.05 in pre-RTP lost profit ($107,753.81 post-RTP). Claimant's tax returns indicate accrual basis, but the P&Ls are unmarked. Materially fluctuating Costs of Goods Sold appear to reflect cash basis with a year-end adjustment. In 2009, Cost of Goods Sold ranged from 20.4% in January to 95.5% in December, with an annual average of 73.2%. In 2010, Cost of Goods Sold ranged from 8.4% in January to 116.4% in December, with an annual average of 76.8%. Claimant's P&Ls also have significant cumulative entries recorded in single months—e.g., Claimant recorded the entirety of its "Employee Benefits" expense of $23,400 for 2009 in the month of May and for 2010 in the month of April, rather than over the course of the year.

32. **Claim XXX98.** Claimant is a Zone D telecommunications installation contractor located in Florida. The Settlement Program awarded Claimant $136,799.53 in pre-RTP lost profit ($172,796.61 post-RTP). Claimant's P&Ls indicate the accrual basis of accounting. Claimant's P&Ls contain numerous financial data corrections. Claimant made an error correction entry in December 2010 described as "To correct posting of 2009", indicating that both December 2010 and at least one month in 2009 are misstated. Also, a large inventory correction was booked on December 31, 2010. Together, the inventory adjustment and the year-end correction artificially decrease 2010 variable profit in the compensation period.

33. **Claim XXX37.** Claimant is a Zone D glass installation company. The Settlement Program awarded Claimant $624,091 in lost profit ($1,404,204.01 post-RTP). Claimant purports to be on the accrual basis of accounting per its tax returns, verified by its P&Ls. However, it appears monthly results are not accrual basis. Monthly gross profit percentages are fairly stable except for December, including negative gross profit in Dec 2010. This is indicative

of year-end cumulative corrections and means all 12 months during the year are not accurate, which also can be seen in variable profit fluctuations.

34. **Claim XXX50.** Claimant is a Zone D land development business located in Alabama, over 400 miles from the Gulf of Mexico. The Settlement Program awarded Claimant $38,671.44 in pre-RTP lost profit ($48,829.30 post-RTP). Claimant's P&Ls and tax returns purport to be accrual basis accounting. Claimant's 2010 revenue and Variable Profit were the highest of any year from 2007 through 2010. Claimant's financials show erratic fluctuations in monthly variable profit percentage including months with negative variable profit. The gross profit percentages range from negative 119% to 93% in 2008, negative 5% to 87% in 2009, and 18% to 91% in 2010. Adjusting entries were noted in December of 2008.

35. **Claim XXX82.** Claimant is a Zone B home repair business. The Settlement Program awarded Claimant $63,739.03 in pre-RTP lost profit ($144,670.32 post-RTP). Both Claimant's tax returns and P&Ls purport to be on the accrual basis. However, it does not appear monthly statements are accurately maintained on accrual basis. Monthly gross profit percentages vary between negative 432% and 48% in 2008, between negative 8% and 52% in 2009, and between negative 214% and 50% in 2010, indicating that revenue and corresponding expenses are mismatched.

36. **Claim XXX50.** Claimant is a Zone C electrical repair company. The Settlement Program awarded Claimant $38,378.34 in pre-RTP lost profit ($47,972 post-RTP). Claimant's P&Ls state they are on the accrual accounting basis. However, it does not appear monthly statements are accurately maintained on the accrual basis. Gross profit margins show significant volatility ranging between negative 42% and 79% in 2007; 4% and 72% in 2008; negative 115% and 72% in 2009; and 30% to 127% (negative Cost of Goods Sold) in 2010. Negative Cost of Goods Sold indicative of year-end correction or cumulative adjustment and means prior months' Cost of Goods Sold overstated.

37. **Claim XXX69.** Claimant is a Zone C construction contractor. The Settlement Program awarded Claimant $53,393.38 in pre-RTP lost profit ($67,726.73 post-RTP). Monthly P&Ls state that they are on the accrual accounting basis. However, the monthly variable profit percentages show significant volatility ranging between negative 248% and 62% in 2007; negative 16% and 53% in 2008; negative 570% and 66% in 2009; and negative 197% and 81% in 2010. This volatility is indicative of a matching issue.

38. **Claim XXX68.** Claimant is a Zone A drywall contractor. The Settlement Program award Claimant $26,198.05 in pre-RTP lost profit ($65,495.13 post-RTP). Both Claimant's tax returns and P&Ls purport to be on the accrual basis. However, it appears revenue is not recorded when earned. Much of the revenue and variable profit for 2010 are reported in December. This is due to a catch-up entry of $14,000 that was recorded to revenue on December 10, 2010.

39. **Claim XXX26.** Claimant is a Zone D manufactured homes merchant. The Settlement Program awarded Claimant $133,517.54 in pre-RTP lost profit ($166,896.93 post-RTP). Claimant's P&Ls and tax returns are both marked as accrual basis. However, there are

matching issues inconsistent with accrual basis accounting; for example, there are months with significant revenue and no Cost of Goods Sold and vice versa. Monthly gross profit percentages vary between negative 9,929% and 100% in 2008; negative 50% and 105% (negative Cost of Goods Sold) in 2009; and negative 8,264% and 100% in 2010.

40. **Claim XXX00.** Claimant is a Zone D full-service sign company. The Settlement Program awarded Claimant $456,912.37 in pre-RTP lost profit ($574,060.46 post-RTP). Claimant is on the accrual basis of accounting according to its tax returns, verified by its P&Ls. However, Bad Debt expense is almost entirely booked in December and there are negative Cost of Goods Sold amounts due to year-end adjustments (which further indicate other months are misstated as well). Monthly gross profit percentages show volatility ranging between negative 15% and 83% in 2008; negative 86% and 302% (negative Cost of Goods Sold) in 2009; and negative 14% to 121% (negative Cost of Goods Sold) in 2010.

41. **Claim XXX86.** Claimant is a Zone D electrical construction company located in Alabama. The Settlement Program awarded Claimant $143,955.45 in pre-RTP lost profit ($179,944.31 post-RTP). Claimant is on the accrual basis according to its P&L. However it does not appear monthly statements are accurately maintained on accrual basis. There is inconsistent basis of accounting as adjusting entries sometimes are included in the P&Ls, and sometimes not included. Claimant's P&Ls report several months in both the Compensation and Benchmark Periods with a negative variable profit percentage, as well as large fluctuations on a month-to-month basis. For example, Claimant's variable profit percentage ranges between negative 31% and 97% in 2008; negative 114% and 94% in 2009; and negative 180% to 94% in 2010.

42. **Claim XXX02.** Claimant is a Zone D drywall installation service. The Settlement Program awarded Claimant $131,808.48 in pre-RTP lost profit ($167,396.77 post-RTP). While Claimant's P&Ls state that they are on the accrual accounting basis, monthly financials do not appear to be accurately maintained on accrual basis. Monthly gross profit percentages show significant volatility ranging between negative 723% and 97% in 2009; and negative 26% and 76% in 2010.

43. **Claim XXX31.** Claimant is a Zone C welding and fabricating company. The Settlement Program awarded the Claimant $89,191.74 in pre-RTP lost profit ($111,489.68 post-RTP). Claimant's P&Ls purport to be on the accrual basis of accounting. However, it does not appear monthly statements are accurately maintained on accrual basis. Significant variability is noted in the monthly Gross Profit percentages between negative 16% and 92% in 2009; and 35% to 95% in 2010.

44. **Claim XXX91.** Claimant is a Zone C electrical contractor. The Settlement Program awarded Claimant $94,769 pre-RTP lost profit ($118,461 post-RTP), which implies that in the absence of the Spill, Claimant's 2010 variable profit margin would have increased more than 500% over its performance in 2009. Claimant's P&Ls indicate the accrual-basis accounting method. However, it appears accurate accrual basis statements are not maintained on a monthly basis. Monthly gross profit percentages show significant volatility

ranging between negative 8,560% and 69% in 2008; negative 495% and 68% in 2009; and negative 59,589% and 72% in 2010.

45. **Claim XXX38.** Claimant is a Zone B floral shop. The Settlement Program awarded Claimant $116,201.17 in pre-RTP lost profit ($350,927.53 post-RTP). Claimant's P&Ls indicate that they are kept on an accrual basis. However, Claimant confirmed that it did not subtract corresponding variable expenses from revenue generated in August and September 2008. As explained by Claimant's attorney, "[T]he reason for the increases in contract labor expense in September and October 2008 is that the business was paying contract laborers for the large wedding jobs they had in the previous months (August and September)." The monthly gross profit percentages show significant volatility ranging between negative 98% and 84% in 2008; negative 40% and 123% (negative Cost of Goods Sold) in 2009; and -20% to 106% (negative Cost of Goods Sold) in 2010.

46. **Claim XXX23.** Claimant is a Zone C flooring wholesaler and installer. The Settlement Program awarded Claimant $55,697 pre-RTP lost profit ($69,621.76 post-RTP). According to its federal income tax return, Claimant asserted that it used the accrual basis of accounting. However, the monthly statements appear to not be maintained on an accrual basis. The monthly gross profit percentages show significant volatility, particularly in 2008 when the percentages ranged between negative 19% and 82%. For 2009 and 2010, these percentages were more stable ranging between 32% and 76%, and between 21% and 58% respectively.

47. **Claim XXX38.** Claimant is a Zone C construction company. The Settlement Program awarded Claimant $121,127.93 in pre-RTP lost profit. P&Ls and tax return purport to use the accrual basis. However, it appears monthly statements not maintained on accrual basis. A bulk entry for Worker Comp in December 2007 is contrary to proper accrual accounting on monthly basis. Also, the monthly gross profit percentages show significant volatility ranging between negative 38% and 40% in 2007; negative 46% and 55% in 2008; negative 60% and 80% in 2009; and negative 26% and 56% in 2010.

48. **Claim XXX78.** Claimant is a Zone C dealer and subcontractor of architectural metal wall panel systems used in commercial, industrial, and non-residential markets. The Settlement Program awarded Claimant $246,294.10 in pre-RTP lost profit ($307,867.63 post-RTP). While Claimant's P&Ls do not identify an accounting method, the tax returns indicate the completed contract method of accounting. Significant fluctuations in variable profit percentages including months with negative variable profit indicate monthly statements may not be accurately maintained. Claimant explained to the Settlement Program that the costs of goods sold associated with completed projects are frequently not recorded "for up to several months after the project is complete and revenue has been recognized."

49. **Claim XXX73.** Claimant is a Zone D construction company. The Settlement Program awarded Claimant $524,633.88 in pre-RTP lost profit ($661,119.85 post-RTP). Claimant's tax returns state that the completed contract accounting method was used, and the P&Ls state the accrual method was used. However, the completed contract method was incorrectly applied and expenses were not matched; the Claimant recorded all expenditures as Cost of Goods Sold throughout the year. Then, at year-end, one adjusting entry was made to move

the amounts associated with uncompleted contracts out of Cost of Goods Sold into Work In Progress. Therefore, revenue is not recorded when earned on a monthly basis, and revenues are not matched with corresponding variable expenses.

50. **Claim XXX55.** Claimant is a Zone C sales company for modular homes. The Settlement Program awarded the Claimant $157,542.47 in pre-RTP lost profit ($196,928.09 post-RTP). Claimant's P&Ls purport to be on the accrual basis. However, it does not appear monthly statements are accurately maintained using accrual accounting. Claimant's financials show erratic fluctuations in monthly variable profit percentage including months with negative Variable Profit. Monthly gross profit percentages vary significantly and financials include months with zero revenue and negative Cost of Goods Sold.

51. **Claim XXX02.** Claimant is a Zone C paving company. The Settlement Program awarded Claimant $207,501.50 in pre-RTP lost profit ($262,926.88 post-RTP). While Claimant's tax returns indicate accrual basis, the P&Ls are unmarked. Using the revenues used by the CSSP, there is some volatility in monthly gross profit percentages. They range from negative 4% to 64% in 2007, negative 17% to 57% in 2008 and negative 34% to 53% in 2010. 2009 was remarkably consistent; it would appear that the Claimant allocated the revenue based on Cost of Goods Sold or vice versa. There is a lot of inconsistency over the years.

52. **Claim XXX15.** Claimant is a Zone D insulation contractor. The Settlement Program awarded Claimant $222,640.31 in pre-RTP lost profit ($282,080.39 post-RTP). While Claimant's tax returns purport to be accrual basis, the P&Ls are unmarked. In addressing questions from the CSSP, the Claimant stated that there were errors that impacted revenue in August 2008 (correction in September) and in October 2011 (correction in November). The Settlement Program did not adjust the P&Ls to make the correction in the proper months. "Purchases" as a percent of revenue varies widely, from 5% to 108% in 2008, 20% to 293% in 2009 and 6% to 124% in 2010.

53. **Claim XXX85.** Claimant is a Zone D commercial construction company located in Mississippi. The Settlement Program awarded Claimant $235,550.67 in pre-RTP lost profit ($298,118.34 post-RTP). The P&Ls were unmarked; however, Claimant's federal income tax returns state that it uses the accrual accounting method. However, it appears monthly statements are not maintained on accrual basis. The supporting documents show that the Claimant did not provide consistent financial data in the P&Ls. For 2007 (and 2008 by inference), the Claimant included the year-end AJEs (adjusting journal entries). In 2009 and 2010, the Claimant did not include the AJEs. The monthly gross profit percentages show significant volatility ranging from negative 40% to 48% in 2007, negative 82% to 58% in 2008, negative 55% to 57% in 2009 and negative 1,180% to 56% in 2010.

54. **Claim XXX88.** Claimant is a Zone C furniture store. The Settlement Program awarded Claimant $142,905.76 in pre-RTP lost profit ($431,575.40 post-RTP). Claimant's tax returns are marked as having been completed as on an accrual basis of accounting, but Claimants P&Ls are unmarked. However, it appears that monthly financial statements are not maintained on an accrual basis. Negative Cost of Goods Sold in July 2009 indicates the presence of fiscal year-end adjustments. This is confirmed by Claimant's rep. Claimant's

variable profit percentage fluctuates widely ;  for example, in 2009, Claimant's monthly variable profit percentages fluctuated from 47.78% in June to 124.98% in July.  In 2010, Claimant's monthly variable profit percentages changed from negative 40.3% in May to 49.3% in June.

55. **Claim XXX04.**  Claimant is a Zone D flooring retail and installation business.  The Settlement Program awarded Claimant $84,554.28 in pre-RTP lost profit ($105,692.85 post-RTP).  Claimant's P&Ls are unmarked, but its tax returns indicate the accrual basis of accounting was used.  However, it appears monthly statements are not maintained on an accrual basis.  The Claimant only applies accrual adjustments in December, so, in effect, January through November are on a cash basis.  There are year-end adjustments to inventory (P&Ls include "Beginning Inventory" and "Ending Inventory" accounts) in December.  In addition, the monthly gross profit margins are volatile ranging from negative 55% to 60% in 2009 and negative 19% to 48% in 2010.

56. **Claim XXX62.**  Claimant is a Zone D plumbing contractor.  The Settlement Program awarded Claimant $84,600 in pre-RTP lost profit ($105,750 post-RTP).  Claimant's rep states that the Claimant maintains their books on an accrual method, but files its tax returns on the cash basis.  The rep indicates that the Claimant makes an entry in December to convert the accrual basis to cash basis.  Later, the rep describes the Claimant's billing practices that vary from job to job and indicate that revenues are not consistently recorded when earned.  The bookkeeping practices described by the Claimant's rep seem to be a hybrid form of accrual accounting, and, as a result, monthly gross profit margins show significant volatility ranging from negative 223% to 63% in 2009 and negative 332% to 331% (negative revenue) in 2010.

57. **Claim XXX99.**  Claimant is a Zone D promotional product retailer.  The Settlement Program awarded Claimant $85,030.53 in pre-RTP lost profit ($107,920.96 post-RTP).  Claimant's P&Ls and tax returns are both marked as having been completed as on an accrual basis of accounting.  However, monthly statements do not appear to be prepared on accrual basis.  Claimant does not accurately track its inventory on a monthly basis, and there are significant fluctuations in gross margins, from as low as negative 49.6% in January 2010 and as high as 69.5% in April 2008.  Monthly "cost of sales" incorrectly reflects "inventory purchases" rather than "inventory sold"

58. **Claim XXX16.**  Claimant is a Zone C furniture sales company.  The Settlement Program awarded Claimant $35,520.20 in pre-RTP lost profit ($40,650.25 post-RTP).  Claimants P&Ls are unmarked, but Claimant's tax returns are marked as having been completed as on an accrual basis of accounting.  However, it does not appear monthly statements were accurately prepared using accrual accounting.  Claimant does not accurately track its inventory on a monthly basis, as there are significant fluctuations in gross margins, from as low as 17.7% in February 2010 and as high as 80.7% in July 2010.  Monthly "cost of sales" incorrectly reflects "inventory purchases" rather than "inventory sold."  Inventory change is only measured at each year-end, resulting in only an annual accrual basis cost of sales measurement.

12

59. **Claim XXX75.** Claimant is a Zone C construction equipment dealer. The Settlement Program awarded Claimant $323,421 in pre-RTP lost profit ($410,745 post-RTP). Claimant's P&Ls purport to be accrual-basis accounting. However, Claimant's financial records indicate accurate accrual accounting is not done on a monthly basis. In May 2008, $689,673 was recorded as Cost of Goods Sold, but only $88,756 was recorded as revenue, for a gross profit of negative 677%. In June 2008, the Claimant recorded negative $41,195 in Cost of Goods Sold and $88,756 in revenue for a gross profit of 140%. In Nov 2010, $352,704 was recorded as Cost of Goods Sold, but only $82,149 was recorded as revenue for a gross profit of negative 576%. In December 2008 and December 2010, the Claimant recorded negative Cost of Goods Sold of $473,644 and $399,979, respectively.

60. **Claim XXX08.** Claimant is a Zone C construction company. The Settlement Program awarded Claimant $444,235.51 in pre-RTP lost profit ($559,714.39 post-RTP), despite the fact that Claimant's variable profit actually increased from 2009 to 2010, and then declined in 2011. Claimant's P&Ls indicate that they are kept on an accrual basis. However, it does not appear monthly financial statements are accurately matched. Claimant appears to consistently recognize revenue one month prior to paying for the products sold. For example, in September 2009, the Claimant recorded $112,568 in Cost of Goods Sold and $516,377 in revenues, for a gross profit of 78%. One month later in October 2009, the Claimant recorded $414,704 in Cost of Goods Sold and only $71,377 in revenue for a gross profit of negative 481%. This suggests that Claimant incurs costs in months different than the months in which it records revenue that those costs generated.

61. **Claim XXX55.** Claimant is a Zone D construction company that supplies and installs reinforcing steel and is located in Madison, Mississippi  The Settlement Program awarded Claimant $376,559.90 pre-RTP lost profit ($470,699.88 post-RTP). Claimant's P&Ls purport to be accrual basis. The monthly statements do not appear to reflect accurate accrual basis. Gross profits fluctuate significantly from month to month and include multiple months with negative grows profit. For example, Claimant's monthly gross profit fluctuated from negative 91% to 76% in 2010.

62. **Claim XXX36.** Claimant is a Zone D orthotics, prosthetics and mobility equipment provider. The Settlement Program awarded Claimant $134,311.79 pre-RTP lost profit ($169,628.74 post-RTP). Claimant's P&Ls are unmarked, but its tax returns are labeled as accrual. However, monthly financials appear to not be prepared using accurate accrual accounting. Claimant's variable profit percentage changes significantly from month to month and indicates revenues are not matched with corresponding variable expense.

63. **Claim XXX67.** Claimant is a Zone A antique store that purports to maintain its financial data on an accrual basis. The Settlement Program nonetheless awarded Claimant $761,321 pre-RTP ($2,664,623 post-RTP) despite variable profits increasing 72% during its July 2010-June 2011 fiscal year. However, Claimant does not maintain monthly accrual records during the year. Claimant does not accurately track its inventory on a monthly basis. Monthly "cost of sales" incorrectly reflects "inventory purchases" rather than "inventory sold." Inventory change is only measured at each fiscal year-end (i.e., June 30), resulting in only an annual

13

accrual basis cost of sales measurement. Thus, only the fiscal year end annual cost of sales percentage is a reliable benchmark of accrual based cost of sales to sales.

64. **Claim XXX71.** Claimant is a Zone D provider of wood mats. The Settlement Program awarded Claimant $2,992,106 in pre-RTP profit ($3,742,263 post-RTP). Claimant purports to use the accrual basis of accounting per its tax returns and P&Ls. However, the Claimant's monthly statements do not reflect accrual basis. Over $1.6 million of material purchases were recorded in cost of sales in July 2009, with a portion of those materials sold in August 2009 and the remaining were returned and recorded as negative cost of sales in September 2009. The improper cash basis accounting distorts performance in each month, and multiple other unmatched distortions are included in the monthly data. As a result, Claimant had significant fluctuations in variable profit percentage.

65. **Claim XXX30.** Claimant is a Zone D construction company. The Settlement Program awarded Claimant over $12.6 million in total compensation. Claimant purports to maintain its financial data on an accrual basis. However, accrual accounting is not maintained consistently on a monthly basis. Claimant follows complete contract method of revenue and had an annual variable profit percentage of 29.4% and 29.9% for 2009 and 2010, respectively. However, significant fluctuations in monthly gross profit suggest of claimant performed completed contract revenue calculation only at year end. Specifically, 2009 and 2010 included 4 months each with significant negative gross profits (ranging from negative $(537,000) to $(3.7 million)) and other months with gross profit percentages more than 3 to 4 times the annual monthly average. For example, in December 2009, Claimant recorded more than $1.9 million in variable expenses to correct for an underreporting of expenses earlier in the year. Likewise, in December 2010, Claimant recorded more than $225,000 in negative expenses to correct for an overstatement of expenses in earlier months.

66. **Claim XXX07.** Claimant is a Zone A jewelry store. The Settlement Program nonetheless awarded Claimant $232,000 pre-RTP ($812,000 post-RTP) despite 2010 being the Claimant's best year during the period on record (2007-2011). Claimant purports to maintain its records on an accrual basis. However, monthly "cost of sales" is based on a fixed estimated cost of sales percentage throughout the year with corrections to actual inventory generally made at year-end. This means that not one single month of claimant's financial data is correct, and, in particular, the inconsistent timing of the inventory corrections particularly distorts the 2010/benchmark comparison. Eleven months of the year use a fixed percentage proxy and the twelfth month uses the correction.

67. **Claim XX37.** Claimant is a construction contractor in Zone D. The Settlement Program awarded Claimant over $2.6 million in total compensation. This award was based on accrual basis monthly statements that Claimant admits are incorrect. Specifically, in 2010, an external audit of Claimant's 2009 financial records revealed that the records understated Claimant's 2009 cost of sales by more than $1.4 million. Claimant corrected its annual financial records and corrected its tax returns. However, the Settlement Program nonetheless used Claimant's uncorrected and admittedly erroneous 2009 monthly P&L's which omitted the $1.4 million of adjustments required to measure variable profit on an accrual basis.

14

Understating cost of sales by more than $1.4 million overstated Claimant's 2009 profits and thus overstated Claimant's award.

68. **Claim XXX55.** Claimant is a Zone A veterinary clinic.  The Settlement Program awarded Claimant $130,210.06 in pre-RTP lost profit ($325,525.15 post- RTP), notwithstanding that Claimant's variable profit in 2010 exceeded its variable profit in the Benchmark years. Claimant's P&Ls are marked as completed on an accrual basis.  Nevertheless, Claimant's financial records indicate matching problems.  The Settlement Program failed to properly assign year-end financial corrections to the periods in which the financial data recognition errors occurred.  100% of claimant's employee lease expense for 2007 was recorded in December (which represented 45% of total variable expense for 2007), which is indicative of cost not being accrued in proper months (as cost is incurred).  Additionally, monthly "cost of sales" incorrectly reflects "inventory purchases" rather than "inventory sold" with a cumulative correction at year-end.

69. **Claim XXX95.** Claimant is a Zone D solar panel sales and installation contractor.  The Settlement Program awarded Claimant $691,732 in lost profit ($866,957 post-RTP), which amounts to a finding that in the absence of the Spill, Claimant's 2010 variable profit margin would have increased more than 300% over its performance in 2009.  Claimant's P&Ls purport to be accrual basis, however, there are still matching problems.  Clamant stated that cost of sales adjustment was recorded on a "periodic" basis, rather than monthly as would be required.  Gross profit fluctuations ranged from negative 245% to 65% in 2009 and negative 42% to 66% in 2010, indicative of inconsistent application of accrual based revenue method to corresponding job costs expenses.

70. **Claim XXX45.** Claimant is a Zone D cleaning contractor.  The Settlement Program awarded Claimant $553,222 ($692,991 post-RTP).  Claimant uses the accrual basis of accounting per its tax returns.  Although Claimant states that it is on the accrual basis, its financial statements reflect fluctuations in monthly margins that are not consistent with the accrual method or the company's stable annual gross margin.  For example, Claimant's 2009 variable profit fluctuated from negative 73% to 60%.  Similarly, Claimant's 2010 variable profit fluctuated from negative 79% to 60%.

71. **Claim XXX95.** Claimant is a Zone D excavation contractor.  The Settlement Program awarded Claimant $1,227,346.11 in pre-RTP lost profit ($1,538,917.64 post-RTP).  While Claimant's profit and loss statements ("P&Ls") do not identify an accounting method, according to Claimant's tax returns it uses the accrual method of accounting.  Claimant recorded a significant bad debt write-off in December 2008 for $330,292, in addition to a smaller write-off of $89,984 in December 2009.  This is almost certainly an end of year correction for prior overstatements of revenue or understatements of expenses.  Claimant also reflects significant fluctuations in monthly gross profits suggesting percentage of completion calculations not conducted accurately on a monthly basis.  Claimant also had large year-end bonuses not accrued during the months.

72. **Claim XXX28.** Claimant is a Zone D funeral home.  The Settlement Program awarded Claimant $235,622.60 pre-RTP lost profit ($294,528.25 post-RTP).  Claimant's tax returns

are marked as using accrual basis, but its P&Ls are unmarked.  Monthly gross profit margin fluctuations indicate Claimant was not recording discounts and cost of services/sales against corresponding expenses.  This is shown by significant fluctuations in its gross profit margins from month to month.  Claimant also recorded significant fluctuations in net variable profit, ranging from negative 8.83% to 82.95%.

73. **Claim XXX18.**  Claimant is a Zone D aggregate materials company.  The Settlement Program awarded Claimant $184,467.67 pre-RTP lost profit ($230,584.59 post-RTP).  Claimant's tax returns are marked as using accrual basis; P&Ls are unmarked.  Claimant's financial record includes significant fluctuations in variable profit.  Claimant also recorded large "inventory adjustments" at the end of the year.  Such adjustments are cumulative corrections for errors throughout the year and suggest all months are misstated.

# EXHIBIT B

1. <u>Claim No. XXX89</u>:  Claimant is a Zone C professional services company in Louisiana that provides consulting services for the nuclear industry and other power plants throughout the world.  The Settlement Program awarded Claimant $408,758 pre-RTP ($510,948 post-RTP), even though Claimant's revenue and variable profit in 2010 were *higher* than in any other year from 2007-2011.  Claimant's client list includes all U.S. nuclear plants, many fossil plant operators, and several major international nuclear utilities, which would not have been impacted by the Spill.

2. <u>Claim No. XXX15</u>:  Claimant is a Zone D family medical practice clinic located in Alabama.  The Settlement Program awarded Claimant $528,198 pre-RTP ($662,586 post-RTP) in lost profits.  During Claimant's Compensation Period, the physician who had previously generated the most revenue for the Clinic was unable to practice medicine because his medical license had been revoked by the State of Alabama.

3. <u>Claim No. XXX86</u>:  Claimant is a Zone C wireless phone retailer and service company in central  Louisiana.  The Settlement Program awarded Claimant $108,207.15 pre-RTP ($135,258.94 post-RTP).  Claimant's business experienced "extensive damage" resulting from a fire sometime in late 2009 or early 2010.  As a result of the damage sustained from the fire, Claimant's business was not in operation in 2010.

4. <u>Claim No. XXXX41</u>:  Claimant is a Zone D farm in Northern Mississippi approximately 275 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant $91,425.60 pre-RTP ($116,110.51 post-RTP) in lost profit.  Claimant's financial documentation demonstrates that it did not engage in farming operations in either 2009 or 2010.  Claimant recorded no crop revenue and zero variable costs in 2009.  In 2010, Claimant similarly recorded no crop revenue, and its only variable costs were for fuel in November 2010, and for seeds/plants in December 2010.  These costs related to preparing land for crops to be raised in 2011, which is the first year Claimant raised and sold crops since 2008.  Accordingly, Claimant could not have experienced a Spill-related loss as Claimant opted not to plant crops in either 2009 or 2010.

5. <u>Claim No. XXX08</u>:  Claimant is a Zone D dental office more than 200 miles from the Gulf of Mexico in Northern Alabama.  The Settlement Program awarded Claimant $108,282.59 in lost profits ($137,518.89 post-RTP), despite the fact that Claimant's post-Spill revenue in 2010 was greater than or equal to its revenue for each corresponding month from May through September in the Benchmark Year, 2009.  Claimant generated less revenue in October, November, and December 2010 because Claimant's building suffered water damage (unrelated to the Spill) and was forced to close.   Claimant's sworn statement to its insurance company asserts that the *water damage* caused over $47,000 a month in lost business income.

6. <u>Claim No. XXXX20</u>:  Claimant is a Zone D inland marine towing business located in Louisiana.  Claimant operates a single tugboat.  The Settlement Program awarded

Claimant $184,538 pre-RTP ($231,272 post-RTP).  In November 2010, Claimant's tugboat--its only source of revenue--was not operating because the tugboat was undergoing major repairs unrelated to the Spill.  Indeed, Claimant acknowledged that these repairs "took [the tugboat] out of service *therefore lowering revenues*." (emphasis added).

7.  <u>Claim No. XXX72</u>:  Claimant is a disaster recovery contractor that assists the federal government with hurricane recovery efforts.  Claimant did not suffer any lost profits from the Spill.  Rather, Claimant did not have any business during the post-spill period in 2010 because there were not any hurricanes requiring its services.   Nonetheless, the Settlement Program awarded Claimant more than $2.6 million, treating the absence of hurricanes and thus the absence of any ability to conduct its business as a Spill-related loss of profits.

8.  <u>Claim No. XXXX02</u>:  Claimant is a Zone D excavating company located in Alabama.  The Settlement Program awarded Claimant $2,798,893 pre-RTP ($3,502,760 post-RTP).  Claimant sold substantially all of its assets in August 2009.

9.  <u>Claim No. XXXX60</u>: Claimant is a Zone D attorney located in Northern Louisiana.  The Settlement Program awarded Claimant $136.066.86 pre-RTP ($172,252.58 post-RTP).  Because Claimant's business license was revoked on November 21, 2009 and was not reinstated until September 11, 2012, Claimant only recorded approximately $3,000 in revenue during the entirety of 2010 and 2011.

10.  <u>Claim No. XXX65</u>:  Claimant is a Zone D nursing home facility in Central Louisiana.  The Settlement Program awarded the Claimant $522,083 in pre-RTP lost profits ($662,834 post-RTP).  Almost a full year before the Deepwater Horizon Incident, Claimant shut down its facility and transferred its license to operate the business.

11.  <u>Claim No. XXX60</u>:  Claimant is a Zone C real estate rental company which, prior to the Spill, earned revenue from leasing two properties to Saturn car dealerships.  The Settlement Program awarded Claimant $189,952.80 in pre-RTP lost profit ($238,448.50 post-RTP).  Claimant's only major sources of income, the Saturn dealership leases, ceased prior to the Spill because those dealerships went out of business in 2009.  In 2010, the year of the Spill, Claimant did not earn any revenue.

12.  <u>Claim No. XXX38</u>:  Claimant is a Zone C company that provides water filtration solutions in Alabama. The Settlement Program awarded Claimant $3,345,518 pre-RTP ($4,181,897 post-RTP).  The Settlement Program included in its calculation commercial rental revenues for properties that Claimant sold in 2007 and that Claimant no longer owned at the time of the Spill.  The Settlement Program's calculation also included $26.6 million in revenues from a FEMA contract related to Hurricane Katrina in 2007— revenue that Claimant could not have expected to earn in 2010, a year in which there were no hurricanes.

13. <u>Claim No. XXX60</u>:  Claimant is a Zone D waste management company located in Alabama.  The Settlement Program awarded Claimant $1,357,120 pre-RTP ($1,704,690 post-RTP).   Claimant's revenue spiked significantly in 2008 due to two major Hurricanes, Gustav and Ike, hitting Louisiana and Texas.  Notably, Claimant recorded $2,564,249 in variable profit in September 2008 alone, which represents 67% of 2008 annual revenue and more variable profit than is recorded in any full *year* 2009-2011.  Accordingly, Claimant could not "have expected to earn" after the Spill the same profit as in prior years because there were no hurricanes.  Claimant thus did not incur compensable Economic Damage.

14. <u>Claim No. XXX62</u>:  Claimant is a Zone A hotel operator and restaurant located in Key West, Florida.  The Settlement Program awarded Claimant $989,201 pre-RTP ($2,414,983 post-RTP), despite the fact that Claimant recorded more revenue and had a higher variable profit in 2010 than in pre-Spill 2009.  Claimant took 32 of its 269 rooms "out of order for renovation" from August-October 2010 (Compensation Period) and then took an additional 30 rooms "out of order" during September-October 2010 (Compensation Period) due to "pool area renovations."

15. <u>Claim No. XXX58</u>:  Claimant is a Zone B catering service and restaurant located in Lacombe, Louisiana.  The Settlement Program awarded the Claimant $675,452.34 pre-RTP ($2,038,639.52 post-RTP).  Among other services, Claimant provides catering to emergency response clean-up personnel, particularly after hurricanes.  Claimant's revenue spiked in December 2007 as well as September/October 2008 due to Hurricanes Katrina and Gustav.  For example, Claimant recorded approximately $894,000 in revenue in December 2007 alone, which represents close to 50% of its 2007 revenue, from  a large catering event for volunteers providing Hurricane Katrina clean-up.  Claimant could not "have expected to earn" after the Spill the same profit as in prior years because there were no hurricanes.

16. <u>Claim No. XXX89</u>:  Claimant is a Zone C hotel located in Texas.  The Settlement Program awarded Claimant $478,815.90 pre-RTP ($1,442,937.30 post-RTP).  Claimant experienced a significant spike in revenue from September 22, 2008 through February 2009 as a result of Hurricane Ike.  Specifically, the hotel was fully occupied during this period as residents of Galveston returned to the city following a mandatory evacuation resulting from Hurricane Ike's landfall in the Galveston area on September 13, 2008.  Claimant's occupancy levels returned to pre-hurricane levels  after February 2009.  Accordingly, Claimant could not "have expected to earn" after the Spill the same profit as in prior years because there were no hurricanes.

17. <u>Claim No. XXXX20</u>:  Claimant is a Zone A rental company.  The Settlement Program awarded Claimant $24,996 pre-RTP ($63,490 post-RTP).  Claimant sold its short term rental property (the subject of the award) on September 30, 2010.  The Settlement Program established a Compensation Period of October-December, 2010, after claimant sold its property.

18. <u>Claim No. XXX86</u>:  Claimant is a Zone C investment holding company located in Florida.  The Settlement Program awarded Claimant $81,881.60 pre-RTP ($103,989 post-

RTP), notwithstanding that Claimant's loss was not caused by the Spill.  Claimant did not record *any* revenue or expenses—except for $138.75 in licenses and taxes in February 2010—from December 2009-February 2011.  Claimant admitted that this lack of revenue was due to a loss of clients in 2009.

19. Claim No. XXX51:  Claimant is a hotel in Mississippi.  The Settlement  Program awarded Claimant $168,227.10 in pre-RTP lost profit ($453,045.84 post-RTP).  Claimant experienced a fire in mid-September 2010 that caused the hotel to remain closed from October 2010 until the Spring of 2011.  Claimant recorded no revenue during those months.  Claimant's compensation period included October.

20. Claim No. XXX66:  Claimant is a Zone D restaurant located in central Mississippi, approximately 180 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant $111,421.38 pre-RTP ($252,388 post-RTP).  Claimant operated a Garfield's restaurant from January 2007 to August 2009.  Claimant closed the restaurant in January 2010.  Claimant then leased the land to a third party and, thus, received only rental income.  In 2011, Claimant again opened its own restaurant at the property.

21. Claim No. XXX08:  Claimant is a psychiatric hospital located more than 100 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant more than $2 million, notwithstanding that Claimant was busier in 2010 than in 2009.  The Settlement Program ignored the fact that more than one-half year before the spill, Claimant's third-party payors (*e.g.* government programs and private insurers) reduced the rates for which they paid for Claimant's services.

22. Claim No. XXX97:  Claimant is a catfish farm located more than 300 miles from the Gulf of Mexico.  Claimant's 2010 variable profit before payroll was five times greater than its 2009 variable profit before payroll.  Notwithstanding this highly successful 2010, the Settlement Program awarded Claimant almost $1 million.

23. Claim No. XXX76:  Claimant is a cotton, corn, soybean and wheat farm located more than 300 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant more than $550,000, even though Claimant's 2010 variable profit before payroll exceeded its variable profit from the three preceding years by more than 42%.

24. Claim No. XXX37:  Claimant is a Zone D cancer diagnosis and treatment center located in Alabama.  The Settlement Program awarded Claimant $992,492 pre-RTP ($1,240,615 post-RTP) despite the fact that Claimant's 2010 variable profit was more than two times higher than its 2009 variable profit.   Claimant's submitted documentation demonstrates that the award was driven by an error in Claimant's internal billing practices.

25. Claim No. XX18:  Claimant is a highway paving contractor located hundreds of miles from the Gulf of Mexico.  The Settlement Program awarded the claimant $7.7 million in pre-RTP compensation ($9.6 million post-RTP), notwithstanding that 2010 was the Company's best year on record (gross profits were $1.3 million greater than any other

year).  This award implies that, in the absence of the Spill, Claimant's 2010 profit margin would have doubled over its actual record 2010.

26. <u>Claim No. XX20</u>:  Claimant is a Zone A cabinet designer/retailer with two locations in Florida.  The Settlement Program awarded Claimant $695,361.79 pre-RTP ($1,043,042.69 post-RTP).  During Claimant's Benchmark Period, a line of cabinets for which Claimant received substantial commission income was discontinued.  Claimant's financial data demonstrate that Claimant's revenue and variable profit declined in 2010 as a result.

27. <u>Claim No. XXX51</u>:  Claimant is a Zone D six-lawyer law firm located in Mississippi. The Settlement Program awarded Claimant $4,225,069 pre-RTP ($5,281,336 post-RTP). The record demonstrates that Claimant "devoted nearly all of its resources" to litigating a personal-injury case from 2006 until it settled in September 2009, with Claimant receiving a more than $7 million contingent fee.  Based predominantly on that single fee, which Claimant received during its 2009 Benchmark Period, the Settlement Program awarded Claimant $4,225,069 in lost profit; however, Claimant earned more revenue  in 2010 than in 2008 or in 2011.  The decline in Claimant's 2010 revenue as compared to 2009 is an artificial loss caused not by the Spill, but by the mere coincidence that Claimant had received and recorded in September 2009 an enormous fee that was the result of three years of work.

28. <u>Claim No. XXXX05</u>:  Claimant is a Zone D row crop farmer located in Northern Mississippi, over 300 miles from the Gulf.  The Settlement Program awarded Claimant $1,407,226 pre-RTP ($1,762,938 post-RTP), which implies that Claimant would have earned a 2010 variable profit 23% greater than its Benchmark variable profit.

29. <u>Claim No. XXXX46:</u>  Claimant is a Zone D row crop farmer in Northern Mississippi, more than 300 miles from the Gulf of Mexico.  The Settlement program awarded Claimant $300,459.06 ($381,583.01 post-RTP with accounting support) in lost profit, despite the fact that Claimant's variable profit in 2010 was 36% higher than in 2009 (the Benchmark Year).  The months in which Claimant's crops were sold were not the same from year to year.

30. <u>Claim No. XXX92</u>:  Claimant is a Zone C single family home construction company. The Settlement Program awarded Claimant $576,720 pre-RTP ($720,900.21 post-RTP). Claimant did not suffer economic damage as a result of the Spill.  Claimant admitted that its profits had been declining for several years due to the collapse of the housing market.

31. <u>Claim No. XXXX11</u>:  Claimant is a Zone B law firm located in Florida.  The Settlement Program awarded Claimant $420,113 pre-RTP ($946,275 post-RTP) even though Claimant earned more than double the variable profit in 2010 than in 2009.  Claimant specializes in personal injury, medical malpractice, nursing home negligence, and product liability claims.  In 2010, the year of the Spill, Claimant's revenue actually increased by 62% from 2009.

32. <u>Claim No. XXXX16</u>:  Claimant is a Zone D cattle ranch and catfish farm located in Northern Mississippi, approximately 200 miles away from the Gulf of Mexico. The Settlement Program awarded Claimant $25,414.52 in lost profit ($31,768.15 post-RTP), notwithstanding the fact that Claimant recorded 22% more revenue in 2010 than it did in the Benchmark Year of 2009.

33. <u>Claim No. XXXX85</u>:  Claimant is a Zone D farm located in Northern Mississippi, approximately 250 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant $73,470.63 pre-RTP ($92,180.19 post-RTP), notwithstanding the fact that Claimant's crop sale revenue was higher in 2010 than in any year from 2007 to 2009 and its variable profit was higher in 2010 than in either 2008 or 2009.

34. <u>Claim No. XXX17</u>:  Claimant is a Zone D farm located in Northern Louisiana, more than 200 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant $279,286 pre-RTP ($353,43 post-RTP), notwithstanding the fact that Claimant's 2010 revenue increased 24% as compared to its 2007-2009 average.

35. <u>Claim No. XXXX40</u>:  Claimant is a Zone D row crop farmer located in Northern Mississippi, over 300 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant $535,459 pre-RTP ($669,324 post-RTP) notwithstanding that Claimant's revenue increased 22% in 2010 as compared to 2009.  The Settlement Program's award implies that, but for the Spill, Claimant should have expected a 2010 variable profit 63% greater than its 2009 Benchmark variable profit.

36. <u>Claim No. XXXX45</u>:  Claimant is a Zone D row crop farmer located in Northern Mississippi, over 250 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant $119,709 pre-RTP ($152,030 post-RTP), notwithstanding that  Claimant's revenue in 2010 increased by 37% as compared to its 2008-2009 Benchmark Year average.  This award implies that, but for the Spill, Claimant would have expected a 2010 variable profit 221% greater than its 2008-2009 Benchmark variable profit.

37. <u>Claim No. XXXX38</u>:  Claimant is a Zone D plaintiffs' law firm in Louisiana.  The Settlement Program awarded Claimant $391,096 pre-RTP ($488,870 post-RTP), notwithstanding that Claimant recorded more revenue and more variable profit in 2010 than in any other year on record, and could not have incurred a Spill-related loss. Claimant's documentation shows that Claimant represents over 270 other claimants who have submitted claims to the CSSP.

## Exhibit C

## Examples of Policy Decisions Potentially Affected by Fifth Circuit Ruling

**Policy 274**: **Reconciliation of Financial Information**

Policy 274 provides general rules that "the Claims Administrator may, in his discretion, request additional information or documentation to address discrepancies between amounts reflected in a tax return and comparable items in a profit and loss statement for the same period" and that "[r]econciliation of tax returns and profit and loss statements may be performed as deemed most appropriate by the reviewing accountants in the exercise of their professional judgment and given the circumstances of any particular claim, whether at the revenue level only or otherwise." This Policy is much too vague regarding the tasks of addressing discrepancies and reconciling profit and loss statements to tax returns that is required by CSSP accountants in order to ensure monthly revenues and corresponding expenses are accurate and properly matched, and, indeed, appears to allow CSSP to bypass these necessary steps as a matter of "professional judgment." While these concerns have proven valid over time through the appeals process, this reconciliation becomes even more important as part of the process of ensuring costs and revenues are contained in the proper periods and appropriately matched.

**Policy 295**: **Entry of Total Revenue**

This Policy addresses quantification of monthly revenue for use in the Exhibit 4B "Revenue Pattern" tests. Policy 295 suggests that the CSSP simply takes as given revenue entries recorded in the Claimant's monthly profit and loss statements. Such an approach is inconsistent with the analysis that is required by CSSP accountants to ensure revenue is accurately recorded in the proper month to conform to accrual-style accounting methods. "Matching" in the context of accrual accounting is not simply the matching of revenues and corresponding expenses, but also the matching of revenues with the temporal period (in this case, the month) when the revenues were actually earned through the delivery of goods or services.

**Policy 299**: **Determination of an Excluded Real Estate Developer**

Section 2.2.4.7 of the Settlement Agreement excludes Real Estate Developers, including any Natural Person or Entity that develops commercial, residential or industrial properties. Policy 299 establishes guidelines regarding how the Settlement Program will determine if a claimant is an excluded real estate developer. A revised version of this Policy is under review as part of the Panel Meeting process, and Policy 299 remains in effect at this time. The approach taken in Policy 299 for determining whether an entity is an excluded real estate developer focuses only upon the claimant's 2010 activity to make this determination and means that entities engaged in real estate development activity during the Benchmark Period years only will not be excluded from filing BEL claims. This Policy permits the inclusion of Benchmark Period revenues related to real estate development activity even where such activity ceased in the Compensation Period. As such, to the extent such claimants generated any Benchmark Period variable profit from development activities, those claimants will be awarded BEL compensation when, in fact, they experienced no economic loss due to the Spill.

**Policy 300**:  **Multi-Facility Business Claimants**

Policy 300 concerns a Multi-Facility Business Claimants with locations both within and outside the Gulf Coast Areas that submits claims for only those Facilities within the Gulf Coast Areas.  In Policy 300, the Claims Administrator announces a policy in which for such claimants, "P&L's for those Facilities outside the Gulf Coast Areas are not necessarily required" and that the Claims Administrator "may in his discretion require any and all documentation that he deems appropriate to properly evaluate a given claim or to resolve questions presented by a particular claim, including but not limited to additional individual Facility P&Ls, consolidating schedules, or other records."  By suggesting that P&Ls from Facilities outside the Gulf Coast Areas will not typically be reviewed, this Policy is likely to result in inaccurate matching of monthly revenues and corresponding expenses for the Facilities located with the Gulf Coast Areas.  Often, it will be necessary to examine P&Ls of other Facilities to ensure monthly revenues and corresponding expenses are treated appropriately.  Moreover, by leaving to "discretion" when the Claims Administrator will require additional documentation, there is not sufficient clarity that this Policy will result in accurate matching of monthly revenues and corresponding expenses.  Also, evaluation of intercompany and related party transactions are critical to determining the existence of fictitious losses unrelated to the spill for all claimants, and ensuring consistent timing and matching between companies, but particularly those within controlled groups.

**Policy 307**:  **Non-Profit Entities**

Policy 307 establishes specific rules pertaining to the review and processing of claims made by non-profit entities.  In particular, Policy 307 states that income received by non-profit entities in the form of grant monies or contributions shall typically be treated as revenue for that entity for purposes of the various required calculations under the terms of the Settlement Agreement.  The Fifth Circuit's ruling requires that "revenues" be accurately computed, and, therefore, Policy 307 is implicated by the ruling.  Moreover, Policy 307 suggests entities without tax returns may be compensated despite BEL documentation requirements to the contrary expressly requiring such documents to ensure profit and loss statements are reconciled to tax returns, an important step in ensuring proper matching has occurred in the profit and loss statement. Further, to the extent government grants and other gifts from outside the Zone cannot be plausibly be considered losses caused by the oil spill, policies related to those amounts should be reconsidered.

**Policy 328:**  **Business Economic Loss Claims:  Non-Revenue Items of Entities**

Policy 328 establishes that certain items "typically" shall not be treated as "revenue" for the purposes of various calculations under the Settlement Agreement relating to BEL claims:  (a) insurance proceeds, (b) interest income, and (c) gains and losses from sales of assets.  The policy notes that in reaching this conclusion the Claims Administrator relied in part on two factors:  (i) "such items are not typically treated as 'revenue' under generally accepted accounting principles" and (ii) the templates and testing of claims calculations conducted by the Parties did not treat such items as "revenue" for purposes of the Settlement Agreement.  This policy is currently under review for possible revision in the Panel Meeting process. However, in light the

Fifth Circuit opinion, the Claims Administrator should undertake a further review such that additional items may need to be included in this list, and to the extent exceptions are being considered to treat non-revenue items as revenue, such exceptions may be inconsistent with the Fifth Circuit's opinion.

**Policy 349: Benchmark Period for Claimants Passing the Local and Non-Local Customer Mix Test**

Policy 349 addresses what Benchmark Periods will be used by the Settlement Program for Claimants that establish causation by satisfying the Customer Mix Test together with the other requirements of the Modified V-Shaped Revenue Pattern Test or the Decline-Only Revenue Pattern Test of Exhibit 4B. In part, this Policy provides, "the Claims Administrator will calculate the claimant's compensation using the most favorable Benchmark Period for which the claimant satisfies the applicable Revenue Pattern test." This Policy will need to be re-examined in light of the Fifth Circuit ruling because it is silent on how "revenue" is being computed to determine whether a claimant satisfies the Modified V-Shaped Revenue Pattern Test or Decline-Only Revenue Pattern Test, and instead will need to make clear that "revenue' must be computed to comport with matching required by the Fifth Circuit opinion and that calculating the claimant's compensation will require matching of monthly revenues and corresponding expenses in both the Benchmark Period and Compensation Periods.

**Policy 373: Recurring Revenue Streams**

Policy 373 states that "[a]ll recurring revenue streams that are deemed to be within a businesses' normal course of operations" should be included for purposes of performing the various calculations under the terms of the Settlement Agreement with regard to entities asserting Business Economic Loss claims. As an example, Policy 373 provides that it will include in the BEL analysis "a restaurant that generates income from food service and also generates rental income by renting an apartment attached to the building." Such a policy needs to be reexamined to determine how non-operating forms of revenue should be matched on a monthly basis. For example, while BP believes government subsidies should not be considered revenues as they are not operating results, the CSSP has decided to include those revenues as in the "normal course of operations" and therefore those revenues would need to be matched to corresponding expenses.

**Policy 459: External Profit and Loss Template**

Policy 459 provides that the Claims Administrator has "created an External Profit and Loss Template" that Business Economic Loss claimants "may use…to supplement their contemporaneous P&Ls." The template allows a claimant to enter revenue and expense line items, and states that claimants must enter line items in the corresponding month in which the claimant "recorded the item on the contemporaneous P&Ls." Use of the template appears inconsistent with the notion that Settlement Program accountants will need to verify the accuracy and authenticity of profit and loss statements submitted by claimants, and ensure that monthly revenues and corresponding expenses are accurately captured. It would seem the Settlement

Program might use the P&L as provided to make its BEL computations, which would be inconsistent with the Fifth Circuit ruling.

## Policy 464:  Requirement of Monthly and Annual Profit and Loss Statements

Policy 464, which is the Policy attached to Mr. Juneau's Declaration, addresses the Settlement Program's treatment of monthly and annual profit and loss statements under the Settlement Agreement.  This policy, for example, provides general rules regarding (1) creation dates of profit and loss statements; (2) when the Claims Administrator will request source documents for profit and loss statements; (3) when a claimant can restate its profit and loss statements to change the accounting method by which the statements were prepared in the regular course of a claimant's business; (4) when a claimant submits profit and loss statements based on different accounting methods; (5) when a claimant cannot submit profit and loss statements maintained in the regular course of a claimant's business; and (6) when there are gaps in the information submitted by the claimant.  Many of the rules and practices described in Policy 464 will require revision to comply with the Court's order to implement proper matching of monthly revenues and corresponding expenses.  For example, this policy does not stipulate that correct matching of monthly revenues and corresponding expenses is required, and does not identify procedures the Settlement Program should undertake to verify the authenticity and accuracy of monthly profit and loss statements in light of the ruling.  Policy 464 suggests that BEL computations will be made using profit and loss statements as given, which implies incorrect matching for virtually all cash basis claimants and many accrual basis claimants.  Even for claimants that use accrual-based accounting methods, Policy 464 simply states if a claimant submits both cash and accrual basis profit and loss statements, the Claims Administrator "typically" will not use the cash basis profit and loss statements.  Furthermore, Policy 464 references that Claims Administrator's Accountant Reviewers "will use their professional judgment" in determining the appropriate level of detail "required to resolve questions presented by a particular claim" which leaves unclear the efforts that will be undertaken to review and evaluate BEL claims both generally and for the matching errors addressed by the Court order.  Policy 464 fails to articulate sufficient practices for CSSP accountants to follow to verify the accuracy of the financial data submitted by a claimant, and scrutinize carefully financial information submitted for data entry errors or recording of revenue or expense in the wrong period, and it is entirely silent on the remedy for claimants not providing properly matched monthly financial statements.

## Policy 465:  Defense Contractors and Subcontractors

Policy 465 establishes guidelines regarding how the Settlement Program will determine if a claimant is an excluded defense contractor or subcontractor.  Section 2.2.4.6 of the Settlement Agreement excludes "Defense Contractors/Subcontractors, including firms which derive in excess of at least 50% of their annual revenue from contracts with the United States Department of Defense and Individuals whose employer qualifies as a Defense Contractor."  Exhibit 18 requires the Claims Administrator to determine the applicability of the exclusion of defense contractors based upon "review of (a) the claimant's 2010 tax return, (b) 2010 business permits or license(s), and/or (c) other evidence of the relevant business's or individual's activities necessary for the Claims Administrator to determine whether the exclusion applies."

The approach taken in Policy 465 for determining whether an entity is an excluded defense contractor or subcontractor focuses only upon the claimant's 2010 activity to make the determination and means that entities engaged in defense contractor and subcontractor work during the Benchmark Period years only will not be excluded from filing BEL claims. This Policy permits the including of Benchmark Period revenues related to defense contractor and subcontractor work where such activity ceased in the Compensation Period. As such, to the extent such claimants generated any Benchmark Period variable profit from defense contractor and subcontractor work, those claimants will be awarded BEL compensation when, in fact, they experienced no economic loss due to the Spill.

**Policy 466:  Assignment of Expenses of Low Dollar Claims**

Section 4 of Exhibit 4A to the Settlement Agreement requires Business Economic Loss claimants to submit monthly and annual profit and loss statements or alternative source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011. Policy 466 addresses how the Claims Administrator will apply the portion of Exhibit 4A to claims by sole proprietor businesses with annual revenues of $250,000 or less that do not maintain profit and loss statements in the ordinary course of business. The Policy contends that such claimants typically can locate source documents to determine historic monthly revenue, but they cannot determine the amount of expenses incurred in each month of the Benchmark and Compensation Periods. Policy 466 provides that the Claims Administrator will "typically" assign the annual variable expenses reflected on the entity's tax return to months based on the percentage of annual revenue earned in those months subject to certain restrictions relating to how the Settlement Program will determine revenue earned. Because this policy addresses how to attribute monthly revenues and earnings, it must be examined in light of the Fifth Circuit's ruling with consideration as to how revenues will be properly matched to months to reflect actual earnings activities.

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-274 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

### I. Profile  - EXTERNAL

| Subject | Reconciliation of Financial Information | | |
|---------|------------------|---|---|
| Active Date | 10/11/12 | Policy Impact | ☐All Claims Regardless of Active Date ☑All Claims Greater than Active Date |
| Type of Decision | | | Claims Administrator Decision |
| Settlement Agreement Reference | | | Exhibit 4A |
| Affected Claim Types and/or Review Processes | | | BEL |

### II. Summary

Pursuant to Section 4 of Exhibit 4A to the Settlement Agreement, the Claims Administrator may, in his discretion, request additional information or documentation to address discrepancies between amounts reflected in a tax return and comparable items in a profit and loss statement for the same period.  Reconciliation of tax returns and profit and loss statements may be performed as deemed most appropriate by the reviewing accountants in the exercise of their professional judgment and given the circumstances of any particular claim, whether at the revenue level only or otherwise.  The Settlement Program will perform a reconciliation of (i) revenue and (ii) total expenses in the claimant's P&Ls and tax returns.  Where such reconciliation reveals a material discrepancy between the claimant's P&Ls and tax return, the Claims Administrator will seek to resolve the discrepancy.

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-295 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile  - EXTERNAL | | | |
|---|---|---|---|
| **Subject** | Entry of Total Revenue | | |
| **Active Date** | 11/1/12 | **Policy Impact** | ☐All Claims Regardless of Active Date<br>☒All Claims Greater than Active Date |
| **Type of Decision** | | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | | Exhibits 4B and 4C |
| **Affected Claim Types and/or Review Processes** | | | BEL |

| II. Summary |
|---|
| If a Business Claimant does not fall within the Causation Presumption, the Settlement Program uses several "Revenue Pattern" tests to determine if the Business Claimant satisfies the Causation requirement set forth in the Settlement Agreement.  These tests require a claimant's monthly "total business revenue" to show certain revenue patterns.  The Program interprets "total business revenue" to mean Total Net Revenue.  Most Profit and Loss statements list only one amount for monthly total revenues.  This one amount may be labeled as Gross Revenues, Gross Sales or Total Sales.  If the claimant's Profit and Loss statements provide only one amount for monthly total revenues,  the Settlement Program will use that amount for "total business revenue."   Some Profit and Loss statements show both Gross Revenues and Net Revenues.  Net Revenues may also be labeled as Net Sales.  If the claimant's Profit and Loss statements provide both Gross Revenues and Net Revenues, the Settlement Program will use Net Revenues for "total business revenue".  The Settlement Program will never calculate the revenue patterns using the amounts shown for Gross Profits, Net Profits or Net Income. These amounts reflect income after the deduction of expenses, which the Program does not use to perform the Revenue Pattern Causation tests. |

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-299 v2 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile  - EXTERNAL | | | |
|---|---|---|---|
| **Subject** | Determination of an Excluded Real Estate Developer | | |
| **Active Date** | 5/16/13 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Section 2.2.4.7 and Section 5.9.3 | |
| **Affected Claim Types and/or Review Processes** | | Exclusions | |
| **Superseding Information** | | Policy 299 v2 revises Policy 299 v1 on 05/16/2013 | |

| II. Summary |
|---|
| See Final Policy Memo. |

After discussions with and input from the Parties, the Claims Administrator adopted and announced Policy No. 299 to the Parties on 11/28/12 to govern our application of the language in Section 2.2.4.7 of the Settlement Agreement excluding Real Estate Developers.  This policy is categorized as Agreed to by the Parties.  It was among the 64 policies that we posted publicly on 3/28/13.

Section (c) of Policy 299 provides:

(c) Business Designation on Tax Returns:  An Entity that expressly identified or described its business as real estate development on Schedule B (or elsewhere) on its 2010 Tax Return shall be considered to be an Excluded Real Estate Developer, with no further analysis

This provision created an absolute rule that excludes any entity (or a Claiming Job at any entity) that described its principal business activity and/or principal product or service as real estate development on its 2010 tax returns.  We have encountered certain instances, however, where the evidence in the claim file establishes that the entity had ceased all development activity by 1/1/10 and that the designation on its 2010 tax returns did not accurately reflect its actual operations before and after the Spill in 2010.  This would lead to exclusions that seem arbitrary and unfair because not grounded in reality.

As a result, the Claims Administrator has determined to modify this section of the policy to remove the conclusive presumption created by the business designation on an entity's 2010 tax returns and instead make the presumption rebuttable.  Using the precepts already applied by Section (e) of the policy to all other claimants, this change will allow a claimant to establish that an entity, with a description in its 2010 tax returns of real estate development as its principal business activity and/or principal product or service, had in fact ceased real estate development activity before 1/1/10.  We announce the complete policy, as revised in section (c), as follows:

***Exclusions:  Determination of an Excluded Real Estate Developer.***  Section 2.2.4.7 of the Settlement Agreement excludes:

Real Estate Developers, including any Natural Person or Entity that develops commercial, residential or industrial properties. This includes, but is not limited to, any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of Real Property, including condominiums with multiple residential units and/or a residential subdivision with contiguous home sites and homes, provided, however, that Real Estate Developers shall be eligible to assert Coastal Real Property Claims under Section 5.7 and Real Property Sales Damage Claims under Section 5.9.

Section 5.9.3 of the Settlement Agreement provides that, other than as allowed in the Real Property Sales framework, no claimant may "recover under this Agreement, including any Exhibit thereto, for Economic Damage based on a reduction in sale price, or an alleged reduction in market value, of real estate they owned or in which they had an ownership interest."  Section

1

VI of Exhibit 18 to the Settlement Agreement confirms this exclusion, by reference to Sections 2.2.4.7 and 5.9.3.  Exhibit 18 requires the Claims Administrator to determine the applicability of the exclusion of real estate developers based upon "review of (a) the claimant's 2010 tax return, (b) 2010 business permits or license(s), and/or other evidence of the relevant business's or individual's activities necessary for the Claims Administrator to determine whether the exclusion applies."  In contrast to its treatment of excluded Defense Contractors, the Settlement Agreement provides no revenue threshold applicable to determining who is or is not a Real Estate Developer; rather, the Settlement Agreement takes a more subjective approach and leaves that determination to the sound discretion of the Claims Administrator.  The Claims Administrator will implement these provisions as follows:

(a) Claimants Affected by this Exclusion:  This exclusion applies to any Entity that is a Real Estate Developer and any Individual employed by a Real Estate Developer, attempting to assert any claim in the Program other than Coastal Real Property Claims under Section 5.7, Wetlands Real Property Claims under Section 5.8, and Real Property Sales Damage Claims under Section 5.9 of the Settlement Agreement. The analysis required by this exclusion shall be performed at the Entity level, examining the attributes of the business Entity.  If the Claims Administrator has determined that an Entity is an Excluded Real Estate Developer, the employment of any employees of that Entity will be considered to be excluded as well.  Where the information available on the claim of an Individual claimant suggests that the claimant's employer is a Real Estate Developer and the Claims Administrator has not previously determined whether that employer is an Excluded Real Estate Developer, the Claims Administrator will contact the claimant and determine on a case-by-case basis the appropriate measures to obtain any information and/or documents regarding the claimant's employer to permit the Claims Administrator to make the necessary analysis of the employer's operations required under this Policy.

(b) Time Period for Analysis:  Pursuant to the requirements of Exhibit 18, the Claims Administrator will examine the attributes of the Entity during 2010.

(c) Business Designation on Tax Returns:   An Entity that expressly identified or described its business as real estate development on Schedule B (or elsewhere) on its 2010 Tax Return shall be presumed to be an Excluded Real Estate Developer.  This presumption may be rebutted by information available on the claim that indicates to a reasonable degree of certainty that the Entity had been engaged in Real Estate Development Activity before 1/1/10 but had ceased Real Estate Development Activity by 1/1/10 and was not engaged in such activity in 2010, as provided in Section (e) below.

(d) Other Entities:  On all other Entities, the Claims Administrator will examine any of the following information available on the Entity to determine whether it was more likely than not that the Entity was sufficiently engaged in Real Estate Development

2

Activity during 2010 such that it may reasonably be characterized as a Real Estate Developer:

(1) Any 2010 business permits or license(s) of the Entity.

(2) Any revenue from real property sales reported by the Entity on its 2010 Tax Return as ordinary income (other than depreciation recapture), rather than as capital gains income, shall be considered to be revenue associated with Real Estate Development Activity.

(3) Any information on any of these expenses of the Entity during 2010 that are considered to be associated with Real Estate Development Activity:  Expenses for permitting; architectural, surveying and construction fees and costs; draws to contractors, and expenses relating to the acquisition of raw land; land use planning; landscape architecture appraisal; architecture; association start-up; bank inspection; builder's risk/professional liability; civil engineering and surveying; civil site work; construction loans and title insurance; debt financing fees; demolition; developer fees and warranties; environmental and geotech; fences, gates, walls and signage; interest paid to debt sources; land planning; landscaping and irrigation; legal and condominium/association documents; parking structure; pool, pool deck and fencing; project management; project theming; road improvements; site improvements; site lighting; threshold and concrete testing; and waterproofing consultation.

(4) Any materials in the claim file, the Entity's promotional materials, website and other statements that indicate that the Entity was engaged in Real Estate Development Activity in 2010.  "Real Estate Development Activity" includes any activities involved in the making of any material change in the use of buildings or land, including the renovation and re-lease of existing buildings, the purchase of raw land for development, the sale of improved land or parcels to others and the planning, design, arranging of financing, zoning approvals, construction, marketing, sale or lease of such projects.

(e) Benchmark Period Attributes:  If the information available on the claim indicates to a reasonable degree of certainty that the Entity had been engaged in Real Estate Development Activity before 1/1/10 but had ceased Real Estate Development Activity by 1/1/10 and was not engaged in such activity in 2010, the Entity shall not be considered to be an Excluded Real Estate Developer. An Entity will be considered to have ceased Real Estate Development Activity when it has: (1) sold, conveyed, transferred, or otherwise disposed of all real property on which the Entity's prior Real Estate Development Activities took place, or entered into contracts to do so; or (2) completed all Real Estate Development Activities and assumed the responsibilities of operating the developed property according to its intended use and without holding them for sale at a future time. Such an Entity shall proceed pursuant to the Start-Up

3

Business framework under Exhibit 7 to the Settlement Agreement, if the Entity ceased its Real Estate Development Activity fewer than 18 months before 4/20/10 and thus has fewer than 18 months of operating history as a business not engaged in Real Estate Development Activity.

(f) Construction Contractors.  Notwithstanding the foregoing, an Entity engaged in construction that also acquires land for the purposes of erecting residential dwellings for sale on a dwelling by dwelling basis, rather than as part of a subdivision or other development by the Entity, will not be considered to be an Excluded Real Estate Developer.

4

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-300 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile  - EXTERNAL | | |
|---|---|---|

| **Subject** | Business Economic Loss Claims: Multi-Facility Business Claimants | |
|---|---|---|
| **Active Date** | 12/4/12 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | Exhibit 5 |
| **Affected Claim Types and/or Review Processes** | | BEL |

**II. Summary**

Exhibit 5 of the Settlement Agreement addresses Compensation of Multi-Facility Businesses.  Pursuant to Section II of Exhibit 5, required documentation includes "Separate profit and loss (P&L) statements for each individual Facility that were prepared and maintained in the normal course of business."

(a) For a Multi-Facility Business with locations both within and outside the Gulf Coast Areas who submits claims for only those Facilities within the Gulf Coast Areas, the Claims Administrator interprets this provision such that P&L's for those Facilities outside the Gulf Coast Areas are not necessarily required.

(b) The Claims Administrator may in his discretion require any and all documentation that he deems appropriate to properly evaluate a given claim or to resolve questions presented by a particular claim, including but not limited to additional individual Facility P&L's, consolidating schedules, or other records.

# DEEPWATER HORIZON
## CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-307 v2 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|
| | **I. Profile  - EXTERNAL** |

| Subject | Business Economic Loss: Non-Profit Entities |
|---|---|
| **Active Date** | 12/12/12 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| **Type of Decision** | | | Court Decision |
| **Settlement Agreement Reference** | | | Exhibit 4A |
| **Affected Claim Types and/or Review Processes** | | | BEL |
| **Superseding Information** | | | Policy 307 v2 revises Policy 307 v1 on 12/12/2012 |

| **II. Summary** |
|---|

The Claims Administrator shall apply the Settlement as follows with respect to business economic claims of non-profit entities:

(a) Income received by non-profit entities in the form of grant monies or contributions shall typically be treated as revenue for that entity for purposes of the various required calculations under the terms of the Settlement Agreement.

(b) For those non-profit entities who are required to file income tax returns or who have in fact filed income tax returns (whether required to file or not), submission of income tax returns is required as outlined in Exhibit 4A of the Settlement Agreement.

(c) If a non-profit entity is not required by law to file an income tax return and in fact has not filed such a return, such entity may submit a Verification of Nonfiling from the IRS, together with the entity's organizational documents indicating that the entity is a Non-Profit organization, in satisfaction of the requirement to produce income tax returns as outlined in Exhibit 4A of the Settlement Agreement.

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-328 v1 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile  - EXTERNAL | |
|---|---|

| Subject | Business Economic Loss Claims: Non-Revenue Items of Entities |
|---|---|
| Active Date | 2/8/13 | Policy Impact | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| Type of Decision | | | Claims Administrator Decision |
| Settlement Agreement Reference | | | |
| Affected Claim Types and/or Review Processes | | | BEL |

| II. Summary |
|---|

The Claims Administrator interprets the Settlement Agreement such that the following items shall not typically be treated as "revenue" for purposes of the various calculations to be performed under the terms of the Settlement Agreement with regard to entities asserting BEL claims: (a) insurance proceeds, (b) interest income, and (c) gains or losses from sales of assets. In arriving at this conclusion, the Claims Administrator has in part relied upon two factors. First, such items are not typically treated as "revenue" under generally accepted accounting principles. Second, the extensive templates and testing of claims calculations jointly conducted by both Parties prior to implementation of this claims program, by agreement of the Parties, did not treat such items as "revenue" for purposes of this Settlement Agreement.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-349 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

### I. Profile  - EXTERNAL

| Subject | Benchmark Period for Claimants Passing the Local and Non-Local Customer Mix Test. | | |
|---------|---------|---|---|
| **Active Date** | 3/27/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 4B | |
| **Affected Claim Types and/or Review Processes** | | BEL | |

### II. Summary

Exhibit 4B to the Settlement Agreement prescribes the causation requirements for Business Economic Loss claims.  Claimants in Zones B, C, and D that pass the Modified V-Shaped Revenue Pattern or Decline-Only Revenue Pattern, and who do not satisfy causation requirements through another method prescribed in Exhibit 4B, must also satisfy the requirements of the "Customer Mix Test."  Exhibit 4B does not specify which Benchmark Period applies to a claimant that establishes causation by satisfying the Customer Mix Test, together with the other requirements of the Modified V-Shaped Revenue Pattern Test or the Decline-Only Revenue Pattern Test.  The Claims Administrator will apply the policy that if a claimant passes the Customer Mix Test by the comparison of local and non-local customers for a three consecutive month period in 2009 as compared to the same period in 2010, the Claims Administrator will calculate the claimant's compensation using the most favorable Benchmark Period for which the claimant satisfies the applicable Revenue Pattern test.  That Benchmark Period may, or may not, include 2009 only.

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-373 v2 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile  - EXTERNAL | |

| **Subject** | Business Economic Loss Claims: Recurring Revenue Streams |
|---|---|
| **Active Date** | 4/23/13 | **Policy Impact** | ☐ All Claims Regardless of Active Date<br>☑ All Claims Greater than Active Date |
| **Type of Decision** | | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | | |
| **Affected Claim Types and/or Review Processes** | | | BEL |
| **Superseding Information** | | | Policy 373 v2 revises Policy 373 v1 on 04/23/2013 |

| II. Summary |
|---|

All recurring revenue streams that are deemed to be within the businesses' normal course of operations should be included in the analysis.  For example, a restaurant that generates income from food service and also generates rental income by renting an apartment attached to the building.

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-459 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

| I. Profile  - EXTERNAL | | | |
|---|---|---|---|
| **Subject** | External Profit and Loss Template | | |
| **Active Date** | 9/18/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 4A | |
| **Affected Claim Types and/or Review Processes** | | BEL | |

| II. Summary |
|---|
| The Claims Administrator created an External Profit and Loss Template to be posted on the DWH Settlement website.  Business Economic Loss claimants may use this template to supplement their contemporaneous P&Ls.  See attached for instructions and the P&L template. |



*Monthly Profit and Loss Template Instructions*

1. **Introduction.**  Exhibit 4A of the Settlement Agreement requires that BEL claimants provide monthly Profit and Loss Statements (P&Ls) that establish monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011.  Policy 286 clarifies that these P&Ls must be prepared in the normal course of business or created based on contemporaneous alternate source documents.  You must provide contemporaneous P&Ls to satisfy the requirements of Exhibit 4A and this template is not a substitute for contemporaneously prepared P&Ls.

2. **Purpose of Profit and Loss Template.**  The data entered into the Profit and Loss Template does not satisfy the requirement of contemporaneous P&Ls, but serves to assist the program in analyzing your P&Ls and processing your claim in a more efficient manner.  The profit and loss data entered in the template must follow the same layout as the contemporaneous P&Ls you provided so that the order of accounts and account descriptions remain consistent between the template and the contemporaneous P&Ls.   The use of the template is optional and claimants are not required to submit this template to satisfy the documentation requirements of Exhibit 4A.

3. **How to Use the Profit and Loss Template.**  To access the Monthly Profit and Loss Template, Click Here.

   (a) **Accounting Method.**  You must choose the accounting method at the top of the template that matches the accounting method of the contemporaneous P&Ls you submitted.

   (b) **Account Descriptions.**  You must enter the Account Description for each Revenue, COGs and Expense line item in column A of the template.

   (c) **Revenue and Expense Line Items.**  You must enter Revenue, COGS and Expense line items in the sections of the template corresponding to the appropriate Account Description.  You must enter all line items in dollars and cents to the nearest penny in the corresponding month in which you recorded the item on the contemporaneous P&Ls.

   (d) **Other Losses.**  You must enter positive amounts in the "Other Income (Loss)" section for Other Income and negative amounts in the "Other Income (Loss)" section for Other Losses.

   (e) **Subtotals and Formulas.**  The template includes subtotals and formulas for reconciliation and data entry quality control purposes.  These cells are locked and cannot be edited.

   (f) **Additional Rows.**  If the number of pre-populated rows is insufficient for the complete chart of accounts, you may enter additional rows.  To insert a new row, you must left click on a row number in the appropriate section (Revenues, COGS, Expenses, Other Income, or Other Expense) to highlight the row, right click on the row number and select "Insert" from the drop-down menu.

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

4. ***Questions.*** If you have any questions about the information in this Alert, please email Questions@dhecc.com, phone the Call Center at 1-800-353-1262, or visit a Claimant Assistance Center.  Law firms should contact their Law Firm Contacts for assistance.

429492
9/18/13

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-464 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile  - EXTERNAL | | | |
|---|---|---|---|
| **Subject** | Requirement of Monthly and Annual Profit and Loss Statements | | |
| **Active Date** | 9/4/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | | Claims Administrator Decision |
| **Settlement Agreement Reference** | | | Section 4 of Exhibit 4A |
| **Affected Claim Types and/or Review Processes** | | | BEL |
| **Superseding Information** | | | Policy 464 supersedes Policy 355 on 09/04/2013<br>Policy 464 supersedes Policy 286 on 09/04/2013<br>Policy 464 supersedes Policy 232 on 09/04/2013<br>Policy 464 supersedes Policy 85 on 09/04/2013 |

| II. Summary |
|---|
| Please see the attached Final Policy memo. |

**FINAL POLICY ANNOUNCEMENT**

**POLICY 464: BUSINESS ECONOMIC LOSS CLAIMS:  REQUIREMENT OF MONTHLY AND ANNUAL PROFIT AND LOSS STATEMENTS**

I.      **Introduction.**

Section 4 of Exhibit 4A to the Settlement Agreement requires Business Economic Loss ("BEL") claimants to submit monthly and annual profit and loss statements or alternative source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011.  To apply this requirement, the Claims Administrator previously adopted several policies:

1.  **Policy 85:  *Business Economic Loss Claims: Profit and Loss Statements*.**  Addressed the requirement in Section 4 of Exhibit 4A that P&Ls "shall identify the dates on which they were created," and states that if a claimant has already submitted P&L statements that do not identify the dates on which they were created, the claimant may resubmit the P&L statements with the addition of the dates on which they were created or may provide a separate document identifying the dates on which the P&L statements were created.

2.  **Policy 232:  *Profit and Loss Statements (P&Ls).***  Addressed not requiring an annual P&L if 12 monthly P&Ls were provided, and not requiring a missing monthly P&L where 11 monthly P&Ls and an annual P&L had been provided.

3.  **Policy 286: *Creation of Monthly Profit and Loss Statements.***  Addressed the requirement to submit P&Ls as kept in the regular course of business, creating P&Ls from contemporaneous source documents or submission of alternate source documents to the Claims Administrator.  The language of this policy appeared in the 10/22/12 Alert Reminder Regarding Document Requirements for BEL Claims that was referred to in footnote 1 of the 3/5/13 memorandum to the Parties that became Policy 355 v.1, as explained below.

4.  **Policy 355 v.0:  *Alternate Source Documents for Revenues and Expenses.***  Addressed (a) monthly allocations of revenues/expenses; (b) monthly allocations of owner and officer payroll; and (c) the rule that BEL claimants were permitted to restate P&Ls from cash to accrual basis, but not from accrual to cash basis.  This policy had a lengthy history.  The Claims Administrator first announced this policy to the Parties by memorandum on 9/25/12.  The Parties' responses on 9/28/12 led to a meeting of the Administrative Panel on 10/1/12, after which the Claims Administrator re-issued the policy, along with policies on other subjects, to the Parties by memorandum on 10/8/12.  The Claims Administrator circulated on 4/2/13 an Excel Compendium of all policies that the Claims Administrator felt should be posted publicly.  This policy bore Policy ID 259 in that Compendium.  When the Claims Administrator placed this policy in the Policy Keeper software tracking application, it became Policy 355 v0 and was marked as superseded by Policy 355 v1.

1

426479

5. **Policy 355 v1:** *Business Economic Loss Claims: Documentation Requirements.* Combined Policies 286 and 355 v.0 and became the controlling policy on this subject. Included (1) a reminder of the BEL documentation requirements described in the 10/22/12 Alert (from Policy 286); (2) described the creation by claimants of P&Ls from alternate source documents; (3) stated that claimants were not merely to allocate revenues and expenses evenly over 12 months; and (4) described the Claims Administrator's review where P&Ls were not maintained by a claimant in the regular course of business. The Claims Administrator announced this policy in a 3/5/13 memorandum to the Parties and later made it Policy 355 v1 in the Policy Keeper application, marking it as superseding Policy 355 v.0.

6. **Policy 355 v.0 (c):** *Restatement of Profit and Loss Statements.*  The Claims Administrator issued this policy in a 10/8/12 memorandum to the Parties and marked it as Policy 355 v.0(c) in the Policy Keeper application.

The Claims Administrator announces this comprehensive policy regarding the treatment of P&Ls under the Settlement Agreement.  Henceforth the Claims Administrator will consider this policy to be the governing policy on this subject.  All capitalized terms used in this policy that are defined in the Settlement Agreement shall have the meanings given to them in the Settlement Agreement.

II.   **Policy Statement.**

A.   **General Requirement.**

In support of a BEL claim, Section 4 of Exhibit 4A of the Settlement Agreement Framework requires claimants to submit, for the claimed Benchmark Period, 2010 and, if applicable, 2011, either (1) monthly and annual profit and loss statements or (2) alternate source documents establishing monthly revenues and expenses.  A claim without complete monthly P&Ls and an annual P&L for an applicable period shall be considered incomplete and such claimants shall be required to provide them or explain why they cannot provide them in an explanation that the Claims Administrator considers to be reasonably reliable.  Claimants are not permitted merely to allocate revenues or expenses equally over a twelve month period.  Rather, claimants are required to submit sufficient documentation to establish actual monthly revenues and expenses as required by the Settlement Agreement.

B.   **Creation Date of P&Ls.**

The Claims Administrator will require verification of the dates on which a claimant's profit and loss statements were created.  That verification may be verbal or in writing.  The Claims Administrator may, in his discretion, request source documents for profit and loss statements.  If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.

2

C.  **Accounting Method for P&Ls:  General Rule**.

A BEL claimant is required to submit the monthly and annual profit and loss statements that were maintained in the regular course of the claimant's business, using the accounting method used in compiling such statements in the regular course of the claimant's business.

D.  **Restatement of P&Ls Using Different Accounting Method:  General Rule**.

The Claims Administrator has adopted this general rule regarding the circumstances in which a claimant submitting monthly and annual P&Ls in support of a BEL claim may restate such statements to alter the accounting method by which they were prepared in the regular course of the claimant's business:

1.  Cash to Accrual Restatement Permitted:  If the claimant's profit and loss statements for a relevant period were prepared on a cash basis, the claimant is permitted to restate such statements on an accrual basis.

2.  Accrual to Cash Restatement Not Permitted:  If the claimant's profit and loss statements for a relevant period were prepared on an accrual basis, the claimant is not permitted to restate such statements on a cash basis.

This general rule is subject to the specific provisions of the remainder of this policy.

E.  **Claimants With P&Ls Based on Different Accounting Methods**.

The Claims Administrator will observe the following guidelines in connection with P&Ls based on different accounting methods:

1.  **Claimant Submits Cash Basis P&Ls Only:**

(a) Accrual Basis Claimants:  If the available information establishes that the claimant's regular accounting method for the applicable period was accrual basis, the Claims Administrator will typically not use the cash basis P&Ls for any purpose.  The claim will typically be considered incomplete and the claimant must submit accrual basis P&Ls.

(b) Cash Basis Claimants:  If the available information establishes that the claimant's regular accounting method for the applicable period was cash basis, the Claims Administrator will typically use the cash basis P&Ls for Causation Tests (if applicable) and for the Compensation Calculation on the claim.

2.  **Claimant Submits Accrual Basis P&Ls Only:**  The Claims Administrator typically will use the accrual basis P&Ls for Causation Tests (if applicable) and for the Compensation Calculation on the claim, regardless of whether the claimant's regular accounting method for the applicable period was cash basis or accrual basis.

    **3.**   **Claimant Submits Both Cash Basis and Accrual Basis P&Ls:**

        (a)  Selection of P&Ls for Use in Review:  If the claimant submits both cash basis P&Ls and accrual basis P&Ls, the Claims Administrator typically will not use the cash basis P&Ls for any purpose.  Instead, the Claims Administrator typically will use the accrual basis P&Ls for Causation Tests (if applicable) and for the Compensation Calculation on the claim.

        (b)  No Mixing of P&Ls with Different Accounting Methods:  The Claims Administrator will not mix cash basis P&Ls for some months with accrual based P&Ls for other months for any purpose.  Instead, the Claims Administrator will use only cash basis P&Ls or accrual basis P&Ls consistently across all months of the applicable Benchmark Period and Compensation Periods.

        (c)  Same P&Ls for Causation and Compensation:  For claimants in Zones B, C or D that must establish Causation, the Claims Administrator will use the same set of P&Ls (cash or accrual, but not both) in determining the monthly revenue amounts to perform the Revenue Pattern Causation Tests and in performing the Compensation calculation.

**F.**   **Claimants That Cannot Submit P&Ls Maintained in the Regular Course of Business.**

    **1.**   **Claimants Subject to This Subsection of This Policy.**

    Subsection II.F of this policy applies to BEL claimants that: (1) did not maintain monthly and/or annual profit and loss statements in the regular course of their business, prepared at or near the time of the events recorded; or (2) did maintain such statements but after diligent efforts cannot locate or re-produce them to submit in support of a BEL claim.

    **2.**   **Duty of Claimants to Create P&Ls.**

    A claimant subject to Subsection II.F may create such monthly statements based on contemporaneous alternate source documents (which may include, but are not limited to, invoices supporting revenues, invoices or bills supporting expenses, purchase orders, bills of lading, contracts, leases, bank statements, schedules, check registers, canceled checks, sales journals, credit card statements, etc.).  To the extent that claimants are not in possession of such supporting documentation, they are encouraged to seek and obtain such documentation from relevant third parties.  If the claimant engages an accountant to create these P&Ls, such accounting expenses may be submitted for reimbursement pursuant to the terms of the Claimant Accounting Support provisions in Section 4.4.13 of the Settlement Agreement.  The Claims Administrator may allow a particular claimant to create such monthly P&Ls in "summary" form, provided the submission contains data regarding all revenue and expenses in sufficient detail to allow the Claims Administrator properly to apply the terms of the Settlement Agreement to that specific claim. The Claims Administrator reserves the right to require submission of all or parts

of the underlying source documentation to verify the accuracy of any P&Ls that are created.

### 3. <u>Claimants That Cannot Create P&Ls</u>.

If creating monthly and/or annual P&Ls would result in an undue burden to a claimant subject to Subsection II.F despite the availability of the Claimant Accounting Support reimbursement, the claimant may be allowed to submit the contemporaneous alternate source documentation to the Claims Administrator. The Claims Administrator's Accountant Reviewers will determine whether, in the Claims Administrator's discretion, it is appropriate to assist the claimant with devising P&Ls sufficient to permit the Claims Administrator to conduct the causation and compensation evaluations required on the claim. In evaluating whether creating monthly and/or annual P&Ls would result in an undue burden to the claimant, the Claims Administrator will consider the following factors:

(a) The claimants eligible for treatment under this Section II.F.3 ("Eligible Claimants") typically will be *pro se* claimants.

(b) Accounting firms, tax preparers, attorneys, consultants, and other professional services typically will not be Eligible Claimants.

(c) Eligible Claimants typically are those that report income on a Form 1040 Tax Return with a Schedule C or E that includes documentation of expenses.

(d) Eligible Claimants typically are those with annual revenues less than $50,000 in each year included in the Causation and Compensation calculations (*i.e.*, the claimed Benchmark Period, 2010, and 2011, if applicable). The Claims Administrator's Accountant Reviewers may pro-rate this dollar threshold to account for partial years.

(e) Eligible Claimants typically are those that report income on Federal tax returns that were self-prepared. Claimants with tax returns prepared by an accountant typically will not be eligible for treatment under this Section II.F.3.

(f) Eligible Claimants typically will not have presented any support documentation generated with the assistance of accounting software (*e.g.*, claimants who have submitted quarterly or annual financials generated with the use of accounting software would typically not be eligible).

(g) Eligible Claimants will be able to provide support for actual revenues. If the claimant requires "Customer Mix" data to satisfy Causation, the claimant typically will not be eligible for treatment under this Section II.F.3.

### 4. <u>Review of Claims From Claimants Subject to Subsection II.F</u>.

In the review of BEL claims submitted by claimants subject to Subsection II.F, the Claims Administrator reserves the right to determine an appropriate level of supporting and/or explanatory documentation and information for the circumstances of a given claim. It is

426479

anticipated that in such instances for those claims involving very small dollar amounts, a lesser level of detail may be required than may be required for larger or more complicated claims. The Claims Administrator's Accountant Reviewers will use their professional judgment in determining the appropriate level of detail required to resolve questions presented by a particular claim. In determining the level of detail required, the Claims Administrator may take into account such factors as the nature, size and complexity of the business and the historical patterns of revenues and expenses.

###### G.  **Gaps in Information.**

(a) If a BEL claimant has submitted 12 monthly P&Ls for an applicable period but is unable to produce an annual P&L statement, an annual P&L is not required and the claim shall not be considered incomplete for that reason. Instead, the Claims Administrator will create the annual P&L as necessary based upon the total revenues and expenses in the 12 monthly P&Ls.

(b) If a BEL claimant has submitted 11 out of 12 monthly P&Ls for an applicable period and an annual P&L for that period, the missing 12th monthly P&L is not typically required and the claim shall not be considered incomplete for that reason. Instead, the Claims Administrator will calculate the missing month's revenue and expenses as the difference between the 11-month total and the annual total for the period.

###### H.  **Fraudulent Claims.**

This policy is subject to the processes followed by the Claims Administrator to detect and deny payment on fraudulent claims.

426479

| Pol-465 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

### I. Profile  - EXTERNAL

| Subject | Defense Contractors and Subcontractors | | |
|---------|------|---|---|
| **Active Date** | 9/3/13 | **Policy Impact** | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Section 2.2.4.6 and Exhibit 18 | |
| **Affected Claim Types and/or Review Processes** | | Exclusions | |

### II. Summary

See the attached Final Policy memo.

| FINAL POLICY ANNOUNCEMENT |
|---|
| POLICY 465: EXCLUSIONS:  DEFENSE CONTRACTORS AND SUBCONTRACTORS |

I.      **Introduction.**

      Section 2.2.4.6 of the Settlement Agreement excludes "Defense Contractors/Subcontractors, including firms which derive in excess of at least 50% of their annual revenue from contracts with the United States Department of Defense and Individuals whose employer qualifies as a Defense Contractor."  Exhibit 18 to the Settlement Agreement states:

> For Defense Contractors and Real Estate Developers or Sellers, the applicability of the exclusion will be determined by the Claims Administrator based upon his review of (a) the claimant's 2010 tax return, (b) 2010 business permits or license(s), and/or (c) other evidence of the relevant business's or individual's activities necessary for the Claims Administrator to determine whether the exclusion applies.
>     . . . .
> Claims from businesses and their employees for which at least 50% of annual revenue is generated from contracts with the United States Department of Defense will be considered defense contractors.

      The Claims Administrator has followed the plain language of these provisions to date, but has encountered specific situations warranting more detailed rules of decision.  The Claims Administrator has adopted the following policy to implement the Settlement Agreement in those situations.

II.     **Policy Statement.**

    A.    **Definitions.**

        1.    **Incorporation of Settlement Agreement Definitions:**  All capitalized terms used in this policy that are defined in the Settlement Agreement shall have the meanings given to them in the Settlement Agreement.

        2.    **Annual Revenue**:  The revenue reported on the claimant's 2010 federal tax return during that claimant's 2010 fiscal year.

        3.    **DOD:**  The United States Department of Defense, as well as the Army, Navy, Air Force, and Marine Corps, and any office, department, agency, field activity, combatant command, or other organization under the authority, direction, and control of the DOD, as dictated by the "Organization of the Department of Defense (DOD)" published on the Office of the Secretary of Defense Website, http://odam.defense.gov/omp/Functions/Organizational_Portfolios/Organization_and_Functions_Guidebook.html.  The United States Army Corps of Engineers (USACE) is a division of the United States Army and this is part of the DOD.

1

The United States Coast Guard is currently and was at all times during 2010 part of the Department of Homeland Security and thus is not part of the DOD.

4. **DOD Contract:**  Any contract for which the DOD or any agency, department, or organization under its authority, direction, and control is the major agency, major funding agency, contracting agency, or program/funding agency.

5. **Excluded Defense Contractor:**  Any contractor, Prime Contractor and/or Subcontractor determined to be excluded under the terms of this policy.

6. **Entity or Entities:**  The term "Entity" and "Entities" in this policy refer to both (1) a business Entity that has submitted any claim and (2) an employer of an Individual claimant who has submitted an Individual Economic Loss claim based on a Claiming Job at that employer.

7. **Potentially Excluded Defense Contractor:**  An Entity with any of the attributes described in section II.D of this policy.

8. **Prime Contractor:**  An Entity or Natural Person named as "prime awardee" by the DOD.

9. **Revenue Analysis:**  The test required under section II.F of this policy.

10. **Subcontractor:**  An Entity or Natural Person named as "sub awardee" by the DOD.

B. **Claimants Affected by this Exclusion.**

An Entity for which at least 50% of annual revenue is generated from contracts with the DOD will be considered an Excluded Defense Contractor and may pursue only Coastal Real Property Claims or Wetlands Real Property Claims in the Program.  The Claims Administrator will deny any other Claims submitted by an Excluded Defense Contractor.  The analysis required by this policy shall be performed at the Entity level by examining the attributes of the business Entity.  If the Claims Administrator has determined that an Entity is an Excluded Defense Contractor, the employment of any employees of that Entity will be considered to be an excluded job for purposes of Individual Economic Loss claims.  Where the information available on the claim of an Individual claimant suggests that the claimant's employer may have contracts with the DOD and the Claims Administrator has not previously determined whether that employer is an Excluded Defense Contractor, the Claims Administrator will notify the claimant and determine on a case-by-case basis the appropriate measures to obtain any information and/or documents regarding the claimant's employer to permit the Claims Administrator to make the necessary analysis of the employer's operations required under this policy.

C. **Time Period for Analysis.**

Pursuant to Exhibit 18, the Claims Administrator generally will examine the revenues of the Entity in all of 2010.  The Claims Administrator may examine certain attributes of the Entity outside 2010 as necessary to determine whether the Entity's 2010 attributes relate back to DOD Contracts awarded prior to 2010.

2

429393

**D.  Identification of Potentially Excluded Defense Contractors.**

The Claims Administrator will identify any Entity with any one or more of the following attributes as subject to further analysis as a Potentially Excluded Defense Contractor:

1. **Self-Identification:**  An Entity that identified itself as a Defense Contractor on any part of its 2010 tax return, any 2010 business permits or licenses, any document submitted by the Entity or one of its employees to the Settlement Program, or on the Entity's own website or promotional materials.

2. **DOD Contracts:**  An Entity that provides documents indicating a DOD Contract, or indicating revenue received from the DOD, including descriptions of business activity performed for or on any base, air station, barracks, or other installation used or owned by the United States Army, Navy, Air Force, or Marine Corps.

3. **NAICS Codes:**   An Entity to which the Claims Administrator assigns one of the following NAICS Codes:

   (a) 332992:  Small Arms Ammunition Manufacturing
   (b) 332993:  Ammunition (except Small Arms) Manufacturing
   (c) 332994:  Small Arms Manufacturing
   (d) 332995:  Other Ordnance and Accessories Manufacturing
   (e) 336411:  Aircraft Manufacturing
   (f) 237990:  Other Heavy and Civil Engineering Construction (subject to the Moratoria Losses analysis if not an Excluded Defense Contractor)
   (g) 336611:  Ship Building and Repairing (subject to the Moratoria Losses analysis if not an Excluded Defense Contractor)
   (h) 541330:  Engineering Services (subject to the Moratoria Losses analysis if not an Excluded Defense Contractor)

4. **External Source Research:**  An Entity that received any revenue or award from a DOD Contract in 2010, as reported on one of the following websites:

   (a) www.governmentcontractswon.com
   (b) www.usaspending.gov
   (c) https://www.fpds.gov/fpdsng_cms/index.php

**E.  Compilation of 2010 DOD Contracts.**

If the Claims Administrator identifies an Entity as a Potential Defense Contractor, the Claims Administrator will compile publicly available information available on www.usaspending.gov, on all DOD Contracts awarded to the Entity from which the Entity derived revenue in 2010.  The Claims Administrator will include all DOD prime contracts and subcontracts completed by the Entity on or after January 1, 2010, or executed by the Entity on or before December 31, 2010.

**F.  <u>Revenue Analysis</u>.**

The Claims Administrator will determine the dollar amount of all revenues derived by the Entity from DOD Contracts completed or executed during 2010.  If the Claims Administrator determines that the Entity derived 50% or more of its 2010 revenue from DOD Contracts, the Entity is an Excluded Defense Contractor (but may pursue Coastal Real Property claims or Wetlands Real Property claims).  If the Claims Administrator determines that the Entity derived less than 50% of its 2010 revenue from DOD Contracts, the Entity is not an Excluded Defense Contractor and all its revenues from any source will be considered in reviewing the claim.

**G.  <u>Claimant Outreach</u>.**

The Claims Administrator may contact any affected claimant on a case-by-case basis as necessary to perform the Compilation of 2010 DOD Contracts and the Revenue Analysis to request additional supporting documentation, including but not limited to:

1. Job cost summaries or sub-ledgers detailing revenue amounts by month, by contract/revenue source, and by year for the periods corresponding to the 2010 fiscal year;

2. A listing of all executed contracts (and copies of contracts) during the periods included in the Entity's 2010 federal tax return; and

3. Invoices and cash receipt ledgers to support billings and customer collections.

429393

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-466 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

| I. Profile  - EXTERNAL | | | |
|---|---|---|---|
| **Subject** | Assignment of Expenses for Low Dollar Claims | | |
| **Active Date** | 8/14/13 | **Policy Impact** | ☑ All Claims Regardless of Active Date<br>☐ All Claims Greater than Active Date |
| **Type of Decision** | | Claims Administrator Decision | |
| **Settlement Agreement Reference** | | Exhibit 4A, Section 4 | |
| **Affected Claim Types and/or Review Processes** | | BEL | |

| II. Summary |
|---|
| Please see the attached Final Policy memo. |

<div style="border: 1px solid black; background-color: #c5d1b0; padding: 10px;">

**POLICY ANNOUNCEMENT**

**BUSINESS ECONOMIC LOSS CLAIMS: ASSIGNMENT OF EXPENSES FOR LOW
DOLLAR CLAIMS**

</div>

## I.  Introduction.

Section 4 of Exhibit 4A to the Settlement Agreement requires Business Economic Loss claimants to submit monthly and annual profit and loss statements or alternative source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011.  The Claims Administrator's accounting team has observed that many individuals who are not formally organized into business entities but who operate as sole proprietor businesses have difficulty meeting this requirement because they do not maintain profit and loss statements in the ordinary course of business.  These claimants can typically locate source documents to determine their historic monthly revenue, but they cannot determine the amount of expenses incurred in each month in the Benchmark and Compensation Periods. This proposed policy addresses how the Claims Administrator will apply the requirements of Section 4 of Exhibit 4A to this sub-set of claimants.

## II.  Policy Statement.

The following guidelines apply to Business Economic Loss claims, Start-Up Business Economic Loss claims and Failed Business Economic Loss claims (collectively, "BEL claims") with the following characteristics:

1)  The claimant reports annual income and expenses on a Form 1040 Schedule C or E for one or more years between 2007 and 2011.  The years for which the claimant files federal income taxes using a Form 1040 Schedule C or E are referred to herein as the "Applicable Year(s)."

2)  The claimant prepares monthly profit and loss statements ("P&Ls") for the Applicable Year(s) based on its books and records to support a BEL claim.

3)  The claimant's expenses are not included on the P&Ls for the Applicable Year(s) because the claimant is unable to use alternate source documents to establish monthly expenses.

4)  The claimant's annual revenue shall not exceed $250,000 for the Applicable Year(s).

For BEL claims that satisfy all of the above criteria, the Claims Administrator will typically assign the annual variable expenses reflected on the entity's Federal Tax Return for the Applicable Year(s) to months based on the percentage of annual revenue earned in those months, subject to the following general restrictions:  (a) revenue amounts must be detailed by month and supported by contemporaneous documentation; and (b) the claimants will typically be required to submit a Form 1099 to support the annual revenue for the Applicable Year(s).  Notwithstanding

the foregoing, application of the policy set forth above shall be subject to the professional judgment of the Claims Administrator's accounting team.

428913