# October 23, 2013
# Notice of Filing Exhibit II.3

SUBMITTED *IN CAMERA*
PURSUANT TO BP'S 10/9/13 LETTER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179  SECTION J |
| This document relates to all actions. | * * * * * * * * | Honorable CARL J. BARBIER  Magistrate Judge SHUSHAN |

## BP'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR ENTRY OF A PROPOSED FORM OF PRELIMINARY INJUNCTION IN COMPLIANCE WITH <u>THE FIFTH CIRCUIT'S OPINION OF OCTOBER 2, 2013</u>

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.   The Fifth Circuit Reversed The Claims Administrator's BEL Policy,
     Ordered A Preliminary Injunction, And Provided Significant Guidance To
     Frame The Remand Proceedings. ........................................................................... 3

     A.   The Fifth Circuit Held That Matching Is Required For Accrual-Basis
          Claims, And Strongly Indicated That Matching Must Apply To All
          Claims. .......................................................................................................... 3

     B.   A Preliminary Injunction Should Be Entered So That Only Claimants
          Experiencing Actual Injury *And* Injury Traceable To The Incident Can
          Recover — Properly Preserving BP's Ability To Seek That Same
          Relief On A Permanent Basis. ...................................................................... 5

II.  A Tailored Injunction Capable Of Preventing Interim Harm From All Forms
     of Legal Error Identified By The Fifth Circuit Should Be Entered. ..................... 7

     A.   Matching Problems Permeate *Both* Cash- And Accrual-Basis Business
          Claims. ........................................................................................................... 8

          1.   Multiple Current Settlement Program Policies Are Grounded
               On The Concept That Matching Is Not Required. ............................ 8

          2.   Significant Numbers Of Accrual- *And* Cash-Basis Claims
               Are Not "Properly Matched" And "Sufficiently Matched,"
               As The Fifth Circuit Held Is Required. ........................................... 10

          3.   Even Where Claimants Purport To Match Because They
               Supposedly Use Accrual Accounting, The Settlement
               Program Fails To Require Such Claimants To Submit
               Accurate Financials. ........................................................................ 13

          4.   Failing to Halt Matching Errors For All Types Of Claimants
               Risks Further Irreparable Harm Being Inflicted On BP. ............... 14

     B.   Causation Problems Independently Permeate Both Cash- And Accrual-
          Basis Claims. ............................................................................................... 15

C.      Actual-Injury Problems Permeate Both Cash- And Accrual-Basis Claims. .................................................................................................16

III.    **BP's Proposed Process For Resolving The Possible Ambiguity Found In the Settlement Agreement.** ...............................................................................**18**

IV.     **Putting An Appropriate Remand Process In Place And Then Developing A Detailed And Error-Free Substitute Policy And Accompanying Procedures In Conformity With The Principles Identified By The Fifth Circuit Will Take Time** .................................................................................................................**20**

        A.      BP's Proposed Matching And BEL Implementation Policy ..................................20

        B.      BP's Proposed Actual Injury Approach .................................................................23

        C.      The Fifth Circuit Contemplates A Deliberate Approach To Crafting A New Set Of BEL Policies And Procedures To Comply With Its Opinion. ....................................................................................................24

**CONCLUSION** .................................................................................................................**25**

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ............................................................................................ 16

*Denney v. Deutsche Bank AG,*
  443 F.3d 253 (2d Cir. 2006) ................................................................................ 16

*E*Trade Fin. Corp. v. Deutsche Bank AG,*
  74 F. App'x 119 (2d Cir. 2010) ........................................................................... 14

*Halvorson v. Auto-Owners Ins. Co.,*
  718 F.3d 773 (8th Cir. 2013) ............................................................................... 16

*H-D Mich., LLC v. Hellenic Duty Free Shops S.A.,*
  694 F.3d 827 (7th Cir. 2012) ................................................................................. 9

*In re Deepwater Horizon,*
  Nos. 13-30315, 13-30329 (5th Cir. Oct. 2, 2013) ...................................... passim

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................................................ 16

## INTRODUCTION

On October 2, 2013, the United States Court of Appeals for the Fifth Circuit decided *In re Deepwater Horizon*, Nos. 13-30315, 13-30329 (5th Cir. Oct. 2, 2013), reversing the Claims Administrator's interpretation of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement's Business Economic Loss ("BEL") Framework.  As the Fifth Circuit explained, the Claims Administrator's interpretation "is completely disconnected from any reasonable understanding of calculation of damages."  Slip op. at 23.  In contrast, the interpretation advanced by BP "seems amply supported by the language of Exhibit 4C and much more consistent with general accounting and economic norms."  *Id.* at 18.

The Fifth Circuit nonetheless remanded to the District Court to address BP's interpretation in the first instance.  It instructed this Court to "expeditiously craft" a "stay tailored so that those who experienced actual injury traceable to loss from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments until this case is fully heard and decided through the judicial process."  *Id.* at 35.

In the wake of the Fifth Circuit's ruling, there are two immediate questions for this Court: what injunction should the Court enter, and what proceedings should the Court conduct on remand?  This memorandum offers BP's answers to those two questions, while also outlining the substitute BEL Policy and accompanying procedures necessary to correct the prior misinterpretations of the BEL Framework.[1]

---

[1] In compliance with the Court's order of October 3, 2013, BP is submitting this memorandum *in camera*.  *See* Rec. Doc. 11566 at 2.  Given the importance of these proceedings to BP, the Class, and the public at large, however, BP respectfully submits that this Court's remand proceedings should be conducted in public.  *See In re Deepwater Horizon*, slip op. at 35.  BP accordingly requests that the Court issue an order docketing BP's submissions and providing that the status conference scheduled for October 11, 2013, will be held on the record in open court.

*First*, the Fifth Circuit held that proper matching of revenue and expenses is required for claims submitted using accrual-basis financials, and strongly suggested that such matching should also be required for claims submitted using cash-basis financials.  Yet under existing policies, proper matching is not required *at all* — either for cash-basis, *or* for accrual-basis financials.  The result is that claimants with no injury, or with no injury arising from the spill, receive significant payments.  BP submits that the injunction entered by this Court must be sufficient to prevent the irreparable harm to BP of unmatched claims being paid, whether those claims purport to rely on the accrual basis, the cash basis, or some idiosyncratic amalgam.

*Second*, with respect to the proceedings on remand, the Fifth Circuit indicated that BP's interpretation is reasonable as it comports with the text and purposes of the Settlement.  *See In re Deepwater Horizon*, slip op. at 18.  Indeed, it reached this conclusion and vacated the Claims Administrator's interpretation despite reviewing the "significant parol evidence" advanced by Class Counsel and relied upon by the Claims Administrator.  *Id.* at 21.  For that reason, and in compliance with the Court's order, BP has proposed policy language that complies with the Fifth Circuit's opinion.  If Class Counsel have any additional parol evidence to add, they should be permitted to present it on a schedule set by the Court (with BP having a corresponding right to respond).  But if — as BP suspects — they do not, the Court should instruct the Claims Administrator to implement policies guaranteeing sufficient matching of revenues and expenses for all claims while also ensuring that claimants that did not suffer injuries attributable to the *Deepwater Horizon* spill are ineligible for payment.  The new policy and its accompanying procedures cannot be devised and implemented immediately, but the parties and the Court can work to prepare the necessary reforms within the sixty days that the Fifth Circuit has allotted for these remand proceedings.

2

**ARGUMENT**

I.     **The Fifth Circuit Reversed The Claims Administrator's BEL Policy, Ordered A Preliminary Injunction, And Provided Significant Guidance To Frame The Remand Proceedings.**

The Fifth Circuit's decision reversed the order affirming the Claims Administrator's BEL Policy and remanded for entry of a protective injunction and for this Court and the parties to address several issues necessary to craft a BEL compensation policy compliant with the Settlement Agreement, Federal Rule of Civil Procedure 23, and Article III of the Constitution. *See In re Deepwater Horizon*, slip op. at 35-36.  The issues that must be addressed on remand to bring the Program into compliance include matching revenues and expenses using accurate data ("sufficient" and "proper" matching, *id.* at 18-21), and ensuring that claimants have experienced actual injuries traceable to the *Deepwater Horizon* incident.

A.     **The Fifth Circuit Held That Matching Is Required For Accrual-Basis Claims, And Strongly Indicated That Matching Must Apply To All Claims.**

The Fifth Circuit laid out several fundamental principles of accrual accounting.  *See In re Deepwater Horizon*, slip op. at 11-12 & n.4.  Accrual accounting "recogni[zes] revenue when the entity becomes entitled to receive payment, as opposed to the when the payment is actually received." *Id.* at 11.  "Expenses that can be readily traced to the recognized revenues are themselves recognized at the same time as those revenues." *Id.*  Indeed, "even those expenses that cannot be directly traced to certain revenues are often allocated over multiple time periods, even if the cash outlay occurs all at once." *Id.* at 11 n.4.  This correspondence of revenues and expenses "is sometimes referred to as 'matching' revenues and expenses, but in any case [] is a fundamental aspect of day-to-day record-keeping on the accrual-basis." *Id.* at 11-12.  In contrast, "[c]ash accounting can be useful for many enterprises as a method of analyzing periodic cash

3

needs, but this use is largely unrelated to the concepts of 'revenue' and 'expenses,'" *id.* at 11, which are the words in the Settlement's BEL compensation framework.

The Fifth Circuit noted that the BEL order under review might have been "holding that the cash-in, cash-out interpretation applied to all claims, including those supported by accrual accounting." *See id.* at 15. The Fifth Circuit clarified that the BEL compensation framework set forth in Exhibit 4C "cannot be said to permit ignoring sufficiently matched data from accrual-basis claimants." *Id.*

For claims using cash-basis accounting or other methods that necessarily do not include matching, the Fifth Circuit ultimately held that "Exhibit 4C is ambiguous as to whether claims that are not based on matched revenues and expenditures are to be matched for Exhibit 4C purposes." *See id.* at 23. The Fifth Circuit remanded to this Court to develop the factual record, including "whether, before the agreement was signed, the parties discussed the divergent effects of cash- and accrual-basis accounting records on the Exhibit 4C formula." *Id.* at 23-24.

The Fifth Circuit opined that several interpretive principles weigh powerfully in BP's favor with respect to the interpretation of Exhibit 4C. Exhibit 4C's language "reasonably could be interpreted to mean that the expenses to be subtracted must be those that 'correspond' to the revenue earned and that the 'same time period' refers to the Benchmark period on the one hand, and to the Compensation period on the other, whichever is being calculated." *Id.* at 18. Indeed, such "an interpretation seems amply supported by the language of Exhibit 4C and much more consistent with general accounting and economic norms." *Id.* This interpretation also is supported by the Settlement's requiring "'sufficiently-matched' revenue and expenses from accrual-basis claimants." *Id.* Moreover, because "cash accounting does not inherently recognize relationships between cash flows and their underlying transactions, the term 'corresponding

4

variable expenses' reasonably could imply an accrual-style framework inherent in Exhibit 4C." *Id.* at 19-20.

In contrast, the Fifth Circuit expressed serious doubt about the reasonableness of interpreting Exhibit 4C as not requiring matching for all claims. That "doubt is particularly strong due to the fact that only matching provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for real losses." *Id.* at 21. "[S]ubtracting temporally-related revenues and expenses recorded by cash-basis claimants would not result in numbers that could fairly be said to represent actual economic losses or lost 'variable profits.'" *Id.* at 17. Indeed, such an interpretation would lead to some claimants being compensated for lost variable profits while others would be compensated for negative cash flows "based solely on how claimants maintained their financial records," a result "difficult to understand." *Id.* A "claimant's idiosyncratically-maintained records" cannot "dictate the way Exhibit 4C is applied to a claim, especially if Exhibit 4C is supposed to be an objective formula." *Id.* at 21. Finally, the Fifth Circuit cautioned that after "all the other arguments are considered, it remains of significance that the interpretation urged by the Administrator is completely disconnected from any reasonable understanding of calculation of damages." *Id.* at 23.

### B. A Preliminary Injunction Should Be Entered So That Only Claimants Experiencing Actual Injury *And* Injury Traceable To The Incident Can Recover — Properly Preserving BP's Ability To Seek That Same Relief On A Permanent Basis.

Part III of the opinion, which was adopted by a majority of the panel, requires this Court to enter a preliminary injunction limiting payment to "those who experienced [1] ***actual injury*** [2] ***traceable to loss from the Deepwater Horizon accident***." *In re Deepwater Horizon*, slip op. at 35 (emphasis added); *see also id.* at 37 (Southwick, J., concurring) (agreeing that injunction

should be entered "as stated in Part III" of the majority opinion).  Part III of the opinion is clear as to the fundamental parameters of the preliminary injunction the Fifth Circuit ordered.

An injunction of that scope will preserve the Court's ability to order such relief on a permanent basis.  Indeed, Part II of the opinion written by Judge Clement explained her view that "BEL claimants who admittedly either have suffered no loss at all or have suffered losses that were not caused by the oil spill … would have no colorable legal claim."  *Id.* at 25.  Such claimants lack standing.  Significantly, a class "must therefore be defined in such a way that anyone within it would have standing," meaning that the class must be defined so that all class members have colorable legal claims.  *Id.* at 27-28 (internal quotation omitted).  Even if a defendant attempted to achieve "global peace" by allowing claimants without standing to recover from the settlement (which BP did not agree to allow), such a motive could not remedy the class certification problem.  *Id.* at 30-31.  Applying these principles to the Settlement, Judge Clement found that the Settlement must be interpreted so as to exclude those without colorable claims:

> Turning to the present case, the district court had no authority to approve the settlement of a class that included members that had not sustained losses at all, or had sustained losses unrelated to the oil spill, as BP alleges.  If the Administrator is interpreting the Settlement to include such claimants, the Settlement is unlawful.  Should BP's proposed interpretation of the Settlement exclude putative class members with no colorable legal claim, the district court should have rendered the Settlement lawful by adopting that interpretation, as long as the interpretation is reasonable and effective.

*Id.* at 31.  Judge Clement emphasized that interpreting the Settlement to include "businesses without colorable legal claims . . . could imperil a final approval of the settlement and can be considered in evaluating the correct interpretation of possible ambiguities."  *Id.* at 33.

Judge Southwick explained that this portion of Judge Clement's opinion "is logical in finding that constitutional infirmities would exist if certain corrections are not made to the

6

interpretation of Exhibit 4C."  *Id.* at 37 (Southwick, J., concurring).  Judge Southwick divided his concurrence into a discussion of (1) loss measurement, meaning proof of "properly" computed "economic loss"; and (2) loss causation, meaning weeding out those who have suffered losses that were not caused by the oil spill.  *Id.* at 37-38.  He agreed with Judge Clement that including claimants who had no losses at all would raise serious Rule 23 concerns.  "[I]f the methods of computing losses do not, at least for a large number of claimants, determine in any reasonable fashion whether a financial loss actually occurred, there are significant Rule 23 problems in the incoherence of the calculation method. … [T]o allow the means of showing loss to become disconnected from economic realities threatens to distort entry into the class and is a defect under Rule 23."  *Id.* at 39.  Thus, both Judges Clement and Southwick agreed that allowing persons with no losses into the class would jeopardize certification under Rule 23.[2]

## II.   A Tailored Injunction Capable Of Preventing Interim Harm From All Forms of Legal Error Identified By The Fifth Circuit Should Be Entered.

The Fifth Circuit directed this Court to determine, *inter alia*, whether the Claims Administrator and Settlement Program were matching revenues and expenses properly and sufficiently.  *See id.* at 16-24.  Unfortunately, the Settlement Program does not in fact do so for many claimants, and instead accepts whatever financial records are tendered by a claimant without performing or requiring sufficient matching even as to claimants purporting to use accrual accounting.  Additionally, the Court also remanded for consideration of the issue of

---

[2] As for causation, Judge Southwick stated that this issue had not been briefed and he therefore declined to address it on the merits at this stage of the appeal.  *See In re Deepwater Horizon*, slip op. at 37, 39.  Instead, Judge Southwick "would only have identified the relevant principles and authorities, then remanded for such consideration as the parties and the district court bring to ***the issue of causation*** as they address the measurement of loss."  *Id.* at 39-40 (emphasis added).  Therefore, Judges Clement and Southwick both held that this Court and the parties must consider the impact on class certification of including persons without losses caused by the *Deepwater Horizon* Incident in the class when framing a policy for compensating BEL claims.  This is an undeniable part of the issues remanded by the majority.

causation in light of its potential impacts on the ability of the Settlement to secure final approval. *See id.* at 33; *see also id.* at 37-40 (Southwick, J., concurring).

As described below, there are four overarching problems with the Program as it currently operates. **First**, the Settlement Program's formal policies do not require matching, a problem that includes but certainly is not limited to the BEL policy itself. *See infra* Section II.A.1. **Second**, in reliance upon those policies, the Settlement Program has not required matching, either for cash-basis or accrual basis claims. *See infra* Section II.A.2. **Third**, even where claimants purport to match or engage in accrual accounting, the Program uses flawed revenue and expense data for purposes of both loss calculations under Exhibit 4C and the causation tests under Exhibit 4B. *See infra* Section II.A.3. **Fourth**, the Program is improperly (and in a fashion that threatens the viability of the entire Settlement) paying the claims of those who have no actual losses or who have no losses caused by the spill. *See infra* Section II.B.-C.

### A. Matching Problems Permeate *Both* Cash- And Accrual-Basis Business Claims.

The Claims Administrator's defective notion that matching is not required permeates all aspects of the Settlement Program. For that reason, BP submits that the injunction issued by the Court must stop payment of *all* BEL claims that are affected by the Settlement Program's failure to match. The proposed form of injunction BP is filing in compliance with this Court's Order of October 3, 2013, *see* Rec. Doc. 11566, is designed to comply with the Fifth Circuit's instructions in Part III of its opinion.

### 1. Multiple Current Settlement Program Policies Are Grounded On The Concept That Matching Is Not Required.

Any injunction adequate to meet the Fifth Circuit's standards must encompass every Settlement Program policy or procedure erroneously premised on the view that matching

8

revenues and expenses was unnecessary.  This defective view manifests itself in a variety of settings, and locating and correcting all of them will require an injunction that is not underinclusive by being directed solely at the January 15, 2013 Policy Decisions.  After all, "tailored" does not mean "tiny" — the pervasiveness of the Program's erroneous no-matching premise requires a correspondingly protective injunction.  *See, e.g.*, *In re Deepwater Horizon*, slip op. at 35 (stay should be tailored so that those who did not "experience[] actual injury traceable to loss from the Deepwater Horizon accident . . . do not receive their payments"); *see also H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 843 (7th Cir. 2012) ("[T]he injunction must also be broad enough to be effective.").

The Claims Administrator contends that one of the key BEL policies does not need reconsideration and is already compliant with the Fifth Circuit's remand, but in reality Policy 464 plainly requires reconsideration.  *See* Decl. of Patrick A. Juneau, Rec. Doc. 11566 (Oct. 3, 2013).  Policy 464 concerns the Settlement Program's treatment of monthly and annual Profit and Loss ("P&L") statements, which could reflect either (or both) cash- and accrual-basis accounting.  As the Fifth Circuit observed, accrual-basis accounting lends itself to the type of matching that is necessary to apply the terms of the Settlement Agreement.  In fact, the Fifth Circuit expressed its expectation that the Program would never convert accrual-basis P&L statements to cash-basis, thereby "ignoring already-matched revenues and expenses."  *In re Deepwater Horizon*, slip op. at 15.  Yet, Policy 464 states only that "the Claims Administrator **typically** will use the accrual-basis P&Ls."  Policy 464 (emphasis added).  An exception appears available, *inter alia*, when a claimant has submitted both cash-basis and accrual-basis P&Ls; in that case, "the Claims Administrator will use only cash basis P&Ls or accrual basis P&Ls consistently across all months . . . ."  *Id.* at 4.  This policy does not commit the Claims

9

Administrator to using available accrual-basis financials.  This policy needs revision to remove any possibility of disregarding properly matched accrual-basis accounting.

In addition, notwithstanding the Claims Administrator's specific assertion that the Settlement Program always processes the accrual-basis financials submitted by claimants, *see* Rec. Doc. 11566 at 3, many claimants have elected to submit both accrual- *and* cash-basis statements.  Of 35 such cases, the Settlement Program in 17 cases computed the compensation determination using the cash-basis statements.  *See* Brents Decl. (Ex. C) ¶ 6.

Other examples abound.  As Gaspardo explains, "[t]here are over 100 CSSP policies relating to BEL implementation," and "all BEL-related policies should be reviewed during the remand process for compliance with the Fifth Circuit's opinion."  Gaspardo Decl. (Ex. D) ¶ 24; *see also* Gaspardo Decl. (Ex. D) Ex. C (identifying a non-exhaustive list of twelve specific Settlement Program policies that require reevaluation).   While those examples are not exhaustive, they illustrate the variety of contexts in which the premise that matching is not required by the Agreement has woven itself into the fabric of the Program.

### 2. Significant Numbers Of Accrual- *And* Cash-Basis Claims Are Not "Properly Matched" And "Sufficiently Matched," As The Fifth Circuit Held Is Required.

In reliance on its flawed policies, the Settlement Program is not engaging in matching — the only method that "provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for real losses."  *In re Deepwater Horizon*, slip op. at 21. Critically, "even where BEL claimants purport to follow accrual basis accounting, and where the claimant's annual P&Ls are accurately prepared on the accrual basis, the monthly P&Ls will frequently be inaccurate and unreliable."  Gaspardo Decl. (Ex. D) ¶ 8.

Expert economist Hal Sider analyzed a significant sample of profit and loss data "submitted by BEL claimants and compiled by the CSSP in the ordinary course of its review of BEL claims." Sider Decl. (Ex. E) ¶ 4. His analysis confirms that matching problems "are not limited to claimants that rely on cash basis P&L data." *Id.* ¶ 9. Specifically, Sider used seven metrics to identify "identify claims for which monthly revenue is unlikely to be matched to corresponding variable expenses." *Id.* ¶ 11. Those include (1) claims with monthly revenue spikes (56% of BEL offers);[3] (2) claims with monthly variable expense spikes (69% of BEL offers); (3) claims with wide month-to-month swings in variable profit margin ("share spike") (65% of BEL offers); (4) claims with negative revenue items reported in monthly financial data (6% of BEL offers); (5) claims with months with negative variable expenses (45% of BEL offers); (6) claims with months with negative variable profit (60% of BEL offers); and (7) claims with bad debt expenses clustered in a single month (20% of BEL offers). *Id.* Overall, 94% of claims meet at least one of these metrics. *Id.* ¶ 12.

The accrual-basis label is no panacea. *See* Gaspardo Decl. (Ex. D) ¶ 8 ("In short, the label 'accrual basis' on a P&L submitted by a BEL claimant in and of itself does not mean the P&L is 'accurate and reliable' or 'sufficiently matched' as the Fifth Circuit confirmed is required . . . ."). In fact, the accrual claims appear to suffer matching problems at least as frequently as the sample as a whole. From a random sample of 500 BEL claims, Sider concluded that 56% of accrual claimants satisfied the revenue spike criterion, compared to 55% for the full BEL sample; 64% of accrual claimants satisfied the variable cost criterion, compared to 66% for the full sample; 70% satisfied the share spike criterion, compared to 66% for the full BEL sample;

---

[3] "Where accrual basis P&Ls are consistently and accurately prepared, in many cases "margins" (the profit from each dollar of revenue) tend to remain relatively consistent over time. This makes sense as most businesses operate similarly from month-to-month, and generally show consistent operating results and profits from those operations. Gaspardo Decl. (Ex. D) ¶ 9.

10% of accrual claimants satisfied the negative revenue criterion, compared to 8% for the full sample; 70% of accrual claimants satisfied the negative variable cost criterion, compared to 68% for the full sample; 75% of accrual claimants satisfied the negative variable profit criterion, compared to 67% for the full sample; and 48% of accrual claimants satisfied the bad debt criterion, compared to 35% for the full sample.  *See* Sider Decl. (Ex. E) ¶ 32 & tbl. 5.

A further problem arises from the practice of many business claimants of idiosyncratically blending cash and accrual methods.  As Gaspardo explained, "[i]nconsistently or idiosyncratically applied accrual-basis principles either on a temporal (month-to-month) or account-by-account basis create mismatching distortions similar to cash basis statements." Gaspardo Decl. (Ex. D) ¶ 10.  For example, records purporting to employ the accrual basis nevertheless "will not reflect cost of inventory sold, will not contain proper accruals for payroll bonuses, will not update estimates, will contain cut-off errors, will maintain certain accounts on the cash basis, or will include other inaccuracies where accrual principles are not followed on a monthly basis." *Id.* ¶ 12.

Notwithstanding the fact that ostensible accrual records are often not properly matched, claimants have suggested in the wake of the Fifth Circuit opinion that as long as they submit accounting records that they say were kept on an accrual basis, no further analysis by the Settlement Program is necessary.  *See, e.g.*, Final Proposal Regarding Claim No. XXXX21 ("This argument is without merit because [claimant] utilizes the accrual method of accounting, and thus sufficiently 'matches' revenue and expenses as a matter of its ordinary record-keeping.").  This position represents a gross misreading of the Fifth Circuit's opinion.  The Fifth Circuit did not craft a safe harbor or transform the purported use of accrual accounting into a talisman that would exempt claimants from true matching — particularly where the financial

records presented are not accurately maintained using the accrual method.  To the contrary, the Court recognized only that "***properly-matched*** accrual-basis claims should not be disturbed."  *In re Deepwater Horizon*, slip. op. at 21 (emphasis added); *see also id.* at 19.  Accrual claims that do not reflect properly-matched/sufficiently-matched revenue and corresponding variable expenses must be scrutinized and corrected to ensure accurate matching.

> ### 3.   Even Where Claimants Purport To Match Because They Supposedly Use Accrual Accounting, The Settlement Program Fails To Require Such Claimants To Submit Accurate Financials.

Nor is it accurate to describe the problem as simply matching *vel non*.  The Fifth Circuit held that "a claimant's idiosyncratically-maintained records" should not "dictate the way Exhibit 4C is applied to a claim, especially if Exhibit 4C is supposed to be an objective formula."  *In re Deepwater Horizon*, slip. op. at 21.  As BP has explained, an equally serious problem is the submission and continued processing of ***knowingly incorrect financial data***.

One example of incorrect data involves financials that are corrected in the year-end "true ups" common in certain industries.  *See, e.g.*, Hall Supp. Decl. (Rec. Doc. 8963-41) ¶¶ 10-13 (example of a construction firm that corrects its inaccurate monthly revenue data only at the end of the year); *see also* Alexander Decl. (Rec. Doc. 8963-36) ¶¶ 14-16; Sider Decl. (Rec. Doc. 8963-46) ¶ 40; *see also* Gaspardo Decl. (Ex. D) ¶ 14.   For these businesses, the Claims Administrator's interpretation miscalculates lost profits because adjustments made at year end — or any other time of the year — mean that figures for both the month of the adjustment and for the months being corrected will be inaccurate.  *Id.*  Program accountants have flagged errors caused by year-end "true ups," and yet claims awards have ultimately been made without correction.  *See* Gaspardo Decl. (Ex. D) ¶ 18.  As BP established in the Fifth Circuit, failure to use the "foundational" method of matching, which is necessary to "provide[] a realistic chance of

13

. . . compensating claimants for real losses" inevitably leads to a process of garbage-in/garbage-out.  *In re Deepwater Horizon*, slip op. at 21, 24; *see also* BP 5th Cir. Merits Br. at 25 (citing *E\*Trade Fin. Corp. v. Deutsche Bank AG*, 374 F. App'x 119, 121 (2d Cir. 2010)).

A related problem is that a "P&Ls . . . created for purposes of submitting a BEL claim present[] an additional risk of intentional use of mismatched monthly revenue and variable expenses to obtain a BEL award under the Settlement."   Alexander Decl. (Ex. B) ¶ 15. "Although this presents significant concerns that the documentation may be either inaccurate or drafted specifically for purposes of the claim — which raises serious fraud risks — the CSSP fails even to follow up on this issue to request additional information approximately 85% of the time."  *Id.*; *see also id.* ("Most of the time (96%) P&Ls are submitted by BEL claimants with no date (47% of the time) or a non-contemporaneous date (49% of the time).").  Moreover, in more than 60% of the claims that Alexander reviewed, "there is a discrepancy between the annual revenue and net income amounts reported in P&Ls submitted by the claimant and the claimant's tax returns."  *Id.* ¶ 16.  "These differences are indicative of misapplication of claimants' bases of accounting, the use of different accounting bases for the preparation of the claim and/or other errors. However, the CSSP does not request additional information to reconcile these significant discrepancies 34% of the time, posing a significant risk of inaccurate submissions and potential fraudulent activity."  *Id.*

### 4.   Failing to Halt Matching Errors For All Types Of Claimants Risks Further Irreparable Harm Being Inflicted On BP.

These proceedings involve the "potential loss to [BP] and its public shareholders of hundreds of millions of dollars of unrecoverable awards."  *In re Deepwater Horizon*, slip. op. at 35.   And indeed, between the beginning of March and the end of September 2013, "the

cumulative number of BEL offers made by the CSSP increased by more than 150% — from 4,801 on March 3, 2013 to 12,327 on September 29, 2013." Sider Decl. (Ex. E) ¶ 7. The injunction should appropriately reflect the risk of serious irreparable harm to BP.

**B.      Causation Problems Independently Permeate Both Cash- And Accrual-Basis Claims.**

As described above, the Fifth Circuit's opinion recognizes that the payment of awards to claimants who have not suffered injuries causally related to the spill raises serious questions under both Rule 23 and Article III. *See supra* Section I.B; *see also In re Deepwater Horizon*, slip op. at 35 (payment should be limited "those who experienced [1] *actual injury* [2] *traceable to loss from the Deepwater Horizon accident*") (emphasis added). Moreover, the Claims Form that is submitted by Business Economic Loss claimants describes how to make a claim "for damages arising from the Deepwater Horizon Incident on April 20, 2010." *Deepwater Horizon* Economic and Property Settlement Business Economic Loss Claim Form (Purple Form) at 1, *available* at http://www.deepwaterhorizoneconomicsettlement.com/docs/claim/Business_ Economic_Loss_Claim_Form.pdf, and the form further requires the claimant to certify that all information submitted on the claim form is true and accurate. *See id.* at 9.

Many claimants have asserted losses with no apparent connection relation to the oil spill. For example:

- Claim No. XXXX02: Claimant is a Zone D excavating company located in Alabama. The Settlement Program awarded Claimant $2,798,893 pre-RTP ($3,502,760 post-RTP). Claimant sold substantially all of its assets in August 2009.

- Claim No. XXXX60: Claimant is a Zone D attorney located in Northern Louisiana. The Settlement Program awarded Claimant $136,066.86 pre-RTP ($172,252.58 post-RTP). Because Claimant's business license was revoked on November 21, 2009 and was not reinstated until September 11, 2012, Claimant only recorded approximately $3,000 in revenue during the entirety of 2010 and 2011.

*See* Gaspardo Decl. (Ex. D) Ex. B ¶¶ 8, 9.

Indeed, Sider's analysis demonstrates that "fully 59% of BEL claimants that gained eligibility through the V-test would have failed this test had it been applied based on aggregate May-December revenue."  Sider Decl. (Ex. E) ¶ 27.  Such a finding "raises concerns . . . and warrants a careful review of the monthly revenue data to ensure that eligibility is not due solely to errors in reported monthly revenue."  *Id.*  Moreover, 39% of claimants "narrowly passed" the V-test, implying that "the monthly revenue data that are the basis of claimant's eligibility must be carefully reviewed to ensure that a favorable eligibility determination is not due to errors in reported monthly revenue alone."  *Id.* ¶ 29.  Accordingly, it is necessary to develop procedures to identify claims suspected to have no causal connection to the spill.  *See* Ex. F at 5-7.

### C.     Actual-Injury Problems Permeate Both Cash- And Accrual-Basis Claims.

Rule 23 "must be interpreted in keeping with Article III constraints."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).  Consistent with this principle, courts have regularly held that "for a class to be certified, each member must have standing and show an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision."  *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013); *accord Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("[N]o class may be certified that contains members lacking Article III standing.").  And it is of course black-letter law that a plaintiff cannot have standing absent an ***injury in fact*** that is causally connected to the defendant's conduct and redressable by a favorable court decision.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  It is for that reason that the Fifth Circuit has instructed this Court to enter a "stay tailored so that those who experienced ***actual injury traceable to loss from the Deepwater***

16

*Horizon accident* continue to receive recovery but those who did not do not receive their payments."  *In re Deepwater Horizon*, slip op. at 35 (emphasis added).

In light of these legal principles, the Settlement Program must reform its policies so that claimants who have suffered no injury do not receive payments.  Yet under current policies, "matching problems . . . result in BEL offers being extended to large numbers of claimants that suffered no loss in variable profit"  Sider Decl. (Ex. E) ¶ 35.  "Evaluation of a claimant's losses in variable profits over longer periods reduces the potential influence of errors in measurement of monthly revenue and corresponding variable expenses."  *Id.* ¶ 14.  "Where BEL claimants appear not to have suffered reductions in variable profits measured over longer periods but nonetheless obtain compensation under the CSSP's application of the BEL framework, the CSSP award likely is the result of errors in matching monthly revenue to the corresponding variable expenses."  *Id.*  The results indicate that "31% of claimants receiving BEL offers did not experience a loss in variable profit measured over the May-December or January-December periods in 2010 relative to the same months in the Benchmark Period." *Id.* ¶ 16.

Another method for identifying claims that were unlikely to have suffered any losses is to ask whether they participated in the Gulf Coast Claims Facility ("GCCF") process, which did not require a release to receive an emergency or interim payment.  *See* Sider Decl. (Ex. E) ¶ 23. Remarkably, approximately *85%* of BEL offers since March have been made to businesses that did not participate in the GCCF.  *Id.*  Had these businesses believed that they suffered actual losses, it is unclear why they would not have participated because no release was required and thus their participation to obtain emergency or interim GCCF payments had no downside.

Finally, actual awards confirm what the statistics reveal.  For example:

- <u>Claim No. XXX76</u>:  Claimant is a cotton, corn, soybean and wheat farm located more than 300 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant more than $550,000, even though Claimant's 2010 variable profit before payroll exceeded its variable profit from the three preceding years by more than 42%.

- <u>Claim No. XX18</u>:  Claimant is a highway paving contractor located hundreds of miles from the Gulf of Mexico.  The Settlement Program awarded the claimant $7.7 million in pre-RTP compensation ($9.6 million post-RTP), notwithstanding that 2010 was the Company's best year on record (gross profits were $1.3 million greater than any other year).  This award implies that, in the absence of the Spill, Claimant's 2010 profit margin would have doubled over its actual record 2010.

Gaspardo Decl. (Ex. D) ¶¶ 23, 25.

### III.    BP's Proposed Process For Resolving The Possible Ambiguity Found In the Settlement Agreement.

The Fifth Circuit rejected Class Counsel's position that the Settlement Agreement does not require matching, notwithstanding the "significant parol evidence" that Class Counsel cited in support of its position.  *See In re Deepwater Horizon*, slip op. at 21.  Hence, it would be improper to revisit that parol evidence; its insufficiency is law of the case because the Fifth Circuit already has considered and rejected it.  The Fifth Circuit nonetheless held that "Exhibit 4C is ambiguous as to whether claims that are not based on matched revenues and expenditures are to be matched for Exhibit 4C purposes."  *Id.* at 23.  Rather than resolve this ambiguity immediately, the Fifth Circuit "remand[ed] to the district court to develop a more complete factual record regarding the meaning of Exhibit 4C or other relevant parts of the agreement and make relevant findings."  *Id.* at 23-24.

BP submits that the remand proceedings should have three objectives:  (1) to determine whether Class Counsel relies on any parol evidence other than that already considered and rejected by the Fifth Circuit and/or to receive BP's parol evidence, as necessary; (2) to devise a solution to the problem of fictitious claims and inflated losses; and (3) to determine what policy

and documentary changes are necessary to solve the "causation" problems identified by the Fifth Circuit.

To develop a record that will achieve these objectives and enable this Court to make the findings contemplated by the Fifth Circuit, BP proposes the following schedule and proceedings:

*First*, if Class Counsel still contend that the parties agreed that matching principles do not apply to cash-basis claims, Class Counsel shall submit within fourteen days a brief and all additional evidence on which Class Counsel rely to support this contention. This submission should not rehash arguments and evidence that the Fifth Circuit already has considered and found insufficient. If Class Counsel have no evidence to add, their submission should focus on their proposals to ensure that matching principles are properly applied. BP would then have fourteen days to respond to Class Counsel's submission with its proposals and, if necessary, supporting parol evidence.

*Second*, following the exchange of these written submissions, the parties should have a ten-day period, or longer if appropriate, to meet and confer with Special Master Freeh to determine whether agreement can be reached to resolve the issues raised in the respective submissions.

*Third* and finally, if the parties cannot reach agreement on the issues raised by these submissions, the Court would hold an evidentiary hearing to resolve these issues and make the findings contemplated by the Fifth Circuit. In advance of the hearing, the parties would identify any witnesses they intend to call and evidence they intend to present.

IV.     **Putting An Appropriate Remand Process In Place And Then Developing A Detailed And Error-Free Substitute Policy And Accompanying Procedures In Conformity With The Principles Identified By The Fifth Circuit Will Take Time.**

In this final section, BP describes in broad strokes the new policy that it submits the Settlement Program should enter as a result of the Fifth Circuit's remand.  Nonetheless, it will take time to (1) put the right remand process in place and exchange the party submissions described in Section III above; and (2) fully develop substitute Program procedures, including correcting and/or modifying existing Program policies that are based upon the assumption that matching is not required.  Thus, the preliminary injunction must remain in place long enough to prevent the payment of illegitimate or suspect claims while that important work is completed.

A.     **BP's Proposed Matching And BEL Implementation Policy**

BP's draft policy (Ex. F) is based upon the Fifth Circuit's BEL Ruling, which confirms BP's prior submissions in this Court.  It sets forth the overall conceptual framework that must be used in developing new procedures for the proper handling of BEL claims.[4]

*General Framework For BEL Claims*.  The "goal of the settlement" is to "compensat[e] claimants for real losses" resulting from the Deepwater Horizon incident.  *See* Ex. F at 1 (quoting *In re Deepwater Horizon*, slip op. at 21).   Furthermore, an "accrual-style framework" is necessary to "determin[e] actual economic losses," because cash-basis accounting does "not result in numbers that could fairly be said to represent actual economic losses or lost 'variable profits.'" *See id.* (quoting *In re Deepwater Horizon*, slip op. at 17, 19-21).

The "requirement of matching is foundational for accrual-basis claims," and "only matching provides a realistic chance of achieving the ostensible goal of the settlement of

---

[4]  In addition, because other economic loss frameworks, including but not limited to the Multi-facility, Start-Up and Failed Business Frameworks, require both accurate determination of monthly revenue and corresponding variable expense and actual injury caused by the spill, the principles in BP's proposed policy are fully applicable to those types of claims as well.

compensating claimants for real losses." *See id.* (quoting *In re Deepwater Horizon*, slip op. at 21, 24).    Accordingly, regardless of the accounting method used by a claimant, the Settlement Program must calculate all BEL awards pursuant to a "properly-matched accrual-basis" approach, because only "properly matched claims lead to fair and proper results."   *See id.* (quoting *In re Deepwater Horizon*, slip op at 20-21).

*Step One Compensation*.  Determination of the Step One Compensation amount is based on Exhibit 4C.    For computation of Variable Profit, under Exhibit 4C, the claims shall be processed by following the two-step calculation described on page 2 of Exhibit 4C:

1. Sum the monthly revenue over the period.

2. Subtract the corresponding variable expenses from revenue over the same period.

This two-step process requires the use of matching principles as stated above.  *See id.* at 2.

*Revenue Recognition*.  The revenue to be recognized in each month in the Benchmark and Compensation Periods shall be based on accrual-style revenue recognition rules and principles to be applied to the BEL claimant's financial records based on the nature of the business and the industry in which it operates.    *See id.*

*Corresponding Variable Expenses*.  The Claims Administrator must review each BEL claim to ensure that expenses that relate to the revenue properly recognized in each month according to the foregoing principles are properly matched.  Only the variable expenses that relate to the revenue properly recognized in a particular month shall be used for purposes of calculating Variable Profit. *See id.* at 2-3.

*Cash Basis Accounting Must Be Adjusted*.  Claimants using cash accounting must be evaluated using accrual and matching concepts.  Otherwise, the resulting calculation would lack

"economic []coherence."  *See id.* at 3 (quoting *In re Deepwater Horizon*, slip op. at 17).  The adjustments shall be made by the Settlement Program's accountants.

*Matching Must Be Proper*.  The Claims Administrator must also take appropriate steps to ensure that the financial data submitted by the claimant are accurate and properly matched.  It would be inappropriate to treat accrual-basis claimants as if they were cash-basis claimants.  *See id.* at 3-4.  This could occur, for example, if the Settlement Program were processing claims based on simply what was recorded in the financial records in certain months, without giving appropriate consideration to other data indicating that proper matching was not fully reflected in the monthly financial statements. *See id.*  Again, the Settlement Program accountants shall be responsible for ensuring that proper matching takes place.

*Error And Fraud Controls*.  The Claims Administrator must develop new controls and procedures or modify existing controls and procedures designed to provide reasonable assurance that significant errors, irregularities, or fraud do not occur and remain undetected prior to determining and paying BEL claims.  *See id.* at 4.

*Causation Requirements*.  Claimants that have not suffered injury caused by the oil spill are not class members and lack standing to maintain a legal claim against BP.  *See id.* at 5.  The Claims Administrator must develop rules and procedures to identify BEL claims from claimants who are not proper class members or are otherwise not entitled to payment.  If there are any objective facts in the claimant file or available from other reliable sources which indicate that in whole or in part the claimant did not suffer any spill-related loss, then the claimant is not a class member and such damages are not compensable under the settlement.  Detailed programs shall be developed to assure adequate investigation and identification of such facts.  BP has proposed certain objective indicators that, if triggered, should cause the Claims Administrator to engage in

appropriate review and investigation to assure that a claimant's injuries not traceable to the Deepwater Horizon accident are excluded. *See id.* at 6.

> ***Application Of Exhibit 4B V-Test***.   The Claims Administrator must develop new procedures to ensure that the causation tests under Exhibit 4B are applied using the revenue that is determined as a result of the policy and procedures proposed by BP.   The new procedures would require a subsequent review and consideration of causation after monthly revenue is finally identified as part of the BEL claims review process.  *See id.*

> ***Prior Policies***.  All prior Policies related to the determination of causation for BEL claimants are withdrawn.   All prior BEL claims-related policies or procedures are vacated until further notice.   The Claims Administrator shall review and evaluate each existing BEL claims policy and, in consultation with the parties, revise and update those policies.  *See id.* at 6.

> ***Claimant Communications and Claims Form***.   The Claims Administrator shall develop rules and procedures to deter BEL claims from claimants who are not proper class members or are otherwise not entitled to payment, including a modified Claims Form.  *See id.* Attach. 1 (BP's Proposed Claims Forms).

## B.  BP's Proposed Actual Injury Approach

The Fifth Circuit's opinion and the Article III principles discussed in Section II.C compel a simple and obvious conclusion:  if payments are not limited to those who have suffered an actual injury sufficient to give them standing, the class settlement will fail and thus harm valid class members who, by deciding not to opt out, had clearly decided that their opportunities to try to recover under the Settlement were superior to their litigation options.   Nevertheless, as BP has observed, the Settlement Program has frequently granted awards to claimants whose own submissions make plain (or even admit) that they have not suffered any injury.   For example:

- <u>Claim No. XXX65</u>:  Claimant is a Zone D nursing home facility in Central Louisiana.  The Settlement Program awarded the Claimant $522,083 in pre-RTP lost profits ($662,834 post-RTP). Almost a full year before the Deepwater Horizon Incident, Claimant shut down its facility and transferred its license to operate the business.

- <u>Claim No. XXX15</u>:  Claimant is a Zone D family medical practice clinic located in Alabama. The Settlement Program awarded Claimant $528,198 pre-RTP ($662,586 post-RTP) in lost profits. During Claimant's Compensation Period, the physician who had previously generated the most revenue for the Clinic was unable to practice medicine because his medical license had been revoked by the State of Alabama.

Gaspardo Decl. (Ex. D) Ex. B. ¶¶ 2, 10.[5]  The Settlement Program must be given time to amend existing policies and procedures to ensure that claimants are not awarded money notwithstanding their failure to assert an injury sufficient to give rise to standing under Article III and to meet the injury requirement that is an element of black-letter tort law.  *See In re Deepwater Horizon*, slip op. at 25, 28, 31. Claimants without injury not only cannot recover from the Program, they are not class members.  *See* Settlement Agreement Section 1.3.1.2 (Rec. Doc. 6430-1).

### C.   The Fifth Circuit Contemplates A Deliberate Approach To Crafting A New Set Of BEL Policies And Procedures To Comply With Its Opinion.

BP's approach is reasonable and can be implemented in due course.  *See, e.g.*, Rec. Doc. 8963-16 at 1 ("The Claims Administrator recognizes that the type frameworks proposed by BP constitute a reasonable approach to evaluating such claims."); *see also* Alexander Decl. (Ex. B) ¶ 6; Gaspardo Decl. (Ex. D) ¶ 10; Finch Supp. Decl. (Rec. Doc. 8965-7) ¶¶ 27-37; Weil Decl. (Rec. Doc. 8965-19) at 10:383-11:389.  Yet working through these issues to ensure fidelity to the Settlement and ameliorate the dangers to class certification identified by the Fifth Circuit will take time and should be approached systematically.   The Fifth Circuit itself encouraged the

---

[5]  It is also possible to conceptualize claims like the two examples above as failing for lack of causation.  Whether claims of this nature are classified as improper for lack of causation or for lack of actual injury (or both), BP submits that they cannot be paid under the Fifth Circuit's ruling.  *See supra* Parts I.B, II.C.

parties and the Court to be deliberate and calculated in resolving these issues.  *See In re Deepwater Horizon*, slip op. at 35.

To consider these questions, this Court must enter an injunction "that allows the time necessary for ***deliberate reconsideration*** of these significant issues on remand."  *Id.* (emphasis added).  Moreover, the Fifth Circuit has opted to hold the case in abeyance for 60 days pending resolution of the remand proceedings, strongly signaling that a hurry-up or truncated remand process was not contemplated.  *See* Oct. 2, 2013 L. Cayce Ltr. To W. Blevins (Ex. A).

## CONCLUSION

The Court should enter a preliminary injunction fully compliant with all aspects of the Fifth Circuit's decision.  Such a preliminary injunction would avoid inflicting further irreparable harm on BP due to Settlement Program errors including (1) improper or insufficient matching; (2) use of inaccurate and flawed data; (3) the payment of claims that fail to meet the causation requirements imposed by the Settlement interpreted consistent with basic tort law, Rule 23, and Article III of the Constitution; and (4) the failure of the Settlement Program to ensure that claimants have suffered actual injury before issuing awards.

Additionally, such a preliminary injunction must remain in place long enough to allow substitute Settlement Program policies to replace the many currently operative, yet defective policies built on a foundation of legal errors — whether errors already identified by the Fifth Circuit or those remaining yet to be exposed in these remand proceedings.  The preliminary injunction ordered by the Court must be carefully crafted or it will fail to provide the requisite time to root out the Program's many errors and reform the Program going forward.  In short, the remand should not be rushed.

October 9, 2013

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax: (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

**OF COUNSEL**

Respectfully submitted,

   _/s/ Richard C. Godfrey, P.C._
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kevin T. Van Wart, P.C.
Wendy L. Bloom
Jeffrey J. Zeiger
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Dominic E. Draye
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

   _/s/ Don K. Haycraft_
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.**
**AND BP AMERICA PRODUCTION COMPANY**