# MEMORANDUM

**To:** Claims Administrator

**From:** Class Counsel

**Re:** <u>In re: *Deepwater Horizon*
MDL No. 2179</u>

**Subject:** BP Letter dated Oct. 23, 2013 re: Development of Criteria

**Date:** October 23, 2013


**BP's Suggestion that the Settlement Program Should Re-Assess the Time Period in Which Revenue Was Allegedly "Earned" (*i.e.* that the Program should "Move Around" or "Smooth" Revenue) Was Expressly Rejected by All Three Members of the BEL Panel**

All three judges on the Panel rejected BP's argument that the Settlement Program should "smooth" occasional "spikes" in revenue that might occur within the claimants' "comparable" Benchmark and Compensation Periods.  As held by Judge Clement:

> BP's primary concern seems to be the uneven cash flows of certain types of businesses.  We accept this possibility, but we see nothing in the agreement that provides a basis for BP's interpretation.  Despite the potential existence of this kind of distortion, the parties may not have considered it, agreed to ignore it, or failed for other reasons to provide clearly for this eventuality.  The district court was correct that BP's proposed interpretation is not what the parties agreed.[1]


**BP's Suggestion that the Settlement Program Should Attempt to Determine "Revenue Attribution Criteria" relating to the "Earnings Activities of a Business" Is Contrary to the Settlement Agreement and Generally Accepted Accounting Principles, as well as the BEL Decision**

BP suggests that revenues are "attributable to the period in which they are earned, based upon identifiable earnings activities and revenue drivers, based on the industry and business cycle" of the claimant.[2]  BP does not cite any authority for this proposition.  Not the Settlement Agreement.  Not the BEL Decision.  Not any Generally Accepted Accounting Principle.

---

[1] SLIP OPINION, p.25.  (This finding appears in Part I of Judge Clement's opinion, which was joined by Judge Southwick.  And it is clear that Judge Dennis also agrees.)

[2] BP LETTER, at p.3.

BP goes on to suggest that "the revenue attribution criteria should focus on the earning activities of a business."[3]  Again, BP does not cite any language or authority for this proposition from the Settlement Agreement.  Nor the BEL Decision.  Nor any Generally Accepted Accounting Principle.

Clearly, the Settlement Agreement neither includes, nor references, "revenue attribution criteria."  Nor does the Settlement Agreement reference, define, nor direct the Claims Administrator to identify or quantify "earning activities".  Rather, the Settlement Agreement directs the Settlement Program to "sum the monthly revenue over the period" [Exhibit 4C], based upon "monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses" [Exhibit 4A].

BP appears to contend that *Statement of Financial Accounting Concepts No. 6,* which was cited in the BEL Decision, instructs the Settlement Program to essentially disregard the revenue recorded on the monthly P&Ls – even Accrual-basis monthly P&Ls – and, instead, conduct a forensic (and inherently subjective) analysis (requiring voluminous documents that are nowhere identified in nor contemplated by Exhibit 4A) into when the "earnings activities" occurred.

Actually, however, the cited portion of the BEL Decision appears  –  **not**  in any of the Court's actual holdings (*i.e.,* Parts I(B), I(C), and I(D)), but rather – in the introductory discussion of general "Revenue and Expense Recognition Principles" (Part I(A)).  What Judge Clement observes, in that introductory section, is simply that:

> ...accrual accounting has a fundamental principle the recognition of revenue **when the entity becomes entitled to receive payment**, as opposed to when the payment is actually received. *See Statement of Financial Accounting Concepts No. 6,* ¶139.  **Expenses** that can be readily traced to the recognized revenues are themselves recognized at the same time as those revenues. *Statement of Financial Accounting Concepts No. 6,* ¶146.[4]

---

[3]BP LETTER, at p.4.

[4]SLIP OPINION, p.11, (emphasis supplied).

Particularly when read in context with the remainder of the opinion, it is clear that the focus is on the recognition of *expenses,* not revenue.[5] But even within the context of the Court's reference to SFAC No. 6, Judge Clement is talking about the recognition on revenue "*when the entity becomes entitled to receive payment*" – **not** when the business activities occurred.

Indeed, there is no Generally Accepted Accounting Principle that would direct an accountant preparing Accrual-based financial statements to book revenue based upon the timing of "earnings activities", as opposed to when the payment is due to be paid.

Moreover, this type of analysis was expressly rejected by Judge Clement in Part I(D):

> BP further argues that "comparable" months of the Benchmark and Compensation period refer to months in which **comparable activities** took place. We find nothing in the record to support that interpretation.
>
> The district court held that "comparable" refers to the same calendar months in both the Benchmark and Compensation period. We do not disturb this holding for two reasons. First, we conclude that this is the most natural reading of the word "comparable" in the context of the agreement. **The agreement allows the claimant to pick as few as three months or as much as an average of nine months over three calendar years. This, along with the word "comparable," clearly indicate that the Benchmark and Compensation periods were referring to months of the same name, without any complex analysis of what type of business activities took place within those months.** Second, we conclude that our holding as to cash and accrual-basis claimants will resolve *some* of the issues BP claims results from the district court's interpretation of "comparable."

---

[5]For example, in the holding on Accrual-based Claimants (Part I(B)), Judge Clement defines the issue in terms of the word "corresponding" – *i.e.* "As we understand the district court's March 5 order, it interpreted 'corresponding' to mean that any cash disbursed within a given month should be deemed to "correspond" to cash received in that month, simply by virtue of the fact that the cash flowed in and out in the same month.... The district court echoed Class Counsel's December 2012 memorandum, holding that "matching" would require the Administrator to look outside the claimant's chosen Benchmark and Compensation periods." SLIP OPINION, pp.14-15. Similarly, in the holding on Cash-based Claimants (Part I(C)), Judge Clement again focuses on the word "corresponding" – *i.e.* "As noted above, the district court held that the words 'corresponding' and 'in the same time period' must be read to mean that expenses correspond to the time period in which they were recorded and further that 'expenses' means 'cash paid.'... [S]tep 2 says this: 'Subtract the corresponding variable expenses from revenue over the same time period.' Had the words 'corresponding' and 'variable' been omitted, the district court's explanation would not be so difficult to accept,...." SLIP OPINION, p.17. **The question raised by BP was never how to "sum the monthly revenue". Rather, the question was: Which expenses "correspond" to that revenue? Which expenses do you "subtract"?**

> **BP's primary concern seems to be the uneven cash flows of certain types of businesses. We accept this possibility, but we see nothing in the agreement that provides a basis for BP's interpretation.** Despite the potential existence of this kind of distortion, the parties may not have considered it, agreed to ignore it, or failed for other reasons to provide clearly for this eventuality. The district court was correct that BP's proposed interpretation as not what the parties agreed.[6]

As BP Counsel confirmed in September of 2012:

> **One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's contemporaneously-maintained financial data submitted in compliance with documentation requirements.** These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements. Among other reasons, these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was **too dependent on accounting judgments** that were not transparent.
>
> ….**The Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements**….
>
> …. Because the claimant's **actual monthly results** are the foundation for the causation and compensation evaluations under the BEL framework, use of allocated proxy rather than actual data could severely distort the resulting outcomes.[7]

BP's current position, by contrast, asks the Settlement Program to *replace* "contemporaneously-maintained financial data submitted in compliance with documentation requirements" reflecting "the claimant's actual monthly results" *with* "the use of professional judgment or discretion".

---

[6] SLIP OPINION, pp.24-25, (emphasis supplied).

[7] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU (Sept. 28, 2012) (re: Sept. 25th Policy Announcements), at p.2 (emphasis supplied) [Rec. Doc. 8963-68].

**BP's Suggestion That the Settlement Program Should Differently "Match" Expenses in Financials that Were Already Prepared and Submitted Using an Accrual Method Directly Contradicts the Underpinning of the BEL Decision**

The entire BEL Decision is predicated on the premise that, since some level of matching of expenses is "required" where Accrual-based financials are concerned, some level of matching of expenses should presumably also be required where Cash-basis financials are concerned. For example, Judge Clement states that:

> Because cash accounting does not inherently recognize relationships between cash flows and their underlying transactions, the term "corresponding variable expenses" reasonably could imply an accrual-style framework inherent in Exhibit 4C....
>
> At least as to claims presented on an accrual-basis, not only did BP not assent to ignoring the need for matching revenues with expenses, it clearly insisted on it....
>
> The record creates a different perplexity, namely, why would parties who agree as to the propriety of matching for one set of claims reject it for other claims? ....
>
> We remand because the district court did not acknowledge the requirement of matching that is foundational for accrual-basis claims and it did not then explain why it was interpreting the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring the matching of cash-basis claims.[8]

Similarly, Judge Southwick concurs that:

> Part I of the panel opinion identifies the crucial question for remand: should matching be required for *all* claims when it is clearly required for many?[9]

BP, however, now claims that the type of matching that is generally found in Accrual-based is **not** in fact what Exhibits 4A and 4C require:

> [E]ven when the CSSP uses accrual-basis records, that does not solve the problems identified by the Fifth Circuit, because many of the accrual-basis records submitted have matching problems given the manner in which

---

[8] SLIP OPINION, pp.19-24.

[9] SLIP OPINION, p.38 (Southwick, concurring).

the records have been presented and/or used by the CSSP. BP's review of claimant files reveals that indicia of matching problems occur in accrual-basis claims at comparable rates to the general population of BEL claims.[10]

While BP seems to be applying a wholly subjective methodology to identify what Mr. Sider unilaterally and subjectively now characterizes as "matching problems" (that are not defined anywhere within either the BEL Decision nor Exhibit 4C),[11] the fundamental contradiction in logic remains:

The entire BEL Decision is premised on the notion that the Settlement Agreement "requires" matching of expenses where the Claimant has prepared and submitted Accrual claims.

Hence, if matching of expenses does not appear in Accrual-based claims, then it doesn't need to appear in Cash-basis claims either.

The truth, as noted in BP Counsel's letter of September 28, 2013,[12] is that the Parties were focused on the use of ***contemporaneous*** Monthly P&Ls[13] – whether they were fully matched, partially matched, or not matched at all.[14]

### BP's Current Proposal Proves that No One Ever Intended Anything Other than What Is Reflected in the Court's Ruling of March 5, 2013

BP Counsel's letter this date is perhaps the best evidence of what the Settlement Agreement was never intended to compel.

Where, in the 1,000-plus page Settlement Agreement, are the Eleven Different Industry Categories identified?

Where are the eleven different sets of "Revenue Attribution Criteria" spelled out?

---

[10] BP MEMO IN SUPPORT OF MOTION TO STRIKE JUNEAU DECLARATION [Doc 11726-15], at p.6; *citing,* SIDER DECLARATION (Oct. 9, 2013) [Doc 11726-8] ¶¶ 31-34.

[11] *See, e.g.,* SIDER DECLARATION (Oct. 9, 2013) [Doc 11726-8] ¶11, (as well as ¶¶ 31-34).

[12] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU (Sept. 28, 2012) (re: Sept. 25th Policy Announcements) [Rec. Doc. 8963-68].

[13] *See* SETTLEMENT AGREEMENT, Section 38.38, and Exhibit 4A, No.4.

[14] Perhaps the best evidence of this (aside from Mr. Holstein's Letter) is the fact that the Settlement Agreement was formally amended, with BP's agreement and consent, to eliminate the requirement of CPAs to certify that the claims were submitted in conformity with GAAP in order to qualify for the Accountant Reimbursement Compensation. *Compare* Section 4.4.13.4 in the original Settlement Agreement [Doc 6276-1] (April 18, 2012), *with,* Section 4.4.13.4 within AMENDMENT NO. 1 [Doc 6414-6] (May 2, 2012).

Page 6

BP recently took the position in a Brief to the U.S. Fifth Circuit that: "*Comcast* settled this division of authority, making clear that certification under Rule 23(b)(3) requires a reliable, common methodology for measuring classwide damages."[15]

Does BP – who fully supported Rule 23 approval in the hopes of benefitting from a classwide release – really contend that Exhibit 4C to the Economic & Property Damages Class Settlement Agreement contemplates eleven different industry-specific Business Economic Loss (BEL) sub-Frameworks that would be interpreted and applied subjectively by Program Accountants on a case-by-case basis in eleven different ways?

It is now almost a year since BP started to raise these issues, and BP has still not identified or defined what it contends was "agreed to" when the Settlement Agreement was signed in April of 2012.

---

[15] *See* BP APPELLEES BRIEF ON THE MERITS, No.13-30095 (Aug. 30, 2013), p.44.