UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO, ON APRIL 20, 2010 | * | SECTION "J" |
| | * | |
| THIS DOCUMENT RELATES TO: | * | |
| | * | JUDGE BARBIER |
| *No. 2:13-cv-05804-CJB-SS; Elton Johnson v.* | * | MAG. JUDGE SHUSHAN |
| *BP Exploration and Production, Inc, et al* | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## Plaintiff's Memorandum in Support of Plaintiff's Motion to Enforce Settlement Agreement With BP

The Court should enforce the written settlement agreement between BP and Johnson

because:

1. The GCCF, acting on express authority granted to it by BP, made a written settlement offer on BP's behalf. Johnson accepted the offer. A contract was formed. Even if BP did not somehow grant authority to the GCCF to settle claims brought against BP, BP subsequently ratified the contract when it repeatedly acknowledged that a settlement agreement existed and refused to exercise its right to appeal the settlement;

2. The GCCF's written settlement offer to Johnson provided reasonable certainty as to all material terms. It also provided explicit instructions on how to accept the offer. Johnson accepted the offer according to its terms. A contract was formed;

3. BP's attorneys repeatedly acknowledged that a valid settlement agreement existed. BP only generated its after-the-fact "no contract" arguments when Tidewater refused to indemnify BP;

4. BP cannot avoid its contractual obligations by arguing that Johnson failed to sign the Release and Covenant Not to Sue since BP and the GCCF made it impossible for Johnson to perform this task by refusing to send the Release to Johnson. The doctrine of prevention excuses a party like Johnson from fulfilling a condition when his contractual counterparty prevents the condition from occurring. In short, BP cannot refuse to fulfill its contractual obligation to provide Johnson with a Release and Covenant Not to Sue and then cynically claim that "no payment is owed because Johnson has not yet signed the document we refuse to send him."

# I.

## Facts

Plaintiff Elton Johnson served on the *M/V Damon B. Bankston* in close proximity to the *Deepwater Horizon*.   When the *Deepwater Horizon* exploded, Johnson was in the *Bankston's* change room.  The explosions were violent enough to "buckle" the ceiling in the change room.  Ex. 12 A (*ex parte* interview with Louis Langlois).  After helping rescue the *Deepwater Horizon* survivors and returning to shore, one of Johnson's co-workers at Tidewater noticed that Johnson complained about "headaches and appeared visibly distressed."   Ex. B (GCCF investigator's summary of *ex parte* interview with Jeffrey Malcom).  The co-worker believed Johnson was "traumatized" by the incident.  *Id*.  Johnson also filled out a Coast Guard form indicating that he was "shooken up" and it took him some time to "come to my senses."  Ex. C (Coast Guard report).  On April 26, 2010, Johnson visited a family physician who diagnosed him with a right shoulder injury, a back injury, and post-traumatic stress disorder ("PTSD").  Ex. D.  He was referred to a psychiatrist who confirmed the PTSD diagnosis on May 11, 2010.  Ex. E.  On June 23, 2010, an orthopedic surgeon confirmed Johnson sustained a shoulder and back injury.  Ex. F.  The surgeon eventually recommended a lumbar fusion surgery and arthroscopic shoulder surgery.  *Id*.  He has been under regular treatment for his physical and mental injuries since the accident.  As his Jones Act employer, Tidewater has accepted its maintenance and cure obligation, paid his medical bills, and never questioned the genuineness of his injuries.  Ex. G (Tidewater maintenance and cure correspondence/payments).

Against this background, Johnson filed a personal injury suit against BP and Tidewater pursuant to the Jones Act and general maritime law.  His case was then removed

to this Court.   In February 2011, Johnson began negotiating to settle his case with the Feinberg Rozen, LLP and the GCCF (collectively referred to as the "GCCF").   The GCCF was created by Feinberg Rozen, LLP "at the request of BP."   Ex. H (Recital Section).   Its mission was to "settle and authorize payments of certain Claims[1] asserted against BP as a result of the explosion at the Deepwater Horizon rig."   *Id.*; *See also* Ex. I at ¶ I(A) ("BP has also authorized the GCCF to process certain non-OPA claims involving physical injury or death.").   The contract between BP and the GCCF expressly provides that the GCCF "shall perform . . . Claim Settlement and payment services, ***including settlement of Claims and payments in settlement of Claims***."   Ex. H at pg. A-1 (emphasis added).   BP clearly authorized the GCCF to enter into settlement agreements on its behalf.

The settlement negotiations with the GCCF were intense and lengthy.   They lasted for eight months.   The negotiations were conducted in person, by e-mail, and over the telephone. The parties reached an agreement on the settlement amount on September 19, 2011.   Four days later, the GCCF sent a formal written offer letter to Johnson.   The letter makes a "Final Payment Offer" of $2,698,095.00.   Ex. J (offer letter) at pg.1, ¶ I.   The offer letter also notes that the settlement will require Johnson to "waive and release any claims for bodily injury that you have or may have in the future against BP and all other potentially responsible parties with regard to the [Deepwater Horizon Incident on April 20, 2010][2], and prevents you from submitting any bodily injury claim seeking payment from a court."   *Id*.   The letter then explicitly informs Johnson how to accept the "Final Payment Offer":

---

[1] The contract defines "Claim" as a "monetary demand or claim made by any Individual . . . against BP or its Affiliates as relief for each alleged bodily injury or death . . ."). Ex. 1 at pg. 14.   This definition obviously encompasses Johnson's personal injury claim.

[2] The offer letter actually uses the term "Oil Spill," but defines "Oil Spill" as "the Deepwater Horizon Incident on April 20, 2010." Ex. J.  Johnson inserted the actual definition of the term for clarity's sake.

> If you want to be paid the Final Payment Offer and fully resolve the entire claim now, you can accept the Final Payment Offer.
>
> * * *
>
> To accept the Final Payment Offer, check the box on the Election Form indicating that you accept the Final Payment Offer, sign it and return it to the GCCF no later than 90 days after the date of this Letter.

*Id.* at pg. 2, ¶ II.[3]

Johnson understood the terms of the offer and manifested his assent by complying with its terms. Ex. K (acceptance form). The GCCF made a settlement offer pursuant to the authority granted to it by BP. Johnson accepted it. A contract was formed.

***Even BP acknowledged that a settlement agreement existed***. BP's attorneys at Kirkland & Ellis, LLP (the same firm that is now disavowing the contract) informed Tidewater that "[t]he GCCF's settlement with Mr. Johnson falls within the scope of the indemnity agreement between the parties and BP reserves its right to seek indemnification from Tidewater for all BP funds the GCCF pays to settle Mr. Johnson's claim." Ex. L (correspondence from BP to Tidewater). BP also noted that "Elton Johnson has accepted the [settlement] offer" and BP would be responsible for funding the settlement. Ex. M (correspondence from Tidewater to BP). BP further indicated that it approved of the settlement by noting that "**BP will not appeal the GCCF's settlement with Mr. Johnson**." Ex. L. Accordingly, BP demanded that Tidewater indemnify it. Ex. N (correspondence from BP to Tidewater); Ex. L.

Tidewater rejected BP's indemnity demand. First, it claimed that it would not indemnify BP because Tidewater was not allowed "to participate in the claims process." Ex.

---

[3] The offer also provides a fourteen (14) day window for BP to object to the settlement offer. Ex. J at pg. 2,¶ II. BP made the conscious decision to *not* object to the settlement offer. Ex. 12(g) (letter to Tidewater explaining that "BP will not appeal the GCCF's settlement with Mr. Johnson.").

M at pg. 1; *See also* pg. 2 ("In short, the ***settlement amount was offered and accepted*** before Tidewater . . . [was] given notice of the proceedings or an opportunity to participate."). As a back-up reason for refusing to indemnify BP, Tidewater noted that its agreement with BP does not require Tidewater to indemnify BP for "claims based on the gross negligence of BP," and the "settlement is so high because the GCCF has taken both gross negligence and punitive damages into account." *Id.* at pg. 2. Tidewater concluded its letter by acknowledging that a settlement agreement existed, but reserved its right to challenge whether the settlement "falls within the scope of the indemnity agreement." *Id.*

Tidewater further pleaded with BP to exercise its right to appeal the settlement offer. *Id.* ("Tidewater again requests in the strongest terms that BP appeal the settlement."). Had BP done so, the settlement offer would not have been valid and no contract would have come into existence. BP unequivocally refused to appeal. Ex. L ("BP will not appeal the GCCF's settlement with Mr. Johnson."). After BP repeatedly acknowledged that a settlement agreement existed and informed Tidewater that it would not appeal the settlement, Tidewater raised a new (third) argument in an attempt to get out of its indemnity obligations. It argued that Johnson's injuries were somehow "exaggerated." ***BP and the GCCF were well-aware of the facts underlying Tidewater's allegations when the settlement offer was extended and were well-aware of these facts when BP chose not to appeal the settlement offer***. Still, BP apparently determined that it was easier to back out of the repeatedly acknowledged settlement with Johnson than it was to engage in an indemnity dispute with Tidewater. As a result, the settlement was never funded and Johnson filed a breach of contract lawsuit in Texas state court (where BP has its principal place of business).

Johnson filed his breach of contract lawsuit by intervening in a *Deepwater Horizon* Jones Act personal injury suit that had been pending in Texas state court for over a year. BP then removed the case to the Southern District of Texas where it was assigned to the Honorable Lynn Hughes. Before the JPML could render a final decision on whether to transfer the breach of contract case to MDL-2179, Judge Hughes ordered BP to file a motion for summary judgment by June 1, 2012.[4] This was just two months after the case was removed and before any discovery, other than Rule 26 disclosures, could be undertaken. After the issue was briefed, Judge Hughes granted summary judgment in favor of BP on dubious grounds. Johnson then appealed to the Fifth Circuit. On appeal, BP largely disavowed the grounds that the district court based its ruling on, but raised several new arguments that the district court did not rely on. The Fifth Circuit vacated the summary judgment and ordered that the case be transferred to this Court due to Your Honor's "detailed knowledge of all aspects of the BP litigation and settlement programs." *BP Exploration & Prod., Inc. v. Johnson*¸ 2013 WL 4018614 at \*2 (5th Cir. Aug. 8, 2013).

Now that the case is before this Court, Johnson respectfully requests that the Court enforce the written settlement agreement and compel BP to deliver the settlement funds to Johnson. A binding contract requires an offer, an acceptance, consideration on both sides, and reasonable certainty as to the essential terms. Here, there was a clear written offer, titled "Final Payment Offer," with instructions for how to "accept" the offer. It specified the essential terms of the deal: a promise to pay of a specific amount of money, in exchange for a promise to release "claims for bodily injury that you have or may have in the future," against

---

[4] The clerk of the JPML *sua sponte* determined that this case was not appropriate for inclusion in MDL-2179. BP appealed this decision to the actual Panel. The court in the Southern District of Texas issued his ruling before the JPML did.

BP and "all other potentially responsible parties," along with forbearance from "submitting any bodily injury claim seeking payment from a court."  Ex. J.  Johnson accepted the offer exactly according to its instructions.  Ex. K.  This was a contract.  Everyone at the time (including BP and Tidewater) recognized this simple fact.

BP attempted to escape liability on the grounds that Johnson, through no fault or choice of his own, was denied his contractual right to sign the boilerplate Release.  The doctrine of prevention excuses Johnson from this obligation since the GCCF and BP made it impossible for Johnson to perform this task.  Further, signing the Release was not a condition precedent for the *formation* of the contract.  It was a condition *under* the contract.  The contract was formed when Johnson signed and accepted the "Final Payment Offer" according to its terms.  The exchange of promises in the contract included the following: the GCCF promised to send a Release embodying the description in the Final Payment Offer; Johnson promised to sign it; the GCCF promised to then pay $2,698,095 on behalf of BP.  In contracts with sequential obligations like this, each party's performance is a condition precedent for the subsequent obligations of the other.  If a party commits a material breach by reneging on its part, the other party is excused from subsequent obligations.  Thus, if Johnson had received the Release, but refused to sign it, BP would have had no payment obligation, *not* because there was no contract, but because, under the contract, such a refusal would be a material breach.  But that is not what happened.  Johnson stood—and stands— ready, willing, and able to sign the release.  The GCCF reneged on its contractual obligation to send it to him, and BP still refuses to present it to him.  Under the contract doctrine of prevention, Johnson is therefore excused from the requirement to sign the release, his failure

to do so does not constitute a breach, and the signature no longer constitutes a condition precedent to receiving the agreed payment.

BP also attempted to escape liability by arguing that the GCCF was an independent contractor that BP cannot be held responsible for. But nothing in the GCCF's relationship with BP can gainsay the fact that the GCCF was a claims handling facility, "acting for and on behalf of" BP. The GCCF may not have been BP's agent in all things, but it had the authority that matters here: to enter into settlement agreements that "shall be binding upon BP." Ex. O; Ex. H at pg. A-1. Nothing in any law or procedure affecting the GCCF gave the GCCF or BP the right to back out of a duly-formed settlement contract with a third-party. BP's own lawyers recognized, affirmed, and ratified the GCCF's "settlement with Johnson," and BP must be held to that settlement. The Court should grant this motion and enforce the settlement agreement.

## II.

## The Court Should Enforce the Settlement

This Court recently explained the legal standards that govern this motion as follows:

"Federal courts possess the inherent power to enforce agreements entered into in settlement of litigation pending before them." *Smith v. Ford Motor Co.,* No. 98–2299, 1999 WL 649636, at *2 (E.D.La. Aug. 24, 1999) (citing *Eastern Energy, Inc. v. Unico Oil & Gas, Inc.,* 861 F.2d 1379, 1380 (5th Cir.1988)).

\* \* \*

"Questions regarding the enforceability or validity of [settlement] agreements are determined by federal law—at least where the substantive rights and liabilities of the parties derive from federal law. *Mid–South Towing Co. v. Har–Win, Inc.,* 733 F.2d 386, 389 (5th Cir.1984) (citing *Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207 (5th Cir.1981)). Because the claims before the Court are brought under general maritime law, the Court applies federal maritime law to interpret and enforce the settlement agreement.

When interpreting a contract under general maritime law, the "court may not look beyond the written language of the document to determine the intent of

the parties unless the disputed contract provision is ambiguous." *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 332–33 (5th Cir.1981) (citing *Hicks v. Ocean Drilling and Exploration Co.,* 512 F.2d 817, 825 (5th Cir.1975)). The "basic principle of contract interpretation in [maritime] law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd.,* 393 F.3d 550, 555 (5th Cir.2004) (citing *Foster Wheeler Energy Corp. v. An Ning Jiang MV,* 383 F.3d 349, 354 (5th Cir.2004)). Words in a contract are given their plain meaning as understood by a reasonable person. *Sander v. Alexander Richardson Inv.'s,* 334 F.3d 712, 716 (8th Cir.2003).

*Magee v. ENSCO Offshore Co.*, 2013 WL 2389910 (E.D. La. May 30, 2013) (Barbier, J.).

**A.     Johnson entered into a valid and enforceable contract with BP under which he is entitled to recover $2,698,095**

This is at its heart a simple case, based on simple contract principles.  The GCCF sent Johnson a written settlement offer, *denoted as such*, on behalf of BP.  Ex. J.  Johnson signed and accepted the offer, and he has never breached the resulting contract.  Ex. K.  He is entitled to collect the agreed payment.  BP's arguments to the contrary deny the reality of a straightforward offer and acceptance, and penalize Johnson for an omission not by him, but by the GCCF and BP.  Johnson is entitled to recover in the settlement.

**1.     An offer was made**

A contractual offer is "a conditional promise dependent for its enforceability on the offeree getting in exchange the offeror's requested act, forbearance or return promise." 1 WILLISTON ON CONTRACTS § 4:7 (4th Ed.).  I will agree to do X if you agree to do Y.  As distinguished from negotiations, a contractual offer contemplates a firm bargain that will become binding now, as opposed to further discussions that may culminate in a later agreement.  It requires "the offeror's manifestation of willingness to enter into a proposed bargain communicated in such a manner that the offeree may understand that by assenting the bargain will be concluded." *Id.*; *accord* RESTATEMENT (SECOND) OF CONTRACTS § 24

(1981)  ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.")

The GCCF's September 23, 2011 letter is an offer to conclude a bargain now.  It culminated months of negotiations, and the words "final" and "offer" appear repeatedly throughout the document.  Ex. J.  By its own terms, it communicated a "Final Payment *Offer*" of a definite amount of money, and stated "[i]f you want to be paid to the Final Payment Offer *and fully resolve the entire claim now*, you can accept the Final Payment Offer."  *Id*.  The offer included instructions on how to "accept" immediately by checking a box and signing a form included with the offer:

> If you want to be paid the Final Payment Offer and fully resolve the entire claim now, you can accept the Final Payment Offer.  The Final Payment Offer is valid for 90 days.  This Letter contains an Election Form with a box to accept the Final Payment Offer and a space for the required signatures.  To accept the Final Payment Offer, check the box on the Election Form indicating that you accept the Final Payment Offer, sign it and return it to the GCCF no later than 90 days after the date of this Letter.

*Id*.

All descriptions of what will happen after a party "accept[s]" the "offer" are expressed in terms of what "will" happen under the agreement, and do not contemplate any further negotiations:

> We then **will** send you a Release to be signed and returned to be paid the Final Payment Amount.  The GCCF **will** mail or wire the Final Payment Amount as indicated on the Claim Form within 14 days after receipt of a complete and properly signed Release.

*Id*. (emphasis added).[5]

Only a potential appeal by BP (which did not happen) or a breach of the contract by one of the parties could prevent the Release from being signed and payment of the agreed amount.  In short, consistent with its own nomenclature as an "offer" inviting the offeree to "accept," the letter to Johnson left no doubt that such acceptance would conclude the bargaining and create a settlement agreement.  Even the letter that the GCCF (sent months after-the-fact) repudiating the contract acknowledged that a binding offer was made and the offer was accepted:

> [T]he GCCF sent Mr. Johnson a determination letter on September 23, 2011 **offering him $2,698,096 to finally resolve his claim.  In order to receive the offered Final Payment, Mr. Johnson was required to and did return an election to accept the offer**.  Thereafter, the GCCF would in the normal course have sent to Mr. Johnson a Release and Covenant not to Sue, which Mr. Johnson would have been required to sign in order to receive his Final Payment.

Ex. P (GCCF February 22, 2012 repudiation letter).  Therefore, the September 23, 2011 letter constitutes an "offer."

### 2.     Johnson accepted the offer according to its terms

The Final Payment Election Form (Ex. K) demonstrates with equal clarity that Johnson accepted the offer.  A party accepts a contractual offer by assenting to the offer "in a manner invited or required by the offer."  RESTATEMENT (SECOND) OF CONTRACTS § 50 (1981).  Johnson did precisely what the offer letter told him to do in order "to accept the Final Payment Offer."  *See* Ex. K.  He checked the box (entitled "ELECTION TO ACCEPT FINAL PAYMENT OFFER"), signed the form, and returned it on time:

---

[5] These descriptions of what will take place in the future describe the parties' sequential contractual obligations under the contract that was formed when Johnson accepted the offer by checking the box on the Election Form.

| | C. **ELECTION TO ACCEPT FINAL PAYMENT OFFER** |
|---|---|
| X | I elect to be paid the Final Payment Offer described in my Determination Letter and acknowledge that it is subject to any outstanding lien identified in **Attachment B** to the Letter (if the Letter has an Attachment B) and any other lien of which the GCCF receives notice before payment of the Final Payment Offer.  The GCCF will send you a Release and Covenant Not to Sue that you must sign and return to be paid. |

| | SIGNATURE | | |
|---|---|---|---|
| Claimant Signature | *Elton Johnson* | Date | 9 / 24 / 11 (Month/Day/Year) |
| Name of Person Signing (Print or Type) | Elton Johnson | | |

You can send this Election Form to elect to be paid this Final Payment Offer using any of the following ways:

*Id.*

  The post-settlement communications between BP's counsel and Tidewater Marine's counsel confirm that a binding settlement agreement existed.  BP's counsel told Tidewater Marine by letter that the GCCF had "offered to settle" Johnson's claim[6], by e-mail "that the GCCF has agreed to pay Elton Johnson $2,698,095,"[7] and by telephone that "Elton Johnson has accepted the offer from the GCCF."[8]  Tidewater Marine responded by asking BP to exercise its right to appeal the settlement.  Ex. M.  BP wrote back, noting that "BP will not appeal the GCCF's *settlement* with Mr. Johnson."  Ex. L (emphasis added).  BP and Tidewater Marine had it right then.  The GCCF offered a settlement, Johnson accepted it, and a contract resulted.  At the very least, a genuine issue of material fact existed.

### 3. The offer that Johnson accepted provided reasonable certainty regarding all of the material terms of the settlement

  The offer and acceptance are valid if the offer letter describes the terms of the contract with "reasonable certainty."  RESTATEMENT (SECOND) OF CONTRACTS § 33(a) (1981). The September 23, 2011 offer letter provided "reasonable certainty" as to the rights Johnson was surrendering:

---

[6] Ex. N.
[7] Ex. M.
[8] Ex. M.

> The Release waives and releases **any** claims for bodily injury that you have or may have in the future against BP **and all other potentially responsible parties** with regard to the [Deepwater Horizon Incident on April 20, 2010], and **prevents you from submitting any bodily injury claim seeking payment from a court**.

Ex. J (emphasis added).[9]

There is no uncertainty here.  This description of the Release's terms explains that Johnson must release every conceivable defendant/entity and forever put an end to his efforts to recover money for his injuries.  These are standard terms for settling personal injury lawsuits, and the Release that was to follow would have merely been a boilerplate memorialization of these standard terms.  Moreover, Johnson clearly understood that these were the terms of the contract when he accepted the offer:

> When I agreed to [settle my case], I understood that I was completely giving up any right I had to receive any more money from anyone as a result my injuries, the explosions, of the events that followed.  I understood that I was giving up my right to sue anyone else as well.

Ex. Q (Johnson affidavit).

Despite the broad language which notes that "[t]he Release waives and releases **any** claims for bodily injury that you have or may have in the future against BP **and all other potentially responsible parties** with regard to the [Deepwater Horizon Incident on April 20, 2010]," BP has argued that the settlement agreement was insufficiently definite as which parties were to be released.  Even if BP is correct that the "Final Payment Offer" was

---

[9] The offer letter also tells Johnson that he can only accept the Final Payment Offer if he wants to "fully resolve the **entire** claim now."  Ex. J.  In other words, Johnson "fully resolve[d] the entire claim" when he accepted the Final Payment Offer.  The boilerplate Release that was to follow was not necessary to accomplish this.  It simply memorialized the terms that the parties already agreed on.

insufficiently definite as to who was being released (which Johnson disputes), this still would not prevent contract formation.  As one court noted:

> An agreement need not spell out all details of the bargain in order to be enforceable. Even if the parties have left some terms of their agreement indefinite, a court may enforce the agreement if it has means of giving content to the indefinite terms, or if those terms are not material to the bargain.

*U.S. v. Bedford Associates,* 657 F.2d 1300, 1310 (2d Cir. 1981) (citations omitted)) *See also Forte Sports, Inc. v. Toy Airplane Gliders of America, Inc.*, 371 F.Supp.2d 648, 649 (E.D. Pa. 2004) ("It is well established that a contract comes into being once the parties have reached a meeting of the minds on the essential terms and have manifested the intent to be bound by those terms.  Once this has occurred, the existence of gaps in the agreement will not vitiate it.") (internal citations omitted).  This is true even when the contract is indefinite as to an essential term.  RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").

BP has also incorrectly argued that the agreement does not provide reasonable certainty regarding what claims Johnson was releasing because the offer letter uses the term "bodily injury," but does not define what a "bodily injury" is.  The GCCF's standard Release defines "bodily injury" in a standard manner that includes "without limitation mental health injury and including any alleged economic loss in connection with bodily injury or mental health injury" – i.e. mental anguish and loss of earning capacity.   Ex. R.  The offer letter uses the term in the same way that the Release does.

"Bodily injury" refers to all the damages that Johnson sustained as a result of the personal injury he is sued over. It is nonsensical to suggest that the GCCF's offer letter was only offering to settle the portion of Johnson's claim that seeks recovery for physical pain, but was leaving open the portion of his claim that seeks recovery for mental anguish and lost wages. That is why the offer letter explicitly states that Johnson can only accept the Final Payment Offer if he wants to "*fully* resolve the *entire claim* now." Ex. J (emphasis added).

That is how Johnson understood the offer letter. Ex. Q. It is also how a reasonable observer would view the offer as well. Indeed, BP's lawyers did not believe the offer was too indefinite considering they repeatedly acknowledged that an agreement existed. Ex. L; Ex. M; Ex. N.[10] Therefore, the Court should enforce the agreement.

### 4. Consideration existed

BP has also argued that consideration was lacking based on the erroneous belief that Johnson only promised to release his claims, but never promised to sign the actual Release documents. Valid consideration is "any performance which is bargained for." RESTATEMENT (SECOND) OF CONTRACTS § 72 (1981). A promise to waive and release one's claims is viable consideration. Johnson did not have to explicitly state "I promise to sign the Release." That promise can be inferred. RESTATEMENT (SECOND) OF CONTRACTS § 4 (1981) ("A promise . . . be inferred wholly or partly from conduct.").

The parties had been negotiating for months. Finally, on September 23, 2011, the GCCF sent its offer letter. The letter made a "Final Payment Offer" of $2,698,095. Ex. J. It

---

[10] Even if BP's interpretation of the agreement were correct, this would only mean that the parties settled Johnson's claims for physical injuries for $2,698,095, but decided to leave open his claims for psychological injuries. Johnson believes the obvious interpretation of the settlement language covered all his claims. But, if BP is correct, this would not void the contract. Johnson would still entitled to the settlement funds under BP's interpretation. He would simply still able to pursue his claims for psychological injuries.

made clear that, in order for Johnson to receive the money, he must "sign a Release and Covenant Not to Sue." *Id*.; Ex. P ("Mr. Johnson was required to and did return an election to accept the offer.  Thereafter, the GCCF would in the normal course have sent Mr. Johnson a Release and Covenant Not to Sue, which Mr. Johnson would been required to sign in order to receive his Final Payment.").  The letter went on to describe the contents of the Release that Johnson would have to sign.  Importantly, if Johnson "want[s] to be paid the and fully resolve the entire claim now," he must accept the Final Payment offer by "check[ing] the box on the Election Form indicating that you accept the Final Payment Offer, sign it and return it to the GCCF."  Ex. J.  The Election Form that Johnson signed stated "I elect to paid the Final Payment Offer [i.e. $2,698,095] described in my Determination Letter."  Ex. K.  The Election Form then informed Johnson that "[t]he GCCF will send you a Release and Covenant Not to Sue that you must sign and return to be paid."  *Id*.

The clear inference is that Johnson was promising to sign the Release when he accepted the offer.  He wanted to be paid the Final Payment Offer of $2,698,095 and put an end to his lawsuit.  The offer letter clearly states that he will not receive the money until he signs the Release.[11]  Given the context, when Johnson accepted the offer, he was promising to sign the Release that the GCCF promised to promptly send.

Moreover, once Johnson agreed to the Final Payment Offer, he was contractually obligated to sign the Release (once the GCCF sent it to him) since an agreement had already been formed.[12]  He was not free to sign or not sign at his whim and sole discretion.  Signing

---

[11] Johnson's failure to sign the Release is excused under the doctrine of prevention.  Consequently, the money is due.

[12] In contracts with sequential obligations like this, each party's performance is a condition precedent for the subsequent obligations of the other.  If a party commits a material breach by reneging on its part, the other party is

the Release was "performance which was bargained for."  If Johnson refused to sign, he would be breaching this part of the contract.  BP could enforce the contract by: (1) seeking to enforce the settlement; (2) refusing to fund the settlement; (3) seeking to dismiss the underlying personal injury case based on the defense of "accord and satisfaction"; or (4) seeking specific performance requiring him to sign.  Indeed, courts (including this Court) regularly enforce settlement agreements in circumstances like this.  *Garrett v. Delta Queen Steamboat Co., Inc.*, 2007 WL 83177 at *1 (E.D. La. Mar. 14, 2007) (Barbier, J.) (ordering specific performance requiring seaman to sign Release and enforcing settlement agreement); *In re Amway Corp.*, 579 F.2d 907, 909 (5th Cir. 1978) (enforcing settlement agreement when seaman refused to sign Release); *Strange*, 495 F.2d at 1236-37 (enforcing settlement agreement when longshoreman refused to sign Release); *In re Gibson*, 2009 WL 3241641 at *4 (E.D. Okla. Sept. 25, 2009) (ordering specific performance requiring maritime plaintiffs to sign Release and enforcing settlement); *Latham v. QCI Corp.*, 2009 WL 483208 at *1 (S.D. Tex. Feb. 25, 2009) (enforcing settlement agreement when plaintiff refused to sign Release); *Mobley v. Montco, Inc.*, 2004 WL 307478 at *2 (E.D. La. Feb. 17, 2004) (enforcing settlement agreement when seaman refused to sign Release); *See also Aycock v. Noble Corp.*¸ 2006 WL 2521211 at *2 (S.D. Tex. Aug. 30, 2006) (enforcing settlement agreement in Jones Act case when defendant refused to tender funds and Release because "[a]n oral agreement in this case existed as soon as Plaintiff accepted Defendant's offer of settlement.  That offer could not be withdrawn once accepted.").

---

excused from subsequent obligations.  Thus, if Johnson had received but refused to sign the release, BP would have had no payment obligation, *not* because there was no contract, but because, under the contract, such a refusal would be a material breach.  But that is not what happened.  Johnson stood—and stands—ready, willing, and able to sign the release.  The GCCF reneged on its contractual obligation to send it to him, and BP still refuses to present it to him.

The contract does not lack for consideration.   The Court should enforce the settlement agreement and compel BP to pay the settlement funds.

**5.      The doctrine of prevention prohibits BP from avoiding its contractual obligations because BP refused to send a copy of the Release to Johnson to sign**

BP's fallback argument has been that a contract exists, but BP has no obligation to fund the settlement because Johnson never signed the Release and signing the Release was a condition precedent to *payment* (as opposed to a condition precedent to contract *formation*). However, the condition here (i.e. signing the Release) has only gone unfilled because BP and the GCCF failed to fulfill their contractual obligation to send the Release to Johnson.  Ex. J at pg. 2, ¶ II ("We will then send you a Release to be signed . . ."); Ex. K ("The GCCF will send you're a Release and Covenant Not to Sue . . ."); Ex. P ("Thereafter, the GCCF would in the normal course have sent Mr. Johnson a Release and Covenant Not to Sue . . .").  When a condition does not occur because a contractual counterparty prevents it from occurring, its non-occurrence is excused under the doctrine of prevention.  *Ballard v. El Dorado Tire Co.*, 512 F.2d 901, 907-08 (5th Cir. 1975); *Clear Lake City Water Auth. v. Friendswood Dev.Co. Ltd.*, 344 S.W.3d 514, 520 (Tex.App.—Houston [14th Dist.] 2011, pet. denied) ("a party who 'prevents or makes impossible' the occurrence of a condition precedent upon which liability under a contract depends cannot rely on the nonoccurrence to escape liability."); 13 WILLISTON ON CONTRACTS § 39:4 (4th ed.) ("If a promisor prevents or hinders the occurrence or fulfillment of a condition to his or her duty of performance, the condition is excused . . . [and] [t]he liability of the promisor is fixed regardless of the failure to fulfill the condition."); RESTATEMENT (SECOND) OF CONTRACTS (1981) § 245 ("Where a party's

breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.").[13]  "The reason for this result is that the law implies a promise not to frustrate occurrence of an explicit promise.  One who promises to do a thing if a given condition occurs has impliedly promised not to prevent the performance of the condition." *Ballard*, 512 F.2d at 907 n.4.

Johnson cannot sign the Release until the GCCF (or BP) fulfills its obligation to send the Release to Johnson.  The GCCF promised to do this without qualification unless BP appealed (which it did not).[14]  Ex. J at pg. 2, ¶ II; Ex. K.  Because the failure to sign the Release was caused by the GCCF's refusal to comply with its obligation to send the Release (and BP's ongoing refusal to send the Release), the failure to sign the Release is excused and Johnson is entitled to recover as if it had been fulfilled.  *Ballard*, 512 F.2d at 907-08; *Clear Lake City Water Auth.*, 344 S.W.3d at 520.

Recognizing that its argument is barred by the prevention doctrine, BP has also argued that the GCCF did not fail to fulfill its obligation to send the Release because the offer letter "says nothing about the timeline on which the GCCF would furnish a release."  In other words, BP or the GCCF could send the release two years from now and still be in compliance with the contract.  This argument lacks any merit.  When maritime contracts do not contain explicit deadlines, the law implies a requirement that performance be completed in a "reasonable" time period.  *Matter of Rio Grande Transport, Inc.*, 770 F.2d 262, 264 (2d Cir. 1985) ("Since neither settlement agreement provided for payment within a specific time,

---

[13] The same rule applies if the Court determines that the GCCF or BP "repudiated" the contract instead of merely prevented Johnson from performing the condition. RESTATEMENT (SECOND) OF CONTRACTS (1981) § 255 ("Where a party's repudiation contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.").

[14] The failure to send the Release is another way in which BP breached the contract.

the law implies a requirement to pay within a reasonable time.").  The agreement was formed more than 2 years ago.  A "reasonable time" has passed.  The Court should reject BP's argument and find that the condition precedent to payment under the contract (i.e. Johnson's signature on the Release) is excused under the doctrine of prevention.

### 6.     The GCCF had authority to enter into binding settlement agreements on behalf of BP

"To create an agency relationship based on actual authority, such authority must have been delegated to the agent either by words that expressly or directly authorize him to do a delegable act, or such authority may be implied from the facts and circumstances attending the transaction in question."  *In re Tasch, Inc.*, 46 Fed. Appx. 731 at *4 (5th Cir. 2002); RESTATEMENT (THIRD) AGENCY § 1.02 (2006) ("An agent acts with actual authority when . . . the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act.").  A claims representative for a corporate defendant who has handled a case for a significant period of time is presumed to have authority to settle that case.  *See Cia Anon Venezolana De Navegacion v. Harris*, 374 F.2d 33, 35-36 (5th Cir. 1967).  Last, a party cannot prevent an agency relationship from arising simply by including "independent contractor" language in a contract.  *In re McClure*, 430 B.R. 358, 366 (Bkrtcy. N.D. Tex. 2010); RESTATEMENT (THIRD) AGENCY § 1.02 (2006) ("Whether a relationship is characterized as agency in an agreement between parties . . . is not controlling."); *See also Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988) ("[P]arties to a contract cannot automatically prevent a legal status like 'borrowed employee' from arising merely by saying in a provision in their contract that it cannot arise.").

Here, BP expressly delegated authority to the GCCF to settle and pay claims made against BP. The GCCF was created "at the request of BP." Ex. H (Recital Section). Its mission was to "settle and authorize payments of certain Claims asserted against BP as a result of the explosion at the Deepwater Horizon rig." *Id.*; Ex. I at ¶ I(A) ("BP has also authorized the GCCF to process certain non-OPA claims involving physical injury or death."). Specifically, in exchange for $1,250,000/month, the GCCF "shall perform . . . Claim Settlement and payment services, ***including settlement of Claims and payments in settlement of Claims***." Ex. H at pg. 18 (emphasis added). According to the contract's "Definitions" section, a "Claim" is a "monetary demand or claim made by any Individual . . . against BP or its Affiliates as relief for each alleged bodily injury or death . . .")." *Id.* at pg. 14.

Johnson's personal injury claim against BP is obviously a "Claim" under the BP-GCCF contract. BP authorized the GCCF to settle cases like Johnson's on BP's behalf.[15] The GCCF had actual authority to bind BP in this case. In this case, BP's engaged the GCCF to "settle Claims and make payments in settlement of Claims" brought against BP. Ex. H at pg. 18. BP is bound by the GCCF's actions in settling Johnson's case.

### 7.   Even if the GCCF did not have actual authority to settle Johnson's case, BP ratified the settlement

Even if the GCCF did not have actual authority to settle cases on BP's behalf, the settlement agreement would still be enforceable since BP ratified it. "A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations; or (b) conduct that justifies a reasonable assumption that the person so consents." RESTATEMENT (THIRD)

---

[15] The GCCF clearly thought so as well since the first paragraph of the offer letter states that "[t]he GCCF . . . act[s] for and on behalf of [BP]." *See* Ex. J.

AGENCY § 4.01 (2006).  "To be effective as a ratification, the principal's assent need not be communicated to the agent or to the third parties whose legal relations will be affected by the ratification."  RESTATEMENT (THIRD) AGENCY § 4.01 (2006), cmt. b; *See also* cmt. d ("To constitute ratification, the consent need not be communicated to the third party or the agent.").   Here, BP manifested assent that the GCCF's contract offer would affect BP's legal relations.   BP's conduct also justified a reasonable assumption that it consented to the settlement.

BP informed Tidewater Marine that "Elton Johnson has accepted the [settlement] offer" and BP would be responsible for funding the settlement.  Ex. M.  As a result, BP demanded that Tidewater Marine indemnify it.  Ex. N; Ex. L.  Tidewater Marine responded by "request[ing] in the strongest terms that BP appeal the settlement."  Ex. M.  Had BP appealed, the GCCF's offer would have been void and no contract could have been formed.  Ex. J.  But BP refused to appeal and, instead, chose to allow the settlement to go through.  Ex. L ("BP will not appeal the GCCF's settlement with Mr. Johnson.").  BP then reiterated its demand that Tidewater Marine indemnify BP.  Ex. L.

BP's refusal to appeal the GCCF's settlement offer, taken in conjunction with its multiple indemnity demands, clearly "manifests assent that [the GCCF's contract] shall affect [BP's] legal relations [with Johnson and Tidewater Marine]."   BP's conduct in refusing Tidewater Marine's request to appeal the settlement also justified a reasonable assumption that BP consented to the settlement.  BP ratified the contract and is responsible for the GCCF's conduct.  The Court should enforce the settlement agreement.

7.      **BP's "fraud" allegations are baseless and are meant to distract the Court from the weakness of its claims on the merits**

BP has also argued that it was fraudulently induced into entering the settlement agreement because Johnson supposedly exaggerated the extent of his injuries.  To be clear, there was no fraud here and BP is only raising this issue to distract the Court from the fact that it is trying to back out of a written contract that its attorneys repeatedly acknowledged existed.  In fact, when Johnson sued BP for breach of contract in Texas state court, BP did not even plead "fraud" as an affirmative defense.  Ex. S (BP's state court Answer).  Moreover, the "facts" that form the basis of BP's after-the fact "fraudulent inducement" argument were well known to BP and the GCCF **before** they extended the settlement offer to Johnson.  Tidewater Marine then raised this argument with BP again and urged BP to exercise its right to appeal the settlement to prevent a contract from being formed.  BP determined the allegations were baseless and told Tidewater Marine that "BP will not appeal the GCCF's settlement with Mr. Johnson."  Ex. L.  It is difficult to understand how a party can be fraudulently induced to enter a contract when it has full awareness of the fraud allegations *before* entering into the agreement.  Regardless, out of an abundance of caution, though, Johnson will lay out the relevant facts so the Court can see how flimsy BP's "fraud" allegations really are.

Johnson was in the *Bankston's* change room at the time of the explosions.  The explosions damaged the structural integrity of the change room's ceiling.  Ex A.  Johnson was knocked up against a wall and was dazed.  Ex. D; Ex. E.  After he regained his composure, he assisted in the rescue of the *Deepwater Horizon* survivors.  The *Bankston* then returned to shore.  One of Johnson's co-workers at Tidewater noticed that Johnson

complained about "headaches and appeared visibly distressed." Ex. B.  The co-worker believed Johnson was "traumatized" by the incident.  *Id*.  Johnson also filled out a Coast Guard form indicating that he was "shooken up" and it took him some time to "come to my senses."  Ex. C.  On April 26, 2010, Johnson visited his family physician who diagnosed him with a right shoulder injury, a back injury, and post-traumatic stress disorder ("PTSD").  Ex. D.  He was referred to a psychiatrist who confirmed the PTSD diagnosis on May 11, 2010.  Ex. E.  On June 23, 2010, an orthopedic surgeon confirmed Johnson sustained a shoulder and back injury.  Ex. F.

In some of Johnson's medical records, he told the doctors he was "dazed" by the explosions, but did not lose consciousness.  In others, the doctors reported that he did temporarily lose consciousness.  There are also discrepancies over how many feet Johnson was from the wall he was knocked into.  These discrepancies form the basis of BP's and Tidewater's "fraud" allegations.

Normally, a defendant would use these discrepancies to try to impeach a plaintiff at trial.  Depending on whether the impeachment material was as strong as the defendant thought, a jury may latch onto the inconsistencies or may decide that the defense lawyer is simply grasping at straws.  This uncertainty is why parties often compromise and settle personal injury cases before they reach trial. This case is no different.  It is not fraud.

Moreover, after Johnson filed suit, he regularly produced his medical records to BP, the GCCF, and Tidewater.  Ex. T (examples of cover letters transmitting medical records).  All of the (minor) inconsistencies that form the basis of BP's "fraud" defense were evident to anyone reviewing those medical records.  Yet, these inconsistencies did not: (1) stop the GCCF from making its settlement offer; (2) did not prompt BP to appeal the settlement

despite Tidewater's repeated requests; and (3) did not stop Tidewater from paying maintenance and cure benefits for Johnson's supposedly overstated injuries.   It is incomprehensible that BP is now attempting to claim that Johnson fraudulently induced it into a settlement agreement based on inconsistencies in medical records that BP, the GCCF, and Tidewater all *possessed months before the settlement offer was made*.

The truth is Tidewater raised "fraud" as a mere afterthought when it feared that its first two indemnity defenses might be unsuccessful.[16] Tidewater did this in hopes of blowing up the settlement so Johnson would hopefully settle for a lesser amount, and thereby, reduce Tidewater's indemnity exposure/liability.   Now, BP has disingenuously latched onto Tidewater's argument to muddy the waters in this simple breach of contract case.  The Court should reject BP's ploy and enforce the contract as written.

## III.

## Conclusion

The Court should deny BP's motion and grant Plaintiff's motion.

---

[16] Tidewater's original defenses were: (1) no indemnity was owed because Tidewater was not allowed "to participate in the claims process."; and (2) its indemnity agreement with BP does not require Tidewater to indemnify BP for "claims based on the gross negligence of BP," and the "settlement is so high because the GCCF has taken both gross negligence and punitive damages into account."  Ex. M.

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/ Kurt B Arnold*

_____

Kurt B. Arnold
State Bar No. 24036150
6009 Memorial Drive
Houston, Texas 77007
Telephone:    (713) 222-3800
Facsimile:     (713) 222-3850

**ATTORNEYS FOR JOHNSON**

**OF COUNSEL:**

Jason Itkin
State Bar No. 24032461
Cory Itkin
State Bar No. 24050808
6009 Memorial Drive
Houston, Texas 77007
Telephone:    (713) 222-3800
Facsimile:     (713) 222-3850

<u>**Certificate of Service**</u>

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to all known counsel of record by CM/ECF and/or another means in accordance with the Federal Rules of Procedure on this 25th day of October, 2013.

*/s/ Kurt B Arnold*

_____

Kurt B. Arnold