## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | **MDL No. 2179** |
| | **SECTION J** |
| **This Document Relates to: 13-cv-2323** | **JUDGE BARBIER** |
| | **MAGISTRATE SHUSHAN** |

### <u>INTERVENOR COMPLAINT FOR DAMAGES</u>

NOW COMES PLAINTIFF, **Anthony Wilks**, through undersigned counsel, who does allege, aver and represent as follows:

Plaintiff files this intervention complaint in Case number 13-CV-2323 filed in the Eastern District of Louisiana titled Roberts Hotels Shreveport, LLC v. BP Exploration, et al. Plaintiff is a part of the group of plaintiffs associated in this complaint. Plaintiff adopts all of the allegations in the underlying complaint.

Plaintiff has suffered damage and injuries to financial and personal interest, damage to the economic livelihood, lost profits and/or impairment in earning capacity as a result of the oil spill by the oil rig Deepwater Horizon in the Gulf of Mexico beginning on April 20, 2010. Plaintiff have occupations and abilities to perform its chosen occupation which were destroyed and/or adversely and detrimentally affected on April 20, 2010 and therefore till 12/2010 and beyond when the Deepwater Horizon exploded, burned and subsequently sank in the Gulf of Mexico.

The Plaintiff made a presentment claim on the responsible party pursuant to the Oil Pollution Act of 1990, satisfying the presentment requirements of 33 U.S.C. §§ 2713(a) and (b). Without the Plaintiff receiving any payment on its claim pursuant to 33 U.S.C. §2713(c) (2) and satisfied the mandatory condition precedent to file this suit. Plaintiff hereby adopts and incorporates as if fully restated herein the Presentment Letter, BP Claim Form, short form joinder and Supporting Documentation submitted to the responsible party, (Presentment Letter, BP Claim Form, short form joinder and Supporting Documentation are sometimes referred herein as "presentment")

The Plaintiffs have opted-out or are in an excluded class and thus are not members of the class as defined in the Economic and Property Damages Settlement Agreement. In re: *Oil Spill by the Oil Rig "Deepwater horizon" in the Gulf of Mexico, on April 20, 2010, MDL No. 2179.* The Plaintiff's complaint against alleged Defendants is as follows:

## LIST OF PLAINTIFFS

**ALABAMA:**

1. Anthony Wilks    (BP PRESENTMENT CLAIM NO: 1101512-01 (FILED _6/7/2013_) Short Form Joinder document NO: 135894_ FILED _7/30/2013_ is a resident of Mobile, AL of legal age.

### Nature of the Action

1. On or about April 20, 2010, the *Deepwater Horizon* drilling platform exploded and sank, causing a spill of over 200 million gallons of crude oil over several months from the Macondo Well, MC-252, and resulting in the worst maritime environmental disaster in United States history.

2. Plaintiff has suffered economic injury, damage and/or losses as a result of the oil spill.

## THE PARTIES, JURISDICTION AND VENUE

3. Plaintiff bring these claims pursuant to Federal General Maritime Law including/and/or the Oil Pollution Act of 1990 ("OPA"), 33 USC §2701, *et seq.* and those actions surviving and applicable under the facts in the parent case of 10 MDL2179; this being an ancillary case to that MDL.

4. Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction.

5. Jurisdiction also exists before this Court pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

6. Defendant, BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. §2714.  This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

7. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service[1] ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated.  BP Exploration has been designated as the "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010.  It shall, however, be referred to as the MMS throughout this Complaint.

U.S.C. § 2714. BP Exploration's principle business establishment and registered business office in Louisiana is 5615 Corporate Blvd. Suite 400B, Baton Rouge, LA 70808 and whose agent of service for process is C.T. Corporation, 5616 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808.

8. Defendant, BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

9. BP America's BP Exploration's principle business establishment and registered business office in Louisiana is 5615 Corporate Blvd. Suite 400B, Baton Rouge, LA 70808 and whose agent of service for process is C.T. Corporation, 5616 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808.

10. Defendant BP P.L.C. is a British public limited company with its corporate headquarters in London, England. BP P.L.C. is the global parent company of the worldwide business operating under the "BP" logo. BP P.L.C. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally. Plaintiffs further adopt and incorporate by reference all jurisdictional allegations against BP p.l.c. set forth in Paragraphs 212-218 of the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re Oil Spill by the Oil Rig "Deepwater*

*Horizon" in the Gulf of Mexico, on April 20, 2010.*

11. BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as the "BP Defendants" or "BP."

12. Defendant, Halliburton Energy Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.  Halliburton is registered to do and does business in the State of Louisiana.  Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations.

13. BP EXPLORATION, BP AMERICA, and BP P.L.C. are sometimes referred to herein collectively as "BP" or "Defendants."  As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

14. The Plaintiff herein adopts and incorporates the reservation of all rights, claims, and causes of action against Transocean Ltd. And Halliburton Energy Services, Inc., as stated in ¶¶ 23-25 of the Amended Economic Loss Class Complaint.

15. Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools.  Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.  "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

16.  Defendant, TRANSOCEAN LTD, is a Swiss corporation that maintains substantial U.S.

offices at 4 Greenway Plaza, Houston, Texas 77046. According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean LTD was an owner, managing owner, owner pro hac vice, and/or operator of the MODU Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. At all pertinent times, Transocean Ltd was doing business in the State of Alabama.

17. Defendant, TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. (hereinafter "Transocean Offshore"), is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Alabama. Defendant, Transocean Offshore, is an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.

18. Defendant, TRANSOCEAN HOLDINGS, LLC (hereinafter Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Alabama. Defendant, Transocean Holdings, is affiliated with Transocean LTD and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the Deepwater 8 Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the United States Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting

from the explosion aboard the Deepwater Horizon.

19. Defendant, TRITON ASSET LEASING GMBH (hereinafter "Triton"), is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Defendant, Triton, is affiliated with Transocean LTD. and is an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

20. Defendants, Transocean LTD., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton, are hereinafter referred to collectively as "Transocean." At the Macondo site, Transocean provided the Deepwater Horizon MODU and personnel to operate it. At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its vessel control and operational systems. Transocean also provided operational support for drilling related activities on board the Deepwater Horizon, as well as onshore supervisors and support for those drilling activities at all times relevant to the Oil Spill.

21. Venue is proper in this jurisdiction because the defendants' actions, inactions, and failures directly and proximately caused the damage and harm to the Plaintiff in this jurisdiction and classification is pending in this jurisdiction.

22. On April 20, 2010, a blowout, explosion, and multiple fires occurred aboard the mobile offshore drilling rig *Deepwater Horizon,* resulting in the sinking of the *Deepwater Horizon* and an oil spill in the Gulf of Mexico (sometimes hereinafter "the Spill") that has caused, is causing, and will continue to cause, damage to the Plaintiffs. This is an action for damages, penalties, and other relief by the Plaintiff against the parties known to be responsible for the Spill. The Defendants named in

this lawsuit collectively and individually engaged in grossly negligent, wanton, and reckless conduct in the drilling and operation of the Macondo well, the operation of the *Deepwater Horizon,* and the containment of the Spill.

23. Defendants' actions resulted in the blowout of the Macondo well, caused the explosion, burning, and sinking of the *Deepwater Horizon* rig, and directly resulted in the release of crude oil and other pollutants into the waters of the Gulf of Mexico and of the Plaintiffs. These pollutants have damaged, are damaging, and will continue to damage Plaintiffs' economic livelihood.

### Factual Background

24. Plaintiff adopts and incorporates as if fully restated herein the factual allegations, causes of action, and prayer for relief, raised in the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (the "MDL Complaint").

25. Plaintiff further adopts and incorporates as if restated herein all factual allegations information contained in the short form joinders and presentments referenced above *as well as ANY PLAINTIFF PROFILE FORM AND/OR COMPLAINT PREVIOUSLY FILED BY PLAINTIFF(s).*

26. Plaintiff further adopts and incorporates as if fully restated herein Supplemental and Amended Responses to Phase One Written Discovery Requests, dated October 8, 2011; Amended Response to Phase One Request for Admission No. 76, dated December 27, 2011; and Supplemental and Amended Responses to Phase One Interrogatories Nos. 6, 7, and 17, dated December 14, 2012 in the MDL.

27. Causation is causation under the OPA and other applicable laws.  The use of descriptions

is exemplary, it being impossible to write out all of information developed during the litigation incorporated by reference in the forms provided and additional supplements are unnecessary in light of the adoption of that information which is already shared with the defendants.  RTP(s) are used where appropriate for all of the reasons used in the settlement. In particular, they reflect the fact that this event was not a single year event but had far reaching consequences which are still felt. This document adopts all arguments made for damages or enhanced damages in the settlement and in the litigation and in all claims filed either under the GCCF, litigation pending or under OPA presentment.

28. Companies making sales losses are all based on the potential sales (gross for valuation and net for actual losses) in addition to other methodologies. Similarly, this may be based on the potential sales of the company for a year, the "but for" sales of the company where facts show the company had the resources to reach those targets or based on actual sales in prior years or months before the spill.

29. Damages directly or indirectly to property held as inventory or otherwise which was liquidated in 2010 or even subsequent years is based in part on historical records showing that the sales prices during the spill were greatly reduced. In one claim for example a property sold before the spill for 4.5 million dollars, improved with two spec houses immediately before the spill and was foreclosed on for under 700,000 dollars showing that properties along the coast lost as much as 80% of their value where transfers or changes occurred during the spill. This occurred over all properties so that it is a drop of more than 80% in value occurred for water adjacent or water proximate properties even after they had hundreds of thousands of dollars in improvements during or before the

spill.

30. We incorporate by reference all of the documentation concerning causation, liability or otherwise developed in the underlying case: IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April20, 2010MDL NO. 2179 Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated, Plaintiffs, v. BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., Defendants. Civil Action No. 12-970 and the other pending consolidated complaints and the evidence developed under those.

31. This analysis is not considered exhaustive but is used in order to complete the presentment. Other methods of analyzing the information provided using generally accepted accounting principles would apply to this analysis and other analysis and this is only exemplary.

32. The *FACTUAL ALLEGATIONS OF DAMAGE/INJURY/HARM SUFFERED BY PLAINTIFF AS A RESULT OF SPILL* are more specifically set in the presentments and the short form joinders which are incorporated by reference herein and summarized below.

33. Plaintiff, out of the abundance of caution, made and/or re-made "presentment" of a Claim in accord with 33 USC §§ 2702(b) and 2713, by submitting a description of the claim with a "sum certain" and supporting documentation to BP as the "responsible party" under OPA *via* e-mail with additional information sent U.S. express Mail, on the dates given above.

34. Because Plaintiff previously asserted claims against the responsible party through the

presentment and short form joinder referenced above; this ancillary proceeding is filed out of abundance of caution and to supplement and not replace other actions pending.

35. BP either denied the claims or otherwise failed to satisfy within 90 days of presentment.

*The Macondo Lease, and BP's Exploration Plan and Drilling Permit*

36. On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf forty eight (48) miles off the coast of Louisiana.

37. In the process of obtaining its lease, BP represented that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.

38. BP represented that it was unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  In the event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount to which it assured the MMS that it was prepared to respond.  BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

39. Based on these assurances, the MMS approved BP's Initial Exploration Plan ("EP") for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.

40. After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

*The Deepwater Horizon's Poor Safety and Maintenance Record*

41. The Deepwater Horizon was a dynamically-positioned, semi-submersible deepwater drilling vessel built for Transocean and put into service in February 2001.

42. At all times relevant herein, the *Deepwater Horizon* was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D *Deepwater Horizon* ("Drilling Contract"), and later amendments to that agreement.

*The Macondo Well*

43. The Macondo prospect site is in the Northern Gulf of Mexico, an area known in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, and brittle rock formations.   At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet deep.  BP knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico and those conditions at these depths would render normal remediation efforts futile and a blow out might have long term impacts.

44. BP struggled with the Macondo well before the events of April 20, 2010.  The problems included varying pressures, varying strengths of formation layers, brittle rock formations, and kicks of natural gas bursting into the well further confirming that this was a fundamentally dangerous undertaking.

45. As the drilling schedule fell farther behind due to these and other problems, BP increased the pressure on the Deepwater Horizon's crew to speed up the drilling effort at Macondo in an effort to reduce costs.  BP repeatedly chose to violate industry guidelines and government regulations and ignore warnings from their own employees and contractors on the Deepwater Horizon to reduce costs and save time on the behind-schedule and over-budget Macondo well.

*Conduct Leading up to the Explosion*

46.  By April 9, 2010, BP had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained.  In their rush to complete the well, BP made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

47. BP chose a "long string" design for the Macondo well with fewer barriers against the risk of hydrocarbon blowouts because the safer "liner/tieback" option (which had been part of their original well design and was recommended by their contractors) would have taken longer to complete and would have added several million dollars in cost.

48. BP used inferior metal well casings for the casing pipe material itself, in violation of BP's own safety policies and design standards.

49. BP knowingly used too few centralizers on one or more pieces of casing pipe.

50. BP failed to fully circulate the drilling mud through the entire length of the well before beginning the cementing job, thus failing to properly clean the well bore and prepare the annular space for cementing, and thus failing to take action that could have revealed other

problems that contributed to the weaknesses of the Macondo well.

51. Defendants knew the cementing work the *Deepwater Horizon* was performing was especially risky. BP's mid-April plan review predicted cement failure, stating "[c]ement simulations indicated it is unlikely to be a successful cement job due to formation breakdown." Yet, Defendants made minimal efforts to contain the added risk. To save time and money, Defendants chose not to run a 9 to 12-hour procedure called a cement bond log to assess the integrity of the cement seal. Defendants also failed to secure the wellhead with a lockdown sleeve, a critical apparatus that locks the wellhead and the casing in the seal assembly at the seafloor, before allowing pressure on the seal from below.

52. Based on testing performed before the final cement job at the Macondo well, Halliburton knew that its cement slurry design was unstable. In addition, Halliburton and BP had results in March 2010 showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data.

53. In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms, the BOPs. Defendants were aware of the risk of BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs. Defendants were also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the *Deepwater Horizon*.

54. Defendants failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, functional technology to prevent blowouts.

55. Defendants failed to ensure that the *Deepwater Horizon's* BOP had sufficient, functional,

built in redundancy to eliminate single-point failure modes.

56. Defendants failed to ensure that all foreseeable repairs (if any) and foreseeable modifications (if any) to the Deepwater Horizon's BOP were performed, completed, and tested with the drilling vessel's operations shut down and the well secured.

57. Defendants failed to ensure that the testing of the *Deepwater Horizon's* BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV (remotely operated vehicle) connection points, and verifying the functionality of the automated mode function and/or autoshear.

58. Defendants could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deepwater drilling was present and available on the *Deepwater Horizon*, but did not do so.

59. Defendants could have installed a back-up acoustic trigger to activate the *Deepwater Horizon's* BOP in the event that the main trigger failed to activate.

60. While some testing has been completed, the investigation of the BOP retrieved from the seafloor, and other matters related to the disaster at the Macondo well, is still ongoing. Thus, the Plaintiff reserves the right to amend this Complaint once further information from that and any other future investigations becomes available.

61. BP was aware of Transocean's poor maintenance of the *Deepwater Horizon* and its practice of disabling or bypassing vital safety systems and alarms, but they continued to operate the vessel and did not report the inadequacies.

62. Upon information and belief, in addition to the examples set forth above, other non-exclusive examples of BP's misconduct, negligence and/or wantonness include:

a. Utilizing a defective well casing that was prone to fail when under heavy pressure;

b. Failing to observe dangerous and recurring problems with highly flammable gaseous compounds, and instituting risky cementing and drilling procedures hours before the *Deepwater Horizon* explosion;

c. Failing to institute common industry protective measures necessary to detect the buildup of highly flammable gaseous compounds before and during the cementing process;

d. Accelerating drilling operations in an effort to save money and pressuring employees hours before the *Deepwater Horizon* explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf s crust;

e. Using an improperly designed cement mixture ("slurry"), and failing to properly conduct and/or review the results of laboratory testing of the slurry;

f. Failing to deploy a casing hanger lockdown sleeve;

g. Displacing mud in the well with less-dense seawater before cementing had fully set;

h. Using non-standard spacer fluid mixture and volume;

i. Continuing to operate the Macondo Well after the well failed pressure tests;

j. Continuing to operate the Macondo Well without repairing the blowout preventer's annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers' protective measures against a blowout;

k. Failing to disclose or correct the fact that the battery on the blowout preventer was weak and one of its control pods was broken;

l. Consciously electing not to install an acoustically activated remote-control shutoff valve;

m. Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put into place in order to speed up the drilling process thereby creating high pressure instability in the well;

n. Failing to install a deepwater valve to be placed nearly 200 feet under the sea floor;

o.     Failing to recognize that pressure and flow data from the well were warning signs of a blowout;

p.     Failing to develop sufficient well control procedures for vessel workers to handle larger influxes into the well – for a hydrocarbon influx as large as occurred, flow should have been diverted overboard, not to the mud-gas separator;

q.     Failing to properly design, install, or maintain power supply to the blow-out preventer ("BOP"), including without limitation the use of only one blind shear ram, faulty maintenance, faulty post-market modifications, and other issues;

r.     Failing to properly design, install, or maintain connections from the blow-out preventer's control panel to the blow-out preventer;

s.     Failing to maintain properly and repair the BOP: BP officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010, but no action was ever taken to address the problems.  In addition to posing a significant safety risk, BP's choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly; and,

t.     Failing to equip the vessel with sufficient safety equipment, including operational gas sensors and a gas alarm system.

u.     Drilling at a depth and under conditions where it was impossible to operate safely or make permanent repairs with certainty

63.  BP knew, or should have known, of the acts and omissions outlined above, and was negligent, wanton, and reckless in drilling and continuing to drill in the face of these dangers, acts and omissions.

64. In sum, Defendants knew of the dangers associated with deep water drilling, and they knew of unique problems and shortcomings in the Macondo Well and *Deepwater Horizon* vessel.  Yet, Defendants failed to take appropriate measures to prevent damage to the Plaintiff, and thousands of citizens who are dependent upon the Gulf of Mexico and the Gulf coast to make a living.

*Post-Explosion Conduct*

65. Defendants' conduct after the explosion was insufficient to minimize damage, and was in some cases as negligent, wanton, and reckless as the conduct that led to the explosion.

66. BP failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the *Deepwater Horizon* explosion, and they misrepresented their capability to conduct offshore drilling operations safely and contain oil releases that might occur in connection with such operations.

67. BP attempted to downplay and conceal the severity of the oil spill after the explosion. Defendants' leak estimate of 5,000 barrels per day was found by government investigators to be a fraction of the current official leak estimate of 60,000 barrels of oil per day. In addition, the worst case scenario estimate of 100,000 barrels of oil per day is over 100 times BP's initial estimate of 1,000 barrels per day.

68. Defendants were also slow and incomplete in their announcements and warnings to residents and business people such as the Plaintiff about the severity, forecast, and trajectory of the Spill. The spill continued until at least 9/18/2013

69. Furthermore, the chemical dispersants used by Defendants to accelerate the dispersal of the oil has significant side-effects. Corexit EC9500A and Corexit EC9527A were the principal dispersants used. These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill. In addition, the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be <u>no</u> safe level of exposure to a

carcinogen, so all contact should be reduced to the lowest possible level." Further, the OSHA-required Material Safety Data Sheets ("MSDS") for both versions of Corexit used indicate they may have a potential to bio-accumulate in the tissues of fish or other organisms. Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261."

70. Corexit EC9500A and Corexit EC9527A are more toxic and less effective than at least twelve other EPA-approved dispersants and are banned from use on oil spills in the United Kingdom. Defendants stated that they chose to use Corexit because it was available the week of the rig explosion.

71. More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August. Dispersant use continued well after the Spill at the wellhead was stopped. The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface. Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to widespread concentrations of oil.

72. In addition to the events that led up to the oil spill and the treatment of the oil spill offshore, the defendants engaged in conduct which was non directly related to the spill but which ultimately caused much of the damage suffered by the Plaintiff. This conduct included, inter-alia, misrepresenting in print and media the extent of the spill, mis-representing what BP was doing to help after the spill; mis-representing what the spill entailed, the damage done, the residual effects and other things which the plaintiff relied upon in the their business decisions and which harmed them in the following respects: 1)

the continued operations which they otherwise could have cut to save expense, 2) the economy was and is adversely affected by the uncertainty caused as these misrepresentations were disclosed and as they continue to be discovered.

73. Oil, dispersants, and other pollutants released by Defendants remain in Gulf waters, the Gulf floor, Alabama waters, and land owned and/or within the state of Alabama, and continue to cause damage.  Oil, dispersants, and other pollutants have settled into the sediment on the Gulf floor and the bed underlying waters of Alabama, where it has killed, is killing, and will continue to kill marine life and will continually discharge into, and cause damage to, the water, land, property, and resources.

*Wantonness (Louisiana, Alabama, Texas, Mississippi)*

74. Plaintiff incorporates and re-alleges each and every allegation set forth above herein by reference.

75. Defendants, directly or through agents, breached their legal duties to the Plaintiff by failing to exercise reasonable care and acted with reckless, willful, and wanton disregard for the Plaintiff in the construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and the Macondo Well, and in planning and implementing oil containment and prevention activities before and after the oil disaster.

76. Upon information and belief, the Plaintiff avers that the fire explosion and sinking of the *Deepwater Horizon*, resulting Spill, and damages were caused by the Defendants' reckless, willful, and wanton conduct as more fully set forth above.

77. Defendants knew or should have known that their willful, wanton, and/or reckless conduct would result in the oil disaster, causing past, present, and future damages to the waters, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands,

marshlands, and other natural and economic resources.

78. As a direct and proximate result of the combining and concurring wantonness of all Defendants, the Plaintiff has and will continue to be damaged, including but not limited to, loss of income, loss of profits and/or earning capacity, and all other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available..

79. The Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the Plaintiff.

80. The Plaintiff demands judgment against all Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined by a jury.


IV.      PUNITIVE DAMAGES

81. Plaintiff incorporates and re-alleges each and every allegation set forth above herein by reference.

82. Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton, and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence.   The Plaintiff, society as a whole, and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

83. BP and Transocean focused primarily on profit while disregarding public and

environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

84. BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting, time-saving, and financial gain.

85. Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the *Deepwater Horizon* and prevented said system from operating properly and preventing or containing the explosions, fire, and loss of life.

86. BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using a long string well design with too few barriers to gas flow.

87. BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

88. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

89. BP, Transocean, and Halliburton focused primarily on profit while disregarding public

and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

90. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to run a cement bond log test to evaluate the integrity of the cement job.

91. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

92. BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

93. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

94. BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper

operation and use of the BOP appurtenant to the *Deepwater Horizon*.

95. BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

96. BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

97. BP and Transocean willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

98. BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico, and thus the economic wellbeing of the Plaintiffs.

99. In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and wellbeing of the Plaintiffs.

100.     The conduct of BP, Transocean, and Halliburton was oppressive, wanton, malicious, reckless, or grossly negligent because they:

    a.   failed to maintain and/or operate the *Deepwater Horizon* properly;

    b.   operated the *Deepwater Horizon* in such a manner that the safety and integrity of the vessel and the well were disregarded to save time and money;

    c.   ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

    d.   failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon*;

    e.   violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

    f.   failed to take appropriate action to avoid or mitigate the accident;

    g.   failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

    h.   failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order;

    i.   failed to provide appropriate disaster prevention equipment; and,

    j.   failed to have an appropriate emergency spill response plan or readily available spill response equipment.

101.     The conduct of BP, Transocean, and Halliburton, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because their conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and economic wellbeing of the plaintiff; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of their financial gain; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish them and deter further

repetition by them or others.

102.     The Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the Plaintiffs and its citizens.

103.     Accordingly, the Plaintiff are entitled to an award of punitive damages in an amount to be determined at trial.

104.     BUSINESS CLAIMANT – LOST EARNINGS OR PROFITS

### SUMMARY OF CLAIM –

Calculation of Damages:  $329,000

Question 4: Individuals/Buyers/Clients; Loss revenue and lack of confidence due to the Oil Spill lead to fewer loan applications which resulted in fewer closed sales/ mortgages/ profits.

### CAUSATION

In 2010, prior to the oil spill, the claimant worked for a Company provided financing in Mobile, Alabama, and was growing at a fast pace.  Work declined to almost nothing after the oil spill and has only begun the process of recovery. House Values on the Gulf Coast dropped immediately 10% to 45% after the oil spill. Condos dropped 25% to 65% include after the oil spill. Our revenue dropped immediately after the spill and has taken us several years and we are still recovering-see attach.

People quit borrowing money. People were also unable to borrow money because of property value decline.

We incorporate by  reference all of the documentation concerning causation, liability or otherwise developed in the underlying case: IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April20, 2010MDL NO. 2179Bon Secour Fisheries, Inc., et

al., on behalf of themselves and all others similarly situated, Plaintiffs, v. BP Exploration & Production Inc.; BPAmerica Production Company; BP p.l.c., Defendants. Civil Action No. 12-970 and in particular that filed by any mortgage company, bank, developer or mortgage broker, but not limited to that group.

This analysis is not considered exhaustive but is used in order to complete the presentment.  Other methods of analyzing the information provided using generally accepted accounting principles would apply to this analysis and other analysis and this is only exemplary. Causation is causation under the OPA and other applicable laws.  The use of descriptions is exemplary, it being impossible to write out all of information developed during the litigation incorporated by reference in the forms provided and additional supplements being unnecessary in light of the adoption of that information which is already shared with the defendants.  RTP(s) are used where appropriate for all of the reasons used in the settlement. In particular, they reflect the fact that this event was not a single year event but had far reaching consequences which are still felt. This document adopts all arguments made for damages or enhanced damages in the settlement and in the litigation and in all claims filed either under the GCCF or under OPA presentment.

Companies making sales losses are all based on the potential sales (gross for valuation and net for actual losses) in addition to other methodologies. Similarly, this may be based on the potential sales of the company for a year, the "but for" sales of the company where facts show the company had the resources to reach those targets or based on actual sales in prior years or months before the spill.

### For Each Claim

105.     We incorporate by  reference all of the evidence and documentation and legal theories  concerning  damages,  causation,  liability  or  otherwise  developed  in  the

underlying case: IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April20, 2010MDL NO. 2179Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated Plaintiffs, v. BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., Defendants. Civil Action No. 12-970.

106.     This analysis is not considered exhaustive but is used in order to complete presentment and suit.   Other methods of analyzing the information provided using generally accepted accounting principles would apply to this analysis and this is only exemplary.

107.     Causation is causation under the OPA and other applicable laws.   The use of descriptions is exemplary, it being impossible to write out all of information developed during the litigation incorporated by reference in the forms provided and additional supplements and it being unnecessary in light of the adoption of that information which is already shared with the defendants.   RTP(s) are used where appropriate for all of the reasons used in the settlement. In particular, they reflect the fact that this event was not a single year event but had far reaching consequences which are still felt. This document adopts all arguments made for damages or enhanced damages in the settlement and in the litigation and in all claims filed either under the GCCF or under OPA presentment.

108.     Companies making claims for sales losses are based in part on the potential sales in addition to other methodologies. Similarly, this may be based on the potential sales of the company for a year, the "but for" sales of the company where facts show the company had the resources to reach those targets or based on actual sales in prior years or months

before the spill.

109.     House Values on the Gulf Coast dropped immediately 10% to 45% after the oil spill. Condos dropped 25% to 65% include after the oil spill. Revenue dropped immediately after the spill and it has taken several years to even partially recover. Investment in projects ceased and the recovery has not completely reached these projects. The effect on liquidity of these values and business losses are directly related to damages and are foreseeable consequences and within the scope of the claims made.

110.     People largely quit borrowing, spending and lending money as a result of these problems and banks restricted credit. People were unable to borrow money because of property value decline and lost income.

### Claims for Relief

111.     Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints, presentments and the Short Form Joinder No.(s) set forth above against the Defendants as responsible parties under the Oil Pollution Act, 33 USC §2701, et seq., which holds responsible parties liable to plaintiffs for removal costs and damages arising out of the following:

112.     Loss of Natural Resources;

113.     Loss or Damage to Real or Personal Property;

114.     Subsistence Use;

115.     Loss of Revenues;

116.     Loss of Profits and/or Earning Capacity; and

117.     Loss of Public Services

118.     Other covered causes

119.    Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints, presentments, and the Short Form Joinder No.(s) (listed above), against all defendants identifying General Maritime Law causes of action and claims for relief relating to the following:

120.    Negligence; and

121.    Gross Negligence and Willful Misconduct

122.    Other claims which are covered

123.    Plaintiff adopts and incorporates as if restates herein, all claims for relief raised in the MDL Complaints; presentments; and the Short Form Joinder No. listed above, against all defendants for Punitive Damages arising out of willful and wanton misconduct and/or gross negligence as alleged and described in the MDL Complaints.

**PRAYER FOR RELIEF**

124.    WHEREFORE, Plaintiff demands judgment against Defendants, jointly, severally, and *in solido,* as follows:

125.    Economic and compensatory damages in amounts to be determined at trial;

126.    Punitive Damages;

127.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

128.    Reasonable claims preparation expenses;

129.    Attorneys' fees;

130.    Costs of litigation; and

131.    Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

**REQUEST FOR TRIAL BY JURY**

132.     Plaintiff requests that the above and foregoing be heard at trial by a jury of peers.

Dated July 31, 2013.

Respectfully submitted,

**ATTORNEYS FOR PLAINTIFF**

s/ Gregory Friedlander

Gregory Friedlander
ALBN 0188
Gregory M. Friedlander & Associates, P.C.
11 S. Florida St.
Mobile, AL 36606-1934
(251) 470-0303
(888) 441-2123
E-Mail Address: Isee3@aol.com

/s/ Wesley J. Farrell, Esq.
Wesley J. Farrell, Esq., FLBN 71785
Terry A. C. Gray, Esq, FLBN 100732
Farrell & Patel, Attorneys At Law
113 Almeria Ave
Coral Gables, FL 33134
Tel: 305-798-4177
Fax: 800-946-6711

Sarah E. Spigener, Esq., LSBN 31975
Farrell & Patel, Attorneys At Law
1515 Poydras St., Suite 1400
New Orleans, LA 70112
Tel: 504-233-8585
Fax: 504-264-5953

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing PROPOSED INTEVENTION COMPLAINT  has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 31st day of July, 2013.

/s/ Sarah Spigener