## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** **"Deepwater Horizon" in the Gulf** **of Mexico, on April 20, 2010** **This Document Relates to:** **No. 12-970** | **MDL No. 2179** **SECTION: J** **JUDGE BARBIER** **MAGISTRATE SHUSHAN** |

## DECLARATION OF STEPHEN J. HERMAN

I, Stephen J. Herman, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana, the U.S. Fifth Circuit Court of Appeals, and the U.S. Supreme Court.

2. James Parkerson Roy and I have been appointed by the Court to serve as Co-Liaison Counsel for Plaintiffs in MDL No. 2179 and Co-Lead Class Counsel for the Economic & Property Damages Settlement Class.

3. I have previously submitted a Declaration dated July 23, 2012 [Doc 7104-5] and a Declaration dated April 1, 2013 [Doc 9087-3], which are respectfully incorporated by reference herein.

4. This Declaration is submitted in response to the Court's request for any additional evidence relating to whether the parties discussed, prior to the time the Settlement Agreement was executed, whether or not expenses and revenues would be matched for all Business Economic Loss (BEL) Claims, (*see* SCHEDULING ORDER REGARDING BEL REMAND (10/25/2013) [Doc 11735], ¶2).

**Personal Involvement in and Familiarity with Relevant Settlement Negotiations**

5.  I was both directly and indirectly involved in the Economic & Property Damages Settlement negotiations, as generally described in my previous Declaration of July 23, 2012 [Doc 7104-5], as well as Mr. Godfrey's Declaration of August 13, 2012 [Doc 7114-9].  Of particular relevance to the subject of the Fifth Circuit remand:

6.  While I was not intimately involved in the negotiation of the specific BEL Compensation Framework provisions contained in Exhibit 4C, I was familiar with the evolution of BEL Compensation Frameworks generally through discussions with Mr. Rice, Mr. Fayard and Mr. Roy; was physically present during several of the discussions between the PSC Negotiating Team and Counsel for BP regarding the BEL Frameworks; actively participated in several of the discussions regarding the Causation Framework, Exhibit 4B; and became directly involved in the resolution of the dispute that was the subject of Mr. Godfrey's February 17, 2012 E-Mail [Doc 8963-58].[1]

7.  In addition, I personally drafted and participated in the negotiation and finalization of the Multi-Facility Framework for BEL Claims contained in Exhibit 5, and was further involved in the negotiation and drafting of the definition of "Contemporaneous" that appears in Section 38.38 of the Settlement Agreement.[2]

8.  I, together with Jim Roy and Elizabeth Cabraser, also negotiated, drafted and finalized the "Claimant-friendly" provisions that appear in Sections 4.3.1, 4.3.7, 4.3.8, 4.4.7 and 4.4.9 (as well as 6.1, 6.1.1.1 and 6.1.2.1.1) of the Settlement Agreement.[3]

---

[1] Leading the discussions I attended regarding the BEL Frameworks for BP were generally Ms. Bloom and Mr. Godfrey.  Mr. Neath, Mr. Holstein, Mr. Lennard, Mr. Cantor and BP's expert/consultant, Hal Sider, were also frequently present.

[2] Mr. Karron was generally leading the discussions for BP on the Multi-Facility Framework. My recollection is that Ms. Bloom was leading the discussions regarding the definition of "Contemporaneous".

[3] These negotiations occurred initially and primarily with Mr. Lennard, speaking for BP.  I believe that Mr. Holstein was also present.  Eventually, Mr. Godfrey, Mr. Cantor, Mr. Douglas and others for BP were involved in the revision and finalization of the language that appears in the Settlement Agreement.

9. Finally, I was directly involved in the negotiation, drafting and finalization of the Amendment to the Settlement Agreement dated May 2, 2012 [Doc 6414-6], including the modification of Section 4.4.13.4.[4]

## Settlement Discussions

10. To the best of my knowledge, recollection and belief, there were no specific discussions between the Parties regarding the "matching" of expenses to revenue in cash-basis (or other) BEL Claims.

11. Indeed, based particularly on my experience in the negotiation, drafting and finalization of the Multi-Facility Framework and the definition of Contemporaneous, BP's primary focus was on the submission and evaluation of the actual monthly profit and loss statements ("P&Ls") (if any) that had been generated by the claiming Entity during the relevant Benchmark and Compensation Periods in the ordinary course of its business.

12. Neither BP nor the PSC Negotiating Team expressed a suggestion or expectation that Program Accountants would make any attempt to 'move' or 'match' expenses into or out of the monthly Benchmark or Compensation Periods; or otherwise attempt to determine which particular expenses "corresponded" with the monthly revenues that had been recorded during the relevant Benchmark and Compensation Periods.

13. Neither BP nor the PSC Negotiating Team expressed a suggestion or expectation that Program Accountants would look to the "business activities" of the claiming Entity to attempt to determine what revenues had been "earned" during the Benchmark or Compensation Periods. Nor do I recall any discussion or proposal regarding "revenue attribution criteria".

14. Neither BP nor the PSC Negotiating Team expressed a suggestion or expectation that cash-basis P&Ls could not be submitted; would have to be converted to accrual-based P&Ls prior to submission; or would have to be converted to accrual-based P&Ls by the Program Accountants.

---

[4] These discussions occurred initially with Mr. Godfrey, and, I believe, Mr. Lennard. Mr. Karron became BP's point person in finalizing the language.

15. Indeed, it was always my understanding and expectation from the settlement discussions that the review of monthly P&Ls by the Settlement Program would be fairly mechanical, objective, and relatively efficient.

16. My experience regarding Section 4.3.8 in particular further reinforces my understanding and belief that Counsel for BP, like the PSC Negotiating Team, were focused on the specific monthly revenues obtained and expenses incurred.  There was an awareness, particularly with respect to seasonal and cyclical businesses, that there would be time lags between the initial, continuing and sometimes delayed effects of the Spill and the ultimate resulting financial impacts on the businesses in question.  The solution to this was not to 'smooth' revenue or expenses, but to provide the Claimant with optionality. We wanted to make sure, and BP agreed, that the monthly experiences of revenue and expenses selected by the Claimant, (or, alternatively, utilized by the Claims Administration Vendors), would maximize the Economic Damage Compensation Amount.

17. The Documentation requirements in Exhibit 4A for tax returns, annual P&Ls, the authority of the Claims Administrator to request source documents, and the authority of the Claims Administrator to look into potential discrepancies between the monthly P&Ls and the tax returns, were all motivated on BP's part – not by a necessity or desire to "match" expenses with revenues in cash basis (or other) BEL Claims, but – by the desire to prevent potential fraud.  These concerns, (also reflected in the Exhibit 4A requirement to identify the dates on which the P&Ls were created), were specifically discussed when BP agreed to the definition of "Contemporaneous" that appears in Section 38.38.

18. Similarly, my recollection of the discussions surrounding the Multi-Facility Business Documentation and Additional Multi-Facility Business Documentation in Exhibit 5 is that BP was motivated – not by a necessity or desire to "match" expenses with revenues from outside of the relevant Benchmark and Compensation Periods, but – by the desire to protect against "double payments" to multiple facilities within the same Entity and/or

settlement compensation that might be associated with ineligible or non-claiming facilities.

### The May 2, 2012 Amendment

19. After the original Settlement Agreement was made available to the public, I started to receive complaints from CPAs and attorneys that the Claimant Account Support Compensation would be of little or no benefit to the great majority of BEL Claimants, as the accountants preparing the claims would generally not be able to "sign and attest they have submitted information in compliance with generally accepted accounting principles" (*see* original Section 4.4.13.4 (April 18, 2012) [Doc 6276-1]).

20. These CPAs and attorneys complained that many businesses did not keep their books under GAAP;  that the Documentation provisions in Exhibit 4A did not require the preparation and submission of financial statements in conformance with GAAP;  that attestation of compliance with GAAP would be unduly burdensome and expensive;  and that, in several ways, the Settlement Agreement generally, and BEL Claim Frameworks in particular, expressly deviated from GAAP in several material respects.

21. We brought this to the attention of BP Counsel, who agreed that an attestation of compliance with GAAP is not what was intended, and that the Settlement Agreement would be amended in this regard.

22. My recollection and impression from these discussions is, again, that BP was focused primarily on the claiming Entity's use of the actual monthly P&Ls (if any) that had been generated during the relevant Benchmark and Compensation Periods in the ordinary course of its business.  Where monthly P&Ls had not been generated by the claiming Entity in the ordinary course of its business, BP wanted to ensure that CPAs preparing and submitting claims would use a "*consistent*" methodology for both the Benchmark and Compensation Periods, and would not "ignore the implications of information known or reasonably suspected to be untrue, incomplete, inconsistent or inaccurate." (*see* amended Section 4.4.13.4 (May 2, 2012) [Doc 6414-6]) (emphasis supplied)

23. I do not recall, during these discussions, any suggestion or contemplation that either the CPAs preparing and submitting BEL Claims or the Settlement Program Accountants reviewing BEL Claims would engage in any attempt to "match" expenses to revenue in pre-existing, contemporaneous, cash-basis (or other) monthly P&Ls.

## Review of My Files

24. I have reviewed my notes and drafts from the settlement negotiations, as well as the e-mail communications with BP Counsel relating to the preparation and filing of the May 2, 2012 Amendment.

25. I have not found any notes or communications inconsistent with my recollection of the discussions as stated in Paragraphs 10-23 above.  In addition:

26. A September 15, 2011 draft of the Compensation Framework for Business Claims prepared by BP defines "expected variable profit" with reference to "total average revenue *during* the 'claimant benchmark period'" and then directs that "the total average variable profit is calculating by subtracting the total average variable costs *incurred during* the 'claimant benchmark period' from the total revenue earned during the 'claimant benchmark period'." [5, 6]   Then, BP defines "actual variable profit" in terms of "actual revenue earned by the claimant less variable costs *incurred during* the 'claimed loss period'." [7]

27. No subsequent drafts, notes or memos in my files reference or suggest that expenses from outside the claimant's Benchmark and Compensation Periods would be "matched" to revenue that is recorded during the Benchmark or Compensation Periods;  nor reference or suggest that cash-basis claims will be treated either differently from or the same as accrual-basis claims;  nor reference or suggest that the timing of earnings or expenses

---

[5] Bates No. 001433 (emphasis supplied).

[6] It is my understanding that BP, at this point, was taking an EBITDA approach to compensation, which was rejected by the PSC Negotiating Team and ultimately abandoned, beginning on or around November 3, 2011, in favor of the Step One and Step Two Variable Profit approach ultimately reflected in Exhibit 4C.

[7] Bates No. 001434 (emphasis supplied).

will be governed by "generally accepted accounting principles" nor "accrual-based" accounting principles, nor any other particular accounting methodology.

28. As far back as September 27, 2011, BP's proposed Documentation Requirements for Business Claims focused on: "Monthly and annual profit and loss statements identifying individual line items for the claimed benchmark period and 2010-2011, or alternate source documents establishing monthly revenue such as sales and use tax returns or bank statements."[8]

29. None of my subsequent drafts, notes or memos relating to the Documentation Requirements for Business Claims – nor the Multi-Facility Businesses Framework, nor the definition of "Contemporaneous" – instruct, direct or suggest that monthly or annual P&Ls must be prepared or submitted on an "accrual" basis, or in accordance with "generally accepted accounting principles"; nor do they instruct, direct or suggest that the claiming Entity must provide the Settlement Program with sufficient documents so that the Program Accountants can attempt to determine which expenses from outside of the relevant Benchmark and Compensation Periods might be "matched" to or "corresponded" with the revenues recorded during the relevant Benchmark and Compensation Periods; nor do they instruct, direct or suggest that the claiming Entity must provide the Settlement Program with sufficient documents so that the Program Accountants can examine the claimant's "business activities" outside of the relevant Benchmark and Compensation Periods, or other "revenue attribution criteria".

30. An internal e-mail dated April 24, 2012, reflects a discussion with BP Counsel on April 23, 2012, in which BP Counsel apparently communicated that BP "did not intend that Claims Preparers would have to certify that underlying business records were prepared in conformity with GAAP; only that they were applying GAAP principles with respect to what they were doing – at least to the extent that the Settlement Frameworks don't call for something else." In an e-mail that same day with BP Counsel, BP agreed to remove "in compliance with generally accepted accounting principles" from Section 4.4.13.4 so that the requirement was simply that the retained professional sign and attest that that

---

[8] This BP Documentation Requirements for Business Claims September 27, 2011 draft has been identified by Bates Nos. 1528-1529, even though such Bates Numbers do not appear on the face of the document.

have submitted information "on a consistent basis" and have not ignored the implications of information known or reasonably suspected to be untrue, incomplete, inconsistent or inaccurate.  Later that day, in further e-mail communications between Joe Rice and BP Counsel, BP agreed to replace the word "attest" with the word "verify" because of a concern that the word 'attest' is a term of art that would have arguably required a CPA assisting with the preparation of a claim to audit the underlying financials of the Entity.

31. None of the notes, memos or drafts in my files make any reference to or suggestion that the "business activities" of the claiming Entity would be considered in trying to determine when revenue is deemed to be "earned" for Causation or Compensation purposes.

32. None of the notes, memos or drafts in my files contain any definition of or other reference to "revenue attribution criteria".


Signed, under penalty of perjury, this 5th day of November, 2013, in New Orleans, Louisiana.

Stephen J. Herman