IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

DECLARATION OF JOSEPH F. RICE
RE: BEL REMAND ISSUES

I, JOSEPH F. RICE, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the state of South Carolina and the District of Columbia. I am admitted to appear before the United States Fifth Circuit Court of Appeals and the United States Supreme Court, among others.

2. On August 13, 2012, I filed three declarations in the above case in support of issues presented in the Fairness Hearing. The Declaration re: Overall Settlement Negotiations filed under Docket No. 7101-8 is incorporated herein as if repeated verbatim.

3. My previous declaration provided a history of the settlement negotiations and my role in those negotiations.

4. This declaration is submitted in response to the Court's request for any additional evidence related to whether the parties discussed, prior to the time the Settlement

Agreement was executed, whether or not expenses and revenue would be matched for all Business Economic Loss (BEL) claims (*see* Scheduling Order Regarding BEL Remand, 10/25/13, Document No. 11735).

**Personal Involvement in the Negotiations and Document Generation**

5. During the course of the negotiations I was personally involved in virtually every negotiating session discussing the BEL frameworks.

6. Either I, or other individuals under my direction, generated many drafts of agreements, edited in redline agreements, and maintained the document management for the PSC negotiating team.

7. An index of all drafts exchanged concerning the BEL Compensation, Documentation, and Causation Frameworks is provided as "Exhibit A."

8. In the early days of negotiations, the drafts often addressed documentation, causation and compensation within the same document, and if so that document is indicated. It is my personal belief, based on review of all of my records and emails, that this is a comprehensive list of all of the document drafts that were generated. Within these documents not only are there drafts of the Exhibits to the Settlement Agreement, but on occasion the parties would use the exchange of memoranda to lay out positions, point out differences, and make compromise proposals. To the extent relevant herein, those documents are included in the index.

9. As we moved the negotiations to New Orleans in late 2011 and through the spring of 2012, we began actually drafting the Settlement Agreement itself. An index of the exchanges of draft Settlement Agreements is provided as "Exhibit B." There may be

additional drafts that were retained by others, but these are the principal drafts that I maintained during the settlement negotiations.

## My Document Review

10. I have spent extensive time since the issue of matching expenses to revenue arose reviewing and studying all of the draft agreements, reviewing the draft exhibits, and reviewing hundreds of emails between myself and the BP parties, between myself and our negotiating team, and our consulting accounting experts.[1]

11. As a course of conduct, after a significant negotiating session, I would generate a document I labeled "Memo JR to JR." These memos would lay out the specific points discussed in that negotiating session and my mental impressions about where the parties were and where the negotiations could go. I believe that these memos are covered by the attorney-client privilege and work-product doctrine; however, if the Court requests, I will file them under seal for the Court's *in camera* review.

12. After the review of all these materials, I can unequivocally say that during the approximate year of intense negotiations that led to the Economic & Property Damages Class Settlement Agreement, there was never a discussion related to the matching of expenses to revenues in either claims using accrual accounting or claims using cash basis accounting.

13. There was never a representation from any party expressing the suggestion or expectation that the Claims Administrator or the Vendors for the Claims Administrator would make

---

[1] I have searched and reviewed emails from Rick Godfrey, Wendy Bloom, Jeff Lennard, Jim Neath, Mark Holstein, and Dan Cantor, the principal BP negotiating team.

any attempt to "move" or "match" expenses into or out of the Plaintiff-selected Benchmark Period or Compensation Period.

14. There was never any request, representation or suggestion that the Claims Administrator or Claims Administrator Vendors would attempt to determine which particular expenses "corresponded" with the monthly revenues that had been recorded on the monthly P&Ls in the months selected for the Benchmark Period and the Compensation Period.

15. There was never any request, representation or suggestion that the Claims Administrator or Claims Administration Vendors would attempt to look at the "business activities" of a claimant (or other "revenue attribution criteria") to attempt to determine what revenues had been "earned" during the Benchmark or Compensation Periods.

16. It was expressly understood by the parties that cash basis accounting would be a frequent method of bookkeeping.

17. The insistence on contemporaneous monthly P&Ls was intended to allow the claimant to use existing documents. During the end of the negotiations, because of the concern that many businesses may not have kept monthly P&Ls in a real time setting, a definition of "Contemporaneous" was added so that it specifically and expressly allowed for the creation of monthly P&Ls by a claimant post spill, at a time that the Claimant knew such would be a criteria for presenting claims for compensation to the Claims Administrator. In conjunction with the express negotiated definition of Contemporaneous found in § 38.38 of the Settlement Agreement, the parties also agreed to require a general statement as to when the monthly P&Ls were created and if created other than simultaneous with

   the event, to vest in the Claims Administrator additional discretion to judge the credibility of the documents.[2]

18. What the Court has asked us to address in my view requires us to prove a negative. In that sense, the entire record of all drafts, notes, and other written communications could be considered "evidence" that discussions regarding the matching of expenses to revenue did not, in fact, take place. We understand that the Court does not expect such a submission and has requested that such evidence be provided in the form of a declaration. In that respect, I offer a more detailed discussion of the actual negotiations of the parties, as further set forth herein. In some cases, I have selected documents that I believe are of particular relevance to the Court's consideration.

## The Negotiations

19. In the summer of 2011, Calvin Fayard and I requested the opportunity to meet with the GCCF vendors and Mr. Feinberg. One of the purposes of the meeting was to get a clear understanding of what they had seen in the claims filed with the GCCF to date. As a result of that meeting, we were able to verify and add to our knowledge concerning the scope of claims that had been paid by the GCCF. We learned at that time and verified that GCCF had paid claimants in every county in every state of Alabama, Louisiana, and Mississippi. Maps we generated in the summer of 2011 from the GCCF data and exchanged with BP to indicate the widespread nature of claimants that had been presented to the GCCF are provided as "Exhibit C." We were told unequivocally that BP

---

[2] The language "the profit & loss statements shall identify the dates on which they were created" first appears in the Documentation Requirements from BP on March 1, 2012.

had full access to all claims data submitted to the GCCF and was aware of the nature of the claims.

20. In the early meetings Mr. Feinberg indicated that a big problem we would face is that people assumed that the financial data from the Plaintiffs would be backed up by records, but that the GCCF experience was that underlying pre-spill data (e.g., from the 2008-2009 timeframe) was not readily available. This formed a great impression on Mr. Fayard and me for the need to have flexibility for our class members to use the pre-existing financial records they had, and to be able to create financial records from the documents they had, and not have a strict requirement of backup documentation.[3]

21. In the June 30, 2011 meeting that occurred in London, Mr. Godfrey explained that BP "would like to avoid a calculation on every individual case and would like to develop a fixed formula for some losses in some industries and apply it to everyone in that industry and maybe even then determine what a profit margin is in an industry and apply that to historical revenue and just deem that to be the loss."

22. In the summer of 2011, there was significant discussion between the parties where the terms "core claims" and "non-core claims" were used. "Core claims" were described by Mr. Godfrey to include Seafood- or Tourism-related claims, and "non-core claims" were other business-type claims. At the time of our meetings in the summer of 2011, Mr. Godfrey expressly included in his description of "non-core claims" the claims of construction companies and professionals, including attorneys.

---

[3] I use the terms "class members" and "class" to refer generally to claimants who are entitled to make claims and receive payment through the Court-Supervised Settlement Program. While there is an element of the Economic & Property Damage Class Settlement Agreement that contemplates Rule 23 approval and a class-wide release in favor of BP, the Agreement also provides for a Claims Administration and Trust to process and pay the claims of eligible Claimants, as a contractual matter, under an Individual Release.

23. BP had a very sophisticated GPS mapping software that was used by BP during the negotiations, and it shared access to the software with the PSC negotiating team. This software allowed one to take any segment of a state, and search that area for significant information, including the types of businesses. We often looked at businesses that were in agricultural, construction, and professional services. A page that was generated from this mapping system is provided as "Exhibit D.". Multiple pages of these printouts were available. This is offered to illustrate the extensive knowledge that the parties had at the time of the negotiations about the various businesses that were located in a given area, whether it was Zone A, Zone B, Zone C, or Zone D, including agricultural and construction businesses.

24. During the initial months of settlement discussions, the parties focused on the geographical area that would be included in the Class, as well as the method the parties would approach to establish causation. It was not until late summer of 2011 that the parties began focusing intensely on the method of calculating the compensation.

25. Early in the negotiations sessions during August 2011, when the parties were discussing the potential application of punitive and consequential damages on top of a base economic loss, Jim Neath expressed the intent and belief that "a good deal of what I pay for may be over and above what they can get in litigation, so I'm compensating some where they could lose; so when that compensation figure even before the RTP, that compensation figure is paying a premium." While this may or may not be true, it (in my mind) supported the notion and desire on BP's part for a broad geographical class definition in order to achieve closure.

26. From early in the negotiations, the PSC was focused on Variable Profit as the measure of compensation. BP understood how the PSC was proposing the application of expected Variable Profit. In the BP draft dated September 15, 2011 ("Exhibit E"), BP expressly stated in discussing expected Variable Profit in Section F: "The variable margin is calculated to the extent possible as follows: total average variable profit is divided by the total average revenue during the 'claimant benchmark period.'" Throughout the discussion of expected variable profit, the reference is to "[a]verage variable costs incurred during the claimant benchmark period." If one continues in Section F(2), in the reference to actual variable profit, it is addressed in (2)(a) as "'actual variable profit'" is calculated as <u>actual</u> revenue earned by the claimant less variable costs incurred <u>during</u> the 'claimed loss period.'" From the very beginning, the parties were using the revenue and expenses as stated in the claimant selected time as established on the financial records. There was never a discussion or reference to matching expenses to revenue or in any way moving items around from their financial statements. This Variable Profit approach stayed consistent throughout the negotiations from the PSC's point of view, ultimately was the agreed-to process in the Settlement Agreement, and established from the very beginning that we were looking at revenue and expenses "as incurred."

27. Throughout the negotiating process, BP had an extensive team of accountants and economists who appeared in some negotiating sessions but worked separately with the PSC's consulting accountants and formed an Accounting Working Group. This Accounting Working Group exchanged voluminous samples of real claims that had been processed through the GCCF that presented all types of issues concerning calculating

losses. At no time in any of the meetings that I attended with the Accounting Working Group or in any documentation provided by the Accounting Working Groups was there ever a suggestion made in any sample that there would be an alteration of the reported expenses or revenues or any type of matching of expenses to revenue.[4]

28. On November 3, 2011, Mr. Fayard and I provided the BP negotiating team a detailed memo "re: Economic Loss for Business Claimants" ("Exhibit F"). The memo addressed a number of overall issues, including the damage calculations. As an exhibit to the memorandum, there was a document titled "Damage Calculation Methodology for Business Claims." Attached to that memorandum was a Claims Calculator memo, as well as a sample of the application of the methodology. This damage methodology was being supplied in reply to BP's previously stated position that it wanted to use exclusively a damage calculation model referred to as the "EBITDA" model.

29. In the November 3, 2011 memorandum, we expressly discussed the approach to determining expenses and acknowledged that the parties had, through their accounting working groups, previously agreed in large part to the allocation of expenses between fixed and variable. The parties did not adopt standard accounting definitions of fixed and variable expenses and spent an enormous amount of time in the early part of negotiations creating their own list of fixed and variable expenses that ultimately was included as Settlement Agreement Exhibit 4D.

---

[4] Hal Sider was in attendance at many, if not all, such meetings. While Mr. Sider has provided numerous declarations to the Court since December 2012 addressing the claim compensation, never has he expressly stated under oath that he or his team ever raised the matching of expenses to revenues with PSC negotiating team. He may file a new declaration now suggesting matching was discussed, but it will be the first time.



30. On page 2 of the November 3, 2011 memo, we make reference to Step 2 Damage Calculation and make it perfectly clear that we were using "monthly profit and loss statements to calculate the total revenue amount." Nowhere in this discussion of the Variable Profit model was there ever the suggestion or hint that there would be an alteration of the monthly P&Ls by way of matching expenses in some fashion. Nor is there a reference to treating cash-based accounting records differently from accrual-based accounting records. The emphasis was on using the agreed-to documentation contained in the Plaintiffs' contemporaneous files.

31. On November 10, 2011, in response to the November 3, 2011 memo, the BP Negotiating Team presented a memo to Mr. Fayard and me ("Exhibit G"). Mr. Godfrey states that this response "builds off of a period of extended negotiation and discussion." In addressing documentation, Mr. Godfrey states: "BP's documentation requirements for Business Economic Loss claims, attached as Exhibit A to the memo, does not propose any significant revisions to the PSC's proposal." After addressing causation in Section A, Mr. Godfrey addresses compensation in Section B to his memorandum. Mr. Godfrey states: "The BP and PSC Accounting Working Groups recognize . . . and have discussed alternative approaches of identifying fixed and variable salary costs." It was the issue of payroll costs that was presenting a very difficult dilemma for the parties in the negotiations. After laying out BP's position in Section B(2) of the November 10 memo and comparing it to the Plaintiffs' Variable Profit Margin, Mr. Godfrey proposed a compromise of taking the two calculations and averaging them together, a concept that would clearly have never allowed for a matching of expenses or standard accounting

practices. This document indicates and establishes the level of detail and care the parties went to in negotiating the treatment of an expense item as fixed or variable, the dissecting of the entire salary and payroll issues in the financial statements, and the attention to detail for all issues that were important to the parties. Nowhere in this document is there any reference to altering the recorded expenses on the monthly P&L or "matching" expenses and revenue at any point in time by anyone.

32. Within the November 10, 2011 memo, there is reference to the continuing discussion the parties were having about the use of a claimant-specific growth factor and then trying to develop separate independent industry growth factors. Later in the negotiations the PSC took the position and maintained the position that they would not negotiate separate treatment for industries in the calculation of their losses other than what became the Seafood Program. Nowhere in the document are claimants treated differently in determining their compensation based on what industry they are in.

33. In the most recent documents submitted to the Court by BP's current counsel, George Brown, BP now proposes separate classifications of businesses into 11 separate industry categories and that a unique approach be undertaken for each industry. Clearly, this type of framework, and this level of detail, was never mentioned or discussed at any time in the settlement negotiations.[5]

34. The November 10, 2011 memo confirms that the parties both approached the calculation of compensation in a two-step process. One would look at the 2010 loss plus a growth factor. BP wanted the base measure to be "adjusted EBITDA" between the

---

[5] Mr. Brown was never in attendance at any settlement negotiation meeting regarding the BEL framework prior to October 2013.

Compensation Period in 2010 and the comparable months in the Benchmark Period. "Adjusted EBITDA" was described by BP to reflect earnings before interest, taxes, depreciation, and amortization adjusting for (i.e. adding back) owner's compensation. BP acknowledged that the PSC proposed base for Step 1 compensation was the calculation of the difference between the Variable Profit earned between the same time periods BP had proposed. Variable Profit was calculated as revenue less variable costs as identified by the BP and PSC working groups.

35. On November 16, 2011, accepting BP's good faith attempt at compromise by averaging the EBITDA and the Variable Profit Margin approach, I, on behalf of the PSC Negotiating Team, responded in a memo "Re: Compensation Framework" ( "Exhibit H"). In that memorandum we acknowledge the substantial agreements the working group had reached in the classification of fixed and variable expenses and recommended that it be finalized as soon as possible. I laid out the different positions between EBITDA and Variable Profit but expressly rejected the averaging approach that Mr. Godfrey had proposed, and reiterated our theme that "we have to provide tools that are user friendly for all businesses and we believe that all businesses can work from revenue but many will not be able to work from EBITDA."

36. From November 16 to December 13, 2011, the parties had a number of negotiating meetings.

37. On December 13, 2011, Rick Godfrey sent a response to the PSC's November 16, 2011 memo ("Exhibit I"). Mr. Godfrey addresses the Causation issues raised in the November 16 memo and the Compensation issues. He states: "Until today, the last business

compensation document was produced by the PSC on November 16, 2011. The PSC provided a response memo dated November 16, 2011 but no corresponding markup."

38. On page 3 of the December 13, 2011 memo (Bates No. 004569), Mr. Godfrey states: "On compensation, the parties discussed four key issues; (1) EBITDA vs. Variable Profit, (2) Fixed & Variable Payroll Expenses, (3) Claimant Specific Factor, and (4) Tourism Factor/Industry Factor." Mr. Godfrey states: "In discussions prior to December 1, BP had proposed it was willing to accept PSC's position that Variable Profit be used provided that BP's proposal for Fixed & Variable Payroll Expenses be utilized." It goes on for several pages to discuss the problems with the PSC's approach to payroll expenses. From that date forward the PSC never moved off the Variable Profit Margin approach to the calculation of compensation for Business Economic Losses. The parties did address payroll expenses.

39. The drafts exchanged after December 13, 2011 were PSC's draft of December 19, 2011, BP's draft of December 27, 2011, and the short exchanges of points in memos of January 5, 2012 dealing with specific line items, followed by the PSC's reply to BP's January 5, 2012 proposal laying out three options for the Fixed/Variable salary determination.

40. Option Three was accepted on January 11, 2012 by BP, and the Business Economic Loss compensation document was finalized in all material parts relevant to these discussions on January 18, 2012.

41. After the January 11 acceptance by BP of the PSC's proposal on Variable Payroll Expenses, the parties moved to finalize the language of the Variable Profit calculation.

The pertinent changes that were made can be found by comparing the language in the draft of January 22, 2012:

> **Variable Profit / Variable Margin**:  These items are calculated as follows:
> 1. Sum the monthly Benchmark Period revenue.
> 2. Subtract the corresponding variable expenses, which include:
>    a. Cost items identified as variable in Attachment A.
>    b. Variable portion of salaries, calculated as described immediately below.
>    c. Variable portion of COGS, calculated by excluding salary costs (which are discussed below in Fixed & Variable Payroll Expenses) and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.
> 3. The result is referred to as Variable Profit (for the Benchmark Period).  Divide the Variable Profit by the total Benchmark Period revenue to calculate the Variable Margin percent.

To the language in the Agreement-In-Principle.  On March 1, 2012, after discussion between the parties, the language was changed to read:

> **Variable Profit**:  This is calculated for both the Benchmark Period and the Compensation Period as follows:
> 1. Sum the monthly revenue over the period.
> 2. Subtract the corresponding variable expenses from **revenue over the same time period.** (emphasis added)
>    Variable expenses include:
>    a. Variable Costs as identified in Attachment A.
>    b. Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.
>    c. Variable portion of COGS, calculated by excluding salary costs (which are discussed below in the definition of Fixed and Variable Payroll Expenses) and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.
>
> **Variable Margin**:  This is calculated only for the Benchmark Period and is calculated as follows:



1. Sum Variable Profit from May through December of the years selected by the claimant to be used for the Benchmark Period.
2. Sum total revenue from May through December of the years selected by the claimant to be used for the Benchmark Period.
3. Calculate Variable Margin percent as Variable Profit calculated in (1) divided by total revenue calculated in (2).

This is the language that was ultimately contained in the Agreement-In-Principle filed March 3, 2012, and is the language contained in Exhibit 4C of the May 2012 Final Settlement Agreement.

42. Throughout the entire negotiating and drafting history, despite the detailed memos and drafts exchanged between the parties, there was never any reference to matching of expenses to revenue. It is clear from the reading of the actual history of the documents and following of the discussions, the PSC never wavered from the Variable Profit approach to compensating business claimants.

43. The PSC negotiated specifically for certain expense items to be treated as variable and certain items to be treated as fixed. They negotiated extensively over how to treat payroll costs, not as a standard accounting method but in a specific formula calculated to work for the circumstances of this settlement, and the same occurred for cost of goods sold and other items.

44. Generally accepted accounting principles were not adopted into this settlement, and standard definitions were not adopted into this settlement. The parties spent the first three months of 2012 meticulously writing up the Settlement Agreement and finalizing the exhibits that are reflected in the Agreement-In-Principle filed with the Court on March 3, 2012, and the "Economic And Property Damages Settlement Agreement As

Amended On May 2, 2012, And As Preliminarily Approved By The Court On May 2, 2012," filed with the Court on May 3, 2012.

### The Vendor Discussions

45. Early in the negotiation process, BP promoted the proposition that if an agreement were reached, while a new Claims Administrator would be appropriate, it would be in everyone's best interests for the efficiency of the process, (as well as BP management's comfort level), that the parties allow BrownGreer to continue as a Vendor to the Claims Administrator, and that PriceWaterhouse continue as the principal accounting vendor.

46. As the settlement discussions proceeded, we spent time interviewing both vendors, with BP and in private, to understand their experience and their willingness to adapt to the new Settlement Agreement terms and provisions.

47. I personally met with Mr. Hacker, from PriceWaterhouse, and with Orran Brown and Lynn Greer, in this process.

48. As the Settlement Agreement came together, Mr. Fayard and I recommended to the PSC that we adopt BP's recommendation of the use of PriceWaterhouse and BrownGreer, but the PSC also insisted on the inclusion of an additional independent accounting vendor, which ultimately was selected to be Postlethwaite & Netterville. The Court subsequently appointed all of these vendors at the joint request of the parties.

49. Once the Agreement-In-Principle was filed with the Court on March 3, 2012, the parties immediately started preparing for the transition and movement to the Claims Center. AAn example of emails to show the extensive work done with the vendors between



March and June of 2012 is provided as "Exhibit J." There are dozens of this type of detailed exchange of information with the Vendors.

50. The April 13, 2012 memo from Orran Brown is one document indicative of the detailed meetings that we had with the Vendors on how the Settlement Agreement worked ("Exhibit K").

51. Shortly after the filing of the Agreement-In-Principle, I prepared a PowerPoint that I intended to use to start educating the PSC members in much more detail on how the settlement worked. Out of an abundance of caution, I circulated that PowerPoint to Rick Godfrey of Kirkland & Ellis on March 5, 2012, to be certain BP agreed that I was setting forth in that PowerPoint the appropriate description of how the documents worked ("Exhibit L").

52. On March 6, 2012, Wendy Bloom returned BP's edits to the PowerPoint deck. I would call to the Court's attention Slide 38 of the PowerPoint and Ms. Bloom's comments in her March 6 memo where she states, "Slide 38: Point 2. Perhaps instead use: 'Economic loss is estimated by comparing results of the post-spill period with the **same months** (emphasis added) in the claimant selected benchmark period.'" There were no references in the PowerPoint to any requirement of matching expenses to revenue, nor did Ms. Bloom correct me and suggest that any such references should be made in the PowerPoint. ("Exhibit M," select slides.)

53. In late March the settling parties requested PWC and Postlethwaite & Netterville undertake a review of the BEL Framework and provide comments.

54. On April 4, 2012, Charles Hacker of PWC notified the settling parties (Joe Rice of PSC and Dan Cantor for BP) of some "questions and observations," and made some recommendations ("Exhibit N"). Among observations or recommendations the accountants suggested the following: "We recommend applying the variable margin percent calculated in Step 2 (see page 2) to revenue in order to calculate variable profit in Step 1 (see page 1) as opposed to deducting variable costs from revenue."

55. The PWC's/ Postlethwaite & Netterville's recommendation pointed out "this will: (2) have the potential of more accurately matching revenue with expenses by consistently using a longer base period; …"

56. On April 15, 2012, PSC Counsel and I provided a reply to Charles Hacker of PWC and expressly stated in reply to the suggestion related to matching revenue and expenses "**this is not agreed to.**" ("Exhibit O" (emphasis added).)

57. In the time period between April 4, 2012 and April 15, 2012, the settling parties exchanged additional comments and made agreed-to modification to the BEL Framework ("Exhibit P"). Those modifications did *not* alter the Step 1 Variable Profit Calculation in the Settlement Agreement as Mr. Hacker suggested.

58. At the time we filed the final Settlement Agreement, the parties were preparing for a large "tutorial" presentation to the Claims Administrator and Vendors. On May 7, 2012, Dan Cantor provided us with the BP proposed final PowerPoint deck ("Exhibit Q").

59. I reviewed the deck at the time and I have studied it again recently. The Documentation, Causation, and Compensation slides are consistent with what the parties negotiated over twelve months and agreed to. I call the Court's attention to the following slides:

> <u>Slide 3</u>: "Qualifying businesses receive compensation for all losses regardless of facts and circumstances" - "all businesses qualifying using overall revenue trends."
>
> "Compensation Calculations are based on lost variable profits with no adjustment or offset for mitigated fixed costs."
>
> <u>Slide 5</u>: "May qualify using one period of loss and receive compensation based on a different period of loss to maximize benefits."
>
> <u>Slide 10</u>: Compensation is based on the difference between the company's 2010 actual profit post-DWH Spill and expected profit in the absence of the DWH Spill."
>
> <u>Slide 12 - 15</u>: The Calculation.

60. There is nothing in the presentation to ever suggest that a process would occur where revenue would be altered or expenses would be matched to revenue.

61. There is one good reason that we never educated the Vendors on matching expenses to revenue.

62. At the time of entering the contractual Settlement Agreement, we never agreed or intended for matching of expenses to revenue to occur.

63. The PSC did not agree to the matching of revenue and expenses as Hacker et al., recommended, and BP never asked for it.

64. In May 2012, when the Settling Parties presented the "Tutorial" to the Claims Administrator and Vendors on how the BEL Framework worked, and specifically how the Compensation Calculation was to be performed, the recommendation of matching



expenses had been made by the accounting Vendors. The PSC had rejected the recommendation and change to the agreement, and matching of expenses was not included in the joint presentation on how the Compensation Calculation was to be performed.

Signed under penalty of perjury, this 6th day of November, 2013, in Mount Pleasant, South Carolina.

_____
JOSEPH F. RICE