To:      Joe Rice, Calvin Fayard
Fr:      Jim Neath, Rick Godfrey, Wendy Bloom
Date:    November 10, 2011
Re:      Business Economic Loss Claims

This memorandum provides BP's response to the proposal of PSC settlement counsel for settlement of Economic Loss Business Claims dated November 3, 2011.   As with your memo, our response builds off of a period of extended negotiation and discussion.

## I.  Description of Exhibits

We have attached the following exhibits to this memorandum:

Exhibit  A:  Documentation Requirements for Business Economic Loss Claims (BP 11/10/11) (bates numbered 004102 to 104)

Exhibit B:  Causation Requirements for Business Economic Loss Claims (BP 11/10/11) (bates numbered 004094 to 4101)

Exhibit C:  Compensation Framework for Business Economic Loss Claims (BP 11/10/11) (bates numbered 004105 to 4108)

Exhibit D:  Tourism Definition (BP 11/10/11) (bates numbered 004093)

Exhibit E:  Seafood Distribution Chain -- Definitions (BP 11/9/11) (bates numbered 004051)

Exhibit F:  Economic Loss and Property Class Definition Exclusions (BP 11/10/11) (bates numbered 004089 to 4092)

Exhibit G:  Zone-Related Documents:  (1) Classifications and Implementation (BP 11/10/11) (bates numbered 004061); (2) Maps of Zones (BP 10/11/11) (bates numbered 004062 to 4070); (3) Geographical Definitions of Zones (BP 10/11/11) (bates numbered 004071 to 4088)

## II.  Overview

### A.      Documentation and Causation Requirements (Exhibits A and B)

On the documentation requirements for business claimants, BP's Documentation Requirements for Business Economic Loss Claims, attached as Exhibit A, does not propose any significant revisions to the PSC's proposal.  As the parties discussed, BP has removed the option for claimants to supply state tax returns as an alternative to federal tax returns because investigation by BP's accounting work group identified that the state tax returns for all but one state do not include the necessary information requirement for the causation and compensation elements of the settlement framework.

On the causation requirements for business claimants, BP has given serious consideration to the PSC's proposal to eliminate what the parties informally referred to as haircut zones.  There are some

1

modifications to the PSC's causation proposal that BP has made in its proposal attached as Exhibit B primarily involving certain percentages and the number of months used in the underlying computations. With these modifications, BP is prepared to accept the PSC's proposal to eliminate the concept of the haircut zones.

In addition, BP notes that the PSC has inserted at the top of its causation proposal a proposal that BP contribute $375 million to a fund to promote tourism.   The parties have discussed this concept for some time.  As we have stated before, BP is amenable to considering as a feature of the settlement payments to promote tourism; however, BP rejects the amount of the payments proposed by the PSC.  Moreover, we do not see this as related to the causation requirement for businesses to establish whether they experienced an economic loss due to or resulting from the DWH incident.  Accordingly, we have deleted the proposal from the causation document, not to eliminate discussion of the concept but because we believe it should be addressed as part of broader discussions relating to the risk transfer premium.

**B.  Compensation Framework Document**

Discussed below is BP's rationale for the key revisions that we have incorporated in response to the PSC's current proposal for the compensation component of the settlement framework for business economic loss claims.  These revisions are included in the BP document attached as Exhibit C entitled "Compensation Framework for Business Economic Loss Claims":

**1)  Fixed / Variable Salaries**

The BP and PSC accounting working groups recognized that many claimants' salary costs reflect both fixed and variable components and have discussed alternative approaches to identifying fixed and variable salary costs in determining claimant compensation.   BP believes the working groups have made great strides in this area to reach an accommodation that both sides find acceptable.   Our current proposal, conceptually is very similar to the proposal that the PSC working group presented yesterday although it differs in certain implementation details.

BP's accounting working group suggested determining the fixed/variable portions of total payroll costs based on the observed change in salaries relative to the observed change in revenues between the peak and off-peak seasons.  Based on analysis of claim files, PSC's accounting working group claimed that the BP group's suggestion implied that certain claimants' salary costs were nearly 100% variable.  Based on analysis of the same files, BP's accounting working group noted that the method also implied that certain claimants' salary costs were nearly 100% fixed.

The PSC group proposed that a claimant's minimum monthly level of salary costs approximates a firm's fixed salary costs and should be used as a floor in allocating salary costs between fixed and variable components.  BP's accounting group accepted the PSC group's suggestion that a minimum level of salary costs can be used to approximate a firm's fixed salary costs.

Based on the PSC accounting group's observation, BP now proposes a simplified approach for determining fixed and variable salary costs.  Specifically, BP proposes calculating the fixed component of salary costs based on the average salary costs in the three months between January 2009 and December 2010 with the lowest salary costs.  Any salary costs in excess of this level are to be treated as variable.

2

BP believes this proposal provides an economically reliable and easily implemented approach to determining the variable portion of salary costs.  Furthermore, BP believes that this approach is easier to implement and explain to claimants compared to the current PSC proposal.

## 2) EBITDA vs. Variable Profit

BP initially proposed calculating 2010 compensation by multiplying (i) the difference in a claimant's actual revenue and revenue that a claimant would be expected to generate in the absence of the spill, and (ii) the variable margin earned by claimants in the pre-spill period.[1]  PSC responded that this approach failed to adequately account for changes in claimants' costs in the post-spill period and proposed an alternative framework that more explicitly accounted for post-spill cost changes.

BP attempted to account for the PSC's comments by proposing a "2-step" compensation framework, and the PSC working group recognized that its proposal also could be expressed in an analogous manner.  In the 2-step framework, "Step 1" compensation is calculated as the difference in profits or margins earned during the 2010 Compensation Period relative to the comparable months of the Benchmark Period, assuming no growth in revenue.  "Step 2" compensation accounts for the impact of changes in expected revenue on profits and is calculated as the incremental margin generated by changes in sales expected in the absence of the spill.

While the BP and PSC working groups agreed that the 2-step framework is appropriate for evaluating compensation due to claimants, BP and PSC have proposed alternative approaches to calculating Step 1 compensation.  BP and PSC agreed on calculation of Step 2 compensation.

With respect to Step 2, both sides agreed that determination of Step 2 compensation requires assessing which of claimants' costs are fixed and variable.  Based on a review of multiple claims, the BP and PSC working groups reached a working agreement on this fixed/variable classification.  BP's proposal now incorporates the results of the BP and PSC working groups' classification analysis, which is attached as Attachment A to the Compensation Framework for Business Claims.  Both groups recognize that minor refinements in classifications may be needed as additional claims are reviewed.

With respect to Step 1, the BP working group has proposed that compensation be calculated as the difference in "Adjusted EBITDA" between the compensation period in 2010 and the comparable months in the benchmark period.  Adjusted EBITDA reflects earnings before interest, taxes, depreciation and amortization, adjusting for (i.e., adding back) owner's compensation.  The PSC working group has proposed that Step 1 compensation be calculated as the difference between Variable Profit earned between the Compensation Period in 2010 and the Variable Profit earned in comparable months in the Benchmark Period.  Variable Profit is calculated as revenue less variable costs, as identified by the BP and PSC working groups.

---

[1] PSC has also suggested that certain claimants were not adversely affected by the DH Spill until 2011; however, the PSC has not provided any evidence to support this possibility.  The proposed causation and compensation frameworks do not address the circumstance.  BP's analysis of available data indicates that few, if any, claimants are likely to fit these circumstances and, as such, they are not addressed in the proposed frameworks.

BP believes that the Adjusted EBITDA approach is more reliable than the PSC's proposed Variable Profit approach for calculating Step 1 compensation.  The Adjusted EBITDA approach reduces the impact of uncertainty inherent in assigning costs exclusively to a "fixed" or "variable" category which can result in both over- and under-compensation of claimants.

Nonetheless, in the spirit of compromise, BP now proposes that Step 1 compensation be calculated as the average of the calculations based on the adjusted EBITDA and Variable Profit approaches.

**3)      Claimant Specific Factor**

The Claimant Specific Factor captures the percentage change in revenue the claimant could expect to generate in the absence of the spill as reflected in the trend in the claimant's pre-spill revenue.  The Claimant Specific Factor reflects the expected impact on claimant revenue of both general changes in economic conditions as well as changes in claimant performance in the pre-spill period.

BP proposed that the Claimant Specific Factor be calculated as the percentage change in revenues generated by the claimant in January to April 2010 compared to revenue generated by the claimant in the same months during the Benchmark Period.  PSC proposed that only positive values of the Claimant Specific Factor be used in the calculation.

PSC has not articulated a principled economic or accounting rationale for excluding negative Claimant Specific Factors, nor does one exist.  PSC has also raised as an issue that for some tourist businesses the use of January-April for calculating the Claimant Specific Factor may not be reliable due to the relatively small amount of commerce conducted during these months.

Due to the absence of a principled economic or accounting rationale for applying a Claimant Specific Factors only if a positive value is generated, BP's proposal applies the Claimant Specific Factor regardless of whether the value is positive or negative.  In response to the issue the PSC has raised about the potential lack of reliability of the Claimant Specific Factor for some tourism businesses, BP proposes to limit Claimant Specific Factor to a maximum of 20% and a minimum of -20%.

**4) Tourism Industry Factor**

Early on in negotiations, BP understood the PSC to be contending that the Claimant Specific Factor failed to adequately account for the unique growth in the tourism industry in other resort areas during the summer of 2010 relative to the pre-spill period of 2010 that might have been expected to occur along the Gulf Coast as well.  In response, BP proposed incorporating a Tourism Industry Factor into the compensation framework.  An appropriately-defined benchmark area should have characteristics that are similar to the Gulf Coast tourism industry but be unaffected by the Deepwater Horizon incident.  For example, areas that benefited by attracting tourists that otherwise would have visited the Gulf Coast would not be an appropriately-defined benchmark area.

BP proposed using tourism revenue trends in a benchmark area, DelMarVa (Sussex Co, DE and Worchester Co, MD), to approximate the growth in unique growth tourism that might be expected along the Gulf Coast in the summer of 2010.  This benchmark was selected based on the fact that this area, like much of the Gulf Coast, is a drive-to beach destination and did not appear to attract a material number of tourists who otherwise would have visited the Gulf Coast.

4

PSC in turn proposed to use six additional benchmark areas in the calculation – Cape May, NJ, Anne Arundel County, MD, Ocean County, NJ, Virginia Beach, VA, Myrtle Beach, SC, and Dare County, NC.  BP accepted four of the six additional benchmark areas proposed by PSC, rejecting Myrtle Beach, SC based on evidence that it benefited from the spill in 2010 due to the diversion of tourism from the Gulf Coast, and rejecting Anne Arundel County because it is not an ocean beach destination.  Based on the six remaining areas, BP proposed that tourism claimants be entitled to a Tourism Industry Factor of 3.4% and that this factor be applied only to businesses that satisfy the Tourism Definition agreed to by the parties.

PSC then proposed excluding two of these areas – Sussex County, DE and Ocean County, NJ – because they had relatively low revenue growth during Summer 2010 as measured by Smith Travel, and proposed a Tourism Industry factor of 6.8% based on the remaining counties.  PSC also proposed to apply the Tourism Industry factor to all claimants, not just those that satisfy the Tourism Definition agreed to by the parties.

In addition to the difference in the geographic benchmark areas used by BP and PSC, the difference between the 3.4% Tourism Industry Factor proposed by BP and the 6.8% Tourism Industry Factor proposed by PSC also appears to reflect, in part, PSC's comparison of Smith RevPAR data from post-spill 2010 relative to the same months in 2009 while the appropriate comparison involves calculating the difference between the year-on-year change from post-spill months and the year-on-year change observed in pre-spill months (January-April).  (See Compensation Framework for Business Claims, September 15, 2011, 001431-32.)  Application of the calculation outlined in the September 15 document to the benchmark areas identified by PSC would yield a Tourism Industry Factor of 6.25%.

BP's current proposal agrees to increase to 4% the Tourism Industry Factor although the data support 3.4% as a more appropriate Tourism Industry Factor.   The two benchmark areas that the PSC seeks to delete in deriving the Tourism Industry Factor -- Sussex County, DE and Cape May, NJ -- are appropriate benchmark areas, and the PSC failed to provide a principled basis for excluding these areas from the analysis.  BP does not agree to extend the Tourism Industry Factor to non-tourism industries given the continued weak economic performance of the general economy in the summer of 2010.  BP's offer to increase the Tourism Industry Factor to 4% is contingent upon PSC agreement that the Tourism Industry Factor, only be applied to business claimants that fit within the Tourism Definition attached as Exhibit D.

## C.  Other Documents

### 1.  Tourism Definition

BP has updated the Tourism Definition, attached as Exhibit D, to reflect the final list agreed to by the parties.  The prior draft included "x" marks for the NAICS codes that BP had proposed deleting and adding, and, per the PSC's memo dated November 3, as well as prior discussions, the PSC has accepted BP's proposals.

### 2.  Seafood Distribution Chain

BP has made several edits to the Seafood Distribution Chain - Definitions, attached as Exhibit E.   One edit is simply to reorder the entities in the chain such that all of the entity types that are afforded a

causation presumption throughout the entire class geography are grouped together, and the other entity types follow below.  Also, in an attempt to respond to PSC's proposal with regard to "Seafood Retailers" being afforded a presumption in Zone C, previously referred to as the buffer zone, BP has modified the definition for "Seafood Retailer."   With this change, BP is amenable to the PSC's proposal.

**3.  Exclusions from Economic Loss and Property Class Definition**

BP has incorporated into a single document, Economic Loss and Property Class Definition Exclusions, attached as Exhibit F, the exclusions it seeks from the class definition.   BP has accepted the PSC's proposal that video gaming, bingo parlors and off-track betting parlors not be excluded, as well as stand alone ATM businesses and payday loan and paycheck advance businesses.

**4.  Zones**

BP has provided three documents relating to the zones as Exhibit G.

In the document titled "Zone Classifications and Implementation," BP proposes that we move to referring to those geographies in which some or all business claimants are afforded a presumption of causation as Zone A, Zone B and Zone C.   Also, BP accepts the PSC's counter to BP's proposal of a .10 mile radius for exit ramps of a .25 mile radius.  However, BP proposes that for limited access roads, e.g. interstates where drivers can only exit at exit ramps, that the zone include any parcel on a frontage road within .5 mile of the beginning access point of the frontage road from the exit ramp.  We do not feel that the PSC's proposal is realistic regarding the distance that tourists on their way to Gulf Coast destinations would travel along a frontage road after exiting an interstate.

In the document titled "Maps of Zones" BP identifies what it proposes to constitute the Zones A, B and C agreed upon by the parties with modifications to the zones such that boundaries conform to streets, bodies of water that are definable.  In these maps, BP accepted the proposals discussed last week in New York with Rhon Jones regarding Eglin Air Force Base Area, agreeing to add a new Zone C, and Walton County / Bay County North, agreeing to add a new Zone C.

In the document titled "Geographical Definitions of Zones," BP was provided a written description of the boundaries for each of the proposed Zones A, B and C for Economic Loss claims.

## Documentation Requirements for Business Economic Loss Claims (BP 11/10/11)[1]

The framework outlined below applies to business claims.

In order to be eligible for compensation, a business claimant must provide the following:

1.   The claimant must complete the claim form describing the claimed losses and the period of loss.

2.   Federal tax returns for the claimed Benchmark Period[2] as defined in the Compensation Framework for Business Economic Loss Claims, and federal tax returns for the years 2010, and, if applicable, 2011.[3]
   a)   Provide the complete federal tax return and the applicable supporting documentation.
   b)   For self employed individuals, provide Form 1040, pages 1 and 2, along with Schedules C, D, E, and F.

3.   Provide monthly and annual profit and loss statements identifying the individual line items for the claimed Benchmark Period,[4] 2010 and, if applicable, 2011,[5] or alternate source documents establishing monthly revenues and expenses.  These documents must reconcile with the tax returns supplied in 2 above.

4.   If the claimant falls within any of the specific business types listed below, the following additional documents are required for the claimed Benchmark Period, 2010, and, if applicable, 2011:
   a)   Retail

---

[1] These Documentation Requirements do not apply to (i) start-up businesses; (ii) businesses claiming to have ceased operations; (iii) development and construction businesses; and (iv) multi-establishment claimants and business that sell to customers in multiple presumption zones.  Other provisions of the settlement agreement might require additional documentation for specific business types.

[2] Per the definition of Benchmark Period in the Compensation Framework for Business Economic Loss Claims, the claimant can select among the following Benchmark Periods: 2009, the average of 2008-2009, or the average of 2007-2009.  If the claimant selects a benchmark period prior to 2009, the claimant shall provide documents for each of the applicable years.

[3] Claimants who must satisfy the requirements of Sections II and III of the Causation Framework for Business Economic Loss Claims are required to submit 2011 federal tax returns.

[4] If the claimant selects a Benchmark Period prior to 2009, the claimant shall provide the documents for the applicable years.

[5] Claimants included in Sections II or III of the Causation Requirements for Business Economic Loss Claims are required to submit 2011 monthly profit and loss statements or alternate source documents.

IIGHLY CONFIDENTIAL

      i.    Monthly sales and use tax returns;

b) Lodging
      i.    Lodging tax returns;
      ii.   Occupancy reports or historical rental records, on a per unit basis if available;
      iii.  Documentation to identify how the rental property is managed, such as management contract from a third-party management company or an affidavit from an owner that manages its own property.

c) Fishing
      i.    Trip tickets and/or related reports filed with the applicable government agencies identifying volume of catch and sales price.

5.     Additional documents may be required depending on the causation provisions the claimant is seeking to satisfy, as reflected in "Causation Requirements for Business Economic Loss Claims". These documents include, where applicable:

a) Monthly credit card receipts, or customer registration logs, such as hotel registries;
b) Documentation listing customers by location and monthly sales associated with those customers;
c) Business documents reflecting contemporaneous recording of receipts from customers;
d) Copy of any long-term contracts for which the claimant seeks reimbursement;
e) Documents demonstrating cancellation of contracts;
f) Evidence of spill-related reservation cancellations, such as letters, emails, hotel logs, for the relevant time;
g) Documents demonstrating historical purchases of Gulf of Mexico harvested seafood;
h) Documents establishing historical costs of Gulf of Mexico harvested seafood;
i) Other business documents the claimant believes establish causation pursuant to the terms of the settlement;
j) Purchase orders or invoices documenting seafood purchase costs for the compensation period, and for the year 2010 or 2011 if applicable.

6.     Claimant must provide a copy of any license required to operate its business. For example, claimants shall produce the following for the Benchmark Period, 2010 and, if applicable, 2011:

a) Commercial/recreational fishing
b) Real estate licenses
c) Occupancy licenses (lodging, including hotel and condo)
d) Business licenses
      i)   Restaurant
      ii)  Bars (liquor)

HIGHLY CONFIDENTIAL

00410

iii) Taxi/livery licenses
iv) Services

7.      Claimants who have received any of the payments listed below must provide documentation of the amount of payments received:

a)  VoO payments
b)  Payments from GCCF
c)  Payments from BP as part of its OPA claims process
d)  Other sources of income that can be used to reconcile tax returns with business financial statements.

9.      Copy of Articles of Incorporation, if applicable.

10.     Form authorizing claims administrator to verify tax records and other government filings.

**THE DOCUMENTATION REQUIREMENTS FOR BUSINESS ECONOMIC CLAIMS IS A WORK IN PROGRESS. ONCE THE COMPENSATION AND CAUSATION REQUIREMENTS ARE FINALIZED, THEN THE DOCUMENTATION REQUIREMENTS WILL NEED TO BE REVIEWED TO BE CERTAIN IT IDENTIFIES ALL DOCUMENTS NEEDED TO COMPLY WITH COMPENSATION AND CAUSATION REQUIREMENTS.**

IGHLY CONFIDENTIAL
00410

## CAUSATION REQUIREMENTS FOR BUSINESSES ECONOMIC LOSS CLAIMS (BP 11/10/11)[1]

I.     **Business Claimants for Which There is No Causation Requirement**

1)  If you are a business claiming economic loss that occurred in Zone A, you are not required to provide any evidence of causation unless you fall into one of the exceptions agreed to by the parties.[2]

2)  If you are a "Commercial Fisherman," or "Landing Site," or "Commercial Wholesale or Retail Dealer A," or "Primary Seafood Processor," as set forth in "Seafood Distribution Chain Definitions," you are not required to provide any evidence of causation.

3)  If you are a "Commercial or Wholesale or Retail Dealer B," or a "Secondary Seafood Processor," or a "Seafood Wholesaler or Distributor," or a "Seafood Retailer," as set forth in "Seafood Distribution Chain Definition," you are not required to provide any evidence of causation.

4)  If you are in Zone A or Zone B, and you meet the "Tourism Definition," you are not required to provide any evidence of causation.

II.    **Causation Requirements for Zone B and Zone C**

If you are not entitled to a presumption as set forth in (I) above and your loss occurred in Zone B or Zone C then you must satisfy the requirements of one of the following sections A-F below:

A.  V-Shaped Revenue Pattern:

Total business revenue shows the following pattern:

1.  <u>DOWNTURN:</u> a decline of 12.5% or more in total revenues during a period of three consecutive months between May-December 2010 compared to the same months in 2009; AND

2.  <u>LATER UPTURN:</u> an increase of 7.5% or more in total revenues in the same three-month period in 2011 compared to the same period in 2010.

OR

B.  Modified V-Shaped Revenue Pattern:

---

[1] This Causation Requirements for Business Economic Loss Claims does not apply to (i) start-up businesses; (ii) businesses claiming to have ceased operations; (iii) development and construction businesses; and (iv) multi-establishment claimants and businesses that sell to customers in multiple presumption zones. Causation requirements for these types of business economic loss claims will be presented separately.
[2] Businesses within Zone A that are required to provide evidence of causation include "Casinos," "Slots at Racetracks," "Riverboats," and "Landbased Casinos."

1

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

Total business revenue shows the following pattern:

1.    <u>DOWNTURN</u>:  a decline of 5% or more in total revenues during *each* of three consecutive months between May-December 2010 compared to the same months in 2009; AND

2.    LATER UPTURN:   an increase in total revenues of 3% or more in *each* of the three consecutive months in 2011 compared to the same three consecutive month period as claimant selected for the DOWNTURN in 2010; AND

ONE OR MORE OF THE FOLLOWING:

a.   The claimant demonstrates proof of a 5 percentage point decline in the share of total revenue generated by non-local customers over a period of three consecutive months from May-December 2010 compared to the same months in 2009, as reflected in:[3]

- customer credit card receipts or other contemporaneously maintained records of payment; or
- customer registration logs (e.g., hotel registries).

OR

b.   The claimant demonstrates proof of a  5 percentage point decline in the share of revenue generated by customers located in Zone A, Zone B, or Zone C over a period of three consecutive months from May-December 2010 compared to the comparable period in 2009, as reflected in:
- monthly customer credit card receipts or other contemporaneously maintained records of payment; or
- documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
- business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

OR

c.   The claimant provides contemporaneous written evidence of the cancellation of a long-term contract as the direct result of the spill that claimant was not able to replace.  Proof of a spill-related contract cancellation only establishes

---

[3] BP will present a definition of non-local customers at a later date.

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

004095

causation for the specific contract substantiated by the claimant and may result in recovery only of damages solely associated with such contract.

OR

C.  Decline-Only Revenue Pattern:

1.  <u>DOWNTURN:</u>  a decline of 12.5% or more in revenues during each of three consecutive months between May-December 2010 compared to the same months in 2009 without a recovery in the corresponding months of 2011;

AND

2.  Specific documentation identifying factors outside the control of the claimant that prevented the recovery of revenues in 2011, such as:
    - The entry of a competitor in 2011
    - Bankruptcy of a significant customer in 2011
    - Nearby road closures affecting the business
    - Unanticipated interruption resulting in closure of the business;

AND

3.  <u>ONE OF THE FOLLOWING</u>:

- The claimant demonstrates proof of a  5 percentage point decline in the share of revenue generated by non-local customers over a period of three consecutive months from May-December 2010 compared to the comparable period in 2009, as reflected in:
    o  monthly customer credit card receipts; or other contemporaneously maintained records of payment;
    o  customer registration logs (e.g., hotel registries).

- The claimant demonstrates proof of a 5 percentage point decline in the share of revenue generated by customers located in Zone A, Zone B, or Zone C over a period of three consecutive months from May-December 2010 compared to the comparable period in 2009, as reflected in:
    o  monthly customer credit card receipts or other contemporaneously maintained records of payment; or
    o  documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or

3

    o   business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

OR

D.  Proof of Spill-Related Cancellations

- Claimant may establish causation by providing contemporaneous written evidence of spill-related reservation cancellations (*i.e.*, letters, emails, hotel logs for the relevant time, or an affidavit from an independent third party citing the spill as the reason for cancellation) that the claimant was unable to rebook. Proof of spill-related reservation cancellations only establishes causation for the specific cancellations substantiated by the claimant and may result in recovery only of damages solely associated with such cancellations established as causally resulting from the spill.  However, if the lodging facility has food and/or beverage services on site, the evidence of cancellation shall satisfy causation for the specific losses corresponding to such cancellation in those service areas as well.

- The claimant provides contemporaneous written evidence of the cancellation of a long-term contract as the direct result of the spill that claimant was not able to replace.  In the absence of contemporaneous written evidence, the claimant must present an affidavit from an independent third party affirming that the cancellation was spill-related.  Proof of a spill-related contract cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery only of damages solely associated with such contract.

OR

E.  For claimants defined as "Seafood Retailers" (including restaurants):

- Claimant demonstrates purchases of Gulf of Mexico harvested seafood from Zone A, Zone B, or Zone C vendors represented at least 10% of food costs during 2009, as reflected in historical purchase orders and/or invoices.

    AND

- Claimant demonstrates a 10% decline in net profit during a period of three consecutive months between May-December 2010 compared to the same months in 2009.

OR

F.  A business claimant on a property that is contiguous to the property of a separate MDL 2179 business claimant may rely on the documentation submitted by such

4

separate MDL 2179 claimant to satisfy these Causation Requirements for Business Economic Loss Claims.  Only business claimants with annual revenue of $50,000 or below are eligible to establish causation under this criterion.

III.   **Causation Requirements for Geographic Areas Outside of Zones A, B, and C**

If you are not entitled to a presumption as set forth in (I) above and your loss occurred outside of Zones A, B or C, then you must satisfy the requirements of one of the following sections A-F below:

    A.   V-Shaped Revenue Pattern:

Business revenue shows the following pattern:

    1.   DOWNTURN: a decline of 15% or more in total revenues during a period of three consecutive months between May-December 2010 compared to the same months in 2009;

        AND

    2.   LATER UPTURN: an increase of 10% or more in total revenues in the same period in 2011 compared to the same three consecutive month period as Claimant selected for the downturn in 2010.

    OR

B.   Modified V-Shaped Revenue Pattern:

Total business revenue shows the following pattern:

    1.   DOWNTURN: a decline of 10% or more in total revenues in each of three consecutive months between May-December 2010 compared to the same months in 2009;

        AND

    2.   LATER UPTURN:   an increase in total revenues of 7% or more in each of the three consecutive months in 2011 compared to the same three consecutive month period as claimant selected for the DOWNTURN in 2010;

        AND

    3.   ONE OF THE FOLLOWING:

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

004098

- The claimant demonstrates proof of a  5 percentage point decline in the share of revenue generated by non-local customers over a period of three consecutive months from May-December 2010 compared to the comparable period in 2009, as reflected in:
  - monthly customer credit card receipts; or
  - customer registration logs (e.g., hotel registries).

- The claimant demonstrates proof of a  5 percentage point decline  in the share of revenue generated by customers located in Zone A, Zone B or Zone C over a period of three consecutive months from May-December 2010 compared to the comparable period in 2009, as reflected in:
  - monthly customer credit card receipts other contemporaneously maintained records of payment; or
  - documentation contemporaneously maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
  - business documents reflecting contemporaneous recording of receipts or invoice listing customers by locations.

- The claimant provides contemporaneous written evidence of the cancellation of a long-term contract as the direct result of the spill that claimant was not able to replace.  Proof of a spill-related contract cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery only of damages solely associated with such contract.

OR

C.   Decline-Only Revenue Pattern:

1. DOWNTURN:  a decline of 15% or more in revenues during each of three consecutive months between May-December 2010 compared to the same months in 2009 without a recovery in the corresponding months of 2011;

AND

2. Specific documentation identifying factors outside the control of the claimant that prevented the recovery of revenues in 2011:
   - The entry of a competitor in 2011
   - Bankruptcy of a significant customer in 2011
   - Nearby road closures affecting the business
   - Unanticipated interruption resulting in closure of the business;

6

AND

3.  ONE OR MORE OF THE FOLLOWING:

- The claimant demonstrates proof of a 5 percentage point decline in the share of revenue generated by non-local customers traveling to the Gulf from the feeder markets defined on Exhibit 1 over a period of three consecutive months from May-December 2010 compared to the comparable period in 2009, as reflected in:
    o   monthly customer credit card receipts or other contemporaneously maintained records of payment; or
    o   customer registration logs (e.g., hotel registries).

- The claimant demonstrates proof of a 5 percentage point decline in the share of revenue generated by customers located in Zone A, Zone B or Zone C over a period of three consecutive months from May-December 2010 compared to the comparable period in 2009, as reflected in:
    o   monthly customer credit card receipts or other contemporaneously maintained records of payment; or
    o   documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
    o   business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

OR

D.  Proof of Spill-Related Reservation Cancellations

- Claimant may establish causation by providing contemporaneous written evidence of spill-related reservation cancellations (*i.e.*, letters, emails, hotel logs for the relevant time) that the claimant was unable to rebook.  Proof of spill-related reservation cancellations only establishes causation for the specific cancellations substantiated by the claimant and may result in recovery only of damages solely associated with such cancellations established as causally resulting from the spill.  However, if the lodging facility has food and/or beverage services on site, the evidence of cancellation shall satisfy causation for the losses in those service areas as well.

- The claimant provides contemporaneous written evidence of the cancellation of a long-term contract as the direct result of the spill that claimant was not able to replace.  In the absence of contemporaneous written evidence, the claimant must present an affidavit from an independent third party affirming that the

7

cancellation was spill-related.  Proof of a spill-related contract cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery of damages solely associated with such contract.

OR

E.    For claimants defined as "Seafood Retailers" (including restaurants):

- o  Claimant demonstrates purchases of Gulf of Mexico harvested seafood from Zone A, Zone B or Zone C vendors represented at least 10% of food costs during 2009, as reflected in historical purchase orders and/or invoices.

AND

- Claimant demonstrates a 10% decline in net profit during a period of three consecutive months between May-December 2010 compared to the same months in 2009.

OR

F.    A business claimant on a property that is contiguous to the property of a separate MDL 2179 business claimant may rely on the documentation submitted by such separate MDL 2179 claimant to satisfy these Causation Requirements for Business Economic Loss Claims.  Only business claimants with annual revenue of $50,000 or below are eligible to establish causation under this criterion.

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

004101

### Compensation Framework for Business Economic Loss Claims (BP 11/10/11)

The compensation framework for business claimants compares the profit of a business for a pre-spill Benchmark Period to the profit that the claimant might have expected to earn in the post-spill period of 2010.[1] The calculation is divided into two steps:

**Step 1** – Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period. Step 1 compensation reflects the average of two methods of measuring the reduction in profits over this period: (i) The reduction in Adjusted EBITDA (which reflects earnings before interest, taxes, depreciation and amortization, adjusted for owner's compensation and other non-operating income and expenses) and (ii) The reduction in Variable Profit (which reflects the claimant's revenue less its variable costs).

**Step 2** – Compensates claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to sales from the benchmark period. This calculation reflects a Claimant Factor that captures growth in the pre-spill months of 2010 compared to the Benchmark Period and a Tourism Industry Factor for business claimants in tourism industries that satisfy the Tourism Definition agreed to by the parties.

For purposes of the two step calculation, the parties have agreed to a defined list of fixed and variable expenses as reflected in Attachment A.

In order to allocate payroll expenses into fixed and variable components, a minimum level of fixed payroll costs will be measured based on the average of the three months between January 2009 and December 2010 in which the claimant had its lowest payroll costs.

Cost of Goods Sold (COGS) will be treated as a variable expense after excluding, to the extent possible, the following cost items which may be embedded in COGS and are likely to be fixed in nature: Amortization, Depreciation, Insurance Expense, Interest Expense, and Contract Services.

Based on these considerations, the resulting calculations are performed to determine compensation for claimants.

### I.    Definitions

For the purposes of this calculation, the following are defined terms:

**Compensation Period:** The compensation period is selected by the Claimant to include three or more consecutive months between May and December 2010.

---

[1] This Compensation Framework for Business Claims does not apply to (i) start-up businesses; (ii) businesses claiming to have ceased operations; (iii) development and construction businesses. Compensation frameworks for these types of businesses will be presented separately.

1

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

004105

**Benchmark Period:** The Benchmark Period is the pre-spill time period corresponding to the months of the Compensation Period that a claimant chooses as the baseline for measuring its historical financial performance. The claimant can select among the following Benchmark Periods: 2009, the average of 2008-2009, or the average of 2007-2009.

**Claimant Specific Factor:** In order to capture the impact of pre-spill trends in the claimant's performance on revenue that might have been expected in the post-spill period, Benchmark Period revenue will be adjusted by a Claimant Specific Factor. The following steps will be used to compute the Claimant Specific Factor:

1. Calculate the difference between claimant's total revenue for January through April 2010 and total revenue in January through April of the Benchmark Period.[2]
2. Divide the revenue change calculated in (1) by total revenue in January through April of the Benchmark Period to derive the Claimant Specific Factor. Note that the Claimant Specific Factor will be applied regardless if it is a positive or negative amount. However, if the Claimant Specific Factor falls below -20% or exceeds +20%, it will be set at -20% or +20%, respectively.

**Tourism Industry Factor:** Claimants in the Tourism Industry, as defined by the parties, shall be entitled to a 4.0% Tourism Industry Factor.

**Adjusted-EBITDA:** Earnings before interest, taxes, depreciation, and amortization, adjusted for (i.e., adding back) owner's compensation and other non-operating income and expenses.

**Variable Profit / Variable Margin:** These items are calculated as follows:
1. Sum the monthly Benchmark Period revenue.
2. Subtract the corresponding variable expenses, which include:
    a. Cost items identified as variable in Attachment A.
    b. Variable portion of salaries, calculated as described immediately below.
    c. Variable portion of COGS, calculated by excluding fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, Interest Expense and Contract Services and the variable portion of salaries included in COGS.
3. The result is referred to as Variable Profit (for the Benchmark Period). Divide the Variable Profit by the total Benchmark Period revenue to calculate the Variable Margin.

**Fixed & Variable Payroll Expenses:** Fixed and Variable Payroll Expenses are calculated based on the understanding that every business must operate with a minimum core staff and are defined using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims for January 2009 through December 2010. Fixed and variable payroll expenses are calculated as follows:

---

[2] Calculation of a claimant-specific factor may be inappropriate for certain fishing claimants given the seasonal nature of fishing activity. For fishing claimants, it may be appropriate to use an industry-specific factor based on the difference between the value of the relevant species-specific 2009 catch and NOAA's forecast of the change in catch volume between 2009 and 2010. BP continues to evaluate this alternative.

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

004106

1. Obtain monthly amounts for the following payroll expenses: (a) Salaries & wages; (b) Payroll taxes (including workers compensation, unemployment insurance); (c) Employer costs for employee benefits.  Calculations include components of salaries and related expenses included in both SG&A and COGS.
2. Sum these payroll expenses on a monthly basis to determine the Total Payroll Expense for each month.
3. Identify the three months in 2009-10 with the lowest Total Payroll Expense.
4. Define "Fixed Payroll Expenses" as the average payroll expense over the three months with the lowest Total Payroll Expense.
5. For any month with smaller total payroll costs than the average of the three lowest months, all payroll costs will be considered fixed expenses.
6. Any monthly payroll costs in excess of the Fixed Payroll Expenses will be considered variable expenses.

**Incremental Revenue**: Revenue in selected Benchmark Period is multiplied by the Claimant Specific Factor and the Tourism Industry Factor (if applicable) to calculate Incremental Revenue. This represents the projected change in revenue compared to the Benchmark Period.

## II.     Step 1

Step 1 of the compensation calculation is determined as the average of:

(1)      The difference in Adjusted-EBITDA between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period, and

(2)      The difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period.

As noted above, the Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.

For claimants that participated in the VoO program, it is necessary to separately determine Step 1 compensation based on non-VoO income only.[3]  For claimants that participated in VoO, Step 1 compensation is calculated based on comparison of 2009 levels of Adjusted-EBITDA and Variable Profit and 2010 levels of Adjusted EBITDA and Variable Profits based on non-VoO activities only.

## III.    Step 2

Using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims:

---

[3] Claimants are required to report payments received under the VoO program.  If claimants that received VoO payments fail separately to report costs incurred in VoO and non-VoO activities, then Step 1 compensation for non-VoO activity alone can be determined through a pro-rata revenue based allocation of variable costs between VoO and non-VoO related activities.

3

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

(1)     Calculate total revenue amount for the 2010 Compensation Period and the comparable months in the Benchmark Period.

(2)     Calculate the Claimant Specific Factor.

(3)     Calculate Incremental Revenue by multiplying the total Benchmark Period revenue by the sum of Claimant Specific Factor and the Tourism Industry Factor (if applicable).

(4)     Multiply Incremental Revenue by the Variable Margin.

## IV.     Total Compensation

Total Compensation is calculated as follows:

(1)     Add Step 1 Compensation to Step 2 Compensation.

(2)     Apply the agreed-upon Risk Transfer Premium (RTP).

(3)     Subtract from the sum of Step 1 and Step 2 payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, as well as profits earned by the claimant by participating in the VoO program, as determined in the calculation of Step 1 compensation for fishing claimants.

4

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

004108