UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010

MDL No. 2179

SECTION: J
JUDGE BARBIER
MAGISTRATE JUDGE SHUSHAN

## DECLARATION OF RHON E. JONES

I, Rhon E. Jones, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the State of Alabama, the United States District Court for the Middle, Northern and Southern Districts of Alabama, the U.S. Third, Sixth, Tenth and Eleventh Circuit Court of Appeals, and the U. S. Supreme Court.

2. I have been appointed by the Court to serve on the Plaintiffs Steering Committee in MDL No. 2179 and Class Counsel for the Economic & Property Damages Settlement Class.

3. This Declaration is submitted in response to the Court's request for any additional evidence relating to whether the parties discussed, prior to the time the Settlement Agreement was executed, whether or not expenses and revenues would be matched for all Business Economic Loss (BEL) Claims, (*see* SCHEDULING ORDER REGARDING BEL REMAND (10/25/2013) [Doc 11735], ¶2).

### Personal Involvement in and Familiarity with Relevant Settlement Discussions

4. I was asked by Mr. Rice, Mr. Fayard and Co-Liaison Counsel to represent the PSC in a "working group" with consulting experts and representatives of BP to discuss, develop and test the Business Economic Loss frameworks for Causation and Compensation.

5. As such, I was personally involved in the negotiation of the entire BEL Framework, including the specific BEL Causation and Compensation Framework provisions contained in Exhibits 4B and 4C; was physically present and actively participated in numerous "working group" sessions; and was also present for several of the larger discussions between the PSC Negotiating Team and Counsel for BP.

6. I also worked separately with my partner, John Tomlinson, and our team of experts and consultants, to sample, test, and develop feedback regarding the Causation and Compensation Frameworks based on our meetings and discussions with BP.

## "Working Group" Sessions and Other Discussions with BP

7. I do not recall any discussions between the Parties regarding the "matching" of expenses to revenue in cash-basis (or other) BEL Claims.

8. I believe that BP's primary focus was on the submission and evaluation of the actual monthly profit and loss statements ("P&Ls") prepared in the ordinary course of business.

9. BP did not propose, and our working group did not assume in our analyses, that Program Accountants would make any attempt to 'move' or 'match' expenses into or out of the monthly Benchmark or Compensation Periods; or otherwise attempt to determine which particular expenses "corresponded" with the monthly revenues that had been recorded during the relevant Benchmark and Compensation Periods. BP did not propose, and our working group did not assume in our analyses, that Program Accountants would look to the "business activities" of the claiming Entity to attempt to determine what revenues had been "earned" during the Benchmark or Compensation Periods.

10. BP did not propose, and our working group did not look at, any "revenue attribution criteria".

11. BP did not propose, and our working group did not assume in our analyses, that cash-basis P&Ls could not be submitted; or that cash-basis P&Ls would have to be converted to accrual-based P&Ls prior to submission; or that cash-basis P&Ls would have to be converted to accrual-based P&Ls by the Program Accountants.

12. There was awareness particularly with respect to seasonal and cyclical businesses, that there would be time lags between the initial, continuing and sometimes delayed effects of the Spill and the ultimate resulting financial impacts on the businesses in question. The solution to this was not to 'smooth' revenue or expenses, but to provide the Claimant with optionality.

13. My recollection of the discussions surrounding the Documentation requirements in Exhibit 4A, (including the requirement for tax returns, the requirement for annual P&Ls, the authority of the Claims Administrator to request source documents, and the authority of the Claims Administrator to look into potential discrepancies between the monthly P&Ls and the tax returns), is that BP was concerned – not with the ability to "match" expenses with revenues in cash basis (or other) BEL Claims, but – with the prevention of possible fraud.

## The May 2, 2012 Amendment

14. After the original Settlement Agreement was made available to the public, I received complaints from CPAs that the accountants preparing the claims would generally not be able to "sign and attest they have submitted information in compliance with generally

accepted accounting principles" (*see* original Section 4.4.13.4 (April 18, 2012) [Doc 6276-1]).

15. These CPAs complained that many businesses did not keep their books under GAAP; that the Documentation provisions in Exhibit 4A did not require the preparation and submission of financial statements in conformance with GAAP; that attestation of compliance with GAAP would be unduly burdensome and expensive; and that, in several ways, the Settlement Agreement generally, and BEL Claim Frameworks in particular, expressly deviated from GAAP in several material respects.

### Review of My Files

16. I have reviewed my notes and drafts from the settlement negotiations, the sample test cases we looked at, and my e-mail communications with BP counsel.

17. I have not found any notes or communications inconsistent with my recollection of the discussions as stated in Paragraphs 1-16, above.

Signed, under penalty of perjury, this 5th day of November, 2013 in Montgomery, Alabama.

_____
Rhon E. Jones