UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010

MDL No. 2179

SECTION: J
JUDGE BARBIER
MAGISTRATE JUDGE SHUSHAN

**DECLARATION OF MICHAEL ALLEN SCOTT, CPA, CFF**

1. My name is Michael Allen Scott and my professional credentials are as follows: I am currently the Partner in Charge of the Panama City, Florida offices of Carr, Riggs & Ingram, LLC, a position that I have held since January 1999. I graduated from Huntingdon College, located in Montgomery, Alabama, with a Bachelor of Arts in Accounting. I have been a licensed CPA in Florida since 1981. I obtained my CFF (Certified in Financial Forensics) in 2010, which is a credential established by the AICPA and granted exclusively to CPAs who have demonstrated considerable expertise in forensic accounting in a variety of service areas including economic damages calculations. Additional areas of concentration in my career include consultation and involvement with mergers and acquisitions, negotiations of business transactions, tax planning and preparation for businesses and individuals, and business loss calculations due to interruption of operations. Further, I was retained by the Plaintiffs Steering Committee (PSC) in MDL 2179 and was heavily involved in the settlement negotiations between the PSC and BP attorneys and consultants, an engagement that began in June 2011 and lasted until the Settlement Agreement was reached. My contributions to the DWH Oil Spill settlement negotiations consisted primarily of analyzing and modeling loss calculations using concepts discussed during the negotiations to assist and support the PSC in its negotiations.

2. In my participation on behalf of the PSC, I was involved in hundreds of hours of meetings with BP's numerous consultants and legal representatives to work through issues and examples raised by the attorneys in the Business Economic Loss portion of the Economic and Property Damages Class Settlement Agreement (Settlement Agreement). As a result, I have firsthand knowledge of the discussions that took place over several months and were formalized in the Settlement Agreement.

3. During the settlement negotiation process CRI developed claim testing excel spreadsheets that would simulate many of the proposed/negotiated BEL calculations so results could be analyzed in real time and shared with both parties. To my knowledge and based on interaction with BP's team of accountants and attorneys, BP prepared similar calculation templates to test results of the negotiated methodologies.

4. I spent months in meetings and discussions with BP's economic, accounting and legal representatives regarding the details of the negotiated terms of the BEL framework. During these meetings/discussions, BP representatives were provided actual business test case profit and loss statements from several industries which were used to apply aspects of the negotiated BEL methodology. In fact, on many occasions, both the PSC and BP would compare the results of these tests to see if the negotiated terms were being interpreted correctly as well as to ascertain the impact of those terms to the respective parties.

5. At no point in any of the negotiation meetings in which I participated were there discussions regarding any requirement of claimants to use one accounting method over another, or to use any financial statements other than those kept and recorded contemporaneously by the potential claimant. The test case financial statements provided to BP included both cash and accrual statements which went without comment from BP. Both the PSC and BP spent several months testing various calculations of methodologies proposed by both parties utilizing the test case profit and loss statements. In formulating the methodology used in determining Causation testing (Exhibit 4B of the Settlement Agreement), which is a revenue test by nature, both parties had available the same test case profit and loss statements upon which to base their testing. Again, there were no discussions regarding cash or accrual basis P&Ls, nor discussions involving the reporting of revenue or looking at activities outside of the Benchmark and Compensation Periods to analyze if revenues should be reported in another period.

6. During negotiations, BP was in fact directly in favor of the use of financial data that was prepared contemporaneously with the Benchmark and Compensation Periods. Consequently, the document requirements of the Settlement Agreement provide that "Profit and loss statements shall identify the dates on which they were created." (Exhibit 4A to the Settlement Agreement). This requirement was the only stipulated criteria in regards to the preparation of the profit and loss statements to be submitted by claimants. In addition, there were never discussions of any kind regarding the matching of revenue and expenses, the restatement of monthly revenue, or the use of revenue attribution for any claimant or industry. There certainly was no testing proposed or performed by the parties prior to settlement which involved the identification or correction of matching or revenue restatement issues. The term "matching" was never raised or used in any session, meeting or document that I can recall.

7. Any monthly revenue spikes, negative revenue entries, negative variable expenses, and/or wide variations in monthly variable profit margin, which BP now claims would necessitate the matching of revenue and expenses or the restatement of revenue, would have been readily apparent to BP representatives from analyzing these test case profit and loss statements prior to settlement. Despite having access to test case profit and loss statements, BP representatives never raised these matching issues, nor did they question the basis of accounting or accounting methodology used to report revenues and expenses as presented in these test case P&Ls. Not only did BP not raise these issues, they readily accepted and in fact agreed with the PSC team on how revenue and expenses were recorded for both accrual and cash based accounting test cases.

8. Had BP discussed or proposed the introduction of any of the above-referenced topics during the settlement discussions, it would have necessitated additional negotiated written terms/exhibits regarding testing procedures/criteria for matching analysis, and document requirements that are not currently contained within the written Settlement Agreement. Conversely, BP actively participated in several weeks of discussion, testing, and development of other specialized settlement calculations and lists for other unique issues, such as a fixed and variable payroll formula (Exhibit 4C of the Settlement Agreement), fixed and variable expense list (Exhibit 4D, Attachment "A" of the Settlement Agreement), and business growth factors and percentages (Exhibit 4C).

I declare under penalty of perjury that the foregoing is a true and correct statement of my analysis and opinions.

_____
Michael Allen Scott, CPA, CFF

Dated: NOV 4, 2013