# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by | * | **MDL NO. 2179** |
| the Oil Rig "Deepwater Horizon" | * | |
| in the Gulf of Mexico, on April 20, 2010 | * | **SECTION J** |
| | * | |
| This document relates to: | * | |
| All Cases and No. 12-970 | * | **Honorable CARL J. BARBIER** |
| | * | |
| | * | **Magistrate Judge SHUSHAN** |
| | * | |
| | * | |

## DECLARATION OF WENDY L. BLOOM

I, Wendy L. Bloom, do hereby declare that the following statements made by me under oath are true and accurate to the best of my knowledge, information and belief:

### Introduction

1.      I am a partner in the law firm of Kirkland & Ellis LLP.  I serve as counsel for BP Exploration & Production Inc. and BP America Production Company, along with other BP entities who have been named as defendants in the above-captioned litigation (collectively, "BP").

2.      The Economic and Property Damages Settlement Agreement ("Settlement Agreement"), as amended on May 2, 2012 (Rec. Doc. 6430-1),[1] was the result of many months of arm's-length negotiations between counsel representing the Plaintiffs' Steering Committee ("PSC" or "Class Counsel") and counsel for BP (collectively, the "Parties").[2]  I personally and directly participated in the settlement discussions on behalf of BP and was one of the principal

---

[1] All "Rec. Doc." numbers refer to MDL 2179.

[2] A history of the Economic and Property Damages Settlement negotiations, including participants, can be found in the Declaration of Richard C. Godfrey (Rec. Doc. 7114-9) filed on August 13, 2012.

negotiators for BP regarding Settlement Agreement Exhibits 4A-4E for Business Economic Loss ("BEL") claims.

3.      The attorneys with authority to convey the PSC's final position on issues for BEL negotiations were Mr. Calvin Fayard of Fayard & Honeycutt and Mr. Joseph Rice of Motley Rice LLC.  Two experts for the PSC — Michael Scott, an accountant from the accounting firm Carr Riggs & Ingram, and Robert Michael Wallace, an accountant and software developer who had developed a spreadsheet calculator for submitting business claims to the Gulf Coast Claims Facility ("GCCF") — also participated in some BEL settlement negotiations.

4.      BP was represented in the BEL negotiations by attorneys and representatives from BP and multiple law firms with significant class action and complex litigation experience, including Mr. Richard C. Godfrey of Kirkland & Ellis LLP, Mr. Andrew Karron of Arnold & Porter LLP, and myself.  BP also had a team of experts from multiple disciplines, including economics, finance, damages, accounting, and demographics, that participated in the BEL settlement discussions to provide counseling and analysis for BP as negotiations took place. These experts included, among others, Mr. Hal Sider of Compass Lexecon, an economist, and Mr. Brian Gaspardo of O'Neill & Gaspardo LLC, both a CPA and MBA.

5.      In accordance with the Court's October 25, 2013 Scheduling Order regarding the BEL Remand (Rec. Doc. 11735), I submit this Declaration to supplement the factual record regarding the intended meaning of Exhibit 4C as it applies to the calculation of a claimant's lost variable profits.

### Overview of the Business Economic Loss Compensation Framework

6.      Exhibit 4C of the Settlement Agreement compensates business claimants for the profit that they would have been expected to earn in the absence of the DWH spill.

7.     The BEL Compensation Framework uses a two-step process.  Step 1 compensates claimants for any reduction in Variable Profit between the 2010 compensation period selected by the claimant (which must include three or more consecutive months between May and December 2010) and the comparable months of the claimant-selected Benchmark Period:  2009, the average of 2008-09, or the average of 2007-09.   Step 2 compensates claimants for lost anticipated growth—that is, incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to results from the Benchmark Period, using two growth rate factors.

8.     The base compensation calculated from the Step 1 and Step 2 process is then multiplied by a Risk Transfer Premium ("RTP").  The RTP compensates the claimant, among other things, for future risks.

9.     Any payments previously received by the claimant from the GCCF or BP's OPA claims process, and certain VoO payments, are then subtracted to arrive at a total compensation amount.

**BP's Discussions with the PSC Relating to Exhibit 4C**

10.     BP and the PSC had preliminary meetings in spring 2011 to discuss the possibility of engaging in settlement discussions.  The Parties discussed early in the negotiations that any proposed class settlement would need to satisfy Rule 23 requirements such as typicality, commonality, predominance, and adequacy of representation.  In one of the first meetings I participated in with the PSC, Mr. Rice said in substance that the settlement must include methodologies that would generate similar outcomes for similarly situated claimants.  During a May 20, 2011 meeting at Mr. Fayard's home, Mr. Rice gave an example of two jet ski rental shops just down the beach from each other and emphasized the need to establish a methodology

that treated each of the shops consistently from an economic perspective. He asserted this was not occurring under the GCCF and would need to be remedied in any settlement with the PSC. He gave the same example during a meeting on July 14, 2011, and this time expressed his view that consistent treatment of similarly situated claimants was also needed to gain the support of state attorneys general, including Mississippi Attorney General James Hood. This principle of consistent treatment (as illustrated often by the jet ski example) was repeated by Mr. Rice throughout the negotiations. At no time during the course of the negotiations did any PSC representative say that claimants would or should be paid differing amounts based on how a claimant happened to keep its financial records or record revenues and expenses or that accrual-basis and cash-basis claimants would or should be treated differently.

11.     The Parties began discussing a framework for BEL claims in approximately June 2011. These negotiations typically took place in person for several days at a time.[3] At a meeting in London on June 9, 2011, Mr. Fayard expressed that his job and that of Mr. Rice was not to seek a "windfall" for claimants, but rather to seek full compensation for losses incurred. At another meeting in June, the Parties discussed and agreed upon some of the key principles that would govern a settlement. These principles included devising a compensation methodology based on judicial oversight, objectivity, rational outcomes, fair outcomes, and parity for similarly situated claimants.

---

[3] Among the many issues BP and the PSC had to work through during BEL negotiations was the time period for which lost profits would be calculated. From early on in the discussions, we made clear on behalf of BP that the compensation period could not extend into 2011. For example, I discussed this view with Mr. Rice and Mr. Fayard in meetings on July 13, 2011, July 20, 2011, and August 3, 2011. For the PSC, Mr. Rice expressed the view that the compensation period should extend into 2011 and also that some claimants might have experienced lost profits from the DWH Spill for a period of time less than the entire span of May to December 2010. The end result of these discussions is reflected in Exhibit 4C, such that claimants may select as their Compensation Period "three or more consecutive months between May and December 2010."

12.     In August, I participated in negotiation sessions with the PSC at Kirkland & Ellis' New York and Chicago offices.  During one session, Mr. Rice suggested that the settlement should compensate businesses for damages resulting from their "cash flow."  In a subsequent session, Mr. Rice expressed that BP was singularly focused on lost profits in designing the compensation methodology.  During that session, BP's Global Head of Litigation James Neath responded that compensation for business economic loss would need to be based on lost profits. Mr. Neath explained that lost profits is the accepted methodology for proving economic loss and is proven in court every day.

13.     Shortly after BP rejected Mr. Rice's suggestion in late August, BP circulated a draft on August 30, 2011 setting forth the framework for BEL compensation.  I do not recall any further discussions among the Parties after that point regarding the potential use of a methodology based on anything other than lost profits.  From that point on, the Parties' negotiations focused on developing a lost profits calculation that would be consistently applied to claimants and that would generate similar outcomes for similarly situated claimants.

14.     Accordingly, from late August 2011 forward, discussion of the BEL Compensation Framework focused on compensating businesses for economic loss by comparing the profits a claimant would have earned in the absence of the *Deepwater Horizon* spill to the actual profits earned by the claimant.  Although the Parties negotiated extensively about how to calculate lost profits, the Parties never deviated from a lost profits framework after the initial draft framework was exchanged on August 30, 2011.

15.     This August 30, 2011 draft of the BEL Compensation Framework described the lost profits methodology in an overview as follows:

Calculate 2010 damages by establishing the following elements:

    1.      Calculate revenue lost due to the DH spill based on the difference between (i) revenue expected in the absence of the DH spill ("expected" revenue); and (ii) actual revenue for the period commencing on or after May 1 and any date up to December 31, 2010 ("claimed loss period").

    2.      Calculate profits lost as a result of the DH spill by deducting costs that would have been incurred in generating revenue lost as a result of the DH spill.

(August 30, 2011 BP Draft BEL Compensation Framework, attached hereto as Exhibit A.)

16.     On or about August 31, 2011, the PSC provided a mark-up of BP's August 30, 2011 Draft BEL Compensation Framework, which is attached hereto as Exhibit B. The PSC did not object to the draft's lost profits framework, and this remained the applicable framework through to the final agreement. Likewise, the PSC did not object to the overview's explanation that lost profits would be calculated by determining the difference between actual and expected revenue and then subtracting "costs that would have been incurred in generating revenue lost as a result of the DH spill." This explanation, which reflected the concept of matching revenue to expenses, also carried through subsequent drafts to the final agreement, albeit using different language to capture the same concept.

17.     During subsequent negotiations over how to implement the lost-profit approach, the PSC never suggested to BP that they were seeking to pay claimants based on a cash-flow analysis or on any other methodology that did not reflect a claimant's true lost profits. Similarly, the PSC never suggested to BP that they were seeking to pay claimants based on a methodology that did not reflect economic reality. In sum, nothing said by the PSC in the negotiation process indicated that the BEL Compensation Framework would calculate compensable lost profits in a manner different from compensating a claimant for the difference between actual and expected revenue less the corresponding variable expenses incurred to generate that revenue.

18.     Contemporaneous communications from the PSC in fall 2011 were consistent with an expectation that the Settlement Program and its vendors would undertake to match revenue to corresponding expenses.  In these communications, the PSC flagged the importance of accurate financial records in calculating lost profits and the need for accountants to analyze and adjust existing accounting records to eliminate distortions and properly calculate lost profits. For example:

- In a meeting on September 1, 2011, Mr. Rice proposed that business claimants were going to need access to accountants to make claims, and he began advocating for the Settlement Agreement to include reimbursement for claimants' accountants.

- At a meeting at the Royal Sonesta Hotel in New Orleans during the week of September 12, 2011, the PSC's accountants, Mr. Wallace and Mr. Scott, made a presentation to a group that included myself, Mr. Rice, and others.  Mr. Wallace stated that the best method of computing lost profits was to look at monthly lost profit, but that this requires accurate financial records.  In this presentation, Mr. Wallace stated that, for the most part, claimants are not at a "sophisticated" level of inputting information in their financial statements.  He noted that his clients misclassify expenses as fixed that may be variable.  He noted that in his experience clients' profit and loss statements ("P&Ls") may be "skewed" because, by way of example, businesses often do not accurately record expenses such as bad debt.  Mr. Wallace noted as an example of how he identifies whether a P&L contains inaccuracies that he would look for whether the P&L contained negative monthly gross profit entries in which case the P&L is not valid.   Mr. Wallace explained

that adjustments are necessary to ensure accurate P&L statements.  He explained that in working with claimants on GCCF claims, he would input their profit and loss data into a computer model to run difference scenarios to make a professional judgment whether the client's P&Ls were skewed.

- In a PSC proposal to BP dated September 21, 2011 for "calculating the lost profit" of business claimants, the PSC advocated for starting with gross profit and adjusting it for "fixed cost of goods sold and variable SG&A items to determine lost profits" and acknowledged that the claimant's "[m]onthly accounting records must be consistently maintained such that the monthly Gross Profit and Gross Profit Margin are reliable."  (*See* September 21, 2011 PSC submission to BP, attached hereto as Exhibit C.)

- During a negotiation session on September 27 in Washington, D.C., PSC accountant Mr. Wallace asked what type of personnel should review claims and suggested they should be accountants if the Parties were to utilize a monthly lost profits methodology.  The next day, the PSC prepared a document outlining procedures for claims processing by accountants.  (*See* September 28, 2011 PSC submission to BP, attached hereto as Exhibit D.)

- Consistent with what Mr. Wallace had stated at the meeting at the Royal Sonesta, a spreadsheet, provided on October 17, indicated that Mr. Wallace had made a manual adjustment to cost of goods sold, which is a variable expense that is tied directly to the computation of variable profit.  In describing this adjustment, the document contained the following footnote to an Excel file produced on October 17:  "Some claimants (e.g. Seafood Processors) may report monthly processing

costs using standard cost accounting systems.  In these instances, COGS [Cost of Goods Sold] must be adjusted to reflect the ACTUAL monthly costs." (*See* excerpt of October 17, 2011 PSC Excel spreadsheet, attached hereto as Exhibit E (emphasis in original).)  Such adjustments are necessary to ensure that expenses are properly allocated to revenues.[4]

19.    As negotiations continued in November 2011 against this backdrop, BP proposed in its November 10, 2011 draft of the Compensation Framework for Business Economic Loss claims that Step 1 compensation reflects the average of two methods of measuring reduction in profits:   (i) the reduction in Adjusted EBITDA and (ii) the reduction in "Variable Profit." (November 10, 2011 Compensation Framework for Economic Loss Claims, attached hereto as Exhibit F.)  The Framework proposed calculating "Variable Profit" by "[s]um[ming] the monthly Benchmark Period revenue" and "[s]ubtract[ing] the *corresponding* variable expenses" (emphasis added).[5]

20.    The Parties went on to negotiate additional issues, but they never again discussed the methodology in which "corresponding variable expenses" would be subtracted from revenues

---

[4] To facilitate BEL negotiations to arrive at a compensation methodology, Mr. Godfrey, Mr. Neath, and I, along with Mr. Rice and Mr. Fayard, agreed to allow a working group of BP counsel and its experts to engage in break-out discussions with PSC lawyers, Rhon Jones and John Tomlinson, and their two experts, Michael Scott and Robert Michael Wallace.  The working group was tasked with trying to work toward an agreed list for classifying expenses reflected on P&Ls as fixed versus variable, including a formula for payroll expenses.  Certain claimant data was provided as part of the Parties' efforts to define fixed and variable expenses, to evaluate using EBITDA as opposed to Variable Profit, and to perform other calculations that did not implicate the question of matching.  BP lacked the necessary information to determine whether the claimant data properly matched revenues and expenses as required under the Settlement Agreement.  Accordingly, the calculations performed as part of this exercise did not require or involve verification of the accuracy of the P&Ls or consideration of whether expenses and revenues were recorded in the appropriate months.

[5] Among other communications exchanged during this time period, on November 3, 2011, Mr. Rice and Mr. Fayard sent me, Mr. Neath, and Mr. Godfrey a memorandum regarding Economic Loss for Business Claims.  (*See* November 3, 2011 PSC memo to BP, attached hereto as Exhibit G.)  Among other things, that memo indicated the following elements were necessary to obtain a BEL recovery:  "1) Class membership. 2) Compliance with the Framework for Business Loss. 3) Compliance with Causation for Business Loss.  4) Documentation for the Business Loss."

to arrive at variable profit.  Nor did the Parties revisit the overall lost-profits framework.  For instance, the Parties disagreed over whether to include EBITDA as part of the variable profit calculation.  But that was a debate over how best to calculate lost profits and achieve an appropriate measure of economic reality.  As documents exchanged by the Parties reflect, there was a mutual goal of "quantifying the economic loss of a business"—"for determining economic injury."  (*See* November 15, 2011 Cox Decl., ¶ 3, attached hereto as Exhibit H; November 15, 2011 BP Memorandum Regarding EBITDA, attached hereto as Exhibit I, November 16, 2011 PSC Memo at ¶ 2, attached hereto as Exhibit J.)

21.     In a separate memorandum provided by the PSC on November 16, 2011, regarding BEL Causation Requirements, the PSC stated that the BEL "process is very complex and complicated" and acknowledged that the settlement would require "trained" accountants to assist in the submission and review of BEL claims.  (*See* November 16, 2011 PSC Memo regarding Causation Requirements, attached hereto as Exhibit K.)  This is because the negotiated BEL frameworks required much more than simply taking a claimant's financial records as given (or in the form maintained at the claimant's business).  Indeed, at no time did any representative from the PSC state that a claimant's financial records would just be accepted at face value.  Instead, financial records would need to be scrutinized to accurately determine a claimant's revenues and corresponding expenses.  The Parties repeatedly discussed during the course of negotiations that the Settlement Program would need to be staffed with professional accountants to implement the BEL framework as drafted.

22.     Consistent with this understanding, the Parties agreed to ensure that the Settlement Program and its accountants would have the documentation necessary to accurately determine a claimant's revenues and corresponding expenses.  During negotiation sessions, I

expressed on behalf of BP how for BP it was critical for the Settlement Program (and the professional accountants working for the Settlement Program) to obtain the information they needed to accurately make a variable profits calculation. Indeed, I recall several times Mr. Rice responding during negotiations that I was being too skeptical and not sufficiently trusting that claimants would supply accurate financial information. Those negotiations led to Exhibit 4A, Documentation Requirements for Business Loss Claims. Exhibit 4A not only requires claimants to submit, among other things, federal tax returns and "[m]onthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011," but allows the Claims Administrator to request additional documentation when needed. This includes requesting "source documents for profit and loss statements" and, if there is a discrepancy with amounts reflected in a tax return, "to provide additional information or documentation." Exhibit 4A thus ensures that the Claims Administrator accountants will be provided with the information they need to examine claimants' financial records, making any adjustments necessary to properly reflect revenues and corresponding expenses, including matching revenues with expenses.

23.     After December 2011, negotiations involving Step 1 compensation were largely complete. On January 12, 2012, BP and the PSC reached agreement on the key remaining open issues relating to the Business Economic Loss Framework. The Parties reported this agreement to Magistrate Judge Shushan on the same day. On January 18, 2012, the Parties incorporated these changes into the Compensation and Causation Frameworks for Business Economic Loss, and agreed that these Frameworks were final. One week later, however, the PSC proposed changes to both the Compensation and Causation Frameworks for Business Economic Loss,

thereby re-opening negotiations on the BEL Frameworks. Most of these negotiations involved Step 2 of the compensation calculation. On February 8, 2012, the Parties made final revisions to the "Variable Profit" definition, none of which altered the requirement to match revenues with "corresponding variable expenses." (February 8, 2012 BP Draft Compensation Framework, attached hereto as Ex. L.) The "Variable Profit" definition in the final version of Exhibit 4C remains unchanged from BP's February 8, 2012 draft.

24.    The Parties finalized terms on BEL Compensation on March 1, 2012.

25.    In sum, after August 2011, the Parties' negotiations focused on how to create a lost-profits framework for measuring economic loss. Nothing said in the negotiation process suggested that the PSC ever intended the BEL Compensation framework to calculate compensable lost profits in a manner inconsistent with BP's view: that the calculation of a claimant's loss is dependent on taking the difference between expected and actual revenues earned during a period and subtracting the corresponding variable expenses incurred to generate that revenue.

**CSSP Accountants Recognize Matching Must Occur**

26.    On March 14, 2012, I, along with other BP attorneys and experts, met with Chuck Hacker and other representatives from PwC to discuss various issues regarding settlement implementation. Mr. Hacker and PwC had not been involved in negotiating or drafting the Settlement Agreement and they were accordingly working through what they would need to do as the Settlement Program accountants to implement the agreement that the Parties had already negotiated. At this meeting, we discussed the use of variable profit to calculate a claimant's loss under the BEL Compensation Framework. We also discussed the amount of work that would be

required for Settlement Program accountants to calculate losses accurately under the BEL Framework.

27.     In response to our discussion, Mr. Hacker suggested there may be easier ways to calculate lost profits (including by using an annual variable margin as BP originally had proposed in its August 30, 2011 draft, *see* Exhibit A). We stated that we recognized that doing so would simplify calculating lost profits, but that the Parties had agreed to use the specific lost profits calculation in the Settlement Agreement Compensation Framework. I understood that performing the calculation called for in the Agreement would require a significant effort, both to determine which expenses were variable and to match those variable expenses to corresponding revenues. Indeed, one of the reasons that BP required the Settlement Program to hire hundreds of accountants was to ensure that the accountants would scrutinize a claimant's financial documentation to determine accurately a claimant's revenues and corresponding expenses as required by the Agreement. This conversation with Mr. Hacker confirmed for me that the Settlement Program would properly implement Exhibit 4C.

28.     On April 4, 2012, Mr. Hacker sent an email regarding the BEL Framework to Mr. Rice, which was copied to counsel for BP. In the email, Mr. Hacker reiterated the same suggestion for a different variable profit calculation that he raised during our March 14 meeting, which he stated would "[h]ave the potential of more accurately matching revenue with expenses by consistently using a longer base period." (April 4, 2012 Hacker email, attached hereto as Exhibit M.) Mr. Hacker's suggestion that his alternative variable profit calculation would "more accurately match[] revenue with expenses" acknowledged the common understanding that the Settlement Agreement required matching. Mr. Hacker also again suggested that his proposed calculation would "[r]educe the amount of work required" to calculate BEL claims, which I

again understood as an acknowledgment that the accountants would be matching revenues and expenses under the Settlement Agreement. This memo from Mr. Hacker confirmed that PwC understood matching would be required under the Settlement Agreement. The need to perform matching was the unmistakable premise of Mr. Hacker's alternative suggestion.

29.     The Parties finalized various issues related to the Settlement Agreement in April 2012. (*See, e.g.*, April 10, 2012 email from Rice to Bloom and Godfrey, attached hereto as Exhibit N.) The lost profits calculation, however, remained unchanged. The Settlement Agreement was executed on April 18, 2012, and then re-executed as amended on May 2, 2012. The Court entered an order granting final approval of the Settlement Agreement on December 21, 2012.

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true to the best of my knowledge, belief, and information.

_____

Wendy L. Bloom

Dated:  November 7, 2013

# Exhibit A

# Compensation Framework for Business Claims[1]

August 30, 2011

The framework outlined below applies to business claims.

Overview:    Calculate 2010 damages by establishing the following elements:[2]

1.    Calculate revenue lost due to the DH spill based on the difference between (i) revenue expected in the absence of the DH spill ("expected" revenue); and (ii) actual revenue for the period commencing on or after May 1 and any date up to December 31, 2010 ("claimed loss period").

2.    Calculate profits lost as a result of the DH spill by deducting costs that would have been incurred in generating revenue lost as a result of the DH spill.

3.    Determine claimant compensation by deducting sums received in connection with the DH spill.

Detailed Explanation:

1.    Determination of claimants' lost revenue

A.    The "claimant benchmark" period is defined as the claimant's chosen period in which to supply revenue data from one of the following three options:  (i) 2007-2009, (ii) 2008-2009, or (iii) 2009.

B.    "Expected" revenue is calculated by multiplying claimant's revenue for the "claimed loss period" in the "claimant benchmark" period by two factors that attempt to account for conditions affecting post-spill revenue unrelated to the spill:  (i) a claimant-specific factor; and (ii) an industry factor.

C.    Claimant-specific factor

i.    The claimant-specific factor attempts to account for conditions that affected claimant's revenue in the pre-spill period (relative to the "claimant benchmark" period) that also would be expected to affect revenue in the post-spill period (relative to "claimant benchmark" period).  Examples of such conditions might include the entry or exit

---

[1] This Compensation Framework pertains only to claimants that generated revenue in 2009.  Excluded businesses are (i) businesses engaged in commercial fishing, processing, and distribution; (ii) start-up businesses; (iii) businesses claiming to have ceased operations due to the spill; (iv) development and construction businesses; (v) gaming businesses; and (vi) banks [+ others subject to further discussion].

[2] All damages paid will be paid on a pre-tax basis.

1

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

of a competitor or changes in economy-wide conditions that would affect claimant revenue in both the pre-spill and post-spill period.

ii.   The claimant-specific factor is calculated as the percentage change in the claimant's revenue in the relevant "pre-spill months" (defined in ii.a below) relative to the same months in the "claimant benchmark" period.

    a.   "Pre-spill months" shall be defined as January-April 2010.

    b.   If the claimant selects 2009 as the "claimant benchmark" period, the claimant-specific factor is calculated as the claimant's percentage revenue growth between Jan-April 2010 and Jan-April 2009. If the claimant-specific factor is 3% (-3%), then the claimant's "expected" revenue for "the claimed loss period" is 3% higher (lower) than claimant's actual revenue in May-December 2009. Because the claimant-specific factor is applied to "the claimed loss period" revenue in the "claimant benchmark" period, "expected" revenue is constructed to account for claimant-specific revenue growth prior to the spill.

    c.   Alternatively, for example, if the claimant selects 2008-09 as the "claimant benchmark" period, the claimant-specific factor is calculated as the claimant's percentage revenue growth between Jan-April 2010 and the claimant's average revenue in January-April 2008 and January-April 2009:

$$[\text{Rev}_{(\text{Jan-April 2010})} / .5*[\text{Rev}_{(\text{Jan-April 2008})} + \text{Rev}_{(\text{Jan-April 2009})}]]\text{-}1$$

If this factor is 10% (-10%), then the claimant's "expected" revenue for "the claimed loss period" 2010 is 10% higher (lower) than the claimant's average revenue in May-December 2009 and May-December 2008.

D.   Industry factor

i.   The industry factor accounts for factors that were likely to affect the claimant's performance in the "claimed loss period" in the absence of the spill unrelated to changes expected based on claimant-specific effects. The industry factor would capture, for example, an increase (decrease) in May-December 2010 tourism revenue relative to the same period in the "industry benchmark" period that is different than

2

000526

the increase (decrease) in "pre-spill months" tourism revenue relative to the same months in the "industry benchmark" period.

ii. The industry factor is calculated by identifying benchmark regions likely unaffected by the DH spill, where tourism trends track with those in the Gulf areas, and then calculating the difference between (i) the percentage change in revenue between May-December 2010 and May-December in the "industry benchmark" period, and (ii) the percentage change in revenue between the pre-spill months of 2010 and the same months in the "industry benchmark" period.

   a. The "industry benchmark" period is defined as 2007-2009. Accordingly, the industry factor would be calculated as follows: If (i) Jan-April 2010 revenue is 3% above the average Jan-April revenue from 2007-2009 and (ii) May-December 2010 revenue is 6% above the average May-December revenue from 2007-2009, then the industry factor would be 3% (= 6%-3%).

   b. If the industry factor is 3% (-3%), then the claimant's "expected" revenue for May-December 2010 is 3% higher (lower) than claimant's actual revenue in May-December calculated as an average across 2007-2009 (assuming a claimant-specific factor of zero).

iii. Proposed estimation of the industry factor

   a. The DelMarVa areas (Sussex County DE and Worcester County MD) provide an economically appropriate benchmark area for calculating the industry factor.

   b. Average revenue for 2007-2009 will be used as the baseline. Smith Travel Research ("STR") provides best available indicator for the tourism industry, specifically STR's Revenue per Available Room ("RevPAR") .

E. Calculation of "expected" revenue

i. The claimant's "expected" revenue for the post-spill is calculated based on (i) the claimant's revenue in May-December of the "claimant benchmark" period; (ii) the claimant-specific factor; and (iii) the industry factor.

ii. For example, if the claimant factor is +3% and the industry factor is +3%, and the claimant's revenue in May-December of the "claimant

3

benchmark" period is X, then "expected" revenue is calculated as X*(1+.03)*(1+.03).

    iii.    Lost revenue is calculated as the difference between actual revenue in "the claimed loss period" and "expected" revenue.

2.    Calculation of lost profits

    A.    The claimant's lost profits reflect the difference between (i) claimant's lost revenue, and (ii) the incremental costs that claimant would have incurred in generating lost revenue, calculated as follows:

        i.    Identify the claimant's incremental costs including, among others, raw materials, hourly wages and commissions, utilities, inventory, office supplies, packaging/mailing/shipping costs, overhead related to lost revenue.  The scope of costs included in this calculation may vary based on the claimant's industry.

        ii.    Calculate the claimant's variable margin, defined as revenue minus incremental costs, expressed as a percentage of revenue.  The variable margin is calculated using data that corresponds to the "claimant benchmark" period.  [Parties will continue to explore whether it is possible to identify industry-specific measures of variable margins.]

        iii.    Calculate lost profits as the product of (i) lost revenue and (ii) variable profit margin.

    B.    Calculation of claimant compensation

        i.    Claimants will be compensated for their lost profits less other income earned by claimants and any OPA payments received.  This includes:

            a.    OPA payments (from BP and/or the GCCF)
            b.    Business interruption income; and
            c.    Other income of the following types: (i) all income resulting from the incident; (ii) all income from alternative employment or business undertaken; and (iii) potential income from alternative employment or business not undertaken, but reasonably available.

4

# Example of Compensation Calculation

|  |  | Jan-April | May-Dec [3] |
|---|---|---|---|
| *Elements of "Expected" Revenue Calculation* | | | |
| *Based on Claimant Data*[4] | | | |
| Avg. 2008-2009 | [A] | $1,000 | |
| 2010 | [B] | $1,030 | |
| Claimant-specific Factor | [C] = [(B-A) / A] | +3% | |
| | | | |
| *Based on Industry Data* | | | |
| Avg. 2007-2009 | [D] | $100 | $100 |
| 2010 | [E] | $103 | $106 |
| | [F] = [(E-D) / D] | +3% | +6% |
| Industry Factor | [G] = [$F_{May-Dec}$ - $F_{Jan-Apr}$] | +3% | |
| | | | |
| *Compensation Calculation* | | | |
| Avg. 2008-2009 Revenue | [H] | | $3,000 |
| 2010 "Expected" Revenue | [I] = [H * (1+C)*(1+G)] | | $3,183 |
| 2010 Actual Revenue | [J] | | $2,000 |
| 2010 Lost Revenue | [K] = [I - J] | | $1,183 |
| Variable Margin | [L]=50% | | |
| 2010 Lost Profit | [M] = [K * L] | | $591 |
| 2010 Other Income | [N] | | $100 |
| 2010 Claimant Compensation | [O] = [M - N] | | $491 |

---

[3] In this example the claimant has selected May-December 2010 as its "claimant loss" period.

[4] In this example the claimant has selected 2008-2009 as its "claimant benchmark" period.

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

000529

# Exhibit B

# Compensation Framework for Business Claims[1]

### August 30, 2011

The framework outlined below applies to business claims.

Overview:    Calculate 2010 damages by establishing the following elements:[2]

1. Calculate revenue lost due to the DH spill based on the difference between (i) revenue expected in the absence of the DH spill ("expected" revenue); and (ii) actual revenue for the period commencing on or after May 1 and any date up to December 31, 2010 ("claimed loss period"). WHY ARE WE LIMITED TO 8 MONTHS (MAY – DEC 2010) INSTEAD OF A FULL YEAR (MAY 2010 – APR 2011)? If losses extend further, request additional claim.

    *[handwritten: ISSUE W RTP]*

2. Calculate profits lost as a result of the DH spill by deducting costs that would have been incurred in generating revenue lost as a result of the DH spill.

3. Determine claimant compensation by deducting sums received in connection with the DH spill.

Detailed Explanation:

1. Determination of claimants' lost revenue

    A. The "claimant benchmark" period is defined as the claimant's chosen period in which to supply revenue data from one of the following three options:  (i) 2007-2009, (ii) 2008-2009, or (iii) 2009.  We go back 5 years (2005-2009)

    B. "Expected" revenue is calculated by multiplying claimant's revenue for the "claimed loss period" in the "claimant benchmark" period by two factors that attempt to account for conditions affecting post-spill revenue unrelated to the spill:  (i) a claimant-specific factor; and (ii) an industry factor.

    C. Claimant-specific factor

        i. The claimant-specific factor attempts to account for conditions that affected claimant's revenue in the pre-spill period (relative to the "claimant benchmark" period) that also would be expected to POSITIVELY affect revenue in the post-spill period (relative to

---

[1] This Compensation Framework pertains only to claimants that generated revenue in 2009.  Excluded businesses are (i) businesses engaged in commercial fishing, processing, and distribution; (ii) start-up businesses; (iii) businesses claiming to have ceased operations due to the spill; (iv) development and construction businesses; (v) gaming businesses; and (vi) banks [+ others subject to further discussion].

[2] All damages paid will be paid on a pre-tax basis.

"claimant benchmark" period).  Examples of such conditions might include the entry or exit of a competitor or changes in economy-wide conditions that would affect claimant revenue in both the pre-spill and post-spill period.

ii.    The claimant-specific factor is calculated as the percentage change in the claimant's revenue in the relevant "pre-spill months" (defined in ii.a below) relative to the same months in the "claimant benchmark" period.

    a.    "Pre-spill months" shall be defined as January-April 2010.

    b.    If the claimant selects 2009 as the "claimant benchmark" period, the claimant-specific factor is calculated as the claimant's percentage revenue growth between Jan-April 2010 and Jan-April 2009.  If the claimant-specific factor is 3% (-3%), then the claimant's "expected" revenue for "the claimed loss period" is 3% higher (lower) than claimant's actual revenue in May-December 2009.  Because the claimant-specific factor is applied to "the claimed loss period" revenue in the "claimant benchmark" period, "expected" revenue is constructed to account for claimant-specific revenue growth prior to the spill.

    c.    Alternatively, for example, if the claimant selects 2008-09 as the "claimant benchmark" period, the claimant-specific factor is calculated as the claimant's percentage revenue growth between Jan-April 2010 and the claimant's average revenue in January-April 2008 and January-April 2009:

$$[\text{Rev}_{(\text{Jan-April 2010})} / .5*[\text{Rev}_{(\text{Jan-April 2008})} + \text{Rev}_{(\text{Jan-April 2009})}]]-1$$

If this factor is 10% (-10%), then the claimant's "expected" revenue for "the claimed loss period" 2010 is 10% higher (lower) than the claimant's average revenue in May-December 2009 and May-December 2008.

D.    Industry factor

i.    The  industry factor accounts for factors that were likely to affect the claimant's performance in the "claimed loss period" in the absence of the spill unrelated to changes expected based on claimant-specific effects.  The industry factor would capture, for example, an increase (decrease) in May-December 2010 tourism revenue relative to the

2

**Formatted:** Highlight

**Formatted:** Highlight

**Formatted:** Highlight

same period in the "industry benchmark" period that is different than the increase (decrease) in "pre-spill months" tourism revenue relative to the same months in the "industry benchmark" period.

ii. The industry factor is calculated by identifying benchmark regions likely unaffected by the DH spill, where tourism trends track with those in the Gulf areas, and then calculating the difference between (i) the percentage change in revenue between May-December 2010 and May-December in the "industry benchmark" period, and (ii) the percentage change in revenue between the pre-spill months of 2010 and the same months in the "industry benchmark" period.

    a. The "industry benchmark" period is defined as 2007-2009. Accordingly, the industry factor would be calculated as follows:  If (i) Jan-April 2010 revenue is 3% above the average Jan-April revenue from 2007-2009 and  (ii) May-December 2010 revenue is 67% above the average May-December revenue from 2007-2009, then the industry factor would be 34% (= 67%-3%).

    b. If the industry factor is 3% (-3%), then the claimant's "expected" revenue for May-December 2010 is 3% higher (lower) than claimant's actual revenue in May-December calculated as an average across 2007-2009 (assuming a claimant-specific factor of zero).

                                                                     **Formatted:** Highlight

iii. Proposed estimation of the industry factor

    a. The DelMarVa areas (Sussex County DE and Worcester County MD) provide an economically appropriate benchmark area for calculating the industry factor.  WHY THIS AREA? SUGGEST A BLENDED SET OF SIMILAR COMMUNITIES.

                                                                     **Formatted:** Highlight

    b. Average revenue for 2007-2009 will be used as the baseline. Smith Travel Research ("STR") provides best available indicator for the tourism industry, specifically STR's  Revenue per Available Room ("RevPAR") .

E. Calculation of "expected" revenue

i. The claimant's "expected" revenue for the post-spill is calculated based on (i) the claimant's revenue in May-December of the "claimant benchmark" period; (ii) the claimant-specific factor; and (iii) the industry factor.

3

     ii.    For example, if the claimant factor is +3% and the industry factor is +34%, and the claimant's revenue in May-December of the "claimant benchmark" period is X, then "expected" revenue is calculated as X*(1+.03)*(1+.0304).

     iii.    Lost revenue is calculated as the difference between actual revenue in "the claimed loss period" and "expected" revenue.

2.    Calculation of lost profits

    A.    The claimant's lost profits reflect the difference between (i) claimant's lost revenue, and (ii) the incremental costs that claimant would have incurred in generating lost revenue, calculated as follows:

     i.    Identify the claimant's incremental costs including, among others, raw materials, hourly wages and commissions, utilities, inventory, office supplies, packaging/mailing/shipping costs, overhead related to lost revenue. The scope of costs included in this calculation may vary based on the claimant's industry.

     ii.    Calculate the claimant's variable margin (LOI) , defined as revenue minus Cost of Goods Sold (COGS), plus Fixed COGS Expenses (e.g. Salaries, Equipment Depreciation, etc.) minus incremental (aka Variable) costs (e.g. Credit Card Fees, etc.), expressed as a percentage of revenue. The variable margin is calculated using data that corresponds to the "claimant benchmark" period. [Parties will continue to explore whether it is possible to identify industry-specific measures of variable margins.]

     iii.    Calculate lost profits as the product of (i) lost revenue and (ii) variable profit margin (LOI).

    NOTE: The above calculation (2.A) only represents the Revenue Trend Analysis methodology. As such, it fails to recognize monthly PROFIT fluctuations due to unique business operation and/or seasonality. Suggest adding the following calculations:

     1.    Gross Profit using Average Annual LOI (aka Variable Margin)
     2.    Gross Profit using Average MONTHLY LOI (aka Variable Margin)

    B.    Calculation of claimant compensation (Lawyer stuff)

    i.       Claimants will be compensated for their lost profits less other income earned by claimants and any OPA payments received.  This includes:

            a.     OPA payments (from BP and/or the GCCF) credited at the end of RTP application.

            b.     Business interruption income; and

    c.      Other income of the following types: (i) all income resulting from the incident; (ii) all income from alternative employment or business undertaken; and (iii) potential income from alternative employment or business not undertaken, but reasonably available.

Formatted: Indent: Left:  1.5"

5

## Example of Compensation Calculation

|  |  | Jan-April | May-Dec [3] |
|---|---|---|---|
| *Elements of "Expected" Revenue Calculation* | | | |
| Based on Claimant Data [4] | | | |
| Avg. 2008-2009 | [A] | $1,000 | |
| 2010 | [B] | $1,030 | |
| Claimant-specific Factor | [C] = [(B-A) / A] | +3% | |
| | | | |
| *Based on Industry Data* | | | |
| Avg. 2007-2009 | [D] | $100 | $100 |
| 2010 | [E] | $103 | $10~~7~~6 |
| | [F] = [(E-D) / D] | +3% | +~~7~~6% |
| Industry Factor | [G] = [F$_{May-Dec}$ - F$_{Jan-Apr}$] | | +~~4~~3% |
| | | | |
| *Compensation Calculation* | | | |
| Avg. 2008-2009 Revenue | [H] | | $3,000 |
| 2010 "Expected" Revenue | [I] = [H * (1+C)*(1+G)] | | $~~3,183~~ 3,214 |
| 2010 Actual Revenue | [J] | | $2,000 |
| 2010 Lost Revenue | [K] = [I - J] | | $~~1,183~~ 1,214 |
| Variable Margin | [L]=50% | | |
| 2010 Lost Profit | [M] = [K * L] | | $~~591~~ 607 |
| 2010 Other Income | [N] | | $100 |
| 2010 Claimant Compensation | [O] = [M - N] | | $~~491~~ 507 |

> Formatted: Highlight
>
> Formatted: Highlight

---

[3] In this example the claimant has selected May-December 2010 as its "claimant loss" period. WHY ONLY 8 MONTHS?  If we're using the "Claimant Loss Period" to determine final payments by years, this period should include 12 months (i.e. May 2010 – April 2011)?

> Formatted: Highlight

[4] In this example the claimant has selected 2008-2009 as its "claimant benchmark" period.

# Exhibit C

Produced Pursuant to
Rule 408

9/21/11
fr. TTS

## Loss Calculation Method:

BP Position:  BP's position is to use net income and then come up to find your loss, versus taking gross profit and going down.

PSC Position:  The PSC believes calculating the lost profit from the pre-tax operating income as proposed by BP makes it much more confusing, less user friendly, and requires much more explanation of how it works. This approach would require listed every Fixed SG&A Expense item on the P&L which would be very laborious and error-prone.

We stand by our position that you start with gross profit and you adjust it for a fixed cost of goods sold and variable SG&A items to determine lost profits. It is important to note that these adjustments (Fixed COGS and SG&A items) are very limited and, therefore, much easier to explain and work with.

## Loss Period Definition:

BP Position: Limiting "Claimed Loss Period" to May 1, 2010 through December 31, 2010, 8 Months.

PSC Position:  The PSC's position is you use May 1, 2010 through April 30, 2011, which is a full year.  Including a full 12 month post-spill business cycle will include lost profits that may appear in the early 2011 for businesses with significant operations during the first four months of the year.

## Calculating the Variable Margin, a/k/a Loss of Income Ratio / LOI.

BP Position:  BP's position is to base this on a calendar year of January to December benchmark.

PSC Position:  PSC's position is you should use the 12 months from May to April benchmark to calculate the pre-spill variable margin. This is consistent with the post-spill period for which we are trying to calculate monthly Lost Profits.

# Growth Factor Calculation Methodology:

1. The "Expected Post-Spill Monthly Revenue" calculation includes:

    a.  Calculate the ***Average Historical Monthly Revenue*** (Rev Base) based on 2007, 2008 and/or 2009. Keeping in mind that this timeframe includes one of the worst economic periods in history. This determines our lost revenue foundation, but <u>does NOT recognize any year-to-year (2009 to 2010) growth that existed immediately prior to the oil spill.</u>

    b.  Calculate the ***Growth Trend Factor*** (Growth Factor) comparing Jan – Apr 2009 and Jan – Apr 2010 revenue to determine if a <u>positive growth trend</u> existed immediately prior to the oil spill. In other words, was there an indication that the claimant was experiencing revenue growth and <u>climbing out of the recession at the time of the oil spill?</u> If so, the claimant would have experienced <u>Lost Growth</u> that was not included in the Average Historical Revenue (see 1-a) and, therefore, must be ADDED to the Rev Base.

2. Based on the above statements, I submit the following conclusion:

    a.  The ***Rev Base*** and ***Growth Factor*** calculations must be viewed independently. Accordingly, the Growth Factor should always be calculated as the <u>increase</u> of 2009 to 2010 because this recent year-to-year comparison represents the best measurement of projected growth for the post-spill period (May 2010 – Fwd).

    b.  The Growth Factor by definition is a positive item which, if present, should be calculated to compensate the claimant for such loss. However, when the calculation results in a negative number, it should not be used to reduce the claimant's overall Lost Profits.

# Loss Calculation Methods Definitions

**Calculations Methods:**
- A. Revenue Trend
- B. Gross Profit using Monthly Variable Margin (aka LOI)

**A.  Revenue Trend Criteria:**

- a. Required documents include:
  - i. Monthly P&Ls
  - ii. Federal Income Tax Returns
  - iii. List of Fixed Cost of Goods Sold Expenses (see example list)
  - iv. List of Variable SG&A Expenses (see example list)

**B.  Gross Profit Method using Monthly Variable Margin Criteria:**

- a. Required documents include:
  - i. Monthly P&Ls
  - ii. Federal Income Tax Returns
  - iii. List of Fixed Cost of Goods Sold Expenses (see example list)
  - iv. List of Variable SG&A Expenses (see example list)

- b. Monthly accounting records must be consistently maintained such that the monthly Gross Profit and Gross Profit Margin are reliable.

- c. Business should exhibit significant monthly revenue and/or gross profit fluctuations due to seasonal and/or monthly business operation.

**C.  Fixed Cost of Goods Sold Items (Fixed COGS):**

- a. COGS expenses that do not fluctuate with sales revenue or production volume are considered Fixed Expenses and must be added back to Gross Profit to determine the Variable Margin Rate. Examples include, but are not limited to :
  - i. Fixed management salaries and benefits
  - ii. Depreciation on equipment

**D.  Variable SG&A Items:**

- a. SG&A expenses that fluctuate with sales revenue are considered Variable Expenses and must be subtracted from Gross Profit to determine the Variable Margin Rate. Examples include, but are not limited to :
  - i. Commissions
  - ii. Bad debts
  - iii. Credit card fees

# Exhibit D

## Claims Data Collection Procedure

The purpose of this document is to outline the steps required to gather data required to prepare a business oil spill loss claim.

1. Claimant presents required documents (P&Ls, tax returns, etc.) as described previously.

2. Documents from #1 are reviewed by accountant to determine acceptability.

3. Accountant discusses quality and quantity of data with claimant and asks the following questions:

    a. Does COGS include any Fix Expense items such as depreciation, management salaries, interest expense, etc.? If yes, claimant is asked to provide detailed monthly COGS worksheet separating Fixed vs Variable Expense items.

    b. Does SG&A include any Variable Expense items such as sales commissions, credit card fees, bad debts, etc.  If yes, these items are identified on the P&L.

4. Accountant reviews information received for #3a and #3b. If reviewed items appear reasonable relative monthly revenues, these amounts are used to calculate Variable Margin as follows:
    a. [ (Benchmark *Gross Profit* + Fixed COGS – Variable Expenses) / Benchmark *Revenue*]

Produced Pursuant To Rule 408
9/28/2011

# Exhibit E

**Data Entry: Adjustments (ALT)**
May - Dec 2007, 2008, 2009 & 2010

| Adjustments | May-07 | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Per-13 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cost of Goods Sold:** | | | | | | | | | | |
| Depreciation-Equip | 2,761 | 4,937 | 2,779 | 2,797 | 2,775 | 2,748 | 2,775 | 2,789 | $ | 24,361 |
| Amortization | | | | | | | | | | - |
| * Adjust from standard to actual cost | (157,525) | 4,076 | (46,773) | (25,662) | 14,940 | (44,159) | (16,619) | (81,645) | | (353,367) |
| **Total COGS Adjustments** | $ (154,764) | $ 9,013 | $ (43,994) | $ (22,865) | $ 17,715 | $ (41,411) | $ (13,844) | (78,856) | $ | (329,006) |
| | | | | | | | | | | |
| **SG&A Expenses:** | | | | | | | | | | |
| Depreciation | | | | | | | | | $ | - |
| Amortization | | | | | | | | | | - |
| **Total SG&A Adjustments** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - | $ | - |

\*   Some claimants (e.g. Seafood Processors) may
    report monthly processing costs using standard
    cost accounting systems. In these instances,
    COGS must be adjusted to reflect the ACTUAL
    monthly costs.

| May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 | Per-13 | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2,618 | 2,618 | 2,618 | 2,618 | 2,595 | 2,618 | 2,618 | 2,618 | $ | 20,921 |
| | | | | | | | | | - |
| (128,560) | 11,113 | 42,131 | 1,749 | (135,793) | (13,851) | (79,714) | (114,401) | | (417,326) |
| $ (125,942) | $ 13,731 | $ 44,749 | $ 4,367 | $ (133,198) | $ (11,233) | $ (77,096) | $ (111,783) | $ | (396,405) |
| | | | | | | | | $ | - |
| | | | | | | | | | - |
| $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |

| | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | Per-13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2,341 | 2,291 | 2,341 | 2,341 | 2,341 | 2,341 | 2,341 | 2,341 | | $ 18,678 |
| | (207,376) | (51,885) | (54,102) | 5,800 | 126,030 | 18,483 | 88,424 | 89,286 | | - |
| | | | | | | | | | | 14,660 |
| $ | (205,035) | $ (49,594) | $ (51,761) | $ 8,141 | $ 128,371 | $ 20,824 | $ 90,765 | $ 91,627 | | $ 33,338 |
| | | | | | | | | | $ | - |
| | | | | | | | | | | - |
| $ | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |

| May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | Per-13 | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2,826 | 3,233 | 3,233 | 2,826 | 2,826 | 2,826 | 2,826 | 2,826 | | $ 23,422 |
| | | | | | | | | | - |
| 3,021 | 2,974 | (287,384) | 80,788 | (37,770) | (147,264) | 63,815 | (99,399) | | (421,219) |
| $ 5,847 | $ 6,207 | $ (284,151) | $ 83,614 | $ (34,944) | $ (144,438) | $ 66,641 | $ (96,573) | | $ (397,797) |
| | | | | | | | | | $ - |
| | | | | | | | | | - |
| $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ - |

# Exhibit F

**Compensation Framework for Business Economic Loss Claims (BP 11/10/11)**

The compensation framework for business claimants compares the profit of a business for a pre-spill Benchmark Period to the profit that the claimant might have expected to earn in the post-spill period of 2010.[1]  The calculation is divided into two steps:

>  **Step 1** – Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period.  Step 1 compensation reflects the average of two methods of measuring the reduction in profits over this period:  (i) The reduction in Adjusted EBITDA (which reflects earnings before interest, taxes, depreciation and amortization, adjusted for owner's compensation and other non-operating income and expenses) and (ii) The reduction in Variable Profit (which reflects the claimant's revenue less its variable costs).

>  **Step 2** – Compensates claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to sales from the benchmark period. This calculation reflects a Claimant Factor that captures growth in the pre-spill months of 2010 compared to the Benchmark Period and a Tourism Industry Factor for business claimants in tourism industries that satisfy the Tourism Definition agreed to by the parties.

For purposes of the two step calculation, the parties have agreed to a defined list of fixed and variable expenses as reflected in Attachment A.

In order to allocate payroll expenses into fixed and variable components, a minimum level of fixed payroll costs will be measured based on the average of the three months between January 2009 and December 2010 in which the claimant had its lowest payroll costs.

Cost of Goods Sold (COGS) will be treated as a variable expense after excluding, to the extent possible, the following cost items which may be embedded in COGS and are likely to be fixed in nature: Amortization, Depreciation, Insurance Expense, Interest Expense, and Contract Services.

Based on these considerations, the resulting calculations are performed to determine compensation for claimants.

I.   **Definitions**

For the purposes of this calculation, the following are defined terms:

**Compensation Period:**  The compensation period is selected by the Claimant to include three or more consecutive months between May and December 2010.

---

[1] This Compensation Framework for Business Claims does not apply to (i) start-up businesses; (ii) businesses claiming to have ceased operations; (iii) development and construction businesses.  Compensation frameworks for these types of businesses will be presented separately.

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

004105

**Benchmark Period:** The Benchmark Period is the pre-spill time period corresponding to the months of the Compensation Period that a claimant chooses as the baseline for measuring its historical financial performance.  The claimant can select among the following Benchmark Periods: 2009, the average of 2008-2009, or the average of 2007-2009.

**Claimant Specific Factor**:  In order to capture the impact of pre-spill trends in the claimant's performance on revenue that might have been expected in the post-spill period, Benchmark Period revenue will be adjusted by a Claimant Specific Factor.  The following steps will be used to compute the Claimant Specific Factor:

1.  Calculate the difference between claimant's total revenue for January through April 2010 and total revenue in January through April of the Benchmark Period.[2]
2.  Divide the revenue change calculated in (1) by total revenue in January through April of the Benchmark Period to derive the Claimant Specific Factor. Note that the Claimant Specific Factor will be applied regardless if it is a positive or negative amount.  However, if the Claimant Specific Factor falls below -20% or exceeds +20%, it will be set at -20% or +20%, respectively.

**Tourism Industry Factor:**  Claimants in the Tourism Industry, as defined by the parties, shall be entitled to a 4.0% Tourism Industry Factor.

**Adjusted-EBITDA:**  Earnings before interest, taxes, depreciation, and amortization, adjusted for (i.e., adding back) owner's compensation and other non-operating income and expenses.

**Variable Profit / Variable Margin**:  These items are calculated as follows:
1.  Sum the monthly Benchmark Period revenue.
2.  Subtract the corresponding variable expenses, which include:
    a.  Cost items identified as variable in Attachment A.
    b.  Variable portion of salaries, calculated as described immediately below.
    c.  Variable portion of COGS, calculated by excluding fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, Interest Expense and Contract Services and the variable portion of salaries included in COGS.
3.  The result is referred to as Variable Profit (for the Benchmark Period).  Divide the Variable Profit by the total Benchmark Period revenue to calculate the Variable Margin.

**Fixed & Variable Payroll Expenses:**  Fixed and Variable Payroll Expenses are calculated based on the understanding that every business must operate with a minimum core staff and are defined using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims for January 2009 through December 2010.  Fixed and variable payroll expenses are calculated as follows:

---

[2] Calculation of a claimant-specific factor may be inappropriate for certain fishing claimants given the seasonal nature of fishing activity.  For fishing claimants, it may be appropriate to use an industry-specific factor based on the difference between the value of the relevant species-specific 2009 catch and NOAA's forecast of the change in catch volume between 2009 and 2010.  BP continues to evaluate this alternative.

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

004106

1. Obtain monthly amounts for the following payroll expenses: (a) Salaries & wages; (b) Payroll taxes (including workers compensation, unemployment insurance); (c) Employer costs for employee benefits.  Calculations include components of salaries and related expenses included in both SG&A and COGS.
2. Sum these payroll expenses on a monthly basis to determine the Total Payroll Expense for each month.
3. Identify the three months in 2009-10 with the lowest Total Payroll Expense.
4. Define "Fixed Payroll Expenses" as the average payroll expense over the three months with the lowest Total Payroll Expense.
5. For any month with smaller total payroll costs than the average of the three lowest months, all payroll costs will be considered fixed expenses.
6. Any monthly payroll costs in excess of the Fixed Payroll Expenses will be considered variable expenses.

**Incremental Revenue**: Revenue in selected Benchmark Period is multiplied by the Claimant Specific Factor and the Tourism Industry Factor (if applicable) to calculate Incremental Revenue. This represents the projected change in revenue compared to the Benchmark Period.

## II.   Step 1

Step 1 of the compensation calculation is determined as the average of:

(1)   The difference in Adjusted-EBITDA between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period, and

(2)   The difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period.

As noted above, the Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.

For claimants that participated in the VoO program, it is necessary to separately determine Step 1 compensation based on non-VoO income only.[3]  For claimants that participated in VoO, Step 1 compensation is calculated based on comparison of 2009 levels of Adjusted-EBITDA and Variable Profit and 2010 levels of Adjusted EBITDA and Variable Profits based on non-VoO activities only.

## III.   Step 2

Using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims:

---

[3] Claimants are required to report payments received under the VoO program.  If claimants that received VoO payments fail separately to report costs incurred in VoO and non-VoO activities, then Step 1 compensation for non-VoO activity alone can be determined through a pro-rata revenue based allocation of variable costs between VoO and non-VoO related activities.

3

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

004107

(1)     Calculate total revenue amount for the 2010 Compensation Period and the comparable months in the Benchmark Period.

(2)     Calculate the Claimant Specific Factor.

(3)     Calculate Incremental Revenue by multiplying the total Benchmark Period revenue by the sum of Claimant Specific Factor and the Tourism Industry Factor (if applicable).

(4)     Multiply Incremental Revenue by the Variable Margin.

## IV.     Total Compensation

Total Compensation is calculated as follows:

(1)     Add Step 1 Compensation to Step 2 Compensation.

(2)     Apply the agreed-upon Risk Transfer Premium (RTP).

(3)     Subtract from the sum of Step 1 and Step 2 payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, as well as profits earned by the claimant by participating in the VoO program, as determined in the calculation of Step 1 compensation for fishing claimants.

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

004108

# Exhibit G

Attorney Work Product
Privileged and Confidential
Do Not Distribute

# MEMO



MotleyRice®
LLC
ATTORNEYS AT LAW

| | |
|---|---|
| **TO:** | Jim Neath, Rick Godfrey, Wendy Bloom |
| **FROM:** | Joe Rice, Calvin Fayard |
| **DATE:** | November 3, 2011 |
| **RE:** | Economic Loss for Business Claims |

The framework you have requested requires these elements to reach a recovery.

1) Class membership.

2) Compliance with the Framework for Business Loss.

3) Compliance with Causation for Business Loss.

4) Documentation for the Business Loss.

The beginning point for each of these claims is the geographical location of the business, the individual, or the loss. We feel the requested causation standard contained in your causation document provides a very stringent provision for claimants to meet. If we were to discuss and agree to that type of causation requirement, we feel a substantial number of claimants will be unjustly eliminated. We understand the legal arguments about causation, and we also understand that this is a settlement and that such matters have to be compromised in order to reach agreement. Therefore, we have formulated an overall causation standard that we believe meets all parties' needs.

Our approach builds off of all of our numerous lengthy discussions and establishes the following:

1) Geographical location: We adopt the Presumption Zone A, Presumption Zone B, and Buffer Zone approach. The buffer zone for a non US Interstate Highway shall run a .1 of a mile from either side of the highway right of way. The buffer zone from a US interstate highway shall run a .1 of a mile from either side of the highway right of way except at exit interchanges. The buffer zone at an exit

Memo.docx

Attorney Work Product
Privileged and Confidential
Do Not Distribute

interchange shall run .25 of a mile from either side of the highway right of way since the right of way itself is over .10 of a mile

2) We adopt the dividing Seafood into Primary and Secondary. (Attached)

3) We agree with the Tourism definition we have exchanged. (Attached)

4) We eliminate the Haircut Zones throughout the balance of the class area, so that the class would consist of Presumption Zone A, Presumption Zone B, Buffer Zone, and all else and accept the Maps of November 2. 2011 (Bates #3935-3943) and the other areas like Key West previously finalized.

5) We implement the growth rate pursuant to our discussions, resulting in an Individual Growth Rate, plus there is an Industry Growth Rate. The Growth Rate for the Tourism Industry proposed by the PSC is 6.8%, and the Growth Rate proposed by BP for the Tourism Industry is 3.5%. We propose to use the 6.8% for all industries across the board.

6) Attached are the following documents:

   A. Documentation Requirements for Business Claims
   B. Causation for Business Loss
   C. Seafood Distribution – Definitions
   D. Damage Calculation Methodology for Business Claims, including Sample Models

This responds to all of the issues related to determining the initial loss for each Economic Business Claim we have been discussing.

We also have the determination and application of the Risk Transfer Premium, which is subject to further discussion of the parties.

# Exhibit H

## DECLARATION OF CHARLES C. COX

Charles C. Cox deposes and states, pursuant to 28 U.S.C. § 1746:

1.      I am an economist (Ph.D., University of Chicago) and have held positions in academia, the government, and the private sector.  A copy of my curriculum vitae is attached as Exhibit A.  I have particular experience and expertise in matters relating to securities regulation. I served as Chief Economist of the U.S. Securities and Exchange Commission ("SEC") from 1982-83.  Thereafter, I was appointed a Commissioner of the SEC, where I served from 1983-89, and as Acting Chairman during 1987.  In my capacity as an SEC Commissioner, I was intimately involved in reviewing and approving SEC regulations, including those governing public company disclosure of financial information and regulated accounting for publicly traded companies through rulemaking, interpretation, and oversight of the Financial Accounting Standards Board.

2.      I have been qualified and testified as an expert witness in cases related to securities markets, valuation, damages, ERISA, accounting litigation, and corporate governance in federal and state courts and before the U.S. Securities and Exchange Commission and arbitration panels.

3.      I understand that there is a dispute between two negotiating parties regarding an appropriate methodology for quantifying the economic loss of a business.  One party has advocated a loss quantification method that compares (a) Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") during specified months in the year prior to the conduct that allegedly injured the business to (b) EBITDA in the comparable months in the year of the conduct.  Opposing counsel has questioned the appropriateness of EBITDA as a measure

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

of economic performance.  In particular, I understand that opposing counsel has asserted that EBITDA is a metric that has been rejected by the U.S. Securities and Exchange Commission.

4.      EBITDA is a well-recognized measure of economic performance.  The SEC recognizes EBITDA as an established metric of a firm's economic performance and public companies regulated by the SEC regularly report EBITDA.

5.      EBITDA has been a well-recognized measure of a firm's economic performance for over 20 years.  EBITDA is now common enough that it is a topic in journal articles and textbooks on financial analysis and valuation.  For example:

- "Firm cash flow is calculated using the standard measure of firm-level performance, EBITDA, which stands for earnings before interest, taxes, depreciation, and amortization."[1]

- "When buying a business . . . it is common to examine the value of the firm as a multiple of the . . . earnings before interest, taxes, depreciation, and amortization (EBITDA)."[2]

- "EBITDA projection is the heart of high-yield bond analysis."[3]

6.      EBITDA is also commonly used by researchers in the field of financial economics.[4]  Indeed, I note that even the blog post cited by opposing counsel recognizes that EBITDA is a "valuable" metric for evaluating a company's earnings and is routinely used by

---

[1] Steven Kaplan and Per Stromberg, Leveraged Buyouts and Private Equity, 22 J of Econ. Perspectives 18 (2008).  See also James L. Gilbert, How to Map Your Industry's Profit Pool, Harvard Business Review 149 (May 1998/June 1998); Lawrence Revsine, Daniel W. Collins, & W. Bruce Johnson, Financial Reporting and Analysis, 201 (2nd ed. 2002); James C. Van Horne, Financial Management Policy, 357, 359 (12th ed 2002);  Geoffrey A. Hirt, Stanley B. Block & Somnath Basu, Investment Planning for Financial Professionals 220-221 (2006).

[2] Aswath Damodaran, Damodaran on Valuation 237 (2nd ed. 2006).  See also Aswath Damodaran, Investment Valuation 383, 454 (2nd ed. 2002); Shannon P. Pratt, Robert F. Reilly & Robert P. Schweihs, Valuing a Business 187 (4th ed. 2000).

[3] J. Thomas Madden & Joseph Balestrino, Management of a High-Yield Bond Portfolio in Frank Fabozzi ed, The Handbook of Fixed Income Securities 948 (2001).

[4] See Kaplan and Stromberg, note 1 above.

004125

banks in loan covenants as the metric for measuring the borrower's financial performance.[5]

EBITDA is also routinely used to value businesses in the context of mergers and acquisitions.[6]

7.     EBITDA is a useful metric of a firm's current economic performance because it approximates cash flow generated by the business.  Non-cash expenses of depreciation and amortization, which are not part of cash flow, are added back.  Similarly, taxes, which are a function of, among other things, the form of business organization, are added back to eliminate their potentially distortive effect on measuring the firm's economic performance.  The usefulness of  EBITDA is widely recognized in the financial literature:

> "EBITDA is a widely used proxy for operating cash flow as it reflects the company's total cash operating costs for producing its products and services.  In addition, EBITDA serves as a fair 'apples-to-apples' means of comparison among companies in the same sector because it is free from differences resulting from capital structure (i.e., interest expense) and tax regime (i.e., tax expense)."[7]

8.     The widespread acceptance of EBITDA is reflected in the fact that many firms report EBITDA in public disclosures filed with the SEC.  To gauge the frequency of this type of EBITDA disclosure, I searched SEC Forms 8-K (8-Ks frequently contain a company's earnings announcement) filed between August 1 and November 11, 2011 and found 3,506 Forms 8-K that included an EBITDA disclosure.

9.     Indeed, SEC regulations adopted pursuant to the Sarbanes-Oxley Act of 2002 expressly define EBITDA as an approved financial disclosure by registrants.  *See* SEC Reg.

---

[5] K. Berman and J. Knight, "How EBITDA Can Mislead," <u>Harvard Bus. Review</u> blog (Nov. 19, 2009, 11:34 a.m.) (hereafter, "HBR blog").

[6] *See* notes 1 and 2.

[7] Joshua Rosenbaum & Joshua Pearl, <u>Investment Banking</u>, 34 (2009).  *See, also,* James R. Hirchner, Financial Valuation, 204, 217 (2003) and Baruch Lev, <u>How to Win Investors Over</u>, 6 Harvard Bus. Review (Nov. 2011).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

S-K Item 10(e)(1)(ii)(A), 17 C.F.R. § 229.10(e)(1)(ii)(A).[8]  As with all such financial measures that are modifications of Generally Accepted Accounting Principles ("GAAP"), the registrant must provide a reconciliation of EBITDA with GAAP financial reporting.

10.     I understand that opposing counsel has noted that the HBR blog suggests that EBITDA can be a misleading measure if a firm misclassifies expenses and thereby distorts the inputs into the EBITDA calculation.  While that is true, it is no less true for any economic measure.  Misclassification that intentionally misstates the inputs to a calculation will lead to a distorted result.  That possibility is not a reason to reject EBITDA any more than it is a reason to reject GAAP accounting or other well-accepted measures.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of November, 2011 in Chicago, IL.

Charles C. Cox

---

[8] *See also* Latham & Watkins LLP Advisory, "Adjusted EBITDA Is Out of the Shadows as Staff Updates Non-GAAP Interpretations" (Feb. 22, 2010) (Noting new SEC Staff Guidance permitting use of certain measures based on adjustments to EBITDA).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

# Exhibit A

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

**CHARLES C. COX**                                            November  2011

Business Address:          Compass Lexecon
                           332 South Michigan Avenue
                           Suite 1300
                           Chicago, Illinois  60604
                           (312) 322-0260
                           ccox@compasslexecon.com

## PROFESSIONAL EXPERIENCE

Senior Vice President, Compass Lexecon (formerly Lexecon) (1989-present).

Chairman, United Shareholders Association (1990-1993).

Commissioner, U.S. Securities and Exchange Commission (1983-1989);
Acting Chairman, U.S. Securities and Exchange Commission (1987);
Chief Economist, U.S. Securities and Exchange Commission (1982-1983).

Assistant Professor of Management, Texas A&M University (1980-1982);
Director of John M. Olin Fellowship Program, Texas A&M University (1981-1982).

Assistant Professor of Economics, Ohio State University (1972-1980).

National Fellow of the Hoover Institution, Stanford University (1977-1978).

## FIELDS OF SPECIALIZATION

Financial Markets, Industrial Organization, Money and Banking.

## EDUCATION

University of Chicago, Chicago, Illinois; Ph.D. 1975.

University of Chicago, Chicago, Illinois; A.M. 1970.

University of Washington, Seattle, Washington; B.A. 1967.

## PUBLICATIONS

Futures Trading and Market Information, Journal of Political Economy, 84 (December 1976).

The Enforcement of Public Price Controls, Journal of Political Economy, 88 (October 1980).

Monopoly Explanations of the Great Depression and Public Policies Toward Business,
        The Great Depression Revisited, edited by Karl Brunner (1981).

**HIGHLY CONFIDENTIAL**
**SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT**

Greenmail, the Market for Corporate Control, and Governance, Texas A&M Business Forum, 1 (Winter 1984).

Accounting Standards From an Economist's Perspective, Journal of Comparative Business and Capital Market Law, 7 (December 1985).  Reprinted in The SEC and Accounting:  The First 50 Years, edited by Robert H. Mundheim and Noyes E. Leech (1986).

Public Accounting:  Whose Profession Is It Anyway, Ohio CPA Journal, 45 (Spring 1986).

Investment Company Servicing:  Growth, Innovation and Competition, American Banker (May 9, 1986).

Conflicts of Interest -- A Regulator's View, Trust Management Update, No. 97 (June 1986).

Regulatory Implications of Computerized Communications in Securities Markets, Technology and the Regulation of Financial Markets, edited by Anthony Saunders and Lawrence J. White (1986).

The Market for Markets:  Developments of International Securities Trading (with Douglas C. Michael), Catholic University Law Review, 36 (Summer 1987); reprinted in Corporate Practice Commentator, 30, No. 3 (1988).

Internationalization of the Capital Markets:  The Experience of the Securities and Exchange Commission, Maryland Journal of International Law and Trade, 11 (Summer 1987).

Anti-Merger Mania, Journal for Corporate Growth, 3 (Fall 1987).

Two Views on the Law of Insider Trading, The Legal Environment of Business by Roger E. Meiners, Al H. Ringleb, and Frances L. Edwards (1988).

Bases of Insider Trading Law (with Kevin S. Fogarty), Ohio State Law Journal, 49 No. 2 (1988).

An American Perspective on the 1987 Stock Market Crash, Securities Bulletin of The Stock Exchange of Hong Kong, 28 (August 1988).

Private Employment of Prison Labor (with Roger E. Meiners), Journal of Private Enterprise 17 (Fall 2001).

Review of Steven Lustgarten, Industrial Concentration and Inflation, Journal of Money, Credit, and Banking, 8 (February 1976).

Review of Walter C. Labys (ed.), Quantitative Models of Commodity Markets, Journal of Political Economy, 84 (June 1976).

Review of John T. Dunlop and Kenneth J. Fedor (ed.), The Lessons of Wage and Price Controls -- The Food Sector, Journal of Political Economy, 88 (December 1980).

Comment, Why Monetarism is Failing, Wall Street Journal (December 22, 1980).

Review of Arnold R. Weber and Daniel J.B. Mitchell, The Pay Board's Progress:  Wage Controls in Phase II, Journal of Money, Credit, and Banking, 13 (February 1981).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

Review of Edward H. Clarke, <u>Demand Revelation and the Provision of Public Goods</u>, Journal of Economic Literature (December 1981).

<u>SEC Not Avoiding Concept of Fraud</u>, Legal Times (December 7, 1987).

## **TESTIMONY**

Testimony of Charles C. Cox in Re: <u>Department of Enforcement, Complainant vs. David Lerner Associates, Inc. and William Mason, Respondents</u>, Financial Industry Regulatory Authority (FINRA), Office of Hearing Officers, Disciplinary Proceeding, No. 20050007427, (June 10 & 13, 2011).

Declaration of Charles C. Cox in Re:  <u>Alstom Securities Litigation,</u> Master Case No: 03 CV 6596 (VM), United States District Court, Southern District of New York, (December 15, 2010).

Deposition of Charles C. Cox in Re:  <u>Alstom Securities Litigation,</u> Master Case No: 03 CV 6596 (VM), United States District Court, Southern District of New York, (October 29, 2010).

Deposition of Charles C. Cox in Re: <u>The Estate of George E. Batchelor and The Batchelor Foundation, Inc. v. Deloitte & Touche, LLP and BDO Seidman, LLP</u>, No. 02-07135-CA-04, Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, (September 27, 2010).

Testimony of Charles C. Cox in Re: <u>Morton S. Goldfine and Adrienne M. Goldfine vs. Barack, Ferrazzano, Kirschbaum & Pearlman, et al.,</u> No. 05 L 6360, Circuit Court of Cook County, Illinois, (April 7, 2010).

Deposition of Charles C. Cox in Re:  <u>Abu Dhabi Commercial Bank, King County Washington, SEI Investments, et al. vs. Morgan Stanley & Co. Incorporated, Morgan Stanley & Co. International Limited, The Bank of New York Mellon, QSR Management Limited, Moody's Investors Service Inc., Moody's Investors Service Ltd., Standard & Poor's Rating Services and The McGraw Hill Companies, Inc.,</u> Civil Action No. 1:08-cv-07508, United States District Court, Southern District of New York, (February 17, 2010).

Declaration of Charles C. Cox in Re:  <u>Abu Dhabi Commercial Bank, King County Washington, SEI Investments, et al. vs. Morgan Stanley & Co. Incorporated, Morgan Stanley & Co. International Limited, The Bank of New York Mellon, QSR Management Limited, Moody's Investors Service Inc., Moody's Investors Service Ltd., Standard & Poor's Rating Services and The McGraw Hill Companies, Inc.,</u> Civil Action No. 1:08-cv-07508, United States District Court, Southern District of New York, (December 21, 2009).

Testimony of Charles C. Cox in Re: <u>American International Group, Inc. Securities Litigation,</u> Master File No. 04 Civ. 8141 (DAB), United States District Court, Southern District of New York, (August 13 & 14, 2009).

Testimony of Charles C. Cox in Re: <u>Gene Badger, John Love, Marvin Evans, Sid Barnack and John Willis derivatively on behalf of Plaintiffs Shareholders' Corporation vs. Southern Farm Bureau Life Insurance Company and Plaintiffs' Shareholders Corporation</u>, Case No. 6:06-CV-1253-ORL-19, United States District Court, Middle District of Florida, Orlando Division, (March 16, 2009).

- 4 -

Deposition of Charles C. Cox in Re:  American International Group, Inc. Securities Litigation, Master File No. 04 Civ. 8141 (JES), United States District Court, Southern District of New York, (October 16, 2008).

Deposition of Charles C. Cox in Re: Gene Badger, John Love, Marvin Evans, Sid Barnack and John Willis derivatively on behalf of Plaintiffs Shareholders' Corporation vs. Southern Farm Bureau Life Insurance Company and Plaintiffs' Shareholders Corporation, Case No. 6:06-CV-1253-ORL-19, United States District Court, Middle District of Florida, Orlando Division, (September 16, 2008).

Declaration of Charles C. Cox in Re: American International Group, Inc. Securities Litigation, Master File No. 04 Civ. 8141, United States District Court, Southern District of New York, (August 19, 2008).

Declaration of Charles C. Cox in Re: Electronic Data Systems Corp. "ERISA" Litigation, Case No. 6:03-MD-1512 (Lead Case 6:03-CV-126 "ERISA"),United States District Court, Eastern District of Texas, Tyler Division, (February 25, 2008).

Testimony of Charles C. Cox in Re: In the Matter of Arbitration Between Ramius Capital Group, LLC, et al. against Bear, Stearns & Co. Inc. et al., NYSE Case No. 2005-016372, FINRA Legacy Dispute Resolution Program, (October 23, 24, 25, 2007) (November 12, 2007).

Declaration of Charles C. Cox in Re: Electronic Data Systems Corp. "ERISA" Litigation, Case No. 6:03-MD-1512 (Lead Case 6:03-CV-126 "ERISA"),United States District Court, Eastern District of Texas, Tyler Division, (October 20, 2007).

Deposition of Charles C. Cox in Re: Credit Suisse Securities (USA) LLC, Plaintiff against MMA Mortgage Investment Corporation f/k/a Midland Mortgage Investment Corporation, Defendant, Case No. 07-CV-142, United States District Court, Southern District of New York, (May 31, 2007).

Affidavit of Charles C. Cox in Re: Scientific-Atlanta, Inc. Securities Litigation, Civil Action No. 1:01-CV-1950-RWS, United States District Court, Northern District of Georgia, Atlanta Division, (April 19, 2007).

Affidavit of Charles C. Cox in Re: Scientific-Atlanta, Inc. Securities Litigation, Civil Action No. 1:01-CV-1950-RWS, United States District Court, Northern District of Georgia, Atlanta Division, (January 19, 2007).

Deposition of Charles C. Cox in Re: Alaska Interstate Construction, L.L.C. et al v. Pacific Diversified Investments, Inc., et al., Case No. 3AN-05-7921 CI, Superior Court for the State of Alaska, Third Judicial District at Anchorage, (November 8, 2006).

Deposition of Charles C. Cox in Re: William Carroll, et al., v. Blackacre Capital Management, LLC et al., Case No. 03-1555-CA, Court for Charlotte County, Florida, (October 18, 2006).

Declaration of Charles C. Cox in Re: SEC Investigation, U.S. Securities & Exchange Commission, (March 11, 2006).

Declaration of Charles C. Cox in Re: Qwest Communications International, Inc. Securities Litigation, Civil Action No. 01-RB-1451 (CBS), United States District Court, District of Colorado, (June 28, 2005).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

Testimony of Charles C. Cox in Re: Hansen Bancorp, et al. vs. United States of America, No. 92-828C, United States Court of Federal Claims, (April 28, 2005).

Deposition of Charles C. Cox in Re: Mark Levy v. Sterling Holding Company, LLC, National Semiconductor Corporation and Fairchild Semiconductor International, Inc., Civil Action No. 00-994 (GMS), United States District Court, District of Delaware, (July 30, 2004).

Affidavit of Charles C. Cox in Re: Raytheon Company Securities Litigation, Civil Action No. 99-12142 (PBS), United States District Court, District of Massachusetts, (April 8, 2004).

Deposition of Charles C. Cox in Re: Raytheon Company Securities Litigation, Civil Action No. 99-12142 (PBS), United States District Court, District of Massachusetts, (February 5, 2004).

Deposition of Charles C .Cox in Re: Coltec Industries Inc., Plaintiff vs. United States, Defendant, Case No. 01-72T, United States Court of Federal Claims, (January 29, 2004).

Deposition of Charles C .Cox in Re: AMF Bowling Securities Litigation, Civil Action No. 99-Civ-3023 (HB), United States District Court, Southern District of New York, (January 15, 2004).

Affidavit of Charles C. Cox in Re: Convergys Corporation vs. United States Cellular Corporation, No. 51-Y-181-00791-03, American Arbitration Association, Chicago, Illinois, (November 17, 2003).

Testimony of Charles C. Cox in Re: Convergys Corporation vs. United States Cellular Corporation, No. 51-Y-181-00791-03, American Arbitration Association, Chicago, Illinois, (October 29, 2003).

Deposition of Charles C .Cox in Re: Austern Trust Dated 7/11/94, Barry M. Austern and Susan L. Austern, Trustees derivatively on behalf of DPL, Inc. vs. Peter H. Forster, et al., Case No. A0207067, Court of Common Pleas, Hamilton County, Ohio, (September 29, 2003).

Affidavit of Charles C .Cox in Re: Austern Trust Dated 7/11/94, Barry M. Austern and Susan L. Austern, Trustees derivatively on behalf of DPL, Inc. vs. Peter H. Forster, et al., Case No. A0207067, Court of Common Pleas, Hamilton County, Ohio (September 26, 2003).

Testimony of Charles C. Cox in Re: Caroline Hunt Trust Estate vs. United States, No. 95-531C, United States Court of Federal Claims, (July 22, 2003).

Deposition of Charles C. Cox in Re: Sabratek Liquidating, LLC vs. KPMG, LLP, Case No. 01-C-9582, United States District Court, Northern District of Illinois, Eastern Division, (June 5, 2003).

Deposition of Charles C. Cox in Re: Mark Ginsburg, M.D., et al. vs. Gambro AB, and COBE Laboratories, Inc., Case No. 97-018445 CA (13), Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, (March 3 & 13, 2003).

Deposition of Charles C. Cox in Re: Michael Dloogatch et al. v. John N. Brincat, John N. Brincat, Jr., William C. Croft, Mercury Finance Company and KPMG Peat Marwick, Case No. 07 CH 8790, Circuit Court of Cook County, Illinois County Department, Chancery Division, (February 10, 2003).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

Deposition of Charles C. Cox in Re: Obtek L.P., et al. v. Lucent Technologies, Inc., et al., Cause No. 1-01-226, District Court of 382nd Judicial District, Rockwall County, Texas, (December 4, 2002).

Deposition of Charles C. Cox in Re: Bruce S. Schwartz, et al. v. Qualcomm, Incorporated, Case No. 2000 CV 002101, Div 3, District Court, Boulder County Colorado, (October 17, 2002).

Deposition of Charles C. Cox in Re: Nina Aversano, Plaintiff, v. Lucent Technologies, Inc. Defendant, Docket No. Mid-L-10004-00, Superior Court of New Jersey Law Division Middlesex County, (September 24, 2002).

Affidavit of Charles C .Cox in Re: Livent, Inc., Noteholders Securities Litigation, Master File No. 98 Civ. 7161 (VM), United States District Court for the Southern District of New York, (June 12, 2002).

Affidavit of Charles C. Cox in Re: Nina Aversano, Plaintiff, v. Lucent Technologies, Inc. Defendant, Docket No. Mid-L-10004-00, Superior Court of New Jersey Law Division Middlesex County, (June 7, 2002).

Affidavit of Charles C. Cox in Re: MTC Electronic Technologies Shareholder Litigation, Master File No. CV-93-0876 (JG) CV-95-2499 (JG) MDL No. 1059, United States District Court, Eastern District of New York, (May 11, 2002).

Testimony of Charles C. Cox in Re: Healthsouth Corporation Securities Litigation, Master File No. CV-98-J-2634-S, United States District Court for the Northern District of Alabama, Southern Division, (April 23, 2002).

Affidavit of Charles C. Cox in Re: Livent, Inc., Noteholders Securities Litigation, Master File No. 98 Civ. 7161 (VM), United States District Court for the Southern District of New York, (April 18, 2002).

Testimony of Charles C. Cox in Re: In the Matter of the Arbitration Between William J. Higgins and Mary Elizabeth O'Leary vs. Neuberger Berman LLC and Howard Ganek, Docket #2000-008693, New York Stock Exchange Arbitration, (February 28, 2002).

Declaration of Charles C. Cox in Re: SEC Investigation File No. NY-6860, U.S. Securities & Exchange Commission, (January 17, 2002).

Testimony of Charles C. Cox in Re: Florida State Board of Administration, Plaintiff, vs. CompuServe Corporation, et al., Defendants, No. 97 CVG-03-3906, Arbitration Hearing, Columbus, Ohio, (December 14, 2001).

Deposition of Charles C. Cox In Re: Florida State Board of Administration, Plaintiff, vs. CompuServe Corporation, et al., Defendants, No. 97 CVG-03-3906, Court of Common Pleas, Franklin County, Ohio, (December 7, 2001).

Affidavit of Charles C. Cox in Re: HealthSouth Corporation Securities Litigation, Master File No. CV-98-0-2634-S, United States District Court for the Northern District of Alabama, Southern Division, (October 17, 2001).

Testimony of Charles C. Cox in Re: Dean West, et al., Plaintiffs vs. Prudential Securities, Inc., Defendant, Case No. 99-567-DRH, United States District Court Southern District of Illinois, (October 16, 2001).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

Deposition of Charles C. Cox in Re: <u>MTC Electronic Technologies Shareholder Litigation</u>, Master File No. CV-93-0876 (JG), CV-95-2499 (JG), MDL No. 1059, United States District Court, Eastern District of New York, (April 4-6, 2001).

Testimony of Charles C. Cox in Re: <u>David Strohm, as Stockholder's Agent for and on behalf of the former Saros Stockholders, Claimants v. FileNet Corporation, Respondent</u>, Case No. 74Y168037699, American Arbitration Association, (March 20 & 21, 2001).

Affidavit of Charles C. Cox in Re: <u>Investigation No. MRD199701072</u>, NASD Regulation, Inc., (January 17, 2001).

Testimony of Charles C. Cox in Re:  <u>Elmer Krogman, et al. v. Continental Investment Corp. et al.</u>, Civil Action No. 3:98-CV-2895-T, United States District Court for the Northern District of Texas, Dallas Division, (November 16, 2000).

Deposition of Charles C. Cox in Re: <u>Westfed Holdings Inc. et al., Plaintiffs and Federal Deposit Insurance Corporation, Plaintiff-Intervenor v. The United States of America</u>, Defendant, No. 92-820C, United States Court of Federal Claims, (October 12, 2000).

Testimony of Charles C. Cox in Re: <u>Auditor Independence</u> U. S. Securities & Exchange Commission Public Hearing on Proposed Auditor Independence Rules, Washington, DC, (September 20, 2000).

Affidavit of Charles C. Cox in Re: <u>Richard Kaufman, et al. vs. Motorola, Inc., et al.</u>, No. 95-CV-1069, United States District Court for the Northern District of Illinois, Eastern Division, (August 15, 2000).

Testimony of Charles C. Cox in Re: <u>Jason A. Forge, et al. vs. National Semiconductor Corporation, et al.</u>, No. CV770082, Superior Court of the State of California, County of Santa Clara, (July 5, 2000).

Deposition of Charles C. Cox in Re: <u>Advance Bank, F.S.B. v. United States</u>, No. 92-829C, United States Court of Federal Claims, (June 7 & 8, 2000).

Testimony of Charles C. Cox in Re: <u>Gordon Dumont v. Charles Schwab & Co. Inc.</u>, Civil Action No. 99-2840 c/w 99-2841, United States District Court for the Eastern District of Louisiana, (May 30, 2000).

Deposition of Charles C. Cox in Re: <u>Goodman Epstein, et al., Plaintiffs, v. Cyrix Corporation, National Semiconductor Corporation, et al., Defendants</u>, No. CV770082, Superior Court of the State of California for the County of Santa Clara, (May 23, 2000).

Deposition of Charles C. Cox in Re:  <u>Elmer Krogman, et al. v. Continental Investment Corp. et al.</u>, Civil Action No. 3:98-CV-2895-T, United States District Court for the Northern District of Texas, Dallas Division, (May 11, 2000).

Affidavit of Charles C. Cox in Re: <u>Harvey Greenfield, et al., Plaintiffs vs. CompuServ Corporation, et al., Defendants</u>, Case Nos. 96 CVG-06-4810, 96 CVG-08-5837, 97 CVG-03-3906, 97 CVG-07-7223, Court of Common Pleas, Franklin County, Ohio, (April 28, 2000).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

Testimony of Charles C. Cox in Re:  John K. Castle et al. and Federal Deposit Insurance Corporation v. United States, No. 90-1291-C, United States Court of Federal Claims, (January 14, 18, 19, 2000).

Affidavit of Charles C. Cox in Re:  Elmer Krogman, et al. v. Continental Investment Corp. et al., Civil Action No. 3:98-CV-2895-T, United States District Court for the Northern District of Texas, Dallas Division, (December 21,1999).

Testimony of Charles C. Cox in Re: All-Tech Investment Group, Inc., v. Knight Securities L.P., National Association of Securities Dealers, Inc., Arbitration No. 98-02132, New York, (October 27, 1999).

Affidavit of Charles C. Cox in Re:  Max Fecht, et al. v. Northern Telecom Ltd. et al, No. 93 Civ. 4384, United States District Court Southern District of New York, (August 11, 1999).

Declaration of Charles C. Cox in Re: Alpha Group Consultants, Ltd., et al., v. Bear, Stearns & Co., Inc., No. 91-0143-IEG, United States District Court, Southern District of California, (July 2, 1999).

Deposition of Charles C. Cox in Re:  Max Fecht, et al. v. Northern Telecom Ltd. et al, No. 93 Civ. 4384 (MGC), United States District Court Southern District of New York, (June 30, 1999)

Deposition of Charles C. Cox in Re:  Caroline Hunt Trust Estate v. United States, No. 95-531-C, United States Court of Federal Claims, (April 7 & 8, 1999).

Testimony of Charles C. Cox in Re: Jeffrey M. Steinberg and John Geron, File No. 3-9608, United States Securities and Exchange Commission Administrative Proceeding, (January 13, 1999).

Deposition of Charles C. Cox in Re: John K. Castle et al. and Federal Deposit Insurance Corporation v. United States, No. 90-1291C, United States Court of Federal Claims, (December 17, 1998, January 26, 1999).

Affidavit of Charles C. Cox in Re: McKowan Lowe & Co., Ltd., v. Jasmine Ltd. et al., No. 94-CV-522 and No. 96-CV-2318 (consolidated), United States District Court for the District of New Jersey, (December 10, 1998).

Deposition of Charles C. Cox in Re: Fightertown Entertainment, Inc. v. Robertson, Stephens & Company, Piper Jaffray Inc., John C. Siegler, et al., No. 750511, Superior Court of California, Orange County, (September 2, 1998).

Testimony of Charles C. Cox in Re: Alpha Group Consultants, Ltd., et al., v. Bear, Stearns & Co., Inc., No. 91-0143-IEG (AJB), United States District Court, Southern District of California, (August 19, 1998).

Deposition of Charles C. Cox in Re: Alpha Group Consultants, Ltd., et al., v. Bear, Stearns & Co., Inc., No. 91-0143-IEG (AJB), United States District Court, Southern District of California, (June 24 & August 8, 1998).

Deposition of Charles C. Cox in Re: STI Classic Funds et al. v. Bollinger Industries, Inc., et al., No. 3:96C-V-0823-R, United States District Court, Northern District of Texas, Dallas Division, (June 19, 1998).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

Affidavit of Charles C. Cox in Re: <u>Safety-Kleen Corporation v. Laidlaw Environmental Services, Inc.</u>, No. 97C8003, United States District Court, Northern District of Illinois, Eastern Division, (March 4, 1998).

Affidavit of Charles C. Cox in Re: <u>Edouard Serfaty et al. v. International Automated Systems, Inc., and Neldon P. Johnson</u>, Case No. 2:96 CV 0583C, United States District Court, District of Utah, Central Division, (February 25, 1998).

Affidavit of Charles C. Cox in Re: <u>Computer Associates International, Inc. v. Computer Sciences Corporation</u>, CV-S-98-00278-LDG (RHL), United States District Court, District of Nevada, (February 24, 1998).

Testimony of Charles C. Cox in Re: <u>Safety-Kleen Corporation v. Laidlaw Environmental Services, Inc.</u>, No. 97C8003, United States District Court, Northern District of Illinois, Eastern Division, (January 30 & February 2, 1998).

Deposition of Charles C. Cox in Re: <u>Safety-Kleen Corporation v. Laidlaw Environmental Services, Inc.</u>, No. 97C8003, United States District Court, Northern District of Illinois, Eastern Division, (January 23, 1998).

Testimony of Charles C. Cox in Re: <u>Publicis Communication v. True North Communications Inc., et al.</u>, No. 97 C 8263, District Court for the Northern District of Illinois, Eastern Division, (December 19 & 22, 1997).

Affidavit of Charles C. Cox in Re: <u>Publicis Communication v. True North Communications Inc., et al.</u>, No. 97 C 8263, District Court for the Northern District of Illinois, Eastern Division, (December 15, 1997).

Testimony of Charles C. Cox in Re: <u>Augustus Condus, et al. v. Howard Savings Bank, et al.</u>; Civil Action Nos. 89-5131 and 91-2465 and <u>Leo A. Gutman, et al. v. Howard Savings Bank, et al.</u>; Civil Action No. 90-2397; United States District Court for the District of New Jersey, (November 20, 1997).

Deposition of Charles C. Cox in Re: <u>Morton S. Goldfine and Adrienne M. Goldfine vs. Michael L. Steinberg, American Express Company, Shearson Lehman Brothers Holdings, Inc., et al.</u>, No. 93 L 5233, Circuit Court of Cook County, Illinois, (October 27 & 28, 1997).

Testimony of Charles C. Cox in Re: <u>NASD Regulation, Inc., Market Surveillance Committee v. Morgan Stanley & Co., Inc. et al.</u>, Disciplinary Hearing Panel of the Market Regulation Committee, NASD Regulation, Inc., CMS960235, (July 16, 1997).

Deposition of Charles C. Cox in Re: <u>Robert Stuchen, et al., Plaintiffs vs. Duty Free International, et al., Defendants</u>; Superior Court of the State of Delaware (New Castle County), Civil Action No. 94C-12-124; and <u>Victor M. Guerra, et al., Plaintiffs v. Duty Free International, et al., Defendants</u>; Superior Court of the State of Delaware (New Castle County), Civil Action No. 95C-04-13, (June 4, 1997).

Deposition of Charles C. Cox in Re: <u>Augustus Condus, et al. v. Howard Savings Bank, et al.</u>; Civil Action No. 91-2465 and <u>Leo A. Gutman, et al. v. Howard Savings Bank, et al.</u>; Civil Action No. 90-2397; United States District Court for the District of New Jersey (WGB), (February 14, 1997).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

Deposition of Charles C. Cox in Re:  Joseph W. and Helen B. Teague et al. Plaintiffs vs. James O. Bakker, Defendant; United States District Court for the Western District of North Carolina, Civil Action No. 3:87CV514, (June 28, 1996).

Affidavit of Charles C. Cox in Re:  Evelyn Shea et al. Plaintiffs v. New York Life Insurance Company et al. Defendants; United States District Court, Southern District of Florida, Case No. 96-0746-CIV-NESBITT, (June 21, 1996).

Deposition of Charles C. Cox in Re: Raisy Levitan et al., Plaintiffs v. A Pea In the Pod, et al., Defendants; United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3-94 CV-0247D, (June 12, 1996).

Deposition of Charles C. Cox in Re: Janet Ziemack et al. Plaintiffs against Centel Corporation et al. Defendants; United States District Court for the Northern District of Illinois, Eastern Division, No. 92 C3551, (May 23, 24, 1996).

Deposition of Charles C. Cox in Re: Nasdaq Market-Makers Antitrust Litigation; United States District Court for the Southern District of New York, 94 Civ. 3996 (RWS) M.D.L. No. 1023, (May 10, 11, 1996).

Affidavit of Charles C. Cox in Re: Nasdaq Market-Makers Antitrust Litigation; United States District Court for the Southern District of New York, 94 Civ. 3996 (RWS) M.D.L. No. 1023, (April 30, 1996).

Deposition of Charles C. Cox in Re: Wayne Laverne Prim, Plaintiff vs. Loretta Jean Prim, Defendant; Ninth Judicial District Court of the State of Nevada in and for the County of Douglas, No. 31327, Dept. No. 1, (November 20, 1995).

Testimony of Charles C. Cox in Re: H.R. 2131, The Capital Markets Deregulation and Liberalization Act of 1995; Subcommittee on Telecommunications and Finance of The House Committee on Energy and Commerce, (November 14, 1995).

Testimony of Charles C. Cox in Re:  Douglas E. O'Neil et al. v. Curtis H. Appel et al., Price Waterhouse and Embrace Systems Corporation; United States District Court for the Western District of Michigan, Southern Division, No. 1:94-CV-97 (RHB), (August 25, 1995).

Declaration of Charles C. Cox in Re: Mark Erwin, Trustee, Mark Erwin Sales, Inc. Defined Benefit Plan, et al., Plaintiffs v. Resources High Equity, Inc., et al., Defendants; Superior Court for the State of California, County of Los Angeles, Case No.: BC080254, (July 11, 1995).

Affidavit of Charles C. Cox in Re: Douglas E. O'Neil, et al., Plaintiffs v. Curtis H. Appel et al., Defendants, United States District Court for the Western District of Michigan, No. 1: 94-CV-97 (RHB), (May 31, 1995).

Testimony of Charles C. Cox:  Concerning Securities Litigation Reform; Subcommittee on Securities of the Senate Banking, Housing and Urban Affairs Committee, (April 6, 1995).

Deposition of Charles C. Cox in Re: Storage Technology Securities Litigation; United States District Court for the District of Colorado, No. 92-K-750, (December 13, 14, 1994).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

Deposition of Charles C. Cox in Re: <u>Harold J. Robins and Alan Freeberg, Plaintiffs vs. Moore Medical Corp., et. al., Defendants</u>; United States District Court for the Southern District of New York, No. 91 Civ. 3701 (MEL), (December 5, 1994).

Testimony of Charles C. Cox in Re: <u>Sidney Morse, Ann Drake and Robert L. Baumgarten, Plaintiffs vs. Abbott Laboratories, Robert A. Schoellhorn, Duane L. Burnham and Jack W. Schuler, Defendants</u>; United States District Court for the Northern District of Illinois, Eastern Division, No. 90 C 1982, (February 28, March 1, 2, 3, 4, 7, 1994).

Affidavit of Charles C. Cox in Re:  <u>Sandy Liebhard, et. al., Plaintiffs vs. Square D Company and Jarre L. Stead, Defendants</u>; United States District Court for the Northern District of Illinois, Eastern Division, No. 91 C1103, (February 8, 1994).

Affidavit of Charles C. Cox in Re:  <u>Time Warner Inc. Securities Litigation</u>; United States District Court for the Southern District of New York, No. 90 Civ. 4051 (MEL), (February 1, 1994).

Deposition of Charles C. Cox in Re:  <u>Union Pacific Corporation, Union Pacific Railroad Company and Missouri Pacific Railroad Company -- Control -- Chicago and North Western Holdings Corp. and Chicago and Northwestern Transportation Company</u>: Before the Interstate Commerce Commission, Finance Docket No. 32133, (January 21, 1994).

Affidavit of Charles C. Cox in Re: <u>Dennis E. Bentley, et. al., Plaintiffs vs. Legent Corporation, et. al., Defendants</u>; United States District Court for the Eastern District of Virginia, Alexandria Division, No. 93-894-A, (January 7, 1993).

Deposition of Charles C. Cox in Re:  <u>William R. Fry, et. al., Plaintiffs vs. UAL Corporation</u>; United States District Court for the Northern District of Illinois, Eastern Division, No. 90 C0999, (January 14, April 7, 1994).

Testimony of Charles C. Cox in Re: <u>United States of America v. Gary Singer and The Cooper Companies, Inc.</u>; United States District Court for the Southern District of New York, 92 Cr. 964 (RJW), (December 20, 21, 1993).

Deposition of Charles C. Cox in Re: <u>Dennis E. Bentley, et. al., Plaintiffs vs. Legent Corporation, et. al., Defendants</u>; United States District Court for the Eastern District of Virginia, Alexandria Division, No. 93-894-A, (December 9, 1993).

Verified Statement of Charles C. Cox in Re: <u>Union Pacific Corporation, Union Pacific Railroad Company and Missouri Pacific Railroad Company -- Control -- Chicago and North Western Holdings Corp. and Chicago and Northwestern Transportation Company</u>: Before the Interstate Commerce Commission, Finance Docket No. 32133, Dated November 24, 1993.

Affidavit of Charles C. Cox in Re:  <u>Compaq Securities Litigation</u>; United States District Court for the Southern District of Texas, Houston Division, Civil Action H-91-9191, (September 27, 1993).

Deposition of Charles C. Cox in Re: <u>American Dental Laser, Inc. Securities Litigation</u>; United States District Court Eastern District of Michigan, Southern Division, No. 92-CV-71917-DT, (August 19, 20, 1993).

Deposition of Charles C. Cox in Re: <u>Janivo Holding, B.V., Plaintiff v. Continental Bank N.A. and First Interstate Commercial Mortgage Company of Illinois, Defendants</u>; United States

District Court for the Northern District of Illinois, Eastern Division, No. 91C7728, (August 12 and September 15, 1993).

Testimony of Charles C. Cox in Re: <u>Lynn A. Schwartz, Plaintiff, vs. System Software Associates, Inc., Roger E. Covey, and David L. Harbert, Defendants</u>; United States District Court for the Northern District of Illinois, Eastern Division, No. 91 C1154, (June 29, 1993).

Testimony of Charles C. Cox in Re: <u>Intervivos and Testamentary Trusts of J.E. Barbey, also known as John E. Barbey, Deceased</u>; Court of Common Pleas of Berks County, Pennsylvania, Orphans' Court Division, No. 46273, 47416, 47417, 47418, 47419, (April 27, 1993).

Affidavit of Charles C. Cox in Re: <u>Sandy Liebhard, et al., Plaintiffs vs. Square D Company and Jarre L. Stead, Defendants</u>; United States District Court for the Northern District of Illinois, Eastern Division, No. 91 C1103, (March 12, 1993).

Declaration of Charles C. Cox in Re: <u>Mortgage and Realty Trust Securities Litigation</u>; United States District Court for the Eastern District of Pennsylvania; Master file No. 90-1848, (March 9, 1993).

Deposition of Charles C. Cox in Re: <u>Scott Paper Securities Litigation</u>; United States District Court for the Eastern District of Pennsylvania; Master File No. 90-6192, (February 19, 20, 1993).

Deposition of Charles C. Cox in Re:  <u>Amos M. Ames, et. al., Plaintiffs, vs. Marguerite M. Paul, et. al., Defendants</u>; Circuit Court Juneau County, State of Wisconsin, Case Nos. 92-CV-31, 92-CV-32, (January 26, 1993).

Deposition of Charles C. Cox in Re:  <u>Mortgage and Realty Trust Securities Litigation</u>; United States District Court for the Eastern District of Pennsylvania; Master File No. 90-1848, (January 12, 1993).

Deposition of Charles C. Cox in Re: <u>Sandy Liebhard, et al., Plaintiffs vs. Square D Company and Jerre L. Stead, Defendants</u>; United States District Court for the Northern District of Illinois, Eastern Division, No. 91 C1103, (November 18, 19, 1992).

Deposition of Charles C. Cox in Re: <u>Estate of Technical Equities Corporation, Plaintiff, vs. Harry C. Stern; Stern Management Associates, a general partnership; Bear Stearns & Co.; Michael J. Doherty; Does 3-500, and Roes 1-100, Defendants.</u>  Superior Court of California, County of Santa Clara; Master File No. 1991, Santa Clara County Superior Court No. 600306, (September 4, 5, 1992).

Testimony of Charles C. Cox in Re:  <u>In the Matter of the Trust created by George A. Hormel and Designated as Trusts Nos. 4, 5 and 6, and of the Trust created by Jay C. Hormel and Designated as Trusts Nos. 101, 102, 103, 201, 202, 203, 301, 302 and 303.</u> District Court of the State of Minnesota, County of Mower, Third Judicial District, Nos. C5-54-22378, C7-54-22379, C3-54-22380, C9-57-23659, C5-57-23660, C7-57-23661, C9-57-23662, C0-57-23663, C2-57-23664, C4-57-23665, C6-57-23666, C8-57-23667, (August 26, 27, 28, 1992).

Deposition of Charles C. Cox in Re:  <u>In the Matter of the Trust created by George A. Hormel and Designated as Trusts Nos. 4, 5 and 6, and of the Trust created by Jay C. Hormel and Designated as Trusts Nos. 101, 102, 103, 201, 202, 203, 301, 302 and 303.</u> District Court of the State of Minnesota, County of Mower, Third Judicial District, Nos. C5-54-22378, C7-

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

54-22379, C3-54-22380, C9-57-23659, C5-57-23660, C7-57-23661, C9-57-23662, C0-57-23663, C2-57-23664, C4-57-23665, C6-57-23666, C8-57-23667, (August 19, 1992).

Affidavit of Charles C. Cox in Re:  Del Monte Corporation, Plaintiff, v. Polly Peck International, PLC; PPI Del Monte Tropical Fruit Company, North America and DMII (International) Ltd., Defendants.  PPI Del Monte Tropical Fruit Company, North America and DMII (International) Ltd., Counterclaim Plaintiffs, v. Del Monte Corporation, Counterclaim Defendant, United States District Court for the Southern District of New York, 91 Cov. 6486 (WK), (May 11, 1992).

Affidavit of Charles C. Cox in Re:  Sandy Liebhard, et al., Plaintiffs vs. Square D Company and Jarre L. Stead, Defendants; United States District Court for the Northern District of Illinois, Eastern Division, No. 91 C1103, (April 15, 1992).

Deposition of Charles C. Cox in Re:  Rospatch Securities Litigation, United States District Court for the Western District of Michigan, Southern Division, No. 1:90-CV-805, 1:90-CV-806, 1:91-CV-85, (April 7, 1992).

Affidavit of Charles C. Cox in Support of Shearson's Motion for Summary Judgment in Re: General Acquisition, Inc., et al., Plaintiffs v. GenCorp Inc., et al., Defendants, GenCorp Inc., Defendant-Counterclaimant, v. Wagner & Brown, et al., Defendants on the Counterclaims and Shearson Lehman Brothers Inc. and Shearson Lehman Brothers Holdings Inc., New Party Defendants on the Amended Counterclaims, United States District Court for the Southern Division of Ohio, Eastern Division, C2-87-348, (February 28, 1992).

Deposition of Charles C. Cox in Re:  General Acquisition, Inc., et al., Plaintiffs v. GenCorp Inc., et al., Defendants, GenCorp Inc., Defendant-Counterclaimant, v. Wagner & Brown, et al., Defendants on the Counterclaims and Shearson Lehman Brothers Inc. and Shearson Lehman Brothers Holdings Inc., New Party Defendants on the Amended Counterclaims, United States District Court for the Southern Division of Ohio, Eastern Division, 2:87-CV-348, (November 20, 21, 22 and December 19, 20, 1991).

Deposition of Charles C. Cox in Re:  DBA Securities Litigation, United States District Court for the Middle District of Florida, Orlando Division, No. 89-032-Civ-Orl-19, (August 30, 1990).

Affidavit of Charles C. Cox:  Submitted on behalf of all defendants in Re:  David Jacobson, et al., against Bear Stearns & Co., Inc., No. 90/7333; Richard Moose, et al., against Merrill Lynch, Pierce Fenner & Smith, Inc., No. 90/15850; Michael Hecht, et al., against Shearson Lehman Hutton Holdings, Inc., No. 90/15852;  David Jacobson and Samuel Brach, et al., against Prudential-Bache Securities Inc., No. 90/8406; M & L Partnership, Milton Mandelblatt and Leah Mandelblatt, et al., against Pain Webber Incorporated, No. 90/15851; M & L Partnership, et al., against Regional Clearing Corp., No. 90/7240; Supreme Court of the State of New York, County of New York, (July 27, 1990).

Securities and Exchange Commission Proposed Legislation 'The Insider Trader Act of 1987' And Memorandum of Support, Subcommittee on Securities of the Senate Banking, Housing and Urban Affairs Committee, (August 7, 1987).

Internationalization of the Securities Markets, Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce, (August 5, 1987).

Program Trading, Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce, (July 23, 1987).

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

Corporate Takeover Legislation, Committee on Banking, Housing and Urban Affairs, United States Senate, (June 23, 1987).

Legislation to Define Insider Trading, Subcommittee on Securities of the Senate Banking, Housing and Urban Affairs Committee, (June 19, 1987).

The Commission's Authorization Request for Fiscal Years 1988-90, Subcommittee on Tele-communications and Finance of the House Committee on Energy and Commerce, (June 4, 1987).

The Commission's Market Oversight, Surveillance, and Enforcement Programs, Subcommittee on Telecommunications and Finance of the House Committee on Energy and Finance, (May 5, 1987).

Federal Regulation of Tender Offers, Subcommittee on Antitrust, Monopolies and Business Rights of the Senate Judiciary Committee, (April 2, 1987).

Oversight Hearings, Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, (March 5, 1986).

Tender Offer Process, Subcommittee on Taxation and Debt Management of the Senate Committee on Finance, (April 22, 1985).

The Current Legislative Framework Governing the Financial Services Industry, Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, (April 2, 1985).

Oversight Hearings, Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, (March 21, 1985).

Title I of H.R. 4557, the Proposed Secondary Mortgage Market Enhancement Act, Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, (March 14, 1984).

Oversight Hearings, Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, (February 23, 1984).

Nomination of Charles Coleman Cox, Committee on Banking, Housing, and Urban Affairs, United States Senate, (November 9, 1983).

## HONORS AND AWARDS

Charles R. Walgreen Foundation for the Study of American Institutions Fellowship, 1970-1972.

National Defense Education Act Title IV Graduate Fellowship, 1967-1970.

Graduate Magna Cum Laude with Distinction in Economics, 1967.

Phi Beta Kappa 1966.

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

## OTHER ACTIVITIES

Member, American Economic Association, Mont Pelerin Society.

Referee, Journal of Political Economy, American Economic Review, Journal of Law & Economics, Journal of Money, Credit, and Banking, Economic Inquiry, National Science Foundation, Review of Social Economy, Social Science Quarterly.

Participant and speaker at multiple conferences on the Economics of Corporate, Securities and Commodities Law, Mergers and Acquisitions, and the Regulation of Markets.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT**

# Exhibit I

Memorandum Regarding EBITDA
November 15, 2011

In discussing an appropriate methodology for quantifying the economic loss of a business, we have advocated that Step 1 of the quantification methodology should compare (a) a claimant's Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"), during specified months in the year prior to the acts complained of to (b) EBITDA in the comparable months during the year in which those acts occurred. Similarly, our proposed methodology for valuing losses for failed businesses relies on the use of EBITDA.

Questions have been raised by opposing counsel about the appropriateness of EBITDA to quantify a business's economic loss. In particular, opposing counsel have suggested that EBITDA has been rejected by the U.S. Securities and Exchange Commission and is not accepted by courts. As we explain below, neither of those assertions is correct.

EBITDA is a widely used financial metric and has been for more than 20 years. Textbooks on financial analysis and valuation and journal articles routinely cite EBITDA as a standard measure. *See* Declaration of Charles C. Cox (Nov 15, 2011) ¶¶ 5-7 & nn. 1-7.

Moreover, as Mr. Cox, a former SEC Commissioner, explains in his declaration, the SEC has *not* rejected EBITDA as a measure of financial performance. To the contrary, SEC regulations expressly recognize EBITDA as a well-established non-GAAP measure of financial performance -- that is, a measure of performance that is different from, but which can be reconciled with, the Generally Accepted Accounting Principles (GAAP) accounting conventions required to be used for public company financial statements filed with the SEC. *See* Cox Decl. ¶¶ 8-9; SEC Regulation S-K item 10(e), 17 C.F.R. § 229.10(e)(1)(ii)(A). Consistent with SEC rules, thousands of public companies regularly provide EBITDA information in their quarterly earnings announcements. *See* Cox Decl. ¶ 8. Notably, the SEC regulations do not refer to variable profit (the methodology advocated by opposing counsel as the methodology for quantifying economic loss in Step 1).

Courts also have accepted EBITDA. The Delaware Chancery Court, perhaps the premier business court in the nation, repeatedly has recognized EBITDA as an appropriate measure of financial performance. *See, e.g., Hexion Specialty Chemicals, Inc. v. Hunstman Corp.*, 965 A.2d 615, 740 (Del. Ch. 2011) ("What matters is the results of operation of the business. Because EBITDA is independent of capital structure, it is a better measure of the operational results of the business. Changes in Huntsman's fortunes will thus be examined through the lens of changes in EBITDA. This is, in any event, the metric the parties relied on most heavily in negotiating and modeling the transaction."); *Wavedivision Holdings, LLC and Michigan Broadband, LLC v. Millennium Digital Media Systems, L.L.C.,* C.A. No. 2993-VCS (Del. Ch. Sept. 17, 2010), 2010 WL 3706624 at *23-*24 (Using EBITDA).

Courts also have recognized that EBITDA is an appropriate metric for valuing failed businesses. *See, e.g., In re Biddiscome International, L.L.C.*, 392 B.R. 909, 918 (Bankr. M.D. Fla. 2008) ("The most common measure of the value of a business is the cash flow approach, which measures value based on how much income the business will produce to provide a return

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

on the investment. The value is determined by multiplying the business's earnings before interest, taxes, depreciation and amortization, or "EBITDA," by a certain number that is determined based on the type of industry.").

Nothing in the blog post provided to us by opposing counsel refutes any of these points.[1] To the contrary, the blog post supports the conclusion that EBITDA is a well-recognized measure of business performance used by investors and lenders.[2]  Nor does the blog post's recognition that EBITDA can be a misleading indicator of firm performance when a firm changes its accounting rules from the initial comparison period warrant rejecting EBITDA.  Such intentional changes would distort any measure of performance, including those based on GAAP or variable profit.

The WorldCom case cited by the blog similarly does not support rejection of EBITDA. WorldCom's misclassification of expenses resulted in misstating its financial statements under GAAP, which would similarly have distorted measures of both EBITDA and variable profit.[3]

In that regard, it is notable that the blog post does not compare EBITDA with variable profit measures of firm performance and thus ignores recognized limitations of variable profit measures:  Variable profit depends on classification of costs as "fixed" or "variable," which are not standardized or consistent between businesses.  To the extent that such classifications are necessarily imperfect, those imperfections will distort a variable profit measure of a firm's economic performance.  EBITDA, which does not depend on fixed/variable cost classification, does not suffer from this flaw.  That is why we believe that, in these circumstances, EBITDA is an appropriate measure.

---

[1] *See* K. Berman and J. Knight, "How EBITDA Can Mislead," <u>Harvard Bus. Review</u> blog (Nov. 19, 2009, 11:34 a.m.).

[2] *Id.*

[3] *See In re WorldCom Sec. Litig.,* 346 F.Supp.2d 628, 641 (S.D.N.Y. 2004) ("WorldCom started in 2001 to capitalize WorldCom's line costs.  [Management] would review WorldCom's financial results toward the end of each quarter in order to decide how much of the line cost expenses to capitalize.  The capitalization of line costs was unsupported by any contemporaneous analysis or records, and was a violation of GAAP.  It is undisputed that it constituted fraud.").

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

# Exhibit J

Attorney Work Product
Privileged and Confidential
Do Not Distribute





| | |
|---|---|
| **TO:** | Jim Neath, Rick Godfrey, Wendy Bloom |
| **FROM:** | Joe Rice |
| **DATE:** | November 16, 2011 |
| **RE:** | Compensation Framework |

We have not responded with a redline document but seek to identify the open issues.

1.    Salary – In the salary discussion the PSC is relying on the Working Group to resolve the treatment of the salary cost and is not going to address until the Working Group completes its work in DC which should resolve the issue.

2.    EBITDA versus variable profit –

Step 2:  The PSC and BP are in agreement the Working Group has reached substantial agreements on fixed/variable classifications and believe we should allow them to finalize that this week, and there is no discussion point for us at the current time.

Step 1:  We have discussed the current EBITDA versus variable profit issues internally and with some security litigation experts.  The concern is EBITDA while still an accepted, although heavily criticized, accounting methodology for valuation of a company, it is not the appropriate starting point for determining economic injury to an ongoing business.

BP offered to use as the starting point the average of the adjusted EBITDA and the variable profit which generally would be viewed as a reasoned resolution but here that does not work.

1)    The PSC believes the positions they have taken in the Working Group have shown significant compromise to address the concerns the BP Working Group had on the revenue based approach.

Attorney Work Product
Privileged and Confidential
Do Not Distribute

2)      The average approach here does not use any recognized accounting standards but is merely an adjustment that doesn't have any basis in accounting principles.

3)      The application of the EBITDA approach has shown to be much more time consuming and difficult to calculate.

4)      We have to provide tools that are user friendly for all businesses and we believe that all businesses can work from revenue but many will not be able to work from EBITDA.  Therefore, we stand by our Step 1 approach of working from the variable profit.

5)      GCCF does not use EBITDA but uses our approach

3.   Claimant Specific Factor –

The PSC wants to only use the positive growth in revenue with no cap.  BP has proposed to use both positive and negative growth with a +20/-20 cap/floor. The growth rate is being calculated over a very short period of time and is in itself limiting.  It is only comparing 2009 to 2010.  The overwhelming evidence shows the expectations for the tourism season in 2010 were high for the Gulf Coast coming off the Katrina recovery years.  The growth in other comparable areas reached record levels in 2010.  In light of all of this, we cannot agree to the use of a negative growth rate.  We will accept your cap of +20% on the growth rate but we disregard negative growth rates.

4.   Tourism Factor / Industry Factor –

The PSC wants 6.8% across the board on the growth rate for all industries. BP has proposed 4% on Tourism only.  BP implies their understanding of our previous position however we do not believe there is a basis for that understanding.  We have stated all along that the Gulf Coast area is driven by the Tourism Industry and the Seafood Industry.  For reasons that are obvious in this negotiation, the PSC has always taken the position that the economy has to be looked at in light of the principle elements of tourism and seafood.  A quick review of the studies show an economic impact that is a multiple of the seafood catch/landings value.  Everything the studies talk about works from seafood and tourism.  Therefore, the PSC reiterates its position that it is an overall industry number.

The PSC will agree to 5.5% across the board Growth Rate but will not entertain any proposals that ignore one group of claimants, or that pits one against the other as is suggested by BP's last proposal.

# Exhibit K

**Attorney Work Product**
**Privileged and Confidential**
**Do Not Distribute**

# MEMO



| | |
|---|---|
| **TO:** | Jim Neath, Rick Godfrey, Wendy Bloom |
| **FROM:** | Joe Rice, Calvin Fayard |
| **DATE:** | November 16, 2011 |
| **RE:** | Causation Requirements |

We have studied your Economic proposal closely and met with others of our group. We appreciate the efforts you have made to try to help bring this to closure and we hope that you likewise appreciate what we have done.

We have growing concerns that the process is very complex and complicated.  It is true that many business claimants will have a sophisticated accounting system and staff, but we have to recognize many will not.  The PSC previously suggested accounting assistance be provided by the Fund.  The ideas include:

- Training sessions for our accountants regionally.
- If claimant uses a settlement trained accountant the Fund will directly pay the accountant with some established fee schedule.
- In-house traveling accountants with a duty of loyalty to a claimant.

In addition to this we need to discuss openly the role of class counsel, post settlement.  We have to remember that Due Process is required both pre and post settlement.

In responding to your document of November 10th we felt it would be appropriate to try to show how narrow the differences are.

We are working from your November 10th memo that uses the Causation Standard instead of the so called "haircut zones."

     I)    We have added a self-standing agreement concerning the Marketing Fund as attachment #2.

     II)    Documentation

Attorney Work Product
Privileged and Confidential
Do Not Distribute

1)    BP eliminates the use of the State Tax returns because their experts do not think all states require the necessary information needed to calculate the damages.  The PSC will agree to delete the State Tax return.

2)    We believe all other edits address wording or style for clarification and are not substantive.

III)   Causation

1)    BP changes the definition of "Seafood Retailer" to require 25% of total food costs to be seafood.  The PSC will agree to this.

2)    In II. A., BP wants 12.5% decline in three months of losses with a 7.5% increase over three months in Zone B & C.  The PSC wants 5% decline and 5% increase over two months.

The PSC believes the BP position negates the intent of the use of the Zones.  PSC also continues to make it clear the lack of 2010 recovery is subject to explaination.

3)    In II. B. 1. and B.2., BP and the PSC both use 5% decline and 3% return but BP wants it three consecutive months and the PSC wants it during each of two consecutive months.

The PSC believes the BP position negates the intent of the use of the Zones.

In "(a)" and "(b)" of the second part of the section, BP wants 5 percentage point decline and a three month period of time.  The PSC wants a 5% decline over two months.  The PSC believes the BP position negates the intent of the use of the Zones.

4)    In section C., Decline-Only Revenue Pattern:

BP uses 12.5% and a three month decline as in the V-shaped pattern.  The PSC uses 5% and two months.  The only thing that keeps this claim from satisfying the V-shaped requirement of Section A is the revenue return did not occur in 2011.  Now we have added the burden of establishing why that did not happen and linking it to non-local customers or the tourism trade.  We believe that is sufficient nexus without anything further.  PSC will go to 7.5% decline at two months.

Attorney Work Product
Privileged and Confidential
Do Not Distribute

In section 3, we had agreed to use 5% decline and two months.  We have deleted "in the ordinary course."  This is not a normal business record and claimants should be allowed to create from whatever records they have.

5)      In section D., we do not think there are any issues.

6)      In section E., in light of your changing the definition of "Seafood Retailers," we do not need section E here (Zone A, B & C).

7)      In section F., BP proposes a $50,000 cap on the base revenue claim in order to be able to qualify under Section F.  The PSC will agree to $150,000.

8)      In III. A., we are in agreement, except you deleted the possibility of 2011 not increasing, and we added that back.

9)      In III. B., BP wants 5 percentage points and three months.  The PSC wants 5% decline and three months.  If we reach agreement in Zone B and C then here we will agree to go to your 5 percentage points and three months.

10)     In III. C., BP wants 15% and three months.  The PSC wants 7.5% and three months.  We have already agreed to your 5 percentage point approach in paragraph C(3) here versus 5% decline.  In order to close this item the PSC will agree to a 10% decline with three months and the 5 percentage point.

11)     On D., we have no changes

12)     In section E., we are out of Zone A, B & C, and this section is required here.

13)     In section F., we agree to $150,000 base claim cap.

# Exhibit L

Produced Pursuant
To Rule 408

### Compensation Framework for Business Economic Loss Claims (2/8/2012) BP

The compensation framework for business claimants compares the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010.[1]  The calculation is divided into two steps:

> **Step 1** – Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period.  Step 1 compensation reflects the reduction in Variable Profit (which reflects the claimant's revenue less its variable costs) over this period.

> **Step 2** – Compensates claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to sales from the Benchmark Period. This calculation reflects a Claimant Factor that captures growth or decline in the pre-spill months of 2010 compared to the comparable months of the Benchmark Period and a General Adjustment Factor.

For purposes of the two step calculation, the parties have agreed to a defined list of fixed and variable expenses as reflected in Attachment A.

In order to allocate payroll expenses (including Salaries and Wages, Employee Benefits, and, where applicable, 401K Payments, but excluding Owner/Officer Compensation) into fixed and variable components, a minimum level of fixed payroll costs will be measured based on the average of the two months between May 2010 and December 2010 in which the claimant had its lowest payroll costs. Certain exceptions are identified below for identifying months with the claimant's lowest payroll costs.

For claimants that include Cost of Goods Sold (COGS) in their financial statements, COGS will be treated as a variable expense after excluding, to the extent possible, the following cost items which may be embedded in COGS and are likely to be fixed in nature: Fixed COGS Payroll, Amortization, Depreciation, Insurance Expense, Interest Expense, and Contract Services.

Based on these considerations, the resulting calculations are performed to determine compensation for claimants.

I.    **Definitions**

For the purposes of this calculation, the following are defined terms:

**Compensation Period:**  The Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.[2]

---

[1] This Compensation Framework for Business Claims does not apply to (i) start-up businesses; (ii) failed businesses; (iii) and developers.  Compensation frameworks for these types of businesses will be presented separately.
[2]  The use of different compensation periods for seafood and related water-driven businesses remains under discussion.

1

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

024514

Produced Pursuant
To Rule 408

**Benchmark Period:** The Benchmark Period is the pre-spill years  which claimant chooses as the baseline for measuring its historical financial performance.  The claimant can select among the following Benchmark Periods: 2009, the average of 2008-2009, or the average of 2007-2009.

**Claimant-Specific Factor**:  In order to capture the impact of pre-spill trends in the claimant's  revenue performance that might have been expected in the post-spill period, Benchmark Period revenue will be adjusted by a Claimant-Specific Factor.  The following steps will be used to compute the Claimant-Specific Factor:

> A. **Calculate the difference between claimant's total revenue for January through April 2010 and total revenue in January through April of the Benchmark Period.**
>
> B. Divide the revenue change calculated in Step A by total revenue in January through April of the Benchmark Period to derive the Claimant-Specific Factor. If the calculated Claimant-Specific Factor falls below -2% or exceeds +10%, then it will be set at -2% or +10%, respectively.

**General Adjustment Factor:**  All Claimants shall be entitled to a 2.0% General Adjustment Factor.

**Variable Profit**:  This is calculated for both the Benchmark Period and the Compensation Period as follows:

1. Sum the monthly revenue over the period.
2. Subtract the corresponding variable expenses from revenue over the same time period. Variable expenses include:
   a. Variable Costs as identified in Attachment A.
   b. Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.
   c. Variable portion of COGS, calculated by excluding salary costs (which are discussed below in the definition of Fixed and Variable Payroll Expenses) and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.

**Variable Margin**:  This is calculated only for the Benchmark Period and is calculated as follows:

1. Sum Variable Profit from May-December of the Benchmark Period.
2. Sum total revenue from May-December of the Benchmark Period.
3. Divide Variable Profit by total revenue from May-December of the Benchmark Period to calculate Variable Margin percent.

**Fixed and Variable Payroll Expenses :**  Fixed and Variable Payroll Expenses are calculated based on the understanding that every business must operate with a minimum core staff and are defined using

2

Produced Pursuant
To Rule 408

monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims, for May through December 2010.  Fixed and Variable Payroll expenses are calculated as follows:

1. Obtain monthly amounts for the following payroll expenses (excluding Owner/Officer Compensation):  (a) Salaries & wages; (b) Payroll taxes (including FICA, workers compensation, unemployment insurance); (c) Employer costs for employee benefits.  Calculations include components of salaries and related expenses included in both Selling, General & Administrative Expenses ("SG&A") and COGS.
2. Sum these payroll expenses on a monthly basis to determine the Total Payroll Expense for each month.
3. Identify the two months between May and December 2010 with the lowest Total Payroll Expense.

   - Months in which the claimant has zero revenue, zero non-officer payroll expenses, or the business is closed,  will be excluded from this calculation.
4. Define "Fixed Payroll Expenses" as the average payroll expense over the two months with the lowest Total Payroll Expense.
5. For any month with Total Payroll Expenses less than Fixed Payroll Expenses, all payroll costs will be considered fixed expenses.
6. For any month with Total Payroll Expenses greater than Fixed Payroll Expenses, the excess amount of Total Payroll Expenses will be considered variable expenses.

**Incremental Revenue**: Revenue in the selected Benchmark Period for the months corresponding to the Compensation Period is multiplied by the Claimant-Specific Factor and the General Adjustment Factor to calculate Incremental Revenue. This represents the projected change in revenue over the Compensation Period, compared to the Benchmark Period.

II.      **Description of Compensation Calculation**

**Step 1 Compensation**

Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.

As noted above, the Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

024516

Produced Pursuant
To Rule 408

For claimants that participated in the VoO program, Variable Profit in the Compensation Period will exclude revenue generated by or costs incurred in connection with VoO.[3]

## Step 2 Compensation

Using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims:

(1)     Calculate total revenue in the claimant-selected Benchmark Period for the months corresponding to the Compensation Period.

(2)     Calculate the Claimant-Specific Factor.

(3)     Calculate Incremental Revenue.

(4)     Multiply Incremental Revenue by the Variable Margin[4].

## Total Compensation

Total Compensation is calculated as follows:

(1)     Add Step 1 Compensation to Step 2 Compensation.

(2)     Apply the agreed-upon Risk Transfer Premium (RTP).

(3)     Subtract from the sum of Step 1 Compensation and Step 2 Compensation any payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, as well as any VoO Settlement Payment Offset and VoO Earned Income Offset, where applicable.

---

[3] Claimants are required to report payments received under the VoO program.  If claimants that received VoO payments fail separately to report costs incurred in VoO and non-VoO activities, then Step 1 Compensation for non-VoO activity alone can be determined through a pro-rata revenue based allocation of variable costs between VoO and non-VoO related activities.

[4] If a multi-year Benchmark Period is used, then the average Variable Margin over this period is used in the calculation.

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSION CONFIDENTIALITY AGREEMENT

024517

# Exhibit M



**pwc**

{In Archive}  Business Economic Loss Framework

Charles R. Hacker    to: Rice, Joe                          04/04/2012 11:10 PM

Cc:  Mark Staley, Robin Pilcher, Bill Potter, Ted Martens, "Cantor, Daniel"

Bcc:  Katherine Torres, Emily F Kent, Thomas J Frangella, John J. Petzold

| | |
|---|---|
| From: | Charles R. Hacker/US/FAS/PwC |
| To: | "Rice, Joe" <jrice@motleyrice.com> |
| Cc: | Mark Staley <mstaley@pncpa.com>, Robin Pilcher <rpilcher@pncpa.com>, Bill Potter <bpotter@pncpa.com>, Ted Martens/US/FAS/PwC@Americas-US, "Cantor, Daniel" <Daniel.Cantor@APORTER.COM> |
| Bcc: | Katherine Torres <ktorres@pncpa.com>, Emily F Kent/US/FAS/PwC@Americas-US, Thomas J Frangella/US/FAS/PwC@Americas-US, John J. Petzold/US/FAS/PwC@Americas-US |
| Archive: | This message is being viewed in an archive. |

Joe-

As you requested at our meeting last week, attached please find questions and observations from the accountants in connection with the business economic loss framework.  The comments are from both PwC and Postlethwaite & Netterville.

After you get a chance to review, we would be glad to discuss with you in detail.

Chuck



Framework_Recommendations_4_4_2012[1].docx

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSIONS CONFIDENTIALITY AGREEMENT
4/4/12

# Business Economic Loss Framework Observations

**Appendix 4.A Business Documentation Framework**
*Note: We would like to comment further on the documentation appendix upon review of the claims form, when received.*

- Do the affidavits need to be signed by anyone more than the claimant (i.e. attorney, notary, etc.) if not specified otherwise?

- 4A.1 The specific criteria delineating a business claimant from an individual claimant should be added here.

- 4A.8. Payments from Real Estate Fund should be added to the current list.

- 4A.9  The year should be explicitly stated in this sentence (e.g., Additional documentation for claimants with annual revenue of $75,000 or less "*in 2009*" which seek to establish causation on the basis of a Causation Proxy Claimant.

**Appendix 4B Business Compensation Framework**

- Were alternative causes of losses not directly related to the Spill considered? Under the proposed Compensation Framework for Business Economic Loss Claims (the "Framework"), unless specifically addressed on a claim by claim basis, revenue fluctuations due to hurricanes, change in location of business, change in customer base, floor plan expansion, change in product/service offering, and any other alternative causes of losses not directly related to the Spill may or may not impact the loss calculation.

- Under the Framework, the results of using revenues as the only metric to measure losses for businesses that are driven primarily by volume (e.g., gas stations, utility companies, lodging) may be skewed by the impact of underlying non-loss related price fluctuations.

- Claimants may select what they believe to be the most favorable Benchmark Period utilizing only revenues.  This may not result in the highest Business Economic Loss determination, as the impact of variable expenses must also be considered.  Is it the intent of the parties to let the accountants use a Benchmark Period, other than the one selected by the Claimant, if it results in a more favorable claim amount? This is unclear in the current version of the framework we have reviewed.

- Can the benchmark period for causation be different from the benchmark period for the compensation calculation?

- We recommend applying the Variable Margin percent calculated in Step 2 (see page 2) to revenue in order to calculate Variable Profit in Step 1 (see page 1), as opposed to deducting variable costs from revenue.  This will:

    1. Minimize the potential impact of non-representative variable expenses derived from using only a limited number of months;

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSIONS CONFIDENTIALITY AGREEMENT
4/4/12

2. Have the potential of more accurately matching revenue with expenses by consistently using a longer base period; and

3.  Reduce the amount of work required to complete Step 1 (as the Variable Margin already needs to be calculated in Step 2) as well as the amount of work required for the claimant to calculate the highest Business Economic Loss.

- In determining the Claimant-Specific Factor, a four month base period (January – April) may or may not be long enough to adequately project a trend for a potential eight-month loss period. Additionally, the months of January through April typically represent the off-peak season for most claimants, which may not reflect an adequate level of sales activity to accurately measure the anticipated growth of the peak season (e.g. May through October). The Framework should be expanded to include the consideration of longer base period(s) (e.g., 6-month; 8-month; and 12-month).

**Appendix 4C Business Causation Framework**
- 4C.II.E. and 4C.III.F.  The year should be explicitly stated in this sentence (e.g., Additional documentation for claimants with annual revenue of $75,000 or less "***in 2009***" which seek to establish causation on the basis of a Causation Proxy Claimant.

- The concept of the Customer Mix test presents the following concerns and these concerns should be considered in the execution and efficiency of the test:
    o Difficulty for claimant in providing documentation (i.e. Cash transactions are considered in total revenue, but are unable to be identified by specific customer);
    o Verifying the completeness and accuracy of the documentation may prove difficult;
    o Not efficient for an accountant with "shoebox" method of handling receipts; and
    o Documentation for distance requirements (i.e. local vs. nonlocal) is not typically maintained in the ordinary course of business and may be difficult for the claimant (or accountant) to create.

- The following terms appear in the Framework and need further clarification/consideration:
    o Urban Area vs. Urban Cluster  (A Rural customer is one located in an area outside the Urban Area or Urban Cluster, as defined by the US Census Bureau's classification in Attachment 4C.II.E and 4C.III.F. Urban Areas or Urban Clusters need further explanation within the Framework.)
    o Wholesaler vs. Retailer (Wholesaler and Retailer definitions are set forth in the "Seafood Distribution Chain Definition" document, which has not yet been provided to PwC/P&N. These were not defined in the framework.)

- The verbiage in the Framework presents, for example, a "Down" percentage of 8.5% and an "Up" percentage of 5%. However, Exhibit A on page 10 presents the reciprocal of an "Up" percentage of -8.5% and a "Down" percentage of 5%. Consider reversing the table headings from "Up" and "Down" to "Down" and "Up".

- If a claimant does not meet the revenue v-test, modified v-test, or decline only requirements, and does not provide documentation to establish causation on the basis of cancelled

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSIONS CONFIDENTIALITY AGREEMENT
4/4/12

contracts/reservations, etc., is it the expectation of the parties the claim should be denied or marked deficient?

## Appendix 4D Attachment A – Fixed and Variable Costs

- Many items such as repairs and maintenance and certain taxes are typically grouped together on P&L expense categories without further explanation or breakout. Of particular note on this appendix some items such as repairs and maintenance and taxes and licenses/property taxes/payroll taxes/unemployment taxes, etc. were listed having components of both a fixed and variable nature requiring a further breakout.

  If these items are not broken out on the P&Ls provided by the claimant, should the accountant use judgment to allocate to the expense categories or should the claim be put on hold to obtain more information from the claimant? Many claimants may not be able to provide a breakout to distinguish between certain items, and it may be difficult for them to create.

- Should expenses be considered if they do not appear on this list or is the list intended as an all-encompassing list of allowed costs for each claim? Adding verbiage to indicate the intent would provide additional clarity.

## Appendix 5 Multi-Facility Business Framework

- A "Multi-facility Business"...at its option, elect to file separate claims for each "Facility" as defined below, or may elect to file a consolidated claim for all Facilities. The claimant may not, however, elect to file a claim for any combination of Facilities comprising a subset of the claimant's Facilities". According to footnote #1, this is still a point of contention between parties – has this been settled?

- Page 2:  "The damage methodology set forth in the Compensation Frameworks for Business Economic Loss Claims shall be applied to each Claiming Facility, subject to the following modification:   All direct expenses associated with the Claiming Facility in the contemporaneously-prepared P&L statements, and only such expenses, must be included in the calculation." It appears that relevant variable expenses incurred at the corporate level may be excluded from the loss calculation.  Is that the intent here?

- It may be helpful to provide an example in the Framework to illustrate the above. (I.e. If a large grocery store has 200+ locations across the US and 20 locations across the Gulf are preparing to file a claim what combination of business/separate claims can be pursued according to the Framework?)

- As a point of interest, if the claimant chooses to file by separate locations, the opportunity to offset any gains is lost.

## Appendix 6 Failed Business Framework

- A failed-start up is defined as a business, which among other things, starts on or after 11/1/2008 (Appendix 6, page1). However, a start-up is defined as a business has less than 18 months of operating history prior to the spill, which if taken literally would mean October 19, 2008 – April 19, 2010 (Attachment 7, page 1). These dates are conflicting. Can some clarification of verbiage be applied to the definition of both types of start-up Frameworks?

HIGHLY CONFIDENTIAL
SUBJECT TO SETTLEMENT DISCUSSIONS CONFIDENTIALITY AGREEMENT
4/4/12

- Footnote #1 in attachments 6 notes this appendix does not apply to property development and/or construction businesses. Will these types of businesses be considered in a compensation Framework yet to be determined or just excluded?

- This Framework makes mention for the need of projections/forecasts. Projections are based on a fixed set of assumptions whereas a forecast would be the best estimate of what should take place in the market considering external economic factors. Any and all references to "projections" should be replaced with "forecasts" if the intent would be to estimate what would reasonably take place under the given market conditions.

**Appendix 7 Start-Up Businesses Framework**
- Footnote #1 in attachment 7 notes this appendix does not apply to property development and/or construction businesses. Will these types of businesses be considered in a compensation Framework yet to be determined or just excluded?

- This Framework makes mention for the need of projections/forecasts. Projections are based on a fixed set of assumptions whereas a forecast would be the best estimate of what should take place in the market considering external economic factors. Any and all references to "projections" should be replaced with "forecasts" if the intent would be to estimate what would reasonably take place under the given market conditions.

*Note on Individual Frameworks: The last available copy is dated 2/28/2012. Is a more recent draft available?*
**Appendix 8B Addendum to Individuals Framework – Benefits Losses**
- Are disability income insurance benefits and/or long-term care insurance benefits covered? These benefits are not specifically addressed under "Health Insurance".

**Appendix 8D Addendum to Individuals Framework - Interviews of Claimants Alleging Individual Economic Loss and Other Individuals Providing Sworn Statements in Support of Such a Claim**
- Our copy states "Still in Negotiation", is a more recent copy available?

**Other Comments**
- Class Counsel should coordinate directly with the relevant state agencies (i.e., Louisiana Department of Wildlife and Fisheries, Florida Fish and Wildlife Conservation Commission, etc.) to obtain historical Marine Fishery Trip Tickets on behalf of all claimants.  Obtaining this information has proven to be problematic for claimants in the past, as it requires the claimant to make a visit to the relevant state agency to make an in-person request for the documentation.

- To the extent possible, leverage off work previously performed, including but not limited to review of the "pilot" claims used to test the compensation framework for business economic loss claims in an effort to develop training materials, which can be shared for both internal training of newly hired accounting staff and external training for professional claims preparers.

# Exhibit N

| | |
|---|---|
| **From:** | Rice, Joe |
| **To:** | Bloom, Wendy L.; Godfrey, Richard C. |
| **CC:** | calvinfayard@fayardlaw.com; sherman@hhkc.com; Jim Roy; Elizabeth Cabraser; jeffrey.lennard@snrdenton.com; Wallace, Benee; Rice, Joe |
| **Sent:** | 4/10/2012 6:20:56 PM |
| **Subject:** | BP Oil - Comments to Document updates from Wendy Bloom April 9 & 10, 2012 |

This is an update as of 1:30 pm Eastern, Tuesday, April 10th.

I. Causation Requirements For Business Economic Loss Claims:

This document was in the done bucket and is attached to the AIP. Today BP has submitted a new version under Bates #027623 – 027636. The finalized version that is in the AIP is dated March 1, 2012. From a review of the document, the following changes have been requested.

1)  On page 27623, I(2), strike ""Commercial Fisherman," or." Joe would agree to this.

2)  In II, the proposed change is to strike "loss occurred" and insert "are located." Joe is not agreeable to that change.

3)  Footnote #1 at the bottom of the page, the request is to strike "developers" and insert "entities, individuals or claims not included within the Economic Class definition." Joe is not agreeable to this change. The second change in this paragraph is to strike "Causation requirements for these types of business economic loss claims will be presented separately." Joe is agreeable to strike that phrase.

4)  On page 027627, under III. Causation Requirements for Zone D, the proposed change is to strike "loss occurred" and insert "are located." Joe is not agreeable to that change.

Those are the only changes I noted on the proposed pages. Please bring to my attend if I missed anything else.

II. Framework for Individual Economic Loss Claims:

The PSC had signed off on the document with the only open issue being the use of economic loss. We proposed in the last draft, which was circulated on April 5th, to just use the term that has been adopted in the drafting of loss earnings income or profit, and that change was proposed on page 7 definition P. That was the only issue of contention between the parties as of April 5th.

Today Wendy has circulated an April 9th, 2012 draft from BP, bearing Bates #027651 – 027702.

These are my responses to her proposed changes:

1)  I am disappointed with trying to make significant changes at this late date.

2)  In paragraph P on 027657, I will not agree to the insertion of the phrase "from a Claiming Job."

3)  On page 027668 in paragraphs 5 and 7, the deletion of the word "Commission" is acceptable.

4)  That same change occurs on page 027677, and it is acceptable there as well.

5)  On page 027693, the additions to add the Non-Recurring Event Compensation back in for Category 3 in paragraph 5 and 7 are acceptable.

6)  On page 027701, the addition to Step 3 is acceptable because it makes the $20,000 still the cap, which was the agreement.

7)  On page 027702, the four insertions of the words "from the Claiming Job" are not acceptable.

III. Coastal Real Property Claims and Wetlands:

By April 9th memo Wendy wanted to insert the phrase, "The use of environmental data …" through "… resource damages." Joe has no objection to this inclusion if Calvin, Caroline, and John are okay with it.

IV.  Compensation Framework for Vessel Physical Damage Claims:

BP sent a draft of April 9, 2012, bearing Bates 027598 – 027609.  These are my comments.

1)   I. Eligibility Requirements (ii), strike the words "or pursuant to an insurance policy covering the Eligible Vessel."  The reason to strike this is, it is covered by subrogation, if it exists, and if we were going to allow you to claim this collateral source you would still be responsible for the deductibles and would have to write all that in.  Since it is covered by subrogation, it doesn't need to be here.

2)   Definition C, Physical Damage, add a second sub-paragraph, "ii)  Damage to nets, rakes, traps, or other gear used in the harvesting of Seafood."  Add to the end of sub-paragraph (i) the word "Or," so it would be (i) Or (ii).  The document as now drafted does not include the damage that would have been suffered when nets received heavy doses of oil from bringing stuff up off of the bottom or dragging it through a plume.  This leads to point number 3.

3)   The scope of the timing of the physical damage should be changed from April 2010 to December 2011.  With that change to 2011 that date has to be changed in the claim form in question 1, and then in the Documentation Requirements in question 2, and on the Verification in the lead-in paragraph.

**Joseph F. Rice**  | Attorney at Law | Motley Rice LLC
28 Bridgeside Blvd. | Mt. Pleasant, SC 29464
**o.** 843.216.9159 | **f.** 843.216.9290 | jrice@motleyrice.com

*dictated but not read*

Confidential & Privileged

Unless otherwise indicated or obvious from its nature, the information contained in this communication is attorney-client privileged and confidential information/work product. This communication is intended for the use of the individual or entity named above. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies—electronic, paper or otherwise—which you may have of this communication.