# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179  SECTION J |
| This document relates to: All Cases and No. 12-970 | * * * * * * | Honorable CARL J. BARBIER  Magistrate Judge SHUSHAN |

## DECLARATION OF RICHARD C. GODFREY

I, Richard C. Godfrey, do hereby declare that the following statements made by me under oath are true and accurate to the best of my knowledge, information and belief:

### Introduction

1. I serve as counsel for BP Exploration & Production Inc. and BP America Production Company, along with other BP entities that have been named as defendants in the above-captioned litigation (collectively, "BP"). I am a senior partner in the law firm of Kirkland & Ellis LLP. For more than 30 years, the focus of my practice has been complex litigation, including representing corporate defendants in trial and appellate courts in multiple putative class actions. I make this Declaration based upon my own personal knowledge.

2. The Economic and Property Damages Settlement Agreement ("Settlement Agreement"), as amended on May 2, 2012 (Rec. Doc. 6430-1),[1] was the result of many months of arm's-length negotiations between counsel representing the Plaintiffs' Steering Committee ("PSC" or "Class Counsel") and counsel for BP (collectively, the "Parties"). I personally

---

[1] All "Rec. Doc." numbers refer to MDL 2179.

1

participated in the settlement discussions and the negotiations as the lead outside counsel for BP. These negotiations first commenced in or around the first half of 2011 and concluded in April 2012.[2]

3. During the negotiations, I was involved in discussions with the PSC concerning the goals and basic approach for the Business Economic Loss Frameworks ("BEL Frameworks"), including Exhibit 4C regarding compensation.

4. While a number of individuals from or associated with the Plaintiffs' Steering Committee were involved in the settlement negotiations from time to time, I (along with others representing BP) principally discussed the goals and basic approach for the BEL Frameworks with Mr. Calvin Fayard of Fayard & Honeycutt and Mr. Joseph Rice of Motley Rice LLC.[3]

5. In accordance with the Court's October 25, 2013 Scheduling Order regarding the BEL Remand (Rec. Doc. 11735), I submit this Declaration to supplement the factual record regarding the intended meaning of Exhibit 4C as it applies to the calculation of a claimant's lost variable profits.

**Discussions with Class Counsel Relating to Exhibit 4C**

6. BP and Class Counsel had preliminary meetings in the first half of 2011 to discuss at a very high level the overall scope of a potential class settlement. As the Parties discussed the

---

[2] I previously submitted a declaration on August 13, 2012 that outlined a history of the Economic and Property Damages Settlement negotiations, including dates of meetings and participants. (*See* Declaration of Richard C. Godfrey, Rec. Doc. 7114-9.)

[3] I also engaged in settlement discussions at various points in time with other PSC lawyers such as Mr. James Roy of Domengeaux, Wright, Roy & Edwards, L.L.C. and Mr. Stephen Herman of Herman, Herman, Katz & Cotlar L.L.P., but my involvement in BEL discussions principally involved Mr. Fayard and Mr. Rice, and to a much lesser extent, and on a few occasions, Mr. Rhon Jones and Mr. John Tomlinson of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., and a PSC expert, Mr. Robert Michael Wallace. My recollection is that Mr. Jones and Mr. Tomlinson began participating at times in various settlement discussions starting in the summer of 2011.

2

possibility of settlement, certain themes in the Parties' discussions became readily apparent that would apply not only to BEL claims, but to the settlement as a whole.

7.      For example, during one of the first meetings I had with the PSC to discuss a possible settlement, Mr. Rice and Mr. Fayard made clear that any settlement must treat similarly situated claimants with similar economic losses alike from an economic perspective.  Mr. Rice routinely made this point throughout the course of the negotiations.  Indeed, during one of the early settlement meetings, for example, I recall that Mr. Rice gave us an example of two beachfront jet ski businesses close in proximity to each other, and he stressed that any proposed settlement would need to have a damages compensation methodology that treated and compensated these businesses in like fashion.  According to Mr. Rice, and as he saw it in contrast to the Gulf Coast Claims Facility, a Rule 23 class action settlement would need to set forth an objective framework and provide for court supervision, internal appellate procedures and other protections for claimants, and transparency and consistency in all stages of the claims process.  As I recall it, this point was made by Mr. Rice on various occasions throughout the negotiations.

8.      Later, while the BEL Frameworks were being drafted and up to the time the Settlement Agreement was executed, neither Mr. Rice nor anyone else from the PSC ever suggested that the availability of and/or the amount of compensation that a claimant would receive under the BEL Frameworks should or would turn simply on how financial data was recorded by a claimant, or would differ depending on whether a claimant presented records on an accrual or cash basis.  Instead, our discussions all aligned with the understanding that we jointly discussed during our negotiations that similarly situated people or businesses must be treated similarly from a compensation perspective.  That is why BP eventually agreed upon Exhibit

4C—a lost profits methodology—the stated purpose of which is to "compare[] the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn...." At no time did the PSC suggest a contrary view with respect to Exhibit 4C. Similarly, at no time after the first draft of what became the BEL Framework was exchanged between the parties on August 30, 2011 did Mr. Rice or anyone else from the PSC suggest or state to me that a claimant's "actual profit" for the BEL Frameworks would or even could be determined by measuring differences in cash flows, which as I understand it is not a lost profits methodology and does not determine lost profits.

9. Another constant theme from our negotiation discussions was the need to develop a standard, well-recognized compensation methodology that would comply with Rule 23. Recognizing the likely risk of a Rule 23 challenge to any class settlement reached, the Parties during the negotiations eventually focused on developing a basic lost profits methodology that was consistent with how courts often determine damages. A methodology that awarded differing compensation based on idiosyncrasies of a claimant's financial record keeping would not comply with Rule 23 in my view. The PSC never suggested to me that such an approach was to be part of the BEL Frameworks. Moreover, such a suggestion would have been inconsistent with the Parties' mutual desire to reach a settlement that could survive a Rule 23 challenge.

10. Another significant theme from the negotiations was that the Parties were seeking to compensate claimants for actual economic losses caused by the oil spill. From my discussions with Mr. Rice and his colleagues, my understanding was that the Parties were agreeing in Exhibit 4C to compensate businesses for economic loss by comparing the profits a claimant would have earned in the absence of the *Deepwater Horizon* spill and the actual profits earned by the claimant. The PSC wanted a lost-profits calculation methodology that could be consistently

4

applied to all claimants, and that would generate similar compensation outcomes for similarly situated claimants. At no time during the period while the BEL Frameworks were being drafted and prior to the execution of the Settlement Agreement did anyone from the PSC ever suggest or state to me that the determination of whether there was a compensable loss or the amount of compensation under the BEL Frameworks would depend and vary upon whether the books and records of a claimant were maintained on an accrual or cash basis. Likewise, at no time did anyone from the PSC ever suggest or state to me that Exhibit 4C would require subtracting the corresponding variable expenses from revenues (*i.e.*, the matching of revenues and expenses) for only some claims but not all claims.

11. Over the course of several months starting in late August 2011, the Parties exchanged drafts and proposals regarding the BEL Frameworks' lost profits calculation. These included BP's initial proposal to use a pre-spill variable margin, BP's proposal to use EBITDA and the PSC's proposal to use variable profit. For any of these options to measure lost profits accurately, they needed to (i) reflect revenues earned and not cash receipts, (ii) reflect expenses and not cash expenditures, and (iii) ensure that corresponding variable expenses incurred in generating those revenues would be subtracted from the revenues.

12. In fact, BP during the negotiations demanded, and it was subsequently agreed, that the Settlement Program would hire as many accountants as necessary so that they could make the key determinations regarding revenues and expenses with respect to and in accordance with what eventually became Exhibit 4C of the Settlement Agreement. There was no suggestion made by the PSC to me that the Settlement Program would simply take a claimant's financial records as given (or in the form maintained at the claimant's business) under the BEL Frameworks. Instead, financial records would need to be scrutinized and analyzed by the

accountants in order for them to accurately determine a claimant's revenues and corresponding variable expenses under Exhibit 4C.

13. In short, nothing said or suggested to me in the negotiation process indicated that the Plaintiffs' Steering Committee, eventually appointed as Class Counsel, ever intended prior to the execution of the Settlement Agreement to calculate compensable lost profits under Exhibit 4C in a manner that was inconsistent with BP's view, which was—in accordance with Exhibit 4C—to compensate claimants for reductions in variable profit by taking revenues earned during a period and subtracting the corresponding variable expenses incurred to generate that revenue.

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true to the best of my knowledge, belief, and information.

_____
Richard C. Godfrey

Dated: November 7, 2013