# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179 <br> SECTION J |
| | * * * | HONORABLE CARL J. BARBIER |
| This document relates to Civ. A. No. 12-970. | * * * | MAGISTRATE JUDGE SHUSHAN |

**DECLARATION OF BRIAN L. GASPARDO**

I, Brian L. Gaspardo, hereby declare and state as follows:

1. I am over the age of 21 years and a resident of the State of Illinois. Unless otherwise stated, I have personal knowledge of the facts set forth herein and, if called to do so, could testify truthfully thereto.

2. In accordance with the Court's October 25, 2013 Scheduling Order regarding the BEL Remand (Rec. Doc. 11735), I submit this Declaration to supplement the factual record regarding the intended meaning of Exhibit 4C as it applies to the calculation of a claimant's lost variable profits.

3. I am the Managing Member of O'Neill & Gaspardo, LLC, a consulting and CPA firm located in Mokena, Illinois. I am a Certified Public Accountant and have over 20 years of professional experience performing audit, tax, accounting, business valuation, financial analysis, and consulting services for clients throughout the United States. I received a B.A. in economics from Harvard University in 1991 and an M.B.A. from the University of Chicago in 2001. I serve on the Boards of Old Plank Trail Bank and La Rabida Children's Hospital in Chicago.

1

4.     I was a participant, on behalf of BP, at many negotiating sessions with representatives of the Plaintiffs' Steering Committee ("PSC") that ultimately resulted in the Settlement Agreement executed by the parties on April 18, 2012 ("Settlement Agreement").

**The Settlement Agreement Relies on a "Lost Profits" Framework**

5.     I participated in negotiating sessions of the Accounting Working Group.[1]  In sessions of that group that I attended, representatives of both BP and the PSC consistently asserted that the purpose of the Compensation Framework for BEL claimants was to compensate businesses for lost profits due to the Deepwater Horizon oil spill.  The parties discussed the fact that under the Settlement Agreement this would be accomplished by comparing the profits a claimant would have earned if the spill had not occurred to the actual profits earned by the claimant.  At no point did a representative of either party state that they were seeking a measure of damages other than an accurate measure of lost profits that appropriately captured economic reality.

6.     In particular, at no point did a representative of either party suggest that an economically rational measure of lost profits would not require that expenses be matched to the revenue those expenses generated.  To the contrary, this concept was inherent in the parties' discussion of which expenses would be classified as "fixed" and which would be categorized as

---

[1]  The Accounting Working Group was a subset of the larger negotiating group.  It met approximately ten times for an hour or two during each meeting.  Members of the group included the following individuals from BP:  Hal Sider (Compass Lexecon), Evan McKay (Compass Lexecon), George Hickey (Compass Lexecon), Jim Olin (C2G Advisors, LLC), Craig Elson (CRA International), Renee McMahon (CRA International), Charles Douglas (Kirkland & Ellis LLP), and Andrew Karron (Arnold & Porter LLP); as well as counsel and experts from the PSC:  John Tomlinson (Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.), Rhon Jones (Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.), Michael Scott (Carr Riggs & Ingram, LLC), and Robert M. Wallace (consulting accountant).  Most of these individuals attended most meetings, although not every member was present at every meeting and other individuals joined some meetings.

2

"variable" under the Settlement Agreement.  This distinction between "fixed" and "variable" was critical because Exhibit 4C provides that variable profits are to be determined by subtracting "corresponding variable expenses" from revenue; fixed expenses are excluded from the computation.

7.	In an Accounting Working Group meeting devoted to the topic of distinguishing fixed from variable expenses, the PSC, specifically Mr. Scott, proposed that the test for whether a given expense qualified as a variable expense would be whether the expense changed as revenue changed—in other words, whether the expense varied with revenue.  I understood this definition of variable expense as a clear recognition by the PSC and its accounting advisors that a variable expense must inherently be tied to the revenue generated by that expense.

### Adjustments to Claimants' Financial Statements Are Necessary

8.	Representatives of both parties also stated that they recognized that monthly financial statements from claimants would often be unreliable and that to ensure statements were relevant and reliable the Claims Administrator would be required to review the statements submitted by claimants, request additional documentation, and make adjustments.

9.	During the course of negotiations, BP never agreed that it would be acceptable if claimants failed to allocate revenue in the appropriate months, refused to match expenses to the revenue those expenses generated, or defined "corresponding variable expenses" in a manner such that expenses do not correspond to the revenue they generated.  Rather, BP relied on the fact that the accountants in the CSSP would detect these irregularities and engage in these very adjustments.[2]

---

[2]  Throughout this declaration, I refer to the CSSP.  At the time of negotiations, we referred generally to this concept of the body that would review claimants submissions as the "claims facility," "Claims Administrator," or "whatever takes the place of the GCCF."

3

10. The representatives of the PSC often stated that the Claims Administrator would need to make adjustments to claimants' P&L statements. The PSC and BP agreed, and often said, that the role of the Claims Administrator would be to investigate anomalies in the claimants' records and make corrections as needed. Bonuses were one example of an expense discussed by the parties that would need to be allocated to the time in which the services were rendered (and bonus/revenue earned). During an Accounting Working Group meeting in the fall of 2011, the parties discussed how to handle a bonus paid by a claimant at a single point during the year. Mr. Wallace acknowledged that the Claims Administrator would be responsible for allocating expenses like bonuses across the months in which they were incurred. In the case of a bonus, this meant allocating the single expense into smaller expenses across the months in which the work was performed. From the discussion about this example, I understood that the Claims Administrator would be responsible for recording revenue in the proper months and matching expenses to the revenue generated by those expenses.

11. To accommodate the need for adjustments in claimants' statements, Exhibit 4A contains provisions that require the claimant to provide additional documentation upon request by the Claims Administrator and which allow the Claims Administrator to make correcting adjustments as necessary. I had direct involvement in the negotiation of the terms of Exhibit 4A. During negotiations of the terms, BP requested more stringent documentation requirements, including sales by customer by month, shipping logs, inventory reports, project management software reports, and other specific documents. In the Accounting Working Group, the PSC expressed concerns that expanding the list of required documents could be overly burdensome for some claimants and that different documents would be needed for different industries and claimants.

12. To resolve this conflict between the PSC's desire for a claimant-friendly process and BP's insistence that sufficient records be produced to allow for the adjustments necessary to determine lost profits consistent with economic reality, the PSC, specifically Joe Rice, suggested that the Settlement Agreement need not have an expansive list of additional documents required because the Claims Administrator should have the ability to request additional documents as necessary. This agreement, which accomplished both parties' goals, was embodied in the statement that the Claims Administrator may "request source documents for profit and loss statements."[3]

13. The agreed purpose of Exhibit 4A was to allow the Claims Administrator to confirm the accuracy of monthly financial statements as submitted or receive the detail necessary to adjust and accurately reflect monthly financial statements. I recall that the Accounting Working Group discussed what would be done when anomalies in monthly P&L statements were encountered by the CSSP. The conclusion of BP and PSC was that when such anomalies appeared, the Claims Administrator had the ability to investigate such issues, ask for additional documentation, and take action to ensure that the statements provided an accurate and reliable measure of economic loss.

### Accounting Experts Are a Necessary Element of Claims Administration

14. In keeping with the recognition that the Claims Administrator would be required to make adjustments to claimants' financial statements, representatives of the PSC repeatedly

---

[3] Exhibit 4A states, "The Claims Administrator may, in his discretion, request source documents for profit and loss statements. If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation."

expressed their expectation that the Claims Administrator would be required to exercise accounting expertise.

15. On or about September 28, 2011, for instance, Mr. Wallace provided a sample of claimant data for the stated purpose of illustrating the need for accounting expertise. The claimant in the example was a seafood processor. Mr. Wallace provided his computation of how this claimant should be treated and how he believed compensation computations should be performed. In his example, Mr. Wallace made an apparent adjustment from a standard cost used by this claimant to an accounting of actual costs across months. Mr. Wallace also made two points with his example: First, it would be impossible to standardize claims processing because each claimant will have idiosyncrasies in how they reflect and record data; and, second, it would be necessary for the Claims Administrator (or his accountants) to have the accounting expertise to address differences in the accounting approach taken by claimants in order to make the adjustments necessary to treat similarly situated businesses similarly.

16. The PSC consistently urged the CSSP to hire accounting firms that would be capable of exercising their judgment and expertise in the resolution of claims. The PSC's original concern, as expressed in negotiations, was that the burden to provide accurate and reliable accounting records suitable for use in a lost profits analysis should not rest on claimants, but that they should be able to "come as they are," bringing contemporaneous financial information as kept in the ordinary course. PwC was already employed in the GCCF process, and the parties discussed the fact that PwC made adjustments in the course of their GCCF work (although a PSC complaint was that those adjustments were not done in an open way and shared with claimants). Mr. Wallace stated that it was necessary to have experienced accountants who would be able to treat similarly situated claims in the same manner. The PSC also recommended

hiring Postelthwaite & Netterville. It was my understanding, based on many negotiating sessions with the PSC, that the two accounting firms, PwC and Postelthwaite & Netterville, would apply skills well beyond data entry.

17. The role of the accounting professionals hired by the CSSP was also recognized by Mr. Rice during negotiations over the content of documents required by Exhibit 4A to the Settlement Agreement. For example, Mr. Rice argued that extensive production of documents should not be required of claimants to guard against fraud because there would be an accountant review of claimants' files which would then determine if additional production was warranted. The PSC stated in a September 28, 2011 document outlining the Claims Data Collection Procedure that the accountants hired would review the information received from the claimants and would perform the required calculations "[i]f reviewed items appear reasonable relative [to] monthly revenues." By implication, items that contain errors and misstatements or don't reflect economic reality would be unreasonable and the accountants would not use those documents to calculate compensation without making adjustments necessary to reflect economic performance and reality.

## BP Did Not Agree to Limit CSSP's Scrutiny of Claims

18. From late October through early November 2011, the PSC provided claimant data to perform a limited exercise. As part of this exercise, I reviewed several Excel spreadsheets described as "calculation worksheets/data entry files" provided by the PSC on or about October 17, 2011. In them is a footnote, apparently created by PSC, which states, "Some claimants (e.g. Seafood Processors) may report monthly processing costs using standard cost accounting systems. In these instances, COGS must be adjusted to reflect the ACTUAL monthly costs." The reference to adjusting expenses to reflect "ACTUAL monthly costs" is consistent with the

statements made by representatives of the PSC, including Mr. Wallace and Mr. Scott, throughout negotiations.

19. This process was not designed to replicate the analysis that the CSSP would later undertake. The PSC did not provide the full files for the claimants and withheld much of the information about these claimants, consistent with the purpose of the exercise. Although I was not responsible for BP's calculations using the data provided by the PSC in October 2011, I was present for the discussion between the parties. First, the purpose of the exercise was not to confirm the accuracy of the underlying monthly data or conform data to economic reality. Second, the data provided would not have been adequate to detect trends or evaluate whether further testing was necessary and, as a result, no such analysis was performed. Third, there was no analysis of whether the monthly data provided in these examples was accurately measured because there was no opportunity to understand the claimant's business, ask questions of the claimant, or obtain documentation (including tax returns, which are required under the Settlement Agreement). Without this information, it was impossible to assess the reasonableness and economic reality of the monthly statements presented, and therefore such an analysis was not performed. Even if a request for additional data could have been made, such a request would have had no purpose since the Accounting Working Group was not making a judgment about how much the claimant was actually entitled to recover.

20. I recall that in one of the examples discussed in late October or early November, 2011, the parties noted an anomaly in the data. Rather than seek to correct this anomaly, the parties simply used the data in the exercise and acknowledged that were the example a real claim, the CSSP would inquire and request additional documents necessary to assess the economic reality.

**BP Believed that the CSSP Would Attempt to Measure Economic Performance**

21. The representatives of PSC never said to BP that the CSSP would fail to match corresponding variable expenses to the revenue generated by that expense. Approximately one month before the parties signed the Settlement Agreement, I attended a meeting in New Orleans with Mr. Hacker of PricewaterhouseCoopers LLP. Mr. Hacker suggested that Step One of Exhibit 4C could be calculated in a way different from that which the parties had negotiated and agreed. He suggested that the calculation of Variable Profit could be calculated with "less work" by using an element of Step Two that avoided the calculation of "corresponding variable expenses" on a monthly basis for the post-spill period. Mr. Hacker did not indicate that if the parties failed to accept his suggestion, he would not match revenue to corresponding variable expenses. In fact, this statement indicated to me that Mr. Hacker understood that the process of matching revenue to corresponding variable expenses would be a necessary element of his work under the agreed to language. Moreover, to my knowledge, the PSC never suggested that Mr. Hacker would not perform matching under the Settlement Agreement.

22. I subsequently reviewed a memo from Mr. Hacker dated April 4, 2012, in which he again raised the alternate method of calculation, which would "[h]ave the potential of more accurately matching revenue with expenses by consistently using a longer base period" and "[r]educe the amount of work required to complete Step 1." Again, the PSC did not agree to this proposal, but there was no indication from Mr. Hacker or the PSC that the CSSP would not perform the "work" Mr. Hacker described as "accurately matching revenue with expenses."

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true to the best of my knowledge, belief, and information.

Dated: November 7, 2013

_____
Brian L. Gaspardo