**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This document relates to: All Cases and No. 12-970 | * * * * | Honorable CARL J. BARBIER |
| | * * | Magistrate Judge SHUSHAN |

**MEMORANDUM IN SUPPORT OF
MOTION TO AMEND SCHEDULING ORDER RE BEL REMAND AND
PRELIMINARY INJUNCTION RELATING TO BEL CLAIMS**

The class definition agreed to by the parties and approved by the Court includes within the class *only* those persons who suffered damages and whose damages arose "as a result of" the Oil Spill.  The agreed-to class definition satisfies Article III because it ensures that the class members have standing.  The agreed-to class definition also satisfies Rule 23 because it joins as class members only those persons whose damages were incurred "as a result of" a common accident – the Oil Spill.  As this Court recognized in approving the Settlement, "persons with marginal or potentially worthless claims, whose presence could have complicated the settlement process, were excluded from the proposed class."[1]

The Claims Administrator, however, has rewritten the class definition as a matter of policy or practice by consciously and systematically paying claimants whose losses lack a causal connection with the Oil Spill.  He has done this, in part, by misreading Exhibit 4B to permit such a result, missing the import of the pivotal language in footnote 1 of that Exhibit:  "Th[ese] Causation Requirements for Business Economic Claims do[] *not* apply to . . . Entities,

---

[1]    Order and Reasons Granting Final Approval of the Economic and Property Damages Settlement Agreement at 33, Dec. 21, 2012, Doc. No. 8138.

Individuals or Claims **not** included with the Economic Class definition . . . ."[2]  In place of the agreed-to definition, which confines the class to claimants who suffered loss "as a result of" the Oil Spill, the Claims Administrator has further erred by substituting a definition of economic loss that awards compensation to claimants in the Gulf region who assert that they suffered loss shortly after the Oil Spill, without regard to any actual causal connection between their loss and the Spill.  As the Claims Administrator forthrightly informed the Fifth Circuit "BEL" panel, his accounting team has reviewed and paid claims "for losses that a reasonable observer might conclude **were not in any way related to** the Oil Spill."[3]  He has certainly paid at least $76 million in claims where it was clear from the claims file itself that the Oil Spill was not the cause of any losses.  And he has paid another $546 million or more in claims where any "reasonable observer" would conclude that the losses "were not in any way related" to the Spill.

Recognizing the grave Article III and Rule 23 problems that would result if the class were defined to include persons and businesses that did not suffer losses resulting from the spill, Judge Clement concluded that in "[a]llowing recovery from the settlement fund by those who have no case and cannot state a claim" — i.e., claimants who suffered no loss or loss that was not caused by the oil spill – "the court acts *ultra vires*."[4]  Thus, "[s]hould BP's proposed interpretation of the Settlement exclude putative class members with no colorable legal claim,

---

[2]   Settlement Agreement Ex. 4B n.1, May 3, 2012, Doc. No. 6430-9.

[3]   Brief of Appellees Deepwater Horizon Court Supervised Settlement Program at 16, *In re Deepwater Horizon*, Nos. 13-30315 & 13-30329 (5th Cir. May 24, 2013) (emphasis added).

[4]   *In re Deepwater Horizon*, No. 13-30315, slip op. at 28 (5th Cir. Oct. 2, 2013) ("BEL Decision").

the district court should have rendered the Settlement lawful by adopting that interpretation, as long as the interpretation is reasonable and effective."[5]

Regarding the remand's scope, Judge Clement stated that issues concerning standing "can be considered in evaluating the correct interpretation of possible ambiguities in this agreement" lest an interpretation of the Settlement Agreement continue that perpetuates *ultra vires* acts and "imperil[s] a final approval of the settlement."[6]  Judge Southwick concurred about the scope of the remand proceedings.  He "would not make the pronouncements that appear in Part II," believing them to be premature, but said that "[i]nstead, I would defer the issue and allow the parties on remand to give it the attention it deserves."[7]  Thus, while Judge Southwick declined to address the causation issues **pre-remand** absent further factual development, he joined Judge Clement in saying that it is appropriate for this Court to give the issue "the attention it deserves" **after** remand.[8]

---

[5]   *Id.* at 31.

[6]   *Id.* at 33.

[7]   *Id.* at 37 (Southwick, J., concurring).

[8]   It was Class Counsel who first called attention to the interaction of loss and causation, arguing that proof of loss pursuant to Exhibit 4B substituted for proof of causal nexus.  The issue of standing was before the Fifth Circuit in any event, as it is before every court at every stage in the proceedings.  *See Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 n.6 (5th Cir. 2002) ("[B]ecause 'standing is a jurisdictional requirement, [it] may always be addressed for the first time on appeal.'") (quoting *Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001)); *see also Ford v. Nylcare Health Plans of the Gulf Coast, Inc.*, 301 F.3d 329, 331-32 (5th Cir. 2002) ("Although Article III constitutional standing was not raised by the parties or considered by the district court, we must – where necessary – raise it *sua sponte*."); *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496 (5th Cir. 2007) (en banc) (after voting to hear the appeal en banc, upon further review of the record "which we are bound to make," *sua sponte* vacating the judgment of the district court for lack of standing).

Similarly, the Court has an independent duty to evaluate compliance with Rule 23; this issue cannot be waived.  *See, e.g., Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998); *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003).

Thus, BP respectfully disagrees with the Court's determination that the parties may not submit evidence regarding causation as it concerns Article III standing and Rule 23, but may only file additional fact evidence regarding "the intended meaning of Exhibit 4C."[9]  BP accordingly seeks to show that the Administrator (i) has adopted a policy or practice (ii) that rewrites the class definition and (iii) authorizes the payment of claims that lack a causal nexus to the Oil Spill.

This memorandum sets forth in summary fashion BP's proffer of evidence and argument.

## I.   THE SETTLEMENT AGREEMENT, AS APPROVED BY THE COURT, CONFINES THE CLASS TO PERSONS INJURED AS A RESULT OF THE OIL SPILL

### A.   The Class Definition

The class definition is paramount for determining whether the class satisfies the requirements of Article III and Rule 23, and whether paying claims without a causal nexus to the Oil Spill are *ultra vires*.  The Settlement Agreement did not define the class in terms of economic loss alone.  Individuals and entities who meet the geographical prerequisites for class membership "are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories."  And the "Economic Damage Category" is limited to any "[l]oss of income, earnings or profits suffered by Natural Persons or Entities *as a result of* the Deepwater Horizon Incident . . . ."[10]

---

[9]   Scheduling Order Regarding BEL Remand at 2, Oct. 25, 2013, Doc. No. 11735.

[10]   Settlement Agreement ¶¶ 1.3, 1.3.1.2, May 3, 2012, ECF No. 6430-1 (emphasis added). Similarly, the Subsistence Damage Category is limited to persons who relied on subsistence resources that were "diminished or restricted . . . due to or resulting from the Deepwater Horizon Incident"; the Vessel Damage Category is limited to physical damage sustained by an eligible vessel "due to or resulting from the Deepwater Horizon Incident"; and employees of businesses in Support Services to Oil and Gas Industry are limited to "non-oil and gas industry Economic Damages due to or resulting from the Deepwater Horizon Incident."  *Id*. ¶¶ 1.3.1.3, 1.3.1.5, 1.3.1.10.

**B.     The Settlement Agreement Taken As a Whole**

Not just the class definition, but the Settlement Agreement as a whole requires that claimants have suffered economic loss that can be causally connected to the Oil Spill.  The Agreement preamble, the class notice, the settlement website, the claims form, and the release all reflect this requirement.

1.     The preamble to the Settlement Agreement states that the Agreement's purpose "is to settle all ***and only*** the Released Claims of the Economic Class, Plaintiffs, and Economic Class Members . . . ."[11]  Released Claims, in turn, are defined as "all claims ***arising out of, due to, resulting from, or relating in any way to, directly or indirectly,*** the Deepwater Horizon Incident."[12]

2.     The detailed class notice advises potential class members that "[i]f you had economic loss or property damage ***because of*** the Deepwater Horizon oil spill, you could get money from a class action settlement," and that "[i]f you are included in the Economic & Property Damages Settlement, you may receive money if you have been ***damaged by*** the Deepwater Horizon oil spill . . . ."  The notice further explains that in order for a claimant to determine whether he is a class member, he must answer two questions: "Do you have any economic loss ***arising out of*** the Deepwater Horizon Incident?" or "Was your real or personal property damaged ***as a result of*** the Deepwater Horizon Incident?"[13]  At no time did the Court or

---

[11]   Settlement Agreement at 1 (emphasis added).

[12]   *Id.* ¶ 10.2 (emphasis added).

[13]   Detailed Class Notice at 1, 6-7, Deepwater Horizon Claims Center Economic & Property Damage Claims, http://www.deepwaterhorizoneconomicsettlement.com/docs/Economic_Detailed_Notice_English_8.28.2012.pdf (last visited Nov. 7, 2013) (emphasis added).

Class Counsel tell class members before final approval of the settlement that a person or business could claim for losses under the Settlement that were ***not*** caused by the oil spill.

     3.     The settlement website also tells potential class members that recoverable damage is loss suffered "***as a result of*** the Deepwater Horizon Incident."[14]

     4.     The instruction booklet for the claims form explains that a Business Economic Loss Claim "is for businesses . . . that assert economic loss ***due to*** the Spill," and that the Economic Loss Class includes those natural persons and entities "suffering an economic loss which was ***a result of*** the Deepwater Horizon Incident."[15]

     5.     And the first page of the claims form itself, which must be signed under penalty of perjury, states that "[t]he Business Economic Loss Claim is for businesses . . . that assert economic loss ***due to*** the Spill."[16]

     Each of these elements of the Settlement Agreement provides an independent reason to avoid the Rule 23, Rules Enabling Act, and Article III problems that, as Judge Clement said, should be avoided if at all possible in construing the Agreement.  ***Together***, these elements constitute a mutually reinforcing thicket of provisions that negate any reading of the Agreement that would pay for losses both causally connected to the spill and not causally connected.

---

[14]   FAQs, Deepwater Horizon Claims Center Economic & Property Damage Claims, https://cert.gardencitygroup.com/dwh/fs/faq?.delloginType=faqs#Q2 (last visited Nov. 7, 2013) (emphasis added).

[15]   Instructions for Completing the Business Economic Loss Claim Form at 3-4, Mar. 20, 2013, Doc. No. 8964-34 (emphasis added).

[16]   Business Economic Loss Claim Form at 1, Mar. 20, 2013, Doc. No. 8964-33 (emphasis added).

### C.     Rule 23 Does Not Permit Certification of a Class Defined to Include Members Who Suffered No Injury At All or No Injury Caused by BP.

The class definition's requirement that loss be "as a result of" the spill is not a happenstance of the parties' agreement, but both a constitutional imperative and a requirement for court-approved class certification pursuant to Rule 23 and the Rules Enabling Act.  In a private settlement, the parties can make whatever agreement they wish.  But "[a] class settlement is not a private agreement between the parties."[17]  Rather, as Judge Clement explained, "[i]t is a creature of Rule 23, which authorizes its use to resolve the legal claims of a class 'only with the court's approval'" – approval that "must, as always, adhere to the precepts of Article III and the Rules Enabling Act." [18] If the class definition is interpreted to sweep within it significant numbers of businesses that did not suffer any loss resulting from the Oil Spill — and thus would have no claim against BP — the Settlement cannot survive review under Rule 23. This is true for the reasons fully set forth in BP's briefs in the BEL Appeal[19] and summarized here:

1.     ***Adequacy Would Be Defeated.***  Rule 23(a)(4) provides that a class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To satisfy this requirement, "[a] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (quotation omitted). Notwithstanding the fact that the class encompasses individuals and businesses from across the Gulf who experienced different types of economic injuries, the Court concluded that Class

---

[17]   BEL Decision at 30.

[18]   *Id.*

[19]   *See* Brief for Appellants BP Exploration & Production Inc., BP America Production Company, and BP p.l.c., *In re Deepwater Horizon*, Nos. 13-30315 & 13-30329 (5th Cir. May 3, 2013).

Counsel could represent the entire class, in part because "persons with marginal or potentially worthless claims . . . were excluded from the proposed class."[20]  The Claims Administrator's misinterpretation of the class definition turns this understanding on its head by including persons within the class who did not suffer injury as a result of the Oil Spill.  Moreover, it is contrary to Rule 23(a)(4) to expect that the same class counsel can adequately represent both legitimate claimants, who were harmed by the Spill, as well as interlopers, who seek recovery based on an incident that did not harm them.

2. ***Commonality, Predominance, and Typicality Would Be Defeated.***  Rule 23(a)(2) and 23(b)(3) require that class members share common issues, and that those common issues predominate over individual ones.  The commonality requirement of Rule 23(a)(2) requires that the class members "have suffered the same injury," *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (internal quotation omitted), and the predominance requirement of Rule 23(b)(3) is even "more stringent."  *See Amchem Prods.*, 521 U.S. at 609.[21]  These demanding tests cannot be satisfied where the class is redefined to include potentially unlimited numbers of individuals and businesses whose losses did not result from the Spill and who, by definition, have not therefore suffered the same injury as other class members.[22]

---

[20]  Order and Reasons Granting Final Approval of the Economic and Property Damages Settlement Agreement at 33.

[21]  *See also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (holding that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable" to plaintiffs' theory of liability); *accord Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006).

[22]  *See Banda v. Corzine*, Civ. No. 07-4508, 2007 WL 3243917, at *17 (D.N.J. Nov. 1, 2007) (presence of persons who "have no claim whatsoever . . . prevent[s] fulfillment of the commonality-of-claims requirement").  And since "[t]he commonality and typicality requirements of Rule 23(a) tend to merge," *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982), the claims of the representative parties are also no longer typical in light of the Claims Administrator's interpretation of the class definition.

3.       ***The Class Notice Would Be Rendered Defective.***  Rule 23(c)(2)(B)(ii) provides that the class notice must state "the definition of the class certified."  Yet the class notice here did not say that persons without losses caused by the spill were part of the class, as the Claims Administrator has now interpreted and applied the definition; the notice said the opposite.  *See supra* I.B(2).  Thus, the class notice was inadequate.

4.       ***Superiority and Fairness Would Be Destroyed.***  The superiority requirement of Rule 23(b)(3) seeks to "'achieve economies of time, effort, and expense, and promote ***uniformity of decision as to persons similarly situated*** . . . .'" *Amchem*, 521 U.S. at 615 (emphasis added) (quoting Fed. R. Civ. P. 23 Advisory Committee's Note, 39 F.R.D. 69, 102-03 (1966)).  But by reading the causal-nexus requirement out of the class definition, the Claims Administrator treats uniformly persons who are not similarly situated – that is, persons whose injuries are causally connected to the Spill and those whose injuries are, at most, temporally connected.

5.       ***Class Membership Would Be Rendered Non-Ascertainable.***  Rule 23 requires that the class be "adequately defined and clearly ascertainable." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (internal quotation marks omitted).  The agreed-to definition meets that standard.  The Claims Administrator's redefinition of the class to exclude a causal nexus requirement does not meet the standard, because no one can be sure which losses lacking any certain connection to the Spill will be compensated.  *See Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 689 (S.D. Fla. 2006) (the class definition must base membership on a "rational demarcation"), *aff'd on other grounds by* 582 F.3d 1227 (11th Cir. 2009).

The Claims Administrator's rewritten class definition would thus be fatal to certification under Rule 23.  For that reason, BP submits, it cannot be a correct interpretation of the parties' agreement.

### D.      Article III Standing Requires That a Class Member's Injury Be Causally Connected to the Defendant's Conduct

Article III standing requires that the plaintiff's injury be "fairly . . . trace[able]" to the defendant's challenged conduct.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).  That test of traceability, according to the Supreme Court, "is not 'an ingenious academic exercise in the conceivable.'"  *Id*. at 566 (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688 (1973)).  Thus, for purposes of Article III, the plaintiff lacks standing who sues the blacksmith for failing to secure the nail in the horseshoe that hobbled the horse that threw the general who hit his head and lost the battle, and thereby the war, leading to the destruction of plaintiff's property.  The plaintiff's claim is no stronger when he simply alleges that his property was destroyed around the same time that the blacksmith failed to secure the nail.  The parties' joint expert, Professor John Coffee, assured the Court that the Settlement Agreement's class definition excluded persons with just such indirect claims of economic loss:

> [N]ot only is the class compact, but ***the chain of causation is kept short***.  Causation of the injuries covered by the Settlement Agreement inevitably leads back to the Macondo well blowout, the Deepwater Horizon explosion and the resulting oil spill.  ***Although it might be possible to argue that persons at considerable distance from the explosion and oil spill were economically injured through layoffs or reduced business activity, the class definition stops well short of attempting to incorporate such claims***.[23]

---

[23]   Decl. of John Coffee ¶ 5, Aug. 10, 2012, Doc. No. 7110-3 (emphasis added).

It is broadly accepted that a class must be so defined that the members will have standing. *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("[I]f the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad."); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("The class must therefore be defined in such a way that anyone within it would have standing."); *Red v. Kraft Foods, Inc.*, No. CV 10-1028-GW, 2011 WL 4599833, at *5 (C.D. Cal. Sept. 29, 2011) ("[A] class definition can only include prospective plaintiffs who have Article III standing.").[24]  Here, the parties crafted a definition of class membership that honors the constitutional standing requirement.  The definition keeps the chain of causation short precisely because a plaintiff's injury must be fairly traceable to the defendant's conduct.  The Claims Administrator, however, has rewritten the class definition by adopting a policy and following a practice that reads the causal-nexus requirement out of the definition.  And pursuant to that rewritten definition, he has systematically paid claimants whose "loss of income, earnings, or profits" was not suffered "as a result of" the Oil Spill.

## II.     CONTRARY TO THE CLASS DEFINITION AND IN VIOLATION OF ARTICLE III AND RULE 23 REQUIREMENTS, THE CLAIMS ADMINISTRATOR HAS PAID $600 MILLION OR MORE IN CLAIMS FOR LOSSES THAT LACK CAUSAL NEXUS TO THE OIL SPILL

Despite the class definition's requirement that class members have losses suffered "as a result of" the Oil Spill, and despite Professor Coffee's explanation that the definition keeps the chain of causation "short," the Claims Administrator has systematically disregarded the class

---

[24]   The courts of appeals for the Second, Eighth and Ninth Circuits go further and state that every member of the class must have standing.  *Denney*, 443 F.3d at 264 ("[N]o class may be certified that contains members lacking Article III standing"); *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 779 (8th Cir. 2013) ("'[A] named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves.'" (quoting *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010))); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (citing *Denney*).

definition and paid claims for losses that lack a causal connection to the Spill.  He has paid, to use his own words, claims "for losses that a reasonable observer might conclude **were not in any way related to** the Oil Spill."  And he has done so deliberately, pursuant to a policy or practice that changes the class definition to include persons and entities who lack standing.

Representative of such no-nexus claims is Claim No. XXXX60, filed by an attorney in Northern Louisiana (Zone D). The Claims Administrator awarded him $172,000. His lower revenues were not due to the Oil Spill, however, but to the fact that his business license was revoked *in 2009* and not reinstated until 2012.[25]  Much the same is true of the excavation company located Zone D (Alabama) that sold substantially all of its assets in 2009 and therefore saw a drop in revenue from more than $20 million in 2009 to less than $1 million in 2010.  The decline in revenue had absolutely nothing to do with the Spill, of course, but was the direct result of the company's pre-Spill sale of its business-generating assets.[26]  The Claims Administrator nevertheless awarded the company more than $3.5 million. And he paid $4 million to a storm clean-up and construction company that had a banner year in 2008 when it received $30 million in FEMA contracts for clean-up activities following Hurricanes Gustav and Ike, but had dramatically reduced revenues in 2010 when there were no major hurricanes.[27] The Oil Spill had nothing to do with the fact that, *before* the Spill, the lawyer lost his license, the excavation company sold its assets, and the clean-up company enjoyed a revenue spike because of a hurricane season double-whammy.

---

[25]   Decl. of Allison B. Rumsey App. A, ¶ 2, Nov. 7, 2013 (attached as Exhibit A).

[26]   *Id.* App. A, ¶ 24.

[27]   *Id.* App. A, ¶ 15.

We cannot be sure precisely how many such claims the Administrator has paid so far. But our review indicates that he has paid $76 million to claimants whose losses were clearly caused by events other than the Oil Spill (as in the examples above) and approximately $546 million to claimants far-removed from the Spill whose businesses (e.g., farms, law firms, healthcare, manufacturing, etc.) have no logical connection with the Spill, and certainly not by a short chain of causation.[28]

It is no surprise that such claims have been filed, for plaintiffs' counsel have placed advertisements that contradict the class definition and tell residents in the Gulf region that "[t]he craziest thing about the settlement is that you can be compensated for losses that are

---

[28]   Rumsey Decl. ¶¶ 4, 5 & App. B. BP believes that the number of claim awards paid to those having damages unrelated to the Spill is much greater than the list in paragraph 4 for the reasons given in that paragraph.  Moreover, as noted in prior submissions, the pattern of claims is at odds with economic reality.  If the class definition ensures that the chain of causation is short, as Professor Coffee explained, then the fewest number of claims should arise in those areas at the greatest distance from the Spill.  Instead, the pattern is of increasing claims *from Zone D* – and from businesses like farming, manufacturing, healthcare and professional services, whose economic vitality has no apparent connection to oil drilling in the Gulf – with the total value of such claims exceeding $1 billion.  Decl. of Hal Sider ¶ 4, Feb. 18, 2013, Doc. No. 8964-17; Supplemental Decl. of Hal Sider ¶¶ 22-29, March 14, 2013, Doc. No. 8964-18; Decl. of Hal Sider ¶ 36, Oct. 9, 2013, Doc. No. 11726-8; Decl of Hal Sider ¶¶ 7, 22-27, Nov. 7, 2013 (attached as Exhibit B).

The pattern of claims under the Settlement Agreement is also at odds with Professor Coffee's assurance that the chain of causation is short in two additional ways: (1) the upward trend in claims from Zone D is at odds with what is known about the larger economic impact of the Spill on the region; and (2) the upward trend in claims from persons who did not participate in the GCCF indicates that persons who initially did not believe the Spill caused them any damages now do.  Sider Decl., Nov. 7, 2013, ¶¶ 9-21.

UNRELATED to the spill";[29] and that "*[y]ou may even have reason to believe that BP did not cause your reduced revenues. Those things don't matter.*"[30]

The Article III and Rule 23 problems that result from the Administrator's actions are not that the agreed-to and approved class definition inadvertently results in some small number of claimants who lack standing receiving awards.  The problem is that, by reading the "as a result of the Deepwater Horizon Incident" limitation out of the class definition as a matter of practice or policy, the Administrator has opened membership in the class to an ***unlimited*** number of persons and businesses who simply suffered a claimed loss in the relevant time periods.  The situation here is like the hypothetical posed and answered by the court in *Messner v. Northshore University Healthsystem*, 669 F.3d 802 (7th Cir. 2012) (cited approvingly by Judge Clement, *see* BEL Decision at 29). In that antitrust case, the court posed the following hypothetical class definition – "if plaintiffs had sought certification of a class shown to include an high percentage of individuals who paid for medical services at Northshore's hospitals after the merger but under Northshore's pre-merger contracts with insurers" – and explained that such a class "obviously could not be certified [because] it would contain a vast number of people who could not have been harmed by the merger because they purchased medical services in the absence of the market power allegedly created by that merger." *Id*. at 824-25 (citing *Oshana v. Coca-Cola Corp.*, 472 F.3d 506, 514 (7th Cir. 2006)).[31]  Likewise here, a class cannot be certified or

---

[29]   Paul M. Barrett, *How BP Got Screwed on Gulf Oil Spill Claims*, Bloomberg Businessweek (June 27, 2013), http://www.businessweek.com/articles/2013-06-27/how-bp-got-screwed-on-gulf-oil-spill-claims.

[30]   Plaintiffs' Attorneys' Advertisements at 4, Mar. 20, 2013, Doc. No. 8964-25 (emphasis in original).

[31]   *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298 (5th Cir. 2009), is not to the contrary.  In *Mims*, this Court merely held the district court did not abuse its discretion where the defendant speculated that "the class as defined *may* include plaintiffs who are not in fact

maintained that does not incorporate and apply a causal-nexus requirement; otherwise, the class would include persons whose losses were not (i) "as a result of" the Oil Spill (for purposes of Article III standing) or (ii) "typical" of those suffered by the class representatives or "common" to the class members as a whole (for purposes of Rule 23).

Apart from the importance of a causal nexus to compliance with Article III and Rule 23 requirements, however, the Settlement Agreement by its terms requires the Administrator to recognize and apply the class definition before doing anything else.  In other words, the Administrator is to make a threshold determination of class membership before proceeding to any other term in the Agreement.  Thus, when he receives a claims form, the Administrator's first order of business is to determine whether the claimant is a class member.  Plaintiffs' counsel explained the workings of the claims process in just that way at the preliminary approval hearing: "I think sort of ***the general principles of the settlement is that one needs to determine if they've got class membership.  Then*** they need to look at each of the damage categories . . . to determine if they have a claim in one or more of those categories."[32]  The Administrator makes this threshold determination for businesses that are expressly excluded from the class, such as casinos and oil and gas companies.  And when he himself has failed to identify the claimant as an excluded entity, he has acted on evidence from BP challenging class membership.  The Settlement Agreement requires him to do so the same for claimants who are not members of the

---

eligible for the discount," by looking to the defendant's own criteria as to which customers were eligible for the unlawfully withheld discount.  590 F.3d at 307-08 (emphasis added).  *Mims* did not address the question whether Rule 23 should be read to avoid Article III concerns that arise from (i) a class definition that lacks a causal-nexus element or (ii) the certification of a class that demonstrably includes a substantial number of class members that have suffered no constitutional injury.

[32]   Tr. of Hr'g on the Mots. for Conditional Certification of Rule 23(b)(3) Classes for Settlement Purposes at 20, Apr. 25, 2012, Doc. No. 6395 (emphasis added) ("Preliminary Approval Tr.").

class because their loss is not due to the Spill.  "[P]ayment of *admittedly* non-spill-related claims," the BEL Decision said, "is a legal nullity."  BEL Decision at 31; *see id.* at 28 ("Allowing recovery from the settlement fund by those who have no case and cannot state a claim, the court acts *ultra vires*.").[33]

## III.   A CLAIMANT DOES NOT HAVE STANDING BECAUSE HE SATISFIES THE "CAUSATION" CRITERIA OF EXHIBIT 4B

Plaintiffs argue that paying claimants whose losses clearly were not caused by the Oil Spill is not *ultra vires* for lack of standing (i) because "BP agreed to the class definition and to the specific injuries and losses it agreed to be sufficiently related to the oil spill to be deserving of compensation" and (ii) because Exhibit 4B's criteria define causation.[34]

BP agreed to the class definition, of course, but that definition expressly requires that class members have suffered economic damage "as a result of" the Oil Spill.  Plaintiffs are mistaken in saying that BP agreed to the Administrator's re-definition of class membership that disregards objective and undeniable evidence that a claimant's damages were not due to the Spill.  In any event, it is a "truism that subject matter jurisdiction 'cannot be conferred by consent, agreement, or other conduct of the parties.'"  *Gasch v. Hartford Acc. & Indem. Co.*, 491 F.3d 278, 284 (5th Cir. 2007); *Di Vosta Rentals, Inc. v. Lee*, 488 F.2d 674, 679 (5th Cir. 1973)

---

[33]   The class definition has meaning independent of the causation issues presented by Exhibit 4B.  This proffer focuses on claimants who are *not* class members, but may be able to show economic loss under Exhibits 4B & C.  But there are surely other potential claimants who *are* class members, but cannot satisfy the causation requirements of  Exhibits 4B, such as a business that suffered a downturn in revenue due to the Spill, but only after 2010 (i.e., the deadline under Exhibit 4B).  No one would question the authority and duty of the Administrator to deny such a claim, nor would they deny that such a class member would be bound by the class release.

[34]   Letter Brief to the Honorable Judges of the U.S. Fifth Circuit Court of Appeals from James Parkerson Roy and Stephen J. Herman at 5, *In re Deepwater Horizon*, No. 13-30095 (5th Cir. Oct. 18, 2013) ("PSC Letter Brief").

("Parties may not agree to expand the jurisdiction of the federal courts."); *Montegut v. Williams Commc'ns, Inc.*, 109 F. Supp. 2d 496, 498 n.2 (E.D. La. 2000) ("[I]t is black letter law that the parties may not consent to federal subject matter jurisdiction where it is lacking.") (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)).   And it likewise true that parties cannot agree to ignore or waive the requirements of Rule 23; either the certification complies with the Rule or it doesn't.  *See Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998).

Nor are plaintiffs correct that Exhibit 4B contains the "mechanism" to establish causation.[35]  First, Exhibit 4B itself expressly provides that it does not apply to any claimant who is not a class member.  Footnote 1 to the Exhibit states: "Th[ese] Causation Requirements for Business Economic Claims do[] *not* apply to . . . Entities, Individuals or Claims *not* included with the Economic Class definition . . . ."[36]  In short, the Administrator must determine first whether a claimant is a member of the class before even considering the damage categories and applying Exhibit 4B.[37]  As noted above,[38] Plaintiffs' counsel said so at the preliminary approval hearing; the first step, he explained, is to determine whether a claimant is a member of the class, and only after making that determination does one even proceed to consider whether the claimant meets the criteria for one of the damage categories: "Now, the standard approach one needs to

---

[35]  *Id.* at 6.

[36]  Settlement Agreement Ex. 4B n.1.

[37]  *See supra* notes 10-16 and accompanying text.

[38]  *See supra* p. 15.

take ***after they determine if they are a class member*** is they need to look for causation, and then they need to look at each damage category . . . .[39]

Second, Exhibit 4B contains criteria for assessing declines in revenue; it contains no criteria for linking any such decline to the Oil Spill.  Thus, while the Alabama excavation company that sold its assets in 2009 suffered a revenue decline under the Exhibit 4B criteria and received a $3.5 million award, that decline was not due to the Spill under any form of logic.  In fact, there was not a loss at all.  As plaintiffs' counsel also explained at the preliminary approval hearing, "When I talk about looking for ***causation***, . . . what we're looking for is a ***downturn in revenue***, and we have percentage guidance."[40]  Plaintiffs' argument, then, is merely semantic – Exhibit 4B may be labeled "Causation Requirements," but, as Judge Southwick said, they have nothing to do with "prov[ing] that the loss had ***any factual relationship*** to BP's actions."[41] Proof of decline in revenue is distinct from proof of a causal nexus, and the Supreme Court has been clear that a plaintiff must establish both.[42]

Third, Exhibit 4B describes what showing a claimant must make; it does not limit what evidence the Administrator may consider.  That is why Exhibit 4A gives the Administrator broad rights to obtain additional documentation from the claimant.  So while it is true that a claimant

---

[39]   Preliminary Approval Tr. at 24 (emphasis added).  The Constitution, as well as the contract, requires focusing on class membership first.  The Supreme Court has held that constitutional standing is a threshold issue, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("[T]he first and fundamental question is that of jurisdiction . . . ."), as has the Fifth Circuit, *see Rivera*, 283 F.3d at 319.  If determining class membership was not the first step, then the claims form would not require the claimant to affirm under penalty of perjury that he had suffered damages due to the Spill.

[40]   Preliminary Approval Tr. at 25 (emphasis added).

[41]   BEL Decision at 38-39 (Southwick, J., concurring) (emphasis added).

[42]   *See Lujan*, 504 U.S. at 560-61.

need not submit proof expressly linking his economic loss to the Oil Spill, when the Administrator is confronted with evidence that the loss is not traceable to the Spill, Exhibit 4B does not tell him to ignore that evidence.[43]  On the contrary, footnote 1 instructs him that Exhibit 4B "does not apply" because the claimant is not a member of the class.

Fourth, it is a commonplace rule of statutory and contract construction that any ambiguity should be resolved in a way that avoids constitutional questions and that renders a contract legal and enforceable.  Footnote 1 to Exhibit 4B restricts its applicability to class members.  But even if the relationship between the class definition and Exhibit 4B were ambiguous, that ambiguity must be resolved in favor of the class definition in order to remove any question of standing.  *See* BEL Opinion at 31 ("Should BP's proposed interpretation of the Settlement exclude putative class members with no colorable legal claim, the district court should have rendered the Settlement lawful by adopting that interpretation, as long as the interpretation is reasonable and effective.").[44]  BP's interpretation of the Settlement Agreement is the only one that avoids the serious Article III and Rule 23 questions that arise if the Claims Administrator continues to grant awards to claimants who have no causal nexus to the Oil Spill.

---

[43]   Exhibit 4A empowers the Claims Administrator to request additional documentation.  *See* Settlement Agreement Ex. 4A ¶¶ 1, 4, May 3, 2012, Doc. No. 6430-8.

[44]   *See, e.g.*,  *Hobbs v. McLean*, 117 U.S. 567, 576 (1886) ("[I]t is a rule of interpretation that, where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted."); *see also Int'l Union, United Auto., Aerospace, & Agric. Implement Workers v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) (if a serious constitutional question arose in interpreting a settlement agreement, "a court might well construe the provision to avoid or ameliorate it"); *Nat'l Audubon Soc'y v. Watt*, 678 F.2d 299, 301 (D.C. Cir. 1982) (adopting a construction of a contract between the Secretary of the Interior and an environmental group that "avoid[ed] potentially serious constitutional questions").

## CONCLUSION

For these reasons, the Court should: (1) amend the scheduling order on remand to permit BP to submit evidence and argument regarding the payment of claims for losses not causally connected to the Oil Spill and (2) modify the preliminary injunction to include the following provision: "The Claims Administrator and Settlement Program are further ENJOINED from paying any business economic loss claim unless they first determine that the claimant is a member of the class, including that the claimant is within the economic class definition and has suffered loss of income, earnings or profits as a result of the Deepwater Horizon Incident."

November 7, 2013

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Respectfully submitted,

    _/s/ Kevin M. Downey_____
Kevin M. Downey
F. Lane Heard, III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 434-5000
Telefax:  (202) 434-5029

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Telefax: (202) 942-5999

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 662-5985
Telefax: (202) 662-6291

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606
Telephone: (312) 876-8000
Telefax: (312) 876-7934

*OF COUNSEL*

                    */s/ Don K. Haycraft*
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Telefax: (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Telefax: (202) 879-5200

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of November, 2013.

/s/ Don K. Haycraft
Don K. Haycraft