# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179<br><br>SECTION J |
| | * * | HONORABLE CARL J. BARBIER |
| This document relates to Civ. A. No. 12-970. | * * * * | MAGISTRATE JUDGE SHUSHAN |

**DECLARATION OF HAL SIDER**

I, Hal Sider, hereby declare and state as follows:

1. I am over the age of 21 years and a resident of the State of Illinois. Unless otherwise stated, I have personal knowledge of the facts set forth herein and, if called to do so, could testify truthfully thereto.

2. I am an Executive Vice-President of Compass Lexecon, an economic consulting firm with its headquarters in Chicago, IL. I have been retained by BP and my responsibilities include monitoring the implementation of the Settlement Agreement. I previously submitted declarations in this matter on February 18, 2013, March 14, 2013, April 21, 2013, July 16, 2013, August 5, 2013, September 20, 2013, October 9, 2013, and October 18, 2013. My February 18 declaration summarizes my qualifications and includes my curriculum vitae.

3. I, and others under my supervision, review and evaluate BEL compensation awards made to claimants by the Court Supervised Settlement Program ("CSSP") as reflected in data posted by the Claims Administrator to the CSSP portal as well as claims activity as reported in computer files made available to BP by the CSSP. I, and others under my supervision, have

1

compiled and evaluated the financial information reported in the profit and loss (P&L) statement data files used by the CSSP in evaluating BEL offers and have reviewed a large number of BEL claims files and offers. I have also regularly evaluated data on economic activity in Gulf States on an on-going basis since the DWH spill.

I.      **Introduction and Overview of Conclusions**

4.      My October 9, 2013 declaration concluded that "patterns of [BEL] awards often bear little relationship to economic reality" and highlighted the large number of BEL offers made to claimants in industries and geographic areas "with little apparent relationship to the DWH spill."[1]  I have been asked by counsel for BP to evaluate such patterns further in order to assess whether a substantial number of BEL claimants likely did not suffer losses due to the DWH spill.

5.      The BEL claim form states that "[t]he Business Economic Loss Claim is for businesses […] that assert economic loss due to the Spill", and claimants must attest to the truthfulness of the submitted information on p. 9 of the form. I understand that CSSP does not routinely evaluate whether a claimant's losses were due to the spill beyond the criteria identified in Exhibit 4B to the Settlement Agreement.

6.      My analysis evaluates (i) the extent to which BEL claimants previously claimed that they suffered harm due to the spill by participating in the GCCF process or filing a Short Form Joinder in MDL 2179; (ii) the frequency with which BEL claimants are drawn from industries and geographic areas unlikely to have been affected by the DWH spill; (iii) the extent to which BEL offers are made to such claimants; and (iv) the extent to which BEL offers are made to claimants that did not suffer reductions in revenue or variable profit between 2009 and 2010.

---

1. Sider Declaration, October 9, 2013, (¶¶23-24). My February 18, 2013 declaration (¶¶14-20) and March 14, 2013 declarations (¶¶22-29) addressed similar issues and drew similar conclusions.

7. My analysis indicates that a substantial portion of BEL claims and offers are concentrated in geographic areas and industries with little apparent economic connection to the DWH spill (although these results alone do not indicate whether any particular claimant's losses were spill-related – a determination that would require a review of the individual claimant's circumstances).

8. In evaluating the extent to which the CSSP compensates BEL claimants for losses unrelated to the DWH spill, it is important to understand the extent, if any, to which the DWH spill affected general economic activity in the class geography. Section II evaluates a variety of economic indicators, all of which suggest that the DWH spill did not have a negative impact on statewide economic activity in the Gulf States. Section III expands the analysis presented in my February 18, 2013, March 14, 2013, and October 9, 2013 declarations and shows that much BEL activity is concentrated among claimants that did not previously claim spill-related harm by participating in the GCCF or filing an SFJ, and a substantial portion of BEL activity is concentrated in industries and areas that have no direct connection to the DWH spill.

**II. DWH Spill and General Economic Activity**

9. In interpreting patterns of BEL activity, it is important to understand the extent, if any, to which the DWH spill affected general economic activity in the Gulf region. Losses suffered by claimants both near and far from the Gulf Coast may have been due to factors other than the spill. The smaller the DWH spill's impact on overall economic activity, the less likely it is that losses suffered by claimants are spill-related, especially for those located far from the Gulf coast and/or from industries outside the Gulf Coast tourism and seafood sectors (which suffered the most direct impact of the spill).

10. Evaluation of a variety of economic indicators highlights that the DWH spill did not adversely affect the general level of economic activity throughout each of the Gulf States.[2] This conclusion is based on a comparison of pre-spill and post-spill economic activity as reflected in a variety of standard economic indicators, including sales tax revenue, employment levels and tourism activity. More specifically, I evaluate the change in the economic indicators between May-December of 2009 and May-December 2010, using as a benchmark the changes in these indicators observed between January-April 2009 and January-April of 2010 that provides a "control" for other changes in economic conditions over this period.[3] These results, reported below, indicate that the aggregate impact was confined relative to the overall level of economic activity in the state. However, these results do not necessarily mean that the spill had no effect on a particular business or region.

11. If the DWH spill had an adverse effect on general economic activity in the Gulf States, indicators of economic activity would be expected to be lower in May-December 2010 compared to May-December 2009 (or at least lower than would be expected based on changes in the indicators observed between January-April 2009 and January-April 2010). However, for each state and economic indicator analyzed, economic activity was greater than expected in the post-spill period.

12. One key indicator reflecting spending by residents and tourists in Gulf states is sales tax receipts, since almost all purchases are subject to such state taxes. To the extent the spill had an adverse effect on statewide economic activity, one would expect to see

---

2. The section evaluates changes in economic indicators for Louisiana, Mississippi, Alabama, and Florida. The class geography includes four counties in Texas which I exclude from this analysis. In addition, the class geography excludes some inland and Atlantic coastal counties in Florida.
3. This approach is conceptually equivalent to the "Interim methodology" publicized and used by BP in making settlement offers to a variety of government entities following the DWH spill.

corresponding decline in state sales tax receipts.[4] As shown in Table 1, Louisiana sales tax revenue grew by 5.2% between May-December of 2009 and 2010, while in January-April of 2010 sales tax revenue was 9.8% lower in 2010 relative to 2009. Together, these data indicate that sales tax revenue was 15.0% higher in May-December than expected based on January-April receipts. As the table indicates, in each of the Gulf States, sales tax revenue in May-December 2010 was higher than in the same period of 2009, and above the level expected based on January-April trends. These data thus provide no support for the claim that the DWH spill had an adverse statewide impact on sales tax receipts.

**Table 1**
**Percentage Change in State Sales Tax Collections**
**2009-2010**

|  |  | LA | MS | AL | FL |
|---|---|---|---|---|---|
| Jan. - Apr. 2009-2010 | [1] | -9.8% | -2.4% | 2.3% | 0.4% |
| May - Dec. 2009-2010 | [2] | 5.2% | 1.6% | 3.2% | 3.8% |
| Relative Change | [3] = [2] - [1] | 15.0% | 4.0% | 0.8% | 3.4% |

Source: State Departments of Revenue.
Note: Data reflect month of generation, one month prior to collection month.

13. Table 2 presents a similar analysis based on employment levels. The results indicate that employment grew in each state between May-December of 2009 and the same period of 2010 relative to levels expected based on January-April trends. These data thus provide no support for the view that the DWH spill had an adverse statewide impact on employment levels.

---

4. Sales taxes, unlike state income taxes, are collected each month. Our analysis classifies sales tax receipts based on the month in which the taxes were generated, not the month in which the taxes were collected. Other state taxes, such as income taxes, are collected at least in part on an annual cycle and thus are not amenable to a before/after analysis of this type.

5

**Table 2**
**Percentage Change in Average Employment Levels**
**2009-2010**

|  |  | LA | MS | AL | FL |
|---|---|---|---|---|---|
| Jan. - Apr. 2009-2010 | [1] | -2.2% | -2.1% | -2.5% | -2.7% |
| May - Dec. 2009-2010 | [2] | -0.2% | 0.4% | 0.0% | 0.2% |
| Relative Change | [3] = [2] - [1] | 2.0% | 2.5% | 2.5% | 2.9% |

Source: Bureau of Labor Statistics CES data.
Note: Data are seasonally adjusted.

14. Table 3 presents a similar analysis for the tourism industry based on revenue per available hotel/motel room (RevPAR) data reported by Smith Travel Research (STR). RevPAR is a standard metric of tourism activity used throughout the industry. The results indicate that RevPAR grew in each state between May-December of 2009 and the same period of 2010. Moreover, in each state, the percentage May-December growth exceeded the level expected based on January-April trends. These data provide no support for the view that the DWH spill had an adverse statewide impact on tourism activity, as reflected in RevPAR.

**Table 3**
**Percentage Change in RevPAR**
**2009-2010**

|  |  | LA | MS | AL | FL |
|---|---|---|---|---|---|
| Jan. - Apr. 2009-2010 | [1] | 1.4% | 1.1% | -2.2% | 0.6% |
| May - Dec. 2009-2010 | [2] | 13.8% | 8.4% | 13.2% | 6.8% |
| Relative Change | [3] = [2] - [1] | 12.4% | 7.3% | 15.4% | 6.3% |

Source: Smith Travel Research.

15. Recognizing that claimants both near and far from the Gulf Coast can suffer losses that are unrelated to the DWH spill, the absence of evidence of substantial statewide impact of the DWH spill on these economic indicators suggests that losses suffered by many

6

potential claimants were not spill related, especially for those located far from the Gulf coast or from industries not directly affected by the spill.[5]

### III. BEL Activity Among Claimants Unlikely to Have Been Affected by the DWH Spill

16. The section extends the analysis presented in my prior declarations of the extent of BEL activity from claimants unlikely to have been affected by the DWH spill. My analysis indicates that the vast majority of BEL claims are from claimants that did not previously indicate that they had suffered spill-related harm by participating in the GCCF or by filing an SFJ. My analysis also indicates that the bulk of BEL claimants are from geographic areas that are remote from the Gulf Coast and from industries other than the tourism- and seafood-related industries which were most directly affected by the spill. (As mentioned above, these results alone do not indicate whether any particular claimant in such industries and areas was affected by the spill. Instead, any such determination would require a more careful review of the individual claimant's circumstances.)

#### 1. Prior GCCF Activity among BEL Claimants

17. As discussed in my February 18, 2013, March 14, 2013, and October 9, 2013 declarations, an indication of the likelihood that BEL claimants suffered losses unrelated to the spill is reflected in the share of BEL claimants that did not participate in the GCCF and/or did not file Short Form Joinders indicating their intent to participate in MDL 2179. One would expect many businesses harmed by the spill to make claims with the GCCF, because GCCF claimants could receive emergency and interim payments without signing a release.

---

5. Data from InfoUSA indicate that Zone D, which covers the bulk of the Class geography, accounts for 74% of all businesses that are potential class members. InfoUSA is national business directory database.

7

18.     Figure 1 shows that at the start of the program, fewer than 30% of BEL claims were filed by claimants that did not participate in the GCCF.  However, since the beginning of 2013, this figure exceeds 80%, and the average exceeds 85% over the past 5 months.



**Figure 1**
**Monthly Share of New BEL Claims Filed by Non-GCCF Claimants**

Source: CSSP data as of 10/28/2013.

19.     Table 4 summarizes GCCF participation by BEL claimants by Zone.  The results indicate that fully 85% of Zone D claims are from non-GCCF participants compared to 52.8% of Zone A BEL claimants.  In addition, only 8.6% of BEL claims are from claimants that received any payment from the GCCF.  The great majority of BEL claimants that participated in the GCCF had their claims rejected by the GCCF.

8

**Table 4**
**Share of BEL Claims by GCCF Status**

| Claim Zone | Submitted Claims | % Not in GCCF | % Paid by GCCF |
|---|---|---|---|
| ZoneA | 16,308 | 52.8% | 20.4% |
| ZoneB | 5,804 | 65.1% | 12.1% |
| ZoneC | 22,733 | 67.1% | 8.2% |
| ZoneD | 36,338 | 85.0% | 3.2% |
| Missing | 1,214 | 81.9% | 1.9% |
| Total | 82,397 | 72.2% | 8.6% |

Source: CSSP data as of 10/28/2013.

20. Table 5 reports GCCF participation by industry for BEL claimants and indicates that nearly 80% of claimants from the agriculture, professional services, construction, health care, manufacturing, and wholesale industries did not participate in the GCCF.

**Table 5**
**Share of BEL Claims from Non-GCCF Claimants by Industry**

| Industry | Submitted Claims | % Not in GCCF |
|---|---|---|
| Agriculture: Crops | 1,529 | 99.3% |
| Professional Services: Lawyers | 1,991 | 95.3% |
| Agriculture: Other | 1,051 | 93.7% |
| Health Care | 3,748 | 86.1% |
| Professional Services: Other | 4,502 | 82.4% |
| Manufacturing | 2,615 | 82.1% |
| Wholesale Trade | 2,529 | 82.1% |
| Construction | 9,822 | 79.2% |
| Real Estate | 4,425 | 76.9% |
| Retail Trade | 8,774 | 75.7% |
| Services | 6,997 | 69.7% |
| All Other Industries | 2,849 | 67.1% |
| Transportation and Warehousing | 1,765 | 66.3% |
| Missing | 14,471 | 65.2% |
| Property Rental | 7,291 | 63.3% |
| Arts, Entertainment, and Recreation | 2,050 | 56.4% |
| Bars and Restaurants | 4,304 | 52.4% |
| Hotels and Motels | 1,308 | 46.7% |
| Seafood Processing | 376 | 25.8% |
| Total | 82,397 | 72.2% |

Source: CSSP data as of 10/28/2013.

21. Table 6 updates the analysis presented in my October 9, 2013 and prior declarations and shows that only 8.7% of BEL offers are made to claimants that filed an SFJ, and that only 12.1% of claimants that have received offers above $500,000 filed SFJs. Only 1 of 144 law firms that have received offers of $500,000 or more filed an SFJ. Similarly, only 3 of 89 manufacturing firms and none of the 66 crop farmers receiving large BEL awards filed an SFJ.

**Table 6**
**BEL Offers to Claimants that Filed Short Form Joinders**

| Industry | Offers Above $500,000 | | | All BEL Offers | | |
|---|---|---|---|---|---|---|
| | Offers | Claimants with SFJ | % of Total | Offers | Claimants with SFJ | % of Total |
| Agriculture: Crops | 66 | 0 | 0.0% | 224 | 0 | 0.0% |
| Professional Services: Lawyers | 144 | 1 | 0.7% | 399 | 13 | 3.3% |
| Transportation and Warehousing | 32 | 1 | 3.1% | 265 | 16 | 6.0% |
| Manufacturing | 89 | 3 | 3.4% | 432 | 28 | 6.5% |
| Agriculture: Other | 27 | 1 | 3.7% | 119 | 1 | 0.8% |
| Construction | 318 | 16 | 5.0% | 1,679 | 101 | 6.0% |
| All Other Industries | 39 | 2 | 5.1% | 821 | 51 | 6.2% |
| Health Care | 64 | 4 | 6.3% | 672 | 27 | 4.0% |
| Professional Services: Other | 74 | 5 | 6.8% | 986 | 49 | 5.0% |
| Wholesale Trade | 80 | 6 | 7.5% | 381 | 25 | 6.6% |
| Real Estate | 27 | 4 | 14.8% | 1,148 | 52 | 4.5% |
| Hotels and Motels | 108 | 20 | 18.5% | 461 | 113 | 24.5% |
| Services | 42 | 8 | 19.0% | 1,171 | 68 | 5.8% |
| Arts, Entertainment, and Recreation | 52 | 11 | 21.2% | 509 | 81 | 15.9% |
| Retail Trade | 151 | 35 | 23.2% | 1,318 | 159 | 12.1% |
| Bars and Restaurants | 87 | 26 | 29.9% | 939 | 176 | 18.7% |
| Property Rental | 37 | 12 | 32.4% | 1,378 | 115 | 8.3% |
| Seafood Processing | 48 | 25 | 52.1% | 156 | 61 | 39.1% |
| Total | 1,485 | 180 | 12.1% | 13,058 | 1,136 | 8.7% |

Sources: CSSP data as of October 27, 2013; MDL 2179 Short Form Joinder data as of March 16, 2012.

## 2. BEL Activity is Concentrated in Zones and Industries Remote from the DWH Spill

22. As highlighted in my prior declarations, a large share of BEL claims and offers are made to claimants in geographic areas distant from the Gulf and in industries other than

10

tourism and seafood, which were most directly affected by the spill indicates that many firms receiving BEL offers did not suffer spill related losses.

      **a.**      **Trends in BEL Claims by Zone**

23.      The share of BEL claimants from geographic areas distant from the Gulf has grown dramatically over the course of the BEL program, indicating that recent claimants are less likely to have been affected by the DWH spill than those that filed claims in the program's early months. Figure 2 shows that the share of claims from Zone D has grown from less than 30% in the initial months of the BEL program to roughly 50% in recent months. Claims from Zones C and D together now account for more than 80% of new BEL claims.

**Figure 2**

**Monthly Share of New BEL Claims in Zones C and D**

[Line chart showing Percent of Claims (0%–90%) on the y-axis and Month (06/12 through 10/13) on the x-axis. Solid line labeled "Zones C/D" rises from about 58% in 06/12 to about 82% in 10/13. Dashed line labeled "Zone D" rises from about 24% in 06/12 to about 57% in 10/13.]

Source: CSSP data as of 9/30/2013.

      **b.**      **BEL Offers by Industry and Zone**

24.      Table 7 summarizes the value of BEL offers by industry for Zones A/B and C/D. The table reports percentage of the value of BEL offers for these Zone/industry combinations.

- The industries most directly affected by the DWH spill in Zones A/B account for only 21% of the value of BEL offers. (These industries include Zone A/B tourism-related industries broadly defined to include lodging, restaurants, bars, property rental, real estate, entertainment, and retail as well as seafood-related industries.)
- Offers to claimants in Zones C/D together account for 58% of the value of BEL offers. Three of the four industries accounting for the largest dollar amount of BEL offers – construction (21%), law firms (9%), manufacturing (7%) – are not tourism- or seafood-related, and thus do not have a direct connection to the DWH spill.

**Table 7**

**Distribution of BEL Offer Amounts by Industry and Zone**

| Industry Group | Industry | Zone A-B | Zone C-D | Total |
|---|---|---|---|---|
| Tourism or Seafood Related | Arts, Entertainment, and Recreation | 2.6% | 1.0% | 3.5% |
| | Bars and Restaurants | 4.2% | 1.8% | 6.0% |
| | Hotels and Motels | 3.3% | 2.7% | 6.0% |
| | Property Rental | 2.8% | 0.6% | 3.4% |
| | Real Estate | 1.9% | 1.6% | 3.5% |
| | Retail Trade | 4.5% | 5.0% | 9.5% |
| | Seafood Processing | 1.6% | 1.4% | 3.0% |
| | Sub-Total | 21.0% | 14.2% | 35.1% |
| Other | Agriculture: Crops | 0.1% | 3.0% | 3.1% |
| | Agriculture: Other | 0.7% | 1.3% | 1.9% |
| | Construction | 4.5% | 16.0% | 20.6% |
| | Health Care | 2.0% | 2.6% | 4.6% |
| | Manufacturing | 2.0% | 5.0% | 6.9% |
| | Professional Services: Lawyers | 4.9% | 4.5% | 9.4% |
| | Professional Services: Other | 1.9% | 3.4% | 5.3% |
| | Services | 2.2% | 1.8% | 4.0% |
| | Transportation and Warehousing | 0.3% | 1.4% | 1.7% |
| | Wholesale Trade | 0.8% | 3.3% | 4.1% |
| | All Other Industries | 2.0% | 1.1% | 3.1% |
| | Missing | 0.2% | 0.1% | 0.3% |
| | Sub-Total | 21.5% | 43.3% | 64.9% |
| Total | | 42.5% | 57.5% | 100.0% |
| Total Amount Offered ($ M) | | | | $3,195.6 |

Source: CSSP data as of 10/28/2013.

### c. Zone D BEL offers to claimants "closer to" and "farther from" the Gulf

25. The zone structure of the Settlement Agreement reflects the view that the likelihood that losses are spill-related is lower for claimants located farther from the Gulf coast. Zone D covers a broad geographic area, with the northern borders of Alabama and Mississippi extending more than 300 miles from the Gulf coast and other Zone D areas located only a few miles from the Gulf.[6] If compensation is limited to claimants that suffered spill-related losses, it would be expected that Zone D claimants located closer to the Gulf would receive a higher share of BEL offers than Zone D claimants located farther from the Gulf, after controlling for differences in the number of Zone D businesses located "closer to" and "farther from" the coast. The differences across these two groups with respect to average distance from the coast is substantial – the average distance is roughly 32 miles, among the "closer to" BEL claimants that have received offers, while the average distance is 217 miles for claimants from the "farther from" group.

26. The available data indicate that closer-in Zone D BEL claimants do not receive a disproportionately high share of offers, indicating that BEL offers are often driven by factors other than harm resulting from the spill. Table 8 reports the dollar share of BEL offers to Zone D claimants located more than and less than 150 miles from the Gulf coast. The table also reports the share of Zone D business establishments located in each of these "sub-zones". The table shows that the closer-in areas of Zone D account for 65% of Zone D business establishments but only 59% of the value of Zone D offers; the farther-out areas of Zone D account for 41% of the value of Zone D BEL offers, which is greater than the area's 35% of

---

6. Measurement of distance to the Gulf is based on the shortest straight-line distance to the Specified Waters of the Gulf as defined in Exhibit 23 of the Settlement Agreement.

Zone D business establishments. That is, the more distant sub-zone accounts for a disproportionately large share of BEL offers.

### Table 8

### Zone D BEL Claims by Distance to Gulf Waters

| Distance Category | Average Distance (Miles) | Offers (% of Total Dollars) | InfoUSA Establishments |
|---|---|---|---|
| 0-150 Miles | 31.6 | 58.6% | 64.7% |
| 150+ Miles | 217.7 | 41.4% | 35.3% |
| Total | 91.6 | 100.0% | 100.0% |

Note: Analysis includes Zone D portions of LA, MS, AL and FL. InfoUSA Establishments include all Zone D establishments by zip code centroid distance.

27. The fact that Zone D claimants located farther from the Gulf, and thus less likely to have suffered spill-related harm, receive a disproportionately large share of Zone D BEL offers suggests that BEL offers frequently compensate claimants for losses that are not spill-related. These results, of course, do not suggest that losses suffered by claimants located closer to the Gulf necessarily were spill-related. To the contrary, these results suggest that as a general matter BEL offers are often driven by factors other than spill-related harm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is a true and correct statement of my analysis and opinions.

Dated: November 7, 2013

*Hal Sider*

Hal Sider