**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| This Document Relates to: | SECTION: J |
| No. 12-970 | JUDGE BARBIER |
| | MAGISTRATE SHUSHAN |

## OPPOSITION TO BP's MOTION TO AMEND SCHEDULING ORDER AND MOTION TO AMEND INJUNCTION

### (RE CAUSATION)

Eligible Claimants in the Court-Supervised Settlement Program and the Economic & Property Damages Settlement Class respectfully submit the following memorandum in Response to BP's Motion to Amend Scheduling Order and in Opposition to BP's Motion to Amend the Injunction relating to BEL Claims [Doc 11819]:

**MAY IT PLEASE THE COURT:**

The *Deepwater Horizon* Economic and Property Damages Settlement Agreement forms a contractual agreement between the BP Parties and participating classmembers who submit claims to the Settlement Program.[1]

---

[1] *See, e.g.,* SETTLEMENT AGREEMENT, Section 4.1 (establishment of *Deepwater Horizon* Court Supervised Settlement Program); Section 4.4 (Process for Making Claims); Section 5.12 (establishment of Settlement Trust); Section 21.2 (severability of any provisions found to be invalid, illegal or unenforceable); Section 21.3 (the Claims Administrator will continue to process claims that have been submitted to the Program in the event the class settlement is not fully and finally approved); Section 26.1 (regarding the binding effect of the Agreement on the Parties); Exhibit 26 (Individual Release). *See also, e.g.,* COMPLAINT, *BP v. Deepwater Horizon Court Supervised Settlement Program,* No.13-492 (March 15, 2013) ¶65 ("The Settlement Agreement is a valid contract meeting all required elements: offer, acceptance, and consideration"). *See also,* Ehrheart v. Verizon Wireless, 609 F.3d 590, 592-593 (3d Cir. 2010) ("The requirement that a district court review and approve a class action settlement before it binds all class members does not affect the binding nature of the parties' underlying agreement") (*citing,* In re Syncor ERISA Litig., 516 F.3d 1095, 1100 (9th Cir. 2008)).

The Economic & Property Damages Class Settlement Agreement has separately, and additionally, been approved by the Court under Rule 23(b)(3) and Rule 23(e) as a class settlement, which is binding upon on absent classmembers with respect to economic and property damage rights and claims arising out of the *Deepwater Horizon* Incident.[2]

BP agreed, in the Economic and Property Damages Settlement Agreement, that whether an Entity experienced an actual injury traceable to the *Deepwater Horizon* Incident would be determined by the objective criteria set forth in the Causation Framework contained in Exhibit 4B.

Further, in light of the numerous filings with and representations to the Court, Settlement Program Claimants and absent members of the Economic & Property Damages Settlement Class respectfully submit that BP should be judicially estopped from now taking a contrary position.

For these reasons, for the reasons outlined further below, and for the reasons stated in Class Counsel's *In Camera* Submission of October 9, 2013 [Doc 11728-1], and Class Counsel's Letter Brief to the U.S. Fifth Circuit in Case No. 13-30095 [Doc 11728-6], BP's Motion should be denied.

<u>**The Settlement Agreement Requires and**</u>
<u>**Defines the Criteria by Which a Loss Caused by the Spill is Established**</u>

The Economic & Property Damages Settlement Agreement provides an objective way for Settlement Program Claimants and absent classmembers to establish the existence of traceable injury due to or resulting from the *Deepwater Horizon* Incident.

---

[2] *See* ORDER AND JUDGMENT [Doc 8139] (Dec. 21, 2012).  In particular, Paragraphs 8-14 of the Order and Judgment provide BP with "the general classwide release ('Economic Class Release') contained in Section 10 of the Settlement Agreement."  (*See also,* SETTLEMENT AGREEMENT, Sections 10.1–10.6.)

BP, taking Section 1.3.1.2 of the Class Definition out of context and in isolation, now argues that in order to be an eligible Claimant or Classmember, the business must satisfy a subjective and as-yet-undefined "requirement" that a loss of income, earnings, or profits was suffered "as a result of" the *Deepwater Horizon* Incident.

This, however, ignores that fact that: **(i)** the Economic Damage Category "summary" is prefaced and modified by Sections 1.3 and 1.3.1 of the Class Definition, which make clear that such claims categories are "fully described" in the attached Exhibits;[3] **(ii)** "Economic Damage" is defined to mean loss of profits, income or earnings "<u>allegedly</u>" arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the *Deepwater Horizon* Incident;[4] and **(iii)** the Settlement Agreement itself goes on to set forth the objective methodology by which it is determined that a claiming Entity has, in fact, suffered a loss of income, earnings or profits "as a result of" the *Deepwater Horizon* Incident.

Specifically, Section 5.3.2.3 sets forth the "Causation Requirements For Business Economic Loss Claims" as follows:

> Business Economic Loss Claimants, unless causation is presumed, must establish that their loss was due to or resulting from the Deepwater Horizon Incident.  The causation requirements for such Claims are set forth in Exhibit 4B.[5]

---

[3] *See also,* SETTLEMENT AGREEMENT, Section 5.3.1 ("The Economic Damage Claim Process, Economic Damage Claim Frameworks, and other details for determining the Economic Damage Compensation Amounts are set forth in the Exhibits to this Agreement, which are incorporated herein by reference"); Section 5.3.2.1 ("The frameworks setting forth the documentation requirements governing Business Economic Loss Claims, and the standards for evaluating such Claims, are set forth in Exhibits 4A-7 to the Agreement"); Section 5.3.2.3 ("The causation requirements for such Claims are set forth in Exhibit 4B"). *See generally,* Exhibit 4B.

[4] SETTLEMENT AGREEMENT, Section 38.55 (emphasis supplied).

[5] *See also,* SETTLEMENT AGREEMENT, Sections 5.3.1 and 5.3.2.1.

Exhibit 4B, in turn, sets forth the transparent and objective methodologies by which the Parties agreed that BEL Claimants would establish that their loss was due to or resulting from the *Deepwater Horizon* Incident.

<u>The Causation Requirement is a Separate and Distinct Requirement</u>

As observed by Judge Southwick, "Exhibit 4B of the Settlement Agreement allowed causation to be supported by loss calculations under Exhibit 4C rather than by requiring the claimant to prove that the loss had any factual relationship to BP's actions."[6]

It should be noted, at the same time, that for most claims, (and virtually all of the claims that BP is complaining about), the Causation Requirements for Business Economic Loss Claims under Section 5.3.2.3 and Exhibit 4B are separate and distinct from the Compensation Methodology set forth in Section 5.3.2.4 and Exhibit 4C.

Exhibit 4B is a revenue-only test, which requires the claiming Entity to demonstrate not only a Downturn in revenue, but some other indicia that the downturn was caused by the spill – *i.e.* either a Later Upturn in revenue (the V-Shaped Revenue Pattern), or a showing that a certain amount of their customers were either tourists or living in an affected zone (the Modified-V and Decline-Only Revenue Patterns), or a showing of Spill-Related Cancellations.[7]

These Causation Tests are illustrated by two graphs on the next page. [8, 9]

---

[6] SLIP OPINION, pp.38-39 (Southwick, concurring); *see also,* SLIP OPINION, pp.37-38 (Southwick, concurring) ("The Settlement Agreement resolved two separate issues by, in effect, combining them. One concerned loss *causation,* and the other loss *measurement.* If a BEL claimant could prove an economic loss, properly measured, that proof substituted for evidence of causation…. The agreement simplified the claims process by making proof of loss a substitute for proof of factual causation"). The V, Modified-V, and Decline-Only Tests require additional indicia that the claimed losses are Spill-related.

[7] Certainly, there are tens of thousands of businesses within Zones B, C and D which are not eligible for Compensation, as they cannot satisfy one or more of the Causation Tests. *See, e.g.,* Exhibit A to CLAIMS ADMINISTRATOR'S STATUS REPORT (Oct. 11, 2013) [Doc 11646-1], at p.3 (2,840 BEL Causation Denials).

[8] BUSINESS ECONOMIC LOSS CLAIMS: CAUSATION REVENUE TREND TEST (for "Tutorial" with Claims Administrator) (May 7, 2012) (submitted herewith as part of Exhibit "A").

[9] SUMMARY OF REVENUE PATTERN requirements for CAUSATION TESTS (displayed during Preliminary Approval Hearing) (April 25, 2012) [Doc 9087-1, at p.5].

## Business Economic Loss Claims: Causation Revenue Trend Tests

### V-Shaped Revenue Pattern

Revenue decline in 2010 Compensation Period (Zone B & C= 8.5%; Zone D= 15%) compared to the same months in the Benchmark Period year(s) followed by recovery (increase in revenues) in the same months of 2011 (B & C= 5%; D= 10%).



### Modified V-Shaped Revenue Pattern

Revenue decline in 2010 Compensation Period (B & C= 5%; D= 10%) compared to the same months in the Benchmark Period year(s) followed by recovery (increase in revenue) in the same months of 2011 (B & C= 5%; D= 7%) plus additional items.



### Decline Only Revenue Pattern

Revenue decline in 2010 Compensation Period (Zone B & C= 8.5%; Zone D= 15%) compared to the same months in the Benchmark Period year(s) plus additional items including factors outside company's control preventing recovery.



## PRELIMINARY APPROVAL HEARING
### Class Counsel Presentation
### April 25, 2012

### Summary of Revenue Pattern Requirements for Causation Tests

| Test | Zone A | Zone B (Non-Tourism and Non-Seafood) | | Zone C (Non-Seafood) | | Zone D | |
|---|---|---|---|---|---|---|---|
| | Down Up | Down | Up | Down | Up | Down | Up |
| V-Test | N/A | -8.5% | 5% | -8.5% | 5% | -15% | 10% |
| Modified V-Test* | N/A | -5% | 5% | -5% | 5% | -10% | 7% |
| Down Only test* | N/A | 8.50% | N/A | 8.50% | N/A | 15% | N/A |

*= For the Modified V-Test and the Down Only Test, additional requirements apply, as described in Exhibits.

Rec. Doc. 9087-1 (page 5)

It is only after a claiming Entity establishes Causation under Exhibit 4B that the Compensation is determined under the separate and distinct methodology set forth in Exhibit 4C. This Compensation Methodology is a Two-Step Process, which factors in both revenue and expenses, and which can be calculated using different months than were used to establish Causation.[10]

<u>The Allegedly "Fictitious" Claims that BP is Complaining About Are Claims Which Met the Required Proof of Causation</u>

While BP agreed that there would be limited businesses and geographic locations centered around tourism and the seafood industry for which causation would be presumed, these are not the claims that BP is complaining about.  Rather, BP is complaining almost exclusively about non-tourism and non-seafood businesses in Zone C and Zone D who *satisfied* the objective Causation Requirements BP agreed to in Exhibit 4B.[11]

<u>**Article III, Rule 23, and the Rules Enabling Act**</u>

As set forth in Class Counsel's Letter Brief to the U.S. Fifth Circuit in Case No. 13-30095, all Article III elements are satisfied.[12]  The Class Representatives clearly have Article III standing.  All Claimants allege that they have a loss caused by the Spill.  The eligible BEL Claimants are required to specifically establish a loss caused by the Spill under the objective

---

[10]  *See, e.g.,* Addendum to Causation Requirements for Business Economic Loss Claims and Compensation Framework for Business Economic Loss Claims [Doc 6276-10, at pp.7-8].

[11]  *See, e.g.,* APPENDIX B to Rumsey Declaration submitted by BP in Support of its Motion ("LIST OF AWARDS TO ZONE D CLAIMANTS MORE THAN 100 MILES FROM THE GULF IN SPECIFIED INDUSTRIES") [Doc 11819-2, at pp.19-48]; *see also,* APPENDIX A [Doc 11819-2, at pp.6-18];  Appendix B to BP'S MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION (March 15, 2013) ("Non-Exhaustive Examples of Claims Affected by Misapplication of Business Economic Loss Frameworks") [Doc 8910-3, at pp.47-71].

[12]  *See* Doc. 11728-6, at pp.5-8.

tests and criteria agreed to in Exhibit 4B.  And all absent classmembers have, at the very least, a "colorable" claim, under the broad remedial provisions of OPA,[13] the claims that were acknowledged and paid by BP in its GCCF,[14] and as defined within the Gulf Coast Area in the Economic & Property Damage Settlement Agreement.[15]

Moreover, the Article III, Rules Enabling Act and Rule 23 questions could only possibly affect the approval of the Class Settlement (and BP's Classwide Release) under Rule 23(b)(3) and/or Rule 23(e).

Parties retain the right to freely enter into settlement agreements and other enforceable contracts, irrespective of the arguable requirements or limitations of Rule 23.[16]

## Judicial Estoppel

Judicial estoppel is an equitable doctrine that "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." In re Paige, 610 F.3d 865, 876 (5th Cir. 2010); Hopkins v. Cornerstone Am., 545 F.3d 338, 347 (5th Cir. 2008); Hall v. GE Plastic Pac. PTE Ltd., 327 F.3d 391, 396 (5th Cir. 2003).   As the Fifth Circuit has noted:

> The purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest. Importantly, because judicial estoppel is designed to protect the judicial system,

---

[13] See LETTER BRIEF TO U.S. FIFTH CIRCUIT (Oct. 18, 2013) [Doc 11728-6] at p.6 fn.16; citing, 33 U.S.C. ¶¶ 2702(a), 2702(b)(2)(E), 2705(a), and  2713; In re: Deepwater Horizon, 808 F.Supp.2d 943, 958-962, 965-966 (E.D.La. 2011), David W. Robertson, The Oil Pollution Act's Provisions on Damages for Economic Loss, 30 MISS.C.L.REV. 157, 158-160 (2011).

[14] See, e.g., GCCF Maps [Doc 11804-7 thru -11].

[15] See SETTLEMENT AGREEMENT, Sections 1.1, 1.2, and 38.78, and Exhibit 22.

[16] See Footnote 1, supra.  Indeed, to nullify or amend the substantive terms of the contractual Settlement Agreement between the BP Parties and participating Claimants based on (alleged) Rule 23 concerns would likely run afoul of the Rules Enabling Act.

not the litigants, detrimental reliance by the party opponent is not required.

In re Paige, 610 F.3d at 876; Superior Crewboats, Inc. v. Primary P&I Underwriters (In re Superior Crewboats, Inc.), 374 F.3d 330, 335 (5th Cir. 2004).

In the Fifth Circuit, judicial estoppel applies where: (1) the party's position is clearly inconsistent with the previous one; (2) the court has accepted the previous position; and (3) the change in position is not inadvertent. In re Paige, 610 F.3d at 876; Superior Crewboats, 374 F.3d at 335.

Typically, judicial estoppel focuses on the positions a party has taken in its pleadings, but may also include counsel's statements in open court. In re Paige, 610 F.3d at 876 n.4; Ergo Science Inc. v. Martin, 73 F.3d 595, 600 (5th Cir. 1996).

BP also has contractual obligations to support and defend the class settlement in the district court and on appeal, from inception to finality.[17]

---

[17] *See* SETTLEMENT AGREEMENT, Section 16.1 ("The Parties agree to take all actions necessary to obtain final approval of this Agreement and the entry of a Final Order and Judgment, and dismissing all Released Claims against Released Parties with prejudice"); Section 17.1 ("The Parties agree to support the final approval and implementation of this Agreement and defend it against objections, appeal, or collateral attack. Neither the Parties nor their Counsel, directly or indirectly, will encourage any person to object to the Economic and Property Damages Settlement"); *see also,* Section 9.1 ("Communications by or on behalf of the Parties and their respective Counsel regarding this Agreement with the public and the media shall be made in good faith, shall be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final approval of the Settlement"); *see also, e.g.,* F.W.F. Inc. v. Detroit Diesel Corp., 494 F.Supp.2d 1342, 1359 (S.D.Fla. 2007), *aff'd,* 308 F.App'x 389 (11th Cir. 2009) ("Every maritime contract imposes an obligation of good faith and fair dealing between the parties in its performance and enforcement…. The duty embraces, among other things, an implied obligation that neither party shall do anything to injure or destroy the right of the other party to receive the benefits of the agreement").

## Previous Pleadings, Filings and Statements by the BP Defendants on Causation

On April 18, 2012, BP filed the *Deepwater Horizon* Economic and Property Damages Settlement Agreement into the record, which, as noted *supra,* defined Causation for Business Economic Loss (BEL) Claimants according to the objective criteria set forth in Exhibit 4B.[18]

On April 18, 2012, BP also filed a Joint Memorandum in Support of Preliminary Approval, which stated that:

> The standards for establishing causation for individuals are flexible and provide claimants with multiple options. Causation is presumed for those individuals most likely to have been affected by the spill, including those on the coast and those employed in certain seafood related businesses. Other individual claimants are required to demonstrate a loss of earnings attributable to the spill during May through December 2010 (or other applicable period in the case of certain Seafood Industry claimants) based on financial information….
>
> \*   \*   \*
>
> Businesses in certain geographic zones and industries, such as seafood processing, will not be required to provide documentation demonstrating causation, while businesses in other zones will be required to submit varying degrees of evidence of causation. For example, businesses in Fairhope, Alabama fall into Zone B. In order to recover, they must submit evidence of causation. One such form of evidence is documentation of a V-shaped revenue pattern—an aggregate decline of 8.5% or more in total revenues over a period of three consecutive months in the eight months following the spill followed by an aggregate increase of 5% or more in total revenues over the same period in 2011.[19]

On May 8, 2012, BP submitted a powerpoint presentation to the Court-appointed and Court-supervised Claims Administrator and Trustee, which stated that:

---

[18] *See* SETTLEMENT AGREEMENT (April 18, 2012) [Doc 6276-1], Sections 1.3.1, 5.3.1, 5.3.2.1, and 5.3.2.3; and EXHIBIT 4B [Doc 6276-9].

[19] JOINT MEMO IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL (April 18, 2013) [Doc 6266-1] pp.17, 20. *See also,* EXCERPTS FROM PRELIMINARY APPROVAL HEARING (April 25, 2012) [Doc 8963-59], *and,* PRELIMINARY APPROVAL HEARING PRESENTATION (April 25, 2012) [Doc 9087-1].

Qualifying businesses receive compensation for <u>all</u> <u>losses</u> regardless of actual facts and circumstances."[20]

On August 13, 2012, BP submitted a Memorandum in Support of its Motion for Final Settlement Approval, in which BP stated that:

> Without regard to total payout figures, the parties negotiated claims frameworks, programs, and processes, including details such as (1) what categories of claims would be paid, (2) what types of proof would be required for claimants to receive a settlement payment, (3) whether certain claimants should be permitted to benefit from causation presumptions that BP was willing to accept for settlement purposes (despite its informed legal views as to what OPA or maritime law strictly demanded), and (4) how settlement benefits would be calculated. The negotiations were thus exclusively focused, from the outset, on producing claims frameworks that could be administered fairly, objectively, and consistently.
>
> \*   \*   \*
>
> …the class definition references geography to reduce or eliminate disputes regarding whether particular claims are included and to focus relief on those in the most affected areas of the Gulf region. *See, e.g.*, Coffee Decl. (Joint Ex. C) ¶ 4 ("Also simplifying this case is the fact that the class definition carefully excludes remote claimants . . . . This deliberately narrow definition of the class . . . ensures that this class action will remain compact and that class members will be similarly situated (and hence more cohesive).")
>
> \*   \*   \*
>
> …the class definition takes pains to specify a list of exclusions, for two reasons: (1) *to exclude claims that BP does not believe are even <u>colorably</u> compensable under OPA or maritime law*; and (2) to avoid the inclusion of claims that could not be efficiently resolved by a definable and administrable claims framework…. The result is a class that is neither sprawling nor under-inclusive, but instead carefully tailored to what the parties could reasonably agree on against the backdrop of the uniform body of OPA and maritime law that the Court has ruled is applicable….
>
> \*   \*   \*

---

[20] BUSINESS ECONOMIC GROWTH: BENEFITS (from BP Draft Tutorial Presentation, at p.3) (emphasis in original) (submitted herewith as part of Exhibit "A").

Business economic damage claimants will also be compensated under the settlement for post-spill losses of earnings and profits. As with the individual framework, the goal of the business framework is to fairly compensate businesses for their losses suffered as a result of the spill; it "uses the well-recognized approach of measuring lost earnings or profits by comparison of the post-DWH Spill Compensation Period to a Benchmark Period."

\* \* \*

Many businesses will benefit from causation presumptions…. As Dr. Fishkind explains, the zones and industry definitions governing causation presumptions are economically reasonable, as they benefit the claimants most likely to have been affected by the spill.

\* \* \*

For those claimants required to prove causation, however, the tests are reasonable. *See* Landry Decl. (Ex. 13) ¶ 38 (describing the causation tests as "consistent with . . . economic reality"). Indeed, in many ways the causation principles are remarkably favorable to claimants. *See, e.g.*, Sharp Decl. (Ex. 18) ¶ 17 ("*[O]nce a business meets the causation requirements, for purposes of quantifying compensation, all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other causes.*").[21]

On August 13, 2012, BP submitted the Declaration of Holly Sharp, confirming that:

Once a business meets the causation requirements, for purposes of quantifying causation, *all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other causes.*[22]

---

[21] BP MEMO IN SUPPORT OF MOTION FOR FINAL SETTLEMENT APPROVAL (Aug. 13, 2012) [Doc 7114-1], at pp.6-7, 11-12, 29-30, 33, (emphasis supplied); *see also*, EXCERPTS FROM BP'S MEMO [Doc 8963-60]. *See also*, EXCERPTS FROM DECLARATIONS SUBMITTED BY BP'S EXPERTS IN SUPPORT OF FINAL APPROVAL [Doc 8963-61].

[22] DECLARATION OF HOLLY SHARP [Doc 7114-18], p.10, ¶17; *quoted in*, BP'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL [Doc 7114-1], at p.33, (emphasis supplied); *see also*, FROM SHARP DECLARATION [Doc 8963-62].

On August 13, 2012, BP also submitted the Declaration of James Henley, who stated that:

> The transparency and objectivity of the frameworks, which rely on expressly stated requirements or mathematical formulas, assures that claimants can understand how their claims can be treated under the frameworks.
>
> \* \* \*
>
> For businesses in Zone A or in certain industries in Zones B and C or Primary Seafood Processors in Zone D, there is a presumption of causation, which will inevitably include businesses that were not economically or financially affected by the DWH Spill.
>
> \* \* \*
>
> …the causation tests reflect reasonable expectations about the economic harm the DWH Spill could have caused to a business, and therefore are appropriate tests for the purpose of establishing causation. The "V tests" require that a business demonstrate a loss after the DWH Spill and a subsequent recovery. Based on my experience analyzing economic loss litigation cases, it is reasonable to expect a recovery at some point after a demonstrated loss where the circumstances claimed to have caused the loss have changed. The tests reflect this reasonable expectation. Moreover, the tests contain exceptions where it is reasonable to expect that other factors may have prevented a recovery, such as entrant of a new competitor or construction preventing customer access.[23]

On August 13, 2012, BP also submitted the Declaration of Henry Fishkind, who stated that:

> …projected earnings during a Claimant-selected post-DWH spill compensation period are compared to actual earnings during that period and *the difference is deemed a compensable loss.*[24]

---

[23] DECLARATION OF JAMES HENLEY [Doc 7114-11], pp.5, 18, 19  ¶¶ 8, 24, 25.  *See also,* EXCERPTS FROM DECLARATIONS SUBMITTED BY BP'S EXPERTS IN SUPPORT OF FINAL APPROVAL [Doc 8963-61].

[24] DECLARATION OF HENRY FISHKIND [Doc 7114-5], p.10, ¶31.  *See also,* EXCERPTS FROM DECLARATIONS SUBMITTED BY BP'S EXPERTS IN SUPPORT OF FINAL APPROVAL [Doc 8963-61].

On September 28, 2012, BP's Counsel, in a letter to the Court-appointed and Court-supervised Claims Administrator and Trustee, (filed into the record by BP on March 20, 2013), reiterated that:

> *One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's contemporaneously-maintained financial data submitted in compliance with documentation requirements.* These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements. Among other reasons, these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent.
>
> ….The Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements….[25]

Around the same time, Mike Juneau, on behalf of the Claims Administrator, had posed the following inquiry to the parties:

> As to BEL claims, once a claimant's financial records satisfy the causation standards set out in Exhibit 4B, does the Settlement Agreement mandate and/or allow the Claims Administrator to separate out losses attributable to the oil spill vs. those that are not? Stated another way, once a claimant passes the causation threshold, is the claimant entitled to recovery of *all* losses as per the formula set out in Exhibit 4C, or is some consideration to be given so as to exclude those losses clearly unrelated to the spill?
>
> I will give a hypothetical situation to try to illustrate the question we are asking:
>
> *Hypo:* A small accounting corporation / firm is located in Zone B. They meet the "V-shaped curve" causation test. The explanation for the drop in revenue is that  one of the three partners went out on medical leave right around the time of the spill. Their work output, and corresponding income, thus went down by about a third. The income went back up 6 months later when the missing partner returned from medical leave.

---

[25] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU (Sept. 28, 2012) (re: Sept. 25th Policy Announcements), p.1 [Doc 8963-68].

Applying the compensation formula under Exhibit 4C of the Settlement Agreement, the accounting firm can calculate a fairly substantial loss. Is that full loss recoverable?[26]

In response to the question and hypothetical, BP, in a letter to the Court-appointed and Court-supervised Claims Administrator and Trustee, (filed into the record by BP on March 20, 2013), confirmed that:

If proper application of the methodology with accurate financial data yields a determination that causation is satisfied, *BP agrees with Class Counsel that all losses calculated in accordance with ... Exhibits 4C ... of the Settlement Agreement are presumed to be attributable to the Oil Spill.*

\* \* \*

….If the accurate financial data establish that the claimant satisfies the BEL causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be attributable to the Oil Spill.

*Nothing in the BEL Causation Framework (Ex. 4B) or Compensation Framework (Ex. 4C) provides for an offset where the claimant firm's revenue decline (and recovery, if applicable) satisfies the causation test but extraneous non-fictional data indicate that the decline was attributable to a factor wholly unrelated to the Oil Spill. Such "false positives" are an inevitable concomitant of an objective quantitative, data-based test.*[27]

Based on BP's response, the Claims Administrator issued a formal Policy Statement on October 10, 2012, further confirming that there would be no inquiry into potential "alternative causes" of the claimant's losses.[28]

---

[26] E-MAIL FROM MIKE JUNEAU TO PARTIES (Sept. 25, 2012) [Doc 8963-66] (filed into the record by BP on March 20, 2013).

[27] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU (Sept. 28, 2012) (re: Issues Raised by Class Counsel or Settlement Program), at pp.1,3 (emphasis supplied) [Doc 8963-67] (filed into the record by BP on march 20, 2013).

[28] ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Oct. 10, 2012), No.2. [Doc 8963-71] (filed into the record by BP on March 20, 2013).

On November 8, 2012, BP appeared before the Court at the Fairness Hearing in support of final approval of the Economic & Property Damages Class Settlement. BP Counsel stated, among other things, that:

> We're presuming causation for whole sections of the Settlement Class depending on where you reside and the nature of your business.

> \*   \*   \*

> It's not only common sense; it's economic reality…. They were a product of arm's length negotiations informed by local experts.[29]

On November 19, 2012, BP submitted Joint Proposed Findings in Support of Final Approval of the Class Settlement, in which the Parties again confirmed that:

> The documentation, causation, and compensation framework for general Business Economic Loss Claims appears as Exhibits 4A-4E of the Settlement Agreement. The framework is fair, reasonable, and adequate….

> \*   \*   \*

> Causation is presumed (i) for all businesses in Zone A; (ii) for Tourism businesses in both Zones A and B; (iii) for all Primary Seafood Industry claimants; (iv) for Secondary Seafood Industry claimants in Zones A, B, and C; and (v) for Charter Fishing businesses in Zones A, B, and C. Where causation is presumed, the causation presumption applies to all losses established pursuant to the compensation methodology.

> \*   \*   \*

> The Settlement Agreement fairly and reasonably presumes causation for certain industries more likely to have been affected by the spill; the businesses that benefit from the presumption are the businesses that could most likely prove causation in litigation.

> \*   \*   \*

> Where causation is not presumed, the causation tests are reasonable and flexible; they use standardized and transparent approaches. The causation tests reflect rational expectations about the economic harm that the spill could have caused businesses. The first option is the V-shaped revenue test, which requires proof of a downturn after the spill

---

[29] *See* Doc 8963-72.

followed by a later upturn. Claimants with a less severe V ("Modified V-Shaped Revenue Pattern") or whose business did not experience an upturn in 2011 ("Decline-Only Revenue Pattern") may still recover provided that they can provide certain reasonable additional information. The causation tests are economically rational and supported by data regarding the economic impact of the oil spill on the Seafood and Tourism industries.

                              *     *     *

Once the causation tests are satisfied, *all revenue and variable profit declines during the Compensation Period <u>are presumed</u> <u>to be</u> <u>caused</u> <u>entirely</u> <u>by</u> <u>the spill</u>, with no analysis of whether such declines were also traceable to other factors unrelated to the spill.*[30]

On December 12, 2012, the Parties appeared before Judge Barbier in Court. BP Counsel confirmed to the Court that BP agreed with the Claims Administrator's Policy Statement regarding application of the Causation Framework.[31]

On December 21, 2012, the Court issued its Order and Judgment [Doc 8139] as well as its Order and Reasons [Doc 8138]. In approving the Economic & Property Damages Class Settlement, the Court held as follows:

Some business claimants must demonstrate that the spill caused their losses. In many other cases causation is presumed. The Settlement Agreement presumes causation for certain industries more likely to have been affected by the spill; the businesses that benefit from the presumption are the businesses that could most likely prove causation in litigation.

                              *     *     *

*…the proposed class in this case consists exclusively of individuals and businesses that have already suffered economic loss and property damage,* and the Settlement compensates class members for their past losses through detailed, objective compensation criteria….*[32]

---

[30] JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc 7945], at pp. 33, 36, 37, 38, 39 ¶¶ 108, 117, 122, 124, 126 (emphasis supplied); *see also,* FROM JOINT PROPOSED FINDINGS [Doc 8963-73].

[31] E-MAIL FROM JUDGE BARBIER re "MEETING TODAY re NON-PROFITS AND SIP" (Dec. 12, 2012) [Doc 8963-75] (filed into the record by BP on March 20, 2013).

[32] ORDER AND REASONS (Dec. 21, 2012) [Doc 8138] pp.11, 31 (emphasis supplied).

BP did not timely appeal the Order, Reasons or Judgment, nor has BP moved to modify the judgment under Rule 60.[33]

On March 15, 2013, the BP Parties filed a Complaint in these proceedings against the Court-Supervised Settlement Program and the Claims Administrator, in which BP alleged, agreed, acknowledged and confessed that:

> The Settlement Agreement is a valid contract meeting all required elements: offer, acceptance, and *consideration*.[34]

On July 8, 2013, the Parties appeared before the U.S. Fifth Circuit Court of Appeals in No. 13-30315.  BP Counsel stated the following:

| | |
|---|---|
| Judge Clement: | I have a question, sir. In your reply brief, you said the only issue in this appeal is the lost profits calculation and you were talking about how the variable profit is to be calculated…. My problem is I think the real issue in the case is causation and consideration. If you look at 4B where is BP's consideration for agreeing to pay those claims without proving they were caused by the Oil Spill? |
| BP Counsel: | This is a settlement, and with respect to the causation issue, that is not the issue that is before this court…. |

---

[33] A party seeking to modify the substance of a district court's consent decree bears a heavy burden of establishing that revision of the decree is justified. *See* Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 383 (1992) ("Although…a district court should exercise flexibility in considering requests for modification of a[]… consent decree, it does not follow that a modification will be warranted in all circumstances. Rule 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application," not when it is no longer convenient to live with the terms of a consent decree. Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree"). Further, the Court said that, "[a] party seeking modification of a consent decree may meet its initial burden by showing either a *significant* change either in factual conditions or in law." *Id.* at 384 (emphasis added). "Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385 (citing Twelve John Does v. District of Columbia, 861 F.2d 295, 298-299 (D.C. Cir. 1988), *and* Ruiz v. Lynaugh, 811 F.2d 856, 862-63 (5th Cir. 1987)). But, "[i]f it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Id.*

[34] COMPLAINT, *BP v. Deepwater Horizon Court Supervised Settlement Program,* No.13-492 (March 15, 2013) ¶65, (emphasis supplied).

The settlement agreement with respect to 4B as to causation provided a mechanism which allowed someone to come through the door to be then entitled to prove the amount of actual lost profits. It was a compromise, which every settlement agreement is, with respect to causation issues….

Judge Clement:     …. Where is the legal connexity between the damage or an injury and the ability to make BP pay?

BP Counsel:     It was a part of a compromise. There's going to be tens of thousands –

Judge Clement:     Where's the consideration?

BP Counsel:     The consideration is the consideration of the settlement class as a whole….

Judge Dennis:     A major consideration is no one can bring suit against you on the oil spill outside of this class action which you have now settled.

BP Counsel:     Exactly, your honor.

Judge Clement:     They couldn't bring suit against you anyway if it wasn't caused by –

BP Counsel:     They could bring suit.  They'd have to prove causation. They could sue, and this is a compromise of tens of thousands of claims. But the important thing, and the issue that were' talking about here, is, assuming causation, assuming that a claimant gets through the door and is now entitled to prove lost profits;  we then come to what everyone agrees in this case. The Appellees say this on page 27 of their brief: This appeal presents a straight forward question of contract interpretation.[35]

In the decision of October 2, 2013, both Judge Clement and Judge Southwick note that "alternative causes of losses were irrelevant if the financial figures supported that a loss

---

[35] *See* Unofficial Transcript of Hearing before U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, at pp.10-14, (submitted herewith as Exhibit "B").

occurred." SLIP OPINION, p.21.[36]   Judge Southwick also concluded that: "Because the Rule 23

problem BP raises is confined to the *measurement of loss* and <u>not</u> to *the questions of standing* of

claimants who cannot show their losses were caused by BP's actions, I would not at this time

suggest there is a fundamental Rule 23 defect in the Settlement Agreement."[37]

<u>Conclusion</u>

For the above and foregoing reasons, for the reasons stated in Class Counsel's *In Camera*

Submission of October 9, 2013 [Doc 11728-1], and for the reasons stated in Class Counsel's

Letter Brief to the U.S. Fifth Circuit in Case No. 13-30095 [Doc 11728-6], the Court should find

that: **(i)** the Economic & Property Damages Settlement Agreement satisfies the requirements of

the General Maritime Law, Article III, the Rules Enabling Act, and Rule 23; **(ii)** the BEL

Causation requirements in Exhibit 4B have been interpreted and applied correctly by the Claims

Administrator; and **(iii)** BP is estopped from taking any position to the contrary.

This <u>7th</u> day of <u>November</u>, <u>2013</u>.

Respectfully submitted,

<table>
<tr><td>    /s/   Stephen J. Herman    </td><td>      /s/ James Parkerson Roy</td></tr>
<tr><td>**Stephen J. Herman**, La. Bar No. 23129</td><td>**James Parkerson Roy**, La. Bar No.11511</td></tr>
<tr><td>**HERMAN HERMAN & KATZ LLC**</td><td>**DOMENGEAUX WRIGHT ROY EDWARDS LLC**</td></tr>
<tr><td>820 O'Keefe Avenue</td><td>556 Jefferson Street, Suite 500</td></tr>
<tr><td>New Orleans, Louisiana 70113</td><td>Lafayette, Louisiana 70501</td></tr>
<tr><td>Telephone: (504) 581-4892</td><td>Telephone: (337) 233-3033</td></tr>
<tr><td>Fax No. (504) 569-6024</td><td>Fax No. (337) 233-2796</td></tr>
<tr><td>E-Mail: sherman@hhklawfirm.com</td><td>E-Mail: jimr@wrightroy.com</td></tr>
<tr><td>*Co-Lead Class Counsel*</td><td>*Co-Lead Class Counsel*</td></tr>
</table>

---

[36] *See also,* SLIP OPINION, pp.37-38 (Southwick, concurring) ("the parties agreed that Exhibit 4B's causation framework to ignore alternative explanations for actual losses that occurred to claimants during the proper time period").

[37] SLIP OPINION, p.39 (Southwick, concurring) (emphasis supplied).

## ECONOMIC & PROPERTY DAMAGES CLASS COUNSEL

Brian H. Barr
LEVIN, PAPANTONIO
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Opposition will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of November, 2013.

/s/  Stephen J. Herman and James Parkerson Roy