UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010

MDL No. 2179

SECTION: J
JUDGE BARBIER
MAGISTRATE JUDGE SHUSHAN

## DECLARATION OF ROBERT MICHAEL WALLACE

1. My name is Robert Michael Wallace and I previously submitted a Declaration in this case on February 18, 2013, which is respectfully incorporated by reference herein.

2. I have reviewed each of the declarations of Wendy Bloom, Hal Sider, and Brian Gaspardo (Declarants) submitted in this matter. Based on my review, it is apparent to me that these three Declarants have taken isolated statements made by me out of context, in an attempt to support a premise (matching of revenue and expenses) that was never discussed during negotiations nor written into any provision of any draft of the BEL framework. In fact, the Declarants rely only on broad statements made very early in the negotiation process before any particular BEL calculation or methodology had been agreed to or formulated in writing. The purported assumptions made by the Declarants are based on innuendo and half-truths and not on any factual evidence or record of specific discussions regarding the "matching of revenue and expenses."
To more specifically reply to the Declarants' assumptions, I state as follows[1]:

**Wendy L. Bloom's Declaration:**

*Ms. Bloom states on Page 7, Paragraph 18, of her Declaration: "At a meeting at the Royal Sonesta Hotel... during the week of September 12, 2011,.........Mr. Wallace stated that, for the most part, claimants are not at a sophisticated level of inputting information in their financial statements. He noted that his clients misclassify expenses as fixed that may be variable. He noted that in his experience clients' profit and loss statements (P&Ls) may be "skewed" because by way of example, businesses often do not accurately record expenses such as bad debt. Mr. Wallace noted as an example of how he identifies*

---

[1] My failure to address/reply to any specific statement of the Declarants is not an admission as to the truth of any statement.

*whether a P&L contains inaccuracies that he would look for whether the P&L contained negative monthly gross profit entries in which case the P&L is not valid.*

3. First, the topic of the classification of fixed and variable expenses was in fact discussed in negotiations as is evidenced by the inclusion of Exhibit 4D to the Settlement Agreement (Attachment A – Fixed and Variable Cost). However, to be clear, Ms. Bloom's statements are not my words, but her own attempt at word-play and innuendo, to convey BP's current unsupportable position. The phrases referenced above, including "for the most part" and "skewed" are not words that I used in negotiations to describe a potential claimant's financial statements.

4. As I recall, we were specifically discussing fixed vs. variable expenses, and I noted that some smaller business clients are not sophisticated and, therefore, do not always classify expenses as fixed or variable correctly WITHIN A MONTH. For example, a claimant may record a computer purchase as supplies for a month, when it is really an asset and not an expense and it should be correctly classified as such. The focus of these discussions was that expenses should be correctly CLASSIFIED as fixed or variable within the MONTH they were recorded in the contemporaneous financial statements (NOT whether these specific expenses were recorded in the "correct" month). Eventually, as a remedy to the issue of determining which expenses should be classified as fixed or variable, a list of expenses was negotiated and agreed to by the parties and memorialized as Exhibit 4D of the Settlement Agreement. These discussions certainly did not include any mention by the Declarants (or anyone) that monthly expenses (fixed or variable) from contemporaneous financial statements would be allocated to different months based on any "matching" concept.

5. Regarding Ms. Bloom's "Bad Debt" reference above, during our negotiations, we clearly identified and discussed a definitive list of fixed vs. variable expenses including Bad Debt Expense.(See Exhibit 4D) Again, the focus was on identifying the classification of these items as fixed or variable within the month recorded. Even with the focus on this particular expense item, not one of the Declarants mentioned allocating this expense throughout the year. Instead, the focus was consistently placed on the proper classification of expenses found in the month it was recorded. Consequently, there is no requirement in Exhibit 4D (or anywhere in the Settlement Agreement) that these expenses be allocated to different months or "matched."

6. Regarding the proper context of my comment on "negative monthly gross profit," this discussion revolved around one specific example of a small business client who had incorrectly classified some Operating Expenses as Cost of Sales items WITHIN A SPECIFIC MONTH (This was not any example of a misclassification of expenses in one month vs. another). Again, these reclassifications were made "within each month" and

were a matter of classification and using the correct nomenclature of certain expense items on a financial statement and not as part of matching or smoothing methodology that would allocate expenses or revenues to different months from which they were contemporaneously recorded. I certainly did not say that a P&L was "invalid" because of such a misclassification.

*Ms. Bloom states in Paragraph 18: "Consistent with what Mr. Wallace had stated at the meeting at the Royal Sonesta, a spreadsheet, provided on October17$^h$, indicated that Mr. Wallace had made a manual adjustment to cost of goods sold, which is a variable expense that is tied directly to the computation of variable profit. In describing this adjustment, the document contained the following footnote to an Excel file produced on October 17: Some claimants (e.g. seafood processors) may report monthly processing costs using standard cost accounting systems. In these instances, COGS [Cost of Goods Sold] must be adjusted to reflect the ACTUAL monthly costs.....Such adjustments are necessary to ensure that expenses are properly allocated to revenues."*

7. First, Ms. Bloom's liberal assumption that my alleged statements at the Royal Sonesta were "consistent" or connected in any way to the production of the spreadsheet on October 17, 2011, is incorrect. Second, the last sentence of Ms. Bloom's excerpt "Such adjustments are necessary to ensure that expenses are properly allocated to revenues" is certainly not a statement that I ever made in settlement negotiations nor is it found anywhere in the excel spreadsheet she references, although it is conveniently included by Ms. Bloom right after her excel spreadsheet reference. In addition, this statement is nowhere to be found in the Settlement Agreement.

8. The Excel file produced October 17, 2011 demonstrates a unique GCCF claim situation I observed with a Seafood Processor client that we thought was of interest in understanding different accounting approaches. Some Seafood Processors maintain their monthly accounting records and P&L reports on a Standard Cost Accounting Approach. This does not reflect the ACTUAL monthly cost of sales **within a specific month, but only an estimated cost of sales in that month**. For example, the company accountants calculate an "estimated cost per pound" of shrimp. This is used to create monthly management-based financial reports. At year end, the Actual Expenses are compared to the estimated Standard Cost Accounting balances resulting in an adjusting journal entry. This was not a "matching" or "smoothing" adjustment of monthly cost of sales over a different month or period of months but the replacement of estimated cost of sales with the actual cost of sales within each month. The Declarants misguidedly attempt to take one isolated statement using the terms "Actual monthly costs" in a very unique Cost Accounting circumstance, and apply a meaning that is inapplicable.

### Hal Sider's Declaration

*Mr. Sider states in his Declaration at paragraph 12 that "Mr. Wallace stated, on behalf of the PSC, that claimants' accounting was often not sophisticated and the claimants' P&Ls may need to be adjusted to ensure reliability"*

9. Despite Mr. Sider's alleged assumptions, any comments made by me regarding adjustments to profit & loss statements were limited to the simple reclassification of variable and fixed expenses or the correct nomenclature for certain line items already recorded WITHIN a particular month of the contemporaneous financial statements, and not related to any adjustments that would reallocate expenses or revenue to DIFFERENT months based on any matching or attribution of revenue concept. Again, in all of the negotiating sessions in which I participated, there were never any discussions with Mr. Sider regarding the matching of revenue and expenses. (See also paragraphs 3-6 above)

*Mr. Sider states in his declaration at paragraph 14 that "Mr. Wallace presented an example calculation based on a seafood processing company whose P&L statement included an annual adjustment to its Cost of Goods Sold.....Mr. Wallace explained that the company's monthly financial statements were based on an estimated "standard cost," but the actual costs it realized differed from this estimate. Mr. Wallace's presentation of this example highlighted the presence of his adjustment to monthly costs, although his precise methodology for making these monthly adjustments was not discussed...This example indicated to me at the time that Mr. Wallace recognized that adjustments to claimants' financial data would be necessary to yield accurate measures of lost variable profits." Mr. Sider also states in paragraph 16 that "Spreadsheets provided by the PSC that contained the claimant specific financial data noted that claimants' reported COGS (cost of goods sold) would need to be adjusted to reflect actual costs incurred and, therefore, economic reality"*

10. Please note my explanation in paragraphs 7 and 8 above. The purpose of using a Standard Cost Accounting system is for management of a company to track its performance throughout a period, even if its actual costs incurred in production are not yet known.[2] This adjustment is not based on revenue generated for the month; rather, it is based on the actual expenses incurred in each month, as evidenced by the fact that the adjustment can increase or decrease the amount recorded as the standard cost for months in the same year. This by no means is a "matching" concept and was not provided by me to imply that any such concept should be implemented within the Settlement Agreement.

---

[2] This is a methodology of reporting typically employed by companies in the manufacturing industry, and it is not widely used by companies in other industries. The process to set standard unit costs occurs in conjunction with a company's budgeting and planning process for a coming year, and management will consider historical performance and historical data to estimate what they expect the unit cost of goods to be in future periods. At period-end, management will analyze its actual costs incurred and adjust the prior months' cost of goods sold expense to reflect the actual expenses incurred.

Neither at that time nor anytime thereafter, were there any comments or questions from Mr. Sider regarding this particular issue, or the applicability, implementation, or testing of matching or revenue attribution concepts for any of the test cases. Also, there are no writings or drafts of BEL calculation documents from Mr. Sider that suggest that matching concepts were to be included in the Settlement Agreement.

**Brian L. Gaspardo's Declaration**

> *Mr. Gaspardo states in paragraph 8 of his declaration that "Representatives of both parties also stated that they recognized that monthly financial statements from claimants would often be unreliable and that to ensure statements were relevant and reliable the Claims Administrator would be required to review the statements submitted by claimants, request additional documentation, and make adjustments."*

11. See responses 3-6 above.

> *Mr. Gaspardo states in paragraph 10 of his declaration that "During an Accounting Working Group meeting in the fall of 2011, the parties discussed how to handle a bonus paid by a claimant at a single point during the year. Mr. Wallace acknowledged that the Claims Administrator would be responsible for allocating expenses like Bonuses across the months in which they were incurred."*

12. I recall discussing Bonuses with Mr. Gaspardo in the context of their classification as a fixed expense and as part of a management compensation/payroll formula. I certainly do not recall stating in any manner that the Claims Administrator should "allocate Bonuses (or anything else) across the months in which they were incurred." or "work was performed." In fact, that statement would run contrary to my position on the treatment of that particular expense. Typically, bonuses would have been paid within the same month each year. For example, bonuses are often paid at year end in the form of an Employee Holiday Bonus or when management has assessed the company's performance for that year. The discussions were focused on WHEN expenses were paid for comparison with comparable benchmark periods (e.g. December 2010 compared to December 2008 and 2009) and the importance of using the required contemporaneously prepared monthly P&Ls.

13. After reviewing the Declarations of BP in the preceding paragraphs, if they are implying that I discussed with any representative of BP whether or not expenses and revenue would be matched for all Business Economic Loss (BEL) claims, the answer is clear – I did not. We did not discuss whether or not expenses and revenue would be matched for any BEL claim, much less all BEL claims. Any implication or statement otherwise is simply not true.

I declare under penalty of perjury that the foregoing is a true and correct statement of my analysis and opinions.

R. Michael Wallace, CPA

Dated: November 12, 2013