THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

DECLARATION OF JOSEPH F. RICE
RE: BEL REMAND ISSUES

I, JOSEPH F. RICE, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I filed a declaration of November 6, 2013 in this action. I give this additional declaration in response to issues raised in the BP filings. I incorporate my previous declaration fully herein.

2. I reviewed the declaration of Wendy Bloom in detail. While many of the statements made by Ms. Bloom providing background information are accurate, I provide this declaration to correct some comments and to provide context.

3. At the time of the settlement discussions I did raise the fact that under the GCCF there had been two jet ski businesses located side by side that had received wildly different evaluations from the GCCF using different approaches in calculating losses. This was presented as an example of why the Settlement Agreement had to have common, objective, and transparent

frameworks for all businesses so that a business would know going into the Settlement with a high degree of accuracy what they would be entitled to receive in compensation.

4.   I believe this is further support for the position that an after the fact, yet to be described, process that would involve matching expenses to revenue was never agreed to or contemplated by the parties as it would present unknown features into the Settlement Agreement and to the calculation of compensation, such that a Claimant would have no way of knowing what objective and transparent criteria was going to be applied.

5.   In my prior declaration I described the conversation with Mr. Feinberg where he made it perfectly clear to Mr. Fayard and me that Claimants were not in possession of documents to prove a lot of detail back up for financial statements. The PSC would never have, and did not agree, to a settlement process that would require that type of detail.[1]

6.   The Documentation Requirements found in Exhibit 4(A) of the Settlement Agreement are not properly quoted by Ms. Bloom in her affidavit. Exhibit 4(A), paragraph 4, says,

> "Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011. Profit and loss statements shall identify the dates on which they were created. The Claims Administrator

---

[1] While this matter has been argued before the Court for almost a year, we have yet to receive from BP a proposal of how they think this matching of expenses to revenue would ever be done. A process they assert was agreed to by the parties two years ago.



<u>may</u>, in his discretion, request source documents for profit and loss statements. <u>If there is a discrepancy</u> between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation. (Emphasis Added)

The parties clearly negotiated that monthly and annual profit and loss statements were the first and main document requirement. The alternate source documents are an alternative to monthly and annual profit and loss statements (i.e. or), not in addition to the monthly and annual and profit and loss statements as Ms. Bloom suggests. The Claims Administrator **does** have discretion to request source documents for the profit and loss statements, not documentation for every business activity that occurred in the five year (2007 – 2011) period of time. Only if the Claims Administrator determines there **is a discrepancy** between amounts in a tax return and the monthly profit and loss statements **may** the Claims Administrator request additional information or documentation. The PSC negotiating team never agreed to an open forensic analysis or a total business evaluation that would require detailed documentation that we were told by Mr. Feinberg early in the process the Claimants would not have. The claims process has shown that Claimants do not have that type of detailed financial records going back to 2007.

7. In paragraph 16 Ms. Bloom refers to the discussions related to the August 31, 2011 draft. The parties did discuss the development of a framework for taking revenue and reducing it by variable expenses or variable costs. Then for several months collectively, and with the

accounting working team, negotiated exactly how to do this. We addressed which expenses would be deemed fixed, which would be deemed variable, what items in cost of goods sold (COGS) would be treated as variable expenses and the exclusion of specific items we would treat as fixed within COGS. We discussed specifically how to handle payroll and salary, and how to adjust it for seasonal businesses. We discussed expenses that could be both fixed and variable, and we specifically negotiated a percentage division to be applied. (see Settlement Agreement Exhibit 4C and 4D) What was never suggested, and never negotiated, was **any attempt** to create an after the fact process by which expenses would be matched to revenue over a five year period of time, or that a claimant would have to produce documents to allow restatement of the contemporaneous financial statements recording of revenue by some unknown criteria .

8.      In paragraph 17, Ms. Bloom inserts the concept and wrote "corresponding variable expenses incurred to generate that revenue." There was never a draft of the Settlement Agreement compensation formula that linked variable expenses to specific revenue. You will not find the words "generate that revenue" in any settlement draft. Nor will you find "actual economic losses" or "matching of revenue and expenses". On complete review Ms. Bloom's suggested interpretation and language is also missing. Attachment A is a Chart that takes the quotes from the declarations of Ms. Bloom and Mr. Godfrey (left side of Chart) and shows the results of the word search of the Settlement Agreement and Exhibits. (right side of the chart)  Attachment B is the result of a word search of the Settlement Agreement for the words "match" and "matching".

9. In paragraph 18 of Ms. Bloom's declaration she acknowledges that we knew that our Claimants were not "sophisticated" at inputting information into their financial statements. It is for this reason that we insisted on a transparent, simple process that relied upon the monthly P&Ls, and that we expressly negotiated adjustments for cost of goods sold and variable "Selling, General, & Administrative" (SG&A) expenses, and why BP expressly negotiated for adjustments in payroll and salary references.

10. From a review of the documents that have been presented to the Court, it is obvious that the parties meticulously negotiated every word of the BEL Framework. For BP now to suggest that the parties intended in any way for there to be:

- an individual evaluation by industry,

- shifting agricultural claims from a calendar year to an annual crop year,

- the development of a hierarchy of processes,

- the development after the fact of triggers to warrant alteration in stated revenue from the Monthly P&L's,

- Ratios and formulas subsequently developed by the Claims Administrators team to match expenses to revenue,

- Attributes revenue recorded over 6 years ago under some unknown rules, and

- treat each industry in a different fashion,

is contrary to all of the evidence presented to the Court by the parties when they jointly presented the objective, transparent Settlement Agreement.[2]

11. If the parties had contemplated the development of triggers and changes of variable expenses or percentage of revenue, why is there no negotiation history of the trigger points? Surely there would be at least one discussion of the applicable percentage from a group of sophisticated attorneys and economists that spent months negotiating each percentage point change that went into the revenue trend V-shaped calculation in the Causation framework? If there were going to be triggers applied, they would have been negotiated, not left to fate. If we were going to match expenses to revenue, why would we have needed tax returns to reconcile the monthly profit and loss statements[3]?

12. Ms. Bloom, in paragraph 26 of her declaration, refers to a meeting with Mr. Hacker where PSC representatives were not in attendance. In Ms. Bloom's declaration she suggests coming away from that meeting with a comfort level that because there was a recognition of a significant amount of work to be done by accountants, that Mr. Hacker was intending to apply some matching of expenses to revenues. However, on April 4, 2012, when BP received Mr. Hacker's memo, which clearly identified his recommendation that the document be **changed to allow for matching**, (emphasis added) no one from BP suggested to Mr. Hacker, or to the PSC that matching was an agreed-to process where the PSC expressly rejected the attempt of altering the Settlement Agreement by saying "This is not agreed to". (Exhibit O to the Rice November 6, 2013 Declaration, submitted as Record Doc. No. 11804-23 and Attachment 3 Rice email to Mike Juneau dated October 23, 2013 and Mike Juneau's responding email dated November 6, 2013.)



13.     Mr. Hacker's April 4, 2012 memo cannot be read as Ms. Bloom seeks to read the document. Mr. Hacker discusses, on page 1 of his memo,

> "Under the proposed Compensation Framework for Business Economic Loss claim (the "Framework"), unless specifically addressed on a claim by claim basis, revenue fluctuations due to hurricanes, changes in locations of businesses, changes in customer base, floor plan expansions, changes in product/service offerings, and any other alternative causes of loss not directly related to the Spill may or may not impact the loss calculation."

There is no reasonable inference one can draw to interpret Mr. Hacker's memo as suggesting that matching of expenses and revenues is going to occur. He expressly interpreted the document, at that time, as it has been interpreted consistently since that time by the Claims Administrator Accounting Vendors after numerous tutorials with the Settling Parties, as not requiring matching of expenses to revenue but to use the claimant's contemporaneous monthly P&L statements as submitted absent a discrepancy with the Federal Tax Returns.

Signed under penalty of perjury this 12th day of November, 2013.



Joseph F. Rice

---

[2 & 3] BP would have the Court believe we negotiated for over 145 days every little detail but then left to the Claims Administrator and Vendors the responsibility and authority to arbitrarily: (1) assign bad debt on a pro-rata basis, (2) obtain job schedules, obtain job-specific work performance schedules and to match variable expenses to revenue for each month from January 2007 through 2011 (3) to multiply newly created revenue by the annual ratio of revenue to variable expenses in the variable expenses reported for that month, (4) to determine crop years for each agricultural

business and apply crop year versus calendar year, (5) to require hourly billing records for any professional association going back to 2007 to pro-rate expenses over the life of a business matter. Among numerous other expense and revenue manipulations these are just some of the current suggestions from BP of what matching would require.