THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

DECLARATION OF CALVIN C. FAYARD, JR.
RE: BEL REMAND ISSUES

I, CALVIN C. FAYARD, JR., respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am a native and a lifelong resident of South Louisiana.

2. I attended and graduated from the public school system, including primary school, high school, collegeand law school.

3. I have worked in the Gulf of Mexico, offshore from Texas and Louisiana, and also worked in the petrochemical industry through my college years.

4. From early childhood I have enjoyed the recreational opportunities including hunting and fishing in coastal areas of Texas, Louisiana, Mississippi, Alabama and Florida, as well as offshore fishing in the Gulf of Mexico.

5. I am familiar with the lack of educational opportunities offered to some residents of the Gulf Coast and their reliance on day-to-day subsistence opportunities.

6. I am licensed to practice law in Louisiana, and I was appointed by the Court to the Plaintiffs' Steering Committee in the fall of 2010.

7. The Gulf of Mexico fuels the livelihood of hundreds of thousands of hard working individuals and many businesses. It is their "way of life." The Gulf is also the heart of the basic economic structure of coastal communities, towns and cities. And just as importantare the fruits and products that flow from the Gulf of Mexico which have direct

impact on areas which are hundreds of miles from the Gulf shoreline; particularly, in Mississippi, Alabama and Louisiana.

8. Thus, when the BP explosion and oil spill occurred, it resulted in both immediate and long range impact to the entire Gulf south region and many miles beyond.

9. I was asked by co-liaison counsel Jim Roy and Steve Herman to focus on development of a plan for resolution and/or settlement of the litigation in MDL 2179. I immediately implemented a plan to develop confidential and offline communication networks with appropriate defense counsel.

10. In the fall of 2010 I reached out, with Mr. Herman and Mr. Roy's consent, and requested Joseph F. Rice of Motley Rice LLC to assist me. I had worked with the Motley Rice firm previously for a number of years in the tobacco litigation, as well as several other matters, and was quite familiar with their work. Joe Rice agreed to assist me, and we began developing alternative strategies for potential settlement of some or all of the litigation before the Court in MDL-2179.

11. For the next several months Joe Rice and I worked closely together to implement the plan, and we began meeting with relevant individuals to further educate ourselves on the complexities presented by the litigation and the issues that needed to be addressed.

12. In the spring of 2011 we began informal discussions with the representatives of BP which were ongoing until the summer of 2011 when we entered into active confidential negotiations. After numerous months of weekly, if not daily, meetings, we filed the current Class Settlement Agreement with the Court in April 2012. I participated personally in virtually all settlement negotiating sessions which were held in London and various cities throughout the United States.

13. I have reviewed all declarations filed with the Court concerning the current issue presented. I submit this declaration to supplement the factual record regarding the intended meaning of Exhibit 4(c) of the Settlement Agreement, as it applies to the question presented by the Court.

14. I distinctly remember the "jet ski" example Ms. Bloom refers to in her declaration. Joe Rice referenced the two jet ski rental claimants in settlement negotiations to point out the continued complaint that Claimants had about the GCCF treating similarly situated businesses in grossly different ways, without any transparency.

15. It became one of my focal points during the negotiations to be certain that there was a single, simple, straight-forward methodology for a Claimant to understand how their losses would be evaluated and calculated.

16. I knew from nearly forty years of experience in practicing law in the Gulf Coast area and living here my entire life that many of the businesses as well as individuals that we were representing would not have detailed financial records, would have possibly lost

historical records in floods and storms that frequent our area, and perhaps they would not have particularly sophisticated financial records.

17. It was my intent throughout the negotiations to be sure that we had an objective, transparent and fair claims process. In seeking consistent treatment, I wanted one methodology for calculating the compensation a Claimant would be entitled to that would be based on the Claimant's own business records, as maintained in the normal course of their business and that would not create unwarranted nor unduly burdensome obstacles of proof to their rights to receive compensation.

18. Early in our negotiations we fought for a damage model that measured losses not only as those occurring post-spill in the calendar year 2010, but also those that occurred in 2011 and thereafter. BP insisted on limiting the time period to May to December, 2010. Ultimately we agreed to the limitation of 2010 but it was only in exchange for giving the plaintiff the flexibility to choose three or more months in 2010 as the Compensation Period. This was a decision reached by compromise that we made during the negotiation of the Settlement to give the plaintiff the optionality.

19. If there had ever been any indication by BP that smoothing of expenses and revenue throughout the calendar year must occur, then the optionof the plaintiff to pick three or more months which was agreed upon by the parties and memorialized in the Settlement Agreement would not have had any significant value to the plaintiff. We, as negotiators,rather than agreeing to end in 2010, would have instead maintained our position for a much larger time period of measurement of damages, which could have included 2011 and thereafter. Put another way, in return for the plaintiffs getting this optionality, BP got their May-December 2010 time limitation period.

20. As set forth in Joe Rice's declaration, we insisted on a loss calculation using actual revenue with a reduction for variable expenses. We did **not** accept the general accounting principles ("GAAP") of variable expenses, and in fact we negotiated **specifically**:

    a. A list of variable expenses and fixed expenses that is located in Exhibit 4(D);

    b. A determination of how to handle salary and payroll cost including a percentage allocation;

    c. A percentage split maintenance and repair costs.

21. Throughout the negotiations there wereconsistently detailed and intense discussions over any issues that could possibly affect the Compensation Calculation. As they frequently reminded us, BP was represented by counsel with extensive and significant complex litigation experience,and they were accompanied by a team of experts from multiple disciplines that also represented substantial expertise. It is my perception that these professionals were permanent members of BP's negotiation travel team and were employed not only as consultants, in the traditional sense, but were also very focused on

performing detailed and precise analysis of each and every provision of the settlement agreement considered in advance of, during and after each negotiation session.

22. At **no** time did this sophisticated group of professionals **ever** suggest that variable expenses should be matched to the specific revenue that was generated during a period of time selected by the Claimant as the Compensation Period.

23. **Never** did this sophisticated group of professionals notify me of any assumption they were making concerning the definition of "revenue" and "expenses."

24. **Never** did this group of sophisticated professionals ever suggest that a farmer or a "Mom and Pop operation" was going to be required to go back for five years, to 2007, and produce documentation of their business activity during each month of the years 2007 through 2010 in order to determine what they were doing each day of the week, or each month, and when they received compensation for the work they did during that period of time, which is the concept that BP is **now** promoting to the Court as the "intended matching of expenses to revenues."

25. In April of 2012 when Mr. Rice received Mr. Hacker's email of April 4, we immediately discussed the implications of Mr. Hacker's suggestion to require some type of matching of expenses to revenues, and as indicated in Mr. Rice's response to Mr. Hacker, "**this is not agreed to.**" (emphasis added).

26. I cannot provide testimony of what Ms. Bloom or Mr. Godfrey might have understood, might have assumed, might have developed a common understanding of, or what they thought the unstated unmistakable premises were. However, I can state from my own personal knowledge that they **never** suggested to me in any meeting, email, phone call conversation or otherwise that there was a requirement, or should be a requirement, for a detailed evaluation or forensic-type audit of economic activity required in each and every BEL claim in order to have a compensable, measureable loss under the terms of the Agreement we negotiated.

Further affiant states not.

Signed, under penalty of perjury, this _11th_ day of November, 2013.

_____
CALVIN C. FAYARD, JR.