# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by<br>the Oil Rig "Deepwater Horizon"<br>in the Gulf of Mexico, on April 20, 2010 | * <br> * <br> * <br> * | MDL NO. 2179 <br><br> SECTION J |
| This document relates to:<br>All Cases and No. 12-970 | * <br> * <br> * <br> * <br> * <br> * <br> * | Honorable CARL J. BARBIER <br><br> Magistrate Judge SHUSHAN |

### REBUTTAL DECLARATION OF RICHARD C. GODFREY

I, Richard C. Godfrey, do hereby declare that the following statements made by me under oath are true and accurate to the best of my knowledge, information and belief:

#### Introduction

1. My background and qualifications are set out in my initial remand declaration of November 7, 2013. (Rec. Doc. 11818-2.) As before, I make this Rebuttal Declaration based upon my own personal knowledge.

2. In accordance with the Court's October 25, 2013 Scheduling Order regarding the BEL Remand (Rec. Doc. 11735), I submit this Rebuttal Declaration to respond to certain (but not all) statements made in the declarations submitted by Class Counsel ("Class Counsel" or "PSC") on November 6, 2013.

#### Class Counsel's Submission Confirms the Need for "Matching" on All Claims

3. I am not aware of any document exchanged during the course of the Settlement Agreement negotiations suggesting or stating that Exhibit 4C required matching only for some but not all claims. Nor am I aware of any discussion during the course of the negotiations that suggested or stated that Exhibit 4C required matching only for some but not all claims. Neither I

nor anyone else representing BP as far as I am aware ever did or said anything suggesting that BP agreed that implementation of Exhibit 4C would be determined based upon either a measurement of differential cash flows or, alternatively, how each claimant idiosyncratically recorded its financial information.

4. Mr. Rice asserts that "standard definitions were not adopted into this settlement." (Declaration of Joseph F. Rice ¶ 44, Rec. Doc. 11804-4.) I do not believe this to be correct, as I never heard any suggestion during negotiations that the terms "revenue," "incurred," and "expenses" were intended to have a meaning other than their ordinary meanings in the context of a lost-profits analysis. Thus:

- At no time prior to the signing of the Settlement did Mr. Rice or anyone else from the PSC say to me or anyone else at BP to my knowledge that the word "revenue" in Exhibit 4C was used to mean cash receipts.

- At no time prior to the signing of the Settlement did Mr. Rice or anyone else from the PSC say to me or anyone else at BP to my knowledge that the word "expense" in Exhibit 4C was used to mean cash expenditures.

- At no time prior to the signing of the Settlement did Mr. Rice or anyone else from the PSC say to me or anyone else at BP to my knowledge that the word "earn" in Exhibit 4C was used to mean receipt of cash.

- At no time prior to the signing of the Settlement did Mr. Rice or anyone else from the PSC say to me or anyone else at BP to my knowledge that the phrase "actual profit" in Exhibit 4C was used to mean the difference between cash receipts and cash expenditures.

- At no time prior to the signing of the Settlement did Mr. Rice or anyone else from the PSC say to me or anyone else at BP to my knowledge that the phrase "reduction of profit" in Exhibit 4C was used to mean a reduction in the difference between cash receipts and cash expenditures.

Had I understood that these terms did not have their ordinary meanings, but instead had the special and unique meanings Mr. Rice now ascribes to them, BP would have objected at the

2

time. Indeed, the Court (Judge Barbier) found that the Agreement used "standardized formulas derived from generally accepted and common methodologies"—a finding that is inconsistent with Mr. Rice's assertion. (December 21, 2012 Order and Reasons Granting Final Approval of the Economic and Property Damages Settlement Agreement at 8, Rec. Doc. 8138.)

5.  I believe Mr. Herman and Mr. Rice to be mistaken when they state that "[n]either BP nor the PSC Negotiating Team expressed a suggestion or expectation that Program Accountants would . . . attempt to determine which particular expenses 'corresponded' with the monthly revenues . . . [or] attempt to determine what revenues had been 'earned' during the Benchmark or Compensation Periods." (Declaration of Stephen J. Herman ¶¶ 12–13, Rec. Doc. 11804-1; *see also* Declaration of Joseph F. Rice ¶¶ 14–15 (arguing that there "was never any request . . . that the Claims Administrator . . . would attempt to determine which particular expenses 'corresponded' with the monthly revenues . . . [or] attempt to determine what revenues had been 'earned'").) The fact is that those exact words—"corresponding" and "earn"—were agreed to and explicitly referenced in the final version of Exhibit 4C (pp. 1 and 2).[1] In addition (and as far as I am aware no one from the PSC has denied it), the failure to accord those words with their settled and well understood meanings would result in a Compensation Framework methodology that does not compensate for lost profits. I have no recollection of any discussion during the course of the negotiations in which it was suggested that the word "corresponding" would be superfluous or that the word "earned" would mean cash receipts.

---

[1] Mr. Herman's and Mr. Rice's assertion that implementation procedures for matching were never discussed during the negotiation of the Settlement Agreement is a *non sequitur*. The parties agreed that Variable Profit would be calculated by subtracting the "corresponding variable expenses" from "revenue." This requires matching. Thus, any suggestion that "matching" is not required for all claims because the negotiating teams did not discuss the specific future implementation procedures or policies for the Compensation Framework is simply wrong.

3

**Class Counsel Inaccurately Describe the Significance of the Documentation Requirements**

6.    Class Counsel's declarants assert that BP's motivation for the documentation requirements of Exhibit 4A was "not . . . a necessity or desire to 'match' expenses with revenues . . . but . . . the desire to prevent potential fraud." (Declaration of Stephen J. Herman ¶ 17, Rec. Doc. 11804-1; *see also* Declaration of Rhon E. Jones ¶ 13, Rec. Doc. 11804-26.) Class Counsel is mistaken in the breadth of their assertion concerning Exhibit 4A. During the negotiation of what became Exhibit 4A, representatives of BP expressed the importance of ensuring that the Claims Administrator obtained documentation not only to combat potential fraud, but also to accurately calculate compensation. Exhibit 4C depends upon and requires accurate and complete financial data—not limited, erroneous, or inaccurate claimant financial data.

7.    Mr. Rice and Mr. Herman both also suggest that the definition of "contemporaneous" in the Settlement Agreement is relevant to the question of whether the Claims Administrator should ensure that revenues and corresponding expenses are properly matched. They are mistaken. My understanding, based on the negotiations and as reflected in Exhibit 4A, was that the Claims Administrator and his team of accountants would play a critical role in reviewing, evaluating, and taking whatever steps were necessary to select and/or adjust the financial data submitted by claimants for the purpose of complying with the Agreement.

8.    To be clear, at no time during the negotiations did anyone from the PSC ever suggest to me or to anyone else representing BP to my knowledge that Settlement Program accountants would simply take the financial records submitted in support of a business claim *as is* or *as recorded* by that business—under various accounting or book keeping methods—and plug those numbers into the Exhibit 4C calculations. During the settlement negotiations, we had many discussions about the need to comply with Rule 23, and never once during those

discussions did the PSC suggest or outline the interpretation of Exhibit 4C for which they argue now. And with good reason; we could not agree to their interpretation because it would treat similarly situated claimants differently and therefore could not comply with Rule 23.

9. Nor did I, or anyone else from BP to my knowledge, ever state or expect as Mr. Herman suggests that monthly P&Ls would be the only documents that the Settlement Program would review in evaluating a business economic loss claim. To the contrary, BP's negotiators insisted and bargained for the entire scope of extensive documentation set forth in Exhibit 4A's documentation requirements.

10. In addition, I did not participate in any negotiation session in which the parties agreed to a term of the Settlement that "the review of monthly P&Ls by the Settlement Program would be fairly mechanical, objective, and relatively efficient." (Declaration of Stephen J. Herman ¶ 15, Rec. Doc. 11804-1.) That standard is not incorporated in the Settlement Agreement and at no time did I or anyone in my presence ever suggest that under the BEL Compensation Framework a claimant's compensation would be based simply upon a review of the submitted monthly P&Ls.[2] While we certainly discussed and hoped for an efficient claims submission and review process, and while Exhibit 4C is in my view an objective Compensation Framework, during the negotiations it was recognized and discussed that there were complexities with many business claims, which is one of the reasons why "the Settlement Program would hire as many accountants as necessary so that they could make the key determinations regarding revenues and expenses… ." (Declaration of Richard C. Godfrey ¶ 12, Rec. Doc. 11818-2.)

---

[2] Likewise, despite Mr. Rice's purported desire for "flexibility for our class members to use the pre-existing financial records they had," (Declaration of Joseph F. Rice ¶ 20, Rec. Doc. 11804-4), Exhibit 4A requires certain documentation—*i.e.,* "In order to be eligible for compensation, a business claim must provide the following . . ."— and allows the Claims Administrator to request additional backup documentation. (Exhibit 4A at 1.)

5

11. Finally, any suggestion in Class Counsels' declarations that providing claimants with the option of selecting the periods of time over which to calculate damages somehow indicates that matching would not be required is incorrect. The selection of the period of time is different from the determination of which revenues and expenses properly belong in that period for purposes of calculating lost profits. Nothing in the course of the negotiation of the Settlement Agreement suggested to me that the selection of the time period would or should prevent the Claims Administrator from determining the revenues and expenses that properly belong in that time period.

**Class Counsel Do Not Accurately Characterize or Explain BP's Prior Proposals**

12. During the negotiations over the BEL Framework, BP negotiators at one point suggested averaging the compensation amounts determined by a Variable Profit approach and an EBITDA approach. Class Counsel argue that this approach "would clearly have never allowed for a matching of expenses or standard accounting practices." (Declaration of Joseph F. Rice ¶ 31, Rec. Doc. 11804-4.) This is incorrect in my view. For either the Variable Profit or EBITDA approaches "to measure lost profits accurately, they needed to (i) reflect revenues earned and not cash receipts, (ii) reflect expenses and not cash expenditures, and (iii) ensure that corresponding variable expenses incurred in generating those revenues would be subtracted from the revenues." (Declaration of Richard C. Godfrey ¶ 11, Rec. Doc. 11818-2.) Thus, BP's November 10, 2011 proposal that lost profits be calculated as the average of the calculations based on Adjusted EBITDA and Variable Profit did not eliminate the need for matching. Matching was required to accurately calculate Variable Profit for half of the calculation and to accurately calculate Adjusted EBITDA for the other half. In any event, BP's proposal was rejected.

13. As Mr. Rice concedes, BP's proposed EBITDA approach also involved the core concepts of "earnings" and "losses." Mr. Rice correctly states the EBITDA calculation was designed to determine the claimant's "2010 loss." (Declaration of Joseph F. Rice ¶ 34, Rec. Doc. 11804-4.) He also acknowledges that BP described the EBITDA approach as an effort to reflect "earnings." (*Id.* ¶ 34) Although the EBITDA approach was not ultimately adopted, these same concepts of "earnings" and "loss" are reflected Exhibit 4C.

### Class Counsel Mischaracterize the Claimant-Friendly Provisions

14. Mr. Herman notes that he "negotiated, drafted and finalized the 'Claimant-friendly' provisions that appear" in the Settlement Agreement. (Declaration of Stephen J. Herman ¶ 8, Rec. Doc. 11804-1.) Those provisions require, for example, Settlement Program accountants to consider whether an alternative combination of months for the compensation and benchmark periods would yield a higher compensation amount for the claimant. But my view and understanding, based on my direct involvement in negotiating and discussing those provisions, is that they do not otherwise alter the terms of the Settlement Agreement or require that other settlement clauses be interpreted in favor of claimants. Indeed, the claimant-friendly provisions are limited by "the terms of the ECONOMIC DAMAGE CLAIM FRAMEWORK." (Settlement Agreement § 4.3.8.) Any contrary suggestion in Class Counsel's submission is inconsistent with my recollection of the negotiations.

### Class Counsel's Citation To and Reliance on Undisclosed Notes

15. In his declaration, Mr. Rice attempts to "quote" statements he claims were made by me and other BP negotiators during meetings that were not recorded or transcribed as far as I know. (*See, e.g.*, Declaration of Joseph F. Rice ¶¶ 11, 21, 25, Rec. Doc. 11804-4.) Based on Mr. Rice's declaration, I understand that the "quotations" included in Mr. Rice's declaration are

7

quotations from his own internal notes. Obviously I do not know anything about his internal notes or file memos that I and BP have never seen. Likewise, I cannot know whether they accurately reflect settlement discussions or whether they accurately quote from or take out of context things that I and others representing BP said or suggested.[3] Given that Mr. Rice is likely quoting from his notes, however, it is significant that he does not claim to have any note that answers the Court's specific remand question. That is, he apparently has no note showing that "the parties to the Settlement Agreement had discussed the intended meaning of Exhibit 4C insofar as it applies to the use of cash versus accrual basis accounting to calculate loss of variable profits." (Rec. Doc. 11735.)

16. Mr. Rice attributes a quotation to me from a June 30, 2011 meeting regarding avoiding a "calculation on every individual case." (Declaration of Joseph F. Rice ¶ 21, Rec. Doc. 11804-4.) I do not recall one way or the other whether I said that. But, at the time, the parties were discussing the concept of using industry-specific measures of variable margins, instead of claimant-specific variable margins, and then applying those in some fashion to determine any actual losses and compensation. This was a concept discussed and raised early on in our settlement discussions, but the concept was abandoned because the parties were unable to identify published industry-specific measures of variable margins. In sum, the quotation in paragraph 21 of Mr. Rice's declaration, whether accurate or not, has no relationship to Exhibit 4C and has no bearing on the parties' actual agreement or their understanding regarding matching.

---

[3] Mr. Rice also cites to various memoranda that he attributes solely to me. (*See, e.g.*, Declaration of Joseph F. Rice ¶¶ 31, 37, 38, Rec. Doc. 11804-4.) In general, the memoranda came from the BP negotiating team and I was only one of several senders listed on the memoranda.

### Limited Involvement of Certain Class Counsel Declarants

17. Class Counsel submitted declarations by Mr. Herman and Mr. Scott to support their interpretation of Exhibit 4C. Based upon BP's records and my own recollection, as set forth in my declaration dated August 13, 2012 (Rec. Doc. 7114-9), Mr. Herman was not present at many of the negotiation meetings or sessions that took place in 2011; in contrast, I was present for nearly all of those meetings or negotiating sessions. In addition, Mr. Herman was not present at many of the meetings identified by Mr. Rice as having significance with respect to the parties' BEL Framework discussions. Mr. Scott, an accountant, participated in an accounting working group but was not a principal negotiator on behalf of the PSC.

18. Class Counsel also submitted a declaration from Mr. Rhon Jones. While Mr. Rhon Jones was involved in working group discussions, he was not from my perspective a principal negotiator of the BEL Framework. To my recollection, Mr. Jones was involved only in some narrow aspects of the BEL negotiations, including in the latter part of February 2012.

### Discussions Regarding Class Definition

19. Mr. Rice makes a number of statements that relate to issues other than matching. I respond to those statements because he has made them, but not because they are relevant to the issue identified in the Court's October 25 Scheduling Order.

20. Mr. Rice makes the statement that he "use[s] the terms 'class members' and 'class' to refer generally to claimants who are entitled to make claims and receive payment through the Court-Supervised Settlement Program." (Declaration of Joseph F. Rice, n.3, Rec. Doc. 11804-4.) But the class and its members are defined terms that were negotiated, agreed to, and subsequently approved and adopted by the Court. In particular, during the negotiations over the Settlement Agreement in June 2011 in London, Mr. Rice suggested defining a class member

as any individual or entity filing a claim. On BP's behalf, I recall that I rejected this concept and told Mr. Rice and Mr. Fayard that BP would not compensate any such claimants. Rather, I expressed BP's view that class membership had to be limited to those individuals or entities that experienced actual injury or loss as a result of the *Deepwater Horizon* incident. At another meeting in July 2011, the parties again discussed the possible class definition. Mr. Rice and Mr. Fayard questioned whether the class could include those "claiming" to be injured by the spill or just those who were in fact "injured by" the spill. I explained my viewpoint that this needed to be an "incurred" injury class and not a "claims" injury class, particularly given my concerns about compliance with Rule 23.

21. At a meeting on August 3, 2011 in New York, Mr. Rice renewed the concept of a no-injury class by arguing that a "big burp" of oil may occur sometime in the future and therefore BP might be interested in trying to include in the Settlement claimants who, while having no actual injury now, might be injured in the future if additional oil were to surface and impact them. I again explained and stated that BP did not want to include in the class those people and businesses who had not experienced any economic loss due to the spill. Also, I raised certain Rule 23 concerns about this concept. By the end of the meeting, or shortly thereafter, my recollection is that Mr. Rice responded by agreeing that a person or business who had no current economic loss due to the spill now but might in the future could not be in the possible class we were discussing because he, she or it had no injury. Ultimately, after lengthy and somewhat prolonged negotiations over several months, we agreed on a class definition that requires individuals and entities seeking to file BEL claims to have a "[l]oss of income, earnings or profits suffered by Natural Persons or Entities as a result of the DEEPWATER HORIZON INCIDENT, subject to certain Exclusions." (Settlement Agreement § 1.3.1.2.)

22. Likewise, Mr. Rice's discussion regarding "core" and "non-core" claims is in my view beside the point given the directed subject of this remand. (*See* Declaration of Joseph F. Rice ¶ 22, Rec. Doc. 11804-4.) Regardless, these core/non-core discussions were part of the early stage negotiation process of considering various ideas for settlement structure and possible methods of compensation. As I recall it, "core" claims were claims by participants in the seafood or tourism industries while "non-core" claims were those by participants in industries that had some more general link to, but were still tied into or related in some manner to, the Gulf Coast seafood or tourism industries. But the "core" versus "non-core" concept has nothing to do with what the parties eventually agreed upon in Exhibit 4C.

23. Contrary to what is suggested in Mr. Rice's declaration (Declaration of Joseph F. Rice ¶ 22, Rec. Doc. 11804-4), I did not propose that "construction companies and professionals, including attorneys" would be included in any settlement. At that time, and during those early stages of the negotiations, it was Mr. Rice who brought up the issue of claimants of various types, including these. We stated in response that such claimants, if any, would fall into the "non-core" category, and that settlement exclusions (that is, entities or claim or business types that were not part of the class or which would be excluded from the class) would be negotiated over time. In other words, the fact that "non-core" claims were discussed does not suggest or demonstrate that BP proposed to pay claims for professional services and construction. Instead, we discussed the need to develop a list of the types of claims that would be excluded. The first time I can recall that professional services firms (specifically a dentist working on the Gulf Coast who catered in large measure to tourists) were raised by the PSC was in our negotiation session of August 17, 2011.

11

24. In fact, each and every example of claimants and claims presented to us by Mr. Rice, including claims for professionals, farms, and others, was based upon a specific fact pattern that Mr. Rice outlined in support of a claim having a tight and direct nexus with demonstrable lost profits caused by the oil spill. There was never a discussion of any example of a business claimant (farm, professional, contractor, or otherwise) by Mr. Rice or any other member of the PSC in my presence that would be included in the class regardless of whether it had any losses caused by the oil spill. The professional service example that Mr. Rice used, which he provided during a meeting on August 17, involved a dentist whose business was located just off the beach in Port St. Joe, and whose business from tourists had declined during the summer of 2010 due to the oil spill. The only lawyer example ever presented by Mr. Rice was a lawyer in what became Zone A, who catered to the beach and tourist trade, and who lost business as a result of fewer tourists due to the oil spill. When I asked Mr. Rice about the nature of the legal business lost, he responded that it was handling DUIs, misdemeanors, and similar cases involving tourists and businesses dealing with tourists. Unlike these professional examples, Mr. Rice never provided or gave to me or anyone else from BP as far as I am aware the example of a law firm in Baton Rouge, or stated that any other professional services firms would be a class member and hence eligible to make a claim simply if the business could make its numbers work on a cash differential basis. As to construction firms, Mr. Rice pointed out that the GCCF had paid certain construction firms or contractors that had demonstrated losses due to the spill, such as those with a project near the Gulf shoreline that experienced some reduced business due to the spill. But to my knowledge he never raised and we never discussed a road paver in Northern Alabama being compensated, or any claims similar to that, which had nothing to do with the oil spill.

25. Mr. Rice asserts that the parties had "extensive knowledge" of the various businesses in Zones A, B, C, and D. (Declaration of Joseph F. Rice ¶ 23, Rec. Doc. 11804-4.) As I said above, we did not agree in the summer of 2011 to the scope of the class definition; it was an iterative process, whereby we wanted exclusions of various claimant types, some of which the PSC ultimately agreed to and others of which it did not. Thus, BP did not succeed in excluding every type of claim it advocated for excluding from the Class; and Mr. Rice and his colleagues did not get every type of claim that they advocated should be included within the Class definition. Instead, the parties settled on a definition that included only those "Natural Persons or Entities" that suffered a "[l]oss of income, earnings or profits suffered . . . as a result of the DEEPWATER HORIZON INCIDENT." (Settlement Agreement § 1.3.1.2.)[4] In fact, the parties' negotiations regarding the boundaries of the Economic Loss Zones were focused on Gulf Coast related tourism and seafood-related businesses, including driving routes to Gulf beach areas. At no time in my presence, did Mr. Rice or anyone else from the PSC say or suggest that a farmer in what became Zone D, for example, would be able to make a claim and recover under the settlement based solely upon differences in cash receipts and expenditures, or make a claim that had nothing to do with lost profits caused by the oil spill. The only farm example that I recall Mr. Rice using involved a peanut farmer who catered to the tourist trade by selling peanuts from a roadside stand on a main tourist road to the Gulf Coast, and who allegedly lost profits during the summer of 2010 due to the decline in tourism caused by the oil spill.

26. Similarly, Mr. Rice includes another supposed quotation from BP's Mr. Neath in "August 2011" regarding businesses included in the proposed class. (Declaration of Joseph F.

---

[4] In addition, the parties agreed to exclude certain businesses and claim types from the class definition. (*See* Settlement Agreement §§ 2 and 3 (excluding certain industries such as gaming and financial institutions, and certain claims, such as moratoria losses, as all defined in the Agreement).)

Rice ¶ 25, Rec. Doc. 11804-4.) Of course, at that time we had not agreed upon and were only starting to negotiate the contours of the class definition. Moreover, I do not recall Mr. Neath saying those words. What I do recall is Mr. Neath acknowledging, in response to various PSC statements, that the GCCF was paying out monies to various people and businesses that they could not likely recover in litigation. From my perspective, BP and the GCCF frequently had differences of opinion as to the resolution of particular claims, which is one reason why BP negotiated for various terms in what eventually became Exhibits 4A, 4B, 4C, 4D, and elsewhere in the final Settlement Agreement.

27. During the negotiations, the PSC advocated for as broad a geographic class definition as possible, while BP (Mr. Neath, myself, and others for BP) negotiated for a narrower and more precise geographic scope for the class definition. In the end, the PSC did not get as broad a geographic class definition scope as it originally wanted; and BP likewise did not get as narrow a geographic class definition scope as it attempted to achieve. When finally agreed upon, the geographic scope of the class definition was limited to parts of two states and the entirety of three states, as half or more of the State of Florida and nearly all of Texas were excluded from the geographic scope of the class definition. (*See* Settlement Agreement §§ 1.1, 1.2.)

*[signature]*
Richard C. Godfrey

Dated: November 12, 2013

14