# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by<br>the Oil Rig "Deepwater Horizon"<br>in the Gulf of Mexico, on April 20, 2010 | * <br> * <br> * <br> * | MDL NO. 2179 <br><br> SECTION J |
| This document relates to:<br>All Cases and No. 12-970 | * <br> * <br> * <br> * <br> * <br> * | Honorable CARL J. BARBIER <br><br> Magistrate Judge SHUSHAN |

## REBUTTAL DECLARATION OF WENDY L. BLOOM

I, Wendy L. Bloom, do hereby declare that the following statements made by me under oath are true and accurate to the best of my knowledge, information and belief:

**Introduction**

1. On November 7, 2013, I provided a declaration—in accordance with the Court's October 25, 2013 Scheduling Order regarding the BEL Remand (Rec. Doc. 11735)[1]—to supplement the factual record regarding the intended meaning of Exhibit 4C as it applies to the calculation of a claimant's lost variable profits. (Rec. Doc. 11818-1.) My background and involvement regarding the negotiation of the Economic and Property Damages Settlement Agreement ("Settlement" or "Agreement"), as amended on May 2, 2012 (Rec. Doc. 6430-1), are detailed in that submission.

2. I submit this Rebuttal Declaration to respond to certain statements made in the declarations submitted by Class Counsel ("Class Counsel" or "PSC") on November 6, 2013. (Rec. Doc. 11804.)

---

[1] All "Rec. Doc." numbers refer to MDL 2179.

1

## Response to Class Counsel's November 6, 2013 Submission

3. The PSC has submitted declarations from Mr. Herman, Mr. Rice,[2] Mr. Jones, and Mr. Scott.

4. On at least one occasion that I can recall during the negotiations, in August 2011, Mr. Rice used the term "cash flows" as distinguished from "lost profits." Based on this discussion, I believed that Mr. Rice appreciated the distinction between cash flows and lost profits. (Rec. Doc. 11818-1 at ¶ 12.) Instead of using cash receipts and cash expenditures, the Parties agreed to use the terms revenue and expenses and to calculate compensation based on a lost-profits approach.

5. Exhibit 4A ensures (if applied correctly) that the Settlement Program accountants will be provided with the information necessary to examine a claimant's financial records and make any adjustments necessary to properly reflect revenues and corresponding expenses, including matching revenues with expenses. The Parties never discussed or agreed that the Settlement Program would simply take the financial data as recorded and submitted by the claimant.[3]

6. I likewise do not agree with Class Counsel's assertions that the "Documentation requirements in Exhibit 4A . . . were all motivated on BP's part – not by a necessity or desire to 'match' expenses with revenues in cash basis (or other) BEL claims, but – by the desire to prevent potential fraud." (*See, e.g.,* Rec. Doc. 11804-1 at ¶ 17.) It is true that BP was concerned about potential fraud, but the documentation requirements of Exhibit 4A served other purposes

---

[2] In Paragraph 7 of Mr. Rice's declaration, Mr. Rice attaches an index of drafts exchanged concerning the BEL Compensation, Documentation, and Causation Frameworks. This does not include an August 30, 2011 draft Compensation Framework, which is attached to my November 7 declaration as Exhibit A.

[3] The Parties did not agree that a claimant's compensation would be determined solely upon how a business claimant recorded its financial data. As stated in my November 7 declaration (Rec. Doc. 11818-1 at ¶ 10), such a compensation approach would make no sense, and would not comport with Rule 23 from my perspective.

as well, such as ensuring that the Settlement Program accountants received all the financial documents necessary to ensure the accuracy of entries on a claimant's P&Ls and to perform the calculation of lost profits.

7. Mr. Rice has included a section entitled "The Vendor Discussions." (Rec. Doc. 11804-4 at p. 16.) These discussions did not involve negotiations between BP and the PSC, but instead concerned implementation of terms to which the Parties already had agreed.

8. For example, Mr. Rice refers to a draft PSC PowerPoint that he sent to Mr. Godfrey on or about March 5, 2012.[4] (Rec. Doc. 11804-4 at ¶¶ 51-52.) Mr. Rice asserts that the PowerPoint did not include any references to the matching of revenues and expenses and that BP did not insist that he add such a reference. (*Id.* ¶ 52.) Actually, I noticed that the PSC deck was quite cursory in describing the Exhibit 4C of the BEL Framework. In a reply email to Mr. Rice and Mr. Fayard dated March 6, 2012 at 2:08 a.m., I made a suggestion regarding the page of PSC deck entitled, "Business Economic Loss Framework." I wrote, "This section never explains that compensation is based on comparing Variable Profit in 2010 to the Benchmark Period. It also does not explain the mechanics of Step 1 and Step 2 although perhaps the PSC prefers not to include that detail." A copy of my email and selected pages of the draft PSC deck are attached hereto as Exhibit A. Furthermore, in another email from me to Mr. Rice and Mr. Fayard on March 6, 2012 at 6:18 p.m. with comments on the PSC deck that is attached as Exhibit M to Mr. Rice's declaration, I responded to this PowerPoint presentation with comments on certain of the slides, including stating that what was to be measured under the BEL Framework was "[e]conomic loss." Moreover, the PSC PowerPoint does not state that cash receipts and cash expenditures would be the basis for determining lost profits, or that claimants with cash-based

---

[4] Although Mr. Rice includes the March 5, 2012 PowerPoint under his "Vendor Discussions" section, it is not my understanding that this PowerPoint was used with the Settlement Program's vendors.

3

financial records should be treated differently than those with accrual-based financial records. And, likewise, nowhere does the PSC state in the PowerPoint that inaccurate and erroneous financial data could or would be used to compensate for fictitious or nonexistent losses.

9. Mr. Rice also includes selected pages of the PSC PowerPoint relating to Exhibit 4B. Notably, Mr. Rice does not include a prior page of PSC deck, page 10, that provide key points regarding class membership. This page is entitled "Economic Class" and includes these two bullets "nexus to oil" and "loss". See Exhibit A.

10. Additionally, while Mr. Rice contends that "flexibility" was an important point for him and Mr. Fayard in negotiations (Rec. Doc. 11804-4 at ¶ 20), I note that Mr. Rice has not referenced a comment that I relayed for BP to the PSC deck on this topic. The draft deck included at page 4 a bullet "Flexibility in Damage Calculations," to which I responded by email, "Flexibility in Damage Calculations" strikes us as inaccurate given there is a set framework to use. Perhaps instead "Multiple Options for Benchmark Year(s) Against Which Damage Will Be Measured." See Exhibit A.

11. Mr. Rice also refers to a fifteen-slide PowerPoint that was prepared for an accounting vendor "tutorial" in May 2012, a document prepared after the execution of the Settlement Agreement. (Rec. Doc. 11804-4 at ¶¶ 58-63.) I disagree with Mr. Rice's assertions that the PowerPoint somehow shows that the PSC "never agreed or intended for matching of expenses to revenue to occur." (Rec. Doc. 11804-4 at ¶ 62.) Page 3 of this deck states, **"Compensation calculations are based on lost variable profit** with no adjustment or offset for mitigated fixed costs." (Rec. Doc. 11804-4 at Exhibit Q, emphasis added.) Also, one of the slides he cites highlights the Parties' focus on compensating claimants for lost profits. Slide 10 states: "Compensation is based on the difference between the company's 2010 actual profit post-

DWH Spill and expected profit in the absence of the DWH Spill." (Rec. Doc. 11804-4 at Exhibit Q.) That is consistent with my understanding of Exhibit 4C, its plain language and meaning, and the Parties' joint goal as discussed during negotiations of determining whether there were any actual lost profits caused by the oil spill and compensating claimants for those losses. The PowerPoint statement, however, is inconsistent with the PSC's current notion that a claimant can seek to recover for differences in cash flows or for claims other than lost profits caused by the oil spill. Of course, not every issue the accountants would address in implementing the Settlement Agreement was detailed in this document, for this was an introductory session.

12. This deck is also relevant to Mr. Rice's claims regarding the BEL documentation requirements. (Rec. Doc. 11804-4 at ¶ 20.) Page 4 of this deck also references the fact that BEL claimants would be required to provide backup reports and other information that would enable adjustment of financial statements for accuracy, not simply production of profit and loss statements. This page states, "Documentation requirements designed to utilize reports and information generally available in the normal course of business." Page 15 identifies claimants will need to provide "Other documents as necessary based on claim."

13. Mr. Rice cites a portion of an email he sent to PwC accountant Chuck Hacker on the evening of April 15, 2012, to suggest that the PSC did not agree to match revenues and expenses. (Rec. Doc. 11804-4 at ¶¶ 54-56.) I did not read Mr. Rice's email to suggest that the PSC did not agree to match revenues and expenses. As I explained in my declaration of November 7, after the Parties had already agreed to Exhibit 4C, Mr. Hacker proposed a methodology—similar to the methodology BP proposed near the beginning of negotiations—to calculate Step 1 of the compensation framework more efficiently. Mr. Rice responded to Mr. Hacker's suggestion: "This is not agreed to." (Rec. Doc. 11804-4 at ¶ 56 & Ex. O.) Based on

this response, Mr. Rice now asserts that his response suggested that he rejected the concept of matching. This is not, and was not at the time, how I understood Mr. Rice's response. My reading of Mr. Rice's response is that he was (correctly) noting that the Parties had not agreed to the methodology that Mr. Hacker suggested. I do not, and did not at the time, understand Mr. Rice's response to suggest that matching would not occur under the Agreement. Had I understood it to call into question whether the Claims Administrator should engage in the matching of revenues with corresponding expenses, I would have objected.[5] As noted, Mr. Hacker said his proposed method had "the potential of *more accurately* matching revenue with expenses." (Rec. Doc. 11818-1 at ¶ 28 & Ex. M (emphasis added).)

14. Mr. Rice also has included in his declaration various assertions on issues unrelated to matching. In response to Mr. Rice's statements in Paragraphs 19 and 20 of his November 6 declaration, BP's position regarding class membership was clear from the earliest negotiation sessions. Mr. Rice raised two different class membership scenarios during negotiations. The first involved the issue of whether the class could include businesses or individuals not injured in 2010 but that might be injured in the future, *e.g.*, in 2015 if a hurricane were to stir up oil and there would be some sort of re-oiling of parts of the Gulf. The second concerned Mr. Rice's question of whether the class definition could include businesses or individuals who "claimed" economic loss. In both instances, Mr. Godfrey expressed BP's view that class membership had to be limited to only those individuals or entities that experienced actual injury or loss as a result of the *Deepwater Horizon* incident. Ultimately, the Parties agreed that businesses seeking to file BEL claims must meet the description of the Economic Damage

---

[5] It is important to note that PwC met with the Parties separately to discuss various issues relating to Settlement implementation, and therefore BP can only respond to the contents of those email exchange between the PSC and PwC received by BP.

Category, "Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the DEEPWATER HORIZON INCIDENT, subject to certain Exclusions." (Settlement Agreement §1.3.1.2)

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true to the best of my knowledge, belief, and information.

_____
Wendy L. Bloom

Dated: November 12, 2013



# Douglas, Charles W

**From:** Bloom, Wendy L.
**Sent:** Tuesday, March 06, 2012 2:08 AM
**To:** 'Rice, Joe'
**Cc:** Calvin Fayard; james.neath@bp.com; Godfrey, Richard C.; Bloomer, Andrew B.; mark.Holstein@bp.com; Baden, John
**Subject:** Suggestions re PowerPoint-- Wetlands, Coastal, Real Property Sales --Rule 408 Settlement Communication

Joe and Calvin,

Here are some comments re the Power Point as it relates to economic loss and property.

Pg 2   In title "State" should be "States".   Under Medical Class Administrator, "court" and "parties" should be capitalized.  Under "property loss" change "realized sales" to "real property sales" to be consistent w framework title

p. 3    In title "State" should be "States" and "Retain" should be "Retains"

p. 4   Third bullet on left, insert "of" before "all Damage" and insert "$" sign at front of top right bullet.  "Flexibility in Damage Calculations" strikes us inaccurate given there is a set framework to use   Perhaps instead "Multiple Options For Benchmark Year(s) Against Which Damage Will Be Measured"

p. 5        Perhaps confusing to break-out "failed start-up" when it is same framework as "failed business".   The parenthetical after "Multi-Establishment Businesses" might be edited to read something like "Operations in Multiple Locations In Class Geography Under One Corporate Umbrella"   Perhaps under "Individual/Employee" part a might read "standard framework" and part b might read "special framework for peddlers / vendors"

Pg 6  Under property damage, perhaps change #1 from "realized sales" to "real property sales."   Referring to coastal & wetlands as addressing only "impairment of use & enjoyment" is overly narrow as description of purpose of the compensation.   Also "stigma" might be added.

Pg 7   Should change "Residence" to "Residents" and "Tourist" to "Tourists"

Pg 8   Exclusions are incomplete.  Insurance companies, funds, defense contractors & real estate developers should be added to the list of excluded claims.  Also excluded are ""Federal, State and local government and related entity claims." Also Claimants who have received GCCF payments and executed a release are excluded.

Pg 9  Reference to "impairment to use and enjoyment"  for coastal & wetlands is overly narrow as description of purpose of compensation.  Perhaps change reference from "realized loss on sale" to "real property sales" -- BP does not concur that a "realized loss" occurred.  On #2 "real property fixtures or clean-up" -- framework makes clear clean-up of real property is addressed in the fixed payment amount not the property damage component.

Pg 19  PSC is showing a screen shot from NAICS.com, which is a for-profit site.  We suggest showing the comparable site from the US Census Bureau.  http://www.census.gov/eos/www/naics/

Pg 21  Incorrect to classify "Commercial Fishermen" as in "primary" -- now "Commercial Fishermen" are broken out separately in Seafood definition because they are compensation pursuant to the Seafood Program.

Pg 24  For the description of commercial or wholesale dealer A, after "and/or Texas for which" add "75% or more" and resume with text "of the cost of the product…."

Pg 26  For the description of commercial or wholesale dealer B, after "and/or Texas for which" add "less than 75%"" and resume with text "of the cost of the product…."

Pg 30    For  Zone A, perhaps say "Causation Presumed" rather than that "No One Required To Prove Causation," and for Zone B or C, the sStatement is incomplete, but perhaps edit to read "If not in certain seafood or tourism businesses, proof of causation required." Or change  Zone B or C to read "Causation Proof May Be Required"

Pgs 31-34   The customer mix tests require a 10% decline in "share" of customers, not just a 10% decline.

Also on pg. 31, insert "And" in section I on left side after "Benchmark Period" and before "5% Increase"  and add an "OR" between Section I and Section II.  And then in Section II, add an "And" after "by the claimant" and before "An increase of"  and then after "compared to 2010" add "And either" before "1. 10% Decline…."   Also, since "Benchmark Period" is used on pg 31 but not defined, consider  moving slide 36 (Benchmark Period) here so it is clear what is meant and also to get up front the point re flexibility in Benchmark Period.

Also on pg 32:  Add "And" after "by the claimant" and before "1. Document"  Also edit point 1 to read:  1.  Document Outside Factor that prevented rebound (new competitor, big customer went bankrupt, etc.) And either a. 10% decline revenue from non-local customers Or b. 10% decline revenue for Zones B or C.  Add "Or" between Sections III and IV

Pg. 33  Under Section 1, add "And" after "Benchmark Period" and before "10% Increase"  Insert OR between Sections I & II.   in Section II, add word "And" after "by the claimant" and before "An increase"   And under Section II, add "And either" after "compared to 2010" and before "1. 10% Decline…."

Pg 34  Add the word "And" after "months of 2011" and before "1. Document…"   Add the words "And either" after "went Bankrupt, etc.)" and before "a. 10% Decline.."  Edit subpart (a) to read "10% Decline Revenue from Non-Local Customers OR b. 10% Decline in Revenue for Zone A, B or C"  And add term "OR" ahead of Section IV.

Pg 35  Add the word "And" after "during 2009" and before "Decline of 7.5%"  and insert "OR" after section V and before Section VI.  Add under Section VI "Documentation submitted by Causation Proxy Claimant" to insert "for claimants with revenue below $75,000.

Pg 36  Add the date "April 20, 2010" as title for the middle blue line.  Change Benchmark Period explanation to read "same months claimant selected for compensation period claimant can choose 2009, 2008-09 or 2007-09" On right side revised "any 3 months or more" to read "any 3 or more consecutive months"

Pg 37   Delete term "Compensation Period" from step 2 b/c "January-April 2010" is not the Compensation Period.

Pg 38  This section never explains that compensation is based on comparing Variable Profit in 2010 to the Benchmark Period.  It also does not explain the mechanics of Step 1 and Step 2 although perhaps PSC prefers not to include that detail. p.38     For item 1, edit to add after "any 3" "or more consecutive months"

Pg 39  Is reference to "Seafood Compensation" to the "Seafood Program ?

Pg 41  change to read:  "Was in business before 11/1/08" and then "Went out of business after 5/1/10 but before 12/31/11

p.43      Should be "property development and/or "construction" not "contribution" business

p.44      MVIC means "market value of invested capital"

Pg 45   Change last line to read "After 5/1/10" and "Before 12/31/11'

2

P. 47   change last bullet to read" "+Sweat Equity (if applicable) with -- Cap o $150,000.

p.48       Under II, it should say "Presumed If Employer Filed Claim in MDL Settlement Process and established causation or received GCCF compensation offer"  change Section II to read "II Employee Causation Standards" & then a bullet "If Employer Causatoin Presumed"

Pg 50  PSC uses term "Periodic Pay"  records and term should be "Pay Period Earnings Documentation" and such documents are requested of all claimants to the extent available, not only if no tax documents are provided. "Receipts," not "recipes"

Pg 51   Does not seem that RTP should be referenced as part of the growth rate.  Add to right of black box which reads "Add Growth Factor" the following:  January-April 2010:/January-April Benchmark Year.


p. 52  These examples are wrong in 2 respects.  **First**, the growth factors are supposed to be (1) summed and then (2) that sum is multiplied by Benchmark Period earnings.  Here, PSC has multiplied Benchmark earnings by 1 growth factor and then multiplied the product of that by a second growth factor.  That overinflates the result.  **Second**. it seems the math is wrong.  In example, last row should read:  24,000 x 2% = 480.00 and then total should be $26,880.000" And then last row of example 2 should read "21,000 x 2% = $420" and then total should be "21,000.00"  Example 3 should be edited as follows: $21,000 x 4.5%=$21,945 and  "$21,000 x 2% = $420 for a total of $22,365. " .

Pg 53  add $ before 2000.

p.55       Should read "not voluntarily unemployed"

Pg 56  Seems subsistence claims slide should reference the interview process.

Pg. 59:  Perhaps change title on slide to read  "Real Property Sales" -- framework does not reference term "realized loss" which is title in the slide.  Also, framework states sale must have closed "during the time period April 21, 2010 to December 31, 2010" whereas this slide indicates incorrectly in first line that closing must have occurred "between 4/20/10 and 1/1/11."   Also, slide then refers incorrectly in two places to sales closing by "12/31/11" when date should be on or before "12/31/10."

Pg 60:   January 1, 2011 should be December 31, 2010

Pg 61:  Typo in item 1 "supplement" should be "supplemented." In item 1 perhaps delete "all currently available data" or at least insert "all currently available NRD data" Typo in item 2 "The" should be "the."

Pg 62:   The allocation is based on 255 days (from April 20, 2010 to Dec. 31, 2010), not 265.   In the italicized fn insert the word "average" between "highest" and "Property"

Pg 63:    The fn "using NRDA assessments lines" should be deleted.   For parcels with only an NRD assessment finding presence of oil,  and no SCAT linear footage, parcel receives the minimum.   Perhaps reference minimum.  Perhaps have a title above the $25,000 line which reads:  Payments For Parcels On Which The Presence Of Oil Was Reported By SCAT or NRDA" and then under $10,000 and above $4,500 insert a title "Payments For Parcels Along The SCAT Line But On Which No Presence Of Oil Was Reported."

Pg 67   Perhaps change bullet to read "No compensation for losses due to moratorium, although rig suppliers can be compensated for losses due to spill related business interruption unrelated to moratorium.


Wendy

**Wendy Bloom | Kirkland & Ellis LLP**
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2343 **DIRECT** | (312) 862-2200 **FAX**
wendy.bloom@kirkland.com

# PSC and BP
# Proposed Settlement Class Action

March 5, 2012

# Class Wide Benefits

- Local Management
- Claimant Friendly Processing
- Full Disclosure od all Damage Calculations
- Right to appeal
- Court is Final Decision Maker
- Processing Starts Immediately

- 57,000,000 Marketing/Promotion
- Flexibility in Damage Calculations
- Growth Rate for Everyone
- Business and Individual

2

# Economic Class

## Claims Made Process

- Geographical Location

- Nexus to Oil

- Loss

- Durational Risk

3

# Business Economic Loss Framework

Compares 2010 to either:
   a) 2009
   b) Average of 2008 & 2009
   c) Average of 2007, 2008 & 2009

1. Claimant may select any 3 months or more between May and December as damaged period.
2. Must use same months in Benchmark and 2010 for Economic Loss
3. Every Business Economic Loss has
   a) A claimant specific growth rate:
      - Claimants actual up to 10%, never lower than -2.0%
   b) A Gulf Coast Business Rate of +2.0%

4