# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER |
| This document relates to Civ. A. No. 12-970. | * * * | MAGISTRATE JUDGE SHUSHAN |

**REBUTTAL DECLARATION OF HAL SIDER**

I, Hal Sider, hereby declare and state as follows:

1. I am over the age of 21 years and a resident of the State of Illinois. Unless otherwise stated, I have personal knowledge of the facts set forth herein and, if called to do so, could testify truthfully thereto.

2. I am an Executive Vice-President of Compass Lexecon, an economic consulting firm with its headquarters in Chicago, IL. I have been retained by BP and my responsibilities include monitoring the implementation of the BEL framework of the Settlement Agreement by the Court Supervised Settlement Program (CSSP). I previously submitted declarations in this matter signed on February 18, 2013, March 14, 2013, April 21, 2013, July 16, 2013, August 5, 2013, September 20, 2013, October 9, 2013, October 18, 2013, and November 7, 2013. My February 18 declaration summarizes my qualifications and includes my curriculum vitae.

3. I submit this declaration to respond to certain points raised in the declarations submitted in this matter on November 6, 2013 by Joseph F. Rice and Rhon E. Jones.

1

4.    In paragraph 26 of his declaration, Mr. Rice states that "[t]his Variable Profit approach stayed consistent throughout the negotiations from the PSC's point of view, ultimately was the agreed-to process in the Settlement Agreement, and established from the very beginning that we were looking at revenue and expenses 'as incurred.'"[1] Mr. Rice appears to be arguing that Variable Profit should be calculated based on cash receipts and expenditures, with "as incurred" interpreted to mean the date that such cash receipts and expenditures were recorded. I disagree. In both the drafts of what became Exhibit 4C to the Settlement Agreement as well as the negotiations of that document, the parties used the terms "revenue," "expenses," and "incurred." Based on how these words were used during negotiations, my contemporaneous understanding was that the parties were using these terms to reflect their standard usage and meaning by economists and accountants in a lost-profits analysis. In this context, "revenue" does not mean cash receipts. Likewise, the date an expense is "incurred" does not mean the date when a cash payment has been made. At no time did Mr. Rice or other PSC representatives propose that "revenues," "expenses," or "incurred," should be defined or otherwise understood in a non-standard way to reflect receipts and expenditures as recorded in cash-basis financial statements. Had Mr. Rice or any representative of the PSC attempted to define the terms in that way during the negotiations, I would have objected on the basis that compensation on cash-in/cash-out would not measure economic loss. In any event, the terms "cash receipt" and "cash expenditure" were readily available and could have been used if those were the concepts that PSC intended to express.

5.    In paragraph 29 of his declaration, Mr. Rice states that "[t]he parties did not adopt standard accounting definitions of fixed and variable expenses and spent an enormous amount of

---

[1] Mr. Herman makes similar statements in his declaration at paragraphs 16 and 26. My response is equally applicable to Mr. Herman's apparent misuse of the term "incurred."

2

time in the early part of negotiations creating their own list of fixed and variable costs that ultimately was included as Settlement Agreement Exhibit 4D." Mr. Rice's statement does not accurately characterize the Accounting Working Group's attempts to evaluate fixed and variable costs. At the time of the negotiations, neither BP nor PSC representatives in the Accounting Working Group proposed application of non-standard definitions to the general terms "variable" expenses or "fixed" expenses, which have standard and widely understood meanings to economists and accountants. In fact, Mr. Scott, an accountant for the PSC, explained to the Accounting Working Group the need to use the standard understanding of "fixed" and "variable" expenses. Mr. Scott's statements were consistent with the group's subsequent attempts to identify as "variable," those expenses that change as a firm's output and revenue change, and categorize as "fixed" those expenses that do not vary with revenue. This approach is standard in attempting to define fixed and variable costs for the purpose of measuring lost profits. BP and PSC members of the Accounting Working Group agreed that the group would not be able to identify and classify all line-item expenses that would be reported on claimants' P&Ls and that the accountants employed by the Claims Administrator would do so as necessary.

6. In paragraph 31 of his declaration, Mr. Rice states that "[a]fter laying out BP's position in Section B(2) of the November 2010 memo and comparing it to the Plaintiffs' Variable Profit Margin, Mr. Godfrey proposed a compromise of taking the two calculations and averaging them together, a concept that would clearly have never allowed for a matching of expenses or standard accounting practices." Mr. Rice's comments here appear to discuss BP's proposal during one phase of the negotiations to calculate "Step 1" losses by taking the average of (i) Variable Profit, and (ii) adjusted EBITDA (earnings before interest, taxes, depreciation and amortization, after adding back owner's compensation). It was evident to me based on

3

discussions I attended that participants in the Accounting Working Group understood both "Variable Profit" and "EBITDA" to reflect standard economic and accounting concepts. That was not in debate at the time. Members of the Accounting Working Group discussed differences of opinion with respect to which measure would provide the most reliable calculation of a claimant's lost profits. In order to obtain reliable calculations of changes in *either* Variable Profit *or* EBITDA, it is necessary to identify both the revenue earned in a period and the corresponding expenses incurred. Failure to do so by relying on, for example, cash basis financial statements as the basis of revenue and expenses would yield erroneous measures of a claimant's losses based on either Variable Profit or EBITDA. Moreover, I do not understand Mr. Rice's statement that the averaging proposal "would clearly have never allowed for matching." Whether the Variable Profit or the EBITDA approach was used, or some combination of the two, matching would be required to accurately calculate lost profits. I do not recall any suggestion from the PSC at the time of the negotiations contrary to this understanding. BP's averaging proposal reflected BP's view at the time that both approaches would yield reasonably reliable, although non-identical, calculations of lost profits *if* revenue and expenses were properly measured.

7. In paragraph 12 of his declaration, Mr. Jones states that "[t]here was awareness particularly with respect to seasonal and cyclical businesses, that there would be time lags between the initial, continuing and sometimes delayed effects of the Spill and the ultimate resulting financial impact on the business in question. The solution to this was not to 'smooth' revenue or expenses, but to provide the Claimant with optionality." As reflected in Exhibit 4C, the parties agreed to provide claimants with the option to select the periods to be used in the calculation of damages. But nothing in the course of negotiations indicated that cash

expenditures and cash receipts over the selected time periods would dictate the calculation of revenue, variable expense or variable profits.  Had Jones or any representative of the PSC attempted to define the terms in that way during the negotiations, I would have objected on the basis that compensation on cash-in/cash-out would not measure real economic loss.  Mr. Jones' statement mixes two concepts that I understood to be distinct during the negotiation of the Settlement Agreement:  (i) optionality and (ii) measurement of revenue earned and corresponding variable expenses.  When participating in negotiations, I understood optionality to provide flexibility in specification of the Claimant's "Compensation Period" to reflect the months that provide the most favorable measure to the claimant of the impact of the Spill.  I understood at that time that accurate measurement of revenue earned and corresponding variable expenses is required to accurately measure the lost variable profits regardless of the optionality provided in the Settlement Agreement.  I understood at the time that optionality would allow flexibility in determining Compensation Periods when revenue earned and corresponding variable expenses were accurately measured.  No party ever expressed the view that optionality permitted inaccurate measurement of lost profits based on cash received and expended.

Dated:  November 12, 2013

_____
Hal Sider