CHRISTINE REITANO

VERSUS

BP EXPLORATION AND PRODUCTION,
INC. AND PATRICK A. JUNEAU

DOCKET No. 13-9913 DIV. FILED-8

CIVIL DISTRICT COURT 2013 OCT 21 P 1:43

PARISH OF ORLEANS

CIVIL
DISTRICT COURT

STATE OF LOUISIANA

### PETITION FOR BAD FAITH BREACH OF CONTRACT, DENIAL OF EQUAL PROTECTION PURSUANT TO THE LOUISIANA CONSTITUTION, DEFAMATION AND DAMAGES

NOW INTO COURT, through undersigned counsel, comes CHRISTINE REITANO, a resident of full age and majority of the Parish of Orleans, State of Louisiana who, with respect, represents:

1.

Made the defendants herein are:

A. BP EXPLORATION AND PRODUCTION, INC, ("BP"), a Delaware corporation authorized to do and doing business in the State of Louisiana, having appointed CT Corporation as its agent for service of process; and

B. PATRICK A. JUNEAU a resident of full age and majority of Lafayette and Orleans Parishes, State of Louisiana, INDIVIDUALLY, and as Claims Administrator of the Court Supervised Claims Program (CSSP), and as Trustee of the *Deepwater Horizon* Economic and Property Damages Trust (the "Settlement Trust").

2.

This Court has jurisdiction pursuant to Louisiana Constitution, Art. 5, Sections 16 and 32 and pursuant to Louisiana Code of Civil Procedure, arts. 1 and 2. There is no diversity of citizenship and no federal questions are raised in this Petition. All claims are based on contract law of Louisiana and the Constitution and laws of the State of Louisiana. This case is not qualified to be considered a "tag-along" matter and, therefore, is not subject to legitimate removal to federal court.

3.

Venue is proper in this Court pursuant to Louisiana Code of Civil Procedure, arts. 74 and 76.1.

EXHIBIT A

## BACKGROUND

4.

On April 20, 2010 an offshore oil well (The Macondo Well) in the Gulf of Mexico located off of the South coast of the State of Louisiana and operated by BP and a number of its sub-contractors and/or co-venturers, exploded, immediately killing eleven innocent American Citizens and, within days, was completely burned up and sank in 5,000 feet of water in the Gulf of Mexico. From April to July 2010, the uncapped well spewed uncontrollable millions of gallons and barrels of crude oil and other noxious and toxic chemicals into the Gulf of Mexico destroying the eco-structure in the Gulf and ultimately damaging the properties along the coast of five states including Texas, Louisiana, Mississippi, Alabama and Florida. The immediate physical damage and personal injuries caused by the oil spill were only the beginning. The economic impact of the spill and the use of toxic dispersants to control the "appearance" of the spill has greatly affected and damaged the lives, property and businesses of people all along the five gulf states and, in some cases, persons and businesses in states that are not even contiguous to the Gulf of Mexico. The damage caused by BP's operation of the Macondo Well and its ultimate explosion and demise cannot be overestimated. In fact, the conduct of the operation of the well has been adjudicated to be criminal, in addition to the civil responsibility which BP and its associates and sub-contractors will have to bear.

5.

Shortly after the Macondo Well exploded, it was apparent that an organized system for processing and paying claims of those damaged by the spill would have to established. Thus, the Gulf Coast Claims Facility (GCCF) was established and was under the administration of Mr. Kenneth Feinberg. In 2012 it was determined that the GCCF would be replaced and a settlement was reached in the matter entitled "In Re: Oil Spill by the Oil Rig 'Deepwater Horizon' in the Gulf of Mexico on April 20, 2010" bearing docket number MDL-2179, pending in the Eastern District of Louisiana before the Honorable Judge Barbier.

6.

In order to facilitate the new claims process, the Claims Administrator's Office (CAO) was established and Mr. Patrick A. Juneau (Mr. Juneau) was approved, accepted and appointed as the Claims Administrator by all of the parties, including Class Counsel, BP and the Court.

7.

As part of the settlement agreement BP agreed to fund the operations of the CAO.

## THE HIRING OF CHRISTINE REITANO

8.

In March, 2012, between the settlement agreement and its final approval, Mr. Juneau and Ms. Christine Reitano came to an agreement that Ms. Reitano would be retained as a contract employee in the CAO. It was decided that Ms. Reitano would begin her employment duties in the CAO on April 1, 2012.

9.

Prior to her oral agreement to begin working for the CAO, Ms. Reitano had represented and filed certain claims for a small number of claimants in the GCCF which was, at or about the same time, being replaced by the CAO and the Court Supervised Settlement Program (CSSP). In advance of and in preparation for her work for the CAO, Ms. Reitano dutifully and professionally notified the GCCF that she no longer represented her prior clients and she also wrote to her clients that she was terminating her services for them and they would need to seek separate counsel. One of those claimants represented by Ms. Reitano in the GCCF was Casey Thonn. Ms. Reitano wrote to Mr. Thonn on March 30, 2012, two days before she began work for the CAO on April 1, 2012, and terminated her professional relationship with him. (A copy of the termination letter to Mr. Thonn is attached and made a part hereof as **Exhibit A** and her notice of termination to the GCCF is attached as **Exhibit B**). From that point forward Ms. Reitano did not claim, attempt to claim, attempt to collect or even expect a referral fee from Mr. Thonn's subsequent attorneys. Any claim or allegation to the contrary by anyone is false.

10.

Ms. Reitano began working for the CAO on April 1, 2012. On or about April 18, 2012 Ms. Reitano and BP and Mr. Juneau entered into an agreement entitled "Undertaking of Christine Reitano in Furtherance of Court's Order Appointing Claims Administrator." (The "Undertaking" is attached and made a part hereof as **Exhibit C**). The "Undertaking" was supplemented and amended in July, 2012 by virtue of a document entitled "Supplement and Amendment to Undertaking of Christine Reitano in Furtherance of the Court's Order appointing Claims Administrator." In accordance with the Supplement and Amendment, Ms. Reitano's employment agreement was no

longer called an "Undertaking" but was then called an "Agreement."   The Supplement and Amendment to the Agreement of Ms. Reitano includes Schedule 1 which is the "Description and Scope of Service" to be performed by Ms. Reitano in her job.   (The Supplement and Amendment is attached and made a part hereof  as **Exhibit D**).   (The Schedule 1 "Description and Scope of Service" for Ms. Reitano is attached and made a part hereof as **Exhibit E)**.

11.

As part of the Supplemental and Amended Agreement, a new Indemnity Agreement was entered into between Ms. Reitano and BP.   It replaced Paragraph 4 of the original Undertaking.(The new Indemnity Agreement is attached and made a part hereof as **Exhibit F)**. The Indemnity Agreement has a choice of forum clause which provides for jurisdiction of claims under the Agreement to be brought in the U.S. District Court for the Eastern District of Louisiana.   Ms. Reitano is not making a claim under this Agreement.   In addition, there are not federal claims being asserted herein and there is no diversity of citizenship.   Thus, the parties cannot confer jurisdiction on the federal court.

### THE PRECIPITOUS, UNPRECEDENTED, UNJUSTIFIED AND UNLAWFUL TERMINATION OF MS. REITANO

12.

On June 26, 2013 without any warning whatsoever, much less a 10 day notice to cure as provided in her Agreement, Ms. Reitano was terminated from her employment by Mr. Patrick A. Juneau.   (The termination letter is attached and made a part hereof as **Exhibit G)**.   According to the termination letter, Ms. Reitano was terminated "for cause," but there is no cause or even a simple reason given in the letter.

13.

In the employment Agreement "Cause" is a defined term.   It is defined as follows:

> "As used herein, "Cause" shall mean any of the following: (1) the failure of Reitano to perform the services in accordance with the requirements of paragraph 1, which failure is not cured within 10 days after written notice thereof, (2) the breach by Reitano of any other obligations under this Undertaking, which breach is not cured within 10 days of written notice thereof, (3) the commission of any act or any omission involving gross negligence, fraud, or other intentional or willful misconduct by Reitano, and (4) any other violation of a statute, regulation, order, decree or court requirement by Reitano."

14.

Ms. Reitano did not receive any notice, written or otherwise, of any possible violation by Ms. Reitano of paragraph 1 or of any other obligation under the Agreement and she was not allowed 10 days to cure any unidentified violation which was "thought" to have occurred. To this date, neither Mr. Juneau nor anyone else in the CAO has identified any violation by Ms. Reitano of her obligations under the contract.

15.

Ms. Reitano has fully, faithfully, ethically, professionally and dutifully performed all of her duties and obligations pursuant to her employment Agreement up to and including the day of her termination. She has not violated any provision of the agreement. Even if it was suspected that she violated a provision, she was not informed of a violation and she certainly was not given 10 days to cure any obligation specified in paragraph 1 or anywhere else in the Agreement. Ms. Reitano has certainly not committed any act or omission which would involve gross negligence, fraud or other intentional or willful misconduct.

16.

On the contrary, Mr. Juneau, precipitously and without any semblance of a meaningful investigation into the truth of the "speculation" which existed at that time, terminated Ms. Reitano for no reason at all.

17.

On or about July 2, 2013, and in response to reckless and malicious allegations by BP about misconduct and fraud on the part of employees of the CAO, including Ms. Reitano who was identified by name, the Court appointed Louis J. Freeh as the Special Master to look into the allegations which had been made by BP regarding fraud being committed in the CAO. On September 6, 2013, Mr. Freeh filed his written "Report" (The Freeh Report, Document 11287, U.S.D.C., EDLA, MDL Docket No. 2179), in which he made several findings, allegedly based on "evidence" he gathered over 66 days, none of which was attached to the report or voluntarily made available to anyone. Even after a motion and order for the production of the "evidence" he gathered, Mr. Freeh only provided heavily redacted versions of some of the evidence relying on his various claims of "irrelevancy," attorney-client privilege and/or work product privilege. Mr. Freeh was

asked to identify the "client" who was claiming the privilege. The response from a Freeh employee was that Mr. Freeh, the Special Master, is the client of Mr. Freeh's lawfirm! The lawyer and the client are the same. (The redacted email exchange in which the Special Master is designated as "the client" is attached hereto as **Exhibit H**).

18.

After receiving and reviewing the Freeh Report, Ms. Reitano informed the attorneys for Mr. Juneau and BP of the correct, factual and truthful evidence regarding Ms. Reitano and requested her reinstatement and back pay. This request was denied. Since Ms. Reitano has never been given a reason for her termination, we must rely on the Freeh Report to find out what the allegations of misconduct MAY be. Regarding Ms. Reitano, there are three areas of discussion in the Freeh Report related to Ms. Reitano: (1) The Thonn Claim and her alleged demand for a referral fee while working for the CAO; (2) recommending her husband, Lionel Sutton, for a job he did not get at Garden City Group ( an approved vendor in the CSSP); and (3) defending some of the practices of Brown-Greer (another approved vendor in the CSSP). It is specifically and affirmatively asserted that Ms. Reitano committed no fraud with regard to any claim being processed in the CAO and, in particular, committed no fraud and had no conflict of interest with regard to the Thonn claim.

## THE THONN CLAIM

## (SMOKE AND MIRRORS)

19.

Mr. Freeh erroneously concluded that Ms. Reitano had retained a referral fee interest in the Thonn claim after she went to work for the Claims Administrator and, when she said she did not retain that interest, she was not being truthful. Ms. Reitano terminated her relationship with Mr. Thonn, in writing, on March 30, 2012 before she went to work for the CAO. (See **Exhibit A**). She also notified the GCCF of her termination. (See **Exhibit B**. In the heavily redacted materials provided by Mr. Freeh after being ordered to produce them, he included the letter to the GCCF, but noticeably failed to mention or include Ms. Reitano's letter to Mr. Thonn, the relevancy and importance of which cannot be disputed. In fact, other than the entire transcript of Ms. Reitano's statement (which has yet to be provided) and the affidavit of Ms. Mancuso (discussed below), this letter is one of the top three relevant documents to Ms. Reitano. Interestingly, at the interview of Ms. Reitano, Mr. Freeh did not seek to introduce the Thonn letter and, toward the end of the interview,

counsel for Ms. Reitano informed Mr. Freeh that there were important documents she would like to put on the record, one of which was the Thonn termination letter. Mr. Freeh objected and responded (paraphrased) that he would be the "decider" of what went into the record, contradicting the "open-door policy" on receipt of information declared in his report. Reluctantly, he allowed the letter to be placed on the record but he failed to mention it or include it in the materials referenced in his Report or provided to the court and Ms. Reitano.

20.

Mr. Freeh's assumptions/allegations/erroneous conclusions regarding Ms. Reitano and the Thonn claim are based on a "summary" of an unrecorded statement given by Ms. Christina Mancuso of the Andry Law Firm to Freeh employees. The "summary" is the opinion of an employee of Mr. Freeh as to what was said. Mr. Freeh's conclusion in regard to Ms. Reitano and the Thonn fee are totally incorrect and not based on the true facts. His conclusions are nothing short of a misrepresentation and distortion of the information provided by Ms. Christina Mancuso.

21.

Ms. Christina Mancuso, an attorney working in the Andry Lerner Law Firm, upon whom Mr. Freeh allegedly relies for his erroneous statements, has now stated, under oath, that Ms. Reitano did not ask, at any time, for a referral fee on the Thonn claim after it went to the Andry Lerner Law Firm for disposition. Furthermore, Ms. Mancuso states that she made no such statements to Mr. Freeh's employees. (See Affidavit of Christina Mancuso attached hereto as **Exhibit I**). In his apparent zeal to find fraud and conflicts (so he could continue to work beyond his initial report--phase three of his mandate), Mr. Freeh erroneously discredits Ms. Reitano, by intentionally and wrongfully mischaracterizing a discussion of an "Attorney Contingent Fee" contract and a "Referral Fee Contract." Ms. Reitano NEVER discussed a "referral fee" for the Thonn claim with anyone at the Andry Lerner Law Firm. She had no expectation of receiving one after she terminated her relationship with Mr. Thonn. Ms. Reitano did discuss with Ms. Mancuso the 20% client contingency fee agreement with Mr. Thonn and whether it would be honored and not increased. To make matters worse, in his continued zeal to support his claim of fraud and a conflicts of interest, Mr. Freeh declares numerous times in his Report that Ms. Reitano lied when she denied a discussion of a referral fee or the expectation of a referral fee on the Thonn claim. Those statements and accusations are false and insupportable.

22.

The allegations regarding the alleged expected referral fee in the Thonn claim are the only allegations in Mr. Freeh's report which, if true, could possibly rise to the level of "cause" under the terms of Ms. Reitano's contract. The sworn and truthful affidavit of Ms. Mancuso conclusively proves that the allegations do not rise to any level because the allegations are simply false. The truth about Ms. Reitano and the Thonn claim could have been easily discovered and should have been discovered and known to Mr. Juneau prior to the abrupt termination of Ms. Reitano for no reason. After all, he had a former FBI agent at his disposal who supposedly did an investigation. Unfortunately for Ms. Reitano, Mr. Juneau terminated her employment without even asking her about *her* involvement or lack of it in the Thonn case.

23.

In his erroneous allegations/findings regarding the Thonn claim, Mr. Freeh also claims that Ms. Reitano denied that her husband had an expectation of a referral fee in the Thonn case. Although the full transcript of the interview with Ms. Reitano has not been provided, neither Ms. Reitano nor her counsel (who were both present for the interview) recall that Mr. Sutton's expectations were even discussed. Ms. Reitano affirmatively states that she had no knowledge of her husband's expectations or agreements regarding the Thonn claim prior to her termination and, in fact, she had no such knowledge prior to the day of her meeting with Mr. Freeh.

## THE ALLEGED DEFENSE OF BROWN GREER AND THE RECOMMENDATION OF HER HUSBAND FOR A JOB HE DID NOT GET.

24.

In addition to the erroneous allegations regarding the Thonn claim, it has been alleged that Ms. Reitano somehow acted as a "defender" for BrownGreer (a vendor in the program) and that Ms. Reitano, on one occasion, recommended her husband for a job at Garden City Group (another vendor in the program). The husband was not hired. With regard to the allegations about "defending" Brown Greer, the evidence will show that Ms. Reitano's positions were all validated by Mr. Juneau, the Claims Administrator. Moreover, neither one of these events, even if true, would rise to the level of "cause" for the termination of Ms. Reitano. In fact, if either of these allegations or circumstances had been confirmed, the most that should have occurred is that Ms. Reitano would have been given 10 days notice to cure.

## THE CAUSES OF ACTION

### BAD FAITH BREACH OF CONTRACT AND DAMAGES

25.

BP and Mr. Juneau have breached their obligations under employment Agreement of Ms. Reitano in bad faith and are liable to her for "all damages, foreseeable or not, that are a direct consequence" of their breach. La. Civ. C. art. 1997. The damage caused by the breach are immeasurable and include, but are not limited to, lost wages, loss of future wages, lost of future employment opportunities, loss of reputation, and mental, physical and emotional damages.

### DEFAMATION

26.

BP began its malicious defamation campaign in court filings and then escalated its slander war to a full-on media assault with press releases and paid advertisements boldly *identifying* Ms. Reitano and branding her as a criminal engaged in fraudulent misconduct.[1] Its campaign was then and continues to be relentless. They have left no stone unturned to declare that they are victims being defrauded by Ms. Reitano and others. They have obviously not checked the available and discoverable facts, because it can be easily shown that Ms. Reitano has only acted professionally, ethically and has performed her duties dutifully.

27.

The scandalous, false and reckless allegations of BP against Ms. Reitano are the genesis of all of the damages that have occurred since the allegations were made. The allegations were then and remain false. The damage to Ms. Reitano's reputation has been fatal to her career. The damages and claims were made internationally and broadcast to anyone who could read or write in the entire world. BP knew, or should have known, and could have easily known by a reasonable investigation,

---

[1] After the fact and after the damage was done to Ms. Reitano by name, apparently realizing that identifying alleged wrongdoers by name without proof of their wrongdoing is dangerous and possibly expensive territory, BP subsequently changed its approach in its media campaign to get out of its obligations to the claimants. In its Renewed Motion to stop paying the claims it had agreed to pay, BP alleges more fraud but only refers to the alleged evildoers as unidentified "Appeals Judges" with conflicts and/or "two employees in the Mobile office" who were allegedly falsifying claims. Picking up on the supposed safety of this approach, Mr. Freeh, in his Report, after identifying and excoriating several lawyers and their firms by name for the way they calculated claims (trip tickets vs. tax returns), then retreats to using only "another law firm" or a "second law firm" when describing conduct similar to the conduct for which the named attorneys are criticized.

that the allegations were false. In fact, it is alleged, on information and belief, that BP conjured up the allegations to sensationalize what they believed was their plight because they thought they made a bad deal in the settlement which gives rise to the CSSP. Their plan was to overstate the allegations of alleged fraud in the process, portray themselves as victims of the fraud and try to get a new and better deal. The defamation of Ms. Reitano was intentional and financially motivated by BP.

28.

Then, to make matters worse, Mr. Juneau, the Claims Administrator, without so much as glancing in his side mirrors, accepted BP's defamatory allegations about Ms. Reitano lock, stock and barrel and unceremoniously and precipitously fired Ms. Reitano, stating it was for cause, but refusing to identify the alleged cause. For this reason, Mr. Juneau is liable in solido with BP for the damages sustained by Ms. Reitano. Prior to her termination, Ms. Reitano was not even asked if *she* expected or received a referral fee in the Thonn case. The evidence will show that no cause for her termination existed—then or now.

29.

After surmising what Mr. Juneau likely suspected and providing proof that the suspicions were insupportable, Ms. Reitano gave BP and Mr. Juneau an opportunity to mitigate the damages they had caused and asked for reinstatement and back pay. Both defendants have steadfastly refused to acknowledge that their suspicions are insupportable and have not only refused to mitigate the damages, but have continued in the aggressive campaign to defame her both by acts of commission and omission.

30.

Ms. Reitano has young children and numerous relatives and friends. The damage to her personally, professionally, emotionally and financially as a result of the defamation is immeasurable. And, the fact that the intentional and malicious defamation was for the pecuniary gain of the defendant, BP, makes it reprehensible.

## UNEQUAL PROTECTION PURSUANT TO THE LOUISIANA CONSTITUTION
## (LOUISIANA CONSTITUTION, ARTICLE I, SECTION 3)

31.

Ms. Reitano has been singled out for harsh and unequal treatment prohibited by the Louisiana Constitution. On information and belief, several "appellate judges" in the CSSP have been

identified, not by name, as having very real and actual conflicts because they remained employed in their law firms after they became appellate judges and their firms or clients of the firms had pending claims in the CSSP which, if paid, would result in a financial benefit to the subject judges. The penalty: the judges were simply required (after the facts were known) to resign from their firms and they were not terminated as appellate judges. Ms. Reitano was fired only on the suspicion of a conflict which can be proved to be non-existent–then or now. It is alleged, on information and belief, that all of the appeals judges in the program are male. Ms. Reitano is a female.

32.

In addition, the Freeh report describes in detail the actual and proved conflict of several executives of the CSSP who have received no penalty at all and are still working for the CAO. The Crescent City Group consists of several high level executives of the CAO, including the CEO. Mr. Freeh found "that actual and apparent conflicts of interest involved the most senior officials of the CAO." He went on to identify Mr. David Odom, Kirk Fisher, Chris Reade, David Duval and Scott Sherick, "all DHECC officials" as being involved. The penalty: the high level executives were required to withdraw the offensive proposal and have been allowed to keep their jobs at the CAO. Surely an actual and proved conflict is worse than a suspected, but unproved, conflict. It is alleged, on information and belief, that all of the CAO executives involved in the Crescent City Group are male.

33.

Ms. Reitano requests a trial by jury.

WHEREFORE, CHRISTINE REITANO PRAYS that this Petition be served on the defendants PATRICK A. JUNEAU and BP EXPLORATION AND PRODUCTION, INC., and, after all legal delays and process that there be judgment herein in favor of Christine Reitano and against Patrick A. Juneau and BP Exploration and Production, Inc., jointly, severally and in solido, in an amount sufficient to compensate her for all of her damages, injuries, costs and expenses, foreseeable and unforeseeable, caused by the defendants as a result of the causes of action stated herein and any causes of action subsequently supplemented and added to this Petition.

PETITIONER FURTHER PRAYS for all general and equitable relief in the premises and all attorneys fees and punitive damages which may be allowed by law.

PETITIONER FURTHER PRAYS for a trial by jury upon bond being posted in accordance with law.

RESPECTFULLY SUBMITTED:

Mary Olive Pierson, (La. Bar No. 11004)
8702 Jefferson Hwy., Suite B (70809)
P.O. Box 14647
Baton Rouge, LA 70898
Ofc: (225) 927-6765
Fax: (225) 927-6775
Email: mop@mopslaw.com

Patrick J Fanning (La. Bar No. 5441)
238 Huey P. Long Ave.
Gretna, LA 70053
Ofc: (504) 368-7888
Fax: (504) 368-7263
Email: pfanninglaw@aol.com

**PLEASE SERVE:**

BP EXPLORATION AND PRODUCTION, INC.
Through CT Corporation System
5615 Corporate Blvd., Ste 400B
Baton Rouge, LA 70808

AND

MR. PATRICK JUNEAU
The *Deepwater Horizon* Economic and Property Damages Trust
935 Gravier St., Suite 1905
New Orleans, LA 70112

A TRUE COPY

DEPUTY CLERK CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

March 30, 2012

Casey Thonn
3836 Kent Street
Slidell, LA 70458

RE:   *GCCF Claim No.: 1060469*

Dear Casey:

Please allow this letter to confirm that we will no longer be representing you regarding your GCCF Claim.

My new position as Counsel to the Special Master in the Court Supervised Claims Program for the BP Settlement Fund prevents me from representing any claims or interests made upon the fund.

I wish you the best of luck in the pursuit of your claim and a happy and prosperous future.

With kindest personal regards, I remain

Sincerely,

**SUTTON & REITANO**


Christine Reitano



686184



# SUTTON & REITANO

935 Gravier Street, Suite 600, New Orleans, LA 70112
Telephone (504) 599-8230   Facsimile (504) 595-6079
Toll Free 1-888-480-5560



Laurel H. Sutton, III •
Christine Reitano *

＊ Also Admitted in Texas
＊ Also Admitted in New York

March 30, 2012

Gulf Coast Claims Facility
P.O. Box 9658
Dublin, OH 43017-4958

RE:   GCCF Claim No.: 1080269

Dear GCCF:

Please allow this letter to confirm that we will no longer be representing Casey Thonn in connection
with his GCCF Claim.

With kindest personal regards, I remain

Sincerely,

SUTTON & REITANO

Christine Reitano

Christine Reitano

TAB 4



EXHIBIT
B

SM-01-CR00427

UNDERTAKING OF CHRISTINE REITANO IN FURTHERANCE OF COURT'S ORDER
APPOINTING CLAIMS ADMINISTRATOR

This Undertaking is entered into on April 18, 2012 by and between Christine Reitano ("Reitano") and BP Exploration & Production Inc. ("BP") in furtherance of the Court's March 8, 2012 First Amended Order Creating Transition Process appointing Mr. Patrick Juneau ("Juneau") as the Claims Administrator of the Transition Process and the proposed Court Supervised Claims Program (Doc. 5995) (the "Transition Order") by the Honorable Carl Barbier of the United States District Court of the Eastern District of Louisiana in *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179 ("MDL 2179") (the "Court"). Interim Class Counsel has reviewed this Undertaking and has concluded that the retention of Reitano is in furtherance of the Transition Order and will assist Juneau in carrying out the responsibilities of the Claims Administrator of the Transition Process and the proposed Court Supervised Claims Program.

RECITALS

A.    The Court in MDL 2179 issued the Transition Order which appoints Juneau as the Claims Administrator of the Transition Process and the proposed Court Supervised Claims Program;

B.    Reitano will assist Mr. Juneau in carrying out the responsibilities of the Claims Administrator of the Transition Process and the proposed Court Supervised Claims Program; and

C.    Pursuant to the Agreement-in-Principle Regarding "*Deepwater Horizon*" Economic Loss and Property Damages Settlement, BP shall be solely responsible for all costs of the claims administration including the fees of agreed upon staff retained by the Claims Administrator to assist the Claims Administrator in carrying out the Claims Administrator Services as defined in Paragraph 1 below.

D.    A settlement trust (the "Settlement Trust") shall be established for the purpose of, amongst other things, paying the costs of administering the proposed Court Supervised Claims Program. The Settlement Trust shall be established pursuant to the order of the Court. The Settlement Trust shall be structured and operated in a manner so that it qualifies as a "qualified settlement fund" under Section 468B(d)(2) of the Internal Revenue Code and Treasury Regulation §1.468B-1.

UNDERTAKING PURSUANT TO TRANSITION ORDER

NOW THEREFORE, in consideration of the recitals and undertakings contained herein, Reitano and BP agree as follows:

1.    Claims Administrator Services.

a.    Reitano shall work at the direction of the Claims Administrator to assist with the Claims Administrator's responsibilities as set forth in: (a) the Transition Order (and any amendments or modifications thereof); (b) the Agreement-in-Principle Regarding "*Deepwater Horizon*" Economic Loss and Property Damages Settlement; (c) a final settlement agreement among the parties, should such agreement be finalized and filed and approved by the Court; and (d) as otherwise specified or ordered by the Court ("Claims Administrator Services"). Reitano



EXHIBIT

C

shall perform such services in a professional manner and strictly in accordance with the foregoing Agreement-in-Principle, the final settlement agreement, should one be finalized and approved by the Court, and otherwise in accordance with the Court's orders.  Reitano further agrees that she will comply with all legal and ethical obligations related to assisting Juneau in his Court-appointed role as the Claims Administrator.  Reitano shall comply with the foregoing obligations and duties. Reitano shall devote substantially all of her time to the assistance of the Claims Administrator in connection with the Claims Administrator's responsibilities as set forth above.

      b.      Upon the establishment of the Settlement Trust, this Agreement shall be amended to reflect that Reitano is retained as an independent contractor by the Settlement Trust and that the Settlement Trust shall become responsible for the Compensation obligations set forth in Paragraph 2 below.

2.      Compensation.

      a.      Reitano shall be compensated in the amount of $20,833 per month to  provide assistance to the Claims Administrator in carrying out of Claims Administrator Services (the "Compensation").  Such Compensation shall be paid on a month-to-month basis starting on April 1, 2012 through and including the date which is the earlier of: (i) the Court denies the parties' motion for preliminary approval; (ii) the Court denies the parties' motion for final approval; (iii) the reversal on appeal of a Court order granting final approval; (iv) the Court enters an Order closing the proposed Court Supervised Claims Program; (v)  Juneau resigns, can no longer serve or is removed by the Court as the Claims Administrator; or (vi) Reitano is terminated by the Claims  Administrator for Cause (collectively, "Termination Events").  As used herein, "Cause" shall mean any of the following:  (1) the failure of Reitano to perform the services in accordance with the requirements of Paragraph 1, which failure is not cured within ten (10) days after written notice thereof, (2) breach by Reitano of any other obligations under this Undertaking, which breach is not cured within ten (10) days of written notice thereof, (3) the commission of any act or any omission involving gross negligence, fraud, or other intentional or willful misconduct by Reitano, and (4) any other violation of a statute, regulation, order, decree or court requirement by Reitano.

      b.      The first twenty-four (24) months of Reitano's Compensation, effective as of April 1, 2012, is guaranteed by BP regardless of whether a Termination Event in Paragraphs 2(a)(i) through and 2(a)(v) occurs prior to the expiration of that twenty-four (24) month period.  In the event that Reitano's service is terminated by virtue of one of the Termination Events in Paragraphs 2(a)(i) through 2(a)(v) prior to the first twenty-four (24) month period, Reitano shall be paid the balance of the guaranteed monthly payments within ninety (90) days of the termination date.  However, in the event that a Termination Event in Paragraph 2(a)(vi) occurs, any unpaid Compensation under this Paragraph 2(b) shall not be paid to Reitano.

      c.      In addition to the Compensation, Reitano shall be reimbursed on a monthly basis the reasonable and necessary  expenses incurred by Reitano in order to assist the Claims Administrator in carrying out the Claims Administrator Services (the "Expenses").  Such reimbursable Expenses shall include travel and travel-related expenses (mileage, lodging, parking, meals, etc.) when such expenses are incurred in the course of assisting the Claims Administrator in carrying out the Claims Administrator Services.

3.   Funding Mechanism for Payment of Compensation and Expenses.

   a.   The Compensation and Expenses shall be paid to Reitano (Tax EIN 093546102) via wire transfer out of an account to be agreed upon by BP and Interim Class Counsel on a monthly basis on the 15th day of each month (the "Claims Administration Account").

   b.   Reitano shall submit invoices and supporting documentation for all Expenses for payment from the Claims Administration Account at least fifteen (15) calendar days prior to the payment date described in Paragraph 3(a) above. Copies of all invoices and supporting documentation shall be provided to BP and Interim Class Counsel at the same time when such invoices and supporting documentation are submitted for payment from the Claims Administration Account.

   c.   BP has the right to audit and challenge the payment of any Expenses on the grounds that such amounts are not reasonable and necessary for Reitano to assist the Claims Administrator in carrying out the Claims Administrator Services. If Reitano contests BP's rejection of any Expenses, Reitano may present the dispute to the Court for resolution.

4.   Indemnification.  BP shall indemnify, defend and hold Reitano harmless, to the full extent lawful, from and against any losses, liabilities, expenses, claims, suits, investigations or proceedings related to or arising out of Reitano's assistance to the Claims Administrator in carrying out of the Claims Administrator Services or any other services performed by Reitano under this Undertaking (collectively, "Losses"), including but not limited to Losses resulting from Reitano's negligence, except that Reitano will not be indemnified or held harmless with respect to any Losses that are finally judicially determined to have resulted solely from Reitano's gross negligence or intentional or willful misconduct, including fraud.  BP further agrees that Reitano shall not have any liability to BP in connection with Reitano's appointment to assist the Claims Administrator or any services performed by Reitano under this Undertaking, except for Losses incurred that are finally judicially determined to have resulted solely from the gross negligence or intentional or willful misconduct of Reitano. If any claim, suit, investigation or proceeding is threatened or commenced as to which Reitano proposes to demand indemnification under this Paragraph 4, Reitano will notify BP with reasonable promptness, but failure to do so shall not relieve BP of any of its obligations under this Paragraph 4 unless BP can establish that the delay in receiving such notice actually prejudiced BP and then only to the extent of such prejudice.

5.   Term and Termination.

   This Undertaking shall be effective as of April 18, 2012 and shall terminate upon the happening of a Termination Event.  The audit right of BP under Paragraph 3(c) shall survive any termination or expiration of this Undertaking.

6.   Notices.  All notices and correspondence required to be given by this Undertaking shall be delivered by hand or certified mail, return receipt requested and postage pre-paid, or by a nationally recognized courier service, or by facsimile transmission, and be addressed as follows:

If to Christine Reitano:

   Christine Reitano
   Sutton and Reitano
   935 Gravier St., Ste 1910
   New Orleans, LA 70112
   Phone 504 592 3230
   Fax 504 585 1789

- 3 -

If to BP:

> Mark Holstein
> BP Legal
> 501 Westlake Park Boulevard
> Houston, Texas 77079
> Tel.: 281-366-6895
> FAX: 281-366-5801

If to Interim Class Counsel:

> James P. Roy
> DOMENGEAUX WRIGHT ROY & EDWARDS LLC
> 556 Jefferson Street, Suite 500
> Lafayette, Louisiana 70501
> Telephone: (337) 233-3033
> Fax No: (337) 233-2796

>       and

> Stephen J. Herman
> HERMAN HERMAN KATZ & COTLAR LLP
> 820 O'Keefe Avenue
> New Orleans, LA 70113
> Telephone: (504) 581-4892
> Fax No. (504) 569-6024

7.    _Review and Consent of Interim Class Counsel_. Interim Class Counsel has reviewed this Undertaking and has concluded that the retention of Reitano is in furtherance of the Transition Order and will assist Juneau in carrying out the responsibilities of the Claims Administrator of the Transition Process and the proposed Court Supervised Claims Program.  Reitano shall perform services hereunder under the direct supervision, direction and control of Juneau, and other than the foregoing conclusion of Interim Class Counsel, Interim Class Counsel shall have no role in the supervision, direction or control of Reitano whatsoever.  Nothing in this Undertaking shall establish or be construed to establish a relationship between Reitano, on the one hand, and Interim Class Counsel, Class Counsel, Lead Class Counsel, Co-Liaison Counsel or PSC, on the other hand, of any nature, kind or type, including, but not limited to an employment or independent contractor relationship. None of Interim Class Counsel, Class Counsel, Lead Class Counsel, Co-Liaison Counsel and PSC shall have any financial responsibility for, or obligation to fulfill or satisfy the payment of, any compensation, wages, benefits or expenses hereunder.

8.    _Independent Contractor_.  The parties hereto intend that Reitano is and shall continue to be an independent contractor throughout the term of this Undertaking.  Reitano is not to be considered an employee or agent of any party for any purpose in connection with her role assisting Juneau in carrying out the responsibilities of the Claims Administrator of the Transition Process and the proposed Court Supervised Claims Program, including, but not limited to, for purposes of the Federal Insurance Contribution Act, the Social Security Act, the Federal Unemployment Tax Act, income tax withholding (federal, state and local) and any and all state taxes.  Reitano agrees to timely file any necessary federal and state income tax returns, whether quarterly, annual or otherwise.

- 4 -

9.    Conflict of Interest and Recusal.  Reitano represents, warrants and covenants that she will assist Juneau in carrying out the responsibilities of the Claims Administrator of the Transition Process and the proposed Court Supervised Claims Program in a professional manner and that she will do so at all times during the term of this Undertaking free of any conflict of interest as an independent contractor not affiliated with any other person or entity other than the Claims Administrator. Reitano shall have no authority to hire any sub-contractor or other person or entity to perform any Claims Administration Services or other services related to the Transition Process and/or the proposed Court Supervised Claims Program.  Reitano will take appropriate steps to avoid even the appearance of a conflict of interest or loss of impartiality with respect to the performance of her official duties as part of the Transition Process and the proposed Court Supervised Claims Program. Reitano shall not participate, without prior written approval from the Claims Administrator, in any activity that presents or would appear to present to a reasonable person who is knowledgeable of the relevant facts, a conflict of interest with the Transition Process or the proposed Court Supervised Claims Program. However, merely being acquainted with an individual who, or entity that, has made a claim with the Transition Process and/or the proposed Court Supervised Claims Program does not by itself require Reitano to be recused from official activities that relate to the Transition Process and/or the proposed Court Supervised Claims Program. Reitano is not allowed to perform any official duties in the Transition Process and/or the Court Supervised Claims Program that relate to any former employer of Reitano with respect to the Transition Process and/or the proposed Court Supervised Claims Program without prior written approval of the Claims Administrator.

10.    Miscellaneous.  The terms and conditions of this Undertaking constitute the entire agreement between Reitano and BP relating to the subject matter of this Undertaking and shall supersede all previous agreements and understandings between Reitano and BP with respect to the subject matter of this Undertaking. Each party represents and warrants to the other that the individual executing this Undertaking on behalf of each party has the power and authority to do so, and that this Undertaking constitutes a legal, valid and binding obligation of such party enforceable against such party in accordance with its terms.  This Undertaking shall inure to the benefit of and be binding upon Reitano and BP and shall not be assigned by either party without the prior written consent of the other party.  This Undertaking shall be governed by and construed in accordance with the laws of the State of Louisiana without giving effect to its principles of conflict of laws.  The terms of this Undertaking may be amended only upon the written consent of Reitano and BP.

IN WITNESS WHEREOF, the parties have executed this Undertaking as of the date first set forth above.


Christine Reitano


BP Exploration & Production Inc.



Bob Talbott

Interim Class Counsel

_____
James P. Roy

_____
Stephen J. Herman

Revised Execution Version

### SUPPLEMENT AND AMENDMENT TO UNDERTAKING OF
### CHRISTINE REITANO IN FURTHERANCE OF
### THE COURT'S ORDER APPOINTING CLAIMS ADMINISTRATOR

This Supplement and Amendment (this "Amendment") to the Undertaking of Christine Reitano in Furtherance of the Court's Order Appointing Claims Administrator (the "Undertaking") is made and entered into by and among **Christine Reitano** ("Reitano"); BP Exploration and Production, Inc. ("BP"), solely for the purposes of the Indemnification provisions of Paragraph 4 below; and Patrick Juneau ("Juneau"), as Claims Administrator of the Court Supervised Claims Program, and as Trustee of the *Deepwater Horizon* Economic and Property Damages Trust (the "Settlement Trust"); and, for the purpose of taking cognizance of and approving the terms of this Amendment as provided in paragraph II below, the "Lead Class Counsel" (formerly the "Interim Class Counsel" as identified in the Undertaking) as of the 4th day of May, 2012 (the "Amendment Effective Date"). All of the parties identified above and appearing herein are identified collectively as the "Parties". Any terms not defined in this Amendment shall have the meanings ascribed to them in the Undertaking.

### RECITALS:

A. The Undertaking was made and entered into by and among Reitano, BP and Interim Class Counsel on April 18, 2012.

B. Paragraph 1(b) of the Undertaking provides that "[u]pon the establishment of the Settlement Trust, this Agreement [*sic*, the Undertaking] shall be amended to reflect that Reitano is retained as an independent contractor by the Settlement Trust and that the Settlement Trust shall become responsible for the Compensation obligations set forth in Paragraph 2 below".

C. The Settlement Trust has been established as of May 4, 2012, Juneau has been named as Trustee, and the creation and establishment of the Settlement Trust has been approved by the Court.

D. In addition, the "Agreement in Principle" (as identified in the Undertaking) has been formalized, its terms embodied in, and has been superseded by the "*Deepwater Horizon* Economic and Property Damages Settlement Agreement (the "Settlement Agreement") dated as of April 18, 2012, which has been approved on an interim basis by the Court.

E. Accordingly, the Parties desire to and do hereby enter into this Amendment in order to implement the terms of Paragraph 1(b) of the Undertaking and to bring the status of the Undertaking current with the developments which have occurred after its date.

{00179013-2}


EXHIBIT
D

SUPPLEMENT AND AMENDMENT TO UNDERTAKING:

NOW THEREFORE, in consideration of the recitals and undertakings contained herein, the Parties agree as follows:

I. The Undertaking be and is hereby supplemented and amended as of the Amendment Effective Date in the following respects:

1. By replacing the word "Undertaking" with the word "Agreement" wherever it appears.

2. By amending Paragraph 1(a), Claims Administrator Services, to: (i) replace, wherever they appear, the words "final settlement agreement among the parties, should such agreement be finalized and filed and approved by the Court" (or any variation thereof), with the words "the Settlement Agreement"; and (ii) precede the current text with the following sentence: "The description and scope of the services to be performed by Reitano are as set forth on attached Schedule 1."

3. By amending Paragraph 2, Compensation, to: (i) insert the words "by the Settlement Trust", after the words "shall be compensated" on the first line of subparagraph (a) and again after the words "shall be reimbursed" on the first line of subparagraph (b); (ii) replace the figure "$20,833" with the figure "$25,000" on the first line; (iii) replace the date "April 1, 2012" with the words "the Effective Date" on the fourth line; and (iv) add at the end the following:  "Any single expenditure of more than $2,000, or expenditures exceeding $5,000 in the aggregate in any individual calendar month, shall require advance written approval by the Claims Administrator or his Chief Financial Officer."

4. By amending Paragraph 3, Funding Mechanism for Payment of Compensation and Expenses, to: (i) insert the words "by the Settlement Trust", after the words "shall be paid", on the first line of subparagraph (a); (ii) insert the words "to the Settlement Trust", after the words "shall submit", on the first line of subparagraph (b); (iii) delete the words "and Interim Class Counsel" after the term "BP" on the fourth – fifth lines of subparagraph (b); and (iv)  substitute the words "the Settlement Trust", for the term "BP", wherever it appears in subparagraph (c).

5. By deleting Paragraph 4, Indemnification, in its entirety (to be replaced by a separate agreement).

6. By amending Paragraph 5, Term and Termination, to: (i) replace the date "April 18, 2012" with the words "the Amendment Effective Date"; and (ii) substitute the words "the Settlement Trust" for the term "BP" after the words "the audit right of".

7. By amending Paragraph 6, Notices, to add:

    "if to the Settlement Trust or to the Claims Administrator:

Mr. Patrick Juneau
The *Deepwater Horizon* Economic and Property Damages Trust
935 Gravier Street, Suite 1905
New Orleans, LA 70112
Telephone: (504) 264-9740
Fax:          (504) 264-9746
Email: mjj@dheclaims.com

8.  By amending Paragraph 10, Miscellaneous, to replace, wherever they appear, the words "Reitano, and BP" with the words "Reitano, BP and the Settlement Trust".

II. Lead Class Counsel has reviewed this Amendment, takes cognizance of its terms and consents hereto, subject to the same terms, conditions and qualifications as contained in Paragraph 7 of the Undertaking.

III. As supplemented and amended hereby, the Undertaking remains and shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the Effective Date.

_____

Christine Reitano

BP Exploration & Production, Inc.

By: _____

Its: _____

_____

Patrick Juneau,
Claims Administrator of the
Court Supervised Claims Program,

and

Trustee of the *Deepwater Horizon* Economic and
Property Damages Trust

Lead Class Counsel

_____      8-1-12

James P. Roy

{00179013-2}

Stephen J. Herman

{00179013-2}

Schedule 1

Description and Scope of Service

Christine will serve as Claims Counsel for the Claims Administrators Office with the following
responsibilities:

- Work with the Parties to identify any policy / legal issues and seek resolution at the
  direction of the Claims Administrator
- Assist the Claims Administrator with interpretation of the Settlement Agreement, Court
  Orders and other legal documents
- Work with the vendors and Contract Administrator's staff on legal issues and provide
  guidance as needed

{00179013-2}


EXHIBIT
E

## INDEMNITY AGREEMENT

This Indemnity Agreement (the "Indemnity Agreement") is entered into by and between Christine Reitano ("Reitano"), an individual with offices at 935 Gravier St., Ste. 1910, New Orleans, LA 70112; and BP Exploration & Production Inc. ("BP"), and is effective as of April 18, 2012.

## RECITALS

WHEREAS, BP, a Delaware corporation, and certain of its affiliates have been named as defendants in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 (the "MDL Litigation");

WHEREAS, BP and the Economic Class Representatives, individually and on behalf of the Economic and Property Damages Settlement Class, by and through Lead Class Counsel entered into an Economic and Property Damages Settlement Agreement ("Settlement Agreement") dated April 18, 2012, and amended May 1, 2012, for the purpose of settling all Released Claims against the Released Parties, including BP;

WHEREAS, the United States District Court of the Eastern District of Louisiana (the "Court") has preliminarily approved the Settlement Agreement by Order dated May 2, 2012;

WHEREAS, on May 4, 2012, BP, Lead Class Counsel, the Trustee and J.P. Morgan Trust Company (the "Directed Trustee") entered into the *Deepwater Horizon* Economic and Property Damages Trust Agreement (the "Trust Agreement") creating the Settlement Trust (as defined in Section 1 below);

WHEREAS, the Settlement Trust is intended to meet the requirements of a qualified settlement fund within the meaning of section 468B of the Internal Revenue Code of 1986, as amended from time to time, and section 1.468B-1(c) of the Treasure Regulations promulgated thereunder;

WHEREAS, the Settlement Trust's purpose is to establish a mechanism to pay Settlement Payments (as defined in the Settlement Agreement) and the costs of administering the Settlement Program (as defined in the Settlement Agreement) in accordance with the terms of the Settlement Agreement and the Trust Agreement.

WHEREAS, BP and Reitano have entered into an Undertaking of Christine Reitano in Furtherance of Court's Order Appointing Claims Administrator dated April 18, 2012 (the "Reitano Undertaking") ;

WHEREAS, the Settlement Trust and Reitano have entered into a Supplement and Amendment to the Reitano Undertaking dated May 4, 2012 (the "Reitano Amendment"); and

WHEREAS, pursuant to the Reitano Amendment, Reitano will provide certain services to assist with the administration of claims under the terms of the Settlement Agreement and the Trust Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties (as defined in Section 1 below) agree to the terms and conditions set forth herein.

Page 1


EXHIBIT
F

# AGREEMENT

1.      Definitions.

The following words and phrases have the meanings indicated.  Other words and phrases appearing in capital letters throughout this Indemnity Agreement shall have the meanings they are given with their first operative use.  Terms not otherwise defined herein shall have the same meanings ascribed to them in the Settlement Agreement, the Trust Agreement, the Reitano Undertaking and/or the Reitano Amendment.

    1.1      Claim: has the meaning ascribed to it in the Settlement Agreement.

    1.2      Claimant:  has the meaning ascribed to it in the Settlement Agreement.

    1.3      Parties: means Reitano and BP.

    1.4      Settlement Trust: means the qualified settlement trust fund established pursuant to that certain *Deepwater Horizon* Economic and Property Damages Trust Agreement, dated May 4, 2012, among BP, Lead Class Counsel, the Claims Administrator, and the Directed Trustee.

2.      Indemnification.

    2.1      Indemnification by BP.  BP shall indemnify, defend and hold Reitano harmless, to the full extent lawful, from and against any losses, liabilities, damages, costs and expenses from any third party claims, suits, investigations or proceedings related to or arising out of Reitano's assistance to the Claims Administrator in carrying out of the Claims Administrator Services or any other services performed by Reitano under the Reitano Undertaking, as amended by the Reitano Amendment (collectively, "Losses"), including but not limited to Losses resulting from Reitano's negligence, except that Reitano will not be indemnified or held harmless with respect to any Losses that are finally judicially determined to have resulted solely from Reitano's gross negligence or intentional or willful misconduct, including fraud.  BP further agrees that Reitano shall not have any liability to BP in connection with the Reitano's appointment to assist the Claims Administrator or any services performed by Reitano under the Reitano Undertaking, as amended by the Reitano Amendment, except for Losses incurred that are finally judicially determined to have resulted solely from the gross negligence or intentional or willful misconduct, including fraud, of Reitano.

    2.2      Process.  If any claim, suit, investigation or proceeding is threatened or commenced by a third party as to which Reitano proposes to demand indemnification under Section 2.1, Reitano will notify BP with reasonable promptness, but failure to do so shall not relieve BP of any of its obligations under Section 2.1 unless BP can establish that the delay in receiving such notice actually prejudiced BP and then only to the extent of such prejudice.  BP shall, unless it contests the duty to indemnify pursuant to Section 2.1, assume the defense of such claim with counsel chosen by it.  Reitano shall reasonably cooperate with BP in such defense, at no cost to BP.  Reitano may, at her option and sole expense, be represented by counsel of her choice in any action or proceeding with respect to such claim. BP shall not be liable for any litigation costs or expenses incurred by Reitano's own counsel.

3.      Miscellaneous.

    3.1      Successors and Assigns.  The terms and conditions of this Indemnity Agreement shall be binding upon the Parties and inure to the benefit of the Parties and their respective successors and permitted assigns; provided, however, that, unless otherwise provided in this Indemnity Agreement, the obligations of the Parties under this Indemnity Agreement may not be delegated nor shall any rights be

assigned or transferred, including by merger, reorganization, change of control, acquisition or sale of all or substantially all of its assets or business or otherwise (including, without limitation, by operation of law) (collectively a "Sale Transaction"), by a Party without the other Party's prior written consent, except that BP may assign or transfer its rights and obligations hereunder, without such consent, to a successor in interest to BP's business (including by merger or operation of law), or to any third party that purchases all or substantially all of the assets or business of BP.

3.2    Modification.   No provision of this Indemnity Agreement may be changed unless the change is set forth in a written amendment to this Indemnity Agreement signed by the Parties.

3.3    No Waiver.   If a Party waives compliance with any term or condition of this Indemnity Agreement, it shall not be deemed a waiver of any other right, nor to permit less than strict compliance with any term or condition on any future occasion.

3.4    Governing Law.   This Indemnity Agreement shall be governed by and construed in accordance with the law of the State of Louisiana without reference to its conflict of laws principles. The Parties agree that any claim, action, proceeding or suit related to or arising from this Indemnity Agreement shall be subject to the jurisdiction of the United States District Court for the Eastern District of Louisiana, to which the Parties irrevocably submit.

3.5    Notices.   All notices and correspondence required to be given by this Indemnity Agreement shall be delivered by hand or certified mail, return receipt requested and postage pre-paid, or by a nationally recognized courier service, or by facsimile transmission, and be addressed as follows:

If to BP:

> Mark Holstein
> BP Legal
> 501 Westlake Park Boulevard
> Houston, Texas  77079
> Tel.: 281-366-8895
> FAX: 281-366-5901

If to Reitano:

> Christine Reitano
> Sutton and Reitano
> 935 Gravier St., Suite 1910
> New Orleans, LA  70112
> Ph: 504-592-3230
> Email: reitanoc@aol.com

3.6    Counterparts.   This Indemnity Agreement may be executed in one or more counterparts which taken together shall constitute one single agreement between the Parties.

[*Signature Page Follows*]

Page 3

IN WITNESS WHEREOF, the Parties have caused this Indemnity Agreement which shall be effective on the date first above-written, to be executed on their behalf by the undersigned duly authorized individuals.

BP Exploration & Production Inc.                    Christine Reitano

By:                                                By:
_____                          _____
Signature                                          Signature

_____                          _____
Printed Name                                       Printed Name
Marra T. Travis                                    Christine Reitano

_____                          _____
Printed Title                                      Printed Title
Vice-President                                     Claims Counsel

_____                          _____
Date                                               Date
8-6-12                                             8/19/12

Page 4



DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

Patrick A. Juneau
*Claims Administrator*

June 26, 2013

Ms. Christine Reitano
935 Gravier Street, Suite 1910
New Orleans, LA 70112

Dear Ms. Reitano:

Pursuant to the 4/18/12 Undertaking of Christine Reitano in Furtherance of Court's Order Appointing Claims Administrator and the supplement (the "Agreement"), your status as an independent contractor under the Agreement is terminated for cause. Your termination date is June 26, 2013. Please note that, notwithstanding your termination, the investigation into all issues involved continues.

Please ensure that you abide by all on-going confidentiality obligations and return immediately any information or materials you have regarding your responsibilities. Please also respond to this notice, in writing, that you have returned all information and materials.

Sincerely,

PATRICK A. JUNEAU



EXHIBIT
G

935 Gravier St., Suite 1905 | New Orleans, LA 70112 | TEL 504.934.4999 | FAX 504.934.4998
www.deepwaterhorizoneconomicsettlement.com

**From:** Mary Olive Pierson
**Sent:** Wednesday, September 25, 2013 12:35 PM
**To:** 'Greg Paw'
**Subject:** RE: Special Master Production to Christine Reitano - 9/24/13 - Email 1 of 2

Mr. Paw:



Also, I am curious about the basis for the "attorney client privilege and the work product privilege" asserted at the bottom of the notes of the Odom and Mancuso interviews.  Who is the client with the privilege?

Mary Olive Pierson

P.O. Box 14647 (70898)

8702 Jefferson Highway, Suite B

Baton Rouge, LA 70809

Office: (225) 927-6765

EMAIL #1



On Sep 26, 2013, at 4:53 PM, "Greg Paw" <paw@freehgroup.com> wrote:

Dear Ms. Pierson —



Finally, you asked about the basis for the "attorney client privilege and the work product privilege" asserted at the bottom of the interview notes for Mr. Odom and Ms. Mancuso, and asked who the client is with the privilege. Our investigation was conducted at the direction of the Special Master, who is an attorney. Several attorneys, including myself, were involved in the interview and reporting process. We maintain a privilege to these work papers, which are appropriately marked so as to maintain confidentiality.

Please feel free to contact me should you have any further questions or require any further information.

Regards,

Greg

**EMAIL #2**

Gregory A. Paw
Counsel to Special Master Louis J. Freeh
paw@freehgroup.com
267-421-7033

EMAIL #3

On Thu, Sep 26, 2013 at 6:11 PM, Mary Olive Pierson <mop@mopslaw.com> wrote:
Last item first: you mention a lot of lawyers but you have not identified the client with your asserted. "Attorney
client" privilege. Who is it?

Sent from my iPhone

EMAIL #4

| | |
|---|---|
| From: | Greg Paw <paw@freehgroup.com> |
| Sent: | Thursday, September 26, 2013 6:51 PM |
| To: | Mary Olive Pierson |
| Cc: | Marie Tremont |
| Subject: | Re: Special Master Production to Christine Reitano - 9/24/13 - Email 1 of 2 |

Dear Ms. Pierson --

While I thought this point was clear from my message of earlier today, please note that our client is the Special
Master.  If I can provide any further information to you, please let me know.

Regards,

Greg

<u>AFFIDAVIT</u>

STATE OF LOUISIANA

PARISH OF ___Orleans___

    **BEFORE ME,** the undersigned Notary Public, personally came and appeared,

**CHRISTINA E. MANCUSO**

Who, after being first duly sworn did state as follows:

1)   I am an attorney employed by the Andry Lerner L.L.C. law firm ("AL") in New Orleans, Louisiana. I make this Affidavit. The statements contained in this Affidavit are within my personal knowledge, and, if called upon to testify, I could and would testify competently thereto.

2)   I attended Baylor University in Waco, Texas (B.A., 1982) and Baylor Law School (J.D. 1984). I was admitted to the State Bar of Texas in 1984 and practiced at several firms from 1984 – 1990. I worked at Baron & Budd, P.C. in Dallas, Texas from 1990 until 2007 in Mass-Tort/Multi-Party Toxic Tort litigation. I hold an AV® Preeminent™ Rating by Martindale-Hubbell.

3)   I am the senior AL staff attorney handling claims for property and economic damages resulting from the BP "Deepwater Horizon" Oil Spill in the Gulf of Mexico on April 20, 2010 ("Oil Spill"). My responsibilities include the preparation, filing, and processing of our clients' Oil Spill claims. I am knowledgeable about AL's Oil Spill client files.

4)   In the normal course of business, AL uses various contracts and agreements to set forth the terms of AL's representation of its clients. These forms include:
    a. Attorney-Client Contract – When AL is contacted by a prospective client about representation, AL sends a proposed Attorney-Client Contract to the prospective client.
    b. Attorney Referral Agreement – When AL is contacted by another attorney regarding representation of a client, AL sends a proposed Attorney Referral Agreement to the attorney.

5)   Casey Thonn ("Thonn") is a commercial fisherman that suffered losses as a result of the Oil Spill. AL filed five claims on his behalf. To date, Thonn has received three settlement checks - A VoO settlement check in the amount of $49,400.00, A Seafood Vessel Owner settlement check in the amount of $166,652.10 and Boat Captain settlement check in the amount of $190,350.25 – a total of $406,402.35. To my



knowledge, the Thonn claims were processed in the regular course of business and in a normal manner according to the applicable DWHCC procedures, Policies and Appellate decisions. Thonn was awarded and paid less settlement funds on both his Boat Captain Claim and his Vessel Owner claim than the sums requested in the initial DWHCC filings.

6)   I was interviewed by the Freeh Group Investigative Team ("Investigators") on August 7, 2013. My understanding of the Report of Special Master Louis J. Freeh, dated September 6, 2013[1] ("Report") is that any references therein to statements made by me are taken from the notes of the Freeh Group Investigative Team related to my interview ("Interview Report"), a copy of which was provided pursuant to an Order of the Court[2] as bates range SM-01-TALF-00386-00388.[3]  That document states:

> *"The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product."*

As such, it is necessary to clarify certain misconceptions reflected in the Interview Report.

7)   I had an initial conversation with a Ms. Christine Reitano ("Reitano") by telephone in which she indicated to me that she was sending to AL a DWHCC claim – that of a commercial shrimper named Casey Thonn. During this call, Reitano inquired of me whether our firm would honor and maintain the Attorney-Client Contract percentage of 20%, to which she and Mr. Thonn had previously agreed. I confirmed that AL would certainly honor that Attorney-Client Contract percentage.

8)   The only sum mentioned in our conversation was that of the 20% Attorney-Client Contract. At no time during this conversation did we discuss an Attorney Referral Agreement. After that call in the regular course of business, after contacting Jonathan Andry, I sent to Reitano a proposed, unsigned Attorney Referral Agreement.

---

[1] [Rec. Doc. 11287]
[2] [Rec. Doc. 11442]
[3] See Exhibit A

9) There is a discrepancy in the Report regarding my interview. The Report states "but that Ms. Reitano also requested a referral fee."[4]

Explanation: Reitano did not request a referral fee from me during this call or during any other calls which I had with her.

10) There is a discrepancy in the Report regarding my interview. The Report states: "Ms. Mancuso also stated that Ms. Reitano asked AndryLerner honor the *percentage referral fee* (italics added) that was contained in the Thonn disc"[5] as described to the Freeh Investigators.

However, the Interview Report indicates: "Ms. Mancuso said that Ms. Reitano requested she have Andry Lerner honor the *attorney percentage* [italics added], for Ms. Reitano in the Thonn contract, as set forth as a fee agreement in that contract."

It was my understanding that Ms. Reitano asked me if Andry Lerner would honor the *Attorney-Client Contract percentage fee.* To my knowledge there was not then, and there is not today, any Attorney Referral Agreement on the Reitano/Thonn disc, only the Attorney-Client Contracts - that is contracts between attorneys Smith Stagg and Casey Thonn and attorney Reitano and Casey Thonn.

11) There is an ambiguity in the Interview Report which states: "requested she (Mancuso) have AndryLerner honor the attorney percentage, for Ms. Reitano, in the Thonn contract, *as set forth as a fee agreement in that contract* (italics added)."[6]

The wording is clear up to "Thonn contract". The wording of "as set forth as a fee agreement in that contract" I believe references the Attorney-Client Contract, not an Attorney Referral Agreement.

12) The Interview Report states: "Ms. Mancuso recalled that she sent Ms. Reitano an attorney referral contract packet."[7]

Explanation: I sent Ms. Reitano an Attorney Referral Agreement. I did not send her a "contract packet."

13) The Interview Report states: "Ms. Mancuso also recalled that she sent an Andry Lerner claimant attorney referral contract to Mr. Thonn with the same percentage requested by Ms. Reitano."[8]

Explanation: I recall that I sent an Andry Lerner claimant Attorney-*Client* Contract to Mr. Thonn with the same percentage requested by Ms. Reitano.

---

[4] Report Page 26, 3rd Paragraph
[5] Report Page 26, 4th Paragraph
[6] Interview Report Page 2, line 2
[7] Interview Report Page 2, lines 2 & 3
[8] Interview Report Page 2, lines 3 & 4

3

14) The Interview Report reads: "Ms. Mancuso was unaware if Ms. Reitano ever returned the signed referral *contract* [Italics added]."[9]

Explanation: I have no present knowledge if Ms. Reitano ever returned an executed Attorney Referral Agreement. However, the Attorney-Client Contract signed by Thonn was received by AL.

15) The Report states: "Ms. Mancuso remembered communications with Ms. Reitano about the referral and the fee."[10]

Explanation: I only recall discussing with Ms. Reitano the Attorney-Client Contract and the exchange of client information to process the claims.

16) Reitano did provide information along with a CD disc containing numerous documents and client information to AL. Reitano worked on the Thonn claim with the Gulf Coast Claim Facility and AL relied on this work and information and it was validated in the subsequent meetings and contact with Thonn.

17) In my interview I explained the standard option in the Settlement Agreement in conjunction with the DWHCC Policies which permit a Claimant to use the annual Tax Return income to confirm commercial fishing income as opposed to the use of trip tickets, as stated in DWHCC Policy No. 262[11]:

> *"Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. UPDATE: The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel hearing:*
>
> *On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, **the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:***
>
> *(a) **Single Catch/Single Vessel Claimants:** If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is **submitting a claim for only one vessel and one catch type:***
> *(1) The Claims Administrator **will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form,** subject to the following.*
> *(2) The revenues shall be **limited to those shown in the applicable tax returns.***
> *(3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the*

---

[9] Interview Report Page 2
[10] Report Page 25
[11] See Exhibit B

4

*documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.*
*(b) **SWS-1 Claimants:** If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns:*
*(1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation:*
*a) The Claims Administrator will rely upon the SWS-1 allocation and will not consider trip tickets or other documents for that purpose, subject to the following:*
*b) The revenues shall be **limited to those shown in the applicable tax returns.***
*c) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the assertions in the SWS-1. If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.*
*(2) If the claimant has indicated in the SWS-1 that the Claims Administrator is to use the claimant's trip ticket allocations if they result in a higher award than the SWS-1 allocation:*
*a) The Claims Administrator will determine the claimant's trip ticket allocation under Subsections (c) or (d) below and will compare the resulting award to that determined using the SWS-1 allocation. The Claims Administrator will base the resulting Eligibility Notice on the higher award.*
*b) If the award is based upon the SWS-1 allocation, the revenues shall be limited to those shown in the applicable tax returns."*

18) From my work I know that the Louisiana Department of Wildlife and Fisheries ("LDWF") Trip Tickets Database is not always an accurate source of complete information on the landings of commercial fishermen, mainly due to human error in data entry, as well as the failure to submit trip tickets.[12] From my work I know trip tickets are used generally by the State for conservation, regulation, and the review of the gear and area specific catch information that will improve the accuracy of stock assessments from the Louisiana waters which aid the LDWF to oversee fishing limits, fishing boundaries, management of public waters, and regulation enforcement.

19) The Thonn Expert Economic Report filed with the Boat Captain Claim indicated that the settlement sum should be in the amount of $259,459.00. An initial Eligibility Notice was issued in the amount of amount of $885.58.

20) Pursuant to the Settlement Agreement, the DWHCC has an affirmative duty to provide the claimant with the highest possible settlement value from the submitted documents[13]:

*"The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting*

---

[12] See Exhibit C, DWHCC Policy No. 404
[13] Settlement Agreement (Section 4.3.8)

> *documentation under the terms in the Economic Damage Claim Process to produce the greatest ECONOMIC DAMAGE COMPENSATION AMOUNT that such information and supporting documentation allows under the terms of the ECONOMIC DAMAGE CLAIM FRAMEWORK."*

21) Per my conversation with our DWHCC firm liaison it was my understanding that DWHCC does often initially issue an Eligibility Notice using trip tickets as the basis of calculation due to the software of the DWHCC computer. An AL attorney in fact sent an email dated January 22, 2013 to the firm liaison inquiring as to why the DWHCC often initially uses trip tickets in calculating loss instead of using the submitted documents which request the use of Tax Returns.[14]

22) Per the terms of the Settlement Agreement and Policies, AL filed a Request for Reconsideration, requesting the DWHCC to use Tax Returns instead of trip tickets in the DWHCC calculation. A Post-Reconsideration Eligibility Notice was then issued for $189,647.64 per terms of the Settlement Agreement. Upon review, it was determined that the Eligibility Notice sum was *incorrect in that the DWHCC should not have deducted Shrimp Cost Percentage from his Boat Captain claim in the calculation loss,* that such a deduction in the loss calculation is only done on the Vessel Owner claim per the terms of the Settlement Agreement. On this good faith basis, AL then filed an Appeal on this Eligibility Notice due to the manner in which the Settlement Agreement was written regarding the Shrimp Cost Percentage deduction, and requested the amount of $648,648.00 per the language in the Settlement Agreement and DWHCC Policies as of that date. *Please see Settlement Agreement Shrimp Compensation Plan[15] which states:*

> *"If the Claimant is a Boat Captain and Benchmark Revenue was calculated based upon his earnings, such as from tax return or financial information, then no Shrimp Cost Percentage is applied, skip to step 5."*

23) AL filed the Appeal due to "error calculation", "error in reviewing submitted documentation" and "error in Prior Payment Offer."[16] The filing of this Appeal then opened up to BP the entire DWHCC claim file to oversight review by an appellant Judge with the possibility of such Appeal eventually going to Judge Barbier.

24) The Thonn appeal documents received by AL show that BP's Initial Proposal Regarding Claim No. 19691[17] attached a copy of Thonn's 2009 Tax Return and Economic Expert Report BP and states on Page 1:

> *"BP agrees with the Settlement Programs calculation of Claimant's Compensation Amount. BP therefore, submits an Initial Proposal*

---

[14] See Exhibit D
[15] [Rec. Doc. 6430-22]
[16] See Exhibit E, Coastal Claims Group Letter, Dated January 7, 2013
[17] See Exhibit F

*Compensation Amount $22,932.00, the amount Claimant is entitled to according to the terms of the Settlement Agreement Seafood Compensation Framework."*

25)   AL also received BP's Final Proposal filed Feb 4, 2012[18] which states:

*"As BP explained in its Initial Proposal, the Settlement program correctly calculated both Claimant's Compensation Amount and the Claimant's prior payment offset"* and *"BP, therefore, submits a Final Proposal Compensation Amount of $22,932.00 and Final Proposal Prior Offset Payment of $72,500.00."*

26)   The Notice of Appeal Panel Decision was issued March 28, 2013[19] which awarded claimant $189,189.00, the amount of BP's Final Proposal.  The Appeal Panel stated:

*"The Appeal Panel's decision will stand as the Settlement Program's final determination on this claim."*

The Appeal and the appeal fee were lost by Thonn.  The Post-Appeal Eligibility Notice was issued on April 9, 2013.  BP did not seek judicial review of the Appellate Panel's decision which is permitted under the terms of the DWHCC Appeal process. In fact, during the Appeal process, a new DWHCC Policy, No. 342, had been issued on February 8, 2013, which interpreted and clarified the Agreement as written and addressed this very issue of shrimp cost percentage deduction for an individual who is both a Vessel Owner and a Boat Captain.[20]

27)   The Thonn Expert Economic Report indicated that the Vessel Owner Claim should be $327,272.  A DWHCC Eligibility Notice for Thonn's Vessel Owner Claim was issued in the amount of $864.78.  Per the terms of the Settlement Agreement, AL filed a Request for Reconsideration, requesting the DWHCC to use Tax Returns instead of trip tickets in the claim calculation.  The Post-Reconsideration Eligibility Notice was then issued for $238,636 ($166,136.13 after the offset of prior seafood payments).  However, the Notice inadvertently omitted accounting fee reimbursement pursuant to the Settlement Agreement.  Upon review, it was determined that the Eligibility Notice sum was correct in that the Thonn Vessel Owner Economic Expert Report was in error, as the *calculations omitted to subtract the Shrimp Cost Percentage* in the loss calculation.  AL then filed an Appeal on this Post-Reconsideration Eligibility Notice to obtain the allowed reimbursement for accounting fees *only*, pursuant to the terms of the Settlement Agreement.

28)   The filing of the Appeal opened up to BP the claim file on this claim.  Working through our DWHCC firm liaison, pursuant to DWHCC procedure, the issue was resolved, the accounting fees reimbursement was added to the Claim and a Post-

[18] See Exhibit G
[19] See Exhibit H
[20] See Exhibit I

7

Reconsideration Eligibility Notice dated January 28, 2013 was issued listing $515.97 as reimbursement for accounting fees. AL then withdrew the Appeal.

29) The suggestion that the chart shown in the Report on Page 60 reflects "suspicious and fraudulent characteristics" is misleading, as the Chart simply reflects that the claims were processed according to the Settlement Agreement and the DWHCC process and Policies.  The Settlement Agreement and the DWHCC Policies provide for and allow a commercial fisherman to request the use of Tax Returns instead of trip tickets to calculate loss.[21]

30) The Report states on Page 58 the title "Unsubstantiated Increases in the Value of Mr. Thonn's Claim…"

Mr. Thonn's Federal Internal Revenue filings for 2009 and 2010 do substantiate his income for those years in accordance with the Settlement Agreement and approved DWHCC Policies.[22]

31) I have met with claimant Thonn and spoken with him on numerous occasions.  I reviewed the documents he provided to Reitano.  In working with him, my impression of his character is that of a diligent and hard-working individual.

32) At no time during the course of filing claims with the DWHCC was I told, it was implied, suggested or intimated that any claims filed by AL would receive special attention or treatment or would be treated in any other manner other than through the known DWHCC claim procedure process. No individual or entity requested me to perform any kind of action in the processing and filing of Thonn's claims which was outside of the usual DWHCC claim processing procedure.

33) Exact claim status information can be obtained on the firm's filed claims as well as unfiled but registered claims on the DWHCC Website, the various reports, claim files, Notices, definitions and claim filing summaries which are available for view and are reached through the attorney portal for AL permits AL to keep current on the following:

a)  The number of claims filed on behalf of what number of claimants
b)  The number of claims which have submitted a signed claim form.
c)  The number of claimants who have started a Registration Form but did not complete it, completed a Registration Form and filed a claim and completed a Registration Form but have not completed the claim form.
d)  Which claims have Eligibility Notices and the amounts.
e)  The number of offers and amounts which have been accepted, paid and how many are pending payment.
f)  The number of claims in accounting.

---

[21] See Exhibit B
[22] See Exhibit B

g)   The number of claims which are eligible but no payment is warranted due to prior Oil Spill payment(s).

h)   The claims which are designated Incomplete, those designated Incomplete and waiting for a Response, those claim designated Incomplete in which a Response has been sent and is again in Review.

i)   The number of claims in which Responses have been sent but not yet processed.

j)   The number of claims which have been excluded from the Class, closed, withdrawn, on appeal and / or denied.

k)   The number of claims which are still In Claim Review and In Claims Review but with no Notice yet issued.

l)   The overall statistics of the submissions to the DWHCC.

34)   Status Reports filed routinely by DWHCC Claims Administrator Patrick Juneau in the Multi-District Litigation also help in monitoring the flow of claims by the DWHCC in order to compare firm filings to the filings submitted to the DWHCC.[23]

35)   The type of information contained in the email dated May 9, 2013, between Lionel Sutton and Glen Lerner, which I was only recently shown, is made available to any firm filing DWHCC claims through the Attorney Claim Portal website's Reporting tab and other sources as described in Paragraphs 33 and 34, above.[24]

**SWORN TO AND SIGNED** below before me, Notary Public, after reading the whole, on _October 13_, 2013, in the jurisdiction mentioned above.

AFFIANT:

_____
CHRISTINA E. MANCUSO

Witness 1: _Christine Hay_          _____  LEWIS SCOTT JOANEN
Printed Name: _CHRISTINE HAY_      Notary Public                Notary Public
                                                                Bar No. 21431, ID No. 59231
Witness 2: _Terry P. Alleman_  Printed Name: _Parish of Orleans, State of Louisiana_
Printed Name: _Terry P. Alleman_  Notary No./Bar No.: _21431_  My commission is for life
                                   My Commission Expires: _at death_

---

[23] See Exhibit J, Claims Administrator Status Report of May 13, 2013
[24] See Exhibit K, dated May 9, 2013, reflecting AL's claim portal statistics

9

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Christina Mancuso |
| Title: | Toxic Tort Litigation Attorney |
| Office: | AndryLerner |
| Date/Time: | August 7, 2013 9:00 AM |
| Attendees: | Walt Donaldson, Steve Tidwell, Laure Kirk, David Courcelle (attorney for Mancuso) |
| Location: | 935 Gravier S., New Orleans, La. 70112 |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Christina Mancuso.

On the above date and times, Christina Mancuso was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Mancuso was advised concerning the need for truthfulness and honesty and was further advised concerning the penalties for perjury under Title 18 USC section 1001. She was further advised that she would not be adjourned as a witness and could be recalled.



Regarding the Casey Thonn claim, Ms. Mancuso said that the first time she became involved with this claim based on a telephone call from Christine Reitano. During the call, Ms. Reitano told Ms. Mancuso she was sending two claims on a disc for referral to Andry Lerner. She does not recall if there was actually another claim, other than Mr. Thonn's, on the disc. Ms. Mancuso said that Ms. Reitano

1



EXHIBIT
A

SM-01-TALF00386

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

requested she have Andry Lerner honor the attorney percentage, for Ms. Reitano, in the Thonn
contract, as set forth as a fee agreement, in that contract. Ms. Mancuso recalled that she sent Ms.
Reitano an attorney referral contract packet. She also recalled that she sent an Andry Lerner claimant
attorney referral contract to Mr. Thonn with the same percentage requested by Ms. Reitano.   When
asked if a contract is always sent to the claimant, Ms. Mancuso said that some lawyers do and others do
not.  Ms. Mancuso was unaware if Ms. Reitano ever returned the signed referral contract. In the Andry
Lerner process, that would not be a role she would handle.



Ms. Mancuso confirmed again that she had never known or met Mr. Sutton.   Regarding Ms. Reitano,
she did recall she had two or three conversations with Ms. Reitano, generally regarding whether Ms.

2

SM-01-TALF00387

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Reitano had or had not sent the disc with the claims and there were no conversations after that.



*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

3

SM-01-TALF00388



EXHIBIT

B

| Pol-262 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---|---|

### I. Profile - EXTERNAL

| Subject | Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. | |
|---|---|---|
| Active Date | 10/8/12 | Policy Impact | ☐All Claims Regardless of Active Date<br>☑All Claims Greater than Active Date |
| Type of Decision | | Claims Administrator Decision |
| Settlement Agreement Reference | | Exhibit 10 |
| Affected Claim Types and/or Review Processes | | Seafood |
| Superseding Information | | Policy 262 supersedes Policy 257 on 10/08/2012<br>Policy 262 supersedes Policy 241 on 10/08/2012<br>Policy 262 supersedes Policy 212 on 10/08/2012 |

### II. Summary

Documents that Allocate Benchmark Period Revenues by Vessel, Landing, and Catch Type. UPDATE:  The Claims Administrator modified these rules further and issued the following revised policy in the 10/8/12 Memo to the Parties after the 10/1/12 Panel hearing:

On any claim in the Seafood Program where the Claims Administrator is required to allocate the claimant's Benchmark Period revenue by catch type, vessel and landing location, interpreting and applying the language in Exhibit 10 that the claimant must provide "sufficient information" for the Claims Administrator to make such allocation, the Claims Administrator will use the information available on the claim in the following hierarchy of proof, as sufficient to satisfy the proof requirements of Exhibit 10 to the Settlement Agreement:

(a) Single Catch/Single Vessel Claimants:  If the claimant has submitted tax returns with supporting documents for the Benchmark Period and the Claims Administrator can determine from the Claim Form or other information available on the claim that the claimant is submitting a claim for only one vessel and one catch type:
(1) The Claims Administrator will allocate the revenues from the claimant's tax returns to the one type of catch asserted on the Claim Form, subject to the following.
(2) The revenues shall be limited to those shown in the applicable tax returns.
(3) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the allocation assertions in the Claim Form.  If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.
(b) SWS-1 Claimants:  If the claimant is not subject to Subsection (a) and has submitted a signed Sworn Written Statement (SWS-1) to allocate the claimant's Benchmark Period revenues shown in tax returns:
(1) If the claimant has indicated in the SWS-1 that the Claims Administrator may rely only on the SWS-1 for such allocation:
a) The Claims Administrator will rely upon the SWS-1 allocation and will not consider trip tickets or other documents for that purpose, subject to the following.
b) The revenues shall be limited to those shown in the applicable tax returns.
c) The Claims Administrator will not enter or compute all information regarding trip tickets or their equivalent for the claimant, but will survey the documents available on the claim to note information that conflicts with the assertions in the SWS-1.  If such conflict arises, the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim.
(2) If the claimant has indicated in the SWS-1 that the Claims Administrator is to use the claimant's trip ticket allocations if they result in a higher award than the SWS-1 allocation:
a) The Claims Administrator will determine the claimant's trip ticket allocation under Subsections (c) or (d) below and will compare the resulting award to that determined using the SWS-1 allocation.  The Claims Administrator will base the resulting Eligibility Notice on the higher award.
b) If the award is based upon the SWS-1 allocation, the revenues shall be limited to those shown in the applicable tax returns.
(c) Louisiana Trip Ticket Database:  If the claimant is not subject to Subsections (a) or (b) and the Claims Administrator is able to determine the claimant's Benchmark Period revenues using the trip ticket data received by the Claims Administrator from the Louisiana Department of Wildlife and Fisheries, the Claims Administrator will rely on such data to determine such revenues and their allocation by vessel and catch type and will not consider trip tickets other document for that purpose.  The Claims Administrator will not consider tax return revenues on such claims.
(d) Specific Trip Tickets or Equivalent:  If the Claimant is not subject to Subsections (a), (b) or (c), the Claims Administrator will determine the claimant's Benchmark Period revenues and their allocation using trip tickets or their equivalent.

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-404 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

| | I. Profile - EXTERNAL |
|---|---|

| Subject | Seafood Program: Handling Errors in Vessel Registration Information Reported in the LDWF Trip Ticket Database |
|---------|---|
| Active Date | 8/28/13 | Policy Impact | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| Type of Decision | | | Clarified by Seafood Neutral |
| Settlement Agreement Reference | | | |
| Affected Claim Types and/or Review Processes | | | Seafood |

| II. Summary |
|---|

The Claims Administrator prepared and sent a memorandum to the Seafood Neutral explaining the substance and procedural history of the announced policy and requesting his opinion on how to resolve the issue. At the Seafood Neutral's request, the Claims Administrator then provided the Seafood Neutral – with a copy to the Parties – certain claims information germane to the issue. After considering that information alongside the announced policy, the Seafood Neutral advised the Claims Administrator that he agreed with the proposed approach. Accordingly, after thorough consideration of the Parties' responses and the Seafood Neutral's opinion, the Claims Administrator announces the final policy as originally announced, repeated verbatim below:

In Louisiana, seafood dealers are required to report the seafood they purchase from commercial fishermen to the Louisiana Department of Wildlife and Fisheries ("LDWF"). In reporting this sales information, the dealer must identify by registration number the vessel that landed the catch. A number of claimants have indicated that the seafood dealers to whom they sold their catch entered the wrong registration number, and, therefore, reported the sale to the LDWF under the wrong vessel. This erroneous reporting creates a discrepancy in the Claims Administrator's reviews of the affected Louisiana-based commercial fishermen's claims in the Seafood Compensation Program. If a claimant believes that his landings were reported to the LDWF under the wrong vessel and wishes to have the revenue associated with those misreported sales considered as part of the claimant's Seafood Compensation Program claim, the claimant must submit (1) a sworn written statement describing the discrepancy in detail and (2) sworn written statement from the dealer who incorrectly reported the landings confirming and explaining the dealer's reporting error.

EXHIBIT

C

Chris Mancuso

EXHIBIT
D

**Subject:**            FW: General Question regarding Eligibility Notices under the Seafood Compensation Program - Trip Tickets v. Income Tax Returns

**From:** Nikeita Ashe [mailto:nashe@dhecc.com]
**Sent:** Tuesday, January 22, 2013 2:10 PM
**To:** Kalley LeBoeuf
**Cc:** Mary Rubio
**Subject:** RE: General Question regarding Eligibility Notices under the Seafood Compensation Program - Trip Tickets v. Income Tax Returns

Kailey,

I just wanted to inform you that we have implemented a new Re-Review process in addition to Reconsideration. You may seek a Re-Review if you have additional supporting documentation. I don't think that is your case here, but I wanted to inform you of that update for future references. I can seek clarification for you on the use of Trip Tickets vs. Income Tax Returns, however, without having an actual CID, receiving clarification may be difficult. Please let me know how you'd like me to move forward.

Thanks,
Nikeita

**From:** Kailey LeBoeuf [mailto:KLeboeuf@andrylawgroup.com]
**Sent:** Tuesday, January 22, 2013 2:58 PM
**To:** Nikeita Ashe
**Cc:** Mary Rubio
**Subject:** General Question regarding Eligibility Notices under the Seafood Compensation Program - Trip Tickets v. Income Tax Returns

Niketia,

I have a question regarding eligibility notices that I would appreciate your input on. My question is limited to claimants under the seafood compensation program. We have received many eligibility notices from the claims facility regarding several claimants in which the claims facility used trip tickets to calculate the claimants loss in lieu of the claimants Income Tax Return. I understand that we can upload the SWS 1 to request that the claims facility use either the claimants trip tickets OR income tax returns to calculate the loss. In some of these instances, we have uploaded the SWS 1 with the claim form (requesting that the claims facility use Income Tax Returns), and the claims facility still uses trip tickets to calculate the loss. In other circumstances, we may have not uploaded a SWS 1 requesting that the facility use Income Tax Returns to calculate a loss, and the claims facility uses the trip tickets to calculate the loss.

ALL of the claimants that I am referring to would have received eligibility notices in a higher amount if the claims facility would have used Income Tax Returns. This is despite the fact that we have either uploaded the SWS 1 requesting that the facility use Income Tax Returns and despite the fact that Section 4.3:8 provides that the claims administrator shall process the information completed to produce the greatest economic damage compensation amount.

The problem that this causes is that we have to request for reconsideration to request that the claims facility use Income Tax Returns (which should have been done anyway considering the SWS 1 and/or Section 4.3.8). 1. This really holds up the entire process. 2. We then receive a post reconsideration eligibility notice and sometimes the amount is still incorrect. 3. This means we now have to appeal, which causes even more delays and involves paying fees.

1

I just do not understand how this keeps happening.  I do not have a list of clients that this has happened to, but this has definitely been going on.  Is there any way you can look into this for me?  Any assistance would be greatly appreciated.  Thank you for your time.

Sincerely,

Kailey

Kailey L. LeBoeuf Esq.
Andry Lerner, L.L.C.
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-525-5535
Facsimile: 504-586-8933
E-Mail: kleboeuf@andrylawgroup.com

CONFIDENTIALITY NOTICE:  This e-mail transmission (and the documents accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege.  It is intended only for use by the person(s) to whom it is addressed.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution of or the taking of any action in reliance on the contents of this information is strictly prohibited.  If you have received this transmission in error, please notify us immediately by telephone to arrange for the return of the documents.

Kailey L. LeBoeuf Esq.
Andry Lerner, L.L.C.
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-525-5535
Facsimile: 504-586-8933
E-Mail: kleboeuf@andrylawgroup.com

CONFIDENTIALITY NOTICE:  This e-mail transmission (and the documents accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege.  It is intended only for use by the person(s) to whom it is addressed.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution of or the taking of any action in reliance on the contents of this information is strictly prohibited.  If you have received this transmission in error, please notify us immediately by telephone to arrange for the return of the documents.



800 Mariner's Plaza Drive, Ste. 821
Mandeville, LA 70448
985-778-2016 (Main Office)
www.CoastalClaimsGroup.com

January 7, 2013

Jonathan B. Andry, Esq.
Andry Lerner, LLC
610 Baronne Street
New Orleans, LA 70113

      Re:    Casey Thonn, Claimant ID No. 100051739
              Boat Captain Claim ID No. 19691

Dear Mr. Andry:

Per your request, we have reviewed the Post-Reconsideration Eligibility Notice for the above referenced claim. We have found that the Claims Center has incorrectly calculated this loss for the following reasons:

1.  The adjuster incorrectly calculated a Shrimp Cost Percentage resulting in a lower Base Loss even though this claim was based on Tax Return information, as per the Settlement Agreement (relevant Pages Attached for your review).

2.  They also incorrectly calculated the Base Compensation for this claim as the Base Compensation was supposed to equal the Base Loss.

I have attached our revised calculations based upon the terms of the Settlement Agreement. Mr. Thonn's Boat Captain Claim should have results in a Final Compensation Amount of $648,648. If you have any additional questions, please let me know.

With kindest personal regards, I remain

                        Very truly yours,

                        *Leslie M. Butler*

                        Leslie M. Butler
                        Director of Operations

/lbt
Enclosure

PDF created with pdfFactory Pro trial version www.pdffactory.com
PDF created with pdfFactory Pro trial version www.pdffactory.com



EXHIBIT

E

**Historical Shrimp – Casey Thonn**
Claimant ID No. 100051739, Claim No. 19691



| Vessel Size | Additional Catch Factor | Shrimp Cost Percentage | Vessel Owner/ Commercial Fisherman Vessel Lessen Share | Boat Captain Share |
|---|---|---|---|---|
| <30 feet | | | | |
| 30-44 feet | | | | |
| 45-74 feet (Ice) | | | | |
| 45-74 feet (Freezer) | | | | |
| 75+ feet (Ice) | | | | |
| 75+ feet (Freezer) | | | | |
| RTP | | | 8.25 | 7.25 |

**Key**
Enter Raw Data
Selected Data

| | 2007 | 2008 | 2009 | | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| | | | 156,000 | | | | 156,000 |
| Averages | | | | | | | |
| 2007-2009 | 2008-2009 | | 2009 | 2007-2009 | 2008-2009 | | 2009 |
| 156,000 | 156,000 | | 156,000 | 156,000 | 156,000 | | 156,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 Gross Revenue Benchmark Period | 156,000 | a | | 156,000 | a | |
| Additional Catch Factor | 1.20 | | | 1.20 | | Based on vessel size from above |
| 2 Additional Catch Adjusted | 187,200 | c=a*b | | 187,200 | c=a*b | |
| Adjustment for change in prices 10-11 | 1.2 | d | | 1.2 | d | For all size vessels |
| 3 Total adjusted Benchmark Revenue | 224,640 | e=c*d | | 224,640 | e=c*d | |
| 4 Benchmark shrimp cost | 60,840 | | | SKIP | | |
| 5 Base Shrimp Loss | 57,330 | g=(e-f)*.35 | | 78,624 | f=e*.35 | |
| 6 Base compensation | 22,932 | | | 78,624 | g=f | |
| RTP | 7.25 | i | | 7.25 | h | |
| 7 Final compensation | 189,189 | j=h+(h*i) | | 648,648 | i=g+(g*h) | |

PDF created with pdfFactory Pro trial version www.pdffactory.com
PDF created with pdfFactory Pro trial version www.pdffactory.com

3.      Calculate Total Adjusted Benchmark Shrimp Revenue by multiplying the
        Additional Catch Adjusted Benchmark Shrimp Revenue by 1.2, the
        Adjustment for Changes in 2010-11 Prices.

Total Adjusted Benchmark Shrimp Revenue = (Additional Catch Adjusted Benchmark Shrimp
        Revenue * Adjustment for Changes in 2010-11 Prices).

4.      If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel
        Lessee or (ii) the Claimant is a Boat Captain and Benchmark Revenue was
        calculated using trip tickets or their equivalents, calculate Benchmark
        Shrimp Cost.   Benchmark Shrimp Cost is calculated by multiplying
        Benchmark Shrimp Revenue by the Shrimp Cost Percentage.  The Shrimp
        Cost Percentage, presented in Table 12, is expressed as a percentage of
        revenue and reflects standard industry non-labor variable costs.  If the
        Claimant is a Boat Captain and Benchmark Revenue was calculated based
        upon his earnings, such as from tax return or financial information, then
        no Shrimp Cost Percentage is applied, skip to step 5.

Benchmark Shrimp Cost = (Benchmark Shrimp Revenue * Shrimp Cost Percentage)

**TABLE 12**

| VESSEL SIZE | SHRIMP COST PERCENTAGE |
|---|---|
| <30 feet | 42% |
| 30-44 feet | 39% |
| 45-74 feet Ice | 39% |
| 45-74 feet Freezer | 42% |
| 75+ feet Ice | 54% |
| 75+ feet Freezer | 52% |

5.      Calculate the Base Shrimp Loss using the Shrimp Loss Percentage of
        35%.

a.      If (i) the Claimant is a Vessel Owner/Commercial Fisherman
        Vessel Lessee or (ii) the Claimant is a Boat Captain and Total
        Adjusted Benchmark Shrimp Revenue was calculated using trip
        tickets or their equivalents, the Base Loss is calculated as follows:

Base Shrimp Loss = (Total Adjusted Benchmark Shrimp Revenue − Benchmark Shrimp
        Cost) * 35%

22

029320

b.   If the Claimant is a Boat Captain and Total Adjusted Benchmark Shrimp Revenue was calculated using a different source than trip tickets or their equivalents, the Base Loss is calculated as follows:

Base Shrimp Loss = Total Adjusted Benchmark Shrimp Revenue * 35%

6.   Determine Base Compensation by multiplying Base Shrimp Loss by the appropriate Vessel Owner/Commercial Fisherman Vessel Lessee or Boat Captain share. Vessel Owner and Boat Captain shares differ by boat size and type and are presented in Table 13.

a.   Base Compensation for Vessel Owners/Commercial Fisherman Vessel Lessees is calculated as:

Base Compensation = Base Shrimp Loss * Shrimp Vessel Share

b.   Base Compensation for Shrimp Boat Captains is calculated as:

i.   If Shrimp Boat Captain Compensation is calculated based on trip tickets then the Base Compensation for Shrimp Boat Captains is calculated as:

Base Compensation = Base Shrimp Loss * Shrimp Boat Captain Share

ii.   If Shrimp Boat Captain Compensation is calculated based on tax returns and financial records, then the Base Compensation for Shrimp Boat Captains is calculated as:

Base Compensation = Base Shrimp Loss

TABLE 13

| VESSEL TYPE AND SIZE | SHRIMP VESSEL OWNER/COMMERCIAL FISHERMAN VESSEL LESSEE SHARE | SHRIMP BOAT CAPTAIN SHARE |
|---|---|---|
| <30 feet | 45% | 45% |
| 30-44 feet | 45% | 40% |
| 45-74 feet Ice | 45% | 30% |
| 45-74 feet Freezer | 45% | 30% |
| 75+ feet Ice | 45% | 25% |
| 75+ feet Freezer | 45% | 25% |

23

PDF created with pdfFactory Pro trial version www.pdffactory.com

CC: "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM>,
"jandry@andrylawgroup.com" <jandry@andrylawgroup.com>
Subject: BP's Initial Proposal - Claim No. 19691 - Casey Thonn
Date: Thu, 24 Jan 2013 20:18:56 -0500
To: "DDuval@dheclaims.com" <DDuval@dheclaims.com>, "jgoodwin@browngreer.com"
<jgoodwin@browngreer.com>,
"ClaimForms@deepwaterhorizoneconomicsettlement.com"
<ClaimForms@deepwaterhorizoneconomicsettlement.com>
From: "Warlick, Sarah E." <Sarah.Warlick@aporter.com>
Transaction Date (UTC): 2013-01-25 01:20:05
Original Requestor: Sarah.Warlick@aporter.com

Mr. Duval,

Please find enclosed BP's Initial Proposal with respect to the appeal of
claim number 19691 - Casey Thonn.

Kind regards,
Sarah

Sarah E. Warlick
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: +1 202.942.6409
sarah.warlick@aporter.com<mailto:sarah.warlick@aporter.com>
www.arnoldporter.com<http://www.arnoldporter.com>

--------------------

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any
attachments) was not intended or written to be used, and cannot be used, for
the purpose of (i) avoiding U.S. federal tax-related penalties or (ii)
promoting, marketing or recommending to another party any tax-related matter
addressed herein.

--------------------

This communication may contain information that is legally privileged,
confidential or exempt from disclosure. If you are not the intended
recipient, please note that any dissemination, distribution, or copying of
this communication is strictly prohibited. Anyone who receives this message
in error should notify the sender immediately by telephone or by return e-
mail and delete it from his or her computer.
-----------------------------------------------------------

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com



BP'S INITIAL PROPOSAL REGARDING CLAIM NO. 19691

INTRODUCTION

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of Its Initial Proposal with regard to the appeal of Claim No. 19691 (Claimant Casey Thonn). The Settlement Program issued its original Eligibility Notice awarding the Claimant a Compensation Amount of $83.10 on November 6, 2010. Following the Claimant's Request for Reconsideration, the Settlement Program revised its calculation and issued a Compensation Amount of $22,932.00. The Claimant then filed this Appeal on January 7, 2013.

In his appeal, Claimant argues that (1) the Settlement Program incorrectly applied the Seafood Compensation Framework's Shrimp Compensation formula, (2) the Settlement Program deducted Claimant's prior seafood-related payment twice, and (3) the Settlement Program did not accurately calculate the Claimant's Accounting Support Reimbursement.

The Settlement Program properly calculated Claimant's Award Amount. BP, therefore, submits an Initial Proposal Compensation Amount of $22,932.00 and Initial Proposal Prior Payment Offset of $72,500. Although BP agrees that the Settlement Program miscalculated the Claimant's Accounting Support Reimbursement, the Claimant is only entitled to $1,000, not the more than $10,000 it is requesting.

EXPLANATION OF BP's POSITION

The claim at issue is a Seafood Program shrimp boat captain claim for the vessel Boss Hoss (Hull ID LAZ62111E101). This claim is governed by the Seafood Compensation Framework's Shrimp Compensation Plan (the "Plan"). Settlement Agreement, Exhibit 10.

A.    The Settlement Program Correctly Calculated Claimant's Compensation Amount

The Plan requires a vessel owner seeking compensation under the Historical Revenue Method, like this Claimant, to provide evidence to demonstrate his or her commercial shrimping revenue during the selected Benchmark Period. Settlement Agreement, Ex. 10 at 18-19. The Settlement Agreement is clear that a claimant must substantiate its claimed losses by submitting, among other things, (a) "[t]rip tickets or their equivalents" or (b) "[f]ederal or state tax and financial information . . . to identify components of gross revenue derived from commercial shrimp harvesting by vessel for the Benchmark Period for each vessel for which the Claimant submits" a claim. *Id.* at 19. The Settlement Program uses this financial data to determine the claimant's Benchmark Shrimp Revenue, which is the basis for determining the Claimant's claimed losses resulting from the Spill. *Id.* at 21.

The Benchmark Shrimp Revenue can be based on either a Claimant's gross revenue or a Claimant's earnings. According to the Plan, "[t]he Claims Administrator may determine the *gross vessel revenue* or Boat Captain *earnings* from shrimp landings in the Gulf Coast areas based on the Claimant's tax returns...." *Id.* (emphasis added). The Benchmark Revenue figure is then inputted into a formula to arrive at a Total Adjusted Benchmark Shrimp Revenue. *Id.* at 21-22.

The Settlement Program must then determine the amount of costs, if any, to deduct from a claimant's revenue. If the Settlement Program used a claimant's *gross revenue* as its Benchmark Revenue, then it must calculate a Claimant's Benchmark Costs. *Id.* at 22. The Shrimp Cost Percentage is used to determine a Claimant's Benchmark Shrimp Cost. *Id.* According to the Plan, the Shrimp Cost Percentage is "expressed as a percentage of revenue and reflects standard industry non-labor variable costs." The resulting Benchmark Shrimp Cost is then subtracted from the Claimant's gross revenue. However, if a claimant's earnings are used

2

for Benchmark Revenue, the Program does not need calculate or subtract any additional costs. *Id.* This makes economic sense.  Gross revenue is a claimant's revenue before any deductions for variable costs are applied.  A claimant's earnings, on the other hand, already include deductions for these costs and do not need to have additional costs subtracted from them.

The Claimant is arguing that simply because he is a Boat Captain and he used tax returns for his financial data that the Shrimp Cost Percentage should not be used to calculate and then deduct Benchmark Costs for his claim.  This is contrary to the plain language of the Settlement Agreement.  The Settlement Agreement states that the Benchmark Cost calculation should only be skipped if, "the Claimant is a Boat Captain **and** Benchmark Revenue was calculated based upon his **earnings**, such as from tax return[s] or financial information." *Id.* (emphasis added). Here, the Settlement Program used Claimant's *gross revenue* of $156,000, indicated on his 2009 federal tax return as "Gross receipts," to calculate Claimant's Benchmark Revenue.  Claimant's 2009 Form 1040, Schedule C, attached hereto as Exhibit 1.  The Settlement Program, therefore, properly applied the Shrimp Cost Percentage to Claimant's Benchmark Revenue to determine and then subtract Claimant's Benchmark Costs from his gross revenue.[1]

B.     The Settlement Program Properly Deducted Claimant's Prior Seafood Spill-Related Payments

According to the Seafood Compensation Framework, "[c]ompensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments…." Settlement Agreement, Ex. 10 at 3.  In order to apply this requirement, the Settlement Agreement instructs that "[t]he Claims Administrator shall offset any compensation under the Seafood Compensation Program by the total of the Seafood

---

[1] The accounting report submitted with Claimant's original claim is also in agreement with the Settlement Program's calculation.  *See* Coastal Claims Group Report at 8, attached hereto as Exhibit 2.

Spill-Related Payment amount." *Id.* at 85. The Agreement defines Seafood Spill-Related Payments as "compensation paid to a claimant through the OPA Process, by BP, the GCCF, or through the Transition Facility for economic loss claims relating to Seafood." *Id.* at n. 3.

In his Appeal, the Claimant asserts that the Settlement Program applied his prior payment offset twice. Indeed, the Eligibility Notices for Claimant's Boat Captain Claim (No. 19691) and Vessel Owner Claim (No. 19690) both include a prior payment offset of $72,500. BP agrees that this offset should only apply once. BP notes that the Settlement Program has corrected this error in the Claimant's Post-Reconsideration Eligibility Notice for Claim 19691. According to the "Summary of All Eligible Seafood Compensation Program Claims," the prior payment offset has only been applied once.[2]

C.    The Claimant is Only Entitled to Accounting Support Reimbursement of $1,000

The Settlement Agreement provides for Accounting Support Reimbursements to reimburse claimants for "reasonable and necessary accounting fees related to Claims preparation." Settlement Agreement § 4.4.13. The calculation of a Claimant's reimbursement depends on whether the Claimant is a business or an individual. *Id.* at §§ 4.4.13.7-8. A Business Claimant's reimbursement, "may not exceed 2% of the total Economic Damage Compensation Amount (excluding RTP) for business Claims over $50,000 with all other Claims limited to $1000." *Id.* at 4.4.13.8. A Business Claimant is defined as, "an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member Claiming Economic Damage allegedly arising out of...the Deepwater Horizon Incident." *Id.* at § 38.15.

---

[2] If the offset of $72,500 has been applied to a prior Award received by the Claimant, BP agrees that it should not be applied here. However, if it has not been applied to any prior Award, BP submits that the offset should apply to this claim.

The Claimant asserts that he is a Business Claimant, because he filed a Form 1040 Schedule C for his shrimping business. The record evidence indicates that Claimant filed a Schedule C and is, therefore, entitled to accounting support reimbursement as a Business Claimant. According to the Claimant's Memorandum in Support of its Appeal, it is seeking reimbursement of $10,562.50 in fees for claim preparation work for Claimant's Boat Captain claim. *See* Coastal Claims Invoice, attached hereto as Exhibit 3. In its Post-Reconsideration Eligibility Notice, the Settlement Program identified $1,161.25 in reimbursable fees for this claim. As a Business Claimant with a pre-RTP Compensation Amount of less than $50,000, reimbursement is capped at $1,000. Therefore, BP submits that Claimant is eligible for an Accounting Support Reimbursement Payment of $1,000.

\*\*\*

In light of the above, BP agrees with the Settlement Program's calculation of Claimant's Compensation Amount. BP, therefore, submits an Initial Proposal Compensation Amount of $22,932.00, the amount the Claimant is entitled to according to the terms of the Settlement Agreement's Seafood Compensation Framework. Additionally, BP agrees that Claimant's Prior Seafood Spill-Related Payments should only be deducted once, but without evidence that these payments have been deducted from other Claims for which the Program has issued payment, BP submits an Initial Proposal Prior Payment Offset of $72,500. Finally, BP submits that Claimant is entitled to Accounting Support Reimbursement of $1,000.

CC: "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM>,
"jandry@andrylawgroup.com" <jandry@andrylawgroup.com>
Subject: BP's Final Proposal - Claim No. 19691 - Casey Thonn
Date: Mon, 4 Feb 2013 21:14:54 -0500
To: "DDuval@dheclaims.com" <DDuval@dheclaims.com>, "jgoodwin@browngreer.com"
<jgoodwin@browngreer.com>,
"ClaimForms@deepwaterhorizoneconomicsettlement.com"
<ClaimForms@deepwaterhorizoneconomicsettlement.com>
From: "Warlick, Sarah E." <Sarah.Warlick@aporter.com>
Transaction Date (UTC): 2013-02-05 02:15:08
Original Requestor: Sarah.Warlick@aporter.com


Mr. Duval,

Please find enclosed BP's Final Proposal with respect to the appeal of claim
number 19691 - Casey Thonn.

Kind regards,
Sarah

Sarah E. Warlick
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: +1 202.942.6409
sarah.warlick@aporter.com<mailto:sarah.warlick@aporter.com>
www.arnoldporter.com<http://www.arnoldporter.com>


------------------------------------------

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any
attachments) was not intended or written to be used, and cannot be used, for
the purpose of (i) avoiding U.S. federal tax-related penalties or (ii)
promoting, marketing or recommending to another party any tax-related matter
addressed herein.


------------------------------------------

This communication may contain information that is legally privileged,
confidential or exempt from disclosure. If you are not the intended
recipient, please note that any dissemination, distribution, or copying of
this communication is strictly prohibited. Anyone who receives this message
in error should notify the sender immediately by telephone or by return e-
mail and delete it from his or her computer.

------------------------------------------------------------------------

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com



EXHIBIT
G

<u>BP'S FINAL PROPOSAL REGARDING CLAIM NO. 19691</u>

BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum in Support of Its Final Proposal with regard to the appeal of Claim No. 19691 by the Claimant (Casey Thonn). The Claimant is appealing that (1) the Settlement Program incorrectly applied the Seafood Compensation Framework's Shrimp Compensation formula, (2) the Settlement Program deducted Claimant's prior seafood-related payment twice, and (3) the Settlement Program did not accurately calculate the Claimant's Accounting Support Reimbursement.

As BP explained in its Initial Proposal, the Settlement Program correctly calculated both Claimant's Compensation Amount and the Claimant's prior payment offset. BP also explained that it agrees that the Settlement Program miscalculated the Claimant's Accounting Support Reimbursement, but that the Claimant is only entitled to $1,000, not the more than $10,000 it is requesting. BP, therefore, submits a Final Proposal Compensation Amount of $22,932.00 and Final Proposal Prior Payment Offset of $72,500.

<u>EXPLANATION OF BP's POSITION</u>

A.   <u>The Settlement Program Correctly Calculated Claimant's Compensation Amount</u>

The claim at issue is a Seafood Program shrimp boat captain claim for the vessel Boss Hoss (Hull ID LAZ62111E101). This claim is governed by the Seafood Compensation Framework's Shrimp Compensation Plan (the "Plan"). Settlement Agreement, Exhibit 10. As part of the calculation of a Claimant's Compensation Amount, the Settlement Program must determine the amount of costs, if any, to deduct from a claimant's revenue. If the Settlement Program used a claimant's *gross revenue* as a claimant's Benchmark Revenue, then it must calculate Benchmark Costs. *Id.* at 22. The claimant's Benchmark Revenue is multiplied by a Shrimp Cost Percentage to determine a claimant's Benchmark Shrimp Cost. *Id.* According to

1

the Plan, the Shrimp Cost Percentage is "expressed as a percentage of revenue and reflects standard industry non-labor variable costs." *Id.* The resulting Benchmark Shrimp Cost is then subtracted from the Claimant's gross revenue. However, if a claimant's *earnings* are used for Benchmark Revenue, the Program does not need to calculate or subtract any additional costs. *Id.* This makes economic sense. Gross revenue is a claimant's revenue before any deductions for variable costs are applied. A claimant's earnings, on the other hand, already include deductions for variable costs and do not need to have additional costs subtracted from them.

According to the Claimant, however, he should not have any Benchmark Costs deducted from his gross Benchmark Revenue. In his Initial Proposal, the Claimant argued that simply because he is a Boat Captain and he used tax returns for his financial data that the Shrimp Cost Percentage should not be used to calculate and then deduct Benchmark Costs from his gross revenue. Claimant's Memorandum in Support of Appeal at 1. The Claimant has misinterpreted the Settlement Agreement. The Agreement states that the Benchmark Cost calculation should only be skipped if, "the Claimant is a Boat Captain <u>and</u> Benchmark Revenue was calculated based upon his <u>earnings</u>, such as from tax return[s] or financial information." *Id.* (emphasis added). To be exempt from the Benchmark Cost calculation, therefore, a claim must satisfy a two-part test: (1) it must be a Boat Captain claim and (2) Benchmark Revenue must be based on a Claimant's *earnings*.

The Claimant's Boat Captain claim does not satisfy this test. The Program used Claimant's *gross revenue* -- not its earnings -- as Claimant's Benchmark Revenue. Specifically, the Settlement Program used Claimant's 2009 gross revenue of $156,000, indicated on his federal tax return as "Gross income." Claimant's 2009 Fsorm 1040, Schedule C, attached to BP Initial Proposal as Exhibit 1. The Settlement Program, therefore, properly applied the Shrimp

Cost Percentage to Claimant's Benchmark Revenue to determine and then subtract Claimant's Benchmark Costs from his gross revenue.[1]

B.   The Settlement Program Properly Deducted Claimant's Prior Seafood Spill-Related Payments

According to the Seafood Compensation Framework, "[c]ompensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments…." Settlement Agreement, Ex. 10 at 3.  In order to apply this requirement, the Settlement Agreement instructs that "[t]he Claims Administrator shall offset any compensation under the Seafood Compensation Program by the total of the Seafood Spill-Related Payment amount." Id. at 85.  The Agreement defines Seafood Spill-Related Payments as "compensation paid to a claimant through the OPA Process, by BP, the GCCF, or through the Transition Facility for economic loss claims relating to Seafood." Id. at n. 3.

The Settlement Agreement has only applied the prior payment offset once.  Although the Eligibility Notices for Claimant's Boat Captain Claim (No. 19691) and Vessel Owner Claim (No. 19690) both include a prior payment offset of $72,500, the "Summary of All Eligible Seafood Compensation Program Claims" on these Eligibility Notices only apply the offset once.

C.   The Claimant is Only Entitled to Accounting Support Reimbursement of $1,000

The Settlement Agreement provides for Accounting Support Reimbursements to reimburse claimants for "reasonable and necessary accounting fees related to Claims preparation." Settlement Agreement § 4.4.13.  A Business Claimant's reimbursement, "may not exceed 2% of the total Economic Damage Compensation Amount (excluding RTP) for business Claims over $50,000 with all other Claims limited to $1000." Id. at 4.4.13.8.  A Business

---

[1] The accounting report submitted with Claimant's original claim is also in agreement with the Settlement Program's calculation. See Coastal Claims Group Report at 8, attached to BP Initial Proposal as Exhibit 2.

Claimant is defined as, "an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member Claiming Economic Damage allegedly arising out of…the Deepwater Horizon Incident." *Id.* at § 38.15.

The record evidence indicates that Claimant filed a Schedule C and is, therefore, entitled to accounting support reimbursement as a Business Claimant. As a Business Claimant with a pre-RTP Compensation Amount of less than $50,000, reimbursement is capped at $1,000. Therefore, BP submits that Claimant is eligible for an Accounting Support Reimbursement Payment of $1,000.

***

In light of the above, BP agrees with the Settlement Program's calculation of Claimant's Compensation Amount. BP, therefore, submits a Final Proposal Compensation Amount of $22,932.00, the amount the Claimant is entitled to according to the terms of the Settlement Agreement's Seafood Compensation Framework. Additionally, BP agrees that Claimant's Prior Seafood Spill-Related Payments should only be applied once, but without evidence that this offset has been applied to other Claims for which the Program has issued payment, BP submits a Final Proposal Prior Payment Offset of $72,500. Finally, BP submits that Claimant is entitled to Accounting Support Reimbursement of $1,000.



**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| NOTICE OF APPEAL PANEL DECISION | | | |
|---|---|---|---|
| DATE OF NOTICE: March 28, 2013 | | | |

### I. CLAIMANT AND CLAIM INFORMATION

| Claimant Name | Last/Name of Business<br>THONN | First<br>CASEY | Middle |
|---|---|---|---|
| Claimant ID | 100051739 | **Claim ID** | 19691 |
| Claim Type | Seafood Compensation Program | | |
| Law Firm | Andry Law Group/Andry Lerner, LLC | | |
| Vessel Name | | Hull ID | |

### II. APPEAL PANEL DECISION

The Economic and Property Damages Settlement Agreement ("Settlement Agreement") written by Class Counsel and BP requires the Claims Administrator to designate an Appeals Coordinator to coordinate the Appeals Process. This Notice is an official communication from the Appeals Coordinator and relates to the claim identified in Section I. BP or the claimant appealed this claim, and the Appeals Coordinator submitted the claim for Appeal Panel review. The Appeal Panel has completed its review of the Appeal and has reached a final decision on the claim. The details of the Appeal Panel's decision are below:

| | | Proposal Chosen |
|---|---|---|
| Compensation Amount | $189,189.00 | BP |
| Risk Transfer Premium Multiplier | 0.00 | BP |
| Prior Payment Offset | $72,500.00 | BP |

The Compensation Amount awarded by the Appeal Panel will appear in Section 2, line 1 of your Post-Appeal Eligibility Notice. We will increase this Compensation Amount by the applicable Risk Transfer Premium, if any, and also decrease this Compensation Amount by any applicable offsets to determine your Award Amount. If this was a Claimant Appeal of a Post-Reconsideration Eligibility Notice and the claimant prevailed upon appeal, the pre-Risk Transfer Premium Compensation Amount will be increased by 5%. If we have received notice of any outstanding lien, we will also deduct that applicable amount from your Award Amount.

The Appeal Panel's decision will stand as the Settlement Program's final determination on this claim.

### III. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

For questions about this Notice of Appeal Panel Decision or the status of your other claim(s), contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com**. If you are a law firm or claims preparation company, you should call or email your designated DWH Contact for help or assistance. You may also visit a Claimant Assistance Center for help. For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com**.

EXHIBIT

H

## IV.  SUMMARY OF OTHER SUBMITTED  CLAIMS

We received one or more additional Claim Forms from you that are not included or addressed in this Notice.  This chart summarizes the status of those claims as of the date of this Notice.  You will receive or have already received separate Notices for each additional claim.  You may monitor the status of your other claims by using the DWH Portal. If you do not use the DWH Portal, contact us by one of the methods listed in Section III of this Notice to find out the current status of your other claims or use the "Check My Status" feature located on the homepage of the official Settlement Program website at **www.deepwaterhorizoneconomicsettlement.com**.

|  | Claim Type | Claim ID | Claim Status |
|---|---|---|---|
| 1. | Seafood Compensation Program | 19690 | Payment Received |
| 2. | VoO Charter Payment | 20741 | Payment Received |
| 3. | Subsistence | 97550 | Claim Form Submitted |



DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

APR - 2 2013

DWH0337392288

CASEY THONN
C/O: ANDRY LAW GROUP/ANDRY LERNER, LLC
610 BARONNE STREET
NEW ORLEANS, LA  70113

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Pol-342 | CLAIMS ADMINISTRATOR'S APPROVED POLICY |
|---------|----------------------------------------|

I. Profile - EXTERNAL

| Subject | Seafood Program:  Calculation of Boat Captain Income on Claims by Owner/Operators | |
|---------|------------|---|
| Active Date | 2/8/13 | Policy Impact | ☑All Claims Regardless of Active Date<br>☐All Claims Greater than Active Date |
| Type of Decision | | | Clarified by Seafood Neutral |
| Settlement Agreement Reference | | | Exhibit 10 |
| Affected Claim Types and/or Review Processes | | | Seafood |

II. Summary

Under Exhibit 10, Class Members who owned or leased and captained their own vessel during the qualifying time period have both (1) a Vessel Owner and (2) a Boat Captain claim in the Seafood Compensation Program.  The Historical Revenue Compensation Method, which is available for all of the Seafood species types, uses revenues in past Benchmark Years to calculate an award amount that differs by operator type.  When a claimant who is both Boat Captain and Vessel Owner/Lessee has submitted a Schedule C to support the Boat Captain claim, the Claims Administrator will use the gross revenues in Line 1 of the Schedule C as the revenues in past Benchmark Years and then will apply the Exhibit 10 Cost Percentage, the Loss Percentage and the Boat Captain share set by Exhibit 10 to derive the number multiplied by the RTP to get the award amount for the claimant on the Boat Captain claim.  The Claims Administrator will not use Schedule C Line 29 net profits number (or the net profits number shown on any line in other tax forms) on the Boat Captain claim of a claimant who is both Boat Captain and Vessel Owner/Lessee, for doing so would eliminate the premise for an award to that claimant on a Vessel Owner/Lessee claim.  The Seafood Neutral has informed the Claims Administrator that he agrees with this policy.

EXHIBIT
I

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

EXHIBIT

tabbies

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig
    "Deepwater Horizon" in the Gulf
    of Mexico, on April 20, 2010

MDL NO. 2179

SECTION J

Applies to: *All Cases*

JUDGE BARBIER
MAGISTRATE JUDGE SHUSHAN

| REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW | | | |
|---|---|---|---|
| STATUS REPORT NO. | 9 | DATE | May 13, 2013 |

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re:  Oil Spill by the Oil Rig            MDL NO. 2179
    "Deepwater Horizon" in the Gulf
    of Mexico, on April 20, 2012            SECTION J

Applies to: *All Cases*                     JUDGE BARBIER
                                            MAGISTRATE JUDGE SHUSHAN

<u>REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON
ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE
STATUS OF CLAIMS REVIEW</u>

<u>STATUS REPORT NO. 9, DATED MAY 13, 2013</u>

The Claims Administrator of the Deepwater Horizon Economic and Property Settlement

Agreement (the "Settlement Agreement") submits this Report to inform the Court of the current

status of the implementation of the Settlement Agreement. The Claims Administrator will

provide any other information in addition to this Report as requested by the Court.

    I.    STATUS OF THE CLAIMS REVIEW PROCESSES AND CLAIM PAYMENTS

    A.  Claim Submissions.

        1.  Registration and Claim Forms.

The Claims Administrator opened the Settlement Program with needed functions staffed

and operating on June 4, 2012, just over 30 days after the Claims Administrator's appointment.

We have received 147,920 Registration Forms and 164,758 Claim Forms since the Program

opened, as shown in the Public Statistics for the Deepwater Horizon Economic and Property

Damages Settlement ("Public Report") attached as Appendix A.  Claimants have begun but not

fully completed and submitted 11,866 Claim Forms.  The Forms are available online, in hard

copy, or at Claimant Assistance Centers located throughout the Gulf.  Of the total Claim Forms

submitted, 14% of claimants filed in the Seafood Program, 20% filed Individual Economic Loss

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

(IEL) Claims, and 32% filed Business Economic Loss (BEL) Claims (including Start-up and

Failed BEL Claims). *See* App. A, Table 2. DWH staff at the Claimant Assistance Centers

assisted in completing 30,119 of these Claim Forms. *See* App. A, Table 3. The nineteen

Claimant Assistance Centers also provide other forms, including Personal Representative Forms,

Subsistence Interview Forms and Sworn Written Statements and Authorizations.

### 2. Minors, Incompetents and Deceased Claimants.

The table below describes the claims filed on behalf of minors, incompetents and

deceased claimants in the Settlement Program.

| | Table 1. Minors, Incompetents and Deceased Claimants | | | | | |
|---|---|---|---|---|---|---|
| | | Minor Claimants | | Incompetent Claimants | | Deceased Claimants | |
| | | Total | Change Since Last Report | Total | Change Since Last Report | Total | Change Since Last Report |
| 1. | Claims Filed | 45 | +2 | 61 | +5 | 224 | +16 |
| 2. | Referred to GADL | 30 | +6 | 16 | 0 | N/A | N/A |
| 3. | Eligible for Payment | 6 | +5 | 26 | +2 | 93 | +8 |
| 4. | Approval Orders Filed | 3 | +3 | 21 | +3 | 73 | +16 |

### 3. Third Party Claims.

Court Approved Procedure Order No. 1 (as entered September 9, 2012, and amended

March 11, 2013) ("CAP") defines the process by which the Claims Administrator will receive,

process and pay the claims and/or liens asserted by attorneys, creditors, governmental agencies,

or other third parties against the payments to be made by the Claims Administrator to eligible

claimants under the Settlement Agreement ("Third Party Claims"). The Amended CAP

streamlines the enforcement documentation requirements to support a Valid Third Party Claim

and provides that the Court will adopt a Third Party Claim dispute resolution process for attorney

fee liens and Third Party Claims other than those asserted by a state or federal agency. On April

9, 2013, the Court appointed Judge Jerry Brown as the Attorney Liens Adjudicator.  On April 15, 2013, the Court approved the Rules Governing the Third Party Claims Dispute Resolution Process as to Attorney Fee Liens.  We issued Alerts about the Amended Court Approved Procedure, Judge Brown's appointment and the Court's approval of the Attorney Fee Lien Dispute Resolution Rules on April 22, 2013.

We now require a Third Party Claimant to send us enforcement documentation soon after the initial Third Party Claim assertion.  We notify the affected Settlement Program claimant about an Enforced Third Party Claim against a potential Settlement Payment as soon as we receive sufficient documentation, regardless of where the underlying Settlement Program Claim is in the review process.  The claimant may, but does not have to, object to the Third Party Claim at this time.  After we send an Eligibility Notice to the affected Settlement Program claimant against whom an Enforced Lien has been asserted, we send the claimant/claimant's attorney and the Third Party Claimant a Notice of Valid Third Party Claim and provide the claimant 20 days to notify us of any objection to the Third Party Claim.  We also updated the Third Party Claims Frequently Asked Questions on the DWH Settlement website to explain all of these changes.

We continue to process and pay Third Party Claims as reflected in Table 2 below.

| | Table 2.  Third Party Claims | | | | | | |
|---|---|---|---|---|---|---|---|
| | Type of Third Party Claim ("TPC") | TPCs Asserted | TPCs Asserted Against Claimants With a DHCC ID | TPCs[1] Asserted Against Payable Claims | Valid TPCs Asserted Against Payable Claims | TPCs Paid/ Ready for Payment (TPClmt) | Claims with TPCs Paid/ Ready for Payment (Clmt) |
| 1. | Attorney's Fees | 2,340 | 1,882 | 325 | 174 | 119 | 279 |
| 2. | IRS Levies | 448 | 422 | 39 | 40 | 29 | 33 |
| 3. | Individual Domestic | 257 | 148 | 75 | 59 | 46 | 53 |

[1] The streamlined enforcement requirements allow us to assess validity earlier in the process, although we will not know if a valid TPC is asserted against a payable claim until the Eligibility Notice goes out.

3

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Table 2.  Third Party Claims | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Support Obligations** | | | | | | |
| 4. | Blanket State-Asserted Multiple Domestic Support Obligations | 4 states | N/A | N/A | N/A | 0 | 0 |
| 5. | 3rd Party Lien/Writ of Garnishment | 542 | 233 | 13 | 7 | 4 | 3 |
| 6. | Claims Preparation/ Accounting | 831 | 643 | 29 | 10 | 1 | 6 |
| 7. | Other | 25 | 21 | 1 | 0 | 0 | 0 |
| | **TOTAL** | 4,443 | 3,349 | 482 | 290 | 199 | 374[2] |

To date, we have removed 1,392 lien holds due to parties releasing their claims or resolving disputes.

B.  Claims Review.

We completed our first reviews and issued our first outcome notices on July 15, 2012, and Payments on July 31, 2012.  There are many steps involved in reviewing a claim so that it is ready for a notice.

1.  Identity Verification.

The Tax Identity Number (TIN) Verification review is the first step in the DWH claims review process.  The table below contains information on the total number of claimants reviewed in the Program, the outcome of those reviews, and the percentage of claimants that receive Verification Notices after review.

---

[2] If the TPC amount is in dispute, we pay the Claimant the undisputed portion of his/her/its Settlement Payment.  A Third Party Claim can be asserted against one or more Settlement Program Claims.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Table 3. Identity Verification Review Activity. | | | | | |
|---|---|---|---|---|---|
| | Outcome | Claimants Reviewed Since Last Report | Monthly Percentage | Total Claimants Reviewed | Total Percentage |
| 1. | Verified During Review | 4,017 | 84.4% | 41,398 | 78.4% |
| 2. | SSN Notice Issued | 73 | 1.5% | 2,307 | 4.4% |
| 3. | ITIN Notice Issued | 10 | .2% | 398 | .8% |
| 4. | EIN Notice Issued | 661 | 13.9% | 8,683 | 16.4% |
| 5. | Total Reviewed | 4,761 | 100% | 52,786 | 100% |

The table below contains information on the number of TIN Verification Notices issued, how many have been cured after the claimant responded to the Notice, and the average time to cure in days.

| Table 4. Identity Incompleteness Activity. | | | | |
|---|---|---|---|---|
| | Notice Type | Notices Issued | Number Cured | Percentage Cured | Average Time to Cure in Days |
| 1. | SSN Notice | 2,307 | 1,846 | 80% | 137 |
| 2. | ITIN Notice | 398 | 334 | 84% | 160 |
| 3. | EIN Notice | 8,683 | 7,467 | 86% | 80 |
| 4. | Total Issued | 11,388 | 9,647 | 85% | 125 |

2. **Employer Verification Review ("EVR").**

The EVR process ensures that all employees of the same business are treated uniformly and that each business is placed in the proper Zone.  The review also walks through the intricate analysis necessary to assign the right NAICS code to a business. The EVR team has completed the EVR analysis for over 150,000 businesses and rental properties.

From April 11, 2013, through May 10, 2013, the team completed the EVR step for 13,072 businesses and properties.  We identified an average of 429 new businesses and properties to review each day and completed the EVR review for an average of 436 businesses

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

and properties each day.  We continue to review new businesses and rental properties on a first-in, first-out basis.

### 3.  Exclusions.

The Exclusions review process ensures that claims and claimants excluded under the Settlement Agreement are appropriately denied.  The Exclusions team guides the reviewers and the EVR team when questions arise during the exclusion determination.  Table 5 below shows the number of Denial Notices issued to date for each Exclusion Reason and the team responsible:

| | Table 5. Exclusions | | | |
|---|---|---|---|---|
| | **Exclusion Reason** | **Team Responsible** | **Denial Notices Since Last Report** | **Total Denial Notices** |
| 1. | GCCF Release | Exclusions | 1,313 | 6,164 |
| 2. | BP/MDL 2179 Defendant | | 13 | 198 |
| 3. | US District Court for Eastern District of LA | | 0 | 22 |
| 4. | Not a Member of the Economic Class | Claims Reviewers | 14 | 154 |
| 5. | Bodily Injury | | 0 | 2 |
| 6. | BP Shareholder | | 0 | 6 |
| 7. | Transocean/Halliburton Claim | | 0 | 0 |
| 8. | Governmental Entity | Claims Reviewers/ EVR | 66 | 611 |
| 9. | Oil and Gas Industry | | 73 | 353 |
| 10. | BP-Branded Fuel Entity | | 3 | 27 |
| 11. | Menhaden Claim | EVR | 1 | 10 |
| 12. | Financial Institution | | 30 | 160 |
| 13. | Gaming Industry | | 58 | 549 |
| 14. | Insurance Industry | | 22 | 116 |
| 15. | Defense Contractor | | 62 | 247 |
| 16. | Real Estate Developer | | 37 | 39 |
| 17. | Trust, Fund, Financial Vehicle | | 5 | 12 |
| 18. | Total Denial Notices from Exclusions | | 1,697 | 8,670 |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

### 4. Claimant Accounting Support Reviews.

A special team handles Claimant Accounting Support ("CAS") reviews. CAS reimbursement is available under the Settlement Agreement for IEL, BEL, and Seafood claims. After a claim is returned from the Accountants or BrownGreer's reviewers as payable and the Compensation Amount is known, the CAS team reviews accounting invoices and CAS Sworn Written Statements. Table 6 includes information on the number of CAS reviews we have completed to date, whether the Accounting Support documentation was complete or incomplete, and the amounts reimbursed.

| | Table 6. Claimant Accounting Support Reviews | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Claim Type | CAS Review Result | | | | Total CAS Reviews | | CAS $ Amount Reimbursed | |
| | | Complete | | Incomplete | | | | | |
| | | Since Last Report | Total to Date | Since Last Report | Total to Date | Since Last Report | Total to Date | Since Last Report | Total to Date |
| 1. | BEL | 729 | 6027 | 68 | 590 | 797 | 6617 | $1,760,236.88 | $8,230,892.82 |
| 2. | IEL | 43 | 804 | 19 | 168 | 62 | 972 | $9,530.93 | $51,897.92 |
| 3. | Seafood | 214 | 3182 | 28 | 481 | 242 | 3663 | $144,823.59 | $1,137,210.36 |
| 4. | TOTAL | 986 | 10,013 | 115 | 1,239 | 1,101 | 11,252 | $1,914,591.40 | $9,420,001.10 |

### 5. QA Review.

The Quality Assurance ("QA") process addresses three fundamental needs of the Settlement Program, which are to: (a) ensure that all claims are reviewed in accordance with the policies of the Settlement Agreement by targeting anomalous claims results through data metrics analysis; (b) provide a mechanism to monitor reviewer performance and the necessary tools to efficiently and effectively provide feedback to reviewers; and (c) identify areas of review resulting in high error rates that require retraining or refined review procedures and data validations.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

We have implemented a reviewer follow-up process for all claim types.  We provide

daily follow-up to reviewers whose claims resulted in different results after a QA review the day

before.  We also have a report that identifies specific reviewers who require re-training, and

reveals whether there are issues that warrant refresher training for all reviewers.  Table 7 shows,

by Claim Type, the number of claims identified for QA review through the database QA process,

as well as how many QA reviews have been completed, how many are in progress, and how

many are awaiting review.

| | Table 7.  Quality Assurance Reviews | | | | | | |
|---|---|---|---|---|---|---|---|
| | Claim Type | Total Claims Needing QA To Date | QA Reviews Completed | % Completed | QA Reviews in Progress | Claims Awaiting QA | QA Reviews Completed Since Last Report |
| 1. | Seafood | 19,574 | 17,554 | 90% | 1,301 | 719 | 4,282 |
| 2. | IEL | 15,432 | 9,571 | 62% | 726 | 5,135 | 2,050 |
| 3. | BEL | 8,783 | 6,778 | 77% | 406 | 1,599 | 1,895 |
| 4. | Start-Up BEL | 830 | 624 | 75% | 32 | 174 | 128 |
| 5. | Failed BEL | 1,330 | 1,201 | 90% | 20 | 109 | 101 |
| 6. | Coastal Real Property | 14,704 | 14,504 | 99% | 120 | 80 | 1,989 |
| 7. | Real Property Sales | 626 | 622 | 99% | 0 | 4 | 24 |
| 8. | VoO Charter | 7,241 | 7,227 | 100% | 10 | 4 | 151 |
| 9. | Subsistence | 9,271 | 2,322 | 25% | 155 | 6,794 | 752 |
| 10. | Wetlands | 2,262 | 2,057 | 91% | 93 | 112 | 322 |
| 11. | Vessel Physical Damage | 507 | 313 | 62% | 9 | 185 | 229 |
| 12. | TOTAL | 80,560 | 62,773 | 78% | 2,872 | 14,915 | 11,923 |

6.  Claim Type Review Details.

Table 8 provides information on the number of claims filed, how many claims have been

reviewed to Notice, the claims remaining to review, and how many claims were reviewed to

8

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

either a Notice or "Later Notice" to date, by claim type.  Table 8 splits the claims reviewed to a

"Later Notice" into separate sections distinguishing claims receiving Notices after we conduct a

Reconsideration review from claims reviewed for additional materials submitted by a claimant in

response to an Incompleteness Notice.

| | | Table 8.  Throughput Analysis of Claims Filed and Notices Issued | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A. Claims Reviewed to First Notice | | | | | | | | |
| | | Status of All Claims Filed | | | | | Productivity Since Last Report on 4/11/13 | | | |
| | Claim Type | Total Claims Filed To Date | Reviews Completed to Notice | | Claims Remaining to Review | | New Claims Filed | Avg Daily Claims Filed | Reviews Completed to First Notice | Avg Daily Reviews to First Notice |
| 1. | Seafood | 23,862 | 19,998 | 84% | 3,864 | 16% | 245 | 8 | 2,890 | 96 |
| 2. | IEL | 29,946 | 23,857 | 80% | 6,089 | 20% | 984 | 33 | 2,599 | 87 |
| 3. | IPV/FV | 232 | 212 | 91% | 20 | 9% | 11 | 0 | 14 | 0 |
| 4. | BEL | 46,424 | 21,895 | 47% | 24,529 | 53% | 4,576 | 153 | 1,941 | 65 |
| 5. | Start-Up BEL | 3,226 | 1,986 | 62% | 1,240 | 38% | 298 | 10 | 148 | 5 |
| 6. | Failed BEL | 2,519 | 1,777 | 71% | 742 | 29% | 146 | 5 | 166 | 6 |
| 7. | Coastal RP | 23,841 | 22,031 | 92% | 1,810 | 8% | 1,981 | 66 | 2,597 | 87 |
| 8. | Wetlands RP | 5,234 | 2,855 | 55% | 2,379 | 45% | 895 | 30 | 363 | 12 |
| 9. | RPS | 1,142 | 951 | 83% | 191 | 17% | 95 | 3 | 77 | 3 |
| 10. | Subsistence | 18,947 | 2,605 | 14% | 16,342 | 86% | 2,838 | 95 | 1,290 | 43 |
| 11. | VoO | 8,292 | 8,111 | 98% | 181 | 2% | 100 | 3 | 142 | 5 |
| 12. | Vessel | 1093 | 860 | 79% | 233 | 21% | 128 | 4 | 111 | 4 |
| 13. | TOTAL | 164,758 | 107,138 | 65% | 57,620 | 35% | 12,297 | 410 | 12,338 | 411 |
| | | B. Claims Reviewed to Later Notice | | | | | | | | |
| | | Initial or Preliminary Incompleteness Response | | | Follow-Up Incompleteness Responses | | | Requests for Reconsideration | | |
| | Claim Type | Total Responses | Claims with Later Notice | Remaining Claims | Total Responses | Claims with Later Notice | Remaining Claims[2] | Total Requests | Claims with Later Notice | Remaining Claims[2] |
| 1. | Seafood | 4,409 | 2,402 | 2,007 | 961 | 421 | 540 | 1,384 | 624 | 760 |
| 2. | IEL | 11,297 | 6,353 | 4,944 | 2,698 | 1,190 | 1,508 | 1,513 | 582 | 931 |
| 3. | IPV/FV | 74 | 66 | 8 | 22 | 9 | 13 | 15 | 2 | 13 |
| 4. | BEL | 11,276 | 6,794 | 4,482 | 3,637 | 1,844 | 1,793 | 1,756 | 587 | 1,169 |
| 5. | Start-Up BEL | 1,066 | 723 | 343 | 497 | 209 | 288 | 171 | 36 | 135 |
| 6. | Failed BEL | 568 | 366 | 202 | 279 | 141 | 138 | 237 | 92 | 145 |
| 7. | Coastal RP | 3,529 | 2,964 | 565 | 818 | 577 | 241 | 907 | 587 | 320 |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| | Table 8. Throughput Analysis of Claims Filed and Notices Issued | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 8. | Wetlands RP | 175 | 128 | 47 | 21 | 15 | 6 | 266 | 101 | 165 |
| 9. | RPS | 157 | 148 | 9 | 36 | 34 | 2 | 121 | 88 | 33 |
| 10. | Subsistence | 613 | 112 | 501 | 25 | 1 | 24 | 29 | 5 | 24 |
| 11. | VoO | 831 | 810 | 21 | 333 | 305 | 28 | 536 | 372 | 164 |
| 12. | Vessel | 508 | 438 | 70 | 183 | 135 | 48 | 79 | 42 | 37 |
| 13. | TOTAL | 34,503 | 21,304 | 13,199 | 9,510 | 4,881 | 4,629 | 7,014 | 3,118 | 3,896 |

C. Claim Payments.

   1. Notices and Payments.

   We issued our first payments to claimants on July 31, 2012. Tables 4 and 5 of the Public Report attached at Appendix A provide detail on the notices and payments issued to date. As of May 10, 2013, we have issued 40,459 Eligibility Notices with Payment Offers totaling $3,224,375,803 billion. As of that date, we also have made over $2.14 billion in payments on 31,980 claims.

   2. Claimants in Bankruptcy.

   Since the Claims Administrator approved the procedures for making Settlement Payments to claimants in bankruptcy on February 20, 2013, we have issued Bankruptcy Notices to approximately 60 claimants who had previously received Eligibility Notices. We continue to review these claim files to determine if the claimants submitted the documents necessary to remove the bankruptcy hold so the claims can be paid. For claimants who have not submitted all of the requested documentation, we continue to reach out to those claimants to let them know what needs to be submitted to so they can receive payment on their claims.

D. Re-Reviews, Reconsiderations and Appeals.

   1. Re-Review Reviews and Outcomes.

   The Claims Administrator implemented a Re-Review process beginning on January 18, 2013, that provides claimants with the opportunity to request a Re-Review of their claim within

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

30 days after an Eligibility or Denial Notice if they have additional documents not previously submitted to support their claim. This Re-Review leads to a Post Re-Review Notice, from which claimants may then request Reconsideration if they wish. To date, there have been 30,727 Eligibility and Denial Notices issued from which claimants can seek Re-Review. Of those, 5,017 are still within the 30 day window to seek Re-Review and have not yet done so, leaving 25,710 that have passed the window for seeking Re-Review. Of those, claimants have asked for Re-Review of 1,326 claims. Thus, the rate of Re-Review from all final determinations is 5.2%. The rate of Re-Review from Eligibility Notices is 4% and the rate of Re-Review from Denial Notices is 10%.

Table 9 summarizes the Re-Reviews Reviews we have completed, the number of Post-Re-Review Notices we have issued, and whether the outcome of the Re-Review review resulted in an award that was higher (↑), lower (↓),or the same (↔). The table also includes information showing whether an original Exclusion Denial was confirmed or overturned on Re-Review. The number of Notices issued is fewer than the reviews completed because there is a 36 hour lag time between when the review is completed and when the Notice is issued.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Table 9.  Re-Reviews | | | | | |
|---|---|---|---|---|---|
| **A.  Re-Review Requests and Reviews** | | | | | |
| | | | Reviews Completed To Date | | |
| | Claim Type | Requests Received To Date | Total | Completed Since Last Report | Average Weekly Reviews |
| 1. | Seafood | 330 | 111 | 24 | 6 |
| 2. | IEL | 116 | 15 | 2 | 1 |
| 3. | IPV/FV | 7 | 0 | 0 | 0 |
| 4. | BEL | 381 | 130 | 4 | 7 |
| 5. | Start-Up BEL | 16 | 5 | 0 | 0 |
| 6. | Failed BEL | 38 | 34 | 0 | 2 |
| 7. | Coastal | 242 | 182 | 16 | 10 |
| 8. | Wetlands | 137 | 113 | 0 | 7 |
| 9. | Real Property Sales | 10 | 10 | 0 | 1 |
| 10. | Subsistence | 11 | 0 | 0 | 0 |
| 11. | VoO | 34 | 34 | 2 | 2 |
| 12. | Vessel | 4 | 1 | 0 | 1 |
| 13. | TOTAL | 1,326 | 635 | 48 | 37 |

| Table 9.  Re-Reviews | | | | | | | |
|---|---|---|---|---|---|---|---|
| **B.  Re-Review Notices Issued** | | | | | | | |
| | | Notices Issued | | Outcome of Review | | | |
| | Claim Type | Total Issued to Date | Weekly Average | Compensation Amount for Eligible Claims | | | Exclusion/Denials | |
| | | | | ↑ | ↓ | ↔ | Confirmed | Overturned |
| 1. | Seafood | 101 | 5 | 53 | 4 | 38 | 5 | 1 |
| 2. | IEL | 4 | 0 | 0 | 0 | 0 | 4 | 0 |
| 3. | IPV/FV | 6 | 0 | 0 | 0 | 0 | 6 | 0 |
| 4. | BEL | 130 | 7 | 56 | 8 | 18 | 45 | 2 |
| 5. | Start-Up BEL | 4 | 0 | 3 | 0 | 0 | 1 | 0 |
| 6. | Failed BEL | 25 | 1 | 0 | 0 | 0 | 25 | 0 |
| 7. | Coastal | 88 | 5 | 21 | 1 | 16 | 51 | 1 |
| 8. | Wetlands | 21 | 1 | 2 | 0 | 0 | 20 | 1 |
| 9. | Real Property Sales | 4 | 0 | 0 | 1 | 0 | 3 | 0 |
| 10. | Subsistence | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11. | VoO | 30 | 2 | 7 | 5 | 12 | 8 | 2 |
| 12 | Vessel | 1 | 1 | 0 | 0 | 0 | 1 | 0 |
| 13. | TOTAL | 414 | 22 | 142 | 19 | 84 | 169 | 7 |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

### 2. Reconsideration Reviews and Outcomes.

To date, there have been 68,114 Eligibility, Denial and Incompleteness Denial Notices issued from which claimants can seek Reconsideration. Of those, 7,989 are still within the 30 day window to seek Reconsideration and have not yet done so, leaving 60,125 that have passed the window for seeking Reconsideration. Of those, claimants have asked for Reconsideration of 6,972 claims. Thus, the rate of Reconsideration from all final determinations is 11.6%. The rate of Reconsideration from Eligibility Notices is 6% and the rate of Reconsideration from Denial and Incompleteness Denial Notices is 22%.

Table 10 summarizes the Reconsideration Reviews we have completed, the number of Post-Reconsideration Notices we have issued, and whether the outcome of the Reconsideration review resulted in an award that was higher (↑), lower (↓), or the same (↔). The table also includes information showing whether an original Exclusion Denial was confirmed or overturned on Reconsideration. The number of Notices issued is fewer than the reviews completed because there is a 36 hour lag time between when the review is completed and when the Notice is issued.

| | Table 10. Reconsideration | | | | |
|---|---|---|---|---|---|
| | **B. Reconsideration Requests and Reviews** | | | | |
| | Claim Type | Requests Received To Date | **Reviews Completed To Date** | | |
| | | | Total | Completed Since Last Report | Average Weekly Reviews |
| 1. | Seafood | 1,377 | 846 | 56 | 60 |
| 2. | IEL | 1,502 | 1014 | 76 | 72 |
| 3. | IPV/FV | 15 | 4 | 0 | 0 |
| 4. | BEL | 1,744 | 1337 | 96 | 96 |
| 5. | Start-Up BEL | 170 | 139 | 13 | 10 |
| 6. | Failed BEL | 232 | 196 | 7 | 14 |
| 7. | Coastal | 902 | 789 | 51 | 56 |
| 8. | Wetlands | 267 | 262 | 17 | 19 |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| Table 10. Reconsideration | | | | | |
|---|---|---|---|---|---|
| B.   Reconsideration Requests and Reviews | | | | | |
| | | | Reviews Completed To Date | | |
| | Claim Type | Requests Received To Date | Total | Completed Since Last Report | Average Weekly Reviews |
| 9. | Real Property Sales | 120 | 117 | 0 | 8 |
| 10. | Subsistence | 28 | 10 | 0 | 1 |
| 11. | VoO | 537 | 507 | 18 | 36 |
| 12. | Vessel | 78 | 63 | 9 | 5 |
| 13. | TOTAL | 6,972 | 5,284 | 343 | 377 |

| B.   Reconsideration Notices Issued | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Notices Issued | | Outcome of Review | | | |
| | Claim Type | Total Issued to Date | Weekly Average | Compensation Amount for Eligible Claims | | | Exclusion/Denials | |
| | | | | ↑ | ↓ | ↔ | Confirmed | Overturned |
| 1. | Seafood | 628 | 16 | 333 | 44 | 162 | 86 | 3 |
| 2. | IEL | 687 | 17 | 97 | 6 | 29 | 559 | 1 |
| 3. | IPV/FV | 4 | 0 | 0 | 0 | 0 | 4 | 0 |
| 4. | BEL | 623 | 16 | 213 | 19 | 107 | 262 | 23 |
| 5. | Start-Up BEL | 36 | 1 | 7 | 0 | 5 | 23 | 1 |
| 6. | Failed BEL | 92 | 2 | 0 | 0 | 0 | 92 | 0 |
| 7. | Coastal | 595 | 16 | 62 | 12 | 212 | 299 | 10 |
| 8. | Wetlands | 104 | 3 | 11 | 1 | 17 | 75 | 0 |
| 9. | Real Property Sales | 94 | 2 | 0 | 0 | 2 | 90 | 2 |
| 10. | Subsistence | 5 | 0 | 0 | 0 | 0 | 5 | 0 |
| 11. | VoO | 462 | 12 | 58 | 2 | 109 | 252 | 41 |
| 12 | Vessel | 46 | 1 | 25 | 1 | 7 | 13 | 0 |
| 13. | TOTAL | 3,376 | 87 | 806 | 85 | 650 | 1,760 | 81 |

3.   Appeals.

(a)   *BP Appeals.*

To date, we have issued 13,311 Eligibility Notices that meet or exceed the threshold amounts rendering them eligible for BP to appeal.  Of those, 430 are still within the time for BP to appeal, leaving 12,881 that have passed the window for BP to consider whether to appeal.  Of

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

those 12,881, BP has appealed 1,377, or only 10.6%. However, out of the 1,377 claims BP has

appealed, they have subsequently withdrawn 142 appeals, and another 34 have been resolved for

the same amount of the Eligibility Notice. Thus, out of the 1,377 claims BP has appealed, 176

have either been withdrawn or resolved, confirming that the outcome of the review was correct.

If we remove those 176 from the 1,377 BP has appealed to arrive at a more realistic "rate of

disagreement" BP has with our results, that leaves 1,201 claims out of 12,881, or a 9.3% rate of

disagreement.

Table 11 provides summary information on the status of BP's appeals.

| Table 11.  Status of BP Appeals | | | | |
|---|---|---|---|---|
| A.   Appeal Filing/Resolution | | | | |
| | Status | As of 4/11/13 | Since Last Report | Total |
| 1. | BP Appeals Filed | **1,020** | 357 | **1,377** |
| 2. | Appeals Resolved | **349** | 224 | **575** |
| (a) | Withdrawn | 103 | 39 | 142 |
| (b) | Panel Decided | 40 | 117 | 157 |
| (c) | Settled by Parties | 171 | 39 | 210 |
| (d) | Remanded by Panel | 0 | 19 | 19 |
| (e) | Administratively Closed | 7 | 0 | 7 |
| (f) | Closed for Reconsideration Review | 28 | 12 | 40 |
| B.   Pending Appeals | | | | |
| 3. | In Pre-Panel Baseball Process | | 549 | |
| 4. | Currently Before Panel | | 252 | |
| 5. | TOTAL PENDING | | 801 | |

(b) *Claimant Appeals.*

Before a claimant may appeal, he must seek Reconsideration and receive a Post-

Reconsideration Notice. To date, we have issued 3,376 Post-Reconsideration Notices. Of those,

745 are still within the time for the claimant to appeal, leaving 2,631 that have passed the

window for the claimant to consider whether to appeal. Of those 2,631, claimants have appealed

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

431, or 16.3%. Of the 431 Claimant Appeals, 264 are appeals of Post-Reconsideration Denial

Notices and 166 are appeals of Post-Reconsideration Eligibility Notices.

Table 12 provides summary information on the status of Claimant Appeals:

| | Table 12. Status of Claimant Appeals | | | |
|---|---|---|---|---|
| | A.  Appeal Filing/Resolution | | | |
| | Status | As of 4/11/13 | Since Last Report | Total |
| 1. | **Claimant Appeals Filed** | **384** | **47** | **431** |
| 2. | **Appeals Resolved** | **111** | **87** | **198** |
| (a) | Panel Decided | 66 | 84 | 150 |
| (b) | Settled by Parties | 26 | -2 | 24 |
| (c) | Remanded by Panel | 0 | 1 | 1 |
| (d) | Administratively Closed | 4 | 0 | 4 |
| (e) | Withdrawn | 15 | 4 | 19 |
| | B.  Pending Appeals | | | |
| 3. | **In Pre-Panel Baseball Process** | 51 | | |
| 4. | **In Pre-Panel Non-Baseball Process** | 71 | | |
| 5. | **Currently Before Panel** | 111 | | |
| 6. | **TOTAL PENDING** | 233 | | |

(c) *Resolved Appeals.*

As reported in the tables above, 773 Claimant and BP Appeals have been resolved.  Table

13 provides a summary of these resolved appeals, by Claim Type.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

| | | Table 13. Outcome After Appeal | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Appeals Settled or Decided by Panel | | | | | | Withdrawn | Admin. Closed | Closed Because Claimant Asked For Recon. | Total |
| Claim Type | | Award Amount after Appeal, Compared to Original Notice | | | | | | | | | |
| | | Higher | Lower | Same | Denial Upheld | Denial Over-turned | Remand | | | | |
| 1. | Seafood | 10 | 76 | 7 | 5 | 0 | 1 | 39 | 3 | 8 | 149 |
| 2. | BEL | 65 | 156 | 7 | 34 | 5 | 12 | 89 | 5 | 31 | 404 |
| 3. | Wetlands Real Property | 0 | 1 | 2 | 2 | 0 | 0 | 2 | 0 | 0 | 7 |
| 4. | Coastal Real Property | 0 | 2 | 4 | 5 | 0 | 1 | 4 | 0 | 0 | 16 |
| 5. | Real Property Sales | 0 | 2 | 2 | 13 | 0 | 0 | 2 | 1 | 0 | 20 |
| 6. | VoO Charter Payment | 17 | 29 | 14 | 22 | 9 | 2 | 17 | 2 | 0 | 112 |
| 7. | IEL | 5 | 8 | 2 | 19 | 2 | 1 | 4 | 0 | 1 | 42 |
| 8. | VPD | 10 | 6 | 0 | 0 | 0 | 3 | 4 | 0 | 0 | 23 |
| 9. | Total | 107 | 280 | 38 | 100 | 16 | 20 | 161 | 11 | 40 | 773 |

## II.   CLAIMANT OUTREACH EFFORTS

We have continued our Claimant Outreach efforts since the previous Court Status Report:

### A.   Law Firm Contacts.

The Law Firm Contacts team continued to increase their outreach efforts related to Identity Verification Incompleteness Notices, in addition to continued outreach efforts across several damage categories related to incompleteness reasons.  Firm Contacts continued to facilitate conference calls held in collaboration with the accountants to efficiently address documentation requirements and resolve outstanding Program questions. Firm Contacts also continued outreach efforts regarding incomplete payment documentation.

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**B.  Communications Center (CCC).**

The CCC continues to enhance Claimant Outreach efforts by working directly with each damage category.  Continued outreach campaigns included calls to claimants who emailed the Program with questions or status inquiries, incomplete claims, Identity Verification issues, and to claimants with incomplete payment documentation.  The CCC continuously seeks self-improvement.  By increasing the frequency of structured and informal Agent feedback, the CCC is improving Agent competency and realizing an increase in positive feedback from Claimants.

**C.  Claimant Assistance Centers (CACs).**

The Claimant Outreach Program (COP) continues at the CACs.  To date, the COP has completed over 42,500 outreach calls to claimants.  The CACs continued outreach efforts to claimants with incomplete claims across all damage categories.  In addition to these outreach efforts, the team called claimants who filed claims of all claim types in a CAC.

**D.  Summary of Outreach Calls.**

The table below summarizes some of the Claimant Outreach Program efforts:

| Row | Location | Calls Made | Incomplete Claims Affected | Claims With New Docs After Call | % of Claims With New Docs After Call | Claimants Visiting CAC After Call | % of Claimants Visiting CAC |
|---|---|---|---|---|---|---|---|
| | Table 14.  Outreach Call Volume (As of 5/10/13) | | | | | | |
| 1. | BrownGreer | 42,506 | 16,221 | 12,142 | 75% | 6,068 | 37% |
| 2. | Garden City Group | 39,485 | 6,257 | 4,354 | 70% | 408 | 7% |
| 3. | P&N | 10,967 | 3,115 | 2,404 | 77% | 91 | 3% |
| 4. | PWC | 738 | 298 | 264 | 89% | 9 | 3% |
| 5. | Total | 93,696 | 25,891 | 19,164 | 74% | 6,576 | 25% |

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

### III.   POLICY KEEPER

On May 7, 2013, we added 242 additional policies to Policy Keeper.  With the addition of these new policies, Policy Keeper now has 306 policies for the public to review.  The Parties agreed to publicize these policies because they affect how claims are processed in the Settlement Program and inform claimants and the public about policy decisions not explicitly delineated within the Settlement Agreement.  By providing these policies to the public, they help claimants and Appeals Panelists understand what policy was in place when the Claims Administrator reviewed a particular claim.  Further, to provide transparency in how the Settlement Program reviews claims, we included superseded policies.  Several policies have a long history and have changed significantly over time, thereby changing the review steps and criteria for certain Claim Types.  For these reasons, we provided claimants and the public with any policy that may have affected the review of their claims.

### IV.   CONCLUSION

We offer this Report to ensure that the Court is informed of the status of the Program to date.  If the Court would find additional information helpful, we stand ready to provide it at the Court's convenience.

/s/ Patrick A. Juneau
PATRICK A. JUNEAU
CLAIMS ADMINISTRATOR

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 13th day of May, 2013.

/s/ Patrick A. Juneau
Claims Administrator

**Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement**

May 17, 2013

Claims Administrator Patrick Juneau has announced that the Settlement Program began issuing payments on July 31, 2012, and has been issuing outcome Notices since July 15, 2012. The Program will issue Notices on a rolling basis as we complete reviews, and they will include Eligibility Notices, Incompleteness Notices, and Denial Notices. Each Notice will provide information explaining the outcome. We will post Notices on the secure DWH Portal for any law firm or unrepresented claimant who uses the DWH Portal. We will notify firms and unrepresented claimants by email at the end of each day if we have posted a Notice that day. Firms and unrepresented claimants may then log onto the DWH Portal to see a copy of the Notice(s). Law firms or claimants who do not use the DWH Portal will receive Notices in the mail.  Claimants who receive an Eligibility Notice and qualify for a payment will receive that payment after all appeal periods have passed, if applicable, and the claimant has submitted all necessary paperwork, including a fully executed Release and Covenant Not to Sue.

| Table 1 | | Filings by State of Residence | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | State | Registration Forms | | | | Claims | | | |
| | | Form Begun | Form Submitted | Total | % | Form Begun | Form Submitted | Total | % |
| 1. | Alabama | 821 | 27,279 | 28,100 | 18% | 1,592 | 30,769 | 32,361 | 18% |
| 2. | Florida | 1,968 | 50,849 | 52,817 | 34% | 5,010 | 51,164 | 56,174 | 32% |
| 3. | Louisiana | 1,627 | 35,288 | 36,915 | 24% | 2,578 | 44,835 | 47,413 | 27% |
| 4. | Mississippi | 549 | 17,995 | 18,544 | 12% | 917 | 19,344 | 20,261 | 11% |
| 5. | Texas | 244 | 8,306 | 8,550 | 6% | 673 | 7,106 | 7,779 | 4% |
| 6. | Other | 1,068 | 8,203 | 9,271 | 6% | 1,096 | 11,540 | 12,636 | 7% |
| 7. | Total | 6,277 | 147,920 | 154,197 | 100% | 11,866 | 164,758 | 176,624 | 100% |

Chart 1:  Filings by State of Residence



| Table 2 | | Number of Claims by Claim Type | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Claim Type | Claims | | | | Unique Claimants with Form Submitted |
| | | Form Begun | Form Submitted | Total | % | |
| 1. | Seafood Compensation Program | 422 | 23,862 | 24,284 | 14% | 10,244 |
| 2. | Individual Economic Loss | 6,225 | 29,946 | 36,171 | 20% | 29,918 |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 143 | 232 | 375 | <1% | 232 |
| 4. | Business Economic Loss | 2,500 | 46,424 | 48,924 | 28% | 41,051 |
| 5. | Start-Up Business Economic Loss | 260 | 3,226 | 3,486 | 2% | 2,931 |
| 6. | Failed Business Economic Loss | 252 | 2,519 | 2,771 | 2% | 2,372 |
| 7. | Coastal Real Property | 845 | 23,841 | 24,686 | 14% | 16,745 |
| 8. | Wetlands Real Property | 211 | 5,234 | 5,445 | 3% | 1,745 |
| 9. | Real Property Sales | 181 | 1,142 | 1,323 | 1% | 918 |
| 10. | Subsistence | 672 | 18,947 | 19,619 | 11% | 18,940 |
| 11. | VoO Charter Payment | 93 | 8,292 | 8,385 | 5% | 5,925 |
| 12. | Vessel Physical Damage | 62 | 1,093 | 1,155 | 1% | 958 |
| 13. | Total | 11,866 | 164,758 | 176,624 | 100% | 120,034 |

Chart 2:  Number of Claims by Claim Type





**DEEPWATER HORIZON CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

Appendix A

Page 1 of 3

Case 2:10-md-02179-CJB-SS   Document 9807-1   Filed 05/13/13   Page 2 of 3

Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement,
May 17, 2013

| Table 1 | Claimant Assistance Center | Filings by Claimant Assistance Center | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Registration Forms | | | | Claims | | | |
| | | Form Begun | Form Submitted | Total | % | Form Begun | Form Submitted | Total | % |
| 1. | Apalachicola, FL | 26 | 1,256 | 1,282 | 5% | 37 | 1,750 | 1,787 | 6% |
| 2. | Bay St. Louis , MS | 9 | 529 | 538 | 2% | 31 | 633 | 664 | 2% |
| 3. | Bayou La Batre, AL | 21 | 849 | 870 | 3% | 50 | 973 | 1,023 | 3% |
| 4. | Biloxi , MS | 36 | 1,247 | 1,283 | 5% | 59 | 1,503 | 1,562 | 5% |
| 5. | Bridge City, TX | 2 | 332 | 334 | 1% | 15 | 575 | 590 | 2% |
| 6. | Clearwater, FL | 73 | 2,092 | 2,165 | 8% | 357 | 1,594 | 1,951 | 6% |
| 7. | Cut Off, LA | 13 | 425 | 438 | 2% | 24 | 574 | 598 | 2% |
| 8. | Fort Walton Beach , FL | 12 | 1,207 | 1,219 | 5% | 52 | 1,655 | 1,707 | 6% |
| 9. | Grand Isle, LA | 5 | 142 | 147 | 1% | 6 | 215 | 221 | 1% |
| 10. | Gretna/Harvey, LA | 38 | 1,949 | 1,987 | 8% | 50 | 1,981 | 2,031 | 7% |
| 11. | Gulf Shores, AL | 20 | 1,826 | 1,846 | 7% | 60 | 2,430 | 2,490 | 8% |
| 12. | Houma, LA | 25 | 787 | 812 | 3% | 42 | 1,018 | 1,060 | 4% |
| 13. | Lafitte, LA | 4 | 286 | 290 | 1% | 12 | 387 | 399 | 1% |
| 14. | Mobile, AL | 61 | 5,671 | 5,732 | 23% | 184 | 6,086 | 6,270 | 21% |
| 15. | Naples, FL | 24 | 1,195 | 1,219 | 5% | 35 | 1,090 | 1,125 | 4% |
| 16. | New Orleans – CBD BG, LA | 15 | 332 | 347 | 1% | 22 | 346 | 368 | 1% |
| 17. | New Orleans East, LA | 45 | 1,877 | 1,922 | 8% | 108 | 2,189 | 2,297 | 8% |
| 18. | Panama City Beach, FL | 23 | 1,619 | 1,642 | 7% | 95 | 2,346 | 2,441 | 8% |
| 19. | Pensacola, FL | 25 | 1,206 | 1,231 | 5% | 64 | 1,471 | 1,535 | 5% |
| 20. | Total | 477 | 24,827 | 25,304 | 100% | 1,303 | 28,816 | 30,119 | 100% |

Chart 3: Number of Claims by Claimant Assistance Center





**DEEPWATER HORIZON
CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement

May 17, 2013

| Table 4 | Claim Type | Eligible - Payable | Eligible - No Payment | Incomplete | Denial | | | | | Opt-Outs | Withdrawn | Closed | Total Claims Issued Notice |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Exclusion Denials | Prior GCCF Release | Causation Denials | Other Denials | Incomplete Denials | | | | |
| 1. | Seafood Compensation Program | 6,475 | 983 | 5,767 | 41 | 2,217 | 0 | 202 | 882 | 1,164 | 1,915 | 394 | 20,040 |
| 2. | Individual Economic Loss | 1,280 | 360 | 11,766 | 1,904 | 1,753 | 28 | 504 | 4,893 | 511 | 240 | 973 | 24,212 |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 4 | 0 | 56 | 4 | 22 | 0 | 37 | 69 | 2 | 28 | 10 | 232 |
| 4. | Business Economic Loss | 7,266 | 141 | 8,264 | 387 | 438 | 1,281 | 32 | 2,750 | 555 | 319 | 819 | 21,972 |
| 5. | Start-Up Business Economic Loss | 299 | 11 | 934 | 22 | 34 | 29 | 21 | 440 | 66 | 47 | 66 | 1,989 |
| 6. | Failed Business Economic Loss | 8 | 6 | 552 | 34 | 83 | 136 | 408 | 368 | 60 | 33 | 96 | 1,784 |
| 7. | Coastal Real Property | 15,526 | 19 | 1,947 | 4 | 516 | 0 | 2,167 | 719 | 141 | 139 | 924 | 22,102 |
| 8. | Wetlands Real Property | 1,482 | 1 | 74 | 6 | 48 | 0 | 819 | 9 | 9 | 120 | 297 | 2,864 |
| 9. | Real Property Sales | 383 | 0 | 35 | 4 | 38 | 14 | 349 | 28 | 3 | 19 | 85 | 958 |
| 10. | Subsistence | 472 | 0 | 979 | 9 | 964 | 0 | 6 | 1 | 125 | 31 | 27 | 2,614 |
| 11. | VoO Charter Payment | 6,804 | 14 | 122 | 9 | 0 | 0 | 526 | 544 | 25 | 41 | 45 | 8,130 |
| 12. | Vessel Physical Damage | 460 | 9 | 217 | 4 | 0 | 0 | 38 | 78 | 12 | 10 | 35 | 863 |
| 13. | Total | 40,459 | 1,544 | 30,713 | 2,428 | 6,113 | 1,408 | 5,109 | 10,780 | 2,673 | 2,942 | 3,591 | 107,760 |

| Table 5 | Claim Type | Eligibility Notices Issued with Payment Offer | | Accepted Offers | | Payments Made | | Unique Claimants Paid |
|---|---|---|---|---|---|---|---|---|
| | | Number | Amount | Number | Amount | Number | Amount | |
| 1. | Seafood Compensation Program | 6,475 | $919,549,076 | 4,742 | $812,053,996 | 4,249 | $794,466,992 | 2,726 |
| 2. | Individual Economic Loss | 1,280 | $14,893,090 | 1,035 | $11,611,451 | 939 | $10,281,963 | 939 |
| 3. | Individual Periodic Vendor or Festival Vendor Economic Loss | 4 | $14,396 | 3 | $7,961 | 3 | $7,961 | 3 |
| 4. | Business Economic Loss | 7,266 | $1,726,213,863 | 6,363 | $1,494,475,898 | 5,306 | $889,361,558 | 5,140 |
| 5. | Start-Up Business Economic Loss | 299 | $72,940,962 | 258 | $42,432,057 | 226 | $31,595,150 | 215 |
| 6. | Failed Business Economic Loss | 8 | $1,218,046 | 3 | $589,357 | 3 | $589,357 | 3 |
| 7. | Coastal Real Property | 15,526 | $95,823,321 | 13,829 | $86,345,130 | 12,530 | $74,554,747 | 10,004 |
| 8. | Wetlands Real Property | 1,482 | $84,341,416 | 1,344 | $65,752,707 | 1,269 | $55,089,828 | 568 |
| 9. | Real Property Sales | 383 | $21,730,196 | 365 | $20,996,749 | 349 | $20,912,824 | 324 |
| 10. | Subsistence | 472 | $4,317,052 | 393 | $3,456,000 | 330 | $2,914,641 | 330 |
| 11. | VoO Charter Payment | 6,804 | $274,543,232 | 6,520 | $268,186,886 | 6,415 | $262,089,805 | 4,917 |
| 12. | Vessel Physical Damage | 460 | $8,783,152 | 401 | $7,146,264 | 361 | $5,105,895 | 347 |
| 13. | Total | 40,459 | $3,224,375,803 | 35,346 | $2,813,054,463 | 31,980 | $2,146,970,462 | 25,516 |

Legend:

1. Form Begun - Includes electronically filed registration or claim forms for the period of time between the moment a claimant or his attorney has initiated the submission of a form and moment they complete that filing by submitting the electronic signature. This definition also includes hard copy registration or claim forms where the DWH Intake Team is in the process of linking the scanned images and has not yet completed the data entry on that form.

2. Form Submitted - Includes electronically filed registration or claim forms after the claimant or his attorney completes the electronic signature and clicks the submit button. This definition also includes hard copy registration or claim forms where the DWH Intake Team has completed both the linking of scanned images and the data entry on that form.

3. Unique Claimants with Form Submitted - Counts the unique number of claimants with at least one Claim Form Submitted for each Claim Type. Because claimants may file claims for more than one Claim Type, the sum of all Claim Types will not equal the count of total unique claimants.

4. Notices Issued - The count of Notices Issued in Table 4 counts each unique claim issued a Notice only once. For claims issued multiple Notices, this report uses the following hierarchy when counting the claim: (1) Eligible – Payable; (2) Eligible – No Payment; (3) Denial; (4) Incomplete; (5) Withdrawn; (6) Closed.

5. Payment Information - The timing of payment can be affected by a number of factors. Even after the DHECC receives a Release, delay in receipt of a W-9, or in receipt of the Attorney Fee Acknowledgment Form can delay payment. In addition, any alterations or omissions on the Release Form, or an assertion of a third-party lien against an award amount, can delay payment. As a result, this report will show a higher number of Accepted Offers than Amounts Paid.

6. Note: The Claims Administrator continually monitors the status of all claim filings. Through this process, the Claims Administrator may find duplicate claims from the same claimant. In such cases, the Claims Administrator will close the duplicate claim and only process the remaining valid claim. This report excludes duplicate claims from all counts of claims filed.



DWH 8127

**Analysis of Submissions from Andry Law Group/Andry Lerner, LLC**
(As of 5/9/13 )

### Table 1: Firm Representation

| | Category | Total | % |
|---|---|---|---|
| 1. | Registration Form Begun | 88 | 22% |
| 2. | Registration Form Signed w/o Claim Form | 66 | 16% |
| 3. | Claim Form Begun | 2 | <1% |
| 4. | Claim Form Signed | 246 | 61% |
| 5. | **Total Number of Claimants Represented by Firm** | 402 | 100% |

### Table 2: Claims Filed

| | Claim Type | Total | % |
|---|---|---|---|
| 1. | Seafood Compensation Program | 151 | 32% |
| 2. | Individual Economic Loss | 79 | 17% |
| 3. | IPV or Festival Vendor Economic Loss | 0 | 0% |
| 4. | Business Economic Loss | 89 | 19% |
| 5. | Start-Up Business Economic Loss | 8 | 2% |
| 6. | Failed Business Economic Loss | 3 | 1% |
| 7. | Coastal Real Property Damage | 9 | 2% |
| 8. | Wetlands Real Property Damage | 10 | 2% |
| 9. | Real Property Sales Damage | 1 | <1% |
| 10. | Subsistence Damage | 38 | 8% |
| 11. | VoD Charter Damage | 62 | 13% |
| 12. | Vessel Physical Damage | 16 | 3% |
| 13. | **Total Claims Filed** | 466 | 100% |



EXHIBIT

K

### Table 3: Notices Issued

| | Claim Type | Eligible / Payable | Eligible No Payment | Incomplete | Denial: Exclusion Denials | Denial: Prior UCCF Release | Denial: Causation Denials | Denial: Other Denials | Denial: Incomplete Denials | Withdrawn | Closed | Total Claims Issued Notice |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Seafood Compensation Program | 34 | 18 | 57 | 0 | 0 | 0 | 0 | 1 | 6 | 4 | 120 |
| 2. | Individual Economic Loss | 4 | 0 | 34 | 6 | 0 | 0 | 3 | 0 | 1 | 2 | 50 |
| 3. | IPV or Festival Vendor Economic Loss | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4. | Business Economic Loss | 14 | 1 | 26 | 1 | 0 | 3 | 0 | 2 | 2 | 0 | 49 |
| 5. | Start-Up Business Economic Loss | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 6. | Failed Business Economic Loss | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| 7. | Coastal Real Property Damage | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 8. | Wetlands Real Property Damage | 0 | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 4 |
| 9. | Real Property Sales Damage | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| 10. | Subsistence Damage | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 11. | VoD Charter Damage | 46 | 0 | 5 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 58 |
| 12. | Vessel Physical Damage | 4 | 0 | 4 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 10 |
| 13. | **Total** | 106 | 19 | 131 | 7 | 1 | 5 | 15 | 3 | 10 | 6 | 303 |

### Table 4: Payment Information

| | Claim Type | Eligibility Notices Issued with Payment Offer: Number | Eligibility Notices Issued with Payment Offer: Amount | Accepted Offers: Number | Accepted Offers: Amount | Payments Made: Number | Payments Made: Amount |
|---|---|---|---|---|---|---|---|
| 1. | Seafood Compensation Program | 34 | $2,669,564 | 26 | $2,291,956 | 26 | $2,508,336 |
| 2. | Individual Economic Loss | 4 | $41,499 | 0 | $0 | 0 | $0 |
| 3. | IPV or Festival Vendor Economic Loss | 0 | $0 | 0 | $0 | 0 | $0 |
| 4. | Business Economic Loss | 14 | $4,480,471 | 11 | $3,495,447 | 9 | $1,702,287 |
| 5. | Start-Up Business Economic Loss | 1 | $54,830 | 0 | $0 | 0 | $0 |
| 6. | Failed Business Economic Loss | 0 | $0 | 0 | $0 | 0 | $0 |
| 7. | Coastal Real Property Damage | 3 | $17,370 | 3 | $17,370 | 3 | $17,370 |
| 8. | Wetlands Real Property Damage | 0 | $0 | 0 | $0 | 0 | $0 |
| 9. | Real Property Sales Damage | 0 | $0 | 0 | $0 | 0 | $0 |
| 10. | Subsistence Damage | 0 | $0 | 0 | $0 | 0 | $0 |
| 11. | VoD Charter Damage | 46 | $1,817,400 | 46 | $1,817,400 | 46 | $1,623,618 |
| 12. | Vessel Physical Damage | 4 | $26,198 | 3 | $20,842 | 2 | $16,159 |
| 13. | **Total** | 106 | $9,107,332 | 89 | $7,643,014 | 86 | $6,070,970 |

Chart 1: Registration and Claim Form Filings by Day



— Registration Forms   — Claim Forms

Andry Law Group/Andry Lerner, LLC has confirmed representation of an additional 28 claimants, but the firm has not yet begun any Registration or Claim Forms as of the date of this report.  The report does not count these claimants' because they are not in the DWH Program yet.



DEEPWATER HORIZON
CLAIMS CENTER

DWH 8127

Analysis of Submissions from Andry Law Group/Andry Lerner, LLC
(As of 5/9/13 )

**Table 5: Status of Claim Processing**

| Category | Seafood Compensation Program | Individual Economic Loss | IPV/RW Economic Loss | Business Economic Loss | Start-Up Business Economic Loss | Failed Business Economic Loss | Coastal Real Property | Wetlands Real Property | Real Property Sales | Subsistence | VoO Charter Payment | Vessel Physical Damage | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Claims Not Under Review | 0 | 6 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 15 | 4% |
| (a) Claim Form Not Submitted | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1% |
| (b) Claimant Editing Claim Form | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| (c) Claim Closed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 1% |
| (c) Claim Closed - Claimant Opted Out of Settlement | 0 | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 2% |
| (e) Claim Form Untimely Submitted | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (f) Claim Withdrawn | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 2. Claims Not Yet Issued Notice | 36 | 36 | 0 | 7 | 2 | 1 | 6 | 6 | 0 | 34 | 0 | 6 | 136 | 32% |
| (a) Claim Form Submitted | 0 | 0 | 0 | 2 | 0 | 0 | 3 | 0 | 0 | 8 | 0 | 0 | 13 | 3% |
| (b) Claim Processing Awaiting Policy Decision | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (c) Under Timeliness Review | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1% |
| (d) In Claims Review | 2 | 31 | 0 | 4 | 1 | 0 | 6 | 3 | 0 | 25 | 0 | 6 | 78 | 19% |
| (e) Claim Closed - Parcel Included in Claim Zone after Parcel Eligibility Review | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (f) In QA Review | 20 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 26 | 6% |
| (g) In Accountant Review | 12 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 4% |
| 3. Claims with Notice Sent | 40 | 18 | 0 | 13 | 0 | 0 | 0 | 4 | 1 | 4 | 4 | 2 | 86 | 21% |
| (a) Notice Issued after Claim Form Review: Signature Incomplete | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (b) Notice Issued After Claim Review: Field Visit Required. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (c) Notice Issued After Parcel Eligibility Review: Claim Eligible | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (d) Notice Issued after Parcel Eligibility Information Requested | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (e) Notice Issued After Preliminary Claim Review: Claim Incomplete | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| (f) Notice Issued After Claims Review: Payable Claim or Claim Eligible But No Payment Due Determination | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 2% |
| (g) Notice Issued After Claims Review: Claim Incomplete | 8 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 16 | 4% |
| (h) Notice Issued After Follow-Up Review: Claim Incomplete | 15 | 5 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 27 | 6% |
| (i) Notice Issued After Claims Review: Claim Denied | 0 | 7 | 0 | 2 | 0 | 0 | 0 | 4 | 1 | 0 | 1 | 1 | 16 | 4% |
| (j) Notice Issued After Claims Review: Claim Denied After Failure to Cure Incompleteness | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| (k) Notice Issued After Claimant Request: Claim Withdrawn | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 10 | 2% |
| (l) Notice Issued After Review: Duplicate Claim | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 1% |
| (m) Notice Issued After Review: Reclassified Claim | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (n) Notice Issued After Review: Claim Closed | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| 4. Claims with Responses to Notice | 41 | 19 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 5 | 93 | 22% |
| (a) Response to Preliminary Incompleteness Notice Received | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| (b) Response to Incompleteness Notice Received | 2 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 1% |
| (c) Response to Follow-Up Incompleteness Notice Received | 4 | 1 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 16 | 4% |
| (d) In Claims Review after Notice Issued | 9 | 10 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 24 | 6% |
| (e) In QA Review after Notice Issued | 13 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 4% |
| (f) In Accountant Review after Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (g) Claimant Requested Re-Review After Payable Claim or Claim Eligible But No Payment Due Determination | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1% |
| (h) Claimant Withdrew Re-Review Request after Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (i) Notice Issued after Follow-Up Claim Form Review: Signature Incomplete | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (j) Notice Issued After Re-Review: Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (k) Notice Issued After Re-Review: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (l) Offer Accepted / Claimant waives right to request Re-Review / Reconsideration | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| (m) Offer Accepted / Claimant waives right to request Reconsideration | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (n) Offer Accepted / Claimant waives right to request Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| (o) Claimant Requested Re-Review After Claim Denied | 9 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 11 | 3% |

DEEPWATER HORIZON CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

DWH 8127

**Analysis of Submissions from Andry Law Group/Andry Lerner, LLC**
**(As of 5/9/13 )**

| | | | | | | | | | | | | | | | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (o) Claimant Requested Reconsideration After Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (q) Claimant Requested Reconsideration After Claim Denied | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| | (r) Claimant Requested Reconsideration After Claim Denied for Failure to Cure Incompleteness | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (s) Claimant Withdrew Reconsideration Request After Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (t) Claimant Withdrew Reconsideration Request After Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (u) Claimant Withdrew Reconsideration Request After Claim Denied for Failure to Cure Incompleteness | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (v) Deadline to Request Reconsideration for Eligibility Notice Expired | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| | (w) In Claims Review after Reconsideration Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (x) In QA Review after Reconsideration Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (y) In Accountant Review after Reconsideration Notice Issued | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (z) Notice Issued After Reconsideration: Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (aa) Notice Issued After Reconsideration: Claim Incomplete | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 | 1% |
| | (ab) Response to Post-Reconsideration Incompleteness Notice Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ac) Notice Issued After Reconsideration: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ad) Claimant Requested Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ae) Notice Issued After Claimant Request: Appeal of Eligible Claim | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (af) Notice Issued After Claimant Request: Appeal of Denied Claim | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 6 | 1% |
| | (ag) Appeal Payment Processed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ah) Claimant Withdrew Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ai) BP Requested Payment Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (aj) BP Withdrew Payment Appeal Request | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ak) BP Waived Right to Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (al) Claimant's Initial Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (am) BP's Initial Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (an) Notice Issued After Appeal: Initial Proposal Submitted | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ao) Claimant's Final Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (ap) BP's Final Proposal for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (aq) Notice Issued After Appeal: Final Proposal Submitted | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | <1% |
| | (ar) Claimant's Compromise Amount for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (as) BP's Compromise Amount for Appeal Received | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (at) Notice Issued After Appeal: Payable Claim or Claim Eligible But No Payment Due Determination | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (au) Notice Issued After Appeal Panel Review: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (av) Notice Issued After Appeal: Claim Denied | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| 5. | **Payments** | 28 | 0 | 0 | 9 | 0 | 0 | 3 | 0 | 0 | 0 | 46 | 3 | 89 | 21% |
| | (a) Release Sent to Claimant | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (b) Claim Payment Documentation Accepted | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 1% |
| | (c) Claimant Elects 5% Reduction in Compensation Amount to Pay for Appeal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (d) Appeal Payment Processed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (e) Final Payment Processing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0% |
| | (f) Payment Issued on Claim | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | <1% |
| | (g) Payment Received | 24 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 46 | 2 | 84 | 20% |
| 6. | **Total** | 147 | 79 | 0 | 54 | 2 | 1 | 9 | 10 | 1 | 38 | 62 | 16 | 419 | 100% |

DEEPWATER HORIZON
CLAIMS CENTER