**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** **"Deepwater Horizon" in the Gulf** **of Mexico, on April 20, 2010** **This Document Relates to:** **No. 12-970** | **MDL No. 2179** **SECTION: J** **JUDGE BARBIER** **MAGISTRATE SHUSHAN** |

**CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE**

Eligible Business Economic Loss (BEL) Claimants in the Court-Supervised Settlement Program and the Economic & Property Damages Settlement Class respectfully submit the following memorandum in response to the Court's Order of October 25, 2013 [Doc 11735]:

MAY IT PLEASE THE COURT:

As set forth in Plaintiffs' original *In Camera* Submission [Doc 11728-1], Letter to the Court of October 18, 2013 [Doc 11728-4], Letter Brief to the U.S. Fifth Circuit in No. 13-30095 dated October 18, 2013 [Doc 11728-6] [Fifth Cir. Doc. 00512413345], Memo to the Claims Administrator dated October 23, 2013 [Doc 11728-7], Supplemental Declaration of Allen Carroll [Doc 11740-1], Opposition to Amend Scheduling Order and Injunction [Doc 11826], and Sur-Reply in Opposition to Amend Scheduling Order and Injunction [Doc 11848-1], Plaintiffs respectfully submit that the appropriate focus turns on whether the Settlement Program should attempt to "match" *expenses* to the recorded Benchmark and Compensation Period revenue on *Cash Basis* financials using the existing Documentation.   With respect to the issue of Causation, Plaintiffs submit that: **(i)** the Parties agreed, and the Settlement Agreement memorializes and reflects, that the question of whether an Entity suffered a traceable injury "as a

result of" the Spill would be determined, for both Class Definition and Business Economic Loss Claim purposes, based solely and exclusively on the objective tests set forth in the BEL Causation Framework, Exhibit 4B; **(ii)** the Parties' Settlement Agreement is a valid and enforceable contract under the General Maritime Law, and a valid Class Settlement under Rule 23, the Rules Enabling Act, and Article III; **(iii)** the issue was not included within a majority of the BEL Panel's formal remand order or injunction; and **(iv)** BP is judicially estopped from taking current positions which directly contradict the numerous pleadings, statements and other representations BP made regarding the issues of Causation and Class Definition from the time the Settlement Agreement was filed on April 18, 2012 thru the date of Final Approval by the Court on December 21, 2012.  With respect to the issue of *revenues,* Plaintiffs believe that BP's apparent suggestion that revenues should be "moved" or "smoothed" based on "business activities" or other as-yet-to-be-defined "revenue attribution criteria" was rejected in Part I(D) of Judge Clement's opinion, which was joined by Judge Southwick and implicitly by Judge Dennis.

With that backdrop, Plaintiffs turn to the question posed by the Court, specifically:

> Whether the parties to the Settlement Agreement had discussed the intended meaning of Exhibit 4C insofar as it applies to the use of cash versus accrual basis accounting to calculate loss of variable profits?[1]

In Class Counsel's evidentiary submission,[2] the plaintiffs established the following basic facts:

1. There were no discussions between the parties regarding the "matching" of expenses.[3]

2. In negotiating the underlying Documentation requirements in Exhibit 4A, the Parties focused on the need, preference and use of the pre-existing monthly P&Ls (if any) that

---

[1] SCHEDULING ORDER REGARDING BEL REMAND [Doc 11735] (Oct. 25, 2013), p.1.

[2] *See* DOC. 11804.  *See also,* REPLY SUBMISSION (Nov. 12, 2013) [Doc 11833].

[3] RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶12; FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶22; HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶10; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶7; WALLACE DECLARATION (Feb. 18, 2013) [Doc 8963-4], ¶3; SCOTT DECLARATION (Nov. 4, 2013) [Doc 11804-27], ¶5.

were actually prepared in the ordinary course of business – without regard to whether those financials were maintained on a cash, accrual or other basis.[4]

3. In negotiating the Multi-Facility Documentation requirements in Exhibit 5, the Parties focused on the need, preference and use of the pre-existing monthly P&Ls (if any) that were actually prepared in the ordinary course of business – and the Additional Documentation Requirements were directed *not* to the issue of "matching", but to the desire by BP to prevent "double payments" and/or compensation to non-claiming or ineligible facilities.[5]

4. In negotiating the definition of Contemporaneous, the Parties never suggested a confusion, misunderstanding, disagreement or departure from the focus on the need, preference and use of the pre-existing monthly P&Ls (if any) that were actually prepared in the ordinary course of business.[6]

5. The Parties never suggested, proposed or discussed that cash-basis P&Ls could not be submitted; would have to be converted to accrual-based P&Ls prior to submission; or would have to be converted to accrual-based P&Ls by the Program Accountants.[7]

6. The negotiations regarding Section 4.3.8 confirmed an awareness of seasonal and cyclical businesses, which would experience time lags between the initial, continuing and sometimes delayed effects of the Spill – and that those Entities would be afforded claimant-favorable optionality, (not the "smoothing" or revenue or expenses).[8]

7. The Parties never suggested, proposed or discussed the notion that Program Accountants would look to the "business activities" of the claiming Entity to attempt to determine what revenues had been "earned" during the Benchmark or Compensation Periods.[9]

---

[4] RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶ 20; RICE DECLARATION (Nov. 12, 2013) [Doc 11833-6], ¶¶ 5-6; FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶¶ 16, 26; HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶¶ 17, 22, 29; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶13; SCOTT DECLARATION (Nov. 4, 2013) [Doc 11804-27], ¶6.

[5] HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶18.

[6] RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶17; HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶¶ 17, 29.

[7] RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶¶ 16-17; FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶24; HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶14; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶11; SCOTT DECLARATION (Nov. 4, 2013) [Doc 11804-27], ¶5.

[8] HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶16. *See also,* JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶12.

[9] RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶15; HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶13; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶9; SCOTT DECLARATION (Nov. 4, 2013) [Doc 11804-27], ¶5. *See also,* RICE DECLARATION (Nov. 12, 2013) [Doc 11833-6], ¶¶10-11; FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶¶ 24, 26; WALLACE DECLARATION (Feb. 18, 2013) [Doc 8963-4], ¶3.

8.  The Parties never suggested, proposed or discussed the utilization of eleven different industry frameworks within the Business Economic Loss Damage Category.[10]

9.  The Parties never suggested, proposed or discussed "revenue attribution criteria".[11]

10. After the Settlement Agreement was made available to the public, Class Counsel received complaints from CPAs and attorneys regarding the Claimant Accounting Support Compensation, based on the fact that many businesses did not keep their books under GAAP; that the Documentation provisions in Exhibit 4A did not require the preparation and submission of financial statements in conformance with GAAP; that attestation of compliance with GAAP would be unduly burdensome and expensive; and that the Settlement Agreement generally, and BEL Claim Frameworks in particular, expressly deviated from GAAP in several material respects.[12]

11. BP agreed to amend the Settlement Agreement to make it clear that CPAs did not have to attest that the financials complied with GAAP.[13]

12. Some of BP's own early draft proposals for the Compensation Framework demonstrate that the Parties were contemplating variable costs "incurred during the 'claimed loss period.'"[14]

13. None of the many Compensation Framework drafts ever stated that you would "match" expenses to revenues, nor move or smooth or average revenues based on the timing of "business activities" or other "revenue attribution criteria".[15]

14. Before the Settlement Agreement was finalized, Mr. Hacker, from PwC, recognized and specifically noted to the Parties that, under the Compensation Framework that had been

---

[10] RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶33. *See also,* RICE DECLARATION (Nov. 12, 2013) [Doc 11833-6], ¶¶10-11. (*Note* – The Parties did discuss, over the course of their negotiations, potential different possible frameworks for Real Estate Developers and for Oil & Gas Support Services; the specialized Framework for the latter appears in Exhibit 16, while the former were excluded from the Settlement under Section 2.2.4.7. But with respect to the businesses and industries within BEL Framework, there is only one Compensation scheme.)

[11] RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶15; HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶13; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶10. *See also,* RICE DECLARATION (Nov. 12, 2013) [Doc 11833-6], ¶¶10-11; FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶24; WALLACE DECLARATION (Feb. 18, 2013) [Doc 8963-4], ¶3; SCOTT DECLARATION (Nov. 4, 2013) [Doc 11804-27], ¶5.

[12] HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶¶19-20; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶¶14-15. *See also,* WALLACE DECLARATION (Feb. 18, 2013) [Doc 8963-4], ¶4; FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶20.

[13] HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶¶ 21, 30.

[14] *See* BP DRAFT PROPOSED COMPENSATION FRAMEWORK (Sept. 15, 2011) [Doc 11804-2]. *See also,* HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶26; RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶26 (and Rice Declaration Ex. "E" [Doc 11804-13]).

[15] RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶¶ 7-8, 10, 12-15, 26-44 (and Rice Declaration Exhibits "E"-"I" [Doc 11804-13 thru -17]); HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶¶ 25, 27, 31-32; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶17.

negotiated, there would be no attempts by the Program Accountants to further "match" expenses to revenues, beyond what was reflected in the Contemporaneous P&Ls.[16]

15. In response to PwC's observations regarding the Compensation Framework, the PSC confirmed that this is what had been intended and agreed. Aware of PwC's interpretation, and informed of the PSC's confirmation of same, BP remained silent, and the language was never changed.[17]

Class Counsel also submitted evidence placing the negotiations in context, to demonstrate that: **(i)** BP was aware, from its experience in the GCCF, from the GPS data that was available, and from the Accounting Working Group work with Test Cases, of the nature and geographic location of the businesses that were going to be eligible to make BEL Claims, and the nature and extent (and limitations) of the underlying financial business records that would be available;[18] **(ii)** the Compensation (and Causation) Framework(s), as intended, agreed to, and correctly interpreted and applied by the District Court and the Claims Administrator were intended to and do provide a framework to treat similarly situated claimants fairly and consistently under one set of common, objective and transparent criteria;[19] and **(iii)** the Settlement Agreement was intended to be and is a binding and enforceable contract between BP and participating Claimants, irrespective of full and final Rule 23 approval.[20]

---

[16] AFFIDAVIT OF CHARLES HACKER JR. (March 28, 2013) [Doc 9089-3], ¶3; E-MAIL FROM HACKER TO RICE AND CANTOR, ET AL (April 4, 2012) [Doc 9089-3, Ex. 1, filed under seal]; RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶¶ 53-55; E-MAIL FROM HACKER TO RICE AND CANTOR, ET AL (April 4, 2012) [Doc 11804-22].

[17] RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶¶ 56-57; RICE RESPONSE TO HACKER (April 15, 2012) [Doc 11804-23]; RICE DECLARATION (Nov. 12, 2013) [Doc 11833-6], ¶¶ 12-13 (and Rice Declaration Ex. "3" [Doc 11833-9]). *See also,* FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶25.

[18] *See generally,* FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10]; RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶¶19-27; GCCF MAPS [Doc 11804-7 thru -11]; SAMPLE GPS BUSINESS DATA [Doc 11804-12]; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶¶7-13; SCOTT DECLARATION (Nov. 4, 2013) [Doc 11804-27], ¶¶3-8; JONES DECLARATION (Nov. 12, 2013) [Doc 11833-2], ¶2; TEST CASE INDUSTRY INFORMATION [Doc 11833-3]; SCOTT DECLARATION (Nov. 12, 2013) [Doc 11833-5]; WALLACE DECLARATION (Feb. 18, 2013) [Doc 8963-4]; WALLACE DECLARATION (Nov. 12, 2013) [Doc 11833-4]; TOMLINSON DECLARATION (Feb. 18, 2013) and TEST CASES [Doc 8963-86]; SUPP TOMLINSON DECLARATION (April 1, 2013) [Doc 9087-4].

[19] HERMAN DECLARATION (Nov. 11, 2013) [Doc 11833-1], ¶ 8, (*see also,* ¶5). *See also,* FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶¶ 14-17; RICE DECLARATION (Nov. 12, 2013) [Doc 11833-6], ¶¶ 3-4.

[20] HERMAN DECLARATION (Nov. 11, 2013) [Doc 11833-1], ¶¶ 5-7.

In many cases, BP has not addressed or responded to this evidence in any way.  In other cases, BP simply places a (generally erroneous or irrelevant) spin on what the evidence allegedly means.  Class Counsel will address these points in turn.

<u>No Specific Discussions Between the Parties regarding the "Matching" of Expenses</u>

BP does not provide direct evidence of any discussions regarding the "matching" of expenses.  BP simply contends that an August 2011 BP Draft BEL Compensation Framework's reference to "costs that would have been incurred in generating revenue lost as a result of the DH spill" "*reflected* the *concept* of matching revenue to expenses" which, BP contends, "also carried through subsequent drafts to the final agreement, *albeit using different language.*"[21]  Indeed, with respect to Judge Clement's specific question – *i.e.* "whether, before the agreement was signed, the parties discussed the divergent effects of cash- and accrual-basis accounting records on the Exhibit 4C formula"[22] – Mr. Godfrey effectively admits that no such discussions took place.[23]

<u>Exhibit 4A Focused on Pre-Existing Monthly P&Ls Prepared in the Ordinary Course of Business</u>

BP does not provide any direct evidence that the Documentation requirements in Exhibit 4A were specifically intended to allow for the "matching" of expenses.

BP merely contends that the Documentation requirements *can* allow the Program Accountants to make adjustments "including matching"[24] and were (in addition to potential fraud prevention) "also" intended to "accurately calculate compensation".[25]

---

[21] BLOOM DECLARATION (Nov. 7, 2013) [Doc 11818-1], ¶16, (emphasis supplied).

[22] SLIP OPINION, p.23.

[23] *See* GODFREY DECLARATION (Nov. 7, 2013) [Doc 11818-2], ¶10 ("At no time during the period while the BEL Frameworks were being drafted and prior to the execution of the Settlement Agreement did anyone from the PSC ever suggest or state to me that the determination of whether there was a compensable loss or the amount of compensation under the BEL Frameworks would depend or vary upon whether the books and records of a claimant were maintained on an accrual or cash basis").

[24] *See* BLOOM REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-2], ¶5.

Exhibit 5 Focused on Pre-Existing Monthly P&Ls Prepared in the Ordinary Course of Business

BP does not respond to this evidence.

Negotiations regarding the Definition of "Contemporaneous" Confirmed Focus on Actual P&Ls

BP does not directly respond to Class Counsel's evidence on this point.  Mr. Godfrey notes that "the Claims Administrator and his team of accountants would play a critical role in reviewing, evaluating, and taking whatever steps were necessary to select and/or adjust the financial data submitted by the claimants."[26]  Which may have been Mr. Godfrey's understanding. But that wasn't Class Counsel's point.

Class Counsel's point was that:  If the Parties had, up to that point in time, agreed that P&Ls would have to be prepared, submitted or converted by the Settlement Program under an accrual or GAAP type methodology, then that would have likely been reflected in the definition of "Contemporaneous" found in Section 38.38 – which was negotiated and agreed to fairly late in the process.  That no such reference in the definition exists further supports the fact that the Parties had never discussed or agreed to such a proposition.

No Discussions regarding a Requirement of Accrual-based P&Ls

BP does not present evidence that accrual-based P&Ls would be required.  Indeed, Mr. Godfrey had expressly confirmed, during the hearing on April 5, 2013, that: "Accrual accounting is not required by the agreement, Your Honor."[27]

---

[25] *See* GODFREY REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-1], ¶6;  *see also,* BLOOM REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-2], ¶6 ("to ensure the accuracy of entries on a claimant's P&Ls and to perform the calculation of lost profits").

[26] *See* GODFREY REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-1], ¶7.

[27] TRANSCRIPT (April 5, 2013), p.24.

<u>Discussions regarding Section 4.3.8 Recognized the Likelihood of "Spikes" and "Valleys" – From Which Claimants Were Intended and Agreed to Benefit</u>

BP does not directly address the evidence on this point. Mr. Godfrey states that the "Claimant-friendly" provisions, and in particular Section 4.3.8, "do not alter the terms of the Settlement Agreement" and "are limited by 'the terms of the Economic Damage Claim Framework.'"[28] Which may be true.[29] But that wasn't Class Counsel's point.

Class Counsel's point was: If the type of "matching" and/or "smoothing" that BP is currently suggesting were actually discussed, intended and agreed upon at that point in time during the negotiations, it would have come up during the discussions surrounding Section 4.3.8. That no such discussions occurred further supports the fact that the Parties had never contemplated or agreed to such a proposition.

<u>No Discussions to Move Revenue based on "Business Activities"</u>

None of the BP Declarations reference discussions regarding the "smoothing" or other rearrangement of recorded revenues based on the Claimant's "business activities".

Contrary to Mr. Godfrey's suggestion,[30] the definition of Variable Profit contained within the final version of Exhibit 4C does <u>*not*</u> include the word "earn". Rather, it refers to revenue "over the period" and revenue "over the same time period".[31]

Mr. Sider states that "'revenue' does not mean cash receipts" and that he *assumed* that "revenues" would not "be defined or otherwise understood in a non-standard way to reflect

---

[28] *See* GODFREY REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-1], ¶14; *see also,* SIDER REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-3], ¶7.

[29] *Note* - Class Counsel have always taken the position that Section 4.3.8 should be read together with Section 4.3.7 and applied to all eight of the Damage Category Claims. The Claims Administrator has agreed with BP to limit Section 4.3.8 to BEL, IEL and Seafood Compensation Claims.

[30] *See* GODFREY REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-1], ¶5 ("those exact words— 'correspond' and 'earn'—were agreed to and explicitly referenced in the final version of Exhibit 4C").

[31] SETTLEMENT AGREEMENT, Exhibit 4C [Doc 6276-10, at 3].

receipts and expenditures as recorded in cash-basis financial statements."[32]   However: **(i)** It is standard to generally treat cash receipts as "revenue" by the majority of small businesses that keep their books under a cash basis methodology;[33] **(ii)** Even under an accrual-basis methodology, it is _not_ standard to record revenues based on the entity's underlying "business activities";[34] **(iii)** Mr. Sider does not indicate that this was specifically discussed with PSC representatives; and **(iv)** Mr. Sider does not reference any discussions, proposals or drafts to move revenues into or out of the Benchmark or Compensation Periods based on the Claimants' "business activities".

No Discussions to Break BEL Claimants into Eleven Industry Accounting Frameworks

BP does not present evidence that this was contemplated, discussed or proposed.

No Discussions regarding "Revenue Attribution Criteria"

BP does not present evidence that this was contemplated, discussed or proposed.

Accountants and Attorneys Complained about the original Claimant Accounting Support Compensation Provision as Unworkable and Inconsistent with the Settlement Agreement

BP suggests that "the change in language did not result from any concern on BP's part that an aspect of the process was 'unduly burdensome and expensive.'"[35]   That may be true.  But it doesn't refute that fact that Class Counsel received complaints from CPAs and attorneys that many businesses did not keep their books under GAAP; that the Documentation provisions in Exhibit 4A did not require the preparation and submission of financial statements in

---

[32] SIDER REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-3], ¶4.

[33] SUPPLEMENTAL DECLARATION OF ALLEN CARROLL (Oct. 24, 2013) [Doc 11740-1]. *See also,* PANZECA DECLARATION (Feb. 18, 2013), ¶14.

[34] SUPPLEMENTAL DECLARATION OF ALLEN CARROLL (Oct. 24, 2013) [Doc 11740-1] ("Under accrual principles, revenue should not be recognized until it is realized or realizable and earned"); *citing,* FASB CONCEPT STATEMENT 5, Paragraphs 83(b) and 84(a); KIESO, WEYGANDT & WARFIELD, *Intermediate Accounting* (14th ed.), p.60.

[35] KARRON REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-4], ¶12.

conformance with GAAP; or that, in several ways, the Settlement Agreement generally, and BEL Claim Frameworks in particular, expressly deviated from GAAP.[36]

<u>The Claimant Accounting Support Compensation Requirements were Amended to Remove the Attestation of Compliance with GAAP</u>

BP agrees.[37]

<u>BP's Own Draft Proposals Reflect Understanding and Intent to Look at Expenses "Incurred During the 'Claimed Loss Period'"</u>

BP does not address the language in BP's own September 15, 2011 Draft Compensation Framework, except to say that "BP's proposal was rejected."[38]  While it is true that the specific September 15, 2011 draft, and BP's EBITDA approach generally, were not formally adopted, the language used by BP to discuss costs "incurred during" the Compensation Period stands as evidence of the general discussions and intent.

<u>No Reference to "Matching" or "Business Activities" or "Revenue Attribution Criteria" in Any Draft Proposed Compensation Framework</u>

BP has pointed to none.

<u>PwC Recognition and Communication on April 4, 2012 that No Matching Was Required</u>

BP admits that it received and reviewed not only the April 4, 2012 Hacker suggestion for an alternate compensation framework that would specifically match expenses to revenue, but also Mr. Rice's April 15, 2012 response, (*i.e.* "This is not agreed to").[39]

---

[36] HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶¶ 19-20, 30; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶¶ 14-15. *See also,* WALLACE DECLARATION (Feb. 18, 2013) [Doc 8963-4], ¶4; FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶20.

[37] KARRON REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-4], ¶10.

[38] GODFREY REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-1], ¶12.

[39] BLOOM REBUTTAL DECLARATION (Nov. 12, 2013) [Doc 11836-2], ¶13; BLOOM DECLARATION (Nov. 7, 2013) [Doc 11818-1], ¶28 (and Bloom Declaration Ex. "M" [Doc 11818-1, at 85-89]).

This 18th day of November, 2013.


Respectfully submitted,


   /s/  Stephen J. Herman   
**Stephen J. Herman**, La. Bar No. 23129
**HERMAN HERMAN & KATZ LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Co-Lead Class Counsel*

   /s/ James Parkerson Roy
**James Parkerson Roy**, La. Bar No.11511
**DOMENGEAUX WRIGHT ROY & EDWARDS LLC**
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Co-Lead Class Counsel*

### ECONOMIC & PROPERTY DAMAGES CLASS COUNSEL

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

Brian H. Barr
LEVIN, PAPANTONIO
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

**<u>CERTIFICATE OF SERVICE</u>**

We Hereby Certify that the above and foregoing Brief will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pre-Trial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this <u>18th</u> day of <u>November</u>, <u>2013</u>.

<u>/s/ Stephen J. Herman and James Parkerson Roy</u>