**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179<br><br>SECTION J |
| | * | |
| This document relates to: All Cases and No. 12-970 | * * | Honorable CARL J. BARBIER |
| | * * | Magistrate Judge SHUSHAN |

**BP'S MEMORANDUM RE BEL REMAND**

The BEL Panel was perplexed: "[W]hy would parties who agree as to the propriety of matching for one set of claims reject it for other claims," particularly when "only matching provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for real losses." *In re Deepwater Horizon*, No. 13-30315, slip op. at 21 (5th Cir. Oct. 2, 2013) ("BEL Decision").  The Panel did not mince words.  To base compensation on cash-in, cash-out accounting for selected months would be "economic[ally] incoheren[t]," "economically meaningless," would not represent "actual economic losses or lost 'variable profits,'" and would be "completely disconnected from any reasonable understanding of calculation of damages." *Id*. at 17, 21, 23.  And were that in fact the parties' agreement, the Panel foresaw problems: Judge Clement said that "[u]nless a claimant can colorably assert a loss, it lacks standing," *id*. at 25, and Judge Southwick said that "to allow the means of showing loss to become disconnected from economic realities threatens to distort entry into the class and is a defect under Rule 23," *id*. at 39 (Southwick, J., concurring).

To eliminate all doubts, the BEL Panel remanded with instructions "to develop a more complete factual record regarding the meaning of Exhibit 4C or other relevant parts of the

agreement," including whether "the parties discussed the divergent effects of cash- and accrual-basis accounting records on the Exhibit 4C formula." *Id*. at 23-24.[1]

The parol evidence regarding Exhibit 4C establishes four points:

- ***First***, the parties did not discuss treating cash-basis claimants differently from accrual-basis claimants in calculating "Variable Profit."

- ***Second***, the parties did discuss and agree – from the outset and consistently – that similarly situated claimants should be similarly compensated.  Only matching of revenues and corresponding expenses achieves that objective, because only matching compensates claimants for their real losses.  Cash-in, cash-out comparisons, on the other hand, involve "randomly associated numbers" that have little likelihood of "show[ing] anything relevant to damages." *Id*. at 23.

- ***Third***, the parties also discussed and agreed that claimants should be compensated for real economic loss based on a standard, well-recognized methodology.  To that end, the parties agreed to base compensation on lost profits, which requires comparing "revenue" and "expenses" as accountants and economists use those terms to calculate real lost profits.

- ***Fourth***, the parties discussed and agreed that, because the claims process was to be claimant-friendly, it was essential to staff the CSSP with an army of accountants to make the determinations about "revenue" and "corresponding variable expenses" necessary to compute actual lost profits, if any.

The parties' negotiations played out, of course, in the context of securing Court approval for a class settlement.  The requirements of Article III standing and Rule 23 class certification made it essential for the parties to define the class and calculate compensation in a way that determined real economic loss.  Whatever their other disagreements, the parties negotiated with the common aim of reaching a class settlement that would win court approval and that would make like awards to like claimants.  The only interpretation of Exhibit 4C consistent with that common aim is one that recognizes that Exhibit 4C (i) creates a single methodology, (ii) based on recognized accounting and economic concepts, (iii) which requires the CSSP's accountants to

---

[1]   Adding to this instruction, Judge Southwick said that the Court should "reconsider the interpretation of Exhibit 4C for unmatched claims in light of the ***necessity*** of revenue and expense matching to realistic measurement of economic loss." *Id*. at 38 (Southwick, J., concurring) (emphasis added).

analyze the claimants' financial records – whether kept on a cash, accrual or hybrid basis – in a

manner (iv) that properly attributes "revenue" to the month when it is earned and matches that

"revenue" with "corresponding variable expenses" so as (v) to measure real economic loss (i.e.,

damages).  Otherwise, the Settlement Program awards are not compensation either for "real

losses" or for "lost 'variable profits.'"  BEL Decision at 17, 21.

**I.      The Parties Did Not Discuss Treating – and Did Not Agree to Treat – Cash-Basis Claimants in a Different and Economically Incoherent Way.**

The BEL Panel said that comparing a business's cash-in and cash-out on a monthly basis

"is completely disconnected from any reasonable understanding of calculation of damages." *Id*.

at 23.  On the other hand, "matching" provides "a real-time view of the net economic value of a

transaction." *Id*. at 12.  Class Counsel's declarations do not dispute either statement.  Thus, the

BEL Panel's question is whether "the parties discussed the divergent effects of cash- and

accrual-based accounting records on the Exhibit 4C formula" and decided to rely on cash-basis

records without any adjustment, even if economically meaningless. *Id.* at 23.  Class Counsel's

declarations address a different question.  They deny that the parties discussed "matching," but

they dodge and never answer the BEL Panel's question whether the parties (i) discussed the

"divergent effects of cash- and accrual-based accounting records" and (ii) decided nonetheless to

compensate cash-basis claimants based on an economically meaningless calculation.

Class Counsel did give a direct answer to the BEL Panel's question in their letter to the

Court, dated October 18, 2013.  There they said, "Class Counsel do not recall or believe that any

such discussions took place."  Doc. No. 11728-4.  That frank admission is correct.  It also should

be dispositive in interpreting Exhibit 4.  It is a basic canon of construction that the court should

interpret any contractual ambiguity so as to avoid senseless or absurd results,[2] and "the

interpretation urged by the Administrator [and also Class Counsel] is completely disconnected

from any reasonable understanding of calculation of damages."  BEL Decision at 23.  In this

regard, it is important what Class Counsel did *not* say in the negotiations.  They "never

suggested to BP that they were seeking to pay claimants based on a methodology that did not

reflect economic reality."  Bloom Decl. ¶ 17.  And they never said "that the determination of

whether there was a compensable loss or the amount of compensation under the BEL

Frameworks would depend and vary upon whether the books and records of a claimant were

maintained on an accrual or cash basis."  Godfrey Decl. ¶ 10; *see* Bloom Decl. ¶ 10.  On the

contrary, as Part II explains, the parties' polestar in the negotiations was providing like

compensation to like claimants.  To do that, it was necessary to determine the claimants' *real

losses* and, in turn, to match revenues with corresponding expenses.

## II.      The Parties Common Intent Was to Make Like Awards to Like Claimants.

From the outset of the negotiations, Class Counsel complained that the GCCF was

making different awards to similarly situated claimants, and Class Counsel insisted that the

settlement adopt a methodology that would ensure that like claimants would be compensated in a

like manner.  As his "go-to" example of like businesses that should receive like awards, Mr. Rice

repeatedly spoke about two jet-ski businesses located on the same beach – thus, presumably with

similar revenue ups and downs.  Godfrey Decl. ¶ 7; Bloom Decl. ¶ 10; Rice Rebuttal Decl. ¶ 3;

Fayard Rebuttal Decl. ¶ 14.  Mr. Rice's latest declaration backpedals, arguing that he presented

---

[2]     *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 114 (5th Cir. 2010) (rejecting interpretation
        that led to "unreasonable and absurd results"); *Dore Energy Corp. v. Prospective Inv. & Trading Co. Ltd.*, 570
        F.3d 219, 225 (5th Cir. 2009) ("An outer boundary in interpretation is to avoid unreasonable consequences or
        inequitable or absurd results even when the words used in the contract are fairly explicit.") (quotation omitted);
        *see La. Gas Sys., Inc. v. Tee Oil, Inc.*, 1987 WL 9107, at *5 (E.D. La. Mar. 31, 1987) (Barbier, J.).

the example only to show the need for a "common, objective, and transparent frameworks for all businesses . . . ." Rice Rebuttal Decl. ¶ 3. But Mr. Rice had no reason to speak about two identical businesses that were literally "similarly situated" (i.e., on the same beach) except to make the point that they should receive the *same* compensation. He obviously never suggested that it would be acceptable for these two jet-ski businesses that were alike in every way to receive different compensation if they kept their books differently.

To that end, "the PSC was focused on Variable Profit as the measure of compensation." Rice Decl. ¶ 26. Only an interpretation of Exhibit 4 that gives "revenue" and "expense" their widely understood economic and accounting meanings fulfills the parties' objective to compensate like claimants in like manner, based on real economic loss. The Claims Administrator recognized this principle himself when he said: "If the claimant's profit and loss statements for a year were prepared on an accrual basis, the claimant will not be permitted to restate such statements on a cash basis . . . , for such restatement could result in a loss or a greater loss not related to the Spill but instead is a result only of the timing of cash received." P. Juneau Memo. at 2, Oct. 8, 2012, Doc. No. 8963-9.

Take Class Counsel's example of the two jet-ski rental businesses and, as he did, assume that both happened to have the same revenues, expenses and profits (or losses) in 2008, 2009 and 2010. Assume further that both businesses paid their gasoline expense by charging it to a credit card and then paid off the credit card charges for June, July and August in September. Assume finally that both businesses submitted claim forms that used September-November as the Compensation Period, but that one business used cash-basis accounting and, the other, accrual-basis accounting. Class Counsel's interpretation plainly would not result in like compensation to the two businesses, although the businesses are alike in every way *except* how they keep their

books.  The jet-ski business that used cash-basis accounting would show a large, one-time expense for gasoline purchases in September, while the business that used accrual-basis accounting would show no gasoline expense in September, as it would have recorded the gasoline expense in the months of June, July and August after matching that cost to the rental revenue for those months.  As result, the cash-basis accounting business would show a greater "loss" in the September-November period and would receive greater compensation.

Thus, only a methodology that matches "revenue" and "expenses" accomplishes the parties' mutual objective of treating like claimants alike.  Mr. Herman's second declaration tacitly admits that the two jet-ski businesses would be treated the same *only if* they happened to keep their books in the same way.  Herman Rebuttal Decl. ¶ 8 ("It is my general understanding . . . that two businesses of the same size and the same nature would typically tend to keep their books under a similar accounting methodology.").  But, with those words, he also tacitly admits that it was Class Counsel's expectation that the two businesses would be treated alike.  The Court can be sure of this: Class Counsel never said, "Similarly situated claimants should receive the same compensation, but only if they keep their books in the same way."

### III.    The Parties' Common Intent Was to Compensate Real Lost Profits.

The focus on variable (or lost) profits also reflected the parties' discussion and agreement to compensate claimants based on actual economic losses caused by the Oil Spill, as determined by a standard, well-recognized methodology.  Godfrey Decl. ¶¶ 8-10; Bloom Decl. ¶¶ 12-14, 16, 20 ("[T]he Parties never deviated from a lost profits framework after the initial draft framework was circulated on August 30, 2011"); Gaspardo Decl. ¶ 5 ("At no point did a representative of either party state that they were seeking a measure of damages other than an accurate measure of lost profits that appropriately captured economic reality."); Sider Decl. ¶¶ 5, 8-10.  Mr. Rice

approvingly points to a BP slide presentation that (i) referred to "lost variable profits" as the basis for compensation, (ii) was "consistent with what the parties negotiated over twelve months and agreed to," and (iii) was accurate in defining lost variable profits as the difference between a "company's 2010 actual profit post-DWH Spill and expected profit in the absence of the DWH Spill."  Rice Decl. ¶ 59; *see* Bloom Rebuttal Decl. ¶ 9.

The agreed-to "lost profits" methodology used "the standard terms of economic lost profits analysis, including revenue, profits, and expenses."  Sider Decl. ¶ 8.  In using these standard terms, "[a]t no time did any representative of the PSC indicate an intent to deviate from the standard approach to calculating lost profits."  *Id.* ¶ 9.  Yet the record was and is undisputed that cash-in/cash-out comparisons cannot determine lost profits.[3]  The Claims Administrator has now acknowledged this fundamental economic concept, P. Juneau Memo. at 2, and the BEL Panel observed this fact repeatedly.  BEL Decision at 17, 19, 21, 23.

Equally significant is the fact that the parties did not use the terms "receipt" and "expenditure."  "Revenue" does not mean receipt (cash inflow), and "expense" does not mean expenditure (cash outflow).[4]  Class Counsel neither claimed they did, Godfrey Rebuttal Decl. ¶ 4, nor "propose[d] that 'revenues,' 'expenses,' or 'incurred,' should be defined or otherwise understood in a non-standard way to reflect receipts and expenditures as recorded in a claimant's cash-basis financial statements."  Sider Rebuttal Decl. ¶ 4.  Mr. Fayard now says no one told him

---

[3]  Finch Supp. Decl. ¶ 11, Doc. No. 8964-7 ("I have done lost profit analyses for over 20 years, and no court would uphold a lost profits analysis done as Class Counsel has suggested . . . ."); Polinsky Decl. ¶ 33, Doc. No. 8964-15 (noting erroneous awards would result where "net cash received over a designated oil-spill period may be less than economic profits over that period"); Rose Decl. ¶ 6, Doc. No. 8964-16 ("Cash basis financial statements are maintained for purposes of monitoring a firm's current cash position not for determining profitability."); Richardson Decl. ¶ 11, Doc. No. 8964-28 ("The complete reliance on monthly cash inflows and outflows leads to a cash flow estimate for a period of time, not an estimate of the loss of variable profits . . . ."); Sharp Decl. ¶ 2, 8964-29 ("This is not an accepted method for calculating lost profits . . . .").

[4]  Weil Decl. at 4, Doc. No. 8964-19 ("*Revenue* does not mean *receipt*. . . .  The BEL Framework refers to *revenues*, not receipts, and to *corresponding variable expenses*, not to corresponding variable expenditures."); *see also* Sider Rebuttal Decl. ¶ 4.

"of any assumption they were making concerning the definition of 'revenue' and 'expenses.'" Fayard Rebuttal Decl. ¶ 23.  But BP was not making an "assumption" about the meaning of those terms; BP used them according to their established definitions.  Plaintiffs' declarations do not dispute that for purposes of calculating real lost profits in the real world "revenue" and "expenses" are well-understood accounting and economic terms.  For these reasons, Mr. Rice is misguided in arguing that matching is inconsistent with the objective of establishing an objective and transparent framework.  Rice Rebuttal Decl. ¶¶ 3-4.  What approach could be more objective and more transparent than one using familiar accounting and economic terms according to their established meaning and calculating compensation in a manner consistent with economic reality?

The rules of contractual construction require a court to give terms of art their accepted, technical meaning.  *Lloyds of London v. Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996).  And the Fifth Circuit has done so for accounting terms specifically.  *See, e.g.*, *Marathon E.G. Holding Ltd. v. CMS Enters. Co.*, 597 F.3d 311, 319-20 & n.11 (5th Cir. 2010) (adopting the technical, accounting definition of the term "attributable to"); *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 282 (5th Cir. 1987) (same for the term "costs").

The BEL Panel has explained already that "[c]ash accounting . . . is largely unrelated to the concepts of 'revenue' and 'expenses'" and "would not result in numbers that could fairly be said to represent actual economic losses or lost 'variable profits.'"  BEL Decision at 11, 17.  The parties' agreed objective, however, was to calculate lost profits and compensate real losses. Only by matching could they meet their objective to compensate like claimants in like manner.

## IV.     The Parties' Common Intent Was to Employ Accountants, Not Require Claimants, To Match Revenues and Expenses.

The parties discussed the importance of a claimant-friendly claims process – that is, one that permitted a claimant to submit its existing financial records.  Rice Decl. ¶ 17.  But the

parties recognized that the price of making the claims process simple for the claimant would be to complicate the Administrator's review of claims.  The Herman and Jones declarations assert that Exhibit 4A's documentation requirements were BP's idea and reflected its desire to police potential fraud.  Herman Decl. ¶ 17; Jones Decl. ¶ 13.  In fact, the PSC first flagged the concern that the claims "'process is very complex and complicated'" and would require "'trained'" accountants to review and make sense of the financial records.  Bloom Decl. ¶ 21 (quoting PSC memorandum).  Detecting fraud was an additional reason for employing large numbers of accountants, not the sole reason.  Godfrey Rebuttal Decl. ¶ 6; Bloom Rebuttal Decl. ¶ 6.  As the BEL Panel noted, the Agreement contains "extensive documentation requirements which would allow claims administration accountants to process claims in accordance with economic reality." BEL Decision at 24.

Class Counsel insist that there was never any discussion of "matching" – indeed, that the term was never used.  Scott Decl. ¶ 6; Rice Rebuttal Decl. ¶ 8.  But the incontrovertible fact is that the term was used, and, significantly, it was used at the very end of the negotiations, after the parties had finalized the terms of Exhibit 4.  PwC recognized that matching would be required. On March 14, 2012, representatives of BP met with Chuck Hacker and other members of PwC who had been studying what Exhibit 4C required the accountants to do, and Mr. Hacker suggested that there might be easier ways to calculate lost profits.  BP agreed, but explained that the Settlement Agreement required the more complicated approach, and, indeed, that was why the CSSP would employ hundreds of accountants.  Bloom Decl. ¶ 27.  Not deterred, Mr. Hacker emailed Mr. Rice on April 4 to repeat his suggestion and to add that it would "[h]ave the potential of *more accurately matching* revenue with expenses by consistently using a longer base period." *Id*. ¶ 28 (quoting email) (emphasis added); Gaspardo Decl. ¶ 22.  The PSC rejected

Hacker's proposal, Rice Decl. ¶ 56, but it did not reject the concept of matching.  The Hacker proposal, after all, was not that the Settlement Agreement should be revised to introduce the requirement that revenue and expense be matched; rather, the proposal recognized that the Agreement already required matching, but offered what Mr. Hacker deemed a better mouse trap to match revenue and expenses "more accurately."

Plaintiffs' only response is to mischaracterize the plain language of the Hacker email.  Mr. Rice says that Hacker recommended that "the document [Exhibit 4C] be **changed to allow for matching**."  Rice Rebuttal Decl. ¶ 12 (emphasis in original).  But Mr. Hacker did not say that.  What he actually said was not that he had a suggestion "to match revenue with expenses," but that he had a suggestion for "more accurately matching revenue with expenses."  "More accurately" than what?  "More accurately," needless to say, than Exhibit 4C, as already agreed to by the parties.  The Hacker proposal punctuates the negotiation process and makes clear that PwC understood that Exhibit 4C required matching, told the parties so, and told them using the term "matching."

## CONCLUSION

From the BEL Panel's perspective, the only interpretation of the Settlement Agreement that makes economic sense is one that matches revenue and expense, because only matching operates to "compensat[e] claimants for real losses."  BEL Decision at 21.  The same is true from the parties' perspective, based on the principles the parties discussed and agreed to during the negotiations.  Only by matching "revenue" and "expense" does the Claims Administrator employ a standard, well-recognized methodology that compensates real economic loss and thereby treats like claimants in a like manner.  And only if he does so can the Settlement Agreement possibly comply with Rule 23, which of course, was a central goal of the parties' negotiations.

10

November 18, 2013

Respectfully submitted,

   */s/ Kevin M. Downey*

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX 77079
Telephone: (281) 366-2000
Telefax: (312) 862-2200

Kevin M. Downey
F. Lane Heard III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Telefax: (202) 434-5029

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Telefax: (202) 942-5999

   */s/ Don K. Haycraft*

S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 662-5985
Telefax: (202) 662-6291

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Telefax: (312) 862-2200

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606
Telephone: (312) 876-8000
Telefax: (312) 876-7934

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Telefax: (202) 879-5200

*OF COUNSEL*

***ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of November, 2013.

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft