IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * MDL NO. 2179 <br> * <br> * SECTION J <br> * |
| This document relates to: <br> All Cases and No. 12-970 | * <br> * Honorable CARL J. BARBIER <br> * <br> * Magistrate Judge SHUSHAN |

## BP'S PROPOSAL FOR MATCHING AND MEMORANDUM IN SUPPORT OF PERMANENT INJUNCTION RELATED TO BEL CLAIMS

With a considerable measure of skepticism, the BEL Panel asked why it would be that parties who agree that matching is appropriate for accrual-basis claims would find it inappropriate for cash-basis claims. And so the Panel remanded for further proceedings to determine whether the parties did, in fact, agree to treat cash-basis claims in a way that the Panel called "economically meaningless." *In re Deepwater Horizon*, 732 F.3d 326, 338 (5th Cir. 2013) [hereinafter BEL Decision]. The evidence establishes, we submit, that the parties agreed: (1) to compensate only those persons and entities who suffered actual economic injury (*i.e.*, damages) as a result of the Oil Spill;[1] (2) to employ a "lost profits" analysis to determine actual economic loss; and (3) to calculate lost profits using an "accrual-style framework" that properly matches monthly "revenues" and "corresponding variable expenses." *Id*. at 337-38 (suggesting that "the term 'corresponding variable expenses' reasonably could imply an accrual-style framework inherent in Exhibit 4C" and stating that "only matching provides a realistic chance of achieving

---

[1] The BEL Panel said: "[I]t remains of significance that the interpretation urged by the Administrator is completely disconnected from any reasonable understanding of calculation of *damages*. In interpreting a settlement, surely some weight has to be given to what *damages* recoverable in civil litigation actually are." 732 F.3d at 339 (emphases added).

the ostensible goal of the settlement of compensating claimants for real losses"); *see* BP's Mem. Re BEL Remand, Nov. 18, 2013, (Doc. No. 11863).

It does not require a complicated order to implement "matching" and an "accrual-style framework" for all claims and thereby to ensure the awards made by the Settlement Program compensate actual damages. Attached as Exhibit 1 is a proposed order that consists of seven elements:

    1. The Claims Administrator and Settlement Program shall process and pay all Business Economic Loss ("BEL") claims – whether new claims, claims for which final determination notices and payments were suspended pursuant to the Preliminary Injunction, or claims in the Claims Appeal Process – in such a way as to:

    (a) Determine proper monthly "revenues" and "corresponding variable expenses" related to those revenues consistent with an accrual-style framework, obtaining and using objective and reliable sources of information as necessary to make this determination in an informed manner, as authorized by Exhibit 4A of the Settlement Agreement.

    (b) Screen all BEL claims for failure to record monthly revenues and corresponding variable expenses accurately, using a proper accrual framework and triggers consistent with those identified in the Declaration of Patrick Juneau, Oct. 25, 2013 (Doc. No. 11741), and the Declarations of Hal Sider, Oct. 9, 2013 (Doc. No. 11726-8) and Nov. 7, 2013 (Doc. No. 11819-3).

    (c) Employ a definition of "revenues" that treats as revenues those enhancements of an entity's net assets which derive from earnings activities constituting its principal and ongoing business operations.

    (d) Attribute monthly "revenues" in a manner consistent with economic reality based on those business operations that generate earnings.

    (e) Employ a definition of "corresponding variable expenses" that treats as such expenses those actual or expected reductions in net assets that have occurred or will occur as a result of the entity's principal and ongoing business operations and, for

2

>  any given month, were incurred to generate the revenues properly attributed to that month.
>
>  (f) Take into account all factual information known and reasonably available to the Settlement Program regarding "revenue" and "corresponding variable expenses," including subsequently corrected financial data, so as to achieve results consistent with economic reality in the calculation of lost profits.
>
>  (g) Calculate BEL lost profits under Exhibit 4 of the Settlement Agreement using monthly "revenues" and "corresponding variable expenses," determined in accordance with this order, so as to reflect actual economic loss during the selected Compensation Period.

This proposed order follows from the BEL Decision, once it is applied to all claims, whether based on accrual-basis, cash-basis or some other form of accounting records. Implicit or explicit in the BEL Decision are the following principles that should guide the Settlement Program in "matching" revenue and expenses for the Benchmark and Compensation periods:

1. *Lost Profits*. The objective of the Settlement Agreement – and of the claims review process – is to compensate actual economic loss, specifically lost profits. Thus, the BEL Panel spoke of matching as the only realistic method for "compensating claimants for real losses." BEL Decision at 338.[2] Conversely, the flaw in comparing cash-in with cash-out is that

---

[2] *See id.* at 333 ("correlation gives business decision-makers a real-time view of *the net economic value* of a transaction in the period"); 336 ("subtracting temporally-related revenues and expenses recorded by cash-basis claimants would not result in numbers that could fairly be said to represent *actual economic losses or lost 'variable profits'*"); 337 (matching "expenses to be subtracted" by requiring that the expenses be "those that 'correspond' to the revenue earned . . . . seems amply supported by the language of Exhibit 4C and much more *consistent with general accounting and economic norms*"); 338 ("only matching provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for *real losses*"); 339 ("[T]he interpretation urged by the Administrator is completely disconnected from *any reasonable understanding of calculation of damages*."); 339 ("[T]he agreement contains not only the terms 'corresponding' and 'variable,' but extensive documentation requirements which would allow claims administration accountants to process claims *in accordance with economic reality*."); 346-47 (Southwick, J., concurring) ("I agree to remand with instructions to reconsider the interpretation of Exhibit 4C for unmatched claims in light of the necessity of revenue and

it is often "economically meaningless," for it compensates "artificial losses that appear only from the timing of cash flows," not "real economic losses." *Id*. Thus, the polestar for the Settlement Program in all the decision making connected with the claims review process is to measure actual lost profits.

      2.    *Accrual-Style Framework*. The BEL Decision did not find that the parties adopted a particular set of accounting rules. But it said that "cash accounting does not inherently recognize relationships between cash flows and their underlying transactions" and, therefore, does not ensure measurement of actual lost profits. *Id*. at 337. The BEL Panel spoke of "an accrual-style framework," in contrast, as one that measures actual lost profits by recognizing the relationship (*i.e.*, "match") between revenues earned in a particular period and the expenses that generated those revenues. Indeed, many claims that purport to use accrual accounting are not properly matched when one carefully examines the claimant's P&Ls.[3] Thus, the court's reference to "an accrual-style framework" rather than particular accounting rules reflects its view that more important than the application of any particular accounting method is the measurement of actual economic losses.

---

    expense matching *to realistic measurement of economic loss*."); *see also* Order and Reasons Granting Final Approval of Settlement, Dec. 21, 2012, at 10 (Doc. No. 8138) (Exhibits 4A-4E constitute a framework "derived from recognized and accepted methodologies applied in evaluating *business economic loss claims*"). (Emphases added).

[3]    Alexander Decl. ¶ 14 (Doc. No. 11726-5) ("The CSSP Accountants need the knowledge of a claimant's accounting basis to implement appropriate procedures to discover and correct matching and other errors in claims." (citing Appendices 1 and 2 to the declaration)); Gaspardo Decl. ¶¶ 6-18 (Doc. No. 11726-7) (describing "a list of 73 examples of BEL claim files . . . reviewed in which the claimant purported to submit 'accrual basis' financial information, but the monthly revenues and expenses recorded in the P&Ls submitted by the claimant exhibit strong indicia of not being 'sufficiently matched'"); Sider Decl. ¶¶ 31-34 (Doc. No. 11726-8) ("claims identified by claimants as relying on accrual basis financial statements suffer from problems relating to improper and insufficient matching of monthly revenue to corresponding variable expenses that are comparable to those observed among BEL claims taken as a whole").


3. *Revenues and Expenses*. Employing an accrual-style framework has three components.

The first is a definition of "revenue," which are enhancements to a business entity's net assets that derive from those earnings activities constituting its principal and ongoing business operations. *Id.* at 333 (citing Statement of Financial Accounting Concepts ("SFAC") No. 6 and distinguishing "revenue" from receipt of payment).[4]

The second is a definition of "expenses," which are those actual (or expected) outflows of net assets that have occurred (or will occur) as a result of the entity's principal and ongoing business operations. *Id.* at 333 & n.4 (citing SFAC No. 6, ¶¶ 146-47).[5]

The third component, applicable both to revenue and expenses, is one of temporality. Revenues are recognized in (or attributed to) the month when the business earns and becomes entitled to receive them, not when payment is received. It is necessary to estimate reliably when revenue was earned in order to ensure that the Variable Profit calculation results in a calculation of losses that reflect economic reality. To that end, rules for revenue attribution are important and will assist the Settlement Program in ensuring that claimants with like losses receive like

---

[4] *See also* SFAC No. 6 ¶ 78 (FASB 1985); Alexander Decl. ¶ 8 (Doc. No. 8963-36); Dietrich Decl. ¶¶ 15-16, 18 (Doc. No. 8963-37); Fishkind Decl. ¶ 18 (Doc. No. 8964-8); Weil Decl. ll. 138-48 (Doc. No. 8963-47); Brief of Amici Curiae Accounting Professors in Support of Appellants at 8, *In re: Deepwater Horizon*, Case No. 13-30315 (5th Cir. May 10, 2013) (Document 00512243426).

[5] *See also* Alexander Decl. ¶ 9 (Doc. No. 8963-36); Dietrich Decl. ¶¶ 15, 17-18 (Doc. No. 8963-37); Fishkind Decl. ¶ 19 (Doc. No. 8964-8); Weil Decl. ll. 150-57 (Doc. No. 8963-47) Brief of Amici Curiae Accounting Professors, *supra* note 4, at 8.

compensation. Such rules should be based on objective indicators that correspond to true asset enhancement and, thus, to the timing of when revenue is earned.[6]

Similarly, because variable expenses must be traced to the revenues they generated, expenses are recognized in (or attributed to) the same month as those revenues for purposes of calculating Variable Profit, not necessarily to the month in which a cash payment was made. "This correlation" between revenues and expenses, the Fifth Circuit said, gives "a real-time view of the net economic value of a transaction in the period most relevant to its overall economic significance." BEL Decision, 732 F.3d at 333 (citing SFAC No. 6, ¶ 140). To the extent that variable expenses attributable to multiple months are recorded in a single month, they should be attributed and matched to the months in which the revenue to which those expenses actually relate was earned. What the Fifth Circuit called this "correlation" between revenues and expenses is what Exhibit 4C of the Settlement Agreement refers to as "corresponding variable expenses." *Id*. at 337 (explaining that such expenses "reasonably could be interpreted to mean that the expenses to be subtracted must be those that 'correspond' to the revenues earned").[7] It is these corresponding variable expenses that must be identified and subtracted from revenue in order to properly calculate Variable Profit.

4.    *Accurate and Complete Information*. The Settlement Agreement does not require claimants to submit their financial records other than as they are kept in the ordinary course of business. Nor need claimants match revenues and expenses themselves, and this proposal does not suggest otherwise. Rather, as the BEL Panel noted, Exhibit 4A of the Settlement Agreement

---

[6] Asset enhancing activities are the work a business does or the costs it incurs that give rise to the right to receive cash or other consideration. Revenue attribution rules can be organized by industry, because businesses in the same industry typically have similar earnings cycles.

[7] *See also* Alexander Decl. ¶ 13-14 (Doc. No. 8963-36); Dietrich Decl. ¶ 19 (Doc. No. 8963-37); Sider Decl. ¶¶ 44-47 (Doc. No. 8963-46); Polinsky Decl. ¶ 6 (Doc. No. 8963-44).

creates "extensive documentation requirements which would allow claims administration accountants to process claims in accordance with economic reality." *Id*. at 339. The mandatory nature of those requirements – "[i]n order to be eligible for compensation, a business claimant ***must*** provide" certain categories of documents, Settlement Agreement Ex. 4A, Apr. 18, 2012 (Doc. No. 6276-8) (emphasis added) – should ensure that the Settlement Program has a solid base of financial information.

But Exhibit 4A recognizes that the required documentation may not be complete, or may raise questions. And so, in addition to requiring the submission of certain records at the outset, Exhibit 4A also authorizes the Claims Administrator to call for additional documentation, if necessary, to understand the underlying earnings activities in the Benchmark and Compensation Periods. In other words, consistent with the goal the Settlement Agreement to "compensat[e] claimants for real losses," BEL Decision, 732 F.3d at 338, the Settlement Program is empowered – indeed, is required – to seek additional information where such additional information is necessary to implement the compensation framework properly. If, subsequent to the creation of P&Ls and other documents submitted in support of a claim, additional information comes to light that gives a more accurate and complete picture of the underlying economic activities, the Settlement Program should take this information into account. In short, the Settlement Program should not only scrutinize claims submissions for errors and irregularities, but also request and examine additional source documents from the claimant (as well as other available information) in order to apply rigorously the three principles discussed above.

In sum, the BEL Decision describes the necessary components of a claims-review process that recognizes the importance of "matching." The components include, at a basic level, the definitions of "revenues" and "expenses," both of which recognize the importance of

identifying the underlying economic activities, not simply tracking the flow of cash. Recognition of the underlying transaction, in turn, inherently involves identification of the timing of the transaction – *i.e.*, when did the business engage in the activities that earned revenue and when did it incur the expenses for the business operations that gave rise to that revenue? This correlation between particular revenues and particular expenses is the essence of "matching," which is captured in the settlement's requirement that the claims-review process identify "corresponding variable expenses."

A process that in this manner (i) defines revenues and expenses, (ii) attributes them to the correct month, and (iii) correlates variable expenses to the revenues generated by those expenses will measure economic performance in a meaningful way. Where from an economic perspective there are "lost profits," this approach accurately determines that loss, and where from a legal perspective there are "damages," this approach accurately quantifies them. Thus, Judge Southwick spoke of "the ***necessity*** of revenue and expense matching to realistic measurement of economic loss." *Id*. at 346-47 (emphasis added).

Nothing about this "matching" proposal will seem foreign, or out of the ordinary, to the sophisticated accountants working with the Settlement Program.[8] It would be strange to think that an accrual-style framework, designed to process claims "in accordance with economic reality," would be foreign to them. *Id.* at 339. The BEL Panel certainly saw nothing out of the ordinary in expecting the Settlement Program to do so, noting that the documentation required by Exhibit 4A "presumably would allow accountants fairly, if at times imperfectly, to 'match' revenues and expenses if such were required." *Id*. at 337. As one potential method of

---

[8] *See* Finch Suppl. Decl. ¶¶ 27-37 (Doc. No. 8963-39); Weil Decl. ll. 374-389 (Doc. No. 8963-47).

implementing BP's Proposed Injunction, BP offers a set of guidelines for the Claims Administrator's consideration. *See* Exhibit 2 hereto.

For the reasons discussed in BP's Memorandum Re BEL Remand, the Court should find that the only interpretation of the Settlement Agreement that makes sense is one that matches revenue and expenses. And for the reasons set forth in this memorandum, the Court should enter an order or permanent injunction in the form attached as Exhibit 1 to implement that interpretation of the Agreement.

November 21, 2013

Respectfully submitted,

   */s/ Kevin M. Downey*

| | |
|---|---|
| James J. Neath | Kevin M. Downey |
| Mark Holstein | F. Lane Heard III |
| BP AMERICA INC. | WILLIAMS & CONNOLLY LLP |
| 501 Westlake Park Boulevard | 725 Twelfth Street, N.W. |
| Houston, TX 77079 | Washington, D.C. 20005 |
| Telephone: (281) 366-2000 | Telephone: (202) 434-5000 |
| Telefax: (312) 862-2200 | Telefax: (202) 434-5029 |

| | |
|---|---|
| Daniel A. Cantor<br>Andrew T. Karron<br>ARNOLD & PORTER LLP<br>555 Twelfth Street, NW<br>Washington, DC 20004<br>Telephone:  (202) 942-5000<br>Telefax:  (202) 942-5999<br><br>Robert C. "Mike" Brock<br>COVINGTON & BURLING LLP<br>1201 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>Telephone:  (202) 662-5985<br>Telefax:  (202) 662-6291<br><br>Jeffrey Lennard<br>Keith Moskowitz<br>DENTONS US LLP<br>233 South Wacker Drive<br>Suite 7800<br>Chicago, IL  60606<br>Telephone:  (312) 876-8000<br>Telefax:  (312) 876-7934<br><br>***OF COUNSEL*** | _/s/ Don K. Haycraft_<br>S. Gene Fendler (Bar #05510)<br>Don K. Haycraft (Bar #14361)<br>R. Keith Jarrett (Bar #16984)<br>LISKOW & LEWIS<br>701 Poydras Street, Suite 5000<br>New Orleans, Louisiana 70139<br>Telephone:  (504) 581-7979<br>Telefax:  (504) 556-4108<br><br>Richard C. Godfrey, P.C.<br>J. Andrew Langan, P.C.<br>David J. Zott, P.C.<br>Jeffrey J. Zeiger<br>Wendy L. Bloom<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle Street<br>Chicago, IL 60654<br>Telephone:  (312) 862-2000<br>Telefax:  (312) 862-2200<br><br>Jeffrey Bossert Clark<br>Steven A. Myers<br>KIRKLAND & ELLIS LLP<br>655 Fifteenth Street, N.W.<br>Washington, D.C. 20005<br>Telephone:  (202) 879-5000<br>Telefax:  (202) 879-5200 |

***ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.<br>AND BP AMERICA PRODUCTION COMPANY***

10

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 21st day of November, 2013.

                                                   /s/ Don K. Haycraft
                                                   Don K. Haycraft