**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** **"Deepwater Horizon" in the Gulf** **of Mexico, on April 20, 2010** **This Document Relates to:** **No. 12-970** | **MDL No. 2179** **SECTION: J** **JUDGE BARBIER** **MAGISTRATE SHUSHAN** |

## CLASS COUNSEL COMMENTS ON BP "MATCHING" PROPOSALS

Eligible Business Economic Loss (BEL) Claimants in the Court-Supervised Settlement Program and the Economic & Property Damages Settlement Class respectfully submit the following comments in response to the Court's Order of November 15, 2013 [Doc 11861], as a supplement to Class Counsel's submissions on Expense Recognition [Doc 11885-1] and Revenue Recognition [Doc 11885-2], and in response to BP's Proposal [Doc 11886]:[1]

MAY IT PLEASE THE COURT:

BP's 65-page "Proposed Guidelines for Implementation of BEL Claims Processing Consistent with Fifth Circuit BEL Opinion" continues to pretend that the Fifth Circuit ordered the District Court and the Claims Administrator to match expenses to revenues.  To the contrary, Judge Southwick, joined by Judge Clement, simply instructed the Court to "enter a narrowly tailored and potentially brief stay"[2] while the Court determined, on remand, whether the Parties had intended to match expenses to revenue,[3] (which they didn't).[4]

---

[1] Class Counsel respectfully incorporate the preface to their CLASS COUNSEL SUBMISSION OF PROPOSAL FOR MATCHING EXPENSES (Nov. 21, 2013) [Doc 11885], at pp.1-2.

[2] In re: Deepwater Horizon, 732 F.3d 326, 346 (5th Cir. 2013) (Southwick, J., concurring).

[3] Deepwater Horizon, 732 F.3d at 346 ("we are vacating and remanding for *further consideration* of the interpretation of Exhibit 4C") (Southwick, J., concurring) (emphasis supplied).

[4] *See generally,* CLASS COUNSEL BRIEF [Doc 11862]; *citing,* CLASS SUBMISSION [Doc 11804], *and,* CLASS REPLY [Doc 11833].

Even assuming *arguendo* that the Fifth Circuit suggested that *expenses* should be moved into or out of the relevant Benchmark and Compensation Periods to better match the recorded revenues in Cash Basis Claims, (i) the Court expressly rejected the notion that recorded *revenues* should be moved into or out of the relevant Benchmark and Compensation Periods,[5] and (ii) Judge Clement's entire opinion was premised on the assumption that Accrual Claims would already be sufficiently matched:

> Because cash accounting does not inherently recognize relationships between cash flows and their underlying transactions, the term "corresponding variable expenses" reasonably could imply an accrual-style framework inherent in Exhibit 4C....

> At least as to claims presented on an accrual-basis, not only did BP not assent to ignoring the need for matching revenues with expenses, it clearly insisted on it....

> The record creates a different perplexity, namely, why would parties who agree as to the propriety of matching for one set of claims reject it for other claims? ....

> We remand because the district court did not acknowledge the requirement of matching that is foundational for accrual-basis claims and it did not then explain why it was interpreting the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring the matching of cash-basis claims.[6]

Similarly, Judge Southwick concurs that:

> Part I of the panel opinion identifies the crucial question for remand: should matching be required for *all* claims when it is clearly required for many?[7]

BP's current suggestion that the type of matching typically found in Accrual Basis Claims is (allegedly) **_not_** what Exhibit 4C "requires" belies the entire logic behind the Fifth Circuit's decision.  (The truth, as noted in BP Counsel's letter of September 28, 2012,[8] is that the

---

[5] *See* Part I(D) of the BEL Decision. <u>Deepwater Horizon</u>, 732 F.3d at 339-340.
[6] <u>Deepwater Horizon</u>, 732 F.3d at 337, 338 and 339.
[7] <u>Deepwater Horizon</u>, 732 F.3d at 346 (Southwick, J., concurring).
[8] DOC 8963-68.

Parties were focused on the use of *contemporaneous* Monthly P&Ls – whether they were fully matched, partially matched, or not matched at all.)

BP's 65-page Proposed Guidelines also belies the finding of the Court of Appeals that the provisions of the Settlement Agreement "clearly indicate that the Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis of what type of business activities took place within those months.*"[9]

Finally, BP's Proposed Guidelines to move or "smooth" or otherwise re-allocate recorded revenues into and out of the relevant Benchmark and Compensation Periods not only has no support under the Settlement Agreement,[10] but has absolutely no basis under Generally Accepted Accounting Principles (GAAP), other accepted Accrual Basis accounting methods, or any other recognized accounting standards. In particular, Paragraph 83(a) of FASB Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, states that revenue and gains are realized when products (goods or services), merchandise, or other assets *are exchanged for cash or claims to cash.*[11] Revenue is realizable when related assets received or held are *readily convertible to known amounts of cash or claims to cash.* FASB Codification, §605-10-25-1.[12] BP's proposal violates this principle by revising the contemporaneous profit and loss statements to recognize revenue in periods well before they could be recognized under any known accounting standard. As verified by Dr. Mark Kohlbeck:

---

[9] Deepwater Horizon, 732 F.3d at 340 (emphasis supplied).
[10] *See generally*, CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862], pp.3-4, 8-9; *citing*, SETTLEMENT AGREEMENT, Exhibit 4C, p.2 [Doc 6276-10, at 3]; RICE DECLARATION (Nov. 6, 2013) [Doc 11804-4], ¶15; HERMAN DECLARATION (Nov. 5, 2013) [Doc 11804-1], ¶13; JONES DECLARATION (Nov. 5, 2013) [Doc 11804-26], ¶¶9-10; SCOTT DECLARATION (Nov. 4, 2013) [Doc 11804-27], ¶5; RICE DECLARATION (Nov. 12, 2013) [Doc 11833-6], ¶¶10-11; FAYARD DECLARATION (Nov. 11, 2013) [Doc 11833-10], ¶¶ 24, 26; WALLACE DECLARATION (Feb. 18, 2013) [Doc 8963-4], ¶3.
[11] The Financial Accounting Standards Board (FASB) establishes the accrual-based Generally Accepted Accounting Principles referred to commonly as "GAAP".
[12] The Securities & Exchange Commission follows this concept of revenue recognition. *See* Codification of STAFF ACCOUNTING BULLETINS TOPIC 13: REVENUE RECOGNITION, found at http://www.sec.gov/interps/account/sabcodet13.htm.

Recognition of revenue and expenses under the accrual-basis of accounting (GAAP) is based on the revenue recognition principle and the expense recognition principle. The revenue recognition principle requires the revenue to be both earned and realizable to be recognized (Concepts Statement No, 5, ¶83)

\*   \*   \*

_Moving revenue properly recognized in one period under accrual-basis of accounting (GAAP) to another period (for example, in an effort to smooth earnings) is a form of earnings management and is considered unacceptable for financial reporting purposes by the accounting profession._[13]

As well as CPA Allen Carroll:

GAAP recognition rules and "matching" most often apply to expense recognition _not revenue recognition_….

_BP's proposal to move revenue to match expenses is backwards and violates the very concept referred to as matching_ in BP's out of date textbook….

_The matching approach that BP advocates is not matching in any sense recognized in the accounting world,_ but is merely an allocation formula that artificially moves revenue into months before or after it was earned based on variable expenses.[14]

For all of the reasons previously briefed, and based on all of the evidence previously submitted, BP's Proposed Guidelines are contrary to both the intent of the Parties and the BEL Decision.   Yet even assuming _arguendo_ that either the parties intended or the Fifth Circuit directed that expenses and revenues be "matched" in all claims, the specific Proposed Guidelines submitted by BP are completely unworkable, subjective, inefficient, and contrary to established accounting principles.

---

[13] DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶¶ 6, 10, (emphasis supplied).

[14] SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13, 14. _See also,_ FASB CONCEPT STATEMENT 5, Paragraphs 83(b) and 84(a); KIESO, WEYGANDT & WARFIELD, Intermediate Accounting (14th ed.), p.60; BRIEF OF _AMICI CURIAE_ CERTIFIED PUBLIC ACCOUNTING SOCIETIES IN SUPPORT OF APPELLEES, No.13-30315 (June 24, 2013), at pp.4-5 [Fifth Cir. Doc. 00512285581, at 11-12]; PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85] ¶¶ 14, 23, 27; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77], p.2; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78], ¶¶ 7-8; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79], ¶¶ 6-7; SUPPLEMENTAL CARROLL DECLARATION (Oct. 24, 2013) [Doc. 11740-1].

**BP's Proposed Guidelines Exceed the Language and Spirit of the Documentation Provisions**

Addressing the argument that matching of expenses in Cash Basis claims was precluded by the Documentation provisions set forth in Exhibit 4A, which require claimants who prepared their financials on a Cash Basis to submit those Contemporaneous Cash Basis financials to the Settlement Program, the Court of Appeals comments that: "*The difference is between what claimants had to present* – either cash-basis or accrual-basis claims – *and what the Administrator thereafter was to do.*"[15]   Hence, it is clear that whatever further matching of expenses that the Claims Administrator might be called upon to make should be performed by the Settlement Program, utilizing the existing Documentation.

BP itself represented to the Court that the documents required under the Settlement Agreement would not create a material burden:

> [T]he "*documentation requirements for [Business Economic Loss] claims . . . are reasonable and provide flexibility that is favorable to claimants" and "will not unreasonably burden valid claimants.*" Henley Decl. (Ex. 10) ¶ 23; see also Fishkind Decl. (Ex. 4) ¶ 80 ("The documentation requirements needed to support a Claim are tailored to the methodology in the relevant Framework and generally *consist of the types of documents businesses keep in the normal course of their business.*"); Sharp Decl. (Ex. 18) ¶ 12 ("The required business documents are relevant to causation and damages analysis and are the types of *documents that businesses must keep in the ordinary course of business, or are readily prepared and produced from a business' books and records.*"); Richardson Decl. (Ex. 16) ¶ 47 ("Given that companies routinely have this information available, it is reasonable to request it as a part of the Frameworks and should in no way exert an undue burden upon a business.").[16]

The new Proposed Guidelines violate BP's representations to the Class and to the Court. For Claimants who are now defined by BP as "Long Earning Cycle" Claimants, BP proposes to

---

[15] <u>Deepwater Horizon</u>, 732 F.3d at 338 (emphasis supplied).
[16] BP DEFENDANTS' MEMORANDUM IN SUPPORT OF FINAL APPROVAL [Doc 7114-1], pp.31-32; *see also, e.g.,* BP PROPOSED TUTORIAL, p.4 [Doc 11826-1 at 5] ("*Documentation requirements designed to utilize reports and information generally available in the ordinary course of business*"); *see also,* p.15 [Doc 11826 at 16].

require documents which may or may not exist, that _precede_ the Benchmark Period, or were not generated until _after_ 2011.  *Contrast with,* EXHIBIT 4A, ¶4 (requiring monthly and annual P&Ls or alternate source documents "for _the claimed Benchmark Period_, _2010_ and, _if applicable, 2011_" – which 2011 documents, where applicable, are only required for _Causation,_ not Compensation).[17]  Under BP's Proposed Guidelines, professional service firms would have to submit billing records to show the hours worked on various matters;  not only are Billing Records not included on the list of required documents, but in order to document 2007 revenues, the professional service firm would have to submit 2006 – and perhaps even earlier – records. Similarly, construction companies operating on a completed contract basis would have to produce job records from 2006 and earlier.

**No One Ever Contemplated or Agreed To a Forensic Audit of Each Claim**

There is absolutely no basis to ask the Claims Administrator and Program Accountants to audit financial statements and request supporting source documentation, such as daily sales reports or shipping logs.  As noted by Judge Clement, the Settlement Agreement clearly focuses on the Benchmark and Compensation Periods "_without any complex analysis of what type of business activities took place within those months_"[18] – and hence certainly without a complex analysis into what type of business activities took place _before_ or _after_ those periods.

If a claimant has such source documentation, the information is likely already reflected in the General Ledger.   The only additional knowledge to be gained by obtaining this documentation would be to check that the Claimant's accounting system was functioning

---

[17] *See* EXHIBIT 4A, ¶4, p.2 fn.5 ("Claimants included in Sections II or III of the _Causation Requirements_ for Business Economic Loss Claims are required to submit 2011 monthly profit and loss statements or alternate source documents") (emphasis supplied).
[18] Deepwater Horizon, 732 F.3d at 340 (emphasis supplied).

properly, which is an auditing function – far afield from the contemplated process for mechanically, efficiently and objectively evaluating and processing claims.

For the Settlement Program personnel to obtain and review shipping records to recalculate or verify monthly revenue, it would be very time-intensive, and unlikely to produce results that would be materially different.  Furthermore, the claimant would have to incur substantial additional accounting costs both to gather and review and explain this documentation on the front end and to confirm what the Settlement Program has calculated on the back end, in the event of any difference.

BP's Proposed Guidelines also fail to reasonably address the situation where a Claimant simply does not have sufficient source documentation to recalculate monthly revenue.  For example, BP states that if the Job Schedule documentation is not available, then revenues will be allocated based on monthly expenses.  However, there is no mention of what would happen if expenses were also not "properly recorded".  The net result would lead to the complete smoothing of annual financial results, which would not account for a business' ebb and flow of activity during the course of a year.  (Not to mention specifically and expressly rejected and opposed by BP in September of 2012.)  It would merely divide the year into equal months and not reflect "economic reality".

BP's proposal also fails to address the process by which a claimant may prove that expenses are reported in the proper period.  BP's entire proposal suggests that expenses are reported in the "wrong" period, which may not be the case.  There are plenty of examples where a Claimant simply had a spike in expenses during a given month.  BP's proposal does not account for that economic reality.

**BP's Proposed Guidelines Rely on Numerous Subjective Determinations**

BP's Proposed Guidelines inject a tremendous amount of subjectivity into the Claims evaluation process.   BP is essentially asking the Program Accountants to decide how a Claimant's specific business transactions should have been handled, based on unknown and undefined (as well as inherently subjective) considerations not spelled out anywhere in the Settlement Agreement.

**BP's "Earnings Cycle" Proposals Are Not Recognized under GAAP**

It would be in violation of FASB guidance to recognize revenue using BP's Proposed Guidelines relating to BP's proposed "Earnings Cycles":

- Effort Based Earnings Cycle – BP proposes that a business falling under this category would recognize revenue before it is realizable and before it has been earned.  Where an attorney with a contingent fee arrangement wins a case, but there is a time lag before the fee is actually received, the lump sum fee revenue would still be recognized as revenue all at once, not over the preceding periods.

- Time Based Earnings Cycle – BP proposes that a business would recognize revenue before it has been earned.  Until a farmer harvests the crop and delivers the goods (or claims to the goods), that farmer has not earned any revenue.

- Market Presence Earnings Cycle – BP's proposal is completely illogical and absurd.  A real estate agent cannot recognize revenue before a sale occurs.  Until that point, the agent has no claim to any commission income, and it is thus not recognized.  As any agent will tell you, plenty of deals never close.

**BP's Proposed Treatment of Bad Debt is Contrary to GAAP**

The BP Proposed Guidelines regarding Bad Debt are directly contrary to accepted accrual basis accounting rules.  Under those well-defined principles, the impairment of receivables shall be recognized when, based on all available information, it is probable that a loss has been incurred based on past events and conditions existing on the date of the financial statements;

losses shall not be recognized before it is probable that they have been incurred.[19]  BP's proposal to revise recorded revenue is contrary to this principle and unworkable.  BP does not explain how the Settlement Program would account for revenue recorded in pre-Benchmark periods. Likewise, it is inappropriate from an accounting standpoint, and will frequently be impossible as a practical matter, (not to mention contrary to the Settlement Agreement), to reduce recorded 2010 revenues that were not "bad" when a Claim was properly submitted in 2012.  Once again, under the guise of developing an Accrual-style framework, BP proposes just the opposite.

**BP Proposes an Additional Inappropriate Matching "Trigger"**

BP tries to impose an additional step to identify a potential "matching issue".  As demonstrated in the examples in BP's Appendix, BP proposes that the Claims Administrator also compare the annual variable profit margin in 2010 to that of the Benchmark Period.  This is in direct violation of the Settlement Agreement.  The first four months of 2010 are pre-spill and should not be considered.  Additionally, some businesses were only damaged for a small period of time, which is why the three-consecutive-month loss window was negotiated and agreed-to by the Parties.

**BP's Proposed Guidelines Are Much More Complex (and Subjective) than BP Suggests**

BP greatly oversimplifies the calculations they are proposing.  BP implies in its supporting Memorandum that these proposed alternatives are so simple that anyone can calculate them.  However, that is often not the case.  In some circumstances, it would require heavy involvement with the Claimant's accountant to provide this information.  For example:

- BP's description of the "Effort Based Earnings Cycle" proposal leads the reader to believe that this is a simple calculation whereby you can take a person's bill rate multiplied by the number of hours to arrive at revenue for the month.  However, it fails to

---

[19] FASB Accounting Standards Codification 310-10-35-8.

take into consideration many likely scenarios, such as discounts to certain clients, any fixed fee arrangements, and any write-offs. This would require a lot of adjustments and is likely something that only someone very knowledgeable about the financial records could perform.

- BP's description of its "Time Based Earnings Cycle" Proposal leaves major questions unanswered. First, the proposed alternative does not consider any crops (*e.g.* lumber) that have a growing cycle greater than one year. Second, it assumes that the period in which revenue is generated can only be the time from which a crop is planted to the time it is harvested. There are a lot of other activities that take place throughout the year (*e.g.* soil preparation, business development/meetings, review of financial performance for the year). BP does not address how those activities would be accounted for in its proposal.

## "Non-Revenue Items"

The Non-Revenue Items section is misleading and confusing. First, it implies that the Settlement Program is currently including non-operating revenue items in the calculation, which is not the case. Secondly, what is BP's proposal regarding capital assessments in the context of a Homeowners Association? Is BP saying that capital assessments should be treated as operating income?

## Is A Claimant Potentially Required to "Correct" More Than Once?

In BP's last example, the "corrected" P&Ls have variable profit margins that differ by more than 50%. Will the Claimant be free from further scrutiny after correcting their P&Ls? Or will the Claimant be subject to a second matching test? Where is the subjective line drawn in the process?

## The Davis/KPMG Declaration Is Not in Evidence

BP repeatedly refers to John Davis' "KPMG Declaration" – an unsolicited proffer that is beyond the scope of the Court's Scheduling Order and was stricken from the record.

This 26th day of November, 2013.

Respectfully submitted,

<table>
<tr><td>

___/s/   Stephen J. Herman___

**Stephen J. Herman**, La. Bar No. 23129
**HERMAN HERMAN & KATZ LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Co-Lead Class Counsel*

</td><td>

___/s/ James Parkerson Roy___

**James Parkerson Roy**, La. Bar No.11511
**DOMENGEAUX WRIGHT ROY & EDWARDS LLC**
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Co-Lead Class Counsel*

</td></tr>
</table>

## ECONOMIC & PROPERTY DAMAGES CLASS COUNSEL

<table>
<tr><td>

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

Brian H. Barr
LEVIN, PAPANTONIO
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser

</td><td>

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier

</td></tr>
</table>

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400

deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail:  duke@williamslawgroup.org

Telefax: (305) 476-7444
E-Mail:  ervin@colson.com


## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Comments will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pre-Trial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 26th day of November, 2013.


/s/ Stephen J. Herman and James Parkerson Roy