# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: **Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**<br><br>This Document Relates to:<br><br>No. 12-970 | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br><br>**MAGISTRATE SHUSHAN** |

## BP'S RESPONSE TO
## CLASS COUNSEL SUBMISSION OF
## PROPOSAL FOR MATCHING EXPENSES

The Court directed the parties to file proposals "designed to be responsive to the Fifth Circuit's BEL decision,"[1] which requires that the Settlement Agreement be implemented so as to ensure that the "means of showing loss [does not] become disconnected from economic realities." *In re Deepwater Horizon*, 732 F.3d 326, 347 (5th Cir. 2013) (Southwick, J., concurring) ("BEL Decision"). The parties designed the compensation framework to that end, for they required compensation to be based on lost profits.[2] Basing compensation on a "matching" of cash-in and cash-out rather than a "matching" of revenues and expenses, the BEL Panel said, would not determine actual economic injury and would not permit a calculation of

---

[1] Scheduling Order Regarding BEL Matching Proposals at 1, Nov. 15, 2013 (Doc. No. 11861).

[2] Had the Settlement Agreement been designed to compensate claimants who did not have actual economic injuries, it would not have passed muster under Rule 23 and Article III. *Id.* at 343 ("If the Administrator is interpreting the Settlement to include such claimants [i.e., "that had not sustained losses at all"], the Settlement is unlawful."); *id.* at 347 (Southwick, J., concurring) ("[T]o allow the means of showing loss to become disconnected from economic realities threatens to distort entry into the class and is a defect under Rule 23.").

lost profits.  *Id*. at 336, 338.  BP has therefore proposed (i) an "accrual-style framework" that (ii) properly matches monthly "revenues" and "corresponding variable expenses" for the purpose of (iii) conducting a "lost profits" analysis (iv) based on actual economic injury.  That proposal is set forth in BP's proposed seven-point order.

What is striking about Class Counsel's Proposal is that it does not mention "actual economic injury" or "lost profits."  Nor does it refer to what the BEL Panel called "any reasonable understanding of calculation of damages."  *Id*. at 339.  Class Counsel's Proposal does make a grudging concession to "some level of matching," but it is a concession for concession's sake.  And it is a concession limited to cash-basis claims,[3] although BP has demonstrated that many accrual-basis claims also present matching problems and fail the Administrator's seven screening criteria.[4]  The Proposal is not tethered to any principle, nor does it appear aimed at any target.  That is, the elements of the Proposal (both as to Revenue Recognition and Expense Recognition) have nothing to do with (i) carrying out a lost profits analysis, (ii) ensuring that settlement awards compensate for actual losses, or  (iii) paying like compensation to like claimants.  And, for that reason, the Proposal is not a solution to the problem identified by the Fifth Circuit.

Consider first Class Counsel's Statement on Revenue Recognition.[5]  If it is aiming at economic reality, it misses the mark in three fundamental ways:

---

[3]  Class Counsel Submission at 2, Nov. 21, 2013 (Doc. No. 11885) ("[S]ome level of matching in Cash Basis Claims is likely required . . . .").

[4]  *See* BP's Proposal for Matching at 4 & n.3, Nov. 21, 2013 (Doc. No. 11886).

[5]  Class Counsel Statement, Nov. 21, 2013 (Doc. No. 11885-2) (hereafter "CCS:RR").

1.      First, it misconstrues the Fifth Circuit's BEL Decision at a fundamental level. The BEL Decision talks at length about cash- and accrual-basis accounting, about matching of revenues and expenses, and about the measurement of actual economic injury.  That discussion occupies six pages of the BEL Decision, 732 F.3d at 333-39, under the headings, "Revenue and Expense Recognition Principles," "Accrual-Basis Claimants," and "Cash-Basis Claimants."  But the passage that Class Counsel quotes in its opening sentence – ostensibly about recognition of "revenues" – *has nothing to do with matching revenues and corresponding variable expenses*. CCS:RR at 1.  The quotation comes from the BEL Panel's holding regarding "'Comparable' Periods" language, which decided whether "comparable" refers to the same calendar months in both the Benchmark and Compensation period.  BEL Decision, 732 F.3d at 339-40.  Thus, Class Counsel sets off on the wrong foot: What they quote, they quote mistakenly.  That alone is telling.

But it is also telling what they do *not* quote, for in the immediately preceding sentence, the Panel said, "[W]e conclude that our holding as to cash and accrual-basis claimants will resolve some of the issues BP claims results from the district court's interpretation of 'comparable.'"  *Id*. at 340.  That is, the court considered the dispute about "comparable" months largely irrelevant as a practical matter, because proper matching of revenue and expenses would generally resolve the problem of compensating claimants who had not suffered any real economic injury.

2.      Second, Class Counsel miss the mark by focusing on the *accounting* principles that govern proper financial reporting, not the *economic* principles that are essential to determining actual economic injury and, specifically, lost profits.  Class Counsel assert that most Gulf Coast businesses keep their books on bases other than GAAP, that the IRS computes

taxable income based on the taxpayer's method of accounting, and that income properly recognized in one period should not be moved "'for financial reporting purposes.'"  CCS:RR at 2-4 (quoting Kohlbeck Decl.).  But the object of the Settlement Agreement is not to check whether businesses in the Gulf Coast Region maintain acceptable monthly accounting records, or to compute taxable income, or to implement a financial reporting system for claimants.  It is to determine lost profits.[6]

The BEL Decision states clearly that the Agreement must be read consistent with a basic understanding of *damages*: "[I]t remains of significance that the interpretation urged by the Administrator is completely disconnected from any reasonable understanding of calculation of *damages*. In interpreting a settlement, surely some weight has to be given to what *damages* recoverable in civil litigation actually are."  BEL Decision, 732 F.3d at 339 (emphases added).  The BEL Panel said – and Class Counsel have never disputed – that any determination of *damages*, including lost profits, must be based on a comparison of revenue and expenses (not cash inflow and outflow) for the Benchmark and Compensation Periods.  A lost profits analysis begins therefore with an attribution of revenue consistent with economic reality.[7]

3.    Third, Class Counsel resist offering a proposal that is responsive to the BEL Decision by refusing to use the Decision's terminology and refusing to follow its analytical approach, which focused on actual economic loss.  When the BEL Panel spoke of revenue and its proper recognition, it did not use the terms "move" or "smooth" at all, and yet Class Counsel uses those terms repeatedly (and pejoratively) to characterize the proper matching that is part of

---

[6]    *See, e.g.*, Godfrey Decl. ¶ 9, Nov. 7, 2013 (Doc. No. 11818-2); Bloom Decl. ¶ 13, Nov. 7, 2013 (Doc. No. 11818-1).

[7]    *See, e.g.*, Fishkind Decl. ¶ 8, Mar. 20, 2013 (Doc. No. 8964-8).

an accrual-style framework designed to determine lost profits.  When Class Counsel argue that "revenue should not typically be moved into or out of the relevant Benchmark and Compensation Periods," CCS:RR at 1, they assume that revenue has already been properly attributed to a particular period.  But for claimants who keep their books on a cash basis, as well as many claimants who keep their books on a hybrid basis, the books do not attribute ***revenue*** to a month, but record ***cash receipts***.[8]  As the BEL Panel said, "cash accounting does not inherently recognize relationships between cash flows and their underlying transactions."  BEL Decision, 732 F.3d at 337.  An accrual-style framework based on concepts of revenue and expense rather than cash flows inherently considers such relationships.  It begins by asking – from an economic perspective – when the underlying business activity took place that earned the revenue.[9]

For that reason, to attribute revenue is not to "move" something, but to assign it for the first time to the period in which the related earnings activities took place.  The analysis done by the Settlement Program, after all, is retrospective.  The Program's accountants are looking at the facts in hindsight, and they know both (i) the amount of revenue earned; and (ii) when the business's earnings activities took place.  For purposes of determining lost profits, the question is (i) ***to what period*** is it appropriate to attribute the revenue (ii) in light of ***when*** the earnings activities occurred so that one can determine (iii) ***whether*** a loss of profits occurred.

---

[8]   Even accrual-basis claimants make errors that require proper attribution and may recognize revenue after the related earning activity because recognition awaited the removal of uncertainties.  *See* Alexander Decl. ¶¶ 14-16, Mar. 20, 2013 (Doc. No. 8963-36); Gaspardo Decl. ¶¶ 4, 6-18, & Ex. A (Doc. No. 11726-7).

[9]   BEL Decision, 732 F.3d at 337 ("[C]ash accounting, by nature, ignores any significance that might be related to the timing of cash receipts and payments, beyond mere cash flow concerns."); *see also* Fishkind Decl. ¶ 11, Mar. 20, 2013 (Doc. No. 8964-8); Gaspardo Decl. ¶ 8, Oct. 23, 2013 (Doc. No. 11726-26).

This criticism is not to reject Class Counsel's Proposal in its entirety:

- We agree that the "Administrator has developed testing to identify claims where a matching issue may be present."  Class Counsel Proposal: Expense Recognition at 1, Nov. 21, 2013 (Doc. No. 11885-1) (hereafter "CCP:ER").  He should perform that testing.  He should also perform the additional screens (or tests) identified by BP that will make the screening more accurate.  The undisputed record establishes that they will advance the goal of identifying claims that have not properly matched revenues and expenses.[10]

- We agree that for some claimants "the revenue recognition principles are the same in practice under both cash and accrual methods," i.e., lead to similar results.  CCS:RR at 2.[11] But, of course, there are many claimants for which the principles are not the same in practice and do not lead to similar results, with the potential mismeasurement of lost profits from failing to match revenue and expense amounting to hundreds of millions of dollars.[12]  The Fifth Circuit's BEL Decision requires the Court to address this, as it has done by asking for matching proposals.

- We agree, too, that "without the documentation to establish the dates on which services were rendered for each transaction, conversion of revenue to an 'accrual type" methodology would be inherently artificial . . . ."  CCS:RR at 2.  But neither the BEL Panel nor BP suggests that proper revenue attribution or matching be done without documentation to

---

[10]  *See, e.g.,* Juneau Decl., Oct. 25, 2013 (Doc. No. 11741); Sider Decl., Nov. 7, 2013 (Doc. No. 11825-3).

[11]  Class Counsel assert, without evidence, that this is true "[f]or the vast majority of claimants."

[12]  *See* Sider Decl., Feb. 18, 2013 (Doc. No. 8965-17); Supp. Sider Decl. ¶¶ 18-25, Mar. 14, 2013 (Doc. No. 8964-18).

support it in the first instance.[13]   Exhibit 4A empowers the Settlement Program to secure the

needed information,[14] and it should do so.

- We agree that the use of Generally Accepted Accounting Principles "is not required under the Settlement Agreement." CCS:RR at 2. The BEL Panel understood that what was required to determine actual economic injury was an "accrual-style framework," not the application of accounting principles that serve a purpose other than calculating damages.

- We agree, most importantly, that the objective is accurately assessing "economic reality." *Id*.[15]

This final point of agreement in principle, however, highlights the parties' larger

disagreement. Class Counsel want the Administrator to implement the settlement as he did

before the Fifth Circuit's opinion, and they only reluctantly concede that there should be "some

level of matching." They do not offer a cohesive, principled proposal, but present instead two

"Statement[s]" that in large part continue to reject the very idea of matching.

The Statement on Revenue Recognition makes no clear proposal, unless it is that revenue

should be recognized only if it meets four criteria that are merely accounting standards for

contemporaneous financial reporting, *id*., not criteria that concern the calculation of damages or

lost profits. As a result, Class Counsel's proposal generally will not result in attribution of

---

[13]   *See, e.g.*, BP's Proposal for Matching Ex. 2, at 29, Nov. 21, 2013 (Doc. No. 11886-2).

[14]   Where the documentation does not exist, BP proposed ways to proceed. *E.g.*, *id.* at 15-16.

[15]   When Class Counsel say that "[m]oving revenue creates a significant risk of distorting economic reality if recognition is not based on [GAAP], which is not required under the Settlement Agreement," they seem both to embrace and reject GAAP, but they unmistakably endorse the principle that compensation should be based on "economic reality."

revenue to the month in which it is earned and claimants will continue to receive offers based on time periods identified by reductions in cash flows, not reductions in profits.

The Statement on Expense Recognition pays lip service to the Settlement Agreement's requirement that "corresponding variable expenses" be matched to revenue for all claims, but then undermines the requirement by suggesting that only "***certain*** variable expenses be apportioned to correspond to revenue."  CCP:ER at 1 (emphasis added).  Class Counsel also say certain variable expenses should "typically" be matched and that other expenses "typically" should not, without citing any evidence to support the two categories.  CCP:ER at 1-2.  And they seek to create special rules that will continue to produce results inconsistent with economic reality.  Regarding bad debts for example, Class Counsel again resort to financial reporting standards and propose that bad debts be recognized when deemed uncollectible.  But bad debt expenses relate either to specific revenues that become uncollectible (and, therefore, should be matched to those revenues) or to a general reserve (and, therefore, should be matched pro rata to revenues).  Regarding travel expenses, Class Counsel claim that these expenses are "inherently unrelated to the period in which the revenue item is recorded" and should not be matched. CCP:ER at 2.  Yet the accounting standard approvingly quoted by Class Counsel one page earlier (and cited by the BEL Decision, 732 F.3d at 333), requires that at least certain travel expenses be treated as a variable cost and matched because "[t]he revenue and expense(s) are directly related to each other and require recognition at the same time."  CCP:ER at 1 (quoting Statement of Fin. Accounting Concepts No. 6, Fin. Accounting Standards Bd., ¶ 146).[16]  Thus, in their two short

---

[16]  *See also* Statement of Fin. Accounting Concepts No. 6, Fin. Accounting Standards Bd., ¶ 146 ("Other examples of expenses that may result from the same transaction and be directly related to sales revenues are ***transportation to customers***, sales commissions, and perhaps certain other selling costs." (emphasis added)).

8

statements, Class Counsel at one and the same time (i) state that the Settlement Agreement does not require GAAP accounting, (ii) cite GAAP as authoritative, and (iii) apply GAAP inconsistently.

What Class Counsel have offered is not a logical proposal for matching, but limited concessions that aim to maintain the status quo.  Their proposal, in effect, is that the Court (i) consider as revenue whatever the claimant recorded at the time (whether based on cash-in or underlying earnings activity and whether correct or not) and (ii) match some expenses to recorded revenue, even where the expenses would be matched to revenue in the wrong period. This makes no sense on its face.  And, tellingly, Class Counsel do not defend their proposal as a methodology that will accurately measure lost profits or treat like claimants in like manner.  The courts have recognized that, for purposes of determining damages and as a matter of economic reality, one must look at when the earnings activities took place, not when income was received. This problem often arises when law firms or marriages involving a lawyer-spouse dissolve.  In *Seale v. Sledge*, 430 So. 2d 1028 (La. Ct. App. 1983), at issue was the division of a law firm's revenue upon its dissolution.  Taking a cash accounting perspective, certain members of the firm argued that "work in progress does not become an asset in terms of money until the work is completed and the fee is paid when a firm is on a cash basis."  *Id.* at 1031.  The Louisiana Court of Appeals rejected that view, holding that the value of a contingency fee can be considered an asset of the firm notwithstanding the fact that it had not yet been collected or is even certain to be earned.  *Id.* (citing *Due v. Due*, 342 So. 2d 161, 166 n.5 (La. 1977).[17]  In *Due*, the problem of

---

[17]   The court in *Seale v. Sledge* held that the decision in *Donald v. Glazer,* 194 So.2d 176 (La. Ct. App. 1967), *writ refused*, 196 So.2d 533 (La. 1967), was in error when it said that accounts receivable from an accounting partnership handled on a cash basis were not considered as income or an asset until collected.  *Seale*, 430 So. 2d at 1030-31.

valuation arose in a divorce, where the wife argued that the community property included the value of the husband's work on an unresolved, contingency-fee case.  The Supreme Court of Louisiana held that there was "no merit to the defendant's argument that, somehow by reason of technical characterization, no economic value should be attributed to an attorney's interest in a contingent fee contract until the successful prosecution of the claim entitles him to actual compensation for his services."  *Id*. at 165 (also noting that "[t]he valuation of these interests in pending contracts have arisen, for example, in suits by former law partners for a division of the assets following dissolution of the partnership").  Courts elsewhere have taken the same economic-realist view.[18]  Like the BEL Decision, these cases reflect the law's pragmatic view that, in matters of valuation and damages, economic reality trumps formal accounting rules, particularly cash accounting.

### Conclusion

For the foregoing reasons, BP requests that the Court enter the Proposed Order that was submitted along with BP's Proposal for Matching.  Only BP's Proposed Order does what the Fifth Circuit requires.  Class Counsel's Proposal, in contrast, seeks to maintain the status quo prior to the Court of Appeals decision, and ignores the requirement that the Settlement Program conform to economic reality by determining and awarding compensation only for lost profits.

---

[18]   *See also Bader v. Cox*, 701 S.W. 2d 677, 682 (Tex. App. 1985) (holding that "we cannot agree with [the] contention that because the partnership operated on a cash-basis accounting system and because the value of the contingent-fee files at the time of decedent's death is not readily or easily ascertainable, the files are not assets of the partnership"); *Gottlieb v. Greco*, 298 A.D. 2d 300, 301 (N.Y. App. Div. 2002) ("[P]ending contingency fee cases of a dissolved law partnership are assets subject to distribution to be valued as of the date of dissolution . . . .").

November 26, 2013

Respectfully submitted,

_/s/ Kevin M. Downey_

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Kevin M. Downey
F. Lane Heard III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 434-5000
Telefax:  (202) 434-5029


Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

_/s/ Don K. Haycraft_

S. Gene Fendler (Bar #05510)

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

*OF COUNSEL*

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 26th day of November, 2013.


/s/ Don K. Haycraft
Don K. Haycraft