UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE
GULF OF MEXICO, ON APRIL 20, 2010

This Document Applies to:

No. 12-970, Bon Secour Fisheries, Inc., et al.
v. BP Exploration & Production Inc., et al.

MDL 2179

SECTION: "J"

JUDGE BARBIER

MAG. JUDGE SHUSHAN

**GLEN LERNER'S RESPONSE TO THE COURT'S SEPTEMBER 6, 2013, ORDER TO
SHOW CAUSE AND OBJECTIONS TO SPECIAL MASTER'S REPORT**

4288502.5

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

I.      THE ORDER MUST BE VACATED AS TO LERNER BECAUSE THE COURT LACKS BOTH AUTHORITY AND JURISDICTION TO SANCTION HIM.......................................................................................................................3

       A.     The Court Canot Sanction Lerner Because Is Not Before The Court as a Party or Lawyer.............................................................................................3

       B.     The Court Lacks Jurisdiction Over Lerner Because He Was Not Served With The Order ..............................................................................................4

II.    THE ORDER MUST BE VACATED BECAUSE THE UNCLEAN HANDS DOCTRINE IS INAPPLICABLE AS MATTER OF LAW. ...............................5

       A.     The Unclean Hands Doctrine Cannot Be Used To Invalidate Privately Negotiated Attorney-Fee Contracts or to Disqualify a Lawyer From Representing Clients ................................................................................5

            1.    *The unclean hands doctrine is a defense to an equitable remedy sought by a plaintiff and thus is inapplicable here.* ...................................5

            2.    *The Court does not have the power to invalidate attorney-fee contracts.*...........................................................................................7

       B.     The Doctrine Of Unclean Hands Cannot Operate To Deprive AndryLerner or Lerner of Attorneys' Fees Beyond the Thonn Claim. .........................7

III.   THE ORDER MUST BE VACATED AS TO LERNER BECAUSE HE DID NOT ENGAGE IN ANY IMPROPER CONDUCT, LET ALONE ANY UNCONSCIONABLE OR MORALLY REPREHENSIBLE ACTS, THAT WOULD WARRANT APPLICATION OF THE DOCTRINE OF UNCLEAN HANDS...............................................................................................................8

       A.     Neither The Thonn Referral Fee nor the Crown LLC Payments Were Intended To "Corrupt" the DHECC Process. ..........................................9

            1.    *Sutton did not provide any advantage to any AndryLerner client.* ..............9

            2.    *There was no "agreement" among Lerner, Andry, and Sutton to influence the claims process or gain an unfair advantage.* .......................15

       B.     The Manner of Making The Payments Was Not Meant to Conceal Them. ..........21

ii

C.    Lerner Did Not Lie to the Special Master or Participate in Any Coordinated Response to the CAO's Internal Investigation.................................23

D.    Lerner Did Not Violate the Nevada Rules of Professional Conduct. ...................23

IV.    THE  COURT  CANNOT  SANCTION  LERNER  WITHOUT  AN EVIDENTIARY HEARING. .............................................................................................24

CONCLUSION.....................................................................................................................25

4288502.5

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Alcatel USA, Inc. v. DGI Technologies, Inc.*,
   166 F.3d 772 (5th Cir. 1999) ............................................................. 7

*Blessey Marine Servs., Inc. v. Jeffboat, LLC*,
   Civ. Action No. 10-1863, 2011 WL 3349844 (E.D. La. Aug. 3, 2011) .................................... 8

*Brown v. Watkins Motor Lines, Inc.*,
   596 F.2d 129 (5th Cir. 1979) ............................................................. 7

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991) ......................................................................... 25

*Crowe v. Smith*,
   151 F.3d 217 (5th Cir. 1998) ......................................................... 24, 25

*Dahl v. Pinter*,
   787 F.2d 985 (5th Cir. 1986) ............................................................. 9

*F.J. Hanshaw Enterps., Inc. v. Emerald River Dev., Inc.*,
   244 F.3d 1128 (9th Cir. 2001) ........................................................... 24

*Garcel, Inc. v. Hibernia Nat'l Bank*,
   No. 01-772, 2002 WL 356307 (E.D. La. Mar. 5, 2002) ............................................ 6

*Hazeur v. Keller Indus.*,
   983 F.2d 1061, 1993 WL 14973 (5th Cir. 1993) .................................................. 25

*Helmac Prods. Corp. v. Roth (Plastics) Corp.*,
   150 F.R.D. 563 (E.D. Mich. 1993) ........................................................ 4

*In re Bank of La./Kenwin Shops Inc.*,
   No. Civ. A. MDL No. 1193, 1998 WL 213768 (E.D. La. Apr. 28, 1998) ............................. 4

*In re Yorkshire, LLC*,
   540 F.3d 328 (5th Cir. 2008) ............................................................. 3

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994) ..................................................................... 24

*Kansas City So. R. Co. v. Pilgrim's Pride Corp.*,
   No. 06-0003, 2010 WL 1293340, *11 (W.D. La. Mar. 29, 2010) ................................... 6

iv

*Keystone Driller Co. v. Gen. Excavator Co.*,
   290 U.S. 240 (1933) ................................................................ 5, 8, 9

*Mackler Prods., Inc. v. Cohen*,
   146 F.3d 126 (2d Cir. 1998) .................................................... 24, 25

*Manez v. Bridgestone Firestone North Am. Tire, LLC*,
   533 F.3d 579 (7th Cir. 2008) ........................................................ 5

*McGuire v. Sigma Coatings, Inc.*,
   48 F.3d 902 (5th Cir. 1995) ....................................................... 4, 5

*Mitchell Bros. Film Group v. Cinema Adult Theater*,
   604 F.2d 852 (5th Cir. 1979) ................................................... 6, 7, 8

*Natural Gas Pipeline Co. v. Energy Gathering, Inc.*,
   2 F.3d 1397 (5th Cir. 1993) .......................................................... 3

*Precision Instrument Mfg. Co. v. Auto. Maint. Machinery Co.*,
   324 U.S. 806 (1945) ..................................................................... 6

*Ruiz v. Estelle*,
   679 F.2d 1115 (5th Cir. 1982) ................................................... 2, 25

*Stanley v. Trinchard*,
   No. Civ. A. 02-1235, 2004 WL 2988484 (E.D. La. Dec. 9, 2004) ............ 4

*United States v. Falcone*,
   311 U.S. 205 (1940) ................................................................... 16

*Waffenschmidt v. Mackay*,
   763 F.2d 711 (5th Cir. 1985) ........................................................ 3

## **STATUTES**

Fed. R. Civ. P. 53(f)(1) ................................................................... 4

Fed. R. Civ. P. 53(f)(3) ................................................................... 2

Fed. R. Civ. P. 53(f)(4) ................................................................... 2

v

4288502.5

## INTRODUCTION

The Court has issued an Order requiring Glen J. Lerner ("Lerner") to "show cause why the Court should not adopt" Special Master Louis J. Freeh's findings and recommendations that Lerner be disqualified "from representing [Court Supervised Settlement Program ("CSSP")] claimants (or collecting fees from such claimants) under the Unclean Hands Doctrine." Rec. Doc. 11288 at 3. The Order issued after the Special Master completed an "external investigation" into the resignation of Lionel H. Sutton ("Sutton") from the CSSP.

We demonstrate below that the Court should not, indeed cannot, adopt the findings and recommendations of the Special Master, and should vacate the Order.[1] There are three dispositive legal objections that warrant vacating the Order against Lerner, which do not require the Court to analyze the evidence. *First*, the Court lacks the authority to impose the recommended sanctions against Lerner, because he is neither a party nor a lawyer before the Court. *Second,* the Court lacks jurisdiction over Lerner, because he was not served with any formal process. *Third*, the legal ground for sanctions – the doctrine of "unclean hands" – is inapplicable. The "unclean hands" doctrine is an equitable doctrine which bars a *party* from seeking an *equitable* remedy against another because of its misconduct. It cannot be used to invalidate hundreds of privately negotiated attorney fee contracts or to bar a lawyer from appearing before a tribunal, as the Special Master has proposed.

---

[1] Lerner objects to having to file this pleading without complete record access. The Special Master has refused to provide him with full and unrestricted access to the investigative record pertaining to him, in violation of his right to due process. Lerner has moved the Court to compel additional disclosures from the Special Master, Rec. Docs. 11619 & 11663, but as of the filing of this Response and Objections, those motions are unresolved. Additionally, the Special Master has allowed Lerner to inspect thousands of pages of telephone records, but Lerner has not yet received a copy of them, pursuant to a stipulated protective order. We reiterate those requests and believe that denial of the requested material denies Lerner's fundamental rights. Although the Court has issued an order extending the deadline to file a response to January 17, 2014, Rec. Doc. 11979, that order is unclear as to whether it extends the deadline for all the Show Cause parties or only for The Andry Law Firm. In the exercise of caution, Lerner files the instant pleading. We reserve the right to supplement this Response and Objections after Lerner receives access to the remaining portions of the investigative record.

If the Court does not vacate the Order based on these legal objections, it must be vacated on the evidence.  The Special Master has made sweeping pronouncements of wrongdoing against Lerner.  These "findings," however, are owed no "presumption of correctness," *Ruiz v. Estelle*, 679 F.2d 1115, 1163 (5th Cir. 1982),[2] and the Court must review them *de novo*.  Fed. R. Civ. P. 53(f)(3), (4).  That means that the Court must consider with fresh eyes not only the Special Master's investigative record, but the additional evidence that Lerner submits with this pleading, in deciding whether Lerner acted with "unclean hands."

The evidence establishes that Lerner did nothing improper.  He broke no law or rule of professional responsibility.  And he did not engage in the kind of "unconscionable" or "morally reprehensible" conduct that would warrant a finding of "unclean hands."  The payments to Sutton did not "corrupt," nor were they intended to corrupt, the settlement process.  Report at 21. The undisputed fact is that Sutton did not advantage or attempt to advantage, in any way, a single one of AndryLerner, LLC's over 600 claims – not a single claim.  There also was no agreement to pay Sutton fees "in return for" advancing AndryLerner client claims.  *Id.* at 82.  An email exchange between Sutton and Lerner in January 2013 – which the Special Master apparently failed to obtain – flatly contradicts the assertion that there was an illicit agreement to corrupt the process.  After Lerner asked Sutton whether claims processing could be expedited, Sutton responded:  "*You can't. . . .  The process will get faster on its own as grey areas are resolved and applied across the board*."[3]  This email and other evidence corroborate Lerner's sworn testimony to the Special Master, in which he denied that there was any connection between the payments made to Sutton and AndryLerner claims.  Indeed, Lerner only agreed to pay Sutton based on

---

[2] Because the Special Master's Report was not "based on hearings conducted on the record after proper notice," but rather on "his own observations and investigations in the absence of a formal hearing," "the findings[] and conclusions of the Special Master are not to be accorded any presumption of correctness[.]"  *Ruiz*, 679 F.2d at 1163.
[3] For a full discussion of this email, see page 17, *infra*.

Sutton's representation that he had fully disclosed his financial interests in Crown LLC and the Casey Thonn claims to Mr. Juneau.  Lerner could not have possibly attempted to corrupt the claims process when he understood that Sutton's employer had authorized his receipt of the Crown and Thonn payments.

As we have explained, the Court must vacate the Order based on this Response and Objections.  However, if the Court determines that the evidence raises sufficient questions about whether Lerner acted with "unclean hands," then the Court may not, at this stage, simply adopt the Special Master's findings and impose the recommended sanctions.  Rather, because the recommended sanctions are criminal in nature, Lerner is entitled to the full panoply of due process rights, including an evidentiary hearing at which he can examine witnesses and present evidence, before the Court can impose punishment.   If the Court does not vacate the Order at this stage, it should issue a scheduling order for discovery and set an evidentiary hearing date.

I.   **THE ORDER MUST BE VACATED AS TO LERNER BECAUSE THE COURT LACKS BOTH AUTHORITY AND JURISDICTION TO SANCTION HIM.**

A.   **The Court Cannot Sanction Lerner Because He Is Not Before the Court as a Party or Lawyer.**

The Order as to Lerner must be vacated because this Court lacks authority to sanction him.  The federal courts' inherent authority to impose sanctions on parties and lawyers that appear before them, *see In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008), does not extend to non-parties or non-appearing lawyers.  The Fifth Circuit has observed that "[i]t is unclear whether the inherent power to sanction discovery abuses extends to abuses committed by nonparties."  *Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1411 (5th Cir. 1993).  To the extent that the Fifth Circuit and this Court have approved sanctions against nonparties, they have done so where the nonparty violated a specific court order or controlled a party to the litigation.  *See Waffenschmidt v. Mackay*, 763 F.2d 711, 713 (5th Cir. 1985) (court

3

may sanction nonparties who, with "actual notice" of the court's order, "actively aid and abet a party in violating that order"); *In re Bank of La./Kenwin Shops Inc.*, No. Civ. A. MDL No. 1193, 1998 WL 213768 (E.D. La. Apr. 28, 1998) (sanctioning a nonparty who managed and controlled a corporate party for making misrepresentations to the court). *But see Stanley v. Trinchard*, No. Civ. A. 02-1235, 2004 WL 2988484, at *3 (E.D. La. Dec. 9, 2004) (declining to sanction a nonparty and its counsel for violating a protective order).

Lerner is neither a party to this litigation, nor an attorney of record to any party or any claimant before the Deepwater Horizon Economic & Real Property Claims Center ("DHECC"). He is not a member of this Court's bar. He did not violate a specific order; nor does he control a party to this litigation. Lerner's connection with this case is that he is a member of a law firm, AndryLerner, which represents claimants before the DHECC. He did not personally work on any client claim.[4] Merely being a member of a firm that has clients before the DHECC is not sufficient to confer upon this Court authority to sanction Lerner. *See Helmac Prods. Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563, 567 (E.D. Mich. 1993) (the "power to sanction cannot possibly extend to everyone who interferes with litigation before the court" because "[o]therwise, the power to sanction would be so wide that it would be unenforceable").

**B.      The Court Lacks Jurisdiction Over Lerner Because He Was Not Served With the Order.**

The Order should be vacated for the additional reason that the Court lacks jurisdiction over Lerner. *See* Fed. R. Civ. P. 53(f)(1) (requiring the Court to give "notice" to the parties who are the subject of a special master's report). "To acquire jurisdiction over" Lerner in accordance with due process, the Court "must serve on [him] a document, 'such as a summons, notice, writ, or order.'" *McGuire v. Sigma Coatings, Inc.*, 48 F.3d 902, 907 (5th Cir. 1995) (citations

---

[4] Lerner testified that he invested in AndryLerner, but did not work on the cases. The day-to-day work was done by a firm lawyer, Christina Mancuso. Ex. 6 at 14-16, 39.

omitted).  In *McGuire*, the Fifth Circuit held that a court "did not acquire personal jurisdiction" to sanction a party's in-house attorney because the attorney "had not been served with any document that would satisfy the requirement of formal process."  *Id.* at 906-07; *see also Manez v. Bridgestone Firestone North Am. Tire, LLC*, 533 F.3d 579, 590-94 (7th Cir. 2008) (overturning sanctions against attorney who had not been served).  "Actual notice of the litigation does not satisfy the requirement of proper service of a summons under Rule 4, and . . . this same rule applies with at least as great force to a proceeding to consider sanctions against a [nonparty]."  *McGuire*, 48 F.3d at 907 (citation omitted); *see also Manez*, 533 F.3d at 592 ("[T]he kind of casual notice that one can infer from this record that [the nonparty] may have received is not good enough.").

Like the in-house attorney in *McGuire*, Lerner is "not a party to the case (or the alter ego of a party), nor an attorney in [the case], nor a member of the district court's bar, and thus [is] not otherwise subject to the district court's jurisdiction."  48 F.3d at 907.  Accordingly, under *McGuire*, the failure to serve Lerner with the Order and the Special Master's Report under Rule 4 renders this Court without jurisdiction to sanction him.

## II.    THE ORDER MUST BE VACATED BECAUSE THE UNCLEAN HANDS DOCTRINE IS INAPPLICABLE AS MATTER OF LAW.

### A.    The Unclean Hands Doctrine Cannot Be Used to Invalidate Privately Negotiated Attorney-Fee Contracts or to Disqualify a Lawyer From Representing Clients.

1.    *The unclean hands doctrine is a defense to an equitable remedy sought by a plaintiff and thus is inapplicable here.*

The doctrine of "unclean hands" cannot, as a matter of law, give rise to the sanctions recommended against Lerner.  The doctrine is grounded in the maxim that the *complainant* "must come into court with clean hands."  *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244 (1933).  Under the doctrine, a court can refuse to grant relief to a "party," *i.e.*, a

plaintiff, who comes before the court requesting *equitable* relief. *Kansas City So. R. Co. v. Pilgrim's Pride Corp.*, No. 06-0003, 2010 WL 1293340, *11 (W.D. La. Mar. 29, 2010) ("The doctrine of unclean hands allows a court to bar recovery when *a party* asserting an equitable claim against another can be shown to have engaged in fraud or bad faith behavior with that person." (emphasis added) (citation omitted)); *Garcel, Inc. v. Hibernia Nat'l Bank*, No. 01-772, 2002 WL 356307, at *3 (E.D. La. Mar. 5, 2002) ("It is well established in our jurisprudence that the defense of 'unclean hands' is applicable only to actions for *equitable relief*." (emphasis added)). Here, Lerner is not a party seeking equitable relief. He is a member of a law firm that represents claimants who are seeking money damages—a legal remedy. The Special Master has cited no case, and we have found none, that would permit the Court to apply the unclean hands doctrine to a nonparty like Lerner.

The unclean hands doctrine also does not apply because the DHECC has suffered no harm. *See Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979) ("The alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct."). There is no evidence that any AndryLerner claim was manipulated or gained any advantage as a result of the payments to Sutton. Report at 4. Nor is there evidence that the DHECC would not have paid the Thonn claims, if Sutton had disclosed the referral fees. The absence of harm means that the unclean hands doctrine does not apply.

Finally, the doctrine cannot be used against Lerner because his alleged misconduct is not related to the merits of the Thonn claim. The unclean hands doctrine applies to equitable claims raised by "one tainted with inequitableness or bad faith *relative to the matter in which he seeks relief*." *Precision Instrument Mfg. Co. v. Auto. Maint. Machinery Co.*, 324 U.S. 806, 814 (1945)

6

(emphasis added).  It is not applied "where [the] plaintiff's misconduct is not directly related to the merits of the controversy between the parties, but only where the wrongful acts 'in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.'"  *Mitchell Bros.*, 604 F.2d at 863 (internal quotation marks and citation omitted).  Here, the matter in controversy before the DHECC and the Court is the Thonn claim, *i.e.*, was Thonn compensable for loss under the Settlement Agreement.  The payment of a referral fee to Sutton has nothing to do with the *bona fides* of the Thonn claim.  It is a collateral matter to which the maxim of unclean hands does not apply.  *See Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 797 (5th Cir. 1999) (doctrine inapplicable where plaintiffs' unlawful or inequitable conduct is merely collateral to the plaintiff's cause of action).

### 2. *The Court does not have the power to invalidate attorney-fee contracts.*

The doctrine of unclean hands cannot be employed to strip an attorney of fees set pursuant to contract and to invalidate attorney-client contracts.  The Fifth Circuit has held that a court abuses its discretion when it reduces the percentage of a contingency fee contract, when neither party to the contract has expressed dissatisfaction nor has its validity been questioned. *See Brown v. Watkins Motor Lines, Inc.*, 596 F.2d 129, 130-32 (5th Cir. 1979) (district court may not reduce contingency fee where no party petitioned the court to modify the contractual fee agreement; the court had no authority and lacked jurisdiction to force upon parties a remedy they did not seek).  Here, no AndryLerner client has complained about the attorneys' fees.  A wholesale invalidation of every AndryLerner fee contract lies beyond the Court's authority.

### B. The Doctrine of Unclean Hands Cannot Operate to Deprive AndryLerner or Lerner of Attorneys' Fees Beyond the Thonn Claim.

Were the Court to apply the doctrine of unclean hands to invalidate any attorneys' fees, it could not reach beyond the Thonn claim.  Courts apply unclean hands to eliminate a right to

relief *only* when the alleged misconduct "has immediate and necessary relation to the equity that [the party] seeks in respect of the matter in litigation. . . . [and] only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Keystone Driller*, 290 U.S. at 245; *see also Mitchell Bros.*, 604 F.2d at 863 ("The maxim of unclean hands is not applied where plaintiff's misconduct is not directly related to the merits of the controversy between the parties."); *Blessey Marine Servs., Inc. v. Jeffboat, LLC*, Civ. Action No. 10-1863, 2011 WL 3349844, at *6 (E.D. La. Aug. 3, 2011) ("'[T]he flagrancy of a party's behavior must be directly proportionate to the severity of the sanction imposed,' and . . . sanctions must be 'narrowly tailored to serve only their necessary function.'" (citation omitted)).

The only issue before this Court relating to an AndryLerner client claim is whether Sutton received an *improper* referral fee on the Thonn claim. The Special Master has identified no other AndryLerner client claim that was in any way related to Sutton's receipt of a referral fee or that had an associated undisclosed referral fee. Nor has the Special Master identified any alleged misconduct with respect to any other AndryLerner client claims. Therefore, the unclean hands doctrine, if it applies at all, cannot operate to deprive the law firm and Lerner of any attorneys' fees beyond those arising from the Thonn claim.

## III.   THE ORDER MUST BE VACATED AS TO LERNER BECAUSE HE DID NOT ENGAGE IN ANY IMPROPER CONDUCT, LET ALONE ANY UNCONSCIONABLE OR MORALLY REPREHENSIBLE ACTS, THAT WOULD WARRANT APPLICATION OF THE DOCTRINE OF UNCLEAN HANDS.

As we have explained above, the Court can, and should, vacate the Order based solely on Lerner's legal objections. If the Court reaches the facts, the Order should be vacated on that ground, as well. When subjected to *de novo* review, the evidence establishes that Lerner did not engage in any improper conduct, let alone the kind of "unconscionable" or "morally

8

reprehensible" act required to apply the doctrine of unclean hands.  *See Keystone Driller*, 290 U.S. at 245 (doctrine applies only to "unconscionable act[s]" and "violations of conscience" affecting the equitable relations between the parties); *Dahl v. Pinter*, 787 F.2d 985, 988 (5th Cir. 1986) ("conduct must be morally reprehensible" for the doctrine to apply).

### A.   Neither the Thonn Referral Fee nor the Crown LLC Payments Were Intended to "Corrupt" the DHECC Process.

The Special Master concluded that Lerner, Andry, and Sutton "worked together" to corrupt the claims process, Report at 6, 81, and that Sutton accepted payments – specifically, the Crown "salary" and the Thonn fees – "in return for" providing improper advantages to AndryLerner.  Report at 82.  The facts do not support these "findings."

#### 1.   *Sutton did not provide any advantage to any AndryLerner client.*

The most significant proof that there was no scheme to corrupt the settlement process is that Sutton did not provide, or even attempt to provide, any improper advantage to any AndryLerner client, including Thonn.  "The Special Master did not find *any evidence* that either Mr. Sutton or Ms. Reitano directly manipulated the valuation of claims by accessing the DHECC database" or by any other means.  Report at 4, 25, 81 (emphasis added).  Nor did he find any evidence – as opposed to his conclusory pronouncements – that Sutton expedited or advanced any AndryLerner claim in any fashion whatsoever.  Indeed, there is no evidence that Lerner ever communicated with Sutton about any specific claim.[5]

An analysis of Sutton's database accesses confirms that Sutton in no way influenced the processing of any AndryLerner claim.  During his eight-month term of employment, Sutton

---

[5] Lerner testified that he never spoke to Sutton about any specific AndryLerner claim, including Thonn.  Ex. 6 at 69-70.  Sutton testified that Lerner never asked him about Thonn and that only Andry ever asked him directly about the status of any AndryLerner claims.  Ex. 8 at 56.

4288502.5

accessed the CAO's claims database with respect to 188 different claimants.[6]  Of these accesses, *only four* related to an AndryLerner client:  Casey Thonn; Talen's Marine & Fuel LLC; Motivation, Inc; and Vishnu Enterprises, Inc.[7]  As Exhibit 10 shows, Sutton did not access any of these claimant's files *before* the initial eligibility notice issued, if at all.  For each of the three paid Thonn claims, the first eligibility notice issued on or *before* Sutton began work at the CAO on November 1, 2012.  As to Motivation, its eligibility notice issued on February 15, 2013, one month *before* Sutton accessed the claim.  None of the two remaining Thonn claims, the multiple Talen's Marine claims, or the single Vishnu Enterprise claim ever received an eligibility notice.  Thus, Sutton's database accesses resulted in no advantage for any of the four AndryLerner he accessed.  Either the claim was already deemed eligible before Sutton accessed the claim, or it never received an eligibility notice, his access notwithstanding.

Additionally, if Sutton was an "insider" for AndryLerner, the data ought to show that he accessed AndryLerner claims more frequently than others.  But it does not.  With the exception of Thonn, Sutton did not access the AndryLerner claims disproportionately relative to non-AndryLerner claims.  For instance, Talen's Marine, which Sutton accessed 15 times, was one of six claims (excluding Thonn) accessed at least 10 times.[8]  Sutton accessed the Motivation claim only once, and Vishnu Enterprises claim three times.  The most frequently accessed claim, other than Thonn, was not an AndryLerner claim, but for a client of Breit Drescher Imprevento & Walker, P.C., which Sutton accessed 24 times.  Additionally, AndryLerner's clients were not the most accessed by Sutton.  Sutton accessed more client files for six other law firms than for

---

[6] Ex. 11.
[7] Ex. 9.
[8] *Id.*

AndryLerner.[9]  It should come as no surprise that the Thonn claims were the most frequently accessed – Sutton had a financial interest in them.  However, the otherwise standard frequency with which Sutton accessed the remaining AndryLerner claims demonstrates that he was not working as an "insider" for the firm.

The objective data is consistent with the results of the CAO's internal investigation, which determined that neither Sutton nor Reitano "played any part in the actual processing of claims or that they improperly influenced the computation of any claims."  Hr'g. Tr., July 19, 2013, at 49.  This finding is unsurprising, as the multi-staged claims procedure makes it impossible for one CAO employee to corrupt the process.  As the Court observed at the July 19th hearing:  "These claims are analyzed and computed by multiple layers of review and quality control within the program by different analysts and accountants.  . . . [I]t would be highly unlikely, if not impossible, that any single person would be able to falsely inflate or corrupt the processing of claims at the Settlement Program."  *Id.* at 49-50.  The Thonn claims are illustrative. They went through multiple layers of review by DHECC employees and contractors; BP and its review team; and on certain claims, DHECC internal auditors *and*, at the request of Thonn's counsel, an appellate review panel.  Report at 35-38, 40-41; Ex. 3 at ¶ 22-28.  Sutton could not have manipulated the Thonn claims, or any other.

Unable to identify any actual claims manipulation, the Special Master identifies one instance in which Sutton gave Lerner information about the status of AndryLerner claims as evidence of corruption of the claims process.  Report at 40.  In an email dated May 9, 2013,

---

[9] Ex. 11.  For example, Sutton accessed the database for seven clients of the Block Law Firm APLC, the Law Office of Harry Still, LLC, and Sher, Garner Cahill, Richter, Klein & Hilbert, LLC, compared to four of AndryLerner.

4288502.5

Sutton gave Lerner a status summary of the 466 AndryLerner claims before the DHECC (hereafter "May 9 Email").[10]  This email is not evidence of corruption for a host of reasons.

*First*, Sutton did not provide this summary information "at [the] behest" of Lerner, as the Special Master contends.  Report at 81.  The email immediately preceding Sutton's disclosure is a declarative statement from Lerner – "They are not paying claims.  Insane." – that plainly was not an effort to solicit information.

*Second*, providing claims information was open and commonplace at the DHECC. Explaining the May 9 Email, Sutton testified that the email was a "report that I typically would have done a lot because what happens is lawyers would call and say, 'My claims aren't getting paid.  What's going on?  Ya'll are taking too long.' . . . [The email was an effort to show], "Hey, the problem is not in our office.  You guys aren't doing what y'all are supposed to do to get claims processed."[11]  Sutton denied that the May 9 Email provided an advantage to AndryLerner:

> [W]e would have assisted everyone like that. . . . I understood that responding to an attorney that asked a question about the status of his claim, I understood that was a part of my job.  I understood that we were supposed to [] assist attorneys and claimants when they called to understand what was going on with that claim."[12]

Sutton further testified that he accessed the claims database for outside lawyers "[a]t least every day," often at Juneau's behest, who asked him to check claims "several times a week."[13]  Juneau corroborated Sutton's testimony, agreeing that "a regular part of [Sutton's] work" was responding to lawyers' inquiries about claims.[14]  Sutton's access records to the DHECC claims

---

[10] Ex. 12.
[11] Ex. 8 at 105-06.
[12] *Id.* at 107.
[13] *Id.* at 213-14.  Elsewhere, Sutton testified that he queried claims "countless" times, *id.* at 31; it "was part of his daily job," *id.* at 32.
[14] Ex. 5 at 96.

database bear out Juneau's testimony, showing that four out of five times (80%) Sutton accessed the database to review records of a *non*-AndryLerner claimant.[15]

*Third*, Sutton was not the only one at the CAO who fielded lawyer inquiries about the status of claims.  So, too, did Mr. Juneau and other high-level persons.   As Andry testified, he contacted Mr. Juneau directly about the status of all 675 AndryLerner claims and to ask "is there any way we can do something to kind of get all of this going; tell me who I need to talk to; what do I need to do."[16]  Sutton also testified that he and Michael Juneau had to put controls on the number of lawyer inquiries because, according to Mike Juneau, the number of inquiries was "'just getting ridiculous.'"[17]  As Sutton put it, "Lawyers called me every day about claims."[18]

*Fourth*, the summary claims information that Sutton provided Lerner was not confidential.  As the Declaration of AndryLerner lawyer Christina Mancuso establishes, the data supplied in the May 9 Email could be obtained through a DHECC web-based portal.[19]  Sutton's testimony corroborates Mancuso:  "They have access to the same thing that I was looking at, as I understand.  They – the lawyer could look at the portal and look at the same stuff that I was looking at for [the May 9 Email].  That was always my understanding."[20]

*Fifth*, the May 9 Email does not show, as the Special Master claims, that Sutton was providing "advice on how to remedy deficiencies in some claims . . . [i]n return for payments."

---

[15] Ex. 13; Report at 82.  According to the Special Master's numbers, Sutton accessed the claims database 496 times and, of those accesses, 83 were of AndryLerner clients.  That means Sutton on 413 different occasions accessed the electronic claims file of a *non*-AndryLerner claimant.  *See* Ex. 10 (detailing Sutton's accesses on a claimant-by-claimant basis).

[16] Ex. 4 at 23.  Andry also testified that in March 2013, he again spoke directly to Juneau about the status of seven pending claims, including The Andry Law Firm claim.  *Id.* at 55.

[17] Ex. 8 at 208-10.

[18] *Id.*  Juneau further stated that it was not at all unusual to be pushed on claims:  "So we get pushed all the time by people.  Claimants push us, people – politicians push us, everybody pushes us."  Ex. 5 at 97. Juneau's assistant, Rebecca Jenkins, confirmed the frequency of claim inquiries, telling the Special Master "people are constantly calling to check in on claims."  Ex. 14 at 2.

[19] Ex. 3 at ¶ 35.  ("The type of information contained in the email dated May 9, 2013, between Lionel Sutton and Glen Lerner, which I was only recently shown, is made available to any firm filing DWHCC claims through the Attorney Claim Portal website's Reporting tab and other sources . . .").

[20] Ex. 8 at 109.

Report at 82.  Rather, he was merely doing his job.  According to Section 4.3.7 of the Settlement Agreement, the Claims Administrator and its vendors are required to use their "best efforts" to provide claimants "with assistance, information, opportunities and notice" so that the claimant "has the best opportunity to be determined eligible for and receive" a settlement payment.  Rec. Doc. 6430-1 at 18.   By identifying claim deficiencies Sutton was simply doing what the Settlement Agreement required him to do.

*Finally,* in a follow-on email omitted from the Report, Lerner asked whether he could "share this [the claims summary] with my office manager Susan [DeSantis]?" Sutton responded, "Yes.  And she should know to call me when she has problems."[21]  If there was anything illicit about Sutton providing claims information to Lerner, Lerner would not have asked, and Sutton surely would not have acceded, to sharing the information with DeSantis.

In addition to the May 9 Email, the Special Master cites three additional emails – dated March 16, 2012; January 29, 2013; and February 15, 2013 – between Lerner and Sutton to support his allegation that "Lerner and Mr. Sutton intended to exercise improper personal influence within the CAO in order to advance their mutual benefit."  Report at 21.  The emails reflect the kind of harmless banter one would expect from long-time friends who also are business partners, and none contain any evidence of any nefarious intent to corrupt the claims process.  For instance, in the March 16, 2012, email in which Lerner states "How can we use [Reitano's employment with the CAO] to our benefit," Sutton tersely responds "Not sure" and immediately moves on to a question about Crown business.[22]  Also, in the February 15, 2013, email, within a long discussion about Crown business ("We need to suck it up for about 8 months and then I think the world is our oyster"), Lerner plainly is being tongue-in-cheek by

---

[21] Ex. 15.
[22] Ex. 16.

exclaiming that "I'd be on easy street if Mr. Andry could settle some BP claims!"[23]  Two lines later, Lerner references visiting Duke University to see a game against North Carolina.  These are not emails of people scheming to corrupt the claims process.[24]  Indeed, as discussed further *infra*, these very emails and others contain exchanges that show there was no scheme to corrupt.

<blockquote>

2.    *There was no "agreement" among Lerner, Andry, and Sutton to influence the claims process or gain an unfair advantage.*

</blockquote>

Though the Special Master "found" that Lerner, Andry, and Sutton "worked together" to corrupt the claims process, Report at 6, 81, the facts are to the contrary.  The evidence shows that the payments made to Sutton were not the product of any agreement among the three lawyers, but were made based on a good faith understanding that Sutton was entitled to the payments and that his receipt of them had been disclosed and approved by Mr. Juneau.

Lerner agreed to make the Crown payments to Sutton long before Sutton went to work for the CAO.  Lerner and Sutton became business partners in Crown in May 2010.[25]  In or about June 2012 – six months *before* Sutton was offered a position with the CAO – Lerner agreed to buy out a portion of Sutton's and two other partners' equity stakes in Crown.  Lerner agreed to pay Sutton $120,000 for his equity stake, to be paid over a 12-month period.[26]  Lerner and Sutton could not have possibly agreed to corrupt the claims process through the Crown payments when

---

[23] Ex. 17.

[24] The Special Master concludes that the Thonn Claim "discloses fraudulent characteristics."  Report at 10.  The Mancuso Affidavit squarely refutes this finding.  Ex. 3 at ¶ 29-30.  Regardless of the claim's *bona fides*, Lerner was not in any way involved in its preparation or submission.

[25] Founded on April 16, 2010, four days *before* the Deepwater Horizon explosion, Crown was established by Sutton and two others to sell water reclamation solutions for industrial wastewater in the mining, oil and gas industries.  Ex. 18.  The Special Master did not question the legitimacy of Crown.

[26] Ex. 6 at 48-50.

their equity buyout agreement was struck six months before Sutton knew he would be working for the CAO.[27]

Nor were the Thonn fee payments the product of any agreement among Lerner, Andry, and Sutton.   Report at 21, 82.   To the contrary, the evidence shows that Lerner and Andry strongly *disagreed* about paying a referral fee.   Sutton never spoke to Andry about the referral fee; only to Lerner.[28]   When Andry learned about the referral fee from Lerner, he objected to paying it because Sutton and his wife were employed with the CAO.   Andry testified that he thought "it wasn't proper for [Sutton and Reitano] to receive a fee because they worked at the facility" and he "object[ed] to a fee being paid" and made his objection clear to Lerner.[29]   Lerner corroborated Andry's account, testifying that Andry was "definitely uncomfortable" with and "objected to" the referral fee payments.[30]   Lerner, however, told Andry that he intended to honor the fee payment, because Sutton had assured him that Mr. Juneau had approved Sutton's receipt of the fee, *see infra*.   These accounts are supported by Susan DeSantis, who worked on behalf of Lerner at AndryLerner.   DeSantis has attested in a Declaration obtained by counsel[31] that she understood that Sutton had referred Thonn to AndryLerner, but Andry adamantly objected to AndryLerner paying Sutton the referral fee.[32]   Lerner and Andry cannot have formed a scheme to corrupt the claims process, when they disagreed about making the fee payments.   *See United States v. Falcone*, 311 U.S. 205, 210 (1940) ("The gist of the offense of conspiracy . . . is

---

[27] Sutton strongly denied any connection between the Crown payments and the DHECC's payment of Thonn's claims:  "One didn't have anything to do with the other. . . .  [The Thonn claim] had nothing to do with Crown."  Ex. 8 at 66.

[28] *Id.* at 69, 132; Ex. 6 at 30.  Sutton was certain that he did not speak to Andry because, at the time of the referral, the two were not on speaking terms because of a fee dispute in an unrelated, earlier case.

[29] *See* Ex. 4 at 31, 48.

[30] Ex. 6 at 29, 58.  *See also id.* at 37 (Andry was "uneasy" with referral fee payment).  The Report found that "[t]he available evidence reveals no hint of disagreement by Mr. Jon Andry to paying Mr. Sutton the Thonn referral fee." Report at 33.  Not so.  Lerner testified that Andry disagreed with paying the referral fee.  Ex. 6 at 29, 58.

[31] The Special Master interviewed DeSantis but what she told the Special Master is unknown to Lerner, because her unredacted interview memorandum has not been produced.

[32] Ex. 2 at ¶ 5-6.

agreement among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy.").

Other evidence demonstrates that the Thonn fee payments were not made for an unlawful or improper purpose. *First*, a key email that the Special Master failed to uncover[33] soundly refutes the allegation that, "[i]n return for payments from Lerner and Mr. Jon Andry, Mr. Sutton . . . expedited the processing of the claims." Report at 82. In an email dated January 29, 2013 – between the first and second Thonn payments – Lerner asked Sutton: "How can we speed up our review process?" Sutton responded:

> *You can't.* Yours are going pretty fast. The process will get faster on its own as grey areas are resolved and applied *across the board*. What you can do is make sure that any incomplete notices are responded to asap. Previously, responses to incomplete notices were sent to the back of the line but we will be streamlining that process very soon.

(Emphasis added.)[34] Sutton told Andry the very same thing. At a lunch, Andry asked if Sutton could help the slow-moving AndryLerner claims. According to Andry, Sutton's response was "he wasn't over any claims. Didn't deal with any claims. And he understood my concern and my complaint because that was happening a lot, but [said] that the facility was getting better, and that they were trying to process claims."[35] The veracity of Sutton's responses is confirmed by his database accesses, *supra*, which show that he did nothing to advance any AndryLerner claim.

*Second*, Lerner's uncontradicted testimony is that he agreed to pay Sutton based on the understanding that Mr. Juneau *had approved* Sutton's receipt of the Thonn fees. Lerner told the Special Master that he recognized the potential conflict of interest created by paying Sutton a

---

[33] If he did uncover it, the Special Master did not produce it to Lerner, raising the question of what other favorable information has the Special Master withheld.
[34] Ex. 23.
[35] Ex. 4 at 25-26.

referral fee,[36] and that he agreed to make the payments only because Sutton told him that

Mr. Juneau had authorized Sutton to receive it.

> Q.      Let's stick with the conversations about this between you and Jon [Andry].
>
> A.      I think Jon was definitely uncomfortable in two manners:  First, I mean, obviously at first glance referring or paying a fee on a case to somebody that's working at the claims administration office would raise eyebrows, and so Jon was like, I don't feel comfortable paying him.  And obviously my answer was, well, based upon my conversation at the time he referred that case, and I knew *Thonn* was the case because that was the only case we got referred from him, he represented that he had disclosed this to Mr. Juneau.
>
> Q.      You're saying he.  Who are you referring to?
>
> A.      "Tiger" Sutton.  *At the time he referred the case, he represented that he had told Mr. Juneau about this, and there was no issue with the fee.*
>
> Q.      Did he tell that to you?  Mr. Sutton.
>
> A.      Sir, yes, sir, of course.  That's the reason I took the case.
>
>                                    . . .
>
> A.      My first thing was, well, first, I said, "Did you clear this with your boss?  Is this okay?"  [Sutton] said, "I told Pat Juneau about the case.  There are no issues with me referring the case.  I have no involvement with it." . . . . So I had no reason to not believe "Tiger," having known him for 25 years.  I said, "Fine, send it over to the office."  That was all I said.

(Emphasis added).[37]  The Report barely acknowledges Lerner's critical testimony.  Report at 5,

29.  The Report also omits a key email showing that Sutton continued to mislead Lerner after

the CAO's investigation began.  In an email dated July 9, 2013, Sutton told Lerner:  "I told Pat

---

[36] Lerner previously had raised conflict of interest concerns with Sutton.  In an email dated March 16, 2012, after learning that Reitano had accepted a job at the CAO, Lerner asked Sutton:  "Is there a conflict with my cases (Andry Lerner) going in front of her with our business relationship?  Will she get my FLorida [sic] cases too?"  Sutton assured Lerner:  "No conflict.  She will be working for the special master."  Ex. 16.  Additionally, Lerner testified that he was "pissed" when he learned that Sutton had taken the job with the CAO because of the potential appearance of a conflict of interest.  Ex. 6 at 52.  He asked Sutton, "'Why are you taking the job?  I got all my cases with BP.  You're a salaried employee.  Did you clear this with Mr. Juneau?  Does he know?'  . . . Because it just didn't look kosher, you know?'"  *Id.*

[37] *Id.* at 29-30.  Lerner also testified that he asked Sutton "if it was okay to send the case," and Sutton responded, "'yes, I cleared it with Pat.'"  *Id.* at 43.  *See also Id.* at 57-59 ("'Tiger' gave me his word that it was okay for him to receive [the Thonn fee], I had no reason not to believe 'Tiger.'"; "I had no reason to believe there was any issue with [the referral fee].  'Tiger' had told me he had disclosed it to Mr. Juneau.").

about [Thonn] before I started.  When this first came up i told Pat that the only case I sent was thonn before I started.  He told me that he already knew about Thonn because he remembered that I told him . . .".[38]  Like his representation that Mr. Juneau had approved the referral fee payments,[39] these statements to Lerner were not true.

*Third*, the timing and circumstances of the client referral demonstrate that Thonn was unconnected to Sutton's employment with the CAO.  Despite Sutton's representation to Lerner that he was referring Thonn to AndryLerner, Reitano, not Sutton, referred Thonn to the firm  in or about early April 2012, around the time she went to work for the CAO and at least six months before Sutton was offered a job with the CAO.[40]  Reitano testified that she had not conferred with her husband about referring the Thonn claim to AndryLerner; nor had she expected that she or her husband would be paid a referral fee.[41]  She also did not speak to Lerner about the referral.[42]  Lerner, Andry, and Sutton could not have agreed to corrupt the claims process when Sutton was not involved in the Thonn referral and, even if he was, the referral occurred six months before the job opportunity arose with the CAO.

*Fourth*, the evidence shows that Lerner did not perceive the Thonn payments as anything other than a proper referral fee.  In fact, Lerner barely recalled the agreement and its terms.

---

[38] Ex. 22 at 2.

[39] Ex. 8 at 69.

[40] The accuracy of this timing is corroborated by an email dated April 3, 2012, from AndryLerner attorney Christina Mancuso to Casey Thonn, in which she wrote:  "A pleasure speaking with you today.  Called and left a message for attorney Christine Reitano re please send me the disc with claim information of claimant Casey Thonn.  I will make you a copy once I receive this disc.  We will send you an intake packet."  Ex. 19.  Furthermore, almost five months before Sutton went to work for the CAO, Thonn signed a Power of Attorney form, filed with the DHECC, on June 8, 2012, authorizing AndryLerner to serve as his counsel.  Ex. 20.  Mancuso confirmed in her interview with the Special Master and in her Declaration that Reitano referred Thonn.  Ex. 21; Ex. 3 at ¶ 7.

[41] Ex. 7 at 105.  Though the Special Master suggests that Reitano expected a referral fee, Report at 26-27, that is untrue, as described in the attached Mancuso Affidavit.  Ex. 3 at ¶ 9 ("Reitano did not request a referral fee during this call or during any other calls which I had with her.").

[42] Ex. 6 at 32 (Lerner's testimony that he did not have a conversation with Reitano about the Thonn case; "I didn't even know it was Christine's case").

19

- In a December 14, 2012 email,[43] Andry asked Lerner, "did you talk to Tiger about Thonn," to which Lerner quizzically responded, "Thonn?"[44]  After Andry explained that Sutton had asked about the initial fee payment, Lerner again asked Andry:  "what is thon [sic]?"  Only after Andry explained that "it is Casey Thon [sic] the case that Tiger referred" did it refresh Lerner's memory, prompting him to respond, "We were going to pay Thon [sic] but only once I'm paid.  Not paying out of my pocket."

- A month later, on January 7, 2013, when Sutton asked Lerner to check on the first Thonn fee payment,[45] Lerner asked his CFO, Jeff Cahill, whether he had received any fees relating to Thonn and, again evincing his lack of knowledge or recollection about the referral fee, asked Sutton, "Tiger, how much is your fee[?]"[46]

- Two months later, on March 20, 2013,[47] Lerner again expressed confusion about the referral fee.  In response to an email from Susan DeSantis that she would be mailing the second Thonn referral fee check, Lerner said:  "I'm confused on Thonn.  I am supposed to give referral attorney 50% correct?  That was our deal with him.  If fee was $33K and you send me $16k for my end and I'm supposed to send him the full $16k then I get no fee.  Same as the last referral."  DeSantis answered, "Your 40% will be in a draw not referral," to which Lerner simply said, "ok."

---

[43] Ex. 24 at 2-3.
[44] *Id.* at 3. Lerner testified that he did not come to know the name Casey Thonn until Sutton raised the payment of his fee. Ex. 6  at 22-23.
[45] Ex. 25.
[46] Ex. 26.  The email corroborates Lerner's testimony that he did not negotiate a percentage fee arrangement with Sutton at the time of the referral.  Ex. 6 at 61.
[47] Ex. 27.

4288502.5

If the Thonn fees were in fact agreed-upon graft payments, as the Special Master contends, surely Lerner would have remembered them.[48]

*Finally*, contrary to what the Special Master contends, Report at 5, Lerner's non-disclosure of the Thonn fee or his ownership share in Crown to the DHECC does not prove he intended to conceal those payments. Lerner owed no duty of disclosure to the DHECC. The DHECC's Code of Conduct Policy imposes the burden of avoiding and disclosing conflicts of interest on its "Contractors, Subcontractors, and Vendors."[49] It was Sutton's responsibility to disclose any potential or actual conflicts of interest, and Lerner understood that he had done so.

### B.   The Manner of Making The Payments Was Not Meant to Conceal Them.

The manner of paying the Thonn fees is not, as the Special Master contends, Report at 5, proof of an intent to conceal. The payments that reached Sutton were first issued to Lerner's law firm in Nevada, Glen Lerner & Associates. According to Susan DeSantis, this came about because Andry was adamant that AndryLerner would not pay a referral fee to Sutton.[50] DeSantis asked Kay Perkins, the then-office manager at AndryLerner, to issue a check for half of the 20% attorneys' fee to Glen Lerner & Associates (she does not recall who authorized the payment). Once the initial disbursement process was set up, checks for Thonn's claims were processed in the same manner.[51] DeSantis disclaimed any intent to conceal payments to Sutton.

Once the funds arrived in Glen Lerner & Associates' accounts, it was not Lerner who directed that they be forwarded to the "Old Crown Account." That instruction was provided by

---

[48] Lerner's lack of recall is consistent with his description of the initial conversation about the Thonn fee with Sutton. Lerner testified that the conversation was "a 15- to 30-second conversation in [Tiger's] Suburban with 'Tiger.'" Ex. 6 at 29.

[49] Ex. 28 at § 1.0.

[50] Ex. 2 at ¶ 6.

[51] *Id.* at ¶ 8. It is also evident from the email traffic that Lerner was not keeping track of when AndryLerner issued checks to Glen Lerner & Associates. *See* Ex. 26 (Lerner asking Cahill, "Jeff, did we receive monies from Andry. If so, Tiger, how much is your fee?"); Ex. 29 (Lerner asking Cahill, "Did we receive Thon? . . . Tiger, what was the deal on that?").

4288502.5

Sutton.  According to the attached Declaration of Glen Lerner & Associates CFO, Jeff Cahill, he wired the referral fee payments to the Old Crown Account at Sutton's request, without direction from Lerner.[52]  Email corroborates Cahill's account.  As to the first payment, Sutton directed Cahill to "deposit [it] in the crown acct so I can get it."[53]  According to Cahill, Sutton likewise directed that the second referral payment be made to the Old Crown account.[54]  With respect to the third referral fee payment – contained within a $25,000 wire transfer from Glen Lerner & Associates to the "new" Crown Account – Cahill explained that he combined it with another Crown payment for administrative convenience.[55]  Lerner was not involved in that decision.

Nor are there any false accounting records in this case that might support an intent to conceal.  The referral fee checks from AndryLerner to Glen Lerner & Associates were clearly marked as relating to the Thonn claim.  The first check is marked "Casey Thonn VoO Charter Payment;" the second is marked "Casey Thonn/Boat Captain" and "Referral Fees/Boat Captain"; and the third is marked "Casey Thonn" and "Attorney Fees/Vessel Owner."[56]  Similarly, the books and records of Glen Lerner & Associates and Crown reflect the true nature of the wires sent to Sutton.  The wiring instruction for the second referral fee reflects the name "Casey Thonn."[57]  So, too, does the wiring instruction for the third payment from the "new" Crown account to the Old Crown Account.[58]  Moreover, Glen Lerner & Associates' ledger entries

---

[52] Ex. 1 at ¶¶ 14-15, 28-29.
[53] Ex. 30.
[54] Ex. 1 at ¶ 17.
[55] *Id*. at ¶¶ 23-25.
[56] Ex. 31.
[57] Ex. 32.
[58] Ex. 33.

4288502.5

accurately reflect that the referral fees were for Sutton on the Thonn claim.[59]  These entries are all accurate because no one believed there was anything to hide.

### C.     Lerner Did Not Lie to the Special Master or Participate in Any Coordinated Response to the CAO's Internal Investigation.

The Special Master's other assertions of wrongdoing by Lerner demonstrate the indiscriminate character of his accusations.  In a heading on page five of the Report, the Special Master suggests that Lerner made "material false statements and omissions."  (Capitalization omitted.)  The Special Master does not, however, identify any material false statement or omission made by Lerner.  Similarly, in a heading on page 43, the Special Master alleges that Lerner and others "discuss their response to the CAO."  (Capitalization omitted.)  However, Lerner never made any statements to the CAO's internal investigators, and he did not confer with anyone else about testimony before the CAO.  Report at 43-44.

### D.     Lerner Did Not Violate the Nevada Rules of Professional Conduct.

The Special Master suggests that Lerner may have violated Rule 1.5 of the Nevada Rules of Professional Conduct by failing to secure a written referral fee agreement with Thonn.  Not so.  Lerner did not personally provide legal services to Thonn.  Therefore, to the extent Lerner could be held responsible for the failure to prepare a written referral fee agreement, it would have to be under Rule 5.1 of the Nevada Rules.  That rule provides that a lawyer of a law firm "shall be responsible for another lawyer's violation of the Rules of Professional Conduct if . . . [t]he lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or [t]he lawyer is a partner . . . and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action."  There is no evidence that Lerner

---

[59] Ex. 34.  The General Ledger's entries refer to the fees, in chronological order, as "Thonn, Casey Claim" and "Pass through to Tiger Sutton"; "Andry referral deposit" and "Thonn pmt to Tiger Sutton"; and "Correct transfer to Crown – part was thonn." *Id.*

ordered or ratified the absence of a written referral fee agreement or knew of the absence of a written referral fee contract and failed to correct it.  He, therefore, did not violate Rule 1.5 by failing to secure a written referral fee agreement from Thonn.  In any event, a professional rules violation of this sort does not rise to the level of "unclean hands."

## IV.  THE COURT CANNOT SANCTION LERNER WITHOUT AN EVIDENTIARY HEARING.

For the reasons set forth in Sections I-III above, this Court should vacate the Order.  If, however, the Court declines to vacate the Order at this stage, Lerner must be afforded additional process before sanctions may be imposed.

Due process protections must be afforded to persons who, as here, face sanctions that are criminal in nature.  *See Crowe v. Smith*, 151 F.3d 217, 227, 228 (5th Cir. 1998) (due process violated when sanctions were "criminal in character" without "affording the benefit of an independent and impartial prosecutor"); *F.J. Hanshaw Enterps., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1139 (9th Cir. 2001); *Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 130 (2d Cir. 1998).  A sanction is considered criminal if it is "punitive, to vindicate the authority of the court," but civil if it "either coerce[s] the [sanctioned party] into compliance with a court's order, [or] . . . compensate[s] the [other party] for losses sustained."  *Int'l Union*, *United Mine Workers of Am.* v. *Bagwell*, 512 U.S. 821, 828-29 (1994) (citation omitted).  The recommended sanction here – invalidating all of AndryLerner's attorney-fee contracts and disqualifying Lerner from representing clients before the CSSP – is plainly punitive and is intended to vindicate the court's authority, as it would result in millions of dollars in lost fees.  Nor is the proposed penalty intended to coerce compliance with a court order or to compensate a party for loss.  *See F.J. Hanshaw*, 244 F.3d at 1138 (holding that a $500,000 sanction was "criminal in nature" because it was "clearly punitive and intended to vindicate the court's authority," "was not intended to

compensate," and "could not be avoided by future compliance"); *Mackler Prods.*, 146 F.3d at 129 (concluding that a $10,000 sanction was criminal in nature because "it did not seek to coerce future compliance," "no opportunity to purge was provided," and it "was payable to the court, rather than to the injured party").[60]

An evidentiary hearing in this matter is critical because Lerner was not given an opportunity to participate in the proceedings before the Special Master. *See Ruiz*, 679 F.2d at 1162-63 (allowing a special master "to submit to the district court 'reports based upon his own observations and investigations in the absence of a formal hearing before him' . . . not only transcends the powers traditionally given masters by courts of equity, but denies the parties due process"). The Special Master's refusal to provide complete discovery of the investigatory record only magnifies the prejudice Lerner will suffer, unless granted an evidentiary hearing. *See Crowe*, 151 F.3d at 230-31. Accordingly, if the Court does not vacate the Order, the Court must issue a scheduling order for discovery and set this matter for an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, Glen J. Lerner respectfully requests that the Court vacate the Order to Show Cause.

---

[60] Even if the sanctions recommended by Special Master Freeh were civil in nature, Lerner is still entitled to an evidentiary hearing because the alleged conduct occurred outside of the court's presence. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 57 (1991) ("As long as a party receives an appropriate hearing, . . . the party may be sanctioned for abuses of process occurring beyond the courtroom."); *Hazeur v. Keller Indus.*, 983 F.2d 1061, 1993 WL 14973, at *5 (5th Cir. 1993) (explaining that "due process considerations undoubtedly are implicated" when a court "imposes sanctions under its inherent authority," and that "such sanctions should not be imposed 'without fair notice and an opportunity for a hearing on the record'") (citation omitted).

4288502.5

*/s/ William W. Taylor*

Pauline F. Hardin (La. Bar #6542)
James E. Wright, III (La. Bar #13700)
Virginia W. Gundlach (La. Bar #18493)
**JONES WALKER LLP**
201 St. Charles Ave. – 49ᵗʰ Floor
New Orleans, Louisiana 70170
Telephone: (504) 582-8110
Fax: (504) 589-8110
phardin@joneswalker.com
jwright@joneswalker.com
ggundlach@joneswalker.com

William W. Taylor, III (D.C. Bar #84194)
Amit P. Mehta (D.C. Bar #467231)
**ZUCKERMAN SPAEDER LLP**
1800 M. Street, NW – Suite 1000
Washington, D.C. 20036-5807
Telephone: (202) 778-1800
Fax: (202) 822-8106
wtaylor@zuckerman.com
amehta@zuckerman.com

*Attorneys for Glen J. Lerner*

26

4288502.5

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing "GLEN LERNER'S RESPONSE TO THE COURT'S SEPTEMBER 6, 2013, ORDER TO SHOW CAUSE AND OBJECTIONS TO SPECIAL MASTER'S REPORT" has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 16th day of December, 2013.


_/s/ William W. Taylor_
William W. Taylor, III

27