EXHIBIT 6

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3     *************************************************************

 4     IN RE:  OIL SPILL BY THE
       OIL RIG DEEPWATER HORIZON
 5     IN THE GULF OF MEXICO ON
       APRIL 20, 2010
 6                                CIVIL ACTION NO. 10-MD-2179 "J"
                                  NEW ORLEANS, LOUISIANA
 7                                WEDNESDAY, JULY 31, 2013, 1:00 P.M.

 8     THIS RELATES TO ALL CASES

 9     *************************************************************

10
                      SWORN STATEMENT OF GLEN LERNER, ESQUIRE
11                 TAKEN BEFORE THE HONORABLE LOUIS J. FREEH
                               SPECIAL MASTER
12

13     APPEARANCES:

14
                                  LOUIS J. FREEH, SPECIAL MASTER
15                                MATTHEW DOLAN, ESQUIRE

16
                                  JONES WALKER
17                                PAULINE F. HARDIN, ESQUIRE
                                  JAMES E. WRIGHT, III, ESQUIRE
18                                201 ST. CHARLES AVENUE
                                  NEW ORLEANS LA  70170
19

20
       OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
21                                CERTIFIED REALTIME REPORTER
                                  REGISTERED MERIT REPORTER
22                                500 POYDRAS STREET, ROOM HB406
                                  NEW ORLEANS, LA   70130
23                                (504) 589-7779
                                  Cathy_Pepper@laed.uscourts.gov
24
       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
25     PRODUCED BY COMPUTER.
```

**C O N F I D E N T I A L**

SM-03-GL00425

01:17PM 1    also licensed in Nevada, Arizona, Minnesota.  I'm not sure if

01:17PM 2    he got licensed in Illinois yet, but I know he's trying to.

01:17PM 3              We have Andry Lerner, and I have a small little

01:17PM 4    office in Naples where I'm moving with one attorney there named

01:17PM 5    Marni Scuderi.

01:17PM 6    Q.   What's the name of that firm if it's been named?

01:17PM 7    A.   Glen Lerner Injury Attorneys.

01:17PM 8    Q.   Are you the only principal member there?

01:17PM 9    A.   Sir, yes, sir.

01:17PM 10   Q.   Let's talk -- you just mentioned the Andry Lerner firm?

01:17PM 11   A.   Pardon me?

01:17PM 12   Q.   You just mentioned the Andry Lerner firm?

01:17PM 13   A.   Sir, yes, sir.

01:17PM 14   Q.   You and Jon Andry are the two members there?

01:17PM 15   A.   Yes, sir.

01:17PM 16   Q.   Anyone else who's had a membership or equity interest in

01:17PM 17   it?

01:17PM 18   A.   As far as I know, no, sir.

01:18PM 19   Q.   Approximately when was that started?

01:18PM 20   A.   Maybe a year and a half to two years ago.  It's going to

01:18PM 21   be my best guess.  I think that's when we did all the

01:18PM 22   partnership agreements and all that stuff according to the laws

01:18PM 23   of Louisiana.  I know it took a while for the attorneys to

01:18PM 24   draft everything up and then finally they sent it to me.

01:18PM 25   Q.   How is the ownership or equity or control of that divided

**C O N F I D E N T I A L**

**SM-03-GL00438**

01:18PM 1   between you and Mr. Andry?  I'm talking about Jon Andry now.

01:18PM 2   A.   I believe there is a 40/60 split, if I'm not mistaken, at

01:18PM 3   least in terms of everything that we're doing -- any existing

01:18PM 4   cases.  And I think it's 40/60 on any existing cases, and then

01:18PM 5   anything that I referred into the firm was 50/50.

01:18PM 6   Q.   What about something that Mr. Andry refers into the firm?

01:18PM 7   A.   That would be 40/60.

01:18PM 8   Q.   Who's got the 60?

01:18PM 9   A.   Jon Andry is 60.

01:18PM 10  Q.   And you're 40?

01:18PM 11  A.   Sir, yes, sir.

01:18PM 12  Q.   Did you put any seed money into the formation of that

01:19PM 13  entity?

01:19PM 14  A.   Oh, yes, sir.

01:19PM 15  Q.   Approximately how much?

01:19PM 16  A.   About a million, two to get it going.  It wasn't so much

01:19PM 17  to get it going.  It was a process over about a course of a

01:19PM 18  year just, I think, to help the firm keep growing and to

01:19PM 19  sustain it during the nascent stages of *BP* litigation and other

01:19PM 20  stuff we were hoping to get involved in.

01:19PM 21  Q.   Did Mr. Andry contribute or invest any money there?

01:19PM 22  A.   Part of the -- no, sir.  I mean, certainly I think he was

01:19PM 23  taking his money that he'd earned and keep the lights on and

01:19PM 24  everything, so, but in terms of buying into the firm or

01:19PM 25  something, it was basically his existing firm already.  I was

**C O N F I D E N T I A L**

SM-03-GL00439

01:19PM 1    buying into it and getting involved in helping the firm
01:19PM 2    hopefully grow.
01:19PM 3    Q.   Approximately how many people, if you know, are employed
01:19PM 4    in the firm, and again, an approximation between lawyers and
01:19PM 5    nonlawyers.
01:19PM 6    A.   My guess, I think there were, including Jon, there might
01:20PM 7    be either four or five attorneys, if I'm not mistaken.   And
01:20PM 8    support staff.   Gosh, I don't know, maybe ten or so.
01:20PM 9    Q.   Was the primary purpose of establishing that firm to
01:20PM 10   address and deal with what's been referred to as the *BP*-related
01:20PM 11   litigation?
01:20PM 12   A.   Part of it, yes, sir.   Certainly, I think, we looked at BP
01:20PM 13   as a launching point for it, and also the fact that I've been,
01:20PM 14   you know, with my practices, we do so many claims on a monthly
01:20PM 15   basis, and so my business acumen as relating to the
01:20PM 16   administration of claims was far greater than Jon's, so I think
01:20PM 17   I brought a lot to the table in that respect, and also the
01:20PM 18   ability -- obviously I was bringing some financial assistance
01:20PM 19   to keep everything floating.
01:20PM 20   Q.   You said that was part of it.   Was there another part or
01:20PM 21   at least --
01:20PM 22   A.   I think we were looking to --
01:20PM 23   Q.   If you just let me finish my question --
01:20PM 24   A.   Oh, yes, sir.   I'm sorry.
01:20PM 25   Q.   So Ms. Pepper doesn't yell at me.

**C O N F I D E N T I A L**

SM-03-GL00440

01:28PM 1  A.   On a relatively regular basis, more of a need-to-know

01:28PM 2  basis on my part.  Every now and then she would just send me

01:28PM 3  something, I guess, to the best of my knowledge that this is

01:28PM 4  happening, that is happening, but I couldn't tell you how

01:28PM 5  often.

01:28PM 6  Q.   How often would you speak to her on the telephone during

01:28PM 7  this period?

01:28PM 8  A.   Not that often.

01:28PM 9  Q.   Would you have meetings with her only when you came in as

01:28PM 10  you described, a day or two a month or did you meet more often?

01:28PM 11  A.   I wasn't even in that often.  I would say every six weeks

01:28PM 12  to two months.

01:28PM 13  Q.   You would come and spend the whole day there?

01:28PM 14  A.   Part of the day.  Enough to just talk with everybody.  I'm

01:28PM 15  the happy guy in the office.  I walk around and I'm kind of

01:28PM 16  like Kris Kringle.  I spread good cheer.  Everybody is always,

01:28PM 17  Come down more often.  We love it when you're in the office.  I

01:29PM 18  try to infuse the place with a certain energy but still, you

01:29PM 19  know, we're a business.  And so -- but I wasn't there that

01:29PM 20  often.

01:29PM 21  Q.   Would you be familiar, even on a general basis, with the

01:29PM 22  number of cases or the names of cases or the types of cases

01:29PM 23  that were in that law firm?

01:29PM 24  A.   No, sir.  In fact, I didn't even know the name of the

01:29PM 25  *Thonn* case until I saw the e-mails on it.  I didn't know the

**C O N F I D E N T I A L**

SM-03-GL00446

01:29PM  1    name of any cases.  That wasn't really part of my job
01:29PM  2    description.
01:29PM  3    Q.    So you're referring now to the *Casey Thonn* case?
01:29PM  4    A.    Sir, yes, sir.
01:29PM  5    Q.    The first time you learned that your firm represented him,
01:29PM  6    meaning the Andry Lerner firm, was reading e-mails?
01:29PM  7    A.    I knew we represented somebody.  I didn't know the name of
01:29PM  8    the guy until I actually saw the e-mail and getting paid on it.
01:29PM  9    Q.    I'm sorry, I don't understand your answer then.  You said
01:29PM  10   you knew we represented somebody?
01:29PM  11   A.    Well, I knew, when it was "Tiger" sending an e-mail about
01:29PM  12   the case, "Where is my fee?", I guess because that's part of
01:30PM  13   the reason we're here, I suppose, I didn't even know who
01:30PM  14   Casey Thonn was.  I just knew that "Tiger" had referred a case
01:30PM  15   to the office.  I didn't know the name of the guy.
01:30PM  16   Q.    You didn't notice on the e-mails the name Thonn,
01:30PM  17   T-H-O-N-N?
01:30PM  18   A.    I didn't really pay attention to it until I saw "my fee,"
01:30PM  19   and then I figured out this must be the guy.  I knew nothing
01:30PM  20   about the case.  I'd never spoken to the guy.  I didn't even --
01:30PM  21   when the case was referred over, I had nothing to do with the
01:30PM  22   actual handling of the case when he referred over.
01:30PM  23   Q.    Did you ever meet Casey Thonn?
01:30PM  24   A.    No, sir.
01:30PM  25   Q.    Did you ever speak to him on the phone as far as you know?

**C O N F I D E N T I A L**

01:36PM 1  follow up with that?

01:36PM 2  Q.   Let's stick with the conversations about this between you

01:36PM 3  and Jon.

01:36PM 4  A.   I think Jon was definitely uncomfortable in two manners:

01:37PM 5  First, I mean, obviously at first glance referring or paying a

01:37PM 6  fee on a case to somebody that's working at the claims

01:37PM 7  administration office would raise eyebrows, and so Jon was

01:37PM 8  like, I don't feel comfortable paying him.  And obviously my

01:37PM 9  answer was, Well, based upon my conversation at the time he

01:37PM 10  referred that case, and I knew *Thonn* was the case because that

01:37PM 11  was the only case we got referred from him, he represented that

01:37PM 12  he had disclosed this to Mr. Juneau.

01:37PM 13  Q.   You're saying *he*.  Who are you referring to?

01:37PM 14  A.   "Tiger" Sutton.  At the time he referred the case, he

01:37PM 15  represented that he had told Mr. Juneau about this, and there

01:37PM 16  was no issue with the fee.

01:37PM 17  Q.   Did he tell that to you?  Mr. Sutton.

01:37PM 18  A.   Sir, yes, sir, of course.  That's the reason I took the

01:37PM 19  case.

01:37PM 20  Q.   When he told you that, did you make a notation anywhere or

01:37PM 21  reference it in an e-mail or make any recording of that?

01:37PM 22  A.   No, sir.  In fact, my whole conversation about the

01:38PM 23  referral of this case, which I subsequently came to be known as

01:38PM 24  *Mr. Thonn*, was probably a 15- to 30-second conversation in a

01:38PM 25  Suburban with "Tiger," where we said, "Hey, now that I'm going

**C O N F I D E N T I A L**

SM-03-GL00453

01:38PM 1    to go work for the claims administration office, I have one

01:38PM 2    case to refer.  And I want to refer the case to you guys."

01:38PM 3          I'm like, "Okay."  My first thing was, well, first, I

01:38PM 4    said, "Did you clear this with your boss?  Is this okay?"

01:38PM 5          He said, "I told Pat Juneau about the case.  There

01:38PM 6    are no issues with me referring the case.  I have no

01:38PM 7    involvement with it."

01:38PM 8          And I believe as a judge -- you were a lawyer at one

01:38PM 9    point, sir?  I don't know if you were a lawyer, but that

01:38PM 10   proverbial Chinese wall.  So I had no reason to not believe

01:38PM 11   "Tiger," having known him for 25 years.  I said, "Fine, send it

01:38PM 12   over to the office."  That was all I said.

01:38PM 13         He said, "No, I'm not sending it to the office.  I'm

01:38PM 14   referring it to you because Jon screwed me on the *BellSouth*

01:38PM 15   fee."  That was it.

01:38PM 16         I said, "Okay, send it to the office and tell them

01:38PM 17   it's my referral."

01:38PM 18   Q.    This was a conversation you said that took place in a

01:38PM 19   Suburban?

01:38PM 20   A.    Yes, sir.  I believe that's what "Tiger" has, a big

01:39PM 21   Suburban.

01:39PM 22   Q.    Was it in New Orleans or somewhere else?

01:39PM 23   A.    Sir, sir, yes.

01:39PM 24   Q.    Again, your recollection of the approximate time of that

01:39PM 25   conversation?

**C O N F I D E N T I A L**

SM-03-GL00454

01:40PM 1    A.    "Jon screwed me on the *BellSouth* case," you know.   That

01:40PM 2    was it.

01:40PM 3    Q.    How long did this conversation take?

01:40PM 4    A.    15 to 30 seconds.   That was it.

01:40PM 5    Q.    Did you ask him anything about the case?

01:40PM 6    A.    Not a thing.

01:40PM 7    Q.    Did he tell you anything about the case?

01:40PM 8    A.    Sir, no, sir.

01:40PM 9    Q.    Did you ever have a conversation about that case with

01:40PM 10   Christine Reitano?

01:40PM 11   A.    To the best of my recollection, no.   I think I've only

01:40PM 12   spoken to Christine -- I haven't seen Christine.   In fact,

01:40PM 13   since then, I think since the referral of that case I may have

01:41PM 14   only seen Christine once if I've seen her at all.   I didn't

01:41PM 15   even know it was Christine's case.

01:41PM 16   Q.    You thought it was Mr. Sutton's case?

01:41PM 17   A.    Sir, yes, sir.

01:41PM 18   Q.    Did he explain the reason to you at that time why he was

01:41PM 19   referring it?

01:41PM 20   A.    Yes, sir.

01:41PM 21   Q.    Again, could you, as best you recall, tell us what he told

01:41PM 22   you in terms of his reason for referring the case?

01:41PM 23   A.    He told me he had accepted a job at the claims

01:41PM 24   administration office.

01:41PM 25   Q.    You made a reference before that he talked about having

**C O N F I D E N T I A L**

**SM-03-GL00456**

| | |
|---|---|
| 01:46PM 1 | A.    I don't believe we ever talked about it more than one |
| 01:46PM 2 | time.  And it was just with the original -- with that first |
| 01:46PM 3 | payment.  I felt Jon was somewhat uneasy with it, one, because |
| 01:46PM 4 | of the fact that "Tiger" was at the claims administration |
| 01:46PM 5 | office.  And without him having an understanding of what |
| 01:46PM 6 | happened in our conversation and him telling me that |
| 01:46PM 7 | Mr. Juneau, which I told him, "Hey, he told me he cleared this |
| 01:46PM 8 | with Pat Juneau.  He's had no involvement, to the best of my |
| 01:46PM 9 | knowledge, with the claim.  He referred the case.  He did |
| 01:46PM 10 | substantial work, according to you guys, he's got to be paid." |
| 01:46PM 11 | You can't take the guy's money and then say, We're not going to |
| 01:46PM 12 | pay you.  Part of the referral process is people get paid if |
| 01:46PM 13 | they refer the cases. |
| 01:46PM 14 | Q.    Did Mr. Andry agree to that? |
| 01:46PM 15 | A.    I think he was uneasy with it.  One, is, as I told you, |
| 01:46PM 16 | there were two competing things going on.  I think he still had |
| 01:46PM 17 | some animosity towards "Tiger" for whatever reasons, and I |
| 01:46PM 18 | think he wanted to be like Pontius Pilot (indicating):  I'll |
| 01:47PM 19 | take your money but you go take the liability for payment.  I |
| 01:47PM 20 | gave him my word and I have no reason to believe that this -- |
| 01:47PM 21 | that he can't get the fee. |
| 01:47PM 22 | Q.    Did Mr. Andry object to you making the payment? |
| 01:47PM 23 | A.    I don't know if you could say *object*.  I just think he |
| 01:47PM 24 | said, "I'm going to send you the money.  You do what you want |
| 01:47PM 25 | with it." |

**C O N F I D E N T I A L**

SM-03-GL00461

01:48PM 1   A.   I was practicing in the State of Nevada, yes, sir.

01:48PM 2   Q.   Is it your understanding that you don't have to enter into

01:48PM 3   such an agreement in Louisiana?

01:48PM 4   A.   I don't know.  I don't know what they did.  I wasn't the

01:48PM 5   one that would sign it anyway.  That would be signed by the

01:48PM 6   Louisiana attorney.

01:48PM 7   Q.   Who was that?

01:48PM 8   A.   That would be Jon Andry.

01:48PM 9   Q.   Do you know if Mr. Andry signed such an agreement?

01:48PM 10  A.   No, sir.  I know nothing about the case once it came to

01:48PM 11  the office.  I don't know who handled it or anything.

01:49PM 12  Q.   Do you know any attorney who worked on the case in terms

01:49PM 13  of its actual day-to-day processing or operation?

01:49PM 14  A.   If I had to guess, I would probably guess Chris Mancuso,

01:49PM 15  but I couldn't tell you for sure.  But she would usually handle

01:49PM 16  the cases from the intake process forward.

01:49PM 17  Q.   Did you ever speak to her about this particular case,

01:49PM 18  *Casey Thonn*?

01:49PM 19  A.   I couldn't.  I didn't know the name of the case.

01:49PM 20  Q.   Is it your testimony that you first learned or you first

01:49PM 21  recall learning about the name of the case when you read

01:49PM 22  materials within the last few weeks?

01:49PM 23  A.   No.  I came to know that Casey Thonn was a fee on a case

01:49PM 24  that "Tiger" sent, once I kept seeing the e-mails with Thonn on

01:49PM 25  them.  But I think if he was on anything before he demanded,

**C O N F I D E N T I A L**

SM-03-GL00463

| | | |
|---|---|---|
| 01:53PM | 1 | Q.   Did he say *Mr. Juneau* or just used the phrase *his boss*? |
| 01:53PM | 2 | A.   No, I'm sure he would have referred to him as *Mr. Juneau* |
| 01:53PM | 3 | or *Pat*. |
| 01:53PM | 4 | Q.   Was that in response to a question you asked him? |
| 01:53PM | 5 | A.   Sure.  I asked him if it was okay to send the case. |
| 01:53PM | 6 | Q.   His response was yes? |
| 01:53PM | 7 | A.   "Yes, I cleared it with Pat."  Or Pat Juneau or |
| 01:53PM | 8 | Mr. Juneau.  I don't know which one he said.  I couldn't tell |
| 01:53PM | 9 | you for sure.  Gosh, that was eight, nine months ago. |
| 01:53PM | 10 | Q.   Now, at the time that Mr. Sutton went to work for the |
| 01:53PM | 11 | claims administrator, he also had a business relation with you |
| 01:54PM | 12 | through Crown; is that correct? |
| 01:54PM | 13 | A.   Sir, yes, sir. |
| 01:54PM | 14 | Q.   I'm going to ask you some more specific questions about |
| 01:54PM | 15 | that, but he was on a monthly compensation basis with respect |
| 01:54PM | 16 | to Crown? |
| 01:54PM | 17 | A.   Sir, yes, sir. |
| 01:54PM | 18 | Q.   What was your understanding -- let's go back to December |
| 01:54PM | 19 | of last year.  What was your understanding at that time about |
| 01:54PM | 20 | how much money he was being paid and for what reason with |
| 01:54PM | 21 | respect to Crown? |
| 01:54PM | 22 | A.   Well, actually, he started receiving money from Crown -- I |
| 01:54PM | 23 | had put about a million to a million and a half into Crown, up |
| 01:54PM | 24 | until June of -- May of 2012.  Originally the deal was, I |
| 01:54PM | 25 | wasn't even on the original operating agreement.  Joey Dartez, |

**C O N F I D E N T I A L**

SM-03-GL00467

02:00PM 1    "Hey, we need to bring somebody in to execute.  We're so close,

02:00PM 2    but you guys can't execute."

02:00PM 3           And so I said, "I'm bringing in my handpicked CEO."

02:00PM 4           I had spoken to Mike.  Mike was actually about to

02:00PM 5    take another job in London.  I called him right before he was

02:00PM 6    going to take this job in London.  I said, "Mike, remember we

02:00PM 7    had gone down to Houston two years ago?  Well, I invested in it

02:00PM 8    and it works.  I want you to come down and see the machine

02:00PM 9    operate."

02:00PM 10          And he said, "Well, I'm about to go to London.  I had

02:00PM 11   just accepted a job basically with this" -- I don't know if it

02:00PM 12   was an equity firm in London, but....

02:00PM 13   Q.   So he ended up becoming the CEO?

02:00PM 14   A.   Yes, sir.  You shortened it.

02:00PM 15   Q.   What were the financial arrangements between you being the

02:01PM 16   only investor and the majority owner and Mr. Sutton?

02:01PM 17   A.   Well, at the time I wasn't the majority owner, and I'm

02:01PM 18   still not the actual majority owner.  Everybody was 25 percent

02:01PM 19   at the time.  And I basically, at the end of May, 2012, I said,

02:01PM 20   "This isn't working for me anymore.  It's obvious we need more

02:01PM 21   capital.  If you guys want me to put any more money into this

02:01PM 22   thing, I'm paying Mike $35,000 a month, that's what a CEO is

02:01PM 23   going to get -- a low-paid CEO, but we need him.  We can't

02:01PM 24   execute without somebody who understands the engineering

02:01PM 25   aspects and who still understands a boardroom."

**C O N F I D E N T I A L**

SM-03-GL00472

02:01PM 1      They were -- at first, until they saw what Mike could

02:01PM 2  do the first six months, they were really upset about me paying

02:01PM 3  Mike this money.  "And you guys, if you don't agree to changing

02:01PM 4  the shares, then I can't fund it any more."

02:01PM 5      They said, "Well, if you're going to change the

02:01PM 6  shares, then we want to get a monthly salary."

02:01PM 7      I said, "Okay."  So we agreed to a salary.

02:01PM 8      And so for me basically taking on any expenses,

02:01PM 9  insurance, all this, so many ancillary costs associated with

02:02PM 10  this, Mike's salary, all the traveling expenses, everything,

02:02PM 11  they agreed, each one of them, to reduce their ownership

02:02PM 12  interest by 8 percent each, so 24 percent in total.  Mike

02:02PM 13  and -- I'm sorry, Tim and Joey, I think, at first were either

02:02PM 14  5,000 to 6,500 a month.  I couldn't tell you exactly.

02:02PM 15  Q.   Would you characterize that as *salary* or *equity return*?

02:02PM 16  A.   We called it *salary*, but it was basically salary and

02:02PM 17  consideration for them giving up a share of their equity.  And

02:02PM 18  the same thing with "Tiger" got paid $10,000 a month, and that

02:02PM 19  was salary for him giving up a share of his equity.

02:02PM 20  Q.   And also expenses from time to time?

02:02PM 21  A.   I think there were some expenses.  I don't know if there

02:02PM 22  were a whole lot of expenses on his part.

02:02PM 23  Q.   As best you recall, for what period of time or -- strike

02:02PM 24  that.

02:02PM 25      When did you start paying, let's just stick with

**C O N F I D E N T I A L**

SM-03-GL00473

02:03PM 1   Mr. Sutton, a monthly amount?  If it was $10,000 --
02:03PM 2   A.   His wasn't so much.  In the beginning his was monthly.
02:03PM 3   The first couple months he received his monthly, just like the
02:03PM 4   other guys.  And then I became cash strapped and I said to him,
02:03PM 5   "Guy, I'm just going to get to you when I have settlements.
02:03PM 6   These guys I have to pay because they have no other jobs."
02:03PM 7        You know, "Tiger" was still a practicing attorney to
02:03PM 8   the best of my knowledge at the time so he had income coming
02:03PM 9   in.  These guys had no other jobs.  "They're my priority; I'll
02:03PM 10  catch you up as we go."
02:03PM 11       If I fell behind, he was cool, but he would be
02:03PM 12  saying, "Hey, you owe me this much.  You owe me this much."
02:03PM 13  Q.   You said you started paying him in the first couple of
02:03PM 14  months.  In point of time, when to your recollection was that?
02:03PM 15  A.   It would have been some time after we agreed to it in the
02:03PM 16  beginning of June of 2012.  I couldn't tell you when I paid him
02:03PM 17  his first payment or second payment.
02:03PM 18  Q.   As you described, sometimes they would be monthly payments
02:03PM 19  and sometimes they would not be and you would have to catch up
02:03PM 20  and he would remind you in some of the e-mails we'll go over
02:03PM 21  that payments were due?
02:04PM 22  A.   Oh, yes, sir.  Yeah, I think at one point I had only paid
02:04PM 23  him $36,000 through, I think, March when he should have already
02:04PM 24  been paid $100,000.  And he's like, "You owe me $64,000."  I
02:04PM 25  was doing the best I could to run a business on a shoestring

**C O N F I D E N T I A L**

02:05PM   1    process ever administered in the United States.  And so based

02:05PM   2    upon the complexity of the claims, the number of claims, the

02:05PM   3    number of people affected, it started off really slow.  This is

02:05PM   4    a gargantuan task.  I think it's sped up and it's gotten

02:05PM   5    smoother as you've gone along.

02:05PM   6    Q.    At the time Mr. Sutton went to work for the

02:06PM   7    administration, did you have a conversation with him about the

02:06PM   8    Crown payments and the business relationship that he had with

02:06PM   9    you at that time with respect to Crown?

02:06PM  10    A.    If you don't mind my using a bad word, I was pissed.  I

02:06PM  11    mean, I said to him, "Why are you taking the job?  I got all my

02:06PM  12    cases with BP.  You're a salaried employee.  Did you clear this

02:06PM  13    with Mr. Juneau?  Does he know?"  Because we're here.  We're

02:06PM  14    here now.  Because it just didn't look kosher, you know?

02:06PM  15    Q.    When in point of time did you have this conversation with

02:06PM  16    him?

02:06PM  17    A.    The first day he told me that he took the -- he took the

02:06PM  18    job with, I guess the claims administration office.

02:06PM  19    Q.    You raised this concern with him?

02:06PM  20    A.    The second I heard it.

02:06PM  21    Q.    Did you also raise the concern with Mr. Andry?

02:06PM  22    A.    I think I was upset, and I may have voiced my opinion that

02:06PM  23    I felt "Tiger" was somewhat of a moron for taking the job.

02:06PM  24    Q.    To Jon Andry?

02:07PM  25    A.    I may have said it, and if I didn't, I certainly thought

**C O N F I D E N T I A L**

SM-03-GL00476

02:12PM 1    any retainer fee to Mr. Sutton in regard to the *Casey Thonn*

02:12PM 2    matter?

02:12PM 3    A.    Retainer fee or referral fee?

02:12PM 4    Q.    Either one.  Any payment in regard to the *Casey Thonn*

02:12PM 5    case?

02:12PM 6    A.    I can't -- gosh, I don't recall a conversation to that

02:12PM 7    effect because we did pay him.  So I can't imagine --

02:12PM 8    Q.    Go ahead.  I'm sorry.

02:12PM 9    A.    I can't imagine that we would agree not to pay him and

02:12PM 10   then I paid him.

02:12PM 11   Q.    Had Jon Andry told you not to make that payment, would you

02:12PM 12   have agreed with that?

02:12PM 13   A.    No, sir.  I believe that, you know, if I gave my word on

02:13PM 14   something, and "Tiger" gave me his word that it was okay for

02:13PM 15   him to receive it, I had no reason not to believe "Tiger."  I

02:13PM 16   had no reason not to believe that they had done a substantial

02:13PM 17   amount of work on it, so I was comfortable with it.  And so if

02:13PM 18   I gave him my word that I would pay him a fee, I would pay him

02:13PM 19   a fee if it came from my own money.

02:13PM 20   Q.    Did you advise at any point Mr. Jon Andry that you were

02:13PM 21   making the fee payments to Mr. Sutton in regard to the

02:13PM 22   *Casey Thonn* case?

02:13PM 23   A.    I'm sure he knew that I was paying, yes, sir.

02:13PM 24   Q.    How are you sure that he knew?

02:13PM 25   A.    Either I told him I was going to pay it, irregardless

**C O N F I D E N T I A L**

SM-03-GL00481

| | | |
|---|---|---|
| 02:13PM | 1 | or -- or I just did.  I don't really recall. |
| 02:13PM | 2 | Q.    Is it your understanding or belief as you sit here today |
| 02:13PM | 3 | that you made those payments over his specific objection? |
| 02:13PM | 4 | A.    I guess.  It's quite possible.  I can't say for sure.  I |
| 02:13PM | 5 | don't really know.  I can't recall what Jon and I spoke about. |
| 02:14PM | 6 | I just think he was -- he wasn't comfortable. |
| 02:14PM | 7 | Q.    Well, did he object to you making the payments? |
| 02:14PM | 8 | A.    He objected to him being involved in the payment being |
| 02:14PM | 9 | made.  I don't -- I can't speak for what he wanted me to do. |
| 02:14PM | 10 | But he was Pontius Pilot (indicating):  I'm washing my hands of |
| 02:14PM | 11 | this.  You do what you want.  I'll take my end of the fee, but |
| 02:14PM | 12 | I'm not going to pay him; I'm going to keep my word. |
| 02:14PM | 13 | Q.    So he never requested you or told you or directed you in |
| 02:14PM | 14 | any way not to make the payments yourself to Mr. Sutton? |
| 02:14PM | 15 | A.    I can't say that he did or he didn't.  I can't really |
| 02:14PM | 16 | recall.  I know he didn't want to be involved in it.  He was |
| 02:14PM | 17 | washing his hands of it, but I can't say exactly what he said, |
| 02:14PM | 18 | so I don't want to put words in his mouth and I don't want you |
| 02:14PM | 19 | putting words in my mouth either, with all due respect. |
| 02:14PM | 20 | Q.    We're not trying to do that.  Had he objected specifically |
| 02:14PM | 21 | to you making the payments, is it your belief that you would |
| 02:14PM | 22 | have not made the payments? |
| 02:14PM | 23 | A.    No, I would have, as long as I didn't think I was doing |
| 02:14PM | 24 | anything wrong, I was going to make the payments.  I said I |
| 02:15PM | 25 | would make the payment.  I had no reason to believe there was |

**C O N F I D E N T I A L**

**SM-03-GL00482**

02:15PM 1    any issue with it.  "Tiger" had told me he had disclosed it to

02:15PM 2    Mr. Juneau.  To my knowledge there was no conflict, you know.

02:15PM 3    Obviously we're here now, but at the same time, if I gave my

02:15PM 4    word on it, that's it.

02:15PM 5    Q.   Do you want to take a short break?

02:15PM 6              (WHEREUPON, at this point in the proceedings, a brief

02:23PM 7    recess was taken.)

02:23PM 8                             EXAMINATION

02:23PM 9    BY MR. FREEH:

02:23PM 10   Q.   We're back on the record.  We took a short break.

02:23PM 11        Mr. Lerner, let me go back again, just to clarify a

02:24PM 12   few things, with respect to your conversations, any

02:24PM 13   conversations by you and Jon Andry regarding the issue of any

02:24PM 14   payments to Mr. Sutton regarding the *Casey Thonn* case.  Do you

02:24PM 15   understand?

02:24PM 16   A.   Sir, yes, sir.

02:24PM 17   Q.   Thank you.  As best you recall, you told us about a

02:24PM 18   conversation and there were concerns expressed by Mr. Andry

02:24PM 19   about the propriety of paying that fee once Mr. Sutton went to

02:24PM 20   work for the administrator.  Do you recall that conversation?

02:24PM 21   A.   Sir, yes, sir.

02:24PM 22   Q.   Do you recall any other conversations with him on that

02:24PM 23   subject matter at any time including up to today?

02:24PM 24   A.   I don't recall any, but they very well may have occurred

02:24PM 25   and I think he certainly had his opinion on it as I stated.

**C O N F I D E N T I A L**

SM-03-GL00483

02:25PM  1    Q.    Was this an issue that you recall recurring in

02:25PM  2    conversations on a regular basis or on intervals with

02:25PM  3    Mr. Andry?

02:25PM  4    A.    I can't recall, no, sir.  I just -- I'm sure the only time

02:25PM  5    that I really recall it would have been at the time of the

02:25PM  6    initial payment when that -- the issue first came up.

02:25PM  7    Q.    With respect to the payments to Mr. Sutton, so I

02:25PM  8    understand how they were made and what they represented, is it

02:25PM  9    your understanding that on the *Casey Thonn* case, the

02:25PM 10    administrator would make a payment to the Andry Lerner Law Firm

02:25PM 11    of some amount?

02:25PM 12    A.    Sir, yes, sir.

02:25PM 13    Q.    What would happen to that payment once it reached the

02:25PM 14    Andry Lerner firm as far as you understand?

02:26PM 15    A.    I suppose it was disbursed according to whatever

02:26PM 16    percentage was owed the client, whatever percentage was owed

02:26PM 17    the firm.

02:26PM 18    Q.    The *Casey Thonn* case was a case that you originated,

02:26PM 19    correct?

02:26PM 20    A.    Sir, yes, sir.

02:26PM 21    Q.    What was your understanding as to the fees you would be

02:26PM 22    entitled for a case that you originated at Andry Lerner?

02:26PM 23    A.    It would have been 50 percent.

02:26PM 24    Q.    50 percent of the fee?

02:26PM 25    A.    If there were no other referrals attached to it.

**C O N F I D E N T I A L**

SM-03-GL00484

61

| | |
|---|---|
| 02:26PM 1 | Q.    Where would the other 50 percent go? |
| 02:26PM 2 | A.    To Jon Andry. |
| 02:26PM 3 | Q.    So on the *Casey Thonn* case, is it your understanding that |
| 02:26PM 4 | 50 percent of the fee went to Andry Lerner and 50 percent went |
| 02:26PM 5 | to you? |
| 02:26PM 6 | A.    No, sir.  My understanding now is that -- no, sir. |
| 02:26PM 7 | Q.    What's your understanding? |
| 02:26PM 8 | A.    As I look at the checks and everything, I think, to the |
| 02:26PM 9 | best of my knowledge, 50 percent, because I guess that's what I |
| 02:27PM 10 | subsequently have come to know that was Mr. Sutton's agreement, |
| 02:27PM 11 | he got -- the 50 percent was paid to me and then paid to |
| 02:27PM 12 | Mr. Sutton. |
| 02:27PM 13 | Q.    You didn't receive any portion of that? |
| 02:27PM 14 | A.    No, sir.  The money came to my firm and it went right out |
| 02:27PM 15 | to Mr. Sutton. |
| 02:27PM 16 | Q.    Now, when you say that was *his agreement*, you're referring |
| 02:27PM 17 | to Mr. Sutton? |
| 02:27PM 18 | A.    I believe so, with my office. |
| 02:27PM 19 | Q.    Who in your office did he make that agreement with? |
| 02:27PM 20 | A.    I don't know.  I just sent the case over there.  I told |
| 02:27PM 21 | him to contact the office.  That was it. |
| 02:27PM 22 | Q.    Did he make the agreement with you in terms of the |
| 02:27PM 23 | percentage? |
| 02:27PM 24 | A.    Oh, no, sir. |
| 02:27PM 25 | Q.    Did he make it with Jon Andry? |

**C O N F I D E N T I A L**

SM-03-GL00485

02:36PM 1    A.    Sir, yes, sir.

02:36PM 2    Q.    Did you speak to him after he went to work there?

02:36PM 3    A.    Of course.  We were partners in Crown.

02:36PM 4    Q.    Did you ever talk to him about the claims that were before

02:36PM 5    the claims administrator office?

02:36PM 6    A.    I think there was some conversations but nothing -- no

02:36PM 7    specific names of cases or anything.  I wouldn't know the

02:36PM 8    cases.

02:36PM 9    Q.    Tell us about some conversations that you recall.

02:36PM 10   A.    Oh, gosh, I can't recall, but I think most of it was, Why

02:36PM 11   is this taking so long?

02:36PM 12   Q.    Do you recall ever speaking to him about a specific claim?

02:37PM 13   A.    I wouldn't have known the name of any claims.  I think he

02:37PM 14   sent me an e-mail once with the name of one of our claims,

02:37PM 15   which was probably the first time I would have ever known the

02:37PM 16   name of the claim, I think.

02:37PM 17   Q.    Having looked at the e-mails, what claim are you thinking

02:37PM 18   of or referring to?

02:37PM 19   A.    It was called Talen or Talen's.

02:37PM 20   Q.    Do you recall speaking to him about that claim?

02:37PM 21   A.    Oh, no.  I've never -- I've never mentioned anything about

02:37PM 22   a specific claim, I don't believe.

02:37PM 23   Q.    How many times did you have -- how many different times

02:37PM 24   did you have any conversation with Mr. Sutton after he went to

02:37PM 25   work for the claims administrator about his work there or

**C O N F I D E N T I A L**

**SM-03-GL00493**

02:37PM 1  matters or cases before the administrator, as best you recall?

02:37PM 2  A.    Gosh.   I don't even know if there were really many

02:37PM 3  telephone calls where it wasn't just -- it may have come up in

02:37PM 4  two seconds of passing when we're talking about Crown or the

02:37PM 5  kids.   You know, our kids are really close, aside from that.   I

02:38PM 6  never really spoke to him about any cases that wasn't -- I

02:38PM 7  didn't know anything about the whole process, really.   I

02:38PM 8  just -- my only concern was is it going to keep moving.   That

02:38PM 9  was it.

02:38PM 10  Q.    What, if anything, did he say to you in response to any of

02:38PM 11  those conversations?

02:38PM 12  A.    Well, one time, I think he either sent me one or two

02:38PM 13  e-mails, which I'm sure you probably have, they were

02:38PM 14  unsolicited e-mails when I just -- I think one e-mail I said,

02:38PM 15  "This BP thing, this is insane," or whatever, and he spelled

02:38PM 16  out the status of our cases.

02:38PM 17  Q.    So when you say *unsolicited*, you mean that you didn't

02:38PM 18  request the information?

02:38PM 19  A.    Oh, no, sir.   But at the same time, I don't believe the

02:38PM 20  information that he divulged was anything that gave us a

02:38PM 21  competitive advantage or something that he wouldn't give to

02:38PM 22  other firms.

02:38PM 23  Q.    But he did, in fact, give you information about the

02:38PM 24  claims?

02:38PM 25  A.    Status of our claims.   No specific claims, just, You have

**C O N F I D E N T I A L**

SM-03-GL00494