# EXHIBIT 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

****************************************************************

IN RE: OIL SPILL BY THE OIL RIG *DEEPWATER HORIZON* IN THE GULF OF MEXICO ON APRIL 20, 2010

CIVIL ACTION NO. 10-MD-2179 "J"
NEW ORLEANS, LOUISIANA
MONDAY, JULY 29, 2013, 3:00 P.M.

THIS RELATES TO ALL CASES

****************************************************************

SWORN STATEMENT OF **LIONEL "TIGER" SUTTON, III, ESQ.**
TAKEN BEFORE THE HONORABLE LOUIS J. FREEH
SPECIAL MASTER

APPEARANCES:

LOUIS J. FREEH, SPECIAL MASTER
BENJAMIN SCOTTI, ESQUIRE
STEVE TIDWELL

LEE & WALSH
MICHAEL S. WALSH, ESQUIRE
257 MAXIMILIAN STREET
BATON ROUGE LA 70802
(ATTORNEY FOR LIONEL SUTTON, III, ESQ.)

OFFICIAL COURT REPORTER: CATHY PEPPER, CRR, RMR, CCR
CERTIFIED REALTIME REPORTER
REGISTERED MERIT REPORTER
500 POYDRAS STREET, ROOM HB406
NEW ORLEANS, LA 70130
(504) 589-7779
Cathy_Pepper@laed.uscourts.gov

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY. TRANSCRIPT PRODUCED BY COMPUTER.

**CONFIDENTIAL**

needed to do that, which most lawyers didn't, I mean, until we explained it to them, that it had to all add up correctly, and you can't add up the corporate papers unless you have all of the facilities.

Q. When you then had the meeting with him, the only meeting that we've talked about, across the street in the restaurant, Reuben's, whatever it was, did you relate to him what you had found out?

A. Yes, just what I told you just then.

First, he was like, why? And I explained, because that's -- they have to look at the big picture or whatever, all that -- like I just told you.

Q. As far as you know, was he ever paid for that claim?

A. I really don't know.

Q. You never heard from him or anyone else that he was paid on that claim?

A. No.

Q. When you said you would typically pull up the name and see where it was, you did that in this particular case, correct?

A. Yes.

Q. How many other cases during the months that you were there did you do a similar exercise; in other words, query about a particular claim?

A. Countless. I couldn't tell you. I mean --

Q. Hundreds? I'm not trying to trick you.

A. No, I know.
Q. I'm trying to get a sense.
A. I'm trying -- I'm trying to think how long I was there. I mean, I didn't start --
Q. You were there from November to --
A. Yeah. I wouldn't have started doing that in November or probably even December because I didn't know enough about the process.

I mean, I would want to say, I mean, it could have been a hundred or more. I mean, that was part of my daily job, really, that I did that, so I couldn't tell you how many times.
Q. After that meeting with Mr. Andry, did you meet with him again?
A. I don't think so. I can't remember the next time I actually saw him.
Q. Did you have subsequent telephone calls with him about various matters relating to the claims administration?
A. The *Talen's* claim, he called me, I think, a few times to ask me about that. He may have called me about two or three other claims, but I don't remember.

I mean, lawyers called me every day about claims. So I can't exactly remember, but it could have been a few more; but, I don't remember what they were or anything.
Q. Do you remember speaking to him on the phone about the *Thonn* claim?

04:21PM talking about the payment of the claims and the status of the payment of the claims; is that correct?

04:21PM A. You'd have to show me the e-mails; but, I did -- that was -- I did that with a lot of lawyers on a regular basis. So if you're saying that I did, to me, that wouldn't be surprising.

04:22PM Q. Well, I'm not talking about a lot of lawyers, now. I'm asking you about claims that came out of the Lerner Andry representation.

04:22PM A. I can only remember talking to them about a handful of claims; the *Thonn* claim, the *Talen's* claim and maybe three other claims that he may have -- that Jon may have mentioned in the phone calls we talked about.

04:22PM I don't remember ever talking to him about any other specific claims.

04:22PM Q. Did Jon ask you to check on the *Thonn* claim at some point?

04:22PM A. No. I don't think so.

04:22PM Q. Did Lerner?

04:22PM A. No.

04:22PM Q. Did anyone else?

04:22PM A. Casey Thonn.

04:22PM Q. You kept speaking to Casey Thonn, even after your wife recused herself and had the case assigned to Andry, correct?

04:22PM A. I had him as a personal injury client.

04:22PM Q. While your wife was working for the administrator?

claim to be paid?

A. No. When it got paid, it got paid. I didn't have any -- wasn't trying to push the claim to get paid.

Q. I didn't ask you that; but, when it got paid, you would get paid your arrears from Crown? That was your expectation?

A. No, I didn't get -- it had nothing to do with Crown. I never got paid my arrears from Crown to anything with the *Thonn* case. I don't know what you're saying there. I don't understand the question.

Q. I'll repeat the question. When Lerner got paid, when Lerner got money out of the claims process, you expected to get paid with respect to your Crown obligations?

A. No. One didn't have anything to do with the other.

When he got paid out of the *Casey Thonn* fee, I expected to get my share of the fee for the work that I had done on Casey Thonn's case when I represented him before the GCCF before I went to work for Pat.

That's what I expected from the *Thonn* case. I didn't expect -- it had nothing to do with Crown.

Q. Well, you would know, would you not, based on the payment of the claim from the administrator, when Lerner was getting money or not getting money?

A. No. I wouldn't know that.

Q. Well, if the claim was paid, you could -- and we'll go over the e-mails in detail -- you could determine when Lerner

04:38PM Q. Well, you said you were entitled to it because of the prior representation?

04:38PM A. For the work I had done on Thonn's case with the GCCF.

04:38PM Q. So the money you got from Lerner you believe was in payment of the work you had done on the *Thonn* case?

04:38PM A. It was my share of the *Thonn* fee for the work that I had performed on the *Thonn* case.

04:39PM Q. Did you ever disclose that to Mr. Juneau?

04:39PM A. No.

04:39PM Q. You never disclosed it to anybody at the Claim Administration Office?

04:39PM A. No.

04:39PM Q. Was Mr. Andry aware of that?

04:39PM MR. WALSH: I'm sorry, but aware of what?

04:39PM THE WITNESS: That I disclosed it?

04:39PM BY MR. FREEH:

04:39PM Q. No, that you had a fee that you believed was owing to you from the prior representation?

04:39PM A. I know I spoke to Glen about it, Glen Lerner, and e-mailed him about it. I don't recall whether or not I would have talked to Jon about it because when I sent -- when *Casey Thonn* went over there, I wasn't really talking to Jon at that point, so I don't remember if I ever spoke to him about it or not.

04:39PM It was Glen. I mean, that's who I was getting the fee from.

05:44PM Q. That's the first page of S-08.
05:44PM A. Oh, the last e-mail in the chain?
05:44PM Q. Yeah. 5/9 at 3:51 p.m.
05:44PM A. Okay.
05:44PM Q. You say, "Just between me and you, here is the report."
05:44PM A. Right.
05:44PM Q. What do you mean, "just between me and you"?
05:44PM A. Well, I'm just sending that to him. This is a report that I typically would have done a lot because what happens is lawyers would call and say, "My claims aren't getting paid. What's going on? Y'all are taking too long." The same complaining that they always did.

05:44PM Most of the time, if not all of the time, it wasn't a problem in our office; it was a problem with the way they were doing their claims.

05:44PM So I would look at -- I wouldn't pull up their claims, but you can pull up a pie chart that would show their total. It wouldn't show individual claims, but it would show the total -- or a graph or something. It would show, okay, you have 402 claimants, 61 percent have submitted a signed claim form.

05:45PM So, right then and there, you see that he's complaining that -- like most lawyers, he's complaining that his complaints haven't been paid, and only 60 percent have even submitted a claim form. 22 percent started a registration form

but didn't finish it.

Q. No, I can read the document.

A. So that's what I would have been saying is, "Hey, the problem is not in our office. You guys aren't doing what y'all are supposed to do to get claims processed."

Q. How many similar e-mails like this in the time you were there did you send to other lawyers with this kind of detail?

A. I don't know. A lot of times, I might have read it to them right off the screen.

Q. But the question is, any other e-mails that you wrote that you recall composing with this amount of detail?

A. I don't recall. I don't recall how many other ones or what other ones I would have done. I know most of the time I probably would have.

Most of the time, they would have called me on the phone, and I would have pulled it up on the screen while they were talking to me. I would have said, "Hey, you know, you hadn't been doing your job. Only 60 percent of your clients have even filed a claim form," or something like that.

I mean, it was to show that, hey, it's not our office, it's you guys.

Q. When you say *just between me and you*, are you indicating or trying to communicate to him that you want to keep this confidential, your report?

A. No. What I'm probably saying is that I didn't want him to

fuss at Jon about it or say that I said, you know, that the cases -- that Jon wasn't doing his job of making sure his cases got filed properly or something.

That's probably what I meant because, you know, Jon and I were just getting started -- starting to talk again, and I probably didn't want him to say, "Hey, I checked, and you're screwing up. I've been paying you this money, you hadn't gotten these cases filed yet." That's probably what I meant, if I recall right.

Q. Would you say, Mr. Sutton, by getting this information, reporting it in this detail, sending it to Mr. Lerner, that you were assisting him in his claims?

A. Only to the extent that we would have assisted everyone like that. I don't know. I don't know how to answer that.

I did this -- I understood that responding to an attorney that asked a question about the status of his claim, I understood that was part of my job. I understood that we were supposed to him assist attorneys and claimants when they called to understand what was going on with that claim.

Pat made me -- made that very clear. He, in fact, asked me to do that on a daily basis.

Q. At the time you wrote this particular e-mail to Mr. Lerner, you had an ongoing business relationship with him, and he was paying you money on a regular basis, and he owed you money; is that correct?

doing on that -- what the problem was on that claim.

So I didn't think that there was a problem with this at all. I still don't know think that there was a problem with this at all. I mean, I understood that to be my job.

Q. You don't think this was a conflict you should have reported at the time?

A. No, because all I'm reporting -- all I'm telling him is what has been filed. I'm not -- I mean, no. I don't -- I don't see that as a conflict at all.

Q. The information you're giving him, he could not himself get from the documents that he would have received from the administrator?

A. Oh, no, I think he could have. I think he definitely could have looked at all of his claims and saw that only 61 percent signed the claim.

They have access to the same thing that I was looking at, as I understand. They -- the lawyer could look at the portal and look at the same stuff that I was looking at for this. That was always my understanding.

So he could have done that and looked at it himself; but, Glen is not a -- he wouldn't have done that.

Q. Looking at the next page, Glen sends you an e-mail on May 9, 15:13, the middle of the page, and he says, "Ooh la la. Work harder. How is Chris?"

A. Yeah.

06:35PM Glen is not there. Glen is never there. So you couldn't refer it to Glen and tell somebody, "Go see Glen Lerner," because he's never anywhere.

06:35PM Q. Did you talk at that time to Jon Andry at all about the referral?

06:35PM A. No. I don't think I was talking to Jon at that time.

06:36PM Q. You told Mr. Tidwell that there was nothing in writing about any fee or payment back to you for the referral? Nothing was --

06:36PM A. No.

06:36PM Q. -- put in writing?

06:36PM A. No.

06:36PM Q. But Jon Andry was someone who you not only didn't trust, but who you said had burned you before in terms of a payment, correct?

06:36PM A. Correct.

06:36PM Q. You didn't think it was necessary to have something in writing to protect your interest?

06:36PM A. I hadn't talked to Jon about any of it. I was dealing with Glen, and I didn't think it was important for me to put it in writing for Glen. I was dealing with him. I wasn't dealing with Jon at all.

06:36PM Q. But Jon was going to be the attorney who did the representation?

06:36PM A. No. As I understood, it was going to be the Andry Lerner

A.  They had their own claim, and they represented parties, yes. A lot, I think. I don't know how many.

Q.  Was this a law firm you were familiar with before you worked in connection with the CAO?

A.  No, other than I've heard of them, and I know who they are. But the way I got involved in this, I was walking past the conference room one day, and Mike said, "Oh, I've got a meeting with the lawyers from Sher Garner. They want to discuss some claims. Come in."

So I went in there, and I saw a one of the lawyers I went to school with was in there. We were on moot court together or something. I said, "Hey, I hadn't seen you in 20 years," or whatever it was.

So they wanted to discuss -- they had a list of cases they were going to discuss with Mike, like a hundred cases. So we started listening to them.

Finally, you know, Mike said, "Look" -- Mike passed it off on me because he wanted to get out of there quick. Anyway, he said, "Look, we can only deal with so many cases at a time."

In fact, what Mike and I came up with -- because so many law firms were contacting he and I and wanting to know the status -- and they just wanted to know "the status of our cases." So what we said was, we will give you one in-person meeting, where you come in there and we'll discuss generically,

08:43PM in general, the process and what's going on in the cases; but, that's your one meeting.

08:43PM Then, after that, you've got to send us, like, a list of five cases a week or 10 cases a week, and then we will figure out everything that's going on with those and get it back to you.

08:43PM So Mike and I started doing that, because we had a big law firm out of Miami that Pat brought me into a meeting, and it was the same thing.

08:43PM There was some representative from Alabama who brought a bunch of lawyers over there to a meeting with Pat, and he brought me in there, and I had to explain that to him.

08:44PM I mean, that was -- that was basically what I was doing all the time, because these people will drive you crazy.

08:44PM So I didn't know Sher Garner. I knew who they were. But when I walked into that meeting, I knew the attorney. Mike kind of said, "You take Sher Garner."

08:44PM But I think he was still dealing with them because I believe I was on spring break, and I was on the beach, and they were -- kept e-mailing me claims to check, and Mike was getting cc'd on it, too.

08:44PM Because Mike said, "We've got to put a stop to this shit. It's just getting ridiculous." That's when we started saying only five a week, or whatever we came up with.

08:44PM Q. So trying to minimize or control the number of inquiries

CONFIDENTIAL

08:44PM from outside lawyers, were you spending --
08:44PM A. At that time.
08:44PM Q. At that time, you were spending most of the your time as you just described, running down queries and claims by lawyers, either coming to you directly or to Mike or Pat, and they were then assigning you to do the follow-up?
08:44PM A. Lawyers, claimants, accountants.
08:45PM What had happened was, the reason -- and I alluded to this before -- when the stay came out, we felt like -- the switchboard was being lit up. BrownGreer was being just bombarded, oh, what's going to happen to my claim, and all that kind of stuff.
08:45PM So we said we needed to come up with some type of script that BrownGreer could read when all of these people starting calling. This was when it was getting, you know, publicity and all that kind of stuff.
08:45PM So we came up with a script, and BrownGreer was supposed to give it to their people to read. At the bottom of the script it said, "If you have any questions, you can contact Tiger Sutton at," and it gave my DHE e-mail address and my cell phone number.
08:45PM But the first girl that read the script, she didn't know that that sentence was supposed to be if she had any questions, and she read that into the script. I mean, she read that -- then some lawyer got it and posted it on the trial

08:48PM the script and your name and cell phone number being out there.

08:48PM So the question is the following: Over the course of the months that you were there, if you can estimate, maybe you can't, but if you could estimate on how many different occasions did you query a database on behalf of some lawyer or matter? Was it --

08:48PM A. Every day; but, how many times a day, I couldn't tell you. But at least every day.

08:49PM Q. At least every day?

08:49PM A. At least every day.

08:49PM Q. A couple or more than a couple?

08:49PM A. I would say more than a couple, but I don't know.

08:49PM Sometimes we would query for the accountants. You know, we would have a meeting --

08:49PM Q. This question is just for lawyers and outside counsel.

08:49PM A. I mean, it was -- obviously, it was a lot when the stay was first lifted. Then, when we were going to the hearing, when Pat was -- I got a lot more. I mean, you would get -- from lawyers, you would get like -- it would be in spurts depending on what was going on with the Court, particularly at the end because everybody was trying -- wanted to know if their claim was going to get through the process before the Judge ruled and then before the Fifth Circuit ruled. So they would call you every day.

08:49PM So, in spurts, I would be doing a lot more than a

couple of days. Sometimes it would just be a couple of days. Pat would give me a list several times a week.

EXAMINATION

BY MR. TIDWELL:

Q. A couple of things. Did you have a case involving a Cody Nedved? Does that ring any bells?

A. No. Spell it, please.

Q. Cody, C-O-D-Y, Nedved, N-E-D-V-E-D.

A. Nedved sounds -- but I know a Melved from playing baseball with my kids, so I don't know if that's why that name sounds familiar.

Q. It was a *BP* derivative matter?

A. Oh, no, I don't think I would have known him.

Q. You know, you were trying to wrap your arms around how many times that you might have looked at Casey Thonn's.

A. Yes.

Q. You checked his claim about almost twice as much as anybody else did in the CAO office.

A. I checked it twice as much as anybody else in the CAO checked? Well, I would expect that because he was calling and asking me.

Q. Right. Right. Probably out of all the ones that you checked, he was probably by about a quarter more than any of those you checked.

A. I would expect that because he was my personal injury