UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>No. 12-970 | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

## MEMORANDUM IN SUPPORT OF CLASS COUNSEL'S MOTION TO STRIKE UNSUBSTANTIATED EXHIBITS AND TO CONTEST MISSTATEMENTS CONCERNING SPECIFIC CLAIMS

NOW INTO COURT, through appointed Class Counsel, come Claimants in the Court-Supervised Settlement Program and the Economic & Property Damages Settlement Class who respectfully move to strike the Declaration of Allison Rumsey and Appendices A and B (collectively referred to as "BP Counsel Declaration") attached thereto [Rec. Doc. 11819-2].

### I. BP Counsel's Declaration and the Attached Appendices Materially Misstate Claims Files and Should be Stricken as Misleading the Court with Unreliable Hearsay.

BP Counsel's self-serving Declaration glaringly misstates material facts regarding claim files and violates all evidentiary standards for reliability.[1] Of the 64 claims identified by BP Counsel in Appendix A, more than half contain no information beyond the financial test that BP agreed to

---

[1] This is not the first time that BP has materially misstated the record to the Court with one-sided, unreliable hearsay. In its *Emergency Motion for a Preliminary Injunction Against the Claims Administrator for a Preliminary Injunction to Enjoin Payment Awards for Business Economic Loss Claims Based on "Fictitious" Loss* filed in March 2013 [Rec. Doc. 8910-3], BP submitted another Declaration from a BP consultant that purported to detail a number of payments for "fictitious losses." Once Class Counsel informed the Court that a number of the claims cited by BP had been previously paid directly by BP and/or the GCCF, BP quickly dropped those "samples." *Class Counsel Opposition to BP Emergency Motion for a Preliminary Injunction*, at 18-20 [Rec. Doc. 9082-2].

1

in Exhibit 4B to further establish that the claim was causally connected to the spill. 17 of the Claims contain statements from Claimants' directly opposite of BP Counsel's Declaration and Appendices. These material omissions are tantamount to BP Counsel misleading the Court.

Appendix B is even more troubling. Appendix B is a list of almost 1,200 claim "summaries." The list purports to establish how certain claims from certain industries from a certain distance from the spill could not have been impacted by the spill. However, there is no description of the type of business or financials, other than grouping them by distance and industry. In fact, BP Counsel did not even compile the list; the list was compiled by an "economic consultant" who is not even named in the Declaration.

From an evidentiary standpoint, BP Counsel's Declaration violates every principle of reliability. The Declaration contains multiple layers of hearsay, fails to make her statements based upon "personal knowledge," and, most disturbing of all, completely failed to attach (or submit under seal) any supporting documentation to substantiate her extraordinary factual conclusions.[2] These material omissions are designed to mislead the Court with absurd statements absent any semblance of evidentiary reliability.

A.   **BP Counsel's Declaration Materially Misleads the Court.**

Appendix A to the Rumsey Declaration consisted of a list of 64 examples allegedly demonstrating claims where there was "no causation."[3] The list apparently was created by

---

[2] BP Counsel's "offer" to provide the claim excerpts that support her position is baffling – as though the "offer" to provide somehow lends any type of evidentiary verifiability to unabashed conclusions of BP counsel. Certainly, BP is no stranger to filing exhibits under seal as it has done dozens of times over the last three and a half years.

[3] On November 15, 2013, this Court denied BP's motion and on November 22, 2013 issued an order detailing the basis of the denial. [Rec. Doc. 11857] Since the Court adopted the arguments raised by Class Counsel in its *Sur-Reply in Opposition to BP's Motion to Amend Scheduling Order and Injunction* [Rec. Doc. 11848] when denying BP's motion, Class Counsel's argument

Rumsey and a number of unnamed attorneys from Arnold & Porter, LLC, as well as unnamed "experts."[4] The area of expertise is not identified. BP Counsel's unsupported list materially omits 17 Claimants' own statements that their losses were a result of the Spill or that contain other statements of causation.[5] 17 times BP Counsel omitted the statements of the Claimant.

In fact, four claimants on Appendix A had already been paid by BP through the GCCF for claims relating to the Spill. In 2010 and 2011, BP paid these four claimants (Claim Nos. XXX23, XXX51, XXX20, XXX62) a combined total of more than **$1.5 million** for business losses caused as a result of the BP Oil Spill.[6]

The majority of claimants on the List of 64 did not respond to BP's causation arguments. Their claims files are silent on causation. They simply noted that actual causation was not an issue per the Settlement Agreement.[7] The Below list is comprised of those instances where the Claimant discusses causation or where the Appeals Panel finds that BP's causation arguments are factually wrong.[8]

|    | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|----|------------------------------------|-------------------------------------------|
| 1. | Claim No. XXX08: ... ***Claimant had no injury due to the Spill***. Claimant's decline in revenue in late 2010 was caused by this water damage that forced its office to close. . . | Claimant further addresses BP's alternative causation argument by explaining that it actually had 2 locations and that following the closure of one office, all patients were routed to the other office (6.8 miles away). Thus, ***Claimant contends it was not completely shut down*** and |

---

concerning the unreliability of the list of 64 was also adopted. However, since the matter has been remanded, Class Counsel submits the instant motion to better complete the record.
[4] *Rumsey Declaration*, ¶ 3.
[5] Nor is Appendix A an appropriate Fed. R. Evid.; 1006 summary. *See U.S. v. Nguyen*, 504 F.3d 561 (5th Cir. 2007) (finding that a testimonial summary of the content of records is not an appropriate summary under Rule of Evidence 1006 or Fifth Circuit caselaw).
[6] *Id.* at 8.
[7] *Creevy Declaration*, at ¶ 5, attached as Exhibit "A".
[8] *Id.* at ¶ 4.

|   | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|---|
|   |   | continued to generate revenue during the late 2010 months.   Doc. Id. XXXX148<br>**Appeal Panel:** On 6/3/13, found for Claimant and noted that, *"The Claimant's business was not totally shut down* for unrelated causes. . . ." Doc. ID XXXX5778 |
| 2. | Claim No. XXXX20:  . . . In November 2010, Claimant's tugboat—its only source of revenue—was not operating because the tugboat was undergoing major repairs unrelated to the Spill. . . . *Claimant did not incur any injury due to the Spill* or for any other reason. . . . | On 6/27/13, the Appeal Panel found in favor of Claimant and noted that ". . . *BP's argument concerning vessel repairs finds no support in the record* or the Settlement Agreement." Doc. ID XXXX1876 |
| 3. | Claim No. XXX65: Claimant is a Zone D nursing home facility in Central Louisiana. . . . Almost a full year before the Spill, Claimant shut down its facility and transferred its license to operate the business. Yet, the Settlement Program engaged in the fiction that the absence of revenue in 2010, after Claimant had closed and transferred its license, was an injury due to the Spill. | Claimant's Final Proposal admits that at the facility in question, it transferred its operating license on May 31, 2009.  Nonetheless, Claimant argues that although it shut down its "larger line of service", *it continued to operate another line of service at that same location, i.e., it still earned revenues at said location*. (with sufficient revenue in 2011 to pass the V☐shaped Pattern Revenue Test) Doc. ID XXXX3226 |
| 4. | Claim No. XXX51: Claimant is a hotel in Mississippi. . . . Claimant experienced a fire in mid-September 2010 that caused the hotel to remain closed from October 2010 until the Spring of 2011. Claimant recorded no revenue during those months. Claimant's Compensation Period included October 2010. The Settlement Program created the fiction that the absence of revenue in October 2010 was a loss resulting from the Spill, when in fact it was due to the fact that | Claimant countered that it received insurance proceeds that "replaced" the otherwise lost proceeds during the periods the hotel was closed. Doc. ID XXXX763<br><br>On 6/27/13, the Appeal Panel found in favor of Claimant, noting that Claimant fully accounted for its business interruption insurance income in its financial statements and that "…*Claimant voluntarily recalculated its monthly profit and loss statements in its final proposal to apply the* |

4

|   | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|---|
|   | the fire caused the business to shut down. | *insurance proceeds when they were earned rather than when they were received which reduced the claim by $52,877.57 in BP's favor. Nonetheless, BP still contends that Claimant is entitled to an award of $0. . ."* Doc. ID XXXX5745 |
| 5. | Claim No. XXX08: . . . Claimant's decrease of profit in 2010 was directly attributable to a reduction, which took effect prior to the Spill, in rates paid by third-party payors (e.g. government programs and private insurers). | Claimant contends that *"BP fails to consider that all health care businesses' financial performance tracks the general economy and harm to the economy results in harm to all health care business.* Rates are lowered either because of loss of tax revenue to governmental payors, *patients and their families delay treatment, and private insurers drop rates because they lose enrolled members."* Doc. ID XXXX119.<br><br>On 6/28/13, a unanimous three member Appeal Panel found in favor of claimant stating "BP's argument that the claimant may have had some decreased reimbursement rates does not provide justification for not implementing the financial process set forth in the Settlement Agreement and confirmed by the District Court." Doc. ID XXXX4014 |
| 6. | Claim No. XXX00: Claimant is a non-profit in Florida that provides counseling for at risk youth and their families. Claimant's economic performance in 2010 changed *not as a result of an injury due to the Spill*—or indeed any injury at all—but rather due to an elective change in the matter in which Claimant receives funding. . . . | Claimant responded that, "While [Claimant] did change the structure of its contract to receive State Funding, this change actually saved [Claimant] more in expenses than it cost in revenue. *If [Claimant] had not done this change, the losses in 2010 would have been even greater than they were for 2010."* Doc. ID XXXX366 |
| 7. | Claim No. XXXX41: . . . Claimant's financial documentation demonstrates that it did not engage in farming operations in either 2009 or 2010. . . . *Claimant could not have experienced an injury due to the Spill*—or indeed any injury regardless of cause—as Claimant opted not to plant crops in either 2009 or 2010. | Claimant responds that *despite BP's assertion that it ceased farming activities in 2009 and 2010, Claimant planted wheat in the fall of 2010. Claimant also earned revenue from the rental of his farm equipment in 2009* because the land he leased was not available to Claimant that year. Doc. ID XXXX7639 |
| 8. | Claim No. XXX27: Claimant operates a car | GM announced the elimination of the Pontiac |

|  | **What BP Represented To The Court:** | **What BP Failed To Disclose To The Court:** |
|---|---|---|
|  | dealership in Louisiana . . . . General Motors eliminated the Pontiac brand of automobiles, which Claimant sold, prior to Claimant's Compensation Period. Accordingly, Claimant's losses related to the elimination of the Pontiac brand were *entirely unrelated to the Spill*. . . . | brand on April 27, 2009. For the period of June-Dec 09 the *Claimant sold its remaining inventory of Pontiac vehicles*. The claimant received a wind down letter from GM on June 1, 2009 stating that it would have to close by October 31, 2010. On May 27, 2010 the *Claimant signed a reinstatement agreement with GM. From the June 1, 2009 through the date of the reinstatement the claimant was a Buick/GMC dealer selling and servicing new and used cars. The claimant was a Buick/GMC dealer throughout the entire process without any change in business model*. Doc. XXXX6836 |
| 9. | Claim No. XXX60: Claimant is a Zone C real estate rental company which, prior to the Spill, earned revenue from leasing two properties to Saturn car dealerships. . . . . Claimant's only major sources of income, the Saturn dealership leases, dried up prior to the Spill because those dealerships went out of business in 2009. In 2010, the year of the Spill, Claimant did not earn any revenue because it had, prior to the Spill, lost its tenants. *Claimant did not incur an injury due to the Spill*. | Claimant's response: ". . . It is correct that the tenants stopped paying rent the end of 2009. However, *but for the spill and the devastating economic effects of the spill, the properties may well have been leased during 2010*. To suggest that the only way the Claimant could have suffered a loss is from not being paid anticipated rents from the same tenant in past years imposes an unsupportable condition on making a successful claim that does not exist in the Agreement, and which defies logic. *Claimant certainly expected to earn profits in 2010, and may have been successful in doing so but for the spill*." Doc. ID XXXX972 |
| 10. | Claim No. XXX58: Claimant is a Zone B catering service and restaurant located in Louisiana. . . . Among other services, Claimant provides catering to emergency response clean-up personnel, particularly after hurricanes. Claimant's revenue spiked in December 2007 as well as September/October 2008 due to Hurricanes Katrina and Gustav. . . . | Claimant counters that it handles mass catering events for all [REDACTED] Restaurants for all occasions, and not merely just hurricanes. Such mass catering includes fundraisers, weddings, receptions, and festivals. Though Claimant benefitted from two large catering jobs related to hurricanes, this does not evidence Claimant's "line of business" as BP suggests. Doc. ID XXXX7056 |

6

|     | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
| --- | --- | --- |
| 11. | Claim No. XXX48: Claimant, a Zone B emergency room physician's group operating in Louisiana, entered into a contractual relationship with a hospital pursuant to which it received certain subsidies until its patient volume or billings increased. . . . The lower subsidy in 2010 was not the result of an injury due to the Spill, but, to the contrary, the elimination of an agreed-to subsidy when Claimant's business expanded. . . . | *Claimant argues that the subsidy in question is hopelessly intertwined with all other revenue.* "If you see a decrease in this account, you can bet the farm that there will be a corresponding increase in revenues elsewhere in the P&Ls. Which account will go up in that case would take a much more complicated and lengthy explanation, but it will happen by necessity. There is no substantive difference between this account and the contractual adjustments on hospital P&Ls. The Subsidy revenue line is for reporting just one of several different types of revenue earned under the same contract, and it is directly and integrally related to those other revenue accounts." Doc. ID XXXX4748 |
| 12. | Claim No. XXXX25: Claimant is a Zone C dentist office located in Florida. . . . *Claimant did not incur an injury due to the Spill*. Rather, Claimant's revenue declined because of the departure of one of Claimant's dentists prior to the Spill. | Claimant points out that: "BP is correct that Dr. [REDACTED] left the practice during 2009 and that Claimant removed him from the Annual Report as a 'managing member/manager.' However, *the attached Buyout Agreement and Promissory Note proves that _____ left effective the 2nd day of February, 2009. Any income attributed to _____ would not have been recorded in the applicable 2009 'Only Benchmark Months' of June through October*. Therefore, the variable profits being compared from the relevant 2009 'Only Benchmark Period' would be comparable to the 2010 variable profits in the same months." Doc. ID XXXX1590 |
| 13. | Claim No. XXX40: Claimant is a Zone C cancer diagnosis and treatment center located in Alabama. . . . Claimant experienced a one-time lag in processing its insurance reimbursements causing spikes in revenue during the Benchmark Period—an event that had nothing to do with the Spill and yet inflated Claimant's award. . . . | Claimant argues that *"after the oil spill and the ensuing lost jobs and lost insurance benefits the numbers of patients unable to pay increased dramatically, although the incidence of cancer occurring in the general population remained consistent."* Doc. ID XXXX6111 |
| 14. | Claim No. XXX17: Claimant is a Zone C | *Claimant addressed the timing of revenues and* |

7

|   | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|---|
|   | residential building construction company. **Claimant did not incur an injury due to the Spill**. Rather, Claimant's business was in a free fall prior to the Spill. . . . | *ongoing expenses of the claimant to show that claimant remained in operation during the class period.* Doc. ID   XXXX5129<br>**Appeal Panel**: Panel ruled for Claimant on 7/29/13. "The record supports the Claim Administrator's award which is affirmed." Doc ID XXXX4012 |
| 15. | Claim No. XXX33: . . . **Claimant's loss was not a result of the Spill but appears to be a result of the fact that Claimant was not actually in business.** . . . | **Appeal Panel:** "*. . . The claimant addressed the issue raised by BP regarding whether this company was a valid business entity entitled to compensation under the settlement agreement. It provided a copy of a valid business license. It presented copies of it's corporate tax returns and P and Ls. It provided a legitimate explanation of some of the nuances with it's financial statements.* . . . Additionally, the financial calculations were appropriate and consistent. There is no improper anomaly as asserted by BP. . . . " Doc. ID XXXX1355 |
| 16. | Claim No. XXX44: Claimant is a television broadcasting studio located in Zone A. . . . **Claimant did not incur an injury due to the Spill**. . . . The decline in relative revenue in 2010 was not due to the Spill, but rather the absence of revenue-generating elections for the studio. | Claimant argues that the political advertising in 2010 actually exceeded that in 2009. Political advertising is only one of over 29 separate revenue line items and that political ads occur throughout the benchmark and compensation periods. Doc. ID XXXX680 |
| 17. | Claim No. XXX73: Claimant, a commercial leasing company located in Florida (Zone A), . . . **Claimant's loss was not due to the Spill**. This award was driven by the inclusion of commercial rental revenues in the Benchmark Period for a space that ceased generating revenue in September 2009, either because the lease for the property was cancelled or it ended and was not renewed. This space was not leased | Claimant argues that, **"Claimant specifically denies BP's assertion and actually did expect to earn a profit on Space 107 in 2010, but could not because of the Spill."**<br>Doc. ID XXXX852 |

| What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|
| again in 2010. | |

The above list demonstrates just how misleading and unreliable BP Counsel's Declaration has proven. 17 claims contain some type of causation statement by the Claimant or other financial information that supports causation. In some instances, the Appeal Panel itself recognizes Claimants' explanation of financials in an effort to support damage calculations.

### B.  Rumsey's Declaration is not based on personal knowledge.

Rumsey fails to state that the Declaration is based upon her personal knowledge. While she states that the summaries in the appendices "are true and accurate representations of the data in the claims files to the best of [her] knowledge," Rumsey does not have "personal knowledge" of the files themselves or the data.[9] Rumsey admits that the Appendices were not prepared by just her but with other unnamed attorneys at her firm and unnamed "experts" whose "expertise" is never identified.[10] This makes the Appendices textbook hearsay and inadmissible. *U.S. v. $92,203 in U.S. Currency*, 537 F.3d 504, 508 (5th Cir. 2008) (striking an affidavit based on hearsay); *Boken v. Dengel*, 340 F.3d 300, 313 (5th Cir. 2003) (striking an affidavit as inadequate where it was stated on "information and belief" as opposed to "personal knowledge").

Rumsey does not get a pass because she is an attorney. Attorneys are subject to the same "personal knowledge" requirement as any other declarant. *Wells Fargo Home Mortg., Inc. v. Lindquist*, 592 F.3d 838, 845–46 (8th Cir.2010) (holding that district court properly ignored attorney's affidavit because he did not assert personal knowledge of the transaction); *Brainard v.*

---

[9] *Rumsey Declaration*, at ¶ 3.
[10] *Id.* at 4.

*Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir.2005) (holding attorney's affidavit that does nothing more than assemble properly authenticated evidence is still not admissible, because it is not based on personal knowledge); *United States v. Peterson*, 414 F.3d 825, 827 (7th Cir. 2005) ("The lawyer's affidavit, being hearsay, is no evidence at all."); *Suit v. Ellis*, 282 F.2d 145, 147 n.2 (5th Cir.1960) ("The motion for new trial is of little assistance to the petitioner except as a pleading to be considered by the Court, because the affidavit was made by the attorney and not by the petitioner, and because it failed to contain any showing that the attorney had any personal knowledge of the facts alleged."); 11 MOORE'S FEDERAL PRACTICE § 56.94[7][a], at 56–245 (3d ed. 2011) (stating that "an attorney's affidavit or declaration is subject to the same personal knowledge requirement as any other affidavit or declaration . . . .").

C.   **Appendix B Contains No Indicia of Reliability.**

Even concerning Appendix B, in which she only lists certain businesses located more than 100 miles from the Gulf, BP Counsel offers no proof or support or even explanation for its unabashedly sweeping statement that "there is no apparent reason why these losses, so far from the Gulf coast and in industries that are unlikely to have been impacted by the Spill, would have any nexus to the Spill."[11]

First and foremost, each and every one of these claims demonstrated a loss from the Spill based on the objective financial tests that BP agreed would demonstrate a loss from the Spill. *See Opposition to BP Motion to Amend*, at 2-6. [Rec. Doc. 11826] Moreover, from an evidentiary standpoint, BP Counsel offers no financial analysis. BP offers no business or economic reasons as to why any of the redacted businesses in Appendix B could not have had losses related in any way to the spill. Appendix B is nothing more than a list of four fields for

---

[11] *Rumsey Declaration*, at 3.

almost 1,200 claimants: redacted claim ID, industry type, approximate number of miles from the Gulf, and total award amount. Nothing else.

Equally troubling is that BP Counsel does not even identify the name of the "economic consultant" who compiled the list. As such, Appendix B is an evidentiary nightmare – a list of redacted claims compiled by an unidentified BP consultant. BP never provided unredacted copies of Appendix A or B to the Court or Class Counsel. Rather than honor its evidentiary burden of submitting evidence to support its motion for an injunction, BP Counsel simply states that if anyone wants it, they can come ask BP for it.[12]

**WHEREFORE** Plaintiffs respectfully pray that this Court strike the BP Counsel Declaration and the attached Appendices.

This 18th day of December, 2013.

Respectfully submitted,

__/s/ Stephen J. Herman__
**Stephen J. Herman**, La. Bar No. 23129
**HERMAN HERMAN & KATZ LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Co-Lead Class Counsel*

__/s/ James Parkerson Roy__
**James Parkerson Roy**, La. Bar No.11511
**DOMENGEAUX WRIGHT ROY EDWARDS LLC**
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Co-Lead Class Counsel*

---

[12] *Rumsey Declaration*, at 1 & 2.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Motion, together with the Exhibits, has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of December, 2013.

/s/  Stephen J. Herman and James Perkerson Roy