# EXHIBIT A

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF JOHN S. CREEVY

I, John S. Creevy, respectfully declare, under penalty of perjury, that I have personal knowledge as to the following:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana and the United States Fifth Circuit Court of Appeals. I am over the age of 18 and, if called, competent to testify to the facts set forth herein.

2. I am an attorney at the law firm of Herman, Herman & Katz, LLC, working on behalf of Class Counsel for the Economic & Property Damages Settlement Class. In connection with my work with Class Counsel, I have reviewed and become familiar with the Economic & Property Damages Settlement, as amended, in the above captioned case. I have reviewed numerous claims awards made by the Court-Supervised Settlement Program (CSSP) pursuant to that Settlement, the briefing of appeals of claims awards by BP and Claimants, and related claims files available through the Settlement Program portal.

3. The document attached to this Declaration as Appendix 1 was created by me following review of the November 7, 2013, Declaration of Allison B. Rumsey [Doc 11819-2] and the Exhibit A attached to that declaration identifying certain business economic loss claims filed with the CSSP.[1] I have reviewed the documents submitted to the CSSP in connection with the 64 claims identified by Ms. Rumsey in her declaration. In particular, I have reviewed the memoranda and documents submitted by BP and by claimants in support of positions on appeal and any appeal decisions with the stated reasoning provided by the Appeal Panel.

4. I have identified at least 17 claims (listed on Appendix 1) for which the Claimant has provided evidence or argument contradicting the statements contained in Ms. Rumsey's Declaration that the 64 listed claimants did not suffer a loss related to the *Deepwater Horizon* oil spill. To the extent that Appendix 1 contains any quotations, I have personally confirmed that these quotations are as found in the claims file.

5. I have identified another 32 claims listed in Ms. Rumsey's Declaration for which the claimant argued for and/or relied upon the causation presumptions and/or objective financial causation tests found in the Settlement Agreement (generally Exhibit 4B) in opposition to BP's appeal of the claim award. An additional 6 claims have not yet proceeded to the point of filing of memoranda.

6. Of the 41 claims listed in Ms. Rumsey's Declaration which have resulted in an Appeal Panel decision in favor the Claimant, I have identified in the record only 14 claims for which BP sought discretionary review of the appeal decision by the Court.

---

[1] See RUMSEY DECLARATION (Nov. 7, 2013) [Doc 11819-2], pp.6-18.

7. Although the Claimants' identifying information do not appear on the Appendix to this declaration, in order to preserve the confidentiality pursuant to outstanding orders of the Court, I can provide the identifying information if requested to do so by the Court.

8. Of the 64 claims listed by Ms. Rumsey in her declaration, I have identified from the Settlement Program records four claimants who appear to have been paid in aggregate over $1,500,000 for oil-spill-related business economic losses by the Gulf Coast Claims Facility (Claim Nos. XXX23, XXX51, XX20 and XXX62).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th Day of December, 2013 in New Orleans, Louisiana.

_____
John S. Creevy

# APPENDIX 1

## 17 SAMPLES FROM BP's LIST OF 64 ALLEGED "NO CAUSATION" CLAIMS

| | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|---|
| 1. | Claim No. XXX08: . . . **Claimant had no injury due to the Spill**. Claimant's decline in revenue in late 2010 was caused by this water damage that forced its office to close. . . . | Claimant further addresses BP's alternative causation argument by explaining that it actually had 2 locations and that following the closure of one office, all patients were routed to the other office (6.8 miles away). Thus, **Claimant contends it was not completely shut down** and continued to generate revenue during the late 2010 months.  Doc. Id. XXXX148<br>Appeal Panel: On 6/3/13, found for Claimant and noted that, "**The Claimant's business was not totally shut down** for unrelated causes. . . ." Doc. ID XXXX5778 |
| 2. | Claim No. XXXX20: . . . In November 2010, Claimant's tugboat—its only source of revenue—was not operating because the tugboat was undergoing major repairs unrelated to the Spill. . . . **Claimant did not incur any injury due to the Spill** or for any other reason. . . . | On 6/27/13, the Appeal Panel found in favor of Claimant and noted that ". . . **BP's argument concerning vessel repairs finds no support in the record** or the Settlement Agreement." Doc. ID XXXX1876 |
| 3. | Claim No. XXX65: Claimant is a Zone D nursing home facility in Central Louisiana. . . . Almost a full year before the Spill, Claimant shut down its facility and transferred its license to operate the business. Yet, the Settlement Program engaged in the fiction that the absence of revenue in 2010, after Claimant had closed and transferred its license, was an injury due to the Spill. | Claimant's Final Proposal admits that at the facility in question, it transferred its operating license on May 31, 2009. Nonetheless, Claimant argues that although it shut down its "larger line of service", **it continued to operate another line of service at that same location, i.e., it still earned revenues at said location**. (with sufficient revenue in 2011 to pass the V-shaped Pattern Revenue Test) Doc. ID XXXX3226 |

| | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|---|
| 4. | Claim No. XXX51: Claimant is a hotel in Mississippi. . . . Claimant experienced a fire in mid-September 2010 that caused the hotel to remain closed from October 2010 until the Spring of 2011. Claimant recorded no revenue during those months. Claimant's Compensation Period included October 2010. The Settlement Program created the fiction that the absence of revenue in October 2010 was a loss resulting from the Spill, when in fact it was due to the fact that the fire caused the business to shut down. | Claimant countered that it received insurance proceeds that "replaced" the otherwise lost proceeds during the periods the hotel was closed.<br>Doc. ID XXXX763<br><br>On 6/27/13, the Appeal Panel found in favor of Claimant, noting that Claimant fully accounted for its business interruption insurance income in its financial statements and that "...*Claimant voluntarily recalculated its monthly profit and loss statements in its final proposal to apply the insurance proceeds when they were earned rather than when they were received which reduced the claim by $52,877.57 in BP's favor. Nonetheless, BP still contends that Claimant is entitled to an award of $0. . ."* Doc. ID XXXX5745 |
| 5. | Claim No. XXX08: . . . Claimant's decrease of profit in 2010 was directly attributable to a reduction, which took effect prior to the Spill, in rates paid by third-party payors (e.g. government programs and private insurers). | Claimant contends that *"BP fails to consider that all health care businesses' financial performance tracks the general economy and harm to the economy results in harm to all health care business.* Rates are lowered either because of loss of tax revenue to governmental payors, *patients and their families delay treatment, and private insurers drop rates because they lose enrolled members."* Doc. ID XXXX119.<br><br>On 6/28/13, a unanimous three member Appeal Panel found in favor of claimant stating "BP's argument that the claimant may have had some decreased reimbursement rates does not provide justification for not implementing the financial process set forth in the Settlement Agreement and confirmed by the District Court." Doc. ID XXXX4014 |
| 6. | Claim No. XXX00: Claimant is a non-profit in Florida that provides counseling for at risk youth and their families. Claimant's economic performance in 2010 changed *not as a result of an injury due to the Spill*—or indeed any injury at all—but rather due to an elective change in the matter in which Claimant receives funding. . . . | Claimant responded that, "While _____ did change the structure of its contract to receive State Funding, this change actually saved _____ more in expenses than it cost in revenue. *If _____ had not done this change, the losses in 2010 would have been even greater than they were for 2010."* Doc. ID XXXX366 |

|   | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|---|
| 7. | Claim No. XXXX41: . . . Claimant's financial documentation demonstrates that it did not engage in farming operations in either 2009 or 2010. . . . **Claimant could not have experienced an injury due to the Spill**—or indeed any injury regardless of cause—as Claimant opted not to plant crops in either 2009 or 2010. | Claimant responds that **despite BP's assertion that it ceased farming activities in 2009 and 2010, Claimant planted wheat in the fall of 2010. Claimant also earned revenue from the rental of his farm equipment in 2009** because the land he leased was not available to Claimant that year. Doc. ID XXXX7639 |
| 8. | Claim No. XXX27: Claimant operates a car dealership in Louisiana . . . . General Motors eliminated the Pontiac brand of automobiles, which Claimant sold, prior to Claimant's Compensation Period. Accordingly, Claimant's losses related to the elimination of the Pontiac brand were **entirely unrelated to the Spill**. . . . | GM announced the elimination of the Pontiac brand on April 27, 2009. For the period of June-Dec 09 the **Claimant sold its remaining inventory of Pontiac vehicles**. The claimant received a wind down letter from GM on June 1, 2009 stating that it would have to close by October 31, 2010. On May 27, 2010 the **Claimant signed a reinstatement agreement with GM. From the June 1, 2009 through the date of the reinstatement the claimant was a Buick/GMC dealer selling and servicing new and used cars. The claimant was a Buick/GMC dealer throughout the entire process without any change in business model**. Doc. XXXX6836 |
| 9. | Claim No. XXX60: Claimant is a Zone C real estate rental company which, prior to the Spill, earned revenue from leasing two properties to Saturn car dealerships. . . . . Claimant's only major sources of income, the Saturn dealership leases, dried up prior to the Spill because those dealerships went out of business in 2009. In 2010, the year of the Spill, Claimant did not earn any revenue because it had, prior to the Spill, lost its tenants. **Claimant did not incur an injury due to the Spill**. | Claimant's response: ". . . It is correct that the tenants stopped paying rent the end of 2009. However, **but for the spill and the devastating economic effects of the spill, the properties may well have been leased during 2010**. To suggest that the only way the Claimant could have suffered a loss is from not being paid anticipated rents from the same tenant in past years imposes an unsupportable condition on making a successful claim that does not exist in the Agreement, and which defies logic. **Claimant certainly expected to earn profits in 2010, and may have been successful in doing so but for the spill**." Doc. ID XXXX972 |

|     | **What BP Represented To The Court:** | **What BP Failed To Disclose To The Court:** |
| --- | --- | --- |
| 10. | Claim No. XXX58: Claimant is a Zone B catering service and restaurant located in Louisiana. . . . Among other services, Claimant provides catering to emergency response clean-up personnel, particularly after hurricanes. Claimant's revenue spiked in December 2007 as well as September/October 2008 due to Hurricanes Katrina and Gustav. . . . | Claimant counters that it handles mass catering events for all of the restaurant group's special occasions, and not merely just hurricanes. Such mass catering includes fundraisers, weddings, receptions, and festivals. Though Claimant benefitted from two large catering jobs related to hurricanes, this does not evidence Claimant's "line of business" as BP suggests. Doc. ID XXXX7056 |
| 11. | Claim No. XXX48: Claimant, a Zone B emergency room physician's group operating in Louisiana, entered into a contractual relationship with a hospital pursuant to which it received certain subsidies until its patient volume or billings increased. . . . The lower subsidy in 2010 was not the result of an injury due to the Spill, but, to the contrary, the elimination of an agreed-to subsidy when Claimant's business expanded. . . . | ***Claimant argues that the subsidy in question is hopelessly intertwined with all other revenue.*** "If you see a decrease in this account, you can bet the farm that there will be a corresponding increase in revenues elsewhere in the P&Ls. Which account will go up in that case would take a much more complicated and lengthy explanation, but it will happen by necessity. There is no substantive difference between this account and the contractual adjustments on hospital P&Ls. The Subsidy revenue line is for reporting just one of several different types of revenue earned under the same contract, and it is directly and integrally related to those other revenue accounts." Doc. ID XXXX4748 |
| 12. | Claim No. XXXX25: Claimant is a Zone C dentist office located in Florida. . . . ***Claimant did not incur an injury due to the Spill.*** Rather, Claimant's revenue declined because of the departure of one of Claimant's dentists prior to the Spill. | Claimant points out that: "BP is correct that _____ left the practice during 2009 and that Claimant removed him from the Annual Report as a 'managing member/manager.' However, *the attached Buyout Agreement and Promissory Note proves that _____ left effective the 2nd day of February, 2009. Any income attributed to _____ would not have been recorded in the applicable 2009 'Only Benchmark Months' of June through October*. Therefore, the variable profits being compared from the relevant 2009 'Only Benchmark Period' would be comparable to the 2010 variable profits in the same months." Doc. ID XXXX1590 |

|  | **What BP Represented To The Court:** | **What BP Failed To Disclose To The Court:** |
|---|---|---|
| 13. | Claim No. XXX40: Claimant is a Zone C cancer diagnosis and treatment center located in Alabama. . . . Claimant experienced a one-time lag in processing its insurance reimbursements causing spikes in revenue during the Benchmark Period—an event that had nothing to do with the Spill and yet inflated Claimant's award. . . . | Claimant argues that *"after the oil spill and the ensuing lost jobs and lost insurance benefits the numbers of patients unable to pay increased dramatically, although the incidence of cancer occurring in the general population remained consistent."* Doc. ID XXXX6111 |
| 14. | Claim No. XXX17: Claimant is a Zone C residential building construction company. *Claimant did not incur an injury due to the Spill.* Rather, Claimant's business was in a free fall prior to the Spill. . . . | *Claimant addressed the timing of revenues and ongoing expenses of the claimant to show that claimant remained in operation during the class period.* Doc. ID   XXXX5129<br>**Appeal Panel**: Panel ruled for Claimant on 7/29/13. "The record supports the Claim Administrator's award which is affirmed." Doc ID XXXX4012 |
| 15. | Claim No. XXX33: . . . *Claimant's loss was not a result of the Spill but appears to be a result of the fact that Claimant was not actually in business.* . . . | **Appeal Panel:** *". . . The claimant addressed the issue raised by BP regarding whether this company was a valid business entity entitled to compensation under the settlement agreement. It provided a copy of a valid business license. It presented copies of it's corporate tax returns and P and Ls. It provided a legitimate explanation of some of the nuances with it's financial statements. . . .* Additionally, the financial calculations were appropriate and consistent. There is no improper anomaly as asserted by BP. . . . " Doc. ID XXXX1355 |
| 16. | Claim No. XXX44: Claimant is a television broadcasting studio located in Zone A. . . . *Claimant did not incur an injury due to the Spill.* . . . The decline in relative revenue in 2010 was not due to the Spill, but rather the absence of revenue-generating elections for the studio. | Claimant argues that the political advertising in 2010 actually exceeded that in 2009. Political advertising is only one of over 29 separate revenue line items and that political ads occur throughout the benchmark and compensation periods. Doc. ID XXXX680 |

|     | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
| --- | --- | --- |
| 17. | Claim No. XXX73: Claimant, a commercial leasing company located in Florida (Zone A), . . . *Claimant's loss was not due to the Spill*. This award was driven by the inclusion of commercial rental revenues in the Benchmark Period for a space that ceased generating revenue in September 2009, either because the lease for the property was cancelled or it ended and was not renewed. This space was not leased again in 2010. | Claimant argues that, **"Claimant specifically denies BP's assertion and actually did expect to earn a profit on Space 107 in 2010, but could not because of the Spill."** Doc. ID XXXX852 |