IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION: J<br><br>Honorable CARL J. BARBIER<br><br>Magistrate Judge SHUSHAN |

**CHRISTINE REITANO'S THIRD SUPPLEMENTAL RESPONSE
TO FREEH REPORT AND RESERVATION OF RIGHTS**

## I. INTRODUCTION

### A. GENERAL OBJECTION

This Court has no jurisdiction over Ms. Christine Reitano. This fact has been demonstrated in Ms. Reitano's First and Second Supplemental Responses to the Freeh Report. (Documents 11414, 11681, and 11681-1, 2, and 3). This fact has also been placed before the Court in Ms. Reitano's Motion to Dismiss for Lack of Jurisdiction. (Documents 11683 and 11683-1. No hearing has been set for the motion to dismiss and no hearing has been held to allow Ms. Reitano to present evidence and/or cross examine the so-called "evidence" presented by Mr. Freeh in his obviously biased and non-independent report. In fact, Ms. Reitano has not even been provided access to all of the evidence allegedly gathered by Special Master Freeh (SM Freeh) which was used to arrive at his insupportable allegations. Ms. Reitano, by filing this Third Response to the Freeh Report, does not waive any of her rights or objections to any further order of this court affecting her person or rights without first addressing the fact that the court lacks jurisdiction over Ms. Reitano. Only one further order would be appropriate insofar as Ms.

Reitano is concerned and that is an order dismissing the allegations against her and dissolving the show cause order.

If the Freeh investigation and report were truly "independent," it would have presented all of the evidence available for the court to consider and make a determination about the allegations before the court. This was not done. Not even close. Mr. Freeh made no effort at objectivity and his report was obviously result driven. His investigation methods are unexplained and incomplete. He has openly refused to share all of the evidence upon which he supposedly relied, unless ordered to do so by the court. If his evidence is worth what he claims, there should be no problem in exposing it to sunlight, scrutiny and cross-examination. Ms. Reitano reserves the right to further respond to SM Freeh's findings upon receipt of ALL available evidence

In the case of Ms. Reitano, SM Freeh's most serious allegation about her has been discredited with sworn testimony and SM Freeh has made no effort to correct his false accusations.

### B. INCORPORATION OF ALL PRIOR FILINGS

As part of this Third Response to the Freeh Report, Ms. Reitano renews and reiterates each and every paragraph and allegation, including exhibits, as set forth in her Initial Response (Document 11414), her Supplemental Response (Document 11681, 11681-1, 2 and 3) and her Motion to Dismiss (Document 11683 and 11683-1).

### II. THE WHOLE TRUTH ABOUT CHRISTINE REITANO AND HER ROLE AT THE CLAIM ADMINISTRATOR'S OFFICE

In spite of Mr. Freeh's blatant and unsupported efforts to diminish the job that Christine Reitano did while at the Claim Administrator's Office (CAO), she was a valued, hard working

and faithful employee. In order for the court to properly consider the allegations against her, Ms. Reitano's role at the CAO must be discussed.

Ms. Reitano was hired by Patrick Juneau in early 2012 and began her employment on April 1, 2012 to serve as Claims Counsel for the CAO with the following responsibilities:

- Work with the Parties to identify any policy/legal issues and seek resolution at the direction of the claims administrator

- Assist the Claims Administrator with interpretation of the Settlement Agreement, Court Orders and other legal documents

- Work with the vendors and Contract Administrator's staff on legal issues and provide guidance as needed (See **Exhibit 1**).

Though SM Freeh does not discuss Ms. Reitano's fulfillment of her responsibilities, Ms. Reitano did, in fact, carry out these responsibilities to their fullest, from the inception of her employment in April 2012, until her untimely and unlawful termination in June of 2013.

The Claims Administrator implemented several hundred policies during the course of Ms. Reitano's employment. Ms. Reitano, at the direction of the Claims Administrator, worked with the court appointed Vendors to develop the processes used by the Claims Administrator to adopt and promulgate policies needed to implement the Settlement Agreement as drafted by the Parties. The first policies formulated in the Settlement Program started with an Excel spreadsheet of questions circulated numerous times to the Parties for answers and comments that the Settlement Agreement did not specifically address until, ultimately, 169 policies were created.

During this period, the Parties were working with their respective teams to understand their own negotiating history, as well as exploring with each other the scope of each issue as it arose, the various potential consequences of different positions, and attempting to resolve the issue and reach agreement without the need to convene a Panel. There were numerous ex parte communications between the Vendors and the Parties during this period, and the need to

centralize and streamline the processes by which issues were communicated and resolved became apparent to both the Claims Administrator and the Parties.

In early July, 2012, Ms. Reitano was designated by the Claims Administrator to be the "funnel" through which ALL communication regarding the Economic Settlement Program, its vendors, policies, procedures, rules, FAQ's, etc, must be directed

In late July, the Program transitioned from using Excel spreadsheets to using memoranda for the exchange of policy questions and comments. If the Settlement Agreement was vague or incomplete on a specific issue, or unique factual circumstances came to light during the review, or there was a need for an administrative process, the Claims Administrator proposed or implemented a policy by circulating a memo to the Parties. The Claim's Administrator's Process of policy creation using the memo format resulted in the creation of 155 policies.

These issues were typically identified by the Vendors, predominately BrownGreer, during the review process. Ms. Reitano's responsibilities involved working with the vendors and Contract Administrator's staff on legal issues and providing guidance as needed. To this end, Ms. Reitano worked with a multitude of Vendor review teams and their respective team leaders on nearly all legal issues. Ms. Reitano, at the direction of and behalf of the Claims Administrator, provided guidance and oversight on the following issues: Seafood Program Implementation Issues (for which there are 22 components); Wetlands Implementation Issues; Coastal Property Implementation issues; IEL Claims; BEL Claims; Subsistence Claims; Transition Issues; Payment Processing Issues; Prior Payment Offsets; Opt Outs; Attorney Representation and Attorney Lien Resolution Issues; Third Party Claims and Garnishment Issues; Structured Settlements, Bar Dates; Seafood Second Distribution; Development of Confidentiality Order; Development of several Court Appointed Procedures (CAP's);

Development of Multiple Sworn Written Statements; Frequently Asked Questions; Notice Templates; Guardian Ad Litem Appointment and Procedures; Moratoria Issues; Real Estate Developer Issues; Tourism issues; Fraud and Abuse Procedures and Implementation Issues; Reconsideration and Appeals Implementation Issues; the creation of a Re-Review Process; Communication issues; and Global Notes.

Once these issues had been identified and a recommendation thereupon formulated, Ms. Reitano had the further responsibility of seeking resolution of such issues at the direction of the Claims Administrator. Mr. Juneau recognized the magnitude of Ms. Reitano's workload in his sworn statement:

> Q. How did you come to hire her? Did someone recommend her to you?
>
> A. She applied for the job. She said, "You have an opportunity I would like." This was the real formative stage of the thing. I didn't even have an office at the time.
>
> We were using the sixth floor conference room in the building - - you know where our offices is there. Sutton and his wife, as you know, have an office in that building. She mentioned to me, "If you" - - "I would be very much interested in working in that program."
>
> Q. Before she approached you, did you know her?
>
> A. No. No. No. I knew him. I did not know her.
>
> No, let me take that back. I may have met her, because she was married to him, once - - maybe once or twice; but, I mean, I don't even know if I would have recognized her at the time.
>
> Q. She was not a social friend?
>
> A. Oh, no.
>
> Q. You had never worked with her as an attorney?
>
> A. Never.

Q. Did there come a time when you did, in fact, hire her?

A. There was.

Q. What convinced you or persuaded you that she would be someone appropriate to hire for that position?

A. Well, she is very bright. I mean, it was very obvious talking to her. She had a good academic resume, I thought. She was very bright.

We were in the - - in the formative stages of the case. Judge, let me tell you something, that stage of the world, it was scrambled eggs. I got a Court Order telling me to open this facility on June 4th, and to make the transition, which turned out to be a half billion dollar claim. You're looking at it, me and Mike. That's all. That's really all we got.

All of these issues are bubbling. We knew we had to activate this thing. It ain't the easiest thing in the world in five states to find somebody who doesn't have any contact with the *BP* litigation.

She approached me. She seemed very bright to me, credentials. I did the same process I told you about earlier, about circulating the resume and so forth, got the approval.

Q. So you sent it to BP and the plaintiffs' counsel?

A. Absolutely. I've done that consistently.

Q. Did BP come back with any comments or - -

A. No. As a matter of fact, they drafted the first agreement that was signed with her.

Q. Never raised any concerns about her - -

A. Never.

Q. - - employment?

A. Never.

To be honest with you we have dealt with 10 million issues in this case. The girl -- well, the lady proved out to be very

> intelligent, very quick in understanding, you know, documents about that thick.
>
> She--she did quality work that I saw over that extended period of time, from inception til--Tiger Sutton came on November 1, as I recall.
>
> That period of time, I mean, she was more or less a funnel, because I had no other source, you know, that we were dealing with. She was carrying a pretty substantial load during that period of time." (SM-01-CR00689-692, Juneau Statement, incorporated herein by reference.)

Even BP Counsel, Keith Moscowitz, in his Statement/Declaration filed by BP with its original request for injunction supports the fact that Ms. Reitano "was carrying a pretty substantial load" and that she was actually doing her job.[1] A careful analysis of the true meaning of the Moscowitz affidavit was previously provided to Mr. Freeh in correspondence dated August 9, 2013. (See **Exhibit 2**, attached hereto.)

Ms. Reitano, at the direction of the Claims Administrator, worked with the Vendors to create an application called the Policy Keeper. In addition to being an electronic file cabinet of all Settlement Program policies, Policy Keeper allowed the Claims Administrator, the Vendors, BP and Class Counsel to draft, review and implement policies. During her employment at the CAO, Ms. Reitano was a staunch advocate of open communication and transparency. It was always her position in group discussions regarding public policy publication, that each and every policy and its history be published and made public.

In addition to this work, Ms. Reitano also had the title and role of "Document Reviewer," a significant role in and of itself. Additionally, while Mr. David Duval was "Appeals Coordinator," in late May, early June of 2013,[2] Ms. Reitano was assigned the role of fielding the substantive issues arising from the Appeals Process as appeals escalated in the face of the BEL

---

[1] The Moscowitz affidavit is Document Number 10761-5.
[2] Only days before her abrupt and unlawful termination.

policy interpretation controversy. As mentioned above, Ms. Reitano fulfilled her obligations to the utmost, always going above and beyond the call of duty.

Unfortunately for Ms. Reitano, ever since BP's claims of fraud and multiple requests to enjoin the claims process arose, each and every one of the hundreds of actions of Ms. Reitano, has been scrutinized with a microscope. On the other hand, and fortunately for Ms. Reitano, as set out in the official findings referenced below, not one single impropriety was found to exist in all that work product.

Pursuant to the Court's direction the Claim's Administrative Office continued its internal investigation, including a review of the Deepwater Horizon Program policies and claims processes, resulting in a Supplemental Report on Review of Conduct and Claims Processing Issues,[3] submitted on July 17, 2013 which found, in pertinent part as follows:

- p. 5 "As previously reported, Christine Reitano's duties included serving as the Documentation Reviewer ... As noted in our prior report, we have reviewed the 4 claims in which denial was overturned and found no indication of wrongdoing in those instances."

- p. 5 "The Program has conducted a comprehensive review of the various "policies" that have been developed and implemented during the course of the Program. That review focused on those policies that BP did not specifically "accept" or agree to. A total of 230 policies fall into this category....After this comprehensive review, this group concluded that the Program's policies are appropriate and are free of any undue or improper influence from Ms. Reitano or Mr. Sutton."

- p. 6-7 "A dedicated team at BG is charged with responsibility for determining whether particular claimants are to be assigned a "Tourism" designation....The Program has gone back to review all such determinations given that Christine Reitano was in part involved in these discussions....We have found no indication of

---

[3] Filed in the record of these proceedings as part of an earlier motion and identified as Document No. 10774-5. It is incorporated herein by reference.

> any wrongdoing and have concluded that the individual decisions were appropriate and well- founded in each instance."

- p. 7 (Real Estate Developer) "Decision on this issue have been made by the BG Real Estate Developer Team and Patrick Juneau, Michael Juneau and Christine reitano from the CAO....We have found no indication of any wrongdoing and have concluded that the individual decisions were appropriate and well- founded in each instance."

- p. 23 "Conclusion. After reviewing all the policies that BP did not explicitly accept, the Claims administrator concluded that Ms. Reitano or Mr. Sutton did not have any undue influence on any policies or their implementation to the claims review process. Moreover, the Claims administrator confirmed that BP has had an opportunity to review all but seven of the policies created during the course of the Settlement Program. The Claims administrator and his vendors concluded that the Settlement Program policies remain accurate and that the Settlement Program willl continue to implement the policies in the claims review processes."

Ms. Reitano gave guidance to the implementation of nearly 400 policies spanning the spectrum of issues inherent in this complex agreement, and not a single impropriety has been or can be detected. It is nothing short of astonishing that SM Freeh, the "expert" investigator, could not find any room in his biased, facially inconsistent and supposedly "independent" report to mention these objective, factual and truthful findings about Ms. Reitano and her work.

It is readily apparent that Ms. Reitano's role at the Claims Administrator's Office was central and encompassing. It is doubtful that any one person at the CA's office possessed as much institutional knowledge about the Program as she did. And yet, SM Freeh does not portray Ms. Reitano in the light in which the above objective evidence would cast her. Throughout his interview and his Report, SM Freeh set out to make Ms. Reitano responsible for duties regarding governance and the creation and implementation of a Code of Conduct which were not her duties in the first place, but the duties of outside counsel and David Odom, the CEO. And, conversely,

he did not give her any credit for the faithful and diligent performance of her real duties. For example, SM Freeh asked her numerous questions about his erroneous idea that Ms. Reitano was somehow in charge of project governance (Odom's job) and conflict determination and resolution which was the job of the Sessions-Fishman Law Firm. After Ms. Reitano's sworn interview to SM Freeh on July 29, 2013, she supplemented her testimony on August 9, 2013 with correspondence containing correct information on conflict resolution. (See Exhibit 2). SM Freeh has not seen fit to amend or supplement his report with this evidence.

In his report, Mr. Freeh seeks without warrant, to diminish and ridicule Ms. Reitano's legitimate contributions to the Program by underplaying them or not mentioning them at all, and instead attempts to make her the scapegoat for the duties and shortcomings of those who were in fact responsible for those duties. It is legitimate to ask: Who is Mr. Freeh protecting?

### III. SPECIFIC RESPONSES TO FREEH REPORT

A.     THE THONN FEE: The Attorney-Client Contract Fee is NOT a Referral Fee.

Without a doubt, this is the most serious, but false charge leveled at Ms. Reitano. The charge was squarely discredited over two months ago in a sworn affidavit from Ms. Christine Mancuso. In spite of this presentation of "credible evidence," SM Freeh has made zero effort to correct his obvious mistake.

Beginning on page 25 of his report, Mr. Freeh discusses what he headlines as "Evidence of Material False Statements and Omissions by …Christine Reitano… Regarding the Thonn Referral Fee." He relies heavily on his "opinion" of what he or his associates *think or claim* Ms. Christina Mancuso said in her interview and the sworn testimony of Ms. Reitano. He dismisses Ms. Reitano's testimony as false because he erroneously interpreted Ms. Mancuso's statement and, therefore, concluded that Ms. Reitano must be lying. The error of his ways has been fully

demonstrated with sworn testimony, which he has completely failed to acknowledge, even though he has had the information for over two months. This is what Mr. Freeh reports:

> p. 2 "...Christina Mancuso said Ms.Reitano contacted her about the Thonn claim and requested a referral fee."
>
> p. 5 "Ms. Reitano denied under oath that she had any involvement in arranging a referral fee for the Thonn claim. However, an attorney at AndryLerner [Ms. Mancuso]and Andry Lerner firm records contradict her denial. Ms. Reitano continues to insist she had no knowledge or role in arranging a referral fee for the Thonn claim despite this *credible evidence* to the contrary." (Italics in text).
>
> p. 10 "Ms. Reitano should be disqualified based on her involvement in arranging the Thonn referral payments with AndryLerner, and her denial of this conduct.
>
> p. 26 "Contradicting Ms. Reitano's assertions, Ms. Mancuso, the Andry Lerner attorney handling the Thonn claim, told investigators that not only did Ms. Reitano contact her about the Thonn claim, but that Reitano also requested a referral fee.
>
> p. 26 "Ms. Mancuso also stated that Ms. Reitano asked that AndryLerner honor the percentage *referral* fee that was contained in the Thonn disc." (Italics added).

These interpretations of Ms. Mancuso's statements are completely wrong. Mr. Freeh obviously relied very heavily on his "interpretation" of what his associates claim Ms. Mancuso said in her interview about the Thonn fee and her discussions with Ms. Reitano on the subject. Ms. Mancuso's interview was not recorded and only notes of the interview exist to sustain his interpretation of what Ms. Mancuso said.[4] Unfortunately for Mr. Freeh, Ms. Mancuso has a better recollection of not only what she told Mr. Freeh's associates, but she also has very good recall of the events which Mr. Freeh erroneously interpreted.

---

[4] So far we have only been given a redacted version of the notes. This mistake in interpreting what the witness said is because of the faulty practice of FBI and former FBI employees to not use recorders. It is a very bad practice/habit.

In order to make sure the truth was told, Ms. Mancuso has signed a sworn affidavit (credible evidence) of the real facts regarding her conversations with Ms. Reitano and this sworn testimony makes it very clear that Mr. Freeh is 100% wrong on his allegations and opinions about Ms. Reitano's alleged participation in the Thonn case after she terminated her professional relationship with Mr. Thonn. (The Mancuso affidavit was attached to Ms. Reitano's Supplemental (Second) response to the Freeh report and it is incorporated herein by reference. See Document 11681-2). This affidavit contradicts 100% of what Mr. Freeh called "credible evidence" that Ms. Reitano requested a referral fee in the Thonn case from Ms. Mancuso. The affidavit also contradicts Mr. Freeh's allegation that Ms. Reitano was lying about her conversations with Ms. Mancuso. Both Ms. Mancuso and Ms. Reitano have the same interpretation and recollection of their conversations. It is Mr. Freeh who got it wrong and it is he who did not tell the truth.

One thing is clear from the redacted notes of the Mancuso interview, her affidavit, and the testimony of Ms. Reitano: Neither Mr. Freeh nor his associates understand the difference between an attorney-client fee contract and an attorney referral fee contract. Or, based on Mr. Freeh's obvious bias as seen throughout his report, perhaps he intentionally conflated these two concepts in order to reach his desired goal, which makes him not-so-independent.

Ms. Reitano correctly testified that she did not arrange or have any expectation of receiving a referral fee for Casey Thonn's claim after she terminated her professional relationship with Mr. Thonn. During her entire employment at the CAO, she was unaware that her husband had any expectation of receiving a fee on the Thonn case. No one from the CAO ever asked her if she arranged or expected to receive a referral fee on the Thonn case. Mr. Freeh's false accusations are derived from his convoluted, false and erroneous "opinion" of what

Ms. Mancuso said in her interview. His error is further derived from his very apparent lack of understanding of the difference between an attorney-client fee contract and an attorney referral contract. There is no evidence at all, much less "credible evidence" as Mr. Freeh claims, that Ms. Reitano was in any way, shape or form involved in arranging a referral fee or had any expectation to receive a referral fee from the Casey Thonn claim. The affidavit of Ms. Mancuso is "credible evidence" that all of Mr. Freeh's allegations and opinions of Ms. Reitano regarding the Thonn fee are totally false and are not supported by any evidence at all.

One additional and very disturbing fact is that Mr. Freeh was originally ordered to provide monthly reports after his initial report. There is nothing in the record to confirm that this order has been followed. Nevertheless, even if Mr. Freeh did not feel compelled to file the court-ordered supplemental reports, surely if he were truly an "independent" special master, he would have taken the time to correct his previous report in order that the Court could be fully informed of the truth regarding the Thonn fee and the error of his previous report on such a serious matter. He has known the truth for over two months and he has made no effort to correct his errors.

B.   CAO HIRES ATTORNEYS CHRISTINE REITANO AND LIONEL SUTTON

On page 19, Freeh reports: "Ms. Reitano recommended to Mr. Patrick Juneau that her husband be hired....The CAO's CEO, David Odom, expressed reservations about Mr. Sutton's qualifications. Mr. Odom stated that he initially advised Mr. Patrick Juneau and Mr. Michael Juneau, CAO Special Counsel, not to hire Mr. Sutton because he heard in the community that Mr. Sutton was believed to have 'ethical issues.'[5] . . . Mr. Odom also referenced Ms. Reitano's 'big sales job' to both Mr. Patrick Juneau and Mr. Michael Juneau to get her husband hired." Contradicting Odom's opinions, Freeh also finds:

---

[5] This is, at its best, unreliable hearsay from unidentified people "in the community." No reliable investigator would include this in a report, much less rely on it for any purpose.

> p. 19 "In his statements, Mr. Patrick Juneau said that Mr. Odom expressed reservations about hiring Mr. Sutton, *but* his reservation was limited to the fact that Mr. Sutton was married to Ms. Reitano."
>
> p. 19 "Mr. Michael Juneau said that Mr. Odom had expressed reservations about Mr. Sutton"s reputation."

However, according to the notes of Michael Juneau's interview, he *also* said: "When asked if anyone expressed reservations when Mr. Sutton was hired, Mr. Michael Juneau said that Mr. Odom had said to his father that he had concerns about Sutton. Michael Juneau continued by saying that he felt that Mr. Odom may have had concerns because he might have felt that by bringing in Mr. Sutton *his own position may be threatened.*"[6] This apparent bias on the part of Mr. Odom is not noted anywhere in the Freeh Report.

In addition to reporting the biased opinions of Mr. Odom regarding Mr. Sutton, Mr. Freeh also relied on Mr. Odom to criticize Ms. Reitano because her step daughter (Mr. Sutton's daughter) applied for the Media and Press Coordinator position at the CAO. Mr. Freeh alleges:

> p. 19 "Mr. Odom also stated that the DHECC media and press coordinator position initially was to be filled by Mr. Sutton's and Reitano's daughter. Mr. Odom *understood* that their daughter turned the job offer down as *she thought she was not qualified.* Mr. Odom felt that at some point it was beginning to appear the Reitano wanted to make the CAO a 'family affair.'"[7] (Italics added).

Mr. Odom should not quit his day job to become a mind reader. Ms. Ashley Elizabeth Sutton most certainly did not "think" she was not qualified for the job. She was qualified and she knew she was very qualified. She turned down the job because it was apparent that the Claim Administrator was not knowledgeable about computers and was completely unfamiliar with the

---

[6] Michael Juneau interview, July 16, 2013, incorporated by reference, Bates NumberSM-01-CR00658, p. 4).

[7] Mr. Odom was desperate to get a new PR person. The firm already hired on contract was a failure and not doing anything. He told Ms. Reitano of his desperation and she told him about her step-daughter, who was a rising star in public relations, and simply told him to call her. Actually, except for the showing the obvious bias of Mr. Odom and SM Freeh, this paragraph has no place in the Report.

value and use of social media in public relations. The claims process is 100% computer driven and social media is essential in any public relations assignment. This lack of knowledge of the Claim Administrator was not impressive. In addition, Mr. Odom, who participated in her interview, appeared to have no interest in her skills or education. In spite of the generous salary offered, it appeared that the job was a dead end and that is why it was turned down. (See Affidavit of Ashley Elizabeth Sutton, attached as **Exhibit 3**).

C. THE RECOMMENDATION OF MR. SUTTON FOR A JOB HE DID NOT GET AT GARDEN CITY GROUP.[8]

Freeh reports the following:

p. 9 "In response to an inquiry from the GCG, Ms. Reitano personally recommended that the GCG, one of the DHECC's vendors, hire her husband for a proposed legal position."

p. 9 "The Vendor (Neil Zola), who told the special master it was "ludicrous" to hire Mr. Sutton due to the conflict of interest, did not hire Mr. Sutton.

This alleged "issue" is further discussed on page 67 and 68.

p. 67-68 "In approximately July, 2012, he (Zola) approached Ms. Reitano, at the time an attorney at the CAO, asking whether she knew of any attorneys in New Orleans that would be qualified and interested in such a position. Mr. Zola responded that Ms. Reitano got back to him and said that her husband would be interested in the job."

The truth is that Zola did not approach Ms. Reitano. It was Jennifer Keough of his office who did. Keough specifically asked Ms. Reitano to recommend someone that Ms. Reitano thought could get along with Zola. At a dinner meeting in June, the month before, it appeared that Mr. Zola and Mr. Sutton got along very well, so Ms. Reitano recommended him to Ms. Keough. Mr. Freeh should know this because it is reflected in the senders and recipients of the

---

[8] This anecdotal information is completely inconsequential in this matter. It has no significance in considering Ms. Reitano's job performance.

emails he refers to in his report. Instead, Mr. Freeh reports: "Mr. Zola's account of Ms. Reitano's recommendation of her husband for a job is corroborated by a series of emails...Keough wrote: when you talk to Tiger see what he thinks.. Reitano responded that Tiger is interested... Tiger will talk to Pat....Keough responded Zola thought it would be better if Mr. Sutton called him (Zola) before consulting with Mr. Patrick Juneau." Therefore, the emails, contrary to SM Freeh's assertions about them, prove that it was actually Zola who discouraged Mr. Sutton from getting approval of Mr. Juneau in advance. On page 68, Freeh notes that Mr. Sutton, in his interview, "recalled that Neil Zola called him regarding the job and expressed concern that Mr. Patrick Juneau might think GCG was trying to get into "his good graces or something" by hiring Mr. Sutton (as if Zola would object to getting in Mr. Juneau's good graces!). He (Sutton) stated that he told Mr. Zola he understood and that was the end of it."

No one, until now, has ever claimed that the consideration of hiring Mr. Sutton for the job, which never got off the ground, was "ludicrous,"[9] or that tossing this idea around and discarding it could possibly be a reason to accuse Ms. Reitano of any impropriety.

## D. THE ALLEGATION OF IMPROPRIETY BECAUSE MS. REITANO WAS SUPPORTIVE OF BROWNGREER

First, it has to be understood and made clear that Ms. Reitano's job was to be supportive of ALL of the Vendors to the Program. (See Exhibit 1).

Freeh reports on page 12 that: "BG relied upon Reitano to advance BG's interests within the CAO in an effort to resist and to undermine the implementation of business practices to control its costs and to eliminate inefficiencies."

---

[9] It was certainly not any more "ludicrous" than Mr. Zola inviting members of the CAO (which would include Mr. Juneau) in October of 2012 to attend the Giants/Saints game in New York in December in GCG's reserved suite, even though such and invitation was a violation of the "DHECC Code of Conduct Policy" governing gifts and gratuities applicable to "All Program Contractors, Subcontractors, and Vendors." (See **Exhibit 4**). It is also a violation if any employees of the CAO attended the game as a guest of GCG.

On page 74, Mr. Freeh comes to the far reaching conclusion, so far that it is out of reach, that "BG utilized Mr. Sutton and Ms. Reitano to promote BG's own business and financial interests within the CAO in an effort to resist and undermine the implementation of new business practices which would control costs and eliminate inefficiencies." Mr. Freeh is correct when he states: "According to Patrick Juneau, Ms. Reitano became an integral part of his legal team, working on policy and general legal matters." In common parlance, a young person would respond to this statement: "Well, Duh?" Just take a look at Exhibit 1 which describes Ms. Reitano's job as exactly that. Ms. Reitano's role, not even remotely captured in Mr. Freeh's report, is described in the first section of this response. Ms. Reitano worked on a daily basis with Orran Brown and his employees working to identify any policy/legal issues and seeking resolution from the Parties at the direction of the Claims Administrator.

Mr. Freeh goes on to present 3 examples, apparently with the hope of demonstrating an effort on the behalf of BG to "resist and undermine the implementation of new business practices which would control costs and eliminate inefficiencies." Mr. Freeh's first mistake in this endeavor is that 2 out of the 3 scenarios have nothing to do with costs or efficiencies whatsoever. The discussion regarding the "502" errors identified by Chris Reade has nothing to do with costs or budgets. It potentially could have had something to do with an IT error, except for the fact that Mr. Reade recognized the following day that the actual occurrence of the error only occurred at a hundredth of a percentage point. Mr. Reade subsequently apologized to BrownGreer's IT officer, a fact which Mr. Freeh could have easily discovered in a legitimate investigation and reported it accurately.

Second, the discussion about Ms. Sara Cullen's request for BG's training materials and processes had nothing to do with costs, efficiencies, or budgets either. The request does,

however, implicate a rather complicated problem, in that the request came from Ms. Cullen's "Carrollton Group" email address. The "Carrollton Group" is an "outside employer" or "software company," involving Mr. Odom and Mr. Reade, as discussed in Mr. Freeh's report on p. 73, which just so happens to be the same business that Mr. Odom represented to Mr. Juneau did not involve any business that "would have caused a conflict of interest with his position at the DHECC." (See page 73 of the Freeh Report). Remarkably, Mr. Freeh omits or excises this objective, readily ascertainable fact from his discussion regarding Ms. Cullen's request for Mr. Brown's operational and procedural information. Instead he takes issue with Mr. Brown's "resistance" in supplying internal, confidential information to a business which operates outside of the Program.

The final scenario presented by Mr. Freeh is the situation where "*Former* Director of BPRG,"[10] Mr. Scott Sherick, requests data regarding BG reviewers and their tasks, more specifically, reviewers tasked with Tax ID Verification and other "Initial Causation Review" tasks. At the time of these email exchanges, the BPRG was holding meetings with the Vendors and requesting data in an alleged effort to improve overall "utilization." Mr. Sherick was requesting this information because the BPRG was recommending that this initial review role performed on all claims, including BEL claims, be transferred from the BrownGreer reviewers to the accountants in the instance of BEL reviews. This is what Mr. Brown was alluding to when he wrote: "I assume they are trying to figure out how many new people will have to be hired and trained by the accountants to assume all BEL duties." (Freeh Report, p. 75).

---

[10] This acronym stands for Business Processing Reporting Group and the group consisted of Sherrick, Odom, Fisher and Reade (all officials of the Program) who, also together as a group, had formed Crescent City Group. Crescent City Group is criticized for its conflicts in a section of the Report, but none of the members were singled out for their obvious conflict and given the same or even similar treatment as Ms. Reitano, who actually had no conflicts. In fact, the BPRG/CCG members are all still employed at the CAO and, on information and belief, Mr. Sherrick has been rehired.

The proposal or recommendation promulgated by BPRG to transfer the role of causation review from BG to the accountants was not logical. BG had spent months developing the protocols and procedures, as well as training staff to perform these categories of review. Secondly, and more importantly, the BPRG proposed transfer of roles from BG to the accountants was at a time when the accountants were experiencing a significant backlog. By January 2013, BG's processes, now mature and working, were resulting in a steady flow of claims to the accountants. On the other hand, at the time the BPRG was pursuing the potential shift of duties from BG to the accountants, there were approximately 5000 BEL claims sitting, waiting for review in accountant queues. One can only speculate as to the rationale for pursuing such measures. This recommendation was fully vetted and was not adopted.

Furthermore, this recommendation lacked any capacity to "control costs or inefficiencies." The "factual" assertions made by Mr. Freeh in this regard are simply incorrect, just as the unsubstantiated assertions regarding the statements of Ms. Mancuso have been proven to be incorrect by her affidavit. These erroneous assertions amount to material errors that should not have been made in the first place and now that they have been made, they must be corrected.

## CONCLUSION

There is only one appropriate order remaining to be issued in this matter with regard to Christine Reitano—her motion to dismiss for lack of jurisdiction should be GRANTED and the show cause order purportedly addressed to her should be dissolved. No negative action should be taken with regard to Ms. Reitano and the recommendations of Mr. Freeh regarding Ms. Reitano should be dismissed.

Respectfully submitted,

/s/ Mary Olive Pierson
Mary Olive Pierson, La. Bar No. 11004
8702 Jefferson Hwy., Suite B (70809)
P.O. Box 14647
Baton Rouge, LA 70898
(225) 927-6765 - Office
(225) 927-6775 - Fax
mop@mopslaw.com - Email

*Counsel for Christine Reitano*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Christine Reitano's Third Supplemental Response to Freeh Report and Reservation of Rights has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179 on this 16th day of December, 2013.

/s/ Mary Olive Pierson
Mary Olive Pierson