**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by | * | **MDL NO. 2179** |
| the Oil Rig "Deepwater Horizon" | * | |
| in the Gulf of Mexico, on April 20, 2010 | * | **SECTION J** |
| | * | |
| This document relates to: | * | |
| *Elton Johnson v. BP American Exploration* | * | **Honorable CARL J. BARBIER** |
| *& Production Inc.*, No. 2:13-cv-5804 | * | |
| | * | **Magistrate Judge SHUSHAN** |
| | * | |
| | * | |

<u>**COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION
TO ENFORCE SETTLEMENT AND
IN SUPPORT OF BP'S MOTION FOR SUMMARY JUDGMENT**</u>

Of Counsel:

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
richard.godfrey@kirkland.com
andrew.langan@kirkland.com

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jeffrey.clark@kirkland.com
dominic.draye@kirkland.com

Don K. Haycraft
Devin C. Reid
LISKOW & LEWIS LLP
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 556-4128
Facsimile: (504) 556-4108
dkhaycraft@liskow.com
dcreid@liskow.com

**ATTORNEYS-IN-CHARGE FOR
DEFENDANTS BP EXPLORATION &
PRODUCTION INC., AND BP
PRODUCTS NORTH AMERICA INC.**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................... 1

SUMMARY OF THE CASE.......................................................................................... 2

SUMMARY OF THE ARGUMENT ............................................................................. 5

ARGUMENT ................................................................................................................. 8

I.      BP and Johnson Never Formed a Contract Because the Release Contained
Material Terms That Were Absent from Earlier Communications Between the
GCCF and Johnson. .............................................................................................. 8

      A.     The Determination Letter Lacked Material Terms and Made Clear That a
Signed Release Was Necessary To Form a Contract. .............................. 8

      B.     The GCCF Was Not BP's All-Purpose Agent and Could Not Deviate from
the Terms of Its Charter Documents To Award Payments Without a
Release. .................................................................................................. 14

II.     Any Contract Between the GCCF and Johnson Included a Condition on Payment
That Went Unsatisfied. ..................................................................................... 18

III.   At the Very Least, Johnson Is Not Entitled to Enforce the Alleged Settlement
When Factual Issues Remain Open, Including BP's Affirmative Defense of
Fraudulent Inducement. .................................................................................... 23

CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BP Exploration & Production, Inc. v. Johnson*,
   2013 WL 4018614 (5th Cir. Aug. 8, 2013) ........................................................... 2, 4

*Campbell v. Melton*,
   817 So. 2d 69 (La. 2002) ........................................................................................ 20

*Castillo v. Spiliada Maritime Corp.*,
   937 F.2d 240 (5th Cir. 1991) .................................................................................. 9

*Creamer Bros., Inc. v. Hicks*,
   907 So. 2d 880 (La. Ct. App. 2005) ....................................................................... 21

*Durden v. Exxon Corp.*,
   803 F.2d 845 (5th Cir. 1986) .................................................................................. 10

*Eastern Marine Corp. v. Fukaya Trading Co., S.A.*,
   364 F.2d 80 (5th Cir. 1966) .................................................................................... 19

*Foster v. Daon Corp.*,
   713 F.2d 148 (5th Cir. 1983) .................................................................................. 7

*Garrett v. Delta Queen Steamboat Co.*,
   2007 WL 83177 (E.D. La. Mar. 14, 2007) ............................................................ 12

*Gauthier v. Continental Diving Services, Inc.*,
   831 F.2d 559 (5th Cir. 1987) .................................................................................. 9

*German Lloyd v. Mexican Petroleum Corp. of La.*,
   24 F.2d 46 (5th Cir. 1928) ...................................................................................... 13

*Halliburton v. Ocean Drilling & Exploration Co.*,
   620 F.2d 444 (5th Cir. 1980) .................................................................................. 9, 13

*Hull v. Norcrom, Inc.*,
   750 F.2d 1547 (11th Cir. 1985) ............................................................................. 2

*Hussain v. Boston Old Colony Ins. Co.*,
   311 F.3d 623 (5th Cir. 2002) .................................................................................. 23

*In re Amway Corp.*,
   579 F.2d 907 (5th Cir. 1978) .................................................................................. 12

**Page(s)**

*In re Babcock & Wilcox Co.*,
   2002 WL 1874836 (E.D. La. Aug. 13, 2002)........................................................ 18

*In re Gibson*,
   2009 WL 3241641 (E.D. Okla. Sept. 25, 2009) ................................................... 13

*Jones v. Cain*,
   600 F.3d 527 (5th Cir. 2010)............................................................................... 25

*Kensington Court Assocs. v. Gullo*,
   579 N.Y.S.2d 485 (App. Div. 1992) ................................................................... 12

*Kitty Hawk Aircargo, Inc. v. Chao*,
   418 F.3d 453 (5th Cir. 2005)................................................................................. 1

*Latham v. QCI Corp.*,
   2009 WL 483208 (S.D. Tex. Feb. 25, 2009)....................................................... 13

*Mack Trucks v. BorgWarner Turbo Sys., Inc.*,
   2011 WL 1045108 (E.D. Pa. Mar. 22, 2011) ..................................................... 21

*Mizutani v. Happy Huckster Corp.*,
   847 F. Supp. 2d 702 (E.D. Pa. 2012) ................................................................. 11

*Mobley v. Montco, Inc.*,
   2004 WL 307478 (E.D. La. Feb. 17, 2004) ........................................................ 13

*Riccardi v. Modern Silver Linen Supply Co.*,
   356 N.Y.S.2d 872 (N.Y. App. Div. 1974).............................................................. 2

*Rudolph v. D.R.D. Towing Co. LLC*,
   94 So. 3d 21 (La. App. 2012) ............................................................................... 9

*Spring Street Partners-IV, L.P. v. Lam*,
   730 F.3d 427 (5th Cir. 2013)............................................................................... 24

*Stipelcovich v. Sand Dollar Marine, Inc.*,
   805 F.2d 599 (5th Cir. 1986)................................................................................. 9

*Strange v. Gulf & S. Am. S.S. Co.*,
   495 F.2d 1235 (5th Cir. 1974)............................................................................. 13

*Tanguis v. M/V Westchester*,
   2003 WL 22077688 (E.D. La. Sept. 3, 2003) ..................................................... 23

**Page(s)**

*Tweedie Trading Co. v. Parlin & Orendorff Co.*,
  204 F. 50 (7th Cir. 1913) ........................................................................ 13

*Western Nat'l Bank of N.Y. v. Armstrong*,
  152 U.S. 346 (1894) ............................................................................... 18

*Willard, Sutherland & Co. v. United States*,
  262 U.S. 489 (1923) ............................................................................... 14

**Statutes**

33 U.S.C. § 2713(a) ............................................................................... 14, 17

43 U.S.C. § 1349(b)(1) ............................................................................... 4

Fed. R. Civ. P. 56(a) ............................................................................... 5

Fed. R. Civ. P. 81(c) ............................................................................... 25

**Other Authorities**

13 Williston On Contracts § 38:7 (4th ed. 2012) ...................................... 19, 21

Black's Law Dictionary (9th ed. 2009) ...................................................... 19

Restatement (Third) Agency § 2.03 (2006) .............................................. 15

Restatement (Third) of Agency § 4.03 (2006) ......................................... 17

## INTRODUCTION

Elton Johnson voluntarily presented his personal injury claims to the Gulf Coast Claims Facility ("GCCF").  Under the GCCF's process, two key elements were required to create a binding settlement of a plaintiff's claims against BP: (1) an amount of compensation adjudicated to be fair and appropriate by the GCCF and found to be acceptable by the claimant in a preliminary form *together with* (2) the claimant's signature on a release terminating his or her legal claims against BP.  In this case, the GCCF reached a determination on an amount, which Johnson jumped at the chance to claim (because, as would later come into focus for the GCCF, his claims were "fabricated").  But the fact remains that Johnson never signed — or even saw — the release, and thus no contract between the claimant and BP was ever created.

This Court is well aware that GCCF releases, like their successor releases in the Court Supervised Settlement Program, *are* the settlement contracts between BP and claimants; this is why claimants are given the option to consult with a lawyer *prior to* signing and *remain free* to refuse to sign after they review its terms.  Johnson recognizes that to prevail he must defend the legal theory that BP could have compelled him to sign the release based on his signing the acknowledgment form.  MTE 16-17.[1]  Johnson's argument falters right at that step.  The GCCF releases were decidedly not intended to be compulsory "boilerplate," especially not as regards the sight-unseen personal injury releases that were not posted online.  The Justice Department, which reviewed the releases, would never have signed off on such a defective process in 2010.  The Department's involvement in review of the GCCF process was extensive.[2]

---

[1]  Citations to the Plaintiff's Motion to Enforce Settlement Agreement With BP are in the form "MTE __."

[2]  *See, e.g.*, Letter from U.S. Associate Attorney General, Thomas J. Perrelli, to Kenneth Feinberg, Gulf Coast Claims Facility (Feb. 4, 2011), available at http://www.justice.gov/asg/2011-2-4-perrelli-ltr-feinberg.pdf.   Judicial notice can be taken of the level of GCCF oversight this letter reflects. *See Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking notice of material published on agency's website).  BP made this point in its Fifth Circuit brief, and Johnson had no response, whether substantively or to judicial notice of it.

It is axiomatic that "'both parties must be bound or neither is bound'" to a contract. *Hull v. Norcrom, Inc.*, 750 F.2d 1547, 1550 (11th Cir. 1985) (quoting *Riccardi v. Modern Silver Linen Supply Co.*, 356 N.Y.S.2d 872, 875 (N.Y. App. Div. 1974)). On the undisputed facts here, it is clear that the GCCF never sent Johnson the release because, before it would normally do so, Johnson's employer raised a red flag about the veracity of Johnson's claims. The GCCF responded by ordering an independent investigation that concluded that the claims were "fabricated," Ex. A at 1; *see generally* Ex. B at 1, prompting the claims facility to deny Johnson's claims, leaving him to pursue a remedy in court but necessitating that he prove up his claims. Johnson omits this critical set of facts concerning the Guidepost fraud investigation and crafts his brief as if BP were quibbling about minor "discrepancies" concerning how and where Johnson was purportedly injured, rather than whether he was injured at all. MTE 24.

For present purposes, the most important fact is that Johnson never received and never accepted the only document that could bind both BP and him. Without the signed release, Johnson was free to change his mind. In fact, many GCCF claimants did just that; others attempted to modify the release when they saw the terms and objected to them. Johnson's *post hoc* assurance that he would have signed is legally inconsequential. Without the signed release, there was no deal.

## SUMMARY OF THE CASE[3]

Elton Johnson brought this contract action after the GCCF denied his claim seeking compensation for a physical injury allegedly incurred as a result of the explosion on the

---

[3]  This case arrives on remand from the Fifth Circuit, via transfer from the Southern District of Texas. *See BP Exploration & Production, Inc. v. Johnson*, 2013 WL 4018614 (5th Cir. Aug. 8, 2013). Immediately upon removal, BP sought to have this case transferred here, which Johnson steadfastly resisted. Prior briefing has been extensive and Johnson's positions ever-shifting, so BP wishes to make clear that prior points BP has made in that briefing should be considered and thus incorporates by reference all of its briefing in the transferred case from the Southern District of Texas and in the Fifth Circuit, including the supplemental letter briefing ordered on appeal.

*Deepwater Horizon* on April 20, 2010.  In its Denial Letter, the GCCF cited the conclusion of independent investigators that Johnson's claims were "fabricated."  Ex. A at 1.

The reasons for doubt were not, however, immediately apparent.  In fact, only after Tidewater Marine LLC ("Tidewater"), which owes an indemnification obligation to BP here, learned that the independent GCCF was planning to take steps to settle the claims for nearly $2.7 million did Tidewater file with the GCCF testimony and documents casting serious and credible doubt on the veracity of Johnson's claims.   These materials chronicled Johnson's own contradictory statements and, more importantly, included sworn statements from the crewmembers on the *Damon Bankston* who served with Johnson and assisted in the rescue of crew and other workers on board the *Deepwater Horizon*.  *See* Ex. C.

In particular, Tidewater's letter explained that a crewmember below deck with Johnson stated that "at no point did he witness Johnson strike his head, lose consciousness, or in any way injure himself."  Ex. C at 4.  And while the seaman nearest the *Deepwater Horizon* at the time of the explosion "was able to feel some force from the explosion, it was not enough to knock him down and did not cause him to lose his footing or impact him in any way."  *Id.* at 3.  Tidewater also supplied the GCCF with documents completed by Johnson himself, including a form from the day of the incident in which Johnson checked "no" in response to the question "Were you injured?"  *Id.* at 10.  Faced with this information, the GCCF referred the matter to an independent investigator, Guidepost Solutions, "pursuant to its standard protocol."  Ex. A; *see also* Ex. D. at 11 (requiring the GCCF to "implement procedures to: 1. Verify and authenticate claims . . . .").  After investigation, Guidepost concluded that "Johnson's claims of physical injury as a result of the Deepwater Horizon explosion appear to be fabricated."  Ex. B at 17.  After the GCCF reviewed these materials, it concluded that Johnson's claims were not sufficiently reliable to

warrant payment under the procedures it had adopted as modeled on the federal Oil Pollution Act of 1990 ("OPA").  It issued a formal Denial Letter on February 22, 2012.  Ex. A.

The GCCF's denial did not prejudice Johnson's ability to pursue his tort claims and seek compensation from BP and Tidewater.  In fact, he had already filed a tort suit against the same defendants in May 2010, which remains pending in MDL 2179.  Nevertheless, in a brazen display of claim-splitting and forum-shopping, Johnson intervened in an unrelated and already-settled lawsuit pending in Texas to pursue his current argument that the GCCF had somehow formed a contract to settle with him.  Johnson argues that the GCCF departed from its Protocols governing claims processing to enter into a contract by sending a letter alerting him to the amount of money for which it would be willing to settle — all while ignoring that the GCCF claims process had not been consummated, specifically for lack of a signed release.  BP removed these claims to federal court, over Johnson's insistence that they do not "aris[e] out of, or in connection with" with the  *Deepwater Horizon*'s ill-fated operations.  Rec. Doc. 1 (citing 43 U.S.C. § 1349(b)(1)).[4]  Thankfully, the Fifth Circuit ended Johnson's jurisdictional objections in its order transferring the case to this Court.  *BP Exploration & Production, Inc.*, 2013 WL 4018614.  As a result, Johnson has finally stopped fighting federal jurisdiction.

Given this Court's familiarity with the GCCF, it is no wonder that Johnson brought these claims in state court, stubbornly fought removal to federal court, resisted transfer to this Court, and appealed his first defeat to the Fifth Circuit (where his counsel misleadingly told that Court that the JPML had "decided" against transfer, when the panel had not yet seen the case[5]) — a

---

[4]   For convenience, BP will cite the docket in MDL 2179 as "MDL Doc." and the docket in No. 2:13-cv-5804 as "Rec. Doc."

[5]   Oral Arg. 7:17-32, *available at*  http://www.ca5.uscourts.gov/OralArgRecordings/12/12-20512_6-3-2013.wma (Mr. Itkin: "[T]he judicial panel on multidistrict litigation considered transferring this case to Judge Barbier's MDL and decided that this case does not share common facts with the other cases pending in the MDL and should not be transferred to Judge Barbier's MDL . . . .").  In fact, the JPML had not yet reviewed the case; its clerk had merely

4

strategy that wound up landing him in exactly the jurisdiction he tried to avoid.  In contrast, BP has always maintained that Johnson's contract claims belong in MDL 2179.  They share the same essential facts with Johnson's underlying personal-injury claims.  Moreover, this Court has the advantage of familiarity with the GCCF process, including its focus on detecting and defeating fraud, as well as the GCCF Protocols' insistence on a signed release before any settlement could be formed.  And much like in the CSSP claims process, this Court appreciates that it is the final decision of the claims facility that counts, not an intermediate conclusion.  Johnson's Day-of-Incident lawsuit is unlike other such suits.  It is uniquely flawed, as the Court will see when it eventually reaches the merits of Johnson's underlying suit.[6]  Of course, avoiding a discussion of those merits is the whole reason for Johnson's fervent attempts to pursue a purported settlement for almost $2.7 million grounded on what was later revealed to be an incorrect assumption that he filed his claims in good faith.

## SUMMARY OF THE ARGUMENT

After years of procedural maneuvers, Johnson has now filed what he calls a "Motion to Enforce Settlement Agreement with BP" in No. 2:13-cv-5804.  *See* MDL Doc. 11734 (Plaintiff's "Motion").  This Motion is best understood as a motion for summary judgment on Johnson's contract claims under Federal Rule of Civil Procedure 56.  In response, BP files a combined opposition together with its own motion for summary judgment.  In each instance, the moving

---

denied a conditional transfer order.  The actual judges of the JPML were considering the case when the Southern District of Texas temporarily mooted the disputed transfer issue by granting BP's motion for summary judgment.

[6]  To discourage other litigants from adopting Johnson's claim-splitting and forum-shopping strategies, this Court should deal with the underlying tort suit in the normal course of proceedings within MDL 2179.  Quick disposal of Johnson's contract claims makes sense in light of the Fifth Circuit's transfer order.  Nothing in the Fifth Circuit remand, however, goes to the validity or appropriate timing for resolving Johnson's tort claims.  That adjudication will require resolution of additional issues not relevant to the current contract-law claims, including whether Johnson can demonstrate any injury at all.  His narrative here fails to mention his pre-existing physical injuries, *see* MTE 24, which undermine any right to recovery.

party must establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For any of three independent reasons, this Court should deny Plaintiff's Motion; two of these three reasons also entitle BP to summary judgment on Plaintiff's contract-law claims.

*First*, Johnson's effort to saddle BP and Tidewater with an obligation to pay him $2,698,095.00 rests on a pair of preliminary letters that were inadequate to form a contract. The first is the Determination Letter in which the GCCF announced the proposed payment. Ex. E. This is also the letter that first alerted Tidewater that the GCCF did not have full information about Johnson's claim. Ex. C at 1. Accompanying the Determination Letter was the Final Payment Election Form, which Johnson signed and returned to the GCCF. Ex. F. Contrary to Johnson's assertion that this exchange "requires BP to pay money to Johnson in exchange for him dismissing his lawsuit," Ex. G at 6, *every* document in question stated that Johnson would need to sign a release before BP would have any such obligation. *E.g.,* Ex. E (Determination Letter: "$2,698,095.00, which is the amount that can be paid now *if* you decide to accept the Final Payment Offer *and* you sign a Release and Covenant Not to Sue.") (emphasis added); Ex. F (Final Payment Election Form: "The GCCF will send you a Release and Covenant Not to Sue that *you must sign and return to be paid*.") (emphasis added). The reason for requiring review and acceptance of the release is the same reason that failure to do so defeats Johnson's contract claims: the release contained material terms to which the parties had not agreed. These terms included, among others, the precise scope of claims that Johnson would be releasing, two pages of parties covered by the release, what body of law governed the release, and representations that the claimant had not sold or transferred any rights to his claim to anyone else. Until Johnson saw

6

and accepted the release, BP had no assurance that he would do so and had no way to force him
to accept the deal.  In sum, the release was ***the*** only potential contract, and it was never executed.

**Second**, even if the preliminary notification that Johnson received in the Determination
Letter could constitute a contract, that contract included a condition on payment, namely
Johnson's signature on the release document, which went unsatisfied.  Ex. E.  The best Johnson
can argue in response is that the GCCF unfairly withheld transmission to him of the release
because of intervening evidence from Tidewater.  But nothing in the Determination Letter bound
the GCCF to send the release by a date certain.  Moreover, a 90-day delay — the duration
necessary for the Determination Letter to expire, *see id.* at 2 — is eminently reasonable in light
of the extensive new Tidewater evidence and the need for an independent investigation by
Guidepost.[7]  Even under Johnson's contention that the Determination Letter was sufficient to
form a contract, the terms of that "contract" included a condition precedent to payment and an
internal expiration date that together created a safety valve for the GCCF to avoid making an
undeserved payment.  This also defeats Johnson's claim that the GCCF had an obligation to send
the release within a "reasonable" time.  MTE 19.  Reasonability in the realm of contract law is
judged under "all the circumstances," *Foster v. Daon Corp.*, 713 F.2d 148, 150-51 (5th Cir.
1983).  The circumstances here include discovery of Johnson's fabrications.

**Third**, even if a contract existed and even if all conditions had been satisfied, summary
judgment for Johnson remains inappropriate because factual disputes exist over, *inter alia*,
whether the contract was fraudulently induced.  *See* Answer, MDL Doc. 11510, at 6.  Plaintiff

---

[7]  Johnson protests that "***BP and the GCCF were well-aware of the facts underlying Tidewater's allegations when
the settlement offer was extended*** . . . ."  MTE 5 (emphasis original); *see also id.* 23-25.  In fact, the GCCF issued
its initial Determination Letter on September 23, 2011, Ex. E; Tidewater did not provide its evidence until October
20, 2011, Ex. C.; the sworn statements of Johnson's crewmates were taken on October 13, 2011 (Louis Longlois,
Jeffrey Malcolm, and Alwin Landry) and October 18, 2011 (Anthony Gervasio).

attempts to side-step the Rule 56(a) standard for summary judgment by styling his Motion as one to enforce a settlement agreement.  In substance, however, his request is for summary judgment on the claims in the case in which he filed the motion — *i.e.,* the contract claims in No. 2:13-cv-5804.  But those claims are subject to factual disputes that both parties recognized in earlier iterations of this case and no court has ever resolved.  Unlike BP's grounds for summary judgment, which are wholly legal, Johnson's contract claims would have to overcome fact-intensive affirmative defenses, the most important of which is fraud in the inducement.

This Court should deny Johnson's Motion and grant BP's request for summary judgment because the parties did not form a contract.  This is largely the same reason given in Part 3 of the opinion from the Southern District of Texas.  Rec. Doc. 39.  Alternatively, even if a contract had been formed, its terms permitted the GCCF to withhold sending a release in light of new and substantial evidence of fraud then under active investigation.  Finally, and at the very least, unresolved factual questions bar any grant of summary judgment to Johnson.

## **ARGUMENT**

### I.  **BP and Johnson Never Formed a Contract Because the Release Contained Material Terms That Were Absent from Earlier Communications Between the GCCF and Johnson.**

#### A.  **The Determination Letter Lacked Material Terms and Made Clear That a Signed Release Was Necessary To Form a Contract.**

The bedrock of any contractual obligation is that all parties have agreed to the same material terms and all parties derive some benefit from the bargain.  In the present case, the release that Johnson never signed is a material aspect of any potential settlement agreement accomplished via the GCCF.  In fact, because it represents the entire benefit of the bargain for BP, the release *is* the contract.  Its terms far exceed the single sentence that Johnson would elevate to the level of a contract in the Final Payment Election Form (part of the GCCF's then-

8

ongoing and interlocutory process).  The parties' lack of agreement on all material terms defeats any claim to contract formation.

As with any contract, a settlement agreement only exists where the parties have agreed to all material terms of the agreement.  *Rudolph v. D.R.D. Towing Co. LLC*, 94 So. 3d 21, 24 (La. App. 2012) (applying Louisiana law in a maritime case to hold that "[a] compromise settles *only* those differences that the parties clearly intended to settle.") (emphasis added).  Courts are especially solicitous of seamen's rights in the settlement process and therefore insist that they have full information before settling their claims, as did the Justice Department, which reviewed and approved use of the release.  *See, e.g., Stipelcovich v. Sand Dollar Marine, Inc.*, 805 F.2d 599, 606 (5th Cir. 1986) (explaining courts' special concern for seamen as "wards of admiralty" and corresponding scrutiny of settlements involving seamen).

In the current case, the GCCF's Determination Letter of September 23, 2011 and Johnson's Final Payment Election Form did not explain beyond vague generalities what rights Johnson would surrender in exchange for a payment.  Exs. E, F.  Although both documents informed Johnson that a signed release was a condition of payment, neither of them described the terms of that release.  Moreover, the release was not publicly available, as Johnson has acknowledged.  Rec. Doc. 37 n.17.  If the many Fifth Circuit cases concerning settlements with seamen convey anything, it is the materiality of release provisions.  In fact, so important are the terms of a settlement agreement that "[t]he burden is on the shipowner to show that the seaman signed the release with a full understanding of his rights and the effect of his action." *Halliburton v. Ocean Drilling & Exploration Co.*, 620 F.2d 444, 445 (5th Cir. 1980); *see also Castillo v. Spiliada Maritime Corp.*, 937 F.2d 240, 244 (5th Cir. 1991) (same); *Gauthier v. Continental Diving Services, Inc.*, 831 F.2d 559, 561 (5th Cir. 1987) ("releases signed by seaman

9

are given careful scrutiny by the court."); *Durden v. Exxon Corp.*, 803 F.2d 845, 847 (5th Cir. 1986) ("Admiralty courts scrutinize a seaman's release to determine whether the seaman fully understood his rights and the consequences of the release").  This rule only makes sense because release provisions are important — *i.e.,* they are the type of provision that cannot be left open if parties are deemed to have formed a true contract.

Here, Johnson never received, let alone read and signed, the document that "releases and forever discharges, and covenants not to sue" BP and dozens of other defendants.  Ex. H at 6, ¶ 1.  Examples from the release further clarify that the Determination Letter did not make the contents of the release "reasonably certain."  The sentence on which Johnson hangs his claim to certainty of material terms refers its reader to the release and reads, in its entirety:  "***The Release*** waives and releases any claims for bodily injury that you have or may have in the future against BP and all other potentially responsible parties with regard to the Oil Spill, and prevents you from submitting any bodily injury claim seeking payment from a court."  Ex. E at 1 (emphasis added); MTE 12-13.  This sentence contains no details and by its nature simply cross-references another document.  It leaves a reasonable reader to guess at what else the release might contain, and indeed a comparison reveals far-reaching and material differences:

- ***First***, the GCCF was created in the shadow of OPA, leading to the question: does the use of "responsible parties" in the Determination Letter carry the statutory meaning of that term?  The negative answer lies in the Release, with its far-broader two-page list of released parties.  And the list is especially material because Johnson's employer, Tidewater, is not a responsible party under OPA but nevertheless appears on the released parties list.  Ex. H at 9; *compare* Pl's Ex. R (omitting this page — and ***all but one*** of the release's nine pages — in an effort to make the document appear inconsequential).

- ***Second***, the Determination Letter says that the release applies to "bodily injury."  That term is undefined, however, until a claimant reviews the release and learns that bodily injury "include[es] without limitation mental health injury and economic loss in connection with bodily injury or mental health injury."  Ex. H at 4.  This clarification is material because Johnson's alleged injuries include "mental injury . . . mental anguish and distress and fright" as well as "profound depression, anxiety and suffering."  Rec.

10

Doc. 1-4 ¶ 19.  Moreover, the Release also extinguishes related economic loss claims, as noted, not merely medical claims *qua* medical claims.  Ex. H at 6, Section 1.[8]

- ***Third***, the Determination Letter refers to claims that "***you*** have or may have."  Ex. E. at 1 (emphasis added).   It is not reasonably certain from this description whether the settlement will require Johnson to join with others to release related claims.  In fact, the release extends to claims held by the releasing party's spouse, parents, heirs, estate and other beneficiaries.  Ex. H at 6.  For a married claimant (Johnson was engaged at the time of the *Deepwater Horizon* incident), a spousal signature is also required, *Id.* at 3, 5, though it was not required on the interlocutory Final Payment Election Form, Ex. F.

The differences between the one-sentence summary in the Determination Letter and the text of the release illustrate that the former was insufficient to make a claimant "reasonably certain" about the release's details.  Johnson is thus incorrect to say that the release was "boilerplate" that "simply memorialized the terms that the parties already agreed on."  MTE 13 n.9.

Any assertion that signing the release was inconsequential or merely ministerial must fail.  As other courts have recognized, "[t]he signing or non-signing of the release by plaintiff was not simply a formality or ministerial act."  *Mizutani v. Happy Huckster Corp.*, 847 F. Supp. 2d 702, 705 (E.D. Pa. 2012).  Based on the record, neither BP nor this Court has any way of knowing whether Johnson (or more importantly all GCCF claimants) would ultimately agree to the terms of the required release.  His assurances that he was "ready, willing, and able to sign the release," MTE 7, 16 n.12, are inherently unverifiable (though readily understandable given that his claims were found to have been fabricated).  As might be expected, other GCCF claimants, after signing and returning their Determination Letters, refused to consummate settlements upon reviewing the Release.  The GCCF also often had to send new documents and insist that claimants execute the

---

[8]  Johnson advances the new argument that if the release is not deemed to simply be a boilerplate implementation of the interlocutory GCCF letter he received and purported to accept, then because it did not mention mental anguish claims, that letter should be construed to release only his physical injury claims.  MTE 15 n.10.  This would absurdly have BP paying $2.7 million not to settle all of Johnson's claims but only to settle a slice of them.  What Johnson misses is the fact that the Determination Letter's silence on the extra-physical-injury scope of the released claims shows that there was no meeting of the minds.

release *as written*, without modification, after claimants would mark changes and send them back.  Ex. H at 2 (explaining that claimant cannot alter the release).

If roles were reversed, no one would argue that BP could force Johnson to sign the release or enforce the terms of the unsigned release against him.  *See, e.g., Kensington Court Assocs. v. Gullo*, 579 N.Y.S.2d 485, 486 (App. Div. 1992) (refusing to issue an injunction to a mortgage company to sign a release, among other reasons, because "[u]nless a court can determine what the agreement is, it cannot know whether the contract has been breached in order to fashion a proper remedy.").  Yet, Johnson proposes exactly this defective remedy in explaining how his alleged contract would work: "BP could enforce the contract by: (1) seeking to enforce the settlement [*i.e.,* the release]; (2) refusing to fund the settlement; (3) seeking to dismiss the underlying personal injury case based on the defense of 'accord and satisfaction'; or (4) seeking specific performance requiring him to sign."  MTE 17; *see also id.* at 16 ("he was contractually obligated to sign the Release").

One of the few innovations in Johnson's current brief, relative to his earlier summary judgment loss in the Southern District of Texas, is the inclusion of cases purportedly showing that BP could force him to sign a document he has never seen or enforce that document's terms against him.  MTE 17.  None of these cases is on point.  *First*, none of them arises in the context of an OPA-compliant settlement program with a framework of rules and protocols like the GCCF.  *See infra* Part I.B (explaining GCCF context).  *Second*, in *none* of the cases Johnson cites did the parties dispute whether the agreement contained all material terms.  *Garrett v. Delta Queen Steamboat Co.*, 2007 WL 83177 at *11-12 (E.D. La. Mar. 14, 2007) (Barbier, J.) (expressly finding that there was no confusion over the terms of the agreement); *In re Amway Corp.*, 579 F.2d 907, 908 (5th Cir. 1978) (parties agreed to all material terms in open court);

*Strange v. Gulf & S. Am. S.S. Co.*, 495 F.2d 1235, 1236 (5th Cir. 1974) (case about mutual mistake); *In re Gibson*, 2009 WL 3241641 at *2 n.3 (E.D. Okla. Sept. 25, 2009) ("the written memorandum contained all the material terms"); *Latham v. QCI Corp.*, 2009 WL 483208 at *1 (S.D. Tex. Feb. 25, 2009) ("[Plaintiff] and [defendant] agreed to the essential terms of a settlement"); *Mobley v. Montco, Inc.*, 2004 WL 307478 at *1 (E.D. La. Feb. 17, 2004) (agreement on all material terms, but plaintiff "changed his mind"). Johnson remains unable to cite a single case in which a plaintiff — especially a seaman — was forced to live by an agreement, the material terms of which he never saw. *Compare Halliburton*, 620 F.2d at 445. The absurdity of suggesting that BP could mutually enforce the purported contract here illustrates the release's materiality.

The purported contract here is simply not mutual as between BP and Johnson. *See North German Lloyd v. Mexican Petroleum Corp. of La.*, 24 F.2d 46, 47 (5th Cir. 1928) (accepted offer insufficient to create a maritime contract where the agreement was indefinite and non-mutual because "[i]t is therefore clear from the context that a future agreement, which would bind some of the steamers less than the whole number in the fleet, was intended . . . . [which meant that] its performance was made to depend upon the mere will of either party to it."). Here, the contract Johnson claims is breached depended upon his mere unilateral and non-binding expression of intention to sign a release sometime in the future. *See Tweedie Trading Co. v. Parlin & Orendorff Co.*, 204 F. 50, 54 (7th Cir. 1913) (maritime shipping contract was unenforceable because "its provisions are unilateral and cannot be enforced for unexecuted portions thereof").

Even if Johnson now attempts to assure this Court of his pre-suit intent to sign the release, it would create a double-standard to demand a fully informed and formalized waiver of rights when the ***defendant*** seeks to enforce a settlement but to accept an unwritten and

13

uninformed assertion of a mere intent to sign when a *plaintiff* seeks to do the same.  *See Willard, Sutherland & Co. v. United States*, 262 U.S. 489 (1923) (maritime contract not binding where nothing in its writing compelled one of the parties to take an ascertainable quantity, which was a material term).  Of equal magnitude, without agreement on the release, BP would not have received any consideration for the $2.7 million payment that Johnson seeks to collect.  To construe the sophisticated GCCF adjudicatory process that both the Justice Department and the American Bar Administration[9] went over with a fine tooth comb to reach such an absurd outcome falls of its own weight.

Viewed from any angle, the parties have not agreed to crucial components of the alleged contract that Johnson asks this Court to enforce.  A contract that, on the Plaintiff's own theory, "requires BP to pay money to Johnson in exchange for him dismissing his lawsuit," Rec. Doc. 2 at 6, must include agreement on the terms of such a dismissal.  Because such a fully-formed agreement is lacking, this Court should grant summary judgment to BP.

**B.     The GCCF Was Not BP's All-Purpose Agent and Could Not Deviate from the Terms of Its Charter Documents To Award Payments Without the Release.**

Unlike claimants alleging economic injuries alone, personal-injury claimants like Johnson were under no legal obligation to submit their claims to the GCCF.  33 U.S.C. § 2713(a).  Rather, BP made the GCCF process available to claimants like Johnson as an option.  Ex. I at 2-3.  By pursuing that option, Johnson agreed to the rules that governed the GCCF: the Final Rules Governing Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology (the "Payment Rules"), Ex. I, and the Protocol for Interim and Final Claims ("Protocol"), Ex. D.  Those documents make clear that the GCCF was not BP's all-

---

[9] *See* http://www.americanbar.org/content/dam/aba/migrated/poladv/letters/tortlaw/2010aug13_feinberg_l.authcheck dam.pdf.

purpose agent and that the claims facility has a duty to detect and prevent fraud.  The GCCF framework also clarifies the impossibility of entering a settlement without a signed release.  For the first time in this litigation, Johnson has acknowledged that the GCCF acted in accordance with its ground rules.  *See* MTE 3, 21 (citing Pl's Ex. I, the Protocol).  No reasonable participant in the GCCF could believe that the Determination Letter constituted an offer that could be accepted without reviewing and executing a release.

Nothing in the GCCF's governing documents or operating procedures would lead a reasonable person to think that the Facility had authority to act outside the Protocol and Payment Rules.  *See* RESTATEMENT (THIRD) AGENCY § 2.03 (2006) ("a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations").  To argue the opposite, Johnson cites the contract between BP and the GCCF to conclude that BP "authorized the GCCF to enter into settlement agreements on its behalf."  MTE 3.  This is true but ignores that Feinberg Rozen was also bound to enter into settlements compliant "with all applicable laws and regulations and the Claims Protocols set forth in Exhibit B" to its contract with BP.[10]  Ex. J. at 1; *see also* MTE 3, 8 (citing the same page containing the incorporation language).  Not only was Feinberg Rozen bound to follow the Protocols incorporated into its contract with BP, but that contract also recognized Feinberg Rozen as an independent contractor.  *Id.* at 10-11.  Contrary to Johnson's assertion (MTE 8, 20), the GCCF's independence was not a façade.  Independent reviews by former Attorney General Michael Mukasey and ethics expert Professor Stephen Gillers confirm the GCCF's independence.  *See*

---

[10]  To further illustrate the importance of confining a claims facility to its defined powers, consider the consequences of Johnson's argument on MDL 2179 member cases like *Barber v. BP Exploration & Production Inc.*, No. 2:13-cv-06457.  In that case, the GCCF's successor, the Court-Supervised Settlement Program ("CSSP"), mistakenly sent releases to a claimant who had opted out of the class.  Because Mr. Barber had actually received the settlement contract, his case is a step beyond the current case, yet it cannot be correct that the CSSP has the ability to settle claims with non-class members.  The CSSP, like the GCCF before it, cannot act beyond its charter.

Exs. K, L.  The United States also recognized the Facility's independence from BP in a pleading before this Court.  MDL Doc. 1322 at 15.[11]

The incorporated documents state that "[a]ccepting a Final Payment requires the Claimant to sign a release of past and future claims."  Ex. D at 7.  The event that triggers payment is not the claimant's signature on some Final Payment Election Form that accompanies a Determination Letter, but rather the GCCF's "receipt of the signed Release."  *Id.* (requiring GCCF to issue payment within 14 days of receiving release).  In fact, neither the Protocol nor the Payment Rules even mentions the Final Payment Election Form, which was merely devised by the GCCF as a waypoint in the course of its multi-stage process.  *See* Exs. D, I.  By contrast, the Payment Rules go to extraordinary lengths to alert the claimant that he "**will be required to sign a release**" before receiving a Final Payment.  Ex. I at 2 (emphasis original).

To serve its purpose (which again traces to OPA), the GCCF's process for adjudicating claims terminated only when one of the following events occurred:

1.      the GCCF denied a claim (as occurred here);

2.      the GCCF transmitted a release, and the claimant refuses to sign the release as written (including modifying the release before signing it) and the offer is withdrawn because of the expiration of the 90-day window; or

3.      the GCCF transmits a release, and the claimant signs the release as written, creating a binding contract.

Only the third outcome forms a binding contract; under either of the first two termination events, claimants remain free to pursue other remedies, including seeking reconsideration (which Johnson tellingly never did — seeming recognition that he had no answer to the Guidepost report) or pursuing claims in court.  Johnson would create out of whole cloth a fourth terminal

---

[11]  In light of the GCCF's independence — and its independent refusal to pay Johnson's claims — it is not even clear why BP is the correct defendant in the current action, as Judge Hughes pointed out prior to transfer.

event, in which a "contract" is formed without the required release and with the prospect of future litigation left open.  This theory contradicts the GCCF's purpose and procedures.

The GCCF's process, modeled on OPA, limited that entity's ability to facilitate settlement contracts between BP and claimants.  By submitting his claim to the GCCF, Johnson voluntarily subjected himself to the fraud-detection rules that the GCCF had established.  What was the GCCF to do upon learning of Johnson's fraud?  Under Plaintiff's untenable theory of this case, the GCCF was apparently supposed to ignore such evidence from highly credible sources in favor of an (un-formed and un-finalized) contract — effectively telling BP and the GCCF's own overseers such as the Justice Department that fraud was immaterial and payment was required even in the face of the claimant not having signed a release.  That is not the law. Johnson's remedy for the GCCF's denial of his claim is not judicial review of the GCCF's decision via his defective contract theory, since this would only foment additional collateral litigation when the whole point of the GCCF process was *to avoid litigation*.  *Cf.* 33 U.S.C. § 2713.  Rather, his remedy was to return to litigating his pending maritime tort case.

The argument that BP ratified a nonexistent contract between Johnson and the GCCF is a prime example of the Plaintiff's deep confusion (or attempted obfuscation) as to how the GCCF system operated.  *See* MTE 21-25.  The fundamental defect in this regard (even assuming that the GCCF was BP's agent) is that a principal can only ratify what his agent actually does.  In this case, the GCCF never formed a contract, meaning that there was nothing for BP to ratify.

Plaintiff's ratification theory has another major flaw.  As the Restatement explains, "[a] person is not bound by a ratification *made without knowledge of material facts* involved in the original act when the person was unaware of such lack of knowledge."  RESTATEMENT (THIRD) OF AGENCY § 4.03 (2006) (emphasis added); *Western Nat'l Bank of N.Y. v. Armstrong*, 152 U.S.

346, 352 (1894) ("It is scarcely necessary to say that a ratification, to be efficacious . . . must be made with knowledge of the material facts."); *In re Babcock & Wilcox Co.*, 2002 WL 1874836, at *5 (E.D. La. Aug. 13, 2002) ("But ratification can take place only if the client was in possession of all the material facts and circumstances attending the agreement to be ratified."). All of the correspondence that Plaintiff postures as ratification occurred **before** Tidewater's October 20, 2011 filing of materials making out more than a *prima facie* case of fraud to the GCCF. Exs. M (Oct. 3), N (Oct. 5), O (Oct. 5). The facts contained in the October 20 Tidewater exposé of the real events on the *Damon Bankston* were highly material to the issue of whether BP would assent to a contract to settle Johnson's claims. *See* Ex. C. Plaintiff attempts to downplay the Tidewater revelations on the ground that the GCCF had months to review his medical records, which included "inconsistencies" that became part of the reason for concluding that his claims were fabricated. MTE 24-25. He never mentions, however, the significant new information that came to light on October 20, 2011. That material included the sworn statements of Johnson's heroic co-workers as well as a form where Johnson himself admitted that he was uninjured. Ex. C; *see also supra* n.3. Even assuming, contrary to law, that BP could "ratify" the GCCF action and that the GCCF entered into a contract with Johnson, that ratification would be invalid under the requirement that a ratifying principal have knowledge of all material facts.

## II.   Any Contract Between the GCCF and Johnson Included a Condition on Payment That Went Unsatisfied.

At every turn, the GCCF reminded Johnson that payment of the settlement was conditional on his signing a release. The very documents that Johnson claims create a contract state that no payment is due until a release is signed. Indeed, in order for the GCCF to serve its intended function as an independent adjudicator of claims against BP and thereby spare courts from that burden, securing releases was essential. In this unusual case, the brief period between

Johnson leaping at the Final Payment Offer and the GCCF sending out a release gave Tidewater just enough time to document the fraud and report it to the GCCF.  Fortunately, BP was not yet bound to pay Johnson's claims and the GCCF could investigate further.

Every authority recognizes failure of conditions precedent as a defense.  Such a condition is "[a]n act or event . . . that must exist or occur before a duty to perform something promised arises."  BLACK'S LAW DICTIONARY 334 (9th ed. 2009).  As a result, "the failure of a condition to occur excuses performance by the party whose performance is conditioned."  13 WILLISTON ON CONTRACTS § 38:7 (4th ed. 2012); *see also Eastern Marine Corp. v. Fukaya Trading Co., S.A.*, 364 F.2d 80, 84 (5th Cir. 1966) (employing traditional understanding of condition precedent in maritime contract case).

The undisputed facts show that every communication from the GCCF included the condition that Johnson sign a release in order to be paid.  In its initial Determination Letter, the GCCF stated that "[t]he amount of the Final Payment Offer ('the Final Payment Offer'), is $2,698,095.00, which is the amount that can be paid now *if you decide* to accept the Final Payment Offer *and* you sign a Release and Covenant Not to Sue (the 'Release')."  Ex. E at 1 (emphasis added).  The same condition appeared in the Final Payment Election Form that Johnson returned to the GCCF: "The GCCF will send you a Release and Covenant Not to Sue that *you must sign and return to be paid*."  Ex. F at 1 (emphasis added).  The Determination Letter and the Election Form are the two documents on which Johnson places greatest weight. He characterizes them as offer and acceptance, sufficient to entitle him to nearly $2.7 million. This selective reading overlooks the condition expressed in the same documents that a claimant must sign a release before BP becomes bound.

Consistent with its public function as an OPA-compliant claims facility, the GCCF publicized its processes and requirements, including the requirement of a release. *See, e.g.,* Ex. D at 8 ("Claimants who accept a Final Payment must sign a Release."); Ex. I at 2 ("**To receive a Final Payment, a claimant will be required to sign a release** . . . ." (emphasis original)); Ex. P at 15 (Frequently Asked Question No. 46: "Do I have to sign a Release to be paid a Full Review Final Payment? Yes . . . ."). In fact, the Protocol even *explicitly* notes that the execution of a release is not a condition on payment but on acceptance: "*Accepting* a Final Payment requires the Claimant to sign a release of past and future claims." Ex. D at 7 (emphasis added).

Courts have regularly enforced conditions similar to the one here. The most straightforward examples arise in the home-sale context. After a buyer and seller conclude terms but before closing, the failure of a condition may excuse one of the parties from closing. The Supreme Court of Louisiana faced exactly this scenario in *Campbell v. Melton*, 817 So. 2d 69 (La. 2002), where the contract provided: "any single mechanical item repair that exceeds $2,000.00 the Seller has the option to repair or the contract will be null & void." *Id.* at 72. Although the buyers in *Campbell* wanted the seller to repair several costly mechanical defects and complete the sale, the seller instead chose to take no action, and the condition went unsatisfied. *Id.* at 76. *Campbell* shows the importance of conditions when new information emerges after contract formation. In the present case, the GCCF learned of Johnson's possible fraud only after sending out the Determination Letter. That letter was also the first time Tidewater, as BP's indemnitor, learned of the scale of a possible settlement and rushed to supply the GCCF with information contradicting Johnson's false claims. This chain of events resembles the seller's situation in *Campbell*, who discovered the cost of repairing his HVAC, water softener, and electrical systems, and then chose to sell the home to a different buyer rather than

make the repairs and sell under his original contract.  The opportunity to learn more about a transaction is one of the advantages of including conditions.

The same doctrine applies in the context of settlements and it defeats Johnson's assertion that BP is guilty of "prevention."  MTE at 7, 16 n.11, 18-19.  *Creamer Bros., Inc. v. Hicks*, 907 So. 2d 880 (La. Ct. App. 2005).  In *Creamer Brothers*, the litigants agreed that the defendant would transfer $65,000 to the plaintiff's attorney and the funds would "not be disbursed until the final resolution of this matter and the mutual agreement of the parties."  *Id.* at 882.  The court recognized "mutual agreement" as a condition for payment, and "[t]hus, one of the conditions for disbursal of the money was not satisfied."  *Id.* at 885.  Just as the defendant in *Creamer Brothers* withheld his consent based on a "dispute as to the final amount owed," *id.*, the GCCF was within its rights to withhold the release and allow the condition to go unsatisfied.   Johnson cites Williston for the rule that "[i]f a promisor prevents or hinders the occurrence or fulfillment of a condition to his or her duty of performance, the condition is excused . . . ."  MTE 18 (citing 13 WILLISTON ON CONTRACTS § 39:4).  But Williston clarifies the required type of "prevention" just a bit later in a passage Johnson neglects to mention: "where one ***improperly*** prevents the performance or the happening of a condition of his or her own promissory duty, the offending party thereby eliminates it as a condition . . . ."  *Id.* (emphasis added); *see also Mack Trucks v. BorgWarner Turbo Sys., Inc.*, 2011 WL 1045108 (E.D. Pa. Mar. 22, 2011) (granting summary judgment to the defendant because plaintiff's signature on a "product application agreement" was a condition precedent to warranty payments, and the defendant had done nothing "improper" to prevent satisfaction).

The GCCF did not act "improperly" in refusing to send a release after receiving credible evidence from Johnson's co-workers that his claims were fraudulent, hiring the Guidepost firm

to investigate those allegations, and then issuing a final decision that Johnson's claim should be denied as "fabricated." In fact, the GCCF's actions were wholly proper and consistent with its obligations as a claims facility. The first barrier to fraudulent claims is the requirement of substantiation. The GCCF required a personal injury claimant to submit, among other materials, "[i]nformation concerning the cause of physical injury or death" and "concerning the circumstances of the physical injury or death." Ex. D at 4; *see also* Ex. I at 2-3 (same requirement in Payment Rules). After a claim is filed, the GCCF can demand further substantiation or simply deny claims. *Id.* at 6 ("Incomplete records will delay a claim's review, affect the damages calculation and could result in denial of the claim.") (emphasis omitted); *see also* Ex. D at 7 (reserving right to demand more documentation). Nothing confines the GCCF's ability to investigate claims and consider new information to the initial stages of claim evaluation. Rather, the GCCF "shall" investigate potentially fraudulent claims, whenever that concern arises. *Id.* at 11.

For its part, the Determination Letter says nothing about the timeline on which the GCCF would furnish a release. Ex. E. It establishes only that BP had 14 days from the Determination Letter in which to appeal the Final Payment Offer and that Johnson would need to sign a release within 90 days. *Id.* at 2. Contrary to Johnson's suggestion, MTE 18-19, neither of those statements obliges the GCCF to send the release immediately upon receiving Johnson's Final Payment Election Form. Indeed, both of the time restrictions mentioned in the Determination Letter serve the goals *of the GCCF* (not Johnson's desires): the 14-day window limits challenges by BP, and the 90-day window establishes a time certain at which the GCCF may close the books on its indication to a claimant as to how much it would be willing to settle a claim for.

Any contract that might exist between Johnson and BP must be read to contain a condition on payment.  That condition went unsatisfied when the GCCF learned of possible misconduct by Johnson.  This case illustrates the value of including conditions, and the Court should not effectively excise such an important term from a rational settlement process designed by the GCCF in consultation with the U.S. Justice Department, other legal experts, and BP.

**III.    At the Very Least, Johnson Is Not Entitled to Enforce the Alleged Settlement When Factual Issues Remain Open, Including BP's Affirmative Defense of Fraudulent Inducement.**

Johnson's haste to trap BP in an alleged settlement is nowhere more transparent that in the caption of his "Motion to Enforce Settlement Agreement with BP."  Antecedent to any enforcement action is the existence of a contract.  This Court should construe Johnson's Motion as a motion for summary judgment on his contract claims.   Unlike BP's parallel motion, Johnson's request is premature because factual questions essential to his recovery remain unresolved — even if the Court were to accept as valid Johnson's deeply flawed legal theories of contract formation and excused conditions precedent.

In determining how to treat a pleading, courts look beyond the document's caption to its substance.  *Hussain v. Boston Old Colony Ins. Co.*, 311 F.3d 623, 633 n.39 (5th Cir. 2002) (construing a pleading "according to its substance rather than its form or label").  This Court has applied this rule to purported motions to enforce settlement agreements.  *See, e.g., Tanguis v. M/V Westchester*, 2003 WL 22077688 (E.D. La. Sept. 3, 2003) (holding that despite the "guise" of seeking to enforce a settlement, "[t]his request to enforce settlement is in fact a fee dispute").  Johnson's Motion, filed in his contract case, is in substance a motion for summary judgment on the contract claims.

As discussed above, summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  In assessing the existence of a fact dispute, the court views "the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013).

Beyond their legal soundness, Johnson's and BP's motions differ in their reliance on factual determinations.  Both of BP's arguments for summary judgment — *i.e.,* no contract was formed, or any contract that was formed included an unsatisfied condition — prevail even when this Court resolves all factual issues in Johnson's favor.  In fact, there are no genuinely disputed material facts relevant to BP's contract arguments.  They depend only on unchallenged documents and the fact that Tidewater presented evidence that led the GCCF to terminate its process and issue a final denial of Johnson's claim.  There is no genuine dispute as to these facts.  BP's positions do not depend on a factual finding over whether or not Johnson engaged in fraud.  In contrast, accepting Johnson's contract claims would depend on this Court affirmatively finding that he did ***not*** engage in fraud.  But the parties genuinely dispute those material facts.  *See* BP's Answer, MDL Doc. 11510, at 6-7.  Among the affirmative defenses asserted in the Answer is that Johnson cannot collect on any contract claims because he fraudulently induced the GCCF to send him the Determination Letter.  *Id.*  BP also contests certain factual claims that do not appear in Johnson's complaint but slip into his briefing.  *E.g.,* MTE at 7, 16-17 (asserting that Johnson would have signed the release if he had received it).  At the very least, the factual dispute over whether Johnson committed fraud is a genuine dispute as to a material fact.  If resolved in favor of BP, the fraud question leads to the same conclusion that Guidepost reached: Johnson's claims were fabricated, meaning that his representations to the GCCF constituted fraudulent inducement and he is not entitled to judgment as a matter of law.

In prior iterations of this litigation, the parties have both recognized that fraudulent inducement presents a fact issue precluding summary judgment in Johnson's favor. Johnson's responses have always been feeble. In the Southern District of Texas, Johnson told the court not to "worr[y] that BP's allusions to fraudulent inducement might otherwise present a fact issue," because, he asserted, the question was waived. Doc. 37 at 22 n.28. Thankfully, Johnson does not repeat his waiver argument in this Court beyond the level of subtle *innuendo* (*see* MTE 23, referring to BP's state court answer),[12] but his concession about the factual issues inherent in BP's fraudulent inducement defense remain instructive.

Unlike BP's arguments against a contractual obligation to pay Johnson for his alleged injuries, Johnson's position requires resolution of genuinely disputed material facts. Unless or until these facts are settled, Johnson's Motion should be denied.

## CONCLUSION

Whether because the parties never entered into a contract or because any settlement agreement contained a condition that went unsatisfied, this Court should deny Plaintiff's Motion and grant BP's Motion for Summary Judgment. At the very least, this Court should deny Plaintiff's Motion until all genuine disputes of material fact are resolved.

---

[12] BP addressed Johnson's now-abandoned claim of waiver in the Southern District of Texas, explaining that the district court's briefing order and thus Fed. R. Civ. P. 81(c) applied to permit "other defenses or objections." Doc. 38 at 9 n.4 (citing Fed. R. Civ. P. 81(c) and the court's briefing order). In any event, Johnson does not repeat his waiver assertions in his opening brief in this Court. As a result, they are — fittingly — waived. *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived."). Finally, note that BP did file an extensive FRCP-governed answer in this Court and Johnson never objected to BP doing so. MDL Doc. 11510.

Date: December 16, 2013

Respectfully Submitted,

Of Counsel:

/s/ Don K. Haycraft
Don K. Haycraft
Devin C. Reid
LISKOW & LEWIS LLP
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 556-4128
Facsimile: (504) 556-4108
dkhaycraft@liskow.com
dcreid@liskow.com

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
richard.godfrey@kirkland.com
andrew.langan@kirkland.com

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jeffrey.clark@kirkland.com
dominic.draye@kirkland.com

**ATTORNEYS-IN-CHARGE FOR DEFENDANTS BP EXPLORATION & PRODUCTION INC., BP PRODUCTS NORTH AMERICA INC., BP CORPORATION NORTH AMERICA INC., AND BP CORPORATION NORTH AMERICA INC.**

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 16, 2013, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system. I also certify that I have served this filing by United States Postal Service to all counsel of record who are not registered to receive electronic service by operation of the court's electronic filing system.

/s/ Don K. Haycraft