# Exhibit B



# REPORT OF INVESTIGATION

**Date of Report:** January 24, 2012

**Claimant:** Elton Johnson

**Claimant Address:** 728 Highway 3041, Bunkie, LA  71322

**Claim Number:** GCCF:  3495033

**Date Referred to Guidepost:** October 26, 2011

---

**Executive Summary** – <u>Claim is Unsubstantiated</u>

Elton Johnson alleges a loss of $45 million in connection with physical injuries he sustained while employed on board the *Platform Supply Vessel Damon B. Bankston* ("*PSV Bankston*") at the time of the Deepwater Horizon Mobile Offshore Drilling Unit ("Deepwater Horizon") explosion.  In fact, there is no credible evidence Johnson suffered injuries as a result of the incident, and multiple fellow crew members, one of whom was standing alongside Johnson at the time of the explosion, disputed the events and injuries Johnson later reported.

Johnson did not submit any overtly fraudulent document, thus a Finding of Potetnial Fraud is not supported by this investigation.  The overwhelming weight of the evidence, however, thoroughly negates his alleged injuries.

**Summary of Claim**

Elton Johnson submitted a Full Review Final Payment ("Final Payment") claim for $45 million in Physical Injury losses due to the oil spill.

**Summary of Investigation**

In his Final Payment claim form, Johnson reported that he sustained injuries while working aboard the Deepwater Horizon. In support of his claim, he submitted, among other documents, various medical evaluations indicating that he exhibited symptoms of Post-Traumatic Stress Disorder (PTSD).

Johnson reported that he was employed as a crew member on *PSV Bankston*, a vessel that was off-loading drilling mud at the Deepwater Horizon platform on April 20, 2010; the crew of *PSV Bankston* was involved in the rescue of Deepwater Horizon personnel following the explosion that occurred on that day. Johnson alleged that, as a result of the explosion, he was thrown approximately seven feet into a wall and onto a door in *PSV Bankston's* engine room. Johnson alleged that he was knocked unconscious, sustained injuries to his brain, shoulder and back, and that he now suffers from anxiety, nightmares, restlessness and depression. At the time of the explosion, Johnson had been assigned to *PSV Bankston* for four days.

On November 3, 2011, Guidepost Solutions investigators, retained by GCCF, went to Port Fourchon, Louisiana, and interviewed Cliff LaCour, an attorney with the law firm of Laborde and Neuner; Laborde and Neuner is the legal counsel for Tidewater Marine, the owner/operator of *PSV Bankston*. LaCour escorted the investigators on board the vessel, where they secured permission from the Captain on duty, Mike Trigg, to take photographs and to interview members of his crew.

The investigators inspected various areas aboard *PSV Bankston*, including the alleged accident site, which is a locker area known as the "Change Room." The investigators photographed locations and equipment aboard the vessel that are relevant to this claim; a list of photographs and other exhibits obtained during this investigation is attached to the end of this report.

Interviews of Germone Vaughn, Louis Longlois and John Logan

On November 3, 2011, the investigators interviewed Germone Vaughn, Louis Longlois, and John Logan; these individuals were crew members who, along with Johnson, were present aboard *PSV Bankston* at the time of the explosion.

*Germone Vaughn*

In sum and substance and among other things, Germone Vaughn said he was an AB (Able Bodied) Unlimited Rigger aboard *PSV Bankston* and had been assigned to the vessel for four years. Vaughn said he was off watch at the time of the explosion and was not with Johnson at that time. Vaughn described the explosion as a "big boom that kinda rocked the boat a little."

2

Vaughan said he joined the rescue operation soon after the explosion, and that he remembered seeing Johnson throughout the evening helping rescue people in the water and pulling them onboard *PSV Bankston*. Vaughn said he never heard Johnson complain of any injuries or discomfort. Vaughn said that once the crew disembarked in Port Fourchon, Louisiana, and completed some necessary reports, he traveled with Johnson in a multi-passenger van to Amelia, Louisiana. According to Vaughn, this was a two-hour trip and Johnson did not complain of any injuries or discomfort during the drive.

*Louis Longlois*

In sum and substance and among other things, Louis Longlois said he was an AB/QMED[1]/Rigger and had been employed by Tidewater Marine for seven years; Longlois said he was a regular crew member of *PSV Bankston*. Previously, on October 13, 2011, Longlois provided a sworn statement to a Laborde and Neuner attorney recalling his account of the events surrounding the Deepwater Horizon explosion and his knowledge of any injuries sustained by Johnson. The investigators provided Longlois with a copy of his sworn statement and Longlois confirmed that it was accurate.

Longlois told investigators he was with Johnson onboard *PSV Bankston* at the time Johnson's alleged injuries were reported to have occurred. Longlois said they were in the Change Room, where the crew kept their Personal Protective Equipment (PPE). Longlois said he, Johnson and Jonathan Escala were donning their PPE when the blowout and explosions occurred. Longlois said Escala was standing closest to the doorway leading to the stern of the vessel, Johnson was standing several feet forward of Escala, and Longlois was several feet forward of Johnson. Longlois said the explosions buckled the ceiling, and caused the engine room door to open and become jammed. Longlois said he saw Escala, who was closest to the door, go down on one knee, but at no time did he observe Johnson lose his footing, strike his head, lose consciousness, or in any way become injured. Longlois said he was with Johnson the entire time they were in the Change Room, and that all three men exited the Change Room together.

Longlois said he, Escala and Johnson then made their way across the deck to the mud hose coupler, disconnected it, and began the rescue effort using the Fast Rescue Craft (FRC). Longlois said that throughout the ensuing rescue operation he had very little contact with Johnson; however, he said he did not notice any problems with Johnson when he did see him. Longlois said Johnson never complained of any injuries, even when specifically asked if he was injured.

---

[1] QMED means Qualified Member of the Engine Department.

Longlois recalled that attorney Cliffe Laborde convened a meeting on the bridge of *PSV Bankston* once the vessel was dockside, and asked each crew member if any injuries had been sustained.  Longlois said crew members also filled out various reports, including a Tidewater Marine Statement Form that documented any eyewitness accounts a crew member might have relative to the injury of another crew member.  Longlois said he did not report Escala's injury on this form, though he told the investigators he did witness Escala fall on his knee; Longlois suggested that he did not think Escala's injury was significant.

*John Logan*

In sum and substance and among other things, John Logan said he is an AB Deckhand and that at the time of the explosion, he was off watch and in his bunk onboard *PSV Bankston*.  He said his duties during the rescue effort were those of a "spotter," looking for persons in the water.  Logan recalled passing by Johnson "a couple of times" as he went through the stern doorway to the Change Room.  He said he believed he saw Johnson near the Jacobs ladder with some of the other crew during the rescue efforts.  Logan could not provide any information concerning Johnson's alleged accident or injuries, but said he did not know Johnson had reported an injury until weeks after the incident.

Interviews of Alwin Landry, Cliffe Laborde III and Jeremy Morrow

On November 4, 2011, the investigators interviewed Captain Alwin Landry and attorneys Cliffe Laborde III and Jeremy Morrow at the Law Office of Laborde and Neuner in Lafayette, Louisiana.

*Alwin Landry*

In sum and substance and among other things, Alwin Landry said he was a Captain/Master Class employed with Tidewater Marine, and that his assignment on April 20, 2010, was Master of *PSV Bankston*.  Landry said he had been a Captain with Tidewater Marine since 1999.  Previously, on October 13, 2011, Landry provided a sworn statement to a Laborde and Neuner attorney recalling his account of the events surrounding the Deepwater Horizon explosion and his knowledge of any injuries sustained by Johnson.  The investigators provided Landry with a copy of his sworn statement and Landry confirmed that it was accurate.

Landry recalled that he instructed Longlois and Anthony Gervasio to disconnect the mud hose following the explosion, but he could not see the men actually complete the task.  He also said he did not know specifically which crew members were involved in moving the Jacob's ladders from the port to the starboard side of the vessel.  Landry did not remember issuing any particular

instructions to any specific crew members, other than ordering Longlois and Gervasio to disconnect the mud hose; thus, he did not know what specific role Johnson played in the rescue effort.

Landry said that once *PSV Bankston* was relieved by the Coast Guard Cutter *Zephyr*, he departed for Port Fourchon, Louisiana. He said that while underway, he learned of Escala's injuries and inquired about the welfare of the remainder of his crew. He recalled that no other crew member reported any injuries or accidents.

According to Landry, *PSV Bankston* docked in Port Fourchon at approximately 1:00 a.m. on April 21, 2010. Landry recalled that Cliffe Laborde, an attorney with Laborde and Nuener whom they had picked up at another oil platform on the way to Port Fourchon, asked each crew member about his mental and physical condition. Landry said Escala was the only crew member who reported an injury. Landry said Johnson never complained of injuries or discomfort, and that he first heard of Johnson's alleged injuries weeks later.

*Cliffe Laborde III and Jeremy Morrow (Laborde and Nuener Law Firm)*

In sum and substance and among other things, Cliffe Laborde said that upon arrival in Port Fourchon nine hours after departing the Deepwater Horizon, he asked each crew member individually if they had suffered any physical injuries. Laborde said he was also very concerned about the crew's mental health and repeatedly offered assistance to anyone who felt they needed it. Laborde said Jonathan Escala, whose knee had struck the deck at the time of the explosion, was the only person who reported a problem.

In sum and substance and among other things, Jeremy Morrow recalled that Johnson approached him for assistance with completing his Coast Guard report; Morrow said he reviewed Johnson's report and assured him it was completed properly. According to Morrow, Johnson asked for assurance several times. Morrow further recalled that Johnson had to be summoned back to the bridge because he had departed without signing his report.

<u>Interviews of Gary LeBlanc, Paul Erickson, Norman Logsdon, Jeffrey Malcolm and Bill Wayne Marsh</u>

On November 15, 2011, investigators interviewed *PSV Bankston* crew members Gary LeBlanc and Paul Erickson at the offices of Laborde and Neuner in Lafayette, Louisiana.

5

*Gary LeBlanc*

In sum and substance and among other things, Gary LeBlanc said he was Chief Engineer aboard *PSV Bankston* and had been employed with Tidewater Marine since 1995. LeBlanc said that he did not remember seeing Johnson at any time during the rescue operation, but that he did see him shortly after all survivors had been recovered; he said he did not observe anything unusual about Johnson, and Johnson did not complain about any injuries.

LeBlanc recalled the crew meeting upon arrival at Port Fourchon, and confirmed that attorney Cliffe Laborde asked everyone individually if they were injured in any way. LeBlanc said Johnson did not complain of any injury.

*Paul Erickson*

In sum and substance and among other things, Paul Erickson said he is a Mate, Navigator and Dynamic Position Operator, and that he had been employed with Tidewater Marine for eight years. Erickson stated that on the date of the explosion, he was on watch on the bridge of *PSV Bankston* with Captain Landry.

Erickson said he did not remember what Johnson was doing during the rescue operation, and that he never saw Johnson while the *PSV Bankston* was returning to port. Erickson said he did not learn of Johnson's injury report until three or four weeks after the Deepwater Horizon incident.

*Norman Logsdon*

On November 16, 2011, investigators returned to the office of Laborde and Neuner and interviewed Norman Logsdon. In sum and substance and among other things, Logsdon reported that he is a Captain with Tidewater Marine and had been employed by the company for six and a half years; he said he was the alternate Captain on *PSV Bankston* at the time of the Deepwater Horizon explosion.

Logsdon said that following the explosion, he observed Gervasio, Longlois and a man he believed was Johnson move across the main deck toward the mud hose coupler. He said this is the only time he remembers seeing Johnson during the entire incident. Logsdon recalled the dockside crew meeting where Laborde questioned each crew member individually about any injuries sustained; Logsdon said Escala was the only crew member who reported an injury and that he did not become aware of Johnson's alleged injuries until two weeks after the incident.

Logsdon said he, Johnson, Escala, Marsh and Malcolm departed Port Fourchon in the van bound for Amelia, Louisiana, which was approximately two hours away. Logsdon recalled that Marsh

was driving the vehicle and Johnson was seated in the rear. Logsdon said he was seated in the front and did not speak to Johnson directly; however, he said he could hear Johnson and Malcolm joking and laughing in casual conversation. Logsdon could not specifically remember what Johnson and Malcolm were discussing, but he never heard them mention any injuries incurred by Johnson.

*Jeffrey Malcolm*

On November 18, 2011, investigators interviewed Jeffrey Malcolm in Tampa Bay, Florida. In sum and substance and among other things, Malcolm said he was employed by Tidewater Marine and assigned to *PSV Bankston* as a Mate at the time of the Deepwater Horizon explosion.

Malcolm remembered occasionally seeing Johnson while crew members recovered survivors from the water. He remembered that Johnson was working with Logan assisting survivors as they came out of the water. Malcolm said that once the all survivors were on board *PSV Bankston*, he instructed Johnson to help escort them from one area of the main deck to the triage area; Malcolm said the footing was very slippery so it was important that survivors be assisted in their movement across the deck. Malcolm said that Johnson also assisted with the task of moving the injured to the location where helicopters were evacuating the seriously injured.

Malcolm said that after the initial rescue effort, he asked everyone, including Johnson, if they were okay, and he recalled that no one complained of any injuries. Malcolm said he did not notice anything unusual about Johnson throughout the incident. He said Johnson, like all the crew members, initially appeared dazed but that it did not seem unusual, given what they had all experienced. Malcolm said he completed a Tidewater Marine report concerning Escala's injury approximately two weeks after the incident, but that he was never asked to complete a report concerning Johnson's alleged injury.

Malcolm said that once the crew members were released in Port Fourchon, he rode in the van with Escala, Johnson, Marsh and Logsdon en route Amelia, Louisiana. Malcolm said there was never any mention of an injury to Johnson during the trip.

Malcolm said that Johnson drove him to the New Orleans International Airport after the van arrived in Amelia, and that Johnson initially seemed happy and simply glad to be going home. According to Malcolm, Johnson received a telephone call about halfway through the trip from someone Malcolm believed to be a family member, since Johnson ended the call with the phrase, "I love you." Malcolm recalled that after the call ended, Johnson's mood was very different and he started complaining of headaches and appeared visibly distressed. Malcolm said that Johnson also started speaking of feeling bad emotionally, needing to go home, and not being able to

7

return to work.  He said Johnson may have used the word "traumatized" to describe his condition.

*Bill Wayne Marsh*

On November 22, 2011, investigators interviewed Bill Wayne Marsh in Amelia, Louisiana. In sum and substance and among other things, Marsh said he had worked for Tidewater Marine for 16 years and was assigned to *PSV Bankston* as a QMED at the time of the Deepwater Horizon explosion.  Marsh said that, following the explosion, he first remembers seeing Johnson near the FRC, where Johnson told him he did not want to get into the smaller vessel.  Marsh said he later asked Johnson to help with relocating the Jacobs ladders from the port to the starboard side of *PSV Bankston*; Marsh said Johnson refused to help, saying something to the effect that he didn't want to participate in the rescue.  Marsh said Johnson then turned away and walked back inside the Change Room door.  Marsh said that once all of the survivors were pulled from the water and safely on deck, he saw Johnson again; during this meeting Johnson reportedly told Marsh he was going to "get some money out of Tidewater."  Marsh recalled that he asked Johnson if he was hurt and that Johnson replied, "No, but everyone on the rig is going to get some money.  Why not me?"  Marsh said he then asked Johnson, "How do you expect to get money if you are not hurt?"  According to Marsh, Johnson replied, "I'm all shook up."  Marsh said Johnson never told him he was actually injured as a result of the explosion or the rescue operation.

Marsh stated that he did not inform anyone about Johnson's plan to allege an injury until the day of this interview.  He stated that he advised Tidewater's crew coordinator, Kerry Mathews, and Attorney Cliff LaCour, just before the investigators arrived in Amelia.  Marsh further related that at no time did Johnson tell Marsh he was injured as a result of the explosion or the rescue operation.

Marsh remembered the meeting of all the crewmembers held on the bridge of the *PSV Bankston* once they were dockside.  He also recalled Derwin Breaux (In-House Counsel for Tidewater) assisting with the completion of his Coast Guard report, since Marsh cannot read or write. Marsh went on that during this meeting he was asked by someone, but does not remember who, if he was all right.  Marsh also did not recall completing a Tidewater report concerning the injury to Escala.[2]

---

[2] LaCour at this time produced a Tidewater Report with Marsh's name on it; however the report was typed, without a signature or mark.  Marsh could not recall having ever seen this report before.

Marsh had a very difficult time remembering some events and appeared to be confused by some details. As an example, Marsh stated that the explosion occurred prior to the sounding of the General Alarm; all other crew members interviewed stated just the opposite. Marsh could not recall if he drove the carry-all to Amelia, Louisiana once off watch. The other crew members stated he was the driver. Once Marsh acknowledged that he was the driver of the carry-all, he could not remember who the passengers were except to say that he knew Johnson was one of them. Marsh stated that he did not have any conversation with Johnson at this time and didn't over hear anything Johnson may have said during the trip.

Marsh stated that he first became aware of Jonson's reported injury when he returned to work two weeks after the incident.

*Jonathan Escala*

On December 13, 2011, investigators interviewed Jonathan Escala in Kenner, Louisiana. In sum and substance and among other things, Escala stated that he was born on June 26, 1969 and was first employed with Tidewater on November 29, 2006. Escala went on that he was assigned as a deckhand on the *PSV Bankston*.

Escala stated that on April 20, 2010, he was onboard the *PSV Bankston*. Escala stated that on the evening of the explosion, he was on standby waiting for the next mud transfer and was in the change room, sitting on the end of a bench, nearest to the doorway. He was alone in the change room at this time. Escala described that what he first heard as "a loud pressure from the rig" followed seconds later by "a loud thunder bolt going off." When this occurred he was standing. The plexiglass window from the change room door "blew off" the gasket striking his hard hat, and the lower part of the door struck him in the knee. Escala said he walked out onto the deck and saw a rain of liquid mud going over the supply boat and a fire coming from the top of the rig.

Escala stated that he first came into contact with Elton Johnson after the second explosion as Johnson came into the Change Room from what Escala believed was the Engine Room. Escala was unsure of exactly how long after the second explosion it was when he first saw Johnson, but thought it was from "three to five minutes."

Escala said Johnson seemed unharmed. At this time, he and Johnson left the Change Room together to go and help Anthony Gervasio disconnect the mud hose. After this, they went to help launch the rescue boat and join in the rescue operations. Escala stated that this was when he recalled first seeing Louis Longlois, Billy Marsh, Paul Erickson, John Logan, Germone Vaughn and Gary LeBlanc. Johnson did not complain of, or seem to have, a head, shoulder or back injury, and never reported having any injury. As far as he recalled, Johnson was helping in the rescue operations.

9

Escala stated that once the rescue operations were concluded and they arrived back at Port Fourchon he reported his knee injury to a Tidewater attorney that he believed may have been Cliff Laborde. Escala further advised that the Tidewater attorney stated that he needed to see a doctor and have an x-ray taken of his knee. Escala also stated that during the meeting in the wheel house of the *PSV Bankston*, he recalled the attorney, Laborde, asking everyone if they were injured. He did not recall anyone, including Johnson, stating that they had an injury.

Escala was shown a statement form pertaining to his injury and confirmed this was in fact his handwriting and his signature and that he completed the form. Escala did not recall completing any other statements or forms during this time. After completing the statement and the meetings on the vessel, Escala was taken to the doctor by Charles Portier. Escala stated that after he left with Portier, he did not have any contact with Johnson, and he did he speak to anyone, including Johnson's attorney, about an alleged injury that Johnson may have suffered.

*Anthony Gervasio*

On 14 December 14, 2011, investigators interviewed Anthony Gervasio in Lafayette, Louisiana.

Prior to beginning the interview, the investigators requested that Gervasio read over the transcript of the statement he had provided at an earlier date regarding the events of April 20, 2010. Once Gervasio was finished reading over his earlier statement, the investigators started the interview.

In sum and substance and among other things, Gervasio confirmed that the sworn statement he had just read over was his statement and that everything in the statement is accurate.

Gervasio related that he is a Chief Engineer employed with Tidewater Marine and his assignment on April 20, 2010, was Chief Engineer on the *PSV Bankston*. He had been assigned to the vessel for approximately two and half years. On April 20, 2010, Gervasio was assigned the Noon to Midnight watch. Gervasio stated Johnson had joined the crew of the *PSV Bankston* just three or four days prior to the blowout and that he did not know Johnson before he joined the crew.

Gervasio recalled that Johnson was on hose watch at the start of the shift. Gervasio was moving between the tanks on deck and the control room (engine room). When the rig stopped transferring mud, Gervasio and Johnson took the opportunity to eat dinner. Gervasio recalled that around 9:00 to 9:15 pm, he went down to the engine room to check all systems in preparation for resuming the mud transfer process. It was at this time that Gervasio heard the sound of "gas blowing off." He went upstairs to the main deck to investigate the sound, at which time the first explosion occurred. He described it as a small orange flash. About a minute later the second explosion occurred. He then hurried back down to the engine room to check the fuel system and engines.

10

Gervasio stated that he then rushed upstairs and attempted to exit the engine room through the door leading to the Change Room. He recalled that the dogs, or door latches, were locked and once he unlocked them he was able to enter the Change Room. Inside the room, Gervasio observed Jonathan Escala to his left and Louis Longlois to his center and Johnson to his right awaiting further instruction. Gervasio said all four crew members exited the Change Room onto the deck with Gervasio in the lead. According to Gervasio, they all went directly to the hose connection where Gervasio and Longlois managed to disconnect the mud transfer hose.

Gervasio remembered placing his hand on Johnson to stop his forward progress while trying to throw the mud hose overboard. He stated that he was afraid he would become tangled in the hose and slip or fall overboard. Gervasio said that once the hose was overboard, he, Johnson, Escala and Longlois moved to the FRC. The vessel was launched, and Gervasio and Longlois boarded it and began the rescue operation. Gervasio did not remember seeing Johnson during the rescue operation. He did recall seeing Johnson and all the other crewmembers once the initial rescue operation was completed. He recalled that at this time he instructed Johnson to go down to the engine room and make sure the alarms did not sound.

Gervasio said he went to bed around 6:30 a.m. and did not see Johnson again until shift change when they had lunch together with Longlois. Gervasio asked Johnson and Longlois if they were okay and if they needed anything. He recalled that they both replied they were okay.

Gervasio again asked Johnson if he was okay later in the engine room. He also asked Johnson if he needed a nap, since Johnson had earlier advised him he did not sleep well; again, Johnson told Gervasio he was okay. Gervasio stated Johnson performed his duties without complaint, as the vessel traveled faster than normally and they had to keep watch on the engines. Gervasio recalled that at the dock in Fourchon, Louisiana an attorney, Cliff Laborde, repeatedly asked every crewmember if they were injured and if they need any assistance. He remembered Escala seemed reluctant to report his injury, and that no one else came forward.

Gervasio first heard of Johnson's reported injury when he provided his sworn statement to the Tidewater Attorneys. Gervasio said he never spoke to Johnson or anyone else about Johnson's alleged injury.

*Elton Johnson*

On December 21, 2011, investigators interviewed Elton Johnson in Houston, Texas. In sum and substance and among other things, Johnson stated that he was born on January 9, 1988. He was first employed by Tidewater Marine in 2006, laid off in May of 2009 and re-hired in March of 2010, at which time he was assigned to the *PSV Bankston*.

11

Johnson stated that on April 20, 2010, he was a crewmember of the *PSV Bankston* with the position of QMED working under the direction of the Chief Engineer, Anthony Gervasio. Johnson said both he and Anthony Gervasio were assigned to work the noon to midnight shift.

Johnson recalled having breakfast at around 11:30 a.m. on April 20th, just before going on watch at 12:00 p.m. According to Johnson, the Noon to Midnight crew went through their usual Job Safety Analysis procedures and then began transferring mud to the *PSV Bankston* from the Deepwater Horizon.

Johnson said that on the evening of April 20, 2010, he was on standby in the event they would begin pumping mud again. He went to the galley while on standby and then went to the movie room and watched a movie, along with Jonathan Escala and Kenneth Bounds, the cook. During this time, Johnson heard a loud noise which he described as "Like an air compressor, you know, blowing off." He walked out of the galley door to the outside deck and looked towards the rig and "the whole sky was full of mud." He said Louis Longlois "grabs me and says get your slicker suit, we have to unhook the hose." Johnson stated that at that point, he, Escala and Longlois descended, in this order, down the interior stairs into the Change Room.

Johnson said he was coming through the door to enter the Change Room at the time of the explosion. He was knocked back and to his right hand side and rendered unconscious or "dazed."[3] When he recovered he was on his feet, slumped over against the wall in the corner near the sink area. He saw that Escala and Longlois were no longer in the Change Room. He did not think that Escala and Longlois were ever aware he was in need of assistance. Johnson stated that he remembered striking his shoulder on something, but he did not recall hitting his head. He claimed to have had a vision of his little niece reaching her hands out to him while he was unconscious or "dazed" for a few seconds.

Johnson illustrated for the investigators exactly where his position was when this event took place. He indicated his position and of Escala and Longlois in the Change Room. (See Exhibit #18).[4]

---

[3] Despite numerous direct questions asking if he was rendered unconscious, as in "knocked out," Johnson never gave a direct answer. As described below, he adopted the phrase "altered state" when that was suggested by his attorney.

[4] Anthony Gervasio stated that once the second explosion occurred, he went to the engine room to check everything and then quickly proceeded to the Change Room. Once he entered the change room he observed that to his left was Jonathan Escala, to his center was Louis Langlois and to his right was Elton Johnson. Gervasio stated that all three were standing in the Change Room, minutes after the second explosion, apparently waiting on him to direct them on what to do next. Elton Johnson stated that no one was in the Change Room after the second explosion and that he was there alone.

12

Johnson related that once he recovered from his "dazed" state, he put on his PPE and joined the rescue effort already in progress. He explained how he manned the Jacobs Ladder positioned farthest to the stern, helping to pull people onboard. Johnson remembered working with Gary LeBlanc and John Logan. Johnson stated that during the rescue operations, he was not asked by anyone if he was injured.

Johnson said once the *PSV Bankston* was released, they sailed to and tethered to another platform, the Matterhorn. Johnson recalled that this was where they picked up supplies for the injured and also when the Tidewater attorneys came onboard. Johnson stated that he was instructed to go to the Engine Control Room and to stay there to complete his shift. He further stated that Gervasio came in and out of the engine room and that there was no talking. He said, "It was just quiet," and no one came in to ask him if he was okay.

Johnson described his injuries at the time of the incident as a headache and stated that he did not realize he was injured until the following day when he was back at the Tidewater office in Amelia, Louisiana. Johnson stated that he never advised anyone he was injured until then.

Johnson recalled the debriefing meeting at the dockside in Fourchon, Louisiana, where he had to complete a Coast Guard statement regarding what happened. Johnson stated he was told not to write what he "thinks" happened, but just a general statement, "short and sweet." Johnson recalled that there was a second statement completed for the Tidewater attorneys in reference to Jonathan Escala and Escala's injuries, not regarding the explosion. In this statement, Johnson was requested to describe in detail exactly what he knew about Escala's accident. According to Johnson, this reported stated he was "off watch." Johnson advised that he did not complete this form and that he was not "off watch" at the time of Escala's injury. The third form he recalled was a questionnaire that was produced by Johnson's attorney, Arnold Itkin, during this interview.[5] This form includes several questions; number 6 asked: "Were you injured?" Johnson's answer was, "I was shooken up a little." (See Exhibit #19.) Johnson did not mention any headaches or back and shoulder injuries on the form.

During this interview, Johnson did not offer any details as to his injuries, other than to state that during the time he was completing the required statements, he was feeling stiff and sore and his head was "throbbing." He further stated that he had not had any sleep. Johnson advised that once he completed the forms, he had a Tidewater attorney, Jeremy Morrow, look them over to make sure they was completed correctly.

Johnson insisted that no one ever inquired as to his well-being or if he was injured at any time while on the vessel or on land. He claimed that once back at the Tidewater office he requested that Tidewater Managers, Kerry Mathews and Charlie Portier, provide him with medical

---

[5] This is the first time the investigators became aware of this questionnaire.

13

assistance. Johnson said that while in was in the guard shack he specifically told Matthews and Portier that "he was going to need to see a doctor."

Johnson said Mathews instructed him to drive Jeffrey Malcolm to the New Orleans Airport and then Tidewater would get Johnson back to work on another boat. Johnson stated that he told Kerry, "Man, I just want to go home, man. I want to go home." He further stated that Kerry advised him: "Well, if you want to go home, go ahead and go home." That was the last he heard from Tidewater.

Johnson stated he sought medical treatment approximately one week after the explosion. Johnson said he saw several doctors including a family practitioner, a psychiatrist, a neurologist, an orthopedist and a pain management & rehabilitation doctor. When asked about the conflicting statements he had provided to several of the different attending physicians regarding what happened to him during the explosion, Johnson explained that the doctors were all mistaken. Johnson could not explain the differences in his statements to physicians about the nature and extent of his injuries. Johnson refused to state that he was knocked "unconscious" as in being "knocked out." Instead he explained his condition as an "altered state," after his attorney, Cory Itkin, suggested that was what had happened to him. Johnson continued to insist that the explosion knocked him back six feet.

Johnson denied speaking to the Associated Press, which had reported that he claimed to have been thrown seven feet into an engine room door and that he was knocked unconscious. Johnson's attorney, Itkin, suggested that Johnson's former attorneys, Steve Herman and Eddie Knoll may have provided this information to the press.

Johnson said that now, nearly 21 months after the explosion, he liked to go fishing: "I'm a fisherman; that is what I do." Johnson stated he was able to use his gas stove and is able to pump his own gas into his vehicle, stating: "I'm back to myself like that." Johnson stated that his shoulder was doing well and "is good as it's gonna get." He said the only thing he was dealing with now was his back and that it was stable and the medications take care of it. Johnson stated that he would say he was currently only restricted to not lifting anything over 50 pounds and further stated that he was employable with a job if he did not have to lift anything over that weight.

*Charlie Portier*

On January 12, 2012, investigators interviewed Charlie Portier in Amelia, Louisiana. In sum and substance and among other things, Charlie Portier informed the investigators that he was born on February 18, 1948, and has worked for Tidewater for the last sixteen years. His position has been Operations Manager for the Human Resources Department for the last fifteen years. Portier stated that he was responsible for the hiring, training and placement of employees onboard the different vessels through the HR and the Crewing Departments.

Portier said that on the morning of April 22, 2010, he arrived at work at the Tidewater office at about 7:30 a.m. Portier recalled that the carry-all van had arrived and he could see from his window employees getting out. He walked outside to tell them all hello and to thank them for doing a good job under the circumstances.

Portier stated that he did not remember having any specific conversations with any of the employees who got off the vessel on that date, other than one of the employees who had pictures of the explosion on a cell phone. He could not recall who that individual was or whose cell phone it was.

Portier remembered that on that morning he was assigned to take Jonathan Escala to Dr. Davis' office in Houma, Louisiana and then take him back to the ship that same day. Portier did not recall who asked him to bring Escala to the doctor or when the decision was made to take him to the doctor.

Portier stated that Elton Johnson never advised him that he needed to see a doctor. He said if he had had any indication that anyone was having problems, he would have immediately contacted Monique Hagan who was in charge of coordinating treatment for anyone who needed medical attention of any kind. Portier stated if anyone was injured, it would not have been something that would have been ignored.

According to Portier, when an employee is injured, Tidewater immediately takes them to see Dr. Davis in Houma for evaluation. An employee can report an injury to the captain on the vessel or anyone else in crew assignment. Monique Hagan would be contacted at that point and she would set up an appointment with Dr. Davis, who is available 24 hours a day to treat Tidewater employees. Portier stated that the company's Safety Management System has a policy on reporting injuries. Elton Johnson would have had an orientation on some of the elements of the Safety Management System in which this would have been covered. Portier was not sure who would have given that orientation to Johnson, but that information would be in Johnson's personnel file.

Portier stated that Johnson and six other employees got off the vessel on April 22, 2012, and the next day, April 23rd, Portier attempted to contact all seven of the them. Twenty-four hours had passed at this point and he wanted to check on them to see if they were okay or needed medical attention of any kind. Portier stated he spoke with six of the employees, but could not reach Elton Johnson. Portier said he left a message on Johnson's voicemail. Portier then decided to call Johnson's girlfriend's cell phone since he had spoken to her on April 20, 2012, to let her know that Johnson was okay. Portier stated that when he spoke to her on April 23, 2012, she seemed elusive and did not want to tell him what was going on with Johnson.

Portier said he received a telephone call later that same day from Johnson, and Johnson advised him he had hired an attorney by the name of Eddie Knolls. Portier then contacted Vince

15

Almerico, Tidewater's general counsel in New Orleans, Louisiana to advise him that Johnson had hired an attorney. Portier stated that in these conversations with Johnson and his girlfriend, neither of them ever said Johnson needed to see a doctor.

Portier stated that Johnson was hired to work 28 days on and 14 days off. He believed that Johnson could have been assigned to attend a rigging class once he returned to port; however, he was not sure of that. He related that if Johnson would have been assigned to go to work on another vessel once the *PSV Bankston* returned, that would have been coordinated through Kerry Matthews.

*Kerry Matthews*

January 12, 2012, investigators interviewed Kerry Matthews in Amelia, Louisiana. In sum and substance and among other things, Kerry Matthews stated that he was born on June 23, 1969, and has worked for Tidewater Marine for seventeen years as a Crew Coordinator. He has been in this position for about five years. His duty is to assign crew members to different vessels.

Matthews stated that he was told about the explosion on the Deepwater Horizon on April 20, 2010, when he came into work on the morning of April 21. He recalled the carry-all van arriving that morning at the guard shack. He walked outside with Charlie Portier to greet the crew members coming off the vessel and ask how they were doing. He stated that Portier asked all the crew members if they were okay and also called each of them the next day to check on them. Matthews further stated all crew members seemed fine at that time.

Matthews stated that he did not have any conversations with Elton Johnson on April 21, 2010, or any time after that regarding the need to see a doctor. Company policy requires an injured crew member to contact the captain and advise him they are sick or injured. The captain would contact Matthews who would then contact Monique Hagan, and she would coordinate the appointment and transportation to see Dr. Davis, the Tidewater doctor. Matthews stated that if anyone needed to see a doctor, it would have been arranged immediately.

Matthews stated Johnson was not assigned to go on another vessel once he returned on April 21, 2010. Johnson's next assignment would have been in a training school located behind the Tidewater offices until there was another vessel to which he could be assigned. Matthews related that Buck Montae would have been the person to assign Johnson to the training school. Johnson would have been on stand-by until his next assignment. Matthews stated he did not know who asked Johnson to take Jeffrey Malcolm to the airport when they returned to the Tidewater office.

Matthews understood that Johnson was available and ready to return to work, but contact could not be made with him. At some point Portier advised him that Johnson was not available to return to work on a vessel. He was not sure exactly when Portier had told him, but he did not

16

schedule Johnson on any future assignments. Portier also told Matthews that Johnson had hired an attorney, but Matthews could not recall when.

**Conclusion**

The interviews of all of Johnson's crewmates provided no credible evidence that Johnson suffered the physical injuries he alleged in connection with the Deepwater Horizon explosion. Multiple crew members of *PSV Bankston* reported that Johnson was actively involved in ship activities following the explosion and at no time during the incident or in the days following the incident complained of an injury. All crew members were individually questioned shortly after the incident about any injuries they might have sustained, and Johnson never mentioned having been hurt. Additionally, Louis Longlois, who was with Johnson when the explosion occurred, disputed Johnson's claims of being thrown into a door and being rendered dazed or unconscious. Johnson's behavior on the day of the explosion and immediately thereafter is inconsistent with statements attributed to him regarding his purported injuries. Johnson's claims of physical injury as a result of the Deepwater Horizon explosion appear to be fabricated.

**End of Report**