# Exhibit J

EXECUTION VERSION

# AGREEMENT

This Agreement (this *"Agreement"*) is made and entered into as of the 15th day of June, 2010 (the *"Effective Date"*) by and between BP Exploration & Production Inc., a Delaware corporation (*"BP"*), and Feinberg Rozen, LLP, a District of Columbia limited liability partnership (*"Feinberg Rozen"*). Unless otherwise defined with their first use, capitalized terms used herein shall have the meanings ascribed to them in Section 15.

## RECITALS

A.  At the request of the White House and BP, Kenneth R. Feinberg (*"Feinberg"*), acting through and as a partner of Feinberg Rozen, has established the Gulf Coast Claims Facility (*"GCCF"*) to independently administer and where appropriate settle and authorize the payment of certain Claims asserted against BP as a result of the explosion at the Deepwater Horizon rig and consequent spillage of oil into the Gulf of Mexico (the *"Event"*).

B.  In connection therewith, BP desires to hereby engage Feinberg Rozen to operate the GCCF and provide the other services specified herein.

C.  This Agreement sets forth certain understandings, unrelated to decisions regarding the compensability of Claims, with respect to the services to be provided by Feinberg Rozen and the remuneration to be paid therefor.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.  **SERVICES AND COMPENSATION**

    (a)  Feinberg Rozen shall perform the claims administration and settlement services described in Exhibit A attached hereto (collectively, the *"Services"*) in accordance with the terms of this Agreement, including the exhibits hereto. In performing such Services, Feinberg Rozen agrees to make available the services of Feinberg.

    (b)  Feinberg Rozen shall perform the Services in accordance with all applicable laws and regulations and the Claims Protocols set forth in Exhibit B. Without limiting the generality of the foregoing, Feinberg Rozen shall follow OPA as it operates and administers the GCCF.

    (c)  BP agrees to pay Feinberg Rozen the compensation set forth in Exhibit C for the performance of the Services.

    (d)  Each employee or Subcontractor selected by Feinberg Rozen to perform a particular task shall be technically and professionally qualified to perform such task. Each employee and Subcontractor of Feinberg Rozen shall be under Feinberg Rozen's supervision, direction and control, and Feinberg Rozen shall be responsible for the conduct of such employee

and Subcontractor. Feinberg Rozen shall replace or remove from providing any of the Services any employee or Subcontractor if it determines that such employee or Subcontractor fails to meet the standards of performance set forth in this Agreement.

2. **REPRESENTATIONS AND WARRANTIES**

(a) Feinberg Rozen represents, warrants, and covenants as follows:

(i) it has the power and authority to enter into this Agreement and to perform all of its obligations hereunder;

(ii) this Agreement does not violate or conflict with any other agreement to which Feinberg Rozen is a party or by which it is bound;

(iii) all Services provided hereunder shall be performed by qualified personnel, in a timely, professional and workmanlike manner consistent with good and sound professional practices and in accordance with generally accepted industry practices;

(iv) it and each of its employees and Subcontractors authorized to perform Services hereunder has not previously entered into any agreement that would restrict any of such persons in the performance of the Services;

(v) it shall comply with all applicable foreign and United States federal, state and local laws, rules and regulations in its performance of this Agreement;

(vi) it has the capacity and resources to perform the Services; and

(vii) each of the employees of Feinberg Rozen performing Services is legally entitled to work in the United States and has all necessary visas and work permits.

(b) BP represents, warrants, and covenants as follows:

(i) it has the corporate power and authority to enter into this Agreement and to perform all of its obligations hereunder; and

(ii) this Agreement does not violate or conflict with any other agreement to which BP is a party or by which it is bound.

3. **INDEMNITY**

(a) BP shall indemnify, defend, and hold harmless Feinberg Rozen and its partners and employees (collectively, the *"Feinberg Rozen Indemnitees"*) from and against any and all threatened or commenced actions, causes of action, suits, claims, processes, proceedings, investigations, costs, damages, demands, expenses, fees and/or other liabilities ("***Indemnified Claims***") that are threatened, asserted, brought, commenced, or sought by any person or entity, whether public or private, governmental or non-governmental (other than BP, BP's Affiliates, the Feinberg Rozen Indemnitees, the Subcontractors and the Trust), relating to or arising from the operation of the GCCF, including reasonable fees and costs of counsel, chosen in accordance

2

with Section 3(b), incurred in connection with the foregoing, except that BP shall have no obligation to indemnify any Feinberg Rozen Indemnitee where the claim arose out of the gross negligence or intentional or willful misconduct, including fraud, of the Feinberg Rozen Indemnitees.  For purposes hereof, the term "employees" shall include certain persons who work with or for Feinberg Rozen but whose employment status is that of independent contractor rather than direct employee, the names of whom are set forth as <u>Exhibit F</u>.  Feinberg Rozen may, from time to time, notify BP of additional persons similarly hired or retained by Feinberg Rozen.  Upon BP's consent, which shall not be unreasonably withheld, <u>Exhibit F</u> will be amended to include such additional persons.  The inadvertent failure of Feinberg Rozen to notify BP of such hiring or retention of additional persons shall not preclude it from subsequently providing such notice to BP, and the fact of such subsequent notice by itself shall not be a ground for BP to withhold its consent.

(b)     A Feinberg Rozen Indemnitee shall give prompt written notice to BP of any Indemnified Claims, and BP shall assume the defense of such claim with counsel chosen by the Feinberg Rozen Indemnitee that is reasonably acceptable to BP.  The Feinberg Rozen Indemnitees, other than Feinberg Rozen, are third party beneficiaries of Sections 3(a) and (b).

(c)     BP shall also agree to indemnify, defend and hold harmless all Subcontractors hired or retained by Feinberg Rozen and their employees in connection with its operation of the GCCF, a current list of which Subcontractors is set forth as <u>Exhibit G</u>, *provided that* BP and such Subcontractors agree upon separate indemnification agreements after negotiating the terms and conditions thereof in good faith.

(d)     BP agrees that, in addition to its indemnification obligations to the Feinberg Rozen Indemnitees set forth above, to the maximum extent permissible by law, Feinberg and Feinberg Rozen shall incur no liability to BP or its Affiliates by reason of acts or things done, suffered or omitted in performing the Services in strict accordance with the terms and conditions of this Agreement, except where the liability arose out of the gross negligence or intentional or willful misconduct of the Feinberg Rozen Indemnitee.

4.      **CONFIDENTIALITY**

(a)     A party (each a *"Disclosing Party"*) may disclose its Confidential Information to the other party (a *"Receiving Party"*) in connection with the performance of their respective obligations under this Agreement.  For the purposes of this Agreement, *"Confidential Information"* shall mean all information revealed by or through the Disclosing Party which the Receiving Party either knows or reasonably should know to be proprietary and confidential in nature including without limitation: (i) information either expressly or implicitly identified as originating with or belonging to the Disclosing Party or marked or disclosed as confidential (including information disclosed to the Disclosing Party by a third party, including a Subcontractor, under an obligation of confidentiality); and (ii) information traditionally recognized as proprietary or trade secrets of the Disclosing Party.

(b)     Confidential Information shall in no event include information which: (i) was known to or in the possession of the Receiving Party at the time of first disclosure by the Disclosing Party; (ii) is or becomes generally known in the industry or becomes public

3

knowledge without default by the Receiving Party of its obligations hereunder; (iii) the Receiving Party can demonstrate, from written records, has been independently developed through the Receiving Party's employees, none of whom had access to the Confidential Information; or (iv) is generally furnished to third parties by the Disclosing Party without confidentiality restriction.

    (c) The Receiving Party may disclose Confidential Information pursuant to obligations imposed by a Governmental Authority or by statute, regulation or other law, provided that the Receiving Party provides to the Disclosing Party detailed written notice of such obligations in sufficient time (to the extent allowed by law) so as to permit the Disclosing Party to seek an appropriate protective order or otherwise intervene to protect the Confidential Information.

    (d) The Receiving Party shall not disclose or otherwise share the other party's Confidential Information with any third party. A Receiving Party may use the Confidential Information for the sole purpose of performance of its obligations under this Agreement and for no other purpose and shall protect the Confidential Information in the same manner in which it would protect its own Confidential Information, which in no event shall be less than reasonable care. The Receiving Party agrees not to disclose the Confidential Information except to its employees, authorized representatives, or Subcontractors who have a need to know such Confidential Information and who have agreed to confidentiality provisions at least as protective as the terms of this Agreement.

    (e) The Receiving Party agrees that, if there is a breach or threatened breach of the provisions of this Agreement, the Disclosing Party may have no adequate remedy in monetary damages and accordingly shall be entitled to seek injunctive relief in a court of competent jurisdiction, notwithstanding other remedies that may be available to it.

    (f) All Confidential Information shall remain the exclusive property of the Disclosing Party, and the Receiving Party shall have no rights to use the Confidential Information except as expressly provided herein. Within ten (10) business days after receiving written instructions from the Disclosing Party, the Receiving Party shall return to the Disclosing Party all Confidential Information in tangible form that is in the Receiving Party's possession, custody or control (except as otherwise required by law or regulatory authority). Notwithstanding the foregoing, (a) Feinberg Rozen shall, and shall cause its Subcontractors to, retain all Confidential Information of BP as required by applicable law or as directed by BP in writing from time to time, and (b) Feinberg Rozen shall, and shall cause its Subcontractors to, comply with the terms of any court orders or BP corporate policies relating to document retention or preservation that may be communicated and directed by BP in writing from time to time.

    (g) Within forty-eight (48) hours of becoming aware of any acquisition, access, use or disclosure of Confidential Information in violation of this Agreement including by (i) a party, its officers, directors, employees, representatives, subcontractors, or agents, (ii) a third party to whom the Receiving Party disclosed Confidential Information, or (iii) any other third party who may gain or attempt to gain access to such information, the Receiving Party shall report any such acquisition, access, use or disclosure to the Disclosing Party. All reports

4

involving the acquisition, access, use or disclosure of Confidential Information shall include the following information:

    1)    A brief description of what happened, including the date of the breach and the date of the discovery of the breach, if known;

    2)    A description of the types of Confidential Information that were involved in the breach (such as whether full name, social security or employee identification number, date of birth, home address, account number, or other types of information were involved);

    3)    Any steps Individuals or Businesses should take to protect themselves from potential harm resulting from the breach;

    4)    A brief description of what the Receiving Party is doing to investigate the breach, to mitigate harm to the potentially affected Individuals or Businesses, and to protect against any further breaches; and

    5)    Contact procedures for Individuals or Businesses to ask questions or learn additional information, which shall include a toll-free telephone number, an e-mail address, website, or postal address.

    (h)    The Receiving Party's obligation to report the acquisition, access, use or disclosure of Confidential Information in violation of this Agreement to the Disclosing Party is required even where the acquisition, access, use or disclosure does not pose a significant risk of financial, reputational, or other harm to the Individual or Business to whom the information relates.

    5.    **USE OF CERTAIN FACILITIES AND ASSETS; SECURITY REQUIREMENTS**

    (a)    <u>Use of Certain Assets</u>.  BP, in its sole discretion, may, from time to time, allow Feinberg Rozen to use and access certain of its computers, equipment, furniture, properties, infrastructure and other assets (collectively, the *"BP Assets"*).  Feinberg Rozen shall at all times respect the BP Assets and retain them in its own custody and not permit the BP Assets to be moved from their location without the prior written consent of BP.  Feinberg Rozen shall operate and use the BP Assets with reasonable care and in accordance with any applicable instructions, and shall maintain reasonable insurance coverage for any loss or damage thereto.  Feinberg Rozen shall not subject the BP Assets to abnormal, abusive, illegal, or hazardous use or conditions.  Feinberg Rozen shall not make any alterations, modifications or improvements to the BP Assets without the prior written consent of BP.  All BP Assets shall be operated in accordance with applicable federal, state or local law.  All such BP Assets shall be promptly returned to BP upon the conclusion of the Services, termination or expiration of this Agreement or the request of BP.

    (b)    <u>Access to Certain Facilities</u>.  BP, in its sole discretion, may, from time to time, allow Feinberg Rozen to use and access certain facilities, properties and offices owned or leased by BP, its Affiliates or their service providers (collectively, *"BP Facilities"*).  Feinberg Rozen shall at all times respect the BP Facilities and comply with all applicable BP policies and

procedures related to the access or use of such BP Facilities, as provided by BP to Feinberg Rozen from time to time, including, without limitation, any instructions relating to security, and environmental, safety and health policies and procedures. Feinberg Rozen shall not make any alterations, modifications or improvements to the BP Facilities without the prior written consent of BP. All BP Facilities shall be accessed and operated in accordance with applicable federal, state or local law. Feinberg Rozen shall promptly vacate such BP Facilities upon the conclusion of the Services, or termination or expiration of this Agreement.

      (c)    <u>Compliance With IT and Security Requirements</u>.

          (i)    <u>Security Requirements</u>. Feinberg Rozen shall comply, and shall cause all Feinberg Rozen employees and Subcontractors to comply, with the information security and data protection requirements set forth in <u>Exhibit D</u> (the *"Security Requirements"*). As periodically requested by BP, Feinberg Rozen shall promptly complete BP's Third Party Service Provider Information Security Questionnaire and other documents or requests for information regarding Feinberg Rozen's information security practices (*e.g.*, audits, summaries of test results, or other equivalent evaluations of Feinberg Rozen's information security practices).

          (ii)    <u>Information Handling Requirements</u>. Feinberg Rozen hereby agrees that it shall comply, and shall cause all Feinberg Rozen employees and Subcontractors to comply, with all reuse, redisclosure and other personal information handling, processing, security, and protection requirements that are specifically required of a non-affiliated third-party processor or servicer (or subcontractor) under applicable federal, state and local laws, rules, and regulations, including all laws related to personal information and data and privacy and protection thereof. Without limiting the foregoing, Feinberg Rozen agrees that: (A) it is prohibited from disclosing or using any nonpublic personal information disclosed to it by BP or otherwise gathered by Feinberg Rozen during the Claims process, except solely to carry out the purposes for which it was disclosed; and (B) it has implemented and will maintain an information security program designed to meet applicable law (collectively, the *"Information Security Program Requirements"*).

          (iii)    <u>Security Audits</u>. During the Term and thereafter for as long as Feinberg Rozen retains Claimant information or other personal information, BP and its representatives and agents shall be entitled to conduct audits of Feinberg Rozen's and its Subcontractors' relevant operations, facilities, and systems to confirm that Feinberg Rozen and its Subcontractors have complied with the Security Requirements and the Information Security Program Requirements (the *"Security Audits"*). Any Security Audit shall be scheduled and conducted during normal business hours and shall not unreasonably interfere with Feinberg Rozen's or its Subcontractors' business activities. In the event that any Security Audit results in the discovery of material security risks to an Individual's information resulting from a failure to comply with the Security Requirements, Feinberg Rozen shall (A) respond to BP in writing with Feinberg Rozen's plan to promptly take reasonable measures and corrective actions necessary to restore compliance with the Security Requirements, at no cost to BP, and (B) allow BP to review any system and transaction logs, including those of the Subcontractors, related thereto which pertain to information or data potentially compromised. Feinberg Rozen shall have five (5) business days to develop a remediation plan, unless the parties mutually agree in writing to a longer period of time for such cure. BP's right, and the right of its representatives and agents, to

6

conduct Security Audits, and any exercise of such right, shall not in any way diminish or affect Feinberg Rozen's duties and liabilities under this Agreement.

(d) Other.

(i) <u>Document Retention</u>. Feinberg Rozen shall comply, and shall cause all Feinberg Rozen employees and Subcontractors to comply, with the court order (and any subsequent court orders) and other demands and requests regarding document retention attached hereto from time to time as <u>Exhibit E</u> regardless of whether such orders, demands, and requests apply by their terms to Feinberg Rozen.

(ii) <u>Code of Conduct</u>. Feinberg Rozen shall perform its obligations hereunder in a manner that is consistent with the principles stated in BP's Code of Conduct, a copy of which has been provided to Feinberg Rozen, and any revised or successor code of conduct. Feinberg Rozen shall cause all Feinberg Rozen Subcontractors to comply with the Code of Conduct, and any revised or successor code of conduct.

(iii) <u>ESH and Physical Security</u>. Feinberg Rozen shall comply, and shall cause all Feinberg Rozen employees and Subcontractors to comply, with BP's standard environmental, safety and health policies and physical security policies that are communicated to Feinberg Rozen from time to time.

6. **REPORTING; ACCESS TO CLAIM FILES; COMMUNICATION; AUDITS AND COMPLIANCE**

(a) <u>Reporting</u>. Feinberg Rozen shall report, and shall agree to certain other reasonable reporting obligations with respect to information sufficient for BP, among other things, to comply with OPA, report financial results, and pursue indemnification, contribution, subrogation, insurance and other claims attempting to recover costs, expenses, damages, liabilities or losses from third parties. Except as set forth in Sections 6(b) and 10(d) hereto, or in connection with legal process, such reporting obligations shall not require Feinberg Rozen to disclose personally identifying information submitted by Claimants.

(b) <u>Access to Claim Files on Written Request</u>. Where BP requests copies of Claim Files and all other Claim-related information (collectively, "***Claims Information***") to present claims to insurers and others in order to seek indemnification, contribution, subrogation, insurance or other recovery payments or other reimbursements for costs, expenses, damages, liabilities or losses in connection with the Event, Feinberg Rozen shall provide true and complete copies thereof upon BP's written request. If Claims Information is provided to BP under this subparagraph, BP will use such Claims Information only for the purposes set forth in this subparagraph.

(c) <u>Communication</u>. Feinberg Rozen shall establish a process of communicating with its employees and Subcontractors (as well as receiving communications from such parties) to ensure that all information is properly and accurately disseminated in accordance with applicable law. If necessary, Feinberg Rozen shall coordinate collection of information and materials from such persons consistent with the terms of this Agreement and to facilitate the Services and its reporting obligations hereunder. Without limiting the generality of the foregoing, Feinberg Rozen shall promptly communicate to such persons the terms and

7

conditions of any litigation "hold" or preservation court orders that may be communicated and directed by BP in writing from time to time.

(d) <u>Audit</u>. During the Term of this Agreement and for a period of three (3) years after the termination or expiration of this Agreement, BP, its representatives and agents shall be entitled to conduct audits of Feinberg Rozen's and its Subcontractors' relevant books, records, facilities and infrastructure to confirm that Feinberg Rozen has properly billed BP for fees and expenses incurred in connection with this Agreement, and has otherwise complied with its obligations under this Agreement. Such audits shall be scheduled and conducted during normal business hours and shall not unreasonably interfere with Feinberg Rozen's business activities. Feinberg Rozen agrees to provide access to the relevant records, facilities and infrastructure, including those of its Subcontractors, for purposes of the audit. Prompt adjustment shall be made to compensate for any discrepancies disclosed by such audit (including interest on overcharges equal to the Prime Rate set forth in the *Wall Street Journal* from the date such overcharges were initially paid by BP until the date such overcharges are reimbursed to BP) and Feinberg Rozen agrees to otherwise promptly remedy any other nonconformance found as the result of the audit. Any such audit shall be paid for by BP.

(e) <u>Compliance</u>. If the Services under this Agreement include either (i) an application that relates to BP's financial reporting obligations under rules and regulations of the United States Securities and Exchange Commission (***"SOX Application"***) or (ii) infrastructure (including without limitation, data centers) or networks supporting a SOX Application, Feinberg Rozen shall cooperate and work with BP and BP's auditors as requested by BP (at BP's sole cost and expense) in order to provide the necessary information to which Feinberg Rozen has lawful access, or within Feinberg Rozen's possession, that BP requires for its compliance obligations under the Sarbanes-Oxley Act of 2002, and otherwise support BP's financial reporting obligations in the manner reasonably requested by BP.

7. **SUBCONTRACTORS**

Feinberg Rozen shall not subcontract any of its obligations under this Agreement to any third party without BP's prior written approval, which approval shall not be unreasonably withheld. Feinberg Rozen shall not enter into any Subcontract without first giving an opportunity to BP to review the proposed Subcontract. All such Subcontracts shall contain provisions that are consistent with, and as protective of BP as, the terms of this Agreement, including, without limitation, Sections 2(a), 4, 5, 6, 7, and 9 through 15, as well as provisions that allow transfer or assignment to BP or its designee in the event of termination or expiration of this Agreement. With any proposed Subcontract submitted for BP's review, Feinberg Rozen shall provide BP with a list of all owners, shareholders, partners, members or other similar persons of such proposed subcontractors, unless such subcontractors are publicly held corporations listed on a major stock exchange. Upon BP's approval of the Subcontract, the Subcontractor's name shall be added to the list of Subcontractors on <u>Exhibit G</u>, and an updated version of such exhibit shall be attached hereto.

8

8. **RELATED TRANSACTIONS**

(a) BP has entered into that certain Claims Services Agreement with Worley (the *"BP - Worley Claims Services Agreement"*), and Feinberg Rozen has entered into that certain GCCF - Worley Claims Services Agreement with Worley (the *"GCCF - Worley Claims Services Agreement"*). Feinberg Rozen agrees that it shall not amend or modify the GCCF - Worley Claims Services Agreement in any manner that could reasonably be expected to have a material adverse effect on the claims services provided thereunder, without first notifying BP in writing, and cooperating with BP and Worley to minimize the impact such amendment or modification may have on such claims services.

(b) Feinberg Rozen shall forward copies of invoices of its Subcontractors, within a reasonable time after it receives such invoices, to BP. In addition, Feinberg Rozen shall use commercially reasonable efforts to verify the accuracy of any invoices submitted by a Subcontractor, including Worley, before forwarding such invoices to BP.

(c) Feinberg Rozen agrees to promptly notify BP if it becomes aware of (i) any breach by a Subcontractor, including Worley, of its Subcontract with Feinberg Rozen, or (ii) any occurrences or circumstances that could have a material adverse effect on the claims processing or the Services provided hereunder.

(d) Feinberg Rozen shall use commercially reasonable efforts to enforce the terms of its Subcontracts with its Subcontractors.

9. **USE OF TRADEMARKS**

Feinberg Rozen may not use BP's trademarks, logos and domain names in any manner without BP's prior written consent.

10. **TERM AND TERMINATION**

(a) <u>Term</u>. This Agreement shall commence as of the Effective Date and shall expire on August 31, 2013, unless earlier terminated in accordance with Sections 10(b) and 10(c) below (the *"Term"*). Upon the termination or expiration of this Agreement for any reason, Feinberg Rozen agrees to provide Services for up to an additional twelve-month transitional period upon the written request of BP to wind down and transition the operations of the GCCF to a successor or to BP, as the case may be, all in accordance with the terms of this Agreement.

(b) <u>Termination by BP</u>. BP may terminate this Agreement as follows:

(i) in the event Feinberg Rozen materially breaches its obligations under this Agreement, by providing thirty (30) calendar days prior written notice thereof to Feinberg Rozen, unless Feinberg Rozen cures such breach within such thirty (30) day period;

(ii) in the event BP determines, in consultation with the Trustees, that Feinberg or Feinberg Rozen has breached his or its fiduciary obligations to expend funds, and administer and resolve Claims in accordance with the Claims Protocols, by providing ten (10) business days prior written notice thereof to Feinberg Rozen;

9

      (iii) in the event Feinberg ceases to devote a substantial portion of his time to operating, managing and administering the GCCF, by providing ten (10) business days prior written notice thereof to Feinberg Rozen; and

      (iv) in the event of a Governmental Termination Action, by providing five (5) business days prior written notice thereof to Feinberg Rozen.

BP shall not exercise the foregoing termination rights without first seeking the concurrence of the United States Department of Justice.

    (c) <u>Termination by Feinberg Rozen</u>.  Subject to Section 10(a) with respect to the provision of Services during a transition period, Feinberg Rozen may terminate this Agreement for any reason whatsoever upon giving thirty (30) calendar days' prior written notice of such termination to BP.

    (d) <u>Return of Claims Information</u>.  Within thirty (30) days after the termination or expiration of this Agreement, Feinberg Rozen shall return, and shall cause its Subcontractors to return, to BP any and all Claims Information in its and their possession or control as to which Feinberg Rozen has concluded making all independent judgments regarding the processing of Claims.  The Claims Information shall be delivered to BP in such format as BP reasonably specifies.  BP shall thereafter not be subject to any restrictions or limitations whatsoever with respect to any such Claims Information, including in connection with the use, storage, handling, processing or administration thereof.

    (e) <u>Survival</u>.  Upon such termination, all rights and duties of the parties toward each other shall cease except:

      (i) that BP shall be obliged to pay, within thirty (30) days of the effective date of termination, all amounts owing to Feinberg Rozen and any of Feinberg Rozen's Subcontractors for Services performed prior to the termination date and related expenses, if any, in accordance with the provisions of Section 1 (Services and Compensation) hereof; and

      (ii) Sections 2 (Representations and Warranties), 3 (Indemnity), 4 (Confidentiality), 5(d)(i) (Document Retention Policy), 6(a) (Reporting), 6(b) (Access to Claim Files), 6(d) (Audit) and 6(e) (Compliance), 9 (Use of Trademarks), 10(d) (Return of Claims Information), 11 (Independent Contractor; No Agency), 14 (General), 15 (Definitions), and this Section 10(e) (Survival) shall survive termination or expiration of this Agreement in accordance with their terms.

  11. **INDEPENDENT CONTRACTOR; NO AGENCY**

  It is the express intention of the parties that Feinberg Rozen shall be an independent contractor throughout the Term of this Agreement.  Except as otherwise agreed to by the parties, nothing in this Agreement shall in any way be construed to constitute Feinberg Rozen as an agent or representative of BP, and Feinberg Rozen shall otherwise perform the Services hereunder as an independent contractor.  The execution of this Agreement shall not be construed to create an attorney-client relationship between BP and Feinberg Rozen, and the provision of

10

Services hereunder shall not constitute, or be otherwise construed to constitute, provision of legal advice from Feinberg Rozen, or any of its partners or employees, to BP.

12. **INSURANCE**

Feinberg Rozen represents that it currently has, and covenants that it will maintain during the Term, the following types and amounts of insurance policies: General Liability - $1,000,000 each occurrence/$2,000,000 general aggregate; Umbrella - $5,000,0000 limit; and Workers Compensation - $500,000 each accident/$500,000 policy limit/ $500,000 each employee. The current issuer of the General Liability and Umbrella policies is OneBeaconAmerica Insurance Company, and the current issuer of the Workers Compensation policy is Employers' Fire Insurance Company.

13. **EQUAL OPPORTUNITY**

As a federal government contractor, BP complies with the equal opportunity and affirmative action provisions of 41 C.F.R. §§ 60-1.4, 60-250.4, and 60-741.5, which collectively prohibit discrimination in employment on the basis of race, color, religion, sex, national origin, mental or physical disability, or status as a veteran of the Vietnam era. Feinberg Rozen is hereby put on notice Feinberg Rozen may have obligations under these same provisions.

14. **GENERAL**

(a) Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of New York, without reference to its choice of law rules. Any dispute, controversy or claim arising out of or relating to this Agreement shall be settled by binding arbitration in the manner described in this Section 14(a). The arbitration shall be conducted pursuant to the Commercial Rules of the American Arbitration Association ("***Rules***") then in effect. Notwithstanding those Rules, the following provisions shall apply to such arbitration: The arbitration shall be conducted by a panel of three arbitrators, with one arbitrator chosen by each of the parties and the third appointed by the other two arbitrators. If the two arbitrators are unable to agree on the third arbitrator, such third arbitrator shall be appointed in accordance with the Rules. The arbitrators selected in accordance with this Section 14(a) are referred to herein as the "***Panel***." The parties and the arbitrators shall use reasonable, diligent efforts to complete the arbitration within 60 days after the appointment of the Panel. The Panel shall, in rendering its decision, apply New York law, without reference to its choice of law rules, except that the interpretation and enforcement of this Section 14(a) shall be governed by the U.S. Federal Arbitration Act. The proceedings shall be in the English language and shall take place in New York, New York. The Panel shall issue its decision in writing, with an explanation of the bases for its decision. The fees of the Panel shall be shared equally by the parties.

(b) Assignment. Neither this Agreement nor any right or obligation hereunder or interest herein may be assigned, delegated or otherwise transferred by either party without the prior written consent of the other party, except that BP shall have the right to assign its rights and obligations hereunder to an Affiliate or in connection with a Loss Transfer Transaction (as defined below) without such consent.

11

(c)     Entire Agreement.  This Agreement is the entire agreement of the parties and supersedes any prior agreements between them, whether written or oral, with respect to the subject matter hereof.  No waiver, alteration, or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by duly authorized representatives of the parties hereto.

(d)     Attorneys' Fees.  In any court action, suit or proceeding at law or equity which is brought by one of the parties pursuant to Section 14(a), the prevailing party shall be entitled to reasonable attorneys' fees, in addition to any other relief to which such party may be entitled.

(e)     Severability.  The invalidity or unenforceability of any provision of this Agreement, or any terms thereof, shall not affect the validity or enforceability of this Agreement as a whole, which shall at all times remain in full force and effect.

(f)     Waiver.  Any waiver of the provisions of this Agreement or of a party's rights or remedies under this Agreement must be in writing to be effective.  Failure, neglect, or delay by a party to enforce the provisions of this Agreement or its rights or remedies at any time shall not be construed and shall not be deemed to be a waiver of such party's rights under this Agreement and shall not in any way affect the validity of the whole or any part of this Agreement or prejudice such party's right to take subsequent action.

(g)     Headings.  The article, section and subsection headings used in this Agreement are intended for reference purposes only and shall not affect the interpretation or construction of any provision of this Agreement.

(h)     Remedies Cumulative.  Unless expressly provided otherwise in this Agreement, all rights and remedies granted to each party hereunder are cumulative and in addition to, and not in lieu of, any other rights or remedies otherwise available to such party at law or in equity.

(i)     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

(j)     Third Party Payment Processing and Loss Transfer Transactions.  Feinberg Rozen agrees to cooperate in good faith with BP, provide all relevant information or records, and take all reasonable actions necessary for BP to (i) appoint a third party administrator of any Claims Payments or settlements that require more than one payment of funds to any Claimant, or (ii) to transfer its rights, obligations, and commitments related to the Claims (including this Agreement) to a third party in connection with a sale, transfer or assignment of the liabilities associated with the Claims, including a securitization transaction (a **"Loss Transfer Transaction"**).

(k)     Notices.  All notices and correspondence required to be given by this Agreement shall be delivered by hand or certified mail, return receipt requested and postage pre-paid, or by a nationally recognized courier service, or by facsimile transmission, and be addressed as follows:

12

If to BP:

    Mark Holstein, Esq.
    c/o Tara Lindsey
    BP Legal
    501 Westlake Park Boulevard
    Houston, Texas 77079
    Tel.: 281-366-8895
    FAX: 281-366-5901

With a copy to:

    Thomas H. Milch, Esq.
    Arnold & Porter LLP
    555 Twelfth Street, N.W.
    Washington, D.C. 20004
    Tel.: 202-942-5030
    FAX: 202-942-5999

If to Feinberg Rozen:

    Camille Biros
    Feinberg Rozen, LLP
    1455 Pennsylvania Avenue, N.W., Suite 390
    Washington, D.C. 20004-1008
    Tel.: 202-371-1110
    FAX: 202-962-9290

With a copy to:

    David B. Pitofsky, Esq.
    Goodwin Procter LLP
    The New York Times Building
    620 Eighth Avenue
    New York, New York 10018-6149
    Tel.: 212-813-8972
    FAX: 212-355-3333

15. **DEFINITIONS**

The following words and phrases have the following special meanings. Other words and phrases appearing in capital letters throughout this Agreement shall have the special meanings they are given with their first operative use.

"*Affiliate*" means a company or entity in which a party, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such party. "*Control*" and, with correlative meanings, the terms "*controlled by*" and "*under*

13

*common control with*" means (a) the power to direct the management or policies of an entity, whether through ownership of voting securities or by contract relating to voting rights or corporate governance, resolution, regulation or otherwise, (b) to own twenty percent (20%) or more of the outstanding voting securities or other ownership interest of such entity, or (c) if not meeting the preceding, the owning or controlling entity owns or holds (directly or indirectly) at the maximum control or ownership right permitted in the country where such entity exists.

"*BP Administered Claim*" means Governmental Claims, Vessel of Opportunity Claims and any other Claim administered, settled or otherwise resolved by BP other than through the GCCF Claims Process.

"*Business*" means any entity, company, corporation, partnership, limited liability company or other organization that conducts business operations (whether or not for profit) and is incorporated, organized, or otherwise existing under the laws of any state.

"*Claim*" means a separate monetary demand or claim made by any Individual or Business against BP or its Affiliates as relief for each alleged bodily injury or death, damage to real or personal property, removal and cleanup costs, lost profits and lost earning capacity, or loss of subsistence use of natural resources suffered or sustained by such Individual or Business as a result of the Event. Notwithstanding the foregoing, Claim does not mean any worker's compensation claims, claims relating to criminal proceedings, Governmental Claims, Vessel of Opportunity Claims, or fines and penalties assessed by a Governmental Authority.

"*Claim File*" means a compilation of information regarding a Claim in electronic, paper or other form.

"*Claim Fund*" means the trust fund established by BP pursuant to the Trust Agreement from which Claims Payments shall be made.

"*Claimant*" means an Individual or Business that has made a Claim against BP or any of its Affiliates related to or arising out of the Event.

"*Claims Payment*" means a payment from the Claim Fund, or an account or subaccount thereof, to a Claimant for any GCCF Administered Claim.

"*Claims Protocols*" means the protocols adopted by the GCCF with respect to the administration and settlement of Claims. The Protocol for Interim and Final Claims is set forth in Exhibit B hereto.

"*GCCF Administered Claim*" means a Claim administered or settled through the GCCF Claims Process. Such Claims shall not include BP Administered Claims.

"*GCCF Claims Process*" means the process for the administration and settlement of Claims by GCCF, established, in part, through the Claims Protocols.

"*Governmental Authority*" means (a) a United States federal or state government (including agencies or entities of any such government, such as the United States Coast Guard and Environmental Protection Agency), (b) a federal or state legislative body, (c) a state or

14

federal court, including administrative court, (d) a special master or mediator, appointed or approved by a federal or state court, government, governmental agency or entity, or federal or state legislative body, with power or authority over the processes and performance of BP in connection with the Event, and (e) successors to the foregoing.

"*Governmental Claim*" means a monetary demand or claim made by a Governmental Authority against BP or its Affiliates as relief for removal and clean up costs, lost government revenues, increased costs of public services, and damage to real or personal governmental property, or otherwise, in each case suffered or sustained by such Governmental Authority as a result of the Event.

"*Governmental Termination Action*" means (i) a formal or official recommendation, action, order, decree, ruling, or decision of a Governmental Authority, communicated in writing to BP, (x) recommending, requiring, ordering, decreeing, ruling or deciding that this Agreement be terminated, or (y) the terms of which materially adversely affect the performance of the Services hereunder, and (ii) a statute, regulation, rule or other law promulgated by a state or United States federal legislative body that mandates termination of the Agreement, or that otherwise materially adversely affects the performance of the Services hereunder.

"*Individual*" means a natural person.

"*OPA*" means the Oil Pollution Act of 1990, as amended.

"*Subcontract*" means a contract between Feinberg Rozen and a Subcontractor.

"*Subcontractor*" means an independent contractor, subcontractor, vendor or service provider retained by Feinberg Rozen to perform a portion of the Services hereunder, which contractor, subcontractor, vendor or service provider has been approved by BP, which approval shall not be unreasonably withheld. Such authorized Subcontractors shall be set forth on Exhibit G, as it may be amended from time to time by the parties. "Subcontractor" does not include any experts retained by Feinberg Rozen to provide advice to Feinberg Rozen, as opposed to Services hereunder.

"*Trust*" means the trust established pursuant to the Trust Agreement.

"*Trust Agreement*" means the Trust Agreement, dated as of August 6, 2010, between BP, as grantor, John S. Martin, Jr. and Kent D. Syverud, as individual trustees, and Citigroup Trust - Delaware, N.A., as corporate trustee.

"*Trustee*" means a trustee of the Trust.

"*Vessel*" means a boat, vessel, ship, hovercraft or other watercraft used principally at sea or on a waterway.

"*Vessel of Opportunity Claim*" means a separate monetary demand or claim made by an Individual or Business against BP or its Affiliates as relief for damage to a Vessel owned or leased by an Individual or Business, suffered or sustained as a result of use of such Vessel for

15

removal, clean up or containment efforts, on a "first responder" basis, in connection with the Event, as directed by BP.

"*Worley*" means Worley Catastrophe Response, LLC, Worley Catastrophe Services, LLC, and Worley Claims Services, LLC, collectively.

[*SIGNATURE PAGE FOLLOWS*]

16

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**BP Exploration & Production Inc.**

By: _____[signature]_____

Title: Director of Claims

Address: 501 Westlake Park Blvd
Houston, Texas 77079

**Feinberg Rozen LLP**

By: _____

Title: _____

Address: _____

17

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**BP Exploration & Production Inc.**

By: _____

Title: _____

Address: _____

**Feinberg Rozen LLP**

By: _[signature]_

Title: _Business Manager_

Address: _1455 Pennsylvania Ave N.W. Washington, DC 20004_

17

# EXHIBIT A

## SERVICES

Subject to the terms and conditions of the Agreement, Feinberg Rozen shall perform the following Services:

- **Claim intake services**, including maintenance of a call center, website and information technology systems to log, process and administer such intake.

- **Claim review services**.

- **Claim evaluation services**, including services of evaluators and other experts to determine losses and appropriate adjustments thereto.

- **Claim settlement and payment services**, including settlement of Claims and payments in settlement of Claims. Feinberg Rozen shall independently determine whether a given Claim is compensable and, if so, the appropriate amount of compensation. Feinberg Rozen's determinations with respect to OPA Claims will be guided by OPA and federal law. Determinations with respect to non-OPA Claims will be guided by applicable law. As the decisions of Feinberg Rozen regarding compensability of GCCF Administered Claims are independent, methodologies applied and decisions made by Feinberg Rozen in connection therewith shall not be deemed endorsed or concurred in by BP. All Claims Payments shall be made from the Claim Fund.

- **Claim administration services**, including maintenance of appropriate databases and information technology systems therefor.