# Exhibit K

# DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel 212 909 6000
www.debevoise.com

**Michael B. Mukasey**
Partner
Tel 212 909 6062
Fax 212 909 7062
mbmukasey@debevoise.com

*<u>Via Federal Express and e-mail</u>*

October 7, 2010

Kenneth R. Feinberg, Esq.
Feinberg Rozen, LLP
1455 Pennsylvania Avenue, NW
Suite 390
Washington, DC 20004-1008

Dear Mr. Feinberg:

    Enclosed please find one original and four copies of our memorandum reviewing the compensation arrangements between Feinberg Rozen, LLP and BP relating to the administration of the Gulf Coast Claims Facility.

    Thank you for selecting us for this important project.

Very truly yours,

*[signature]*

Michael B. Mukasey

New York • Washington, D.C. • London • Paris • Frankfurt • Moscow • Hong Kong • Shanghai

# DEBEVOISE & PLIMPTON LLP

Date  October 8, 2010

Memorandum to Feinberg Rozen, LLP

From   Michael B. Mukasey[1]

**Gulf Coast Claims Facility:
Feinberg Rozen, LLP's Compensation**

EXECUTIVE SUMMARY ........................................................................................................1

I. SCOPE OF ASSIGNMENT AND WORK PERFORMED ..................................3

II. BACKGROUND ..................................................................................................4

  A. The Oil Spill and Types of Injuries............................................................4

  B. The Compensation Fund ............................................................................5

  C. Retention of Feinberg Rozen, LLP ............................................................5

  D. Feinberg Rozen, LLP .................................................................................6

  E. Current Compensation Agreement ............................................................7

III. WHETHER THE METHOD OF COMPENSATION IS REASONABLE............8

  A. Flat Fees.....................................................................................................8

  B. Alternative Fee Arrangements ...................................................................9

IV. WHETHER THE AMOUNT IS REASONABLE................................................11

  A. Factor 1: The Time, Labor and Results Obtained by Counsel..................12

  B. Factor 2: The Novelty and Difficulty of the Assignment .........................13

  C. Factor 3: The Experience, Ability and Reputation of Feinberg Rozen ...................................................................................................................18

---

[1] Partner, Debevoise & Plimpton LLP. This memorandum has been written with the assistance of Lorna G. Schofield, also a partner of Debevoise & Plimpton LLP, and of Marjorie J. Menza, David W. Feder and John Nichols, associates of Debevoise & Plimpton LLP.

New York • Washington, D.C. • London • Paris • Frankfurt • Moscow • Hong Kong • Shanghai

|   | D. | Factor 4: The Preclusion of Other Employment Due to the Acceptance of the Project .................................................................. 21 |
|---|----|---|
|   | E. | Factor 5: The Undesirability of the Assignment ..................................... 22 |
|   | F. | Factor 6: Comparable Compensation ..................................................... 23 |
| V. | FUTURE WORK AND COMPENSATION .......................................................... 25 |
|   | A. | Nature and Extent of Future Work .......................................................... 25 |
|   | B. | Recommendation for Compensating Future Work ................................. 26 |

# EXECUTIVE SUMMARY

We were retained by Feinberg Rozen, LLP ("Feinberg Rozen" or the "Firm") to review the reasonableness of compensation the Firm is receiving from BP for administering the $20 billion Gulf Coast Claims Facility ("GCCF" or the "Facility"), and to recommend what adjustments, if any, should be made for future compensation. As described more fully below, the monthly fee the Firm receives covers all salaries of the partners and employees of the Firm who are working on the matter, as well as the Firm's related overhead. We have concluded that the current arrangement – a flat fee of $850,000 per month – is within the range of reasonable compensation for the initial phase of the GCCF engagement. For future work, we recommend that the parties consider adjusting the amount of compensation at agreed-upon intervals to ensure that it reflects adequately the level of engagement and resources required of the Firm.

On June 16, 2010, the White House and BP appointed Kenneth R. Feinberg to administer the independent GCCF, with the mandate to work quickly, fairly, and transparently to review damages claims from people and businesses affected by the Deepwater Horizon oil spill. Feinberg was in many ways the obvious choice to manage the GCCF, given his national reputation for resolving complex, high-profile disputes. Feinberg has settled the claims of Vietnam veterans injured by Agent Orange, families of the victims of the September 11th attacks and hundreds of thousands of others in products liability and other high-profile matters. His leanly staffed firm – Feinberg Rozen – has a combined 60 years of claims administration experience. This singular combination of expertise in large-scale claims administration work, national credibility, and centralized, responsive staffing qualified the Firm uniquely for the GCCF engagement.

The Firm's work on the GCCF is largely unprecedented. The assignment is to allocate the largest claims fund in American history and to do so under both intense time pressure and

public scrutiny. Submitted claims often have been poorly documented, difficult to assess or both. The Firm's core team has been working grueling hours, often six or seven days a week. Drawing on past experience, in relatively short order they have prepared the emergency protocol for claims evaluation, canvassed potential claimants, consulted with government and industry officials, transitioned the existing BP claims process, trained a small army of claims reviewers and set about reviewing the most complicated and/or controversial claims. In the seven weeks since the Facility began operation, the Firm has received 128,100 claims and approved 54,056 claims for payment, disbursing $1,049,223,614.71. The engagement commands a substantial commitment of the Firm's personnel and other resources, such that the Firm is severely limited in other engagements it can accept.

Despite the highly unusual aspects of the GCCF engagement, the Firm's fees to date are consistent with its compensation for roughly analogous previous engagements, and less than amounts earned by attorneys who bring the largest securities and torts cases. The amount fairly compensates the Firm for efforts expended on the GCCF and offsets the significant distortion of the Firm's business.

I.  **SCOPE OF ASSIGNMENT AND WORK PERFORMED**

On August 24, 2010, we were retained by Feinberg Rozen, LLP ("Feinberg Rozen" or the "Firm") to make an independent review of the compensation arrangement between the Firm and BP relating to the Firm's services in administering the Gulf Coast Claims Facility ("GCCF" or the "Facility"). In particular, we were retained to (1) review the reasonableness of Feinberg Rozen's compensation for its services in the initial phase of the GCCF administration, and (2) recommend what changes, if any, should be made to the compensation arrangement for subsequent phases of that administration.

In preparing this report, we reviewed among other things materials regarding the professional qualifications and experience of Feinberg Rozen, the Firm's compensation practices in other matters, and its retention for, and time and labor spent on, the GCCF project. We also researched the history and operations of the GCCF as well as compensation practices for third-party neutrals, special masters, class action counsel and others. We interviewed the seven professionals affiliated with the Firm who have worked on the GCCF project. We also interviewed two BP representatives, primarily regarding the retention of the Firm for the GCCF project. Feinberg Rozen has agreed to compensate us for our time and expenses at our usual billing rates in connection with this review.

Below, we provide background on the establishment of the GCCF, including the Firm's engagement. Next, we assess the current compensation arrangement between the Firm and BP in light of other possible fee arrangements. We then address whether the amount of compensation is reasonable, as applied to completed work. Finally, we discuss the nature and extent of future work to be performed on the GCCF and evaluate whether the method and amount of future compensation should be amended to reflect future work.

3

II. **BACKGROUND**

A. <u>The Oil Spill and Types of Injuries</u>

On April 20, 2010, the off-shore drilling rig, Deepwater Horizon, located in the Gulf of Mexico (the "Gulf") exploded, resulting in the deaths of 11 men and an oil spill from the Macondo well that lasted more than 80 days and released an estimated 5 million barrels of crude oil into the Gulf. On July 14, 2010, the wellhead for the Macondo well was temporarily capped, and on September 19, 2010, the well was declared permanently sealed.

The spill resulted in an immediate moratorium on commercial fishing in portions of the Gulf. That closure, still in effect for certain regions as of the date of this report, at one time affected the entire Eastern portion of the Louisiana coastline and all of the Mississippi and Alabama coastlines, reaching into a portion of the Florida panhandle. It is not known when areas that remain subject to the closure will be reopened for commercial fishing.[2] In Louisiana alone, an estimated 44,000 jobs depend on the fisheries. This includes crews on fishing boats, wholesalers and processing plant workers.

The spill also resulted in the closure of beaches along the Louisiana, Mississippi, Alabama and Florida panhandle coastlines. These beach closures occurred as early as May 2010 and lasted through much of the summer. According to news reports, hoteliers, restaurateurs and other business owners at or near the affected Gulf beaches saw significant declines in business over the summer, possibly attributable to the oil spill and the diversion of tourism to unaffected areas. Other Gulf Coast businesses reliant upon summer tourism in unaffected areas, such as in

---

[2] Shortly after the explosion, over 88,000 square miles of the Gulf were closed to fishing. As of October 5, 2010, 23,360 square miles of the Gulf remain closed. NOAA, Map of Closed Area, http://sero.nmfs.noaa.gov/sf/deepwater_horizon/BP_OilSpill_FisheryClosureMap_100510.pdf.

4

Southwest Florida, have reported cancellations by vacationers who anticipated the spill reaching those areas. Real estate agents in the Gulf region have reported decreased sales due to the spill.

In an effort to break up large oil slicks, chemical dispersant was released into the Gulf. The dispersant had its intended effect, but its long-term impact on the Gulf eco-system, in particular the fish, shrimp and mollusks harvested from the Gulf, are unknown. In addition, recent studies suggest that large underwater plumes of oil persist. The long-term effect of these plumes on the fisheries is also unknown.

B.  The Compensation Fund

On June 16, 2010, representatives of BP met with President Obama and agreed to establish a claims process, funded with $20 billion, to operate through 2013 to settle all Oil Pollution Act ("OPA") and tort claims arising out of the spill.[3] BP agreed to contribute $3 billion to the fund in the third quarter of 2010, with an additional $2 billion in the fourth quarter. Thereafter, BP will contribute $1.25 billion per quarter until $20 billion has been reached. The fund does not limit BP's liability, and BP has publicly committed to provide further funds should claims exceed $20 billion. In accordance with OPA, no claimant may obtain double recovery as against BP. It is expected that the Facility will accept claims for three years from the date on which the final protocol becomes operative.

C.  Retention of Feinberg Rozen, LLP

The same day the fund was announced, the White House and BP selected Kenneth R. Feinberg to serve as the administrator of what was called the claims facility. Prior to the White House announcement, Feinberg had risen to the top of a short list of independent claims

---

[3] Press Release, BP, BP Establishes $20 Billion Claims Fund for Deepwater Horizon Spill and Outlines Dividend Decisions (June 16, 2010), *available at* http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7062966.

5

administrators under consideration by BP. Feinberg has a national reputation in claims settlement dating back to 1984, when he was appointed the Special Settlement Master in the Agent Orange product liability litigation. Among other engagements, he has since served as the Special Settlement Master in the federal and state DES cases and as the Trustee administering the Dalkon Shield Claimants' Trust. More recently, he administered the $7 billion September 11th Victim Compensation Fund and the Hokie Spirit Memorial Fund established for those affected by the Virginia Tech shooting in April 2007.

### D. Feinberg Rozen, LLP

The White House Fact Sheet released the day Feinberg was appointed stated that "a new, independent claims process will be created with the mandate to be fairer, faster, and more transparent in paying damage claims by individuals and businesses" than the one quickly put in place by BP just after the spill began.[4] With this mandate, Feinberg assembled at his firm – Feinberg Rozen – a team of legal and business professionals with a combined 60 years of experience in claims administration. Although Feinberg was named administrator, Feinberg Rozen was actually retained to administer the GCCF. Feinberg Rozen is a small firm with a substantial practice in alternative dispute resolution or "ADR," broadly defined as bringing parties together to resolve contentious, high-stakes disputes. The Firm's GCCF team comprises most of its professionals: the Firm's two law partners, Kenneth R. Feinberg and Michael Rozen; a senior consulting attorney, Jacqueline E. Zins; a project manager, Camille S. Biros; and a director of special projects, David L. Feinberg. Because of the demands of the BP matter, the

---

[4] Press Release, The White House, FACT SHEET: Claims and Escrow (June 16, 2010), *available at* http://www.whitehouse.gov/the-press-office/fact-sheet-claims-and-escrow.

Firm also has hired two additional attorneys. Like the rest of the team working on the GCCF, their compensation is paid by the Firm, not by BP.

Feinberg Rozen's ADR practice is unique. The Firm has been appointed to administer the most high-profile claims processes this nation has seen. As part of this work, the Firm has drafted dozens of complex claims protocols, trained claims adjudicators – including administrative law judges – in hearing claims, and has heard thousands of claims ranging from property damage from Hurricane Katrina to the wrongful death claims resulting from the September 11th attacks. The Firm's work also has involved in-depth compensation analysis, as with Feinberg's appointment as the Special Master for TARP Executive Compensation, a review of compensation paid to certain executive officers of firms that received extraordinary TARP (Troubled Asset Relief Program) relief, and Feinberg Rozen's recent engagement to assess the professional fees charged to the Lehman Brothers estate in U.S. Bankruptcy Court in New York.

Kenneth R. Feinberg and Michael Rozen also are sought out to help parties reach global settlements and fairly allocate settlement proceeds in matters involving numerous claimants. The Firm works with banks and insurance companies to assist claimants in obtaining their funds on a timely basis, particularly from defendant corporations with liquidity constraints.

E. Current Compensation Agreement

At the inception of the engagement, the Firm insisted that its fees and disbursements be paid from money separate from the fund. This has been the practice thus far, and payment to the Firm is not provided for in the Trust Agreement that governs the $20 billion fund.

Under the current agreement between BP and the Firm, BP has agreed to pay the Firm $850,000 per month prospectively at the beginning of each month, plus disbursements, beginning in mid-June and ending October 1, 2010. All disbursements, including the cost of

7

subcontractors, are charged to BP at cost without any mark-up. BP and the Firm agreed to revisit this compensation arrangement beginning as of October 1, 2010.

III. **WHETHER THE METHOD OF COMPENSATION IS REASONABLE**

A. Flat Fees

The current compensation arrangement between the Firm and BP is for a flat fee payable monthly. Methods of compensation for arbitrators and mediators vary by engagement. For longer or more complex proceedings, arbitrators typically charge a flat daily rate, and mediators usually charge a daily or monthly rate, or a single negotiated fee for the entire matter. Claims administrators also customarily charge a flat monthly fee. These fees typically are billed on a prospective basis, at the outset of an assignment, representation or hearing.

Feinberg Rozen's usual practice is no different. The Firm usually negotiates at the outset of an engagement a flat fee for the work it performs, sometimes with a success fee payable at the end depending on the outcome.[5] For its mediation work, the Firm may negotiate a monthly fee or a flat fee for the entire matter. The Firm's strategic settlement work on behalf of particular clients is also charged on a flat fee basis. The Firm's special master work necessarily is performed under court supervision, but is generally billed on a flat fee basis. The Firm's claims administration practice is usually billed on a flat fee basis, with the amount typically subject to change over time. Depending on the matter, the initial stage of the Firm's work on a claims administration matter may be billed at a higher rate than later work. Although lawyers at the Firm keep time sheets reflecting the time they spend daily on a matter, this practice is usually for

---

[5] The Firm sometimes charges hourly or daily rates for its arbitration practice, where fees tend to adhere to those of the arbitration associations.

8