# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | **MDL No. 2179** |
| | **SECTION: J** |
| This document relates to Civil Action No. 12-970. | **JUDGE BARBIER** |
| | **MAGISTRATE SHUSHAN** |

## MEMORANDUM IN SUPPORT OF
## <u>BP's MOTION FOR RELIEF PURSUANT TO RULE 60(b)(3)</u>

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ............................................................................................................3

    A.    Watts Angles to Join the Plaintiffs' Steering Committee. ..................................3

    B.    BP Agreed in Settlement to Compensate More Than 50,000 Crew with Seafood Compensation Claims – More Than 76 Percent of Them Represented By Watts. ........................................................................5

    C.    The Seafood Compensation Program Provides for Two Distributions. ...........7

    D.    Watts Perpetrated the Fraud Using Stolen or Fictitious Social Security Numbers. ................................................................................10

I.    WATTS' FRAUD NECESSITATES RULE 60(B)(3) RELIEF. ...............................12

    A.    BP Has Established a Prima Facie Case (and More) of Fraud Warranting Discovery. ...................................................................14

    B.    The Fraud Prevented BP from Fully and Fairly Presenting Its Case During Settlement Negotiations. ........................................................16

II.    THE COURT SHOULD ORDER THE RETURN OF THE PORTION OF THE SEAFOOD FUND SURPLUS THAT WAS PROCURED BY FRAUD. ...........17

III.    IN THE ALTERNATIVE, THE COURT SHOULD ACT PURSUANT TO RULE 62.1 AND STATE THAT IT WOULD GRANT BP'S RULE 60(B)(3) MOTION. .............................................................................18

    CERTIFICATE OF SERVICE ...............................................................................21

## TABLE OF AUTHORITIES

**Federal Cases**

*AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) ........................................................ 20

*Conerly v. Flower*, 410 F.2d 941 (8th Cir. 1969) .......................................................... 21

*Cresswell v. Sullivan & Cromwell*, 668 F. Supp. 166 (S.D.N.Y. 1987) ...................................... 16

*Gov't Fin. Servs. One L.P. v. Peyton Place, Inc.*, 62 F.3d 767 (5th Cir. 1995)............................. 15

*H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115 (6th Cir. 1976)....................... 15

*Harre v. A.H. Robins Co.*, 750 F.2d 1501 (11th Cir. 1985).......................................................... 18

*Hesling v. CSX Transp., Inc.*, 396 F.3d 632 (5th Cir. 2005)................................................ 16, 19

*Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009) ........................................................ 20

*Lopez Dominguez v. Gulf Coast Marine & Assocs., Inc.*, 607 F.3d 1066 (5th Cir. 2010)............ 22

*Marcotte ex rel. Estate of Ortega v. Burlington N. Santa Fe Rail Corp.*, No. CIV-04-0836, 2007 WL 5685130 (D.N.M. Oct. 11, 2007)................................................................... 16, 20

*Rally Mfg., Inc. v. Mr. Gasket Co.*, No. 87-1533, 1992 WL 211010 (S.D. Fla. June 12, 1992) .. 18

*Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir. 1978)......................................... 15, 18, 19, 21

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396 (5th Cir. 1981) ........................................... 15, 16, 21

*United States v. City of New Orleans*, 731 F.3d 434 (5th Cir. 2013) ......................................... 19

*Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626 (N.D. Cal. 1978) ............................................... 15

**Other Authorities**

C. Robertson & J. Schwartz, "Many Hit by Spill Now Feel Caught in Claim Process," *The New York Times* (April 18, 2011). ................................................................................................... 4

G. Contreras, "Feds raid offices of BP plaintiff attorney," *Houston Chronicle* (Feb. 27, 2013), available at http://www.houstonchronicle.com/news/houston-texas/houston/article/Feds-raid-offices-of-BP-plaintiff-attorney-4311360.php ........................................................................ 13

Henry J. Friendly, *Federal Jurisdiction: A General View* (1973) ............................................... 19

**Federal Rules**

Fed. R. Civ. P. 60(b) ..................................................................................... 21

Fed. R. Civ. P. 60(b)(3)................................................................................. 15

Fed. R. Civ. P. 62.1 ................................................................................ 22, 23

**Court Filings in MDL 2179**

Doc. Nos. 3424–3444 ...................................................................................... 6

First Amended Compl. by Plaintiffs Tran Ngoc Dung, *et al.*, Oct. 19, 2010, Doc. No. 563.......... 4

Liaison Counsel Memo., July 6, 2011, Doc. No. 3142.................................... 5

Mot. to Appoint Counsel Mikal C. Watts to Plaintiffs' Steering Committee, Aug. 27, 2010, Doc. No. 106................................................................................................... 4

Opt-Out Letter, http://www.deepwaterhorizoneconomicsettlement.com/docs/Seafood_Opt-Out_Terms.pdf (last visited Dec. 16, 2013)......................................................... 5, 10

Order and J. Granting Final Approval of Economic and Property Damages Settlement and Confirming Class Certification of the Economic and Property Damages Settlement Class, Dec. 21, 2012, Doc. No. 8139 ..................................................................................... 1

Order, March 13, 2013, Doc. No. 8894 ......................................................... 6

Pretrial Order 24, Jan. 12, 2011, Doc. No. 982.............................................. 5

Pretrial Order 53, Sept. 10, 2012, Doc. No. 7350.......................................... 4

Pretrial Order 8, Oct. 8, 2010, Doc. No. 506 ................................................ 4

Settlement Agreement, Ex. 10, May 3, 2012, Doc. No. 6430 .................... 9, 10

Settlement Agreement, May 3, 2012, Doc. No. 6430–22............................. 11

**Court Filings in Other Cases**

Civil No. 10-08888, captioned *In re: Oil Spill by the Oil Rig "Deepwater Horizon" SHORT-FORM JOINDERS*, Doc. Nos. 676–40856, 40936–42457, 44311–46801, and 47801–52221 .. 5

Compl. by Plaintiffs Tran Ngoc Dung, *et al.*, June 3, 2010, Doc. No. 1-2, *Dung, et al. v. BP Exploration & Prod., Inc., et al.*, No. 2:10-CV-03178 (E.D. La.) (Barbier, J.)......................... 4

**Exhibits to This Filing**

Declaration of Richard Godfrey ("Godfrey Decl.") (attached as Exhibit 1) ................... 6, 7, 8, 10

Declaration of Mark Holstein ("Holstein Dec.") (attached as Exhibit 2) ............................... 6, 7, 8

Declaration of Dzmitry Asinski ("Asinski Decl.") (attached as Exhibit 3) ........................... 11, 12

Declaration of Maria Travis ("Travis Decl.") (attached as Exhibit 4) ................................... 12, 13

BP is pursuing two alternative avenues for relief.  In addition to this Motion seeking relief from a portion of the Court's December 21, 2012 judgment, BP has filed a complaint against Mikal Watts, the Watts Guerra law firm, and the class, including its named representatives,[1] *see* Complaint, *BP Exploration & Production, Inc., et al. v. Watts, et al.*, and accompanying Motion for a Preliminary Injunction Suspending the Second Distribution of the Seafood Compensation Program, which seeks interim relief during the pendency of that action.

## PRELIMINARY STATEMENT

Brazen fraud necessitates this Rule 60(b) motion – fraud that, if not remedied, stands to cost BP substantial sums and to hold the entire Seafood Compensation Program ("the Program") up to public ridicule.

This motion concerns the Program, which was established to compensate those persons and businesses most directly affected by the Deepwater Horizon Oil Spill, namely those who earn their livelihood from Gulf waters.  BP agreed to pay $2.3 billion into the Seafood Compensation Program, and it did so because the Plaintiffs' Steering Committee represented that there would be tens of thousands of persons and businesses who would make legitimate claims on the Program.  One lawyer alone, Mikal Watts, and his law firm, Watts Guerra LLP,[2] claimed to represent more than 40,000 deckhands who allegedly suffered economic injuries as a result of the Oil Spill.  Watts did not just claim to represent more than 40,000 potential claimants,

---

[1]   Order and J. Granting Final Approval of Economic and Property Damages Settlement and Confirming Class Certification of the Economic and Property Damages Settlement Class, Dec. 21, 2012, Doc. No. 8139.  Unless otherwise noted, all cited docket entries are from *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-MD-2179 (E.D. La.) (Barbier, J.).

[2]   We refer hereafter to Mikal Watts and his law firm collectively as "Watts."

however; he also filed 42,722 short-form joinders with the Court, allegedly on behalf of individual deckhands.  Watts' clients constituted more than 88 percent of the individual crew claimants who filed SFJs from the Gulf fishing industry.  No wonder, therefore, that BP was willing to pay so much.

What BP did not know then, but knows now, is that the overwhelming majority of the 42,722 claimants are almost certainly not clients of Watts – indeed, more than half that number are simply phantoms.  Of 42,722, less than 2 percent – just 648, to be exact – filed a claim under the Program. Who, then, are these other 42,074 persons who filed short form joinders?  When Watts filed them, BP did not believe that they were fraudulent.  But when in 2013 Watts submitted the 42,722 claims to the BP Claims Program ("BPCP") (plus another 1,000 or so claims for good measure),[3] BP began to check their Social Security Numbers ("SSNs").  And, in answer to the question "Who are these 42,722 claimants?" what BP found is that, for 40 percent of the claimants, the SSN belongs to a living person other than the named claimant.  For 13 percent, the SSN is incomplete or a "dummy" number (*e.g.*, 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).  For 5 percent, the Social Security number belongs to a dead person other than the named claimant.

Call it "identity theft" on a massive scale, or the wholesale fabrication of Social Security numbers for non-existent clients.  Two things are certain.  First, when Watts wanted to persuade BP that it should commit billions of dollars to the Seafood Compensation Program, he claimed 42,722 clients.  When it came to filing actual claims, he had a mere 648 clients, only 8 of whom have been found eligible for payment.  There is now every reason to think that the explanation

---

[3]    The BPCP is a separate program set up to address the claims of individuals and businesses not subject to the Settlement Agreement – either because of opt outs or otherwise.

for this glaring discrepancy is fraud.  Second, also certain is the fact that, had BP known that

Watts was misrepresenting the number of his clients, and even their very existence, BP would

have taken a different approach to settlement negotiations.

BP thus asks this Court (i) to suspend the second distribution from the Program during

the pendency of this Motion and (ii) to grant BP discovery and an evidentiary hearing regarding

the extent of Watts' fraud and how much of the balance of the Seafood Fund should be returned

to BP as a result of it.

## BACKGROUND

We explain below how the story unfolded.  The story itself is simple.  Watts claimed to

represent tens of thousands of persons, real or imagined, in order to persuade BP to pay more

into the Seafood Compensation Fund and to increase Mikal Watts' chances of obtaining a seat on

the Plaintiffs' Steering Committee.

### A.      Watts Angles To Join the Plaintiffs' Steering Committee.

Beginning in June 2010, Watts filed at least 25 complaints with this Court that were

consolidated with MDL 2179, purportedly on behalf of approximately 40,000 plaintiffs ("the

Watts claimants").[4]  Watts filed the first of these complaints on June 3, 2010.[5]  Thereafter, on

August 27, 2010, Mikal Watts filed a sworn and notarized application for membership on the

Plaintiffs' Steering Committee ("PSC"), claiming that he "ha[d] previously filed multiple civil

---

[4]  *See, e.g.*, First Amended Compl. by Plaintiffs Tran Ngoc Dung, *et al.*, Oct. 19, 2010, Doc.
     No. 563 (listing more than 3,000 plaintiffs).

[5]  Compl. by Plaintiffs Tran Ngoc Dung, *et al.*, June 3, 2010, Doc. No. 1-2, *Dung, et al. v. BP
     Exploration & Prod., Inc., et al.*, No. 2:10-CV-03178 (E.D. La.) (Barbier, J.).

actions in this litigation and currently represent[ed] over 40,000 plaintiffs."[6]  Mikal Watts thus

represented – both to BP and this Court – that he had many, many more clients than any other

attorney or law firm competing for a place on the Committee.  The Court appointed Mikal Watts

to the PSC.[7]  As *The New York Times* reported at the time, "Lawyers on such committees

typically reap a financial bonanza . . . ."[8]

    The Court thereafter adopted a procedure that allowed claimants to join the class action

complaint by filing a short-form joinder ("SFJ") rather than filing separate complaints.[9]  Watts

filed over 44,500 SFJs with the Court.[10]  Of the 44,500-plus Watts SFJs, 42,722 were allegedly

on behalf of individual seafood crew claimants.[11]  Only 5,998 other SFJs had been filed by other

---

[6]   Mot. to Appoint Counsel Mikal C. Watts to Plaintiffs' Steering Committee at 1, Aug. 27,
     2010, Doc. No. 106.

[7]   Pretrial Order 8, Oct. 8, 2010, Doc. No. 506; *see also* Pretrial Order 53, Sept. 10, 2012, Doc.
     No. 7350 (re-appointing the PSC, including Watts).

[8]   C. Robertson & J. Schwartz, "Many Hit by Spill Now Feel Caught in Claim Process," *The
     New York Times* (April 18, 2011).  The article also quoted Watts as telling the newspaper in
     an interview, "I have a signed contingency-fee contract with every client."  *Id.*

[9]   Pretrial Order 24, Jan. 12, 2011, Doc. No. 982.

[10]  *See* Liaison Counsel Memo., July 6, 2011, Doc. No. 3142 ("Approximately 107,000 short-
     form joinders have been entered on the docket, with the Watts Guerra firm accounting for
     44,510 of those filings."); *see also* Civil No. 10-08888, captioned *In re: Oil Spill by the Oil
     Rig "Deepwater Horizon" SHORT-FORM JOINDERS*, Doc. Nos. 676–40856, 40936–
     42457, 44311–46801, and 47801–52221 (the vast majority of the SFJs filed in these docket
     ranges were filed by Mikal Watts).

[11]  Opt-Out Letter at 2,
     http://www.deepwaterhorizoneconomicsettlement.com/docs/Seafood_Opt-Out_Terms.pdf
     (last visited Dec. 16, 2013) (listing 42,722 "Watts Individual/Crew Fishing SFJs").  This
     publicly accessible version of the Opt-Out Letter embodies the terms of the Opt-Out Letter

representatives on behalf of individual seafood crew claimants.[12]  Thus, Watts filed 88 percent of

the individual seafood crew claim SFJs.  Although Mikal Watts resigned from his position as a

member of the PSC on March 13, 2013,[13] he has not withdrawn from his "representation" of

these alleged clients.[14]

> **B.    BP Agreed in Settlement To Compensate More Than 50,000 Crew with Seafood Compensation Claims – More Than 76 Percent of Them Represented by Watts.**

BP and the PSC initiated global settlement discussions in spring 2011.  In the latter part

of February 2012, the idea of having a separate, capped fund for certain seafood related claims

arose.[15]  Intense negotiations followed, which ultimately established the groundwork for the

Seafood Compensation Program.[16]

# REDACTED

---

submitted jointly by BP and the PSC to the Court on April 17, 2012.  BP refers to this publicly accessible version because the official letter was filed under seal and is not reflected in any docket entry in MDL 2179.

[12]  *Id.*

[13]  Order, March 13, 2013, Doc. No. 8894.

[14]  Mikal Watts did withdraw from the representation of 142 plaintiffs in a series of filings on July 25, 2011.  *See* Doc. Nos. 3424–3444.  He did not, however, withdraw from his alleged representation of the remaining plaintiffs, who still numbered in excess of 40,000.

[15]  Declaration of Richard Godfrey ("Godfrey Decl.") ¶ 7 (attached as Exhibit 1).

[16]  Declaration of Mark Holstein ("Holstein Dec.") ¶ 5 (attached as Exhibit 2).

# REDACTED

---

[17]   Although BP does not believe punitive damages would have been applicable in this case, it recognized that the Court ruled that punitive damages were available for general maritime law claimants.  *See* Order & Reasons, Aug. 26, 2011, Doc. No. 3830.

[18]   Holstein Decl. ¶¶ 5–6; Godfrey Decl. ¶¶ 8–9.

[19]   Holstein Decl. ¶ 7; Godfrey Decl. ¶ 8.

[20]   Godfrey Decl. ¶ 9.

[21]   Holstein Decl. ¶ 8; Godfrey Decl. ¶ 10.

[22]   Godfrey Decl. ¶ 11.

REDACTED

**C.**     **The Seafood Compensation Program Provides for Two Distributions.**

REDACTED

The end result was the Seafood Compensation Program, Exhibit 10 to the final Settlement Agreement submitted to the Court for approval in May 2012.[27]

The Seafood Compensation Program contemplated two major distributions.  In the first round, the Court Supervised Settlement Program would review all claims, determine their

---

[23]   Holstein Decl. ¶ 9.

[24]   Godfrey Decl. ¶ 12.

[25]   Holstein Decl. ¶ 10; Godfrey Decl. ¶ 13.

[26]   Godfrey Decl. ¶ 14.

[27]   Settlement Agreement, Ex. 10, May 3, 2012, Doc. No. 6430–22.

validity, and pay out compensatory awards.  Regarding the first distribution, the parties

"estimated [it] to result in prompt claims payments totaling more than $1.9 billion."[28]  The

second round of distributions would occur only "[i]n the event there are Seafood Compensation

Program Amount funds remaining."[29]  The Program would distribute any such funds "to

claimants that received compensation from the Seafood Compensation Program" in the first

round "in proportion to the Claimant's gross compensation expressed as a share of the gross

compensation paid by the Claims Administrator to all claimants under the Seafood

Compensation Program," or by a distribution that the Seafood Neutral determines "would be

more appropriate in light of the information available at the time of the second distribution,"

subject to this Court's approval.[30]  Thus, the Court continues to supervise the distribution of the

Seafood Fund.

　　　If there is money left in the Seafood Fund after the first round of distributions, then, this

structure provides a premium to those claimants who received compensation in the first

distribution.  But if the number of legitimate claimants is unexpectedly small, then the structure

provides not a premium, but a windfall to the claimants who received compensation in the first

round.  The opt-out feature of the settlement reduces the potential for such a windfall.[31]  The opt-

out terms provide for a credit against the $2.3 billion fund if a number of claimants (above a

---

[28]　*Id.* at 3.

[29]　*Id.*

[30]　*Id.*

[31]　Settlement Agreement, § 8.2, May 3, 2012, Doc. No. 6430-22; Opt-Out Letter, http://www.deepwaterhorizoneconomicsettlement.com/docs/Seafood_Opt-Out_Terms.pdf (last visited Dec. 16, 2013).

certain threshold) opts out.

# REDACTED

        In connection with this opt-out provision, the parties attached a chart which identified the "Number of Potential Claimants in Gulf Fishing Industry." It added the number of "Watts Individual/Crew Fishing SFJs" (42,722) to the number of "Non-Watts Individual/Crew Fishing SFJs" (5,998), and added an additional 7,000 "Assumed New Individual/Crew Fishing SFJs" to reach a total of 55,720 "Total Crew Claimants."[33] Had 42,000 claimants from the list of "Watts Individual/Crew Fishing SFJs" opted out, BP would have received back a substantial portion of the $2.3 billion it paid into the Seafood Fund. But, of course, virtually none of Watts' phantom claimants and "clients" who are not really clients have opted out.[34] In fact, Watts only filed a very small number of opt outs.

        In this way, Watts' claim that he represented more than 40,000 claimants, including his filing of SFJs far in excess of that number of claimants, inflated the value of the Seafood Compensation Program to $2.3 billion. But when fewer than 1,000 persons from that group filed

---

[32]   Godfrey Decl. ¶ 17.

[33]   Opt-Out Letter at 2, http://www.deepwaterhorizoneconomicsettlement.com/docs/Seafood_Opt-Out_Terms.pdf (last visited Dec. 16, 2013).

[34]   *See* Settlement Agreement, § 8.2.1, May 3, 2012, Doc. No. 6430–22 (the procedure for properly opting out of the Settlement Agreement requires a class member to submit a written request to opt out, which must be signed by the natural person or entity seeking to opt out, and cannot be signed by the class member's attorney).

claims, and the other 42,000 Watts "clients" did not opt out, Watts' phantom clients created an unjustifiable, fraud-based windfall for the first-round claimants.

### D.   Watts Perpetrated the Fraud Using Stolen or Fictitious Social Security Numbers.

To date, there have been only 24,520 Seafood Compensation Program claims filed. Of these, 4,491 were individual seafood crew member claims. The Seafood Fund has distributed $1.05 billion in the first round, not $1.9 billion.[35]

Watts ultimately filed only 648 individual crew claims under the Seafood Compensation Program – less than 2 percent of the number of claimants he purported to represent.[36] Of those 648 claimants, only 8 have been found eligible for payment, with 17 claims still pending and available for possible compensation.[37] In short, more than 98 percent of the Watts claimants never even filed a claim with the Seafood Compensation Program, while 96 percent of the claims that he did file have been denied. The deadline for filing claims has passed.

But in January 2013, Watts filed 43,976 claims with the BP Claims Program ("BPCP") – a program set up to address the claims of individuals and businesses who are excluded from the Settlement Agreement, or who have validly exercised their legal right to opt out of the Settlement Agreement, or who wish to pursue claims that are expressly reserved to them pursuant to the Settlement Agreement.[38] Virtually all of the Watts claims submitted to the BPCP

---

[35]   Declaration of Dzmitry Asinski ("Asinski Decl.") ¶¶ 5–6 (attached as Exhibit 3).

[36]   *Id.* ¶ 7.

[37]   *Id.*

[38]   Declaration of Maria Travis ("Travis Decl.") ¶ 2 (attached as Exhibit 4).

corresponded to the SFJs filed with the Court.[39]  As purported members of the class, it is unclear

on what basis Watts filed these claims with the BPCP.  But in any event he did, and when the

BPCP sought to verify these SSNs,[40] it could confirm the identity of only 42 percent of the Watts

claimants.[41]  Of the remaining SSNs:

- 40 percent belong to living persons other than the named claimant;[42]

- 13 percent are incomplete or "dummy" numbers (*e.g.*, 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);[43] and

- 5 percent belong to a dead person other than the named claimant.

While attempting to verify the identities of these claimants, the BPCP discovered that one

of its own employees – who was not a commercial fisherman, had never retained Watts as

counsel, and had never filed a claim – had been included among Watts' client list not once, but

twice.[44]  His first "claim" included his name, current address, a defunct phone number, and a

wholly incorrect SSN.  His second "claim" included his name, his parents' address, his parents'

phone number, and a different, incorrect SSN.[45]

---

[39]  *Id.* ¶¶ 3–4.

[40]  *Id.* ¶¶ 5–6.

[41]  This is not to say that those claimants recovered, but rather simply that those claimants had a valid SSN that matched their name or other identifying information.

[42]  The SSN was typically associated with a name completely different from that on the claim form, or, if the name bore some similarity, no other information (*e.g.*, a current or past address) matched that on the claim form.  *See id.* ¶ 6.

[43]  *Id.* ¶ 7.

[44]  *Id.* ¶ 8.

[45]  *Id.*

It is bad enough that Watts filed fraudulent SFJs with the Court and BPCP claims for at least 58 percent of the claimants.  But even among the 42 percent of claims with matched names and SSNs, *more than 95 percent* never filed a claim with the Program.  The inference of fraud is overwhelming.

There apparently is an investigation by the United States Department of Justice. According to several news reports, in February 2013, the Secret Service executed search warrants at Mikal Watts' two law offices in San Antonio, Texas.  Per the reports, the searches were the result of a "federal investigation over the legitimacy of his client list in a case stemming from the deadly 2010 BP oil spill."[46]  Mikal Watts resigned from the PSC shortly after these searches, and the Court ordered his removal.[47]

## ARGUMENT

## I.    WATTS' FRAUD NECESSITATES RULE 60(b)(3) RELIEF.

Justice demands that BP receive relief from that portion of the judgment that resulted from Watts' barefaced fraud.  BP thus asks this Court (i) to suspend the second distribution of the Seafood Fund during the pendency of this Motion and (ii) to grant BP discovery regarding the full extent of Watts' fraud and what portion of the Seafood Fund should be returned to BP as a result of it.

Rule 60(b) permits the Court to relieve a party from a judgment based on "fraud . . . , misrepresentation, or misconduct by an opposing party."  Fed. R. Civ. P. 60(b)(3).  Discovery

---

[46]   G. Contreras, "Feds raid offices of BP plaintiff attorney," *Houston Chronicle* (Feb. 27, 2013), available at http://www.houstonchronicle.com/news/houston-texas/houston/article/Feds-raid-offices-of-BP-plaintiff-attorney-4311360.php

[47]   *See* Order, Mar. 13, 2013, Doc. No. 8894.

under Rule 60(b) is warranted upon a prima facie showing of fraud, misrepresentation, or misconduct.  *See H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1118 (6th Cir. 1976); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 647 (N.D. Cal. 1978), *aff'd per curiam*, 645 F.2d 699 (9th Cir. 1981).  And a party is entitled to permanent relief if it "establish[es] by clear and convincing evidence (1) that the adverse party engaged in fraud or other misconduct and (2) that this misconduct prevented the moving party from fully and fairly presenting his case."  *Gov't Fin. Servs. One L.P. v. Peyton Place, Inc.*, 62 F.3d 767, 772 (5th Cir. 1995) (internal quotation marks omitted); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978).

Rule 60(b) must "be liberally construed in order to do substantial justice."  *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981); *see also Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir. 2005).  Although "finality is an important goal, the justice-function of the courts demands that it must yield, in appropriate circumstances, to the equities of the particular case in order that the judgment might reflect the true merits of the cause."  *Seven Elves*, 635 F.2d at 401.  That the judgment here was the product of a settlement is of no moment.  *ex rel. Estate of Ortega v. Burlington N. Santa Fe Rail Corp.*, No. CIV-04-0836, 2007 WL 5685130, at *18 (D.N.M. Oct. 11, 2007) ("Nothing in the language of rule 60(b) precludes an action for fraud in connection with a settlement."); *see also Cresswell v. Sullivan & Cromwell*, 668 F. Supp. 166, 172 (S.D.N.Y. 1987) ("[T]he importance of finality does not override the important policy of deterring fraud, in the settlement of lawsuits as well as other transactions.").

A.     **BP Has Established a Prima Facie Case (and More) of Fraud Warranting Discovery.**

The facts shout fraud.  Tens of thousands of Watts "clients" have proved to be phantom claimants.  That fact alone establishes a prima facie case of fraud warranting discovery.  Indeed, BP respectfully submits that the evidence already meets the clear and convincing standard warranting ultimate relief.

Substantial, reliable evidence supports the conclusion that Watts perpetrated fraud on BP and the Court.

# REDACTED

These claimants constituted more than 76 percent of the total individual crew claimants that the Seafood Compensation Program was expected to compensate.  Yet only 648 Watts claimants ultimately filed for recovery from the Program – fewer than 2 percent of the number Watts claimed to represent.  Subsequent events explain why.  When the BPCP attempted to verify the Watts claimants' Social Security numbers, it discovered that thousands of Watts' would-be claimants utilized Social Security numbers of deceased persons, and likely do not exist.  Some of those who *do* exist have denied hiring Watts to represent them.  The controversy surrounding Watts' client list has drawn scrutiny from the press and prompted investigation by federal law enforcement.  Taken together, these facts provide clear and convincing evidence of fraud.

# REDACTED

REDACTED   Absent fraud, there is no question but that BP would have been in a significantly different negotiating position.

The courts have afforded Rule 60(b)(3) relief where the evidence of fraud or misconduct, as here, concerns a fundamental aspect of the case.  In *Rozier*, 573 F.2d 1332, the fraud concerned the failure to produce a relevant document and the failure to correct written discovery responses stating that the information in the document did not exist.  The Fifth Circuit reversed the denial of Rule 60(b)(3) relief, stating that the defendant's fraudulent concealment had "completely sabotaged" the judicial process and "accomplished little more than the adjudication of a hypothetical fact situation imposed by [defendant's] selective disclosure of information." *Id.* at 1346.  The Eleventh Circuit reversed the denial of a Rule 60(b)(3) motion based on the false testimony of the defendants'' expert where the defendants' attorneys knew or should have known the testimony was false.  *Harre v. A.H. Robins Co.*, 750 F.2d 1501, 1503–04 (11th Cir. 1985), *opinion vacated in part on other grounds per curiam*, 866 F.2d 1303 (11th Cir. 1989); *see also Rally Mfg., Inc. v. Mr. Gasket Co.*, No. 87-1533, 1992 WL 211010, at *5 (S.D. Fla. June 12, 1992) (granting relief where the plaintiff concealed his relationship as the prospective employer of defendant's former employee when the employee testified at trial).

*Rozier* involved the suppression of a single document, and, *Harre*, the false testimony of a single witness.  Here, the act of fraud can be multiplied 40,000 times.  Watts' fraudulent representations that tens of thousands of his clients were prepared to proceed against BP, when in fact less than 2 percent of those appear legitimate, warrant the Court staying the second distribution under Rule 60(b)(3) and granting discovery in order to determine the extent of the fraud and what portion of the Seafood Fund should be returned to BP as a result.

15

### B.   The Fraud Prevented BP from Fully and Fairly Presenting Its Case During Settlement Negotiations.

The evidence also demonstrates that Watts' fraud put BP on unfair footing during settlement negotiations and led it to take an approach to negotiations that it otherwise would not have taken.

"Rule 60(b)(3) asks whether the moving party had a "full and fair" opportunity to present its case – *i.e.*, to make its strongest argument.  The standard applies to settlements as well as trial verdicts.  *Rozier*, 573 F.2d at 1339; *United States v. City of New Orleans*, 731 F.3d 434, 442–43 (5th Cir. 2013).  The Rule in either case "'is aimed at judgments which were unfairly obtained.'" *Hesling*, 396 F.3d at 641 (quoting *Rozier*, 573 F.2d at 1339).  In the settlement context, "[t]he Court must decide whether [the alleged misconduct] substantially interfered with [plaintiff's] ability to fully and fairly enter into settlement negotiations."  *Marcotte*, 2007 WL 5685130, at *22.

# REDACTED

Courts have long acknowledged the inherent "risk of 'in terrorem' settlements that class actions entail." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1752 (2011).  The risk, which exists because, "[w]hen the potential liability created by a lawsuit is very great, even though the probability that the plaintiff will succeed in establishing liability is slight, the defendant will be under pressure to settle rather than to bet the company," *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 678 (7th Cir. 2009); Henry J. Friendly, *Federal Jurisdiction: A General View* 120 (1973).  Any defendant that learns that tens of thousands of plaintiffs are lining up against it has "good reason" to settle, if nothing else because settlement avoids "protracted and costly litigation" where, if liability were established,

"determining the value of [thousands of claimants'] claims" would require "thousand[s of] separate hearings." *Kohen*, 571 F.3d at 678.

This is exactly what happened.

<br/>

# REDACTED

<br/>

In short, there is no question but that BP can readily demonstrate that the misrepresentations substantially prejudiced its ability to "fully and fairly" present its case in settlement negotiations.

## II.      THE COURT SHOULD ORDER THE RETURN OF THE PORTION OF THE SEAFOOD FUND SURPLUS THAT WAS PROCURED BY FRAUD.

Once the full extent of Watts' misconduct has been brought to light, this Court should exercise its discretion to grant BP relief pursuant to Rule 60(b). *See Rozier*, 573 F.2d at 1346; *see also Seven Elves*, 635 F.2d at 402.  The Court has "broad discretion as to the type of relief it might grant," *Conerly v. Flower*, 410 F.2d 941, 944 (8th Cir. 1969), and Rule 60(b) expressly authorizes it to impose "just terms," *see* Fed. R. Civ. P. 60(b), *Conerly*, 410 F.2d at 944.  In this case, justice demands that the Court order the return of some portion of the $1.3 billion surplus remaining in the Seafood Fund, which was procured by fraud.

### III.  IN THE ALTERNATIVE, THE COURT SHOULD ACT PURSUANT TO RULE 62.1 AND STATE THAT IT WOULD GRANT BP'S RULE 60(b)(3) MOTION.

If the Court determines that it lacks jurisdiction to grant BP's Rule 60(b)(3) motion pending the Fifth Circuit's resolution of the pending appeals from this Court's approval of the settlement (5th Cir. No. 13-30095), it should issue a ruling stating that it would grant BP's Rule 60(b)(3) motion.  *See* Fed. R. Civ. P. 62.1.[48]  The Court has the power to issue an indicative ruling pursuant to Rule 62.1, and to advise the Fifth Circuit that it would grant BP's Rule 60(b)(3) motion if the Court of Appeals remands for that purpose.  *See* Fed. R. Civ. P. 62.1(a)(3); *Lopez Dominguez v. Gulf Coast Marine & Assocs., Inc.*, 607 F.3d 1066, 1074 (5th Cir. 2010) ("[I]f [the Court] indicates that it will grant the [Rule 60(b)] motion, the appellant may then

---

[48] Rule 62.1 provides:

(a) **Relief Pending Appeal.**  If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:

   (1) defer considering the motion;

   (2) deny the motion; or

   (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

(b) **Notice to the Court of Appeals.**  The movant must promptly notify the circuit clerk under Federal Rule of Appellate Procedure 12.1 if the district court states that it would grant the motion or that the motion raises a substantial issue.

(c) **Remand.**  The district court may decide the motion if the court of appeals remands for that purpose.

Fed. R. Civ. P. 62.1.

make a motion in the Court of Appeals for a remand of the case in order that the district court

may grant such motion." (alteration and internal quotation marks omitted)).  In the alternative,

the Court should advise the Fifth Circuit that BP's Motion at least raises a "substantial issue"

under Rule 60(b)(3).  *See* Rule 62.1(a)(3).

**CONCLUSION**

Fraud is fraud, and it never should be permitted, much less rewarded.  Accordingly, this

Court should grant preliminary, interim relief by suspending the second distribution from the

Program during the pendency of this Motion and grant BP discovery and an evidentiary hearing

regarding the extent of Watts' fraud, and how much of the balance of the Seafood Fund should

be returned to BP as a result of it.


December 17, 2013

                                                    Respectfully submitted,


James J. Neath                              ___/s/ Kevin M. Downey_____
Mark Holstein                               Kevin M. Downey
BP AMERICA INC.                             F. Lane Heard III
501 Westlake Park Boulevard                 Margaret A. Keeley
Houston, TX  77079                          WILLIAMS & CONNOLLY LLP
Telephone:  (281) 366-2000                  725 Twelfth Street, N.W.
Telefax:  (312) 862-2200                    Washington, D.C. 20005
                                            Telephone:  (202) 434-5000
                                            Telefax:  (202) 434-5029

19

| | |
|---|---|
| Daniel A. Cantor | _/s/ Don K. Haycraft_ |
| Andrew T. Karron | S. Gene Fendler (Bar #05510) |
| ARNOLD & PORTER LLP | |
| 555 Twelfth Street, NW | |
| Washington, DC 20004 | Don K. Haycraft (Bar #14361) |
| Telephone:  (202) 942-5000 | R. Keith Jarrett (Bar #16984) |
| Telefax:  (202) 942-5999 | LISKOW & LEWIS |
| | 701 Poydras Street, Suite 5000 |
| | New Orleans, Louisiana 70139 |
| Robert C. "Mike" Brock | Telephone:  (504) 581-7979 |
| COVINGTON & BURLING LLP | Telefax:  (504) 556-4108 |
| 1201 Pennsylvania Avenue, NW | |
| Washington, DC 20004 | |
| Telephone:  (202) 662-5985 | Richard C. Godfrey, P.C. |
| Telefax:  (202) 662-6291 | J. Andrew Langan, P.C. |
| | David J. Zott, P.C. |
| | Jeffrey J. Zeiger |
| Jeffrey Lennard | Wendy L. Bloom |
| Keith Moskowitz | KIRKLAND & ELLIS LLP |
| DENTONS US LLP | 300 North LaSalle Street |
| 233 South Wacker Drive | Chicago, IL 60654 |
| Suite 7800 | Telephone:  (312) 862-2000 |
| Chicago, IL  60606 | Telefax:  (312) 862-2200 |
| Telephone:  (312) 876-8000 | |
| Telefax:  (312) 876-7934 | Jeffrey Bossert Clark |
| | Steven A. Myers |
| **_OF COUNSEL_** | KIRKLAND & ELLIS LLP |
| | 655 Fifteenth Street, N.W. |
| | Washington, D.C. 20005 |
| | Telephone:  (202) 879-5000 |
| | Telefax:  (202) 879-5200 |

**_ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY_**

20

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 17th day of December, 2013.

　　　　　　　　　　　　　　　　　　　　　　 _/s/ Don. K. Haycraft_
　　　　　　　　　　　　　　　　　　　　　　 Don K. Haycraft

21