# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * <br> * <br> * <br> * | MDL NO. 2179 <br><br> SECTION J |
| This document relates to: <br> All Cases and No. 12-970 | * <br> * <br> * <br> * | <br> HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF RICHARD C. GODFREY

I, Richard C. Godfrey, do hereby declare that the following statements made by me under oath are true and accurate to the best of my knowledge, information and belief:

1.      I serve as counsel for BP Exploration & Production Inc. and BP America Production Company, along with other BP entities who have been named as defendants in the above-captioned litigation (collectively, "BP"). I am a senior partner in the law firm of Kirkland & Ellis LLP. For more than 30 years, the focus of my practice has been complex litigation, including representing corporate defendants in trial and appellate courts in multiple putative class actions. I make this Declaration based upon my own personal knowledge.

2.      The Economic Loss and Property Damages Settlement Agreement ("Settlement Agreement"), as amended on May 2, 2012 (Rec. Doc. 6430-1),[1] was the result of many months of arm's-length negotiations between counsel representing the Plaintiffs' Steering Committee ("PSC" or "Class Counsel") and BP and its counsel. I served as the lead outside counsel for BP and participated in the settlement discussions and negotiations. These negotiations first commenced in or about the first half of 2011 and concluded in April 2012.[2]

3.      I was not directly involved in drafting the "Seafood Compensation Program" set forth in Exhibit 10 to the Settlement Agreement. Nor do I recall discussing the Seafood Compensation Program with Mr. Watts, as I do not recall him personally participating in the settlement negotiations. However, I was involved in various discussions with the PSC

---

[1]  All "Rec. Doc." Numbers refer to MDL 2179.

[2]  I previously submitted a Declaration on August 13, 2012 that outlined the history of the Economic Loss and Property Damages Settlement negotiations, including dates of meetings and participants. (*See* Declaration of Richard C. Godfrey, Rec. Doc. 7114-9.)

(principally, although not exclusively, with Mr. Rice and Mr. Fayard) concerning the goals and basic approach for what became the Seafood Compensation Program.

4.     The negotiations with respect to the Seafood Compensation Program that led to an Agreement-in-Principle dated March 2, 2012 occurred during a series of in-person meetings in New Orleans in late February 2012.   In the Agreement-in-Principle, the precursor to what became the Settlement Agreement's Seafood Compensation Program is referred to as the "Seafood Program."

5.     While a number of individuals from or associated with the PSC were involved in the negotiations from time to time, I, along with others from or representing BP discussed the goals and basic approach for the Seafood Program principally (although not exclusively) with Mr. Joseph Rice of Motley Rice LLC and Mr. Calvin Fayard of Fayard & Honeycutt.[3]

6.     These PSC representatives who directly participated in the negotiations told us that they had been in communication over time with other members of the PSC, including as I recall it, Mr. Watts.

7.     Toward the end of the negotiations which eventually led to the March 2 Agreement-in-Principle, the concept of having a separate Seafood Program (a capped compensation fund) for seafood-related claims arose.   Intense negotiations followed, initially over the course of February 23-25, 2012, which ultimately led to the Seafood Program set forth in the March 2 Agreement-in-Principle.

---

[3]   *See* my August 13, 2012 Declaration (Rec. Doc. 7114-9) for a list of other individuals involved.  I also participated in settlement discussions at various points in time with other PSC lawyers such as Mr. James Roy of Domengeaux, Wright, Roy & Edwards, L.L.C., and Mr. Stephen Herman of Herman, Herman, Katz & Cotlar L.L.P., but my recollection is that my involvement in the Agreement-in-Principle Seafood Program discussions principally involved Messrs. Rice and Fayard for the PSC, although I also recall that at various points during this time period Magistrate Judge Shushan was involved in assisting the parties' negotiations.

8.      A significant part of these negotiations at this stage focused on the amount of the cap and who would be in or covered by the Seafood Program's capped fund. During the negotiations, BP insisted that the Seafood claims of various individuals (such as crew), including Mr. Watts' clients, be included in the class and covered by any capped seafood fund.  The PSC, on the other hand, took the position that Watts' 40,000 plus clients and certain individuals (crew) should be excluded from any Seafood Program's capped fund and thus should be allowed to claim under other non-capped provisions of the settlement that BP was negotiating with them. Ultimately, as reflected in Exhibit 10 of the Settlement Agreement, individuals included in the Seafood Compensation Program are Commercial Fishermen, Seafood Boat Captains, all other Seafood Crew, Oyster Leaseholders and Seafood Vessel Owners (all as defined in Exhibit 3 to the Settlement Agreement) with economic loss claims relating to Seafood.[4]

9.      Mr. Watts' name was specifically invoked by both sides during the negotiations. BP made clear to the PSC that it did not want to agree to a Seafood Program capped fund only to find out later that Mr. Watts opposed the deal, or that Mr. Watts' clients and certain other individual claimants were not covered by the Seafood Program's capped fund.  Put simply, BP's monetary offers for the Seafood Program's capped fund were intended to cover the Seafood claims made by individuals, including crew, such as Mr. Watts' clients.  BP explained that to the PSC during the negotiations.  BP recognized that any individual client of Mr. Watts or any other lawyer could opt out of the Seafood Program or the settlement in its entirety, but BP wanted

---

[4] Exhibit 10 to the Settlement Agreement expressly acknowledges that individual claimants who make claims and/or receive compensation under the Seafood Compensation Program are not precluded from making an independent claim for and/or receiving compensation for other of the Settlement Benefits in the Settlement Agreement unrelated to claims covered by the Seafood Compensation Program.  *See* Exhibit 10, pp. 029147-48.

assurances from the PSC that the entire PSC, including Mr. Watts, would agree to and support the settlement and its Seafood Program's capped fund.

10.     BP never backed off its insistence that the Seafood claims of various individuals (such as crew), including the Watts plaintiffs, be included in the Seafood Compensation Program.  BP explained to the PSC negotiators that it was important to BP that those individuals, if they had a Seafood claim, could make a claim for compensation only under the Seafood Program's capped fund.  The negotiations progressed with BP steadily increasing the amount it was willing to pay into the Seafood Program's capped fund.  But with each increased offer BP made, it made clear that the offer must include compensation of individual claimants, including Mr. Watts' clients.  The PSC countered with demands that excluded certain individual claimants (crew), such as Mr. Watts' clients, from the Seafood Program's capped fund.

11.     On February 24, 2012, BP increased its prior offer for the Seafood Program's capped fund to $1.6 billion, including individual claimants, such as crew.  The PSC's counteroffer was $3.25 billion, excluding certain individual claimants (crew).  At some point on February 24, my recollection is that Magistrate Judge Shushan became involved in these negotiations.  On February 25, I recall that BP increased its offer to $2.1 billion, again including individuals, such as crew like Mr. Watts' clients. The PSC responded with a $2.55 billion counteroffer, still excluding certain individuals (crew).

12.     On February 25, my recollection is that BP increased its prior offer by $200 million (to $2.3 billion), again requiring that the Seafood claims of individual claimants, such as crew (*e.g.*, the Watts clients), be included in the fund.   At some point late on February 25th, as I recall it, the PSC representatives agreed with BP's last $2.3 billion offer.  But they advised BP that they would have to seek approval of BP's last offer from the entire membership of the PSC,

who would have to approve it.  They told us that they would recommend approval to the entire PSC membership.  BP believed that Watts was a member of the PSC at that time.

13.    We later were informed by the PSC negotiators that the PSC had approved the $2.3 billion Seafood Program capped fund.  The parties then continued their negotiations, which led to the "Agreement-in-Principle Regarding *Deepwater Horizon* Economic and Property Damages Settlement," signed on March 2, 2012.   At various points in time, I recall that Magistrate Judge Shushan assisted the parties in the course of their negotiations over the language of the Agreement-in-Principle.  That Agreement-in-Principle expressly states that it "is not complete and must be superseded by a more definitive written 'Settlement Agreement'… which shall control over, supersede, and replace this Agreement-in-Principle."  After additional, lengthy negotiations, the Agreement-in-Principle was superseded and replaced by the Settlement Agreement, signed April 18, 2012, amended on May 2, 2012, and approved by the Court (the Honorable Carl J. Barbier) on December 21, 2012.

14.    The Agreement-in-Principle specified that the PSC and Class Counsel would develop a framework for compensating seafood industry claimants, which would be subject to the approval of the Court-designated neutral and BP.  (Agreement-in-Principle, Section 3(b)(2) at p.5).  The Seafood Compensation Program, Exhibit 10 to the Settlement Agreement, is the framework for compensating seafood industry claimants developed in accordance with this provision of the Agreement-in-Principle.

15.    After March 2, I was not directly involved in the subsequent and detailed negotiations regarding how the $2.3 billion Seafood Program capped fund would be allocated among the various categories of seafood claimants.  However, as noted above, BP insisted that

the $2.3 billion capped fund would cover individuals, including crew (*e.g.*, Watts' clients), and as a result, I did become involved in the negotiation of the opt-out provision.[5]

16.    Those further negotiations led to the opt-out letter sent to the Court under seal on April 17, 2012. *See* the 4/17/12 letter to Hon. Carl Barbier from J. Roy, S. Herman, and R. Godfrey. The terms of the opt-out provision in the Settlement Agreement and the 4/17/12 letter speak for themselves. As BP understood the opt-out provision, it would be responsible for paying (outside of the Settlement's Seafood Compensation Program) the first 15% of opt outs that were Category III individuals. As reflected in the chart attached to the opt-out agreement, BP understood that Category III individuals would include Mr. Watts' clients. However, BP was to receive a credit against its $2.3 billion payment into the Seafood Compensation Program for opt-outs over and above this 15% figure.

17.    In sum, during the opt-out portion of the negotiations, BP made clear to the PSC negotiators that because the $2.3 billion capped fund for the Settlement's Seafood Compensation Program included compensation for Category III individuals such as Mr. Watts' clients, BP did not want to find out later that all or most of those Seafood claimants would opt out, with the result being that BP would have overpaid into the Seafood Compensation Program's capped $2.3 billion fund. My recollection is that this was one of the bases upon which the opt-out letter of April 17, 2012 was negotiated and agreed to among the parties. In this regard, *see* in particular

---

[5]    I should note that there was an original opt-out provision in the Agreement-in-Principle's Seafood Program term, specifically found at Section 3(b)(iv), on page 6 of the document. Like the Agreement-in-Principle itself, that term was the subject of further negotiation after March 2, 2012 leading up to the Settlement Agreement.

that letter's Exhibit A, Paragraphs 2, 4 and 7, among other paragraphs, and also the chart listing "Individuals" including "Watts Individual/Crew Fishing SFJs 42,722."[6]

18.     This Declaration is being filed confidentially and under seal as an Exhibit to the Memorandum In Support of BP's Motion For A Preliminary Injunction Suspending the Second Distribution of the Seafood Compensation Program, as well as the Memorandum In Support of BP's Motion for Relief Pursuant to Rule 60(b)(3), in *BP Exploration & Production, Inc., et al v. Watts, et al.*  This Declaration is intended to remain confidential unless unsealed by the Court through the appropriate process.


I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true to the best of my knowledge, belief, and information.

Richard C. Godfrey

Dated:  December 16, 2013

---

[6] I should note, and as the April 17, 2012 letter provides, the opt-out concerns that BP had--*i.e.,* overpaying into the capped fund in the event of significant opt-outs--were not limited to the possibility of individual opt-outs, such as Mr. Watts' clients, but also included other possible claimants opting out.  As a result, the negotiated opt-out terms also accounted for other possible claimants, as reflected for example in paragraph 3 of Exhibit A to the April 17, 2012 letter.