UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010 | MDL 2179 SECTION "J" |
| This Document Applies to: | JUDGE BARBIER |
| No. 12-970. Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al. | MAGISTRATE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### LIONEL SUTTON, III'S MEMORANDUM IN OPPOSITION TO THE REPORT OF SPECIAL MASTER LOUIS FREEH

MAY IT PLEASE THE COURT:

**The Freeh Report is "structurally deficient, one-sided, and seemingly advocacy-driven." Moreover, its conclusions, "simply are not credible." Instead, the Freeh Report is "deeply flawed" and "lacking basic indicia of a credible investigation."**

The above statement was the finding of Judge Michael Chertoff, former United States Department of Homeland Security Secretary, after reviewing the entirety of a report prepared by Louis Freeh on February 18, 2012. (Chertoff Report attached as Exhibit A)

As will be shown below, Judge Chertoff's description of the Freeh Report above is strikingly applicable to the Freeh Report in the instant litigation.

### ARGUMENT

Section 4.3.7 of the Settlement Agreement (SA) provides:

The Settlement Program, including the <u>Claims Administrator</u> and Claims Administration Vendors, <u>shall work with the Economic Class Members (including individual Economic Class Members' counsel</u> and Class Counsel) <u>to facilitate</u>

1

Economic Class Members' <u>assembly and submission of Claim Forms, including all</u> <u>supporting documentation</u> necessary to process Claim Forms under the applicable Claims Process. The Settlement Program, including the <u>Claims Administrator</u> and Claims Administration Vendors, <u>shall use its best efforts</u> to provide Economic Class Members with <u>assistance, information, opportunities and notice</u> so that the Economic Class Member has <u>the best opportunity to be determined eligible for and receive the</u> <u>Settlement Payment(s) to which the Economic Class Member is entitled</u> under the terms of the Agreement. (emphasis added)

Louis Freeh's Report in this litigation does not identify a single action taken by Sutton regarding the processing of claims that was not mandated by Section 4.3.7 of the SA. Instead, Freeh attempts to tarnish actions that were required by the SA, and provided equally to all claimants, by assuming that those actions were taken solely for Sutton's self-interest. However, Freeh's leap to that baseless assumption ignores two basic facts: One, Sutton performed the actions complained of on hundreds of claims, not only for those in which he allegedly had an interest. Two, a Qualified Claimant's interest and the Claims Administrator's interest are one and the same:  **That the claimant receive all that they were entitled to under the Settlement Agreement.**

 Freeh concluded that Sutton's employment with the Claims Administration (CA) was a conflict of interest, and that the conflict automatically resulted in Sutton acting in his own self-interest. Freeh's conclusions are based on three facts. One, Sutton received a fee for work done on a single claimant's file prior to Sutton's employment with the CA (Thonn). Two, Sutton held a minority interest in an unrelated business (Crown) and one of the other minority interest holders (Lerner) was a partner in a firm (Andry Lerner) that represented claimants. Three, that Sutton held a non-managerial interest

in a company that filed a claim (Romeo Papa).

Whether Sutton did have a conflict of interest prohibited by Sutton's Employment Agreement is a matter of dispute. However, the facts are that none of the above relationships are illegal, none of the above relationships were directly prohibited by the SA and, more importantly, **the Special Master did not find any evidence that Sutton directly manipulated the valuation of any claims**.

Webster's Dictionary defines Conflict of Interest as a conflict between the private interest and the official responsibility of a person in a position of trust. Freeh assumed that Sutton's private interests described above conflicted with the responsibilities placed on him by the Settlement Agreement. Although Freeh conducted 80 interviews, reviewed Sutton's bank accounts, email accounts and phone records going back to before there was even an oil spill much less a settlement and whether or not the records had any relevance to Sutton's part time employment with the CA, wrote a 97 page report with 500 exhibits, he still **presented no evidence of a single instance where Sutton acted in any manner contrary to the SA and the duties it imposed on him.**

There is no evidence that Sutton's private interests in any claim resulted in him doing anything different than what was required by Section 4.3.7. The Thonn claim was reviewed by CA Vendors, Internal Auditors, External Auditors, BP and an Appellate Panelist. Crown has not made a claim and has no intention of doing so. The claimants represented by Lerner have had their claims reviewed multiple times with no evidence of improper payments. Romeo Papa filed a claim but did not seek a specific amount and the claim was not even calculated during Sutton's term with the CA. There is no evidence that Sutton had any involvement in calculating the value of any claim, much less one that he allegedly had an interest in.

In concluding that Sutton automatically acted in his own self-interest, Freeh incorrectly

assumed that the interest of the CA is adverse to the interest of a qualified Claimant. Apparently, Freeh believes that this settlement program is an adversarial process similar to the program run by Kenneth Fineberg. In fact, nothing could be further from the truth. Section 4.3.7 and the very first page of the Court approved website make it abundantly clear:

1)      The **Claims Administrator** is **charged** with the **duty** to implement and administer the settlement for the **benefit** of the Economic Class Members.

2)      The **Claims Administrator** is **charged** with the **responsibility to work with the Claimants** to **facilitate**, **assemble** and **submit** Claim Forms, including all supporting documentation.

3)      The **Claims Administrator** is **charged** with the **responsibility** to **provide Claimants** with **assistance, information, opportunities and notice** so that the Claimant has the **best opportunity to receive the payment(s) to which the Claimant is entitled.**

Section 4.3.7 of the SA mandates that the CA consider the best interest of the Claimant at all times. That is the Claims Administrator's "**duty**" and "**responsibility**". Every action taken by Sutton, and complained of by Freeh, was in fulfillment of that requirement.

<u>Thonn</u>

In his report, Freeh stated that Sutton viewed Andry Lerner claims in the DHECC database an unusual number of times. He artfully stated that Sutton viewed various pages of claims 496 times and that in 83 of those views Sutton accessed claims represented by Andry Lerner. What Free failed to state was that Sutton accessed only **FOUR** different Andry Lerner claims during the entire time he was employed by the CA. (DHECC Logs attached as Exhibit B) that is only **.005%** of all claims filed by Andry Lerner. For Freeh to conclude that Andry and Lerner paid Sutton over One Hundred and Sixty Thousand Dollars to find out the status of four claims is absurd. <u>All</u> of the evidence available to Freeh

4

clearly showed that status updates was a service provided to claimants and attorneys by multiple claims administration employees thousands and thousands and thousands of times.

Admittedly, Sutton viewed the Thonn claim an unusual number of times, but there were many reasons for the CA's office to access a single claim multiple times. The very first page of the evidence presented by Freeh shows that Sutton accessed the Thonn claim 5 times in 3 minutes on 12/17/12. It also shows that he accessed a claim for an unrelated law firm 4 times in 3 minutes. Those multiple views were the result of a programming issue that required a user to log in repeatedly to look at different pages of the same claim. To claim that each view was a different check on the Thonn claim is inflammatory and ignores the obvious. Sutton and Thonn already testified that Thonn requested that Sutton periodically check the status of the claim because Thonn wanted to make sure that there were no problems caused by an ex-girlfriend working for one of the vendors. Also, like every other claimant, he wanted to know the status of his claim. Additionally, because he was familiar with the claim from the work his firm did on it with the GCCF, Sutton used the Thonn claim to familiarize himself with the computer system he was expected to use, as well as the SA itself. There was absolutely no prohibition on CA attorneys having unlimited access to any claim. Freeh cannot point out a single instance where Sutton did anything to manipulate the Thonn claims in any manner whatsoever.

Furthermore**, the evidence produced by Freeh shows that Sutton never looked at the Thonn claims until after all claims were fully calculated and eligibility notices were issued to the claimant**. Significantly, Freeh neglected to include that the Thonn VOO claim was completed and paid out to Thonn and his attorneys weeks before Sutton even started working for the CA.

Knowing that he could point to no direct wrongdoing by Sutton, Freeh attempted to show that parts of the Thonn claims were improperly calculated. That finding has been shown to be incorrect by

5

Brown Greer, Internal Auditors, Class Counsel and BP. Even if the claim was calculated incorrectly, there is no evidence that Sutton had any role at all in those calculations.

Perhaps more significant, while discussing the Thonn claim, Freeh noted that he discovered a second law firm that submitted at least four claims with tax returns more favorable than trip tickets. (The very same issue that he uses with regard to the Thonn claim to accuse Sutton, Andry and Lerner of corruption and the recommendation that each be prevented from representing claimants). In those four claims, Freeh found that the tax returns resulted in pay outs of as much as 114% greater. Unbelievably, Freeh did not identify the second law firm or the claimants, made no allegations of corruption and made no recommendation that the second law firm be prevented from representing claimants. **If the second law firm improperly manipulated data to the benefit of their private clients and to the detriment of their class clients, the possibility that the law firm is a member of the Plaintiff's Steering Committee, mandates disclosure, not cover up.**

With no evidence that Sutton had any influence on the manner in which the Thonn claim was calculated and reviewed, Freeh made another absurd assumption that none of the parties involved could be expected to do their auditing jobs correctly unless they knew that Sutton had an interest in the claim. True to form, and even with an assumption so patently ridiculous, Freeh chose not to disclose all of the evidence.

There is clear evidence in the DHECC database, and in Freeh's own investigative material, that David Odom, CEO of the entire Claims Administration, had knowledge of Sutton's intention to get paid for work that his firm did on the Thonn seafood claim months before Sutton ever received any payment on that claim. If Odom thought that Sutton's request for that fee had even the appearance of a conflict of interest, or was in any manner a violation of the Employment Agreement that Odom drafted,

6

and more than likely presented to Sutton for signature after he learned of Sutton's fee request, he had a duty to so notify Sutton prior to Sutton's acceptance of the fee. Had Odom advised Sutton that it was his position as CEO that the fee was improper, this entire issue could have been avoided before any payment was made. It can certainly be argued that Odom's knowledge and failure to act signified the CA's acquiescence in the arrangement and reinforces Sutton's belief that his receipt of the fee was in no way improper. Without discovery, Sutton is unable to show when Odom obtained that information, how it was obtained, who it was provided to, when it was provided and why it was withheld from Sutton, Juneau and the Court.

Freeh had to admit that he did not find any evidence that Sutton even attempted to influence the Thonn claims. Without such evidence, whether Sutton ultimately received payment for work his firm did on the claims prior to his employment with the CA is irrelevant: The fee was based on *Quantum Meruit* and legal under Louisiana Law, it was condoned by the CEO and, as noted by Class Counsel in its Comments to the Special Master Report, Sutton's fee was likely not a violation of the Louisiana Rules of Professional Conduct. Any perceived conflict was resolved when Sutton resigned. Thonn received the payments to which he was entitled to under the SA. He had no complaints and testified to Freeh that he fully expected Sutton to get paid for the work that was done on his claim before Andry Lerner began representing him. Thonn was a qualified, legitimate claimant. Thonn's interest, his attorneys' interest, Sutton's interest and the CA's interest were the same: For Thonn to receive the Settlement Payment(s) to which he was entitled under the terms of the Agreement. **There was no conflict between Sutton's private interest and his official responsibility.**

<u>Crown</u>

Sutton and Lerner are minority members of a water reclamation company. The company was

formed long before there was an oil spill. Initially there were four members owning 25% each. In early 2012, Lerner negotiated to purchase additional shares from the other three members. By May 2012, six months before Sutton started at the CA's office, it was agreed that the three members, including Sutton, would sell Lerner eight shares each for an agreed upon price to be paid in twelve equal installments beginning June1, 2012. There is no evidence that the payments had any relation to the claims process. The other two members were not lawyers and had no claims. All three selling members, including Sutton, received the same price. All of the above was provided to Freeh through independent testimony and documentation.

Freeh concluded that Sutton's ownership of the company was a "clear conflict of interest" because Lerner also had a partnership interest in Andry Lerner. However, Freeh's conclusion is in direct contrast to the law of this circuit. In *In Re: Placid oil Co.*, 802 F2d &83 (CA 5 1986) the court determined that a Judge serving on the Board of Directors of a small corporation with counsel in the case before him did not warrant recusal unless the corporation itself was the litigant. In fact, the Court found that there was not even the appearance of a conflict. Certainly Sutton's ownership of a minority interest in a company with a lawyer representing clients in a case that has already been settled does not warrant a more stringent conflicts rule than that of a Judge actually deciding a matter before him. Unlike the law firms owned by a number of the appeals panelist lawyers during their employment with the CA, Crown did not file a claim, did not represent any claimants and did not receive any monetary payments from the CA. Unlike the appeals panelists themselves, Sutton did not have the authority to calculate any claims.

Although he improperly concluded that the relationship of Sutton and Lerner presented a conflict of interest, Freeh presented no evidence that Sutton ever acted in any interest other than the

8

interest that was required of Sutton as per the SA. Sutton only checked the status of four Andry Lerner claims. The SA mandated that the Claims Administrator consider the best interest of Andry Lerner's clients when processing their claims and provide them with all necessary <u>assistance</u>, <u>information</u>, <u>opportunities</u> and <u>notice</u>.

Freeh was forced to admit that Sutton did not manipulate the valuation of any of Andry Lerner's claims. The evidence presented by Freeh shows that Sutton only looked at four of Andry Lerner's claims during the entire time he was employed by the Claims Administrator. He looked at one of the claims once and made no further inquiries. He looked at another claim three times in one minute and made no further inquiries. One of the claims was the Thonn claim discussed above and the remaining claim was the Talen's claim which will be discussed below.

Andry Lerner submitted **<u>675</u> claims**. Sutton only looked at **<u>4</u>**. As part of his regular duties, Sutton looked at claims for attorneys, accountants and claimants every day. Freeh's claim that there was something improper and perhaps even illegal about Sutton looking at .005% of Andry Lerner's claims is not only ludicrous but clearly defamatory. When one considers that the request to check the status of the Thonn claim came from Thonn, and the request to look at the Talens claim came from Juneau, Freeh's entire complaint of Sutton and Andry Lerner and their "unclean hands" is that Sutton looked at 2 of their claims for 2 minutes. For a former Director of the United States FBI to conclude that Andry Lerner paid Sutton over $80,000 per minute to "look" at 2 claims for 2 minutes, with no evidence that the claims were manipulated in any manner, is beyond comprehension. Again, unlike the appeals panelists that were allowed to keep their jobs, Sutton did not decide the value of any claims and did not write any opinions.

With no evidence that Sutton manipulated the valuation of Andry Lerner claims, Freeh claimed

that Sutton expedited the claims. In support of that assertion, Freeh included a quote from an email from Lerner to Sutton wherein Lerner asked Sutton what could be done to get Lerner cases prioritized. However, Freeh failed to include Sutton's response wherein **Sutton advised Lerner that his claims could not be prioritized or expedited.** (Sutton Lerner Emails attached as Exhibit C) Sutton went on to advise Lerner that the only way for Lerner to speed up processing was to make sure claims were filed correctly and incompleteness notices were responded to timely. The information that Sutton did provide was available on the Andry Lerner portal and regularly emailed to all law firms by the CA vendors. Freeh's failure to include Sutton's reply to Lerner's request is inexcusable conduct by a court appointed "independent" Special Master.

<u>Romeo Papa</u>

Freeh also claimed that Sutton's non managerial, partial ownership of Romeo Papa created a conflict of interest. First, there is nothing in the SA that directly prevents a company partially owned by Sutton from filing a claim. As previously acknowledged by the Court, at least two law firms with partners working as appeals panelists, and getting paid by the CA to actually decide the value of claims, filed their own claims in the Settlement Program. Those panelists were not even identified, much less discharged, investigated and publicly accused of corruption. Second, even if there was a conflict of interest, it was cured when Sutton resigned. Third, and most important, there is no evidence that Sutton had any involvement at all in the calculation of the Romeo Papa claim. The Romeo Papa claim was not even processed during Sutton's tenure at the Claims Office.

With no evidence that Sutton acted in his own self-interest, Freeh attempted to manufacture the possibility of a future act by claiming that Sutton was tasked with formulating the guidelines for paying moratoria claims. Putting aside that Sutton resigned before that fantasy could take place, it is evident

that Freeh did not understand the Settlement Agreement and did not have a clear understanding of the Claims Administrator's role. Exhibit 16 of the SA clearly states that only BP and the PSC are authorized to develop agreed upon Moratoria guidance that the CA shall apply. At the time of Freeh's report, that very issue was before this Court. Once again, Freeh reached a conclusion that ignored the evidence, the clear language of the SA and the Record in this very case.

<u>Talen's</u>

The next claim that Freeh took issue with was the Talen's Marine claim. Sutton testified that he reviewed the claim at the request of Pat Juneau. Apparently Juneau stated that he did not remember such a conversation. Regardless of why Sutton reviewed the claim, it was pursuant to the mandate of section 4.3.7 of the Settlement Agreement and in accordance with the standard practices of the CA. There is absolutely no evidence to suggest otherwise.

Freeh claimed that Sutton met with claimant attorney Jon Andry and explained to him that the claim was incomplete because additional tax returns were required. He insinuated that there were multiple and nefarious meetings and phone calls. How Freeh can claim that any conversation between Andry and Sutton about the Talen's incompleteness notice was somehow improper is beyond the imagination and could only be made by someone that neglected to read the very beginning of the SA and purposefully ignored the volumes of evidence that was available to him. Every day countless attorneys and claimants are told by countless CA employees and vendors what needs to be done to cure incompleteness notices. Not only is that type of communication encouraged, it is required. Without it, the entire claims process would be at a standstill.

Even worse, Freeh chose to ignore evidence that Sutton was concerned that the Talen's

11

claim may have been improperly classified and that Sutton presented that concern to Pat Juneau. After Sutton reviewed the claim, he expressed his concern that the claim was classified as Tourism although it may have been Moratoria, which would have resulted in a much lower payment, if any at all. Ironically, Sutton told Juneau that he was worried that if the possible error was discovered later, Sutton could be accused of overlooking the problem because of his friendship with Andry. Juneau advised Sutton not to discuss the matter any further and to let the process work itself out. That conversation was revealed to David Welker and Mike Juneau, and acknowledge by Pat Juneau, during Sutton's final interrogation before his resignation. It appeared to Sutton that Welker wrote down what took place. All of the above was told to Freeh. He was provided with Welker's notes and given the opportunity to question him. Sutton was allowed neither.

Examples of Claimant Assistance

Immediately after being employed, Pat Juneau presented Sutton with a memorandum from a PSC attorney raising three issues with one of his personal client's claims. Sutton researched the issue and presented his findings to Juneau. Sutton presumed that Juneau then discussed the findings with the attorney. A policy was ultimately developed, and approved by Juneau, that directly benefitted that claimant.

Within a short time of being hired, Sutton was provided with the name and number of an Alabama lawyer that was complaining about the way some of his claims were being processed. Juneau instructed Sutton to research the claims and contact the attorney to explain what needed to be done to facilitate processing. The attorney refused to discuss the claims with Sutton and wanted a meeting with Juneau. Several days later, the attorney, Juneau and Sutton met in the CA

offices. Sutton went through each claim to explain the defects and what needed to be done to get the claim processed. At no time did Juneau instruct Sutton to do otherwise. It was clear to Sutton that the type of communication and assistance provided to the attorney was required by the Settlement Agreement and approved by the CA. Sutton was even complemented by Juneau for his preparation and presentation.

On one occasion, Sutton was requested by Juneau to attend a meeting in the CA conference room with Juneau, Alabama Representative Doug Broxson and a number of his constituents. The claims process was discussed in general and several of the attendees had specific questions about specific claims. All attendees were invited to contact Sutton if they had any other problems. Several of the attendees accepted that offer.

On another occasion, Sutton was asked by Juneau to attend a meeting with a large hotel association and its lawyers, representing approximately 2,000 claimants. The association members were having difficulty getting the credit card information necessary to pass the customer mix test and requested assistance from the CA. As usual, all attendees were instructed to contact Sutton with any other specific problems. As far as Sutton is aware, Mike Juneau, with the assistance of Magistrate Shushan, continued to work on the credit card issue.

On one occasion Sutton was instructed by Juneau to contact a lawyer in Baton Rouge and assist him in getting a claim filed for his client. Juneau told Sutton that the attorney was a friend and was attempting to file under OPA, but Juneau thought the claim could be filed in the Settlement Program. Sutton's instructions to that attorney were the same as that given to the Romeo Papa business manager. Go online and upload as much information as possible.

There was one large claim of a local Catholic Girl's School that the vendor accountants

were having trouble processing. It appeared that the claimant and its accountants were not providing full and correct responses to the incompleteness notices. The vendor accountants were suspicious that false information was deliberately being provided. At the direction of Juneau, Sutton and at least one vendor accountant met with the claimant attorney and his staff in the CA offices to discuss the incompleteness notices, responses and what the claimant needed to do to get paid. That meeting was preceded and followed by multiple phone calls with the claimant and its attorney. Although that attorney was a member of the PSC, Sutton understood that the same type of one on one communication and assistance was available to all.

At the request of Mike Juneau, Senior Class Counsel (Sutton's position was Claims Counsel), Sutton contacted a Lafayette lawyer that had questions about filing hundreds of claims in association with a group of lawyers from Texas. Sutton met with the lawyers in the CA offices several times and also spoke by phone a number of times. Pat Juneau and Mike Juneau were kept apprised of all discussions.

At the request of Mike Juneau, Sutton attended a meeting with a local law firm to discuss a large number of claims. Upon learning that Sutton attended law school with one of the lawyers, Mike Juneau designated Sutton as that firm's contact with the CA. That firm contacted Sutton multiple times about multiple claims, including the firm claim. That was all done with full knowledge of Pat Juneau and Mike Juneau. A named partner from that firm even contacted Sutton at home one evening complaining that BP was aware of the amount the firm was receiving for its own claim before the eligibility notice was scheduled to go out. The attorney complained that BP was threatening to use that information to prevent the law firm from filing an amicus brief on behalf of a client in a related matter. At the direction of the Pat Juneau, Sutton

launched an investigation into how BP could have obtained that information. The source of the leak was never discovered.

On several occasions, at the direction of Mike Juneau, Sutton and a Senior Accountant met with a member of the PSC at the PSC attorney's private office to discuss a number of claims the attorney intended to file. There were multiple discussions as to how those claims would be filed and processed and what policies would be affected. Again, Sutton understood that the type of communication and assistance provided was not only encouraged by the CA, it was mandated by the Settlement Agreement whether the attorney was a PSC member or not.

Pat Juneau also asked Sutton to contact the son of one of Juneau's friends in Baton Rouge to answer questions he had about his claim. Sutton called the claimant, emailed the questions to the appropriate vendor and discussed the answers with Juneau and the claimant. Juneau further instructed Sutton to have the claim processed immediately. That instruction was conveyed to and acknowledged by an employee at Brown Greer by email. Unlike the Andry Law Firm claim, that claim was not already "in line to be processed". That was the first and only time Sutton ever attempted to expedite a claim and it was at the direct instruction of Pat Juneau. The email to expedite the claim was from Sutton's DHECC email account and was obviously available to Freeh. One can only imagine why it was not included in the Special Master's Report.

All of the above communications were done at the direction or with the consent of the CA. All of the above communications were documented by email, phone records or notes in the CA's office. Since Sutton has not been given access to any of those documents, the above examples are only the ones he recalled. There were many more. Every single one of the above examples contained much more direct communication and assistance than that complained of by

Freeh with regards to Andry, Lerner, Thonn or Romeo Papa. At no time did Sutton think that any of the actions taken were improper or in conflict with the SA. In every instance, Sutton believed that the interest of the Claimant and the interest of the CA were aligned: **To assist the claimant in getting the payment it was entitled to under the Settlement Agreement.**

Although Sutton was not given access to documentation referencing the above examples, the Special Master certainly had access. For Freeh to conclude that the actions taken by Pat Juneau, Mike Juneau  and Sutton in the above examples were acceptable, but the much lesser actions taken by Sutton with regard to two Andry Lerner cases (Thonn and Talens) is ridiculous and confirms that the "independent investigator" was not so independent. There is no evidence that Sutton ever did anything more than what was required by the Settlement Agreement whether he had an alleged interest or not. **All claimants and their attorneys were treated the same.**

<u>Andry Law Firm</u>

In an inexplicable attempt to allow BP to avoid paying a claim that multiple audits determined to be proper, Freeh concluded that repeated requests by the Andry brothers as to the status of the Andry Law Firm claim to numerous CA employees, and **one** inquiry from Sutton to a Senior Accountant somehow resulted in the claim being improperly expedited. (Sutton will defer discussion of the multitude of private client claims directly expedited by the CA at the direction of PSC members and focus only on the Andry Law Firm claim)

Freeh acknowledged that no one, including Sutton, actually requested that the claim be expedited. In fact, Freeh did not even provide evidence that the claim was expedited. Instead, he inferred, with no evidence at all, that one status request by  Sutton (mistakenly referred to as a Senior Attorney) to Mark Staley, the Senior Partner in charge of  Postelwaite and Netterville's

work in the settlement process and Sutton's contact at P & N,  somehow caused Staley to feel compelled to expedite the case. Not only does Freeh fail to support this ridiculous assumption with evidence (there is no statement from Staley referenced in the Report and the parties accused therein were not allowed to take his deposition), and disregarding the multiple times that Pat Juneau, Mike Juneau and Sutton met with Staley and discussed claims with him almost daily, it fails in the light of Freeh's own factual determinations.

In discussing Jon Andry's attempts to expedite Andry Lerner claims, Freeh determined that Andry contacted Pat Juneau about four claimants. Freeh also determined that Juneau responded by having his Executive Assistant contact a Brown Greer employee to get information about the claims. It defies logic for Freeh to conclude that one email from Sutton to Senior Accountant, Mark Staley, requesting information on a claim was improper influence but that Pat Juneau's Executive Assistant's email, sent on behalf of Juneau, seeking the same type of information from a mid-level BG employee was not. It should also be noted, although Freeh certainly did not, that **in that one email Juneau checked the status of as many Andry Lerner claims as Sutton did during his entire employment**.

During the time period when this Court was considering a stay of the claims of certain industries, including law firms, the CA sent a script to the call centers to read to any callers that had questions about the stay and its effect on their claims. The script included Sutton's email and cell number in case the call center had any questions. Unfortunately, the script was read to include Sutton's contact information and subsequently posted on a number of lawyer web sites. From that day forward, Sutton received countless calls and emails from lawyers seeking information about their claims. Sutton determined status, checked for problems and provided

17

information pursuant to the duties required of him by section 4.3.7 of the SA. **All claimants and attorneys were treated equally.** Pat Juneau was fully aware of Sutton's actions. Likewise, the above was fully explained to Freeh in Sutton's deposition.

Employment Agreement

Sutton was employed by the CA as a part time subcontractor on November 1, 2012. When discussing compensation, Sutton advised Juneau that Sutton could only devote approximately 75% of his time to work at the Claims Office because he had a private law practice and other businesses that required his attention. Juneau agreed and Sutton was paid a reduced salary pursuant to that understanding.

Sutton's law practice and the corporate office of Crown LLC were immediately adjacent to the Claims Office. Juneau allowed Sutton to use the Claims Office conference room for depositions of his firm clients. Sutton's firm and Crown had signs at the entrance to the building, in the 19th floor lobby and on the office door.  Additionally, Juneau acknowledge in his sworn statement that Sutton told him about Crown, "You know what I do remember......., he said 'I have an interest in a company named Crown'." (Juneau tx attached as Exhibit D p.47 lines 3-5). Juneau also acknowledged that Sutton told him that his firm represented claimants before Sutton started at the Claims Office and may have referred those claimants to Andry. (Exhibit D p.48 lines 23-25)

Sutton's signed Employment Agreement, did not state that he could not have a preexisting, minority interest in an unrelated business with an attorney that represented claimants. Sutton's signed Employment Agreement did not state that he could not get paid for work done on a claim before he began working at the Claims Office. In fact, Juneau only told Sutton that he

"can't <u>represent</u> anybody in this thing ...." (Exhibit D p.48 lines 21, 22).

Neither Sutton's signed Employment Agreement (which Sutton did not receive until after the Romeo Papa claim was filed) nor the SA itself stated that a separate company partially owned by Sutton could not make a claim to which it would otherwise be entitled. Sutton did not realize that the Romeo Papa claim could be a problem until he learned that Pat Juneau's son's claim was denied after it was already calculated.  Pat Juneau told Sutton that rather than have his son lose money, he was going to personally pay his son the money he would have received under the SA. Sutton testified to Freeh that he thought the Romeo Papa claim was worth little, if anything at all, and rather than have a problem with his partner, he intended to do the same thing as Juneau. The claim was not processed while Sutton was at the Claims Office so he never learned its value.

The evidenced introduced by Freeh at Sutton's deposition shows that CEO Odom did not even provided Sutton with a correct Employment Agreement until months after he began his part time job with the Settlement Program. Sutton does not recall signing a Confidentiality Agreement or any other paperwork that the other employees were required to sign. Nothing other than a single, undated and signed Employment Agreement has been produced by Freeh. Sutton does not recall ever getting an employment handbook, policies or anything else which set forth what was expected of him. He never attended a meeting where any of those things were discussed. Sutton assumed he was treated different because he was the only person in the CA's office employed part time.

Sutton was required to avoid any conflicts of interest. While one could argue that Sutton's relationship with Romeo Papa could give the appearance of a conflict, there is absolutely no evidence that Sutton ever acted in his own self-interest. **Every action cited against**

19

**him by the Special Master with regards to Sutton's handling of any claims was proper and mandated by the Settlement Agreement**.

Despite the conflicts of interest cited in his report, Freeh found no evidence that those conflicts affected any claims. As the Court stated in its Ruling on BP's Motion to Stay, **"it would be highly unlikely, if not impossible that any single person would be able to falsely inflate or corrupt the processing of claims at the settlement program."**

<u>Claims Administrator's Office</u>

Every month, the CA files a Report to inform the Court of the status of the implementation of the Settlement Agreement. Included in that Report is a section entitled "Claimant Outreach Efforts". Within that section are subsections describing contacts and communications made to law firms and claimants. (All such Reports have already been filed in the record)

Each month, the Report details outreach efforts by the CA related to incompleteness reasons, documentation requirements and program questions. Outreach to law firms also includes conference calls to claimant lawyers held in collaboration with the accountants working on their claims. Outreach to claimants includes calls to claimants with status inquiries and incompleteness questions. As of May 5, 2013 the Program completed over 42,000 outreach calls. (Status Report No. 9, attached as Exhibit E).

While finding fault with Sutton's response to status inquiries from Thonn, Lerner and the Andrys, Freeh purposefully ignored the tens of thousands of responses made by the CA to other claimants and law firms with status inquiries, as well as the many calls and meetings that Pat Juneau, Mike Juneau and Sutton had with other claimants and their attorneys. Sutton's

20

relationships with Thonn, Lerner and the Andrys should have had no bearing on an independent investigation of Sutton's actions unless there was clear evidence that Sutton improperly acted on those relationships or treated those parties different than any other claimants and attorneys.  An analysis of Freeh's report, as well as the evidence he included and evidence he did not include, proves that **all of Sutton's actions were in furtherance of the duties and responsibilities imposed upon him by the Settlement Agreement and no different than the actions taken by or for anyone else.**

Finally, pursuant to the Court's direction, the CA performed an internal investigation of the Settlement Program's claims process and policies. A Supplemental Report was provided to the Court dated July 17, 2013, prior to the release of the Freeh Report. (CA Supplemental Report attached as Exhibit F) The CA reviewed the Thonn claims, the Andry Law Firm claim and all Andry Lerner BEL claims. The CA concluded that although a few claims may have had minor errors, **"any errors were unrelated to anything involving Christine Reitano or Lionel Sutton in any respect."** The CA also concluded that all claims policies were **"free of any undue or improper influence from Reitano or Sutton."**

<u>DISCOVERY</u>

This entire memorandum was done without the opportunity for Sutton to conduct any discovery. Freeh was allowed unlimited access to not only the entire claims process, including all employees and all vendors, but to Sutton's personal and law firm emails, bank accounts and phone records. He was allowed to compel testimony from persons not even associated with the claims process. He was given subpoena power. He was referred to as a "Judge" and on some occasions failed to dissuade the belief that he was still with the FBI. Despite repeated requests

from all parties affected by Freeh's report, this Court would not allow anyone to review the entirety of the "evidence" obtained by Freeh. Freeh was allowed to decide what evidence would be produced and he clearly failed to include known exculpatory evidence. Sutton was not even provided with a copy of his own deposition until October 31, 2013 and only after Magistrate Shushan ordered Freeh to produce it.

The irony in Freeh's repeated opposition to full discovery should not be lost on this Court or anyone else. When faced with allegations of defamation regarding statements made about Graham Spanier in the Freeh Report produced for Penn State, and Spanier's request for a stay of those proceedings, Freeh's attorneys filed pleadings in opposition to the stay complaining that Spanier refused to reveal the basis of his claim and that Freeh and his firm would **"remain stuck in the untenable position of having Spanier's broad accusations clouding their reputations without being able to defend themselves."** (Spanier Opposition attached as Exhibit G). If the consequences of Freeh's report in the instant case were not so devastating to Sutton and his family, Freeh's hypocriticalness would be laughable.

Freeh claims to have conducted his investigation of Sutton as a judiciary official. As BP correctly stated in its response to Brown Greer's Motion to Restrict the Use of Freeh's Report, "the Supreme Court has explained, **'[t]here is no special perquisite of the judiciary which enables it . . . to suppress, edit, or censor events which transpire in proceedings before it.'** *Craig v. Harney*, 331 U.S. 367, 374 (1947)."

Certainly, when faced with Freeh's recommendations of criminal prosecution, disciplinary proceedings and restrictions on his ability to practice law, Sutton, who has not even been made a party to these proceedings, deserves the same consideration argued for by Louis

22

Freeh, defendant in the Spanier action, and British Petroleum, defendant in this action.

## CONCLUSION

When one is able to see through the innuendo, out of context statements, factual mistakes, incorrect assumptions, faulty legal analysis, lack of evidence, self-dealing and fantasies that make up the Freeh Report, the conclusion is clear. At no time did Sutton commit any crime or knowingly violate the written terms of his Employment Agreement or the Settlement Agreement.

Freeh's findings with regard to Sutton are summed up on page 82 of his report. "In return for payments from Mr. Lerner and Mr. Jon Andry, Mr. Sutton checked on their client's claims, expedited the processing of claims, and gave advice on how to remedy deficiencies in some claims."

Notwithstanding that Freeh's inflammatory summary contradicts his own report which alleges that Sutton expedited one claim, not claims, and gave remedial advice on one claim, not claims, had Sutton been allowed to conduct discovery, the actual evidence would have shown that:

(1) In his role at the DHECC, Sutton did not do anything for anyone for payments;

(2) Sutton received a fee for the substantial work his firm did on the Thonn claim prior to his employment with the CA;

(3) Lawyers serving as  appellate attorneys in the DHECC settlement process participated, or intended to participate, in fees earned by their law firms representing clients in the DHECC settlement;

(4) CEO David Odom knew about the Thonn fee before it was paid;

(5) CEO David Odom never told Sutton that the Thonn fee was improper;

(6) Sutton had no role in the calculation of the Thonn claim;

23

(8) Sutton did not look at the Thonn claim until after eligibility notices were sent out;

(9) Sutton and two other shareholders agreed to sell shares in Crown LLC to Lerner before there was even an oil spill settlement;

(10) Sutton checked the status of 4 Andry Lerner claims out of 675 Andry Lerner claims during his entire employment;

(11) Pat Juneau checked the status of 4 Andry Lerner claims in 1 day;

(12) Sutton never participated in the calculation, or manipulated the value, of any Andry Lerner claims;

(13) Sutton never provided Andry Lerner, or any other attorneys, any information that was not available on their law firm portals and/or provided to all attorneys;

(14) At the request of Pat Juneau, Sutton gave advice 1 time on how to remedy 1 incompleteness notice on 1 Andry Lerner Claim;

(15) The entire Claims Administration, including Pat Juneau, Mike Juneau and Sutton, gave advice at least 40,000 times on how to remedy thousands of incompleteness notices;

(16) Sutton never expedited, or attempted to expedite, any Andry Lerner claims;

(17) Sutton refused, in writing, to expedite or prioritize any Andry Lerner claims;

(18) Sutton never expedited, or attempted to expedite, the Andry Law Firm claim;

(19) The only claim Sutton ever expedited was at the direction of Pat Juneau, and it was for Juneau's friend's son;

(20) Members of the Plaintiffs' Steering Committee expedited many of their private client claims with the assistance of the Claims Administrator;

(21) Sutton never participated in the calculation of the Romeo Papa claim;

24

(22) The Romeo Papa claim was not calculated while Sutton worked for the DHECC;

(23) Sutton did not manipulated, or attempt to manipulate, the value of the Romeo Papa claim;

(24) Sutton did not expedite, or attempt to expedite, the Romeo Papa claim;

(25) Sutton did not, and did not have the authority to, establish guidelines for the payment of claims associated with the Moratoria;

(26) Law firms with partners serving as appellate attorneys in the DHECC settlement process filed claims for damages allegedly caused by the oil spill;

(27) Lawyers serving as  appellate attorneys in the DHECC settlement process received , or intended to receive, payment for damages allegedly caused by the oil spill;

(28) Lawyers serving as appellate attorneys in the DHECC settlement process determined, and affected the determination of, the value of many claims;

(29) An internal investigation conducted by the entire Claims Administration concluded that any errors in the claims process were unrelated to anything involving Sutton in any respect**;**

(30) An internal investigation conducted by the entire Claims Administration concluded that all claims policies were free of any undue or improper influence from Sutton**;** and

(31) Sutton never provided any information or assistance to any attorney or claimant that was not required by Section 4.3.7 of the Settlement Agreement.

 **There is absolutely no evidence that Sutton's private interests, whatever they may have been, ever resulted in an actual conflict with his official responsibilities.** Any perceived conflict was remedied when he resigned.

Lionel Sutton respectfully submits that once this Court reviews all of the evidence

submitted, all of the evidence withheld and takes notice of the complete lack of any incriminating evidence, it will reach the same conclusion as Judge Chertoff:

**The Freeh Report's "factual findings and inferences lack objectivity and lack factual support." The Freeh Group "viewed itself as an advocate first and an impartial investigator second." Freeh "cherry-picked evidence and stretched to reach conclusions." "The end result is a lopsided report that lacks even the appearance of objectivity."**

Notwithstanding that the entire report is inadmissible hearsay, but given that Freeh was appointed Special Master in the instant litigation, along with all of the rights and privileges associated therewith, the clear applicability of Judge Chertoff's conclusions to the matter presently before this Court takes on a particularly sinister meaning and mandates that the Freeh Report be rejected in its entirety.

Respectfully submitted:

/s/ Michael S. Walsh_____
Michael S. Walsh
Attorney at Law
Bar Roll Number: 8500
Taylor, Porter, Brooks & Phillips LLP
451 Florida Blvd., 8th Fl N
PO Box 2471
Baton Rouge, LA  70821
Telephone: 225-387-3221

26

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010 | MDL 2179<br><br>SECTION "J" |
| This Document Applies to: | JUDGE BARBIER |
| No. 12-970. Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al. | MAGISTRATE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**CERTIFICATE**

I hereby certify that on December 18, 2013, a copy of the foregoing *Lionel Sutton, III's Memorandum in Opposition to the Report of Special Master Louis Freeh* was electronically filed with the Clerk of Court using the CM/ECF system.  Notice of this filing will also be sent to counsel(s) of record by means of the Court's electronic filing system.

Baton Rouge, Louisiana, this 18th of December, 2013

/s/ Michael S. Walsh_____
Michael S. Walsh