COVINGTON & BURLING LLP

**PRIVILEGED AND CONFIDENTIAL**
**Attorney-Client Communication**
**Attorney Work Product**

# ASSESSMENT OF THE
# REPORT BY FREEH SPORKIN & SULLIVAN, LLP
## TO THE
# GAMING COMPLIANCE COMMITTEE OF
# WYNN RESORTS, LIMITED

## April 17, 2013

Prepared by Covington & Burling LLP
Michael Chertoff
Steven E. Fagell
Benjamin S. Haley
David M. Zionts

**COVINGTON & BURLING LLP**

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

### TABLE OF CONTENTS

PAGE

I.      Introduction and Executive Summary ........................................................... 1

II.     Background ................................................................................................. 3

        A.      Background and Context of the Freeh Report ....................................... 3

        B.      Assignment and Process ...................................................................... 8

III.    The Freeh Report Suffers From Numerous Deficiencies in Investigative Process .......... 10

        A.      Best Practices in Internal Investigations ............................................. 10

                1.      Document Collection and Review ............................................. 10

                2.      Documentation of the Investigative Process ............................. 11

                3.      Witness Interviews .................................................................... 11

                4.      Evidentiary Support for Findings ............................................. 12

                5.      Consideration of Alternate Explanations ................................. 13

                6.      Credibility Determinations ....................................................... 13

        B.      Specific Process Deficiencies in the Freeh Report ............................... 14

                1.      The Freeh Report Lacks an Adequate Description of Investigative
                        Process ..................................................................................... 14

                2.      The Freeh Report Does Not Provide Any Interview Summaries
                        Other Than Mr. Okada's ............................................................ 15

                3.      The Freeh Report's Documentary Evidence Is Deficient .......... 15

                4.      The Freeh Report Does Not Adequately Consider Alternate
                        Explanations and Fails to Investigate Verifiable Facts .............. 18

                5.      The Freeh Report Does Not Give Due Consideration to Mr.
                        Okada's Account of the Facts ................................................... 18

                6.      The Freeh Report's Credibility Determination Regarding Mr.
                        Okada Is Not Reliable ............................................................... 20

IV.     The Freeh Report's Factual Findings and Conclusions Are Not Credible ...................... 21

A.    Mr. Okada's Alleged "Personal Rejection" of Wynn Resorts' Anti-Bribery Policy .......................................................................................... 21

    1.    The Freeh Report's Account of the February 24, 2011 Board Meeting Is Not Reliable .......................................................................... 21

    2.    The Freeh Report Reaches Unsupported Conclusions Concerning FCPA Training and Code of Conduct Acknowledgment ........................ 22

B.    The Freeh Report's Conclusion That Mr. Okada Violated Philippine Land Ownership Law in Bad Faith Is Not Credible ...................................... 24

C.    "Apparent FCPA Violations" Involving PAGCOR Officials .............................. 28

    1.    The Freeh Report Ignores or Minimizes Legal Issues ............................. 28

        a)    The Freeh Report Misleadingly Frames Its Conclusions.............. 28

        b)    The Freeh Report Ignores Potentially Available Affirmative Defenses ........................................................................ 29

    2.    The Freeh Report's Factual Conclusions Regarding the PAGCOR Visits Lack Support.................................................................. 30

        a)    As to All But One Visit, the Freeh Report Offers No Supporting Evidence ................................................................ 30

        b)    The Freeh Report's Conclusions Concerning the September 2010 PAGCOR Visit Suffer From Numerous Deficiencies ........ 32

    3.    The Report Fails to Explore Involvement of Wynn Resorts or Steve Wynn ...................................................................................... 36

D.    "Possible Patterns" of FCPA Violations Involving Korean Government Officials.......................................................................................... 37

E.    The Report's Conclusions Regarding the Payment of Expenses in Connection With a Visit to the 2008 Beijing Olympics Are Not Reliable .......... 40

V.    Conclusion .................................................................................................. 41

COVINGTON & BURLING LLP

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

## I.       Introduction and Executive Summary

We were asked by Morgan, Lewis & Bockius LLP to conduct an independent review of the report by Freeh Sporkin and Sullivan, LLP ("FSS") to the Wynn Resorts, Limited Gaming Compliance Committee concerning allegations against Board member and major shareholder Kazuo Okada (the "Freeh Report").[1]  The Freeh Report contains serious allegations against Mr. Okada.  It concludes that Mr. Okada has "personally rejected" compliance with the Foreign Corrupt Practices Act ("FCPA"), and "strongly believes" in his right to bribe foreign officials when doing business in Asia.  It concludes that he has knowingly contravened Philippine law in structuring his business affairs, demonstrating an insistence on "doing business as he desires."  It concludes that he has a "practice and pattern" of committing "prima facie violations" of the FCPA.  In particular, it concludes that Mr. Okada "personally directed" tens of thousands of dollars' worth of hospitality, gifts, and payments to a Philippine casino regulator over the course of five days in September 2010.  On the basis of these findings, the Report opines that Mr. Okada presents a "substantial, ongoing risk" to Wynn Resorts.

Wynn Resorts acted on the Freeh Report immediately.  At the time of the Report, Mr. Okada was Wynn Resorts' largest shareholder and a member of its Board of Directors.  The same day FSS submitted the Report, the Wynn Resorts Board voted to redeem Mr. Okada's shares at a 30% discount.  The next day, Wynn Resorts filed suit against him for breach of fiduciary duty, and attached the Freeh Report as an exhibit to its complaint.  Litigation between Wynn Resorts and Mr. Okada continues on multiple fronts, with the allegations in the Freeh Report playing a central role.

In our opinion, the Freeh Report is deeply flawed, and its conclusions are not adequately supported.  The Freeh Report's most significant shortcomings are as follows:

- **The Report is tainted by the timing and circumstances of its creation.**
  The chronology of the intra-Board dispute between Mr. Okada and his colleagues implies that Wynn Resorts commissioned the Report for a clear purpose: to justify ousting Mr. Okada from the Board and redeeming his 20% stake in the company at a substantial discount.  This outcome-driven approach is evident throughout the Report.  The Report is replete with unsupported negative conclusions about Mr. Okada — conclusions that ignore potentially exculpatory evidence or explanations.  The relationship between the Report's genesis and its findings is most clearly demonstrated by FSS's hasty submission of the Report mere days after interviewing Mr. Okada, followed by the Board's quick decision to redeem Mr. Okada's shares and file a lawsuit with the Report attached.  In a revealing exchange in which FSS Principal Louis Freeh denied Mr. Okada a meaningful opportunity to supply additional

---

[1]       *See* Report by Freeh Sporkin & Sullivan, LLP, to the Gaming Compliance Committee of Wynn Resorts, Limited (Feb. 18, 2012) (hereinafter "Freeh Report") (Exh. 1).

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

information, Mr. Freeh likened the Report to a "brief" — *i.e.*, an advocacy piece, not an objective document that is intended to impartially present the facts.

- **The Report's factual findings and inferences lack objectivity and lack factual support.** The Freeh Report consistently pairs grave and far-reaching conclusions with scant and unreliable supporting evidence and incomplete investigation and analysis. For example, FSS broadly alleges a "practice and pattern" of FCPA violations, but does not provide sufficient detail to meaningfully evaluate these incidents. Even as to the core episode on which FSS does go into detail — a September 2010 visit to Wynn Macau by Philippine gaming regulators — the Report reaches sweeping conclusions on the basis of strained readings of unreliable documents, while ignoring alternate explanations and declining to pursue any path that might lead away from its conclusions.

- **The Report's legal analysis is superficial and inflammatory.** The Freeh Report reaches legal conclusions through deficient legal analysis. Incredibly, FSS assesses whether Mr. Okada's alleged conduct runs afoul of the FCPA without even mentioning affirmative defenses available under the statute. It similarly asserts a bad faith, possibly criminal violation of Philippine law, while ignoring key aspects of the legal analysis it commissioned from a local law firm, as well as evidence that Mr. Okada sought the advice of counsel in order to act within the bounds of Philippine law.

- **FSS's investigative process is insufficiently documented and reveals a number of gaps.** The Freeh Report lacks basic indicia of a credible investigation. Most fundamentally, FSS fails to provide any meaningful explanation of its process, giving the impression that neither its search for documents nor its interview process was thorough and independent. At critical junctures, moreover, the Freeh Report cites to documents that are of dubious provenance or otherwise unreliable; relies on potentially biased interviewees without considering their motivations and without providing any supporting documentation; and overlooks potential interviewees who might have shed light on significant facts. At the same time, FSS treats Mr. Okada dismissively, relegating his interview to an afterthought, making a sweeping and largely unexplained credibility determination against him, and neglecting to follow up on objectively verifiable claims that might support his account. To follow Mr. Freeh's "brief" metaphor, the Report treats Mr. Okada as very much "the other side," not as the subject of a fair, thorough, and independent investigation. The end result is a lopsided Report that lacks even the appearance of objectivity.

COVINGTON & BURLING LLP

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

## II.    Background

### A.    Background and Context of the Freeh Report

Steve Wynn and Kazuo Okada have had a longstanding business and personal relationship.  In 2000, after Mr. Wynn lost control of Mirage Resorts, Inc. in a hostile takeover, Mr. Okada joined him in founding Wynn Resorts, Limited ("Wynn Resorts").[2]  Mr. Okada initially invested $260 million in Wynn Resorts, followed by an additional $120 million.[3]  Mr. Wynn "could hardly believe" Mr. Okada's investment at the time, and the two formed a close personal friendship.[4]  At a 2004 hearing before gaming regulators, Mr. Wynn described Mr. Okada as a man of integrity, who had once told him, "Take the high road.  Do the right thing."[5]

As of February 2012, Mr. Okada held a 20% stake in Wynn Resorts, making him its largest shareholder.[6]  Mr. Wynn had previously held a comparable share, but lost half of his holdings in his 2010 divorce.[7]  Mr. Okada also served as Vice Chairman until October 2011, when that position was eliminated,[8] and member of the Board until February 2013, when he resigned a day before a shareholder vote to remove him.[9]

In 2008, Universal Entertainment Corp. ("Universal"), of which Mr. Okada is Chairman and majority shareholder, commenced plans to build a casino in the Philippines, receiving a provisional license from the Philippines Amusement and Gaming Corporation ("PAGCOR").[10]  In a May 2008 call with stock analysts, Mr. Wynn reportedly stated that he "love[s] Kazuo Okada" and "there is hardly anything that I won't do for him," but that he did not "contemplate[]

---

[2]     Alexandra Berzon & Kate O'Keeffe, *Board of Wynn Resorts Forcibly Buys Out Founder*, Wall Street Journal (Feb. 20, 2012), *available at* http://online.wsj.com/article/SB10001424052970203358704577233052477385494.html.

[3]     *Id.*  Mr. Okada made this investment through Aruze USA, Inc.  Freeh Report at 3 (Exh. 1).  For simplicity, we will refer to Aruze USA's shares in Wynn Resorts as belonging to Mr. Okada.

[4]     Nathan Layne, Taro Fuse & Kevin Krolicki, *Special Report: Japan's Casino Tycoon Bet Big on Philippines fixer*, Reuters (Dec. 31, 2012), *available at* http://www.reuters.com/article/2012/12/31/us-okada-philippines-idUSBRE8BU00320121231.

[5]     *Id.*

[6]     Berzon & O'Keeffe, *supra* note 2.

[7]     *Id.*

[8]     Freeh Report at 3 (Exh. 1).

[9]     *See* Press Release, Wynn Resorts, Kazuo Okada Resigns From Wynn Resorts Board of Directors (Feb. 21, 2013), http://phx.corporate-ir.net/phoenix.zhtml?c=132059&p=irol-newsArticle&ID=1787664&highlight=.

[10]     Freeh Report at 14 (Exh. 1).

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

an investment in the Philippines."[11]  In June 2010, however, Mr. Wynn and Wynn Resorts' Chief Operating Officer Marc Schorr joined Mr. Okada in the Philippines, where (as documented by "photographs of the trip") they "toured a hotel, shopping mall and casino showcasing Manila's investment potential, and sat through a presentation on the new [Universal casino] project in an air-conditioned marquee."[12]



In May 2011, Wynn Resorts pledged to donate $135 million to the foundation supporting the University of Macau, a gift representing 70% of the University's endowment that, according to media reports, had "become a pet cause for many top government officials in Macau and China."[15]  Mr. Okada was the sole objecting shareholder, and he later made a books and records demand on the Wynn Resorts Board relating to the donation.[16]  When that demand was rejected, Mr. Okada filed a lawsuit in Clark County District Court seeking to compel Wynn Resorts to make its books and records available.[17]  On February 8, 2012, the U.S. Securities and Exchange

---

[11]     Complaint ¶ 61, *Okada v. Wynn Resorts, Ltd.*, No. 2:13-cv-00136 (D. Nev. Jan. 24, 2013) (hereinafter "Securities Complaint") (Exh. 2) (quoting Steve Wynn on a conference call with stock analysts in 2008); *see also* Farah Master, *Billionaire Casino Moguls to Play Best Hand, in Court*, Reuters (Feb. 8, 2012), *available at* http://www.reuters.com/article/2012/02/09/us-wynn-okada-idUSTRE81803N20120209 (reporting the same statement).

[12]     Vinicy Chan & Kana Nishizawa, *Billionaire Okada's Manila Tour Is Defining Moment as Wynn Goes "Nuclear"*, Bloomberg (March 5, 2012), *available at* http://www.businessweek.com/news/2012-03-03/okada-manila-tour-proves-defining-as-wynn-goes-nuclear; *see also* Securities Complaint ¶ 62 (Exh. 2) (photographs of Messrs. Okada and Wynn in the Philippines).

[13]     ████████████████████████

[14]     ██

[15]     Kate O'Keeffe & Alexandra Berzon, *Macau School Ties Roil Wynn Resorts*, Wall Street Journal (March 2, 2012), *available at* http://online.wsj.com/article/SB10001424052970204571404577253232255305166.html.

[16]     Berzon & O'Keeffe, *supra* note 2.

[17]     *See* Petition for a Writ of Mandamus, *Okada v. Wynn Resorts, Ltd.*, No. A-12-654522-B (Clark County Dist. Ct. Jan. 11, 2012) (Exh. 4).

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

Commission ("SEC") informed Wynn Resorts that it was conducting an informal inquiry into the Macau donation.[18]

Following Wynn Resorts' decision not to invest in the Philippines and Mr. Okada's objection to the Macau donation, Messrs. Wynn and Okada's relationship continued to deteriorate.  On November 2, 2011, the Wynn Resorts Gaming Compliance Committee retained FSS to conduct an investigation relating to Mr. Okada.[19]  On February 6, 2012, prior to interviewing Mr. Okada, Mr. Freeh briefed the Compliance Committee on the investigation.[20]  On either February 14 or 15, 2012, Mr. Freeh interviewed Mr. Okada in Tokyo, Japan.[21]  On February 17, 2012, Mr. Freeh and Thomas O'Brien, Mr. Okada's counsel, exchanged correspondence concerning Mr. Okada's request to submit additional material for FSS's consideration.[22]  Mr. Freeh offered Mr. O'Brien two options: (1) Mr. Okada could, by the end of the day, submit a "proffer" of the additional information he wished FSS to consider; or (2) he could have an "opportunity to respond to [the] report after he receives a copy."[23]  Mr. Freeh noted in connection with the second option that "I will certainly consider and evaluate whatever information may be provided."[24]  Mr. O'Brien elected that option in light of "the tight time framework."[25]  Mr. Freeh then responded that, "[j]ust to confirm, I will now deliver my report to the Compliance Committee having completed my investigation," and informed Mr. O'Brien that "the report I am submitting is not a 'draft' subject to being finalized after Mr. Okada provides any response.  Rather this is akin to a final brief being submitted with the opportunity for a response to be made."[26]

---

[18]     Wynn Resorts, Ltd., Current Report (Form 8-K) (Feb. 13, 2012) (Exh. 5); *see also* Chris Sieroty, *SEC Probes Wynn Resorts Macau Dealings*, Las Vegas Review-Journal (Feb. 13, 2012), *available at* http://www.lvrj.com/business/sec-probes-wynn-resorts-macau-dealings-139255308.html.

[19]     Freeh Report at 1 (Exh. 1).

[20]     *See* Complaint ¶ 41, *Wynn Resorts, Ltd. v. Okada*, No. A-12-656710-B (Clark County Dist. Ct. Feb. 18, 2012) (hereinafter "Wynn Complaint") (Exh. 6).

[21]     The Freeh Report states that the interview was conducted on February 15.  Freeh Report at 36 (Exh. 1). ████████████████████████████████████

[22]     *See* E-mail from Louis Freeh to Thomas O'Brien (Feb. 17, 2012), Exh. E to Securities Complaint (Exh. 8).  We reviewed copies of this correspondence reproduced in a publicly available exhibit filed in the securities litigation between Mr. Okada and Wynn Resorts.  We are not in a position to authenticate documents given the scope of our assignment, but we are unaware of any challenge to the authenticity of these documents in the underlying litigation.

[23]     *Id.*

[24]     *Id.*

[25]     *Id.*

[26]     *Id.*

**PRIVILEGED AND CONFIDENTIAL**
**Attorney-Client Communication**
**Attorney Work Product**

COVINGTON & BURLING LLP

On February 18, 2012, Mr. Freeh presented his findings to the Wynn Resorts Board and submitted FSS's final 47-page report (the "Freeh Report").[27]  The Freeh Report states that it was based on "dozens" of interviews and a review of "thousands" of documents, and throughout cites to material contained in an Appendix.[28]  The Report primarily considers Mr. Okada's "attitude" toward compliance issues, the corporate structure relating to his company's land ownership in the Philippines, and alleged "prima facie FCPA violations" involving Philippine and Korean officials.  Its primary conclusions are that:

- Mr. Okada "strongly believes" that "when doing business in Asia, he should be able to provide gifts and things of value to foreign government officials."[29]

- Mr. Okada "designed" his operations in the Philippines "in a manner which appears to contravene" the Philippine Constitution and criminal law, and which "demonstrate[s] [his] intent to do business as he desires, regardless of the applicable laws and regulations."[30]

- Mr. Okada "appear[s] to have engaged in a longstanding practice of making payments and gifts" to PAGCOR officials "in an amount exceeding US 110,000," and that these payments are part of a "pattern of prima facie violations of the FCPA," including additional "possible" violations involving Korean officials.[31]

- Mr. Okada "personally directed" payments and gifts to PAGCOR Chairman Cristino Naguiat and his party during a September 2010 stay at Wynn Macau.[32]

- Mr. Okada presents a "substantial, ongoing risk" to Wynn Resorts.[33]

The same day that Mr. Freeh submitted the Report, the Wynn Resorts Board formally concluded that Mr. Okada and his affiliated companies were "unsuitable" under the Company's Articles of Incorporation, and voted to redeem Mr. Okada's shares.[34]  Wynn Resorts then

---

27      Wynn Complaint ¶ 44 (Exh. 6).

28      Freeh Report at 1 (Exh. 1).

29      Freeh Report at 1 (Exh. 1).

30      Freeh Report at 1, 46 (Exh. 1).

31      Freeh Report at 1-2 (Exh. 1).

32      Freeh Report at 28 (Exh. 1).

33      Freeh Report at 2 (Exh. 1).

34      Wynn Complaint ¶ 45 (Exh. 6); *see also* Press Release, Wynn Resorts, Wynn Resorts Board Concludes Year-Long Investigation of Kazuo Okada After Receiving Freeh Report (continued…)

COVINGTON & BURLING LLP

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

redeemed Mr. Okada's shares, valued at the time at $2.77 billion, for a $1.9 billion promissory note, payable in 10 years at 2% interest.[35]   The note represented "a 30% discount to the market value of [Mr. Okada's] stake," according to media reports.[36]   A casino consultant and analyst told the *Wall Street Journal* that the transaction was "highly accretive for Wynn Resorts," and that earnings per share could grow by 15%.[37]

At 2:14 a.m. on February 19, the following day, Wynn Resorts sued Mr. Okada in Clark County District Court for breach of fiduciary duty.[38]   Wynn Resorts appended a copy of the Freeh Report to its complaint, and to a Form 8-K filed with the SEC the same day, thereby publicly disclosing it.[39]   By the next day, the *Wall Street Journal* had reviewed and published an article on the Report.[40]   Wynn Resorts has not, however, publicly disclosed the Appendix of supporting materials quoted and cited throughout the Report.

Litigation between Wynn Resorts and Mr. Okada has continued.  On March 12, 2012, Mr. Okada removed the Wynn Resorts case against him to federal court and filed an answer and counterclaims, including a challenge to the validity of the share redemption.[41]   The federal court remanded the case to state court on June 21, 2012,[42] and trial is currently scheduled for April 2014.[43]   Separately, on January 24, 2013, Mr. Okada filed a lawsuit in federal court against Wynn Resorts alleging securities violations relating to Wynn Resorts' proxy solicitations.[44]   Mr. Okada voluntarily dismissed that action after the court refused to enjoin a shareholder vote on his

---

Detailing Numerous Apparent Violations of U.S. Anti-Corruption Laws (Feb. 19, 2012), http://phx.corporate-ir.net/phoenix.zhtml?c=132059&p=irol-newsArticle&ID=1662678&highlight=.

[35]     Berzon & O'Keeffe, *supra* note 2.

[36]     *Id.*

[37]     *Id.*

[38]     Wynn Complaint (Exh. 6).

[39]     Wynn Resorts, Ltd., Current Report (Form 8-K) (Feb. 19, 2012) (Exh. 9) (attaching the Wynn Complaint and the Freeh Report).

[40]     Berzon & O'Keeffe, *supra* note 2 (noting that the Freeh Report "was reviewed by The Wall Street Journal").

[41]     *See* Docket Report, *Wynn Resorts, Ltd. v. Okada*, No. 2:12-cv-00400 (D. Nev. March 12, 2012) (retrieved March 14, 2013) (Exh. 10).

[42]     *See id.*

[43]     *See* Register of Actions, *Wynn Resorts, Ltd. v. Okada*, No. A-12-656710-B (Clark County Dist. Ct. Feb. 19, 2012) (retrieved March 14, 2013) (Exh. 11).

[44]     *See* Securities Complaint (Exh. 2).

**PRIVILEGED AND CONFIDENTIAL**
**Attorney-Client Communication**
**Attorney Work Product**

COVINGTON & BURLING LLP

removal from the Wynn Resorts Board.[45]  In March 2013, Mr. Okada appeared before the Nevada Gaming Control Board.[46]

### B.   Assignment and Process

In February 2013, Morgan, Lewis & Bockius LLP, counsel to Universal and Mr. Okada, retained Covington and Burling LLP ("Covington") to perform an independent assessment of the Freeh Report.

Michael Chertoff and Steven Fagell led the Covington team, which also included Benjamin Haley and David Zionts.[47]

Judge Chertoff is senior of counsel in Covington's White Collar Defense and Investigations practice group, where he has handled a variety of complex criminal and civil regulatory matters.  Over the course of his career, he has led dozens of major internal investigations for a range of corporate clients.  Before joining Covington in 2009, Judge Chertoff served as Secretary of the U.S. Department of Homeland Security, where he led a 218,000 person department with a budget of $50 billion.  Prior to his appointment to the Cabinet, Judge Chertoff served from 2003 to 2005 as a judge on the U.S. Court of Appeals for the Third Circuit. Before becoming a federal judge, he was the Assistant Attorney General for the Criminal Division at the U.S. Department of Justice.  In that position, Judge Chertoff oversaw the investigation of the 9/11 terrorist attacks and formed the Enron Task Force, which produced more than 20 convictions, including those of CEOs Jeffrey Skilling and Kenneth Lay.  Judge

---

[45]    *See* Docket Report, *Wynn Resorts, Ltd. v. Okada*, No. 2:12-cv-00400 (D. Nev. March 12, 2012) (retrieved March 14, 2013) (Exh. 10).

[46]    Chris Sieroty, *Kazuo Okada Summoned to Nevada Gaming Control Board Hearing*, Las Vegas Review-Journal (March 8, 2013), *available at* http://cdcgamingreports.com/kazuo-okada-summoned-to-nevada-gaming-control-board-hearing/?doing_wp_cron=1363529581.6402089595794677734375.

In connection with that proceeding, Universal issued a press release responding to the Freeh Report.  *See* Press Release, Universal Entertainment Corp., Universal Entertainment Corporation's Group Response to the Allegations of the Freeh Report (March 13, 2013) (Exh. 12).  We became aware of this response while we were in the process of finalizing our review, and had already independently reached our conclusions regarding the FSS investigation.  As noted below, we were not asked to conduct a parallel investigation into the matters under investigation by FSS, and we are not in position to assess the factual statements made by Universal in its press release.  We note, however, that some of Universal's responses are consistent with the alternative explanations that we conclude FSS should have, but failed to, pursue.  *See, e.g.*, *infra* § IV.C.2 (discussing alternate explanation of Mr. Okada's role in the September 2010 Wynn Macau episode).

[47]    Neither Covington nor any of the lawyers involved in this matter has performed any work for Universal, Mr. Okada, or any related entities in the past.

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

Chertoff's career includes more than a decade as a federal prosecutor, including service as U.S. Attorney for the District of New Jersey, First Assistant U.S. Attorney for the District of New Jersey, and Assistant U.S. Attorney for the Southern District of New York.  He has received numerous awards, including the Department of Justice Henry E. Petersen Memorial Award (2006); the Department of Justice John Marshall Award for Trial of Litigation (1987); NAACP Benjamin L. Hooks Award for Distinguished Service (2007); the European Institute Transatlantic Leadership Award (2008); and two honorary doctorates.  Judge Chertoff's trial experiences have been featured in numerous books.  Judge Chertoff, who served as a law clerk to Justice William Brennan, Jr., of the U.S. Supreme Court and Judge Murray I. Gurfein of the U.S. Court of Appeals for the Second Circuit, is a *magna cum laude* graduate of both Harvard College and Harvard Law School.

Mr. Fagell is co-chair of the firm's Global Anti-Corruption practice group and a partner in the White Collar Defense and Investigations practice group.  He focuses on criminal and civil regulatory matters presenting complex legal, political, and reputational risks.  Mr. Fagell has led numerous governmental and internal anti-corruption investigations for multinational companies in a range of industries.  He has also represented numerous Board committees in investigations in connection with shareholder derivative litigation.  From 2009-2010, Mr. Fagell served as Deputy Chief of Staff and Counselor in the Criminal Division at the Department of Justice, where he was integrally involved in the formulation of Division policy in connection with the Foreign Corrupt Practices Act, corporate and securities fraud, and other forms of financial fraud.  Mr. Fagell, who served as a law clerk to Judge Peter J. Messitte of the U.S. District Court for the District of Maryland, is a *magna cum laude* graduate of both Dartmouth College and Harvard Law School.

Mr. Haley is special counsel in Covington's White Collar Defense and Investigations and Global Anti-Corruption practice groups.  His practice focuses on anti-corruption/FCPA, board committee, and securities enforcement investigations.  Mr. Haley, who also served as a law clerk to Judge Peter J. Messitte of the U.S. District Court for the District of Maryland, is a *magna cum laude* graduate of Amherst College and the University of Maryland School of Law, where he served as Editor in Chief of the Law Review and was elected to Order of the Coif.

Mr. Zionts is an associate in Covington's Litigation and International practice groups, with a particular focus on appellate litigation.  Immediately prior to joining Covington, he served as Special Advisor to a senior official at the U.S. Department of State.  Mr. Zionts, who served as a law clerk to Justice Stephen G. Breyer of the U.S. Supreme Court and Judge Merrick B. Garland of the U.S. Court of Appeals for the D.C. Circuit, is a *summa cum laude* graduate of Columbia University, and a *magna cum laude* graduate of Harvard Law School, where he was Articles Chair of the Harvard Law Review and received the Fay Diploma for having graduated first in his class.

As noted above, Covington's assignment was to conduct an independent review of the Freeh Report.  To carry out this assignment we reviewed the Freeh Report and its Appendix.[48]

---

[48]     We are not aware that the Appendix has been publicly disclosed, and so have reviewed a copy provided to us by Morgan, Lewis & Bockius LLP.  Since the Appendix itself does not (continued…)

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

We also consulted publicly available documents and conducted legal research as necessary. We were not asked to conduct a parallel investigation of the matters that were the subject of the Freeh Report.

## III.  The Freeh Report Suffers From Numerous Deficiencies in Investigative Process

### A.  Best Practices in Internal Investigations

The goal of any internal investigation should be to find facts through a reliable, credible, fair, and well-documented process. The reliability and credibility of an investigation's conclusions depend upon a process that takes into account all relevant information and does not fail to consider alternate explanations for events. It is also critical to adequately and transparently document the investigation's conclusions, so that the investigator's audience — here, not only the Wynn Resorts Board, but also the Clark County District Court, the U.S. Government, the press, and the general public — can independently assess the support for those conclusions.

### 1.  Document Collection and Review

A sound process for the preservation, collection, and review of relevant documents and information is an essential element of a reliable and credible investigation. An investigator should start from the proposition that *all* relevant materials should be preserved for possible review.[49] While the specific facts of the case and practical considerations may militate in favor of a more targeted approach to collection and review, investigators must be mindful that "[d]ocument review is the key investigative technique from which all else flows in an internal investigation."[50] Thus, if an investigation has a flawed document collection and review process, that is likely to be a fatal flaw in the investigation as a whole.

It is typically not sufficient for investigative counsel to proceed solely on the basis of documents assembled or provided by management, or on "self-selection" of relevant documents

---

appear to have its own system of pagination, and the Freeh Report only cites generically to the Appendix without pinpoint citations to specific pages, we have attached relevant portions of the Appendix as exhibits, with parallel citation to the Bates numbers printed on the copy of the Appendix that we have reviewed. We have also attached as exhibits copies of court filings and other documents we have reviewed, but have not attached copies of newspaper articles and press releases that are readily available on the internet.

[49]    *See* Dan K. Webb et al., *Corporate Internal Investigations* § 8.01 (2012) ("[I]nvestigating counsel must be sure that all relevant documents are gathered, reviewed and kept in a fashion that will allow easy access to them for future use."); *id.* § 8.04[1] ("The specific purpose of this aspect of the investigation is to gather *all* relevant documents. Counsel must design a system that is most likely to result in *all* relevant documents being retrieved." (emphasis added)).

[50]    Richard M. Phillips & Jeffrey L. Bornstein, *Internal Investigations*, *in* 4 A.A. Sommer, Jr., *Securities Law Techniques* § 119.05[1] (Matthew Bender 2013).

COVINGTON & BURLING LLP

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

by employees involved in the events under investigation.  Investigative counsel must take steps to verify independently that the investigation team is provided access to all relevant documents, *e.g.*, by conducting interviews with document custodians.  Finally, documents should be collected in a manner that ensures that they are not altered, and investigative counsel should keep detailed records of the provenance of all materials collected.[51]

### 2.    Documentation of the Investigative Process

Documentation of the investigative process is a critical component of a reliable and credible investigation.  Without thorough documentation, there may be an insufficient "audit trail" to test the investigation's conclusions.  Among other things, the investigator should carefully and completely document: (1) the process by which relevant documents were preserved, collected, and reviewed; and (2) the identities of witnesses interviewed, the substance of witness accounts, and the identities of witnesses who were not available for an interview.  As a leading treatise on corporate internal investigations explains, an investigative report should include "[a] description of steps taken during the investigation [that] chronicle[s] the investigation from beginning to end."[52]  This description "will provide the reader with an overall picture of how the allegation was addressed and establish that management and investigating counsel acted reasonably," and "should provide credibility for the conclusions stated previously and the description of the evidence and analysis of the law."[53]

### 3.    Witness Interviews

Witness interviews are an essential part of the investigative process, because they allow witnesses to fill in the gaps that exist in a documentary record, and to give needed context to documents and events.  The goal of an interview in an internal investigation is to develop an accurate and comprehensive record of a witness's knowledge, not to elicit damaging testimony from an adversary.  Thus, interviews in internal investigations should not be employed as a game of "gotcha."  Instead, to the extent possible, the interviewee should be given advance notice of

---

[51]     *See id.* § 119.05[1] ("It is crucial for both the efficiency and credibility of the investigative process that all documents be carefully gathered, identified, secured and tracked throughout the investigation . . . .  A log should be kept of all documents, noting who provided the document, who had possession of the document, where it was found and the date the document was collected.").

[52]     *See* Webb, *supra* note 49, § 11.04[1][a][iii]; *see also* Phillips & Bornstein, *supra* note 50, § 119.06 (report should describe the "logistical steps taken to conduct the investigation, such as the time it took, the number of persons who worked and the total number of hours spent on the investigation, the number and types of documents collected and analyzed, the locations visited and searched for relevant documents (including storage facilities), the number and identity of the people interviewed, and any experts who were retained and consulted.  It [should] also identif[y] any important witness who refused to cooperate and the reasons for the refusal as well as any other potential evidence that was unavailable or otherwise was not examined.").

[53]     Webb, *supra* note 49, § 11.04[1][a][iii].

**COVINGTON & BURLING** LLP

**PRIVILEGED AND CONFIDENTIAL**
**Attorney-Client Communication**
**Attorney Work Product**

the topics and even the specific documents that will be the subject of inquiry. In a set of "Recommended Practices" for internal investigations, the American College of Trial Lawyers recommends that "[a]bsent special circumstances such as valid concerns of possible witness tampering, obstruction of justice, other evidence of attempts to disrupt the integrity of the internal investigation or the unavailability of hard-copy or electronic documents, [investigative counsel] should make available to witnesses or their counsel the topics and documents that will be covered in the interview, and allow [witnesses] to obtain copies of their documentary files, including calendars and electronic data."[54] Along similar lines, it is generally appropriate to give the interviewee the opportunity to review and clarify or supplement the record of the interview after the interview is complete.[55]

### 4.    Evidentiary Support for Findings

To be reliable and credible, an investigation's factual findings require meticulous citation to evidentiary materials. The reader of an investigative report cannot be expected to accept an investigator's *ipse dixit* recitation of facts, particularly where the investigator is relying on documents or witness statements to draw inferences about issues of knowledge and intent. "[I]t is critical to [a report's] credibility that it identify the basis for each and every significant statement" supporting its findings.[56] Accordingly, if the conclusions of a report are to stand up to scrutiny, the "report should contain citations for every significant factual statement and legal proposition."[57] A report that bases conclusions on documents or interview summaries that are not made available to the reader is simply not reliable.[58] Finally, while investigative counsel are not constrained by rules of admissibility, if a report relies on documents to support its conclusions, it should to the fullest extent possible use primary sources (*i.e.*, originals or

---

[54]    American College of Trial Lawyers, *Recommended Practices for Companies and Their Counsel in Conducting Internal Investigations* 26 (2008) (hereinafter "ACTL Recommended Practices"), *available at* http://www.actl.com/AM/Template.cfm?Section=All_Publications&Template=/CM/ContentDisplay.cfm&ContentID=3390.

[55]    *Id.* at 27 ("Absent special circumstances such as valid concerns of possible witness tampering, obstruction of justice, or other evidence of attempts to disrupt the integrity of an investigation, [investigative counsel] should give counsel for witnesses an opportunity to suggest modifications to the memoranda so as to avoid misstating or mischaracterizing a witness's statements.").

[56]    Phillips & Bornstein, *supra* note 50, § 119.06.

[57]    *Id.*

[58]    *See, e.g.*, *id.* § 119.06 ("[I]t generally makes no sense to provide citations to nonpublic documents not available to the reader."); *cf. Sutherland v. Sutherland*, 958 A.2d 235, 244-45 n.34 (Del. Ch. 2008) (rejecting the report of a special litigation committee in derivative litigation where the report was "wholly devoid of citations to key documents or interview summaries," and noting that "the lack of a record hinder[s] the court's, and the plaintiff's, ability to scrutinize the SLC's good faith, independence, and reasonableness").

COVINGTON & BURLING LLP

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

unaltered copies of documents), not excerpts, digests, or compilations created for the purpose of the investigation.

### 5.        Consideration of Alternate Explanations

To conduct a credible and reliable investigation, an investigator must consider and analyze *all* relevant facts.  As the Delaware Chancery Court has explained in the similar context of special litigation committee reports prepared in connection with shareholder derivative litigation, "[t]he touchstone of good faith in the context of a special litigation committee report is its demonstrated willingness to deal openly and honestly with all relevant and material information."[59]  In practice, this means considering alternate explanations for events, transparently addressing conflicting witness accounts, and confirming verifiable facts.[60]

### 6.        Credibility Determinations

While assessments of the credibility of witnesses are an inherent part of any investigation, the context of internal investigations requires that investigators tread lightly in this area.  Internal investigations are not trials.  Witnesses are not examined under oath or under the supervision of a judge administering rules of evidence.  Nor are their accounts subject to "testing in the crucible of cross-examination."[61]  Additionally, individuals who are the subject of the investigation are typically not afforded unfettered access to the documents and witnesses that are made available to the investigator.

To the extent that credibility determinations are made, they should be made only after the investigator has considered all relevant factors bearing on the witness's credibility, including relevant documents, other witness accounts (which themselves may raise credibility issues), other circumstantial evidence relating to the witness's motivations and conduct, and the investigator's perception of the witness's demeanor and behavior in the interview.  If credibility determinations are material to the investigation's findings, it is critical that the investigator provide a transparent account of the reasons behind those determinations.[62]  Summarily stating

---

[59]      *Id.* at *3.

[60]      *See* Phillips & Bornstein, *supra* note 50, § 119.06 ("Contradictory or otherwise conflicting evidence should be identified and evaluated as objectively as possible.  Areas that can be verified as to the accuracy or authenticity should also be noted and explained."); Webb, *supra* note 49, § 11.04[1][a][vii] (a report's analysis "should . . . set forth the direct and circumstantial evidence supporting and contradicting the allegations, breaking it down to each element of the potential offense or cause of action; identify any evidentiary gaps which might be developed further; [and] assess the credibility of key witnesses supporting or refuting the allegation"); *id.* § 11.04[1][a][v] (a report must not "ignore key differing witness accounts").

[61]      *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

[62]      *See* Webb, *supra* note 49, § 11.04[1][a][v] ("To the extent that credibility assessments must be made, those assessments and the factors considered in making them should be set forth in sufficient detail.").

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

that the investigator does not find a particular witness credible, without pointing to the specific pieces of evidence that contradict a witness's account, does not provide the investigator's audience with a fair opportunity to assess the reliability of the determination.  If the investigator is making the determination based on little more than a "gut feeling" about a witness's believability, that should be explained.

    **B.**    **Specific Process Deficiencies in the Freeh Report**

        **1.**    **The Freeh Report Lacks an Adequate Description of Investigative Process**

      As noted above, an investigative report should include a detailed description of the process that was followed in the investigation.  The Freeh Report is patently deficient on this front.  Apart from a one-sentence description of FSS's investigative process, the Freeh Report does not directly address this issue:

> FSS has performed its investigation by interviewing dozens of individuals and by reviewing thousands of documents, electronic emails, corporate and public records.[63]

This brief description leaves unanswered many questions that go directly to the reliability and credibility of the investigation, such as:

- Who was interviewed?  Did FSS seek to interview anyone who refused or was otherwise unavailable to be interviewed?  Were interview summaries or memoranda prepared for all witnesses interviewed?

- How did FSS collect relevant documents and data?  Did it engage an experienced electronic discovery consultant to assist in the collection of electronic data?  Did it conduct interviews of document custodians?  Did it rely on Wynn Resorts management and employees to identify relevant data?  Did it identify any gaps in relevant documents or data?

- How did FSS perform its document review?  Did it filter data with keyword search terms?  Who performed the document review?

- How did FSS perform its review and analysis of charges to the Aruze City Ledger Account?  Did it perform a forensic analysis of the relevant expenses?  Did it review data in (or reports provided from) Wynn's accounting systems, or did it rely on compilations provided by Wynn management?

---

[63]    Freeh Report at 1 (Exh. 1).

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

Without answers to these questions, a reader of the Freeh Report is left with serious questions about the reliability of FSS's investigative process. These concerns are particularly acute when they are considered together with the additional process deficiencies discussed below.

### 2. The Freeh Report Does Not Provide Any Interview Summaries Other Than Mr. Okada's

Although the Freeh Report indicates that FSS conducted "dozens" of interviews, the Report does not provide summaries or interview memoranda for any witnesses other than Mr. Okada. [64] This raises significant reliability issues, because, as discussed below, the Report cites heavily to witness accounts to support key conclusions, as well as its determination that Mr. Okada's account of certain events is not credible. Without any record of these interviews, the reader is left with no basis to assess whether they support the Report's conclusions. This is particularly problematic where conflicting witness accounts exist, and the Report credits the accounts of other witnesses that on their face raise credibility issues. [65]

### 3. The Freeh Report's Documentary Evidence Is Deficient

As discussed above, if an investigative report relies on documents to support its conclusions, it should to the fullest extent possible use primary sources for support. The use of excerpts, digests, or compilations created for the purpose of the investigation raises inherent reliability and credibility issues. Put differently, the reader should have confidence that the document cited for support is what the Report says it is, that the Report includes a full, unaltered copy of the document, and that there are no questions about the provenance of the document. The Freeh Report is flawed on this front because it relies on documents that are facially deficient for the purposes for which they are offered.

First, in support of its conclusion that "[t]here is evidence that Mr. Okada personally directed the payments and gifts provided to [PAGCOR] Chairman [Cristino] Naugiat" in September 2010, the Report relies primarily on a purported "Email from Matt Araki to Beatrice Yeung dated October 5, 2010." [66] ███████████████████████████

---

[64]   The Report cites to interviews with 15 witnesses other than Mr. Okada.

[65]   For example, in its discussion of Mr. Okada's statements at the February 24, 2011 meeting of the Board of Wynn Resorts, the Report implicitly credits the account of Steve Wynn. *See* Freeh Report at 11 n.17 (Exh. 1). Given the nature of the dispute between Messrs. Wynn and Okada, a careful investigator would be attuned to the risk that Mr. Wynn's account of events could be slanted. In a situation such as this, providing interview summaries or memoranda as support for statements in the Report is particularly important. The same is true with respect to the interview of Manuel Camacho, a witness who FSS acknowledged had difficulty recollecting relevant details. *See* Freeh Report at 16 n.44 (Exh. 1) ("Although Mr. Camacho, who is in his seventies, failed to recall some details of his dealings with Mr. Genuino and Mr. Soriano, FSS credits the general account given by him during the December 13, 2011 interview.").

[66]   *See* Freeh Report at 28 n.99 (Exh. 1).

COVINGTON & BURLING LLP



Putting aside the fact that the Report mischaracterizes this document as an "e-mail" when it clearly is not, this document is not a reliable piece of evidence.  It leaves the reader with

---

67

COVINGTON & BURLING LLP

numerous questions, including who prepared it and for what purpose, how it was obtained by FSS, and most important, what was left out.

Second, the Report's reliance on what it calls the "Aruze City Ledger Account records" is flawed. These records (dated January 18, 2012) appear to be a summary of account activity that was created for the purpose of FSS's investigation:[68]



A reliable investigation into the charges on this account calls for more than a summary of this type. An investigator can certainly produce or request a summary of account entries as a convenience in order to facilitate review. However, that summary alone cannot answer most of the key questions that an investigation should address, *e.g.*, who authorized and approved certain charges, what was the purpose of such charges, and whether such charges were reimbursed. Indeed, on these questions, a summary of the type that FSS relies upon is patently deficient. In anti-corruption investigations, it is common for investigative counsel to retain forensic accountants to assist with the review of relevant accounts. Such reviews typically involve not only an examination of summaries like the one relied upon by FSS, but also a thorough review of underlying documentation supporting individual expense items (*e.g.*, receipts and invoices), and

---

[68]  ████████████████████████████████████████

**PRIVILEGED AND CONFIDENTIAL**
**Attorney-Client Communication**
**Attorney Work Product**

**COVINGTON & BURLING LLP**

an examination of how charges are ultimately treated in relevant books and records (*e.g.*, were any of the relevant expenses reimbursed). FSS appears not to have engaged in this type of forensic accounting analysis.[69]

### 4. The Freeh Report Does Not Adequately Consider Alternate Explanations and Fails to Investigate Verifiable Facts

One of the hallmarks of a reliable and credible investigative report is its careful consideration of alternate explanations of events and full investigation of verifiable facts. As discussed in greater detail below, the Freeh Report fails repeatedly on this front. For example, not only does the Freeh Report essentially ignore Mr. Okada's account of events, it fails altogether to address a number of factual issues that cut against its conclusions. Additionally, FSS apparently chose not to investigate whether certain alleged payments benefitting Philippine and Korean officials were reimbursed, despite evidence in its own record suggesting they may have been.[70] Similarly, it appears that FSS failed to follow up on Mr. Okada's statement that he fired an employee for incurring unauthorized expenses in connection with the September 2010 PAGCOR visit, a verifiable factual claim that, if true, would tend to undermine the conclusion that Mr. Okada personally directed the payments.[71]

### 5. The Freeh Report Does Not Give Due Consideration to Mr. Okada's Account of the Facts

FSS conducted an extensive interview of Mr. Okada on February 14 or 15, 2012. Because he was the target of the investigation, the interview of Mr. Okada should have been a centerpiece of the investigation. Instead, it appears to have been an afterthought, occurring days before the Report's February 18, 2012 submission, the Board's February 18, 2012 vote to redeem Mr. Okada's shares, and Wynn Resorts' February 19, 2012 lawsuit attaching the Report as an exhibit.[72] In light of the short amount of time between the interview and the Report's

---

[69] 

[70]     *See infra* §§ IV.C.2, IV.D.

[71]     *See infra* § IV.C.2.b.

[72]     The Wynn Complaint alleges that FSS sought to interview Mr. Okada earlier but that Mr. Okada did not make himself available. If that is indeed the reason for FSS's cursory treatment of that interview in its analysis, it should at a minimum have disclosed that fact in the Report itself. (continued…)

**PRIVILEGED AND CONFIDENTIAL**
**Attorney-Client Communication**
**Attorney Work Product**

COVINGTON & BURLING LLP

submission and follow-on consequences, it is likely that FSS would already have reached its conclusions by the time FSS interviewed Mr. Okada.

In addition to the timing of the interview relative to the release of the Report, the structure of the Report suggests that Mr. Okada's interview did not receive appropriate attention. Rather than treat Mr. Okada's interview as it did other interviews and integrate Mr. Okada's statements into the Report's substantive analysis, FSS simply tacked on a discussion of the interview to the end of the Report. Indeed, as discussed below, in its substantive discussion of each of the issues under investigation (except for the allegation concerning the 2008 Beijing Olympics), the Report omits any reference to statements by Mr. Okada. While the Report indicates that FSS did not find Mr. Okada credible *on certain issues*, a fair treatment of all the facts would have at least addressed Mr. Okada's account frontally. Instead, by disaggregating Mr. Okada's statements from the substantive discussion of the issues under investigation, the Report provides an incomplete and one-sided account of events and gives certain pieces of evidence the appearance of greater weight than they deserve.

Finally, FSS failed to give Mr. Okada a meaningful opportunity to supplement the record of his interview before it issued the Report. Mr. Okada has claimed that he was not informed of the topics of the investigation prior to the interview,[73] and even with some advance notice, in an ordinary investigation a CEO would not necessarily be expected to have intimate familiarity with the details of specific past transactions and expenses.[74] It therefore appears to have been reasonable for Mr. Okada's counsel to request the opportunity for Mr. Okada to submit additional material for FSS's consideration after the conclusion of the interview.[75] Despite Mr. Okada's request — and numerous factual questions raised in the interview that called out for further investigation — FSS elected to issue the Report without giving Mr. Okada a genuine opportunity to provide any additional information.[76] Simply put, the timing and circumstances

---

In any event, whatever responsibility Mr. Okada bears for the timing of the interview does not excuse FSS's failure to fairly consider his account and integrate it into its analysis.

[73]   *See* Securities Complaint ¶ 81 (Exh. 2).

[74]   Many of the questions Mr. Freeh asked Mr. Okada, which related to activities of Universal and other corporate entities, would, in the context of civil litigation, generally be the types of questions directed to a corporate representative in a Rule 30(b)(6) deposition.

[75]   *See* E-mail from Louis Freeh to Thomas O'Brien (Feb. 17, 2012), Exh. E to Securities Complaint (Exh. 8).

[76]   *See id.* We note that the American College of Trial Lawyers recommends that "[a]bsent special circumstances such as valid concerns of possible witness tampering, obstruction of justice, or other evidence of attempts to disrupt the integrity of an investigation, if a final written report is to be prepared, [investigative counsel] should share tentative conclusions as to witnesses' conduct with counsel for present or former employees whose conduct is under examination for possible correction or modification." ACTL Recommended Practices, *supra* note 54, at 27.

**PRIVILEGED AND CONFIDENTIAL**
**Attorney-Client Communication**
**Attorney Work Product**

COVINGTON & BURLING LLP

of this episode suggest that FSS was more concerned with supplying its Report to the Compliance Committee immediately than it was with developing a full and fair account of the facts. Indeed, Mr. Freeh's choice of words in correspondence with Mr. Okada's counsel on this subject is telling. Mr. Freeh described the Report not as an objective and independent account, but effectively as an advocacy piece, saying that it was "akin to a final brief being submitted with the opportunity for a response to be made." Mr. Freeh's "brief" metaphor suggests that he viewed FSS's role not as a purely independent fact-finder, but more akin to that of a prosecutor developing a case.

### 6.  The Freeh Report's Credibility Determination Regarding Mr. Okada Is Not Reliable

It is evident from the Freeh Report that, because FSS concluded that Mr. Okada was not credible, FSS chose not to investigate his contrary factual account. While it is always difficult to evaluate credibility determinations on a cold record, here, there are strong reasons to question FSS's determination that Mr. Okada is not credible. To begin with, where the Report addresses Mr. Okada's credibility directly, it does so largely in summary fashion, relying on unspecified "evidence" and "the facts and reasonable inferences" drawn therefore, or on witness accounts that the reader has no basis to test in the absence of witness interview summaries or memoranda.[77] This sort of dismissive approach leaves the reader with no confidence that FSS's credibility determination is itself credible.

Fundamentally, FSS's credibility determination is informed by flawed factual conclusions. In other words, FSS finds Mr. Okada not to be credible because he denied engaging in certain conduct, and — according to FSS — the evidence shows otherwise. However, if, as discussed below, FSS's factual conclusions themselves are not adequately supported, then they should not be relied upon to show that Mr. Okada is not credible. This is particularly so where FSS failed to investigate key factual issues and verifiable claims that go to the heart of Mr. Okada's credibility.

---

[77]     *See* Freeh Report at 47 (Exh. 1) ("The substantial evidence relating to Chairman Naguiat's September 2010 stay at Wynn Macau, including e-mails, Coughlan's statements, and the facts and reasonable inferences regarding this evidence, cast substantial doubt on Mr. Okada's credibility."; "Mr. Okada also vehemently denied making statements to fellow board members to the effect that doing business in Asia requires and permits bribes to be made to government officials. Mr. Okada's denials are directly contradicted by many of his fellow board members.").

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

## IV.   The Freeh Report's Factual Findings and Conclusions Are Not Credible

### A.   Mr. Okada's Alleged "Personal Rejection" of Wynn Resorts' Anti-Bribery Policy

#### 1.   The Freeh Report's Account of the February 24, 2011 Board Meeting Is Not Reliable

The Freeh Report reaches the provocative conclusion that "Mr. Okada strongly believes and asserts that when doing business in Asia, he should be able to provide gifts and things of value to foreign government officials."[78]  This conclusion is based on the allegation that, at a February 24, 2011 Board meeting, Mr. Okada "*stated his personal rejection* of Wynn Resorts anti-bribery rules and regulations, as well as legal prohibitions against making such payments to government officials."[79]  This strongly worded conclusion, however, based solely on interviews with Wynn Resorts Board members conducted nearly a year later, is not credible.

FSS bases its narrative of the Board meeting only on oral accounts; there does not appear to be any written record of Mr. Okada's alleged statements, ██████████████████████.[80]  Despite this exclusive reliance on interviews, FSS does not make available any transcripts or notes.[81]  Moreover, the Report's account is confused and unclear: it is not obvious when the Report purports to quote Mr. Okada directly (through the interviewees' recollection), when the Report relies on paraphrases by the interviewees, or when FSS itself is paraphrasing the paraphrases.[82]  For example, the Report quotes a "claim" by Mr. Okada, attributing this quotation to a Board member who participated by phone and said Mr. Okada used "words to that effect."[83]  The Report also relies on what a Board member "understood Mr. Okada to mean."[84]  These indirect and ambiguous recollections — provided nearly a year after the meeting — cannot, standing alone, support the Freeh Report's strong claim that Mr. Okada "stated" his "rejection" of anti-bribery laws.  Moreover, the potential unreliability of these accounts is compounded by the fact that Mr. Okada speaks "little English" and relies on a translator,[85] creating a serious risk that the surprising remarks attributed to him were the product of miscommunications and misunderstandings.

---

[78]   Freeh Report at 1 (Exh. 1).

[79]   Freeh Report at 10 (emphasis added) (Exh. 1).

[80]   

[81]   

[82]   *See* Freeh Report at 11 (Exh. 1).

[83]   Freeh Report at 11 (Exh. 1).

[84]   Freeh Report at 11 (Exh. 1).

[85]   *See* Layne, Fuse & Krolicki, *supra* note 4 ("Okada speaks little English.").

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

The Freeh Report's conclusions also lack credibility because FSS fails to consider the motives of its interviewees, which include Steve Wynn himself.  Members of the Wynn Resorts Board, and particularly Mr. Wynn, were already in an adversarial posture toward Mr. Okada at the time of these interviews.  Mr. Okada and the rest of the Board had previously come into conflict about the Philippine investment, and then staked out competing positions on corporate governance issues relating to the $135 million University of Macau donation, leading to litigation between Mr. Okada and the rest of the Board.  Moreover, Mr. Wynn and potentially other Board members stood to gain financially from the results of the Freeh Report, which they ultimately invoked to justify redeeming Mr. Okada's shares at a substantial discount.  Considering FSS's readiness to make adverse credibility findings against Mr. Okada, it is perplexing that the Report would not even mention or consider the obvious interests its interviewees had in condemning Mr. Okada.

Finally, the Freeh Report's bottom-line conclusion — that Mr. Okada admitted in a Board meeting to personal hostility toward, and rejection of, anti-bribery laws — is sufficiently inflammatory as to require much more robust substantiation.  One would also expect Mr. Wynn and the Board to take immediate corrective action upon learning that a Board member is overtly hostile to company policy and U.S. law.  Yet less than two months after that meeting, the Board nominated Mr. Okada for re-election to the Board, and unanimously recommended that shareholders vote for him.[86]  FSS's failure to point to *any* substantial reaction by the Board for nearly a year, or to explain the Board's endorsement of Mr. Okada shortly after the meeting, further casts doubt on the Report's conclusion that Mr. Okada "personally rejected" anti-bribery rules at this meeting.

### 2.   The Freeh Report Reaches Unsupported Conclusions Concerning FCPA Training and Code of Conduct Acknowledgment

The Freeh Report concludes that Mr. Okada "has failed to make himself available" for FCPA compliance training.[87]  According to FSS, this failure bears on Mr. Okada's "likely future conduct."[88]  The sole basis for this conclusion is Mr. Okada's inability to attend a single session,

---

[86]   *See* Wynn Resorts, Ltd., Proxy Statement (Schedule 14a), at 3-4 (Apr. 7, 2011) (Exh. 16) ("At the recommendation of the Nominating and Corporate Governance Committee, the Board is nominating the following four directors for re-election as Class III directors: Russell Goldsmith, Robert J. Miller, Kazuo Okada, Allan Zeman. . . . OUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE FOR THE ELECTION OF THE NOMINEES LISTED ABOVE. . . . Mr. Okada, a founding stockholder along with Mr. Wynn, as well as the Company's Vice Chairman, brings an international perspective that is essential to the Company's strategic vision.  In addition, his primary business as a manufacturer and developer of gaming equipment adds significant value to our operations.").

[87]   Freeh Report at 32 (Exh. 1).

[88]   Freeh Report at 32 (Exh. 1).

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

on October 31, 2011 (two days before Wynn Resorts retained FSS to investigate him).[89]
However, FSS does not acknowledge a letter from Mr. Okada personally requesting that the
session be moved to accommodate his schedule, in which Mr. Okada stated his "appreciat[ion]"
for the training and that he is "determined . . . to make efforts to contribute to the very high legal
and ethical standards that Wynn Resorts upholds."[90]   The Report also ignores Mr. Okada's
request for a recording of the training session after it was held in his absence.[91]   These facts, all
reflected in the Report's Appendix, are inconsistent with FSS's suggestion that Mr. Okada
intentionally avoided learning about the FCPA.  Moreover, the inference the Freeh Report draws
— that Mr. Okada's failure to attend a single training session indicates that he is "likely" to
commit future FCPA *violations* — is absurd.  It would be extraordinarily naïve to reason that
attendance or absence at a legal training session is truly probative of whether someone intends to
break the law.  Indeed, FSS's willingness to indulge such a flimsy inference undermines the
credibility of the Report.

The Freeh Report's reliance on Mr. Okada's alleged failure to sign a form acknowledging
that he read the latest edition of the company's Code of Conduct is similarly faulty.  The Report
fails to mention that Mr. Okada's counsel sought clarification regarding terminology in the Code
that he found "very imprecise."[92]   As late as two weeks before the Freeh Report was submitted,
Mr. Okada's representatives continued to seek discussion with Wynn Resorts about the Code of
Conduct, with the stated aim of "get[ting] to a point that Mr. Okada can comfortably sign and
return the Acknowledgement."[93]   Mr. Okada's counsel further suggested that his client's
hesitation reflected a concern that the Code of Conduct was being used as part of an intra-Board
dispute.  Specifically, Mr. Okada's representatives were concerned that under the revised Code
of Conduct, Mr. Okada's Philippine project could be considered a conflict of interest.[94]   Mr.
Okada's concerns appear to have been well-founded.  When Wynn Resorts filed its lawsuit the
day after the Freeh Report was submitted, it alleged that the Philippine casino "will compete with
Wynn Macau" and therefore violates Mr. Okada's obligations under the Code of Conduct.[95]

---

[89]     Freeh Report at 11-12, 32 (Exh. 1).

[90]     Letter from Kazuo Okada to Kim Sinatra (undated)

[91]     *See* Letter from Gidon M. Caine to Robert L. Shapiro

[92]     *Id.*

[93]     E-mail from Barry Brooks to Kevin Tourek (Feb. 1, 2012)

[94]     *See id.*; Letter from Gidon M. Caine to Robert L. Shapiro (Dec. 1, 2011)

[95]     Wynn Complaint ¶¶ 48-59 (Exh. 6); *see also id.* ¶ 27 ("Okada proceeded to announce that
he and Universal planned to lure high-limit, VIP gamblers from China to its Manila Bay resort-
casino, the same customer base as Wynn Macau.  In short, Okada was creating a new casino in
direct competition with Wynn Macau.").

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

The Freeh Report describes the correspondence between Wynn Resorts and Mr. Okada's counsel,[96] but ignores it in concluding that Mr. Okada's failure to sign the acknowledgement "suggests that he intends to continue his apparent practice and pattern of making FCPA prohibited payments on a going-forward basis."[97]  This conclusion is not only inconsistent with the evidence in the record, but it also defies common sense.  It is difficult to believe that the mere delay in signing an acknowledgement form "suggests" an intention to break the law going forward.

### B.    The Freeh Report's Conclusion That Mr. Okada Violated Philippine Land Ownership Law in Bad Faith Is Not Credible

The Freeh Report concludes that Mr. Okada "designed his corporate gaming business and operations in the Philippines in a manner which appears to contravene Philippine Constitutional provisions and statutes that require 60% ownership by Philippine nationals, as well as a Philippine criminal statute."[98]  FSS reports that the land in question is owned by Eagle I Landholdings, Inc. ("Eagle I"), in which Aruze USA has a 40% stake.[99]  Eagle II Holdco, Inc. ("Eagle II") owns 60% of the shares of Eagle I, and Platinum Gaming and Entertainment ("Platinum") owns 60% of the shares of Eagle II.[100]  Platinum appears to be Filipino-owned.[101] If 60% Filipino ownership of a corporation is sufficient to consider its shares in another corporation as Filipino-owned, then Eagle I's structure satisfies the legal requirements.  If, on the other hand, one calculates the actual percentage of ownership on a layer-by-layer basis, then Eagle I would appear to fall short of the necessary threshold.  FSS commissioned MM Lazaro &

---

[96]      Freeh Report at 34 (Exh. 1).

[97]      Freeh Report at 32 (Exh. 1).

[98]      Freeh Report at 1 (Exh. 1).

[99]      Freeh Report at 15 (Exh. 1).

[100]     Freeh Report at 15 (Exh. 1).

[101]     FSS prefaces this section of its Report with an extensive discussion of Platinum and other entities, under the heading of "Corporate Links between Mr. Okada's Business Interests and Those of Philippine Government Officials."  *See* Freeh Report at 13-17 (Exh. 1).  Nowhere does FSS explain the relevance of this digression, but it appears to suggest by innuendo that these relationships were improper, and perhaps that they undermine the legitimacy of Platinum's stake in Eagle II.  Because of the questionable relevance of this narrative, we do not address it in detail.  We note, however, that this discussion suffers from many of the defects that pervade the Freeh Report.  For example, in making the serious allegation of a "cash payoff" related to "build[ing] roads needed for Mr. Okada's casino project," FSS relies on an interview with Manuel M. Camacho, whose account FSS "credits" without explanation, despite his advanced age and "fail[ure] to recall some details."  Freeh Report at 16 & n.44 (Exh. 1).

**COVINGTON & BURLING** LLP

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

Associates ("Lazaro"), a Philippine law firm, to analyze this question.[102]  Although FSS claims that the Lazaro Memorandum offers "substantial evidence and credible legal opinion" finding that Mr. Okada violated the law,[103] it reads the Memorandum selectively, ignores important qualifications and caveats, and ultimately reaches unwarranted and exaggerated conclusions.



---

[102] _____ .

[103]    Freeh Report at 19 (Exh. 1).

[104] _____ .

[105] _____ .

[106] _____ .

[107]    _See_ Freeh Report at 14-17 (Exh. 1).

[108] _____

COVINGTON & BURLING LLP



Yet the Freeh Report goes even further and concludes that Mr. Okada committed this violation in bad faith, demonstrating his "intent to do business as he desires, regardless of the



PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

applicable laws and regulations,"[117] and risking "civil as well as criminal sanctions."[118]  These inflammatory conclusions, beyond ignoring salient aspects of the Lazaro Memorandum, greatly exaggerate the severity of what at worst appears to be a technical violation.  FSS does not entertain the possibility — noted in 2011 by a prominent Philippine attorney — that corporations "which relied on the 'Control Test' as consistently upheld by administrative rulings" should not be "penalized" but instead should "be allowed an opportunity to correct the structure of their shareholdings."[119]  In fact, that appears to be exactly what has happened here: recent developments indicate that Philippine authorities have responded by working with Universal to ensure that land ownership issues are resolved before its casino opens — not by bringing criminal charges.[120]



The Freeh Report, however, omits this detail entirely, both in its substantive analysis of the land ownership issue and even in its separate discussion of Mr. Okada's interview.

        In short, the Freeh Report concludes that Mr. Okada "circumvented" the law, but relies on a tentative and caveated legal opinion, without addressing any of the legal uncertainties that opinion raised, and without mentioning the evidence that

---

[117]     Freeh Report at 46 (Exh. 1).

[118]     Freeh Report at 19 (Exh. 1).

[119]     Manuel L. Manaligod, Jr., *Reckoning With Nationality Restrictions*, Business Mirror (July 28, 2011), *available at* http://www.cvclaw.com/On%20Firm%20Ground/On%20Firm%20Ground%20(July%2028,%20 2011).pdf.  According to his law firm's website, Mr. Manaligod is a former senior lawyer in the Office of the Chief Presidential Legal Counsel.  *See Manaligod, Manuel L. Jr.*, http://www.cvclaw.com/people_manaligod.php (last visited March 28, 2013).

[120]     *See* Maila Ager, *Pagcor Still Waiting for Okada's Group to Settle Land Ownership Issue*, Philippine Daily Inquirer (Feb. 19, 2013), *available at* http://business.inquirer.net/108279/pagcor-still-waiting-for-okadas-group-to-settle-land-ownership-issue.

[121]     ██████████████████████████████████████████.

[122]     ██

[123]     *See, e.g.*, *In re Walters*, 868 F.2d 665, 668 (4th Cir. 1993).

COVINGTON & BURLING LLP

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

████████████   Fundamentally, what FSS describes is a pattern of behavior that corporations in the United States engage in every day: attempting to organize their affairs to best pursue their interests within a complex regulatory structure.  Mr. Okada appears to have "circumvented" the law in the same sense corporations "circumvent" higher tax rates by organizing themselves in Delaware, or structuring their affairs so as to take advantage of tax loopholes.  It is certainly possible that Mr. Okada received unreliable advice on a complicated issue of Philippine law, or that the governing interpretation of that law simply changed.  In neither case would the suggestion of "criminal" conduct be warranted, much less the conclusion that Mr. Okada simply does business "as he desires" without regard for the law.

### C.   "Apparent FCPA Violations" Involving PAGCOR Officials

#### 1.   The Freeh Report Ignores or Minimizes Legal Issues

##### a)   The Freeh Report Misleadingly Frames Its Conclusions

Throughout the Report, FSS uses carefully chosen words to avoid definitively claiming that Mr. Okada has committed any legal violation.  FSS's preferred formulation is to assert that Mr. Okada has committed, and even engaged in a "practice and pattern" of, "prima facie violations" of the FCPA.[124]  FSS never explains what it means by this phrase.  *Black's Law Dictionary*, however, defines the term "prima facie" as "at first sight; on first appearance *but subject to further evidence or information*."[125]  Thus, the Freeh Report couches its conclusions in a way that subtly indicates it has reached no conclusions at all.

At the same time, the Report is written in a manner that gives the appearance of a more definitive conclusion.  FSS does not refer to its conclusions as evidentiary in nature or subject to further information; rather, it "concludes" that Mr. Okada has committed "prima facie violations," full stop.  Indeed, the Report's headline conclusion is that these "prima facie violations" — on their own — create "substantial, ongoing risk" to Wynn Resorts.[126]  This type of conclusion is inconsistent with conventional legal usage.  Independent fact-finders typically speak of a "prima facie case" as an evidentiary matter, possibly shifting the burden of proof to the other party, but not signaling a final conclusion.[127]  The curiously phrased finding that Mr. Okada has engaged in a "pattern of committing prima facie violations" is, in legal terms, not meaningful.

---

[124]   *See, e.g.*, Freeh Report at 10 (Exh. 1) (referring to "Mr. Okada's prima facie violations of FCPA *[sic]*").

[125]   BLACK'S LAW DICTIONARY 1310 (9th ed. 2009) (emphasis added).

[126]   Freeh Report at 2 (Exh. 1).

[127]   A leading case illustrating how courts use the term "prima facie" is *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), the Supreme Court's seminal decision articulating a burden-shifting framework for consideration of Title VII discrimination claims.

COVINGTON & BURLING LLP

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

Ultimately, the Freeh Report leaves the impression that FSS was in search of a conclusion that would support finding Mr. Okada "unsuitable."[128]  Perhaps for that reason, FSS relies so heavily on a finding that Mr. Okada committed "prima facie violations" — a finding that, in reality, is not much of a finding at all.

### b) The Freeh Report Ignores Potentially Available Affirmative Defenses

The deficiency of the Freeh Report's legal analysis is most glaring in its failure even to acknowledge the possibility of affirmative defenses for the "prima facie violations" it identifies. The FCPA specifically provides two affirmative defenses, both of which may be relevant here and warranted further investigation and discussion in the Freeh Report.  First, the FCPA provides a defense where the payment or gift is "lawful under the written laws and regulations of the foreign official's . . . country" (the "local law" defense).[129]  Second, the FCPA provides a defense for "a reasonable and bona fide expenditure, such as travel and lodging expenses, incurred by or on behalf of a foreign official" that is "directly related to the promotion, demonstration, or explanation of products or services" (the "promotional expenditures" defense).[130]  The Freeh Report does not even mention, let alone analyze the possible availability of, these defenses.  As one FCPA commentator noted, "the Freeh Report is shockingly deficient" in this respect.[131]

The promotional expenditures defense in particular merited investigation, considering the statement by a spokesperson for the President of the Philippines that Chairman Naguiat went to

---

[128]     Unsurprisingly, Wynn Resorts avoided whatever nuance was intended by the phrase "prima facie violations" when it conveyed the results of FSS's investigation.  Immediately after the Report was released, Wynn Resorts issued a press release that nowhere used the phrase "prima facie," instead stating that the Freeh Report "uncovered and documented more than three dozen instances" in which Mr. Okada *engaged in improper activities* for [his] own benefit in *apparent violation* of U.S. anti-corruption laws."  Press Release, Wynn Resorts, Wynn Resorts Board Concludes Year-Long Investigation of Kazuo Okada after Receiving Freeh Report Detailing Numerous Apparent Violations of U.S. Anti-Corruption Laws (Feb. 19, 2012) (emphases added), http://phx.corporate-ir.net/phoenix.zhtml?c=132059&p=irol-newsArticle&ID=1662678&highlight=.  The press followed suit: Bloomberg reported that the Freeh Report found "violations," without using the "prima facie" qualifier.  David Voreacos, *Okada Put Gambling Official in $6,000 Suite, Wynn Says* (Feb. 21, 2012), *available at* http://www.bloomberg.com/news/2012-02-21/okada-payments-to-gambling-officials-violated-u-s-bribery-law-wynn-says.html.

[129]     15 U.S.C. § 78dd-1(c)(1).

[130]     15 U.S.C. § 78dd-1(c)(2).

[131]     Mike Koehler, *Wynn-Okada and Offensive Use of the FCPA*, FCPA Professor (Feb. 29, 2012), http://www.fcpaprofessor.com/wynn-okada-and-offensive-use-of-the-fcpa.

COVINGTON & BURLING LLP

Wynn Macau to attend a "gaming convention" in his capacity as a "casino operator."[132] Moreover, most of the incidents FSS considers "prima facie violations" involved relatively modest expenditures that may well have qualified for the promotional expenditures defense, depending on the purpose of the visit — salient details the Report fails to investigate.[133]  The Freeh Report should also have investigated whether a local law defense was available for any of these visits, considering the Philippine Government's position that "there [was] no ethical violation" during the Naguiat visit.[134]  For example, it could have sought advice on this issue from the Philippine legal counsel that it had retained.  While the local law defense is available only in very narrow circumstances, its omission from the Report is another example of a lack of rigor.

### 2.     The Freeh Report's Factual Conclusions Regarding the PAGCOR Visits Lack Support

#### a)     As to All But One Visit, the Freeh Report Offers No Supporting Evidence

The Freeh Report claims to identify "thirty-six (36) separate instances," over a three-year period, "when Mr. Okada, his associates and companies made payments exceeding US 110,000, which directly benefited senior PAGCOR officials, including two chairmen and their family members."[135]  The number of discrete incidents identified is central to FSS's conclusion that Mr. Okada has "apparently been engaging in a longstanding practice and pattern of committing prima facie violations of anti-bribery laws, particularly the FCPA."[136]  However, FSS discusses only one set of visits in any detail.  No narrative is provided to explain any of the other expenses, and the limited information that is provided falls far short of what would be necessary to substantiate the Report's far-reaching conclusions.

As an initial matter, the Freeh Report never explains the evidentiary support for these incidents.  The Report's only explanation of these incidents is a simple table, listing only an individual's name, PAGCOR affiliation, location and date of stay, and "Total Charged to Aruze City Ledger Account."[137]  We note that the Macau government's Personal Data Protection Office recently fined Wynn Macau, Limited for transferring personal information concerning hotel

---

[132]     Mita Legaspi, *Palace: PHL, PAGCOR's Naguiat Are Collateral Damage in Wynn-Okada Boardroom War*, GMA News (Feb. 23, 2012), *available at* http://www.gmanetwork.com/news/story/249208/news/nation/palace-phl-pagcor-s-naguiat-are-collateral-damage-in-wynn-okada-boardroom-war.

[133]     *See infra* § IV.C.2.a.

[134]     Legaspi, *supra* note 132.

[135]     Freeh Report at 20 (Exh. 1).

[136]     Freeh Report at 43 (Exh. 1).

[137]     Freeh Report at 20-22 (Exh. 1).

**COVINGTON & BURLING** LLP

**PRIVILEGED AND CONFIDENTIAL**
Attorney-Client Communication
Attorney Work Product

guests to Wynn Resorts in connection with FSS's investigation, without the consent of those guests or the Personal Data Protection Office.[138]

According to the Report, FSS "reviewed records of the Aruze City Ledger Account," as well as "available underlying documentation furnished by Wynn Resorts management." FSS's lack of rigor in identifying evidentiary support makes this claim difficult to evaluate: the table is supported by one citation, stating only "See City Ledger Account. [See Appendix]," with no specific page reference.[139] The "available underlying documentation" — which, as noted above, is essential to a reliable review of these expenses — is nowhere described in the Report itself, nor is it furnished in the Appendix.

Even if the evidentiary record were sufficiently described and sourced to provide a proper basis for reaching conclusions about these expenses, it does not justify the conclusion that Mr. Okada is personally responsible for bribing Philippine officials. As the Report later makes clear, expenses may be charged to the Aruze City Ledger Account without any personal involvement by Mr. Okada. Accordingly, the ledger entries themselves are not evidence against Mr. Okada personally. Since the Report offers no further evidence or explanation for whether these expenses were incurred for a corrupt purpose, and even then whether Mr. Okada was in any way involved in them, there is insufficient evidence to support FSS's conclusion that they represent part of a "practice and pattern" of FCPA violations by Mr. Okada. Moreover, absent a thorough investigation into the nature and purpose of each of these expenses, it is impossible to rule out the availability of affirmative defenses. FSS's failure to consider the promotional expenditures defense is particularly irresponsible, in light of the fact that all of the expenses (leaving aside the September 2010 incident discussed below) are relatively modest and consistent with ordinary room charges.[140]

---

[138]    *See Wynn Macau Fined MOP20,000 for Privacy Breach*, macaubusiness.com (March 27, 2013), *available at* http://www.macaubusiness.com/news/wynn-macau-fined-mop20000-for-privacy-breach/22519/; *see also* Allison Grande, *Macau Watchdog Fines Wynn For Customer Data Transfers*, LAW360.com (March 27, 2013), *available at* http://www.law360.com/securities/articles/427830?nl_pk=9677ecc2-e9c6-4719-b691-8f430e59365d&utm_source=newsletter&utm_medium=email&utm_campaign=securities. In investigations of this type, it is typical for investigative counsel to obtain data privacy advice to ensure that any cross-border data transfers do not run afoul of applicable privacy regulations, particularly when significant reputational interests are implicated. The Freeh Report does not indicate that any such advice was sought or provided in connection with FSS's investigation.

[139]    Freeh Report at 23 n.73 (Exh. 1) (brackets in original).

[140]    For example, as a point of comparison, the Wynn Macau website lists a 3-night (weekday) reservation for a one-bedroom lake-view suite in June 2013 at $1908.37. *See* Wynn Macau Reservations Page (March 4, 2013) (Exh. 23). Expenses allegedly associated with a 3-night June stay by former PAGCOR Chairman Efraim Genuino were slightly less. *See* Freeh Report at 20 (Exh. 1).

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

**b)**     **The Freeh Report's Conclusions Concerning the September 2010 PAGCOR Visit Suffer From Numerous Deficiencies**

The only visit the Report discusses in any detail is a September 2010 visit to Wynn Macau by a group led by PAGCOR Chairman Naguiat.  FSS alleges that the Naguiat party was provided with accommodations at a Villa (which costs $6,000 per day) and $20,000 in cash and gifts, all expensed to the Aruze City Ledger Account.[141]  On the basis of interviews with Wynn Macau management and a few e-mails, the Freeh Report concludes that the expenses were incurred based on "Mr. Okada's knowledge" and "personal[] direct[ion]."[142]  The Report then notes Mr. Okada's general interest in his casino project, and concludes that the Naguiat visit "was most likely related to Mr. Okada's business interests in the Philippines."[143]  On the basis of these factual conclusions, FSS states that "Mr. Okada's hosting and payments on behalf of PAGCOR Chairman Naguiat and his family at Wynn Macau . . . would therefore constitute a prima facie violation of the FCPA both by Mr. Okada as well as by Aruze USA, Inc."[144]

The Freeh Report's conclusions regarding the Naguiat visit are not supported by the record.  Preliminarily, there are significant deficiencies in the interview and evidence collection process that raise significant doubts as to whether FSS was justified in reaching any conclusions at all.  Even taking FSS's record at face value, the Report's principal factual conclusions are not adequately supported by that record.  First, the conclusion that $20,000 worth of cash and gifts were given is called into question by evidence in the record that FSS ignores.  Second, the conclusion that Mr. Okada had personal knowledge, and personally approved or ratified, the expenses of the Naguiat visit is based on a strained reading of a document that is of dubious authenticity.  And third, the inference of corrupt intent fails to account for possible legitimate business purposes of the visit, which Chairman Naguiat may have raised if he had been interviewed.

**(1)**     **Investigative Process Deficiencies**

The Freeh Report's conclusions are suspect at the outset because they appear to be based on a selective search for evidence.  Aside from the last-minute interview of Mr. Okada, whose recollection of events FSS categorically declined to credit, FSS apparently limited its interviewees to Wynn Macau management.  It did so despite the fact that three distinct groups of people are involved in the Report's narrative: Wynn Macau management; Mr. Okada's employees (Yoshiyuki Shoji and Masato Araki); and Chairman Naguiat's party.  Apart from Mr. Okada, Messrs. Shoji and Araki would have been the best sources for information concerning Mr. Okada's personal knowledge.  FSS could have asked Mr. Araki in particular about the circumstances of his firing, which Mr. Okada told Mr. Freeh was the result of incurring

---

[141]     Freeh Report at 24, 27 (Exh. 1).

[142]     Freeh Report at 27-28 (Exh. 1).

[143]     Freeh Report at 28-31 (Exh. 1).

[144]     Freeh Report at 31 (Exh. 1).

COVINGTON & BURLING LLP

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

unauthorized expenses at Wynn Macau.[145]  FSS could also have asked Chairman Naguiat directly about the gifts he allegedly received, particularly in light of the evidence in the record that the cash advances were intended to be reimbursed.[146]  These deficiencies are compounded by the Freeh Report's lack of explanation of its document search, giving the impression that Wynn Resorts may have provided FSS with only those documents it considered damaging to Mr. Okada.[147]  Under these circumstances, a fair and thorough investigation would not reach factual conclusions without at least attempting to gather additional information.

### (2)      Alleged Cash Payments and Gifts

The Freeh Report's first major factual conclusion — that the Naguiat group was "provided with approximately US 20,000 cash to use for gaming and also shopping" — is called into question by facts reflected in the Report's own Appendix.  In an e-mail sent during the Naguiat visit to Angela Lai, an executive assistant at Wynn Macau, Mr. Shoji notes that the Naguiat group "will reimburse the amount spent at Wynn to our company based on the bill to be issued by Wynn.  This arrangement is just providing them with convenience."[148]  FSS fails to mention this e-mail.  Without even considering relevant evidence that any cash advances were merely for purposes of convenience to be reimbursed later, the Freeh Report's conclusion that $20,000 in "payments and gifts" were provided to the Naguiat group is incomplete and misleading.[149]

---

[145]      Freeh Report at 38 (Exh. 1).

[146]      The Report states that FSS spoke with two PAGCOR officials in December 2011, but gives no indication that it attempted to interview any of the participants in the September 2010 visit.  *See* Freeh Report at 30 (Exh. 1).

[147]      That impression is strengthened by FSS's admission, in discussing the Korea allegations, that documents it reviewed (though fails to cite) were "provided by Wynn Resorts."  Freeh Report at 31 (Exh. 1).  Nowhere else in the Report does FSS explain how it obtained the documents on which it relies.

[148]      E-mail from Y. Shoji to A. Lai (Sept. 24, 2010)

[149]      FSS's failure to consider relevant evidence concerning these payments is compounded by its failure to interview Chairman Naguiat.  Among other things, FSS indicates that a Chanel bag was purchased for Chairman Naguiat's wife.  However, Chairman Naguiat has publicly stated that the Chanel bag was purchased due to a misunderstanding, and that he returned it.  According to a press account, "Naguiat confirmed that a pricey Chanel bag was delivered to the suite by someone connected to Okada, but Naguiat claims this was a misunderstanding.  Upon arriving at Wynn Macau, Naguiat had offhandedly remarked to an Okada liaison that he hoped to pick up a Chanel bag for his wife during his stay, and Naguiat figures 'the staffer was just trying to impress his guests.  In any case, I had the bag returned immediately.'"  *See* Steven Stradbrooke, *Okada Skips Wynn Macau Meeting; Philippine Gov't Says PAGCOR Blameless*, CalvinAyre.com (Feb. 24, 2012), *available at* http://calvinayre.com/2012/02/24/business/okada-skips-wynn-macau-meeting-philippine-govt-says-pagcor-innocent/; *see also Naguiat Got Free Rooms, Not Gifts: Pagcor*, Agence France-Presse (Feb. 22, 2012), *available at* http://www.abs-(continued…)

**PRIVILEGED AND CONFIDENTIAL**
**Attorney-Client Communication**
**Attorney Work Product**

**COVINGTON & BURLING** LLP

### (3)      Mr. Okada's Alleged Knowledge and Direction

The Freeh Report's factual conclusion that Mr. Okada "personally directed" these payments is also insufficiently supported.  FSS principally relies on a purported e-mail from Mr. Okada's assistant, Mr. Araki, concerning a second PAGCOR delegation in October 2010.  According to the Report, Mr. Araki wrote: "Our Chairman Okada once again instructed us to take care of the group, but not like last time meaning that we will not take care of their room charges and others."[150]  The document the Report cites, however, has little if any evidentiary value, particularly without any explanation of its origins. ███████████████████████████████████████████████████████████████████████████████

Assuming these words can be attributed to Mr. Araki with any confidence, and that nothing of evidentiary significance was omitted, it still would be an inadequate basis for FSS's strong conclusions.  It would not be surprising if Mr. Araki were to invoke his high-profile boss's name as authority to give added weight to his request, even if not authorized to do so.  There would have been particular reason for FSS to question Mr. Araki's claim to speak for his boss, given Mr. Okada's statement that he fired Mr. Araki for his conduct during the Naguiat visit.  Whether Mr. Araki had in fact been fired should have been verifiable, but FSS appears to have assumed Mr. Araki's status as a faithful agent without looking into the facts.  Finally, even if Mr. Araki's words accurately reflected Mr. Okada's actual instructions *in October*, they would still not necessarily establish what Mr. Okada "personally directed" *in September*.  If Mr. Okada had learned about the excessive expenses after the Naguiat visit but before October 5, an ordinary and legitimate reaction would be to direct that the next visit should "not [be] like last time."

The Freeh Report also cites a November 10, 2010 e-mail from Mr. Shoji to Wynn Macau President Ian Coughlan, requesting that the Villa be billed at a lower rate. ███████████████████████████████████████████████████████████████ FSS concludes, from this second-hand summary of a conversation between Messrs. Okada and Coughlan, that it demonstrates Mr. Okada's knowledge of the expenses.

An initial problem with this conclusion is that FSS obtained a *first-hand* account of this conversation from Mr. Coughlan.  Given the importance the Report attributes to Mr. Shoji's e-

---

cbnnews.com/business/02/22/12/naguiat-got-free-rooms-not-gifts-pagcor (reporting that PAGCOR Vice President Francis Hernando "insisted the allegations of cash payments and gifts were false").

[150]      Freeh Report at 28 (Exh. 1).

[151]      ██████████████████████████████████████████████████████████; *supra* § III.B.3.

[152]      ███████████████████████████████████████████████████████████.

**PRIVILEGED AND CONFIDENTIAL**
Attorney-Client Communication
Attorney Work Product

mail, it is likely that FSS asked Mr. Coughlan about it, and yet FSS offers no indication that Mr. Coughlan corroborated its interpretation of the e-mail.[153]



That possibility is consistent with Mr. Okada's statement that he scolded Mr. Shoji, prompting his resignation.[155]  FSS's reliance on this ambiguous e-mail is at least incomplete in the absence of any apparent attempt to interview Mr. Shoji, or otherwise verify whether and under what circumstances Mr. Shoji resigned.[156]

### (4)    Alleged Corrupt Intent

Finally, the Freeh Report's lack of sufficient investigation calls into question its factual conclusion that the Naguiat visit "most likely related to Mr. Okada's business interests in the Philippines."[157]  The Report offers no specific connection between the visit and these interests, except to note Mr. Okada's continued interest in maintaining a gaming license that had previously been granted.[158]  While that fact may provide a general incentive to seek influence for any entity with a government license, it is not so conclusive that it alone supports a finding of

---

[153]    FSS interviewed Mr. Coughlan twice, once on January 5, 2012, and once on February 2, 2012.  *See* Freeh Report at 26 n.90 (Exh. 1).

[154]    ████████████████████.

[155]    *See* Freeh Report at 38 (Exh. 1) ("Mr. Okada stated that the cost of Chairman Naguiat's stay at Wynn Macau caused a 'problem' for Universal and that as a result Araki was fired, and Shoji resigned after having been scolded by Mr. Okada.").

[156]    In addition to relying on the e-mail from Mr. Shoji and the purported e-mail from Mr. Araki, FSS notes that Mr. Okada's e-mail address was listed on the "cc" line of two e-mails relating to the Naguiat visit, implicitly (but not expressly) suggesting that these e-mails support a finding of "personal knowledge."  Freeh Report at 25, 47 (Exh. 1).  FSS acknowledges, however, Mr. Okada's statement that he "rarely uses his personal computer" and "would not have seen such emails."  Freeh Report at 47.  Aside from its general refusal to credit Mr. Okada's statements, FSS offers no evidence that Mr. Okada actually did see these e-mails.  ████████████████████████████████████████

[157]    Freeh Report at 31 (Exh. 1).

[158]    *See* Freeh Report at 28-30 (Exh. 1).

corrupt intent, especially when FSS ignored possible innocent explanations. A spokesperson for Philippine President Acquino has publicly stated that Chairman Naguiat went to Macau "as a casino operator and not as a casino regulator" to attend "a gaming convention of casino operators," and that it is customary that "casino operators are provided accommodations elsewhere."[159] FSS could not credibly conclude that Mr. Okada acted with corrupt intent — an element of an FCPA violation[160] — based only on a general consideration of possible incentives, without at least ascertaining alternate explanations, which could reasonably have been examined by seeking to interview Chairman Naguiat.

*   *   *

In sum, the Freeh Report's factual conclusion that Mr. Okada personally directed excessive expenditures for the benefit of Chairman Naguiat's party for the purpose of corruptly influencing him is not adequately supported by the evidence. The conclusion is based on a deficient investigation, during which FSS appears not to have sought interviews from the most material witnesses or conducted a thorough search for documents. It ignores evidence from FSS's own record that tends to cast doubt on its theory concerning the alleged payments and gifts. It places undue emphasis on two e-mails that do not support FSS's allegation of personal involvement by Mr. Okada. And it imputes a corrupt intent based only on a general consideration of incentives without making reasonable attempts to understand alternate explanations.

### 3.    The Report Fails to Explore Involvement of Wynn Resorts or Steve Wynn

If the Freeh Report's factual conclusions can be treated as credible, they would still raise questions about the possible role played by Wynn Resorts, its employees, and its management, including Mr. Wynn. According to FSS, PAGCOR officials received special treatment at Wynn Macau with the full knowledge and participation of the hotel's management and staff. Moreover, again based on the facts as developed by FSS, the September visit occurred *five months before* the Wynn Resorts Board determined that the Company should not be involved in Mr. Okada's Philippine venture. FSS also ignored, but could easily have ascertained, the fact that Mr. Wynn and his company's Chief Operating Officer apparently joined Mr. Okada in the Philippines in June 2010, where the group toured a casino "showcasing Manila's investment potential" and attended a presentation on the Universal project.[161] These circumstances at least raise questions about the role played by Mr. Wynn, Wynn Resorts, and its employees in the

---

[159]     *Legaspi, supra* note 132. The Freeh Report characterizes PAGCOR's "primary" role as one of regulator, Freeh Report at 28 (Exh. 1), but fails to mention that PAGCOR operates 13 casinos. *See PAGCOR: Frequently Asked Questions*, http://www.pagcor.ph/casino-filipino-branches.php (last visited March 28, 2013).

[160]     *See* 15 U.S.C. § 78dd-1(a).

[161]     *See* Chan & Nishizawa, *supra* note 12.

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

"prima facie FCPA violations" that the Freeh Report alleges.  FSS's failure even to explore their role indicates a lack of thoroughness and calls into question FSS's objectivity.

Rather than investigate these issues, the Freeh Report appears to address them indirectly in a defensive stand-alone section, where FSS concludes that Mr. Okada did not pursue the Philippine investment "for the benefit of" Mr. Wynn.[162]  This conclusion is not supported by the facts proffered.  FSS relies solely on two Aruze Corp. press releases.  The first stated that Aruze sought to "commence operation of a casino resort on its own," and that it "has received agreement from Steve Wynn that he will supply all necessary support."[163]  The second release stated that the casino "shall be conducted independently by ARUZE CORP," and that "where essential management-based know-how is concerned, the Company intends to proceed with the project under the full guidance of Wynn Resorts, Limited's Steve Wynn."[164]  Without explanation, FSS immediately concludes that these press releases demonstrate that Mr. Okada never intended the Philippine investment to be "for the benefit of" Mr. Wynn.

These press releases do indicate that Mr. Okada was pursuing an investment in the Philippines as a Universal project.  However, far from ruling out investment by Mr. Wynn, the releases plainly contemplate at least some form of Wynn involvement in the project.  They certainly do not foreclose the inference that Mr. Wynn was interested in, and considering investing in, the project.  The press releases should also have been read in the context of two facts that were either known or readily knowable to FSS.  First, in June 2010, Mr. Wynn accompanied Mr. Okada to Manila and engaged in activities consistent with that of a potential investor.[165] ██████████████████████████████████████████████████ ████████████████████████████████████  The Freeh Report's conclusion that Mr. Okada's activities could not have been "for the benefit" of Mr. Wynn is therefore based on a selective reading of two press releases, and a failure to explore or even consider relevant factual context.

**D.      "Possible Patterns" of FCPA Violations Involving Korean Government Officials**

As one of its seven summary conclusions, the Freeh Report states that the FSS investigation "has produced substantial evidence that":

---

[162]      Freeh Report at 34 (Exh. 1).

[163]      Freeh Report at 34 (Exh. 1).

[164]      Freeh Report at 35 (Exh. 1).

[165]      *See* Chan & Nishizawa, *supra* note 12.

[166]      ████████████████████████████████████████████████████████
██████████████████████████████.

> . . . Mr. Okada, his associates and companies appear to have engaged in a pattern of such prima facie violations of the FCPA. For example, in 2010 it also is possible that Mr. Okada, his associates and companies made similar payments to a Korean government official who oversees Mr. Okada's initial gaming investment in that country. Additional investigation is needed to develop and confirm these possible FCPA violations.[167]

In support of these conclusions, in a section entitled "Possible Pattern of FCPA Violations Regarding Korean Government Officials," the Report discusses visits to the Wynn Las Vegas and Wynn Macau properties in 2010 and 2011 by Jong Cheol Lee, the Commissioner of the Incheon Free Economic Zone ("IFEZ") Authority, and several guests, and lists $5,945.52 in charges to the Aruze City Ledger Account in connection with these visits.[168] FSS states that "[r]egistration documents provided by Wynn Resorts disclosed annotations for Mr. Lee and three other guests, indicating: 'Share with Incheon Free Economic Zone,'" though the Report neither cites nor appends any such registration documents.[169] While the Report does not provide any detail regarding the purpose of these visits, it implies that they were intended to corruptly influence Mr. Lee, who is characterized as a "government official who oversees Mr. Okada's initial gaming investment in [Korea]."[170]

FSS's findings on this issue are once again couched in carefully chosen words. Here, rather than referring to "prima facie violations," the Report speaks in terms of "possible" violations, and violations that "may" have occurred.[171] These types of speculative and highly qualified conclusions are nonetheless offered together with the PAGCOR allegations to support FSS's assertion that Mr. Okada engaged in a "pattern" of FCPA violations. This choice of words is a bridge too far. If, on the facts developed in the investigation, FSS was unable to conclude that there was anything more than a "possible" FCPA violation in connection with Mr. Okada's dealings with Korean officials, the follow-on conclusion that this was part of a "pattern" is not sustainable.

Moreover, it is difficult to see how a credible investigation could ever reach the conclusion that there is "substantial evidence" of an FCPA violation (much less a "pattern" of violations), where "[a]dditional investigation" is required. This is particularly so where the admitted factual gaps go to the core issue of corrupt intent. As the Freeh Report acknowledges,

---

[167]   Freeh Report at 2 (Exh. 1).

[168]   Freeh Report at 31 (Exh. 1).

[169]   Freeh Report at 31 (Exh. 1).

[170]   Freeh Report at 2 (Exh. 1).

[171]   *See, e.g.*, Freeh Report at 46 (Exh. 1) ("[T]he preliminary evidence also shows that in connection with Mr. Okada's efforts to develop a gaming business in IFEZ, Mr. Okada and his associates *may* be engaging in the same pattern of proscribed payments to government officials." (emphasis added)).

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

"further investigation is required in order to determine (i) the nature of Mr. Okada's relationship with these guests; (ii) whether these guests actually had a government affiliation at the time of their 2010 visits to Wynn Las Vegas and Wynn Macau; and, (iii) the status of Mr. Okada's gaming initiative in Korea."[172]

Indeed, when one considers what little evidence FSS developed in its investigation of these issues, it becomes clear that there is no basis to make any factual conclusions about Mr. Okada's conduct. It appears that the entirety of the evidence developed by FSS on these issues consisted of the entries on the Aruze City Ledger Account, some "[p]reliminary internet research" relating to the IFEZ project, and Mr. Okada's statements in his February 2012 interview. Critically, apart from Mr. Okada's interview (discussed below), FSS appears not to have developed any evidence going directly to the question of why these Korean officials visited Wynn properties. If FSS either did not investigate these issues thoroughly or failed to turn up sufficient evidence to support a stronger conclusion, the only responsible finding that the Report could reach is that these matters require further investigation.

Additionally, while Mr. Freeh questioned Mr. Okada extensively on this issue during his February 2012 interview, the Report appears largely to ignore Mr. Okada's account in reaching its conclusions. Although the Report discusses and cites excerpts of Mr. Okada's interview on this topic in Section VI ("Summary of Mr. Okada's February 15, 2012 Interview"), there is no mention of Mr. Okada's account in Subsection V.4 of the Report ("Possible Pattern of FCPA Violations Regarding Korean Government Officials"), where FSS presents the most detailed account of its investigative findings on this issue. While FSS may assume that Mr. Okada is not credible, any fair account of the facts would explain the basis for this credibility determination. The Report is woefully lacking on this front. It fails to state explicitly that it does not find Mr. Okada credible on this issue, much less explain why.



---

[172]     Freeh Report at 32 (Exh. 1). Despite its lack of certainty regarding whether these guests were government officials, FSS elsewhere asserts a government affiliation as if it were an established fact: "[T]he following amounts were paid for government Lee *[sic]* and his party." Freeh Report at 31 (Exh. 1).

[173]

**COVINGTON & BURLING LLP**

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

████████████████████████████ ██   Notably, the Report does not identify any steps taken by FSS to further investigate whether these charges were in fact reimbursed.

In light of Mr. Okada's account, the Freeh Report's analysis of the Korea allegations is particularly deficient in its failure to mention, much less analyze, the potential availability of the FCPA's "promotional expenditures" defense. ███████████████████████████████ ████████████████████████████████████████████████ █   In our view, any credible investigation would have focused on this issue.

### E.   The Report's Conclusions Regarding the Payment of Expenses in Connection With a Visit to the 2008 Beijing Olympics Are Not Reliable

The Report summarily concludes that "Mr. Okada has stated that Universal paid expenses related to then-PAGCOR Chairman [Efraim] Genuino's trip to Beijing during the 2008 Olympics."[176]  This conclusion is both factually unsupported and meaningless in the absence of further investigation.



---

[174] ████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████

[175]    *See* United States Department of Justice & United States Securities and Exchange Commission, A RESOURCE GUIDE TO THE U.S. FOREIGN CORRUPT PRACTICES ACT 24 (2012) ("The FCPA allows companies to provide reasonable and bona fide travel and lodging expenses to a foreign official, and it is an affirmative defense where expenses are directly related to the promotion, demonstration, or explanation of a company's products or services, or are related to a company's execution or performance of a contract with a foreign government or agency.")

[176]    Freeh Report at 2 (Exh. 1).

[177]    Freeh Report at 36 (Exh. 1). ████████████████████████████
████████████████

COVINGTON & BURLING LLP

**PRIVILEGED AND CONFIDENTIAL**
**Attorney-Client Communication**
**Attorney Work Product**



At most, the Report offers potentially inconsistent and vague statements suggesting that Universal may have paid some portion of Chairman Genuino's expenses.  Faced with these inconsistent statements, a credible investigation would have taken steps to reconcile them in some way.  For example, an investigator who wanted to know more about this issue likely would have sought to interview additional witnesses and seek documentary evidence relating to the purported expenses.  It appears that FSS took no further investigative steps, as it offers no other witness accounts on this issue and no documentary evidence.

Given the paucity of factual support for the proposition that Universal paid for Chairman Genuino's expenses in connection with the Beijing trip, it is telling that the strongest conclusion the Report reaches is that Mr. Okada "stated" that Universal paid these expenses.  While FSS is willing in other contexts (*e.g.*, the PAGCOR and Korea allegations) to raise the specter of "prima facie" or "possible" FCPA violations on questionable factual support, it does not make any such suggestion here.  This may be an implicit recognition that in light of the conflicting statements by Mr. Okada and the absence of any documentary support to confirm the facts, no stronger conclusions could be reached.  Thus, like the Korea allegations, the brief discussion of the Genuino trip does nothing but inject atmospherics and innuendo into the Report, perhaps to buttress weak support for other allegations.

## V.  Conclusion

An independent investigation should employ a careful and thorough process, consider all relevant and material evidence, and reach sound factual and legal conclusions.  The Freeh Report's numerous deficiencies on all of these fronts suggest that FSS viewed itself as an advocate first and an impartial investigator second.  Indeed, rather than comprehensively gather information about the incidents under review from all sources and perspectives, FSS appears to



178

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

COVINGTON & BURLING LLP

have cherry-picked evidence and stretched to reach conclusions that would be helpful to the Wynn Resorts Board.  To use Mr. Freeh's words, the Report has the feel of a "brief" focused on telling one side of the story.

In addition to the Report's overarching deficiencies, each of FSS's primary conclusions is seriously flawed:

- The Freeh Report concludes that Mr. Okada strongly believes in his right to bribe officials in Asia.  However, this conclusion is based on unreliable accounts of interested witnesses and implausible inferences.

- The Freeh Report concludes that Mr. Okada designed his business operations in the Philippines to circumvent that country's laws.  However, this conclusion disregards the significant qualifications in the legal analysis on which it is based, and ignores the evidence that Mr. Okada attempted to comply with Philippine law by seeking the advice of counsel.

- The Freeh Report concludes that Mr. Okada has engaged in a "practice and pattern" of committing "prima facie FCPA violations."  However, this conclusion is based on an incomplete legal analysis; a failure to collect evidence concerning most of the allegations; a disregard of evidence tending to undermine FSS's assumptions; and a failure to investigate plausible alternate explanations.

- The Freeh Report concludes that incidents involving Korean officials and a trip to the Beijing Olympics with a Philippine official support its finding of a pattern of FCPA violations.  However, this conclusion is based on evidence sufficiently weak that FSS is unable to find any actual improprieties, giving the appearance that these incidents were included in the Report purely for atmospherics.

- The Freeh Report concludes that Mr. Okada presents a "substantial" regulatory risk for Wynn Resorts.  However, this conclusion is based on FSS's other inadequately supported conclusions, as well as unreasonable and implausible inferences from Mr. Okada's lack of attendance at a training session and delay in signing an acknowledgment form.

These conclusions, considered both individually and in the context of a structurally deficient, one-sided, and seemingly advocacy-driven investigation, simply are not credible.