```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3  ****************************************************

 4  IN RE:  OIL SPILL BY THE
    OIL RIG DEEPWATER HORIZON
 5  IN THE GULF OF MEXICO ON
    APRIL 20, 2010
 6                              CIVIL ACTION NO. 10-MD-2179 "J"
                                NEW ORLEANS, LOUISIANA
 7                              THURSDAY, AUGUST 1, 2013, 8:00 A.M.

 8  THIS RELATES TO ALL CASES

 9  ****************************************************

10

11         SWORN STATEMENT OF PATRICK A. JUNEAU, ESQUIRE
             TAKEN BEFORE THE HONORABLE LOUIS J. FREEH
12                          SPECIAL MASTER

13

14  APPEARANCES:

15
                                LOUIS J. FREEH, SPECIAL MASTER
16                              JAMES BUCKNAM, ESQUIRE
                                STEVE TIDWELL
17

18

19

20  OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                CERTIFIED REALTIME REPORTER
21                              REGISTERED MERIT REPORTER
                                500 POYDRAS STREET, ROOM HB406
22                              NEW ORLEANS, LA   70130
                                (504) 589-7779
23                              Cathy_Pepper@laed.uscourts.gov

24
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
25  PRODUCED BY COMPUTER.
```

**CONFIDENTIAL**

| | |
|---|---|
| 08:18AM 1 | mean, you know, where they were about settlement negotiations, |
| 08:18AM 2 | and we started talking about it. |
| 08:18AM 3 | I had to conceptually start thinking about how in the |
| 08:18AM 4 | world do you put this thing together? Because I was told -- |
| 08:18AM 5 | this is very unique for this case -- it is for me -- I was told |
| 08:19AM 6 | initially that we're going to make an appointment -- there were |
| 08:19AM 7 | going to be several appointments simultaneously, which I had |
| 08:19AM 8 | nothing to do with -- as they were going to appoint some |
| 08:19AM 9 | court-appointed vendors that I was to work with, some of which |
| 08:19AM 10 | had already been working, were working in the Gulf Coast Claim |
| 08:19AM 11 | Facility. |
| 08:19AM 12 | BrownGreer, Garden City, and Price Waterhouse were |
| 08:19AM 13 | the three; that they would be appointed as the vendors, and I |
| 08:19AM 14 | was to work with those people. They were subject, for lack of |
| 08:19AM 15 | a better word, to my general oversight, you know, from their |
| 08:19AM 16 | activities. |
| 08:19AM 17 | I knew BrownGreer because BrownGreer was the |
| 08:19AM 18 | appointed claims company in *Vioxx*, when Judge Fallon, here in |
| 08:19AM 19 | this Court -- I was appointed -- I handled that case as the |
| 08:19AM 20 | special master, so I knew who they were, and I had worked with |
| 08:20AM 21 | their senior people. |
| 08:20AM 22 | I knew who Price Waterhouse was, obviously; but, the |
| 08:20AM 23 | individual people, etcetera, you know, I had no knowledge of. |
| 08:20AM 24 | Then I was told that they were appointing |
| 08:20AM 25 | simultaneously with that appointment Postlethwaite & |

**CONFIDENTIAL**

| | | |
|---|---|---|
| 08:20AM | 1 | Netterville, which is another accounting firm, because they |
| 08:20AM | 2 | wanted to have two accounting firms. That was worked out, |
| 08:20AM | 3 | obviously, between BP and the plaintiffs' group. |
| 08:20AM | 4 | Q.   So you had no role in selecting that? |
| 08:20AM | 5 | A.   No, none at all. I mean, I found out then. |
| 08:20AM | 6 | Then I was also told, as kind of the unknown part of |
| 08:20AM | 7 | this whole mystery here, as another massive part of this case, |
| 08:20AM | 8 | is you are going from this voluminous -- this program here, the |
| 08:20AM | 9 | Gulf Coast Claims program that Ken Feinberg was -- to this |
| 08:21AM | 10 | program here. It's a totally different program. There's no |
| 08:21AM | 11 | question. |
| 08:21AM | 12 | Q.   Much more complex? |
| 08:21AM | 13 | A.   I'm going to explain that to you, if I can, in a minute. |
| 08:21AM | 14 | But my point being, it will be the transition. So that was a |
| 08:21AM | 15 | little animal of its own. I was in charge of the transition, |
| 08:21AM | 16 | along with the Judge appointed Lynn Greer, of BrownGreer, |
| 08:21AM | 17 | because they had been involved and would be involved in both, |
| 08:21AM | 18 | as kind of transition coordinator working directly with me. |
| 08:21AM | 19 | Because there were a significant number of claims |
| 08:21AM | 20 | that were still here which had not been resolved under the |
| 08:21AM | 21 | protocol of the Gulf Coast Claims Facility. So I had to take |
| 08:21AM | 22 | over that and make that transition, get those claims paid; and, |
| 08:21AM | 23 | simultaneously, under the order, the original order, I was to |
| 08:21AM | 24 | open the door for this whole program on June 4. So we really |
| 08:22AM | 25 | had two things going on. |

**CONFIDENTIAL**

SM-01-LS00746

| | | |
|---|---|---|
| 08:52AM | 1 | *conduct or ethics policy*? |
| 08:52AM | 2 | A. If they did, it didn't get to me, you know. |
| 08:52AM | 3 | Q. Same question with respect to a compliance policy or a set |
| 08:52AM | 4 | of policies and procedures in the area of compliance? |
| 08:53AM | 5 | A. I have no knowledge of that. |
| 08:53AM | 6 | Q. As you began to set up your office, did you, yourself, or |
| 08:53AM | 7 | anybody on your staff draft, initiate any process that would |
| 08:53AM | 8 | lead to the establishment of those types of policies? |
| 08:53AM | 9 | A. Yes. That's what I told David Odom. I said, activate, |
| 08:53AM | 10 | innovate, whatever word you want to use, a process that -- we |
| 08:53AM | 11 | have tight contractual obligations here, since we're dealing |
| 08:53AM | 12 | with independent contractors -- to include things of conflict |
| 08:53AM | 13 | of interest and all that sort of stuff, and establish a code -- |
| 08:53AM | 14 | and I'll go through that with you in just a minute -- a code of |
| 08:53AM | 15 | conduct that I want the people working here, and circulate |
| 08:53AM | 16 | that. |
| 08:53AM | 17 | We established and put in place a program about |
| 08:54AM | 18 | entertainment, expenses, and regulations that control all of |
| 08:54AM | 19 | us. We did that. |
| 08:54AM | 20 | Q. You directed Mr. Odom to do that -- |
| 08:54AM | 21 | A. That's exactly what I did. |
| 08:54AM | 22 | Q. -- very early on in his employment? |
| 08:54AM | 23 | A. Uh-huh (affirmative response). |
| 08:54AM | 24 | Q. Did he do so? |
| 08:54AM | 25 | A. Yeah. |

**CONFIDENTIAL**

SM-01-LS00747

| | | |
|---|---|---|
| 08:59AM | 1 | Q.   Were you present there? |
| 08:59AM | 2 | A.   You know, I might have been there for a part of that |
| 08:59AM | 3 | meeting.  I know I instructed Odom to do that.  He could tell |
| 08:59AM | 4 | you specifically. |
| 08:59AM | 5 | I think -- I go in and out of a lot of meetings in a |
| 09:00AM | 6 | day's time, but -- I seem to recall having been there, but I |
| 09:00AM | 7 | can't say that for sure. |
| 09:00AM | 8 | Q.   Let me just take the instance of Mr. Sutton, who we're |
| 09:00AM | 9 | going to talk about in a moment after we give our reporter a |
| 09:00AM | 10 | short break.  But you did mark it as an exhibit, and we are |
| 09:00AM | 11 | then referring to Mr. Sutton. |
| 09:00AM | 12 | In other words, when he was brought on board, |
| 09:00AM | 13 | obviously, he signed this document, as you've indicated and as |
| 09:00AM | 14 | we have ourselves confirmed; is that correct? |
| 09:00AM | 15 | A.   Yeah. |
| 09:00AM | 16 | Q.   Are you the individual who hired Mr. Sutton? |
| 09:00AM | 17 | A.   I guess you could say -- yeah, I think so. |
| 09:00AM | 18 | Q.   Did anyone recommend that you hire him, if you recall? |
| 09:00AM | 19 | A.   No.  I don't think -- I mean, I don't remember anybody -- |
| 09:00AM | 20 | this is what I remember.  I remember he sought the employment. |
| 09:00AM | 21 | Obviously, his wife, she had been there since the |
| 09:01AM | 22 | inception.  I knew Sutton before.  He was from New Iberia, |
| 09:01AM | 23 | Louisiana.  He had worked for me for a short period of time, I |
| 09:01AM | 24 | don't know, maybe a year -- I don't know how many years ago, |
| 09:01AM | 25 | 15 years ago or something like that -- in Lafayette, Louisiana. |

**CONFIDENTIAL**

```
09:01AM  1       I hadn't seen that guy.  I had no contact with him
09:01AM  2  subsequent to that.
09:01AM  3       I hired his wife.  Then he came and said he would
09:01AM  4  like to work.  I considered that.  I said, "Well, give me your
09:01AM  5  resumé."
09:01AM  6       I took the resumé.  I went through the same process
09:01AM  7  as I told you I did with everybody else, both sides.  Said they
09:01AM  8  did a background check, the same process.
09:01AM  9       I considered it.  I talked to him.  I talked -- I
09:01AM 10  knew that he knew a lot about -- because he was from
09:01AM 11  New Iberia, Louisiana -- the fishing industry, the boats and
09:01AM 12  things like that; and, to me -- that was an asset to me.
09:02AM 13       It's like saying -- if you're talking about a keel of
09:02AM 14  a boat, you don't have to explain to somebody what that is.
09:02AM 15       So the short answer to your question is I'm the one
09:02AM 16  that made that decision.
09:02AM 17  Q.   When you said you submitted his name or resumé to BP, did
09:02AM 18  they express any reservations about hiring him?
09:02AM 19  A.   I don't remember any.  The only one -- the only one I
09:02AM 20  remember expressing any reservation -- I remember David Odom
09:02AM 21  telling me, he said, "You know, I don't think it's
09:02AM 22  necessarily" -- "because you got a man and wife employee."  He
09:02AM 23  said that.
09:02AM 24       MR. BUCKNAM:  Did Keith Moskowitz ever make any
09:02AM 25  statement along those lines to you, on behalf of BP?
```

**CONFIDENTIAL**

```
09:09AM  1   that Mr. Sutton was in a business relationship with
09:09AM  2   Glen Lerner?
09:09AM  3   A.   You know what I do remember, to answer that question, I
09:09AM  4   think Mr. Sutton told me, he said, "I have an interest in a
09:09AM  5   company named Crown."  I said, "Does Crown" -- I said, "Does
09:09AM  6   Crown have any claim or have anything to do with this
09:09AM  7   litigation?"  "No, it does not."
09:09AM  8            I said, "Because it cannot and cannot in the future
09:09AM  9   have anything to do with it, if that's what your interest is."
09:09AM 10   I just happen to remember that name.  I don't remember the name
09:09AM 11   of Lerner.
09:09AM 12   Q.   At which point did he have this conversation with you
09:09AM 13   about Crown?  Not Lerner, but Crown?
09:09AM 14   A.   That was earlier.  Real early on.
09:10AM 15   Q.   Before he was working --
09:10AM 16   A.   Yeah, when I was talking.  That's right.  I was saying,
09:10AM 17   "Do you represent anybody," and so forth.  He said, "Well,
09:10AM 18   I'm" -- and I think he mentioned, "I'm an officer" -- or "I
09:10AM 19   have some interest in Crown."  I said, "Okay."
09:10AM 20            Then I told him just what I just told you.  I think
09:10AM 21   that was real early in the -- even before the execution of that
09:10AM 22   agreement.
09:10AM 23   Q.   Do you recall him mentioning that a man named Lerner was
09:10AM 24   associated with Crown?
09:10AM 25   A.   Judge, I don't remember that.
```

**CONFIDENTIAL**

```
09:10AM  1   Q.   At that point in time -- he's coming aboard in November of
09:10AM  2   2012 -- would you have recognized the name Glen Lerner?
09:10AM  3   A.   No, not really.
09:10AM  4   Q.   Are you familiar with a firm in New Orleans called
09:10AM  5   Andry Lerner?
09:10AM  6   A.   I'm familiar with The Andry Law Firm.  I knew about that
09:10AM  7   name.
09:10AM  8   Q.   But the name Glen Lerner was not familiar to you?
09:10AM  9   A.   Lerner was not familiar to me, no.
09:10AM 10   Q.   Did Mr. Sutton tell you at any time that he was receiving
09:10AM 11   payments from Mr. Lerner?
09:11AM 12   A.   No, sir, I don't recall anything like that.
09:11AM 13   Q.   Did Mr. Sutton or anyone else tell you, prior to these
09:11AM 14   events becoming public, that Mr. Lerner was partners with
09:11AM 15   Jon Andry in the Andry Lerner Law Firm?
09:11AM 16   A.   I don't remember any discussions like that.
09:11AM 17   Q.   You said you don't recall, at least before the matters
09:11AM 18   here became public, the name Andry Lerner Law Firm?
09:11AM 19   A.   I really don't.  I remember Sutton saying -- you remember
09:11AM 20   when I told you, I said, "Well, if you've got a claim, you
09:11AM 21   can't" -- "you can't represent anybody in this thing, today or
09:11AM 22   tomorrow, in the future."
09:11AM 23            I think he may have told me that, "I referred" -- "I
09:11AM 24   gave two names of firms to go to."  I think one of the names --
09:11AM 25   I remember the name Andry is a firm he suggested these people
```

**CONFIDENTIAL**

SM-01-LS00751

| | | |
|---|---|---|
| 09:12AM | 1 | Q. Do you recall ever having a conversation with Mr. Sutton |
| 09:13AM | 2 | where he mentioned the name Romeo Papa? |
| 09:13AM | 3 | A. No, sir. |
| 09:13AM | 4 | Q. Do you recall ever having a conversation with Mr. Sutton |
| 09:13AM | 5 | when he told you he had an interest in a company named |
| 09:13AM | 6 | Romeo Papa? |
| 09:13AM | 7 | A. No. I don't recall any such conversation. |
| 09:13AM | 8 | Q. Any recollection of a conversation where Mr. Sutton told |
| 09:13AM | 9 | you he was working in conjunction with a man named Perez? |
| 09:13AM | 10 | A. No, sir. |
| 09:13AM | 11 | Q. Did Mr. Sutton ever tell you that he had an interest in a |
| 09:13AM | 12 | company that was a claimant before the administrative office? |
| 09:13AM | 13 | A. No, sir. |
| 09:13AM | 14 | Q. Did he ever ask you for permission to stay associated with |
| 09:13AM | 15 | a company that was a current claimant before the administration |
| 09:13AM | 16 | office? |
| 09:13AM | 17 | A. No, sir. |
| 09:13AM | 18 | Q. Had he asked you that, what would you have told him? |
| 09:13AM | 19 | A. No. |
| 09:13AM | 20 | (WHEREUPON, at this point in the proceedings, |
| 09:13AM | 21 | Exhibit PJ-4B was marked.) |
| 09:13AM | 22 | BY MR. FREEH: |
| 09:13AM | 23 | Q. Let me show you what we've marked as 4B. Let's leave it |
| 09:14AM | 24 | this way. You've not seen this document before, so I would ask |
| 09:14AM | 25 | you to take a look at it. |

**CONFIDENTIAL**

SM-01-LS00752

| | |
|---|---|
| 09:14AM  1 | It purports to be a Secretary of State Louisiana |
| 09:14AM  2 | document or public report. Again, talks about a company called |
| 09:14AM  3 | *Romeo Papa* and lists some officers. I would ask if any of that |
| 09:14AM  4 | is familiar to you? |
| 09:14AM  5 | A.   No, sir. |
| 09:14AM  6 | Q.   Do you recall ever having a conversation with Mr. Sutton |
| 09:14AM  7 | where you described to him a situation involving one of your |
| 09:14AM  8 | sons, a doctor, who had a claim that couldn't be processed |
| 09:14AM  9 | because you were the administrator? If you recall? |
| 09:15AM 10 | A.   I may have had a conversation with him; but, the reason I |
| 09:15AM 11 | say that is because it came up -- I have a son that's a doctor, |
| 09:15AM 12 | and I found out he had filed a claim. There were a lot of |
| 09:15AM 13 | claimants out there. |
| 09:15AM 14 | I told Keith Moskowitz -- I'm the one that told |
| 09:15AM 15 | him -- I said, "My son is not part of what we're doing. He's a |
| 09:15AM 16 | doctor, got his own separate practice. He's got a claim. Is |
| 09:15AM 17 | that a problem for y'all," you know. |
| 09:15AM 18 | He really didn't say anything. He nodded, you know, |
| 09:15AM 19 | like -- nothing. I never heard any more about it. |
| 09:15AM 20 | Then we did -- I think Mike came up, and we sent him |
| 09:15AM 21 | a letter. He said, "Well, we never responded, but I never told |
| 09:15AM 22 | you anything." It didn't add up to me because I was the guy |
| 09:16AM 23 | that raised the issue. |
| 09:16AM 24 | Then when he said, "Well, that may be a problem for |
| 09:16AM 25 | us," I said, "Well, then I'll tell my son if you think that." |

**C O N F I D E N T I A L**

SM-01-LS00753

| | | |
|---|---|---|
| 09:16AM | 1 | I talked to my son.  He said, "Well if that's the case, we'll |
| 09:16AM | 2 | withdraw the claim."  That's what happened.  I told him that. |
| 09:16AM | 3 | But I don't remember, to answer your question -- |
| 09:16AM | 4 | Q.   My question is, did you ever have that discussion with |
| 09:16AM | 5 | Mr. Sutton that you recall? |
| 09:16AM | 6 | A.   You know, I really don't -- I'm -- I may have mentioned |
| 09:16AM | 7 | this to Sutton or somebody in my office that we had this claim. |
| 09:16AM | 8 | I'm saying that could have happened. |
| 09:16AM | 9 | Q.   Let me ask the question another way.  I'm not trying to |
| 09:16AM | 10 | confuse.  I'm trying to -- |
| 09:16AM | 11 | A.   Sure. |
| 09:16AM | 12 | Q.   -- ask a question based on what someone else has told me. |
| 09:16AM | 13 | So you said Mr. Sutton never came to you and said he |
| 09:16AM | 14 | was associated with a company called *Romeo Papa*? |
| 09:16AM | 15 | A.   I don't ever recall that. |
| 09:16AM | 16 | Q.   Leaving aside the name Romeo Papa, you don't recall |
| 09:16AM | 17 | Mr. Sutton ever coming to you after he went to work for you and |
| 09:16AM | 18 | saying, "I am related to a current claimant before the office"? |
| 09:17AM | 19 | A.   I don't ever recall that, no, sir. |
| 09:17AM | 20 | Q.   You don't recall a situation where he made that type of |
| 09:17AM | 21 | statement to you or any other type of statement to you, where |
| 09:17AM | 22 | you responded by giving the example of your own son and your |
| 09:17AM | 23 | own experience with being connected to a claimant? |
| 09:17AM | 24 | A.   I really don't recall that. |
| 09:17AM | 25 | (WHEREUPON, at this point in the proceedings, |

**C O N F I D E N T I A L**

```
09:34AM  1    Q.   Do you recall why you decided at that moment to speak to
09:34AM  2    him by yourself?
09:34AM  3    A.   Well, it was very troubling to me, you know, that this
09:34AM  4    allegation was made.  Somebody mentioned to me, you know, that
09:34AM  5    if we knew -- they were on suspension at that point, and they
09:34AM  6    were wondering what the heck was going on, Sutton and Reitano,
09:34AM  7    his wife.  I mean, "Why are we on suspension?  Nobody has
09:35AM  8    talked to us."
09:35AM  9             So, then I think I brought him in.  I said, "I've got
09:35AM 10    a question to ask you.  We've got some allegations of
09:35AM 11    impropriety.  I want to know, did you, in any fashion, have any
09:35AM 12    financial interest in any claim that had anything to do with
09:35AM 13    BP?"  That's in essence what I did.
09:35AM 14             It was very troubling to me.  That's why I did it.
09:35AM 15    Q.   What was his response?
09:35AM 16    A.   No.
09:35AM 17    Q.   Was that at a moment when this matter had become public,
09:35AM 18    or had it just become known within the office?
09:35AM 19    A.   No.  That was before.
09:35AM 20    Q.   How long a meeting was that, if you recall?
09:35AM 21    A.   It wasn't long.  It didn't take long.  Five minutes.
09:35AM 22    Q.   Do you recall you saying anything else or Mr. Sutton
09:35AM 23    saying anything else?
09:35AM 24    A.   No.  No.  I just knew it was a big focus of mine.  I was
09:36AM 25    very concerned about that.  I wanted to look him in the face
```

CONFIDENTIAL

SM-01-LS00755

| | | |
|---|---|---|
| 10:17AM | 1 | mentioned, but it didn't have anything to do with any relation, |
| 10:17AM | 2 | to my recollection, having to do with anything -- any interest |
| 10:17AM | 3 | that he had in the claim. I don't remember anything like that. |
| 10:17AM | 4 | Q.    You don't recall ever relating that story to Mr. Sutton in |
| 10:17AM | 5 | his response to telling you he had a personal claim before the |
| 10:17AM | 6 | administrator? |
| 10:17AM | 7 | A.    No, sir. |
| 10:17AM | 8 | Q.    You would remember that conversation? |
| 10:17AM | 9 | A.    I think so. |
| 10:17AM | 10 | Q.    Did you ever tell Mr. Sutton that -- I'm sorry. |
| 10:18AM | 11 | A.    The answer is no.  If somebody would have had that, I |
| 10:18AM | 12 | would have probably said, "Well, the son is withdrawing the |
| 10:18AM | 13 | claim.  What are you talking to me about this?"  I mean, this |
| 10:18AM | 14 | is an absolute no. |
| 10:18AM | 15 | Q.    After this interview on June 20th, Mr. Sutton submitted a |
| 10:18AM | 16 | resignation to you; is that correct? |
| 10:18AM | 17 | A.    Yes. |
| 10:18AM | 18 | Q.    Did you ask him to resign, or did he volunteer to resign? |
| 10:18AM | 19 | A.    I didn't ask him to resign. |
| 10:18AM | 20 | Q.    Do you recall receiving his resignation letter? |
| 10:18AM | 21 | A.    I do. |
| 10:18AM | 22 | Q.    Do you have that? |
| 10:18AM | 23 |             MR. FREEH:  All right.  Let me mark what's PJ-16. |
| 10:18AM | 24 |             (WHEREUPON, at this point in the proceedings, |
| 10:18AM | 25 | Exhibit PJ-16 was marked.) |

**CONFIDENTIAL**

SM-01-LS00756

| | | |
|---|---|---|
| 10:18AM | 1 | BY MR. FREEH: |
| 10:18AM | 2 | Q. Ask you if that's the e-mail he sent you when he resigned? |
| 10:19AM | 3 | A. (Witness reviews the document.) Yeah. I think that's |
| 10:19AM | 4 | accurate. It's accurate. That's the resignation letter, yeah. |
| 10:19AM | 5 | Q. It's dated Friday, June 21, 2013, which would be the |
| 10:19AM | 6 | day -- or the morning, because it's 8:13 a.m., after the |
| 10:19AM | 7 | interview. Does that agree with your recollection as to about |
| 10:19AM | 8 | when you received this? |
| 10:19AM | 9 | A. Yes. |
| 10:19AM | 10 | Q. In this document, which is less than a page in length, at |
| 10:19AM | 11 | no point in this document does he state or admit in any way, |
| 10:20AM | 12 | shape or fashion that he did, in fact, receive fees or payments |
| 10:20AM | 13 | relating to a claim before the administration office, correct? |
| 10:20AM | 14 | A. That's what I read. |
| 10:20AM | 15 | Q. Nowhere in this document does he state words to the effect |
| 10:20AM | 16 | that any monies he received with respect to a claim before the |
| 10:20AM | 17 | administration office were known to the administration office |
| 10:20AM | 18 | or approved by someone in the administration office? |
| 10:20AM | 19 | A. I didn't see that in there. |
| 10:20AM | 20 | Q. I'm going to ask you a few questions about |
| 10:20AM | 21 | Christine Reitano. You mentioned that you hired her before |
| 10:20AM | 22 | Mr. Sutton went to work for you? |
| 10:20AM | 23 | A. Yes, that was early on. |
| 10:20AM | 24 | Q. How did you come to hire her? Did someone recommend her |
| 10:20AM | 25 | to you? |

**CONFIDENTIAL**

| | | |
|---|---|---|
| 10:20AM | 1 | A.  She applied for the job.  She said, "You have an |
| 10:20AM | 2 | opportunity I would like."  This was the real formative stage |
| 10:20AM | 3 | of the thing.  I didn't even have an office at the time. |
| 10:21AM | 4 | We were using the sixth floor conference room in the |
| 10:21AM | 5 | building -- you know where our offices is there.  Sutton and |
| 10:21AM | 6 | his wife, as you know, have an office in that building.  She |
| 10:21AM | 7 | mentioned to me, "If you" -- "I would be very much interested |
| 10:21AM | 8 | in working in that program." |
| 10:21AM | 9 | Q.  Before she approached you, did you know her? |
| 10:21AM | 10 | A.  No.  No.  No.  I knew him.  I did not know her. |
| 10:21AM | 11 | No, let me take that back.  I may have met her, |
| 10:21AM | 12 | because she was married to him, once -- maybe once or twice; |
| 10:21AM | 13 | but, I mean, I don't even know if I would have recognized her |
| 10:21AM | 14 | at the time. |
| 10:21AM | 15 | Q.  She was not a social friend? |
| 10:21AM | 16 | A.  Oh, no. |
| 10:21AM | 17 | Q.  You had never worked with her as an attorney? |
| 10:21AM | 18 | A.  Never. |
| 10:21AM | 19 | Q.  Did there come a time when you did, in fact, hire her? |
| 10:21AM | 20 | A.  There was. |
| 10:21AM | 21 | Q.  What convinced you or persuaded you that she would be |
| 10:21AM | 22 | someone appropriate to hire for that position? |
| 10:21AM | 23 | A.  Well, she is very bright.  I mean, it was very obvious |
| 10:22AM | 24 | talking to her.  She had a good academic resumé, I thought. |
| 10:22AM | 25 | She was very bright. |

**CONFIDENTIAL**

SM-01-LS00758

| | | |
|---|---|---|
| 10:22AM | 1 | We were in the -- in the formative stages of the |
| 10:22AM | 2 | case. Judge, let me tell you something, that stage of the |
| 10:22AM | 3 | world, it was scrambled eggs. I got a Court Order telling me |
| 10:22AM | 4 | to open this facility on June 4th, and to make the transition, |
| 10:22AM | 5 | which turned out to be a half billion dollar claim. You're |
| 10:22AM | 6 | looking at it, me and Mike. That's all. That's really all we |
| 10:22AM | 7 | got. |
| 10:22AM | 8 | All of these issues are bubbling. We knew we had to |
| 10:22AM | 9 | activate this thing. It ain't the easiest thing in the world |
| 10:22AM | 10 | in five states to find somebody who doesn't have any contact |
| 10:22AM | 11 | with the *BP* litigation. |
| 10:22AM | 12 | She approached me. She seemed very bright to me, |
| 10:22AM | 13 | credentials. I did the same process I told you about earlier, |
| 10:22AM | 14 | about circulating the resumé and so forth, got the approval. |
| 10:23AM | 15 | Q.   So you sent it to BP and the plaintiffs' counsel? |
| 10:23AM | 16 | A.   Absolutely. I've done that consistently. |
| 10:23AM | 17 | Q.   Did BP come back with any comments or -- |
| 10:23AM | 18 | A.   No. As a matter of fact, they drafted the first agreement |
| 10:23AM | 19 | that was signed with her. |
| 10:23AM | 20 | Q.   Never raised any concerns about her -- |
| 10:23AM | 21 | A.   Never. |
| 10:23AM | 22 | Q.   -- employment? |
| 10:23AM | 23 | A.   Never. |
| 10:23AM | 24 | To be honest with you, we have dealt with 10 million |
| 10:23AM | 25 | issues in this case. The girl -- well, the lady proved out to |

**CONFIDENTIAL**

SM-01-LS00759

|  |  |
|---|---|
| 10:23AM 1 | be very intelligent, very quick in understanding, you know, |
| 10:23AM 2 | documents about that thick. |
| 10:23AM 3 | She -- she did -- she did quality work that I saw |
| 10:23AM 4 | over that extended period of time, from inception till -- |
| 10:23AM 5 | Tiger Sutton came on November 1, as I recall. |
| 10:23AM 6 | That period of time, I mean, she was more or less a |
| 10:23AM 7 | funnel, because I had no other source, you know, that we were |
| 10:23AM 8 | dealing with. She was carrying a pretty substantial load |
| 10:23AM 9 | during that period of time. |
| 10:23AM 10 | Q. You said that it was hard to find people who had no |
| 10:24AM 11 | connection to the case, the *BP* matter; is that correct? |
| 10:24AM 12 | A. Yeah, that's a fact. |
| 10:24AM 13 | Q. When you interviewed -- |
| 10:24AM 14 | A. I'm not saying she was the last of the food chain. I'm |
| 10:24AM 15 | not trying to convey that to you. But that -- by the way, that |
| 10:24AM 16 | is still true today. Michael Juneau and I are doing all |
| 10:24AM 17 | this -- well, we're doing the work of about ten lawyers right |
| 10:24AM 18 | now. It's just the nature of it. |
| 10:24AM 19 | First of all, we got this controversy that's going on |
| 10:24AM 20 | out there; but, we're woefully short. If you went out today |
| 10:24AM 21 | and said you were looking -- you'd probably get a lot of |
| 10:24AM 22 | applications, but you -- I worked for this firm, we did this. |
| 10:24AM 23 | You may have this firm, you may have that. We've seen that |
| 10:24AM 24 | constantly. It's a shrinking market for us. |
| 10:24AM 25 | Q. With respect to Christine Reitano, when you were speaking |

**CONFIDENTIAL**

|  |  |
|---|---|
| 10:24AM 1 | to her about hiring her, bringing her aboard as a lawyer, did |
| 10:24AM 2 | you check any of her references yourself, did you ask for any |
| 10:24AM 3 | experiences or talk to her about what her training or |
| 10:25AM 4 | experience was in any type of a claims administration process? |
| 10:25AM 5 | A.   I knew -- two reasons I hired her.  It wasn't just |
| 10:25AM 6 | availability.  I would not do that.  She had experience in |
| 10:25AM 7 | dealing -- because this is a little -- this complex litigation |
| 10:25AM 8 | world is its own animal out there.  She had had experience in |
| 10:25AM 9 | dealing in this complex litigation world with claims and class |
| 10:25AM 10 | action things; about that, I knew.  That's all on her resumé. |
| 10:25AM 11 | That background, in addition to her academics, were |
| 10:25AM 12 | things that were very attractive to me, you know.  I don't |
| 10:25AM 13 | know -- then I told you what I did, about I sent it to BP, they |
| 10:25AM 14 | do the background, same thing we did in the past. |
| 10:25AM 15 | I don't know that I went further than that, and I |
| 10:25AM 16 | don't think I did.  I was satisfied with that, me. |
| 10:26AM 17 | I think -- you know, I don't remember, but I have -- |
| 10:26AM 18 | I seem to recall either BP and/or the plaintiffs interviewing |
| 10:26AM 19 | her because I had made that a policy.  Anybody -- I want to |
| 10:26AM 20 | hire anybody, come talk to them.  That's what I'm fixing to do. |
| 10:26AM 21 | I've made that available to everybody. |
| 10:26AM 22 | Q.   While you were in the process of hiring her and discussing |
| 10:26AM 23 | her working for you, did she tell you that she had some matters |
| 10:26AM 24 | and cases that were before the Claims Administrator, to your |
| 10:26AM 25 | recollection? |

**CONFIDENTIAL**

SM-01-LS00761