IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY,
PENNSYLVANIA
CIVIL ACTION – LAW

| | |
|---|---|
| GRAHAM B. SPANIER | : |
| | : |
| | : |
| Plaintiff, | : |
| | : Docket No. 2013-2707 |
| v. | : |
| | : |
| LOUIS J. FREEH and FREEH SPORKIN | : |
| & SULLIVAN, LLP, | : |
| | : |
| Defendants. | : |
| | : |

## OPPOSITION OF DEFENDANTS TO
## MOTION OF PLAINTIFF TO STAY CIVIL PROCEEDINGS

Judge Louis J. Freeh and Freeh Sporkin & Sullivan, LLP have been sued by

Graham B. Spanier on the basis of nothing more than a one-page Writ of Summons

containing a one-line accusation of "defamation."   As a matter of law and

fundamental fairness, Judge Freeh and his law firm are entitled to know why they

have been sued and the purported factual basis for Spanier's accusation.

Although Spanier has repeatedly used the press and the public air waves to

prosecute his unsworn "virtual" complaint against Judge Freeh and to mount a self-

serving public relations campaign, Spanier now opposes Judge Freeh's request that he file a Complaint in this Court—under oath—articulating his legal claims and substantiating his allegations with facts.   Spanier has succeeded in garnering headlines for suing Judge Freeh without having to provide any substantiation.  His motion now asks the Court to stop his own lawsuit and relieve him of his obligation to file a Complaint.  Spanier bears the heavy burden of demonstrating why a stay is necessary—and he has failed to meet that burden in every respect.

For several reasons, the Court should deny Spanier's request.  First, Spanier has not articulated—and cannot articulate—a single reason why he will be prejudiced if he is compelled merely to file a complaint backing up his accusation.  Spanier's sole reason for seeking the stay is that certain witnesses that he may call to testify may assert their Fifth Amendment right against self-incrimination.  This hypothetical "prejudice" would *only* arise, if at all, after the filing of the Complaint and during the latter phases of the litigation, such as discovery or trial.  Thus, Spanier will not suffer the potential "prejudice" he identifies if he files a Complaint.

Second, the bold, sweeping assertion that Judge Freeh and his law firm "cannot articulate any prejudice that they would suffer" if this action were stayed is simply not true.   Judge Freeh and his law firm now suffer—and will continue to suffer—the prejudice of being publicly accused of tortious conduct without any

knowledge of the precise allegations against them.  If Spanier does not file a

complaint, they will remain stuck in the untenable position of having Spanier's

broad accusation clouding their reputations without being able to defend

themselves.  And, permitting Spanier to evade his obligation to file a complaint

will violate the longstanding policy of this Commonwealth that persons accused of

defamation are entitled to promptly investigate the claims against them.

In short, Spanier has failed to establish any proper basis to stay his

obligation to file a verified Complaint.  In the event that Fifth Amendment issues

arise later in the proceeding, the Court can address those issues at that time in

whatever context they arise.  But the potential for third-parties to assert the Fifth

Amendment is no basis for staying the filing of a complaint.  The Motion to Stay

should be denied and the Court should direct Spanier to promptly file a verified

Complaint.

## PROCEDURAL HISTORY

On July 11, 2013, Spanier filed a Praecipe for a Writ of Summons, in which

he stated that the "Type of Matter," was "Defamation."  On the corresponding civil

cover sheet, Spanier checked the box for a "Slander/Libel/Defamation" case.  On

September 12, 2013, Spanier filed a Praecipe to Issue Amended Writ of Summons.

On September 30, 2013, upon Defendants' Praecipe to File Complaint, the

prothonary issued a Rule to File Complaint.  On October 18, 2013, Spanier filed a

motion to stay this civil proceeding, pending the conclusion of Spanier's criminal proceeding.

**STATEMENT OF FACTS**

**A.   Judge Freeh And His Law Firm Are Commissioned By PSU To Complete An Independent Investigation And Issue A Report**

On November 12, 2011, the Special Investigations Task Force, on behalf of The Pennsylvania State University's ("PSU") Board of Trustees, engaged Freeh Sporkin & Sullivan, LLP ("FSS") as Special Investigative Counsel to perform an independent, full, and complete investigation of: (i) the alleged failure of PSU personnel to respond to and report to the appropriate authorities the sexual abuse of children by former PSU football coach, Gerry A. Sandusky and (ii) the circumstances under which the abuse could occur in PSU facilities. FSS was given unfettered access by PSU to PSU staff as well as data and documents maintained throughout the University.

On July 12, 2012, FSS released the "Report of the Special Investigative Counsel Regarding Actions of The Pennsylvania State University Related to the Child Sexual Abuse Committed by Gerry A. Sandusky" (the "Report").

**B.   Spanier Launches Media Attack Against Judge Freeh And The Report[1]**

---

[1]    A court may take judicial notice of the existence of newspaper articles. *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 162, n.5 (3d Cir. 2004).

4

After the Report was issued, Spanier and his attorneys publicly attacked the Report numerous times.  On the heels of the Report on July 23, 2012, Spanier sent a letter to PSU's Board of Trustees, attacking the Report.  Spanier's letter was reported on by numerous media sources. The Associated Press quoted Spanier as stating that the Report is "egregious in its incomplete and inaccurate reporting" of Spanier's discussions with trustees, PSU's General Counsel, and others, and that the "[R]eport is full of factual errors and jumps to conclusions that are untrue and unwarranted." (Ex. A, 7/23/12 Associated Press article.)

On August 22, 2012, Spanier's attorneys issued an 18-page self-titled "Critique" of the Report and held a lengthy news conference denouncing the Report.  Spanier's attorneys stated, among other things, that the Report was "inaccurate, incomplete, and approached with a prosecutorial bias." (Ex. B, 8/24/12 Pittsburgh Post-Gazette article.)  Spanier's attorneys further stated that, "It is now apparent that Judge Freeh was not an independent investigator, but a self-anointed accuser who . . . recklessly and without justification created victims of his own." (Ex. C, 8/23/12 New York Times article.)

Meanwhile, on the same day, Spanier gave an in-person interview to ABC News, which aired on various network television shows, including "World News with Diane Sawyer," "Nightline," and "Good Morning America." (Ex. D, 8/22/12 ABC News Press Release.)  Spanier stated that e-mails referenced in the Report

were taken out of context.  (Ex. E, 8/24/12 Philadelphia Inquirer article.)  On

August 22, 2013, Spanier also gave an in-person interview to The New Yorker, in

which Spanier is reported as stating:  "The Freeh report is wrong.  It's unfair.  It's

deeply flawed.  It has many errors and omissions.  They interviewed, they say,

over 430 people . . . .  Many of them described those interviews to me as a witch-

hunt."  (Ex. F, 8/23/12 CNN Report at 17.)

On August 23, 2012, Spanier gave a phone interview to the Pittsburgh Post-

Gazette, in which he is reported as commenting, "'What has been especially

troubling . . . was the Freeh report with its conclusions that are absolutely

unfounded, unfair, and just plain wrong.'"  (Ex. G, 8/24/12 Pittsburgh Post-Gazette

article.)  On the same day, Spanier also gave a phone interview to the Philadelphia

Inquirer, in which he is reported as stating, that the Report's portrayal of him was

"inaccurate."  (Ex E, 8/24/12 Philadelphia Inquirer article.)

## C.    Spanier Is Criminally Charged

On November 1, 2012, Spanier was charged in the Court of Common Pleas

of Dauphin County with endangering the welfare of children, perjury, obstruction

of justice, criminal conspiracy, and failure to report sexual assault (the "Criminal

Proceeding").  Timothy Curley and Gary Shultz were also charged.  On

July 30, 2013, after a two-day preliminary hearing, Spanier was ordered to stand

trial in the Criminal Proceeding.  A trial date has not been scheduled in the

Criminal Proceeding.

## STATEMENT OF QUESTION INVOLVED

Should plaintiff be compelled to file a complaint where plaintiff's primary

justification for staying a civil proceeding—the alleged prejudice that plaintiff

would suffer from witnesses refusing to testify based on self-incrimination

concerns—is not implicated if he files a complaint?

*Suggested Answer:  Yes.*

## ARGUMENT

Spanier, as the party seeking the stay, bears the burden of establishing that a

stay is necessary.  *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936).  "Staying a case

is an extraordinary measure and criminal defendants have no generalized due

process right to stay proceedings in a related civil action."  *Reck v. Berkshire Life

Ins. Co. of Am.*, No. 10-cv-0529, 2011 WL 335569, at *2 (W.D. Pa. Jan. 31, 2011)

(citation omitted).

Courts in Pennsylvania may consider the following factors in determining

whether to stay a civil case pending resolution of a criminal case:  "(1) the extent

to which the issues in the civil and criminal cases overlap; (2) the status of the

case, including whether [the plaintiff] has been indicted; (3) the [defendants']

interests in proceeding expeditiously weighed against the prejudice to [defendants]

caused by a delay; (4) the private interests and burden on the [plaintiff]; (5) the interest of the Court; and (6) public interest." *Anderson v. Scott*, No. 30006-2009, at 4 (Lawrence Cnty. Com. Pl. Sept. 15, 2011) (citing *Kaiser v. Stewart*, No. 96-cv-6643, 1997 WL 66186, at *2 (E.D. Pa. Feb. 6, 1997) (Ex. B. to Pl.'s Mem.)).

The court is to consider these factors "with the basic goal being to avoid prejudice." *Volmar Distribs. v. New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993). The balance of these factors weighs heavily in favor of denying Spanier's motion to stay because while Spanier will suffer *no* prejudice from the mere filing of a complaint in this proceeding, Judge Freeh and his law firm will be greatly prejudiced if this case lingers on without Spanier setting forth his allegations.\

## I. Spanier Has Not Identified Any Prejudice That Could Result From Filing A Complaint In This Proceeding

Spanier repeatedly stakes his motion on only one argument: he argues that his ability to prosecute this action will be prejudiced if witnesses—who are also defendants in the Criminal Proceeding—assert their right to self-incrimination. (Pl.'s Mem. at 1, 5, 7.) But it is inconceivable that Spanier would suffer this purported prejudice by filing a *complaint*. Spanier's own argument demonstrates as much. Spanier argues that the other defendants in the Criminal Proceeding "will be witnesses in this case," and that these witnesses will "likely . . . assert their . . . right[] against self-incrimination should this case move forward before the criminal case concludes." (*Id.* at 7.) Spanier further argues that he will be prejudiced by an

"incomplete and inadequate record."[2]  (*Id.* at 8.)  But these are concerns that could only arise, if at all, during discovery or at trial, when witness testimony is a factor. Spanier's articulated prejudice—on which he basis his motion—is simply not implicated if he files a complaint.  As Spanier acknowledges, his articulated prejudice, if any, would occur only if this case were to "*move forward.*"  (*Id.* at 7.)

Spanier's assertion of prejudice is premature for another reason.  Without knowing Spanier's allegations, the Court cannot determine whether any witness could properly assert the protection of the Fifth Amendment.  In *McQueary v. Pennsylvania State University*, 2012-1804 (Centre Cnty. Com. Pl. Dec. 20, 2012) (Ex. H), the court denied defendant's motion to stay, based on a comparison of plaintiff's civil complaint to charges asserted against the defendants in the Criminal Proceeding.  In *McQueary*, plaintiff alleged defamation, among other claims, against PSU.  PSU filed a motion to stay, arguing that its ability to respond

---

[2]    Spanier's reliance on *Doe* to support his argument—a case in which the plaintiff was deemed not to oppose the motion because he failed to respond—is misplaced.  *See Doe v. Pa. State Univ*, No. 4:12-cv-2068, 2013 U.S. Dist. LEXIS 21604, at *2 (M.D. Pa. Feb. 14, 2013) (Ex. B to Pl.'s Mem.).  *Doe* is further distinguishable because defendants in the civil proceeding (who were also defendants in the Criminal Proceeding) asserted their Fifth Amendment rights in response to plaintiff's complaint.  By contrast, here, Spanier bases his motion on the attenuated possibility that other individuals who are defendants in the Criminal Proceeding may invoke their right against self-incrimination, at some later point in this litigation.

to the complaint would be burdened if witnesses who are defendants in the Criminal Proceeding assert their Fifth Amendment rights. The court rejected this argument, holding that because the issues in the Criminal Proceeding did not overlap with plaintiff's civil case, the defendants in the Criminal Proceedings "[i]f called, . . . have no 5th Amendment right to refuse to testify, nor need they fear that information gathered in this case can be used against them in the criminal proceedings." (*McQueary*, slip op. at 7.) Likewise here, the Court will not be able to measure any purported prejudice to Spanier unless he files a complaint.

As demonstrated above, the prejudice upon which Spanier bases his motion is not implicated if Spanier files a complaint. Spanier has failed to satisfy his burden of demonstrating that a stay is needed. *See Landis*, 299 U.S. at 255. Therefore, Spanier's Motion to Stay should be denied.

## II.  Judge Freeh And His Law Firm Will Be Greatly Prejudiced If Spanier Does Not File A Complaint

Spanier boldly argues that Judge Freeh and his law firm "cannot articulate *any* prejudice," if this matter is stayed. (Pl.'s Mem. at 1, 5, 8.) This is a gross understatement. Judge Freeh and his law firm are severely prejudiced if Spanier does not file a complaint—this is reason alone to deny Spanier's motion.

### A.    Judge Freeh And His Law Firm Are Entitled To Know The Allegations That Are The Basis Of Spanier's Claim

It is a fundamental principle of litigation that Judge Freeh and his law firm are entitled to full and fair notice of the grounds upon which a claim against them rests. In this case, Judge Freeh and his law firm are greatly prejudiced by the holding pattern Spanier has imposed upon them. While Spanier has broadly accused them of wrongdoing by filing the Writ of Summons, Judge Freeh and his law firm cannot defend themselves because Spanier has refused to reveal the basis of his claim. As a result, Judge Freeh and his law firm have no way of remedying any harm that may have occurred to their reputations.

Spanier's refusal to file a complaint is surprising in light of Spanier's readiness to publicly attack Judge Freeh to the media before initiating this action. As set out above, Spanier and his attorneys set out on what has been described as a "media blitz," in which they repeatedly and vehemently denounced the Report. It is fundamentally unfair for Spanier to benefit from launching a "virtual" complaint against Judge Freeh and his law firm in the media but now refuse to file an actual complaint in a court of law where they can avail themselves of defenses available under the applicable civil rules and case law.

In a last-ditch effort to evade filing a complaint, Spanier contends that Judge Freeh and his law firm are estopped from asserting any prejudice because this litigation is somehow their fault after they declined to enter a tolling agreement.

11

(Pl.'s Mem. at 8.)  But Spanier misses the point.  The prejudice that Judge Freeh and his law firm suffer is because Spanier has not and still refuses to substantiate his claim with verified allegations.  A tolling agreement would only have amplified this prejudice—Spanier would be able to continue his media attack on Judge Freeh and his law firm while they would have no forum to defend against Spanier's claims.

Because the prejudice of this holding pattern is so great to Judge Freeh and his law firm, Spanier should not be allowed to avoid his obligation to file a complaint.  *See Int'l Fidelity Ins. Co. v. Podlusky*, No. 07–0235, 2007 WL 2752139, at *3 (W.D. Pa. Sept 19, 2007) ("The public has an interest in prompt resolution of civil disputes, and in not allowing those being investigated for criminal wrongdoing to avoid their civil obligations.") (Ex. H).  Judge Freeh and his law firm should be afforded the right, at the very minimum, to know what they are being accused of and assert a defense in a court of law.

### B.     A Stay Would Violate The Longstanding Policy That A Defendant Is Entitled To Promptly Investigate Defamation Claims

Unlike other torts claim, there is a one-year statute of limitations for defamation claims.  *See* 42 Pa. C.S. § 5523.  This short statute of limitations evinces the Pennsylvania legislature's intent that plaintiffs should file defamation claims swiftly so that defendants have the opportunity to promptly investigate any claims against them.  In *Evans v. Philadelphia Newspapers, Inc.*, 601 A.2d 330,

333 (Pa. Super. Ct. 1991), the court noted that the Pennsylvania legislature has given longer or shorter statutes of limitations for various torts actions for public policy reasons. *Id*; *Hurst v. Beck*, No. 91-cv-2492, 1992 WL 396592, at *4 (E.D. Pa. Dec. 17, 1992) ("In separating defamation from other tort claims, the legislature expressed a clear intention to keep the statute of limitations for defamation shorter than other tort causes of action.") (Ex. H).

The one-year statute of limitations for defamation claims reflects "a longstanding policy . . . in Pennsylvania to allow defendants in defamation cases an opportunity to make a prompt investigation of claims made against them while the evidence is still fresh in the minds of prospective witnesses." *Evans*, 601 A.2d at 333 (quoting trial court). The court further noted that the prompt resolution of defamation claims "is especially necessary for cases involving slander because the actual content of the statements could quickly fade from the minds of witnesses. Even where the case involves libel, it is still necessary to investigate the circumstances surrounding the making of the statement and it is crucial that it is done promptly." *Id*.

Allowing Spanier to stay this action, without filing a complaint, cuts against this longstanding policy. Spanier should be compelled to file a complaint before

13

the memories of relevant witnesses for both parties and the parties themselves

erode.[3]

## CONCLUSION

For the reasons set forth above, Spanier's Motion to Stay Civil Proceedings

should be denied and Spanier should be compelled to file a complaint in this

matter.

Dated:  November 12, 2013

/s/ Robert C. Heim
Robert C. Heim (Pa. 15758)
Michael L. Kichline (Pa. 62293)
Asha T. Mehrotra (Pa. 315176)
William T. McEnroe (Pa. 308821)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 (phone)
(215) 994-2222 (facsimile)

Lisa M. Welsh (Pa. 307382)
Miller, Kistler & Campbell
720 South Atherton Street, Suite 201
State College, PA 16801-4669

---

[3]     Spanier should, at the least, be required to file a complaint in this proceeding.  To the extent that the Court disagrees, Spanier's motion should not be granted in its entirety because Spanier's request for a stay until his criminal case has "concluded," is indeterminate.  Spanier argues this "action will likely be stayed for a year, at most." (Pl.'s Mem. at 7.)  This is doubtful because a trial date has not been set in the Criminal Proceeding.  And even after the Criminal Proceeding ends—whenever that may be—there is the potential for the verdict to percolate through the trial and appellate courts for an indefinite time period.  There is no definite end in sight to Spanier's Criminal Proceeding and the granting of a stay until his criminal trial has been "resolved" or "concludes" is inappropriate.

(814) 234-1500 (phone)
(814) 234-1549 (facsimile)

*Attorneys for Defendants Louis J.
Freeh and Freeh Sporkin & Sullivan,
LLP*

# EXHIBIT "A"

## _Ex-PSU exec: I was abused_, wouldn't turn blind eye

The Associated Press State & Local Wire
July 23, 2012 Monday 11:54 PM GMT

Copyright 2012 Associated Press All Rights Reserved

**Section:** STATE AND REGIONAL

**Length:** 508 words

**Byline:** By MARYCLAIRE DALE, Associated Press

**Dateline:** PHILADELPHIA

---

| Body |
| --- |

Ousted Penn State University president Graham Spanier insisted Monday that he wouldn't have ignored child sexual -abuse complaints as the school's top administrator because he was beaten repeatedly as a child by his father, his lawyer told The Associated Press.

Spanier received regular "disciplinary beatings" by his father as a teen, and had to have his nose straightened several times, lawyer Peter Vaira said. The abuse was never sexual, Vaira said.

Spanier said in a letter dated July 23 to the school's board of trustees that he would not have turned "a blind eye" to the victims of convicted child molester Jerry Sandusky because of Spanier's own abuse history. Sandusky, the former assistant football coach, is awaiting sentencing for crimes involving 10 boys, both on and off campus.

"It is unfathomable and illogical to think that a respected family sociologist and family therapist, someone who personally experienced massive and persistent abuse as a child, someone who devoted a significant portion of his career to the welfare of children and youth ... would have knowingly turned a blind eye to any report of child abuse or predatory sexual acts directed at children," Spanier said in the letter.

The letter was obtained by the AP through someone close to the case. The person did not want to be identified because the person was not authorized to release the letter.

In reaction to unprecedented NCAA penalties announced Monday against Penn State, acting athletic director David Joyner, said, "We are deeply disappointed that some of our leaders could have turned a blind eye to such abuse, and agree that the culture at Penn State must change."

Spanier's successor Rodney Erickson vowed that the school would.

"We must create a culture in which people are not afraid to speak up, management is not compartmentalized, all are expected to demonstrate the highest ethical standards ...," he said.

University officials had no comment Monday on Spanier's letter.

Spanier said he does not recall receiving any emails about a 1998 report and subsequent investigation that Sandusky had showered with a boy on Penn State's campus. And he said he did not understand the 2001 shower incident observed by then-graduate assistant Mike McQueary was sexual.

The Patriot-News first reported Monday on the letter.

A recent internal report on the Sandusky scandal blasted Spanier, former coach Joe Paterno and others for failing to report the abuse complaints to authorities.

Spanier calls the university investigation conducted by ex-FBI chief Louis Freeh "egregious in its incomplete and inaccurate reporting" of Spanier's discussions last year as a grand jury pursued the Sandusky case with trustees, the university's top counsel and others.

"The report is full of factual errors and jumps to conclusions that are untrue and unwarranted," Spanier wrote.

Two university officials former Vice President Gary Schultz and athletic director Tim Curley are awaiting trial on charges of perjury and failure to report child abuse. Spanier has not been charged in the case.

CYNTHIA GOLDMAN

# EXHIBIT "B"



189 of 647 DOCUMENTS

Copyright 2012 P.G. Publishing Co.
Pittsburgh Post-Gazette

August 24, 2012 Friday
SOONER EDITION

**SECTION:** STATE; Pg. B-1

**LENGTH:** 969 words

**HEADLINE:** SPANIER DENOUNCES FREEH REPORT;
EX-PENN STATE PRESIDENT LABELS IT 'UNFOUNDED, UNFAIR ... AND WRONG'

**BYLINE:** Paula Reed Ward, Pittsburgh Post-Gazette

**BODY:**

When Penn State University president Graham Spanier met with his administrators in 2001 about an incident involving former assistant football coach Jerry Sandusky with a child in a locker room shower, he knew no details of what had occurred.

"I received no specifics," Mr. Spanier said Thursday in an interview with the Pittsburgh Post-Gazette. "It was a brief, unscheduled, heads-up [kind of] meeting."

The ousted president said he was not told in which building the incident occurred -- other than it being an athletic facility -- that he didn't know the time of day it occurred or who the reporting party was.

"In the lens of 2012, I certainly wish, knowing everything I know now about this criminal, outrageous child predator, I wish we had all known more, and therefore ... been motivated to intervene more forcefully," he said. "I don't think any of us knew any more than there was a report of horseplay in the shower.

"I would have forcefully and immediately intervened."

Mr. Spanier, who hasn't spoken publicly since being forced to resign as Penn State's president in November, spoke to the Post-Gazette by phone Thursday -- a day after doing a lengthy interview with ABC News and The New Yorker magazine.

It was also the day after his lawyers held a news conference denouncing the report by former FBI director Louis Freeh analyzing the university's handling of the Sandusky sex abuse allegations. They claimed the report was inaccurate, incomplete and approached with a prosecutorial bias.

Mr. Spanier, who said the past several months have taken an emotional and physical toll on him, agreed.

SPANIER DENOUNCES FREEH REPORT; EX-PENN STATE PRESIDENT LABELS IT 'UNFOUNDED, UNFAIR ... AND WRONG' Pittsburgh Post-Gazette August 24, 2012 Friday

"What has been especially troubling, having made that adjustment [to life away from the presidency], was the Freeh report with its conclusions that are absolutely unfounded, unfair and just plain wrong," he said.

Mr. Spanier was interviewed by Mr. Freeh and two of his colleagues July 6 -- just six days before the report was issued.

He was told ahead of time the interview would last at least one full day and possibly part of a second.

However, the entire interview lasted about five hours and covered only about half of the topics Mr. Spanier was told would be included.

"It appeared about half-way through they didn't want to hear the whole story from me," Mr. Spanier said. "I know now the report was already written and slightly amended after. The conclusions weren't changed."

He called that disappointing.

He believes Penn State and the university's board of trustees should never have accepted the university-commissioned report.

The Freeh findings were relied upon by the NCAA in determining sanctions for the university's football program, which included a $60 million fine, a four-year ban on postseason play, the stripping of all wins from 1998 to 2011 and a five-year probationary period.

"I have a tremendous amount of experience with the NCAA and athletic matters. They should have received the report but not accepted it," Mr. Spanier said. "I believe the NCAA overstepped its bounds."

Going back to the incident in 2001, Mr. Spanier said he had little recall of the allegations.

What is known is that then-graduate assistant coach Mike McQueary reported to head coach Joe Paterno and then to athletic director Tim Curley and senior vice president Gary Schultz that he had seen Mr. Sandusky in the shower with a young boy.

There is a discrepancy between what Mr. McQueary testified to at Mr. Sandusky's trial in June -- that he saw a very clear sexual act occurring -- and what Penn State administrators claimed in grand jury testimony -- that he saw "horseplay."

Mr. Spanier said Thursday it was described to him as "horseplay," which to him equated to snapping towels and throwing water.

The university president said the administrators agreed with a plan in which Mr. Curley was to tell Mr. Sandusky, who was retired by then, they were "uncomfortable even with the idea of showering with a youth. 'We don't want you to do it again. Don't bring kids in the shower.' That was a directive."

In addition, Mr. Curley was to go to Mr. Sandusky's charity, the Second Mile, to inform officials there and seek their cooperation.

Mr. Spanier has been criticized as possibly attempting to cover up abuse based on an email he wrote on the matter on Feb. 27, 2001, at 10:18 p.m..

He said Thursday he didn't remember the message, written to Mr. Curley, at all until he saw it recently.

In it, he wrote: "This approach is acceptable to me. It requires you to go a step further and means that your conversation will be all the more difficult, but I admire your willingness to do that and I am supportive. The only

SPANIER DENOUNCES FREEH REPORT; EX-PENN STATE PRESIDENT LABELS IT 'UNFOUNDED, UNFAIR ... AND WRONG' Pittsburgh Post-Gazette August 24, 2012 Friday

downside for us is if the message isn't heard and acted upon, and we then become vulnerable for not having reported it. But that can be assessed down the road. The approach you outline is humane and a reasonable way to proceed."

Mr. Spanier explained his wording by saying that he was concerned Mr. Sandusky wouldn't understand what they were trying to tell him.

"I remember thinking ... that we should see if the message is heard -- does he accept it? If he doesn't, we could be vulnerable and conclude that we need to elevate our intervention to a higher level," Mr. Spanier said in his interview. "I'm giving you reconstructed, today, what my thinking may have been. But I don't actually remember."

Mr. Spanier, who is on sabbatical from Penn State and considering going back there to teach, said he still loves the institution. He continues to promote it and encourage donors and supporters.

"I devoted 26 years of my life to Penn State," he said. "I have tremendous loyalty to it. The university is what it is today, in part, because of the work I did and leadership I provided.

"I believe in due course that [this situation] will be behind us, and I can properly take my place and be recognized for what I accomplished."

**NOTES:** Paula Reed Ward: pward@post-gazette.com or 412-263-2620. /

**LOAD-DATE:** August 25, 2012

# EXHIBIT "C"



206 of 647 DOCUMENTS

Copyright 2012 The New York Times Company
The New York Times

August 23, 2012 Thursday
Late Edition - Final

**SECTION:** Section B; Column 0; Sports Desk; Pg. 11

**LENGTH:** 784 words

**HEADLINE:** Spanier's Lawyers Attack Freeh Findings

**BYLINE:** By ADAM HIMMELSBACH

**BODY:**

Lawyers for the former Penn State president Graham B. Spanier issued a searing rebuttal Wednesday to findings by the former F.B.I. director Louis J. Freeh that Spanier and other top university officials had helped conceal allegations of child abuse involving the former assistant football coach Jerry Sandusky.At a news conference in Philadelphia, the lawyers called the Freeh report, released in July after an independent investigation commissioned by Penn State, "a myth" as it pertained to Spanier.

"It is now apparent that Judge Freeh was not an independent investigator, but a self-anointed accuser who, in his zeal to protect victims of wrongdoing from a monster, recklessly and without justification created victims of his own," said one of Spanier's lawyers, Timothy Lewis, a former United States district court judge.

Spanier has not been charged with a crime. His lawyers were asked Wednesday if they thought an indictment was imminent.

"We have no information that would lead us to believe that," the lawyer John E. Riley said.

In June, Sandusky was convicted on 45 counts of child sexual abuse. He is awaiting sentencing. Tim Curley, Penn State's former athletic director, and Gary Schultz, a former university vice president, are facing charges related to the extent of their knowledge of a 2001 allegation of abuse against Sandusky.

Spanier, who was fired as president in November after Sandusky's arrest, did not attend Wednesday's news conference. But portions of interviews he gave to ABC News and The New Yorker were released.

"The Freeh report is wrong, it's unfair, it's deeply flawed," Spanier told The New Yorker. "It has many errors and omissions."

Spanier said he had spoken to many people who were interviewed for the report, and he said he felt some of their

Spanier's Lawyers Attack Freeh Findings The New York Times August 23, 2012 Thursday

claims that did not fit Freeh's narrative were left out.

"Many of them described the interviews to me as a witch hunt," Spanier said. "They felt like it was back in the era of McCarthyism."

Spanier's lawyers issued an 18-page response to the Freeh report, challenging its content.

Lewis cited a 1998 episode involving Sandusky and a child that was investigated by the police and child protective services. No charges were filed against Sandusky at the time.

Freeh said Spanier had failed to protect children on campus and concealed the facts of that episode to avoid bad publicity after the investigation. But Lewis said Spanier had received copies of e-mails saying that the investigation was complete and that there was no evidence of criminal behavior, so he had no reason to take action.

Spanier told The New Yorker he had no recollection of those 1998 e-mails until they were brought to his attention during the recent investigation.

Spanier's lawyers also disputed Freeh's claims that Spanier knew details of the former graduate assistant Mike McQueary's account of a 2001 encounter between Sandusky and a child in a Penn State locker room shower.

McQueary reported the encounter to Coach Joe Paterno, who relayed the account to Curley and Schultz. But Lewis said there was no evidence that Spanier knew that it was sexual in nature.

"I remember asking two questions," Spanier told The New Yorker. "Are you sure that's how it was described to you, as 'horsing around'? And the answer was yes from both Gary and Tim. And are you sure that's all that was said to you? And the answer was yes."

Spanier added: "I remember, for a moment, sort of figuratively scratching our heads and thinking about what's an appropriate way to follow up on 'horsing around.' I had never gotten a report like that before."

Spanier has been criticized for a February 2001 e-mail to Curley and Schultz in which he alluded to a "humane" way of dealing with Sandusky. He told The New Yorker he was referring to Curley's decision to tell Sandusky he was reporting him to the Second Mile, the charity for at-risk youth that Sandusky founded.

"I think what many people wanted to read into it was that it was humane for us not to turn him in for being a child predator," Spanier said. "But I never, ever heard anything about child abuse or sexual abuse or my antennae raised up enough to even suspect that."

Spanier was asked what he would have done differently.

"Based upon what I was told and what I knew and the reliance that you have on others to follow up on things, there wouldn't have been a basis for handling that any differently," he said.

But hindsight, Spanier added, offers a different view.

"I wish I could have known what I know now," he said, "or even that I would have had just a little more information, suspicion, awareness, because that could have provided a basis for motivation for a higher level of intervention."

URL:
http://www.nytimes.com/2012/08/23/sports/ncaafootball/lawyers-for-graham-b-spanier-call-claims-in-freeh-report-a-myth.html

**LOAD-DATE:** August 23, 2012

# EXHIBIT "D"

# In An Exclusive Interview with ABC News Josh Elliott, Former President of Penn State Dr. Graham Spanier Speaks Out For the First Time Since the Penn State Scandal Erupted

8+1   3                      0    Text   |

By ABCNewsPR    Aug 22, 2012 11:59am

Interview to air starting Wednesday, August 22 on "World News with Diane Sawyer," ESPN, "Nightline," and Continuing on "Good Morning America," and "Good Afternoon America" on Thursday, August 23 as well as across all ABC News platforms including ABC Radio, News One, ABCNews.com and Yahoo!

In an exclusive television interview to air tonight, ABC News' Josh Elliott speaks with Dr. Graham Spanier, the embattled former president of Penn State, in the wake of the Jerry Sandusky sexual abuse scandal. For the first time viewers will hear, in his own words, his version of the events that allegedly took place under his leadership. Dr. Spanier will answer questions about what he knew and when he knew it and discuss the late Joe Paterno's knowledge and involvement in the situation. Paterno's dismissal after 45 years leading Penn State football came in the wake of this scandal.

The interview airs on Wednesday, August 22 on "World News with Diane Sawyer," ESPN, and "Nightline" on the ABC Television Network. Additional portions of the interview will air on "Good Morning America" on Thursday, August 23, continuing on "Good Afternoon America," and will be available on ABCNews.com, ABC News Radio and ABC NewsOne.

ESPN will air portions of the interview beginning on the late afternoon *SportsCenter* (on ESPNEWS) and on the ensuing *SportsCenter* beginning at 6 p.m. ET on ESPN. In addition, Wednesday's "Outside the Lines" (3 p.m., ESPN) will feature a report from **John Barr**, who is at the Spanier's lawyers press conference in Philadelphia. Legal analyst Roger Cossack will also appear on the show. ESPN.com will also provide interview video and Barr's reporting.

Dr. Spanier, who served as President of Penn State for over 16 years, was widely considered among the most powerful university presidents in America and was one of the biggest champions of the vaunted "Penn State Way."

In his wide-ranging interview with Elliott, Dr. Spanier will discuss not only the recent events involving Jerry Sandusky and the state of Penn State football but will also reveal his personal story, including details about his own history of childhood abuse.

Today Dr. Spanier's attorneys held a press conference in Philadelphia to critique the Freeh Report.

11/12/13     In An Exclusive Interview with ABC News' Josh Elliott, Former President of Penn State Dr. Graham Spanier Speaks Out For the First Time Since the Penn ...

# EXHIBIT "E"



188 of 647 DOCUMENTS

Copyright 2012 Philadelphia Newspapers, LLC
All Rights Reserved
The Philadelphia Inquirer

August 24, 2012 Friday
CITY-D Edition

**SECTION:** NATIONAL; P-com News for PC Home Page; Pg. A01

**LENGTH:** 1041 words

**HEADLINE:** Spanier says he would have fought NCAA sanctions against Penn State

**BYLINE:** By Jeremy Roebuck; Inquirer Staff Writer

**BODY:**

The NCAA's crippling sanctions against Pennsylvania State University were "unprecedented" and "wrong," the college's former president, Graham B. Spanier, said Thursday, adding that he would have fought harder against them.

In an interview with The Inquirer, the ex-university chief acknowledged the tough task his successor, Rodney Erickson, has faced in shepherding Penn State through the fallout from the Jerry Sandusky child sex-abuse scandal.

But he suggested the university's decision to accept those punishments last month was a misstep. They included a $60 million fine, a four-year postseason ban, and the voiding of 13 years of Joe Paterno's football team wins.

"The NCAA sanctions go well beyond its authority," said Spanier, an ex-NCAA board chair. "What they did to Penn State is unprecedented. It was done without a hearing and due process. I believe it to be wrong."

Spanier made his statements on the second day of a media blitz in which he spoke out for the first time since his resignation in the wake of Sandusky's arrest.

He resigned on Nov. 9, the same day the university board of trustees fired Paterno.

In interviews released Wednesday by ABC News and the New Yorker, Spanier sought to repair his reputation. He insisted he had no knowledge of Sandusky's sexual assaults on young boys, and said several e-mails suggesting he knew of the allegations had been taken out of context.

Meanwhile, his attorneys blasted a university-backed investigation led by former FBI Director Louis Freeh. That probe found that Spanier and others at Penn State sought to bury Sandusky's crimes, fearing the damage publicity would do.

Spanier says he would have fought NCAA sanctions against Penn State The Philadelphia Inquirer August 24, 2012
Friday

But Thursday's interview marked the first time Spanier has addressed Freeh's scathing criticism of his performance as the university's chief executive and his successor's handling of the worst crisis in Penn State's history.

"I greatly admire Rod Erickson," Spanier said. "He has been handed the reins of a situation that is very difficult, and he's trying his best to manage this."

In his report last month, Freeh said, "Spanier failed in his duties as president," and accused him of keeping information about the state's criminal investigation from the trustees.

"I did not downplay anything," Spanier responded Thursday. "I knew very little. I was told almost nothing."

Several board members quoted anonymously in Freeh's report painted Spanier as an administrator overconfident in his ability to manage a crisis and flippant when it came to his duty to report to trustees.

"Trustees expressed that Spanier 'filtered' issues in the best light of a desired outcome, showed trustees 'rainbows' but not 'rusty nails,' and 'scripted' or 'baked' issues, leaving no room to debate or confront Spanier even when disagreement arose," the Freeh report said.

On Thursday, Spanier called that portrayal "inaccurate and somewhat offensive," and said he had spoken to several board members who claimed they gave Freeh glowing endorsements of his administration. None of those appeared in Freeh's report, he noted.

"If they asked 430 people about me, I can't imagine there are more than a few that said anything pejorative about me," he said.

According to Freeh's report, Spanier and former university counsel Cynthia Baldwin were informed of the grand jury investigation into Sandusky in early 2010. But they did not brief the board until more than a year later. Spanier said he had limited information with which to brief the trustees.

In Thursday's interview, Spanier offered a slightly different recollection of his involvement in the grand jury investigation.

He said Baldwin had told him investigators were looking into a 2001 incident involving Sandusky and a boy who had been seen the assistant coach in a shower.

He said he was unaware that multiple Sandusky accusers had come forward, that Baldwin had sat in on the grand jury testimony of other Penn State administrators, or that state police had interviewed several other members of the athletic staff.

"I knew very little. The only thing I had to go on was the questions I was asked about by the grand jury," Spanier said. He added, referring to Baldwin: "I wish she would have said more if she knew more. I believe that she was doing what she felt was appropriate."

Many board members later reported they learned of Sandusky's arrest and of the arrests of then-athletic director Tim Curley and Gary Schultz, a retired vice president, in November through news reports. Though Spanier and his inner circle knew charges were imminent at least a week before they became public, "we had no idea about the scope of what was coming," he said. "We thought we had more time" to respond.

As for the NCAA sanctions, Spanier, who in addition to serving as chair of the association's board of directors has been a member of the association's executive committee, argued that the penalties violated the organization's bylaws. Typically, schools facing possible punishment undergo an investigation and have the opportunity to challenge any findings.

Spanier says he would have fought NCAA sanctions against Penn State The Philadelphia Inquirer August 24, 2012
Friday

NCAA president Mark Emmert acknowledged last month that the association bypassed its normal procedure with Penn State but cited the Freeh report as the basis for its decisions. That investigation was far more thorough than anything his organization could have done, he said.

Erickson later told university trustees he accepted the penalties without question because the NCAA had threatened to shut down Penn State's football program for several years.

"By accepting the Freeh report, they put themselves in a difficult situation with the NCAA," Spanier said, referring to university administrators. "I expect part of it is a desire to put this behind them and move on, but there are hundreds of thousands of people who aren't ready yet to move past it."

Asked why he waited until nine months after his resignation to speak out, Spanier said that after enduring months of accusations about his own culpability, he felt the need to set the record straight.

"I assumed that truth, justice, fairness, and reason would prevail," he said. "But, regrettably, I concluded more recently that it wasn't going to happen."

Contact Jeremy Roebuck at 267-564-5218, jroebuck@phillynews.com, or follow @jeremyrroebuck on Twitter.

**GRAPHIC:** Photograph by: AP

**LOAD-DATE:** August 24, 2012

# EXHIBIT "F"



195 of 647 DOCUMENTS

Copyright 2012 Cable News Network
All Rights Reserved

CNN

**SHOW:** CNN NEWSROOM 1:00 PM EST

August 23, 2012 Thursday

**TRANSCRIPT:** 082305CN.V11

**SECTION:** NEWS; International

**LENGTH:** 7017  words

**HEADLINE:** Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicago; Bill Clinton Stars in New Obama Ad; Good and Bad Economic News from the CBO; Age of Father Could Contribute to Autism

**BYLINE:** Suzanne Malveaux, Ted Rowlands, Tom Foreman, Alison Kosik, Elizabeth Cohen, Don Lemon

**GUESTS:** None

**HIGHLIGHT:**

    Chicago's homicide rate is surging and many of the victims show up in the Cook County Hospital Trauma Unit, where the hospital is stretched thin with added patients. As election draws closer, former President Bill Clinton is stepping up his support for President Obama's re-election with a new campaign ad. The Congressional Budget Office today has bad and good news, saying massive U.S. spending cuts and tax hikes will shrink the U.S. deficit, but it will send the country into recession and raise the unemployment rate. Autism rates have increased almost 80 percent in the past five years and a new study says the age of fathers may be part of the reason why.

**BODY:**

    SUZANNE MALVEAUX, CNN ANCHOR: The uncertain path of Tropical Storm Isaac which is churning in the Caribbean. And we are following why the FBI is concerned about anarchists disrupting the national convention -- Republican convention in Tampa. So, let's get right to it.

    Mitt Romney on the campaign trail in Hobbs, New Mexico, and his focus is energy today. I a speech, just moments ago, Romney spelled out his energy plan, and it calls for more drilling, fewer regulations and what he say will make this country energy independent in eight years.

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

(BEGIN VIDEO CLIP)

MITT ROMNEY (R), PRESIDENTIAL CANDIDATE: If I'm the president of the United States in a few months here, I will set a national -- I will set a national goal of America and North America -- North American energy independence by 2020. North American energy independence by 2020. That means we produce all the energy we use in North America.

(END VIDEO CLIP)

MALVEAUX: Mitt Romney, he is calling for more drilling, fewer regulations when it comes to the U.S. Energy Policy. He says it's going to make the country energy independent by 2020. Let's bring in Alison Kosik of the New York Stock Exchange. Talk a little bit about this, Alison, because first of all, not surprising, he is talking about Virginia and North Carolina, two very important battleground states where drilling is very important. He is talking about more drilling, less regulations here. Is it possible -- is it likely when he says we need to be energy independent, and he can make it happen by 2020?

ALISON KOSIK, CNN BUSINESS CORRESPONDENT: Well -- and it is achievable so he's not so far off of mark. But here's what one analyst told us, Suzanne, that, you know what? We're already kind of well on our way to weaning ourselves off of Mideast oil already. Because you look at what has been happening here in the country in the past six -- in the past six years or so, domestic oil production, the amount of oil that we produce right here at home, that amount has gone up while the amount of oil that we import has actually gone down. Today, more than half of the oil that we use is actually produced here in the U.S. And the oil that we do import, it may not come from where you think it does. In fact, more than half the oil that we do import, it actually comes from the western hemisphere, from Canada, Mexico, Venezuela and the Caribbean. Only 22 percent of the oil that we import actually comes from the -- comes from the Mideast. We spoke with Frank Barastro, he's at the Nonpartisan Center for Strategic and International Studies, and he thinks that what he's hearing from Romney as far as his energy plan goes, he calls it too simplistic and one dimensionally because what really needs to happen to get us more independent is you need to have this combination of increased production, new efficiency standards, and alternative energy. Now, what Romney is saying that getting -- by getting America off foreign oil, that would create three million new jobs, and it would bring in a lot of revenue -- new government revenue up to $1 trillion worth, something that the Congressional budget office, though, is disputing -- Suzanne.

MALVEAUX: And, Alison, we know that former President Bush, he always talked about weaning ourselves off this addiction, he used to call it, to foreign oil. President Obama, the administration, is really focusing on renewable energy, solar and wind power. Explain to us -- describe for us, if you will, the difference between Romney's plan and what we are already seeing from the president.

KOSIK: Yes, and what you're referring to -- what the president was talking about was kind of that all of the above approach, you know, expanding production and the use of alternative energy like wind and solar, natural gas, biofuels and nuclear. He's -- and also, believe it or not, many may not know this, he's also done very little to restrict fracking, that's that controversial process of extracting oil through rock, it's controversial because there's a concern it contaminates ground water. He's also opened up new areas for drilling in the Gulf of Mexico. And he's also indicated he'll issue permits to drill in the arctic. But at the same time, what the president has done, he has increased environmental and safety standards for offshore drilling and he's tightened emissions rules on power plants. And he's actually issued fewer permits for drilling and part of the reason for that is that moratorium after the BP spill in 2010 -- Suzanne.

MALVEAUX: It's a hot political issue. Thank you very much, Alison, appreciate it.

KOSIK: Sure.

MALVEAUX: So, this is not a political storm, but Tropical Storm Isaac could threaten the Republican convention

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

in Florida. Some forecast maps taking the storm on a path that could actually hit Florida. Now, the convention that begins Monday, that's in Tampa. And today's Florida's governor said that the state is going to be prepared. They are going to coordinate with some of those convention organizers.

(BEGIN VIDEO CLIP)

RICK SCOTT, GOVERNOR, FLORIDA: Local times teams will make the evacuation plans for their areas depending on what happens. The convention will make its own decision. But the goal is with this information -- by having everybody together, we'll have the same information so we can coordinate our efforts and work together.

(END VIDEO CLIP)

MALVEAUX: The actual site of the convention, it's in a mandatory evacuation zone, so if Isaac becomes a category two hurricane, they are certainly going to take a look at these possibilities. Now, it's not in the forecast right now, but even if the storm hits nearby, flooding could be a big problem. Here is Brian Todd.

(BEGIN VIDEOTAPE)

BRIAN TODD, CNN CORRESPONDENT (voice-over): This was only about eight weeks ago in Tampa, Bay Shore Boulevard, a main drag underwater. This was no hurricane, but Tropical Storm Debby which delivered significant flooding to downtown Tampa, just a few blocks from the "Tampa Bay Times" forum where the Republican national convention will be held. If Tropical Storm Isaac turns into a hurricane as projected, Tampa could find itself in its crosshairs in the coming days.

(BEGIN VIDEO CLIP)

BRIAN LAMARRE, METEOROLOGIST, NATIONAL WEATHER SERVICE: With a hurricane of category one that could come our way -- the hurricane category one, anywhere from three to six feet of flooding could impact this area.

(END VIDEO CLIP)

TODD: Brian Lamarre, Chief Meteorologist with the National Weather Service's branch in Tampa, says that city is right at sea level in some places, just above it in others. Tampa's mayor says, if the storm comes that way, public safety trumps politics.

(BEGIN VIDEO CLIP)

BOB BUCKHORN (D), MAYOR, TAMPA, FLORIDA: If we had to make that decision to cancel or to postpone or to move the convention, we will do that knowing full well that my obligation and city's obligation is to move people out of harm's way.

(END VIDEO CLIP)

TODD: It would be the second straight Republican convention affected by a big storm.

(BEGIN VIDEO CLIP)

UNIDENTIFIED FEMALE: Actually, all of the program tonight has been cancelled.

(BEGIN VIDEO CLIP)

TODD: In 2008, much of the first night of the GOP convention was tossed out. That event was in St. Paul, nowhere

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

near the storm zone. But officials didn't like the optics of opening up a glitzy event while Hurricane Gustav raged down
in Louisiana.

(on camera): A worse-case scenario for Tampa, according to Lamarre and other experts, that a strong hurricane
around category three strength comes ashore right around here, just north of Tampa. Now, because hurricane's churn in
a counter clockwise motion in the northern hemisphere, they say that that could drive water from the Gulf of Mexico up
Tampa Bay, trap the water in Tampa Bay, flood this area near Tampa -- in downtown Tampa near the convention
center. Then, it would push water over this way making this area, St. Petersburg, into an island.

(voice-over): That has happened but not for more than 90 years. In October 1921, a category three hurricane
slammed right into that point north of Tampa. Back then, this region was a lot less populated. Isaac's not projected to be
that strong and may not hit Tampa, but if it does, Lamarre says, storm surge is the number one killer.

(BEGIN VIDEO CLIP)

LAMARRE: A lot of people live and work along the water, and so a lot of people make -- need to make sure that
they get out in time before the hurricane comes their way.

(END VIDEO CLIP)

TODD: Tampa officials insist they are ready with solid evacuation routes planned, but a challenge around the
convention will be the 50,000 or so added people in the downtown Tampa area, most from out of town, so getting them
evacuated may be problematic. Brian Todd, CNN, Washington.

(END VIDEOTAPE)

MALVEAUX: Tropical Storm Isaac, getting stronger, expected to hit several Caribbean nations this weekend
before closing in on the U.S. coast. I want to bring in our Chad Myers to talk a little bit about what we're expecting in
the next couple of days and how soon it could hit here.

CHAD MYERS, AMS METEOROLOGIST: Yes. You know, I think the next place that would get hit significantly
will be the Dominican Republic. It could be 10 to 15 inches of rainfall there that would cause flooding. Wind in Santo
Domingo maybe 50 or 60. But then it goes right over Haiti, and if it goes over Haiti right at Port-au-Prince with all of
those people living in tents, literally 400 and something thousand people living in canvas and plastic, because of the
earthquake long ago, that it's -- that the next place where it's really under the gun. And I really appreciate all this focus
on Tampa, and all this other stuff, but let me tell you, this storm could still go all the way to South Carolina, and it could
still go all the way to New Orleans.

So, don't take your eyes off the prize. If you live in any of those areas, don't think that we're just talking about
Tampa, because this could be a big storm. It would be a bigger storm and a bigger event if the storm stays south of the
islands and in the warm water. That would cause the storm to get significantly stronger than what the forecast is right
now. And let me get to the forecast, because I can show it to you. There's Tropical Storm Isaac, 200 miles south of
Puerto Rico. It is forecasted to travel right over Port-au-Prince, right over Cuba and into the Gulf of Mexico.

Now, that said, why don't you take your eyes off the prize? Because this is one potential side and this is the other
potential side. This would be catastrophic for somebody in the Gulf Coast area, because, at this point in time, we'd have
to have a three in the middle of that hurricane. That would be a big hurricane if that's happen because it stays in the
water, water is warm, water make storms get bigger. If it stays over Cuba for a longer time, it would be more of a dead
storm. Cuba would just really take the stuffing out of it, because it would be over land, land kills our hurricane for a
while and so do the mountains, but then when we get back up here, it gets stronger. Understand that that is still the
forecast distance of error for this time. This is five days away from where we are now, and you just have to understand
that this may go well, it may go badly.

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

And I tell you, the first thing -- the only thing I can guarantee you about this storm, is that we're going to change our mind before it gets somewhere, because these models have been changing their mind all day long. They are now to the west of Florida, not to the east like some of them were, and so they're kind of getting packed in here into the Gulf of Mexico, well far enough west of Tampa, that it really does not become an issue for Tampa. If that changes, I will certainly tell you. How does this work? And I show you the lines all of the time, but I don't ever really get to show you the model, the forecast itself. So, there we go. Here's the model itself predicting what it thinks the storm will do every six hours. And this is still a long way away. Let me tell you, models are wrong all the time. And this is just one, but the people of the panhandle of Florida, possibly all over to Louisiana with this scenario would get hit very hard, maybe even touching the Florida Keys and Key West. But it would stay far enough away from Tampa that we wouldn't have to worry about it, Suzanne.

MALVEAUX: And, Chad, I understand that there's even more trouble brewing in the Atlantic, perhaps another tropical storm that's formed, do we know?

MYERS: There are -- there are others out there. And, in fact, I can show you on this computer model, this is Joyce, J O Y C E. It is up here in the middle of the North Atlantic. It came from the Central Atlantic and has made a big, long turn, it's almost off the map, and it even misses Bermuda. There's another bit of storminess coming off the African coast. September 10th is the peak of hurricane season. I haven't looked at the calendar today but we are getting very close, --

MALVEAUX: Yes.

MYERS: -- like two weeks away or so from that. And so, we are -- honestly, we could have one or two named storms in the water for the entire time for the next month. MALVEAUX: Wow. It's right around the corner, the peak, that's just a couple of weeks away. Chad, thank you, appreciate it.

MYERS: Yes, you're welcome.

MALVEAUX: Federal agencies, they are warning of another potential threat to the Republican national convention in Tampa. And the Democratic convention in Charlotte. They are concerned about possible violence by anarchists. An intelligence bulletin obtained by CNN warns that extremists may try to close down bridges in the Tampa Bay area. Now, officials are concerned they might try to use IEDs or homemade bombs as well. Of course, security is going to be tight, both at Tampa and Charlotte, but the feds say that there are things that state and local agencies should be on the lookout for. So, what are they? They include anarchists getting their hands on explosive materials, taking firearms training. Also, extremists preparing for violence with groups that they oppose.

And Sunday, on the eve of the Republican convention, CNN's coverage kicks off at 8:00 p.m. Eastern with a profile of the presumptive presidential nominee, Mitt Romney, and watch "Romney Revealed, Family and Faith and the Road to Power" followed by a preview of the convention, that's at 9:30. Then on Monday, live coverage of the RNC from Tampa, Florida, that's beginning at 7:00 p.m. Eastern on CNN.

Here is what are working on for this hour.

(voice-over): The U.S. is known around the world for having a big middle-class, but a new report says it's shrinking fast. We will look at the numbers.

Penn State's former president is defending himself against accusations of covering up child sex abuse in the Jerry Sandusky case. Watch our interview with Graham Spanier.

And a study finds a link between a child's risk of autism and the age of the father.

MALVEAUX: The news is not good for America's middle class. According to a new report from the Pew Research

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

Center, the middle class has, quote, "endured its worse decade in modern history." So these are some of the numbers we're talking about. Back in 1970, middle class income accounted for 62 percent of the U.S. income. Upper class income equaled 29 percent of all U.S. income. And fast forward now to 2010. The middle class accounted for only 45 percent of U.S. income, while upper class income rose the 46 percent.

I want to bring in Paul Taylor. He's executive vice president of Pew Research Center.

Paul, first of all, your numbers. When you just take a look at the numbers alone, it really looks like people are struggling. This is a middle class that has lost a great deal of net worth. You say 2001, you take a look at the net worth of a family, middle class family, it's $130,000. In 2010, now we're talking about $93,000. What is going on?

PAUL TAYLOR, EXECUTIVE VP, PEW RESEARCH CENTER: Well, it has been a terrible decade for almost everybody, but particularly the middle class. We had a shallow recession at the beginning of the decade. We had a very deep recession towards the end of the decade from which we haven't fully recovered. We had the housing market collapsed and most of the middle class wealth is tied up in its house. We have, of course, the high unemployment. You add it all up. This is the first decade in the modern era since World War II where the middle class has less income at the end of the decade than they had at the beginning. And as you noted, they have much less wealth. They've lost about 30 percent of their wealth. Most of it, the value of their home.

MALVEAUX: Paul, how do they get it back? How do we recover?

TAYLOR: Well, that's better left for the folks who are going to be in Tampa and Charlotte in the next couple of weeks. That's what this presidential campaign is all about. This report was designed to say, here's where we are now, here's how deep this hurt has been. We asked people, have you recovered from this recession, that's now three years officially that the recession is over, but nearly half say, no, I haven't recovered, half of the middle class. Then we said, how long you think it's going to take for you to recover? And almost half of those say at least five years. And a small share, about 10 percent, say I will never recover. So this country is hurting and the middle class in particular is hurting.

MALVEAUX: Is there anything that you found surprising by this survey that was revealed?

TAYLOR: Well, the numbers you showed at the beginning are actually sort of interesting. One of the things that's happened to the middle class is it's actually gotten smaller. We asked people in our survey what class you consider yourself in. And about 49 percent say I think of myself as middle class. We asked the same question four years ago, 53 percent. That's not a big decline, but it's in sync with the same findings we have when we look at census data and we look at the group in the middle and we look at the group in the middle.

And what we find is today about 51 percent of the country is in what we can statistically define as the middle class, about two-thirds to double the national income medium. That's about $40,000 a year to just under $120,000 for a family of three. So about 51 percent are in that statistical middle right now. You go back 40 years --

MALVEAUX: Right.

TAYLOR: And you adjust for inflation and everything else, 61 percent were in that middle. The middle class is getting smaller. There are fewer people in it. People have gone both up and down the income scale. But as your first chart pointed out, all the money has gone up. So the middle class has a smaller slice of a shrinking pie. And that's one of the reasons why it's in such a ornery mood as this election goes into its final weeks. MALVEAUX: I can understand that. And people, how are they feeling about the 401(k)s, their retirement plans and their futures?

TAYLOR: We have declining confidence. We asked this question many times over the last several years and the -- do you have enough money? Are you confident you have enough money to last through your retirement? Fewer and few people say they're very confident about that. And the group that's least confident -- or actually not the people who are already retired, it's the people on the cusp of retirement. The folks in their 50s and early 60s. They are feeling the pinch,

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

in part because their 401(k)s famously sort of became 201(k)s, or maybe they hadn't put in enough to begin with. But they are feeling very vulnerable.

MALVEAUX: All right, Paul Taylor, thank you so much. I know not a lot of good news here, but you bring up a really good point, and that is, watch those conventions, Democrats and Republicans conventions, to see who's got the plan you believe is actually going to turn things around for the middle class. Thank you, Paul. Appreciate it.

TAYLOR: Thanks for having me.

MALVEAUX: Sure.

"Forbes" calls them the women who run the world. The magazine out with its list of 100 most powerful women. They lead countries, companies, charities, rule entertainment and media empires. The oldest person on the list is Queen Elizabeth at 86. Youngest, Lady Gaga at 26 and -- 26 years old. Oprah Winfrey, she just missed finishing in the top 10. She comes in at number 11.

Here's a look at the top five. "New York Times" executive editor Jill Abramson. She is at the number five spot. Number four, Melinda Gates, co-chair of the Bill and Melinda Gates Foundation. Number three, Dilma Rousseff, the president of Brazil. Secretary of State Hillary Clinton in at number two. And the number one most powerful woman in the world, according to "Forbes," German Chancellor Angela Merkel.

The class of 2016. They get started in college this fall, as a matter of fact. Some as early as this week. I'm going to drop off my niece tomorrow. They come from a very different world than a lot of their professors. So let's give you some examples here.

They've only known women to hold some powerful positions. The secretaries of state in their lifetime, well they've included Madeleine Albright, Condoleezza Rice, Hillary Clinton. One of the many cultural facts of Wisconsin's Beloit (ph) College that includes its annual mindset list. So, some other things that they talk about, the class of 2016. Caller IDs, GPS systems always available. Gas stations never fixed flats, but they do serve cappuccino. And Coke and Pepsi always been sold in recycled plastic bottles. The list is meant to remind professors about the cultural influences in their students' lives.

And Penn State's former president says he's another victim in the Sandusky scandal, claiming that he has been falsely accused of covering up child sexual abuse. Hear his side of the story.

MALVEAUX: Penn State's head football coach and the university president both lost their jobs at the same time when those explosive allegations of child sexual abuse emerged from the school. Coach Joe Paterno died in January and until now Penn State's former president, Graham Spanier, has not said anything publically about the investigation, Jerry Sandusky's conviction or the scandal that cost him his career. Well, now he is speaking and he gave an interview to our own Jeffrey Toobin, CNN's senior legal analyst. And Jeff's in New York right now.

Jeff, first of all, explain to us why he is speaking up now and what is his main message?

JEFFREY TOOBIN, CNN SENIOR LEGAL ANALYST: Well, I think he's just an angry, frustrated person. And he's been a public person in his life and he feels like he's been wronged. He doesn't think he did anything wrong. And he spoke to me. And just, I should say, that the -- if people want to read it, it's available at newyorker.com. It was done for the "New Yorker" magazine.

MALVEAUX: So, what is his main point? I mean he says that he disagrees with this legal investigation?

TOOBIN: Right. I mean the Louis Freeh report, he says, was completely unfair to him. Jerry Sandusky was, we all agree, a complete sociopath and a very, very evil person. But what Spanier said to me is that, I didn't' know. I didn't

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

cover it up. I didn't conceal anything, nor should I be criticized for failing to report since I was not informed that he was, in fact, behaving this way. This is what he said. Here's a tape of what he said about the Freeh report.

(BEGIN VIDEO CLIP)

GRAHAM SPANIER (voice-over): The Freeh report is wrong. It's unfair. It's deeply flawed. It has many errors and omissions. I know they have had a lot of very good people on that team working on this. They interviewed, they say, over 430 people. Many of those folks have spoken to me about their interviews. Many of them described those interviews to me as a witch-hunt.

(END VIDEO CLIP)

TOOBIN: You know, those are -- that's strong language. And I'm not sure I agree with it all, but it gives you some sense of how angry Spanier is.

MALVEAUX: Yes. I mean weren't there e-mails within that investigation that did disclose that he at least knew what was happening?

TOOBIN: Well, there are two incidents that he is accused of knowing something about and failing to do the right thing. The first is 1998. He was only copied on e-mails there. He says he doesn't remember anything about it. And it's worth pointing out that in 1998, those allegations were in fact passed to the police in State College and that investigation was closed without any charges.

2001 is a much more problematic situation for Spanier. That was the time, many people will remember, that Mike McQueary, the red- haired assistant -- graduate assistant --

MALVEAUX: Right.

TOOBIN: Saw what appeared to be a rape going on between Sandusky and a young boy in the showers at Penn State. Spanier's version of that is that by the time the story reached him, all he heard was that Sandusky was involved in horseplay. That's the word he heard. Not any sort of sexual assault. Not -- certainly not any rape. And he said given the fact that at that point Sandusky was not even an employee of Penn State, and all he heard was that this was horseplay, how he handled it which was telling Second Mile that he -- that Sandusky couldn't do this kind of thing anymore was an appropriate reaction under the circumstances.

MALVEAUX: And, Jeff, the investigation aside here, does he have any personal feelings about what happened to these young boys?

TOOBIN: Well, here's the tape. Here's an excerpt from the tape of how he feels about that question.

(BEGIN VIDEO CLIP)

SPANIER: There are times when I am in a mode of substantial grief about what happened to those kids. And then I switch into times of grieving for myself, and my colleagues and the Paterno family, who I know so well, and the community that's suffering here. We always talked about the Penn State family. And that's how this place feels and how we operate. Everybody knows everybody. Everybody's connected. This is a trauma in so many ways at so many levels.

(END VIDEO CLIP)

TOOBIN: This is -- you know, this really is something that I think people will really have mixed feelings about, comparing his grief to the grief of the people who were abused by Jerry Sandusky. But if you believe that Spanier lost his job unjustly, you can see why he feels grief for himself, as well as for the victims.

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

MALVEAUX: And, Jeff, we've got to wrap it here, but real quick, is he doing anything? What is he doing?

TOOBIN: Well, he's still a tenured professor. He's a sociologist at Penn State. He's still doing some work apparently for the federal government. But let's not -- let's be clear, his career is ruined. And this is the thing he will be remembered for, for the rest of his life and beyond.

MALVEAUX: All right, Jeff, thank you. Good interview.

Gun violence in Chicago is now so bad that Cook County's trauma unit is full. We're talking about every night. Want to show you firsthand what it is like at the ER.

MALVEAUX: Chicago's homicide rate is surging. This month alone, there have been at least 38 homicides.

Ted Rowlands shows us that many of the victims show up in the Cook County Hospital where the trauma unit is really stretched thin.

(BEGIN VIDEOTAPE)

TED ROWLANDS, CNN CORRESPONDENT (voice-over): 12:30 a.m., a 22- year-old gunshot victim arrives at the Cook County Trauma Unit.

UNIDENTIFIED MALE: My arms. My arms.

UNIDENTIFIED MALE: What is hurting the most?

(CROSSTALK)

ROWLANDS: He's in pain, but stable and able to speak.

UNIDENTIFIED MALE: My arms. My arms.

UNIDENTIFIED MALE: Listen, we just want you to slow down and relax.

ROWLANDS: After rolling him on his side, doctors start counting the bullet holes.

UNIDENTIFIED MALES: Four, five, six.

(CROSSTALK)

UNIDENTIFIED MALE: Six definite ones.

(CROSSTALK)

UNIDENTIFIED MALE: What were you doing when this happened to you?

UNIDENTIFIED MALE: I was walking.

ROWLANDS: They find 13 bullet holes. Each one is bandaged until the doctors can see the x-rays. Then they will need a plan to save this man's life.

Meanwhile, two more patients have just arrived adding to what feels like chaos, but to the staff --

DR. ANDREW DENNIS, COOK COUNTY HOSPITAL TRAUMA UNIT: I'm Dr. Dennis.

ROWLANDS: -- including the attending physician, Dr. Andrew Dennis, it is another normal day in a Chicago

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

trauma unit.

DENNIS: Well, the patients keep coming and coming. It's like machine gun fire. you can expect this to happen every single night.

ROWLANDS: Like the city of Chicago's homicide rate, the Cook County Trauma Unit patient rate is up 30 percent this year. On this night, seven shotgun victims and two stabbing victims, in addition to 18 others involved in battery cases or motor vehicle accidents.

Upstairs in the operating room, a 29-year-old gunshot victim is in surgery.

UNIDENTIFIED MALE: Can I have a --

ROWLANDS: Doctors opened up this man's stomach and removed this .9 millimeter bullet. He has damage to his intestine and tailbone, but he is expected to survive.

(on camera): The trauma unit treats everyone from start to finish, beginning with emergency surgery and care if needed, and follow-up. But unfortunately, some of the patients come back.

DENNIS: So what happened to your leg here?

ROWLANDS (voice-over): New wounds reveal old ones. The x-rays for the gunshot victim in bed two show gunshot pellets from a previous shooting.

DENNIS: So now I have metal all over, and I don't know what is new and what is old.

ROWLANDS: And look at this man's scar. It shows where he was shot at point-blank range last year. Dr. Dennis handled that case.

DENNIS: Close your eyes.

ROWLANDS: There are some patients that can be difficult to deal with. This man was stabbed by his girlfriend and came in intoxicated.

UNIDENTIFIED MALE: That's like in the back. I'm going to stay fresh until the day I die.

What's up, Boo? I'm buzzing, baby.

ROWLANDS: Security is high. Some patients have police officers actually with them trying to get information from them as they get treated. A group of detectives showed up to talk the victim with 13 bullet holes who, according to the x-rays, may now have a major problem.

DENNIS: So how did this get here, is my question?

UNIDENTIFIED MALE: Got you.

DENNIS: It either went this way or it came up from the arm.

ROWLANDS: A bullet in his shoulder may have travelled through his chest, which could be life threatening, so Dr. Dennis orders more x-rays. Dying is common here. These death packets with information for families are sitting out on the table ready to use.

DENNIS: There is a lot of death that happens here and it is unfortunate. Not all of it is violence but a good portion of it is violence.

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

ROWLANDS: It is after 2:00 a.m. when the x-rays come back. The 22-year-old with 13 bullet holes is in the clear. The bullet that was a concern came through his arm. He was sent home the next morning, leaving the bed open for the next person who unfortunately will be arriving soon.

Ted Rowlands, CNN, Chicago.

(END VIDEOTAPE)

MALVEAUX: As election draws closer, former President Bill Clinton is stepping up the support for President Obama's re-election with a new campaign ad.

MALVEAUX: President Obama and Mitt Romney running neck and neck in some of the crucial battleground states. So in a new Quinnipiac/CBS/"New York Times" poll, President Obama leads Mitt Romney 49 percent to 46 percent in Ohio, and -- that was in Florida. In Ohio, Obama is at 50 percent compared to 44 percent for Mitt Romney. And in Wisconsin, the home state of V.P. candidate, Paul Ryan, the president ahead of Romney, 49 percent to 47 percent. But you have to know the margins in the Florida, Wisconsin, within the margin of error for these sample polls.

And former President Bill Clinton is starring in a new ad for President Obama's election campaign. The ad is called "Clear Choice." it is going to air in several battleground states.

(BEGIN VIDEO CLIP)

BILL CLINTON, FORMER PRESIDENT OF THE UNITED STATES: This election, to me, is about which candidate is more likely to return us to full employment. This is a clear choice. The Republican plan is to cut more taxes on upper-income taxes and go back to deregulation. That's what got us in trouble in the first place. President Obama has a plan to rebuild America from the ground up.

(END VIDEO CLIP)

MALVEAUX: Clinton has been a top surrogate for President Obama this year. And in campaign speeches, President Obama gives credit to President Clinton and his policies for the strong economy of the 90s.

President Obama says that Romney does not care about class sizes in our schools, but does the president's comments pass the test?

Tom Foreman has the fact check. (BEGIN VIDEOTAPE)

(CROSSTALK)

TOM FOREMAN, CNN CORRESPONDENT (voice-over): Class size and what it means to how kids learn has been a long and hotly contested issue. President Obama and many educators clearly believe smaller classes with fewer students per teacher are the way to go. So his latest ad tries to school Mitt Romney on that subject.

(BEGIN VIDEO CLIP)

UNIDENTIFIED ACTOR: Some of our children's greatest experiences have been in the smaller classrooms.

AD ANNOUNCER: But Mitt Romney says class sizes don't matter. And he supports Paul Ryan's budget, which could cut education by 20 percent.

(END VIDEO CLIP)

FOREMAN: But let's dig into the lesson plan. Did Romney really say class sizes don't matter? No.

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

MITT ROMNEY, (R), FORMER MASSACHUSETTS GOVERNOR & PRESIDENTIAL CANDIDATE: If you
had a class of five, that would be terrific. If you had a class of 50, that's impossible.

FOREMAN: Addressing Philadelphia teachers in May, Romney cited an international study showing that
sometimes schools with small classes fail. Sometimes schools with big classes succeed. Therefore, he says, class size
should not be given excessive weight when we consider how to make schools better.

(on camera): Certainly, the president's education advisors would not agree, or would they? In a 2010 speech to the
American Enterprise Institute, Secretary of Education Arne Duncan said, sure, class size may matter up to third grade.

ARNE DUNCAN, SECRETARY OF EDUCATION: But in secondary schools, at the high-school level, districts
may be able to save money without hurting students while allowing modest but smartly targeted increases in class size.
In fact, teachers in Asia sometimes request larger class sizes because they think the broad distribution of students and
skill levels can help accelerate student learning across the board.

FOREMAN: As for Paul Ryan's plan to cut education funding, the truth is, while education may suffer under a
Ryan budget, how much would be cut and where is not clear.

So the grade for this ad? I'm tempted to give it an "F" for false. We'll go with "M" for misleading.

Tom Foreman, CNN, Washington.

(END VIDEOTAPE) MALVEAUX: This is a headline that caught our attention today from the "Daily Beast" web
site. It says that "Yoga Teachers Love Obama." This article breaks down the political contributions to the president and
Mitt Romney by profession. Here is what we are looking at. President Obama gets more contributions from lawyers,
CEOs, teachers and firefighters than Romney. He also leads among rabbis and Catholic priests and yoga instructors.
Romney gets more donations than the president from stock traders, wealth managers, entrepreneurs, also from farmers
and ranchers and homemakers.

A new government reports says the U.S. economy could slide into another serious recession. That is if Congress
doesn't do anything before January.

MALVEAUX: Good news and bad news coming from the Congressional Budget Office today. Massive U.S.
spending cuts and tax hikes will shrink the U.S. deficit, but it will send the country into recession and raise the
unemployment rate.

I want to bring in Alison Kosik from the New York Stock Exchange to talk about this.

They release this report, but Congress divided on which way to go on this. And, Alison, let's play this out if we can.
If Congress doesn't do anything, and people are talking about going over the fiscal cliff.

ALISON KOSIK, CNN CORRESPONDENT: Exactly. So if Congress does nothing, and that means that the
enormous amount of tax hikes and across-the-board spending cuts would all happen at once, and here is what the CBO,
the Congressional Budget Office, is predicting would happen. They say GDP, meaning economic growth in the U.S.,
would shrink from a half a percent from the end of this year to the end of next year. We have not seen GDP shrink since
2009. That would really slam the brakes on the recovery. The CBO also says, if we go over that fiscal cliff, it would
cause the unemployment rate to go back up to 9 percent by the second half of next year. Right now it's at 8.3 percent.
But if Congress steps in to do something before January 1st to stop one or both of these policy changes, the CBO says
the economy would create two million more jobs and the unemployment rate would stay at 8 percent. But there is a cost
to that as well if Congress does step in -- Suzanne?

MALVEAUX: Alison, talk about the debt, the idea of the spending cuts to reduce the debt. Would that actually

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

happen?

KOSIK: Yes, so, the whole point of the spending cuts, Suzanne, is to reduce the national debt and the deficit. Now the CBO is projecting that the spending cuts would bring down the debt from 73 percent of GDP this year to 58.5 percent in 10 years. Without the spending cuts to go into effect, the CBO projects that the GDP debt would skyrocket to 73 percent. And if that happens, it would improve the budget deficit to 4 percent GDP. Now if the cuts don't take effect, the deficit will hit a $1 trillion in 2013. But here in lies the -- this is part of the reason why you are seeing the Congress frozen on this issue, because it is a decision of whether or not doing nothing could cause a recession here in the U.S., or possibly getting a handle on the deficit and the debt. It is kind of a double-edged sword and nobody wants to touch this hot-potato issue in the middle of an election season -- Suzanne?

MALVEAUX: Very true. And, Alison, the stocks, how are they doing?

KOSIK: Not too well. The Dow is down about 117 points. A pretty lackluster picture on the jobs picture. Unemployment claims -- first time that the jobless claims rose last week to 372,000. So you are seeing the layoffs still treading water, not giving much incentive for the investors to buy in today -- Suzanne?

MALVEAUX: Thank you, Alison.

A new study shows that the older a man gets, the higher the chance he will father a child with Autism. We'll take a look at the connection.

MALVEAUX: Autism rates have increased almost 80 percent in the past five years. A new study says the age of fathers may be part of the reason why.

Elizabeth Cohen, tell us a little bit why this is the case. What does the study show?

ELIZABETH COHEN, CNN SENIOR MEDICAL CORRESPONDENT: It's so interesting. This was a study out of Iceland. They took 78 families, so mom, dad, child. When they looked really closely at the genes, they found the mom was not the reason. The mom was not associated with any increased risk for autism. They also looked at schizophrenia. It was the dads. The dads were much more likely to have these random mutations linked to autism as they got older. So the numbers really tell the whole story. When they looked at the child -- I'm sorry, at the father. A 20-year-old father, that child would have 25 random mutations. So at age -- a 20-year-old father, 25 mutations. A 40-year-old father, the child would have 65 random mutations. Again, mutations associated with autism or schizophrenia.

And I mean, I guess the bottom line is, you know, eggs get old. As women, we hear that all the time. Go have those babies before your eggs get too old. Well, sperm gets old, too.

MALVEAUX: The same is true. What if you're somebody who wants to be a father, you're an older man, is there anything you can do to limit the chances of these mutations?

COHEN: No, there's nothing you can do. They just happen naturally.

But I want to add, if there's any 40-year-old men watching us who plan on conceiving a child tonight, it is OK, go ahead and conceive that child. Nobody is saying don't do it. In fact, as a 40-year-old man, the risk of fathering a child with autism or schizophrenia, it's 2 percent at most. So the risk is still very, very small. It's just interesting, the difference as you get older.

MALVEAUX: It's more of a risk as you get older, but that risk is still very small.

COHEN: The risk is still very small. You asked about what men can do. There is a discussion in this article in "Nature" that maybe men should think about banking their sperm at age 20. That way, if you don't get married and have a child until you're, say, 50, you can always go back to that 20-year-old sperm that you left in the bank. No one's

Drilling Tactics; Isaac Threatens GOP Convention; Republican And Democratic Conventions, Storms; Middle Class
Falls Further Behind; Penn State's Ex-President Speaks; Homicide Rate Rises in Chicag

actively encouraging this, but it is an interesting question.

MALVEAUX: Interesting debate.

Thanks, Elizabeth.

COHEN: Thanks.

MALVEAUX: And encouragement for all the guys out there.

(LAUGHTER)

COHEN: All the 40-year-old men watching us who want to conceive a child tonight. That's right.

MALVEAUX: All right. Thank you.

The Mars rover has completed its very first test drive. We'll show you the pictures.

And he believes there's no such thing as disabilities, only bad technology. He is on "The Next List."

(BEGIN VIDEO CLIP)

UNIDENTIFIED MALE: I am just in love with, enamored with the design of the human body, its elegance. Nature
has often these very powerful principles that, if captured in a technology, in a device, can be very, very extraordinary in
their capacity to help people move again. So it's -- that's the basic thesis of our work. We steal from the cookie jar of
nature. We apply that and we build synthetic constructs that emulates that functionality.

(END VIDEO CLIP)

MALVEAUX: Not a Mars rover if it doesn't rove, right? It's another high-five moment for the NASA team
operating the rover "Curiosity." 350 million miles away on Mars, the machine took a little test drive this week. You can
actually see the wheel tracks in the Martian dust. Pretty cool. "Curiosity" roved forward, backed up a little bit, took
some cool pictures. NASA hopes to soon send the rover on trips up to 100 yards a day. Pretty cool stuff.

CNN NEWSROOM continues right now with Don Lemon.

Hey, Don.

**LOAD-DATE:** August 24, 2012

# EXHIBIT "G"



189 of 647 DOCUMENTS


Copyright 2012 P.G. Publishing Co.
Pittsburgh Post-Gazette

August 24, 2012 Friday
SOONER EDITION

**SECTION:** STATE; Pg. B-1

**LENGTH:** 969 words

**HEADLINE:** SPANIER DENOUNCES FREEH REPORT;
EX-PENN STATE PRESIDENT LABELS IT 'UNFOUNDED, UNFAIR ... AND WRONG'

**BYLINE:** Paula Reed Ward, Pittsburgh Post-Gazette

**BODY:**

When Penn State University president Graham Spanier met with his administrators in 2001 about an incident involving former assistant football coach Jerry Sandusky with a child in a locker room shower, he knew no details of what had occurred.

"I received no specifics," Mr. Spanier said Thursday in an interview with the Pittsburgh Post-Gazette. "It was a brief, unscheduled, heads-up [kind of] meeting."

The ousted president said he was not told in which building the incident occurred -- other than it being an athletic facility -- that he didn't know the time of day it occurred or who the reporting party was.

"In the lens of 2012, I certainly wish, knowing everything I know now about this criminal, outrageous child predator, I wish we had all known more, and therefore ... been motivated to intervene more forcefully," he said. "I don't think any of us knew any more than there was a report of horseplay in the shower.

"I would have forcefully and immediately intervened."

Mr. Spanier, who hasn't spoken publicly since being forced to resign as Penn State's president in November, spoke to the Post-Gazette by phone Thursday -- a day after doing a lengthy interview with ABC News and The New Yorker magazine.

It was also the day after his lawyers held a news conference denouncing the report by former FBI director Louis Freeh analyzing the university's handling of the Sandusky sex abuse allegations. They claimed the report was inaccurate, incomplete and approached with a prosecutorial bias.

Mr. Spanier, who said the past several months have taken an emotional and physical toll on him, agreed.

SPANIER DENOUNCES FREEH REPORT; EX-PENN STATE PRESIDENT LABELS IT 'UNFOUNDED, UNFAIR
... AND WRONG' Pittsburgh Post-Gazette August 24, 2012 Friday

"What has been especially troubling, having made that adjustment [to life away from the presidency], was the Freeh report with its conclusions that are absolutely unfounded, unfair and just plain wrong," he said.

Mr. Spanier was interviewed by Mr. Freeh and two of his colleagues July 6 -- just six days before the report was issued.

He was told ahead of time the interview would last at least one full day and possibly part of a second.

However, the entire interview lasted about five hours and covered only about half of the topics Mr. Spanier was told would be included.

"It appeared about half-way through they didn't want to hear the whole story from me," Mr. Spanier said. "I know now the report was already written and slightly amended after. The conclusions weren't changed."

He called that disappointing.

He believes Penn State and the university's board of trustees should never have accepted the university-commissioned report.

The Freeh findings were relied upon by the NCAA in determining sanctions for the university's football program, which included a $60 million fine, a four-year ban on postseason play, the stripping of all wins from 1998 to 2011 and a five-year probationary period.

"I have a tremendous amount of experience with the NCAA and athletic matters. They should have received the report but not accepted it," Mr. Spanier said. "I believe the NCAA overstepped its bounds."

Going back to the incident in 2001, Mr. Spanier said he had little recall of the allegations.

What is known is that then-graduate assistant coach Mike McQueary reported to head coach Joe Paterno and then to athletic director Tim Curley and senior vice president Gary Schultz that he had seen Mr. Sandusky in the shower with a young boy.

There is a discrepancy between what Mr. McQueary testified to at Mr. Sandusky's trial in June -- that he saw a very clear sexual act occurring -- and what Penn State administrators claimed in grand jury testimony -- that he saw "horseplay."

Mr. Spanier said Thursday it was described to him as "horseplay," which to him equated to snapping towels and throwing water.

The university president said the administrators agreed with a plan in which Mr. Curley was to tell Mr. Sandusky, who was retired by then, they were "uncomfortable even with the idea of showering with a youth. 'We don't want you to do it again. Don't bring kids in the shower.' That was a directive."

In addition, Mr. Curley was to go to Mr. Sandusky's charity, the Second Mile, to inform officials there and seek their cooperation.

Mr. Spanier has been criticized as possibly attempting to cover up abuse based on an email he wrote on the matter on Feb. 27, 2001, at 10:18 p.m..

He said Thursday he didn't remember the message, written to Mr. Curley, at all until he saw it recently.

In it, he wrote: "This approach is acceptable to me. It requires you to go a step further and means that your conversation will be all the more difficult, but I admire your willingness to do that and I am supportive. The only

SPANIER DENOUNCES FREEH REPORT; EX-PENN STATE PRESIDENT LABELS IT 'UNFOUNDED, UNFAIR ... AND WRONG' Pittsburgh Post-Gazette August 24, 2012 Friday

downside for us is if the message isn't heard and acted upon, and we then become vulnerable for not having reported it. But that can be assessed down the road. The approach you outline is humane and a reasonable way to proceed."

Mr. Spanier explained his wording by saying that he was concerned Mr. Sandusky wouldn't understand what they were trying to tell him.

"I remember thinking ... that we should see if the message is heard -- does he accept it? If he doesn't, we could be vulnerable and conclude that we need to elevate our intervention to a higher level," Mr. Spanier said in his interview. "I'm giving you reconstructed, today, what my thinking may have been. But I don't actually remember."

Mr. Spanier, who is on sabbatical from Penn State and considering going back there to teach, said he still loves the institution. He continues to promote it and encourage donors and supporters.

"I devoted 26 years of my life to Penn State," he said. "I have tremendous loyalty to it. The university is what it is today, in part, because of the work I did and leadership I provided.

"I believe in due course that [this situation] will be behind us, and I can properly take my place and be recognized for what I accomplished."

**NOTES:** Paula Reed Ward: pward@post-gazette.com or 412-263-2620. /

**LOAD-DATE:** August 25, 2012

# EXHIBIT "H"

# *McQueary v. Pennsylvania State Univ.*, No. 2012-1804 (Centre Cnty. Com. Pl. Dec. 20, 2012)



IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

MICHAEL J. MCQUEARY,                    :       No. 2012-1804
       Plaintiff                                 :
  Vs                                               :
                                                       :
THE PENNSYLVANIA STATE                  :
UNIVERSITY,                                      :       Type of Case:  Whistleblower
       Defendant

**OPINION**

**ISSUE**

**Should these proceedings be stayed in whole or in part pending the outcome of the criminal cases against Graham B. Spanier, Gary C. Schultz and Timothy M. Curley?**

The Pennsylvania State University (hereinafter "Penn State") asserts that this matter should be stayed because there are overlapping factual and legal issues arising out of the criminal prosecutions of **Graham B. Spanier, Gary C. Schultz, and Timothy M. Curley** which should be resolved first.  Penn State further asserts that its ability to respond to the complaint may be hampered by the aforementioned criminal defendants' invocation of their 5th Amendment rights and that it would be at a disadvantage in framing a response to the complaint and formulating a defense.  Finally, Penn State asserts that the interests of not only itself, but the criminal defendants, the abuse victims, the court and the public would be served by a stay.

**Background**

In order to analyze the issue presented, it is necessary to view this case in the overall context of the investigation into and the litigation resulting from the sexual abuse committed by

1

Gerald A. Sandusky, hereinafter ("Sandusky[b]), on Penn State's premises dating back to at least 1998.

I have read the "Freeh Report"[1] and reviewed the criminal complaints filed against Athletic Director Timothy M. Curley,[2] (hereinafter "Curley"), Senior Vice President-Finance and Business, Gary C. Schultz,[3] (hereinafter "Schultz"), and President of Penn State, Graham B. Spanier, [4] (hereinafter "Spanier"). The Rule 119 Affidavit attached to the complaints incorporates as Exhibit "A" the Report of the Thirty-Third Statewide Investigating Grand Jury. These documents, the Freeh Report, the Rule 119 Affidavits and the Grand Jury Report, provide the time line within which this case can be viewed.

### Chronology of Events

1. A report was made that Sandusky showered with an eleven (11) year old on May 3, 1998 and that both were naked.[5]

2. Michael J. McQueary, (hereinafter "McQueary"), was a Graduate Assistant Coach on the Penn State football team during the period 2000-2003.

3. On the evening of February 9, 2001, McQueary observed Sandusky and a young boy in the shower at Lasch Building, part of the Penn State athletic complex. Both were naked.

---

[1] "Report of the Special Investigative Counsel Regarding the Actions of The Pennsylvania State University Related to the Child Sexual Abuse Committed by Gerald A. Sandusky" by Freeh Sporkin & Sullivan, LLP, July 12, 2012. I note that Penn State has publicly embraced this report. *See,* Remarks of Chairman Karen Peetz at Penn State Board of Trustees regular meeting, September 12, 2012, *available at:* http://progress.psu.edu/resource-library/story/board-of-trustees-chairman-karen-peetz-delivers-remarks.
[2] *See* Court of Common Pleas, Dauphin County, No. CP-22-CR-5165-2011 and No. CP-22-MD-1385-2012.
[3] *See* Court of Common Pleas, Dauphin County, No. CP-22-CR-5164-2011 and No. CP-22-MD-1386-2012.
[4] *See* Court of Common Pleas, Dauphin County, No. CP-22-MD-1387-2012.
[5] As this incident is not relevant to my analysis, I do not discuss the response of Curly, Schultz and Spanier to it.

2

McQueary believed inappropriate sexual conduct was occurring and made his presence known prompting Sandusky to separate from the boy.

4. On the morning of February 10, 2001, McQueary visited Joseph V. Paterno, (hereinafter "Paterno"), at his home and reported what he saw.

5. Paterno was Penn State's head football coach and Sandusky had been his long time assistant defensive coordinator.

6. Paterno reported McQueary's observations to Curley and Schultz on February 11, 2001.

7. On February 12, 2001, Curley and Schultz met with Spanier.

8. Sometime before February 19, 2001, McQueary met with Curley and Schultz and told them what he had observed.

9. While Curley and Schultz told McQueary they would get back to him about what he had seen, they did not.

10. On or about March 1, 2004, McQueary was hired as an assistant football coach by Penn State.

11. On or about January 7, 2010, the Pennsylvania Attorney General's Office (hereinafter "AG"), served subpoenas on Penn State for the personnel records of Sandusky and correspondence pertaining to him.

12. On December 14, 2010, McQueary appeared before the Grand Jury and testified that he had discussed his observations of February 9, 2001, with Curley and Schultz.

13. On January 12, 2011, Curley, Schultz and Paterno testified before a Grand Jury.

14. On March 22, 2011, Spanier was interviewed by law enforcement authorities.

3

15. Curley, Schultz and Spanier were questioned as to what they knew about the incident reported by McQueary and when they knew about it.

16. On November 4, 2011, criminal charges were filed against Sandusky in Centre County and against Curley and Schultz in Dauphin County.

17. On November 5, 2011, Spanier caused to be published on Penn State's official news site his statement of support for Curley and Schultz. See Exhibit "B" to McQueary's complaint.

18. On November 6, 2011, the Board of Trustees of Penn State placed Curley on administrative leave and announced that Schultz had retired.

19. On November 9, 2011, the Board of Trustees of Penn State removed Spanier as President and Paterno as head football coach of Penn State.

20. On November 13, 2011, McQueary was placed on administrative leave.

21. Sandusky was convicted of multiple sexual offenses on June 22, 2012. One of those convictions related to the incident McQueary had reported to Curley and Schultz. McQueary was a witness at Sandusky's trial.

22. The suit <u>Doe B. v. The Second Mile, Gerald Sandusky and The Pennsylvania State University</u>, was filed in the Court of Common Pleas of Philadelphia County on June 28, 2012 at Case No. 03727 June Term, 2012.

23. On July 5, 2012, McQueary's employment with Penn State was terminated.

24. The suit, <u>Doe C. v. The Pennsylvania State University</u> was filed in the Court of Common Pleas of Philadelphia County on July 31, 2012 at Case No. 120704291.

4

25. The suit, <u>Doe A. v. The Second Mile, Gerald Sandusky and The Penn State University</u>, was filed in the Court of Common Pleas of Philadelphia County on November 30, 2011 at Case No. 111102968.

26. The suit, <u>C. Miller v. The Second Mile, Gerald Sandusky and The Penn State University</u> was filed in the Court of Common Pleas of Philadelphia County on December 22, 2011 at Case No. 02933 December Term, 2011.

27. McQueary's suit against Penn State was filed on October 2, 2012.

28. Additional criminal charges were filed against Curley and Schultz on November 1, 2012.

29. Spanier was indicted on November 1, 2012.

30. As of December 5, 2012, the preliminary hearings on the new charges filed against Curley and Schultz and the charges filed against Spanier were indefinitely continued.

31. Curley and Schultz's trial date of January 7, 2013, has also been indefinitely continued.

32. McQueary is expected to be a witness in the pending criminal cases.

### Discussion

Counsel for the parties agree that the factors to be considered in weighing whether a stay should be granted are set forth in, <u>In Re Adelphia Communications Securities Litigation</u>, 2003 WL 22358819 (E.D.Pa.) at *3, to wit:

> (1) The extent to which the issues in the civil and criminal cases overlap; (2) the status of the criminal proceedings, including whether any defendants have been indicted; (3) the plaintiff's interests in expeditious civil proceedings weighed against the prejudice to the plaintiff caused by the delay; (4) the burden on the defendants; (5) the interests of the court; and (6) the public interest.

5

and <u>Golden Quality Ice Cream Co., Inc. v. Deerfield Specialty Papers, Inc., et al.</u>, 87 F.R.D. 53

at 56, to wit,

> Broadly stated, in terms of the problems presented by this litigation, the principal factors are five-fold:   (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation.
>
> Preliminarily, I note that several of the cases cited by Penn State involve situations

where one or more of the defendants in the criminal proceedings were also defendants in the

civil litigation.  Further, the conduct at issue was an element common to both cases.   As such,

defendants had legitimate self-incrimination concerns.  Also, a criminal conviction necessarily

lessened the burden of discovery and proof on the civil plaintiffs, such that delaying the civil

case was appropriate.  Those factors do not exist here.

## 1. Issue Overlap Between Civl and Criminal Cases

The AG in the criminal cases will be focused on the time period up to March 22, 2011,

and what the defendants knew of and when they knew of Sandusky's improper sexual conduct.

Penn State has no role in prosecuting the criminal charges, nor is it defending the defendants.

Thus, the criminal cases impose no burden on Penn State.  As the Freeh Report makes clear,

Penn State has already made the information it has pertaining to Sandusky regarding THIS

6

INCIDENT available to the AG.[6]  Its employees with knowledge of the events concerning Sandusky's conduct regarding this incident have already been interviewed.

Penn State is the defendant in this case and may well want to call one or more of the criminal defendants as witnesses.  If called, the criminal defendants have no 5th Amendment right to refuse to testify, nor need they fear that information gathered in this case can be used against them in the criminal proceedings.  The focus in the criminal proceedings is what defendants knew about Sandusky's improper conduct on the date they appeared before the Grand Jury or met with investigators, not the reason why McQueary was let go.   As to the defamation count, the sole issue is whether the Spanier statement in support of Curley and Schultz defamed McQueary.  Whether the criminal defendants were truthful in their testimony regarding what they knew about the incident McQueary observed and reported is factually and legally distinct from McQueary's whistleblower and defamation claims.

Simply put, while there may be overlapping witnesses, there are no overlapping issues in the criminal and civil cases.

This factor does not support the grant of a stay.

## 2.  Status of Criminal Proceedings

It is my understanding that as of December 5, 2012, all pending criminal matters have been indefinitely continued.  While defendants may well not want to be deposed, etc. in this

---

[6] "The Special Investigative Counsel performed the forensic analysis and review of this raw data independent of the University staff.  From this review and analysis, the Special Investigative Counsel discovered the most important documents in this investigation – emails among former President Graham B. Spanier, former Senior Vice President-Finance and Business Gary C. Schultz and Athletic Director Timothy M. Curley from 1998 and 2001 – relating to Sandusky's crimes.  The Special Investigative Counsel immediately provided these documents to law enforcement when they were discovered." Freeh Report at 11.

7

matter, their interests can and will be protected by the court pending resolution of their criminal cases.

I note, as did the Freeh Report,[7] that if a similar contemporaneous electronic record exists as to their discussions[8] or those of any other Penn State official involved in the decision to terminate McQueary, as exists concerning Sandusky, there may be no need to call them as witnesses. The written word is as powerful as the spoken word in proving one's case.

This factor does not support the grant of a stay.

### 3. Burden on Defendants

As I have already made clear, the criminal defendants have no burden imposed on them in this case other than the burden placed on any non-party witness.

I note from both the Freeh Report and the Second Grand Jury Report that Penn State's Information Technology Department contains a specialized unit denominated the "SOS" unit, which is "trained and dedicated to assembling responsive electronically stored data in response to litigation needs or other legal process[9]." This unit was able to retrieve more than 3.5 million pieces of electronic data and documents spanning twelve (12) plus years when requested to do so by the Freeh investigators. As the Grand Jury also noted, Penn State "has in place a well defined historical practice and procedure for responding to subpoenas, "at page 23. In this day

---

[7] "Moreover, the extensive contemporaneous documentation that the Special Investigative Counsel collected provided important insights, EVEN INTO THE ACTIONS OF THOSE WHO DECLINED TO BE INTERVIEWED." (emphasis added) Freeh Report at 12.

[8] I do not imply that such a record exists or that any one of the defendants participated in or made the decision to terminate McQueary's employment.

[9] Second Grand Jury Report, p. 23, *available at:* http://www.attorneygeneral.gov/uploadedFiles/Press/spanier-schultz-curley_presentment-11-1-12.pdf.

8

of electronic discovery and in light of Penn State's specialized expertise in this area, I see no meaningful burden placed on Penn State to search its files for relevant information regarding why McQueary was let go.  Indeed, an electronic search may eliminate the need for the in person examination of individuals, only to discover they have no relevant information.

While hundreds of persons had to be interviewed and thousands of documents reviewed to determine the full scope of Sandusky's improper conduct spanning many years and involving multiple victims, who knew of it and when, no such far-reaching inquiry is needed here.  One or more persons likely made the decision to end McQueary's employment.  Once that person is identified and deposed, McQueary's Whistleblower action can be resolved.  Identifying the decision maker now, as opposed to after the conclusion of the criminal trials, imposes no burden whatsoever on Penn State.  In fact, it may lessen the burden on Penn State as it will avoid unnecessary discovery, expense, etc.

If the decision maker turns out to be one or more of the defendants, the court can control the method and timing of discovery addressed to them so as not to interfere with their criminal trial preparation.  If it is someone else, then the issue of their participation in this case is moot.

Penn State infers that other current or former employees may decline to cooperate for self-incrimination reasons if the defendants do not testify.  As I believe they are not at risk of incriminating themselves, this argument is unpersuasive.  The suggestion that these same unidentified witnesses may not want to testify without prior or contemporaneous testimony from the defendants defies logic and experience.  A person with relevant testimony must provide it absent a legal basis for refusing to do so.   Until such a basis is asserted, I am unprepared to

9

assume that Penn State employees with relevant information will decline to provide it.   The experience of the Sandusky case does not support this suggestion.

Penn State also believes that its access to McQueary may be limited by the AG.  I know of no authority by which the AG can prevent a willing witness from testifying.   McQueary's counsel has indicated that he will make McQueary available to Penn State when requested. Should the AG object, the issue can be dealt with then.

This factor does not favor the grant of a stay.

### 4.  The Interests of the Court

Sandusky's conduct has resulted in ongoing litigation in three counties.

The victims suits are being handled by the 1st Judicial District, Philadelphia County. Sandusky, his charitable organization, The Second Mile, and Penn State are named defendants.   Penn State has publicly stated its interest in resolving these cases in light of Sandusky's conviction. As neither Sandusky nor Second Mile have any direct connection to the McQueary suit, resolution of either the victims' or McQueary suits will not advance or delay resolution of the other.

Similarly, the criminal cases pending in Dauphin County involve DIFFERENT PARTIES, witnesses, elements and burdens of proof.  The only common denominator between those cases and the present case is that McQueary and PERHAPS one or more of the defendants will be witnesses.  As with the victims' cases, resolution of either the criminal or civil case neither advances nor delays resolution of the other.

10

The interests of any one court in awaiting the outcome in another results in no advantage to the court, nor does it serve to conserve any judicial resources. Accordingly, each court should be free to resolve the matter before it as expeditiously as it sees fit.

This factor does not favor the grant of a stay.

## 5. The Public Interest

I believe that if the court insures the parties receive a fair and prompt hearing, the public interest is satisfied.

This factor is neutral regarding a stay.

## 6. The Interests of Non-Parties

Judge Pollak in his Golden Quality opinion addressed this factor noting that several of the non-parties to the civil proceedings were facing criminal prosecution. The dilemma for those non-parties was that they were officers of the corporate civil defendant and could be called upon to speak on behalf of the corporate defendant. Seeing a real risk to their 5th Amendment right, Judge Pollak deemed this impediment to carry significant weight regarding the requested stay. No such concern exists here. Assuming, arguendo, that Curley, Schultz and/or Spanier individually or collectively terminated McQueary in violation of the Whistleblower Act, that fact is irrelevant to their pending criminal prosecutions.

Whether Spanier defamed McQueary is also irrelevant in his criminal case.

Penn State asserts that the victim-civil plaintiffs may be affected if this case proceeds before the criminal cases conclude. I disagree. Those plaintiffs have not named Curley, Schultz and Spanier as defendants. The Sandusky conviction is clearly admissible against him

11

and McQueary has already testified in the Sandusky trial as to what he saw, who he told and when. To the extent that the McQueary trial or discovery process readdresses that testimony, no information not already publicly known would be disclosed. Accordingly, the victim-plaintiff involved in the McQueary testimony suffers no harm by allowing this case to proceed. As McQueary has no personal information regarding the other victim-plaintiffs, their cases likewise are not impacted by any testimony in this case.

This factor does not favor the grant of a stay.

**7. Plaintiff's Interest in Prompt Resolution versus prejudice to Plaintiff Caused by Delay**

Penn State asserts that plaintiff should be required to demonstrate, "a particularly unique injury, such as the dissipation of assets or an attempt to gain an unfair advantage from the stay," Adelphia Communications, 2003 WL 22358819 *4, as opposed to the mere delay in his right to promptly pursue his claim.

Judge Pollak introduced the concept of "potential prejudice" in his Golden Quality Opinion. In discussing this point he noted the overlapping nature of the criminal and civil cases, the fact that both were proceeding in the SAME judicial district and that a result favorable to the government in the criminal case would "obviate much of the expenditure of time and dollars which plaintiffs would otherwise be compelled to invest in their civil suits," Golden Quality at 56. Based on this belief, he found that some delay was acceptable. Here, as I have already noted, the criminal and civil cases do not overlap, and involve different defendants, different elements. The discovery requested differs and the conviction or acquittal of one or more of the defendants

12

will not advance McQueary's claims. As the basis of Judge Pollak's concerns do not here exist, his "potential prejudice" test is inapplicable.

Penn State asserts that McQueary, if he prevails, may be entitled to interest, etc. and that he is not currently suffering any economic harm as he is receiving his severance pay. I note that Exhibit "A" to his complaint, his employment agreement, calls for eighteen (18) months' severance pay. Those payments will end by January 2014 at the latest. During conference and at oral argument on this Motion, plaintiff's counsel stated that he anticipated discovery, etc. would consume the better part of one (1) year. Penn State did not disagree with his assessment. If this case is stayed, McQueary may well find himself without funds to live on and/or to prosecute his claim which, to me, rises to the level of economic harm.

McQueary asserts that pursuant to Article I, Section 11 of the Pennsylvania Constitution, he has the right to the prompt resolution of his case. I have not previously had a plaintiff argue this ground and credit counsel for his novel approach. However, it is unnecessary to remind the court of this right as every court strives to resolve all matters in a timely fashion. Obviously, as here, there are competing factors to be assessed in determining what constitutes a timely fashion. Many of those factors have already been discussed.

An additional factor that I deem relevant is the publicly stated (through various members of Penn State's Board of Trustees) desire of Penn State to restore its reputation as promptly as possible. Certainly, McQueary should have the same right. Allowing this case to proceed now will afford both parties that opportunity.

This factor does not support the grant of a stay.

13

Based on the foregoing, I enter my

# O R D E R

AND NOW, this ____*19th*____ day of December, 2012, the Motion for Stay is **DENIED**.

BY THE COURT:

THOMAS G. GAVIN                              SJ

14

*Int'l Fidelity Ins. Co. v. Podlucky*
No. 07-0235, 2007 WL 2752139
(W.D. Pa. Sept. 19, 2007)

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 2752139 (W.D.Pa.)
**(Cite as: 2007 WL 2752139 (W.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
INTERNATIONAL FIDELITY INSURANCE
COMPANY, Plaintiff,
v.
Gregory J. PODLUCKY and Karla S. Podlucky,
Defendants.

Civil Action No. 07-0235.
Sept. 19, 2007.

Amy E. Bentz, Jack W. Plowman, Bentz Law Firm,
P.C., Pittsburgh, PA, for Plaintiff.

John R. Orie, Jr., Orie & Zivic, Robert O. Lampl,
Pittsburgh, PA, for Defendants.

*MEMORANDUM and ORDER*
GARY L. LANCASTER, District Judge.

**\*1** This is an action in breach of contract.
Plaintiff seeks to recover more than $300,000 under
a General Agreement of Indemnity executed in its
favor by defendants. Plaintiff has filed a motion for
judgment on the pleadings as to Count II of its
complaint [doc. no. 18]. Plaintiff contends that de-
fendants have admitted all facts relevant to Count
II, in which defendants seek an order of specific
performance requiring that defendants post suffi-
cient collateral under the Agreement. Defendants
allege that there are facts in dispute preventing
entry of judgment on the specific performance
claim. Defendants also have filed a motion to stay
these proceedings pending resolution of a criminal
investigation against Mr. Podlucky [doc. no. 21].

For the reasons set forth below, both motions
will be [missing text]

*I. BACKGROUND*
Defendant Gregory J. Podlucky is the founder
of Le-Nature's, Inc. Le-Nature's is currently the

debtor in a Chapter 11 bankruptcy proceeding
pending in this judicial district. Public sources re-
veal that various federal agencies are investigating
Mr. Podlucky's involvement in wire and bank fraud,
perjury, destruction of evidence, and financial
crimes arising out of his business dealings.

In April of 2005, Gregory Podlucky, and his
wife, Karla, executed a General Agreement of In-
demnity in favor of plaintiff. Plaintiff issued two
payment bonds under the Agreement, identifying
Le-Nature's as principal. The obligees under these
bonds have made demands for payment on plaintiff
due to Le-Nature's alleged non-payment. Plaintiff
has set reserves against these claims, and has made
one payment of almost $49,000. The total amount
of plaintiff's reserves and/or payments against the
claims is $303,438.00. Plaintiff has filed this action
to seek indemnification from defendants for these
amounts. Plaintiff has also asked the court to order
defendants to specifically perform that part of the
Agreement requiring them to immediately post suf-
ficient collateral.

II. *APPLICABLE LEGAL STANDARDS*

A. *Motion for Judgment on the Pleadings*

A Rule 12(c) motion is designed to provide a
means of disposing of cases when the material facts
are not in dispute, and judgment on the merits may
be achieved by focusing on the content of the
pleadings and any facts of which the court may take
judicial notice. A motion for judgment on the
pleadings may be made at any time after the plead-
ings are closed.

Such motions, being directed toward a deter-
mination of the substantive merits of the controversy,
should be granted only where it is clear that the
merits of the controversy can be fairly and fully de-
cided in such a summary manner. *Shelly v. Johns-
Manville Corp.,* 798 F.2d 93, 94 (3d Cir.1986). In
ruling on a Rule 12(c) motion, the court is required

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2007 WL 2752139 (W.D.Pa.)
(Cite as: 2007 WL 2752139 (W.D.Pa.))

to view the allegations of the pleadings as true and the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.   *Soc'y Hill Civic Ass'n v. Harris,* 632 F.2d 1045, 1054 (3d Cir.1980).

**B.** *Motion to Stay*

*2 A district court has broad discretion to stay proceedings as an incident to its power to control its own docket. *Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). When a party in a discretion to stay discovery, in whole or in part, until disposition of the criminal matter. *RAD Services. Inc. v. Aetna Sur. and Cas. Co.,* 808 F.2d 271, 279 n. 3 (3d Cir.1986). Staying a case is an extraordinary measure and criminal defendants have no generalized due process right to stay proceedings in a related civil action. *United States v. Breyer,* 41 F.3d 884, 893 (3d Cir.1994); *DeVita v. Sills,* 422 F.2d 1172, 1181 (3d Cir.1970). A party seeking a stay bears the burden of establishing that a stay is needed.   *Landis,* 299 U.S. at 255.

In deciding how to exercise its discretion, a court must initially assess to what extent the issues in the criminal and civil cases overlap, and consider the status of the criminal case, including whether the defendant has been indicted. *See e.g., In re Derivative Litigation,* 2007 WL 1101276 (E.D.Pa. Apr.11, 2007). Then, the court is to weigh the following factors: (1) the interest of the plaintiff in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiff of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendant; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interest of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation. *Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc.,* 87 F.R.D. 53, 55 (E.D.Pa.1980).

**III.** *DISCUSSION*

**A.** *Motion for Judgment on the Pleadings*

Plaintiff has moved for entry of judgment on the pleadings as to Count II of its complaint. In that count, plaintiff asks the court to enforce the "placement in funds" provision of the Indemnity Agreement. According to plaintiff, defendants have admitted all of the facts relevant to Count II. Defendants claim that they have sufficiently denied the allegations of the complaint, and asserted affirmative defenses, such that judgment on the pleadings is inappropriate. For the reasons that follow, we deny the motion for judgment on the pleadings.

We find that plaintiff has mischaracterized defendants' answer. Defendants have not admitted the relevant allegations of the complaint. Instead, they have denied that they have the obligation to post collateral under the circumstances of the claims made, and the terms of the Agreement. In addition, defendants have raised numerous affirmative defenses to plaintiff's claims. As demonstrated by plaintiff's own reply brief, several of these defenses require a decision as to the appropriate state law to apply to this case, and invite speculation regarding why defendants have not posted the collateral, and the facts and circumstances surrounding execution of the Agreement, among other things. It is inappropriate to resolve such matters in the context of a motion for judgment on the pleadings.

*3 This is not a case in which the material facts are not in dispute, and the merits of the controversy can be fairly and fully decided in a summary manner. Hence, the motion for judgment on the pleadings must be denied.

**B.** *Motion to Stay*

In their opposition to plaintiff's motion for judgment on the pleadings, defendants include a "Motion for Say [sic] of All Proceedings." [doc. no. 21, pg. 2]. In the filing, defendants allege that Mr. Podlucky is the subject of an "ongoing criminal investigation" and that his criminal defense counsel has advised him "to make no public representation,

Not Reported in F.Supp.2d, 2007 WL 2752139 (W.D.Pa.)
**(Cite as: 2007 WL 2752139 (W.D.Pa.))**

in order to avoid compromising his Constitutional rights under the Fifth Amendment." *Id.* at p. 3. According to defendants, Mr. Podlucky cannot participate in the defense of this action while asserting his Fifth Amendment rights in connection with the criminal investigation. Thus, defendants ask that this matter be stayed "until such time as the criminal investigation and proceedings against [Mr.] Podlucky have been concluded." Defendants filed no brief in support of their motion.

Defendants' filing does not satisfy their burden to justify the extraordinary remedy of a stay. As an initial matter, defendants have provided no information regarding the content of the investigation against Mr. Podlucky so that we can determine to what extent the issues overlap. Public sources referred to by plaintiff indicate that Mr. Podlucky is being investigated for various financial and business crimes involving Le-Nature's. Le-Nature's is not a signatory to the Agreement, but is the principle on the payment bonds issued by plaintiff. The issues in this case may overlap with the matters being investigated criminally, or they may not. Based on the information that is currently available, we cannot make a definitive determination on this factor. Therefore, this weighs against granting a stay.

The status of the criminal case also weighs against granting a stay. Mr. Podlucky has not been charged with any crime stemming from the criminal investigation. We have no formal charges to assess, and no way of knowing whether, or when, they will issue. It would be speculative to stay this civil case until resolution of a criminal case that has not yet been commenced, and about which we know nothing substantive.

Given that we cannot assess the overlap between the civil and criminal cases, and that the criminal case has not been commenced, our assessment of the five *Golden Quality* factors becomes superfluous. Furthermore, defendants, who have the burden of proof on this motion, have not provided any evidence or argument regarding the factors. Re-

gardless, we find that each *Golden Quality* factor supports our decision to deny the motion to stay.

We assess each of the five factors in turn. The plaintiff has an interest in proceeding expeditiously with this case. Mr. Podlucky's business is in bankruptcy. There is a real risk that assets will not be available to satisfy any judgment against him, or his wife, were this matter to be delayed indefinitely. On the other hand, there is no indication that these proceedings will impose any particular burden on defendants. Defendants have identified only the specter of a conflict with Mr. Podlucky's Fifth Amendment rights as justification for the stay. However, as of now, there is no concrete evidence that his rights will be implicated were this matter to proceed. The convenience of the court and the interest in judicial efficiency favor allowing this case to proceed, rather than to languish on the court's docket indefinitely. The public has an interest in prompt resolution of civil disputes, and in not allowing those being investigated for criminal wrongdoing to avoid their civil obligations.

**\*4** Thus, defendants have failed to sustain their burden to obtain this extraordinary remedy. Our independent assessment of all relevant factors leads to the conclusion that the motion to stay should be denied.

IV. *CONCLUSION*

Judgment on the pleadings is not appropriate in this case. Defendants have failed to justify the extraordinary remedy of a stay. Both motions will be denied.

The appropriate order follows.

*ORDER*

Therefore, this *18th* day of September, 2007, IT IS HEREBY ORDERED that the plaintiff's motion for judgment on the pleadings [doc. no. 18] is DENIED;

IT IS FURTHER ORDERED that defendants' motion to stay [doc. no. 21] is DENIED.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2752139 (W.D.Pa.)
**(Cite as: 2007 WL 2752139 (W.D.Pa.))**

W.D.Pa.,2007.
International Fidelity Ins. Co. v. Podlucky
Not Reported in F.Supp.2d, 2007 WL 2752139
(W.D.Pa.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Hurst v. Beck*, No. 91-2492
1992 WL 396592
(E.D. Pa. Dec. 17, 1992)

Westlaw.

Not Reported in F.Supp., 1992 WL 396592 (E.D.Pa.)
**(Cite as: 1992 WL 396592 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Wendy R. HURST, M.D.
v.
William W. BECK, Jr., M.D., et al.

Civ. A. No. 91–2492.
Dec. 17, 1992.

Giuliana F. Robertson, David E. Landau, Michael
D. Shaffer, Hoyle, Morris & Kerr, Philadelphia,
Pa., for plaintiffs.

John B. Langel, David S. Fryman, Suzanne E.
Turner, Ballard, Spahr, Andrews and Ingersoll,
Charisse R. Lillie, Ballard, Spahr, Andrews & In-
gersoll, Philadelphia, Pa., for defendants.

MEMORANDUM AND ORDER
HUTTON, District Judge.
    *1 Presently before the Court is defendant
Theodore Tsaltas, M.D.'s ("Dr. Tsaltas") Motion
for Summary Judgment on Counts I, II, IV, and VI,
defendant Pennsylvania Hospital's Motion for Sum-
mary Judgment on Count III and VI, defendant
William W. Beck, M.D.'s ("Dr. Beck") Motion for
Summary Judgment on Count VI, plaintiff Wendy
R. Hurst, M.D.'s ("Dr. Hurst") response and the de-
fendants' reply.

I. FACTS AND PROCEDURAL DEVELOP-
MENTS
    The present action seeks relief against the
plaintiff Hurst's former employer, the defendant
Pennsylvania Hospital, and two physicians, Dr.
William W. Beck, Director of the Department of
Obstetrics and Gynecology's residency program,
and Dr. Theodore Tsaltas, an attending physician.
[FN1] Dr. Hurst claims that both the hospital and the
two named physicians gave the Avery Medical
Center of Connecticut references about her that
were both defamatory and based upon information

contained in the plaintiff's confidential personnel
file. Based upon this information, the Avery Center
declined to hire Dr. Hurst.

    The plaintiff and her husband, Dr. Richard
Levine, initiated this action on April 17, 1991.
They also filed suit against the Avery Center in the
United States District Court for the District of Con-
necticut. The Connecticut suit has subsequently
settled. After filing an amended complaint on June
14, 1991, with this Court, the plaintiff was granted
leave to file the present Second Amended Com-
plaint.[FN2] On November 2, 1992, the defendants
filed the present Motion for Summary Judgment.

II. DISCUSSION
A. *The Applicable Law*
    When a federal Court sits in diversity it must
apply the substantive law of the forum state. *Erie
R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). Un-
der the Rules of Decision Act, 28 U.S.C. § 1652
(1988 & Supp.1992), "the laws of the several states,
except where the Constitution or treaties of the
United States or acts of Congress otherwise require
or provide, shall be regarded as rules of decision in
civil actions in the courts of the United States, in
cases where they apply." *Id.*

    The United States Supreme Court has held that
the judicial decisions of the state courts are "laws"
of the states within the meaning of the above stat-
ute. *Erie R.R. Co.,* 304 U.S. at 78. The federal
courts are to follow the decisions of the Supreme
Court of the state where they have spoken. *See,
Commissioner of Internal Revenue v. Estate of
Bosch,* 387 U.S. 429, 465 (1967). In addition, " 'an
intermediate appellate state court ... is a datum for
ascertaining state law which is not to be disreg-
arded by a federal court unless it is convinced by
other persuasive data that the highest court of the
state would decide otherwise.' " *Id.* (quoting *West
v. American Tel. & Tel. Co.,* 311 U.S. 223, 237
(1940)).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1992 WL 396592 (E.D.Pa.)
**(Cite as: 1992 WL 396592 (E.D.Pa.))**

B. *The Standard For Summary Judgment*

The purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038 (1977). When considering a motion for summary judgment, this Court shall grant such motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, this Court will resolve all reasonable doubts and inferences in favor of the nonmoving party. *Arnold Pontiac—GMC, Inc. v. General Motors Corp.*, 700 F.Supp. 838, 840 (W.D.Pa.1988).

**\*2** The inquiry into whether a "genuine issue" of material fact exists has been defined by the Supreme Court as whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.*

The Supreme Court articulated the allocation of burdens between a moving and nonmoving party in a motion for summary judgment in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The Court held that the movant had the initial burden of showing the court the absence of a genuine issue of material fact, but that this did not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. *Id.* at 323. The Court also held that Rule 56(e) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324 (quoting Fed.R.Civ.P. 56(e)).

The Supreme Court further elaborated on the

type of evidence that the nonmoving party is required to adduce in order to withstand a motion for summary judgment:

We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred [a genuine issue of material fact].

*Id.* Although all three defendants filed one Motion for Summary Judgment, the grounds upon which each defendant seeks relief are distinct. The Court will review each in turn.

C. *Defendant Tsaltas's Motion for Summary Judgment*

Defendant Tsaltas argues that he is entitled to summary judgment because all of the plaintiff's claims against him are barred by the statute of limitations. Before moving to the merits of Dr. Tsaltas's claims, however, the Court must first review both the timing and legal standard by which Dr. Tsaltas was made a party in this case. As the previous discussion indicated, Dr. Tsaltas was not brought into this action until this Court granted the plaintiff's Motion to file the Second Amended Complaint, naming Dr. Tsaltas, on August 3, 1992.

In granting the plaintiff's Motion this Court first addressed the question of whether the complaint against Dr. Tsaltas would "relate back" to the original filing of April 17, 1991, as provided for under Fed.R.Civ.P. 15(c). The amended version of Rule 15(c) provides:

An amendment of a pleading relates back to the date of the original pleading when

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1992 WL 396592 (E.D.Pa.)
**(Cite as: 1992 WL 396592 (E.D.Pa.))**

*3 (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(j) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the proper party.

*Id.* In addition, Fed.R.Civ.P. 4(j) requires that service of the summons and complaint be made within 120 days of the filing of the complaint or longer if good cause can be shown by the plaintiff. *Skoczylas v. Federal Bureau of Prisons,* 961 F.2d 543, 545–46 (5th Cir.1992).

This Court was concerned about the relation back requirements because the Third Circuit has held that changing the name of a John Doe party to the proper party is a change of a party and the amendment will relate back only if the requirements of Rule 15(c) are met. *Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 174 (3d Cir.1977). The Court found that under the standard of Fed.R.Civ.P. 12(b)(6), plaintiff had met her burden of proving that Dr. Tsaltas had inferentially received the required notice under Rule 15(c). (Memorandum and Order, Aug. 3, 1992, at 8–9).

However, in reaching the decision that plaintiff had satisfied her burden of proof respecting Rule 15(c)(2) and (3), this Court held:

In allowing the amendment, the Court does not foreclose the defendant's ability to raise the statute of limitation as a defense, because the Court

has not made a factual finding regarding when the defendant received notice. The Court has used the facts as the plaintiff has provided them, because the futility argument is essentially a motion to dismiss and the same standards would apply. After discovery has been completed and there is a factual record upon which the Court can determine when Dr. Tsaltas received notice of the action, the Court can revisit the statute of limitations in a motion for summary judgment. In addition, the defendant will also be able to raise all of the other defenses which he asserts are available such as failure to exhaust administrative remedies under Title VII.

(Memorandum and Order at 10). Dr. Tsaltas's Motion for Summary Judgment essentially re-raises the Rule 15(c) notice argument that this Court rejected under the Rule 12(b)(6) standard.

The foregoing discussion on Rule 15(c) is relevant to Dr. Tsaltas's Motion for Summary Judgment because his primary basis for relief is the statute of limitations under Pennsylvania substantive law. Dr. Tsaltas's theory for Summary Judgment on Counts I (defamation), II (Intentional Interference with Contractual Relations), IV (Intentional Interference with Prospective Contractual Relations) and Count VI (Discrimination on the Basis of Sex and Pregnancy), is that his entry into the case does not date back to April 17, 1991. Therefore, he is entitled to Summary Judgment on Counts I, II, IV and VI of the Complaint because they each have a statute of limitations less than one year. The following discussion of Pennsylvania state substantive law on the relationship between defamation and intentional interference with contractual relations makes clear why Dr. Tsaltas argues that his claims do not relate back under Rule 15(c).

*4 Under Pennsylvania law, defamation related torts have a one year statute of limitations. 42 Pa.Con.Stat. § 5523 (Supp.1992). The defamation statute of limitations is distinct from the otherwise applicable general two year statute of limitations for other causes of actions. Title 42 Pa.Con.Stat. §

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1992 WL 396592 (E.D.Pa.)
**(Cite as: 1992 WL 396592 (E.D.Pa.))**

5524, the two year limitation, provides in relevant part:

Two Year Limitation

The following actions and proceedings must be commenced within two years:

(7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter.

42 Pa.Con.Stat. § 5524(7). In separating defamation from other tort claims, the legislature expressed a clear intention to keep the statute of limitations for defamation shorter than other tort causes of action. In discussing why the Pennsylvania legislature made such a distinction, the Superior Court stated in *Evans v. Philadelphia Newspapers, Inc.,* 601 A.2d 330 (Pa.Super.Ct.1991):

It is therefore clear that a longstanding policy exists in Pennsylvania to allow defendants in defamation cases an opportunity to make a prompt investigation of claims made against them while the evidence is still fresh in the minds of prospective witnesses. This is especially necessary for cases involving slander because the actual content of the statement could quickly fade from the minds of witnesses.

*Id.* at 333.

In *Evans* the Pennsylvania Superior Court held that while defamation is a separate and distinct action from tortious interference with contract, a trial court must first make a threshold determination whether the tortious interference claims existed solely because of the defamatory statements. *Id.* at 333–34. If the trial court finds that there is no independent basis for the tortious interference claims, absent defamatory statements, the court must apply the one year statute of limitations to *both* claims for

relief. *Id.*

In *Evans* the Superior Court held that a cause of action for tortious interference and libel, arising out of incorrect statements that the newspaper printed about the Philadelphia African–American Community, existed only because of the false statements. The court reasoned that because the injury to contract relationships arose only out of the defamatory statements, the tortious interference with contract claim was subject to the one year statute of limitations for libel and held:

Accordingly, the one year statute of limitation for defamation cannot be circumvented by cloaking such a cause of action in other legal raiment.

*Id.*

As support for its decision to leave the two torts separate, but apply the shorter statute of limitations to interference claims based on false statements, the court stated:

*5 without such a rule, any plaintiff having a claim for defamation concerning his business practices would be able to avoid the one year statute of limitations by simply designating the defamatory statement either disparagement or tortious interference, which have longer limitation periods.

*Id.* (citing *Wild v. Rarig,* 234 N.W.2d 775, 793 (Minn.1975), *cert. denied,* 424 U.S. 902 (1976)) (other citations omitted). The *Evans* decision instructs that the trial court must make its own independent determination, as a matter of law, whether the separate cause of action for tortious interference is separate and unique from the defamatory statements or exists entirely because of the statements. *Id.* at 335. If this Court concludes that the tortious interference with contract claim owes its existence solely to the defamatory statements, then the Court must apply the one year statute of limitations.[FN3]

This Court's review of the record indicates that the one year statute of limitation is appropriate for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1992 WL 396592 (E.D.Pa.)
**(Cite as: 1992 WL 396592 (E.D.Pa.))**

both the defamation claim (§ 5523(1)) and the tortious interference with contract claim. *See Evans,* 601 A.2d at 334–35. According to the Second Amended Complaint, Dr. Tsaltas made the defamatory comments "during the first two weeks of May, 1990." *Id.* at ¶ 21. Under § 5523(1), plaintiff would have had to file her complaint for defamation by May, 1991. Similarly, all of the tortious interference claims flow directly from the defamatory statements.

Plaintiff Hurst urges this Court to find that Dr. Tsaltas's reading of her personnel file, disclosing her CREOG residents scores, relating to the Avery Center that certain other physicians did not like to work with Dr. Hurst, and that the Avery Center should contact Dr. Beck, all constitute separate conduct beyond defamation and therefore is a separate tort. (Plaintiff's Memorandum at 15–16). Accordingly, this Court should then apply the two year statute of limitations. The Court finds, however, that each of these actions arise out of the alleged defamatory statements. While each of the foregoing actions might have had an impact on the plaintiff's business, the "gravamen" of plaintiff's complaint is that the foregoing conduct was detrimental because of its defamatory character. *Evans,* 601 A.2d at 333. This Court, consistent with *Evans,* will not "circumvent the statute of limitations by cloaking such a cause of action in other legal raiment." *Id.* at 334. Accordingly, this Court holds that the tortious interference with contract claims are controlled by the one year statute of limitations.

Herein lies the significance of whether the Second Amended Complaint "relates back" under Fed.R.Civ.P. 15(c). If the Second Amended Complaint, substituting Dr. Tsaltas's for Dr. Doe, does not relate back to the original filing on April 17, 1991, then the defamation count *and* the tortious interference with contract counts are time barred. *Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 174 (3d Cir.1977) (Rule 15(c) requirements must be complied with for relation back); *Evans,* 601 A.2d at 333. If the Second Amended Complaint does re-

late back then the Court must reach the merits of Dr. Hurst's complaint.

**\*6** The affidavits and the plaintiff's own admissions at 15–16 indicate that summary judgment must be granted in Dr. Tsaltas's favor on Count I for defamation. In this Court's Memorandum and Order of August 3, 1992, the Court granted plaintiff's Motion to Amend the Complaint and stated:

In the present case, Dr. Tsaltas and Dr. Beck were both members of the Obstetrics and Gynecology Department at Pennsylvania Hospital. While the Court cannot determine as a matter of law that the relationship of the parties provided actual notice, the relationship does provide an inference which discovery could bear out. This inference is that due to the size of the department and the fact that both doctors supervised the plaintiff, and only one was sued, Dr. Tsaltas did receive some notice of the pending action.

(Memorandum and Order at 8). The Court determined that under Rule 12(b)(6) the Court would not consider Dr. Tsaltas's affidavit or any other evidence "beyond the pleadings." *Id.* at 8–9.

Through discovery, Dr. Tsaltas has provided the Court with both an affidavit that he lacked knowledge of Dr. Hurst's suit and his deposition testimony is consistent with that representation. ( *See* Tsaltas' Deposition, Defendant's Exhibits C (affidavit) and D (deposition) at 137–38, had no knowledge of suit's nature as he and Dr. Beck were not close or "conversational colleagues."). Dr. Tsaltas has provided sufficient evidence to rebut the reasonable inference that this Court suggested in its Memorandum and Order of August 3, 1992.

Under Fed.R.Civ.P. 56(e), it is now the plaintiff's affirmative obligation to provide evidence that Dr. Tsaltas had notice within the 120 day period. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); Fed.R.Civ.P. 56(e). This evidence need not

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1992 WL 396592 (E.D.Pa.)
**(Cite as: 1992 WL 396592 (E.D.Pa.))**

be sufficient to prevail at trial, but must create a colorable dispute of fact that would preclude summary judgment. It is not sufficient under Fed.R.Civ.P. 56 to rely on the pleadings or the inference they produce under the standard of Rule 12(b)(6).

The Court finds that the plaintiff has failed to produce any evidence that Dr. Tsaltas had notice of this action within the 120 days that Rule 4(j) requires.[FN4] In fact, the plaintiff's own position in response to the Motion for Summary Judgment suggests that plaintiff has abandoned this theory. At pages 17 and 21 of the plaintiff's response, she argues:

> Moreover, Dr. Tsaltas received notice of these claims when Dr. Hurst filed her complaint in the Tsaltas action within the two year statute of limitations applicable to these torts.

*Id.* at 21. This abandonment of the argument that Dr. Tsaltas had notice within one year, coupled with his sworn affidavit (Defendant's Exhibit C), indicate that plaintiff has not found in discovery the information necessary to support notice that the Court granted her under 12(b)(6). Accordingly, Dr. Tsaltas's Motion for Summary Judgment on all Counts is GRANTED.[FN5]

### D. *Defendant Pennsylvania Hospital's Motion for Summary Judgment on Counts III and VI*

**\*7** Pennsylvania Hospital Moves for Summary Judgment on Counts III (Breach of Implied Covenants of Good Faith and Fair Dealing) and Count VI (Discrimination on the Basis of Sex and Pregnancy). Because both Counts raise material issues of fact that are still in dispute, Pennsylvania Hospital's Motion for Summary Judgment is DENIED.

### 1. *Implied Duties of Good Faith and Fair Dealing*

The plaintiff argues that she had a fixed term of employment with Pennsylvania Hospital, memorialized by four successive one year appointment letters to the residency program. (*See e.g.,* Plaintiff's Exhibits B and D (residence appointment letters)).

It is the plaintiff's theory, under the Pennsylvania Superior Court case of *Somers v. Somers,* 613 A.2d 1211 (Pa.Super.Ct.1992), that claims of good faith and fair dealing apply to every contract, including employment contracts. *Id.* at 1213.

Pennsylvania Hospital urges this Court to reject Dr. Hurst's claim as a matter of law because there is no *express* statement in the employment contract that obligates Pennsylvania Hospital to act with good faith. *Baker v. Lafayette College,* 504 A.2d 255 (Pa.Super.Ct.1986) (adopting requirement of good faith), *aff'd,* 532 A.2d 399 (Pa.1987). In *Baker* the Pennsylvania Superior Court held that Lafayette College was obliged to undertake its published tenure review policy with good faith as the duty of good faith review was implicit in the contract. 504 A.2d at 255. Pennsylvania Hospital argues that based on *Baker* there must be an express undertaking in the employment contract, to review the applicant, before a requirement of good faith can be read into the contract.

This Court, however, finds the latter interpretation of the good faith requirement in *Somers* to be a more accurate representation of Pennsylvania law. In *Somers* the Superior Court, after reviewing *Baker,* held that a duty of good faith and fair dealing may arise either under an express contractual provision or under the Pennsylvania doctrine of "necessary implication" where there is no express obligation in the contract. *Somers,* 613 A.2d at 1214 (citing *Frickert v. Deiter Bros. Fuel Co., Inc.,* 347 A.2d 701 (Pa.1975); *Slater v. Pearle Vision Center, Inc.,* 546 A.2d 676 (Pa.Super.Ct.1988)). The *Somers's* court described the doctrine as:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1992 WL 396592 (E.D.Pa.)
**(Cite as: 1992 WL 396592 (E.D.Pa.))**

613 A.2d at 1214 (citing *Frickert,* 347 A.2d at 708).

Further, when this Court reviewed the doctrine of "necessary implication" in *Paul J. Muller Assoc., Inc. v. Transamerica Occidental Life Insur. Co.,* No. 90–3128, 1992 WL 111283 (E.D.Pa. May 15, 1992) (Hutton, J.), it reached the same conclusion as the *Somers* court, namely that the law implies an agreement to effectuate the benefits of the parties' bargain. In *Muller* this Court stated:

*\*8* Where an obligation is within the contemplation of the parties at the time of contracting or the obligation is necessary to carry out the intentions of the parties, the court may imply that obligation.

*Muller,* at \*2 (citing *Slater v. Pearle Vision Center, Inc.,* 546 A.2d 676, 679 (Pa.Super.1988); *Diamon v. Penn Mutual Fire Ins. Co.,* 372 A.2d 1218, 1226 (Pa.Super.1977)). In footnote 2 of the *Muller* opinion this Court stated:
Analysis of the *Diamon* case and the *Slater* case indicate that the doctrine of necessary implication and the doctrine of good faith and fair dealing are based upon the same language in prior Pennsylvania Supreme Court opinions.

*Muller,* at \*2, n. 2.

Under Dr. Hurst's theory, she entered the residence program with the express purpose of obtaining references and ultimately obtaining a full time position as a practicing gynecologist. This Court concludes that the question of whether future employment is a material term of Dr. Hurst's entering the Pennsylvania Hospital residence program, is a question of fact that precludes summary judgment. If Dr. Hurst entered the contract with the intention of obtaining references, and this practice is "necessarily implicated" in such a contract, this Court cannot enter summary judgment. *See Somers* 613 A.2d at 1214 (good faith will vary from one contract to another). Accordingly, the defendant's Motion for Summary Judgment on Count III is

DENIED.

*2. Equitable Relief Under Title VII*

Pennsylvania Hospital next moves for Summary Judgment on Count VI, discrimination based on sex and pregnancy, pursuant to Title VII, 42 U.S.C. § 2000e–2 (Supp.1992). Pennsylvania Hospital argues that Title VII affords only equitable relief. *Hurst v. Beck,* 771 F.Supp. 118, 123 (E.D.Pa.1991) (citing 42 U.S.C. § 2000e–5(g)). It is Pennsylvania Hospital's theory that Dr. Hurst is no longer an employee, and therefore the hospital is not in a position to offer her any form of "equitable relief." (Defendant's Memorandum at 20). Dr. Hurst responds that she is seeking the equitable relief of "front pay" (the money she would have received from the Avery Center). (Plaintiff's Memorandum at 35).[FN6]

Title 42 U.S.C. § 2000e–5(g) (Supp.1992) provides:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

*\*9* 42 U.S.C. § 2000e–5(g)(1). This provision allows the district court broad discretion in fashioning an equitable remedy once the plaintiff proves an allegation of unlawful employment discrimination.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1992 WL 396592 (E.D.Pa.)
**(Cite as: 1992 WL 396592 (E.D.Pa.))**

*Green v. USX Corp.,* 843 F.2d 1511, 1531 n. 17 (3d Cir.1988), *vacated on other grounds,* 490 U.S. 1103 (1989).

Defendant Pennsylvania Hospital moves for Summary Judgment on the grounds that the plaintiff has no equitable remedy available to her under the statute. In support of its position, Pennsylvania Hospital urges this Court to follow the Fourth Circuit's 1992 case of *Polsby v. Chase,* 970 F.2d 1360 (4th Cir.1992). The *Polsby* court held that in the Fourth Circuit there is no equitable claim for "front pay" from the previous employer because such a calculation would be "too speculative" as a matter of law. *Id.* at 1366. The Fourth Circuit stated:

> Although a situation may arise where fashioning equitable relief presents no problems, the better solution is to allow the ex-employee to seek either state or other federal law remedies against the *former* employer or the same Title VII remedies against the *prospective* employer who based its decision not to employ the ex-employee on the fact that she sought Title VII relief from a prior employer.

> *Id.* (citations and footnote omitted).

This Court concludes, however, that the equitable remedy of "front pay" is the law of the Third Circuit. *Green* 843 F.2d at 1531; *Goss v. Exxon,* 747 F.2d 885 (3d Cir.1984); *Beck v. Hurst,* 771 F.Supp. 118, 123 (E.D.Pa.1991). As this Court stated in its earlier opinion:

> Awarding front pay is within the discretion of the court, *Dillon v. Coles,* 746 F.2d 998, 1006 (3d Cir.1984), and is an alternative to the remedy of reinstatement. *See Ezold v. Wolf, Block, Schorr and Solis-Cohen,* 758 F.Supp. 303, 306 (E.D.Pa.1991). Front pay is an equitable award for a reasonable future period required for the victim to reestablish her rightful place in the job market.

771 F.Supp. at 123. Nothing in the *Polsby* case persuades this Court that "front pay" should not continue to be the law within the Third Circuit. The plain language of 42 U.S.C. § 2000e-5(g)(1) states "back pay ... or any other equitable relief as the court deems appropriate." Absent a decision from the Third Circuit that excludes "front pay" as an appropriate equitable remedy under § 2000e-5, this Court will continue to follow *Goss* and consider "front pay" as a potential remedy. Accordingly, Pennsylvania Hospital's Motion for Summary Judgment on Count VI, on the theory that no equitable relief is available to Dr. Hurst, is DENIED.

*E. Dr. Beck's Motion for Summary Judgment on Count VI*

Dr. Beck's argument in favor of Summary Judgment on Count VI is identical to Pennsylvania Hospital's. As stated above, this Court rejects the argument that plaintiff Hurst is without any potential equitable remedy under Title VII. Therefore, Dr. Beck's Motion for Summary Judgment on Count VI is DENIED for the reasons stated above.

*F. Motion to Strike Jury Trial for Title VII Claims.*

*10 Finally, the defendants move this Court to strike Dr. Hurst's claim for a jury trial on her Title VII claims. The Supreme Court has firmly established that there is no right to a jury trial for Title VII claims. *Lehman v. Nakshian,* 453 U.S. 156 (1981); *United States v. Burke,* 112 S.Ct. 1867 (1991). The equitable nature of Title VII claims makes their resolution the sole province of the Court and not the jury. *See Lehman,* 453 U.S. at 164. Accordingly, the defendants' Motion to Strike Plaintiff's Demand for a Jury is GRANTED on Count VI of the Second Amended Complaint.

An appropriate Order follows.

ORDER

AND NOW, this 16th day of December, 1992, upon consideration of the Defendants' Motion for Partial Summary Judgment and the Plaintiff's response thereto, IT IS HEREBY ORDERED that the Defendants' Motion is GRANTED in part and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1992 WL 396592 (E.D.Pa.)
**(Cite as: 1992 WL 396592 (E.D.Pa.))**

DENIED in part.

IT IS FURTHER ORDERED that:

(1) Judgment is entered in favor of Defendant Dr. Theodore Tsaltas on Counts I, II, IV, and VI and against the Plaintiff Dr. Wendy R. Hurst;

(2) Dr. Theodore Tsaltas is DISMISSED from this action;

(3) Defendant Pennsylvania Hospital's Motion for Summary Judgment on Counts III and VI is DENIED; and

(4) Defendant Dr. William W. Beck's Motion for Summary Judgment on Count VI is DENIED.

FN1. Both the original complaint and the amended complaint named Dr. John Doe, rather than Dr. Theodore Tsaltas, as the third defendant. By Memorandum and Order date August 3, 1992, this Court allowed plaintiff Hurst to file her Second Amended Complaint substituting Dr. Tsaltas for Dr. Doe under Fed.R.Civ.P. 15(c).

FN2. The Second Amended Complaint seeks the following relief: Count I (defamation); Count II (Intentional Interference with Contractual Relations); Count III (Breach of Implied Covenants of Good Faith and Fair Dealing); Count IV (Intentional Interference with Prospective Contractual Relations); and Count VI (Discrimination on the Basis of Sex and Pregnancy). By Order dated July 16, 1992, in Civil Action No. 92–2845, the Court dismissed Count III against Tsaltas and by Order dated August 15, 1992, this Court dismissed Count V against all defendants (Intentional Infliction of Emotional Distress). *Hurst v. Beck,* 771 F.Supp. 118, 123 (E.D.Pa.1991).

FN3. This Court rejects the plaintiff's argument that *Loughrey v. Landon,* 381 F.Supp. 884, 886 (E.D.Pa.1974) controls as opposed to *Evans.* In *Loughrey,* the district court held that slander and tortious interference were two distinct causes of action and applied the longer statute of limitations. However, this Court sitting in diversity must apply the substantive law of the forum state as it exists today, not as it was in 1974. Although not a Pennsylvania Supreme Court decision, *Evans* serves as an accurate predictor of Pennsylvania law. *See Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 429, 465 (1967) (use appellate courts to predict state law). Finally, the *Evans* court rejected the same argument that the plaintiff advances, namely that two separate statutes of limitations apply.

FN4. The Defendants' Reply Brief cites eighteen depositions that have taken place since May 4, 1992. (Defendants' Reply Brief at 3 n. 2). All but two of the depositions are of other practicing physicians. Despite this discovery material, the plaintiff has been unable to show any colorable evidence that would preclude summary judgment on the question of notice.

FN5. Similarly, plaintiff Hurst had to have filed her Title VII complaint within 90 days of the Equal Employment Opportunity Commission's ("EEOC") issuance of the right-to-sue letter. 42 U.S.C. § 2000e–5(f)(1) (Supp.1992). Because Dr. Tsaltas did not receive notice until 1992, plaintiff Hurst failed to commence her Title VII suit against Dr. Tsaltas within the appropriate statute of limitations.

FN6. Dr. Hurst concedes in her brief that she is not seeking reinstatement or other similar equitable relief from Pennsylvania Hospital under 42 U.S.C. § 2000e–5(g). (Memorandum at 35).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1992 WL 396592 (E.D.Pa.)
**(Cite as: 1992 WL 396592 (E.D.Pa.))**

E.D.Pa.,1992.
Hurst v. Beck
Not Reported in F.Supp., 1992 WL 396592
(E.D.Pa.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**MILLER, KISTLER & CAMPBELL**
By:   Lisa M. Welsh (Pa. 307382)
720 South Atherton Street, Suite 201
State College, PA 16801-4669
(814) 234-1500 (phone)
(814) 234-1549 (facsimile)

**DECHERT LLP**
By:   Robert C. Heim (Pa. 15758)
       Michael L. Kichline (Pa. 62293)
       Asha T. Mehrotra (Pa. 315176)
       William T. McEnroe (Pa. 308821)
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
(215) 994-4000 (phone)
(215) 994-2222 (facsimile)              *Attorneys for Defendants Louis J.*
                                        *Freeh and*
                                        *Freeh Sporkin & Sullivan, LLP*

## CERTIFICATE OF SERVICE

I, Asha T. Mehrotra, hereby certify that I caused to be served on

November 12, 2013, a true and correct copy of Opposition of Defendants to

Motion of Plaintiff to Stay Civil Proceedings by first-class mail upon the

following:

> Elizabeth K. Ainslie, Esq.
> SCHNADER HARRISON
> SEGAL & LEWIS LLP
> 1600 Market Street, Suite 3600
> Philadelphia, PA 19103-7286
> *Attorney for Plaintiff*

> /s/ Asha T. Mehrotra
> Asha T. Mehrotra

16