IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | * | **MDL No. 2179** |
| Horizon" in the Gulf of Mexico, | * | |
| On April 20, 2010 | * | **Section: J** |
| | * | |
| *This filing relates to: All Cases* | * | **District Judge Carl J. Barbier** |
| | * | |
| (Including Civil Action No. 12-970) | * | **Magistrate Judge Shushan** |
| | * | |
| | * | |

------------------------------------------------------------------

**QUALIFIED PROTECTIVE ORDER APPROVING THE PROCEDURE APPLICABLE TO HEALTHCARE BUSINESS CLAIMS SUBMITTED PURSUANT TO THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT AND AUTHORIZING THE DISCLOSURE OF IDENTIFIABLE CONFIDENTIAL HEALTH INFORMATION**

**CONSIDERING** the request by Patrick A. Juneau, the Claims Administrator of the Economic and Property Damages Settlement (the "Claims Administrator") for entry of an Order in aid of implementation of the Court Supervised Settlement Program, pursuant to this Court's continuing and exclusive jurisdiction under Section 18.1 of the Economic and Property Damages Settlement Agreement as amended on May 2, 2012 (the "Settlement Agreement") and the December 21, 2012 Order Granting Final Approval of the Settlement Agreement (Document No. 8139); and

**FURTHER CONSIDERING** the Declaration of Lynn C. Greer that was submitted to the Court in support of the Claims Administrator's request;

**IT IS HEREBY ORDERED** as follows:

1. The attached procedure (the "Procedure"), which the Court finds is necessary to accomplish the claims process pursuant to the Economic and Property Damages Settlement Agreement as it pertains to Healthcare Business Claimants satisfying causation through the customer mix tests, is approved as Court Approved Procedure No. 4.

2. Pursuant to the Procedure and based upon the Claims Administrator's showing that (a) Patient Identifiable Confidential Health Information as set forth below is the minimum necessary for a full and fair review of Healthcare Business Economic Loss claims satisfying causation through the customer mix test, and (b) Security Program Requirements are in place to protect the confidentiality and privacy interests of the Claimants and their patients, the Court

hereby authorizes Healthcare Business Claimants to disclose to the Court-Supervised Settlement Program Patient Identifiable Confidential Health Information required by the Claims Administrator in the implementation of the Settlement Agreement, including patient names, initials, Social Security numbers, medical record numbers, health plan beneficiary numbers, account numbers, and other unique identifying numbers, characteristics or codes that could be used to identify an individual patient; street names, numbers, city, state, and zip codes for individual patients; telephone numbers and facsimile numbers; electronic mail addresses; device identifiers and serial numbers; biometric identifiers; descriptions of procedures and/or procedure codes; and any other personal or confidential identifiers relating to the services provided to individual patients.

      3.    The use of Patient Identifiable Confidential Health Information for any purposes other than to process Healthcare Business claims is prohibited.  All Patient Identifiable Confidential Health Information (including copies made) produced by a Healthcare Business Claimants are subject to the document retention/destruction requirements otherwise applicable to Confidential Protected Information submitted by Business Economic Loss Claimants.

      **SIGNED** at New Orleans, Louisiana, this <u>19</u> day of <u>December</u>, 2013.

      _____
      United States District Judge

| **DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT COURT APPROVED PROCEDURE** | | | |
|---|---|---|---|
| Court Approved Procedure Number | 4 | Effective Date | December 19, 2013 |
| **Subject** | Procedure Applicable to Evidence Submitted in Support of Healthcare Business Claims | | |

1. *Defined Terms.* All undefined terms used in this Procedure shall have the same meanings given to such terms in the Economic and Property Damages Settlement Agreement (as amended on May 2, 2012) ("Settlement Agreement").

2. *The Purpose of this Procedure.* Exhibits 4B and 7 of the Settlement Agreement sets forth what documentation is required to establish causation for those Business Economic Loss Claimants for whom causation is not presumed. (Rec. Doc. 6430-9.) Compliance with the documentation requirements under Exhibits 4B and 7 will require certain claimants in the healthcare industry who may be "covered entities" as defined in 45 C.F.R. § 160.103 ("Healthcare Business Claimants") or who may otherwise be subject to state law confidentiality requirements to provide "protected health information" as defined in 45 C.F.R. § 160.103 ("HIPAA-Protected Information") that is ordinarily prohibited from disclosure by "covered entities" under the Standards for Privacy of Individually Identifiable Health Information 45 C.F.R. Part 160 and Part 164, Subparts A and E, implementing the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) ("HIPAA") and/or other health information privacy laws and regulations. Healthcare Business Claimants include, without limitation, any Business Economic Loss Claimants who would be required to submit patient identifiable information to support their claims in accordance with Exhibits 4B and 7, including but not limited to entities with a NAICS Code beginning with 621, 622, or 623 (Medical and Health Service Providers) or with a NAICS Code beginning with 624 (Social Services), or entities in NAICS Code 524114 (Health Insurance Providers), NAICS Code 446199 (Retailers of Medical Equipment), or NAICS Code 446110 (Pharmacies and Drug Stores).

3. *Healthcare Business Claimants.* For purposes of this Order, Healthcare Business Claimants include any Business Economic Loss Claimants: (a) with a NAICS Code beginning with 621, 622, or 623 (Medical and Health Service Providers); (b) with a NAICS Code beginning with 624 (Social Services); (c) in NAICS Code 524114 (Health Insurance Providers); (d) in NAICS Code 446199 (Retailers of Medical Equipment); or (e) in NAICS Code 446110 (Pharmacies and Drug Stores).

4. *Authorization to Disclose Confidential Health Information.* The Court hereby directs Healthcare Business Claimants to disclose to the Court-Supervised Settlement Program Confidential Health Information required by the Claims Administrator in the implementation of the Settlement Agreement, including patient names, initials, Social Security numbers, medical record numbers, health plan beneficiary numbers, account numbers, and other unique identifying numbers, characteristics or codes that could be used to identify an individual patient; street names, numbers, city, state, and zip codes for individual patients; telephone numbers and facsimile numbers; electronic mail addresses; device identifiers and serial numbers; biometric

1

identifiers; descriptions of procedures and/or procedure codes; and any other personal or confidential identifiers relating to the services provided to individual patients.

**5.** *Handling of Confidential Health Information.* Any Patient Identifiable Confidential Health Information received by the Claims Administrator shall be governed by the Claims Administrator's Procedure Regarding Access to Claims Information and Data and any Order by this Court regarding the confidentiality of claims information. Authorized recipients of Patient Identifiable Confidential Health Information under the terms of the Claims Administrator's Procedure Regarding Access to Claims Information and Data and any Order by this Court regarding the confidentiality of claims information shall enforce the Information Security Requirements set forth in their respective Agreements with the Claims Administrator and take all appropriate steps to protect the confidentiality of the Patient Identifiable Confidential Health Information.

**6.** *Implementation of this Procedure.* The Claims Administrator has the discretion to administer any steps necessary to implement this process.

**7.** *Amendments to this Procedure.* Any amendments to this procedure shall be subject to Court approval.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2012 | MDL NO. 2179<br><br>SECTION J |
| Applies to: *All Cases* | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

### DECLARATION OF LYNN C. GREER

1. ***Personal Information.*** My name is Lynn C. Greer. I am a founding partner of BrownGreer PLC ("BrownGreer"), located at 250 Rocketts Way, Richmond, Virginia.

2. ***Personal Knowledge.*** The matters set forth in this Declaration are based upon my personal knowledge, experience, and training, as well as facts related to me in my capacity as a supervising partner for BrownGreer's work on the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Program").

3. ***General Description of BrownGreer.*** BrownGreer is a firm experienced in the legal and administrative aspects of the design, approval, and implementation of claims facilities to provide damages payments, medical monitoring, or other benefits for the resolution of mass claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicle.

4. ***Role in the Program.*** BrownGreer provides services to Patrick Juneau, the Claims Administrator of the Court Supervised Settlement Program ("CSSP") established under the Program. Among other services, BrownGreer assisted in creating the process for the review of claims received by the Program, procured and trained staff needed to process the claims, and procured and trained the staff in the Claimant Assistance Centers ("CACs") used in the Program.

5. ***Defined Terms.*** All capitalized terms used in this Declaration that are defined in the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Settlement Agreement") shall have the meanings given to them in the Settlement Agreement.

### A. Overview of the Customer Mix Test.

6. ***How the Customer Mix Test Works.*** Exhibits 4B and 7 of the Settlement Agreement set forth the various Causation Requirements that claimants with general Business Economic Loss ("BEL") claims and Start-Up Business Economic Loss ("Start-Up BEL") claims,

{00243855-1}
1

respectively, may use to establish Causation. Claimants with BEL and/or Start-Up BEL claims must establish Causation under these provisions of the Settlement Agreement to be eligible for a Compensation calculation, unless the claimant's business is in an industry and/or Economic Loss Zone for which Causation is presumed. One of the ways that such claimants can establish Causation is referred to in Exhibits B and C of Exhibits 4B and 7 as the Customer Mix Test.

Claimants with BEL claims can satisfy the Customer Mix Test in one of two ways:

(a) First, a claimant with a BEL claim can satisfy the Customer Mix Test by demonstrating a decline of 10% in the share of total revenue generated by non-local customers[1] over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Shaped Revenue Pattern or the Decline-Only Revenue Pattern, as applicable, compared to the same three consecutive month period in 2009.

(b) Second, a claimant with a BEL claim that has customers in Zones A-C can satisfy the Customer Mix Test by demonstrating a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Shaped Revenue Pattern or the Decline-Only Revenue Pattern, as applicable, compared to the same three consecutive month period in 2009.

Claimants with BEL claims who satisfy the Customer Mix Test must also satisfy additional requirements to establish Causation. Under the Modified V-Shaped Revenue Test, the claimant must satisfy the following two requirements: (1) the business revenue must show an aggregate decline of a specified percentage[2] in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant, and an aggregate increase of a specified percentage[3] in total revenues over the same period of three consecutive months in 2011 compared to 2010 (the "First Prong of the Modified V-Shaped Revenue Test"); and (2) the Customer Mix Test. Under the Decline-Only Revenue Test, the claimant must satisfy the following three requirements: (1) The business revenue must show an aggregate decline of a specified percentage[4] over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant (the "First Prong of the Decline-Only Revenue Test"); (2) specific documentation identifying factors outside the control of the claimant that prevented recovery of revenues in 2011 (the "Second Prong of the Decline-Only Revenue Test"); and (3) the Customer Mix Test.

---

[1] Exhibits 4B and 7 of the Settlement Agreement state that a customer shall be considered a "non-local customer" if the customer resides more than 60 miles from a claimant business location.

[2] The minimum percentage of decline for the Modified V-Shaped Revenue Pattern Test is 5% for businesses in Economic Loss Zones B and C and 10% for businesses located in Economic Loss Zone D.

[3] The minimum percentage of increase for the Modified V-Shaped Revenue Pattern Test is 5% for businesses in Economic Loss Zones B and C and 7% for businesses located in Economic Loss Zone D.

[4] The minimum percentage of decline for the Decline-Only Revenue Pattern Test is 8.5% for businesses in Economic Loss Zones B and C and 15% for businesses located in Economic Loss Zone D.

{00243855-1}
2

434701
12/19/13

Claimants with Start-Up BEL claims can satisfy the Customer Mix Test in one of two ways:

(a) First, a claimant with a Start-Up BEL claim that has customers in Zones A-C can satisfy the Customer Mix Test by demonstrating an aggregate increase of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of three consecutive months from May 2011 to April 2012 as selected by the claimant for the Upturn Revenue Pattern, compared to the same three consecutive month period from May 2010 to April 2011.

(b) Second, a claimant with a Start-Up BEL claim that meets the Tourism Definition or the Seafood Distribution Chain Definition can satisfy the Customer Mix Test by demonstrating an aggregate increase of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May 2011 to April 2012 as selected by the claimant for the Upturn Revenue Pattern, compared to the same three consecutive month period from May 2010 to April 2011.

Claimants with Start-Up BEL claims who satisfy the Customer Mix Test must also satisfy additional requirements to establish Causation. Under the Upturn Revenue Pattern Plus Test, the claimant must satisfy the following two requirements: (1) the claimant must demonstrate an aggregate increase of a specified percentage[5] in total revenues over a period of three consecutive months from May 2011 to April 2012 as selected by the claimant (the "First Prong of the Upturn Revenue Test"); and (2) the Customer Mix Test.

**7.** *What Information the Settlement Agreement Requires to Apply the Customer Mix Test.* To perform the Customer Mix Test on BEL claims, the Program must have the claimant's physical address, the physical address of the claimant's customers, and the amount of revenue generated by each customer (or at least a percentage of customers to establish the required share in total revenue) in at least three consecutive months from May-December 2010 and the same months in 2009[6]. Exhibit 4B of the Settlement Agreement states that claimants can demonstrate the requirements of the Customer Mix Test by using information reflected in the following types of documents:

(a) Customer credit card receipts or other contemporaneously maintained records of payment;
(b) Customer registration logs (*e.g.*, hotel registries);
(c) Documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
(d) Business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

---

[5] The minimum percentage of increase for the Upturn Revenue Pattern Plus Test is 8.5% for businesses in Economic Loss Zone B, 10% for businesses in Economic Loss Zone C, and 15% for businesses located in Economic Loss Zone D.

[6] Start-Up claims require the amount of revenue generated by customers in at least a period of three consecutive months from May 2011 to April 2012 and the same months from May 2010 to April 2011.

{00243855-1}
3

434701
12/19/13

Exhibit 7 of the Settlement Agreements adds the following types of documents to this list for Start-Up BEL claims in Economic Loss Zones B and C:

> Any other documentation providing evidence of the portion of the claimant's revenue projected to be generated by customers in Zones A-C versus outside of Zones A-C during the Compensation Period. The claimant must be able to demonstrate that the projections were prepared prior to the DWH Spill and provided to and utilized by a financial institution extending credit to the Start-Up Business.

8. *Who Must Satisfy a Customer Mix Test.* Claimants with BEL claims must satisfy the Customer Mix Test if: (1) the claimant's industry designation and/or Economic Loss Zone do not entitle the claimant to a presumption of Causation, as set forth in Exhibit 4B of the Settlement Agreement; (2) the claimant satisfies the First Prong of the Modified V-Shaped Revenue Test or the First and Second Prongs of the Decline-Only Revenue Test; and (3) the claimant fails to establish Causation through any other method prescribed in Exhibit 4B.

Claimants with Start-Up BEL claims must satisfy the Customer Mix Test if: (1) the claimant's industry designation and/or Economic Loss Zone do not entitle the claimant to a presumption of Causation, as set forth in Exhibit 7 of the Settlement Agreement; (2) the claimant satisfies the First Prong of the Upturn Revenue Test; and (3) the claimant fails to establish Causation through any other method prescribed in Exhibit 7.

9. *How many Claimants Require Analysis Under the Customer Mix Test.*

As of October 14, 2013, there were approximately 1,641 total BEL and Start-Up BEL claims that required a Customer Mix Test analysis to establish Causation. The table below shows a breakdown of these claims:

| | **Causation Test Requiring Customer Mix Analysis** | **No. of Claims** |
|---|---|---|
| 1. | Potential Pass for Modified V-Shaped Revenue Pattern (BEL) | 780 |
| 2. | Potential Pass for Decline-Only Revenue Pattern (BEL) | 206 |
| 3. | Potential Pass for both Modified V-Shaped and Decline-Only Revenue Patterns (BEL) | 12 |
| 4. | Potential Pass for Upturn Revenue Pattern (Start-Up) | 643 |
| 5. | **Total** | **1,641** |

434701
12/19/13

Of these, 143 have NAICS Codes associated with the healthcare industry[7]. The table below shows a breakdown of this sub-set of these claims:

|   | Causation Test Requiring Customer Mix Analysis | No. of Claims |
|---|---|---|
| 1. | Potential Pass for Modified V-Shaped Revenue Pattern (BEL) | 92 |
| 2. | Potential Pass for Decline-Only Revenue Pattern (BEL) | 13 |
| 3. | Potential Pass for both Modified V-Shaped and Decline-Only Revenue Patterns (BEL) | 1 |
| 4. | Potential Pass for Upturn Revenue Pattern (Start-Up) | 37 |
| 5. | Total | 143 |

These numbers do not include claims with a Claim Status indicating that the claim has been closed, withdrawn, is a duplicate, has received payment, has been reclassified, or is a Non-Headquarters Facility from a Consolidated Multi-Facility Business that would not require a separate Causation analysis. They do, however, include claims that have received a Denial or Eligibility Notice, but have not yet reached a finite state (*i.e.*, the claimant could still request Re-Review or Reconsideration, the result of which could affect the eligibility of the claim).

**10.** *Necessity of Patient Identifiable Information to Apply Customer Mix Test on Healthcare Business Claims.* Patient identifiable information is necessary to perform the Customer Mix Test on healthcare business claims for various reasons. Patient address information is required for verifying the Economic Loss Zone of each patient and the distance from each patient to the healthcare business claimant, which information is a required component of the Customer Mix Test. The amount of revenue that the healthcare business claimant can attribute to each patient is also required for purposes of determining the share of total revenue generated by non-local customers and the share of total revenue generated by customers located in Zones A-C. Additionally, health insurer/payor information may be required for certain claimants, at the discretion of the Claims Administrator, for purposes of processing and verifying amounts and dates of receipts and other records of payment. Descriptions of procedures, diagnoses codes, and biometric identifiers may be required for certain claimants, at the discretion of the Claims Administrator, for the purpose of: (a) assessing and verifying the reasonableness/appropriateness of the type of medical service by the healthcare business claimant; (b) assessing and verifying whether the medical service is consistent with the diagnosis; and (c) assessing and verifying the reasonableness/appropriateness of the charge for the medical service rendered. In addition, other forms of documentation that is not specifically enumerated in this section may be required by the Claims Administrator as he determines is reasonably necessary.

The Claims Administrator originally announced Policy 326 v.1 (HIPAA – Policy Applicable to Evidence Submitted in Support of Healthcare Business Claims) in an alert

---

[7] This includes entities: (a) with a NAICS Code beginning with 621, 622 or 623 (Medical and Health Service Providers); (b) with a NAICS Code beginning with 624 (Social Services); (c) in NAICS Code 524114 (Health Insurance Providers); or (d) in NAICS Code 446199 (Retailers of Medical Equipment).

{00243855-1}
5

434701
12/19/13

circulated to the Parties on January 31, 2013.  The language of this policy is attached as Exhibit A.  It was later contended that the policy exceeded the Claims Administrator's authority because it was read as eliminating a mandatory document requirement of the Customer Mix Test, in violation of Exhibit 4B by allowing a healthcare provider to assert it has satisfied a Customer Mix Test without submitting the underlying contemporaneous documentation substantiating the assertion.  It was also contended that the policy might allow fraudulent claims submissions.  In light of these concerns, the Claims Administrator has concluded that it is desirable to revise and update this policy.

### B. **Precautions to Restrict Use of Patient Identifiable Information.**

11. *Duty to Protect Confidential Duty to Protect Confidential Claims Information.* Both the Order Regarding the Confidentiality of Claims Information of the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Confidentiality Order") entered on June 29, 2012, and the Agreement to Provide Claims Administration and Staffing Services between the Claims Administrator and BrownGreer (the "Vendor Agreement") executed on May 13, 2013, contain specific provisions to protect the confidentiality of claims information and limit its use solely for the sole purpose of aiding the Claims Administrator in the implementation of the Settlement Agreement.  The CSSP has confirmed my understanding that that these or similar provisions are included in the vendor agreements between the CSSP and each vendor involved in the administration of the Program (each "Vendor" or "Vendors"), including but not limited to the Claims Administrator's Accountant Reviewers.

12. *The Confidentiality Order.*  On June 29, 2012, the Court entered the Confidentiality Order.  The Confidentiality Order governs access to and use of "Claims Information" which includes all the GCCF claims data and files, as well as all information received or generated relating to DWH claims.  All Claims Information must be kept confidential and only disclosed as allowed by the Confidentiality Order and subsequent Court orders.  It also controls the Claims Administrator's duties to preserve the confidentiality of DWH claims information.

13. *Claims Administrator's Use of Confidential Information.*  Paragraph 7 of the Confidentiality Order allows the Claims Administrator to use confidential Claims Information as he deems necessary for the performance of his duties under the Settlement Agreement and, in his discretion, to disclose such information to Vendors and other persons and entities engaged by the Claims Administrator to aid in the implementation of the Settlement Agreement.  Additionally, the Confidentiality Order allows the Claims Administrator to provide Claims Information to certain federal and state agencies in connection with their official responsibilities and in response to subpoenae or other legal process.

14. *The Use of Claims Information.*  Pursuant to Paragraph 13 of the Confidentiality Order, persons receiving Claims Information can only use it for the purpose for which they were allowed to receive the information.  They may only disclose it to others as is reasonably necessary for the implementation of such purpose, and those persons receiving the Claims

Information must take the necessary steps to preserve the confidentiality of the Claims Information and only use the Claims Information for the purpose for which they received it.

15. *Certifications Required of Certain Recipients of Claims Information.* Before the Claims Administrator discloses Claims Information to Vendors and other persons and entities aiding in the implementation of the Settlement Agreement, Paragraph 14 of the Confidentiality Order requires that every recipient of such information read the Confidentiality Order and then sign a Certification agreeing to be bound by the Order, to use the Claims Information only for the purpose for which the recipient was permitted access to such information and to keep the Claims Information confidential and not disclose it to any party not necessary for the performance of such authorized purpose or as required by law.

16. *Claims Administration Vendor Responsibilities.* Each Vendor is responsible for ensuring that everyone on its staff who has access to Claims Information has signed a Certification and that it has internal controls and protocols to limit access to and use of Claims Information by members of its staff and others to whom it discloses Claims Information.

17. *Master Log of Certifications.* Paragraph 14 also requires the Claims Administrator to maintain a log of all recipients who have executed a Certification. BrownGreer collects spreadsheets from Vendors containing Certification compliance information and compiles that information into the Master Log for the Court of all recipients of Claims Information who have executed a Certification, including the Claims Administrator's staff, Vendors, Appeal Panelists and recipients of Claims Information including individuals from the National Pollution Funds Center, the Department of Justice and other law enforcement officials, and individuals receiving Claims Information in response to a subpoena or other legal process.

18. *Confidentiality Under the Vendor Agreement.* Pursuant to the terms of each Vendor Agreement, the Vendor agrees that the Claims Files, Claimant Information and any other personally identifiable or otherwise protected information obtained by a Vendor is confidential in nature and subject to protection under Applicable Law. The Vendor also agrees that it shall use the confidential information solely for the performance of its obligations under the Vendor Agreement.

19. *The Information Security and Data Protection Requirements.* Additionally, each Vendor Agreement obligates each Vendor to comply with the Information Security Program Requirements set forth in the Vendor Agreement (or the Exhibits attached thereto) and participate in Security Audits to confirm its compliance with those requirements. The policy dictates requirements for collecting, using, maintaining and disclosing information, for data security to protect the security, integrity and accessibility of nonpublic personal financial and health information and other confidential data, for virus protection, and for security assessment tests to protect against unauthorized access and identify security weaknesses. The Data Protection Section of the policy describes in detail what the Vendor must do to protect confidential information and prevent unauthorized use of and access to confidential information. Adherence to these requirements ensures that all information gathered in connection with the Claims Services is treated appropriately with regard for confidentiality and privacy and in

{00243855-1}
7

434701
12/19/13

compliance with all Applicable Law, and that all disclosures of information are restricted to the minimum necessary required for the business needs of claims processing.

20. *HIPAA Expertise.* BrownGreer employs two attorneys who are very familiar with the HIPAA Privacy Regulations and experienced in guiding Health Care Providers and Health Insurers in complying with those regulations.

21. *Protections Over Confidential Claims Information Submitted for Business Healthcare Claims.* Vendor compliance with the requirements in the Confidentiality Order and the Vendor Agreement ensures that any information protected under the Health Insurance Portability and Accountability Act ("HIPAA") and other applicable privacy laws, and submitted to the CSSP in support of a Healthcare Business claim will be kept confidential and only disclosed to others as is reasonably necessary to aid the Claims Administrator in the implementation of the Settlement Agreement. Additionally, the CSSP is subject to the document retention policies approved by the Court. It is my understanding that as the CSSP nears completion, the Claims Administrator will request a Court Order setting forth the proper means of transfer or disposal of all claimant-provided documentation and records.

I, Lynn C. Greer, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on this 19th day of December, 2013.

_____
Lynn C. Greer

{00243855-1}
8

434701
12/19/13

**FINAL POLICY**

**POLICY 326: BUSINESS ECONOMIC LOSS: POLICY APPLICABLE TO EVIDENCE SUBMITTED IN SUPPORT OF HEALTHCARE BUSINESS CLAIMS**

A. **Introduction.**

Exhibits 4B and 7 of the Settlement Agreement set forth the various Causation Requirements that claimants with general Business Economic Loss ("BEL") claims and Start-Up Business Economic Loss ("Start-Up BEL") claims, respectively, may use to establish Causation. Claimants with BEL and/or Start-Up BEL claims must establish Causation under these provisions of the Settlement Agreement to be eligible for a Compensation calculation, unless the claimant's business is in an industry and/or Economic Loss Zone for which Causation is presumed. One of the ways that such claimants can establish Causation is referred to in Exhibits B and C of Exhibits 4B and 7 as the Customer Mix Test.

Claimants with BEL claims can satisfy the Customer Mix Test in one of two ways:

(a) First, a claimant with a BEL claim can satisfy the Customer Mix Test by demonstrating a decline of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Shaped Revenue Pattern or the Decline-Only Revenue Pattern, as applicable, compared to the same three consecutive month period in 2009.

(b) Second, a claimant with a BEL claim that has customers in Zones A-C can satisfy the Customer Mix Test by demonstrating a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Shaped Revenue Pattern or the Decline-Only Revenue Pattern, as applicable, compared to the same three consecutive month period in 2009.

Claimants with BEL claims who satisfy the Customer Mix Test must also satisfy additional requirements to establish Causation. Under the Modified V-Shaped Revenue Test, the claimant must satisfy the following two requirements: (1) the business revenue must show an aggregate decline of a specified percentage in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant, and an aggregate increase of a specified percentage in total revenues over the same period of three consecutive months in 2011 compared to 2010 (the "First Prong of the Modified V-Shaped Revenue Test"); and (2) the Customer Mix Test. Under the Decline-Only Revenue Test, the claimant must satisfy the following three requirements: (1) The business revenue must show an aggregate decline of a specified percentage over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant (the "First Prong of the Decline-Only Revenue Test"); (2) specific documentation identifying factors outside the control of the claimant that

prevented recovery of revenues in 2011 (the "Second Prong of the Decline-Only Revenue Test"); and (3) the Customer Mix Test.

Claimants with Start-Up BEL claims can satisfy the Customer Mix Test in one of two ways:

(a) First, a claimant with a Start-Up BEL claim that has customers in Zones A-C can satisfy the Customer Mix Test by demonstrating an aggregate increase of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of three consecutive months from May 2011 to April 2012 as selected by the claimant for the Upturn Revenue Pattern, compared to the same three consecutive month period from May 2010 to April 2011.

(b) Second, a claimant with a Start-Up BEL claim that meets the Tourism Definition or the Seafood Distribution Chain Definition can satisfy the Customer Mix Test by demonstrating an aggregate increase of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May 2011 to April 2012 as selected by the claimant for the Upturn Revenue Pattern, compared to the same three consecutive month period from May 2010 to April 2011.

Claimants with Start-Up BEL claims who satisfy the Customer Mix Test must also satisfy additional requirements to establish Causation. Under the Upturn Revenue Pattern Plus Test, the claimant must satisfy the following two requirements: (1) the claimant must demonstrate an aggregate increase of a specified percentage in total revenues over a period of three consecutive months from May 2011 to April 2012 as selected by the claimant (the "First Prong of the Upturn Revenue Test"); and (2) the Customer Mix Test.

To perform the Customer Mix Test on BEL claims, the Program must have the claimant's physical address, the physical address of the claimant's customers, and the amount of revenue generated by each customer (or at least a percentage of customers to establish the required share in total revenue) in at least three consecutive months from May-December 2010 and the same months in 2009. Exhibit 4B of the Settlement Agreement states that claimants can demonstrate the requirements of the Customer Mix Test by using information reflected in the following types of documents:

(a) Customer credit card receipts or other contemporaneously maintained records of payment;
(b) Customer registration logs (*e.g.*, hotel registries);
(c) Documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
(d) Business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

Exhibit 7 of the Settlement Agreements adds the following types of documents to this list for Start-Up BEL claims in Economic Loss Zones B and C:

Any other documentation providing evidence of the portion of the claimant's revenue projected to be generated by customers in Zones A-C versus outside of Zones A-C during the Compensation Period. The claimant must be able to demonstrate that the projections were prepared prior to the DWH Spill and provided to and utilized by a financial institution extending credit to the Start-Up Business.

Claimants with BEL claims must satisfy the Customer Mix Test if: (1) the claimant's industry designation and/or Economic Loss Zone do not entitle the claimant to a presumption of Causation, as set forth in Exhibit 4B of the Settlement Agreement; (2) the claimant satisfies the First Prong of the Modified V-Shaped Revenue Test or the First and Second Prongs of the Decline-Only Revenue Test; and (3) the claimant fails to establish Causation through any other method prescribed in Exhibit 4B.

Claimants with Start-Up BEL claims must satisfy the Customer Mix Test if: (1) the claimant's industry designation and/or Economic Loss Zone do not entitle the claimant to a presumption of Causation, as set forth in Exhibit 7 of the Settlement Agreement; (2) the claimant satisfies the First Prong of the Upturn Revenue Test; and (3) the claimant fails to establish Causation through any other method prescribed in Exhibit 7.

As of October 14, 2013, there were approximately 1,641 total BEL and Start-Up BEL claims that required a Customer Mix Test analysis to establish causation. Of these, 143 have NAICS Codes associated with the healthcare industry (not including claims with NAICS Code 446110 (Pharmacies and Drug Stores)). The Claims Administrator originally announced Policy 326 v.1 (HIPAA – Policy Applicable to Evidence Submitted in Support of Healthcare Business Claims) in an alert circulated to the Parties on January 31, 2013. The language of Policy 326 v.1 permitted the submission of a notarized affidavit executed by an authorized representative of the Healthcare Business Claimant with personal knowledge of the information set forth in the affidavit. The affidavit was required to contain certain coded information concerning individual patients; the dates of service for each individual patient; the dollar amount of business revenue, net of contractual allowances, attributable to each of the individual patients; and the locale of each individual patient, denominated either by zone or as non-local. The affidavit was prohibited from including patient identifiable information.

It was later contended that the policy exceeded the Claims Administrator's authority because it was read as eliminating a mandatory document requirement of the Customer Mix Test, in violation of Exhibit 4B by allowing a healthcare provider to assert it has satisfied a Customer Mix Test without submitting the underlying contemporaneous documentation substantiating the assertion. It was also contended that the policy might allow fraudulent claims submissions. In light of these concerns, the Claims Administrator has concluded that it is desirable to revise and update this policy.

**B. Adoption of Policy 326 v.2.**

    **1. Overview.**

This policy is designed to implement the Causation Requirements for Healthcare

3

Business Claimants located in Zone B, Zone C and/or Zone D, and to provide specific rules applicable to the disclosure and handling of identifiable confidential health information received by the Claims Administrator consistent with the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. 1320d et seq. (commonly referred to as "HIPAA") and other applicable health information privacy laws and regulations.  The general Causation Requirements for Businesses Economic Loss set forth in Exhibits 4B and 7 to the Deepwater Horizon Economic and Property Damages Settlement Agreement as amended on May 2, 2012 ("Exhibits 4B and 7"), remain in full force and effect.  This policy applies vertically from the Claims Administrator's office down through all contractors, subcontractors and vendors associated with the Deepwater Horizon Economic Claims Center (the "DHECC") and it will remain in force and effect for the duration of the DHECC claims process.

2. **Scope of this Policy.**

This policy applies to all emails and other electronic files or databases, paper documents, notes, calendars, logs, forms, worksheets, computations, or other materials in any physical or electronic form received by the Claims Administrator from Healthcare Business Claimants, particularly those located in Zone B, Zone C and/or Zone D that submit evidence in an attempt to satisfy either the (a) Non-Local Customer Mix Test and/or the (b) Zones A-C Customer Mix Test ("Customer Mix Tests"), as set forth in Exhibits 4B and 7.

3. **Healthcare Business Claimants.**

For purposes of this policy, a Healthcare Business Claimant is an entity:

(a) With a NAICS Code beginning with 621, 622 or 623 (Medical and Health Service Providers);

(b) With a NAICS Code beginning with 624 (Social Services);

(c) In NAICS Code 524114 (Health Insurance Providers);

(d) In NAICS Code 446199 (Retailers of Medical Equipment); or

(e) In NAICS Code 446110 (Pharmacies and Drug Stores).

4. **General Requirements of the Customer Mix Tests.**

Pursuant to Exhibit 4B of the Settlement Agreement, claimants satisfying Causation through the Customer Mix Tests must provide:

(a) Customer credit card receipts or other contemporaneously maintained records of payment; or

(b) Customer registration logs (e.g., hotel registries); or

(c) Documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or

(d) Business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

According to Exhibit 7 of the Settlement Agreement, Start-Up Business Claimants may alternatively provide:

> Any other documentation providing evidence of the portion of the claimant's revenue projected to be generated by customers in Zones A-C versus outside of Zones A-C during the Compensation Period. The claimant must be able to demonstrate that the projections were prepared prior to the DWH Spill and provided to and utilized by a financial institution extending credit to the Start-Up Business.

**5. Document Requirements for Healthcare Business Claimants.**

Healthcare Business Claimants satisfying Causation through the Customer Mix Tests must provide comparable information as that generally required by Exhibits 4B and 7 of the Settlement Agreement. The Claims Administrator will seek a Court Order, pursuant to 45 C.F.R. § 164.512(e)(1), authorizing a Healthcare Business Claimant to disclose to the Claims Administrator certain types of patient identifiable confidential health information that is comparable to the information referenced in Section 4, above, and approving a procedure for the disclosure and handling of patient identifiable confidential health information. A Business Economic Loss claim from a Healthcare Business Claimant satisfying Causation through the Customer Mix Tests shall be considered incomplete without the required information.

Patient address information is required for verifying the Economic Loss Zone of each patient and the distance from each patient to the healthcare business claimant, which is a required component of the Customer Mix Test. The amount of revenue that the healthcare business claimant can attribute to each patient is also required for purposes of determining the share of total revenue generated by non-local customers and the share of total revenue generated by customers located in Zones A-C. Additionally, health insurer/payor information may be required for certain claimants, at the discretion of the Claims Administrator, for purposes of processing and verifying amounts and dates of receipts and other records of payment. Descriptions of procedures, diagnoses codes, and biometric identifiers may be required for certain claimants, at the discretion of the Claims Administrator, for the purpose of: (a) assessing and verifying the reasonableness/appropriateness of the type of medical service by the healthcare business claimant; (b) assessing and verifying whether the medical service is consistent with the diagnosis; and (c) assessing and verifying the reasonableness/appropriateness of the charge for the medical service rendered. In addition, other forms of documentation that is not specifically enumerated in this section may be required by the Claims Administrator as he determines is reasonably necessary.

**6. Implementation.**

The Claims Administrator has the discretion to revise this policy over time and issue updates to all DHECC vendors. The Claims Administrator also has the right to audit compliance with this policy.

419148
12/18/13