## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| **In re:  Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010**<br><br>**These Pleadings apply to:  *All Cases***<br><br>(Including Nos. 10-2771 and 10-4536) | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br><br>**MAGISTRATE SHUSHAN** |

### POST-TRIAL BRIEF

**Submitted by Plaintiffs and Claimants-in-Limitation
For the Phase Two Limitation and Liability Trial**

Plaintiffs and Claimants-in-Limitation, including the State of Alabama and the State of Louisiana, through Plaintiffs' Co-Liaison Counsel, Coordinating Counsel for the States, the Plaintiffs' Steering Committee, and the PSC Phase Two Trial Team, respectfully submit the following Post-Trial Brief, in accordance with the Court's Order of October 21, 2013 [Doc 11706], to address specific legal and factual issues raised by the Court and by the Parties based on the evidence admitted during the Phase One and Phase Two Limitation and Liability Trial: [1]

## MAY IT PLEASE THE COURT:

It was established at trial that BP consciously disregarded the need to prepare for an uncontrolled deepwater blowout and willfully extended the capping of the Macondo Well by

---

[1] Consistent with the Court's Order, the Plaintiffs will also be submitting PROPOSED FINDINGS OF FACT jointly with the other Phase Two Aligned Parties, as well as their own PLAINTIFFS' PROPOSED FINDINGS AND CONCLUSIONS. Plaintiffs respectfully incorporate such Proposed Findings of Fact and Conclusions, as well as Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], Plaintiffs' Phase One POST-TRIAL BRIEF [Doc 10458], Plaintiffs' Phase One Post-Trial REPLY BRIEF [Doc 10714], Plaintiffs' Supplemental Submissions regarding the Halliburton Guilty Plea [Docs 11511, 11512, 11625], and PLAINTIFFS' OPPOSITION TO BP'S MOTION FOR PARTIAL JUDGMENT [Doc 11604], in further support of the legal and factual issues addressed in this Post-Trial Brief.

intentionally concealing material information and affirmatively misleading the U.S. Government and others regarding the volume of hydrocarbons escaping from the well after the blowout.

This, however, was not the Plaintiffs' burden.  The question, rather, is whether BP's overall conduct – as evidenced by not only the Phase Two issues of post-spill lying to the Government and pre-spill lack of preparedness, but also the Phase One issues of fast and reckless drilling, establishing and maintaining a dysfunctional leadership team, proceeding with the cement job without reliable test results, proceeding with the displacement despite a failed negative pressure test, refusing to correct known and persistent maintenance failures, and recklessly selecting, configuring, and refusing to upgrade the BOP – demonstrates a willful, wanton and reckless disregard for the environment, the property rights of others, and/or public health and safety.

With respect to the Phase Two evidence in particular, BP did not dispute the fact that BP did absolutely nothing in advance of the Macondo incident on April 20, 2010 to develop source control plans and equipment in preparation for a possible deepwater blowout.  BP simply attempts to muster, in its defense, an argument that the Government allegedly "approved" of its lack of preparation and that others in the industry allegedly failed to do the same.

As outlined herein, these defenses are factually unsupported and legally irrelevant.

Based on the law and on the evidence submitted in the Phase One and Phase Two Trial, BP's corporate conduct associated with the Macondo Well explosion, fire, blowout and resulting spill was willful, wanton and reckless, and was a direct result of BP corporate policies and/or with the knowledge, approval and/or ratification of BP officers with policymaking authority.

For these reasons, based on the trial record, and for the reasons further outlined below, Judgment should be entered herein in favor of Plaintiffs and against BP.

**T**ABLE OF **C**ONTENTS

**Page**

Introduction   .   .   .   .   .   .   .   .   .   .   1

Table of Contents   .   .   .   .   .   .   .   .   .   3

Table of Authorities   .   .   .   .   .   .   .   .   .   4

A Finding of Willful, Wanton or Reckless Conduct Should Be Made on the Series
and Accumulation of Acts and Omissions Established by the Evidence Admitted
in the Phase One and Phase Two Trial   .   .   .   .   .   .   5

It is Undisputed that BP Willfully and Recklessly Refused to Prepare for an
Uncontrolled Deepwater Blowout, the Largest Known Risk in the Gulf   .   .   6

  Both Legally and Factually, BP Has Failed to Establish a Defense
  Predicated on an Alleged "Industry Standard"   .   .   .   .   7

  BP Violated Regulatory Standards   .   .   .   .   .   .   11

  Advance Preparation Would Have Unquestionably Allowed BP to
  Mitigate the Duration and Extent of the Spill, Irrespective of the
  Particular Circumstances Surrounding a Blowout   .   .   .   .   13

BP's Intentional Misrepresentations and Omissions Combined with Multiple
Other Causative Factors – including BP's Own Reckless Failure to Prepare for a
Blowout and Post-Spill Miscalculations and Mistakes – to Extend the Duration
and Expanse of the Spill   .   .   .   .   .   .   .   .   15

BP's Willful Misconduct in Lying to the U.S. Government (and Others)
After the Spill is Relevant to the Overall Question of BP's State of Mind,
Even If It Were Found Not to be a Direct Cause of Any Delay   .   .   .   15

Conclusion   .   .   .   .   .   .   .   .   .   .   16

Certificate of Service   .   .   .   .   .   .   .   .   .   20

**TABLE OF AUTHORITIES**

<b><u>Page(s)</u></b>

<u>Baker v. S/S Christobal</u>, 488 F.2d 331 (5th Cir. 1974)   .   .   .   .   10

<u>Clements v. Steele</u>, 792 F.2d 515 (5th Cir. 1986)   .   .   .   .   .   16

<u>Cumberland Coal v. Fed. Mine Safety & Health Review Commission</u>,
    515 F.3d 247 (3d Cir. 2008)   .   .   .   .   .   .   12

<u>Durham v. County of Maui</u>, 692 F.Supp.2d 1256 (D. Haw. 2010)   .   .   .   10

<u>Elliott v. Brunswick Corp.</u>, 903 F.2d 1505 (11th Cir. 1990)   .   .   .   .   8

<u>Folks v. Kansas Power & Light</u>, 755 P.2d 1319 (Kan. 1988)   .   .   .   10

<u>Gryc v. Dayton-Hudson Corp.</u>, 297 N.W.2d 727 (Minn. 1980)   .   .   .   10

<u>Hardy v. Gulf Oil Co.</u>, 949 F.2d 826 (5th Cir. 1992)   .   .   .   .   15

<u>Jowers v. BOC Group, Inc.</u>, 608 F.Supp.2d 724 (S.D.Miss. 2009)   .   .   .   10

<u>Maxey v. Freightliner Corp.</u>, 665 F.2d 1367 (5th Cir. 1982) .   .   .   .   9, 10

<u>Schlichter v. Port Arthur Towing Co.</u>, 288 F.2d 801 (5th Cir. 1961) .   .   .   10

<u>Secretary of Labor v. Plateau Mining Corp.</u>, 25 F.M.S.H.R.C. 738 (2003),
    *aff'd*, 28 F.M.S.H.R.C. 501, 2006 WL 2524065 (2006)   .   .   .   12

<u>Stolt Achievement Ltd. v. Dredge B.E. LINDHOLM</u>, 447 F.3d 360 (5th Cir. 2006).   15

<u>The T.J. Hooper</u>, 60 F.2d 737 (2d Cir. 1932) .   .   .   .   .   .   8

30 C.F.R. ¶250.105   .   .   .   .   .   .   .   13

30 C.F.R. ¶250.107   .   .   .   .   .   .   .   13

30 C.F.R. ¶250.401   .   .   .   .   .   .   .   13

30 C.F.R. ¶250.401(a).   .   .   .   .   .   .   .   13

30 C.F.R. ¶254.5(c)   .   .   .   .   .   .   .   .   11-12, 13

Fifth Circuit Pattern Jury Instructions: Civil §4.4 (2006)   .   .   .   10-11

**A Finding of Willful, Wanton or Reckless Conduct Should Be Made on the Series and Accumulation of Acts and Omissions Established by the Evidence Admitted in the Phase One and Phase Two Trial**

As set forth in Plaintiffs' Phase One Post-Trial submissions, an accumulation or series of negligent acts or omissions are properly viewed together in order to determine whether the defendant has acted out of gross negligence, willful misconduct, or a wanton or reckless disregard.[2]

Hence, the burden is *not* on Plaintiffs to show that BP's pre-spill planning, in and of itself, rises to the level of wanton, willful or reckless conduct.  Nor are the plaintiffs required to show that BP's post-spill intentional misconduct, in and of itself, caused or contributed to the uncontrolled flowing of the well for 87 days.

Rather, it is only Plaintiffs' burden to show that BP's **(i)** pre-spill failure to plan, *combined with* BP's **(ii)** post-spill intentional misrepresentations and concealment – *combined with* BP's **(iii)** fast and reckless drilling, with little or no regard for the safe kick margin, despite multiple kicks, and in violation of the MMS Regulations requiring a safe drilling margin; **(iv)** creating, maintaining and largely ignoring a dangerously dysfunctional leadership team, which embraced the corporate culture of cutting costs and maximizing profits; **(v)** proceeding with the cement job without a set of reliable test results confirming the slurry's stability; **(vi)** proceeding with the displacement despite a failed negative pressure test; **(vii)** selecting, configuring, sequencing, modifying, and refusing to upgrade the safety critical BOP, which was not sufficient or appropriate for the Macondo well; and **(viii)** knowingly refusing to correct the persistent

---

[2] *See* PSC's Phase One POST-TRIAL BRIEF [Doc 10458], pp.13-14 (*see also,* pp.14-18); Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], pp.23-24; *see also,* PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.2-4, 15-17.

maintenance failures of safety critical equipment on the DEEPWATER HORIZON [3] – evidences a willful and reckless disregard for the environment, the property rights of others, and/or public health and safety.

The Phase Two evidence, in this respect, cannot be untethered from the Phase One evidence, in making the overall determination of BP's state of mind with respect to the damages and effects of the Macondo disaster.[4]

Nevertheless, the Phase Two evidence, standing alone, establishes that BP was wanton and reckless in both its pre-spill lack of planning and in its post-spill lying to the Government and others regarding the flow rate and source control.

### It is Undisputed that BP Willfully and Recklessly Refused to Prepare for an Uncontrolled Deepwater Blowout, the Largest Known Risk in the Gulf

Based on the record in this case, there is no question that it was foreseeable to BP that a deepwater well in the Gulf of Mexico could experience a blowout.  Indeed, BP Management had identified the risk of a deepwater blowout as one of the highest risks worldwide, and the number one risk in the Gulf of Mexico.[5]  And both BP and the industry generally knew, beginning in

---

[3] *See* Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], pp.129-158 (*see also,* pp.40-55, 75-90, 158-169); PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.4-6, 15-17.

[4] *See* ORDER [Doc 11087] (Aug. 22, 2013) p.1 ("The record has been held open pending the conclusion of Phase Two and any subsequent phases. All evidence admitted during Phase One is also part of the record of Phase Two"). *See also, generally,* PSC's Phase One POST-TRIAL BRIEF [Doc 10458], pp.14-18 (*see also,* pp.10-14); PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.2-4.

[5] *See, e.g.,* L. McKay Testimony (Phase One), 508:21-509:4; Hayward Depo, 196:10-18; Bea Testimony (Phase One), 302:20-23, 464:8-11; Bea Testimony (Phase Two), 425:15-427:24;  Bea Phase Two Report (TREX-11750R) pp.10-11, 17 (pdf pp.11-12, 18); Perkin Phase Two Report (TREX-11464R) pp.25-26; TREX-4171; TREX-4423; D-20050; L. McKay Depo, 89:21-91:10, 594:18-595:10; Inglis Depo, 125:3-8; Frazelle Depo, 11:17-12:7, 160:11-18, 219:8-15.

1991, that it was necessary to engage in deepwater source control planning and to develop deepwater source control capping equipment and techniques.[6]

Yet, BP Management admittedly spent no time or money preparing for a deepwater source control effort.[7]  BP Management did not direct or provide for any training in deepwater source control.[8]  Nor did BP Management develop or acquire any capping equipment.[9]  It is clear, in sum, that BP's pre-spill preparation was nothing more than a plan to make a plan.[10]

BP does not dispute this.

## Both Legally and Factually, BP Has Failed to Establish a Defense Predicated on an Alleged "Industry Standard"

As set forth in Plaintiffs' Phase One Post-Trial submissions, compliance with industry standards does not preclude a finding of gross or egregious conduct.[11]  For example, in *Elliott v. Brunswick,* the Eleventh Circuit stated that:

---

[6] *See generally* Bea Testimony (Phase Two), pp.425-440; Bea Phase Two Report (TREX-11750R) pp.3-5 (pdf pp.4-6); Perkin Phase Two Report (TREX-11464R) pp.25-26; *see also, e.g.,* TREX-11625 (Drilling Engineers Association 1991 "DEA-63" Report); TREX-7353 (International Association of Drilling Contractors 1998 Well Control Guidelines); TREX-9828 (BP Alaska 2001 recognition of capping devices as Best Available Technology); TREX-6299 (SPE and IADC 2003 Conference); D-20039 (SPE/IADC 2005 Report No. 92626); TREX-9239 (2005 Ole Rygg publication); TREX-11400 (2008 International Oil Spill Conference).

[7] *See, e.g.,* Inglis Depo, 162:9-21; Rohloff Depo, 102:14-23, 138:19-139:13, 139:16, 140-25-142:6; L. McKay Depo, 102:21-103:9, 104:22-105:13.

[8] *See, e.g.,* Ziegler Testimony (Phase Two), 504:4-6; Bush Depo, 31:13-17; Frazelle Depo, 219:16-220:4; Rohloff Depo, 26:23-27:5, 27:21-28:10, 30:8-31:7, 104:17-105:1; Wellings Depo, 82:15-83:14; Bea Phase Two Rebuttal Report (TREX-11751R) p.6.

[9] *See, e.g.,* Hayward Depo, 343:13-20; Rohloff Depo, 48:7-17; Lynch Depo, 201:15-20; *see also* Phase Two Trial Transcript, 530:7-10 (statement by BP Counsel: "While it was feasible and practical to have a type of capping device for deepwater operations, there were no capping stacks specifically designed for deepwater blowouts").

[10] *See* TREX-769.179 (BP Oil Spill Response Plan, section 6(c)); *see also* Bea Phase Two Report (TREX-11750R) p.3; Hayward Depo, 255:11-21; Rohloff Depo, 47:6-49:1, 275:3-276:5; Wellings Depo, 247:1-8; R. Lynch Depo, 183:21-184:4; Holt Depo, 63:24-64:20.

[11] *See* PSC's Phase One POST-TRIAL BRIEF [Doc 10458], pp.24-26.

> We do not, naturally, dismiss a manufacturer's compliance with industry standards, but we must also remember that ***those standards may sometimes merely reflect an industry's laxness, inefficiency, or inattention to innovation.*** As Judge Learned Hand stated in *The T.J. Hooper*: "A whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own test, however, persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission."

Elliott v. Brunswick Corp., 903 F.2d 1505, 1508 (11th Cir. 1990) (emphasis supplied) (*quoting*

The T.J. Hooper, 60 F.2d 737, 740 (2d Cir. 1932)).

In this particular case, the entire industry recognized the need to develop capping stack equipment as far back as 1991.[12] Indeed, an industry study predicted and diagramed at that time an uncontrolled blowout strikingly similar to what would occur at Macondo almost twenty years later.[13] To the extent that companies other than BP may have also failed to adequately prepare for a deepwater blowout, this reveals nothing more than laxness, inefficiency, and inattention to innovation by other companies.

BP held itself out as a "leader" in the industry.[14] BP's predecessor Amoco was part of the 1991 industry study,[15] and BP specifically recognized in 2001 that, if the DEEPWATER HORIZON drifted off station, the EDS or "Dead-man" function on the BOP failed to activate, and the well was flowing, ROVs would not be able to successfully shut in the well.[16] How would it be anything other than willful, wanton and reckless for BP to refuse to invest *any* time,

---

[12] *See, e.g.*, TREX-11625 (Drilling Engineers Association 1991 "DEA-63" Report); TREX-7353 (International Association of Drilling Contractors 1998 Well Control Guidelines); TREX-6299 (SPE and IADC 2003 Conference); D-20039 (SPE/IADC 2005 Report No. 92626); TREX-9239 (2005 Ole Rygg publication); TREX-11400 (2008 International Oil Spill Conference); *see generally* Bea Testimony (Phase Two), pp.425-440; Bea Phase Two Report (TREX-11750R) pp.3-5 (pdf pp.4-6); Perkin Phase Two Report (TREX-11464R) pp.25-26.

[13] TREX-11625.399 and TREX-11625.401; Bea Testimony (Phase Two), 435:7-10.

[14] *See, e.g.*, Hayward Depo, 209:17-210:4; L. McKay Depo, 42:5-15; TREX-6298.11; TREX-120174; TREX-6015.4; Dupree Testimony (Phase Two), 599:9-12.

[15] TREX-11625.18.

[16] TREX-4423; (*see also* D-20050).

money, training or other effort into capping technology, devices and other associated planning? As the head of BP's post-spill source control effort acknowledged: "We were the largest operator in the deepwater Gulf of Mexico, and a lot of the other operators didn't have near as much equipment as we had."[17]  Yet BP, a self-proclaimed "leader" in the industry, refused to invest a single penny into developing or acquiring the necessary equipment for post-spill source control.

As a factual matter, moreover, BP came far from proving that there was an "industry standard" to develop no pre-spill capping stack or other source control plans, equipment or technology. *See, e.g.,* Maxey v. Freightliner Corp., 665 F.2d 1367, 1376 (5th Cir. 1982) (when considering whether a defendant has complied with an industry standard, "a district court must limit its consideration to evidence actually presented at trial").  Indeed, as noted, the industry was recognizing the need for such devices since 1991.[18]

Moreover, there was evidence presented at trial that capping stack devices had, in fact, been developed, deployed and utilized by others in the industry, using existing technology.[19] The evidence showed that Cameron's own BOPs had been used as capping stack solutions as early as the 1980s, and were actually used to kill wells in Kuwait.[20]  BP itself, in 2001, adopted well capping devices in Alaska as the best available technology.[21]

---

[17] Dupree Testimony (Phase Two), 599:9-12. *See also* Dupree Testimony (Phase Two), 694:1-5 ("building a capping stack wouldn't be a significant amount of money considering the amount of money that we spent in the deepwater").

[18] *See, e.g.,* TREX-11625 (Drilling Engineers Association 1991 "DEA-63" Report); TREX-7353 (International Association of Drilling Contractors 1998 Well Control Guidelines); TREX-6299 (SPE and IADC 2003 Conference); D-20039 (SPE/IADC 2005 Report No. 92626); TREX-9239 (2005 Ole Rygg publication); TREX-11400 (2008 International Oil Spill Conference); *see generally* Bea Testimony (Phase Two), pp.425-440; Bea Phase Two Report (TREX-11750R) pp.3-5 (pdf pp.4-6); Perkin Phase Two Report (TREX-11464R) pp.25-26.

[19] *See generally* Ziegler Testimony (Phase Two), 531:5-533:2, 535:1-9, 544:13-20; Herbst Depo, 327:18-22, 328:1-10, 359:3-23, 360:22-361:17, 363:13-364:3, 393:8-394:1.

[20] McWhorter Depo, 175:8-178:9; Perkin Phase Two Report (TREX-11464R) p.28; Ziegler Report (TREX-11578R) p.37.

[21] Indeed, BP concluded and certified that a well capping solution could mitigate the overall duration and extent of an uncontrolled blowout by 50%.  TREX-9828; Bea Testimony (Phase Two), 438:4-17; D-20037.

With respect to deepwater operations, the evidence established that at least two capping-type solutions had been previously utilized in deep water: (1) a blowout in Malaysia in 1988, and (2) the JIM CUNNINGHAM incident in the eastern Mediterranean in 2004, where a BOP-on-BOP technique was used.[22]   There was also evidence that Shell and Senta Drilling had capping devices available for a deepwater project off the coast of Brazil.[23]   And BP itself recognized the potential use of capping stacks in deepwater environments, identifying them as a "Level 3: Phase 2" solution in the January 2010 Gulf of Mexico Deepwater SPU Well Control response guide.[24]

In sum: Based on the law and the evidence, BP cannot support any type of an "industry standard" defense. *See, e.g.,* Maxey v. Freightliner, *supra*, 665 F.2d at 1376; Baker v. S/S Christobal, 488 F.2d 331, 333 (5th Cir. 1974) (*quoting* Schlichter v. Port Arthur Towing Co., 288 F.2d 801 (5th Cir. 1961)) ("compliance with the customs and practices of an industry is not in itself due care"); Durham v. County of Maui, 692 F.Supp.2d 1256, 1262 (D. Haw. 2010); Jowers v. BOC Group, Inc., 608 F.Supp.2d 724, 767 (S.D.Miss.2009) ("conformity with established industry standards, while evidence of whether a product is reasonably safe, may never be conclusive on the point"); Folks v. Kansas Power & Light, 755 P.2d 1319, 1326 (Kan. 1988) (punitive damages imposed against a utility company despite compliance with an industry safety standard); Gryc v. Dayton-Hudson Corp., 297 N.W.2d 727, 733 (Minn. 1980) (punitive damages assessed against the manufacturer of highly flammable cotton nightwear, despite the compliance with regulatory and industry standards); FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.4 (2006) ("The fact that the defendant conducted its operations in a manner similar to that of other companies is not conclusive as to whether the defendant was negligent or not"); *see also* FIFTH

---

[22] Turlak Testimony (Phase Two), 318:8-22; Ziegler Testimony (Phase Two), 537:18-538:8.

[23] Ziegler Report (TREX-11578R) p.37.

[24] Perkin Phase Two Report (TREX-11464R) p.28; TREX-2386.

CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.4 ("A long accepted practice may be an unsafe practice").

**BP Violated Regulatory Standards**

As set forth in Plaintiffs' Phase One Post-Trial submissions, a defendant's compliance with regulatory standards does not preclude a finding of gross or egregious conduct.[25]  Moreover, in Phase Two as in Phase One:

- The Government relied largely on information that was provided (or not provided) by BP;

- The MMS and Coast Guard officials were frequently overtaxed, understaffed, and of limited training;

- There were several instances where BP's conduct (or failure to act) went beyond the scope of what was ostensibly permitted under the specific regulation, application, or approval in question;

- There were several instances where BP provided insufficient, inaccurate or misleading information to the Government; and,

- BP clearly violated MMS regulations.

Specifically, it was clear that the Oil Spill Response Plan (OSRP) ostensibly approved by the Government was directed toward efforts to try to contain and collect the oil once it reached the surface.[26]  The Oil Spill Response Plan was not intended to be a source control plan,[27] and the regulations concerning the plan requirements expressly state: "Nothing in this part relieves you from taking all appropriate actions necessary to immediately abate the source of a spill." 30

---

[25] *See* PSC's Phase One POST-TRIAL BRIEF [Doc 10458], pp.21-23.

[26] *See* TREX-769.

[27] *See, e.g.,* Bush Depo, 16:24-17:20, 21:4-14, 28:6-10, 63:20-65:1, 67:24-68:12; Hayward Depo, 255:11-21; TREX-9099.38; Bea Testimony (Phase Two), 441:5-7; Ziegler Report (TREX-11578R) p.22.

C.F.R. ¶254.5(c);[28] *see, e.g.,* Cumberland Coal v. Fed. Mine Safety & Health Review Commission, 515 F.3d 247, 253-254 (3d Cir. 2008) (the approval of a mining company's ventilation plan by the Mine Safety & Health Administration is not a defense to the violation of mandatory safety regulations).[29] As a factual matter, moreover, the evidence is clear that the Government expected BP to be able to abate the source of an oil spill as soon as possible.[30] "The federal government has neither the skilled personnel nor the appropriate equipment to respond independently to an oil blowout in deepwater and must rely wholly on the responsible party."[31]

The Phase Two evidence further establishes that the Federal Government was relying on BP to provide the Government with source control information.[32]  In addition to lying to the Government with respect to the flow rate (to which BP pleaded guilty),[33] BP also failed to

---

[28] *See also* TREX-9099.38 ("The regulations do not, however, address subsea containment of oil, nor do they require discussions on spill abatement such as well intervention or drilling of relief wells").

[29] A mining company's approved ventilation plan "represents the ***minimum specifications*** for ventilating the mine. A mine operator may violate section 75.334(b)(1) even though it is fully complying with the approved ventilation plan. First, the mine operator has better knowledge of the conditions that will be encountered when mining commences. More importantly, because an underground coal mine is a dynamic environment, a mine operator must be constantly vigilant when monitoring the conditions underground and it must make changes to its ventilation system as conditions warrant." Cumberland Coal, 515 F.3d at 253-254 (emphasis supplied) (*quoting* Secretary of Labor v. Plateau Mining Corp., 25 F.M.S.H.R.C. 738, 759 (2003), *aff'd,* 28 F.M.S.H.R.C. 501, 2006 WL 2524065 (2006)).

[30] *See, e.g.,* Herbst Depo, 302:24-303:8, 397:17-398:22; Bea Testimony (Phase Two), pp.442:2-15, 464:1-4; D-20046; Ziegler Testimony (Phase Two), 516:4-24.

[31] TREX-9124.  Of course, given the fact that BP had no source control plan, BP left itself with no quickly deployable solution in the event of a disaster, and was unprepared to handle the response to a deepwater well blowout. *See, e.g.,* Hayward Depo, 254:14-256:18, 621:17-21; Bush Depo, 28:6-10; Ziegler Testimony (Phase Two), 518:15-17, 524:12-18.

[32] *See, e.g.,* Landry Depo, 579:12-580:21 (BP, not the Government, had all of the information regarding reservoir permeability, the gas/oil ratio, the oil viscosity, measured flow pressure at the base of the BOP, and the skin of reservoir); *see also, e.g.,* Dupree Testimony (Phase Two), 698:11-13 (Unified Command was dependent upon BP to provide accurate information); Chu Depo., 188:9-16; Landry Depo, 94:7-95:14, 230:7-15 ("I would look to them [*i.e.* BP] … as the Responsible Party"), 321:14-15 ("I relied on the work of BP through Doug Suttles as the Lead Person for BP").

[33] *See* TREX-52673 at pdf pp.16-18 (*U.S. v. BP Exploration and Production, Inc.,* No. 2:12-cr-00292 [Doc 2-1] (Nov. 15, 2012) (Exhibit A to the BP Guilty Plea Agreement, Factual Allocution, re violation of 18 U.S.C. §1505)).

comply with its pre-spill representation to the MMS regarding the training of its employees in source control response.[34]

Far from establishing some type of a defense based on the alleged "approval" of its OSRP by the Government, BP clearly violated the regulatory requirements to: **(i)** take necessary precautions to keep the well under control at all times, 30 C.F.R. ¶250.401; **(ii)** immediately abate the source of a spill, 30 C.F.R. ¶254.5(c); and **(iii)** use the Best Available and Safest Technology (BAST), 30 C.F.R. ¶¶250.105, 107 and 401(a).[35]   At the end of the day, BP certified to the Federal Government in its Initial Exploration Plan for the Macondo well that it was capable of responding at the source to a worst-case discharge of up to 162,000 barrels of oil per day.[36]   BP was clearly not in compliance with respect to that regulatory certification.[37]

## Advance Preparation Would Have Unquestionably Allowed BP to Mitigate the Length and Extent of the Spill, Irrespective of the Particular Circumstances Surrounding a Blowout

At various times, BP has seemed to suggest that it was appropriate for the company to do nothing in advance of the spill because it could not predict exactly when, where or how such an uncontrolled blowout might occur.

Aside from the fact that a similar post-spill situation was specifically predicted by the Drilling Engineers Association in 1991,[38] the evidence is clear that efforts prior to the spill would

---

[34] *See, e.g.,* Bea Testimony (Phase Two) 446:4-447:15; D-20043; D-20052; D-20053; D-20054; D-20055; D-20056.

[35] *See generally,* Ziegler Report (TREX-11578R) p.20 (these regulatory requirements are performance standards;  without prescribing the specific means and methods, the Government expects and demands operators like BP to satisfy the requirements).

[36] TREX-768.98; *see also* TREX-6181.26 (Certification of Capability).

[37] *See, e.g.,* Herbst Depo, 398:7-22; *see also* Bush Depo, 28:11-16, 65:6-19 and TREX-10267 (while regulations regarding the Oil Spill Response Plans have not changed, BP's current OSRP contains a detailed discussion of potential source control options).

[38] TREX-11625.399; TREX-11625.401; Bea Testimony (Phase Two) 435:7-11; D-20031.

have reduced the duration and extent of the post-blowout event.  BP representatives admitted that "it's much better to have a plan in place" than to "create a plan … in the middle of a crisis."[39] Former CEO Tony Hayward and the leaders of the post-spill source control effort, Charles Holt and James Dupree, all admitted that BP did not have the equipment it needed in place, and were essentially creating plans on how to kill the well as they went along.[40]  It is because BP "didn't have the equipment to attack a Macondo-type event" that "we had to engineer so many things simultaneously on the fly."[41, 42]

Cameron personnel similarly confirmed that the lack of pre-spill planning resulted in "paralysis by analysis," "running this show like a game of Scrabble," having "no clue what to do next," and "running around like chickens with their heads cut off."[43]

In sum, the evidence establishes that, had BP prepared for a deepwater blowout, with a capping stack available on April 20, 2010, the well could have likely been shut in within 24 days.[44]

---

[39] Holt Depo, 45:11-24.

[40] Hayward Depo, 343:13-20; Holt Depo, 43:14-44:23; Dupree Testimony (Phase Two), 706:14-707:24.

[41] Dupree Testimony (Phase Two), 707:22-23.

[42] Indeed, BP now has several capping devices available for worldwide deployment in the event of another deepwater blowout, establishing the feasibility of both the technology and its deployment. Frazelle Depo, 225:13-226:6; TREX-11640.

[43] *See* Ziegler Testimony (Phase Two), 519:7-520:23; TREX-10072.

[44] *See, e.g.,* TREX-9345 (the time to land and close in a capping stack can be accomplished in one to three weeks); TREX-9564 (providing an estimate of 24 days from onset of incident to install a capping stack); Ziegler Testimony (Phase Two), 544:13-20 (from the point in time at which BP had a capping device, it could have shut in the Macondo well in as little as seven days); Perkin Phase Two Report (TREX-11464R) p.7 (had a properly designed and assembled capping stack been made prior to the incident, the uncontrolled flow could have been arrested in a matter of weeks); *see also, e.g.,*  Dupree Testimony (Phase Two), 695:18-696:25 and TREX-9573.3 (a deepwater drill was conducted using a capping stack built after the Spill, and the well was capped in 4.77 days).

**BP's Intentional Misrepresentations and Omissions Combined with Multiple Other Causative Factors – including BP's Own Reckless Failure to Prepare for a Blowout and Post-Spill Miscalculations and Mistakes – to Extend the Duration and Expanse of the Spill**

One consistent fallacy in BP's previous filings has been BP's efforts to frame each element of its post-spill conduct in isolation.  The General Maritime Law clearly recognizes that multiple causative factors can combine and contribute to a harmful series of results.[45]  And, as set forth in Plaintiffs' Phase One Post-Trial submissions, an accumulation or series of negligent acts or omissions are properly viewed together in order to determine whether the defendant has acted out of gross negligence, willful misconduct, or a wanton or reckless disregard.[46]

Plaintiffs are not asserting a traditional "reliance" upon a "fraud" cause of action against BP. Rather, Plaintiffs allege that BP's intentional misconduct in concealing material facts, overtly misstating facts it knew were not true, and otherwise misleading the Government, *together with other factors,* including BP's own pre-spill failure to prepare for an uncontrolled blowout, as well as BP's (and/or perhaps the Government's) post-spill misjudgments and miscalculations, all conspired to significantly delay the capping of the well.

**BP's Willful Misconduct in Lying to the U.S. Government (and Others) After the Spill is Relevant to the Overall Question of BP's State of Mind, Even If It Were Found Not to be a Direct Cause of Any Delay**

The Phase Two evidence establishes that BP's willful misconduct in lying to the Government after the spill extended the blowout by a number of weeks.[47]  Yet, even assuming

---

[45] *See, e.g.,* <u>Stolt Achievement Ltd. v. Dredge B.E. LINDHOLM</u>, 447 F.3d 360, 364 (5th Cir. 2006); <u>Hardy v. Gulf Oil Co.</u>, 949 F.2d 826, 835 (5th Cir. 1992).

[46] *See* PSC's Phase One POST-TRIAL BRIEF [Doc 10458], pp.13-14 (*see also,* pp.14-18); Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], pp.23-24; *see also,* PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.2-4, 15-17.  *See also,* PLAINTIFFS' OPPOSITION TO BP'S MOTION FOR PARTIAL JUDGMENT [Doc 11604] pp.5-6, 14.

[47] In addition to the joint Phase Two Aligned Parties' PROPOSED FINDINGS OF FACT submitted contemporaneously herewith, *see generally,* TRANSOCEAN AND HALLIBURTON'S OPPOSITION TO BP'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS [Doc 11603] pp.2-11.

*arguendo* that there were no causal relationship between BP's lies and the length or extent of the spill, (which is denied), such intentional misconduct would nevertheless be relevant to the ultimate question of whether BP acted with a willful, wanton or reckless disregard. *See, e.g.,* Clements v. Steele, 792 F.2d 515, 516-517 (5th Cir. 1986) ("the 'mental attitude of the defendant' is what turns ordinary negligence into gross negligence" and can be inferred from the totality of the circumstances).[48]

### <u>Conclusion</u>

For the above and foregoing reasons, for the reasons set forth in Plaintiffs' Phase One POST-TRIAL BRIEF [Doc 10458], for the reasons set forth in Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], and for the reasons set forth in the Aligned Parties' Phase Two PROPOSED FINDINGS OF FACT submitted contemporaneously herewith, Plaintiffs respectfully pray that the Court enter Final Judgment and Reasons against the BP Defendants as set forth in the Plaintiffs' supplemental and amended PROPOSED FINDINGS AND CONCLUSIONS submitted contemporaneously herewith.

This <u>20th</u> day of <u>December</u>, <u>2013</u>.

Respectfully submitted,

   /s/   Stephen J. Herman                /s/ James Parkerson Roy

**Stephen J. Herman**, La. Bar No. 23129        **James Parkerson Roy**, La. Bar No.11511

**HERMAN HERMAN & KATZ LLC**              **DOMENGEAUX WRIGHT ROY**

820 O'Keefe Avenue                      **& EDWARDS, LLC**

New Orleans, Louisiana 70113           556 Jefferson Street, Suite 500

Telephone: (504) 581-4892              Lafayette, Louisiana 70501

---

[48] *See generally* PSC's Phase One POST-TRIAL BRIEF [Doc 10458], pp.13-18; Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], pp.70-71, 180-182; and PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.3-4. *See also,* PLAINTIFFS' OPPOSITION TO BP'S MOTION FOR PARTIAL JUDGMENT [Doc 11604] pp.5-6, 15.

Fax. No. (504) 569-6024
Email: sherman@hhklawfirm.com
*Plaintiffs Liaison Counsel*

Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130

Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## **ADDITIONAL PSC PHASE TWO TRIAL TEAM MEMBERS**

Frank Petosa
MORGAN & MORGAN, P.A.
600 N. Pine Island Road, Suite 400
Plantation, Florida 33324
(954) 318-0268
E-Mail:  fpetosa@forthepeople.com

Anthony Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Tel: (504) 525-1500
Fax: (504) 525-1501
E-Mail: airpino@irpinolaw.com

## THE STATE OF ALABAMA

The Honorable Luther Strange
*Attorney General*
Corey L. Maze
*Special Deputy Attorney General*
Winfield J. Sinclair
*Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL  36130
Phone: (334) 353-4336
E-Mail: cmaze@ago.state.al.us

*Counsel for the State of Alabama, and*
*Coordinating Counsel for the States*

## THE STATE OF LOUISIANA

The Honorable James D. "Buddy" Caldwell
*Attorney General*
James Trey Phillips
*First Assistant Attorney General*
Megan K. Terrell
*Assistant Attorney General*
*Section Chief –Environmental*
P.O. Box 94005
Baton Rouge, LA 70804-9005
Telephone: (225) 326-6708

Allan Kanner
Elizabeth B. Petersen
Douglas R. Kraus
Allison M. Shipp
KANNER & WHITELEY, LLC
701 Camp Street
New Orleans, LA 70130
Telephone: (504) 524-5777

T. Allen Usry
USRY, WEEKS, & MATTHEWS, APLC
1615 Poydras St., Suite 12
New Orleans, LA 70112
Telephone: (504) 592-4641

Henry T. Dart
Grady J. Flattmann
HENRY DART, ATTORNEYS AT LAW P.C.
510 N. Jefferson St.
Covington, LA 70433
Telephone: (985) 809-8093

*Counsel for the State of Louisiana, and*
*Co-Coordinating Counsel for the States*


### <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the above and foregoing Post-Trial Brief has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this <u>20th</u> day of <u>December</u>, <u>2013</u>.


<u>/s/  Stephen J. Herman and James Parkerson Roy</u>