UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig<br>          "DEEPWATER HORIZON" in the Gulf<br>          of Mexico, on April 20, 2010<br><br>These Pleadings apply to:  *All Cases*<br><br>(Including Nos. 10-2771 and 10-4536) | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

## PLAINTIFFS' PROPOSED FINDINGS AND CONCLUSIONS

[Limitation and Liability Trial]

Plaintiffs and Claimants-in-Limitation, including the State of Alabama and the State of Louisiana, through Plaintiffs' Co-Liaison Counsel, Coordinating Counsel for the States, the Plaintiffs' Steering Committee, and the PSC Phase Two Trial Team, respectfully submit the following supplemental and amended Proposed Findings and Conclusions:[1]

**MAY IT PLEASE THE COURT:**

---

[1] Consistent with the Court's Order of October 21, 2013 [Doc 11706], the Plaintiff Steering Committee, the Attorney General of Alabama and the Attorney General of Louisiana will also be submitting a PROPOSED FINDINGS OF FACT together with the other Phase Two Aligned Parties, as well as a Plaintiffs' Phase Two POST-TRIAL BRIEF [Doc 12038]. As the Court has recognized, there exists one single note of evidence with respect to the Limitation and Liability Trial, including both Phase One and Phase Two. *See* ORDER [Doc 11087] (Aug. 22, 2013). Accordingly, Plaintiffs respectfully incorporate, not only these Phase Two Joint Proposed Findings of Fact and Post-Trial Brief, but also Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], Plaintiffs' Phase One POST-TRIAL BRIEF [Doc 10458], Plaintiffs' Phase One Post-Trial REPLY BRIEF [Doc 10714], and Plaintiffs' Supplemental Submissions regarding the Halliburton Guilty Plea [Docs 11511, 11512, 11625], as well as PLAINTIFFS' OPPOSITION TO BP'S MOTION FOR PARTIAL JUDGMENT [Doc 11604], in further support of the supplemental and amended Proposed Findings and Conclusions set forth respectfully for the Court's consideration herein.

At the conclusion of Phase One, Plaintiffs suggested that the two primary issues regarding the liability of the BP Defendants – BP Exploration & Production, Inc., BP America Production Company, and BP P.L.C. – were:

- Whether Plaintiffs have established that the conduct of BP employees constitutes willful or reckless disregard?[2] And,

- Whether Plaintiffs have established that BP, through corporate policy or through officials with policy-making authority, had knowledge of, approved, or ratified the willful or reckless conduct in question?[3]

The Phase One and Phase Two evidence, when taken together,[4] establishes that the BP Defendants exhibited a willful, wanton and reckless disregard for the environment, the property rights of others, and public health and safety, which caused and/or contributed to the Macondo blowout, explosion, and fire, and to the duration and extent of the resulting spill.

Specifically, the Plaintiffs' Phase One Proposed Findings and Conclusions,[5] together with the joint Phase Two Aligned Parties' Proposed Findings of Fact submitted contemporaneously

---

[2] Plaintiffs noted that BP had formally waived the $75 million limitation of liability under the Oil Pollution Act, 33 U.S.C. §2704(a)(3). *See* Rec. Doc. 559. Nevertheless, Plaintiffs, out of an abundance of caution, suggested that the Court conclude that BP is guilty of "gross negligence or willful misconduct" under §2704(c)(1)(A) and/or "violation of an applicable Federal safety, construction or operating regulation" under §2704(c)(1)(B), in the event that BP might, at some point, with respect to some claim, attempt to repudiate or challenge the applicability of its prior stipulation. Moreover, Plaintiffs noted that the Court would implicitly address these issues in connection with the Clean Water Act violations arising out of the penalty claims brought by the United States. *See* Plaintiffs' Phase One POST-TRIAL BRIEF [Doc 10458] p.2 fn.5; Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459] p.18 fn.65.

[3] As set forth in Plaintiffs' Phase One Post-Trial Submissions, Plaintiffs respectfully suggest and reserve the right to argue that a less stringent standard for the imputation of punitive damages to the corporate defendants can and should be applied. The Supreme Court, in *Baker v. Exxon,* recognized the state of uncertainty in the law regarding this issue, which was left unresolved by the Court. 554 U.S. at 482-484. *See* Plaintiffs' Phase One POST-TRIAL BRIEF [Doc 10458] pp.2-3, 18-20, (*see also* pp.4-6); Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459] p.18 fn.66.

[4] *See* ORDER [Doc 11087] (Aug. 22, 2013) p.1 ("The record has been held open pending the conclusion of Phase Two and any subsequent phases. All evidence admitted during Phase One is also part of the record of Phase Two").

[5] *See* Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459], pp.129-158 (*see also,* pp.40-55, 75-90, 158-169). *See also* PSC's Phase One Post-Trial REPLY BRIEF [Doc 10714], pp.4-6, 15-17.

herewith, establish that the BP Defendants and their employees demonstrated a willful, wanton and reckless disregard, by:

- engaging in fast and reckless drilling, with little or no regard for the safe kick margin, despite multiple kicks, and in violation of the MMS Regulations requiring a safe drilling margin;

- creating, maintaining and largely ignoring a dangerously dysfunctional leadership team, which embraced the corporate culture of cutting costs and maximizing profits;

- proceeding with the cement job without a set of reliable test results confirming the slurry's stability;

- proceeding with the displacement despite a failed negative pressure test;

- selecting, configuring, sequencing, modifying, and refusing to upgrade the safety critical BOP, which was not sufficient or appropriate for the Macondo well;

- knowingly refusing to correct the persistent maintenance failures of safety critical equipment on the DEEPWATER HORIZON;

- **refusing to plan or prepare for a deepwater blowout by developing or acquiring the necessary and appropriate source control equipment, training and associated plans, despite decades of warnings, and in disregard of the largest known risk in the Gulf**; and,

- **intentionally concealing, exaggerating and otherwise misrepresenting material facts and information to the U.S. Government (and others) following the blowout on April 20, 2010.**

Plaintiffs, therefore, combining the Phase One record with the Phase Two record, respectfully amend their proposed summary Findings and Conclusions,[6] as follows:

> ....
>
> 7. BP and its employees were negligent, and such negligence was a substantial contributing cause of the blowout, explosion, fire, and the initiation of the discharge of oil, **as well as the duration and extent of the resulting spill**;

---

[6] *See* Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459] p.26, Nos. 7-11.

8. BP's employees' conduct was the result of gross negligence and willful misconduct, within the meaning of OPA, 33 U.S.C. §2704(c)(1)(A);

9. BP and its employees violated applicable Federal safety, construction or operating regulations within the meaning of OPA, 33 U.S.C. §2704(c)(1)(B);

10. BP's employees engaged in willful and wanton conduct, and such willful and wanton conduct was a substantial contributing cause of the blowout, explosion, fire, and the initiation of the discharge of oil, **as well as the duration and extent of the resulting spill**;

11. The willful and wanton conduct of BP employees was the result of corporate policy and/or was otherwise known to, approved by, and/or ratified by corporate officials with policymaking authority;

**….**

With regard to the last issue, plaintiffs respectfully supplement the facts and evidence highlighted in Plaintiffs' Phase One Proposed Findings and Conclusions[7] (as well as Plaintiffs' Phase One Post-Trial Reply Brief[8]), based on the Phase Two evidence, and now respectfully propose additional Findings and Conclusions further establishing that the BP Defendants, through corporate policy and/or through officials with policy-making authority, had knowledge of, approved, and/or ratified the willful, wanton and reckless conduct summarized above:

## Plaintiffs' Proposed Additional Findings
## Regarding the Corporate Blameworthiness of BP

1. The refusal to have any capping devices or other source control planning in place was not unique to the drilling of the Macondo Well; rather, BP refused to invest any time or money in source control preparations for any or all deepwater wells, company-wide. The absence of a capping device, training, and other associated planning as of April 20, 2010 was not

---

[7] *See* Plaintiffs' Phase One PROPOSED FINDINGS AND CONCLUSIONS [Doc 10459] pp.158-169 (see also pp.40-47, 51-54).

[8] *See* Plaintiffs' Phase One Post-Trial REPLY BRIEF [Doc 10714] pp.4-6.

something that 'slipped through the cracks' on Macondo due to the wanton or reckless disregard of one or two employees; it was the conscious result of corporate policy.

2. For example, BP's Oil Spill Response Plan (OSRP), which failed to include any specific planning or provisions for source control efforts, was not a Macondo Plan, but a response plan (or lack thereof) for all deepwater drilling in the Gulf. *See* TREX-769.

3. Professor Bob Bea, an expert in process safety and risk management, testified that BP proceeded to drill the Macondo Well "in disregard of the Gulf environment and economy." *See* Bea Phase Two Report (TREX-11750R), p.25 (pdf page 26). Based on BP's own Major Accident Risk Matrix, the likelihood and associated consequences of an uncontrolled blowout constituted an "Unacceptably High Risk" that was "well above" BP's "Group Reporting Line." *See* Bea Phase Two Report (TREX-11750R), p.17 (pdf page 18); Bea Testimony (Phase Two), 425:15-427:24; D-20023. Indeed, the project and its associated risks were above the BP Group Reporting Line, as they "were not Fit-for-Purpose or As Low as Reasonably Practicable" (ALARP). *See* Bea Phase Two Report (TREX-11750R), p.22 (pdf page 23); Bea Testimony (Phase Two), 425:2-426:13, 428:22-429:1, 431:13-432:6; D-20021; D-20032; D-20024. Hence, "multiple senior vice-president approvals" were required. Bea Testimony (Phase Two), 427:22-24.

4. BP willfully and wantonly proceeded in the face of these risks, and in conscious disregard of almost twenty years of warnings about the need to develop and/or acquire source control equipment and associated planning. *See, e.g.,* TREX-11625 (Drilling Engineers Association 1991 "DEA-63" Report); TREX-7353 (International Association of Drilling Contractors 1998 Well Control Guidelines); TREX-4423 (and D-20050) (2001 BP internal acknowledgment of risk that the HORIZON drifts off-station, the BOP fails, and ROVs cannot

be used to stop the uncontrolled blowout); TREX-6299 (SPE and IADC 2003 Conference); D-20039 (SPE/IADC 2005 Report No. 92626); TREX-9239 (2005 Ole Rygg publication); TREX-11400 (2008 International Oil Spill Conference); *see also, generally* Bea Testimony (Phase Two), pp.432:13-440:12; Bea Phase Two Report (TREX-11750R) pp.3-5 (pdf pp.4-6); Perkin Phase Two Report (TREX-11464R) pp.25-26.  As stated by Halliburton's expert, "it defies common sense that they would not have a plan." Ziegler Testimony (Phase Two), 567:19-20.

5.	Andy Inglis, the CEO of BP Exploration & Production and a member of the BP P.L.C. Board, personally signed and approved the Executed Financial Memorandum for the Macondo Exploratory Well. *See* TREX-6327.2; Inglis Depo, 21:22-22:19.  The certification in the initial Exploration Plan and in the OSRP that BP had the capability to respond to a worst-case discharge of 162,000 BOPD was not simply the statement of a reckless employee, but a formal certification by BP. *See* TREX-768.99 (and D-20047); TREX-769.496; *see also* TREX-6181 (Certificate of Compliance).  When BP made the certification, Inglis knew that BP had spent zero dollars on source control technology or planning for the highest risk in the Gulf of Mexico. Inglis Depo, 125:3-8, 161:1-162:21.  Hayward also knew that BP had performed no source control planning. Hayward Depo, 255:5-256:10, 343:2-20.

6.	BP's conscious disregard of the post-blowout risks stemmed from BP's "every dollar counts" corporate culture and policy to maximize profits, while cutting costs.  For example, BP's Crisis and Continuity Management Plan was intended primarily to "interface with external BP groups to protect [BP's] reputation, financial integrity, and license to operate." TREX-11603.4; Bea Phase Two Rebuttal Report (TREX-11751R), p.8.  As a matter of corporate policy, BP specifically authorized its personnel to ignore mitigation if the risks were too expensive to mitigate. TREX-1200061.12 (BP Gulf of Mexico SPU Drilling, Completions and

Intervention Risk Management Plan). *See also, e.g.,* TREX-2248.3 and TREX-2248.7 ("making every dollar count") (from Head of the BP E&P Executive Office in London at BP p.l.c.); TREX-6298.23 (BP Exploration & Production had reduced production costs by $900 million and improved operating efficiency by $300 million in 2008-2009) (*see* TREX-6298.1 (to, among others, Andy Inglis and "Latta, Randy L (UK)")).

7. BP, in this regard, is organized globally, by function. *See* L. McKay Testimony (Phase One), 537:18-22. BP P.L.C. is included within, sets standards for, and provides management for the "BP Group" – which describes the entirety of BP's operations, from exploration and production, to refining and marketing, to alternative energy, and the corporate center. *See* Armstrong Depo, 25:18-27:22; *see also,* Hayward Depo, 561:18-562:8 (BP Exploration & Production is more appropriately characterized as an "internal organizational unit" within BP p.l.c. than as a "legal subsidiary"); Suttles Depo, 798:7-22, 803:1-11 (Exploration & Production was an "organizational entity" within the BP Group; "I don't know if BP Exploration & Production was a legal entity"); TREX-6079.3 (BP Annual Report and Accounts, 2009, p.2) ("BP" or "BP Group" is defined by the company as "BP p.l.c. and its subsidiaries" which are entities "controlled by the BP group" including "the power to govern the financial and operating policies" of the subsidiaries) (discussed in Hayward Depo, 864:11-866:1).

8. The BP Exploration & Production Executive Office was run out of the United Kingdom, with a registered office for BP p.l.c. on St. James Square, in London, England. *See, e.g.,* TREX-2248.1. The BP E&P presentation for 2010 indicated that "SPU will remain the organizational unit for integrated business delivery." TREX-2248.7. The BP Organizational Chart shows both Exploration & Production and the Gulf of Mexico SPU falling within and

under the P.L.C. Board of Directors, with a "Direct reporting relationship" from Mr. Dupree, the Leader of the GoM SPU, to Mr. Inglis, the CEO of E&P, to Tony Hayward, the CEO of P.L.C., to the P.L.C. Board of Directors, to the Safety, Ethics and Environment Assurance Committee (SEEAC). TREX-2557.

9. Mr. Suttles believed, at the time of his testimony, that his paycheck came from BP North America, but he reported to Andy Inglis, as the Executive Officer of Exploration & Production; Suttles did not know and could not name the specific entity for which he served as Chief Operating Officer except to say E&P. *See* Suttles Depo, 548:4-553:3. Richard Lynch believed that he was employed by BP America, but testified that his Central Development Organization was responsible for BP projects globally. *See* R. Lynch Depo, 13:4-15, 384:14-385:16; *see also, e.g.,* TREX-2347.5 (reflecting CDO global projects, global reach).

10. Following the blowout, numerous corporate officers were directly involved in willful and intentional misrepresentations to the U.S. Government and others. These corporate officers were serving as designated spokespersons for and representatives of the BP Defendants, and were otherwise vested with policymaking authority. These corporate officers made, had knowledge of, directed, approved, and/or ratified the willful and intentional misrepresentations. For example:

11. Tony Hayward, who was the CEO of BP P.L.C. at the time, represented that the "Top Kill" had a 60-70% chance of success. TREX-150307N; *see also, e.g.,* Hayward Depo, 263:14-25; TREX-10532 (BP Talking Points Memo); TREX-11317 (e-mail from Secretary Salazar to Rahm Emmanuel, White House Chief of Staff) ("BP probability of success-80 percent").

12.     Andy Inglis was the CEO of BP Exploration and Production, and served on the Board of Directors of BP P.L.C. *See* Inglis Depo, 21:22-22:19.  Mr. Inglis also served on the Group Operations Risk Committee (GORC), and participated in the BP PLC Board's Safety, Ethics and Environment Assurance Committee (SEEAC). *See, e.g.,* TREX-3822; TREX-7203; TREX-6325; D-2675. (*See also, e.g.,* TREX-6328 (Inglis terminated in September of 2010 by BP P.L.C.))  Mr. Inglis was specifically informed that the 5,000 BOPD estimate was unreliable, and that the flow rates could be up to 100,000 BOPD. *See, e.g.,* TREX-3220.1; TREX-10779.  Inglis responded, through his assistant, Jasper Peijis, with a directive not to put such information in writing. Mason Depo, 317:22-321:15; *see also* TREX-9157.1 (after Inglis, Peijs and Tony Hayward receive flow rate modeling, Peijs instructs McAughan and others not to forward the information).

13.     Harry Thierens was based in London at the time of the blowout. Thierens Depo, 17:4-22.  He was the Vice-President Operations, Drilling & Completions. Thierens Depo, 17:21-18:10; 434:15-20.  Thierens had knowledge, on April 25, 2010, of modeling that put the flow rate at ranges of 30,200 to 69,500 BOPD. *See* TREX-6110.

14.     Paul Tooms held several different titles, including Vice-President of Engineering for Exploration & Production. Tooms Depo, 19:21-20:2, 508:25-509:5. "It was a global job." Tooms Depo, 509:14. After the spill, Mr. Tooms, from London, exercised authority over the access to flow rate data. *See, e.g.,* TREX-6195; TREX-9164; TREX-9474; Tooms Depo, 304:3-305:17; *see also* TREX-6197 (from Tooms at "BP Exploration Operating Company Ltd" at Sunbury-on-Thames Middlesex).  Tooms had knowledge of internal BP 15,000 to 25,000 BOPD flow rate estimates. Hill Depo, 396:6-397:10, 425:9-18.  On April 28, 2010, Tooms received an e-mail showing rates as high as 65,171 BOPD. *See* TREX-5063.4.  Tooms also knew that the

"Top Kill" would fail if the rate exceeded 15,000 BOPD. Tooms Depo, 263:23-264:14, 582:12-583:13.

15.     Doug Suttles was delegated authority "for all operational matters (S&OI, production, drilling, resources and costs) across the Segment" and was the designated Chief Operating Officer of BP Exploration & Production. TREX-2248.8; Suttles Depo, 22:7-11; TREX-1624; *see also* Suttles Depo, 773:22-774:12 (had oversight for drilling globally). Admiral Landry expressly "relied on the work of BP through Doug Suttles as the Lead Person for BP." Landry Depo, 321:10-15. Mr. Suttles is the one who signed the May 10, 2010 letter to Admiral Landry, MMS Regional Director Lars Herbst, and National Incident Commander Thad Allen reaffirming BP's false and misleading 5,000 BOPD estimate. *See* TREX-9155.

16.     Richard Lynch was Vice-President of Drilling & Completions for the Central Developments Organization. R. Lynch Depo, 11:23-25. Mr. Lynch was one of three BP executives upon whom Admiral Landry relied for information. Landry Depo, 84:11-21. Lynch told BP's expert, Adam Ballard, that BP was not releasing any flow rate information. TREX-9475; Ballard Tetsimony (Phase Two), 1000:7-1001:16; Ballard Depo, 292:9-294:23, 297:9-16. Lynch also instructed a BP engineer "not to forward the rates to anyone." Saidi Depo, 407:2-408:8. In addition, Lynch was present for the meetings in which BP internally analyzed and then externally misrepresented why the "Top Kill" had failed. *See, e.g.,* Cook Depo, 138:6-139:8.

17.     James Dupree was the SPU Leader for the Gulf of Mexico. *See* Dupree Testimony (Phase Two), 580:6-7; TREX-2557. (He is now BP's Chief Operating Officer of Resource Development & Technology. Dupree Testimony (Phase Two), 579:10-11.) Dupree "led the source control efforts on behalf of BP." Dupree Testimony (Phase Two), 580:19-22. Mr. Dupree

admitted that he concealed 86,600 BOPD flow rate estimates from the National Lab scientists and Federal Science Team. Dupree Testimony (Phase Two), 691:10-15.

18.     David Rainey was the Vice-President of Exploration within the Gulf of Mexico. Rainey Depo, 17:10-13.  Mr. Rainey was one of three BP executives upon whom Admiral Landry relied for information. Landry Depo, 84:11-21.  Rainey, who made calculations of up to 92,000 and 103,000 BOPD, worked with BP attorneys to produce the "Rainey Memo" to be provided to the Government, reflecting a range of only 1,000 to 14,000 BOPD, with 5,000 BOPD as the "best guess". *See, e.g.,* Rainey Depo, 146:2-22, 150:5-13, 152:22-153:19, 158:8-161:23, 181:25-184:18, 187:8-188:12; TREX-3213; TREX-3214; TREX-3218.  Mr. Rainey also advised Dr. McNutt and others during a meeting on May 23, 2010 that his "best estimate" of the flow rate was 5,000 BOPD. *See* McNutt Depo, 424:3-13.

19.     Gary Imm was BP's "MC252 Incident Commander, Source Control." *See* TREX-5329.  Mr. Imm instructed Rob Marshall, the Subsea Manager for the Gulf of Mexico, and Alistair Johnson not to communicate with anyone regarding internal BP flow rate calculations. *See, e.g.,* TREX-8656.

20.     BP's Guilty Plea further establishes corporate wrongdoing. The factual allocution regarding BP's violation of 18 U.S.C. §1505 repeatedly refers to the conduct of BP:

> 1. BP, through a former vice president, withheld information….
>
> 2. BP, through a former vice president, withheld information….
>
> 3. BP, through a former vice president, falsely represented….
>
> 4. BP, through a former vice president, falsely represented….
>
> 5. BP falsely suggested….
>
> 6. On or about June 25, 2010, in a BP letter to Congressman Markey….

TREX-52673.16-17. The factual allocation expressly concludes with an admission that "BP's former vice president's knowledge and actions are attributable to BP." TREX-52673.18.

21. BP P.L.C. is a signatory to the criminal guilty plea. *See* TREX-52673 (BP Guilty Plea Agreement) at pdf p.12; *see also,* Order, p.19 ¶38 [TREX-52673 at pdf p.38] ("This Order shall be applicable to the defendant, and to the extent specified herein, to BP plc and Affiliates"); Resolutions of the Board of Directors of BP plc [TREX-52673 at pdf pp.54-56]; *see also,* Order, pp.1-2 ¶1.a. [TREX-52673 at pdf pp.20-21] (Retention of Process Safety Manager applies to "any entity controlled, directly or indirectly, by BP plc that participates in deepwater drilling in the Gulf of Mexico"); Order, p.9 ¶11.a. [TREX-52673 at pdf p.28] (cement Design and Competency applies to "the defendant, BP plc, or the Affiliates").

22. The U.S. Government looked to and interacted with Mr. Hayward and BP P.L.C., in addition to the American subsidiaries. Specifically, Janet Napolitano, the Secretary of Homeland Security, and Lisa P. Jackson, the Administrator of the EPA, wrote BP P.L.C. CEO Tony Hayward on May 20, 2010, complaining that BP was not making relevant information and data available to the U.S. Government and the public at large. TREX-7361; s*ee also* L. McKay Depo, 133:23-136:4. Mr. Hayward testified before Congress on June 17, 2010 regarding the DEEPWATER HORIZON explosion, fire and resulting oil spill as "the Chief Executive of BP plc." *See* TREX-6060.1; TREX-6001.24.

This 20th day of December, 2013.


Respectfully submitted,


   /s/   Stephen J. Herman                      /s/ James Parkerson Roy
**Stephen J. Herman**, La. Bar No. 23129      **James Parkerson Roy**, La. Bar No.11511
**HERMAN HERMAN & KATZ LLC**              **DOMENGEAUX WRIGHT ROY**
820 O'Keefe Avenue                                     **& EDWARDS, LLC**
New Orleans, Louisiana 70113               556 Jefferson Street, Suite 500
Telephone: (504) 581-4892                  Lafayette, Louisiana 70501
Fax. No. (504) 569-6024                     Telephone: (337) 233-3033
Email: sherman@hhklawfirm.com          Fax No. (337) 233-2796
*Plaintiffs Liaison Counsel*                     E-Mail: jimr@wrightroy.com
                                                    *Plaintiffs Liaison Counsel*


## **PLAINTIFFS' STEERING COMMITTEE**

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER, HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

**ADDITIONAL PSC PHASE TWO TRIAL TEAM MEMBERS**

Frank Petosa
MORGAN & MORGAN, P.A.
600 N. Pine Island Road, Suite 400
Plantation, Florida 33324
(954) 318-0268
E-Mail:  fpetosa@forthepeople.com

Anthony Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Tel: (504) 525-1500
Fax: (504) 525-1501
E-Mail: airpino@irpinolaw.com


**THE STATE OF ALABAMA**


The Honorable Luther Strange
*Attorney General*
Corey L. Maze
*Special Deputy Attorney General*
Winfield J. Sinclair
*Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL  36130
Phone: (334) 353-4336
E-Mail: cmaze@ago.state.al.us

*Counsel for the State of Alabama, and*
*Coordinating Counsel for the States*



**THE STATE OF LOUISIANA**

The Honorable James D. "Buddy" Caldwell
*Attorney General*
James Trey Phillips
*First Assistant Attorney General*
Megan K. Terrell
*Assistant Attorney General*
*Section Chief –Environmental*

P.O. Box 94005
Baton Rouge, LA 70804-9005
Telephone: (225) 326-6708

Allan Kanner
Elizabeth B. Petersen
Douglas R. Kraus
Allison M. Shipp
KANNER & WHITELEY, LLC
701 Camp Street
New Orleans, LA 70130
Telephone: (504) 524-5777

T. Allen Usry
USRY, WEEKS, & MATTHEWS, APLC
1615 Poydras St., Suite 12
New Orleans, LA 70112
Telephone: (504) 592-4641

Henry T. Dart
Grady J. Flattmann
HENRY DART, ATTORNEYS AT LAW P.C.
510 N. Jefferson St.
Covington, LA 70433
Telephone: (985) 809-8093

*Counsel for the State of Louisiana, and*
*Co-Coordinating Counsel for the States*

## CERTIFICATE OF SERVICE

    WE HEREBY CERTIFY that the above and foregoing Proposed Findings and Conclusions have been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of December, 2013.

    /s/ Stephen J. Herman and James Parkerson Roy