**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

<table>
<tr><td>In re:  Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010<br><br>**This document applies to:**<br>*All Cases*</td><td>MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN</td></tr>
</table>

## <u>TRANSOCEAN AND HALLIBURTON'S PHASE TWO POST-TRIAL BRIEF WITH RESPECT TO THE SOURCE CONTROL SEGMENT</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   BP FAILED TO PLAN OR PREPARE FOR A BLOWOUT ........................................... 2

III.  BP'S MISREPRESENTATIONS AND OMISSIONS ABOUT THE FLOW
      DELAYED CAPPING THE WELL ...................................................................... 2

      A.    BP Intentionally Lied About the Flow Rate ............................................... 2

      B.    BP's Lies Resulted in a Top Kill Strategy Doomed to Fail ............................. 5

            1.    BP Knew Top Kill's Likelihood of Success Depended on Flow
                  Rate ................................................................................................. 5

            2.    BP Lied About Top Kill's Likelihood of Success ................................... 7

            3.    BP's Lies Corrupted the Decision To Proceed with Top Kill ................... 7

      C.    After the Top Kill Failed, BP Was Responsible For the Decision to
            Abandon a Capping Strategy .................................................................. 9

            1.    BP Knew Top Kill Failed Because of High Flow but Falsely
                  Claimed That Ruptured Disks Were the *Only* Plausible
                  Explanation ...................................................................................... 9

            2.    BP's False Diagnosis of Top Kill's Failure Resulted in the
                  Abandonment of the BOP-on-BOP Strategy ......................................... 12

      D.    The BOP-on-BOP Option Was Ready and Would Have Capped the Well .......... 13

      E.    BP's Goal Not To Make the Situation Worse Does Not Justify Its Decision
            to Favor Top Kill over a Capping Strategy and, More Importantly, BP's
            Post-Incident Actions Were the Antithesis of That Goal—BP Made It
            Worse ................................................................................................ 15

IV.   BP'S CONDUCT WAS A SUPERSEDING CAUSE OF OIL THAT SPILLED
      AFTER THE WELL SHOULD HAVE BEEN CAPPED ............................................. 17

V.    BP ALONE IS AT FAULT FOR ITS SOURCE CONTROL CONDUCT ..................... 21

VI.   CONCLUSION ....................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Breeland v. Sec. Ins. Co.*,
   421 F.2d 918 (5th Cir. 1969) ................................................................................3

*Coffel v. Stryker Corp.*,
   284 F.3d 625 (5th Cir. 2002) ............................................................................ 20

*Exxon Co. U.S.A. v. Sofec, Inc.*,
   517 U.S. 830 (1996) ................................................................................... 17, 20

*In re Alex C. Corp.*,
   Nos. 00-12500; 01-12186, 2011 AMC 157, 174 (D. Mass. Nov. 1, 2010) .......................... 20

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   No. MDL-1446, 2010 WL 9077875 (S.D. Tex. Jan. 19, 2010) .............................. 20

*In re Omega Protein, Inc.*,
   548 F.3d 361 (5th Cir. 2008) ............................................................................ 21

*Knight v. F/T Endurance*,
   No. A94-121 CV, 1996 A.M.C. 958 (D. Alaska Feb. 6, 1996) ............................ 22

*Lone Star Indus. Inc. v. Mays Towing Co.*,
   927 F.2d 1453 (8th Cir. 1991) ......................................................................... 19

*Moore v. Johns-Manville Sales Corp.*,
   781 F.2d 1061 (5th Cir. 1986) ......................................................................... 22

*Narcissus Shipping Corp. v. Armada Reefers, Ltd*,
   950 F. Supp. 1129 (M.D. Fla. 1997),
   *as amended by* 986 F. Supp. 1383 (M.D. Fla. 1997) .......................................... 22

*Nunley v. M/V DAUNTLESS COLOCOTRONIS*,
   727 F.2d 455 (5th Cir. 1984) ..................................................................... 17, 18

*Protectus Alpha Navigation. Co. Ltd. v. N. Pac. Grain Growers, Inc.*,
   767 F.2d 1379 (5th Cir. 1985) ................................................................... 18, 19

*Skipper v. United States*,
   1 F.3d 349 (5th Cir. 1993) ......................................................................... 17, 18

*Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*,
   447 F.3d 360 (5th Cir. 2006) ......................................................... 17, 19, 20, 21

## TABLE OF AUTHORITIES
### (cont'd)

**Page**

*Taylor v. Swartwout*,
    445 F. Supp. 2d 98 (D. Mass 2006) ....................................................................... 19

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
    608 F.3d 871 (D.C. Cir. 2010) ................................................................................. 3

*United States v. Reliable Transfer Co.*,
    421 U.S. 397 (1975) ............................................................................................... 21

*Urbach v. United States*,
    869 F.2d 829 (5th Cir. 1989) ................................................................................. 17

TREATISES

Restatement (Second) of Torts § 442 ............................................................................ 18

Restatement (Second) of Torts § 442(c) ........................................................................ 19

Restatement (Second) of Torts § 442(e) ........................................................................ 19

Restatement (Second) of Torts § 442(f) ........................................................................ 19

Restatement (Second) of Torts § 448 ............................................................................ 17

Restatement (Third) of Torts: Apportionment of Liability § 8 (2000) .......................... 22

## I.   __INTRODUCTION__

There can be no doubt that BP lied about the flow of oil from the well.  It has admitted that in its guilty plea to obstructing Congress.  The Phase Two trial showed that these lies mattered.  BP told the world that its "best estimate" of the flow was 5,000 barrels per day.  As a result of that false statement, Unified Command approved a Top Kill strategy whose likelihood of success depended on that low flow estimate being truthful.  Then, BP's misrepresentations about the reasons Top Kill failed—driven by its refusal to publicly acknowledge the high flow rate—caused Unified Command to approve BP's recommendation to abandon a capping strategy.  The result of BP's conduct was weeks and weeks of additional discharge of oil.

BP's Mr. Mazzella testified, "if your inputs are wrong, your outputs are wrong."  M. Mazzella, P2 TT 806:4.   Yet, BP executives failed to truthfully disclose the inputs on the critical issue of flow rates.  They repeatedly provided the government—and their own source control team—with unsupportable low flow estimates and withheld numerous higher flow rate estimates. When Top Kill failed, just as BP employees and consultants had predicted, BP executives then told the government that collapse disks—not the high flow rate—were the *only plausible explanation* for the failure.  The truth, as BP had been warned before Top Kill, was that Top Kill failed because the flow path through the BOP, and the resulting flow rate of hydrocarbons into the sea, was simply too large.

BP's false and misleading inputs resulted in wrong outputs:  Decision-makers authorized and continued to push Top Kill with a vanishingly small chance of success.  Then, on May 29, based on BP's false diagnosis of the Top Kill's failure, decision-makers abandoned the BOP-on-BOP option then ready to go—an option that could and would have successfully capped the well. The result is a spill that dragged on unnecessarily for weeks.

1

BP spent a significant amount of money on source control after the blowout, and many BP employees and contractors worked hard to cap the well, but as explained in the PSC's separately filed brief, BP failed to spend *any money* in advance to prepare for a spill.  Only when it was too late did BP pour resources into the problem.  Moreover, despite all the money and hard work BP invested after the blowout, BP's repeated false statements about the flow rate caused decision-makers to approve source control strategies doomed to fail and to abandon strategies destined to succeed.

BP has argued that common sense dictates it would not have done anything to prolong the spill it spent so much money and effort to combat, but the point is not that BP intended to make the spill worse.  The fact is that BP clearly intended to conceal and lie about the true flow rate and the reasons for Top Kill's failure, and had obvious public relations motives for minimizing the flow rate.  The consequences of that lie—and the further misrepresentations it engendered—was to prolong the spill.

## II.   BP FAILED TO PLAN OR PREPARE FOR A BLOWOUT

As set forth in the factual recitations contained in the PSC's brief and in the Aligned Parties' Proposed Phase Two Findings of Fact, BP failed to prepare and plan for a blowout. Transocean and HESI adopt and incorporate those factual recitations pertaining to BP's failure to prepare adequately for a deepwater blowout.  BP's failure to prepare and plan for a blowout provides an additional basis for increasing the allocation of liability to BP as discussed *infra*.

## III.   BP'S MISREPRESENTATIONS AND OMISSIONS ABOUT THE FLOW DELAYED CAPPING THE WELL

### A.   BP Intentionally Lied About the Flow Rate

There can be no dispute that in the weeks following the April 20, 2010 blowout, BP falsely represented the flow rate from the well to Unified Command and the public.  BP has

*admitted* as much.  In pleading guilty to obstruction of Congress, BP admitted that, at the same time it was publicly proclaiming that the well was flowing at 5,000 barrels per day, "BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that *it did not share with the Unified Command*."  TREX-52673.17 at ¶ 5 (emphasis added).

This binding admission establishes three facts as a matter of collateral and judicial estoppel: (1) BP had *flow rate estimates*; (2) BP had multiple flow rate estimates *significantly greater* than 5,000 BOPD; and (3) BP *withheld* those flow rate estimates *from the Unified Command.  See, e.g.*, *Breeland v. Sec. Ins. Co.*, 421 F.2d 918, 922-23 (5th Cir. 1969) (defendant collaterally and judicially estopped from re-litigating admissions in support of guilty plea); *see also United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc*., 608 F.3d 871 (D.C. Cir. 2010) (district court found collateral and judicial estoppel from guilty plea admissions).

The evidence confirms BP's admissions: At the same time BP repeatedly told government officials its "best estimate" was 5,000 barrels per day, its own employees were warning that these estimates were unsupported, likely erroneous, and contrary to a variety of information known to BP but not shared with the public.  For example:

| **BP Representation** | **BP Internal Information** |
| --- | --- |
| BP's Doug Suttles told Admiral Landry on April 28 that BP's "best estimate" was just **2,500 BOPD** and that its range was **1,000-5,000 BOPD**.  Depo. of M. Landry, 192:10-25 | BP email from April 28 "bound[ing] the answers on flowrate" internally at a range of **2,523 to 65,171 BOPD**.  TREX-05063.4. |
| Suttles sent to Admiral Landry a chart on May 10 labeling **5,000 BOPD** the "Most Likely Model" and deleting estimates that had appeared on BP's internal version of the chart.  TREX-09155.4. | BP expert and 30(b)(6) witness Adam Ballard admitted that although the May 10 chart was based on hydraulic modeling, **no hydraulic modeling supported calling 5,000 BOPD the "Most Likely Model."**  A. Ballard, P2 TT  953:25-954:4; 957:21-958:6; |

| | D-25011A (PowerPoint with animation showing alterations from original chart, TREX-9330, to chart submitted to Adm. Landry on May 10). |
|---|---|
| On May 19, Doug Suttles forwarded a memo to Admirals Landry and Allen, authored by David Rainey, which stated the "best guess" based on overflight data was **5,707 BOPD**. TREX-3218.1.1.TO; TREX-3218.15.1.TO. This memo was subsequently attached to the May 24 BP Letter to Congressman Markey, TREX-1651.10, that formed part of the basis for BP's guilty plea. TREX-52673.17 at ¶ 5. | On May 15 Mike Mason emailed BPXP CEO Andy Inglis warning against "standing behind a 5,000 BOPD figure as our modeling shows that this well could be making **anything up to ~100,000 bopd."** TREX-03220.1 (emphasis added); *see* A. Ballard, P2 TT 998:15-20 (Ballard saw no evidence this was shared with Unified Command). <br><br> On May 17, Dr. Tim Lockett sent an email stating **5,000 bopd "has little if no origin" and "would appear to err on the low side."** TREX-09250.2 (emphasis added). <br><br> Dr. Wilson testified that "**the significant majority" of BP's flow rate scenarios "are higher than 5,000**." J. Wilson, P2 TT 104:16-105:1 (emphasis added). <br><br> Mr. Dupree, leader of the BP response, acknowledged that he did not tell the Federal Science Team about the **86,600 BOPD** flow rate BP had calculated and that he had learned about on May 16. J. Dupree, P2 TT 689:14-691:15. |

These misrepresentations were not an oversight or accident. BP executives took purposeful steps to conceal flow rate estimates. For example, in his May 10 letter to Admiral Landry and other government officials, BP's Doug Suttles attached a chart showing just two flow rate estimates—5,000 BOPD as the "most likely model" and 55,000 BOPD as the "worst case model." TREX-9155.4. But BP had doctored this chart before sending it to the government. Jasper Peijs, an executive assistant to the CEO of BP Exploration and Production, Andy Inglis, had *deleted* from BP's internal version of the chart six additional estimates of 10,000, 20,000, 40,000, 60,000, 109,000, and 162,000. TREX-11906, 11907; J. Wilson, P2 TT

109:16-111:1.  Just days later, on May 15, the head of BP's Petroleum Engineering flow rate work group, Mike Mason, warned BPXP CEO Inglis: "We should be very cautious about standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd . . . ."  TREX-3220.1.  Instead of making any effort to correct the information it was giving Unified Command, Inglis's assistant, Peijs, called Mason into a meeting and warned him that "next time you have an idea or thought like this"—i.e., the "big number"—he should discuss it in person.  Depo. of M. Mason, 320:1-321:15.  Two days later, on May 17, BP's Vice President Richard Lynch instructed BP's Adam Ballard: "We remain in a position where no flow related information can be released internally or externally."  TREX-9475.3.

These were not isolated incidents.  BP engaged in a concerted effort to conceal high flow rate estimates.  *E.g.,* TREX-8656.1 ("tell [BP modeler] Alistair not to communicate to anyone on this [an 82,000 BOPD estimate]"); Depo. of F. Saidi, 407:2-19; 408:2-8 (BP engineer testifying she was "instructed" by a BP Vice President "not to forward the rates to anyone."); TREX-09474.1 ("rates are confidential and I was told … not to write anything about it"); TREX-09475.4 ("we are not releasing any information that can be related to rate").

### B.   BP's Lies Resulted in a Top Kill Strategy Doomed to Fail

#### 1.   BP Knew Top Kill's Likelihood of Success Depended on Flow Rate

On May 16, BP recommended to top-level government officials, including Admiral Allen and Secretaries Chu and Salazar, that Top Kill be attempted.  TREX-142819N.1-2 (BP "Recommendation" to perform "a Dynamic/Momentum Kill"); J. Dupree, P2 TT 618:25-620:4 (TREX-142819N was presented to government officials on May 16); Depo. of  C. Holt, 72:10-14, 73:5-15, 323:19-24 (BP recommended Top Kill to Unified Command).  The strategy had two components—the momentum kill (pumping heavy mud down into the well) and the junk shot

(pumping material into the well in the hope of restricting or clogging the orifice).  Rec. Doc.
7076 (Stipulated Facts), Definitions of "MOMENTUM KILL" and "JUNK SHOT"; G. Perkin,
P2 TT 197:6-20; J. Dupree, P2 TT 615:18-617:5.  These government officials approved the
recommendation.  Depo. of C. Holt, 73:16-19.  BP, however, *knew* that Top Kill's success
depended on flow rate; and it knew Top Kill would not succeed at a flow rate of 15,000 BOPD
or more.

Simple physics demonstrates that the momentum kill depended on flow rate: To succeed,
the force of the fluid being pumped into the well must overcome the force of the fluid coming
out of the well.  I. Adams, P2 TT 1097:14-1099:24.  BP planned to pump fluid into the well at 50
barrels per minute, knowing that inflow could not stop an outflow of 15,000 BOPD or above.
TREX-08537.1 (BP informed "with 15000 bopd, you can not kill it with 50 bpm"); *see also*
TREX-8553.1 ("Modeling indicates that a dynamic kill cannot be successfully executed if the oil
flow rate is 15000 STBpd").  Indeed, BP's Mr. Dupree, the leader of response efforts,
acknowledged that at 15,000 BOPD the momentum kill "was probably not going to work."  J.
Dupree, P2 TT 712:8-20; *accord* I. Adams, P2 TT 1100:19-22 (Adams did no modeling to show
momentum kill could succeed at flow over 15,000 BODP).  Despite its awareness of the
overriding importance of flow rate, BP falsely minimized that importance and the likely failure
of Top Kill, telling government scientists that Top Kill would "struggle" only if flow rates were
"significantly higher than current estimates" of 5,000 BOPD.  TREX-140914.2.

BP argued at trial that the "junk shot" portion of Top Kill made the flow rate irrelevant.
This is false.  The "junk shot" procedure that BP submitted and Unified Command approved
states expressly that it is based on a 5,000 barrels per day flow rate.  TREX-9148.5.3.TO
(approved Junk Shot procedure); TREX-9675.12.  Based on that false low flow rate, the flow

path through the BOP was estimated at only ½ inch—a small hole that the "junk" might be able to plug.  TREX-9148.5.3.TO.  A higher flow, however, meant a bigger hole—one that could not realistically be plugged with junk pumped through the narrow 3 inch choke and kill lines.  *See* Depo. of P. Campbell, 367:25-369:2 ("a very generous flow path" meant "can't stop this with a junk shot"); I. Adams, P2 TT 1122:3-1123:1.

### 2.      BP Lied About Top Kill's Likelihood of Success

Disregarding its internal flow rate estimates, BP falsely told government decision-makers and the public that the Top Kill was a "slam dunk" and had a 60-80% chance of success.  Depo. of S. Chu, 308:9-11, 308:13-16 (told by BP that Top Kill was a "slam dunk"); TREX-11317.1 (80% chance); TREX-150307N (Tony Hayward announcing 60-70% chance); TREX-10532.2 (60-70% chance).

There was no basis for these claims, and BP's own witnesses disavowed them at trial.  Mr. Dupree testified he "certainly wouldn't have represented it in that way" when asked about the claim that Top Kill had a 60-70% chance of success.  J. Dupree, P2 TT 712:24-713:3.  And BP's Mr. Mazzella testified he would not have supported the "slam dunk" claim.  M. Mazzella, P2 TT 815:24-816:4; *see also* J. Wilson, P2 TT 128:1-10 (Dr. Wilson: "I saw no evidence that it was a slam dunk.  And, in fact, I would be quite worried about the Top Kill chance of success after reviewing the hydraulic modeling.").

### 3.      BP's Lies Corrupted the Decision To Proceed with Top Kill

BP's lies mattered.  It strains credulity to think that government officials would have signed off on BP's recommendation to proceed with Top Kill if, instead of asserting the Top Kill was a "slam dunk," BP had explained that its 5,000 BOPD "best estimate" for flow rate was a fantasy and that momentum kill would not succeed if flow equaled or exceeded 15,000 BOPD.

As Secretary Chu testified, both momentum kill and junk shot "[we]re dependent on flow rate." Depo. of S. Chu, 307:4:-22. And he explained that "if one knew earlier the amount of flow, things would have been different." Depo. of S. Chu, 198:8-199:13; *id.* at 230:18-232:1 ("if BP gave us their estimates of flow … a week or two prior to top kill, we would have gotten into much more serious discussions about the feasibility"); *id.* at 188:17-21 (acknowledging that getting complete and accurate information from BP was important to Chu's ability to do his job); *id.* at 205:21-25 (Chu considered BP's internal estimates of the flow rate material to his analysis); *see also* Depo. of M. Landry, 230:7-15 ("they should be providing me with all information they have"); *id.* at 618:17-20 (acknowledging the importance of full and complete information from BP in order to perform her oversight function).

Not only did BP misrepresent the flow rate, BP also failed to tell high-level government officials, including Admiral Landry, that momentum kill would fail at flows of 15,000 BOPD or more. Depo. of M. Landry, 446:24-447:4 (Landry was not informed that the Top Kill would not work if the flow rate was over 15,000 BOPD). Not surprisingly, these officials all testified they would have wanted BP to tell them about this limitation. Depo. of M. Landry, 493:23-494:3 (Landry would have expected BP to share the 15,000 BOPD limit with her personally); Depo. of L. Herbst, 441:17-442:13 (Herbst was not informed of the 15,000 BOPD limit, and knowing about it would have been "very helpful"); Depo. of T. Lockett, 404:23-405:4 (BP flow rate modeler testifying "I would not disagree with that statement" that "it was important for decision-makers evaluating whether to go forward with the Top Kill, to have the best information available about the flow rate").

At trial, BP played deposition clips of government officials' testimony, including testimony from Admiral Thad Allen, to suggest that flow rate did not matter. But this testimony

related to the government's spill response efforts on the surface (deploying boats and boom, engaging in controlled burns, etc.), *not* specifically to source control efforts, where flow rate information was critical. *Compare* Depo. of T. Allen, 213:19-23 (acknowledging that "the estimates of 1,000 and 5,000 were inconsequential in terms of the effort that [we were] mounting to respond to the spill"), *with* Depo. of T. Allen,  514:16-516:5, 637:20-639:19 (developing "accurate and scientifically grounded flow rate information" was "vital," "fundamentally important," "relevant" and "consequential" to source control).

C.     **After the Top Kill Failed, BP Was Responsible For the Decision to Abandon a Capping Strategy**

After Top Kill failed, BP failed to acknowledge the problem it knew about all along—that the hole was too big and the flow too great—but instead falsely claimed that ruptured collapse disks in the well were the only "plausible" explanation for Top Kill's failure.  That false diagnosis resulted in the decision to abandon the BOP-on-BOP capping option.

1.     **BP Knew Top Kill Failed Because of High Flow but Falsely Claimed That Ruptured Disks Were the *Only* Plausible Explanation**

On May 29, one day after Top Kill failed, BP formally presented its explanation to the Unified Command.  BP's verdict:  There was only one plausible explanation—collapse disks in the casing had opened before the rig sank, allowing Top Kill mud to flow out through those disks into the formation.  TREX-11614 (BP's May 29 Top Kill Analysis slide presentation).  BP presented two other scenarios on May 29, including a scenario that attributed Top Kill's failure to "massive flow" through the BOP.  However, BP characterized those scenarios as "possible" but "*not plausible*."  TREX-11614; J. Dupree, P2 TT 716:21-717:7.  Government officials who attended the May 29 meeting remembered the presentation in the same terms:  BP claimed that the rupture disks were the only plausible explanation.  Rear Admiral Cook, who attended the May 29 meeting, recalled "from being there, that the context was that there was no other

plausible scenario being presented, only that one for the failure of the top kill."  Depo. of K. Cook, 156:25-159:12; *accord* Depo of. L. Herbst,  494:16-21 ("Q.  In fact, BP presented this failed rupture disks scenario as the only plausible scenario for explaining the top kill's failure; is that right?  A. From what I recall, that was the only one, yes."); Depo of T. Hunter, 605:20-23 (similar); Depo. of M. McNutt, 459:18-460:12 (similar); Depo. of C. Holt, 188:4-12; 190:18-191:13 (similar).

BP's claim was untenable.  First, as discussed above, BP knew that (a) Top Kill was likely to fail if the flow equaled or exceeded 15,000 BOPD and (b) its own modeling showed the flow likely exceeded 15,000 BOPD.  When Top Kill failed, the most obvious and plausible explanation was that it had failed as predicted because the flow exceeded 15,000 BOPD.

Second, BP employees Mark Mazzella and Kurt Mix and consultants Wild Well Control and Bob Grace all watched the Top Kill procedure and concluded that it failed because the flow path through the BOP was too large.  On the second night of the Top Kill operation, BP engineer Kurt Mix sent Jon Sprague, a senior BP engineering executive, a text message explaining that Top Kill was failing because there was "[t]oo much flow rate—over 15000 [BOPD] and too large an orifice."  *See* TREX-09160.1 (text message from BP engineer Kurt Mix).  Mark Mazzella, BP's well control authority, believed Top Kill failed because "the holes were too big or there were multiple holes."  M. Mazzella, P2 TT 825:24-826:10 (Wild Well, Bob Grace, and the "consensus of the whole forward team" was that flow path was too large).  And just two days after the May 29 meeting, Wild Well Control reported to BP that Top Kill failed because the flow path was too large (and hence the flow too great) and could not be blocked.  TREX-9946.2 (May 31 memorandum from Wild Well Control to BP).  Wild Well Control's memo did not mention open collapse disks as a possible explanation (*id.)*; the "consensus" view among Wild

Well Control's experienced source control specialists was that the Top Kill had not failed due to the disks. Depo. of D. Barnett, 121:20-122:2. These conclusions were reached by those in the best position to assess Top Kill's failure, but BP's May 29 presentation to the government ignored the contemporaneous conclusions of its engineers, and BP never corrected its May 29 conclusions after receiving only two days later the assessment of Wild Well Control, its hired source control expert.[1] Depo. of L. Herbst, 499:2-7 (Herbst does not recall anyone from BP sharing view that Top Kill failed because flow rate was over 15,000 BPD); Depo. of M. McNutt, 460:21-461:25 (answering "Oh, no" when asked if BP shared the view that the Top Kill was failing because the flow rate was too high); Depo. of T. Allen, 588:7-21 ("I have no memory of such a conversation"); Depo. of T. Hunter, 608:6-22 ("I recall no reference to Mr. Mix's work"); Depo of C. Holt (BP 30(b)(6) witness), 201:4-202:4 (Mix's view "was not listed in the scenarios" BP presented on May 29).

Third, BP's own experts agreed that "massive flow" through the BOP was not only the explanation that proved to be "the truth," but was a realistic explanation based on evidence available at the time. I. Adams, P2 TT 1129:18-1131:11, 1136:23-1137:7. BP's Mr. Adams conceded that, based on information available to BP at the time, the massive flow scenario was consistent with *all the evidence*. I. Adams, P2 TT 1137:24-1138:18, 1139:13-1140:15; TREX-11614.4.TO. But BP falsely told the government that the massive flow scenario was "not plausible" and was "not consistent" with the evidence. I. Adams, P2 TT 1140:16-1141:4; *see* TREX-11614.6 (BP's May 29 Top Kill Analysis slide presentation).

---

[1] This is consistent with BP's practice of ignoring the advice of the very source control experts it assembled. E. Ziegler, P2 TT 519:10-520:23; Depo of D. Barnett 105:4-106:8, 112:9-113:16, 163:5-8, 163:10, 163:12-17, 175:24-176:2, 180:23-181:2; TREX-10072; TREX-10499; TREX-10607; TREX-10610 (Wild Well Control's Pat Campbell, stating that Exxon Mobil "didn't feel that BP was listening or had any interest in their input, or that BP was not showing any respect for [their] contribution.").

In short, BP explicitly dismissed the correct scenario—that Top Kill failed due to the massive flow rate—and falsely claimed that the only plausible explanation was the incorrect claim that the rupture disks had failed.

      **2.**      **BP's False Diagnosis of Top Kill's Failure Resulted in the Abandonment of the BOP-on-BOP Strategy**

In the concluding slide of BP's false and fateful May 29 presentation, BP recommended, based on its incorrect diagnosis of Top Kill's failure, that the BOP-on-BOP would have to be abandoned.  There is no dispute—all parties have stipulated—that on that very day, May 29, the BOP-on-BOP strategy was abandoned.  Rec. Doc. 7076 #83 (Stipulated Facts).

BP's own expert Iain Adams *conceded* the causal connection:  "*[a]s a result of Scenario 3* [the ruptured disks scenario], *the decision was made not to shut in the well but to move toward containing, catching the oil.*"  I. Adams, P2 TT 1128:21-24 (emphasis added); *accord* I. Adams, P2 TT 1069:5-9 ("Coming out of Top Kill . . . a new concern was identified, *and as a result BOP-on-BOP was removed from the table*") (emphasis added).

Both Government officials' and BP's testimony is consistent with BP's expert's concession:  BP's explanation for Top Kill's failure caused the decision to abandon the BOP-on-BOP option.  Depo. of L. Herbst, 495:9-496:3 (BOP-on-BOP abandoned because of May 29 presentation); *accord* Depo. of C. Holt,  209:2-7, ("Q. And as a result of what BP offered at the time as the most likely reason [for Top Kill's failure], the BOP on BOP option was removed as an option, correct?  A. Yes, that was—that's correct."); Depo of J. Wellings, 189:10-193:14; Depo. of M. Landry, 635:18-636:5; J. Dupree, P2 TT 715:25-716:9.

Internal government correspondence confirms that BP's May 29 misrepresentations about the cause of the Top Kill's failure caused the abandonment of the BOP-on-BOP strategy.  For example, just after the meeting ended, Admiral Cook sent Admiral Allen an email update stating,

"Meeting completed," and informing Admiral Allen that based on BP's presentation, "BOP on BOP not advisable, now or in the future, because of rupture disk issue. . . . Again a potential broaching scenario."  TREX-9411.1.

### D.     The BOP-on-BOP Option Was Ready and Would Have Capped the Well

There can be no doubt that if the BOP-on-BOP option had not been abandoned, it would have been ready to deploy and it would have worked.

BP told Admiral Landry in late May that the BOP-on-BOP option would be ready immediately after Top Kill, and the contemporaneous evidence demonstrated that the BOP-on-BOP was repaired and ready to be installed within days.  Depo of J. Wellings,  182:16-21 (James Wellings, leader of BP's BOP-on-BOP and capping stack teams: the BOP-on-BOP procedure was "done and ready to implement" by the end of May); TREX-11261N.2.BP (BOP-on-BOP May 29 installation schedule); TREX-8542 (Wellings: "After the top kill failed we [were] again going to install the cap then the decision was made to use the top hat and containment.").  BP's own expert conceded he had not disputed that the BOP was ready to be installed *as scheduled* on June 3 and to cap the well by June 6.  I. Adams, P2 TT  1147:21-1148:8, 1150:7-1150:25.

Had it been employed, there is no doubt that the BOP-on-BOP option would have worked.  E. Zeigler, P2 TT 537:6-17 (Ziegler: BOP-on-BOP would have succeeded in shutting in the well if it had been implemented in May).  In fact, the BOP-on-BOP strategy that was ready to deploy in late May had the same key components as the capping stack that successfully shut in the well in July.  R. Turlak, P2 TT 360:16-362:20.  In particular, the BOP was equipped with precisely the same type of blind shear ram used on the capping stack to shut in the well.  I. Adams, P2 TT 1157:12-18, 1157:22-25; R. Turlak, P2 TT 416:5-11 (Turlak:  *DDII* BOP to be used in BOP-on-BOP option had blind shear rams like the blind shear rams that were used on the successful capping stack); Rec. Doc. 7076 # 133 (Stipulated Facts).

At trial, BP pointed to risks of the BOP-on-BOP option.  But all source control methods were recognized as having risks.  Those risks, including the ones emphasized by BP at trial, were identified and appropriately addressed.  In fact, the contemporaneous BP-led Peer Assist, consisting of blowout experts from across the industry, identified the very risks BP emphasizes now.  Those experts, with no ax to grind, concluded that "the BOP on BOP operation is feasible and can be managed safely."  TREX-10505.5; TREX-10535.1 ("We've completed the HAZID for the well capping effort … We have mitigations for all the risks."); E. Zeigler, P2 TT 537:18-538:8 (Ziegler: "the technology and the application of setting a BOP-on-BOP in deeper water from a floating rig was achievable and existed as a technique in the industry").  BP's own expert, Iain Adams, testified that the Peer Assist conclusion that the BOP-on-BOP option was feasible and could be managed safely "was a reasonable statement for the team to come up with at the time."  I. Adams, P2 TT 1153:14-20.

It is undisputed that the collapse disks that BP blamed for the Top Kill's failure were in fact intact; thus, the BOP-on-BOP would not have caused an underground blowout.  J. Dupree, P2 TT 717:8-11.  But even assuming ruptured collapse disks could not be ruled out as a risk at the time, the BOP-on-BOP had *the same* venting capabilities—to release hydrocarbons and thereby reduce pressure—that allowed the capping stack to be safely deployed many weeks later.  R. Turlak, P2 TT 327:6-329:5 (Turlak describing multiple venting options available on *DDII* BOP); *id.* at 351:12-19 (chokes would attach to the same side outlet valves on the capping stack and on the BOP-on-BOP); G. Perkin, P2 TT 214:1-10 (Perkin: "the BOP-on-BOP option could have been utilized to mitigate any concerns about the rupture disks.  You could incorporate a venting option."); I. Adams, P2 TT 1157:12-1158:3.

The risks of removing the Lower Marine Riser Package (LMRP), which BP focused on at trial, were similarly identified by the Peer Assist experts at the time and were viewed as subject to feasible and safe mitigation.  BP had a plan in place as early as May 6 to cut any drill pipe found between the LMRP and BOP with an ROV saw.  R. Turlak, P2 TT 337:8-21.  And the LMRP concerns were definitely resolved by May 25, when BP and Unified Command *approved* the LMRP removal procedure.  TREX-141123.  As BP's expert conceded, this procedure included contingency plans in the event the LMRP initially became stuck when unlatched.  I. Adams, P2 TT 1154:6-24.

Finally, even if removing the LMRP was an obstacle, the Three Ram Capping Stack, which could be attached on top of the LMRP, was ready to be deployed on June 4, 2010, and could have capped the well by June 10, 2010.  T. Smith, P2 TT 898:22-900:4; 901:14-18; TREX-143045 (email from Charles Curtis to Trevor Smith dated May 30, 2010:  "Completion date ready to ship offshore Friday, June 4, 2010.").  The truth is that the risks BP now asserts with respect to the BOP-on-BOP and capping stack options were raised and addressed before BP's lies distorted the decision-making process.

> **E.**     **BP's Goal Not To Make the Situation Worse Does Not Justify Its Decision to Favor Top Kill over a Capping Strategy and, More Importantly, BP's Post-Incident Actions Were the Antithesis of That Goal—BP Made It Worse**

BP argued at trial that one of its guiding principles for source control was "don't make it worse," and that attempting Top Kill rather than a capping strategy was consistent with that principle.  J. Dupree, P2 TT 596:25-597:25, 659:17-22, 730:2-6.  This rationale for BP's actions does not withstand scrutiny.

As an initial matter, Top Kill itself was a dangerous operation that posed risks to the safety of those involved.  TREX-8533.1; *see also* TREX-142710N.13 (BP presentation identifying "People, Pressure, SIMOPS" as one of the "Top Risks" of the Top Kill); TREX-

10509.13 (BP's May 7 Source Control Update showing that the junk shot had been "reviewed with industry experts" and was "a high risk option" with "High" "Associated risks"); TREX-8541.4 (concluding that the Top Kill would be "very problematic" and the BOP-on-BOP should therefore "be prioritized" above the Top Kill). Thus, with knowledge that Top Kill was unlikely to work, BP still chose to risk the safety of those involved in the procedure.

Moreover, Top Kill presented the same risks of a subsea blowout and potential harm to the relief well as a capping strategy. The Peer Assist team that evaluated the risks of Top Kill before the operation reported a consensus finding that if BP successfully plugged the well with the junk shot, a breach could result. TREX-10506.3-.4 (Top Ten Findings of Peer Assist Report). And BP's expert Mr. Adams explained that "damage to well integrity was a very significant [risk of Top Kill], and the potential downsides were significant," because if the rupture disks had burst during the Top Kill that could have resulted in a breach. I. Adams, P2 TT 1050:23-1051:19. BP further knew that if Top Kill caused a breach, it could jeopardize the relief well operation. TREX-9940.12 (May 14 BP Top Kill presentation listing "Jeopardizing Relief Well" among Top Kill's "High Level Risks"); J. Dupree, P2 TT 643:6-647:13 (explaining how a subsea breach with multiple outlet points would "really complicate[] the potential success of the relief well"); I. Adams, P2 TT 1055:2-24 (the Top Kill could jeopardize the relief wells by compromising well integrity).

Balancing the risks and benefits, it might have made sense under BP's "don't make it worse" principle to try Top Kill if 5,000 BOPD truly had been the best estimate for flow; but it made no sense to risk lives, safety, and well integrity trying a Top Kill procedure that had little to no chance of success, when a capping strategy with a similar set of well integrity risks—but a far

greater likelihood of success—was also available.  Instead, BP made it worse; oil flowed into the Gulf for weeks and weeks after BP abandoned the BOP-on-BOP option.

## IV.   BP'S CONDUCT WAS A SUPERSEDING CAUSE OF OIL THAT SPILLED AFTER THE WELL SHOULD HAVE BEEN CAPPED

The doctrine of superseding cause essentially asks "whether the defendant is to be held liable for an injury to which he has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which he is not responsible." [2]  *Nunley v. M/V DAUNTLESS COLOCOTRONIS*, 727 F.2d 455, 464 (5th Cir. 1984) (quoting William L. Prosser, Law of Torts 270 (4th ed. 1971); *accord Exxon Co. U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) ("The doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable."); *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 367-68 (5th Cir. 2006) (similar).

When an intervening force is not merely negligent but intentionally tortious or criminal, it will constitute a superseding cause, unless the original actor realized or should have realized its negligence would give rise to the later intentional tort or crime.  *See e.g.*, *Skipper v. United States*, 1 F.3d 349, 353-54 (5th Cir. 1993) (intentional tort or crime is a superseding cause); *Urbach v. United States*, 869 F.2d 829, 833-34 (5th Cir. 1989) (applying Texas law that "an intervening criminal act will break the chain of causation"); Restatement (Second) of Torts § 448 (1965) (intentional tort or crime is a superseding cause unless original negligent actor should have realized tort or crime would occur).  Transocean and HESI did not realize and could not

---

[2] In discussing superseding cause and allocation of liability issues, neither Transocean nor HESI concedes any negligence or liability for the Macondo blowout (other than, for Transocean, as expressly admitted in Transocean Deepwater Inc.'s plea agreement) or for BP's actions and inactions following the Incident.  Both Transocean and HESI deny any liability for damages to any other party.

have realized that BP would intentionally lie about the flow rate. It is irrelevant whether BP

intended for its false statements to prolong the spill; what matters is that BP's misrepresentations

caused the spill to continue.

Even if BP's conduct falls short of an intentional tort, it qualifies as a superseding cause

under the Restatement (Second) of Torts multi-factor test for determining whether an intervening

force amounts to a superseding cause of harm to another. These factors are:

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
>
> (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
>
> (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
>
> (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
>
> (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Nunley*, 727 F.2d at 464 (quoting Restatement (Second) of Torts § 442 (1965)); *Skipper*, 1 F.3d

at 354 n.6 (same).

These factors are considered in their totality, and a superseding cause may be based on

some combination of the Restatement factors being satisfied. *See Protectus Alpha Navigation.*

*Co. Ltd. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379, 1384 (5th Cir. 1985) (relying on three

Restatement factors to conclude that the defendant's negligence in casting a burning ship off

from the dock after which the ship was lost would have been superseding cause of any

negligence by the shipowner in causing the fire in the first place because the defendant's act was:

"(1) not a normal result of the situation (Restatement § 442(c)); (2) wrongful towards [the shipowner] (§ 442(e)); and (3) culpable to a serious degree (§ 442(f))."); *Stolt Achievement*, 447 F.3d at 368 n.25 (two of the Restatement factors relevant to superseding cause inquiry); *Lone Star Indus. Inc. v. Mays Towing Co.*, 927 F.2d 1453, 1459-60 (8th Cir. 1991) (finding superseding cause because harm brought about by intervening negligence was different in kind from harm that otherwise would have resulted, and not addressing other Restatement factors).

Applying these factors compels a finding that BP's misrepresentations constitute a superseding cause. These misrepresentations were "wrongful" and BP's culpability ultimately led to a guilty plea to obstruction of Congress. Restatement (Second) of Torts § 442(e), (f) (1965). BP's repeated lies and misrepresentations were "extraordinary" and unforeseeable, not normal under the circumstances at the time (*id.* § 442(b)); BP's conduct was "independent" of any alleged negligence by Transocean or HESI (*id.* § 442(c)); and BP's lies were voluntary, avoidable, and entirely of BP's own doing (*id.* § 442(d)).

The weeks upon weeks of delay was also "different in kind" from the harm that would have resulted had the well been capped in mid-May or early June. *See, e.g.*, *Lone Star Indus.*, 927 F.2d at 1459-60 (superseding cause where sinking of vessel resulting from intervening negligence was different in kind from damage to hull caused by original negligence); *Taylor v. Swartwout*, 445 F. Supp. 2d 98, 106 (D. Mass 2006) (superseding cause where, *inter alia*, plaintiff's conduct "resulted in bodily injuries substantially different in kind from those which could have been reasonably anticipated by [defendant's] conduct"). But even if the dramatic increase in the amount of oil discharged was considered a difference in degree of harm, not a difference in kind, BP's misconduct would still constitute a superseding cause. *See Protectus Alpha Nav. Co.*, 767 F.2d at 1384 (negligence in casting off a burning ship amounted to

superseding cause based on three of the Restatement factors—extraordinariness, culpability, and wrongfulness—even though the harm—fire damage—was not different in kind).

The evidence also amply proves that BP's false statements *caused* a delay in capping the well. As discussed above, BP is wrong in asserting that there was no actual reliance upon BP's post-Incident statements. To establish a superseding cause, the injury—here weeks and weeks of discharged oil—must have been "brought about" by BP's conduct. *Sofec*, 517 U.S. at 837; *accord Stolt Achievement*, 447 F.3d at 367-68 (same); *cf. In re Alex C. Corp.*, Nos. 00-12500; 01-12186, 2011 AMC 157, 174 (D. Mass. Nov. 1, 2010) (rejecting superseding cause defense where there was *no* "causal link between [the allegedly negligent] omissions and the subsequent allision"). Even in the common-law fraud context, "[i]t is not necessary that the [false] representations were the sole inducement, but the representations relied upon must have been a material factor in inducing the plaintiff's action." *Coffel v. Stryker Corp.*, 284 F.3d 625, 636 (5th Cir. 2002); *accord In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. MDL-1446, 2010 WL 9077875, at *45 (S.D. Tex. Jan. 19, 2010) ("[T]he material misrepresentation or omission need not be the only inducer of the plaintiff's course of action, but it must have a material influence on the plaintiff's conduct and be a substantial factor in bringing about his action.").

There is no doubt that BP's misrepresentations about flow were a substantial factor in inducing government decision-makers to approve the Top Kill. It only made sense to try Top Kill if it had a chance of working. The predictions of Top Kill's likelihood of success were *premised* on a flow rate of 5,000 BOPD, and BP *knew* there was an upper bound—15,000 BOPD—at or above which Top Kill was almost certain to fail. By failing to tell Unified Command about any of its high flow rate estimates, BP caused Unified Command to sign off on a bad decision to go forward with Top Kill.

BP's misrepresentations did not just cause the decision to attempt Top Kill, they also caused the decision *not* to try a capping strategy—a strategy that would have worked.  A BOP-on-BOP strategy could have been deployed in mid-May, but instead Unified Command approved Top Kill.  Worse, by misrepresenting the reasons for Top Kill's failure—including failing to acknowledge the reality of the high flow rate—BP caused the decision to abandon the BOP-on-BOP option on May 29.  Indeed, that decision occurred the very day that BP told the leaders of the response efforts that burst disks was the *only* plausible explanation for Top Kill's failure.  BP's own expert conceded the causal connection.  Thus, BP's post-Incident conduct constitutes a superseding/intervening cause that relieves Transocean and HESI from liability for oil spilled after the well could and should have been capped.

## V.   BP ALONE IS AT FAULT FOR ITS SOURCE CONTROL CONDUCT

Even putting aside superseding cause, this Court will ultimately have to allocate overall fault for the blowout and resulting harm.[3]  *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975) (recognizing proportional fault); *In re Omega Protein, Inc.*, 548 F.3d 361, 370 (5th Cir. 2008) ("In admiralty cases, federal courts allocate damages based on the parties' respective degrees of fault."); *Stolt Achievement,* 447 F.3d at 370 (Trial court must review "the number and quality of faults by each party.").

Factors for assigning percentages of responsibility to each person whose legal responsibility has been established include: "(a) the nature of the person's risk-creating conduct, including any awareness or indifference with respect to the risks created by the conduct and any

---

[3] In discussing superseding cause and allocation of liability issues, neither Transocean nor HESI concedes any negligence or liability for the Macondo blowout (other than, for Transocean, as expressly admitted in Transocean Deepwater Inc.'s plea agreement) or for BP's actions and inactions following the Incident.  Both Transocean and HESI deny any liability for damages to any other party.

intent with respect to the harm caused by the conduct; and (b) the strength of the causal connection between the person's risk-creating conduct and the harm." Restatement (Third) of Torts: Apportionment of Liability § 8 (2000); *See also Moore v. Johns-Manville Sales Corp.*, 781 F.2d 1061, 1062, 1065 (5th Cir. 1986) (jury properly apportioned responsibility under Texas law among asbestos manufacturers according "greater or lesser roles in causing the injury").

Regardless of how the Court may allocate fault for the April 20 blowout—a subject that was the focus of Phase One—it was not inevitable that the resulting spill would last 87 days. The well could and should have been capped long before July 15. Among the parties, BP alone bears responsibility for causing the spill to last as long as it did—both because it failed to prepare to respond to a spill and because of its misrepresentations during the response. Any overall fault allocation must take into account the needlessly prolonged consequences of BP's conduct. *See, e.g.*, *Narcissus Shipping Corp. v. Armada Reefers, Ltd*, 950 F. Supp. 1129, 1144 (M.D. Fla. 1997), as amended by 986 F. Supp. 1383 (M.D. Fla. 1997) (apportioning responsibility based on the parties' various negligent acts; considering, on part of bareboat charterer, negligence in stowing cargo and, after cargo shifted, in choosing to head for a port without the necessary facilities to stow cargo; considering, on the part of cargo owner, failure to pay for adequate stowing materials and failing to inform other parties of relevant facts regarding prior problems with cargo shifting); *Knight v. F/T Endurance*, No. A94-121 CV, 1996 A.M.C. 958, 966-68 (D. Alaska Feb. 6, 1996) (considering the parties' various negligent acts in apportioning responsibility, including party's failure to properly respond in emergency situation). Transocean and HESI should not be required to bear responsibility for BP's Source Control failures.

## VI.   CONCLUSION

BP's post-Incident misrepresentations regarding the Macondo flow rate were intentional and unforeseeable, and resulted in oil spilling into the Gulf of Mexico for weeks longer than it

should have.  BP's actions and inactions had consequences, and BP alone should be held

accountable and liable for those consequences.  For the reasons set forth above, this Court should

find that BP's conduct constitutes a superseding cause and should account for BP's Phase Two

conduct (including its failure to plan and prepare for a blowout) in its ultimate fault allocation,

resulting in a significantly higher allocation of fault to BP.

DATED: December  20, 2013                                Respectfully submitted,


By: /s/ Brad D. Brian                          By: /s/ Steven L. Roberts
Brad D. Brian                                  Steven L. Roberts
Michael R. Doyen                               Rachel Giesber Clingman
Luis Li                                        Sean Jordan
Grant Davis-Denny                              SUTHERLAND ASBILL & BRENNAN LLP
Daniel B. Levin                                1001 Fannin Street, Suite 3700
MUNGER TOLLES & OLSON LLP                       Houston, TX  77002
355 So. Grand Avenue, 35th Floor               Tel: (713) 4710-6100
Los Angeles, CA  90071                          Fax: (713) 354-1301
Tel: (213) 683-9100                            Email:  steven.roberts@sutherland.com
Fax: (213) 683-5180                                     rachel.clingman@sutherland.com
Email:  brad.brian@mto.com                             sean.jordan@sutherland.com
        michael.doyen@mto.com
        luis.li@mto.com
        grant.davis-denny@mto.com
        daniel.levin@mto.com


John M. Elsley                                 By: /s/ Kerry J. Miller
ROYSTON, RAYZOR, VICKERY &                      Kerry J. Miller
WILLIAMS LLP                                    FRILOT, LLC
711 Louisiana Street, Suite 500                1100 Poydras Street, Suite 3800
Houston, TX  77002                             New Orleans, LA  70163
Tel: (713) 224-8380                            Tel: (504) 599-8194
                                               Fax: (504) 599-8154
                                               Email:  kmiller@frilot.com


**Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean
Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.**


**GODWIN LEWIS PC**

/s/  Donald E. Godwin                          Bruce W. Bowman, Jr.
*Attorney-in-charge*                           State Bar No. 02752000

State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Gavin E. Hill
State Bar No. 00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Jerry C. von Sternberg
State Bar No. 20618150
Jerry.VonSternberg@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

Bruce.Bowman@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

Misty Hataway-Cone
State Bar No. 24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**Attorneys for Defendant Halliburton Energy Services, Inc.**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 20, 2013, I electronically filed the foregoing with the Court's CM/ECF system and service on all counsel of record by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

/s/ Kerry J. Miller
Kerry J. Miller