**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010<br><br>**This document applies to:**<br>*All Cases* | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

<u>**TRANSOCEAN AND HALLIBURTON ENERGY SERVICES, INC.'S**</u>
<u>**PHASE TWO PROPOSED CONCLUSIONS OF LAW**</u>
<u>**WITH RESPECT TO THE SOURCE CONTROL SEGMENT**</u>

# TABLE OF CONTENTS

Page

I.    THE EVIDENCE SHOWS THAT DESPITE KNOWING THE RISK, BP
      DID NOT PREPARE FOR SOURCE CONTROL OF A DEEPWATER
      WELL BLOWOUT AND SUCH FAILURE CONSTITUTES
      NEGLIGENCE.................................................................................................... 1

II.   BP'S NEGLIGENCE IN FAILING TO HAVE A SOURCE CONTROL
      PLAN IN PLACE PRIOR TO MACONDO, AND ITS FAILURE TO
      EXECUTE A SOURCE CONTROL PLAN FOLLOWING THE
      BLOWOUT, CAUSED A SUBSTANTIAL DELAY IN SHUTTING IN
      THE WELL............................................................................................................ 2

III.  BP IS COLLATERALLY AND JUDICIALLY ESTOPPED BY THE
      ADMISSIONS IN ITS GUILTY PLEA ................................................................. 3

IV.   BP'S MISCONDUCT IS A SUPERSEDING CAUSE OF OIL THAT
      SPILLED AFTER THE WELL SHOULD HAVE BEEN CAPPED ................... 3

      A.    BP's Intentional and Unforeseeable Lies About Flow Rate Are a
            Superseding Cause ................................................................................... 3

      B.    BP's Lies Caused a Delay in Capping the Well ...................................... 7

      C.    BP's Negligence in Failing to Have and Execute a Plan for a
            Deepwater Blowout Also Constitutes a Superseding Cause ................... 10

      D.    BP Alone Is Liable for Oil Discharged as a Result of BP's Source
            Control Negligence and Misconduct....................................................... 10

      E.    A Superseding Cause Defense Is Legally Available Despite
            Transocean's Guilty Plea........................................................................ 11

V.    BP'S SOURCE CONTROL CONDUCT ALSO MUST BE TAKEN
      INTO ACCOUNT IN THE ALLOCATION OF FAULT................................... 12

VI.   FINDINGS RELATED TO THE QUANTIFICATION SEGMENT ARE
      NOT BINDING ON TRANSOCEAN OR HESI IN THIS OR FUTURE
      LITIGATION ...................................................................................................... 14

VII.  TRANSOCEAN'S LIABILITY UNDER OPA AS AN OPERATOR OF
      THE MACONDO WELL UNDER OPA § 2704(C)(3) OR FOR OIL
      DISCHARGED ON OR ABOVE THE SURFACE OF THE WATER ............. 15

VIII. NO PARTY IN THIS LITIGATION BROUGHT FORTH ANY
      EVIDENCE SUGGESTING THAT TRANSOCEAN OR HESI'S
      CONDUCT IN RELATION TO SOURCE CONTROL WAS
      ANYTHING OTHER THAN EXEMPLARY .................................................... 16

i

# TABLE OF AUTHORITIES

**Page**

FEDERAL CASES

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Foundation*,
   402 U.S. 313 (1971) ................................................................. 14

*Breeland v. Sec. Ins. Co.*,
   421 F.2d 918 (5th Cir. 1969) .................................................... 3

*Canal Barge Co. v. Torco Oil Co.*,
   220 F.3d 370 (5th Cir. 2000) .................................................... 2

*Carter v. Morehouse Parish School Bd.*,
   441 F.2d 380 (5th Cir. 1971)               15

*Chavez v. Noble Drilling Corp.*,
   567 F.2d 287 (5th Cir.1978) ..................................................... 2

*CMS Software Design Sys., Inc. v. Info Designs, Inc.*,
   785 F.2d 1246 (5th Cir. 1986) ................................................. 15

*Coffel v. Stryker Corp.*,
   284 F.3d 625 (5th Cir. 2002) .................................................... 8

*Daigle v. Point Landing, Inc.*,
   616 F.2d 825 (5th Cir. 1980) .................................................... 2

*Donaghey v. Ocean Drilling & Explor. Co.*,
   974 F.2d 646 (5th Cir. 1992) .............................................. 2, 10

*E. I. du Pont de Nemours & Co. v. McCain*,
   414 F.2d 369 (5th Cir. 1969) .................................................... 4

*Exxon Co. v. Sofec, Inc.*,
   517 U.S. 830 (1996) ......................................................... 4, 8, 9

*Goldberg v. Kelly*,
   397 U.S. 254 (1970) ............................................................... 15

*Harper Macleod Solicitors v. Keaty & Keaty*,
   260 F.3d 389 (5th Cir. 2001) ................................................. 15

*In re Alex C. Corp.*,
   Civ. A. 00-12500-DPW, 2010 WL 4292328 (D. Mass. Nov. 1, 2010)........................ 8

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Cooper/T. Smith,*
  929 F.2d 1073 (5th Cir. 1991) ................................................................. 2

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
  2010 WL 9077875 (S.D. Tex. 2010) .......................................................... 8

*In re Great Lakes Dredge & Dock Co.,*
  624 F.3d 201 (5th Cir.2001) ................................................................. 1, 2

*In re Omega Protein, Inc.,*
  548 F.3d 361 (5th Cir. 2008) ................................................................. 13

*Lone Star Indus., Inc. v. Mays Towing Co.,*
  927 F.2d 1453 (8th Cir. 1991) .......................................................... 6, 7, 10

*Moore v. Johns-Manville Sales Corp.,*
  781 F.2d 1061 (5th Cir. 1986) ............................................................... 13

*Nat G. Harrison Overseas Corp. v. American Tug Titan,*
  516 F.2d 89 (5th Cir. 1975) ............................................................... 7, 12

*Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.,*
  924 F. Supp. 1436 (E.D. Va. 1996) ........................................................... 2

*Nunley v. M/V DAUNTLESS COLOCOTRONIS,*
  727 F.2d 455 (5th Cir. 1984) .......................................................... 4, 6, 12

*Protectus Alpha Nav. Co. v. N. Pac. Grain Growers, Inc.,*
  767 F.2d 1379 (5th Cir. 1985) ............................................................. 6, 8

*Rachal v. Hill,*
  435 F.2d 59 (5th Cir. 1970) ................................................................. 15

*Skipper v. United States,*
  1 F.3d 349 (5th Cir. 1993) ............................................................... 4, 5, 6

*Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM,*
  447 F.3d 360 (5th Cir. 2006) .......................................................... passim

*Taylor v. Swartwout,*
  445 F. Supp. 2d 98 (D. Mass 2006) ........................................................... 7

*United States of America v. Transocean Deepwater Inc.,*
  2:13-cr-00001-JTM-SS (E.D. La. Jan. 3, 2013) ............................................. 12

## TABLE OF AUTHORITIES
### (continued)

**Page**

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
   608 F.3d 871 (D.C. Cir. 2010) ................................................................................. 3

*United States v. Reliable Transfer Co.*,
   421 U.S. 397 (1975) ................................................................................................. 13

*Urbach v. United States*,
   869 F.2d 829 (5th Cir. 1989) ................................................................................... 4

*Withhart v. Otto Candies, L.L.C*,
   431 F.3d 840 (5th Cir. 2005) ................................................................................... 1

**FEDERAL STATUTES**

33 U.S.C. § 1319(c)(1)(A) (Clean Water Act) ............................................................. 11

33 U.S.C. § 1321(b)(3) (Clean Water Act) ................................................................... 11

33 U.S.C. § 2704(c)(3) .................................................................................................. 16

**FEDERAL RULES**

Fed. R. Evid. 705 ......................................................................................................... 15

**TREATISES**

Restatement (Second) of Torts ..................................................................................... 4

Restatement (Second) of Torts § 442 ........................................................................... 6, 10

Restatement (Second) of Torts § 442(c) ....................................................................... 6, 7

Restatement (Second) of Torts § 442(e) ....................................................................... 6

Restatement (Second) of Torts § 442(f) ........................................................................ 6, 7

Restatement (Second) of Torts § 448 (1965).................................................................. 5

Restatement (Third) of Torts: Apportionment of Liability § 8 (2000) ........................... 13

## TRANSOCEAN AND HESI PROPOSED CONCLUSIONS OF LAW

I.   **THE EVIDENCE SHOWS THAT DESPITE KNOWING THE RISK, BP DID NOT PREPARE FOR SOURCE CONTROL OF A DEEPWATER WELL BLOWOUT AND SUCH FAILURE CONSTITUTES NEGLIGENCE**

1.   BP knew the risk of a blowout and the significant consequences should such a blowout occur.  BP, if it were a prudent operator, would have planned accordingly.

2.   Prior to Macondo, despite identifying and acknowledging the significant risk and severe consequences of an uncontrolled deepwater blowout in the Gulf of Mexico, BP failed to act as a prudent operator in the following respects:

- BP failed to develop any source control plan. *See* Aligned Parties' Proposed Findings of Fact, §§ IV, V.

- BP failed to undertake or underwrite any effort to prepare for source control.  BP had no plan.  *See id.* § IV.B.

- BP spent no money researching or developing source control.  *See id.* § IV.B.2.

- BP refused to provide any training on deepwater source control. *See id.* at Section § IV.B.3.

- BP failed to have the necessary tools (*e.g.* pre-fabricated capping device) for deepwater source control because it spent no money on equipment prior to the blowout.  *See id.* § IV.B.1.

3.   BP failed to follow federal regulations requiring it to have plans and equipment in place to immediately abate the flow.  *See id.* § § XI, XII. Negligence is cognizable under general maritime law, and the required elements are essentially the same as common-law negligence.  *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir.2001); *Withhart v. Otto Candies, L.L.C*, 431 F.3d 840, 842 (5th Cir. 2005).  To state a claim for relief under general maritime law, a party must demonstrate that there was a duty owed by the defendant, a breach of that duty, injury sustained, and a causal connection between the defendant's conduct and the resultant injury.  *Great Lakes*, 624 F.3d at 211; *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000); *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991).  Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances. *Great Lakes*, 624 F.3d at 211; *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980); *see Nat'l Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1450 (E.D. Va. 1996) ("Negligence under maritime law is simply the failure to use reasonable care under the circumstances.").

1

4.     BP's failures to develop a robust source control plan, to have it in place prior to beginning drilling the Macondo well, and to execute it following the blowout did not meet the standard of ordinary care.  Further, BP's failures to properly prepare the necessary tools and equipment, to allocate resources to source control, to train its personnel on how to respond to a blowout, and to deploy necessary resources and equipment to stop the flow of oil did not meet the standard of ordinary care.  Therefore, BP's acts and omissions as set out herein were negligent under general maritime law.

## II.   BP'S NEGLIGENCE IN FAILING TO HAVE A SOURCE CONTROL PLAN IN PLACE PRIOR TO MACONDO, AND ITS FAILURE TO EXECUTE A SOURCE CONTROL PLAN FOLLOWING THE BLOWOUT, CAUSED A SUBSTANTIAL DELAY IN SHUTTING IN THE WELL

5.     BP's lack of planning led to improvised, failed, or misguided efforts, wasting significant time, "analysis paralysis," and led to BP creating source control plans "on the fly." *See* Aligned Parties' Proposed Findings of Fact § VI.A.  With proper preparation, the spill could have been stopped within as little as seven days, but definitely within weeks by a risk-mitigated, BOP-on-BOP option that would have been equally effective as the Capping Stack (which ultimately succeeded in shutting in the well).  *See id.* § VI.B.

6.     Under the general maritime law, a party's negligence is actionable if it is the legal cause of the resultant harm, and the negligence must be a substantial factor in causing the injuries.  *Great Lakes*, 624 F.3d at 213-14; *Donaghey v. Ocean Drilling & Explor. Co.*, 974 F.2d 646, 649 (5th Cir. 1992); *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir.1978).

7.     It was not inevitable or foreseeable that the Macondo well would discharge oil for 87 days.  The well could and should have been capped long before, and BP bears the responsibility for allowing the Macondo well to flow as long as it did.  The injury—here the weeks and weeks of continued oil flow from the Macondo well—was legally caused by BP's

2

negligent conduct in failing: (1) to develop a robust source control plan and have it in place prior to beginning drilling the Macondo well; (2) to properly prepare the necessary source control tools and equipment; (3) to allocate resources to source control; (4) to train its personnel on how to respond to a blowout; and/or (5) to execute a source control plan following the blowout.  BP's failures were a substantial factor in causing the continued flow of oil from the Macondo well.

## III.   BP IS COLLATERALLY AND JUDICIALLY ESTOPPED BY THE ADMISSIONS IN ITS GUILTY PLEA

8.      BP admitted in its guilty plea, *inter alia*, that it "had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command."  TREX-52673.17.

9.      BP is bound by this admission, as well as its other admissions in support of its guilty plea, by judicial and collateral estoppel.  *E.g.*, *Breeland v. Sec. Ins. Co.*, 421 F.2d 918, 922-23 (5th Cir. 1969) (defendant collaterally and judicially estopped from re-litigating admissions in support of guilty plea); *see also United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010) (district court found collateral and judicial estoppel from guilty plea admissions).

## IV.   BP'S MISCONDUCT IS A SUPERSEDING CAUSE OF OIL THAT SPILLED AFTER THE WELL SHOULD HAVE BEEN CAPPED

### A.   BP's Intentional and Unforeseeable Lies About Flow Rate Are a Superseding Cause

10.      The doctrine of superseding cause essentially asks "'whether a defendant is to be held liable for an injury to which he has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which he is not responsible.'"  *Nunley v. M/V DAUNTLESS COLOCOTRONIS*, 727 F.2d 455, 464 (5th Cir. 1984) (quoting Prosser, Law of Torts, 4th Ed. 270); *accord Exxon Co. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) ("The doctrine

of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable."); *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 367-68 (5th Cir. 2006) (same).

11.     Plaintiffs in this Circuit bear the burden of establishing proximate cause, which includes demonstrating that no superseding cause breaks the chain of causation. *See E. I. du Pont de Nemours & Co. v. McCain*, 414 F.2d 369, 374 (5th Cir. 1969) ("The theory of new and independent cause is not an affirmative defense; it is but an element to be considered by the jury in determining the existence or non-existence of proximate cause.")

12.     When an intervening force is not merely negligent but intentionally tortious or criminal, it will constitute a superseding cause, unless the original actor realized or should have realized its negligence would give rise to the later intentional tort or crime. *E.g.*, *Urbach v. United States*, 869 F.2d 829, 833-34 (5th Cir. 1989) (applying Texas law that "an intervening criminal act will break the chain of causation"); *Skipper v. United States*, 1 F.3d 349, 354-54 (5th Cir. 1993) (unforeseeable criminal conduct is a superseding cause).  The Fifth Circuit, following the Restatement (Second) of Torts, has recognized that "'[t]he act of a third person in committing an *intentional tort or crime* is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.'"  *Skipper*, 1 F.3d at 354 n.6 (quoting Restatement (Second) of Torts § 448 (1965)).

13.     Transocean and HESI did not realize and "should [not] have realized" that BP would intentionally mislead the government about the flow rate—especially when that information was vital to the decisions being made about capping the well.  Accordingly, BP's lies about flow rate leading up to the failed Top Kill effort and its misrepresentations after Top Kill failed, including its representation that flow rate was not a plausible explanation for that failure, constitute a superseding cause.

14.     Even if BP's conduct was not intentionally tortious or criminal, it would still qualify as a superseding cause.  The Fifth Circuit, following the Restatement, has recognized a number of factors relevant to determining "whether an intervening force is a superseding cause of harm to another:"

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
>
> (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
>
> (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
>
> (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
>
> (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Nunley*, 727 F.2d at 464 (quoting Restatement (Second) of Torts § 442); *Skipper v. United States*, 1 F.3d 349, 354 n.6 (5th Cir. 1993) (same).

15.     The Restatement factors are considered in their totality, and a superseding cause may be based on some combination of the factors being satisfied.  *See Protectus Alpha Nav. Co.*

*v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379, 1384 (5th Cir. 1985) (relying on three § 442 factors to conclude that the defendant's negligence in casting a burning ship off from the dock after which the ship was lost would have been superseding cause of any negligence by the shipowner in causing the fire in the first place because the defendant's act was: "(1) not a normal result of the situation (Restatement § 442(c)); (2) wrongful towards [the shipowner] (§ 442(e) ); and (3) culpable to a serious degree (§ 442(f))."); *Stolt Achievement*, 447 F.3d at 368 n.25 (two of the Restatement factors relevant to superseding cause inquiry); *Lone Star Indus., Inc. v. Mays Towing Co.*, 927 F.2d 1453, 1459-60 (8th Cir. 1991) (finding superseding cause because harm brought about by intervening negligence was different in kind from harm that otherwise would have resulted without consideration of other Restatement factors). Applying these factors here compels a finding that BP's lies about flow rate and misrepresentations about the reasons for Top Kill's failure constitute a superseding cause.

16. BP has already admitted that its misrepresentations to Congress about flow rate were not just wrongful but criminal. BP admitted in support of its guilty plea that it withheld multiple flow rate estimates over 5,000 BOPD from the Unified Command. *See* Restatement (Second) of Torts § 442(e), (f).

17. BP's repeated lies and misrepresentations were "extraordinary" and unforeseeable, not normal under the circumstances at the time. *Id.* § 442(b). No one, let alone Transocean or HESI, could have foreseen or anticipated that BP would misrepresent or withhold its internal flow rate estimates from government decision-makers, particularly when those flow rate estimates were critically important to determining what source control methods to undertake. *See Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89, 96-97 (5th Cir. 1975) (negligence in performing salvage contract, including deliberately sinking barge and allowing it

6

to remain underwater for seven months, was an unforeseeable intervening cause resulting in total loss of vessel, despite improper stowage of cargo that caused original capsize).

18.     BP's conduct was "independent" of any alleged negligence by Transocean or HESI.  Restatement (Second) of Torts § 442(c).  Even assuming that negligence by Transocean or HESI contributed to the blowout, BP's repeated false statements about and affirmative concealment of the flow rate and its misrepresentations about the failure of Top Kill were not the "normal result" of a blowout situation.  *Id.*  Rather, BP's misconduct during Source Control was voluntary, avoidable, and entirely of BP's own doing.  *Id.* § 442(d).

19.     The weeks upon weeks of delay was also "different in kind" from the harm that would have resulted had the well been capped in mid-May or early June.  *See, e.g.*, *Lone Star Indus.*, 927 F.2d at 1459-60 (superseding cause where sinking of vessel resulting from intervening negligence was different in kind from damage to hull caused by original negligence); *Taylor v. Swartwout*, 445 F. Supp. 2d 98, 106 (D. Mass 2006) (superseding cause where, *inter alia*, plaintiff's conduct "resulted in bodily injuries substantially different in kind from those which could have been reasonably anticipated by [defendant's] conduct").  But even if significantly increasing the amount of oil discharged was considered a difference in degree of harm, not a difference in kind, BP's misconduct would still constitute a superseding cause.  *See Protectus Alpha Nav. Co.*, 767 F.2d at 1384 (negligence in casting off a burning ship amounted to superseding cause based on three of the Restatement factors—extraordinariness, culpability, and wrongfulness—even though the harm—fire damage—was not different in kind).

### B.     BP's Lies Caused a Delay in Capping the Well

20.     To establish a superseding cause, the injury—here weeks and weeks of discharged oil after Top Kill failed and the BOP-on-BOP option was abandoned—must have been "brought about" by BP's conduct.  *Sofec*, 517 U.S. at 837; *accord Stolt Achievement*, 447 F.3d at 367-68

(same); *cf. In re Alex C. Corp.*, Civ. A. 00-12500-DPW, 2010 WL 4292328, at *8 (D. Mass. Nov. 1, 2010) (rejecting superseding cause defense where there was *no* "causal link between [the allegedly negligent] omissions and the subsequent allision").

21.     Even in the common-law fraud context, "[i]t is not necessary that the [false] representations were the sole inducement, but the representations relied upon must have been a material factor in inducing the plaintiff's action." *Coffel v. Stryker Corp.*, 284 F.3d 625, 636 (5th Cir. 2002); *accord In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2010 WL 9077875, at *45 (S.D. Tex. 2010) ("[T]he material misrepresentation or omission need not be the only inducer of the plaintiff's course of action, but it must have a material influence on the plaintiff's conduct and be a substantial factor in bringing about his action").  Here, BP's misrepresentations were a substantial factor in causing decision-makers first to choose Top Kill as opposed to BOP-on-BOP as a source control method and then in early June to shelve the BOP-on-BOP option, which would have successfully capped the well.

22.     BP's misrepresentations about flow were a substantial factor in inducing decision-makers to approve the Top Kill.  BP repeatedly told government officials in the Unified Command in the days and weeks before Top Kill that the "best estimate" for flow rate was 5,000 BODP, when BP knew it had many higher internal flow rate estimates that it did not share with the government.  BP also knew that Top Kill was unlikely to succeed at a flow rate of 15,000 BOPD or more.  By telling the Unified Command that 5,000 BOPD was the best estimate and withholding higher estimates and by reassuring both government officials and the public that Top Kill was a "slam dunk" with a 60-80% chance of success, BP's conduct was a substantial factor in the decision to go forward with Top Kill instead of favoring the BOP-on-BOP option that was in development in the same May time period.

23.     BP's misrepresentations about why Top Kill failed were a substantial factor—indeed the critical factor—in the decision to abandon the BOP-on-BOP option and adopt a collection strategy, guaranteeing the well would flow for many additional weeks.  BP told government officials in the Unified Command on May 29, the day after Top Kill failed, that massive flow through the BOP was "not plausible" and the ruptured disks were the only plausible explanation for the failure.  That claim was wrong: high flow rate was not only plausible, but highly likely, and BP knew it.  And BP's misrepresentations on May 29 resulted in the decision to abandon the BOP-on-BOP option that very day.

24.     If the BOP-on-BOP option had been deployed instead of being abandoned, it would have successfully shut in the well.  The BOP-on-BOP was prepared, could have been safely deployed as early as mid-May and was ready to be installed within days of Top Kill's failure.

25.     Whether BP had any subjective intent to prolong the spill is irrelevant to whether its misrepresentations about flow rate amount to a superseding cause by delaying capping the well.  *E.g.*, *Sofec*, 517 U.S. at 835 (holding captain's negligent and unforeseeable failure to plot ship's position was a superseding cause of negligence that had caused ship to become unmoored when captain's negligence resulted in grounding of ship, without regard for whether captain *intended* to ground ship).  Whether BP made its false statements and concealed the flow rate estimates to minimize the magnitude of the spill for public relations reasons, potential liability reasons, or simply because BP's executives became invested in the lowball estimates, the fact is that BP caused weeks upon weeks of needless delay in capping the well.  The question here is only whether BP's misconduct resulted in delay.  There is no doubt that it did.

C.   **BP's Negligence in Failing to Have and Execute a Plan for a Deepwater Blowout Also Constitutes a Superseding Cause**

26.    BP's negligence in failing to have a plan in place to respond to a blowout and in failing to execute a source control plan following the blowout also supports a superseding cause. According to the Fifth Circuit, "[t]he superseding cause doctrine applies where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 367-68 (5th Cir. 2006). "It is predicated on the notion that 'there must be a terminus somewhere, short of eternity, at which the second party becomes responsible in lieu of the first.'" *Id.*  BP's failure to plan and prepare for a subsea deepwater blowout prior to Macondo constitutes an intervening and superseding cause. *See Donaghey,* 974 F.2d at 652; *Lone Star Indus., Inc., v. Mays Towing Co., Inc.,* 927 F.2d 1453, 1460 (8th Cir. 1991) (applying general maritime law); Restatement (Second) of Torts § 442.

27.    Transocean and HESI could not have foreseen that, in the face of known risk, BP would fail to have a plan in place to respond to a deepwater blowout, that BP would fail to execute a source control plan following the blowout, and that failure would cause months of additional flow of oil.  As such, BP's source control failures are a superseding cause of the continued flow of oil and resultant damages.

D.   **BP Alone Is Liable for Oil Discharged as a Result of BP's Source Control Negligence and Misconduct**

28.    Having found that BP's negligence and misconduct constitutes a superseding cause, the Court finds that Transocean and HESI are not liable for oil discharged after the well would have been shut in but for BP's conduct.

10

29.     Because the BOP-on-BOP option could and should have been used to shut in the well by the middle of May, before the Top Kill, but was not because of BP's superseding fault, Transocean and HESI are not liable for oil discharged after on or about May 15, 2010.

30.     Alternatively, the well could and should have been shut in shortly after Top Kill failed, but BP's misrepresentations on May 29 about the reasons for Top Kill's failure caused the abandonment of a capping option at that time.  Because the evidence shows that capping options were available, and could have been successfully employed by June 4, 2010, Transocean and HESI are not liable for oil discharged after June 4, 2010.

### E.     A Superseding Cause Defense Is Legally Available Despite Transocean's Guilty Plea[1]

31.     Transocean Deepwater Inc.'s guilty plea to one misdemeanor violation of the Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3), does not preclude a superseding cause defense.

32.     In support of its plea Transocean Deepwater Inc. admitted that its "negligent conduct" in connection with the negative pressure test on April 20, 2010, and its agreement to proceed with displacement at BP's instruction after the test, "together the negligent conduct of others, was a proximate cause of the blowout and the discharge of certain quantities of oil and natural gas from the Macondo well into the Gulf of Mexico."  Guilty Plea Agreement, Exhibit A at 4, *United States of America v. Transocean Deepwater Inc.*, 2:13-cr-00001-JTM-SS (E.D. La. Jan. 3, 2013).  Transocean Deepwater Inc. did not admit, and nothing in the guilty plea suggests, that its conduct leading up to the blowout proximately caused *all* of the discharge over the entire 87-day course of the spill.

---

[1] This section is proposed by Transocean alone.

33.     It is well established that the superseding cause defense applies "where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Stolt Achievement*, 447 F.3d at 367-68; *Nunley*, 727 F.2d at 464 (same).  Even if a defendant is found to have proximately caused some injury, it will not be liable for further injury brought about a superseding cause, despite the fact that the original conduct may have been a but-for cause of the original injury.  Thus, for example, in *Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89 (5th Cir. 1975), the Fifth Circuit held that the damages awarded to a barge owner following the loss of the barge were properly limited to those damages arising from the barge's capsize, which was proximately caused by the defendant's stevedores' negligent loading of cargo.  *Id.* at 93, 96.  The barge had been declared a total loss after the salvors deliberately sank it in the course of the salvage operation and it sustained further damage, but the barge owner was entitled to recover these further damages from the defendant—despite the finding that the defendant had proximately caused the original casualty—because the salvors' conduct was a superseding cause of the that loss.  *Id.* at 96-97.

34.     Here, regardless whether Transocean's conduct was a proximate cause of the April 20, 2010 blowout and of the discharge of "certain quantities" of oil, Transocean is not responsible for oil discharged as a result of the weeks of delay caused by BP's post-spill conduct.

## V.     BP'S SOURCE CONTROL CONDUCT ALSO MUST BE TAKEN INTO ACCOUNT IN THE ALLOCATION OF FAULT

35.     It is well established that proportional fault applies in maritime law.  *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975) (recognizing proportional fault); *In re Omega Protein, Inc.*, 548 F.3d 361, 370 (5th Cir. 2008) ("In admiralty cases, federal courts allocate damages based upon the parties' respective degrees of fault."); *Stolt Achievement, Ltd. v. Dredge*

12

*B.E. LINDHOLM*, 447 F.3d 360, 370 (5th Cir. 2006) (trial court must review "the number and quality of faults by each party").

36.     Factors for assigning percentages of responsibility to each person whose legal responsibility has been established include: "(a) the nature of the person's risk-creating conduct, including any awareness or indifference with respect to the risks created by the conduct and any intent with respect to the harm caused by the conduct; and (b) the strength of the causal connection between the person's risk-creating conduct and the harm."  Restatement (Third) of Torts: Apportionment of Liability § 8 (2000); *See also Moore v. Johns-Manville Sales Corp.*, 781 F.2d 1061, 1062, 1065 (5th Cir. 1986) (Jury properly apportioned responsibility among asbestos manufacturers according "greater or lesser roles in causing the injury") (Texas law).

37.     There is no evidence to suggest that Transocean or HESI did anything wrong during the source control efforts or aided BP in any misrepresentations or concealment.

38.     BP, and only BP, should have its allocation of liability increased significantly as the result of (a) its failures to properly plan for and execute source control of a deepwater blowout such as Macondo and (b) its failure to provide full and accurate information concerning the rate of flow.

39.     Regardless of the Court's findings with respect to causes of the blowout on April 20, 2010, BP's source control conduct, including both its failure to prepare for a blowout and its lies that caused delay in capping the well, increases BP's share of fault for the overall damage from the Macondo incident and reduces any fault attributable to Transocean and/or HESI.[2]

---

[2] In discussing allocation of liability issues, neither Transocean nor HESI concedes any negligence or liability for the Macondo blowout (other than, for Transocean, as expressly admitted in Transocean Deepwater Inc.'s plea agreement) or for BP's actions and inactions following the Incident.  Both Transocean and HESI deny any liability for damages to any other party.

40.     Therefore, because the well could and should have been shut in by mid-May 2010, or at the latest by June 4, 2010, but was not due to BP's conduct, BP's overall share of fault must be increased and any share of fault to Transocean and/or HESI decreased to account for the consequences of BP's post-spill wrongful conduct.

## VI.     FINDINGS RELATED TO THE QUANTIFICATION SEGMENT ARE NOT BINDING ON TRANSOCEAN OR HESI IN THIS OR FUTURE LITIGATION

41.     On July 12, 2013, the Court issued an order excluding Transocean and HESI from examining or presenting witnesses during the quantification segment of Phase Two.  Rec. Doc. 10672 at 2.  As such, findings from the quantification segment only bind the United States, BP, and Anadarko.  None of the findings related to the quantification segment of the Phase II trial are binding on Transocean or HESI in this litigation.

42.     Under fundamental principles of due process, a party may not be bound by the adverse consequences of litigation in which it did not participate, whether or not another party has adopted the same litigating position that the excluded party would have taken.  *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Foundation*, 402 U.S. 313, 329-30 (1971) ("Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue.  They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position.").

43.     The Federal Rules of Evidence, as well as principles of due process, require that parties be able to exercise their right to confront and cross-examine adverse expert witnesses.  Fed. R. Evid. 705; *see also Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).  The right of a party to present rebuttal evidence is especially important where the opposing party bears the burden of proof.  *See, e.g.*, *CMS Software Design Sys., Inc. v. Info Designs, Inc.*, 785 F.2d 1246, 1248-49

14

(5th Cir. 1986) (reversing an involuntary dismissal of an action on the grounds that the plaintiff did not have an opportunity to rebut defendant's affirmative defense); *Carter v. Morehouse Parish School Bd.*, 441 F.2d 380, 382 (5th Cir. 1971) ("A ruling based on evidence which a party has not been allowed to confront or rebut is one which denies due process.").

44.     Nor may Transocean or HESI be collaterally estopped by any findings from the Quantification Segment.  "[T]he doctrine of collateral estoppel will not be applied unless it appears that the party against whom the estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding." *Rachal v. Hill*, 435 F.2d 59, 62 (5th Cir. 1970); *see also Harper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389, 395 (5th Cir. 2001) ("Traditional rules of preclusion as adopted in federal case law—whether under the doctrine of collateral estoppel or res judicata—require that the party to be estopped from re-litigating a claim have had a full and fair opportunity to litigate the issue").  Transocean and HESI's exclusion from the Quantification Segment forecloses the application of collateral estoppel against them based on any Quantification Segment findings.

45.     Accordingly, to the extent any party seeks to hold Transocean or HESI liable for some amount of damages or penalties based on the number of barrels discharged, findings from the Quantification Segment cannot be binding on Transocean or HESI because neither were permitted to offer evidence against the United States' case.

## VII.   TRANSOCEAN'S LIABILITY UNDER OPA AS AN OPERATOR OF THE MACONDO WELL UNDER OPA § 2704(C)(3) OR FOR OIL DISCHARGED ON OR ABOVE THE SURFACE OF THE WATER[3]

---

[3] This section is proposed by Transocean alone.  *See* Transocean's Phase One Proposed Conclusions of Law, Rec. Doc. 10463 at 293-303 (Proposed Conclusions of Law regarding Transocean's OPA liability).

46.     The Court has previously determined that BP and Anadarko, as lessees of the well, are the Oil Pollution Act ("OPA") responsible parties for discharge below the surface of the water, and that Transocean, as owner of the *Deepwater Horizon*, is an OPA responsible party for discharge on or above the surface of the water.  Rec. Doc. 5809 at 5-15.  In its pretrial ruling, the Court did not determine whether Transocean could be considered an "operator" of the Macondo well for purposes of 33 U.S.C. § 2704(c)(3), which imposes liability for removal costs to the United States and any state or local governments on the "operator" of an Outer Continental Shelf facility from which oil is discharged.  Rec. Doc. 5809 at 11-12.

47.     In its Phase One Proposed Findings of Fact and Conclusions of Law, Transocean proposed findings that it is not an operator of the Macondo well and bears no liability for removal costs under § 2704(c)(3).  Rec. Doc. 10463 at 293-99.  The parties have agreed, however, that a determination of Transocean's liability, if any, under § 2704(c)(3) will be addressed by cross motions to be submitted at a later date to be set by the Court.

48.     The parties have also agreed that a determination of Transocean's liability, if any, for oil discharged on or above the surface of the water will be addressed by cross motions to be submitted at a later date to be set by the Court.

## VIII.    NO PARTY IN THIS LITIGATION BROUGHT FORTH ANY EVIDENCE SUGGESTING THAT TRANSOCEAN OR HESI'S CONDUCT IN RELATION TO SOURCE CONTROL WAS ANYTHING OTHER THAN EXEMPLARY

49.     No party in this case put forth any evidence of any improper conduct on the part of Transocean or HESI in connection with the attempts to stop the flow of hydrocarbons from the Macondo well during the period April 22, 2010 through September 19, 2010. *See* Aligned Parties' Proposed Phase Two Findings of Fact Sections IX, XX.

50.     Neither Transocean nor HESI was in charge of—nor responsible for—the direction of Source Control operations.

16

51.     There is no evidence of negligence, recklessness, or any wrongdoing whatsoever on the part of Transocean or HESI in connection with any attempts to stop the flow of hydrocarbons from Macondo after the blowout and sinking of the vessel during the period April 22, 2010 through September, 2010.[4]

52.     There is no evidence of negligence, recklessness, or any wrongdoing whatsoever on the part of Transocean or HESI in connection with any attempts to quantify the amount of oil that flowed from the Macondo well during the period April, 2010 through September, 2010.

DATED:  December 20, 2013                    Respectfully submitted,

By: /s/ Brad D. Brian                        By: /s/ Steven L. Roberts
Brad D. Brian                                Steven L. Roberts
Michael R. Doyen                             Rachel Giesber Clingman
Luis Li                                      Sean Jordan
Grant Davis-Denny                            SUTHERLAND ASBILL & BRENNAN LLP
Daniel B. Levin                              1001 Fannin Street, Suite 3700
MUNGER TOLLES & OLSON LLP                     Houston, TX  77002
355 So. Grand Avenue, 35th Floor             Tel: (713) 4710-6100
Los Angeles, CA  90071                        Fax: (713) 354-1301
Tel: (213) 683-9100                          Email:  steven.roberts@sutherland.com
Fax: (213) 683-5180                                  rachel.clingman@sutherland.com
Email:  brad.brian@mto.com                           sean.jordan@sutherland.com
        michael.doyen@mto.com
        luis.li@mto.com
        grant.davis-denny@mto.com
        daniel.levin@mto.com

John M. Elsley                               By: /s/ Kerry J. Miller
ROYSTON, RAYZOR, VICKERY &                   Kerry J. Miller
WILLIAMS LLP                                 FRILOT, LLC
711 Louisiana Street, Suite 500              1100 Poydras Street, Suite 3800
Houston, TX  77002                           New Orleans, LA  70163
Tel: (713) 224-8380                          Tel: (504) 599-8194
                                             Fax: (504) 599-8154
                                             Email:  kmiller@frilot.com

**Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.**

---

[4] Transocean and HESI specifically reserve all liability arguments made in the Phase One proceedings.

**GODWIN LEWIS PC**

/s/  Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Gavin E. Hill
State Bar No. 00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Jerry C. von Sternberg
State Bar No. 20618150
Jerry.VonSternberg@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

Misty Hataway-Cone
State Bar No. 24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**Attorneys for Defendant Halliburton Energy Services, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2013, I electronically filed the foregoing with the Court's CM/ECF system and service on all counsel of record by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

/s/ Kerry J. Miller
Kerry J. Miller

18