**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | * | **MDL No. 2179** |
| "Deepwater Horizon" in the Gulf of | * | |
| Mexico, on April 20, 2010 | * | **SECTION: J** |
| | * | |
| | * | |
| | * | **Judge Barbier** |
| **This Document Relates To:** *All Cases* | * | |
| | * | **Magistrate Judge Shushan** |

---

**PHASE TWO POST-TRIAL BRIEF OF BP EXPLORATION & PRODUCTION
AND ANADARKO PETROLEUM CORPORATION:
QUANTIFICATION SEGMENT**

Warren Anthony Fitch
Ky E. Kirby
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
Telephone: (202) 373-6000

James J. Dragna
BINGHAM MCCUTCHEN LLP
355 S. Grand Avenue, Suite 4400
Los Angeles, CA 90071
Telephone: (213) 680-6400

Deborah D. Kuchler, T.A. (Bar No. 17013)
KUCHLER POLK SCHELL
WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, LA 70112
Telephone: (504) 592-0691

*Attorneys for Anadarko Petroleum
Corporation*

Don K. Haycraft (Bar No. 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Barry E. Fields, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
Kimberly O. Branscome
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc.*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 5

I.    THE GOVERNMENT'S DISCHARGE ESTIMATES ARE TOO UNCERTAIN
TO BE RELIED UPON BY THE COURT. ................................................... 5

    A.    The Government's Initial Discharge Estimate Was Uncertain. ............................. 6

        1.    Under Political Pressure, Government Scientists Developed the
August 2010 Cumulative Flow Estimate Over a Few Days. ..................... 6

        2.    The August 2010 Cumulative Discharge Estimate was Uncertain. ............ 8

    B.    The Government Has Not Materially Changed Its Flow Estimate Despite
New Evidence. ................................................................................ 10

    C.    The Government's Flow Estimate Is Highly Uncertain. ...................................... 10

        1.    Dr. Dykhuizen Admitted that Cumulative Discharge Could Be Far
Lower than 5 MMstb. ........................................................... 11

        2.    Dr. Griffiths's Method is Unreliable......................................... 11

        3.    Dr. Pooladi-Darvish's Methods Likewise Contain Significant
Uncertainty........................................................................... 13

    D.    Government Experts Base Their Estimates On An Unfounded Assumption
That Flow Restrictions Did Not Change Materially From April 22 to July
15........................................................................................... 13

        1.    Dr. Dykhuizen Claimed to Account for Erosion by Assuming Zero
Flow for Two Days But Acknowledged His 2.5 MMstb
Uncertainty Range is Attributable to the Effects of Erosion. ................... 14

        2.    Dr. Griffiths Incorrectly Assumed No Change in Restrictions Over
Time. ................................................................................ 14

        3.    Dr. Pooladi-Darvish Incorrectly Assumed No Material Change in
Flow Restrictions Over Time........................................................ 15

II.    THE GOVERNMENT ESTIMATES ARE INCONSISTENT WITH
MEASURED DATA AND EVIDENCE OF CHANGING FLOW PATH
RESTRICTIONS. ....................................................................... 16

    A.    Source Control Efforts Caused Changes in Flow Restrictions. .......................... 16

i

    B.      For at Least Five Weeks, Restrictions to Flow in the BOP and Kinked Riser Changed Because of Erosion. .................................................................... 17

          1.      Erosion Significantly Altered Flow Restrictions in the BOP and Kinked Riser. ........................................................................... 17

          2.      Erosion Occurred at Least Through May 27, 2010. .................................. 18

          3.      Restrictions in the BOP Diminished Steadily Throughout the Five-Week Period, Resulting in a Near Doubling of the Flow Rate. ................ 19

    C.      Government Experts' Cement Erosion Assumptions Are Not Scientifically Plausible. ..................................................................................................... 19

    D.      Analysis of the Slug Flow in May 2010 Refutes the Government's Flow Rate Curve. ..................................................................................................... 20

          1.      Slug Flow Occurred from May 13 to May 20, 2010. ............................... 21

          2.      Dr. Zaldivar's Modeling and Simulations Confirm that the Flow Rate(s) in Mid-May 2010 Could Only Have Been Between 24,900 and 35,900 Stock Tank Barrels per Day. ..................................................... 22

III.     THE GOVERNMENT OVERSTATES CUMULATIVE FLOW BY USING AN INAPPROPRIATE METHOD TO CONVERT FLOW TO STOCK TANK CONDITIONS. .............................................................................................................. 23

    A.      The Single-Stage Flash Process is Not Subject to Uncertainties Inherent in Many Multi-Stage and Oceanic Separation Processes. ......................................... 24

    B.      Multi-Stage Separation Process Modeling is Arbitrary and Does Not Reflect What Actually Took Place at Macondo. ..................................................... 24

    C.      Done Correctly, Oceanic Separation Results in a Conversion Number Similar to the Single-Stage Flash Value. ............................................................... 25

IV.     MATERIAL BALANCE ANALYSIS IS THE MOST RELIABLE METHOD FOR DETERMINING THE VOLUME OF OIL RELEASED AT MACONDO. ........... 26

V.      PROPER APPLICATION OF MATERIAL BALANCE ANALYSIS RESULTS IN A RELIABLE AND CONSERVATIVE CUMULATIVE DISCHARGE ESTIMATE OF 3.26 MMSTB. ........................................................................................ 27

    A.      Initial Connected Oil Volume at Macondo is 112 MMstb. .................................. 28

    B.      The Macondo Reservoir's Uniaxial Pore Volume Compressibility is Approximately Six Microsips. ............................................................................... 31

          1.      Six Microsips is the Measured Value for UPVC at Macondo. ................. 31

2.      Weatherford Performed Industry-Standard Tests on Appropriate Core Samples. ........................................................................................ 33

3.      BP's Use of 12 Microsips in Modeling Done as Part of the Shut-In Effort is Irrelevant. ..................................................................................... 35

4.      A 12 Microsip Rock Compressibility Value is Fundamentally Inconsistent with Applicable Data. .......................................................... 36

C.      Dr. Blunt Correctly Determined the Pressure Depletion in the Reservoir to be 1367 psi. ................................................................................................... 37

VI.     DR. GRINGARTEN'S SEPARATE FLOW RATE HISTORY MODEL FURTHER VALIDATES DR. BLUNT'S CUMULATIVE FLOW ESTIMATE. .......... 39

CONCLUSION ................................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

33 U.S.C. § 1321(b)(7) ............................................................................................................. 23

## INTRODUCTION

Determining the volume of oil that leaked from a deepwater reservoir, 18,000 feet below the surface of the Gulf of Mexico, over 86 days while flow restrictions and flow paths constantly changed is a complicated engineering endeavor that never before has been attempted.  Faced with this unprecedented challenge, BP Exploration & Production ("BP") and Anadarko Petroleum Corporation ("Anadarko") asked leading engineers to use state-of-the-art industry techniques to develop the most scientifically reliable estimate of the volume of oil discharged from the Macondo Reservoir.  Among those experts is Dr. Martin Blunt, one of the world's foremost reservoir engineers.  Based on an exhaustive analysis of reliable, measured data collected from the Macondo Reservoir, and input from other highly regarded engineers, Dr. Blunt determined the best estimate of the cumulative oil discharge is 3.26 million stock tank barrels (MMstb), from which the Court should subtract 810,000 stb of collected oil per the parties' stipulation.  Dr. Blunt calculated his best estimate using material balance analysis, an industry-standard method that can be used to develop an estimate without relying on uncertain evidence or speculative assumptions about (i) the precise flow path of the hydrocarbons over 86 days; (ii) changes in flow path restrictions during the 86 days; or (iii) the effect of those changes on daily flow rate.

Rather than providing the Court with a cumulative discharge estimate derived by applying proven scientific techniques to the best available data, the Government merely presents a rehash of a 4.9 MMstb estimate hastily developed in mid-2010 based on limited information and substantial speculation.  As Government witnesses conceded, the 2010 estimate was founded on an assumed "fictional" state—one that expressly ignored flow restriction changes that admittedly occurred.  Indeed, contemporaneous documentation confirms the lack of scientific

basis supporting the Government's estimate.  Secretary of Energy Steven Chu had sought this initial cumulative estimate for public relations and possible settlement negotiation purposes—not for establishing a scientific truth.  To this end, senior officials gave scientists only a few days to develop a cumulative discharge estimate, telling them that the Government would publicly release an estimate with or without their input.  Required to provide a quick estimate but lacking sufficient data to do so, the scientists simply "took the position there was no significant change following the first few days after the event"—after months of telling superiors that understanding changes in flow restriction was critical to derive a credible scientific flow estimate.  Although the Government announced that its estimate had an uncertainty range of +/- 10%, behind-the-scenes discussions indicate that this range was not based on careful scientific calculation or analysis; it was selected because it "felt" right.  Indeed, Government expert Dr. Ronald Dykhuizen admitted that the uncertainties with the estimate were so great, he was unwilling even to assign an error range to it.

The Government's original estimate might have been acceptable for political or public relations purposes, but it falls well short of satisfying the burden of proof under the Clean Water Act.  Nevertheless, the Government essentially asks the Court to accept that same number—with its flawed assumptions and methodologies—regardless of evidence known today about conditions during the 86-day flow period.  Indeed, notwithstanding the data now available to it, and the time to study those data, the Government uses the same core approach as in 2010: start with a final day flow rate estimate of approximately 50,000 bbls/day, extrapolate back over 86 days of flow to an initial flow rate of approximately 60,000 bbls/day, and then total the daily flow rates.  This framework focuses primarily on reservoir depletion and ignores the significant changes in flow restrictions that indisputably occurred during the spill.  As Dr. Dykhuizen

2

confirmed, consideration of those restrictions and related erosional processes could only *reduce* the Government's cumulative flow number, which is why the Government and its experts only give a "hand wave" to flow restrictions and erosion.

The evidence unequivocally shows flow restrictions changed in a manner inconsistent with the Government experts' assumptions of a high flow rate at the beginning of the incident that steadily *decreased* over 86 days.  Most fundamentally, there is abundant physical evidence of significant erosion inside the *Deepwater Horizon*'s BOP and kinked riser.  Dr. Srdjan Nesic, a leading expert on metal erosion, showed how this erosion caused flow restrictions to decrease materially through at least late May 2010.  As Dr. Nesic explained, decreasing flow restrictions resulted in an *increasing* flow rate during this early period—a trend that cannot be reconciled with any of the Government experts' analyses.  Just as there was metal erosion within the BOP and kinked riser, so too there was erosion in cement located at the wellbore's bottom.  Dr. Andreas Momber, an expert in cement erosion and degradation, demonstrated that the rapid cement erosion rates suggested by the Government experts are thousands of times higher than any known erosion rates for cement-based materials.  As with metal erosion, cement erosion would cause flow to *increase* over time.

The undisputed May 2010 appearance of slug flow—a multi-phase flow phenomenon generally occurring only at lower flow rates—provides further evidence of the fundamentally flawed nature of the Government's assumed flow rate histories. After performing a methodical, comprehensive analysis of the slug flow, including running thousands of computer simulations, Dr. Michael Zaldivar estimated that the flow rate from May 13 to 20 was between 24,900 and 35,900 stb/day, with a best estimate of 30,000 stb/day—half the daily flow rate suggested by the Government for this period.

The changing flow path conditions and unknown variables over the 86-day period fatally undermine the reliability of the Government's hydraulics and reservoir simulation analyses.  Dr. Adrian Johnson, an engineer with more than 20 years of experience modeling oil and gas flow, concluded it is not possible to use hydraulics analysis to estimate cumulative flow with any reasonable degree of engineering certainty.  Likewise, Dr. Blunt quickly abandoned the idea of using reservoir simulation to estimate a cumulative discharge estimate because, in his opinion, it is not possible to develop a reliable description of flow over time.

Unlike the Government's hydraulics and reservoir simulation techniques, material balance analysis is not plagued with the uncertainties associated with trying to estimate a flow rate for each day of the incident; instead, it relies on readily discernible reservoir properties to calculate the total volume of oil discharged.  Put simply, it is the most reliable method for determining cumulative flow in this case. Although Government expert Dr. Mohan Kelkar endorsed material balance analysis as a reliable method for calculating cumulative flow, he inexplicably failed to use correct values for the three variables required for the analysis:  initial connected oil volume, rock compressibility, and reservoir pressure change.  Rather than conduct a connectivity analysis of the Macondo Reservoir, the Government experts incorrectly assumed that a single well could access all hydrocarbons in the reservoir.  Ignoring testing performed by an independent service laboratory, Dr. Kelkar opted to use a rock compressibility value twice the measured value—an inflated value used briefly by BP in "worse-case scenario" modeling leading up to the shut in of the well.  Finally, Government experts failed to account for the Second Law of Thermodynamics (the fundamental principle that hot things cool) in calculating change in reservoir pressure; all Government experts agreed that the wellbore cooled and that such cooling influenced reservoir pressure, but their analyses fail to consider these factors.

By contrast, Dr. Blunt applied established principles of physics to reliable data collected before the blowout and after the well was shut in to determine that 3.26 MMstb of oil were discharged from the Macondo Reservoir.  Dr. Blunt's determination is neither anomalous nor an outlier.  Dr. Dykhuizen testified that the lower bound of his cumulative estimate is 3.5 MMstb.  Dr. Kelkar calculated a release of 3.4 MMstb by varying one input, changing it to a number that he acknowledged was "within the bounds of . . . reality."   Further, Dr. Blunt's estimate is consistent with an estimate developed by Dr. Alain Gringarten, who is widely regarded as the world's preeminent expert in well test analysis.   Using industry-standard well test analysis techniques, Dr. Gringarten estimated the cumulative discharge was between 2.4 and 3.0 MMstb.

In sum, the Government has not adequately supported (and cannot support) either its cumulative flow estimate or the flow rate trend it has insistently espoused.  The initially alluring consistency of the Government experts' opinions results from their adherence to a preordained number.  They arrived at the same estimate by using whatever means necessary to support a 5 MMstb estimate, including ignoring evidence, making speculative assumptions, and settling for scientifically untenable error ranges.  But applying reliable scientific methods to data developed over the last three years leads to one firm conclusion: the cumulative flow from the Macondo Reservoir is substantially lower than what the Government claims.

## ARGUMENT

## I.   THE GOVERNMENT'S DISCHARGE ESTIMATES ARE TOO UNCERTAIN TO BE RELIED UPON BY THE COURT.

The Government's cumulative discharge estimate of approximately 5 MMstb of oil is based more on speculation and guesswork than data and science.  One can trace the estimate to a rushed and unscientific process in late July 2010 when the Government developed a cumulative discharge estimate of 4.9 MMstb to announce to the public and to use in possible settlement

5

negotiations with BP. The scientists involved in developing this estimate recognized it was uncertain and would need to be reevaluated as more evidence became available. Despite this recognition, the Government did not refine or reassess the estimate as additional data and evidence became available; it steadfastly clung to its flawed original estimate.

### A.     The Government's Initial Discharge Estimate Was Uncertain.

In 2010, Government scientists developed a 4.9 MMstb estimate over a "critical weekend" under pressure from political appointees. TREX 9908. The scientists involved in the process acknowledged the obvious: there was significant uncertainty in the estimate. For instance, Dr. Dykhuizen, a Government scientist who testified at trial as an expert witness, admitted the error range for the 4.9 MMstb estimate could not even be quantified. Tr. at 1417–18. Rather than waiting to release a scientifically defensible estimate, the Government simply assured the public that the estimate in its August 2, 2010 press release would be updated as more evidence came to light. TREX 8809. This estimate was never intended to be the final answer to the cumulative discharge question.

### 1.     Under Political Pressure, Government Scientists Developed the August 2010 Cumulative Flow Estimate Over a Few Days.

Dr. Art Ratzel, leader of a Department of Energy science team involved in estimating flow from the reservoir, testified that the August 2010 cumulative discharge estimate was created, from "start to finish," in "less than three days." Ratzel Dep. at 544. Tellingly, the spreadsheet used to develop the cumulative estimate was entitled, "Wednesdaynightrush.XLS." Tr. at 1454–55. Not only were the scientists operating under a tight deadline, but they also were under "intense" pressure from senior Government leaders, including Secretary of the Interior Kenneth Salazar, Secretary Chu, "and above." TREX 9662; Sogge Dep. at 157; Havstad Dep. at 84–85.

In truth, Government scientists had not originally expected to reach consensus on a cumulative discharge estimate within weeks after the well was shut in.  Dr. Marcia McNutt, Director of the United States Geological Survey and Flow Rate Technical Group ("FRTG")[1] leader, believed the group would have ample time to review scientific data and develop a reliable cumulative estimate.  TREX 9662; McNutt Dep. at 301–04.  Indeed, on the morning of July 28, 2010, Deputy Secretary of the Interior David Hayes assured Dr. McNutt that there was no rush to provide a final flow rate estimate: "If you can help make sure that folks do not think there's a rush here, I would appreciate it.  There isn't a rush."  TREX 9662.

Within hours, however, the plan changed.  That afternoon, Dr. McNutt emailed Mr. Hayes and Secretary Salazar's Chief of Staff: "HELP!!! I just got off a call with Tom Hunter [co-director of the Federal Science Team].  He said that we HAVE to have a new flow rate by FRIDAY.  He said that is coming from Secretary Chu and above."  TREX 9662.0001.  Two hours later, Secretary Chu told Dr. McNutt, Dr. Hunter, and others that he had just participated in a telephone call led by Secretary of Homeland Security Janet Napolitano and reiterated the demand for a cumulative flow estimate in two days.  TREX 9718.0001.

Dr. Hunter, concerned by the rushed request for a cumulative flow estimate, emailed Secretary Chu and others that evening.  Dr. Hunter emphasized the need to "[ensure] that the pace for getting these results is consistent with the subsequent need for accuracy," and stressed the importance of understanding what changes had taken place that might have affected flow rate over time.  TREX 9718.0001.  Given the time constraints, Dr. Hunter warned that it was "unlikely we can get the full time frame analysed from the beginning of the incident . . . ."

---

[1] In May 2010, the National Incident Commander commissioned the FRTG to develop oil flow rate estimates.  TREX 8804.0006.

TREX 9718.  This warning was not surprising.  Just two days earlier, the three Department of Energy laboratory teams working on flow rate issues had concluded that none of their methods "provide 'believable' mass flow results—too many model uncertainties and/or data for quantitative analysis."  TREX 9706.0005.

Despite understandable misgivings, Government scientists attempted to comply with the demands of senior Government officials.  On Friday, July 30, the science teams presented their flow-rate findings, but reached no consensus on a cumulative discharge estimate.  TREX 8827.0001–03.  Nevertheless, Secretary Chu made clear that the Cabinet "want[ed] to get a new number tomorrow so it can be in the papers tomorrow."  TREX 8827.0003.  One stated purpose of the estimate was for "damages" to be charged to BP.  Tr. at 1309, 1339–40.  Consequently, as Dr. Hunter admitted at trial, Secretary Chu was not focused on accuracy.  Tr. at 1339–40.

During the meeting, Secretary Chu's Chief of Staff bluntly stated: "Something will go out tomorrow (probably around 60k), even if we don't come up with something."  TREX 8827.0004.  In response to the Government's planned release of an estimate with or without the federal science teams' input, the scientists started suggesting means to generate quickly a cumulative estimate by totaling daily flow rate estimates.  Dr. Hunter proposed, "Let's use a (daily) range of 53–63k."  Dr. McNutt responded, "We can also say that it has changed over time from a number near 60 to a number near 50."  TREX 8827.0004.  These statements confirm that the Government did not plan to release a refined estimate based on careful scientific analyses; it was about to release a back-of-the-envelope calculation.

### 2. The August 2010 Cumulative Discharge Estimate was Uncertain.

Two days later, on August 2, the Government announced that "the scientific teams estimate[d] that approximately 4.9 million barrels of oil have been released from the well."  The

press release stated that the estimate was the "most accurate to date" and had an uncertainty range of +/- 10 percent.  TREX 8809.0001.  This assertion was not true.  The scientists involved in developing the estimate were concerned about the unreliability of the data with which they were working and were uncertain in their conclusion.  Notes from the July 30 team meeting state that there was "[i]nsufficient information to perform an uncertainty analysis on flow rate and total flow at time of meeting" and that the "[v]alues presented are point estimates only" and "[t]he uncertainty is not bounded by the range of values presented."  TREX 8635.0096; Ratzel Dep. at 101.  Notes taken by two Government scientists during the July 31 team meeting likewise describe the informal approach used to determine uncertainty.  One scientist concluded the 10% uncertainty estimate was selected because it "felt" right: "Cabinet wants clean nice number.  Uncertainty still being worked out.  ±10% feels better, ±5% too tight. . . . As far as US Gov neg w/ BP this is good enough. (Steve)."  TREX 8628.0058.  Another scientist made clear the team did not believe the uncertainty analysis needed to be scientifically defensible because "**they'll settle so detail doesn't matter**."  TREX 8842.0002 (emphasis added).

In the September 2011 DOE-NNSA Report, the Government identified limitations in the August 2010 estimate, including what information was unavailable and which assumptions therefore had to be made.  TREX 9361.  The Government acknowledged that "[w]hile there had been attempts throughout post-accident times to quantify the instantaneous flow rate, the DOE-NNSA Flow Team and other researchers directed by the DOI were generally stymied in these attempts prior to well shut-in, largely because of uncertainties in the well geometry, the BOP, and reservoir depletion."  TREX 9361.0049.  At that time, the BOP was still located on the sea floor, and Government scientists had not attempted to characterize or quantify how conditions along the flow path might have changed because of erosion or the reservoir's level of

productivity.  TREX 9361; Ratzel Dep. at 209–10, 580–81.  Consequently, "assumptions were necessary" and "uncertainties [were] high."  TREX 9361; 9389.0002.

**B.     The Government Has Not Materially Changed Its Flow Estimate Despite New Evidence.**

Although the Government assured the public that its "scientists will continue to analyze data and may in time be able to further refine this estimate," TREX 8809, this has not been the case.  This is most obvious in the Government's refusal to alter its flow rate estimates when confronted with evidence of metal erosion in the BOP and kinked riser.  Specifically, in late 2010, new evidence called into question the Government's fundamental assumption that reservoir depletion (not flow path erosion) was the dominant cause of flow rate changes—an assumption leading to a mistaken claim that flow rate decreased (not increased) after the explosion.  After the BOP was recovered, testing revealed significant metal erosion.[2]  TREX 143132; 143145; 143175; 143198; 143201.  Dr. McNutt alerted federal scientists to this "new information" that would have "great bearing on the flow rate" and stressed the need to "consider carefully the competing processes of depletion of the reservoir, which causes flow rate to decrease, and possible widening of the flow path, which causes the flow to increase.  The final (flow rate) curve may be peaked in the middle for all I know."  TREX 9671.  Dr. McNutt warned that the team "would be remiss to ignore this new evidence." TREX 9671.  That is exactly what the Government experts have done in this case.

**C.     The Government's Flow Estimate Is Highly Uncertain.**

The Government's experts concede the high degree of uncertainty in their estimates.

---

[2] Secretary Chu admitted that erosion is one of the factors necessary to consider in assessing total flow, but confirmed that the Government flow rate team did not consider erosion in the estimate reached on July 30–31, 2010.  Chu Dep. at 134, 44–45.

Given the complicated flow path and changing wellbore conditions, a hydraulics analysis cannot be reliably applied to determine cumulative flow from the reservoir.  Tr. at 2109–10; 3038–39. To generate a hydraulics-based flow rate, one needs two reliable pressure readings across a *known* geometry.  Tr. at 1315–16.  This information is not available, which means that one cannot use the hydraulics approach to calculate a daily flow rate—much less cumulative flow over 86 days.  Tr. at 1316.

### 1.   Dr. Dykhuizen Admitted that Cumulative Discharge Could Be Far Lower than 5 MMstb.

Dr. Dykhuizen was refreshingly candid in discussing the limitations of his analysis; he admitted his cumulative estimate of 5 MMstb has an uncertainty range of +20 percent to -30 percent, and his final day flow rate calculation has an uncertainty range of +/- 20 percent.  Tr. at 1436–37, 66–67.  Thus, the lower bound of Dr. Dykhuizen's range is 3.5 MMstb, which is consistent with Dr. Blunt's cumulative estimate of 3.26 MMstb.

### 2.   Dr. Griffiths's Method is Unreliable.

Dr. Stewart Griffiths's hydraulics analysis is even more fundamentally unsound.  Dr. Griffiths is not an expert in oil and gas; before his work on the *Deepwater Horizon* response, Dr. Griffiths had never calculated the oil flow rate from a reservoir.  Tr. at 1676–77, 79.  His cumulative discharge estimate is based on an *ad hoc* approach never before used to analyze such flow; it is an approach that is not generally accepted either in the fluid dynamics community or in the oil and gas industry.  Tr. at 1678–81; 3041–61.  After assessing Dr. Griffiths's approach in 2010, Dr. Dykhuizen concluded it was only a "curve fitting exercise" that did not provide "an independent calculation of the flow rate at any time in the accident response due to errors in the model."  TREX 11435.0001; 11436.0002.

Dr. Griffiths conceded that if restrictions in the wellbore and the BOP were both

changing over time, as they indisputably were, his method would not generate realistic results. Tr. at 1638–39.  Dr. Griffiths's analysis relies heavily on information about pressure changes from the reservoir to the wellhead (as measured by the PT-B pressure gauge at the base of the BOP), even though no pressure data from this gauge is available from April 20 to May 8, 2010. Tr. at 1612, 3063–64.  Because Dr. Griffiths's method requires a daily flow rate estimate, he assumed values for PT-B pressure measurements (and corresponding flow rates) for the 18 days for which there was no PT-B pressure data.  Tr. at 1675–76; 3063–64.  Strikingly, he predicted the highest flow rates during the time when no data was available.  Tr. at 1675–76.  Had he chosen a more reasonable method on which to base his assumption about PT-B pressure data for these 18 days—for example, one based on pressure data from April 20—his estimated flow over the 18-day period would have been 500,000 barrels less (a 50% reduction).  Tr. at 3070–73.

The overly sensitive nature of Dr. Griffiths's method raises further doubts about its reliability.  For example, changes in the reservoir's productivity index ("PI")—a reservoir's ability to produce fluids in response to pressure changes in a well—have a significant effect on Dr. Griffiths's cumulative discharge estimates.  Tr. at 3064.  To develop his "Best Estimate," Dr. Griffiths assumed a constant PI for the entire flow period—even though he agreed that the Macondo Reservoir's PI changed over time.  Tr. at 1687, 1692.  Dr. Johnson confirmed it would be unusual for a flowing well to have a constant PI.  Tr. at 3032–33, 64; D24618.  As Dr. Johnson demonstrated, had Dr. Griffiths used more reasonable assumptions about PI profiles that change over time, his estimate would have decreased by up to 1.3 MMstb.  Tr. at 3069.

Conversely, Dr. Griffiths's method is insensitive to differences in reservoir pressure change.  Dr. Griffiths admitted that he could use disparate reservoir pressures—each of which would represent a different physical state—and he would still calculate the same cumulative

estimate.  Tr. at 1742–43.  In fact, one could use Dr. Griffiths's method with ***no decrease*** in reservoir pressure, and his predicted cumulative discharge still would be 5 MMstb.  Tr. at 1743. Even more striking, Dr. Griffiths's method would predict a cumulative discharge greater than 5 MMstb were he to assume less reservoir depletion.  Tr. at 1742.

**3.     Dr. Pooladi-Darvish's Methods Likewise Contain Significant Uncertainty.**

Dr. Mehran Pooladi-Darvish's analysis fares no better.  Using numerical reservoir simulations, Dr. Pooladi-Darvish's modeling predicted cumulative flows ranging from 3.3 to 7 MMstb while maintaining a good match with the capping stack pressure data—a range he considered to be unacceptably large.  Tr. at 2056.  Although Dr. Pooladi-Darvish attempted to reduce uncertainty by "history matching" with collection data, his collection-data restraint is based only on nine to ten hours of data from July 15—less than half a day out of an 86-day flow period.  Tr. at 2063.  Dr. Pooladi-Darvish acknowledged he did not calibrate his model using other collection data, such as riser insertion tube tool collections in May, Top Hat collections in June, or BOP choke-line collections before July 15.  Tr. at 2063–64.  While Dr. Pooladi-Darvish agreed the largest uncertainties in his analysis are associated with resistances to flow, he also conceded the restriction to flow caused by the BOP was "not well known," the "uncertainty in the degree of restriction within the BOP" was "large," and this uncertainty "could have a potentially large impact on the estimates of flow rate."  Tr. at 2030–31; 2035–36.

**D.     Government Experts Based Their Estimates On An Unfounded Assumption That Flow Restrictions Did Not Change Materially From April 22 to July 15.**

Although the methods used by the Government experts differ, they each are based on the underlying—and demonstrably false—assumption that flow restrictions did not change meaningfully over time.

13

      **1.**      **Dr. Dykhuizen Claimed to Account for Erosion by Assuming Zero Flow for Two Days But Acknowledged His 2.5 MMstb Uncertainty Range is Attributable to the Effects of Erosion.**

Dr. Dykhuizen mistakenly claimed that "all significant erosion was complete by the second day of the blowout."  Tr. at 1473–74; TREX 11644.0006–07.  He described his assumption as a "hand wave" to erosion and acknowledged he did not calculate how erosion might have influenced flow rate over time—notwithstanding his June 2010 statement that "[a]ny model has to not only assume various flow paths and resistances; it has to account for potential erosion during the long flowing time."  Tr. at 1439–40, 43–46, 73–76; TREX 9389.0002.  Thus, Dr. Dykhuizen has essentially conceded that his "hand wave" assumption undercuts his 5 MMstb estimate.  Tr. at 1435.

      **2.**      **Dr. Griffiths Incorrectly Assumed No Change in Restrictions Over Time.**

Similarly, Dr. Griffiths's Best Estimate of cumulative flow "does not account for erosion in the reservoir and wellbore."  Tr. at 1623–24.  Indeed, Dr. Griffiths effectively held everything below the BOP in an unchanged state over the 86 days.  Tr. at 1689–90.  Despite his assertions to the contrary, the PT-B pressure gauge readings cannot adequately account for erosion in the BOP.  Tr. at 3076–78.  This is because changes occurring upstream (below) ***and*** downstream (above) of the gauge, such as erosional changes in the wellbore and the BOP, would affect pressure measurements; some changes would increase the pressure and some would decrease it.  Tr. at 1721, 23; 3076.  The PT-B pressure gauge readings represent the sum of all changes in the system.  One cannot use those readings to draw any accurate conclusions about how a particular flow path restriction changed over time.  Tr. at 3076.

### 3. Dr. Pooladi-Darvish Incorrectly Assumed No Material Change in Flow Restrictions Over Time.

Dr. Pooladi-Darvish's "analytical" and "numerical" reservoir simulation methods are based essentially on the assumption that resistances to flow did not change materially over time. In his "analytical" method, Dr. Pooladi-Darvish estimated the flow rate on July 15, 2010 (the final day before the well was shut) and then "project[ed] this rate backwards in time to the date of explosion." Tr. at 2020; TREX 11653.0003. In doing so, Dr. Pooladi-Darvish assumed a constant resistance in both the reservoir and the wellbore. Tr. at 2025–26. His method did not account for erosion occurring at the wellbore's bottom, and it tried to account for erosion in the BOP by *assuming* what the PT-B pressure gauge readings might have been before May 8. Tr. at 2026–27.

In his "numerical" simulation method, Dr. Pooladi-Darvish attempted to match his simulation cases to reservoir pressure buildup data and collection rates. Tr. at 2053–54. But Dr. Pooladi-Darvish's "base" and "sensitivity" cases—which form the basis of his best cumulative flow estimate—took no account of erosion occurring in the BOP or wellbore cement. Tr. at 2036–37. Dr. Pooladi-Darvish's third grouping of numerical simulation cases (the so-called "what-if" cases) similarly failed to account appropriately for erosion. Although Dr. Pooladi-Darvish claimed these cases incorporate effects of erosion by considering changing PT-B pressure gauge readings, none of the models, for example, adequately addressed erosion in the BOP or wellbore cement. Tr. at 2028, 41, 45–46, 50–51.

Dr. Pooladi-Darvish ultimately conceded that a "discussion of erosion really doesn't matter to" him, and, even in his "what-if" cases, he "never tried to *accurately* model erosion." Tr. at 2044, 50 (emphasis added). Therefore, he does not know how an accurate description of

erosion (which admittedly occurred) would affect his analysis.

## II.   THE GOVERNMENT ESTIMATES ARE INCONSISTENT WITH MEASURED DATA AND EVIDENCE OF CHANGING FLOW PATH RESTRICTIONS.

The Government's assumption that flow path restrictions did not change materially over 86 days cannot be reconciled with the physical evidence.  In the summer of 2010, Dr. Dykhuizen acknowledged that assuming a constant well geometry would be a "fictional" state because "many geometry changes occurred.  These include, but are not limited to, the riser and kink being cut off, junk shots, and erosion."  TREX 9375; 9376.0001.  Indeed, the flow-rate profiles advanced by the Government experts are inconsistent with what we now know the flow rate to have been in mid-May based on an evaluation of the slug flow emanating from the riser end.

### A.     Source Control Efforts Caused Changes in Flow Restrictions.

As intended, source control efforts affected the flow coming out of the reservoir.  For example, attempts were made in late April to close the BOP rams and LMRP annular preventers.  TREX 9675.0008–09.  Even though closing the rams and annular preventers did not successfully shut in the well, it plainly affected the restrictions of flow in the equipment.   TREX 145357.0027.  During the "momentum kill," which began May 26, heavy drilling mud was pumped through the BOP's choke and kill lines, which also affected flow.  TREX 9675.0012.  Thereafter, bridging material (so-called "junk") was pumped along with the heavy drilling mud into the choke and kill lines.  TREX 9675.0012.  A significant amount of the "junk," which was intended to restrict flow through the well, was found lodged in the BOP when it was recovered from the sea floor.  TREX 145357.0028.  As Dr. Johnson observed, "we don't know how much was there at various points between Top Kill and the end of the incident and how that changed over time.   We don't know how the Junk Shot moved around in the BOP and changed restrictions in the BOP.  So it just adds uncertainty to what's going on."  Tr. at 3056–57.

**B.     For at Least Five Weeks, Restrictions to Flow in the BOP and Kinked Riser Changed Because of Erosion.**

Despite knowing that significant erosion occurred in the BOP flow path, the Government presented no expert on metal erosion.  The only Government witness who offered any type of "analysis" of metal erosion (Dr. Griffiths) was neither offered nor accepted as an expert in erosion, and he could only speculate about a "mental picture" of how erosion might have progressed.  Tr. at 1707–08.  Dr. Griffiths performed no independent computational or other analysis to confirm his hypothesis about the rate of metal erosion.  Tr. at 1707–08.  In contrast, BP and Anadarko retained Dr. Nesic, a leading expert on metal erosion and Director of Ohio University's Institute for Corrosion and Multiphase Technology.  TREX 11529R.  Dr. Nesic demonstrated that, at least through May 27, significant erosion caused restrictions in the BOP and kinked riser to change, which caused flow rate to increase.

**1.     Erosion Significantly Altered Flow Restrictions in the BOP and Kinked Riser.**

Metal erosion significantly altered flow restrictions in the *Deepwater Horizon*'s BOP and riser.  The blind shear rams, casing shear rams, upper annular preventer, and kinked riser—the four geometries studied by Dr. Nesic—all showed visible evidence of metal erosion.  Tr. at 2858–63; TREX 143201; 143132.   Dr. Nesic inspected these components after they were recovered in the fall of 2010 and concluded that each bore indicia of erosion.  The blind shear rams showed massive erosion—most notably where hydrocarbons passed through the partially closed blocks.  Tr. at 2858–63; TREX 143201; 143132.  Erosion damage was also visible on the recovered casing shear rams, which were not activated until April 29—over a week after the Government experts contend that meaningful erosion had ceased.  Tr. at 2863–66; TREX 143145; 143175.  Moreover, the upper annular preventer had nearly disintegrated, and the drill

17

pipe around which the annular closed was heavily eroded.  Tr. at 2865–67; TREX 143198.
Finally, video recorded by remotely operated vehicles ("ROVs") show that two holes formed in
the kinked riser on April 28 and that a third hole did not appear until May 19—a month after the
Government experts contend meaningful erosion had ceased.  Dr. Nesic confirmed that erosion
caused these holes.  Tr. at 2867–76; TREX 143133; 143108; 140783.

### 2.      Erosion Occurred at Least Through May 27, 2010.

Contrary to the suggestions of the Government's experts, erosion of the *Deepwater
Horizon*'s BOP and riser could not have occurred in just a few hours or days.  As Dr. Nesic
explained, metal erosion occurs as long as there is sand in the hydrocarbon flow.  Tr. at 2851–52.
Dr. Hans Vaziri, BP's Distinguished Advisor for Sand Management and a leading expert in sand
prediction and sand production in oil wells, concluded that the Macondo Reservoir produced
sand at least through the end of May 2010.  Vaziri Dep. at 10–11, 15–18, 20–24, 26.
Specifically, Dr. Vaziri estimated the reservoir produced between 19,300 and 40,300 pounds of
sand.  Vaziri Dep. at 38–39, 120; D23645.  He further found that approximately half the sand
was produced in the first two weeks following the blowout, with the remainder produced by the
end of May.  Dr. Vaziri emphasized that it is likely sand production continued beyond May
2010, but used that as the end date to be "conservative."  Vaziri Dep. at 59, 64–65, 139–142,
193, 222.  The Government offered no expert opinion on sand production in response to Dr.
Vaziri's testimony.  Indeed, Government scientists implicitly acknowledged the reservoir was
still producing sand at least as of May 19, when Alex Slocum, a member of the Federal Science
Team, emailed Dr. Hunter stating that "the appearance of a 3rd hole at the kink" implies "the
well is producing sand."  TREX 8851.0002.

Based on Dr. Vaziri's testimony and the evidence of continuing erosion in the kinked

riser, Dr. Nesic conservatively concluded that metal erosion occurred from April 22 through at least May 27, a 35-day period.  Tr. at 2876–77; TREX 11529R.0012, 0036–37; 140783.

### 3.    Restrictions in the BOP Diminished Steadily Throughout the Five-Week Period, Resulting in a Near Doubling of the Flow Rate.

Erosion of the BOP and kinked riser components caused flow rate to increase dramatically from April 22 to May 27—indeed, the rate nearly doubled during this time.  Tr. at 2855–56, 2900–04; TREX 11529.0032–37.  Dr. Nesic reached this conclusion using complex computational models for each of the studied components.  Tr. at 2861, 80.  Specifically, Dr. Nesic simulated particles and flow passing through the components and then compared the degree of restriction caused by each component in its pre-eroded state to its final eroded state.  Tr. at 2849–54, 87–88; TREX 11529R.0031–32.  Dr. Nesic successfully validated his models by comparing areas of erosion predicted by the model to erosion actually observed on the recovered components.  Tr. at 2885–88.

Dr. Nesic's analysis showed that the flow restrictions changed steadily over time.  Tr. at 2888–92.  Because the restriction created by each geometry is directly related to flow rate, Dr. Nesic was able to analyze the effect of metal erosion on flow rate from the reservoir.  Tr. at 2900–04; TREX 11529R.0036–37; D23955B.  Assuming that the BOP and kinked riser were the main restrictions to flow from April 22 to May 27, relative flow rate from the reservoir would have almost doubled because of erosion (88% +/- 2%) regardless of initial flow rate.  This increase in flow rate was for the most part steady throughout the five-week period.  Tr. at 2855–56, 2900–04; TREX 11529R.0032–37, 0004–05; D23631; D23955B; D23945.

### C.    Government Experts' Cement Erosion Assumptions Are Not Scientifically Plausible.

BP and Government experts agree that at one point there was a substantial amount of

cement impeding the flow of hydrocarbons up the wellbore, but over time that impediment dramatically decreased.  Tr. at 2977–79; TREX 11452.0010; 11485R.0012; 11644.0009.[3]  The disputed issue is the period over which the cement erosion occurred.

 Government experts Drs. Griffiths and Dykhuizen assumed the well cement eroded and no longer restricted flow after a relatively short time.  Dr. Griffiths assumed that the cement at Macondo was reasonably intact at the start of the incident, but that "any resistance to flow by the cement" was eliminated within nine hours to 36 hours.  Tr. at 1648–49; TREX 11485R.0011–12.  Similarly, Dr. Dykhuizen did not "believe that erosion had a significant effect on overall flow from the well past the second day of the blowout."  TREX 11452.0010–11.

The Government experts' assumption that all cement eroded within a few hours of the incident is not scientifically plausible.  Dr. Momber, one of the world's leading experts in cement erosion, reviewed more than 200 known cement erosion scenarios and found no support for the rates suggested by the Government's experts.   Tr. at 2966–68, 74–75; TREX 11644.0004, 15–16.  Instead, Dr. Momber found "that the erosion rates required for Dr. Dykhuizen and Dr. Griffiths are far off the erosion rates known for cement-based materials even under extreme conditions.  They must have been some orders of magnitudes higher."  Tr. at 2985–90; TREX 11644.0015–16 ("The government experts' assumed erosion rates are 10,000 to 100,000 times greater than any reported in the extensive literature devoted to concrete erosion.").

**D.    Analysis of the Slug Flow in May 2010 Refutes the Government's Flow Rate Curve.**

The Government's estimate of a 60,000 bbls/day flow rate in mid-May 2010 cannot be

---

[3] The flow path of the hydrocarbons was through the production casing, including the shoe track.  TREX 11644.0005; Rygg Dep. at 125, 151.  Halliburton filled the shoe track with cement approximately 21 hours before hydrocarbons entered the wellbore. TREX 1.0023–24.

reconciled with the occurrence of slug flow—a phenomenon of multi-phase flow consisting of alternating oil-dominant and gas-dominant flows—that took place during mid-May 2010.[4]  Slug flow is a "bounded" condition that occurs only within certain ranges of flow rate.  Tr. at 2702, 08, 33.  Slug flow is a "lower flow rate phenomen[on]" because it requires specific ratios of oil and gas speeds that exist only at lower flow rates.  Tr. at 2714.  At high flow rates—like those assumed by the Government's methods—slug flow would break down into other types of multiphase flow.  Tr. at 2714.  Slug flow is well known in the oil and gas industry and is studied during the design and operation of multiphase pipelines.  Tr. at 2708; TREX 11683.0009; 130544.0012, 16–20.   Dr. Michael Zaldivar, who has significant experience analyzing and investigating multiphase flow phenomena (including slug flow), concluded that the flow rate from May 13–20 was bounded between 24,900 and 35,900 stb/day, with a best estimate of 30,000 stb/day.  Tr. at 2702–09, 11; TREX 11683.0005–06, 09–10, 34–39; 130544.0012, 16–20.

### 1.      Slug Flow Occurred from May 13 to May 20, 2010.

It is undisputed that slug flow occurred from the end of the *Deepwater Horizon*'s riser from May 13 to May 20, 2010.  Tr. at 2711; 1416–17, 87; TREX 9183.0011, 151; 11683.0009.  Slug flow is characterized visually by alternating periods of light- and dark-colored flow and a corresponding change in trajectories based on flow density. Tr. at 2719–22; TREX 11683.0009, 15–16.  Not only is slug flow clearly visible on ROV video footage, but Dr. Zaldivar performed trajectory analysis to confirm that the dark-colored and light-colored fluids were oil and gas,

---

[4] This assertion also cannot be reconciled with the Government's statements in May 2010 about flow rate.  On May 23, Dr. McNutt proposed telling the public that the analysis performed by the Government did not support a flow rate as high as 50,000 bbls/day; she suggested publicly stating that, "Indications at this point are that the rate of release is greater than the original estimate of 5000 barrels per day, but media reports that the rate of release is 10 times that are nowhere near borne out by thorough analysis."  TREX 9643.0001; McNutt Dep. at 143–44.

respectively.   Tr. at 2719–22; TREX 11683.0009, 0015–16; D23470; D24252.   The Government's FRTG Plume Team also observed the alternating dark-colored and light-colored flow pattern and likewise found that it "confirms the 'slug flow' regime."  TREX 9183.0150.

>    **2.    Dr. Zaldivar's Modeling and Simulations Confirm that the Flow Rate(s) in Mid-May 2010 Could Only Have Been Between 24,900 and 35,900 Stock Tank Barrels per Day.**

The "very regular pattern" of slug flow observed from the riser end and its link to the oscillatory motion of the riser's "buoyant loop" permitted Dr. Zaldivar to model the system and calculate flow rate boundaries.  Tr. at 2719–22, 33; TREX 11683.0009, 16–17.  To calculate the range of possible flow rates for May 13–20, Dr. Zaldivar built models of the full riser system (including riser movement) and the kink leaks using LedaFlow—a multiphase flow simulator.[5] Tr. at 2710, 25–29, 33–35, 41, 48; TREX 11683.0026.  Multiphase flow simulators are used in the oil and gas industry to evaluate hydrocarbon flow rates for multiphase flow in nearly every oil and gas pipeline in the world.  Tr. at 2705, 08; Rygg Dep. at 33–34.  Both OLGA and LedaFlow are supported by thousands of hours of field-tested data.  Tr. at 2708; TREX 011683.0043–44.  These routinely used models are "very accurate" in their predictions of multiphase flow.  Tr. at 2706–08.

Dr. Zaldivar's LedaFlow models produced an "excellent match" to the observed slug flow behavior at Macondo.  Tr. at 2748–49.  Indeed, Dr. Zaldivar described it as "the best match I've ever seen to the observed slug flow behavior."  Tr. at 2749.  Based on thousands of

---

[5] Multi-phase flow simulators require an engineer to use a "geometric transformation" when modeling flow through non-circular geometries—such as those in the flow paths at Macondo. Tr. at 2742–44.  Dr. Zaldivar used the geometric transformation called "hydraulic diameter"; it is the "gold standard" for geometric transformation.  Tr. at 2743–44.  The Government has identified no scientific literature or evidence showing that use of hydraulic diameter for geometric transformation is inappropriate.  Tr. at 2841–42.

simulations, Dr. Zaldivar concluded that total flow rate for May 13–20 is bounded between 24,900 and 35,900 stb/day, with a best estimate of 30,000 stb/day.  Tr. at 2710–11, 33, 57, 60–62; TREX 11683.0029–32.  There is no evidence that the flow rate from May 13–20 was below 24,900 stb/day or above 35,900 stb/day.  Tr. at 2762.

## III.   THE GOVERNMENT OVERSTATES CUMULATIVE FLOW BY USING AN INAPPROPRIATE METHOD TO CONVERT FLOW TO STOCK TANK CONDITIONS.

There is no dispute that the volume of liquid oil at stock tank conditions is less than the volume of hydrocarbon fluid at reservoir conditions—and less than the volume of oil at sea floor conditions.  Tr. at 2338–39.  Expressing liquid oil volumes in units of stock tank barrels is standard practice in the petroleum industry, and the Government has agreed that stock tank conditions are the appropriate measure for oil discharged from the reservoir.  Stip. Moot. BP's Mot. for Partial Summ. J. Against the U.S. at 1 (Rec. Doc. 8620); Mem. in Supp. of the U.S. Mot. to Preclude Op. Test. of BP/Anadarko Witness Curtis Whitson as to Pure Ques. of Law at 1 (Rec. Doc. 11056); Tr. at 2131.   Indeed, the Government experts have all expressed their estimates in stock tank barrels.   TREX 11452.0003; 11485R.0004; 11549R.0007; 11653.0004. Further, the parties' experts agree that in converting the volume of oil discharged at the bottom of the sea to stock tank conditions, one must use a conversion factor consistent with the physical processes that took place at Macondo.  Tr. at 1833; 2131; 2336.[6]  For instance, Government expert Dr. Aaron Zick agreed it is important to consider the real world circumstances in which the hydrocarbon fluid traveled from the reservoir to stock tank conditions.  Tr. at 1833.

---

[6] Under the Clean Water Act only discharged oil—not gas—is subject to penalty.  33 U.S.C. § 1321(b)(7).

A.      **The Single-Stage Flash Process is Not Subject to Uncertainties Inherent in Many Multi-Stage and Oceanic Separation Processes.**

The "single-stage flash" process is the standard methodology in the petroleum industry for converting calculations of reservoir flow into standard tank barrels when, as here, there is uncertainty about the exact process of the oil-gas separation.  Tr. at 1831; 2132.  It is commonly used in oilfield operations and is the simplest process that can be used to convert the volume of hydrocarbon fluid to stock tank oil barrels.   Tr. at 1831; 2132.   Government expert Dr. Dykhuizen used single-stage flash as his conversion methodology, as did Dr. Blunt, Dr. Gringarten, and Dr. Zaldivar.  Tr. at 1469; 2131–32; 2549; 2775.

The single-stage flash process not only avoids uncertainties inherent in many multi-stage or oceanic separation methods, but it also is a good approximation of what might have happened at Macondo.  There is no dispute that the oil and gas did not physically separate along the flow path from the reservoir to the sea floor.  Tr. at 2370–71; 1831–32.  It is scientifically plausible that once there, the oil and gas remained in contact as they rose through the ocean to the surface. Tr. at 2263.  If that occurred, the result would be a single-stage flash.  Tr. at 2263.

B.      **Multi-Stage Separation Process Modeling is Arbitrary and Does Not Reflect What Actually Took Place at Macondo.**

The four-stage, laboratory-based separation process used by at least one Government expert (Dr. Pooladi-Darvish) reflects neither what happened to the Macondo hydrocarbon fluid nor what might have happened to that fluid had the well been produced.  TREX 11653.0157.  By design, a multi-stage separation process is not intended to reflect naturally occurring conditions. Multi-stage separation processes are engineered specifically to extract more liquid oil than would otherwise be extracted naturally.  TREX 11490R.00025.  The hydrocarbons at Macondo went through no such engineered separation process.  Tr. at 1762, 1824–25; 2133.   Further, the

24

laboratory four-stage process does not even reflect what might have happened if the reservoir had been produced.  Tr. at 2133; 2322, 33–34, 57.[7]  Tellingly, the four-stage process was not the separation process used for fluid collected by surface vessels.  Tr. at 1825–26.  In short, the multi-stage separation process is not relevant to what happened at Macondo between April 20 and July 15, 2010.

### C.    Done Correctly, Oceanic Separation Results in a Conversion Number Similar to the Single-Stage Flash Value.

BP's fluid phase expert Dr. Curtis Whitson is the acknowledged leader in the field.  Dr. Whitson has won the Society of Petroleum Engineers' highest technical award for his work in fluid phase behavior and is widely regarded as the world's foremost expert in hydrocarbon phase behavior.  Tr. at 2135; 2310–12.  Even Dr. Zick acknowledged "[t]here is no one in the world with more experience in these areas."  Tr. at 1790; TREX 11492.0001.

Dr. Whitson developed an "ocean separator" model to represent the separation of oil and gas that occurred naturally at Macondo; he determined the actual shrinkage that took place is essentially the same as predicted by the single-stage flash method.  Tr. at 2313–14, 35–36; TREX 144128.0001–08.  Dr. Whitson's model is based on an accurate equation of state ("EOS") and takes into account all realistic thermodynamic effects.  Tr. at 2135; 2327–29, 36, 38–45, 47–57; TREX 144128.0001–08.

Dr. Whitson's "oceanic" model is preferable to the one offered by Dr. Zick for two primary reasons.  First, Dr. Whitson's model is based on an accurate EOS, which describes the physical and thermodynamic properties of Macondo Reservoir fluids captured in pre-incident

---

[7] Even if the four-stage process had been implemented during production, it would not have been conducted with the same efficiency as in the laboratory.  Tr. at 2133–34.

fluid samples—including the shrinkage factor to be used for the "oceanic" process.   TREX 11496.0009.   Because shrinkage factor is the most important measurement made by a fluids laboratory, the oil industry expects an EOS to match laboratory data within two percent.   Tr. at 2324–25.   Dr. Whitson's EOS model predicted the shrinkage factor of the Macondo fluid within that margin—and in some cases to within one percent.   Tr. at 2324–25.   In contrast, the average shrinkage factor error in Dr. Zick's EOS model was 4.5 percent—more than double the industry-accepted margin of error.   Tr. at 1795, 1810–11; 2323–26, 28, 29–30, 34–35, 58–59.

Second, an accurate "oceanic process" must account for the solubility of hydrocarbons as they travel through open ocean.   Dr. Whitson properly modeled the physical process of the Macondo Reservoir fluid as it travelled from the sea floor up through 5,000 feet of seawater. TREX 11496.0009.   This "oceanic process" incorporates 130 depths or stages of separation, and simulations of gas separating from the changing oil were performed for each stage.   TREX 11496.0009.   In contrast, although Dr. Zick conceded at trial that solubility is an "undeniable" aspect of hydrocarbons interacting with seawater, his own "oceanic" separator model fails to account for this fundamental interaction.   Tr. at 1817, 24, 26–28, 2374–75.   Perhaps most notably, no Government expert used Dr. Zick's "oceanic model" in calculating spill volumes. Tr. at 1829–30; TREX 011490R.0025–26.[8]

## IV.   MATERIAL BALANCE ANALYSIS IS THE MOST RELIABLE METHOD FOR DETERMINING THE VOLUME OF OIL RELEASED AT MACONDO.

Material balance analysis can be reliably applied to determine cumulative flow from the

---

[8] BP and Anadarko hereby incorporate by reference their earlier filings related to the expert opinions offered by Drs. Whitson and Zick.  *See* BP and Anadarko Opp. to U.S. Mot. to Excl. Test. of Dr. Curtis Whitson (Rec. Doc. 11209); BP and Anadarko Mot. in Opp. to U.S. Mot. to Preclude Surrebuttal Expert Op. Test. (Rec. Doc. 11224).

Macondo Reservoir and is not subject to the uncertainty that infects the Government's analyses that are based on assumed daily flow rates. Tr. at 2105–06. Material balance analysis honors fundamental principles of physics and is a well-established reservoir engineering method. TREX 11549R.0023. Because material balance is based on the basic principle that what flowed from the reservoir is the difference between what oil was in place in the reservoir before and after the discharge, daily flow rates over the 86-day period need not be determined. Tr. at 2103–05. Consequently, this methodology eliminates nearly all the uncertainty inherent in the methodologies used by the Government experts. Indeed, Dr. Kelkar agreed that material balance analysis is the preferred method for determining cumulative flow, as evidenced by his own use of the method in this case. Tr. at 1843. Use of material balance is particularly appropriate where, as here, high quality data are available for each of the inputs necessary to determine cumulative flow for that analysis.

## V. PROPER APPLICATION OF MATERIAL BALANCE ANALYSIS RESULTS IN A RELIABLE AND CONSERVATIVE CUMULATIVE DISCHARGE ESTIMATE OF 3.26 MMSTB.

The robust upper-bound estimate of the cumulative volume of oil released from the Macondo reservoir is 3.26 MMstb. In a material balance analysis, cumulative flow (Np) is the product of three variables: initial volume of oil connected to the well (N); compressibility of the rock and fluids in the reservoir (c); and change in reservoir pressure ($\Delta$p). Dr. Martin Blunt honored both basic principles of physics and the "quite good quality data" available about the Macondo Reservoir in determining each of these values. Tr. at 2103.

Dr. Blunt is one of the world's leading reservoir engineers. He serves as Professor and Chairman Emeritus of Petroleum Engineering at Imperial College London. He has authored more than 200 scientific papers, and his work has been cited more than 8,000 times by other

27

experts in the field.  Dr. Blunt has received numerous professional awards, including the Society of Petroleum Engineers' award for outstanding contributions to the field before age 45 and the Society of Core Analysts award for lifetime achievement.  TREX 11553R.0004.

### A.    Initial Connected Oil Volume at Macondo is 112 MMstb.

The best scientific evidence available indicates that no more than 112 MMstb of oil were connected to the Macondo well.  To determine initial connected oil volume, Dr. Blunt first determined the total amount of oil in the entire reservoir.  Tr. at 2115–18.  He then evaluated what portion of that oil was connected to the well and converted that oil volume to stock tank conditions.  Tr. at 2115–18.  Dr. Blunt calculated the total amount of oil in the reservoir using seismic data collected before the well was drilled, information about the geologic properties of the region, and pressure data collected after the well was shut in.  Based on seismic data from BP's Pre-Drill Technical Assurance Memorandum, Drs. Kelkar and Blunt essentially agreed on the total volume of hydrocarbons in place.  Tr. at 1854–55; 1921, 2103–04, 17.

To quantify the volume of oil actually connected to the Macondo well, it is important to consider the geology of the region.  Reservoirs in the Gulf of Mexico are formed of so-called channel complexes separated by impenetrable regions of shale; it is therefore unlikely that all channel complexes in the Macondo Reservoir were connected at a single point and that the well was drilled through that exact point.  Tr. at 2118–22.  In fact, BP anticipated drilling multiple wells into this reservoir, as described in the Pre-Drill Technical Assurance Memorandum. TREX 150129.  Not surprisingly, a consulting expert working with U.S.G.S. scientists stated, "it is geologically reasonable that there is limited channel connectivity."  TREX 8624.0006.

Dr. Kelkar's simplistic assumption that 100% of the hydrocarbon-bearing sands are connected to the Macondo well is neither scientifically plausible nor supported by the evidence.

Although Dr. Kelkar acknowledged that some of the channels at Macondo might not have been connected to the well, he did not perform a connectivity analysis to determine connected oil volume; he simply assumed all the reservoir's oil could flow out of the single well.  Tr. at 1924, 32.

In contrast, Dr. Blunt analyzed the geology of the area and performed a pressure analysis to quantify the level of connectivity.  This pressure analysis, which is a reservoir engineering best practice, assessed the pressure build-up in the reservoir after the well was shut in on July 15 to determine the size of the connected oil field.  Tr. at 1924–25, 2124–26, 36.  This analysis required a determination of the reservoir's permeability.  Permeability, a measure of oil's ability to flow in the reservoir formation, is one of the major factors affecting the speed at which the pressure signal moves.  A higher permeability (as reflected by a faster moving pressure signal) means that the oil will flow more quickly and the reservoir boundaries are further away.  TREX 11553R.0045.

Although Dr. Blunt independently calculated a permeability value of 300 mD for the Macondo Reservoir using pressure data from the capping stack, he ultimately used a higher, more conservative permeability estimate calculated by Dr. Alain Gringarten, a professor at Imperial College London with more 30 years' experience studying fluid flow in porous media.  TREX 11553R.0040, 45.  Dr. Gringarten is widely acknowledged as the world's preeminent expert in well test analysis.  Tr. at 2180.  He pioneered the industry-standard technique of determining permeability using both derivative and semi-log plots of pressure and flow-rate data.  Dr. Gringarten's technique became standard in the industry because older methods—like those used by the Government experts—were inadequate.  Tr. at 2506–07, 21–22.

Both flow rate and pressure data are required when using well test analysis—the

industry-standard technique—to estimate permeability.  Tr. at 1928–29; 2174–76; 2510; Levitan

Dep. at 371.  Dr. Gringarten is the only expert to use the flow rate and complete and accurate set

of pressure data collected during the MDT tests conducted on April 12, 2010—the only set of

simultaneous flow rate and pressure data for Macondo.  Tr. at 1928–29, 2515; TREX

11696R.0009–11.  Dr. Gringarten used the derivative plots of these data to identify radial flow

stabilization and from that calculated permeability.  Tr. at 3227; TREX 11696R.0028.  He then

verified his results using a semi-log plot.  Tr. at 3227.[9]  In contrast, Government rebuttal expert

Dr. Leif Larsen used an incomplete and inaccurate set of data, which he analyzed with outdated

and inadequate methods.  Tr. at 2524–25, 3207–08, 23–24.

Using the best available data and the "gold standard for permeability assessment," Dr.

Gringarten concluded the reservoir's permeability is most likely 238 mD—with a 90% chance

that the permeability exceeds 170 mD and only a 10% chance that the permeability exceeded 329

mD.  Tr. at 2828–30; TREX 11553R.0047, 64–67; 11696R.0032–33.  Taking a conservative

approach, Dr. Blunt used Dr. Gringarten's high-end permeability estimate of 329 mD in his

pressure analysis.  Tr. at 2178–79, 2200; TREX 11553R.0039.  Use of the largest plausible

permeability estimate resulted in the largest plausible connected reservoir area.  Tr. at 2097,

2190–91; TREX 11553R.0109.

To calculate total connected oil volume, Dr. Blunt conservatively estimated that as much

as 90% of the total reservoir volume was contained in the connected reservoir area.  This

assumption was conservative because some of the unconnected hydrocarbon-bearing sand shown

---

[9]  Dr. Gringarten also used deconvolution to analyze the MDT data.  TREX 11696R.0028.
Deconvolution is a sophisticated industry-standard technique, which Dr. Gringarten helped
develop for use in petroleum engineering, that allows the user to see further into the reservoir
than older methods using the same data set.  Tr. at 2508; TREX 11696R.0019–24.

on the Macondo seismic map was likely thicker than Dr. Blunt's assumed value of ten feet—the minimum thickness that would appear on a seismic map.  Similarly, it is unlikely that the average thickness of the entire connected reservoir area was 90 feet.  Tr. 2126–28; 2222–23; TREX 11553R.0024, 0109.  After converting connected oil to standard tank barrels using the single-phase separation processed discussed in Section III.A., *supra*, Dr. Blunt determined that 112 MMstb of oil were connected to the Macondo well.

### B.   The Macondo Reservoir's Uniaxial Pore Volume Compressibility is Approximately Six Microsips.

The reservoir's average uniaxial pore volume compressibility ("UPVC"), which is sometimes referred to as "rock compressibility" or "formation compressibility," is approximately 6.35 microsips.  A value materially higher than this is inconsistent with available laboratory data and with what is known about the region's geology.   At trial, the Government offered no independent analysis of the reservoir's rock compressibility.   Dr. Pooladi-Darvish used six microsips for rock compressibility in his base case.  Tr. at 2052.  Although Dr. Kelkar used a value of 12 microsips in his expert report, he performed no analysis of the rock mechanics measurements performed on the Macondo rock samples and admitted that six microsips is a reasonable estimate.  Tr. at 1893–94.  Changing only the rock compressibility value in Dr. Kelkar's analysis to six microsips would reduce his cumulative flow estimate to less than 4 MMstb.  TREX 11553R.0007.

### 1.   Six Microsips is the Measured Value for UPVC at Macondo.

It is undisputed that the measured value of UPVC for the rock samples taken from the Macondo Reservoir is approximately six microsips.  The most reliable way to estimate a reservoir's UPVC is to analyze rock core samples in a laboratory.  Tr. at 2411.  Rotary sidewall core samples were taken from the reservoir in mid-April 2010 after the well was drilled but

before the blowout occurred.  Tr. at 2413–14; Loos Dep. at 29–35.  Weatherford Laboratories, a well-respected service laboratory with extensive experience performing core analyses, tested three of these core samples for UPVC.  Tr. at 2140–41; TREX 9050; 11497.0006.  The Weatherford-measured UPVC of the Macondo rock samples—the only direct measurement of UPVC available—is approximately six microsips.  Tr. at 2285–86; 2422.

The Government's experts agree that the Macondo core samples have a laboratory measured UPVC of approximately six microsips.  As Dr. Kelkar has admitted, "measurements on the Macondo rocks themselves indicated a rock compressibility of 6;" indeed, he used a rock compressibility value of approximately six microsips in his June 2010 report for the FRTG.  Tr. at 1897; TREX 9859.  Dr. Paul Hsieh, a member of the Government's Well Integrity Team, also acknowledged that he has never seen any measurements or core data suggesting a rock compressibility of anything other than six microsips.  Tr. at 1550–51.

Dr. Robert Zimmerman, a foremost authority on rock mechanics and the compressibility of sandstones, confirmed that the reservoir's UPVC was approximately six microsips.  Tr. at 2141.  Dr. Zimmerman authored the *Compressibility of Sandstones*, the definitive book on sandstone compressibility that has been cited over 300 times in scientific literature.  Tr. at 2141.  He is also Editor-in-Chief of the *International Journal of Rock Mechanics* and is co-author of the leading book in the field of rock mechanics.  TREX 011497.

Based on an evaluation of Weatherford's uniaxial compression test, Dr. Zimmerman estimated Macondo's average UPVC to be 6.35 microsips.  Tr. at 2398–99, 2421–22; TREX 11497.0013–15.  Dr. Zimmerman further verified rock compressibility by analyzing results from two other types of tests from which UPVC could be derived.  Tr. at 2427–28.  Weatherford performed those tests—the hydrostatic stair-step porosity test and the ultrasonic acoustic/velocity

test—on additional Macondo Reservoir core samples.  Tr. at 2427–28; TREX 9050; 9056.

The hydrostatic stair step test provides information about hydrostatic compressibility of the reservoir, which is closely related to UPVC.  Tr. at 2430–31.  Using standard equations, Dr. Zimmerman converted raw data from this test to UPVC, arriving at an estimated range of 4.56 to 5.47 microsips.  Tr. at 2429–34, 3297; TREX 11497.0016–17.  Weatherford also performed an ultrasonic/acoustic velocity test that measured how fast sound waves travelled through core samples.   Tr. at 2444–46; TREX 11497.0018–19.   Again, using known and accepted mathematical equations, Dr. Zimmerman determined that this particular test indicated that the reservoir rock's UPVC was approximately four microsips.  Tr. at 2445–51; TREX 11497.0018–19.  Dr. Zimmerman concluded the results from the hydrostatic stairstep porosity test and the ultrasonic/acoustic velocity test confirmed a reservoir UPVC value of approximately six microsips.[10]  TREX 11497.0016–17, 19.

### 2.   Weatherford Performed Industry-Standard Tests on Appropriate Core Samples.

The Government tries to sidestep the laboratory-measured data by suggesting that the tests were not performed on appropriate types of cores or under the right testing conditions.  TREX 11698R.0005–06.[11]  The Government is incorrect that UPVC measurements should be taken only from so-called conventional cores.   Rotary sidewall cores are appropriate for

---

[10] Based on the anticipated porosity of the rock at Macondo and what was known of geology in the area, BP predicted pre-drill a rock compressibility of "about 6 microsips."  TREX 9283.  The measured porosity of Macondo samples was consistent with the anticipated value, lending further support for the predicted value of six microsips.  Tr. at 2144–48.

[11] BP and Anadarko hereby incorporate by reference their motion and offer of proof related to expert opinions on the subject of rock compressibility.  *See* BP and Anadarko Mot. in Opp. to U.S. Mot. to Preclude Surrebuttal Expert Op. Test. (Rec. Doc. 11224).

determining UPVC and are commonly used in the industry for exactly that purpose.  Tr. at 2415; Vinson Dep. at 356–57; Loos Dep. at 143–44.  Although conventional whole core samples might be preferable where the rock is anisotropic—stiffer in one direction than in another—no evidence suggests anisotropy at Macondo and certainly not to the degree suggested by the Government.  Tr. at 2456, 68–69, 2499–500; D23701.  Indeed, Dr. Kelkar agreed at trial that he saw no laminations (a possible indicator of anisotropy) in the Macondo sandstone, and the Government offered no data showing significant anisotropy.  Tr. at 1916–17.

Contrary to the Government's assertions, the size of the Macondo core samples had no effect on the UPVC measurements.  Length-to-diameter ratio does not have an appreciable effect on UPVC measurements.   Tr. at 2481–83; TREX 11497.0010.   Here, the samples were approximately 1.1 inch x 1.2 inches, which are standard sample sizes for rotary cores and appropriate for UPVC testing.  Tr. at 2482–83; TREX 9067; Loos Dep. at 56.

Finally, Weatherford performed the UPVC tests in an appropriate and industry-standard manner.   Tr. at 2428; Loos Dep. at 199–200.   Although the Government criticizes the temperature at which the tests were conducted and the fluid that was used, neither aspect affects the validity of the compressibility measurements here.   Indeed, Dr. Roegiers conceded that performing UPVC testing at room temperature conditions is commonplace in the industry.  Tr. at 3326.  Even if it were possible to test the core samples at reservoir temperature—which would be difficult, if not impossible—doing so would have minimal impact on the final UPVC measurements.  Tr. at 2485–90.  Finally, it bears mention that the saturant used by Weatherford (kerosene) was an appropriate pore fluid that is regularly used in UPVC testing.  Tr. at 2488–89; TREX 11497.0035.

### 3.     BP's Use of 12 Microsips in Modeling Done as Part of the Shut-In Effort is Irrelevant.

Consistent with the measured data, BP used a compressibility value of six microsips in all modeling conducted after the Macondo well was shut in, including those developed for use in relief well drilling.  Tr. at 1554–55; 2670–71; TREX 8642; 8643; 11551; 142325.1.  The Government's argument in support of a UPVC value of 12 microsips rests entirely on a discussion among BP reservoir engineers and rock mechanic specialists about the appropriate values of rock compressibility to use in worst-case modeling leading to shut-in.  Tr. at 1866–67; TREX 11549R.0027, 28, 45.

The context surrounding this discussion makes it clear that the inflated compressibility value used in modeling during a short time period was not based on an assessment that the actual compressibility of the reservoir rock was 12 microsips.[12]  Dr. Robert Merrill, the BP reservoir engineer who led the modeling efforts leading to shut-in, testified that based on measured data his initial modeling used a rock compressibility value of six microsips.  Tr. at 2645–48, 50; TREX 10859.0001.  The reservoir model cited by the Government was later developed to help predict worst-case pressures that might be seen during shut-in because the team was concerned about how much time they might have to recognize well integrity failure.  Tr. at 2650–51, 55–56; Vinson Dep. at 417–19.  The final numbers they used for rock compressibility included multiples of the measured value: six microsips; 12 microsips; and 18 microsips.  Tr. at 2659.  The reference to 12 microsips as the "most likely" case referred only to that value being the mid-case,

---

[12] Even if those involved in the discussions believed that 12 microsips was an appropriate value—which they did not—they did not yet have access to the full capping stack pressure data to evaluate whether their proposed rock compressibility value was consistent with the size of the connected oil field.  Tr. at 2153–56.

not that it was either a measured or an anticipated value.  Tr. at 2660.  After the Macondo well

was shut in, Dr. Merrill and others resumed using six microsips as the proper value for rock

compressibility, including for modeling in connection with the relief well.  Tr. at 2670–71;

TREX 9318; 10924; 11551.

#### 4.     A 12 Microsip Rock Compressibility Value is Fundamentally Inconsistent with Applicable Data.

The Government's use of a rock compressibility value of 12 microsips cannot be

reconciled with known data about the Macondo Reservoir and the surrounding geological area.

To verify the accuracy of the known data indicating a compressibility of six microsips, Dr. Blunt

performed a consistency check—a fundamental step in reservoir engineering.   Dr. Blunt

analyzed whether a higher compressibility number is consistent with other data about the

reservoir.  TREX 11553R.0045, 47.  He found it is not.[13]  If the rock compressibility at Macondo

were as high as 12 microsips, one would expect the pressure wave after shut in to travel more

slowly across the reservoir.  Tr. at 2153–56.  If the pressure wave moved more slowly than

predicted, it would mean that the area of connected oil is smaller.

Such  a  circumstance  would  have  two  consequences,  both  of  which  make  a

compressibility  value  of  12  microsips  unlikely.   First,  an  upward  adjustment  of  the  rock

compressibility  value  would  necessarily  mean  a  downward  adjustment  of  the  total  amount  of

hydrocarbon-bearing sands.  Therefore, even if Dr. Kelkar were correct about 12 microsips—

which he described as no more than a "guess" or an "educated guess"—he would need to reduce

his total oil volume and therefore his cumulative estimate.  Second, a smaller area of connected

---

[13] Dr. Zimmerman also confirmed that a UPVC value of 12 microsips is not consistent with the
Weatherford test data.  TREX 11497.0016, 18.

oil is not consistent with the seismic data.  Tr. at 2150–52.

A rock compressibility value of 12 microsips also is not consistent with what is known about the geological area surrounding Macondo.  Dr. Kelkar is the senior author of a study finding that the medium value of rock compressibility in this Gulf of Mexico region for reservoirs around the same age as Macondo is ***three microsips***—a value far below the 12 microsips suggested by the Government.  TREX 11560.

### C.    Dr. Blunt Correctly Determined the Pressure Depletion in the Reservoir to be 1367 psi.

Government expert Dr. Kelkar overstates the reservoir pressure depletion by failing to take into account the fundamental principle that hot oil trapped in the wellbore will cool and exert a higher final pressure on the reservoir.  The volume of oil released from the Macondo Reservoir is directly proportional to the difference between the pressure in the reservoir before the blowout and after the blowout.  TREX 11553R; 011549R.  There are two steps in deriving final reservoir pressure (and hence pressure depletion): converting the capping-stack pressure to down-hole values, and then ascertaining the additional pressure buildup after the well was sealed with cement.  TREX 11553R.0034.

All the experts in this case estimated the final reservoir pressure using measurements from a pressure gauge on the capping stack, a device that was separated from the reservoir by more than 13,000 feet of oil in the wellbore.   Tr. 2159–64; TREX 11553R.0033–34; 11549R.0017; 11653.0065; 11696R.0138.  They all agree that the capping stack gauge pressure must therefore be converted to reservoir pressure by accounting for the weight of oil in the wellbore (the "head").  TREX 11553R.0033–34; 11549R.0017; 11653.0065; 11696R.0138.  The difference between the final pressures calculated by Dr. Blunt and the Government experts results from the conversion of capping stack pressure to down-hole values.  TREX 11553R.0033.

During the discharge, hot oil flowed through the wellbore, heating the casing, cement, and surrounding rock.  TREX 11553R.0033.  When the well was shut in and flow ceased, the oil in the wellbore began to cool.  TREX 11553R.0033.   This undisputed phenomenon is a fundamental principle of physics—the Second Law of Thermodynamics.  Tr. at 1939–42; TREX 11654R.0011.  All things being equal, colder fluids are denser than warmer fluids, and so the pressure difference between the capping stack and the reservoir increased as the wellbore oil cooled.  TREX 11553R.0034; D23558.  Therefore, a proper conversion of capping stack to downhole pressure must account not only for the height of the oil column, but also for the changing density of the wellbore oil.  Dr. Kelkar and other Government experts inexplicably failed to make this fundamental adjustment.  Their analysis implies that oil in the capping stack, surrounded by cold seawater for 19 days, remained as hot as or hotter than the oil deep in the reservoir.  TREX 11553R.0034.  As Dr. Blunt showed, the oil at the capping stack cooled after shut-in from about 243°F to about 95°F.  TREX 11553R.0034.  The heads calculated by the Government experts require wellbore oil temperatures of more than 200°F, with Dr. Griffiths's and Dr. Pooladi-Darvish's conversions requiring temperatures even hotter than the reservoir temperature of 243°F.  TREX 11553R.0090.  Their assumption of little or no cooling (or in Dr. Griffiths's and Dr. Pooladi-Darvish's cases, of heating) leads to an erroneous—*i.e.*, too light— density for the head, and this error leads, in turn, to an understatement of the pressure difference between the capping stack and the reservoir.  TREX 11553R.0034.

To determine final reservoir pressure, one additional factor must be considered.  Because well pressure will increase after shut-in, Dr. Blunt developed an analytic model that matched the measured data as accurately as possible and then used that model to predict the future pressure trend.  TREX 11553R.0037.  This approach is considered best practice in reservoir engineering.

38

Tr. at 2159–64.   The predicted reservoir pressure stabilized at a value of 10,489 psi approximately three months after the well was shut in, resulting in a change in reservoir pressure of 1,367 psi.

The failure of the Government's experts to take into account wellbore cooling and to predict an equilibrated final reservoir pressure results in an understated reservoir pressure drop from before the incident until after shut-in.   TREX 11553R.0034.   Just this one error means that the Government's experts overestimate the volume of oil released by anywhere from 200,000 stb to 700,000 stb, depending upon the method.   TREX 11553R.0007, 90; D23560.

## VI.   DR. GRINGARTEN'S SEPARATE FLOW RATE HISTORY MODEL FURTHER VALIDATES DR. BLUNT'S CUMULATIVE FLOW ESTIMATE.

Using industry-standard techniques, Dr. Gringarten estimated the cumulative discharge from Macondo to be between 2.4 and 3.0 MMstb.   Tr. at 2509–10; TREX 11696R.0012, 49–57. Dr. Gringarten used deconvolution, which is a sophisticated mathematical tool that can reconstruct flow rate history from pressure history and permeability.   Tr. at 2535, 39, 2619.   Dr. Gringarten is an expert in deconvolution and one of the pioneers of its use in the oil and gas industry, where it has become a standard technique for estimating flow rates and correcting inaccurate flow rate estimates.   Tr. at 2508, 35–36.   No other expert used deconvolution to estimate flow rate.   Tr. at 2536–37.

Unlike the flow histories proposed by the Government's experts, Dr. Gringarten's best estimate of flow rate history at Macondo is consistent with both the appearance of slug flow and the measured permeability of the reservoir.   Because flow rate out of the reservoir is a function of the reservoir's permeability, any flow rate estimate must be consistent with the permeability of the reservoir—per Darcy's Law.   Tr. at 2510–12; TREX 11696R.0006.   Unlike the Government's experts, Dr. Gringarten constrained his flow rate estimates with both pressure

history and reservoir permeability—and his rate history is consistent with the observed pattern of slug flow in mid-May.  Tr. at 2538–39; TREX 11696R.0006, 25, 45.  Dr. Gringarten also accounted for possible changes in the wellbore configuration by considering two extreme possible locations of the drill pipe and accounted for changes in multiphase flow effects in the well, which significantly affected flow rate over time.  Tr. at 3039; TREX 11696R.0034–43; 145357.0114.

In sum, Dr. Gringarten's analysis underscores the deficiencies in and unreliability of the Government's preconceived, speculative estimates and substantiates Dr. Blunt's finding that cumulative discharge from the Macondo reservoir totaled 3.26 MMstb.

## CONCLUSION

For the reasons set forth above, the Court should find that **3.26 MMstb** of oil were released from the Macondo Reservoir and that after accounting for 810,000 stb of collected oil, 2.45 MMstb of oil escaped into the environment.


December 20, 2013                                        Respectfully submitted,

                                                        */s/ Don K. Haycraft*
                                                        Don K. Haycraft

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of December 2013.

*/s/ Don K. Haycraft*
Don K. Haycraft