**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, | * * * | MDL No. 2179 |
| | * | |
| | * | Section: J |
| This Pleading applies to: | * | |
| | * | Judge Barbier |
| | * | |
| All Cases | * | Magistrate Judge Shushan |
| | * | |
| | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**POST-TRIAL BRIEF OF DEFENDANTS BP EXPLORATION & PRODUCTION INC.,**
**BP AMERICA PRODUCTION COMPANY, AND BP p.l.c.**

**SOURCE CONTROL**

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Paul D. Collier
Emily R. Dempsey
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Christopher Landau, P.C.
Steven A. Myers
Katherine A. Crytzer
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC  20005
Telephone:  202-879-5000
Facsimile:  202-879-5200

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.*

December 20, 2013

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

I.     The Facts Here Do Not Establish The Culpability Necessary To Support Punitive Damages Under General Maritime Law. ......................................................... 3

     A.     BP's Pre-Spill Source-Control Plan Does Not Support Punitive Damages. ........... 4

     B.     BP's Post-Spill Source-Control Efforts Do Not Support Punitive Damages. ..................................................................................... 10

          1.     The Timing of Capping the Well Was Driven by Engineering Challenges and the "Don't Make It Worse" Principle. ............................. 14

          2.     BP Did Not Make Misrepresentations Regarding Flow Rate That Caused a Delay in Shutting In the Well Before Top Kill. ........................ 16

               a.     Flow-Rate Estimates Did Not Dictate Response Strategies, Including Top Kill. ....................................................... 18

               b.     The Federal Government Generated The 5,000 bopd Flow-Rate Estimate, But Did Not Rely On It. ........................................ 19

               c.     BP Shared Flow-Rate Estimates in Excess of 5,000 bopd With the Government. .................................................... 20

               d.     BP's Hydraulic Modeling in April and May 2010 Did Not Generate Flow-Rate Estimates That Would Have Impacted the Source-Control Response. ...................................... 21

               e.     The Conduct Attributed to BP Under the Plea Agreement Did Not Affect the Source-Control Response. ........................... 22

               f.     The Decision to Implement Top Kill Before BOP-on-BOP Was Driven by Sound Engineering Judgment. ............................. 23

               g.     Unified Command Approved Top Kill After an Independent Analysis and with a Full Appreciation of Its Risks and Limitations. ................................................ 25

               h.     BOP-on-BOP and the Capping Stack Were Not Ready Until After Top Kill Concluded. .................................... 27

3.      BP Did Not Make Misrepresentations Regarding Top Kill's Failure
That Caused a Delay in Shutting In the Well. ......................................... 29

a.      Data Collected From Top Kill Supports BP's Conclusion
After Top Kill That There Was A Potential Risk Of A
Subsea Broach If The Well Was Shut-In. ...................................... 30

b.      The Federal Government Evaluated The Top Kill Data And
Independently Concluded That There Was A Potential Risk
Of A Subsea Broach If BOP-on-BOP Were Implemented. .......... 34

4.      The Source-Control Team Designed, Manufactured, Tested And
Successfully Installed A Unique Capping Device Tailored For The
*Deepwater Horizon* Blowout. ................................................................. 35

II.      The Facts Here Do Not Establish That BP's Conduct Was A Superseding Cause
Of Plaintiffs' Injuries From The Oil Spill .......................................................................... 38

III.     The Facts Here Do Not Establish The Basis For An Increased Fault Allocation To
BP .......................................................................................................................................... 40

CONCLUSION ................................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alley v. Gubser Dev. Co.*,
   785 F.2d 849 (10th Cir. 1986) ................................................................. 6

*Atlantic Sounding Co. v. Townsend*,
   557 U.S. 404 (2009) ................................................................................ 4

*Burlington N. & Santa Fe Ry. v. United States*,
   556 U.S. 599 (2009) ................................................................................ 40

*Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
   704 F.3d 413 (5th Cir. 2013) ............................................................... 11, 12

*Drabik v. Stanley-Bostitch, Inc.*,
   997 F.2d 496 (8th Cir. 1993) ................................................................. 6

*EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*,
   438 F.3d 519 (5th Cir. 2006) ................................................................. 39

*Exxon Co., USA v. Sofec, Inc.*,
   517 U.S. 830 (1996) ............................................................................... 39

*In re Great Lakes Dredge & Dock Co.*,
   624 F.3d 201 (5th Cir. 2010) ............................................................... 11, 23

*In re Mid-South Towing Co.*,
   418 F.3d 526 (5th Cir. 2005) ............................................................... 11, 23

*In re P&E Boat Rentals, Inc.*,
   872 F.2d 642 (5th Cir. 1989) ................................................................. 4

*Nader v. Allegheny Airlines, Inc.*,
   626 F.2d 1031 (D.C. Cir. 1980) ......................................................... 5, 10

*Richards v. Michelin Tire Corp.*,
   21 F.3d 1048 (11th Cir. 1994) ............................................................. 5, 6

*Satcher v. Honda Motor Co.*,
   52 F.3d 1311 (5th Cir. 1995) ................................................................. 10

*Urbach v. United States*,
   869 F.2d 829 (5th Cir. 1989) ................................................................. 39

**Statutes and Regulations**

18 U.S.C. § 1505 ........................................................................................................ 22

33 U.S.C. § 1321(c)(2)(A) ...................................................................................... 1, 11

30 C.F.R. § 250.105 .................................................................................................... 9

30 C.F.R. § 250.107(c) ................................................................................................ 9

30 C.F.R. § 254.1(a) ............................................................................................... 1, 4

40 C.F.R. § 300.105(d) .......................................................................................... 1, 11

40 C.F.R. § 300.323(c) .............................................................................................. 12

**Other Authorities**

*Restatement (Second) of Torts* (1965) ..................................................................... 39

## INTRODUCTION

Just as the *Deepwater Horizon* oil spill presented a challenge of unprecedented magnitude, it generated a response of unprecedented scope.  As with any such massive endeavor, it is always possible—with the benefit of hindsight—to second-guess decisions made in real time in the face of substantial uncertainty.  And that is precisely what the Aligned Parties—a marriage of convenience between plaintiffs seeking recovery from all defendants, on the one hand, and certain of those defendants opportunistically seeking to shift the blame, on the other—are doing here.  In particular, they attack defendants BP Exploration & Production Inc. and BP America Production Company (collectively BP)[1] over pre-spill source-control planning and post-spill source-control response efforts.

As a threshold matter, those attacks ignore the Federal Government's preeminent role in oil spill prevention and response.  Federal law requires a leaseholder, as a condition for engaging in deepwater drilling, to prepare and obtain regulatory approval of an Oil Spill Response Plan showing that the leaseholder "can respond quickly and effectively whenever oil is discharged from [a] facility."  30 C.F.R. § 254.1(a).  And, if there is a substantial oil discharge, federal law requires the **President** to "direct all Federal, State, and private actions" to respond to the discharge by establishing a "unified command system" to "bring[] together the functions of the Federal Government, the state government, and the responsible party to achieve an effective and efficient response, where the [Federal On-Scene Coordinator] maintains authority."  33 U.S.C. § 1321(c)(2)(A); 40 C.F.R. § 300.105(d).  Under this legal framework, private parties are neither required nor even **permitted** to respond to an oil spill independent of the federal authorities.

---

[1] While BP p.l.c. is also a named defendant as to some claims, there is no evidence that it had any direct role in the events leading to the April 20 blowout or the subsequent response.  (*See generally* BP's Phase Two Proposed Findings of Fact and Conclusions of Law ("FFCL") § I.A.1.)

It follows that the Aligned Parties' attacks on BP's source-control planning and response efforts are effectively attacks on the Federal Government.  In particular, the Aligned Parties contend that both the federally approved source-control plan and the federally directed source-control response effort were not only inadequate but wrongful.  Such alleged wrongdoing, according to the Aligned Parties, (1) supports an award of punitive damages against BP under general maritime law, (2) qualifies as a superseding cause of plaintiffs' injuries, and (3) warrants an increased allocation of fault to BP.  These arguments fail as a matter of both fact and law.

The undisputed evidence here shows that BP's source-control plan was duly submitted to and approved by federal regulators, which is hardly surprising because that plan fully complied with relevant industry standards.  The Aligned Parties insist that the plan was inadequate because the oil flowed for 86 days.  But such hindsight provides no basis for deeming a source-control plan inadequate, much less wrongful.  Rather, the plan must be assessed by reference to conditions at the time it was prepared and approved.  The undisputed evidence here—including the fact that the plan was approved by government regulators and complied with industry standards—negates any suggestion of wrongdoing.

The same is true of BP's source-control response efforts.  Pursuant to federal law, the response to the *Deepwater Horizon* oil spill was directed by federal officials through a Unified Command.  The Aligned Parties do not, and cannot, contend that BP or any other private party had either the responsibility or the authority to undertake any source-control response efforts independent of Unified Command.  Rather, the Aligned Parties contend that BP sabotaged Unified Command's response effort by misrepresenting and omitting flow-rate estimates.  The problem with that theory, however, is that Unified Command did not rely on BP's flow-rate estimates in making its source-control response decisions.  Rather, in light of the inherent

2

uncertainty surrounding the flow rate, Unified Command based its decisions on worst-case flow-rate assumptions.  In light of those assumptions, as federal decisionmakers testified without contradiction, flow-rate estimates did not affect the source-control effort.  It follows that there is no causal connection between BP's flow-rate estimates and Unified Command's response.

At the end of the day, the premise of the Aligned Parties' argument is nonsensical.  BP—of all entities—had a compelling interest in stopping the flow of oil as quickly as possible.  BP spared no effort or expense on the source-control effort, pushing the boundaries of science and spending an unprecedented *$1.6 billion* on the source-control response alone.  The notion that BP acted not only wrongfully but egregiously and maliciously to delay a resolution of the crisis defies not only law but common sense.  Unfortunately, this blowout presented an extreme and unprecedented engineering challenge that required a revolutionary and collaborative response effort, so that—notwithstanding herculean efforts—the oil flowed for 86 days.  Even if, with the benefit of hindsight, the Aligned Parties are able to second-guess the planning for, and execution of, the source-control response, they cannot come close to establishing that they were injured by any wrongful—much less egregious or malicious—conduct by BP.  Accordingly, BP's conduct with respect to source control does not support an award of punitive damages under general maritime law, and does not qualify as a superseding cause of plaintiffs' injuries or warrant an increased fault allocation to BP.

## ARGUMENT

### I.    The Facts Here Do Not Establish The Culpability Necessary To Support Punitive Damages Under General Maritime Law.

As BP explained in its Phase One post-trial submissions, which it incorporates here by reference, punitive damages are available under general maritime law only where a particular defendant, with a culpable state of mind, engaged in "willful, wanton, or outrageous conduct."

*Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 409, 414 n.4 (2009); *In re P&E Boat Rentals, Inc.*, 872 F.2d 642, 650 (5th Cir. 1989).[2]   The Aligned Parties cannot remotely meet this demanding standard: they cannot establish any wrongdoing by BP—much less the requisite egregious and culpable wrongdoing—with respect to either the pre-spill source-control planning or the post-spill source-control response effort.  Each point is addressed in turn below.

### A.       BP's Pre-Spill Source-Control Plan Does Not Support Punitive Damages.

The Aligned Parties first assert that punitive damages are warranted because "BP consciously disregarded the need to prepare for an uncontrolled deepwater blowout prior to Macondo."  (Pls.' Opp. to BP's Mot. for Partial J. (Rec. Doc. 11604) ("Pls.' Opp.") 6 (capitalization modified).)  According to the Aligned Parties, BP failed to "ensure it had an adequate source control plan," and "BP's pre-spill preparation was nothing more than a plan to make a plan." (*Id.* at 6-7 (capitalization modified); *see also* Transocean & Halliburton's Opp. to BP's Mot for Partial J. (Rec. Doc. 11603) ("Co-Defts.' Opp.") 1 ("BP failed to plan or prepare for a blowout.") (capitalization modified).)  That assertion is baseless.

Under federal law, a leaseholder cannot drill a deepwater oil well without submitting an Oil Spill Response Plan to the relevant federal regulatory body, which was then called the Minerals Management Service ("MMS"), within the Department of the Interior.  *See* 30 C.F.R § 254.1(a).  Federal regulators, in turn, may approve such a plan **only** if the leaseholder "demonstrate[s] that [it] can respond quickly and effectively whenever oil is discharged from [a] facility."  *Id.*

---

[2] This Court has previously rejected BP's argument that the Oil Pollution Act of 1990 (OPA) entirely displaces general maritime law as applied to economic-loss claims resulting from oil spills, and denied BP's request to certify that issue for interlocutory review.  (*See* Rec. Docs. 3830 at 38, 4378).  BP offers the following discussion without prejudice to its position that general maritime law is displaced here.

It is undisputed that BP prepared a source-control response plan for a blowout of the Macondo well that was submitted to, and approved by, MMS regulators.  (*See* TREX 769; TREX 768; TREX 9675.0004; TREX 8957; Tr. 445-46, 463-64 (Bea); Saucier Dep. 209-10, 214-15 (MMS could not have approved BP's plan unless it "complied with all applicable requirements"); Herbst Dep. 27-28, 78-79; FFCL § II.B.1(f).)  BP's federally approved plan set forth specific strategies for responding to a deepwater blowout:

- Remotely activating the blowout preventer ("BOP") through remote-operated vehicle ("ROV") intervention (TREX 769.0179; Tr. 600, 602 (Dupree); Rohloff Dep. 39-41; Herbst Dep. 324; Tr. 445-46 (Bea));

- Drilling one or more relief wells to intersect with, and kill, the well (TREX 768.0010; Allen Dep. 31; Rohloff Dep. 45-46; Tr. 445-46 (Bea)); and

- Standing up a team of technical experts to assess the blowout and to develop alternative source-control strategies (TREX 769.0179; Rohloff Dep. 47-48; Tr. 445-46 (Bea)).

(TREX 9675; TREX 8957; FFCL §§ II.B.1(a)-(c).)  Beyond reviewing this plan, MMS regulators visited BP's facilities to assess spill preparedness.  (TREX 8975; Herbst Dep. 92-93; Tr. 466-68 (Bea).)  At the very least, the undisputed evidence that BP's source-control plan for the Macondo well complied with federal regulations negates the extreme and culpable misconduct necessary for punitive damages.  *See, e.g.*, *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994) (because "compliance with … federal regulations … is some evidence of due care," such compliance generally negates the culpability necessary to support punitive damages); *Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031, 1035 (D.C. Cir. 1980) ("[A defendant] may not be condemned as a wanton wrongdoer for conforming to the standards set and the practices approved by the agency charged with the duty of regulating it.").

It is not surprising that BP's response plan obtained federal regulatory approval, because that plan satisfied industry standards for responding to a deepwater blowout.  (Campbell Dep.

Vol. 1 339-40; Herbst Dep. 78-79; Tr. 600 (Dupree); FFCL §§ II.B.1(a)-(c), (g).)  As the Aligned Parties' own expert Dr. Bob Bea acknowledged, BP's spill response plan was "very similar"—if not "almost identical"—to deepwater-spill response plans submitted by, and approved for, each of the major oil and gas operators (Shell, Exxon, and Chevron).   (Tr. 482-84 (Bea); TREX 142244.0065 (Shell); TREX 142243.0268 (Exxon); TREX 142242.241.3 (Chevron); TREX 769.0179.)   BP's compliance with industry standards, like its compliance with government regulations, negates the extreme and culpable misconduct necessary for punitive damages.  *See, e.g.*, *Richards*, 21 F.3d at 1059 (because "compliance with … industry practices is some evidence of due care," such compliance generally negates the culpability necessary to support punitive damages); *Drabik v. Stanley-Bostitch, Inc.*, 997 F.2d 496, 510 (8th Cir. 1993) ("Compliance with industry standard and custom serves to negate conscious disregard and to show that the defendant acted with a nonculpable state of mind .…"); *Alley v. Gubser Dev. Co.*, 785 F.2d 849, 856 (10th Cir. 1986) (finding error "[i]n submitting the issue of punitive damages to the jury" where "[t]he record fails to establish that the defendants did anything other than conform to industry standards").

Contrary to the Aligned Parties' suggestion (Pls.' Opp. 9), it is undisputed that relief wells are an accepted response to a deepwater blowout.  (Allen Dep. 31; Rohloff Dep. 45-46; TREX 768.0010; Herbst Dep. 60, 78-79 (MMS Director testifies that industry standard was for operators to initiate relief-well operations in response to well-control events); Tr. 643-44, 662, 715 (Dupree) ("[T]he industry standard option to kill the well and the ultimate option to kill the well was the relief well.").)  Indeed, relief wells are considered the best source-control method for a deepwater blowout because they can succeed under the widest range of blowout conditions. (Barnett Dep. 157; McKay Dep. 19, 535; Inglis Dep. 152, Campbell Dep. Vol 1 339-40 ("[T]he

standard practice in the industry in terms of well control response for a blowout such as Macondo is to drill a relief well and also develop devices to directly intervene with the well.").) As the Aligned Parties' own expert acknowledged, a relief well may be the **only** method of controlling a complicated blowout.  (Tr. 500 (Bea); TREX 11755.23.1.)

The Aligned Parties also complain that standing up a team of experts in advance to respond to a spill is nothing more than a "plan to make a plan."  (Pls.' Opp. 6.)  But the undisputed evidence establishes that this is an integral component of a proper response plan because each deepwater blowout presents "unique challenges."  (Herbst Dep. 84-85, 314 ("[E]ach case is likely going to be different as far as a blowout, from my experience.  So each case would have to be looked at on a case-by-case basis…"); Tr. 830 (Mazzella); Barnett Dep. 333; *see also* TREX 11755.20.1 (every blowout is unique); FFCL § II.B.1(c)(3).)  Because it is "impossible to predict" the conditions surrounding a particular deepwater blowout, it is also impossible to predict the appropriate response.  (Tr. 831-32 (Mazzella); TREX 11755.20.3 (no "cookbook" procedure works across all deepwater blowouts); TREX 7353.357.5 ("Blowouts do not always have a straightforward solution.").)  That is why both federal regulators and the industry expect operators to stand up a team of experts to analyze a particular deepwater blowout and then tailor an appropriate source control plan.  (Herbst Dep. 79 ("[T]he expectation is that a company would stand up a source control group within the incident command structure to identify the specific ways to attack the source control"); Tr. 480-83 (Bea).)

Moreover, BP did more than "plan to make a plan."  The company took concrete steps before the spill to ensure that it could immediately stand up a team of source-control experts if necessary.  (TREX 769.0179; Tr. 743-44 (Mazzella).)  BP had contracts in place with three recognized blowout experts—Wild Well Control ("WWC"), Cudd Well Control, and Boots &

Coots (a Halliburton company).  (Tr. 743-44 (Mazzella); TREX 11467; Tr. 477-78 (Bea); Tr. 3045 (Roth).)  In these contracts, each well-control company represented that it could and would provide the necessary expertise and equipment to respond to a deepwater blowout.  (TREX 11467; Tr. 745 (Mazzella); Tr. 480 (Bea).)  Additionally, BP trained its own employees to respond to a blowout, requiring employees pre-selected for response operations to participate in various training, drills, and exercises.  (Holt Dep. 35; Tr. 741 (Mazzella); Rohloff Dep. 25-27; FFCL §§ II.B.1(d)-(e).)

Finally, the Aligned Parties devote considerable energy to arguing that BP's source-control plan was inadequate because it did not mandate the use of, and BP did not have, a deepwater capping stack, the type of device that ultimately staunched the flow of oil.  (Pls.' Opp. 10-12.)  But this is classic Monday-morning quarterbacking.  It is undisputed that, before the *Deepwater Horizon* incident, no one in the industry had ***ever*** built a deepwater capping stack. (Barnett Dep. 326, 332-33; Allen Dep. 75; Tr. 495-96 (Bea) (Shell, Exxon, and Chevron did not have a deepwater capping stack); Tr. 746 (Mazzella); FFCL § II.B.1(g)(1).)  Even Rob Turlak, Transocean's Manager of Subsea Engineering and Well Control Systems, who testified for the Aligned Parties, conceded that in more than 35 years in the deepwater business, he had never heard of a deepwater capping stack.  (Tr. 317, 412 (Turlak).)

It is further undisputed that, at the time of the *Deepwater Horizon* incident, federal regulators did not require deepwater capping stacks and had no expectation that operators would have such devices in place in anticipation of a "very low-probability event" like the *Deepwater Horizon* spill.  (Tr. 496-97 (Bea); Allen Dep. 32-33, 75-76, 647; Domangue Dep. 158; Herbst Dep. 301; FFCL § II.B.1(f)(4).)  That point, however, does not stop the Aligned Parties from arguing that BP violated federal regulations on the theory that a capping stack is the best

available and safest technology (BAST) for regaining control of a deepwater blowout.  Relevant federal regulations, however, define BAST as "the best available and safest technologies *that the [MMS] Director determines to be economically feasible* ...." 30 C.F.R. § 250.105 (emphasis added).  Here, the MMS Director determined neither that a deepwater capping stack was BAST, nor that it was economically feasible.  (Herbst Dep. 301; *see generally* FFCL § II.B.1(f)(4).)  To the contrary, MMS considered "compliance with [MMS] regulations to be the use of BAST." 30 C.F.R. § 250.107(c).  In the absence of any federal regulation or MMS directive requiring a deepwater capping stack, BP complied with the BAST regulation.

Although no one in the industry had ever built or used a deepwater capping stack, the Aligned Parties insist that BP acted not only negligently but egregiously and maliciously by failing to anticipate the need for one.  (Pls.' Opp. 10-12.)  In support of that remarkable assertion, the Aligned Parties cite industry documents that, at best, obliquely reference the possibility of using a deepwater capping stack; even the Aligned Parties' own expert conceded that none of those documents specifically *recommends* a pre-built deepwater capping stack.  (Tr 436; 501-02 (Bea); *see also* FFCL § II.B.1(g)(2).)

The Aligned Parties also contend that BP itself concluded that capping stacks were the best available and safest technology for responding to a deepwater blowout.  (Pls.' Opp. 8-9.)  Their primary, if not sole, support for that contention is a draft BP Alaska document that discusses the use of a capping stack for *surface* wells.  (TREX 9828.0002 ("Well capping is both compatible and feasible with all drill operations *as the technology is applied at the surface*.") (emphasis added); Tr. 503 (Bea) (admitting that the BP Alaska document refers to "surface capping onshore" and that surface well operations are not automatically applicable to deepwater operations).)  Regardless of how this document characterizes capping stacks for use with *surface*

9

wells, it does not suggest that BP concluded that capping stacks were the best available and safest technology for **deepwater** wells.  This is especially true when the evidentiary record establishes that the industry as a whole had not accepted capping stacks for use with deepwater blowouts.  (*See generally* FFCL § II.B.1(g).)

The bottom line here, once again, is that BP cannot be subjected to punitive damages where it complied with both federal regulations and industry standards that did not call for a deepwater capping stack.  *See*, *e.g.*, *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995) (punitive damages unwarranted for failure to employ leg guards because "no government or agency thereof has ever required them, … and the industry as a whole categorically rejects the need for leg guards").  In short, BP "may not be condemned as a wanton wrongdoer for conforming to the standards set and the practices approved by the agency charged with the duty of regulating it."  *Nader*, 626 F.2d at 1035.

### B.  BP's Post-Spill Source-Control Efforts Do Not Support Punitive Damages.

The Aligned Parties next assert that punitive damages are warranted because BP's "misrepresentations and omissions about the flow delayed capping the well."  (Co-Defts.' Opp. 2; capitalization modified).  In particular, the Aligned Parties assert that "BP lied about the flow rate and Top Kill's chances of success, which **caused** the decision to favor Top Kill over the BOP-on-BOP capping option," and that "[a]fter the Top Kill failed, BP concealed that the flow rate was a likely explanation, and falsely claimed that ruptured disks were the only plausible explanation."  (*Id.* at 3, 7, emphasis modified; *see also* Pls.' Opp. 2 (alleging that BP "refused to 'expeditiously' develop and implement the ultimately successful BOP-on-BOP/capping stack strategy").)  Again, these assertions are baseless.

Like the Aligned Parties' attacks on BP's pre-spill source-control planning, their attacks on BP's post-spill source-control efforts fail to establish any wrongdoing, much less the egregious and malicious wrongdoing necessary for punitive damages.  Once again, the Aligned Parties' challenges to the *Deepwater Horizon* source-control efforts amount to no more than Monday-morning quarterbacking.  If the source-control effort were as simple and straightforward as the Aligned Parties now suggest, the flow of oil would have been stopped far sooner.  BP dedicated all of the company's resources to the source-control response—spending more than *$1.6 billion* in the process—and certainly had no incentive to prolong the effort.  (Tr. 1048 (Adams); TREX 11737R.0004.)  Even if the Aligned Parties can show that, in hindsight, the source-control response could or should have been handled differently, they cannot show that the response supports punitive damages against BP.  *See, e.g.*, *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 213-14 (5th Cir. 2010); *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005).  And that point is particularly compelling because the Federal Government, not BP, directed the source-control response.

Under federal law, as noted above, a leaseholder like BP is neither required nor permitted to take the lead in responding to a deepwater oil spill; rather, that responsibility is vested exclusively in the Federal Government.  *See*, *e.g.*, 33 U.S.C. § 1321(c)(2)(A); 40 C.F.R. § 300.105(d); *Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 418 (5th Cir. 2013) ("In the face of an extensive oil spill, federal law directs the President to ensure the effective and immediate removal of the oil in accordance with a National Contingency Plan and to direct all federal, state and private actions in that regard.").  Here, the Federal Government established a Unified Command within hours of the incident, and immediately assigned a Federal On-Scene Coordinator—a position that Coast Guard Admiral Mary Landry assumed on April 23,

11

2010.  (TREX 9675.0005-06.)   Within ten days of the incident, on May 1, 2010, Homeland

Security Secretary Janet Napolitano named Admiral Thad Allen, then Commandant of the Coast

Guard, as National Incident Commander to oversee the response along with the Federal On-

Scene Coordinator.   (TREX 9675.0006; Allen Dep. 133; *see also* 40 C.F.R. § 300.323(c).)

Under this framework, BP did not—and could not—execute source-control response strategies

independent of Unified Command.  (Tr. 228 (Perkin); Allen Dep. 254; Landry Dep. 76; Chu

Dep. 67-68 (all "major steps" were "vetted by the science and engineering teams").)  Rather, BP

could at most recommend source-control strategies to Unified Command for review and, if

appropriate, approval.  (Tr. 596 (Dupree); *see* FFCL § II.B.2(b)(1).a.)

The Aligned Parties thus err by suggesting that BP had responsibility for, or authority

over, the source-control response.  As the Fifth Circuit has explained:

> In the case of the *Deepwater Horizon* disaster, the federal government's response
> to the spill involved monumental efforts.  Almost 50,000 people, including over
> 17,000 National Guard members, and over 4,000 vessels were deployed in the
> Gulf of Mexico and the coastal region.  Federal oversight of the matter spanned
> multiple governmental agencies, with the President dispatching to the Gulf region
> the Secretaries of the Interior and Homeland Security, the Administrator of the
> EPA, the President's Assistant for Energy and Climate Change Policy, and the
> Administrator of NOAA.

*Center for Biological Diversity*, 704 F.3d at 418; *see also id.* at 425 ("The killing of the Macondo

well occurred at the insistence of the federal government acting pursuant to the extraordinary

powers granted to the President to oversee and direct the emergency response to the oil spill.").

That is not to say that BP played no role in the response, but it was necessarily a subsidiary role.

*See id.* at 418 ("BP participated in the response activities at the direction of the federal

authorities to stop the oil spill.")

As relevant here, Unified Command did not blindly rely on BP for the science, but

instead engaged the Federal Science Team, a group of scientists led by Energy Secretary Steven

Chu, a Nobel Prize winning physicist, to independently analyze source-control strategies. (TREX 9178; Chu Dep. 29-32; Tr. 1275, 1279-80, 1284-85 (Hunter); Allen Dep. 99-101, 281-85, 287-88 (no source-control strategy approved without the Federal Science Team first reviewing, commenting, and providing input); *see* FFCL § II.B.2(c).)   Admiral Allen compared the Federal Science Team members to "junk yard dogs" who refused to rely on anyone's input and recommendations, but instead performed their own independent evaluations.  (Allen Dep. 277-80, 301-03.)   They knew, as did everyone else, that the whole world was watching the source-control effort.

Under the umbrella of Unified Command, federal scientists and BP engineers worked closely together.  (TREX 11905R.0016-18; Landry Dep. 86-88, 91 (individuals from BP, the Coast Guard, MMS, and various other agencies worked together in an open space to manage the response); Allen Dep. 306 (BP was transparent about response issues with the federal government); Tr. 1279-81, 1290 (Hunter) (federal scientists worked side by side with BP on response efforts "virtually every day"); Hand Dep. 452-54 (Transocean's Director of Performance and Operations characterizes source-control response as a team effort).)   BP communicated within the Unified Command structure and shared information and data to facilitate analysis and decisionmaking about source-control options.  (Tr. 1305-06 (Hunter) ("The lines [of communication] with BP were certainly open."); Domangue Dep. 152; McKay Dep. 529-30.)   At scheduled daily meetings, Unified Command, BP, and other responders received updates and discussed different options.  (Allen Dep. 47-48, 423-24; Saucier Dep. 128; Tr. 593 (Dupree); Hand Dep. 33-34.)

In addition, BP provided federal responders with well data and information that allowed them to manage the source-control response.  (Allen Dep. 303-08; TREX 9125 (Federal Science

Team had access to data); Hunter Dep. 43, 90 (information flow during the response was great and if something was available, it was shared with the Federal Science Team).)  BP provided this information quickly and, where possible, in "real-time."  (Chu Dep. 61-63, 191-92, 318; McNutt Dep. 639-41; TREX 11305.002.)  Federal responders thus had access to the available data to independently calculate flow rate and evaluate source-control options, including the approval of Top Kill and the analysis of its failure.  (Tr. 257-58 (Perkin); Tr. 152 (Wilson), Chu Dep. 33-34, TREX 11305.0002; Tr. 1068-69 (Adams); Landry Dep. 663-67, 685 (MMS engineers used reservoir and production data to calculate a worst-case discharge of 100,000 bopd); Herbst Dep. 180, 230; Lehr Dep. 81; Saucier Dep. 213; *see* FFCL §§ II.B.2(d)(5), II.B.2(f)(1).)  In addition to sharing raw data with the federal responders, BP shared a range of flow-rate estimates, including some in excess of 5,000 bopd. (TREX 9115; TREX 9619.0007-08; TREX 8883.0002; Allen Dep. 681-85; Landry Dep. 351, 355, 578-79; TREX 9620; FFCL § II.B.2(i)(4).)

### 1.    The Timing of Capping the Well Was Driven by Engineering Challenges and the "Don't Make It Worse" Principle.

The source-control response to the *Deepwater Horizon* blowout was complicated by uncertainties about the hydrocarbon flow and the condition of the BOP and wellbore.  (TREX 9642; McNutt Dep. 115-16.)  Each source-control strategy required careful study and risk assessment, and had to be specifically engineered in light of these uncertainties.  (Herbst Dep. 60-61; Barnett Dep. 333; Tr. 832 (Mazzella); TREX 7353.357.5 ("Blowouts do not always have a straightforward solution."); Hand Dep. 259, 266-67, 314, 462 (Transocean's Director of Performance and Operations testifies that he was skeptical that anyone could have predicted the circumstances of the *Deepwater Horizon* blowout); TREX 9686.0002; Hunter Dep. 26-28 (acknowledging the complexity and difficulty of controlling the discharged oil).)

14

For example, Unified Command had to make decisions in the absence of certainty regarding (a) the flow path and flow rate of the hydrocarbons; (b) the condition of the wellbore; (c) the presence and erosion of flow restrictions in the BOP, wellbore, and kinked riser; (d) the reason the *Deepwater Horizon* BOP's lower marine riser package ("LMRP") failed to unlatch when the rig was lost; (e) whether a capping device could be connected to the BOP if the LMRP could not be removed; and (f) the condition and location of debris within the BOP and kinked riser.  (Hunter Dep. 37, 63-66, 91-92, 150-51, 186-87; TREX 9669; TREX 11578R-v2.026; TREX 9709.0001 (estimating flow rate was a complicated problem that depended on unavailable information about the well and BOP).)  Unified Command thus tried to craft source-control strategies that did not depend on these variables.  (Holt Dep. 260-65; Wellings Dep. 365, 457, 461 (assessing whether BOP-on-BOP option could be installed at the worst-case flow rate); Tr. 653 (Dupree); Herbst Dep. 137-38 (designing Top Kill with Junk Shot so it could succeed regardless of flow rate.)

In light of these uncertainties, Unified Command proceeded under a "Don't Make It Worse" approach.  (Allen Dep. 66-67, 280; Tr. 1045-46 (Adams); Tr. 597 (Dupree); Campbell Dep. Vol. 1 186; Herbst Dep. 162-63; Hunter Dep. 95-98; Tr. 371-72 (Turlak).)  This meant that each source-control option required careful risk assessment and engineering analysis to avoid making the situation worse, with particular emphasis on minimizing the risk of an underground blowout or damaging the relief wells.  This cautious approach necessarily delayed the response.  (Allen Dep. 207-08; TREX 9140.0001 (undertaking source-control actions as quickly as possible while still allowing time for risk identification and mitigation); Tr. 1045-46 (Adams); TREX 11737R.0005; *see generally* FFCL § II.B.2(b)(4).b.)  BP engineers and government scientists were forced to develop new technologies, including the innovative three-ram capping stack

15

installed in July 2010, to address the unique risks and conditions of the *Deepwater Horizon* oil spill.  (Tr. 1295 (Hunter) (engineering capping stack to attach to *Deepwater Horizon* BOP was a "heroic engineering effort that worked quite well.").)

One "overarching concern" that contributed significantly to source-control decisionmaking was the risk of a subsea broach allowing oil to flow from the damaged wellbore into the surrounding formation and then escape into the seabed through one or more fractures. (Allen Dep. 54-55.)   In that event, the situation would become virtually uncontrollable. (Brannon Dep. 126; TREX 11737R.0005.)  Because, as Admiral Allen testified, "we did not know whether or not there was a breach of the formation," this "overarching concern" contributed to Unified Command's decision to set aside BOP-on-BOP after Top Kill failed. (Allen Dep. 157; *see generally* FFCL § II.B.2(f).)

The Aligned Parties ignore Unified Command's "Don't Make It Worse" philosophy, and contend that BP should have just gone ahead and capped the well earlier.  But, putting aside that BP had no authority to respond independent of Unified Command, such a cavalier attitude could have led to a catastrophe.  (Hand Dep. 386-87 (Transocean's Director of Performance and Operations recognized in May 2010 that if BOP-on-BOP failed, the responders would have a flowing well and "no back up options.  I think it[']s unlikely they will do this.")  It was not until the uniquely configured and fully risk-assessed three-ram capping stack was ready to be installed in early July 2010 that Unified Command had a capping option that appropriately mitigated all the risks, including the "overarching concern" of well integrity.  (Tr. 610, 612 (Dupree).)

## 2. BP Did Not Make Misrepresentations Regarding Flow Rate That Caused a Delay in Shutting In the Well Before Top Kill.

Virtually all of the Aligned Parties' challenges to BP's post-spill conduct relate to the Top Kill procedure implemented in late May 2010.  In particular, the Aligned Parties argue that:

(1) BP's misrepresentations and omissions regarding flow rate and Top Kill's likelihood of success led to the prioritization of Top Kill over other source-control methods, especially BOP-on-BOP (*see* Co-Defts.' Opp. 3-7, Pls.' Opp. 14); and (2) BP misrepresented the reasons for Top Kill's failure in order to cover up the true flow rate, which led to the discontinuation of BOP-on-BOP and further delayed capping the well (*see* Co-Defts.' Opp. 7-11, Pls.' Opp. 14).  Both arguments are meritless.

In May 2010, Unified Command pursued a highly engineered and risk-mitigated strategy known as Top Kill.  (*See generally* FFCL § II.B.2(d).)  Proposed by industry experts and used successfully to stop other blowouts, Top Kill consisted of two elements: (1) injecting various bridging materials into the BOP to restrict flow ("Junk Shot"), and (2) immediately pumping mud into the BOP to overcome the momentum of the flow ("Momentum Kill").  (Tr. 616-17 (Dupree); Campbell Dep. Vol. 1 361; Barnett Dep. 324-25; TREX 11737R.0007; Hand Dep. 171, 259 (Transocean's Director of Performance and Operations testifies that Top Kill "was proposed by industry experts").)  If Top Kill could overcome the upward flow, cement could be injected into the well to permanently stop the blowout.  (Tr. 1041, 1050 (Adams); TREX 11737R.0007.

It was at least reasonable to believe that Top Kill could succeed here.  Junk Shot and Momentum Kill procedures had been successfully used around the world to stop surface well blowouts, and blowout expert WWC had used Junk Shot successfully on at least 100 wells. (TREX 11737R.0007; TREX 11738R.0008; Campbell Dep. Vol. 1 364-65; McNutt Dep. 241-44; TREX 9653 (describing Top Kill as a "proven method"); Tr. 752-53, 761, 798-99 (Mazzella) (estimating that Top Kill is successful 60-70% of the time for surface wells); TREX 142710.0009; D23334.)  Moreover, the conditions within the BOP could have been favorable for

Top Kill.  (Barnett Dep. 179-81 (if the flow path through the BOP was a "series of small pathways," which was possible, the probability of success for Junk Shot was "fairly high.").)  If BP believed that Top Kill was doomed to fail, the company would not have devoted extensive resources to implement it.  (Tr. 752-53, 761 (Mazzella); TREX 142710.0009; D23334.)

> **a.      Flow-Rate Estimates Did Not Dictate Response Strategies, Including Top Kill.**

Unified Command did not rely upon BP's flow-rate estimates or even its own internal estimates to drive source-control decisionmaking, including the decision to pursue Top Kill. (*See generally* FFCL § II.B.2(i).)  Knowing that all flow-rate estimates in April and May were inherently uncertain, Unified Command relied on worst-case flow-rate estimates, and would not have changed response efforts based on higher flow-rate estimates.  (Landry Dep. 274-75, 335, 355-56; Hunter Dep. 751 (noting in May 2010 that there were insufficient data "to make a flow rate estimate"); TREX 9710; TREX 9693.)  Admiral Allen was "skeptical" of early flow-rate estimates, and instructed responders to "focus on the response, getting equipment out there, assuming the worst-case scenario," counseling that "the numbers ultimately would take care of themselves."  (Allen Dep. 210.)  Similarly, Admiral Landry testified that from day one, her efforts "were aimed at a worst case discharge" and that she would not have changed the response effort in any way had she seen flow estimates up to 90,000 barrels of oil per day ("bopd"). (Landry Dep. Tr. 335, 355-56; Henry Dep. 125-26 (by April 22, Coast Guard determined that it was impossible to determine the flow rate and worked from a worst-case scenario perspective).)

Indeed, prior to Top Kill, federal responders had their *own* flow-rate estimates from the National Oceanic and Atmospheric Association ("NOAA"), and later, the federally staffed Flow Rate Technical Group ("FRTG").  The FRTG was formed on May 19, 2010, "to speak with one voice" and use the "best available science" to independently assess flow rate.  (Allen Dep. 247-

48.)   The FRTG was comprised of federal scientists and independent experts from various government and academic institutions—but *not* BP.   (Tr. 591 (Dupree); McNutt Dep. 160; TREX 9655.0002).)   Once the FRTG was formed, it gave the exclusive word on flow rate, and Admiral Landry would look to that group for flow-rate estimates if necessary.   (Landry Dep. 62, 365, 684-85; Allen Dep. 300.)   Rather than attempting to address this point, the Aligned Parties hide from it, going as far as to shield their experts from information showing that federal responders generated their own flow-rate estimates.   (Tr. 144 (Wilson); Tr. 257-58 (Perkin) (testifying that he was not asked to, nor did he, perform any investigation of flow-rate estimates that the government independently generated before Top Kill).)

### b.   The Federal Government Generated The 5,000 bopd Flow-Rate Estimate, But Did Not Rely On It.

The Aligned Parties criticize BP for standing behind a 5,000 bopd flow-rate estimate in April and May, and allege that federal responders relied upon that figure in deciding whether to implement Top Kill.   (Co-Defts.' Opp. 3; Pls.' Opp. 14-15.)   Putting aside the fact that Unified Command did not rely on the 5,000 bopd estimate when approving Top Kill and making other source-control decisions, NOAA—not BP—was the genesis of that estimate.   (Henry Dep. 177-78, 314; Lehr Dep. 254; TREX 9619.)   NOAA's Charlie Henry conveyed that estimate to Admiral Landry, who then discussed it with BP's Incident Commander, Doug Suttles, and announced the figure during a press conference on April 28, 2010.   (Allen Dep. 215-18, 548-49; Sogge Dep. 101-02; Henry Dep. 377-80, 421-25, 439-40; McNutt Dep. 227-31; TREX 8935.0001; TREX 8936.0001; TREX 9655.0010-11; TREX 9113.0001.)   Thus, as Admiral Landry stated at the conference, "***NOAA experts*** believe the output can be as much as 5,000 barrels."   (TREX 9617 (emphasis added).)

19

In any event, throughout the response, Unified Command always recognized the uncertainties associated with NOAA's 5,000 bopd estimate, and did not rely on it.  (Landry Dep. 191, 275-76, 696-97; Chu Dep. 111-15; Allen Dep. 210-11, 237-39, 484-85, 690-93; Sogge Dep. 348; TREX 11310.0001; TREX 11311.0001.)   Dr. Marcia McNutt, Director of the FRTG, admitted that by mid-May, no one in the government had any confidence in that estimate. (McNutt Dep. 438-39.)  Tom Hunter, Co-Director of the Federal Science Team, confirmed that the 5,000 bopd estimate "did not make a significant difference in our engagement of the top kill, because … our conclusion was we didn't know what the flow was."  (Hunter Dep. 683-84; Tr. 1291 (Hunter).)  There is no evidence that Unified Command relied on a 5,000 bopd estimate when deciding to pursue Top Kill.  (Chu Dep. 113-16; TREX 11311.0001; TREX 9113.0001; TREX 9177.0010-11; Allen Dep. 213-15, 483-84, 687-90 (initial flow-rate estimates of 1,000 and 5,000 bopd were inconsequential to source-control decisionmaking because all parties knew that flow rate could be well in excess of those figures); Landry Dep. 167, 356, 696-97, 699 (Admiral Landry would not have changed response effort even if she had seen estimates as high as 90,000 bopd).)

### c.      BP Shared Flow-Rate Estimates in Excess of 5,000 bopd With the Government.

BP shared a wide range of flow-rate estimates—many in excess of 5,000 bopd—with federal responders before Top Kill.  (*See* FFCL §§ II.B.2(d)(4).b, II.B.2(i)(4).)  For example, before Top Kill, BP shared flow-rate estimates in excess of 5,000 bopd and as high as 40,000, and worst-case estimates as high as 162,000 bopd.  (TREX 9175 (sharing worst-case estimate of 162,000 bopd on April 22); TREX 9620; Landry Dep. 351-52 (on April 28, NOAA officials received estimates from BP up to 70,201 bopd); TREX 8993 (on April 30, BP expressed to MMS that flow rate could be between 5,000 to 40,000 bopd); TREX 9619.0008 (stating on May 19 that

flow rate could be as high as ~100,000 bopd if all restrictions were removed).)  Although federal responders did not have every flow-rate estimate that BP generated, they had a wide range of BP flow-rate estimates.  (*See generally* FFCL §§ II.B.2(d)(4).b, II.B.2(i)(4).)

On May 19, 2010, BP's Doug Suttles sent Admiral Landry an e-mail attaching the "most recent work on flow rate estimation."  (TREX 9619.)  Admiral Landry received and reviewed that e-mail with attachments containing various estimates, including a page of "Key Messages," with an "expected case" of 40,000 bopd, an "alternate case" of approximately 60,000 bopd, and a worst-case scenario of 100,000 bopd.  (Landry Dep. 345, 681, 689-90; TREX 9619.)  Admiral Landry, however, testified without equivocation that she ***did not rely*** on these estimates for ***any*** purpose.  (Landry Dep. 345-46.)  This was consistent with the federal responders' overarching approach described above: they recognized that early flow-rate figures were highly uncertain and therefore did not base source-control decisions on them.  (Cook Dep. 347 ("[F]low rate was not a factor that determined which source control option was being put forward."); Chu Dep. 111-15; Allen Dep. 210-11, 237-39, 484-85; Sogge Dep. 348).)

> **d.**   **BP's Hydraulic Modeling in April and May 2010 Did Not Generate Flow-Rate Estimates That Would Have Impacted the Source-Control Response.**

To support their contention that BP withheld material flow-rate estimates, the Aligned Parties place much emphasis on hydraulic modeling of the Macondo well that BP engineers performed in April and May 2010.  But that modeling was never intended to measure the ***actual*** flow rate, but rather was performed—often under "extreme conditions"—to provide answers to various questions (many posed by federal officials) concerning source-control techniques, such as "what if the BOP were removed?" and "by what percentage would flow increase if the kinked riser, LMRP, or BOP were removed?"  (Inglis Dep. 311-12; Mason Dep. 204-05, 276-77, 463 (in

response to a request from Interior Secretary Ken Salazar, Mason's team modeled a variety of scenarios to determine how much flow rate would increase if LMRP were removed); Hill Dep. 590; Tr. 928-32, 935-37, 943 (Ballard); TREX 9156.0002; D23922; *see generally* FFCL § II.B.2(h)(2).)

Thus, as the Aligned Parties' expert Dr. Wilson conceded, "at no time did BP attempt to model the ***actual*** flow rate." (Tr. 88, 145-46 (Wilson).) Given the uncertainty surrounding the input data in April and May 2010, there was insufficient information to estimate the flow rate using hydraulic modeling. (Tr. 917-18, 920-21 (Ballard); D23214; D23207B; TREX 11905R.0019; TREX 11578R-v2.0026 (Aligned Parties' expert Ziegler admits that, during the response, BP lacked pressure and temperature data necessary to calculate flow rate); *see generally* FFCL § II.B.2(h).) These uncertainties also made it impossible to generate a reliable range of flow rates or to determine the probability of any rate within that range, other than identifying a worst case or upper bound. (Tr. 926-27, 930-31, 949-51, 1016 (Ballard) (in April and May 2010, hydraulic modeling could not inform BP of a "most likely" range of flow rates; it could only inform BP only that actual flow rate was between just above zero and the worst-case scenario); D23214; Tr. 90-91 (Wilson) (in April and May 2010, the input parameters required for hydraulic modeling were "too uncertain maybe to estimate flow rate on a particular day.").)

> ### e. The Conduct Attributed to BP Under the Plea Agreement Did Not Affect the Source-Control Response.

As the Court is well aware, BP reached a plea agreement with the Department of Justice in November 2012. *See United States v. BP Exploration & Production Inc. et al.*, No. 12-292, Rec. Doc. 2-1 (E.D. La. Nov. 15, 2012). In that agreement, BP admitted to obstruction of Congress under 18 U.S.C. § 1505 based on a May 24, 2010 letter response to an information request from the Committee on Energy & Commerce of the U.S. House of Representatives, then

chaired by Representative Edward Markey.  *See id.* ¶ 1.  Although the guilty plea related to obstruction of **Congress**, not **Unified Command**, the allocution states that BP "had multiple internal documents with flow-rate estimates that were significantly greater than 5,000 bopd that it did not share with Unified Command."  *Id.* Ex. A ¶ 5.

The plea, however, has no bearing on the issue presented here.  Nothing in the plea agreement or allocution suggests that BP did not share all of its underlying flow-rate **data**, or that any of the flow-rate **estimates** not shared with Unified Command would have changed Unified Command's decisions.  To the contrary, as noted above, the record is clear that Unified Command did not make its source-control decisions in reliance on flow-rate estimates that BP either shared or failed to share.  In the absence of any such reliance, the Aligned Parties cannot prove that any non-disclosure of flow-rate estimates by BP caused them any harm.  And in the absence of causation, the Aligned Parties have no claim against BP.  *See, e.g., Great Lakes Dredge & Dock*, 624 F.3d at 213-14; *Mid-South Towing*, 418 F.3d at 534.

### f.   The Decision to Implement Top Kill Before BOP-on-BOP Was Driven by Sound Engineering Judgment.

The Aligned Parties argue that Unified Command approved Top Kill over BOP-on-BOP because of BP's purported omissions and misrepresentations about flow-rate estimates.  (Co-Defts.' Opp. 3-7.)  That argument, however, overlooks the many reasons to proceed with Top Kill before BOP-on-BOP.

**First**, this sequencing complied with Unified Command's "Don't Make It Worse" philosophy: if Top Kill failed, the team could then proceed to BOP-on-BOP.  (TREX 11737R.0007; Holt Dep. 222-24, 229-30 (Top Kill perceived as the "no regrets" option).)  In contrast, if the team prioritized BOP-on-BOP (which required the removal of the *Deepwater*

*Horizon* LMRP), a subsequent Top Kill would be "very, very difficult." (Tr. 759 (Mazzella); Tr. 1042 (Adams); *see generally* FFCL § II.B.2(d)(3).)

**Second**, Top Kill (unlike BOP-on-BOP) would not require removing the LMRP, a high-risk operation that could have disastrous consequences if unsuccessful. (Tr. 610, 612 (Dupree); TREX 11737R.0020; TREX 3919.0006; Hand Dep. 396-97 (Transocean's Director of Performance and Operations acknowledged that LMRP removal would "be a risky operation"); Tr. 768-69 (Mazzella).) If the LMRP became stuck after being unlatched, it would allow hydrocarbons to escape between the lower BOP and the LMRP, limiting future source-control options and substantially complicating collection efforts. (Tr. 610 (Dupree); TREX 11737R.0019; TREX 10901; *see generally* FFCL § II.B.2(e)(5).a.)

**Third**, Top Kill was fully risk-mitigated and ready to begin by late May, while BOP-on-BOP was not estimated to be ready until, at the earliest, June 6. (TREX 11737R.0009-10; TREX 11261N.2.2.) Independent experts and specialists who reviewed the proposed Top Kill procedure in May 2010 were optimistic: there were no "technical 'show stoppers,'" and it was "a good step forward." (Tr. 755-56, 800 (Mazzella); TREX 10506.0004; TREX 142916 (BP invited industry experts from Chevron and Exxon, Petroleum Engineering professors, and government scientists to participate in a Top Kill Peer Review to identify issues that might have been missed).) The risks associated with Top Kill that the Aligned Parties contend should have led to its rejection—including jeopardizing the relief wells, over-pressuring the well, or injuring workers—were mitigated, deemed acceptable by Unified Command, and ultimately never materialized. (TREX 11737R.0010; TREX 11738R.0009; Tr. 753 (Mazzella) (Top Kill risks could be identified and controlled); Tr. 1056-57 (Adams) (identifying a risk is no reason to avoid an operation if the risk can be appropriately mitigated); *see generally* FFCL § II.B.2(d)(2).)

24

g.      **Unified Command Approved Top Kill After an Independent Analysis and with a Full Appreciation of Its Risks and Limitations.**

Contrary to the Aligned Parties' contention, Unified Command was fully aware all along that Top Kill might fail.  (McNutt Dep. 171 (many people in the federal government were "cautious" about the chances that Top Kill would succeed); TREX 144662; TREX 11305.0003 (before Top Kill, Federal Science Team "scrutinized options for other strategies if the top kill [was] not successful").)  Further, federal responders understood that Top Kill, which included Junk Shot, was not dependent on flow rate, and therefore, had no reason to rely on BP's or the Federal Government's own internal flow-rate estimates when analyzing and approving Top Kill. (Tr. 653 (Dupree).)

From a strictly scientific perspective, Top Kill was not flow-rate dependent: the purpose of the Junk Shot operation was to reduce the orifice size in the BOP, which in turn would reduce the flow rate and enable the subsequent Momentum Kill operation to succeed in controlling the flow.  (Tr. 1101 (Adams); Tr. 762, 805-07 (Mazzella); Holt Dep. 246 (the "effective use of bridging material in the BOP stack or in this wellbore would have negated the—the flow rate impact on the—on the top kill.")  The question was whether the Junk Shot could successfully increase the blockage in the BOP and restrict the flow path to the point where a Momentum Kill could succeed.  (Allen Dep. 356-57, 698-99; Holt Dep. 248-49.)  Because federal responders understood these engineering principles, flow rate estimates in May 2010 had no bearing on Unified Command's decision to approve and implement Top Kill.  (Hunter Dep. 111; Herbst Dep. 137-38; *see generally* FFCL § II.B.2(d)(4).)

Although Top Kill was not constrained by the flow rate, a pure Momentum Kill (without the benefit of a Junk Shot) was deemed unlikely to succeed if the flow rate exceeded 15,000

25

bopd based on modeling performed by BP contractor Dr. Rygg.  (Tr. 1059 (Adams); Holt Dep. 176, 179-80; TREX 10511).)  BP disclosed the 15,000 bopd limit on Momentum Kill to federal responders a week before Top Kill began.  (Hunter Dep. 161-63, 497-98; Allen Dep. 361-65, 436-38, 440-41; Chu Dep. 304-06; Barnett Dep. 103-04; TREX 9131.0002; 9132.0001-02; TREX 9135; TREX 9675.0012; Holt Dep. 161, 164-66, 308-10 (Secretary Salazar and other federal responders were briefed about Add Energy's modeling, flow rate inputs, and conclusion that Momentum Kill would not be effective if the flow rate exceeded 15,000 bopd); *see generally* FFCL § II.B.2(d)(4).a.)

Federal responders not only understood that a pure Momentum Kill was unlikely to succeed if the flow rate exceeded 15,000 bopd, but—before Top Kill—had internal flow-rate estimates in excess of 15,000 bopd.  (*See* Henry Dep. 330-31; TREX 8895 (government scientist estimating the flow rate to be 64,000 bopd on April 25); TREX 9649 (government flow-rate estimates as high as 80,000 bopd on May 23); TREX 9652 (FRTG determines that the minimum flow rate was 14,000 to 20,000 bopd on May 25); Allen Dep. 460-62.)   This evidence underscores that federal responders understood the risks and benefits when they approved Top Kill.  (*See generally* FFCL § II.B.2(d)(4).b.)

The federal responders who led Unified Command not only had access to the same underlying data as BP, but also obtained independent research, analysis, and input from the Federal Science Team before authorizing Top Kill.  (Hunter Dep. 18-19, 28, 37-38; Allen Dep. 204-06, 320-21.)  Top Kill was reviewed extensively by engineers and scientists from MMS, the Department of Energy, and the U.S. Coast Guard before Unified Command approved and implemented it.  (TREX 11737R.0007; Herbst Dep. 123 (MMS reviewed both the Momentum Kill and Junk Shot procedures); TREX 144843; Hunter Dep. 37-38; TREX 9687.0001 (a team of

26

federal scientists from the National Labs analyzed the proposed Top Kill operation and determined it was safe to proceed); Landry Dep. 618; TREX 11305.0003 (Secretary Chu and the federal scientists conducted their own analysis of the pre-Top Kill diagnostics data and based on that analysis, the "U.S. government gave the final go-ahead to proceed with the 'top kill.'")  Far from being the uninformed bystanders portrayed by the Aligned Parties, the federal responders were fully involved in vetting, approving, and implementing Top Kill.  (*See generally* FFCL §§ II.B.2(d)(1), II.B.2(d)(5).)

> ### h.   BOP-on-BOP and the Capping Stack Were Not Ready Until After Top Kill Concluded.

Although the Aligned Parties suggest that implementing Top Kill somehow delayed the implementation of a capping option, the fact is that there was no capping option ready to be installed when Top Kill was undertaken.  Rather, the evidence establishes that BOP-on-BOP was neither ready for safe implementation nor approved before Top Kill, or even shortly after, and could not meet the "Don't Make It Worse" philosophy at that time.  (Tr. 289 (Perkin) (when Top Kill began, the *DDII* BOP was not ready to be implemented with BOP-on-BOP); Tr. 614-15 (Dupree) (BP's source-control leader not satisfied that BOP-on-BOP was sufficiently risk-mitigated at the time of Top Kill).)

Notably, on the day before Top Kill began, the *DDII* BOP that Transocean was preparing for use with BOP-on-BOP failed its Deadman test, triggering an investigation.  (TREX 145079; Tr. 289 (Perkin).)  Transocean's *DDII* BOP was still undergoing repairs, testing, and maintenance after Top Kill concluded.  (Tr. 1071 (Adams); Holt Dep. 235.)  It was not until June 5 that the *DDII* BOP passed a subsea Deadman test and, even then, the casing shear rams failed, requiring the BOP to be pulled to the surface for additional repairs.  (Tr. 408-10 (Turlak); TREX 141081.150.2.; TREX 141081.150.4; *see generally* FFCL § II.B.2(e)(4).)   Although

Transocean's subsea engineer testified that the *DDII* BOP could have been used with BOP-on-BOP without the casing shear rams (Tr. 410 (Turlak) ("[Y]ou really don't need the casing shear rams."), they were essential to the operation, and in fact closing them was the first step in the draft procedure.  (Tr. 1074-75, 1156, 1169 (Adams).)

When Top Kill began, the Well Capping Team—which included subsea experts from BP, Transocean, Cameron, and WWC—was not only grappling with BOP maintenance issues, but still working to mitigate known risks with BOP-on-BOP, such as hydrate formation and landing the BOP through the flowing hydrocarbon plume.[3]  (TREX 10522.0033-40 (May 13-14 Peer Assist); TREX 10647 (as of May 27, Stress Engineering was conducting hydrate modeling for BOP-on-BOP); Tr. 280 (Perkin) (acknowledging that hydrate formation assessment was still in the works after Top Kill began); Tr. 284 (Perkin) (WWC still developing a guide frame for landing the BOP at the end of May 2010); Tr. 608 (Dupree) (BOP-on-BOP guide frame not anticipated to be completed until June 4, 2010).)  As one example, at the time that Top Kill concluded, the team was still working on a venting feature to mitigate well-integrity risks and manage pressure within the wellbore.  (Tr. 606 (Dupree); Tr. 401 (Turlak); Tr. 286-89 (Perkin) (at end of May 2010, there was still work being performed on the venting feature); TREX 4318); Tr. 401-04 (Turlak); TREX 11261N.2 (BOP-on-BOP venting feature would not be installed until June 4 at the earliest); *see generally* FFCL §§ II.B.2(e)(5)-(6).)

In light of these facts, the Aligned Parties now offer up a variety of unusual and high-risk venting options for BOP-on-BOP.  (*See* Co-Defts.' Opp. 11.)  None of these proposals were risk-

---

[3] The Aligned Parties erroneously contend that the risks associated with the BOP-on-BOP option were fully mitigated by the May 13-14 Peer Assist.  To the contrary, the Peer Assist participants concluded that all risks had been **identified**, not **mitigated**, by the Well Capping Team, and that "[t]here is much to be done for the BOP on BOP to be implemented with confidence."  (TREX 10522.0001, 29; *see also* Tr. 614-15 (Dupree).)

assessed or identified during the actual source-control efforts, and in certain instances were expressly warned against by Transocean.  (Tr. 1077-80 (Adams); D23771A; TREX 11245 (in May 2010, Transocean's subsea specialist advised that venting through the choke and kill lines would need evaluation because it was normally not an option); *see* FFCL § II.B.2(e)(5).d.)

The final planning chart, which accounted for the many parallel workstreams associated with BOP-on-BOP, set June 6 as the earliest date that BOP-on-BOP could be installed.  (Tr. 404-05 (Turlak); TREX 11261N.2.4.)  By that time, Unified Command had discontinued BOP-on-BOP in light of well-integrity concerns identified after Top Kill.  (Tr. 405 (Turlak).)  And even at that time, Transocean was still trying to get its BOP to pass testing that would have allowed it to be used in a BOP-on-BOP strategy.  (Tr. 1074-75 (Adams); Tr. 409-10 (Turlak); TREX 11743.0004, 0048-56; *see generally* FFCL § II.B.2(e)(3).)

### 3.    BP Did Not Make Misrepresentations Regarding Top Kill's Failure That Caused a Delay in Shutting In the Well.

Despite the responders' best efforts, Top Kill was unsuccessful and the procedure was discontinued on May 28.  BP and the Federal Science Team independently assessed the possible reasons for that failure.  The teams independently reached an alarming conclusion regarding the integrity of the Macondo well: they could not rule out the possibility that Top Kill failed because one or more pathways from the wellbore into the formation had opened through the collapse disks in the 16-inch casing, and that further attempts to cap the well could cause a subsea broach.  (TREX 11737R.0015; *see* FFCL § II.B.2(f).)  Based on this conclusion, Unified Command set aside BOP-on-BOP because the well-integrity concerns made capping the well no longer an option and instead focused on collection efforts.  (Tr. 861-63 (Smith); FFCL § II.B.2(f)(4).)

Undeterred, the Aligned Parties assert that BP concluded that Top Kill failed because of a high flow rate and sought to conceal this information by presenting a false diagnosis for Top

29

Kill's failure and proposing that BOP-on-BOP be abandoned in light of fabricated well-integrity concerns.  (*See* Co-Defts.' Opp. 7-11.)  Again, that assertion is untenable.  Immediately after Top Kill, BP suggested the Top Hat collection method, which could reveal a high flow rate.  (TREX 11737R.0012-13.)   Needless to say, a company seeking to ***conceal*** a flow rate would not recommend a strategy that would ***reveal*** a flow rate.

If BP had been trying to conceal a high flow rate, it would have promptly pursued, not discontinued, BOP-on-BOP after Top Kill.  BOP-on-BOP lacked the highly accurate pressure sensing equipment that was subsequently installed on the capping stack and enabled responders to estimate a flow rate.  Further, modeling performed in May 2010 established that BOP-on-BOP was insensitive to flow rate and could be landed at worst-case flow estimates and thus, if successful, would never reveal the true flow rate.  (Wellings Dep. 456-57 (BP performed a sensitivity analysis on BOP-on-BOP using a worst-case discharge of 70,000, showing that the flow rate did not impact the successful installation of a second BOP).)

> **a.    Data Collected From Top Kill Supports BP's Conclusion After Top Kill That There Was A Potential Risk Of A Subsea Broach If The Well Was Shut-In.**

Based on an unexpected pressure drop during Top Kill, BP engineers and government researchers rightfully raised concerns that mud pumped down the well during that operation might have exited through the 16-inch casing collapse disks and into the formation.  (Tr. 669 (Dupree); TREX 150306N; *see generally* FFCL § II.B.2(f).)   Immediately after Top Kill concluded, BP's casing design expert reviewed the data and concluded that it was possible that during the initial blowout (not during Top Kill), a sufficient pressure differential could have existed to cause the collapse disks to rupture.  (Tr. 669-71 (Dupree) (collapse disk failure was not the only possible explanation but it was an observation that could not be ignored); Inglis Dep.

673, 675; TREX 150306N.6; Barnett Dep. 238-39, 318-19 (WWC agrees that flow out to the collapse disks was a possible explanation for the failure of Top Kill).)  If that were the case and the well were shut in, there was a risk that hydrocarbons would flow into the formation and cause a subsea broach.  (TREX 144843.0005, 09; TREX 11737R.0015; Hand Dep. 481.)

Until this point in the response, the overarching well-integrity concern had been that responders would take some action that would rupture the outward-acting burst disks.  (Tr. 1070 (Adams); TREX 11738R.0007.)  The concern changed after Top Kill: if the inward-acting collapse disks had ruptured during the blowout, this would radically reduce the pressure to which the wellbore could be subjected without risking a subsea broach.  Adequately managing the pressure to avoid a subsea broach was something that BP and the government believed could not be accomplished with BOP-on-BOP.  (Tr. 1070 (Adams); TREX 11737R.0007; FFCL §§ II.B.2(f)(3)-(4).)

Shortly after Top Kill failed, BP presented the Federal Government with its analysis and conclusions about the reasons for that failure.  On May 29, 2010, based on a quick overnight analysis, BP presented to the Federal Government three "possible" failure scenarios that partially or fully matched the Top Kill data.  (TREX 11614.0005-12; Tr. 1127 (Adams); TREX 144925; Tr. 249 (Perkin); see FFCL § II.B.2(f)(2).a.)  With the information available at the time (and without the benefit of data obtained during well shut-in), BP's engineers could not definitively determine which scenario accounted for Top Kill's failure or rule any of them out.  (TREX 11613.0045; Tr. 1166 (Adams).)

In the first scenario, hydrocarbon flow was up the production casing, and the mud from Top Kill predominantly flowed straight out of the BOP into the ocean, rather than being forced down the wellbore.  (Tr. 1133 (Adams); TREX 11614.0005-06; TREX 11613.0040.)  This

scenario accounted for some, but not all, of the Top Kill observations, and required "[m]assive [mud] flow past [the] rams," something BP engineers judged would have caused significant erosion.  (TREX 11614.0006; Tr. 1133-34 (Adams); TREX 11613.0040; TREX 150088.0002.)  As BP engineers were seeing "little evidence of erosion," this scenario was deemed unlikely, and labeled "Possible but not Plausible."  (TREX 11614.0006; TREX 150088.0001-02.)

In the second scenario, the casing hanger was not anchored, and hydrocarbon flow was up both the production casing and the annular space outside the production casing.  (TREX 11614.0007-08; Tr. 1127 (Adams); Holt Dept. at 193-94.)  This scenario also supported some, but not all, of the Top Kill data and observations, and was likewise labeled "Possible but not Plausible."  (TREX 11614.0007-08; Tr. 1127 (Adams).)  Reflecting the uncertainty and ongoing analysis at the time, however, Energy Secretary Chu and BP's Andy Inglis agreed in an e-mail conversation occurring between May 31, 2010 and June 1, 2010 that a modified second scenario was "equally plausible" as the third scenario.  (Tr. 1162-64 (Adams).)

In the third scenario, characterized as the "nightmare scenario," the collapse disks had ruptured in the immediate aftermath of the incident, and the Top Kill mud was flowing down the annular space and out through the collapse disks into the formation.  (TREX 11614.0009-12; TREX 11613.0043-45.  This third scenario was consistent with all the key Top Kill data and observations gathered, and was therefore labeled both "Possible and Plausible."  (TREX 11614.0010-11; Tr. 249 (Perkin) (this scenario raised concerns about well integrity).)  Under the third scenario, if the well was capped, hydrocarbon flow through the open collapse disks would lead to a subsea broach and an "uncontrollable hydrocarbon blowout along geologic fractures."  (TREX 144925.0001; TREX 11478.0001; Tr. 1128 (Adams).)  BP acted prudently by bringing these possibilities, including the "nightmare scenario" to federal responders' attention:

32

BP was being responsible in terms of raising the issue of well integrity ....  [T]he government was pushing BP to consider worst-case scenarios, and that's exactly what BP did.  They considered a worst-case scenario by raising the possibility of a loss of well-integrity, and that's exactly the sort of issue [the government] wanted them to do, and that's what [BP] did.  (McNutt Dep. 456.)
</blockquote>

The Aligned Parties, however, now allege that BP misrepresented the reason for Top Kill's failure, contending—in hindsight—that the third scenario was neither possible nor plausible.  (Co-Defts.' Opp. 7-11.)  None of their experts performed an independent analysis of the Top Kill data to determine whether any of the scenarios that BP presented to the Federal Government was possible or plausible.  (Tr. 210, 244 (Perkin) (testifying that he neither reviewed the Top Kill data in any detail nor performed any independent analysis of the Top Kill data); Tr. 175 (Wilson) (testifying that he did not independently analyze Top Kill's failure); Tr. 486-87 (Bea) (testifying that he offered no opinion on the operations of the *Deepwater Horizon* source-control response).)  In contrast, BP has offered the unchallenged expert analysis of Mr. Gibson, who analyzed the Top Kill data and confirmed that BP's conclusion in the third scenario—that flow was out the collapse disks in the 16-inch casing—was consistent with the data and both possible and plausible.  (TREX 11613.0043; Tr. 1166-67 (Adams).)  Based on the available data, the third scenario had to be considered a "real possibility" when making source-control decisions, and thus justified setting aside BOP-on-BOP in light of well-integrity concerns.  (TREX 11613.0045 ("The Top Kill results did not allow BP and the [UC] to select just one of the three scenarios, or to rule any of them definitely out.  This left all three scenarios open as possibilities.  From the data available at the time it was reasonable to conclude that one or more collapse disks could have ruptured."); Tr. 1166 (Adams).)

b.      **The Federal Government Evaluated The Top Kill Data And Independently Concluded That There Was A Potential Risk Of A Subsea Broach If BOP-on-BOP Were Implemented.**

Secretary Chu insisted that the Federal Science Team independently evaluate the Top Kill data to determine whether the team came to the same conclusion as BP, namely that the collapse disks may have opened in the initial explosions, creating a path to the formation.  (Chu Dep. 73-78;  TREX 11305.0002-03;  Tr. 1068-69 (Adams);  Hunter Dep. 211-12, 220-21;  TREX 9695.0002; TREX 144847.1.2 (May 31, 2010 e-mail from Secretary Chu to federal scientists emphasizing "the importance of doing a completely independent analysis of the top kill data"); TREX 9697.0001; TREX 11296.0002 (federal scientists prepared a presentation disclosing the results of their analysis of why Top Kill may have failed); FFCL § II.B.2(f)(3).)[4] Based on its independent analysis, the Federal Science Team concluded that there was a chance that the 16-inch casing collapse disks had been damaged during the initial explosion and that if the team shut in the well with BOP-on-BOP, there was a risk of a subsea broach.  (Chu Dep. 73-77; TREX 11305.0002; McNutt Dep. 248-50; Tr. 674 (Dupree).)  Senior federal leadership emphasized in communications that the federal scientists had independently concluded that the collapse disks may have opened during the initial explosions and that shutting in the well could lead to catastrophic consequences.  (TREX 9656; TREX 9146 ("*Our scientists* have determined that the risks are to[o] great to shut the well in from the top.  E.g. with the addition of a new BOP" (emphasis added)); Hunter Dep. 203-04; TREX 9146.)  The government shared BP's concern about the "significant risk" of a subsea broach.  (Saucier Dep. 391-92; Herbst Dep. 160.)

---

[4] The Aligned Parties take out of context a May 27, 2010 e-mail from BP to service companies indicating that no one outside of Paul Tooms' group was to receive Top Kill data.  (TREX 6195.)  This e-mail was an attempt to prevent the service companies from forwarding such data to third parties uninvolved in the response effort, not an attempt to restrict the flow of information to federal responders.  (Holt Dep. 294-97.)  To this day, federal responders have not alleged (nor could they) that Top Kill data were not promptly provided to them; to the contrary, Secretary Chu acknowledged that federal responders received those data in real time.  (Chu Dep. 73-78.)

The Aligned Parties assert that BP misled the federal government about trumped-up well integrity concerns (Co-Defts.' Opp. 7-11), but the federal leadership specifically refuted this assertion.  According to Admiral Allen, most of the issues related to well integrity after Top Kill were affirmatively raised by the Federal Science Team.  (Allen Dep. 61.)  As the Aligned Parties' own expert admitted, Admiral Allen relied on the Federal Science Team, not BP, for conclusions about whether the rupture disks in the casing had opened.  (Tr. 263 (Perkin).)  In light of the Federal Science Team's well-integrity concerns, "the most conservative and reasonable assumption to be made" by Unified Command was to set aside BOP-on-BOP as an option until conditions in the well were better understood.  (Hunter Dep. 200; Allen Dep. 375 (as it related to the decision not to go forward with BOP-on-BOP as a method of shutting in the well, the "combined recommendation of BP and the Science Team and the counsel [he] was getting was that it was too risky to proceed"); TREX 11305.0003 ("[The] decision to move [was] based both on independent analysis from the federal government and review of BP's suggested options"); *see generally* FFCL §§ II.B.2(f)(3)-(4).)

### 4.    The Source-Control Team Designed, Manufactured, Tested And Successfully Installed A Unique Capping Device Tailored For The *Deepwater Horizon* Blowout.

After analysis of Top Kill data raised new concerns about well integrity, the focus shifted to collecting the hydrocarbons at the source until relief wells could stop the flow.  The three-ram capping stack, which the Well-Capping Team had been developing in parallel with alternative strategies, was then repurposed to function as a collection device.  (Tr. 1083-85 (Adams); TREX 11737R.0017; Tr. 862-63 (Smith).)  The work required to engineer, build, and test the capping equipment, including the transition spool, and to optimize it for hydrocarbon collection and well-integrity testing, stretched into early July 2010.

35

The Aligned Parties assert that the successful installation of the three-ram capping stack in July proves that BOP-on-BOP or an early version of the capping stack could have worked sooner.  (*See* Co-Defts.' Opp. 11.)  Once again, they are wrong.

***First***, the three-ram capping stack could safely divert hydrocarbons to surface vessels.  (Tr. 1083-85 (Adams); TREX 11737R.0017; Tr. 861-63 (Smith) (after Top Kill, the three-ram capping stack was designed with multiple take-off points to allow for collection to the *Q4000* and *Discoverer Enterprise* surface vessels); (Tr. 679-81 (Dupree); TREX 140797N.0011; Allen Dep. 377-78.)  In contrast, neither BOP-on-BOP nor the two-ram capping stack was optimized for hydrocarbon collection.  (TREX 11737R.0012; TREX 11738R.0006-08.)

***Second***, the three-ram capping stack was far superior to the other capping options with respect to monitoring and mitigating well integrity.  In late June 2010, the Federal Science Team requested that the capping stack be equipped with sophisticated pressure sensors to provide accurate pressure readings during a well-integrity test and to facilitate the use of the capping stack during a controlled shut-in.  (Tr. 1295 (Hunter) (testifying that the Federal Government "insisted and BP easily agreed to put pressure gauges on the capping stack"); Tr. 854, 864 (Smith); Tr. 1083-84 (Adams); Tr. 685 (Dupree); TREX 11737R.0017; TREX 11320.0012, 21.)  Additionally, the three-ram capping stack's venting system was designed to automatically vent subsea in the event pressure control was lost.  This feature—which BOP-on-BOP lacked—protected the well from the risk of over-pressuring and causing a subsea broach.  (Tr. 1083-84, 1086 (Adams); TREX 11737R.0017.)  The capping stack also had custom-designed features to relieve pressure build-up in the event that Unified Command decided to proceed with a well shut-in.  (Holt Dep. 87; Tr. 686 (Dupree).)

36

**Third**, the capping stack, unlike BOP-on-BOP, was designed to land on and attach to the wellhead component above the BOP, the flex joint, without having to remove the LMRP. This was a strategic choice: it avoided the risks associated with removing the LMRP, including the risk that the LMRP would not release or became stuck after it unlatched, complicating collection efforts. (Tr. 610 (Dupree); TREX 11737R.0019.)

Although the federal leadership applauded BP for engineering the capping stack (*see, e.g.*, Chu Dep. 319-20), the Aligned Parties criticize the time it took to engineer and install it. That criticism comes with ill grace. Just because BP eventually developed a solution tailored to the specific problems posed by the *Deepwater Horizon* oil spill does not prove that BP could or should have developed that solution earlier, or that the solution eventually developed to respond to this particular situation would be appropriate in **every**—or **any**—other situation. (Tr. 1083 (Adams) (describing the uniqueness of the tailored solution); Tr. 614 (Dupree) (same).)

Indeed, the Aligned Parties ignore the substantial risk assessment and engineering analysis required to land the capping stack on the flex joint. (Tr. 565 (Ziegler) (alleging that landing a capping device on a blown-out well is "a piece of cake" that is "done every day in the industry"); Tr. 413-15 (Turlak) (testifying that he could have made the connection between the flex joint flange and capping stack "a lot quicker" than the BOP Connections Team despite his lack of knowledge of risks associated with capping); Tr. 272 (Perkin) (complaining generally of delays in capping, but failing to perform any investigation of the many projects that the BOP Connections Team worked to fruition).)

The evidence, in short, reflects that it was painstaking, cautious, and diligent work, performed under intense time pressure, that ultimately allowed for successful installation of the capping stack. (Thierens Dep. 240 (capping stack team worked "furiously" to design and deliver

a deepwater capping stack); Tr. 271, 273 (Perkin) (a substantial amount of engineering went into attaching the capping device to the flex joint flange); *see generally* FFCL § II.B.2(g)(1).)  Most of the equipment and tooling used to install the capping stack had not been envisioned, much less designed or manufactured, before the *Deepwater Horizon* incident.  (Tr. 850-51 (Smith).)  As work progressed, the team overcame numerous challenges, extending the timeline for capping the well.  (TREX 11737R.0020-21); Thierens Dep. 240 (efforts to land a capping stack on top of the flex joint involved "very complex engineering"); Tr. 842-43, 845, 863, 866 (Smith) (well capping team modified capping strategy in response to new information and data).)  Moreover, the team was preparing to operate in 5,000 feet of water utilizing ROVs with limited capabilities, adding an additional layer of complication.  (Tr. 845-46 (Smith); TREX 11737R.0020.)  Any suggestion that the timetable for successfully installing the capping stack resulted from intentional, egregious, or malicious delay is frivolous and irresponsible.

## II.    The Facts Here Do Not Establish That BP's Conduct Was A Superseding Cause Of Plaintiffs' Injuries From The Oil Spill.

As a variation on the foregoing punitive-damages argument, BP's co-defendants argue that "BP's lies and omissions had the effect of delaying the capping of the well and were a superseding cause of oil that spilled into the Gulf *after* the well would have been capped but for BP's fraud."  (Co-Defts.' Opp. 1, emphasis added; *see also id.* at 11-15.)  That argument fails as a matter of both fact and law.  As noted above, the facts here do not remotely establish that, in connection with the pre-spill source-control plan or post-spill source-control efforts, BP engaged in any wrongful conduct causative of plaintiffs' injuries, much less any wrongful conduct that would relieve BP's co-defendants of their responsibility for those injuries.

Under settled law, a superseding cause "is an act of a third person ... which by its intervention prevents the actor from being liable for harm to another which his antecedent

negligence is a substantial factor in bringing about." *Restatement (Second) of Torts* § 440 (1965). The law generally does not give negligent parties such a free pass. Thus, the doctrine of superseding cause is narrow, and applies only in the unusual circumstance where a subsequent tortfeasor caused injury in a manner "sufficiently unforeseeable" to the original tortfeasors that it may be deemed "to interrupt the chain of causation." *EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 526 n.10 (5th Cir. 2006).

Here, it is fanciful to suggest that BP's ***response*** to an unprecedented oil spill—as opposed to the underlying spill itself—caused plaintiffs' injuries. *Cf. Urbach v. United States*, 869 F.2d 829, 833-34 (5th Cir. 1989) (doctrine of superseding causation applied to prevent liability for an American hospital that wrongfully discharged a mental patient, who was subsequently arrested in Mexico and beaten to death by inmates in a Mexican jail). Because nothing that BP did or failed to do delayed the well capping, BP's source-control response efforts did not cause any injury, and BP accordingly cannot have been a superseding cause of any injury. *See, e.g.*, *Exxon Co., USA v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) (superseding cause applies where "the injury was ***actually brought about*** by a later cause of independent origin that was not foreseeable.") (internal quotation omitted; emphasis added).

Moreover, even if BP's conduct had delayed the response (which it did not), it still would not qualify as a superseding cause as a matter of law. As explained in BP's Proposed Findings of Fact and Conclusions of Law, not every intervening force constitutes a superseding cause sufficient to absolve an original tortfeasor of legal responsibility, and BP's alleged misconduct does not fall into that category. (*See Restatement (Second) of Torts* § 442; FFCL § IV.C.)

In any event, this Court has already rejected the very argument that the Aligned Parties present here, albeit under the rubric of "divisibility" rather than superseding cause. Like the

Aligned Parties, BP previously argued that it might not be responsible for all injuries resulting from the oil spill in light of other parties' subsequent conduct, and that the damages flowing from the spill therefore might be "divisible" depending on when they occurred.  (*See* Rec. Doc. 4392, at 13-15; Rec. Doc. 5124, at 9-10, citing, *inter alia*, *Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 614 (2009).)  This Court, however, rejected that argument, holding that liability for damages from the spill is joint and several.  (Rec. Doc. 5809, at 12.)  Although BP respectfully disagrees with that ruling, and reserves the right to challenge it in subsequent proceedings, there is no basis for applying a different ruling to the Aligned Parties here— especially Transocean, which has already ***acknowledged*** its responsibility for the blowout.

## III.   The Facts Here Do Not Establish The Basis For An Increased Fault Allocation To BP.

Finally, the Aligned Parties argue that an increased fault allocation to BP is appropriate based on the company's spill preparedness and spill response.  (*See* Co-Defts.' Opp. 15; Pls.' Opp. 2.)  Once again, this argument is baseless.  For the reasons described above, the Aligned Parties have failed to prove that any additional fault should be allocated to BP based on its preparation for, or conduct during, the response.

## CONCLUSION

For the foregoing reasons, this Court should conclude, based on the record established at the Phase Two Trial, that neither BP's response plan nor its post-spill conduct supports an award of punitive damages under general maritime law, and does not qualify as a superseding cause of plaintiffs' injuries or warrant an increased fault allocation.

December 20, 2013

Respectfully submitted,

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Paul D. Collier
Emily Dempsey
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Christopher Landau, P.C.
Steven A. Myers
Katherine A. Crytzer
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC  20005
Telephone:  202-879-5000
Facsimile:  202-879-5200

*/s/ Don K. Haycraft*
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of December 2013.

*/s/ Don K. Haycraft*
Don K. Haycraft