# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, | * <br> * MDL No. 2179 <br> * <br> * Section: J |
| This Pleading applies to: | * <br> * Judge Barbier <br> * |
| All Cases | * Magistrate Judge Shushan <br> * <br> * |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## BP AND ANADARKO'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Warren Anthony Fitch
Ky E. Kirby
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
Telephone: (202) 373-6000

James J. Dragna
BINGHAM MCCUTCHEN LLP
355 S. Grand Avenue, Suite 4400
Los Angeles, CA 90071
Telephone: (213) 680-6400

Deborah D. Kuchler, T.A. (Bar No. 17013)
KUCHLER POLK SCHELL
WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, LA 70112
Telephone: (504) 592-0691

*Attorneys for Anadarko Petroleum Corporation*

Don K. Haycraft (Bar No. 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Barry E. Fields, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
Paul D. Collier
Bridget K. O'Connor
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

Timothy A. Duffy, P.C.
R. Christopher Heck
Vanessa Barsanti

Andrew H. Schrag
Michael A. Fragoso
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL   60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

*Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.*

# <u>TABLE OF CONTENTS</u>

PROPOSED FINDINGS OF FACT ........................................................................1

I.     THE PARTIES AND THE NATURE OF THE PROCEEDINGS. ...................................1

     A.    The Parties. .....................................................................................1

          1.    The BP Defendants. ...........................................................1

          2.    Anadarko. ..........................................................................3

          3.    The Aligned Parties. ..........................................................3

               (a)    Transocean. ............................................................3

               (b)    Halliburton. ...........................................................4

               (c)    Claimants. .............................................................4

               (d)    State Governments. ...............................................5

          4.    The Federal Government. ....................................................5

     B.    The Nature of the Action. .................................................................5

     C.    The Claims at Issue in Phase Two of MDL 2179. ...................................7

          1.    Economic and Property Damages Cases. ...............................7

          2.    United States Government Claims. .......................................7

           3.    State and Local Government Claims. .....................................7

          4.    Claims Between Defendants. ................................................8

     D.    The Court's Jurisdiction. ...................................................................8

     E.    Trial. ..............................................................................................8

     F.    Post-Trial Submissions. ....................................................................9

II.    BP'S PROPOSED FINDINGS OF FACT AS TO SOURCE CONTROL. ....................10

     A.    The *Deepwater Horizon* Source Control Response Was Conducted Under a Comprehensive Scheme of Regulation and Oversight. ..........................10

     B.    BP's Conduct With Respect to Source Control Was Reasonable and Appropriate, Not Negligent or Grossly Negligent. ................................12

i

1.    BP Had an Appropriate Source Control Plan in Place at the Time of the *Deepwater Horizon* Incident..............................................................12

    (a)    BP's Source Control Plan Included the Industry-Accepted Method to Respond to a Blowout by Drilling a Relief Well. ........15

    (b)    BP and Transocean's Response Plans Included Utilizing ROVs to Activate Remotely the BOP.............................................17

    (c)    BP's Source Control Plan Included the Industry Standard Practice of Assembling a Team of Experts to Assess and Address the Situation. ...................................................................18

        (1)    It Is Standard Industry Practice to Stand up a Team of Experts to Respond to a Spill. .......................................18

        (2)    BP's Team of Experts Included Leaders in the Field Who Contracted with BP Before the Incident. .................21

        (3)    Experts Are Needed Because Every Blowout Is Unique...........................................................................24

        (4)    BP's OSRP Plan to Stand up a Team of Experts Was the Same as Other Companies Operating in the Gulf of Mexico.................................................................26

    (d)    BP Trained Its Employees for Responding to a Deepwater Blowout..........................................................................27

    (e)    BP Held Unannounced Spill Response Drills..............................29

    (f)    Before the *Deepwater Horizon* Incident, MMS Approved BP's Deepwater Blowout Response Plan. ....................................30

        (1)    In Accordance with Regulations, Leaseholders Must Provide Their Deepwater Blowout Response Plans to MMS. ........................................................................30

        (2)    The MMS Reviews Deepwater Blowout Response Plans and Approves Them Only if They Meet Federal Requirements. .......................................................30

        (3)    The MMS Reviewed and Approved BP's Deepwater Blowout Response Plan..................................31

        (4)    The MMS Did Not Require or Expect Leaseholders in the Gulf of Mexico to Have Access to a Pre-Built Deepwater Capping Stack.................................................32

(g)    It Was Not Industry Practice to Have a Pre-Built Deepwater Capping Stack.................................................34

    (1)    No Well Operator or Other Entity Had Access to a Pre-Built Deepwater Capping Stack. ................................36

    (2)    No Industry Publications Recommended a Pre-Built Deepwater Capping Stack..................................38

2.    BP Implemented Its MMS Approved Source Control Plan with Diligence and Care....................................................39

    (a)    BP's Conduct During the Response Demonstrates Its Diligence and Care....................................................41

        (1)    BP Undertook a Massive, Unprecedented Response Effort. ....................................................42

        (2)    BP Placed no Limitations on the Resources Called upon for the Response Effort. ............................45

        (3)    The Response Placed Focus on the Collection of Oil. ....................................................46

    (b)    BP Implemented Its Source Control Plan Under Federal Government Supervision. ..................................48

        (1)    BP, the Federal Science Team, and the Unified Command Consistently Worked Together to Face Unprecedented Challenges..................................52

            a.    No Source Control Strategy Could Be or Was Implemented Without Approval by the Federal Government................................61

        (2)    Consistent with Its MMS-Approved IEP and MMS Expectations, BP Quickly Commenced Drilling Two Relief Wells. ................................64

        (3)    Consistent with BP's MMS Approved OSRP and with the MMS's Expectations, the Response Team Used ROVs to Attempt to Activate the *Deepwater Horizon* BOP..................................65

            a.    Transocean's Undocumented Changes to the BOP Contributed to the Difficulty of Closing the Well. ................................69

(4)     BP Stood up a Team of Experts to Evaluate
        Additional Source Control Measures That Could Be
        Implemented. ...................................................................72

        a.     Multiple Containment and Collection
               Strategies Were Being Considered and
               Planned Simultaneously..........................................74

        b.     Every Option Was Evaluated Using the
               "Don't Make It Worse" Philosophy.......................77

(c)     The Federal Government Conducted Independent
        Assessments of Source Control Methods. ....................................80

(1)     All Data Concerning the Well Was Shared with the
        Federal Government..........................................................81

(2)     The Federal Government Conducted Independent
        Analyses of Source Control Methods. ...............................83

(d)     Top Kill Was a Viable Solution and Properly Attempted. ............85

(1)     The Federal Science Team, Unified Command, and
        BP Agreed that Top Kill Was the Most Viable
        Source Control Option at the Time It Was
        Implemented. ...................................................................89

(2)     Top Kill Was a Highly Engineered Strategy. ...................93

        a.     BP Conducted a Peer Assist With Industry
               Experts to Identify and Mitigate the Risks
               for Top Kill. ...........................................................97

        b.     BP Mitigated the Risks Associated with Top
               Kill, Including Risks Associated with the
               Relief Well and Pressure Build-Up During
               Junk Shot................................................................98

(3)     Unlike Other Options, Top Kill Did Not Jeopardize
        the Ability for Alternative Collection or
        Containment Methods......................................................104

(4)     Top Kill Was Not Flow-Rate Dependent Because of
        the Junk Shot Component. ..............................................105

        a.     BP Disclosed the 15,000 bopd Limit on
               Momentum Kill to the Federal Government
               and Its Contractors. ..............................................107

iv

            b.     The Federal Government Had Flow Rates Exceeding 15,000 bopd Before Top Kill Was Implemented. ...............................110

    (5)     The Federal Government Performed an Independent Analysis of Top Kill and Approved It. ...........................113

(e)     A Risk-Mitigated BOP-on-BOP Option Was Not Ready Prior to Top Kill. ......................................................116

    (1)     A Well Capping Team Was Stood up Shortly After the Incident and Worked Throughout the Response to Develop a Capping Solution for the Macondo Well. ............................................................117

    (2)     The Well Capping Team Had Broad Subsea Expertise and Worked Tirelessly and Collaboratively. ...................................................117

            a.     The Well Capping Team Selected the *Discoverer Enterprise* BOP for BOP-on-BOP Option Until It Was Reassigned to Collection on May 10. ...........................120

            b.     The Well Capping Team Subsequently Planned to Use the *DDII* BOP for the BOP-on-BOP Option. ...................................122

            c.     The Peer Assist in Mid-May 2010 Involved Numerous Industry Experts and Identified Action Items for the BOP-on-BOP Option. .........123

    (3)     Projected Timelines and Witness Testimony Confirm That BOP-on-BOP Was Not Ready to Be Implemented Until After Top Kill Was Concluded. ........127

    (4)     Transocean's BOPs Had Outstanding Critical Maintenance and Could Not Be Utilized for the BOP-On-BOP Option. ...................................130

            a.     The *Discover Enterprise* BOP Had Outstanding Maintenance and Testing When It Began Collection Efforts. ...............................130

            b.     The *DDII* BOP Had Outstanding Maintenance and Testing Issues in June 2010. ..................................................133

(5)     Risks Associated with the BOP-on-BOP Option
        Had Not All Been Mitigated prior to Top Kill. ...............137

        a.      LMRP Removal Concerns Had Not Been
                Mitigated Prior to Top Kill. ................................139

        b.      Hydrate Mitigation for the BOP-on-BOP
                Option Was Not Complete Prior to Top Kill. ......144

        c.      The Guide Frame for the BOP-on-BOP
                Option Was Not Installed Prior to Top Kill.........146

        d.      The Venting Solution to Address Well
                Integrity Concerns Was Not Estimated to Be
                Ready Until June 2010.........................................147

(6)     No BOP-on-BOP Procedures Had Been Finalized or
        Approved by Unified Command prior to Top Kill. .........154

(f)     Based on Independent Analyses of Top Kill Data, the
        Federal Government and BP Concluded That the Risks of
        Utilizing BOP-on-BOP Were Too High Because of the
        Risk of a Subsea Broach, Which Would Have Worsened
        the Situation. ..............................................................155

        (1)     The Federal Government Had Access to All Top
                Kill Data.........................................................158

        (2)     BP Offered Various Possible Reasons for Failure of
                Top Kill...........................................................159

                a.      Following the Failure of Top Kill, BP
                        Performed a Rapid Analysis Overnight to
                        Determine the Reason for Top Kill's
                        Failure, and Presented Three Possible
                        Scenarios to the Federal Government. ................160

        (3)     The Federal Government Conducted Independent
                Analysis and Reached Conclusions About Well
                Integrity and Risk of Subsea Broach. ..............167

        (4)     In Light of Well Integrity Concerns, BOP-on-BOP
                Was Set Aside in Favor of a Collection Strategy. ...........172

(g)     BP Designed, Manufactured, and Tested a Revolutionary
        Type of Capping Device. .............................................181

vi

(1)     Developing an Effective Capping Stack Required
        Extensive Unprecedented Analysis and
        Engineering. .................................................................. 181

(2)     The Capping Stack That Closed the Well Was
        Specifically Designed to Monitor and Mitigate the
        Possibility of a Subsea Broach. ...................................... 191

        a.      The BOP-on-BOP Option Did Not Have
                The Capabilities Of The Capping Stack That
                Closed the Well. .................................................. 194

        b.      The Two-Ram Capping Stack Lacked
                Features and Functionality of the Capping
                Stack That Closed the Well. ................................ 196

(3)     It Cannot Be Said with Any Degree of Engineering
        Certainty That the Well Could Have Been Shut In
        Within Weeks, Even with a Pre-Built Capping
        Stack. .............................................................................. 198

(h)     In April and May 2010, BP Lacked the Tools to Reliably
        Estimate Flow Rate Using Hydraulic Modeling. ....................... 200

        (1)     During the Response, Hydraulic Modeling Was
                Performed Under Atypical Conditions Because the
                Required Inputs Were Unknown or Uncertain. .............. 202

        (2)     In April and May 2010, Hydraulic Modeling Was
                Used to Test the Robustness of Source Control
                Options and to Better Understand the Impact of
                Changes in the Condition of the System. ..................... 207

        (3)     Hydraulic Modeling Conducted by BP and Its
                Contractors in April and May 2010 Could Not and
                Did Not Inform BP as to the Actual Flow Rate or a
                "Most Likely" Flow Rate. ............................................ 211

(i)     BP's Flow Rate Representations Had No Negative Impact
        on Source Control. ................................................................... 213

        (1)     Due to the Significant Uncertainty Surrounding
                Flow Rate, the Federal Government Did Not Rely
                on BP's Flow Rate Representations. .............................. 214

        (2)     Early in the Response, the Federal Government
                Looked to NOAA and the MMS for Flow Rate

Estimates, Including the 1,000 bopd and 5,000 bopd Estimates. ............................................................215

(3)    The Federal Government Looked to the Flow Rate Technical Group for Flow Rate Information. .................222

(4)    BP Regularly Shared Information and Data with Government Officials Involved in the Response So That the Government Could Evaluate the Source-Control Efforts Underway..................................................224

(5)    In Any Event, the Source Control Efforts Undertaken Were Based on Flow Rate Figures That Exceeded All Undisclosed Estimates..............................227

III.    BP'S AND ANADARKO'S PROPOSED FINDINGS OF FACT AS TO QUANTIFICATION.........................................................................231

A.    No More than 2.45 Million Barrels Spilled into the Gulf of Mexico as a Result of the *Deepwater Horizon* Incident. ........................................236

B.    The Hydraulic Methods Employed by the United States Experts Are Unreliable Because Information Essential to those Methods Is Unknown over the 86-Day Flowing Period.........................................................237

1.    Numerous Government Experts Admitted That the Information Required to Generate a Reliable Estimate of the Cumulative Release Using Hydraulic Methods Was Unavailable in This Case. ........237

2.    A Daily Flow Rate Could Not Be Accurately Calculated Until the Well Was Capped. ...................................................................239

3.    The U.S. Experts' Hydraulic Methods Cannot Accurately or Reliably Calculate a Total Cumulative Release.......................................241

(a)    The Inputs Required for a Proper Hydraulic Model Are Complex and, in the Case of Macondo, Changed over Time. ...........................................................241

(b)    The Government's Hydraulic Experts' Quantification Methodologies Do Not Account for the Complex Hydraulic Inputs and How Those Inputs Changed over Time. ...................244

(c)    The Government's August 2010 Press Release Estimate Was Generated over a Weekend, Based upon Limited Information and for the Purpose of Negotiations with BP. .........246

(d)     The Government's August 2010 Estimate Was Not Updated With Additional Evidence That Became Available after August 2, 2010 ..................................................... 255

(e)     Dr. Dykhuizen's Estimate Is Improperly Based on Measurements Taken Only on the Last Days of Flow and Assumes No Change in Restrictions over Time. ......................... 257

   (1)     Dr. Dykhuizen's Cumulative Flow Estimate Is Predicated on His Capping Stack Flow Rate Estimate, but His Capping Stack Calculations Are Flawed. ........................................................................ 257

   (2)     Dr. Dykhuizen's Cumulative Estimate Rests on the Unsupported and Unrealistic Assumption that Everything in the Macondo Well Remained Constant from April 22 to July 15, 2010. ........................ 259

   (3)     Dr. Dykhuizen Admitted That All of His Estimates Were Inaccurate and That Uncertainty on His Cumulative Estimate Could Not Be Bounded When Only His Own Analysis Is Considered. ........................... 262

   (4)     Dr. Dykhuizen's Top Hat Calculations Do Not Increase the Reliability of His Cumulative Flow Estimate. ........................................................................ 266

   (5)     Dr. Dykhuizen's Top Kill Estimate is Also "Not Very Accurate," and It Does Not Add to the Reliability of His Cumulative Flow Estimate. ................ 270

(f)     Dr. Griffiths's Method is Scientifically Unsound Because It Is Based on Limited Data and Unsupported Assumptions About the Macondo Well System. ............................................... 273

   (1)     Dr. Griffiths Had No Prior Experience Calculating the Flow Rate of Oil Through a Well, and Failed to Use Industry-Standard Methods in His Work. ................. 273

   (2)     Dr. Griffiths's Use of "Constant Discharge Coefficients" to Evaluate the Entire 86-Day Period Preordained a Flow Rate That Decreased over Time. ........................................................................ 274

   (3)     There Was Too Much Uncertainty about Changes in the Macondo Well System over Time to Use a Hydraulic Method. .......................................................... 277

(4)     Correcting for Dr. Griffiths's Unsupported Assumption of a Constant Productivity Index Reduces His Best Estimate by 1.3 Million Barrels. .........279

(5)     Correcting for Dr. Griffiths's Unsupported Assumption of a Constant Wellbore Discharge Coefficient Changes His Flow Rate Trend from Decreasing to Increasing over Time. ..............................281

(6)     Correcting for Dr. Griffiths's Unsupported Assumptions Regarding the Starting Pressure Reduces His April 20 to May 8 Estimate by Another 500,000 Stock Tank Barrels over That Period. ...........................................................................282

(7)     Dr. Griffiths's Method Cannot Account for Erosion Downstream of the PT-B Pressure Gauge. ......................284

(8)     Dr. Griffiths Did Not Conduct a True Validation of His Method .....................................................................287

(9)     Dr. Griffiths's Method Produces Nonsensical Results. ...............................................................................290

(10)    The Uncertainty Range for Dr. Griffiths's Best Estimate Cumulative Release is Much Greater Than He Acknowledges. ...........................................................292

(g)     Dr. Pooladi-Darvish Similarly Relies on a Narrow Sample of Data Points and Assumes No Material Change in Restrictions over Time. ...............................................................294

(1)     Dr. Pooladi-Darvish Failed to Account for Erosion. .......294

(2)     Dr. Pooladi-Darvish's Numerical Modeling Revealed That the Post-Shut-In Pressure Data Could Be Matched by Flow Estimates as Low as 3 Million Stock Tank Barrels...............................................298

(3)     Dr. Pooladi-Darvish Attempted to Match Only a Small Fraction of the Available Collection Rate Data, and Did So Through an Imprecise, Unreliable "Eyeballing" Method. .......................................................298

4.     The United States Experts Concede Their Methods Do Not Include Analyses of, and Therefore Do Not Properly Account for, Erosion........300

(a)    The Erosion Experts Who Have Analyzed the Macondo Well Confirm That Restrictions Eroded over Time—Not over a Period of Hours or Days as Assumed by U.S. Experts—Resulting in an Increasing, Rather Than Decreasing, Flow Trend...............................................................302

    (1)    Dr. Srdjan Nesic—a Leading Expert on Metal Erosion—Confirmed that Erosion in the BOP and Kinked Riser Continued Through at Least May 21.........304

        a.    Metal Erosion Significantly Altered Flow Restrictions in the BOP and Riser. ......................305

        b.    Erosion Occurred in the BOP at Least Through May 27, 2010. .......................................307

        c.    Assuming That the BOP and the Kinked Riser Were the Main Restrictions to Flow at the Macondo Well, Metal Erosion Caused the Relative Flow Rate to Nearly Double Between April 22 and May 27, and This Increase in Flow Rate was Steady Throughout the Five-Week Period.......................309

        d.    Erosion of the BOP and Riser at the Macondo Well Could Not Have Occurred in Just a Few Hours or Days. ...................................313

    (2)    Dr. Andreas Momber—the World's Leading Expert in Cement Erosion—Confirmed That the U.S. Experts' Cement Erosion Assumptions Are Not Scientifically Plausible......................................................314

        a.    Like the U.S. Experts, Dr. Momber Assumed the Cement Was Set for the Purposes of His Analysis. ....................................315

        b.    Dr. Momber Compared the Erosion Rates Required to Achieve the Erosion Assumed by the Government Experts with Those He Had Encountered in His Experience and Observed in a Comprehensive Literature Review. ...............................................319

        c.    Dr. Momber's Analysis Shows That the U.S. Experts' Cement Erosion Assumptions Require Cement Erosion Rates Orders of

                 Magnitude Higher Than Any Known
                 Cement Erosion Rates...........................................320

        d.     Dr. Momber Disagreed with Dr. Griffiths's
                 Interpretation of Mr. Emilsen's Discussion
                 of the Change in Net Pay at 21:30, and
                 Suggested That "Hydraulic Fragmentation"
                 Is a Plausible Alternative Explanation for
                 That Change......................................................323

5.     U.S. Experts Also Fail to Account for the Existence of Slug Flow
       and Its Implications on Flow Rate for the Period During Which It
       Was Observed. ........................................................324

   (a)   Slug Flow Is a Bounded Flow Regime; It Can Only Occur
       at Certain Flow Rates............................................325

   (b)   Dr. Michael Zaldivar Is an Expert in Modeling and
       Evaluating Multiphase Flow and Slug Flow in Oil and Gas
       Pipelines...............................................................326

   (c)   Slug Flow Occurred from the End of the *Deepwater
       Horizon*'s Riser from May 13–20, 2010. ....................328

   (d)   Dr. Zaldivar's LedaFlow Modeling and Simulations
       Confirm That the Flow Rate(s) in Mid-May 2010 Could
       Only Have Been Between 24,900 and 35,900 Barrels per
       Day. ....................................................................331

     (1)   Dr. Zaldivar's LedaFlow Models Fully and
        Accurately Reproduced the *Deepwater Horizon*
        Riser Flow System. .........................................332

        a.     Dr. Zaldivar Used Accurate Fluid Properties
              in His Analysis.....................................333

        b.     Dr. Zaldivar Correctly Modeled Multiphase
              Flow Using the Hydraulic Diameter—the
              "Gold Standard" Geometric
              Transformation—to Transform the
              Noncircular Flow Area to a Circular Flow
              Area....................................................334

     (2)   Dr. Zaldivar's Models Are Robust and His
        Calculations of Flow Rate for Mid-May 2010 Are
        Accurate; In Fact, Dr. Zaldivar's LedaFlow
        Simulations Produced the Best Match to Observed

Slug Flow Behavior That He Has Witnessed in His Entire Career. ...................................................................337

6.    Accurate Flow Rate Modeling Requires Accurate Sources for Fluids Properties. .................................................................339

    (a)    The U.S. Experts Performing Hydraulic Analyses Did Not Use Reliable Sources for Fluids Properties. ...............................341

7.    BP's Internal Documents and Public Statements Are Consistent with Its Estimates In This Case...............................................342

    (a)    The Government's Arguments Regarding BP's 20F Statement Are Belied by the Language of That Statement Itself. ..................................................................342

8.    The Government's Focus on Certain Figures Found in Assorted Internal BP Documents Does Not Establish That Those Figures Were Reliable Flow Rate Estimates. ........................................344

C.    The Material Balance Methodology Utilized by Dr. Blunt Is the Most Reliable Method to Calculate Cumulative Flow from the Macondo Reservoir. ...............................................................................346

1.    First Material Balance Variable, N: Initial Connected Oil Volume. .......350

    (a)    Seismic Analysis Is Used by Both Material Balance Experts as a Starting Point. .........................................352

    (b)    Uncertainty in the Pre-Drill Volume Prediction Was Reduced by the Accuracy of the Seismic Estimate of Reservoir Thickness. .................................................353

    (c)    Connectivity Was Not Analyzed in the Pre-Drill Seismic Volume Prediction Used by Both Drs. Kelkar and Blunt.............355

    (d)    The Reservoir Consists of Narrow Sinuous Sandstone Channels Deposited in Different Locations and at Different Depths over Geologic Time, a Phenomenon Recognized in the Industry (and by the U.S.'s Non-Testifying Expert) as Limiting Likely Connectivity. .....................................356

    (e)    The United States Testifying Experts Assume 100% Connectivity.................................................................359

    (f)    The Macondo Reservoir Was Compartmentalized, Not 100% Connected to the Well. .....................................360

xiii

(g)    Dr. Kelkar Recognized the Need for an Assessment of Connectivity, but Did Not Perform Such an Analysis. ...............361

(h)    Dr. Blunt Uses a Conservative Approach to Estimate a Maximum Connectivity and Hence a Robust Upper Bound for the Initial Connected Volume Variable, N. ...........................362

(i)    Summary of Conservative Assumptions and Methods Used by Dr. Blunt to Ensure that His Number for Initially Connected Oil Volume Was a Robust Upper Bound ..................365

(j)    Dr. Blunt Used Accurate Fluids Properties in His Analysis. .......366

(k)    Dr. Kelkar Used Invalid Fluid Properties to Artificially Inflate 'N.'" ...............................................................................366

    (1)    Upper Bound Connected Oil Volume is 112 MMstb. ..............................................................................367

2.    Second Material Balance Variable, C: Compressibility. ........................367

(a)    The Pore Volume Compressibility of the Macondo Reservoir Was Measured by an Independent Laboratory Consistent with Industry Standards. .............................................368

(b)    Dr. Zimmerman, the World's Leading Expert on Sandstone Compressibility, Calculated That the Pore Volume Compressibility of the Macondo Reservoir Was Approximately 6 Microsips. ......................................................371

    (1)    Dr. Zimmerman Is the World's Leading Expert on Sandstone Compressibility. ................................................372

    (2)    Dr. Zimmerman Analyzed Results from Three Different Lab Tests on Eight Different Core Samples and Determined That the Pore Volume Compressibility of the Macondo Reservoir Was Approximately 6 Microsips. ............................................373

(c)    BP Scientists in Charge of Macondo Analysis Regarded the Value of Rock Compressibility to Be 6 Microsips, and Used Higher Alternative Scenarios During a Short Period, When Assessing the Worst-Case Risks of Shut-In. .....................379

    (1)    BP's Science Team Calculated a Rock Compressibility of 6 Microsips, and Never Changed This Scientific Conclusion; They Added Higher Alternative Cases Including 12 Microsips for a

Limited Time to Assess the Risks of Pressure Build-Up in the Event of Shut-In. ...............................................380

(2) U.S. Experts Admitted that BP's Temporary Use of Alternative Scenarios of 12 microsips Occurred in the Context of Perceived Risk from Shut-In Pressures Building Up Too High. ....................................383

(3) BP Documents Relied Upon by the United States Show that Higher Compressibility Numbers Were Temporary Safety Factors, Not Reflective of a Scientific Conclusion. .......................................................384

(4) No Evidence Supports the United States' Contention that Measurements of Compressibility Using Rotary Sidewall Cores Should Be Doubled. .........386

(5) The July 8 and 9 Merrill PowerPoints Cited in Dr. Kelkar's Expert Report Do Not Evidence a Scientific Conclusion That the "Most Likely" Value of Compressibility Was 12 Microsips.............................387

(6) Following the July 15 Shut-In Decision, BP Engineers Used 6 Microsips to Analyze Pressure Data—Including During Critical Relief Well Operations. .......................................................................389

(7) The United States Knew that BP Used 6 Microsips for Pore Volume Compressibility Throughout the Incident Except for Certain Limited Worst-Case Analyses of Shut-In Risk. ................................................391

(d) Secretary of Energy Chu and other U.S. Officials and Scientists Questioned the Doubling of Rock Compressibility from the 6 Microsips to 12, but Their Questions Were Never Answered. ................................................392

(e) Dr. Kelkar Used 6 Microsips During His Pre-Litigation Work with the U.S. Flow Rate Technical Group. ........................394

(f) Dr. Kelkar Co-Authored an Article Finding a Mid-Range Value of Gulf of Mexico Rock Compressibility Was 3 microsips, with 10 microsips Being an "Extreme" High Value for the Fields Surveyed. ....................................................395

(g) Drs. Roegiers and Huffman Are Neither Correct nor Credible. ..........................................................................395

(1)     Dr. Roegiers's "Best Practices" Are Not Industry Standard. ........................................................395

     a.     The Orientation of the Macondo Core Samples Did Not Affect the Reliability of the Test Results. ...................................396

     b.     The Size of the Macondo Core Samples Was Adequate for PVC Testing. ...................................398

     c.     The Saturant Used During PVC Testing of the Macondo Cores Was Appropriate. .................398

     d.     The Macondo Cores Were Appropriately Tested at Room Temperature. ..............................399

(2)     Dr. Huffman Lacks Experience and Expertise in UPVC Testing. .................................................399

     a.     Dr. Huffman's Criticism Regarding Core Orientations Is Unfounded. ...................................400

     b.     Dr. Huffman's Claimed Porosity Values Derived from His Well Log Analysis Are Unreliable. ...............................................400

(h)     Conclusion: Rock Compressibility is 6.35 Microsips.................401

3.     Third Material Balance Input, ΔP: Change in Pressure. ..........................402

(a)     Prediction of Final Capping Stack Pressure.................................403

(b)     Conversion of the Capping Stack Pressures to Down-Hole Values. ........................................................................404

(1)     Cooling of the Wellbore Resulted in a Denser Oil, and Hence Higher Final Pressure, and Hence Lower Depletion and Flow. ........................................405

(2)     The U.S. Experts Inflated Pressure Depletion by Ignoring the Second Law of Thermodynamics, Resulting in an Over-Estimate of Oil Released. .............405

(c)     Dr. Kelkar's Criticisms of Dr. Blunt's Final Reservoir Pressure Are Unfounded. ........................................................407

(d)     The Pressure Drop is 1,367 psi. ...................................408

4.      Reservoir Properties Have Interrelated Effects, and Government Experts Neglected the Industry-Standard Practice of a "Consistency Check" that Would Have Shown That Doubling the Measured Compressibility Requires Shrinking the Inferred Reservoir Size, Reducing the Estimated Flow.........................................409

    (a)     Compressibility Cannot Be Unilaterally Doubled Without Shrinking the Inferred Reservoir Size and Hence the Calculated Cumulative Flow.......................................................410

    (b)     The Industry-Standard Method of Consistency Checking Provides Independent Reservoir-Engineering Confirmation of Dr. Zimmerman's Geomechanical Analysis that the Measured Rock Compressibility Value of 6 Microsips is Reliable. .................................................................................412

D.      An Analysis of the Permeability of the Reservoir Shows that Reservoir Engineering Methods Are the Only Reliable Way to Estimate the Total Release of Oil.................................................................................413

    1.      Introduction to Permeability Estimating Methods. ..................................414

    2.      Reliable Flow Rate Estimates Must Be Constrained by Permeability. .................................................................................416

    3.      Only Drs. Gringarten and Blunt Use Industry-Accepted "Well Test Analysis" Methods to Estimate Permeability. .........................................417

        (a)     Dr. Gringarten Uses the Only Data Set Providing the Combination of Flow Rate and Pressure Histories Necessary to Determine Permeabilities. ......................................418

            (1)     Dr. Gringarten Estimated the Permeability Was 238 mD.......................................................................420

            (2)     Dr. Gringarten Used the Standard Well Test Analysis Methodology for Determining Permeability. .................................................................420

            (3)     Dr. Gringarten Accounted for the Noise in the MDT Data and His Estimates Are Reliable.............................424

            (4)     Dr. Larsen's Critiques Are Not Credible ........................424

                a.      Dr. Larsen Used an Incomplete and Inaccurate Data Set. .............................................424

b.     Dr. Larsen Estimated Permeability Using an Imprecise and Unreliable Method.......................425

c.     Dr. Larsen's Permeability Estimate Would Be Lower if He Used the Standard Methodology of a Derivative Plot.......................427

d.     The Model Used by Dr. Gringarten Did Not Affect His Permeability Estimate. .......................427

(b)     Dr. Blunt Adopts Dr. Gringarten's Analysis but Selects the High-End, Low-Probability Permeability in Order to Err on the Side of Higher Flow..............................................427

(c)     Drs. Pooladi-Darvish and Hsieh Used Permeabilities That Are Double the Correct Number...................................430

E.     The Material Balance Method Is Less Uncertain Than Methods that Calculate Daily Flow Rates, But of the Methods That Calculate Flow Rate Over Time, Dr. Gringarten's Method Is Best. ....................................431

1.     Dr. Gringarten Estimated the Cumulative Discharge Was 2.4 to 3.0 MMstb...........................................................................431

2.     Only Dr. Gringarten Used Industry-Standard Methods for Estimating Flow Rate over Time. ...........................................432

3.     Dr. Gringarten Used Bottomhole Pressure in His Cumulative Discharge Analysis. ................................................................433

4.     Dr. Gringarten Constrained His Flow Rate Estimates by the Known Reservoir Parameters. .................................................434

5.     Dr. Gringarten Used Accurate Fluids Properties in His Analysis. ..........435

6.     Dr. Gringarten Did Not Analyze the Rate of Erosion..............................435

F.     Conversion of Reservoir Barrels to Surface Volumes Should be Done Using the "Single-Stage Flash" Process. ............................................436

1.     The Spill Should Be Measured in Stock Tank Barrels for Purposes of Clean Water Act Penalties..................................................436

2.     The "Single-Stage Flash" Process Is the Default Method of Conversion Used in the Industry, and Also the Simplest Method to Apply..........................................................................................437

3.      BP Experts Appropriately Used the Single-Stage Flash Process to Convert Volumes to Stock Tank Barrels. ..................................................439

4.      Other Processes for Converting to Stock Tank Barrels Are Inaccurate and Inappropriate...................................................................439

5.      Dr. Zick's Equation of State Model Artificially Inflated the Number of Stock Tank Barrels, Even When the Single-Stage Flash Process Is Used. ......................................................................443

PROPOSED CONCLUSIONS OF LAW ...................................................................444

IV.     BP'S PROPOSED CONCLUSIONS OF LAW AS TO SOURCE CONTROL. ............444

   A.   Working Under the Federal Government's Supervision, BP Exercised Reasonable Care in Sealing the Well..................................................445

        1.      BP Was Not Negligent Regarding Its Source Control Plan....................445

        2.      BP Used Every Reasonable Means to Shut the Macondo Well..............451

   B.   The Aligned Parties Have Not Shown That BP Was Negligent, Much Less That There Was Willful Misconduct. ..................................................454

        1.      BP Provided a Wide Range of Flow Estimates to the Federal Government, Which Relied on Its Own Estimates in Any Case. ...........454

        2.      BP Was Not Required to Have a Pre-Built Capping Stack. ...................456

        3.      Top Kill Was a Reasonable Source Control Measure, and Did Not Delay Other Source Control Alternatives. ................................................458

        4.      The BOP-on-BOP Option Was Thoroughly Considered But Not Pursued Because of Reasonable Concerns That It Would Make the Blowout Worse. ........................................................................461

   C.   Transocean and Halliburton Have Failed to Establish That Any Act of BP Was a Superceding Cause. ..................................................................463

V.      BP'S AND ANADARKO'S PROPOSED CONCLUSIONS OF LAW AS TO QUANTIFICATION...........................................................................................470

   A.   3.26 MMstb is the Best Estimate of the Oil Released from the Reservoir. .........472

        1.      The Opinion and Analysis of BP's Expert Dr. Blunt is the Most Persuasive and Credible.........................................................................472

        2.      Dr. Gringarten's Discharge Estimate Based On Flow Rates Supports Dr. Blunt's Material Balance Analysis.....................................475

B.      The Government's Experts are Not Persuasive. ....................................................476

C.      Single-Stage Flash is the Most Appropriate Method to Convert Flow to
        Stock Tank Conditions..........................................................................................480

VI.   SUMMARY OF CONCLUSIONS AS TO SOURCE CONTROL AND
      QUANTIFICATION.........................................................................................................482

<u>**PROPOSED FINDINGS OF FACT**</u>

**I.      THE PARTIES AND THE NATURE OF THE PROCEEDINGS.**

1.      This complex, multidistrict litigation arises from the April 20, 2010 explosion and fire aboard the mobile offshore drilling unit *Deepwater Horizon* in the Gulf of Mexico, the loss of that vessel two days later, and the resulting flow of hydrocarbons from the *Deepwater Horizon's* appurtenances, located on the Mississippi Canyon Block 252 well in the Macondo Prospect (the "Macondo well").  The Parties previously litigated Phase 1 of MDL 2179, and BP hereby incorporates its previous Proposed Findings of Fact and Conclusions of Law from Phase One (Rec. Doc. 10467).

2.      The Phase Two Trial addressed (i) "source control" issues pertaining to the conduct or inaction of BP, Transocean, or other relevant parties regarding stopping the release of hydrocarbons from the *Deepwater Horizon*'s appurtenances from April 22, 2010 through approximately September 19, 2010, and (ii) "quantification of discharge" issues pertaining to the amount of oil actually released into the Gulf of Mexico as a result of the Incident from the time when these releases began until the Macondo well was capped on approximately July 15, 2010 and then permanently cemented shut on approximately September 19, 2010.  Second Amended Pretrial Order No. 41 at 2-3 [CMO No. 4] (Rec. Doc. 6592).

     **A.      The Parties.**

          **1.      The BP Defendants.**

3.      BP Exploration & Production Inc. ("BPXP") is the BP entity that bid for and was awarded the right to lease Mississippi Canyon Block 252 ("MC-252") in March 2008 and which was named a responsible party for the oil spill by the U.S. Government on April 28, 2010 under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.*  Agreed Stipulations ¶ 96 (Rec. Doc. 5927); Statement of BP Exploration & Production Inc. Re Applicability of Limit of

Liability Under Oil Pollution Act of 1990 (Rec. Doc. 559). BPXP originally leased 100% of the MC-252 prospect leasehold from the United States, but through lease exchange agreements and assignments had reduced its leasehold interests to a 65% interest at the time of the Incident. Agreed Stipulations ¶ 100 (Rec. Doc. 5927); BP Parties' Amended Answer to the First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III(B1) ¶ 247 (hereinafter, "BP Answer to First Am. B1 Master Compl."). BPXP is a Delaware corporation with its principal place of business in Texas. BP Answer to First Am. B1 Master Compl. ¶ 210; BP Parties' Answer to the Morales Original Petition ¶ 7 (Rec. Doc. 1216).

4.      As a responsible party, BPXP acted to seal the well under the supervision of the federal government.

5.      BP America Production Company ("BPAPC") was a party to the drilling contract concerning the use of the *Deepwater Horizon* to drill the Macondo well. Agreed Stipulations ¶ 96 (Rec. Doc. 5927); BP Answer to First Am. B1 Master Compl. ¶ 211. BP America Production Company is a Delaware corporation with its principal place of business in Texas. BP Answer to First Am. B1 Master Compl. ¶ 211.

6.      BP America Inc., BP Company North America Inc., and BP Corporation North America Inc. are holding companies with no Gulf of Mexico operational assets. BP p.l.c.'s Responses and Objections to Plaintiffs' Interrogatory No. 37. BP America Inc. is a Delaware corporation with its principal place of business in Texas; BP Company North America Inc. is a Delaware corporation with its principal place of business in Illinois; and BP Corporation North America Inc. is an Indiana corporation with its principal place of business in Texas. BP's Answer to First Amended Complaint of the State of Veracruz ¶¶ 11-12 (Rec. Doc. 5339).

2

7.      BP Products North America Inc. is an entity primarily involved in "downstream" operations, including crude oil refineries and the transportation and marketing of refined products such as gasoline.  BP p.l.c.'s Responses and Objections to Plaintiffs' Interrogatory No. 37.  It is a Maryland corporation with its principal place of business in Illinois.  *Id*.  The BP Parties' First Amended Answer to the First Amended Complaint of the State of Veracruz ¶ 13 (Rec. Doc. 8658-2).

8.      Each of the foregoing BP defendants is a direct or indirect wholly-owned subsidiary of BP p.l.c.  BP p.l.c. is a corporation organized under the laws of England and Wales and does not have a registered agent for service of process in the United States.  It did not lease the MC-252 leasehold.  BP Answer to First Am. B1 Master Compl. ¶ 212.

**2.      Anadarko.**

9.      Anadarko Petroleum Corporation  ("Anadarko") and Anadarko E&P Company LP ("Anadarko E&P") are defendants solely in the Quantification portion of the Phase Two trial.  As of April 20, 2010, Anadarko owned a 25% interest in the Macondo Prospect lease.  Anadarko E&P had no ownership interest in the Macondo Prospect at the time of the Incident.

**3.      The Aligned Parties.**

(a)      **Transocean.**

10.      Several Transocean entities were involved in drilling activities at the Macondo well.  Triton Asset Leasing GmbH was the owner of the *Deepwater Horizon* vessel.  Phase 1 Tr. 4518.  Transocean Holdings LLC was a signatory to the drilling contract with BP America Production Company concerning the use of the *Deepwater Horizon* to drill the Macondo well.  Agreed Stipulations ¶¶ 91, 94-95, 98 (Rec. Doc. 5927).  Transocean Deepwater Inc. employed numerous personnel onboard the *Deepwater Horizon*, and Transocean Offshore Deepwater

Drilling Inc. employed a number of land-based rig operations personnel, including the *Deepwater Horizon* rig manager. Phase 1 Tr. 4518.

11.     These Transocean entities also were involved in executing and providing advice regarding source control activities, as discussed. *See* Section II.B.2(b)(3)

12.     The foregoing Transocean entities (collectively, "Transocean") are subsidiaries of Transocean Ltd. Phase 1 Tr. 4518.

<div align="center">(b)     <b>Halliburton.</b></div>

13.     Halliburton Energy Services, Inc. ("Halliburton") cemented the Macondo well, including designing, pumping, and testing the cement slurry. Beck Dep. at 350-51. Halliburton's Sperry Sun division had well-monitoring responsibilities at the well. TREX 000611 at BP-HZN-2179MDL00338244. Halliburton is a wholly-owned subsidiary of Halliburton Company. Halliburton Energy Services, Inc.'s Disclosure Statement, Civ. A. No. 10-01573 (Rec. Doc. 8).[1]

14.     Halliburton also was involved in providing advice regarding source control activities.

<div align="center">(c)     <b>Claimants.</b></div>

15.     The claimants in this action include many tens of thousands of individuals and businesses who have filed claims in these proceedings. The Court ordered that the Plaintiffs' Steering Committee would represent the many claimants in MDL 2179. Second Amended Pretrial Order No. 41 [CMO No. 4] at 3 (Rec. Doc. 6592). The claimants were plaintiffs only in the Source Control portion of the Phase Two trial.

---

[1] "Civ. A. No." is used in this section to designate the Civil Action Number of a MDL 2179 member case pending before this Court.

(d)      **State Governments.**

16.      As a result of their claims against some or all defendants, the States of Alabama and Louisiana were party plaintiffs to the Phase Two trial.  The States of Alabama and Louisiana were party plaintiffs to the Source Control Portion.  *See* Order Re Presentation of Evidence in Phase Two Trial at 4 (Rec. Doc. 11087).

### 4.      The Federal Government.

17.      Pursuing claims against defendants BP and Anadarko, the United States was the only plaintiff in the Quantification portion of the Phase 2 trial.  *Id.*

### B.      The Nature of the Action.

18.      The Deepwater Horizon was a mobile offshore drilling unit owned and operated by Transocean.  *See* In re Oil Spill, 841 F. Supp. 2d 988, 992 (E.D. La. 2012).  On the evening of April 20, 2010, a loss of well control allowed hydrocarbons to escape from the Deepwater Horizon and its appurtenances.  *Id.* at 991.

19.      The resulting fire destroyed and sank the rig on April 22, 2010.  Hydrocarbons thereafter began to flow from the *Deepwater Horizon's* appurtenances.  *See* In re Oil Spill, 792 F. Supp. 2d 926, 930 n.1 (E.D. La. 2011).

20.      Immediately after the explosion, BP activated its Oil Spill Response Plan and began assembling resources.  Stipulated Facts at 7 (Rec. Doc. 7076).

21.      Within days of the loss of the *Deepwater Horizon*, a comprehensive response infrastructure took shape under the direction of the Federal On-Scene Coordinator ("FOSC").  Through the FOSC, the Unified Command, and the National Incident Command, the United States directed a spill response operation that engaged more than 47,000 individuals, thousands of vessels, and dozens of aircraft.  BP and numerous state agencies also participated directly in the Unified Command's response.  *Id.*; *See* Stipulated Facts at 5 (Rec. Doc. 7076).

22.     BP began developing several options in parallel for stopping the flow of hydrocarbons.  *See* Section II.B.2(b)(4)a.

23.     On April 21, 2010, BP commenced developing plans for drilling relief wells. Stipulated Facts at 7 (Rec. Doc. 7076).  On April 22, 2010, ROVs made several attempts to activate the *Deepwater Horizon's* BOP.  *Id*. at 7-8.

24.     By April 23, 2010, cofferdams, pollution domes, and a capping stack were identified as potential source control options.  *Id*. at 8.

25.     Multiple attempts were made to close the BOP and Lower Marine Riser Package ("LMRP") over the next several days.  *Id*. at 8-10

26.     The first relief well was spudded on May 2, 2010.  *Id*. at 10.

27.     On May 6-7, 2010, the Cofferdam was positioned over the leak at the end of the *Deepwater Horizon* riser.  *Id*. at 10.  While it was being lowered, hydrate crystals formed inside of it, and this prevented its successful placement.  *Id*.

28.     On May 15, 2010, a riser insertion tube tool ("RITT") was inserted into the end of the riser and hydrocarbons were then transported to the *Discoverer Enterprise* for collection and flaring.  *Id*. at 11.

29.     The drilling on the second relief well began on May 16, 2010.  *Id*. at 12.

30.     On May 26-28, 2010, the Top Kill procedure was attempted, using both the momentum kill and junk shot procedures.  *Id*

31.     The Top Hat was installed above the *Deepwater Horizon's* LMRP on June 3, 2010, directing hydrocarbons to the *Discoverer Enterprise* for collection and flaring.  *Id*. at 13.

32.     On July 12, 2010, BP landed the 3-ram Capping Stack.  *Id*. at 16.

33.     The 3-ram Capping Stack's kill and choke side outlets were closed on July 15, 2010, terminating the flow of hydrocarbons.  *Id*. at 17.  BP, under the direction of the United States, permanently sealed the well in September 2010.  *Id*. at 19.

34.     That sequence of events gave rise to hundreds of civil actions in jurisdictions throughout the Gulf States and elsewhere asserting a wide variety of claims.  On August 10, 2010, the Judicial Panel on Multidistrict Litigation established this multidistrict proceeding to centralize the vast majority of the related cases before this Court.

### C.     The Claims at Issue in Phase Two of MDL 2179.

#### 1.     Economic and Property Damages Cases.

35.     The majority of the pending cases seek to recover for alleged economic damages such as lost personal income or lost business revenue.  Most of these cases involve claims under OPA, and many also include claims under state law or general maritime law theories of negligence.

#### 2.     United States Government Claims.

36.     The U.S. Department of Justice filed a civil complaint in December 2010 against BPXP, Transocean, Anadarko, and MOEX seeking a declaration of liability under OPA and civil penalties under the Clean Water Act ("CWA"), 33 U.S.C. § 1251; *See* Civ. A. No. 10-04536. The United States has settled its claims versus Transocean and MOEX.

#### 3.     State and Local Government Claims.

37.     The State of Alabama has filed lawsuits against Anadarko, Transocean, Halliburton, and BP seeking damages for alleged economic and environmental harms, including natural resource damages, civil penalties under state law, declaratory and injunctive relief, and punitive damages as a result of the Incident.  Rec. Doc. 1887; Civ. A. Nos. 10-04182, 13-02645, 13-02646, 13-02647, 13-02813.

38.     The State of Louisiana filed a lawsuit against BP and others seeking to declare various defendants liable for removal costs and damages, including natural resource damages under federal and state law, and to recover civil penalties, attorneys' fees, and response costs under state law.  Rec. Doc. 2031.

### 4.     Claims Between Defendants.

39.     Settlements that BP has reached with other defendants (such as Weatherford; M-I, LLC; Anadarko; MOEX; and Cameron), as well as the class settlements BP has reached with plaintiffs (which have resulted in the assignment of certain of BP's cross-claims to certain settlement class members) have resolved many of the cross-claims between defendants.  *See*, *e.g.*, Rec. Docs. 7278, 7279.  Significant claims between certain defendants remain, including BP's claims against Halliburton and Transocean.

40.     As part of the source control portion of Phase 2, Transocean and Halliburton seek to establish a superseding cause defense against BP to limit their own liability.  Aligned Parties' Pre-Trial Statement at 21-22 (Rec. Doc. 11411).

### D.     The Court's Jurisdiction.

41.     This Court possesses both original subject matter jurisdiction and removal jurisdiction pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b)(1); pursuant to 28 U.S.C. § 1441; and pursuant to precedent defining the nature of federal enclaves (pursuant to which federal question jurisdiction also inherently exists under 28 U.S.C. § 1331) over thousands of cases consolidated in MDL 2179.  This Court also has jurisdiction over many of the cases consolidated in MDL 2179 pursuant to diversity jurisdiction under 28 U.S.C. § 1332.

### E.     Trial.

42.     The Phase Two Trial commenced on September 30, 2013.  Over the following three weeks, the Court heard testimony from 50 witnesses, with 21 witnesses appearing live and

the remainder testifying by video deposition.  In addition, the parties used 604 demonstratives during trial, and the Court admitted into evidence 1,047 trial exhibits and 61 deposition bundles.

43.     On October 1, 2013, the conclusion of the Aligned Parties' Source Control case, BP moved for a judgment based on the evidentiary record thus far. BP's Mot. for Judgment on Partial Findings (Rec. Doc. 11559).  The Court deferred its ruling on BP's motion.  Day Three Minute Order at 1 (Rec. Doc. 11585).

44.     The parties concluded their presentation of evidence on October 18, 2013.  A final conference for marshalling of exhibits and other evidence was held on November 7, 2013.

**F.     Post-Trial Submissions.**

45.     Following the conclusion of the Phase Two trial, the Court ordered that the parties to the Phase Two Trial submit post-trial briefs and proposed Findings of Fact and Conclusions of Law not later than December 20, 2013.  Rec. Doc. 11706.  Response briefs are due January 24, 2014. *Id.*

46.     This document contains BP's proposed findings of fact and conclusions of law as to Source Control and BP and Anadarko's joint proposed findings of fact and conclusions of law as to Quantification.

## II.    BP'S PROPOSED FINDINGS OF FACT AS TO SOURCE CONTROL.[2]

### A.    The *Deepwater Horizon* Source Control Response Was Conducted Under a Comprehensive Scheme of Regulation and Oversight.

47.    At the time of the *Deepwater Horizon* incident, federal regulations required leaseholders to submit a spill response plan to MMS for review and approval before commencing drilling activities in the Gulf of Mexico.  The regulations mandated that the spill response plan "describe the general procedures that have been developed and instituted … to ensure that the source of a discharge is controlled as soon as possible after a spill occurs."  TREX 011753. Further, the response plan had to demonstrate that the leaseholder could "respond quickly and effectively whenever oil is discharged from [its] facility."  30 C.F.R. §§254.1 (2010) (OSRP); *see also* 30 C.F.R. §§254.2 (2010) (OSRP); 30 C.F.R. §250.202 (IEP) (2010).

48.    MMS was charged with reviewing and approving spill response plans.  MMS only approved a spill response plan if it complied with all applicable MMS requirements and federal regulations.  30 C.F.R. §250.233(b) (2010); Herbst Dep. at 28-29.

49.    In the event of an oil spill, federal regulations require a participant in removal actions to implement its MMS-approved response plan under federal supervision.  33 U.S.C. §1321(c)(3)(B) (those participating in removal actions must implement their response plan and may only deviate from the response plan "if the President or the Federal On-Scene Coordinator determines that deviation from the response plan would provide a more expeditious or effective response to the spill ...."); *see also* Herbst Dep. at 78-79.

50.    After the *Deepwater Horizon* blowout, the response to the Macondo oil spill was governed by the National Oil and Hazardous Substances Pollution Contingency Plan, or National

---

[2] Anadarko does not join BP's Proposed Findings of Fact as to Source Control as it is not a defendant in the Source Control proceedings.

Contingency Plan ("NCP"), a set of federal regulations that prescribe how the Government will respond to oil spills. *See* 40 C.F.R. §300, Subpart D; Stipulated Facts at 5 (Rec. Doc. 7076).

51. The NCP envisions a "unified command system that brings together the functions of the Federal Government, the state government, and the responsible party to achieve an effective and efficient response ...." 40 C.F.R. §300.105.

52. Under the NCP, the Coast Guard is the lead agency for oil spill response in the Outer Continental Shelf, designating the Federal On-Scene Coordinator ("FOSC") and providing a large contingent of responders. The FOSC directs the response efforts, oversees the command system, and has ultimate decision-making power at Unified Area Command. *See* Stipulated Facts at 5 (Rec. Doc. 7076); 40 C.F.R. §300.120(a) (per federal statutes, the FOSC "directs response efforts and coordinates all other efforts at the scene of a discharge or release"); *see also* 40 C.F.R. §300.120(e);40 C.F.R. §300.135(d) ("The basic framework for the response management structure is a system (*e.g.*, a unified command system), that brings together the functions of the federal government, the state government, and the responsible party to achieve an effective and efficient response, where the OSC maintains authority"); 40 C.F.R. §300.135(n).

53. The Unified Area Command ("UAC"), or Unified Command ("UC"), "refers to the organization established to oversee the management [of the spill] and authorized to set overall strategy and priorities, allocate critical resources according to priorities, ensure the incident is properly managed, and ensure that the objectives [are] met and strategies followed." The UC is comprised of the FOSC, the State-on-Scene-Coordinators, and the On-Scene Coordinators ("OSC") for the Responsible Party (or Parties) (*i.e.*, the Responsible Party's Incident Commander). Stipulated Facts at 5 (Rec. Doc. 7076).

54.     According to the NCP, the Responsible Party (or Parties) must be included in the Unified Command structure in order to "achieve an effective and efficient response."  *See* 40 C.F.R. §300.105.  Although the NCP directs the OSC to monitor or direct all federal, state, local, and private removal actions, the OSC may "allow the responsible party to voluntarily and promptly perform removal actions" if the OSC determines that having the Responsible Party perform such actions will "ensure an effective and immediate removal of the discharge."  *Id*. Under that scenario, the OSC supervises the Responsible Party's actions.  40 C.F.R. §300.305.

55.     If an oil spill is classified as a Spill of National Significance, the Commandant of the Coast Guard may designate a National Incident Commander to provide national-level support for the operational response.  40 C.F.R. §300.323 (2010).  Under this scenario, the FOSC maintains authority for and is required to direct all response operations.  *See* 33 U.S.C. §1321 (c)(2) (requiring the  President or his designee to direct all federal, state, and private response actions in case of a discharge posing a substantial threat to public health or welfare); 40 C.F.R. §323(b); 40 C.F.R. §300.135(a) (the FOSC "shall direct response efforts and coordinate all other efforts at the scene of a discharge or release").

**B.     BP's Conduct With Respect to Source Control Was Reasonable and Appropriate, Not Negligent or Grossly Negligent.**

**1.     BP Had an Appropriate Source Control Plan in Place at the Time of the *Deepwater Horizon* Incident.**

56.     When the blowout occurred, BP had a spill response plan in place.  Landry Dep. at 439-40; Rohloff Dep. at 24; Herbst Dep. at 317-18.

57.     According to Admiral Landry, Federal On-Scene Coordinator ("FOSC") for the *Deepwater Horizon* response, "BP had an Oil Spill Response Plan that they filed with MMS. MMS has the Approval Authority under OPA [and] having that plan filed is a recognition of [BP's] preparedness."  Landry Dep. at 455-56.

58.   Based on his personal observations of the response from April 21, 2010, through August 15, 2010, Bryan Domangue of MMS believed BP was prepared to respond to the blowout.  Domangue Dep. at 11-12, 14, 253-54.

59.   The federal government expected BP to do three things in response to a deepwater blowout: (1) "the initial response … would be or should be" to attempt to actuate the BOP through mechanical or remote means; (2) "relief wells would be expected to be drilled"; and (3) "the expectation is that a company would stand up a source control group within the incident command structure to identify the specific ways to attack the source control."  Herbst Dep. at 78-79, 314.

60.   Consistent with that expectation of the federal government, BP's source control plans identified three primary methods for source control: (1) attempting to use remotely operated vehicles (ROVs) to shut in the well with the *Deepwater Horizon* BOP; (2) drilling a relief well; and (3) standing up a team of experts to address the situation.  TREX 000769 (Oil Spill Response Plan, "OSRP"), TREX 002386 (Well Control Response Guide, "WCRG"), TREX 000768 (Initial Exploration Plan, "IEP").

61.   An OSRP outlines how a company like BP would respond to an oil spill that reached the surface waters of the Gulf or the shoreline.  Bush Dep. at 28; Herbst Dep. at 23-24; TREX 000769.  BP's OSRP contained more than 500 pages describing extensive planning and resources for responding to a spill, on topics such as response team locations, communications and outreach, and monitoring and tracking the spill.  TREX 000769; Bush Dep. at 78 (the OSRP was "very effective" responding to the incident).

62.   An OSRP also includes a section specifically on source control that addresses how a well operator would respond to a source control event.  Herbst Dep. at 24.  BP's OSRP

described specific methods and resources necessary for source control to ultimately shut in a well.  Tr. at 471-73 (Bea); TREX 011754.29.7; Rohloff Dep. at 73-74.

63.     BP's 2009 Gulf of Mexico Regional OSRP was a regional plan that covered BP's drilling at the Macondo well.  Herbst Dep. at 31.  BP's OSRP was industry standard and provided the foundation for how to operate a response, including setting up the response, assigning accountability and responsibilities, scaling the response to address the incident, and marshaling appropriate equipment and resources.  McKay Dep. at 12-13, 41, 50.  It was understood that such plans must be adjusted to the unique situation faced during a particular incident.  McKay Dep. at 216.

64.     BP planned to start the deepwater source control methods at the same time and to work many response options in parallel.  Rohloff Dep. at 58-59.

65.     The GoM SPU Well Control Response Guide ("WCRG") provided a working methodology to safely and effectively manage an initial response to a well control incident, covering the first 48 hours until dedicated control and recovery teams formed and well control specialists were on location.  TREX 002386.0009; Rohloff Dep. at 60.  BP's WCRG was in place as of April 20, 2010.  Tr. at 485 (Bea).  The Plaintiffs' process safety expert, Dr. Bea, described the development of BP's Deepwater GoM SPU WCRG as "part of [the] development of a process safety management system.  It is very good."  Tr. at 485 (Bea).

66.     The WCRG included appendices to provide information needed for a response at particular sites, including the *Deepwater Horizon*, in fulfillment of BP's general requirement to have asset-specific well control guides.  Tr. at 742 (Mazzella); TREX 142592.

67.     Mark Mazzella, who was BP's Well Control Segment Engineering Technical Authority (SETA) and who has decades of blowout response experience, prepared the WCRG

14

based on other procedural documents he had prepared over the prior decades.  Tr. at 738, 740 (Mazzella).  Mr. Mazzella, who has seen many well control planning documents, believes that BP's WCRG "far exceeds" anything that he has seen from other operators.  Tr. at 740 (Mazzella).

68.    The International Association of Drilling Contractors ("IADC") published guidelines for companies to aid them in conducting operations in the deepwater areas of the world.  Hand Dep. at 136-37; TREX 007353.

69.    The 1998 IADC Deepwater Well Control Guidelines (TREX 007353) stated that a key to blowout response is the creation of a "Blowout Contingency Plan" which provides a "pre-determined organizational structure" for response.  TREX 007353.0353.  Consistent with IADC recommended practice, BP's WCRG included a Blowout Contingency Plan, going beyond what MMS required.  TREX 002386; Saucier Dep. at 419.

70.     Source control response technology is often developed by contractors, rather than leasehold operators.   In addition to BP's preparations for spill response, Transocean had a structure in place for source control response.  Hand Dep. at 124.

71.    Specifically, Transocean had an Emergency Response Team based in the local area that would respond to the emergency.  Hand Dep. at 118, 124-25.  If the situation escalated to the point where it was not possible to activate the BOP and shut in the well, Transocean would supply services and support to the leasehold operator and assist them with wild well control operations.  Hand Dep. at 118, 124-25.

       (a)    **BP's Source Control Plan Included the Industry-Accepted Method to Respond to a Blowout by Drilling a Relief Well.**

72.    The standard practice of the industry in response to a blowout is to drill a relief well and develop devices to directly intervene with the blowout.  Campbell Dep. Vol. I at 339-

40; McKay Dep. at 19, 535; Inglis Dep. at 152-53.  According to the Government, it was "a given" that relief well operations would be conducted to control an emergency well control situation.  Herbst Dep. at 60.

73. During the *Deepwater Horizon* response, relief wells were considered to be the "ultimate, permanent way" to secure the Macondo well.  McKay Dep. at 536; Barnett Dep. 176 (Wild Well Control's preferred path was to keep "the primary control option the relief well").

74. NTL 2008-G04 (TREX 008956) and MMS regulations required BP to certify in its IEP that it had the financial ability to drill a relief well and perform other emergency well control operations.  Herbst Dep. at 58-60; TREX 008956.0008; *see also* TREX 000768.0010 ("BP … has the financial capability to drill a relief well and conduct other emergency well control operations."); Allen Dep. at 31; Rohloff Dep. at 45-46; Holt Dep. at 622.

75. Exploration planning at BP, as reflected in BP's IEP, involved relief well contingency planning, well control planning, surface containment planning and identification of associated equipment, including dispersants.  Wellings Dep. at 16-18, 52, 95, 410.

76. BP had access to drilling rigs and drill pipe, giving it the ability to quickly commence relief well drilling in the event of a deepwater blowout.  McKay Dep. at 40, 535.  BP quickly planned to drill relief wells during the response.  Herbst Dep. at 304; Landry Dep. at 464.

77. Industry documents such as "DEA 63" described source control for offshore drilling.  TREX 011755.1.1.  DEA-63 recognized that relief well drilling was the only alternative if there are any complications after a blowout.  Tr. at 500 (Bea); TREX 011755.23.1 ("…relief well drilling is probably the only alternative").

78.     The MMS was one of the participants in the meetings which led to DEA-63.  Tr. at 499 (Bea).  DEA-63 was described by Aligned Parties' expert, Dr. Robert Bea, as "an important foundation document" which had the goal of addressing problems operators would face in a deepwater blowout scenario.  Tr. at 433 (Bea).

79.     As of February 21, 2003, as reflected in a presentation to the Society of Petroleum Engineers IADC conference, recommendations for complex source control events had not developed beyond what was recommended in DEA-63.  Tr. at 498, 500 (Bea); TREX 006299.6.1 ("The most recent blowout containment procedures can be found in the DEA-63 floating vessel blowout control which was released in 1990.").

80.     In the prior deepwater blowout to which Wild Well Control (one of the well control expert companies contracted to BP (TREX 011467)) responded, a relief well was used as no other option was found to be very practical.  Barnett Dep. at 332.

(b)     **BP and Transocean's Response Plans Included Utilizing ROVs to Activate Remotely the BOP.**

81.     BP's source control plan included the activation of emergency equipment, such as the BOP.  Tr. at 472 (Bea); Rohloff Dep. at 73-74; TREX 011754.29.7.  BP's OSRP described remotely activating emergency equipment using intervention technology using remotely operated vehicles (ROVs).  Tr. at 472 (Bea); Rohloff Dep. at 36-37, 40-42, 73-74; TREX 011754.29.7; TREX 000769.0179; Herbst Dep. at 324.  BP had access to ROVs prior to April 20, 2010 for immediate use in the event of a deepwater blowout.  McKay Dep. at 39.

82.     According to Admiral Allen, "[t]he use of ROVs to attempt to actuate a blowout preventer are part of [the] intended role of the blowout preventer" during a well control event.  Allen Dep. at 78.  MMS also believed that having the ability to do ROV intervention is a good thing and a very valuable tool and plan.  Domangue Dep. at 58, 140.  Transocean relies on these

17

secondary means of operating the BOP with ROV intervention if the primary means of well control have not succeeded.  Hand Dep. at 337.

83.     Immediately after the explosions on the *Deepwater Horizon*, many ROVs were brought in to assist the effort (Boughton Dep. at 87) and ROVs were used in the first few days after the explosions to attempt to activate the BOP.  Landry Dep. at 463; Herbst Dep. at 304.

<div align="center">

(c)      **BP's Source Control Plan Included the Industry Standard Practice of Assembling a Team of Experts to Assess and Address the Situation.**
</div>

84.     BP's OSRP described assembling a team of experts for responding to a deepwater blowout:

> [I]n the event the spill source cannot be controlled by the facility operator or remotely with the safety system, BP will activate the Oil Spill Response Plan and assemble a team of technical experts to respond to the situation.  The team will be comprised of personnel familiar with the facility, including production superintendents, foreman . . . .  The deputy incident commander or operations section chief will be responsible for monitoring information produced by the team.

Tr. at 472-73 (Bea); TREX 011754.29.7; Holt Dep. at 622; TREX 000769.0179.

85.     BP planned to have its team of well control specialists in place within twenty-four hours of a well control incident.  Rohloff Dep. at 34, 51-52.  The team of well control specialists would immediately analyze the situation and start working to develop potential solutions. Rohloff Dep. at 51-52, 56-57.

<div align="center">

(1)      **It Is Standard Industry Practice to Stand up a Team of Experts to Respond to a Spill.**
</div>

86.     The standard practice in the oil exploration industry for responding to a deepwater blowout is to stand up a team of well control and blowout response experts to assist with a blowout.  Tr. at 830 (Mazzella); Herbst Dep. at 84-85; Hand Dep. at 318, 349; Rohloff Dep. at 123, 181.

<div align="center">18</div>

87.     For responding to a deepwater blowout, MMS expected BP to stand up a source control team with the expertise to evaluate the situation and identify potential source control options that could be implemented to bring the situation back under control.  Tr. at 473 (Bea); Herbst Dep. at 60-61, 314.

88.     According to IADC Well Control Guidelines, "[T]he key to a sound, effective BCP [blowout contingency plan] is to designate and properly organize a team of individuals with the right combination of technical and operational capabilities."  TREX 007353.354.1 (IADC Well Control Guidelines, Oct. 1998); Tr. at 477 (Bea).  Dr. Bea noted that this statement was "very true" and represented good policy.  Tr. at 477 (Bea); TREX 007353.354.1.  Dr. Bea stated that it is a safety-related mitigation barrier for an oil company to have experts in the field to respond in the event of a blowout.  Tr. at 473 (Bea); TREX 011754.29.7.

89.     The experts on the source control teams would assist in responding to the specific scenarios encountered in the response to a blowout.  Tr. at 830-32 (Mazzella).

90.     BP's team of technical experts, as described in the OSRP, was to comprise "personnel familiar with the facility including production superintendents, foremen, facility engineers, and production and/or drilling engineers."  Holt Dep. at 32-34; TREX 010503.0006.

91.     Before the *Deepwater Horizon* incident, BP set up and trained an Incident Management Team to respond to an incident using the Incident Command System under the direction of an incident commander.  Rohloff Dep. at 25-26, 30; Bush Dep. at 8-9, 76 (BP's Crisis and Continuity Management/Emergency Response Center provided training for Incident Management Team members on how to operate within the confines of the ICS structure).

92.     The Incident Management Team's purpose was "to respond to incidents in [BP's] operation."  Bush Dep. at 109.  Once BP's Incident Management Team is activated, "they take the plan, and they run with it."  Bush Dep. 149.

93.     In the Gulf of Mexico, BP had identified a set of individuals who "were on call 24 hours a day" to respond to an incident as part of the "Incident Management Team."  Tr. at 588 (Dupree); Bush Dep. at 17, 148-49 (BP used the OSRP to activate the Incident Management Team and "to mitigate damage to the maximum extent practicable").

94.     BP set up an Incident Management Team duty roster, and members of the Incident Management Team were on a rotation to respond if an incident occurred.  Rohloff Dep. at 25; Bush Dep. at 17-18, 56.   Incident Management Team personnel "serve[d] one-week rotations" and BP "always [made] sure we ha[d] someone on call."  Bush Dep. at 17-18.

95.     BP had designated personnel to work on the Source Control branch of the Incident Management Team to tailor a source control response in the event of a deepwater blowout.  Bush Dep. at 24-25.  The individuals designated for the Source Control Branch of the Incident Management Team had a background in drilling and had "years of source control experience."  Bush Dep. at 33, 75.  They also had access to plans separate from and in addition to the OSRP.  Bush Dep. at 17-18, 75.

96.     BP's source control leader had significant training in the incident command system.  Tr. at 702 (Dupree).

97.     On the evening of April 20, 2010, BP's Incident Management Team was immediately activated to respond to the incident.  Tr. at 588 (Dupree).  That night, James Dupree spoke to an operations manager at BP who had already "raised" the Incident Management Team,

meaning "phone calls [were made] to those people who [we]re on call [to] get them into the crisis center immediately."  Tr. at 588 (Dupree).

<div align="center">

**(2)**   **BP's Team of Experts Included Leaders in the Field Who Contracted with BP Before the Incident.**

</div>

98.     In addition to the internal BP resources and personnel designated to be involved in a deepwater blowout, BP had contracted with outside well control specialists to be available in the event of an emergency.  Tr. at 477-78 (Bea); Tr. at 744 (Mazzella); Rohloff Dep. at 52, 296-97; *e.g.*, TREX 011467.

99.     BP's plan called for the retention of experts from different firms that could each bring unique capabilities to the task of responding to a blowout.  Tr. at 743-44, 750 (Mazzella). Engagement of experts from outside the company is important because it draws on the outside firms' knowledge of the different conditions and the techniques that have been used effectively to remediate other blowouts and can bring in the necessary equipment and people to "leverage" the exploration company's own resources.  Tr. at 749-50 (Mazzella).

100.     As set forth in BP's OSRP and WCRG, industry leaders in well control would be immediately called to assist in the event of a well control incident.  Rohloff Dep. at 48-49, 100; TREX 000769.0179, 0432-522; TREX 000769; TREX 002386.

101.     BP relied on its well control experts to remain up to date on available deepwater blowout control technology and equipment.  Rohloff Dep. at 140.

102.     Specifically, before the *Deepwater Horizon* incident, BP contracted with Wild Well Control for its services.  TREX 011467; Campbell Dep. Vol. I at 332-33; Tr. at 478-79 (Bea).  Wild Well Control contracts with 410 companies in the Gulf of Mexico to provide well control response in the event of an incident.  Campbell Dep. Vol. I at 333-34.  Wild Well Control

<div align="center">

21

</div>

had one of the best offshore response divisions in the well control industry, Tr. at 743-44 (Mazzella), and is a leader in their field, Tr. at 478 (Bea).

103.    It was consistent with industry practice for BP to have a company like Wild Well Control (with the capability of drilling a relief well) on retainer to assist with a catastrophe. Campbell Dep. Vol. I at 340-41.

104.    The Aligned Parties' spill preparedness expert, Dr. Bea agrees that having a company like Wild Well Control on standby is "prudent" and "part of a predesigned mitigation plan." Tr. at 480 (Bea).

105.    In its contract with BP, Wild Well Control also represented that it had the capabilities to respond if called upon in an emergency. Tr. at 479 (Bea); TREX 011467. Wild Well Control represented that "in the event of a well control incident, [Wild Well Control] will assist [BP] in evaluation of the situation, mobilization of materials, personnel and services required in the firefighting, recovery, capping, and relief well operations." Tr. at 479 (Bea): TREX 011467.69.1; Barnett Dep. at 294-95.

106.    Through its contract with BP, Wild Well Control agreed that it "shall provide or have access to, as well as identify personnel to provide, but not limit itself to: firefighting, surface blowout control, capping on fire capabilities, subsurface blowout control, engineering response and prevention capability, relief well design, and intervention and explosive expertise." Tr. at 480 (Bea); TREX 011467.

107.    In its contract with BP, Wild Well Control was empowered to get the necessary personnel and equipment needed for a response. Tr. at 745 (Mazzella). Wild Well Control had the ability to decline to do deepwater jobs if they believed there to be too great a risk to people or

the environment, but never needed to exercise the option while working for BP.  Campbell Dep. Vol. I at 310-12, Vol. II at 11.

108.    Wild Well Control's contract with BP was reviewed by BP's Well Control SETA Mark Mazzella.  Tr. at 734-35, 742-43 (Mazzella).  As BP's Well Control SETA, Mazzella reviewed contracts with BP's well control and blowout response specialists to ensure that the contracts provided for the necessary personnel and equipment to respond to a well control event or a blowout.  Tr. at 743, 745-46 (Mazzella).

109.    Mazzella signed off on the Wild Well Control Master Services Agreement on behalf of BP even though the agreement did not offer a deepwater capping stack.  Tr. at 746-47 (Mazzella).  He did so because "it's been [his] experience in the industry prior to Macondo that a Macondo-type capping stack had never been required" and "we relied on the well control specialists to help us understand what these [capping stack related] needs were."  Tr. at 746, 748 (Mazzella).

110.    Prior to joining BP, Mazzella had worked on hundreds of blowout responses worldwide.  Tr. at 734-36 (Mazzella); D23320.  Mazzella began to work directly at BP in 2005, after previously working at Cudd, (a well control and blowout response specialty firm) including as Vice President of Global Operations and Engineering at Cudd.  Tr. at 736 (Mazzella). Mazzella also ran his own well control response company (Global Pressure Control) that employed about 100 individuals.  Tr. at 736 (Mazzella).  In his development as a well control and blowout response professional, Mazzella was mentored by "legends" in the well control and blowout response industry, including Red Adair, Coots Matthews, Boots Hansen, and Bob Cudd. Tr. at 737 (Mazzella).  Prior to working at BP, Mazzella also served as an Incident Commander for some operators in blowout response, and as of September 2013 sat on the Well Control

23

Committee of the IADC.  Tr. at 736, 738 (Mazzella).  Mazzella has been elected by that Committee to serve on the IADC Review Board.  Tr. at 736, 738 (Mazzella).

111.    Before the *Deepwater Horizon* incident, BP retained other third-party contractors in addition to Wild Well Control.  For example, BP retained Cudd Pressure Control to assist in the event of a well control incident.  Tr. at 744 (Mazzella).  Cudd arrived on scene to assist BP the day after the *Deepwater Horizon* blowout.  Tr. at 749 (Mazzella).  Cudd Pressure Control had some of the best specialists in capping wells on land.  Tr. at 743-44 (Mazzella).

112.    Before the *Deepwater Horizon* incident, BP also had a contract with Boots & Coots.  Tr. at 744 (Mazzella).  Boots & Coots personnel also arrived on scene to assist BP the day after the blowout.  Tr. at 749 (Mazzella).  Boots & Coots were "the best relief well drillers." Tr. at 743-44 (Mazzella).

### (3)    Experts Are Needed Because Every Blowout Is Unique.

113.    "Every blowout is unique and will require different tools."  Tr. at 474 (Bea); *see* McKay Dep. at 66; Barnett Dep. at 333; TREX 010633.

114.    DEA-63, the 1991 joint industry study on blowouts recognized that all blowouts are different and require different solutions.  Tr. at 474-75 (Bea); TREX 011755.20.1.  It is impossible to generate a "cookbook procedure" that will work in all deepwater drilling blowout cases and circumstances.  Tr. at 474-75 (Bea); TREX 011755.20.3.

115.    The 1998 IADC Deepwater Well Control Guidelines (TREX 007353) recognized that "[b]lowouts do not always have a straightforward solution."  TREX 007353.357; TREX 007353.357.5.  "There are many instances where precise plans cannot be formulated until certain information is obtained."  Tr. at 477 (Bea); TREX 007353.357.5.  "It is important that the blowout task force [BTF] be capable of formulating feasible strategies based on experience and judgment."  Tr. at 477 (Bea); TREX 007353.357.5.

116.    Emergency well control operations must be performed on a "case-by-case basis." Herbst Dep. at 60.  Intervention methods must be "specific to the geometries" of the subsea configuration, as well as "the pressures, the temperatures and the water depths."  Inglis Dep. at 168-69.  The "response plans are a guide and they're a framework and they're foundation, and they have to be flexed and utilized based on the unique situation that—that is encountered." McKay Dep. at 216.

117.    Deepwater drilling introduces additional challenges not presented by conventional shallow water drilling.  Thierens Dep. at 15.  Containment of a deepwater blowout is more complicated than containment of a shallow water blowout.  Inglis Dep. at 124.  Complications in deepwater include, among others, deployment of equipment, high seafloor pressures, and low water temperatures.  Inglis Dep. at 124-25.

118.    It is "impossible to predict" the scenarios that will occur at a blowout in advance of the event.  Tr. at 831-32 (Mazzella).  Steve Hand, Transocean's Director of Performance and Operations, was skeptical that anyone could have predicted the circumstances associated with the *Deepwater Horizon*'s uncontrolled blowout in 5,000 feet of water where the BOP has failed to close-in the well.  TREX 010888.0004; Hand Dep. at 259, 266-67, 314, 462.

119.    One could not predict the amount of time required to resolve a blowout before the incident occurs.  McKay Dep. at 66, 119.

120.    The WCRG stated that "every well control event is unique and response and mitigation actions must be tailored to suit."  TREX 002386.0010.  The WCRG was not intended to be a "how-to-fix-it manual" for a response or a description of the specific tools needed for a response, because any given well control or blowout situation would involve too many variables to be included into one document; rather, the WCRG was premised on a need "to evaluate,

assemble a team … and then prepare the plan to go ahead" with what would be needed in the situation that presented itself.  Tr. at 779-80, 829-30 (Mazzella).

121.    Each response scenario requires custom-made equipment as small changes from one scenario to another "makes certain things that are applicable" to one "completely inapplicable" to the other.  Barnett Dep. at 334; Patteson Dep. Vol. I at 137.

<div align="center">

**(4)     BP's OSRP Plan to Stand up a Team of Experts Was the Same as Other Companies Operating in the Gulf of Mexico.**

</div>

122.    BP's OSRP followed the MMS's Notice to Lessees as to what should be included in the OSRP.  Tr. at 471 (Bea); Johnson Dep. at 92.

123.    At the time of the *Deepwater Horizon* incident, BP's OSRP Section 6.C contained information regarding source control response planning.  Bush Dep. at 28.  The source control methods contained in BP's OSRP were "very similar," if not "almost identical," to the OSRPs submitted by four other major oil companies in the Gulf of Mexico (Exxon, Chevron, ConocoPhillips, and Shell).  Tr. at 482-84 (Bea); TREX 008951.0001.  References to specific source control equipment were not required.  Herbst 40-42.

124.    Shell's OSRP Section 6.C reads: "A source control group is named on the spill management team.  Their duties are to assess the situation, contact well control specialists or divers, as necessary."  Tr. at 481 (Bea); TREX 142244.65.1.  Shell's OSRP does not contain any more specific source control procedures.  Tr. at 482 (Bea).  Shell is a company that Plaintiffs' process safety expert Dr. Bea described as "A plus, outstanding."  Tr. at 481 (Bea).

125.    Exxon's OSRP Section 6.C is "almost identical" to BP's OSRP.  Tr. at 483 (Bea).  Exxon's Section 6.C reads: "[i]n the event the spill source cannot be controlled by the facility operator or remotely with a safety system, ExxonMobil will activate the oil spill response plan and assemble a team to respond to the situation."  Tr. at 483 (Bea); TREX 142243.268.2.

126.   Chevron's OSRP Section 6.C is "very similar" to the language used in BP's OSRP.   Tr. at 484 (Bea).   In the event of an emergency, Chevron will "activate its oil spill response plan and assemble a team of technical experts to respond to the situation."   Tr. at 484 (Bea); TREX 142242.241.3.

<div align="center">

(d)   **BP Trained Its Employees for Responding to a Deepwater Blowout.**

</div>

127.   Prior to the *Deepwater Horizon* incident, BP employees had undergone training, drills, and exercises that addressed responding to well control events.   Holt Dep. at 35; Rohloff Dep. at 334.   BP's training for personnel to respond to a blowout included "a systematic approach" that assured the necessary personnel knew how to respond to an event.   Tr. at 741 (Mazzella).   The proper individuals at BP received "detailed training" in responding to blowouts. Tr. at 741 (Mazzella).   BP had personnel in its wells organization that had technical expertise in deepwater wells and well control.   Rohloff Dep. at 52, 334.

128.   As BP's Well Control SETA, Mark Mazzella supervised the training of BP employees to participate as necessary in a well control event or blowout response.   Tr. at 734, 739, 741 (Mazzella).   Mazzella believed BP personnel were trained to do what it was necessary for them to do in the Macondo response, including as part of the incident management plan.   Tr. at 741 (Mazzella).   As Mazzella explained, "what we would do is we would have a group of trainers.   There would be a systematic approach to the trainers .... From there, it would be carried out where the SPU well control TAs .... would provide the detailed training and break teams up into little groups and practice scenarios that were part of the training slides in the training curriculum."   Tr. at 741 (Mazzella).

129.   Before the *Deepwater Horizon* incident, one of the training resources used at BP was its Well Control Response Guide (the "WCRG") for deepwater well control events including

<div align="center">

27

</div>

blowouts.  Tr. at 739 (Mazzella); TREX 002386 (WCRG dated Jan. 2010); Rohloff Dep. at 146. The WCRG provided instructions on how to form teams needed for a blowout response within the Incident Management Team process.  Tr. at 739 (Mazzella); TREX 002386.0009.

130.    BP's Deepwater GoM SPU WCRG's objectives were to "provide a clear, concise instruction to key personnel in the event of a well control incident that are compatible with BP's tiered emergency response system [including] the call out procedures [and the] incident management team formation for a well control emergency."  TREX 002386; Tr. at 485 (Bea). Dr. Bea agreed that clear, concise instructions in the event of an emergency are "the right kind of thing to communicate to team members."  Tr. at 486 (Bea).

131.    The "big focus" of the "Operations" Section of the Incident Management Team was oil spill response, including the oil spill response plan and mobilization of response resources.  Rohloff Dep. at 26.  Members of BP's Incident Management Team were trained on and familiar with their roles on the Incident Management Team.  Rohloff Dep. at 25-26; Bush Dep. at 39.

132.    BP had a Crisis and Continuity Management Plan (TREX 011603) in place that covered BP's conduct in connection with Macondo well at the time of the *Deepwater Horizon* incident.  Johnson Dep. at 42; TREX 011603.0002.  BP's Crisis and Continuity Management Plan sets forth how BP would support its Gulf of Mexico Incident Management Team in an emergency situation.  Johnson Dep. at 42; TREX 011603.0003-04.  Sections of BP's Crisis and Continuity Management Plan include "notification and activation," "response process," and "training, exercising and plan ownership/maintenance."  TREX 011603.0002.

133.    As part of BP's training schedule, it had a worst-case discharge deepwater blowout drill scheduled for May 2010.  Rohloff Dep. at 105.

(e)      **BP Held Unannounced Spill Response Drills.**

134.    Prior to the *Deepwater Horizon* incident, the MMS conducted unannounced oil spill drills of BP.  Tr. at 466-68 (Bea); Herbst Dep. at 94; TREX 008975.  During these unannounced MMS drills, an operator would generally be expected to stand up a portion of its incident command structure.  Herbst Dep. at 95-96.  The MMS reported to BP on its performance on those unannounced drills.  Tr. at 466-68 (Bea); TREX 008975.

135.    On November 20, 2008, MMS held an unannounced drill, testing BP's "spill response preparedness" and "the effectiveness of [BP's regional] Oil Spill Response Plan." TREX 008975.0001; Herbst Dep. at 92-93.  For each of the categories on which MMS evaluated BP in the drill, including "Organizational Design Objectives," "Response Support Objectives," and "Requested Documentation," BP was given a "pass" rating.  Tr. at 467-68 (Bea); TREX 008975; TREX 008975.0002-03; Herbst Dep. at 93.

136.    MMS Regional Supervisor, Michael Saucier wrote in January 2009 to BP about one drill, stating "the purpose of this drill was to test your spill response preparedness and to assess the effectiveness of your oil spill response plan."  Tr. at 468 (Bea); TREX 008975.1.3.

137.    This MMS drill involved representatives from MMS and the United States Coast Guard.  Tr. at 466-67 (Bea); TREX 008975.1.4.  The MMS evaluator describing the drill noted that "safety was the highest priority during the response."  Tr. at 468 (Bea); TREX 008975.2.5. Dr. Bea testified that he would want to see this sort of attention to safety as part of a drill.  Tr. at 468 (Bea).

138.    In 2009 and 2010, BP was an MMS National SAFE Award Finalist.  Saucier Dep. at 201-02.  The National SAFE Award "recognizes and commends companies for exemplary conduct of safe and pollution-free operations by adhering to all regulations, employing trained

29

and motivated personnel, and going the extra mile to enhance safety and environmental protection." Saucier Dep. at 201-02; TREX 004740.0002.

> (f) **Before the *Deepwater Horizon* Incident, MMS Approved BP's Deepwater Blowout Response Plan.**
>
> > (1) **In Accordance with Regulations, Leaseholders Must Provide Their Deepwater Blowout Response Plans to MMS.**

139.    In accordance with federal regulations, BP was required to submit its Oil Spill Response Plan (TREX 000769) to the MMS for review and approval before BP could undertake any operations at the Macondo well.  30 C.F.R. §254.1 (2010); Rohloff Dep. at 332-33; McKay Dep. at 42-43, 492.

140.    BP submitted a regional Oil Spill Response Plan for its operations in the Gulf of Mexico that covered BP's operations at the Macondo well.  TREX 000769; Stipulated Facts at 4 (Rec. Doc. 7076); Saucier Dep. at 215; TREX 011753.0002 (MMS "encourages each OCS lessee or designated lease operator to submit and reference a regional OSRP that covers all of its existing OCS … facilities and leases in the Gulf of Mexico").

141.    Federal regulations also required BP to submit an Initial Exploration Plan (TREX 000768) to MMS for review and approval in order to obtain authorization to drill the Macondo well.  30 C.F.R. §250.201; Inglis Dep. at 127-28.

> > (2) **The MMS Reviews Deepwater Blowout Response Plans and Approves Them Only if They Meet Federal Requirements.**

142.    The MMS was responsible for ensuring that oil and gas operators who perform operations offshore are prepared to respond to a spill, both with surface response and subsea source control.  Herbst Dep. at 29-30.

143.   MMS approval of an OSRP demonstrates that the MMS determined that the OSRP met the requirements both of federal regulations and any applicable clarifying documents, including any applicable Notice to Lessee.  Herbst Dep. at 28-29.

144.   The MMS would not have approved BP's OSRP if the OSRP had not met all regulatory requirements.  Tr. at 464 (Bea); Saucier Dep. at 214.

145.   MMS approval of an IEP signifies that the MMS determined that the IEP met all applicable regulatory requirements.  Saucier Dep. at 209-10.

146.   The MMS would not have approved BP's IEP if the IEP had not met all regulatory requirements.  Saucier Dep. at 209-10.

### (3)   The MMS Reviewed and Approved BP's Deepwater Blowout Response Plan.

147.   The U.S. Department of Interior, through the MMS, approved BP's deepwater blowout response plan.  Allen Dep. at 14-15, 27-28, 105-06; Tr. 463-64 (Bea).

148.   On June 29, 2009, BP submitted its OSRP to the MMS for review and approval. Stipulated Facts at 4 (Rec. Doc. 7076).

149.   The MMS reviewed BP's OSRP, including the worst case discharge summary that BP provided.  Saucier Dep. at 213; Herbst Dep. at 43-44.

150.   The MMS concluded that the information in BP's OSRP was sufficient to meet the federal regulations and other requirements for an oil spill response plan, and approved BP's OSRP on July 21, 2009.  Stipulated Facts at 4 (Rec. Doc. 7076); Tr. at 464 (Bea); Saucier Dep. at 213; Herbst Dep. at 31.

151.   BP's OSRP met the federal regulations in place at the time of the *Deepwater Horizon* incident.  Allen Dep. at 654-55; Rohloff Dep. at 60, 62; McKay Dep. at 12-13.

152.    On February 23, 2009, BP submitted its IEP for the Macondo well to the MMS for review and approval.  TREX 008957.0002; *see also* Tr. 464 (Bea).

153.    The MMS reviewed BP's IEP and concluded that it was consistent with all federal regulations and approved BP's IEP on April 6, 2009.  Saucier Dep. at 209-10; TREX 008957.0002; Herbst Dep. at 69; Saucier Dep. at 209.

154.    Relief wells were, at the time of the *Deepwater Horizon* incident, the only source control measure that was specifically required to be included in an IEP.  Herbst Dep. at 59-60; Allen Dep. at 105-06 (the plans BP had in place, at the time of the incident, regarding the drilling of a relief well were deemed sufficient).

### (4)    The MMS Did Not Require or Expect Leaseholders in the Gulf of Mexico to Have Access to a Pre-Built Deepwater Capping Stack.

155.    BP's responsibility with regard to spill response preparation was to comply with the relevant federal regulations.  Cook Dep. at 326-27.

156.    Before the *Deepwater Horizon* incident, federal regulations did not require companies to have, or to have access to, a prebuilt deepwater capping stack.  Tr. at 496-97 (Bea); Allen Dep. at 75-76, 647; Domangue Dep. at 158; Cook Dep. at 323-24.

157.    Before the *Deepwater Horizon* incident, federal regulations did not require companies to research, test, or develop a pre-built deepwater capping stack.  Allen Dep. at 32-33.

158.    The MMS did not expect companies to develop equipment for a low probability event, like the *Deepwater Horizon* incident.  Herbst Dep. at 301-02.

159.    Before the *Deepwater Horizon* incident, Wild Well Control, an industry-leading well control response company, did not recommend the inclusion of a capping stack in a deepwater blowout response plan.  Campbell Dep. Vol. I at 326-27; Tr. at 479-80 (Bea).

160.    In the summer of 2010, there were no solutions waiting, ready, and immediately available (from the oil industry, the Government, or anywhere else) to stop the flow of oil from the *Deepwater Horizon* blowout.  Hunter Dep. at 50-51; TREX 009689.0005.

161.    No operator in the Gulf of Mexico referenced a pre-built deepwater capping stack in its response plan before the *Deepwater Horizon* incident, and no operator in the Gulf of Mexico had informed the MMS that it intended to use a pre-built deepwater capping stack in the event of a deepwater blowout.  Saucier Dep. at 211-12; Suttles Dep. at 219.

162.    MMS officials understood that blowouts "historically are very rare" (Herbst Dep. at 83), and that "[t]here is no real historical context – as far as what would be needed" for a blowout like the *Deepwater Horizon* incident.  Herbst Dep. at 301.  MMS officials also recognized that "planning for the events [like the *Deepwater Horizon* incident] that have never occurred would be difficult."  Herbst Dep. at 302.

163.    Before the *Deepwater Horizon* incident, the MMS conducted a study about the frequency and results of blowouts in the Gulf of Mexico for the period between 1992 and 2006 and published its findings.  Tr. at 492 (Bea); TREX 011752.  According to the MMS study, "the blowout with the longest duration during the current study was a period of 11 days …."  Tr. at 493 (Bea); TREX 011752.2.2.  The MMS study noted that "49 percent of the blowouts stopped flowing in 24 hours or less …" and "41 percent lasted between one and seven days."  Tr. at 493 (Bea); TREX 011752.2.2.

164.    Before the *Deepwater Horizon* incident, there had never been a deepwater blowout in water depth of 5,000 feet or greater.  Inglis Dep. at 117-18.

165.     MMS officials acknowledged that the *Deepwater Horizon* blowout was a "low probable (sic) [probability] event based on historical drilling in the Gulf of Mexico, ***both deepwater and shallow***." Herbst Dep. at 53 (emphasis added).

166.     MMS did not expect a company to "develop something or have something available for a very low probability event." Herbst Dep. at 301.

167.     The Aligned Parties' expert, Dr. Robert Bea, agreed that "there is no perfect approach to determine what is an acceptable and desirable risk associated with an engineering system." Tr. at 490 (Bea). In the context of industrial activities, all risk cannot be completely eliminated and some exposure to risk must be tolerated. Tr. at 489 (Bea).

> (g)     **It Was Not Industry Practice to Have a Pre-Built Deepwater Capping Stack.**

168.     Before the *Deepwater Horizon* incident, a deepwater capping stack was not available anywhere in the industry. Hunter Dep. at 53-55; Bhalla Dep. at 11-12, 15, 53-54; Frazelle Dep. at 442-43; Tr. at 745 (Mazzella); Allen Dep. at 465, 638-39; Saucier Dep. at 211; Herbst Dep. at 75, 361; Wellings Dep. at 19; Hand Dep. at 317.

169.     Before the *Deepwater Horizon* incident, the industry had not needed a pre-built deepwater capping stack to respond to a blowout. Further, before the *Deepwater Horizon* incident, the industry believed that a deepwater blowout would present unique conditions that would need to be evaluated by specialists before it would be possible to place a capping stack on a deepwater blowout. Tr. at 746-47 (Mazzella).

170.     Before the *Deepwater Horizon* incident, Wild Well Control had determined that because each blowout presented unique circumstances and challenges that required event-built equipment and because of the large degree of variation in potential blowout scenarios, it was not feasible to pre-fabricate a capping stack. TREX 011737R.0016; Barnett Dep. at 333-34.

171.    It is the role of well control service companies to provide equipment like a capping stack in responding to a well control incident.  Barnett Dep. at 326-27.

172.    Neither BP nor the oil and gas industry had "off-the-shelf componentry" to address the unique conditions at Macondo.  McKay Dep. at 65.

173.    The basic ram-type equipment included in a deepwater capping stack—the "dumb iron"—was available before Macondo, but the technology to connect the Capping Stack to the well in the manner it was at Macondo (on the flex joint above the LMRP) had not been explored before Macondo.  Tr. at 747 (Mazzella).

174.    Mark Mazzella, who had decades of experience in blowout response, had never seen any industry document, paper or presentation that suggested that a capping stack could or should be landed on the flex joint above the Lower Marine Riser Package.  Tr. at 747 (Mazzella). Prior to Macondo, everything that Mr. Mazzella had seen relating to the potential use of deepwater capping stacks assumed that the capping stack would require removal of the LMRP so that the capping stack could be landed on a standard subsea connector such as an H-4 connector on the top of the lower blowout preventer ("BOP") stack.  Tr. at 747 (Mazzella).

175.    DEA-63 noted that "affixing [a] capping stack to casing that is bent at an angle, egged, lipped, eroded, or split may be difficult" and that capping stacks "will probably be applicable only in certain low pressure situations."  Tr. at 500 (Bea); TREX 011755.42.1.

176.    Before the *Deepwater Horizon* incident, not even the MMS had thought about the possibility of pre-building a deepwater capping stack for a deepwater blowout.  Herbst Dep. at 82.

177.    Before the *Deepwater Horizon* incident, there had not been any work in the industry to determine how to use a capping stack in deepwater.  Herbst Dep. at 306-07.

178.   Admiral Landry recognized that BP was not "required to have equipment ready" and that when "the blowout occurred, [BP was] in compliance with MMS's regulations, and [BP was] in compliance with our regulations in terms of the—the Mobile Offshore Drilling Unit that was operating."  Landry Dep. at 439.

179.   Even after the *Deepwater Horizon* incident, at least as far as its role as a service company is concerned, Halliburton does not believe that any specialized pre-built equipment is necessary in order to respond to a blowout, beyond what is available for everyday operations. Vargo Dep. at 25.

### (1)   No Well Operator or Other Entity Had Access to a Pre-Built Deepwater Capping Stack.

180.   No one in the oil and gas industry, including deepwater drilling operators such as Chevron and Exxon, drilling contractors such as Transocean, and BOP manufacturers such as Cameron, had a pre-built capping stack that was ready and available to shut in the flow of oil from the *Deepwater Horizon* blowout.  Hunter Dep. at 53-55; Bhalla Dep. at 11-12, 15, 53-54; Frazelle Dep. at 442-43; Tr. at 745 (Mazzella); Allen Dep. at 465, 638-39; Saucier Dep. at 211; Herbst Dep. at 75, 361; McWhorter Dep. at 174-75; Tr. at 495-96 (Bea); Tr. at 317-18, 412 (Turlak).

181.   Before the *Deepwater Horizon* incident, no entity had ever even built a deepwater capping stack.  Thierens Dep. at 240, 370; Campbell Dep. Vol. I at 334-35, 339; Barnett Dep. at 326; *see also* TREX 011583.0005 (demonstrating that a deepwater capping stack was not used to stop the flow during the *Jim Cunningham* incident).

182.   Before the *Deepwater Horizon* incident, Transocean had drilled offshore wells for many different oil companies, including Shell, Chevron, ENI, Anadarko, and BHP, and did not have and was not aware of anyone having a prefabricated deepwater capping stack.  Tr. at 411-

12 (Turlak); Boughton Dep. at 209 (Transocean did not have any specific, pre-incident plans that addressed the contingency of hydrocarbons flowing after the failure of a blowout preventer on the sea floor).

183.   The oil and gas industry relied on specialist response firms to adapt surface capping stacks to address specific blowout situations, including the engineering needed for the connection between the surface capping stack and the well.  Tr. at 748 (Mazzella).

184.   Cameron, a BOP manufacturer, did not have a subsea capping stack before the *Deepwater Horizon* incident.  McWhorter Dep. at 174-75.

185.   Cameron surface BOPs had previously been configured by Wild Well Control, with whom BP had a contract to provide services and equipment in the event of a blowout, to be able to cap surface wells, but Cameron itself had not configured its BOP equipment into a capping stack.  McWhorter Dep. at 178, 189.

186.   Cameron is not aware of capping stacks being called the best available technology to stop the uncontrolled flow of oil through a well.  McWhorter Dep. at 179.

187.   During the response, BP sought out any equipment in the industry that could assist in the response, and Secretary Salazar held a meeting in Washington, DC with industry leaders in mid-June 2010 to attempt to source equipment.  Tr. at 598-99 (Dupree).  No operator was able to provide much equipment and no capping stack was available.  Tr. at 599 (Dupree).

188.   A subsidiary of Wild Well Control, Blowout Tools Inc., had access to surface capping stacks, but no capping stack like the one that was used on the Macondo Well.  Campbell Dep. Vol. I at 337.

### (2)    No Industry Publications Recommended a Pre-Built Deepwater Capping Stack.

189.    DEA-63 was an industry document that discussed subsea blowouts, but as the Aligned Parties' spill preparedness expert admitted, DEA-63 did not recommend building capping stacks.  Tr. at 501 (Bea); TREX 011755.49.3 ("equipment design is beyond the scope of this Phase I study"); TREX 011755.49.2 ("Initiation of Phase II of this study is not recommended at this time.").

190.    The recommendations for source control described in DEA-63 had not changed as of 2003 (Tr. at 501-02 (Bea); TREX 011755.49.3; TREX 011755.49.2; TREX 006299.6.1), and as of 2003, the IADC was not recommending development of a capping stack.  Tr. at 502 (Bea); TREX 007353.414.1.

191.    While the Aligned Parties rely on the 1999 PCCI Report "Oil Spill Containment, Remote Sensing and Tracking for Deepwater Blowouts: Status of Existing and Emerging Technologies" (TREX 005053), that report on its face "does not address deepwater well control."  TREX 005053.0007.

192.    The 1999 PCCI Report "Oil Spill Containment, Remote Sensing and Tracking for Deepwater Blowouts: Status of Existing and Emerging Technologies" (TREX 005053) recognizes that "because blowout scenarios vary, there is not a single subsurface collection device applicable to all scenarios."  TREX 005053.0007.

193.    The 1999 PCCI Report "Oil Spill Containment, Remote Sensing and Tracking for Deepwater Blowouts: Status of Existing and Emerging Technologies" (TREX 005053) does not recommend either the development or use of a prebuilt deepwater capping stack.   TREX 005053.0006.

194.    The 1998 IADC Deepwater Well Control Guidelines (TREX 007353) do not recommend the development or use of a prebuilt deepwater capping stack.  TREX 007353.0353-54.

### 2.    BP Implemented Its MMS Approved Source Control Plan with Diligence and Care.

195.    BP demonstrated that it was prepared to initially respond to the *Deepwater Horizon* incident.  Herbst Dep. at 303.  Pursuant to its OSRP, BP (1) attempted to remotely activate the BOP, (2) stood up a source control team under the incident command system, and (3) started planning to drill relief wells.  Herbst Dep. at 303-04.

196.    The "overriding" priority for BP during the *Deepwater Horizon* response was killing the Macondo well and stopping the flow of hydrocarbons.  McKay Dep. at 19, 531.

197.    BP's MMS approved source control plan formed the foundation for an unprecedented level of response that included thousands of vessels and hundreds of aircraft. McKay Dep. at 49.

198.    BP activated its Incident Management Team in Houston within hours of the incident.  Hayward Dep. at 252-53; Johnson Dep. at 120.  BP called the on-duty members of the Incident Management Team into the crisis center to begin responding to the incident.  Johnson Dep. at 120-21.

199.    BP supported its Incident Management Team throughout the response by providing resources (including employees) and facilities to the team.  Johnson Dep. at 121.

200.    The morning after the *Deepwater Horizon* blowout occurred, BP was standing up its crisis center in Houston and starting to implement its response plan.  McKay Dep. at 526-27.

201.    By May 1, 2010, BP had multiple work streams in place to stop the *Deepwater Horizon* spill, including ROV intervention to activate the BOP, relief well drilling, design of a

deepwater capping stack and similar techniques, and various containment options.  McKay Dep. at 531-32.

202.    The National Incident Commander established a "unity of effort" between the federal Government and BP, and according to Admiral Allen, none of BP's actions were a cause for concern.  Allen Dep. at 190-92.  BP timely and appropriately responded to Government directives regarding containment, capacity, and redundancy.  Allen Dep. at 258-63.

203.    The sequence of source control efforts reflected an attempt to control the well as early as possible without waiting for relief well intersection, and BP's efforts at the wellhead deserved high marks.  Allen Dep. at 207-08; TREX 009140.0001.

204.    During the *Deepwater Horizon* response, BP did everything it could possibly have done to shut in the Macondo well safely as quickly as practicable.  Tr. at 1169-70 (Adams).

205.    BP's participation in the Unified Command's response demonstrated sound engineering judgment, gave appropriate attention to the safety of workers engaged in the response, and enabled the Unified Command to secure the well safely as expeditiously as practicable, taking due account of uncertainties about the condition of the well, the need to minimize the risk of subsea broaching while mitigating environmental damage to the extent possible, the need to keep options open, and the need to avoid making the situation worse.  Tr. at 1169-70 (Adams); TREX 011737R.0004.

206.    "BP immediately accepted its responsibilities as a Responsible Party under the applicable statutes and regulations, and throughout the summer of 2010 exerted itself to mitigate the damage caused by the *Deepwater Horizon* incident."  TREX 011737R.0005.

207.    BP was an integral part of the Unified Command created to respond to the *Deepwater Horizon* incident, and worked to minimize the environmental impact of the thousands of barrels of oil being discharged into the Gulf of Mexico.  TREX 011737R.0005.

208.    "BP took steps to ensure the safety of the workers at the surface, as serious injuries and deaths [have] been known to occur on prior blowout responses."   TREX 011737R.0005.  "Intricate planning was necessary to allow the numerous vessels" operating on the surface "in close quarters to execute their simultaneous operations safely."   TREX 011737R.0005.

(a)    **BP's Conduct During the Response Demonstrates Its Diligence and Care.**

209.    During the response, BP collaborated with: (1) numerous Government agencies, including the Department of Energy and the Federal Science team, the Department of Defense, MMS, the EPA, and the USCG, (2) major oil and gas companies, including Exxon, Shell, Chevron, Conoco Philips, Anadarko, Marathon, Hess, Petrobras, and ENI, (3) oil and gas service companies, and (4) various members of academia.  TREX 002292.

210.    According to Secretary Steven Chu, BP was engaged in the response, wanted to stop the leak as soon as possible and marshaled the resources to stop the leak as soon as possible.  Chu Dep. at 59-60, 318-20.

211.    According to Admiral Allen, BP immediately mobilized resources and employees to respond to the incident.  Allen Dep. at 403-04.  BP's entire Gulf of Mexico resources became focused on the response (Rohloff Dep. at 158; Allen Dep. at 156-57, 197) including hiring third-party contractors to assist in the efforts (Allen Dep. at 157).

212.    Based on his observations of the response from April 21, 2010, through August 15, 2010, Bryan Domangue, Houma District Manager for MMS stated "given the circumstances

of the blowout and what occurred, I am convinced that the effort undertaken to get--to secure the well was the most anyone could do."  Domangue Dep. at 253-54.

213.    Based on his experiences in Houston during the *Deepwater Horizon* response, Admiral Cook testified "I believe [BP was] committed to fulfilling their responsibilities as a Responsible Party, and I believe [BP was] committed to shutting-in the well."  Cook Dep. at 636.

214.    Tom Hunter, former Director of Sandia National Laboratories, believed that BP was "doing an enormous amount of activity in a well-defined organized manner" during the response.  Hunter Dep. at 81.

215.    Admiral Allen gave "good marks to BP for its work at the well."  Allen Dep. at 467.

### (1)    BP Undertook a Massive, Unprecedented Response Effort.

216.    "The scale of the Response was unprecedented by any measure - manpower, physical and financial resources, and the level of cooperation between industry and government." Tr. at 1048 (Adams); TREX 011737R.0004.    The *Deepwater Horizon* response was also unprecedented in: (1) its water depth, (2) its complexity, and (3) the efforts made by BP.  McKay Dep. at 50, 544-45; Suttles Dep. at 358.  BP took its responsibility as a responsible party under OPA seriously, and in conjunction with the Unified Command, led the biggest response any company has ever mounted.  Hayward Dep. at 481; Hunter Dep. at 59-60.

217.    "At its peak, the collaboration during the *Deepwater Horizon* response brought together more than 47,800 responders."  McKay Dep. at 52, 538; TREX 006113.0072.

218.    BP's collaboration during the response brought together more than 6,000 marine vessels, including 5,800 vessels of opportunity to assist with and support the response efforts. McKay Dep. at 541-42; TREX 006113.0072.

219.    Doug Suttles' first conversation with Admiral Landry about BP's plans for the response included discussion about how the response team would be structured, and where it would be located.  Landry Dep. at 459-60, 463.

220.    The individuals working at the Command Center during the response included, among others, the Unified Command, BP, Transocean, and many Government entities, including the Department of the Interior, the Department of Energy, the Department of Homeland Security, USCG, MMS, NOAA, Sandia National Laboratories, the Navy, and the Air Force.  McKay Dep. at 537.  "[T]here were 600 companies" and "at least 50 or 60 Government scientists and technical experts" working together as part of the Unified Command.  McKay Dep. at 654. Those at the Command Center were working "shoulder to shoulder" 24 hours and day, seven days a week, to bring the Macondo well under control.  McKay Dep. at 537.

221.    BP's response efforts were designed, engineered, and built by a multidiscipline engineering team lead by BP with input from various contractors and individuals in the industry and Government, and were engineered and built on a 24-hour-[a-day] basis.  Hayward Dep. at 826-27.

222.    In the Houston based response space, there were 5,800 people "24/7 in that crisis center at any one point in time … includ[ing] the Coast Guard, the MMS, and all the engineering teams that we had there running during the response."  Tr. at 593 (Dupree).

223.    BP asked for, and received, assistance from the oil and gas industry during the response.  Tr. at 591-92, 598-99 (Dupree); McKay Dep. at 544; Herbst Dep. at 165.  Eight exploration and production operators, including ExxonMobil, Chevron, ConocoPhillips, ENI, Petrobras, Statoil, and Total also assisted BP with source control and response operations during the *Deepwater Horizon* response.  McKay Dep. at 540-41; TREX 006113.0072; D23250.

224.    BP prepared extensive work space for use during the response.  Tr. at 592 (Dupree).  For the Houston crisis center, "it was purpose-built, but it also ha[d] a training and learning center right next to it.  [BP] broke open the training and learning center so that we had a significant amount of square footage to work with .... And each of these teams would have their own area they were working in .... But in general, we were all on one big floor and we were all together in that floor."  Tr. at 592 (Dupree).

225.    In Robert, Louisiana, the Unified Command had a "major Command Center where a lot of the logistics and Admin and Finance had an office" as part of the "huge open space" where they were working with BP.  Landry Dep. at 86.

226.    Six deepwater drilling vessels worked with BP during the response to perform operations from containment to drilling relief wells.  McKay Dep. at 542; TREX 006113.0072.

227.    BP brought in two Floating Production Storage and Offloading vessels (FPSOs) during the response to provide additional containment options.  McKay Dep. at 542-43; TREX 006113.0072.  A group was devoted to these SIMOPS, and they required careful planning, procedures, and coordination.  Cook Dep. at 225.  As Admiral Cook testified, there were an extraordinary number of ships operating in close proximity during the response, and it was "phenomenal" that this was accomplished without any accidents.  Cook Dep. at 224-25.

228.    As contemplated in BP's deepwater blowout response plan, BP's response efforts during the *Deepwater Horizon* response included subsea, surface, and onshore intervention efforts.  McKay Dep. at 61.

229.    None of the subsea containment strategies used during the *Deepwater Horizon* response had ever been attempted in water depths similar to Macondo.  Herbst Dep. at 376; Tr. at 693, 707 (Dupree).

230.    BP called upon "every available industry and government capability that [it] could get [its] hands on" to help bring an end to the *Deepwater Horizon* incident.  McKay Dep. at 66, 544.

231.    BP leadership ensured that BP had launched, to the best of its ability, the maximum surface response to the spill possible, and made certain that everyone understood that no resources were to be spared, but that the full power and resources of BP were at the disposal of those responding to the incident.  Hayward Dep. at 804-05; Tr. at 602 (Dupree).

232.    BP brought in employees from its organizations across the world to assist with the response.  Inglis Dep. at 300.  BP's subsea response team included more than 1,000 engineers and scientists from BP, from the industry, and from all of the major science and engineering institutes in the United States.  Hayward Dep. at 828-29, 859-60.

233.    Even after the *Deepwater Horizon* incident, BP refurbished and repaired the equipment used and developed during the incident and made it available to other members of the oil and gas industry through the Marine Well Containment Company.  Rohloff Dep. at 15, 186-87, 197.

### (2)    BP Placed no Limitations on the Resources Called upon for the Response Effort.

234.    BP responded to the incident with everything it could conceive of, from the very beginning, without regard to cost.  Hunter Dep. at 59-60; Hayward Dep. at 275-76.

235.    BP never told the Unified Command not to try a source control option because it might cost too much.  Saucier Dep. at 238; Herbst Dep. at 237-38.  Cost was not a consideration in the response (Tr. at 602 (Dupree); Campbell Dep. Vol. I at 350; Tr. at 1048 (Adams); TREX 011737R.0004) and cost was never a factor in BP determining what action to take.  Saucier Dep. at 238.

236.     During the time when Admiral Allen worked with BP on the response, he did not "believe [he] ever heard the issue of cost raised."  Allen Dep. at 311.

237.     Ultimately, BP spent over $1.6 billion for source control during the *Deepwater Horizon* response.  Tr. at 1048 (Adams); TREX 011737R.0004.

<div align="center">(3)      <strong>The Response Placed Focus on the Collection of Oil.</strong></div>

238.     BP's Deepwater Blowout Response Plan included plans to address the collection and mitigation of oil on the surface.  Rohloff Dep. at 101-02; McKay Dep. at 12-13, 45-46.  As required by MMS, BP's OSRP listed various Oil Spill Response Organizations (OSROs) that BP would rely on in the event of a spill.  Herbst Dep. at 35.  BP's OSRP also identified specific equipment that would be used for recovery of oil on the surface.  Rohloff Dep. at 343-44.

239.     Before the incident, BP contracted with National Response Corporation ("NRC") and Marine Spill Response Corporation ("MSRC") to provide assistance with surface oil and mitigation in the event of an oil spill.  Rohloff Dep. at 50-51, 55; TREX 000769.0497.

240.     Concurrently with other source control options, BP developed the Containment and Disposal Project ("CDP") with the goal of collecting all hydrocarbons before they hit the seawater and transporting them to a production, storage, and offloading vessel, the *Helix Producer*.  Tr. at 914 (Ballard).

241.     BP simultaneously progressed several different options to collect oil to mitigate its impact on the environment including the cofferdam, riser insertion tool ("RITT"), and Top Hat.  Tr. at 600 (Dupree); D23231A; Barnett Dep. at 325-26 (at the time of the incident, a cofferdam (converted to a pollution dome), a RITT, or a Top Hat did not exist in the industry).

242.     Before the *Deepwater Horizon* blowout was capped, the various collection techniques captured a total of 810,000 barrels.  *See* February 19, 2013 Stipulation Mooting BP's Motion for Partial Summary Judgment Against The United States (Rec. Doc. 8620).

<div align="center">46</div>

243.    BP developed a RITT which was successful in collecting oil from the riser.  The amount of hydrocarbons collected was highly variable because the flow rate was intermittent at the time the RITT was in use.  Hayward Dep. at 260-61, 825.  Admiral Landry approved the RITT procedure.  Landry Dep. at 361-62.

244.    BP further developed a "Top Hat" which was placed over the LMRP and was successful in collecting some oil and gas.  Hayward Dep. at 261, 826.  Admiral Landry approved the Top Hat procedure.  Landry Dep. at 361-62.

245.    The *Discoverer Enterprise* was a unique vessel and the only vessel in the Gulf of Mexico that could collect hydrocarbons at the time of the *Deepwater Horizon* incident.  Tr. at 604 (Dupree); Campbell Dep. Vol. I at 358-59; Barnett Dep. at 328; Suttles Dep. at 513; Cook Dep. at 208-09 (there are a limited number of ships that can collect hydrocarbons and those are typically "not authorized for U.S. service").  The *Discoverer Enterprise* could collect approximately 15,000 barrels of oil per day.  Suttles Dep. at 511.

246.    The Top Kill manifold was also used to flow oil to the *Q4000* to be flared.  Tr. at 604 (Dupree).

247.    BP worked to increase collection capacity throughout the incident.  Allen Dep. at 599-600; Inglis Dep. at 346; TREX 009165.0001.  BP "brought all the equipment that it could …. bring to bear" to collect oil on the surface.  Inglis Dep. at 151; Cook Dep. at 201 ("everybody who worked [at the Houston Incident Command Post] was just thinking towards making sure we could contain the most oil possible").

248.    BP was still building additional collection capacity when the well was shut in. Suttles Dep. at 491.

(b)     **BP Implemented Its Source Control Plan Under Federal Government Supervision.**

249.    The federal Government had the responsibility and authority to approve procedures and direct the response.  Allen Dep. at 627-29; *see also* Stipulated Facts at 4-5 (Rec. Doc. 7076).

250.    The National Contingency Plan is the federal blueprint for responding to an oil spill.  Landry Dep. at 62.  The National Contingency Plan sets forth the command structure for responding to a spill.  Landry Dep. at 62.  Within the command structure established by the National Contingency Plan is the National Response Team.  Landry Dep. at 62.  The National Response Team is "made up of several federal agencies who can bring the necessary coordination and statutory authorities to the response."  Landry Dep. at 62-63.

251.    The role of the Federal On-Scene Coordinator ("FOSC") as described in the National Contingency Plan is as "the ultimate authority for decisions based in executing operations in a response, [and] statutory authority and obligation to execute the response."  Landry Dep. at 64; *see also* Stipulated Facts at 2, 5 (Rec. Doc. 7076).  Even though the Unified Command involves multiple stakeholders, the FOSC is the ultimate decision maker in the Unified Command System.  Landry Dep. at 64; Herbst Dep. at 97, 151.

252.    Beginning the night of April 20, 2010, response efforts were under the direction and control of the FOSC, and under the direction and control of Unified Area Command from its establishment on April 23, 2010.  TREX 011737R.0007; Stipulated Facts at 2-5 (Rec. Doc. 7076).

253.    The Unified Command used the Incident Command System organizational structure to organize and carryout the *Deepwater Horizon* response.  Stipulated Facts at 5 (Rec. Doc. 7076).  BP personnel were always present working within the Unified Command.  Saucier

48

Dep. at 238.  BP worked within the Incident Command System throughout the response.  McKay Dep. at 160.

254.    The Unified Command consisted of the FOSC, the State Representative, and the Representative of the Responsible Party.  Allen Dep. at 405-10.

255.    The Unified Command agreed that source control operations would be run out of the Houston Crisis Center, which was designated as an Incident Command Post, because Houston was where all of the engineers were and where the majority of the industry was located.  Tr. at 581, 589 (Dupree); *see also* Stipulated Facts at 6 (Rec. Doc. 7076).

256.    On April 29, 2010, the incident was declared a Spill of National Significance, and, on May 1, Admiral Thad Allen was appointed National Incident Commander.  Allen Dep. at 86-87, 405-06; Stipulated Facts at 6 (Rec. Doc. 7076).

257.    Prior to implementation of the National Incident Command structure, Admiral Allen (as Commandant of the Coast Guard) had been briefed and consulted on response efforts, including source control, and had been part of frequent "Senior Leadership" discussions about the response.  Allen Dep. at 16-17, 85-87, 188-90.

258.    When the National Incident Commander issued an order, BP complied.  Allen Dep. at 288.  BP "needed [Admiral Allen's] approval before [BP] could go ahead" with any intervention recommendations that were made.  Hayward Dep. at 824.

259.    Statutory responsibility for source control rested with the MMS.  Landry Dep. at 71.  The MMS had direct oversight of BP's source control efforts.  Landry Dep. at 358.

260.    Although the MMS had statutory authority for source control, the FOSC's team was "looking over MMS's shoulder to lend any additional expertise."  Landry Dep. at 75.  "BP

proffered several proposals for Source Control … over the … time I was FOSC, and MMS was the approving authority, and [the FOSC] signed off."  Landry Dep. at 445.

261.    During the response, Admiral Landry, as FOSC executed her responsibility to ensure the Responsible Party acted efficiently, effectively, and minimizing environmental and economic impact.  Landry Dep. at 64-65, 69-70.  Admiral Landry, as FOSC, "coordinates the response on the front line, oversees BP's efforts, and directs additional actions where necessary." Landry Dep. at 73-74; TREX 009497.

262.    The MMS and USCG approval was required before any source control procedure could be implemented.  Saucier Dep. at 387.  Throughout the response, the MMS provided oversight over the source control intervention strategies that were proposed.  Herbst Dep. at 101. The MMS and USCG personnel in Houston participated in the drafting of source control procedures.  Saucier Dep. at 386.  Mr. Saucier never felt that he or the MMS were excluded from the source control decision making process.  Saucier Dep. at 240-41.

263.    Secretary of Energy Steven Chu and Secretary of the Interior Ken Salazar were personally involved and actively engaged in the response efforts, and would at times be at the Houston Incident Command Post.  Tr. at 590 (Dupree); Hunter Dep. at 33-34, 40-41; TREX 009686.0003; TREX 009687.0003; TREX 008976.0001; Herbst Dep. at 103.  During the response, high-level BP employees served as liaisons to Government officials, including Secretaries Salazar and Chu and Admiral Allen, regarding source control efforts.  Allen Dep. at 276-77.

264.    "[M]ost of the [Department of Interior] personnel" that participated in the *Deepwater Horizon* response *were* trained in well control and the incident command system, and many had "on the job" training that was relevant to source control during an offshore blowout.

50

Herbst Dep. at 87-88.  The Coast Guard Marine Inspectors had post-graduate backgrounds in engineering, and they were involved in developing source control procedures and HAZOP and HAZID exercises.  Cook Dep. at 76.

265.  Then-Lieutenant Commander Richard Brannon (now Commander Brannon) was the United States Coast Guard Federal Incident Commander for the Houston Incident Command Post ("ICP"), taking over from Commander Mark Shepard on May 15, and remaining in that role until July 1.  Brannon Dep. at 18, 56, 60, 97.

266.  Commander Brannon was a member of the Coast Guard's Gulf Strike team, which specialized in oil spill response.  Brannon Dep. at 17; Cook Dep. at 50.  He was in day-to-day command of the Houston ICP, which required "working with BP's Unified Commander on decisions regarding tactical operations" and required the management of USCG and MMS personnel who were working with BP engineering teams on source control procedures.  Brannon Dep. at 18-22.  He reported directly to the National Incident Commander, Admiral Thad Allen, whom he copied on most communications.  Brannon Dep. at 22.

267.  Dr. Marcia McNutt led the Government's Flow Rate Technical Group ("FRTG") which was formed to calculate a flow rate.  Tr. at 591 (Dupree).  BP was not invited to participate in the FRTG.  Tr. at 591 (Dupree); D23250; TREX 009678 (May 19, 2010 E-Mail from D. Moore, member of the NIC Interagency Solutions Group, to members of the FRTG stating "Please remember that the only role of BP in the exercise is in providing access to data").  Dr. McNutt was also Secretary Salazar's representative in the Houston Incident Command Post when Secretary Salazar was not there.  Tr. at 591 (Dupree); Brannon Dep. at 26; Cook Dep. at 58.

268.    Captain Patrick Little was Chief of Staff to Admiral Landry, and was involved in reviewing the technical aspects of procedures sent to her for approval, giving the Coast Guard a firsthand view of the highly technical nature of the source control efforts.  Brannon Dep. at 47-48; Cook Dep. at 104, 415-16.

269.    Rear Admiral Kevin Cook was Admiral Allen's representative at the Houston ICP from May 23, 2010.  Cook Dep. at 30.  Admiral Allen selected Admiral Cook because he wanted somebody with a strong technical background to help him understand Source Control efforts. Cook Dep. at 35-36.  Admiral Cook had a background in chemical engineering, and had been involved in responding to oil spills for almost two decades at the time of the *Deepwater Horizon* incident.  Cook Dep. at 12, 27-29.

270.    The Coast Guard provided the Government expertise in maritime operations, and brought in personnel with engineering backgrounds.  Cook Dep. at 55-56.  The MMS provided the Government expertise in drilling and subsea equipment.  Cook Dep. at 55-56.

### (1)    BP, the Federal Science Team, and the Unified Command Consistently Worked Together to Face Unprecedented Challenges.

271.    The source control effort between May and September 2010 was a massive, collaborative undertaking involving Government agencies, industry, and academia.  Hunter Dep. at 96-97; TREX 009676.0001.  There were "a lot of good people working together on both sides."  Cook Dep. at 433-34.

272.    "Government scientists and engineers [worked] with BP to use the best, most advanced technology that exists to try to stop the flow of oil as quickly as possible."  Landry Dep. at 74; TREX 009497.

273.    According to Admiral Allen, BP was transparent about source control issues with the federal Government, and the environment was collaborative.  Allen Dep. at 34, 271-74, 303-

08.    Mr. McKay, himself, frequently served as BP's "liaison" between Secretary Salazar, Secretary Chu, Administrator Jackson, Admiral Allen and the highest levels in the U.S. Government regarding the development of source control methods and their prioritization. McKay Dep. at 529-30.

274.    Within the first day or two of the response U.S. Coast Guard personnel arrived in the Houston Incident Command Post which had been established to handle the source control efforts. Tr. at 589-90 (Dupree). The MMS also sent representatives, as did the Departments of Interior and Energy. Tr. at 590 (Dupree); D23250.

275.    U.S. Government representatives were "in the BP offices" during the response. Landry Dep. at 198. The MMS was "[e]mbedded" in the source control team and the Unified Command from "day one" during the response. Herbst Dep. at 79, 104-05; TREX 008976.0001; Domangue Dep. at 14-15, 78-79, 92, 104-05.

276.    In early May, President Obama directed Dr. Chu, in his capacity as Secretary of Energy, to form a Federal Science Team to work with BP on source control efforts. Chu Dep. at 63. "The complexity, duration, and difficulty of controlling the oil discharged .... required the establishment of a Federal Science Team to provide source control oversight of [BP's] efforts." Hunter Dep. at 26-28; TREX 009686.0002. The Federal Science Team consisted of scientists employed by Sandia, Lawrence Livermore, and Los Alamos National Lab. TREX 011737R.0007; Tr. at 590 (Dupree). "The Department of Energy ha[d] engaged some of the world's top scientists and engineering minds from Sandia, Los Alamos, and Livermore Labs to lend their experience." Landry Dep. at 74; TREX 009497.

277.    The Federal Science Team was led by Secretary Chu, and gave the U.S. Government an opportunity to investigate, analyze, and understand each potential source control

53

option and to provide feedback to the Unified Area Command.  Tr. at 590 (Dupree); Allen Dep.
at 277-80; *see also* Stipulated Facts at 2 (Rec. Doc. 7076); Hunter Dep. at 24-25.

278.   The Federal Science Team was present at the Houston ICP to provide oversight
and review proposed procedures, advising senior Unified Command decision-makers on whether
proposed procedures were good, bad, or required changes.  Brannon Dep. at 26-27; Cook Dep. at
65; Herbst Dep. at 155; Stipulated Facts at 7 (Rec. Doc. 7076) (the Federal Science Team "was
convened by Secretary of Energy Chu and Secretary of Interior Salazar to, among other things,
assist in reviewing and analyzing source control procedures developed" at the Houston ICP).

279.   The Unified Command did not approve any source control plan or procedure
without the Federal Science Team first reviewing, commenting, and providing input.  Allen Dep.
at 281-85, 287-88; TREX 009178 (clip 1 and clip 2).

280.   Members of the Federal Science Team (Department of Energy and National
Laboratories) arrived in Houston the first week of May 2010.  Secretary Chu arrived in Houston
on May 12, 2010.  Chu Dep. at 53-56; TREX 006113.0002.

281.   The Federal Science Team included Secretary Steven Chu, Tom Hunter, Richard
Garwin, Alex Slocum, George Cooper, Arun Majumdar, and other Government scientists.  Chu
Dep. at 27-28.

282.   The Federal Science Team was directly involved in the response and analyzed
source control strategies in an attempt to help stop the leak.  Chu Dep. at 29-30, 64-65.

283.   The National Laboratories (Sandia, Lawrence Livermore, and Los Alamos
National Laboratories), also referred to as the Tri-Labs, supported the Federal Science Team.
Chu Dep. at 30-32.

284.    The Federal Science Team was embedded with BP's response team in BP's Houston Crisis Center, and "had access to conference rooms resplendent with data all over the walls" from the well, as well as ROV footage being streamed live.  Hunter Dep. at 74-76.

285.    For example, BP provided riser and BOP inspection data, including radiography data, to the Government during the response, who conducted independent processing and validation of the raw radiographic data.  Knox Dep. at 166-67, 170, 428-31.

286.    The United States Coast Guard had representatives embedded with BP in all steps of the source control solution development process: concept, design, planning, hazard analysis, and development of procedures.  Brannon Dep. at 48-49, 162-63; TREX 010672.0001; Cook Dep. at 75.  The goal was to provide a high-level review of risk identification and risk mitigation for the Federal On-Scene Coordinator.  Brannon Dep. at 49-50.

287.    There was active communication between senior employees of BP and senior officials of the Government throughout the *Deepwater Horizon* response.  Cook Dep. at 41-42.

288.    Commander Brannon and the federal officials under his command worked with BP on developing source control options and planning operations.  Brannon Dep. at 19-21. Commander Brannon had daily meetings with BP personnel, including Andy Inglis, James Dupree, Bernard Looney, and Richard Lynch, as well as regular meetings with the BP engineering teams.  Brannon Dep. at 23-25.

289.    While stationed at the Houston ICP, the MMS personnel worked with BP engineering teams to develop source control procedures.  Brannon Dep. at 21.

290.    The Coast Guard and the MMS each had an office at BP's Westlake offices. Brannon Dep. at 24; Cook Dep. at 50-51, 54-55.  The Coast Guard had access to BP's Houston Crisis Center and the rooms within, including the rooms where the BP engineering teams were

working.  Brannon Dep. at 24-25.  There were no restrictions placed on where the Coast Guard representatives could go, and they were free to interact with the BP engineering teams.  Cook Dep. at 75-76.

291.    If the Coast Guard or the MMS personnel had any concerns about a source control procedure, they would raise it with the BP engineering teams.  Brannon Dep. at 25.  BP and the federal officials would attempt to work through those concerns, and they might change the proposed procedure or otherwise try to mitigate those concerns.  Brannon Dep. at 25-26.

292.    To coordinate the source control efforts and keep everyone informed of each option's progress, twice-daily interface meetings were held at 6:30 a.m. and 4:30 p.m. Central. Tr. at 593 (Dupree); Brannon Dep. at 35-36; TREX 009406.0004; Stipulated Facts at 6 (Rec. Doc. 7076).  The USCG and the MMS attended these meetings and there was an open phone line to the Unified Command.  Tr. at 593-94 (Dupree); Brannon Dep. at 35-36; TREX 009406.0004; Stipulated Facts at 6 (Rec. Doc. 7076); Hand Dep. at 33-34.  Admiral Landry, and other Coast Guard representatives, would call into the meeting.  Brannon Dep. at 46.  Federal scientists and other federal officials, including Secretary Chu, Admiral Cook, Dr. Marcia McNutt, and Secretary Salazar, would attend this meeting when they were in Houston.  Brannon Dep. at 35-36, 45-46.  The leaders of the each of the respective teams would report on the prior 24 hours of work and what was anticipated to occur in the next 24 hours.  Tr. at 593 (Dupree); Brannon Dep. at 35-36; Cook Dep. at 95-96.  At the conclusion of the meeting the leader of the meeting would make sure if anyone needed more information or had anything they wanted to contribute.  Tr. at 594 (Dupree).

293.    Additionally, the Unified Command and the National Incident Commander received briefings continuously throughout the event.  Allen Dep. at 16-17, 114.  Every morning,

there was a call at 9:00 a.m. Eastern, 8:00 a.m. Central, with Admiral Allen, Secretary Salazar, Secretary Chu, and senior BP officials.  Participants on the call discussed a Gantt Chart that laid out the different source control options under consideration.  Allen Dep. at 47-48, 423-24; Stipulated Facts at 7 (Rec. Doc. 7076); Brannon Dep. at 38; TREX 009406.0004; Cook Dep. at 91.  This call would last between twenty minutes and one hour, and it afforded the Secretaries an opportunity to ask questions and seek out additional information about upcoming procedures and any alternatives.  Brannon Dep. at 39; Tr. at 595-96 (Dupree).  Discussions included the risks involved in the procedures under consideration, and the Secretaries took advantage of the opportunity to ask questions, and were interested and involved in the process of selecting Source Control procedures.  Brannon Dep. at 39-40; Tr. at 595-96 (Dupree).

294.    There were also Area Command Conference Calls at 7:30 a.m. and 5:00 or 5:30 p.m. in the Unified Command, where they would receive updates from the Incident Command Posts to keep the Unified Command informed on what was transpiring.  Saucier Dep. at 128; Stipulated Facts at 6 (Rec. Doc. 7076); Brannon Dep. at 36-37, 44-45; TREX 009406.0004. During this call, the Houston ICP would update the other ICPs on discussions that had taken place at the 6:30 a.m. and 4:30 p.m. daily Interface Meetings.  Brannon Dep. at 37.  The 5 p.m. call every afternoon was led by Secretary Napolitano and included Admiral Allen, Secretary Chu, Lisa Jackson, and David Hayes.  Allen Dep. at 420-24; TREX 009406.0004, 0007.

295.    At 6:00 a.m. and 6:00 p.m. daily there was a Shift Change/Operations Brief meeting attended by the Federal Incident Commander, Incident Commanders and their deputies (including BP's Incident Commander), and representatives working in the operations, logistics, finance, operations planning, and documentation areas of the Incident Command Structure. Brannon Dep. at 31, 34-35, 45; TREX 009406.0004.

296.     At 8:30 a.m. daily there was a SIMOPS meeting, which was usually attended by a representative of the Coast Guard.  Brannon Dep. at 40; TREX 009406.0004.  "SIMOPS" refers to surface vessels conducting simultaneous operations in close proximity to each other.  Brannon Dep. at 255.  During the Response, numerous large vessels were operating within just feet of each other, which was a daily concern, presenting a major challenge to responders.  Brannon Dep. at 255-56.

297.     At 9:00 a.m. daily there was a Command and General Staff meeting involving the Federal Incident Commander and other Incident Command personnel, where activities for the previous 24 hours and the next 24 hours were discussed.  Brannon Dep. at 40-42; TREX 009406.0004.  At 3:00 p.m. and 3:30 p.m. daily the same attendees would hold a Tactics meeting and then a Planning meeting to discuss and approve the work plan for the next 24 hours.  Brannon Dep. at 42-43; TREX 009406.0004; Cook Dep. at 93-94.

298.     In addition to these scheduled meetings there were ad hoc meetings between BP and the Government personnel at the Houston ICP.  Cook Dep. at 98-99; Tr. at 618-19, 656, 665 (Dupree).

299.     Admiral Cook commented that "[i]n addition to having [his] questions answered in meetings, [he] created the opportunity to engage key BP seniors in their work spaces.  TREX 009409.0001; Cook Dep. at 127-28.  They were very willing to make time and seemed candid in their assessments of [courses of action] and potential pitfalls."  TREX 009409.0001; Cook Dep. at 127-28.

300.     The decision-making process was not a matter of BP presenting information and the Government making a decision based on that information.  Cook dep. at 382-83; Tr. at 595-96 (Dupree).  The process was open-ended and the Government had the opportunity to request

more information—it was a continuous discussion.  Cook Dep. at 382-83; Tr. at 595-96 (Dupree).

301.    As Admiral Cook noted, "there were skeptics in … every containment scenario that was being presented."  Cook Dep. at 144.  "[E]ach [Source Control method] had its own risks, each presented its own contribution to mitigating the spill or eliminating the source." Cook Dep. at 145.

302.    The Government was always looking at the risks involved in any source control procedure.  Cook Dep. at 328-29.  Sometimes this delayed implementation of a source control procedure until both BP and the Government agreed that identified risks had been appropriately mitigated.  Cook Dep. at 328-29.  Source control procedures were not ready for deployment until the Government said they were ready.  Cook Dep. at 330-31; Tr. at 596 (Dupree).

303.    The federal Government also engaged outside industry to evaluate response efforts.  Allen Dep. at 49; *see also* Stipulated Facts at 3 (Rec. Doc. 7076).

304.    A tremendous amount of engineering was done to control the well.  Allen Dep. at 308-11; TREX 009178 (clip 3); TREX 011737R.0004.

305.    Throughout the response, the Unified Command had to adjust plans for killing the well based on the individual circumstances of the blowout.  McKay Dep. at 65; Tr. 601-02 (Dupree); Tr. at 1160 (Adams).

306.    There was a general agreement between the National Incident Commander Admiral Thad Allen and BP that well control and well kill were the first response priorities, and that flow rate work (*e.g.*, use of ROVs for flow rate estimation purposes) had to be conducted so as to not interfere with source control efforts.  McNutt Dep. at 431-33.

307.   BP worked collaboratively with the Government, bringing a host of resources to bear on the problems encountered during the response.  McNutt Dep. at 474-75; Hunter Dep. at 39-40, 61-63, 90-91; TREX 009689.0010; TREX 009676.0001.

308.   "Government scientists and engineers [were] working with BP to use the best, most advanced technology that exists to try to stop the flow of oil as quickly as possible." Landry Dep. at 74; TREX 009497.

309.   For major intervention operations, BP invited not only the Government's Well Kill Review Team, but also a large review board drawn from other oil companies, oil field service companies, and well intervention specialists from all over the world to participate.  The reviews frequently resulted in additional follow up reviews prior to final recommendations concerning the procedures under consideration.  Hunter Dep. at 31-33; TREX 009686.0003.

310.   BP's work with Transocean, as well as other companies, on source control was a team effort.  Hand Dep. at 452-54 (testifying that source control was a team effort between Transocean, BP, and other companies, and that Transocean was represented at Unified Area Command).

311.   The Unified Command approached Transocean where they had questions about the BOP.  Hand Dep. at 38.

312.   Transocean provided representatives to support source control initiatives, including the Capping Stack, the BOP-on-BOP option, and ROV intervention.  Hand Dep. at 41. Transocean ensured that these representatives had the requisite expertise, and Transocean representatives would participate in the daily calls run by Unified Command, during which an update would be provided on progress over the past 24 hours and the actions planned for the next 24 hours.  Hand Dep. at 31-32, 42-43.

313.    Steve Hand, Transocean's Director of Performance and Operations, never felt that BP was shortchanging resources, manpower, technical support, contractors, or financial resources during the response effort.  Hand Dep. at 259; 267 (testifying that he was impressed with the response effort that he participated in).  Mr. Hand personally attended peer reviews and meetings on individual projects "to provide any input required from Transocean."  Hand Dep. at 36.

314.    Transocean was the largest offshore driller in the world in 2010 and held itself out as the premier expert in drilling offshore wells.  Hand Dep. at 109.  Transocean should know the abilities and limitations of its equipment.  Hand Dep. at 109-10.  After the explosions, Transocean wanted to shut in the Macondo well.  Hand Dep. at 96.  If Transocean knew of specific types of interventions that it believed could shut in the well, it would have shared and promoted them.  Hand Dep. at 96-97.  Likewise, if Transocean knew of certain intervention strategies with respect to its BOP that would not work, it should have shared that information.  Hand Dep. at 96-97.

           **a.**      **No Source Control Strategy Could Be or Was Implemented Without Approval by the Federal Government.**

315.    The Unified Command had the ultimate approval authority for source control operations.  Tr. at 596 (Dupree); Tr. at 759 (Mazzella); Tr. at 228 (Perkin); Holt Dep. at 323-24; McKay Dep. at 480; TREX 002292.0002.

316.    The federal Government, through the FOSC and the National Incident Commander ("NIC"), was in charge of the source control efforts during the *Deepwater Horizon* response.  Herbst Dep. at 153; Domangue Dep. at 204-05, 207-08; D23250.  The FOSC had the authority to direct BP's source control actions.  Brannon Dep. at 72; Cook Dep. at 73-74; Saucier Dep. at 402.  BP would propose possible source control solutions, but the decision to move

forward with any of them rested with the federal Government.  Cook Dep. at 380-81; *see also* TREX 009675.0003-04.

317.    Admiral Thad Allen, National Incident Commander, was the ultimate decision maker for the U.S. Government during the incident response, and ultimately approved decisions on the path forward.  McNutt Dep. at 474; Hayward Dep. at 824; Hunter Dep. at 33-34; TREX 009686.0003.

318.    Because the federal Government directed source control actions, BP did not take source control actions without first obtaining approval from the Unified Command.  Allen Dep. at 21-26, 251-55; TREX 009100.0006; TREX 009116.0002; TREX 009121.0001; TREX 009122.0001; Allen Dep. at 341-43; TREX 009127.0001; TREX 009128.0001; Chu Dep. at 70-72, 82-83; TREX 011304.0001; TREX 011307.0001.

319.    BP was not allowed to move forward on a course of action without the Government's approval.  Hunter Dep. at 293-94; TREX 009903.0001

320.    The federal Government vetted, discussed, and approved all major source control efforts.  Chu Dep. at 67-68, 70; TREX 011303.0001.  An in-depth discussion was held with Secretary Salazar ahead of every option.  Tr. at 596 (Dupree).  Any source control procedure needed to be reviewed by Unified Command.  Saucier Dep. at 240.

321.    The Department of Energy, the Department of the Interior, the Coast Guard, and the U.S. Geological Service were also part of the decision-making process during the relief effort.  Lynch Dep. at 704-05.  NOAA provided scientific support to the Unified Command.  Herbst Dep. at 184.  The final order to proceed on an intervention would come from the FOSC.  Lynch Dep. at 552.

322.    The Government was part of the creation process for source control strategies, and contributed to development of the source control procedures.   Cook Dep. at 383-84. Secretary Salazar, Secretary Chu, and David Hayes had input on each source control decision. Allen Dep. at 425-427.

323.    BP and the Government "reviewed, and debated and discussed" source control intervention options throughout the response.  McKay Dep. at 655-56.

324.    By the time a source control procedure reached the Unified Command, it had been reviewed by BP, by BOEM, and had gone through peer reviews, peer assists, and hazard identification sessions.  Saucier Dep. at 240.  BOEM was always involved in the final approval process.  Saucier Dep. at 240-41.

325.    It was common practice for Coast Guard personnel to participate in hazard identification exercises before procedures were sent to Unified Area Command for approval. Brannon Dep. at 49-50.  If Coast Guard personnel identified hazards, those hazards needed to be mitigated before the procedure was sent to Unified Area Command.  Brannon Dep. at 50.

326.    Engineering teams would prepare detailed procedures, BP would make a recommendation, and the Unified Command would approve the option.  Tr. at 596 (Dupree).

327.    Part of the role of the National Incident Commander was to review procedures and recommend them to the Unified Command for approval.  Brannon Dep. at 50.

328.    Experts from the federal Government reviewed and approved "all major steps related to source control."  Herbst Dep. at 146; Allen Dep. at 287-88.  The MMS would not sign off on a procedure unless they considered it a task that could be performed safely.  Domangue Dep. at 126-27.

### (2) Consistent with Its MMS-Approved IEP and MMS Expectations, BP Quickly Commenced Drilling Two Relief Wells.

329. A relief well is a well drilled to intersect a blown-out well so that kill fluids can be injected into the blown-out well. TREX 011737R.0006.

330. As of April 20, 2010, drilling a relief well was the primary means of shutting in a well with a subsea blowout. Saucier Dep. at 241-42. Relief wells constituted the only proven and reliable method to shut in a subsea blowout. Saucier Dep. at 242. A relief well applies to the "widest range of scenarios." Barnett Dep. at 157.

331. Preparation and permitting for the relief wells began the day after the incident. Tr. at 600 (Dupree); Hand Dep. at 348-49; Stipulated Facts at 7 (Rec. Doc. 7076). BP applied to the MMS for a drilling permit, which is part of the generally practiced method for responding to a blowout. Saucier Dep. at 242; TREX 011737R.0006.

332. BP drilled two relief wells while simultaneously undertaking other source control efforts, which the MMS considered prudent. Herbst Dep. at 85-86. The second relief well was instituted in case of an issue developed with the initial relief well. Tr. at 602 (Dupree).

333. At the time of the *Deepwater Horizon* incident, BP had two drilling rigs under contract that BP used to drill two relief wells, and also had access to the necessary drill pipe to commence drilling the relief wells immediately. McKay Dep. at 481, 535. The *DDIII* drilled the primary relief well; the *DDII* drilled the contingency relief well. Tr. at 603-04 (Dupree); Frazelle Dep. at 210-12.

334. BP proceeded promptly and effectively with relief well efforts. Allen Dep. at 480; Hayward Dep. at 253, 255. BP initiated relief well efforts immediately, and the first relief well was spudded within days of the incident. Hayward Dep. at 823-24; Stipulated Facts at 10-11 (Rec. Doc. 7076).

335.    The MMS and the Unified Command were aware of the relief well operations as they were being drilled as well as the engineering plans that the well entailed.  Saucier Dep. at 149.  Someone at the MMS was monitoring all relief well operations.  Saucier Dep. at 149.  There were no incidents of noncompliance at the relief wells related to drilling operations.  Saucier Dep. at 155-56.

336.    A subsea broach could imperil the ability to kill the well with a relief well.  Tr. at 643-44 (Dupree).  The purpose of the relief well is to inject mud into the well and have the weight of the mud stop the well from flowing so if the well has broached it can provide an exit path for the mud.  Tr. at 643-44 (Dupree); Campbell Dep. Vol. I at 193.  Without the weight of mud to hold it back, the well can then begin flowing again.  Tr. at 644 (Dupree).  Subsea broaching could prevent the well from being killed "by conventionally known means."  Campbell Dep. Vol. I at 194.

> **(3)**    **Consistent with BP's MMS Approved OSRP and with the MMS's Expectations, the Response Team Used ROVs to Attempt to Activate the *Deepwater Horizon* BOP.**

337.    The industry-standard first response was to attempt to use ROVs to activate the *Deepwater Horizon*'s BOP.  Tr. at 600, 602 (Dupree); Herbst Dep. at 304.  Using ROVs to activate the BOP was what Wild Well Control recommended for initial intervention efforts.  Campbell Dep. Vol. I at 151-53.

338.    Initial attempts were made beginning the night of April 20, 2010, to activate the BOP.  Tr. at 602 (Dupree).  ROV intervention efforts began less than 24 hours after the explosions on the *Deepwater Horizon*.  TREX 009550.

339.    Transocean led the efforts to attempt to use ROVs to activate the *Deepwater Horizon*'s BOP.  Thierens Dep. at 30; Frazelle Dep. at 529-30; Boughton Dep. at 10, 68, 88, 98

(Transocean's Subject Matter Expert for Subsea Systems and Equipment had responsibilities for ROV intervention after the explosions, including developing plans, writing procedures, and locating equipment); Hand Dep. at 37.

340.    Cameron provided technical assistance in attempts to activate the *Deepwater Horizon*'s BOP.  McWhorter Dep. at 131.

341.    There was an expectation in the industry that the drilling contractor would provide source control expertise related to its BOP and the related operations.  Herbst Dep. at 456. According to Transocean's Director of Performance and Operations, it was Transocean's responsibility to know how to close its BOP in a flowing well situation.  Hand Dep. at 59, 259.

342.    By April 21, 2010, Transocean had its own Incident Command Center at its Houston office and had placed an Incident Commander in charge of their response operations. Domangue Dep. at 81-82, 105-06, 144-45, 175.  Transocean brainstormed ideas for closing in the well via ROV intervention.  Boughton Dep. at 92-94.  Transocean would generate, vet, and present ideas for intervention.  Boughton Dep. at 101

343.    From April 21, 2010 to April 23, 2010, Bryan Domangue of the MMS observed the Transocean response from Transocean Command Center in Transocean's Houston office. Domangue Dep. at 25, 27, 78, 79-80, 104, 145.

344.    During this time period, Mr. Domangue believed that Transocean was leading the effort to shut in the well, which included ROV intervention efforts to activate the BOP. Domangue Dep. at 79-80, 93-94, 105-06.  Mr. Domangue communicated what was occurring at Transocean's offices to his superiors, including Michael Saucier.  Domangue Dep. at 103-04. The personnel working out of Transocean's Houston offices communicated with the vessel personnel offshore who were deploying the ROVs to attempt to actuate the BOP.  Domangue

66

Dep. at 145.  Following Mr. Domangue's departure from Transocean's offices on April 23, the MMS had other representatives onsite at Transocean's offices to monitor Transocean's BOP intervention efforts.  Domangue Dep. at 92.

345.    In addition to representatives from Transocean, representatives from Wild Well Control, Cameron, BP, and Oceaneering participated in the ROV intervention efforts.  Boughton Dep. at 388-89, 536; Holt Dep. at 63; Thierens Dep. at 196.

346.    Attempting to use ROVs and subsea accumulators to close the *Deepwater Horizon* BOP was an appropriate use of available resources.  McKay Dep. at 37; Herbst Dep. at 111-12; TREX 011737R.0028.  Mr. Domangue would have "weighed in" if he and the MMS disagreed with a strategic decision regarding the BOP intervention plan; however, Mr. Domangue did not need to do so.  Domangue Dep. at 96-97.

347.    When determining whether and how to attempt to use ROVs to activate the BOP, the BOP team had to get its proposed plans approved by the Unified Command.  Thierens Dep. at 681.  The FOSC had final responsibility and made the "ultimate decisions" with regard to the BOP intervention efforts.  Domangue Dep. at 204-05, 207-08.

348.    BP also brought in an ROV subsea systems specialist to assist with the efforts to activate the *Deepwater Horizon*'s BOP during the response.  Thierens Dep. at 656.

349.    Even if ROVs would not have been able to get enough pressure to fully close the rams in the BOP, the ROVs may have been able to get sufficient pressure to move the rams and provide a restriction to flow.  Thierens Dep. at 666.

350.    While there was a possibility that the sealing elements on the BOP rams could be eroded and unable to seal if the ROVs were able to activate the *Deepwater Horizon* BOP's rams, no one could determine with any certainty at the time if that would occur.  Thierens Dep. at 671.

351.    When the *Deepwater Horizon* rig sank, there was an "extensive period of time" during which there was zero visibility and the BOP team could not use the ROVs to access the BOP.  Thierens Dep. at 682.

352.    Initial ROV intervention efforts involved cutting the autoshear trigger pin, which triggered the accumulators on the BOP stack to close in the blind shear ram.   TREX 011737R.0028.  There is broad agreement that the off-center drill pipe in the BOP brought it outside the blind shear ram's cutting surface, and because the location of the drill pipe prevented the blind shear rams from closing, ROV pumping capacities were ultimately irrelevant.  TREX 011737R.0028.

353.    The autoshear pin on the *Deepwater Horizon* BOP was cut on April 22nd to release stored hydraulic pressure to shut in the well.  McWhorter Dep. at 419-21.  That does not rely on ROV pump capacity to close the rams.  McWhorter Dep. at 421.  When the pin was cut the LMRP rocked, which indicated the release of a tremendous amount of energy.  McWhorter Dep. at 441.

354.    BP and Transocean surprised MMS officials by how quickly they were able to get ROVs on site and attempting BOP closure.  Domangue Dep. at 39.

355.    The MMS believed ROV intervention efforts between April 21, 2010 and May 5, 2010, constituted a very valuable tool and plan.  Domangue Dep. at 140.

356.    At no time between April 21, 2010, and May 5, 2010, did the MMS believe ROV intervention efforts were not an option worth pursuing or that they should not be pursued. Domangue Dep. at 141.

357. No United States Government representative advised BP, Transocean, or any other party not to proceed with attempting to simulate the autoshear or AMF/deadman via ROV intervention. Domangue Dep. at 106, 115-16.

358. The MMS believed that all parties that were involved in the ROV intervention efforts were making a good faith and significant effort to achieve a successful outcome with the ROV intervention. Domangue Dep. at 85-86; 141.

359. BP pursued ROV intervention without respect to cost or expense. Domangue Dep. at 87-88.

> **a.   Transocean's Undocumented Changes to the BOP Contributed to the Difficulty of Closing the Well.**

360. The *Deepwater Horizon* BOP stack was owned by Transocean. Rohloff Dep. at 80.

361. There is an expectation in the industry that a drilling contractor is knowledgeable about its BOP and the control of the BOP equipment. Herbst Dep. at 456; Holt Dep. at 59-60. Transocean was responsible to know about any changes made to its *Deepwater Horizon* BOP. Hand Dep. at 90; Rohloff Dep. at 92.

362. The *Deepwater Horizon* BOP stack had an ROV panel on it. An ROV can be used to turn mechanisms on the ROV panel or stab into the panel itself. If an ROV stabs into the ROV panel, then the ROV can then pump hydraulic fluid into the BOP's control system. This then allows an ROV to operate certain functions of the BOP that are on the ROV panel. Thierens Dep. at 658-59.

363. The ROV panel on the *Deepwater Horizon* BOP had a pipe ram close function that should have been operable by stabbing an ROV into the appropriate part of the ROV panel and pumping hydraulic fluid into the control system. Thierens Dep. at 659.

69

364.    On April 21, 2010, the BOP team believed the pipe ram closed function was plumbed to the middle pipe rams.  Thierens Dep. at 660.

365.    On April 25, 2010 a BP representative was advised that Transocean had made a change to the *Deepwater Horizon* BOP's control system "a couple of months ago."  Thierens Dep. at 198-99; TREX 006095.0012.   Transocean had provided mislabeled schematics. McWhorter Dep. at 433-35; TREX 010231.

366.    The Transocean representatives on the BOP team did not know what change had been made to the Transocean BOP, and when requested, Transocean could not provide drawings of the change to the Transocean BOP.  Thierens Dep. at 198-99; TREX 006095.0012; Boughton Dep. at 171-73.

367.    During ROV intervention efforts, Transocean "scrambled around looking for the last revision" of the schematic for the *Deepwater Horizon* BOP.   Boughton Dep. at 95 (Transocean's Subject Matter Expert for Subsea Systems and Equipment).

368.    Transocean did not provide BP with accurate as-built drawings of the *Deepwater Horizon* BOP.  Thierens Dep. at 270.  Transocean provided wrong, out-of-date drawings of the BOP, which impacted the response.  Tr. at 603 (Dupree); Campbell Dep. Vol. I at 351-53. Drawings of the BOP were being modified during the response to reflect observations that were made.  Thierens Dep. at 270.

369.    In early May, as the BOP teams' efforts to attempt to use ROVs to activate the *Deepwater Horizon*'s BOP were coming to a close, Transocean notified the Response Team that prior to the incident it had made a change to the plumbing of the *Deepwater Horizon* BOP. Thierens Dep. at 30, 31, 205; TREX 009549.0001.  As a result of this change, the portion of the ROV panel that the BOP team had been attempting to activate was linked to a test ram (which

could not contain pressure to shut in the well) instead of the middle pipe rams, to which the ROV panel should have been linked according to schematics of the BOP.  Thierens Dep. at 30, 464; Domangue Dep. at 31-32; Boughton Dep. at 171-73; Hand Dep. at 88-89, 324; TREX 010234 (internal Transocean email acknowledging that Transocean's *Deepwater Horizon* BOP had a plumbing error and that "BP is ballistic .… rightly so.").

370.    Prior to Transocean's notification of the mis-plumbed BOP, and after considered discussion, the BOP Team, which included representatives of BP, Transocean, and Cameron, among others, chose to attempt to activate the middle pipe rams to close in the well because the variable bore pipe rams in the middle pipe rams could seal on multiple sizes of pipe.  Thierens Dep. at 31, 205.

371.    Prior to Transocean's notification of the mis-plumbed Transocean BOP, the Response Team thought that it was using ROVs to stab into a portion of the ROV panel that would activate the middle pipe rams.  Thierens Dep. at 30.

372.    In fact, the portion of the ROV panel that should have activated the middle pipe rams was instead plumbed to a test ram.  Thierens Dep. at 660-61; Frazelle Dep. at 530-31; Stipulated Facts at 7 (Rec. Doc. 7076).  The hot stab that the BOP team had been using could not activate the middle pipe rams.  Thierens Dep. at 205.

373.    When relaying the fact that the Transocean BOP was mis-plumbed, a Transocean representative "held his head down and shook his head and said, 'This is plumbed wrong.'" Thierens Dep. at 32.

374.    Members of the BOP team that had been attempting to activate the BOP with ROVs were not aware of the mis-plumbed Transocean BOP before Transocean's announcement. Thierens Dep. at 31-32.

375.    The issue with the mis-plumbed Transocean BOP was "serious[]," and a BP representative on the BOP team "quite frankly was astonished that this could have happened." Thierens Dep. at 203, 205-06; TREX 006097.0022.

376.    With the announcement of the mis-plumbed Transocean BOP, a BP representative on the BOP team "lost all faith in [the *Deepwater Horizon*'s] BOP stack plumbing."  Thierens Dep. at 206; TREX 006097.0022.

377.    During the response, Transocean spent between 12 and 24 hours of ROV time to observe the BOP stack to investigate changes that had been made to the *Deepwater Horizon* BOP that Transocean did not understand.   Thierens Dep. at 267-69.   BP expected that Transocean would have been aware of changes that had been made to Transocean's BOP. Thierens Dep. at 268-69.

378.    During the response, there were multiple leaks in the Transocean BOP.  Tr. at 603 (Dupree).  There was a significant leak in the BOP control system that prevented the BOP team from building enough pressure to activate the BOP's blind shear rams.  Thierens Dep. at 252-53; TREX 006100.0003.  There was also a significant leak on a part of the ST locking system on the BOP that took considerable effort to tighten.  Thierens Dep. at 256-58.  There were also leaks on the BOP's upper annular surge bottle, upper annular shuttle, and lower annular shuttle.  Thierens Dep. at 257.

(4)    **BP Stood up a Team of Experts to Evaluate Additional Source Control Measures That Could Be Implemented.**

379.    After the incident, BP immediately activated its emergency response team and notified the U.S. Coast Guard, as required by BP's OSRP.  Tr. at 588 (Dupree); TREX 011737R.0006.

380.    As described in BP's OSRP, and in conformance with standard industry practice, the emergency response team included engineers within BP, the well control companies already under contract to BP, such as Wild Well Control, and other contractors such as Transocean, Cameron, and Halliburton.  Tr. at 748-49 (Mazzella); TREX 011737R.0006; Campbell Dep. Vol. I at 41-42 (BP contacted Wild Well within hours of the incident); Barnett Dep. at 294 (Wild Well Control was involved in the response from the beginning).  BP brought in all the experts from the industry, including third-party well control specialists.  Holt Dep. at 38; D23250.

381.    Cameron had representatives in the Houston ICP 24-hours a day during the response.  McWhorter Dep. at 21-22.  Cameron has knowledge of equipment but not on fundamental well kill principles.  McWhorter Dep. at 321.  Cameron viewed the source control effort as being the "whole of industry and the whole of government."  McWhorter Dep. at 415-16.

382.    BP also brought in expertise from other oil companies, including Shell and ExxonMobil, and the oilfield services sector to help and advise the response.  Tr. at 1048 (Adams); TREX 011737R.0007; Brannon Dep. at 164.  "For major reviews, such as the well kill, BP invited … a large review board drawn from other oil companies, oil field service companies, and well intervention specialists from all over the world to participate."  TREX 009123.0426; Cook Dep. at 77.

383.    Further, BP brought in other leading industry service providers such as Boots & Coots, Schlumberger, and Oceaneering.  Tr. at 591-92 (Dupree).  Between 500 and 800 people were working in the Houston Incident Command post at any one time.  Tr. at 593 (Dupree).

384.    It was good practice to call in the outside experts because the conditions faced at Macondo were unique and the outside experts had seen a variety of different conditions in the

past and were familiar with the various response options that needed to be considered.  Tr. at 749 (Mazzella).

385.    The outside experts were put on the various teams being set up at the Houston command center to develop source control options.  Tr. at 750 (Mazzella).

386.    BP issued an open request to the industry for support, equipment, and assistance. Tr. at 1048-49 (Adams).  A guiding principle was to leave no stone unturned and BP sought assistance from industry, the community, the science teams, and anyone else who could provide assistance.  Tr. at 597 (Dupree).

387.    The cooperative nature of the response meant that there were multiple entities involved whose views needed to be considered, including those of the well control companies and the federal Government.  TREX 011737R.0006.

388.    In conformity with BP's OSRP, the BP emergency response team developed specific procedures and ordered or fabricated the equipment needed to try to shut in the well, kill the well, and to contain prior to the time when a relief well could be completed, to the extent permitted by the Federal On-Scene Coordinators.  TREX 011737R.0006.

> **a.  Multiple Containment and Collection Strategies Were Being Considered and Planned Simultaneously.**

389.    A guiding principle of the response was to engineer all options in parallel.  Tr. at 597 (Dupree); Barnett Dep. at 325.  As there were uncertainties in the condition of the well the plan was to have as many options available to be executed if needed.  Tr. at 599-601 (Dupree); D23231A.  BP began working "several simultaneous operations" "virtually immediately." McKay Dep. at 19; Boughton Dep. at 555.

390.     Parallel options were pursued with authorization from the federal Government, and the sequencing of source control efforts was developed in consultation with the federal Government.  Allen Dep. at 312-17; TREX 009178 (clip 5); D23231A.

391.     The source control response was characterized by rapid technological advances and an unprecedented pace of technological development.   Hunter Dep. at 56-58; TREX 009689.0005-06.

392.     Multiple containment options were pursued in parallel to increase capacity and redundancies.  Allen Dep. at 255-59; McKay Dep. at 30, 32, 536; Hand Dep. at 365-66; Cook Dep. at 130, 636-37; Hayward Dep. at 253-54, 257-58, 820-21; Hunter Dep. at 95-98; TREX 009676.0001;  TREX  009116.0002-04;  TREX  009117.0001;  TREX  009118.0001;  TREX 011737R.0012, 0016.

393.     Work on the Capping Stack was progressed at the same time as work on Top Kill, Top Hat, the RITT, and the Relief Wells.  Cook Dep. at 605-06; TREX 011737R.0012.

394.     An alternative developed in parallel with the Capping Stack was known as the BOP-on-BOP option, which involved landing a second drilling BOP on top of the *Deepwater Horizon* lower BOP after removing the Lower Marine Riser Package to expose the hydraulic connector.  TREX 011737R.0012.  BOP-on-BOP was a procedure designed to shut in the well. TREX 011738R.0010.

395.     BP established multiple teams at the Houston command center to work on the parallel options and strategies to respond to the unique conditions presented by the blowout, including an Engineering Support Team, a Top Kill/Static Kill Team, a Relief Well/Bottom Kill Team, a Capping Team, and Containment Teams.  Tr. at 750-51 (Mazzella); McKay Dep. at 536; *see also* TREX 002386.0005; TREX 010898.0002; D23250; D23328.  Mark Mazzella, as BP's

Well Control SETA, helped to make sure that the organization of the teams was "systematic" and that the "right people" were assigned to each team.  Tr. at 751-52 (Mazzella).

396.    The BP people working on the source control effort assigned to the various teams followed the guidelines in the WCRG, and worked within the teams into which they had been organized.  Tr. at 751 (Mazzella); McKay Dep. at 30, 534, 536.

397.    Mazzella, for his part, was involved in the work of each of the teams at the Houston command center, in part to address any gaps that might exist in the overall effort and to respond to questions from the teams.  Tr. at 754-55 (Mazzella).

398.    Bryan Domangue of the MMS agreed that following April 20, 2010, source control was a multi-faceted effort.  Domangue Dep. at 83.

399.    Containment options were pursued in tandem with well capping activities.  Allen Dep. at 262-63; Tr. at 601 (Dupree); TREX 009119.0001.  In discussions around May 5, "BP discussed several options they were running simultaneously for attempting to stop the flow of oil."  Landry Dep. at 470.

400.    Following his arrival at the Houston ICP on May 23, Admiral Cook noted in an email to Admirals Allen, Landry, and Neffenger that "BP clearly understands that one path forward is not enough.  While there is significant focus on the [T]op [K]ill, there is very strong focus on the post [T]op [K]ill (failure) path."  TREX 009409.0001; Cook Dep. at 126-27.  "My overall sense is that BP is moving as quickly as it can."  TREX 009409.0001; Cook Dep. at 129.  In her response, Admiral Landry noted that she "saw the same commitment and earnest effort from all" when she visited the day before.  TREX 009409.0001.

401.    Under the direction of the Unified Command, BP designed a multiple parallel path intervention strategy, which mounted a very significant surface response (ultimately

involving 48,000 people, 7,000 boats, and hundreds of planes), as well as subsurface options to contain, collect, and plug the leak.  As soon as an option was deemed ready to be implemented by the Unified Command, it was implemented.  Hayward Dep. at 253-54, 257-58, 820-21; Hunter Dep. at 95-98; TREX 009676.0001; Cook Dep. at 330-31.

<div align="center"><strong>b.    Every Option Was Evaluated Using the "Don't Make It Worse" Philosophy.</strong></div>

402.   "Don't make it worse" was a guiding principle throughout the response.  Allen Dep. at 66-67, 280; Tr. at 1045-46 (Adams); Tr. at 597 (Dupree); Campbell Dep. Vo1. I at 186; Patteson Dep. Vol. II at 49-50; Inglis Dep. at 155-56, 158; Herbst Dep. at 162-63; McWhorter Dep. at 315-16; Holt Dep. at 91 ("don't make the situation worse" was a fundamental principle applied to all relief efforts); Suttles Dep. at 489; Rainey Dep. at 271; Chu Dep. at 124-25; Vargo Dep. at 58; TREX 009412.002; TREX 009676.0001; TREX 011905R.0014-15.

403.   Transocean employees also understood that the philosophy of the response was "let's not make it worse."  TREX 010888 (notes from interview with Steve Hand, Transocean's Director of Performance and Operations who participated in the spill response).

404.   "Don't make it worse" was a philosophy that, while aiming both to shut in the well as quickly as practicable and to contain as much oil as practicable, required making sure that risks were identified and mitigated before proceeding with any source control option.  Tr. at 1045-46 (Adams); TREX 011737R.0005.  This principle drove the risk-mitigated approach to source control, affecting the sequencing and timing of source control actions, as well as the amount of time it took to implement those actions.  Tr. at 1045-46 (Adams).

405.   A natural instinct in situations like the *Deepwater Horizon* response is to try to implement solutions as rapidly as possible.  Tr. at 1042 (Adams).  Rapid implementation of

<div align="center">77</div>

potential source control solutions does not necessarily allow time to properly mitigate risks.  Tr. at 1042 (Adams).

406.    BP openly and publically took a risk-mitigated approach to source control, and took action to carefully assess risks before putting forward any option for closing in the well.  Tr. at 1044, 1046-47 (Adams); Tr. at 613-14 (Dupree).

407.    The Unified Command's strategy, and that of the FOSC, was to work multiple source control work streams at the same time, and, as the products of those work streams became available, the Unified Command implemented those intervention strategies that were available the earliest and would not make the situation worse.  Inglis Dep. at 158, 662.

408.    As Secretary Chu testified, each source control action was taken only after weighing the risks and the benefits.  Chu Dep. at 124-25.

409.    As the Aligned Parties' expert conceded, responders need to take a very careful approach to shutting in a blowing out well, and any shut-in should be performed "carefully and precisely."  Tr. at 536-37 (Ziegler).

410.    In assessing source control strategies, responders needed to collect data to assess whether the well had integrity.  Tr. at 536-37 (Ziegler).  "Well integrity" means "the ability of the well to contain the fluids and pressures for which it was designed."  Tooms Dep. at 15. Because the Macondo Well was not a general production well, and because there was no production tubing in it as a result, there was a single barrier left to breach before the hydrocarbons would contact the rupture disks and the intermediate casing they were contained in.  Tooms Dep. at 162.  If the hanger had lifted off the wellhead housing, those rupture disks may be exposed to whatever pressure existed once the well was shut in.  Tooms Dep. at 157.

411.    Well integrity was a concern in all the decisions made during the response. Frazelle Dep. at 254; Brannon Dep. at 83; Barnett Dep. at 319-320 (well integrity concerns were raised "very early on" in the response); Tooms Dep. at 157 (the integrity of the Macondo Well was a serious concern immediately following the incident).

412.    In light of the plan to stop the flow of oil without making the situation worse, if an intervention option had some risk of making the situation worse, then it would need to be reworked until the response team was comfortable that the option would not, in fact, make the situation worse.  Holt Dep. at 439-40.

413.    All source control decisions were based on identifying the risks involved with that option, analyzing those risks, and then devising mitigations for those risks.  Cook Dep. at 605-06.  Some source control options might be ready to deploy earlier than others because they had fewer unmitigated risks.  Cook Dep. at 605-06.

414.    As Mark Mazzella testified, "We knew that there were several possible opportunities that we had to remediate [the blowout], but the one thing we kept in mind is we did not want to progress a technique that would shut the well in and, if it failed, prevent us from using an alternative technique."  Tr. at 752 (Mazzella).

415.    According to the MMS representative, both BP and the federal Government considered all available options for source control carefully, and no source control decisions were made with a reckless disregard for the consequences.  Saucier Dep. at 242.

416.    One of the Federal Science Team's roles was to use scientific judgment in reviewing potential solutions to determine options that were safe, appropriate, and potentially effective without doing further harm.  Hunter Dep. at 56; Barnett Dep. at 339 (the Federal Science Team shared concerns about the integrity of the well).

417.   During the response, hydraulic modeling was used to evaluate the potential downsides of source control options, such as the possibility of increasing the flow or preventing other source control methods from being effective.  TREX 011905R.0015.

418.   The Well Capping Team considered the risks of installing a capping stack so as not to make the situation worse.  Tooms Dep. at 173; Tooms Dep. at 174-75.  In particular, there was concern that the rupture disks had been dislodged, which could lead to a subsea breach.  Tooms Dep. at 164.  It was also necessary for the team to determine whether the capping stack could withstand the estimated shut-in pressure, which BP subsequently concluded it could.  Tooms Dep. at 174-75.

419.   It is prudent in any drilling or well operation to assess the risks presented by the knowns and unknowns, and mitigate those risks before taking any action.  Tr. at 1043 (Adams).  If a significant risk is identified, responders are faced with a choice of either pressing ahead anyway and hoping the risk does not manifest, or taking a step back and perhaps modifying their approach to something that may take longer to implement.  Tr. at 1046 (Adams).  If an option that is quicker to implement presents significantly higher risks, choosing an option that is lower risk but takes longer to implement is justified.  Tr. at 1046-47 (Adams).

420.   The primary focus of all involved in the response was to stop the flow as quickly as possible, while managing risks to human life and the environment.  TREX 011905R.0014.

### (c)   The Federal Government Conducted Independent Assessments of Source Control Methods.

421.   For the response, the federal Government brought in a "cadre of people that were very knowledgeable" about the oil and gas industry.  Allen Dep. at 99-101.

422.   The federal Government was embedded in BP's offices at the Westlake complex in Houston.  Each source control method was reviewed and jointly staffed up to the Unified Area

Command.  Allen Dep. at 46-47, 91, 283-86, 301-03, 411-12; TREX 009178 (clip 1), TREX 009178 (clip 2).

423.   Admiral Allen made several personal trips out to the well site to understand information firsthand.  Allen Dep. at 91-92.  He did not just depend on BP for information, but relied on a wide variety of Government technical experts and industry experts to independently verify the propriety of a particular course of action or a particular proposal.  Allen Dep. at 49.

424.   Each proposed source control method was reviewed and analyzed at multiple levels within the Unified Command before the Unified Command approved it.   TREX 011737R.0007.

425.   Scientists from the National Labs modeled conditions in the well in order to "assess the stability of the damaged structure," support the evaluation of alternative courses of action to stop the leak," and to "provid[e] independent validation of certain calculations performed by BP."  TREX 009709.0001.

### (1)   All Data Concerning the Well Was Shared with the Federal Government.

426.   Unified Command had access to everything BP did during the response.  Tooms Dep. at 273.

427.   There was good sharing of information between BP and the Government during the response.  Havstad Dep. at 32-33.  During Dr. Hunter's work on the response, he believed the information flow from BP was "great" and that there were no limitations on his ability to get information that he felt was important.  Hunter Dep. at 43, 73-75.

428.   Secretaries Salazar and Chu and the Federal Science Team were not shy about requesting information.  Brannon Dep. at 289.  When Secretary Chu or the Federal Science Team asked for information, they received it, and according to Secretary Chu, there was a mutual trust

and respect between the Federal Science Team and BP.  Chu Dep. at 191-92; Brannon Dep. at 288-89.

429.    According to Admiral Allen, the Federal Science Team had access to data.  Allen Dep. at 303-08; Tooms Dep. at 288 (the Federal Science Team had "full access to the information that they needed to assess whether you could shut the well in"); TREX 009125.0001.

430.    BP provided fluid data, well test data/analysis, petrophysical logs, reservoir size, wellbore diagrams, and pressure and temperature measurements from the Macondo Well to the federal Government.   TREX 009684.0001-0106; McNutt Dep. at 645-46.  BP "tried to be as helpful as possible" to the Government teams "in providing them the data so they could understand the reservoir."  Tooms Dep. at 311-12.

431.    BP provided the federal Government with real time access to the collection data from the RITT, live access to the ROV video feed, information on reservoir characteristics and fluid properties, temperature measurements, and pressure data from the PT-B pressure gauge.  Tr. at 1014-16 (Ballard); Tr. at 1023-25 (Ballard); TREX 011905R.0015-17; Lehr Dep. at 155-157 (there was no delay on the part of BP in getting requested video segments to the Plume Team).

432.    BP provided all the Top Kill data for all three stages of the Top Kill to the federal Government in "real-time."   McNutt Dep. at 639-41; TREX 009681.0001-11; TREX 009682.0001-36; TREX 011305.0003.

433.    In a May 30, 2010, email Secretary Steven Chu of the Department of Energy, as part of the Federal Science Team responding to the incident, confirmed that the federal Government was "getting the data at the same time as BP engineers."  Chu Dep. at 75; TREX 011305.0002.

434.    Richard Brannon, Federal Incident Commander in Houston, never had any problems getting requested data from BP.  Brannon Dep. at 99.

435.    When asked whether he had ever had any concerns or reservations about a lack of transparency on the part of BP throughout the course of his involvement with the subsea source control response, Admiral Cook replied "No."  Cook Dep. at 356.  BP was candid and open with the federal Government during the response.  BP made raw data available very quickly.  Chu Dep. at 61-63, 318; TREX 011302.0001.

436.    During the course of response, BP received many requests for information while activities were ongoing and additional information was simultaneously collected.  According to Secretary Chu, in light of the complexity of the operation, BP responded quickly to the requests for information.  Chu Dep. at 41.

### (2)    The Federal Government Conducted Independent Analyses of Source Control Methods.

437.    The Federal Science Team had a superior understanding of fundamental engineering and scientific principles when compared to BP, which made it particularly suited to its oversight role.  Cook Dep. at 427-28.  The Federal Science Team at times shared information that it had developed with the Government before sharing it with BP.  Hunter Dep. at 87; TREX 009137 (May 27, 2010 E-mail from Los Alamos scientist D. Sullivan, with subject line "RE: Top Kill – Update," instructing other federal scientists to "be careful sharing these notes and data" and to "keep all information in the Lab and amongst only those with a need to know").  It was not unusual for the U.S. Government to have meetings about ongoing source control efforts without including BP.  Cook Dep. at 261.

438.    The Unified Command was involved in a series of "intense discussions regarding top kill with BP Engineers" for "10-14 days" before the Top Kill operation.  Allen Dep. at 339-

40.   Representatives of the Government, including Secretary Chu and Federal Science Team members "reviewed BP's work and questioned BP's assumptions related to the top kill technique."  Allen Dep. at 340-41; TREX 009178 (clip 8).

439.   Secretary Chu led the Federal Science Team at BP's Houston Crisis Center like "junkyard dogs," poring over every procedure, keeping a "really, really watchful eye over all the calculations, all the assumptions, and all the procedures that BP … proposed."  Allen Dep. at 301-03; TREX 009178 (clip 2).

440.   Before and during Top Kill, Secretary Steven Chu of the Department of Energy and his Federal Science Team were onsite with BP, looking at the well data in "real-time" to "monitor the progress" of the Top Kill and conduct "independent analysis of the data."  TREX 011305.0002-03.  On May 24, 2010 Secretary Chu and his team "verified that it did make sense to go forward with the 'top kill' attempt."  TREX 011305.0003.

441.   In a May 30, 2010, email Secretary Steven Chu of the Department of Energy, as part of the Federal Science Team responding to the incident, confirmed that the federal Government was "getting the data at the same time as BP engineers, and conducting our own independent analysis of the data so that we can verify the conclusions BP is making at every step."  Chu Dep. at 75; TREX 011305.0002.

442.   After Top Kill, the Federal Science Team continued to analyze the data and "scrutinize[] options for other strategies if the top kill" was not successful.  Indeed, Secretary Chu and the Science Team's role in this process was to "help design strategies for moving forward."  TREX 011305.0002-03.

443.    When the Top Kill effort did not "kill the well," the federal Government also analyzed other source control methods and determined that the next move would be to "put a cap on top of the BOP to contain the spill and pump it to the surface."  TREX 011305.0002.

(d)    **Top Kill Was a Viable Solution and Properly Attempted.**

444.    Top Kill was an effort to kill the well by pumping mud and bridging material into the *Deepwater Horizon* BOP with the intent to increase the restrictions across the BOP and to force mud down the wellbore in sufficient quantity for the weight of the column of mud to preclude flow from the reservoir.  TREX 011737R.0007; TREX 010622.0001.

445.    Top Kill consisted of two parts: (1) Momentum Kill[3], which was the pumping of mud; and (2) Junk Shot, which was the injection of bridging material into the BOP to clog the flow path and assist with creating a back pressure to push the Momentum Kill mud down the well.  Tr. at 616-17 (Dupree); Campbell Dep. Vol. I at 361; Barnett Dep. at 30-31, 324-25; Patteson Dep. Vol. II at 251-52; Holt Dep. at 15, 176-77, 312-13, 327-29; Cook Dep. at 614; D23829A.1.5; TREX 011737R.0007; Stipulated Facts at 3, 5 (Rec. Doc. 7076) ("Top Kill" "refers to the operations comprised of the Momentum Kill and Junk Shot attempted in May 2010 as a means to kill the MC 252 Well").

446.    According to Transocean's Director of Performance and Operations, Top Kill was proposed by industry experts.  Hand Dep. at 171, 259; Holt Dep. at 45 (industry experts helped to design the Top Kill procedure).

447.    Pumping drilling mud and junk shots are conventional methods of responding to a blown out well.  TREX 009827.0001-02.  Although Top Kill was a proven industry standard technique for killing a surface well before the *Deepwater Horizon* incident, it had never before

---

[3] The terms "Dynamic Kill" and "Momentum Kill" were often used interchangeably during the Response.  Holt Dep. at 176, 179-80.  For clarity, the term "Momentum Kill" is used here throughout.

been used in 5,000 feet of water.  McKay Dep. at 192; Holt Dep. at 133; TREX 011737R.0007 (both Momentum Kills and Junk Shots had previously been successfully executed).

448.    BP's Mark Mazzella knew from hundreds of blowout responses involving surface wells that Top Kill operations (that is, Momentum Kill and Junk Shot procedures combined) had been successful in 60 to 70 percent of the situations in which he had attempted them.  Tr. at 752-53 (Mazzella).  Mr. Mazzella advised Secretary Salazar and others that a Top Kill had never been attempted in deepwater before the *Deepwater Horizon* incident, and that the success rate that he had observed was not based on the deepwater environment.  Tr. at 832 (Mazzella).

449.    On May 23, in response to a request for a status update from Admiral Allen, Admiral Cook summarized two meetings on Top Kill that he had attended along with Secretary Salazar.  TREX 011546.0001.  Admiral Cook wrote: "The sobering bottom line is that when pushed, BP gave an 80% chance of the diagnostics being successfully completed and clearly indicating that they will have access to the necessary channels within the BOP to go forward with the kill."  TREX 011546.0001.  If the diagnostic phase was successful, he continued, "BP assigned a 70% probability that the well kill will be successful."  TREX 011546.0001.  "The combined probability then is 56%.  (I consider this close hold)."  TREX 011546.0001

450.    Secretary Chu asked Dr. McNutt what the chances were of Top Kill succeeding.  TREX 144662.0001.  Dr. McNutt responded:

> I told him it was a nonsense question (although more politely than that).  I said it is not like this is a stochastic process and they are going to have multiple random realizations of this process and thus can put standard statistical probabilities on it.  Either this well was going to be killed by a Top Kill or it wasn't.  Period.  A more informative answer might have been: 'Top kills have worked 60-70% of the time when one has access to the well-head to shut in flow from the top.  There has never been success of top kill in other situations, including in the O[uter] C[ontinental] S[helf].'

TREX 144662.0001.

86

451.    BP's source control leader was never asked for a chance of success calculation for Top Kill.  Tr. at 722 (Dupree).

452.    Wild Well Control has used junk shots to seal at least 100 wells.  Campbell Dep. Vol. I at 364-65.  Wild Well Control believed that if the flow path through the BOP was a "series of small pathways" that the probability of success for the Junk Shot operation was "fairly high." Barnett Dep. at 179-81.

453.    If Mr. Mazzella had thought that Top Kill could not work, BP would not have brought together the fleet of ships and close to 300 people on those ships, along with an even larger number of people onshore at the Houston command center, to attempt the Top Kill procedure.  Tr. at 761 (Mazzella); TREX 142710N at 9 (presentation slide 8); D23334.

454.    No one knew the flow path or paths of Macondo reservoir oil at the time when Top Kill was under consideration and was attempted, and so while there was concern about whether Top Kill would be successful, Top Kill had a reasonable chance of success.  Tr. at 798-99, 761 (Mazzella).

455.    While the Aligned Parties contend that a BP engineer, Dr. Tom Knox, concluded that Top Kill was "doomed for failure," Dr. Knox reached that conclusion in mid-July, several weeks after the Top Kill operation was conducted.  Knox Dep. at 346-48, 400-01, 417-19; TREX 009532.0001.  Dr. Knox's conclusion was reached based on a physical inspection of the riser kink that was retrieved in June 2010 after the Top Kill operation had concluded.  Knox Dep. at 346-48, 400-01, 417-19; TREX 009532.0001.

456.    Top Kill was a reasonable effort to undertake during the *Deepwater Horizon* response.  TREX 011737R.0008; TREX 011738R.0012-13.  The deployed procedure was robust and appropriately balanced risk and reward.  Tr. at 1050 (Adams).

457.    Top Kill was a low-risk, high-reward operation that would allow multiple attempts, and could be managed so as not to risk rupturing the burst disks in the 16" casing. TREX 144843.0003.

458.    As a low risk, high reward option, Top Kill was consistent with the "don't make it worse" guiding principle.  Tr. at 730 (Dupree); Holt Dep. at 229-30.

459.    Regardless of opinions as to its chance of success, Top Kill had a clear potential upside in that it could have killed the well, ceasing all flow to the environment.  Tr. at 1041, 1050 (Adams); TREX 011737R.0007.

460.    Beyond the ability to kill the well, Top Kill also provided a substantial diagnostic benefit in that it would provide information about the condition of the well that would aid further source control strategies if necessary.  TREX 011737R.0007, 0010, 0015.

461.    Mr. Campbell, the CEO of Wild Well Control, believed Top Kill should be progressed to at least determine certain diagnostic characteristics through pumping.  Campbell Dep. Vol. II at 21.

462.    Representatives of the Coast Guard and the MMS reviewed the various procedures that would be used during Top Kill.  Herbst Dep. at 145.

463.    The Unified Command's review of Top Kill showed that, with appropriate controls to manage the risks of the procedure, Top Kill had little downside, even if unsuccessful. TREX 011737R.0008.  Risks were identified, and mitigations were put in place.  Tr. at 1041-42, 1050 (Adams).  BP properly mitigated the risks of Top Kill before deploying it.  Tr. at 1042-43 (Adams).

464.   FOSC Admiral Mary Landry delegated authority to Commander Brannon to "make realtime changes" to Top Kill procedures "if needed" during the Top Kill attempt. Brannon Dep. at 72-73.

465.   Contrary to the assertion of the Aligned Parties' expert Mr. Perkin, it was not known at the time that Top Kill could not succeed, and the risks indicated by Mr. Perkin were appropriately identified and mitigated.  TREX 011464R.0009; TREX 011737R.0008.

466.   At one point during the execution of Top Kill it appeared to have successfully killed the well.  Tr. at 664 (Dupree); Barnett Dep. at 315-17; Patteson Dep. Vol. II at 254-55; TREX 010631.  However, the well regained its strength and began flowing again.  Tr. at 665 (Dupree).

467.   As representatives from the MMS and Wild Well Control testified, Top Kill did not delay the ability to cap the well.  Campbell Dep. Vol. II at 12; Herbst Dep. at 128.

468.   Transocean's Director of Performance and Operations was not aware of anyone at Transocean informing BP or the federal responders prior to its implementation that it was their view that Top Kill would not work, and he did not question the decision to attempt the Top Kill before attempting a capping option.  Hand Dep. at 194-95, 259, 396.  Ian Hudson, a Senior Manager at Transocean, expressed support for the initiation of Top Kill.  TREX 010878.0002 (stating in a May 15 email that he "[did not] understand why the kill shot has still not been attempted?").

### (1)   The Federal Science Team, Unified Command, and BP Agreed that Top Kill Was the Most Viable Source Control Option at the Time It Was Implemented.

469.   The Federal Science Team, the Unified Command, and BP sequenced source control options by starting with those that presented less risk or those where the risks could be adequately mitigated.  Allen Dep. at 198-200.

470. Admiral Cook testified that even at the time of his deposition he had no dispute with the order in which BP and the Unified Command implemented each of the major source control efforts. Cook Dep. at 314-15.

471. Leaders of the industry, including the CEO of ExxonMobil and the CEO of Halliburton, confirmed that BP was correctly sequencing source control efforts. Allen Dep. at 200-04, 316-21; TREX 009178 (clip 7).

472. At the time it was implemented, Top Kill emerged as "the best alternative for that particular juncture of source control." Cook Dep. at 435-36.

473. The Unified Command agreed that Top Kill should proceed before BOP-on-BOP. Brannon Dep. at 71.

474. As Transocean's Director of Performance and Operations testified, it would be mere speculation to say that if Unified Command had utilized a capping option before Top Kill, the well could have been shut in sooner. Hand Dep. at 494-95.

475. As Transocean's Director of Performance and Operations testified, the functionality and readiness of the BOP for the BOP-on-BOP option was not the only consideration with regards to the sequence of source control interventions; there were also considerations associated with geology and well construction, for example. Hand Dep. at 195, 259.

476. One reason why it was proper to attempt Top Kill, in addition to the reasonable chance of success, was that the risks of the procedure could be identified and controlled; in contrast, a BOP-on-BOP procedure had higher risks that would have been more difficult to control. Tr. at 753 (Mazzella).

477. The decision was made to attempt Top Kill before BOP-on-BOP because Top Kill was determined, based on engineering and modeling, to have the best chance of not impacting wellbore integrity. Based on its pre-Top Kill analysis, BP believed that the risk of a subsea broach was greater with the BOP-on-BOP option than it was for Top Kill. Furthermore, there would be "no regrets" in the event that Top Kill failed and the Unified Command chose to utilize the BOP-on-BOP option. Holt Dep. at 229-30, 441, 444, 451 (through a number of reviews and calculations, it was determined that Top Kill would impart less pressure onto the wellbore and be more manageable than the BOP-on-BOP option).

478. On May 16, 2010, a "Scientific Summit" to discuss the risks associated with various well kill options was attended by Secretary Salazar, Secretary Chu, Admiral Allen, Dr. Tom Hunter of Sandia National Lab, Dr. Marcia McNutt, Dick Garwin of Secretary Chu's science team, Captain Patrick Little, and BP Executive Leadership, among others. Brannon Dep. 58-59; Holt Dep. at 556-59; TREX 009431.0001-02; TREX 010512.0006.

479. At this May 16 Scientific Summit, BP presented to senior Government officials a recommendation of performing a Momentum Kill. Tr. at 619 (Dupree); TREX 142819N.2. This recommendation was different than Top Kill as implemented because it did not include the Junk Shot portion of the final procedure. Tr. at 645 (Dupree). BP recommended a Momentum Kill alone at this meeting due to then-decreasing pressure measurements at the BOP. Tr. at 647 (Dupree). With decreasing pressures, BP believed that a Momentum Kill without Junk Shot had an increasing chance of success. Tr. at 646-47 (Dupree); TREX 142819N.

480. During this Scientific Summit, BP also presented a number of risks that had been identified for Top Kill. TREX 142819N at 13 (presentation slides 2-11).

481.    All present at the Scientific Summit agreed that BP should continue to plan to execute the Momentum Kill, pending review by the federal scientists.  Brannon Dep. at 59; TREX 010675.0001.

482.    Secretary Salazar wanted Top Kill to go forward as quickly as possible, and he received a full briefing in Houston on May 23, 2010, which was "an important step towards final approval."   Brannon Dep. at 61-63; Cook Dep. at 123-24; TREX 010676.0001; TREX 010677.0001.

483.    The pressure measurements later began to change, which lead BP to believe it was being misled by the pressure gauge.  Tr. at 654-55 (Dupree).  This, in turn, led BP to recommend using Junk Shot as well as a Momentum Kill.  Tr. at 653-55 (Dupree).

484.    On May 23, 2010, BP presented its revised recommendation to senior Government officials including Secretary Salazar.  Tr. at 656 (Dupree); TREX 142710N.1.  The first day of the procedure was planned to conduct diagnostic operations on the BOP to determine the status of valves and attempt to pump into the system.  Tr. at 656-57 (Dupree); TREX 142710N.4. This was the first opportunity to collect data regarding the interior of the BOP.  Tr. at 658 (Dupree).  The presentation also discussed potential risks.  Tr. at 659 (Dupree); TREX 142710N.13.

485.    The Unified Command approved Top Kill.  Tr. at 663-64 (Dupree); Cook Dep. at 313; TREX 008538; TREX 009148; TREX 009353.  A team of federal scientists from three National Labs analyzed the proposed operation and determined that it was safe to go ahead. Hunter Dep. at 37-38; Cook Dep. at 549-50; TREX 009687.0001.  Mr. Herbst, Regional Director of the MMS for the Gulf of Mexico, was not aware of any concerns from anyone that Top Kill should not have been attempted.  Herbst Dep. at 20-22, 127.

486.     The Federal On-Scene Coordinator had ultimate responsibility for the incident response, and could have discontinued Top Kill at any time.  Brannon Dep. at 311-12.

487.     On May 14, 2010, BP manager Jon Sprague prepared an initial draft evaluation of the proposed Top Kill procedure.  TREX 010507; Holt Dep. at 547-48.  The purpose of the document was to describe the recommended sequence of events to intervene on the Macondo well using the Top Kill including the Junk Shot component.  TREX 010507.0004.  This initial draft of the Top Kill evaluation recommended performing pumping and injectivity diagnostics to determine system dynamics and integrity.  TREX 010507.0004.  The feasibility and probability of success of future well intervention activities, including Junk Shot and Momentum Kill, would be evaluated upon analysis of the pumping diagnostics.  TREX 010507.0004.

488.     Though Mr. Sprague's initial draft of the Top Kill evaluation recommended that the BOP-on-BOP option be prioritized above the Top Kill operation, TREX 010507.0004, this preliminary recommendation was removed from subsequent drafts following additional analysis. TREX 010508.0004; Holt Dep. at 127-28.  Mr. Sprague had no involvement in the development of the BOP-on-BOP option, and would not have understood its readiness or risks.  Holt Dep. at 547-48.

### (2)     Top Kill Was a Highly Engineered Strategy.

489.     Secretary Chu described Top Kill as "an incredibly complicated technical and engineering challenge."  TREX 011305.0002.

490.     As Admiral Allen testified, Top Kill required significant engineering of equipment that could effectuate physical pumping of the mud and bridging material.  Allen Dep. at 88-89.

491.     To implement the Top Kill operation, BP was "looking for the best…in the world" to work on it, and staffed it with "the people with the most experience in [momentum]

kill and with bridging wells."  Patteson Dep. Vol. I at 295-97.  BP not only looked to BP employees to work on Top Kill, but "ask[ed] all the major well control providers and service company providers" to send "the best that they had" to advise on the operation.  Patteson Dep. Vol. I at 296-97.

492.    BP put together an "A" team consortium of industry leading contractors who, in performing the Top Kill operation, "used a proven method (although never before [used] in this environment) and delivered what they said they would do."  TREX 009653.0001; McNutt Dep. at 241-44.  The Top Kill operation was "designed, built, and mobilized [in] an immense above and undersea engineering feat that delivered beyond what it was designed to do."  TREX 009653.0001; McNutt Dep. at 241-44.

493.    At the time that Top Kill was attempted, there were several key "unknowns," including: (1) the flow path up the wellbore; (2) the geometry of flow path through surface equipment; and (3) the production rate and proportion of oil, gas, water, and solids in the flow. TREX 010622.0002 (Wild Well Control Project Memo); Tr. at 202 (Perkin).

494.    In light of the many unknowns, BP proceeded in a careful and prudent fashion with Top Kill's implementation.  Tr. at 1043 (Adams).

495.    Planning for Top Kill began on April 25, within days of the *Deepwater Horizon* explosion on April 20.  Tr. at 615 (Dupree); Stipulated Facts at 8 (Rec. Doc. 7076).

496.    Given the uncertainties about flow rate, the team sought to design a Top Kill procedure that had a chance of success regardless of the flow rate.  Holt Dep. at 249-50.  Top Kill, therefore, was not designed around a particular flow rate, but was designed around the pumping capacities the team could deliver for injecting the mud into the BOP.  Barnett Dep. at 322-24; Tooms Dep. at 149.

94

497.    BP's Mark Mazzella worked with outside consultants including Dr. Ole Rygg of Add Energy and Robert Grace to determine how much mud could be introduced into the well system and at what rates (and not to estimate hydrocarbon flow rates).  Tr. at 804-05 (Mazzella).

498.    The bridging material used for Top Kill was obtained from several sources, including Wild Well Control and BJ Services, and was developed and assessed through a collaborative process that included industry experts like David Barnett of Wild Well Control.  Tr. at 816-17 (Mazzella).

499.    In the Junk Shot portion of the Top Kill procedure, and consistent with the use of Junk Shots to control other wells, the injection of the bridging material was sequenced, with the larger-sized material being used before the smaller-size material, in order to try to "pack off" various areas in the BOP that were creating a flow path.  Tr. at 763-64 (Mazzella).

500.    In surface operations, bridging material is positioned next to the well prior to injection.  Tr. at 617 (Dupree).  For the Macondo well, a uniquely engineered Junk Shot manifold on the seabed was used to store the larger-size bridging material, and that material was pumped from that manifold to the BOP, to avoid having to pump the larger bridging material from a greater distance.  Tr. at 617 (Dupree); Tr. at 766; 799-800 (Mazzella).  BP also had the ability to inject bridging material from the surface vessels that were otherwise pumping mud.  Tr. at 617 (Dupree).

501.    The subsea Junk Shot manifold was operated by ROVs controlled from surface vessels, which could either pump material into the BOP, or release and vent pressure if circumstances required.  Tr. at 766 (Mazzella).

502.    Procedures were prepared for everything used in the Junk Shot portion of the Top Kill strategy.  Tr. at 814 (Mazzella).  These procedures were developed under the review of the

BP leadership and all of the Unified Command, and the team working on development of the Junk Shot procedures was "completely transparent" about the bridging material used in the Junk Shot procedure.  Tr. at 814 (Mazzella).

503.    The team working on Top Kill from the main vessels used in the operation could do what was necessary to conduct the operation.  Tr. at 833 (Mazzella).

504.    The *Q4000* was equipped with riser attachments and was a key vessel in the Top Kill operation, from which all bridging material from surface vessels was pumped to the BOP; the other main vessels were the *Centerline*, the command vessel that had pumping capabilities, the *Strongline*, which had additional stores of mud, and the *Blue Dolphin*, which was the "primary kill vessel."  Tr. at 760, 766, 833-34 (Mazzella).

505.    Mr. Mazzella led the Forward Team for the Top Kill operation from the *Centerline*, and the operation was staffed onboard the *Centerline* and other vessels with a handpicked group of blowout response specialists who implemented procedures approved by the Unified Command.   Tr. at 759; Holt Dep. at 142; Patteson Dep. Vol. II at 247; TREX 011737R.0009; TREX 011738R.0012.   BP created procedural and mechanical barriers so that the well would not be over-pressured and risk injuring the integrity of the well.  Tr. at 753-54 (Mazzella).  A board on the *Centerline* was used to record and display the valves, and load tubes containing bridging material that were sequentially numbered so that Mr. Mazzella could control and sequence deployment of the bridging material.  Tr. at 833-34 (Mazzella).

506.    In addition to the primary fleet of four main vessels, the Halliburton *Stem Star* vessel was made available as back-up to the *Blue Dolphin*.  Tr. at 760 (Mazzella).

507.     Other vessels controlled remotely operated vehicles ("ROVs") that provided the "eyes" for the Top Kill operation on the ocean floor, providing six video feeds to the command center and controlling the subsea valves used in the operation.  Tr. at 760-61 (Mazzella).

508.     The team leaders on the vessels had specific procedures to use during the pumping operation, and would confirm their orders to use bridging materials, as well as confirm when they had launched their materials in sequence, as the procedures required.  Tr. at 833-34 (Mazzella).

509.     In the days leading up to Top Kill, Admiral Cook wrote: "My overall sense is that BP is moving as quickly as they can.  There really are a lot of details to tend to when working with specialized equipment at such great depths and such a large number of support vessels on the surface (in a relatively confined area)."  TREX 144730.0001.

### a.     BP Conducted a Peer Assist With Industry Experts to Identify and Mitigate the Risks for Top Kill.

510.     On May 6, BP conducted a Peer Assist with academic experts, industry experts (including representatives from Chevron and Exxon), and Government personnel to provide feedback and identify risks and concerns regarding Top Kill.  Tr. at 618 (Dupree); Tr. at 744, 755-56 (Mazzella); Stipulated Facts at 10 (Rec. Doc. 7076); see TREX 142916; D23881.

511.     A Peer Assist generally aims to bring together the best minds in the industry to collaborate and assess the risks, hazards, and benefits of a proposed engineering strategy.  Tr. at 200 (Perkin); Tr. at 388 (Turlak); Holt Dep. at 138-39.  It is standard practice to consider all the risks for an operation, and Peer Assist review is common at BP.  Tr. at 389 (Turlak); Wellings Dep. at 133-34.

512.     The purpose of the Peer Assist for Top Kill was to identify issues that the Top Kill Team might have missed, using input from people who had not been otherwise involved in

the development of the operation.  Tr. at 755 (Mazzella).  It also aimed to identify opportunities and potential alternatives associated with the Junk Shot or Momentum Kill operation.  TREX 010506.0005.

513.    The results of the Top Kill Peer Assist identified issues to address as the procedure was further developed, but did not identify any overall reason why the Top Kill procedure should not be attempted; most participants in the Top Kill Peer Assist agreed that attempting Top Kill was "a good step forward."  Tr. at 756, 800 (Mazzella); TREX 010506.0004 (no "technical 'show stoppers'" identified).  The risks that were identified included well integrity and compromising the relief well.  TREX 010506.0002.

514.    The Peer Assist participants proposed that more diagnostic work was needed and that the team should consider methods to optimize the Junk Shot.  TREX 010506.0002.

> **b.     BP Mitigated the Risks Associated with Top Kill, Including Risks Associated with the Relief Well and Pressure Build-Up During Junk Shot.**

515.    Identifying that an operation has risks is not in itself a reason to stop an operation going forward where those risks can be appropriately mitigated.  Tr. at 1056-57 (Adams); Vargo Dep. at 75-76.

516.    Halliburton's representative recognized that every offshore operation has risks and that you need to manage them.  Vargo Dep. at 75-76; 216 ("I think anytime you send anyone offshore there is a risk.  There is a risk in everything we do.").

517.    The risks associated with Top Kill were analyzed by the Federal Science Team and BP engineers.  Allen Dep. at 331-41; TREX 009178 (clip 8).

518.    The mitigations BP put in place before commencing the Top Kill procedure demonstrated sound engineering practices, and were appropriate to deal with the identified risks.  Tr. at 1056 (Adams); Vargo Dep. at 217-18; Allen Dep. at 331-41, TREX 009178 (clip 8); Holt

Dep. at 181; TREX 011737R.0010.  As a result of BP's identifying and mitigating risks, the Unified Command was able to execute Top Kill safely, without any of the possible adverse consequences that had been identified and mitigated.   TREX 011737R.0010; TREX 011738R.0012.

519.     In the preparation for Top Kill, the Top Kill team conducted numerous practice exercises that required it to address in "realtime" potential problems that were suggested by participants.  Tr. at 757 (Mazzella).

520.     The risk of blocking the *Deepwater Horizon* BOP's choke and kill lines during Junk Shot was identified prior to Top Kill.  TREX 011737R.0010.  To mitigate this risk, BP employed an outside engineering firm to test the potential for the bridging material that comprised the Junk Shot to block the choke and kill lines during injection.   Tr. at 814 (Mazzella); McWhorter Dep. at 304-05; TREX 011737R.0010.  A BP contractor created a replica of the system to test material to make sure it would pass through.  Patteson Dep. Vol. II at 257.  These tests indicated that the bridging material would successfully pass through the choke and kill lines.  TREX 011737R.0010.

521.     The use of high pressure pumps to deploy Top Kill contained inherent risk. TREX 011737R.0010.  This risk was identified, and the equipment selected was rated to pressures well in excess of those anticipated during the Top Kill operation.    TREX 011737R.0010.  The equipment deployed for Top Kill far exceeded the design criteria of pumping 50 barrels per minute of mud.  TREX 008528.0002 (May 28, 2010 email from Halliburton's Richard Vargo).  Similar equipment is used in daily operations in the oil and gas industry, and standard mitigations for these risks are put in place, such as ensuring the safe location of workers during pumping operations.  TREX 011737R.0010.  These same standard

mitigations during Top Kill brought the risks associated with using high pressure pumping equipment to acceptable levels.  TREX 011737R.0010.

522.    Damage to the integrity of the well from Top Kill was identified as a key risk that required mitigation.  Tr. at 1050-51 (Adams); Vargo Dep. at 58; Tr. at 659 (Dupree); TREX 011737R.0009.  Because Top Kill required pumping mud into the well at high pressure, Tr. at 1051 (Adams), the operation created a risk that deploying Top Kill might exceed the rupture pressure of the outward-acting burst disks in the well casing, potentially resulting in fracture of the formation and a subsea broach.  Tr. at 1051 (Adams); TREX 011737R.0009.  This risk was identified and presented to the U.S. Government.  Tr. at 659 (Dupree); TREX 142710N.13.BP.  The federal Government shared BP's concern, and saw the possibility of a subsea broach as a "significant risk."  Saucier Dep. at 391-92; Herbst Dep. at 160.

523.    The risk of compromising well integrity was mitigated by identifying potentially dangerous pressure levels and avoiding them during execution of the procedure.  Tr. at 1052 (Adams); Tr. at 660-61 (Dupree); TREX 142710N.6.BP; Holt Dep. at 142; Patteson Dep. Vol. II at 247; TREX 011737R.0009; TREX 011738R.0012.  BP created procedural and mechanical barriers so that the well would not be over-pressured and risk injuring the integrity of the well.  Tr. at 756-57 (Mazzella).  For example, there were relief valves, including in the Top Kill hardware system, that would discharge, so that an operator could not over-pressurize the system during pumping and over-pressuring would be impossible.  Tr. at 753-54; 756-57 (Mazzella); Tr. at 1052 (Adams).

524.    It was prudent and sound practice for BP to recommend Top Kill after the risk to well integrity was mitigated by determining a maximum pump rate.  Tr. at 1052-53 (Adams).

525.    The risk of achieving a complete blockage of the flow path with Junk Shot was a key identified risk.  Tr. at 1050-51, 1053 (Adams); TREX 011737R.0009.  The Junk Shot was designed to cause a partial blockage and restrict flow.  Tr. at 1053 (Adams).  Because the flow path was unknown, however, Junk Shot could have either (1) had little or no effect; (2) restricted flow by creating a partial blockage in the flow path (the desired effect); or (3) had too great an effect, completely blocking the flow path.  Tr. at 1053 (Adams).  Completely blocking the flow path may have risked overpressuring the wellbore and rupturing the burst disks.  TREX 011738R.0009.

526.    The risk of compromising well integrity through achieving a complete blockage of the flow path with Junk Shot was mitigated by applying a staged approach, first pumping Momentum Kill alone without Junk Shot, and then by pumping different types of bridging material in limited amounts while monitoring the pressure response.  Tr. at 1053-54 (Adams); TREX 011737R.0009.  There was also a strategy and method to relieve the pressure buildup through the subsea manifold.  Barnett Dep. at 183; Holt Dep. at 476-77, 605-06; TREX 011737R.0009-10.

527.    The initial stage of Top Kill included a diagnostic phase, which gave an indication of the baseline pressure response.  Tr. at 1053-54 (Adams).  This enabled responders to assess any differences in the pressure response when Junk Shot was pumped.  Tr. at 1053-54 (Adams).  The pressure response was constantly monitored throughout the Top Kill operation.  Tr. at 1054 (Adams).

528.    The risk of pressure build-up in the wellbore was not the same for Top Kill as it was for the BOP-on-BOP option.  The methodology employed for Top Kill resulted in lower

pressures than a direct shut-in with a capping device, and consequently a lower chance of compromising well integrity by rupturing the burst disks.  Holt Dep. at 101-02.

529.    It was critical to minimize the risk posed to the relief wells by any potential source control operation.  Tr. at 1055 (Adams).  The risk of compromising the relief wells by pressurizing shallow sands was a key identified risk for Top Kill.  Tr. at 1050-51, 1055 (Adams); TREX 011737R.0010.

530.    Shallow sands intervals that the relief wells would have to drill through had been identified.  Tr. at 1055 (Adams); TREX 011737R.0010.  If Top Kill had compromised well integrity and opened a path between the well and one or more of the shallow sands, there was an identified risk that hydrocarbons would flow into the shallow sands and pressurize them, making them dangerous and difficult to drill through.  Tr. at 622, 661 (Dupree); Tr. at 1055 (Adams); Patteson Dep. Vol. II at 249.

531.    This risk was mitigated by having the first relief well drilled and cased off below the potential leak points in the Macondo well before Top Kill was deployed.  Tr. at 757 (Mazzella); Tr. at 662-63 (Dupree); Tr. at 1055-56 (Adams); Holt Dep. at 134-36; Patteson Dep. Vol. I at 154-55, 259; TREX 011737R.0010.  This mitigation of risk demonstrates BP's sound judgment in the design and execution of Top Kill.  Tr. at 1056 (Adams).

532.    A fundamental problem with the opinions of the Aligned Parties' experts is that they consider risks asymmetrically, and thus unfairly.  TREX 011738R.0012.  They highlight the risks identified with Top Kill (that were mitigated), while ignoring the risks identified with BOP-on-BOP.  TREX 011738R.0012.  A proper comparison between Top Kill and BOP-on-BOP should include an evaluation of the risks and associated mitigations of both operations.  TREX 011738R.0012.

533.    Halliburton was aware of the risk of an underground blowout and surface broaching when it pumped Top Kill.  Vargo Dep. at 52-53.  The mitigation for this risk was maintaining a maximum pressure during pumping, and BP was monitoring the well during pumping.  Vargo Dep. at 53.

534.    As Halliburton's corporate witness on Top Kill acknowledged, based on the pressure response from the well, increasing the Top Kill pump rate from 50 barrels per minute to 80 barrels per minute did not pose a risk to well integrity.  Vargo Dep. at 101-02.

535.    Halliburton personnel were trained to provide the services Halliburton provides, including conducting Momentum Kill pumping operations.  Vargo Dep. at 13-15.  Halliburton uses "the best pumps," and knows how to maintain and use them.  Vargo Dep. at 14-15.  If Halliburton had come close to the pressure limits of its equipment, it would have shut down the operation.  Vargo Dep. at 219-20.

536.    Halliburton had the authority to raise risks it perceived during the response, and could have stopped any job it was involved in, including Top Kill, if it believed the risks were too high.  Vargo Dep. at 78-79.  Halliburton never told BP it thought an operation was too risky to proceed, or that it believed that identified risks had not been adequately mitigated.  Vargo Dep. at 79-82.  Halliburton never suggested that BP should not attempt Top Kill.  Vargo Dep. at 205.

537.    In a May 13, 2010 internal email, a Halliburton employee involved in deploying Top Kill advised other Halliburton personnel that Halliburton was present  "for support purposes only," and to "keep quiet on actual pumping ops" as Halliburton did not "want to be liable for anything."  TREX 008527.0001; Vargo Dep. at 34-35.

103

538.   Prior to commencing Top Kill, Transocean had an opportunity to review the bridging material that would be pumped into the BOP as part of the Junk Shot.  Hand Dep. at 179-80.

539.   Although Steve Hand, Transocean's Director of Performance and Operations, offered personal opinions about Top Kill at his deposition, during the response efforts, he was not privy to how the Top Kill procedure was developed or the costs, benefits, and risks associated with Top Kill.  Hand Dep. at 244-45 (Mr. Hand assumed that a team with better resources performed a technical analysis of the proposed Top Kill procedures).

<div align="center">

**(3)    Unlike Other Options, Top Kill Did Not Jeopardize the Ability for Alternative Collection or Containment Methods.**

</div>

540.   A key concern throughout the response was whether one source control method would eliminate another potential source control method.  Tr. at 1041-42 (Adams); TREX 011737R.0006.  The goal was to avoid, to the extent practicable, deploying a particular source control method if it would preclude deploying other potential source control methods in the future.  TREX 011737R.0006.

541.   One of the positives about Top Kill was that it did not jeopardize other source control options being developed in May 2010 or subsequently implemented if it was not successful.  Tr. at 1041-42 (Adams); TREX 011737R.0008, 0010.

542.   One of the reasons BP and Unified Command agreed to pursue Top Kill was that if the Top Kill operation failed it would still be possible to conduct a BOP-on-BOP operation. Tr. at 1041-42 (Adams); Holt Dep. at 222, 224; TREX 011737R.0008, 0010.  On the other hand, if Unified Command pursued a BOP-on-BOP operation first and it had been unsuccessful, the removal of the LMRP to attempt the BOP-on-BOP operation "would have made a Top Kill-type

operation very, very difficult" because the LMRP is used to control the lower BOP stack  Tr. at 759 (Mazzella).

543.    Later in the response, oil was collected to the *Q4000* via the *Deepwater Horizon* BOP's choke and kill lines.  Barnett Dep. at 329.  If the LMRP had been removed for the BOP-on-BOP option, those valves would have closed, preventing any collection of oil via that method. Barnett Dep. at 329-30.

544.    In early May 2010, Transocean's Director of Performance and Operations recognized that if the *Discoverer Enterprise* BOP-on-BOP option failed, then the responders would have a "60000bbl/day problem and no back up options.  I think its (sic) unlikely they will do this."  TREX 010901; Hand Dep. at 386-87 (testifying that the 60,000 bopd figure was a generally discussed figure and may have been a worst-case scenario number).

### (4)    Top Kill Was Not Flow-Rate Dependent Because of the Junk Shot Component.

545.    There are two separate components to Top Kill: Momentum Kill and Junk Shot. Tr. at 653 (Dupree); Tr. at 761-62 (Mazzella).

546.    Although flow rate would have been relevant to the success of Momentum Kill alone, even a high flow rate was not relevant for Top Kill because Top Kill included Junk Shot. Tr. at 653 (Dupree); Herbst Dep. at 137-38; Holt Dep. at 471; Barnett Dep. at 323-24 (Top Kill was not designed around a particular flow rate).

547.    The purpose of the Junk Shot is to restrict orifice size, which would in turn create additional backpressure, reducing the flow rate and forcing the Momentum Kill mud down the wellbore.  Tr. at 653-54 (Dupree); Tr. at 762, 805-07 (Mazzella); Tr. at 1101 (Adams); Barnett Dep. at 323; Herbst Dep. at 590; Brannon Dep. at 306-07; Cook Dep. at 472-73; Hunter Dep. at 111; Holt Dep. at 25-26, 176-77; 248-49; 312-13.

548.    Effective use of bridging material in the BOP stack or in the wellbore would have negated the flow rate impact on the Top Kill.  Holt Dep. at 246.  If Junk Shot succeeded in reducing the flow rate to a low enough level, a subsequent Momentum Kill could succeed. TREX 011737R.0008-09; Barnett Dep. at 180-81 (inclusion of the junk shot gave Top Kill a "better chance of success").

549.    The success of Top Kill with Junk Shot was not dependent on flow rate, but instead on the relationship between the size of the bridging material and the size of the orifice that it encountered.  TREX 011737R.0008; TREX 011738R.0012; Barnett Dep. at 181 (if the flow path was a series of small pathways, "the probability of success for that junk shot operation was fairly high").

550.    As Admiral Allen testified, all that was needed for Junk Shot to succeed was for it to increase the blockage somewhere in the BOP.  Allen Dep. at 356-57, 698-99.

551.    Prior to Top Kill, BP hired Dr. Ole Rygg at Add Energy to perform modeling relating to the Momentum Kill component of Top Kill.  Tr. at 651-53 (Dupree); Holt Dep. at 307-08.

552.    Modeling performed by Dr. Rygg indicated that a flow rate over 15,000 bopd would decrease the likelihood of success with Momentum Kill alone, and that it could not succeed over 15,000 bopd at the planned mud pumping rate of 50 barrels per minute.  Tr. at 1059 (Adams); Holt Dep. at 176-80; TREX 010511; TREX 011737R.0008.  BP did not put any limitations on Dr. Rygg as to what types of information he was allowed to discuss or disclose to Government representatives.  Rygg Dep. at 291-92.

553.    The 15,000 bopd limit on Momentum Kill applied only to the case modeled by Dr. Rygg using a specific set of assumptions because there was significant uncertainty regarding

the inputs used in Dr. Rygg's model. Tooms Dep. at 149, 264-65, 581-82. Dr. Rygg's modeling assumed near worst case conditions for the Momentum Kill operation: a deep choke and annular flow. TREX 011905R.0029.

554.    Dr. Rygg is not an expert in Junk Shot, and tools to model Junk Shot do not exist. Tr. at 805, 814-15 (Mazzella).

555.    Dr. Rygg's modeling did not take into account Junk Shot, or the higher mud pump rate that was ultimately used. Rygg Dep. at 207; Barnett Dep. at 323; Hunter Dep. at 633-34; Patteson Dep. Vol. II at 253; TREX 011737R.0008. As Junk Shot was designed to reduce the flow rate, nothing can be "deduce[d]" regarding Junk Shot from Add Energy's modeling work. Rygg Dep. at 207.

556.    Dr. John Wilson, the Aligned Parties' expert in hydraulic modeling, agreed that Dr. Rygg's modeling was limited to the Momentum Kill portion of the Top Kill procedure. Tr. at 170 (Wilson).

<div style="text-align:center">

**a.    BP Disclosed the 15,000 bopd Limit on Momentum Kill to the Federal Government and Its Contractors.**

</div>

557.    BP disclosed the 15,000 bopd limit on Momentum Kill to the federal Government and its contractors. Allen Dep. at 361-65, 436-38, 440-41; Chu Dep. at 304-06; Hunter Dep. at 161-63, 497-98; TREX 9132.0001-02; TREX 009135.0001. Add Energy's Top Kill modeling results, including the flow rate inputs and the modeled 15,000 bopd limit for Momentum Kill, were shared within Unified Command prior to the execution of Top Kill. Holt Dep. at 161, 164-66, 308-10.

558.    At BP's request the Federal Science Team performed a "red team" review of the Momentum Kill pumping schedules. Tr. at 649 (Dupree); TREX 142819N. The purpose of the "red team" review was "to get a totally independent view on the [Top Kill] pumping schedule."

<div style="text-align:center">107</div>

Tr. at 649 (Dupree); Brannon Dep. at 63-64 (the red team, which was made up of scientists from Sandia, Los Alamos and Livermore labs, arrived at the Houston ICP to discuss, review, evaluate, make recommendations and report on the risks associated with the Top Kill procedure).

559.    The Federal Science Team's "red team" review included what was called the "Kill the Well on Paper" exercise, which involved a meeting among BP, federal responders and industry experts that took place on May 17.  Tr. at 650 (Dupree); TREX 009245.0001.

560.    On May 17, 2010, the Kill the Well on Paper ("KWOP") meeting was attended by BP employees and contractors and at least nine federal scientists involved in the *Deepwater Horizon* response.  Tr. at 1062-63 (Adams); Tr. at 230-36 (Perkin) (agreeing that Government scientists attended the KWOP discussion); TREX 009245.0002; TREX 009245.2.4.BP. Participants were informed that modeling had indicated that the Momentum Kill could not be successful if the flow rate was above 15,000 bopd.  Tr. at 236 (Perkin); TREX 009245.0002; Rygg Dep. at 117-18.

561.    As Admiral Cook testified, the modeling presented to the Federal Science Team during the KWOP meeting about the limits of Momentum Kill did not consider how Junk Shot would impact the overall Top Kill procedure.  Cook Dep. at 616-18.

562.    Curt Ammerman, a federal scientist at Los Alamos National Laboratory, attended the KWOP exercise and provided a summary to other federal scientists immediately after it. TREX 009135.0001.  According to Mr. Ammerman, at the meeting BP provided the federal scientists with an overview of the Top Kill procedure, answered all questions, and was open to ideas and suggestions provided by the federal scientists.  TREX 009135.0001.  BP informed participants that if the flow rate is 15,000 bpd, the modeling shows that the Momentum Kill will not be successful.  TREX 009135.0001 ("BP appears to be methodically building up an informed

procedure for performing the well kill operation.  Even in the face of a leaking well, BP is taking the time necessary to think through potential failure scenarios and review the step-by-step procedure with all of the individuals involved in the operation.").

563.    The results of the KWOP review, including the results of modeling showing the flow rate limits on Momentum Kill, were then presented at the daily Management Meeting on May 18, 2010, with attendees including the Federal Incident Commander, other representatives from the Coast Guard, and the MMS.  Tr. at 650-52 (Dupree); Brannon Dep. at 35-36, 44, 68-71 (meeting was informed that the Momentum Kill would struggle if the flow rate was greater than 5,000 bopd); TREX 140914.2.1BP; TREX 010679.0011; TREX 010680.0001.

564.    On May 18, 2010, approximately eight days before Top Kill was deployed, a memorandum summarizing the points discussed at the KWOP meeting was circulated to federal scientists from a number of organizations involved in the *Deepwater Horizon* response, including NASA, Los Alamos National Laboratory, Sandia National Laboratories, and Lawrence Livermore National Laboratory.  Tr. at 1062-63 (Adams); Tr. at 232-34 (Perkin); TREX 009245.0001;  TREX 009245.2.4.BP.  The summary noted that the "dynamic kill" (*i.e.*, Momentum Kill) portion of Top Kill could not be successfully executed if the flow rate was greater than 15,000 bopd.  Tr. at 1063, 1104-05 (Adams); Tr. at 236 (Perkin); TREX 009245.0002.

565.    On May 23, Secretary Salazar attended a meeting at BP's Houston facility to review the upcoming Top Kill procedure.  TREX 010512.0039.  The 15,000 bopd modeled limit for Momentum kill was again discussed at this meeting.  Holt Dep. at 569-74.

566.    Wild Well Control was aware of Add Energy's Top Kill models.  Barnett Dep. at 103-04.  Mr. Barnett, however, did not put much importance on them as he was focused on

assembling as much pumping horsepower and fluid to pump as fast as possible.  Barnett Dep. at 103-04.

> **b.**     **The Federal Government Had Flow Rates Exceeding 15,000 bopd Before Top Kill Was Implemented.**

567.    NOAA and the MMS "had a prominent role" in Unified Command's daily discharge estimates during the response.  Cook Dep. at 465-66.

568.    By April 25, 2010, NOAA scientists had estimates of the flow rate of up to 64,426 bopd.  TREX 144811.2.1.BP.

569.    In an April 30 to May 1 internal NOAA email chain deliberating how to respond to a request from the Associated Press for comment on a Florida State professor's estimate that "8 or 9 million gallons of oil" had been spilt by April 28, the NOAA Incident Operations Coordinator instructed a NOAA Public Affairs Specialist: "[W]e are using the 5,000 barrel release until you hear otherwise."  TREX 144836.0001-02.  He noted that a flow rate of 5,000 bopd would equate to 1.68 million gallons spilt by April 28, approximately one fifth of the Florida State professor's estimate.  TREX 144836.0001.  "The professor may be closer to the mark, but [there are] a lot of uncertainties in how this is calculated."  TREX 144836.0001.  The NOAA Public Affairs Specialist then suggested that NOAA reply to the AP query that "NOAA continues to estimate a 5,000 barrel/day release."  TREX 144836.0001.  The NOAA Incident Operations Coordinator responded: "I would not feel comfortable with that.  We are tracking it, and the Unified Command is making the call on the estimated release rate."  TREX 144836.0001.

570.    On May 2, 2010, Secretary Salazar publicly announced a worst-case discharge scenario of 100,000 bopd.  Hunter Dep. at 682.

571.    On May 10, 2010, BP disclosed a potential flow rate of 55,000 bopd to Admiral Landry.  TREX 009155.0003.

572.    On May 14, 2010, Professor Wereley announced a 70,000 bopd flow rate estimate; Admiral Allen was aware of Professor Wereley's estimate.   Allen Dep. at 455-57; TREX 011182.0001.

573.    On May 20, 2010, Robert Pond of the United States Coast Guard wrote an email, subject "Recommend message on flow rate," to a list of recipients including representatives of the MMS, the Coast Guard, and NOAA, recognizing the uncertainty involved with estimating flow rate, and making clear that the flow rate could be anything from 5,000 bopd to 100,000 bopd.  TREX 010698.0001 ("Unfortunately there is no update or better estimate of the flow than what we have put out in the past … the range of 5000 bbls of pure oil per day (that we have used since the beginning) to 100,000 bbls a day of gas and oil that the Purdue University professor has suggested is in the realm of the possible is as valid as anything else we can put out.") (ellipsis in original); TREX 009644.0002.

574.    By May 23, 2010, a few days before Top Kill was implemented, the federal Government's Flow Rate Technical Group, headed by Dr. McNutt, had been established and was discussing its own upper-bound flow rate estimate of 80,000 bopd.  TREX 008868.0002.

575.    In a May 24, 2010, Sandia memorandum, federal scientists estimated that the flow rate was 18,000 bopd, based on visual observations from May 20.  TREX 010700.0004.

576.    On May 25, 2010, the day before Top Kill commenced, the federal Government's Flow Rate Technical Group determined that "multiple lines of scientific evidence agree that the rate of release is at least 14,000 to 20,000 barrels of oil per day."  McNutt Dep. at 207-09; Tr. at 256-57 (Perkin); TREX 009652.0001 (Dr. Marcia McNutt, Director of the Flow Rate Technical

Group, circulated flow rate numbers to Government scientists working on the *Deepwater Horizon* response). Dr. McNutt pointed out that such an estimate is "not as alarmist as the 70,000 [barrels per day] that has been picked up by the media and is demonstrably wrong." McNutt Dep. at 207-09; TREX 009652.0001.

577.   On May 25, 2010, an "FRTG Update" was circulated by a Coast Guard member of the Interagency Solutions Group to a list of recipients including members of the Coast Guard and the MMS, noting based on data collected from the RITT tool that "[t]he true flow rate is clearly greater than 8000 barrels per day." TREX 010702.0001, 0003.

578.   On May 25, 2010, a US Geological Survey employee emailed Dr. McNutt informing her that, based on visual observations of oil on water, one of the Government's experts was estimating that the flow rate could be as high as 40,000 barrels per day, but that a reasonable estimate was the equivalent of over 20,000 barrels per day. TREX 144753.0001. The email noted that defining the extent of the spill was proving difficult. TREX 144753.0001.

579.   On May 25, 2010, before Top Kill was implemented, a member of the Flow Rate Technical Group's Plume Modeling team wrote to Drs. Marcia McNutt and Bill Lehr, among others, that the "prudent scientifically-defensible" *lower bound* for flow rate was 12,000 bopd to 25,000 bopd. TREX 010701.0001; TREX 010703.0003.

580.   On May 26, 2010 a member of the Flow Rate Technical Group wrote to Dr. Lehr of NOAA that "the most likely flow rate" was 20,000 barrels per day. TREX 009683.0001 (also noting that "BP was very quick" to provide requested data); McNutt Dep. at 642-45.

581.   Many people in the federal Government were cautious about the chances of success for Top Kill in light of the Flow Rate Technical Group's initial flow rate estimates. McNutt Dep. at 171. The federal Government was aware of the FRTG's first estimate of a lower

bound range of 12,000 to 19,000 bopd before it was publicly announced on May 27, 2010.  Allen Dep. at 460-62.

582.    On May 27, 2010 the Flow Rate Technical Group announced a lower bound estimate of 12,000 - 19,000 bopd.  McNutt Dep. at 18, 144-47, 220-21; TREX 008811.0001.  At that time, the federal Government's plume team thought that the actual flow rate could be 25,000 bopd or higher.  Sogge Dep. at 107-10, 462; TREX 008811.0001.

### (5)    The Federal Government Performed an Independent Analysis of Top Kill and Approved It.

583.    As with other source control methods, federal officials reviewed extensively the Top Kill operation before implementation.  TREX 011737R.0007.

584.    According to Admiral Allen, participants from the Government, including Secretary of Energy Chu and representatives from the National Labs, reviewed BP's work and questioned BP about its assumptions related to the Top Kill technique.  Allen Dep. at 340.  Over 150 personnel from the National Lab contributed to the Top Kill effort.  TREX 011305.0002.

585.    After the Kill the Well on Paper meeting was held and its summary memorandum was circulated, Government scientists performed their own independent analysis to understand Top Kill.  Tr. at 1063 (Adams); Tr. at 240-43 (Perkin) (agreeing that "the [N]ational [L]abs [were] conducting an independent assessment relating to the Top Kill"); TREX 011480.  Three independent groups from Sandia, Los Alamos, and Lawrence Livermore National Labs worked on verifying predicted shut-in pressures, and were involved in a peer review of the Junk Shot. TREX 144843.0006; TREX 010672.0001.

586.    Secretary Chu appreciated that Top Kill represented an "incredibly complicated technical and engineering challenge" that had "never been done before at this depth."  TREX 011305.0002.  Dr. Chu personally halted the Top Kill going forward while he gave further

thought to one of the issues that was involved in the "Top Kill" exercise.  Chu Dep. at 123-24; TREX 011313 (May 26, 2010 E-mail from White House official Carol Browner stating that Top Kill was "put on hold" because "CHU is rethinking the pipe issue").

587.    The MMS reviewed both the Momentum Kill and Junk Shot procedures before Top Kill was deployed.  Herbst Dep. at 123.

588.    Admiral Cook in Houston was the lead representative from the U.S. Coast Guard for Top Kill, and part of the Government's oversight of the Top Kill operations.  Landry Dep. at 618.  Representatives of the Coast Guard were involved in several hazard identification exercises and procedure meetings prior to the approval of Top Kill.  Brannon Dep. at 49.

589.    Prior to approving it, the federal responders understood that Top Kill could fail.  TREX 011305.0003.  Prior to the start of Top Kill, the Federal Science Team "scrutinized options for other strategies if the [T]op [K]ill [was] not successful."  TREX 011305.0003.  In the days leading up to Top Kill, Admiral Cook wrote: "I think BP clearly understands that one path forward is not enough.  While there is significant focus on the [T]op [K]ill, there is very strong focus on the post [T]op [K]ill (failure) path.  This would very likely be a procedure where the riser is cut above the LMRP (Lower Marine Riser Package which sits on top of the BOP)."  TREX 144730.0001.

590.    The first stage of Top Kill was a diagnostic stage, data from which was reviewed by BP and federal scientists to confirm conclusions reached based on that data.  Brannon Dep. at 77; TREX 010683.0001.  Secretary Chu and the federal scientists received "those results in real time and conducted [their] own analysis of the findings, and verified that it did make sense to go forward with the '[T]op [K]ill' attempt."  TREX 011305.0003.

114

591.     On May 25, 2010 BP engineer Tom Knox wrote in a message that was copied to Secretary Chu and a number of federal scientists: "The Junk [S]hot is no longer on the flow sheet.  It is not an option under consideration."  TREX 009503.0003.  The "flow sheet" Dr. Knox referred to covered only planned operations for the next 24 hours, and he did not intend to imply that Junk Shot was no longer under consideration at all.   Knox Dep. at 358-60; TREX 009503.0002.  Later that same day, in a meeting including Secretary Chu, the MMS, and BP representatives, Secretary Chu asked about Junk Shot and Dr. Knox's email.   TREX 009503.0001.  BP's Kent Wells and representatives from the MMS clarified to Secretary Chu that Junk Shot was still an option under consideration, and that all necessary approvals would be sought should Junk Shot be required.  TREX 009503.0001; Knox Dep. at 360-63.

592.     On May 26, 2010 representatives of the National Labs met with the Department of Energy leadership to discuss the results of the diagnostic phase of the Top Kill procedure.  Brannon Dep. at 74-75; TREX 010682.0001; TREX 141758.0001.  Based on their independent analysis, Secretary Chu and the federal scientists agreed with the conclusions drawn by BP, and agreed that the Top Kill should be executed.   Chu Dep. at 122-24; Allen Dep. at 348-50; Brannon Dep. at 75; Hunter Dep. at 37-38; TREX 009129.0001; TREX 009687.0001; TREX 141758.0001, 0008; TREX 011305.0003; TREX 011313.

593.     Top Kill was approved by the Unified Command, which included representatives from BP, Transocean, the MMS, and the Coast Guard, among others.  Holt Dep. at 70-72; TREX 008983 (Top Kill Procedure approval page signed by L. Herbst, on behalf of the MMS, and M. Landry, on behalf of the Coast Guard).

594.     On May 26, 2010, the federal Government ultimately approved Top Kill.  Tr. at 663 (Dupree); Allen Dep. at 341-43, 348-49, 368-70, 440; Herbst Dep. at 125-26; Hunter Dep. at

213-14; Vargo Dep. at 89; TREX 009695.0003; TREX 009127.0001; TREX 009128.0001; TREX 009133.0001.

(e)     **A Risk-Mitigated BOP-on-BOP Option Was Not Ready Prior to Top Kill.**

595.    A source control alternative developed in parallel with Top Kill and other source control strategies was known as the BOP-on-BOP option.  BOP-on-BOP was a source control procedure designed to shut in the well and involved landing a second drilling BOP on top of the *Deepwater Horizon* lower BOP after removing the Lower Marine Riser Package.   TREX 011737R.0012; TREX 011738R.0009-10.

596.    The idea of shutting in the Macondo well with a second BOP was first proposed for the *Deepwater Horizon* response around the end of April 2010.  Wellings Dep. at 316.

597.    The Government was not aware of any member of the MMS that had "suggested or written about or—or even communicated within the agency about the possibility of having a BOP on BOP means of stopping a deepwater blowout" before the *Deepwater Horizon* incident. Herbst Dep. at 82-83.

598.    BP made the BOP-on-BOP option a priority during May 2010.  TREX 010879 (May 15 email from Pat O'Bryan to various recipients at BP and Transocean confirming "the bop on bop is the priority"); Cook Dep. at 525.

599.    Despite making BOP-on-BOP a priority, there were still outstanding engineering and execution issues for the BOP-on-BOP option at the time that Top Kill had been approved and was ready to be implemented.  Tr. at 606 (Dupree).

(1)    **A Well Capping Team Was Stood up Shortly After the Incident and Worked Throughout the Response to Develop a Capping Solution for the Macondo Well.**

600.    The Capping Stack was progressed beginning very early after the rig sank and work was "full tilt." McWhorter Dep. at 293. Within a few days of April 20, BP had a number of simultaneous measures underway within the Unified Command to develop capping solutions, and discussions had already been held about putting a 2-Ram Capping Stack on the lower stack of the *Deepwater Horizon* BOP. Tr. at 364, 374 (Turlak); McKay Dep. at 529.

601.    Within days of the explosions on the *Deepwater Horizon*, a Well Capping Team was set up to develop capping options to shut in the well. Wellings Dep. at 25-26, 312, 479 (the Well Capping Team was created on or around April 26-27 and included individuals with subsea, capping, engineering, and operations expertise). By April 27, 2010, BP and other responders had started a work stream to develop a possible plan to cap the Macondo well. Inglis Dep. at 665.

602.    The Well Capping Team worked on solutions to cap the well, such as the BOP-on-BOP and Capping Stack solutions, in parallel. Tr. at 374 (Turlak).

603.    Jim Wellings of BP led the Well Capping Team. Boughton Dep. at 80-81. Mr. Wellings had extensive experience with planning operations and managing a diverse team to accomplish a project. Wellings Dep. at 24-25, 437-38.

604.    The Well Capping Team worked throughout the response to develop a capping solution for the well. Tr. at 364 (Turlak).

(2)    **The Well Capping Team Had Broad Subsea Expertise and Worked Tirelessly and Collaboratively.**

605.    The Well Capping Team operated collaboratively, worked long hours, and was usually working in the same conference room all day long during the response. Tr. at 365, 369 (Turlak).

606.     The Well Capping Team met daily at BP's offices to review the work that was ongoing with the capping solutions.  Tr. at 369-70 (Turlak).

607.     The Well Capping Team invited Government representatives to meetings about well capping and regularly informed them about what the Well Capping Team was doing. Boughton Dep. at 82 (Transocean subsea specialist); Wellings Dep. at 332-35 (the Well Capping Team had "many meetings with the MMS" and "shared everything" with them); TREX 011249 (the U.S. Coast Guard met with the Well Capping Team in mid-May to review the BOP-on-BOP options and to discuss hydrate formation); Thierens Dep. at 245.

608.     The Well Capping Team was comprised of engineers from BP, Transocean, Cameron, and Wild Well Control.  Tr. at 364 (Turlak); Boughton Dep. at 79-80.

609.     The Cameron and Transocean engineers who were assigned to work on the Well Capping Team had subsea, operational, and well control expertise.  Tr. at 365-68 (Turlak). Transocean had engineers assigned to the Well Capping Team at all times who had subsea engineering expertise.  Tr. at 365 (Turlak).  Transocean had engineers embedded at the BP offices where the Well Capping Team met and worked, but Mr. Turlak was not embedded at BP's office and worked predominantly out of Transocean's offices.  Tr. at 369 (Turlak). Transocean always had representatives at these daily Well Capping Team meetings, but Mr. Turlak did not go to most of these meetings.  Tr. at 370 (Turlak).

610.     Individuals from Transocean who joined the Well Capping Team included Ian Sneddon, John MacKay, Rob Turlak, Geoff Boughton, and Dave Cameron.  Tr. at 373 (Turlak); Boughton Dep. at 79-80, 82; TREX 011226.0003.  Transocean's primary responsibility on the Well Capping Team was to acquire equipment for capping and to provide subsea expertise. Wellings Dep. at 276.

611.     Cameron's role on the Well Capping Team included procuring equipment, building the Capping Stack, and witnessing modifications to the BOP.  Further, Cameron would advise the Well Capping Team on the BOP and its control systems.  Wellings Dep. at 277. Cameron did not have insight in whether BOP-on-BOP was operationally feasible, *e.g.*, whether debris could be in the way or whether the wellhead could support the weight of a second BOP. McWhorter Dep. at 140.  Cameron provided information such as weights of BOPs and center of gravity, but did not perform any calculations as to whether the wellhead could support a second BOP.  McWhorter Dep. at 148-49.

612.     Individuals from Wild Well Control, including Kerry Girlinghouse, joined the Well Capping Team.  Tr. at 373 (Turlak); Boughton Dep. at 79-80.

613.     Wild Well Control had expertise responding to blowouts and dealing with subsea engineering solutions.  Tr. at 365 (Turlak).  The Wild Well Control representatives on the Well Capping Team had experience with surface capping stacks and helped with the design for the deepwater Capping Stack used at the Macondo well.  Wellings Dep. at 20.

614.     Once the Well Capping Team began work on the BOP-on-BOP option, it evolved as individuals provided input about additional features.  Boughton Dep. at 72-73.

615.     The Well Capping Team had the mantra of "don't make things worse," and wanted to implement the best and safest solution.  Tr. at 371-72 (Turlak).

616.     Everyone on the Well Capping Team, whether they were from Wild Well Control, Cameron, Transocean, or BP, wanted to find "the best solution and the most timely solution" for stopping the flow of oil, and would not "have wanted to settle for less."  Tr. at 371 (Turlak).

617.     While Arnaud Bobillier, a Transocean executive based in Geneva, asserted in a May 9, 2010, email that "a capping option seems by far the best solution," he did not circulate

this outside of Transocean and the recipients, including Steve Hand, had no reason to believe it was circulated outside of Transocean.  TREX 010884.  Further, Steve Hand (Transocean) testified that Mr. Bobillier's proposal was "generic" and a capping option was already being considered by the source control decision-makers.  Hand Dep. at 207-10, 385, 387; TREX 010901 (Mr. Hand discounted Mr. Bobillier's proposal stating, "BP have a much more measured and capable response than three guys in [the] room for a couple of hours.").

> a.   **The Well Capping Team Selected the *Discoverer Enterprise* BOP for BOP-on-BOP Option Until It Was Reassigned to Collection on May 10.**

618.   The *Discoverer Enterprise* BOP was the first BOP considered for the BOP-on-BOP option.  Tr. at 383 (Turlak); TREX 011738R.0005.

619.   On or around May 10, a decision was made to use the *Discoverer Enterprise* for collection operations (*i.e.*, recovering, storing, and processing oil).  Hand Dep. at 355-56; Wellings Dep. at 316-17; Holt Dep. at 317-18, 416-17; TREX 011738R.0005; Tr. at 382-83 (Turlak).

620.   A joint group of decision-makers, including Government representatives, determined that the *Discoverer Enterprise* BOP would be shifted to containment.  Boughton Dep. at 74.

621.   Floating production storage and offload ("FPSO") vessels are not typically authorized for U.S. service, so there were no FPSOs operating in the Gulf of Mexico.  Cook Dep. at 209.  At the time of the *Deepwater Horizon* incident, the *Discoverer Enterprise* was the only vessel at the time with processing facilities for handling flow back to the vessel, separation of oil and gas, flaring of the gas, storage of the oil, and then off-charge of the oil to a tanker.  Wellings Dep. at 317; Holt Dep. at 317-18, 416-17 (the *Discoverer Enterprise* was the only vessel in the field that had containment production capacity); TREX 011737R.0011-12; TREX

011738R.0005. Accordingly, it was intended to be used for collection efforts even before it arrived to assist with the response. TREX 011737R.0011.

622. At the time the decision was made to shift the *Discoverer Enterprise* to collection, its BOP stack was not ready to splash and still had a number of outstanding maintenance and testing items. Holt Dep. at 416-17; Wellings Dep. at 317; TREX 011241.0002 (a number of action items for the Enterprise BOP-on-BOP project, including projects assigned to Turlak and his colleagues at Transocean, were incomplete as of May 11); Tr. at 1072 (Adams); TREX 011738R.0005; Tr. at 388 (Turlak); Wellings Dep. at 441-42.

623. By May 10, the Well Capping Team had not yet mitigated all of the identified risks associated with the BOP-on-BOP option. *See, e.g.*, TREX 009787 (May 7 HAZID Report for the BOP-on-BOP option disclosed that work was ongoing to address 19 risks associated with the procedure); TREX 010505 (May 13-14 Peer Assist identified numerous risks that had not yet been mitigated for the BOP-on-BOP option); *see* Tr. at 614-15 (Dupree). Steve Hand, Transocean's Director of Performance and Operations, does not know whether the *Discoverer Enterprise* BOP-on-BOP option was ready to be deployed in mid-May 2010. Hand Dep. at 163-64, 259.

624. At his deposition, Transocean's Geoff Boughton asserted that the *Discoverer Enterprise* BOP was "ready to roll" for the BOP-on-BOP option somewhere around May 10. Boughton Dep. at 319, 394-95. However, Mr. Boughton's "sole job" as of that time was acquiring equipment to be utilized for the BOP-on-BOP option. Boughton Dep. at 319-20 (testifying that he joined the team as an "equipment finder").

625.     Consistent with the objective of containing flow, the *Discoverer Enterprise* was able to collect some of the flow, which meant that less flow reached the surface.  Holt Dep. at 427-28.

        **b.**       **The Well Capping Team Subsequently Planned to Use the *DDII* BOP for the BOP-on-BOP Option.**

626.     On May 10, 2010, when the *Discoverer Enterprise* was sent to be part of collection efforts, the *DDII* BOP was immediately assigned to the BOP-on-BOP option.  Tr. at 384 (Turlak); Hand Dep. at 355-56; Wellings Dep. at 316; Holt Dep. at 317-18, 416-17; TREX 011738R.0005.  Planning shifted immediately from using the *Discoverer Enterprise* BOP to using the *DDII* BOP.  TREX 011737R.0012; TREX 011738R.0005.

627.     When Mr. Rob Turlak (Transocean) was informed about this substitution of the *DDII* for the *Discoverer Enterprise*, he responded "OK" and did not express any disagreement with this decision.  TREX 010894.

628.     When the decision was made to switch from the *Discoverer Enterprise* to the *DDII* for the BOP-on-BOP option, Mr. Steve Hand (Transocean's Director of Performance and Operations who participated in the capping efforts) did not object to that decision and did not suggest that the *Discoverer Enterprise* BOP was "ready to go" or "going to work."  Hand Dep. at 166, 169, 259.  He has no opinion on whether or not it was the correct decision not to proceed with the *Discoverer Enterprise* BOP option in mid-May and he does not recall any specific discussions with his Transocean colleagues who were working on the response that addressed whether or not it was a mistake not to proceed with the *Discoverer Enterprise* BOP-on-BOP option.  Hand Dep. at 166-69 (Mr. Hand never heard any colleagues from Transocean express on a telephone call or during a Daily Meeting with Incident Command and Area command that "we need to try this BOP on BOP option.").

629.    Once it was determined that the *Discoverer Enterprise* would be used for containment and the *DDII* BOP assigned to the BOP-on-BOP project, the team continued to make progress and move forward with the BOP-on-BOP option.  Boughton Dep. at 74-75; Hand Dep. at 165 (the *DDII* was an alternative for the BOP-on-BOP option).

630.    The switch from the *Discoverer Enterprise* to the *DDII* caused "very little" delay for the BOP-on-BOP project.  This was largely attributable to the similarities between the two rigs and BOPs.  Wellings Dep. at 317-18, 446-47.

631.    The *DDII* BOP stack had to be examined, tested, and certified by the MMS before it could be deployed during the response effort.  Hand Dep. at 375-76.

> ### c.    The Peer Assist in Mid-May 2010 Involved Numerous Industry Experts and Identified Action Items for the BOP-on-BOP Option.

632.    On May 13-14, the Well Capping Team conducted a Peer Assist of the well capping options, including the BOP-on-BOP option.  A Peer Assist is a meeting of industry experts to assess the feasibility and risk associated with various source control options.  Tr. at 275 (Perkin); TREX 010522; Stipulated Facts at 11 (Rec. Doc. 7076).  According to the Aligned Parties expert, Mr. Perkin, it was a good idea to perform the Peer Assist for the capping options. Tr. at 276 (Perkin).

633.    Implementing a BOP-on-BOP option was not a "common, everyday situation," Tr. at 389 (Turlak), and when conducting an operation that is not common, it is a good idea to conduct a peer assist and "consider all the problems."  Tr. at 389 (Turlak).

634.    Because the BOP-on-BOP option was an "unusual operation," Transocean forwarded draft procedures and a hazard identification for the BOP-on-BOP operation to the insurers of the *DDII* vessel.  Hand Dep. at 220-21; TREX 010887.

635. The Peer Assist brought in expertise from around the industry, including representatives from BP, Wild Well Control, ExxonMobil, Transocean, Oceaneering, Cameron, and the MMS, to review the proposed capping procedures for feasibility and safety. Tr. at 1151-52 (Adams); TREX 010505.0025; TREX 010522.50.1. These entities had expertise relating to subsea operations. Tr. at 278 (Perkin).

636. Mr. Turlak did not participate in the Peer Assist for the capping solutions and did not remember it. Tr. at 389-90 (Turlak).

637. The purpose of the Peer Assist was to conduct a review of removing the *Deepwater Horizon* LMRP, landing the *DDII* BOP on the *Deepwater Horizon* lower BOP (BOP-on-BOP), and landing a custom-built capping device on the *Deepwater Horizon* flex joint. TREX 010505.0003. Its report included evaluating the relative merits of the two options. TREX 010505.0003. Importantly, the Peer Assist's focus was on "installation risks," and it did not examine "wider nor longer term implications." TREX 010505.0004. It also did not consider the relative merits of proceeding with Top Kill. TREX 010505.0003.

638. The May 13-14 Peer Assist participants recommended that the Well Capping Team work on a number of BOP-on-BOP related projects concerning: (1) hydrate risks and mitigations, including utilizing lessons learned from the cofferdam attempt and quantifying and modeling glycol flow rates, volumes, and duration needed for effective inhibition; (2) preparations for the BOP-on-BOP option, including performing wellhead stress weight and bending calculations, meeting BOP test and certification requirements, and analyzing the dynamic positioning system on the *DDII* vessel; (3) BOP deployment, including deciding whether to use glycol or methanol for hydrate inhibition; (4) navigating the vessel to the location; (5) releasing and pulling the LMRP, including developing an unlatch plan, assessing

the operation of the ROV with a diamond saw around the plume, and managing visibility concerns; (6) installing the BOP, including designing a ring gasket removal tool and developing a guidance system to land the BOP; and (7) shutting in the well, including how to manage pressure build-up when the well was shut in and developing an exit strategy if things went awry. TREX 010522.0033-40; Tr. at 283 (Perkin).

639.    Key BOP-on-BOP operational risks identified by the Peer Assist included removal of the LMRP, subsea visibility, hydrate management, and the potential need to manage pressure buildup through venting.    Tr. at 1152-53 (Adams); TREX 010505.0005.    It recommended a number of areas that required work to move the BOP-on-BOP option forward. TREX 010505.0009-15.

640.    The Peer Assist participants concluded that the BOP-on-BOP was feasible and could be managed safely once the identified risks had been mitigated.  Holt Dep. at 87-88; TREX 010522.0030.    Nonetheless, the Peer Assist participants were not considering well integrity issues, as this was outside the scope of the Peer Assist.  Wellings Dep. 491-92; TREX 011235.

641.    The Peer Assist participants posited that the BOP-on-BOP had a greater probability of successful installation than a capping option characterized as a ram/valve on flex joint.  TREX 010522.0030; Holt Dep. at 83-85 (testifying that the team believed the BOP-on-BOP had a "greater" probability of successful installation than an alternative capping option). Wellings Dep. at 230-31 (John Turnbull, a BP Engineering Technical Authority, ensured that the Well Capping Team followed a well-vetted process for identifying and mitigating risk associated with the BOP-on-BOP option).  Once the Well Capping Team received the recommendations, they moved forward to address the recommendations.  Wellings Dep. at 235.

642.    The Peer Assist recommendations were circulated by BP on May 15, 2010, with a cover note that indicated: "There is much to be done for the BOP-on-BOP to be implemented with confidence."   TREX 010522.1.4.   Immediately after the Peer Assist, the Well Capping Team identified additional resources that were needed to progress the BOP-on-BOP option, including a hydrate expert, a rigging expert, and DDII rig team members to review the proposed procedures.  TREX 005370.

643.    The Peer Assist raised the issue of whether it would be possible to stab a second BOP on the *Deepwater Horizon* lower BOP stack as it had never been attempted before. Consequently, there was engineering work that was performed after the Peer Assist to evaluate that.  Holt Dep. at 96-97.

644.    For purposes of assessing the feasibility of the BOP-on-BOP option, BP asked Stress Engineering to conduct two modeling studies: one study to assess whether vessels could safely operate over the wellhead in light of the plume reaching the surface and a second study to assess the upward forces on the second BOP while landing on the plume, *i.e.*, BOP blastoff calculations.  Wellings Dep. at 111, 266, 353-54, 460-61; Holt Dep. at 292; TREX 010122. There was a concern that the upward force of the plume would prevent the responders from landing a second BOP on the *Deepwater Horizon* lower stack.  Holt Dep. at 260-63, 290-91; TREX 010517.

645.    BP asked Stress Engineering to use flow rate inputs, including 70,000 bpd, for the modeling.  TREX 010122 (On April 30, 2010, BP requested that Stress Engineering run plume modeling using 70,000 bopd as an input and copied Wild Well Control on the request).  The 70,000 bopd flow rate input represented a worst-case scenario that assumed unobstructed flow, *i.e.*, flow with the LMRP removed and the wellbore unobstructed.  Wellings Dep. at 460-61.

646. The rationale for selecting the 70,000 bopd flow rate input for the modeling was that if modeling showed that the BOP-on-BOP option could succeed at 70,000 bopd (*i.e.*, the second BOP could successfully land and the surface vessels could safely operate over the plume), the BOP-on-BOP option could succeed at lower flow rates. Wellings Dep. at 265-67, 352, 460 (70,000 bopd was a "worst case" figure, not a "best estimate" of the flow rate); Holt Dep. at 265-70, 288-90 (the ~ 70,000 bopd chosen for Stress Engineering's modeling runs was a worst-case scenario not the best flow rate estimate); TREX 010523; TREX 010518.

647. Stress Engineering's modeling determined that the BOP-on-BOP option was insensitive to flow rate or, stated differently, that the force of the oil plume would not impact the ability to land a capping device. Consequently, the likelihood of success of the BOP-on-BOP option was not constrained by flow rate limitations. Holt Dep. at 260-65; TREX 010517; Wellings Dep. at 365, 457, 461 (Stress Engineering's modeling showed that the blast-off force from the plume was insignificant, even at the worst case flow rate).

648. Mr. Turlak testified about an incident in Singapore in 1988 where a second BOP was attached subsea to a lower BOP stack. Mr. Turlak testified that this was a "gas bubbling well," meaning that it was only gas that was "steadily bubbling out," and so it did not have the same type of hydrocarbon plume as the *Deepwater Horizon* incident. Tr. at 382-85 (Turlak).

**(3) Projected Timelines and Witness Testimony Confirm That BOP-on-BOP Was Not Ready to Be Implemented Until After Top Kill Was Concluded.**

649. The Top Kill procedure was ready for approval and was approved by the U.S. Government on May 25, 2010, prior to when the BOP-on-BOP procedure was ready. Tr. at 753 (Mazzella); Holt Dep. at 124 (the Top Kill equipment, procedures, and approval were in place by May 26 whereas BOP-on-BOP was not estimated to be ready until the mid-June time frame); Stipulated Facts at 12 (Rec. Doc. 7076) (Unified Command approval of Top Kill on May 25).

127

Projected timelines, daily reports, and operational reports from the response show that the BOP-on-BOP solution was not physically ready to deploy at the time Top Kill was deployed.  Tr. at 1043, 1071 (Adams); TREX 011737R.0012.

650.  At the time when Top Kill began on May 26, 2010, Unified Command had approved Top Kill but had not approved the BOP-on-BOP option for implementation.  TREX 010238; Hand Dep. at 381; TREX 008538; TREX 009148.

651.  As part of the decision whether to pursue Top Kill before BOP-on-BOP, one factor was that Top Kill was ready approximately two weeks before the BOP-on-BOP option would be ready.  Holt Dep. at 223-24 (Unified Command did not pursue Top Kill before BOP-on-BOP simply because it was ready first).

652.  Admiral Cook testified on behalf of the United States that the earliest point in time when BOP-on-BOP may have been ready to deploy was after Top Kill:

> [B]y the time that the engineering issues associated with consideration of putting another BOP on top of a BOP, weight, the -- the angle of the flex joint, and the ability to make the coupling, were -- were thought to be … within practicalities, *it was after Top Kill*.  And at that point, the well integrity had been drawn into question.

Cook Dep. at 525 (emphasis added).

653.  A regularly updated Gantt chart set forth the forward-looking timeline for the *DDII* BOP-on-BOP option.  The Gantt chart dated May 26, 2010 (the date when Top Kill began), estimated that the outstanding projects for the BOP-on-BOP option could be completed and the stack landed on the *Deepwater Horizon* BOP by June 7.  TREX 010900; Hand Dep. at 377-79; Holt Dep. at 71-73 (the estimated timeline for a risk mitigated BOP-on-BOP utilizing the *DDII* was sometime in mid-June); Holt Dep. at 384 (the *DDII* BOP stack required additional modifications, including venting capability, that were not estimated to be ready until mid-June).

128

654.    Transocean prepared its own planning charts for the BOP-on-BOP option, and its planning chart that was prepared on May 28 indicated that the BOP-on-BOP option was not anticipated to be ready to be installed until June 2 at the earliest.  TREX 011545.0004.

655.    After Top Kill concluded, the Gantt planning chart estimated that the BOP-on-BOP option would not be ready for installation until June 6, 2010.  Tr. at 607-08 (Dupree); TREX 142347N.2.8; TREX 011261N.2 (the May 29 Gantt chart identified that the earliest date to complete the installation of the BOP-on-BOP option was June 6, 2010); Tr. at 404-05 (Turlak).

656.    Because the BOP-on-BOP option was taken off the table at the end of May after Top Kill concluded, the Well Capping Team had stopped work on the planned modifications to the *DDII* that were estimated to be ready in mid-June.  Holt Dep. at 386, 535.

657.    Neither the development nor the execution of Top Kill caused a slowdown in development of the BOP-on-BOP option, Tr. at 1146-47 (Adams); TREX 011738R.0009-10, because the Top Kill and BOP-on-BOP options were developed simultaneously by separate teams and work continued on BOP-on-BOP through Top Kill's implementation.  Tr. at 729 (Dupree); TREX 011738R.0010.

658.    In August 2010, after the well was capped, James Wellings of BP, the Well Capping Team Leader, sent an email to Human Resources personnel relating to rest and recovery after the response effort.  In his email, he characterized the readiness of the capping options during the response (*e.g*., "we were in a position early on to install a cap").  The Aligned Parties rely on this email to argue that the BOP-on-BOP was ready before Top Kill, but Mr. Wellings acknowledges in hindsight that he badly worded his email, which was written several weeks after

the BOP-on-BOP option was set aside, and testified that the team was not in a position to install a cap prior to Top Kill.  Wellings Dep. at 391-92; TREX 008542.

659.    Additionally, the potential capping solutions were reviewed all the way up through the Unified Command, and Mr. Wellings, as the Well Capping Team Leader, was not in a position to decide whether or not a particular capping option was in position to be implemented.  Wellings Dep. at 34-35.

<div align="center">

**(4)    Transocean's BOPs Had Outstanding Critical Maintenance and Could Not Be Utilized for the BOP-On-BOP Option.**

**a.    The *Discover Enterprise* BOP Had Outstanding Maintenance and Testing When It Began Collection Efforts.**

</div>

660.    When the *Discoverer Enterprise* began to participate in collection efforts on May 10, 2010, its BOP had outstanding maintenance issues, meaning that the *Discoverer Enterprise*'s BOP was not ready to be used with the BOP-on-BOP option at that time.  Tr. at 1072 (Adams); TREX 011738R.0005; Tr. at 388 (Turlak); Wellings Dep. at 441-42.

661.    At the time the *Discoverer Enterprise* began to participate in collection efforts on May 10, 2010, its BOP, among other things, had not been tested satisfactorily, there was no venting option designed or installed, and the team had not completed the BOP-on-BOP procedures for review and approval by Unified Command.  Wellings Dep. at 441-42.  BP wanted the ability to bleed pressure in a shut-in situation to protect the integrity of the well.  Hand Dep. at 482-84.  If BP believed a venting option was required, Mr. Hand was "sure they had the relevant information" to require it.  Hand Dep. at 484.

662.    Mr. Turlak testified that one project that still had to be completed for the *Discoverer Enterprise* BOP as of May 10 was putting the HC connector on the BOP stack.  Tr. at 388 (Turlak).

<div align="center">130</div>

663.     When Mr. Turlak testified that the *Discoverer Enterprise* BOP could have been ready a few days after May 10, he was talking about having the equipment there that could mechanically shut in the well and not that the BOP-on-BOP option had been fully risk assessed. Tr. at 386 (Turlak).

664.     Transocean was responsible for maintaining the BOPs that it owned, including the *Discoverer Enterprise* and *DDII* BOPs, and ensuring that the BOPs worked correctly.   Hand Dep. at 45.   During the response, Transocean understood that BP was relying on Transocean's expertise with respect to the BOPs that Transocean owned.   Hand Dep. at 38.

665.     In a May 12, 2010, email James Wellings described the *Discoverer Enterprise* BOP-on-BOP option as "ready to go," meaning that the concept, the equipment, and the feasibility had been assessed.   Wellings Dep. at 164-67, 444; TREX 011230.   But Mr. Wellings' email does not state that the BOP-on-BOP option was ready to be installed, and there were several other steps that would be required to get it ready for installation.   Wellings Dep. at 164-67, 444; TREX 011230.   For example, in the same email, Mr. Wellings states that the Well Capping Team should prepare for the upcoming Peer Review of the BOP-on-BOP option, during which outside experts would review the team's work and propose recommendations for additional modeling, assessments, and evaluations that should be considered before the BOP-on-BOP option could be utilized.   Wellings Dep. at 164-67, 444; TREX 011230.

666.     West Engineering Services provided specialist services regarding BOP stacks. Thierens Dep. at 667.   In late April 2010, BP retained West Engineering Services ("West Engineering") to go to Transocean's *Discoverer Enterprise* rig to perform an audit of the well control equipment, including the BOP, in regards to its fit-for-purpose condition.   The

assessment was conducted from April 28 to May 16, 2010.  TREX 011677.0003-04; Tr. at 291-92 (Perkin).

667.    West Engineering recorded its work and findings in daily reports.  Tr. at 292 (Perkin).

668.    West Engineering prepared a daily report for its audit of the *Discoverer Enterprise* on May 9, 2010, one day before the *Discoverer Enterprise* began collection efforts. TREX 011677.129.2.  The May 9 daily report disclosed that "West was informed tonight that a potential problem with the forward casing shear ram bonnet may exist" and that "the subsea engineer informed West that he has a call in to Hydril.  His plan is to have Hydril come to the rig and investigate this issue."  TREX 011677.0130; Tr. at 292-93 (Perkin) (confirming that Transocean was still working on the issue).

669.    The casing shear rams on the *Discoverer Enterprise* BOP had a leak that required a rebuilt casing shear ram bonnet to be delivered to the rig.  Tr. at 1074 (Adams); TREX 011677.0001, 0004.  The replacement part was not installed and pressure tested until May 16. TREX 011677.0145.  At that time, it was discovered that Hydril had sent the wrong casing shear ram regulator repair kit.  TREX 011677.0145.  Transocean did not have a repair kit or a spare in its fleet.  TREX 011677.0006.

670.    West Engineering's audit report discloses significant outstanding maintenance and testing for the *Discoverer Enterprise* BOP as of May 16 when the auditors left the rig to begin an audit of the *DDII* BOP.  Tr. at 293-94 (Perkin) (Aligned Parties' expert confirmed that there was still work that needed to be completed with respect to the *Discoverer Enterprise* BOP on May 16); TREX 011738R.0005; TREX 011677.146.3; TREX 011677.145.5.

671.    Specifically, the projected work on the BOP included performing end of work maintenance procedures, pressure testing various components, rebuilding the high pressure casing shear ram regulator, and pressure testing and installing a rebuilt casing shear ram bonnet. TREX 011677.146.3.

672.    Among other items, the West Engineering audit inspection found that all the Coflexip hoses in the moon pool were damaged, uncertified, and needed to be replaced.  TREX 011677.0001, 0004, 0015, 0103-04; Tr. at 1072-73 (Adams).  Coflexip hoses are high-pressure hoses that connect the pipework in the moon pool area.  Tr. at 1073 (Adams).

673.    Although he testified that he believed all testing of the *Discoverer Enterprise* BOP was conducted by May 10 (the date that the *Discoverer Enterprise* was assigned to spill collection efforts), Mr. Turlak admitted that he was not involved at all with the audit that West Engineering was conducting of the *Discoverer Enterprise* BOP and did not remember reviewing the inspection report that the West Engineering auditors had prepared.  Tr. at 384-85 (Turlak).

### b.    The *DDII* BOP Had Outstanding Maintenance and Testing Issues in June 2010.

674.    BP retained West Engineering to perform an audit of the *DDII* BOP and determine whether it was suitable for deployment during source control activities.   TREX 141081.

675.    The *DDII* BOP had previously undergone a West Engineering inspection and pressure test in March 2010.  TREX 011738R.0005.

676.    During the *Deepwater Horizon* response, from May 14 to June 10, 2010, West Engineering conducted an audit inspection of the *DDII* well control equipment, including its BOP.  Tr. at 407 (Turlak); TREX 141081; TREX 011743.0001-03.

677.    On May 25, 2010—one day before Top Kill commenced—the *DDII* BOP was not ready to be implemented with the BOP-on-BOP option because, among other things, West had not finished its audit inspection of the *DDII* BOP.  Tr. at 289 (Perkin); Wellings Dep. at 243 (Well Capping Team Leader recalled issues with the *DDII* BOP stack's ability to pass pressure testing in May 2010).

678.    On May 25, Transocean's subsea engineer identified a number of modifications and work that needed to be completed in order for *DDII* BOP stack to be used for the BOP-on-BOP option.  TREX 145079.  Specifically, the subsea engineer stated: "Test ram changeover will take 1-2 days from when it is confirmed and all other BOP activities are complete.  Spool, FSV, etc. will be ready to ship on Tuesday (1/June) to the rig.  (BP should be given Tuesday to Thursday pm shipping.)"  TREX 145079.1.4; Tr. at 288-89 (Perkin) (confirming that on May 25, "there were still modifications being made to the *DDII* with respect to the BOP-on-BOP option").

679.    The *DDII* was also not anticipated to complete stump testing until May 28, 2010.  Tr. at 608 (Dupree); TREX 142347N.2.8.

680.    The *DDII* BOP was still undergoing repair, inspection, and maintenance at the time of and beyond the end of Top Kill on May 28, 2010.  Tr. at 1071 (Adams); Holt Dep. at 235; TREX 007102 at 3 (Transocean's May 27 Handover Notes disclose, "DDII BOP experiencing surface testing / acceptance testing issues - earliest completion of surface testing 'as is' will be late Friday 28th May.  Installation of guide frame, changes to ram configuration and additional Failsafes and vent hub would only take place after testing has been completed.").

681.   The Well Capping Team's Gantt Chart of May 29 identified June 6, 2010 as the earliest date that the *DDII* BOP would be landed for the BOP-on-BOP option.   Tr. at 404-05 (Turlak); TREX 011261N.2.4.

682.   Mr. Turlak agreed that he "would want West to complete their inspection and audit before [he] would use the *DDII* BOP for the BOP option."   Tr. at 407 (Turlak).

683.   Wild Well Control's view was that until all necessary modifications had been made to the *DDII* BOP, BOP-on-BOP was not ready.   Barnett Dep. at 314-15.

684.   The MMS was also aboard the *DDII* watching the testing and repairs that were being conducted on the *DDII* BOP.   TREX 141081; Tr. at 407 (Turlak).

685.   During the inspection, West Engineering auditors identified issues that needed to be resolved with the *DDII* BOP, including issues with the shuttle valves, "some problems with some cards on the SEM's," and "the problem of the pilot-operated check valve in plumbing for the Deadman."   Tr. at 406 (Turlak); TREX 141081; TREX 011738R.0005.

686.   Among other issues, on May 26—the date that Top Kill began—West Engineering found that the *DDII* BOP's Deadman / autoshear system was incorrectly installed and not functioning as designed.   TREX 011743.0001, 0004, 0117 (the engineers determined "that there was possibly a fundamental design flaw" which prevented the Deadman / autoshear system from functioning as designed).

687.   On May 25, the *DDII* BOP from Transocean's rig failed Autoshear and Deadman testing.   TREX 145079; Tr. at 289 (Perkin).

688.   On June 5, after the Deadman system had been repaired, the West Engineering auditors witnessed the *DDII* BOP successfully perform a subsea Deadman test, which confirmed that the Deadman was operational.   TREX 141081.150; Tr. at 408-09 (Turlak).

689.    During that June 5 testing, a problem was identified with the casing shear rams, and the *DDII* BOP had to be pulled to surface again on June 6 for further repairs.  Tr. at 1074-75 (Adams); Tr. at 409-10 (Turlak); TREX 141081.150.4; TREX 011743.0148.

690.    West Engineering determined that the *DDII* BOP casing shear rams needed to be repaired.  Tr. at 1074 (Adams).  On June 5, the casing shear rams of *DDII* BOP were not operational and the BOP had to be pulled to the surface for repairs.  Tr. at 409-10 (Turlak); TREX 141081.150.4.

691.    Mr. Turlak testified that this failure of the *DDII*'s casing shear rams would not have been an issue for the BOP-on-BOP option because "if you were running BOP-on-BOP, this problem really wouldn't be a problem because you wouldn't need your casing shear rams."  Tr. at 410 (Turlak).

692.    Closing the casing shear rams was the first step in the BOP-on-BOP procedure after the capping BOP was landed, so the proper functioning of the casing shear rams was essential to the BOP-on-BOP solution.  Tr. at 1074-75, 1156 (Adams).  Closing the casing shear rams was necessary to mitigate the risk of eroding the blind shear ram elastomers during shut-in.  Tr. at 1156, 1169 (Adams).

693.    Based on his 35 years of experience with subsea well control equipment, BP expert Iain Adams would not recommend using a BOP that had outstanding problems with the casing shear rams as an intervention BOP in a BOP-on-BOP solution.  Tr. at 1035, 1075-76, 1169 (Adams).

**(5)      Risks Associated with the BOP-on-BOP Option Had
Not All Been Mitigated prior to Top Kill.**

694.    The Well Capping Team would only have one opportunity to install the BOP if they advanced this option, and therefore, they wanted to ensure that the BOP would actually work as designed.  Holt Dep. 533-34.

695.    It went "without saying" that the Well Capping Team wanted to implement the "safest" solution because "anything that we were going to do, we wanted to be safe."  Tr. at 371 (Turlak).

696.    The BOP-on-BOP procedure presented risks different from those for the Top Kill procedure, including the risk of incomplete LMRP removal, the "water hammer" effect resulting from a rapid, hard shut-in of the well system, and the weight of the intervention BOP, all of which had to be addressed before proceeding with the BOP-on-BOP procedure.  Tr. at 754, 758-59 (Mazzella).

697.    Assessing the risks associated with the BOP-on-BOP option and looking at the things that might go wrong during the attaching and installing of the BOP was an "important piece to the puzzle when making a decision as to whether to use the BOP-on-BOP or the two-ram stack or the three-ram stack."  Tr. at 386-87 (Turlak).

698.    Mr. Turlak did not deal with assessing the risks associated with installing either the BOP-on-BOP or Capping Stack because he "usually missed those meetings" and did not have knowledge of all of the specific risks associated with the various capping ideas.  Tr. at 375-76 (Turlak).

699.    Mr. Turlak did not have responsibility for assessing all the risks and making a determination as to whether the benefits and the possibility of success of the capping options,

such as the BOP-on-BOP option, outweighed the risks.  Someone else on the team had that role, and Mr. Turlak did not know who was doing that.  Tr. at 386-88 (Turlak).

700.    There was a large group of people who worked on assessing the hazards and mitigating the risks associated with installing the BOP-on-BOP solution, but Mr. Turlak "usually … didn't get involved in that."  Tr. at 375-76 (Turlak).

701.    Mr. Turlak did not meet with the Unified Command and did not know what information was being used to make decisions about whether to go with a 3-Ram Capping Stack or the BOP-on-BOP solution.  Tr. at 376-77 (Turlak).

702.    Mr. Turlak would not substitute his judgment for the judgment of others who considered all the risks associated with the various capping options in ultimately deciding which option to use.  Tr. at 377 (Turlak).

703.    By May 6, on the date that the Well Capping Team had distributed an animation of installing the BOP-on-BOP option, all of the risks associated with this option had not been mitigated.  Tr. at 381 (Turlak); D23767-1 (May 6 animation).

704.    With respect to the BOP-on-BOP animation that the Well Capping Team distributed on May 6, 2010, as Mr. Turlak, the Aligned Parties' BOP-on-BOP witness admitted, "there were lots of things that weren't shown in that video."  Tr. at 381 (Turlak).  For example, certain risks associated with the BOP-on-BOP option, such as a need for venting and soft shut-in capability, were identified after the animation was created.  Tr. at 381-82 (Turlak); D23767-1 (May 6 animation).

705.    Once the engineering team had finalized the engineering for the BOP-on-BOP option, BP leaders would need to be convinced the risks had been sufficiently mitigated before recommending the procedure to the Unified Command, and there would need to be multiple

interactions with the Government prior to implementation.  Tr. at 614 (Dupree).  BP's source control leader was not satisfied that the BOP-on-BOP procedure was sufficiently mitigated at the time of Top Kill.  Tr. at 614-15 (Dupree).

706.    One concern that the engineering team had with the BOP-on-BOP option was whether the wellhead has sufficient mechanical integrity to support the weight of a second BOP stack.  Tr. at 613-14 (Dupree); Campbell Dep. Vol. I at 305-06; McWhorter Dep. at 185-86; TREX 010062; Brannon Dep. at 88-89; Cook Dep. at 147.  Specifically, when the *Deepwater Horizon* sank, the collapsing riser had pulled the BOP over from its vertical position and then released it, leaving it at an incline.  Tr. at 613 (Dupree); D23249; Campbell Dep. Vol. I at 37-38. This movement created a concern for BP's source control leader and the engineering team as to whether the wellhead has sufficient mechanical integrity to support the weight of a second BOP stack.  Tr. at 613-14 (Dupree); Campbell Dep. Vol. I at 305-06; McWhorter Dep. at 185-86; TREX 010062; Brannon Dep. at 88-89; Cook Dep. at 147.

### a.    LMRP Removal Concerns Had Not Been Mitigated Prior to Top Kill.

707.    As the engineering teams prepared options, critical risks, and uncertainties had to be considered.  Tr. at 609 (Dupree).

708.    The plan for the BOP-on-BOP option was to remove the LMRP of the *Deepwater Horizon* BOP and land the second BOP on top of the lower stack of the *Deepwater Horizon* BOP.  Tr. at 377-78 (Turlak); D23767-1; Boughton Dep. at 102, 317-18 (testifying that the plan for the *Discoverer Enterprise* BOP-on-BOP option was to remove the LMRP from the *Deepwater Horizon* BOP and land the second BOP stack on the *Deepwater Horizon* lower BOP stack).

709.   "Getting the LMRP off was the big issue" with the BOP-on-BOP procedure, and there was "tremendous" uncertainty about the risk that the LMRP could not be completely removed.  Tr. at 768 (Mazzella).

710.   The Team Leader of the Well Capping Team believed there was a significant amount of risk associated with removing the LMRP, including concerns about whether the LMRP would actually release, whether there would be drill pipe inside the BOP that would complicate the operation, and whether a second BOP could be stabbed on top of the *Deepwater Horizon* lower stack after the LMRP was removed.  Wellings Dep. at 111-12

711.   Being able to remove the LMRP to land on the lower BOP continued to be a "vexing issue" even after Top Kill.  Cook Dep. at 574-75.  Removal of the LMRP would have been a complex operation, which could have introduced new challenges to the closure efforts. Thierens Dep. at 243.

712.   Cameron's corporate representative who worked on the *Deepwater Horizon* response testified that removal of the LMRP could have increased flow.  McWhorter Dep. at 318.

713.   Transocean employees acknowledge that removing the LMRP from the *Deepwater Horizon* BOP would "be a risky operation."  Hand Dep. at 396-97 (Transocean's Director of Performance and Operations).  Further, Mr. Hand does not agree with a Cameron employee that "releasing the LMRP, cutting the drill pipe and installing a new BOP is the way [a BOP] was designed to work in the first place."  Hand Dep. at 473-75; TREX 010081.  Cameron never conveyed this opinion to BP during the response, despite the fact that they had representatives on the BOP-on-BOP team.  Holt Dep. at 233-35 (BP's 30(b)(6) witness testifying that he does not recall Cameron conveying this opinion to BP).

714.    The Aligned Parties' expert, Mr. Perkin, testified that it was unnecessary to remove the *Deepwater Horizon* BOP's Lower Marine Riser Package before landing a second BOP on top of the *Deepwater Horizon* BOP.   Tr. at 268-69 (Perkin).   Nonetheless, the Transocean subsea engineer, Mr. Turlak, who worked in the Well Capping Team, testified that the Well Capping Team did not discuss attaching a second BOP on top of the LMRP of the *Deepwater Horizon* BOP.   Tr. at 378-79 (Turlak); Wellings Dep. at 109 (the Well Capping Team Leader testified that with the BOP-on-BOP option, there was pretty much no way to do it without removing the LMRP).

715.    Transocean's Team Leader, Iain Sneddon, recognized that the LMRP may not have unlatched and that there should have been contingencies for this scenario.  TREX 011266.

716.    Mr. Turlak was aware that the risks of removing the LMRP were discussed during the Well Capping Team meetings, but it was not his responsibility to assess the risks and develop the procedures associated with removal of the LMRP, and he did not work on the team that looked into that issue.  Tr. at 394 (Turlak).

717.    The Peer Assist conducted on May 13 and 14 identified risks associated with removal of the LMRP.  TREX 142399N.9; Tr. at 394 (Turlak); TREX 010522.0030; Holt Dep. at 88, 94-95, 507.   There was no guarantee that the LMRP would actually disconnect.   TREX 010522.0030; Holt Dep. at 88, 94-95, 507 (BP considered the risk that the LMRP would not unlatch and could not be removed during a BOP-on-BOP attempt and how that would impact other response efforts).

718.    By at least May 14, 2010, officials from the MMS understood that ability to unlatch and remove the LMRP was a significant concern.  TREX 005326.0072-73.

719.     One of the risks that the Peer Assist identified with removal of the LMRP was the need to remove the gasket ring of the LMRP.  TREX 142399N.9; Tr. at 395 (Turlak).  Mr. Turlak was not aware of gasket-ring removal concerns when removing the LMRP, did not work on the team that looked into that issue, and was not aware of when the tooling was developed to address removal of the gasket ring.  Tr. at 395-96 (Turlak).

720.     On May 24, 2010, Transocean was providing comment and feedback regarding the LMRP removal procedure for the BOP-on-BOP option.  The procedure for removing the LMRP was not approved until May 25th, the day before the Top Kill operation commenced. TREX 144989.1.3; Tr. at 281-83 (Perkin).

721.     Before the riser was cut, there were concerns over removal of the LMRP.  TREX 011737R.0020.   There were concerns about the alignment and stability of the *Deepwater Horizon* BOP because of its inclination.  Allen Dep. at 375-76.

722.     Cameron identified risks with cutting the riser without damaging the BOP stack or causing it to shift.  McWhorter Dep. at 401.

723.     One of the concerns with removal of the LMRP was that drill pipe debris in the BOP could prevent the LMRP from fully releasing from the lower BOP stack.  Tr. at 610 (Dupree); D23769.1.1.  The unknown condition and position of the drill pipe within the BOP stack had the potential to inhibit LMRP removal, to damage equipment, or to keep the LMRP in a partially-removed position.  TREX 011737R.0020; Holt Dep. at 507.  Cameron shared these concerns.  McWhorter Dep. at 404.

724.     If the LMRP became stuck after it was unlatched it would allow hydrocarbons to escape between the lower BOP and the LMRP.  Tr. at 610 (Dupree); TREX 011737R.0019.  This additional point of emission would complicate collection efforts and preclude implementation of

any sealed collection system. TREX 011737R.0019. It would also have created a risk of erosion of the sealing faces, which would have had a significant impact on the likelihood of obtaining a seal with an intervention BOP or capping stack. TREX 011737R.0019. Such flowing conditions could also have been complicated by the formation of hydrates, which was a concern in every procedure. Tr. at 611 (Dupree). The inability to fully release the LMRP would have limited options going forward. Tr. at 611 (Dupree).

725.    Following Top Kill, after the riser was cut on June 3, 2010, two pieces of drill pipe were discovered inside the riser, side-by-side. Tr. at 1081-82 (Adams); Tr. at 269 (Perkin); TREX 144625; TREX 011737R.0014, 0017-18; D23822. This discovery heightened existing concerns about being able to effectively remove the LMRP after it was unlatched during the BOP-on-BOP operation. Tr. at 1082 (Adams); TREX 011737R.0014, 0018-19; Tooms Dep. at 475-76, 479; McWhorter Dep. at 403.

726.    A contingency had been developed to cut a single piece of drill pipe between the LMRP and lower BOP during LMRP removal. TREX 011737R.0019. But a second piece of drill pipe would have impacted the viability of this procedure, particularly if the second piece limited the saw's access. TREX 011737R.0019.

727.    The concern about LMRP removal existed in part because the emergency disconnect system on the *Deepwater Horizon* had failed to disconnect the LRMP at the time of the incident. Tr. at 768-69 (Mazzella).

728.    The LMRP was intended to be released by either the BOP emergency disconnect system (which is initiated from the rig) or the Deadman system (which is supposed to be triggered by a loss of communication between the BOP and the rig). TREX 011737R.0020. During the response the status of both these mechanisms was unknown, so the fact that the

LMRP had not released raised the possibility that it was being mechanically held in place by material inside the stack.  TREX 011737R.0020.

729.    Other concerns included damage to the sealing point on the lower BOP, reduced visibility for the installation team owing to a change in flow stream, an increase in flow rate due to removal of a restriction in the flow path, and the potential inability to latch back up and obtain a pressure seal on the exposed BOP connector.  Tr. at 610-12 (Dupree); TREX 011737R.0020; TREX 003919.0006.

730.    Another risk in removing the LMRP was that during the removal a piece of the drill pipe debris might fall and damaged the sealing surface of the lower BOP, which would have complicated trying to land an intervention BOP or a capping stack.  Tr. at 1082 (Adams); Tr. at 612 (Dupree); TREX 011737R.0014, 0018-19; TREX 003919.0006.

731.    BP's concerns about being able to effectively remove the LMRP were valid, and the decision to forego source control options that required removing the LMRP was appropriate. Tr. at 1082 (Adams); TREX 011737R.0019.

> **b.    Hydrate Mitigation for the BOP-on-BOP Option Was Not Complete Prior to Top Kill.**

732.    Hydrate formation was always a concern during the response.  Brannon Dep. at 88-89.

733.    Hydrate formation, and its prevention, was a factor the Well Capping Team had to consider when developing the BOP-on-BOP option, and the team had to address this concern before the BOP-on-BOP option was ready to be installed.  Tr. at 278 (Perkin); Tr. at 380 (Turlak).

734.    For example, for the BOP-on-BOP option, the Well Capping Team had to address the concern that during the landing of the second BOP that the hydrocarbon plume would form

hydrates that would interfere with sealing the second BOP onto the lower BOP stack. Tr. at 278 (Perkin); Tr. at 380 (Turlak).

735. Efforts to mitigate hydrate formation with the BOP-on-BOP option were underway in May 2010. TREX 011737R.0013; Lockett Dep. at 78-80.

736. During the May 13-14 Peer Assist for the capping options, participants discussed the risk of hydrate formation when landing the second BOP. They recommended that the Well Capping Team "focus on hydrate risks and mitigations." TREX 010522.0033; TREX 142399; Tr. at 391-92 (Turlak). At the time of the Peer Assist, hydrate mitigation was in its planning stages and had not been finalized. Tr. at 279 (Perkin); Tr. at 392-93 (Turlak); TREX 142399N.5.1 (identifying need for Peer Review team to review "inhibition system to confirm adequacy and build in additions if needed -- Need hydrate expert and lessons learned from Enterprise and top hat").

737. Mr. Turlak did not work on the team that was involved with mitigating the risk of hydrate formation, was not aware of any engineering analyses or risk mitigations that the team was conducting relating to hydrate mitigation, and did not know when that team actually completed their work. Tr. at 393-94 (Turlak).

738. The Well Capping Team utilized the lessons learned from the cofferdam attempt, which was stymied by hydrate formation. Wellings Dep. at 282-85 (the Well Capping Team communicated with BP's flow assurance team that worked on the cofferdam and reached out to ExxonMobil's hydrate expert).

739. After the Peer Assist, the Well Capping Team received input and recommendations from a hydrate specialist at Exxon. TREX 011253 (Exxon's hydrate specialist provided input on hydrate prediction and mitigation relating to the BOP-on-BOP installation and

the venting option for the BOP-on-BOP); TREX 010646.0010-12 (after meeting with Exxon's hydrate specialist, the Well Capping Team proposed additional workstreams to develop a hydrate mitigation plan).

740.    The Well Capping Team retained Stress Engineering to perform modeling of hydrate formation with the BOP-on-BOP option.  Wellings Dep. at 342; TREX 010647; TREX 011249.  The team also assessed whether hydrate formation would present a problem in the event that surface vessels had to leave the well for a hurricane and could not pump hydrate-inhibiting fluids into the BOP and choke.  TREX 011253.

741.    When Top Kill started on May 26, analysis and modeling of hydrate formation for the BOP-on-BOP option was ongoing.  TREX 010647 (as of May 27, Stress Engineering was conducting heat transfer modeling related to hydrate formation in the BOP-on-BOP operation); Tr. at 280 (Perkin) (acknowledging that the assessment of hydrate formation was still in the works as it related to the BOP-on-BOP option after Top Kill began).

### c.    The Guide Frame for the BOP-on-BOP Option Was Not Installed Prior to Top Kill.

742.    For the BOP-on-BOP option, another risk that the Well Capping Team had identified with landing the second BOP in the hydrocarbon plume was visibility for the ROVs. Tr. at 380 (Turlak).

743.    During the May 13-14 Peer Assist for the capping options, participants identified issues associated with the installation of the BOP for the BOP-on-BOP option.  Tr. at 283 (Perkin).  The Peer Assist participants recommended a "guidance system such that BOP is positively in place before landing assuming loss of visibility." TREX 010522.39.2; Tr. at 283-84 (Perkin) (the Peer Assist recommended a guidance system for landing the BOP because of visibility issues associated with the hydrocarbon plume).

146

744.    The guidance frame was designed to assist with stabbing the BOP over the top of the *Deepwater Horizon* BOP with the well flowing.  Boughton Dep. at 552.

745.    Wild Well Control designed and manufactured the guide frame for the BOP-on-BOP option, and was just beginning to design the guide frame on May 18 when it requested information from Transocean.  Tr. at 397-98 (Turlak); TREX 144952.2.1.

746.    In a May 18 email, Mr. Turlak responded that he was "working on" providing information to Wild Well Control for the guide frame and represented that "I know its [sic] important."  Tr. at 398-99 (Turlak); TREX 144952.2.1.  Mr. Turlak was not aware of when the guide frame for the BOP-on-BOP option was ready for installation.  Tr. at 398-99 (Turlak).

747.    As of May 28, installation of the Guide Frame was still on the critical path.  TREX 011738R.0009.

748.    Integration and testing with the guide frame was not anticipated to be completed until June 4, 2010.  Tr. at 608 (Dupree); TREX 142347N.2.8.

> **d.    The Venting Solution to Address Well Integrity Concerns Was Not Estimated to Be Ready Until June 2010.**

749.    There were well integrity concerns associated with the BOP-on-BOP option.  Allen Dep. at 375-76.  An identified risk of capping operations was that it could cause a subsea broach.  Tr. at 620-21 (Dupree); TREX 142819N.11; Campbell Dep. Vol. I at 185-86.  A broach due to capping operations would have made the situation worse.  Campbell Dep. Vol. I at 186.

750.    The CEO of Wild Well Control believed there were too many unknowns about the wellbore in mid-May to attempt to shut in the well and his recommendation was to attempt to collect oil.  Campbell Dep. Vol. II at 30-33; TREX 003922; Barnett Dep. at 176.  Wild Well Control had issued memos suggesting that "it might be a better course of action to divert and produce as much oil as possible and wait for the relief wells."  Barnett Dep. at 223.

751.    The risk of broaching required the ability to bleed or vent pressure during the BOP-on-BOP installation in the event that the pressure increased above the pressure ratings of the wellhead and casing strings.   The team wanted to avoid rupturing the wellbore casing. Wellings Dep. at 331; TREX 011245; TREX 011253; Tr. at 399 (Turlak).  With the condition of the wellbore at Macondo unknown, there was legitimate concern as to how much pressure any source control activity could safely exert on the wellbore.  TREX 011738R.0006.  The risk of exposing the wellbore to potentially unsafe pressures could not be ignored.    TREX 011738R.0006.

752.    Venting was necessary both to allow a soft shut-in of the well, avoiding a pressure surge, and to allow venting of pressure buildup after shut-in.  TREX 011737R.0012-13; TREX 011738R.0006.

753.    After the May 13-14 Peer Assist, conversations with and presentations to Unified Command raised the risk of underground broaching associated with the BOP-on-BOP option and the risk of impacting the relief wells.  Holt Dep. at 97-99; 109-10 (BP and Unified Command discussed the risk that BOP-on-BOP could compromise the relief wells or broach the seabed).

754.    In a Macondo Technical Note dated May 22, 2010, BP addressed the question: "What is the probability of a rupture disk failing due to wellhead pressure after shutting-in the Macondo well?"  BP engineers concluded that there was less than a 4% chance of the shut-in pressure causing a burst disk failure if the well was shut in and no other preventative activities were taken.  TREX 010531.  Although the likelihood was low, there were high consequences to causing a burst disk to fail.  Holt Dep. at 451.

755.    As more information became known about the blowout, the Well Capping Team had to revise their designs for the capping solution, and one of those design revisions was adding a venting feature.  Tr. at 400 (Turlak).

756.    The need for venting capability was not identified until after the Well Capping Team had shifted from the *Discoverer Enterprise* BOP to the *DDII* BOP.  As a result, the team had not been working on a venting option for the *Discoverer Enterprise*.  Wellings Dep. at 441; Tr. at 399, 401 (Turlak) ("the venting option came into play after the *Discoverer Enterprise* went to rig collection"); Hand Dep. at 154-55 (the venting option was first proposed for the *DDII* BOP); Wellings Dep. at 323 (the Well Capping Team began looking at a venting option while working on the *DDII* BOP stack around May 15, 2010); TREX 011226.0004 (the *Discoverer Enterprise* BOP was never designed to have a venting option whereas the *DDII* BOP-on-BOP option was designed with venting capability).

757.    The first time that a venting solution was identified as a necessary feature for the BOP-on-BOP option was mid-May.   Tr. at 286 (Perkin); Tr. at 1147 (Adams); TREX 011738R.0007.

758.    Once the Well Capping Team was aware of the need for a venting feature with the capping solutions, the work on the venting feature continued through the end of May.  Tr. at 401 (Turlak); TREX 011243 (on May 18, the Well Capping Team was comparing three options for venting or bleeding off pressure after landing the second BOP).

759.    On May 15, 2010, Transocean met with Hydril BOP representatives to discuss the installation of equipment onto the *DDII* BOP that would allow "venting" off excess pressure during the landing and installation of the BOP-on-BOP.   The work was required to enable

venting, including changing the BOP arrangement, relocating failsafe valves, and reviewing the control system to ensure it had adequate functions. TREX 011245.

760. As of May 18, 2010, an internal Transocean document estimated that modifications to the *DDII* BOP to allow venting of excess pressure would take another 10-14 days, which would have been May 28 at the earliest. Tr. at 1076-77 (Adams); TREX 011738R.0006. This was a reasonable, if optimistic, estimate. Tr. at 1147 (Adams); TREX 011738R.0006, 0008.

761. On May 26, a Transocean engineer responded to a request for a "detailed list of modifications/changes/enhancements" that were planned for the *DDII* stack "to enable subsea venting." TREX 004318.0002. Transocean's engineer disclosed a list of "BOP changes required" in order to use the *DDII* BOP for the BOP-on-BOP option. TREX 004318. These changes included removing the existing test rams from the lower cavity and installing shear rams in the lower cavity, relocating the temperature sensory to the lowest cavity, and installing an ROV panel. TREX 004318; Boughton Dep. at 548-49 (testifying that "this was all specific to changing the BOP to make it work for – as a capping BOP").

762. Wild Well Control's view was that until all necessary modifications had been made to the *DDII* BOP, BOP-on-BOP was not ready. Barnett Dep. at 314-15.

763. The rams in a BOP are either open or closed—there are no incremental steps. TREX 011738R.0006. When a well is shut in with a blind shear ram, the well flow is rapidly stopped as the ram closes in less than 45 seconds. TREX 011738R.0006. This rapid change in flow can produce a pressure surge in the well known as the "water hammer" effect. TREX 011738R.0006. Such a pressure surge can expose the wellbore to higher pressures than it would otherwise experience. TREX 011738R.0006.

764.   The 3-Ram Capping Stack that ultimately sealed the Macondo well was slowly shut in over a period of two hours using a subsea choke, rather than by closing its rams.  TREX 011738R.0006.  During closure of the 3-Ram Capping Stack, pressures were closely monitored. TREX 011738R.0006.

765.   The venting solution that was under development during the *Deepwater Horizon* response would have used a subsea choke to vent any pressure buildup subsea to a vent manifold, away from the surface vessel.  Tr. at 1078-79 (Adams); TREX 011738R.0006.  That method had been risk-mitigated and was being progressed.  Tr. at 1078 (Adams).  In light of the identified risk of overpressuring the wellbore, the inclusion of a subsea choke to manage pressure was a prudent and appropriate action to take.  TREX 011738R.0007-08.

766.   A subsea choke would have allowed the well to be shut in by an incremental closure, avoiding a pressure surge.  TREX 011738R.0006.  The shut-in process could have been stopped or reversed if shut-in pressures approached levels deemed to be unsafe.   TREX 011738R.0006.

767.   Providing an alternate flow path via a subsea choke would also protect the blind shear ram from erosion of its sealing surfaces during closure.  TREX 011738R.0006, 0011.  As the blind shear ram was closed, the velocity of hydrocarbons flowing past it would have increased, creating an enhanced risk of erosion.  TREX 011737R.0011.

768.   A subsea choke would also have facilitated opening the intervention BOP back up again if necessary.  TREX 011738R.0006-07.  Large differential pressure across a blind shear ram could have prevented it from opening again.  TREX 011738R.0007; Frazelle Dep. at 249-50. For example, if the shut-in wellhead pressure were 9,000 psi, and the ambient sea pressure at depth was 2,500 psi, the 6,500 psi pressure differential acting upwards on the blind shear ram

could have prevented it from opening up again.  TREX 011738R.0007.  A subsea choke would have allowed relief of any problematic differential pressure.  TREX 011738R.0007.

769.  The design, sourcing, installation, and testing of such a venting system was not an insignificant undertaking.  TREX 011738R.0006.

770.  At the end of May 2010, there was still work being performed with the respect to the venting option for the BOP-on-BOP option.  Tr. at 286 (Perkin).

771.  Subsequent time estimates showed that the modified BOP would not be ready until early June.  Tr. at 1077 (Adams); TREX 011738R.0008-09; Holt Dep. at 534-35.

772.  During the response, the Well Capping Team prepared Gantt charts to track the progress with respect to the capping solutions.  Mr. Turlak received the Well Capping Team Gantt charts during the response, and testified that the Gantt chart for May 29, 2010 identified that the subsea manifold for the venting feature would be transported no earlier than June 2.  Tr. at 401-03 (Turlak); TREX 011261N.2.  Therefore, according to the Well Capping Team's Gantt chart, the venting feature for the BOP-on-BOP option would not have been ready any earlier than June 2 and would not have been installed until June 4.  Tr. at 402-04 (Turlak); TREX 011261N.2.

773.  Although the Well Capping Team worked to add venting capability to the *DDII* BOP, this work was never completed.  Holt Dep. at 392-93 (testifying that equipment had been identified, but it was never installed on the *DDII* BOP).

774.  The Aligned Parties have suggested that venting capability could have been accomplished by venting through the choke and kill lines of the second BOP, but during the response, Transocean's Subsea Department characterized this as "normally not an option" and indicated that this method would "need[] evaluation."  TREX 011245.0001.

152

775.    The 2-Ram Capping Stack option had never progressed far enough to have been developed with a venting option.  Tr. at 400-01 (Turlak).

776.    Regardless of whether the *Discoverer Enterprise* BOP or the *DDII* BOP was to be used with the BOP-on-BOP option, both of them would have required modification to be able to vent excess pressure in light of the well integrity concerns.   Tr. at 1076 (Adams).   These modifications had not been completed on either BOP at the time of Top Kill.  Tr. at 1076, 1080 (Adams); TREX 011737R.0012; TREX 011738R.0005, 0009.

777.    From the earliest days of the response, planning for BOP-on-BOP emphasized that no hydrocarbons were to be flowed to the surface intervention vessel.  TREX 005360.0003. For example, a sealed-off perforated riser was designed to land the BOP-on-BOP while preventing flow back to the surface intervention vessel.  TREX 005360.0003.

778.    The Aligned Parties' suggestion that the subsea venting modifications were unnecessary because the well could have been capped with BOP-on-BOP and vented through existing choke and kill lines is incorrect.  Tr. at 1077-78 (Adams).

779.    The Aligned Parties' proposed alternative of venting the well via the BOP's existing choke and kill lines is a high-risk proposal.  Tr. at 1080 (Adams).  This proposed solution would have involved flowing hydrocarbons at a potentially high rate through the BOP's choke and kill lines to the vessel 5,000 ft. above for as long as it took to complete the relief wells—potentially several months.  Tr. at 1077-78 (Adams); D23771A.

780.    In their standard configuration, the choke and kill lines could not have been used to vent hydrocarbons safely at anything close to the rates that could have been expected from the Macondo reservoir.  TREX 011738R.0009.

781.    The surface vessel would have had to remain on station, connected to the well, during this time.  Tr. at 1077-78 (Adams).  If the surface vessel had to leave due to weather or a system failure, it would have had to pull the intervention BOP LMRP, which would have caused the choke and kill lines to close, shutting in the well.  TREX 011738R.0009.

782.    Upon removal of its LMRP, the *Deepwater Horizon* BOP's choke and kill lines would have failed closed, eliminating those as a venting option.  TREX 011737R.0013; TREX 011738R.0009.

783.    The choke and kill lines on a BOP are Coflexip hoses similar to those identified as damaged and needing replacement in the *Discoverer Enterprise* West Engineering audit inspection report.  Tr. at 1072-73, 1079 (Adams).

784.    If the choke and kill lines were damaged or eroded while venting up under the vessel on station 5,000 ft. above, it would cause a surface release of hydrocarbons, exposing the vessel and its crew to the risk of explosion similar to the original incident on April 20, 2010.  Tr. at 1079-80 (Adams).

785.    The BOP-on-BOP procedure called for using the intervention BOP's choke and kill lines to pump glycol for hydrate mitigation.  TREX 011737R.0013.  This would not have been possible had they been used instead for venting.   TREX 011737R.0013; TREX 011738R.0009.  Hydrate formation during the BOP-on-BOP operation could have caused its failure.  TREX 011737R.0013.

> **(6)     No BOP-on-BOP Procedures Had Been Finalized or Approved by Unified Command prior to Top Kill.**

786.    On May 14, when the Peer Assist was conducted, procedures for the BOP-on-BOP option were still being developed.  TREX 142399.1.1; Tr. at 391 (Turlak).

787.    Procedures for the BOP-on-BOP option were never finalized, and the Unified Command never approved any.  Tr. at 405 (Turlak); Wellings Dep. at 244-45.

>    (f)    **Based on Independent Analyses of Top Kill Data, the Federal Government and BP Concluded That the Risks of Utilizing BOP-on-BOP Were Too High Because of the Risk of a Subsea Broach, Which Would Have Worsened the Situation.**

788.    At the conclusion of Top Kill, the available data raised concerns associated with the BOP-on-BOP option and thus, it was discontinued.  Holt Dep. at 73-74.

789.    As of May 27, 2010, the proposed BOP-on-BOP procedure was ready for review with the exception of drawings for the *DDII* BOP modifications that Transocean had not yet provided.  TREX 140700.0001 (the Well Capping Team was "still waiting on [the drawings] from TOI.")

790.    Immediately after the conclusion of Top Kill, the Federal Science Team and the BP Engineering Team attempted to assimilate the observations from the procedure to understand why Top Kill failed.  Tr. at 667 (Dupree).  As Halliburton has recognized, it was important to conduct a full analysis to determine, among other things, why Top Kill failed and whether the well still had integrity.  Vargo Dep. at 36.

791.     Well integrity was a central concern during the response, and source control methods were evaluated in light of that concern.  TREX 011737R.0006, 0015.  Many conversations were had among responders about well integrity issues that might arise if flow were stopped and pressure built up.  Thierens Dep. at 244.  If the well lost integrity, it could allow hydrocarbons to fracture the surrounding shallow formations, and to ultimately be released at the seabed.  Brannon Dep. at 126; TREX 011737R.0005.  This would have resulted in hydrocarbons being released from multiple seabed locations, precluding effective collection efforts and rendering more difficult or potentially impossible eventually killing the well with

known methods.  Brannon Dep. at 126; Holt Dep. at 141; Thierens Dep. at 244; TREX 011737R.0005-06, 0015.

792.    Analysis of Top Kill data identified a new, enhanced well integrity concern that was shared by BP and federal responders alike.  Tr. at 1069 (Adams); Brannon Dep. at 83; TREX 011737R.0015.

793.    During Top Kill it was expected that pressure would initially increase and then begin to decrease as the mud began to overcome the force of the reservoir and go down the well. Tr. at 668-69 (Dupree); Barnett Dep. at 317.

794.    During the execution of Top Kill, pressure increased and began to decrease as expected; but the pressure flat lined after a 700 psi drop.  Tr. at 668 (Dupree); TREX 150306N.0004; Barnett Dep. at 317-18.  That pressure drop concerned BP as it was coincident with the depth where rupture disks were placed in the 16-inch casing of the well, and BP was concerned that mud was being pumped down the well, exiting through the rupture disks, and broaching the formation.  Tr. at 669 (Dupree).

795.    Prior to Top Kill, the concern had been that responders would take some action on the well that would rupture the outward-acting burst disks.  Tr. at 1070 (Adams); TREX 011738R.0010.  That issue might have been adequately managed during a capping operation using the proposed subsea choke and venting system.  TREX 011738R.0010.

796.    Data from Top Kill raised the possibility that the inward-acting collapse disks had *already* ruptured.  Tr. at 1070 (Adams); TREX 011738R.0010.  The new concern was that there may already be a path open to the formation outside the wellbore, which could ultimately result in a broach to the seabed, with potentially catastrophic consequences for the response.  Tr. at 1070 (Adams); Inglis Dep. at 677; TREX 011738R.0010.

156

797.  The result of the concern, based on the Top Kill data analysis, that there may already be a path open to the formation through the 16" casing rupture disks was an understanding that for future source control strategies there needed to be a radical reduction in pressure to which the wellbore could be safely subjected.  Tr. at 1070 (Adams); TREX 011738R.00010.

798.  When discontinuing the Top Kill effort was being considered, the federal Government required and obtained completed diagnostics from the entire Top Kill effort before deciding how to proceed.  TREX 008528.0001.  According to Halliburton's representative, the federal Government decided whether to continue or discontinue Top Kill.  Vargo Dep. at 247, 252-53.

799.  Based on their independent analyses, BP and the federal Government both concluded that there was a "chance that the rupture disks between the casings were damaged in the initial explosion" and that if the team continued "trying to force mud down, [they] risk[ed] damaging them further."  Tr. at 674 (Dupree); TREX 011305.0002; Cook Dep. at 158 (in light of analysis of data collected from Top Kill, it was the considered judgment of those involved, including Secretaries Salazar and Chu that BOP-on-BOP not proceed); TREX 009103 (May 29, 2010 E-mail from K. Cook to T. Allen stating that "BOP on BOP not advisable, now or in the future, because of rupture disk issue ... Potential high pressure created by BOP on BOP could also lead to hydrocarbon flow into formation ... Again a potential broaching scenario")..

800.  The Aligned Parties' expert, Mr. Perkin, rendered opinions on Top Kill, yet he neither reviewed the Top Kill data in any detail nor performed any independent analysis of the Top Kill data.  Tr. at 244 (Perkin).

801.     Prior to this litigation, Mr. Perkin had never been involved in evaluating well integrity for a deepwater well and he has no experience working with rupture disks used in a deepwater well.  Tr. at 244-45 (Perkin).

<div align="center">

**(1)     The Federal Government Had Access to All Top Kill Data.**

</div>

802.     As the Aligned Parties' expert, Mr. Perkin, acknowledged, Secretary Chu and the federal scientists received the data from Top Kill (including pressure and pumping data) in real time.  Tr. at 245-47 (Perkin); Chu Dep. at 73-78; TREX 011305.0002-03; Hunter Dep. at 211-12; TREX 009695.0002.

803.     The National Incident Commander, Secretary Chu, Tom Hunter, Deputy Secretary Hayes, representatives from the MMS, and much of the Federal Science Team monitored Top Kill in real time from the main command room in Houston.  Tr. at 665 (Dupree); Brannon Dep. at 80; Holt Dep. at 297-99; Hunter Dep. at 190-91; TREX 144470N.1.1.  The pressure and other data from the Top Kill operation was displayed on screens in the control room in real time where anybody could see it.  Cook Dep. at 623.

804.     A May 27, 2010, email sent from BP to service companies during Top Kill indicated that no one outside of Paul Tooms' group was to receive the data that was collected during Top Kill, and that this order came from Charlie Holt and Bill Kirton.  TREX 006195.  Mr. Holt explained that this email was an attempt to ensure that the Top Kill data was not forwarded by those service companies to third-parties without permission from Paul Tooms.  Holt Dep. at 294-97.  This was not an instruction not to share the data with the federal scientists.  Holt Dep. at 297.  This email was not intended to affect the manner in which BP provided Top Kill information to the federal Government, because the Government had live access to all Top Kill data.  Holt Dep. at 297, 563-64; Tooms Dep. at 304-06; TREX 006195.

<div align="center">158</div>

805.    The Federal Incident Commander had no complaints about the data being provided to him by BP, and he heard no such complaints from Secretary Chu.  Brannon Dep. at 81.  He testified that he has never seen a document from any Government official indicating that they had not received Top Kill data that they had requested, and he does not know of any request for Top Kill data that was not fulfilled.  Brannon Dep. at 289.

806.    The federal Government used this real-time access to the Top Kill data to monitor the progress of Top Kill, help design strategies moving forward, and to conduct its "own independent analysis of the data so that [it could ] verify the conclusions that BP [was] making at every step."  TREX 011305.0002; Tr. at 1068-69 (Adams).

807.    Following the final day of Top Kill, BP held an internal meeting before discussing Top Kill's failure with Government officials.  TREX 009424.0004.  When Lars Herbst of the MMS and Admiral Cook knocked on the door, they were asked to come back in three minutes.  TREX 009424.0004.  Mr. Herbst and Admiral Cook came back three minutes later and entered the meeting.  TREX 009424.0004.  Admiral Cook believes there was nothing sinister about this event.  Cook Dep. at 633-35; TREX 009424.0004.  At that time, it was standard practice for BP to have internal meetings before meeting with Government officials.  TREX 009424.0004.

### (2)    BP Offered Various Possible Reasons for Failure of Top Kill.

808.    Following Top Kill, different opinions about why the operation failed were "floating around like feathers on a bird."  Tr. at 828 (Mazzella); Tr. at 1160 (Adams).

809.    BP presented different scenarios to the federal Government, offered multiple possible reasons for the failure of Top Kill, and attempted to reconcile the observations from Top Kill.  Tr. at 671-73 (Dupree); Hunter Dep. at 214-17; TREX 009696.0001.

810.    During BP Management Meetings, which were open to federal officials and attended by the Federal Incident Commander, other representatives of the Coast Guard, and the MMS, BP discussed the possibility that Top Kill had failed because the flow rate was too high. Brannon Dep. at 35-36, 44, 112-13.

811.    After only the first day of Top Kill, a BP engineer, Kurt Mix, sent a text message which read, in total: "Too much flowrate - over 15000 and too large an orifice.  Pumped over 12800 bbl of mud today plus 5 separate bridging pills.  Tired … Going home and getting ready for round three tomorrow."  TREX 009160 (ellipsis in original); Tr. at 1059-61 (Adams).  A text message by its nature is not a reliable evaluation of an operation, especially an important one. Tr. at 1060-61 (Adams).

812.    Mr. Mix's assertion that five separate bridging pills were pumped on the first day is inaccurate, as demonstrated by the more formal Wild Well Control summary, which records the fact that, due to a malfunction, no bridging material left the launcher on the first day.  TREX 010632.0009; Tr. at 1060-61 (Adams); TREX 010684.0001; Holt Dep. at 313-14.  This inaccuracy would cast doubt on the reliability of the conclusion put forward in the text message. Tr. at 1060-62 (Adams).

813.    Nevertheless, following the first day of Top Kill, BP informed federal officials that it believed that most of the mud had come out of the riser instead of going down the wellbore.  TREX 009138.0001.  The Government disagreed, believing that evidence suggested that mud had flown down the wellbore.  TREX 009138.0001.  Everybody agreed that Top Kill should continue.  TREX 009138.0001.

        a.    **Following the Failure of Top Kill, BP Performed a Rapid Analysis Overnight to Determine the Reason for Top Kill's Failure, and Presented**

**Three Possible Scenarios to the Federal
Government.**

814.    Following the failure of Top Kill, an engineering team led by Paul Tooms

analyzed the gathered data to try to understand why Top Kill failed.  Holt Dep. at 185-86, 188.

815.    BP's initial analysis was performed overnight at the insistence of federal officials,

by engineers on little to no sleep, pressures recognized at the time by at least two members of the

National Labs.  TREX 144925.0001 (Dr. Tieszen noting that BP's May 29 analysis had been

performed "under duress from the government, in the middle of the night, with little to no

sleep"); TREX 150303.0002 (Los Alamos National Lab Chief Mechanical Engineer Scott

Perfect noting that "BP scrambled to put together" its May 29 analysis, its engineers having

"operat[ed] with very little sleep for several days").

816.    On May 29, 2010, BP presented the results of its overnight analysis to the federal

Government in a presentation titled "Top Kill Analysis."  Tr. at 1126 (Adams); TREX

011614.0001.  BP presented three "possible" scenarios that might explain the failure of Top Kill.

Tr. at 1127 (Adams); TREX 0011614.005-12.

817.    In Scenario #1 of the "Top Kill Analysis" presentation, hydrocarbon flow was up

the production casing, and the mud from Top Kill predominantly flowed straight out of the BOP

into the ocean, rather than being forced down the wellbore.  Tr. at 1133 (Adams); TREX

011614.0005-06; TREX 011613.0040.

818.    BP presented Scenario #1 to Government officials as a "realistic case that

accounts for all the evidence," though inconsistent with two "Defining Observations" at high

rates.  TREX 011613.0040; TREX 011614.0006.

819.   Scenario #1 was similar to the scenario BP told federal officials it believed to be the reason for Top Kill's failure following the first day's pumping operations.   TREX 009138.0001.

820.   The pressure drop in the Top Kill pumping data indicated that the heavy fluid pumped into the BOP had not just flowed up and out of the BOP.   TREX 010537.0004; Holt Dep. at 530-31.

821.   Scenario #1 would also have required "[m]assive [mud] flow past [the] rams," something BP engineers judged would have caused significant erosion of the BOP components had it occurred.   TREX 011614.0006; Tr. at 1133-34 (Adams); TREX 11613.0040; TREX 150088.0002.   As BP engineers were seeing "little evidence of erosion," Scenario #1 was thought by some to be unlikely.   TREX 150088.0001-02 (internal email chain between a number of BP engineers discussing various proposed scenarios to explain the Top Kill data, including a scenario numbered "2" in the email chain that is similar to Scenario #1 in the May 29 presentation); TREX 011614.0006.

822.   Scenario #1 was not at that time the leading candidate to explain why Top Kill failed, Holt Dep. at 192-93, and the May 29 presentation concluded that Scenario #1 was "Possible but not Plausible."   TREX 011614.0006.

823.   In the May 29 Top Kill Analysis presentation, BP acknowledged to federal officials that the Top Kill pressure data could be explained by few restrictions in the BOP stack, and that the Top Kill mud could have been just flowing out through the BOP without forcing the hydrocarbons back down the wellbore.   TREX 11613.0040.

824.   Had Unified Command been able to confirm Scenario #1 with certainty, the rupture disks would not have been exposed to hydrocarbons, which would have alleviated fears about an underground blowout.  TREX 011613.0040.

825.   In Scenario #2 of the "Top Kill Analysis" presentation, the casing hanger was not anchored, and hydrocarbon flow was up both the production casing and the annular space outside the production casing.  TREX 011614.0007; TREX 011613.0040.  When Top Kill mud was pumped, the casing hanger was pushed back down, preventing the Top Kill mud from forcing the hydrocarbons back down the annular space.  TREX 011614.0007; TREX 011613.0040.  Once pumping stopped, the casing hanger opened back up allowing flow from both the production casing and the annular space to resume.  TREX 011614.0007; TREX 011613.0040.  Top Kill would have failed under Scenario #2 because it would have been able to move mud into the production casing, but not into the annular space outside of it.  Holt Dept. at 193-94.

826.   Though BP presented Scenario #2 as a possibility, it identified a number of inconsistencies with the "Defining Observations" and data, and concluded that Scenario #2 was also "Possible but not Plausible."  Tr. at 1127 (Adams); TREX 011614.0008.

827.   In Scenario #3, hydrocarbons were flowing up the annular space outside the production casing, and possibly up the production casing as well.  TREX 011614.0009.  Crucially, the collapse disks had ruptured during the immediate aftermath of the incident (rather than as a result of Top Kill), and the Top Kill mud was flowing down the annular space and out through the collapse disks into the formation.  TREX 011614.0009-10, 0012; TREX 011613.0043; TREX 011613.0044-45; Holt Dep. at 540-42.

828.   BP's casing design expert reviewed the data and concluded that it was possible that during the initial blow out a sufficient pressure differential could have existed to cause the

collapse disks to rupture.  Tr. at 669-70 (Dupree); Inglis Dep. at 673, 675; TREX 150306N.6. Top Kill could not have caused the collapse or burst disks to rupture as pumping never reached pressures that could have activated the rupture disks.  Tr. at 673 (Dupree).

829.    Scenario #3 was consistent with all the "Defining Observations" identified by BP's May 29 analysis.  Tr. at 1167 (Adams); TREX 011614.0010; TREX 011613.0043.  The May 29 Top Kill Analysis presentation also identified five additional pieces of supporting evidence for Scenario #3, including the fact that the pressure drop observed during pumping correlated with displacing hydrocarbons down to the depth of the first set of rupture disks. TREX 011614.0011.  The May 29 presentation concluded that Scenario #3 was both "Possible and Plausible."  TREX 011614.0010.

830.    Scenario #3 was the scenario that raised concerns about well integrity.  Tr. at 249 (Perkin).  It was the "nightmare scenario" where flow through open collapse disks would lead to an underground blowout—an "uncontrollable hydrocarbon blowout along geologic fractures," and ultimately a broach of the seabed.  Tr. at 1128 (Adams); TREX 144925.0001; TREX 011478.0001.

831.    As the Aligned Parties' expert admitted, BP presented various alternative explanations to the federal Government for Top Kill's failure, only one of which implicated well integrity concerns.  Tr. at 249 (Perkin).

832.    The members of the Unified Command, along with the Federal Science Team and other industry experts, discussed the possibility that the collapse disks may have activated during the blowout causing the failure of Top Kill, and the common view was that the activation of the rupture disks was the most likely scenario.  Inglis Dep. at 673-74.

833.   The scenario involving ruptured collapse disks was not presented as, or considered to be, the only possible explanation; but in light of such detrimental consequences if it were the case it was an observation that could not be ignored.  Tr. at 670-71 (Dupree); McNutt Dep. at 253-54;  Hunter Dep. at 38-39, 198-99, 201-03;  TREX 009687.0001;  TREX 011614.0005-10.

834.   Based on the data from Top Kill, Scenario #3 had to be considered a "real possibility."  TREX 011613.0045;  Tr. at 1166 (Adams).  "The Top Kill results did not allow BP and the Unified Command to select just one of the three scenarios, or to rule any of them definitely out.  This left all three scenarios open as possibilities.  From the data available at the time it was reasonable to conclude that one or more collapse disks could have ruptured."  TREX 011613.0045; Tr. at 1166 (Adams).

835.   On May 31, 2010, Dr. McNutt wrote about "the theory that rupture of a collapse disk in the 16" casing" to Admiral Allen, Secretary Salazar, and Secretary Chu, among others.  TREX 011592.0001.  "While this interpretation is consistent with all of the data in hand, it is not a unique interpretation.  It is, however, the 'no regrets' interpretation, in that it results in conservative decisions that would not lead to further environmental damage (such as a breach of the seafloor by hydrocarbons exiting through overpressured geologic formations)."   TREX 011592.0001.

836.   According to Halliburton's representative, based on the pressure response, everybody involved in pumping Top Kill, including Halliburton, thought that ruptured collapse disks could have been the reason why Top Kill failed.  Vargo Dep. at 233-35, 275-76.  Halliburton had recorded during Top Kill, and had access to, the pressure, rate, and volume data from the operation.  Vargo Dep. at 269-71.

837.    Wild Well Control agrees that flow out of ruptured collapse disks was a possible explanation for the failure of Top Kill.  Barnett Dep. at 238-39, 318-19.

838.    The Aligned Parties' expert Mr. Perkin did not conduct an independent analysis of the Top Kill data to determine whether any of the scenarios that BP presented were possible or plausible.  Tr. at 210 (Perkin).

839.    On May 29, 2010, BP contractor Thomas Selbekk wrote to a BP engineer that his modeling had indicated that the Top Kill pumping data was "consistent with a situation where basically no mud entered the wellbore."  Tr. at 252 (Perkin); TREX 009265.0001.  Mr. Selbekk continued to refine his analysis, and by June 1 had concluded that Scenario #3, mud exiting through ruptured collapse disks, was "the one case that matches the actual [pressure] curve best." Tr. at 252-53 (Perkin); TREX 011621.0001, 0004.

840.    The Aligned Parties' expert Mr. Perkin relies on Mr. Selbekk's May 29 email in reaching his opinion that BP had information casting doubt on its well integrity concerns, Tr. at 216-18, 252-53 (Perkin), but Mr. Perkin did not consider any of Mr. Selbekk's post-May 29 analysis in which Mr. Selbekk refines his conclusions.  Tr. at 253 (Perkin).

841.    BP contractor Morten Emilsen produced a draft report dated May 31, 2010, as part of BP's internal investigation into the *Deepwater Horizon* incident on April 20.  TREX 007270.  Among the evidence considered by Mr. Emilsen were data and witness statements from the day of the April 20 incident.  TREX 007270.0005.  Mr. Emilsen did not consider any data from the Top Kill operation.  TREX 007270.0005.  In his draft report, Mr. Emilsen expressed his belief that, during the initial incident, the flow of hydrocarbons was up through the production casing, rather than the annular space outside the production casing.  TREX 007270.0005-0007.

166

842.     If correct, Mr. Emilsen's conclusion may undermine the scenario where Top Kill mud flowed out of ruptured collapse disks.  Tr. at 254 (Perkin).  If the flow of hydrocarbons at the time of Top Kill was still up through the production casing only, and not up through the annulus outside the production casing, hydrocarbons would not have been able to flow through the collapse disks and out into the formation.  Tr. at 218-19 (Perkin); TREX 11613.40 ("If BP and the Unified Command had been able to confirm [that there was no flow in the annulus] with certainty, the Production Casing Hanger was still in place and sealing, preventing flow from the well to the collapse disks, and this may have enabled Unified Command to shut in the well earlier.").  As the Aligned Parties' expert Mr. Perkin admitted at trial, Mr. Emilsen's report was given to the U.S. Government "very shortly" after it was written.  Tr. at 255 (Perkin).

### (3) The Federal Government Conducted Independent Analysis and Reached Conclusions About Well Integrity and Risk of Subsea Broach.

843.     Following the failure of Top Kill, the Federal Science Team embarked on an analysis of the Top Kill data and well integrity that continued through the summer.  Cook Dep. at 576.

844.     Shortly after Top Kill concluded, Secretary Chu asked federal scientists at the National Lab to "independently analyze the top kill data," to evaluate the reasons why Top Kill failed and determine whether "mud was likely flowing through the seal assembly and out of the rupture disks."  TREX 011477; Tr. at 258-59, 261 (Perkin) (admitting that the Federal Science Team conducted its own independent analysis of the reasons why Top Kill failed at Secretary Chu's direction); Tr. at 1068-69 (Adams); Chu Dep. at 73-78; TREX 011737R.0015; TREX 011296; TREX 011305.0002-03.

845.    On May 31, 2010, Secretary Chu emailed federal scientists to emphasize "the importance of doing a completely independent analysis of the Top Kill data," noting that "[t]he BP scenarios are reasonable, but I see a number of other scenarios."  TREX 144847.1.2.BP.

846.    According to Admiral Allen, most of the issues related to well pressure after Top Kill were affirmatively raised by the Federal Science Team.  Allen Dep. at 61, 65-66.

847.    As the Aligned Parties' expert admitted, Admiral Allen relied on the Federal Science Team for its conclusions and analysis about whether the rupture disks in the casing had opened.  Tr. at 263 (Perkin).

848.    Admiral Allen testified that, as it related to the decision not to go forward with the BOP-on-BOP option as a method of shutting in the well, the "combined recommendation of BP and the Science Team and the counsel [he] was getting was that it was too risky to proceed." Allen Dep. at 375.

849.    On May 30, 2010, federal scientist Dr. Sheldon Tieszen wrote to federal scientists Drs. Ron Dykhuizen and Charlie Morrow, as well as a number of BP engineers including Trevor Hill, that there was a rich set of data from the May 28 Top Kill operation, and that he had sent Drs. Dykhuizen and Morrow the Top Kill data files.  TREX 142361.0002.  Dr. Tieszen noted that Trevor Hill had suggested that the timing of operations on the ship and its relation to the 700 psi drop in pressure "may or may not be consistent with the scenario [they] discussed."  TREX 142361.0002.  Dr. Tieszen further noted that Secretary Chu had also asked for an independent analysis of the visual evidence from Top Kill.  TREX 142361.0002-03 ("[O]ne of the principle pieces of evidence cited for the into the formation theory is the rate at which gas is seen to come back into the kink jets.  Sec. Chu wants to know whether this observation is one's persons (sic)

opinion or whether it can be independently verified.  So he wants Ron/Charlie to watch the kink videos from the third kill shot.").

850.    On May 31, in response to receiving an email chain including Dr. Tieszen's May 30 email, BP's Head of Engineering, Paul Tooms, instructed a number of BP personnel: "I think we should be clear that what we have set out is a plausible explanation and we are open to other interpretations.  If we ultimately have a system that can hold back pressure and find that we can hold say 8000 psi on the system then that would demonstrate that the well still has integrity. And it would be a great outcome."  TREX 142361.0001.

851.    On May 31, 2010, Secretary Chu wrote to BP senior executive Andy Inglis and other Government officials that he believed a "modified" Scenario #2 was "equally plausible without more detailed calculations."  Tr. at 1162-64 (Adams); TREX 009696.0001.  Mr. Inglis replied that he agreed with Secretary Chu.  Tr. at 249-52 (Perkin); Tr. at 1162-64 (Adams); Hunter Dep. at 214-17; TREX 009696.0001.

852.    On June 1, 2010, Drs. Dykhuizen and Morrow prepared a presentation entitled "Mud Flow During Kill," summarizing the results of their independent analysis of why Top Kill may have failed.  Tr. at 260-61 (Perkin); TREX 011296.  The Aligned Parties' expert Mr. Perkin testified that he had not seen this, the Government's own analysis of the Top Kill data, before rendering his opinions in this case.  Tr. 259-61 (Perkin).

853.    Drs. Dykhuizen and Morrow analyzed "[s]everal plausible scenarios" using data from Top Kill, and conducted a two-hour technical consultation with BP flow analysts and geomechanics engineers.  TREX 011620.0007; TREX 011296.0002.  The scenarios considered by Drs. Dykhuizen and Morrow included the three possible scenarios presented by BP on May 29, as well as two additional possible scenarios.  TREX 011296.0003

854.     Regarding BP's Scenario #1, Drs. Dykhuizen and Morrow disagreed with BP that it should necessarily be discounted because there was no evidence of erosion and presented the counterargument that "the BOP is a failed component."  TREX 011296.0004.

855.     Drs. Dykhuizen and Morrow noted that "the BOP pressure flow characteristics may be highly nonlinear," and that there may have in fact been erosion, but the Junk Shot bridging material could have added more resistance and masked the change.   TREX 011296.0004.  They also concluded that some data from Top Kill indicated to them that there may have in fact been erosion.  TREX 011296.0005.  "There is no clear indication that mud flows up past the BOP seals, but this is still possible."  TREX 011296.0016.

856.     Regarding BP's Scenario #2, Drs. Dykhuizen and Morrow concluded that a similar scenario, in which mud went down the production casing and oil flowed up the annular space outside the production casing, was a "likely scenario."   TREX 011296.0016; *see also* TREX 150303.0004-06 (Dick Garwin of Secretary Chu's Science Team concurring with this conclusion based on his own analysis).

857.     Regarding BP's Scenario #3, Drs. Dykhuizen and Morrow calculated that it would not have been possible for all the Top Kill mud to have flowed out of the collapse disks, even at just 50 barrels per minute and if all six collapse disks were ruptured.   TREX 011296.0012.  They therefore concluded that the collapse disks "cannot be the major path for the total mud flow," *i.e.*, that at least some mud must have been going elsewhere.   TREX 011296.0016; *see also* TREX 150303.0004-06 (Dick Garwin of Secretary Chu's Science Team concurring with the conclusion that "[t]he mud cannot possibly be going primarily through the rupture disks," and setting out the results of his own analysis of Top Kill mud flow).

858.     In addition to the BP scenarios, Drs. Dykhuizen and Morrow also concluded that mud traveling down the production casing or the annular space outside the production casing and into a lower geologic fracture were also "reasonable" and "possible" scenarios respectively. TREX 011296.0003, 0006-09, 0016.  They also put forward a theory of "counter current flow," with mud going down the well but oil still coming up.  TREX 011296.0013.  They calculated that this, too, was a "possible" explanation for Top Kill's failure.  TREX 011296.0013-14, 0016.

859.     This analysis by Drs. Dykhuizen and Morrow was praised by Dr. Tom Hunter as "very valuable in reaching conclusions," and described by federal scientist Dr. Tieszen as what "may very well be Sandia's signature contribution" to the *Deepwater Horizon* response.  TREX 144925.0001.

860.     Federal scientist Dr. Tieszen did not rule out Scenario #3 (mud flow through the rupture disks) as a likely explanation for Top Kill's failure, but noted that "there are alternate plausible explanations that in fact may be more likely, and there is reason to believe that further analysis can eliminate the nightmare scenario."  TREX 144925.0001.

861.     On June 14, 2010, Dr. McNutt explained: "The initial interpretation **by both BP and the National Labs** is that the rupture disks **may** have blown during the initial incident."  TREX 011479.0001 (emphasis added).  Dr. McNutt further explained, "If that is the case, then the well should not be shut in from above.  It might risk a blow out through geologic formations to the seafloor.  So we are cautiously proceeding.  The interpretation of the pressure data from the [T]op [K]ill attempt is that there is a hysteresis that is consistent with flow through the rupture disks at the level of the 16" casing."  TREX 011479.0001.

862.    On June 14, 2010, Dr. McNutt noted: "[T]he team that we have from the National [L]abs working at BP in Houston is putting together an experiment to determine whether it is at all safe to shut in this well from the top A[T] ALL."  TREX 011479.0001 (emphasis in original).

### (4)    In Light of Well Integrity Concerns, BOP-on-BOP Was Set Aside in Favor of a Collection Strategy.

863.    On May 29, 2010, in the aftermath of the failure of Top Kill, the Unified Command switched from trying to cap the well to a containment strategy, which sought to collect as much of the hydrocarbons as possible while it waited for the relief wells and considered other options.  Tr. at 1069 (Adams); TREX 011305.0002-03; TREX 011737R.0007, 0015-16.  As a result of this shift in strategy, BOP-on-BOP was taken off the table.  Tr. at 1069 (Adams); TREX 011305.0002-03; TREX 011737R.0015.  The decision was based both on a review by the federal Government of BP's suggested options and an independent analysis by the federal Government.  TREX 011305.0003.

864.    The Federal Science Team determined that well integrity concerns were too great to shut in the well using the BOP-on-BOP method.  Chu Dep. at 76-77; Allen Dep. at 87-88; 493-95; TREX 009146.0001.  The view of the federal scientists was that the casing could have been broached.  Hayward Dep. at 834-835; Stipulated Facts at 13 (Rec. Doc. 7076) ("On May 31, 2010, BP and members of the Federal Science Team agreed that one interpretation of the analysis and diagnostics from the Top Kill indicated an issue with well integrity.").  If the collapse disks had ruptured, BOP-on-BOP could cause hydrocarbons to broach the seabed, which would make the situation worse.  Tr. at 676 (Dupree); Holt Dep. at 230, 386-87.  Therefore, it was determined that a collection strategy should be pursued.  Tr. at 676-77 (Dupree); Chu Dep. at 76-77; McNutt Dep. at 252; Hunter Dep. at 38-39; Holt Dep. at 222-23; TREX 009656.0001; TREX 009687.0001; TREX 009412.2.3; TREX 011305.0002.

865.    Prior to Top Kill, BP engineers calculated that, if hydrocarbons were to flow into the formation through open rupture disks and out of the well casing at the 18" shoe at a rate of 5,000 bopd, the hydrocarbons would broach the seabed within six days.  TREX 008532.0001. There were few significant shallow sands that could absorb hydrocarbons escaping the wellbore in such a manner, and no "stress barriers" that would prevent vertical propagation of any resulting fractures to the seabed.  TREX 008532.0003-04.  Initially broaching the surface near the wellhead, the resulting fractures would be expected to propagate laterally away from the well east-north-east and west-south-west up to 2,400 ft. in either direction.  TREX 008532.0007; Knox Dep. at 387-89.  In the words of federal scientist Dr. Sheldon Tieszen, this would be "the nightmare scenario."  TREX 144925.0001.

866.    On May 29, 2010 Dr. Marcia McNutt, the Director of the U.S. Geological Survey and Chair of the Flow Rate Technical Group, also concluded that "[e]vidence from the top kill operation strongly suggests that the original blast ruptured the 18" rupture disks in the 16" casing, which means that the mud pumped in the top kill is merely escaping into shallow formations well above the reservoir."  TREX 011478.0001; TREX 008804.0003; McNutt Dep. at 248-50.  She emailed Secretary Salazar and Secretary Chu recommending that the "best way forward [was] flow containment and bottom kill" because "any attempt to shut in this well from above strongly risk[ed]over pressuring deep formations with the hydrocarbons and causing an uncontainable blowout to the seafloor."  TREX 011478.0001; McNutt Dep. at 248-50.

867.    On May 29, 2010 Carol M. Browner of the Executive Office of the President relayed the message to Admiral Thad Allen and various White House officials.  She wrote: "Our scientists have determined that the risks are to[o] great to shut the well in from the top.  *E.g.*, with the addition of a new BOP.  That means until the relief well is completed (mid August at

best) we will be in the position of capturing the leaking oil with a cap and new riser to a vessel on the surface." Hunter Dep. at 203-04; TREX 009146.0001.

868.    Following Top Kill, BP did not present to federal officials a definitive conclusion about the status of the rupture disks.  Tr. at 672, 676-78 (Dupree); Cook Dep. at 149-50 (testifying that on May 29 nobody, including BP, knew whether the rupture disks were open and allowing a path into the formation); TREX 009412.2.3.   Nobody was able to definitively conclude whether the well had or had not lost integrity.  Brannon Dep. at 86-87.  However, the concern that broaching would be "a potentially catastrophic event was universally shared."  Cook Dep. at 151.  Transocean agrees that the risk of hydrocarbons broaching the seabed was a "catastrophic risk."  Hand Dep. at 481.

869.    Had the Unified Command not shared the concerns of others about well integrity, it could have directed BP to proceed with BOP-on-BOP.  Brannon Dep. at 84; Cook Dep. at 151.

870.    Dr. McNutt testified: "I believe BP was being responsible when it raised the issue of well integrity.  I think that the Government was pushing BP to consider worst-case scenarios, and that's exactly what BP did.  They considered a worst-case scenario by raising the possibility of a loss of well-integrity, and that's exactly the sort of issue we wanted them to do (sic), and that's what [BP] did."  McNutt Dep. at 456.

871.    Admiral Allen approved the recommendation of moving to collection instead of moving forward with BOP-on-BOP.  Tr. at 678-79 (Dupree).  Secretary Salazar agreed that responders should not move forward with BOP-on-BOP.  Brannon Dep. at 90-91.

872.    On May 30, 2010, BP's Bernard Looney sent a note to Admiral Allen on behalf of Tony Hayward, at Admiral Allen's request, to document the Coast Guard and BP's "collective thinking" on the reasons for the shift to containment following Top Kill.  TREX 009412.0001;

174

TREX 009413.0003; Cook Dep. at 164.   The note was titled "Rationale for Containment vs 'BOP-on-BOP.'"   TREX 009412.0002.   The note began, under the heading "Our Strategy to Date," with a variation on the maxim of the response: "Do not take action which could cause the situation to deteriorate."   TREX 009412.0002.

873.    In the note to Admiral Allen, BP made clear that it was far from certain that the collapse disks had in fact failed.   TREX 009412.0002.   The note set out two learnings from Top Kill: "1. Diagnostics and data acquired suggest that rupture disks in the 16" casing *may* have failed during the initial well control event.   2. *If* they have failed, any attempt to 'shut in' the well from the surface (eg using the BOP on BOP option) could cause hydrocarbons to flow to shallow formations and onwards to the seafloor."   TREX 009412.0002 (emphasis in original).   "As this possibility cannot be ruled out – the lowest risk is to contain the well flow and not shut the well in."   TREX 009412.0002.

874.    The note concluded by setting out three phases to move forward with containment.   TREX 009412.0002.   Neither BOP-on-BOP nor the Capping Stack was included on this list.   TREX 009412.0002; TREX 009413.0001.   In light of the possibility that the well did not have integrity, there were concerns post-Top Kill about deploying anything that would form a tight seal on the well.   Cook Dep. at 222-23.

875.    Secretary Chu and the federal scientists wanted to avoid implementing any source control method that would cause pressure in the well to increase.   TREX 011305.0006.   In light of post-Top Kill well integrity concerns, the Government felt it needed to understand those well integrity concerns better before any sealing device like a capping stack could be considered useful.   Cook Dep. at 333–34.   In light of post-Top Kill well integrity concerns, the Capping Stack, too, was no longer a part of the Government's day-to-day briefing.   Cook Dep. at 333–34.

876.    BOP-on-BOP did not enhance the Unified Command's ability to collect hydrocarbons.  TREX 011738R.0010.  Indeed, BOP-on-BOP would have removed the ability to collect hydrocarbons from the *Deepwater Horizon* BOP's choke and kill lines because it required removal of the *Deepwater Horizon* LMRP, which would have caused those choke and kill lines to fail closed.  TREX 011737R.0012; TREX 011738R.0009–11.

877.    As Halliburton's Richard Vargo recognized, if there is a concern about well integrity responders have to be very careful about capping a well in light of the risk of underground blowout.  Vargo Dep. at 125.  Because the risk that the collapse disks had already ruptured could not be ruled out, BP's recommendation not to proceed with BOP-on-BOP was prudent, even in light of conflicting opinions about the reason for Top Kill's failure.  Tr. at 1070 (Adams); Holt Dep. at 181, 109; TREX 011737R.0015; TREX 011738R.0011.  Federal scientist Dr. Tom Hunter testified that setting aside the BOP-on-BOP option in favor of a collection strategy was the most conservative and reasonable assumption to be made at the time.  Hunter Dep. at 200.

878.    On May 30, 2010 the leader of the Well Capping Team informed individuals at Cameron, Transocean, and Wild Well Control that the BOP-on-BOP option would not be pursued.  TREX 007104.0003.  No one at Cameron, Transocean, or Wild Well Control responded by disagreeing with or challenging this decision.  TREX 007104.0001–03

879.    When the decision was made not to pursue the BOP-on-BOP option, Transocean was made aware of BP's concerns that if the well were shut in, it could breach the formation.  Boughton Dep. at 409–10 (Transocean's Subject Matter Expert for Subsea Systems and Equipment).

176

880.    On May 30, when members of the Well Capping Team from Transocean, Cameron, and Wild Well Control were informed that BOP-on-BOP was being discontinued, none of them expressed any disapproval of this decision.  TREX 007127 (Wild Well Control responded by saying that it was a pleasure working with the BP Lead for the Well Capping Team).

881.    Steve Hand, Transocean's Director of Performance and Operations, who participated in the capping efforts, attended daily meetings and participated in morning telephone calls that included representatives from Area Command and Incident Command.  Hand Dep. at 30–36, 49, 259.  Mr. Hand never expressed to Incident Command or Area Command that he believed that the BOP-on-BOP option was a good option that would work and that they should go forward with it.  Hand Dep. at 167–68 (confirming that when the decision was made not to go forward with the BOP-on-BOP option, he neither objected to that decision nor asserted that the BOP-on-BOP option would work).  Mr. Hand never heard any of his colleagues at Transocean, whether during a telephone call or during a daily meeting with Area Command and Incident Command, say: "We need to try this BOP-on-BOP option."  Hand Dep. at 169.

882.    Although Cameron was aware of concerns about the integrity of the well, it was not involved in any of the analysis in that area.  McWhorter Dep. at 300, 407.  Cameron had a preference for capping since its background was in BOPs, but it did not take into account well integrity concerns.  McWhorter Dep. at 408.  Although Cameron assisted with deploying the Junk Shot manifold, Cameron does not have experience with top kills and does not know what information would be needed to evaluate their likelihood of success.  McWhorter Dep. at 253–55, 289–90.  Cameron did not express any concerns to BP that Top Kill would not work.  McWhorter Dep. at 314.

883. Because of Cameron's "limited visibility" on the decision-making process during the response, and the fact its employees were not in decision-making positions, its employees sometimes produced "less than professional emails" out of frustration. McWhorter Dep. at 285–86 (referring to TREX 010072). This frustration was never expressed to either BP or to Unified Command. McWhorter Dep. at 311–12.

884. During Top Kill there was no clogging of the lines used in the pumping operation; Mr. Mazzella does not recall any statement by Cameron that such clogging occurred, and Cameron was not part of the Forward Team for the Top Kill operation. Tr. at 821–22 (Mazzella).

885. Following the move to containment, BP and its contractors continued to analyze the reasons for Top Kill's failure, and evidence related to whether the well may or may not still have integrity. TREX 150088.0001–03; TREX 011621.0001. BP engineers continued to discuss with federal scientists the various possible scenarios for Top Kill failing, including the three scenarios presented as possible by BP on May 29, and the additional scenarios subsequently proposed by the Government. TREX 150088.0002–03.

886. Following Top Kill the federal scientists also continued looking at the Top Kill data, further developing their expertise and their engineering analyses of the well. Cook Dep. at 334–35. They ultimately developed the Well Integrity Test that enabled them to mitigate the risk that the well had lost integrity. Cook Dep. at 334–35. When the well was eventually shut in, nobody knew for sure whether it had lost integrity. Cook Dep. at 335.

887. As late as July 7, 2010, on the eve of landing the Capping Stack, Dr. McNutt cautioned against optimism for the success of that solution. TREX 009416.0002–03. "I personally believe that the chances are very high that the well is shot to all heck, and that is why

the [T]op [K]ill failed.  Therefore, the well will not hold pressure."  TREX 009416.0003.  "[I]f the tests are not ABSOLUTELY IRONCLAD that the well has integrity, then we will immediately open the valve."  TREX 009416.0003 (emphasis in original).  A Coast Guard representative responded that the Coast Guard shared Dr. McNutt's concerns.  TREX 009416.0002.

888.    The Unified Command continued to test the integrity of the well even after the well was shut in.  Stipulated Facts at 17 (Rec. Doc. 7076).  The Well Integrity Test was designed to test the well "very systematically."  Cook Dep. at 335.  If there were signs that the well did not have integrity, the well would have been opened back up.  Cook Dep. at 335.

889.    As of July 21, 2010, almost a week after the well had been shut in, there was still ongoing analysis and debate about whether the well was leaking to the surrounding formation.  TREX 009418.0001.

890.    Scenario #3 and the implicated loss of well integrity was not definitively ruled out until after the well had been killed and the *Deepwater Horizon* BOP stack had been recovered, at which point it was revealed that the casing hanger was still sealed.  Tr. at 1161 (Adams).

891.    Today, with the benefit of more information, BP recognizes that Top Kill may have failed because the Top Kill, including the Junk Shot component, was unable to restrict the size of the leak path through the BOP.  Holt Dep. at 197.

892.    BP's first proposed plan after the move to containment was to deploy the Top Hat containment strategy, which, if implemented, would prove that the well was flowing at greater than 15,000 barrels per day if the discharge exceeded the collection capacity of the *Discoverer Enterprise*.  TREX 011738R.0015–16.  On the fourth day of collection with Top Hat, almost

15,000 barrels were collected. TREX 011738R.0016. On the fifth day of collection with Top Hat, more than 15,000 barrels were collected. TREX 011738R.0016.

893. The risk that the well could exceed the 15,000 barrel per day collection capacity of the *Discoverer Enterprise* was presented to the U.S. Government at a May 31, 2010 meeting with Secretary Salazar discussing Top Kill's failure and BP's recommendation of collection. TREX 150306N.0012. In a May 31 email, forwarding that presentation, Dr. McNutt warned: "The system can handle 15,000 barrels per day of oil and 75,000 cu ft/day of gas, but the amount of oil may be exceeded especially if the yield goes up by 20% with the riser removed from the system." TREX 011592.0001.

894. In early June 2010 BP was planning to add the *Q4000* as an additional collection vessel. TREX 011738R.0016. On June 16, 2010 BP brought the *Q4000* online, adding additional collection capacity of 8,000 barrels per day, bringing the total collection capacity to approximately 23,000 barrels per day. TREX 011738R.0016. This combined collection capacity was exceeded by the flow, confirming that oil was in fact flowing at a rate above 23,000 barrels per day in June. TREX 011738R.0016.

895. There would have been no reason to pursue these collection methods, which quickly proved that the flow rate was in excess of 23,000 barrels per day, if the goal was to avoid the conclusions that the flow rate was over 15,000 barrels per day, and that Top Kill failed because of it. TREX 011738R.0016. If BP had wanted to avoid these conclusions, the obvious answer would have been instead to attempt to cap the well. TREX 011738R.0016.

896. BP ultimately prepared plans to collect up to 80,000 barrels of oil per day using the Capping Stack as a collection device. Tr. at 679–81 (Dupree); TREX 140797N.11. This

plan included collection through the Top Kill manifold, the side outlets of the Capping Stack, and the top of the Capping Stack.  Tr. at 680–81 (Dupree).

> (g) **BP Designed, Manufactured, and Tested a Revolutionary Type of Capping Device.**
>
> (1) **Developing an Effective Capping Stack Required Extensive Unprecedented Analysis and Engineering.**

897.   The design and successful implementation of the Capping Stack and transition spool was a "heroic engineering effort that worked quite well."  Tr. at 1295 (Hunter).

898.   Given the unprecedented conditions of the *Deepwater Horizon* blowout, including the failure of the Lower Marine Riser Package to release from the BOP, McKay Dep. at 20, the Capping Stack involved using equipment in a manner "that could not be foreseen in advance." Campbell Dep. Vol. I at 182.

899.   The proposal to land a capping device on the BOP was generated by a group of individuals within days of the blowout.  Boughton Dep. at 69, 71, 316; Wellings Dep. at 80–81.

900.   Work on a deepwater capping stack began soon after the idea was conceived. Thierens Dep. at 239.  The Capping Stack Team worked "furiously" to design and deliver a deepwater capping stack.  Thierens Dep. at 240.

901.   During the planning and installation stages for the deepwater Capping Stack, BP worked with a diverse team that included, among others, parties that built the deepwater Capping Stack, parties that built the control system, and ROV operators to design, plan, and install the deepwater Capping Stack.   Thierens Dep. at 237; Boughton Dep. at 68–69 (Transocean employees participated in building and deploying the Capping Stack on the Macondo well).

902.   The Capping Stack Team was "faced with different challenges pretty much every day."  Thierens Dep. at 240.  Hydrate mitigation, potential ram erosion, design of a choke assembly, disconnection of the riser from the flex joint, and pressure capacity of the equipment

were some of the engineering challenges to be overcome.  McWhorter Dep. at 183–85; TREX 011737R.0020.

903.    An April 27 presentation disclosed an early design of the Capping Stack, but it was simply "dumb iron," meaning components such as rams.  It lacked any control systems that were subsequently designed and did not provide any guidance on how to mitigate hydrates, how to deploy it, or how to operate it in 5,000 feet of water.  Wellings Dep. at 129–131, 431, 486 (the idea for a capping stack was proposed shortly after the blowout, but the technology had not been developed); TREX 003919.0009.

904.    As more information was learned about the BOP stack, the Capping Stack design evolved.  Campbell Dep. Vol. I at 380.

905.    ROV panels had to be manufactured for "this particular capping stack" by Oceaneering.  McWhorter Dep. at 163–64.

906.    Considerable challenges faced the Capping Team beyond the assembly and testing of the base Capping Stack.  TREX 011737R.0020.  The challenges included locating a suitable undamaged connection on which to attach the Capping Stack.  TREX 011737R.0020.  Many of the necessary operations for capping stack design and deployment had never before been undertaken in 5,000 feet of water.  TREX 011737R.0020.

907.    There were many technical barriers to deploying the Capping Stack, including: (1) the weight of the device in relation to the structural integrity of the *Deepwater Horizon* stack; (2) the angle at which the flex joint and stack were inclined, exacerbating structural concerns; and (3) connecting the Capping Stack to the flex joint with a seal.  Cook Dep. at 235, 469–70; TREX 011737R.0020 (challenges included establishing the structural condition of the existing wellhead and BOP, and assessing the impact of adding the additional weight of capping equipment);

182

Bhalla Dep. at 48 ("one needed to shim … the lower flex joint because you couldn't just put a capping stack on … the LMRP, otherwise the system would be unstable").

908.    Trevor Smith, a BP engineer with over 30 years of subsea engineering experience, lead a team of subsea engineers and specialists to develop a way of connecting the Capping Stack without removing the *Deepwater Horizon*'s LMRP.  Tr. at 836–38 (Smith).  This team was known as the BOP Connections Team.  Tr. at 836 (Smith).

909.    The BOP Connections Team was based in BP's offices and worked 12-hour days, or longer, continuously during the response.  Tr. at 838 (Smith).

910.    In light of concerns about removing the LMRP, the BOP Connections Team developed alternative transition methods that would allow landing the Capping Stack on the flex joint.  TREX 011737R.0020–21; D23274A.  The flex joint exists to allow a range of movement in the drilling riser.  TREX 011737R.0021.  It connects the BOP to the drilling unit 5,000 feet above as both rig and riser are influenced by the current and weather conditions.  TREX 011737R.0021.

911.    The flex joint flange of the *Deepwater Horizon* was not designed to have a capping stack attached to it, and prior to the *Deepwater Horizon* incident, Mr. Smith was not aware of anyone attaching a capping stack to a flex joint flange and "very much doubt[ed] it occurred."  Tr. at 841–42 (Smith).

912.    Connection of the deepwater Capping Stack to the flex joint flange involved "very complex engineering."  Thierens Dep. at 240.  The engineering complexity reflected the "very specific difficulties of this one case."  McWhorter Dep. at 208; TREX 010062.

913.    The BOP Connections Team was presented with several challenges in connecting the Capping Stack to the flex joint flange, including the risks associated with cutting away the

damaged riser, landing the Capping Stack with debris (drill pipe pieces) inside the cut section of riser, and ensuring that the pressure rating for the flange was not exceeded.  Tr. at 845 (Smith); D23276.

914.    Connecting the Capping Stack was also challenging because it was being conducted at a water depth of 5000 feet and all activities associated would need to be conducted by ROVs, underwater remotely controlled devices with two hydraulic arms with limited capabilities.  Tr. at 845–46 (Smith).

915.    The flex joint flange was not designed to have connections made to it when it was subsea, which presented additional challenges to the BOP Connections Team.  Tr. at 846–47 (Smith).  Some of those challenges included getting access to the bolts, loosening the bolts, separating the flex joint flange to allow for a connection and landing the Transition Spool over the drill pipe debris without damaging the sealing elements.  Tr. at 847–49 (Smith); D23275.

916.    BP engineered and built a Transition Spool—a specially built flange—to connect the Capping Stack to the flex joint.  Tr. at 842 (Smith); TREX 011737R.0021.  The riser stub left after the riser was cut for Top Hat installation was not a suitable point for connecting the Capping Stack.  TREX 011737R.0021.  Instead, the flex joint flange below the riser stub was determined to be capable of supporting the loads imposed by the Capping Stack.  TREX 011737R.0021.  The Capping Team engineered, built, and tested a transition spool to make the connection between the Capping Stack and the flex joint.  TREX 011737R.0021.  By attaching the Capping Stack above the flex joint (to the flex joint flange), the LMRP of the *Deepwater Horizon* BOP did not have to be removed and the risks associated with its removal could be avoided.  Tr. at 840–41 (Smith).

917.    In addition to the Transition Spool, the BOP Connections Team looked at two alternative designs to connect the Capping Stack to the flex joint "as the complexity of that operation became apparent."  Tr. at 842–43 (Smith).  These alternative designs were known as the Flex Joint Overshot and the Latch Cap, and the BOP Connections Team progressed these designs in parallel with development of the Transition Spool.  Tr. at 843 (Smith); D23277.

918.    Many of the installation tools that the BOP Connections Team needed for installing the Capping Stack to the flex joint flange were not available before the *Deepwater Horizon* incident and had to be specifically designed, manufactured, and tested for this incident.  Tr. at 849–51 (Smith); D23766.

919.    Installation tool development was ongoing as of June 22–23, 2010.  TREX 143042.0002–03.

920.    Testing of all the installation tools was not completed until early July, and the last tools that were installed subsea were the restraint blocks on the flex joint to hold it vertical, which were installed on July 7.  Tr. at 851 (Smith).  Only when the restraint blocks were installed and the flex joint was held in a centralized position was the Capping Stack and Transition Spool ready to be installed.  Tr. at 851 (Smith).

921.    The BOP Connections Team conducted a substantial number of physical tests where it simulated at an offsite facility connecting the Transition Spool and use of the installation tools.  The purpose of this physical testing was to ensure before actually attempting to install the Capping Stack that the Transition Spool would connect properly to the flex joint flange and that the installation tools would work as intended.  Tr. at 851–52 (Smith).

922.    The initial design for the Transition Spool had been ready around mid-May.  Tr. at 852–53 (Smith).  When physical testing of the original Transition Spool design was conducted

in June, the BOP Connections Team determined that the guidance system was not strong enough to handle the drill pipe debris that it may encounter during installation and the Transition Spool design had to be modified.  Tr. at 852–53, 907 (Smith).

923.    Physical testing of the Transition Spool and Capping Stack occurred throughout June.  Tr. at 906–07 (Smith); D23934.  For example, testing of the guidance system for the Transition Spool occurred from June 7 to June 13, and a final test of the Transition Spool connection system occurred on June 27.  Tr. at 906–07 (Smith).  Subsequently, the Transition Spool was shipped to Cameron's Berwick facility to connect it to the Capping Stack and ensure that it formed a leak-tight connection before sending offshore for installation.  Tr. at 906 (Smith).

924.    The Transition Spool and Capping Stack could not have been successfully installed without performing the physical testing that the BOP Connections Team performed.  Tr. at 853 (Smith).

925.    Even something as simple as whether the riser stub could be unbolted from the flange was in doubt.  Cook Dep. at 235–36.  A procedure was developed to unbolt the flex joint flange from the riser stub, leaving a pressure-rated flange on which to connect.   TREX 011737R.0021.

926.    On June 3, the kinked riser was cut away from the top of the LMRP.  Tr. at 866 (Smith).  The cutting of the kinked riser revealed information that influenced the connection method that was used to attach the Capping Stack to the flex joint flange because (1) it revealed that there was debris (2 side-by-side drill pipe pieces) in the bottom section of the riser, and (2) the flex joint did not become centralized, meaning that a system for centralizing the flex joint needed to be developed.  Tr. at 866 (Smith); D23934.

927.    The Capping Team identified a risk that debris in the flex joint would obstruct landing the Transition Spool.  TREX 011737R.0022.  The Capping Team designed a "mule shoe" addition to the Transition Spool to guide the Transition Spool into the flex joint, mitigating this debris risk.  TREX 011737R.0022.  After extensive testing, and the discovery of two pieces of drill pipe in the cut riser, the mule shoe was re-designed to increase its robustness.  TREX 011737R.0022.

928.    One issue that the BOP Connections Team had to manage for connecting the Capping Stack to the flex joint flange was straightening out the flex joint from its incline that was created when the riser collapsed.  Specifically, the Well Capping Team had to develop tooling to straighten out the flex joint and to physically test that tooling to ensure that it would work.  Tr. at 849–50 (Smith) (testifying that the BOP Connections Team had to develop a jacking system to centralize the flex joint); Tr. at 271 (Perkin); Tr. at 415 (Turlak); TREX 011737R.0022 (the flex joint had been pulled to its maximum flex limit by the *Deepwater Horizon* when it sank; if subjected to the weight of the Capping Stack and the pressures of shut-in while at this angle, the flex joint would have exceeded its safe working limits).  On July 2, 2010, as a result of the BOP Connections Team's efforts, the *Discoverer Enterprise* commenced installation of the flex joint straightening tool to straighten the inclined flex joint.  Stipulated Facts at 15 (Rec. Doc. 7076)

929.    On July 7, the first version of a document known as the Technical Assurance Report was issued.  Tr. at 866 (Smith); TREX 009575.0001.  The Technical Assurance Report, which was about 500 to 600 pages long with its appendices, was a document that compiled all the engineering analyses associated with installing the Capping Stack, such as analyses to assess

187

the structural and pressure integrity of the stack, and gave assurance that the Capping Stack could be installed.  Tr. at 866–68 (Smith).

930.    The Capping Stack could not have been installed without preparation of the Technical Assurance Report because it "demonstrated that the solution we were about to embark on was likely to work.  If we hadn't completed that analysis, we wouldn't have known if we had overlooked, potentially overlooked something important."  Tr. at 868 (Smith).

931.    The Federal Science Team received and reviewed the Technical Assurance Report before the Capping Stack was installed.  Tr. at 868–69 (Smith).

932.    "The Federal Science Team was fully engaged in the connection design process and participated in review and analysis of the transition options."    TREX 011737R.0022. Secretary Chu sent a list of questions to the BOP Connections Team that were answered June 18, 2010.  TREX 009806.0001–05.

933.    The Federal Science Team and National Laboratories were heavily involved in reviewing and analyzing the Capping Stack and Transition Spool designs and procedures, and they were given presentations and participated in reviews during the response relating to both. Tr. at 868 (Smith); Hunter Dep. at 275–79; TREX 009902.0001–20; TREX 009806.0006–22; Chu Dep. at 252–53.  The Federal Science Team provided feedback regarding the Capping Stack development, and "provid[ed] assurance to the Government that the work we were doing was being done thoroughly and correctly."  Tr. at 869 (Smith).  The Federal Science Team also came up with a number of additional points and made several recommendations that they wanted to implement.  Tr. at 869–70 (Smith); TREX 009575.0175–78.

934.    The Department of Energy conducted a design review of the flex connector spool assembly on June 23, 2010, including an assessment of the proposed pressure and temperature

188

instrumentation to be included.  The instrumentation was intended to support the proposed well integrity test to evaluate well shut-in potential.  A Department of Energy team lead and two high-level representatives of the Federal Science Team stated that doubly redundant pressure measurements below the 3-Ram Capping Stack were appropriate to meet data requirements. TREX 011250; Chu Dep. at 312–16; TREX 011320.0012, 0021.

935.    The Federal Science Team analyzed the connection between the Capping Stack and flex joint flange and recommended that the flex joint be straightened.  Chu Dep. at 279–80.

936.    BP commissioned a study by Stress Engineering, Inc., to ensure that the use of the 3-Ram Capping Stack would not compromise the integrity of the casing and wellhead of the Macondo well.  Bhalla Dep. at 33; TREX 011737R.0021.

937.    The analysis by Stress Engineering concerning the use of the 3-Ram Capping Stack on the Macondo well, once the specific features of the Capping Stack were defined, took two to three weeks, including the time needed for Stress Engineering to prepare a computer model to assess the possible impacts of the use of the 3-Ram Capping Stack on the Macondo well.  Bhalla Dep. at 43–44.

938.    Even if Stress Engineering had "pre-made models" that could be used for the analysis of the possible impacts of the 3-Ram Capping Stack on the Macondo well, and if BP already had a deepwater capping stack, it would have taken five days to conduct the analysis of the possible impacts of the use of the 3-Ram Capping Stack on the Macondo well.  Bhalla Dep. at 44–45.

939.    The capping of the Macondo Well with the Capping Stack was a revolutionary event in our times.  Hunter Dep. at 58, 60–61; TREX 009689.0006–07.

940.    In accordance with its determination to apply every intervention it could design to cap and contain the well, as soon as it was available, BP capped the Macondo Well with the 3-Ram Capping Stack well ahead of when the relief well would have stopped the leak.  Hayward Dep. at 534–35, 830–31; Hunter Dep. at 433–34.

941.    "The Capping Team achieved many engineering firsts in record time when the fabricated, tested, and developed the procedures associated with [installing] the capping stack." TREX 011737R.0022.

942.    It was prudent for the Well Capping Team to finish all testing and make sure it had as high a chance of success as possible before attempting to connect the Capping Stack above the flex joint.  Tr. at 272 (Perkin).

943.    The Capping Stack was not ready to install prior to Top Kill.  Holt Dep. at 228.

944.    The federal Government gave BP "high marks" in its design and build of the Capping Stack.  Allen Dep. at 467, 480; Chu Dep. at 319–20.

945.    Even the Aligned Parties' expert, Mr. Perkin, agreed that there was a substantial amount of engineering that went into attaching the capping device to the flex joint flange.  Tr. at 271, 273 (Perkin).  Mr. Perkin does not know how long it took to develop the flange.  Tr. at 272 (Perkin).

946.    While he contends that he could have made the connection between the flex joint flange and Capping Stack "much quicker," Mr. Turlak was not part of the team that developed the connection system of the 3-Ram Capping Stack to the flex joint flange, and was not involved in assessing the hazards or risk assessments for connecting the Capping Stack to the flex joint flange.  Tr. at 413–15 (Turlak).

947.    Given the circumstances that the response team faced during the response, BP could not have accelerated or expedited the installation of a deepwater Capping Stack on the Macondo well.  Thierens Dep. at 241.

948.    The Aligned Parties' experts ignore the substantial engineering work required to land the Capping Stack on the flex joint.  TREX 011737R.0019–20.

949.    During his trial testimony, in support of his opinion that the Macondo well could have been capped within as little time as seven days, the Aligned Parties' expert Mr. Ziegler claims that landing a capping device on a blowing out well 5,000 ft. below the surface of the water was "easy," "a piece of cake," and was something "done every day in the industry."  Tr. at 544–45, 565 (Ziegler).

950.    Mr. Ziegler's timeline allows, for example, just one day to clear debris from the well and prepare it for capping.  Tr. at 545 (Ziegler); TREX 011578R-v2.0053.  A post-Macondo plan for well capping in Angola, incorporating lessons from the *Deepwater Horizon* response, estimates seven days for this task alone.  TREX 005359.0009; Frazelle Dep. at 232.  Moreover, the Angola timeline assumes responders are able to successfully remove the LMRP to prepare the stack for capping, a procedure that was judged too risky at Macondo.  TREX 005359.0006, 0010, 0017; Tr. 609–12, 620 (Dupree); Tr. 1081–82 (Adams).

### (2)    The Capping Stack That Closed the Well Was Specifically Designed to Monitor and Mitigate the Possibility of a Subsea Broach.

951.    After the analysis of the Top Kill data raised new well integrity concerns, the Well Capping Team shifted the design of the 3-Ram Capping Stack from shutting in the well to functioning as a collection system that diverted hydrocarbon flow to surface vessels.  Tr. at 861–63 (Smith).

952.   The re-designed Capping Stack had enhanced collection capability, providing a sealed system with sufficient off-take points for collection so that all escaping hydrocarbons could be collected by vessels at the surface, or flowed to subsea collection infrastructure.  Tr. at 1083–85 (Adams); Cook Dep. at 249–50; 578–79; TREX 011737R.0017; Tr. at 862–63 (Smith) (after Top Kill, the 3-Ram Capping Stack was being designed with multiple take-off points to allow for collection to the *Q4000* and *Discoverer Enterprise* surface vessels).

953.   On June 12, 2010, almost two weeks after Top Kill, Mr. Smith gave a presentation to the United States Government scientists in which he described how the Capping Stack would be used as a collection system to divert hydrocarbon flow to surface vessels to collect.  Tr. at 863 (Smith).

954.   The Capping Stack also had enhanced venting capabilities: it was designed to automatically vent subsea in the event pressure control was lost, for example if the surface vessels were forced to leave in the event of a hurricane, protecting the well from the risk of overpressuring causing a subsea broach.  Tr. at 1083–84, 1086 (Adams); TREX 011737R.0017.

955.   The Capping Stack was also designed to manage a potential pressure build-up. Specifically, it had chokes and kill lines that provided the ability to open the rams, if necessary, if pressure built up.  Holt Dep. at 87.

956.   The well was ultimately shut in using a Cameron CC40 choke.  McWhorter Dep. at 33.  A choke has the advantage of being able to incrementally and methodically choke down the flow, as opposed to a sudden and total hard shut-in.  McWhorter Dep. at 170.  A choke is normally used in the production of oil, and "not really in a capping stack mode."  McWhorter Dep. at 172–73.

957.    Transocean made changes to the Capping Stack choke system without approval. TREX 010047.00006.   As a result the choke leaked and had to be replaced subsea.   TREX 010047.0006; McWhorter Dep. at 62–65.   This delayed the ability to shut in the well. McWhorter Dep. at 66.

958.    The Well Capping Team modified the Capping Stack's design as new information became available.   The modifications "were consistent with the overarching response principles to minimize environmental harm by collecting the greatest amount of hydrocarbons possible and by proceeding expeditiously with a controlled shut-in while maintaining well integrity."  TREX 011737R.0017.

959.    One such modification was the addition of sophisticated pressure monitoring equipment, which was installed to enhance the Unified Command's ability to assess well integrity during a controlled shut-in.   Tr. at 1083–84 (Adams); TREX 011737R.0017.   The Federal Science Team, in consultation with Secretary Chu, requested this additional functionality in late June 2010.   TREX 011737R.0017; Tr. at 854, 864 (Smith).   Secretary Chu acknowledged that individuals working at his direction approved the construction of the Capping Stack with three gauges.  Chu Dep. at 313–16.

960.    In light of the request, BP's Trevor Smith arranged for a "very accurate" pressure sensor to be fitted to the Capping Stack that would allow for performance of a well integrity test with accurate pressure readings and also to assist with using the Capping Stack for a controlled closure of the well.   Tr. at 854, 864 (Smith); Tr. at 685 (Dupree).

961.    By the time the Capping Stack was ready to be implemented, BP had determined that the pressures within the well were within the capability of the rupture disks, even if they were exposed to hydrocarbons.  Tooms Dep. at 164–65, 216.

962.     Secretary Chu proposed potentially shutting in the well to perform diagnostic work and attempt to determine if the rupture discs were intact.  Tr. at 683–84 (Dupree); TREX 142679.2.1.  A Well Integrity Test was developed and approved by the Unified Command.  Tr. at 684 (Dupree); TREX 140331N.  A substantial amount of engineering was done ahead of time to understand what success and failure looked like in the shut-in procedure.  Tr. at 685 (Dupree); Tr. at 1369 (Hunter).

963.     The planned shut-in of the well was delayed while Secretary Chu considered well integrity concerns.  Allen Dep. at 459–60; Stipulated Facts at 16 (Rec. Doc. 7076).  The shut-in was not unduly delayed by well integrity concerns because those concerns were valid and adequate information could not be collected until pressure testing.  Allen Dep. at 69–70.

964.     The well was shut in using a choke on the side of the Capping Stack and pressures were monitored.  Tr. at 685 (Dupree).  Pressure was monitored subsequent to shutting in the well to evaluate well integrity.  McWhorter Dep. at 57–58.  It was concluded that no broach was occurring.  Tr. at 686 (Dupree).  Until then neither BP nor the U.S. Government had been able to rule out a rupture disc rupture.  Tr. at 685 (Dupree).

965.     The well was then killed with mud and cemented.  Tr. at 686 (Dupree).  Cameron provided technical assistance to get pressure readings.  McWhorter Dep. at 107.

              **a.**      **The BOP-on-BOP Option Did Not Have The Capabilities Of The Capping Stack That Closed the Well.**

966.     Although there is some commonality between certain components of the Capping Stack and a drilling BOP, a drilling BOP does not have the same specialized features and is not designed to perform the same tasks.  Tr. at 1083–84 (Adams).

967.    The Capping Stack was much smaller and lighter than a BOP, giving the Capping Stack an operational advantage.  Tr. at 614 (Dupree); Cook Dep. at 246; Allen Dep. at 377–78 (the Capping Stack was a smaller, lighter, and more agile means to control the well than a BOP).

968.    The Capping Stack used to shut in the Macondo well was not just a smaller version of a BOP stack.  Tr. at 1083 (Adams); Frazelle Dep. at 220 (capping stacks are not necessarily just mini-BOPs); Holt Dep. at 405–06 (the Capping Stack and BOP had fundamental differences; for example, the method of controlling the capping devices and the auxiliary equipment on them is very different).

969.    The Capping Stack's control system differed from a standard BOP control system and had to be built from scratch during the response.  Thierens Dep. at 238.

970.    The venting features of the Capping Stack were distinct from those envisioned for the BOP-on-BOP option.  The Capping Stack offered venting and production capabilities, in addition to the ability to shut in the well.  Hunter Dep. at 274.  With the Capping Stack, the response team could produce back to the *Q4000* vessel or to the freestanding riser.  In contrast, the BOP-on-BOP option was initially designed to vent into the ocean.  Wellings Dep. at 340, 455, 466.

971.    The BOP-on-BOP option, unlike the Capping Stack, would have required the second BOP to be connected to a rig at the surface.  If an event, such as a hurricane, occurred and the rig needed to leave the site, "there would be no method of venting in the event that subterranean pressures built up."  Thierens Dep. at 243.

972.    The Capping Stack could be successfully landed on the flex joint atop the *Deepwater Horizon* LMRP whereas the BOP-on-BOP option could not have been attached to the flex joint.  Tr. at 1087 (Adams).  The flex joint was not strong enough to hold the weight of the

intervention BOP in a BOP-on-BOP option.  Tr. at 1087–88 (Adams).  The BOP proposed for the BOP-on-BOP option was over 50 ft. tall and weighed approximately 360 tons.  Tr. at 1087–88 (Adams).  In contrast, the much smaller and lighter Capping Stack was approximately 18 ft. tall and weighed approximately 75 tons.  Tr. at 1087–88 (Adams).

973.    Weight was a key issue in designing the Capping Stack.  Tr. at 1087–88 (Adams).  The *Deepwater Horizon* stack was already listing following the incident.  Tr. at 1088–89 (Adams).  Had responders attempted to cap the well using an intervention BOP on the flex joint, there was a high likelihood that the flex joint would not have been capable of supporting it.  Tr. at 1088 (Adams).  If the flex joint had failed, the surface vessel would have had to depart, leaving the intervention BOP potentially lying on the seabed.  Tr. at 1088 (Adams).

### b.    The Two-Ram Capping Stack Lacked Features and Functionality of the Capping Stack That Closed the Well.

974.    Early in the response effort, the Well Capping Team was designing a 2-Ram Capping Stack to cap the well.  This capping stack "barely got off the ground" before the Well Capping Team decided to design a 3-Ram Capping Stack.  Tr. at 412-13 (Turlak).  The 2-ram stack quickly evolved into the 3-Ram Capping Stack in May 2010.  Wellings Dep. at 469.

975.    Changing from a 2-Ram Capping Stack to a 3-Ram Capping Stack was not objectionable because the "addition of redundancy [was] probably the right thing to do."  Tr. at 413 (Turlak).

976.    The 2-Ram Capping Stack was designed as a cap to shut in the well, not to manage wellbore pressure.  Tr. at 1084–85 (Adams); TREX 011737R.0017.  Once well integrity issues were raised, the design evolved into a 3-Ram Capping Stack that could vent and perhaps produce reservoir fluids.  Wellings Dep. at 465–68.  The 3-Ram Capping Stack developed for

Macondo was designed to enhance oil collection if there was a risk of broaching.  Tr. at 862–63 (Smith).

977.    To complete the evolution from the 2-Ram to the 3-Ram Capping Stack, the Well Capping Team modified the 2-Ram Capping Stack by adding equipment and functionality.  In particular, they added a third ram, a transition spool, outlets, and a subsea choke.  These modifications allowed the response team to produce back to the surface after shutting in the well, thereby managing pressure or wellbore integrity issues.  Wellings Dep. at 465–67.

978.    The move from the 2-Ram to the 3-Ram Capping Stack was prudent in light of the many unknowns and uncertainties surrounding the well.  Tr. at 1086–87 (Adams).  The 3-Ram Capping Stack included a number of features and functionality that the 2-Ram Capping Stack did not include that were essential in order to execute safe and reliable intervention options.  Tr. at 1084–87 (Adams); Holt Dep. at 510–11, Wellings Dep. at 511 (2-Ram Capping Stack lacked features for hydrocarbon containment and venting, which the 3-Ram Capping Stack had); D23774A; TREX 011737R.0016.

979.    In particular, the 2-Ram Capping Stack did not have venting capability to protect the well from overpressure.  Tr. at 1084–85 (Adams).  A venting option for the 2-Ram Capping Stack was never considered because it had become a 3-Ram Capping Stack by the time the venting option was identified as a necessary feature for the capping option.  Tr. at 400–01 (Turlak).

980.    The 2-Ram Capping Stack, unlike the 3-Ram Capping Stack, did not include a fail-open feature or a sophisticated pressure sensor to facilitate the well integrity test.  Tr. at 1083, 1085–86 (Adams); D23774A.

### (3) It Cannot Be Said with Any Degree of Engineering Certainty That the Well Could Have Been Shut In Within Weeks, Even with a Pre-Built Capping Stack.

981.    Even if a pre-fabricated capping stack had been developed prior to the *Deepwater Horizon* incident, there are too many uncertainties to conclude that the well could have been shut in sooner.  Allen Dep. at 60–61; Tr. at 1090–91 (Adams).  It cannot be said with any degree of engineering certainty that the well could have been shut in within weeks in a manner that minimized risk to the environment and installation vessels, even if BP had access to a pre-built capping stack on April 20, 2010.  Tr. at 1044, 1049, 1087, 1089–90 (Adams); TREX 011737R.0004.  In light of the unknowns at the Macondo well, the response team would still have had to perform a number of risk assessments before utilizing it.  Holt Dep. at 623.

982.    Halliburton acknowledges that it cannot say with any certainty that the flow from the Macondo reservoir would have been stopped sooner with pre-built equipment.  Vargo Dep. at 23.  Halliburton acknowledges that each blowout is different and it is not possible to plan for every event.  Vargo Dep. at 23, 197.  Halliburton admits that the most it can conclude is that pre-built equipment *may* have made a difference.  Vargo Dep. at 23.

983.    Because every well and blowout out is unique, it is not possible to tell whether the Macondo well could have been closed sooner if BP had a pre-built deepwater capping stack.  McKay Dep. at 215; Thierens Dep. at 241.

984.    Dave Barrow of Wild Well Control gave a presentation to the Bureau of Ocean Energy Management, Regulation and Enforcement after the response concerning capping stacks and his estimated timeline for capping a future wild well.  Mr. Barrow, however, was not one of the experts selected by Wild Well Control to participate in well capping efforts during the response.  Notably, Wild Well Control provided other representatives to assist in the capping effort.  Wellings Dep. at 57–58.

985.   In light of the engineering analyses, risk evaluations, and other activities necessary to land the Capping Stack, Admiral Cook was not able to say whether a pre-built capping stack would have had an effect on the timeline to shut in the well.  Cook Dep. at 404–05.

986.   Post-Macondo capping stack engineering incorporates technological advances and lessons learned from Macondo.  TREX 011737R.0026.  It is therefore not realistic to compare post-Macondo capping scenarios with what might have been developed before the incident.  TREX 011737R.0026.

987.   Even surface wells, where capping techniques have a long history, routinely take much longer to cap than the eight days proposed by the Aligned Parties' expert, Mr. Ziegler.  TREX 011738R.0013.  "Intervention teams responding [to] a land well blowout are able to roll equipment on trucks into close proximity with the wellhead."  TREX 011738R.0013.  The Macondo well was 5,000 ft. beneath the Gulf of Mexico.  TREX 011738R.0013.  Intervention at Macondo was far more complex than would be required for a land well blowout.  TREX 011738R.0013.

988.   Even if a pre-built capping stack had existed prior to the *Deepwater Horizon* blowout, it is unlikely that such a capping stack would have been designed to land on the lower BOP after removing the LMRP, not on the flex joint.  Tr. at 1089–90 (Adams); TREX 011737R.0024.  The Aligned Parties' expert Mr. Ziegler admitted he was unable to say whether before the *Deepwater Horizon* blowout, anybody had envisioned landing a capping stack on the flex joint.  Tr. 549–50 (Ziegler).  Therefore, a pre-built stack would still have required months of modification before it was ready to land on the *Deepwater Horizon* BOP's flex joint and perform the functions of the 3-Ram Capping Stack that ultimately shut in the Macondo well.  Tr. at 1089–90 (Adams).

989.    As Mr. Ziegler agreed, as far as pre-fabricating adapters, flanges, and tools for landing a capping stack, "the number of things you might want to connect to are unlimited."  Tr. 551–52 (Ziegler).

990.    During the response, substantial engineering work went into landing the Capping Stack on the flex joint.  TREX 011737R.0024.  Even with a pre-built capping stack, this engineering work to land on the flex joint would have to be completed, and it may not have begun until cutting the riser revealed two pieces of drill pipe, confirming the significant risks involved in removing the LMRP.  TREX 011737R.0024.

991.    Even if a pre-built capping stack were "ready to go" at the time of the blowout, the *Deepwater Horizon* BOP was not ready to accept that equipment until engineering concerns were addressed such as the straightening out of the flange and other concerns about the capping stack tipping over the BOP.  McNutt Dep. at 549–50.

992.    Even if there were a pre-fabricated capping stack, it may not have been suitable for use at the Macondo well.  TREX 011737R.0024–25.  Inglis Dep. at 169, 171–73 (while one can develop generic intervention tools for blowout intervention, the technique for intervention has to be specific to the conditions of the blowout).  Post-Macondo capping stacks are all heavier than the 3-Ram Capping Stack used at Macondo.  TREX 011737R.0024–25.  The additional weight would have required consideration and possibly further engineering in order to safely land on the flex joint.  TREX 011737R.0025.

<div style="text-align:center">

(h)    **In April and May 2010, BP Lacked the Tools to Reliably Estimate Flow Rate Using Hydraulic Modeling.**

</div>

993.    Hydraulic modeling applies hydraulic theory to a system, including mathematical or physical techniques, in order to simulate the behavior of fluids in that system and to make projections about that system.  Tr. at 912 (Ballard); TREX 011905R.0009.  In this case, the focus

<div style="text-align:center">200</div>

of hydraulic modeling is on oil and gas flow in the Macondo well system.  Tr. at 912 (Ballard); TREX 011905R.0009.

994.    In order to produce credible and reliable results, a hydraulic model must: (1) use a valid computational method to generate its outputs, (2) use sufficiently accurate inputs taken from calibrated instruments, and (3) use a clearly defined system through which the fluids will flow.  TREX 011905R.0010–11.

995.    At Macondo, the well system extended from the reservoir to the riser and included four basic components: the reservoir, the near well-bore region, the well, and the surface.  TREX 011905R.0011.  Each portion of the well system requires sufficient inputs to perform a hydraulic analysis, if the goal is to estimate the flow rate of hydrocarbons from the reservoir to the surface.  TREX 011905R0.012.

996.    A variety of different commercial software packages can be used for hydraulic modeling in the oil and gas industry, including PROSPER, GAP, Pipesim, OLGA, WELLCAT, and MBAL.  Tr. at 912–13 (Ballard); TREX 011905R.0009, 0015.  In the absence of data, flow assurance models require assumptions to be used in place of input data in order for the models to operate.  Lockett Dep. at 43.  None of the hydraulic modeling programs were designed or validated for use with a system with as many uncertainties as the Macondo well following the blowout in April 2010.  TREX 011905R.0018.

997.    In traditional oil and gas industry use, while hydraulic models can be used to estimate the flow rate in a production system, the more typical use is to use flow rate as an input to monitor and troubleshoot other aspects of the system, such as pressures and temperatures.  Tr. at 918–19 (Ballard).  The flow rate used in the model is generated by a well test or a flow meter

reading.  Tr. at 919 (Ballard).  At Macondo, there was no flow meter and no well tests were conducted in April or May 2010.  Tr. at 919–20 (Ballard); Knox Dep. at 436–438.

998.    On approximately May 23, 2010, BP approached Halliburton about the possibility of putting a meter on the Macondo well to measure flow rate.  Vargo Dep. at 162–63, 167–68. Any technology Halliburton would have been able to offer in this regard would have been experimental and untried in a similar situation.  Vargo Dep. at 164–65.

<div align="center">

**(1)    During the Response, Hydraulic Modeling Was Performed Under Atypical Conditions Because the Required Inputs Were Unknown or Uncertain.**

</div>

999.    In April and May 2010, there was not sufficient information to estimate the flow rate using hydraulic modeling, given the significant uncertainties surrounding the input data.  Tr. at 917–18, 920–21 (Ballard); D23214; D23207B; TREX 011905R.0013.

1000.   BP and its contractors were not able to estimate the flow rate "with any reasonable degree of accuracy," due to the complexities of multiphase flow and significant number of unknowns.  Tooms Dep. at 143–50, 175–76, 238–39, 285, 367–69.

1001.   Dr. John Wilson, the Aligned Parties' expert in hydraulic modeling, acknowledged that in April and May 2010, the input parameters required for hydraulic modeling were "too uncertain maybe to estimate flow rate on a particular day."  Tr. at 90–91, 146–50 (Wilson); TREX 011900.0008.

1002.   Dr. Wilson agreed that the uncertainties in input parameters for the Macondo well included the degree to which the cement seal between the reservoir and the well had been disrupted, damage to the wellbore architecture due to the accident, several possible fluid flow paths, and the nature of obstructions to flow in the BOP and kinked riser.  Tr. at 146–50 (Wilson); TREX 011900.0008.

1003.  The Aligned Parties' Mr. Ziegler also recognized that during the response BP simply did not have the pressure and temperature data necessary to calculate flow rate.  TREX 011578R-v2.0026.  Pressures in the system were not known in late April 2010.  Knox Dep. at 154–55; TREX 009511.

1004.  Dr. Ole Rygg of Add Energy, Dr. Tom Hunter, the Director of Sandia National Lab and Co-Leader of the Federal Science Team, and Dr. Art Ratzel of Sandia National Lab agreed that as of May 2010 there was not sufficient data from the Macondo well to make a flow rate estimate.  D24273; TREX 011905R.0018–19; Rygg Dep. at 190–93; Hunter Dep. at 63–64.

1005.  As the MMS recognized, there were many different variables that presented problems in attempting to estimate flow rate during the response.  Herbst Dep. at 211–12, 221.  As of April 30, 2010, there was still uncertainty regarding the geometry of the wellbore, including the flow path and restrictions to flow.  Herbst Dep. at 192–93.  According to the MMS, because of these unknowns, any attempt to estimate flow rate during the response would have been speculative.  Herbst Dep. at 193.

1006.  Even as of May 19, 2010, there were "many unknown parameters that [made] a unique solution impossible to obtain" for estimating flow rate.  TREX 009080.0002; Herbst Dep. at 233–24.  Such unknown parameters included the flow path of the oil and the presence of drill pipe in the BOP, Herbst Dep. at 234–35, and as of May 2010, there was not sufficient data available to reliably quantify the gas/oil ratio of the spill.  McNutt Dep. at 115–16; Hunter Dep. at 751.

1007.  The "configuration of the pipe and the wellbore configurations were totally unknown."  McKay Dep. at 200.  Without data related to the wellbore configuration, including

the BOP, pipe within the BOP, and the riser kink, it would be very difficult to estimate a flow rate.  Herbst Dep. at 179–80.

1008.   The cross-sectional area of the flow path was not meaningfully understood until it was recovered from the seabed in early June 2010.  Knox Dep. at 130–31, 224 (Dr. Knox served as BP's 30(b)(6) representative regarding measurement of the apertures through which hydrocarbons flowed into the sea).  Until the riser was recovered, there was little information about the condition of the riser and the potential drill pipe pieces within the riser.  Knox Dep. at 355–56.

1009.   In the first ten days after the incident, Mike Mason and his team "knew very early on that we could not predict the flow rate from this well with any certainty" because there was not sufficient data and information to calculate a flow rate.  Mason Dep. at 46, 48, 52–54, 582. However, from the beginning of his involvement, Mr. Mason's team's goal was to "figure out how to kill the well," not to calculate flow rate.  Mason Dep. at 48, 56–58.

1010.   During the work on the response with Mike Mason, which was prior to closure of the well with the 3-Ram Capping Stack, Farah Saidi also did not believe that she had enough credible data to estimate the flow rate, including information about the flow path, the reservoir, and the system geometry; her work shown, in TREX 010185, was not based on sufficient data to estimate the flow rate.  Saidi Dep. at 438–39.

1011.   Trevor Hill believed that work being performed under the leadership of Mike Mason was not "founded on a detailed understanding" of the well system, and presented values that Mr. Hill called "extremes."  Hill Dep. at 590.

1012.   Due to the significant uncertainty in the parameters required for hydraulic modeling including flow path, net pay, skin, and restrictions in the well, the outputs of the

modeling conducted during the response were not representative of the actual flow rate. Bishop Dep. at 394–95, 471–72, 479–80 (Mr. Bishop served as BP's 30(b)(6) representative regarding modeling of obstructions in the wellbore). As a result of that uncertainty, Simon Bishop explained that calculation of the actual flow rate was "not possible, not practical, not even possible for us to do." Bishop Dep. at 479–80.

1013. In April and May 2010, the skin was unknown. Tr. at 925 (Ballard); Mason Dep. at 277; TREX 011905R.012–13; D23207B. In May 2010, David Decroix of Los Alamos National Lab explained that "there are many complexities in describing the flow from the reservoir to the bottom of the wellbore," "[t]he state of the 'skin' is a big unknown," and "there is A LOT that is unknown about the state of the wellbore completion zone." TREX 009710.0001.

1014. During the same time period, the amount of exposed reservoir was uncertain; it could range from slightly above zero feet to the entire 88 feet of reservoir exposed. Tr. at 925 (Ballard); Mason Dep. at 54, 59, 277–78; D23207B. No data existed to determine or bound a most likely or most reasonable value for the amount of exposed reservoir. Tr. at 925 (Ballard); Mason Dep. at 464–65; TREX 011905R.0012–13.

1015. Similarly, during April and May 2010, permeability was uncertain. Tr. at 925 (Ballard); Mason Dep. at 54; TREX 011905R.0012–13; D23207B.

1016. In April and May 2010, modeling was performed without any understanding of the number or location of any restrictions or the actual geometries. Knox Dep. at 172–74; TREX 009512 (Dr. Knox served as BP's 30(b)(6) representative regarding modeling of obstructions in the BOP and riser and the effect of erosion on the flow rate). As a result, "too many assumptions would be needed" in order to model the system. Knox Dep. at 172–74; TREX 009512. In

addition, in order to determine flow rate, both the size and location of the chokes in the system and the fluid properties must be known.  Knox Dep. at 134–36; TREX 009509.  Fluid properties change based on their position in the system, so a change in a single restriction would "cascade" to the next due to the resulting changes in the properties of the fluid.  Knox Dep. at 198–99.  An additional source of uncertainty was that the flow rate likely increased over time, as restrictions on the well were removed.  Hayward Dep. at 269–70.

1017.   When BP flow assurance engineer Tim Lockett undertook work on the response in late April or early May 2010, he believed that BP lacked information or sufficient information on inflow performance of the reservoir, the restrictions in the BOP, or a clear view of the flow path needed to improve the quality of flow rate studies; by July 2010, there was still a lack of information about most of those parameters used in flow modeling.  Lockett Dep. at 84–85; TREX 011905R.0026–27.

1018.   When Add Energy performed modeling in May 2010, it also had to contend with the various unknowns, including the flow path and the restrictions that may exist in various parts of the wellbore.  As a result, its modeling was based on numerous assumptions.  Holt Dep. at 23–24 (Mr. Holt served as BP's 30(b)(6) representative on considerations of flow rate with respect to the Top Kill procedure).

1019.   At the time of Top Kill, Halliburton believed the flow rate was 30,000 bopd, and was using that as a working assumption.  Vargo Dep. at 82–83, 92, 187–88; TREX 008544.0018.  Halliburton told BP that, in order to model cementing temperature using its own WELLCAT software, it needed to "ramp up the [flow] rates" to match the well geometry, fluid, and temperature inputs it was using at the time.  Vargo Dep. at 139–40, 228–30, 255–58.  BP approved Halliburton using an input to its model of 30,000 bopd as a working assumption.

Vargo Dep. at 93, 139–40, 187–88, 259–60.   Nobody from BP ever told Halliburton not to disclose what it thought the flow rate was.   Vargo Dep. at 139.   At the time of Top Kill, Halliburton had not disclosed to the federal Government its belief that the flow rate was 30,000 bopd.  Vargo Dep. at 140.  However, after reviewing the results of Top Kill, Halliburton realized that its assumptions about well geometry had been wrong.  Vargo Dep. at 239–40, 276–77.

1020.   No expert in the Quantification portion of this case has attempted to use a measured temperature as the starting point from which to arrive at a flow rate estimate.   TREX 011452; TREX 011463R; TREX 011485R; TREX 011486R; TREX 011549R; TREX 011550R; TREX 011653; TREX 011654R; TREX 011553R; TREX 011696R; TREX 011683.

1021.   No expert in the Quantification portion of this case has attempted to use a WELLCAT model to arrive at a flow rate estimate.   TREX 011452; TREX 011463R; TREX 011485R; TREX 011486R; TREX 011549R; TREX 011550R; TREX 011653; TREX 011654R; TREX 011553R; TREX 011696R; TREX 011683.

> **(2)    In April and May 2010, Hydraulic Modeling Was Used to Test the Robustness of Source Control Options and to Better Understand the Impact of Changes in the Condition of the System.**

1022.   The purpose of the hydraulic modeling conducted in April and May 2010 was to test the robustness of Source Control options and to better understand the impact of different Source Control actions or the impact of changes in the condition of the system.  Tr. at 928, 948–49 (Ballard); TREX 011905R.0015, 0019–22; Bishop Dep. at 95; D23214.   For example, hydraulic models were run to evaluate the worst case scenarios in connection with different source control options and to assess "what if" scenarios to determine the impact of changes in conditions.  Tr. at 929, 931 (Ballard); D23208.

1023.   A worst case discharge scenario is one where there are no obstructions in the wellbore.  Herbst Dep. at 42–43.  A worst case discharge estimate is not the same as a daily flow rate estimate.  Herbst Dep. at 601–02.  Worst-case discharge scenarios and parameter studies are different than taking all available data and generating a flow rate estimate.  Hunter Dep. at 678–80.

1024.   Because of the significant number of unknowns, assessing worst case conditions was a prudent engineering practice.  Tr. at 931–32 (Ballard).  Because the models were run to evaluate worst case conditions the modeling results were "biased toward the high end."  Tr. at 929–30 (Ballard).

1025.   An example of modeling a worst case scenario was the work Dr. Ole Rygg performed in connection with the planned relief well dynamic kill.  Tr. at 946–48 (Ballard); D23885; TREX 011905R.0028.  This worst case scenario modeling generated results ranging from 43,000 to 87,000 bopd but because it was run under worst case conditions, it did not inform a "most likely" flow rate.  Tr. at 946–48 (Ballard); D23885; TREX 009266.

1026.   On April 28, 2010, Mr. Hill and Dr. Lockett performed a hydraulic modeling exercise in order to determine what would happen if the kinked riser eroded and no longer served as a restriction to flow.  Tr. at 934–35 (Ballard); TREX 005063.  When Mr. Hill and Dr. Lockett conducted this modeling exercise, significant uncertainties existed including inflow performance, flow path, the condition of the BOP and the extent of additional restrictions to flow, including the kinked riser.  Tr. at 932–34 (Ballard); TREX 005063.0004; Knox Dep. at 154–155.

1027.   The number of uncertainties that existed as of April 28, 2010, were beyond the usual uncertainty encountered in typical industry use of hydraulic modeling.  Tr. at 934 (Ballard).   Due to these uncertainties, Mr. Hill and Dr. Lockett modeled counterfactual

assumptions to generate "extreme conditions" such as assuming the kinked riser was the only restriction to flow and modeling using an infinite productivity index or "PI". Tr. at 935–37 (Ballard); D23922. Mr. Hill and Dr. Lockett's April 28, 2010 hydraulic modeling work did not bound the actual range of potential flow. Tr. at 939–40 (Ballard).

1028. The "orifice sizes" modeled by Mr. Hill and Dr. Lockett to simulate the restrictions to flow in the Macondo well are a theoretical concept in hydraulic modeling and were not intended to depict or bound the actual size of any restriction to flow in the Macondo well. Tr. at 937–39 (Ballard); TREX 005063.0004–05; TREX 011905R.0025.

1029. At the request of Secretary Salazar, BP performed modeling work to determine what the increase in flow could be if there were less restrictions to flow on the well system, including what would happen if the BOP were not on the wellhead providing a restriction to flow. Inglis Dep. at 311–12; Mason Dep. at 115–16. Mike Mason and his team modeled a variety of scenarios to determine how much flow rate would increase if the LMRP were removed in connection with a source control operation. Mason Dep. at 204–05, 274–76; TREX 011905R.0027–28; Tr. at 940–41 (Ballard); D23923; Knox Dep. at 180–83. Mr. Mason believed the purpose of this work was to ensure that removal of equipment from the well would not make the situation worse. Mason Dep. at 463.

1030. The cases Mr. Mason and his team modeled were not intended to depict actual conditions at the Macondo well. Mason Dep. at 276. Mr. Mason conducted a parametric study, starting with the worst possible conditions (88 feet of exposed reservoir, permeability of 300 millidarcies, and zero skin) and then modeling a variety of scenarios to assess the possible percent increase in flow rate if the LMRP were to be removed. Mason Dep. at 276–77, 464; Tr. at 941–43 (Ballard); Ballard Dep. at 80–84; Knox Dep. at 178–80. Mr. Mason's work was not

intended to indicate the actual flow rate or to bound a range of potential rates.  Tr. at 943 (Ballard); TREX 009156.0002.

1031.  Mr. Mason and his team also performed a "reasonableness check" on the Unified Command estimate of 5,000 bopd and were able to generate a rate of 5,000 bopd using hydraulic modeling and reasonable assumptions.  Mason Dep. at 289–91; TREX 011905R.0028; Tr. at 943–45 (Ballard); D23209.

1032.  When Mr. Mason wrote to Mr. Inglis on May 15, 2010, he believed the flow rate was 5,000 bopd per NOAA's estimate (which he had performed a "reasonableness check" on using hydraulic modeling) and did not believe the flow rate was actually as high as 100,000 bopd.  Mason Dep. at 217–21, 252–53, 304.  Mr. Mason wrote the e-mail because his team was not able to estimate flow rate using hydraulic modeling and there was significant uncertainty surrounding any estimate.  Mason Dep. at 219–20, 302–03, 324.

1033.  Modeling performed by Dr. Lockett in April 2010 was not intended to model "what's actually happening in the well;"  for example, the work he reported on April 27, 2010, (TREX 009445) was intended to help assess whether hydrate formation in the well system might block flow.  Lockett Dep. at 92–94; TREX 011905R.0026–27.  Dr. Lockett input a range of values for the Productivity Index from one to ten into his model because the actual Productivity Index was unknown.  Lockett Dep. at 99–100; TREX009445.0006.

1034.  Dr. Lockett also used flow assurance models to analyze flow through the collection system used to produce hydrocarbons from the Macondo reservoir to the surface collection vessels.  That effort was different from any effort to model flow rates.  Lockett Dep. at 140.

210

1035.   Dr. Lockett attempted to analyze the well and possible flow though the well system using either temperature data, pressure data, or velocity measurements, as shown in his email labeled "Best Estimate" (TREX 010646), but there was no data other than thermal data that could be used to try to corroborate the output from Dr. Lockett's temperature-derived analysis.   Lockett Dep. at 157.   Tr. at 1022 (Ballard); TREX 011905R.0021; TREX 011905R.0026–27; Ballard Dep. at 115–18.

1036.   Dr. Lockett proposed the methodologies contained in his "Best Estimate" e-mail (TREX 010646) as potential options for estimating flow rate, but in order to pursue any of the methods, sufficient data was required that was not known in May 2010.  Tr. at 1022 (Ballard); Ballard Dep. at 115–18; TREX 011905R.0021, 0026–27.

1037.   To carry his temperature-derived analysis shown in TREX 010646 further, Dr. Lockett would have needed "fully" to explore the sensitivity of the results to the actual temperatures in the relevant part of the flow path.  Lockett Dep. at 169–70.

1038.   Tony Liao's May 16, 2010, reservoir depletion calculation does not contain a flow rate estimate of 86,000 bopd given the uncertainties and assumptions involved in the modeling, including an inaccurate reading from the PTB pressure gauge that incorrectly indicated a 700 psi pressure drop.  Bishop Dep. at 460–62; Mason Dep. at 293–94.

1039.   None of the flow rates modeled in April or May 2010 exceeded BP's worst case discharge estimate of 162,000 bopd.  TREX 011905R.0024.

### (3)   Hydraulic Modeling Conducted by BP and Its Contractors in April and May 2010 Could Not and Did Not Inform BP as to the Actual Flow Rate or a "Most Likely" Flow Rate.

1040.  At the time of the *Deepwater Horizon* incident, no proven methods existed for reliably measuring multiphase flow at the pressures and temperatures encountered at the water

depth at which the blowout occurred.  TREX 009005.0007; McNutt Dep. at 394–95 (Dr. McNutt served as the U.S. 30(b)(6) representative regarding the FRTG's attempts to estimate or quantify the release of hydrocarbons); Hayward Dep. at 340, 391–92, 833–34; Hunter Dep. at 185.  Nor was there a way to directly measure a daily flow rate.  McKay Dep. at 200.

1041.  As early as April 23, BP informed the MMS that BP could not provide an accurate daily flow rate estimate.  Herbst Dep. at 173–74; TREX 008988.

1042.  The Aligned Parties' Dr. John Wilson agreed that BP did not attempt to model the actual flow rate in April or May 2010.  Tr. at 88, 145–46 (Wilson).

1043.  Due to the number of uncertainties and unknowns about the Macondo system, it was not possible to accurately and reliably estimate flow rate in April and May 2010 using hydraulic models.  Tr. at 925–26 (Ballard).  The uncertainties in the inputs required for hydraulic modeling also made it impossible to generate a range of flow rates or to determine the probability of any rate within that range, other than identifying an upper bound.  Tr. at 926–27, 930–31 (Ballard); D23214; Tooms Dep. at 577–78.

1044.  Hydraulic modeling could only inform BP that the actual flow rate was between just above zero and the worst case scenario.  Tr. at 949–51, 1016 (Ballard).

1045.  As a result of the significant uncertainty in hydraulic modeling inputs, the hydraulic modeling conducted in April and May 2010 could not and did not inform BP that the flow rate exceeded 15,000 bopd at the time the Top Kill procedure was attempted.  Tr. at 949 (Ballard); D23214.

1046.  As of May 27, 2010, while Trevor Hill had calculations of flow rate, he could not say that any one estimate was a "most likely" estimate, based on what he knew at the time.  Hill Dep. at 503–04.

212

1047.  Trevor Hill's empirical observations were likewise uncertain.  He visually observed the oil plume from a video of the flow in May 2010 and formulated what he called an "eyeball estimate" of flow rate, but that estimate was only an approximate estimate, and could not be considered a "best estimate."  Hill Dep. at 579–80.

1048.  Trevor Hill did not perform multiple iterations of his "eyeball estimate" because at the relevant time, in May 2010, "flow rate was not high up on the list of activities on which we were working," and because "[t]he focus was on a number of data collection activities to try and understand the system better" for the source control effort.  Hill Dep. at 580.

1049.  Trevor Hill wrote on May 20, 2010, that determination of flow rate by visual observation would be "highly inexact."  Hill Dep. at 583; TREX 011170.0007.

1050.  BP was first able to make a reasonable estimate of flow rate after the well was capped, but even then significant uncertainty remained due to the presence of multiphase flow.  Tooms Dep. at 243, 577; Hill Dep. at 599.

1051.  Dr. Ronald Dykhuizen agreed that "[w]hile there had been attempts throughout post-accident times to quantify the instantaneous flow rate, the DOE-NNSA flow team and other researchers directed by the DOI were generally stymied in these attempts prior to well shut-in, largely because of uncertainties in the well geometry, the BOP, and reservoir depletion."  Tr. at 1450 (Dykhuizen); TREX 009361.0049.

> (i)    **BP's Flow Rate Representations Had No Negative Impact on Source Control.**

1052.  From the perspective of the Federal Incident Commander, knowing the flow rate was a low-priority concern, and he was not directed by anyone in the Government to prioritize estimating flow rate.  Brannon Dep. at 140–41, 205–06.

1053.   As Admiral Cook testified, "flow rate was not a factor that determined which source control option was being put forward."  Cook Dep. at 347.

1054.   On May 19, 2010, when Admiral Landry and Admiral Allen reviewed a summary of flow rate information from Doug Suttles which included estimates in excess of 15,000 bopd, that summary did not affect source control decision-making because, by that point in time, it was well understood within the Unified Command that there were many different estimates all subject to significant uncertainty.  *See, e.g.*, Allen Dep. at 234–36, 241–45; TREX 009115.0001.  As Admiral Allen testified, by May 19 "All of God's children had a flow rate number".  Allen Dep. at 244-45.  Indeed, at his deposition, Admiral Allen did not even recall seeing the May 19 summary nor did he recall any discussions about it, and certainly not in relation to source control decision-making.  Allen Dep. at 241, 243.

1055.   Unified Command launched an all-out effort to respond to the spill, regardless of flow rate.  McNutt Dep. at 22; Suttles Dep. at 345–46, 435–36, 515.  Unified Command responded to the incident with all available assets.  TREX 010756.0001; Suttles Dep. at 345–46, 435–36, 515.  The scale of the response would have been the same regardless if it were 1,000 bopd or 100 times that.  McNutt Dep. at 218–19; TREX 009655.0003.

### (1)   Due to the Significant Uncertainty Surrounding Flow Rate, the Federal Government Did Not Rely on BP's Flow Rate Representations.

1056.   As of April 20, 2010, Dr. Lehr of NOAA was not aware of any generally recognized method for calculating spills in deep water, nor was there a NOAA-recognized method for calculating deep water spill volume.  Lehr Dep. at 355.

1057.   There is no method in existence today for calculating spill volume in deep water that is endorsed by NOAA.  Lehr Dep. at 355.

1058.   By April 22, the USCG determined that because it was impossible to determine the true flow rate, it would work from a worst case scenario perspective.  Henry Dep. at 125–26, 557–58; TREX 008883.0002.

1059.   The response was not designed or predicated on a flow rate calculation.  Suttles Dep. at 436, 441; Hayward Dep. at 275, 385, 834.

1060.   It "was well-known by everyone in the commend center or who was involved in the Macondo efforts at source control" that there were many unknown variables when attempting to determine the flow rate.  Herbst Dep. at 202.  The federal Government understood that early flow rate estimates were uncertain.  Chu Dep. at 111–15; Allen Dep. at 210–11, 237–39, 484–85, 690–93; Sogge Dep. at 348; TREX 011310.0001; TREX 011311.0001.

1061.   The federal Government understood that flow rate could be substantially larger than 60,000 bopd.  Chu Dep. at 113–16; TREX 011311.0001.

1062.   Admiral Allen directed response personnel to ignore the initial flow rate estimates and to respond assuming a worst-case discharge because initial estimates in spills are often rough, inaccurate, an inexact and usually change over time; as Admiral Allen testified, "All of God's children had a flow rate number" early in the response.  Allen Dep. 210–13, 216, 244–45.

### (2)   Early in the Response, the Federal Government Looked to NOAA and the MMS for Flow Rate Estimates, Including the 1,000 bopd and 5,000 bopd Estimates.

1063.   The Federal On-Scene Coordinator looked to Government entities, not BP, for flow rate information.  Landry Dep. at 80 ("we all had responsibility" for flow rate).  Before the creation of the Flow Rate Technical Group ("FRTG"), Admiral Landry looked to the MMS and NOAA for flow rate information.  Landry Dep. at 60.  At the MMS, Landry looked for flow rate information from Lars Herbst and Mike Saucier.  Landry Dep. at 60–61.  At NOAA, Landry

looked for flow rate information from Charlie Henry and, occasionally, Steve Lehmann.  Landry Dep. at 61.

1064.   NOAA recognized the great deal of uncertainty related to the amount of oil discharged.  Henry Dep. at 216; Lehr Dep. at 245–47; Rainey Dep. at 133, 150–51, 155–56.

1065.   NOAA Scientific Support Coordinator Charlie Henry informed the USCG FOSC on April 22 that the flow rate could be anything between 1,000 bpd or 10,000 bpd, and based on this information, the FOSC publicly announced a 1,000 bopd flow rate estimate on April 24, 2010.  Lehr Dep. at 257–60; TREX 010752.0001; TREX 008886.0001; Henry Dep. at 180–82, 173–75.

1066.   Mr. Henry testified that he was not "relying upon any data that had been given to [him] by BP" for the flow rate estimates that he gave.  Henry Dep. at 228; TREX 8884 (April 22, 2010 E-mail from C. Henry stating that he was calculating a maximum potential release "[w]ithout any estimates from BP").

1067.   Mr. Henry testified that the federal Government was not aware of any scientific analysis that supported the 1,000 bpd estimate that was announced by Admiral Landry on April 24, Henry Dep. at 210–11, but Mr. Henry reported that 1,000 bopd was a reasonable estimate.  Lehr Dep. at 263.

1068.   Soon after the 1,000 bpd estimate was announced, "the Admiral realized they should have followed the rule to multiply it by 10 or 15."  TREX 007802; Landry Dep. at 328–29.  The "rule" referenced was based on what they "all should know" as people "who [Landry had] worked with for years on oil spills" to multiply any estimate by 10 or 15.  Landry Dep. at 329–30.  Landry explained, "it's generally a joke in circles with oil spill responders that from

216

your initial estimates, go ahead and ramp it up." Landry Dep. at 329–30. "It's just a joke that, as a rule of thumb, no matter what you say, it's liable to be more." Landry Dep. at 330.

1069.   According to Mr. Henry, NOAA was under a lot of pressure to publicly quantify the flow rate as of April 24, 2010. Henry Dep. at 291.

1070.   On April 25, 2010, members of NOAA's Emergency Response Division began to perform work on estimating the flow rate. Henry Dep. at 311–12. NOAA scientists began the work independently without a request from the FOSC. Henry Dep. 312. Mr. Henry was not aware of the analysis at the time. Henry Dep. at 341–42. Dr. Lehr analyzed the work, and Mr. Henry was not aware of Dr. Lehr's analysis of this work at the time. Henry Dep. at 345–46. As of April 26, 2010, NOAA did not believe there was sufficient data to determine a reliable flow rate estimate. Henry Dep. at 311; Lehr Dep. at 245–47.

1071.   On April 26, 2010, NOAA developed a flow rate estimate of 5,000 bopd based on data obtained from satellites and overflight observations, which estimate reflected uncertainty regarding the actual flow rate. Henry Dep. at 373–75, 439–40 (Mr. Henry served as the U.S. 30(b)(6) representative regarding the scientific basis of the 1,000 and 5,000 bopd estimates); TREX 008897C.0001; Lehr Dep. at 252–55, 269–71, 306; TREX 009610 (Bill Lehr Interview Summary Form indicating "Charlie [Henry] was responsible for providing the [April 26 estimate] to the ICP and UAC). Dr. Lehr, the source of the 5,000 bopd estimate, informed Mr. Henry that his estimates were "rough" and that "[e]stimating oil volume by visual appearance of the slick is a highly unreliable process." Lehr Dep. at 269–71; TREX 008897C.0001.

1072.   The 5,000 bbl/d estimate came about after Mr. Henry of NOAA approached Admiral Mary Landry saying that he believed the flow exceeded 1,000 bpd. Landry Dep. at 182. Mr. Henry had approached Admiral Landry saying that people were estimating that flow was

more than 1,000 bpd on April 27 or 28, 2010., and that it was his belief that those estimates that exceeded 1,000 bpd were based on satellite imagery.  Landry Dep. at 184–85.

1073.   Admiral Landry's recollection of her April 28, 2010, meeting with Doug Suttles to discuss whether to announce a flow rate estimate higher than 1,000 bbl/d was different than Charlie Henry's recollection.   Landry Dep. at 300–01.   Mr. Henry did not recall Suttles presenting a range of 1–5,000 barrels on an easel.  Landry Dep. at 300–01.

1074.   Admiral Landry believed that the Government had "sufficient information" to provide an estimate to be able to make an informed announcement about flow rate.  Landry Dep. at 218 (discussing the 5,000 barrel/day announcement); Landry Dep. at 220.   The "sufficient information" that Admiral Landry relied upon before announcing a revised 5,000 bbl/d estimate was from NOAA Scientific Support Coordinator, Charlie Henry.  Landry Dep. at 218–19.   That information was "sufficient" because she "rel[ies] on the NOAA SSC to – and their expertise, to inform me on whether or not there's – there's a change in the estimate of outflow."  Landry Dep. at 218–219.

1075.   On April 28, 2010, the Unified Command publicly announced its 5,000 bopd flow rate estimate, which was based on Dr. Lehr's April 26 visual observation analysis.  Allen Dep. at 215–18, 548–49; Sogge Dep. at 101–02; Henry Dep. at 377–80, 421–25, 439–40; McNutt Dep. at 227–31;  TREX 008935.0001;  TREX 008936.0001;  TREX 009655.0010–11;  TREX 009113.0001.

1076.   Dr. Bill Lehr (NOAA) had expertise in oil spill modeling, the use of visual observations to determine the amount of oil on the surface, and understanding the behavior of oil on the surface of the water, including the use of ASTM and Bonn agreement guidelines.  Henry Dep. at 319–22.

1077.   As FOSC, Admiral Landry made the ultimate decision to announce the 5,000 bopd flow rate estimate.  Landry Dep. at 209–10, 304.

1078.   Admiral Landry believes that NOAA may have been involved in trying to estimate flow based on the "diameter of the pipe and the riser and everything."  Landry Dep. at 83.  As of April 28, Admiral Landry was not aware that "NOAA had several scientists behind them offering numbers that were much higher or believed it was much higher" than 5,000 bbl/d. Landry Dep. at 312.  At the time Admiral Landry announced the 5,000 bbl/d estimate publicly, she "wasn't knowledgeable of other work streams that were estimating higher volumes."  Landry Dep. at 323.  Since the incident, Admiral Landry has "seen documents that show they had higher estimates."  Landry Dep. at 323–24.

1079.   Admiral Landry learned after the incident (in preparation for her deposition) that NOAA had estimates showing flow rate as high as 60,000 barrels per day as early as April 28. Landry Dep. at 675.   No one from NOAA provided Admiral Landry with the modeling or calculations they had to compile an estimate of flow.  Landry Dep. at 671.

1080.   The FOSC also looked to the MMS for flow rate information.  Landry Dep. at 60.

1081.   Around May 3, engineers from the MMS had reservoir data and production data about the Macondo prospect.  Landry Dep. at 663–64.

1082.   The MMS calculated a possible worst case discharge of 100,000 barrels per day. Landry Dep. at 667; TREX 009636.  The MMS had "reviewed reservoir and production data from the Mississippi Canyon area and other deepwater wells in order to provide an estimate of a worst case discharge release of oil from the Mississippi Canyon 252 *Deepwater Horizon* blowout."  Landry Dep. at 662–63; TREX 009636.

1083.   Data from nearby wells that the MMS reviewed included reservoir permeability, porosity, pressure and temperature in order to calculate a worst case discharge.  Landry Dep. at 664–65.   For the MMS's calculations, they considered certain factors, including: internal diameter of the casing, friction loss, hydrostatic pressure, fluid flow regime, and gas oil ratio.  Landry Dep. at 666.  No one from the MMS provided Admiral Landry with the calculations or data they used to estimate flow.  Landry Dep. at 670.

1084.  Decisions regarding announcements about estimated flow were approved by Government officials: Admiral Landry made a recommendation to her public affairs person in charge of external communication, that person checked with Homeland Security Secretary Napolitano and sometimes also with White House communications personnel.  Landry Dep. at 210.

1085.   According to Admiral Landry, within a few days after the 5,000 bbl/d estimate was announced publicly, the Government had clear indications the flow rate was larger.  Landry Dep. at 696–97.  This was based on clear evidence that flow was getting worse over time from erosion and deterioration generally.  Landry Dep. at 697.  As time was going on, more was understood about the well based on improved pressure readings, more information about the temperature of flow, better understanding of erosion.  Landry Dep. at 699–700.  Notwithstanding that evidence, Admiral Landry did not make a revised statement to the public (Landry Dep. at 697–98) because of the multiple uncertainties involved in figuring out what the specific flow was.  Landry Dep. at 699.

1086.  Even though Admiral Landry had received information suggesting their standing public estimate of 5,000 barrels was not accurate (including through the letter from Suttles on May 19 with 5–40,000 as a range), Admiral Landry chose not to make any announcement

because once the FRTG was stood up, she relied on the FRTG to understand the flow rate. Landry Dep. at 684–85. Admiral Landry would "not expect BP to go out and make a public statement about a revised flow rate unless they had an accurate assessment of flow rate … or an improved estimate." Landry Dep. at 687.

1087.   According to Admiral Allen, initial flow rate estimates of 1,000 and 5,000 bopd were inconsequential to source control decision-making because all parties knew that flow could be well in excess of those figures based on the Initial Exploration Plan. Allen Dep. at 213–15, 483–84, 687–90; TREX 009113.0001; TREX 009177.0010–11.

1088.   Flow rate estimates different from the 5,000 bopd estimate would not have changed the posture of the Unified Command's operational response. TREX 010756.0001. The Unified Command's 5,000 bopd estimate did not have an impact on the Federal Science Team's work as they concluded that the flow rate could not be determined in May 2010. Hunter Dep. at 683–84.

1089.   Unified Command recognized that successful subsea containment efforts would provide a much more accurate basis for estimating the flow rate than the 5,000 bopd "number [that was] understood by all involved to be a working number and is not the definitive estimate of the spill." TREX 010756.0001.

1090.   The Government did not employ video analyses earlier to estimate the flow rate because it was not until after the RITT tool was inserted that there was any evidence to correct how much of the flow was gas. McNutt Dep. at 225–26; TREX 009655.0009.

1091.   Unified Command also recognized that when the well was contained there would be time to conduct a thorough assessment of the total volume released and potential daily rates. TREX 010756.0001.

### (3)    The Federal Government Looked to the Flow Rate Technical Group for Flow Rate Information.

1092.  Due to the uncertainty around flow rate estimates, Admiral Allen stood up the Flow Rate Technical Group ("FRTG") on May 19, 2010, to speak with one voice about flow rate.  Allen Dep. at 219–24, 239–41, 245–48, 421–22; Sogge Dep. at 23–24; McNutt Dep. at 15.

1093.  The FRTG was initiated by the National Incident Commander and led by Dr. Marcia McNutt, then-Director of the U.S. Geological Survey.  Landry Dep. at 60.  The FRTG was in place to "provide [Admiral Landry] with an estimate of flow rate."  Landry Dep. at 685. It was charged with assessing and estimating the flow.  Herbst Dep. at 180, 230; Lehr Dep. at 81; Saucier Dep. at 213.  BP was never invited to participate in the Flow Rate Technical Group, except to supply raw data.  McNutt Dep. at 160; TREX 009655.0002; Suttles Dep. at 349.

1094.  The National Incident Commander intended that there would not be outside commentary on flow rate between the date the FRTG was stood up until the FRTG developed an official estimate.  Allen Dep. at 294–300; TREX 009124.0090 ("Due to the confusion over the amount of oil flowing, uncontrolled …. the National Incident Commander prohibited the public release of any new flow rate estimates until such time that estimates could be scientifically based.").

1095.  At the time the FRTG was chartered, the Unified Command's 5,000 bopd estimate had been publicly called into question by the academic community and the media. McNutt Dep. at 27–28.  By mid-May, no one in the Government had any confidence in the Unified Command's 5,000 bopd estimate.  McNutt Dep. at 438–39.

1096.  When the FRTG was formed on about May 19, 2010, BP had not attempted to quantify the total flow.  Hill Dep. at 592–93, 598; *see* TREX 011186.

222

1097.  Once the FRTG was formed, the responsibility for estimating flow shifted to that group and was no longer worked on by Unified Area Command.  Landry Dep. at 62.  When the United States announced flow rate estimates, it was through the FRTG.  Sogge Dep. at 27.

1098.  The FRTG was embedded in the operating team on the third floor of the Crisis Center in Houston and had access to all data and information from the well that was available. Hayward Dep. at 383–84

1099.  On May 19, Doug Suttles sent Admiral Landry an email containing information and additional materials related to flow rate, which she reviewed "in the order of [her] business" as FOSC.  Landry Dep. at 345; TREX 009619.  Admiral Landry did not rely on these materials (Landry Dep. at 346), nor was she aware of anyone at the U.S. Government who relied on information contained in that email.  Landry Dep. at 348–49; TREX 009619.  Admiral Landry did not rely on these materials "because they were getting ready to stand up the Flow Rate Technical Group, and [she] was deferring to that Group to be the expertise for estimating what the flow rate is."  Landry Dep. at 345–46; 691.

1100.  Admiral Landry noted that by May 20, 2010, they were "waiting for the results of the Flow Rate Technical Group and it was understood, that rather than going out with confusing information about what the flow rate estimates were, we should wait for the Flow Rate Technical Group to provide the analysis, because there were all sorts of ideas out there what the flow rate might be."  Landry Dep. at 364.  "We had agreed, in the government, *we weren't even going to attempt to estimate a flow rate until we had a good analysis from the Flow Rate Technical Group*."  Landry Dep. at 365 (emphasis added).

1101.  When the United States announced flow rate estimates, it was through the FRTG. Sogge Dep. at 27.

223

1102.   There were many variables and different methodologies that the Government's FRTG used to examine flow rate.  McKay Dep. at 200.  None of the flow estimation methods used by the FRTG to generate their publicly-announced May 27, 2010 estimate of 12,000 to 19,000 bopd utilized hydraulic modeling.  Tr. at 1009–10, 1012 (Ballard); TREX 011905R.0019; D23888; TREX 011902.  In the press release announcing the FRTG's initial estimate, Dr. Marcia McNutt explained that "measurement of the flow of oil is extremely challenging, given the environment, unique nature of the flow, limited visibility, and lack of human access to BP's leaking oil well."  Tr. at 1011–12 (Ballard); D23888; TREX 011902.

<div align="center">

**(4)     BP Regularly Shared Information and Data with Government Officials Involved in the Response So That the Government Could Evaluate the Source-Control Efforts Underway.**

</div>

1103.   Even before the *Deepwater Horizon* sank, BP provided the USCG a worst case scenario case of 62,000 to 110,000 bopd.   TREX 008883.0002; Allen Dep. at 681–85; TREX 009175.0001.

1104.   BP provided Government officials with streaming video of ROV footage from around the well within days after the incident and no later than April 24, 2010.  Landry Dep. at 702.

1105.   BP provided the Federal Science Team with access to information and technical staff from BP and other companies, and invited the Federal Science Team to engineering meetings.  Hunter Dep. at 90; TREX 009690.0001.  BP also provided the Government with full access to BP's subcontractors engaged in the response.  Hunter Dep. at 43; TREX 009687.0003.

1106.   Dr. Marcia McNutt, chair of the FRTG, was in regular communication with BP, and attended the twice daily BP Lead Crisis Response briefings.  Sogge Dep. at 33–34.

1107.   When the FRTG made a request for information, BP provided that information. Sogge Dep. at 38–40.

1108.   Charlie Henry was Admiral Landry's point person to be able to obtain data from BP to assist in his assessments regarding oil estimates.  Landry Dep. at 232.  Mr. Henry never complained to Admiral Landry that he was not getting what he needed from BP.  Landry Dep. at 232–33.  "Mr. Henry noted that BP has not held back on anything and are being very responsive."  Landry Dep. at 251; TREX 009608.0032; Landry Dep. at 252 (Landry approved meeting notes).

1109.   Doug Suttles shared flow rate estimates with Admiral Landry.  Landry Dep. at 25–26.  Admiral Landry acknowledged that as of April 28, NOAA officials, specifically George Graettinger, had received emails from BP with estimates up to 70,201 bbl/d.  Landry Dep. at 351–52, 355; TREX 009620.  From the beginning, estimates provided to the Government, through Admiral Landry, were provided as a range, not a specific amount.  Landry Dep. at 25.

1110.   On May 10, Mr. Suttles sent Admiral Landry updated information regarding BP's estimated worst case scenario for flow.  Landry Dep. at 575–76; TREX 009155.  This revised worst case discharge amount totaled 55,000 bbl/day based on actual measured information from the well including reservoir permeability, gas-oil ratio, oil viscosity, and measured pressure at the base of the blowout preventer.  Landry Dep. at 578–79, 656.  The 55,000 bbl estimate assumed no restrictions to the flow.  Landry Dep. at 579.

1111.   As FOSC, if she chose to do so, Admiral Landry could have ordered BP send her any of the information referenced in the May 10 letter from Doug Suttles.  Landry Dep. at 657–58. Admiral Landry never asked Mr. Suttles for any of the underlying data, Landry Dep. at 658,

and never asked him to provide the modeling done to derive the 55,000 bbl/day estimate.  Landry Dep. at 668.

1112.   On May 19, Mr. Suttles sent an email to Admiral Landry, copying Admiral Allen, which disclosed a possible flow of 5,000–40,000 barrels per day.  Landry Dep. at 347, 682; TREX 009619.  It also included attachments and charts which communicated to her that the flow rate could be as high as 100,000 bopd if flow was up the casing, or 55,000 bopd if it was up the annulus.  Landry Dep. at 690.  Admiral Landry reviewed one of the charts attached to the email from Mr. Suttles on May 19 during the time when she was acting as FOSC.  Landry Dep. at 344; TREX 009619.0002.

1113.   BP communicated the upper bounds on potential flow rate to the United States Government on several occasions.  Tr. at 1016 (Ballard).

1114.   Br. engineer Trevor Hill freely shared information during the *Deepwater Horizon* response with representatives of the National Laboratories, and worked with them in the Houston command center.  Hill Dep. at 480, 589.  Mr. Hill also provided information to the Flow Rate Technical Group led by Dr. Marcia McNutt.  Hill Dep. at 589; *see* TREX 011190.

1115.   Trevor Hill shared the flow rate related estimates contained in an email dated May 7, 2010 (TREX 011169) with a Coast Guard official, including estimates having a range up to 47,000 bopd.  Related information appeared on drawings in an "open room" at the Houston command center used by Paul Tooms, a BP employee.  Hill Dep. at 412–13.

1116.   In addition, Mr. Hill met with National Laboratories representatives in the week prior to June 19, 2010, to discuss data related to pressures and flow in the Macondo well system; he provided all requested data.  Hill Dep. at 609–10, 615–16; TREX 011217.

1117.   At no time to Mr. Hill's recollection was he instructed not to share information with U.S. Government representatives.  Hill Dep. at 613.

1118.   Trevor Hill shared his critique of flow rate estimates prepared by Prof. Wereley in mid-May 2010 with Government representatives, including Dr. Lehr, a staff member of NOAA. Hill Dep. at 572–74; TREX 011215.  Those representatives declined to comment on his critique of Prof. Wereley's estimates.  Hill Dep. at 568–70; TREX 011183.  Trevor Hill did not rely on work by Ole Rygg in his critique of Prof. Wereley's estimates.  Hill Dep. at 571.

1119.   After the well was capped, Dr. Lehr of NOAA, the leader of the FRTG's Plume Team, wrote to Trevor Hill, David Rainey, and others at BP "The *Deepwater Horizon* oil spill, like other large oil spills, was an environmental tragedy.  However, such unfortunate events often have a silver lining found in the spirit of shared concern and cooperation among those tasked with responding to the incident.  Such was the case for this spill.  Industry, Government and scores of volunteers came together to fight the common enemy, the oil leaking from the ocean bottom.  Long hours away from family and friends became the norm in many cases.  I would like to use the occasion of the final capping of the well to thank those BP staff who assisted the Flow Rate Technical Group (FRTG) Plume Team in its assignment to estimate the leak rate.  Without your cooperation, our task would have been impossible."  TREX 011219.0001.

> **(5)** **In Any Event, the Source Control Efforts Undertaken Were Based on Flow Rate Figures That Exceeded All Undisclosed Estimates.**

1120.   The worst case discharge estimate was 162,000 bopd.  TREX 011905R.0023. This estimate assumed a blowout at the seafloor with no restrictions imposed by a BOP or riser, no drill string in place, and no sand bridging in the wellbore.  TREX 011905R.023.  The worst case discharge calculation was not intended as an estimate of the actual flow rate.  TREX 011905R.0023; Allen Dep. at 685.

1121.   The response was postured to respond to a worst case discharge consistent with the doctrine under OPA-90.   Landry Dep. at 130.   From the very beginning, the federal Government directed source control efforts at a worst-case spill of 162,000 bopd.   Allen Dep. at 193–97, 210–11, 401–02, 509, 678–79, 685–87; TREX 009112.0001; TREX 9176.0003; TREX 008996.0002; Henry Dep. at 131–32; McNutt Dep. at 218–19; TREX 009655.0002–03; Rainey Dep. at 253–54; TREX 011905R.0024.   The Coast Guard was mobilized for the worst case discharge.   Landry Dep. at 556.

1122.   According to Admiral Landry, "The Response Efforts Doctrine is [based on] worst-case scenario discharge; and that's what we worked from, from the get-go."   Landry Dep. at 166.   The response was initially designed to address 162,000 barrels per day in reservoir oil being emitted.   Landry Dep. at 166–167.   The worst case discharge that Admiral Landry used from "was later corrected to approximately 60,000 barrels per day."   Landry Dep. at 166.

1123.   Admiral Allen would not have "done anything different[ly]" during the response if he had been told early on that the flow rate was "20,000 or 26,000 or 30,000 barrels a day."   Allen Dep. at 688–90.

1124.   Admiral Allen "never relied on the 1,000 to 5,000 barrels a day" estimate when making source control decisions.   Allen Dep. at 688–90.   Flow rate estimates "weren't consequential in any decision-making" that Admiral Allen did or "the interagency and the response, because we knew this thing had the potential to be much larger than it was."   *Id.*

1125.   That the response efforts were based on worst case discharge did not change during Admiral Landry's involvement in the response: "During as my time as FOSC, I operated under the Doctrine of Worst Case Scenario Discharge and that you have to respond to the worst-case scenario and work your way back.   You don't start with what your estimates are initially and

work your way forward.  You start from where the worst-case scenario discharge is and work your way back.  So we were starting – our response efforts focused on a very significant number of potential barrels for thousands of barrels per day."  Landry Dep. at 169.

1126.  Admiral Landry never changed her approach in the response; they always acted according to spill at worst case discharge.  Landry Dep. at 170.

1127.  During her April 28, 2010 press conference, Admiral Landry noted that "BP has always anticipated and planned for a much larger spill" than only 5,000 barrels per day.  Landry Dep. at 334–35; TREX 009617.  Throughout her tenure as FOSC, Admiral Landry was always planning for a much larger spill than the estimate she announced on April 28.  Landry Dep. at 335.

1128.  "The directive from day one is to plan for a worst-case discharge," and this did not change throughout Admiral Landry's time as FOSC.  Landry Dep. at 335.

1129.  Flow rate estimates in excess of 15,000 bopd did not affect source control response efforts because the response efforts were already aimed at worst case discharges.  Allen Dep. at 236, 292.

1130.  Any flow rate estimates in ranges below 162,000 would not have changed the response effort.  Landry Dep. at 167.  The response planning would not have changed if a revised estimate of 10,000 bbl/day was announced.  Landry Dep. at 131.

1131.  Even after the estimated range was corrected to 60,000 bbl/day from 162,000 bbl/d, Admiral Landry did not change her spill response efforts.  Landry Dep. at 167.  Admiral Landry would not have changed anything about her response if Henry had mentioned to her that he had spreadsheets from BP showing rates as high as 70,201 barrels per day.  Landry Dep. at 355.  "These documents [charts attached to TREX 009620] … would have supported our already

229

… high estimate of worst case scenario discharge." Landry Dep. at 356. The same would have been true if Admiral Landry saw estimates in the 90,000 bbl range—it would not have changed her response. Landry Dep. at 356.

### III.   BP'S AND ANADARKO'S PROPOSED FINDINGS OF FACT AS TO QUANTIFICATION.[4]

1132.   Based on an exhaustive analysis of reliable, measured data collected from the Macondo Reservoir, and input from other highly regarded engineers, Dr. Martin Blunt determined the best estimate of the cumulative oil discharge from the reservoir is 3.26 million stock tank barrels (MMstb), from which the Court should subtract 810,000 stb of collected oil per the parties' stipulation.   *See* Section III.A, *infra*.   Dr. Blunt derives his best estimate using material balance analysis—an industry-standard method that does not require evidence or assumptions about (i) the precise flow path of the hydrocarbons over 86 days; (ii) the changes in flow path restrictions during the flow period; or (iii) the effect of those changes on the daily flow rate.   *See* Section III.C, *infra*.

1133.   The estimates put forward by the Government's hydraulic experts merely present a rehash of the estimate developed hastily over a "critical weekend" in the summer of 2010, under political pressure to generate a single cumulative estimate.   *See* Section III.B, *infra*.   The team that generated that August 2010 estimate, however, lacked the information necessary to reach a reliable result using the hydraulic methodologies they employed.   *See* Section III.B.1. Indeed, as the Government scientists confirmed at trial, they were not able to reach ***any*** estimate —point or cumulative—using hydraulic methodologies until the well was capped on July 15, 2010, when the team obtained for the first time data about the geometry of and pressures in the well.   *See* Section III.B.2, *infra*.   But even then, the Government scientists had only the data they required for the final days of flow, and still lacked the data necessary to reach any reliable conclusions about the amount of flow for the previous days of flow.   Lacking these necessary

---

[4] BP p.l.c. and BPAPC do not join in the Proposed Findings of Fact as to Quantification as neither is a defendant in the Quantification proceedings.

inputs, the Government's August 2010 5 MMstb cumulative estimate was founded upon an assumed "fictional" state—expressly ignoring changes in flow restriction that admittedly had occurred.  *See* Sections III.B.3(a)–III.B.3(e), *infra*.

1134.  The Government's hydraulics experts, Drs. Ronald Dykhuizen and Stewart Griffiths, both concede the fundamental shortcomings in their work, owing to the absence of the information required for the methods they employed.  *See* Sections III.B.3(e)–III.B.3(f), *infra*. Dr. Adrian Johnson, who has over 20 years of experience modeling fluid flow in the oil and gas industry, reviewed Drs. Dykhuizen's and Griffiths's analyses in detail and concludes that it is not possible to use hydraulic modeling to determine cumulative flow with a reasonable degree of engineering certainty.  *See generally* Section III.B.3, *infra*.  Specifically, Dr. Dykhuizen generates an estimate for the final day of flow that bore at least a plus or minus 20 percent uncertainty band—***twice*** the uncertainty range acknowledged by the Government in its August 2010 press release announcing its estimate based upon that same work—and then extrapolated that estimate back in time over the entire period of flow to derive a cumulative estimate of flow. *See* Section III.B.3(e), *infra*.  Although Dr. Dykhuizen was initially unwilling to apply ***any*** uncertainty band to that cumulative estimate due to the massive uncertainty associated with his method and his lack of necessary data, he ultimately conceded that it is more likely that the cumulative amount of flow was lower, rather than higher than the result he reached.  *See* Section III.B.3(e)(3), *infra*.   Dr. Dykhuizen lands on a minus 30 percent uncertainty band for his cumulative flow estimate—***triple*** the uncertainty claimed by the Government in its August 2010 press release—only by relying on other Government estimates that reached similar flow results. *See* Section III.B.3(e), *infra*.  Similarly, Dr. Griffiths's estimate is derived from a method that imposes the July 15, 2010 conditions on the entire 86-day flow period for which Griffiths largely

lacks the input data necessary to generate a cumulative estimate.  *See* Section III.B.3(f), *infra*. Moreover, Dr. Griffiths's primary source of input data for his method—pressure data from the BOP ("PT-B data")—was missing for roughly a quarter of the duration of the flow and, significantly, was missing for the very period in which Dr. Griffiths's model derived the highest flow figures.  *See* Section III.B.3(f)(6), *infra*.

1135.   Dr. Mehran Pooladi-Darvish uses both an "analytical approach" and a "numerical approach" to estimate the amount of oil released from the Macondo reservoir.  But, like Dr. Griffiths and Dr. Dykhuizen, both of his approaches rely on narrow, uncertain data points and assume no material changes in restrictions over time.  *See* Section III.B.3(g), *infra*.

1136.   None of these Government experts accounts for the erosion of metal and cement restrictions that occurred over a period of time, reducing the initial flow rates estimated by these experts.  *See* Section III.B.4, *infra*.  By contrast, BP experts Drs. Srdjan Nesic and Andreas Momber assessed the evidence of metal and cement erosion, respectively, and conclude that the erosion of both materials took place over a period of weeks, rather than in mere hours as assumed by the Government experts.  *See* Section III.B.4(a), *infra*.

1137.   The undisputed appearance of slug flow—a multiphase flow phenomenon that generally occurs only at lower flow rates—in mid-May provides further evidence that the Government's assumed flow rate histories are too high.  After performing a comprehensive analysis of the slug flow, including running thousands of model simulations, Dr. Michael Zaldivar estimates that, from May 13 to 20, the daily flow rate was between 24,900 and 35,900 stb/day, with a best estimate of 30,000 stb/day—***half*** of what the Government suggests for this period.  *See* Section III.B.5, *infra*.

1138.   Unlike the Government's preferred methods, material balance analysis is not plagued with the substantial uncertainties associated with trying to estimate flow rates for each day of the spill; instead, it relies upon measured reservoir properties, and industry-standard analysis based on those measurements, to calculate the total volume of oil discharged.   It is the most reliable method for determining cumulative flow in this case—as recognized by Government expert Dr. Mohan Kelkar, who endorses material balance analysis as an appropriate method for calculating cumulative flow.   Applying established principles of physics and best practices in petroleum reservoir engineering—and making judgment calls to err on the side of higher flow—Dr. Blunt determines that 3.26 MMstb of oil were released from the Macondo Reservoir (of which 810,000 were collected).  *See* Section III.C, *infra*.

1139.   To calculate cumulative flow using material balance analysis, three variables must be determined and used: original connected oil volume, compressibility, and change in reservoir pressure over time.  *See* Sections III.C.1–III.C.3(c), *infra*.  Dr. Kelkar uses incorrect values for each of these variables.  Rather than conduct a connectivity analysis of the Macondo Reservoir, he and the other Government experts incorrectly assume that all of the hydrocarbons were connected to and capable of flowing through the single well.  *See* Section III.C.1, *infra*.  Ignoring measured data, Dr. Kelkar selects a rock compressibility value that was twice the measured value—an inflated value that had been used only briefly by BP in "worst-case scenario" modeling leading up to the shut-in of the well.  *See* Section III.C.2, *infra*.  Finally, Dr. Kelkar, like the other Government experts, fails to account for the Second Law of Thermodynamics—the fundamental fact that hot things cool and thus get heavier—in determining the change in reservoir pressure.  Each of the Government experts agreed that the wellbore cooled down over

time and that such cooling would influence reservoir pressure—but each failed to then incorporate that phenomenon into his analysis. *See* Section III.C.3, *infra*.

1140.   The permeability of the reservoir, a measurement of the connectedness of the microscopic pores in the reservoir sandstone, factors into several of the material balance factors. *See* Section III.D, *infra*. While Government experts Drs. Pooladi-Darvish and Hsieh use permeabilities that are double the correct value, *see* Section III.D.3(c), *infra*, only BP experts Drs. Gringarten and Blunt use the industry-standard "well test analysis" methodology to estimate permeability. *See* Sections III.D.3(a)–III.D.3(b), *infra*.

1141.   Dr. Blunt's estimate employing the material balance method is also consistent with an estimate developed by Dr. Alain Gringarten using a deconvolution method. Dr. Gringarten is widely regarded as the world's preeminent expert in well test analysis. Using industry-standard well analysis techniques, Dr. Gringarten estimates the cumulative discharge from the Macondo Reservoir to be between 2.4 and 3.0 MMstb. *See* Section III.E, *infra*.

1142.   Finally, as explained by BP and Anadarko expert Dr. Curtis Whitson, the conversion of reservoir barrels to surface volumes should be done using the "single-stage flash" process—the industry's default method of conversion, the method consistently employed by the BP experts in this litigation, and the most accurate method of conversion. *See* Section III.F, *infra*. In contrast, the equation of state model employed by Government expert Dr. Zick artificially inflates the number of stock tank barrels. *See* Section III.F.5, *infra*.

A.  **No More than 2.45 Million Barrels Spilled into the Gulf of Mexico as a Result of the *Deepwater Horizon* Incident.**[5]

1143.  Dr. Martin Blunt calculates that 3.26 million stock tank barrels (MMstb) of oil were released from the reservoir.  Tr. at 2095 (Blunt); TREX 011553R.0006; D23508.  810,000 of those barrels were collected.  *See* Stipulation Mooting BP's Motion for Partial Summary Judgment Against the United States at 1 (Rec. Doc. 8620).  Thus, 2.45 MMstb of oil were spilled into the Gulf of Mexico.

1144.   Dr. Blunt is a preeminent expert in the field of reservoir engineering.  Dr. Blunt's more than 200 scientific publications have been cited more than 8,000 times, more than any other authority in petroleum engineering.  Tr. at 2090–92 (Blunt); D23506.  His contributions to petroleum industry knowledge and methods have been repeatedly recognized by such professional organizations as the Society of Petroleum Engineers and the Society of Core Analysts.  D23506; Tr. at 2090–91 (Blunt).  Dr. Blunt helped found two companies that provide oilfield services using analytical techniques that he pioneered.  Tr. at 2086, 2088–89 (Blunt); TREX 011553R.0158.

1145.   Dr. Blunt calculates the volume of oil released using a methodology called "material balance."  Tr. at 2092 (Blunt).   The material balance equation is one of two fundamental equations of reservoir engineering.   TREX 011553R.0091; TREX 011549R.0031 (Kelkar expert report listing material balance as one of the "basic petroleum engineering concepts").

---

[5] Notwithstanding BP's post-trial submissions addressing the number of barrels spilled as a result the *Deepwater Horizon* incident, nothing in these proposed findings of fact and conclusions of law or in the accompanying post-trial briefs should be taken as a concession that BP is liable to the United States for per-barrel penalties under Section 311(b)(7) of the Clean Water Act, 33 U.S.C. § 1321(b)(7).  As BP has consistently maintained, oil from the Macondo reservoir traveled through the Macondo well and discharged exclusively from the *Deepwater Horizon* and its appurtenances, not the Macondo well itself.  *See generally* 5th Cir. No. 12-30883.  Moreover, BP affirmatively denies that it was either the owner, operator, or person in charge of the *Deepwater Horizon*.  *See* BP's Phase One Proposed Findings of Fact and Conclusions of Law ¶¶ 2707-2722 .

1146.   Any value higher than the range calculated by Dr. Blunt dishonors or disregards data, is irreconcilable with essential reservoir-engineering best practices, or ignores fundamental and undisputed principles of geology and physics.  Dr. Blunt's material balance calculations are discussed in more detail *infra* in Section III.C.

> **B.      The Hydraulic Methods Employed by the United States Experts Are Unreliable Because Information Essential to those Methods Is Unknown over the 86-Day Flowing Period.**
>
> > **1.      Numerous Government Experts Admitted That the Information Required to Generate a Reliable Estimate of the Cumulative Release Using Hydraulic Methods Was Unavailable in This Case.**

1147.   Dr. Tom Hunter was the director of Sandia National Laboratories and president of Sandia Corporation as of April 2010 and served as the co-head of the Government's Science Team in responding to the spill.  Tr. at 1273, 1284–85 (Hunter).

1148.   Secretary of Energy Steven Chu and Secretary of the Interior Ken Salazar assembled the Federal Science Team to try to sort out and help with the source control efforts, and the team was comprised of various individuals from the National Laboratories, as well as from the U.S. Geological Survey and NASA.  Tr. at 1284–85 (Hunter).

1149.   The same scientists who generated the Government's cumulative release estimates using hydraulic methods advised the members of the Federal Science Team that it was impossible to calculate a flow rate using hydraulic methods without two pressures and a known geometry in between.  *See* TREX 009389; *see also* Hunter Dep. at 304–05 (to do the most credible analysis of flow, "[i]t would be best to have a known controlling geometry and reliable pressure measurements"); Tr. at 1315 (Hunter).

1150.   Specifically, Dr. Hunter testified that it would not have been possible to generate a reliable flow rate calculation using hydraulic methods in May 2010, and he would not have been comfortable doing so, because such a calculation would have to rely on information that

was not available, and "we didn't try to make an estimate that we would use for any support for decision-making."  Tr. at 1321 (Hunter); Hunter Dep. at 163–66; *see also* Tooms Dep. at 367 (expressing similar inability to calculate, and discomfort with calculating, flow rate during this time period due to lack of information).

1151.  Likewise, Dr. Stewart Griffiths, a United States expert witness and retired scientist from Sandia National Laboratories, testified that he could not calculate his discharge coefficients—the parameters he uses to calculate a cumulative release—for any day prior to July 15 using data relating to such dates because he did not have the data necessary to perform such a calculation.  Tr. at 1686 (Griffiths).

1152.  A complete hydraulic assessment should account for all restrictions that could potentially affect the flow path, including mechanical restrictions like the riser and kink in the riser, restrictions in the BOP such as partially closed rams or annulars, and restrictions within the wellbore (*i.e.*, below the mudline) including skin, mechanical restrictions, and sanding.  Tr. at 1316–18 (Hunter); TREX 009692.3.2; *cf.* Havstad Dep. at 251–52 (fact that the kink at the riser began to form leaks starting on April 28, 2010 is relevant to calculating flow).

1153.  The shortfalls of hydraulic methodologies for quantifying the amount of flow at Macondo prior to July 15, 2010 were summarized by BP flow assurance expert Dr. Adam Ballard as follows: "[T]here just wasn't enough information available during [the April and May 2010] time frame to actually do a hydraulic modeling analysis to determine the flow rate."  Tr. at 917 (Ballard) (explaining the significance of restrictions in the system); D23214; *see also* Tr. at 929–31 (Ballard) (although hydraulic modeling was useful for identifying the "high end" of flow rates for source control purposes, "hydraulic modeling couldn't tell you what the actual was.  It couldn't even give you a probabilistic understanding.").

### 2. A Daily Flow Rate Could Not Be Accurately Calculated Until the Well Was Capped.

1154. Prior to July 15 and the installation of the Capping Stack, the Government teams did not have the data necessary to calculate an accurate estimate. Ratzel Dep. at 418–19 ("The team believed it lacked the data and the confidence in that data."); *see also* TREX 009706.0005 (July 26, 2010 Presentation: Flow Modeling Activities, describing estimation methods generated prior to the Capping Stack: "Tri-Lab Assessment – None of the methods listed above provide 'believable' mass flow results – too many model uncertainties and/or data for quantitative analysis."); Ratzel Dep. at 412–19 (discussing same). For example, on May 23, 2010, Dr. Marcia McNutt—the leader of the Government's Flow Rate Technical Group—suggested that the Government should issue a statement informing the public that based on the analysis her group had performed, suggestions in the media that the flow rate was as high as 50,000 barrels per day at the time were "nowhere near borne out by thorough analysis." McNutt Dep. at 143–44; TREX 009643.0001.

1155. As Dr. Dykhuizen and Dr. Ratzel explained in the DOE-NNSA Report (which memorialized the work of the Government Science Team in generating the August 2, 2010 estimate): "While there had been attempts throughout post-accident times to quantify the instantaneous flow rate, the DOE-NNSA flow team and other researchers directed by the DOI were generally stymied in these attempts prior to well shut-in, largely because of uncertainties in the well geometry, the BOP, and reservoir depletion." TREX 009361.0049; *see also* Tr. at 1450 (Dykhuizen) (agreeing that was his experience as a member of the DOE-NNSA flow team for Macondo).

1156. On July 15, 2010, upon installation of the Capping Stack, the DOE-NNSA team was able to estimate the flow rate on that day. Tr. at 1468 (Dykhuizen). But, as Dr. Dykhuizen

conceded, there "was no data from the capping stack that would – that would allow me to find flow from the previous days.  I was just using pressures reported from the capping stack on the last day."  Tr. at 1468 (Dykhuizen).

1157.  More accurate estimation became possible as of July 15 because, as Dr. Hunter explained in his trial testimony, "the best way to determine flow is to have a known geometry and pressure readings on both sides of it.  And since we knew the pressure at the bottom of the Gulf, we insisted and BP easily agreed to put pressure gauges on the capping stack.  So we knew that geometry would allow us to make another and much better estimate of flow."  Tr. at 1295 (Hunter); *see also* Tr. at 1316 (Hunter) (Q: "The Capping Stack was the first time that you felt that you had a known geometry for purposes of pressure; correct? A: That's correct. And accurate pressure measurements."); *see also* Tr. at 1454 (Dykhuizen) (flow rate calculations did not begin until "the first day the Capping Stack was installed ....").

1158.  When the Capping Stack was installed on July 15, 2010, those attempting to estimate the flow rate obtained, for the first time, (1) a known and understood geometry for flow, and (2) pressure measurements that were reasonably accurate.  Hunter Dep. at 304–05.

1159.  But using that July 15 data and applying it to the prior 86 days, as Dr. Dykhuizen admitted doing in his calculations, reflects "a fictional initial state since the model implicitly assumed that the well geometry does not change during the 85 days of flowing this well."  TREX 009924.0003; *see* Tr. at 1470–71 (Dykhuizen) ("Yes, I wrote those words."); *see also* TREX 009375; TREX 009376 ("many geometry changes occurred.  These include, but are not limited to, the riser and kink being cut off, junk shots, and erosion."); Ratzel Dep. at 575–76.

3.    **The U.S. Experts' Hydraulic Methods Cannot Accurately or Reliably Calculate a Total Cumulative Release.**

(a)    **The Inputs Required for a Proper Hydraulic Model Are Complex and, in the Case of Macondo, Changed over Time.**

1160.   Hydraulic methodologies were inappropriate for estimating the flow over the 86-day period because although information was known about the period prior to flow, and information was known about the well once flow ceased, no one had sufficient information to estimate the flow conditions with any precision during the days between the start of the flow and shut-in.  *See* Tr. at 2109–10 (Blunt) (analogizing use of hydraulic methodology to a tire that had been punctured by a piece of glass three months prior, and attempting to characterize the flow of air from the tire on each day since the puncture occurred: "It's a highly uncertain calculation.  In fact, frankly, I don't think anyone would approach the calculation that way.").

1161.   In order to use a hydraulic method to estimate the cumulative flow from the Macondo reservoir, BP/Anadarko expert Dr. Adrian Johnson explained that "what we need to know is what is the back pressure on the reservoir; and to know that, we need to know what the pressure drops are as we go up the well.  And to know that, we need to fully model the physics of the fluids as we go up the well and take account of any detailed geometry as we go up the well, such as the dual flow paths created by the drill pipe in the well."  Tr. at 3041–42 (Johnson).

1162.   Dr. Johnson has a Ph.D. in Mechanical Engineering, is the Consultancy Manager at FEESA, and has 24 years of experience in the petroleum industry, including the modeling of complex fluid systems like that at Macondo.  Tr. at 3031–33 (Johnson); TREX 011488.0008; D24618.  Dr. Johnson is an expert in multiphase thermal hydraulic modeling and the analysis of multiphase hydrocarbon flow in flow systems.  Tr. at 3038 (Johnson).

1163. Through his work at FEESA, Dr. Johnson routinely uses the Maximus simulator—an in-house, detailed, thermal-hydraulic multiphase simulator that has been field

tested and validated in the oil industry and has the capability to model flow through a single well or multiple wells.  Tr. at 3034–36, 3152 (Johnson).

1164.  Dr. Johnson personally examined the evidence that was recovered from the Macondo well for erosion, including the drill pipes, all the BOP rams and housings, all the Capping Stack parts, the bore, the LMRP, junk shot materials, etc.  Tr. at 3037 (Johnson); *see also* D23410 (displaying images of the physical evidence that Dr. Johnson examined at Michoud); D23411 (same); Tr. at 3056–58 (Johnson) (describing same).

1165.  Based upon his work in this matter, Dr. Johnson concludes that: (1) "you can't use the Government's hydraulic methods to get any kind of cumulative release estimate from the [Macondo reservoir] to any reasonable degree of engineering certainty"; (2) "[t]here are many inputs that are needed into a hydraulic model, and those inputs in this case are changing through time," which "puts huge uncertainty on the whole problem"; and (3) this huge uncertainty in the problem cannot be overcome "by simply calculating what is going on [in the well] on one day, on July 15, 2010, and then basically extrapolating that backwards over the 86 days."  Tr. at 3038–39 (Johnson); D24703; TREX 011488.0004–06, 0049–50.

1166.  The inputs that are necessary to prepare an accurate flow rate estimate using hydraulic methods include: flow path geometry (lengths, internal diameter, wall thickness); flow path characteristics (hydraulic diameter, roughness); temperature (geothermal gradient, heat transfer coefficient); pressures (PT-B, reservoir); productivity index (stb/day/psi); and fluids (composition, equation of state):



*See* D23398; Tr. at 3044–47 (Johnson). Dr. Johnson noted that most, if not all, of the fundamental components of such a hydraulic analysis were not available as to the majority of the 86-day flow period. Tr. at 3050–51 (Johnson).

1167. Dr. Johnson's testimony established the importance of accurately modeling the effects of those inputs on the physics of the multiphase flow as the "oil and gas moves up the well," including changes in pressure, changes in fluid temperature, changes in fluid properties (*e.g.*, density, viscosity), phase changes, and flow regime changes. D23398; D23396A; Tr. at 3045–50 (Johnson).

1168. With respect to temperature, Dr. Johnson testified that it is "very important to get the temperature right to enable you to model properly what the fluids are doing as you move up the well." Tr. at 3046 (Johnson). Temperature "has an effect on the pressure, which has an effect on the back pressure on the reservoir, which ultimately has an effect on how much oil is coming out of the reservoir." Tr. at 3046 (Johnson).

1169.  Using a hydraulic method to model flow over a long period of time under the circumstances present at Macondo—*i.e.*, where there were many changes in the system, including geometry changes, flow path characteristic changes, fluid temperature changes, pressure changes, and productivity index changes—is simply not feasible, because there is "a lot of uncertainty around [the available] information [and] that's the real problem here, is trying to get a good range or a tight range of outputs from a wide range of inputs is just not possible."  Tr. at 3050–51 (Johnson).

> (b)   **The Government's Hydraulic Experts' Quantification Methodologies Do Not Account for the Complex Hydraulic Inputs and How Those Inputs Changed over Time.**

1170.  Massive uncertainty existed over the 86-day period relating to a number of inputs that are necessary to a hydraulic model.  Tr. at 3050-51 (Johnson); D24656.



1171.  Dr. Johnson explained that parameters like the productivity index ("PI", a measure of how much oil a well will produce per unit of pressure in the reservoir) would change over time, increasing from a PI of approximately 9.4 stock tank barrels per day per psi (stb/d/psi) at the start of the blowout (based upon Mr. Emilsen's analysis in Appendix W to the Bly Report) to somewhere in the range of 40 or 50 stb/d/psi at the end of that period, but that there is great uncertainty about how that PI changed between those two points.  Tr. at 3051–52 (Johnson); D24656.

1172.  Dr. Johnson's testimony also established the role of the drill pipe in affecting an analysis of flow over the 86-day period, explaining that although "we know the drill pipe that was going through the BOP and – about 3,000-odd feet down into the well," it is also known that the drill pipe detached from the BOP "at some point in time,"—"probably by Top Kill or during Top Kill, but that's uncertain," and that what happened to it after that is unknown.  Tr. at 3053–55 (Johnson); D24656.

1173.  The effect on the BOP of the 40 buckets of material injected during the Junk Shot attempt presents another significant uncertainty.  As Dr. Johnson explained: "[W]e don't know how much was there at various points between Top Kill and the end of the incident and how that changed over time.  We don't know how the Junk Shot moved around in the BOP and changed restrictions in the BOP.  So it just adds uncertainty to what's going on."  Tr. at 3056–57 (Johnson) (discussing D23410); *see also* D24656 (displaying the various sources of uncertainty over the 86-day period); D23411 (displaying image of the cut end of the drill pipe); Tr. at 3057–58 (Johnson) (describing the recovery of the junk shot material vis-à-vis the cut end of the drill pipe, and the implications on information about the role of the BOP); Tr. at 3058 (Johnson) (explaining that since the photos of the recovered drill pipe show that it is full of junk shot

245

material, "when it's full of Junk Shot … and when it's got parts of the test ram jammed in it, that is going to be a restriction on that flow path.  So this is a change in the flow path over time that's occurring.").

1174.  Dr. Dykhuizen acknowledged in his "Flow Uncertainty Position" paper that the challenges to developing a hydraulic estimate of flow include understanding the fluid properties, the equation of state, issues of density, viscosity, impact of crude oil, temperature and pressure distribution, geometry (including changes in geometry), flow path, the effect of multiphase flow, reservoir depletion, and erosion.  *See* Tr. at 1448–50 (Dykhuizen); TREX 009389 (Flow Uncertainty Position paper).

1175.  Neither Dr. Griffiths nor Dr. Dykhuizen address these uncertainties in their analyses, however.  Tr. at 3058–59 (Johnson).

> (c)     **The Government's August 2010 Press Release Estimate Was Generated over a Weekend, Based upon Limited Information and for the Purpose of Negotiations with BP.**

1176.  The Government's August 2, 2010, estimate was based only on work done over one "critical weekend."  TREX 009908 ("These critical measurements allowed a quantitative basis to evaluate the flow which was done by DOE scientists over a ***critical weekend*** and culminated in bringing together all the flow rate teams who ultimately agreed that the DOE estimate was the one to claim as the official Government estimate.  These estimates at day 87 were combined with depletion estimates by DOE and USGS scientists to get the estimate over the 87 day period.") (emphasis added).

1177. Dr. Arthur Ratzel, co-author of the DOE-NNSA Report that ultimately documented the Government's August 2, 2010, estimate, admitted that the Government's August 2010 cumulative flow estimate was calculated from "start to finish" in "less than three days."  Ratzel Dep. at 544; *see also* Hunter Dep. at 410 ("The syntheses of the six Teams and the work

246

to pull it together into a composite estimate began on the 30th, went into the 31st, and – and culminated in statements on the 1st and 2nd.").

1178.  Government scientists who participated in that process were under "intense" pressure from leadership within the Government—leadership that included Secretary Salazar and Secretary Chu "and above."  Sogge Dep. at 157–58, 223 (there was "intense pressure" on the FRTG to develop flow rate estimates quickly); Havstad Dep. at 84–85 ("it was an emergency …. Things needed to happen very fast …. it wasn't a case where we could go get the best industry software and spend six months calculating what we thought something might be …. We were always on a clock"); TREX 009662; *see also* Sogge Dep. at 224–28 ("there were several times that there were E-mails exchanged about feeling that [Government scientists] would like to have more time to analyze" and that they were being used to generate numbers "on the fly" in order to serve policy-making considerations).

1179.  Dr. Hunter testified there were two purposes to the cumulative flow estimate generated that weekend: the oil budget and negotiating with BP, and confirmed that Secretary Chu had declared that the purpose of calculating a number was for damages to be charged to BP. Tr. at 1339–40 (Hunter).

1180.  On ***Tuesday, July 27, 2010***, Dr. Marcia McNutt sent Dr. Art Ratzel a statistical analysis done by Dr. Antonio Possolo, who aggregated various Government flow estimates, performed a numerical analysis, and concluded that the "best estimate" of oil flow was 53,000 barrels per day.  TREX 009367.  Dr. Ratzel agreed with others that this method of flow estimation was "ludicrous."  Ratzel Dep. at 71–72; TREX  009202.

1181.  Later that day, Dr. Ratzel contacted  members of the Tri-Lab team regarding "an action item," coming out of a meeting with Secretary Chu and Dr. Marcia McNutt, to develop "a

position on flow rates that we can provide to the Government leadership" and that, in addition, "there is some urgency to provide this information back to senior leadership."  TREX 009714. Prior to July 28,  Dr. Ratzel's team had not performed any cumulative flow rate calculations. Ratzel Dep. at 543–44; *see also* TREX 009368 (July 27, 2010 e-mail from Mark Havstad to Ron Dykhuizen and Charlie Morrow stating: "Wasn't it sec. chu who said 'you go to the well with the model and data you have, not the model and the data you wish you had'?  Wasn't it sec. chu who said 'there are known unknowns and there are unknown unknowns['] and there are …. You and morro could might more [sic] shamelessly use models to guess at stuff that otherwise is unguessable ….").

1182.   On the morning of ***Wednesday, July 28, 2010***, Dr. Marcia McNutt, Director of the United States Geological Survey and Flow Rate Technical Group leader, believed the group would have ample time to review the scientific data and develop a cumulative flow estimate. TREX 009662; McNutt Dep. at 301−04.  Indeed, that morning, Deputy Secretary of the Interior David Hayes had assured Dr. McNutt that there was no rush to provide a final flow rate estimate: "If you could help make sure that folks do not think there's a rush here, I would appreciate it. There isn't a rush."  TREX 009662.

1183.   But later that same day, Dr. Tom Hunter informed Dr. Marcia McNutt and others for the first time that they needed to come up with a new flow rate figure ***within two days***, by that Friday: "David, Laura, HELP!!  I just got off a call with Tom Hunter.  He said that we HAVE to have a new flow rate by FRIDAY.  He said that is coming from Secretary Chu and above."  TREX 009662.

1184.   Secretary Chu related the news to Dr. McNutt, Dr. Hunter and others in another email that day: "Just got off the phone from the daily 5 pm tag-ups, led by Sec. Napolitano.

What we really need, hopefully by Friday, is the total amount that has leaked out since the beginning of the accident."   TREX 009718.   Dr. Ratzel admitted feeling "intensified" expectations to provide a refined flow estimate to senior leadership, including Secretaries Chu and Salazar, no later than July 30.  Ratzel Dep. at 452–53, 457–60.

1185.  Dr. Hunter responded to Dr. Chu's email stating: "[T]his is the track we are on but it is unlikely we can get the full time frame analyzed from the beginning of the incident by friday.  [sic] … We will then need an event by event description to look at adjustment and overlay that by a depletion assumption.  [W]e need to assure that the pace for getting these results is consistent with the subsequent need for accuracy."  TREX 009718.

1186.  Notes from a July 28 meeting between Drs. McNutt, Ratzel and others reflect Dr. McNutt's statement that "we can not ever say there is A number for the flow rate; there were probably multiple rates over time due to configuration changes, well head pressure changes reservoir evolution, etc.  At some point we will need to make some educated calculations on how those changes impacted flow."  TREX 008830.

1187.  In these same meeting notes, Dr. Ratzel is reported as saying that the DOE team "gave up on the pressure readings from the BOP because you can't put a hard number with any confidence.  That gage [sic] died yesterday anyway.  At the close of the shut-in there was still a fairly large difference between  the BOP gage [sic] and the stacking cap gage [sic]; this could indicate a faulty BOP gage [sic]."  TREX 008830.

1188.  Dr. Ratzel noted the urgency of the situation in an email to his National Labs peers: "This is becoming a VERY IMPORTANT meeting as leadership in the Government are expecting to be able to announce refined flow estimates following the meeting."  TREX 009716.  *See also* Sogge Dep. at 217–25 (discussing July 30–31, 2010 meetings, and agreeing there was

249

pressure on the FRTG from the Administration to generate flow estimates as quickly as possible: "Yeah.  I would say that we were very aware that there was interest by – by the public, by the media, and – and by the Administration, by the Incident Command, to provide information as soon as we could."); Hunter Dep. at 403–05 (Dr. Hunter understood that the flow rate numbers discussed at the July 30 and 31 meetings would be the "official pronouncement of the Government" regarding flow rate); TREX 009717 (July 29, 2010 e-mail from Mark Sogge to Dr. Ratzel: "I have heard through both USGS and DOE channels that the expectation for the outcome of tomorrow's meeting may have changed (perhaps 'intensified' is a better word), and that a precise consensus flow rate estimate is now needed by the end of the day.").

1189.   Indeed, the Government scientists that engaged in this hurried effort to generate a single flow rate figure, including Dr. Dykhuizen and Charlie Morrow, created a spreadsheet for those calculations named "Wednesdaynightrush.XLS."   TREX 011456.1.1; Tr. at 1454–55 (Dykhuizen).

1190.   The teams met on ***Friday, July 30, 2010*** for several hours to generate the requested estimate, and at that meeting Secretary Chu reported to the group that his Chief of Staff, Rod O'Connor, had informed him that the "Cabinet would like to see the oil budget released this weekend, and wants to get to a new number tomorrow so it can be in the papers tomorrow.  "There are wild rumors flying around about 'unaccounted for' oil; the better we can bound this, the better."  TREX 008827.0003; Ratzel Dep. at 477, 479–80.  Dr. Chu's Chief of Staff was then quoted in the meeting notes as saying: "Something will go out tomorrow (probably around 60k), even if we don't come up with something."  TREX 008827.0004.  Dr. Ratzel confirmed that these meeting notes also appear to reflect a subsequent conversation in which Dr. Hunter suggested "a range of 53 to 63k," and Dr. McNutt suggested saying that the

flow rate "has changed over time from a number near 60 to a number near 50 due to depletion." Ratzel Dep. at 483–85; *see also* McNutt Dep. at 331–35 (consensus was sought at the July 30–31 meeting, even while the Tri-Labs representatives acknowledged the possible errors and the range of uncertainty in their modeling).

1191.   Dr. Ratzel sent an email to his National Laboratories colleagues on Friday, July 30, 2010, attaching a file with what he referred to as a "thought experiment" that Dr. Hunter had them do the night before as to what the total oil release might look like."  TREX 009663.

1192.   Dr. Hunter's meeting notes from the July 30 meeting indicate that the different flow estimation teams reported estimate numbers ranging from 24,000 to 64,000 barrels per day at the start of that meeting.  *See* TREX 009929.0095; Tr. at 1334–36 (Hunter).



1193.   The meeting notes from July 30 also discuss the work performed by Dr. Paul Hsieh in deriving the line for the extrapolation back of the July 15 point estimate that was used to generate the cumulative estimate, stating: "Paul Hsieh did his analysis o'nite."   TREX 008628.0004.

1194.   Dr. Hsieh also repeatedly described his own work as having been performed overnight.  Tr. at 1529 (Hsieh) ("So basically, I had overnight to do this analysis …."); Tr. at 1529 (Hsieh) ("my overnight analysis"); Tr. at 1530 (Hsieh) ("my model that I developed overnight to evaluate the capping stack pressure"); *cf.* McNutt Dep. at 324–26 (Hsieh's work was never peer reviewed by any of the reservoir modeling groups that had worked for the FRTG because their contracts had expired by the time that Hsieh did his work).

1195.   The Government team relied upon Dr. Hsieh's overnight analysis to establish that the flow rate curve was a straight line back from the July 15 shut-in pressure to the initial reservoir pressure.  Hunter Dep. at 341–42.  But fundamental to this assumption of linearity was the assumption that there were no changes in restrictions in the well.  Hunter Dep. at 341–42 ("the linear assumption, or the straight line, as you call it, did not account for changes in flow geometry; hence, what you say [the inability to determine the impact of restrictions in the well is a … key assumption as to whether the straight line presented in August 2nd is or is not an appropriate representation of flow] has to be true.").

1196.   The straight-line flow rate curve is based on nothing more than an assumption on the part of the team: "[T]here were a number of ways to go from this point to this point – I mean, from the high to the low, and it could have been a quadratic shape, it could have been a variable, tortuous path.  It could have all come out in the first day.  It could have all come out in the last week.  The point is we knew the beginning and we knew the end.  It's very difficult to fix a

depletion model with no other data to work with."  Ratzel Dep. at 199–200.  *See also* Tr. at 1441 (Dykhuizen) (testifying that his flow rate curve could have started low and ended at 53,000, or other combinations).

1197.   The teams met again for several hours on ***Saturday, July 31, 2010***, during which the subject of the uncertainty ranges on the team's calculations was discussed.  TREX 008628. At that meeting, there was discussion that the "Cabinet wants a clean nice number," uncertainty was still being "worked out" at that time and "+/- 10% feels better, +/- 5% too tight," and Dr. Chu explained that for "US Gov neg[otiations] w/ BP this is good enough."   TREX 008628.0058; *see also* TREX 008842.0002 ("Reasons: 1. Oil budget; 2. Damages ~ 10–20% they'll settle so detail doesn't matter."); TREX 008621 ("assumptions were necessary" and "uncertainties [were] high."); TREX 009724 ("Both [the Ratzel and Dykhuizen] teams (legitimately) did lot of hand wringing about uncertainties that could be resolved with time and money, but …. negotiations with BP will be based on best estimates of flow and environmental damage …. What's interesting is that Chu is looking for a ballpark number good to one significant digit.  Chu will take the rough flow estimates and combine with equally or even more crude (pun intended) estimates of environmental damage to establish a basis to negotiate with BP over fines."); Hunter Dep. at 372–73, 379, 384–85 (Dr. Hunter: it is "very reasonable" that Dr. Chu declared that the Government's flow rate estimate need only have 10–20% uncertainty); TREX 009726 (July 30 Meeting Notes stating "[a]nything below 10% uncertainty is overkill").

1198.   Secretary Chu confirmed that the 10 percent uncertainty the group adopted was not the result of any calculations, but was rather "a judgment at the table."  Chu Dep. at 153, 156–57; *see also* Chu Dep. at 172 (no numerical calculations for effects of restrictions such as cement, skin, mechanical, friction and sanding); *see also* TREX 009381 ("+/- 10% uncertainty

on these flow rates is certainly optimistic, especially when the analyses do not include a reasonable treatment of possible two-phase flow effects").

1199.   On ***Monday August 2, 2010***, the Government issued a press release with its official estimate of 4.9 million barrels of oil released from the reservoir.   TREX 008809.   The 53,000 barrel estimate was based not on a particular calculation but, rather, on a group "evaluation of the pluses and minuses of the various techniques and our attempts to say, in general, the collective yielded 53,000."   *See* Ratzel Dep. at 68.   The press release described the estimate as "the most accurate to date" with an "uncertainty of plus or minus approximately 10 percent."   TREX 008809.   The August 2 Press Release also specifically noted that "Government scientists will continue to analyze data and may in time be able to further refine this estimate."   TREX 008809.

1200.   This estimate was generated without the benefit of complete information that would affect flow rate, including whether there was erosion in the BOP or wellbore, the correct temperature of the fluids in the Capping Stack, and the final built-up reservoir pressure.   Ratzel Dep. at 87–88, 125–26, 276–77, 279, 281, 152–53, 190–91; Hunter Dep. at 301 (erosion was not considered in the official Government estimates); Chu Dep. at 135–36, 144–45 (erosion could have caused the flow rate to increase over time but that effect was not considered in forming the extrapolation-back model used to compute the Government's official flow rate estimate).   None of the Government's modeling accounts for any change in any flow restrictions over time, except for the riser cut and the addition of the Capping Stack.   Hunter Dep. at 333–34.   Secretary Chu conceded that the Government did not account for changing restrictions in the well in arriving at its final estimate.   Chu Dep. at 136–37, 172, 176–77.

1201.   The July 30, 2010 Government flow rate teams' meeting notes state that as of the time of that meeting, there was "[i]nsufficient information to perform an uncertainty analysis on flow rate and total flow at time of meeting" and that the "[v]alues presented are point estimates only" and "[t]he uncertainty is not bounded by the range of values presented."   TREX 008635.0096; *see also* Ratzel Dep. at 101 (agreeing that statement that there is insufficient information to perform an uncertainty analysis is true).

1202.   In beginning to document the work behind the August 2 estimate, Dr. Dykhuizen put together a first draft, which he provided to Dr. Ratzel on August 6, 2010.  *See* TREX 009392. In that first draft, Dr. Dykhuizen noted, with respect to the discussion of quantifying uncertainty: "I have not tackled error estimates yet.  That is a difficult task since they are mostly modeling errors, and Chu has decided already that they are about 10%.   Maybe we should avoid quantifying them."  TREX 009392.

<div style="text-align:center">(d)   <b>The Government's August 2010 Estimate Was Not Updated With Additional Evidence That Became Available after August 2, 2010.</b></div>

1203.   Although additional evidence about the conditions in the path of flow became available following the issuance of the Government's August 2, 2010, press release, the DOE-NNSA team did not update their analysis to reflect that work.  *See e.g.*, TREX 009379.0001 ("everyone else is quoting our 53K at the shut-in flow rate based on the July 30–31 meetings and Government press release and I think to be consistent, we should stay there as well.  I thought hard on working to 51K and decided we should use 53K calling it our upper bound estimate (which is true if I believe the pipe flow results for choke line).  I frankly do not want any backpedalling on numbers, and as you and I are both aware, 53 or 51 are equally suspect"); Ratzel Dep. at 146–47, 151.  In Dr. Ratzel's view, the "intent" of his team's report was to present calculations that would "[come] out with the same numbers" as the July 31 Government

estimate.  Ratzel Dep. at 144–45.  Dr. Ratzel testified that his "message to Ron" Dykhuizen was to "[s]tay consistent."  Ratzel Dep. at 149.

1204.   Secretary Chu confirmed his belief that when new information that can materially change the estimate (such as the recovery of the BOP)became available, that information should be folded into the analysis.  Chu Dep. at 136–37.

1205.   In the fall of 2010: (a) the BOP was recovered and extensive testing began, revealing BOP rams with significant evidence of significant erosion, TREX 143198; TREX 143201; TREX 143132; TREX 143145; TREX 143175; (b) a lead impression was taken of the casing, providing information about the location and condition of the drill pipe, TREX 040003; (c) testing from the relief well intersection confirmed there were no hydrocarbons in the annulus, establishing that flow had been up through the casing and drill pipe, TREX 040003; (d) the casing hanger and seal assembly were recovered, and the absence of erosion on the outside of the hanger provided further evidence that the flow path had been up the casing, TREX 000911; TREX 000912; and (e) results from cement testing were published, TREX 002477; TREX 002702; TREX 005937.

1206.   In January 2011, Dr. McNutt circulated an email to a number of Government scientists, including Dr. Hunter, alerting them to "new information" relating to BOP forensics that would have "great bearing on the flow rate."  TREX 009671 (stating that the team needed to "consider carefully the competing processes of depletion of the reservoir, which causes flow rate to decrease, and possible widening of the flow path, which causes the flow to increase.  The final curve may be peaked in the middle for all I know.").  Dr. Hunter replied to Dr. McNutt's email, cautioning her against making statements about the flow rate trend over email.  TREX 009671 ("I don't know what should be discussed via email since there is no such thing as confidential as

I understand it.  I would be cautious with another prediction especially one with such great uncertainty.").  Dr. Hunter concluded his response with the statement that "[t]his whole effort needs a systematic correlation of data and forensics"—acknowledging that this new BOP evidence could be important to the determination of the total flow from Macondo.  TREX 009671 (Dr. McNutt: "clearly we would be remiss to ignore this new evidence."); TREX 009387 (Dr. McNutt "informed [Mark Sogge January 4, 2011] that she believes that the BOP forensic results may have bearing on the pattern of flow rate over time").

> (e)    **Dr. Dykhuizen's Estimate Is Improperly Based on Measurements Taken Only on the Last Days of Flow and Assumes No Change in Restrictions over Time.**
>
> (1)    **Dr. Dykhuizen's Cumulative Flow Estimate Is Predicated on His Capping Stack Flow Rate Estimate, but His Capping Stack Calculations Are Flawed.**

1207.   The starting point for Dr. Dykhuizen's estimate of cumulative flow is his estimate of 53,000 barrels per day flowing through the Capping Stack on July 15, 2010.  Tr. at 1434 (Dykhuizen).   Dr. Dykhuizen's cumulative estimate is based on a linear "backwards extrapolation" of that figure through time, to the first day of the spill.  Tr. at 1434 (Dykhuizen) ("Q: And you base this cumulative estimate by taking your 53,000 estimate of July 15th and then using a backwards extrapolation in time to April 20th and then adding up the area for the [integral]; correct? A: That is correct.").

1208.   Because the actual resistances to flow through the Capping Stack are unknown, Dr. Dykhuizen resorts to using "K factors" (a mathematical approximation of resistance to flow) to perform his Capping Stack calculations.  Tr. at 1370–71 (Dykhuizen).

1209.   Dr. Dykhuizen asserted that he obtained his K factors from "standard reference textbooks."  Tr. at 1370–71 (Dykhuizen).  But none of the three National Labs—despite modeling exactly the same physical geometry for the Capping Stack system—could agree on

what K factors to use for the Capping Stack in July 2010, indicating that there is no scientifically accepted "standard" way of determining K factors in the Capping Stack.  Tr. at 1456, 1458 (Dykhuizen); Havstad Dep. at 414–15 (Los Alamos and Sandia used different K values than did Livermore).

1210.  Because Dr. Dykhuizen's method requires him to rely on K factors, his calculations "implicitly assume that you have homogeneous flow," *i.e.*, "that the liquid and the gas are flowing at the same velocities through the Capping Stack." Tr. at 1458–59 (Dykhuizen).

1211.  Dr. Dykhuizen conceded that his homogenous flow assumption was not realistic, because it "did not model or try to determine the type of flow regime or the way the multiphase flow would actually progress through the Capping Stack." *See* Tr. at 1458–59 (Dykhuizen).

1212.  In order to perform a hydraulic calculation of flow rate, Dr. Dykhuizen needed to employ an equation of state.  Tr. at 1448 (Dykhuizen).  An equation of state defines the complex and important interrelationships of density, viscosity, and temperature of hydrocarbons as they undergo changes in pressure.  Tr. at 1448 (Dykhuizen); *see also* Tr. at 1337–38 (Hunter).

1213.  Despite the importance of the equation of state, and despite the fact that they were considering exactly the same fluid flowing through the Capping Stack, the three National Labs did not use the same equation of state to characterize that fluid.  Tr. at 1458 (Dykhuizen).

1214.  Furthermore, when Dr. Dykhuizen and other National Labs scientists employed the same assumptions and hydraulic methods Dr. Dykhuizen employs in his expert report in order to calculate flow rates through the Capping Stack choke line, they all obtained "anomalous" results indicating that as the choke line was closed, the flow rate went *up* instead of down.  Tr. at 1372–73 (Dykhuizen).  Dr. Dykhuizen agreed on cross-examination that this

bizarre result—which requires the rate of flow to go up despite the area open to flow growing smaller as the choke was closed—was "non-physical." Tr. at 1459 (Dykhuizen).

1215.   When his anomalous choke line results are discarded, Dr. Dykhuizen's 53,000 barrels per day Capping Stack estimate is higher than any other Capping Stack flow rate calculated by any other Government scientist.  Tr. at 1465–66 (Dykhuizen); *see also* D24407:



1216.   In fact, while drafting the DOE-NNSA Report, Federal Science Team leadership referred to 53,000 barrels per day as an "upper bound estimate" for the Capping Stack flow rate. *See* TREX 009379.0001.

### (2)   Dr. Dykhuizen's Cumulative Estimate Rests on the Unsupported and Unrealistic Assumption that Everything in the Macondo Well Remained Constant from April 22 to July 15, 2010.

1217.   The 4.9 MMstb estimate first published by the U.S. Government on August 2, 2010 was calculated by taking the 53,000 barrels per day flow rate calculated for July 15, 2010,

drawing a flow trend line straight back to the beginning of the incident, and adjusting daily flow rates to account for just three factors: (1) a gradually decreasing reservoir pressure, (2) removing the riser from the top of the BOP, and (3) installing the Capping Stack. *See* Tr. at 1344–45 (Hunter).  This methodology did not, and could not, account for any changes (such as erosion) that may have affected the flow rate between April 22 and July 15, 2010.  *See* Tr. at 1352 (Hunter).

1218.   In arriving at his 5 MMstb cumulative estimate, Dr. Dykhuizen employs the exact same methodology that the U.S. Government employed in developing the August 2, 2010 estimate.  *See* Tr. at 1408 (Dykhuizen).  And Dr. Dykhuizen admitted that his estimate, like the Government's August 2 estimate, fails to account for any changes beyond reservoir depletion, riser removal, and Capping Stack installation.  *See* Tr. at 1471 (Dykhuizen).  The only way his estimate accounts for, *e.g.*, any potential erosion, is by setting the flow rate to zero on April 20 and 21 as a "proxy" for the effects of erosion.  Tr. at 1471 (Dykhuizen).

1219.   Without the presence of the Capping Stack, as Dr. Dykhuizen wrote in his June 2010 "Flow Uncertainty Position" paper, in order to accurately calculate changes in flow rates from day to day, one must understand how the restrictions to flow might be changing from day to day, and the necessary information about those restrictions was not available until the well was capped.  *See* Tr. at 1446 (Dykhuizen); TREX 009389.

1220.   Specifically, in the "Flow Uncertainty Position" paper, Dr. Dykhuizen identified several factors that would need to be known on any given day in order to calculate flow, including: pressure and temperature distributions throughout the system, known resistances above and below the PT-B gauge, the geometry of the flow path (including the position of the

drill pipe), the effect of a potential split in flow in the BOP, and the rate and effect of reservoir depletion.  TREX 009389.1.1; TREX 009389.2.1; Tr. at 1443–46 (Dykhuizen).

1221.  At trial, Dr. Dykhuizen admitted that data regarding ***all*** of the numerous well conditions that he identified in June 2010 was indeed necessary for an accurate calculation of daily flow rates.  Tr. at 1448–49 (Dykhuizen) (admitting that he needed to understand "fluid properties," "temperature distributions," "pressure distributions," "geometry, including any changes in that geometry," "flow path," "the effect of multiphase flow in [that] geometry," "reservoir depletion," and "erosion"); *see also* Tr. at 1446 (Dykhuizen) (agreeing that he needed to know "that whatever the resistances were on one day, have they changed or are they the same on the next?").

1222.  But Dr. Dykhuizen in fact has ***no such data*** that would allow him to determine with any certainty the condition of the Macondo well on any day prior to the installation of the Capping Stack.  *See* Tr. at 1468 (Dykhuizen) ("Q: There's nothing about the work on your capping stack flow rate that would give you a conclusion that the well was in the exact same condition for the preceding 85 days? A: No. ***There was no data from the capping stack that would – that would allow me to find flow from the previous days.***  I was just using pressures reported from the capping stack on the last day.") (emphasis added).

1223.  Because Dr. Dykhuizen lacks the data necessary to calculate daily flow rates prior to the installation of the Capping Stack, he simply makes an assumption of constancy and extrapolates his July 15 estimate back in time to the beginning of the incident.  *See* Tr. at 1434 (Dykhuizen).

1224.  In 2010, Dr. Dykhuizen described this method of calculating cumulative flow as using a "fictional initial state" because it "assumed that the well geometry does not change

261

during the 85 days of flowing this well." TREX 009924.0003. But, as Dr. Dykhuizen was aware, "[i]n fact, many geometry changes occurred. These included, but are not limited to, the riser and kink being cut off, junk shots, and erosion." TREX 009924.0003. Dr. Dykhuizen's final model does not account for potential changes in flow restrictions on this "fictional initial state," other than through adjustments for the limited effects of the riser removal and Capping Stack installation. *See* Tr. at 1470–71 (Dykhuizen).

1225. As Dr. Dykhuizen admitted at trial, his methodology does not exclude the possibility that flow rates could (contrary to his opinion that flow rates started high and ended low) "start low, it could have a peak in the middle, and then end higher." Tr. at 1440 (Dykhuizen). Due to "a lack of data," Dr. Dykhuizen's flow rates in fact "could start at 10,000 or 20,000" and "work [their] way up" to a final flow rate as low as 43,000 barrels per day. Tr. at 1441 (Dykhuizen).

1226. As BP/Anadarko experts Johnson, Nesic, Momber, and Zaldivar demonstrate, Dr. Dykhuizen's assumption of constancy in the flow path is not consistent with facts now known about changes in the Macondo well over time, including erosion of down-hole cement, erosion of the BOP, erosion of the kinked riser, movement of the drill pipe, and slug flow from the fallen riser. *See* TREX 011488; TREX 011529R; TREX 011644; TREX 011683; *see also* Sections III.B.4–5, *infra*.

### (3) Dr. Dykhuizen Admitted That All of His Estimates Were Inaccurate and That Uncertainty on His Cumulative Estimate Could Not Be Bounded When Only His Own Analysis Is Considered.

1227. When the DOE Tri-Labs Team presented its flow rate analysis to senior Government leadership (including Secretary Chu) on July 30, 2010, they reported that there was "insufficient information to perform an uncertainty analysis on flow rate and total flow," and Dr.

262

Ratzel described the uncertainty of the estimates presented as "not bounded."   *See* TREX 008635.0096; *see also* Tr. at 1460 (Dykhuizen); Ratzel Dep. at 101.

1228.   When the Government's initial 4.9 million barrel cumulative estimate was released to the public on August 2, 2010, Dr. Dykhuizen was not willing to stand behind any error bar at all, because he believed that the uncertainties in the calculation could not be quantified and an error bar could not be bounded.   Tr. at 1434–35 (Dykhuizen); *see also* TREX 009392.0001.

1229.   Although the Government's August 2, 2010 estimate claimed a plus or minus 10 percent uncertainty range as to both the July 15, 2010 point estimate of 53,000 barrels per day and the cumulative release estimate of 4.9 million barrels (TREX 008809), Dr. Dykhuizen acknowledged in his expert report that he "personally thought that the uncertainty bound should be +/- 20%" for the July 15, 2010 estimate of 53,000 stb/day.   TREX 011452.0006-07.   He further noted that he came to view uncertainty as possibly "smaller" than plus or minus 20 percent only with the benefit of the other Government expert reports that "obtained similar flows."   TREX 011452.0007.   And at trial, Dr. Dykhuizen admitted that he assigned a ***plus or minus 20 percent*** error bar to the July 15, 2010 point estimate—***more than double*** the uncertainty assigned to that estimate (as well as to the cumulative estimate) by the Government in its August 2, 2010 press release.   Tr. at 1433–34 (Dykhuizen).

1230.   When Dr. Dykhuizen first calculated the cumulative flow from the Macondo reservoir in 2010, he did not believe that ***any uncertainty figure at all*** could be generated for it.   Tr. at 1434–35 (Dykhuizen) ("Q: When that estimate was first released, that 5 million estimate …. in August of 2010, you did not believe that any error bar could be applied to that number; correct?  A: That is correct, that's what I stated.   Obviously, the error bar is not more than 100

percent.  Q: And when that number – that 4.9 million cumulative number was released in the DOE report, you weren't willing to stand behind an error bar on that 4.9 million cumulative number then either; correct?  A: That is correct.").  Dr. Dykhuizen further testified that only with the benefit of the other Government litigation estimates that reach similar cumulative flow results could he assign even a plus 20 percent to *minus 30 percent* error bar to his cumulative release estimate—*triple the Government's uncertainty figure for that same estimate*.  Tr. at 1436–37 (Dykhuizen); *see also* Tr. at 1436 (Dykhuizen) (admitted that solely on the strength of his own analysis, the lower range of his error bar would be greater than 30 percent).

1231.  The "primary reason" that Dr. Dykhuizen assigns a larger error bar to his cumulative release estimate than he assigns to his point estimate of the flow rate on July 15 is the additional uncertainty involved in "the impact of erosional processes and knowing when erosion stopped."  Tr. at 1435 (Dykhuizen).

1232.  The further from the "known geometry and pressures" of the Capping Stack Dr. Dykhuizen's model goes, the less confident in the accuracy of his daily flow rates Dr. Dykhuizen becomes.  Tr. at 1471–72 (Dykhuizen).  This progressively increasing uncertainty as he projects flow rates back in time is "mainly due to erosion."  Tr. at 1434, 1471–72 (Dykhuizen).  Dr. Hunter agreed that the uncertainty in the Government's initial flow calculation increases the further back in time one goes from the July 15 Capping Stack data.  Tr. at 1349 (Hunter).

1233.  Although he is aware that erosion may have been taking place during the entire time period the flow was occurring, Dr. Dykhuizen chooses not to account for erosion in his model beyond the second day of flow.  Tr. at 1473–74 (Dykhuizen).  Dr. Dykhuizen artificially sets the flow rate on the first two days of the incident to zero, and described this as similar to a "hand wave" to erosion.  Tr. at 1474 (Dykhuizen).  Any uncertainty regarding the duration and

effect of erosion in the flowing system would increase the uncertainty on the low end of Dr. Dykhuizen's cumulative flow estimate, but not the high end.  Tr. at 1435–36 (Dykhuizen).

1234.   Dr. Dykhuizen specifically relies upon the work of Dr. Griffiths to conclude that "significant erosion in flow paths that mattered" had ended prior to May 14, 2010.  Tr. at 1473–76 (Dykhuizen).

1235.  But Dr. Griffiths's conclusions with respect to erosion are incorrect and unreliable, and cannot contribute additional certainty to any estimate of cumulative flow.  Tr. at 3087 (Johnson); *see also* Section III.B.3(f)(7).   There is not "any scientific proof" that Dr. Griffiths's conclusions about cement erosion were reasonable or reliable.  Tr. at 2985 (Member); *see* Section III.B.4(a)(2)c.  And as Dr. Nesic testified, Dr. Griffiths's opinion that metal erosion the BOP and riser occurred on the very short time scale is not reliable—in fact, Dr. Nesic called the erosion rates proposed by Dr. Griffiths "impossible."  Tr. at 2898–2900 (Nesic); *see* Section III.B.4(a)(1)d.

1236.   The error bar on Dr. Dykhuizen's cumulative release estimate should be "far greater than minus 30 percent" because Dr. Dykhuizen's method of calculating cumulative flow simply projects daily flow rates back in time, starting on July 15, but does not account for "all the changes through the system" that occurred during the 86 days of flow.  Tr. at 3086–87 (Johnson).

1237.   Because Dr. Griffiths's analysis—which Dr. Dykhuizen relies upon to reduce his uncertainty regarding changes in the flowing system—does not account for those changes either, Dr. Dykhuizen's 5 million barrel estimate is in fact the "top end" of possible cumulative flow estimates, and even a minus 30 percent error bar does not account for all of Dr. Dykhuizen's true uncertainty.  Tr. at 3086–87 (Johnson); *see also* Section III.B.4, *infra*.

1238. While Dr. Dykhuizen does attempt discrete estimates of daily flow rates for two earlier time periods—the May 28 Top Kill attempt and the period when the Top Hat #4 collection device was installed—these two estimates are both, as Dr. Dykhuizen testified, "especially inaccurate" and there is "no doubt" that the methods he employed to arrive at those estimates were less accurate than the method he used to determine the flow rate on July 15, 2010. Tr. at 1484–85 (Dykhuizen). As between his Top Kill and Top Hat flow rate estimates, Dr. Dykhuizen conceded that it was "difficult to say" which was less accurate. Tr. at 1484–85 (Dykhuizen). As explained below, these additional calculations do not bolster Dr. Dykhuizen's cumulative flow estimate, because they are not reliable. *See* Sections III.B.3(e)(4)–(5), *infra*.

### (4) Dr. Dykhuizen's Top Hat Calculations Do Not Increase the Reliability of His Cumulative Flow Estimate.

1239. The Federal Science Team (including Dr. Dykhuizen) first attempted to use Top Hat data to calculate a flow rate in June 2010, when the Top Hat was first installed. *See* TREX 009706. While those calculations allowed the team to conclude that the flow rate was "in excess of 10–20,000 barrels per day … we could not quantify whether it was – what the actual number might be." Ratzel Dep. at 336–37 (U.S. 30(b)(6) designee re Top Hat calculations); *see also* TREX 009393 ("Top Hat analyses inconclusive – and much too high (our view)").

1240. When the Federal Science Team made a presentation to Dr. Hunter on July 26, 2010 of prior attempts to calculate flow rates, they noted "great uncertainty" in the flow path of hydrocarbons through the Top Hat structure, as well as "uncertainty in pressure measurement." TREX 009706.0005. Due to these uncertainties, the team informed Dr. Hunter that the Top Hat method did not provide "believable" flow rate estimates. TREX 009706.0005. When the Federal Science Team presented these calculations to Government leadership, they intended to

communicate that the Top Hat data "could not provide an accurate estimate of flow."  Ratzel Dep. at 336–37 (U.S. 30(b)(6) designee re Top Hat calculations).

1241.  Notwithstanding the fact that the Government scientists who performed the Top Hat flow rate calculations at the time deemed them unreliable, in seeking to bolster his expert work in this litigation, Dr. Dykhuizen returns to those calculations in his expert work in this litigation as corroboration for his cumulative flow rate estimate.  *See, e.g.,* Tr. at 1453–54 (Dykhuizen).

1242.  An estimate of flow rate using Top Hat data requires an estimate of excess flow out of the unknown bottom area of the Top Hat, known as the "skirt."  *See* Tr. at 1405–06 (Dykhuizen).  Dr. Dykhuizen identifies two methods of calculating skirt flow: one involving using the unknown geometry of the skirt area, and another based purely on visual observation. *See* Tr. at 1405–06 (Dykhuizen); TREX 011452.0100.  Dr. Dykhuizen acknowledged that those "are both inaccurate methods," but that he nonetheless uses them for his Top Hat estimate.  Tr. at 1485–86 (Dykhuizen).

1243.  By all accounts it was, at best, "difficult" to use visual observation to estimate to quantify the flow coming out of the Top Hat skirt.  *E.g.*, Tr. at 1324 (Hunter).  The skirt flow was both the ***largest*** portion of the total Top Hat flow, and the ***most uncertain*** part of that total.  Tr. at 1324 (Hunter) (regarding the Top Hat skirt calculations, "Q: So the least quantifiable part also was the largest component of the flow rate estimate?  A: I think that's right.").

1244.  Dr. Dykhuizen stated that an observer "can't tell the difference" between flow out the Top Hat skirt when shipboard oil collection rates changed by 10–15,000 barrels per day, but that statement is contradicted by the contemporaneous observations of other members of the Government Tri-Labs Team.  *See* Tr. at 1405 (Dykhuizen); TREX 140249.0001.  On June 18,

267

2010, Dr. Donald O'Sullivan of Los Alamos National Laboratory observed that "yesterday the peak collection rate was ~27,000" barrels per day, and at that point the flow out the Top Hat skirt was "noticeably less than what has been seen previously."  TREX 140249.0001.  Dr. O'Sullivan wrote that "[t]he best we can hope to deduce from this is that at current max collection we are approaching the flow rate."  TREX 140249.0001.  This contradictory observation illustrates the great uncertainty and subjectivity inherent in Dr. Dykhuizen's attempt to visually determine the flow rate from the Top Hat.  *Compare* Tr. at 1405–06 (Dykhuizen) (testifying "we said, gee, we can't tell the difference between when the collection is going and when the collection stops.  It seems to be about the same.") *with* TREX 140249.0001 (Dr. O'Sullivan noting that at a collection rate of 27,000 barrels per day, flow from the Top Hat skirt was "noticeably" decreased).

1245.   After analyzing the Top Hat data, Dr. Johnson agreed with Dr. Dykhuizen that the flow rate calculation based on Top Hat data is "hugely uncertain."  Tr. at 3088 (Johnson).  Dr. Johnson testified that it is not possible to describe the geometry of the Top Hat skirt with any certainty.  Tr. at 3088 (Johnson).  If the pressure measured inside the Top Hat was in error by just 0.5 psi, Dr. Johnson calculates that Dr. Dykhuizen's calculated Top Hat flow rate would be cut in half.  Tr. at 3088 (Johnson).  Echoing the Federal Science Team's conclusions during the summer of 2010, Dr. Johnson opined that Dr. Dykhuizen's Top Hat flow rate calculation was "totally unreliable" and that "there are far too many uncertainties around [the Top Hat] estimate to be able to give an estimate to any reasonable engineering certainty."  Tr. at 3087–88 (Johnson).

1246.   Because he recognizes that "the estimates from the Top Hat calculation had quite a large error bar to it," Dr. Dykhuizen presents a "lower bound" Top Hat calculation that ignored the problem of the skirt flow.  Tr. at 1454 (Dykhuizen).

1247.   The Top Hat "lower bound" calculation that Dr. Dykhuizen presents relies on the unfounded assumption that flow rate was decreasing over time.  Tr. at 3089–90 (Johnson); Tr. at 1492–93 (Dykhuizen).  Dr. Johnson testified that Dr. Dykhuizen's 43,000 barrel per day "lower bound" is only accurate "for a point in time at the end of the Top Hat period," because it uses a shipboard collection rate that was only achieved toward the end of the Top Hat period.  Tr. at 3089–90 (Johnson); *see also* Tr. at 1492–93 (Dykhuizen) ("Q: And if, in fact, flow rate is increasing over time rather than decreasing over that time, your lower bound can't be pushed backwards, that is, towards zero; correct? A: If I take your assumption that the flow is increasing with time, I cannot extrapolate that backwards.").  If in fact the flow rate was increasing over time rather than decreasing, a proper lower bound derived from Top Hat data would increase along with the actual Top Hat shipboard collection rates, as shown in Dr. Johnson's Figure 15:



**Figure 15. Revised *Lower Bound* Flow Rate Profile**

Tr. at 3089–90, 3098–99 (Johnson); TREX 011488.0043.

        **(5)     Dr. Dykhuizen's Top Kill Estimate is Also "Not Very Accurate," and It Does Not Add to the Reliability of His Cumulative Flow Estimate.**

1248.  Dr. Dykhuizen's final point estimate is based on Top Kill data and, much like his Top Hat estimate, he agreed that his Top Kill estimate is "not very accurate." Tr. at 1482 (Dykhuizen). Dr. Johnson, in his expert report, enumerates several reasons why Dr. Dykhuizen's Top Kill calculation is "not at all" reliable: the resistances to flow in the BOP during Top Kill are not known, the path of the mud down the BOP and well is not known, and the data set chosen by Dr. Dykhuizen produces flow rates 31% higher than other sets of Top Kill data when the same assumptions and methodology are used. *See* Tr. at 3090–91 (Johnson); TREX 011488.0043–47.

1249.  The resistances to flow within the BOP during Top Kill remain unknown, and make the calculation of flow rates during Top Kill highly uncertain. Tr. at 3091 (Johnson);

270

TREX 011488.0044–46.   Additionally, the physical evidence recovered from the BOP demonstrates that resistances to flow in the BOP would likely have been changing *during* the Top Kill attempts themselves.   Tr. at 3091 (Johnson); TREX 011488.0044–46.   Dr. Johnson examined 40 buckets worth of solid junk shot material recovered from the BOP, which suggested to him that resistances were not constant in the BOP at the time of Top Kill.   Tr. at 3091 (Johnson).

1250.   A calculation of flow rates based on Top Kill data requires an assumption that the mud pumped during Top Kill went directly out the top of the BOP, instead of partially down the well.   TREX 011488.0046.   Dr. Dykhuizen admitted that if this assumption is invalid, his Top Kill calculation is incorrect.   Tr. at 1483 (Dykhuizen).   During his work on the spill response in 2010, Dr. Dykhuizen performed an analysis of Top Kill data in which he concluded that "[c]ounter current flow of mud down" the well with oil flowing up at the same time was possible "as long as the mud flow is slow enough to generate" sufficiently low flowing friction.   TREX 011296.0014.   Given this possibility, as Dr. Johnson writes in his expert report, "it cannot be known where the mud traveled during the Top Kill event."   TREX 011488.0046.

1251.   Dr. Johnson demonstrates the unreliability of Dr. Dykhuizen's "lower bound" Top Kill flow rate calculation by repeating that calculation with a different set of Top Kill data. TREX 011488.0046.   When Dr. Johnson repeats Dr. Dykhuizen's Top Kill flow rate calculation using a set of data from the May 26 Top Kill attempt (rather than the May 28 Top Kill attempt data used by Dr. Dykhuizen), Dr. Johnson obtains a lower bound flow rate of 32,700 barrels per day.   TREX 011488.0046.   Due to the inherent problems with using Top Kill data to calculate flow rates at all, Dr. Johnson does not believe that this *lower* lower bound is any more accurate

than Dr. Dykhuizen's lower bound, but the divergent results plainly demonstrate the fundamental unreliability of Dr. Dykhuizen's Top Kill method.  *See* Tr. at 3091–92 (Johnson).

1252.   Given the high degree of inaccuracy and uncertainty in Dr. Dykhuizen's Top Hat and Top Kill calculations, they do not provide reliable support for the overall flow rate trend Dr. Dykhuizen posits.  *See* Tr. at 3092–93 (Johnson).   Dr. Johnson has demonstrated that both calculations are "far, far too inaccurate" to reliably support that trend line.   Tr. at 3092–93 (Johnson).   Dr. Dykhuizen himself admitted that when their +/-20,000 barrel uncertainty ranges are applied, his Top Kill and Top Hat calculations could lie along any number of flow rate trend lines—including a trend where flow increases over time, yielding a total cumulative flow of approximately 3.5 MMstb.  *See* Tr. at 1486–87 (Dykhuizen); Tr. at 1491–94 (Dykhuizen); D24496.  Dr. Dykhuizen also agreed that this trend line would be consistent not just with his own work, but with Dr. Zaldivar's 30,000 stb/day slug flow estimate.  *See* Tr. at 1493–94 (Dykhuizen); D24496.



(f)     **Dr. Griffiths's Method is Scientifically Unsound Because It Is Based on Limited Data and Unsupported Assumptions About the Macondo Well System.**

(1)     **Dr. Griffiths Had No Prior Experience Calculating the Flow Rate of Oil Through a Well, and Failed to Use Industry-Standard Methods in His Work.**

1253.   Dr. Griffiths presents an estimate for the cumulative release based on an approach that is not generally accepted in the traditional fluid dynamics community.  Tr. at 1678–79 (Griffiths).  When Dr. Dykhuizen assessed Dr. Griffiths's method during the *Deepwater Horizon* response—prior to his engagement as an expert witness for the United States—he concluded that Dr. Griffiths's method was just a "curve fitting exercise" that did not provide "an independent calculation of the flow rate at any time in the accident response due to errors in the model." TREX 011435.0001; TREX 011436.0002.

1254.   Dr. Griffiths is not an expert in oil and gas and, prior to his work on the *Deepwater Horizon* response, he had never calculated the flow rate of oil through a well.  Tr. at 1676–77, 1679 (Griffiths).

1255.   Dr. Griffiths does not use an industry-standard model to calculate his daily flow rates or his total cumulative release.  Tr. at 1677 (Griffiths); Tr. at 3043 (Johnson).  Rather, Dr. Griffiths developed a specialized method that has never before been used to analyze flow through an oil well.  Tr. at 1679–80 (Griffiths).

1256.   Industry-standard thermal hydraulic models perform complex calculations in order to correctly model the physics of a multiphase hydrocarbon flow, *see* Tr. at 3041–42, 3044 (Johnson); D23398, and utilize specific, detailed inputs regarding the flow path geometry (*e.g.*, lengths, internal diameters, wall thickness), flow path characteristics (*e.g.*, hydraulic diameters, roughness), fluid (*e.g.*, composition, equation of state), temperature, pressure, and productivity index, Tr. at 3044–47, 3050 (Johnson); D23398.  These inputs about a flowing system, and how they may change over time, must be included in a model of a multiphase flow in order to accurately calculate a total cumulative release over a period of time using hydraulic methods.  Tr. at 3044–47, 3050 (Johnson); D23398.

1257.   Dr. Griffiths's method of calculating flow rates do not use the inputs used in industry-standard models.  Tr. at 1680–81 (Griffiths); Tr. at 3060–61 (Johnson); D23400.

> **(2)     Dr. Griffiths's Use of "Constant Discharge Coefficients" to Evaluate the Entire 86-Day Period Preordained a Flow Rate That Decreased over Time.**

1258.   Dr. Griffiths's cumulative estimate is based on just two flow inputs: a value of zero obtained from data on July 14, and a value of a partial collection of oil obtained on July 15.  Tr. at 1682–83 (Griffiths).  From this limited data, Dr. Griffiths derives his "constant discharge

coefficients."   Tr. at 1682–83 (Griffiths); D24373; *see also* D23401; D24372-1; D24372-2; D24372-3; D24372-4; D24372-5.

1259.   Some of the data that Dr. Griffiths uses to prepare his discharge coefficients was from the Capping Stack choke line.  Tr. at 1609 (Griffiths).

1260.   Yet Dr. Dykhuizen testified that flow rate calculations based upon the choke line produced "anomalous" results.  Tr. at 1372–73 (Dykhuizen).  And Statoil, a company the DOE-NNSA team retained to evaluate flow through the Capping Stack choke line, concluded that the choke line's complex geometry (and associated pressure losses) rendered that line inappropriate to rely on for purposes of flow rate calculations.  TREX 009361.0034–35; Schulkes Dep. at 112–17 (no model currently exists in the oil and gas industry capable of modeling the flow rate through the choke line due to the complex geometry); Ratzel Dep. at 114–15 (agreeing that Statoil concluded that the configuration of the choke line caused modeling problems).  *See also* TREX 010076.0007 (measured pressures within the accuracy bands of the pressure gauge may cause the observed "spurious" flow rate results); TREX 010076.0003 ("even if it is possible to improve on the flow prediction model, at low pressure differentials the pressure measurement accuracy will still render it unreliable").

1261.  In addition to the errors introduced by his use of the choke line data, Dr. Griffiths's use of constant discharge coefficients in his Best Estimate and two alternative methods ignores the uncertainties that took place over the 86-day flowing period.  Tr. at 3059 (Johnson).

1262.  In particular, by holding the productivity index and wellbore discharge coefficient constant, Dr. Griffiths assumes that nothing in the reservoir or in the well changed over the 86-

day period that would have an effect on the flow rate.  Tr. at 1689–90 (Griffiths); Tr. at 3063 (Johnson).

1263.  Dr. Griffiths's solution to resolving ambiguity about changes at the bottom of the well and the flow path is to apply constant resistance values from April 21 to July 15.  Tr. at 1692–93 (Griffiths).  Dr. Griffiths does not have any direct measurements of any of his six discharge coefficients that he used in this method; he estimates all of them using data from July 14 and July 15, 2010.  Tr. at 1683 (Griffiths).

1264.  Dr. Griffiths's constant discharge coefficients are therefore, by definition, a product of the flow path, the geometry, and the flow conditions that existed *as of July 14 and July 15, 2010*.  Tr. at 1684 (Griffiths); Tr. at 3062–63 (Johnson).  As such, Dr. Griffiths's discharge coefficients do not provide independent information about the state of the well on any day prior to July 14, 2010.  Tr. at 3062–63 (Johnson).  *Cf.* Tr. at 1468 (Dykhuizen) (conceding that no data from the Capping Stack would allow him to find flow rates from the previous days).

1265.  Dr. Griffiths estimates a single value for each of these six discharge coefficients from this limited data from the Capping Stack; he then locks in those values and applies them as constants to calculate a cumulative release for the period from April 20 through July 15.  Tr. at 1685 (Griffiths); Tr. at 3062–63 (Johnson).

1266.  By holding these resistances constant, and calculating daily flow rates based upon the difference in pressure between two points, Dr. Griffiths's method is "preordained" to predict a flow rate that decreased over time.  Tr. at 3080 (Johnson); TREX 011488.0022 ("Given the over-simplicity of Dr. Griffiths's model it is preordained to predict a decreasing flow rate over time, once one assumed a constant PI.  This is because Dr. Griffiths's flow rate is solely dependent on the difference in pressure between the reservoir and PT-B—a difference that is

decreasing with time.").   *Cf.* Tr. at 1473 (Dykhuizen) (conceding that a method that holds resistances constant, and includes reservoir depletion as part of the pressure differential, is preordained to predict a flow rate that goes from high to low).

>   **(3)   There Was Too Much Uncertainty about Changes in the Macondo Well System over Time to Use a Hydraulic Method.**

1267.  Dr. Johnson testified regarding the importance of using a rigorous thermal hydraulic model to calculate the flow rate and cumulative release for Macondo.  Tr. at 3047–49 (Johnson); D23396A.  The complex interactions between changes in pressure and temperature as the multiphase fluid flows up the well, in a system with changing flow path characteristics, can only be accurately modeled using an industry-standard tool.  Tr. at 3049–50 (Johnson); D23398.

1268.  But even an industry-standard tool is not capable of calculating the total cumulative release from the *Deepwater Horizon* blowout.  Tr. at 3051 (Johnson) (Johnson not offering an opinion about the actual total cumulative number of barrels released from Macondo because that answer cannot be reached using hydraulic methods).  Dr. Johnson concludes that there was too much uncertainty regarding the information available over the 86-day flowing period to use hydraulic methods to calculate a reliable cumulative release to any reasonable degree of certainty, whether using Dr. Griffiths's non-traditional method or industry-standard hydraulic models.  Tr. at 3038–39, 3050–51 (Johnson).

1269.  In particular, Dr. Johnson concludes there is too much uncertainty about how the productivity index changed over time; how the pressure at PT-B changed between April 20 to May 8; the meaning of changes in PT-B pressure from May 8 to July 15; when the drill pipe below the BOP detached, when it dropped down into the wellbore, and whether it could have moved up and down in the well during the flowing period; and how the Junk Shot material and

other components of the BOP (such as the variable bore rams) affected the flow path through the BOP, and in particular, drill pipe segment 148. Tr. at 3051–58 (Johnson); D24656.

1270. Dr. Johnson's assessment of the time-dependent uncertainty of the Macondo system is consistent with the view Dr. Ratzel voiced during the *Deepwater Horizon* response. *See e.g.,* Ratzel Dep. at 207–211; TREX 009361.0049 ("While there had been attempts throughout the post-accident times to quantify the instantaneous flow rate, the DOE-NNSA Flow Team and other researchers directed by the DOI were generally stymied in these attempts prior to well shut-in, largely because of uncertainties in the well geometry, BOP, and reservoir depletion.").

1271. Dr. Dykhuizen also expressed this same view regarding the uncertainty of information needed for a hydraulic analysis of the cumulative flow. *See* TREX 009389.0001 (Dykhuizen) ("The resistance at the top of the annulus flow past the hanger is unknown … The geometry of the flow is also unknown ….. Current observations have revealed that the drill pipe that was known to exist in the well has slipped from its last known position. We are told that it is at least 900 feet lower. This is not a definitive statement. It could extend down even farther."); TREX 009389.0002 (Dykhuizen) ("Any model has to not only assume various flow paths and resistances; it has to account for potential erosion during the long flowing time. It is assumed that the kill operation where mud was forced through the various paths could have eroded the BOP …. The model of the system will have a lot of parameters. Some of these are to approximate a complex process (the calculation of a two phase flow rate through an orifice, the difference between the gas and liquid velocities in a rising two phase flow, etc.). Some of these are to approximate the unknown geometry (the ratio of the deep and shallow flow resistances, the amount of flow flowing through the annulus of the BOP, etc).").

      **(4)**      **Correcting for Dr. Griffiths's Unsupported Assumption of a Constant Productivity Index Reduces His Best Estimate by 1.3 Million Barrels.**

1272.  Dr. Griffiths's Best Estimate cumulative release uses a constant productivity index for the entire flowing period.  Tr. at 1687 (Griffiths); D24374; Tr. at 3063 (Johnson).

1273.  Based on over 20 years of experience in the oil and gas industry, Dr. Johnson testified that it would be very unusual for a flowing well to have a constant productivity index. D24618; Tr. at 3032, 3064 (Johnson).

1274.  Dr. Griffiths acknowledged that the productivity index changed from the moment of the blowout to the time of shut-in.  Tr. at 1692 (Griffiths) (agreeing that the PI at the bottom of the well must change because it at the moment of the blowout it was in a range from 7.4 to 9.4 stb/psi/day); Tr. at 3064 (Johnson).

1275.  Moreover, Dr. Griffiths's opinion as to how the productivity index changed over time itself changed on multiple occasions during the course of the litigation.  Tr. at 1692–96 (Griffiths) (from 9 hours in his expert report, to 18 hours and 36 hours enunciated for the first time at his deposition).

1276.  In reaching his conclusion of a rapid change in the productivity index, Dr. Griffiths incorrectly assumed an erosion rate of the exposed reservoir at the bottom of the well based upon a misunderstanding of Mr. Emilsen's analysis contained in Appendix W of the Bly report.  Tr. at 1716 (Griffiths); Tr. at 3065–66 (Johnson); TREX 011488.0010–11 (Johnson Expert Report).

1277.  Dr. Griffiths admitted that there is nothing in Mr. Emilsen's work that suggests that a change of the exposed reservoir, from a height of 13 feet to a height of 16.5 feet, took place gradually over the course of 30 minutes.  Tr. at 1716 (Griffiths).  To the contrary, the

change in net pay was instantaneous and took place precisely at 21:30 on April 20, 2010.  Tr. at 1716–17 (Griffiths); Tr. at 3065–66 (Johnson); TREX 011488.0011.

1278.  Moreover, Dr. Momber demonstrates that—even under Dr. Griffiths's misinterpretation of Mr. Emilsen's work—it is scientifically implausible that downhole erosion could occur at the rate required by Dr. Griffiths's analysis, because such an erosion rate is orders of magnitude faster than any known erosion rates for comparable materials.  Tr. at 2985–90 (Momber); TREX 011644.0015–16.  *See* Section III.B.4(a)(2), *infra*.

1279.  Dr. Griffiths admitted that continued erosion of the cement at the bottom of the well could cause the productivity index to change over time, and that his Best Estimate calculation would not capture that change.  Tr. 1690–91 (Griffiths).

1280.  Dr. Johnson concludes that there are an infinite number of paths that the productivity index could have taken from a value of about 10 on April 20 to Dr. Griffiths's final calculated value of about 44 on July 15.  Tr. at 3065–67 (Johnson).  Because of this, Dr. Johnson concludes that "there's a huge range of input uncertainty, which gives a huge range of output uncertainty." Tr. at 3069 (Johnson).

1281.  Dr. Johnson presents one such path, referred to in his expert report (TREX 011488) as "Path B," which used values for the productivity index that matched both Mr. Emilsen's analysis at the start of the blowout and Dr. Zaldivar's slug flow analysis in mid-May.  Tr. at 3067–68 (Johnson); TREX 011488.12.1.  Using all of Dr. Griffiths's other assumptions and merely replacing Dr. Griffiths's constant productivity index with Path B reduces Dr. Griffiths's Best Estimate calculation by 1.3 million barrels, to a cumulative release of 3.7 million barrels.  Tr. at 3068–69 (Johnson); TREX 011488.14.2.

> **(5)**   **Correcting for Dr. Griffiths's Unsupported Assumption of a Constant Wellbore Discharge Coefficient Changes His Flow Rate Trend from Decreasing to Increasing over Time.**

1282.   Dr. Griffiths uses a constant discharge coefficient for the wellbore (referred to as "Kwell") in his Best Estimate calculation.   Tr. at 1674, 1688–89 (Griffiths); Tr. at 3063 (Johnson).  Dr. Johnson tested the validity of Dr. Griffiths's use of a constant wellbore discharge coefficient by building a model of the Macondo well system in FEESA's proprietary software package, called Maximus.  Tr. at 3079 (Johnson); D24659.

1283.  Dr. Johnson incorporates details about the geometry of the system, the composition of the fluid, the flow path characteristics, and the thermal behavior of the fluid in order to accurately model the physics and multiphase behavior of the fluid as it flowed from the reservoir through the well, including through the dual flow paths of the casing and drill pipe.  Tr. at 3079–80 (Johnson).

1284.  For the fluid composition, Dr. Johnson relies on a sample analyzed by Schlumberger—a sample that Dr. Whitson regarded as showing similar composition and PVT properties as the three other reservoir fluid samples.  Tr. at 3105 (Johnson); TREX 011496.0022. The fluid composition is an input that is used to model how the fluid is going to react to changes in pressure, temperature, and volume, which has significant impact on how much oil comes out of the reservoir.  Tr. at 3047 (Johnson).

1285.  To address the non-circular geometry created by the dual flow paths of the drill pipe and the annular space inside the casing, Dr. Johnson correctly calculates the hydraulic diameter for his Maximus model of the well.  Tr. at 3139–43 (Johnson).  Using the hydraulic diameter of the non-circular geometry is both scientifically sound and standard practice in the oil and gas industry, and it allows Dr. Johnson to preserve the relationship between pressure drop

and flow rate for the actual system.  Tr. at 3116, 3144, 3156, 3175–76 (Johnson).  *See also* Tr. at 2742–43, 2836–37 (Zaldivar); Section III.B.5(d)(1)b, *infra* (describing hydraulic diameter as the "gold standard" geometric transformation used in the oil and gas industry for non-circular pipes).

1286.   Using an industry-standard multiphase model for the wellbore, but using all of Dr. Griffiths's other discharge coefficients, Dr. Johnson demonstrates that due solely to the effects of the drill pipe in the well, the flow rate must have increased over time.  Tr. at 3080–82 (Johnson); D24629; TREX 011488.0019–22.  This is the case whether Dr. Johnson uses a value of 55,000 for the final day flow rate or a value of 53,000.  Tr. at 3104–05 (Johnson).  *See also* TREX 011488.0079–80, TREX 011488.0080 ("As can be seen, the flow rate is relatively insensitive to PI in this range; *i.e.*, the PI must be increased by 70% to increase the flow rate by 10%.").

> **(6)**      **Correcting for Dr. Griffiths's Unsupported Assumptions Regarding the Starting Pressure Reduces His April 20 to May 8 Estimate by Another 500,000 Stock Tank Barrels over That Period.**

1287.   Dr. Griffiths does not utilize the real-time Sperry-Sun data from the final hours and minutes before the blowout in constructing his pre-May 8 pressure history for PT-B.  Tr. at 1699–700 (Griffiths); Tr. at 3070 (Johnson).  Dr. Johnson analyzed the effect on Dr. Griffiths's Best Estimate cumulative release of using a pressure profile for the period from April 20 to May 8 that is based on the last available data point from the Sperry-Sun data.  Tr. at 3070–72 (Johnson); TREX 011488.17.4; D24634.  Dr. Johnson calculates a pressure at PT-B on April 20, 2010 of about 8700 psi—just as United States expert witness Dr. Pooladi-Darvish did.  Tr. at 3070–71 (Johnson); TREX 011653.27.4; TREX 011488.17.4.  Dr. Johnson then performs a linear interpolation from 8700 psi on April 20 to the first data point from PT-B on May 8.  Tr. at 3071–72 (Johnson); TREX 011488.17.4.

1288.   Dr. Griffiths conceded that had he used a linear interpolation from 8700 on April 20 to the first PT-B data on May 8, he would have calculated a lower cumulative discharge under his Best Estimate method.  Tr. at 1706 (Griffiths).

1289.   The period from April 20 to May 8, a period when there is no PT-B pressure data at all, is also the period that Dr. Griffiths calculates the highest daily flow rates and has his largest uncertainty.  Tr. at 1675–76 (Griffiths).

1290.   By merely changing this one assumption about the initial value of PT-B on April 20, but using all other aspects of Dr. Griffiths's method, Dr. Johnson calculates a reduction of 500,000 barrels for the April 20–May 8 period.  Tr. at 3072–73 (Johnson); D24634; TREX 011488.17.4.  That equates to a 50% decrease in the flow rate from April 20–May 8, and an uncertainty of -10% for the total cumulative release, rather than the -3.3% Dr. Griffiths indicates in his report.  Tr. at 3073–74 (Johnson); TREX 011485R.0010 (Table 1, entry for "Flow Rate Before May 8").

1291.   Dr. Johnson concludes that because there can be a 50% difference in the flow rate estimate for those 18 days, there is "huge uncertainty there which makes [Dr. Griffiths's] method unreliable to get a cumulative estimate."  Tr. at 3073 (Johnson).

1292.   Dr. Johnson quantifies the effect of using the interpolated PT-B pressure profile and the Path B productivity index profile.  Tr. at 3074 (Johnson).  Using Dr. Griffiths's own method and constant discharge coefficients, and merely changing the profiles for the productivity index and PT-B pressure readings prior to May 8, Dr. Johnson calculates a cumulative release from the reservoir of 3.4 million barrels and a total volume released to the sea of 2.6 million barrels, as displayed in TREX 011488.19.3.  Tr. at 3074–75 (Johnson).



| Case | Total Volume of Oil from Well (MMstb) | Volume of Oil to DWH (MMstb) | Collected Volume of Oil (MMstb) | Total Volume of Oil Leaked to Sea (MMstb) |
|---|---|---|---|---|
| Constant PI + PT-B extrapolation | 5.0 | 0.10 | 0.81 | 4.1 |
| Constant B PI + PT-B 8700psia @ time zero | 4.5 | 0.01 | 0.81 | 3.7 |
| Path B PI + PT-B Extrapolation | 3.7 | 0.05 | 0.81 | 2.8 |
| Path B PI + PT-B 8700psia @ time zero | 3.4 | 0.00 | 0.81 | 2.6 |

**Table 2. Cumulative Discharge Results Based on the Dr. Pooladi-Darvish and Dr. Griffith PT-B Profiles**

As demonstrated in Table 2, the assumption of a steady decline in the PT-B pressure prior to 8th May 2010, compared with the Dr. Griffiths' assumption of PT-B pressure in this period, results in a decrease in the cumulative discharge from the well of about 500 Mstb from Dr. Griffiths' result – *i.e.*, 10% decrease. Dr. Griffiths fails to account for this variability in his uncertainty range.



### (7)    Dr. Griffiths's Method Cannot Account for Erosion Downstream of the PT-B Pressure Gauge.

1293.  The pressure measured by PT-B reflects the combined effect of all of the changes in the system occurring both upstream of PT-B (*i.e.*, reservoir, bottomhole, wellbore) and downstream of PT-B (*i.e.*, BOP, riser).  Tr. at 1723 (Griffiths); Tr. at 3076 (Johnson); Tr. at 1319–20 (Hunter) ("The pressure that [PT-B] reads is influenced by what is below and what's above.  It reads whatever the pressure is at that point or what it thinks the pressure is, yes.").

1294.  Dr. Griffiths cannot rely on PT-B to account for erosion in the BOP, because it is not possible to know whether a change in PT-B is due to an upstream change, a downstream change, or some combination of the two.  Tr. at 1723–24 (Griffiths); Tr. at 3053, 3076 (Johnson).

1295.  Contrary to Dr. Griffiths's assertion, because PT-B reflects the combined effects of one system, there is no "fantastic coincidence" that PT-B measured changes occurring both

284

upstream and downstream of it.  Tr. at 3078 (Johnson); TREX 011486R.0013 (Griffiths Rebuttal Report).

1296.  There were many changes in the pressure measured by the PT-B gauge between May 8 and July 15.  Tr. at 3076–77 (Johnson); TREX 011488.29.1; D24531.  Many of these variations reflect actual changes in pressure as opposed to gauge error.  Trusler Dep. at 110–11; Tr. at 3077 (Johnson); TREX 011488.0028–29.

1297.  Excluding the Top Kill period, the largest changes in pressure occurred in mid-May, at which time PT-B dropped by about 800 psi between May 8 to May 14, and then recovered to its previously recorded higher value on May 19.  Tr. at 1724–27 (Griffiths).  This time period coincides with observed slug flow from the end of the riser.  Tr. at 2701–02 (Zaldivar); TREX 011683.0005; D24527.

1298.  When the PT-B pressure decreased between May 8 and May 14, that was either due to an increase in resistance upstream of PT-B (*i.e.*, an increase in resistance in the reservoir or wellbore) or a decrease in resistance downstream of PT-B (*i.e.*, a decrease in resistance in the BOP or riser).  Tr. at 1721 (Griffiths).

1299.  Dr. Griffiths concludes that this decrease in PT-B pressure between May 8 and May 14 occurred because the BOP resistance decreased.  Tr. at 1725 (Griffiths).  Dr. Griffiths had to reach this conclusion to remain consistent with his opinion that after the first 36 hours following the explosion there were no changes in the reservoir or wellbore that would significantly affect the flow rate.  Tr. at 1689–90 (Griffiths).

1300.  The PT-B pressure increase between May 14 and May 19 was due either to a decrease in resistance upstream of PT-B (*i.e.*, a decrease in resistance in the reservoir or

wellbore) or an increase in resistance downstream of PT-B (*i.e.*, an increase in resistance in the BOP or riser).  Tr. at 1721, 1723 (Griffiths).

1301.   Dr. Griffiths conceded that the increase in PT-B was not caused by an increase in the resistance to flow in the BOP.  Tr. at 1730 (Griffiths).  Dr. Griffiths admitted that erosion in the reservoir or wellbore could cause the increase in pressure observed in the PT-B data from May 14 to May 19—which would require erosion to have taken place beyond the 36 hours Dr. Griffiths assumed for purposes of his flow calculations.  Tr. at 1727 (Griffiths).

1302.  Dr. Griffiths also admitted that if there was erosion at the reservoir sandface, or erosion/changes in the wellbore, the PI and the wellbore discharge coefficient (Kwell) would not remain constant, but would change over the 86-day period.  Tr. at 1690 (Griffiths).  Because his Best Estimate calculation holds PI and Kwell constant, Dr. Griffiths admitted that he would not have captured the effect of those changes in his Best Estimate.  Tr. at 1691 (Griffiths).

1303.  Dr. Griffiths was unable to offer any physically-based explanations for the variability observed in the PT-B data, what he referred to as "dancing around" and "noise."  Tr. at 1729–30 (Griffiths).  But this "noise" is the data Dr. Griffiths actually uses to calculate his Best Estimate cumulative discharge.  Tr. at 1729 (Griffiths).  According to Dr. Griffiths, there is "no meaning" to day-to-day changes in the data from which he derives his 5 million barrel estimate.  Tr. at 1729–30 (Griffiths).

1304.   Yet, the physical evidence demonstrates that there were many important changes occurring in the system over time.  Tr. at 3050–59 (Johnson); D24656 (middle third section); D24631; D23410; D23411.  And these changes, in fact, could have caused the variability in pressure measured at PT-B.  Tr. at 3076–77 (Johnson); TREX 011488.0028–29.

1305.   In addition, Dr. Trusler presented a methodology to reconcile the PT-B pressure data that differed from Dr. Griffiths's constant offset.   Trusler Dep. at 97–99, 146.   This methodology provides the most accurate way of reconciling the PT-B data.   Trusler Dep. at 169, 211–12.   *See also* Trusler Dep. at 171 (Trusler's methodology is more accurate than Griffiths's constant offset model).

1306.   Dr. Griffiths conceded that Dr. Trusler's method is more accurate than his own constant offset for PT-B.   TREX 011486R.0004 ("As [Dr. Trusler] points out, these corrections are perhaps not 'best' represented by a constant offset but instead vary somewhat with pressure.").   Thus, Dr. Griffiths erroneously concludes that 966 psi had been added to the raw data for the period from July 13 to July 22.   Trusler Dep. at 135, 146, 149–51, 158–59.   When Dr. Trusler's pressure history is used instead of Dr. Griffiths's (both to estimate the discharge coefficients and to calculate the cumulative flow), Dr. Griffiths's total cumulative release decreases by about 5%.   Trusler Dep. at 269–70.

### (8)   Dr. Griffiths Did Not Conduct a True Validation of His Method.

1307.   Dr. Griffiths uses the same constant discharge coefficients derived from the same data on July 14 and July 15 to prepare his Alternative 1 and Alternative 2 estimates:



*See* D24377; *see also* Tr. at 3083–84 (Johnson); D24374; D24375; D24376.

1308.   Just like his Best Estimate calculation, for his Alternative 1 and Alternative 2 cases, Dr. Griffiths applies the same discharge coefficients that he locked in as of July 15, and holds them constant for the 86-day period over which he calculates a cumulative discharge.  Tr. at 1734–36 (Griffiths); Tr. at 3083–84 (Johnson).  Dr. Griffiths does not prepare an alternative case in which one or more of his discharge coefficients, rather than being held constant, varied over the 86-day period.  Tr. at 3084 (Johnson).  Thus, Dr. Griffiths's two alternative methods do not validate his Best Estimate calculation.  Tr. at 3083 (Johnson).

1309.   As Dr. Johnson demonstrated, Dr. Griffiths's Alternative 1 and Alternative 2 cases are "no validation of his Best Estimate at all.  He has got a circular argument there.  He uses the same coefficients, and all they do is really validate his arithmetic, show that he has

added 2 and 2 together and got 4.  It doesn't say 4 is the right answer.  It doesn't validate his estimate at all."  Tr. at 3083 (Johnson).

1310.  Dr. Johnson testified that based on his more than 20 years of experience modeling production systems in the oil and gas industry, and given all of the changes "that we know went on in the system, I can't believe [the discharge coefficients] stayed constant for 86 days."  Tr. at 3085 (Johnson).

1311.  Indeed, Dr. Griffiths admitted that, "[if] both the PI and BOP varied, then all three of my cases would yield a cumulative discharge that differs from the true value."  TREX 011486R.12.6; Tr. at 1740–41 (Griffiths).  This means that Dr. Griffiths's method cannot be used to arrive at a reliable cumulative estimate because he does not, and cannot, know that the discharge coefficients remained constant for 86 days.  Tr. at 3084–85 (Johnson).  Therefore, Dr. Griffiths's method is flawed.  Tr. at 3085 (Johnson).

1312.  Dr. Griffiths also testified that he validated his method through comparison to commercial modeling codes.  Tr. at 1619–20 (Griffiths).  Yet, Dr. Griffiths's comparison to Dr. Liao's PROSPER model is in fact a comparison to geometry that did not exist at any time during the 86-day period, *i.e.*, a model of the casing without any drill pipe whatsoever.  Tr. at 1741 (Griffiths); TREX 011488.0025–26, 0078–79.  Accordingly, this comparison to Dr. Liao's work is "inappropriate and misleading."  TREX 011488.0025 ("Dr. Griffiths's comparison of his model to PROSPER work done by a BP Engineer during the response is inappropriate and misleading.").  *See also* TREX 011488.0025–26 (Johnson Expert Report) (Section 4.3.3).

1313.  Dr. Griffiths's comparison of his results to Dr. Bushnell's Capping Stack model also fails to validate his cumulative flow results, because Dr. Bushnell assumed a homogenous mixture for the flow through the kill line of the Capping Stack, whereas "the flow in the well is

not homogenous."[6]   TREX 011488.0023 (Johnson Expert Report) (concluding that homogenous mixture assumption may be true for points of discontinuity such as the BOP rams, but it is not true for long flow sections such as the well, drill pipe, riser, where there will be significant slip between the liquid and gas phases); Tr. at 1622 (Griffiths) (describing plot from Bushnell's work "not for the wellbore but for the kill line"); Tr. at 1458–59, 1380 (Dykhuizen) (testifying that he corroborated his assumption of a homogenous flow through the Capping Stack based on Bushnell's work).

### (9)   Dr. Griffiths's Method Produces Nonsensical Results.

1314.   Dr. Griffiths testified regarding the importance of validating a model to ensure that the results "make sense" and don't "contradict something I know or believe."  Tr. at 1616–17 (Griffiths).

1315.   But as Dr. Griffiths himself admitted, under his method, the reservoir could undergo zero depletion—meaning that the pressure in the reservoir could remain constant at the initial, pre-drill pressure of 11,850 psi (as if there had been no flow of oil at all)—and Dr. Griffiths would still predict a total cumulative release of 5 million barrels.  Tr. at 1743 (Griffiths).  In Dr. Griffiths's own words, this simply does not "make sense."

1316.   Dr. Griffiths's method would even, contradictorily, predict an increase in the total cumulative release if the final reservoir pressure used in his calculation increased, meaning that there was less depletion than what he thought.  Tr. at 1742 (Griffiths).

---

[6] Neither Dr. Bushnell's expert report nor his deposition testimony is in evidence.  *See* Rec. doc. 11352 (Order Regarding Motion to Strike Dr. Nathan Bushnell) (ruling that the record did not demonstrate "any independent analysis of the computational fluid dynamics models constructed and used by Dr. Bushnell" nor did any US expert "rely on Dr. Bushnell's analysis in formulating his opinions.") (*See* Rec. doc. 11352 at 4); Tr. at 1635 (the Court did not overrule Magistrate Judge Shushan's pre-trial order regarding Dr. Bushnell).  *See also* Tr. at 1633-1634 (describing procedural history regarding Bushnell).  The Court allowed U.S. experts Griffiths and Dykhuizen to make reference to their comparisons to Bushnell's work, but did not allow into evidence Dr. Bushnell's expert work.  Tr. at 1380, 1635.

1317.   Additionally, the two calculations that Dr. Griffiths presents as "validation" of his Best Estimate fail to predict the same daily flow rate for any day during the entire 86-day period. Tr. at 1737 (Griffiths); Tr. at 3039 (Johnson); D24409.  This demonstrates that the results of Dr. Griffiths's method do not "make sense," and in fact "contradict" each other:



D24409.  Indeed, the daily flow rate under Dr. Griffiths's Best Estimate and Alternative 2 differ by as much as 10,000 barrels on May 8, 2010.  Tr. at 1737 (Griffiths).  As Dr. Johnson testified, these alternatives do not "validate his estimate at all."  Tr. at 3083 (Johnson).

1318. Even more strangely, when PT-B decreases, Dr. Griffiths's Best Estimate calculation predicts an *increase* in flow rate, but his Alternative 2 calculation predicts a *decrease* in flow rate—that is, they predict the exact opposite relationship between flow rate and pressure drop.  *Compare* D24531 (Best Estimate plotted with PT-B data) *with* D24408 (Alternative 2 plotted with PT-B data).  *See also* D21214 (Griffiths PT-B pressure profile), D21215 (Griffiths's Best Estimate flow rate profile; Griffiths did not plot flow rate profiles for either of his alternative calculations).

1319.  Finally, Dr. Griffiths presents an illogical and paradoxical analysis in his expert report related to the flow rate before May 8.  TREX 011485R.0046–49 (Griffiths Expert Report, Appendix I: Flow Rates and Discharge Prior to May 8); Tr. at 1710 (Griffiths).  This analysis predicts an increasing flow rate as the BOP elements were functioned—activities that would have made the BOP more restrictive to flow, not less restrictive—including an increase from 36,000 to 41,000 after the Blind Shear Rams were activated and an increase from 41,000 to 61,000 after the Casing Shear Rams were activated.  Tr. at 1709–11 (Griffiths).

> **(10)   The Uncertainty Range for Dr. Griffiths's Best Estimate Cumulative Release is Much Greater Than He Acknowledges.**

1320.  Dr. Griffiths never actually calculates the uncertainty associated with his Best Estimate cumulative release.  Tr. at 1698 (Griffiths) (agreeing that "largely" he "did not recalculate the uncertainties for the Best Estimate number" but rather used the uncertainties from his 2011 work).

1321.  The low uncertainties that Dr. Griffiths presented to the Court are largely based on his work from 2011 where he had a different estimate of flow, and not on the Best Estimate of cumulative release that Dr. Griffiths puts forward in his expert report.  Tr. at 1698 (Griffiths).

1322.  In the uncertainty analysis that he does present, Dr. Griffiths does not include the uncertainty associated with a change in the productivity index over a longer period than 36 hours.  Tr. at 1697 (Griffiths).  Had he done so, that analysis would have decreased his total cumulative release and therefore increased the range of his negative uncertainty.  Tr. at 3069 (Johnson); TREX 011488.14.2; TREX 011488.0016 ("Table 1 shows that the oil volumes leaked to sea vary by about 150% from the lowest to the highest.  This uncertainty range is far greater than the -13.9% and +9.7% that Dr. Griffiths represented as the error bands for his calculations.").

1323.   Dr. Griffiths does not include the uncertainty associated with a different pressure profile than the one he used for PT-B from April 20 to May 8.  Tr. at 1706 (Griffiths); Tr. at 3073 (Johnson); D24634; TREX 011488.0016–19 (Johnson Expert Report).  *See also* TREX 011488.0019 ("As demonstrated in Table 2, the assumption of a steady decline in the PT-B pressure prior to 8th May 2010, compared with Dr. Griffiths's assumption of PT-B pressure in this period, results in a decrease in the cumulative discharge of about 500 Mstb from Dr. Griffiths's result – *i.e.*, 10% decease.  Dr. Griffiths fails to account for this variability in his uncertainty range.").  Had Dr. Griffiths done so, that would have decreased his total cumulative release and therefore increased the range of his negative uncertainty as displayed in D24634:

### Dr. Griffiths's PT-B Pressure Profile Over-predicts the Cumulative Release by as Much as 500,000 Barrels

| | Pressure on April 20 at PTB | Griffiths's best estimate cumulative release Apr 20-May 8 | % change from Griffiths's best estimate cumulative release Apr 20-May 8 | Griffiths's best estimate cumulative release Apr 20-July 15 | % change from Griffiths's best estimate cumulative release Apr 20-July 15 | Griffiths's calculated uncertainty pre-May 8th |
|---|---|---|---|---|---|---|
| Dr. Griffiths's extrapolation | 4,300 psia | 1,000,000 stb | - - - | 5,000,000 stb | - - - | -3.3% to +0.9% |
| Sperry Sun interpolation | 8,700 psia | 500,000 stb | - 50% | 4,500,000 stb | - 10% | - - - |

Source: TREX 011488.0019                                                                 D24634

Tr. at 3072–74 (Johnson).  *See also* Tr. at 3074 (Johnson) ("He should have used this point and explored various paths between that point, and he would have found that he has a much wider uncertainty range than he actually came up with.").

1324.   Because Dr. Griffiths does not know what the PI and PT-B trends were, the "uncertainty bound on his cumulative estimate [is] very, very wide, and far wider than he concluded in his report.  He didn't really do a proper uncertainty analysis, and so it makes the cumulative estimate really totally unreliable."  Tr. at 3177 (Johnson).

1325.   And because Dr. Griffiths's method is based upon constant values from July 14 and July 15, his Best Estimate is "at the high end of an estimate" and "is really very, very inaccurate."  Tr. at 3060 (Johnson).

<div style="text-align:center">

(g)   **Dr. Pooladi-Darvish Similarly Relies on a Narrow Sample of Data Points and Assumes No Material Change in Restrictions over Time.**

</div>

1326.   Dr. Mehran Pooladi-Darvish uses two approaches, which he calls "analytical" and "numerical," to estimate the amount of oil released from the Macondo reservoir, but both of his approaches rely on narrow, uncertain data points and assume no material changes in restrictions over time.  TREX 011653.0007; *see* Sections III.B.3(g)(1)–(3), *infra*.

<div style="text-align:center">

(1)   **Dr. Pooladi-Darvish Failed to Account for Erosion.**

</div>

1327.   In his analytical model, Dr. Pooladi-Darvish estimates the flow rate on the final day before the Capping Stack was closed on July 15, 2010, and then extrapolates this rate backwards in time to the date of the blowout.  Tr. at 2020–21 (Pooladi-Darvish); TREX 011653.0003.

1328.   There is no question that, in the real world, the resistances in that flow path can change over time.  Tr. at 2023–25 (Pooladi-Darvish).  For instance, some erosion likely happened in the *Deepwater Horizon*'s riser from April 22, 2010 until at least June 3, 2010, when that riser was removed.  Tr. at 2032–33 (Pooladi-Darvish).  In fact, U.S. and BP experts alike agree that some changing resistances, or erosion, did occur throughout the incident.  *See* Tr. at 2032–34 (Pooladi-Darvish); Tr. at 1639 (Griffiths); Tr. at 1409 (Dykhuizen); Tr. at 2991

<div style="text-align:center">294</div>

(Member); Tr. at 3037 (Johnson); Tr. at 2855–56 (Nesic).   Yet Dr. Pooladi-Darvish fails to consider changes in the flow path—from erosion or any other cause—in arriving at his best estimate of cumulative flow using the analytical method.  *See* Tr. at 2025–28 (Pooladi-Darvish).

1329.   Dr. Pooladi-Darvish's analysis of post-shut-in pressure buildup data and July 14–15 collection rate data does not rule out the existence of significant erosion in the BOP or in the bottomhole at an earlier time during the spill.  Tr. at 2065–66 (Pooladi-Darvish).

1330.   Dr. Pooladi-Darvish acknowledges that changing the resistances would have affected the flow rates he calculated.  Tr. at 2023–24 (Pooladi-Darvish).

1331.   The second part of Dr. Pooladi-Darvish's analysis is a numerical method, in which he creates reservoir and wellbore models and tries to match them to pressure buildup data and collection rates.  Tr. at 2053–54 (Pooladi-Darvish).   Dr. Pooladi-Darvish ran a "base" numerical case, several "sensitivity" cases, and several additional "what-if" cases, each using different combinations of input parameters.  TREX 011653.0005, 0302; TREX 011654R.0023.

1332.   Only "base" and "sensitivity" cases that matched both pressure readings and collection rates formed the basis of his best estimate of cumulative release.   TREX 011653.0004–05; D21843 (his best estimate of cumulative release range does not take into account the "good" matches from his "what-if" cases).

1333.   In the "base" and "sensitivity" numerical cases, Dr. Pooladi-Darvish does not take into account erosion occurring in the BOP over time.  Tr. at 2036 (Pooladi-Darvish).   Those cases also fail to take into account any cement erosion at the bottom of the wellbore.  Tr. at 2037 (Pooladi-Darvish).

1334.  Dr. Pooladi-Darvish contended that he did  account for erosion in his "what-if" cases by considering the changing pressure readings from the PT-B pressure gauge.  Tr. at 2027–28 (Pooladi-Darvish).[7]

1335.  In his "what-if" cases, Dr. Pooladi-Darvish obtains what he considers "good" matches to the pressure build-up and collection rate data with cases that show a cumulative release as low as 4.43 million stock tank barrels—significantly lower than his stated best-estimate range of 5 to 5.3 million stock tank barrels.  TREX 011654R.0023 (showing "good" matches with cases of cumulative flow as low as 4.43 MMstb); TREX 011654R.0003 ("[M]y best estimate is between 5 and 5.3 MMSTB.").

1336.  In the end, Dr. Pooladi-Darvish claimed that a "discussion of erosion really doesn't matter to" him, but he conceded that, even in his "what-if" cases, he "never tried to ***accurately*** model erosion."  Therefore, Dr. Pooladi-Darvish has no scientific evidence of how an accurate model of erosion would affect his analysis.  Tr. at 2044, 2050 (Pooladi-Darvish) (emphasis added).

1337.  Between his original and rebuttal reports, Dr. Pooladi-Darvish modeled six additional "what-if" cases.   D24546-1; *see also* TREX 011654R.0008–09 n.3; TREX 011653.0302; TREX 011654R.0023 (Dr. Pooladi-Darvish tested four "what-if" cases in his original report, revised two of those cases in his rebuttal report, and ran two additional "what-if" cases, for a total of six "what-if" cases).

1338.  In one of those cases, the Extrapolated +966 psi case, Dr. Pooladi-Darvish finds only a "mediocre" match, and therefore the results of that case can be disregarded.  Tr. at 2039–40 (Pooladi-Darvish); TREX 011653.0302.

---

[7]      Dr. Pooladi-Darvish refers to pressure readings from the PT-B pressure gauge at the base of the BOP as "BOP pressure."

1339.  In his "Flat BOP" "what-if" case, Dr. Pooladi-Darvish creates a model that assumes that the BOP pressure remained constant from April 20 to July 13—the entire duration of the spill.  Tr. at 2041 (Pooladi-Darvish); D24546-2.  But that is inconsistent with the actual data.  *See* TREX 141219N (actual recorded PT-B measurements from May 8th through July 18th); Tr. at 2041 (Pooladi-Darvish); D24546-2; TREX 011653.0027.  Dr. Pooladi-Darvish himself admits that the BOP pressure "certainly varied," and that during the spill, "most of the time the BOP pressure were either above or below" his flat BOP line.  Tr. at 2042–43 (Pooladi-Darvish); D24549.

1340.  Dr. Pooladi-Darvish also models two "Extrapolated BOP" "what-if" cases. TREX 011654R.0023; Tr. at 2045 (Pooladi-Darvish).  There, again, Dr. Pooladi-Darvish ignores the actual PT-B pressure data.  Tr. at 2045-46 (Pooladi-Darvish); D24550.  Instead, Dr. Pooladi-Darvish draws a straight line between the pressure reading on May 8 and the pressure reading on July 13, completely ignoring the readings from the intervening 65 days.  Tr. at 2045–46 (Pooladi-Darvish); D24550.

1341.  He then extrapolates that same straight line backwards in time to the beginning of the incident, despite there being no PT-B pressure readings between April 20 and May 8.  Tr. at 2045–46 (Pooladi-Darvish); D24550.  Dr. Pooladi-Darvish's view is that between May 8 and July 13, the PT-B pressure readings do not provide evidence of significant erosion in the BOP. Tr. at 2047 (Pooladi-Darvish).  Putting aside the fact that the actual BOP readings are not used in any of his models, by extrapolating this no-erosion simulated line to the period before May 8, Dr. Pooladi-Darvish manufactures an "extrapolated" model that assumes no erosion occurred during the entire flowing period.  Tr. at 2048 (Pooladi-Darvish); D24550.

1342. Finally, Dr. Pooladi-Darvish also models two "Restricted BOP" "what-if" cases—models that try to address some of the erosion that occurred before May 8. Tr. at 2048–49 (Pooladi-Darvish); TREX 011654R.0023. Both cases reflect a cumulative flow estimate is less than 5 MMstb—Dr. Pooladi-Darvish's "best estimate." Tr. at 2039, 2049 (Pooladi-Darvish). But even in these two cases (and all other cases, for that matter) Dr. Pooladi-Darvish fails to consider possible cement erosion, or the the period over which it may have occurred. Tr. at 2050–51 (Pooladi-Darvish).

> **(2)** **Dr. Pooladi-Darvish's Numerical Modeling Revealed That the Post-Shut-In Pressure Data Could Be Matched by Flow Estimates as Low as 3 Million Stock Tank Barrels.**

1343. Dr. Pooladi-Darvish's numerical method attempts to match two sets of data, the first of which is pressure buildup data from between July 15, 2010, (when the well was shut in) and August 3, 2010. Tr. at 2053–54 (Pooladi-Darvish).

1344. When matching only the pressure buildup data, the range of good matches in Dr. Pooladi-Darvish's numerical model produces results as low as 3 million stock tank barrels. D24543; TREX 011653.0005; TREX 011654R.0006, 0011; Tr. at 2055–56 (Pooladi-Darvish).

> **(3)** **Dr. Pooladi-Darvish Attempted to Match Only a Small Fraction of the Available Collection Rate Data, and Did So Through an Imprecise, Unreliable "Eyeballing" Method.**

1345. Dr. Pooladi-Darvish also matches limited collection rate data from the end of the flow period. Tr. at 2056–59 (Pooladi-Darvish). Collection took place during many time periods throughout the spill: collections through the riser insertion tube tool, through the Top Hat, and through the BOP's choke line, before July 15, 2010. Tr. at 2063–65 (Pooladi-Darvish); Carmichael Dep. at 257–61. Dr. Pooladi-Darvish does not conduct any matching to the data

from those other collection rates—instead, he limits his matching to collection rate data from a nine- or ten-hour period on the final day of the spill.  Tr. at 2056–59 (Pooladi-Darvish).

1346.  To determine a "so-called" good match to this nine- to ten-hour data set, Dr. Pooladi-Darvish looks at the collection rates predicted by his model runs and compares them to the measured collection rates.  Tr. at 2056–59 (Pooladi-Darvish).  As part of this matching process he determines that a match of within +/-600 barrels meant a "good" match.  Tr. at 2056–59 (Pooladi-Darvish).  If the measured and the simulated rates diverged by more than 600 barrels, the model would be considered a "mediocre" or "bad" match.  Tr. at 2056–59 (Pooladi-Darvish).  To determine whether the match was "good," "mediocre," or "bad," Dr. Pooladi-Darvish would run a cursor along the screen and "eyeball" the error bar.  Tr. at 2056–59 (Pooladi-Darvish).  The difference, however, between a good and mediocre match, is not readily visible to the naked eye.  *See* D24544 (showing two of Dr. Pooladi-Darvish's numerical cases—one exhibiting a "good" match and the other exhibiting a "mediocre" match):



### 4. The United States Experts Concede Their Methods Do Not Include Analyses of, and Therefore Do Not Properly Account for, Erosion.

1347.   Dr. Ronald Dykhuizen admitted that his model "does not have an erosion term in it: The only way I account for erosion is my proxy of assigning zero flow for the first two days." Tr. at 1471–47 (Dykhuizen).

1348.   Dr. Dykhuizen also admitted that the primary reason for his large 30 percent error band on his cumulative estimate is the impact of erosional processes and not knowing when erosion ended.   Tr. at 1435 (Dykhuizen).   Moreover, because erosion only happens in one direction, by failing to understand when the erosional process stopped, the effect of that uncertainty can only be to bring down Dr. Dykhuizen's estimates.   Tr. at 1435 (Dykhuizen); *see also* Chu Dep. at 135 ("if there is significant erosion, it could allow the increase in flow over time").   Dr. Dykhuizen also clarified that the reason the uncertainty on his estimate is the greatest the furthest you get from July 15 is "mainly due to erosion."   Tr. at 1471–72 (Dykhuizen).

1349.   Dr. Dykhuizen described his erosion analysis as "a wave to erosion."   Tr. at 1473–76 (Dykhuizen).

1350.   Dr. Dykhuizen is not an expert in erosion.   *See* Tr. at 1473–76 (Dykhuizen) (admitting "I have no expertise in erosion.").   At trial, he extended his expert report assumption that "all significant erosion was complete by the second day of the blowout," an assumption he calls a "proxy for erosion," to a concession that erosion could have gone on for four or six days, or even 86 days.   Tr. at 1475–76 (Dykhuizen).   Similarly, Dr. Dykhuizen expanded his erosion window from two days in his original expert report to through May 14, 2010 in his rebuttal report.   Tr. at 1473–76 (Dykhuizen); TREX 011453.12.1.   Dr. Dykhuizen also acknowledged that an additional hole in the riser appeared on May 19, 2010.   Tr. at 1473–76 (Dykhuizen); *see*

*also* Ratzel Dep. at 90 (admitting that the appearance of holes in the riser indicates that erosion is occurring).

1351.   The DOE-NNSA Report does not account for any geometry changes other than removal of the riser and installation of the Capping Stack.  Ratzel Dep. at 108–09.  Because the model fails to account for flow geometry changes, *e.g.*, erosion, it cannot accurately calculate the total flow during the spill.  *See* Ratzel Dep. at 138–39.

1352.   The DOE-NNSA Report underlying Dr. Dykhuizen's expert report assumes that there was no erosion of cement, no erosion of the BOP, a constant productivity index throughout the 86 days of the spill, and a constant elevation head of pressure from the reservoir up to the point of release, but Dr. Ratzel conceded that he does not know whether any of those assumptions are correct.  Ratzel Dep. at 209–10; *see also* Ratzel Dep. at 215–17 ("[W]e, the team, had nothing that we could use to quantify any effects due to those things.").  As to what the effect of erosion of the cement would be, Dr. Ratzel stated: "That remains an issue for others to resolve."  Ratzel Dep. at 215–17.

1353.   Dr. Ratzel explained in his deposition that because the team did not feel that it could quantify the effects of these conditions at the time, they simply eliminated them from consideration: "Since we couldn't quantify those effects and since they looked like they kind of counter balanced or were negligible both, we eliminated them from consideration.  I can appreciate your concern about erosion.  I can appreciate your concern about cement.  But I could not quantify, nor could I tell you where they were, nor could I tell you how they would have affected the flow."  Ratzel Dep. at 215–17.

1354.   Erosion of the BOP prior to July 15, 2010 could have affected flow, and the effects of such erosion would not have been detectable in the measurements taken on July 14 and

15.  *See* Ratzel Dep. at 318–19 ("Q: But if the BOP had eroded prior to that final day, it could have affected the flow and you would not have been able to detect it with the measurements taken on July 14th and 15th, correct?  A: That's correct.").

1355.   Secretary of Energy Steven Chu admitted that erosion is one of the factors that is necessary to consider in assessing the total flow, *see* Chu Dep. at 134, but confirmed that the Government flow rate team did not consider erosion in the estimate reached on July 30–31, 2010.  Chu Dep. at 144–45.

1356.   Dr. Stewart Griffiths admitted that in his model, he assumes that "nothing was eroding" and that everything was kept constant in the outflow path, but that in real life, "if restrictions had changed," those constants would have changed.  Tr. at 1585–87 (Griffiths).  Similarly, Dr. Pooladi-Darvish acknowledged that changing resistances would have affected the flow rates he calculated.  Tr. at 2025 (Pooladi-Darvish).  But, like Dr. Griffiths, he fails to account for erosion in both his analytical and numerical methods.  Tr. at 2025–28 (Pooladi-Darvish) (failing to consider erosion in his analytical method); Tr. at 2036 (Pooladi-Darvish) (failing to consider erosion in his base or sensitivity cases, which formed his best estimate of cumulative flow); Tr. at 2037 (Pooladi-Darvish) and Tr. at 2050–51 (Pooladi-Darvish) (failing to consider cement erosion in *any* of his cases).

<div style="text-align:center">(a)  <b>The Erosion Experts Who Have Analyzed the Macondo Well Confirm That Restrictions Eroded over Time—Not over a Period of Hours or Days as Assumed by U.S. Experts—Resulting in an Increasing, Rather Than Decreasing, Flow Trend.</b></div>

1357.   Because the U.S. estimates are based on the assumption that no erosion occurred in the flow path after April 22, any erosion that *did* occur necessarily reduces the U.S. cumulative flow estimates.  *See* Tr. at 1411 (Dykhuizen) ("And so ***if we account for erosion, it's only going to decrease my integral.***") (emphasis added).  Dr. Hunter acknowledged that if any

<div style="text-align:center">302</div>

restriction was "blocking" flow and then "eroded away," then "for those days in which it was blocking, it would reduce the flow" and thus reduce the Government's initial 4.9 MMstb estimate. Tr. at 1349 (Hunter). Dr. Dykhuizen also agreed that "erosional processes work in one direction" and "that direction is to pull [his cumulative flow estimate] down." Tr. at 1438 (Dykhuizen).

1358. As Dr. Dykhuizen admitted, by assuming that no meaningful erosion took place after April 22, 2010, and thus that resistances to flow in the well and BOP were constant after that date, the Government flow models are "preordained to predict a flow rate that goes from low to high." Tr. at 1473 (Dykhuizen). Because of his uncertainty regarding the duration of erosional processes, however, Dr. Dykhuizen acknowledged the possibility that flow is "increasing at the beginning" and that a flow rate trend where the flow rate gradually increases for much longer than two days would still be consistent with the uncertainty range he attaches to his cumulative flow estimate. *See* Tr. at 1439–42 (Dykhuizen); D23996A.

1359. Dr. Johnson confirmed that because the U.S. experts assumed constancy in the cement and BOP, with no erosion after April 22, then "by necessity" their models would predict flow rates that decrease between April 22 and July 15, rather than increase. *See* Tr. at 3080 (Johnson). But, as Dr. Johnson's modeling indicates, the data relied upon by the Government experts could fit a model of flow that *increased* over time just as well as a model of flow that *decreased* over time. *See* TREX 011488.0011–16; Tr. at 3066–69; *see also* Tr. at 3084 (Johnson); TREX 011486R.12.6. Thus, the erosion assumptions that the Government experts make in lieu of a rigorous analysis of erosion result in cumulative flow estimates that in reality represent the ***upper bound*** of all possible estimates. *See* TREX 011488.0011–16; Tr. at 3066–69, 3079–80, 3086–87 (Johnson).

303

### (1) Dr. Srdjan Nesic—a Leading Expert on Metal Erosion—Confirmed that Erosion in the BOP and Kinked Riser Continued Through at Least May 21.

1360. Dr. Srdjan Nesic is a leading metal erosion and computational fluid dynamics expert with 30 years' experience. Tr. at 2844–50 (Nesic); D23626; TREX 011529R.0043–44. Dr. Nesic has a Ph.D. in Chemical Engineering from the University of Saskatchewan and master's and bachelor's degrees in Mechanical Engineering from the University of Belgrade. Tr. at 2844 (Nesic); D23626; TREX 011529R.0043. He is the Russ Professor of Chemical Engineering at Ohio University and Director of the Institute for Corrosion and Multiphase Technology, one of the leading institutes studying metal loss. Tr. at 2847–49 (Nesic); D23626; TREX 011529R.0005, 0043. Dr. Nesic has co-authored over 70 peer-reviewed papers, 100 conference papers, and book articles in relevant fields. Tr. at 2844–50 (Nesic); TREX 011529R.0044–59; D23626.

1361. Much of Dr. Nesic's erosion-related work has been for the oil industry. Tr. at 2844–50 (Nesic). Oil companies are interested in ensuring that there are no breaches of pipe wall during long term production operations, and they look to Dr. Nesic to advise on issues relating to potential erosion of the pipe wall. Tr. at 2845–49 (Nesic).

1362. Metal erosion is a mechanical process of gradual metal loss caused by repeated impact of solid particles. Tr. at 2851 (Nesic); D24603; TREX 011529R.0004. Three factors must be present for metal erosion to occur in an oil well: (i) sufficient solid particles, often sand, in flow; (ii) adequate velocity of moving particles; and (iii) the correct angle of impact. Tr. at 2851–52 (Nesic). Erosion occurs as long as sand or other solid particles are in the system and the other two conditions are met. Tr. at 2852 (Nesic).

1363. If erosion is occurring at one restriction in the system, it is also occurring at other restrictions in the flow path (if any exist). Tr. at 2962 (Nesic).

304

1364.   Dr. Nesic analyzes the effects of metal erosion on flow rate at the Macondo well. Tr. at 2844 (Nesic); TREX 011529R.0004.  To study those effects, Dr. Nesic defines the period of erosion, identifies pre-eroded and eroded geometries of interest that acted as flow restrictions, and analyzes these changing flow restrictions using computational fluid dynamics.  Tr. at 2853–54 (Nesic); TREX 011529R.0011; D23648.

1365.   Computational fluid dynamics is a mathematical technique that solves equations based on the fundamental physics of fluid flow and is ideal for analyzing flow and sand particles passing through complicated geometries.  Tr. at 2849–50 (Nesic); TREX 011529R.0011.

### a.   Metal Erosion Significantly Altered Flow Restrictions in the BOP and Riser.

1366.   Metal erosion significantly altered flow restrictions within the blowout preventer and riser at the Macondo well.  Tr. at 2855–56 (Nesic); D23631; TREX 011529R.0004–05, 0032–37.

1367.   Dr. Nesic studies four geometries to determine the effects of metal erosion on flow rate at the Macondo well: the blind shear rams, the casing shear rams, the upper annular preventer, and the kinked riser.  Tr. at 2856–58 (Nesic); D23632; TREX 011529R.0006–10. After analyzing the flow path and personally inspecting the recovered components at Port Michoud, Dr. Nesic selected these geometries as the most significant restrictions to flow that experienced erosion.  Tr. at 2856–58 (Nesic).

1368.   The blind shear rams were activated on April 22 and created a significant flow restriction at that time, even though they did not completely seal the well as intended.  Tr. at 2858 (Nesic); TREX 011529R.0009; D23633B.  The recovered blind shear rams show massive erosion, most notably around the outer edges of the blocks where hydrocarbons passed through

the partially-closed blocks.  Tr. at 2860–63 (Nesic); TREX 011529R.0009; D23635A; D24200; D24202; TREX 143201.0001; TREX 143132.0001.

1369.  The casing shear rams were activated April 29, severed the drill pipe, and created a significant flow restriction.  Tr. at 2858–59 (Nesic); TREX 011529R.0009–10; D23633B. Erosion damage is visible on the recovered casing shear rams, most notably where particles passing through the severed drill pipe collided with the bottom of the lower casing shear ram blade.  Tr. at 2863–66 (Nesic); D23637A; D24201; D24203; TREX 011529R.0009–10; TREX 143145.0001; TREX 143175.0001.

1370.  The upper annular preventer was activated April 20 and partially sealed around drill pipe 1-B-1, although it was a lesser restriction to hydrocarbon flow than the blind shear rams and casing shear rams.  Tr. at 2865–67 (Nesic); D23633B; TREX 011529R.0005, 0010. The recovered upper annular preventer and drill pipe 1-B-1 show significant erosion; the upper annular preventer was nearly disintegrated, and drill pipe 1-B-1 is heavily eroded where the upper annular partially sealed around it.  Tr. at 2865–67 (Nesic); D23639A; TREX 143198.0001; TREX 011529R.0010.

1371.  When the rig sank on April 22, the riser fell and kinked, forming a nearly 90 degree angle and restricting flow—although, again, not to the extent of the blind shear rams and casing shear rams.  Tr. at 2865–68 (Nesic); D23633B; TREX 011529R.0005, 0010.  Two erosion holes in the kinked riser appeared April 28, and a third erosion hole appeared May 19.  Tr. at 2868–69 (Nesic); D24452; D23633B; TREX 140783.  The appearance of the third hole in the kinked riser on May 19 indicates that sand production and erosion continued at least through that date.  Hunter Dep. at 169; Tr. at 2869 (Nesic).

1372.   The April 28 and May 19 holes in the kinked riser were caused by erosion.  Tr. at 2870–76 (Nesic); Hunter Dep. at 169; TREX 011529R.0024.   Cracking or fracturing can be eliminated as a potential cause of the April 28 and May 19 holes because the location of the holes is beyond the point of greatest stress and the direction of the holes is perpendicular to the plane of stress.   Tr. at 2870–76 (Nesic); D23644B; D24723; TREX 143133.0001; TREX 143108.0001.

### b.   Erosion Occurred in the BOP at Least Through May 27, 2010.

1373.   Erosion occurred at least through May 27, 2010.  Tr. at 2859–60, 2873 (Nesic); D23633B.  Two independent pieces of information support this conclusion: (1) Dr. Hans Vaziri's opinion that sanding at the Macondo well lasted at least through the end of May 2010, and (2) the appearance of the third hole in the riser on May 19, 2010.  Tr. at 2873–74 (Nesic), D24452, TREX 140783, TREX 011529R.0012, 0036–37.

1374.   Dr. Vaziri is a leading expert in sand prediction and sand production in oil wells. Tr. at 2873 (Nesic); D23645; Vaziri Dep. at 23–24, 26.  Dr. Vaziri is BP's Distinguished Advisor for Sand Management, has a Ph.D. from the University of British Columbia in Geotechnical Engineering, and has 25 years' experience in sand prediction.  Vaziri Dep. at 10–11, 15–18, 20–24; D23645.

1375.   The Government did not present testimony of a sand production expert, and Dr. Vaziri's testimony was unrebutted.

1376.  Dr. Vaziri concludes that between 19,300 and 40,300 pounds of sand were produced at the Macondo well, which Dr. Nesic concludes was sufficient to cause the erosion seen in the BOP and at the kink in the riser.  Vaziri Dep. at 120; Tr. at 2873–74 (Nesic); D23645. Dr. Vaziri reaches this conclusion using a program he designed and developed that predicts sand

production, ENHANS.  Vaziri Dep. at 10, 38–39.  ENHANS is routinely used for sand prediction analyses at BP and has been validated as reliable.  Vaziri Dep. at 36–39.

1377.   Dr. Vaziri concludes that sand was produced at the Macondo well at least through the end of May 2010, and, as noted, Dr. Nesic relies in part on this conclusion in forming his opinions.   Tr. at 2873 (Nesic); Vaziri Dep. at 222; D23645.   According to Dr. Vaziri, approximately half the sand was produced in the first two weeks following the incident, with the remainder produced by the end of May.  Tr. at 2963 (Nesic); Vaziri Dep. at 139–142, 193, 222; D23645.  Dr. Vaziri emphasized that his opinion that sand was produced through the end of May is conservative, as it is likely that sand production continued beyond May 2010.  Vaziri Dep. at 64–65, 222.

1378.   Dr. Vaziri reached his opinion that sand was produced through the end of May based on his experience, a rigorous examination of the way rock fails, and an analysis of the speed with which sand can pass through geometrical constraints.  Vaziri Dep. at 59–60, 140–42. Dr. Vaziri routinely predicts the duration of sand production in the course of his work as BP Distinguished Advisor of Sand Management.  Vaziri Dep. at 59–60.

1379.   Dr. Alex Slocum, MIT Professor and member of the Federal Science Team, acknowledged that "the appearance of a 3rd hole at the kink" on May 19 implied "the well is producing sand."  TREX 008851.0002.

1380.  Based on Dr. Vaziri's analysis that sand production lasted at least until the end of May 2010 and the appearance of the third hole on May 19, Dr. Nesic conservatively concludes that metal erosion occurred from April 22 through at least May 27, a period of 35 days.  Tr. at 2876–77 (Nesic); D23633B; D24452, TREX 140783, TREX 011529R.0012, 0036–37.

        **c.**      **Assuming That the BOP and the Kinked Riser Were the Main Restrictions to Flow at the Macondo Well, Metal Erosion Caused the Relative Flow Rate to Nearly Double Between April 22 and May 27, and This Increase in Flow Rate was Steady Throughout the Five-Week Period.**

1381.  Dr. Nesic evaluates the effects of each restriction to flow using a pressure drop analysis.  Tr. at 2877 (Nesic); TREX 011529R.0033.  Pressure drop is the best metric by which to evaluate erosion because pressure drop describes the difficulty with which flow passes through a restriction.  Tr. at 2877–78 (Nesic); TREX 011529R.0033.  As with a garden hose, if a person restricts flow by placing a thumb over the end of the hose, a larger pressure drop is created, resulting in a lower flow rate.  Removing the thumb from the end of the hose results in a smaller pressure drop, increasing flow rate.  Tr. at 2878–79 (Nesic); D23628A.

1382.  Dr. Nesic uses pre-eroded models of each of the four geometries to model the flow restriction created by each geometry, once activated.  Tr. at 2879–80 (Nesic); TREX 011529R.0013–18, 0020–23, 0026–28, 0074–80, 0083–86.  Where possible, Dr. Nesic uses computer aided design ("CAD") models of the actual pre-eroded components used at the Macondo well produced by Cameron in the litigation.  Tr. at 2861 (Nesic); TREX 011529R.0006.  Dr. Nesic positions each pre-eroded component in the "activated" position.  Tr. at 2879–80 (Nesic); TREX 011529R.0013–18, 0020–23, 0026–28, 0074–80, 0083–86.

1383.  With respect to the blind shear rams, which did not fully close, Dr. Nesic uses a "standoff" distance of 1.9 inches, as determined by Dr. Nigel Richardson.  Richardson Dep. at 47, 60, 110–11; TREX 011529R.0014.  Dr. Richardson is the Director of Structural/Thermal Engineering at CD-adapco, the world's largest independent CFD-focused provider of engineering simulation software, support, and services.  Richardson Dep. at 7–8, 24.  Dr.

Richardson has a Ph.D. from Florida A&M University/Florida State University in natural fiber composites and has 20 years' experience in finite element analysis.  Richardson Dep. at 7–8, 24.

1384.  Dr. Richardson uses design files produced by Cameron to model the standoff distance between the blind shear ram blocks.  Richardson Dep. at 19.  The Government did not tender a witness on the blind shear ram standoff, and Dr. Richardson's testimony was unrebutted.

1385.   Dr. Nesic simulates particles and flow passing through the pre-eroded geometries using computational fluid dynamics.  Tr. at 2879–85 (Nesic); D24207A-1; D24213A-1; TREX 011529R.0013–18, 0020–23, 0026–28, 0074–80, 0083–86.  His models calculate the degree of restriction (or pressure drop) each component provided in its pre-eroded state.  Tr. at 2881 (Nesic); TREX 011529R.0013.  His models also predict the locations where the pre-eroded geometries would experience the greatest erosion.  Tr. at 2881 (Nesic); D24207A-1; D24213A-1.

1386.  Dr. Nesic successfully validates his model by comparing areas of projected erosion with erosion seen on the actual recovered components.  Tr. at 2881–83, 2885–86 (Nesic); D24246A; TREX 011529R.0017–18, 0021–24, 0027.  In all cases, his models predict the highest degree of erosion in the locations where the recovered components show the highest actual degree of erosion.  Tr. at 2881–83, 2885–86 (Nesic); D24246A; TREX 011529R.0017–18, 0021–22, 0023–24, 0027.

1387.  Dr. Nesic repeats the simulations using eroded geometries to model flow restrictions created by each fully eroded geometry.  Tr. at 2880, 2886–87 (Nesic); D24210A-1; TREX 011529R.0006, 0013, 0018–20, 0022–24, 0029–31, 0081–82, 0085–86.  Where possible, Dr. Nesic uses laser scans of the actual recovered components.  Tr. at 2880 (Nesic); TREX 011529R.0006.  His models calculate the degree of restriction (or pressure drop) each component provided in its eroded state.  Tr. at 2886–87, 2880 (Nesic); D24210A-1; TREX 011529R.0013,

0018–20, 0022–24, 0029–31, 0081–82.  In total, Dr. Nesic ran thousands of simulations.  Tr. at 2884 (Nesic).

1388.   After modeling the restrictions created by the pre-eroded and eroded geometries, Dr. Nesic's analysis was anchored in two points: a starting point and an end point.  Tr. at 2887–88 (Nesic); TREX 011529R.0031.  He knew the flow restriction each geometry posed on the day it was activated (before it eroded), and he knew the flow restriction each geometry posed on May 27 (conservatively assumed to be the end of the metal erosion period).  Tr. at 2887–88 (Nesic); TREX 011529R.0031.

1389.   Dr. Nesic next analyzes the way each flow restriction changed over time from the day it was activated to May 27.  Tr. at 2888–89 (Nesic); TREX 011529R.0031–32.   To understand how each restriction to flow changed over time, Dr. Nesic performs "transient" simulations, computer simulations that model continuously varying geometries.  Tr. at 2888–89 (Nesic); TREX 011529R.0031–32.

1390.   Based on his transient simulations and applying industry standard principles, Dr. Nesic concludes that the flow restrictions changed steadily over time.  Tr. at 2889–93, 2964–65 (Nesic); TREX 011529R.0031–32; D23892.  Using simplified geometries that retained all key features of the geometries, Dr. Nesic obtains 10 days of reliable data from his transient simulations, which is sufficient to determine the trend of erosion.  Tr. at 2889–90 (Nesic); TREX 011529R.0031–32; D23892.

1391.   Dr. Nesic repeated his simulations for each geometry and consistently identified a linear trend of change with an approximately 97% degree of correlation.  Tr. at 2891–93 (Nesic); TREX 011529R.0032.  A correlation factor above 70% is sufficient to establish a linear trend,

and Dr. Nesic is confident that a 97% correlation factor in his transient simulations established a linear trend.  Tr. at 2892–93, 2964–65 (Nesic); D23892; TREX 011529R.0031–32.

1392.   Once Dr. Nesic identifies the way each restriction changed over time, he analyzes the combined effect of the flow restrictions.  Tr. at 2893–98 (Nesic); TREX 011529R.0032–36. The total restriction to flow posed by the four studied geometries decreased because of metal erosion by three and a half times from April 22–May 27, regardless of initial flow rate.  Tr. at 2893–98 (Nesic); TREX 011529R.0032–36; D23945.

1393.   The blind shear rams and casing shear rams most significantly restricted flow before they eroded; metal loss due to erosion of those components most significantly altered flow restrictions.  Tr. at 2855–56, 2862–65 (Nesic); D23631; TREX 011529R.0004–05, 0018, 0022, 0032–37.

1394.   Dr. Nesic also analyzes the effect of metal erosion on flow rate at the Macondo well.  Tr. at 2900 (Nesic); TREX 011529R.0036–37.  The restriction created by each geometry is directly related to flow rate, and Dr. Nesic uses Bernoulli's equation to correlate pressure drop with flow rate.  Tr. at 2900–04 (Nesic); TREX 011529R.0036–37; D23995B.

1395.   Assuming that the BOP and kinked riser were the main restrictions to flow from April 22 to May 27, the relative flow rate at the Macondo well would have almost doubled (88% +/- 2%) due to erosion regardless of initial flow rate.  Tr. at 2900–04 (Nesic); TREX 011529R.0005, 0032–37.  This increase in flow rate was for the most part steady throughout the five-week sanding/erosion period.  Tr. at 2856 (Nesic); TREX 011529R.0005, 0032–37; D23631; D23995B.

1396. Dr. Nesic does not study flow restrictions of the variable bore rams or the test rams after Top Kill, because he conservatively assumes that the erosion period ended May 27, 2010. Tr. at 2860, 2963 (Nesic).

1397. Pressure drop analysis is the most accurate way to represent the difficulty with which flow passes through a restriction. Tr. at 2906 (Nesic); Tr. at 2877–78 (Nesic); TREX 011529R.0033.

1398. Dr. Nesic does not use pressure data from the PT-B gauge in his analysis because the gauge did not begin capturing data on April 22, and the gauge was not sufficiently accurate to analyze pressure drops across specific components for the purposes of a metal erosion analysis. Tr. at 2943–45 (Nesic).

1399. Dr. Nesic's model uses values for fluid properties, but it is not sensitive to viscosity or density. Tr. at 2902 (Nesic). Had Dr. Nesic had used a different density, the results for pressure drop change, and thus the same ratio for flow rate increase, would have been the same. Tr. at 2963–64 (Nesic).

> **d.** **Erosion of the BOP and Riser at the Macondo Well Could Not Have Occurred in Just a Few Hours or Days.**

1400. It is "impossible" for the observed erosion of the BOP and riser at the Macondo well to have occurred in just a few hours or days. Tr. at 2898–2900 (Nesic). Most obviously, erosion of the casing shear ram could not have begun until it was activated April 29 and the third hole in the kink in the riser did not appear until May 19—a month after the incident. Tr. at 2898–2900, 2903, 2962 (Nesic); D23633B; D24452; D23645; D23995B; Hunter Dep. at 169–71; TREX 008851.0002.

1401. The appearance of the third hole in the kinked riser on May 19 indicates that sand production and erosion continued at least through that date. *See* Hunter Dep. at 169; Tr. at 2869

(Nesic).  If the kink was eroding as of May 19, so too were the BOP components because sand was still being produced at sufficient quantities to cause erosion.  Tr. at 2962 (Nesic).

1402.   Dr. Rory Davis, the Government's Phase 1 Blowout Preventer Expert, testified that "'washing' or what other people call 'erosion'" of the blowout preventer happened "gradually over a long period of time," for "70 or 75 days before the flow was stopped."  Phase 1 Tr. at 2682–83 (Davis).

1403.   Dr. Earl Shanks's testimony about rapid erosion was limited to pieces of drill pipe and was about "a couple of points along the circumference where there was more erosion than others."  Phase 1 Tr. at 9192 (Shanks).  Dr. Nesic testified that "one [cannot] make that leap of imagination that from one case of very fast erosion … everything eroded at the same rate."  Tr. at 2899 (Nesic).  Even a single component does not erode uniformly at the same rate across all surfaces.  Tr. at 2899 (Nesic).

<div style="text-align:center">

(2)   <strong>Dr. Andreas Momber—the World's Leading Expert in Cement Erosion—Confirmed That the U.S. Experts' Cement Erosion Assumptions Are Not Scientifically Plausible.</strong>

</div>

1404.   Dr. Andreas Momber is the world's leading expert in cement erosion, having done extensive research in the field for over twenty years.   TREX 011644.0004; Tr. at 2966–68 (Momber).

1405.   Dr. Momber has spent over 20 years studying erosion processes, particularly of mineral-based materials such as cement.  Tr. at 2968 (Momber); TREX 011644; D24707.  Dr. Momber earned his Master's Degree in the field of heating cement, and received the German equivalent of a Ph.D. from the University of Leipzig, Germany on the topic of rehabilitation of concrete structures.  Tr. at 2966–67 (Momber).  Dr. Momber also earned a habilitation degree—

<div style="text-align:center">314</div>

the highest academic degree available in the German educational system—in the field of erosion of geomaterials.  Tr. at 2966–67 (Momber).

1406.  He is currently a lecturer at the Department of Geo-Resources and Materials Technology at the Aachen University of Technology in Germany in the field of erosion of geomaterials and has published more than 100 peer-reviewed papers related to degradation processes.  TREX 011644; D24707.  Dr. Momber's 20 years of experience relates to both cement and concrete materials, as Dr. Momber explained that both terms relate to the same material but with varying amounts of aggregate or other additive material.  Tr. at 2967–68 (Momber).  The term "well cement" refers to one specific application of these materials within the range of cement and concrete materials that Dr. Momber works with and studies.   Tr. at 2967–68 (Momber).

> **a.** **Like the U.S. Experts, Dr. Momber Assumed the Cement Was Set for the Purposes of His Analysis.**

1407.  For the purposes of his analysis, Dr. Momber considers the cement barrier as the cement in the area of the shoe track, between the reamer shoe and the float collar.  Tr. at 2976–77 (Momber); TREX 011644.7.1.

1408.  The flow path for hydrocarbons was up through the production casing, including the shoe track.  TREX 000001; TREX 011644.0005; Emilsen Dep. at 118–19.

1409.  The shoe track was filled with cement by Halliburton approximately 21 hours prior to hydrocarbon influx.  TREX 000001.0023–24.

1410.  U.S. experts Drs. Griffiths and Dykhuizen assumed that the well cement eroded and no longer restricted flow after 9 to 48 hours.  TREX 011485R.0011–12 (Dr. Griffiths: "The 9 hour estimate thus very likely represents an upper bound on the time to complete elimination of any resistance to flow by the cement"); TREX 011452.0011 (Dr. Dykhuizen: "I do not believe

that erosion had a significant effect on overall flow from the well past the second day of the blowout"); TREX 011644.0006–07.  Dr. Tom Hunter similarly testified that: "[t]here certainly was cement at different places in the well that -- that -- that did -- that affected the flow."). Hunter Dep. at 128–29; *see also* Hunter Dep. at 13–31 (noting that he does not recall any work done to determine what, if any, restrictions the cement was providing to potential flow) ("It'd be hard to disagree that cement doesn't have the role of inhibiting flow, because that's precisely what the role of cement is in a well.").

1411.  Both Dr. Momber and the U.S. experts assume that the cement in the shoe track was set but likely pre-damaged.  TREX 011644.0012 ("A reasonable inference … is that there was substantial cement impeding flow in the wellbore, but that flow was occurring through channels in the cement"); Tr. at 2977 (Momber); TREX 011485R.0012 (Griffiths Report: "assuming that the cement remained reasonably intact"); TREX 011452.0011 (Dykhuizen Report: "initially small flow paths" expanded by erosion).

1412.  Dr. Momber assumes that the cement was set primarily because his analysis is in reply to Dr. Griffiths's expert report and he was trying to make the same assumptions and use the same procedures that Dr. Griffiths did in his Report.  Tr. at 2978–79 (Momber) ("I found that he made assumptions on the status of the cement by mentioning that the cement was reasonably intact and provided at least an initial barrier to erosion as well.").  Dr. Momber's analysis is similarly responding to Dr. Dykhuizen, who assumes that "after 48 hours, any erosion process would not be of any meaning to the flow -- flow rate of hydrocarbons."  Tr. at 2979 (Momber); *see also* TREX 011452.11.2 ("I do not believe that erosion had a significant effect on overall flow from the well past the second day of the blowout.").

1413.   Cement is considered set and immovable at 50 psi of compressive strength.  Phase 1 Tr. at 2426–27 (Benge) ("[Cement] is set and immovable at 50 [psi]."); Phase 1 Tr. at 2571 (Benge) (API RP 65 identifies cement as a barrier at 50 psi); TREX 007792.0025 ("[C]ement shall be considered a physical barrier only when it has attained a minimum of 50 psi compressive or sonic strength.").  *See also* Tr. at 3008 (Member) (discussing Dr. Member's review of the compressive strength evidence); Tr. at 3025–26 (Member) (explaining that the Chevron testing scenarios "were designed to be as close as possible to the situation in the Macondo well in terms of the pressure, in terms of the temperature, in terms of the temperature ramp.  So those are numbers I really could use that gives me a feeling about compressive strength numbers I could expect.").

1414.   It is reasonable to assume that the shoe track cement had achieved at least 50 psi of compressive strength.  TREX 007722.0002 (Halliburton UCA); TREX 002702.0005 (Chevron UCA); TREX 000713.

1415.   Other evidence confirms that the assumption that the cement was set is a reasonable one.  *See e.g.*, TREX 007265.0008 (Appendix W) ("It is probable that the sands were restricted to some degree by the cement and down-hole equipment and that the resulting reservoir exposure is less than the total reservoir thickness.").  In fact, Halliburton's Phase 1 expert Dr. Gene Beck agreed that both the annular and shoe track cement performed as expected and set up to form a barrier.  TREX 008140.0082–83 ("Indications are that the annulus cement performed as expected (*i.e.* that the nitrified cement set up in the annulus), so that the shoe track cement should have performed equally as well.").

1416.   The Government's suggestion that BP witnesses had testified that the cement did not set up misconstrues the testimony to which the Government points.  Specifically, John

Guide's statement that "[t]he cement obviously didn't set up," was made in the context of questioning about discussions that Mr. Guide had **after the incident** about why the cement job failed to form a barrier to hydrocarbons, leading to the blowout. Phase 1 Tr. at 8950–51 (Guide) ("Q. Okay. After the event, did you participate … But did you participate in a discussion with anyone where there was a discussion that the cement job may have been contaminated there -- after it was pumped or during the pumping of it, there in the wellbore, that might have been one of the reasons for an issue with the cement job if, in fact, that was determined to be the case?"). Indeed, it is widely accepted among the fact and expert witnesses from virtually all the parties that the cement job **must have failed** to form a barrier for the blowout to have occurred; had it performed as planned and achieved zonal isolation, the blowout could not have occurred. *See e.g.*, Phase 1 Tr. at 3010 (Probert) ("Q. You agree that the primary cement job failed at Macondo to isolate the hydrocarbons in the well, correct? A. Yeah, we agree that it failed to isolate the hydrocarbons. The issue is we don't know why."). Although Mr. Guide's response used the phrase "set up," it is clear from the context of his answer that he is discussing the performance of the cement job as a whole, in failing to isolate the hydrocarbons, rather than making a statement about the compressive strength of the cement in the shoe track, which is the issue that Drs. Momber, Griffiths and Dykhuizen addressed in their Phase 2 analysis of cement erosion following the blowout. Phase 1 Tr. at 8950–51 (Guide) ("What we discussed -- the word -- we didn't use the word 'contamination' -- … but it was -- it was that the cement didn't fully set up …. It was -- we just said, 'The cement obviously didn't set up.' I don't remember 'contamination.'").

1417. Similarly, the Government's selective quoting of Mr. Jerry Calvert's Phase 1 expert report also misrepresents Mr. Calvert's opinions on the question of the compressive

strength of the cement in the shoe track at the time in question (*i.e.*, following the blowout as the well was flowing).  Specifically, it omits that Mr. Calvert was not even purporting to comment on that question, but was instead focused on whether the cement job as a whole achieved zonal isolation.  *See* TREX 022761 (Calvert Phase 1 Expert Report) ("I have also been asked to analyze whether zonal isolation was achieved and to discuss potential avenues in the cement through which hydrocarbons could flow.").  Thus, like Mr. Guide, Mr. Calvert's comments speak to whether the cement job achieved zonal isolation.  (The parties universally agree that it did not.)  *See* Phase 1 Tr. at 1376 (Bly); Phase 1 Tr. at 6213–14 (Ambrose); Phase 1 Tr. at 2612 (Calvert); Phase 1 Tr. at 2242 (Benge).  The language the Government has quoted from Mr. Calvert is from the discussion in his expert report about the negative pressure test ***as a measure of whether zonal isolation had been achieved***.  TREX 022761 at 12 (Calvert Phase 1 Expert Report) ("If zonal isolation has been achieved, the operator should see no flow during the negative pressure test.").  Mr. Calvert did not address the issue before the Phase 2 experts with respect to cement erosion, *i.e.*, whether cement had set in the shoe track such that there would have been cement to erode in the days and weeks following the blowout.  *See generally* TREX 022761 (Calvert Phase 1 Expert Report) ("I have not been asked, and this report does not address, whether the hydrocarbons that ultimately led to the blowout of the Macondo Well flowed up or down the annulus; rather, this report addresses whether hydrocarbons could have flowed through the shoe track cement.").

> **b.     Dr. Member Compared the Erosion Rates Required to Achieve the Erosion Assumed by the Government Experts with Those He Had Encountered in His Experience and Observed in a Comprehensive Literature Review.**

1418.  Dr. Member calculates the volume of the cement barrier in the shoe track, and then divides that volume by the time periods in which the Government experts assumed erosion

had taken place to derive the effective rate of erosion implicitly assumed by Drs. Griffiths and Dykhuizen. Tr. at 2976–77 (Momber); TREX 011644.

1419. Dr. Momber explained that in assuming that the set cement in the shoe track was "predisturbed," he meant that the cement contained "a net of cracks and voids and pores and of interfaces that would allow a particular volume of hydrocarbons to flow through it." Tr. at 2982 (Momber); *see also* TREX 011644.10.1 (illustrating the appearance of channels that would exist within predisturbed cement).

1420. Dr. Momber's assumption that the cement was predisturbed is reasonable because it is supported by the evidence relating to the blowout. *See* TREX 007265.0055 (Appendix W) ("initially, only smaller channels in the cement were open between reservoir and the wellbore").

1421. In order to calculate the actual amount of cement in the shoe track, accounting for those channels, Dr. Momber calculates the volume of these predisturbed channels using the procedure described in Exhibit A to Dr. Momber's expert report, and subtracts that amount from the total cement volume for the shoe track. Tr. at 2983–85 (Momber); *see* TREX 011644.28.1 (pressure drop calculations table).

1422. The results of this calculation indicated that approximately 19 percent of the cement in the shoe track was occupied by these channels or voids, and Dr. Momber determines that such a figure is consistent with Mr. Emilsen's Appendix W work (and described in Mr. Emilsen's Phase 1 Expert Report and trial testimony (*see* Tr. at 7801–03 (Emilsen); TREX 040003.0007 (Emilsen Expert Report); D04784; D04861)), which indicated that approximately one-fifth of the reservoir was exposed, and that that match is "good proof" of Dr. Momber's calculation. Tr. at 2983–85 (Momber); TREX 011644.28.1.

        **c.**    **Dr. Momber's Analysis Shows That the U.S. Experts' Cement Erosion Assumptions Require**

**Cement Erosion Rates Orders of Magnitude
Higher Than Any Known Cement Erosion Rates.**

1423.   As described in his Expert Report, Dr. Momber testified that he reached two main opinions in this case: (1) that, "assuming that the cement in the Macondo well was set, it is scientifically unsound and unproven that the cement could have been eroded in the time periods issued by the two experts, which would be roughly nine hours and 48 hours"; and (2) with respect to the net pay change from Mr. Emilsen's report discussed in Dr. Griffiths's report, Dr. Momber does "not agree about the gradual net pay change issued by Dr. Griffiths, and I do not agree that the net pay change could have been the result of an erosion process;" instead, Dr. Momber submits that "hydraulic fragmentation" was an alternative scenario that could explain that result.  Tr. at 2970–71 (Momber); TREX 011644; D24708.

1424.   Dr. Momber explained in his trial testimony that the U.S. experts' cement erosion assumptions are scientifically implausible, as they require rates of cement erosion that are orders of magnitude higher than any known cement erosion rates.  Tr. at 2970–71 (Momber); Tr. at 2985–90 (Momber) ("I found that the erosion rates required for Dr. Dykhuizen and Dr. Griffiths are far off the erosion rates known for cement-based materials even under extreme conditions. They must have been some orders of magnitudes higher.").  *See also* TREX 011644.0015–16 ("The Government experts' assumed erosion rates are 10,000 to 100,000 times greater than any reported in the extensive literature devoted to concrete erosion.").  Dr. Momber illustrated the results of his analysis in D24238:



*See* Tr. at 2989–90 (Momber) (noting that "even at rather low compressive strength numbers here on the left side of the graph, we see that there are still orders of magnitudes differences between real erosion rates and erosion rates required for Dr. Griffiths's and Dr. Dykhuizen's approaches").

1425.  Dr. Momber also explained that changes in the composition of the cement slurry (such as the amount of aggregate or other additives) would be manifested in terms of compressive strength, and so this comparison that he performed demonstrates that even when such changes are factored in, the erosion rates assumed by Drs. Griffiths and Dykhuizen are not scientifically plausible.  Tr. at 2991–92 (Momber); *see also* Tr. at 3023–24 (Momber) ("And it is well known in many erosion studies, not just for slurry erosion but for other erosion types as well, that the compressive strength is a parameter that can characterize the erosion resistance of cement-based material.").

1426.  As a starting point, Dr. Member observes that the cement erosion rates necessary for Drs. Dykhuizen's and Griffiths's assumptions seemed implausible and inconsistent with any results that he had observed in all of his previous work in the field.  Tr. at 2974–75 (Member).  Indeed, if the material under review were more of a "cement" than a "concrete," in terms of the amount of aggregate in the slurry, the rate of erosion would actually be slower than those that appear in the literature, and thus even further away from the rates assumed by the Government experts.  Tr. at 2992–93 (Member).

1427.  After a literature review that include a review of numerous articles, containing more than 200 known cement erosion scenarios, Dr. Member finds no support for the rates required by the U.S. experts' assumptions.  TREX 011644.0015–16; Tr. at 2974–75 (Member).

1428.  The U.S. experts provide no scientific bases for their erosion assumptions.  Tr. at 2985, 2993 (Member) ("No. I didn't see any scientific proof in terms of an erosion process.").

> **d.    Dr. Member Disagreed with Dr. Griffiths's Interpretation of Mr. Emilsen's Discussion of the Change in Net Pay at 21:30, and Suggested That "Hydraulic Fragmentation" Is a Plausible Alternative Explanation for That Change.**

1429.  Dr. Griffiths explained his basis for arriving at his conclusions that all erosion had concluded within nine hours by pointing to a discussion in Appendix W of the Bly Report regarding a change in the net pay that occurred at 21:30.  TREX 011485R.12.4 n.10.  He construes that change as a ***rate*** of change and then applying that rate of change beyond the time period addressed in Appendix W to suggest that the productivity index would have reached 43.8 stb/day/psi in 8.6 hours (and therefore that all erosion was complete by that time).  *See* TREX 011485R.12.4 n.10.

1430.  Contrary to the suggestion in Dr. Griffiths's report, however, the net pay change described in Appendix W is ***neither*** a rate of change, ***nor*** is there any basis to extend it beyond

the time reported in the discussion in Appendix W.   TREX 040003.0012 ("The Case 7 simulation assumes that when the pumps are shut down at 21:30 hrs the pressure drops, creating a higher drawdown on the reservoir and from this point forward 16.5 feet of net pay."); *see* Tr. at 2986 (Momber).   As Appendix W explains, the net pay change at issue is identified to have occurred as a step-change rather than as a rate of change (*i.e.*, "***at*** 21:30" (emphasis added)), and is attributed specifically to the pumps being shut down at that time; this occurrence does not happen again during the 8.6 hours after the blowout during which Dr. Griffiths attempts to apply this rate of change to reach his erosion conclusion.   TREX 040003.0012.

1431.   Dr. Momber disagrees with Dr. Griffiths's analysis on this point and provides his own alternative explanation of the net pay change at 21:30 as being attributable to "hydraulic fragmentation"—an explanation that is consistent with Dr. Momber's extensive experience in the field of cement erosion.   Tr. at 3013–14 (Momber) ("And this instantaneously increase in the flow rate could not be explained by any erosion process and so I put forward an alternative scenario.   And, right, yes, this is the so-called 'hydraulic fragmentation.'"); Tr. at 3015 (Momber) ("that must have been incurred by a sudden event, not something like an erosion process.   That is actually my point.").   *See* TREX 011644.0017 (explaining hydraulic fragmentation alternative scenario).

### 5.    U.S. Experts Also Fail to Account for the Existence of Slug Flow and Its Implications on Flow Rate for the Period During Which It Was Observed.

1432.   Slug flow refers to a phenomenon of multiphase fluid flow that consists of alternating oil-dominant and gas-dominant flows.   Tr. at 1487 (Dykhuizen); Lockett Dep. at 132; TREX 011683.0005, 0013; D23840.   Slug flow is a well-known phenomenon in the oil and gas industry and is studied during the design and operation of multiphase pipelines.   Tr. at 2708 (Zaldivar); TREX 011683.0009.   Indeed, slug flow is extensively studied by flow assurance

engineers because it can affect the operational efficiency of receiving facilities.   TREX 011683.0013; Tr. at 2708 (Zaldivar).

1433.   Dr. Michael Zaldivar, a flow assurance engineer retained by BP and Anadarko, evaluated whether slug flow occurred during mid-May 2010 and, if so, what insights could be gained about the flow rate during this period.   Tr. at 2701–02 (Zaldivar); TREX 011683.0005. Over the course of six months, Dr. Zaldivar reviewed hundreds of hours of videos recorded by remotely operated vehicles ("ROVs") and performed more than 1,000 multiphase flow simulations; each simulation took 12–48 hours to complete and therefore required him to use multiple computers to run simulations at the same time.   Tr. at 2710, 2719, 2747–48, 2763–64 (Zaldivar); TREX 011683.0015.   During the course of his analysis, Dr. Zaldivar generated approximately 5 terabytes (5,000 GB) of data.   Tr. at 2747–48 (Zaldivar).

1434.   Dr. Zaldivar concludes that there is robust video evidence of slug flow from May 13–20, 2010, and that the flow rate for this period is bounded between 24,900 and 35,900 stb/day, with a best estimate of 30,000 stb/day.   Tr. at 2711 (Zaldivar); TREX 011683.0005, 0010.

<div align="center">(a)   <b>Slug Flow Is a Bounded Flow Regime; It Can Only Occur at Certain Flow Rates.</b></div>

1435.   It is undisputed that slug flow is a flow condition that only occurs at certain flow rates.   Tr. at 2702, 2708, 2733 (Zaldivar); Tr. at 1487 (Dykhuizen); TREX 011488.0024.   Thus, one can determine flow rate based on the existence of slug flow.   Tr. at 2702, 2708 (Zaldivar).

1436.   Slug flow is characterized as a "lower flow rate phenomen[on]" because it generally occurs only at lower flow rates.   Tr. at 2714 (Zaldivar).   Slug flow requires specific ratios of oil and gas speeds that exist only at lower flow rates.   Tr. at 2714 (Zaldivar).   At very high flow rates, slug flow cannot exist because it will break down into a different type of

<div align="center">325</div>

multiphase flow regime (*e.g.*, mist flow).  Tr. at 2714 (Zaldivar); D23468.  Here, Dr. Zaldivar's analysis and modeling establish that the specific observed slug flow behavior could not have occurred at flow rates higher than 35,900 stock tank barrels per day.  Tr. at 2763–64 (Zaldivar).

<div style="text-align:center">

(b) **Dr. Michael Zaldivar Is an Expert in Modeling and Evaluating Multiphase Flow and Slug Flow in Oil and Gas Pipelines.**

</div>

1437.  Dr. Zaldivar has over 10 years of experience working as a flow assurance engineer.  Tr. at 2702 (Zaldivar); TREX 011683.0006.  Dr. Zaldivar's experience includes analysis and modeling of multiphase flow phenomena, including slug flow,  through oil and gas pipelines on behalf of clients in the oil and gas industry.  Tr. at 2701–09 (Zaldivar); TREX 011683.0006, 0034–39.  Dr. Zaldivar has a bachelor's degree, master's degree, and Ph.D. in chemical engineering.  Tr. at 2702 (Zaldivar); TREX 011683.0006.  Dr. Zaldivar is the founder and principal of evoleap LLC, an engineering services company that provides flow assurance software and services to oil and gas operators around the world.  Tr. at 2704 (Zaldivar); TREX 011683.0005.  Flow assurance engineers like Dr. Zaldivar regularly determine the flow rate boundaries for where slug flow may occur based on evaluating and modeling multiphase flow through oil and gas pipelines.  Tr. at 2708 (Zaldivar); TREX 011683.0013.  This analysis is performed to advise operators on how to avoid slug flow or how to operate at flow rates where slug flow is present.  Tr. at 2708 (Zaldivar); TREX 011683.0033.

1438.  As a flow assurance engineer, Dr. Zaldivar has been involved in over 50 projects or oil fields in which he has performed or participated in multiphase flow modeling using multiphase flow simulators such as LedaFlow and OLGA.  Tr. at 2708 (Zaldivar).  Dr. Zaldivar has built multiphase flow models (using LedaFlow and OLGA) to calculate flow rates for multiphase flow, including slug flow, in oil and gas pipelines.  Tr. at 2702–06 (Zaldivar); TREX 011683.0006. Dr. Zaldivar has designed and built models and systems to predict slug flow in oil

<div style="text-align:center">326</div>

and gas pipelines, just like the model he used for this investigation.  Tr. at 2703 (Zaldivar); TREX 011683.0006.  He has also investigated slug flow in numerous pipeline systems around the world, and has studied many types of slug flow phenomena in engineering projects (including terrain-induced, hydrodynamic, pigging, and ramp-up slug flow).   TREX 011683.0006.  Dr. Zaldivar's prior work using multiphase flow simulators is very similar to the analysis performed in this investigation.  Tr. at 2703 (Zaldivar); TREX 011683.0006.

1439.   Multiphase flow simulators like LedaFlow and OLGA are commercially available and are routinely used by the oil and gas industry to calculate and evaluate hydrocarbon flow rates for multiphase flow in nearly every pipeline around the world.  Tr. at 2705–08 (Zaldivar); Rygg Dep. at 33.  By using such multiphase flow simulators, oil and gas producers can design production pipelines and facilities to avoid or mitigate slug flow.  TREX 011683.0013; Rygg Dep. at 33.

1440.   OLGA is a multiphase flow simulation software program that has been used in the oil and gas industry for over 30 years.  Tr. at 2705 (Zaldivar); TREX 011683.0043; D24563. Marketed by Kongsberg Oil and Gas Technologies, LedaFlow is a multiphase flow simulator similar to OLGA.  TREX 011683.0014, 0043–44; Tr. at 2704–06 (Zaldivar); D24563.  LedaFlow was developed through more than 10 years of collaboration between ConocoPhillips, Total, and SINTEF and is regularly used by flow assurance engineers in the oil and gas industry.  TREX 011683.0014, 0043–44; Tr. at 2705 (Zaldivar); D24563.   Both OLGA and LedaFlow are extensively validated with field data.  Tr. at 2708 (Zaldivar); TREX 011683.0043–44; D24563.

1441. LedaFlow and OLGA are considered "enabling technologies" because the modeling of flow through deepwater pipelines produced by these software packages enabled the industry to move production from onshore to offshore, including into deepwater.  Tr. at 2707–08

327

(Zaldivar); TREX 011683.0043–44.  The fact that the oil and gas industry has been able to drill in deeper and deeper water is a tribute to how well these tools work.  Tr. at 2707–08 (Zaldivar); TREX 011683.0043–44; D24563.  Furthermore, there is a very large body of experimental evidence focusing on multiphase flow, and each of these software packages incorporates the results from these experiments.  Tr. at 2707–08 (Zaldivar); TREX 011683.0043–44.  Therefore, these models are "very accurate" in their predictions of multiphase flow.  Tr. at 2708 (Zaldivar).

1442.  Dr. Zaldivar has significant experience using the LedaFlow software, as he was hired by Kongsberg when it was commercially launching the software.  Tr. at 2704–06 (Zaldivar); TREX 011683.0006, 0039.

1443.  At Kongsberg, Dr. Zaldivar was involved in developing multiphase flow models in LedaFlow and was responsible for the management of two different engineering teams: (1) a team of engineers responsible for the engineering support, studies, and training, and (2) a team of software developers.  Tr. at 2704 (Zaldivar); TREX 011683.0006.  As a result, Dr. Zaldivar is indisputably qualified to perform multiphase flow modeling using LedaFlow.  Tr. at 2704–06 (Zaldivar); TREX 011683.0006, 0039.

<div align="center">(c)   <strong>Slug Flow Occurred from the End of the <em>Deepwater Horizon</em>'s Riser from May 13–20, 2010.</strong></div>

1444.  Slug flow is visible on video footage from remotely operated vehicles ("ROVs") during the time period when the plume from the end of the riser changes colors and trajectories.  Tr. at 2719–22 (Zaldivar); TREX 011683.0009, 0015–16; D23470; D24252.

<div align="center">328</div>

## Slug Flow from Riser End

**Oil-Dominant Flow**      **Gas-Dominant Flow**

Start of Animation          End of Animation

Source: TREX 011683, 130995, 140852          D24252

1445.   Although the existence of slug flow was "very evident" based on review of video footage from ROVs, Dr. Zaldivar performed trajectory analysis to confirm that the dark-colored and light-colored fluids were oil and gas, respectively.   Tr. at 2719–22 (Zaldivar); TREX 011683.0009, 0015–16; D23470; D24252.   If slug flow had not been present, the plume would have appeared as a uniform mixture of oil and gas, as was observed from ROV video footage after May 20.   TREX 011683.0009.   Dr. Zaldivar did not see any slug flow with regular periodicity occurring before May 13 or after May 20.   Tr. at 2725–26 (Zaldivar); TREX 011683.0009; D23470; D24252.

1446.   There is no dispute from any party that slug flow occurred from the end of the *Deepwater Horizon*'s riser from May 13–20, 2010.   Tr. at 2711 (Zaldivar); TREX 011683.0009; Tr. at 1416–17, 1487 (Dykhuizen); TREX 009183.0011, 0151; D23470; D24252.   In fact, several U.S. Government scientists themselves noted or confirmed the existence of slug flow in mid-May 2010.   Tr. at 2710, 2717–18 (Zaldivar); TREX 011683.0009.   For instance, the U.S. Government's FRTG Plume Team observed the alternating dark-colored and light-colored flow

329

pattern and found that it "confirms the 'slug flow' regime."  TREX 009183.0150; Tr. at 2718 (Zaldivar); TREX 011683.0015; D24564.

1447.   The slug flow observed from the riser end between May 13 and May 20 exhibited a "very regular pattern"; the flow transitioned back and forth between oil and gas very regularly. Tr. at 2719–22 (Zaldivar); TREX 011683.0016–17; D24257; D23916; *see also* Tr. at 3068 (Johnson); Tr. at 1488 (Dykhuizen).  Specifically, from May 13–15, the slug flow exhibited what Dr. Zaldivar describes as "double peak behavior," which means over the entire slug period there are two alternations of flow.  Tr. at 2725–26 (Zaldivar); TREX 011683.0016.  Then, from May 16–20, the slug flow exhibited what Dr. Zaldivar describes as "single peak behavior," which means over the entire slug period there is one alternation of flow.  Tr. at 2725–26 (Zaldivar); TREX 011683.0017.

1448.   Contrary to the patterns identified at the riser end from May 13 to May 20, slug flow is typically a chaotic process, *i.e.*, it almost always consists of "chaotic, random" alternations between oil and gas.  Tr. at 2722–25 (Zaldivar).  Slug flow with the periodicity and the extreme degree of regularity observed from May 13 to May 20 is "unique" and "very, very rare."  Tr. at 2722–25 (Zaldivar).  In fact, Dr. Zaldivar has never before witnessed slug flow like this—even though slug flow itself is a very common phenomenon—and it was this unique pattern that allowed Dr. Zaldivar to model the flow and calculate flow rate boundaries.  Tr. at 2722–25, 2733 (Zaldivar); TREX 011683.0009.  Specifically, Dr. Zaldivar's modeling matches the observed single-peak and double-peak behavior of the flow.  Tr. at 2725–26 (Zaldivar).

1449.  As part of the riser sank to the seafloor it began the cyclic motion—hence, Dr. Zaldivar refers to this section of the riser as the "buoyant loop."  Tr. at 2710, 2726 (Zaldivar). Once the buoyant loop's cyclic motion stopped and it finally settled on the seafloor, slug flow

was no longer observed from the riser end.  TREX 011683.0017.  The slug flow from the riser

end is direct*ly l*inked to the oscillatory motion of the riser's "buoyant loop."  Tr. at 2715–16,

2727, 2733 (Zaldivar); Tr. at 1417 (Dykhuizen); TREX 011683.0009; D24679; D24682A.  As

the  period  and  range  of  motion  of  the  riser  changed  over  time,  so  did  the  slug  flow's

characteristics.  TREX 011683.0009, 0017; D24567.  Dr. Zaldivar is able to calculate the flow

rate during this time period based on knowing the unique patter (*i.e.*, signature) of the slug flow

and the measured motion of the riser obtained from ROV footage and ROV navigation data.  Tr.

at 2733 (Zaldivar); TREX 011683.0009.

> (d)   **Dr. Zaldivar's LedaFlow Modeling and Simulations Confirm
> That the Flow Rate(s) in Mid-May 2010 Could Only Have Been
> Between 24,900 and 35,900 Barrels per Day.**

1450.   To calculate the range of possible flow rates for May 13–20, 2010, Dr. Zaldivar

built multiple models of the full riser system (including both the riser's end and kink leaks) using

LedaFlow.  Tr. at 2710, 2725–26, 2733 (Zaldivar); TREX 011683.0026.  Dr. Zaldivar calculates

the flow rate out of the riser end and kink leaks separately, then combines the two estimates to

calculate  total  flow  rate  during  May  13–20,  2010.   Tr.  at  2757–62  (Zaldivar);  TREX

011683.0026.  Dr. Zaldivar performed more than 1,000 multiphase flow simulations with these

models, varying different data in each model and using flow rates ranging from 12,000 stb/day to

60,000 stb/day, in an effort to match the observed slug flow characteristics.  Tr. at 2746–47

(Zaldivar); TREX 011683.0026.  Dr. Zaldivar selected a large range of potential flow rates for

his simulations to gain further confidence in the accuracy of his results and to establish that the

observed slug flow did not occur outside the likely range of flow rates.  Tr. at 2746–47

(Zaldivar).  Each model simulation that resulted in the observed "double-peak" and "single-

peak" slug flow pattern was a "qualifying" flow rate.  Tr. at 2749–52 (Zaldivar); TREX

011683.0029–30; D23865.

1451.   Based on the thousands of simulations, Dr. Zaldivar concludes that the flow rate out of the riser end alone was between 20,000 and 31,000 stb/day, with a best estimate of 25,100 stb/day.  Tr. at 2757 (Zaldivar); TREX 011683.0029–30.

1452.   During mid-May 2010, hydrocarbons were flowing not only from the end of the riser but also from several leaks that developed in the kinked section of the riser just above the *Deepwater Horizon's* BOP and LMRP.   Tr. at 2716 (Zaldivar); TREX 011683.0007–08.  Therefore, to calculate the total flow rate for this period, Dr. Zaldivar also calculated the flow rate from these small leaks.  Tr. at 2734 (Zaldivar); TREX 011683.0010.  Using a conservative model, Dr. Zaldivar calculates a maximum flow rate from the kink leaks of 4,900 stb/day.  Tr. at 2760–61 (Zaldivar); TREX 011683.0030.  As described in more detail below, Dr. Zaldivar's model is conservative because it incorporates a series of very conservative assumptions and parameters.  Tr. at 2760–61 (Zaldivar); TREX 011683.0030, 0106.

1453.   By summing the riser-end and kink-leak estimates, Dr. Zaldivar concludes that the total flow rate for May 13–20, 2010, is bounded between 24,900 and 35,900 stb/day, with a best estimate of 30,000 stb/day.  Tr. at 2710–11, 2733, 2762 (Zaldivar); TREX 011683.0031–32.  There is simply no evidence that the flow rate from May 13–20 was below 24,900 stb/day or above 35,900 stb/day.  Tr. at 2762 (Zaldivar).

>              (1)      **Dr. Zaldivar's LedaFlow Models Fully and Accurately Reproduced the *Deepwater Horizon* Riser Flow System.**

1454.   Using LedaFlow, Dr. Zaldivar built two accurate, detailed, and comprehensive models of the *Deepwater Horizon* riser flow system.  Tr. at 2728–29, 2734–35, 2748 (Zaldivar).  Dr. Zaldivar's LedaFlow models are based on well-known and well-characterized data and properties of the riser flow system, including measured data regarding the motion of the riser's buoyant loop.  Tr. at 2739–41 (Zaldivar); TREX 011683.0093.  The mathematical description of

riser motion used in his model is a "very good fit" to the actual measurements, when normally there is often a difference between the imposed curve and the measured curve.  Tr. at 2739–40 (Zaldivar); TREX 011683.0093.

1455.   Dr. Zaldivar's riser-end model ("No Kink Model") is designed to estimate the flow rate out the riser end by matching the unique slug flow behavior.  Tr. at 2734 (Zaldivar); TREX 011683.0026; D23480-3; D23480-4.  The No Kink Model starts at the first riser joint and extends to the riser end; the model input is a flow rate boundary (varied to determine flow rate) and the model output is a pressure boundary (ambient seafloor pressure).  Tr. at 2734–35 (Zaldivar); TREX 011683.0026; D23480-3; D23480-4.  The No Kink Model uses detailed inputs for riser construction, fluid properties, environmental properties, and riser elevation profile.  Tr. at 2736–41 (Zaldivar); D24569.  The No Kink Model also incorporates the motion of the buoyant loop that matched the oscillations observed on the ROV videos.  TREX 011683.0010.

1456.   Dr. Zaldivar's kink-leak model ("Kink Model") is designed to conservatively estimate flow rate out the riser kink leaks.  Tr. at 2734 (Zaldivar); TREX 011683.0027.  The Kink Model extends the No Kink Model back to include the kinked section of the riser and includes additional parameters for the geometry of the kink holes, a pressure boundary before the kink holes, fluid temperature before the kink holes, location of the kink holes along the kink, and hydrostatic pressure outside the kink holes.  TREX 011683.0026; D23481-3; D23481.

> **a.    Dr. Zaldivar Used Accurate Fluid Properties in His Analysis.**

1457.   Dr. Zaldivar generated fluid property tables using Dr. Whitson's equation of state model.  TREX 011683.0058–59.  *See* Section III.B.6, *infra*.

**b.**      **Dr. Zaldivar Correctly Modeled Multiphase Flow Using the Hydraulic Diameter—the "Gold Standard" Geometric Transformation—to Transform the Noncircular Flow Area to a Circular Flow Area.**

1458.   Multiphase flow simulators like OLGA and LedaFlow are built to model flow through circular pipes.  Tr. at 2742–44 (Zaldivar); D24643.  However, there are situations where it is necessary to model multiphase flow through non-circular geometries.  Tr. at 2742–43 (Zaldivar); D24643.  As a result, there is a body of scientific knowledge based on investigating and developing methods for how to convert, or "transform," non-circular geometries (*e.g.*, flow through an annulus) into equivalent circular geometries for use in single-phase and multiphase flow modeling.  Tr. at 2742–43 (Zaldivar).  The critical aspect of flow models is that they accurately define the relationship between pressure drop and flow rate, and any "geometric transformation" must maintain that correct relationship between pressure drop and flow rate to calculate flow rates accurately.  Tr. at 2743–44, 2784–85, 2811, 2823–24, 2829 (Zaldivar); Tr. at 3116, 3142–45 (Johnson); TREX 130713.0044–47; D24644.

1459.   To accurately model flow through the non-circular geometries that existed in the riser and the kink holes, Dr. Zaldivar uses a geometric transformation called the "hydraulic diameter" (or "equivalent hydraulic diameter").  Tr. at 2743–44 (Zaldivar).  The hydraulic diameter maintains the correct ratio of flow area to "wetted perimeter" (*i.e.*, the perimeter in contact with the fluids), which is necessary to maintain an accurate relationship between pressure drop and flow rate.  Tr. at 2743–44, 2784–85, 2811, 2823–24, 2829 (Zaldivar);  Tr. at 3142–45 (Johnson); TREX 130713.0044–47; D24644.  The hydraulic diameter results in a model with a smaller flow area, but that is expected and necessary to maintain the correct ratios.  Tr. at 2786 (Zaldivar); TREX 130713.0044–47.

334

1460.  Dr. Zaldivar's model correctly captures the ratio between flow area and wetted perimeter, and therefore correctly captures the ratio between pressure drop and flow rate, resulting in an accurate calculation of flow rate.  Tr. at 2745–46, 2787 (Zaldivar); D24643; D24644; D24688.

1461.  Dr. Zaldivar has used the hydraulic diameter for geometric transformation in his own modeling work in the oil and gas industry before his work on this case.  Tr. at 2743–44 (Zaldivar).  The hydraulic diameter is also used by other flow assurance engineers and specialists in order to model non-circular geometries.  Tr. at 2743–44 (Zaldivar).  They would deem the hydraulic diameter to be the geometric transformation of choice in a situation similar to this one. Tr. at 2838–42 (Zaldivar).

1462.  Indeed, the hydraulic diameter is the "gold standard" of geometric transformations for non-circular pipes.  Tr. at 2743–44 (Zaldivar); D24688.  The hydraulic diameter is an accepted principle in fluid dynamics and is supported by the scientific literature. Tr. at 2743–44, 2801, 2807–08, 2811, 2819, 2826 (Zaldivar); Tr. at 3139, 3176 (Johnson); D24688.  There are numerous texts and decades of scientific literature establishing that the hydraulic diameter is the correct geometric transformation for this flow calculation; there are "very few" geometric transformations that have any scientific basis outside of the hydraulic diameter.  Tr. at 2743–44, 2811 (Zaldivar); Tr. at 3139, 3176 (Johnson); D24688; TREX 130713.0044-47.  The user manuals for both commercial multiphase flow simulators used in this investigation (LedaFlow and OLGA) advise users to input the hydraulic diameter for geometric transformation.  Tr. at 2744, 2832–33, 2836, 2838–42 (Zaldivar); TREX 130544.444; D24683A. The United States also did not identify any scientific literature or evidence suggesting that the

335

use of hydraulic diameter for geometric transformation is inappropriate.  Tr. at 2811, 2841–42 (Zaldivar).

1463.  The Government's suggestion that Dr. Zaldivar's flow rates should be doubled is "absolutely unfounded and incorrect" and is not based on science or scientific literature.  Tr. at 2745–46, 2835–36 (Zaldivar).  The United States did not (and cannot) point to any reliable basis—whether in the scientific literature, in flow assurance software user manuals, or otherwise—that would require Dr. Zaldivar to scale his numbers by a factor of two.  Tr. at 2745–46, 2835–36 (Zaldivar).  The United States does not identify any scientific literature or evidence for its proposition that Dr. Zaldivar's flow rates should be doubled.  Tr. at 2811, 2841–42 (Zaldivar).

1464.  The United States suggests that the hydraulic diameter is designed to determine the correct flow velocity or velocities, as opposed to the correct flow rates.  Tr. at 2811, 2829 (Zaldivar); Tr. at 3142–45 (Johnson).  Not surprisingly, the United States does not identify any scientific literature or evidence suggesting that the hydraulic diameter is designed to obtain the correct flow velocity or velocities.  Tr. at 2811, 2841–42 (Zaldivar).  The purpose of the hydraulic diameter is not to determine the correct velocity or velocities of the flow; its purpose is determine the accurate relationship between flow area and wetted perimeter (and thus the relationship between pressure drop and flow rate).  Tr. at 2745–46, 2811, 2823–24, 2829, 2835–37 (Zaldivar); Tr. at 3142–45 (Johnson).

1465.  The United States incorrectly suggests that certain information (*e.g.*, velocity) should be "cherry-picked" from Dr. Zaldivar's model and that further calculations should be performed to "correct" his flow rate estimates (*i.e.*, increase them by a factor of two).  Tr. at 2745–46, 2835–36 (Zaldivar).  However, it would be "very incorrect," and not scientifically

defensible, to take one parameter from the model and try to use it in another situation or another model out of context, as suggested by the United States.  Tr. at 2835–36, 2838–42 (Zaldivar). The United States does not identify any scientific literature or evidence supporting its suggestion that model parameters such as velocity can be extracted and used in another model in another context such as this.  Tr. at 2811, 2841–42 (Zaldivar).

1466.   The United States also challenges the use of the hydraulic diameter for geometric transformation by presenting a hypothetical using leaks from holes in a water tank.  Tr. at 2804–15 (Zaldivar).  As an initial matter, this hypothetical deals with a single-phase fluid, not a multiphase fluid such as the hydrocarbon flow from the Macondo Reservoir.  Tr. at 2838–39 (Zaldivar).  Perhaps more importantly, the United States does not identify or present any scientific literature to support its hypothetical, and in fact the scientific literature strongly contradicts their claims and supports the use of the hydraulic diameter.  Tr. at 2743–44, 2804–15, 2838–39 (Zaldivar); Tr. at 3139, 3176 (Johnson); D24688; TREX 130713.

> **(2)      Dr. Zaldivar's Models Are Robust and His Calculations of Flow Rate for Mid-May 2010 Are Accurate; In Fact, Dr. Zaldivar's LedaFlow Simulations Produced the Best Match to Observed Slug Flow Behavior That He Has Witnessed in His Entire Career.**

1467.   The presence of the unique and repeating periods of flow (*i.e.*, "single-peak" and "double-peak" behavior) made it possible for Dr. Zaldivar to compare the slug flow behavior predicted by his models directly to the field data.  Tr. at 2733 (Zaldivar); TREX 011683.0010. In fact, Dr. Zaldivar's LedaFlow models produces an "excellent match" to the actual observed slug flow behavior during the May 13–20 time period.  Tr. at 2748–49 (Zaldivar); D24683A.  It is very unusual for model results to match observed slug flow behavior this well because slug flow behavior is typically chaotic.  Tr. at 2748–49 (Zaldivar).  Dr. Zaldivar described this as "the best match I've ever seen to the observed slug flow behavior."  Tr. at 2749 (Zaldivar); D24683A.

A review of Dr. Zaldivar's simulations alongside observed ROV videos shows how closely his modeling matches the observed slug flow.  *See* D24683A.



1468.   Dr. Zaldivar performed sensitivity studies for any input parameters that were less certain, such as pipe roughness, inlet temperature, and heat transfer (*i.e.*, the ability for the environmental conditions to move heat away from the pipe).  Tr. at 2741, 2752–54 (Zaldivar); D24571; D23864.  Dr. Zaldivar's sensitivity studies involve varying uncertain input parameters to assess the effect of uncertainty (if any) on his flow rate calculations.  Tr. at 2752–54 (Zaldivar).  Sensitivity studies for each of these input parameters result in flow rates from the riser end around 25,000 to 25,100 stock tank barrels per day (Dr. Zaldivar's best estimate for flow rate from the riser end is 25,100 stock tank barrels per day).  Tr. at 2754–55 (Zaldivar); D23864.  Dr. Zaldivar's LedaFlow model is therefore "insensitive" to variations in each of these input parameters; in other words, uncertainty in these input parameters has a minor effect on the results.  Tr. at 2754–55 (Zaldivar).  This reaffirms that Dr. Zaldivar's LedaFlow model is robust and that his flow rate calculations are accurate.  Tr. at 2754–55 (Zaldivar).

1469.   Dr. Zaldivar also sought to characterize the degree of model uncertainty that might exist and what impact it might have on flow rate.   Tr. at 2755 (Zaldivar).   "Model uncertainty" refers to the expected error in results due to approximations made by one-dimensional models.   TREX 011683.0042.   Dr. Zaldivar is able to estimate model uncertainty to be plus or minus 5% (or a total of 10%).   Tr. at 2756–57 (Zaldivar); TREX 011683.0042.   Dr. Zaldivar considers this range of model uncertainty to be conservative.   TREX 011683.0042.

1470.   Dr. Zaldivar is "very confident" that the best estimate for total flow rate during the period May 13–20, 2010, is 30,000 stock tank barrels per day.   Tr. at 2763–64 (Zaldivar).

### 6.   Accurate Flow Rate Modeling Requires Accurate Sources for Fluids Properties.

1471.   To calculate the volume of oil spilled into the Gulf of Mexico, many experts needed to know the properties of the Macondo hydrocarbon fluid at different temperatures and pressures.   Tr. at 2315–16 (Whitson).

1472.   BP expert Dr. Curtis Whitson developed an "equation of state model" that calculates properties of the Macondo hydrocarbon fluid at various temperatures and pressures. Tr. at 2313, 2315, 2324–25 (Whitson); LeBlanc Dep. at 35.

1473.   Equations of state have been the oil industry standard method of modeling hydrocarbon fluid properties for almost 30 years.   Tr. at 2318 (Whitson).

1474.   Dr. Whitson has created many equation of state models to characterize hydrocarbon fluids over the past 30 years, and regularly teaches courses on the subject.   Tr. at 2307–09 (Whitson).

1475.   As Dr. Zick conceded, "Dr. Whitson is proficient in equation-of-state fluid characterization modeling."   Tr. at 1789 (Zick).

1476.   Dr. Whitson has written the book that the Society of Petroleum Engineers uses for instruction on estimating the properties of oil, gas, and water—*i.e.*, fluid phase behavior.  Tr. at 2310–11 (Whitson).  That book is the best reference on the subject of fluid phase behavior.  Tr. at 1790 (Zick); TREX 011492.0001.  Dr. Whitson has won the Society of Petroleum Engineers' highest technical award, the Anthony F. Lucas Gold Medal, for his work in fluid phase behavior.  Tr. at 2311–12 (Whitson).

1477.   Dr. Whitson is widely regarded as the world's foremost expert in hydrocarbon phase behavior.  Tr. at 2135 (Blunt).  As Dr. Zick admitted at trial: "There is no one in the world with more expertise in these areas" than Dr. Whitson.  Tr. at 1790 (Zick); TREX 011492.0001.

1478.   Dr. Whitson created his equation of state model by tuning it to available data from laboratory measurements on fluid samples.  Those fluid samples were collected from the Macondo reservoir before the blowout and tested by three different laboratories.  Tr. at 2331 (Whitson); DeCoste Dep. at 24–25; LeBlanc Dep. at 45–46.

1479.   The Macondo fluid samples were tested by the laboratories using routine tests following appropriate standards, and were reported by the laboratories accurately.  Shtepani Dep. at 156–57; LeBlanc Dep. at 177, 201–03.

1480.   The accuracy of an equation of state model is evaluated by comparing the predictions from the model to the measured data—particularly the data that are measured accurately and the data that are important for a given application.  Tr. at 2323, 2335 (Whitson).

1481.   Dr. Whitson's equation of state model very accurately describes the properties of the Macondo hydrocarbon fluid.  Tr. at 1791–92 (Zick); Tr. at 2313, 2315, 2324–25 (Whitson); D24604.

1482.   It is appropriate to use laboratory measurements of fluid properties, where available, directly in calculations.  Tr. at 2331 (Whitson).

1483.   It is also appropriate to use an accurate equation of state model to predict fluid properties for use in calculations.  LeBlanc Dep. at 38; Tr. at 2316–17 (Whitson); *see* D24586.

<div align="center">

(a)   **The U.S. Experts Performing Hydraulic Analyses Did Not Use Reliable Sources for Fluids Properties.**

</div>

1484.   United States expert Dr. Dykhuizen uses an equation of state model developed by Sandia Labs in 2010 that has not been verified by BP's or the United States' fluids experts.  TREX 011452.0013; *see* TREX 011490R; TREX 011491R; TREX 011496.  Dr. Dykhuizen does not use the equation of state model that United States expert Dr. Zick believes is best.  Tr. at 1813 (Zick); *see* TREX 011490R; TREX 011491R; TREX 011496.

1485.   United States expert Dr. Pooladi-Darvish uses fluid correlations in his modeling work, including the Vasquez-Beggs fluid correlation.  TREX 011653.0157.  Dr. Pooladi-Darvish does not use the equation of state model that United States expert Dr. Zick believes is best, or data from that equation of state model.  Tr. at 1812–14 (Zick).  Neither BP's nor the United States' fluids expert verified the accuracy of the fluid correlations used by Dr. Pooladi-Darvish.  Tr. at 1813–14 (Zick).

1486.   United States expert Dr. Griffiths does not use the equation of state model that United States expert Dr. Zick believes is best, or data from that equation of state model.  Tr. at 1817 (Zick).

     **7.**    **BP's Internal Documents and Public Statements Are Consistent with Its Estimates In This Case.**

     (a)    **The Government's Arguments Regarding BP's 20F Statement Are Belied by the Language of That Statement Itself.**

1487.  Contrary to the suggestions by the Government that prior public disclosures by BP contradicted its position in this litigation, BP's prior public disclosures—including those referenced by the Government—are entirely consistent with its position in this litigation.  *See* U.S. Pre-Trial Statement for Phase Two at 2 (Rec. Doc. 11265) (quoting, without citation, TREX 130529.0235 (BP's "Annual Report and Form 20-F," March 6, 2011) (hereinafter "Form 20-F")).

1488.  The 4.0 MMstb figure in BP's Form 20-F disclosure that the Government quotes out-of-context in its Pre-Trial Statement was ***not***—as the Government suggests—BP's "current best estimate," of total flow.  Rather, the disclosure states specifically that the figure: "take[s] into consideration not only [BP']s own analysis of the flow and discharge issue, ***but also the analyses and conclusions of other parties, including the US Government***."  *See* TREX 130529.0236 (emphasis added).

1489.  Moreover, the "best estimate" language that the Government purports to quote in its Pre-Trial Statement also specifically refers to the 4.0 MMstb figure as BP's best estimate—***not***, as the Government suggests, of the total flow—but, ***rather***, as its best estimate "***for the purposes of calculating a provision for*** fines and penalties under Section 311 of the Clean Water Act."  TREX 130529.0236 (emphasis added).  Given the express purpose of that figure—*i.e.*, providing a basis for calculating a provision for fines and penalties, and the manner in which it was calculated—*i.e.*, reflecting both BP's ***and*** "the analyses and conclusions of other parties, including the US Government," it makes sense then that the figure exceeds BP's actual best estimates of the total amount that flowed from the Macondo reservoir.  TREX 130529.0236.

1490.  In fact, as explained in the Form 20F disclosure referenced by the Government, the 4.0 MMstb figure was derived almost entirely from the Government's own analysis (as opposed to from BP's analysis): "A charge for potential Clean Water Act Section 311 penalties was first included in BP's second-quarter 2010 interim financial statements.  At the time that charge was taken, the latest estimate from the intra-agency Flow Rate Technical Group created by the National Incident Commander in charge of the spill response was between 35,000 and 60,000 barrels per day.  The mid-point of that range, 47,500 barrels per day, was used for the purposes of calculating the charge."  TREX 130529.0235.

1491.  BP clearly explained in the Form 20-F that in its view, the cumulative oil discharge was 20–50% lower than the Government's August 2 estimate.  TREX 130529.0235 ("It was and remains BP's view, that the 2 August 2010 Government estimate and other similar estimates are not reliable estimates because they are based on incomplete or inaccurate information, rest in large part on assumptions that have not been validated, and are subject to far greater uncertainties than have been acknowledged …. BP believes that the 2 August 2010 discharge estimate and similar estimates are overstated by a significant amount, and that the flow rate is potentially in the range of 20–50% lower.").

1492.  BP also noted in its Form 20F that its own estimate may change over time: "The estimate of BP and of other parties as to how much oil was discharged to the Gulf of Mexico may change, perhaps materially, over time."  *See* TREX 130529.0236.

1493.  BP has maintained since as early as October 2010 that the actual cumulative oil discharge is likely around 20–50% lower than 4.9 million barrels.  *See* TREX 011214.0002 (10/22/2010 BP PowerPoint Presentation to National Commission) ("The August 2 DOE/FRTG Estimate cannot be accurate to +/-10% over the whole time period, contains many flawed

assumptions, and overstates the total volume by 20–50%."); *see also* TREX 006192 (BP'S Preliminary Response to the Flow Rate and Volume Estimate Contained in Staff Working Paper No. 3) (same).

> ### 8. The Government's Focus on Certain Figures Found in Assorted Internal BP Documents Does Not Establish That Those Figures Were Reliable Flow Rate Estimates.

1494. Flow rate estimation is a distinct exercise from: (1) worst case discharge calculations that measure well performance in the absence of restrictions, or (2) parameter studies that vary certain model inputs in order to determine the impact of those inputs on flow rate. Hunter Dep. at 678–81, 683 (Dr. Hunter was designated as the U.S. 30(b)(6) representative on 29 topics, including flow rate calculation methods and factors affecting the ability to estimate flow rate); *see also* BP's Proposed Findings of Fact and Conclusions of Law Source Control at II.B.8(b) [In April And May 2010, Hydraulic Modeling Was Used To Test The Robustness of Source Control Options And To Better Understand The Impact Of Changes In The Condition Of The System].

1495. BP did not estimate flow rate during the 86-day period when the flow was occurring. Hunter Dep. at 46; TREX 009687.0002; Ballard Dep. at 566–67 (30(b)(6) (BP)) (BP never attempted a daily flow rate estimate based on hydraulic modeling and subsea pressures and temperatures prior to July 15); *see also* Section II.B.2(h)(3), *supra*. Once the well was shut in with the Capping Stack, BP engineers Adam Ballard and Farah Saidi performed calculations in an attempt to estimate the rate of flow. Ballard Dep. at 549–50 (Dr. Ballard was designated as BP's 30(b)(6) representative on efforts by BP and its contractors to estimate the daily discharge of hydrocarbons using subsea pressure and temperature measurements).

1496. Dr. Ballard performed his post-shut-in rough estimate of flow rate at the request of one of his supervisors on the Containment and Disposal Project, Tom Marshall. Ballard Dep.

at 161–62; TREX 009491.  Dr. Ballard performed this calculation in approximately one hour.

Ballard Dep. at 174.  Dr. Ballard's rough estimate was generated using an Excel spreadsheet and

a simplified equation for single phase flow.  Ballard Dep. at 164–65.  Dr. Ballard assumed that

there were no restrictions in the BOP and used fluid properties from black oil tables.  Ballard

Dep. at 162–66.  Dr. Ballard soon realized that "there was something flawed in either the

assumptions or the input or the methodology itself" and notified Mr. Marshall that he was not

able to generate a reliable flow rate estimate.  Ballard Dep. at 172–74.

 1497. Farah Saidi's calculation of flow rate through the Capping Stack was performed

shortly after the well was shut in and was limited by the available data and Ms. Saidi's

understanding of the problem at the time.  TREX 009453; Saidi Dep. at 191–92.  Dr. Ballard and

Ms. Saidi later discovered that her estimate contained several errors, including: (1) Ms. Saidi

incorrectly input the equations for pressure drop into the spreadsheet, (2) Ms. Saidi incorrectly

used properties for velocity and density based on ambient conditions (as opposed to conditions in

the Capping Stack, the relevant location for her calculation), and (3) Ms. Saidi assumed that the

flow would not change at different pressures in the Capping Stack.  Ballard Dep. at 539–41,

550–51.

 1498. BP did not attempt to confirm the U.S. Government scientists' flow rate estimates

during the response.  Hill Dep. at 318–19, 631, 633–34.

 1499. In early June 2010, in connection with the engineering for the Top Hat collection

method, Ms. Saidi used assumptions about the Macondo well system and the geometry of the

Top Hat that would not provide a basis for estimating the flow rate at that time.  Saidi Dep. at

439–41; TREX 010191.

1500.   In late June 2010, Dr. Tim Lockett attempted to use data from Top Kill to obtain additional information about the flow paths within the well and the BOP for the purpose of conducting well pressure buildup testing after the well was shut in.  TREX 009452.0001; Lockett Dep. at 203; Ballard Dep. at 148–49.  Based on Dr. Lockett's modeling, he concluded that the productivity index was likely in the range of 10 to 20 at the time of Top Kill.  TREX 009452.0005–06; Lockett Dep. at 100.  The corresponding flow rates generated by Dr. Lockett's modeling were subject to the approximations and assumptions contained in the model, including an assumption that the test rams were open.  Lockett Dep. at 209–11, 231, 237, 438; Ballard Dep. at 152–53; TREX 009452.0006.  If the test rams were in fact closed, Dr. Lockett's entire analysis of the Top Kill data would be "invalid".  Lockett Dep. at 454–55.

1501.   Another modeling exercise performed in late June 2010 by Ashish Chitale was aimed at using the Top Kill data to attempt to determine whether the burst disks had burst and compromised well integrity and to obtain more information about the flow path.  Ballard Dep. at 201–03, 208–11, 213.  This modeling exercise was not aimed at estimating the actual flow rate post-Top Kill.  Ballard Dep. at 201–03, 208–11, 213.  At the time Mr. Chitale's modeling was performed, both the productivity index and the actual restrictions in the system were unknown. Ballard Dep. at 205.

### C.      The Material Balance Methodology Utilized by Dr. Blunt Is the Most Reliable Method to Calculate Cumulative Flow from the Macondo Reservoir.

1502.   The most reliable methodology for estimating the volume of oil spilled from the Macondo reservoir is the material balance methodology.

1503.   The material balance methodology was employed by BP/Anadarko expert Dr. Blunt and United States expert Dr. Kelkar.  TREX 011553R.0012; TREX 011549R.0027.  Both experts endorse the use of this method for this purpose.  Tr. at 2092 (Blunt); Tr. at 1843, 1851,

1917–18 (Dr. Kelkar agreed that the amount of oil spilled can be accurately estimated using accepted petroleum engineering techniques and that the material balance technique is a tool "quite commonly used" by reservoir engineers).

1504.   Material balance is the most basic principle of petroleum reservoir engineering. TREX 011553R.0009; Tr. at 2087–88, 2111 (Dr. Blunt noting that he has taught material balance to thousands of students).  It is a straight-forward application of the law of physics known as "conservation of mass."  Tr. at 2103–04 (Blunt).

1505.   Both parties' experts apply the material balance method to calculate cumulative flow from the Macondo reservoir using the following equation:



D23513; TREX 011553R.0012; TREX 011549R.0027.

1506.   Each of the variables in the equation corresponds to a property of the reservoir that was measured before or after the incident or measured on samples collected pre-incident. Tr. at 2103–06 (Blunt); Tr. at 2183 (Blunt).  Thus, the material balance approach avoids the uncertainties injected by other experts' methods that rely on data measured during the incident. This advantage is illustrated in D24356-1-1, a timeline showing when the data and measurements used by Dr. Blunt were obtained.

1507.   Material balance analysis is understood through the analogy of a deflating tire. Tr. at 2106–10 (Blunt); D23511A.  The difference between the initial pressure of the tire before the leak began and the final pressure is analogous to the depletion of pressure in the Macondo reservoir as the oil flowed, denoted as "$\Delta P$" in the material balance equation.  Tr. at 2106

347

(Blunt).  The amount of air in the tire to begin with is analogous to the amount of oil originally in the reservoir and connected to the Macondo well, denoted as the "N" variable.  Tr. at 2107 (Blunt).  The stiffness (or elasticity) of the tire and the compressibility of enclosed air would determine how much air was released for a given change in pressure; this corresponds to the "c" component in the material balance equation, which combines the compressibility ratios of the hydrocarbon fluids and the reservoir rock.  Tr. at 2107–08 (Blunt).

1508.  The tire analogy also underscores the important difference between the material balance method and the methods used by other experts to calculate the cumulative spill.  Defendants' expert Dr. Gringarten and U.S. experts Dr. Pooladi-Darvish, Dr. Griffiths and Dr. Dykhuizen attempt to reconstruct the history of changing flow rates during the incident, and then integrate (add up) the cumulative flow that results from their time series of flow rates.  Sections III.B.3(e)–III.B.3(g); III.E.  This would be equivalent, in the tire analogy, to estimating the rate of leakage during each hour or day between the initial puncture and the end point.  The United States experts do this by assuming virtual constancy in the geometry of the flow path from the reservoir to the ocean.  *See* Section III.B.4.  Dr. Blunt analogized this to trying to estimate tire leakage by assuming no change in the size of the hole.  Tr. at 2109–10 (Blunt).

1509.  Using material balance analysis avoids the need to reconstruct the history of Macondo flow rates.  Tr. at 2108–09 (Blunt); Tr. at 2103–06 (Blunt).  It is therefore more reliable than other methods used to estimate cumulative flow, especially the methods used by United States experts Pooladi-Darvish, Griffiths, and Dykhuizen, which depend on assumptions about the uncertain geometry of the flow path between the reservoir and the ocean.  *See* Sections III.B.3(e)–(g).

1510.   The Government hydraulic experts use data from—and analyze the behavior of the well during—the incident.  D24356-1-1 (grey area denoting the 86 days of flow).  Within the grey area are simplified images of some of the known changes in the flow path that are ignored by the United States experts.  Outside the grey area are the periods of no flow, which is the when the data or measurements used in Dr. Blunt's material balance analysis was obtained.  *See* D24356-1-1; Tr. at 2105 (Blunt).



1511.   Using the material balance method, Dr. Blunt calculates a range of oil spilled from the reservoir of 2.9 to 3.7 MMstb, with the most likely value being 3.26 MMstb.  TREX 011553R.0006; Tr. at 2095 (Blunt); D23508.

1512.   The endpoints of Dr. Blunt's calculated range are derived by varying the numbers in the material balance equation to account for the full range of measured rock and fluid data, as is discussed in the following sections.  TREX 011553R.0050–52.

1513.   The principal distinction between the material balance calculation by BP/Anadarko expert Dr. Blunt and that of United States expert Dr. Kelkar is that Dr. Blunt uses the measured data, whereas Dr. Kelkar departs from the measurements by doubling the input for "rock compressibility," which accounts for most of the increase in his calculation over that of Dr. Blunt.  *See* Section III.C.2 *infra*.

### 1.   First Material Balance Variable, N: Initial Connected Oil Volume.

1514.   The opposing material balance experts Drs. Blunt and Kelkar agree at least in part on the numbers to input into the "N" variable of the material balance equation.  Dr. Blunt uses a range from 109 to 114 MMstb, with an average value of 112 MMstb.  Tr. at 2115 (Blunt); TREX 011553R.0027–28; D24605.  Dr. Kelkar uses a range from 110 to 137 MMstb.  Tr. at 1855, 1859–60 (Kelkar); TREX 011549R.0028.  Dr. Kelkar has noted that the mid-point value between his two reservoir sizes is consistent with Dr. Blunt's determination.  Tr. at 1918–21 (Kelkar); TREX 011550R.0006, 0015 (Kelkar rebuttal report) (noting that the reservoir size used by Dr. Kelkar, Dr. Blunt, and BP are "remarkably ─ and, we believe, indisputably ─ close to each other[.]").

1515.   The other United States experts who have studied the Macondo reservoir also use a value close to Dr. Blunt's for connected oil volume as either a sole value, an alternative base case, or as one end of their range of input values.  TREX 008615.0016 (Hsieh draft report) (showing a reservoir size of 110 MMstb); TREX 011653.0093 (Pooladi-Darvish expert report) (showing one case with a reservoir size of 109 MMstb).

1516.   This convergence is critical to resolving the parties' opposing contentions about uncertainty.  The United States contends that the material balance method is more uncertain than the "hydraulics" calculations of cumulative flow done by its experts Drs. Griffiths, Dykhuizen,

and Poonadi-Darvish.  Tr. at 1211–15, 1227–28 (United States' opening statement).  BP and Anadarko contend the opposite.  Tr. at 1231–35 (BP's opening statement).

1517.   The parties agree that, in most cases, the greatest contributor to uncertainty in the material balance equation would be the variable N, the amount of oil initially connected to the well.  Tr. at 1846–47, 1917 (Kelkar); TREX 011549R.0028 (Dr. Kelkar's report showing a cumulative productions between 4.5 and 5.5 MM stb based on different reservoir sizes); Tr. at 2111 (Blunt).  But here, the opposing parties agree that their corresponding numbers for the N variable are remarkably close, as is discussed further below.  Thus, the normal source of the biggest uncertainty in the material balance method is, by consensus, unusually certain.

1518.   Dr. Kelkar contends that the material balance method is more uncertain than other methods because, in part, the connected oil volume parameter is uncertain.  Tr. at 1847–48, 1850 (Kelkar).  Dr. Poonadi-Darvish also contends that the connected oil volume is subject to large uncertainty.  TREX 011654R.0013; Tr. at 2005–04 (Poonadi-Darvish).

1519.  BP and Anadarko contend that the uncertainty is greatly reduced by the data obtained for the Macondo reservoir, which confirmed a critical dimension of the volumetric analysis and thus greatly reduced its uncertainty.  *See* Section III.C.1(b), *infra*.  BP and Anadarko also contend that the "conservative" approach of Dr. Blunt makes any uncertainty weigh in favor of a cumulative-flow calculation lower rather than higher than Dr. Blunt's estimate.  *See* Section III.C.1(h), *infra*.  In particular, Dr. Blunt contends that the post-drill confirmatory data pertaining to the variable N, and his method of erring toward higher flow, which is discussed below, make his number an upper bound.  Tr. at 2111; 2136 (Blunt).  Dr. Kelkar made concessions that support this proposition, as is discussed below.  *See* Section III.C.1(b), *infra*.

(a)     **Seismic Analysis Is Used by Both Material Balance Experts as a Starting Point.**

1520.   Both of the experts who apply the material balance methodology start with the same pre-drill analysis of the reservoir size done by BP geology and geophysics experts.  TREX 011549R.0027; Tr. at 1850 (Kelkar); TREX 011553R.0012, 0018–28; Tr. at 2115–16 (Blunt). They use a pre-spill estimate by BP scientists of the amount of oil that was expected to be discovered.  TREX 011549R.0027; Tr. at 1850 (Kelkar); TREX 011553R.0012, 0018–28; Tr. at 2115–16 (Blunt).

1521.   Prior to drilling the Macondo well, BP's scientists analyzed the data from a seismic survey, which generated seismic waves that travelled through the subsea rock strata and reflected back information that could be analyzed to demarcate changes in rock properties. TREX 009283 (BP pre-drill presentation); TREX 005246 (BP's pre-drill technical assurance memorandum reviewing the seismic data).

1522.   The seismic data was analyzed by BP's geology and geophysics scientists to generate a prediction of the location of the reservoir, its size, and how much oil might be present. TREX 005246.0016 (BP's pre-drill technical assurance memorandum showing the reservoir size and possible oil volume).

1523.   The result of the BP seismic analysis is shown in the figure below.  The bright colors represent areas where BP scientists predicted there would be oil.  D23522; D24465; TREX 011553R; TREX 009283.0041 (BP pre-drill presentation); Tr. at 2115–16 (Blunt); TREX 009283 (BP pre-drill presentation analyzing the seismic data).



1524.  Using this analysis, BP scientists predicted a range of probabilities of various volumes of oil that were believed to be housed in the reservoir.  TREX 005246.0016.  These volume predictions are used by both Dr. Blunt and Dr. Kelkar as the starting in their calculation of the N input for the material balance equation.  TREX 011549R.0027; Tr. at 1850 (Kelkar); TREX 011553R.0012; 0018–28; Tr. at 2115–16 (Blunt).

(b)  **Uncertainty in the Pre-Drill Volume Prediction Was Reduced by the Accuracy of the Seismic Estimate of Reservoir Thickness.**

1525.  BP scientists also predicted the thickness of the thickest part of the reservoir, shown in yellowish-green.  Tr. at 2116–17 (Blunt).  This is where BP planned to drill the Macondo well, as shown by the lowest red dot in the lower-middle of the figure.  Tr. at 2116–17 (Blunt); TREX 009283 (BP pre-drill presentation); TREX 005246 (BP's pre-drill technical assurance memorandum reviewing the seismic data).

1526.  When the well was drilled, the thickness ended up being almost exactly what was predicted by BP's pre-drill seismic analysis.  Tr. at 1859; Tr. at 1919 (Kelkar); TREX 011549R.0025 n.32; TREX 011553R.0049–50.  This result is considered notable and important

by both Dr. Kelkar and Dr. Blunt.  TREX 011549R.0025 n.32 (Dr. Kelkar expert report) (noting that BP's prediction of the thickness "validates" the use of the pre-drill seismic data); TREX 011553R.0049–50.

1527.  This fact led Dr. Kelkar to make admissions that negate the Government's contention that uncertainty in the initial oil volume makes the material balance method unreliable.  Dr. Blunt opines that the validation of BP's pre-drill thickness prediction makes the pre-drill prediction of total volume more reliable, and hence a narrower range of uncertainty should be applied.  Tr. at 2116–17 (Blunt); TREX 011553R.0049–50 (noting "the most likely case seismic analysis suggested that the well would encounter 96 ft of oil-bearing sandstone: it encountered 93 ft.").

1528.  Dr. Kelkar initially testified that the use of the seismic added "an inherent additional layer of uncertainty" to his material balance analysis.  Tr. at 1847–48 (Kelkar).  But Dr. Kelkar admitted that the accuracy of BP's pre-drill prediction of thickness increased the reliability of the mid-point of BP's pre-drill prediction of oil volume: "BP had also predicted what type of reservoir thickness they will observe when they drilled the well, and that predicted about 90 feet of thickness.  And when the well was drilled, the thickness turned out to be very close to that value, and that gave us more confidence in picking that P50 value."  Tr. at 1854–55 (Kelkar).  Hitting the predicted thickness on the nose "definitely" narrowed the uncertainty in the in the estimated reservoir volume.  *See* Tr. at 1919 (Kelkar) (admitting that BP's prediction of the reservoir thickness "definitely" narrowed the uncertainty); TREX 011549R.0025 n.32 (Dr. Kelkar's expert report) (noting that the drilled thickness was close to the predicted thickness, "further validating the initial estimates in the pre-drill model.").

1529.   Thus, Drs. Kelkar and Blunt ultimately agree that the pre-drill uncertainty range was narrowed by post-drill measurements.  Having conceded that the match between the pre-drill prediction and the post-drill measurement of reservoir thickness "validated" and "definitely" narrowed the uncertainty of the pre-drill volume estimate, Dr. Kelkar presented no analysis to justify his continued assertion that the N variable of the material balance calculation remains highly uncertain.  *See* Tr. at 1859 (Dr. Kelkar noting that this fact means "there was a lot of confidence" in BP's seismic); Tr. at 1919 (Kelkar); TREX 011549R.0025 n.32.

1530.   Dr. Kelkar and Dr. Blunt use virtually the same mid-point number for initial oil volume.  Tr. at 1918–21 (Kelkar); TREX 011550R.0006, 0015.  Dr. Kelkar does not justify retaining a wide uncertainty range in the variable N in his material balance calculation.  TREX 011549R; TREX 011550R.  His expert report contains no analysis showing that he quantified his uncertainty range in light of the post-drill confirmation of the pre-drill volume data.  TREX 011549R; TREX 011550R.

1531.   Thus, Dr. Kelkar's work provides no support for—and his admissions negate— the Government's contention that the material balance method is less reliable and certain than the competing hydraulic methods.  Tr. at 1847–48, 1850 (Kelkar); *see also* Tr. at 1211–15, 1227–28 (United States' opening statement).

(c)   **Connectivity Was Not Analyzed in the Pre-Drill Seismic Volume Prediction Used by Both Drs. Kelkar and Blunt.**

1532.   The second distinction between the estimates of N by Drs. Blunt and Kelkar relates to the issue of whether the entirety of oil in the Macondo reservoir is connected to the Macondo well.  TREX 011553R.0008 (Dr. Blunt); Tr. at 2170–71 (Blunt).  Connectivity will be less than 100% if the reservoir is "compartmentalized" by geologic faults or sedimentary discontinuities.  Tr. at 2152 (Blunt); TREX 011553R.0022–23.  This would require reducing the

355

value of N in the material balance equation from the number predicted by BP's seismic analysis. *See* Tr. at 2115 (Blunt); TREX 011553R.0018–25.

1533.   BP's pre-drill seismic analysis did not analyze whether the oil predicted to exist in the reservoir was connected or compartmentalized.   TREX 005246 (BP's pre-drill technical assurance memorandum analyzing the seismic data); Tr. at 2117 (Blunt) (noting that the seismic survey "is simply looking at the total volume of hydrocarbon-bearing sandstone, it is not making a comment on connectivity.").  The scientific methods of geology and geophysics do not permit the prediction of connectivity or the identification of compartmentalizing geology with sufficient precision to be used in volumetric predictions pre-drill.  *See* Tr. at 2117 (Blunt) (testifying that connectivity requires an analysis of the seismic, geology, and the pressure data); Tr. at 1925 (Kelkar) (agreeing that it is appropriate and standard to use pressure data to assess the degree of connectivity); TREX 011553R.0018–25 (Blunt expert report) (reviewing the qualitative features of the Macondo reservoir using seismic and geology but then using pressure data to quantify connectivity); Ritchie Dep. at 22, 108–09, 311, 325 (discussing connectivity and noting that there's "a bit of geology and geophysics regarding the static connectivity of the reservoir").

1534.   While the U.S. expert Dr. Kelkar initially contended that BP's pre-drill seismic analysis included a quantification of connectivity, on cross-examination regarding the document cited by him, Dr. Kelkar admitted that the report "doesn't say anything about a connectivity analysis[.]"  *See* Tr. at 1930 (Kelkar).

> (d)   **The Reservoir Consists of Narrow Sinuous Sandstone Channels Deposited in Different Locations and at Different Depths over Geologic Time, a Phenomenon  Recognized in the Industry (and by the U.S.'s Non-Testifying Expert) as Limiting Likely Connectivity.**

1535.   The parties agree about the geological nature of the Macondo reservoir, which in turn gives rise to the limited connectivity that reduces the likely volume of oil connected to the

Macondo well.  Tr. at 1924 (Kelkar) (agreeing that the Macondo reservoir consists of individual sinuous channels of sand); Tr. at 2122 (Blunt) (describing the channels that compose the Macondo reservoir).

1536.  Dr. Kelkar and other United States experts do not reduce their estimates of the volume of oil connected to the Macondo well to account for this recognized phenomenon, as is discussed further below.  *See* Section III.C.1(e).

1537.  Gulf of Mexico deepwater oil reservoirs often consist of a complex of narrow sinuous channels of sandstone containing the oil and gas.  TREX 011553R.0018–23 (Blunt expert report (reviewing the geology of the Macondo reservoir)).  The sandstone channels are typically separated by impermeable shale rock capable of blocking the flow of oil across the reservoir.  TREX 011553R.0018–23.  A single reservoir may contain a large number of channels, some of which may be connected (or partly connected) to a given well, while others may be compartmentalized from the first well and would require the drilling of additional wells to access their oil.  *See* Tr. at 2122–24 (Blunt); TREX 011553R.0018–23; D23521.

1538.  The figure below is a drawing by a BP geologist of the possible spatial relationship of the Macondo reservoir channels, shown in yellow.  TREX 011553R.0001.  These channels house the oil, and  taken together, they comprise the Macondo reservoir.  Tr. at 2118 (Blunt); TREX 011553R.0001.  In between the channels is another kind of rock, "shale," which does not contain oil and which is impermeable to its flow.  Tr. at 2118 (Blunt); TREX 011553R.0001; D23518.  The presence of shale sediments between the sandstone channels is what causes compartmentalization of the reservoir.  (In the background of this figure is the same pre-drill seismic interpretation discussed earlier.)  Tr. at 2118 (Blunt); TREX 011553R.0001; D23518.



1539.   At the front of the figure in D24362 is a vertical cross section, which is enlarged in the next figure, TREX 011553R.0021, below.   In this second figure, the reservoir sand channels would extend in and out of the page.   *See* Tr. at 2121–22 (Blunt); D24362.   The Macondo well location is superimposed, matched up with the depths at which oil-bearing sandstones were discovered.  Tr. at 2121–22 (Blunt); D24362; *see also* TREX 011553R.0021.

1540.   As is illustrated in D24632, oil could flow into the Macondo well from only the channels connected to the well or to another connected channel.  D24362; D23521; Tr. at 2121–23 (Blunt); TREX 011553R.0020-21.   Other channels would be "compartmentalized," that is, unable to contribute their oil to the flowing well during the incident.  Tr. at 2121–23 (Blunt); TREX 011553R.0021.



1541. Thus, calculation of the volume of connected oil, N, must take into account not only the initial oil in place but also the extent of reservoir connectivity. TREX 011553R.0024; Tr. at 1924 (Kelkar) (agreeing that one of the "primary jobs of a reservoir is assessing connectivity" if you "want to predict something"). As is discussed below, the United States' experts do not take into account the extent of reservoir connectivity; only Dr. Blunt does.

1542. A more connected reservoir means a greater share of the total oil in place can flow and, as a result, the material balance analysis will result in a larger cumulative flow. TREX 011553R.0024; *see also* TREX 011549R.0028 (Kelkar expert report) (showing the different cumulative flow predictions based on different oil in place inputs). Thus, by omitting to analyze the degree of connectivity, the United States experts concomitantly overstate their calculations of cumulative flow.

<div align="center">(e)    <b>The United States Testifying Experts Assume 100% Connectivity.</b></div>

1543. Dr. Kelkar's calculated reservoir size assumes that the entire well was connected to the well. *See* TREX 011549R.0025–28 (Kelkar expert report) (using oil in place values but

<div align="center">359</div>

not discussing connectivity); *see also* TREX 011553R.0007 (Blunt expert report); Tr. at 2117 (Blunt)..

1544.  Other United States experts also implicitly assume 100% connectivity.  Dr. Pooladi-Darvish uses various numbers for the initial reservoir volume, but never discounts them based on the percentage of connectivity, which he omits to analyze.  TREX 011653.0016.  Dr. Paul Hsieh of the United States Geological Survey, who did not testify at trial as an expert but whose cumulative-flow number is cited in the United States' pretrial brief, likewise admitted doing no analysis of connectivity, implicitly assuming connectivity of 100%.  TREX 008615.0015.

### (f)     The Macondo Reservoir Was Compartmentalized, Not 100% Connected to the Well.

1545.  United States material-balance expert Dr. Kelkar admitted that "there are no reservoirs with hundred percent connectivity."  Tr. at 1931 (Kelkar).

1546.  With respect to the Macondo reservoir in particular, Dr. Kelkar admitted that it was "absolutely" possible that some of the channels in the Macondo reservoir were not connected to the well (though Dr. Kelkar did not perform an expert analysis of the geology of the Macondo reservoir).  Tr. at 1932 (Kelkar) (Q: And you think it's absolutely possible that some of the channels in the Macondo reservoir are not or were not connected to the well?  A: I have no way of knowing that, yes.).

1547.  Prior to drilling the Macondo well, BP's geology and geophysics team considered it very unlikely that the Macondo reservoir would be fully connected.  Ritchie Dep. at 322–25, 332.

1548.  BP's original development plan for Macondo proposed drilling three wells to produce the field.  D23520; Tr. at 2122–23 (Blunt); Ritchie Dep. at 313–14.  A BP pre-drill

memorandum stated that a single well was expected to be able to access only 63% of the reservoir and that BP might have to drill an additional well in the reservoir to access all recoverable oil.  D23520.  BP's plan for three wells—as opposed to one—would lead to higher production rates by ensuring that the vast majority of the reservoir volume would be connected to at least one of these wells.  TREX 011553R.0023.

1549.  A University of Texas geologist, Professor Peter Flemings, retained by the United States to provide expertise during the response, concluded that there is "geological evidence that it makes good sense that there is an elongate heterogeneous reservoir with a significant probability of poor connectivity."  TREX 008624.0001; Tr. at 1558 (Hsieh) (noting that Dr. Flemings consulted with Government scientists).  He was likely referring to connectivity along the longitudinal channel axis, and lateral connectivity between channels is even more restricted, because of the impermeable shale between them, as discussed earlier.  *See, e.g.*, Section III.C.1(d).

1550.  Limited connectivity has hampered production in channeled turbidite reservoirs like Macondo in fields around the world, including in the Gulf of Mexico.  TREX 011553R.0024.  For example, a paper surveying deepwater Gulf of Mexico fields, and co-authored by Dr. Kelkar, concludes that "some of these reservoirs are highly compartmentalized …."  TREX 011560.0001.

1551.  Thus, the Macondo reservoir was compartmentalized, not 100% connected.

> (g)   **Dr. Kelkar Recognized the Need for an Assessment of Connectivity, but Did Not Perform Such an Analysis.**

1552.  Dr. Kelkar defined the "primary job of a reservoir engineer" to include an assessment of the reservoir's connectivity, which he described as "addressing the …. primary

question" of "how much of the available quantity of fluid may be produced".   TREX 011549R.0031; Tr. at 1924 (Kelkar).

1553.   Dr. Kelkar admitted that he did not perform an analysis of the geology of the Macondo reservoir.  Tr. at 1924 (Kelkar) ("Q: Now, you haven't done your own expert analysis of the geology of Macondo reservoir, have you?  A: I did not.").

1554.   Dr. Kelkar initially asserted that the BP pre-drill report, from which he obtained the seismic data, contained within it an assessment of connectivity.  Tr. at 1930 (Kelkar).  But Dr. Kelkar later admitted that the BP pre-drill report does not say anything about connectivity analysis.  Tr. at 1930 (Kelkar).

> (h)   **Dr. Blunt Uses a Conservative Approach to Estimate a Maximum Connectivity and Hence a Robust Upper Bound for the Initial Connected Volume Variable, N.**

1555.   Dr. Blunt uses the measurements of post-shut-in pressure data to calculate the size of the connected reservoir.  TREX 011553R.0024.  He analyzes the pressure measurements using the method of "well test analysis" described in Sections III.D.1–3.

1556.   This is an industry standard approach.  The use of pressure data to calculate connectivity was recognized by Dr. Kelkar as "absolutely" appropriate and standard for the assessment the degree of connectivity.  Tr. at 1925 (Kelkar).

1557.   Dr. Blunt's methodology requires two steps: first, assessing the connected area and, second, determining the volume of oil bearing sand in the reservoir.  TREX 011553R.0024.

1558.   Connected area is determined by analyzing the distance at which a pressure signal from the well hits the boundaries of the reservoir.  Tr. at 2124–26 (Blunt); TREX 011553R.0035, 0044–45 (Blunt expert report) (discussing how pressure analysis is used to determine the reservoir size).  The pressure signal hit boundaries after a given amount of time.  Tr. at 2124–26 (Blunt); TREX 011553R.0035, 0044–45.

362

1559.  To convert the time into distance to the reservoir boundary, an estimate of permeability is required.  Tr. at 2126–27 (Blunt).  Permeability, the ability of oil to flow in the reservoir formation, is one of the major factors affecting the speed at which the pressure signal moves: a higher permeability means the pressure signal moves faster and that therefore the boundaries are farther away.  TREX 011553R.0044–45.

1560.  As is demonstrated in Section III.C.1(h), Dr. Blunt uses the largest plausible permeability value from Dr. Gringarten to ensure the largest plausible reservoir area.  TREX 011553R.0109; Tr. at 2190–91, 2097 (Blunt).

1561.  The figure below reproduces the seismic analysis used by BP prior to drilling, and later by both Drs. Kelkar and Dr. Blunt, to calculate the amount of oil initially in the Macondo reservoir, as discussed in Section III.C.1(a).  Using the measured time for the pressure signal reach the lateral boundaries, combined with his high-side permeability number to convert the time into distance, Dr. Blunt arrived at an upper-bound connected area shown by the red rectangle.  D23524.



1562.  As expected from the preceding conclusion demonstrating the existence of compartmentalization, the connected area of the reservoir is smaller than the total area that contains oil.  D23523; D23524; D23525; Tr. at 2124–27 (Blunt).

1563.  The simplified analysis of reservoir volume by using pressure-signal timing to calculate an average width for the entire reservoir is a standard approach in petroleum reservoir engineering.  *See* Tr. at 1925 (Kelkar) (agreeing that it is "absolutely" appropriate and standard to calculate connectivity using pressure data).  United States experts also modeled the Macondo reservoir as a rectangle.  TREX 011653.0017; *see also* TREX 008615.0020.

1564.  Second, Dr. Blunt determines how much oil was in the connected area as opposed to outside of the connected area.  Tr. 2126 (Blunt).  Dr. Blunt makes a conservative assumption that any oil-bearing sandstone outside the connected area is only 10 feet thick—the smallest oil thickness detectable by the seismic survey.  TREX 011553R.0109; Tr. 2126–27 (Blunt).  The remaining oil was assumed to be inside the connected area, which meant that the vast majority of the oil was in the connected area.  TREX 011553R.0109; Tr. 2126–27 (Blunt).  The result is that the area of the reservoir deemed to be connected was assumed to be far thicker than the unconnected area, which means that more oil is calculated to be connected than would have been assessed had the thicknesses of the connected and unconnected rock been assumed to be the same.  TREX 011553R.0109; Tr. 2126–27 (Blunt).  This increases the volume of oil calculated to be connected.  TREX 011553R.0109; Tr. 2126–27 (Blunt).

1565.  Using this methodology, Dr. Blunt calculates a reservoir size that has the largest plausible area and thickness with an upper bound connectivity of approximately 90%.  Tr. at 2127–28, 2222–23 (Blunt); TREX 011553R.0024.

1566.  Dr. Blunt's determination of 112 MMstb is thus an upper bound determination of connected oil volume.  TREX 011553R.0025; Tr. at 2097, 2127–28, 2136–37, 2218–29 (Blunt).

1567.  The United States' experts' unsupported assumption of full reservoir connectivity (and the overstated conversion from reservoir to surface volumes, discussed below) results in an additional calculated cumulative flow of 480,000 stb for Dr. Kelkar and 930,000 stb for Dr. Pooladi-Darvish.  *See* Section III.B.6 (discussing United States experts' conversion of reservoir barrels).

> ### (i)  Summary of Conservative Assumptions and Methods Used by Dr. Blunt to Ensure that His Number for Initially Connected Oil Volume Was a Robust Upper Bound.

1568.  The factor of connectivity, as discussed above, renders the midpoint value of N used by both Drs. Kelkar and Blunt more reliable and subject to less uncertainty than is contended by the United States.  Tr. at 1847–48 (Kelkar) (discussing the uncertainty in the connected oil volume); Tr. at 1919 (Pooladi-Darvish) (admitting that BP's prediction of the reservoir thickness "definitely" narrowed the uncertainty); Tr. at 2110–11 (Blunt) (noting that the seismic, geology, and pressure analysis combine to reduce the uncertainty).

1569.  The conservative method used by Dr. Blunt to calculate connectivity (described in Section III.C) also renders the number used for N to be, in Dr. Blunt's words, a "robust upper bound."  Tr. at 2111–12, 2115 (Blunt).

1570.  In conjunction with the confirmatory (and lower) cumulative flow estimate of Dr. Gringarten (discussed in Section III.C.1), these two aspects of the connectivity analysis support the finding that Dr. Blunt's estimate of 3.26 MMstb is a reliable and robust upper bound.  Tr. at 2095 (Blunt); TREX 011553R.0006; Tr. at 2509–10 (Gringarten); TREX 011696R.0012 (Gringarten expert report).  Any uncertainty in connected oil volume would, if considered, result in less oil in place.  *See* Section III.C.1(h).

(j)      **Dr. Blunt Used Accurate Fluids Properties in His Analysis.**

1571.   Dr. Blunt uses fluid properties directly from the laboratory measurements as well as fluid properties calculated from Dr. Whitson's equation of state model.  Tr. at 2131–32, 2204 (Blunt); TREX 011553R.0005, 0053, 0058, 0059.  *See also* Section III.B.6.

(k)      **Dr. Kelkar Used Invalid Fluid Properties to Artificially Inflate 'N.'"**

1572.   United States expert Dr. Kelkar uses fluid data for his material balance analysis derived from the 2010 equation of state model developed without all currently-available data by BP employees.  Tr. at 1814–15 (Zick); TREX 011549R.0027 (citing TREX 009732).

1573.   Equation of state models require the input of laboratory data for accurate construction because "without [the] data, you can't build an equation of state."  Tr. at 2320–21, 2322–23 (Whitson).

1574.   Equations of state can take several months to build.  Tr. at 2318 (Whitson).

1575.   The full set of laboratory measurements of fluid properties was not available until at least June 29, 2010.   Tr. at 2319–20 (Whitson); TREX 008584.0001; *see also* TREX 008583.0001 (June 10, 2010 report of measurements); TREX 009734.0001 (June 11, 2010 report of measurements); LeBlanc Dep. at 46–47.  Some of the laboratory fluid measurements were not considered when BP's 2010 equation of state model was being created.  TREX 011490R.0024.

1576.   Yet the fluid property tables that the United States identifies that were created by BP in the summer of 2010 are dated June 10 and 11, 2010, and therefore could not have been properly calibrated to all the laboratory data.  TREX 011549R.0027 (citing TREX 009732); TREX 009732.0001 (dated June 11, 2010); D22105 (citing TREX 011137); TREX 011137.0001 (dated June 10, 2010).

1577. The United States' fluids expert could not confirm the underlying process used to generate BP's 2010 equation of state model. Tr. at 1815 (Zick).

1578. The United States' fluids expert confirmed that BP's 2010 equation of state model did not predict Macondo hydrocarbon fluid properties to the appropriate degree of accuracy. Tr. at 1815–16 (Zick).

1579. There are inaccuracies and omissions in BP's 2010 equation of state model that raise questions about some of the predictions of that model. TREX 011490R.0024.

1580. The United States' fluids expert could not recommend that any expert use BP's 2010 equation of state model. Tr. at 1815–16 (Zick).

### (1) Upper Bound Connected Oil Volume is 112 MMstb.

1581. For the foregoing reasons, the upper bound connected oil volume is 112 MMstb.. Tr. at 2115 (Blunt); TREX 011553R.0007, 0018–28, 0051; D23532. This value for connected oil volume will be used in the material balance equation to calculate cumulative flow. TREX 011553R.0051.

1582. By overstating the connected oil volume, Drs. Kelkar and Pooladi-Darvish overstate cumulative flow by 480,000 and 930,000 stb, respectively. TREX 011553R.0007; D23533.

### 2. Second Material Balance Variable, C: Compressibility.

1583. The principal difference between the oil volumes derived from the material-balance calculations of Dr. Kelkar and Dr. Blunt arises because both use significantly different values for the second variable, compressibility (C). *See* Section III.C (discussion of material balance equation in introductory portion). As noted above, this variable which combines the compressibility ratios of the hydrocarbon fluids and the reservoir rock. Tr. at 2107–08 (Blunt). While there is little disagreement over the fluid compressibility, the same cannot be said for the

pore volume compressibility of the rock (often referred to more simply as "rock compressibility").  Pore volume compressibility is the parameter that quantifies how easy it is for a porous body to change its size and shape when acted upon by pressures.  Tr. at 2399 (Zimmerman); TREX 011497.0010.  It is an important parameter for quantifying how much fluid can be stored in a reservoir under various conditions.  Tr. at 2405 (Zimmerman); TREX 011497.0012.

1584.  Uniaxial pore volume compressibility is the type of compressibility that most closely resembles the compressibility taking place in the reservoir during depletion—the rock compresses in the vertical direction—and is therefore the most relevant for purposes of calculating the amount of oil released.  Tr. at 2406 (Zimmerman); TREX 011497.0006. Knowing the UPVC is necessary for, among other things, the material balance calculations performed by Drs. Blunt and Kelkar.  Tr. at 2407 (Zimmerman); TREX 011553R.0007; TREX 011549R.0045; TREX 011497.0012.

1585.  As discussed below, Dr. Blunt uses a UPVC value that is based on data from laboratory analysis of rock samples from the Macondo Reservoir.  *See* Sections III.C.2(a)–(b). Dr. Kelkar doubles that value in his analysis, citing internal BP documents.  *See* TREX 011549R.0027.  But BP's internal scientists' use of an increased number for compressibility reflected a temporary concern for ensuring a worst-case analysis of potential pressure build-up after shutting in the well.  *See* Section III.C.2(c).  Both before and after this period, BP used the measured UPVC value in its modeling of the reservoir. *See* Section III.C.2(c).

<div align="center">(a) <strong>The Pore Volume Compressibility of the Macondo Reservoir Was Measured by an Independent Laboratory Consistent with Industry Standards.</strong></div>

1586.  The most reliable way to estimate the pore volume compressibility of any given reservoir is to take cores samples from that reservoir and conduct measurements on those cores

in a laboratory.  Tr. at 2411 (Zimmerman).  Weatherford Laboratories performed uniaxial compression testing on core samples from the reservoir.  TREX 009053; TREX 009067; Loos Dep. at 29 (BP contracted for Weatherford to test rock samples taken from the Macondo reservoir).  Weatherford Laboratories is a commercial laboratory based in Texas that does core analysis.  It is a well-respected service laboratory; both industry and academic institutions hire Weatherford to perform core analysis.  Tr. at 2018–19 (Blunt); Tr. at 2428–29 (Zimmerman); Loos Dep. at 22.  Weatherford regularly performs various tests on reservoir rock samples, including pore volume compressibility tests, to "better understand what type of oil, how much, how to get it out, the characteristics of the rock in different formations."  Loos Dep. at 22.

1587.  For rock mechanics testing, Weatherford can use either rotary sidewall core samples or so-called conventional (whole) cores.  Loos Tr. at 189–90.  In rotary sidewall coring, a tool is dropped down into the borehole, and a rotary device is projected out laterally.  Tr. at 2412 (Zimmerman); D23685.  As the tool rotates, it pulls a cylindrical core out of the reservoir sandstone.  Tr. at 2411–12 (Zimmerman); D23685.  The coring bit is then pulled back into the coring device and eventually brought back up to the surface, where that core is subsequently tested in a laboratory.  Tr. at 2412 (Zimmerman); D23685.

1588.  Only rotary sidewall cores were extracted from the Macondo reservoir before the *Deepwater Horizon* incident; no conventional cores were retrieved.   Tr. at 2411, 2415 (Zimmerman); Tr. at 3307 (Roegiers); Loos Dep. at 220.  Schlumberger, the operator of the coring tool for the Macondo reservoir, descended the tool three times, and made 52 attempts to extract cores from the side of the wellbore.  TREX 006397.  Out of those 52 attempts, 44 rotary sidewall cores were successfully extracted.  Tr. at 2413 (Zimmerman); TREX 006397.  The core

samples were extracted from the D and E layers of the Macondo reservoir.  Tr. at 2414–15 (Zimmerman); D23684; TREX 009053; TREX 009056, TREX 009050; TREX 003542.

1589.   Rock mechanics testing is commonly performed on rotary sidewall cores, and the core samples extracted from the Macondo Reservoir were of acceptable quality for testing. Tr. at 2415, 2428 (Zimmerman); Loos Dep. at 143, 202–03; Vinson Dep. at 356–57. Compressibility results from tests on rotary sidewall cores are just as reliable as test results on "whole cores." Loos Dep. at 190–91.  In order to ensure that the results are reliable, Weatherford has minimum standards to determine whether a given sample is suitable for each type of testing.  Loos Dep. at 56.  The Weatherford routine core analysis manager determines whether a sample is suitable for a given test.  Loos Dep. at 60.  Only those rotary sidewall core samples that met the relevant standards were tested.  Loos Dep. at 190–91, 201–02, 205.  Prior to testing, each core sample was photographed, CT scanned, cleaned, and dried; these are all standard non-destructive procedures that do not affect later testing analysis.  Loos Dep. at 64, 86, 88–89.  It is standard practice by Weatherford to ensure that a sample is clear from cleaning fluid before running subsequent tests.  Loos Dep. at 96–97.

1590.   Tests of the Macondo core samples provided data on rock characteristics such as permeability, porosity, compressibility, strength, grain size, and mineral content.  Loos Dep. at 25–27.  While BP identified the types of tests to be run, it did not influence the results of the tests, or how the tests were run.  Loos Dep. at 198–99.

1591.  The tests performed on the Macondo samples were performed up to Weatherford's high standards, which include quality assurance testing.  Loos Dep. at 160–161, 208–09.  The Weatherford lab technicians who performed the testing for the Macondo rotary core samples had undergone specialized training.  Loos Dep. at 120, 147, 255–56.  No one

interfered with the reliability or objectivity of the test results. Loos Dep. at 198–99. All of the testing performed was accurate and reliable. Loos Dep. at 199, 208–10, 220. The test results were gathered and reported in Weatherford's standard format, and reported in a series of reports compiled by Weatherford employees in the same manner as they ordinarily compile reports for their other industry clients. Loos Dep. at 120–21. Weatherford's standard operating procedures with respect to maintenance and calibration of the testing apparatuses were followed when testing the Macondo samples. Loos Dep. at 160–161. In summation, Weatherford's testing procedures for the Macondo core samples were consistent with industry practice, and were properly followed. Loos Dep. at 208, 210; TREX 011497.0014; Tr. at 2425, 2428 (Zimmerman).

> (b) **Dr. Zimmerman, the World's Leading Expert on Sandstone Compressibility, Calculated That the Pore Volume Compressibility of the Macondo Reservoir Was Approximately 6 Microsips.**

1592. Dr. Robert Zimmerman, the world's foremost expert on compressibility of sandstones, calculates the Macondo UPVC based on Weatherford laboratory data. TREX 011497.0006. No United States expert came forward with an affirmative opinion of the pore volume compressibility of the Macondo reservoir based on actual data.

1593. Of 44 core samples extracted by Schlumberger, Weatherford tested nine of those for rock mechanics properties, and eight of those were used by Dr. Zimmerman to inform his opinion on the best estimate of Macondo Reservoir's UPVC.. Tr. at 2413–14 (Zimmerman). Testing on the ninth core did not provide enough data for a complete analysis of UPVC. Tr. at 2413–14 (Zimmerman). Based on his analysis of Weatherford's tests on Macondo core samples, Dr. Zimmerman concludes that the best estimate for the reservoir's UPVC is 6.35 microsips. TREX 011497.0006, 0008, 0013, Tr. at 2398–99, 2425 (Zimmerman).

371

### (1)   Dr. Zimmerman Is the World's Leading Expert on Sandstone Compressibility.

1594.   Dr. Zimmerman is a professor of rock mechanics at Imperial College London.  Tr. at 2385 (Zimmerman); TREX 011497.0062.  He has three degrees in engineering, including a Ph.D. from the department of mechanical engineering at the University of California, Berkeley, where he wrote his thesis on the effect of pore structure on the pore and bulk compressibilities of consolidated sandstones.  Tr. at 2386 (Zimmerman); TREX 011497.0062, 0086; D23661.

1595.   Dr. Zimmerman has taught numerous classes on the topic of rock mechanics, including compressibility of porous material, of which sandstones are a subset.  Tr. at 2389–90 (Zimmerman); D23663.   His research has focused on numerous topics in rock mechanics, including compressibility of sandstones.  Tr. at 2389–90 (Zimmerman); TREX 011497.0062–86. He co-authored the fourth edition of *Fundamentals of Rock Mechanics*, a well-known and authoritative book in the field of rock mechanics.  TREX 144580; Tr. at 2391 (Zimmerman); Tr. at 1574–75 (Hsieh).  He also authored *Compressibility of Sandstones*, which deals exclusively with compressibility of sandstone rocks, like the Macondo reservoir rock.  D23665; Tr. at 2390–91 (Zimmerman).  Dr. Zimmerman, and his books, are well regarded by BP and United States experts alike.  Tr. 2141 (Blunt); Tr. 1574–75 (Hsieh).

1596.   Dr. Zimmerman published hundreds of articles on various rock mechanics topics—articles that have been cited thousands of times in the academic literature.   TREX 011497.0062–86; Tr. at 2391–92 (Zimmerman); D23662. In addition to authoring his own articles, he serves as an editor of highly respected journals in the field. Since 2006, Dr. Zimmerman has been the editor-in-chief of the *International Journal of Rock Mechanics and Mining Sciences*, the leading journal in the field of rock mechanics.  Tr. at 2392 (Zimmerman); D23666; TREX 011497.0062–86.  He also serves on the editorial boards of *Transport in Porous*

*Media*, and the *International Journal of Engineering Science.*   Tr. at 2392 (Zimmerman); D23666; TREX 011497.0062–86.

1597.   Dr. Zimmerman is a member of various professional organizations, including the Society of Petroleum Engineers, the American Society of Mechanical Engineers, the American Society of Civil Engineers, and the International Society for Rock Mechanics (ISRM), among others.  D23667; TREX 011497.0062–86; Tr. at 2392–93 (Zimmerman).  He was the first person asked by the ISRM to lead the commission of petroleum geomechanics, which organizes workshops, special sessions, and special publications specifically devoted to rock mechanics applications to the petroleum industry.  Tr. at 2393–94 (Zimmerman).  The American Society of Civil Engineers ("ASCE") awarded Dr. Zimmerman the 2010 Biot Medal for lifetime research contributions to the mechanics of porous materials.  Tr. at 2391–94 (Zimmerman); D23668; TREX 011497.0062–86.   The ASCE specifically noted that "'[a]s an exceptionally prolific researcher, Dr. Zimmerman has had a major impact on rock mechanics and [the] theory of poroelasticity." D23668.

> **(2)**     **Dr. Zimmerman Analyzed Results from Three Different Lab Tests on Eight Different Core Samples and Determined That the Pore Volume Compressibility of the Macondo Reservoir Was Approximately 6 Microsips.**

1598.   Dr. Zimmerman analyzes the data measured by Weatherford Laboratories and calculates the average uniaxial pore volume compressibility of the Macondo reservoir at 6.35 msips.  Tr. at 2398 (Zimmerman); TREX 011497.0006.  In arriving at his best estimate of the Macondo Reservoir's average UPVC, he analyzes the results of three separate tests performed by Weatherford TREX 011497.0006; Tr. at 2416 (Zimmerman).

1599.   First, Dr. Zimmerman evaluates the results of  Weather's uniaxial compression test on rock samples.   TREX 011497.0006; Tr. at 2416 (Zimmerman).   These tests were

performed under conditions of uniaxial (vertical) strain, and therefore supply the data that is most directly relevant to the calculation of UPVC.  TREX 011497.0035.  Weatherford tested three rotary sidewall core samples from Macondo (3-6R, 3-16R, and 3-22R) and saturated them with kerosene, an appropriate and commonly-used pressurizing fluid.  TREX 011497.0035; Tr. at 2487–89 (Zimmerman); TREX 009067.  The core samples were then placed between two end-caps, and a heat-shrink jacket was placed over the sample to separate the pore fluid from the pressurized fluid that is used to apply the lateral confining pressure.  TREX 011497.0035.  Once the samples were properly saturated, lateral confining pressure was increased to 13,300 psi, the fluid pressure was increased to 11,800 psi, and the overburden pressure was increased to 14,800 psi—mirroring Macondo reservoir's initial reservoir pressures.   TREX 011497.0035; TREX 009067; Loos. Tr. at 138–39; Tr. at 2417–19 (Zimmerman); D23720.  After establishing the initial reservoir stress, all pressure was maintained constant for a sufficient time to allow the pressures to stabilize.  TREX 011497.0035.

1600.  During the uniaxial compression tests, the overburden pressure of 14,800 psi was maintained constant to mimic the unchanging weight of rock lying above the actual reservoir. Tr. at 2417 (Zimmerman); TREX 011497.0035.  The pore pressure was incrementally reduced from 11,800 psi to 3,800 psi.  TREX 011497.0038; Tr. at 2417–19, 2422–23 (Zimmerman); TREX 009067.  Meanwhile, Weatherford constantly adjusted the lateral confining pressure to prevent the rock from expanding or contracting in the lateral direction.   Tr. at 2418 (Zimmerman).

1601.  The uniaxial compression test measured changes in the bulk volume of the core samples, which is affected by both pore compressibility *and* mineral compressibility. TREX 011497.0036.  Because the relevant measurement for the material balance equation is the pore

compressibility, Dr. Zimmerman converts the measured raw bulk compressibility to the uniaxial pore volume compressibility using known and accepted equations. Tr. at 2420–21 (Zimmerman); TREX 011497.0014–15.   No U.S. expert criticizes the process used by Dr. Zimmerman in converting the measured bulk volume compressibility to pore volume compressibility.   Tr. at 2421 (Zimmerman).

1602.   During the spill, the reservoir pressure is believed to have decreased from 11,800 psi down to approximately 10,400 psi.  Tr. at 2161–64 (Blunt); TREX 011553R.0041–.0042; TREX 011696R.0035.  Dr. Zimmerman takes the uniaxial pore volume compressibility values from each of the three rotary sidewall cores over the relevant pressure range of 11,800 psi to 10,400 psi, and performs an arithmetic average to arrive at his best estimate of 6.35 msips.  Tr. at 2421–25 (Zimmerman); TREX 011497.0013–15; D24651.



1603.   In calculating an arithmetic average Dr. Zimmerman does not include all of the measured values from 11,800 psi to 10,400 psi.  He deemed the results from the first 200 psi of depletion to tainted by experimental artifacts related to friction between the rock and the testing device.  Tr. at 2423–24 (Zimmerman); TREX 011497.0043–44.  If he included these initial data points, he would arrive at a *lower* UPVC value.  Tr. at 2424 (Zimmerman).

1604.   Weatherford performed two other tests that measured rock properties from which an estimate uniaxial pore volume compressibility can also be derived: are hydrostatic stairstep porosity test and the ultrasonic/acoustic velocity test  Tr. at 2416, 2427–28 (Zimmerman); TREX 011497.0006–07.

1605.   Weatherford performed the hydrostatic stairstep test on samples 3-8R, 3-21R, and 3-25R—different core samples than used for the uniaxial compression test.  Tr. at 2427–29 (Zimmerman); TREX 009050. In that test, pore pressure was held constant and the lateral confining pressure and the vertical overburden confining pressure were increased at the same rate to the represent a hydrostatic state of stress——a situation in which all of the confining pressures are equal to each other.  Tr. at 2405, 2429 (Zimmerman); D23677.  The hydrostatic confining pressure was increased, and the porosity of each core was measured at specific intervals.   TREX 009050; Tr. at 2429–30 (Zimmerman); TREX 011497.0016–17.   Dr. Zimmerman analyzes the porosity measurements as a function of stress, and converted them to hydrostatic pore volume compressibility using equations that appear in his book, *Compressibility of Sandstones.*  Tr. at 2430–31 (Zimmerman); TREX 011497.0046–49.  These are well-known equations that relate the measurements taken during the hydrostatic stairstep test to pore volume compressibility.  Tr. at 2429–31 (Zimmerman); TREX 011497.0016–17; D23721; Tr. at 3297

(Roegiers) ("Q: Do you agree that there are well-established relationships to convert porosity measurements from hydrostatic compression tests to a UPVC value? A: Yes.").

1606.   The final step of calculating UPVC from the hydrostatic stairstep test involves converting the calculated hydrostatic compressibility to UPVC, and then interpolating those values over the relevant differential pressure ranges.   TREX 011497.0049; Tr. at 2430–33 (Zimmerman).   To convert hydrostatic pore volume compressibility to UPVC, Dr. Zimmerman uses a well-known equation that required knowledge of a property known as the "Poisson ratio." D23701; Tr. at 2429–33 (Zimmerman); TREX 011497.0016–17.   Both the academic literature and the measured data confirm that the Poisson ratio of the Macondo reservoir sandstone was between 0.1 and 0.2.   TREX 011497.0016 ("The Poisson ratio of a consolidated sandstone usually lies between 0.1 and 0.2); TREX 009056.0009 (showing a measured Poisson ratio of 0.18 for 3-17R, and  0.13 for 3-19R); Tr. at 2430–33 (Zimmerman).

1607.   Finally, Dr. Zimmerman focuses on  the UPVC value at the relevant differential pressure which is the difference between the confining pressure and the pore pressure during the release of hydrocarbons from the reservoir.  Tr. at 2432–33 (Zimmerman); TREX 011497.0046–51.  The average differential pressure in the Macondo reservoir during the spill was 2,372 psi.  TREX 011497.0052; Tr. at 2432–33 (Zimmerman).   Because the tests only gave values at differential pressures of 1,600 and 3,000 psi, Dr. Zimmerman  interpolates the values to arrive at a UPVC value at a differential pressure of 2,372 psi.  Tr. at 2423–33 (Zimmerman); TREX 011497.0052. The derived UPVC value of the three cores from the hydrostatic stairstep porosity test was between 4.56 and 5.47 msips.  Tr. at 2433 (Zimmerman); TREX 011497.0016–17.  Those values are sufficiently close to the 6.35 msips calculations obtained from the direct

uniaxial compression test to confirm the validity of the estimate based on the uniaxial compression tests.  Tr. at 2433 (Zimmerman).

1608.   The third test that Dr. Zimmerman analyzes to arrive at his best estimate of UPVC was the ultrasonic/acoustic velocity test.  Tr. at 2444–45 (Zimmerman).  Weatherford performed this test on core samples 2-4R, 3-17R, and 3-19R, which were different from the cores used in the uniaxial compression test or the hydrostatic stairstep test.   TREX 011497.0018; TREX 009056; Tr. at 2445 (Zimmerman).   Only two of those core samples—3-17R and 3-19R— measured compressional **and** shear velocity, both of which Ares necessary to convert to a UPVC value.   Therefore, Dr. Zimmerman uses only results from these two core samples.   TREX 009056.0009; Tr. at 2447 (Zimmerman); TREX 011497.0052–55.

1609.  The acoustic/ultrasonic velocity test measured how fast sound waves traveled through the Macondo rock.  Two transducers were placed on either end of the sample, and one transducer sent transmitted sound waves to the other transducer.  Dr. Zimmerman takes the measured shear and compressional velocities, along with the measured rock density, and calculates the bulk modulus.  Tr. at 2447–48 (Zimmerman).  Dr. Zimmerman calculates the bulk modulus from the measured data, then converts that to bulk compressibility.  Tr. at 2448 (Zimmerman).  He then converts bulk compressibility to hydrostatic compressibility, and finally to dynamic UPVC.  As a final step, he converts the  dynamic UPVC values into  static UPVC values, which is the relevant value for present purposes.  Tr. at 2449–51 (Zimmerman); TREX 011497.0018–19.  In the end, Dr. Zimmerman determines that the acoustic/ultrasonic velocity test  yielded a UPVC value of 4 msips, which further confirms the validity of the estimate based on the uniaxial compression tests and negates the possibility that the reservoir's UPVC was

appreciably higher than 6.35 msips.  Tr. at 2449–51 (Zimmerman); TREX 011497.0007; TREX 011497.0018–19.

1610.  Notably, Government experts do not dispute that Weatherford's measurements reveal that the UPVC of  the Macondo core samples was approximately 6 microsips.  Indeed, Dr. Pooladi-Darvish uses a rock compressibility of six microsips for his base case.  Tr. at 2052 (Pooladi-Darvish).  Dr. Kelkar performs no analysis of the rocks mechanics measurements conducted on the Macondo rock samples, but admitted that six microsips is a reasonable estimate.  Tr. at 1893–94 (Kelkar).

1611.  Literature correlations between porosity and compressibility, while not capable of providing an exact estimate of UPVC, reveal that the measured porosity of Macondo reservoirs is also consistent with a UPVC value of approximately 6-msips, further bolstering Dr. Zimmerman's calculation.  Tr. at 2144–48 (Blunt).

> (c)  **BP Scientists in Charge of Macondo Analysis Regarded the Value of Rock Compressibility to Be 6 Microsips, and Used Higher Alternative Scenarios During a Short Period, When Assessing the Worst-Case Risks of Shut-In.**

1612.  United States expert Dr. Kelkar uses a rock compressibility value of 12 microsips to calculate a cumulative flow of approximately 5 MMstb.  TREX 011549R 0028; Tr. at 1942 (Kelkar) (testifying that 5 MMstb is the estimate because it is the average between 4.5 and 5.5 MMstb).  He acknowledged that his number was double the value obtained from measurements on samples of the Macondo reservoir rock.  Tr. at 1844–45, 1864 (Kelkar).

1613.  Dr. Kelkar's expert report contains no scientific analysis justifying the doubling of the rock compressibility number derived from rock measurements.  TREX 011549R.  The report cites a single document in support of using 12 microsips: a page from a PowerPoint

presentation by BP reservoir engineer Dr. Robert Merrill, whose testimony about this document and its context are described below.  TREX 011549R.0027–28, 0045.

1614.  In his deposition for the first time, and also at trial, Dr. Kelkar attempted to enlarge the basis for his asserted compressibility number to include selected emails and documents from BP personnel, including Dr. Merrill and several other BP colleagues, as will be discussed below.  Tr. at 1866 (Kelkar).  There is no support for the assertion that the actual value of rock compressibility is 12 microsips.  BP scientists in charge of Macondo modeling never believed that 12 microsips was either the best estimate or most likely value of rock compressibility.  Moreover, as discussed below, even the United States' highest-ranking scientific officials questioned the use of 12 microsips and never received responses to their demands for justification of it.

        **(1)**     **BP's Science Team Calculated a Rock Compressibility of 6 Microsips, and Never Changed This Scientific Conclusion; They Added Higher Alternative Cases Including 12 Microsips for a Limited Time to Assess the Risks of Pressure Build-Up in the Event of Shut-In.**

1615.  The BP engineer who led the scientific modeling to predict the changing pressures in the Macondo well was Dr. Bob Merrill.  Tr. at 2645 (Merrill).

1616.  Dr. Merrill is the author or recipient of the principal documents cited in testimony (but not in the expert report) by U.S. expert Dr. Kelkar to support use of 12 microsips for the rock compressibility input into the material balance equation.  *See* TREX 011549R.0027.  Dr. Merrill and other BP scientists used 12 microsips (along with temporarily-increased numbers for other parameters) to predict worst-case scenarios of possible pressure build-up in the event the well were to be shut in.  After the decision was made to shut in the well, Dr. Merrill resumed using 6 microsips to model the pressure behavior of the Macondo well.  *See* D24698-3

(demonstrative timeline listing documents showing that Dr. Merrill used 12 microsips for a limited time period).

1617.   Starting around late June, Dr. Merrill created scientific models that predicted the build-up of pressures in the well in the event of shut in.  Tr. at 2651 (Merrill).  Dr. Merrill testified that his initial modeling used a rock compressibility value of 6 microsips.  Tr. at 2650 (Merrill); Tr. at 2645–48 (Merrill); TREX 010859.1.1; D24698-1; *see also* Vinson Dep. at 415, 418 (BP's technical experts calculated a rock compressibility of 6 microsips); TREX 008767 (June 15, 2010 E-Mail from Kelly McAughan stating: "We got a rock compressibility of 6 [microsips]").

1618.   BP technical notes showing Dr. Merrill's modeling using 6 microsips were shared with the United States.  *See, e.g.,* TREX 008627.

1619.   On July 6, nine days before the shut-in decision, a group of BP scientists and management gathered to evaluate the work that had been done to evaluate the risk of shutting the Capping Stack.  Tr. at 2651–52 (Merrill).

1620.   In particular, the group discussed the pressures that were expected to build up in the well if the Capping Stack were shut.  Dr. Merrill testified "we were very concerned" that, after shut-in, pressures might build up so high that "burst disks" near the wellhead might rupture, allowing hydrocarbons to erupt into surrounding shallow sediments, resulting in an even worse blowout.  Tr. at 2651-56 (Merrill).  Alternatively, it was feared that if the burst discs had already failed (or if there was any other rupture in the integrity of the well), the magnitude of the pressure could drive the flow into the shallower formations, which would increase the risk of a surface breach.  Tr. at 2651–56 (Merrill).

1621.   Thus, during the July 6 meeting, the gathered scientists and managers discussed whether the scientific modeling of possible pressure build-up after shut-in had encompassed the full range of risk.  Tr. at 2651–56 (Merrill).  A reservoir engineer assigned to a different BP field, Dave Schott, questioned the exclusive use of 6 microsips for compressibility.  Tr. at 2651–56 (Merrill).  That number had been calculated as the average value measured on rock core samples. Tr. at 2651–56 (Merrill).  Pointing out the uncertainty involved in the measurements (discussed below), he suggested the use of higher numbers for the risk assessment.  Tr. at 2651–56 (Merrill).  The consensus at the meeting was to explore higher alternative numbers to ensure that the shut-in risk predictions encompassed a higher range of possible pressure build-up.  Tr. at 2651–56 (Merrill).  There was not a scientific conclusion at this meeting or at any time thereafter that the original value of 6 was invalid or that the measurements from which it was calculated were biased. Tr. at 2654–55 (Merrill).

1622.   Following July 6, Dr. Merrill engaged in a dialog described below, resulting in the decision to use the higher numbers of 12 and 18 microsips along with 6 microsips.  Other parameters also had their input numbers increased, to likewise encompass a higher risk level from predicted pressure build-up.  *See* Tr. at 2651–56 (Merrill).  The numbers for the assumed flow rate and the predicted aquifer size were bumped up.  Tr. at 2651–56 (Merrill).  Each of these changes resulted in higher shut-in pressure predictions.  Tr. at 2651–56 (Merrill).

1623.   The United States now contends that these alternative scenarios reflect a scientific "consensus" within BP that the most likely value of rock compressibility is 12, not 6 microsips. *See* Tr. at 1865 (Kelkar); D21600.  Other sections of this document will refute that assertion based on both the science of rock compressibility (Section III.C.2(b)–(g)) and the content and context of the BP internal documents themselves (Section III.C.2(c)).  Even the United States

experts, on cross examination, admitted that the alternative calculations using 12 microsips were done in the context of evaluating pressure build-up risks, as is shown in the next section.

> **(2)    U.S. Experts Admitted that BP's Temporary Use of Alternative Scenarios of 12 microsips Occurred in the Context of Perceived Risk from Shut-In Pressures Building Up Too High.**

1624.   Another United States expert who purports to have relied on internal BP documents as justification for using rock compressibility of 12 microsips is Dr. Paul Hsieh of the United States Geological Survey.  Dr. Hsieh was initially designated as a trial expert, but then withdrawn.  Nevertheless, his cumulative flow calculation using 12 microsips is cited in the United States' pretrial brief.  *See* United States of America's Pre-Trial Statement at 1, 4, 8 (Rec. Doc. 11265).

1625.   Dr. Hsieh admitted that during the 10 days before the July 15 shut-in, when Dr. Merrill was creating alternative models using 12 microsips, the concern was the possibility of pressure building up too high.  Tr. at 1542–43 (Hsieh).  Dr. Hsieh testified that "there was definitely a risk of shutting in the well and the risk was the underground blowout."  Tr. at 1542 (Hsieh).  This was because after shutting in the well, pressure would build up and increasing pressure could force reservoir fluids into the other formations causing a subsea blowout.  Tr. at 1543 (Hsieh).

1626.   The context of risk assessment was also recognized by Dr. Kelkar, who agreed that there was a risk from buildup of pressure once the Capping Stack was shut.  Tr. at 1897–98 (Kelkar).

###### (3)   BP Documents Relied Upon by the United States Show that Higher Compressibility Numbers Were Temporary Safety Factors, Not Reflective of a Scientific Conclusion.

1627.   At the July 6 meeting described in Section III.C.2(c)(1), BP reservoir engineer David Schott expressed his concern that the uncertainty inherent in measuring rock compressibility meant that the risks of shut-in might not be adequately portrayed if pressure was predicted based on solely the measured average of 6 microsips.   No one else at the meeting raised such a concern.   Tr. at 2651–56 (Merrill).

1628.   Schott was the reservoir engineer for a nearby BP field where two different wells had yielded different measurements of rock compressibility.   Vinson Dep. at 416–17.   Schott believed that the difference might not reflect actual rock characteristics, but might be caused by the method of sampling.   Vinson Dep. at 416–17.   In one well the samples come from "conventional" or "whole" cores, drilled vertically.   Vinson Dep. at 404, 416–17, 442.   In the other well the samples were smaller "rotary sidewall cores," drilled horizontally.   The latter yielded lower measurements of compressibility.   Vinson Dep. at 404, 416–17, 442.   Macondo rock samples were also obtained using rotary sidewall cores.   Tr. at 2653–54 (Merrill).

1629.   Schott's belief as to the cause of the difference was anecdotal.   Tr. at 2653 (Merrill).   He was not a "geomechanic," the name for field personnel specializing in properties such as rock compressibility, nor is there evidence that any other BP scientist at the July 6 meeting presented geomechanical evidence suggesting that the rotary sidewall cores used to measure Macondo compressibility were unreliable.   Tr. at 2653 (Merrill).

1630.   Nevertheless, given the context of predicting risk of pressure buildup from shut-in, the science and management team at the July 6 meeting decided to come up with alternative higher numbers for rock compressibility to use along with 6 microsips. Tr. at 2652–54 (Merrill).

As discussed earlier, they also decided to increase the assumed values for other parameters affecting predicted pressure buildup, such as flow rate and aquifer size. *See* Section III.C.2(c)(1)

1631.   Following the July 6 meeting, Dr. Merrill, BP reservoir engineer Kelly McAughan, and BP geomechanic Steve Willson discussed what values to use for rock compressibility in a series of emails. *See* TREX 011557; Tr. at 2656 (Merrill). Ultimately, they agreed to use 12 and 18 microsips, in addition to the measured value of 6 microsips, for modeling the shut-in pressures. Tr. at 2651–56 (Merrill).

1632.   Their decision-making process over the ensuing two days shows that 12 microsips was not a scientifically determined "most likely" value. *See* Tr. at 2659 (Dr. Merrill noting that BP's geomechanics specialist performed no scientific analysis or written study during the period when increasing rock compressibility).

1633.   When BP's resident expert in geomechanics, Steve Willson, was first told about the decision to use alternative, higher numbers for compressibility, he protested, in response to an email, that "I don't think you can go much above 6 microsips and still honor the data." TREX 011557.0002. Mr. Willson agreed to posit higher compressibility numbers only after obtaining an explanation from Dr. Merrill about the decision at the July 6 meeting to increase pressure-related parameters in order to adequately predict the range of shut-in risk. After getting that explanation from Dr. Merrill, Mr. Willson emailed, "I have spoken with Bob Merrill and have more context now around the question being asked." TREX 011557.0001. Dr. Merrill testified that he had told Steve Willson "we were looking for higher values of compressibility that were still within the realms of possibility so that we could calculate a higher final depleted pressure." Tr. at 2659 (Merrill).

1634.  Dr. Kelkar admitted that he was not aware of this context of the discussion between Mr. Willson and Dr. Merrill at the time that he based his expert report on the BP decision to present an alternative model using 12 microsips.  Tr. at 1910–12 (Kelkar).

### (4)   No Evidence Supports the United States' Contention that Measurements of Compressibility Using Rotary Sidewall Cores Should Be Doubled.

1635.  At trial, Dr. Kelkar highlighted an excerpt of a BP document shown to him by counsel, in which Mr. Willson noted that rotary sidewall cores have "inherent biases."  Tr. at 1868 (Kelkar).  But there was no evidence that Mr. Willson (1) determined that such bias affected the samples taken at Macondo or (2) whether any "bias" was of a magnitude that would require (let alone support) the measured value of compressibility to be doubled.  *See* Tr. at 2659, 2683 (Merrill).  Indeed, the world's leading geomechanics expert on the compressibility of sandstones, Dr. Robert Zimmerman, testified that any "anisotropy" in the horizontal direction would be quantitatively small, as is discussed in Section III.C.2(g)(1).

1636.  On the contrary, in another email from this period, BP reservoir engineer Kelly McAughan notes that Mr. Willson thought 6 microsips was still a good number given Macondo's lower porosities, but that Mr. Willson would look for "a maximum value as well."  TREX 008772.1.1.BP.

1637.  Dr. Kelkar admitted that in his 30 years of reservoir engineering experience, this case was the first time he had ever heard that heard that rock compressibility measurements on rotary sidewall cores could supposedly be biased.  Tr. at 1909–10 (Kelkar).

1638.  Likewise Dr. Merrill, in his 30 years of experience as a reservoir engineer, had never heard any concerns about using rotary sidewall cores to measure rock compressibility.  Tr. 2648–50 (Merrill).

(5) **The July 8 and 9 Merrill PowerPoints Cited in Dr. Kelkar's Expert Report Do Not Evidence a Scientific Conclusion That the "Most Likely" Value of Compressibility Was 12 Microsips.**

1639. On July 8, Dr. Merrill presented an update to his pressure model, this time using values of 6, 12, and 18 microsips for rock compressibility, in order to show alternative worst case pressure-build-up scenarios, as described above. TREX 010841N.3.1.

1640. The presentation compared the pressure response when using different inputs. For example, increasing the rock compressibility from 6 to 12 microsips resulted in an additional 200 psi of pressure. TREX 010841N.3.1.

1641. The sole citation supporting the use of 12 microsips in the expert report of Dr. Kelkar is an excerpt from this presentation where the phrase "Recommend: new 'most likely'" is followed by numbers for three modeling parameters: an aquifer 3.8 times the size of the reservoir, a rock compressibility of 12 microsips, and a flow rate of 35,000 stb/d. TREX 010841N.

1642. Dr. Merrill put "most likely" in quotations in order to highlight that the use of the phrase was not literal. Tr. at 2660–62 (Merrill). Because the number 12 was mid-way between the other two input numbers, it would customarily be interpreted in an ordinary petroleum engineering presentation as being the value adjudged by the scientists as being most likely, with the other two values being judged as "low" and "high" cases. *See* Tr. at 2660–62 (Merrill). Here, the opposite was the case: As discussed earlier, 6 microsips was always judged by the BP Macondo scientists as most likely, but they elected to model two alternative higher values for assessing the risk of pressure build-up from shutting in the well. *See* Sections III.C.2(c)(1)–(3). Thus, when he Dr. Merrill wrote the phrase "most likely" next to "12 microsips" and the other increased numbers (for aquifer size and flow rate) he did so because he those numbers "were not

statistically most likely" but were only the "mid case" for those temporary models.  Tr. at 2660–62 (Merrill).

1643.   On July 9, Dr. Merrill presented a final version of the modeling runs shown on July 8.  Tr. 2662-63 (Merrill); TREX 009324.17.

1644.   The July 9 presentation used the same range of parameter values, but the words "most likely" did not appear on the presentation.  *See* TREX 009324.17.  Dr. Merrill testified that at the time he gave this presentation to the Government, he did not regard 12 microsips as the most likely number for Macondo compressibility and he did not recall telling the Federal Science Team that 12 microsips was the most likely value.  Tr. at 2662–64 (Merrill).

1645.   On the contrary, Dr. Merrill testified that the July 8 and July 9 presentations showed modeling using higher values of rock compressibility because it was "just the right thing to do to seeing how high the pressure could be, since that would determine how quickly the shallower formations actually filled with oil and exceeded their fracture gradient and fracture to surface and caused a subsea blowout."  Tr. at 2664 (Merrill).

1646.   Though Dr. Kelkar cited the July 8 presentations as the sole basis in his expert report explaining why he used 12 microsips, he did not adopt the other assumptions included in the "most likely" section of the presentation, such as a flow rate of 35,000 stb/d (which would result in a cumulative flow of approximately 3 MM stb).  *Cf.* TREX 011549R.0028 (Dr. Kelkar's report).

1647.   In summary, the higher values of rock compressibility used during the 8 days prior to shut-in were "specifically for the purpose of risk to shut-in, not as estimates of the pore volume compressibility of the Macondo reservoir."  Vinson Dep. at 417–19, 440–43.  In analyzing potential pressure build-up risks, BP naturally "would not be looking at using values

of rock compressibility that are lower than what was measured" but instead "ranges that are higher because that's where your sensitivity was."  Vinson Dep. at 444–46.

> **(6)**　**Following the July 15 Shut-In Decision, BP Engineers Used 6 Microsips to Analyze Pressure Data—Including During Critical Relief Well Operations.**

1648.  After the shut-in decision was made on July 15, 2010, Dr. Merrill analyzed the collected pressure data using an input for rock compressibility of 6 microsips.  TREX 010845.10.

1649.  Some post-shut-in documents again presented shut-in analysis using the 12 microsips assumption, but Dr. Merrill testified that he believed these simulations were done prior to shut-in.  D21600 (United States demonstrative citing a July 16 BP presentation that uses a "base case" of 12 microsips); Tr. at 2668–69 (Merrill).

1650.  These simulations, presented at trial by the United States, did not show any pressure data from the Capping Stack pressure gauge.  Tr. at 2669 (Merrill).

1651.  Dr. Merrill used 6 microsips as the input for rock compressibility after shut-in because it was the measured value.  Tr. at 2670–71 (Merrill).

1652.  His decision to resume exclusive use of 6 microsips was reinforced by measurements of pressure after shut-in.  Instead of the dangerous higher pressures that BP had attempted to assess by using higher compressibility assumptions, the pressure data being collected by the Capping Stack pressure gauges was consistent with the pressure predictions using 6 microsips.  Tr. at 2669–70 (Merrill).

1653.  As a result, Dr. Merrill and other BP engineers continued to use exclusively 6 microsips for rock compressibility when assessing the reservoir.  Tr. at 2669–71 (Merrill).

1654.  For example, on July 22, Dr. Merrill used 6 microsips while modeling the pressure depletion for relief well drillers.  TREX 011551.  Dr. Merrill testified that it was

important to accurately predict the pressure in the reservoir because "the drillers were depending upon these pressure predictions to prepare their mud weight." Tr. at 2672–73 (Merrill).

1655.   In late July, Dr. Merrill and BP reservoir engineer Mike Levitan also continued to use a value of 6 microsips in their modeling of the Capping Stack pressure after shut-in.  TREX 010924; TREX 009318; TREX 010933; TREX 010923.

1656.   Dr. Merrill did "shadow" the work of the USGS's Dr. Hsieh, who was using a higher value of rock compressibility.  This shadowing meant Dr. Merrill used Dr. Hsieh's input parameters, including higher rock compressibility, to ensure that Dr. Hsieh's models were accurate and predicted well integrity.  Tr. at 2695–96 (Merrill).  But Dr. Merrill did not use Dr. Hsieh's parameters to model flow rate.  Tr. at 2695–96 (Merrill).

1657.   The timeline below shows that Dr. Merrill used a value of 6 microsips throughout the incident and that he used 12 microsips only as an alternative, higher case for a one-week period in July, while BP was evaluating possible shut-in risk.  D24698-3; Tr. at 2674–75 (Merrill).



(7)     **The United States Knew that BP Used 6 Microsips for Pore Volume Compressibility Throughout the Incident Except for Certain Limited Worst-Case Analyses of Shut-In Risk.**

1658.   Dr. Hsieh and other United States researchers knew that in its original modeling BP exclusively used a value of 6 microsips based on the measured data.  TREX 008627; Tr. at 1539 (Hsieh).

1659.   Dr. Hsieh used 12 microsips in his modeling based on a conversation with Kelly McAughan on July 8 and on the July 9 presentation from Dr. Merrill.  Tr. at 1524, 1526 (Hsieh).

1660.   After shut-in, Dr. Hsieh and other United States researchers were aware that BP was using 6 microsips to analyze the pressure data:

1.   On July 16, Dr. Merrill wrote an email to inform Dr. Hsieh that 6 microsips was the measured value of rock compressibility.  TREX 142325.1.1.

2.   On July 20, Dr. Hsieh met with BP pressure transient analysis expert Dr. Mike Levitan and noted that Dr. Levitan was using a value of 6 microsips for rock compressibility.  TREX 008643; TREX 008643.1.1; Tr. at 1554–55 (Hsieh).

3.   On July 21, Dr. Hsieh sent a spreadsheet to United States consulting expert Peter Flemings indicating that the rock compressibility was 6 microsips "based on discussions with BP reservoir modellers and well test analysts." TREX 008642.

4.   In late July, Mr. Merrill presented pressure transient analysis models using a value of 6 microsips to the Government.  Tr. at 2673–74 (Merrill).

1661.   Dr. Hsieh also did not rely on 12 microsips exclusively in his modeling efforts. Dr. Hsieh presented the results of different models analyzing the Capping Stack pressure. Several of these models showed that Dr. Hsieh was changing different inputs, including the size

of the reservoir, the location of the well, the permeability, and the rock compressibility.  Tr. at 1561–62 (Hsieh); TREX 008640.5.2; TREX 008634.3.1; TREX 008644.0013.  For example, one of the presentations shows models using rock compressibility values between 7.6 and 15.5 microsips.  TREX 008640.5.2.

1662.  Dr. Hsieh admitted that his models could match the measured pressure by varying the input values for permeability and rock compressibility.  Tr. at 1561–62 (Hsieh).  His own analysis therefore contradicted the present United States contention that its scientists relied upon or validated a singular value of 12 microsips for rock compressibility.  *See* United States of America's Pre-Trial Brief at 8–9 (Rec. Doc. 11265) (asserting that U.S. scientists relied upon parameters furnished by BP prior to shut-in).

> **(d)   Secretary of Energy Chu and other U.S. Officials and Scientists Questioned the Doubling of Rock Compressibility from the 6 Microsips to 12, but Their Questions Were Never Answered.**

1663.  As is discussed in detail in Section III.B.3(c), *supra*, at meetings on July 30 and 31, 2010,  a consensus was reached among the Government scientists to publicly announce a cumulative flow estimate of 4.9 MMstb.  Tr. at 1576 (Hsieh).

1664.  The assembled United States scientists were aware that cumulative flow calculations were highly dependent on rock compressibility.   At that meeting, Dr. Hsieh presented a model showing that 6 microsips resulted in 2.9 MMstb whereas 12 microsips resulted in a cumulative flow of 4.6 MMstb, shown in the figure below.  TREX 008635.74.1.



1665.  Dr. Hsieh testified that he clearly communicated that the amount of cumulative flow depended on the value of rock compressibility.  Tr. at 1569 (Hsieh).  Dr. Tom Hunter's handwritten notes taken during the meeting state, "depends on compressibility."   TREX 009929.0094.

1666.  Furthermore, there is evidence that United States scientists were aware that BP did not agree with the use of 12 microsips.  Handwritten notes from this meeting, excerpted below, indicate that Dr. Hsieh informed the Federal Science Team that "BP preferr[ed] 6 microsips."  TREX 008628.0007.



1667.  Emails from early August indicate that United States researchers were aware that there was a controversy regarding the appropriate value of rock compressibility.  In an August 1

393

email to the Director of the United States Geological Survey, Marcia McNutt, a Government researcher wrote: "I would like to see …. justification for the use of a different compressibility than the reported value of 6." TREX 141784.1.1. Another email to Director McNutt states that "6 [microsips] was the original estimate from BP" but that the Paul Hsieh "liked 12 the best." TREX 008662.1.1.

1668.   In an August 2 email, Secretary Chu asked Dr. Hsieh whether "the uncertainties in the rock compressibility" were being "narrowed." TREX 008644.1.1.  Dr. Hsieh responded that he would "continue to research on ways to better define the rock compressibility." TREX 008645.1.2. He did not. Tr. at 1573–74 (Hsieh).

1669.   In summary, the evidence shows that the Federal Science Team was aware that BP did not regard 12 microsips as the correct value.

> ### (e)      Dr. Kelkar Used 6 Microsips During His Pre-Litigation Work with the U.S. Flow Rate Technical Group.

1670.   Dr. Kelkar, the only testifying expert in this case to use 12 microsips as a middle case value for rock compressibility, admitted that his selection of that number was a "best educated guess." *See* Tr. at 1892, 1894, 1896, 1907–08, 1910, 1913  (Kelkar) (testifying nine times that he made a guess or assumptions regarding rock compressibility or discussions surrounding rock compressibility).

1671.   Previously, when he worked as a non-litigation consultant for the U.S. Flow Rate Technical Group (FRTG), Dr. Kelkar calculated and used a value of 6 microsips with a maximum case of 8 microsips based on the measured data.  Tr. at 1844 (Kelkar); Tr. at 1915–16 (Kelkar); TREX 009859.0019 (Dr. Kelkar's FRTG report).

1672.   This is consistent with the conclusions of other United States researchers.  Dr. Pooladi-Darvish also uses 6 microsips and FRTG reservoir consulting expert Dr. Hughes used a

most likely case of 4 microsips.   Tr. at 2052 (Pooladi-Darvish); Maclay Dep. at 574–76 (discussing Dr. Hughes's analysis).

> **(f)**      **Dr. Kelkar Co-Authored an Article Finding a Mid-Range Value of Gulf of Mexico Rock Compressibility Was 3 microsips, with 10 microsips Being an "Extreme" High Value for the Fields Surveyed.**

1673.   A published article surveying production from oilfields in the Gulf of Mexico, co-authored by Dr. Kelkar, presented a mid-range value of 3 microsips for fields of similar geological age to Macondo, with 10 microsips considered an "extreme" "high" value.   TREX 011560.4.1; Tr. at 2287–89 (Blunt).

> **(g)**      **Drs. Roegiers and Huffman Are Neither Correct nor Credible.**

> **(1)**      **Dr. Roegiers's "Best Practices" Are Not Industry Standard.**

1674.   Dr. Roegiers presented "best practices" for conducting pore volume compressibility testing that are nothing more than his personal preferences for rock mechanics testing.   Tr. at 3302–06 (Roegiers).   Dr. Roegiers has never published any articles regarding pore volume compressibility testing or best practices for performing UPV testing.   Tr. at 3299–300 (Roegiers).

1675.   Nor are the guidelines proposed by Dr. Roegiers a part of any published industry standard.   Tr. at 3302–03 (Roegiers).   Indeed, there are currently no published standards or suggested testing methods for uniaxial strain measurements.   Tr. at 3302, 3304 (Roegiers).   The testing methods proposed by Dr. Roegiers reflect his own personal views as to the practices that he hopes others in the industry will one day adopt.   Tr. at 3306 (Roegiers).

a.      **The Orientation of the Macondo Core Samples
Did Not Affect the Reliability of the Test Results.**

1676.   Rotary sidewall cores, like the ones obtained from the Macondo reservoir, are oriented horizontally in the reservoir.    Tr. at 2452–53 (Zimmerman).    The relevant compressibility for purposes of the material balance equation is the vertical compressibility.  Tr. at 2453 (Zimmerman).   Tests on rotary sidewall cores can accurately measure a sample's horizontal compressibility, but one must consider whether  vertical compressibility is different. Tr. at 2452–53 (Zimmerman).  Even if anisotropy were present, it would not necessarily mean that UPVC testing on rotary sidewall cores would underestimate compressibility; it could overstate or understate the reservoir's actual compressibility of the reservoir.  Tr. at 2452–56 (Zimmerman) (explaining that the presence of anisotropy could result in different PVC values if measured in different directions); D23701 (showing that the hydrostatic compressibility of Macondo cores was *lower* than the uniaxial compressibility, meaning that compressibility measurements in the non-vertical direction were actually lower than in the vertical direction). Dr. Zimmerman considered the issue and determined that, although some sandstones exhibit compressibility anisotropy (different compressibility in different directions), there is no evidence of a material amount of anisotropy in the Macondo sandstone.  Tr. at 2452–53 (Zimmerman); TREX 011497.0045.

1677.   The presence of light and dark shading (lamination) in CT scans of core samples can evidence of  compressibility anisotropy..  Tr. at 3313 (Roegiers).  Dr. Blunt, who has experience reviewing hundreds, if not thousands, of CT scans of core samples, observed that the Macondo sand "looks very uniform," meaning that "properties measured in one direction [would] be very similar to properties measured in another direction."  Tr. at 2145 (Blunt). Government expert Dr. Kelkar also agreed at trial that there was no indication of laminations in

the Macondo rock samples.  Tr. at 1916–17 (Kelkar).  Dr. Roegiers admitted that he looked at only one CT scan of a single Macondo core sample, ignoring dozens of other samples, to support his suggestion that Macondo core samples showed evidence of laminations.  Tr. at 3313–14 (Roegiers).

1678.  Perhaps more importantly,  the measured laboratory data does not support the notion of compressibility anisotropy in the Macondo reservoir rock.   Weatherford's uniaxial compression test measured compressibility in the  horizontal direction.  Tr. at 2452 (Zimmerman).  The compressibility derived from the hydrostatic stairstep test was an average compressibility of all three directions (north-south, east-west, and vertical).  Tr. at 2454–56 (Zimmerman).  If the compressibility were materially higher in the vertical direction than in the horizontal direction, the compressibility measured in the hydrostatic stairstep test would have been higher than the compressibility measured in the uniaxial compression test.  Tr. at 2454–56 (Zimmerman); D23701.   But the UPVC value derived from the hydrostatic stairstep test was slightly *lower* than the UPVC from the uniaxial compression test. Thus, the hydrostatic stairstep test provides evidence that the Macondo sandstone was not materially anisotropic—and certainly does not support the notion that the vertical compressibility was twice that of the horizontal compressibility.  Tr. at 2454–56 (Zimmerman); D23701.

1679.  No United States expert quantifies the effect of any potential anisotropy on the compressibility of the Macondo reservoir.  *See, e.g.,* Tr. at 3315 (Roegiers) ("Q: [E]ven if some anisotropy …. exists in the one sample, you are not able to quantify the extent of that anisotropy? A: That's correct.").  There is nothing in the academic literature suggesting sandstones could have a compressibility in the vertical direction that is twice the compressibility in the horizontal direction.  Tr. at 2499–500 (Zimmerman).  Thus, based on all the available evidence, there is no

397

reason to increase the best estimate of UPVC because of anisotropy.  Tr. at 2456 (Zimmerman); D23701.

1680.   Other than the possibility of anisotropy based on the orientation of the core, there is no material difference between the reliability of the results of a UPVC test conducted on rotary sidewall cores, as compared to conventional cores.  Tr. at 2495 (Zimmerman).  Indeed, there is no publically available analysis comparing the results of UPVC testing on rotary sidewall cores from a reservoir versus whole core samples from the same reservoir.  Tr. at 3311–12 (Roegiers).

### b.   The Size of the Macondo Core Samples Was Adequate for PVC Testing.

1681.   The size of the Macondo core samples had no effect on the UPVC measurements. TREX 011497.0010.  Length-to-diameter ratio does not have an appreciable effect on pore volume compressibility measurements.  Tr. at 2482–84 (Zimmerman); TREX 011497.0010.  To obtain a reliable result from PVC testing, the core sample simply needs to properly fit in the testing device.  Loos Dep. at 146–47.  Here, the samples were approximately 1.1 to 1.4 inches long by approximately 0.9 inch in diameter, which is a fairly standard sample sizes for rotary sidewall core samples and appropriate for PVC testing.  Loos Dep. at 56, 203–04, 206–07 (untrimmed size of cores was standard); TREX 08789; TREX 009067.0002, 0105, 0208; Tr. at 2483–85 (Zimmerman).

### c.   The Saturant Used During PVC Testing of the Macondo Cores Was Appropriate.

1682.   During the uniaxial compression test, pores of the core samples have to be saturated with a fluid.  TREX 011497.0014.  In general, the type of pore fluid does not affect the measured pore volume compressibility, so long as the fluid is non-corrosive.  Tr. at 2489 (Zimmerman).  Weatherford saturated the Macondo cores with kerosene—an appropriate pore

fluid that has regularly been used in UPVC testing.  Tr. at 2487–88 (Zimmerman); TREX 011497.0035.

### d. The Macondo Cores Were Appropriately Tested at Room Temperature.

1683. The Macondo core samples were appropriately tested for pore volume compressibility at room temperature.  Tr. at 2490 (Zimmerman).  Conducting UPVC testing at room temperature conditions is commonplace in the industry.  Tr. at 3326 (Roegiers) (admitting that he has personally performed uniaxial compression testing at ambient temperatures).  While the reservoir temperature  is higher than room temperature, pore volume compressibility only slightly increases with increasing temperature.   Tr. at 2143 (Blunt); Tr. at 2489–90 (Zimmerman).  The difference in temperature has an effect of a few percentage points, and is captured within the range of uncertainty in Dr. Zimmerman's analysis.   Tr. at 2489–90 (Zimmerman).

### (2) Dr. Huffman Lacks Experience and Expertise in UPVC Testing.

1684. Despite opining regarding the reliability of Weatherford's UPVC tests, Dr. Huffman himself has no experience performing UPVC tests and has never been responsible for evaluating the compressibility of a rock core based on the results of UPVC tests.  Tr. at 3352–53 (Huffman).

1685. Dr. Huffman has never taught any classes or published any articles on UPVC testing.  Tr. at 3353 (Huffman).  Likewise, he has never done any research on UPVC testing.  Tr. 3353 (Huffman).

1686. In fact, this case is the first time that Dr. Huffman has even been involved in reviewing UPVC test procedures.  Tr. at 3353 (Huffman).

### a. Dr. Huffman's Criticism Regarding Core Orientations Is Unfounded.

1687.  Dr. Huffman is not aware of any industry procedure or standard practice that specifies the orientation of the cores that should be used for purposes of UPVC testing.  Tr. at 3353–54 (Huffman).

1688.  Dr. Huffman admitted that UPVC measurements will not be as sensitive to core orientation if the samples tested are clean sandstone with no shale lamina or silty streaks.  TREX 011515R.0037.

1689.  In the case of Macondo, Dr. Huffman admitted that 7 of the 8 cores evaluated by Dr. Zimmerman were "from the cleaner sandy portion of the reservoir," indicating that UPVC measurements obtained from these samples would not be subject to issues related to core orientation.  TREX 011515R.0037.

1690.  Fellow United States expert Dr. Kelkar admitted even more broadly that the Macondo sandstones were "clean," meaning (as he explained) that there were not shale laminations in the rock.  Tr. at 1916–17 (Kelkar).

### b. Dr. Huffman's Claimed Porosity Values Derived from His Well Log Analysis Are Unreliable.

1691.  According to Dr. Huffman, a well log analysis presented by him indicates the average porosity of the M56E was about 23.6% or 23.7%.  Tr. at 3354 (Huffman).

1692.  None of the other United States experts in the case uses porosity values derived from Dr. Huffman's well log analysis in support of their expert opinions.  Tr. at 3355 (Huffman) (admitting that neither Dr. Kelkar nor Dr. Pooladi-Darvish are relying on Huffman's claimed porosity values for purposes of their cumulative flow analyses).  Rather, Dr. Kelkar uses an average porosity of 21.72% for the Macondo reservoir.  TREX 011549R.0026 (Kelkar Initial Expert Report estimating average porosity of 21.72%).  Likewise, Dr. Hsieh used an average

400

porosity of 21% for the reservoir (TREX 008615.0016 (Hsieh Computer Simulation of Reservoir Depletion and Oil Flow from Macondo Well Following DWH Blowout), and Dr. Larsen used an average porosity of 21 to 22% for the reservoir.  TREX 012102R.0005.

1693.  At trial, Dr. Kelkar testified that he estimated 21.7% average porosity by calculating thickness-weighted porosity from measurements on an actual Macondo rock.  Tr. at 1939 (Kelkar).  Dr. Kelkar's estimated average porosity is consistent with the value accepted by BP expert Dr. Blunt, who likewise uses 21.7% average porosity for purpose of his material balance analysis.  TREX 011553R.0053.

1694.  Accordingly, experts on both sides agree the average porosity of the Macondo reservoir was approximately 21.7%; only Dr. Huffman contends the average porosity of the M56E was as high as 23.7%.  TREX 011549R.0026 (Kelkar Initial Expert Report estimating average porosity of 21.72%); TREX 008615.0016 (Hsieh Computer Simulation of Reservoir Depletion and Oil Flow from Macondo Well Following DWH Blowout using average porosity of 21%); TREX 012102R.0005 (Larsen Rebuttal Report using average porosity of 21 to 22%); TREX 011553R.0053 (Blunt Expert Report, using average porosity of 21.7%); Tr. at 3355 (Huffman) (admitting other United States experts do not use Huffman's claimed porosity values for their own analyses).

<div align="center">(h)   <strong>Conclusion: Rock Compressibility is 6.35 Microsips.</strong></div>

1695.  The average rock compressibility is 6.35 microsips.  Tr. at 2398 (Zimmerman); TREX 011497.0006; Tr. at 2137 (Blunt); D23541; D24469.

1696.  Therefore the total compressibility of rock and fluid is 21.38 microsips.  TREX 011553R.0007, 0029–32, 0051.  This total compressibility will be used in the material balance equation.  TREX 011553R.0051

<div align="center">401</div>

1697.   By using a rock compressibility of 12 microsips, Dr. Kelkar overstates cumulative flow by 1.04 MMstb.  TREX 011553R.0007; D23547; Tr. at 2156 (Blunt).

### 3.      Third Material Balance Input, ΔP: Change in Pressure.

1698.   The final input in the material balance analysis is the change in pressure, ΔP.  The change in pressure is the difference between the initial measured reservoir pressure and the final predicted reservoir pressure.  Tr. at 2158–60 (Blunt).

1699.   The greater the change in pressure, the more oil is released, if everything else is held constant.  *See* TREX 011553R (Blunt expert report); TREX 011549R (Kelkar expert report).

1700.   Dr. Blunt determines a change in pressure of 1,367 psi using a methodology that accounts for physical phenomenon and is industry standard.  Tr. at 2158 (Blunt); TREX 011553R.0033–42, 0071–90; D24608.  United States experts Drs. Kelkar and Pooladi-Darvish calculate greater changes in pressure, but, as discussed below, these calculations ignore the physical phenomenon of oil cooling in the wellbore.  *See* Section III.C.3(b), *infra*.

1701.   The initial reservoir pressure was measured on April 12 by the MDT tool.  Tr. at 2104 (Blunt); Tr. at 2513 (Gringarten); TREX 010475 (MDT report).

1702.   The final reservoir pressure is the pressure that builds up over time after flow has stopped.  *See* Tr. at 2158–60 (Blunt).  Pressure was still building up when the well was cemented in, cutting off the ability to monitor pressure at the bottom of the hole (and in the reservoir).  *See* Tr. at 2158–60 (Blunt).  Therefore, the experts in this case deduce a final equilibrium pressure using the pressure readings measured at the Capping Stack from July 15 to August 3.  Tr. at 2158–60 (Blunt); D23554.

1703.   Both United States and BP experts had to calculate an estimated final reservoir pressure.   Tr. at 2159–60 (Blunt); TREX 011553R.0033; TREX 011549R.0023–24; TREX

402

011653.0065 (Dr. Pooladi-Darvish expert report); TREX 011696R.0138 (Dr. Gringarten expert report).

1704. There are two steps in deriving the final reservoir pressure (and hence the pressure depletion): predicting the additional increase in pressure after the well was cemented in, and then converting the Capping Stack pressure to down-hole values. TREX 011553R.0034; Tr. at 2164–65 (Blunt).

(a)     **Prediction of Final Capping Stack Pressure.**

1705. On July 15, the Capping Stack was installed on top of the BOP. The Capping Stack had pressure gauges. It collected pressure readings until August 3, when the well was cemented in. *See* Tr. at 2160–64 (Blunt); D23555.

1706. When the well was "killed" on August 3, pressure in the reservoir was still rising. TREX 011553R.0037; D23555; D23553; Tr. at 2160–66 (Blunt).

1707. United States and BP experts have calculated estimates of the final equilibrium reservoir pressure. *See* TREX 011553R.0041–42; TREX 011696R.0035; TREX 011653.0198; TREX 011549R.0023–24.

1708. United States and BP experts use different methodologies to calculate final reservoir pressure. The U.S. experts calculate final pressure in two ways: Dr. Pooladi-Darvish uses a simulation and Dr. Kelkar uses a curve-fitting method called the "Mead method." TREX 011653.0198; Tr. at 1878–79 (Kelkar). BP experts Drs. Blunt and Gringarten used analytical flow models using a method called the "derivative plot." Tr. at 2164–65 (Blunt); TREX 011696R.0013–18. The pressure derivative plot is described in more detail in Section III.D.3.

1709. Dr. Kelkar asserts that the Mead method is a more appropriate method of calculating final average reservoir pressure than the derivative analysis. Tr. at 1879–81 (Kelkar).

BP experts disagree.  *See* TREX 011696R.0013–14 (Dr. Gringarten's report criticizing the use of the Mead method employed by Dr. Kelkar); TREX 011553R.0129–30.

1710.   But, as discussed by Dr. Blunt, the difference in the methods used to calculate the final pressure is not the cause of the material difference in the estimated numbers.  Tr. at 2164–65 (Blunt); TREX 011553R.0008.   Rather, the primary difference between the U.S. and BP experts is the approach to converting the Capping Stack pressure to downhole conditions.  *See* Tr. at 2164–65 (Blunt).

<div align="center">

(b)   **Conversion of the Capping Stack Pressures to Down-Hole Values.**

</div>

1711.   The biggest difference between the final pressures calculated by Dr. Blunt and the United States experts comes from the methods used for conversion of Capping Stack pressure to down-hole values.  TREX 011553R.0033.

1712.   The Capping Stack was separated from the reservoir by more than 13,000 feet of wellbore oil.  TREX 011553R.0069; Tr. 2165 (Blunt); D23556.

1713.   All experts agree that the pressure in the reservoir is higher than the pressure measured at the Capping Stack pressure gauge, because of the weight of oil column in the wellbore (commonly referred to as the "head" of oil).   TREX 011553R.0033–34; TREX 011549R.0017; TREX 011653.0013, 0077, 0088 (discussing and showing the addition of pressure based on the weight of the oil column); TREX 011696R.0138; D23557 (demonstrative showing the "head").

1714.   The U.S. experts perform this translation incorrectly, a failure that is the largest source of error in their derivation of the pressure-change input into the material balance equation. Tr. at 2166–67 (Blunt); TREX 011553R.0033; TREX 011696R.0138; TREX 011549R.0017; TREX 011653.0065.

<div align="center">

404

</div>

(1)     **Cooling of the Wellbore Resulted in a Denser Oil, and Hence Higher Final Pressure, and Hence Lower Depletion and Flow.**

1715.   During the spill, hot oil rose through the well, heating the casing, cement, and surrounding rock from the reservoir to the sea bed.  Tr. at 2166 (Blunt).

1716.   When flow ceased, the rock and the oil in the wellbore cooled down again.  Tr. at 2166–68 (Blunt).  This is a manifestation of the Second Law of Thermodynamics, which can be simply stated as "hot things cool down."  Tr. at 2166 (Blunt); D23558 (demonstrative re The Second Law of Thermodynamics).

1717.   Colder fluids are denser, and so the pressure difference between the Capping Stack and the reservoir increased over time.   TREX 011553R.0034; D23558; Tr. at 2007 (Pooladi-Darvish) ("As the fluid cools down, the density goes up and, therefore, the bottom hole pressure goes up.").   The effect of cooling on density, and hence pressure, was ignored by the United States experts, causing them to understate the final pressure, overstate pressure depletion, and overstate cumulative flow, as discussed in the next section.

(2)     **The U.S. Experts Inflated Pressure Depletion by Ignoring the Second Law of Thermodynamics, Resulting in an Over-Estimate of Oil Released.**

1718.   Dr. Blunt accounts for this cooling over time.  TREX 011553R.0033, 0071–90.

1719.   The United States experts do not.  *See* Tr. at 1941–42 (Kelkar); TREX 011549R.0019 (Dr. Kelkar's expert report indicating that there is a fixed head); TREX 011654R.0011 (Pooladi-Darvish rebuttal report indicating that cooling was possible but uncertain).

1720.   But the United States experts acknowledged that cooling does occur, and that this cooling results in a higher reservoir pressure.  Tr. at 1941–42 (Kelkar) (admitting that after the Capping Stack was closed, the wellbore oil would have cooled; Tr. at 2007 (Dr. Pooladi-Darvish:

"As the fluid cools down, the density goes up and, therefore, the bottom hole pressure goes up."); TREX 011654R.0011 (Pooladi-Darvish's rebuttal report states that "the effect of cooling on well fluids is a recognized consideration well-testing").

1721.  By not accounting for cooling, the U.S. experts imply that "oil sitting in the Capping Stack, surrounded by cold steel and deep ocean for 19 days" after the well was shut in, "would remain as hot as, or hotter than, the deep reservoir."  *See* TREX 011553R.0034.

1722.  As Dr. Blunt showed, the oil cooled down after shut-in from about 243 °F at the Capping Stack to at least as low as 95 °F.  Tr. at 2168–70 (Blunt); D23559 (demonstrative showing how the column of oil cooled).

1723.  By contrast, analysis of the oil heads calculated by the United States experts shows that they require temperatures in the Capping Stack of over 200 °F, with Dr. Griffiths's and Dr. Pooladi-Darvish's conversions requiring temperatures *hotter than the reservoir temperature of 243 °F*.  TREX 011553R.0090.  This would be, of course, physically impossible.

1724.  The Government's assumption of no cooling means that the head is lighter, which leads to an understatement of the pressure difference between the Capping Stack and the reservoir.  Tr. at 2167 (Blunt); Tr. at 2007 (Pooladi-Darvish) (noting that cooler fluids are denser and make the bottom hole pressure go up).  This understates the final pressure in the reservoir, which causes an overstatement of the reservoir's pressure depletion.  TREX 011553R.0090.  The result is an over-estimate of oil released.  TREX 011553R.0090.

1725.  Ignoring cooling has a second effect; it makes the permeability required to match the Capping Stack pressure too high.  D23565A; Tr. 2176–78 (Blunt).  As discussed in Section III.D.3(c), by not accounting for cooling, the United States experts, in effect, match the wrong pressure.  The result is an inflated estimate of permeability.  *See* Tr. at 2179–78 (Blunt);

D23565A; TREX 011553R.0039–40.   Since flow rate is proportional to the permeability, a higher permeability will result in an over-estimate of flow rate (and hence cumulative oil released).   TREX 011553R.0040.

1726.   The bottom line is that Dr. Kelkar and Dr. Pooladi-Darvish, by ignoring the Second Law of Thermodynamics—that hot things cool down—calculate too low a final reservoir pressure, and too much depletion.   *See* Tr. at 2170–71 (Blunt).   This contributes to their overstatement of oil released by 220,000 stb and 680,000 stb, respectively.   D23560; TREX 011553R.0007; Tr. at 2170–71 (Blunt).

<div align="center">(c)   <b>Dr. Kelkar's Criticisms of Dr. Blunt's Final Reservoir Pressure Are Unfounded.</b></div>

1727.   Dr. Kelkar asserted that Dr. Blunt ignores the first 10,000 seconds of the pressure buildup data.   Tr. at 1880 (Kelkar).   The first 10,000 seconds, according to Dr. Kelkar, "can be very critical in determining the reservoir properties."   Tr. at 1863 (Kelkar).

1728.   But Dr. Blunt explained that in standard industry practice, the first 10,000 seconds of pressure build-up are primarily used to deduce properties not relevant here, such as "skin" (restrictions to flow) that was not used in Dr. Blunt's analysis.   Tr. at 2128–29 (Blunt); TREX 011553R.0117.   Dr. Kelkar conceded that this first period of data is not relevant to the determination of final pressure or reservoir boundaries.   *See* Tr. at 1926–27 (Kelkar) (admitting that he does not have any objection to Dr. Blunt using the pressure to determine boundaries), 1879 (Kelkar) (explaining how he used the pressure data to calculate a final pressure).

1729.   Dr. Kelkar also asserted that Dr. Blunt did not consider the flow rate variation just prior to shut-in.   TREX 011550R.7.1; Tr. at 1922 (Kelkar).

1730.   But Dr. Kelkar later admitted that his criticism was not correct.   Tr. at 1923 (Kelkar) ("Q: Well, in fact, [Dr. Blunt] looked at rate data just prior to shut-in, right? A: And he

does, he does consider one case, so you're right.").  Furthermore, Dr. Blunt dedicates an entire appendix of his report analyzing the impact of variable flow rates on the pressure analysis.  *See* TREX 011553R.0115–24.

1731.  Dr. Kelkar's third criticism of Dr. Blunt's reservoir pressure is based on the difference between the final reservoir pressures determined by Drs. Gringarten and Blunt.  Tr. at 1880–81 (Kelkar).  The difference is not material.  It would result in a difference of around 7% (or 0.2 MMstb) in terms of oil released, making the erroneous assumption the pressure drop could be considered in isolation (see discussion of "Consistency Check" in Section III.C.4, *infra*).  It is a key part of the analysis (and the topic of Chapter 5 of Dr. Blunt's report) that the reservoir size and pressure drop cannot be considered independently: the small differences in deduced final pressure are caused by the necessary relationship between pressure and reservoir size under standard industry principles of well test analysis.  *See* Tr. at 2276–78 (Blunt); Section III.D.3.  It is unsurprising and insignificant that two experts working independently derive slightly different conclusions as to particular inputs, especially where their fundamental conclusions are the same.  *Compare* TREX 011553R.0006 (Blunt expert report) *and* TREX 011696R.0006 (Gringarten expert report).  In this case, Dr. Gringarten's deduced reservoir size is slightly smaller than Dr. Blunt's.  *See* Tr. at 2276–77 (Blunt).  Recall that Dr. Blunt errs on the side of finding a larger reservoir size.  *See* Section III.C.1(h).  In the end, the two effects cancel each other out, as they have to in order to match the pressure data accurately, meaning the minor differences between Drs. Blunt and Gringarten are not material.  *See* Tr. at 2276–77 (Blunt).

<div align="center">(d)   <strong>The Pressure Drop is 1,367 psi.</strong></div>

1732.  The pressure dropped from 11,856 psi to 10,489 psi during the incident.  TREX 011553R.0033–42.  Thus, the pressure drop is 1,367 psi.  TREX 011553R.0033–42.  This

<div align="center">408</div>

pressure drop is the correct value for the $\Delta P$ variable in the material balance calculation.  TREX 011553R.0051.

1733.  For the reasons discussed above, Drs. Kelkar and Pooladi-Darvish overstate the pressure decline and, as a result, they overstate cumulative flow by 220,000 and 680,000 stb, respectively.  TREX 011553R.0007; D23560; Tr. at 2170–71 (Blunt).

> **4.    Reservoir Properties Have Interrelated Effects, and Government Experts Neglected the Industry-Standard Practice of a "Consistency Check" that Would Have Shown That Doubling the Measured Compressibility Requires Shrinking the Inferred Reservoir Size, Reducing the Estimated Flow.**

1734.  The principal difference between the 5 MMstb cumulative-flow estimate of U.S. expert Dr. Kelkar and the 3.26 MMstb estimate of BP expert Dr. Blunt is accounted for by their different inputs for rock compressibility.  *See* Section III.C.2.  Dr. Blunt uses 6 microsips based on the data from rock core samples.  Dr. Kelkar initially used the same number for his non-litigation analysis during the incident, but doubles the number to 12 microsips in his litigation expert report. *See* Section III.C.2(e).

1735.  Earlier sections discussed Dr. Kelkar's failure to justify departing from the measured data, *see* Sections III.C.2(a) and (c), and how even senior Government officials questioned  how doubling the measured number could be justified, *see* Section III.C.2(d).  Also discussed was Dr. Kelkar's own published survey of Gulf of Mexico oilfields, showing a mid-range compressibility of 3 microsips and that 10 microsips would be an "extreme" high number, *see* Section III.C.2(f).

1736. Midway in scope between these two levels of analysis (*i.e.*, analyzing compressibility measurements on Macondo rock samples versus a survey of the greater Gulf), is an analysis of whether a particular choice of rock compressibility number is consistent with other

data and analysis regarding other Macondo reservoir properties.  This "consistency check" issue is discussed here.

1737.  Before using the material balance formula and multiplying the three numbers together (connected oil volume, compressibility, and change in pressure), a reservoir engineer needs to check whether  the different inputs to the calculation are mutually consistent.  TREX 011553R.0043.

1738.  This consistency check is a critical part of the job of a reservoir engineer; as Dr. Blunt explained, "[t]he essence of reservoir engineering is does the totality of the data make sense?"  Tr. at 2111–12 (Blunt).  This is a standard reservoir engineering step that requires checking the proposed material balance inputs against the backdrop of the pressure analysis and the reservoir geology to ensure they are consistent with each other and mesh into an overall reservoir depiction that is scientifically plausible.  TREX 011553R.0043 (Blunt's expert report); TREX 011696R.0024–25 (Gringarten expert report) (noting that a reservoir model must be verified against data from geology, geophysics, and petrophysics).

1739.  Dr. Kelkar does not perform such a consistency check.  *See* TREX 011549R; Tr. at 2156 (Blunt) (noting that Dr. Kelkar does not perform a consistency check).

1740.  As a result, as shown below, Dr. Kelkar mixes and matches input variables that mathematically yield 5 million stb but which, when analyzed in combination with each other, contradict each other and undercut the end result.

> (a)  **Compressibility Cannot Be Unilaterally Doubled Without Shrinking the Inferred Reservoir Size and Hence the Calculated Cumulative Flow.**

1741.  Dr. Blunt confirms his decision to use the measured data to derive the rock compressibility of 6 microsips by performing a classic reservoir-engineering "consistency check."  TREX 011553R.0043–50.  In Section 5 of his expert report, Dr. Blunt cross-checks the

implications of various assumptions and deductions, to see if all of the pieces of the "Macondo jigsaw" fit together.  *See* TREX 011553R.0043–50.  His United States counterpart, Dr. Kelkar, does not perform such an analysis.  *See* TREX 011549R; Tr. at 2156 (Blunt) (noting that Dr. Kelkar does not perform a consistency check).  Such an analysis shows that Dr. Kelkar's assumption of 12 microsips does not "fit" even his own accompanying assumptions.

1742.  As Dr. Blunt illustrated at trial using metal springs, compressibility affects the speed at which pressure disturbances move through rock.  *See* Tr. at 2153–56 (Blunt).  The speed of pressure-signal transmittal is important, because that is used to estimate the size of the reservoir, which therefore affects the first material balance variable, N.  *See* Section III.C.

1743.  The speed of pressure-signal transmittal is used in reservoir engineering to deduce the size of the connected reservoir.  *See* Section III.C.1(a).  The distance traveled by the pressure signal wave during that measurement time is determined by its speed.  *See* Section III.C.1(a).  That speed is proportional to the rock's permeability, but it is inversely proportional to the rock's compressibility.  TREX 011553R.0043–50; Tr. at 2153–54 (Blunt).

1744.  Thus, under standard reservoir engineering principles, Dr. Kelkar's selection of a rock compressibility of 12 microsips cannot properly be plugged into the material balance equation without checking its consistency with his number for reservoir size.  *See* Tr. at 2156 (Blunt).

1745.  Indeed, as is discussed in Section III.C.1(g), Dr. Kelkar does not analyze the consistency of his deduction of reservoir size with the time taken by pressure signals to reach reservoir boundaries.  Doing so would have shown that his reservoir size would have to shrink under an assumption of higher rock compressibility, as was demonstrated in Dr. Blunt's expert report.  *See* TREX 011553R.0043–50.

411

(b)     **The Industry-Standard Method of Consistency Checking
Provides Independent Reservoir-Engineering Confirmation of
Dr. Zimmerman's Geomechanical Analysis that the Measured
Rock Compressibility Value of 6 Microsips is Reliable.**

1746.   By finding mutual consistency between the results of the pressure analysis,
measured rock properties, and the geological dimensions of the field, there is a higher confidence
in the reservoir properties used in the material balance analysis.  TREX 011553R.0050; *see also*
Tr. at 2283–84 (Blunt).

1747.   The industry-standard (and best-practices required) consistency check
demonstrates that it is appropriate (and necessary) to define the ranges of calculated outcomes
based on the ranges in the measured data.  TREX 011553R.0043–50.  As explained by Dr. Blunt,
this approach "is more robust and avoids the unsupported extrapolations, poor analysis and scant
regard for measured data in the Government's analyses."  TREX 011553R.0050.

1748.   The unique analytical insights given by the reservoir-engineering consistency
check, performed here, explain why, as Dr. Blunt noted, it is a reservoir engineer that makes the
"final call" on the appropriate value of reservoir properties such as rock compressibility based on
all available data.  Tr. at 2155 (Blunt).

1749.   The consistency check method described above uses the measurements of
pressure response to shutting in the well.  Tr. at 2153–56 (Blunt). Of course, such data was not
available to BP's reservoir engineers prior to shut-in.  Tr. at 2153–56 (Blunt); D24698-3
(demonstrative timeline showing that Dr. Merrill used 12 microsips for a limited time period in
early July before the well was killed).  Thus, the BP emails and presentations now being cited by
the Government to support doubling the measured value for compressibility were written at a
time when a reservoir-engineering consistency check of competing compressibility values could
not be performed.  Tr. at 2153–56 (Blunt); D24698-3.

412

1750.   While it was prudent for BP scientists and management to expand the range of inputs for rock compressibility to include 12 microsips prior to shut-in to ensure anticipation of worst-case pressure build-ups given uncertainties in that (and other) parameters (*see* Section III.C.2(c)), after shut-in, the pressure data and consistency check narrow that uncertainty and verify the measured value.  Tr. at 2154–55 (Blunt).

1751.   After the well was shut in, and BP's lead reservoir engineer Dr. Merrill concluded that the incoming pressure data confirmed his judgment that the rock core measurements of compressibility were reliable, and he resumed using exclusively 6 microsips as the input for rock compressibility in his analysis, including his modeling of pressures to be encountered by the relief well.  Tr. at 2669–71 (Merrill).  Dr. Merrill's testimony reinforces the consistency check performed by Dr. Blunt and provides confidence in the measured rock compressibility of 6 microsips.

### D.   An Analysis of the Permeability of the Reservoir Shows that Reservoir Engineering Methods Are the Only Reliable Way to Estimate the Total Release of Oil.

1752.   One parameter that bears upon the validity of both the Hydraulic and Reservoir-based methods is "permeability."

1753.   Permeability is a measurement of the connectedness of the microscopic pores in the reservoir sandstone.  The oil is contained in the pores, so the greater their connectedness, the more easily the oil can flow.  TREX 011696R.0006; TREX 011553R.0033.

1754.   The parties agree that, under the fundamental principle of "Darcy's Law," flow rate through a reservoir rock is directly proportional to permeability.  Tr. at 1936 (Kelkar); TREX 011696R.0006.

1755.   The parties disagree on the permeability of the Macondo reservoir rock by a factor of two.  With the exception of Dr. Kelkar, the United States experts who consider

permeability use a permeability of around 500 milliDarcies (mD) or higher.  TREX 012102R (Dr. Larsen expert rebuttal report with a permeability of 438 mD); TREX 011653.0010 (Pooladi-Darvish expert report stating that he matched the pressure using permeability between 550 and 850 mD).  BP's principal expert on permeability, Dr. Gringarten, estimates that the most likely value for permeability is 238 mD.  TREX 011696R.0006 (Gringarten expert report).  BP's material balance expert Dr. Blunt calculates a higher value, 300 mD, and he conservatively uses a still higher number (derived from Dr. Gringarten's 10%-probability high-end range), 329 mD, in his calculations.  TREX 011553R.0040–45.

1756.   United States experts Drs. Dykhuizen, Griffiths, and Pooladi-Darvish derive their calculations of cumulative flow by attempting to reconstruct the history of changing flow rates during the incident, and then adding up the resulting daily flows.  The accuracy of their estimates of cumulative flow is therefore dependent on the accuracy of their flow rates.  Since flow rate is a function of permeability, the range of plausible flow rates that can be used to calculate cumulative flow is constrained by the probable range of permeability.  Section III.D.2.  As is discussed in Section III.D.2, the Hydraulic calculations of U.S. experts Dykhuizen and Griffiths ignore the constraint of permeability.

1757.  U.S. expert Pooladi-Darvish likewise fails to constrain his cumulative flow estimate according to the probable permeability range, as is discussed in Section III.D.3(c).

### 1.   Introduction to Permeability Estimating Methods.

1758.  Permeability can be estimated in several ways: direct measurements on core samples, correlations to down-hole log measurements, comparisons with neighboring fields, and deduction from pressure analysis.  TREX 011553R.0064–67.

1759.  Well test analysis is a technique used to measure properties of a petroleum reservoir based on the movement of pressure disturbances through the reservoir rock following

flow or shut-in of a well.  Tr. at 2510 (Gringarten); D23599; D23599A; TREX 011696R.0007–09.  Shutting in a well (or otherwise changing the flow rate) causes a change in the pressure of the oil in the rock pores nearest the well.  TREX 011696R.0007–09.  This perturbation affects neighboring connected pores progressively further outward from the well over time, like the movement of ripples in a pond.  TREX 011696R.0007–09.  The nature of the pressure signal propagation provides information about the reservoir dimensions and rock properties, including permeability.  TREX 011696R.0007–09, 0013–18.  The more permeable the rock, the faster the pressure signal propagates.  Tr. at 2510–11 (Gringarten); D23596A; TREX 011696R.0006.

1760.   Well test analysis is the industry's preferred method for estimating permeability, since it is based on data derived from actual flow through the reservoir itself, as opposed to other methods such as, for example, laboratory analysis of flow through core samples or correlations to down-hole  log  measurements.   TREX  011553R.0047  (Blunt  expert  report);  TREX 011696R.0006 (Gringarten expert report).

1761.  Measuring permeability using well test analysis requires not only accurate measurements of pressure, but also knowledge of the historical flow rates that create the pressure signals.  TREX 011553R.0047 (Blunt expert report); TREX 011696R.0006 (Gringarten expert report); Tr. at 1928 (Kelkar) (Q: And that's because in assessing permeability in standard petroleum engineering, you want to know the pressure and the rate history?  A. Absolutely).

1762.  Conventional contemporaneous measurements of flow rate were not made during the incident.  TREX 011696R.0009.  Therefore the United States experts do not use well test analysis to estimate permeability in their initial expert reports.  TREX 011696R.0009.

**2.      Reliable Flow Rate Estimates Must Be Constrained by Permeability.**

1763.   The flow rate out of the reservoir is a function of the reservoir's permeability: the lower the permeability, the lower the flow rate.  Tr. at 2510–11 (Gringarten); D23596A; TREX 011696R.0006.





1764.   This relationship is given by Darcy's Law, which is one of the fundamental laws for flow in porous media.  Tr. at 2511–12 (Gringarten).

1765.   Any estimate of the flow rate must be constrained by or consistent with the permeability.   Tr. at 2531–32 (Gringarten); TREX 011696R.0010.   A flow rate that is not consistent with the permeability cannot be correct.  Tr. at 2531–32 (Gringarten).

### 3. Only Drs. Gringarten and Blunt Use Industry-Accepted "Well Test Analysis" Methods to Estimate Permeability.

1766. Well test analysis is the study of the relationship between pressure, flow rate, and permeability and is used to reveal properties of the reservoir.  Tr. at 2510 (Gringarten); D23599; D23599A.

1767. Well test analysis is a standard technique for estimating permeability.  Tr. at 1928 (Kelkar); Levitan Dep. at 217; TREX 011696R.0025.

1768. Flow rate and pressure data are required to use well test analysis to estimate permeability.  Tr. at 1928–29 (Kelkar); Tr. at 2174–76 (Blunt); Tr. at 2510 (Gringarten); D23599; D23599A; Levitan Dep. at 371.



1769. The prerequisites for calculating permeability using well test analysis—known flow rate history and pressure measurements—existed for a single period of time prior to the incident.  Tr. at 1928–29 (Kelkar); Tr. at 2515 (Gringarten); TREX 011696R.0009–11.  On April

417

12, 2010, a "wireline" tool was lowered into the well and used to measure reservoir pressure and to collect samples of hydrocarbon fluid in the reservoir.  Tr. at 2513–15 (Gringarten); TREX 011696R.0009–11.

1770.   The resulting pressure and flow-rate data are used by BP expert Dr. Alain Gringarten to calculate a permeability of 238 mD with well test analysis.  Tr. at 2528–30 (Gringarten); D24668 TREX 011696R.0032–33.  Government expert Dr. Larsen attempts to use this data but makes critical errors, including using incorrect data.  *See* Section III.D.3(a)(4).

1771.   Well test analysis based on measured pressure and flow rate data provides the most reliable permeability estimate (referred to as the "gold standard for permeability assessment" by Dr. Blunt).  TREX 011553R.0047 (Blunt expert report); TREX 011696R.0006 (Gringarten expert report).  Using reliable pressure and flow rate data, reservoir engineers can calculate permeability based on the actual flow of the oil in the reservoir.  TREX 011553R.0047 (Blunt expert report); TREX 011696R.0006 (Gringarten expert report); Tr. at 1928 (Kelkar) ("Q: And that's because in assessing permeability in standard petroleum engineering, you want to know the pressure and the rate history?  A: Absolutely").

   (a) **Dr. Gringarten Uses the Only Data Set Providing the Combination of Flow Rate and Pressure Histories Necessary to Determine Permeabilities.**

1772.   As noted, on April 12, 2010, a wireline tool called an MDT was lowered to the bottom of the well to take fluid samples from the reservoir; while taking these samples, the tool recorded the flow rate of the fluid coming from the reservoir and the pressure of the reservoir at the MDT.  Tr. at 2513–15 (Gringarten); TREX 011696R.0009–11.



Figure 3.3: Schematic of a typical wireline formation tester

1773.  The data obtained from the MDT tests is the only set of simultaneous flow rate and pressure data for Macondo and is precisely the information needed to determine permeability.  Tr. at 1928–29 (Kelkar); Tr. at 2515 (Gringarten); TREX 011696R.0009–11.

1774.  Dr. Gringarten uses this MDT data to estimate permeability.   TREX 011696R.0006, 0009–11.

1775.  At the time of Dr. Gringarten's report, no other expert had used the flow rate and pressure data collected during the MDT tests to estimate permeability.  Tr. at 2515 (Gringarten); TREX 011696R.0006, 0009.

1776.  Subsequently, and as described below, Dr. Larsen analyzes the MDT test but used an incomplete and inaccurate data set and an unreliable and outdated method.  Tr. at 1928–29 (Kelkar).

(1)    **Dr. Gringarten Estimated the Permeability Was 238 mD.**

1777.   Based on the application of well test analysis to the MDT data, Dr. Gringarten concludes that the most likely value for the permeability of the Macondo reservoir was 238 mD. Tr. at 2528–30 (Gringarten); D24668; TREX 011696R.0032–33.

1778.   Dr. Gringarten thoroughly assesses the uncertainty of his estimate and concludes that there is a 90% chance that the permeability exceeds 170 mD and only a 10% chance that the permeability exceeds 329 mD.  Tr. at 2528–30 (Gringarten); D24668; TREX 011696R.0032–33.



Figure 43: Macondo Permeability – Probability Distribution

Source: TREX 011696-R, 142338, 012101                                                    D24668

(2)    **Dr. Gringarten Used the Standard Well Test Analysis Methodology for Determining Permeability.**

1779.   The standard method to determine permeability from flow-rate and pressure is first to look at how fast pressure changes at each instant in time on a "derivative plot" (also called a log-log plot) and to determine where that curve becomes flat (this is called the radial

flow stabilization).   Tr. at 2506–08, 2517–18 (Gringarten); Tr. at 3203–04, 3238–39, 3241–42 (Larsen); D24662; D24676; TREX 011696R.0014–15; TREX 012102R.0021.



1780.   The result obtained from the derivative plot is then verified by looking at a semi-log plot (also called a Horner plot or superposition plot), which looks at pressure change versus time in a different way from the derivative plot.   Tr. at 2524 (Gringarten); TREX 011696R.0013–15.

1781.   The purpose of this verification step is to confirm that radial flow is actually occurring, thus adding greater certainty to the interpretation of the data.   Tr. at 2521–22 (Gringarten); D24696; TREX 011696R.0024, 0029, 0035.



1782.  Dr. Gringarten pioneered this technique of using the derivative and semi-log plots, and it has become the standard in the industry because older methods (which for example focused only on the semi-log plot) were inadequate.  Tr. at 2506–07, 2521–22 (Gringarten); D23617; *see also* Section III.D.3(a)(4)b.

1783.  The level of radial flow stabilization on a derivative plot determines permeability. Tr. at 2517–18 (Gringarten); Tr. at 3203–04 (Larsen).  The higher the radial flow stabilization, the lower the permeability.  Tr. at 2517–18 (Gringarten); D24662.



1784.  Dr. Gringarten uses the derivative plot to identify radial flow stabilization and calculated permeability from that radial flow stabilization.  Tr. at 3227 (Larsen); TREX 011696R.0028.  Dr. Gringarten then verifies his results using a semi-log plot.  Tr. at 3227 (Larsen).

1785.  Dr. Gringarten also uses deconvolution to analyze the MDT data.  TREX 011696R.0028.  Deconvolution is a sophisticated technique, now standard in the industry, that Dr. Gringarten helped develop for use in petroleum engineering and which allows engineers to see farther into the reservoir than older methods using the same data set.  Tr. at 2508 (Gringarten); TREX 011696R.0019–24.

1786. For the Macondo MDT data, this means that Dr. Gringarten is able to estimate the permeability based on fluid flow in the 600 feet surrounding the well. Tr. at 2514 (Gringarten); TREX 011696R.0028.

### (3) Dr. Gringarten Accounted for the Noise in the MDT Data and His Estimates Are Reliable.

1787. The MDT data has some noise. Tr. at 2520–21 (Gringarten); TREX 011696R.0027. It is not unusual for well test analysis data to be noisy. Tr. at 2520, 2615 (Gringarten); TREX 011696R.0027. Dr. Gringarten's uncertainty assessment of the permeability accounts for noise in the MDT pressure data. Tr. at 2520, 2528–30, 2597–98 (Gringarten).

1788. It is industry-standard to smooth the derivative when conducting well test analysis, but original source data should not be smoothed. Tr. at 3226–27 (Larsen). Dr. Gringarten uses the industry-standard technique of smoothing the derivative; he does not smooth the original source data. Tr. at 3226–27 (Larsen).

1789. Dr. Gringarten's permeability estimates are reliable because they are consistent across multiple buildups (periods when there is no flow and the pressure begins to increase) and with the information obtained from deconvolution, which encompass the entire lengthy sampling periods. Tr. at 2521, 2525–27, 2603, 2605–06 (Gringarten); TREX 011696R.0093, 0095–96, 0104, 0106.

### (4) Dr. Larsen's Critiques Are Not Credible

#### a. Dr. Larsen Used an Incomplete and Inaccurate Data Set.

1790. The basis for Dr. Larsen's criticism of Dr. Gringarten's use of the derivative to estimate permeability is that the quality of the MDT data is not sufficient to allow application of modern techniques and there were too few data points to resolve the quality issue by smoothing the data. Tr. at 3221 (Larsen); TREX 012102R.0006, 0010, 0012, 0018, 0022.

1791. Unlike Dr. Gringarten, Dr. Larsen does not analyze the full and accurate MDT data set. Tr. at 3207–08, 3223–24 (Larsen). The pressure and flow-rate data was collected every 300 milliseconds by the MDT. Tr. at 3207–08 (Larsen). Dr. Larsen does not use the collected data, but instead uses data that was sampled from the collected data every 1 second. Tr. at 3207–08 (Larsen).

1792. Dr. Larsen's sampled data points are interpolated when the sampling points did not match the collected points due to the difference between the sampling rate (1 point per second) and the actual data collection rate (1 point per 0.3 seconds). Tr. at 3207–08 (Larsen).

1793. For this reason, Dr. Larsen in fact analyzes only 30% of the data that was available. Tr. at 3207–08, 3223–24 (Larsen).

1794. In addition, two thirds of the data set that Dr. Larsen samples is interpolated data, not actual data. Tr. at 3207–08, 3223–24 (Larsen). But using interpolated data should be avoided, as Dr. Larsen admitted, because it introduces error and can obscure information in the data. Tr. at 3224 (Larsen).

1795. At the time he was conducting his analysis, Dr. Larsen did not know he was using an incomplete and inaccurate data set. Tr. at 3223–26 (Larsen). Dr. Larsen would have analyzed the complete and accurate data set used by Dr. Gringarten had he known that he had the wrong data set. Tr. at 3223–24 (Larsen). But at his deposition, Dr. Larsen did not know what effect using the full data set would have had on his analysis. Tr. at 3225 (Larsen).

        **b.**        **Dr. Larsen Estimated Permeability Using an Imprecise and Unreliable Method.**

1796. Dr. Larsen relied on semi-log plots to estimate the permeability, instead of derivative plots. TREX 012102R.0011, 0018, 0027, 0036, 0040, 0049, 0056.

1797.   Modern well test analysis uses derivative plots to estimate permeability and uses semi-log plots—which is a different way of looking at the same data—only as a verification step. Tr. at 2524 (Gringarten); TREX 011696R.0013–15.

1798.   It is unreliable to use semi-log plots alone to estimate permeability because they cannot distinguish even between very different permeabilities.   Tr. at 2524 (Gringarten); D24667.   The hypothetical derivative plot (left) and the corresponding semi-log plot (right) in the figure below demonstrate this point. D24667.   The green curves show the correct permeability for each plot; the red and blue curves correspond to incorrect permeabilities. D24667; Tr. at 2524–25 (Gringarten)  As the figure shows, all the curves look like a good "fit" on the semi-log plot.  Tr. at 2524–25 (Gringarten).   By contrast, the more sensitive derivative plot clearly shows that the red and blue curves do not, in fact, fit the pressure data.  Tr. at 2524–25 (Gringarten).



1799.   It is because of this imprecision in semi-log plot analysis that the derivative plot is used, and the standard methodology developed by Dr. Gringarten requires its use.  Tr. at 2506–07, 2521–22, 2524–25 (Gringarten); D24667.

1800.   A wide range of permeabilities can match a semi-log plot by, among other things, adjusting the ratio between the vertical and horizontal permeability (the "Kv/Kh ratio").   Tr. at 3237 (Larsen); TREX 012102R.0014, 0029, 0032, 0061.

1801.   Dr. Larsen has no data on the Kv/Kh ratio of the Macondo reservoir.  Tr. at 3236–37 (Larsen).

> **c.**   **Dr. Larsen's Permeability Estimate Would Be Lower if He Used the Standard Methodology of a Derivative Plot.**

1802.   As noted above, the level of radial flow stabilization on a derivative plot determines the permeability.  Tr. at 2517–18 (Gringarten); Tr. at 3203–04 (Larsen).

1803.   If Dr. Larsen had used the derivative plot to estimate permeability—the standard methodology—he would have arrived at a lower permeability.   Tr. at 3203–04, 3240–41 (Larsen); TREX 012102R.0013, 0028, 0030, 0041, 0057.

> **d.**   **The Model Used by Dr. Gringarten Did Not Affect His Permeability Estimate.**

1804.   Dr. Gringarten and Dr. Larsen use different models in their MDT analyses: Dr. Gringarten uses a limited entry model, while Dr. Larsen uses a single probe model.  Tr. at 3232 (Larsen).

1805.   It is acceptable to use a limited entry model (standard well model with a short open interval) in MDT analysis.  Tr. at 3232 (Larsen); TREX 012102R.0010.

> **(b)**   **Dr. Blunt Adopts Dr. Gringarten's Analysis but Selects the High-End, Low-Probability Permeability in Order to Err on the Side of Higher Flow.**

1806.   Dr. Blunt uses permeability as part of his calculation of the connected volume of the reservoir, the first variable in the material balance equation.  Dr. Blunt's material balance

calculation is discussed in Section III.C, and his derivation of the connected volume variable is discussed in Section III.C.1.

1807. There are two steps in Dr. Blunt's derivation of a number for permeability. First, he calculates his own number by making certain assumptions about historical flow rates during the incident. TREX 011553R.0039. Then he compares his number with the range calculated by Dr. Gringarten using the known flow rates from the MDT tool tests, described in the preceding section. Tr. at 2178–79 (Blunt); TREX 011553R.0039.

1808. Like Dr. Gringarten, Dr. Blunt calculates permeability using the method of well test analysis. TREX 011553R.0039–40, 0116. As discussed previously in Section III.D.3, that method requires knowledge of historical flow rates and pressure readings after shut-in. *See also* TREX 011553R.0039–40, 0116–20.

1809. Dr. Blunt uses the pressure data measured at the Capping Stack following shut-in of the well on July 15. TREX 011553R.0039; Tr. at 2163–64 (Blunt). This is the same pressure data used in the analysis of United States experts Dr. Pooladi-Darvish and Dr. Kelkar. TREX 011549R.0021; TREX 011653.0007, 0065.

1810. Dr. Blunt assumes a final day flow rate of 45,000 stock tank barrels per day (stb/d). D23567; Tr. at 2181–83 (Blunt); TREX 011553R.0039 n.93, 0110. This number is in close agreement with the final-day flow rate asserted by United States experts, once the proper stock-tank barrel conversion is used. D23566; Tr. at 2178, 2200, 2185–86 (Blunt); TREX 011553R.0039.

1811. Using this assumed rate and the Capping Stack pressure data, Dr. Blunt calculates a reservoir permeability of 300 mD. Tr. at 2178, 2200 (Blunt); TREX 011553R.0039.

1812.   Dr. Blunt analyzed the effect on his calculation of varying the assumed flow-rate history.   TREX 011553R.0115–20.   Because the final flow rate was estimated from Capping Stack readings, and the main influence of prior rate history on the permeability calculation comes from the later flow rates, Dr. Blunt found that the various flow rate histories asserted by the parties, and others analyzed in his report, did not significantly affect the result of the permeability calculation.   Tr. at 2182–83 (Blunt); TREX 011553R.0115–20.

1813.   Dr. Blunt's calculation of 300 mD is consistent with the permeability estimations done by BP engineers using core samples and down-hole log measurements.   TREX 011553R.0039, 0063–68; Tr. at 2676–82 (testimony from Dr. Merrill describing the permeability used in his modeling); Mason Dep. at 467 (stating that he believed the maximum permeability was 300 mD); Vinson Dep. at 351–52, 360–61 (BP 30(b)(6) witness discussing BP's derivation of 300 mD during the incident).

1814.   Dr. Kelkar also calculates 300 mD from the core data.   Tr. at 1933–34 (Kelkar); TREX 011549R.0029 (Kelkar expert report).

1815.   Dr. Blunt ultimately elected to use his calculation of permeability as a check rather than as the direct method of deriving the permeability number used in his material balance analysis.   Tr. at 2126–27 (Blunt); TREX 011553R.0045–47.   For the latter, he turns to the analysis by Dr. Gringarten.   Tr. at 2126–27 (Blunt); TREX 011553R.0045–47.

1816.   Dr. Blunt selects the high-end number derived by Dr. Gringarten, denominated "P10" because it is deemed to be only 10% probable that the permeability is that high.   Tr. at 2126–27 (Blunt); TREX 011696R.0048; 0156–58.   In other words, it is 90% likely that the permeability is lower.   Tr. at 2529–30 (Gringarten); TREX 011696R.0048.   (As noted earlier, the "P50" value for permeability calculated by Dr. Gringarten is 238 mD.)   The P10 permeability

adopted by Dr. Blunt from Dr. Gringarten's analysis is 329 mD.  Tr. at 2178–79 (Blunt); TREX 011553R.0047.

1817.   As was discussed in Section III.C.1, by using a high-end, low-probability number for permeability, Dr. Blunt errs on the high side in his material balance calculation of cumulative flow.  Tr. at 2178–79 (Blunt); TREX 011553R.0045.  Using his own independently derived permeability of 300 mD would have decreased the cumulative flow calculation by Dr. Blunt.  Tr. at 2179 (Blunt).

<div style="text-align:center">(c)    <b>Drs. Pooladi-Darvish and Hsieh Used Permeabilities That Are Double the Correct Number.</b></div>

1818.   Any value of permeability based, at least in part, on matching the Capping Stack pressure is biased toward high permeability where the researcher did not account for cooling.  Tr. at 2176–78 (Blunt); TREX 011553R.0039–40; D23565A.  Using the standard derivative pressure plot and accounting for cooling, Dr. Blunt calculates a permeability of 300 mD.   TREX 011553R.0039; *see also* Section III.D.3(b).

1819.   Dr. Blunt also calculates a permeability of 560 mD when he assumed, as did the United States experts, that there was no cooling.  TREX 011553R.0040; Tr. at 2176–78 (Blunt).  This higher permeability from the derivative almost exactly matches the permeability used by Dr. Pooladi-Darvish, for example, who claims to have matched the reservoir pressure using a permeability of 550 mD in his base case.  TREX 011653.0017.  Dr. Pooladi-Darvish does indeed match the pressure, but it is the wrong pressure.  TREX 011553R.0040; Tr. at 2176–78 (Blunt).

1820.   Dr. Pooladi-Darvish's failure to account for cooling is at odds with his statement that "the effect of cooling on well fluids is a recognized consideration in well-testing."  TREX 011654R.0011.

1821.  Since flow rate is proportional to the permeability, the simulation model used by Dr. Pooladi-Darvish significantly over-estimates the flow rate (and hence cumulative oil released).  TREX 011553R.0040; Tr. 2179 (Blunt).

1822.  Additionally, Dr. Pooladi-Darvish and Dr. Hsieh use permeabilities that lay outside the averages from log and core measurements.  TREX 011553R.0040, 0063–67 (Dr. Blunt expert report surveying various reported permeability values and finding a possible range between 200–400 mD); TREX 011653.0016; TREX 008615.0017.

### E.   The Material Balance Method Is Less Uncertain Than Methods that Calculate Daily Flow Rates, But of the Methods That Calculate Flow Rate Over Time, Dr. Gringarten's Method Is Best.

1823.  Material balance (conservation of mass) and Darcy's law are fundamental laws of reservoir engineering.  Tr. at 2512 (Gringarten).

1824.  While Dr. Gringarten focuses on Darcy's law in his analysis to estimate the flow rate over time and ultimately the cumulative discharge, Dr. Blunt focuses on material balance to estimate the cumulative discharge.  Tr. at 2512, 2548–49 (Gringarten).

1825.  There are fewer variables—and less uncertainty—in using the material balance method to estimate the cumulative discharge, as Dr. Blunt did, than in attempting to calculate how the flow rate changed over time, as other experts did.  Tr. at 2548–49 (Gringarten).

### 1.   Dr. Gringarten Estimated the Cumulative Discharge Was 2.4 to 3.0 MMstb.

1826.  Dr. Gringarten estimates the cumulative discharge was 2.4 to 3.0 million stock tank barrels.  Tr. at 2509–10 (Gringarten); TREX 011696R.0012.

1827.  Dr. Gringarten's cumulative discharge estimate is drawn from his estimate of the flow rate over time.  TREX 011696R.0049–57.

1828.   Dr. Gringarten's best estimate of the flow rate over time is consistent with Dr. Zaldivar's slug flow analysis, and the permeability of the Macondo reservoir.  Dr. Gringarten's best estimate of the cumulative discharge is 2.5 MMstb.  Tr. at 2543–45 (Gringarten); D24222; D23622.



1829.   Dr. Gringarten's cumulative discharge estimate is not affected by the rock compressibility.  Tr. at 2548 (Gringarten); TREX 011696R.0048.

1830.   Dr. Gringarten's flow rate estimates are based on single stage flash.  Tr. at 2549 (Gringarten).

### 2. Only Dr. Gringarten Used Industry-Standard Methods for Estimating Flow Rate over Time.

1831.   Dr. Gringarten uses deconvolution to estimate the flow rate over time.  Tr. at 2539, 2619 (Gringarten).  Deconvolution is a sophisticated mathematical tool that, in addition to

the use discussed above, reconstructs flow rate history from pressure history.  Tr. at 2535–36 (Gringarten).

1832.   Dr. Gringarten is an expert in deconvolution and one of the pioneers of its use in the oil and gas industry.  Tr. at 2508 (Gringarten).  Deconvolution is a standard technique in the oil and gas industry.  Tr. at 2508, 2535–36 (Gringarten).  Deconvolution is commonly used in the oil and gas industry to correct inaccurate flow rates or to estimate missing flow rates.  Tr. at 2535–36 (Gringarten).

1833.   Using deconvolution, Dr. Gringarten is able to estimate the flow rates that would reproduce the pressure history of Macondo but that would also be consistent with the known permeability of the Macondo reservoir.  Tr. at 2535, 2538–39 (Gringarten).  No other expert used deconvolution to estimate the flow rate.  Tr. at 2536–37 (Gringarten).

### 3.   Dr. Gringarten Used Bottomhole Pressure in His Cumulative Discharge Analysis.

1834.   Dr. Gringarten uses the pressure at the bottom of the well (bottomhole pressure) to estimate the flow rate.  Tr. at 2551–52 (Gringarten).  It is standard in the oil and gas industry to use bottomhole pressure when calculating flow rates.  Tr. at 2619–20 (Gringarten).

1835.   Wellhead pressure does not accurately reflect what is occurring in the reservoir, and relying on wellhead pressure instead of bottomhole pressure can cause errors in the estimation of flow rate.  Tr. at 2619–20 (Gringarten); TREX 011696R.0038.

1836.   To translate to bottomhole pressure during times when the well was flowing, Dr. Gringarten makes use of Dr. Johnson's multiphase flow modeling.   TREX 011696R.0037; TREX 011488.0114.

1837.   Here, Dr. Gringarten uses two different flow paths—corresponding to the extreme possible locations of the drill pipe—and two different flow rate starting points to

estimate the bottomhole pressure.  TREX 011696R.0034–43.  This allows Dr. Gringarten to use a range of possible bottomhole pressures and thereby to capture the uncertainty in the pressure history.  Tr. at 2551–52, 2620–21 (Gringarten).

1838.  To translate to bottomhole pressure after the well was shut in, Dr. Gringarten makes use of Dr. Blunt's method for accounting for thermal effects as the wellbore cooled. TREX 011696R.0038; TREX 011553.0071–90.

1839.  In addition, for the pressure at the start of the spill, Dr. Gringarten uses the pressure actually measured by the MDT.  Tr. at 2533 (Gringarten).  Because he has the actual measurement for the start of the spill, Dr. Gringarten does not extrapolate pressure from later times.  Tr. at 2624 (Gringarten).

1840.  Dr. Gringarten applies deconvolution to correct the flow rates he started with based on the bottomhole pressure history of Macondo.  Tr. at 2553 (Gringarten).  If Dr. Gringarten had used a higher flow rate for the starting point used to estimate bottomhole pressure, he would have arrived at a lower cumulative flow estimate.  Tr. at 2620–22 (Gringarten).

1841.  As a check, Dr. Gringarten also estimates the cumulative discharge based on wellhead pressure, instead of bottomhole pressure.  Tr. at 2622 (Gringarten) TREX 011696R.0055–57.  Dr. Gringarten's estimate based on wellhead pressure is 2.7 MMstb, which is within the range he calculated using bottomhole pressure—2.4 to 3.0 million stock tank barrels.  Tr. at 2622 (Gringarten); TREX 011696R.0049–57.

### 4.    Dr. Gringarten Constrained His Flow Rate Estimates by the Known Reservoir Parameters.

1842.  The flow rate out of the reservoir is a function of the permeability of the reservoir—the lower the permeability, the lower the flow rate; thus any estimate of the flow rate

must be constrained by or consistent with the permeability.  Tr. at 2510–11, 2531–32 (Gringarten); TREX 011696R.0006, 0010.

1843.  Dr. Gringarten constrains his flow rate estimates with the pressure history and also with the permeability he calculated using the MDT data.  Tr. at 2538–39 (Gringarten).

1844.  The Government experts did not constrain their flow rate estimates with the permeability of the Macondo reservoir.  TREX 011696R.0006, 0025, 0045.

## 5.    Dr. Gringarten Used Accurate Fluids Properties in His Analysis.

1845.  Dr. Gringarten uses fluid properties derived from Dr. Whitson's equation of state model.  Tr. at 2549 (Gringarten); TREX 011696R.0065.  *See also* Section III.B.6.

## 6.    Dr. Gringarten Did Not Analyze the Rate of Erosion.

1846.  Dr. Gringarten does not analyze the erosion of any impediments to flow.  Tr. at 2537–38 (Gringarten).

1847.  Dr. Gringarten uses deconvolution to estimate the flow rate, and deconvolution attributes all changes in pressure to changes in flow rate.  Tr. 2537–38, 2540 (Gringarten).

1848.  It is possible that some pressure changes were caused by erosion of impediments to flow below the pressure gauge, but deconvolution attributes all changes to flow rate and thereby could err on the side of predicting too high of a flow rate.  Tr. 2537–38, 2540 (Gringarten).

1849.  The "skin" calculated by Dr. Gringarten's software for May 8 through shut-in represents the mismatch between pressure predicted by his model and the actual pressure.  Tr. 2542–43, 2566 (Gringarten); *see also* TREX 011696R.0149 ("This shows the required skin to match the pressure history based on the rates and interpretation model").

**F.      Conversion of Reservoir Barrels to Surface Volumes Should be Done Using the "Single-Stage Flash" Process.**

**1.      The Spill Should Be Measured in Stock Tank Barrels for Purposes of Clean Water Act Penalties.**

1850.   For the calculation of penalties in this case, the number of barrels of released oil must be converted to stock tank barrels, which are barrels of liquid oil at stock tank conditions. Tr. at 2131 (Blunt); Tr. at 2336 (Whitson); U.S. Mot. *in Limine* re Whitson at 2 (Rec. Doc. 11056-2).

1851.   Expressing liquid oil volumes in units of stock tank barrels is industry standard. Tr. at 2131 (Blunt).

1852.   The oil industry-standard definition of "stock tank conditions" for oil are 60 degrees Fahrenheit temperature and 1 atmosphere (approximately 15 psi) pressure.  Tr. at 1760 (Zick); Shtepani Dep. at 73.

1853.   The conditions in the Macondo reservoir were approximately 243 degrees Fahrenheit temperature and 11,850 psi pressure.  Tr. at 1766 (Zick).

1854.   As hydrocarbon fluid goes from reservoir conditions (high temperature and pressure) to stock tank conditions (low temperature and pressure), it separates into gas and liquid oil.  Tr. at 2131 (Blunt).  The volume of liquid oil at stock tank conditions is less than the volume of hydrocarbon fluid at reservoir conditions.  Tr. at 1761 (Zick).  The decrease in volume is called "shrinkage."  Tr. at 1760–61 (Zick).

1855.   The amount of shrinkage that occurs depends on, among other things, the number of and pressure/temperature conditions of the "stages" at which hydrocarbon gas is separated from liquid oil.  Tr. at 2354 (Whitson).

1856.   The "shrinkage factor" is the number of stock tank barrels divided by the number of reservoir barrels.  Tr. at 1760–62 (Zick).

1857.   The "formation volume factor" is the number of reservoir barrels divided by the number of stock tank barrels, or the inverse of the shrinkage factor.  Tr. at 1762 (Zick).

### 2.   The "Single-Stage Flash" Process Is the Default Method of Conversion Used in the Industry, and Also the Simplest Method to Apply.

1858.   The "single-stage flash" process occurs when the gas and liquid oil in a hydrocarbon mixture remain in contact until they are separated at stock tank conditions; there is only a single separation point.  Unlike "multistage flash" processes—of which there are many, and for which there is no standard definition—single-stage flash has one, unambiguous definition.  Tr. at 2132–33 (Blunt).

1859.   The laboratory-measured single-stage flash formation volume factors ranged from 2.27 to 2.36, which equated to a shrinkage factor range of .424 to .440 (average .434) stock tank barrels per reservoir barrel.  TREX 011553R.0053; Tr. at 2327 (Whitson).  It is a value in this range that should have been applied for analysis using the single-stage flash process.  Tr. at 2331 (Whitson); D23987-1A; D24589A.

1860.   Dr. Whitson's equation of state model predicts an average single-stage flash shrinkage factor of about 0.433, virtually identical to the laboratory average.   TREX 011491R.0011; TREX 011496.0018; D24589A.

1861.   The single-stage flash process is commonly encountered in oilfield operations.  Tr. at 2132 (Blunt).

1862.   The single-stage flash process is the simplest process that can be used to convert hydrocarbon fluid to stock tank oil.  Tr. at 1831 (Zick).

1863.   The single-stage flash process is the default process used by the industry when it is uncertain what the actual production process is.  Tr. at 1831 (Zick); Tr. at 2132 (Blunt).

437

1864.   In fact, it is the process chosen by United States expert Dr. Dykhuizen for his calculations.  Tr. at 1469 (Dykhuizen); Tr. at 1830–31 (Zick).

1865.   Oil formation volume factor is a property that is typically obtained by running a single-stage flash test in a laboratory.  Shtepani Dep. at 203–04.

1866.   Dr. Whitson develops an "ocean separator" process, which attempts to model the plausible actual pressure and temperature separation conditions experienced by the spilled oil and gas as it rose through the ocean from the exit point near the seabed to the ocean surface.  Tr. at 2313–14, 2335–36 (Whitson).  The pressures and temperatures Dr. Whitson uses for the Gulf of Mexico were accurate.  Tr. at 1826 (Zick).  Dr. Whitson's ocean-separator model takes into account all realistic thermodynamic effects, including the "solubility" the hydrocarbon fluid would experience when exposed to the sea water, in order to calculate how much oil would end up as stock tank barrels.  Tr. at 2336, 2338–45, 2347–57 (Whitson); TREX 144128.0001–08.

1867.   Dr. Whitson's ocean-separator model calculated essentially the same amount of shrinkage as the single-stage flash method.  Tr. at 2135 (Blunt); Tr. at 2327–29, 2355–57 (Whitson).

1868.   It is important to consider the real world circumstances in which the spilled hydrocarbon fluid traveled from the reservoir to stock tank conditions.  Tr. at 1833 (Zick).

1869.   In addition to Dr. Whitson's ocean-separator model, which assumes that oil and gas physically separated from one another as they rose through the Gulf of Mexico, it is also plausible that the spilled oil and gas remained in contact as they rose through the ocean.  If that occurred, the result would be a single-stage flash (without considering solubility).  Tr. at 2263 (Blunt).

438

1870.   And if one were to capture the fluid at the exit point and take it straight to stock tank conditions, ignoring the ocean, a single-stage flash would result; the only point where gas and oil would physically separate would be at stock tank conditions.  Tr. at 2370–71 (Whitson); Tr. at 1831–32 (Zick) (oil and gas were not able to separate between the reservoir and the exit point).

1871.   For each reservoir barrel, the single-stage flash process results in fewer stock tank barrels than the laboratory four-stage process, but it results in more stock tank oil than another process tested by the laboratories called "differential liberation."   Thus, single-stage flash provides the middle value of shrinkage factor out of the three tests performed by the fluids laboratories that measured shrinkage.  Tr. at 2332, 2358 (Whitson); D23987-1A.

### 3.       BP Experts Appropriately Used the Single-Stage Flash Process to Convert Volumes to Stock Tank Barrels.

1872.   Dr. Martin Blunt uses the single-stage flash method to convert the volumes from his calculations into stock tank barrels.  Tr. at 2131–32 (Blunt).

1873.   Dr. Alain Gringarten uses the single-stage flash method to convert the volumes from his calculations into stock tank barrels.  Tr. at 2549 (Gringarten).

1874.   Dr. Michael Zaldivar uses the single-stage flash method to convert the volumes from his calculations into stock tank barrels.  Tr. at 2775 (Zaldivar).

### 4.       Other Processes for Converting to Stock Tank Barrels Are Inaccurate and Inappropriate.

1875.   There are an infinite number of multistage processes.  Tr. at 2133 (Blunt).

1876.   While multistage processes are sometimes engineered by oil companies during normal production of hydrocarbon fluids to increase the production of liquid oil, the hydrocarbon fluid spilled from the Macondo reservoir was not subjected to any such engineered multistage process.  Tr. at 2133 (Blunt).

1877.   One such multistage process is the "four-stage" process conducted experimentally by the fluids measurements laboratories.  Tr. at 2133 (Blunt).

1878.   The laboratory four-stage process does not reflect what *actually* happened to the spilled Macondo hydrocarbon fluid.  Tr. at 1762, 1824–25 (Zick); Shtepani Dep. at 204.  It also does not reflect the process encountered by the fluid collected by surface vessels.  Tr. at 1825–26 (Zick).

1879.   The laboratory four-stage process also does not reflect what ***might have*** happened if there had been no spill.  There is no evidence to suggest that BP would have used the laboratory four-stage process to produce oil from the Macondo reservoir if the spill had not occurred and the reservoir had produced normally.  Tr. at 2133 (Blunt); Tr. at 2322, 2333–34, 2357 (Whitson); Shtepani Dep. at 204; LeBlanc Dep. at 97.  In fact, the conditions for the laboratory four-stage test were not identified until after the blowout.  Tr. at 2333 (Whitson); LeBlanc Dep. at 96; TREX 008596.0001–02.  And it is typically not the case in the oil industry that the multi-stage process tested in a fluids laboratory is the one chosen for use in a production system in the field; instead, the multi-stage laboratory test is conducted to aid in construction of an equation of state and aid in determining optimal production processes.  Tr. at 2322, 2333–34 (Whitson); LeBlanc Dep. at 25–26.  Even if the four-stage process had been implemented during normal production of the Macondo reservoir, it would not have been conducted with the same efficiency as in the laboratory, so less liquid oil at stock tank conditions would result than was measured in the laboratories.  Tr. at 2133–34 (Blunt).

1880.   Although United States expert Dr. Zick claimed to be able to predict what BP would have done if there had been no spill, he is "not an expert on production operations."  Tr. at 1822–23 (Zick).

1881.   Dr. Pooladi-Darvish improperly uses data from the laboratory four-stage process to convert his volume calculations to stock tank barrels.  TREX 011653.0157.

1882.   During the process of collecting fluid on surface vessels, the fluid was subjected to a multi-stage separation process.  That process, however, was not encountered by the fluid that spilled into the Gulf of Mexico.  Tr. at 1825 (Zick).

1883.   United States expert Dr. Zick created a process that he calls an "oceanic model." Tr. at 1824 (Zick).

1884.   Despite claiming that his "oceanic model" was designed to "to mimic the behavior that the ocean might have imposed upon the fluids," Dr. Zick did not create a realistic "*oceanic* model" because the model fails to take into account the composition of the *ocean* and its interaction with the hydrocarbon fluid.  Tr. at 1817, 1824, 1826–27 (Zick); Tr. at 2374–75 (Zick).

1885.   One aspect of the interaction between hydrocarbons and water is solubility. Solubility is a realistic effect that would have happened to the Macondo hydrocarbons moving through the Gulf of Mexico.  Tr. at 1826–27 (Zick); Tr. at 2343–44, 2355, 2374–75 (Whitson). It would begin immediately upon the hydrocarbon entering the sea water.  Tr. at 1829 (Zick).

1886.   Dr. Zick chose to take into account certain aspects of the interaction between the ocean and the hydrocarbons—for instance, the temperatures and pressures, and his belief that the ocean water would keep oil and gas separated—but he arbitrarily refused to take solubility.  Tr. at 1826–27 (Zick).

1887.   It does not make sense to model an "oceanic" process if you do not include the water that is in the ocean.  Tr. at 2343 (Whitson).

1888.   Dr. Zick's ocean-separator shrinkage factor is calculated using Dr. Zick's equation of state model.  A major flaw in Dr. Zick's equation of state model is that it predicted shrinkage factors that do not accurately match the laboratory measurements for the single-stage flash and laboratory four-stage flash processes.  Tr. at 2313 (Whitson).

1889.   The shrinkage factor is the most important measurement made by a fluids laboratory.  Therefore, it is expected within the oil industry that an equation of state will match the laboratory measurements of shrinkage factor within 2 percent.  Tr. at 2323–24 (Whitson).

1890.   The average shrinkage factor error in United States expert Dr. Zick's equation of state model is 4.5 percent, more than double the acceptable margin.  And worse, the predictions of Dr. Zick's equation of state model are always biased in the direction of overstating the amount of oil remaining at stock tank conditions.  Dr. Zick's error with respect to shrinkage does not meet industry standards for acceptability.  Tr. at 1795, 1810–11 (Zick); Tr. at 2325–26, 2328, 2329–30, 2334–35, 2358–59 (Whitson); D23987-1A; D24595.

1891.   As compared to the numerous equation of state models built over the years by BP expert Dr. Whitson, Dr. Zick has created only about 20 equation of state models.  Dr. Zick does not have anywhere near the same amount of experience in creating equation of state models as does Dr. Whitson.  Tr. at 1786–87 (Zick).

1892.   Because Dr. Zick's equation of state is biased with respect to the laboratory-measured processes, that bias carried over to his ocean-separator process.  The accuracy of the underlying equation of state was "paramount to getting a good shrinkage factor through the oceanic process."  Tr. at 2337 (Whitson).  Because Dr. Zick's equation of state is biased with respect to the lab-measured shrinkage factors, Dr. Zick's ocean-separator process is biased, did

not accurately represent the Macondo hydrocarbon fluid, and should not be used to calculate a shrinkage factor or formation volume factor. Tr. at 2331 (Whitson).

1893. Dr. Zick recommends his "oceanic model" simply because it yielded the most stock tank oil. Tr. at 1817–18 (Zick); TREX 011491R.0017–18. Even Dr. Zick himself did not initially recommend using his "oceanic model." TREX 011490R.0025–26 (Zick Original Expert Report). No United States expert used Dr. Zick's "oceanic model" in calculating spill volumes. Tr. at 1829–30 (Zick).

> **5. Dr. Zick's Equation of State Model Artificially Inflated the Number of Stock Tank Barrels, Even When the Single-Stage Flash Process Is Used.**

1894. Dr. Zick's equation of state model is biased in its predictions of the shrinkage factor for the single-stage flash process; his model overpredicts the amount of stock tank oil remaining at stock tank conditions when compared to the actual laboratory measurements. Tr. at 2325–26, 2328, 2358–59 (Whitson).

1895. Therefore, when applying the single-stage flash process, it is inappropriate to use the predictions form Dr. Zick's equation of state model. Tr. at 2331 (Whitson).

1896. Because Dr. Zick's equation of state model is also biased in predicting the shrinkage factor from the four-stage process, his equation of state model should not be used for calculating the four-stage shrinkage either. Tr. at 1795, 1810–11 (Zick); Tr. at 2329–30 (Whitson). Instead, the actual laboratory measurements of 0.461 to 0.487 (average 0.473) stock tank barrels for each reservoir barrel more accurately describe the result of the laboratory four-stage process. Tr. at 2329, 2331, 2357–58 (Whitson); D23987-1A; D24590A.

## PROPOSED CONCLUSIONS OF LAW

## IV.   BP'S PROPOSED CONCLUSIONS OF LAW AS TO SOURCE CONTROL.[8]

1897.   These conclusions of law incorporate BP's Proposed Findings of Fact And Conclusions of Law for Phase 1.  Rec. Doc. 10467.  Thus, these Phase 2 conclusions will not repeat the general standards for negligence, gross negligence, and willful misconduct, which are set forth in the Phase 1 Conclusions of Law.  *Id.* ¶¶ 2723–2766, 2926–2939.  Nor will the Phase 2 conclusions repeat the bases for why Transocean and Halliburton are liable to, and cannot seek indemnity from, BP.  *Id.* ¶¶ 2940–3135.

1898.   Instead, these conclusions will explain why BP did not engage in negligence, gross negligence, or willful misconduct in its efforts to secure the Macondo well.[9]  The Aligned Parties' pre-trial statements argue that BP engaged in reckless, willful, or wanton conduct. Aligned Parties Pre-Trial Statement at 1 (Rec. Doc. 11411).  Nevertheless, because the PSC's complaint alleges negligence, gross negligence, and willful misconduct, Rec. Doc. 1128 ¶¶ 569–636, and because the PSC has previously argued that negligent acts can be aggregated to create gross negligence or willful misconduct, *e.g.*, Rec. Doc. 10458 at 13–14, BP will address how its

---

[8] Anadarko does not join BP's Proposed Findings of Fact as to Source Control as it is not a defendants in the Source Control proceedings.

[9] Before Phase 2 of the trial, BP filed various motions *in limine* as well as motions under Federal Rule of Evidence 702 to exclude testimony of various experts.  *E.g.*, Rec. Docs. 11026, 11027, 11038, 11039, 11043, 11044, 11046, 11054, 11055, 11062, 11063.  BP preserves and (to the extent they were denied) re-urges its arguments in these motions.  Anadarko joins in this position with respect to motions and issues bearing on the Quantification issue.

In addition, this Court has rejected BP's argument that OPA entirely displaces general maritime law as applied to economic loss claims resulting from oil spills, *see* Rec. Doc. 3830 at 38, and denied BP's request to certify that issue for interlocutory review, *see* Rec. Doc. 4378. BP offers these conclusions without prejudice to its position that general maritime law is displaced here.

conduct was not negligent, and *a fortiori* cannot constitute gross negligence or willful misconduct.[10]

1899.   Punitive damages under maritime law are available only where a particular defendant, with a culpable state of mind, engages in extreme and outrageous misconduct.  *See, e.g.*, *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 409, 414 n.4 (2009); *In re P&E Boat Rentals, Inc.*, 872 F.2d 642, 650 (5th Cir. 1989); *Tullos v. Res. Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985).   Because BP's conduct did not constitute gross negligence or willful misconduct, it necessarily did not engage in extreme and outrageous misconduct with the requisite statement of mind, and thus cannot be liable for punitive damages.

1900.   Section IV.A of these conclusions explains how, looking at BP's conduct as a whole, BP's source control efforts were not negligence, much less gross negligence or willful misconduct.   Section IV.B rebuts the Aligned Parties' arguments against this conclusion. Section IV.C demonstrates that BP's source control actions cannot be a superseding cause that reduces Transocean's or Halliburton's liability.

### A.   Working Under the Federal Government's Supervision, BP Exercised Reasonable Care in Sealing the Well.

#### 1.   BP Was Not Negligent Regarding Its Source Control Plan.

1901.   BP's control plan met the standard of care.  *See* Section II.B.  For example, the plan included attempting to remotely activate the BOP through ROV intervention, a prudent step that could have immediately stopped the spill under the correct conditions.  *See* Section II.B.1(b). The plan also provided for use of relief wells, the most reliable way of stopping deepwater blowouts.  *See* Section II.B.1(a).  Finally, BP would assemble a team of technical experts to

---

[10]   BP p.l.c. (and all other BP entities besides BPXP and BPAP) cannot be liable for the additional reasons set forth in Paragraphs 2934-2939 of BP's Phase 1 conclusions.   Rec. Doc. 10467.

determine alternative source control options, which would allow BP to respond to the myriad different conditions of the well.  *See* Section II.B.1(c).  A source control plan with these steps satisfies the duty of care and thus cannot be the basis for a negligence finding.  *See* Order and Reasons re B4 Pleading Bundle at 6 (Rec. Doc. 4285) ("Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances."); *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (same); *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980) (same).

1902.  Moreover, BP's source control plan was approved by the MMS as being in accord with regulatory requirements.  *See* Section II.B.1(f).  Approval by the MMS weighs heavily against any finding of negligence.  *See*, *e.g.*, *Ramirez v. Plough, Inc.*, 863 P.2d 167, 176 (Cal. 1993) ("[W]e conclude that the prudent course is to adopt for tort purposes the existing legislative and administrative standard of care on this issue."); *Jones v. Hittle Serv., Inc.*, 549 P.2d 1383, 1390 (Kan. 1976) ("Compliance is evidence of due care and that the conforming product is not defective, and may be conclusive in the absence of a showing of special circumstances.  Certainly a manufacturer should be able to rely on such standards in the absence of actual or constructive notice that they are inadequate."); *see also Lorenz v. Celotex Corp.*, 896 F.2d 148, 149–50 (5th Cir. 1990) (affirming jury instruction under Texas law that "[c]ompliance with government safety standards constitutes strong and substantial evidence that a product is not defective"); *Simien v. S. S. Kresge Co.*, 566 F.2d 551, 554 (5th Cir. 1978) ("Compliance with these federal statutory safety requirements and industry standards is evidence that a product is not defective."); *Sims v. Washex Mach. Corp.*, 932 S.W.2d 559, 565 (Tex. App. 1995) ("Compliance with government regulations is strong evidence, although not conclusive, that a machine was not defectively designed.").

1903.   Similarly, BP's source control plan was very similar to the plans of other major oil and gas operators such as Shell, Exxon, and Chevron.  *See* Section II.B.1(c).  Compliance with industry standards is powerful evidence that BP was not negligent.  *See, e.g.*, *Baker v. S/S Cristobal*, 488 F.2d 331, 333 (5th Cir. 1974) (holding that although "compliance with the customs and practices of an industry is not in itself due care, … it is evidence of due care") (internal quotations omitted); *Cia Maritima Del Nervion v. James J. Flanagan Shipping Corp., Stevedore Div.*, 308 F.2d 120, 123 (5th Cir. 1962) (holding that although "compliance with the customs and practices of an industry is not in itself due care, … it is evidence of due care") (internal quotations omitted); *Ray Evers Welding Co. v. Occupational Safety & Health Review Comm'n*, 625 F.2d 726, 732 (6th Cir. 1980) ("[N]egligence on the part of a whole industry cannot be lightly presumed.  It must be proven.") (citation omitted).

1904.  Thus, BP's source control plan satisfied the standard of care and BP was not negligent regarding its source control plan.

1905.  Because BP's conduct regarding source control satisfies the standard of care for negligence, it necessarily satisfies the standards of care for gross negligence and willful misconduct.

1906.  Furthermore, even to the extent that BP's conduct regarding the source control plan could be considered negligent, it would not reach the high threshold required for gross negligence.  BP's source control plan included specific measures for stopping a spill as well as providing the company the flexibility to respond to the individual conditions of each blowout.  Taking these precautions precludes a finding of gross negligence.  *See, e.g.*, *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1132 (10th Cir. 2009) (holding that the "undisputed steps that defendants took to enhance the safety of [a road race] would prevent any reasonable juror from

finding gross negligence"); *Kuykendall v. Young Life*, 261 F. App'x 480, 490 (4th Cir. 2008) ("The many precautions [defendant] took to ensure ... safety preclude a finding that it demonstrated an absence of slight diligence, or the want of even scant care.") (internal quotations omitted); *Computalog U.S.A., Inc. v. Blake Drilling & Workover Co., Inc.*, No. 95-3009, 1996 WL 720761, at *2–4 (E.D. La. Dec. 9, 1996) (rejecting gross negligence where defendant exercised some care in visually inspecting the crane).

1907. Moreover, BP's source control plan being approved by the MMS and so satisfying applicable regulations rebuts any claim of gross negligence. *See Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994) (holding that because "compliance with both federal regulations and industry practices is some evidence of due care," such compliance generally negates the culpability necessary to warrant punitive damages); *Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031, 1035 (D.C. Cir. 1980) (defendant "may not be condemned as a wanton wrongdoer for conforming to the standards set and the practices approved by the agency charged with the duty of regulating it"); *Morris v. Cessna Aircraft Co.*, 833 F. Supp. 2d 622, 641–43 (N.D. Tex. 2011) (finding that evidence showing full regulatory compliance with FAA requirements negated showing of gross negligence); *see also Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995) (vacating punitive damages award where defendant complied with governmental regulations and industry standards); *Sloman v. Tambrands, Inc.*, 841 F.Supp. 699, 703 n.8 (D. Md. 1993) ("Since defendant successfully proved that it complied with federal regulations," the defendant "did not act with malice ... and thus plaintiff is not entitled to punitive damages"); *Stone Man, Inc. v. Green*, 435 S.E.2d 205, 206 (Ga. 1993) ("[P]unitive damages ... are, as a general rule, improper where a defendant has adhered to environmental and safety regulations."); W. PAGE KEETON, ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 36 at 233

n.41 (5th ed. 1984) ("In most contexts … compliance with a statutory standard should bar liability for punitive damages.").

1908.  Similarly, BP's source control plan being consistent with industry standards negates any contention of gross negligence.  *See AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) (holding that defendant's decisions could not be grossly negligent "in light of evidence that the decisions, far from representing 'an extreme departure from the standards of ordinary care,' fell well within industry standards") (citation omitted); *Richards*, 21 F.3d at 1059 (relying on defendant's "compliance with both federal regulations and industry practices is some evidence of due care" to hold that its actions were not wanton as a matter of law); *Drabik v. Stanley-Bostich, Inc.*, 997 F.2d 496, 510 (8th Cir. 1993) ("Compliance with industry standard and custom serves to negate conscious disregard and to show that the defendant acted with a nonculpable state of mind ...."); *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1376 (5th Cir. 1982) (holding "that compliance with industry custom can be relevant evidence tending to negate an inference of gross indifference[]" and instructing district court on remand to consider any such evidence "as tending to negate a jury issue of gross indifference"); *Am. Cyanamid Co. v. Roy*, 498 So. 2d 859, 862–63 (Fla. 1986) ("While ... compliance with industry guidelines should not be taken as conclusive evidence bearing on the question of a corporation's negligence, such information may certainly bear on whether a party's behavior represents such an extreme departure from accepted standards of care.").

1909.  BP also did not engage in willful misconduct.  There is no evidence that BP intended to design a source control plan that would delay securing of a well after a blowout.  Nor would BP have any incentive to create such a source plan, given that the longer a blowout continues the greater the damages BP would have to pay under OPA.  To the contrary, BP

created a source control plan similar to other oil companies and approved by the MMS that BP believed would have the best chance of rapidly securing a well after a blowout.  *See, e.g.*, 57A AM. JUR. 2D *Negligence* § 257 ("Generally, to constitute willful misconduct, the actor must have actual knowledge—or what the law deems to be the equivalent of actual knowledge—of the peril to be apprehended, coupled with a conscious failure to avert injury … In order for a defendant to commit a willful injury, there must be design, purpose, and intent to do wrong and inflict the injury, and as long as the element of inadvertence remains in conduct, the conduct is not properly regarded as willful.") (footnotes omitted); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (noting that, at common law, "willful" includes knowing and reckless violations of legal duties).

1910.  For these reasons, BP also did not engage in extreme and outrageous misconduct with the requisite culpable statement of mind regarding its source control plan, and thus cannot be liable for punitive damages.  *See, e.g.*, *Atl. Sounding*, 557 U.S. at 409, 414 n.4; *P&E Boat*, 872 F.2d at 650; *Tullos.*, 750 F.2d at 388.

1911.  In addition to satisfying the standard of care, BP's source control plan did not cause any delay in capping the well.  There is no competent evidence that any alternative source control plan would have led to securing the well sooner.  *See* Section II.B.2(g)(3).  As BP's source control plan did not cause any delays, the plan cannot be the basis for liability, including for punitive damages.  *See Great Lakes*, 624 F.3d at 213–14 ("Under the general maritime law, a party's negligence is actionable only if it is the 'legal cause' of the plaintiff's injuries, which is something more than 'but for' causation—the negligence must be a substantial factor in causing the injuries."); *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005) (holding that a defendant's "fault in the abstract does not give rise to liability.  Instead, the fault must be a

contributory and proximate cause of the damages sustained.") (footnote omitted); *Am. River Trans. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (same).

## 2.    BP Used Every Reasonable Means to Shut the Macondo Well.

1912.   Immediately after the blowout, BP began executing its source control plan.  BP attempted to use ROVs to activate the BOP, began drilling relief wells, and organized a team of experts to analyze alternative source control options.  See Section II.B.2.  These alternatives included Top Kill (a combination of Junk Shot and Momentum Kill) and a new Capping Stack designed specifically for the Macondo well.  See Sections II.B.2(d); II.B.2(h).  BP also began collecting oil from the spill so as to prevent it from flowing into the Gulf and causing further damage.  See Section II.B.2(a)(3).  BP considered a BOP-on-BOP option, but ultimately determined that it was too risky to attempt given the possibility of oil flowing into the surrounding formation.  See Sections II.B.2(e)–II.B.2(f).  BP used the unique Capping Stack to shut in the well.  See Section II.B.2(g)(3).  BP's investigation and use of these various options more than satisfies its duty of ordinary care under the circumstances.  *See* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

1913.  All of BP's actions were directed, supervised, and approved by the federal Government. *See* Section II.B.2(b); *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 418 (5th Cir. 2013) (explaining that "federal law directs the President to ensure the effective and immediate removal of the oil in accordance with a National Contingency Plan and to direct all federal, state and private actions in that regard" and "BP participated in the response activities at the direction of the federal authorities to stop the oil spill").  This direction, supervision, and approval further establishes that BP's actions were reasonable.  *See*, *e.g.*, *Ramirez*, 863 P.2d at 176; *Jones*, 549 P.2d at 1390; *Lorenz,* 896 F.2d at 149–50; *Simien*, 566 F.2d at 554; *Sims*, 932 S.W.2d at 565.

1914.  These source control options were evaluated by a group of third party experts from well control companies, other oil companies, and its existing contractors—in short, BP brought the resources of the entire industry to bear on shutting in the well.  *See* Section II.B.2(b)(4).  These experts generally agreed with BP's approach to source control, again supporting that BP satisfied the standard of care.  *See, e.g.*, *Baker*, 488 F.2d at 333; *Cia Maritima*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

1915.  BP weighed the benefits and risks of each possible source control alternative, as well as the best order in which to attempt them.  *See* Section II.B.2(b)(4)b; *see also* II.B.2(d)–II.B.2(g).  Using this process, BP decided the risk of a BOP-on-BOP option were too high, while determining that Top Kill and a capping stack were viable opportunities to seal the well.  *See* Section II.B.2(d)–II.B.2(g).  This weighing of risks confirms that BP satisfied the standard of care in choosing source control options.  *See*, *e.g.*, *Arsement v. Spinnaker Exploration Co.*, 400 F.3d 238, 253 (5th Cir. 2005) (holding that defendant exercised reasonable care in choosing between two plans to install a sump deck on an oil and gas platform, including by considering the comparative safety of each plan); *Dougherty v. Haaland*, 457 F. Supp. 860, 869 (E.D. Pa. 1978) (finding that shipowner of listing vessel was not negligent in instructing longshoremen to load pipe working *with* the list where loading pipe *against* the list was perhaps more dangerous than loading with the list).

1916.  Thus, BP's source control and containment actions satisfied the standard of care and BP was not negligent in controlling the Macondo well.

1917.  Because BP's conduct regarding source control satisfies the standard of care for negligence, it necessarily satisfies the standards of care for gross negligence and willful misconduct.

1918.   Furthermore, even to the extent that BP's conduct regarding source control could be considered negligent, it would not reach the high threshold required for gross negligence.  BP exercised significant care by using a number of reasonable means to contain and seal the well, and thus could not be considered grossly negligent.  *See, e.g.*, *Milne*, 575 F.3d at 1132; *Kuykendall*, 261 F. App'x at 490; *Computalog U.S.A.*, 1996 WL 720761, at *2–4.

1919.   The federal Government's supervision of BP and approval of BP's source control decisions provides an independent reason for concluding that BP's source control actions were not grossly negligent.  *See Richards*, 21 F.3d at 1059; *Nader*, 626 F.2d at 1035; *Morris*, 833 F. Supp. 2d at 641–43; *see also Satcher*, 52 F.3d at 1317; *Sloman*, 841 F. Supp. at 703 n.8; *Stone Man*, 435 S.E.2d at 206.

1920.   Likewise, BP's source control actions being informed by the views of the industry as a whole rebuts any argument that BP was grossly negligent.  *See AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862–63.

1921.   Similarly, there is no evidence that BP intentionally chose to delay shutting in the well, nor do such allegations make any sense given that the damages BP would have to pay for under OPA would increase the longer the well flowed.  BP's pursuit of multiple well control options demonstrates that it was acting in good faith to seal the well.   Indeed, BP spent approximately $1.6 billion in attempting to control the well.  *See, e.g.*, 57A AM. JUR. 2D *Negligence* § 257; *Safeco Ins. Co.*, 551 U.S. at 57.

1922.  For these reasons, BP also did not engage in extreme and outrageous misconduct with the requisite culpable statement of mind regarding its source control activities, and thus

cannot be liable for punitive damages. *See, e.g.*, *Atl. Sounding*, 557 U.S. at 409, 414 n.4; *P&E Boat*, 872 F.2d at 650; *Tullos.*, 750 F.2d at 388.

1923.   In addition to BP satisfying the standard of care, BP cannot be liable for the independent reason that its source control actions did not cause any injury.   The Aligned Parties have not shown that any alternative source control methods would have shut in the well sooner than BP's actions.   *See* Section II.B.2(g)(3).   Therefore, BP cannot be liable for its source control actions, including for punitive damages, because there is no proof of causation.   *See Great Lakes*, 624 F.3d at 213–14; *Mid-South Towing*, 418 F.3d at 534; *Am. River*, 148 F.3d at 450.

> **B.      The Aligned Parties Have Not Shown That BP Was Negligent, Much Less That There Was Willful Misconduct.**

> > **1.      BP Provided a Wide Range of Flow Estimates to the Federal Government, Which Relied on Its Own Estimates in Any Case.**

1924.   The Aligned Parties' claim that "BP willfully, with the intent to deceive, misrepresented its knowledge of the flow rate" cannot be squared with the evidence.   Aligned Parties Pre-Trial Statement at 1 (Rec. Doc. 11411).   The Aligned Parties allege that BP committed fraud in not providing certain flow rate estimates to United Command.   *E.g.*, *id.* at 2, 18.   Succeeding on this fraud claim requires the Aligned Parties to prove: (1) a false representation—usually of fact—made by the defendant; (2) knowledge or belief on the part of the defendant that the representation is false, or an insufficient basis to make the representation; (3) an intention to induce the plaintiff to act or refrain from acting in reliance on the information; (4) justifiable reliance by the defendant; and (5) damage to the plaintiff resulting from the reliance.   *See Operaciones Tecnicas Marinas S.A.S. v. Diversified Marine Servs., LLC*, 926 F. Supp. 2d 858, 862 (E.D. La. 2013) (holding that fraudulent intent is an essential element of a claim for fraud, a species of willful misconduct); *Cargill, Inc. v. Degesch Am., Inc.*, 875 F. Supp. 2d 667, 675–76 (E.D. La. 2012) (same).

1925.   Although BP did not provide Unified Command with all of its internal flow rate estimates, BP did provide federal Government officials with a wide range of estimated flow rates, including some far greater than 5,000 barrels per day.  *See* Section II.B.2(i).  Providing this variety of estimates to Unified Command rebuts any claims that BP intended to deceive them. *See Operaciones Tecnicas*, 926 F. Supp. 2d at 862 (holding that fraudulent intent is an essential element of a claim for fraud, a species of willful misconduct); *Cargill*, 875 F. Supp. 2d at 675– 76.

1926.   Moreover, the flow rate estimates provided by BP were not relied on by United Command, and thus did not play a causal role regarding source control.  *See* Section II.B.2(i)9. Federal decisionmakers understood early on that all flow rate estimates would be subject to a great deal of uncertainty.  *See* Section II.B.2(i)(1).  Thus, they assumed a worst-case scenario without relying on BP's flow estimates.  *See* Section II.B.2(i)(5).  As BP's flow rate estimates were not relied on and did not play a causal role in any Government decisions, the Aligned Parties cannot prove their claim.  *See Great Lakes*, 624 F.3d at 213–14; *Mid-South Towing*, 418 F.3d at 534; *Am. River*, 148 F.3d at 450; *see also Operaciones Tecnicas*, 926 F. Supp. 2d at 862; *Cargill*, 875 F. Supp. 2d at 675–76.

1927.  The Aligned Parties' allegation fails for the separate reason that the federal Government had its own group of scientists working on flow rate.  *See* Sections II.B.2(c); II.B.2(i)(3).  To the extent that the Government wanted a more specific flow rate estimate than the worst case, it relied on its own groups of scientists instead of BP.  *See* Sections II.B.2(c); II.B.2(i)(3).  Thus, once again, BP's estimates were not relied upon and did not play a causal role in Unified Command's source control decisions.  *See Great Lakes*, 624 F.3d at 213–14; *Mid-*

*South Towing*, 418 F.3d at 534; *Am. River*, 148 F.3d at 450; *see also Operaciones Tecnicas*, 926 F. Supp. 2d at 862; *Cargill*, 875 F. Supp. 2d at 675–76.

1928.   Because of the lack of intent to deceive and lack of causation, BP did not engage in fraud or other willful misconduct, gross negligence, or negligence.

1929.   For these reasons, BP also did not engage in extreme and outrageous misconduct with the requisite culpable statement of mind, and thus cannot be liable for punitive damages. *See, e.g.*, *Atl. Sounding*, 557 U.S. at 409, 414 n.4; *P&E Boat*, 872 F.2d at 650; *Tullos.*, 750 F.2d at 388.

1930.   Moreover, because the Aligned Parties' allegations are meritless, BP is entitled to the full legal benefit of having its actions approved by the federal Government, including in rebutting claims of negligence, gross negligence, or willful misconduct.

### 2.      BP Was Not Required to Have a Pre-Built Capping Stack.

1931.   BP's source control plan complied with all federal Government requirements and industry standards.  *See* Section IV.A.1.  BP did not need to have a pre-built capping stack for its source control plan to satisfy the duty of ordinary care.  *See* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

1932.  Each blowout is unique and presents its own challenges requiring tailored solutions.  *See Section* II.B.1(c)(3).  Each response requires custom-made equipment, *see id.*, II.B.(g), and thus the standard of care does not require an operator to have a pre-built capping stack.  *See* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

1933.  The MMS approved source control plans without requiring, or expecting, operators to have a pre-built capping stack, *see* Section II.B.1(f)(4), supporting that BP did not breach the standard of care.  *See, e.g.*, Ramirez, 863 P.2d at 176; *Jones*, 549 P.2d at 1390; *Lorenz*, 896 F.2d at 149–50; *Simien*, 566 F.2d at 554; *Sims*, 932 S.W.2d at 565.

1934. No industry participant had a pre-built capping stack nor did industry publications recommend having such a stack. *See* Sections II.B.1(f)(4); II.B.1(g). Thus, the industry standard was not to have a pre-built capping stack. *See, e.g.*, *Baker*, 488 F.2d at 333; *Cia Maritima.*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

1935. Therefore, BP not having a pre-built capping stack does not breach the standard of care and BP was not negligent.

1936. Because BP not having a pre-built capping stack does not breach the standard of care for negligence, it necessarily does not breach the standards of care for gross negligence and willful misconduct.

1937. Furthermore, even to the extent that BP not having a pre-built capping stack could be considered negligent, it would not reach the high threshold required for gross negligence. BP had a source control plan in place, which included using a team of experts to address the specific conditions of a blowout, and thus exercised substantial care. *See, e.g.*, *Milne*, 575 F.3d at 1132; *Kuykendall*, 261 F. App'x at 490; *Computalog U.S.A.*, 1996 WL 720761, at *2–4.

1938. The federal approval of BP's source control plan and absence of any requirement for a pre-built capping stack similarly means that BP was not grossly negligent by not having a pre-built stack. *See Richards*, 21 F.3d at 1059; *Nader*, 626 F.2d at 1035; *Morris*, 833 F. Supp. 2d at 641–43; *see also Satcher*, 52 F.3d at 1317; *Sloman*, 841 F. Supp. at 703 n.8; *Stone Man*, 435 S.E.2d at 206.

1939. The industry standard was not to have a pre-built capping stack, providing another reason why BP could not be grossly negligent. *See AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862–63.

1940.   Similarly, there is no evidence that BP intentionally decided not to have a pre-built capping stack to delay sealing the well.  Instead, the evidence shows that the MMS and industry participants had not considered using a pre-built capping stack.  Moreover, because each blowout is unique a capping stack may not be suitable for many kinds of spills.  Finally, BP's source plan and rapid exploration of source control options establishes that BP used good faith in responding to the spill.  *See, e.g.*, 57A AM. JUR. 2D *Negligence* § 257; *Safeco Ins. Co.*, 551 U.S. at 57.

1941.   For these reasons, BP also did not engage in extreme and outrageous misconduct with the requisite culpable statement of mind, and thus cannot be liable for punitive damages. *See, e.g.*, *Atl. Sounding*, 557 U.S. at 409, 414 n.4; *P&E Boat*, 872 F.2d at 650; *Tullos.*, 750 F.2d at 388.

1942.   Even if BP had a pre-built capping stack, there is no basis to say with a reasonable degree of engineering certainty that the spill could have been stopped earlier.  See Section II.B.2(g)(3).  Thus, the Aligned Parties cannot provide causation, and without causation BP cannot be liable, including for punitive damages.  *See Great Lakes*, 624 F.3d at 213–14; *Mid-South Towing*, 418 F.3d at 534; *Am. River*, 148 F.3d at 450.

### 3.   Top Kill Was a Reasonable Source Control Measure, and Did Not Delay Other Source Control Alternatives.

1943.   BP thoroughly analyzed Top Kill and determined that it had a reasonable chance of sealing the well, while also not adversely affecting subsequent source control options if it did not succeed.  *See* Section II.B.2(d).  BP's actions more than satisfy the duty of ordinary care. *See* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

1944.   The federal Government in directing the response to the spill also supported Top Kill and believed that it could seal the well, *see* Section II.B.2(d)(5), *Ctr. for Biological*

*Diversity.*, 704 F.3d at 418, and thus authorized BP to execute the procedure. *See*, *e.g., Ramirez*, 863 P.2d at 176; *Jones*, 549 P.2d at 1390; *Lorenz,* 896 F.2d at 149–50; *Simien*, 566 F.2d at 554; *Sims*, 932 S.W.2d at 565.

1945.   The other industry participants working with BP agreed that Top Kill was worth executing in an attempt to stop the spill, *see* Section II.B.2(d)(2)a, further reinforcing the reasonableness of BP's action. *See, e.g.*, *Baker*, 488 F.2d at 333; *Cia Maritima.*, 308 F.2d at 123; *Ray Evers*, 625 F.2d at 732.

1946.   Other alternatives such as BOP-on-BOP or a capping stack were not ready when Top Kill was attempted. *See* Section II.B.2(e). Thus, BP could not have been negligent in deciding to proceed with Top Kill before those other options. *See* Rec. Doc. 4285 at 6; *Great Lakes*, 624 F.3d at 211; *Daigle*, 616 F.2d at 827.

1947.   Therefore, BP's decision to proceed with Top Kill satisfied the standard of care and BP was not negligent.

1948.   Because BP's conduct regarding Top Kill satisfies the standard of care for negligence, it necessarily satisfies the standards of care for gross negligence and willful misconduct.

1949.   Furthermore, even to the extent that BP's conduct regarding Top Kill could be considered negligent, it would not reach the high threshold required for gross negligence.  BP exercised significant care in analyzing Top Kill as compared to the risks, benefits, and timing of other source control methods.  Thus, BP could not be considered grossly negligent. *See, e.g.*, *Milne*, 575 F.3d at 1132; *Kuykendall*, 261 F. App'x at 490; *Computalog U.S.A.*, 1996 WL 720761, at *2–4.

459

1950.  The federal Government's supervision of BP and approval of Top Kill provides an independent reason for concluding that BP's source control actions were not grossly negligent.  *See Richards*, 21 F.3d at 1059; *Nader*, 626 F.2d at 1035; *Morris*, 833 F. Supp. 2d at 641–43; *see also Satcher*, 52 F.3d at 1317; *Sloman*, 841 F. Supp. at 703 n.8; *Stone Man*, 435 S.E.2d at 206.

1951.  Likewise, that Top Kill was supported by well control experts and other industry participants rebuts any argument that BP was grossly negligent.  *See AMW Materials*, 584 F.3d at 454; *Richards*, 21 F.3d at 1059; *Drabik*, 997 F.2d at 510; *Maxey*, 665 F.2d at 1376; *Am. Cyanamid*, 498 So. 2d at 862–63.

1952.  Similarly, there is no evidence that BP knew that pursuing Top Kill would delay sealing the well.  Indeed, other source control methods such as BOP-on-BOP or the Capping Stack were not ready when BP attempted Top Kill.  BP's pursuit of Top Kill demonstrates that it was acting in good faith and trying every appropriate means to seal the well and stop the flow of oil.  *See, e.g.*, 57A AM. JUR. 2D *Negligence* § 257; *Safeco Ins. Co.*, 551 U.S. at 57.

1953.  For these reasons, BP also did not engage in extreme and outrageous misconduct with the requisite culpable statement of mind, and thus cannot be liable for punitive damages.  *See, e.g.*, *Atl. Sounding*, 557 U.S. at 409, 414 n.4; *P&E Boat*, 872 F.2d at 650; *Tullos.*, 750 F.2d at 388.

1954.  The Aligned Parties' claims regarding Top Kill fail not only because BP satisfied the standard of care, but also because they cannot show that Top Kill was the cause of any delay in sealing the well.  *See* Section II.B.2(d).  Without causation, BP cannot be liable, including for punitive damages.  *See Great Lakes*, 624 F.3d at 213–14; *Mid-South Towing*, 418 F.3d at 534; *Am. River*, 148 F.3d at 450.

4.    **The BOP-on-BOP Option Was Thoroughly Considered But Not Pursued Because of Reasonable Concerns That It Would Make the Blowout Worse.**

1955.   BP analyzed using a BOP-on-BOP option to seal the well, and had Transocean begin preparing a BOP for this use.  *See* Section II.B.2(e)(1).  Based on information obtained from the well, however, it was ultimately determined that the BOP-on-BOP options presented several serious risks, including breaching the formation and interfering with the relief wells.  *See* Section II.B.2(f)6.  BP weighed these risks against the benefits of BOP-on-BOP and alternative source control methods such as the Capping Stack in deciding not to execute BOP-on-BOP. Such a decision cannot be negligent.  *See Arsement*, 400 F.3d at 253; *Dougherty*, 457 F. Supp. at 869.

1956.   Moreover, in directing the spill response the federal Government independently evaluated BOP-on-BOP and determined it should not proceed, *see* Section II.B.2(f)(3), *Ctr. for Biological Diversity.*, 704 F.3d at 418,  further supporting BP's decision.  *See, e.g., Ramirez*, 863 P.2d at 176; *Jones*, 549 P.2d at 1390; *Lorenz,* 896 F.2d at 149–50; *Simien*, 566 F.2d at 554; *Sims*, 932 S.W.2d at 565.

1957.   Thus, BP's decision not to attempt BOP-on-BOP satisfied the standard of care and BP was not negligent.

1958.   Because BP's conduct regarding BOP-on-BOP satisfies the standard of care for negligence, it necessarily satisfies the standards of care for gross negligence and willful misconduct.

1959.   Furthermore, even to the extent that BP's decision not to execute the BOP-on-BOP option could be considered negligent, it would not reach the high threshold required for gross negligence.  BP exercised significant care in analyzing the risks of BOP-on-BOP compared to alternative source control options and had a substantial basis for concluding that BOP-on-BOP

presented unacceptable risks.  Thus, BP could not be considered grossly negligent.  *See, e.g.*, *Milne*, 575 F.3d at 1132; *Kuykendall*, 261 F. App'x at 490; *Computalog U.S.A.*, 1996 WL 720761, at *2–4.

1960.  The federal Government's supervision of BP and agreement that BOP-on-BOP should not proceed provides an independent reason for concluding that BP's source control actions were not grossly negligent.  *See Richards*, 21 F.3d at 1059; *Nader*, 626 F.2d at 1035; *Morris*, 833 F. Supp. 2d at 641–43; *see also Satcher*, 52 F.3d at 1317; *Sloman*, 841 F. Supp. at 703 n.8; *Stone Man*, 435 S.E.2d at 206.

1961.  Similarly, there is no evidence that BP knew that BOP-on-BOP could safely seal the well but decided not to attempt it for some improper reason.  Indeed, BP had every incentive to control the well as quickly as possible.  BP plainly had at least a good faith belief that BOP-on-BOP presented serious risks, and thus its decision not to pursue that option could not be willful misconduct.  *See, e.g.*, 57A AM. JUR. 2D *Negligence* § 257; *Safeco Ins. Co.*, 551 U.S. at 57.

1962.  For these reasons, BP also did not engage in extreme and outrageous misconduct with the requisite culpable statement of mind, and thus cannot be liable for punitive damages.  *See, e.g.*, *Atl. Sounding*, 557 U.S. at 409, 414 n.4; *P&E Boat*, 872 F.2d at 650; *Tullos.*, 750 F.2d at 388.

1963.  Furthermore, whether the BOP-on-BOP option would have sealed the well is unknown and subject to significant uncertainty.  *See* Section II.B.2(g)(2)a.  Thus, the Aligned Parties have not proven that BP's decision not to use BOP-on-BOP caused the well to flow for longer.  This failure to show causation is fatal to all of the Aligned Parties' claims, including for

punitive damages. *See Great Lakes*, 624 F.3d at 213–14; *Mid-South Towing*, 418 F.3d at 534; *Am. River*, 148 F.3d at 450.

### C. Transocean and Halliburton Have Failed to Establish That Any Act of BP Was a Superceding Cause.

1964. Transocean and Halliburton's arguments that BP's source control conduct was a superseding cause relieving them of some portion of responsibility is not supported by the facts or law. Aligned Parties Pre-Trial Statement at 18–19 (Rec. Doc. 11411).

1965. A superseding cause must be "so extraordinary that a reasonably prudent person could not have foreseen [its] occurrence." *Becker v. Tidewater, Inc.*, 586 F.3d 358, 372 (5th Cir. 2009). The Fifth Circuit has explained the conditions under which a person's acts cannot constitute superseding cause:

> The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
>
> (a) the actor at the time of his negligent conduct should have realized that a third person might so act, *or*
>
> (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, *or*
>
> (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

RESTATEMENT (SECOND) OF TORTS § 447, quoted in *Becker*, 586 F.3d at 372 and *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 652 (5th Cir. 1992) (emphasis added).

1966. To determine whether liable conduct rises to the level of a superseding cause of injury, courts evaluate whether:

> (i) the intervening force brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(ii) its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(iii) the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(iv) the operation of the intervening force is due to a third person's act or to his failure to act;

(v) the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; and

(vi) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*See* RESTATEMENT (SECOND) OF TORTS § 442; *Donaghey*, 974 F.2d at 652 & n.11.

1967.   Transocean and Halliburton's superseding cause argument fails for several reasons.   *First*, neither the misstatements to which it has pleaded guilty, nor the alleged conduct attributed to BP by the Aligned Parties, delayed well capping.   *See* Section II.B.2(i).   Because BP's alleged conduct did not cause any injury, it cannot have been a superseding cause of any injury.   *See, e.g.*, *Exxon Co., USA v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) (superseding cause applies where "the injury was ***actually brought about*** by a later cause of independent origin that was not foreseeable") (internal quotation omitted and emphasis added); *In re Alex C Corp.*, 2011 A.M.C. 157, 174, 2010 WL 4292328 (D. Mass. Nov. 1, 2010) (alleged negligence by ship crew not a superseding cause of oil spill when it had no causal effect leading to the spill).

1968.   *Second*, even if BP's conduct could be considered to have caused a delay in sealing the well, BP's action could not be a superseding cause under RESTATEMENT OF TORTS § 447.   This section is phrased in the disjunctive—only one of the three conditions needs to be satisfied to prevent conduct from being a superseding cause.   Here, each of the three conditions is satisfied.

1969.   Transocean and Halliburton should have realized that their liable conduct (such as Transocean's failures to maintain the BOP, monitor the well, and exercise proper well control and Halliburton designing a defective cement slurry and failing to monitor the well) would give rise to a deepwater blowout.   That blowout would be difficult to control and require BP to undertake a variety of well control alternatives that would take significant time to implement. Similarly, the two contractors should have realized that measuring the flow rate of such a blowout would be uncertain.   *See* RESTATEMENT OF TORTS § 447(a).

1970.   A reasonable actor would not regard the time BP took to control the well as "highly extraordinary."   Every blowout is different, and controlling a deepwater blowout is likely to be difficult.   Thus, there would be nothing highly extraordinary about BP—or any other well owner—taking significant time to develop and execute the appropriate source control alternatives.   Similarly, there would be nothing extraordinary in BP having difficulty in estimating the flow rate of the well during the blowout and generating a wide range of estimates. *See* RESTATEMENT OF TORTS § 447(b).

1971.   Moreover, BP's actions were a normal consequence of the situation created by Transocean and Halliburton.   The misconduct of Transocean and Halliburton caused the blowout.   A normal consequence of a blowout is the well owner analyzing and attempting various well control measures that will take time.   Especially given that BP's actions were approved by the Unified Command and industry-leading well control specialists, *see* Section II.B.2(b), there was nothing "extraordinarily negligent" in how BP sought to control the well. Similarly, generating a wide range of internal estimates, not all of which were provided to Unified Command, cannot be considered "extraordinary negligent."   *See* RESTATEMENT OF TORTS § 447(c).

1972.  *Third*, even if the Court reaches the multi-factor test of the RESTATEMENT (SECOND) OF TORTS § 442, those factors weigh against a finding that BP's acts were a superseding cause of the oil discharge.

1973.  BP prevails on the first factor: the harm allegedly brought about by BP's acts (*i.e.*, discharged oil) is the same harm that resulted from Transocean's and Halliburton's own negligent acts, as set forth at length in BP's Phase 1 submissions.  Because BP's alleged misconduct caused a harm that is identical in kind to the harm caused by Transocean and Halliburton, BP's conduct could not have been a superseding cause as a matter of law.  *See Simmons v. United States*, No. 12-528, 2013 WL 2902824, at *7 (W.D. Tex. June 13, 2013); *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 772 F. Supp. 2d 519, 544–45 (S.D.N.Y. 2011); *Winschel v. Brown*, 171 P.3d 142, 149 (Alaska 2007).[11]  Indeed, Transocean and Halliburton effectively admit that the harm is identical in kind, as they seek to use the superseding cause doctrine only to reduce their liability rather than (as is typical in superseding cause cases) to be completely relieved of liability.  Aligned Parties Pre-Trial Statement at 18–19 (Rec. Doc. 11411).

1974.  The second factor similarly weighs in favor of BP: in light of Halliburton's and Transocean's failures aboard the *Deepwater Horizon*, the discharge of oil can hardly be considered an "extraordinary" outcome, rather than a foreseeable outcome.  *See* RESTATEMENT (SECOND) OF TORTS § 442(b).

---

[11]     In opposition to BP's Rule 52(c) memorandum, Transocean and Halliburton protested that "nothing about the blowout caused BP to lie to decision-makers," Rec. Doc. 11603 at 13.  But that is not the right question.  The right question is whether Transocean and Halliburton's conduct in causing the blowout caused the same kind of harm as BP's alleged misconduct.  Because it did, BP's misconduct—even if proven—is not a superseding cause as a matter of law.

1975.   Under the third factor, the intervening force did not operate independently of Transocean and Halliburton's original negligence.   Rather, Transocean and Halliburton assert that BP's conduct interfered with efforts to mitigate the consequences of their own negligence. As the Restatement explains, "[w]here the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause."   RESTATEMENT (SECOND) OF TORTS § 442A.

1976.   The fifth factor weighs heavily in BP's favor because BP's conduct was not "wrongful toward" Transocean and Halliburton and does not "subject [BP] to liability" to them. Specifically, Transocean and Halliburton do not have a viable "fraud" claim against BP, as they do not claim that the alleged fraudulent statements or omissions were made to them or that they relied on them in any way.   *See Tubos de Acero de Mexico, S.A. v. Am. Int'l. Inv. Corp., Inc.*, 292 F.3d 471, 479 (5th Cir. 2002) ("Two elements essential to establishing fraud are (1) an intent to defraud or to gain an unfair disadvantage and (2) a resulting loss or damage."); *In re Bandi*, 683 F.3d 671, 675 (5th Cir. 2012) (describing the "common-law standard of justifiable reliance for actual fraud"); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) (no right of action for fraud on governmental decision maker leading to the Government's approval of actions leading to alleged harms).   These factors weigh against categorizing BP's alleged misconduct as a superseding cause of injury.

1977.   *Fourth*, the Court's February 2012 ruling with respect to divisibility precludes Transocean and Halliburton from arguing that they are liable for some, but not all, of the spill. The Court previously rejected BP's argument that the harm from the spill is divisible and instead

held that "liability under OPA is joint and several when there is more than one responsible party."[12]  Rec. Doc. 5809 at 12.

1978.  In light of this ruling, neither Transocean nor Halliburton may contend that they caused some, but not all, of the discharge.  Yet that is precisely the argument Transocean and Halliburton attempt to make.  They claim that damages from the spill should be apportioned according to their allegations about when the well should have been sealed, Aligned Parties Pre-Trial Statement at 18–19 (Rec. Doc. 11411), even though this Court already has ruled that such damages are not divisible.

1979.  Moreover, Transocean has already admitted its responsibility for the blowout. *See United States v. Transocean Deepwater Inc.*, No. 13-cr-001, Rec. Doc. 3-2 (Allocution) ¶ 15 (E.D. La.) (Transocean admits to being a "proximate cause of the blowout and the discharge of certain quantities of oil and natural gas from the Macondo well into the Gulf of Mexico").  Furthermore, for the reasons described in BP's Proposed Findings of Facts and Conclusions of Law for Phase 1, Halliburton is similarly liable.  As Transocean and Halliburton are liable for at least some of the spill, under this Court's divisibility ruling they are liable for all of the spill.

1980.  Despite the Court's clear guidance, Transocean and Halliburton contend that the Court's February 2012 summary judgment ruling "has nothing to do with a superseding cause defense."  Rec. Doc. 11603 at 14.  That misses the mark.  The Court's February 2012 ruling did not address superseding cause because the motions did not raise this issue.  The ruling did, however, address and reject divisibility, which is a necessary prerequisite for contending that

---

[12] BP reserves its right to contend in this Court, in a future appeal, or in other appropriate forums that a divisibility defense is available to BP.  But so long as the Court's February 2012 ruling remains law of the case, Transocean and Halliburton should not be able to invoke divisibility principles while that defense is foreclosed to BP.

Transocean or Halliburton could divide the spill into components for which they are and are not responsible.  Nor is it relevant, as Transocean and Halliburton allege, that "the superseding cause defense is well established in maritime law," *see id.*, a point with which BP agrees.  Because the divisibility defense is unavailable to Transocean and Halliburton, they are precluded from arguing that they are liable for some, but not all, of the spill.

## V.   BP'S AND ANADARKO'S PROPOSED CONCLUSIONS OF LAW AS TO QUANTIFICATION.[13]

1981.   The United States has brought a claim against BPXP, Anadarko, and Anadarko E&P for fines under the Clean Water Act ("CWA").   Civ. A. No. 2:10-cv-04536, Rec. Doc. 1. The CWA provides that "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged."[14]   33 U.S.C. § 1321(b)(7)(A).

1982.   The Court has previously held, on summary judgment, that BPXP[15] and Anadarko are liable for civil penalties under the CWA as owners of the Macondo well.   *See* Rec. Doc. 5809 at 23–24.   Both BPXP and Anadarko have appealed this ruling to the United States Court of Appeals for the Fifth Circuit and that appeal remains pending.   *See In re Deepwater Horizon*, No. 12-30883 (5th Cir.).   BPXP and Anadarko offer the following discussion without prejudice to that appeal.

1983.   The purpose of the Quantification portion of the Phase 2 trial is to determine the "barrel[s] of oil" spilled for purposes of 33 U.S.C. § 1321(b)(7)(A).

---

[13] BP p.l.c. and BPAPC do not join in the Proposed Findings of Fact as to Quantification as neither is a defendant in the Quantification proceedings.

[14]   Where the violation "was the result of gross negligence or willful misconduct" of such person, the maximum per-barrel fine is tripled.   *See* 33 U.S.C. § 1321(b)(7)(D).   BPXP has explained why it was not grossly negligent and did not engage in willful misconduct in its post-Phase I briefing and proposed findings and conclusions.   *See* Rec. Docs. 10466, 10467, 10734.

[15]   BPAP was not sued by the federal government under the CWA, Civ. A. No. 2:10-cv-04536, Rec. Doc. 1, and cannot be liable under the CWA as it was not an "owner, operator, or person in charge of any vessel, onshore facility, or offshore facility."   33 U.S.C. § 1321(b)(7)(A).   *See* § I.A.1.   The federal government sued BPXP as the sole BP entity in its case.   Civ. A. No. 2:10-cv-04536, Rec. Doc. 1.   Thus, all references in this section to "BP" refer only to BPXP unless otherwise indicated.

1984.   An initial question is who bears the burden of proof on this issue.  The "ordinary default rule [is] that plaintiffs bear the risk of failing to prove their claims" and courts "have usually assumed without comment that plaintiffs bear the burden of persuasion regarding the essential aspects of their claims."  *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005).  Courts have regularly applied this fundamental principle to claims under the CWA, including those brought by the federal Government.  *See United States v. Cundiff*, 555 F.3d 200, 213 (6th Cir. 2009) (holding that federal Government must prove a series of elements to establish a CWA violation); *Coeur D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094, 1102 (D. Idaho 2003) (concluding that the United States as plaintiff bore the burden of proving the elements of a CWA claim); *Waterkeeper Alliance, Inc. v. Hudson*, No. WMN-10-487, 2012 WL 6651930, at *16 (D. Md. Dec. 20, 2012) (holding that that in a citizens suit under the CWA the plaintiff bore the burden of proof); *Colorado Trust for Protection & Benefits v. Souder, Miller & Associates, Inc.*, 870 F. Supp. 2d 1173, 1176 (D. Colo. 2012) (stating that private plaintiffs bore burden of proving that defendant violated the CWA).  As the number of barrels of oil spilled into the Gulf of Mexico is an essential aspect of the Government's claim, the Government as plaintiff bears the burden of proving the number of barrels.

1985.   As a general legal principle, damages must be proven to a "reasonable certainty." *Transcon. Gas Pipe Line Corp. v. Societe D'Exploitation du Solitaire SA*, 299 Fed. App'x 347, 350 (5th Cir. 2008); *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1155 (5th Cir. 1990). That same standard applies to the United States' allegation about the number of barrel of oil spilled, which is a key determinant in the amount of the civil penalty.

1986.  As the evidence from the quantification phase was primarily from expert witnesses, the Court should decide amount of oil spilled into the Gulf based on "which experts

are more persuasive, in terms of the content of their testimony, the basis for their conclusions, the methodologies they used, the acceptance of their methodologies by the scientific community, the tests they performed, and their general credibility (credentials, thoroughness, demeanor, bias towards plaintiffs or defendants …).”  *Bartel v. John Crane, Inc.*, 316 F. Supp. 2d 603, 604 (N.D. Ohio 2004).  The *Daubert* factors used to determine the admissibility of expert testimony, such as whether the opinion is based on sufficient facts or data, also apply to determining the weight given to the evidence.  *See In re Iridium Operating LLC*, 373 B.R. 283, 349–50 (Bankr. S.D.N.Y. 2007) (“The *Daubert* factors apply not only to the admissibility of evidence, but also apply to weight and credibility determinations.”).

1987.  Based on the evidence presented, BP's and Anadarko's experts were more persuasive than those of the United States.[16]  The United States has not carried its burden of proving to a reasonable certainty that approximately 5.0 million stock tank barrels (MMstb)[17] were released from the reservoir.  Instead, consistent with the testimony of BP's experts, 3.26 MMstb of oil were released from the reservoir.  As 810,000 barrels were collected (Rec. Doc. 8620), 2.45 MMstb of oil were spilled into the Gulf of Mexico.

**A.     3.26 MMstb is the Best Estimate of the Oil Released from the Reservoir.**

**1.     The Opinion and Analysis of BP's Expert Dr. Blunt is the Most Persuasive and Credible.**

1988.  Based on the criteria for determining the persuasiveness and credibility of expert witnesses, Dr. Blunt is the most persuasive and convincing for several reasons.

---

[16] Before Phase 2 of the trial, BP filed various motions *in limine* as well as motions under Federal Rule of Evidence 702 to exclude testimony of various experts.  *E.g.*, Rec. Docs. 11061, 11064, 11114.  BP preserves and (to the extent they were denied) re-urges its arguments in these motions.

[17] Expressing liquid oil volumes in units of stock tank barrels is industry standard and thus the appropriate measure under all methodologies used by the experts.  *See* § III.F.

1989.   Dr. Blunt is one of the world's leading reservoir engineers and thus highly qualified. *See* Section III.C.  *See In re Corrugated Container Antitrust Litigation*, 659 F.2d 1322, 1326 (5th Cir. 1981) (affirming district court's reliance on expert who was "emininently qualified" over others who lack the expert's "familiarity with the industry"); *In re Dow Corning Corp.*, 280 F.3d 648, 662 (6th Cir. 2002) (affirming bankruptcy court's reliance on experienced and "widely recognized" experts over less qualified experts); *United States v. NCR Corp.*, No. 10–C–910, 2013 WL 1858597, at *18 (E.D. Wis. May 1, 2013) (accepting testimony of more experienced expert over one with lesser credentials).

1990.   Dr. Blunt's material balance methodology is most suitable for determining the amount of oil spilled into the Gulf of Mexico given the limitations of flow rate methodologies. *See* Sections III.C–III.D.  *See Corrugated Container*, 659 F.2d at 1326 (affirming district court's reliance on expert who used more appropriate methodology over opposing experts); *Goodpaster v. City of Indianapolis*, 2013 WL 6170623, at *3 (7th Cir. Nov. 25, 2013) (affirming district court's reliance on expert who used appropriate methodology and "provided ample explanation for his conclusions"); *Easly v. Waterfront Shipping Co., Ltd.*, 2012 WL 812354, at *6 & n.4 (W.D. Wash. Mar. 9, 2012) (crediting defendant's expert over plaintiff's expert where former's methodology was more "in accordance with industry valuation practices"); *In re 210 Ludlow Street Corp.*, 455 B.R. 443, 449 (Bankr. W.D. Pa. 2011) (relying on expert who applied more typical and usual methodology given the circumstances, as opposed to expert relying on less common methodology).

1991.   Dr. Blunt used the proper data and variables in the material balance methodology. *See* Section III.C.  *Goodpaster*, 2013 WL 6170623, at *3; *Burns v. Branstetter*, No. 3:11–CV–1450–BF, 2012 WL 6141481, at *4 (N.D. Tex. Dec. 11, 2012) (accepting testimony of expert

that "was credible, well-supported, and satisfied all elements of admissibility under *Daubert* and its progeny"); *In re Tribune Co.*, 464 B.R. 126, 150–51 (Bankr. D. Del. 2011) (accepting expert analysis based on proper assumptions and methodologies); *Maritimes & Northeast Pipeline, L.L.C. v. 0.714 Acres of Land, More or Less, in Danvers, Mass.*, No. 02-11054-GAO, 2007 WL 2461054, at *11 (D. Mass. Aug. 27, 2007) (accepting testimony of expert where "his assumptions, methodology, and conclusions were sound and in accordance with applicable legal and professional standards").

1992.  Sufficient data was available to use a material balance methodology to determine the oil spilled.  *See* Section III.C.  *See, e.g.*, *United States v. Wen Chyu Liu*, 716 F.3d 159, 167 (5th Cir. 2013) (explaining that one of *Daubert* factors is whether expert's opinion is based on sufficient facts or data, which is thus also relevant to the weight to be given an expert's testimony); *Roman v. Western Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (same).

1993.  Dr. Blunt used accurate measures for variables, including connectivity, permeability, compressibility, and reservoir pressure.  *See* Sections III.C.1–3, III.D.  *See Goodpaster*, 2013 WL 6170623, at *3; *Burns*, 2012 WL 6141481, at *4; *Tribune*, 464 B.R. at 150–51; *Maritime*, 2007 WL 2461054, at *11.

1994.  Dr. Blunt cross-checked his data and variables against one another to ensure consistency.  *See* Section III.C.3(c).  *Goodpaster*, 2013 WL 6170623, at *3; *Burns*, 2012 WL 6141481, at *4; *Tribune*, 464 B.R. at 150–51; *Maritimes*, 2007 WL 2461054, at *11.

1995.  Based on Dr. Blunt's testimony in court, he is a credible witness.  Therefore, his estimate that 3.26 MMstb of oil were released into the Gulf of Mexico is found to be the most accurate.

##### 2.     Dr. Gringarten's Discharge Estimate Based On Flow Rates Supports Dr. Blunt's Material Balance Analysis.

1996.   Based on what data is available and absent, using the material balance methodology rather than flow rates is the most reliable way to measure the oil released from the reservoir.  *See* Sections III.B–III.D.  *See Corrugated Container*, 659 F.2d at 1326; *Goodpaster*, 2013 WL 6170623, at *3; *Easly*, 2012 WL 812354, at *6 & n.4; *210 Ludlow*, 455 B.R. at 449.

1997.   Nevertheless, of the experts who used a flow rate methodology, Dr. Gringarten's yields the most accurate results.  Based on the criteria for determining the persuasiveness and credibility of expert witnesses, Dr. Gringarten was persuasive and convincing for several reasons.

1998.   Dr. Gringarten used deconvolution, a technique for correcting inaccurate flow rates or estimating missing flow rates that addresses the absence of data needed to estimate a flow rate.  *See* Section III.E.  *See Corrugated Container*, 659 F.2d at 1326; *Goodpaster*, 2013 WL 6170623, at *3; *Easly*, 2012 WL 812354, at *6 & n.4; *210 Ludlow*, 455 B.R. at 449.

1999.   Dr. Gringarten is a highly qualified expert, and one of the pioneers in using deconvolution.  *See* Sections III.D.3, III.E.2.  *See Corrugated Container*, 659 F.2d at 1326; *Dow Corning* 280 F.3d at 662; *NCR Corp.*, 2013 WL 1858597, at *18.

2000.   By using deconvolution, Dr. Gringarten did not need to calculate parameters essential for other flow rate methodologies, such as erosion.  *See* Section III.E.6.  *See Corrugated Container*, 659 F.2d at 1326; *Goodpaster*, 2013 WL 6170623, at *3; *Easly*, 2012 WL 812354, at *6 & n.4; *210 Ludlow*, 455 B.R. at 449.

2001.   Dr. Gringarten used accurate measures for variables, including reservoir pressure and permeability.  *See* Sections III.E.3–5.  *See Goodpaster*, 2013 WL 6170623, at *3; *Burns v.*

*Branstetter*, 2012 WL 6141481, at *4; *Tribune*, 464 B.R. at 150–51; *Maritimes,* 2007 WL 2461054, at *11.

2002.   Dr. Gringarten's estimates also are consistent with observations of the well, such as the presence of slug flow.  *See* Sections III.B.5, III.E.1.  *See, e.g.*, *NCR Corp.*, 2013 WL 1858597, at *20, 33 (finding that expert analysis based on observations credibly rebutted opposing expert's claim of high discharges of pollutants in prior periods).

2003.   Based on Dr. Gringarten's testimony in court, he is a credible witness.

2004.   Dr. Gringarten estimates a cumulative discharge of 2.4 to 3.0 MMstb.  *See* Section III.E.1.  This amount is consistent with, and in fact lower than, Dr. Blunt's estimate, and thus supports Dr. Blunt's result.

### B.      The Government's Experts are Not Persuasive.

2005.   Under the criteria for determining the persuasiveness and credibility of expert witnesses, the experts presented by the Government were not as persuasive as Dr. Blunt or Dr. Gringarten.

2006.   The Government's experts are not as well-qualified as BP's in determining the amount of oil released from the reservoir.  *See* Section III.B.  *See Corrugated Container*, 659 F.2d at 1326; *Dow Corning* 280 F.3d at 662; *NCR Corp.*, 2013 WL 1858597, at *18.

2007.   Drs. Dykhuizen, Griffiths, and Pooladi-Darvish attempt to use flow rate methodologies, which are unreliable here because essential information is absent.  *See* Sections III.B.1–4.  Dr. Griffiths's methodology is unreliable for the additional reason that it is not generally accepted.  *See* Section III.B.3(f)(1).  *See Corrugated Container*, 659 F.2d at 1326; *Goodpaster*, 2013 WL 6170623, at *3; *Easly*, 2012 WL 812354, at *6 & n.4; *210 Ludlow*, 455 B.R. at 449.

2008.   In fact, the opinions of Drs. Dykhuizen, Griffiths, and Pooladi-Darvish are based on limited and inadequate data that make their estimates unreliable.  *See* Sections III.B.1–4.  *See*, *e.g.*, *Wen Chyu Liu*, 716 F.3d at 167; *Roman*, 691 F.3d at 692; *NCR*, 2013 WL 1858597, at *22–23 (finding that where "calibration of the entire model was not possible because there was not sufficient data," the court was "satisfied that there are substantial uncertainties in the calibration process that lead to a lack of confidence in the entire modeling process"); *In re 3dfx Interactive, Inc.*, 389 B.R. 842, 885 (Bankr. N.D. Cal. 2008) (rejecting testimony of expert that did not rely on sufficient facts or data).

2009.   The analyses of the Government's experts produce wide error ranges, with the bottom of those ranges often being similar to the amount of oil calculated by Dr. Blunt.  *See* Sections III.B.3(e)(3), III.B.3(f)(4)–(6).   These wide error ranges prevent the Government's estimates from being persuasive or helpful to the trier fact.  *See, e.g.*, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993) (explaining that "the court ordinarily should consider the known or potential rate of error" in evaluating expert testimony); *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (same).   Moreover, the wide error ranges prevent the Government's estimate from being reasonably certain as required for a determination of the amount of oil spilled.  *Transcon. Gas*, 299 Fed. App'x at 350; *Orduna*, 913 F.2d at 1155.

2010.   The Government experts also ignore variables that are critical to their methodologies.   In particular, all of the models ignore, or make unrealistic assumptions regarding, erosion and other changes in the wellbore and BOP.  *See* Section III.B.4(a).   Each model also suffers from other errors, such as Dr. Kelkar's material balance model failing to take into account changing density and wellbore cooling.  *See* Section III.C.3.  *See Freeland v. AT & T Corp.*, 238 F.R.D. 130, 149 (S.D.N.Y.2006) (holding that where two significant variables were

omitted from expert's regression analysis, and plaintiffs failed to provide appropriate explanation for omission, plaintiffs failed to carry their burden of proof that the incomplete analysis was sufficiently reliable and helpful to justify admission into evidence); *Bonton v. City of New York*, 03 Civ. 2833 (SAS), 2004 WL 2453603, at *3–4 (S.D.N.Y. Nov. 3, 2004) (noting that courts regularly exclude expert analyses that fail to control for relevant variables or other potential causes of results); *In re Intel Corp. Microprocessor Antitrust Litig.*, No. 05-1717, 2010 WL 8591815, at *18–19 (D. Del. July 28, 2010) (Special Master's Report) (holding that an expert's failure to control or otherwise account for relevant variables rendered his results unreliable).

2011.  Similarly, the Government experts' results depend on assumptions that are unfounded or contrary to the evidence.  For example, Dr. Pooladi-Darvish uses values of permeability much higher than the value established by the record.  *See* Section III.D.  Dr. Dykhuizen assumes that the flow rate was decreasing over time.  *See* Section III.B.3(e).  Dr. Griffiths assumes that nothing in the reservoir or well changed that would affect the flow rate. *See* Section III.B.3(f).  Dr. Kelkar incorrectly assumes 100% connectivity and used pore volume compressibility of 12 microsips, neither of which has any foundation in the facts regarding the Macondo well.  *See* Sections III.C.1–2.  *See Payne v. Comm'r*, 224 F.3d 415, 421–22 (5th Cir. 2000) (rejecting expert analysis that relied on incorrect factual assumptions); *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (expert testimony properly excluded where it is not based upon facts in the record but on altered facts and speculation designed to bolster party's position); *Goulas v. LaGreca*, No. 12–898, 2013 WL 2477030, at *10 (E.D. La. June 7, 2013) (disregarding opinion of expert that was based on factually incorrect assumptions); *Crum v. United States*, No. Civ. A. 99-2178, 2000 WL 943253, at *2 (E.D. La. June 6, 2000) (disregarding opinion of expert that was based on factually incorrect or unjustified assumptions);

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1093 (C.D. Cal. 2012) (rejecting expert testimony based on unfounded or speculative assumptions).

2012.  The Government experts' assumptions are inconsistent with observations of the well, including erosion of the riser and BOP, erosion of the cement, the impacts of source control efforts, and slug flow.  *See* Section III.B.4.  *See NCR*, 2013 WL 1858597, at *20, 33 (finding that expert analysis based on observations credibly rebutted opposing expert's claim of high discharges of pollutants in prior periods); *Warfle v. Secretary of Health and Human Services*, No. 05-1399V, 2010 WL 2671504, at *27–28 (Fed. Cl. 2010) (rejecting expert opinions that were inconsistent with physical observations); *Cedar Petrochems. Inc. v. Dongbu Hannong Chem. Co.,* No. 06 Civ. 03972(AJN), 2013 WL 5718447, at *11 (S.D.N.Y. Oct. 21, 2013) (rejecting expert testimony that "was not persuasive because it could not account for the results of" after-the-fact testing).

2013.  Correcting the errors in the Government experts' opinions significantly reduces their estimates of oil released from the reservoir, often to amounts consistent with Dr. Blunt's.  *See* Sections III.B.3(e)(3), III.B.3(f)(4)–(6).  This further reinforces the persuasiveness and reliability of Dr. Blunt's analysis.  *See Corrugated Container*, 659 F.2d at 1326 (affirming district court's who accepted results of defendant's expert where analyses of opposing experts contained errors that when corrected led to estimates that were not inconsistent with defendant's expert).

2014.  The Government's experts failed to perform consistency checks to determine if their analyses were consistent with data about the well, further undercutting the persuasiveness and reliability of their opinions.  *See* Sections III.C.3(c), III.D.  *See Runion v. United States*, No. 2:11–cv–00525, 2013 WL 4881727, at *4 (S.D. W. Va. Sept. 12, 2013) ("The court is not

required to accept as true, and may afford proper weight to, expert testimony that is internally inconsistent or contradictory."); *see also Payne*, 224 F.3d at 421–22; *Guillory*, 95 F.3d at 1331; *Goulas*, 2013 WL 2477030, at *10; *Crum*, 2000 WL 943253, at *2; *Commerce Planet*, 878 F. Supp. 2d at 1093.

2015.   The estimates of the Government experts also lack credibility because they appear to be designed to result in a spill of approximately 5 MMstb, a number which was originally determined in a rushed fashion under heavy political influence.  *See* Sections III.B.3(c)–(d).  *See Goodpaster*, 2013 WL 6170623, at *3–4 (rejecting expert report that was produced for political purposes and had a political tone); *In re Breakwater Shores Partners, L.P.*, No. 10-61254, 2012 WL 1155773, at *8 (Bankr. E.D. Tex. Apr. 5, 2012) (rejecting expert opinion based on "minimalist" analysis as a result of a "challenging workload" and "insufficient resources"); *see also Watkins v. Telsmith, Inc.*, 121 F.3d 984, 990 (5th Cir. 1997) ("Rule 702 demands that experts 'adhere to the same standards of intellectual rigor that are demanded in their professional work.'"); *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996) (same); *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003) (same).

2016.   Based on their testimony in court, the Government experts are less credible than BP's and Anadarko's experts.  *Cedar Petrochems.*, No. 06 Civ. 03972(AJN), 2013 WL 5718447, at *11–12 (finding that experts were not credible based on a variety of factors).

2017.   For these reasons, the Government has not carried its burden of proving to a reasonable certainty that 5 MMstb of oil was released.

### C.   Single-Stage Flash is the Most Appropriate Method to Convert Flow to Stock Tank Conditions.

2018.   Single-stage flash process is the industry standard and not subject to the uncertainties of other methods.  *See* Section III.F.  *See Corrugated Container*, 659 F.2d at 1326;

*Goodpaster*, 2013 WL 6170623, at *3; *Easly*, 2012 WL 812354, at *6 & n.4; *210 Ludlow*, 455 B.R. at 449.

2019.  Dr. Whitson developed an oceanic separator model that represents the separation of oil and gas that would occur naturally.  *See* Section III.F.2.  Dr. Whitson's analysis is persuasive for reasons including his qualification and that his model takes into account all appropriate variables and data.  *See* Sections III.F.2, III.F.4–5.  This ocean separator model yielded results essentially the same as the single-stage flash process, *see* Section III.F.2, reinforcing that single stage flash is the appropriate methodology for converting the flow rate to stock tank barrels.  *See Corrugated Container*, 659 F.2d at 1326; *Goodpaster*, 2013 WL 6170623, at *3; *Easly*, 2012 WL 812354, at *6 & n.4; *210 Ludlow*, 455 B.R. at 449.

2020.  Therefore, single-stage flash is the appropriate method for converting flow to stock tank conditions.

## VI.   SUMMARY OF CONCLUSIONS AS TO SOURCE CONTROL AND QUANTIFICATION.

2021.   In sum, the following conclusions apply to all claims designated as part of the Phase 2 Trial under Second Amended PTO #41, Rec. Doc. 6592, including the claims of the United States; unsettled and still pending day-of-incident personal injury claims in Bundle A; unsettled and still pending claims of private plaintiffs under the B1 and B3 Bundles; claims of local government plaintiffs under Bundle C; and claims of the States of Louisiana and Alabama. *See generally* PTO #11 (Rec. Doc. 569) (describing Bundles).

2022.   BP was not negligent in any part of its planning or conduct regarding source control.

2023.   BP was not grossly negligent, did not act with willful misconduct, and its conduct was not wanton, willful, or outrageous with regard to source control.   Therefore, BP is not liable for punitive damages under maritime law based on its source control activities.

2024.   BP's conduct regarding source control was not a superseding cause and thus does not reduce the liability of Transocean or Halliburton.

2025.   The federal Government has failed to prove that more than 2.45 MMstb of oil were spilled for purposes of calculating penalties under the CWA.

December 20, 2013

Warren Anthony Fitch
Ky E. Kirby
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
Telephone: (202) 373-6000

James J. Dragna
BINGHAM MCCUTCHEN LLP
355 S. Grand Avenue, Suite 4400
Los Angeles, CA 90071
Telephone: (213) 680-6400

Deborah D. Kuchler, T.A. (Bar No. 17013)
KUCHLER POLK SCHELL
WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, LA 70112
Telephone: (504) 592-0691

*Attorneys for Anadarko Petroleum
Corporation*

Respectfully submitted,

*/s/ Don K. Haycraft*
Don K. Haycraft (Bar No. 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Barry E. Fields, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
Paul D. Collier
Bridget K. O'Connor
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

Timothy A. Duffy, P.C.
R. Christopher Heck
Vanessa Barsanti
Andrew H. Schrag
Michael A. Fragoso
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL   60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

*Attorneys for BP Exploration & Production
Inc., BP America Production Co., and BP
p.l.c.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of December 2013.

*/s/ Don K. Haycraft*
Don K. Haycraft