UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | : | MDL NO. 2179 |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | SECTION: J |
| | : | |
| This Document Relates to: | : | JUDGE BARBIER |
| | : | |
| *Civ. No.* 10-4536 | : | MAG. JUDGE SHUSHAN |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

UNITED STATES' PROPOSED CONCLUSIONS OF LAW
FOR THE QUANTIFICATION SEGMENT OF THE PHASE TWO TRIAL

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **INTRODUCTION** | | 3 |
| **I.** | **Relevant Statutory Definitions** | 3 |
| **II.** | **Additional Bases For BP's CWA Liability** | 4 |
| **III.** | **The Total Amount Of Oil Discharged Must Include All Oil And Be Based On Multi-Stage Separation** | 8 |
| a. | The United States Has Already Taken Two Legally Conservative Approaches to Calculating the Volume of Oil Spilled from the Macondo Well. | 8 |
| b. | The Number of Barrels Discharged Cannot Be Discounted to Account for Dissolved Oil or Based on Single-Stage Separation. | 9 |
| **IV.** | **BP May Not Benefit From Any Uncertainty In The Data Regarding Flow Rate** | 11 |
| **V.** | **Statutory Maximum Penalty for BP and Anadarko** | 12 |
| **CONCLUSION** | | 13 |

## INTRODUCTION

As set forth in the United States' Proposed Findings of Fact for the Quantification Segment of the Phase Two Trial, BP's own statements and analyses during the response, the analyses by the United States during the response, and the reliable analyses of the total flow after the response all demonstrate that BP/Anadarko's well spewed approximately 5 million stock tank barrels of oil, only 810,000 of which were captured. The conclusions of law supporting a ruling on these facts are set forth below and are being submitted pursuant to the Phase II Timeline, Rec. Doc. No. 11180.[1]

### I. Relevant Statutory Definitions

    1.    Section 311(b)(3) of the CWA prohibits "[t]he discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or (ii) in connection with activities under the Outer Continental Shelf Lands Act . . . ."

    2.    Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), mandates that "[a]ny person who is the owner, operator or person in charge of any vessel . . . or offshore facility from which oil or a hazardous substance is discharged . . . shall be subject to a civil penalty . . . per barrel of oil or unit of reportable quantity of hazardous substance discharged."

    3.    The Gulf of Mexico includes waters that comprise navigable waters of the United States and the contiguous zone. 33 U.S.C. § 1362(7)-(9); 40 C.F.R. § 110.1.

---

[1] To the extent that BP contends or this Court finds that any of these Proposed Findings of Fact constitute conclusions of law, the United States requests they be treated as conclusions of law. Similarly, to the extent any of the United States' Proposed Conclusions of Law constituted factual findings, the United States requests they be deemed as factual findings.

4. "Oil" means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil. 33 U.S.C. § 1321(a)(1).

5. "Discharge" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping. 33 U.S.C. § 1321(a)(2).

6. Pursuant to 33 U.S.C. § 1321(b)(7) and 40 C.F.R. § 19.4, civil penalties are assessed per barrel of oil discharged.

7. "Barrel" means 42 United States gallons at 60 degrees Fahrenheit. 33 U.S.C. § 1321(a)(13).

## II. Additional Bases For BP's CWA Liability

8. This Court already held BP liable under the CWA as "owner" of the Macondo Well on Summary Judgment. *SJ Order*, Rec. Doc. 5809 (appeal pending, No. 12-30883). Now that all of the evidence of BP's conduct leading up to the blowout and in attempting to stop the oil spill is in, this Court also finds that BP was both an "operator" and a "person in charge" of the Macondo Well and the *Deepwater Horizon*, including the BOP and other parts of the vessel, for purposes of liability under the CWA.

9. In its *SJ Order*, this Court identified the applicable legal definition of "operator", *SJ Order* at 23, holding that an "operator" must "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id*. (quoting *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998)); *see also Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 381-383 (3d Cir. 2013) (finding

4

defendant liable as "operator" for simply managing remedial activities) (under CERCLA); BP's Phase One Conclusions of Law, Doc. No. 10467, ¶ 2713 ("operator must manage, direct, or conduct operations specifically related to pollution").

10. A "person in charge" under the CWA is a person who has the capacity to make timely discovery of oil discharges, the power to direct the activities of persons who control the mechanisms causing the pollution, and the capacity to prevent and abate damage. *United States v. Mobil Oil Corp.*, 464 F.2d 1124, 1127 (5th Cir. 1972); *see also Beartooth Alliance v. Crown Butte Mines*, 904 F. Supp. 1168, 1175 (D. Mont. 1995) (interpreting Section 311) (same test); *Apex Oil Co. v. United States*, 530 F.2d 1291 (8th Cir. 1976) (Section 311); *United States v. Carr*, 880 F.2d 1550 (2d Cir. 1989) (under CERCLA); *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693 (W.D. Ky. 2003) (under CERCLA).

11. Applying the legal definition of operator, and based on the Findings of Fact, evidence at the Phase One trial showed that BP was an "operator" of the Macondo Well, and also an "operator" of the *Deepwater Horizon*, in that BP managed, directed, and conducted operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *See, e.g.,* Proposed [Phase One] Findings of Fact by the United States ("Phase One FoF"), Doc. No. 10460-1, Nos. 13-20, 54, 64, 72-76, 183, 186, 215, 217, 268, 279-280, 288, 307-314, 352-355.

12. BP conceded its status as "operator" through, *inter alia*, the binding Phase One trial testimony of Lamar McKay, chairman and president of BP America in April 2010 and

Executive Vice President of BP PLC at the time of his Phase One trial testimony. *See* FoF No. 599.

13. Applying the legal definition of person in charge, and based on the Findings of Fact, evidence at the Phase One trial showed that BP was a "person in charge" of the Macondo Well, and also a "person in charge" of the *Deepwater Horizon*, in that BP's Well Site Leaders had ultimate authority, and exercised that authority, as to decisions on the rig related to drilling and well operations. *See, e.g.,* Phase One FoF Nos. 13-20, 54, 64, 72-76, 183, 186, 215, 217, 268, 279-280, 288, 307-314.

14. As with its status as operator, BP conceded its status as a "person in charge" in Phase One testimony. *See, e.g.,* Phase One FoF No. 14 (BP Well Site Leader Murry Sepulvado testified that "BP has the final say" in approving the negative pressure test); FoF No. 600 (BP Expert Dr. Beck discussing what it means to be the operator and "the boss" of drilling operations).

15. Evidence at the Phase Two trial showed that BP was both an "operator" of the Macondo Well and the *Deepwater Horizon*, specifically including the BOP, LMRP, and riser, in that BP managed, directed and conducted operations related to controlling oil flow (i.e., pollution) including opening and closing rams in the BOP, manipulating and removing the riser, removing the LMRP, using gauges on the BOP, and other activities related to oil flow. FoF Nos. 601-605. BP conducted various BOP operations using ROVs, including using the BOP to open and close various rams for the Top Kill. FoF No. 601. As part of these events, BP used equipment, such as the BOP, LMRP, and riser for various functions essential to its efforts to stop the pollution. FoF No. 603. To take the Top Kill as but one example, the failed attempt

conducted in late May was performed using the *Deepwater Horizon's* BOP, rams, pressure gauges, and many other pieces of equipment "owned" by Transocean. FoF No. 604. However, while Transocean's "ownership" of the equipment would be relevant to the issue of Transocean's status under the Clean Water Act as an "owner," it does not limit BP's status as an "operator" of the Top Kill and the equipment used during its unsuccessful performance. Other examples abound concerning BP's actions as an "operator" of the BOP and the actions directly related to the management, direction, and conduct of operations (albeit often failed operations) directed to pollution prevention, such as the Riser Insertion Tube Tool, Top Kill, riser removal on June 3, Top Hat use throughout June, and the Capping Stack installed on July 12. FoF No. 605.

16.     Evidence at the Phase Two trial showed that BP was a "person in charge" of the Macondo Well and the *Deepwater Horizon*, specifically including the BOP, LMRP, and riser, in that BP had authority, and exercised that authority, as to decisions related to opening and closing rams in the BOP, manipulating and removing the riser, removing the LMRP, using gauges on the BOP, and other activities related to oil flow. FoF Nos. 601-605. BP conducted various BOP operations using ROVs, including using the BOP to open and close various rams for the Top Kill. FoF No. 601. As part of these events, BP used equipment, such as the BOP, LMRP, and riser for various functions essential to its efforts to stop the pollution. FoF No. 603. To take the Top Kill as but one example, the failed attempt conducted in late May was performed using the *Deepwater Horizon's* BOP, rams, pressure gauges, and many other pieces of equipment "owned" by Transocean. FoF No. 604. However, while Transocean's "ownership" of the equipment would be relevant to the issue of Transocean's status under the Clean Water Act as an "owner," it does not limit BP's status as "person in charge" of the Top Kill and the

7

equipment used during its unsuccessful performance. Other examples abound concerning BP's actions as "person in charge" of the BOP and the actions directly related to the management, direction, and conduct of operations (albeit often failed operations) directed to pollution prevention, such as the Riser Insertion Tube Tool, Top Kill, riser removal on June 3, Top Hat use throughout June, and the Capping Stack installed on July 12. FoF No. 605.

### III. The Total Amount Of Oil Discharged Must Include All Oil And Be Based On Multi-Stage Separation.

#### a. The United States Has Already Taken Two Legally Conservative Approaches to Calculating the Volume of Oil Spilled from the Macondo Well.

17. First, the Clean Water Act defines a "barrel" as 42 gallons at 60 degrees Fahrenheit, but does not specify the pressure at which a barrel is defined. For purposes of this case, the United States calculated the total discharge at the surface pressure of 1 atmosphere (approx 15 psi), which is a conservative approach that accounts for fewer stock tank barrels than would a barrel calculated at a higher pressure. In fact, the oil and gas were discharged to the Gulf at seafloor pressure of approximately 2,200 psi. FoF No. 39.a. The United States took this approach because it is consistent with the industry standard definition of a stock tank barrel (60F and 1 atm).

18. Second, the Clean Water Act defines "oil" as oil of any kind including oil mixed with a waste. Gas spilled into the ocean is a waste and the Macondo Well discharged a significant amount of gas into the Gulf, both in a separate gas stream and mixed with liquid oil. FoF No. 581; *cf. Rice v. Harken Exploration Co.*, 89 F.Supp.2d 820, 822 n.3 (N.D. Tex. 1999) (definition of "oil" includes oil mixed with saltwater or produced brine, a naturally occurring waste product in the production of oil). The United States has already significantly discounted

8

the total number of barrels of oil it could have counted under the Act by not counting the gas, even though the gas includes pollutants such as benzene and toluene and may have even caused environmental harm on its own.

### b. The Number of Barrels Discharged Cannot Be Discounted to Account for Dissolved Oil or Based on Single-Stage Separation.

19. A plain reading of the Clean Water Act says that all oil discharged to the Gulf should be counted for purposes of calculating the statutory maximum penalty. Section 311 says that the penalty is based on the number of barrels "discharged," *without qualification*. 33 U.S.C. § 1321(b)(7)(A) and (D); *cf.* 33 U.S.C. § 1321(b)(3). Under the plain language of the statute, all oil that was discharged into the Gulf counts for purposes of calculating the statutory maximum penalty, including any hydrocarbons that dissolved.

20. BP's own argument in its Motion for Partial Summary Judgment Against the United States with Respect to Its Claims for Civil Penalties for the More Than 800,000 Barrels of Oil that Were Collected and Never Released into the Environment During the *Deepwater Horizon* Oil Spill further supports the United States' interpretation. Rec. Doc. 8213. In that motion, BP sought to limit the amount of civil penalties assessed by the United States to only the oil that came in contact with the waters of the Gulf. In its brief, BP cited the Court in *United States v. Citgo Petroleum Corp.*, which said "fundamental fairness says that you get penalized for the damage that you cause, *which means the oil that got into the water. . . .*" Rec. Doc. No. 8213-1 at 11 (emphasis added) (citing *Citgo*, No. 2:08-cv-893, 2011 WL 10723934 (W.D. La. Sept. 29, 2011), *rev'd on other grounds*, 723 F.3d 547 (5th Cir. 2013)). The *Citgo* Court then concluded that "the important question is how much oil was actually discharged into

9

the waterways." *Id.* at *4-5. In response to BP's motion, the United States and BP stipulated that 810,000 barrels of oil were not to be used in calculating the statutory maximum penalty under the Clean Water Act because that oil never came into contact with any ambient sea water and was collected without entering the environment.

21. Having taken the position in its summary judgment motion that it should be penalized for the "oil that got into the water," BP is judicially estopped from now arguing that a certain amount of oil (including oil mixed with gas) that was discharged into the Gulf waters should be discounted for penalty purposes because those hydrocarbons dissolved after coming into contact with the ocean. The doctrine of judicial estoppel is a means of "prevent[ing] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotations omitted). It "is 'an equitable doctrine invoked by a court at its discretion' to 'protect the integrity of the judicial process.'" *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (quoting *New Hampshire v. Maine*, 532 U.S. at 749–50 (internal quotation marks and citations omitted); *see also* 18 James Wm. Moore et al., *Moore's Federal Practice* § 134.31 at 74 (3d ed. 2013) ("Application of the doctrine of judicial estoppel should be guided by a sense of fairness, with the facts of the particular dispute in mind."); 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4477 at 553 (2d ed. 2002) ("The concern [of judicial estoppel] is to avoid unfair results and unseemliness.").

22. At trial, BP took a second position that is inconsistent with its summary judgment motion, namely that the number of barrels of oil spilled should be calculated based on a single-stage separation. When it wanted credit for collected oil, BP relied on the multi-stage

separation processes used on the collection vessels to maximize the number of barrels collected, and that is in fact the separation process that BP and the United States relied on when they stipulated to the 810,000 barrels collected. FoF Nos. 569-570. Now that BP wants to minimize the number of barrels discharged for penalty purposes, it is asking this Court to find that a multi-stage process is inappropriate (despite the contrary opinions by its own expert, Dr. Whitson) and instead rely on a single-stage process. As with the issue of dissolution, BP is judicially estopped from arguing that a multi-stage process is appropriate when it works to BP's own benefit, but inappropriate when it works against the company's financial interest. This Court therefore invokes the doctrine of judicial estoppel to protect the integrity of the judicial process and prohibit BP from "playing fast and loose with the courts," and "deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750 (internal quotation marks and citations omitted).

## IV. BP May Not Benefit From Any Uncertainty In The Data Regarding Flow Rate

23. To the extent there is uncertainty in the cumulative flow estimate, that uncertainty stems from BP's own actions, and the company may not get the benefit of any uncertainty in determining the total discharge. The Supreme Court has recognized that, "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946); *see also Grace-Cajun Oil Co. No. Two v. Damson Oil Corp.*, 897 F.2d 1364, 1367 (5th Cir. 1990) (same); *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 45-46 (5th Cir. 1972). This principle is not limited to particular areas of law. *Bigelow*, 327 U.S. at 265.

24.     Here, BP chose to drill for oil three miles below the surface of the Gulf, and made a series of decisions, along with other parties, that led to the well blowout. During the response, BP was unable to achieve full collection of the flow at any point during the 87 days of the spill – which would have helped settle the question of how much oil was spilled. BP was unable to get reliable BOP pressure data until May 8 and *chose* not to pursue installing a flow meter to measure the flow directly, not to proceed with (or at least disclose) commissioned independent expert calculations of the Capping Stack flow rate, and not to proceed with its own written plans to measure the total flow from the well up to 50,000 stock tank barrels per day. FoF Nos. 12.a, 12.c, 17.c.  All of these actions tended to increase the uncertainty of any flow estimate. On behalf of the public, the United States has proved that the flow was about 5 million stock tank barrels. BP may not argue that the United States' estimate is uncertain based on difficulties of BP's own making. *Bigelow*, 327 U.S. at 265 ("the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable.")

**V.    Statutory Maximum Penalty for BP and Anadarko**

25.     Based on the Phase One evidence, BP is subject to a civil penalty of up to $4,300 per barrel of oil discharged.  33 U.S.C. § 1321(b)(7)(D), 40 C.F.R. § 19.4.  Multiplying $4,300 per barrel by 4,200,000 barrels yields the statutory maximum of $18,060,000,000 ($18.06 billion) as to BP.

26. With respect to Anadarko, its maximum dollar-per-barrel amount is $1,100 because the United States did not seek the higher amount, so multiplying by the number of barrels gives Anadarko a statutory maximum of $4,620,000,000 ($4.62 billion).

27. No specific penalty is assessed for either BP or Anadarko. Rather, the Court will hold a later Penalty Phase to apply the penalty factors of 33 U.S.C. § 1321(b)(8) and determine a specific penalty amount as to each defendant.

## CONCLUSION

BP is liable as owner, operator and person in charge of the Macondo Well and/or the *Deepwater Horizon* rig and should be penalized for all 4.2 million stock tank barrels of oil that discharged from the well to the Gulf of Mexico.

Respectfully submitted,

| | |
|---|---|
| BRIAN HAUCK | ROBERT G. DREHER |
| Deputy Assistant Attorney General | Acting Assistant Attorney General |
| Civil Division | Environment & Natural Resources Division |
| | |
| PETER FROST | SARAH HIMMELHOCH |
| Directory, Torts Branch, Civil Division | NANCY FLICKINGER |
| Admiralty and Aviation | SCOTT CERNICH |
| STEPHEN G. FLYNN | RICHARD GLADSTEIN |
| Assistant Director | THOMAS BENSON |
| MICHELLE DELEMARRE | Senior Attorneys |
| SHARON SHUTLER | A. NATHANIEL CHAKERES |
| JESSICA SULLIVAN | ANNA CROSS |
| JESSICA MCCLELLAN | BETHANY ENGEL |
| MALINDA LAWRENCE | JUDY HARVEY |
| Trial Attorneys | RACHEL KING |
| | ERICA PENCAK |
| | Trial Attorneys |
| | |
| | */s/ Steven O'Rourke* |
| R. MICHAEL UNDERHILL, T.A. | STEVEN O'ROURKE |
| Attorney in Charge, West Coast Office | Senior Attorney |
| Torts Branch, Civil Division | Environmental Enforcement Section |
| U.S. Department of Justice | U.S. Department of Justice |
| 7-5395 Federal Bldg., Box 36028 | P.O. Box 7611 |
| 450 Golden Gate Avenue | Washington, D.C. 20044 |
| San Francisco, CA 94102-3463 | Telephone: 202-514-2779 |
| Telephone: 415-436-6648 | Facsimile: 202-514-2583 |
| Facsimile: 415-436-6632 | E-mail: steve.o'rourke@usdoj.gov |
| E-mail: mike.underhill@usdoj.gov | |
| | DANA J. BOENTE |
| | United States Attorney |
| | Eastern District of Louisiana |
| | SHARON D. SMITH |
| | Assistant United States Attorney |
| | Eastern District of Louisiana |
| | 650 Poydras Street, Suite 1600 |
| | New Orleans, LA 70130 |
| | Telephone: (504) 680-3000 |
| | Facsimile: (504) 680-3184 |
| | E-mail: sharon.d.smith@usdoj.gov |

Attorneys for the UNITED STATES OF AMERICA

14

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12.

                                            Dated: December 20, 2013

                                            */s/ Sarah Himmelhoch*
                                            Sarah Himmelhoch