# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| CIV. No. 10-4536 | : | MAGISTRATE JUDGE SHUSHAN |

........................................................................................................................................

## UNITED STATES OF AMERICA'S POST-TRIAL BRIEF
## FOR PHASE TWO QUANTIFICATION SEGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I.     The Undisputed Flow Rate At The End Of the Response Was Approximately
       53,000 Barrels ........................................................................................................ 3

II.    The Total Discharge Was Five Million Barrels ..................................................... 4

       A.    The United States' Trial Experts Demonstrated that the Total Discharge
             Was 5 Million Barrels, Just as the Scientific Community Concluded
             Outside of Litigation ................................................................................... 4

       B.    BP's Trial Experts' Estimates Are Unreliable Because They Use
             Highly Uncertain Inputs and Reach Their Conclusions by Contradicting
             BP's Prior Analyses during the Response and Phase One ......................... 9

             1.    Dr. Blunt's analysis ignores standard industry techniques,
                   relies on highly uncertain data, and conflicts with
                   evidence about the reservoir ........................................................ 10

             2.    Dr. Gringarten's circular method requires assuming a flow
                   rate to estimate the flow rate, and relies on flow rate and
                   permeability inputs that are contrary to the evidence ................. 13

             3.    The evidence contradicts Dr. Johnson's critiques
                   of the United States experts ........................................................ 17

III.   Evidence Of Flow Rate Over The Course Of The Response Supports
       A Total Discharge Of 5 Million Barrels And Refutes The Estimates
       Offered By BP At Trial .......................................................................................... 20

       A.    The Evidence Shows that Erosion Happened Quickly
             and Did Not Affect Flow Rate after the Beginning of the Response ...... 20

             1.    The erosion affecting the flow rate occurred early in
                   the response, consistent with BP's proof in Phase One .............. 20

             2.    Despite presenting two trial experts on erosion,
                   BP failed to present any credible evidence of
                   when erosion occurred or how it affected flow rate ................... 22

a.      Even if Dr. Nesic's flawed modeling could be credited, he failed to provide any information concerning how erosion affected flow rate over time ............................... 23

b.      Dr. Member relies on an assumption contrary to the established facts from Phase One, making his opinion irrelevant ............................................................ 25

B.      Flow Rate Estimates for Specific Periods during the Response Confirm that BP's Theory of Erosion Increasing Flow Rate Over Time Cannot Be Correct ................................................. 27

1.      Dr. Dykhuizen calculated flow rates of 60,000 barrels for two different periods in the response ................................... 27

2.      During the response, BP estimated the flow rate based on scenarios that we now know are accurate, and came up with values consistent with the United States' estimate .............. 29

3.      The most significant source control interventions resulted in small changes to the flow rate .................................... 30

4.      Dr. Zaldivar's May 13-20 estimate is too low by a factor of two, but it confirms that the flow rate was *not* increasing over time ...................................................................... 31

IV.     Any Estimate Of The Total Discharge Should Include All Oil And Be Based On Industry-Standard Multi-Stage Separation ............................ 33

A.      Hydrocarbons that Dissolved in the Gulf Cannot Be Discounted as a Matter of Law .............................................. 35

B.      A Multi-Stage Process Is Appropriate to Define Macondo Oil Shrinkage ........................................... 36

C.      BP Should Be Judicially Estopped from Arguing that Multi-Stage Separation Is Not Appropriate, and that Dissolved Oil Does Not Count .................................... 36

D.      The Estimates Made by Drs. Blunt and Gringerten Are more than 10 Percent too Low Because They Fail to Properly Account for Multi-Stage Separation and Count All Oil Reaching the Water ........ 38

V.      Housekeeping ........................................................................... 38

A.    BP Is Liable as an Operator and Person in Charge
       for the Deepwater Horizon ...................................................... 38

B.    United States' Position Regarding the Source Control Segment of
       Phase Two and Its Relation to the Upcoming Penalty Phase .................. 39


CONCLUSION ........................................................................................... 39

# TABLE OF AUTHORITIES

*FEDERAL CASES*

> *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) ........................................................18

> *Gulf Restoration Network, Inc. v. Salazar*, 683 F.3d 158 (5th Cir. 2012) ...........................6

> *New Hampshire v. Maine*, 532 U.S. 742 (2001) ................................................................37

> *Reed v. City of Arlington*, 650 F.3d 571 (5th Cir. 2011) ..................................................37

> *United States v. Citgo Petroleum Corp.*, No 2:08-cv-0893, 2011 WL 10723934
> (W.D. La. Sept. 29, 2011), *rev'd on other grounds*, 723 F.3d 547
> (5th Cir. 2013)..................................................................................................................37

*FEDERAL STATUTES*

> 33 U.S.C. § 1321(a)(1) .........................................................................................................34

> 33 U.S.C. § 1321(a)(13) .......................................................................................................33

> 33 U.S.C. § 1321(b)(3) .........................................................................................................35

> 33 U.S.C. § 1321(b)(7) .........................................................................................................33

> 33 U.S.C. § 1321(b)(8) .........................................................................................................39

> 33 U.S.C. § 1321(b)(7)(A)...............................................................................................1, 35

> 33 U.S.C. § 1321(b)(7)(D)...............................................................................................1, 35

*FEDERAL REGULATIONS*

> 40 C.F.R. § 19.4 ...................................................................................................................32

## INTRODUCTION

The purpose of the Quantification segment of Phase Two is to establish how much oil flowed from the Macondo Well. This finding will be relevant to the Clean Water Act penalty in this case, 33 U.S.C. § 1321(b)(7)(A) and (D), but the importance of reaching the correct number goes beyond the penalty BP and Anadarko will pay. As BP stated shortly after the well was cemented, knowing the quantity discharged "is crucial to understanding the environmental impact [and] shaping appropriate remediation plans. . . ." U.S. Proposed Findings of Fact ("FoF") No. 242. The Macondo spill will be studied for decades to determine the impact on the Gulf and on the people and wildlife that live in the Gulf area. The total discharge is a critical fact informing all of those studies. Moreover, the public has been harmed by the spill and has long wanted to know how much oil was discharged. BP failed during the response to answer that question – even to the extreme of lying to Congress. This Court will have the definitive word on the question that has been on everyone's mind for more than three years.

The evidence shows that the total flow of oil from the Macondo Well was 5 million barrels.[1] That was the conclusion at the end of the response, the conclusion during the three intervening years, and the conclusion reached by the United States' experts at trial. The only people who have publicly disagreed with this "emerging consensus" are the two experts BP hired to testify at trial. [2]

---

[1] In this brief, the United States uses barrels to mean stock tank barrels of oil, as discussed further in Section IV. The Parties have stipulated that 810,000 barrels were collected before contacting the Gulf. The total discharge from the well was 5 million barrels, with 4.2 million barrels entering Gulf waters. Based on that figure, the maximum Clean Water Act penalties are $18 billion for BP (assuming the Court finds BP acted with gross negligence in ruling on Phase One) and $4.6 billion for Anadarko. U.S. Proposed Conclusions of Law ("CoL") No. 25-26.

[2] BP and Anadarko presented jointly at trial. We refer to BP for brevity in this brief.

The United States' trial evidence began with the last day of flow. The installation of the Capping Stack provided a way to calculate the flow rate accurately and a wealth of information about flowing conditions at the well. The United States' experts used that undisputed flow rate and the Capping Stack data to match their models to actual conditions from the well. They came at the problem with several different approaches, and all came to the same conclusion: the total discharge was about 5 million barrels.

By contrast, BP's trial experts ignore and even contradict the undisputed final day flow rate. They rely on methods that place controlling weight on reservoir parameters that are not known with any confidence. While all Macondo calculations have some uncertainty, BP's trial experts selected calculations that depend on inputs that BP itself recognizes could range by a factor of two or three. Rather than acknowledge that input uncertainty, BP's trial experts simply ignore it while using extreme values that minimize the total discharge. For instance, BP's Dr. Martin Blunt needs a compressibility input to reach his total discharge estimate. During the response, BP used a range of rock compressibility values from 6 to 18 microsips and called 12 the "most likely" value, but Dr. Blunt uses about six, resulting in the lowest possible total discharge. *See* FoF No. 207, 211, 216, 292. Similarly, Dr. Alain Gringarten's analysis depends on the estimated permeability of the reservoir. During the response, BP recognized that the permeability was highly uncertain. Before drilling the well, the company called 500 millidarcies the "most likely" permeability in seeking approval to proceed with the well. FoF No. 415. During Phase One, BP used a permeability of 300 millidarcies in expert analysis. *See* TREX-041026.0013. Now Dr. Gringarten presents an analysis that is highly dependent on permeability and he uses a value of 238 millidarcies – 25% less than BP's Phase One evidence and much less than the estimates provided by the United States' testifying experts – again resulting in the

2

lowest possible total discharge. FoF No. 382, 387, 389, 409. To get to their total discharge numbers, BP's trial experts must ignore the best data from the response and contradict BP's own internal experts and Phase One evidence. In reaching its numbers, BP must also assume that erosion is significantly increasing the flow rates over the first month of the response, another assumption that BP cannot prove and that is inconsistent with BP's Phase One proof and its internal experts' estimates from the response.

## ARGUMENT

### I.   The Undisputed Flow Rate At The End Of The Response Was Approximately 53,000 Barrels

After 84 days of oil flowing from the Macondo well, BP installed the Capping Stack on July 12. FoF No. 29, 605. The Capping Stack was equipped with two pressure gauges and its dimensions were precisely known. FoF No. 30, 31, 34. Based on the pressure information and the known resistance in the flow path, calculating the flow rate became a relatively simple task. As BP's experts said in deposition, it was a "direct calculation" (BP Vice President Richard Lynch) and a "direct estimation" of flow rate (BP Source Control segment testifying expert on hydraulic modeling Adam Ballard). FoF No. 34. Moreover, the same data that engineers used to estimate flow rate were relied upon to determine whether the well could be safely shut-in. FoF No. 32-33. The data had to be – and were –accurate. The alternative was making the ongoing disaster even worse: a well leaking into the formation and then oil escaping to the Gulf across miles of seafloor.

The flow rates calculated during the response are consistent with those presented by the United States' trial experts (contrary to what BP's trial experts assume, without basis, as discussed in Section III). During the response, BP's Source Control testifying expert on flow

modeling, Adam Ballard, estimated the daily flow rate at 59,000 to 62,000 barrels, while BP's

Farah Saidi calculated the rate at 51,500, and an engineer working for BP Vice President Richard

Lynch put the number at 56,000. FoF No. 40, 70. During the response, Dr. Ronald Dykhuizen

and other United States scientists calculated the final day flow rate as about 53,000. FoF No. 39,

41, 103. That figure was further corroborated by the estimates of the United States' other

testifying experts: Dr. Stewart Griffiths (53,000), Dr. Mohan Kelkar (54,000), and Dr. Mehran

Pooladi-Darvish (51,800-53,600). FoF No. 44, 45, 107. There is no dispute that the flow rate at

the end of the response was about 53,000 barrels per day, and BP presented no contrary evidence

at trial.

## II.     The Total Discharge Was Five Million Barrels

The undisputed final day flow rate also provides a starting point for a reliable estimate of

cumulative flow. The United States' experts relied on the final day flow rate and the robust

information about flowing conditions made available from the Capping Stack. BP's experts did

not. Instead, BP's experts relied on inputs that were simply not known with any accuracy. Then,

rather than recognize that inaccuracy, they ignored it.

### A.     The United States' Trial Experts Demonstrated that the Total Discharge Was 5 Million Barrels, Just as the Scientific Community Concluded Outside of Litigation

At trial, the United States presented multiple lines of scientific evidence, all concluding

that the total discharge was approximately 5 million barrels. That expert testimony is further

supported by the scientific consensus that developed outside this litigation.

The United States' total discharge evidence began with two witnesses who played critical

roles during the response. ***Dr. Ronald Dykhuizen*** is a scientist at Sandia National Laboratories

specializing in fluid mechanics and multiphase flow; he was the first engineer tapped at the

4

Sandia National Laboratories when BP reached out to the national labs for help modeling potential flow paths. FoF No. 23-24. In short, Dr. Dykhuizen is one of the "nation's top scientists," as BP said during the response. FoF No. 27. Dr. Dykhuizen worked on the response from May through the closure of the Capping Stack, including spending time at BP's command center in Houston. Phase 2 Tr. at 1361:7-15 (Oct. 7, 2013 PM) (Dykhuizen). Based on flow calculations he performed, Dr. Dykhuizen helped develop the criteria by which the Unified Command would decide whether the Capping Stack pressures during shut-in were acceptable and the well could remain shut in. FoF No. 33. BP agreed to be bound by those criteria, which Dr. Dykhuizen developed based on the final day flow rate of 53,000 barrels and a linear reservoir depletion model that resulted in a total discharge calculation of 5 million barrels. FoF No. 33, 39, 102-105. After developing his estimate during the response, Dr. Dykhuizen further studied the issue and presented his 5 million barrel estimate to the Court.

Like Dr. Dykhuizen, ***Dr. Paul Hsieh*** played a critical role in allowing the well to be shut-in. Dr. Hsieh is a hydrologist from the United States Geological Survey who specializes in modeling fluid flow underground. FoF No. 206. He helped develop the shut-in criteria and interpret the pressure data seen after the Capping Stack was shut-in. FoF No. 206, 219-220. Dr. Hsieh's modeling provided an explanation for the pressure data, and allowed the Unified Command to keep the well shut-in with confidence that doing so would not result in an underground blowout. *Id*. Using his reservoir depletion model, Dr. Hsieh concluded that the total flow was 4.9 million barrels, and his work was published as part of the final, peer-reviewed Flow Rate Technical Group report. FoF No. 238.

As the Macondo well was cemented and finally killed in the fall of 2010, there was an "emerging consensus" about the size of the spill. The contemporaneous estimates by the

government scientists whose work was crucial to stopping the flow were corroborated by

independent researchers. The National Commission on the BP Deepwater Horizon Oil Spill and

Offshore Drilling published a paper on "The Amount and Fate of the Oil" that found that

> The *emerging consensus is that roughly five million barrels of oil were released
> by the Macondo well*, with roughly 4.2 million barrels pouring into the waters of
> the Gulf of Mexico. *Using different methods, the government teams and
> independent scientists arrived at the same approximate figure*.

FoF No. 241-242 (emphasis added). That consensus estimate of the total spill is reflected in the

case law as well. The Fifth Circuit has described the disaster as "a three-month long spill of 4.9

million barrels of oil into the Gulf of Mexico." *Gulf Restoration Network, Inc. v. Salazar*, 683

F.3d 158, 163 (5th Cir. 2012).

  In contrast to this emerging consensus, BP's practice throughout the response was to

cloak its internal flow rate analyses in secrecy, and bide its time until compelled to present its

views in this litigation. Notably, BP responded to the Oil Spill Commission by saying it was

"important" to have as accurate an estimate of total volume spilled as possible, and that the

company would present its own estimate "as soon as the information is available to get the

science right." FoF No. 242. What BP did not say that was that even before the well was shut-in,

it had embarked on a *privileged* flow rate analysis involving both internal and external experts.

FoF No. 17-18. BP never disclosed the results of that process or provided any flow rate analysis

until the Quantification trial began. And despite BP's statement that it was waiting on necessary

information to get the science right, its hired trial experts relied on testing *before* the blowout for

critical and highly uncertain parameters. *See, e.g.*, FoF No. 306 (Dr. Blunt's estimate depends on

rock compressibility data from pre-blowout samples), 381-382 (Dr. Gringarten's estimate

depends on permeability from pre-blowout testing).

6

As the emerging consensus developed and BP kept its analyses under wraps, **_Dr. Stewart Griffiths_** pursued his own discharge estimate based on the copious data provided by the BOP pressure gauge. Dr. Griffiths was a senior scientist at Sandia at the time of the blowout and had provided assistance to the government engineers working on source control issues. FoF No. 25, 108. As he did so, he came to an idea for calculating flow rates during the response. By the end of 2011, prior to his involvement in this litigation, he had developed a model that could determine the total discharge and submitted a paper describing his work for eventual publication in a peer-reviewed journal. FoF No. 119.

By the time he came to trial, Dr. Griffiths had retired from Sandia, seen his peer-reviewed Macondo paper published, and spent another year honing his results. He testified that the best estimate of the total flow was 5.0 million barrels, based on the peer-reviewed custom model he built. FoF No. 106-119. Building a model from scratch to solve a specific problem, just as he did over the course of his three-decade career at Sandia, Dr. Griffiths combined knowledge of two basic principles of fluid dynamics, an undisputed trend for the reservoir pressure, and more than 94,000 BOP pressure datapoints collected by BP to estimate the total flow at 5.0 million barrels. *Id*. Because his model was built on actual data from the well, Dr. Griffiths' results are more accurate than could be achieved with a typical hydraulic model. FoF No. 115. By using BOP pressure data over the course of the response, Dr. Griffiths' results take into account any changes in flow path resistance over time. FoF No. 114. After developing his model, Dr. Griffiths validated his results against both the available data and against industry-standard computer models. FoF No. 120. In both cases, the agreement was remarkably good, confirming the conclusion that his model accurately captured the flow rate. *Id*.

Where Dr. Griffiths used a model he built for this question, reservoir engineer **Dr. Mehran Pooladi-Darvish** used the same modeling tools that he has used throughout his career in the oil and gas industry. Dr. Mehran Pooladi-Darvish is a reservoir engineer with previous experience quantifying the discharge from blowouts – the only person with that experience who testified during the Quantification segment. FoF No. 160; Phase 2 Tr. at 1964:19-1965:5 (Oct. 9, 2013 PM) (Pooladi-Darvish). A fundamental part of his work as a reservoir engineer is accounting for uncertainty in input parameters. FoF No. 163. Because such uncertainty is so common, reservoir engineers must check their models against actual dynamic data from the well, including pressure and production data. FoF No. 171-174. In this case, the pressure gauges installed on the Capping Stack and the measurements of collected oil represented some of the most accurate data available regarding the behavior of the well.[3] *Id*. Accordingly, Dr. Pooladi-Darvish made sure to check his models against this data.

Using modeling techniques derived from his typical work performing reservoir analyses for oil companies, Dr. Pooladi-Darvish extensively investigated the range of reservoir/wellbore combinations that were possible given the available data. He varied parameters such as permeability, BOP restriction, and compressibility across a wide range of possible values, and adjusted other parameters in a "history matching" process to find reservoir/wellbore models that matched the shut-in pressure data. FoF No. 168-179. He then observed that, for all of these different models, the cases that matched the pressure data *and* the observed collection rates all generated cumulative discharges of 5.0 to 5.3 million barrels. *Id*. In other words, the sets of

---

[3] The BP experts used the shut-in pressure data as well, but completely ignored the measurements of collected oil.

parameters that matched the observed data had one important thing in common: they resulted in a total flow of 5.0 to 5.3 million barrels.

Finally, **_Dr. Mohan Kelkar_** provided an estimate of the total flow based on the material balance method. Dr. Kelkar's method admittedly lacks the precision of the work performed by Drs. Griffiths and Pooladi-Darvish. Material balance relies on just three inputs; whether that simplicity is a strength or a weakness depends on how accurate the inputs are. FoF No. 194. Dr. Kelkar recognized the uncertainty in the inputs for the Macondo analysis, and evaluated a range of values in concluding that the total discharge was between 4.5 and 5.5 million barrels. FoF No. 188, 193, 232-234. In notable contrast to Dr. Blunt – who also performed a material balance analysis, but ignored uncertainties in his inputs and other external data that would have shown the shortcomings of his analysis – Dr. Kelkar also performed an independent calculation of the final day flow rate that provided additional confidence in his cumulative estimate. FoF No. 236-237.

***

All the lines of evidence – from the last days of the spill through trial testimony – lead to the same place: a total discharge of approximately 5 million barrels.

**B.     BP's Trial Experts' Estimates Are Unreliable Because They Use Highly Uncertain Inputs and Reach Their Conclusions by Contradicting BP's Prior Analyses during the Response and Phase One**

At trial, BP presented two cumulative discharge estimates. As an initial matter, BP's trial estimates were not independent analyses. In fact, both were predetermined by BP. It can hardly be a coincidence that Dr. Blunt's 3.26 million total discharge estimate is identical to the cumulative release that Dr. Gringarten assumed to start his calculation. FoF No. 254.

9

More importantly, these estimates were *not* based on the undisputed final day flow rate of 53,000 barrels. Instead of using the robust data from the Capping Stack period, both Drs. Blunt and Gringarten relied heavily on samples taken or testing done *before* the blowout. Then they used methods that depended on those highly uncertain inputs. Finally, they assigned accuracy to reservoir parameters that were simply not known with any certainty, and used values that sharply contradicted what BP's internal experts found during the response and what BP presented to this Court in Phase One.[4]

1. **Dr. Blunt's analysis ignores standard industry techniques, relies on highly uncertain data, and conflicts with evidence about the reservoir**

Dr. Blunt's analysis and his proposed total oil volume released are unreliable. Dr. Blunt ignored standard reservoir engineering techniques to reach his conclusions, relied on inputs that were – at best – deeply uncertain, and used a model that conflicts with known facts about the reservoir.

To calculate the total release, Dr. Blunt ignored standard reservoir engineering techniques. For instance, Dr. Blunt performed a pressure transient analysis. In standard industry practice, such an analysis requires knowing the flow rate – exactly what Dr. Blunt was trying to figure out. FoF No. 255-258. Faced with that problem, Dr. Blunt derived his own unique, untested models and formulas, which he admitted are not used in "real oilfield practice."[5] FoF No. 259-260.

---

[4] BP's Phase Two trial experts even contradicted what BP itself had previously represented to its shareholders: in its 2011 annual report BP reported that its "current best estimate" was a total discharge of 4 million barrels (without providing any basis for the 4 million estimate). FoF No. 245.

[5] Dr. Gringarten faced the same problem and resorted to an equally problematic solution: he simply assumed a flow rate. FoF No. 418-420.

As demonstrated at trial, there is a reason Dr. Blunt's made-for-litigation formulas are not used in the real world: they do not work. Dr. Blunt's own master modeling file cannot be reconciled with his testimony and other known facts about the reservoir. For instance, Dr. Blunt testified that the "most likely" reservoir permeability was Dr. Gringarten's 238 millidarcy estimate. FoF No. 274. And Dr. Blunt testified that the reservoir was 93 feet thick at the well and less thick elsewhere. *Id*. But using 238 millidarcies for permeability in Dr. Blunt's model results in an average thickness of significantly more than 93 feet. *Id*. In other words, using what Dr. Blunt called the best estimate of permeability means that Dr. Blunt's model gets values for other key reservoir parameters that are known to be incorrect.[6]

Even if Dr. Blunt's *methods* were reliable, his results are not because he relies on incorrect and uncertain inputs.

***Rock Compressibility***. There is no doubt that BP relied on a rock compressibility value of 12 microsips at the most important time during the response: when the Unified Command was deciding whether to leave the well shut in. FoF No. 206-224. In the Phase Two trial, BP asks the Court to ignore that number and credit Dr. Blunt's estimate using a rock compressibility value half that large. The evidence shows, however, that 6.35 microsips is simply not a credible number – as BP's internal experts made perfectly clear during the response. The primary basis for the 6.35 microsip number is three rotary sidewall core samples taken before the blowout, together measuring about three inches in thickness to represent a reservoir that is approximately 5,000 acres and 90 feet thick. FoF No. 292, 294, 299, 310, 311. As BP stated while drilling the well, rotary sidewall cores are "too uncertain to add value" and could be expected to understate the true compressibility. *See* FoF No. 303, 305. During the response BP experts recognized that

---

[6] Dr. Blunt obscures this flaw by using a higher permeability input in his model. FoF No. 274.

rotary sidewall core data had "inherent biases" and produced "conservative" estimates of rock compressibility. FoF No. 209, 213, 214. The United States' testifying experts in rock physics and rock mechanics, Drs. Alan Huffman and Jean-Claude Roegiers, agreed that rotary sidewall cores were uncertain and would tend to understate compressibility. *See* FoF No. 306-363. BP *could have* taken more representative, conventional (whole) core samples and obtained a more accurate value for rock compressibility, but chose not to do so. FoF No. 304. Instead the company opted to rely on much less reliable rotary sidewall cores, "which are easily and inexpensively collected." *Id*. Having made that choice, BP should not be allowed to reap the benefits of the uncertainty it sowed.

Nor can BP justify reliance on the rotary sidewall cores based on the opinions of its testifying expert Dr. Zimmerman. Dr. Zimmerman relied on the same rotary sidewall core data that Dr. Blunt did – the same data that BP long recognized was unreliable: "too uncertain to add value." FoF No. 303. The sidewall cores simply failed to represent the properties of the reservoir, as demonstrated by Dr. Huffman's well log analysis. FoF No. 312-315. Moreover, Weatherford's "rush" test methods failed to properly simulate reservoir conditions, further contributing to uncertainty in the results, as described in detail in the Findings of Fact.[7] FoF No. 316-363. Many of the deficiencies in the test protocol for the rotary sidewall cores were identified by BP's internal experts before and during the oil spill response, yet are disregarded by Drs. Blunt and Zimmerman. *See, e.g.*, FoF No. 328-329, 345, 356-357, 361.

---

[7] BP required Weatherford to conduct the tests on a "rush" basis, causing the Weathford official leading the work to ask her colleagues to "drop[] everything to answer my frantic cry for help when BP was asking for the moon in 48 hours." FoF No. 316.

The evidence shows that the six microsip estimate is both unreliable and too low. It cannot provide a reliable basis for estimating the total flow through material balance, as Dr. Blunt attempted.

***Fluid Separation.*** Dr. Blunt admitted that multi-stage separation is what the industry uses, yet used single-stage separation in his own calculations. FoF No. 590-592. This is inappropriate for calculating the total discharge, as described in Section IV below, and decreased Dr. Blunt's estimate more than 10%. FoF No. 597.

***Permeability.*** In calculating permeability, Dr. Blunt needed a flow rate for the last day. He ignored the undisputed evidence that the flow rate was more than 50,000 barrels per day, *see* Section I, and simply assumed a final day flow rate of 45,000 barrels. FoF No. 273. When Dr. Blunt used a more realistic final day flow rate of 52,603 barrels, he got a permeability of 407 millidarcies – much higher than Dr. Gringarten's assumption and consistent with the United States' evidence. FoF No. 290. Again, Dr. Blunt's estimate cannot be reconciled with the evidence from the response and the Phase One case.

> **2.      Dr. Gringarten's circular method requires assuming a flow rate to estimate the flow rate, and relies on flow rate and permeability inputs that are contrary to the evidence**

Just as Dr. Blunt's estimate relied on a highly uncertain rock compressibility input, BP's alternate estimate of cumulative volume of oil released depends on another highly uncertain parameter – permeability. BP's testifying expert Dr. Gringarten also selected a methodology that was dependent upon knowing the very thing he was seeking to find – flow rate. FoF No. 418-420. Moreover, Dr. Gringarten used the wrong value for the first day of the spill (assuming essentially zero flow while the rig was burning on the sea) and the wrong value for the last day of the spill (45,000 per day when the undisputed evidence shows it was more than 50,000).

13

*Permeability*. Dr. Gringarten acknowledged that his estimate of cumulative volume of oil released was entirely dependent on his estimate of permeability. FoF No. 382. In fact, he acknowledged that if the permeability was twice the 238 millidarcies value that he used, his estimate of the cumulative volume of oil would double. The evidence at trial showed that Dr. Gringarten's permeability value was too low by 70% or more and therefore his cumulative volume of oil was too low by at least 70%. FoF No. 382, 410.

During the response, BP had access to the same sampling data that Dr. Gringarten did for his expert testimony, but used much higher permeability values, including values up to 1,000 millidarcies. FoF No. 414. Before the well was drilled, BP's presentation to get approval for the well called 500 the "most likely" value. FoF No. 415. The United States' well testing expert Dr. Leif Larsen found that Dr. Gringarten cherry-picked the data he used to get the lowest possible permeability value, as described below, and that the actual permeability was between 400 and 500 millidarcies. FoF No. 387-406. Dr. Huffman reached a similar conclusion based on well log data. FoF No. 409. Once corrected for his unrealistically low permeability, Dr. Gringarten's estimate would be consistent with the 5 million barrels reached by the United States' experts.[8]

Dr. Gringarten premised his permeability estimate on pressure transient analysis of the data collected before the blowout. FoF No. 390. In using data from what is known as a wireline

---

[8] Relying on a permeability of 238 millidarcies, Dr. Gringarten estimated the total flow was between 2.4 and 3.0 million barrels. Because he testified that the total was directly proportional to the permeability, the Court can correct Dr. Blunt's estimate by using a realistic permeability. Drs. Larsen and Huffman testified that the appropriate permeability range was 400 millidarcies (68% larger than Dr. Gringarten's estimate) to 500 millidarcies (110% larger). FoF No. 389, 409-410; *see also* FoF No. 290 (when using a realistic final day flow rate, Dr. Blunt calculated a permeability of 407 millidarcies). At 400 millidarcies, Dr. Gringarten's range would be 4.0 to 5.0 million barrels of oil; at 500 millidarcies, it becomes 5.1 to 6.3 million. FoF No. 382, 389, 410**.**

formation test,[9] Dr. Gringarten made a series of choices that drove his estimate to the lowest

possible value. First, Dr. Gringarten used only a single pressure build up curve for each layer of

the reservoir, although multiple build ups were available. FoF No. 401-402. As Dr. Larsen

demonstrated, by choosing to analyze only the build up associated with the pretest – the lowest

flow rate extraction – Dr. Gringarten chose to analyze the most uncertain data available. FoF No.

401-402. Dr. Larsen demonstrated that when all useable build ups were included, the

permeability estimates must be substantially higher in order to match the measured data. FoF No.

403. Second, Dr. Gringarten used a model of the wellbore that was too large – allowing him to

obtain what he called a match to the data with a much lower permeability value. FoF No. 406.

Third, and perhaps most importantly, Dr. Gringarten chose a permeability estimate that did not

match the data. FoF No. 403, 405. His own pressure response curves show that his permeability

estimates are too low.

  ***Beginning Flow Rate***. Because Dr. Gringarten selected a method of analysis that

required a flow rate as an input, Dr. Gringarten had to make assumptions regarding the flow rate.

For the first nineteen days of flow, Dr. Gringarten assumed the lowest flow possible.

Essentially, he assumed that there was minimal flow on the first day after the explosion and that

the flow rate slowly increased until the first measured pressure on May 8, 2013. *See* FoF No.

128, 140-141, 422-423. Dr. Gringarten admitted he had no evidence to support that

assumption. FoF No. 423-424. By assuming minimal flow on the first day, Dr. Gringarten

---

[9] During a wireline formation test, the tool extracts small amounts of fluid from the reservoir and
then the well is shut in to allow the pressure in the reservoir to build up again. FoF No. 391. Each
layer of the reservoir is analyzed separately. FoF No. 392. For each layer, several periods of fluid
extraction are performed with varying amounts of liquid withdrawn in each event. *See* FoF No.
393-394, 400-401. The final sample in the wireline formation test is called the pretest and
involves the smallest amount of liquid extracted from the reservoir. *See* FoF No. 400-401.

contradicts BP's Phase One evidence: BP's testifying expert Morton Emilsen concluded that the initial flow rate just fueling the dramatic fire on the rig was 28,000 to 41,000 barrels. FoF No. 128.

   *Final Flow Rate*. Dr. Gringarten also assumed the wrong value for the final day of flow. Ignoring the fact that BP itself had generated several estimates establishing that the flow rate on the final day was between 51,500 and 62,000 barrels per day, Dr. Gringarten assumed a flow rate and then adjusted it using what he called the "modern" approach of "deconvolution." *See* FoF No. 419-420. In doing so, he developed a flow rate profile that ended with a final day value of around 43,000 barrels per day (or less) – significantly lower than the "direct calculation" done by BP itself at the end of the response. FoF No. 421.

   *Dependent on Assumed Flow Rates*. Dr. Gringarten asserted that deconvolution could reliably "correct" his assumed flow rate to the actual flow rate for each day of the spill. Phase 2 Tr. at 2533:23-2534:15 (Oct. 15, 2013 PM) (Gringarten). This proposition is disproved by his own work. As he testified at trial, Dr. Gringarten performed his analysis twice – with two different assumptions on the flow rates over the response. FoF No. 420. He got two different answers. If deconvolution truly provided a correct flow rate regardless of the starting flow rate assumption, he would have gotten the same answer in both cases. Instead, Dr. Gringarten's assumed flow rate determined the answer he got for the final day and, ultimately, for every day for the flow period.[10]

---

[10] Dr. Gringarten attempted to explain away this problem by noting that the lower his assumed flow rate was at the beginning, the higher his resulting flow rate estimate became. This only proves that his methodology is dependent on his assumed inputs.

### 3.   The evidence contradicts Dr. Johnson's critiques of the United States experts

BP's third witness testifying on the total discharge did not offer an estimate of his own. Dr. Johnson limited his testimony to criticizing the work of Drs. Griffiths and Dykhuizen and offering admittedly unsupported hypotheses on potential alternative inputs. Dr. Adrian Johnson is consultancy director for FEESA, a small oil and gas consulting company that performs hydraulic modeling.[11] The evidence shows that Dr. Johnson's criticisms are unfounded: they are either based on hypothetical inputs that serve only to minimize the total flow or reflect modeling Dr. Johnson performed that fails to reflect the actual geometry of the flow path.

Dr. Johnson testified that there was "huge uncertainty" in modeling the flow from the Macondo well, and he identified three primary sources of that uncertainty: the reservoir productivity index ("PI") trend over time, the BOP pressure data before May 8, and effects of multiphase flow. Phase 2 Tr. at 3038:18-3040:2 (Oct. 18, 2013 PM) (Johnson). Dr. Johnson's "huge uncertainty" was no such thing, however; evidence from the response and Phase One trial makes clear that Dr. Johnson's alternative inputs are too extreme and that Dr. Griffiths' results are reasonable. Indeed, Dr. Johnson's alternative inputs require the conclusion that the flow rate at the beginning of the response was "close to zero," contrary to first-hand observation and BP's Phase One evidence. FoF No. 128.

***Productivity Index***. There is no dispute that Dr. Griffiths used a reasonable PI for the Capping Stack period. FoF No. 131. Moreover, in its modeling during the response, BP used PIs of around 50 barrels/psi/day from the very beginning of the response. FoF No. 134. In other words, the PI trend used by Dr. Griffiths at trial was perfectly consistent with what BP did during

---

[11] Dr. Johnson testified that about a third of FEESA's total revenue came from its post-spill Macondo work for BP. FoF No. 126.

the response. Just two days after the blowout, one of BP's modelers described the information "*known* at the moment," including that the PI was 50 or 55, slightly above Dr. Griffiths' value of 45.[12] FoF No. 134.a.

**BOP Pressures**. There was no BOP pressure data before May 8 because it took 18 days for BP to get data from its PT-B gauge. *See* FoF No. 113, 138. Dr. Griffiths addressed this data gap by looking at the data from the remaining 69 days of flowing conditions and extrapolating that trend back to April 20. FoF No. 113. By contrast, Dr. Johnson proposed an alternative pressure trend based on just two data points: the pressure on May 8 and the pressure on April 20 – *before* the well exploded and uncontrolled flow began into the Gulf. FoF No. 140. Dr. Johnson ignores the fact that the explosion and loss of well control would be expected to cause a huge, immediate decrease in pressure. FoF No. 143. Moreover, the pressure trend proposed by Dr. Johnson – and by Dr. Gringarten – uses the uncertainty created by BP's failure to connect to PT-B for the first 18 days of the response to minimize the flow rate for that period. BP should not be allowed to minimize its liability by taking advantage of an absence of data that BP itself controlled. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable."); *see also* U.S. Proposed Conclusions of Law ("CoL") No. 23-24.

---

[12] In response to Dr. Griffiths' analysis, Dr. Johnson simply offered two hypothesized PI trends, both based on information he was asked to assume by BP counsel and totally at odds with what BP expected during the response. FoF No. 132. He conceded that the paths he presented "probably [are] not what [the PI] did." FoF No. 133.

***Multiphase Flow Modeling***. Dr. Johnson used a commercial computer model to analyze the Macondo well, and argued that his work showed Dr. Griffiths failed to properly capture the complexity of multiphase flow for a situation with two flow paths. However, it was Dr. Johnson's model that failed to match reality. Rather than model a pipe within a pipe – the actual geometry – Dr. Johnson modeled two pipes in parallel (one representing the flow inside the drill pipe and one representing the flow in the annular space between the drill pipe and the production casing), and used the incorrect flowing area for the annular space.[13] FoF No. 148-149, 153. By using an area that was off by as much as a factor of three to five, Dr. Johnson modeled the drill pipe as if it was the bigger flow path. *Id*. In reality, the production casing annulus was twice as big as the drill pipe. FoF No. 153. Dr. Johnson's model thus incorrectly showed more flow in the drill pipe than the annulus, despite the fact that the annulus was the bigger path, contrary to common sense and contrary to BP's own modeling performed during the response and for the Phase One trial. FoF No. 155, 157. Dr. Johnson's failure to correctly model the flow path simply confirms Dr. Griffiths' contention that by using actual data from the well to build a custom model, Dr. Griffiths can get a more accurate description of the flow rate than commercial models. FoF No. 115, 159.

---

[13] Like Dr. Zaldivar, Dr. Johnson used a modeling approximation known as the hydraulic diameter. FoF No. 153. As described below, that approximation can aid in calculation of fluid *velocities*, but calculation of flow rate must be done with the true area, as explained in a flow textbook relied upon by both Dr. Johnson and Dr. Zaldivar. FoF No. 86, 97.

**III.    Evidence Of Flow Rate Over The Course Of The Response Supports A Total Discharge Of 5 Million Barrels And Refutes The Estimates Offered By BP At Trial**

There is no dispute that the flow rate after installation of the Capping Stack was about 53,000 barrels. The only question that remains is how the flow rate changed over time (if at all) to reach that amount. The United States has offered evidence of a moderate decrease in flow rate over time – consistent with the well-known principle of reservoir depletion. By contrast, BP's trial estimates can only be reconciled with the known final day flow rate if the rate was increasing over time. To provide an explanation for an increasing flow rate, BP must prove there was another factor affecting flow rates over time, aside from reservoir depletion.

BP attempted to do so by theorizing that erosion over the course of the response affected flow rates. However, BP failed to offer proof that erosion caused any meaningful change in flow rates over time. This is hardly surprising given that during the Phase One trial BP emphasized that erosion took place extremely quickly. Rapid erosion of the type seen in BP's Phase One evidence would mean that erosion had little effect on the flow rate after the first days (at most) of flow. Moreover, the estimates of flow rates that BP internal experts made during the response and United States' experts made both during the response and in litigation confirm that the flow rate was generally consistent over the spill – not increasing as a result of erosion.

For the reasons described below, BP cannot show that erosion resulted in gradually increasing flow rates over any significant portion of time during the response. This is important because if erosion did not increase flow rates over time, the estimates presented at trial by Drs. Blunt and Gringarten *cannot* be correct. As described in Section I, the undisputed evidence shows a final flow rate of approximately 53,000 barrels. Absent erosion driving flow rates up

over time, the preceding day flow rates would be larger than 53,000 and the total discharge much greater than BP's trial experts claimed.

A.    **The Evidence Shows that Erosion Happened Quickly and Did Not Affect Flow Rate after the Beginning of the Response**

1.    **Any erosion affecting the flow rate occurred early in the response, consistent with BP's proof in Phase One**

The evidence shows erosion happened extremely quickly, as BP noted in Phase One. In general, erosion is a phenomenon that operates most quickly at the beginning of a process and then slows down. FoF No. 468. Erosion depends on fluid velocity; as the flow path expands through erosion, the fluid velocity will decrease and the erosion rate will decrease. *See* FoF No. 468, 520. The evidence shows that general pattern held in this case. BP Phase One testifying expert Earl Shanks concluded that the drill pipe at the upper variable bore rams was eroded through *in less than a second*. FoF No. 462. Similarly, Transocean Phase One expert Greg Childs and BP's Bly report both concluded that erosion at the upper annular preventer caused erosion through the drill pipe at that location in a matter of minutes. FoF No. 465-466. As Dr. Griffiths explained, the evidence of rapid erosion in the BOP demonstrates that similar erosion likely occurred throughout the flow path, so that the evidence of extremely rapid erosion in certain areas

> tells you the capacity to erode things in these very short time frames exists. You would expect that anywhere in this system that that capacity exists. . . . very significant erosion on time scales of seconds, minutes, hours, maybe a couple of days, not on time scales of weeks, months.

FoF No. 476. The erosion that can be seen in the BOP equipment as it sits at Michoud did not occur gradually over the 86 days of flow. It occurred quickly at the very beginning of the response and then ceased to affect the flow rate.[14] FoF No. 440-442, 462-468, 470-472.

The effect of erosion on flow rate can also be seen in pressure data collected by BP. Changes in flow path restrictions would show up in BOP pressure data. FoF No. 114. But the BOP pressure gauge shows a gradual decline over time, consistent with reservoir depletion affecting the flow rate and inconsistent with flow rates increasing due to erosion. FoF No. 475. Dr. Griffiths demonstrated that same effect through his alternative calculations. Those calculations used the same principles as his best estimate, but relied on different pressure data. FoF No. 477. For instance, his best estimate relied on the pressure difference between the reservoir and the BOP, while his two alternatives relied on the pressure difference between the BOP and ambient sea conditions and between the reservoir and ambient sea conditions. FoF No. 112, 477; TREX-011485.0010-0012. The fact that all of Dr. Griffiths' calculations came to essentially the same result indicates that erosion was not affecting the flow rate. FoF No. 477.

> ### 2. Despite presenting two trial experts on erosion, BP failed to present any credible evidence of when erosion occurred or how it affected flow rate

BP offered two expert witnesses at trial that attempted to address erosion rates. The testimony of Dr. Nesic and Dr. Momber shares two fundamental flaws: their testimony is at odds with BP's evidence from the Phase One trial and, even if credited, fails to offer any rates of erosion, and therefore provides no insight into the impact of erosion on flow rate.

---

[14] Erosion might well continue to occur, but, as BP noted during the response, once the flow path reaches a certain size, that restriction no longer has "any material impact on flow." FoF No. 442.

### a. Even if Dr. Nesic's flawed modeling could be credited, he failed to provide any information concerning how erosion affected flow rate over time

Dr. Nesic's modeling is replete with problems, as established at trial and described in the Findings of Fact. Most fundamentally, however, even if Dr. Nesic's modeling worked as designed, it would fail to provide useful information to the Court because he simply assumed what he set out to determine: how quickly erosion happened.

*First,* Dr. Nesic cannot and does not offer any opinion about the rate of erosion. FoF No. 484. He simply makes an assumption, relying on a non-testifying expert, that the erosion lasted until May 27. FoF No. 492. (That non-testifying expert offered no opinions related to erosion. FoF No. 496). Rather than model erosion rates, Dr. Nesic assumes that all significant erosion occurred between April 22 and May 27 and uses that as the starting point for his model. FoF No. 490, 492, 507. Dr. Nesic has no independent basis to know how long erosion lasted or at what rate it occurred. At trial, he pointed to the development of the third hole in the kinked riser on May 19 as support for a long period of erosion. FoF No. 492, 497. However, Dr. Nesic's own testimony about differences in rates of erosion across different parts of the well means that the alleged erosion of the *riser kink* on May 19 indicates nothing about whether significant erosion was still occurring in the *BOP* at that point. *See* FoF No. 500. More important, both BP's internal experts during the response and Dr. Griffiths concluded that the riser kink holes did *not* result from erosion at all, but from cracking or focused flow from the drill pipe inside the riser. FoF No. 474.b, 501. In other words, the riser kink holes were the result of unique conditions caused by the riser falling and bending the metal, rather that erosion. The riser kink holes thus provide no indication of what was happened elsewhere in the flow path.

**Second**, Dr. Nesic considers only a small portion of the overall restriction. The only restrictions Dr. Nesic considered were the riser kink and three sets of BOP rams (the Blind Shear Rams, the Casing Shear Rams, and the Upper Annular). FoF No. 485, 488. Dr. Nesic admits that his conclusion about the change in flow rate over time depends on assuming the BOP and kinked riser were the main restrictions to flow in the period from April 22 to May 27. FoF No. 485-486. However, BP's own calculation from the response – shows that components other than the BOP and the kinked riser accounted for 70 to 85% of the resistance in the well. FoF No. 451-452. Thus, Dr. Nesic's modeling does not provide any conclusions about the change in flow rate over time, because he did not, in fact, model the restrictions of greatest significance.

**Finally**, Dr. Nesic candidly admits that his transient modeling – the sole basis for any conclusion about what happened during his assumed erosion period – "exploded" after modeling ten days of a 35-day period. FoF No. 508. The deficiencies in Dr. Nesic's modeling, however, go beyond the fact that his modeling crashed. The modeling is simply not reliable, for reasons described in detail in the accompanying Findings of Fact. For example:

(1) Dr. Nesic's transient modeling uses the density of oil, not the density of oil and gas, so he is not accurately modeling the flowing fluids. As he testified, any conclusion about what would happen if given a combined density would be speculation. FoF No. 519-520;

(2) Dr. Nesic's modeling is inconsistent with the actual, measured pressure data obtained during the response, which he failed to analyze. FoF No. 517;

(3) The "linear trend" that Dr. Nesic infers from his transient modeling is not supported by his own exploded model. FoF Nos. 509-515. In fact, assuming one can place any reliance on Dr. Nesic's modeling, an exponential curve would better fit the results. FoF No. 509. An

24

exponential curve would also be consistent with the United States' explanation of erosion in the system: that the erosion that mattered for flow rate occurred quickly.

### b. Dr. Momber relies on an assumption contrary to the established facts from Phase One, making his opinion irrelevant

Dr. Momber provides no relevant analysis to the Court. He offers no opinion on the shoe track cement's initial resistance to flow (admitting he does not know the condition of the cement), and does not attempt to calculate a cement erosion rate. FoF No. 541, 547. Accordingly, he cannot offer a credible opinion regarding how quickly any resistance posed by the cement in the well shoe track was eliminated. FoF No. 540-541, 546-547. Moreover, the analysis that Dr. Momber did conduct suffers from a fatal flaw – the assumption that the Macondo well cement had set. FoF No. 526-529, 531, 534.

Although the cement and its condition were the subject of several expert reports and copious trial testimony in Phase One, Dr. Momber made the assumption that the cement was set without reviewing *any* of the trial testimony from Phase One and without citing to a *single* Phase One expert report on cement. FoF No. 531, 534. Had Dr. Momber reviewed that evidence, he would have discovered that the overwhelming conclusion from Phase One, including that of BP cement expert David Calvert and BP Wells Team Leader John Guide, was that the cement was not set. FoF No. 526-528.[15]

Dr. Momber's flawed assumption that the cement was set undercuts both parts of his analysis. His first opinion is that "*assuming the cement in the Macondo well was set*, it is scientifically unsound to believe that the cement could have completely eroded within 9 or 48 hours." D-24708 (BP demonstrative) (emphasis added); *see also* FoF No. 534. Dr. Momber

---

[15] Halliburton's expert, Dr. Gene Beck, also testified that the blowout occurred too quickly for the hydrocarbons to have traveled through cement. FoF No. 529.

offers no opinion as to whether any restriction initially posed by the cement could have been eliminated in 9 or 48 hours had the cement *not* been set. FoF No. 534, 540-541. Moreover, he offers no basis for assuming the cement was set.[16]

Even if the cement had been set, Dr. Momber's analysis is still flawed and unreliable. Dr. Momber lacks any expertise or experience with oilfield cement. FoF No. 530. He attempted to compare erosion rates for the Macondo well cement that he ascribed to Dr. Griffiths and Dr. Dykhuizen to erosion rates for construction concrete in published literature. FoF No. 541-542. But the composition of the Macondo well cement is not analogous to the construction concretes he considered. FoF No. 542. And while Dr. Momber argues, without scientific support, that it is the compressive strength of the materials and not their composition that is relevant, he admitted he did not know the compressive strength of the Macondo well cement. FoF No. 543-544.

Dr. Momber's second opinion, that the Macondo well cement was subject to "hydraulic fragmentation," is similarly based on unfounded assumptions: that the cement was set, and "pre-damaged." Phase 2 Tr. at 2977:16-22, 3000:19-22 9 (Oct. 17, 2013 PM) (Momber); TREX-011644.0016, 0019; *see also* FoF No. 531. Moreover, this opinion conflicts with the Phase One testimony of BP expert Morten Emilsen that the sudden change in downhole restrictions during the blowout was the result of "washout." FoF No. 536. Dr. Momber admits he did not independently evaluate the condition of the cement in the shoe track, and further admits that there is no evidence to support his assumption that there was a network of cracks and pores in the cement before the blowout. FoF No. 539, 547.

---

[16] Dr. Momber does say that he believed Dr. Griffiths assumed the cement was set, and so he made the same assumption. FoF No. 532-533. Dr. Griffiths did not opine on whether the cement was set. Instead he entertained the possibility that "the cement remained reasonably intact." TREX-011485.0012; *see also* FoF No. 533. In any event, Dr. Griffiths does not *rely* on the cement being set for his opinions, while Dr. Momber admittedly does.

Finally, even if Dr. Member's opinion could be credited, it has minimal relevance. Dr. Member admitted that all of the Macondo cement could have eroded in as little as a week and only a portion of the cement had to erode before it provided only a "negligible" resistance to flow. FoF No. 540. Thus his opinion is easily reconciled with Dr. Griffiths' testimony that erosion affecting flow rate occurred within the first couple of days of the blowout.

**B.     Flow Rate Estimates for Specific Periods during the Response Confirm that BP's Theory of Erosion Increasing Flow Rate over Time Cannot Be Correct**

Flow rate estimates performed for discrete periods during the response further confirm that erosion was not significantly affecting the flow rate over time. Both United States scientists and BP employees calculated so-called "point estimate" flow rates looking at specific periods during the response. Those estimates are consistent with a gradual, decreasing flow rate trend. Indeed, once corrected for the modeling flaw described below, BP trial expert Dr. Zaldivar's results are consistent with that flow rate trend and inconsistent with BP's assertions of flow rates increasing over time. Moreover, both United States and BP experts calculated the change in flow rates for major source control interventions like cutting the riser and installing the Capping Stack. These major changes to the flow path resulted in small changes to the flow rate, demonstrating that smaller changes in the flow path would have negligible effects on flow rate.

**1.     Dr. Dykhuizen calculated flow rates of 60,000 barrels for two different periods in the response**

In addition to the final day flow rate discussed in Section I, Dr. Dykhuizen used data available during the response to calculate flow rates for two periods: Top Kill and Top Hat. For both periods, which cover more than a month of the response, Dr. Dykhuizen concluded that the flow rate was about 60,000 barrels.

27

For Top Kill, Dr. Dykhuizen used the available pressure data and mud pumping rates to calculate a best estimate flow rate of more than 60,000. FoF No. 48; TREX-011452.0011. The method was similar to that used by BP's Dr. Ballard in his Capping Stack flow rate calculation performed during the response. FoF No. 48. Importantly, BP *did not challenge* Dr. Dykhuizen's 60,000 Top Kill estimate.[17] Indeed, BP's engineers relied on the same data and reached similar estimates during the response. FoF No. 50. The Top Kill estimate is also probative of what the flow rate was in the days shortly before and after Top Kill. As BP recognized at the time, the BOP pressures showed similar values before Top Kill and after Top Kill, indicating that the flow rate had not changed significantly as a result of the intervention. FoF No. 458.

Dr. Dykhuizen also calculated a flow rate of 60,000 for the Top Hat period from June 3 to July 10. FoF No. 52-55. Notably, Dr. Dykhuizen and other engineers from the National Labs shared similar Top Hat calculations with BP during the response. BP offered no criticism of the calculations then – instead, BP used those calculations to guide containment plans. FoF No. 55. Dr. Dykhuizen's Top Hat calculation looked at the three flow paths from the Top Hat: oil was collected by the ships, flowed through vents on top of the Top Hat, and escaped from under the skirt at the bottom of the Top Hat. FoF No. 54. The volume of collected oil has been stipulated and ranged as high as 25,000 barrels per day for approximately the last two weeks of the Top Hat period. FoF No. 57.a. Dr. Dykhuizen's vent flow calculation of 18,000 barrels per day remains unchallenged by BP. FoF No. 55.d, 57.a. The only significant uncertainty is flow from the skirt,

---

[17] BP expert Adrian Johnson was the only BP witness to address Dr. Dykhuizen's Top Kill analysis, and Dr. Johnson admitted at trial that he included nothing about Dr. Dykhuizen's best estimate in his expert report. FoF No. 49. Under the Court's well-established "four corners" rule, that admission means BP has no evidence to counter Dr. Dykhuizen's 60,000 best estimate. *See, e.g.*, Doc. No. 4486 ("Retained expert opinions are restricted to the four corners of the original report and any rebuttal report.").

which Dr. Dykhuizen conservatively estimated at about 15,000 to 20,000 barrels per day. FoF No. 55.b. Notably when BP's hired expert Dr. Johnson replicated the calculation, he came up with values around 30,000 for the skirt flow. FoF No. 57.b.

> ### 2.   During the response, BP estimated the flow rate based on scenarios that we now know are accurate, and came up with values consistent with the United States' estimate

During the response, BP had employees and outside contractors with expertise in fluid flow trying to determine the flow rate in order to inform "key decisions" and understand the effects of well kill options. FoF No. 4-5.

BP made a handful of flow rate estimates that it actually shared with Unified Command.[18] In order to get permission to apply dispersants, BP had to inform Unified Command what it believed the flow rate was. When it counted to get the right level of dispersants, BP told Unified Command on July 6 and July 11 that the flow rate was 53,000 barrels. FoF No. 75. Similarly, BP agreed to arrange for containment options that would cover 60,000 to 80,000 barrels. FoF No. 55.h. Bringing on more ships to increase containment capacity came with a cost: increased complexity and risk of accident at the surface. *Id.* BP had refused to allow other activities that it thought would increase the risk. *Id.* But the company agreed to increase its containment, suggesting that it knew the flow rate was in that ballpark. *Id.*

BP only *shared* flow rates when it had to – such as the dispersant application. But internally, BP was churning out flow rate estimates from the earliest days of the response. Some of these flow rates were based on assumptions or scenarios that later turned out to be incorrect. But others modeled the flow as it occurred. For instance, BP modeler Tony Liao looked at flow

---

[18] Of course, one of the initial estimates BP shared with Unified Command turned out to be a lie, and BP pleaded guilty for multiple false and misleading flow rate statements. *See* FOF No. 19. We omit those estimates here.

up the production casing and the drill pipe – the flow path that the Parties now know was correct. FoF No. 74. Dr. Liao concluded that the daily flow rate was 63,000 barrels. *Id.* Meanwhile, BP hired Add Energy and Ole Rygg, one of the primary developers of the OLGA multiphase flow model, to perform flow modeling. FoF No. 58-59. On May 10, 2010, Dr. Rygg concluded that the flow through the production casing and drillpipe combined was about 55,000 barrels. FoF No. 60-61. While this modeling was based on assumptions about flowpath that were not confirmed at the time, we now know those assumptions are correct and can be trusted. As Dr. Rygg testified in his deposition: with the correct inputs, his OLGA model will correctly calculate the flow rate, and he had every reason to believe that BP provided him the best inputs. FoF No. 59, 62. Dr. Rygg's 55,000 barrel estimate on May 10 further supports the United States' evidence that the flow rate was not increasing over time, but started just above 60,000 and then declined consistent with typical reservoir depletion.

### 3. The most significant source control interventions resulted in small changes to the flow rate

In addition to the point estimates described above, both BP and the United States estimated how flow rates would change as a result of major interventions to the flow path, such as cutting the riser or installing the Capping Stack. Those analyses show that even the biggest changes to the flow path would have only small impacts on flow rate. Given how little those major changes affected flow, the types of day-to-day changes that occurred in between could not be expected to have any meaningful impact on the flow rate.

The three most dramatic actions taken during the response – the ones with the greatest potential to affect flow rate – were the Top Kill, the cutting of the riser, and the installation of the Capping Stack. As described above, BP concluded during the response that Top Kill had not had

any significant affect on the flow rate, a conclusion validated by the later work of Drs.

Dykhuizen and Griffiths. FoF No. 48, 55-57, 460. BP and the United States also concluded that

cutting the riser had a small effect on flow rate, just a couple of percent at most, while installing

the Capping Stack and closing its rams to shrink the flow area resulted in a similar, minimal

decrease in flow. FoF No. 444, 446-447; TREX-011452.0004. These small changes in flow show

that only a major change in the flow path can make any impact on the flow rate. The much, much

smaller changes that occurred during the rest of the response would not affect the overall flow

rate trend.

### 4. Dr. Zaldivar's May 13-20 estimate is too low by a factor of two, but it confirms that the flow rate was *not* increasing over time

At trial, BP ignored the internal and external experts that it relied upon during the

response, and dismissed the work they did. Instead, BP hired Dr. Zaldivar to come in after the

fact and opine on the flow rate during a week in May 2010. Dr. Zaldivar made an error in his

calculations by modeling a flowing area that was much too small, as described below. Assuming

his model is otherwise valid,[19] correcting that error makes his estimate approximately 60,000

barrels, consistent with the opinions of Drs. Dykhuizen and Griffiths. Just as importantly, Dr.

Zaldivar's examination of the flowing conditions from May 13 to 20 confirms that the flow rate

was *not* increasing over that time, consistent with the United States' evidence and in stark

contrast to BP's contention that erosion was causing flow rate to increase all the way until Top

Kill (or even beyond).

Dr. Zaldivar investigated the flow rate for the period between May 13 and May 20, and

provided the same estimate for each day during that period. *See* FoF No. 76, 437. Thus, Dr.

---

[19] There is evidence that Dr. Zaldivar's method itself cannot reliably estimate the flow rate, even if modeling the correct geometry. FoF No. 99.

Zaldivar's modeling is inconsistent with BP's argument that flow was changing significantly during May. Dr. Zaldivar found that the flow rate was constant between May 13 and May 20, so erosion cannot have been increasing the flow rate in that period. As described above, Dr. Nesic's opinions about how flow rate changed over time cannot be given any credence because he simply assumed an erosion period. Dr. Zaldivar's results mean that Dr. Nesic's assumed erosion period *cannot* be correct: erosion affecting flow rate had concluded by no later than May 13 – two weeks earlier than Dr. Nesic assumed.

Dr. Zaldivar's modeling is also more consistent with higher flow rates than those presented in his testimony. As Dr. Zaldivar explained, the modeling program LedaFlow is built to model flow through circular pipes. FoF No. 81. Dr. Zaldivar used the "hydraulic diameter" of the annular flow path and input that diameter into LedaFlow. FoF No. 82-83. This meant that the flowing area in the actual riser was approximately double what it was in his model. FoF No. 87. Flow rate is equal to density times velocity times area, so twice as much area equals twice as much flow for a given velocity. FoF No. 85-87.

The hydraulic diameter concept is widely used and accepted in fluid mechanics. FoF No. 82. However, as explained by Drs. Dykhuizen and Griffiths and as shown in the fluid mechanics textbook cited by Dr. Zaldivar, it is used to calculate the relationship between pressure drops (the difference in pressure between two points in the flow path) and fluid *velocities*. FoF No. 86-87, 97. Once the correct pressure drops and velocities are known, the flow rate must be calculated using the *actual area* available for flow. *Id.* Dr. Zaldivar never performed this final step, meaning that the actual flow rates through the riser were approximately double what Dr. Zaldivar calculated (since the actual flow area was approximately double the area in his model). FoF No. 87. As the very text that he relies on indicates, Dr. Zaldivar's use of hydraulic diameter is more

32

than "counterintuitive," it is wrong.[20] FoF No. 97.a; *see also* FoF No. 97.b (OLGA manual explicitly provides mechanism for scaling results based on the actual area available for flow). Notably, when BP's internal flow expert Tim Lockett calculated flow rates through the riser kink holes during the response, he used their actual area, rather than a hydraulic diameter, and came up with roughly twice as much flow as Dr. Zaldivar estimated. FoF No. 96, 157.

## IV.    Any Estimate Of The Total Discharge Should Include All Oil And Be Based On Industry-Standard Multi-Stage Separation

Each of the experts that calculated the total amount of oil discharged, or the flow rate on a given day, must take into account how much the oil "shrinks" as it moves from reservoir to surface conditions. This "shrinkage" is important for defining a "barrel" under the Clean Water Act, the unit by which civil penalties are assessed. 33 U.S.C. § 1321(b)(7); 40 C.F.R. § 19.4. The Act defines a "barrel" as 42 United States gallons at 60 degrees Fahrenheit, but does not specify the pressure at which a barrel is measured. 33 U.S.C. § 1321(a)(13). The oil and gas industry defines a stock tank barrel as the oil at 60 degrees Fahrenheit at one atmosphere of pressure, which is approximately sea level pressure. CoL No. 17. That is the definition the United States is using in this case, despite the fact that the Clean Water Act does not require it. *Id*. In reality, oil and gas were discharged from the Macondo well into the Gulf at pressures of approximately 2200 psia, much higher than sea level pressure. FoF No. 39.a; CoL No. 17. That higher pressure means much more of the mixture would have been oil when it entered the water than would be oil at stock tank conditions.

---

[20] The implausibility of Dr. Zaldivar's theory was demonstrated at trial when he testified that a tank with multiple overlapping holes, each of one-inch diameter, would leak fluid at the same rate as a tank with a single one-inch hole. FoF No. 91, 93-95. This is plainly incorrect and contrary to common sense.

The United States' approach to calculating "barrels" for purposes of the Clean Water Act penalty is therefore a conservative one. As oil and gas move toward the Gulf surface and encounter decreasing pressures, gas entrained in the liquid oil separates out, "shrinking" the oil volume by approximately half compared to the volume in the reservoir. *See, e.g.*, FoF No. 564. In other words, by defining "barrel" as the industry does for purposes of this case, the United States has already reduced by half the amount of penalties it could seek under the Act.

The United States' approach to defining the number of "barrels" of "oil" spilled is conservative in another way. The Clean Water Act defines "oil" as oil of any kind including oil mixed with a waste. 33 U.S.C. § 1321(a)(1). Gas spilled into the ocean is a waste, and the Macondo well discharged a significant amount of gas into the Gulf – both as a separate gas stream and as gas entrained in (i.e., mixed with) the liquid oil. FoF No. 581. The United States has already significantly discounted the total number of barrels of oil it could have counted under the Act by not counting the gas, even though the gas includes pollutants such as benzene and toluene and may have caused environmental harm on its own. FoF No. 583.

With those two concessions by the United States, BP is already getting about half off the total amount spilled. Yet BP seeks to further shrink the amount of fluid hitting the Gulf that counts for penalty purposes by arguing for two additional reductions. Specifically, BP claims that a single-stage separation process should be used to calculate stock tank barrels, and that any hydrocarbons that dissolved in the Gulf before reaching the surface should be excluded from the calculation of stock tank barrels. These positions are unsupported by the plain language of the Clean Water Act, BP's prior positions in this case, and industry practice. Moreover, this case is about more than penalty. The amount of oil spilled will be relevant to future phases of this litigation, scientific study, and public interest. In each case, the number of barrels spilled should

34

reflect the oil that actually spilled into the water. A multi-stage separation process that includes *all* the oil spilled from Macondo is consistent with industry practice, matches what BP itself did in taking credit for collected oil, and best reflects what occurred in the Gulf. *See* CoL No. 19-22.

## A.   Hydrocarbons that Dissolved in the Gulf Cannot Be Discounted as a Matter of Law

Once liability is established under Section 311(b)(3) of the Act, the statutory maximum penalty is based on the number of barrels or units of reportable quantities of hazardous substances "discharged," without qualification. 33 U.S.C. § 1321(b)(7)(A) and (D); *cf.* 33 U.S.C. § 1321(b)(3). BP claims that hydrocarbons that dissolved in the Gulf should not be counted toward the Court's determination of the number of barrels of oil discharged. According to BP trial expert Dr. Whitson, this dissolution results in approximately 10% fewer stock tank barrels than that calculated using his proposed oceanic separation process.

There is no reason to ignore 10% of the discharged oil by treating dissolved hydrocarbons as though they have "disappeared." As the Court aptly noted at trial, when one dissolves salt in water the salt is still there, it is simply dissolved in the water phase. Trial Transcript at 2350:25-2351:7. The hydrocarbons that dissolved in the Gulf are no different. They were still discharged to the Gulf, and are still present in the Gulf, simply in a different form. They may dissolve, but they do not disappear. FoF No. 582-584. Under the plain language of the statute, all oil that was discharged into the Gulf should be counted for purposes of calculating the statutory maximum penalty, regardless of whether components of the oil dissolved into the Gulf quickly (polluting the Gulf immediately); dissolved into the Gulf over time; evaporated; were burned or skimmed off the surface or shoreline; biodegraded; coated or were ingested by wildlife; and/or remain in the Gulf today.

### B.      A Multi-Stage Process Is Appropriate to Define Macondo Oil Shrinkage

As experts for both the United States and BP testified, when oil is intentionally produced from reservoir to sea level conditions, oil producers typically remove the gas in multiple stages, each with decreasing temperatures and pressures, a method designed to maximize the amount of gas that stays in liquid oil form. FoF No. 549, 551-554, 558, 591-592. The United States' fluid phase behavior expert Dr. Zick provides two methods to approximate this multi-stage shrinkage – one that tracks the multi-stage process discussed in contemporaneous BP documents, and one that simulates the path the spilled oil and gas followed in the Gulf. FoF No. 550, 559-567, 588-589. BP's expert Dr. Whitson also calculated "shrinkage" using these two methods, and specifically testified at trial that he does not recommend use of a single-stage flash process to approximate the path the Macondo oil took from sea floor to surface conditions.[21] FoF No. 558, 573-586.

### C.      BP Should Be Judicially Estopped from Arguing that Multi-Stage Separation Is Not Appropriate, and that Dissolved Oil Does Not Count

The positions BP took at trial regarding the appropriateness of multi-stage separation and whether hydrocarbons that dissolved in the Gulf should be counted toward the total number of barrels spilled are inconsistent with positions BP has previously taken in this case. In its motion for partial summary judgment regarding collected oil, BP argued two propositions that are relevant here. First, BP sought to limit the amount of civil penalties to only the oil that came in contact with Gulf waters. *See* Motion for Partial Summary Judgment Against the United States with Respect to Its Claims for Civil Penalties for the More Than 800,000 Barrels of Oil that

---

[21] Perplexingly, BP's expert Dr. Blunt ignored the oceanic separation process that BP's own fluids expert, Dr. Whitson, developed and instead concluded that the oil and gas would remain together in one stream all the way from sea floor to surface. This theory is unsupported by either of the fluids experts in this case.

Were Collected and Never Released into the Environment During the Deepwater Horizon Oil Spill, Doc. No. 8213. In its brief, BP relied on the *Citgo* Court for the proposition that "the important question is how much oil was actually discharged into the waterways." Doc. No. 8213-1 at 12 (citing *United States v. Citgo Petroleum Corp.*, No. 2:08-cv-893, 2011 WL 10723934 (W.D. La. Sept. 29, 2011), *rev'd on other grounds*, 723 F.3d 547 (5th Cir. 2013)).[22] Second, BP's summary judgment motion calculated the total amount of collected oil based on the multi-stage separation processes used on the collection vessels to maximize the number of barrels collected. In response, BP and the United States reached a stipulation that 810,000 barrels were collected. Importantly, the stipulated amount was based on a multi-stage collection process.

BP now attempts to walk away from the principles it argued in its summary judgment motion by arguing that *not* all the oil that reached the water should count and that single-stage separation should be used. The Court should give no credence to these arguments. Courts have long recognized the doctrine of judicial estoppel as a means of "prevent[ing] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotations omitted). The doctrine of judicial estoppel "is 'an equitable doctrine invoked by a court at its discretion' to 'protect the integrity of the judicial process.'" *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (quoting *New Hampshire*, 532 U.S. at 749–50) (internal quotation marks and citations omitted); *see also* CoL No. 21.

At BP's urging, the Parties agreed that collected oil should be deducted from the total discharge based on multi-stage separation for every barrel of oil not contacting the water. Now,

---

[22] BP's brief also quoted Judge Southwick's statement at oral argument that "fundamental fairness says that you get penalized for the damage that you cause, *which means the oil that got into the water*…" Doc. No. 8213-1 at 11 (emphasis added).

BP argues that the amount that did contact the water should be further reduced through a single-stage shrinkage calculation. This Court should invoke the doctrine of judicial estoppel here to protect the integrity of the judicial process and prohibit BP from "playing fast and loose with the courts," and "deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750 (internal quotation marks and citations omitted).

> **D.**    **The Estimates Made by Drs. Blunt and Gringarten Are more than 10 Percent too Low Because They Fail to Properly Account for Multi-Stage Separation and Count All Oil Reaching the Water**

For the reasons described above, the Court should find that the proper way to estimate the oil requires using a multi-stage process and counting all oil that enters the water. Drs. Blunt, Gringarten, and Zaldivar failed to do so. That failure means their estimates are at least 10% too low based solely on their choice of single-stage separation.[23] FoF No. 590-598.

**V.**    **Housekeeping**

> **A.**    **BP Is Liable as an Operator and Person in Charge for the Deepwater Horizon**

BP is already liable as "owner" of the well, based on the Court's Order on Summary Judgment ("SJ Order") (Doc. No. 5809) (appeal pending, No. 12-30883). Now that all the evidence of BP's conduct leading up to the blowout and in attempting to stop the oil spill is in, it is appropriate to find BP liable as an "operator" and a "person in charge" of the BOP and/or other parts of the Deepwater Horizon for purposes of liability under the Clean Water Act. *See* FoF No. 599-607; CoL No. 8-16.

---

[23] The factual differences between the fluid analyses offered by Drs. Whitson and Zick are small, and both agree that the difference between a single-stage and multi-stage separation is about 10%. FoF No. 587-589. Dr. Blunt's "shrinkage factor" for his single-stage process is relatively low, correcting his results requires increasing his value by 16 to 20%. FoF. No. 557, 597-598.

The United States has previously set forth the applicable legal definitions of "operator" and "person in charge." United States Phase One Post-Trial Response Brief, Doc. No. 10733 at 24-25. Evidence from Phase One and Phase Two shows that BP qualifies.

In Phase One the United States argued that, applying the legal definitions of "operator" and "person in charge" as set out in the SJ Order, evidence at the Phase One trial showed that BP was an "operator" of the Macondo Well, and also an "operator" and "person in charge" of the Deepwater Horizon itself, in that BP's Well Site Leaders had ultimate authority, and exercised that authority, as to decisions on the rig related to drilling and well operations. *See* United States' Phase One Findings of Fact, Doc. No. 10460-1, ¶¶ 13-20. BP conceded its status as an "operator" and "person in charge" through Phase One testimony. *See* FoF No. 599-600; CoL 12, 14.

Phase Two evidence further supports that BP was an "operator" and "person in charge" of the Deepwater Horizon itself. For instance, BP operated the BOP, LMRP, and riser during all periods of oil flow and conducted various BOP operations using ROVs, including using the BOP to open and close various rams for the Top Kill. FoF No. 601-607.

### B.   United States' Position Regarding the Source Control Segment of Phase Two and Its Relation to the Upcoming Penalty Phase

The Court will hold an (as-yet unscheduled) "Penalty Phase" trial to take evidence on the penalty factors set out at 33 U.S.C. § 1321(b)(8), and select the dollar amount of civil penalty for each defendant. The evidence in the Source Control segment of Phase Two might relate to the Court's evaluation of the penalty factors during the Penalty Phase. For example, if the Court finds that BP did not adequately prepare for Source Control, such evidence may relate to the penalty assessment, even if the Court were to determine that such evidence does not prove General Maritime Law standards of "willful" misconduct or fraud. Therefore, due to the

potential overlap between the Source Control segment and the Clean Water Act claim for penalties, the United States requests that the Court refrain from making any findings as to simple negligence, or any other standard – legal or equitable – beyond those standards specifically required under General Maritime Law as necessary to rule on the Aligned Parties' claims in the Source Control segment. The United States reserves the right to argue, during the Penalty Phase, how any findings from the Source Control segment should relate to the penalty amount.

## CONCLUSION

The evidence shows that the total discharge from the Macondo well was approximately 5 million barrels. That conclusion was first reached shortly after shutting in the well, and has emerged as the consensus in the three years since. It is confirmed by the rigorous new analyses presented at the Phase Two trial by Drs. Griffiths and Pooladi-Darvish, who used the available data from the well, considered possibilities like erosion and potential changes in input parameters, and independently calculated total discharges of 5 million barrels. To reach their differing conclusions, BP's Phase Two trial experts ignored the critical data from shut-in, cherry-picked input parameters while disregarding the associated uncertainty, and repudiated the conclusions of BP's internal experts during the response and BP's own evidence from Phase One. The Court should give no credence to BP's litigation numbers that ignore or contradict what the company relied on in stopping the flow and presenting its Phase One case.

The United States respectfully requests a ruling concluding that the total discharge from the Macondo Well was 5 million barrels, and a further ruling that BP is liable under the Clean Water Act as an operator and a person in charge of both the Macondo Well and the Deepwater Horizon.

Respectfully submitted,

40

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Directory, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
MALINDA LAWRENCE
Trial Attorneys




R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

SARAH HIMMELHOCH
NANCY FLICKINGER
SCOTT CERNICH
RICHARD GLADSTEIN
THOMAS BENSON
Senior Attorneys
A. NATHANIEL CHAKERES
ANNA CROSS
BETHANY ENGEL
JUDY HARVEY
RACHEL KING
ERICA PENCAK
Trial Attorneys

*/s/ Steven O'Rourke*
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

DANA J. BOENTE
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130
Telephone: (504) 680-3000
Facsimile: (504) 680-3184
E-mail: sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

     I hereby certify that the above and foregoing brief has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12.

Dated: December 20, 2013

*/s/ Sarah Himmelhoch*