UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO, ON APRIL 20, 2010 | * | SECTION "J" |
| | * | |
| THIS DOCUMENT RELATES TO: | * | |
| | * | JUDGE BARBIER |
| *No. 2:13-cv-05804-CJB-SS; Elton Johnson v.* | * | MAG. JUDGE SHUSHAN |
| *BP Exploration and Production, Inc, et al* | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## Johnson's Reply to BP's Response to Johnson's Motion to Enforce Settlement Agreement with BP and Response to BP's Motion for Summary Judgment

The Court is well aware of the lengths BP will go to when it wants to back out of a clear, written settlement agreement. BP must go to these lengths in this case because this case involves a clear offer and an equally clear acceptance that included all material terms. The terms of the contract took months to negotiate. After the negotiations concluded, BP's attorneys stated on several occasions that an agreement existed and refused to exercise their right to lodge an appeal block to the deal from becoming finalized. The settlement is straightforward and no different that the countless settlement agreements that courts have regularly enforced after one party has a change of heart. Regretfully, BP, like it has done in several other recent *Deepwater Horizon* cases, alleged it discovered "fraud" once it decided it no longer wanted to comply with the deal previously struck. But there was no fraud.

Indeed, the GCCF's own investigation that BP relies on concluded that "**Johnson did not submit any overtly fraudulent document, thus a Finding of Potential Fraud is not supported by this investigation**." Ex. A. Instead, the investigation simply found mundane discrepancies that appear in most maritime personal injury cases. The witnesses the GCCF interviewed told the GCCF's investigators that: (1) they have little recollection of seeing Johnson

on the day of the explosion; (2) they did not notice that Johnson was injured that day and they do not remember him reporting an injury; but (3) he reported problems on the van ride home the day after the explosion. The witnesses never saw or talked to him again afterwards due to the fact that Johnson started undergoing medical treatment and initiated a lawsuit.

The fact that BP calls this fraud shows how flimsy its contractual excuses are. The Court should not allow BP to back out of its written settlement agreement simply because it later learned that Tidewater would not indemnify it. Instead, the Court should enforce the settlement, put an end to this litigation, and order BP to pay interest from the date the settlement funds were due.

**A.     The Court does not have to apply summary judgment standards to Johnson's motion**

As an initial matter, BP erroneously argues, without citing any legal authority, that Johnson's motion is governed by Rule 56's summary judgment standards. But this is clearly not correct. *Cia Anon Venezolana De Navegacion v. Harris*, 374 F.2d 33, 36 (5th Cir. 1967) (even though the movant titled his motion as a motion for summary judgment, the court was "constrained to view the proceedings as a hearing by the district Court in the exercise of its inherent power to summarily enforce settlement agreements entered into by parties litigant in a pending case."); *Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d. 386, 390-91 (5th Cir. 1984) (outlining procedure district court should follow when enforcing settlement agreements and noting that the district court can make factual findings[1]); *See also Smedley v. Termple Drilling Co.*, 782 F.2d 1357, 1359 (5th Cir. 1986). Here, the Court should follow the procedure outlined in *Mid South Towing Co*. *Mid-South Towing Co.*, 733 F.2d at 390. However, even if the Court believes Johnson's motion is governed by Rule 56, the Court should grant summary judgment in

---

[1] If a summary judgment procedure was required, courts would obviously not be allowed to resolve factual disputes.

2

Johnson's favor since no genuine issues of material fact exist and Johnson is entitled to judgment as a matter of law.

**B.     The offer provided reasonable certainty as to all material terms**

BP does not dispute that an offer was made or that the offer was accepted. Instead, it argues that the offer and acceptance did not constitute a binding contract because the offer letter supposedly did not contain all the material terms of the agreement. Previously, the only material terms to the settlement that BP could identify were as follows:

> In the current case, Johnson's release of his rights to sue BP (and an extensive list of other released parties) is a material aspect of the bargain. In fact, it represents the core benefit of the bargain for BP.

Doc. #33 at pg. 6.

BP's understanding of the material terms of the settlement was the same as Johnson's. Ex. B. The material term for Johnson was that he would receive $2,698,095. The material term for BP was that Johnson would release his rights to sue BP (and any other party). Doc. #33 at pg. 6. The offer letter clearly conveys these terms and describes the contents of the Release:

> The Release waives and releases any claims for bodily injury that you have or may have in the future against BP and all other potentially responsible parties with regard to the [Deepwater Horizon Incident on April 20, 2010][2], and prevents you from submitting any bodily injury claim seeking payment from a court.

Ex. C; *compare with* Doc. #33 at pg. 6 ("Johnson's release of his rights to sue BP (and an extensive list of other released parties) . . . represents the core benefit of the bargain for BP."). The offer letter further notes that Johnson can only accept the Final Payment Offer if he wants to "*fully* resolve the *entire claim* now." Ex. C. Johnson understood these terms when he accepted the offer by signing the "Election to Accept Final Payment Offer" form. Ex. B. There was

---

[2] The offer letter actually uses the term "Oil Spill," but defines "Oil Spill" as "the Deepwater Horizon Incident on April 20, 2010." Ex. C. Johnson inserted the actual definition of the term for clarity's sake.

3

reasonable certainty as to the material terms. That is why BP's attorneys consistently recognized that a settlement agreement existed and that BP would have to pay money to satisfy its contractual obligations to Johnson. Ex. D; Ex. E; Ex. F.

In in its most recent brief, though, BP now claims there were three supposedly material terms that were included in the Release, but were omitted from the offer letter: (1) the parties who were to be released; (2) what claims Johnson was releasing; and (3) whether Johnson's non-existent spouse would have to release her claims. None of BP's after-the-fact excuses prevent contract formation. Therefore, the Court should enforce the settlement.

### 1. The offer letter provides reasonable certainty as to who is being released

The offer letter provides that the agreement "waives and releases *any* claims for bodily injury that you have or may have in the future **against BP and all other potentially responsible parties** with regard to the [Deepwater Horizon Incident on April 20, 2010] . . ." Ex. C (emphasis added). In BP's quest for uncertainty, it argues Johnson may not have realized that Tidewater would be included as "a potentially responsible party." BP's br. pg. 10. In making this argument, BP attempts to manufacture ambiguity by arguing that the term "responsible party" has a specific definition under OPA which differs from how the term is understood in normal tort contexts. *Id.* But Johnson did not bring an OPA claim. He brought a Jones Act claim. Tidewater was his Jones Act employer and owned the vessel he served aboard. It is obviously a "potentially responsible party" in a Jones Act claim. That is why Johnson sued Tidewater in the underlying personal injury suit. Ex. G. The idea that Johnson may not have realized that his Jones Act employer (*who he sued*) is not a "potentially responsible party" defies common sense.

### 2.     The offer letter provides reasonable certainty as to what claims are being released

BP next argues that the offer letter does not provide reasonable certainty as to what claims Johnson was releasing because the offer letter uses the term "bodily injury," but does not define what a "bodily injury" is. BP's br. at p. 10-11. The Release defines "bodily injury" in a standard manner that includes elements of recovery that flow from bodily injuries such as "mental health injury" and "economic loss in connection with bodily injury" – i.e. mental anguish and loss of earning capacity. Ex. H.[3] The offer letter uses the term in the same way that the Release does. That is why it explicitly states that Johnson can only accept the Final Payment Offer if he wants to "*fully* resolve the *entire claim* now." Ex. C (emphasis added). That is how Johnson understood the offer letter. Ex. B.[4] Since all parties agree on what "bodily injury" means, there is reasonable certainty as to this term. RESTATEMENT (SECOND) OF CONTRACTS § 201(1) (1981) ("Where the parties have attached the same meaning to . . . a term . . ., it is interpreted in accordance with that meaning."); *See also id.* at §§ 202(1), (5).

### 3.     The offer letter provides reasonable certainty as to who has to release claims

Last, BP irrelevantly notes that the Release requires Johnson's "spouse" to release her claims. BP's br. at p. 11. ***But BP acknowledges that Johnson was not married***. BP's br. at pg. 11. Moreover, spouses (and other family members) are not allowed to recover for loss of society or on other derivative theories in maritime personal injury cases. *Murray v. Anthony J. Bertucci*

---

[3] BP argues that Johnson could not have known this because the Release was supposedly not publicly available. But BP's summary judgment evidence confirms that this is not the case. BP's Ex. D at pg. 7, ¶ IV(B)("The Release is attached to this Protocol as Tab A."). Regardless, Johnson's attorneys, who negotiated the settlement, had settled several claims with BP through the GCCF and were extremely familiar with the terms of the Release.

[4] Despite BP's attempts to persuade the Court that Johnson would like to keep his claim for mental anguish open, he has consistently maintained that the settlement covers all elements that flow from his personal injuries (such as mental anguish and lost wages). *See* Johnson's memorandum at pg. 15 ("It is nonsensical to suggest that the GCCF's offer letter was only offering to settle the portion of Johnson's claim that seeks recovery for physical pain, but was leaving open the portion of his claim that seeks recovery for mental anguish and lost wages.").

*Constr. Co., Inc.*, 958 F.2d 127, 132 (5th Cir. 1992). BP's claim that a material term of the agreement required Johnson's (non-existent) spouse to release a claim (that she is not legally entitled to assert) does not hold water. The Court should enforce the settlement agreement.

**C.    BP gave the GCCF express authority to settle claims like this one**

BP admits, for the first time in this litigation, that "BP authorized the GCCF to enter into settlement agreements on its behalf." BP's br. at pg. 15.[5] In order to argue that it is not liable for contracts the GCCF entered into, though, BP makes another new argument. It now argues, for the first time, that the Claims Protocols were incorporated into the BP-GCCF contract and prevented the GCCF from entering into binding contracts until the plaintiff signed a Release. *Id*. at pg. 16.

In a misleading attempt to prove this point, though, BP does not cite the Claims Protocol. Instead, it cites Exhibit I to its brief for the proposition a claimant "'will be required to sign a release' before receiving a Final Payment." BP's br. at pg. 16 (citing BP's Ex. I). BP's exhibit, though, is not the Claims Protocols. It is simply an information letter for oil spill claimants, not personal injury claimants. It was not incorporated into the settlement agreement in dispute or the BP-GCCF contract. Moreover, even if the language BP cites *was* in the Claims Protocol, the language simply stands for the proposition that BP's contractual obligation to fund a settlement would normally not be triggered until a clamant complied with his contractual obligation to sign the Release.[6] The language limits the GCCF's ability to fund a settlement, not enter into a settlement in the first place. Since BP acknowledges that it authorized the GCCF to enter into

---

[5] This admission makes BP's arguments regarding the GCCF's supposed independence irrelevant since the only consideration is whether BP gave the GCCF authority to settle claims such as this one. RESTATEMENT (THIRD) AGENCY § 1.02 (2006); *In re McClure*, 430 B.R. 358, 366 (Bkrtcy. N.D. Tex. 2010); *See also Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988).

[6] Johnson's contractual obligation to sign the Release was excused under the doctrine of prevention, though. *Ballard v. El Dorado Tire Co.*, 512 F.2d 901, 907-08 (5th Cir. 1975); RESTATEMENT (SECOND) OF CONTRACTS (1981) § 245. Therefore, the funds are due.

settlement agreements on its behalf (and the Claims Protocols do not limit this authority by requiring the GCCF to obtain a signed Release before binding BP), the Court should enforce the settlement agreement.

**D.   BP knew or should have known of the material facts when it ratified the settlement**

BP argues that it did not ratify the settlement because it supposedly lacked knowledge of the material facts.  But a party cannot avoid ratification when it "had knowledge of facts that would lead a reasonable person to investigate further," but chose not to.  RESTATEMENT (THIRD) AGENCY § 4.06 (2006), cmt. d.  Here, BP had 18 months to investigate Johnson's claim before the case settled.  Moreover, after a telephone call in October 2011, Tidewater's attorney memorialized his conversation with BP's attorney and informed BP that "[b]ased on the file materials we have, the settlement offered by the GCCF in the amount of nearly $2.7 million is excessive and unreasonable given the defenses to Johnson's claim that are available to Tidewater and BP, and the medical records Tidewater has been provided."  Ex. E.  Tidewater then stated that "[w]e will cooperate in any way possible to assist BP in lodging an appeal of the settlement."  *Id*.  Tidewater apparently informed BP's lawyers in its phone calls and e-mails (which have not been provided to Johnson) that it could obtain witness statements from its employees to gin up an "exaggerated claim" defense.  At the very least, a reasonable party in litigation would choose to investigate further before making a decision to not appeal the settlement.  Consequently, the Court should reject BP's "no ratification" defense.

**E.   BP cannot complain that Johnson never signed the Release since BP prevented him from signing it**

The settlement contract in this case was formed when Johnson accepted the settlement offer.  The contract placed sequential contractual obligations on each party.  The GCCF was contractually obligated to send a Release to Johnson.  This was a Release that Johnson's

7

attorneys had reviewed on several previous occasions and was acceptable to Johnson. *See* Ex. B. Johnson was then required to sign the Release and return it to the GCCF. The GCCF was then required to fund the settlement. The GCCF recognized this when it sent its repudiation letter:

> [T]he GCCF sent Mr. Johnson a determination letter on September 23, 2011 offering him $2,698,096 to finally resolve his claim. In order to receive the offered Final Payment, Mr. Johnson was required to and did return an election to accept the offer. Thereafter, the GCCF would in the normal course have sent to Mr. Johnson a Release and Covenant not to Sue, which Mr. Johnson would have been required to sign in order to receive his Final Payment.

Ex. I (GCCF February 22, 2012 repudiation letter).

In other words, Johnson's signature on the Release was not a condition precedent to contract formation. It was a condition on payment *under* the contract that that parties had already formed.[7] Since BP refused to send the Release to Johnson, Johnson was excused from his obligation to sign the Release under the doctrine of prevention. *Ballard v. El Dorado Tire Co.*, 512 F.2d 901, 907-08 (5th Cir. 1975); RESTATEMENT (SECOND) OF CONTRACTS (1981) § 245 ("Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."). BP admits that it made Johnson's performance impossible, but argues that the prevention doctrine does not apply because its conduct was supposedly justified.

Yet, BP's proffered justification for its breach (i.e. Johnson's alleged fraud) is baseless. BP is relying on the GCCF's investigation firm which interviewed 12 witnesses in an attempt to discover fraud. But its conclusion was "**Johnson did not submit any overtly fraudulent document, thus a Finding of Potential Fraud is not supported by this investigation**." Ex. A. Instead, the witnesses simply stated that they did not notice Johnson complaining of injuries until

---

[7] BP recognizes this as well. In its section dealing with whether a contract was formed, it states that the "signed release was a condition of payment." BP's br. at pg. 9.

the day after the explosion while in a van ride. When Tidewater refused to indemnify BP, BP actively searched for a way to invalidate the contract. Alleging fraud, after its own investigation found that "a Finding of Potential Fraud is not supported," is improper. The prevention doctrine applies. The Court should enforce the settlement.

F.  **BP's fraudulent inducement defense is contrived and is untenable as a matter of law**

BP is not claiming that Johnson accepted BP's offer, but never intended to comply with his obligations under the agreement. Instead, it is arguing that Johnson overstated the extent of his injuries in the underlying personal injury claim. Fraudulent inducement is generally not a defense, though, when a party tries to set aside a settlement simply because it subsequently discovers evidence that could have strengthened its position in the underlying (settled) litigation:

> This reasoning has even greater application in the context of a case such as this, where the alleged "fraud" relied upon to set aside the Release relates to the underlying merits of the claim that was settled. If King's position in this litigation were accepted, it would allow a party to reopen any settled litigation if he later discovered evidence bolstering his prior litigation position. If a party was able to undo a binding settlement agreement by simply couching the prior litigation as "fraudulent," there would be no way to assure the full and final resolution of any matter.

*Johnson v. King*, 2011 WL 4963902 at *14 (D. Wyo. Oct. 17, 2011); *See also Howard v. Chris-Craft-Corp.*, 562 F.Supp. 932, 937 (E.D. Tex. 1982) ("A settlement will not be set aside [for alleged fraud], however, merely because one party's case becomes stronger after the settlement is concluded."); *See also Cia Anon Venezolona de Navegacion*, 374 F.2d at 35.

Even if fraud in an underlying personal injury case could be used to set aside a settlement agreement, BP's allegations of fraud are not supported by the facts. *First*, the GCCF's own investigation determined that "**Johnson did not submit any overtly fraudulent document, thus a Finding of Potential Fraud is not supported by this investigation**." Ex. A. Instead, it basically determined that the Johnson did not report any injuries until the next day and that the

9

other crew members did not notice that he was hurt on the day of the incident. These types of inconsistencies are common in maritime personal injury case and do not constitute fraud.[8] ***Second***, a fundamental element of any fraud defense is that the fraudulent party must make a misrepresentation. The GCCF's own investigation admits that Johnson did not do this. Ex. A ("Johnson did not submit any overtly fraudulent document[9]."). ***Third***, a party relying on this defense must show that it justifiably relied on the alleged misrepresentation. It is difficult to imagine that a defendant in a personal injury lawsuit justifiably relies on the allegations made by the plaintiff. Indeed, BP denied all of Johnson's allegations that it was negligent and that its negligence caused damages to Johnson when it answered Johnson's petition in the underlying personal injury case. Ex. J at pg. 2, ¶ d; *See also* Ex. G.

Moreover, "a party claiming fraud and/or misrepresentation must exercise due diligence to discover the fraud and cannot close his eyes and simply wait for facts supporting such a claim to come to his attention." *Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 409 (5th Cir. 1998). Here, BP had 18 months to investigate Johnson's claim before it decided against blocking a settlement through an appeal. It (and the GCCF) could have easily discovered the same information that the GCCF's private investigators discovered[10] had it exercised a minimal level of diligence. The Court should, therefore, reject BP's fraud argument.

## Conclusion

The Court should enforce the settlement or, alternatively, grant summary judgment for Johnson and deny BP's motion. The Court should also award interest.

---

[8] *Howard*, 562 F.Supp. at 937 ("The inconsistencies in the account of the accident as described by the plaintiffs and the [non-party witnesses] do not suggest fraud at all, but rather, the routine good faith discrepancies in recollection that typically occur in the trial of any lawsuit. If adverse parties always agreed on the facts, no case would ever need to be tried.").
[9] It is undisputed that Johnson did not make any oral representations to BP or the GCCF.
[10] Johnson disputes that this information rises to the level of fraud.

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/ Kurt B. Arnold*
_____
Kurt B. Arnold
State Bar No. 24036150
Jason Itkin
State Bar No. 24032461
Cory Itkin
State Bar No. 24050808
6009 Memorial Drive
Houston, Texas 77007
Telephone:   (713) 222-3800
Facsimile:   (713) 222-3850

**ATTORNEYS FOR JOHNSON**

**Certificate of Service**

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to all known counsel of record by CM/ECF and/or another means in accordance with the Federal Rules of Procedure on this 10th day of January, 2014.

*/s/ Kurt B. Arnold*
_____
Kurt B. Arnold