# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * | MDL 2179 |
| BP EXPLORATION & PRODUCTION INC. and BP AMERICA PRODUCITON COMPANY, | * * * | PERTAINS TO: No. 13-6674 |
| Plaintiffs, | * * | |
| versus | * * | SECTION "J" (1) |
| MIKAL C. WATTS, WATTS GUERRA, LLP. and | * * * | JUDGE CARL J. BARBIER |
| BON SECOUR FISHERIES, INC; FORT MORGAN REALTY, INC.; LFBP #1, LLC d/b/a GW FINS; PANAMA CITY BEACH DOLPHIN TOURS & MORE, LLC; ZEKE'S CHARTER FLEET, LLC; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD LUNDY; CORLISS GALLO; LAKE EUGENIE LAND & DEVELOPMENT, INC.; HENRY HUTTO; BRAD FRILOUX; JERRY J. KEE; JOHN TESVICH; and MICHAEL GUIDRY , on behalf of themselves and all others similarly situated, | * * * * * * * * * * * * * | MAGISTRATE SALLY SHUSHAN |
| Defendants. | * * | |

## MEMORANDUM IN OPPOSITION TO BP'S MOTION FOR A PRELIMINARY INJUNCTION SUSPENDING THE SECOND DISTRIBUTION OF THE SEAFOOD COMPENSATION PROGRAM

00231494

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

ARGUMENT ................................................................................................................. 9

   I.   BP IS NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS ............... 10

      A.  BP's Proper Procedural Vehicle for Relief is its Pending Rule 60(b)(3)
          Motion, not this Improper Collateral Attack ....................................................... 11

      B.  BP is Judicially Estopped from Changing its Representations
          About its Motives for Entering the SCP ............................................................... 12

      C.  Even if BP's Underlying Action is Procedurally Proper,
          BP Fails to Establish a Likelihood of Success on Any of its Claims ..................... 15

            1.  The Claims Only Against Mikal Watts Should be Ignored ............................ 16

            2.  BP Has No Likelihood of Success Under Louisiana
               Law Because La. C.C. Art. 1956 Precludes the Invalidation
               of the Settlement Agreement Based on Third Party Fraud .............................. 18

            3.  In Addition to BP's Fraud Claims Being Barred by
               Civil Code Article 1956, BP Cannot Prevail on Count 2 – Rescission
               and/or Reformation of Contract Based on Fraud and/or
               Error Based on La. Civ. Code Arts. 1948-1958 ............................................ 18

            4.  BP Cannot Recover Under Counts 3 and 5 – Intentional
               and Negligent Misrepresentation under Louisiana law ................................. 22

            5.  BP Cannot Recover Under Counts 7 and 8 – Payment
               of a Thing Not Due and Abuse of Process ..................................................... 25

            6.  BP Fails to Demonstrate a Substantial
               Likelihood of Success in its Challenge to the SCP
               Under Federal Common Law (Counts 1, 4, and 6) ......................................... 26

i

II.  BP FAILS TO ESTABLISH A SUBSTANTIAL THREAT OF
IRREPARABLE HARM ................................................................................................30

III. THE HARM TO THE CLASS OUTWEIGHS THE COMPLETE LACK OF
HARM TO BP ..............................................................................................................33

IV.  THE PUBLIC INTEREST WOULD BE DISSERVED
BY GRANTING BP'S REQUEST FOR PRELIMNARY INJUNCTION ......................34

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013) ................................................................................28 (n.101)

*Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*,
  2011 WL 6091807 (S.D. Tx. Dec. 7, 2011) .........................................................31

*Array Holdings Inc. v. Safoco, Inc.*,
  2013 WL 4588506 (S.D. Tex. Aug. 28, 2013)....................................................34

*AT&T Mobility LLC v. Concepcion*,
  131 S.Ct. 1740 (2011) ................................................................................28 (n.101)

*Avmed Inc. v. BrownGreer PLC*,
  300 F. App'x 261 (5th Cir. 2008) .......................................................................11

*Black Gold Marine, Inc. v. Jackson Marine Co.*,
  759 F.2d 466 (5th Cir.1985).................................................................27, 28 (n.102)

*Borne v. A&P boat Rentals No. 4, Inc.*,
  780 F.2d 1254 (5th Cir. 1986) .......................................................................16 (n.74)

*Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*,
  710 F.3d 579 (5th Cir. 2013) ...................................................................9, 10, 15

*DFW Metro Line Servs. v. Sw. Bell Tel. Co.*,
  901 F.2d 1267 (5th Cir. 1990)...........................................................................31

*Dixon v. Toyota Motor Credit Corp.*,
  Civ. A. No. 12-2150, 2013 WL 105048 (E.D. La. Jan. 8, 2013) ...........................9

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
  322 U.S. 238 (1944) ........................................................................................11

*In re Deepwater Horizon*,
  732 F.3d 326 (5th Cir. 2013) ........................................................................32, 34

*In re Lupron Mktg. & Sales Practices Litig.*,
  677 F.3d 21 (1st Cir. 2012) ...............................................................................33

*In re Paige*,
  610 F.3d 865 (5th Cir. 2010)..............................................................................12

*In re Superior Crewboats, Inc.*,
    374 F.3d 330 (5th Cir. 2004) ................................................................................ 13, 15 (n.73)

*J. Lauritzen A/S v. Dashwood Shipping, Ltd.*,
    65 F.3d 139 (9th Cir.1995) ................................................................................ 16 (n.74)

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ................................................................................ 10, 16, 30

*Kadlec Med. Ctr. v. Lakeview Anesthesia Associates*,
    527 F.3d 412 (5th Cir. 2008) ................................................................................ 23

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
    Negara*,
    335 F.3d 357 (5th Cir. 2003) ................................................................................ 9

*Kuehne & Nagel*,
    874 F.2d at 288 (5th Cir.1989) ................................................................................ 16 (n.74)

*Louisiana Crisis Assistance Center d/b/a Louisiana Capital Assistance Center v.
    Alexandria Marzano–Lesnevich*,
    878 F.Supp.2d 662 (E.D La. 2012) ................................................................................ 17

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985) ................................................................................ 33

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ................................................................................ 12, 13

*Newport Ltd. v. Sears, Roebuck & Co.*,
    6 F.3d 1058 (5th Cir.1993) ................................................................................ 23

*Oltman v. Holland Am. Line-USA, Inc.*.
    C05-1408 JLR, 2006 WL 2222293 (W.D. Wash. Aug. 1, 2006) ................................................................................ 16 (n.74)

*Order & Reasons Responding to Remand of Business Economic Loss Issues*,
    Rec. Doc. No. 12055 (E.D. La. Dec. 24, 2013) ................................................................................ 12

*Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.*,
    346 F.3d 530 (5th Cir. 2003) ................................................................................ 29

*Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*,
    621 F.2d 683 (5th Cir. 1980) ................................................................................ 17

*Randolph v. Nationstar Mortgage, LLC*,
    2012 WL 2450016 (E.D. La. June 27, 2012) ................................................................................ 31

*Raymark Indus., Inc. v. Stemple*,
1990 WL 72588 (D. Kan. May 30, 1990) ....................................................................27, 28

*Roho, Inc. v. Marquis*,
902 F.2d 356 (5th Cir. 1990) ...........................................................................................10

*Sargent v. U.S.*,
Civ. A. No. 08-3887, 2008 WL 3154761 (E.D. La. Aug. 5, 2008) ......................................10

*Tisino, et al. v. R&R Consulting and Coordinating Group, L.L.C. et al.*,
478 Fed. Appx. 183 (5th Cir. 2012) ..............................................................................31, 32

*Turner v. Pleasant*,
663 F.3d 770 (5th Cir. 2011) ...........................................................................................11

*US Airways, Inc. v. McCutchen*,
133 S. Ct. 1537 (2013) ....................................................................................................29

*U.S. v. Beggerly*,
524 U.S. 38 (1998) ..........................................................................................................11

*W. Alabama Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
302 F. Supp. 2d 672 (S.D. Tex. 2004) ..............................................................................31

*Wiedemann & Fransen, A.P.L.C. v. Hollywood Marine, Inc.*
811 F.2d 864 (5th Cir. 1987) .....................................................................................16 (n.74)

*Williams v. Walsh*,
558 F.2d 667 (2d Cir.1977) ..............................................................................................17

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ............................................................................................................30

## STATE CASES

*Glotfelty v. Hart*,
2013 WL 6858285 (La.App. 1 Cir. 12/27/13) .....................................................................26

*Mongrue v. State Farm*,
396 So.2d 466 (La.App. 4th Cir. 1981) ...............................................................................25, 26

*Shelton v. Standard/700 Associates*,
798 So.2d 60 (La.10/16/01) ...............................................................................................18

*Smith v. Frey*,
    703 So.2d 751 (La. Ct. App. 4 Cir. 11/19/97) ....................................................18

*Sonnier v. Boudreaux*,
    673 So. 2d 713 (La. App. 1 Cir. 5/10/96) .........................................................19

*Terrebonne Concrete, LLC v. CEC Enterprises, LLC*,
    76 So. 3d 502 (La. App. 1 Cir. 8/17/11) ..........................................................18

*Waguespack, Seago and Carmichael (A PLC) v. Lincoln*,
    768 So.2d 287 (La.App. 1st Cir.9/22/00) .........................................................26

*Walton v. Walton*,
    597 So. 2d 479 (La. Ct. App. 1992) ..................................................................34

## STATUTES

La. Civ. Code Ann. art. 1949 ..............................................................................19

La. Civ. Code Ann. art. 1953 ..............................................................................18

La. Civ. Code Ann. art. 1956 ......................................................18, 18 (n. 77), 22, 26

La. Civ. Code Ann. art. 2315 .........................................................................22, 23

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 60(b) ....................................................................................11, 12

Fed. R. Civ. P. 60(d)(1) .....................................................................................12

## OTHER SOURCES

*Federal Practice and Procedure*
    11A Charles Alan Wright et al.,(3d ed. 2013).......................................................11

*18 Moore's Federal Practice*
    (3d ed. 2000)...............................................................................................13

*Federal Practice and Procedure*
    Charles Alan Wright et al.,(1981) ....................................................................13

MAY IT PLEASE THE COURT:

Defendants Bon Secour Fisheries, Inc.; Fort Morgan Realty, Inc.; LFBP #1, LLC d/b/a GW Fins; Panama City Beach Dolphin Tours & More, LLC; Zeke's Charter Fleet, LLC; William Sellers; Kathleen Irwin; Ronald Lundy; Corliss Gallo; Lake Eugenie Land & Development, Inc.; Henry Hutto; Brad Friloux; Jerry J. Kee; John Tesvich; and Michael Guidry, ("Class Representatives" or "Class") hereby submit their Opposition to the Motion for Preliminary Injunction filed by Plaintiffs BP Exploration & Production Inc. and BP Amer. Prod. Co. ("BP").

## INTRODUCTION

This lawsuit seeks to invalidate the Seafood Compensation Program[1] ("SCP"), a component of the Economic Settlement Agreement[2] ("Settlement Agreement" or "Agreement"), a class settlement approved by this Court under FRCP 23.  In championing the SCP, BP guaranteed that it "has committed to pay $2.3 billion *regardless* of the aggregate amount of claims submitted."[3]  BP's experts explained that "[t]he $2.3 billion cap for the Seafood Compensation Program must be viewed from the perspectives of pounds of seafood produced, the price per pound, and the ultimate revenues."[4]  BP touted the SCP as the result of over nine months of intense negotiations, conducted not only under the "oversight and wise guidance of Magistrate Judge Shushan," but also with the aid of the "nation's leading legal experts."[5]

Now, incredibly, after claiming that its very able team of litigators had "obtained sufficient information about the strengths and weaknesses of their respective cases,"[6] BP argues that alleged issues relating to claims submitted by Mikal Watts on behalf of undocumented

---

[1] Seafood Compensation Program, Rec. Doc. No. 6430-22.
[2] *Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended, Rec. Doc. No. 6430.
[3] Exh. "1" - Nov. 8, 2012 Fairness Hearing Presentation made by BP, Slide 12, titled "The Data Support Approval: The Seafood Compensation Program." (Quoting plaintiff support for the SCP, emphasis added)
[4] Dec. BP's Expert Dr. James A Richardson, in support of Final Settlement Approval, Rec. Doc. No. 7114-17 at 31.
[5] Nov. 8, 2012 Fairness Hearing Tr., Rec. Doc. No. 7892 at 50:2-3; 52:4-10; *see also* Dec. of Richard Godfrey in support of Final Settlement Approval, Rec. Doc. No. 7114-9 (herineafter "Godfrey Declaration I").
[6] BP's Memo in Support of its Motion for Final Settlement Approval, Rec. Doc. No. 7114-1 at 66.

deckhands (the "Watts claims") are grounds for vitiating its promise to innocent Class claimants. However, the truth is these deckhand claims were given no meaningful consideration in the confection of the SCP.   The Watts claims were relegated by BP to a category that was internally capped at $50,000,000, or approximately 2% of the total settlement fund.  And, the issues that BP now complains about were made known to BP as early as April 2011 - almost a year before the SCP was even confected.[7]  Yet, BP raises these complaints only after 5,281 class members made the difficult decision to execute irrevocable releases of the compensatory and punitive claims, in reliance on BP's promise of a **guaranteed** $2.3 billion seafood fund.[8]

BP is right about one thing, the story *is* simple:[9]  (1) BP, with the aid of extremely skilled negotiators and advisors, made a deal to guarantee $2.3 billion in exchange for "global peace" on claims arising from the devastation it wreaked on the Gulf Coast seafood population and industry;[10] (2) BP got exactly what it bargained for – in reliance on BP's guarantee, the Class executed releases on their claims against BP with the promise of a share in the Second Distribution;[11] and (3) now that BP has gotten what it wanted out of the deal, it seeks to default on its legal obligation to the Class by engaging in revisionist history about its motives for entering the SCP.

---

[7] Exh. "2" – Apr. 26, 2011 Letter from Goodwin Procter to Don K. Haycraft, et al;  *see also* Exh. "3" --Robertson & J. Schwartz, "Many hit by Spill Now Feel Caught in Claims Process," *The New York Times*, (April 18, 2011).  (BP also cites to this article in Civil Action 13-6674, within MDL 2179, Rec. Doc. No. 2-8, unredacted Memorandum in Support of Motion for Preliminary Injunction Suspending the Second Distribution of the Seafood Compensation Program, p. 10, fn 7.)

[8] Exh. "4" –Declaration of Stephen J. Hermann, ,¶21 ("Hermann Declaration)

[9] BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 9.

[10] BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 25; BP's Reply Memo in Support of Final Settlement Approval, Rec. Doc. No. 7731 at.12-13; *see also* Dec. of Joseph F. Rice re: Overall Settlement Negotiations, Rec. Doc. No. 7104-6 at 8, ¶13.

[11] Settlement Agreement, Rec. Doc. No. 6430 at 72, §10.1.

## BACKGROUND

This MDL involves thousands of claims related to the *Deepwater Horizon* disaster.  By February of 2011, BP and Class Counsel were engaged in settlement negotiations, which intensified by July 2011 to an "almost-daily basis."[12]  Amongst the hundreds of suits and claims consolidated in this MDL are those submitted by Mikal Watts, on behalf of roughly 40,000 individuals alleged to be Vietnamese deckhands.[13]  Between April and July 2011, Watts filed 44,510 claims in the MDL, through the Short-Form Joinder process authorized by the Court.[14]

In the midst of the parties' negotiations, on April 18, 2011, the *New York Times* reported irregularities in the Watts portfolio of deckhand claims.[15] The article featured a photograph of Tim Nguyen, a Mississippi shipyard worker who discovered that he had been listed as a Louisiana shrimper client of Mr. Watts.[16]  Mr. Nguyen denied that he was represented by Mr. Watts.[17]  The article claims that numerous Vietnamese households received letters from Mr. Watts directing them to send their financial records.[18]  A Vietnamese law student said, "As far as I know almost every other house got it."[19]  Allegedly, Mr. Watts was "met with resistance" from the "Gulf Coast Claims Facility ("GCCF")" when he tried to file claims for 40,000 plus "clients."[20]  So, instead, he attempted to file claim information for 26,000.[21]  The *Times* reported that, "People familiar with the claims process said nearly every submission was listed as a

---

[12] Court's Order and Reasons Approving Final Settlement, Rec. Doc. No. 8138 at 3; *see also* Plaintiffs' Mem. in Support of Final Approval Class Settlement, Rec. Doc. No. 7104 at 3.

[13] Liason Counsel Memo filed July 6, 2011, Rec. Doc. No. 3142 at 3; *see also* Civil Action No. 10-8888, filings between April –July 2011.

[14] *Id.*

[15] Exh. "3" -- Robertson, et al., "Many hit by Spill Now Feel Caught in Claims Process," *The New York Times*, (April 18, 2011).

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

deckhand with identical earnings."[22]  The GCCF did remit settlement checks to 35 Watts clients, but 11 of those clients "protested that they were not represented by him."[23]

On April 26, 2011, Goodwin Procter, counsel on behalf of the GCCF sent a letter to Don Haycraft on behalf of BP and Jennifer Cote for BP America, Inc. among others, highlighting issues with Watts' claimants.[24]  The letter refers to 40,002 Plaintiff Profile Forms provided by Watts' firm, and notes:  (1) 297 were duplicates or otherwise overlapped; (2) there was no information on 12,834 names; (3) the failure to complete claims submission process for 25,494 potential claims; (4) of the remaining 1,337 non-duplicate name submissions, only two listed Watts as counsel, and only one signed the claim form; (5) and, then, of those 1,375 claims, 287 listed a firm other than Watts' as their attorneys; and (6) leaving 1,088 claimants, for whom Watts indicated that he would provide attorney engagement letters, but of the engagement letters provided none related to those 1,088 claimants nor included a valid client signature.[25]  Thus, after rejecting duplicates, submissions with incomplete claim information, claimants represented by different counsel, or for whom there was no signed client engagement agreement with Watts, only one of the 40,002 submissions by Watts qualified.  The Goodwin Proctor letter described that individual as the "lone claimant."

The negotiation process continued into 2012.  And, on March 2, 2012 the parties reached an Agreement-In-Principle on most of the settlement compensation frameworks just before the Phase  One  Limitation  &  Liability  Trial.[26]  ████████████████████████████████████
████████████████████████████████████████████████████████.[27] ██████████████████

---

[22] *Id.*
[23] *Id.*
[24] Exh. "2" - Goodwin Procter letter.
[25] *Id.*
[26] Court's Settlement Approval, Rec. Doc. No. 8138 at 3; *see also* Exh. "4" – Herman Declaration, ¶6
[27] Exh. "4" - Herman Declaration, ¶6.



It was using this framework, based on sales at the dock of the entire seafood catch for the Gulf, that the parties arrived at the $2.3 billion guaranteed amount of the SCP.[34]   The SCP would provide for two distributions.[35]   The first distribution would compensate participants for their economic claims.   After all first round distributions were made, the qualifying participants would receive a second distribution based on the remainder of the $2.3 billion fund.[36]  Although the first round distribution was assumed to be valued at approximately $1.9 billion, this did not account for a dollar-for-dollar offset for

[28] *Id.* at ¶10.
[29] *Id.* at ¶8.
[30] Exh. "5" – Declaration of Joseph F. Rice, ¶11.
[31] *Id.*
[32] Court's Settlement Approval, Rec. Doc. No. 8138 at 3; *see also* Declaration of Richard Godfrey submitted in support of Motion for PI, filed under seal as Rec. Doc. No.2-4 I Civ. A. No. 13-6674 at ¶¶4, 7(hereinafter "Godfrey Declaration II"); Exh. "4" - Herman Declaration, ¶¶8-9. (This was a precursor to the SCP called the "Seafood Program" which appeared in the Agreement-in-Principle).
[33] Exh. "5" - Rice Declaration, ¶12.
[34] Exh. "5" - Rice Declaration, ¶ 13.
[35] SCP, Rec. Doc. No. Rec. Doc. No. 6430-22 at 5.
[36] *Id.*

claimants who already received payment from the GCCF, which totaled approximately $730 Million for seafood claimants.[37]

Although it was ultimately agreed that individual deckhand claims – including the Watts claims – were to be included in the SCP, no meaningful value was ascribed to them.  ████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████.[38]  ████████

███████████████████████████████████████████████████████████████████

████████████████████████.[39]   Under the terms of the SCP, crew claims could fall into one of three categories, depending on the type of documentation provided.[40]   Category III was the most lenient, allowing a claimant to submit his own sworn statement, in addition to a sponsor or attorney-sworn statement, in support of his claim.[41]   With a successful claim, Category III claimants would receive a $5,000 lump-sum payment.[42]   However, claims under Category III were capped at an internal aggregate of $50 million of the SCP total fund – which amounts to just 2.17% of the total $2.3 billion.[43]   And because the number of Category III claimants was unknown, payments for this category would not occur until after the deadline for claims had elapsed, to ensure that there would be adequate funding for all.[44]

In presenting the SCP to the Court in the Preliminary hearing, the Court recognized and the parties agreed that the SCP is a "**guaranteed** payment."[45]   And this guaranteed payment was

---

[37] Dec. of John Perry, Rec. Doc. No. 7110-5 at 5-6; *see also* Dec. of Daniel Balhoff, Rec. Doc. No. 7110-2 at 5.
[38]   Exh. "6" - Opt-Out Letter, p. 2; *see also* publicly available version at http://deepwaterhorizoneconomicsettlement.com/docs/Seafood_Opt_Out_Terms.pdf (last visited Jan. 12, 2014)
[39] *Id.*; *see also* Exh. "5" - Rice Declaration, ¶19; ████████████████████████████████████████
██████████████████████████████████████████
[40] SCP, Rec. Doc. No. 6430-22 at 76.
[41] *Id.* at 76-77.
[42] *Id.* at 95.
[43] *Id.*
[44] Transcript of April 25, 2012 Rule 23 Preliminary Approval Hearing, Rec. Doc. No. 6395 at 35:6-35:19
[45] Court's Settlement Approval, Rec. Doc. No. 8138 at 4 (emphasis added).

based on "**the product sold for as reported by the governmental accounts that keep track of this as to the total sales and the total dollars** …for the whole Gulf area."[46]   In its briefing seeking approval of the SCP, BP lauded the generosity of the $2.3 billion guaranteed fund and affirmed that it was based on the value of seafood harvest, and not the number of claimants:

- "BP has guaranteed payments to the Gulf Coast seafood industry of $2.3 billion — nearly five times the entire annual revenue of the seafood industry and many multiples more than any losses actually suffered by the industry."[47]

- "[I]n the case of the SCP, its ample $2.3 billion funding and the Program's design by a Court-appointed neutral will ensure that all claimants will be made more than whole in the first-round distribution and that participants will, in addition, share generous payments from a second-round distribution."[48]

- "[T]he agreement provides that $2.3 billion will be paid, regardless of the fact that the total claims submitted under the program may be a lesser amount.  This makes it a guarantee rather than a 'cap' ensuring that "BP has no incentive to minimize any plaintiff's individual claim.""[49]

- "The 2.3 billion cap for the Seafood Compensation Program must be viewed from the perspectives of pounds of seafood produced, the price per pound, and the ultimate revenues."[50]

The Court-appointed neutral, John Perry, and his law partner Daniel Balhoff also submitted declarations in support of final settlement approval, and specifically noted that "the Seafood Compensation Program **may well pay less than $1.9 billion in the first distribution**, which would result in a second distribution to be made under the Seafood Compensation Program in an amount in excess of $400 million."[51] The Court then held a Final Fairness Hearing on Settlement Approval on November 8, 2012, at which BP, the Class, and the Court affirmed

---

[46] Transcript of Preliminary Approval Hearing, Rec. Doc. No. 6395 at 37:25-38:9 (emphasis added).

[47] Declaration of BP's Expert Dr. Martin D. Smith, in support of  Motion for Final Settlement Approval, Rec. Doc. No. 7114-19 at ¶¶ 12-18; *see also* BP's Reply Memo in Support of Settlement, Rec. Doc. No. 7731at 58 (emphasis in original).

[48] BP's Reply Memo in Support of Settlement, Rec. Doc. No. 7731 at 12-13.

[49] *Id*. at 13, *quoting* Rec. Doc. No. 7710 at 10 (emphasis added).

[50] Richardson Declaration, Rec. Doc. No. 7114-17 at 31.

[51] Declaration of John W. Perry, Rec. Doc. No. 7110-5 at 5-6; *see also* Declaration of Daniel J. Balhoff, Rec. Doc. No. 7110-2  at 5.

that the SCP (1) was a guaranteed fund; (2) was extremely generous; (3) was based on the seafood harvest; (4) that it accounted for future risks; (5) and the second distribution would exceed $400 Million.[52]   On December 21, 2012, this Court issued its Order and Reasons approving the proposed final Settlement Agreement, including the SCP.[53]   Therein, the Court noted that the SCP "features a **guaranteed $2.3 billion fund**; i.e., $2.3 billion will be distributed to claims in this fund."[54]   It was upon the promise of receiving a second distribution from the $2.3 billion fund that individual class members made the decision to release their claims against BP – compensatory and punitive – and, as is demonstrated by the attached affidavit of Alvin Bordelon, many of these claimants believed that the value of their claims far exceeded the sums they would receive through the SCP.[55]

BP states it began the verification process of the Watts' claimants one month later, in January 2013, after he filed claims with the BP Claims Program.[56]   BP filed the instant action and accompanying motion for preliminary injunction almost one year later, in December 2013, by which time the Class had already executed releases of its claims against BP.    BP brings its claims despite the fact that it agreed "the Agreement shall remain in full force and effect notwithstanding the discovery after the date of this Agreement or at any other time of any additional facts or law, or changes in law, and **this Agreement shall not be subject to rescission or modification by reason of any change or difference in facts** or law."[57]

---

[52] Court's Settlement Approval, Rec. Doc. No. 8138 at 5; Exh. "1" -- Slideshow presentation made by BP to the Court on November 8, 2012, at the Fairness Hearing for Final Settlement Approval, Slides 6, 7, 12, and 13; Transcript of Final Fairness Hearing on November 8, 2012, Rec. Doc. No. 7892 at 27:19-28:4; 57:14-58:1; and 139:23-140:9.
[53] *See* Rec. Docs. No. 8139 and 8138.
[54] Court's Settlement Approval, Rec. Doc. No. 8138 at 7 (emphasis added).
[55] Exh. "7" – Aff. of Alvin Bordelon, Esq. Some Oyster leaseholders viewed their claims as exceeding the amounts they will receive under both distributions of the SCP.  Thus, there are class members that do not agree that the SCP presents a "premium", much less a "windfall" as alleged by BP.
[56] BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 17-18.
[57] Settlement Agreement, Rec. Doc. No. 6430-1 at 81-82, §13.4.

**ARGUMENT**

"The decision to grant a preliminary injunction is to be treated as the **exception rather than the rule**." *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363-64 (5th Cir. 2003) (emphasis added).  To obtain a preliminary injunction, BP must establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that they will suffer irreparable harm absent an injunction; (3) that the threatened harm to BP outweighs the harm the injunction may do to the Class; and (4) that granting the preliminary injunction will not disserve the public interest.[58]  *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).  As this Court has recognized, "[i]n considering whether to grant or deny preliminary injunctive relief, the district court 'must remember that a preliminary injunction is an **extraordinary and drastic remedy**,' and that '[t]he **movant has a heavy burden** of persuading the district court that all four elements are satisfied." *Dixon v. Toyota Motor Credit Corp.*, Civ. A. No. 12-2150, 2013 WL 105048, at *1 (E.D. La. Jan. 8, 2013)(emphasis added).

BP has not met its heavy burden on any of the four elements to establish a right to the "extraordinary and drastic remedy" it seeks – a preliminary injunction denying rightful payment to the Class, whom BP admits is innocent of any wrongdoing.[59]  First, BP has not established a *prima facie* showing that it is substantially likely to succeed on the merits, because its underlying claims are procedurally unsound and without basis in law or fact.  Second, BP cannot demonstrate a substantial threat of irreparable harm arising from a second distribution payment which BP advocated and planned for over the past two years.  Third, the harm to the innocent

---

[58] The last two elements of the district court's preliminary injunction analysis implicate the discretion of that court to craft a remedy and weigh the evidence.  *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011).

[59] Complaint filed in Civil Action No. 13-6674, p. 5 ¶11 ("It is not alleged in this Complaint that the Class engaged in any wrongful conduct.").

Class, who has already signed away its rights against BP in reliance on the second distribution payment it was guaranteed, clearly outweighs the absence of threatened harm to BP.  Finally, as BP itself acknowledged, "[t]he public interest strongly favors settlement in general, and the settlement of class actions in particular."[60]  Therefore, granting the preliminary injunction to halt the settlement agreement would most certainly disserve the public interest.  Accordingly, this Court should deny BP's motion.

## I.      BP is Not Substantially Likely to Succeed on the Merits

In seeking a preliminary injunction, the moving party must present a *prima facie* case with **_sufficient evidence_** (such as pleadings and exhibits) to establish a **_substantial likelihood_** of success on the merits.  *Daniels*, 710 F.3d at 584-85.  To evaluate the likelihood of success on the merits, the court must look to the standards provided by the applicable substantive law.  *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011), citing *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990); *see also Sargent v. U.S.*, Civ. A. No. 08-3887, 2008 WL 3154761, at *6 (E.D. La. Aug. 5, 2008).  Without a valid underlying action, the movant is not entitled to the extraordinary equitable remedy of a preliminary injunction.  *Avmed Inc. v. BrownGreer PLC*, 300 F. App'x 261, 265 (5th Cir. 2008).

As explained more fully below, BP has failed to demonstrate a substantial likelihood of success on the merits because (1) the lawsuit is procedurally improper and (2) the lawsuit is substantively meritless.  Procedurally, the lawsuit is an improper collateral attack on this Court's Order and Judgment adopting the Settlement Agreement.  The lawsuit also contains numerous allegations about BP's motives for entering the SCP, which BP is judicially estopped from making.  Substantively, (should the Court find that the suit is procedurally proper) BP has failed

---

[60] BP's Memo in Support of Final Settlement Approval, Rec. Doc. No. 7114-1 at 44, citing Preliminary Approval Order at 16; 4 *Newberg on Class Actions* § 11:55 (4th ed.).

to establish an entitlement to relief under any of the numerous causes of action asserted.

### A.  BP's Proper Procedural Vehicle for Relief is its Pending Rule 60(b) Motion, not this Improper Collateral Attack

There is no legal justification for pursuit of this independent action to the extent it challenges the SCP while BP simultaneously seeks relief from the Court's Order approving settlement, pursuant to Federal Rule of Civil Procedure 60(b).  "Independent actions must, if Rule 60(b) is to be interpreted as a coherent whole, be reserved for those cases of 'injustices which, in certain instances, are deemed sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata." *U.S. v. Beggerly*, 524 U.S. 38, 46 (1998), quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944).  Therefore, under Rule 60(b), "an independent action should be available only to prevent a grave miscarriage of justice." *Beggerly*, 524 U.S. at 47.  "Resort to an independent action may be had **only rarely**, and then **only under unusual and exceptional circumstance**s."  11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2868 (3d ed. 2013) (emphasis added).

And, as stated by the United States Fifth Circuit, simple fraud is insufficient to justify an independent action.  *Turner v. Pleasant*, 663 F.3d 770, 776 (5th Cir. 2011)(emphasis added).  "If [simple fraud] is the case, a motion under Rule 60(b)(3) is the proper vehicle to reopen judgment." *Id*. at 777.  In *Turner*, the Fifth Circuit identified five elements necessary to maintain an independent action:  "(1) a prior judgment which 'in equity and good conscience' should not be enforced; (2) a meritorious claim in the underlying case; (3) fraud, accident, or mistake which prevented the party from obtaining the benefit of their claim; (4) the absence of fault or negligence on the part of the party; and (5) *the absence of an adequate remedy at law*." *Id*. at 776 (emphasis added).  Here, the most glaring deficiency is under the final element – absence of an adequate remedy at law.  BP has an adequate remedy available in the form of a Rule 60(b)(3)

motion– a fact clearly known to BP since it has *already filed* said motion.[61]

BP is not entitled to circumvent the well-established boundaries of the Federal Rules of Civil Procedure by maintaining this independent action; allowing BP to do so would be precisely the type of "grave miscarriage of justice" Rule 60(d)(1) was intended to prevent.  Because Rule 60(b)(3) is the "proper vehicle" to challenge the Judgment approving the SCP, BP cannot establish a substantial likelihood of success on the merits and the motion for preliminary injunction should be denied.

### B.  BP is Judicially Estopped from Changing its Representations About its Motives for Entering the SCP

As this Court has already recognized, BP is judicially estopped from challenging the Settlement Agreement by taking a position inconsistent to one it successfully urged to the Court in favor of Settlement approval.  *Order & Reasons Responding to Remand of Business Economic Loss Issues*, Rec. Doc. No. 12055, MDL 10-2179, p. 12 (E.D. La. Dec. 24, 2013) (hereinafter "O&R on BEL").  "Judicial estoppel is an equitable doctrine that prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding."  *Id.* at 12-13, *quoting In re Paige*, 610 F.3d 865, 876 (5th Cir. 2010).

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814, 149 L. Ed. 2d 968 (2001).  Judicial estoppel, "generally prevents a party from

---

[61] Complaint filed in Civil Action No. 13-6674, p. 3 ¶5 ("BP is pursuing two alternative avenues for relief.  In addition to this Complaint, BP has filed a motion in [MDL 2179] pursuant to Fed. R. Civ. P. 60(b)."); *see also*  Rec. Doc. No. 11994, filed on December 17, 2013.  Not only was this Rule 60(b)(3) motion filed on the same date as the instant motion seeking injunctive relief, the first twelve pages of the memoranda in support of the respective motions appear to verbatim identical.

**prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase**." *Id.* (emphasis added); also citing 18 Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000); 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981).  As explained by the United States Fifth Circuit, "[t]he purpose of the doctrine is to protect the integrity of the judicial process by **preventing parties from playing fast and loose with the courts to suit the exigencies of self interest**." *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334 (5th Cir. 2004) (emphasis added).

In its O&R on BEL, the Court noted several representations made by BP, both in its memorandum supporting final settlement approval and in declarations submitted by BP's experts, advocating a particular interpretation of the causation element of BEL claims.  The same analysis judicially estops BP from asserting its present underlying challenges to the SCP which, like the BEL claims, are another component of the Settlement Agreement adopted by the Court on December 21, 2012.  In urging approval of the Settlement Agreement, and specifically the SCP, BP reiterated multiple times that the $2.3 billion amount was a guaranteed amount based on total revenues for the harvesting of Gulf seafood species, and that it was generously designed to account for future risks:

- A guaranteed total of $2.3 billion has been allocated to the SCP. This figure represents approximately five times the annual average industry revenue for 2007 to 2009.[62]

- It was a generous program, and it was designed to account for future risks.[63]

- The $2.3 billion cap for the [SCP] must be viewed from the perspectives of pounds of seafood produced, the price per pound, and the ultimate revenues. [64]

---

[62] Class Counsel's and BP Defendants' Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval of Deepwater Horizon Economic and Property Damages Settlement Agreement as Amended on May 2, 2012, Rec. Doc. No. 7945 at  64 (hereinafter "Joint Support for Settlement Approval").
[63] Statement by Richard Godfrey, attorney on behalf of BP at Nov. 8, 2012 Fairness Hearing, Rec. Doc. No. 7892 at 54:15-21.
[64] Richardson Declaration, Rec. Doc. No. 7114-17 at 31.

- A $1.9 billion payout is a conservative estimate and thus . . . a second distribution will likely exceed $400 million.[65]

- The agreement provides that $2.3 billion will be paid, regardless of the fact that the total claims submitted under the program may be a lesser amount.[66]

- [I]n the case of the SCP, its ample $2.3 billion funding and the Program's design by a Court-appointed neutral will ensure that all claimants will be made more than whole in the first-round distribution and that participants will, in addition, share generous payments from a second-round distribution.[67]

- It is reasonable to focus on annual revenues from landings in order to put the $2.3 billion amount in context.[68]

- The $2.3 billion SCP amount represents a large fraction of the present value of the future landings from all Gulf of Mexico fisheries included in the SCP in the class geographies.[69]

- The most appropriate metric for evaluating the adequacy of the SCP is lost industry margin.[70]

- [The SCP] is extremely generous, it's accounting for future risk, and it exceeds these claimants' true aggregate economic losses.[71]

Therefore, BP made numerous representations to the to the Court, via briefing, testimony in open court, and expert declarations, that the SCP was fair precisely *because* the $2.3 billion amount adequately compensated for the risk of future lost revenue by guaranteeing the Class a second distribution payment, and repeatedly emphasized that the $2.3 billion amount was based on "pounds of seafood produced, the price per pound, and the ultimate revenues," not number of claimants.  This Court acknowledged, relied on, and accepted these representations, both in open

---

[65] BP's Memo in Support of Final Settlement Approval, Rec. Doc. No. 7114-1 at 57 (emphasis added).
[66] BP's Reply Memo in Support of Settlement, Rec. Doc. No. 7731 at 12-13.
[67] *Id.* at 13.
[68] Richardson Declaration, Rec. Doc. No. 7114-17, at 31.
[69] Smith Declaration, Rec. Doc. No. 7114-19 at 6.
[70] Joint Support for Settlement Approval, Rec. Doc. No. 7945 at  64, ¶205.
[71] Statement by Richard Godfrey, attorney on behalf of BP at Nov. 8, 2012 Fairness Hearing, Rec. Doc. No. 7892 at 60:17-19.

court and by approving the Settlement Agreement in December 2012.[72]

BP now urges an argument clearly contradictory to its previous position -- that the number of Watts' claimants was the "driving force" in arriving at the $2.3 billion figure and that the Class is benefitting from an undeserved "windfall."  Thus, after presenting ample data about the $2.3 billion amount based on seafood landings and lost revenue, BP takes a completely contradictory position – an assertion unsupported by any evidence or documentation contemporaneous to the SCP negotiations or approval process.  After convincing the Court to accept the SCP by arguing that it was extremely generous, BP now seeks to undo the Agreement because it is *too* generous.  The Court should find that BP is once again judicially estopped from taking a position inconsistent with its earlier arguments to the Court in favor of the Settlement Agreement, and the SCP in particular.[73]  And where BP is judicially estopped from making the underlying claims invalidating the SCP, it cannot establish even a *prima facie* showing of substantial likelihood of success on the merits.

### C. Even if BP's Underlying Action is Procedurally Proper, BP Fails to Establish a Likelihood of Success on Any of its Claims

If this Court were to find that Rule 60(b) does not preclude the initiation of this suit, and that BP is not judicially estopped from making its contradictory arguments, BP's Motion should still be denied it has failed to present **_sufficient evidence_** to establish a **_substantial likelihood_** of success on the merits of the causes of action asserted.  *See Daniels Health Services, L.L.C.,*

---

[72] "The implication now, the sense is now that some of this [first-round distribution of the SCP] is going to be left over.  They are not even going to have to distribute the $1.9 billion, so there will be *more than* $400 million left over."  Statement by the Court, addressing objections to the SCP, at Nov. 8, 2012 Fairness Hearing, Rec. Doc. No. 7892 at 140:2-5 (emphasis added); *see also* Order Approving Settlement, Rec. Doc. No. 8138 at 16 ("The guaranteed total of $2.3 billion allocated to the SCP represents approximately five times the annual average industry gross revenue for 2007-2009 of the Seafood industry in the region covered by the Settlement Agreement.").

[73] Further illustrating BP's attempt to "play fast and loose with the courts;" while filing the instant motion seeking to rescind the SCP, BP was filing reply and letter briefs before the Fifth Circuit advocating final approval of the Class Settlement (including the SCP) with the exception of the BEL interpretation.  These inconsistent arguments prove that BP is trying to "have its cake and eat it too."  *In re Superior Crewboats, Inc.,* 374 F.3d 330, 333 (5th Cir. 2004).

*supra*; *Janvey*, *surpa*.   In this case, BP has asserted eight causes of action – five (5) under Louisiana law and three (3) under federal common law.  In its briefing, BP conflates these eight counts, perhaps in attempt to disguise the weaknesses of its claims, and fails to address many of the key elements required under the law.

As explained below, BP's claims fail under either Louisiana law or federal common law.[74]  If Louisiana law applies to BP's allegations, then BP's claims fail because Louisiana law does not allow the invalidation of settlement agreements based on third party fraud.  And, even if it did, BP cannot satisfy the elements of the Louisiana causes of action asserted (Counts 2, 3, 5, 7, and 8).   Alternatively, if this Court were to find that federal common law applied to BP's claims, the result is the same because BP has not (and cannot) establish that the requisite elements of these claims (Counts 1, 4, and 6) are satisfied.

### 1.   The Claims Only Against Mikal Watts Should be Ignored

At the outset, it should be noted that several of BP's claims are asserted against only Mikal Watts and not the Class (Counts 3, 4, 5, and 8).   BP has not provided any legal basis for seeking injunctive relief against an innocent party, the Class, premised on Counts it alleges solely against Watts.  This Court has specifically recognized that a preliminary injunction is not a cause of action, but rather a remedy that arises from a cause of action against the Defendant.  *See*

---

[74] BP asserts in fn. 48 that "federal common law controls" based on the Fifth Circuit's decision in *Borne v. A&P boat Rentals No. 4, Inc.*, 780 F.2d 1254 (5th Cir. 1986) and because the Settlement Agreement specified that it would be *interpreted* under Admiralty law – but nonetheless asserts both federal and state law claims.  BP's reliance on *Borne* is misplaced, since the underlying claims were brought by a Jones Act Seaman, who the Court recognized as a ward of the Admiralty.  Nor are BP's claims requesting an interpretation of the Settlement Agreement.  Rather, BP seeks to recover for alleged torts that occurred in the State of Louisiana. BP claims that it justifiably relied on misrepresentations by Watts that "induced" BP to settle. (Complaint, paragraphs 54 and 55.)  Louisiana's choice of law rules apply *lex loci delicti* and call for the application of Louisiana law to fraudulent conduct occurring in Louisiana.  And Courts have held that fraudulent inducement of a maritime contract is a state law claim.  *See e.g.* *Wiedemann & Fransen, A.P.L.C. v. Hollywood Marine, Inc.*, 811 F.2d 864, 865 (5th Cir. 1987); *Kuehne & Nagel*, 874 F.2d at 288 (5th Cir.1989); *Oltman v. Holland Am. Line-USA, Inc.*, C05-1408 JLR, 2006 WL 2222293 (W.D. Wash. Aug. 1, 2006) *rev'd and remanded sub nom. Oltman v. Holland Am. Line, Inc*., 538 F.3d 1271 (9th Cir. 2008); *J. Lauritzen A/S v. Dashwood Shipping, Ltd*., 65 F.3d 139, 142-43 (9th Cir.1995).  Therefore, Louisiana law should apply to BP's tort claims, however, as set forth herein, the issue is moot since BP fails under all causes of action asserted.

*gen. Louisiana Crisis Assistance Center d/b/a Louisiana Capital Assistance Center v. Alexandria Marzano–Lesnevich*, 878 F.Supp.2d 662 (E.D La. 2012).   "In other words, a cause of action is generally established by showing the existence of a right held by the plaintiff and a breach of that right by the defendant." *Id.,* citing *Williams v. Walsh*, 558 F.2d 667, 670–71 (2d Cir.1977). Here, BP alleges no breach of any rights by the Class or Class Counsel.   To the contrary, BP expressly states that the Class was not responsible for, nor committed, any fraudulent act alleged.[75]   However, relying on its counts against Mikal Watts, BP seeks an injunction not against Watts, but instead prohibiting innocent class members from receiving the second distribution of the SCP -- the "generous" second distribution that BP promised them in exchange for executing irrevocable releases of their compensatory and punitive claims against BP.

BP states in a footnote: "The fact that BP seeks damages under some causes of action does not preclude the possibility of injunctive relief," *citing Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).[76]   Notwithstanding that the proposition for which it is cited is merely dicta in the opinion, *Productos* is distinguishable from the instant case in a very important regard.   In *Productos*, the plaintiff sought an injunctive remedy against the *same party* against whom it alleged damages.   Here, BP asserts Counts asserting damages claims solely against Watts, and then attempts to use that as the basis for injunctive relief against an innocent third party, the Class.   BP submits no case law in support of its theory that the extraordinary remedy of injunctive relief may arise against an innocent party based on alleged fraudulent conduct and damages committed by another.   Therefore, the Counts alleged solely against Watts (Counts 3, 4, 5, and 8) cannot serve as the basis of the injunctive relief it currently seeks.

---

[75] Complaint filed in Civil Action No. 13-6674, p. 5 ¶11 ("It is not alleged in this Complaint that the Class engaged in any wrongful conduct."); *see also*  BP's Memo in Support of PI, Rec. Doc. No. 2-8, No. 13-6674, p. 25.
[76] BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 27, fn 51.

**2. BP Has *No* Likelihood of Success Under Louisiana Law Because La. C.C. Art 1956 Precludes the Invalidation of the Settlement Agreement Based on Third Party Fraud.**

Under Louisiana law, BP is not entitled to rescind its contractual obligations to those it admits engaged in no wrongdoing and whom BP concedes was unaware of any alleged wrongdoing by a third party to the contract, Watts. Fraud committed by a third person vitiates the consent of a contracting party *only* if the other party knew or should have known of the fraud. *Smith v. Frey*, 97-0987 at 3 (La. Ct. App. 4 Cir. 11/19/97), 703 So.2d 751, 753, citing La. Civ. Code art. 1956; *see also* La. Civ. Code art. 1956, Revision Comment(b). Yet, BP presents to the Court that the Class "accepted the truth of Watts' claims" and did not engage in any wrongful conduct. Therefore, under the plain language of Louisiana law, BP fails to articulate even a *prima facie* case for rescinding its obligation to the Class under the SCP on the facts alleged.[77]

**3. In Addition to BP's Fraud Claims Being Barred by Civil Code Article 1956, BP Cannot Prevail on Count 2 – Rescission and/or Reformation of Contract Based on Fraud and/or Error Based on La. Civ. Code Arts. 1948-1958**

Count 2 actually involves two separate and independent arguments under Louisiana law: Invalidation of the Settlement agreement based on (1) Fraud and/or (2) Error. However, both of these arguments fail for the same reason – the Watts claims were immaterial to the establishment of the SCP. In order to rescind a contract based on fraud under article 1953 of the Louisiana Civil Code, the complainant must demonstrate, *inter alia*, that the alleged fraud "substantially influenced" its consent to the contract. *Terrebonne Concrete, LLC v. CEC Enterprises, LLC*, 2011-0072 (La. App. 1 Cir. 8/17/11), 76 So.3d 502, 509 writ denied, 2011-2021 (La. 11/18/11), 75 So. 3d 464, citing *Shelton v. Standard/700 Associates*, 01–0587, p. 5 (La.10/16/01), 798

---

[77] To the extent that BP argues for an exception pursuant to Comment (c) to Article 1956, which states: "In the situation contemplated in comment (b), relief may nevertheless be obtained on grounds of error if the requirements of revised C.C. Arts. 1949 through 1952 . . . are met." La. Civ. Code art. 1956 cmt(c). BP cannot prevail for rescission based on error because as discussed in Section 3, *infra*, BP has not demonstrated the requisite element for this claim – namely that the Watts claims were the principle cause or motive of the contract.

So.2d 60, 64.  Similarly, in order to invalidate a contract on the grounds of error under Article 1949 of the Louisiana Civil Code, a plaintiff must demonstrate that the "error" was the "principal cause or motive" of the contract.[78] *Sonnier v. Boudreaux*, 95-2127 (La. App. 1 Cir. 5/10/96), 673 So. 2d 713, 717.

Therefore, in order for BP to be entitled to rescission of the SCP for fraud and/or error it must demonstrate that the Watts claims were either the "principle cause or motive" of the contract or that that their alleged existence "substantially influenced" their consent.  The clients of Mikal Watts were not a "driving force" in arriving at the $2.3 billion guaranteed fund as alleged by BP. It is undisputed that the $2.3 billion was based on catch volume of Gulf seafood, not the number of individual claimants.[79]  Although BP harps on the number of clients Watts represents, claiming that Watts represented "88 percent" of the individual seafood crew claimants under the SCP, it says *nothing* about what BP actually thought those claims were worth.[80]  Luckily, the Court need not rely on BP's "convenient" memory.  The documentation contemporaneous to the settlement illustrates the insignificant impact Watts' claimants actually had on the SCP amount.

███████████████████████████████████████████████████

---

[78] Additionally, a contract cannot be vitiated for error when there is inexcusable neglect in discovering the error.  As explained in Section 4 *infra*, the issues that BP now complains of were known to BP and published in the *New York Times* almost a year before the SCP was confected.

[79] "The $2.3 billion cap …must be viewed from the perspectives of pounds of seafood produced, the price per pound, and the ultimate revenues."  Richardson Dec., Rec. Doc. No. 7114-17, at 31; "…the $2.3 billion SCP amount represents a large fraction of the present value of the future landings from all Gulf of Mexico fisheries included in the SCP in the class geographies," Smith Dec., Rec. Doc. No. 7114-19 at 6; "BP is paying, in the present value, 34 percent of all future anticipated revenues for the Gulf seafood industry." Statement by Richard Godfrey, attorney on behalf of BP at Nov. 8, 2012 Fairness Hearing, Rec. Doc. No. 7892 at 59:12-19; "So I want to drop back a minute to talk about how we got to the $2.3 billion.  What we did is we looked at the entire Gulf Coast region, the geographical region, and we looked at the data that was available from all state governments, the state wildlife departments, the state fisheries, as well as NOAA, to determine the total revenue.  This is not profit.  This is what the product sold for as reported by the governmental accounts that keep track of this as to the total sales and the total dollars, and these are in millions for the whole Gulf area."   Statement by Joseph Rice, attorney on behalf of the Class, Transcript of Preliminary Approval Hearing, Rec. Doc. No. 6395 at 37:25-38:9.

[80] BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 8, 26.



[81] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ [82] ██

███████████████████████████ [83] ████████████████████████

█████████████████████ .[84]   The focus was on the revenue of the entire

seafood catch for the Gulf, *not* on the number of claimants.[85]  BP made this clear to the Court in

its presentations in support of final settlement approval, noting that the $2.3 billion SCP amount

was based on "catch volume" and industry revenue at average 2010 prices.[86]  Further, John Perry

and Daniel Balhoff, the Court-appointed neutrals charged with allocation and distribution of the

$2.3 billion, specifically noted in their affidavits that it was the data of the seafood industry and

not any individual lawyer's book of clients that determined the methodology.[87]

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████   Moreover, BP

apparently took no action to investigate the veracity of Watts' claimants, even after being alerted

to potential issues as early as April 2011, which is further indication of how little importance it

assigned to these claims.  And perhaps the best evidence of their immateriality was the fact that

---

[81] Exh.. "5" -- Rice Declaration, ¶10.
[82] Exh.. "4" -- Herman Declaration, ¶8.
[83] Godfrey Declaration II, ¶7.
[84] Exh.. "4" -- Herman Declaration, ¶9.
[85] "The Seafood Compensation Program adopts rules that *address the volume of catch loss and the impact of cost, price, and undocumented catch.*"  Perry Declaration, Rec. Doc. No. 7110-5 at 5 (emphasis added); *see also* Rice Declaration, ¶¶15 and 16.
[86] Slideshow presentation made by BP to the Court on November 8, 2012, at the Fairness Hearing for Final Settlement Approval, Slides 7-11; *see also* BP's Memo in Support of Final Settlement Approval, Rec. Doc. No. 7114-1 at 29 (justifying the $2.3 billion SCP amount as based on "annual revenues of seafood harvested.").
[87] Perry Declaration, Rec. Doc. No. 7110-5 at 3-4; *see also* Balhoff Declaration, Rec. Doc. No. 7110-2 at 3-4.

BP agreed to relegate the Watts' claimants to Category III status, which was capped at $50 million, a mere 2.17% of the $2.3 billion SCP guarantee.    By its words on page 18 of its Injunction Memorandum, BP now protests that the Watts claims were the "driving force" to pay $2.3 billion for "global peace," but in truth, it dumped these claims in a bucket that was capped at roughly 2% of the settlement amount. [88]

BP negotiated and entered into the contract under the watchful eyes of Magistrate Judge Shushan, the Court-appointed neutrals, and this Court.   BP's motives and methodologies for arriving at the $2.3 billion guarantee under the SCP are well-documented in briefing, final fairness transcripts, and expert declarations.   Yet, despite the voluminous record about the formation of the SCP, BP fails to cite to a single declaration, brief, or transcript contemporaneous to the SCP approval process in support of the instant motion.[89]  The reason for this failure is that *no such documentation exists*.   BP is forced to rely on the revisionist accounts of the SCP negotiations submitted by Richard Godfrey and Mark Holstein to bolster its threadbare assertions.   This revisionist history is further evidenced by BP's wordplay – throughout their presentation to the Court, BP referred to the $2.3 billion as a "guarantee" to be paid regardless of the number of claimants, however, BP now characterizes it as a "cap."   Recall that BP adopted a statement by the Thanh Hai Class Plaintiffs that described the $2.3 billion settlement as a "guarantee rather than a cap."[90]   BP now drops its "guarantee," which it used often to promote the SCP to the Court and the Class, and currently describes the settlement fund throughout its recent filings exclusively as "capped," and this only after the class members have

---

[88] BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 25.  ("Page 18" refers to the self-assigned number at the bottom of the page in BP's brief).

[89] BP makes 43 footnote citations in its factual background section, and not one refers to its own briefing submitted in support of final settlement approval, the transcripts from final settlement approval, or its slideshows presented in support of final settlement approval.  *See* BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, pp. 9-18.

[90] BP's Reply in Support of Settlement, Rec. Doc. 7731 at 13.

been lured into signing releases giving up their claims for punitive damages on the promise of a second distribution that BP now wants rescind.  Nowhere in the ninety-five pages that BP filed on December 17, 2013 comprising the Complaint, the Rule 60(b) Motion and the instant Rule 65 Injunction does the word "guarantee" appear.  It vaporized.

And BP advances a game of semantics that has no basis in law or fact; arguing to this Court that the Class is entitled to a "premium" second round distribution but not a "windfall." Yet BP offers no legal test to make this distinction, nor does it offer any basis in the language of the SCP for doing so.  This is because it is a meaningless distinction, designed to avoid the plain fact that BP promised the Class this second distribution and told the Court that its generosity was precisely what made the SCP a "fair and just" settlement.

BP's argument that the alleged existence of the Watts claims was the "driving force" behind the negotiations is simply incorrect and unsupported by any contemporaneous documentation or proof.  The Watts claims were given no meaningful value by BP, and they were ultimately all capped at roughly 2.17% of the total settlement.   Therefore, BP has failed to establish that the Watts claims were either the "principle cause or motive" of the contract or that their alleged existence "substantially influenced" BP's consent to the SCP.

### 4.  BP Cannot Recover Under Counts 3 and 5 – Intentional and Negligent Misrepresentation under Louisiana law.

In Counts 3 and 5, BP asserts Louisiana state law claims under article 2315 of the Louisiana Civil Code for intentional and negligent misrepresentation.  These claims fail for four reasons.  First, they only apply to Mikal Watts.  As stated above, there is no basis for enjoining a defendant based on a cause of action asserted against another party.  Second, these claims would likewise be barred under Louisiana law by the application of La. C.C. art. 1956.  Third, in order to recover for a misrepresentation under article 2315 of the Louisiana Civil Code, the Plaintiff

must demonstrate that the misrepresentation involved a subject that was ***material***. *See Newport Ltd. v. Sears, Roebuck & Co.,* 6 F.3d 1058, 1068 (5th Cir.1993).   As shown by the evidence described above in Section 3, the Watts claims were completely immaterial to the establishment of the $2.3 billion amount of the SCP – stated another way, the Watts claims were immaterial for the same reasons they were not the "principle cause or motive" of the contract or that their alleged existence "substantially influenced" BP's consent.   Lastly, in addition to proving that the claims are material, under Louisiana a claim of misrepresentation under article 2315, BP must demonstrate that it **justifiably** relied on the number of Watts' claimants. *Kadlec Med. Ctr. v. Lakeview Anesthesia Associates*, 527 F.3d 412, 418 (5th Cir. 2008).   BP cannot, in good faith, show that it justifiably relied on the number of Watts' claimants in deciding to pay $2.3 billion.

BP asserts that "had BP known that Watts was misrepresenting the number of his clients, and even their very existence, BP would have taken a different approach to settlement negotiations."[91]   BP further claims, "we now know that over half of Watts' alleged clients were phantoms: individuals never represented by Watts, in a number of cases not even commercial fishermen, and in some instances individuals who are deceased."   But the simple fact is that BP was alerted to the same alleged issues with Watts' claimants it now decries as fraud *as early as April 2011* – almost a full year before the SCP was negotiated.   On April 26, 2011, Goodwin Procter, counsel on behalf of the GCCF[92] sent a letter to Don Haycraft at Liskow & Lewis on behalf of BP and Jennifer Cote for BP America, Inc., among others, highlighting issues with Watts' claimants.   The Goodwin Procter letter specifically refers to 40,002 Plaintiff Profile Forms provided by Watts' firm.   As stated above, the letter noted that there were duplicates,

---

[91] Complaint filed in Civil Action No. 13-6674, ¶4.
[92] "[T]he GCCF cannot be considered 'neutral, or totally 'independent' of BP."   Court's Order and Reasons dated February 2, 2011, Rec. Doc. No. 1098 at 11; *see also In re Deepwater Horizon*, No. 13-30095, 2014 WL 103836 at *2 (5th Cir. Jan. 10, 2014)("BP established its own claims process and later funded the claims process administered by the Gulf Coast Claims Facility ("GCCF")").

missing information, failures to complete the submissions process, names with no information, listings of other law firms, missing retention letters and letters without signatures.[93]  These issues are nearly identical to those that BP now cites in support of "an inference of fraud [that] is overwhelming."[94]

Further, an April 18, 2011 *New York Times* article that BP cites in its own briefing, highlighted potential confusion within the Vietnamese community about whom Watts' represented.[95]  BP's protestation that it did not receive adequate information to verify Watts' claimants until January 2013 is not true.  By at least mid-2011, BP had 40,000+ Short-Form Joinders ("SFJ") from Watts that contained the last four digits of each claimant's Social Security Number, which it could readily match to the first five via the very same Lexis-Nexis database that BP used in January 2013.  To explain, according to the Declaration of Maria Travis, Ex. 4 to BP's Injunction Brief, it was not until January 2013, when Watts filed 43,967 claims with the BPCP that contained the full 9-digit Social Security Numbers for the deckhands, that BP could research their true identity in the LexisNexis database.  However, the SFJs that BP has had since 2011 contained, among other information, the name, address and last four digits of the claimant's Social Security Number.  Using that name and address information in the exact same Lexis-Nexis database, a report could be produced that included the first five digits of the Social Security number, thus providing the full nine-digit Social Security number.  Filed under seal are three such examples of this research,[96] which also reveals that when one searches the Lexis-Nexis database with that nine-digit Social Security number, in each instance it identified names

---

[93] *Id.*
[94] BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 18.
[95] Exh. "3" - *New York Times* article (April 18, 2011).
[96] Exh. "8" Filed under seal are the three examples, each consisting of the SFJ and two LexisNexis Reports.

that differed from the name of the claimant on the SFJ. [97]

BP had all of this information available to it back in 2011 and its failure to investigate these potential issues further evidences the utter lack of importance it assigned to Watts' claimants during SCP negotiations and in arriving at the $2.3 billion guarantee. And it also demonstrates that BP could not, and did not, justifiably rely upon these Watts claims at the time they were confecting the settlement.

The position BP now takes is in direct contradiction to the representations BP made to the Court about the thoroughness of its preparation in Settlement Negotiations, both in briefing and in open court at Fairness Hearings. Even if the Court accepted BP's assertion that it was unaware of any potential issues with Watts' claimants until January of 2013, BP still waited until December 2013, *almost an entire year later*, to raise a challenge to the SCP. BP's apparent strategy was to wait until it had obtained releases from all of the innocent Class Claimants, before challenging the second distribution payment. [98]

For these reasons, BP has not carried its heavy burden of demonstrating a substantial likelihood of success on the merits for its article 2315 claims of misrepresentations. The Watts claims were immaterial to establishing the fund and, even if they mattered, BP could not have justifiably relied upon them.

### 5. BP Cannot Recover Under Counts 7 and 8 – Payment of a Thing Not Due and Abuse of Process

BP's remaining Louisiana Counts are equally meritless. First, Count 7 – payment of a thing not due – is not an available theory under Louisiana law to invalidate the settlement of a legal claim. That is the precise holding of *Mongrue v. State Farm*, 396 So.2d 466 (La.App. 4th

---

[97] Declaration of Martha Travis, Rec. Doc. No. 2-7 Civil Action No. 13-6674, ¶7.   Travis also states that 13.1% of the Watts claimants had "dummy" Social Security Numbers ("e.g., 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"). This would have been readily apparent from at least 5,000 of the 40,000+ Short Form Joinders that Watts had provided in 2011.
[98] *See* Exemplar Release, Ex. 26 to the Settlement, Rec. Doc. 6276-45 at page 15, ¶18.

Cir. 1981) (holding that a settlement made in error was not payment of a thing not due.  The court noted that the defendant denied liability, and the reason for making the settlement was to release all possible claims, not to satisfy actual liability).   Moreover, the entire claim is predicated on the contract being vitiated for fraud or error, which not only renders the cause of action redundant, but ineffective since, as explained above, BP has failed to establish an entitlement to rescission under Louisiana law.

With respect to BP's Count 8, Abuse of Process, this count has been alleged against Mikal Watts only and, as stated above, there is no legal basis to enjoin the Class based on the allegations against Watts – an injunction that would also violate La. C.C. art. 1956.   However, even if "abuse of process" by Watts was available to BP to invalidate the class settlement, BP has submitted no evidence in support of the required elements of this claim.  Specifically, BP must show an ulterior motive on Watts' part and a willful act in the use of the process that is not proper.  *Waguespack, Seago and Carmichael (A PLC) v. Lincoln*, 1999–2016 (La.App. 1st Cir.9/22/00), 768 So.2d 287, 290–291.   "[T]he regular use of process does not constitute an abuse of process; there must be a showing of an abuse through an illegal, improper, or irregular use of process." *See Glotfelty v. Hart*, 2013 WL 6858285, 2013-0870 (La.App. 1 Cir. 12/27/13).  While BP advances supposition and argument, it has offered no evidence of Watts' motives or the willfulness of his actions.   Nor has it shown an illegal, improper or irregular use of some process.  The issues identified with Watts' submission of claims might as easily be attributable to mistake or neglect, as opposed to willful intent.   While it is unknown, it is BP's heavy burden to bear in seeking the instant injunction.

### 6.  BP Fails to Demonstrate a Substantial Likelihood of Success in its Challenge to the SCP Under Federal Common Law (Counts 1, 4, and 6)

If this Court were to decide to apply federal common law to BP's claims, as opposed to

Louisiana law, BP still fails to establish a likelihood of success on its federal common law Counts due to the same factual deficiencies which preclude recovery under Louisiana law.   First, BP has failed to establish a likelihood of success under Count 1 of the Complaint, fraudulent misrepresentation, because it fails to "clearly carry its burden of persuasion" that Watts' alleged misrepresentation of clients was material to the formation of the SCP.   "To prevail on a claim that a contract was fraudulently procured [under the federal common law], the party that was deceived must show that (1) the deceiving party made a *material misrepresentation* or nondisclosure, (2) the representation was false or the nondisclosure implied that the facts were different from what the deceived party understood them to be, (3) the deceiving party knew that the representation was false or that the nondisclosure implied the existence of false facts, (4) the deceiving party intended the deceived party to rely on the misrepresentation or nondisclosure, and (5) the deceived party detrimentally relied upon the misrepresentation or nondisclosure." *Black Gold Marine, Inc. v. Jackson Marine Co*., 759 F.2d 466, 470 (5th Cir.1985)(emphasis added). As to the elements concerning actions of the "deceiving party," as noted *supra*, BP concedes that the Class engaged in no wrongful conduct.   Therefore, BP has no likelihood of success on the Count of fraudulent misrepresentation against the Class on the facts as BP alleges them.[99]

BP cites a twenty-three-year-old, non-controlling, unreported case out of the District of Kansas, *Raymark Indus., Inc. v. Stemple*, in support of its fraudulent misrepresentation claim.[100] Civil Action No. 88-1014-K, 1990 WL 72588, at *1 (D. Kan. May 30, 1990).   In that case, the plaintiff company, Raymark, entered a class action settlement to settle asbestos-related claims by

---

[99] The Class has no information or belief about the alleged actions of Watts.  And as noted *supra*, BP provides no case law in support of seeking the extraordinary remedy of injunctive relief against the Class based on damages asserted against Watts.

[100] BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 24.

a group of automotive brake shoe mechanics. *Id*. Upon learning that the two plaintiffs'
attorneys engaged in a fraudulent process for contriving and processing the claims, the company
filed suit against the attorneys, alleging common law fraud claims, *inter alia*. *Id*. BP correctly
notes that in this case, the Court found ample evidence that the attorneys had engaged in
knowing misrepresentation, and accordingly denied the attorneys' motion for summary judgment
on Raymark's fraud claims. Id. at *29. Interestingly, what BP *fails* to note is that in the *Raymark*
case, the company also sought rescission of the underlying class-action settlement, which the
district court rejected: "[T]he court must . . . conclude that Raymark's claim for
rescission/restitution [of the settlements] *must fail*. IT IS FURTHER ORDERED that the
defendants' motions for summary judgment on [Raymark's] rescission claim . . . [is] granted."
*Id*. (emphasis added). Therefore, the very case that BP relies on illustrates that BP is not entitled
to escape its obligation to the Class under the SCP. [101]

Further, BP fails on two essential elements of the federal common law fraudulent
misrepresentation claim – material misrepresentation and justifiable reliance.[102] As noted *supra*,
BP cannot carry a clear burden of persuasion to establish that the number of Watts' claimants
was material to arriving at the $2.3 billion SCP amount, which was based on Gulf seafood
revenue and repeatedly touted as being a guarantee regardless of the number of claimants under
the Program. Further, in light of the letter to BP and *New York Times* article identifying issues

---

[101] BP also has the audacity to cite to a case involving the "inherent risk of in terrorem settlements" as analogous to
the instant case. BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 25, citing *AT&T
Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1752 (2011). "In terrorem lawsuits" refers to the "extract[ion]" of
"extortionate 'settlements' " of frivolous claims. *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct.
1184, 1200, 185 L. Ed. 2d 308 (2013). This is hardly analogous to the SCP, which by BP's own account was
confected to remedy the immense damage done to the Gulf Seafood industry by the *Deepwater Horizon* oil spill, and
lauded by class action settlement experts, including its own. *See* statement by Richard Godfrey, attorney on behalf
of BP at Nov. 8, 2012 Fairness Hearing, Rec. Doc. No. 7892 at 50:2-3; 52:4-10 (citing involvement of "Professors
Coffee, Miller, Klonoff, and Isaacharoff").
[102] BP identifies "justifiable reliance by the plaintiff" as an element of fraud under federal common law. BP's
Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 22.

with SFJ's which would have sufficed to investigate any such issues, BP cannot demonstrate justifiable reliance on any such alleged misrepresentation by Watts.  Therefore, BP fails to establish a likelihood of success on Count 1 of its Complaint, fraudulent misrepresentation under the federal common law.

Materiality and justifiable reliance is also a required element under the federal common law claim of negligent misrepresentation (Count 4).  *Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.*, 346 F.3d 530, 535 (5th Cir. 2003).  Therefore, for the same reasons it cannot establish a substantial likelihood of success on its fraudulent misrepresentation claim under federal common law, BP cannot establish a likelihood of success on its allegation under Count 4, negligent misrepresentation under federal common law.[103]

Finally, BP's allegation of unjust enrichment under federal common law (Count 6) is completely meritless.  "A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment."  *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1546-47, 185 L. Ed. 2d 654 (2013).  Here, where BP has failed to demonstrate a likelihood of success that the SCP can be invalidated on claims of fraudulent or negligent misrepresentation under the federal common law, BP is precluded from asserting a theory of unjust enrichment to avoid its contractual obligation to pay the Class the second distribution guaranteed under the terms of the SCP.  And under the terms of the Settlement Agreement, BP agreed that "**this Agreement shall not be subject to rescission or modification by reason of any change or difference in facts** or law."[104]  BP's entire argument in support of its unjust enrichment claim rests on the premise that "although the parties contemplated a $400 million surplus after the [SCP's] first distribution, approximately $1.3 billion remains" is

---

[103]  The Class notes that this Count is alleged against only Watts, and BP fails to articulate a legal basis for injunctive relief against the Class based solely on Counts alleged against Watts.

[104]  Settlement Agreement, Rec. Doc. No. 6430-1 at 81-82, §13.4.

demonstrative of the fact that the Class was unjustly enriched.  But this statement is completely false, as evidenced by the statements of this Court, the Court-appointed neutrals, and BP's own briefing, recognizing that "[a] $1.9 billion payout is a conservative estimate and thus . . . a second distribution *will likely exceed $400 million.*"[105]  As noted, the $1.9 billion estimate did not take into account the $730 million offset for prior GCCF seafood claims.  And, members of the class do not agree that the SCP is a "windfall" at all.  Many of Oyster leaseholder claimants believe that the value of their claims (compensatory and punitive) far exceeds the sums they will receive through the SCP.[106]

Therefore, BP has failed to carry its heavy burden on the merits as to *any* of its eight alleged counts.  Its motion for preliminary injunctive relief should be denied.

## II.     BP Fails to Establish a Substantial Threat of Irreparable Harm

BP has also made no showing of even a possibility of irreparable harm.  The party seeking a preliminary injunction must show that the threatened harm is more than mere speculation.  *Janvey*, 647 F.3d at 601. "[A] preliminary injunction *will not be issued simply to prevent the possibility of some remote future injury*."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added).  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary relief that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id*.  "Irreparable harm is neither speculative nor remote, but is actual and imminent. This element is met if [the plaintiff] can prove it is likely to suffer this type of

---

[105] BP's Memo in Support of Final Settlement Approval, Rec. Doc. No. 7114-1 at 57 citing Balhoff Declaration (emphasis added); *see also* "The implication now, the sense is now that some of this [first-round distribution of the SCP] is going to be left over.  They are not even going to have to distribute the $1.9 billion, so there will be *more than* $400 million left over."  Statement by the Court, addressing objections to the SCP, at Nov. 8, 2012 Fairness Hearing, Rec. Doc. No. 7892 at 140:2-5 (emphasis added).
[106] Exh. "7" – Aff. of Alvin Bordelon, Esq.

harm before a trial on the merits."  *W. Alabama Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 683-84 (S.D. Tex. 2004) (emphasis added).

In general, a harm is not irreparable where there is an adequate remedy at law, such as monetary damages.  *DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990).  Where money damages are sought, only "extraordinary circumstances," such as evidence that the defendant is likely to be insolvent before final judgment, may give rise to the irreparable harm required for a preliminary injunction. *Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*, Civ. A. No. 11-3218, 2011 WL 6091807 at *6 (S.D. Tx. Dec. 7, 2011).  "In order to demonstrate irreparable harm, "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Randolph v. Nationstar Mortgage, LLC*, Civ. A. No. 11-2165, 2012 WL 2450016 at *4 (E.D. La. June 27, 2012). "To meet this burden, a plaintiff must demonstrate the threat of irreparable harm by independent proof..." *Id.*

First, BP cannot establish irreparable harm because it has made no showing that the second distribution payment of the SCP is imminent.  In fact, the Court-appointed neutral's recommendation on the second SCP distribution is not expected to be presented to the Court prior to late February 2014 and this Court ultimately controls the timing of the second distribution in accordance with its Rule 23 supervisory obligations.[107]  Second, BP cannot demonstrate that the threatened harm would be irreparable, because money damages would provide an adequate remedy at law if it were entitled to recovery of the second distribution.  The *Tisino* case which BP cites in support of injunctive relief freezing settlement funds is distinguishable from the instant case.[108]  In *Tisino*, the Court relied on evidence that the defendant had "sought to divert, deplete, and/or dissipate substantial portions of the funds."

---

[107] Exh. "5" - Rice Declaration, ¶ 20.
[108] BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 30.

*Tisino, et al. v. R&R Consulting and Coordinating Group, L.L.C. et al.*, 478 Fed. Appx. 183 (5th Cir. 2012).  BP identifies not a single fact pertaining to the risk of insolvency of the Class, or identifying any other actions by the Class that would pose a threat to the recovery of Settlement Funds, in the event that BP were entitled to such recovery.

Further, BP's attempt to analogize the instant motion to the Fifth Circuit's opinion in the Business Economic Loss ("BEL") component of the Settlement Agreement is without merit. Contrary to BP's representation, *the Fifth Circuit did not find "irreparable harm"* arising from payment of settlement awards in the *Deepwater Horizon* case.[109]  In the opinion dealing with Business Economic Loss ("BEL") claims which BP cites, the Fifth Circuit did not conduct an analysis under the "irreparable harm" standard.  *In re Deepwater Horizon*, 732 F.3d 326, 345 (5th Cir. 2013).  In fact, the Fifth Circuit did not apply the four-prong test for preliminary injunction at all, relegating it to a footnote.[110] *Id.*, n.13.  Instead, the Fifth Circuit focused on the standard under a motion to stay, which was also at issue on appeal.  Under this standard, the Fifth Circuit found that a tailored stay to limit recovery to "those who experienced actual injury traceable to the *Deepwater Horizon* accident" was appropriate.  *Id.* at 345.  Here, it is undisputed that the Class claimants are "those who experienced actual injury traceable to the *Deepwater Horizon* accident."  Further, when discussing the unrecoverability of awards in the BEL case, the Fifth Circuit focused on the fact that "awards will have been distributed to potentially thousands of claimants."  *Id.* at 332, n.3.  This is also distinguishable from the instant case, where the pool of Class claimants is known -- those who have already recovered in the first distribution.

Accordingly, where (1) BP offers no independent proof that the harm would be irreparable; and (2) the alleged threat is not imminent, BP has failed to carry its burden to

---

[109] *Id.* at 29 (claiming that the Fifth Circuit made a "finding [of] irreparable harm").
[110] *In re Deepwater Horizon*, 732 F.3d 326, 345 (5th Cir. 2013).

establish a substantial threat of irreparable harm.   Therefore, BP's motion for preliminary injunctive relief must be denied.

### III.       The Harm to the Class Outweighs the Complete Lack of Harm to BP

The harm to the Class if the second distribution payment is enjoined far outweighs the utter lack of harm to BP if its motion is denied.  *See Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).   BP guaranteed the Class claimants a second settlement distribution under the terms of the SCP, and repeatedly emphasized that the SCP was designed to compensate for both present and future losses of seafood revenue.   In reliance on BP's guaranteed second distribution and a $2.3 billion guarantee, innocent class members executed releases their compensatory and punitive claims against BP – even though many of them believed their claims far exceeded the amounts they would ultimately receive in the SCP.[111]   Thus, although BP's claims there is to be a so-called "windfall," the reality is the class as a whole presented compensatory and punitive claims that could have vastly exceeded the amounts paid in both distributions of the under the SCP.

The *Lupron* case which BP cites is distinguishable from the instant facts.[112]   In that First Circuit case, the Court rejected the challenge to a *cy pres*[113] distribution brought by members of a class settlement who had already been compensated.   *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 24 (1st Cir. 2012) *cert. denied,* 133 S. Ct. 338, 184 L. Ed. 2d 239 (U.S. 2012).   In *Lupron*, the terms of the settlement agreement provided that the Settlement Court had discretion to distribute any unclaimed funds, including to "one or more charitable organizations." *Id.* at 26.    This is nothing like the instant case, where at every turn BP guaranteed that the full

---

[111] Exh. "7" – Aff. of Alvin Bordelon, Esq.  This is offered as an example of one segment of class members.

[112] BP's Memo in Support of PI, Rec. Doc. No. 2-8, Civil Action No. 13-6674, p. 31.

[113] "Cy pres is an equitable doctrine that has been imported into the class-action context from the field of trust law." *Klier v. Elf Atochem North America*, 658 F.3d 468, 473–74 (5th Cir.2011).

$2.3 billion would be distributed to the Class.

Finally, BP's reliance on the Fifth Circuit BEL case is again misplaced.  In the BEL case, the Fifth Circuit noted that the interest of "individuals who never could have recovered in individual suits . . ." were outweighed by the potential unknown loss to BP and its shareholders. *In re Deepwater Horizon*, 732 F.3d at 345.  Here, the Class claimants are *not* individuals who never could have recovered against BP.  To the contrary, they were part of a group most devastated by the *Deepwater Horizon* spill, and signed away their rights in direct reliance on BP's $2.3 billion guarantee.  Further, BP has planned and accounted for a $2.3 billion payout for over one year.  No "unknown potential loss" will arise from denial of BP's instant motion.

Therefore, the balancing of potential harms weighs heavily in denial of BP's motion for injunctive relief.

## IV.   The Public Interest Would be Disserved by Granting BP's Request for Preliminary Injunction

As acknowledged by BP, "[t]he public interest strongly favors settlement in general, and the settlement of class actions in particular."[114]  "The law strongly favors settlement of litigation, and *there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into*."  *Array Holdings Inc. v. Safoco, Inc.,* CIV.A. H-12-366, 2013 WL 4588506 (S.D. Tex. Aug. 28, 2013). "Compromise agreements between parties to avoid litigation are favored by law, and courts will not declare a settlement void without a *clear showing* that it violates good morals or public interest."  *Walton v. Walton*, 597 So. 2d 479, 484 (La. Ct. App. 1992).  This motion for preliminary injunction is the most recent in a string of unsuccessful attempts BP has made to challenge various aspects of the Settlement Agreement,

---

[114] BP's Memo in Support of Final Settlement Approval, Rec. Doc. No. 7114-1 at 60, citing 4 *Newberg on Class Actions* § 11 :55 (4th ed.); *see also* Court's Order Approving Final Settlement, Rec. Doc. No. 8138 at 55 ("The public interest strongly favors the voluntary settlement of class actions.")

and allowing it to enjoin this second distribution owed to the Class would only serve to further erode the public interest in bringing resolution to devastation caused by the *Deepwater Horizon* disaster over three years ago.

## CONCLUSION

BP negotiated for and guaranteed a $2.3 billion payout to qualified seafood industry claimants, a figure based on gross revenues of seafood landings in the Gulf, in exchange for global peace.  In reliance on that promise, the Class claimants executed releases on their claims against BP.  Now BP is grasping at straws (over 42,000 of them, in fact) to back out of its end of the bargain.   This Court should deny BP's request for preliminary injunction.

Respectfully submitted,

**IRWIN FRITCHIE URQUHART & MOORE LLC**

*/s/ James B. Irwin*
JAMES B. IRWIN, IV (La. Bar No. 7074)
DOUGLAS J. MOORE (La. Bar No. 27706)
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone (504) 310-2100
Facsimile: (504) 310-2101
jirwin@irwinllc.com
dmoore@irwinllc.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 17th day of January, 2014.

*/s/ James B. Irwin*