# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig<br>"Deep Water Horizon" in the<br>Gulf of Mexico, on April 20, 2010 | * | CIVIL NO: |
| | * | SECTION: "J" (1) |
| This Document Applies to: | | |
| No 12-970, Bon Secour Fisheries, Inc., et<br>al. v. BP Exploration & Production, Inc.,<br>et al. | * | JUDGE BARBIER |
| | * | MAGISTRATE SUSHMAN |

## DECLARATION OF GEOFFREY C. HAZARD, JR

1.      I am Distinguished Professor of Law Emeritus, Hastings College of Law, University of California, and Trustee Professor of Law Emeritus, University of Pennsylvania.  I am a member of the bar in California and Special Ethics Counsel to four law firms advising them on a broad range of issues that arise in the daily practice of law.  I have studied, done research, taught, and practiced in professional ethics and civil litigation for over 45 years.

2.      I was Reporter for the American Bar Association Model Rules of Professional Conduct on which the corresponding Louisiana Rules of Professional Conduct and most other jurisdictions are based.  I am co-author of a treatise and a course book on professional ethics. I have been accepted numerous times as an expert in professional ethics in many other jurisdictions, including Louisiana. A copy of my professional biography is attached as Attachment "A."



3.    The facts contained in this Declaration are within my personal knowledge, and, if called upon to testify, I could and would testify competently thereto.

4.    I have been engaged on behalf of Jonathan Andry for my expert opinion concerning his conduct as charged in the Report of the Special Master Louis J. Freeh ("Freeh Report)". I am being compensated for my work on an hourly rate basis.

## ASSUMED FACTS

5.    As the basis of my opinions I assume the following facts:

(a)    Jonathan Andry and Glen Lerner are law partners, in Andry Lerner LLC whose practice is mostly handling plaintiff personal injury and BP Oil Spill compensation claims.

(b)    Lerner, in his individual capacity, is also a principal with Lionel Sutton in a water purification business Crown LLC ("Crown"). Andry was not a participant in Crown and had no knowledge about the day-to-day operations of Crown.

(c)    Sutton and his wife Christine Reitano were partners in their own law firm Sutton & Reitano, LLC. They were engaged by Casey Thonn to pursue compensation claims on his behalf. Thereafter, they were both hired as attorneys to work for Patrick Juneau, the Claims Administrator in the Court Supervised Settlement Program ("CAO").

(d)    After an initial referral to another firm was unsuccessful, the Sutton firm recommended to Thonn that he hire Andry Lerner as new counsel at or around the time Reitano assumed her role with the CAO. Before substituting out of the case, Reitano had done a substantial amount of work on Thonn's three claims.

(e)    The case was accepted by Andry Lerner as a new matter, and the firm's standard Attorney/Client Contract was signed by client. A traditional client-lawyer relationship

was thus established between Thonn and Andry Lerner. The attorney-client contract with Thonn called for Andry Lerner to receive as attorney's fees 20% of any claims awards paid to Thonn. There was no referral fee agreement signed. Before substituting out of the case, Sutton and Reitano had done a substantial amount of work on Thonn's three claims.

(f)     Based on Sutton's representation that he referred Thonn's claim to Andry Lerner, Lerner agreed to pay Sutton customary referral fee to compensate Sutton for the work previously done by his law firm on Thonn's claims. The claims were in due course settled to Thonn's satisfaction. Andry disagreed with Lerner that Sutton should be pad a referral fee because of his and his wife's employment status with the CAO.

(g)     Andry and Lerner had a pre-existing agreement about how to divide legal fees earned by Andry Lerner. That agreement called for Lerner to receive 50% of the fees on each of the Thonn claims.

(h)     Andry Lerner sent three payments to Lerner's separate law firm in an amount equivalent to Lerner's 50% share of the fees on each of the Thonn claims, or 10% of each Thonn award (e.g., one half of Andry Lerner's 20% attorney's fees), and they were deposited in Lerner's law firm's regular bank account. Subsequently, in three wire transfers that were also documented, Sutton received three payments equivalent to 10% of the Thonn award. Sutton accepted the remittal and has expressed no objection.

(i)     Contemporaneously, Lerner made payments to Sutton as part of their separate Crown business. Lerner and Sutton became partners in Crown in May 2010. Lerner had agreed to buy out a portion of Sutton's and two other partners' equity shares in Crown. This agreement was formed in 2012 at least six months before Sutton went to work for the CAO. Lerner made these equity buy out payments to Sutton in the course of Crown's ongoing

operations. There is no evidence that Andry knew of the Crown payments nor any of the Sutton Lerner business details being made in the same time frame as the Thonn claims were being processed by the CAO.

(j) There is no evidence that the money paid to Sutton in connection with the attorneys' fees earned from settlement of the Thonn claims was anything other than a customary referral fee agreed upon before Sutton went to work for Juneau.

(k)    Nor is there any evidence that the payments to Sutton were made for any illicit purpose such as influencing Sutton or Reitano to commit any corrupt or illegal acts with respect to the Thonn claims. Given the fact that the Freeh Report (at p. 29) concedes that these were referral fees and cites no evidence of any other purpose, it is unreasonable to infer the referral fees were paid for an improper purpose.

(l)    Based upon three independent reviews (one by the Special Master himself), there is no evidence that (1) the Thonn claims were expedited or enhanced by Sutton or Reitano or (2) any of the hundreds of other BP compensation claims filed by Andry Lerner LLC were improperly expedited or enhanced by Sutton, Reitano, or anyone else on Juneau's staff. There is no *quid pro quo* for the payments.

(m)    There is no evidence of unprofessional, dishonest, or otherwise inequitable conduct with regard to the handling by Andry Lerner, or its attorneys, of the Thonn claims or any of the several hundred other claims filed on behalf of their clients.

(n)    On the basis of the reasonable value of their substantial services, Andry Lerner has already earned to date substantial legal fees in their representation of hundreds of BP claimants. To date, the firm has performed numerous services beneficial to its clients such as agreeing to represent them on a contingent fee basis and advance costs, interviewing them and

other witnesses, collecting and analyzing documents, developing a litigation strategy, securing expert accountants to perform damages assessments, preparing and filing the claims forms, responding to inquiries from Juneau's staff, negotiating settlements, and handling appeals in some cases.

## SUMMARY OF OPINIONS

6.    The Freeh Report asserts that Andry has violated the Louisiana Rules of Professional Conduct ("RPC") in the following respects:

(a)    In paying Sutton referral fees without their having been a written consent by Thonn;

(b)    In paying Sutton referral fees while he was employed by Juneau;

(c)    In failing to ask Juneau whether it was proper to remit the referral fees to Sutton;

(d)    In inquiring of Sutton the status of the Thonn claims and similarly making inquiries to other Juneau staff attorneys about the status of their clients' claims.

(e)    In trying to influence Sutton concerning other claims in the BP matter, in part by causing the payment by Lerner to Sutton from the Lerner-Sutton separate business.

7.    In my opinion, none of these accusations has substantive merit on the undisputed facts as stated above and the governing legal principles set forth below. My opinions are:

(a)    Andry did not violate Rule 1.5 (e) of the Louisiana RPC in that the client Casey Thonn did not consent in writing to the referral fee at the time of the referral. Under Rule 1.5, it is the responsibility of the referring attorney with the attorney-client relationship (Sutton) to obtain consent from the client to receive a referral fee. It is the referring attorney who has the existing attorney-client relationship and the duty of disclosure and securing consent. Moreover,

since the client later consented to the sharing of fees, there would be no violation of RPC 1.5 (e) because Louisiana allows later consent.

      (b)    It was not improper for a fee to be offered to Sutton based on work that his law firm performed before he joined Juneau's staff. It was Sutton's responsibility to disclose the fee to Juneau.

      (c)    Andry did not have a duty to make any disclosures to Juneau about the fee paid to Sutton. He had a duty of confidentiality to the client Thonn, and they had no relationship with Juneau that would give rise to a duty to make a disclosure. He had a right to assume that Sutton's request for payment of the fee was in conformity with his ethical obligations.

      (d)    Andry did not violate any ethical or other rules in making *ex parte* inquiries of Sutton and other Juneau staff members about the status of their clients' claims and urging that they be processed expeditiously. The contact was between lawyers, not between a lawyer and someone else's client. There were no *ex parte* contacts with a judicial tribunal in an adversarial proceeding. Andry was involved in a settlement claims process where the claims are resolved in accordance with agreed upon standards and procedures as discussed below. In such a process, it is entirely normal and professionally appropriate for lawyers involved to discuss the status of pending claims. Andry had a professional responsibility to aggressively pursue his client's claims by making inquiries about the status of the claims and pressing for their prompt processing.

      (e)    Andry did not violate any ethical principles in urging that the CAO staff process expeditiously his clients' claims. A lawyer has an ethical duty to represent his client's interests zealously within the bounds of the law. In seeking to have his clients' claims move

forward promptly, a lawyer is rendering competent services to his clients.  A lawyer who does not diligently press for his client to be paid would violate a duty to the client and possibly subject him to a malpractice lawsuit and/or disciplinary proceedings.

### REFERRAL FEES

8.     The payment of fees to Sutton in this case did not violate RPC 1.5.

9.     A referral fee paid by one attorney to another is a legitimate, standard practice authorized by the Louisiana RPC subject to certain requirements.  *See* RPC 1.5 (e).  When a referral is made, written client consent is required.  Rule 1.5 (e) of the Louisiana RPC provides:

> "(c) A division of fee between lawyers who are not in the same firm may be made only if:
>
> (1) the client agrees in writing to the representation by all of the lawyers involved, and is advised in writing as to the share of the fee that each lawyer will receive;
>
> (2) the total fee is reasonable; and
>
> (3) each lawyer renders meaningful legal services for the client in the matter."

10.     It is the referring lawyer's responsibility to obtain the consent.  In this case, the referring attorney would be a lawyer at the Sutton & Reitano Law Firm.  The referring attorney is the one who, at the time of referral, has the lawyer-client relationship and knows that  a referral is to be made.  The receiving lawyer has a responsibility to take action if he learns that there was no consent.

11.     Louisiana RPC deviates from a similar provision in the American Bar Association Model Code in that client consent can be procured after the referral.  The Comments to Rule 1.5 (e) states:

> "Second, under paragraph (e) (1), the client must agree "in writing" to the "share of the fee each lawyer will receive." While the corresponding Model Rule has a

similar requirement in Model Rule 1.5(e)(2), the LSBA proposed this language to permit lawyers to inform the client at any time, rather than only at the commencement of the representation as the ABA Model Rule suggests (but does not expressly provide). The LSBA Ethics 2000 Committee made this recommendation to the court after extensive consultation with representatives of the Louisiana Trial Lawyers' Association.

12.     In any event, there was no harm to Thonn. The purpose of the requirement of consent is to make sure that the client knows what is being done, *i.e.,* his case is not being secretly handled by some strange lawyer. Thonn knew Andry Lerner was handling his case because he hired the firm. *See* Comments to Louisiana RPC 1.5 (e), "Fee Sharing." The 20% contingent fee that Sutton/Reitano was charging Thonn did not increase with the Andry Lerner engagement—another concern addressed by Louisiana RPC 1.5 (e). Accordingly, in my opinion, Andry's conduct did not violate Louisiana RPC 1.5 (e).

13.     In these circumstances, in my opinion, Andry was not at fault because it was Sutton's responsibility to obtain the consent; the client later approved Andry Lerner handing his claims by virtue of hiring the law firm; the client was satisfied with the representation; and no harm resulted. Andry should not be referred for disciplinary proceedings.

14.     The record shows that Sutton and his wife performed substantial services in working up the claims before the case was taken over by Andry Lerner. This amount of "meaningful services" means that there was compliance with Rule 1.5 (e) (3) of the Louisiana RPC.

15.     I do not address whether it was inappropriate for Sutton to accept the fee. The resolution of this issue depends on the extent of his disclosure to Juneau and Juneau's response.

## ANDRY HAD NO DUTY OF DISCLOSURE TO JUNEAU

16.     The Special Master's conclusion about wrongdoing by Andry and the law firm also relies on a supposed duty to have informed Juneau about the propriety of paying Sutton a referral fee before it was paid.  There is no basis for this assumption.

17.     As discussed above, Andry did not agree to pay Sutton a referral fee.  There was nothing to disclose from Andry.

18.     Second, Andry did not have any relationship—whether contractual, fiduciary, or otherwise — that would give rise to a duty to inform Juneau about their representation of Thonn. *See, e,g., Chiarella v. United States,* 445 U.S. 222, 228 (1980) (citation omitted) ("[T]he duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'"). Such a duty does not arise because the Special Master thinks the attorneys should have consulted Juneau.  *See Trustees of Northwest Laundry and Dry Cleaners Health & Welfare Trust Fund. v. Burzynski,* 27 F.3d 153, 157 (5th Cir., 1994) ("In the absence of an agreement, there must be some special relationship between the parties, such as a fiduciary or confidential relationship, before a duty to disclose arises.")

19.     Sutton was Juneau's employee.  The CAO had rules requiring employees to divulge potential conflicts of interest. Sutton apparently recognized this obligation because he reportedly discussed in some regard the relationship with Lerner.  In contrast, Andry was not employed by Juneau, and had no role in the claims determination process.  As such, he had no duty of disclosure to Juneau.

20.     Andry had a right to assume that Sutton's request for payment of the referral fee was in conformity with his ethical obligations.  It was Sutton's duty to advise Juneau because he

had the dual relationship and had direct access to Juneau, the ultimate decision-maker on claims. Lerner inquired of Sutton whether Lerner paying him was appropriate, and Sutton told him that he had spoken with Juneau.

21.     The attorneys had a duty of confidentiality to their client Thonn.  Louisiana RPC 1.6 (a) provides that "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b)."  This broad duty is the cornerstone of an attorney's ability to represent a client.  None of the exceptions in Rule 1.6 (b) are relevant here.

22.     The importance of the duty of confidentiality has long been recognized.  As the Comment 2 to ABA Model Rule 1.6 states:

> "A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation. See Rule 1.0(e) for the definition of informed consent. *This contributes to the trust that is the hallmark of the client-lawyer relationship.* The client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter. The lawyer needs this information to represent the client effectively and, if necessary, to advise the client to refrain from wrongful conduct. Almost without exception, clients come to lawyers in order to determine their rights and what is, in the complex of laws and regulations, deemed to be legal and correct. Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld."

(Emphasis added.)

In this case, Thonn was entitled to confidentiality about his fee agreement with his attorneys, the terms under which they were engaged, and the relationship among his attorneys. That would include the existence of a referral fee if there were one.

**Communications Between Andry Lerner Attorneys and The**

**CAO Staff For Information Were Not Prohibited *Ex Parte***

**Communications Requiring Disclosure to BP**

23.     Andry did not violate any ethical rules or professional standards in making inquiries of Sutton and other Juneau personnel about the status of their clients' claims and urging that they be processed expeditiously.

24.     First, the contact was between lawyers, not between a lawyer and some other lawyer's client.

25.     Second, the attorneys' contacts with the CAO were not prohibited *ex parte* communications with a judicial tribunal engaged in an adversarial proceeding, but instead an administrative settlement process where the claims are determined in accordance with agreed upon standards and procedures.

26.     As discussed above, Andry had a professional responsibility to pursue his client's claims by making inquiries about their status and pressing for their prompt processing.

27.     The permissible nature of these contacts with the CAO's staff is all the more evident in light of the transparency policy of Juneau's office of encouraging lawyers to seek information about the status of their claims with his staff attorneys and obligating his staff to respond to those inquiries. The Settlement Agreement expressly encourages facilitating assembly and submission of claims forms and requires the CAO to utilize "best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement." (Rec. Doc. 6430-1 § 4.3.7). Thus, a transparent process was established where free and open communication

would improve the gathering of documentation necessary to submit a claim. *See* Declaration of Christiana Mancuso, dated December 12, 2013 (Mancuso II Declaration) at ¶¶ 4, 7, 10, 11, 13.

28.   The record shows that lawyers and the CAO's staff routinely discussed the status of claims, what additional information was needed, and the policies and procedures for claims determination. *See* Mancuso II Declaration ¶ ¶ 4, 7, 11, 13. With the goal of getting financial relief to victims as quickly as possible as established in Recital G of the Settlement Agreement, the prevailing approach at the CAO was informality and transparency with an eye toward problem solving, prompt processing of claims, and information sharing. *See* Mancuso II Declaration at ¶¶ 4, 7, 8, 10, 11, 13.

## ANDRY WAS ENTITLED, IF NOT REQUIRED, TO ADVOCATE
## THAT THE CAO EXPEDITE PROCESSING OF HIS CLIENTS' CLAIMS

29.   Andry did not violate any ethical principles in urging that the CAO staff process expeditiously his clients' claims. Indeed, the opposite is true. Andy had an ethical duty to represent his client's interests zealously within the bounds of the law. Louisiana RPC 1.3 mandates that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Comment 1 to the ABA Model Rule 1.3 notes:

> "A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. *A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.*"

(Emphasis added.)

30.   In seeking to have his claims move forward as promptly as possible, a lawyer is fulfilling his ethical duties. Failure to act in this regard could be a failure to act with diligence and promptly.

31.     In the BP claims process, a lawyer aggressively pushing his client's applications is in fact furnishing competent services to his client.  The opposite situation could conceivably constitute a breach of duty to the client and subject him to a malpractice lawsuit and/or disciplinary proceedings.  *See* Common Violations, Rule 1.3 (sanctionable "inattention may result in a matter taking an unreasonably long period of time to be resolved. *See In re Schaefer*, 725 So. 2d 1289 (La. 1999); *see also In re Beck*, 109 So. 3d 897, 905 (La. 2013); *In re Roberson*, 19 So.3d 1186, 2009-1353 (La. 10/16/09) (lawyer's lack of diligence caused client's matter to be dismissed) . . . .")

32.     This conclusion is particularly true since the policies and practice at the CAO office did not establish a formal process by which claims were processed to completion, but only according to the order in which they were filed or some other regimented basis.  Mancuso II Declaration at ¶¶ 12, 14.  In fact, the actual practice for moving a claim along the chain of internal decision-making is largely based on the completeness and complexity of the application. *Id.*  A lawyer calling attention to his client's file and asking that it be moved to the next step—a common occurrence in the BP settlement claims process—has not violated any ethical rules or protocol established by the CAO.  *Id.* at ¶ 13.  That lawyer is acting in the best advocacy tradition of zealous prosecution of a client's claim.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January __9__, 2014 in San Francisco, California.

_____
Geoffrey C. Hazard, Jr.