UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010<br><br>This Document Applies to:<br><br>No. 12-970, Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al. | MDL 2179<br><br>SECTION: "J"<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

### GLEN LERNER'S SUPPLEMENTAL RESPONSE TO THE COURT'S SEPTEMBER 6, 2013, ORDER TO SHOW CAUSE AND OBJECTIONS TO SPECIAL MASTER'S REPORT

Glen J. Lerner ("Lerner") hereby supplements his Response to the Court's September 6, 2013, Order to Show Cause and Objections to Special Master's Report, Rec. Doc. 11988 (hereafter "Response"), in order to identify additional evidence demonstrating that Lerner engaged in none of the unlawful or improper conduct alleged by the Special Master. In Lerner's Response, we showed that the Special Master's contention that Lerner, Lionel Sutton, and Jon Andry worked together to "corrupt" the claims process was not supported by the known evidence. After Lerner filed his Response, Magistrate Judge Shushan ordered the Special Master to disclose an additional 1,317 pages of the investigative record. Rec. Doc. 12026.[1] These additional pages confirm that Lerner did nothing improper. He violated no law or rule of

---

[1] Mr. Lerner reserves the right to supplement his Response further should the Court order the disclosure of additional portions of the investigative record or grant him the authority to interview officials and employees of the CAO, as he has requested in his Objections to Magistrate Judge Shushan's Order. Rec. Doc. 12082.

4313017.5

professional conduct, and he did not engage in any unconscionable or morally reprehensible conduct that would warrant application of the doctrine of unclean hands (which, as a matter of law, does not apply for the reasons explained in the Response, *see* Response at 5-7).

The Special Master conducted an exhaustive investigation into Sutton's resignation, conducting over 80 interviews and reviewing thousands of pages of hard copy and electronic documents. At the end, what the Special Master uncovered was the payment of referral fees to Sutton for referring Casey Thonn – a client that Sutton's law firm had represented and whose claims it had developed *before* Sutton went to work for the CAO – to AndryLerner LLC, and nothing more. Based on these mere fee payments, which are permitted under the Louisiana Rules of Professional Conduct, the Special Master asks the Court to conclude that Lerner, Andry, and Sutton developed and carried out a nefarious plan to corrupt the claims process to advance their own self-interests. But there is absolutely no evidence to support that logical leap. The Special Master's investigation produced no evidence that Sutton attempted to influence a single AndryLerner claim, let alone actually influenced one. Indeed, witnesses, whose interview memoranda the Special Master either withheld or heavily redacted prior to this recent production, uniformly told the Special Master that they no knowledge of any claims manipulation. The investigation produced no evidence that Sutton disclosed any confidential information to Lerner or Andry. To the contrary, the only information that Sutton shared with Lerner was available through the DHECC web portal. And the investigation produced no evidence that Sutton assisted Lerner or Andry in ways prohibited by CAO policy or the settlement agreement or inconsistent with his job duties and responsibilities. In fact, Sutton's sharing of summary claims information with Lerner was no different than what Sutton had done countless times for other lawyers and claimants. As for Lerner's agreement to pay Sutton a

referral fee, he did so only because Sutton told Lerner that the fees had been disclosed to the Claims Administrator and authorized by him. Lerner had no reason to conceal the fee payments, because he understood Sutton had permission to receive them. Simply put, there is no evidence of any wrongdoing by Lerner. For the reasons contained in the Show Cause Response and this supplement, the Court must vacate the Order to Show Cause as to Lerner.[2]

## ARGUMENT

I. **ADDITIONAL EVIDENCE SHOWS THAT SUTTON NEITHER MANIPULATED NOR ATTEMPTED TO MANIPULATE ANY ANDRYLERNER CLAIM, AND HE DID NOT ACT AS AN "INSIDER" ON BEHALF OF LERNER.**

The recently disclosed pages from the investigative record show that, between the Special Master and the CAO internal investigator, at least thirteen employees of the CAO or its vendors sat for interviews, some multiple times.[3] Not one of them testified that he or she was aware of any instance in which Sutton influenced or attempted to influence the processing of any AndryLerner claim. Ex. B (copies of CAO employee and vendor interviews). The Special Master also interviewed six employees or vendors of AndryLerner.[4] Not a single one testified that he or she was aware of any effort to influence any AndryLerner claim, or that AndryLerner

---

[2] BP has taken full advantage of the Special Master's unfounded allegations of wrongdoing to advance its own agenda. BP's latest public relations salvo is a full-page advertisement in yesterday's edition of *The Washington Post* and *The New York Times*. Ex. A. The advertisement mocks the bona fides of The Andry Law Firm claim and selectively quotes portions of the Special Master's Report to besmirch Andry and claims filed by AndryLerner. These types of attacks on reputation and character will continue unabated until the Court rejects the Special Master's findings. We, therefore, urge the Court to act expeditiously to vacate the Order to Show Cause against Lerner.

[3] The Special Master interviewed: David Duval, Appeals Coordinator, CAO; Kirk Fisher, Director of Business Processes and Reporting Group, CAO; Marea Herrington, Consulting Manager, Postlethwaite & Netterville; Michael Juneau, Special Counsel, CAO; Pat Juneau; Robert Levine; Henry Mitchell, Director – Quality Control, Postlethwaite & Netterville; Chris Rinaldi, Senior Claims Analyst, Postlethwaite & Netterville; Mark Staley, Director, Postlethwaite & Netterville; Tracey Steilberg, Appeals and Government Relations Coordinator, CAO; and David Welker, Fraud & Waste, CAO. The CAO internal investigation, in addition to some of the above, also included interviews of: Steve Cirami, Senior Vice President of Operations, Garden City Group, and Christina Hendrick, Court-Appointed Distribution Agent, CAO.

[4] These employees or vendors included: Susan DeSantis, Director of Business Operations; Kailey LeBoeuf, Litigation Attorney; Christine Mancuso, Litigation Attorney; Mary Rubio, Claims Examiner; Scott Stevenson, outside CPA; Leslie Butler Tate, Office Manager.

3

had an "insider" at the CAO. *See* Ex. C (copies of AndryLerner employee and vendor interviews). Indeed, in portions of interview memos that were redacted in earlier productions, AndryLerner employees uniformly said that they were not aware of any influenced or accelerated claims and had not heard that AndryLerner was "wired into" the CAO. *Id.* at SM-04-GL000040, 43, 58. The complete absence of any testimony from any witness that Sutton attempted to influence a claim flatly contradicts the Special Master's assertion that Sutton was an "insider" or that he worked with Lerner to "corrupt" the claims process.

The Special Master also had complete access to the full email archive of the DHECC, including all of Sutton's emails during the eight months he was employed by the CAO. Rec. Doc. 12026-1, ¶¶ 3-4. From the tens of thousands emails in the DHECC archives, the Special Master uncovered only *one instance* in which Sutton made any kind of inquiry about an AndryLerner claim. In mid-January 2013, Sutton asked CAO Appeals Coordinator, David Duval, to check on the status of a claim that Thonn had appealed. Ex. B at SM-04-GL00077. On January 16, 2013, Duval wrote Jennifer Goodwin of Brown Greer, inquiring as to whether the Thonn appeal involved only reimbursement for accountant expenses. Ex. D. Goodwin wrote back the same day:

> The claimant [Thonn] did only appeal the accountant reimbursement, and we see that from the documents he submitted. We are looking at this. We think we might be able to pay these accountant fees without going through the appeal. This may be one where we ask BP if we can re-issue the Eligibility Notice and close the appeal. I should have more information for you tomorrow.

*Id.* In an email on January 17, 2013, Duval advised Sutton: "BG appeal team is working on this claim. They might be able to pay accounting fees without going through appeal process. Hopefully, we will re-issue Notice soon and close appeal." Ex. E.

These emails show Sutton asking a fellow employee to check on the status of one of Thonn's claims, and nothing more. There is no evidence that Sutton made the inquiry at the

behest of Lerner or Andry, or that he passed on what he learned onto either of them. Sutton's inquiry into the status of Thonn's appeal is hardly surprising given that he had a financial interest in Thonn's claim. That the Special Master was able to uncover only one instance in which Sutton made any effort to inquire about an AndryLerner claim with another CAO employee or vendor – and that one instance involved the claim in which he had a financial interest – shows that Sutton was not an "insider" for AndryLerner or Lerner.

II. **ADDITIONAL EVIDENCE DEMONSTRATES THAT SUTTON'S DISCLOSURE OF SUMMARY CLAIMS INFORMATION TO LERNER WAS CONSISTENT WITH HIS GENERAL JOB RESPONSIBILITIES AND WAS NOT DONE IN EXCHANGE FOR ANY PAYMENTS.**

In Lerner's Response, we showed that Sutton's provision of summary claims information to Lerner on May 9, 2013, was not in return for fee payments, but was part and parcel of Sutton's job responsibilities and consistent with the CAO's obligations to assist claimants. Response at 11-15. The recent disclosures only support that conclusion.

Mr. Juneau testified that it was appropriate for CAO employees to check on claims and report their status to lawyers and others. Asked whether Sutton was "authorized in his employment to inquire about particular claims and try to push or facilitate any claims," Mr. Juneau responded that "[Sutton] was authorized because it was all of our roles to inquire if you had an inquiry . . . [but] it was not his role to push a claim or to affect a claim." Ex. F at 99. Mr. Juneau admitted that, on occasion, he directly tasked Sutton to inquire about the status of claims:

> Q. With respect to Mr. Sutton, from time to time did you task him or direct him to respond to a particular attorney or individual that was inquiring about the status of claims?
>
> A. Oh, yeah.
>
> Q. That was a regular part of his work?

5

4313017.5

> A. That goes on today. Unfortunately, we are having to do it, just the two of us.

*Id.* at 96. Juneau explained that it was typical for lawyers and others to ask about the status of claims, and that it was the responsibility of employees like Sutton to respond to their inquiries:

> So we get pushed all the time by people. Claimants push us, people – politicians push us, everybody pushes us. But that's not our role. That's not our job. We try to stick – but if somebody complains about something, I have an obligation to check into the matter to see if it's valid or not valid. Delay, you didn't process a claim, da-da, da-da, we respond individually to requests like that, but that's just to find what the answer is.

*Id.* at 97-98. *See also* Ex. B at SM-04-GL000062 (David Duval stating he received roughly fifteen calls a day from politicians and their offices about the status of constituent claims).

Sutton's provision of summary claims information to Lerner is precisely, as Mr. Juneau testified, what Sutton was authorized to do. After Lerner complained to Sutton – "They are not paying claims. Insane" – Sutton provided Lerner with an unsolicited status summary of 466 AndryLerner claims and explained why some of the claims were processing slowly. Ex. G. Echoing Mr. Juneau's own words, what Sutton did was "check into the matter to see if it's valid or not" and "respond individually" to the person questioning the processing of claims. Ex. F at 98. Sutton did not provide claims information to Lerner in exchange for a fee.

Sutton's CAO phone records also demonstrate that it was commonplace for Sutton to communicate with lawyers about the status and processing of claims. Following the Court's entry of a protective order on December 19, 2013, Rec. Doc. 12020, the Special Master produced to Lerner a copy of the CAO's telephone records during the relevant time period. The phone records list the incoming and outgoing calls on the various CAO phone extensions, including Sutton's. An analysis of Sutton's CAO phone logs show that, during his employment from November 1, 2012, to July 21, 2013, Sutton made or received at least 60 identifiable phone calls involving 27 identifiable different law firms or lawyers. Ex. G (Declaration of James T.

Bagwell).  As these numbers demonstrate, Sutton routinely communicated with lawyers about pending claims, as he did with Lerner on May 9, 2013.  The nefarious inference drawn by the Special Master from that communication is baseless.

### III. LERNER DID NOT DIRECT THE MANNER IN WHICH PAYMENTS WERE MADE TO SUTTON.

In Lerner's Response, we showed that, contrary to the Special Master's allegations, the manner in which Sutton received the Thonn fees did not evidence an intent to conceal those payments by Lerner.  Response at 21-23.  We demonstrated that the pertinent law firms' books and records and transaction documents clearly and accurately recorded the purpose of the payments to Sutton.  *Id.*  And we showed that Lerner had little involvement in the manner in which the fees were routed and paid.  *Id.*

Recently disclosed portions of Susan DeSantis' interview memorandum confirm Lerner's limited role in routing fees to Sutton.  DeSantis was employed by Lerner and was responsible for, among other things, developing and improving processes and procedures at AndryLerner.  The Special Master asked her about the Thonn fees paid to Sutton.  As reflected in portions of her interview memorandum that the Special Master previously withheld from Lerner,[5] DeSantis confirmed that Lerner was not involved in directing how those fees would be paid to Sutton.

> Asked for more detail about her communications with Mr. Sutton regarding Mr. Thonn's claims, Ms. DeSantis explained that Mr. Sutton would ask if a check had been issued to Las Vegas for the referral of Mr. Thonn. . . .  She remembers Mr. Sutton contacting her once before Christmas holidays and once shortly after January 1, 2013 regarding the checks.  On each occasion there had been payments made.  Ms. DeSantis had to confirm with Jeff Cahill [Mr. Lerner's CFO] that he had received the check. . . .  She did not know whether, when Mr. Sutton would contact her, he already knew that a payment had been made; Mr. Sutton just asked if the referral fee for Casey Thonn had been sent to Las Vegas. . . . *Mr. Lerner was copied on e-mails between Mr. Sutton and Ms. DeSantis about the checks, but*

---

[5] Magistrate Judge Shushan ordered the Special Master to produce an unredacted copy of DeSantis' interview memo.

4313017.5

> *she does not recall what Mr. Lerner said about the checks. Mr. Lerner did not give her any directions about the checks.*

Ex. C at SM-04-GL00055-56 (emphasis added).

DeSantis' statement shows that, while informed about how Sutton would be paid, Lerner otherwise was uninvolved in the payments' routing, which was driven by Sutton. Lerner, as noted, was told by Sutton that Mr. Juneau had approved his receipt of the Thonn fees. He had no reason to hide the payments, and it was inconsequential to Lerner how Sutton would be paid, as DeSantis' statement confirms. The alleged "circuitous" manner in which Sutton was paid, Report at 4, 29, therefore, is not evidence of any intent to conceal by Lerner.

## CONCLUSION

For the foregoing reasons, as well as those contained in Lerner's Response, Lerner respectfully requests that the Court vacate the Order to Show Cause.

|  |  |
|---|---|
|  | */s/ William W. Taylor* |
| Pauline F. Hardin (La. Bar #6542) | William W. Taylor, III (D.C. Bar #84194) |
| James E. Wright, III (La. Bar #13700) | Amit P. Mehta (D.C. Bar #467231) |
| Virginia W. Gundlach (La. Bar #18493) | **ZUCKERMAN SPAEDER LLP** |
| **JONES WALKER LLP** | 1800 M. Street, NW – Suite 1000 |
| 201 St. Charles Ave. – 49th Floor | Washington, D.C. 20036-5807 |
| New Orleans, Louisiana 70170 | Telephone: (202) 778-1800 |
| Telephone: (504) 582-8110 | Fax: (202) 822-8106 |
| Fax: (504) 589-8110 | wtaylor@zuckerman.com |
| phardin@joneswalker.com | amehta@zuckerman.com |
| jwright@joneswalker.com |  |
| ggundlach@joneswalker.com | *Attorneys for Glen J. Lerner* |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing "GLEN LERNER'S SUPPLEMENTAL RESPONSE TO THE COURT'S SEPTEMBER 6, 2013, ORDER TO SHOW CAUSE AND OBJECTIONS TO SPECIAL MASTER'S REPORT" has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 17th day of January, 2014.

*/s/ William W. Taylor*
William W. Taylor, III

4313017.5