# EXHIBIT B

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Mike Juneau |
| Title: | Special Counsel |
| Office: | Federal Court Building |
| Date/Time: | August 21, 2013 |
| Attendees: | Walt Donaldson, Alex Dubin |
| Location: | Phone Interview |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Mr. Juneau.

On the above date and times Michael Juneau was interviewed by phone. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Michael Juneau stated that Lionel Sutton did not inform him of his relationship with Romeo Papa. Mr. Juneau also stated that he did not recall ever talking or emailing Mr. Sutton about Romeo Papa.

Mr. Juneau stated that he is familiar, in general, with other organizations in the maritime business, like Romeo Papa, but none that had claims.

When questioned if he asked Mr. Sutton directly of affiliations with any maritime organizations having claims, Mr. Juneau said that he did ask Mr. Sutton this question and Mr. Sutton answered "No." This was after Dave Welker had begun his investigation. Beforehand, Mr. Juneau doesn't recall but doesn't believe that he asked Mr. Sutton because he would have had no reason to.

Mr. Juneau said that he was not aware of Romeo Papa's claim. He was never aware of this claim. He never searched for it. He heard of Romeo Papa for the first time during the Welker investigation.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues

SM-04-GL000020

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-GL000021

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee:   Michael Juneau
Title:   Special Counsel
Office:   Deepwater Horizon Economic Claims Center
Date/Time:   July 16, 2013 1:00 pm
Attendees: Matthew Dolan, Gregory Paw, Laure Kirk
Location: 935 Gravier St., Suite 1905, New Orleans, La., 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP. We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP. We do not represent you Michael Juneau.

On the above date and times Michael Juneau was interviewed in person. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Juneau explained that his job involved communicating with Judge Barbier and that he was
responsible for keeping him updated and informed about how things were operating at the Claims
Administration Office. Mr. Juneau explained that he had been a lawyer for 25 years and that he
practiced in Lafayette, La. and that he was a law partner with Pat Juneau for those 25 years. He
explained that Judge Barbier had appointed him and that he had met with the BP lawyers before being
appointed. Mr. Juneau said that he was the support staff for Mr. Pat Juneau and that Deepwater
Horizon did not pay him; rather, his and his father's law firm paid him. He said that he was the "Special
Counsel" -- more like a lieutenant specifically responsible for legal issues as they came up. Mr. Juneau
said that he coordinates business economic claims and comes into the New Orleans office three days
per week, but that he also meets every Tuesday with Mr. Pat Juneau, who is his father. He explained
that he reports to Judge Barbier and that he lives 2 hours west of New Orleans in Lafayette, La.

Mr. Juneau explained that his father had a national reputation that was very good from class action
cases he had worked on, such as Toyota, and cases in Philadelphia and Minnesota; and that his father
was viewed as being very fair by both the plaintiff and defense lawyers. Mr. Juneau explained that his
father just got a call one day to meet with Mr. Cantor and Mr. Moskowitz, who were BP attorneys, and
then the lawyers asked Judge Barbier to appoint his father as the Special Master.



SM-04-GL000022

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



Mr. Juneau said that he started in May 2012 and was one of the first employees. He said that his father hired Christine Reitano, and she might have been the first one hired. Then David Odom was hired as the CEO, and then Mr. Odom handled most of the hiring from there. When asked about the ethics codes for Deepwater Horizon, he said that they include categories such as no gratuities, no gifts beyond working meals, no conflict of interest, no financial interest in a claim, and rules that employees and their families cannot file claims. He explained that Mr. Odom and Mr. Levine seem to be responsible for managing new employees. Mr. Juneau said he knew of a fraud hotline, but that he could not accurately explain the policies and that Mr. Odom would be able to better explain that.

When further asked about the guidelines for claimants, Mr. Juneau explained that there was a "claimant friendly provision" that said that they are obligated to give people the maximum recovery and that they had to be helpful and assist claimants, and they would also pay for accounting expenses incurred by the claimant. He explained that this may not be a written policy but that those are some of the details he is aware of. Mr. Juneau said that they will give updates during the process but they will not give exact information.



When asked if a conflict of interest would happen with an employee, Mr. Juneau said that there was a formal scrub with every new employee. He said that he was not sure if they checked about outside employment of employees.

Mr. Juneau continued to respond to questioning and explained that he had known that Lionel Sutton was a lawyer with clients prior to Mr. Sutton being hired by Pat Juneau. He said that on Friday he would work on his prior work but that now he was going to work virtually on only CAO work and not work with

2

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

anyone with claims, now that he had moved over. Mr. Juneau said that they had discussed conflict of interest policies with Mr. Sutton and maybe there was a background check. Mr. Juneau explained that Mr. Sutton worked in the legal department focusing on subsistence policy, working with Christina Hendrick and helping to develop procedures and policies and moratoria policy. Mr. Juneau said that he worked on business economic losses and that Mr. Sutton helped him with that when he was out. He also said that Mr. Sutton had helped in a meeting with Martha Curtis, an attorney, when her claims were not progressing. Mr. Juneau said that Mr. Sutton basically helped with legal issues as they came up. Mr. Juneau said that Mr. Sutton, David Duval, Mike Juneau, and Ms. Reitano were all in the legal department reporting directly to Pat Juneau.

Mr. Juneau said that before the current issue arose, they never had any issue with any of Mr. Sutton's work. Then Mr. Welker casually mentioned that he was looking at something concerning Mr. Sutton and may have said that it was the Thonn case.



He added that as issues come up now they are adapting policies, but Mr. Sutton seemed to have a very liberal opinion in most areas, tending to provide more lenient standards for granting claims. Ms. Hendrick seemed to feel that Mr. Sutton was more liberal, but she mainly won concerning the type of policy she felt was needed.

Mr. Juneau said that Mr. Sutton was chosen by Pat Juneau to work at DHECC. He said that since Mr. Sutton's wife Ms. Reitano worked there and that she was good, that she recommended her husband and that she said that he had a background in this. In addition, Mr. Sutton worked at Mr. Juneau's law firm for two years when he was first out of law school and as a result of many dealings with Mr. Sutton over the years it made sense to hire him. Mr. Juneau added that they needed additional legal staff to deal with the many questions that were coming from accountants and BrownGreer.

Mr. Juneau said that Mr. Welker identified an issue with Mr. Sutton that came to his attention. On June 17, 2013, Pat Juneau said that he and Michael Juneau needed to talk to Mr. Sutton and that they needed to get a response from Mr. Sutton about allegations that he may have taken money from a claimant's lawyer or had a financial interest in a firm. Pat Juneau said that Mr. Welker had said that Mr. Sutton may have had interaction with a claim or claims and may have been receiving kickbacks from what the claimants received. Pat Juneau said that Mr. Welker kept the source anonymous. Pat and Michael Juneau sat in Pat Juneau's office and asked Mr. Sutton if he had any financial interest in a claim and if he had referred claims out, and Mr. Sutton said no. Mr. Welker was not in this initial meeting with Mr. Sutton. In this initial interview, Mr. Sutton did not identify Crown LLC as the reason why he was getting money from Mr. Lerner. Mr. Sutton said he was not involved with any claimants and had no financial interest in any claims. When asked if Mr. Sutton denied that he was handling any clients in regards to

3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

claims, Mr. Juneau confirmed that Mr. Sutton said no but he could not say that the question was asked
exactly that way. Mr. Juneau said that he may have some notes on a yellow sheet of paper from that
meeting that he could provide, or maybe from a conversation he had with John Andry.

When asked if anyone expressed reservations when Mr. Sutton was hired, Mr. Juneau said that Mr.
Odom had said to his father that he had concerns about Mr. Sutton. Mr. Juneau continued by saying
that he felt that Mr. Odom may have had concerns because he might have felt that by bringing in Mr.
Sutton his own position may be threatened. Mr. Juneau did say, though, that Mr. Odom said that Mr.
Sutton did not have the best reputation in the world.

On June 17, 2013, once Mr. Juneau and his father had spoken to Mr. Sutton, Mr. Juneau said that he
next reviewed the Thonn case, and it seemed that the claimant was not happy, but he was not aware of
fraud at that time. Mr. Juneau explained that he had full access to claims in the computer system, but
he added that he did not think that he could change things such as the reporting section or the appeals
section.

As the questioning continued about John Andry and Glen Lerner, Mr. Juneau said that he called Mr.
Andry to discuss what they should do. Mr. Welker was not involved in this phone call. Mr. Juneau said
that he had gotten a message from Mr. Lerner on his cell phone saying that he thought that he could
straighten things out. The interviewer said that he sensed that they probably do not want to talk to
Freeh Group, and Mr. Juneau said that Mr. Sutton might and that Ms. Reitano probably would.

Mr. Juneau continued answering questions about Ms. Reitano, saying that she worked where she was
needed in the legal department and that she was involved in process type issues, like reconsideration.
Mr. Juneau explained that Ms. Reitano was a document reviewer appeals coordinator and that she
made decisions as to whether a claimant could reactivate their claim after it had been denied based on a
lack of documentation. She was responsible for establishing if a claim fell under tourism and she
communicated with both sides to answer questions. Ms. Reitano was terminated after the Welker
allegations. His father, Mr. Pat Juneau, reflected on this decision but felt that the termination had to
happen because he had to protect the integrity of the process.

Mr. Juneau said that as far as requiring policies, such as conflict of interest and confidentiality with the
five vendors, it was better to ask Mr. Odom. Mr. Juneau said that he thought that they incorporated
some policies, but he wasn't sure of the detail. Mr. Juneau said that he has not sensed any conflicts
such as gifts between vendors but that he did not know, and that we should contact Mr. Odom. Mr.
Juneau said he did not know of a whistleblower program. When asked if there were any issues about
the fact that the source was anonymous, Mr. Juneau said no but that it just limited their ability to go
back to the source. Mr. Juneau said that his father asked Mr. Welker who the source was but he said
that Mr. Welker kept the person anonymous, so they never got the identity. Mr. Juneau said that he did
not get a sense that Pat Juneau wanted to know who the whistleblower was.

Mr. Juneau said that they are going to review the policymaking process and the report on policymaking
procedures and what policies were deferred, rejected or deferred to the administration to accept. Mr.
Juneau said that they all met on the deferred administration policies and went through each one and
reviewed them and came up with questions. He also said that Mr. Sutton and Ms. Reitano did not write
any policies but that they did offer comments. Mr. Juneau shared some examples of Mr. Sutton's
opinions, such as on subsistence and how to define the impairment of the water. Mr. Sutton's view lost.
As far as moratoria policy, DHECC does not have an adopted policy yet, but Mr. Sutton had opinions.

4

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



Mr. Juneau responded to questions about Ms. Reitano by saying that she was mainly responsible for real estate developers, whether a business should be designated as tourism, and appeals based on lack of documents. BrownGreer has a spreadsheet for each of these issues and sometimes there will be a reversal, maybe four or five times. Mr. Juneau had thought that they were acceptable as they were, but now he realizes they could use additional information.



Mr. Juneau said that he would give the interviewers his notes that may be on a yellow sheet about the conversation he and his father had with Mr. Sutton about the allegations and/or a conversation he had with Mr. Andry about the allegations. He said that he could get an exact monthly figure that his father was paid as Special Master.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

5

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

**Deepwater Horizon Court Supervised Settlement Program ("CSSP")**
**Special Master – Independent External Investigation**
**Interview Report of Freeh Group**

| | |
|---|---|
| Interviewee: | Michael Juneau |
| Title: | Special Counsel |
| Office: | Claims Administrator's Office (CAO) |
| Date/Time: | August 8, 2013 1:00 PM |
| Attendees: | Walt Donaldson, Tim Flynn, Laure Kirk |
| Location: | Phone Interview |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you [Michael Juneau].

On the above date and times Michael Juneau was interviewed by phone. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum and potentially to third parties.



When asked, Mr. Juneau said that he knew that BP did background checks for DHECC employees, but he said that he did not know their actual policies. Mr. Juneau explained that his father would tell BP that he was considering a new hire, and then they would do the background check. Once BP got back to his father and said that everything was okay to go ahead, Pat Juneau would hire the employee. He said that he was not sure if his father received anything in writing. He said that he thought that BP got back to his father verbally, but that he was not involved in this process. Mr. Juneau added that he thought Keith Moskowitz at BP was the point person that was involved with the background checks. When asked about the employees not vetted by BP, he said that he did know who would do background checks.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



Mr. Juneau stated that he did not know if Romeo Papa was designated as a tourism company; however, he did mention that Mr. Welker had identified Lionel "Tiger" Sutton III as having 50% ownership of the company. He explained that BrownGreer decides whether a company should be designated as tourism. If it is a "close call," then BrownGreer calls Michael Juneau, Pat Juneau and [formerly] Christine Reitano to discuss the issue. He said that there is a list that comes from BrownGreer, and they go over the list. He spoke about a particular list with 45 items on it, and he confirmed that for the majority of the claims that needed to be discussed, all three of them were on the call. He did add, however, that there were a few at the end of the list where Ms. Reitano was the only one on the call with BrownGreer. Mr. Juneau said that he did not recall Romeo Papa being on the list, and he confirmed that if a company was not on the list, then BrownGreer made the determination.

Mr. Juneau advised that there are two lists--one that lists the tourism businesses and a second one that lists the real estate developers. Mr. Juneau is only involved with the tourism. Asked again whether Ms. Reitano made decisions unilaterally, he referred to the list of 45 items and said that he was not on those few calls which she handled alone with BrownGreer, but that he did not think she made the final decision. He again confirmed that if a business was not on the list, then BrownGreer made the decision as to whether a business fell under tourism.

2

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Juneau said that he remembered meeting with his father and Mr. Welker to discuss Mr. Sutton and his possible resignation. He said that it took place at night at their office and they confronted Mr. Sutton with the emails. He said that it was a long interview with Mr. Sutton, in which Mr. Juneau sensed that Mr. Sutton was going to make the decision to resign, but he was not sure that Mr. Sutton actually said that. He said that he did not have any notes from the meeting, but after the meeting Mr. Sutton called Mr. Juneau and asked about a procedural issue. Mr. Juneau told Mr. Sutton that for his protection they should not continue to communicate and that they should let the investigation take place. He suggested to Mr. Sutton that Mr. Sutton might consider resigning, but Mr. Sutton cut him off and said that he understood that that was a given. Mr. Sutton told Mr. Juneau that he would him his resignation.

Mr. Juneau said that on June 21, 2013 Mr. Sutton sent an email to him suggesting the correct course of action. He said that Mr. Sutton was considered an independent contractor and that on Fridays he did his other work. He said that his father understood that Mr. Sutton had other work, and he said that he didn't think there was any objection, if there was no conflict. Mr. Juneau was not aware of any documentation on this issue.

Mr. Juneau explained that a good bit of his work involved understanding the program and keeping Judge Barbier updated. He said that he looks at all the claims and needs to understand the whole program.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-GL000030

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

**Deepwater Horizon Court Supervised Settlement Program ("CSSP")**
**Special Master – Independent External Investigation**
**Interview Report of Freeh Group**

| | |
|---|---|
| Interviewee: | Steilberg, Tracy |
| Title: | Appeals Coordinator |
| Office: | CAO |
| Date/Time: | August 27, 2013, 10 AM – 11:15 AM |
| Attendees: | Mike McCall, Ben Scotti |
| Location: | DHECC Claims Center, 14th Floor |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and times Tracy Steilberg was interviewed in person for a second time. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Steilberg confirmed that after leaving the Sutton & Reitano firm, she worked for Frank "the Strong Arm" D'Amico from the summer of 2011 until December of 2011. From December 15, 2011 through April 2012, Ms. Steilberg worked for the law firm Davis Duncan. She then began working at the claims center in May 2012.

Ms. Steilberg confirmed that Ms. Reitano didn't start to work with Mr. Sutton until after Ms. Steilberg left on maternity leave. . Once Ms. Reitano came onboard to work with Mr. Sutton, Ms. Reitano ended up taking on a few GCCF cases, but before this time Ms. Reitano did not have any of her own claims. Ms. Steilberg confirmed that since she began working at the DHECC, Ms. Reitano never asked her to do anything with the claims of claimants that had been represented by Sutton & Reitano.

While working at the claims center, Ms. Steilberg confirmed that she did assist Christine Reitano on an administrative level, because very few others in the office had any administrative experience. Ms. Steilberg reiterated that once she joined the claims center, she wanted more challenging work. When she heard that Mr. Sutton was coming onboard, she told David Odom that she was not going to serve as his assistant. She stated that there were different teams at the claims center and that Mr. Sutton was handling subsistence and moratorium – she stated that she didn't want to be part of those programs and be stuck with him. Ms. Steilberg wanted to work in the appeals arena, which is where she is now.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Ms. Steilberg confirmed that occasionally, Mr. Sutton may have given her something to do that was not claims related while she was working at the claims center. As far as examples of what she was asked to do, Ms. Steilberg stated that it "wasn't big, it was just little things like fixing documents." She stated that she had to help him with things like e-filing documents in federal court. Ms. Steilberg recalled that she would also receive legal briefs from Mr. Sutton where he asked her to assist him with formatting issues like line spacing. These were all cases from Mr. Sutton's old law firm that he was still handling. Ms. Steilberg stated that Mr. Sutton asked her during her work hours at the CAO to do these tasks, but that it literally took her "like two minutes to fix these documents. She confirmed that Mr. Sutton never paid her for these side tasks. She also stated that she didn't want to get stuck doing this kind of work for him and reiterated that as the reason that she requested to work in another area at the CAO. Ms. Steilberg stated that she did not tell Mr. Sutton no when asked to perform these tasks, because she didn't want to "make him mad and ultimately I wanted to use him as a reference." She also mentioned that she would complain to David Duval whenever Mr. Sutton asked her to do something. Ms. Steilberg stated that she didn't have to do anything else for Mr. Sutton while working in the claims center with one exception. She stated that Mr. Sutton asked her to pull up the status of the Thonn claim.

Ms. Steilberg stated that, in terms of total time spent on tasks for Mr. Sutton that were not related to CAO business, she probably spent less than an hour and probably accomplished all of these tasks during her lunch breaks.

When asked about her knowledge of the policies and procedures documents she signed when she came to work for the CAO, she stated that she didn't read all of the documents that she signed – she just "sat down and signed them." Ms. Steilberg stated that she signed the documents and gave them back to the admin folks because she was so swamped with work when she came on board.

Ms. Steilberg stated that she came to know John Andry through Mr. Sutton since they used to be best friends. Ms. Steilberg confirmed that she had contact with Mr. Andry while she worked at the CAO. Ms. Steilberg stated that she pulled up some of his claims to check the status of them. She mentioned that generally, she would sometimes monitor claims to make sure there wasn't something that should be holding them up. In terms of what prompted her to check on the Andry claims, she stated that Mr. Andry would have probably asked her via email to check on the claims. Ms. Steilberg stated that Mr. Andry probably had two pending claims and Ms. Steilberg assured him that the claims were fine and were not held up. She mentioned that one of the claims he handled that was particularly confusing was for Talens Marine. She estimated that Mr. Andry would have sent an email to her with a list of claims or claimants on one or two occasions, although she also stated that many claimants would call up all the time and she would field the requests they made regarding status as they would come in to her.

In terms of social contact with Mr. Andry, Ms. Steilberg stated that a small group of CAO colleagues had a Christmas party of sorts at Pat O'Brien's in early December 2012. During that party, Ms. Steilberg bumped into Mr. Andry who was throwing his own office party at Pat O'Briens. Ms. Steilberg stated that this was when she introduced David Duval to Mr. Andry. Ms. Steilberg stated that Mr. Duval's father, a federal judge, presided over a case where Andry was an attorney – it was the Mr. Go case. It involved a

SM-04-GL000032

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

claim about a certain canal being too wide or narrow and that is why everything flooded during Katrina. Ms. Steilberg introduced Mr. David Duval as Judge Duval's son. She stated to the interviewers that she recalled Mr. Andry asking David Duval that night what Judge Duval thought about his ruling in the Mr. Go case having been overturned on appeal.

She also stated that during that chance meeting, Mr. Andry asked her if she had found a place to work, to which she responded that she was working at the CAO now.

Mr. Steilberg also indicated that Mr. Duval and Ms. Reitano took her out to lunch for her birthday around May 6, 2013 at the Palace Café and while there, she again ran into Mr. Andry, who was attending a baby shower for one of his employees. At this lunch, Mr. Andry stated that he wanted to take Ms. Steilberg out for her birthday soon. Mr. Andry also conversed with Mr. Duval at this chance meeting.

Ms. Steilberg stated that she, Mr. Duval and Mr. Andry had planned to meet for lunch the following week. When Mr. Andry sent Mr. Duval a text confirming the lunch meeting and offering to pick them up, Ms. Reitano saw the text on his phone and expressed an interest in accompanying them to lunch. Ms. Steilberg was in Mr. Duval's office when the text message came through, along with Ms. Reitano and Mr. Duval. During this lunch at the Palace Cafe, Ms. Steilberg stated that they all spoke about Sutton & Reitano and did not discuss any of Mr. Andry's claims or claimants. She confirmed that Mr. Andry paid for this lunch.

Ms. Steilberg stated that she recalled Mr. Andry sending out an email after the first lunch, mentioning he had some claims that he didn't see movement on. Ms. Steilberg recalled that Mr. Duval responded to the email and asked that Mr. Andry send him an email so that he can pull up the claims and check the status.

Ms. Steilberg stated that there was another lunch approximately three weeks later that she attended, along with Mr. Andry and Mr. Duval. Ms. Steilberg stated that Mr. Andry paid for everyone again this time – she recalled Mr. Duval pulling out his card and offering to pay, but that Mr. Landry said "I got this." This was the final lunch they had together.

It was during this second lunch that Mr. Andry asked about the status of his claims. Ms. Steilberg thought that Mr. Andry asked about the deadline for assigning appeals and stated that his claims had not yet been assigned to a panelist and so they were waiting for this to occur. She stated that it should be assigned in a few days to a panelist. Ms. Steilberg stated that she thought his own claim was not on the list of claims previously submitted because if she remembers correctly, the list included only short "little bitty names, nothing like Andry Law Firm." Ms. Steilberg remembers going over the timeframe with him about the appeals process and how many days it could take and what the deadlines were, things of this nature.

Ms. Steilberg stated that she never had any concerns about the appropriateness of Mr. Andry paying for her lunch. She stated that it never dawned on her that there could have been an issue with it, stating that "guys always take me out to lunch." Ms. Steilberg further relayed that there was a sort of unofficial

SM-04-GL000033

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

policy that people at the CAO were not to accept gifts/meals valued at over $100 and that the meals at the Palace Café were probably around $20 per person.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

4

SM-04-GL000034

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Group

| | |
|---|---|
| Interviewee: | Stielberg, Tracy |
| Title: | Co-Appeals Coordinator, former EA to CAO, and Assistant at Sutton & Reitano |
| Office: | Deepwater Horizon Claims Center |
| Date/Time: | July 11, 2013, 2PM – 3PM |
| Attendees: | Steve Tidwell, Ben Scotti |
| Location: | 935 Gravier South, New Orleans, Louisiana |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and times, Tracy Stielberg was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Stielberg has been a legal secretary for 20 years. She is also a notary. Her first job was at Kaiser Aluminum – she left that job and went to work for Sidney Torres' law office. She then went to Leget and Metier to be a legal secretary and left with Lionel Sutton III when he went out on his own. He was always handling personal injury claims. She eventually left his office and went to work at Payne Webber, and then a few other firms, the last of which was Davis and Duncan, before coming back to work with Mr. Sutton, again.

Ms. Stielberg had a baby in 2010 and went on maternity leave. That is when Christine Reitano, Mr. Sutton's wife, came in to work at the office. In terms of how busy Mr. Sutton's law practice was at first, when they started out years ago, in the first year he had about 80 cases, and this was the biggest year he had. He shared space with another attorney who got larger cases. They had maybe 70 cases the next year. There was enough that the firm was kept busy. After maternity leave, she came back and worked for him four days a week but there was not much work. In terms of why the business was shrinking, she believes Mr. Sutton might have burned out on personal injury cases. He had several cases that he lost at trial and possibly didn't want to do this anymore.

At one point, Mr. Sutton and Ms. Reitano called her to come back to work for them. They did not want to pay her for full-time work and asked her to work part time. She thought they felt bad and because she worked on so many cases over time with Mr. Sutton, they didn't want to entirely lose her. She was not receiving enough work. She was particularly concerned that, at times, they were not paying her, but, had sufficient funds to go on European vacations.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

In 2012, Ms. Reitano called her and told her that Pat Juneau and David Odom needed an executive assistant, in the Claims Administrator Office (CAO), Deepwater Horizon Economic Claims Center (DHECC). She came in for an interview and was offered the job. Once she started working at the CAO, she didn't think of herself as a legal secretary at all. She was kind of filling in and doing whatever was needed. As other new employees came onboard, she would assist all employees in the CAO. For about a six month period, Ms. Stielberg was more of an office manager/assistant. She was looking for something more challenging and sought a position in the appeals process. She was assigned to the appeals process, and is currently working there. Currently, the administrative assistant function is being done by Rebecca. To make the switch, she talked to David Odom about working in appeals. She doesn't think the work she is doing is legal, in the usual sense. For instance, on any given day, she prints out several reports that Brown and Greer (BG) has on the CAO claims system portal, and will check to see that the claims appeals are moving. In the event they aren't, she advises Mr. Duval or BG that they need to be moved. Once the appellate decisions come out, she has to print up all of the decisions, hand them out and wait for a request for a follow – on discretionary review. The requests for discretionary reviews are a newer system. The discretionary reviews are intended to determine if she, in her capacity in the CAO appeals office, will handle the matter or if BG will. She also regularly checks emails, on a daily basis, regarding claims. Additionally, she regularly takes calls from claimants asking about problems with claims. When this happens, she offers any assistance she can.

Regarding her interaction with Mr. Sutton in the CAO, she stated that she talked to Mr. Sutton in the hallways and would chit-chat about old cases, from their previous work, together. He came onboard with the CAO during the latter part of last year. When he came onboard, she told Mr. Odom she did not want to be Mr. Sutton's assistant because she worked for him previously. While working for him she felt she did all of the work at his office. She simply did not want to get stuck in that role again. Ms. Stielberg stated she had very little dealings with him at the CAO. She knew he was working on the subsistence program and moratoria policies. She knew Ms. Reitano was working as an attorney for the CAO, with him. To her knowledge, Ms. Reitano worked on policies, document review and handled incomplete claims. Also, Ms. Reitano was being given work regarding the appeals process and she reviewed appellant panelists' remanded decisions. She advised that she had conversations about legal questions and how these fit within the settlement agreement, with Ms. Reitano. She always went to her though and not to Mr. Sutton with any questions. She felt that Ms. Reitano had more institutional knowledge because she was hired first and she considered Ms. Reitano and herself to be friends. Concerning any things she could have discussed with Mr. Sutton, she might have asked him to explain some of the programs like the Vessel of Opportunity (VoO) program.

She first learned of an issue concerning Mr. Sutton, the day before it came out, publicly. She was aware that Mr. Sutton and Ms. Reitano were in the office of CAO Special Counsel Michael Juneau. Prior to this, she had heard that they were making a fuss about appeals. She said that she and Mr. Duval thought that this is what the meeting was about. Instead, Mr. Juneau evidently told them they were placed on leave. Ms. Reitano then called her and asked her to come to meet her at Mr. Sutton's law office on the same floor as the CAO. She did go to Mr. Sutton's law office and he informed her there were allegations that he was getting money on a claim. That occurred on a Thursday night, and it was reported on the internet that same night and on the news, the next. Prior to that day, she had not heard anything from anyone else concerning the allegations.

When she spoke with Mr. Sutton in his office, as far as which claim was involved regarding allegations he had been paid on it, she believes he had to have mentioned Casey Thonn. She was familiar with Casey

2

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Thonn and his claim, because when she worked in Mr. Sutton's office in 2010, Mr. Thonn came into the office to handle his Gulf Coast Claim Facility (GCCF) claim. Regarding any conversations she had with Mr. Sutton or Ms. Reitano pertaining to Mr. Thonn's claims, she recalls asking what had been done with his claims and if they were settled. She recalls Ms. Reitano telling her they referred Casey Thonn to John Andry. As far as she could recall, all of the other claims she might have worked on had settled and none were pending.

She recalled that Mr. Sutton didn't want to handle any oil spill claims cases, but Ms. Reitano did want to handle such claims. She recalled that after copying all of the claim items, she believed she sent the referrals over to the Smith Stag law firm or they may have filed previously with GCCF.

As to whether Mr. Sutton ever asked her about any of the claims he or Ms. Reitano handled at their law firm, she recalled that perhaps once he may have asked her whether the Thonn case was assigned to an appellate panelist yet. She remembered querying the data system on Mr. Thonn's claims and noticed that there were three claims. She thought they might be duplicates but he actually had more than three claims so they were not duplicates. She doesn't recall the exact time of this conversation.

Following Mr. Sutton's and Ms. Reitano's departure, she was interviewed by Dave Welker and Mr. Streif, and, then by a gentleman named Lesley (last name unknown). It was only a brief interview with him, though. The interview with him would have been maybe the next week or so after the suspension.

Regarding her duties working at the Sutton and Reitano law firm, she did a great deal of the organizational paperwork for a large number of Limited Liability Companies (LLC)s. She recalled also working on a large number of LLC's for Mr. Sutton's father, Lionel Sutton, Jr. In most cases, Mr. Sutton was on the paperwork as a member or officer in his father's LLC's. She recalls Mr. Sutton had one titled 610 Baronne LLC, and also one titled T Blue LLC (named after a dog). When asked about an LLC called Romeo Papa, she advised that Robert Perez is on Romeo Papa. She was uncertain if Romeo Papa was the name of the LLC or the name of a boat or both. Ms. Steilberg recalled that Mr. Sutton filed an oil spill settlement claim for Mr. Perez, through his law office, prior to coming to the CAO. They claim was made through the GCCF and she recalled it settled while she worked at Mr. Sutton's law office. She advised it was a VoO claim.

Ms. Stielberg advised that she knew about a falling out between Mr. Sutton and his father. She thinks the falling out stems from an error she made on some filing on LLC paperwork, while working and Mr. Sutton's law firm. She had been working on an operating agreement for Mr. Sutton, Jr., that had Mike Sutton, brother of Mr. Sutton and son of Mr. Sutton Jr., as the manager of the LLC. While working on another LLC operating agreement she believes she mistakenly placed Mike Sutton, and not Mr. Sutton, as the manager of the LLC. She believes Mr. Sutton thought his father was picking his brother over him. She also recalls an LLC involving Mr. Sutton and Mike Sutton, Full Dimension Suppliers, which involved supplying granite and it did not work out. Mr. Sutton obtained a loan and did not pay on it which contributed to the falling out. She believes that, at this point, he wanted out of the family businesses, all of the LLC's, and his father became upset that he didn't want to remain involved in the family business. All of this occurred after Katrina.

She advised that Mr. Sutton was not law partners with John Andry. She recalls that Gibby Andry is John Andry's brother, and they are close in age. At one time, Mr. Sutton had offices on the third floor of the building that John Andry occupied. She stated Mr. Sutton and John Andry were best friends, as they

3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

were law school roommates. While sharing the office building John Andry and Gibby Andry had one letterhead, Mr. Sutton had another. While she was working there, the Andry Lerner law firm was about to form or had just recently formed. When she and Mr. Sutton moved out of the building, there had been a falling out between the attorneys over a fee on a Bell South case, in a large class action case. At this time, Mr. Sutton leased space in the building where the DHECC is currently located.

She stated that she handled the organizational paperwork that formed Crown LLC for Mr. Sutton. Crown was formed to support a special machine used to accompany drilling for gas. The machine is designed to clean water utilized in mining and oil drilling operations, to the point the water can be used for drinking. Tiger is President of Crown LLC, and Joey Dartez, his stepbrother, is a member, as well as the gentleman who invented the machine. She recalls meetings taking place at the law offices regarding Crown, to organize the operation, obtain business cards and create a website. Glenn Lerner wasn't involved in Crown in the beginning. When they were certain the machine worked, and it went through testing, they were trying to get a company to buy the machines and were looking for investors to build the machine. Mr. Sutton went to Glenn Lerner, discussed the business and sold Glenn Lerner on the idea. Mr. Lerner decided to invest in the machine. Mr. Lerner was providing Mr. Sutton with money once a month, and Mr. Sutton handled the checkbook for Crown.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the DHECC.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

4

SM-04-GL000038

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

**Deepwater Horizon Court Supervised Settlement Program ("CSSP")**
**Special Master – Independent External Investigation**
**Interview Report of Freeh Group**

Interviewee:  David Duval
Title:   Appeals Coordinator and Government Relations
Office:  Deepwater Horizon Economic Claims Center
Date/Time:  July 15, 2013
Attendees: Matthew Dolan, Gregory Paw, Laure Kirk
Location: 935 Gravier St., Suite 1905, New Orleans, La, 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP.  We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP.  We do not represent you, David Duval.

On the above date and times David Duval was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

When Mr. Duval was asked about his background he explained that he started with Deepwater Horizon as the Appeals Coordinator on May 1, 2012, which was just a month before they began to process claims on June 4, 2012. He explained that he had been practicing law but had not really enjoyed it so he went to work for a family friend for a tugboat company. The tugboat company was later sold to a Fortune 500 company so he was laid off.  He was unemployed for a short time when his father, Judge Duval of the Eastern District of Louisiana, had lunch with Pat Juneau.  Mr. Juneau mentioned to his father the need for a claim appeals coordinator so he got the job.

Mr. Duval said that he did not work on any issue for the GCCF, that he currently worked for Deepwater Horizon as the Appeals Coordinator monitoring the claim from beginning to end of the appeals process. He further explained that he was also the government relations person that the politicians would call to check on a claim for their constituents. In this capacity, he said he would get roughly fifteen calls per day. Mr. Duval explained that he would get a call from a constituents affairs office checking on that status of a claim and Mr. Duval said that he would check into the issue and he might find out that there was missing documentation, or that a claimant was just confused and hadn't gotten a call back from BrownGreer, so he would try to update the politician on the status of such claims.  He stated that the politicians that called were never demanding just checking in on the status.  Mr. Duval said that the process was very informal and did not require formal documentation, but since the calls were so numerous, he and BrownGreer devised a plan that there would be a representative from each of the four states that would handle these calls going forward.  The constituent affairs office would then e-mail the representative and copy Mr. Duval. He explained that these BG representatives were senior staffers, that they were "the cream of the crop". Mr. Duval further explained that they would inform Mr.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Duval of the status of a claim by a phone call or email and that the process was very informal. He stated that since this process has been in place he does not get that many calls related to government relations. He listed the four representatives as Joe Sanderson for Louisiana, Rae Cousins from Mississippi, Lauren Brickholder form Alabama, and Katie Hamilton from Florida.

Mr. Duval was asked why one county in one of the states was carved out to have no claims and he explained that there was very minimal damage in that section of the state. He confirmed that most of the damage was east of that county and that families that lived on wetlands more than twenty miles from the gulf experienced damages from the water that flowed through the wetlands. Mr. Duval confirmed that BP has scientists working on assessing the oil spill damage to the environment. They have mapped out areas that were impacted and if the damages are documented then BP has agreed to pay certain types of claims in the affected areas. The academia representatives go out and look at the area if a claimant reports that his land or waters were impacted. Mr. Duval said that BP has researched this area thoroughly

Mr. Duval explained that BP has contracted with Arnold & Porter out of Washington D.C. and Sara Warlick and Dan Cantor, from that office to assist with the appeals process. He explained that Ms. Warlick and Mr. Cantor might negotiate with the claimant so that the appeal never has to go to an appeals panelist. Mr. Duval explained that if a claimant receives notice of the appeal, BP starts a clock with 10 day, 15 day and 30 day cutoffs. If the claimant doesn't accept in 30 days, then recommendations are requested and then it goes to the appeals process. Mr. Duval explained that it is a unique appeals process but that if BP appeals within 10 days then that is a "throw away" and then it comes back out and then they have a certain amount of days to go through the process, which can take 15 days. Also, all of this can be re-appealed, per Mr. Duval.



Mr. Duval explained that when he got his position, he had to self disclose as to any conflicts of interest but he did not have a background check. He said they had a conflict of interest policy and he gave the example that if his father or any family members filed a claim he would have to remove himself. He also said that Pat Juneau explained this conflict of interest policy about family members. Mr. Duval said that he had no other employment but he said that he could have other employment as long as there was not a conflict of interest. He said that he did not need to have any formal disclosure of other employment but that Mr. Juneau would expect Mr. Duval to tell him. He also explained that he remembered some policies on ethics codes such as you could not accept gifts or lunches that were more than $50. He said there was no updated annual training but there was an 800 phone number that an employee could call if they had an issue, but when further asked if anyone knows about this phone number, Mr. Duval said

SM-04-GL000063

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

that he didn't think anyone knew about it, he thought that no one "had a clue".

As far as a code of ethics, Mr. Duval said that David Odom handles internal policy and accountability so he may have drafted something. Mr. Duval said he was never aware of any issues or sexual harassment issues, that they were a very tight group and they did not have a human resources representative. He said that there were about twenty claims administrators in his office and that they are responsible for ensuring that the claims process and audit process are handled correctly. Mr. Duval explained that there is no policy or protocol to handle how the staff interacts with claimants, that they just use common sense and get the "ball rolling" if there is any issue. There is also no formal guidance concerning phone calls with claimants other than keeping the information confidential.

Mr. Duval explained that if he had a potential fraud case he would bring it to the SIT team and David Welker's attention and that they would handle it. He further explained that in regards to his computer access, he can view the claim ID#, the person's name, their SS#, and their financials but he cannot change any information that he views. The only thing that he confirmed that he can do is make sure the claim is uploaded into the portal. If someone is questioning where a claim is located in the process he will look into it and sometimes for example, he may find that it has just been mislabeled or that information is missing. He explained that he feels that the appeals process is well run and he confirmed that it is anonymous. He acknowledges that the DHECC is as if you are building the process it as you go. Mr. Duval said that he never has felt uncomfortable in regards to ethical conduct with claimants, or in the office, never even a little.

Mr. Duval responded to questioning concerning his dealings with Tiger Sutton and he explained that since he is an attorney, he had been in some meetings with him and that Mr. Sutton had come into some appeals meetings now and then. He also confirmed that he had some contact with Mr. Sutton via the phone. Then the questioning continued on the remand issue and Mr. Duval explained that when a claimant doesn't feel comfortable he can remand, even if doesn't like the number he has chosen for example, he said that they wanted it taken out, BP wanted it in and Mr. Duval said Mr. Sutton wanted it in for the appeals.

The interview continued with questions about Mr. Sutton and Mr. Duval explained that he met him in court eight years ago on a case where Mr. Sutton's client had fallen and hurt his knee and Mr. Duval remembers saying to his boss that we are going to "zero him out." He stated that he had a good case and so was able to beat him in court. He confirmed that was the only case he had dealings with Mr. Sutton. He said that he interacted with Mr. Sutton, in the office every now and then, when he would come in to ask about the appeals process. He said he did not remember him asking about a certain claim, he said something about questioning something but wasn't specific. Mr. Duval did say that Mr. Sutton had told him at one time to watch out for Gibby and John Andry and that they were very aggressive.

When asked about the Andry Law Firm, Mr. Duval said that it had been assigned the claim to three panelists because it was over $1 million. He didn't know who the exact panelists were but he said he could check his records. He confirmed that was the only dealings with the Andry Law Firm. Mr. Duval said that he did talk to Mr. Sutton sometimes in the workplace about things such as hobbies and that Mr. Duval told Mr. Sutton about his fishing hobby and that his boat was 26 feet but he thought Mr. Sutton also owned a much larger boat with Glen Lerner. Mr. Duval said that Mr. Sutton is still around the building and he saw him today in the men's room on the 19th floor.

3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Duval confirmed that Mr. Sutton had an office in the claims center and that he also went to his other office. He said that Mr. Duval and his wife had an office at Deepwater Horizon but he had not heard anything else about them. Mr. Duval said he did not know of any special process that Mr. Sutton had with his clients in his law firm and that there was no formal financial disclosure report to identify conflicts. Mr. Duval said that David Odom would hold any financial disclosure reports at the office.

The interview continued with questions about Christine Reitano and Mr. Duval said he had more interaction with Ms. Reitano because she was the Designated Document Reviewer, BrownGreer was also involved, and so she was also very involved with appeals. Mr. Duval stated that Christine did not work for him but that they were equals' but she was more of the in-house counsel. He further explained that all employees are not really given specific duties more that they all wear different hats. Mr. Duval continued by saying that Ms. Reitano was more involved in policy drafting, BP liaison and involved with telling Mr. Juneau when she felt something needed to be done. When the questioning continued and Mr. Duval was asked who had more authority, he replied that he did not understand the question, when clarified as to who had more authority with policy development, Mr. Duval said that the steering committees for both sides had that responsibility. Also, he stated that Mr. Juneau would have the final decision.

When asked if Mr. Sutton or Ms. Reitano ever spoke to Mr. Duval about claims, he replied that they did not and he said that he could not direct them to anyone who might have more contact with them. Mr. Duval also said he did not know anyone at Deepwater Horizon who had contact with Mr. Sutton or Ms. Reitano but maybe with BrownGreer, and that they might go to them for the status of an appeal, I just simply work the relationship but there seemed to maybe be a pipeline for them. When asked about BrownGreer he didn't say that that he was disappointed with them he said that any company can do things better but anyone not getting paid gets unhappy and attacks BrownGreer but that's just the people on the street.

Mr. Duval said that he had never worked big claims cases. He said that Garden City was very good and if he had to pick he would pick Garden City. Mr. Duval said that he thought BrownGreer could do better in the area of communication, such as updates along the way to claimants. Maybe they just felt comfortable with Mr. Sutton and Ms. Reitano. He did answer that he did not think that they were picked to work on this case because they had prior relationships.

When the questioning continued about John Andry, Mr. Duval said that Mr. Andry had a big case before his Father. Mr. Duval said that John Andry had said that his dad was great judge, and he had their first lunch approximately three to four months ago and it was with Ms. Reitano and Tracy Steilberg, and the second lunch which was about two months ago was with Ms. Steilberg and Mr. Andry. At the lunch Mr. Andry asked me about a large law firm claim and he wanted to know about the time frame on the appeal. Mr. Duval also confirmed that Mr. Andry picked up the lunch tab that was probably about $20 each.

Mr. Duval confirmed that the Andry law firm claim was on-hold. He was asked if Mr. Welker was involved with putting it on hold and he said yes. Mr. Duval explained that Mr. Andry had asked if the payment could be wired and Mr. Duval had explained that if you had not asked to have wire payments in the initial application it would probably have to be federal expressed but he further explained that BP had fourteen days to review it and on the 15th day if they did not appeal it, the payment would be paid. Mr. Duval said that Mr. Andry was not aware of that process and stated that he would call back on the fifteenth day to check the status. Since Mr. Duval didn't see BP filing a request for a review he assumed

4

SM-04-GL000065

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

that it would be paid. Tiger Sutton had asked Steve Cirami from Garden City Group when the payment was ready, could it be wired. Mr. Welker came in five minutes later and said not to do anything with John Andry's claim for a bit. Mr. Duval continued and said that Mr. Andry had called him about a week ago checking on his payment and asking about the hold-up, his exact words were, "hey man, what the hell is going on". Mr. Duval said that since he was told to back off, he told Mr. Andry that he did not know anything and that it was out of his pay grade. He also said that he told Mr. Andry that it was probably best that they did not talk right now.

When asked about the relationship between Mr. Andry and Mr. Sutton, Mr. Duval said that it had been very unstable for a few years. Mr. Duval said that he did not know about the relationship between Mr. Andry and Glen Lerner, just that Mr. Lerner had that unusual slogan from Las Vegas. He thought that they must have some referral relationship between Lerner and Andry. He confirmed that Mr. Andry had a law firm with Mr. Lerner.

Mr. Duval said that Mr. Sutton mentioned that he was in the oil field services business and since i had worked in tugboats we talked about the business but he said that they never talked "lawyer stories". Mr. Duval did say that at some point Mr. Andry and Mr. Sutton had dealings but he thought that they had a fall out over fees, and that conversations with Tracy Stellberg kind of confirmed that. Mr. Andry and Ms. Stellberg seemed very close per Mr. Duval but when asked about the structure of the relationship, he said that she seemed very knowledgeable. Mr. Duval said that their relationship did not really raise any questions, when he was asked, but he continued saying that he thought it was strange that Ms. Reitano was at the first lunch but Mr. Sutton was not at the lunch.

When the questioning continued about Mr. Sutton's and Ms. Reitano's relationship, Mr. Duval said that he did not like to talk about people's personal lives but he did not think the relationship was good. He said it was an odd loving relationship, they never made a scene but they didn't seem connected as husband and wife. Mr. Duval said that they never went to lunch together; they would leave at different times. Ms. Reitano seemed very involved with the children and since he had played soccer in college they would talk about her kids soccer games.

Mr. Duval confirmed that Mr. Odom was the person that handled acknowledgements of policies for new employees but he said that he was embarrassed to say he could not remember if he signed anything. He did remember that he was asked if he had any friends with BP claims. Mr. Duval said that he did not have anything to disclose as far as friends and that it was just very informal procedures since they knew he had no conflicts. Mr. Duval was asked if someone from BP had seen he and Mr. Andry or other claimants at lunch, do you think they may feel it is inappropriate. Mr. Duval said I think that they may feel uncomfortable but he also said that he had also eaten with BP employees. The interviewer said that he has heard that District Judges feel like islands from old contacts, and Mr. Duval explained that his cousin was like a brother but his cousin's firm represented BP claims and he realized that he may not be able to have lunch with him anymore. He said he was just talking to his dad about that subject.

Mr. Duval said that he could give you the names of the three panelists on the Andry appeal.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

SM-04-GL000066

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

6

SM-04-GL000067

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee:   David Duval
Title:         Appeals and Government Relations Coordinator
Office:        Deepwater Horizon Economic Claims Center
Date/Time:     8/22/13
Attendees:     Frank Piantidosi, Walt Donaldson, Alex Dubin
Location:      935 Gravier St. New Orleans, LA 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010,* 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP.  We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP.  We do not represent you, Mr. Duval.

On the above date and times Mr. David Duval was interviewed in person. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.



1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



2

SM-04-GL000069

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



Questioning then shifted to the Casey Thonn claims. Mr. Duval stated that he did not remember Mr. Thonn at all until he was presented with an email sent to Mr. Thonn that Mr. Duval was on. Mr. Duval claimed that he found out about Mr. Thonn's claim after Mr. Sutton sent him an email asking him something about Mr. Thonn's case. Mr. Duval could not recall his exact response but he remembered that "it was something about shrimp RTP."

Mr. Duval confirmed that he knows Jennifer Goodwin. Asked to whom he was referring in his January 16, 2013 email to Ms. Goodwin, Mr. Duval stated he could not recall exactly but he thinks it must have been in reference to John Andry. After a brief pause, Mr. Duval stated that he remembered and that it must have been that Mr. Sutton asked him about Mr. Thonn's case and he was trying to get information for Mr. Sutton. At the time, Mr. Thonn was represented by Mr. Andry. Mr. Duval does not recall specifically the context of the January 16, 2013 email but he says it must have been referring to Mr. Sutton because in January 2013, he had yet to meet John Andry. Regarding the wording of the email itself, Mr. Duval claimed that he did not know why he wrote to Ms. Goodwin that "I know the attorney for the appeal" when the goal of the email was to obtain information for Mr. Sutton. He stated that he might have been trying to "ease [Ms. Goodwin] to get something." Mr. Duval then stated that he might have known Mr. Andry but only from his billboards in New Orleans. Mr. Duval then exclaimed, "I don't know," and claimed that he could not explain the email to Ms. Goodwin.

SM-04-GL000071

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Ms. Goodwin responded to Mr. Duval's email later on the evening of January 16, 2013 with information on Mr. Thonn's claim. There was no further correspondence on that email string until January 17, 2013 when Mr. Duval emailed Mr. Sutton. Mr. Duval claims that his emails to Mr. Sutton were simply to relay to him the information provided to him by Ms. Goodwin. Asked again, Mr. Duval stated that he could still not remember why he stated in the original email to Ms. Goodwin that he "[knew] the attorney for the appeal." Asked how he knew that Mr. Sutton wanted information on Mr. Thonn's claim, Mr. Duval responded that Mr. Sutton "must have come into [his] office or something," but he does not recall a specific conversation or email.

According to Mr. Duval, at no time did Mr. Sutton express to him that he did not want his name associated with Mr. Thonn's claim. However, Mr. Sutton did tell Mr. Duval that he did not want anything to do with the Andry Law Firm claim. Mr. Sutton made this statement when he heard that Mr. Duval was going to lunch with Ms. Steilberg, Ms. Reitano and John Andry. Mr. Duval claimed that it was at that lunch at the Palace Cafe in early May 2013 that he met John Andry for the first time. Mr. Duval then stated that he went to lunch that day with Ms. Steilberg and Ms. Reitano to celebrate Ms. Steilberg's birthday. Contradicting his earlier statement, Mr. Duval then stated that he had actually met Mr. Andry before this lunch "for just a handshake at a lawyer thing or something" but that he had never had "a phone call or anything." Asked if he had met anyone in Mr. Andry's office, Mr. Duval stated that he had not and that he had not even met Mr. Andry's brother, Gibby.

████████████████████████████████████████████████████████████ Again contradicting a prior statement, Mr. Duval remarked that he and Mr. Andry may have communicated via email in response to Mr. Andry's challenges of the appeals process since Mr. Duval was the appeals coordinator. Mr. Duval then stated that it was actually "very possible" that Mr. Andry might have called him to discuss the appeals process.

The interviewers moved on with the questioning, next asking Mr. Duval if he recalled meeting Mr. Andry at a New Orleans Hornets game in 2013. Mr. Duval thought for a moment and then, stated that he had. Mr. Duval proceeded to tell interviewers the circumstances of his meeting with Mr. Andry. Asked if he recognized Mr. Andry at the game, Mr. Duval stated that he did not even know who John Andry was at that time and that Mr. Andry came up and introduced himself. Mr. Duval was asked when this game took place. He responded that he was sure that it was sometime in mid-February. This timeline conflicts with Mr. Duval's earlier statement that he first met Mr. Andry at the Palace Café in May, as well as his statement that in May 2013, he was only aware of Mr. Andry by his billboards, which was contradicted by his statement that he had actually emailed with Mr. Andry and possibly spoken with him on the phone about the appeals process.  Mr. Duval stated that the meeting at the Hornets game was a "very quick two second conversation" and that Mr. Duval "had no idea who John Andry was." Mr. Duval then immediately contradicted himself again, stating that he recognized his face once he introduced himself. Mr. Duval stated that Mr. Andry did not buy him any food or drinks at the game. He also stated that that Hornets game was the only game he attended that season. Mr. Duval next saw Mr. Andry on May 7 at the Palace Café. Mr. Andry recognized Ms. Steilberg and Ms. Reitano and invited Mr. Duval to come along to a lunch he wanted to take Ms. Steilberg for her birthday.

SM-04-GL000072

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



According to Mr. Duval, Mr. Andry mentioned "zero" about pending appeals at the first lunch. Mr. Duval stated that Ms. Steilberg, Ms. Reitano and Mr. Andry were at that second lunch less than a month later after initially running into each other at the Palace Café. This second lunch also occurred at the Palace with Ms. Steilberg and Mr. Andry but, according to Mr. Duval, Ms. Reitano did not attend. Mr. Duval stated that Mr. Andry did not talk about BP much until the very end of the meal when he asked Mr. Duval about the Tallens Marine claim that has been pending for months. According to Mr. Duval, Mr. Andry asked him if he could check on that claim and to whom he could speak further. Mr. Duval told Mr. Andry he would check it out personally. Both Mr. Duval and Ms. Steilberg looked up the Tallens Marine claim. Mr. Duval stated that the claim seemed convoluted and there may have been an incompleteness notice. Mr. Duval does not recall what the notice was regarding. Mr. Duval then called Mr. Andry and informed him of the complexity of the claim. Mr. Duval stated that this was the last time he spoke with Mr. Andry. Asked whom he called for assistance on the Tallens Claim, Mr. Duval stated that it must have been Michael Tusky, who Mr. Duval uses often to check into these sorts of claims. Mr. Duval recalled an email from Mr. Tusky identifying the claim was incomplete. Mr. Duval did not recall how he informed Mr. Andry of that information.

Mr. Duval stated that Mr. Andry definitely gave him his cell phone number and Mr. Duval has called both his cell and office. Mr. Duval specifically recalled talking about the Andry Law Firm claim with Mr. Andry after he spoke with him about Tallens. This statement is in contrast to Mr. Duval's prior claim that the last time he spoke with Mr. Andry was when he called him to inform him of the complexity of the Tallens claim.

Asked about Mr. Sutton's involvement, Mr. Duval stated that Mr. Sutton would often come in and ask about the Andry appeal. Mr. Sutton would warn Mr. Duval that "Gibby was gonna call." Mr. Duval claimed never to have met Gibby Andry to this day. Mr. Duval did not recall specifically if the Tallens Marine claim was the first claim he looked up for Mr. Andry but there were definitely others. Mr. Andry would give him a list of claims and ask Mr. Duval to find out what the statuses were. Mr. Duval also stated that he was sure that Ms. Steilberg has looked up claims for Mr. Andry as well.

Asked to describe his role at the DHECC, Mr. Duval stated that his job was appeals coordinator and political liaison but hat his relationship with Mr. Andry "took on a life of its own." Mr. Duval did not refer Mr. Andry to an appropriate point of contact within the DHECC because of Mr. Andry's prior relationship

6

SM-04-GL000073

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

with Ms. Steilberg.████████████████████████████████████
████████████████████████████

When Mr. Sutton found out that Mr. Duval was having lunch with Mr. Andry, Mr. Sutton told Mr. Duval that he would not attend because Mr. Andry had an appeal pending. Asked why he decided to go even after Mr. Sutton had explained why he was not going, Mr. Duval stated that he did not take Mr. Sutton's not coming as being about the claims process as much as being a personal matter.

Mr. Duval did not recall sending any documents about an Andry appeal to Mr. Sutton, nor did he recall specifically asking Mr. Sutton asking for any documents.

Mr. Duval recalled Judge Barbier's letter about his decisions standing but not any subsequent emails. Mr. Andry wanted to know if he would get paid right away after the appeals board made a decision on his claim and those of his clients. When Mr. Andry stated this, Mr. Duval got in touch with Steve Cirami. That conversation took place within two weeks of Mr. Andry's eligibility notice being mailed.

Mr. Duval never had the impression that Mr. Andry knew he was on his appeal panel. Mr. Duval claimed that he never asked. Mr. Duval claimed that it was "impossible" for Mr. Andry to have known this information because the only people who could have known were Mr. Odom, Mr. Duval or someone from BG. Asked if his assistant, Ms. Steilberg had access to that information; Mr. Duval confirmed that she did. Mr. Duval stated that this fact did not concern him, even knowing Ms. Steilberg's friendship with Mr. Andry.

Mr. Duval stated that other lawyers with claimants were calling him all the time but that they have stopped since the investigation began. Mr. Duval claims that he was overwhelmed and started "drowning in his extra duties" helping people look up claims. It took away from the job he was hired to do.

Finally, Mr. Duval was asked if Mr. Sutton inquired about any other claims with any frequency. He responded that he did not.

████████████████████████████████████████████████████████

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-GL000074

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

**Deepwater Horizon Court Supervised Settlement Program ("CSSP")**
**Special Master – Independent External Investigation**
**Interview Report of Freeh Group**

| | |
|---|---|
| Interviewee: | Duval, David |
| Title: | Appeals Attorney |
| Office: | CAO |
| Date/Time: | August 27, 2013, 2 PM – 2:30 PM; August 27 (via telephone) 4:50 PM – 5:00 PM; August 27 (via telephone) 5 PM – 5:10 PM |
| Attendees: | Mike McCall, Ben Scotti |
| Location: | DHECC 14th Floor |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and times David Duval was interviewed in person for a third time and the Special Masters team followed up with him two additional times via telephone. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Duval explained that when he met with members of the Special Master team last Thursday, he was frustrated because he did not know certain dates about when he met with John Andry. Mr. Duval stated that he thought it was in May, but members of the Special Master team kept asking him if he was sure about that time period. Mr. Duval stated that he then recalled meeting Mr. Andry at a Hornets basketball game in February or March 2013.

He stated that he went to Tracy Steilberg immediately after his meeting with the Special Masters team on August 22, and Ms. Steilberg refreshed his recollection that he actually met Mr. Andry in early December 2012. He produced a photograph from December of 2012 that shows him and a number of individuals from the CAO, including David Welker, Tracy Steilberg and David Odom at Pat O'Brien's (Restaurant). He remembers Tracy stating that she recognized a number of other individuals at Pat O'Brien's from the Chalmette area, which is where she was also from. Mr. Duval recalled Ms. Steilberg approaching Mr. Andry to say hello and then after that moment, she introduced Mr. Duval to Mr. Andry.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Duval also admitted that, after meeting with members of the Special Masters team on August 22, he contacted a friend who attended the basketball game with him and was reminded that he exchanged cell phone numbers with Mr. Andry at that game.

Mr. Duval stated that he thought about the questions asked by the Special Masters team over the weekend and remembered some details about the first lunch in May where Ms. Reitano was with him, along with Ms. Steilberg and Mr. Andry. He remembered the meeting was at the Palace Café and that they were all bantering back and forth having a good time. Mr. Duval stated that at this luncheon Mr. Andry revealed that there was a falling out between Mr. Sutton and Mr. Andry. Mr. Duval confirmed that Mr. Andry hosted this lunch. Mr. Duval did not remember any sort of claims discussions during the first lunch.

Mr. Duval stated that the invitation to attend the first lunch, which again took place during the first week in May (the birthday lunch), would have either come directly via a phone call or email from Mr. Andry to either himself or Tracy. Mr. Duval stated that he was in his office, and Ms. Steilberg was also there when he received a text message from Mr. Andry, who wrote let's go to lunch. Mr. Duval indicated that Ms. Reitano was in the office and saw the text show up on his phone.

Mr. Duval acknowledged that a second lunch took place with the same group (except Ms. Reitano) at the same place (the Palace Café) in late May, approximately three weeks after the impromptu birthday lunch. Mr. Duval confirmed that during this lunch, Mr. Andry asked about the appeals process and deadline information for when claims are assigned to appeals panelists. Mr. Duval stated that Mr. Andry principally wanted to know when a claim was assigned to an appeals panelist and how long it takes to get paid once the process commenced. Mr. Duval stated that most of Mr. Andry's questions were generic but that he also asked about the Andry Lerner dismissal.

To assist in answering these inquiries, Mr. Duval stated that he either told Mr. Andry to provide a list of the claims or Mr. Andry told him he would provide a list to Mr. Duval. Mr. Duval stated that, as best he could recall, Mr. Andry eventually sent him an email containing some information about the claims sometime after the second lunch.

## SUMMARY OF DAVID DUVAL FOLLOW-UP TELEPHONIC INTERVIEW 8/27/2013

Mr. Duval was contacted telephonically again at his DHECC office phone number around 5 PM on August 27, 2013 in order to ascertain what he meant when he wrote the phrase "I know the attorney for this claim...." via an email dated January 16, 2013 to Jennifer Goodwin.

Mr. Duval stated that he was not 100% certain to whom he was referring when using the phrase "I know the attorney for this claim..." but indicated that he thought the email referred to John Andry.

The interviewers asked him to go back and check his emails from that exact date or the next day to see if there was an email that would refresh his memory as to who exactly he was referring to.

SM-04-GL000076

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

### SUMMARY OF DAVID DUVAL FOLLOW-UP TELEPHONIC INTERVIEW 8/28/2013

Mr. Duval was contacted telephonically again at his DHECC office phone number on August 28, 2013. The interviewers referred to the email message which Mr. Duval had sent to Mr. Scotti earlier in the day, forwarding a copy he had found of his January 17, 2013 email to Mr. Sutton. The interviewers asked Mr. Duval whether, having reviewed the January 17 email, he now had any fresh recollection regarding to whom he was referring in his e-mail to Ms. Goodwin the previous day, when he wrote that he knew the attorney for the claim. Mr. Duval responded that he remained convinced that he was at the time and in his own mind referring to John Andry. He admitted that, having reviewed the January 17 e-mail, he has now concluded that Mr. Sutton must have actually asked him to check on the status of the claim, but he still has no direct recollection of Mr. Sutton making that request to him. Mr. Duval reiterated that his choice of words in his email to Ms. Goodwin was simply the result of his experience in learning how to get more expedient responses to such requests.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-GL000077

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

**Deepwater Horizon Court Supervised Settlement Program ("CSSP")**
**Special Master – Independent External Investigation**
**Interview Report of Freeh Group**

| | |
|---|---|
| Interviewee: | Kirk Fisher |
| Title: | Director of the Business Processes and Reporting Group |
| Office: | DHECC |
| Date/Time: | 7/18/2013 |
| Attendees: | Greg Paw, Matt Dolan, Alex Dubin |
| Location: | 935 Gravier St, New Orleans, LA 70112 |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Mr. Fisher.

On the above date and times Kirk Fisher was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

When the questioning began, Mr. Fisher said that he is the Director of the Business Processes and Reporting Group ("BPRG") at the DHECC, where he also supervises the Quality Assurance ("QA") team. Additionally, Mr. Fisher is a professor at The Louisiana State University ("LSU") College of Business. Mr. Fisher said that he also owns multiple real estate holding companies and is a founding partner in the Crescent City Group, which is a claims settlement administration company that he formed with fellow DHECC executives, David Odom, Chris Read, David Duval and former DHECC employee, Scot Sherick.[1] None of these entities have a claim with the DHECC. Mr. Fischer's family recently sold a newspaper called, *The Advocate.* He said that his family also owns two TV stations.[2]

Mr. Fisher stated that he met Pat Juneau through David Odom. He said that Mr. Odom was a friend with Mike Olinde, and that Mr. Olinde was a friend of Mr. Fisher. He added that Mr. Olinde introduced him to Mr. Odom.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

---

[1] Sherick was a director in the BPRG but was fired.
[2] One is in Baton Rouge and one is in Texas. They are both ABC affiliates.
[3] ████████████████████████████████████████████████

SM-04-GL000078

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

---

[4] Speaking from memory, not hard facts.

2

SM-04-GL000079

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



The interviewers shifted to questions regarding the DHECC code of conduct and human resources policies, and Mr. Fisher replied that everyone reads and signs the code of conduct and there may have been a discussion in an office setting but a formal, corporate-style orientation doesn't exist. When asked who at the DHECC performs the classic HR functions within the QA group, Mr. Fisher responded that he does.  Mr. Fisher characterized his group's approach as "taking it on the fly." If there were an HR issue in the CAO's office (on the 19th floor) Mr. Welker, Mr. Odom or Mr. Pat Juneau would be the one to handle it. He said that people have not come to him to ask about protocol.

The questioning continued, and Mr. Fisher stated that he feels that the code is sufficient and that there is a robust amount of checks and balances regarding the handling of claims files. Mr. Fisher also noted that there is no way for any one person to manipulate any one claim. He said, "Even a strong code of conduct policy wouldn't have stopped Tiger Sutton."

---

5
6

SM-04-GL000080

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

When asked, Mr. Fisher spoke about the small town environment of New Orleans and how it has affected the process and how the program accounts for those issues and stated "just don't cross lines." He said that there's no way to really stop it, "You trust people and do your best to keep tabs on your employees."

Mr. Fisher continued to respond to questions and said that when Mr. Sutton reached out to P&N, this was an example of improper contact with a vendor. Mr. Fisher stated that there is awareness among DHECC staffers of the danger of perceptions of impropriety. When asked, Mr. Fisher remarked that if the claim is over a certain dollar amount, for subsistence claims, this triggers site visits to investigate possibly fraudulent claims. However, Mr. Fisher said that he is unsure what that amount is or what the policy states. He added that "robust" document requirements work as a fairly effective fraud deterrent for business-based claims. Mr. Fisher said that he is unaware of what the triggers are that would lead to site visits for those claims and that P&N & BrownGreer are the ones who make the decisions with regard to site visits.

When asked, Mr. Fisher stated that he started at DHECC two weeks after Reitano.[7] He said, "Christine wanted to be the top dog" while Mr. Fisher said that he is "happier being the #2 guy." He said that no one asked for his input on hiring Mr. Sutton but that he did know that he was being hired. Mr. Fisher said that Mr. Sutton was being brought on to help with subsistence and moratoria claims. He said that he did know of concerns regarding Mr. Sutton being hired "he didn't have a good reputation at all." Mr. Fisher claims to have received his information on Mr. Sutton mainly from Tracy Stielberg, who worked in the same office with Mr. Sutton for years. Mr. Fischer said that she liked to talk about her experiences with Mr. Sutton and that none of the stories she recounted were positive.

As the questioning continued, Mr. Fisher spoke about Mr. Sutton's relationship with Mr. Patrick Juneau and he stated that it was a longstanding relationship that "lends itself to trust." "Tiger was an opportunist" when it came to using his influence with Mr. Juneau. Mr. Fisher noted that this was merely his perception. He also said (Mr. Sutton), "I didn't really see value in what he did." Mr. Fisher said that subsistence was "completely messed up" at the time Mr. Sutton was hired at DHECC. He said that Mr. Sutton did not help remedy this and he added, "he was more of an encumbrance." He said, "Tiger was always kind of a bully." He would try to "clear people out" so he could make the decisions himself. He would use Pat and Michael Juneau's names "to tell people what to do."

The interviewers continued the questioning and Mr. Fischer said, "Tiger injected himself into the audit process." Mr. Fisher stated that he felt this to be "improper" and it "ticked [Fisher] off." He added, "Everything Tiger did was plaintiff-friendly...Tiger was really trying to push the needle [on caloric intake calculation and awards]" which led to much "looser"[8] payouts. Mr. Fisher was uncomfortable with this, so he brought on Dr. Katzmarczik[9] to help put a check on Mr. Sutton's "loose" payouts.

Mr. Fisher continued to explain that some of the caloric values that Mr. Sutton was using were "insanity." He stated that the values Mr. Sutton was applying were, "like what would be used for an Olympic swimmer, not a fisherman." Mr. Fisher said that Dr. Katzmarczik fixed it by putting a "check

---

[7] Before Sutton arrived.

[8] "Higher."

[9] Dr. Peter Katzmarczyk was hired to do a study on caloric intake to help Fisher and the QA team "fix" the subsistence calculator.

SM-04-GL000081

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

digit" into the subsistence calculation formula in order to create a failsafe, such that the formula wouldn't allow massive over-calculations of caloric intake. During this time and thereafter, Mr. Sutton wanted Mr. Fisher and his people out of the subsistence meetings.

The interviewers then shifted the topic and Mr. Fisher stated that Robert Hedgecomb & Scott Sherick were unable to get useful mathematical information because of a "lack of proper computing power." He said that Mr. Sutton had ongoing involvement in impairment zone issue, and that Mr. Sutton and Ms. Reitano were telling people that they reported to S&R, not Mr. Odom.

When asked, Mr. Fisher spoke about Mr. Sutton's involvement with the Mills Firm and Mr. Fisher stated that the "Mills Firm stuff was complete BS." He continued, stating, "Tiger was trying to push a blanket settlement with this firm [through a method of] cut and paste." Mr. Fisher remarked that "maybe the GCCF acted that way but this program doesn't and he [Sutton] was buddies with one of the guys [at the Mills Firm]."[10]

Mr. Fisher continued responding to questions and spoke about his recollection of a specific vessel damage claim where he and Mr. Sutton disagreed on compensability.[11] Mr. Fisher responded that he did specifically recall one instance: A shallow water incident where the boat basically ran aground. "Tiger made this 'leap of logic' that the legal opinion was that [the boat] didn't run aground and [the captain] was just 'churning up the mud'." He said that particular instance stuck out to him, as a time when he really had to push back against Mr. Sutton, because "[Fisher] couldn't allow anyone to bastardize the audit process because it only takes one [to mess everything up]."

When asked, Mr. Fisher said that he did not ever go to Mr. Patrick Juneau or Mr. Michael Juneau to register his displeasure with Mr. Sutton's involvement in the audit process, he said, "Tiger was not really smart. He was narcissistic." If you argued the facts with him, he would generally yield. Mr. Fisher did add, "Tiger & Christine ended up walling off the Juneau's to serve their own purposes and bottleneck power and decision-making with them."

Mr. Fisher said that he really doesn't think Pat Juneau knew how bad Mr. Sutton was because "there was a level of trust [there]."

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

---

[10] Fisher was likely referring to Kenny DeJean.
[11] Claim #21777 – Roy Guidry.

5

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: Kirk Fisher
Title: Director of Business Processes
Office: DHECC CAO
Date/Time: 8/8/2013 3:24pm
Attendees: Tim Flynn, Walt Donaldson, Dennis Shenberger
Location: 935 Gravier St., New Orleans, LA  70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP.  We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP.  We do not represent you, Kirk Fisher.

On the above date and times Kirk Fisher was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.



1

SM-04-GL000083

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



2

SM-04-GL000084

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



Mr. Fisher was asked why he requested an audit of Casey Thonn's claim. He acknowledged that he did as he was responsible for internal audit. But he wasn't sure what specifically prompted him to do so. It wouldn't be uncommon for him to request a review on a file. He has requested this type of review on between two and five claims, but he isn't sure of a precise number. He doesn't remember how he first learned of the Casey Thonn claim. He does, however, remember that noticing that there was something peculiar about the shrimp claim. From a process/audit perspective, he wanted to understand how and why a claim went into reconsideration at $600 and came out at $150,000. He felt that was beyond a process/framework issue and couldn't imagine what anomaly would cause this. He wanted to ensure

3

SM-04-GL000085

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

that he didn't have a major systemic issue. Post facto it's easy to say that is the reason, but he's not sure at the time what prompted his review.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

4

SM-04-GL000086

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: Chris Rinaldi
Title:  Senior Claims Analyst
Office:  Postlethwaite & Netterville
Date/Time: 7/16/2013
Attendees: Greg Paw, Alex Dubin, Rich Baldwin
Location: 935 Gravier S., Suite 1905, New Orleans, La., 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an Independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you Mr. Rinaldi.

On the above date and times Mr. Chris Rinaldi was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Christopher Rinaldi ("Rinaldi") is a Senior Claims Analyst at Postlethwaite & Netterville ("P&N"). During the time period that is the focus of this interview, he was a Junior Claims Analyst ("JCA").

Mr. Rinaldi is originally from New York. He earned both his undergraduate and law degrees from Louisiana State University ("LSU"). Mr. Rinaldi graduated The LSU Law Center in May 2011, and passed the New York State bar examination. Thereafter, he was admitted to the New York State Bar Association. Mr. Rinaldi then returned to Louisiana and attended the LSU undergraduate career fair, where he applied to P&N.

Mr. Rinaldi, who claims to have had no prior relationships with anyone at either P&N or DHECC, told interviewers that after returning to New York, he was interviewed over the phone by P&N and received an offer to join the firm at the completion of that call. Mr. Rinaldi accepted the offer and moved back Louisiana, where he began his employment with P&N on or around June 4, 2012.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Rinaldi was then asked if he recalled receiving any specific preparation or policy direction with regard to accepting gifts or entertainment from DHECC vendors, claimants or related parties. Mr. Rinaldi responded that he did not specifically recall such training but he also would not state that it hadn't occurred.

Mr. Rinaldi also stated that he was currently unaware of the existence of a formal gifts and entertainment policy for P&N and PwC employees working on DHECC cases. When queried as to his understanding of P&N's stance on that issue, Mr. Rinaldi stated that he believed there to be "an implicit understanding" to keep all communications confidential and to "always contact managers" if employees were ever faced with a questionable offer, gift or invitation.

Mr. Rinaldi was then asked about his personal feelings regarding the acceptance of gifts and/or entertainment from DHECC-related parties. Mr. Rinaldi stated that he believed that invitations of any sort would "feel inappropriate" and that he would report any such invitation to his superiors immediately. Mr. Rinaldi did not indicate that he had received any such invitations or offers to date.

Mr. Rinaldi was asked to describe his job and responsibilities at P&N. Mr. Rinaldi informed interviewers that he joined P&N as a Junior Claims Analyst ("JCA") and that his responsibilities at that time were those of an audit preparer and reviewer, working on a team that reported to a Senior Claims Analyst ("SCA").

Mr. Rinaldi was asked to expand on what his position as a JCA entailed, specifically with regard to his work with DHECC. Mr. Rinaldi stated that it consisted mostly of data entry and expense classification, after which another analyst would "double check [his] work."



SM-04-GL000088

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Rinaldi next told interviewers that in February 2013, he was promoted to the position of Senior
Claims Analyst. Mr. Rinaldi was asked to describe his new position as compared to his former position as
a JCA. Mr. Rinaldi remarked that being a Senior Claims Analyst was "basically the same job but with
more targeted projects," mostly focusing on large claim amounts and reconsideration claims. Mr. Rinaldi
also stated that as a Senior Claims Analyst, he is tasked with answering questions posed by junior level
claims analysts working below him. Interviewers asked Mr. Rinaldi if he had a team below him and Mr.
Rinaldi informed interviewers that he has a team of between four (4) and seven (7) JCAs on his team.
Mr. Rinaldi confirmed that his job title currently remains Senior Claims Analyst.

Interviewers began asking Mr. Rinaldi questions regarding his involvement with the business economic
loss ("BEL") claim of the Andry Law Firm ("Andry"). Mr. Rinaldi stated that he began oversight of the
Andry claim as a JCA in December 2012. Mr. Rinaldi claims to have had no prior knowledge of the
existence of the Andry Firm, or its founding partner, Mr. John Andry. Mr. Rinaldi further explained this
by informing interviewers that Andry "had no visibility" and did not engage in OCI (on-campus
interviews) at The LSU Law Center.

Mr. Rinaldi stated that as an auditor of Andry's claim, he requested profit and loss statements for the
firm and that requesting this documentation afforded him a choice: he could just wait for the claimant
to comply with the request or, if he did not receive the requested documentation, he could send an
incomplete notice to the claimant, thereby freezing the claim.

Mr. Rinaldi stated that he waited for Andry to send the requested documentation and that after two
weeks, when it had not arrived, he deemed the claim incomplete and a notice to this effect was
dispatched to Andry. Mr. Rinaldi was asked what was necessary to deem a claim incomplete. He
responded that it was based on his "individual judgment."

Mr. Rinaldi was asked to identify his contact at Andry. He stated that it was a third party accountant
hired by Andry to prepare their BEL claim. Mr. Rinaldi was then asked if he had any prior experience
with that accountant, to which Mr. Rinaldi replied that he did not.

Mr. Rinaldi informed interviewers that once the incomplete notice was sent to Andry, the claim was
handed over to Brown & Greer. █████████████████████████████████████

Mr. Rinaldi stated that he next heard about Andry's claim in March, 2013 (by which time he had been
promoted to Senior Claims Analyst) when he received an email from Mr. Mark Staley ("Staley") inquiring
as to the status of the Andry claim. Mr. Rinaldi was asked if it was normal that he receive an email
directly from M. Staley inquiring about a certain claim. Mr. Rinaldi replied that it was "unusual" and that
this was the first and only time he had ever heard directly from Mr. Staley regarding a particular claim.
Mr. Rinaldi further explained why this was so odd, noting that Mr. Staley was two levels above him at
P&N and that his direct superior would normally be the one to make this sort of inquiry. Mr. Rinaldi
added that he was not sure why Mr. Staley was taking such special interest in the Andry claim.

3

SM-04-GL000089

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Rinaldi told interviewers that when he looked further into the Andry claim, he found that the documents he requested (Andry's profit and loss statements) had actually been submitted and that they were actually submitted *before* Mr. Rinaldi sent out the incomplete claim notice. Mr. Rinaldi stated that this was likely the result of his not having checked the claimant portal (where the status of a claimant's claim was regularly updated). Mr. Rinaldi noted that it is now policy to check the portal before sending an incomplete notice.

Interviewers asked Mr. Rinaldi how he interpreted the information that Andry was erroneously issued an incomplete claims notice. Mr. Rinaldi replied that he his first impression was that because he had sent the notice without first checking the portal, Andry was "ticked off" and complained and that their complaint was likely the reason why he received "special notice" on Andry's claim directly from Mr. Staley.

Mr. Rinaldi stated that Mr. Staley directed him to let him know when the Andry claim was complete.

Mr. Rinaldi was asked what he did once he received this directive (via email) from Staley. Mr. Rinaldi stated that he passed the Andry claim to his "best Junior Analyst," a man named Mr. Jordan Wilkinson and directed him to "keep an eye on [the Andry claim]" so Mr. Rinaldi could keep Staley Informed on the progress of the audit. Mr. Rinaldi was asked to characterize Mr. Staley's level of interest in the Andry file. Mr. Rinaldi described it as "uncommon."

█████████████████████████████████████████████

Mr. Rinaldi was next asked to identify who his direct superior was at the time he received the email inquiry from Staley. He responded that it was a woman named Ms. Maria Herrington ("Herrington"). Mr. Rinaldi was then asked to characterize her relationship as to himself and Mr. Staley within the P&N hierarchy. Mr. Rinaldi responded that Ms. Herrington was his manager and that Mr. Staley was Ms. Herrington's "boss."[2]

When asked, Mr. Rinaldi stated that he never spoke with Ms. Herrington about the Andry claim and he did not recall if he ever spoke with her about Mr. Staley contacting him or about Mr. Staley's direct interest in the claim itself. Mr. Rinaldi stated that hearing from Mr. Staley made him think that there might have been a problem or that he was in trouble but that after the initial email was sent, Mr. Staley seemed to back away and Mr. Rinaldi came to the conclusion that it may have simply been the case that Mr. Staley wanted to be "kept in the loop" on that particular claim.

Mr. Rinaldi was asked if he had any further communication with Mr. Staley after the original email Mr. Staley sent to him. Mr. Rinaldi replied that the next time he had any contact with Mr. Staley was in March 2013 when he emailed Mr. Staley to inform him that the Andry audit was complete.

---

[2] Rinaldi also stated that Herrington presently remains his direct superior.

SM-04-GL000090

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Rinaldi was asked about his contact with Mr. Wilkinson while Mr. Wilkinson was "keeping an eye on" the Andry claim. Mr. Rinaldi stated that he and Mr. Wilkinson kept in regular contact, especially concerning the "large revenue spike and ambiguous insurance cost [in Andry's claim]." Mr. Rinaldi continued that on closer review of Andry's records, the bank statements verified the revenue spikes as resulting from a large settlement and the insurance cost as the addition of an attorney to Andry's health insurance plan.

Mr. Rinaldi stated that during this time, there were no updates going to Mr. Staley and reiterated that the only contact he had with Mr. Staley was the first email he received from him requesting a status update on the Andry claim and the last email he sent Mr. Staley when his team had completed the audit.

Mr. Rinaldi was then asked if anyone other than Mr. Staley had contacted him regarding the Andry file. He replied that no one had. Mr. Rinaldi was then specifically asked if Mr. Sutton had contacted him to inquire about the Andry file. Mr. Rinaldi responded that he had not.

Mr. Rinaldi was asked if there was any discussion between himself and anyone else at P&N regarding how the Andry claim would be paid (wire transfer, FedEx ...). Mr. Rinaldi stated that he had been party to no such discussion.

Interviewers then began questioning Mr. Rinaldi about Mr. Sutton. Mr. Rinaldi claimed to have had zero interactions with Mr. Sutton. He stated that he was unaware until being told by the interviewer that Mr. Sutton and Ms. Reitano were married. Mr. Rinaldi reiterated that Mr. Sutton had never contacted him regarding the Andry claim. Mr. Rinaldi made reference to a "standard release policy" directing him to contact Mr. Sutton if there were any questions regarding the Andry case but Mr. Rinaldi stated that he never did. Mr. Rinaldi stated that he did not recall ever having met or spoken with Mr. Sutton.

Lastly, interviewers asked Mr. Rinaldi if he had any personal worries or reservations regarding possible conflicts of interest regarding the DHECC, specifically as it relates to their interactions with P&N. Mr. Rinaldi stated that he does not.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

5

SM-04-GL000091

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

SM-04-GL000092

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

**Deepwater Horizon Court Supervised Settlement Program ("CSSP")**
**Special Master – Independent External Investigation**
**Interview Report of Freeh Group**

Interviewee: **Mark Staley**
Title:   **Director**
Office: **Postlethwaite & Netterville**
Date/Time: **June 16, 2012, 3:00 PM**
Attendees: **Matthew Dolan, Gregory Paw, Laure Kirk**
Location: **935 Gravier, New Orleans, La., 70112**

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP. We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP. We informed Mark Staley that we do not represent him.

On the above date and times Mark Staley was interviewed in person. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Staley stated that he graduated from LSU in 1998 and had been in the workforce about fifteen years
and that he had worked for Postlethwaite & Netterville for five and a half years. He said that he had
worked at other firms prior to P&N such as Deloitte, in their Texas practice. Mr. Staley said that his
degree was in Information Systems with an accounting background. Mr. Staley is in the consulting
practice at P&N and P&N is involved in providing professional services in information systems, data,
other advisory services, project management and other advisory areas. He stated that they had about
600 full time employees and a few sub-contractors, although he was uncertain of the exact number.
Mr. Staley said that he was a partner and that there were about 27 partners. He explained that he is a
partner and a shareholder and he became a partner about May or June of 2012.



SM-04-GL000093

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

When asked about the training at P&N, Mr. Staley said that every employee has training when they start and they have re-training on an as needed basis.

Mr. Staley explained that the policies, concerning gifts and gratuities, comes under the codes of conduct in the employee handbook, and it is explained to each employee. Mr. Staley said that there may be a separate policy detailed around the conflicts of interest for this project and that he would provide that or the handbook. He also said that he would check to see if an employee signed a gift and entertainment policy for this project.

Pertaining to conflicts of interest, Mr. Staley said that off the top of his head he thought there were procedures around exiting clients such as a conflicts review around existing P&N clients. If an existing P&N client submits a claim, P&N would not calculate those claims. He said that an employee must report claimants that may be a conflict of interest. Mr. Staley said that they review a claim filed in the system, as part of the conflicts of interest policy. They review the conflict if there is one and the potential client is presented to the Director/Partner for review. The Director/Partner will decide as to whether the potential client is a conflict or not. Mr. Staley said that conflicts have come up, but he is not sure of the exact number. He stated, "they handle it."

Mr. Staley responded to questions about the formal process with the claims center and he explained that if a record is identified as a conflict, the information is captured and made available to the local teams of the two vendors, and that the other vendor will handle a conflict that P&N may have and P&N would handle a conflict that they may have identified. Mr. Staley said that he had seen a gift and entertainment policy by P&N.

2

SM-04-GL000094

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



When asked about the Andry Law Firm, Mr. Staley said that it came to his attention during an interview with Dave Welker when he told Mr. Welker that Mr. Sutton had questions about claims and that he wanted to speak to Chris Rinaldi. Mr. Staley said that he emailed Mr. Sutton that he was aware of the Andry Law Firm claim, and asked Chris Rinaldi to update him.  Prior to that Mr. Staley said that he was not aware of Mr. Sutton, but knew he worked in the Claims Administrator Office, he said that Mr. Sutton was involved in meetings that he was also involved in.  Mr. Staley said that Mr. Sutton had asked about the status of claims in the past mainly by emails.

Mr. Staley said that Mr. Mike Juneau and Mr. Pat Juneau also asked about claims and the questions about the status of claims usually went to Mr. Staley or Robin Pilcher, who is a member of his senior team. He explained that the questions usually do not go to anyone lower than the manager level but it is possible, but not likely that questions could have gone to someone at a lower level.  He confirmed that he did not know of a written policy about this issue.  Mr. Staley explained that if someone wanted something from his employees that that would be a distraction.  Mr. Staley also responded that he responded to Mr. Sutton with the status of the claim but he said to the interviewer that he did not understand why Mr. Sutton needed to know the update.  He said that he never met with Mr. Sutton to discuss that claim.  Mr. Staley further explained that he was in weekly team meetings with Mr. Sutton but he had no one-on-one meetings that he could recall.

Mr. Staley was asked if he met with the CA team about moratorium claims and subsistence claims and he said that he had not been involved and didn't know what they were.  The questioning went back to Mr. Sutton's request to speak with Mr. Rinaldi and Mr. Staley said that he probably forwarded the email to Mr. Rinaldi, and asked Mr. Rinaldi for the status. Mr. Staley explained that Marea Herrington is Mr. Rinaldi's direct supervisor and he said that he probably sent the email to Mr. Rinaldi and he would not have done it differently.  He stated that P&N has implemented a new procedure where the claims status requests goes to a team that pulls together the status of information.  He said that the process is more formalized now.  As the questioning continued, Mr. Staley explained that after the request from Mr. Sutton, Mr. Rinaldi came by and said that he had received his email about Mr. Sutton, and Mr. Rinaldi said that he was concerned that the attorney was angry with him and he explained that he was just working the claim.  Mr. Staley said he did not have a memory of Mr. Rinaldi being anxious but subsequently they had talked about it.  Mr. Staley said that he did not remember if Mr. Rinaldi had asked him if he should work on the claim quickly or if it should be addressed.  Mr. Staley did not remember if he asked for an update from Mr. Rinaldi but he said he did get an update via email.  He said

SM-04-GL000095

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

that he believed the email said that he worked the claim and forwarded it through the normal process. Mr. Staley said that it went through PWC quality assurance. He continued by saying that in hindsight, it was out of the ordinary for Mr. Sutton to ask to speak to the accountant that works the claim and that he couldn't recall another instance of that type of request.

Mr. Staley said that now a team reviews this volume of claim inquiries from claimants, CAO or lawyers. He explained that the high volume of status requests from claimants, as well as from CA and a backlog drove the need to have a separate team to deal with these inquiries. Mr. Staley said that the team was put in place over the last few months maybe in April or May. He confirmed that they are keeping a log of the status requests that are sent to them.

When asked if any of Mr. Staley's staff had inquiries from Mr. Sutton, Mr. Staley said that he was not aware of any to anyone below a manager. He added that he was not sure if there might have been inquiries made to managers such as Robin Pilcher, Katherine Torres, Tory Jambon or Marea Herrington from Mr. Sutton. Mr. Staley said that he believed that it did happen to a manager or senior manager but he was not sure and he said he could look into it to see if anyone did get a request, because it was explained that we would want to speak to that manager if indeed Mr. Sutton had requested information. He concluded by saying that he did not think that we needed to add anything else to what they had already asked.

When the questioning continued, Mr. Staley said that that he did not know every step around the process of compensation but he was aware of their controls, he said that any process can be improved but he said that this program has a tremendous amount of control and that the controls are effective. As far as a to do list to improve the process, Mr. Staley said that he could get back to them but he added that they constantly meet to review the procedures and he believes they have a quality product, he said that they continue to have an increase in production as they mature, they are more harmonized, and Mr. Staley said that they look for improvement constantly and discuss cross-vendor issues.



SM-04-GL000096

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Staley said that he would try to provide the code of conduct policy that is in their employee handbook and their entire employee handbook, and if they have a specific one around the project he will provide that. He will confirm if employees sign off on the gift and entertainment policy and he will confirm if they have a policy on anonymity as far as when they bring up an issue of misconduct to management, and that he would provide the policy if possible. Mr. Staley said he would confirm if Robin Pilcher, Katherine Torres, Tory Jambon, or Marea Herrington had been asked by Mr. Sutton about the status of any claims because the interviewers would like to speak to that person if Mr. Sutton had contacted them. Mr. Staley said he would also provide the P&N to do list on improving procedures.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-GL000097

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: Henry Mitchell
Title:    Director – Quality Control
Office:  Postlethwaite and Netterville
Date/Time: 7/17/2013
Attendees: Greg Paw, Frank Piantidosi, Alex Dubin, Rich Baldwin
Location: 935 Gravier S., Suite 1905, New Orleans, La., 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an
Independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP. We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP. We do not represent you Mr. Mitchell.

On the above date and times Mr. Henry Mitchell was interviewed in person. We explained that
information provided in this interview would become part of the investigation record and could be
reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to
third parties.

Mr. Henry Mitchell ("Mitchell") graduated from Louisiana State University ("LSU") in 2012 with his BA
and MBA. He has interned with the Nestle Corporation in St. Louis and with auditing firms in Louisiana
that audit state agencies. Mr. Mitchell was brought into the DHECC by LSU Business School professor,
Mr. Kirk Fisher ("Fisher"), who was also interviewed by the Freeh Group as part of the ongoing
investigation into Mr. Patrick Juneau, Mr. Lionel "Tiger" Sutton, Ms. Christine Reitano and the DHECC
program.



SM-04-GL000098

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

2

SM-04-GL000099

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



3

SM-04-GL000100

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



Mr. Mitchell was asked if he had encountered any issues with regard to establishing vessel length in a claim. Mr. Mitchell responded that when there was decision to be made between more than one vessel length, the procedure was to employ the longest measurement listed. Mr. Mitchell stated that he received this direction from BrownGreer and the claims administrator's legal department ("CA Legal"), although he could not recall which lawyer.[6]

Mr. Mitchell was then questioned as to the extent of his interaction with CA Legal. Mr. Mitchell stated that he had "some" interaction. Mr. Mitchell continued that "for a while, Mike Juneau, Tiger [Sutton] and Christine [Reitano] would attend Tuesday meetings" but that this did not occur every week and it varied as to whom, if any, among them would show up from week to week.

Mr. Mitchell was then asked if CA Legal would ever provide him input on whether or not a claim was compensable. Mr. Mitchell indicated that they would and cited a particular vessel physical damage claim as an example. Mr. Mitchell went on to elaborate on this particular claim, noting that it was odd how involved Mr. Sutton became lobbying for payment.

---

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[6] Mitchell noted that at no time did he have direct contact with the lawyer at CA Legal and that his/her input was sought by Brown and Greer before instructing him.

SM-04-GL000101

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Mitchell indicated that after reading the claim, it was his understanding, as well as that of his team, that the damage done to the propeller and hull of the vessel in question was incurred as a result of the ship running aground and, as such, was not compensable under the terms of the settlement. Mr. Mitchell stated that Mr. Sutton made what Mr. Mitchell felt to be a fairly unreasonable argument in support of paying the claim and ultimately made the unilateral decision to approve the claim for payment over the objections of both Mr. Mitchell and Mr. Fisher.[7]

Mr. Mitchell added that his team had originally characterized the claim as not compensable as well. He also mentioned that Mr. Orran Brown ("Brown") of BrownGreer, who was also present for the Tuesday meeting during which this claim was discussed, felt that the claimant should have been required, at the very least, to provide further supporting documentation that his boat had not received the damage in question as a result of running aground. Mr. Sutton required no such documentation and the claim was paid. Mr. Mitchell again noted that Mr. Sutton was "the final word on what was compensable"

Mr. Mitchell was next asked if his "voice was heard on [his views]" by the decision-makers above him, to which he replied, "not necessarily."

Mr. Mitchell was then asked how decisions to pay or not pay claims were disseminated to his team. Mr. Mitchell stated that he would inform his team about these demands. Mr. Mitchell then informed interviewers that decisions were memorialized in the form of written assessments from vendors, used strictly for documentation purposes so that Mr. Mitchell and his team could be aware if the vendors agreed with compensation decisions.

Mr. Mitchell was asked about the status of the working relationship between his group and Mr. Sutton. Mr. Mitchell responded that vessel physical damage claims were "the big sticking point [between the two groups]" and they were "mostly fine [with regard to] the others."

Asked if he felt that Mr. Sutton had displayed any signs of having a special or self interest in paying any particular claims, Mr. Mitchell responded that he did not and that he felt that it was just Mr. Sutton's view that they should be paid. Mr. Mitchell added when questioned that Mr. Sutton never became emotional or upset when making his arguments.

Mr. Mitchell was then asked if there existed a protocol for him to follow if he felt that Mr. Sutton, or another superior within DHECC, made a bad or unreasonable decision. Mr. Mitchell responded that there was no formally established mechanism and he would simply have discussions with Mr. Fisher but that he was unsure of how Mr. Fisher would proceed afterwards.

████████████████████████████████████████████████████

---

[7] Mitchell's team, in concert with Fisher, prepared a report that voiced their disagreement but this was more for record-keeping purposes, as the decision was ultimately Sutton's to make.

SM-04-GL000102

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



Mr. Mitchell was then asked about DHECC policy regarding payment amounts to eligible claimants. Mr. Mitchell stated that he and his team were instructed to "make sure the claimant gets the max settlement" and that this was generally a non-issue because claimants would usually utilize the correct figures and time periods to maximize their claim amount. Mr. Mitchell added that errors in data entry would, every so often, pay out too much but that claimants were never "shorted" on their claim.



Interviewers next queried Mr. Mitchell as to the code of conduct at DHECC. Mr. Mitchell stated there was a formal code of conduct covering gifts, entertainment and conflicts of interest that all DHECC staffers were required to sign. Mr. Mitchell continued that he believed that those documents sufficiently outlined DHECC policy. Mr. Mitchell added that he could not say for certain if he or any other staffers received further guidance in that area from DHECC.

Mr. Mitchell was then asked if he knew of any instances of conflict of interest or improper gifts being given. He responded that he did not and the closest event that he could recall involved DHECC auditors who were former Postlethwaite and Netterville ("P&N") employees that were assigned to P&N's claim but that this was a non-issue as they removed themselves from the audit.

Mr. Mitchell informed interviewers that Mr. Fisher would periodically make requests for status updates even though the DHECC portal provides claims status information. Mr. Mitchell explained that Mr. Fisher would do this as a method of checking the system and verifying that the portal was showing correct information.

<hr>

6

SM-04-GL000103

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Interviewers next asked Mr. Mitchell if, to his knowledge, anyone at DHECC had attempted to expedite a certain claim. Mr. Mitchell responded that he had no such knowledge but that "every now and then" he and his team would come across a claim that had become "stuck" in the system and that they will bring it to the attention of P&N, who would then handle the claim as they saw fit.



Mr. Mitchell was next asked about the handling of underpayment and overpayments of claims. He stated that BrownGreer will correct an underpayment, if they catch it before the notice is sent to the claimant. Mr. Mitchell added that he was unaware as to the BrownGreer's procedure with regard to an overpayment of a claim.



Mr. Mitchell next stated that his team would send a detailed report to BrownGreer every Thursday, listing the exceptions they had found and, in turn, BrownGreer would examine those claims and present their findings at the Tuesday meetings and they would be discussed. Mr. Mitchell informed interviewers that Tuesday meetings included himself, Mr. Ollendike, Mr. Fisher, Mr. Mike Juneau, Mr. Sutton, Ms. Reitano and any members of Mr. Mitchell's team who composed a report in question. BrownGreer would be represented at these meetings by Mr. Atkinson, Ms. Petkauskas, Mr. Shrunk, Mr. Zola and others (in person and via telephone.) Mr. Mitchell added that the attendance from both sides varied from week to week.

Finally, Mr. Mitchell was asked if he had ever discussed subsistence or impairment zones with Mr. Sutton. Mr. Mitchell stated that he had not.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.


*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the

SM-04-GL000104

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

8

SM-04-GL000105

Steve Cirami (DOB 7/3/1972) was interviewed on June 27, 2013 at 935 Gravier Street, Suite 1905, New Orleans, Louisiana. After being advised of the purpose of the interview, Mr. Cirami provided the following information:

Mr. Cirami is employed by The Garden City Group (GCG) as the Senior Vice President of Operations. He has been employed at GCG for approximately nine and one half years. GCG is a vendor in the Deepwater Horizon Economic and Property Damage Settlement. He, along with other members of GCG's senior management team (including, Neil Zola, Jennifer Keough and Christi Cannon), oversees the GCG role in the project from front end to back end. GCG provides call centers, data center, document intake, data entry and payment of claims as well as various projects as directed by the Claims Administrator.

Mr. Cirami has never heard of Casey Thonn and he is not familiar with his claim. Up until the recent events, Mr. Cirami may have heard the name Jon Andry, but couldn't tell you anything about it.

Mr. Cirami has had very little individual contact with Tiger Sutton. He has attended several meetings with Sutton.

Approximately two weeks ago, Christine Reitano e-mailed him and copied Tiger Sutton on the e-mail. She asked a general question. Can a claimant be paid by wire if they didn't originally elect for wire payment? He wrote back and answered yes, and then explained the process. He directed them to complete a Payment Election Form, but that payment is only wired to the attorney's IOLTA account. Most attorneys have an IOLTA account. This policy and practice had been previously approved by Mr. Juneau. Tiger Sutton responded to his last e-mail that the claimant is the lawyer but doesn't have an IOLTA account, can you do it anyway. Mr. Cirami took that to mean the claimant couldn't or didn't want to use an IOLTA account because it was his claim, not one of a client. Mr. Cirami stated the questions didn't seem unusual at the time. Mr. Cirami answered Tiger Sutton by indicating that it was Mr. Juneau's policy, they had made no exceptions and he could ask Mr. Juneau about it, directing him to Mr. Juneau. Tiger Sutton did not respond to that advise. Mr. Cirami advised that the exchange was all via e-mail and involved no verbal discussion. There was no mention of the claimants name or claim number. This was the only contact he had with Tiger Sutton outside of widely attended meetings.

On June 26, 2013, Christina Hendrick (DOB 11/2/1982) was interviewed at 935 Gravier Street, Suite 1905, New Orleans, Louisiana by David Welker, regarding allegations of misconduct against Lionel H. Sutton III, aka Tiger Sutton. After being advised of the purpose of the interview, Ms. Hendrick provided the following information:

Ms. Hendrick began working at the Deepwater Horizon Economic and Property Claims Trust (DHECC) in August 2012 in the role of the Court Appointed Distribution Agent (CADA), which is the Mutually Agreed Upon Party Responsible for the Administration and Distribution of funds for the Subsistence Program. Prior to her employment at DHECC, she worked for approximately two years at an engineering firm, CDM Smith, as a disaster recovery grants manager. She noted that her secondary role at the DHECC was the policy reviewer and policy keeper in which she reviewed all Claims Administrator's office policies that were circulated after her date of hire, before they were sent to Mr. Juneau.

Ms. Hendrick advised she had nothing to do with the Casey Thonn claim and in fact had never heard of Casey Thonn. She was rarely asked about individual claims and was more often asked firm wide questions relating to law firms. She never heard of Jon Andry and can't recall firm wide issues relating to the Andry Law Firm. She could not recall any communications with the Landry Law Firm either. She has never heard of Glen Lerner and has never dealt with Andry Lerner LLC.

She advised that Tiger never came to her to specifically influence a policy. In most cases, with policies in general, all policies were commented on by employees at Brown Greer, the Director of Fraud, Tiger, and the legal committee. No one has had specific individual influence in the subsistence program. She recalled a specific instance relating to impairment claims from Texas. She asked the parties for input into the proposed policy. Tiger wanted to take a minimalist approach, requiring only one or two documents to comply with the policy. She wanted a more stringent approach requiring more documents and proof. She went with her approach. Once complete he agreed with her approach. Tiger only reviewed two claims administrator program-wide policies (that she was aware of) and in fact he was only copied, she doesn't know if he read them. She advised there were only five approved polices in the subsistence program with one still pending approval. Tiger only had simple word changes and suggestions to clarify sentence structure for most policies. Some policies were open to discussion regarding fairness or implementation, but all were reviewed by pertinent and applicable personnel, not Tiger Sutton alone. If there was a disagreement, she asked him to take it to the entire legal committee for roundtable input. She wanted to open all policies to additional review by others to include fraud, appeals and the legal committee. All conversations she had with Tiger regarding policies that contained some question, she would always seek input from an appropriate entity such as fraud, appeals, or someone at Brown Greer on the subsistence team.

The only individual claims inquiries came from the Mills Law Firm. They called directly to Tiger instead of her. Tiger was friends with an attorney at the Mills firm whose name was Kenny Prejean or Dejean. He did not ask her to treat them any differently. He told them maybe some of their clients may not get paid. He told them maybe some of their clients may not get paid. He told Kenny Prejean or Dejean that they were helping their clients as much as they could but he didn't know what else he could do for them. One other instance she could recall where an individual claimant came to them from an e-mail

SM-04-GL000739

directed to Mr. Juneau. There was no appearance of evil or that it wasn't legitimate. She felt that Tiger was always pushing for leniency, generally on the whole subject of subsistence and not targeting any claim specifically when discussing policy, but the program as a whole.

Tiger never told her that he may have had a financial interest in any claim.

She has never done anything with a claim as a favor to someone. She in fact has only looked at a few claims as a result of telephone calls requesting assistance. She has checked the status of maybe three claims which she referred to the appropriate group in Brown Greer. On each occasion she was legitimately assisting a claimant.

SM-04-GL000740

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Robert Levine |
| Title: | CFO |
| Office: | DHECC CAO |
| Date/Time: | 8/8/2013 3:57pm |
| Attendees: | Tim Flynn, Walt Donaldson, Dennis Shenberger |
| Location: | 935 Gravier St., New Orleans, LA  70112 |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP.  We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP.  We do not represent you, Robert Levine.

On the above date and times Robert Levine was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Levine was asked if Lionel Sutton ever discussed Romeo Papa with him. He replied, "Never." When asked if he knew what Romeo Papa was, he stated that he only found out after Mr. Sutton was gone. He knows about it now because Dave Welker came to him and had some questions about where to find ownership details on tax returns. Mr. Levine is a CPA and showed him where to find the ownership information on the partnership returns and K1 forms. During this process, he became aware of the relationship between Romeo Papa and Lionel Sutton.

In addition, Mr. Sutton never discussed the Casey Thonn claim or any other possible conflicts of interest with Mr. Levine. The only other conflict that Mr. Levine was personally aware of was when Kayla Frey came to him after discovering that her father, a farmer, had filed a claim. Mr. Levine verified that she did not have an interest in the claim and then told her that she did not need to worry about it, but instructed her to inform David Odom.

When asked about ███████████████████ Mr. Levine stated that he does not know the name.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed.  Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription.  These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues

SM-04-GL001305

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

for the Special Master Investigative Team.  These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client.  These notes are privileged as both an attorney-client communication and as attorney work product.

2

SM-04-GL001306

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Welker, David |
| Title: | Fraud & Waste |
| Office: | CAO |
| Date/Time: | August 6, 2013, 8 AM – 12:15 PM |
| Attendees: | Walt Donaldson, Frank Piantidosi, Ben Scotti |
| Location: | Eastern District of Louisiana Federal Courthouse - Judge McNamara Chambers |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Mr. Welker.

On the above date and times David Welker was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Welker began the interview by explaining how the Tiger Sutton revelations came about. An individual approached him on Tuesday, the 28th of May and indicated that he/she had some information to turn over to Mr. Welker as long as Mr. Welker provided assurances of complete confidentiality. Mr. Welker described this persons' motivation in coming forward as honorable: to protect the program and protect Mr. Juneau. Mr. Welker agreed to the confidentiality request and the individual indicated that he/she had received the information second hand from another individual that actually didn't know that he/she came forward – this meant there was no going back to the other individual to obtain additional information. The person also indicated he/she would go to BP with the same information. The informant did not present Welker with any physical information. The information that was relayed to Mr. Welker was as follows: (1) that Tiger had claimant clients that he had represented prior to joining the settlement program and had referred these claimants to John Andry and that in return, Tiger would get referral fees on these claims; (2) that Tiger was involved in policy making and that he was influencing policy to benefit his attorney friends in the area; (3) that Tiger opened a separate bank account for the kickbacks; and (4) that Tiger and Andry had been in business together and that he has attempted to influence a claim made by the Andry law firm.

Mr. Welker stated that, based on this information, he went to the CEO David Odom and also to the CFO Bob Levine and said "I need to talk to you about this issue." This was on Tuesday, May 28 and Juneau was out until Thursday, May 30. So in the interim, Welker went into the system to look at the files - he

SM-04-GL001307

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

went in and reviewed about 10% of the Andry claims, which were approximately 43 different claims. After the GCCF ended and after the transition period, all claims were migrated to the new system, so now after the migration, Mr. Welker stated that there are twice as many claimants. At the outset, he looked to see if Tiger represented any of these claimants. Mr. Welker came upon one claimant, Casey Thonn, and spent a number of days going through his files. He does not recall if the informer he spoke to mentioned Casey Thonn. Mr. Welker speculated that finding the Thonn claim may have been the result of his name appearing early on the list he was reviewing.

On Thursday, May 30, when Mr. Juneau came back into the office, Mr. Welker met with Mr. Juneau and told him of the recent revelations. David Odom, David Levine and Pat Juneau were all present during this meeting. Mr. Welker informed Mr. Juneau that the individual informant claimed that the problems were systemic and involved multiple claimants [however Mr. Welker explained during his interview that what he looked at didn't appear to validate or substantiate the claims by the individual who came forward stating that the problem was rampant]. Mr. Juneau's response at this point was that he wanted more evidence, something more than the one incident or claim by a confidential informant who made an anonymous allegation based upon statements from a third party. After hearing this, Mr. Welker stated that he continued to pull together information and had Chris Reade pull documents up through the middle of the following week. Mr. Welker then had some personal commitments and did not get a chance to speak to Mr. Juneau until the week of June 10 regarding the additional developments. In the meantime, on the day before Mr. Juneau returned, Mr. Welker reached out to the Federal Bureau of Investigation (that Wednesday May 29th) and wanted to know what category of criminal conduct this behavior would fall under, whether it was business bribery of some sort - it didn't appear to be a quid pro quo. Mr. Welker sensed that Mr. Juneau was not too happy that Mr. Welker went to the FBI before speaking to him. Regardless, Mr. Welker informed Mr. Juneau what he now knew after his continued research.

On June 13th, both Pat and Mike Juneau confronted Mr. Tiger Sutton to look into his eyes and ask him directly. However, there was no immediate action. The week after that confrontation, BP requested a meeting and they met BP on 17th of June. Again, it was on the 13th of June that Sutton was confronted and then denied the allegations/evidence against him. However, after the BP meeting on the 17th of June, Mr. Sutton was suspended on the 19th of June and then came in to see Pat, Mike and Mr. Welker on the 20th of June to tell his story. This meeting was the one in which Mr. Welker served as the scribe.



2

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



Mr. Welker stated that there is less of a chance of paying a false claim now than under the GCCF. Virtually every prosecution right now around the country involves GCCF money.



3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



4

SM-04-GL001310

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the

5

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client.  These notes are privileged as both an attorney-client communication and as attorney work product.

6

SM-04-GL001312

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: Marea Herrington
Title: Consulting Manager
Office: Postlethwaite & Netterville
Date/Time: July 30, 2013/1:00 p.m.
Attendees: Greg Paw, Tim Flynn, Mike McCall
Location: 935 Gravier St., 14th Floor, New Orleans, LA

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you [Marea Herrington].

On the above date and time Marea Herrington was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Herrington received her bachelor's degree from Mississippi State University and her master's degree from the University of Tennessee. Prior to her employment at Postlethwaite & Netterville (P&N), she had spent most of her working life in the field of federal student financial aid, working with such institutions as secondary schools. P&N, which is involved in financial aid consulting, was a recent client of hers, and that engagement led to P&N offering her a position as a full-time employee in November 2012. She has worked on the Deepwater Horizon project exclusively since joining P&N as an employee.



During the training on conflicts of interest, Ms. Herrington learned that she was required to report any contact with a claimant in the Court Supervised Settlement Program (CSSP). She advised the interviewers that she is not from the local area and has no relationships with people in the area. She also is in the habit of not "advertising" what she does for a living.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

She has not experienced any of her subordinates coming to her to discuss an actual conflict of interest. There was one conversation, with one of the team leads who is now on the Claims Administration Team, Kyle Martin; however, this conversation was not about an existing conflict of interest, but was more "preemptive" in nature.

Ms. Herrington's responsibilities with P&N have continued to evolve based on the needs of the project. Initially serving as a manager on a Business Economic Loss (BEL) team, Ms. Herrington soon began training other teams. She trains P&N personnel only. She does not know what P&N's turnover rate is for employees on the project, but does not believe that P&N is experiencing a high attrition rate.

Ms. Herrington sometimes has contact with personnel from other DHECC vendors, such as PwC and BrownGreer, mostly in scheduled meetings or when an issue arises with a claim which requires coordination to resolve. The nature of interactions among the vendors involved in claims processing varies with the type of issue involved, but Ms. Herrington has never witnessed representatives of any of the vendors behaving in a manner which she considered less than professional. The general spirit is one of cooperation in order to reach the right decision. Ms. Herrington reports directly to Marc Staley, a director and partner at P&N. She, in turn, directly supervises five senior analysts: Kyle Martin, Angelo Lassey, Logan Pousson, Matt Mick and Alex Prejean. Each senior analyst supervises four or five claims analysts.

Chris Rinaldi was a claims analyst under Ms. Herrington's supervision until approximately March 2013. Mr. Rinaldi moved to another team not supervised by Ms. Herrington due to a structural change. Ms. Herrington is not familiar with a claim for the Andry Law firm that Mr. Rinaldi was working on while he was under her supervision. She does not recall ever hearing of a discussion of a particular claim occurring between Mr. Staley and Mr. Rinaldi. Mr. Staley never mentioned to her that he had talked to Mr. Rinaldi about a claim that needed special attention.

Ms. Herrington is familiar with a procedure whereby, when a claim needs additional attention, the accountant for the claimant e-mails information about the claim to a particular mailbox. She is not aware of instances of such information being mishandled, and specifically not regarding claims handled by Chris Rinaldi.

Mr. Staley has never spoken to Ms. Herrington regarding someone from the Claims Adminstrator's Office (CAO) making inquiries to him about a specific claim, nor has Mr. Staley mentioned Lionel Sutton talking to him about a particular claim.

She has no knowledge of a claim filed by or for a claimant named Casey Thonn.

The only time Mr. Staley ever asked Ms. Herrington about a claim was regarding a reconsideration of a claim for Perone's [phonetic] Restaurant. She does not know how many people with similar positions to hers Mr. Staley supervises, but there are four other members of the senior staff who report directly to him.

2

SM-04-GL001314

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Ms. Herrington receives inquiries from Mr. Staley about the status of particular claims practically every day. She almost never receives such inquiries from the CAO front office. If someone from the CAO wished to speak with an analyst directly about a claim, Ms. Herrington would be "upset." It is her view that analysts should not talk to anyone outside P&N. A protocol to this effect has been in place at P&N since before Ms. Herrington began working there. Ms. Herrington would have no problem, however, if Mr. Staley contacted one of her analysts directly about a claim.

Ms. Herrington stated that P&N is "the best place I have ever worked," and that she has no problems or ethical concerns with anything P&N has ever done. While she has had little contact with the CAO, she has not seen anything that troubles her there, either.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.


*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-GL001315