# EXHIBIT C

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Kailey LeBoeuf |
| Title: | Attorney |
| Office: | Andry Lerner Law Firm |
| Date/Time: | August 2, 2013, 10 AM |
| Attendees: | Greg Paw, Steve Tidwell, James Cobb, Jr. (Attorney for LeBoeuf) |
| Location: | Judge McNamara's Chambers, US Courthouse, New Orleans, Louisiana |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Ms. LeBoeuf.

On the above date and time, Kailey LeBoeuf was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Before commencing the interview, Ms. Kailey LeBoeuf was advised that she was expected to answer, truthfully and honestly, to members of the Special Master team serving as officers of the court. She was warned concerning committing perjury and any penalties that could follow, under 18 U.S.C. Section 1001.

Ms. Kailey LeBoeuf was accompanied to her interview by her attorney, James Cobb Jr. Mr. Cobb is the attorney for the Andry Lerner Law Firm and its employees.

Ms. LeBoeuf stated she is currently employed by the Andry Lerner Law Firm. Since February 2012, she has had a dual practice with both Andry Lerner Law Firm and the Andry Law Group. She noted that she also had assisted on the DHECC claim appeal made by the Andry Law Firm.

Her duties consist of meeting with clients, reviewing law firm work, and general legal duties. With DHECC claims handled by the Andry Lerner Law Firm, her primary responsibilities are eligibility notices, appeals and accounting matters. She currently reports to Christine Mancuso. She regularly works claims accounting matters with the Coastal Claims Group and other accounting firms.

She is familiar with the DHECC claims of Casey Thonn. The first claims she worked on for Mr. Thonn was post reconsideration of a boat claim. In December 2012, Ms. Mancuso assigned her a seafood claim of Mr. Thonn's. Previously, Ms. Mancuso had led the reconsideration work. She recalls one meeting with Mr. Thonn, specifically, where he was required to sign proposal forms. Ms. LeBoeuf believes there may have been one or two more meetings. She did not know the terms of engagement until she found out,

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

several months ago, that Christine Reitano had been the one to transmit the Thonn package. She does recall speaking with Mr. Thonn on the low amount eligibility on his boat captain claim. After working with the accountants, it was discovered that Coastal Claims Group had made an error and a larger eligibility amount went to Mr. Thonn.

Regarding any attorney referral agreements, she learned of the referral fee agreement concerning the Thonn claim several months ago. She is not certain where any referral fee agreement process would begin. She is not involved in the process. Normally, there would be a note in the file regarding any such agreement. Also, in a database for claims operated by Andry Lerner Law Firm, there is a field for comments where the referring attorney's name is usually found.

Ms. LeBoeuf advised that law firms handling DHECC claims are allowed to have portal accounts to access the claims database. Additionally, each firm has a point of contact at the DHECC. Currently, the point of contact she deals with is Nikita Ash. Her contacts with Ash vary based on the complexity of her problem or concern. She also calls concerning the length of time a claim might be in a certain stage.

Regarding any legal fees for Casey Thonn's claims, she said that she generally does not deal with that as one of her duties. Ms. Mancuso regularly looks at the accounting sheets for settlements. However, she has recently been given that duty, also.

Ms. LeBoeuf does not know and has not met Lionel Sutton. She is aware that Jon Andry went to law school with Mr. Sutton. She does not know and has never met Christine Reitano. She has never heard of Crown LLC or Romeo Papa. She does not know anything regarding the current status of Andry Lerner Law firm and Mr. Sutton.

Mr. Cobb asked a series of questions of Ms. LeBoeuf to which she responded that during her time at Andry Lerner Law Firm she did not attempt to influence Casey Thonn's claim; she did not hear anyone at the firm attempt to influence his claim; and she did not hear anyone at the firm was "wired into" the DHECC or any other involved vendor or entity.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-GL000040

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Christina Mancuso |
| Title: | Toxic Tort Litigation Attorney |
| Office: | AndryLerner |
| Date/Time: | August 7, 2013 9:00 AM |
| Attendees: | Walt Donaldson, Steve Tidwell, Laure Kirk, David Courcelle (attorney for Mancuso) |
| Location: | 935 Gravier S., New Orleans, La. 70112 |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Christina Mancuso.

On the above date and times, Christina Mancuso was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Mancuso was advised concerning the need for truthfulness and honesty and was further advised concerning the penalties for perjury under Title 18 USC section 1001. She was further advised that she would not be adjourned as a witness and could be recalled.

As the questioning began, Ms. Christina Mancuso, with her attorney, David Courcelle, present, said that she was a Toxic Tort Litigation Attorney in Dallas and New Orleans and at the time she worked in Texas. She explained that she graduated from Baylor University, in Waco, Texas, in 1984. Following her graduation, she said that she worked at several law firms such as Earhart Rubble Jennings Law Firm, and at Richard Matlock Andrews Law Firm, which was a patent and trademark firm. She also worked at Bear and Bunn, from about 1990 to 2006.

Ms. Mancuso said that she started working in New Orleans in 2011. She explained that Lamie Pool, a former partner of hers, had called asking her to come to work on claims and set up the claims management process with the Andry Law Firm. This would have when the GCCF was ending and the DHECC settlement was transitioning. Ms. Mancuso advised she stayed with the firm when it became the Andry Lerner Law Firm.

Regarding the Casey Thonn claim, Ms. Mancuso said that the first time she became involved with this claim based on a telephone call from Christine Reitano. During the call, Ms. Reitano told Ms. Mancuso she was sending two claims on a disc for referral to Andry Lerner. She does not recall if there was actually another claim, other than Mr. Thonn's, on the disc. Ms. Mancuso said that Ms. Reitano

1

requested she have Andry Lerner honor the attorney percentage, for Ms. Reitano, in the Thonn contract, as set forth as a fee agreement, in that contract. Ms. Mancuso recalled that she sent Ms. Reitano an attorney referral contract packet. She also recalled that she sent an Andry Lerner claimant attorney referral contract to Mr. Thonn with the same percentage requested by Ms. Reitano. When asked if a contract is always sent to the claimant, Ms. Mancuso said that some lawyers do and others do not. Ms. Mancuso was unaware if Ms. Reitano ever returned the signed referral contract. In the Andry Lerner process, that would not be a role she would handle.

Regarding Lionel Sutton, Ms. Mancuso reported she did not know Lionel Sutton, at all. She explained that if there is a significant transaction or notice in a claim, that attorneys, with referral fee agreements, are notified come on now by being copied on the letter. Ms. Mancuso added that she normally keeps in touch with referring attorneys. She does not believe that referral attorneys are copied, regularly, on incomplete notices to the claimant. Ms. Mancuso described that the Andry Lerner claims database list the referring attorney on each claim. Any attorney or employee, in the firm, can go into the database to verify the referring attorney.

Ms. Mancuso explained that it can be a complicated system with the seafood claims, such as the Thonn claim. When shown documents detailing the Thonn claim, she noted, that his appeal included a 1040 schedule C with approximately $110,000 for fishing revenue. If the trip tickets only showed about $452 for 2009, but his subsistence claim reported approximately 1,800 lbs. of shrimp. As that did not reflect the revenue, Ms. Mancuso explained that the trip ticket system, in Louisiana, Mississippi, and Alabama, can be faulty because seafood vendors to whom the shrimp or fish is sold turns in the tickets to the state. The fisherman does not turn in the trip tickets. She noted that Claims Administrator Office has an affirmative duty to provide the highest settlement payments possible to the claimants. Andry Lerner regularly uses the claimant's tax returns, instead of trip tickets to properly calculate the claimant's payment. She noted that many shrimpers and fisherman sell their cash directly utilizing a fresh product license. In her experience, Ms. Mancuso reported that shrimpers generally receive a reduced settlement payment.

When asked, Ms. Mancuso said that the accounting group that Andry Lerner uses, Coastal Claims Group calculates the projected totals, utilizing a cost percentage of the vessel owner/boat captain combination as opposed to if they are a boat owner, only. In Thonn's seafood claim, Coastal Claims Group miscalculated producing a lower settlement payment. In appealing for larger amount, she confirmed that in April 2013, they lost the appeal on Thonn's claim because of the way the settlement was finally interpreted by the claims administration office. Regarding all of thoughts claims, Ms. Mancuso said that Thon received less on every settlement claim of his, claim except for the VoO claim.

Ms. Mancuso said that, in her capacity, she met with Mr. Thonn when he brought requested documents. She said that if someone called him, to come in, it was probably someone that she supervised. When asked how many employees she supervised, she said 3 to 4, at any given time. She stated her only action in the referral fee agreement was that she transmitted the referral fee agreement to Ms. Reitano via email. Ms. Mancuso said that she did not recall if the Andry Lerner claims database showed Mr. Sutton or Ms. Reitano as the referring attorney. She explained that she was not part of the process when the referral fee goes to the attorney. Ms. Mancuso said that the Andry Lerner Office Manager, Kay Perkins, may be the one to send out the payments, but that she did not know.

Ms. Mancuso confirmed again that she had never known or met Mr. Sutton. Regarding Ms. Reitano, she did recall she had two or three conversations with Ms. Reitano, generally regarding whether Ms.

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Reitano had or had not sent the disc with the claims and there were no conversations after that.

When asked, Ms. Mancuso said that she did not know anyone at Andry Lerner that influenced or accelerated a claim, and she said that no one had violated any code of conduct. Ms. Mancuso stated, when asked, that she had never heard anyone at Andry Lerner Law Firm was "wired into" the DHECC Claims Administration Office or any of the court appointed vendors. Her attorney, Mr. Courcelle, was asked how to request the Thonn contract referral agreement, he replied that if it was not in the Special Master's subpoena to Andry Lerner Law Firm, to contact him. Ms. Mancuso said that she never heard anything about Ms. Reitano or Mr. Sutton that gave her pause, and she said that she did not even know that "Tiger" Sutton was Lionel Sutton until the story came out in the paper.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

## Deepwater Horizon Court Supervised Settlement Program ("CSSP")
## Special Master – Independent External Investigation
## Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Leslie Butler Tate |
| Title: | Claims Coordinator, Coastal Claims Group |
| Office: | 3229 36th St, Metairie, LA 70001 |
| Date/Time: | August 8, 2013, 1:00pm |
| Attendees: | Steve Tidwell, Greg Paw |
| Location: | Judge McNamara's Chambers, US Courthouse, New Orleans, LA |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and time, Leslie Tate was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Before commencing the interview, Ms. Tate was advised that she was expected to answer, truthfully and honestly, to members of the Special Master team serving as officers of the court. She was warned concerning committing perjury and any penalties that could follow, under 18 U.S.C. Section 1001.

Ms. Tate stated she started working for the Andry Law Group in November 2010. She continued her employment with Jon Andry through November 2012, finishing with the Andry Lerner Law Firm. She advised that her recollection regarding Jon Andry was that there was a time that Gibby Andry, Jon Andry's brother, and Jon had a falling out while practicing together as the Andry Law Group. At that time, Gibby Andry moved out of the building. She was unaware of what caused the falling out. She advised that the third floor of the building was occupied by Christine Reitano and Lionel "Tiger" Sutton. She never met or saw Mr. Sutton. The only time she met Ms. Reitano was when she visited the third floor of their shared office building to ask when Mr. Sutton and Ms. Reitano would be moving out of the building. Her best recollection was this would have been sometime in October 2011. Her understanding regarding Jon Andry's law firms is that he owns Andry Law Group; Andry Lerner Law Firm (with Glenn Lerner); and, Andry Law Firm.

At the time she joined the firm, there were only three employees in the firm. She is not a paralegal, but, performs paralegal duties. There were approximately 50 Gulf Coast Claims Facility (GCCF) claims being handled by the firm. She was tasked with taking the lead on the GCCF British Petroleum (BP) claims documents. When the current CSSP Deepwater Horizon Economic Claims Center (DHECC) and Claims Administration Office (CAO) were established as part of the claims settlement agreement, she stated Jon Andry formed a law firm, the Andry Lerner Law Firm with Glen Lerner. Andry Lerner strictly handled BP

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

claims during her tenure, there. Ms. Tate advised that toward the end of her time there Kay Perkins became the Office Manager and handled the claims settlement accounting. Glen Lerner would be in the office, occasionally, and she recalled there were approximately 10 staff meetings that he held. Susan DeSantis joined the firm sometime before the current CSSP settlement was final.

Regarding the Casey Thonn CSSP claims, she recalls being told by Jon Andry that the Thonn claims case would be coming into their firm. At this point in the interview, Ms. Tate was shown (1) Thonn DHECC claims details documents and (2) Andry Lerner letter to the DHECC regarding a Vessel of Opportunity (VoO) settlement matter and an accompanying e-mail chain. She recalled that Casey Thonn made numerous telephone calls to her and that he came to the office on several occasions. In her capacity at Andry Lerner, she had access to the attorney portal in the DHECC to check claims status and run relevant reports. Portal access was granted by the DHECC and there was a process for law firms to set up access and IDs for employees. She recalls that Thonn had called several times regarding his VoO claim settlement. She contacted the Andry Lerner DHECC point of contact, Brian Harvey. He told her the claim showed paid in the data base and she told him Thonn had not received it. For a period of time, Thonn still did not receive his payment and when she called Harvey, the claim always showed paid. Thonn eventually received the payment.

She left Andry Lerner, on good terms, to join Coastal Claims Group (CCG), an accounting firm that specializes in handling claims settlement/payment accounting support for claimants and law firms representing claimants. Kevin Ingram, her fiancé is a CCG employee. Andry Lerner is currently a CCG client.

Regarding the e-mails shown to Ms. Tate, she advised that there was not a referral agreement contract with Mr. Sutton on the Thonn claims. She recalls that there were referral agreement contracts with other law firms. Generally, depending on the degree of involvement of the referring attorney, the attorney split on a referred claim settlement was 60% Andry Lerner and 40% referring attorney. The Thonn claim with a Sutton referral fee was the only one without an agreement contract while she worked at Andry Lerner. She stated that this troubled her. She maintained a master spread sheet on all claims that tracked pertinent events and details, including information on referral attorneys. She regularly updated referral attorneys on communications regarding claims. She does not recall what prompted her to send the email, what event caused her sending the email, does not recall Jon Andry or Glen Lerner giving her specific guidance. She does not remember exactly what Mr. Sutton's status was on the claim referral. Christine Mancuso also kept up on attorney referrals communications and status. Ms. Tate recalled that referring attorneys would handle direct client relationships and were expected to work for their 40%. She could not recall Mr. Sutton performing any work on the Thonn claims. She believes the Thonn GCCF claims were emailed to Andry Lerner possibly to Christine Mancuso. Ms. Tate believes she most likely would have had to ask Jon Andry for guidance on referral fees to Mr. Sutton, but does not recall doing so. The Thonn VoO settlement claim did arrive and she believes it was sometime before she departed Andry Lerner, possibly around September or October 2012. She knew that Jon Andry and Glenn Lerner were acquaintances of Mr. Sutton. Jon Andry once commented to her, "Tiger Sutton wants a referral fee on Casey Thonn." From the way he said it, she thought that Jon Andry couldn't believe Mr. Sutton had asked. There was no further discussion between them.

Ms. Tate was asked about her knowledge of Mary Rubio, an Andry Lerner employee. She stated she did know her and worked with her. Rubio initially started as a part-time employee then took over some of Tate's duties. She knows that Rubio was a college graduate and had worked at Delmonico's restaurant prior to joining Andry Lerner. Ms. Tate does not know whether Rubio is an acquaintance of Jon Andry.

2

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Rubio does Andry Lerner's work with CCG in the CCG database. She believes Rubio is still employed with Andry Lerner but is on maternity leave.

In her employment at CCG, Ms. Tate recalls the Thonn claim appeal prior to the official process for seafood claims was established. For seafood claims, the revenue is decided by either tax returns or trip tickets. CCG did handle the Thonn claim that resulted in a higher settlement payment.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-GL000046

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee:   Susan DeSantis
Title:   Director of Business Operations
Office: Glen Lerner Injury Attorneys
Date/Time: July 30, 2012; 2:00 p.m.
Attendees:  Greg Paw, Tim Flynn, Mike McCall; W. Glenn Burns of The Willis Law Group, counsel for Ms. DeSantis
Location: 935 Gravier St., 14th Floor, New Orleans, Louisiana

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and times Susan DeSantis was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. DeSantis furnished the following information:

Ms. DeSantis has a BA in business administration, a Master's degree in finance, and a Six Sigma black belt.

She has served as Director of Business Operations at Glen Lerner Injury Attorneys since May 21, 2012. In that capacity she works on various projects outside the Glen Lerner Las Vegas office. She works in the Chicago and New Orleans offices of the firm. She has previously worked on a project for the firm's Minnesota office and worked briefly on some projects for Crown LLC, but is no longer doing any work for those two offices.

Ms. DeSantis met Mr. Lerner through a mutual friend with whom she used to work and who recommended her to Mr. Lerner. She had previously worked in contract management at a firm called Steifel [phonetic].

Her current specific duties involve helping the Lerner firm build its Chicago office and providing project management skills and high level analysis for the New Orleans office. Her project management duties include matching staff skill sets to available positions and managing the work flow. She works

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

exclusively on the BP project in New Orleans, specifically the filing of claims through the Andry Lerner firm.

Andry Lerner is a partnership, in which Mr. Lerner is one of the partners, per Ms. DeSantis' understanding. She does not know more than that about the structure of Andry Lerner. She works at 610 Barrone Street when in New Orleans. She knows that the Andry Law Group also has offices at 610 Barrone Street, as does another law firm that is not associated with Andry Lerner, as far as Ms. DeSantis knows. The attorneys in this latter firm are Kayle Leboeuf, Vion Douglas and Christine Mancuso. She does not know what other businesses are located at that address. She receives her pay through the Glen Lerner global account. She does not do payroll, so she does not know how the firm pays the rest of its staff.

Ms. DeSantis' residence is in Sarasota, Florida, but she travels almost constantly between Chicago and New Orleans for her job, and gets home about once every six weeks.

She has no involvement with any finance issues at the Glen Lerner firm, as she has no access to the firm's financial systems. If she is looking for her paycheck or a reimbursement, she deals with Jeff Cahill or Brook Channing, usually by e-mail.

She is Glen Lerner's only staff member in New Orleans.

Ms. DeSantis' very brief association with Crown LLC was to perform some administrative tasks, such as setting up spreadsheets and tracking. She worked at Crown for perhaps two weeks total, before her work in New Orleans "got swept up" with the BP project. She never discussed continuing to work for Crown, since Mr. Lerner said that she should focus on the BP project only. She does not know what happened to the work she did for Crown. She would draft documents and send them to Mr. Bryant and Mr. Sutton. She has met Mr. Bryant, but only worked with him via e-mail.

Crown is involved in filtering water from fracking and similar operations. While working at Crown she met Lionel Sutton, Joey Dartez and Mike Bryant, as well as one other individual whose name she does not recall. She had previously met Mr. Sutton, when she came to New Orleans in April 2012 to interview with Glen Lerner. Mr. Lerner had wanted her to meet some of the other people working with him, so she met Mr. Andry at 610 Barrone Street and Mr. Sutton in the evening at dinner. The purpose of these meetings was for her to learn what people in the firm were doing. Mr. Sutton explained that Crown was in the process of securing contracts and needed someone to help with structure, so that it would not be overwhelming when the business started to take off.

She has not been told about any issues at the Andry Lerner law firm. She is not aware of any issues between Mr. Andry and Mr. Lerner, and she stated that she would not know of such issues if they existed.

Ms. DeSantis was not paid a separate salary by Crown. She has always been paid by Lerner, and her salary has not gone up since she started working there.

SM-04-GL000054

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Ms. DeSantis' understanding of the corporate structure of Crown is that there are four partners: Mr. Lerner, Mr. Sutton, Mr. Dartez, and a fourth partner whose name she cannot recall. She does not know how Crown is doing business-wise.

The extent of Ms. DeSantis' knowledge about Mr. Sutton is that he was a partner in Crown; that he and Mr. Lerner went to law school together; and that he previously had a law firm with his wife, whom Ms. DeSantis met only once at dinner. She has not socialized with Mr. Sutton since the dinner. She did see him once at 610 Barrone Street about two months ago, when he was picking up mail. They had a brief, casual conversation on that occasion. Ms. DeSantis was aware that he was working at the DHEEC at the time, which she had heard about in approximately January of February of 2013. She does not know the details of Mr. Sutton's job at DHEEC, except that he does something with the "moratorium," and she does not know what that term means. She has never discussed Mr. Sutton's DHEEC work with him. She has on occasion received e-mails from Mr. Sutton with questions about the status of a "referral fee" and whether a check had been sent to Las Vegas for the claim of a particular client, Casey Thonn. Casey Thonn was a client of Andry Lerner before Ms. DeSantis began working in her current position. She supposes that all Glen Lerner clients with claims in the BP matter are Andry Lerner clients, so she assumes that Casey Thonn would be an Andry Lerner client, which handles the BP project.

Even though Ms. DeSantis is a Glen Lerner employee, she is assigned to work on the BP project. There is a database of Andry Lerner clients called "Client Profile." Casey Thonn is listed in this database. Client Profile contains contact information, documents, what was submitted to claims facility, and general information for all clients. It also contains attorney-client contracts, W9 forms, and Powers of Attorney. There is a space for noting the referring attorney, for the client, but Ms. DeSantis does not remember who the referring attorney was for Casey Thonn. She thinks it may have been Mr. Sutton, but she does not recall who told her that. She added that referring attorneys are always, by definition, attorneys outside the Andry Lerner law group.

Asked for more detail about her communications with Mr. Sutton regarding Mr. Thonn's claims, Ms. DeSantis explained that Mr. Sutton would ask if a check had been issued to Las Vegas for the referral of Mr. Thonn. All checks to the Glen Lerner firm were issued by the 610 Barrone Street office, but Ms. DeSantis does not know what name goes on the check. Part of her responsibility was to monitor all payments to the Glen Lerner firm. She would receive a scanned copy of all checks to the Glen Lerner firm, so she would know that a check was coming. Kay Perkins, the office manager, would talk to her about the analysis of claim payments. The check coming in would indicate for what claim the check was being issued. She remembers Mr. Sutton contacting her once before Christmas holidays and once shortly after January 1, 2013 regarding the checks. On each occasion there had been payments made. Ms. DeSantis had to confirm with Jeff Cahill that he had received the check. She does not know what happened after that, or how Mr. Sutton would be paid his money. She did not know whether, when Mr. Sutton would contact her, he already knew that a payment had been made; Mr. Sutton just asked if the referral fee for Casey Thonn had been sent to Las Vegas. Ms. DeSantis denied having any other role or any communication with anyone else regarding these checks. She does not know whether Mr. Sutton was issued any kind of payment, except what she has read recently from the stories about Mr. Sutton in

3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

the press. Mr. Lerner was copied on e-mails between Mr. Sutton and Ms. DeSantis about the checks, but she does not recall what Mr. Lerner said about the checks. Mr. Lerner did not give her any directions about the checks. [The interviewers requested copies of all e-mails Ms. DeSantis has pertaining to these payments.]

Ms. DeSantis has not had any communication with the Andry law firm regarding payments to Mr. Sutton, nor has Mr. Andry said anything to her regarding them. Mr. Sutton never sent Ms. DeSantis any analysis of the status of the law firm payments, but Mr. Lerner sent a status report of what had been submitted and commented that "we are dragging ass." Neither Mr. Sutton nor anyone else ever asked Ms. DeSantis about the status of a particular payment on the claim of a particular client.

Neither Ms. DeSantis nor anyone else, to her knowledge, ever contacted Christine Reitano about Ms. DeSantis working at Glen Lerner Injury Attorneys.

Ms. DeSantis agreed to furnish to the interviewers all her e-mails with Glen Lerner, Jeff Cahill or Brooke Hanning, whether sent directly or through secretaries, regarding payments to Mr. Sutton.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

4

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Mary Rubio |
| Title: | Claims Examiner |
| Office: | Andry Lerner Law Firm |
| Date/Time: | August 3, 2013, 10 AM |
| Attendees: | Matt Dolan, Steve Tidwell, James Cobb, Jr. (Attorney for Rubio) |
| Location: | DHECC offices, 935 Gravier Street, New Orleans, Louisiana |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and time, Mary Rubio was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Before commencing the interview, Mrs. Rubio was advised that she was expected to answer, truthfully and honestly, to members of the Special Master team serving as officers of the court. She was warned concerning committing perjury and any penalties that could follow, under 18 U.S.C. Section 1001.

Mary Rubio was accompanied to her interview by her attorney, James Cobb Jr. Mr. Cobb is the attorney for the Andry Lerner Law Firm and its employees.

Mrs. Rubio stated that she has worked for Andry Lerner Law Firm since April 2012. She recently returned to work following maternity leave. For the two years prior to joining Andry Lerner, she worked as a waitress at the Delmonico restaurant in New Orleans. During her time at Delmonico, she became acquainted with Jon Andry, a frequent customer. Upon joining the firm, she was assigned to handle data entry for DHECC claims. At the time she began a job, she recalled there were approximately 500 claims. Sometime during her employment, she remembers being told that Lionel Sutton, Jon Andry, and Glenn Lerner are college friends. She knows Glenn Lerner to be Jon Andry's partner in the Andry Lerner Law Firm. During her time of employment, she recalls seeing Glenn Lerner approximately three times.

Mrs. Rubio is familiar with the Casey Thonn claims and has worked on them for Andry Lerner. She believes the claim came into the office around the time she started there. At that time, her supervisor was Leslie Tate. Following Tate, Christine Mancuso was her supervisor for a period of time. Her current supervisor is Kailey LeBouf. Mrs. Rubio does not recall any conversations or meetings with Thonn. She knew that Thonn had a fisherman claim and other claims. She does recall working an eligibility notice for his claim. On the fisherman claim, it was not uncommon for the initial settlement eligibility notice to be

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

low. She does recall working on the appeal on one of his claims and speaking with Tate regarding it. Mrs. Rubio does not recall anything unusual about the Thonn claims. In all claims, attempts are made to obtain the highest available settlement payment of the claimant. All that she knows regarding Lionel Sutton and Christine Reitano, is what she has heard and seen reported in the media regarding the allegations and current investigation.

Mrs. Rubio has never been employed by Brown Greer or any other DHECC court-appointed vendor companies. In her current work assignment with Andry Lerner, she does work with the Coastal Claims Group.

Mrs. Rubio does not know and has never been contacted by Sutton or Reitano. She has no DHECC claims. She has not had any conversations with anyone regarding attempts to influence or accelerate any claims. She is not aware of any attempts by anyone at Andry Lerner to "wire up" relationships with the DHECC Claims Administration Office or court-appointed vendors. Mrs. Rubio is not aware of anyone or anything that might be behind this matter.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

## Deepwater Horizon Court Supervised Settlement Program ("CSSP")
### Special Master – Independent External Investigation
### Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Stevenson, Scott R. |
| Title: | Sole Member |
| Office: | R. Scott Stevenson CPA, LLC |
| Date/Time: | August 29, 2013, 10:30 AM – 11:15 AM |
| Attendees: | Mike McCall, Ben Scotti |
| Location: | DHECC Claims Center, 14th Floor |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and times Scott Stevenson was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Stephenson stated that he is the sole member of his own CPA firm – the company name is R. Scott Stevenson CPA, LLC, and thus he is not an employee of the Andry Law Group. The group pays his CPA firm for contract type CFO services. Those services cover both the Andry Law Group and Andry Lerner LLC, in addition to some additional "light services" he performs for the LLC that owns the building – 610 Baronne Street. Mr. Andry is a member of that LLC. Mr. Stevenson reiterated that the work he performs for 610 Baronne Street LLC is nominal. He has had a relationship with the Andry Law Group since early January 2013. Mr. Stevenson had no business relationship with John Andry prior to this year but he has known Mr. Andry and his family all of his life – Mr. Stevenson's father was friends with Mr. Andry's father.

Mr. Stevenson explained that the terms of the Operating Agreement are such that when Andry Lerner receives the payout from the Settlement facility for a claim, attorney's fees are then calculated based on the contract between the attorney and the client, and then if there is a referring attorney there is a payout to that referring attorney. The balance of that attorney fee--not the amount paid out to the referring attorney but the remaining amount that is left over-- is used to pay for the Andry Lerner expenses payroll overhead. The entire amount that is left over is available to be used; that is to say that the net amount that stays with Andry Lerner is available to pay Andry Lerner expenses.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Stevenson does not know the split amounts between attorneys because the rates are negotiated between Andry Lerner and the negotiating referral attorney. He stated the splits are not consistent and vary from attorney to attorney.

While looking at a copy of the Operating Agreement and the exhibits attached to it, Mr. Stevenson explained that Exhibit A was not the split amount but rather an ownership interest of the partnership. He explained further that Exhibit B was in fact the split of future draws.

Mr. Stevenson did not deal with the receipt of any money from the Thonn claim. The collection was not handled by him. He mentioned that there are certain firm employees who handle those efforts, depending upon who is available when the payments come through. The person or person(s) would be Kay Perkins with either the assistance of Christina Mancuso or another firm attorney by the name of Kailey LeBoeuf. He stated that originally, he was not familiar with the Thonn claim at all because it was originally "below his radar," but he is now familiar with it because of the whole circumstances surrounding this investigation.

Mr. Stevenson then spoke about what he has come to learn since being scheduled for his interview. Mr. Stevenson stated that it was his understanding that the agreement between Andry and Lerner was such that when there was a Lerner referral there would be a 50-50 split of the fee, and in this specific case it was considered a Lerner lead. Mr. Stevenson's understanding of the way that fee was paid was consistent with the verbal agreement between Andry and Lerner as to fee arrangements on the Lerner referrals. As far as Mr. Stevenson knows, there is only a verbal agreement between Andry and Lerner – he has never seen a piece of paper that would indicate something other than this type of fee arrangement.

Mr. Stevenson mentioned that this split arrangement is not a standard split amongst other attorneys – he stated that each attorney negotiates his/her own referral fee split setup. This is his understanding of it, but he has never been a part of those negotiations. In terms of whether referral fee agreements are negotiated verbally or in writing, Mr. Stevenson stated that he doesn't believe there is a consistent method used when making referral arrangements. He stated it is not consistent and that there are some written agreements and some that are not.

Mr. Stevenson stated that he believed the employees who process the payment of referral fees know how much of a percentage that they are supposed to send to the referring attorney because the particular client's case file will contain the amount. He again reiterated that he is not involved in the day to day data collection or analysis. He is not sure of all the different ways that referral fee arrangements are handled internally.

Mr. Stevenson did not review the Thonn file, but he was merely asked to pull some cancelled checks from the bank records. He stated that he did not do all of the data gathering or conduct any drawn out analysis besides basically obtaining checks and dates. He did not look at the claim and the calculation of the claim amount.

2

SM-04-GL000060

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010.* 10-MD-2179 ("MDL-2179")

From what Mr. Stevenson saw, 50% of what was called for under the verbal referral agreement was paid out to Lerner's firm on the Thonn claim. Mr. Stevenson recalled that he saw a check that came in last year for about $4900, which would have presumably represented about 50% of the fee that came in.

In terms of the 50% of what the Lerner firm receives, Mr. Stevenson stated that he has no knowledge of what they do with it.

Mr. Stevenson explained that the 610 Baronne Street entity has no employees – it is an entity that just holds the property. It is only a building and a mortgage.

In terms of total employees, Mr. Stevenson said that Andry Lerner has 7 or 8 employees total, and they all are paid under one employer identification number (EIN). The tax reporting is done under that same EIN.

With respect to the Andry Law Group, Mr. Stevenson said that there are approximately 6 or 8 employees total, and they all are paid under a separate EIN. The tax reporting is handled under this same EIN.

Mr. Stevenson stated that John Andry offers benefits to his employees like health insurance, parking and disability. These benefits are all centralized on one policy that is paid by the Andry Law Group, and he is trying to get Andry Lerner LLC to pay its share of the cost of these benefits, because those employees are under a different payroll and different tax ID as explained previously.

Mr. Stevenson reiterated that there are two sets of employees that work in the same building but have separate EINs, but Andry Law Group has the comprehensive policy that provides health insurance for each of the entities and Andry Lerner LLC is supposed to pay Andry Law Group back for the cost associated for the payroll. The amounts paid out from each entity were not accurately accounted for previously, and so he is trying to become more pro-active about recording the real time costs of running Andry Lerner. Mr. Stevenson opined that if you don't report on one of the company's books, you are either understating the company's numbers or overstating on the other entities books and are not dividing up correctly and being accurate with your financial reporting.

With respect to the underlying payroll and taxes, there is no employee that Mr. Stevenson is aware of that is getting two paychecks from both of these entities, even if the employee performs work for both.

SM-04-GL000061