# EXHIBIT 4

# FILED UNDER SEAL

00039266

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>No. 12-970 | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

## DECLARATION OF STEPHEN J. HERMAN

I, Stephen J. Herman, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana, the U.S. Fifth Circuit Court of Appeals, and the U.S. Supreme Court.

2. James Parkerson Roy and I have been appointed by the Court to serve as Co-Liaison Counsel for Plaintiffs in MDL No. 2179 and Co-Lead Class Counsel for the Economic & Property Damages Settlement Class.

3. I have previously submitted a Declaration dated July 23, 2012 [Doc 7104-5], a Declaration dated April 1, 2013 [Doc 9087-3], a Declaration dated November 5, 2013 [Doc 11804-1], and a Declaration dated November 11, 2013 [Doc 11833-1], which are respectfully incorporated by reference herein.

4. I was both directly and indirectly involved in the Economic & Property Damages Settlement negotiations, as generally described in my previous Declaration of July 23, 2012 [Doc 7104-5], as well as Mr. Godfrey's Declaration of August 13, 2012 [Doc 7114-9].

Case 2:10-md-02179-CJB-DPC   Document 12170-2   Filed 01/17/14   Page 3 of 7

## Discussions Leading to the Creation of the Seafood Compensation Fund

5. I personally attended many, if not all, of the discussions leading up to the execution of the March 2, 2012 Agreement-in-Principle regarding the establishment of a capped yet guaranteed and non-reversionary $2.3 billion Seafood Program.[1]

6. At the time of those discussions, the Phase One Limitation & Liability Trial, originally set to commence on February 27, 2012 and continued for one week until March 5, 2012, was approaching. The Parties had reached agreement-in-principle on most of the compensation frameworks. However, the Parties were still relatively far apart regarding compensation frameworks for losses associated directly with the commercial fishing industry.

7. I specifically recall Mr. Godfrey and I believe others for BP taking the position that the uncapped frameworks being proposed by Plaintiffs at that time would result in aggregate payments that were in excess of many multiples of total annual revenue for the entire Gulf of Mexico commercial fishing industry.

8. At one point, one of BP's experts, Mr. Sider, showed us a PowerPoint presentation which purportedly demonstrated that some of the "earning capacity" (or "expedited") frameworks that were being proposed for shrimp vessel owners and captains in particular would result in an aggregate payout by BP of over $X billion dollars,[2] which was Y years of the approximate $475 million in annual revenue for the entire Gulf of Mexico commercial fishing industry.[3]

---

[1] *See* AGREEMENT-IN-PRINCIPLE, Section 3(b), which was ultimately finalized and approved as the Seafood Compensation Program and Seafood Compensation Program Settlement Fund as provided in Sections 5.2, 5.12.1.1.1, 5.12.1.3, 5.12.1.6.3, 38.127, 38.128, 38.129 and 38.130 of and Exhibit 10 to the Economic & Property Damages Class Settlement Agreement [Doc 6276 and 6276-22], as amended in the Amended Settlement Agreement [Doc 6414-6], as well as the Seafood Program Opt Out Terms [submitted under seal], and the clarification regarding the Express Reservation of "Private" Oyster Leasehold Claims, as provided in FAQ No. 196 and Appendix C of the Order and Judgment Granting Final Approval [Doc 8139, at 15].

[2] I am not sure what the number was. I don't believe I made any notes or obtained a copy of the presentation. Whatever the number was, it was being compared to Total Annual Gulf Seafood Revenue. I do not recall a dollars-per-claim projection with respect to Deckhands, nor do I recall that the figure was based on the number, nature or value of "Watts" or Deckhand Claims.

[3] This presentation may have occurred after the Agreement-in-Principle was signed, as Mr. Perry and Mr. Balhoff were deciding what the final Compensation Frameworks would be. But the comparison of what BP's experts estimated that BP would pay under some of the plaintiffs' proposed frameworks to Total Annual Gulf Seafood Revenue was in any event consistent with BP counsel's representations in moving from open uncapped frameworks to a guaranteed fund.

9. Because it seemed unlikely that the Parties would reach an agreement on specific uncapped frameworks prior to the commencement of the trial, BP proposed that we agree to a capped yet guaranteed and non-reversionary fund for the compensation of the commercial fishing industry.

10. Both leading up to this point and during the discussions over the size of the fund, the numbers that were driving the negotiations were primarily shrimp vessel owners and captains and oyster leaseholders and harvesters, and to a lesser extent crabbers and fin fishermen. I do not recall any emphasis being placed on either "Watts clients" or the claims of deckhands.

11. During the negotiations culminating in agreement on the $2.3 billion number, it is my recollection that BP consistently took the position that all commercial fishermen, including any and all eligible Deckhands, would be included in the Seafood Program,[4] irrespective of the number of eligible claimants who might or might not come forward with qualifying claims.

12. During the negotiations culminating in agreement on the $2.3 billion number, I always understood, anticipated and expected that all commercial fishermen, including any and all eligible Deckhands, would be included in the Seafood Program,[5] irrespective of the number of eligible claimants who might or might not come forward with qualifying claims.[6]

---

[4] BP consistently took the position that oyster leaseholder property damage claims would be included as well.

[5] Again, it was always my understanding, anticipation and expectation that oyster leaseholder claims would also be included within the Seafood Program.

[6] Presumably there would be some opt-out allowance, for which BP would be responsible. Neither the substance nor the mechanics of the Seafood Program Opt Out Terms had been negotiated at that time. But BP consistently insisted, and I always understood and expected, that BP would be protected by the Fund, even with respect to non-participating commercial fishermen (including deckhands) in some way.

Development of the Seafood Compensation Program and the Final Settlement Agreement

13. Between the execution of the Agreement-in-Principle on March 2, 2012 and the final Settlement Agreement on April 18, 2012, both Parties were making interested plaintiff lawyers, fishermen, industry leaders, experts, documents, data, proposals and other information available to Mr. Perry and Mr. Balhoff for their consideration in the creation of the Seafood Compensation Plan that ultimately became memorialized in Exhibit 10 to the Settlement Agreement.

14. I recall, during that time period, Ms. Bloom, Mr. Lennard and I believe Mr. Godfrey and perhaps others from BP expressing uncertainties about how many of Mr. Watts' clients were qualified to and/or actually would submit eligible Settlement Program Claims.[7]

15. In the development of the Seafood Compensation Plan, Mr. Perry and Mr. Balhoff, with the approval of BP, established internal $50 and $80 million limitations with respect to the aggregate Category II and Category III Deckhand Claims. Yet, in accordance with BP's commitment to a guaranteed and non-reversionary $2.3 billion fund dedicated to the Commercial Fishing Industry, it was understood and agreed by BP that if those internal aggregate caps were not reached by eligible Category II and/or Category III Deckhands, any and all excess amounts would be held in trust within the Fund and distributed to eligible Seafood Program Claimants.

16. In the finalization of the Economic & Property Damage Class Settlement Agreement, it was discussed, intended and expressly agreed that individual Seafood Program Claimants who executed an Individual Release would be vested with an interest in the remainder (if any) of the $2.3 billion Seafood Compensation Program Fund.[8]

---

[7] It was and is my understanding that BP was in the possession of database and/or hard-copy Short-Form Joinders, Complaints, Plaintiff Profile Forms (PPFs), and previous submissions to the Gulf Coast Claims Facility (GCCF), (and perhaps the original BP OPA Claims Facility), at that point in time.

[8] *See* Exhibit 26, ¶18(ii).

17. It was also negotiated and agreed by the BP Defendants that the guaranteed and non-reversionary $2.3 billion Seafood Fund would fall within a larger $3.5 billion non-reversionary minimum guarantee to the Class.[9]

### The Settlement Approval Process

18. During the settlement approval process, I had numerous meetings, telephone discussions and e-mail exchanges with BP Counsel, including Mr. Godfrey, Mr. Lennard, Ms. Bloom, and Mr. Neath. Among other things, we discussed the joint and separate briefing, presentation, argument and proposed findings regarding the appropriateness and sufficiency of the Seafood Compensation Program and the Seafood Compensation Fund under Rule 23(a), Rule 23(b)(3) and Rule 23(e).

19. In the Briefs and Exhibits I prepared, and with respect to the presentation and argument I made at the Fairness Hearing, the adequacy of the Seafood Compensation Fund was supported – not with respect to the number of potentially eligible Class Members, but – by the size of the Fund in relation to the aggregate revenue from (and known losses to) shrimp, oysters, crabs, finish and other species landed in the Gulf of Mexico on an annual basis.[10]

---

[9] *See* Section 5.12.1.3; *see also,* Exhibit 26, ¶18(ii).

[10] *See, in particular,* EXHIBIT A (*in globo*) [Doc 7104-1] (and Exhibit A Revision [Doc 7727-1]) *and* JOINT PROPOSED FINDINGS AND CONCLUSIONS IN SUPPORT OF APPROVAL [Doc 7945], pp.58-60; *see also, generally,* FINAL APPROVAL BRIEF [Doc 7104], pp.14-16; REPLY BRIEF [Doc 7727], pp.8-11, 42-48; TRANSCRIPT (Nov. 8, 2012), pp.46-49, 162-163; *see also,* JOINT PROPOSED FINDINGS AND CONCLUSIONS IN SUPPORT OF APPROVAL [Doc 7945], pp.8-9, 57-69, 197-205.

20. I don't recall BP Counsel ever suggesting during any of our meetings, telephone discussions or e-mail communications that the Seafood Compensation Fund or Program be further or alternatively supported based on the number of potential, actual, or eligible Deckhands or other Seafood Program Claimants – nor do I recall BP ever communicating any intention to do so in any of BP's briefing, argument or presentations.[11]

### Individual Releases To Date

21. I am advised by the Settlement Program that at least 5,281 Class Members have already executed Individual Releases in connection with (approximately 12,327) Seafood Compensation Program Claims.

Signed, under penalty of perjury, this 17th day of January, 2014, in New Orleans, Louisiana.

Stephen J. Herman

---

[11] Indeed, a review of the PowerPoint slides that BP provided to us in advance of the Fairness Hearing (and which, to the best of my knowledge and recollection, BP actually used at the Fairness Hearing) reveals: "$2.3 Billion Guaranteed" (BP Slide 6); "5 Times Annual Industry Revenue For 2007-2009; 19.2 Times Lost Industry Revenue In 2010" (BP Slide 7); "Seafood Compensation Program Size Relative to Industry Metrics" (BP Slide 8); comparison of Lost Industry Revenue to Average Industry Revenue to Estimated SCP Shrimp Compensation (BP Slide 9); comparison of Lost Industry Revenue to Average Industry Revenue to Estimated SCP Oyster Compensation (BP Slide 10); "The $2.3 Billion Guaranteed Payout Is Sufficient To Account For 34% Of The Present Value Of All Future Revenues Of The Gulf Seafood Industry" (BP Slide 11).