# EXHIBIT 5

# FILED UNDER SEAL

00039266

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * | MDL 2179 |
| BP EXPLORATION & PRODUCTION INC. and BP AMERICA PRODUCTION COMPANY, | * * * * | PERTAINS TO: No. 13-6674 |
| Plaintiffs, | * * | |
| versus | * * | SECTION "J" (1) |
| MIKAL C. WATTS, WATTS GUERRA, LLP. and | * * * | JUDGE CARL J. BARBIER |
| BON SECOUR FISHERIES, INC; FORT MORGAN REALTY, INC.; LFBP #1, LLC d/b/a GW FINS; PANAMA CITY BEACH DOLPHIN TOURS & MORE, LLC; ZEKE'S CHARTER FLEET, LLC; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD LUNDY; CORLISS GALLO; LAKE EUGENIE LAND & DEVELOPMENT, INC.; HENRY HUTTO; BRAD FRILOUX; JERRY J. KEE; JOHN TESVICH; and MICHAEL GUIDRY, on behalf of themselves and all others similarly situated, | * * * * * * * * * * * * * * | MAGISTRATE SALLY SHUSHAN |
| Defendants. | * * | |

### Declaration of Joseph F. Rice

I, Joseph F. Rice, respectfully declare, under penalty of perjury, that the following synopsis of the settlement negotiations that resulted in the $2.3 billion guaranteed Seafood Compensation Program is true and correct to the best of my knowledge, information and belief:

1. I am licensed to practice law in the State of South Carolina and the District of Columbia. I am admitted to appear before the United States Court of Appeals for the Fifth Circuit and the United States Supreme Court, among others.

2. I have negotiated and settled major class action litigation and complex matters with international corporations, including, for example the Tobacco Litigation (representing Attorneys General); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997); and *Ortiz v. Fibreboard Corp.*, 526 U.S. 815 (1999), as Class Counsel.

3. I previously submitted a Declaration Re: Overall Settlement Negotiations and a Declaration Re: Seafood Program, both dated August 10, 2012 [together, Doc 7104-6] which are incorporated herein by reference.

4. Early in the development of the class action litigation arising from the Deep Water Horizon Oil Spill, Calvin Fayard, on behalf of the Plaintiffs' Steering Committee ("PSC"), enlisted me to work with him to explore and develop settlement opportunities.

5. Discussions with BP were initially conducted in meetings held in a variety of cities throughout the world, including New Orleans, Chicago, New York, Charleston, London, Houston, and Washington, D.C., so that BP's lawyers, economists, and executives could explain and define for the PSC the issues and concerns necessary to a successful settlement from BP's perspective.

6. After these initial meetings and substantial progress, negotiations were brought to New Orleans, where the MDL was being conducted, trial preparation was underway, and the Court's assistance, particularly that of Magistrate Judge Sally Shushan, was available.

7. Throughout 2011 and the first several weeks of 2012, negotiations moved forward without consideration of separating losses and claims related to the damage suffered by individuals in the seafood industry from other individual economic loss claims.

8. The parties' discussions of a framework for resolving individual economic loss claims included assignments of Risk Transfer Premiums ("RTP's") as in the Business Economic Loss claims and the separation of claimants into classifications based upon the quality of documentation they could produce for both 2010 and relevant benchmark periods.

9. Because Mikal Watts and the firm of Watts, Guerra LLP had asserted claims for more than 42,000 persons, many of whom anecdotally fell into the category of transient workers with little documentation, terms such as "Watts' claims," "Watts' deckhands," and "deckhand claims" were adopted as the shorthand reference to all such claims.

10. BP made clear, repeatedly, that it assigned little or no value to the undocumented "Watts" claims. This had long been and was still BP's position in late February 2012, at the time that the overall framework shifted to include the separate, guaranteed Seafood Program.

11. In mid-February 2012 BP's position was that even upon providing sworn declarations from themselves and either a former employer or a sponsor, the final compensation to each such claimant should be capped at a maximum of $3000.

12. After Magistrate Judge Shushan was appointed by the Court to conduct shuttle diplomacy between the parties, and when the Phase One Limitation & Liability Trial was set to commence in just a few days, the suggestion of a separate, guaranteed fund for the Seafood Industry arose. In proposing a capped, guaranteed, and non-reversionary fund, BP made clear that resolution of the claims for damage caused to Gulf Seafood was so important that in order to achieve public acknowledgement that BP had taken responsibility for all actual and potential damage to Seafood, the company would guarantee that it would pay a substantial sum regardless of how many claimants ultimately submitted claims and shared in the guaranteed fund.

13. The $2.3 billion value of the Seafood Compensation Program was determined and agreed to, not on the basis of the number of claimants but on the basis of the annual revenue generated by the entire seafood catch for the Gulf. The oyster leaseholders and harvesters, shrimp vessel owners, boat captains, and fin fishers were the drivers in the discussions of the amount of the guaranteed fund. The size of the fund was not substantially influenced by other factors.

14. Negotiations based on identifiable individual claimants had been getting nowhere, and the idea for a guaranteed Seafood Compensation Program with a valuation based on the revenue generated for the total catch allowed the parties to quickly move toward the global settlement for the class that was agreed to in principle on March 2, 2012 and preliminarily approved on April 18, 2012.

15. An issue in finalizing the guaranteed amount of the Seafood Compensation Program and the agreed upon Risk Transfer Premiums for various categories of class members was the issue of whether individuals in the Seafood Industry who had previously filed SFJ's but had little documentation of losses would be included in the Individual Economic Loss Category or the Seafood Program. On February 25, 2012, as part of reaching final agreement on significant open issues including the applicable RTP for every Loss Category and the dollar amount of the Seafood Program and the Settlement Minimum payment amount, I informed Magistrate Shushan that the PSC would agree to have those undocumented fishers and deckhands who had filed SFJs included in the Seafood Program, telling her, "Okay, I will take care of the Watts claims" in the Seafood Program and not separately in the IEL category of claims.

00230160

16. Following the March 2, 2012 Agreement-in-Principle that a separate Seafood Compensation Program would be adopted to allocate the guaranteed $2.3 billion, the Court appointed John Perry as the neutral to preside over the Seafood Program. Mr. Perry and his partner, Dan Balhoff, met with the parties and numerous representatives (fishermen, industry representative, experts, and plaintiff attorneys). Without wholly accepting the proposal of anyone, Mr. Balhoff and Mr. Perry crafted the document approved as Exhibit 10 (Doc 6276-22) as a bottom's up approach to assure that compensation awarded under the Seafood Program would be fair and adequate, that Risk Transfer Premiums were fairly considered, and that undocumented or minimally documented claims would be internally capped and subject to a bar date.

17. On April 14, 2012, I accepted for the PSC, and Richard Godfrey accepted for BP, a term sheet which reflected that all claimants identified as "Watts Individual/Crew Fishing SFJs" would be included, as noted in Mr. Godfrey's handwriting, in "CAT III". A copy of that signed agreement with Mr. Godfrey's handwritten note is attached hereto as Exhibit A (Under Seal).

18. As reflected in Exhibit 10 on page 66, (Doc 6276-22), the total payments for Category III claims were capped at $50 million.

19. The Seafood Neutral, having overseen initial distributions to documented claimants under the Seafood Program, is currently tasked with preparing a recommendation to the Court regarding the capped payments to Category III claimants and the calculation and payment of the second distribution.

20. I have been participating in meetings with Mr. Balhoff over the last few months as he proceeds with his due diligence in preparing the recommendation to the Court on the second Seafood program distribution. As a result of those meetings and my discussions with him I believe the Seafood Neutral recommendation will not be presented to the court prior to late February 2014.

Signed, under penalty of perjury, this 16th day of January, 2014, in Mount Pleasant, Charleston County, South Carolina.

_____
Joseph F. Rice