# EXHIBIT 7

# FILED UNDER SEAL

00039266

STATE OF LOUISIANA

PARISH OF JEFFERSON

## AFFIDAVIT OF ALVIN J. BORDELON, JR.

BEFORE ME the duly authorized undersigned Notary personally came and appeared Alvin J. Bordelon, Jr., (sometimes hereafter "Affiant"), who after being duly sworn did depose and state as follows:

1. My name is Alvin J. Bordelon, Jr.
2. I have been in the private practice of law since October 5, 1973.
3. My firm is presently Bordelon & Theriot.
4. I am not a member of the PSC.
5. I am not associated with any PSC attorneys or firms.
6. The clients I represent in the Deepwater Horizon matter are solely oyster leaseholders, oyster vessel owners, and oyster boat captains who operate from the lower end of St. Bernard Parish.
7. I undertook to represent my clients for recovery of property damages, diminution of property value, loss of income, general economic damages, expense recovery, punitive damages and/or for any other damages of any kind they sustained as a result of the Deepwater Horizon oil spill.
8. I began by representing my clients during the Gulf Coast Claims Facility (GCCF) process and attempted to negotiate Interim Payments and possible, final settlement of their claims with Kenneth Feinberg and members of his staff.
9. During this process, I gathered information and documentation, researched their rights of recovery under the Oil Pollution Act (OPA), the general maritime law, and various state laws and worked with oyster biologists in order to develop a methodology which might be used to fairly calculate their revenue losses and property damages.
10. I met with Mr. Kenneth Feinberg in Washington and met and communicated with members of his staff and supporting personnel in Louisiana on numerous occasions.
11. I presented the Feinberg group with various position papers, which covered the legal aspects of my clients' claims and proposed analytical frameworks for compensation.
12. I received and evaluated proposals from the Feinberg group throughout 2011 in an effort

to settle my clients' claims.

13. In November, 2011, arrangements were made for one of my principal clients to meet with Plaintiff Steering Committee (PSC) negotiators and BP representatives to provide additional perspective on the nature of the Louisiana oyster industry and how losses and damages sustained by oyster fishermen and leaseholders might be assessed.

14. The meeting took place in 2011 in New Orleans, and it was attended in person by Calvin Fayard, Joseph Rice, PSC attorneys, BP attorneys, BP executives, and BP accountants.

15. In early March 2012, after the Agreement-In-Principle on the present settlement was reached, it was my understanding that BP had agreed to compensate all Gulf-wide fishing claims with a guaranteed $2.3 billion, non-reversionary fund. This fund was later called the Seafood Compensation Fund ("SCF"). It had not yet been determined how the $2.3 billion SCF should be allocated among the various commercial fishermen in the oyster, shrimp, crab and fin fishing industries. It was clear, however, that the guaranteed $2.3 billion SCF, which was capped, had to pay and resolve all commercial fishing claims regardless of the nature of the claims, i. e., compensatory damages, lost revenues, property damage, or punitive damages and that the entire $2.3 billion would be paid only to commercial fishermen and oyster leaseholders, with no reversion of any part of the fund to BP.

16. Also in early March 2012, I received a copy of Judge Barbier's Order appointing John Perry as the third party neutral to preside over development of protocols for allocating and processing the SCF. In this same time frame, I recall meeting with Gerry Nolting, his partners, Bill Roberts and Jonathan Dettman, and attorney Stephen Kreller to discuss the SCF and its allocation among diverse interests.

17. I cannot recall the date, but I was asked whether I would be willing to participate and advocate for oyster leaseholders and fishermen at some of the SCF discussion sessions overseen by Mr. Perry, and on March 20 and March 21, 2012, I met with Mr. Perry and Mr. Balhoff at the Pan American building where discussions were conducted.

18. The meeting was also attended by attorneys representing the diverse interests of claimants within the seafood industry, inclusive of vessel owners, captains, and crewmembers, as well as attorneys for BP and members of the PSC. Mr. Perry and Mr.

        Balhoff received input from all interested parties.

19. I have never met Mikal Watts, and I do not recall his attending or participating in the discussions, nor do I recall meeting any associated counsel of Mikal Watts at the conference. Likewise, I do not recall any discussions regarding Mr. Watts's deckhand claimants.

20. There was discussion of oyster leaseholders and the fact that they had property damage claims, which would have to be compensated, as well as concerns about the cost of reef restoration, ranging from $7,000 to $20,000 per acre. The end result, after all positions were considered, was that oyster leaseholders would have to settle their "leaseholder interest" damages in the amount of $2,000 per acre for Zone A, $1,000 per acre for Zone B, and $400 per acre for Zone C as part of the first round of payments.

21. The loss of revenue and income, past and future, for all sectors of the Gulf commercial fishing industry was discussed at length. Much of the discussion dealt with allocating the SCF based on past earnings documentation, the kind of documentation that might be available, and the interplay between allocation and historical landings and commercial fishing revenue data. In terms of oyster leaseholders, there was discussion centering on the property damages components of their claims and the fact that only leaseholders had such claims.

22. After the final Settlement Agreement, including the Seafood Compensation Plan, was made publicly available in April of 2012, it was then left for me to advise my clients whether they should accept the compensation package, recognizing that acceptance would mean giving BP (and released parties) full and complete release of all claims of every nature, including release of claims for punitive and exemplary damages as might be proven at trial.

23. I advised acceptance for several reasons, among which was my clients' eligibility for a second distribution from the $2.3 billion fund, which I believed would be substantial. I advised my clients that the second round payment they were likely to receive should be considered in deciding whether to accept the settlement. All of my clients accepted the settlement and have given BP full release for all claims, including exemplary damages

claims. This release, however, expressly vests and reserves to them an interest in the remainder of the guaranteed $2.3 billion Seafood Compensation Fund, if any.

24. Based on statements made to me at informational meetings and discussions, which were driven by historical revenue and landings data, and not driven by labor statistics indicating any particular number of commercial fishermen who had to be paid, it is clear to me that any claim by Mikal Watts regarding the number of seafood crew members in his client base could not have been a material factor in the $2.3 billion agreement.

THUS SWORN AND SUBSCRIBED before me the undersigned Notary Public before two competent witnesses on this the 17th day of January 2014, by:

WITNESSES:

_Melanie B. Bordelon_
MELANIE B. BORDELON
Printed name

_Kevin O'Bryon_
Kevin O'Bryon
Printed Name

AFFIANT:

_Alvin J. Bordelon, Jr._
Alvin J. Bordelon, Jr.

NOTARY: MARK E. HANNA
LA BAR NO. 19336
NOTRAY NO. _____

My Commission is
For Life