## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION: "J" |
| This document relates to No. 12-970 | * * * | Honorable Carl J. Barbier |
| | * | Magistrate Judge Shushan |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### INITIAL OBJECTIONS AND RESPONSE
### OF THE ANDRY LAW FIRM TO THE FREEH REPORT

**MAY IT PLEASE THE COURT:**

On July 2, 2013, this Court appointed Louis Freeh as Special Master to, *inter alia*, perform an independent external investigation of, and fact find as to possible ethical violations or other misconduct within, the Court Supervised Settlement Program ("CSSP"). R. Doc. 10564. On September 6, 2013, Mr. Freeh issued the *Report of Special Master Louis J. Freeh* ("*Freeh Report*"). R. Doc. 11287. On that same day, this Court issued an *Order* calling for objections and responses to the *Freeh Report*. R. Doc. 11288. Facing gross inaccuracies contained within the *Freeh Report*, as well as the denial of due process in the confecting of the *Freeh Report* and the withholding of information by the Special Master, all compounded by BP's invidious media campaign against it, The Andry Law Firm, LLC ("The Andry Law Firm") hereby submits the following initial[1] objections and response to the *Freeh Report*. After having finally received key information wrested from the

---

[1] Given the ongoing discovery issues, including the denial of production of certain information, such as unredacted depositions and/or interviews of employees of the Claims Administration Office ("CAO") and the ability to question under oath key witnesses, The Andry Law Firm contends, as it has from the beginning, that it has a due process right to all information with any bearing on the claims process and the interaction between and among the persons mentioned in the *Freeh Report*, including all information gathered by the Special Master, and especially including the information referenced in the *Freeh Report* itself. For these reasons, The Andry Law Firm reserves the right to supplement its *Initial Objections and Response* upon receipt of additional information. *See Motion to Review, And/Or Objections To, Magistrate Judge Shushan's Rulings on The Andry Law Firm's Motions for Production*, R. Doc. 12085, *Motion for Extension of Time to File Response*, R. Doc. 11957, and all record documents referenced therein.

Special Master by this Court and dumped on Christmas Eve, The Andry Law Firm welcomes this opportunity to establish that it acted beyond reproach.

## FACTUAL BACKGROUND

In August of 2012, following the pertinent provisions of the Settlement Agreement agreed to by BP, The Andry Law Firm filed a claim *pro se* with the CSSP. The accounting firm of Kushner LaGraise, L.L.C. independently determined the value of The Andry Law Firm's claim ("the claim") to be $7,908,460.75 after review of financial documents, including monthly financial statements, annual tax returns, and payroll documentation. *See* R. Doc. No. 6430. In December of 2012, the claim was incorrectly placed on hold by the CSSP. On March 20, 2013, over eight (8) months after the claim was filed, the Deepwater Horizon Economic & Real Property Claims Center ("DHECC") finally issued an Eligibility Notice, finding that The Andry Law Firm was entitled to $7,648,722.34.[2]

The DHECC's accounting experts, which included the accounting firms of Postlethwaite & Netterville and PriceWaterhouse Coopers, calculated the value of the claim to be $7,648,722.34. The Andry Law Firm agreed to the DHECC's calculation. BP appealed.[3] On June 4, 2013, the DHECC Appeal Panel upheld the initial compensation finding and awarded $7,818,693.95. The panel stated that it had "independently reviewed the file material submitted in connection with this appeal and after conferences [has] unanimously determined that the award should be upheld."

BP had fourteen (14) days from the date of the Panel's decision of June 4, 2013 to request discretionary review. BP chose not to do so. "Once the Appeal Panelist or Appeal Panel issues a

---

[2] September 20, 2013 Production, SM-01-TALF00030 – SM-01-TALF00224 at SM-01-TALF00063-00074, attached as Exhibit "A."

[3] BP argued that the claim should be re-evaluated due to a "calculation error." In reality, BP's appeal was based upon "alternative causation" and "smoothing." This Court issued orders on March 5, 2013, April 9, 2013, and April 24, 2013, forbidding BP from utilizing those grounds for appeal. *See* Section 5 of *Class Counsel's Comments on the Freeh Report* (R. Doc. 11463); *see also* R. Docs. 8812, 9232 & 9538.

decision, it shall be final."[4]  After BP failed to request discretionary review, the settlement between

BP and The Andry Law Firm became perfected.  Furthermore, The Andry Law Firm formally signed

the acceptance of the claim, further establishing the finality of its adjudication.[5]  The Andry Law

Firm's claim therefore became due and payable on June 18, 2013.  Demand for payment was made

by The Andry Law Firm on that date.[6]

The CSSP's investigation of the claim was exhaustive.  The extensive, redundant, and

independent review of the claim was described by Patrick A. Juneau, Claims Administrator, in his

July 2, 2013 letter to this Court.[7]  Despite all that rigorous review, the CSSP Appeal Panel

unanimously upheld the initial calculation on June 4, 2013.  *Id.* at 3.  Nonetheless, because of the

allegations lodged against Lionel Sutton, the claim was singled out for additional scrutiny.

PriceWaterhouse Coopers performed a second review, and "[t]he Claims Administrator's Quality

Control Team . . . conducted its own review."  *See* R. Doc. 10761-6, at 4.  In Mr. Juneau's own

words, "[a] few 'non-material exceptions' were noted," as a result of this additional review, "but

nothing that affected the final award calculation."  *Id.*  Indeed, Mr. Juneau confirmed that the "file

is properly documented with bank statements, etc." that properly verify the claim.  *Id.*  Since June

---

[4] *Notice of Filing of the Economic and Property Damages Settlement Agreement as Amended on May 2, 2012, and as Preliminarily Approved by the Court on May 2, 2012*.  R. Doc. 6430.  *See* Rules 14 and 18 of the *Rules Governing Discretionary Court Review of Appeal Determinations*, R. Doc. No. 10185.

[5] September 20, 2013 Production, at SM-01-TALF000123-000134, attached hereto as Exhibit "A."

[6] *See* email from Gibby Andry to Patrick Juneau dated June 18, 2013, attached hereto as Exhibit "B."

[7] *See* R. Doc. 10761-6. This Court has also commented on the CSSP quality control procedures:  Because we know there are multiple layers of review in this program, . . . . The claims come in, somebody goes through the paperwork . . . it goes to an analyst of some sort, and then it ultimately goes to an accounting team, it's randomly allotted to an account . . .  And beyond all of that, . . . , if someone is awarded a claim, . . . , the determination letter goes out, you, BP, your client has a right to object, to appeal to an appeal panel, ultimately to appeal, seek discretionary review of the Court . . . . So with that being the case, it's hard for me to fathom how any single person over there, or two persons over there could – . . . we would have to imagine some grand conspiracy where there were dozens of people over there engaged to influence a single claim.  It just seems not very likely at all. *Transcript of Hearing* at 9-10, In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010, Docket No. MDL-2179, attached hereto as Exhibit "C"; *see also* R. Docs. 11138, 11138-3.

18, 2013, The Andry Law Firm's claim has been out of the claims process and the appeal process. Therefore, the claim is a perfected and binding settlement, pursuant to the terms of the master settlement agreement, and has been due and payable since that time.[8]

Notably, the *Freeh Report* identifies no rule violated by, nor any inappropriate action taken by, The Andry Law Firm in filing its *pro se* claim pursuant to the Settlement Agreement that BP itself proposed and agreed to honor. Nor does the *Freeh Report* evidence that The Andry Law Firm altered the calculation of, or expedited, its claim. Instead, the *Freeh Report* employs innuendo to inaccurately conflate The Andry Law Firm with another separate and distinct law firm, following a pattern already begun by BP. Throughout this litigation, BP has consistently and systematically attacked others to suit its own interests. Namely, after BP agreed to a settlement, agreed to a claims administrator, and agreed to pay claims that met the terms of the settlement agreement that it helped confect, BP then began to renege on that settlement agreement in any way possible, with callous disregard for any damages it may cause to victims along the way. *See* R. Docs. 11819 & 11890.

As part of its pattern of attacking innocent claimants, BP recently disparaged celebrity chef Emeril Lagasse in an advertisement that ran in national newspapers.[9] Blaine LeCesne, a Loyola Law School professor closely following the settlement, said it best: "BP's advertising campaign is trying to play on the public's moral outrage, but it's BP that's truly 'insidious' in attacking Lagasse." *Id.* "He has nothing to apologize for," LeCesne said of the chef. *Id.* "There is no ethical dilemma implicated by his submission of a claim. It is BP's own self imposed, clumsy efforts to settle this

---

[8] The Andry Law Firm acknowledges that this Court, in response to rulings by the United States Court of Appeal for the Fifth Circuit, issued orders suspending the issuance of final determination notices and payments pending resolution of the appeal issue, as well as claims currently in the claims appeal process. However, as a fully and finally adjudicated claim, The Andry Law Firm's award should not be adversely affected by later rulings or stay orders of this Court or of the United States Court of Appeal for the Fifth Circuit. *See* R. Docs. 11697, 11790, 11861, 11928, 12055.

[9] *See* http://theadvocate.com/news/7840199-123/bp-ad-blasts-celebrity-chef; http://www.wwltv.com/news/eyewitness/davidhammer/BP-uses-Emeril-as-example-of-abuses-in-oil-spill-settlement-235798801.html.

case that generated these potential anomalies of which it is now complaining." *Id.*   Claims Administrator Patrick Juneau defended the decision to pay Lagasse, just as he previously defended The Andry Law Firm's claim, stating: "This claim satisfied those requirements agreed upon by BP and class counsel." *Id.*  Although BP appealed the program's determination, Juneau explained that "[t]he appeal panelists affirmed the determination of the program and concluded that the claim was correctly processed under the terms agreed upon by BP and the class counsel." *Id.*

Similarly, BP now relentlessly attacks The Andry Law Firm for following the terms of BP's own *Settlement Agreement* through representations by its counsel, its pleadings, and BP advertisements lauding the *Freeh Report*, misleading the CSSP, this Honorable Court, and the public.[10]  BP's publicity campaign against The Andry Law Firm culminated in a false advertisement published in the New York Times on September 11, 2013 proclaiming:

> Fraud and misconduct in the Gulf settlement claims process have now been confirmed.
>
> * * *
>
> • A New Orleans law firm tried to exert "improper personal influence" to advance both its own $7.6 million payment award and claims determinations favoring its clients, and "to corrupt" the claims process "in order to enrich" itself.

BP's declaration that "Fraud and misconduct have now been confirmed" is especially false,

---

[10] *See, e.g.,* R. Doc. 10761-7 (Letter from Holstein to this Court dated June 21, 2013); June 21, 2013 Associated Press Report, *Administrator Opens Probe of Spill Claims Lawyer,* attached to *The Andry Law Firm's Opposition to BP's Motion for an Emergency Preliminary Injunction to Suspend Payment from the Court Supervised Settlement Fund;* Huffington Post Article (citing Letter from Holstein to this Court dated June 21, 2013); R. Doc. 10761-8 at 3 (correspondence from Patrick Juneau to this Court explaining that the claim of The Andry Law Firm was placed on hold in response to inquiries by BP dated July 1, 2013); R. Doc. 10761-1 (BP's *Memorandum in Support of its Motion for Emergency Preliminary Injunction*); *BP Advertisement,* NEW YORK TIMES, September 11, 2013, referenced by Mark Schleifstein in his article: *BP Ad in New York Times Repeats Allegations of Misconduct in Oil Spill Claims Office,* Nola.com (Sept. 17, 2013, 2:54 P.M.) http://www.nola.com/news/gulf-oil-spill/index.ssf/2013/09/bp_ad_in_new_york_times_repeat.html (including link to PDF version of the actual advertisement); *see also* BP's most recent advertisement attached as Exhibit "D."

as it relates to The Andry Law Firm.[11] BP obviously employs these tactics to bolster its media campaign to attack its own Settlement Agreement. Unfortunately, the *Freeh Report* only continued BP's campaign. The *Freeh Report* concluded that "Mr. Lerner and Mr. Jon Andry utilized and benefitted from Mr. Sutton's attorney position inside the CAO in furtherance of their AndryLerner clients' claims, as well as The Andry Law Firm's $7,908,460 claim." R. Doc. 11287, at 9-10.

Whether this conflation by BP and the *Freeh Report* was intentional to derail justice, or mere error, it should be corrected once and for all. The Andry Law Firm was formed in 2000, continues to represent clients, but does not represent one single claimant in the BP litigation, but does have its own *pro se* claim.[12] On the other hand, the separate law firm, AndryLerner, LLC, was formed in 2012. AndryLerner, LLC represents many clients for BP claims, but does not have its own BP claim. The Andry Law Firm does not share in, or have any financial interest in, AndryLerner, LLC. Likewise, AndryLerner, LLC does not share in, or have any financial interest in, either The Andry Law Firm or its perfected BP claim. The Andry Law Firm has two (2) members, Gilbert V. Andry, IV and Jonathan B. Andry. Gilbert V. Andry, IV is not a member of AndryLerner, LLC.

With this distinction clear, the only remaining gripe within the *Freeh Report* as it relates to The Andry Law Firm is that members of The Andry Law Firm allegedly called too often to check on the status of its claim, and that such telephone calls somehow influenced the speed of the claim's processing, despite the fact that there is no rule against a claimant calling to check the status of a

---

[11] The pivotal statement in the middle of the advertisement which states that "a New Orleans law firm tried to exert 'improper personal influence' to advance both its own $7.6 million payment award and claims determinations favoring its clients, and 'to corrupt' the claims process 'in order to enrich' itself." is not only not based in fact, but also is symbolic of the conflation between The Andry Law Firm and AndryLerner, LLC that both BP and Mr. Freeh have employed at will to disparage both firms "with one stone."

[12] *See Affidavit of Gilbert V. Andry, IV* attached to *The Andry Law Firm's Opposition to B.P.'S Motion for an Emergency Preliminary Injunction to Suspend Payments from the Court Supervised Settlement Fund* as Exhibit "E"; *see also* reports of the Louisiana Secretary of State attached hereto as Exhibit "F."

claim, there is no evidence that the inquiries affected the claim payment, and that this Court has acknowledged the impossibility of a single person, or two persons, actually influencing a claim.

## LAW AND ARGUMENT

**I.    The Special Master Should Be Disqualified Based on Conflict of Interest.**

The Andry Law Firm objects to lack of notice and service of, and consent to, the appointment of, and lack of notice of and waiver of objection of conflicts of interest and bases for disqualification of, as well as the scope of the mandate of, the Special Master. *See* Fed. R. Civ. Proc. 4(c)(1) and 53(a)(1). The Andry Law Firm never consented to the Special Master, as required by Fed. R. Civ. Proc. 53(a)(1), who was proposed by BP.[13] Further, he failed to disclose to the members of The Andry Law Firm relevant relationships and conflicts when the members were interviewed.

Additionally, the Special Master should be disqualified under Fed. R. Civ. Proc. 53 and 28 U.S.C. § 455 because his "impartiality might reasonably be questioned."[14] He is obligated to disqualify himself if his participation might be regarded as raising the specter of partiality. Since his appointment, he has had a conflict of interest requiring his disqualification. He is a partner and chairman of the executive committee of Pepper Hamilton LLP, a law firm that also owns his consulting company, Freeh Group International Solutions. Pepper Hamilton is working with Kirkland & Ellis, the firm representing BP, on class-action litigation. R. Docs. 10564, 11672. Further, Freeh just last week revealed that a client of the firm Williams & Connolly, LLC, which

---

[13]"A master must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 USC 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any potential grounds for disqualification."

[14]A judge should "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Code of Judicial Conduct for United States Judges, Canon 3.C(1); *see also* 28 U.S.C. § 455(a) (same standard applicable to "any justice, judge, or magistrate of the United States"). The Code further provides that "[a]nyone . . . who is an officer of the judicial system performing judicial functions, including an officer such as a . . . special master . . . is a judge for the purpose of this Code." *see also United States v. Conservation Chemical Co.*, 106 F.R.D. 210, 234 (W.D. Mo. 1985) (holding that in situations where a special master's impartiality is called into question, the special master must hold himself to the same high standards applicable to the conduct of judges).

7

represents BP, hired the Freeh Group. R. Doc. 12116. Additionally, he continues to be paid significant sums by BP for the investigations conducted herein without any transparency.

Because the Special Master was not properly appointed with the consent of the Show Cause Parties and has conflicts requiring disqualification, the *Freeh Report* should be rejected.

## II.    The Special Master Impermissibly Exceeded the Scope of the Reference.

The Andry Law Firm objects to the Special Master acting beyond the scope of his mandate and the scope permitted by law. The power of a special master is completely dependent upon his order of reference. *United States v. International Business Machines Corp.*, 66 F.R.D. 154 (S.D.N.Y. 1974). Special masters are only authorized to take "evidence upon all matters embraced in the reference" and file a report covering "the matters submitted to the master by order of the reference."[15] The *Order* appointing him Special Master limited his mandate to: (a) performing an independent external investigation into the resignation of Lionel Sutton; (b) fact finding as to any other misconduct within the CSSP; and (c) examining and evaluating the internal compliance program and anti-corruption controls within the CSSP . . . . R. Doc. 10564. Significantly, nowhere in the reference was the Special Master charged with re-adjudicating The Andry Law Firm's claim.

By attempting to re-adjudicate the claim, Mr. Freeh no longer acted as an officer of the Court appointed for a limited purpose.[16] Instead, he arrogated the powers of a judge (which he is no

---

[15] *See* Fed R. Civ. P. 53(c) & (e)(1); *Agricultural Servs. Ass'n v. Ferry-Morse Seed Co.*, 551 F.2d 1057, 1071 (6th Cir. 1977) ("power and authority" depends on reference); *Sauget v. Johnston*, 315 F.2d 816, 818 (9th Cir. 1963) ("report should only cover those matters stated in the order of reference"); *Datapoint Corp. v. Microsystems Corp.*, 31 F. App'x 685 (Fed. Cir. 2002)(district court properly did not adopt aspects of the special master's report that went beyond the scope of the Special Master's authority); *Cremin v. Merrill Lynch*, 328 F. Supp. 2d 865 (N.D. Ill. 2004).

[16] A special master is a judicial officer subject to the control and supervision of a court. *See In re Gilbert*, 276 U.S. 6, 9 (1928); *Cobell v. Norton*, 334 F.3d 1128, 1139 (D.C. Cir. 2003); *Morgan v. Kerrigan*, 530 F.2d 401, 426 (1 Cir. 1967); *Bridgeport Guardians v. Delmonte*, 2007 WL 108472 at *1 (D. Conn. Jan. 10, 2007). It is well established that, as a judicial officer, a special master cannot act as a party or an advocate. For example, in *People Who Care v. Rockford Bd. Of Educ.*, the special master "did party-like things like seeking and resisting discovery." 111 F.3d 528, 540 (7th Cir. 1997) (emphasis added). The Seventh Circuit explained that because a special master is "an ad hoc judicial officer, his occupying the status of a party or 'litigator' . . . may certainly be questioned." *Id.* The court further made

8

longer), an FBI agent (which he is no longer), a party (which he is not and never has been), and a special prosecutor (which he is not).[17]  Rule 53(b)(4) permits the district court to expand the initial mandate of the special master only by amending the referral order and giving notice and an opportunity to be heard to the parties.  *Shafer v. Army & Air Force Exchange Serv.*, 376 F.3d 386, 395 (5 Cir. 2004).  The referral order has not been amended, and The Andry Law Firm has never received notice or an opportunity to be heard.  Further, Fed. R. Civ. P. 53(c)(2) only allows a special master to impose a sanction against a nonparty for discovery violations.

Because the Special Master exceeded his powers, the *Freeh Report* should be rejected.

## III.   The Freeh Investigation and Report Do Not Comport with the Federal Rules.

The *Freeh Report* is ninety-six (96) pages long with five hundred fifty-nine (559) footnotes, being purportedly based upon over eighty (80) interviews, computer forensics, emails, phone records, laptops, subpoena returns, and copious other documents.  This information is referenced selectively throughout the *Freeh Report*, but was not made a part of any record, nor has it all been provided to The Andry Law Firm.  The Special Master has held no hearing, nor introduced any evidence, but

clear that "[s]hould any appealable order be issued after a hearing in which the special master participated in an irregular manner, the appellant if he was prejudiced by the irregularity can ask us to reverse on that basis." *Id.* at 541.  In *Cobell v. Norton*, a special master was appointed as an "internal investigator" to monitor and review the defendants' "trust reform activities."  334 F.3d at 1141 (D.C. Cir. 2003).  But "instead of resolving disputes brought to him by the parties," the special master "became something like a party himself." *Id.* At 1142.  The D.C. Circuit held that the special master's appointment went "far beyond the practice that has grown up under Rule 53" in that the special master was charged "with an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system." *Id; see also Hofmann v. EMI Resorts, Inc.*, 689 F.Supp. 2d. 1361, 1375 (S.D. Fla. 2010); *U.S. v. Microsoft Corp.*, 147 F.3d 935, 953 (D.C. Cir. 1998).  As the Fifth Circuit explained in *Ruiz v. Estelle*, because a special master "is the court's agent," he "should perform his duties objectively" and not like an advocate.  679 F.2d 1115, 1161-62 (5th Cir. 1982).  This court previously had to correct the Special Master.  On October 16, 2013, this Court referred to the Magistrate all outstanding motions for discovery after the Special Master failed to produced documents ordered to be produced.  R. Doc. 11664.

[17]Since issuing his report, Mr. Freeh has continued to overreach his referral by withholding significant portions of the investigative record and filing pleadings opposing legitimate demands for access to the investigative record.  *See* footnote 1; R. Docs. 11627 & 11639.  Mr. Freeh even issued a public statement in response to a Show Cause Party seeking additional information about his potential conflicts of interest. *See* Associated Press, "BP Oil Spill Settlement Probe Target Lashes Out at Special Investigator" (Oct. 17, 2013), available at http://www.nola.com/ news/gulf-oil-spill/index.ssf/2013/10/bp_oil_spill_settlement_probe.html. As Special Master, Mr. Freeh has no authority to file a "reply to any response, objections or motions" filed with respect to his *Report*. *See* R. Doc. 11288 at 4.

instead has only issued a slanted memorandum dubbed a report.

### A.    Mr. Freeh's Investigation and Report Violate the Federal Rules of Evidence.

The *Freeh Report* does not comport with the Federal Rules of Evidence. First, the *Freeh Report* does not constitute, nor is it based upon, relevant evidence. Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. The issue in this case, as it pertains to The Andry Law Firm, involves whether The Andry Law Firm is entitled its BP claim. However, none of the information discussed in the *Freeh Report* has any tendency to make the accuracy of the claim more probable or less probable than it was without that information. Simply put, there is no evidence in the *Freeh Report* that the calculation of The Andry Law Firm's claim was improper, or that any of the actions taken by any of the Show Cause Parties at all impacted the valuation of the claim. In fact, the *Freeh Report* makes the exact opposite conclusion, as Mr. Freeh admits that he "did not find any evidence that either Mr. Sutton or Ms. Reitano directly manipulated the valuation of claims by accessing the DHECC database," and that he "did not find any evidence of such manipulation by other CAO officials." R. Doc. 11287, at 4. Further, to the extent that any information in the *Freeh Report* is relevant, its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or delay [and] waste of time," requiring exclusion under F.R.E. 403.

Second, the *Freeh Report* is inadmissible hearsay. The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." F.R.E. 801(c). A "statement" is then defined as an oral or written assertion or nonverbal conduct intended as an assertion. F.R.E. 801(a).

10

The statements contained within the *Freeh Report* are at least hearsay, if not double or triple hearsay, as they are statements made to Mr. Freeh or others to prove the truth of the matter they assert. Much of the rest of the *Freeh Report* quotes interviews held with certain witnesses without Mr. Freeh, or more importantly, the witnesses themselves available in court to be cross-examined on those statements. It has not been demonstrated that any of these statements meet any exceptions or exclusions to the hearsay rule—likely because Mr. Freeh intends to use them for such proscribed purpose—to prove the truth of the matter asserted. The *Freeh Report* simply cannot be permitted to displace the time-tested search for truth by examination and cross-examination.

The inadmissibility of the *Freeh Report*, and statements contained therein, is compounded by the lack of any hearing preceding the formulation of Mr. Freeh's findings and conclusions.[18] A statement recorded in a public record made by an individual with no business duty to report is considered hearsay-within-hearsay and is excluded, unless it satisfies some other exception. *Id.* Public hearings are essential in these types of cases because they can serve as "the adequate equivalent of cross-examination in protecting litigants' rights." *Id.* at 156 (citing *Franklin v. Skelly Oil Co.*, 141 F.2d 568, 572 (10 Cir. 1944). Thus, because there were no public hearings in this matter, and because they do not meet any other hearsay exceptions, statements in the *Freeh Report* attributed to witnesses in interviews—whether by depositions or summaries—must be *per se* excluded as untrustworthy, as such statements constitute hearsay-within-hearsay.[19]

Lastly, the findings of the *Freeh Report* lack any of the traditional badges of reliability. Counsel was not allowed to ask witnesses any questions in their depositions, much less cross-

---

[18] *See* Advisory Committee Note to Rule 803(8).

[19] *In re September 11 Litigation*, 621 F.Supp.2d 131, 154-57 (S.D.N.Y. 2009); *see also United States v. Taylor*, 462 F.2d 1023, 1026 (8th Cir. 2006); *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991). Like the exclusion of statements attributed to terrorists in the 9/11 Report, witness statements in the *Freeh Report* "cannot qualify as factual findings of the [Special Master]." 621 F.Supp.2d at 157 (holding 9/11 Commission Report inadmissible).

examine, depose, or even interview witnesses, such as the claims personnel who actually handled the claim. None of the findings of the *Freeh Report* were "fully tested," and the Show Cause Parties were not afforded "the time-tested search for truth by examination and cross-examination." *Id.* at 158. Accordingly, the *Freeh Report* should be rejected as based upon inadmissible hearsay.

**B.      Mr. Freeh's Investigation Violated the Federal Rules of Civil Procedure.**

Rule 26 of the Federal Rules of Civil Procedure permits parties discovery regarding any non-privileged matter that is relevant to any party's claim or defense. Fed. R. Civ. P. 26(b)(1). This relevant information need not even be admissible if the discovery appears reasonably calculated to lead to discovery of admissible evidence. Contrary to this rule, Special Master Freeh has attempted to deny discovery of all information related to his investigation. Even after this Court issued orders commanding the Special Master to produce responsive information, The Andry Law Firm still has not received all the relevant information or been able to depose key witnesses. *See* footnote 1, *supra*.

The Andry Law Firm has a due process right, ensconced in the Federal Rules of Civil Procedure, to any and all information bearing on the claims process and the interaction between and among the persons mentioned in the *Freeh Report*, including all of the information gathered by the Special Master, and especially including all information and documents referenced in the *Freeh Report* itself. Because the constitutional right to due process has been substantially denied The Andry Law Firm, the *Freeh Report* should be rejected.

**IV.    This Court Cannot Impose Punitive Sanctions Without an Evidentiary Hearing.**

As the Supreme Court has long recognized, the Due Process Clause limits the government's ability to impose monetary penalties. As such, due process protections must be afforded to persons who, as The Andry Law Firm does here, face sanctions that serve punitive and deterrent purposes

rather than remunerative, remedial, or compensatory ones.[20]  Here, the *Freeh Report* recommends

a sanction of $7,818,693.95.   Such sanction does not serve any remunerative, remedial, or

compensatory purposes, as no party has suffered a loss.[21]  Furthermore, the measure of the loss is not

based on the extent of any harm allegedly done, but rather, is unrelated to the alleged wrongful

conduct in question.   As such, The Andry Law Firm is entitled to full due process protections,

including but not limited to an evidentiary hearing.[22]  As such due process protections have been

denied The Andry Law Firm, the *Freeh Report* should be rejected.

## V.  The Unclean Hands Doctrine Is Barred by *Res Judicata*.

The doctrine of *res judicata* requires that the equitable defense of unclean hands must be

dismissed by this Court.   Courts have held that the affirmative defense of unclean hands was barred

by *res judicata* because judgment had already been entered.[23]  The same result should apply here,

where application of the unclean hands doctrine should be foreclosed by *res judicata*, as the claim

has been fully adjudicated and unclean hands could have been raised during the claim adjudication

process, but was not.  *See* ftnt. 4, *supra*, and related discussion; *see also* Fed. R. Civ. P. 12.

---

[20]The United States Constitution guarantees that the government shall not "deprive any person of life, liberty, or property without due process of law." U.S. Const., amend. XIV. *See Crowe v. Smith*, 151 F.3d 217, 227-28 (5th Cir. 1998) (due process violated when sanctions were "criminal in character" without "affording the benefit of an independent and impartial prosecutor"); *Groppi v. Leslie*, 404 U.S. 496, 502 (1972) ("Reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are basic in our system of jurisprudence," even where rights of less standing than personal liberty are at stake);  *see, e.g. Viator v. Miller*, 136 Fed. Appx. 615, 616 (5th Cir. 2005); *Smith v. Sullivan*, 611 F.2d 1050, 1052 (5th Cir. 1980); *Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996); *SEC v. Cavanaugh*, 445 F.3d 105, 116 & n.25 (2d Cir. 2006); *United States v. Salerno*, 481 U.S. 739 (1987).
[21]*See F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, 244 F.3d 1128, 1139 (9th Cir. 2001) (holding that a $500,000 sanction to be "clearly punitive" because it was "not intended to compensate" and "could not be avoided by future compliance").
[22]*See Groppi*, 404 U.S. at 504 (Even where summary punishment for contempt is imposed during trial, "the contemnor has normally been given an opportunity to speak in his own behalf in the nature of a right of allocution").
[23] *CIBC Mellon Trust Co. v. HSBC Guyerzeller Bank AG*, 56 A.D.3d 307, 308 (N.Y. App. 1st Dept. 2008); *RA Global Services, Inc. v. Avicenna Overseas Corp.*, 843 F.Supp.2d 386, 389 (S.D.N.Y. 2012)("a defense need not have actually been raised in the earlier proceeding to be subject to *res judicata*, so long as it could have been raised.")

**VI.    No Factual Basis Exists for Finding that The Andry Law Firm Has Unclean Hands.**

Even if this Court considers the Freeh Report, despite the conflict of interest, the due process violations in confecting the report, and its lack of evidentiary value, the facts contained in the information gathered by the Special Master do not support the conclusions posited.

This Court must apply *de novo* review.  Fed. R. Civ. P. 53[24] sets forth the appropriate standard of review for the findings of fact and conclusions of law recommended by the Special Master.  Rule 53(f)(3) provides that a court must decide *de novo* all objections to findings of fact made or recommended by a master, unless the parties, with the court's approval, stipulate that the findings will be reviewed for clear error or the findings will be final.  Similarly, Rule 53(f)(4) provides that the court must decide *de novo* all objections to conclusions of law made or recommended by a master.  Herein, the parties have not stipulated that the Special Master's final factual findings are reviewable only for clear error.  Accordingly, this Court <u>must</u> decide The Andry Law Firm's objections to the *Freeh Report's* findings of fact and conclusions of law *de novo*.[25]  In addition, although not mandated by Rule 53, a court may nevertheless review *de novo* a special master's findings of fact and conclusions of law, even as to which there are no objections.[26]  This Court must also review matters of procedure for abuse of discretion.[27]

The *de novo* review that this Court must undertake requires it to "consider the record which

---

[24] Federal Rule of Civil Procedure 53 sets forth generally the powers of special masters, which include holding trial proceedings, making or recommending findings of fact on issues to be decided without a jury, or addressing pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge. Fed. R. Civ. P. 53(a).  A special master's responsibilities typically culminate in a report, as in this case.  This Court has the duty to review the Special Master's report and make the final determination of all issues contained therein.  *See Rogers v. Societe Internationale*, 278 F.2d 268, *cert. denied*, 364 U.S. 895, 81 S.Ct. 223 (1960).

[25] *Id.*; *see also In re Vioxx Prods. Liab. Litig.*, 501 F.Supp.2d 789, 813 (E.D. La. 2007); *Flournoy v. Marshall*, 842 F.2d 875 (6th Cir. 1988); *Grace v. City of Detroit*, 341 F.Supp.2d 709, 714 (E.D. Mich. 2004).

[26] Advisory Committee's Note to Fed. R. Civ. P. 53; *see also In re Vioxx Products Liability Litigation*, 501 F.Supp.2d at 813; however, The Andry Law Firm objects herein to all of the findings of fact of the *Freeh Report* which are adverse to The Andry Law Firm.

[27] Fed. R. Civ. P. 53(g)(5); *see Comtech EF Data Corp. v. Radyne Corp.*, 2008 WL 906532 at 2 (D. Ariz. 2008).

has been developed" and "make his own determination on the basis of that record, without being bound to adopt the findings and conclusions" of the Special Master. *Commissariat A l'Energie Atomique v. Samsung Electronics Co.*, 245 F.R.D. 177, 179 (D. Del. 2007). In other words, this Court should not defer to the Special Master's determinations, but rather must "freely consider the matter anew, as if no decision had been rendered." *United States v. Silverman*, 861 F.2d 571, 576 (9th Cir. 1988). The Fifth Circuit holds that, unless based on hearings conducted on the record, which the *Freeh Report* is not, the reports, findings, and conclusions of the special master are not accorded any presumption of correctness. *Ruiz v. Isabelle*, 679 F.2d 1115, 1162 (5th Cir. 1982).

Reviewed *de novo*, the *Freeh Report* fails to produce any information establishing wrongdoing by, or on behalf of, The Andry Law Firm. As described in detail, *supra*, The Andry Law Firm and AndryLerner, LLC are two (2) distinct law firms. The *Freeh Report* alleges that an improper referral fee was paid to Lionel Sutton. This allegation cannot support any sanction upon The Andry Law Firm, as the firm did not pay any referral fees, nor did it even represent any BP claimants. The Andry Law Firm only presented its own *pro se* claim. Further, no evidence has been presented establishing that The Andry Law Firm influenced the calculation or payment of the claim.

The *Freeh Report* argues that "[t]he evidence shows that Mr. Sutton's direct intervention to expedite The Andry Law Firm claim was related to the DHECC issuing the notice of eligibility on March 20, 2013." *Freeh Report*, p. 6. However, the only allegedly improper action the *Freeh Report* claims was taken by or on behalf of The Andry Law Firm was the contacting of the CSSP by The Andry Law Firm. *Freeh Report*, pp. 6-7, 47-48, 51, 55, 81. However, there is no impropriety inherent in a *pro se* claimant calling the CSSP to inquire as to the status of its claim.[28] There is no

_____

[28]Lionel Sutton has sworn under oath that there was no such rule. Sworn Statement of Lionel Sutton, attached hereto as Exhibit "G."

rule prohibiting a *pro se* claimant from calling the CSSP, to check on the status of a claim or for any other reason, nor is there any rule prohibiting CSSP employees from responding to calls by *pro se* claimants or from checking on the status of their claims. Likewise, there is no rule limiting the number of times, or the frequency of times, a *pro se* claimant could call the CSSP.

In fact, Section 4.3.7 of the BP Settlement Agreement requires CSSP employees to assist claimants with their claims.[29] Section 4.3.7 clearly contemplates that *pro se* claimants and attorneys would call the CSSP and that the employees of the CSSP would respond to their calls. Thus, there was no rule violated when *pro se* claimant The Andry Law Firm called to check on the status of its claim and any calls to the CSSP on behalf of the Andry Law Firm were not improper.[30] The Andry Law Firm was certainly not the only claimant, or law firm, calling the CSSP to inquire as to claim status, or calling frequently, as calls were common and constant.[31]

---

[29] R. Doc. No. 6430-1, at 18. Section 4.3.7 states, in pertinent part, that:
The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall work with Economic Class Members (including individual Economic Class Members' counsel . . . ) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claims Forms under the applicable Claims Processes. The Settlement Program, including the Claims Administrator and the Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.
                                          ***
C. Claimant Outreach. On 10/8/12, the Claims Administrator began to reach out by phone and email to Pro Se claimants who had been issued Incompleteness Notices. In addition, the Claims Administrator works with Law Firms each day through assigned Law Firm Contacts to help those firms submit complete claims and track the status of their claimants. The Settlement Program also has reached out to Law Firms with large numbers of incomplete claims to ensure those firms fully understand the requirements of the Settlement Agreement. These Outreach efforts are ongoing and occur in conjunction with the formal Incompleteness Notices described above.

[30] Lionel Sutton swore under oath that handling phone calls from claimants and counsel for claimants regarding the status of claims was part of his job at the DHECC. Claimants, other than The Andry Law Firm, regularly called checking on the status of claims. He further testified that he would regularly take such phone calls on his cell phone as well as his office phone. Sworn Statement of Lionel Sutton, attached hereto as Exhibit "G"; *see also* R. Doc. 12022 regarding how Lionel Sutton's cell phone number became known to the public.

[31] Claims Administrator Patrick Juneau testified that the CSSP regularly received extensive outside pressure from all sides during the claims process. He swore that "we get pushed all the time by people." Further, documents produced by Special Master Freeh establish that another law firm called so frequently about its own claim that Claims Administrator Patrick Juneau met with representatives of that law firm in person. After the meeting, Lionel Sutton

Furthermore, there is no evidence that anyone on behalf of The Andry Law Firm called Lionel Sutton or any other CSSP employee demanding the expediting of its claim. The information referenced in the *Freeh Report* merely establishes that The Andry Law Firm made calls inquiring as to the status of its claim, which is clearly not improper. Special Master Freeh has never produced any testimony by anyone involved in handling the claim suggesting anyone was asked by anyone associated with The Andry Law Firm to expedite the claim. Lionel Sutton did not testify that he asked anyone to expedite that claim.[32]  Instead, Lionel Sutton has sworn under oath that he never attempted to expedite, never asked anyone to expedite, and never did anything improper regarding, the claim.[33]

Moreover, there is no information that suggests that the claim was in fact expedited. The *Freeh Report* provides no analysis as to the speed at which The Andry Law Firm's claim was processed in comparison to other similar claims. Instead, the information belatedly produced by the Special Master on Christmas Eve establishes that the claim was actually delayed. Accountant Chris Rinaldi began overseeing the claim in December, 2012.[34]  At that time, Mr. Rinaldi requested profit and loss statements. *Id.*  When the requested statements had not arrived within two (2) weeks, Mr. Rinaldi exercised his "individual judgment" and sent an incomplete notice to Jon Andry and heard nothing further regarding The Andry Law Firm's claim until March 2013. *Id.*

emailed the accounting firm reviewing, and the accounting firm responded by stating explicitly that "the team [would] prioritize" that law firm's claim. *See* October 31 Production, attached hereto as Exhibit "H", SM-01-TALF00935. Further, the telephone records produced, both summary and original, indicate that Gibby Andry called claims administrators less than 1/10th of a percent of the time. Additionally, computer access records indicate that Lionel Sutton checked on the status of several other claims more often than he checked on the status of The Andry Law Firm claim.

[32]Emails between Lionel Sutton and Glen Lerner establish that Mr. Sutton could not expedite claims. R. Doc. 11666.13.  Sutton explicitly stated "You can't" in response when asked to get claims "in some sort of priority."

[33]Sworn Statement of Lionel Sutton, attached hereto as Exhibit "G." Lionel Sutton further swore that he never attempted to affect the value of the claim, could not affect the payment of any claim, and did not even know the valuation of the claim until shortly before the eligibility notice was issued. *Id.*

[34]Xmas Eve Production, attached as Exhibit "I", SM-04-TALF000087.

17

In March of 2013, apparently after an inquiry from Mr. Andry to Lionel Sutton,[35] and subsequent email from Lionel Sutton to Mark Staley,[36] Mark Staley emailed Mr. Rinaldi inquiring as to the status of the claim. *Id.* at 89-90. When Mr. Rinaldi looked into it, he noticed that the "missing" documents he had requested had actually been submitted before Mr. Rinaldi issued the incomplete notice, which served to stay or freeze the claim. *Id.* at 90. Mr. Rinaldi believes that he missed these documents by not checking the claimant portal. *Id.* Mr. Rinaldi sent an email back to Mr. Staley informing him that the claim was "live again" and asked Mr. Staley if the claim should receive special treatment. *Id.* at 743. Mr. Staley told Mr. Rinaldi to give the claim to a regular analyst on his team and work it as he would any other claim. *Id.* Following that email, Mr. Rinaldi passed the claim onto his "best Junior Analyst," Jordan Wilkinson, directing Mr. Wilkinson to "keep an eye on the Andry claim." *Id.* at 90. Once Mr. Wilkinson was assigned the claim, he requested bank statements from The Andry Law Firm's accountant, but stated that "[t]he subsequent analysis then went pretty quickly because there was so little needed to complete review of the claim." *Id.* at 785-86. Within approximately two (2) weeks, Mr. Rinaldi was happy to report to Mr. Staley that the audit of claim was finally, belatedly, complete. *Id.* at 90. It is clear from this chronology that the claim was never expedited, but in fact was delayed by several months.

The best evidence of whether the claim was expedited is the statements of the people who actually handled, and inquired regarding, the claim, such as Lionel Sutton, Mark Staley, and

---

[35] Lionel Sutton swore under oath that when Gibby Andry called about The Andry Law Firm claim he was calling about the status of the claim. Sworn Statement of Lionel Sutton, attached hereto as Exhibit "G."

[36] The *Freeh Report* suggests that the inquiry from Lionel Sutton to Mark Staley was extraordinary and therefore nefarious. Freeh Report, pp. 49-50. However, Lionel Sutton has sworn under oath that he would regularly contact Mark Staley to check on the status of claims in response to inquiries by claimants or by counsel for claimants. He further explained that he would communicate with the accountants because details of the status of a claim were not always posted in the computer portal. He additionally, specifically swore that he never instructed Mark Staley, Christopher Rinaldi or anyone else to expedite the claim. Sworn Statement of Lionel Sutton, attached hereto as Exhibit "G."

Christopher Rinaldi. The least persuasive evidence is the Special Master's skewed interpretation of emails and conjecture regarding phone and text records. The best evidence establishes that the claim was not expedited because of undue influence by the members of The Andry Law Firm.

Most strikingly, Special Master Freeh admits that he "did not find any evidence that either Mr. Sutton or Ms. Reitano directly manipulated the valuation of claims by accessing the DHECC database. The Special Master also did not find any evidence of such manipulation by other CAO officials." *Freeh Report*, p. 4. There is not an allegation as to the claim being unduly inflated.

At the July 19, 2013 hearing, this Court correctly characterized the original allegations of BP as allegations regarding the impropriety of a referral fee being paid, when the Court stated:

> The two staff attorneys had previously represented claimants before their employment by the settlement program, that upon becoming employed the attorneys referred, withdrew and referred their cases to a certain law firm which in turn later paid referral fees to them during the time they were employed with the program.

Transcript of Hearing, Exhibit "C," at p. 49. These allegations do not involve The Andry Law Firm. There is no allegation in the *Freeh Report* or anywhere else that The Andry Law Firm paid a referral fee. Based on the lack of evidence of any impropriety by or on behalf of The Andry Law Firm, this Court should refuse to accept the recommendation of the *Freeh Report* that The Andry Law Firm's BP claim be barred pursuant to the unclean hands doctrine.

## VII.   Freeh's Conclusion that the Unclean Hands Doctrine Bars The Claim Ignores Fundamental Requirements of the Unclean Hands Doctrine.

Unclean hands is a historic equitable doctrine which operates to guide a court's discretion in granting equitable relief.[37] The unclean hands doctrine is typically used to defeat an undeserving plaintiff's claim for equitable relief against a defendant that he has injured. *See Mitchell Bros. Film*

---

[37] *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244, 54 S.Ct. 146, 78 L.Ed. 293 (1933) ("It is one of the fundamental principles upon which equity jurisprudence is founded, that [a complainant] must come into court with clean hands.").

*Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979).  However, Mr. Freeh's largely

unsupported conclusions ignore fundamental principles associated with the unclean hands doctrine.

When those principles are properly applied, the unclean hands doctrine cannot operate to deprive The

Andry Law Firm of a claim that was properly calculated and already adjudicated.[38]

### A.   The Claim Cannot Be Barred by the Unclean Hands Doctrine Because The Andry Law Firm Has Not Engaged in Any Willful Misconduct.

In order for the unclean hands doctrine to apply, this Court must find willful misconduct by

the party requesting relief from the Court.[39]  In this case, as described *supra*, The Andry Law Firm

(the claimant) has engaged in no misconduct whatsoever.  Applying the unclean hands doctrine here

therefore would strip the twice adjudicated and admittedly properly calculated claim from the party

to whom it is rightfully due, The Andry Law Firm, and allow a party, BP, which committed felonies,

to benefit from completely unrelated alleged wrongdoing on behalf of a different law firm.  *See* R.

Doc. 11463 at 2.  This outcome is inconsistent with any principle of equity.

Furthermore, the conduct by The Andry Law Firm that was alleged in the *Freeh Report*

certainly cannot be termed "inequitable."  Although the precise meaning of "inequitable conduct"

has not been stated identically in every case, "inequitable conduct" has been defined at various times.

*Compare Mitchell Bros. Film Group*, 604 F.2d at 863 ("wrongful acts"), *with Conan Properties, Inc.

v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985) ("explicit bad faith intent"), *with Dahl v.

Pinter*, 787 F.2d 985, 988 ("unconscionable [acts]" or "offensive to the dictates of natural justice"),

*with Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997) ("fraud or deceit").  Mere

---

[38] *See* Fed. R. Civ. P. 12(b); The unclean hands doctrine is not a legally cognizable cause of action, and therefore there has been a "failure to state a claim upon which relief can be granted."

[39] *In re Aimster Copyright Litig.*, 252 F.Supp.2d 634, 655 (N.D. Ill. 2002) (Conduct of a non-party is irrelevant to the doctrine of unclean hands.); *Sec. Pacific Mortgage and Real Estate Services, Inc. v. Canadian Land Co.*, 690 F.Supp. 1214, 1224 (S.D.N.Y. 1988).

20

phone calls to certain members of the CSSP, even if those phone calls were made with the purpose

of forwarding an already delayed claim, cannot constitute wrongful or unconscionable acts, bad faith

intent, or fraud or deceit sufficient to deprive The Andry Law Firm of its clear entitlement to the full

amount of its BP claim. As described *infra*, Rule 4.3.7 of the BP Settlement Agreement required

CSSP employees to assist claimants with their claims. Thus, these phone calls were in fact permitted

and cannot constitute misconduct. R. Doc. No. 6430-1, at 18. It would be inequitable to bar the

claim through unclean hands based on the inequitable conduct of members of separate law firms,

because the Andry Law Firm should not be held accountable for the alleged actions of another firm.[40]

**B.      For Conduct to Be Relevant to the Unclean Hands Doctrine, It Must Be Directly or Immediately Related to the Relief Sought.**

It is well-established that "courts of equity . . . do not close their doors because of plaintiff's

misconduct, whatever its character, that has no relation to anything involved in the suit." *Keystone*

*Driller*, 290 U.S. at 245. It follows that the unclean hands doctrine should "not be used as a loose

cannon," depriving a party of a remedy merely because he is guilty of unrelated misconduct.

*Healthpoint, Ltd. v. Ethex Corp.*, 273 F.Supp.2d 817, 848 (W.D. Tex. 2001). The unclean hands

doctrine "does not purport to search out or deal with the general moral attributes . . . of a litigant."

*Mitchell Bros. Film Group*, 604 F.2d at 863 (quoting *NLRB v. Fickett-Brown Mfg. Co.*, 140 F.2d

883, 884 (5th Cir. 1944). In fact, the unclean hands doctrine may eliminate a right to relief <u>only</u>

when the alleged misconduct "has immediate and necessary relation to the equity that [the party]

seeks . . ." *Keystone Driller*, 290 U.S. at 245. The Fifth Circuit has held that the conduct must be

"directly related," *Mitchell Bros. Film Group*, 604 F.2d at 863, or "immediately related" to the

---

[40] *See, e.g., Austa La Vista, LLC v. Mariner's Pointe Interval Owners Ass'n, Inc.*, 173 S.W.3d 786, 794 (Tenn. Ct. App. 2005) (holding successor company's claims not barred by unclean hands based on allegedly inequitable conduct of its predecessor because it "cannot be held accountable for its predecessors actions over which it had no control.").

plaintiff's claim. *Dahl v. Pinter*, 787 F.2d 985, 988 (5th Cir. 1986), *vacated on other grounds*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).   The unclean hands doctrine requires a finding of both inequitable conduct and that the conduct relates to the requested relief. *See* Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 2946 (2d ed. 1995).

In *Petro Franchise Systems, LLC v. All American Props., Inc.*, for example, the defendants in a trademark infringement action asserted the defense of unclean hands to the plaintiffs' application for an injunction, claiming that the plaintiffs had "engaged in a variety of intentional conduct designed to reduce the standalone value of the Petro brand." 607 F.Supp.2d 781, 799 (W.D. Tex. 2009). The Western District of Texas rejected the unclean hands defense because the defendants had not established "the necessary relation between the conduct and the injunction which Plaintiffs seek." *Id.* As in *Petro*, this case is based on a mere conjectural relationship between the alleged misconduct and the The Andry Law Firm claim.  Any referral fee allegedly paid to Mr. Sutton has no bearing whatsoever on the valuation and/or processing of the claim as any referral fee allegedly paid was paid on behalf of AndryLerner, not on behalf of The Andry Law Firm.  Moreover, The Andry Law Firm did not commit any misconduct, as all that the *Freeh Report* alleges is that calls were made to the CAO on behalf of The Andry Law Firm to check on the status of its claim.

C.   **In Order for the Unclean Hands Doctrine to Apply, the Alleged Wrongdoing Must Have Injured the Opposing Party.**

The Fifth Circuit has held that the alleged wrongdoing of a party does not bar relief under the unclean hands doctrine unless the opposing party can show that he has been personally injured by the alleged wrongdoing.[41]   In *Positive Black Talk Inc. v. Cash Money Records*, in regard to the

---

[41] *Mitchell Bros. Film Group*, 604 F.2d at 863-64 (citing *Lawler v. Gillam*, 569 F.2d 1283, 1294 (5th Cir. 1978); *see also Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 842 (5th Cir. 2004) (the unclean hands doctrine is altogether inapplicable where the plaintiff's sins do not affect or prejudice the defendant); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796-97 (5th Cir. 1999) ("[W]here the harm done to the defendant is not serious and can be

admission of defendants' evidence regarding the extent to which Jubilee's song sampled music from a Jackson Five song to establish an unclean hands defense, the Fifth Circuit held that the evidence was not admissible because it established an unclean hands defense. 394 F.3d 357, 365 (5 Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 130 S.Ct. 1237, 176 L.Ed.2d 17 (2010). The Fifth Circuit specifically noted that because the defendants could not show that they were personally injured by the sampling of the Jackson Five song, they had no basis for invoking that sampling as the basis of an unclean hands defense. *Id.* Similarly, in *Mitchell Bros. Film Group*, the defendants asserted that plaintiffs could not recover for copyright infringement because the underlying film was obscene. 604 F.2d at 854. The Fifth Circuit concluded: "that plaintiffs' alleged wrongful conduct has not changed the equitable relationship between plaintiffs and defendants and has not injured the defendants in any way." *Id.* at 864.

Here, the *Freeh Report* itself admits that the valuation of the claim has not been affected by the alleged conduct of any of the Show Cause Parties. Likewise, BP itself has not been damaged by such alleged conduct. Therefore, the unclean hands doctrine cannot apply in this case, and certainly cannot serve to bar The Andry Law Firm's legitimate, fully adjudicated BP claim.

## VIII.   The Sanction Recommended by the *Freeh Report* Is Constitutionally Excessive.

The Due Process Clause bars penalties that are arbitrary, oppressive, or unrelated to the government's interest in deterring harmful conduct.[42] The Supreme Court has applied this principle to multiple kinds of penalties and has struck down various penalties it determined to be

---

otherwise corrected, the unclean hands maxim should not be applied.") (internal citations omitted).

[42] *See TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 453-54 (1993) ("[T]he Due Process Clause of the Fourteenth Amendment imposes substantive limits 'beyond which penalties may not go.'") (quoting *Seaboard Air Line R. Co. v. Seegers*, 207 U.S. 73, 78 (1907)); *Blessey Marine Servs., Inc. v. Jeffboat, LLC*, Civ. Action No. 10-1863, 2011 WL 3349844, at *6 (E.D. La. Aug. 3, 2011) ("[T]he flagrancy of a party's behavior must be directly proportionate to the severity of the sanction imposed,' and . . . sanctions must be 'narrowly tailored to serve only their necessary function.'")

unconstitutional.[43]  In particular, the Due Process Clause requires that a penalty not be "grossly excessive." To determine whether any penalty is grossly excessive, a court may consider three (3) factors: (1) the reprehensibility of the defendant's conduct; (2) the ratio between the punitive award and the harm that has been done; and (3) the difference between the punitive award at issue and other comparable penalties. *Gore*, 517 U.S. at 575.  The most important of these three (3) factors is the first, which reflects that a penalty should be proportionate to the blameworthiness of the defendant's conduct. *Id.* at 575-76.  The recommended sanction here does not comport with these requirements, as the only conduct attributed to The Andry Law Firm was calling the CAO to check on the status of its claim.  A $7 million sanction cannot be considered proportionate to any blameworthiness of that conduct, and thus the *Freeh Report's* recommended sanction should be rejected.

## CONCLUSION

The *Freeh Report* makes bold allegations involving unclean hands and potential federal crimes, even insinuating that The Andry Law Firm committed bribery, without any evidence supporting such a conclusion. The *Freeh Report* instead recommended that this Court deny payment of a fully adjudicated, multi-million dollar BP claim of The Andry Law Firm, despite explicitly admitting that the valuation of the claim was proper.

Six (6) months have passed since the CSSP decided, without any hearing or order, to hold payment of The Andry Law Firm's fully adjudicated claim, based on bald allegations by BP improperly associating The Andry Law Firm with AndryLerner, LLC.  During this time, there still has been no evidentiary hearing or even any evidence presented that The Andry Law Firm acted improperly.  Therefore, instead of accepting the recommendations of the *Freeh Report*, this Court

---

[43]*See, e.g., Sw. Telegraph & Telephone Co. v. Danaher*, 238 U.S. 482, 491 (1915) (invalidating a plainly arbitrary and oppressive penalty assessed under an Arkansas statute); *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) (striking down an excessive punitive damages award).

should order that The Andry Law Firm be expeditiously paid its fully adjudicated claim.  In the alternative, at the very least, this Court should grant The Andry Law Firm what due process requires: an evidentiary hearing wherein BP has the burden of proving why The Andry Law Firm's perfected claim should not be paid.

Most crucially for the interests of justice, this Court should not permit BP, through its media attack machine, including its most recent false advertisement of yesterday smearing the Andry Law Firm, to intimidate the organs of justice.  *See* Exhibit "D." Consistent with its relentless media campaign against claimants who dared to file claims pursuant to its Settlement Agreement, BP seeks to renege on its agreements, and re-litigate fully adjudicated claims in the press.  BP lost its appeal of The Andry Law Firm's claim, but through the *Freeh Report* and media attacks, attempts to put the wheels of justice in reverse. This Court should not succumb to such chicanery, nor to the parallel innuendo of the Special Master paid by BP, but should look to the evidence presented, or lack thereof, and rule justly.

Respectfully submitted,

*/s/ Randall A. Smith*
**RANDALL A. SMITH, T.A.  (No. 2117)**
**STEPHEN M. GELÉ (No. 22385)**
**SARA E. PORTER (No. 34190)**
               -OF-
**SMITH & FAWER, L.L.C.**
201 St. Charles Ave., Suite 3702
New Orleans, LA 70170
Telephone: (504) 525-2200
Facsimile:  (504) 525-2205

***Counsel for The Andry Law Firm, LLC***

25

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing motion has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 17th day of January, 2014.

/s/ Stephen M. Gelé
Stephen M. Gelé