1

SWORN
STATEMENT

ORIGINAL

```
***************************
                            *
                            *
IN RE:                      *
                            *
SWORN STATEMENT OF          *
                            *
LIONEL HOWARD SUTTON, III   *
                            *
                            *
***************************
```

SWORN STATEMENT of LIONEL HOWARD SUTTON, III, taken on Monday, January 13, 2014, commencing at 12:50 p.m., at the law offices of Smith & Fawer, 201 St. Charles Avenue, Suite 3702, New Orleans, Louisiana 70170.

EXHIBIT G

**KAY E. DONNELLY & ASSOCIATES**

1                           I N D E X

2                                                   PAGE

3    Caption                                         1

4    Appearances                                     3

5    Examination

6         STEPHEN M. GELE                            4-10

16   Reporters' Certification                        11-12

```
 1    APPEARANCES:

 2

 3        SMITH & FAWER
          Attorneys-at-Law
 4        201 St. Charles Avenue
          Suite 3702
 5        New Orleans, Louisiana 70170

 6        BY:   STEPHEN M. GELE

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    Reported by:   Terence D. Skelton
                    Certified Court Reporter
24                  State of Louisiana

25
```

1           LIONEL HOWARD SUTTON, III,
2  935 Gravier Street, Suite 1910, New Orleans,
3  Louisiana 70112, after having first been duly
4  sworn, did testify on his oath as follows:
5  EXAMINATION BY MR. GELE:
6     Q.  Mr. Sutton, I'm here to question you
7  regarding your time working at the DHECC.
8  While working at the DHECC, did you ever do
9  anything improper regarding the Andry Law
10  Firm claim before the DHECC?
11     A.  No.
12     Q.  Did you ever have anything to do with
13  the processing of the Andry Law Firm claim
14  while at the DHECC?
15     A.  No, other than in a general sense
16  when we would have office-wide meetings to
17  discuss all of the claims as a whole and how
18  they should be run through the system, that
19  type of thing. But never specifically the
20  Andry Law Firm claim.
21     Q.  During the course of your duties at
22  the DHECC, would you regularly contact Mark
23  Staley to check on the status of claims in
24  response to inquiries by claimants or by
25  counsel for claimants?

1      A.   Yes.  Either by email or in person.
2  We saw each other almost every day.
3      Q.   Were details regarding the status of
4  claims always notated on the global notes
5  that you could access through your computer
6  system?
7      A.   No.  It was always an ongoing battle
8  to try to get the claims processors to use
9  global notes so that we could have a better
10 idea what was going on when we looked at the
11 portal.
12     Q.   Would the lack of those notations on
13 occasion cause you to have to contact the
14 accountants?
15     A.   Yes.
16     Q.   During the course of your time at the
17 DHECC, did you ever attempt to affect the
18 value of the Andry Law Firm claim?
19     A.   No.
20     Q.   Did you ever know the value of the
21 Andry Law Firm claim until shortly before the
22 eligibility notice was issued?
23     A.   No.
24     Q.   Did you ever attempt to expedite the
25 Andry Law Firm claim?

1   A.   No.
2   Q.   Did you ever instruct Mark Staley to
3   expedite the Andry Law Firm claim?
4   A.   No.
5   Q.   Did you ever instruct Christopher
6   Renaldi to expedite the Andry Law Firm claim?
7   A.   No.
8   Q.   Did you ever instruct anyone to
9   expedite the Andry Law Firm claim?
10  A.   No.
11  Q.   Did Gibby Andry ever call you or
12  communicate with you in any way about any
13  Andry Lerner claim?
14  A.   No.
15  Q.   Did Gibby Andry ever call you or
16  communicate with you in any way about the
17  Thonn claim?
18  A.   No.
19  Q.   Did Gibby Andry ever tell you whether
20  he had anything to do with any of the claims
21  in which the claimants were represented by
22  the Andry Lerner Law Firm?
23  A.   No.  He only told me that the only
24  claim he had filed was the Andry Law Firm
25  claim, so I deduced that he didn't have

1  anything to do with the other ones.
2      Q.  Did anyone, on behalf of the Andry
3  Law Firm, ever contact you about any claim in
4  which the claimant was represented by Andry
5  Lerner?
6      A.  No.
7      Q.  Could you affect the payment of any
8  claim?
9      A.  No, other than, again, in the general
10 sense, when we would have meetings and
11 discuss policy, which would ultimately be
12 decided by other people, not me, but just, in
13 a general sense, we would talk about all
14 claims, but never any specific claim.
15     Q.  When Gibby Andry called you about the
16 Andry Law Firm claim, was he calling about
17 the status of the claim?
18     A.  Yes.
19     Q.  Was handling phone calls from
20 claimants and counsel for claimants regarding
21 status of claims part of your job at the
22 DHECC?
23     A.  The biggest part, yes.
24     Q.  Would you regularly take phone calls
25 regarding the status of claims on your office

1   phone and on your cell phone?
2       A.  Yes.
3       Q.  I would like to read to you, part of
4   your filing that was made on your behalf,
5   entitled:  Lionel Sutton, III, memorandum and
6   opposition to the report of Special Master
7   Louis Freeh, Docket Number 12022, in
8   Case 2:10-MD-02179.
9           In that document, it's stated on your
10  behalf, quote:
11          During the time period when this
12  court was considering a stay of the claims of
13  certain industries, comma, including law
14  firms, comma, the CA sent a script to the
15  call centers to read to any callers that had
16  questions about the stay and its effect on
17  their claims.  The script included Sutton's
18  email and cell number in case the call center
19  had any questions, period.  Unfortunately,
20  comma, the script was read to include
21  Sutton's contact information and subsequently
22  posted on a number of lawyer websites,
23  period.  From that day forward, comma, Sutton
24  received countless calls and emails from
25  lawyers seeking information about their

1    claims, period.
2         Is that accurate?
3    A.   Yes.
4    Q.   Would the countless phone calls
5    referenced in that passage include phone
6    calls to your cell phone?
7    A.   Yes.  It was my cell phone that was
8    given out, cell phone number.
9    Q.   Did the DHECC have any rule
10   prohibiting you from handling phone calls
11   from claimants and counsel for claimants
12   regarding the status of their claims?
13   A.   No.  We were encouraged to tell
14   people what was going on with their claims.
15   Q.   And did the DHECC have any rule
16   prohibiting you from handling such phone
17   calls on your cell phone?
18   A.   No, not at all.
19   Q.   Did other claimants or other counsel
20   for claimants, other than the principals of
21   the Andry Law Firm, ever call you checking on
22   the status of claims?
23   A.   Yes.
24   Q.   During phone calls with Gibby Andry,
25   did you and Gibby ever discuss your

1  respective sons playing on Isidore Newman's
2  football team?
3      A.  Yes.
4          MR. GELE:
5              Thank you.
6      (Proceedings conclude at 1:00 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    C E R T I F I C A T E
 2
 3              This certification is valid only for
 4     a transcript accompanied by my original
 5     signature and original required seal on this
 6     page.
 7              I, TERENCE D. SKELTON, Certified
 8     Court Reporter in and for the State of
 9     Louisiana, as the officer before whom this
10     testimony was taken, do hereby certify that
11     LIONEL HOWARD SUTTON, III, after having been
12     duly sworn by me upon authority of R.S.
13     37:2554, did testify as hereinbefore set
14     forth in the foregoing 10 pages;
15              That this testimony was reported by
16     me in the stenotype reporting method, was
17     prepared and transcribed by me or under my
18     personal direction and supervision, and is a
19     true and correct transcript to the best of my
20     ability and understanding;
21              That the transcript has been prepared
22     in compliance with transcript format
23     guidelines required by statute or by rules of
24     the board, that I have acted in compliance
25     with the prohibition on contractual
```

```
 1   relationships, as defined by Louisiana Code
 2   of Civil Procedure Article 1434 and in rules
 3   and advisory opinions of the board;
 4           That I am not related to counsel or
 5   to the parties herein, nor am I otherwise
 6   interested in the outcome of this matter.
 7
 8                    [signature: Terence D. Skelton]
 9                    Terence D. Skelton
                      Certified Court Reporter
10                    State of Louisiana
                      Certificate No. 88035
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```