CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Rinaldi next told interviewers that in February 2013, he was promoted to the position of Senior Claims Analyst. Mr. Rinaldi was asked to describe his new position as compared to his former position as a JCA. Mr. Rinaldi remarked that being a Senior Claims Analyst was "basically the same job but with more targeted projects," mostly focusing on large claim amounts and reconsideration claims. Mr. Rinaldi also stated that as a Senior Claims Analyst, he is tasked with answering questions posed by junior level claims analysts working below him. Interviewers asked Mr. Rinaldi if he had a team below him and Mr. Rinaldi informed interviewers that he has a team of between four (4) and seven (7) JCAs on his team. Mr. Rinaldi confirmed that his job title currently remains Senior Claims Analyst.

Interviewers began asking Mr. Rinaldi questions regarding his involvement with the business economic loss ("BEL") claim of the Andry Law Firm ("Andry"). Mr. Rinaldi stated that he began oversight of the Andry claim as a JCA in December 2012. Mr. Rinaldi claims to have had no prior knowledge of the existence of the Andry Firm, or its founding partner, Mr. John Andry. Mr. Rinaldi further explained this by informing interviewers that Andry "had no visibility" and did not engage in OCI (on-campus interviews) at The LSU Law Center.

Mr. Rinaldi stated that as an auditor of Andry's claim, he requested profit and loss statements for the firm and that requesting this documentation afforded him a choice: he could just wait for the claimant to comply with the request or, if he did not receive the requested documentation, he could send an incomplete notice to the claimant, thereby freezing the claim.

Mr. Rinaldi stated that he waited for Andry to send the requested documentation and that after two weeks, when it had not arrived, he deemed the claim incomplete and a notice to this effect was dispatched to Andry. Mr. Rinaldi was asked what was necessary to deem a claim incomplete. He responded that it was based on his "individual judgment."

Mr. Rinaldi was asked to identify his contact at Andry. He stated that it was a third party accountant hired by Andry to prepare their BEL claim. Mr. Rinaldi was then asked if he had any prior experience with that accountant, to which Mr. Rinaldi replied that he did not.

Mr. Rinaldi informed interviewers that once the incomplete notice was sent to Andry, the claim was handed over to Brown & Greer. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Mr. Rinaldi stated that he next heard about Andry's claim in March, 2013 (by which time he had been promoted to Senior Claims Analyst) when he received an email from Mr. Mark Staley ("Staley") inquiring as to the status of the Andry claim. Mr. Rinaldi was asked if it was normal that he receive an email directly from M. Staley inquiring about a certain claim. Mr. Rinaldi replied that it was "unusual" and that this was the first and only time he had ever heard directly from Mr. Staley regarding a particular claim. Mr. Rinaldi further explained why this was so odd, noting that Mr. Staley was two levels above him at P&N and that his direct superior would normally be the one to make this sort of inquiry. Mr. Rinaldi added that he was not sure why Mr. Staley was taking such special interest in the Andry claim.

3



CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Rinaldi told interviewers that when he looked further into the Andry claim, he found that the documents he requested (Andry's profit and loss statements) had actually been submitted and that they were actually submitted *before* Mr. Rinaldi sent out the incomplete claim notice. Mr. Rinaldi stated that this was likely the result of his not having checked the claimant portal (where the status of a claimant's claim was regularly updated). Mr. Rinaldi noted that it is now policy to check the portal before sending an incomplete notice.

Interviewers asked Mr. Rinaldi how he interpreted the information that Andry was erroneously issued an incomplete claims notice. Mr. Rinaldi replied that he his first impression was that because he had sent the notice without first checking the portal, Andry was "ticked off" and complained and that their complaint was likely the reason why he received "special notice" on Andry's claim directly from Mr. Staley.

Mr. Rinaldi stated that Mr. Staley directed him to let him know when the Andry claim was complete.

Mr. Rinaldi was asked what he did once he received this directive (via email) from Staley. Mr. Rinaldi stated that he passed the Andry claim to his "best Junior Analyst," a man named Mr. Jordan Wilkinson and directed him to "keep an eye on [the Andry claim]" so Mr. Rinaldi could keep Staley informed on the progress of the audit. Mr. Rinaldi was asked to characterize Mr. Staley's level of interest in the Andry file. Mr. Rinaldi described it as "uncommon."

[redacted]

Mr. Rinaldi was next asked to identify who his direct superior was at the time he received the email inquiry from Staley. He responded that it was a woman named Ms. Maria Herrington ("Herrington"). Mr. Rinaldi was then asked to characterize her relationship as to himself and Mr. Staley within the P&N hierarchy. Mr. Rinaldi responded that Ms. Herrington was his manager and that Mr. Staley was Ms. Herrington's "boss."[2]

When asked, Mr. Rinaldi stated that he never spoke with Ms. Herrington about the Andry claim and he did not recall if he ever spoke with her about Mr. Staley contacting him or about Mr. Staley's direct interest in the claim itself. Mr. Rinaldi stated that hearing from Mr. Staley made him think that there might have been a problem or that he was in trouble but that after the initial email was sent, Mr. Staley seemed to back away and Mr. Rinaldi came to the conclusion that it may have simply been the case that Mr. Staley wanted to be "kept in the loop" on that particular claim.

Mr. Rinaldi was asked if he had any further communication with Mr. Staley after the original email Mr. Staley sent to him. Mr. Rinaldi replied that the next time he had any contact with Mr. Staley was in March 2013 when he emailed Mr. Staley to inform him that the Andry audit was complete.

---

[2] Rinaldi also stated that Herrington presently remains his direct superior.

SM-04-TALF000090

On June 20, 2013, at approximately 5:15 pm, Christopher Rinaldi was interviewed by David W. Welker at 935 Gravier Street, Suite 1905, New Orleans, Louisiana. Rinaldi was advised of the topic if the interview and thereafter provided the following information.

Christopher Rinaldi advised that he has been employed by Postlethwaite and Netterville (P & N) since June 4, 2012. He served as a claims analyst until he was promoted to the position of Sr. Analyst in February 2013. As an analyst he worked on the BEL Andry Law Firm claim. He recalled that while reviewing the claim in the last week of December 2012, he noted the claim lacked an owner/officer breakout. As a result, he sent out an incompleteness notice on December 27, 2012.

In February or March 2013, he had already been promoted to the position of team lead. He received an e-mail from Mark Staley which asked, "Can you give me an update on this claim" (referring to the Andry Law Firm claim)? He then went into the system and located the claim. He noted that it was in the accountant allocation queue, and e-mailed Mark Staley back and told him, "it's live again, should I request it to be pulled?", meaning placed into his queue. He put a request into the business intelligence team to move the claim into his queue. He then assigned it to Jordan Wilkinson who was the best analyst he had on his team at the time.

Jordan Wilkinson looked over the file and noted that the requested owner/officer breakout had been provided as requested. Wilkinson noticed what was driving the calculation and indicated they needed a bank statement because the Andry Law Firm had received a large settlement for one of the months in question. Wilkinson called the Andry accountant to request the bank statement and Rinaldi recalled an issue Wilkinson noted regarding the reimbursement of an attorney for medical expenses. They received an explanation for paying the medical expenses of an individual he vaguely recalls as "MD". The bank statement verified the revenue spikes and they sent it along.

Rinaldi advised that he never spoke to anyone in the Claims Administrator's Office regarding the Andry claim. When Mark Staley e-mailed him about the claim, his first impression was that someone from the Claims Administrator's Office had contacted Mark Staley because someone complained about a delay or them not being responsive. He did not speak to anyone else about the claim that did not have a legitimate reason to know about it. He thought though that it was worth asking Mark Staley if the claim should receive special treatment. He specifically asked Staley, "Do I have to work this claim?" Staley told him to give it to a regular analyst on his team and work it as you would any other claim. He was instructed to make appropriate telephone calls, ask appropriate questions, and ask for appropriate information to support the claim. Staley asked to be notified when the claim was complete.

He is ninety-nine percent sure no one from the Claims Administrator's Office spoke to Jordan Wilkinson about the claim. Because of the policies and practice of P & N, Wilkinson would have said something to him.

# INVESTIGATIVE REPORT
# FOLLOW-UP
# JULY 1, 2013

## IN RE: Lionel H. Sutton, III Matter

**Situation:** On June 20, 2013, an investigative report was drafted detailing allegations of misconduct by an individual working in the Deepwater Horizon Economic and Property Damages Settlement, Claims Administrator's office. The allegations centered on the conduct of Lionel H. Sutton, III, (Tiger Sutton) an attorney in the office. The investigative report detailed the allegations and subsequent investigation to that date. The instant document provides the results of additional investigative steps.

**Investigation:** Following the completion of the aforementioned investigative report, David W. Welker conducted nine interviews of the Claims Administrator's staff, Tiger Suton and Christine Reitano, Postlewaite and Netterville (P & N) accountants, and a Garden City Group (GCG) employee. David W. Welker also requested that the search of Tiger Sutton's e-mails be expanded to include the words, "Lerner" and the word "fee".

**Interviews:** The following individuals were interviewed by David W. Welker and/or Patrick Juneau and Michael Juneau: Jordan Wilkinson (P & N claims analyst/accountant); Christopher Rinaldi (P & N claims analyst/accountant); Mark Staley (P & N, Director); David Duval (CAO, Appeals Coordinator); Tracy Steilberg (CAO, Executive Assistant); Steve Cirami (GCG, Senior Vice President of Operations); Christina Hendrick (CAO CADA); Lionel H. Sutton, III; and Christine Reitano.

On June 20, 2013, Christopher Rinaldi was interviewed. Rinaldi indicated he is a Senior Claims Analyst at P & N. He advised he was a claims analyst before being promoted to a team lead position and had initially worked on the Andry Law Firm BEL claim in December 2012. In February or March 2013, he received an e-mail from Mark Staley asking for an update on the Andry Law Firm BEL claim. He asked if he needed to personally work on the claim. Staley told him to assign it to a claims analyst and work it as he would any other claim. He assigned the Andry Law Firm BEL claim to analyst Jordan Wilkinson. At no time did he speak to Tiger Sutton regarding the claim and he is ninety-nine percent sure Jordan Wilkinson never spoke directly to Sutton. (TAB 1)

On June 20, 2013, Jordan Wilkinson was interviewed. Wilkinson advised he is a claims analyst at P & N. He advised that he was not assigned the Andry Law Firm BEL claim from its inception. He first received the claim in January/February 2013 after it was assigned to him by

Christopher Rinaldi. He noted that the documents previously requested were in the claim file but he believed he required bank statements to complete his review. He requested the bank statements from the accountant hired by the Andry Law Firm who provided the requestTd information. The subsequent analysis then went pretty quickly because there was so little needed to complete the review of the claim. Wilkinson never spoke to Tiger Sutton regarding tie claim and to the best of his knowledge Tiger Sutton never attempted to contact him directly. TAB 2)

Mark Staley was interviewed on June 21, 2013. Staley advised that he holds the position of Director at P 8 NI He advised that from time-to-time someone from the CAO contacts him regarding the status of a claim. He does not recall being questioned about the claim prior to his e-mail exchange with Tiger Sutton in March 2013. He noted that when Sutton asked to speak to one of his acco¹untants, he didn't read anything into it, but he noted, "no one needs to talk directly to his a¹ ccountants." He advised his accountants initiate any contact, but only with the claimant or auorized representative. It is the policy and practice of P & N that if an accountant must meet wi ; an outside entity, a manager is also present. P & N has a strict confidentiality policy as well as strict ethical standards. He did not speak to Sutton outside the exchat4e of e-mails from Makch 2013 (TAB 15, June 20, 2013 Investigative Report). It was the first time that Sutton had contacted him regarding the Andry Law Firm BEL claim and he does not recall Sutton ever re-contacting him regarding the status of the claim. (TAB 3)

On June 25, 2013, David Duval was interviewed. Mr. Duval is the Appeals Coordinator in the CAO. He advised that he didn't recall Tiger Sutton having any interest in the Casey ThJann appeal. He vaguely recalled a discussion with Sutton regarding the RTP. He recalled that when the Andry Law Firm claim made it to the appeals process, Sutton approached him and asked if it had been assi    ed to a panelist. He asked Duval about the timetable and the process. Sutton told him that Jon    dry or Gibby Andry may call him regarding the appeal. Sutton didn't ask him any specific q estions regarding the appeals panelist but told him that Gibby may call him to ask that question. He didn't recall any other claims that Sutton in which took an unnatural interest. Christine Rei    o never took what he thought was an unnatural or extreme interest in       claim. (TAB 4)

On June 20, 2 113, Tiger Sutton appeared at the offices of the CAO, at the request of the CAO. He was subsequently interviewed by David W. Welker, Patrick Juneau, and Michael Juneau. Sutton indicated he didn't understand what was going on and was not sure of the allegations against him. He was advised of the allegations. He was presented an e-mail in which Sutton wrote, "Did you check on my Thonn fee?" Sutton indicated that Thom owed him money. He could not answer why he called it, "my fee." He indicated that Thonn was a case he woked for a year before he joined the CAO and even if he got paid for it he didn't see the issue. He indicated that any money Lerner sends him is for money he is owed for his role in Crown LLC. Lerner owed him money for public relations expenses and his salary. He was to receive $15,000 monthly for public relations expenses and $10,000 monthly for a salary for Crown LLC. When he referred the Thonn claim to Andry Lerner LLC, he told them (Jon Andry and Glen Lerner)

that the case was in part for Lerner so he could use the money to pay him (Sutton) the money he was owed. When Lerner settles a claim, the money goes to Jon Andry to pay for Crown. He emphasized he didn't get any money from the Thonn claims. He advised that the only reason they referred Thonn to Andry was because Christine began working at the settlement program. When he and Christine represented Thonn, he only had a VoO claim and a seafood claim. He noted that he had also represented Thonn in an auto wreck case in which Thonn received approximately $16,600, but he noted that Andry and Lerner were not involved in that case and he was paid directly by the insurance company. He realized that when he called the money, "his fee", it looked bad. He does not know what the Thonn claim settled for or what the fee was. Every time he discussed Lerner sending money it was for Crown LLC. The e-mail, referring to 50% of the Thonn fee $16665 (TAB 22 June 20, 2013 Investigative Report) was referring to Glen Lerner's share of the Thonn claim, not Thorn's automobile accident. Sutton noted that if he was being dishonest, he wouldn't have done it that way, at least not about the money. He believed this to be an issue between himself and Pat Juneau because it makes it look like he was being dishonest with Pat because he told Pat he did not have a financial interest in any claim. He doesn't believe he violated his contract. He observed that clearly he has to go because of the cost of suspicion, but he wouldn't give up his job for $4900. He concluded that he didn't feel he had given a satisfactory explanation because he didn't have one to give. He didn't see that he had done anything wrong. (TAB 5)

On June 20, 2013, Christine Reitano appeared at the CAO, at the request of the CAO. She was subsequently interviewed by David W. Welker, Michael Juneau and Patrick Juneau. Ms. Reitano was advised of the allegations of misconduct against her husband Tiger Sutton. After being read several e-mails which were attachments to the investigative report of June 20, 2013 detailing the misconduct, Ms. Reitano indicated she was not aware of the contents of the e-mails read to her. She advised that Tiger Sutton is involved in a business, Crown LLC, with Glen Lerner and Glen Lerner is a business partner with Jon Andry. She believed Lerner funds all of Jon Andry's advertisements for the BP oil spill. She was aware they were working on Crown LLC for years. She never handled any Crown LLC money and Tiger Sutton always maintained the checkbook. She advised she had no financial interest in any claim. The Thonn claim was their only claim before the court ordered settlement program that re-filed again in the court ordered settlement. She indicated that she had also represented a claimant names Backes, but wasn't sure if they filed a claim in the settlement program,. If they had filed a claim in the settlement program it would be in the name of Tallulaha's Bar. A review of the DHECC claimant system failed to reveal a claim in the name of Backes or Tallulaha's Bar. She received no money from the Thonn claim. She felt that Tiger Sutton working in the settlement program might get him away from Lerner. She doesn't believe he will take it to another level. She felt that this might be Tiger's way of getting Lerner to do what he was supposed to do. She asked that we get past perception to Tiger's true character. (TAB 6)

On June 26, 2013, Christina Hendrick was interviewed. Ms. Hendrick is the Court Appointed Distribution Agent for the subsistence program. She advised she had nothing to do with the Casey Thonn claim and never heard of Casey Thonn. She never heard of Jon Andry and can't recall any firm-wide issues relating to the Andry Law Firm, nor could she recall any communication with the Andry Law Finn. Likewise she has never heard of or dealt with Glen Lerner. She advised that Tiger Sutton never came to her to specifically influence a policy. In most cases, with policies in general, all policies were commented on by employees at Brown Greer, the Director of Fraud, Tiger Sutton and the legal committee. If she had a disagreement with Sutton, she asked that the issue be taken to the entire legal committee. She felt that Sutton was always pushing for leniency, generally on the whole subject of subsistence not just one claim, but the program as a whole. (TAB 7)

On June 24, 2013, Tracy Steilberg was interviewed. Ms. Steilberg is an Executive Assistant in the CAO. She advised that prior to her employment in the CAO, she worked for Tiger Sutton and Christine Reitano for approximately 19 years. She recalled that the Sutton/Reitano Law Finn handled GCCF claims for the following clients: Casey Thonn; Tim and Wendy Gonzalez; the Backes (Jennifer and others unrecalled); Tallulah's Bar in Slidell; and a woman named Patricia (Last Name Unknown). She is aware that Casey Thonn has a claim in the settlement program because it came through the appeals process. Sutton asked her about the Thonn claim about the same time the claim was going through the appeals process. She probably pulled up the claim to check the status of the claim. If she pulled it up, she probably related the status to Sutton. She thought Thonn had a duplicate claim. She recalled that Casey Thonn hired Sutton and Reitano when the Sutton/Reitano Law Firm was located on the sixth floor at 935 Gravier Street, New Orleans, La. Tiger had to give Thonn up as a client because Christine started working for the settlement program. Christine told her they gave the Thonn claim to Jon Andry. Sutton/ Reitano had the Thonn claim for about a year before the settlement program began. Sutton also asked her about the status of the Andry Law Firm claim around the time the claim was going through the appeals process but before it went to a panelist. He asked her which panelist was assigned the claim but she would not tell him. She told him to check the portal. He told her, if Jon or Gibby asks her, she is to tell them she didn't have that information. She doesn't recall Sutton asking about any other claimants that Sutton/Reitano previously represented. In the course of her duties, she has done nothing to influence or impact the Andry Law Firm claim or the Thonn claim. She handled them as she would any other appeal. She also believed Tiger Sutton had a business with Robert Perez called Romeo Papa, which received funds from the GCCF. (TAB 8)

On June 27, 2013, Steve Cirami was interviewed. Mr. Cirami is employed by the Garden City Group (GCG), as the Senior Vice President of Operations. GCG is a vendor in the Deepwater Horizon Economic and Property Damage Settlement Program. He along with other senior members of GCG's management team oversees the GCG role in the project from front end to back end. GCG provides call centers, a data center, document intake, data entry, and payments

of claims as well as various projects as directed by the Claims Administrator. Mr. Cirami has never heard of Casey Thonn and is not familiar with his claim. Up until the recent events, Mr. Cirami may have heard the name Jon Andry, but couldn't tell you anything about it. Mr. Cirami had very little contact with Tiger Sutton. He has attended several meetings with Sutton. Approximately two weeks prior, Christine Reitano e-mailed him and copied Tiger Sutton on the e-mail. She asked a general question, can a claimant be paid by wire if they did not originally elect for wire payment? He wrote back and answered, yes, and then explained the process. He directed them to complete a Payment Election Form, but that payment is only wired to the attorney's IOLTA account. Most attorneys have an IOLTA account. This policy and practice had previously been approved by Mr. Juneau. Sutton responded to Cirami's last e-mail that the claimant is the lawyer but doesn't have an IOLTA account, can you do it anyway? Mr. Cirami took that to mean the claimant couldn't or didn't want to use an IOLTA account because it was his claim, not one of a client. Mr. Cirami stated the question didn't seem unusual at the time. Mr. Cirami answered Sutton by indicating it was Mr. Juneau's policy, they had made no exceptions, and he could ask Mr. Juneau about it, directing him to Mr. Juneau. Sutton did not respond to that advice. The exchange was via e-mail and involved no verbal discussion. There was no mention of the claimant's name or claim number. This was the only contact he had with Sutton outside of widely attended meetings. (TAB 9)

**Database Review:** Through interviews and the investigation, it was determined that Tiger Sutton was involved in a business named, Romeo Papa, LLC. A review of the Louisiana Secretary of State (SOS) database was queried for information concerning a business named, Romeo Papa. Records were obtained and reviewed that reflect the existence of Romeo Papa, LLC. The sole Registered Agent is listed as Robert H. Perez, 3901 Highway 24, Bourg, La. 70343. The sole Officer is listed as Robert H. Perez, with the same address. The registration date of the corporation is listed as 2/21/2001. (TAB 10)

A review of the DHECC database revealed a Business Economic Loss claim, which is subject to Moratotia Loss review. The claim was filed by Bart Haddad on December 13, 2012, on behalf of Romeo Papa, LLC, claimant # 100158584. (TAB 11)

A review of the financial documents in the claim file revealed that Lionel H. Sutton, III or T-Blue, LLC is listed as a partner on the schedule K tax forms. Louisiana SOS database reflects that T-Blue, LLC was registered on August 8, 2001. The mailing address is listed C/O Lionel H. Sutton, III, at 610 Baronne Street, New Orleans, Louisiana. The sole Registered Agent is listed as Lionel H. Sutton, III and the sole Officer listed is Lionel H. Sutton, III. (TAB 12)

Documents reviewed in the Romeo Papa claim for the tax year 2007, specifically the schedule K tax form lists the partners as T-Blue, LLC and Robert H. Perez. For the tax years 2008, 2009, 2010, and 2011, the schedule B1, form 1065 tax form lists the 50% partnership as Robert Perez, 50% and Lionel H. Sutton, III, 50%, the schedule K for the same tax years, lists the partners as Robert H. Perez and Lionel H. Sutton, III. It is unknown what the current status of the

partnership is beyond the 2011 tax records submitted in support of the aforementioned claim. (TAB 13)

An additional document reviewed in the Romeo Papa, LLC claim file, Doc ID: 7465159, Doc File ID: 17561220, create date of 1/7/13 reflects an Act of Cash Sale and Assignment, Membership Interests and Sharing Ratios of Romeo Papa, LLC.

The document reflects holders and owners of membership interests and sharing ratios of Romeo Papa, LLC before giving effect to this act of cash sale and assignment: listed are

Name: T-Blue, LLC; Membership Interest/Sharing Ratios Owned 51%

Name: Robert Perez; Membership Interest/Sharing Ratios Owned 49%

Holders and Owners of Membership Interests and Sharing Ratios of Romeo Papa, LLC after Giving Effect to this Act of Cash Sale and Assignment:

Name: Lionel H. Sutton, III; Membership Interest/Sharing ratios Owned 50%

Name: Robert Perez; Membership Interest/Sharing Ratios Owned 50% Name:

T-Blue, LLC; Membership Interest/Sharing Ratios Owned 0%

The document is undated but signed by T-Blue, LLC, BY: Lionel H. Sutton, III, Managing Member; Robert Perez, and Lionel H. Sutton, III. (TAB 14)

A review of court records for the U.S. District Court for the Eastern District of Louisiana reflects a civil law suit, 2:11-cv- 02540, Romeo Papa, LLC v. National Response Corporation, in which a complaint with jury demand was filed on October 7, 2011 by Lionel Sutton. Following several pleadings, an order dismissing the case was signed by U.S. District Court Judge Mary Ann Vial Lemmon on November 6, 2012. (TAB 15).

In the matter of State National Insurance Company v. Cummins Mid-South, Inc., 2:11-ev-02207-ILRL-DEK, wherein Romeo Papa, LLC is a plaintiff, Sutton continued to represent Romeo Papa, LLC through April 22, 2013, when court records reflect the Appeal Record was on loan to Lionel H. Sutton, III. (TAB 16).

In the matter of State National Insurance Company v. Cummins Mid-South, Inc. 2:11 — cv — 02207 ILRL-DEK, a review of the Fifth Circuit, Court of Appeals Docket Report reflects Appellant's Brief Filed on June 14, 2013 with Attorney's for Appellant, Harville and Sutton. (TAB 17)

A review of CAO employee claims access reveals that Sutton accessed the Romeo Papa, LLC claim five times between January 4, 2013 and May 2, 2013.

It must *be noted,* Sutton was actively involved in the development of a policy dealing with Moratoria claims as to which claims would be payable under the terms of *the settlement and* which claims would be excluded. The Moratoria policy is still in the drafting stage. Parties are still attempting to reach an agreement on the terms of such policy.

**DHECC E-Mail Review:** Following the drafting of the Investigative Report dated June 20, 2013, the parameters of the e-mail search for Sutton and Reitano's e-mails was expanded to include the words "fee" and "Lerner." The word "fee" was generally too expansive and overwhelming to where the review was not productive. Under the search term Lerner, an e-mail chain was discovered from May 9, 2013, beginning at approximately 3:02 pm, in which Sutton and Lerner discuss a logo for Crown, LLC. Lerner responds, "glad to see you working so hard while I try to figure out how to keep paying for shit." Sutton responded, "u forget. im also working hard to get you $ so you can pay for shit." Lerner responded, "ooh la la, Work harder. How's Chris." Sutton responded, "she's good. it has actually been pretty fun working together on this." Lerner then responded, "They are not paying claims. Insane." Sutton then responded, "Just between me and you, here is your report: 402 claimants; 61% have submitted a signed claim form; 22% started a registration form; 16% finished Registration but did not file a claim form; <1% finished Registration, started a Claim Form but did not finish; 466 total claims filed; 89 paid; 179 incompleteness Notices issued, only 93 responded to (17 of the non-responsives are waiting to get paid); 136 under review but no incompleteness Notices issues; 47 denied. Example of some problems: 1) Your firm was issued an incompleteness notice on Talen's on 12/3. What appears to be a complete response was not received by us until 5/3. During that six month period, a lot of claims got in front of yours. 2) Only a little more than half of your clients have even submitted signed claims. At an intake rate of more than 200/day, your clients will be way behind." (TAB 18)

By e-mail dated June 24, 2013, Chris Reade advised that he had conducted a search of Christine Reitano's DHECC computer. He reported that he could not find any contact between Ms. Reitano and anyone at the Andry Law Firm, including Glen Lerner, Jeff Cahill, Jon Andry and others mentioned in Tiger Sutton's e-mails. He searched the entire computer and all e-mail and the only mention of Casey Thonn, the Andry Firm or any other issues pertinent to this matter are those that come from our automated internal systems, such as payment reports, appeals reports, and similar e-mails from internal systems and staff. The sole mention in an e-mail of Casey Thonn or his claims from Ms. Reitano to anyone else is in an e-mail dated September 17, 2012, entitled, "Re: Expedited Claims." This e-mail has an attachment where Casey Thorn's name is listed first in the Excel file. This e-mail was included in the Investigative Report dated June 20, 2013 at TAB 13, but a copy is included here as well. (TAB 19)

On June 27, 2013, copies of the June 20, 2013, Investigative Report, with attachments, were delivered to the FBI, New Orleans Division, and the United States Attorney, Eastern District of Louisiana at their respective requests. (TAB 20)

*The* investigation at the *Deepwater Horizon* Economic and Property Damages Settlement, Claims Administrator's office continues.

- Please note a correction from the June 20, 2013 investigative report. On page 2, paragraph 2, line 22, it was reported that Casey Thonn has received $477,225.13 in payments from the Deepwater Horizon Economic and Property Damage Settlement. That figure is incorrect. The accurate sum of money he received is $406,402.35.

David W. Welker

SM-04-TALF000792