# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179<br><br>SECTION J |
| This document relates to:<br>*Elton Johnson v. BP American Exploration & Production Inc.*, No. 2:13-cv-5804 | * * * * * * | Honorable CARL J. BARBIER<br><br>Magistrate Judge SHUSHAN |

## BP'S REPLY BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT AND IN SUPPORT OF BP'S MOTION FOR SUMMARY JUDGMENT

Of Counsel:

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
richard.godfrey@kirkland.com
andrew.langan@kirkland.com

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jeffrey.clark@kirkland.com
dominic.draye@kirkland.com

Don K. Haycraft
Devin C. Reid
LISKOW & LEWIS LLP
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 556-4128
Facsimile: (504) 556-4108
dkhaycraft@liskow.com
dcreid@liskow.com

**ATTORNEYS-IN-CHARGE FOR DEFENDANTS BP EXPLORATION & PRODUCTION INC., BP PRODUCTS NORTH AMERICA INC., AND BP CORPORATION NORTH AMERICA INC.**

Johnson's vague attempt to tie this idiosyncratic dispute to the entirely different class action settlement matters currently pending in MDL 2179 is a sure sign of desperation.  *See* Pl's Reply at 1.  No principle of law or logic requires BP to pay Johnson's fraudulent claim here, especially not based on his assertions of an unformed settlement contract with the GCCF and in spite of the overarching point that Congress never intended the actions of an OPA claims facility to be subject to judicial review in the first place (whether via motions to supervise or, as here, via a breach of contract action).  Undeniably, the GCCF acted consistent with its Protocols to issue a final denial on Johnson's claim.

The GCCF process to which Johnson voluntarily submitted himself could end one of three ways: (1) the GCCF makes a final decision to deny a claim; (2) the GCCF grants a claim, but the claimant deems the award to be too low or otherwise refuses to sign a release — meaning no contract is ever formed and litigation remains available — or (3) the GCCF grants a claim and the claimant signs a release, thereby accepting the award.  There is no "fourth way" wherein: (a) the GCCF issues a final denial of a claim after initially stating an agreeable settlement amount (but no other terms); (b) the claimant never signs a release because the claim is later denied after a fraud investigation; yet (c) the claimant remains free to assert that an undefined release of his own design miraculously became operative because he wishes to elevate a preliminary letter to contract status before his fraud is further exposed.  If a GCCF release is signed, there is a contract.  If it is not, there has been no mutual assent and no agreement to material terms.  ***The GCCF release is the only possible contract, and such a release is either signed or it is not.***

Here no release was signed.  Nor is there any contemporaneous evidence that a release was going to be signed.  Instead, the Plaintiff ***has previously conceded*** that the bodily injury release was a nonpublic document and thus that he had neither seen nor reviewed such a release.

1

*See* Doc. 37 at 17 n.17. The *post hoc* affidavit from Plaintiff labeled his Exhibit B is simply an all-too-convenient avowal that he ***would have*** signed a release and cannot backfill the gaping hole in his case. Moreover, nowhere does the affidavit aver that Plaintiff had ever laid eyes on the GCCF personal injury release or that the Plaintiff followed up with the GCCF to request that a release be sent. It is simply untenable, especially in a case involving a seaman, for the Plaintiff to maintain that the highly detailed, nine-page GCCF release could be plucked from the air in the name of contractual gap-filling. To see this, imagine that a GCCF claimant who had never signed a release brought a second claim against another *Deepwater Horizon* defendant — one far down the list in terms of how often it has been sued. How far would such a defendant get in arguing that the sort of pre-final GCCF letter on which Johnson relies granted it a definable contractual release? *See* Ex. H to BP Summ J. Mot. at 6 (listing Schlumberger as released). Not very far. Releases must be clear and not the trigger to opening a Pandora's Box of new litigation about the release's meaning; and a seaman's assent to them must be crystal clear, else *Deepwater Horizon* litigation would stretch out forever.

Beyond these controlling principles, several errors in Plaintiff's Reply demand a response:

***1. Johnson Cannot Evade That He Is Seeking Summary Judgment on His Contract Claims.*** Motions to enforce settlement agreements are recognized in general federal (and Fifth Circuit) jurisprudence. *See, e.g., Magee v. ENSCO Offshore Co.*, 2013 WL 2389910, at *2 (E.D. La. May 30, 2013) (Barbier, J.) ("Plaintiff filed his motion to enforce the settlement before the Court's jurisdiction over the settlement expired; therefore, this motion is properly before the Court, and the Court may enforce the settlement at issue."). But such motions do not exist apart from the Federal Rules of Civil Procedure. Additionally, unlike in *Magee*, this is not a situation

in which it is undisputed by the parties that a settlement agreement was entered (with disputes arising on other matters); instead this is an independent suit filed for breach of contract that must first establish a contract exists. *See Great Lakes Dredge & Dock Co. v. Ebanks*, 870 F. Supp. 1112, 1119-20 (S.D. Ga. 1994) ("[t]he Court cannot order specific performance of a settlement agreement without first declaring that an enforceable settlement agreement indeed exists."). Johnson postures himself as appearing before this Court purely on a motion to enforce a settlement agreement. But that is revisionist history. Johnson filed an independent breach of contract action. Also, Johnson did everything he could both in other trial courts and in the Fifth Circuit to avoid federal court jurisdiction generally (an issue he now concedes) and to avoid ***this Court's jurisdiction specifically***. Only the Fifth Circuit's swift action brought an end to Johnson's games of forum shopping. Ironically, he now pretends the detour he took never happened.

Moreover, the availability of the device of seeking to enforce a settlement plainly does not allow litigants to bypass Rule 56 or disputed issues of material fact. In fact, all of the cases Johnson cites involve nothing more or less than motions for summary judgment. *See Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 388 (5th Cir. 1984) ("Mid-South filed a motion for summary judgment to enforce the compromise settlement."); *accord Cia Anon Venezolana De Navegacion v. Harris*, 374 F.2d 33, 34-35 (5th Cir. 1967) (also a motion for summary judgment).

The *Mid-South* decision is especially informative here. After the District Court granted summary judgment despite one party's assertion that a valid settlement agreement was never formed, the Fifth Circuit overruled the decision and remanded for an evidentiary hearing to determine an open factual issue regarding contract formation. *Mid-South*, 733 F.2d at 391-92. This outcome is a direct application of the summary judgment standard: summary disposition is

appropriate only when there are no factual issues to be resolved. *See also Noble Drilling, Inc. v. Davis*, 64 F.3d 191, 195 (5th Cir. 1995) (interpreting *Mid-South* to require resolution of open factual issues); *Harmon v. Journal Pub'g Co.*, 476 F. App'x 756, 757-58 (5th Cir. 2012) (same). Here, there are no factual questions regarding BP's cross-motion, but Johnson's motion requires resolution of whether or not he fraudulently induced the GCCF to settle. Thus, Johnson's motion fails at its inception — explaining his interest in avoiding the summary-judgment standard — while BP's motion should be granted for the reasons identified below and in the opening brief.

*2. No Contract Arose Because There Was No Agreement on All Material Terms.* There is little to add to BP's opening brief regarding the incongruity between a one-sentence summary of release terms in the GCCF's letter and the actual nine-page release. Particularly damning for Johnson, however, is his new attempt to show that he somehow knew what the release said. Pl's Reply at 5 & n.3.[1] After recognizing that the Determination Letter's reference to "bodily injury" to be materially different from the litany of claims being surrendered by the release, Johnson tries to explain that the documents were identical. *Id.* First, Johnson announces summarily that "the [Determination] letter uses the term in the same way that the Release does." *Id.* Johnson offers no explanation or citation for that proposition, and BP has no reason to believe that any court within the Fifth Circuit would confidently reach the same conclusion if

---

[1] Until now, Johnson has recognized that "[t]he Release is not a publicly available document," Rec. Doc. 37 at 17 n.17, and he has therefore not contested BP's oft-repeated point that he never saw the release — neither before Judge Hughes, nor in the Fifth Circuit. Johnson now implies for the first time that he must have seen the release because it *was* publicly available or certainly his lawyers must have known about it. *See* Pl's Reply at 5 n.3. His should stick with his earlier position. While it is true that the economic and property damage release was publicly available, the personal injury release was not. This is another sign of desperation. To admit familiarity with a related but different release that was attached to the Protocols is for Johnson's counsel to admit (which they have previously resisted) that, as sophisticated lawyers with repeat GCCF experience, they were very familiar with the Protocols themselves. This admission destroys the argument that they were taken unaware by the GCCF's application of those Protocols including their anti-fraud procedures. Indeed, as we noted in our opening brief, this is part of a larger pivot in these remand proceedings, which includes Plaintiff's first admission that the Protocols were relevant by citing to them. *See* MTE 3, 21 (citing Pl's Ex. I, the Protocols). He oddly continues to dispute the relevance of the Protocols' companion document, the GCCF Rules. *See* MDL Doc. 12121. How one but not the other could be relevant is baffling.

4

roles were reversed. *See generally Halliburton v. Ocean Drilling & Exploration Co.*, 620 F.2d 444, 445 (5th Cir. 1980) (explaining the burden on defendants enforcing a release against a seaman). **Second**, Johnson offers his subjective, *post hoc* assurance that he understood the terms "bodily injury" to mean ***any*** injury, "including without limitation[,] mental health injury and economic loss in connection with bodily injury or mental health injury," Ex. H at 4. *See* Pl's Reply at 5. If Plaintiff actually inferred this precise meaning from the two words "bodily injury," he has a very accurate crystal ball. Regardless, as a legal matter, his subjective understanding is irrelevant and unenforceable.

Johnson's responses to BP's other examples of the materiality and uniqueness of the GCCF personal injury release's key terms also illustrate the weakness in his position. For example, Johnson underscores that he was not married at the time of the letter exchange, Pl's Reply at 5-6, but BP did not know that.[2] Moreover, Johnson ignores that the release also mentions parents, heirs and business partners — relationships that fully apply to a bachelor. Releasing claims on behalf of these parties is undeniably a material term. And regarding the three pages of released parties, Johnson offers an explanation only for why he might have thought Tidewater was included. *Id.* at 4. But Tidewater is but one entity on a very long list. Even that explanation is nothing more than his subjective interpretation. Finally, despite Johnson's arguments, it would have been very natural in this context for a party reading the letter

---

[2] Johnson argues that "spouses (and other family members) are not allowed to recover for loss of society or on other derivative theories in maritime personal injury cases." Pl's Reply at 5. This assertion rests on the premise that maritime law would govern the release, which is directly contrary to the release's terms. The release specifies that it will be construed and enforced according to "the laws of the state of residence of the Claimant." Ex. H at 6. Because some States allow derivative claims or other potential claims by relatives, the GCCF and BP drafted the release to include an unmistakable release of such claims and to comply with a wide range of state-law rules. The purpose of the release was to ensure uniform effect (across States) to the greatest extent possible. The specific facts of Johnson's marital status are irrelevant. Most importantly, what this refusal to accept the choice of law provision in the release reveals is that Johnson and the GCCF never agreed on all material terms. Indeed, Johnson's belief that the release is governed by maritime law is at war with the release's terms. He could hardly do a better job demonstrating the lack of agreement between himself and the GCCF.

5

to interpret "responsible parties" to bear its OPA meaning because the GCCF was a claims facility principally set up under OPA.  Yet the release lists a slew of non-responsible parties as benefitting from the release's terms, whether "responsible parties" is given its technical OPA meaning or its commonsense meaning.  No one who had never seen the list could predict *ex ante* its complete contents.

In light of the Fifth Circuit's special concern for seamen's rights in the context of settlement agreements, it is impossible that the *one sentence* Johnson characterizes as containing all material terms can bear the weight he places on it.  *See* BP Br. at 9-10 (collecting cases on the special care taken when enforcing releases against seamen).  The absence of numerous material terms from the Determination Letter defeats Johnson's effort to sign it and declare a contract.

*3.  In the Alternative, Any Contract Included the Signed Release as a Condition Precedent to Payment.*  Johnson is confused in his response to BP's alternative argument that, if a contract existed, execution of the release was a condition precedent to payment.  To be clear, the executed release was necessary to form a contract for all of the reasons identified in Part I of BP's opening brief.  If, however, this Court were to conclude that a contract could have been formed, then the best understanding of the release is as a condition precedent to payment.  Johnson blurs these two alternative arguments.  His theory that he and BP entered a "sequential" contract goes to contract formation, rather than the law of contractual conditions.  Pl's Reply at 7-8.  It is a red herring.  To avoid characterizing the release as a condition, Johnson describes the waiver of (unknown) rights as an *obligation* of his alleged agreement with BP.  *Id.*; *see also* Pl's Br. at 17.  Of course, nothing supports the theory that BP could force Johnson to sign the release or enforce its unknown terms against him.  *See* BP Br. at 9-10, 12.  Plaintiff's theory of a sequential contract has another fatal flaw: it appears nowhere in his complaint.  There, he alleges

that the exchange of letters "requires BP to pay money to Johnson in exchange for him dismissing his lawsuit." Ex. G at 6. This new theory is a made-for-litigation revision that the purported contract required the GCCF "to send a Release." Pl's Reply at 7. Plaintiff's theory that the parties entered a "sequential" contract is therefore waived. *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.").

Johnson's only direct response to the release being an unsatisfied condition is an attempt to resurrect his doctrine of prevention argument. Pl's Reply at 8. In response to BP's point that the condition survives because the GCCF did not "improperly" prevent satisfaction, *see* 13 WILLISTON ON CONTRACTS § 39:4, Plaintiff pivots to arguing the merits of fraud. *Id.* This pivot is one of several attempts by Plaintiff to litigate the issue of fraud in a reply brief. While BP looks forward to adjudicating that dispute in the eventual trial of Johnson's tort claims, it suffices for now that the GCCF reasonably relied on the Guidepost report, which concluded that "there is no credible evidence Johnson suffered injuries" and that Johnson's claims were "fabricated." Ex. B at 1, 17.[3] As explained elsewhere, the Court need not resolve whether the GCCF's third-

---

[3] Johnson's attempt to reimagine the Guidepost report as absolving him of fraud falls flat. One need only look at the very next sentence after the one Johnson quotes in claiming that the GCCF's fraud concerns were "baseless." *See* Pl's Reply at 8. Following Plaintiff's favorite sentence, which merely stops short of finding "overt" documentary fraud, the report states that "[t]he ***overwhelming weight of the evidence***, however, ***thoroughly negates his alleged injuries***." Ex. B at 1 (emphasis added); *see also id.* at 17 (explaining in the report's Conclusion that Johnson's claims "appear to be ***fabricated***") (emphasis added). Looking to the entirety of the report, it is far-fetched in the extreme for Johnson to claim that Guidepost or the GCCF fixated on "mundane discrepancies." Pl's Reply at 1. Of course, to read the report in its entirety, the Court will need to rely on BP's exhibits, since Johnson has repeated his strategy of including only a single page of a document damning to his positions (here, one out of seventeen pages). *See* BP Br. at 10 (exposing a similar selective-excerpts maneuver as to the release).

Instead, of "mundane discrepancies," the Guidepost report found: (1) "multiple fellow crew members, one of whom was standing alongside Johnson at the time of the explosion, disputed the events and injuries Johnson later reported" (Ex. B at 1); (2) fellow crew did not hear him contemporaneously complain of injuries or say he needed to see a doctor, even when back onshore (*id.* at 3, 5, 6, 8, 9, 10, 15, 16); (3) the crew also failed to see Johnson display any injuries (*id.* at 3); (4) crew did see a different crewmember sustain a minor injury and stated to investigators that this

party investigators were correct. The only question is whether the GCCF acted improperly in withholding the release. If anything, the only improper course of action would have been sending the release to a claimant who faced serious, evidence-based accusations of misconduct. That was precisely the type of claim a GCCF looking to pay only deserving claimants should deny and thereby defer for resolution by a court designed to handle adversary litigation.

*4. BP Did Not Ratify Any Agreement with Plaintiff.* Johnson's ratification argument has evolved in response to the fact that BP could not ratify an agreement when it was unaware of the facts surrounding it. Plaintiff now argues that BP had a duty to *sua sponte* investigate Johnson's claim and unearth his fraud. Br. at 7 ("a reasonable party in litigation would choose to investigate further . . . ."). As with so many of his arguments, Plaintiff's position ignores the fact that he was not engaged in litigation with BP; rather, Plaintiff presented his claims to the GCCF, which BP knew to apply reasonable anti-fraud procedures. Johnson identifies nothing that would have prompted a reasonable party to undertake its own investigation on top of the GCCF's diligence when eventually presented with Tidewater's evidence. It is precisely because of its reasonable reliance on the claims facility that BP recommended that Tidewater provide its interview transcripts to the GCCF. Pl's Reply Ex. F ("BP encourages Tidewater to reach out to the GCCF directly with any information . . . ."). Referring Tidewater to the GCCF was the

---

other crewman was the only one who reported an injury immediately after the incident (*id.* at 3-4, 6); (5) Johnson formally reported an injury only weeks later (*id.* at 4); (6) Johnson was asked if he was injured and did not respond affirmatively (*id.* at 6-7, 11); (7) one crewmember recalled that Johnson's mood changed right after he received a telephone call from a loved one, at which point he abruptly began complaining (*id.* at 7); (8) Johnson told crew he wanted to "get some money out of Tidewater" and asked rhetorically, "everyone on the rig is going to get some money. Why not me?" (*id.* at 8); (9) contradicted by numerous other witnesses, Johnson claimed never to have been asked after the Incident whether he was injured, yet also claimed he immediately told Tidewater he was injured (*id.* at 13-14); (10) Guidepost concluded Johnson had given his doctors conflicting statements (*id.* at 14); (11) contradicted by numerous other witnesses, Johnson maintains the explosion threw him six feet (*id.*); and thus (12) Guidepost concluded: "The interviews of all of Johnson's crewmates provided no credible evidence that Johnson suffered the physical injuries he alleged in connection with the Deepwater Horizon explosion …. Johnson's behavior on the day of the explosion and immediately thereafter is inconsistent with statements attributed to him regarding his purported injuries. Johnson's claims of physical injury as a result of the Deepwater Horizon explosion appear to be fabricated." (*id.* at 17).

8

reasonable and correct course of action.  Johnson cannot assert that BP ratified his purported contract based on the latter's decision not to duplicate the functions of the GCCF, as they were designed by the Justice Department after BP and the White House agreed to establish the GCCF.

The only commendable thing about Johnson's new ratification argument on reply is its tacit recognition that BP was correct in its opening brief that ratification is impossible where the alleged ratifying party was unaware of "'all the material facts and circumstances.'"  BP Br. at 18 (quoting *In re Babcock & Wilcox Co.*, 2002 WL 1874836, at *5 (E.D. La. Aug. 13, 2002)); *see also id.* (providing dates for all relevant information about Johnson's fabrications).

    ***5.  BP Need Not Prove Fraud, Though Johnson Must Disprove It.***  As indicated at several points above, the parties have an asymmetric burden with respect to fraud.  BP's arguments rest on the simple fact that the GCCF concluded that "there is insufficient reliable evidence to support this claim" and thereby the GCCF declined to consummate a settlement contract.  Ex. A at 1.  The GCCF reached that conclusion, "pursuant to its standard protocol," after referring the matter to an independent investigatory firm.  *Id.*  This Court need not adjudicate the accuracy of the investigation to recognize that the GCCF ***understood*** the evidence to establish "that Mr. Johnson's account of his injury had been fabricated" or that this was true to a high probability.  *Id.*  That the GCCF reached this conclusion is beyond dispute, and even Plaintiff does not challenge the veracity or admissibility of the Denial Letter, which explains the basis for the GCCF's final action.  *See* Doc. 12121.  BP's burden with respect to showing the role of apparent fraud in the GCCF decision-making process is therefore met.

For his part, Johnson slips into a debate over the type and extent of fraud, but none of the cases he cites adopts the only holding that could allow his motion to prevail — namely, that fraudulent inducement is categorically unavailable in settlement contracts.  Only such a holding

9

would suffice to make BP's assertion that Johnson fraudulently induced the GCCF to send him a Determination Letter a legal irrelevancy and thus fail to constitute a disputed factual issue. But that is not the law. *See, e.g., Helia Tec Res., Inc. v. GE & F Co.*, 2013 WL 3157534, at *1 (S.D. Tex. June 19, 2013) (denying motion for summary judgment because "there are numerous material issues of fact in dispute, including whether [defendants] were fraudulently induced into joining in the Settlement."); *O'Hare v. Graham*, 455 F. App'x 377, 382 (5th Cir. 2011) (affirming judgment that settlement agreement was fraudulently induced and explaining that ratification was no response where the induced party did not have "all of the material facts").

Johnson tries to fall back on the District of Wyoming case, *Johnson v. King*, No. 10-CV-279-S, 2011 WL 4963902, at *14 (D. Wy. Oct. 17, 2011), to argue that the validity of a settlement cannot be relitigated by tossing the label of fraud around. But *Johnson* is distinguishable both in that it did not involve a dispute about whether a settlement contract had ever been formed (as here) and because numerous other grounds existed for rejecting the defendant's counterclaim of fraudulent inducement in that case, including (a) both *res judicata* and collateral estoppel created by prior state court judgments established the settlement's validity and enforceability, *see id.* at *7-*9; and (b) the fact that the defendant had not just once, but **twice** settled the same claims, *id.* at *13.

## CONCLUSION

Whether because the parties never entered into a contract or because any settlement agreement contained a condition that went unsatisfied, this Court should deny Plaintiff's Motion to Enforce and grant BP's Motion for Summary Judgment. At the very least, this Court should deny Plaintiff's Motion until all genuine disputes of material fact are resolved, including BP's defense pleaded in its answer that the GCCF letter was procured via fraud in the inducement.

| | |
|---|---|
| Date: January 17, 2014 | Respectfully Submitted, |
| Of Counsel: | /s/ Don K. Haycraft |
| | Don K. Haycraft (Bar No. 14361) |
| Richard C. Godfrey, P.C. | Devin C. Reid (Bar No. 32645) |
| J. Andrew Langan, P.C. | LISKOW & LEWIS LLP |
| KIRKLAND & ELLIS LLP | 701 Poydras Street, Suite 5000 |
| 300 North LaSalle | New Orleans, LA 70139 |
| Chicago, IL 60654 | Telephone: (504) 556-4128 |
| Telephone: (312) 862-2000 | Facsimile: (504) 556-4108 |
| Facsimile: (312) 862-2200 | dkhaycraft@liskow.com |
| richard.godfrey@kirkland.com | dcreid@liskow.com |
| andrew.langan@kirkland.com | |
| | **ATTORNEYS-IN-CHARGE FOR** |
| Jeffrey Bossert Clark | **DEFENDANTS BP EXPLORATION &** |
| Dominic E. Draye | **PRODUCTION INC., BP PRODUCTS** |
| KIRKLAND & ELLIS LLP | **NORTH AMERICA INC., AND BP** |
| 655 Fifteenth Street, N.W. | **CORPORATION NORTH AMERICA** |
| Washington, DC 20005 | **INC.** |
| Telephone: (202) 879-5000 | |
| Facsimile: (202) 879-5200 | |
| jeffrey.clark@kirkland.com | |
| dominic.draye@kirkland.com | |

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 17, 2014, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system. I also certify that I have served this filing by United States Postal Service to all counsel of record who are not registered to receive electronic service by operation of the court's electronic filing system.

/s/ Don K. Haycraft