UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deep Water Horizon" in the Gulf of Mexico, on April 20, 2010 | * | CIVIL NO: |
| | * | |
| | * | SECTION: "J" (1) |
| This Document Applies to: | | |
| | * | JUDGE BARBIER |
| No 12-970, Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production, Inc., et al. | * | MAGISTRATE SUSHAN |

**ANDRY LERNER, LLC'S SUPPLEMENTAL OBJECTIONS
TO SPECIAL MASTER'S REPORT**

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................... 1

II.    THE SPECIAL MASTER IGNORES HOW THE CLAIMS PROCESS
FUNCTIONS AND ITS CLAIMANT-FRIENDLY PRACTICES .................. 1

        A.    A Non-Adversarial Process Designed To Maximize
              Benefits for Victims ...................................................................... 3

        B     Status Requests Are Encouraged and Responses Mandated ………….3

        C.    The System As Designed Had Significant Checks and Balances Making
              Tampering Impossible .............................................................. 6

        D.    The Special Master Omits Significant Exculpatory Evidence…………9

III.   ANDRY LERNER AND ITS PRINCIPALS DID NOT VIOLATE
STANDARDS OF PROFESSIONAL CONDUCT REGARDING
REFERRAL FEES............................................................................... 10

IV.   ANDRY LERNER HAD NO DUTY OF DISCLOSURE TO JUNEAU........ 12

V.    ANDRY LERNER DID NOT ENGAGE IN ANY CRIMINAL ACTS ......... 12

VI.   CONCLUSION .................................................................................. 14

i

I.      **INTRODUCTION**

Andry Lerner is filing this Supplemental Objections reflect the discovery produced by the Special Master after our December filing.


II.     **THE SPECIAL MASTER IGNORES HOW THE CLAIMS PROCESS FUNCTIONS AND ITS CLAIMANT-FRIENDLY PRACTICES**

The allegations contained in the Special Masters report proceed from a fundamental misunderstanding about the policies and practices for adjudicating BP settlement claims. The Special Master ignored the context in which Andry and Lerner communicated with Sutton and other CAO staff.  The Deepwater Horizon claims process was not designed as an adversarial process but rather designed as a cooperative process between the Claims Office and the claimants.. Discussions and the exchange of information between the Claims Office and counsel for the claimants were encouraged. Unilateral inquiries about status of claims were encouraged.  *See* Section 4.3.7 of the Settlement Agreement. Indeed, CAO staff were encouraged  to answer the tens of thousands of status inquiries from lawyers and  claimants.

A.      **A Non-Adversarial Process Designed To Maximize Benefits for Victims**

These proceedings arise in the context of the implementation of a settlement in which the defendant BP  agreed to fund compensation for tens of thousands of injured parties through a Court-Supervised claims determination process.  The settlement is being implemented by the CAO headed by Patrick Juneau and assisted by a professional staff and outside vendors, pursuant to numerous policies and procedures approved by BP and the Plaintiffs' Steering Committee ("PSC").

1

Section 4.3.7 of the Settlement Agreement mandates that the claims process be a cooperative endeavor to benefit claimants.  The Claims Administrator and its vendors are required to use their "best efforts" to provide claimants "with assistance, information, opportunities and notice" so that the claimant "has the best opportunity to be determined eligible for and receive" a settlement payment.  (Rec. Doc. 6430-1 at 18.)  The CAO , its staff and professionals are mandated to assist at all times "for the benefit of the Economic Class Members." (*Id.* at Recital G)  "Claims will be processed and paid as expeditiously as possible by the Claims Administrator."   See Settlement Agreement (Seafood Compensation Program), Rec. Doc. 6430-22 (filed May 3, 2012) at p. 4.  Moreover, as Henry Mitchell, the Director of Quality Control for Postlethwaite & Netterville ("P&N") testified, it was the CAO's policy to "'make sure the claimants get the max settlement.'" (Mitchell 103).

Claims are determined according to policies and procedures agreed upon by BP and the PSC. The claims process is not a traditional adversary proceeding.  In this case, eligibility and amount of awards are initially determined without BP's participation according to the numerous established policies and the Settlement Agreement as interpreted by the Court. (Mancuso I, ¶ 5) BP does not participate in the process until after an Eligibility Notice is issued.   (Mancuso I, ¶ 6) Written and oral communications between the CAO, vendors, and claimants and their lawyers are routine and an integral part of the process. (*Id.*, ¶¶ 7, 13)

### B.        Status Requests Are Encouraged and Responses Mandated

Implementing the Settlement Agreement's requirement to provide beneficial assistance to claimants, the CAO instituted numerous procedures to facilitate claims, provide information, and assist claimants and attorneys in navigating the complicated system. The goal is transparency at every stage: claimants are afforded a real time window on the processing of their claims. One significant program is the attorney portal account assigned to each attorney which provides to the attorney real time information about the status of attorneys claims directly from the database of the CAO.. (Mancuso I, ¶ 33) A CAO liaison is also assigned to each attorney and provides assistance in processing claims, explaining procedures, and troubleshooting. (Mancuso I, ¶ ¶ 4-7; Kailey LeBoeuf (40)).[1]

Responding to inquiries is commonplace in a system with 195,000 claims. Not surprisingly, 42,000 outreach calls had been logged as of May 5, 2013. (Status Report No. 9 (May 13, 2013) (Rec. Doc. 9907) As the Appeal Coordinator Tracy Steilberg testified, she "regularly takes calls from claimants asking about problems with claims [and she] offers any assistance that she can." (Steilberg (36); *see also id.* at 32 ("many claimants would call up all the time and she would field the requests . . . regarding status . . . .,) Thus, when Andry inquired about some claims, the appeals process, deadlines, how long it takes to get paid, and the status of a list of claims, this was a routine contact from an attorney. (Kailey LeBoeuf (32-33, 36))

Similarly, Andry queried David Duval, Appeals and Government Relations Coordinator, about the status of The Andry Law Firm claim, some other claims, and how

---

[1] The Special Master produced witness interview summaries which are collected in Exhibit 20. They are paginated with Bates stamp numbering beginning SM-03-JA 000001. The citations to those summaries reference the last two or three digits.

long it would take to get paid. (David Duval (73, 76)). This routine inquiry, mostly "generic" questions, was part of his job—just like the "other lawyers with claimants [who] were calling him all the time . . . ." (*Id.* at 74, 76)  Andry made no impermissible request such requesting information as to the composition of an appeal panel for the Andry claim (*Id.* at 74).  Indeed, Mike Juneau told Andry to call Duval or him about his claims.  (Exh. 27).

Patrick Juneau testified about the overwhelming volume of inquiries generated by 195,000 claims and the duty of everyone on his staff and himself to find out the answers to inquiries. (Patrick Juneau at 99).

> "[W]e get literally get hundreds of inquiries, from lawyers, from BP, from the Plaintiffs' Steering Committee, claimants directly, *pro se* claimants, what's the status of my claim.  I try to get those out . . . we have contacts at BrownGreer and find out—we communicate."

(*Id.* at 90-91)

Sutton was required  to respond to attorneys requests for information about the status of claims. Responding to requests was a routine part of his work. (*Id.* at 96)  Sutton in his testimony cites numerous examples of Patrick Juneau and other CAO staff members instructing him to work with attorneys (including PSC members) in resolving problems with their claims.  *See* Lionel Sutton, III's Memorandum in Opposition To The Report of Special Master Louis Freeh (Rec. Doc. 12022) ("Memorandum") at pp. 12-16; Sutton at 117, 209.

The evidence shows that the CAO bred a culture of cooperation, not corruption. Attorneys asking for information and the CAO staff responding was the norm, not the exception in this "claimant friendly" environment.  (Sutton at 211).  This is a dynamic

4

process at work, and Andry Lerner worked within the confines of the system just like thousands of other lawyers and claimants.

The most serious charge against Andry Lerner and its principals is that they improperly communicated with Sutton and other CAO staff (1) to learn about the status of the claims and (2) to urge that they be expedited.  As for the second assertion and as shown above, there is simply no evidence that anyone advocated that Andry Lerner or The Andry Law Firm claims be given preferential treatment in their processing.  Indeed, when Lerner asked Sutton "how can we speed up the process," Sutton replied that "you can't." (Exh. 25)  As for the first assertion, the record conclusively demonstrates that inquiries about status were routine, encouraged, and legitimate. *See* Section IV B, *supra.* In his opinion, Professor Hazard notes several reasons why the charge of wrongful behavior leveled against Andry Lerner and its members is unfounded.

First, the settlement process was not a judicial tribunal conducting adversarial proceedings where *ex parte* contacts are prohibited. (*Id.* ¶ 27)

Second, Andry Lerner's attorneys had a professional responsibility to pursue their clients' claims "by making inquiries and pressing for prompt processing."
(*Id.* ¶ 28)

Third, CAO policies and practice encouraged lawyers to seek information about their claims, and the staff was obligated to be responsive. (*Id.* ¶ 29)  This was a routine practice occurring countless times.  (*Id.* ¶ 30)  "In this environment, what Andry and Lerner did was the norm and expected.  Mancuso I Affidavit at ¶ 13."  (Hazard Declaration, ¶ 32)

5

Fourth, Andry Lerner had an ethical duty to represent its clients zealously within the bounds of the law. *See* Louisiana RPC 1.3 ("A lawyer shall act with reasonable promptness in representing a client."); *see also* Hazard Declaration, ¶ ¶ 33-36. Trying to get their clients paid is competent representation, not misconduct. (*Id.*, ¶¶ 34-35) "A lawyer calling attention to his client's file and asking that it be moved to the next step—a common occurrence in the BP settlement claims process—does not violate any ethical rules or protocol established by the CAO. [Mancuso I Affidavit] at ¶ 13. That lawyer is acting in the best advocacy tradition of zealous prosecution of a client's claim." (Hazard Declaration, ¶ 36)

### C.   The System As Designed Had Significant Checks and Balances Making Tampering Impossible

A settlement claims process of this magnitude—with such comprehensive management programs, policies, procedures, and training—is unprecedented. The administration of the payment of billions of dollars on 195,000 claims required the creation of an adjudication system that was efficient, prompt, and minimized the risk of error, corruption, and fraud. Patrick Juneau, a veteran of mediating and presiding over large settlement programs, and four experienced outside vendors were responsible for designing and implementing the claims process. (Report at p. 8.)

Working with the PSC, BP, and the vendors, the CAO promulgated some 487 policies governing claims determinations based on the Settlement Agreement as interpreted by the CAO and the Court. The CAO also established procedures for processing claims from filing to payment. Literally dozens of CAO staff and vendor employees were involved in one way and at one time or another along the claims

pipeline.  A claim's eligibility and award were largely a mathematical exercise based on data furnished by the claimant, including tax returns and profit and loss statements.

An integral component for preventing improper calculations was a system of checks and balances where determinations at each stage were reviewed by quality assurance specialists and others.  There were a dozen or more check points along the way.   What developed was an elaborate institutional set of checks and balances responsive to Patrick Juneau's "clear ethical 'tone at the top' and sound written policies . . . ." Report at p. 8.

The Administrator is justifiably proud of the great integrity in the program and the multiple layers of review and quality assurance.  (Patrick Juneau at 127)   While no system is fool proof, "[i]t would take Einstein to get into this system. . . . I'm not seeing in the case any influence." (Patrick Juneau at 129)

After receiving two investigative reports from Patrick Juneau concerning issues raised about his office and the handling of claims, the Court echoed this sentiment, commenting on the elaborate protections preventing Sutton from improperly influencing a claim determination.

> "THE COURT:  [I]t's hard for me to fathom how any single person over there, or two persons over there could – I mean, we would have to imagine some grand conspiracy where there were dozens of people over there engaged to influence a single claim.  It just seems not very likely at all. . . .
>
> "There is some evidence that one of the attorneys may have at time made efforts to inquire as to the status of certain claims and/or to expedite certain claims.  **However, this is most important I believe, the internal investigation has not found any evidence that either of the two played any part in the actual processing of claims or that they improperly influenced the computation of any claims.**  In fact, as the Court has noted, these claims are analyzed and computed by multiple layers of review and quality control within the program by different analysts and accountants.  **And as the Court understands the process, it would be highly unlikely, if not impossible, that**

**any single person would be able to falsely inflate or corrupt the processing of the claims at the Settlement Program."**

(Exh. 22 at 9-10, 49-50 (emphasis added))

The Administrator conducted two reviews of the allegations at the heart of this proceeding.  His counsel summarized the findings at the July 19th hearing.

> "At the Court's request, Mr. Juneau's office has also performed an internal review of its policies which does not reveal . . . any improper influence by either of the two attorneys. . . .**[There is a] lack of evidence of any improper influence to date on the actual calculation of claims . . . . We think that it is highly unlikely that that occurred**. . . . [W]e have not been able to find any evidence that your Honor has asked about, that there is any impact on any particular calculation."

(*Id.* 22-23) (emphasis added).

In sum, as to Andry Lerner and The Andry Law Firm claims, no one testified that anyone asked them to "expedite" or "[p]ay this" claim.  (Reitano at 115)

### D.   The Special Master Omits Significant Exculpatory Evidence

There is no evidence of improprieties but there is evidence of propriety. One of the most exculpatory pieces of evidence is curiously omitted from the Report.  The Special Master references an email between Lerner and Sutton of January 29, 2013. (Report at 21). The Special Master cites a portion of the email in support of his case that Lerner asked Sutton how his wife could get Lerner's claims expedited.  Incredibly, the discussion at this part of the Report omits this critical exchange in this email:

> "How can we speed up our review process?"

> "**You can't.**  You are going pretty fast.  The process will get faster on its own as grey areas are resolved and applied across the board. What you can do is make sure that any incomplete notices are responded to asap.  Previously, responses to incomplete notices were sent to the back of the line but we will be streamlining that process very soon."

(Exh. 25)  (emphasis added))

8

Similarly omitted from the Report is additional evidence favorable to the respondents.  At a lunch between Sutton and Andry, a frustrated Andry inquired whether Sutton could help move along his law firm's claims. Sutton responded that

> "he wasn't over any claims.  Didn't deal with any claims. and understood my concern and my complaint because that was happening a lot, but [said] that the facility was getting better, and that they were trying to process claims."

(Andry at 25-26)

The undisputed evidence demonstrates that Sutton could not and did not deal with, much less try to influence claims.

The Special Master also did not disclose that the Andry Law Firm claim was not expedited or prioritized.  According to the "testimonial notes" there were only three people that neutrally handled the Andry Law Firm claim – Staley, Rinaldi and Wilkerson. Their testimony is the best evidence regarding the pace of the claim and should be the only evidence relied on by this Court.  They uniformly testified that it was handled like any other claim and was not expedited.

Mark Staley is a P&N Director who in March 2013 was asked by Sutton about the claim.  Staley asked a subordinate Chris Rinaldi for an update.  (Staley (95))  When he got the information, he forwarded it to Sutton (95).  Sutton never inquired any further and never asked for any preferential treatment.  Rinaldi asked Staley how to handle the claim, and he told him to process it like any other claim.  (Exh. 28, p. 785).

A claims analyst who never dealt with Sutton, Rinaldi testified to the same effect. As it turned out, the inquiry was prompted by an admitted mistake that Rinaldi had made in sending out an Incompleteness Notice when the requested information was in fact on the claimant's portal. (90)  Rinaldi emailed Staley when the audit was completed in the

9

normal course, and he had no other contacts with Staley or anyone else on this file (90-91).  It is utterly false that Sutton's inquiry to Staley was "to expedite The Andry Law Firm claim," and it had nothing to do with "issuing the notice of eligibility on March 20, 2013."  Report, p. 6.

This evidence shows the system working the way it was designed to function.  A claim is not progressing, an inquiry is made, an error is detected and corrected, and the claim moves forward.  In fact, Staley testified that such inquiries from CAO staff were not uncommon.  Patrick and Michael Juneau "also asked about claims," and he fielded those "questions about the status of claims . . . ."  (Staley (95))  In fact, the "high volume of status requests from claimants, *as well as from [CAO]"* created "a backlog . . . ."  (Staley (96))

## III.     ANDRY LERNER AND ITS PRINCIPALS DID NOT VIOLATE STANDARDS OF PROFESSIONAL CONDUCT REGARDING REFERRAL FEES

The Special Master asserts that Andry Lerner has violated the Louisiana Rules of Professional Conduct ("RPC") by paying Sutton referral fees without a written consent by Thonn and in paying Sutton referral fees while he was employed by Juneau. (Report, pp. 85-86)  Neither of these allegations are supported by the facts or law.  In support of its defense on this issue, Andry Lerner offers the Declaration of Geoffrey Hazard C. Hazard, Distinguished Professor of Law Emeritus, Hastings College of Law, University of California, and Trustee Professor of Law Emeritus, University of Pennsylvania.  The Reporter of the American Bar Association Model Rules of Professional Conduct (the basis for the Louisiana professional conduct standards), Professor Hazard is the nation's

foremost authority on professional ethics. (A copy of his professional biography is attached to his Declaration as Attachment "A.")  In his opinion, Andry Lerner and its principals did not violate any professional conduct rules with regard to referral fees paid to Sutton for five reasons.  *See* Declaration, Paragraphs 7 (a)-(c), 8-17.  A few of the more salient reasons include the following:

First, Andry Lerner did not pay a referral fee to Sutton.  Andry Lerner had a direct attorney-client relationship with Thonn as evidenced by its Attorney/Client Contract. (Attachment "B" to Hazard Declaration).

Second, three independent reviews of the Thonn claims and all of the Andry Lerner claims found no irregularities in terms of undue acceleration or enhancement—a fact recognized by the Special Master. *See* Report, p. 4; *see also* Hazard Declaration, ¶ 9.

Third, no ethical standards were violated by the payment of a referral fee if the Court chooses to classify the payment to Sutton as such.  A referral fee paid by one attorney to another is a legitimate, standard practice authorized by the Louisiana RPC subject to certain requirements.   *See* RPC 1.5 (e).

Fourth, Thonn was not harmed. "The purpose of the requirement of consent is to make sure that the client knows what is being done, *i.e.,* his case is not being secretly handled by some strange lawyer." (Hazard Declaration, ¶ 14) Thonn knew Andry Lerner was handling his case because he hired the firm.  *See* Comments to Louisiana RPC 1.5 (e), "Fee Sharing." The 20% contingent fee that Sutton/Reitano was charging Thonn did not increase with the Andry Lerner engagement—another concern addressed by

Louisiana RPC 1.5 (e).  Accordingly, Andry Lerner's conduct did not violate Louisiana

RPC 1.5 (e).[2] (Hazard Declaration, ¶ 14)

There should be no referral to the Louisiana State Bar.

## IV.   ANDRY LERNER HAD NO DUTY OF DISCLOSURE TO JUNEAU

The Special Master faults Andry Lerner and its principals for not informing

Juneau about paying Sutton the so-called referral fees before they were paid.  As

Professor Hazard opines, however, "…Andry Lerner did not have any relationship—

whether contractual, fiduciary, or otherwise—that would give rise to a duty to inform

Juneau about  their representation of Thonn.  *See, e,g., Chiarella v. United States,* 445

U.S. 222, 228 (1980) (citation omitted)."  (Hazard Declaration, ¶ 20).  Andry Lerner and

its principals had a right to assume that Sutton's request for payment of the referral fee

was in conformity with his ethical obligations.  Sutton had the duty to advise Juneau

because he had the dual relationship (CAO employee and referring attorney) as well as

direct access to Juneau.  Lerner inquired of Sutton whether Lerner paying him was

appropriate, and Sutton told him that he had cleared the matter with Juneau. (Lerner at

29-30), *see* Hazard Declaration, ¶ 22).


## V.   ANDRY LERNER DID NOT ENGAGE IN ANY CRIMINAL ACTS

The Special Master references statutes involving money laundering and mail and

wire fraud. *See* Report at pp. 82-84.  On the facts and law, Andry Lerner and its

principals did not violate any criminal statutes, and no referral should be made to the

---

[2] The record shows that Sutton and his wife performed substantial services in working up
the claims before the case was taken over by Andry Lerner. (Sutton at 64-65, 216) This
amount of "meaningful services" means that there was compliance with Rule 1.5 (e) (3)
of the Louisiana RPC. (Hazard Declaration, ¶ 16)

United State Attorney. Andry Lerner offers the opinion of Jay Shapiro, a respected forensic accountant with extensive experience investigating money laundering and fraud schemes. His resume is attached as Exhibit "A" to his Declaration.

The Special Master alleges that the Andry Lerner payments to Lerner's firm and then Lerner's firm to Sutton were "circuitous and convoluted." *See* Report, p. 81. Nothing could be further from the truth. There was nothing nefarious about these payments. These were routine transfers of money from one bank account to another bank account done in a normal manner with no attempt at concealment and recorded in each law firm's general ledger. The transactions were transparent and done in the ordinary course of business. There was no money laundering or fraud. *See* Declaration of Jay Shapiro ¶¶ 8-11, 18-22.

The most critical fact is that the money did not come from illegal activity. The funds were received by Andry Lerner as legal fees from BP's settlement payments to Thonn. There was nothing illegal here. Likewise, Andry Lerner's money paid to Lerner's firm was not "dirty." The money was not "washed" through several banks by means of indirect, disguised transfers. Instead, it moved transparently by checks and wire transfers recorded in the law firms' general ledger, and the source and recipient are identifiable (Cahill (51); *see* Shapiro Declaration, ¶¶ 13-15)

Shapiro emphatically concludes that these transactions have none of the hallmarks of money laundering.

> "[i]f I had been engaged to audit the books and records of Andry Lerner and Lerner's law firm, none of these check and wire transfer transactions would have been identified as suspicious and reportable. Nothing about the checks and wire transfers gives the slightest indication of being part of a money laundering scheme."

13

(Shapiro Declaration, ¶ 18.)

Nor do these financial transactions remotely constitute mail/wire fraud. The essence of the criminal conduct here would be paying Sutton money with the fraudulent intent to defraud someone of money or property. *See* Report, p. 82.  There is no evidence that Sutton did anything to enhance any of the Thonn claims beyond what should have been paid under the policies and formulas.  Likewise, there is no evidence that the CAO was cheated out of "the honest services" of Sutton.  *See Skilling v. United States,* 130 S.Ct. 2928, 2931-32 (2010). For these reasons, Shapiro concludes that the facts do not warrant these charges.

> "[T]here would be no reportable 'Illegal Acts.' The primary reason for this opinion is that there is no evidence that Sutton committed any illegal act in communicating with Andry and Lerner and informing them about the status of their claims. Three independent reviews of the Andry Lerner and The Andry Law Firm claims have found no evidence of manipulation as to the processing or the value of the awards. Absent any evidence of unlawful fraudulent acts by Sutton, I would have nothing to report."

(Shapiro Declaration, ¶ 23).

## VI.    CONCLUSION

For the foregoing reasons, the Court should exonerate Andry Lerner and its principals, order that the stayed claims be allowed to proceed and attorney's fees be paid, and dismiss the Order To Show Cause.

Dated:  January 17, 2014                    Respectfully submitted,

                                            /s/ Douglas S. Draper
                                            Douglas S. Draper
                                            Heller, Draper, Patrick & Horn, L.C.C.
                                            650 Poydras Street, Suite 2500
                                            New Orleans, Louisiana  70130

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Andry Lerner, LLC Objections To Special Master's Report has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System in MDL 2179 this 17th day of January, 2014.


/s/ Douglas S. Draper
Douglas S. Draper

15