# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deep Water Horizon" in the Gulf of Mexico, on April 20, 2010 | * | CIVIL NO: |
| | * | SECTION: "J" (1) |
| This Document Applies to: | | |
| No 12-970, Bon Secour Fisheries, Inc., e al. v. BP Exploration & Production, Inc., et al. | * | JUDGE BARBIER |
| | * | MAGISTRATE SUSHMAN |

## DECLARATION OF JAY SHAPRIO

1.      I am a Certified Public Accountant licensed in State of California since 1978.  I have performed over 1,000 engagements involving accounting principles, auditing standards, and fraud issues.  I am a former "Big 8" partner and Director of Audit & Accounting Services for that firm's Los Angeles Office.  I am an active member of the Association of Certified Fraud Examiners and attended its workshop on Money Laundering in September 2010.  My particular experience with money laundering and mail fraud schemes has been fictitious identities, offshore transactions, insurance policies, prepaid items, circuitous transfers of money, and investments.  I have been accepted as a forensic expert in audit and accounting matters in many jurisdictions.  A copy of my professional biography is attached as "Exhibit A".

2.      The facts and opinions contained in this Declaration are within my personal knowledge and, if called upon to testify, I could and would testify competently thereto.

3.      I have been engaged on behalf of Jonathan Andry ("Andry") for my expert opinion concerning some aspects of his conduct as reflected in the Report of the Special Master Louis J. Freeh ("Freeh Report)".  I am being compensated for my work on an hourly rate basis.

## ASSUMED FACTS

4.   As the basis of my opinions, I assume the following facts:

a.    Andry and Glen Lerner ("Lerner") are law partners in Andry Lerner LLC (formed in February 2012) ("Andry Lerner") whose practice is mostly handling plaintiff personal injury and British Petroleum ("BP") Oil Spill compensation claims (over 500 claimants) which are administratively processed by the Deepwater Horizon Economic & Real Property Claims Center ("DHECC") through the oversight of the Claims Administration Office ("CAO") headed by Patrick Juneau.  The DHECC, which is funded by BP, had several court-appointed vendors responsible for fraud detection and administration irregularities including the "Big 4" firm, PriceWaterhouseCoopers.

b.    Lerner in his individual capacity was also a principal with Sutton in a water purification business ("Crown").   Andry was not a participant in that business, and he was unaware of its day-to-day operations.

      c.    Sutton and his wife, Christine Reitano, were partners in their own law firm. They were engaged by Casey Thonn to pursue three BP compensation claims with DHECC. Thereafter, they were both hired as CAO attorneys to work by Juneau in the Court Supervised Settlement Program ("CSSP") of DHECC

      d.    The Sutton firm recommended to Thonn that he engage Andry Lerner, and he and the firm signed a standard contingent fee Attorney/Client Contract that was the basis for Andry Lerner to later be compensated for their work on his behalf. Before the referral, Sutton and Reitano had done a substantial amount of work on Thonn's three claims.

      e.    The CAO had written policies requiring staff to disclose all conflicts of interest and requiring its staff to fully cooperate with claimants and claimant lawyers as to claim status and professional processing.

      f.    Sutton's duties at CAO did not provide the appropriate authority or an opportunity for improper acceleration and/or enhancement of any claims, including those being handled by Andry Lerner. It was part of every CAO staff member's job to respond to inquiries from claimant's counsel, help move claims through the system, and otherwise be cooperative with the goal of compensating victims as quickly as possible as reflected in the stated objectives in the Settlement Agreement.

      g.    Andry Lerner sent to Lerner 50% of the fees on each of the Thonn claims in accordance with an operating agreement between Lerner and Andry for division of fee income. This agreement preexisted receipt of the Thonn fees and Sutton going to work for the

CAO. Lerner sent Sutton referral fees in accordance with his personal agreement to pay him the fees that Lerner received.

      h. Lerner made other payments to Sutton for his personal services arising from their separate business (Crown) which was launched before Sutton went to work for the CAO. These payments had been made before and after Sutton went to work for Juneau, and Sutton was providing services when he was paid by Lerner. There is no evidence that Andry knew of these Crown payments or their purpose.

      i. There is no evidence that the money paid to Sutton by Lerner in connection with the attorneys' fees earned from settlement of the Thonn claims was anything other than a customary referral fee agreed upon by the attorneys before Sutton went to work for Juneau. Whether it was proper for Sutton to accept such fee does not alter the nature of the payments by Lerner to Sutton.

      j. There is no evidence that the referral fee payments by Lerner were made for any illicit purpose such as influencing Sutton or Reitano to commit any illegal acts with respect to the Thonn claims. Given the fact that the Freeh Report concedes that these were referral fees and cites no evidence of any other purpose, it would be unreasonable to infer that the referral fees were paid for an improper or illegal purpose. No evidence of Thonn award enhancement or unusual processing exists.

      k. There is no evidence that the Thonn claims or The Andry Law Firm claim ($7.9 million) were expedited or enhanced by Sutton or Reitano or that any of the hundreds of

other BP compensation claims filed by Andry Lerner were improperly expedited or enhanced by Sutton, Reitano, or anyone else on Juneau's staff.

l.    Andry did not have personal knowledge that Sutton may have violated CAO guidelines for conflict of interest by failing to make adequate, full disclosure to Juneau.

m.    The money used by Lerner to pay Sutton came from a legitimate source unconnected with any illegal activity. The money came from Lerner's law firm's operating account.

n. The money received by Andry Lerner for its legal fees came from BP in the form of the settlement awarded by the DHEEC. This, too, is a legitimate source unconnected with any illegal activity.

o. The money paid to Lerner from Andry Lerner came from the Andry Lerner operating account. This is also a legitimate source unconnected with any illegal activity.

p. The transfer of money from Andry Lerner to Lerner's law firm was done by checks written on the Andry Lerner operating account. The checks are all recorded in the Andry Lerner general ledger and reflected on its bank statements. This is the customary way in which obligations are paid by businesses, and there is nothing improper or nefarious about these three check transactions.

q. The transfer of money from Lerner's law firm to Sutton's account was done by wire transfers from the Lerner operating account. The three payments reflect on the document that the purpose of the payment was the Thonn fee. The three payments are all

recorded in the Andry Lerner general ledger and reflected on its bank statements. This is a customary way in which obligations are paid by businesses, and there is nothing improper or nefarious about these three wire transfer transactions.

## THE ACCUSATIONS

5.     The Freeh Report asserts that the transfer of funds from Andry Lerner to Lerner's law firm and then the transfer of funds from Lerner's law firm to Sutton was by means of "using circuitous and convoluted interstate wire transfers . . . ." Freeh Report at p. 81. On this basis, Freeh suggests that Andry and others may have violated federal criminal statutes regarding fraud and money laundering.

6.     Specifically, the Freeh Report identifies federal money laundering statutes (18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 1957). These statutes involve a financial transaction whereby the proceeds of certain crimes are concealed as to (1) nature (2) source, or (3) ownership. Section 1957 involves an amount in excess of $10,000 in criminal proceeds. *See* Freeh Report at pp. 84-85.

7.     The Freeh Report also identifies federal mail and fraud statutes (18 U.S.C. §§ 1341, 1343). These statutes involve use of interstate mails or wires in furtherance of a scheme or artifice to defraud or to obtain money or property by means of fraudulent pretenses, representations, or promises. It appears that the Special Master is focusing on whether Sutton illegally manipulated Andry Lerner's clients' claims and engaged in self-dealing by taking bribes or kickbacks, thereby depriving his employer of his honest services. *See* Freeh Report at pp. 82-84.

## SUMMARY OF OPINIONS

8.     The two series of transactions in which funds were transferred—three times from Andry Lerner to Lerner's law firm and then three times from Lerner's law firm to Sutton—were not "circuitous and convoluted" by any means.  These were routine banking transactions done in the ordinary course of business utilizing funds from legitimate sources and customary transparent means for transferring funds from one business to another.

9.     These transactions were all properly documented and recorded on the books of Andry Lerner and Lerner's law firm.  There was no effort to disguise the existence, source, or application of the funds.   The funds were sent directly from one bank account to another bank account without the use of any indirect, intermediary, or convoluted routing.

10.     There was never any "dirty money" to be laundered.  Money from BP is hardly derived from criminal activity.  Nor is payment of legal fees from Andry Lerner to Lerner's law firm and Lerner's law firm to Sutton derived from criminal activity.

11.     Nor were the transfers by interstate mail and wire made in order to defraud or cheat anyone out of money or honest services for his employer.  The record indicates that Sutton was doing what was expected of him as part of his job in answering inquiries from Andry and Lerner.  There is no evidence that Sutton  manipulated the processing of any Andry Lerner claims or The Andry Law Firm claim.

## DISCUSSION

12.     In the ordinary business world and as understood in established accounting and auditing literature, money laundering entails the taking of the proceeds of illegal activity and disguising the (1) existence, (2) source, or (3) application of such "dirty funds" so the proceeds eventually appear to come from a legitimate source.  Such activities could encompass bribery in international trade (Foreign Corrupt Practices Act) and domestic terrorism (Patriot Act).

13.     Typically, the money from the illegal activity is "washed" through several bank accounts by means of indirect, disguised transfers.  It is not uncommon that a bank officer has been corrupted to facilitate the movement of funds so that they appear to be legitimate wire transfers.  The key factor is an element of disguise, that is, the masking of the source and purpose of the transfers.

14.     It is the antithesis of money laundering when there are only two banks involved—the transferor and transferee—and a single transaction.  If the person sending the money was attempting to disguise the source, this would not accomplish his goal because detection would be easy.  The source and recipient are identifiable.

15.     Complete documentation of a transaction—conspicuous transparency—is also not a hallmark of money laundering.  It is not uncommon for there to be phony books and records, fictitious inventory, bogus invoices, phantom receipts, and so forth. Similarly, the businesses involved often have falsified general ledgers and other internal financial records.

16.     The accounting profession is required to use published auditing standards when examining a client's books and records and expressing an opinion on its financial statements. These are promulgated as "Statements of Auditing Standards" (SAS).

17.     Under Statement of Auditing Standards #54, *Illegal Acts by Clients*, ("SAS 54"), auditors have substantial responsibilities when they notice activities that resemble money laundering or fraud.  Auditors must first determine if the suspected money-laundering

activities are likely to have a material effect on financial statements. If so, SAS 54 requires auditors to perform additional procedures including obtaining a detailed understanding of the questionable transactions, the parties involved, and the client's criminal knowledge and intent regarding the act.  The auditors should report money-laundering activities to the client's board of directors. If an accountant believes the consequences of the money laundering have not been properly accounted for or disclosed on the financial statements, SAS 54 states that the auditor should express a qualified or adverse opinion on the financial statements.  If the client refuses to accept the auditor's modified reports, the auditor should resign.

18.     For the reasons set forth in Paragraphs 12 to 15, above, if I had been engaged to audit the books and records of Andry Lerner and Lerner's law firm, none of these check and wire transfer transactions would have been identified as suspicious and reportable. Nothing about the checks and wire transfers gives the slightest indication of being part of a money laundering scheme.

19.     Similarly, based on my assumed facts and the governing standards of accounting and auditing as to "Illegal Acts." there is nothing about the overall movement of about $40,640 that would meet my standard as reportable as "Illegal Acts" for the following reasons:

a.     Andry's partner, Glen Lerner entered into a referral agreement with Sutton.  Andry did not enter into a referral agreement.

b.     Collection of legal fees by Andry Lerner, and payment to Lerner of his share, are not illegal acts.

    c.    Lerner's payment of legal fees to Sutton for work performed before CAO employment is not an illegal act.

    d.    Andry had a professional responsibility to zealously pursue his firm's clients' claims with DHECC by making status inquiries and insisting on a prompt processing in his CAO communications.

    e.    There was no evidence that Andry's efforts were directed to improperly accelerate or over-value any DHECC claims.

    f.    Referral fees represent a legitimate standard practice and are not an illegal act in the State of Louisiana.

    g.    Any disclosures of this transaction were the obligation of persons other than Andry.

20.    In addition, none of these transactions—whether in isolation or take together—would cause any concern by the banks involved. The U.S government has imposed affirmative anti-money-laundering responsibilities on certain financial institutions.  They are required to file a Currency Transaction Report with the government every time a customer executes one or more cash transactions totaling more than $10,000.  The government also requires financial institutions to file Suspicious Activity Reports (SAR) if they suspect that a customer is involved in money-laundering activities.  Under the prevailing standards, no SAR would or should have been filed on these checks and wire transfers.

21.    It is also my opinion that there is no indication here of any illegitimate attempts at concealment. The Freeh Report implies that Andry was involved in the concealment

of the (1) nature, (2) source, and (3) existence of certain monies so as to make them appear to be a "legitimate transaction". These allegedly improper payments included payment of $40,640 from Andry Lerner to Lerner & Associates of Las Vegas, Nevada, payment by Lerner to New Crown account in Las Vegas, Nevada and transfer from the account to Sutton's old Crown bank account in New Orleans, Louisiana, and Andry's alleged participation in the "circuitous route" of payment to Sutton

22.     In my opinion, based on my assumed facts and the governing standards of accounting and auditing as to "Illegal Acts," none of the above events can be accurately described as "concealment" by Andry or anyone else for the following reasons:

a. Lerner and Sutton had a pre-existing business relationship with Crown going back before Sutton went to work for the CAO and before the  referral of the Thonn case. Lerner had already been paying Sutton by this means, and the payments of the Thonn fees were the manner in which other payments had been made.  No new means for payment was established for the Thonn fees.

b.     Andry had no direct involvement in the Crown payment transactions.

c.     Andry was not involved in concealing the nature, source, or existence of the $40,640 in payments made to Sutton.

23.     As for mail fraud, based on the assumed facts and the governing standards of accounting and auditing as to "Illegal Acts," and the required elements for mail fraud, it is my opinion that there would be no reportable "Illegal Acts." The primary reason for

this opinion is that there is no evidence that Sutton committed any illegal act in communicating with Lerner and Andry and informing them about the status of their claims.   Three independent reviews of the Andry Lerner and The Andry Law Firm claims have found no evidence of manipulation as to processing or the value of the awards.   Absent any evidence of unlawful fraudulent acts by Sutton, I would have nothing to report.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th__ day of December in Los Angeles, California.

Jay Shapiro

Jay Shapiro

# JAY SHAPIRO

| | |
|---|---|
| **10635 Santa Monica Blvd** | **Telephone (310) 441-3600** |
| **Suite #190** | **Facsimile   (310) 441-3610** |
| **Los Angeles, CA 90025** | **E-mail: jshapiro@shapiromedia.com** |

1990 to **Present**
**Jay Shapiro CPA, Los Angeles, California**
**Owner**
Specializing in serving the entertainment industry and mid-size
businesses on an international basis.  Over 1000 engagements have
included forensic audits, accounting, income taxation, management
consulting, and financial advisory services for a diverse group of
clients.  Significant accomplishments include expert testimony for
an international defense contractor, major Hollywood/business
litigation, public offerings for NASDAQ and AMEX companies,
and financial advisor in several workout situations, and mergers of
companies up to $500 million in revenues.

 April 2002 to **Present**
Sunrise Media Group, Inc., Los Angeles, California
**Chairman and Chief Executive Officer**
Founded company specializing in financing, development,
production, and distribution of entertainment content and
consulting in all aspects of the entertainment and media industry
on a worldwide basis.

February 2001 to April 2002
Impact Media Group, Inc., Los Angeles, California
**Chief Executive Officer**
President, Chief Financial Officer, and Director responsible for all
worldwide financial, administrative, and operational affairs of this
independent television producer and distributor.  The Company
owned 2,000 hours of programming worldwide, in addition to
producing a wide variety of programming for leading U.S. and
international broadcasters and video markets.

-1-

1990-1993
The Program Entertainment Group, Sherman Oaks, California
**Executive Vice President-Finance and Administration**
Responsible for financial planning, SEC reporting, office administration, and investment activities for this publicly held television Syndication Company.  Reported to Chief Executive Officer and supervised six people.

1982-1990
Laventhol & Horwath, Los Angeles, California
**Partner/Director of Audit and Accounting Services**
Responsible for management of a $5.5 million worldwide audit practice (most profitable in firm) and supervision of five partners and fifty professional staff.  Served as **National Director** of Entertainment and Media Industry Services.  Personally developed over $500,000 of new business while handling $1.6 million in client billing for various specialized industries including financial services.  Senior technical partner in L.A. office and active in firm's SEC review and quality review programs.  Promoted to partner in 1983.  Recognized internationally as an authority in entertainment/media accounting matters.

1973-1982
Peat, Marwick Mitchell & Co., Los Angeles, California
**Audit-Senior Manager**
Primarily responsible for management of audit and accounting engagements, which demanded extensive knowledge of, financial issues affecting the entertainment, merchandising, real estate and financial service industries.  Promoted to Senior Manager in 1980.

**EDUCATION:**     M.S. in Accounting/Finance with distinction, 1973
Arizona State University Graduate School of Business Administration

B.B.A. in Accounting, 1972
University of Wisconsin

**PROFESSIONAL**     Certified Public Accountant, 1978 to Present
**CREDENTIALS/**
**AFFILIATIONS:**     **Chairman**, Entertainment & Sports Industry Committee, California Society of CPA's

-2-

**Chairman**, AICPA Entertainment Accounting Standards Taskforce

**Chairman**, Positive Enforcement Committee, California State Board of Accountancy

**State Board Member/Vice President**, California Society of CPA's

**Member**, Academy of Television Arts and Sciences (ATAS)

**Adjunct Professor**, USC School of Accounting, UCLA Department of Entertainment Studies

**Editorial Review Board**, the Practical Accountant

**Trustee**, Zeta Beta Tau Fraternity

**Member**, Paley Center for Media, and Association of Certified Fraud Examiners(**CFE**)

**Recipient**, City of Los Angeles Certificate of Appreciation.

**Producer**, *World of Mirth*, live stage play

**Diplomate**, and Board Member of American Board of Forensic Accounting – **DABFA**

**Authored**, entertainment chapters (production, distribution, and broadcasting) of Harcourt Brace's <u>Comprehensive GAAP Guide</u>

**Featured**, in <u>Fatal Subtraction, the Inside Story of Buchwald v. Paramount;</u> and <u>Deconstructing Sammy (Sammy Davis Jr)</u>

**Member**, Beverly Hills Bar Association

**SCHEDULE A**

**EXPERIENCE IN LITIGATION CONSULTING**

1. **Working with Bankruptcy Debtors:**

   Qintex Entertainment, Inc.
   Peregrine Entertainment, Inc.
   M.C.E.G.
   Total Experience Records, Inc.
   Showscan Entertainment
   Team Entertainment

2. **Valuation Work:**
   Family Law/Partnership Investigations and Dissolutions
   Film, Television, and Music Libraries/Distribution Systems
   Economic Damages/Lost Profits/Lost Earnings Capacity
   Michael Jackson/Strong Art Collection

3. **Financial Institutions:**

   Audit engagements – S&L, Commercial Banks, and Thrift &
   Loans serving as Western Regional Director for Financial Services
   FDIC and RTC Assistance/Professional Malpractice

4. **Expert Witness Testimony**

   Danny Arnold v. Columbia Pictures (BARNEY MILLER)
   James Garner v. MCA Universal (ROCKFORD)
   Buchwald v. Paramount Pictures (COMING TO AMERICA)
   New Vision Entertainment v. Cineplex Odeon
   Union Finance v. Michael Jackson
   Improv West v. Teleamerica
   Batfilm, Inc. v. Gruber/Peters and Warner Bros. (BATMAN)
   Close v. New Line Cinema & Tri-Star Releasing
   Dunn v. DreamWorks Animation (KUNG FU PANDA)
   Lockheed Martin v. Crane, et al.
   Pierro v. Crown International Pictures
   McFarland (L.RASCALS) v. Kingworld Productions Inc.
   D'Angelo v. Golden Eagle Insurance
   Cobb v. Time Warner, Inc.
   Greer v. Dove Books
   Coury (EAGLES) v. State Farm Insurance
   Elwes v. SAW Productions (SAW)
   Katzenberg v. Walt Disney Company

-4-

AIG v. Paramount Pictures
Steve Guttenberg v. Coca Cola(TV commercials)
TV-3, Inc. v. Royal Insurance Company
APA v. Walt Disney Company (HOME IMPROVEMENT)
Huggins v. Universal Studios (END OF DAYS)
Initiative Media v. State of California
Scarlett v. Viacom International
 L A Superior Court Referee (CRASH)
 Watanabe v. Harrah's Entertainment
 Knox v. Goodwill Industries(BEVERLY HILLS GROOMER)
 Shuptrine v. SCRIPPS Networks(MAN CAVES)
 JCP v. Elite Aviation
 Kesik v. NTV(DECISIONS)

5.     **Forensic Accounting:**
Credit Lyonnais Bank Nederland
Brambilla v. NBC Universal Studios
Filmways/AIP
Lorimar/Karl Video
Nederlander Group
LIVE Entertainment/ Menendez
Henson v. Walt Disney Company
Mae West Estate
Class Action – Cannon Releasing, Carolco Pictures, Ovitz/Walt
Taylor Hackford
Easy Rider Productions
Viacom, Inc. v. Time, Inc.
Compass Pictures (HALLOWEEN)
Slesinger(W.POH) v. Walt Disney Company
Le Studio Canal Plus (U.S.)
John Landis v. M Jackson Estate (THRILLER)
Sammy Davis, Jr. Estate
Dances with Wolves Productions
Main Line Productions (BOXING HELENA)
Wonder Years Productions
Chartoff-Winkler Productions
Devote v. San Bernardino County
 Jack Carter v. Hudson Insurance
Chase-Riboud v. Dreamworks (AMISTAD)
Stuart Benjamin Productions (RAY)
Paramount Pictures Corporation
Moffat v. Grubb Ellis
Carlyle v. New Line Cinemas (SEVEN)
Dorsey v. Regents of the University of California
Trancas Entertainment (HALLOWEEN VI-X)

-5-

Hudson v. Vasquez
Brett-Livingstone Strong/M Jackson Estate(Art Collection)
Dionne Warwick
Brill v. Walt Disney Company (MIGHTY DUCKS)
STAR TREK v. CBS Television
Baldwin Entertainment v. Legendary Pictures(42)
Gross-Weston Productions(TV movies)

## SCHEDULE B

| Public Company Experience | Temporary Position |
|---|---|
| Nostalgia Network, Inc. | COO |
| Peregrine Entertainment, Inc. | COO |
| Qintex Entertainment, Inc. | COO |
| BKLA Bancorp | COO |
| Knowledge Adventure, Inc. | CFO |
| ETI International, Inc. | CFO |
| Valcom Entertainment | CFO |

Mr. Shapiro also served for over three years as Chief Financial Officer for three NASDAQ companies involved in the television industry.  His duties included:

a)   Preparation of SEC and other regulatory filings, and interface with investor relations and financial advisors

b)   Supervision of Corporate Controller and Accounting Department in preparation of financial statements, budgets, income tax fillings, and internal control maintenance

c)   Performance of treasury functions including debt compliance, investment of excess funds, banking relationships, and cash forecasting

## SCHEDULE C

### Securities Offerings

**Lorimar – Telepictures Corporation**
Qintex Entertainment, Inc.
National Mercantile, Inc.
Silver Screen Partners
Matthews Studio Equipment
Relialogic Technology Corp.
Hariston Corporation
AVI Entertainment Group
Digital Technologies Media Group
Knowledge Adventure, Inc.
Lee Pharmaceuticals, Inc.
Meadowbrook Golf, Inc.
NAPICO
Pacific Rim Entertainment, Inc.
Unapix Entertainment, Inc.
XPLORER, Inc.
Peregrine Entertainment, Inc.
Angeles Cinema Investors
Lorimar Film Partners
DEP Corporation
Associated Hosts, Inc.
Teleport – Denver, Inc.
Nostrad Telecommunications, Inc.
ETI International, Inc.
International Thermal Packaging, Inc.
Yellowave Corporation
Valcom, Inc.

-7-