# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deep Water Horizon" in the Gulf of Mexico, on April 20, 2010 | * | CIVIL NO: |
| | * | SECTION: "J" (1) |
| This Document Applies to: | | |
| No 12-970, Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production, Inc., et al. | * | JUDGE BARBIER |
| | * | MAGISTRATE SUSHMAN |

## DECLARATION OF GEOFFREY C. HAZARD, JR

1.      I am Distinguished Professor of Law Emeritus, Hastings College of Law, University of California, and Trustee Professor of Law Emeritus, University of Pennsylvania. I am a member of the bar in California and Special Ethics Counsel to four law firms advising them on a broad range of issues that arise in the daily practice of law. I have studied, done research, taught, and practiced in professional ethics and civil litigation for over 45 years.

2.      I was Reporter for the American Bar Association Model Rules of Professional Conduct on which the corresponding Louisiana Rules of Professional Conduct and most other jurisdictions are based. I am co-author of a treatise and a course book on professional ethics. I have been accepted numerous times as an expert in professional ethics in many other jurisdictions, including Louisiana. A copy of my professional biography is attached as Attachment "A."

3.      The facts contained in this Declaration are within my personal knowledge, and, if called upon to testify, I could and would testify competently thereto.

4.      I have been engaged on behalf of Jonathan Andry for my expert opinion concerning his conduct as charged in the Report of the Special Master Louis J. Freeh ("Freeh Report)".  I am being compensated for my work on an hourly rate basis.

## ASSUMED FACTS

5.      As the basis of my opinions I assume the following facts:

(a)      Jonathan Andry and Glen Lerner are law partners, in Andry Lerner LLC whose practice is mostly handling plaintiff personal injury and BP Oil Spill compensation claims.

(b)      Lerner, in his individual capacity, is also a principal with Lionel Sutton in a water purification business Crown LLC ("Crown").   Andry was not a participant in Crown and had no knowledge about the day-to-day operations of Crown.

(c)      Sutton and his wife Christine Reitano were partners in their own law firm Sutton & Reitano, LLC. They were engaged by Casey Thonn to pursue compensation claims on his behalf.  Thereafter, they were both hired as attorneys to work for Patrick Juneau, the Claims Administrator in the Court Supervised Settlement Program ("CAO").

(d)      After an initial referral to another firm was unsuccessful, the Sutton firm recommended to Thonn that he hire Andry Lerner as new counsel at or around the time Reitano assumed her role with the CAO.   Before substituting out of the case, Reitano had done a substantial amount of work on Thonn's three claims.

(e)      The case was accepted by Andry Lerner as a new matter, and the firm's standard Attorney/Client Contract was signed by client.  A traditional client-lawyer relationship

2

was thus established between Thonn and Andry Lerner. The attorney-client contract with Thonn called for Andry Lerner to receive as attorney's fees 20% of any claims awards paid to Thonn. There was no referral fee agreement signed. Before substituting out of the case, Sutton and Reitano had done a substantial amount of work on Thonn's three claims.

(f)  Based on Sutton's representation that he referred Thonn's claim to Andry Lerner, Lerner agreed to pay Sutton customary referral fee to compensate Sutton for the work previously done by his law firm on Thonn's claims. The claims were in due course settled to Thonn's satisfaction. Andry disagreed with Lerner that Sutton should be pad a referral fee because of his and his wife's employment status with the CAO.

(g)  Andry and Lerner had a pre-existing agreement about how to divide legal fees earned by Andry Lerner. That agreement called for Lerner to receive 50% of the fees on each of the Thonn claims.

(h)  Andry Lerner sent three payments to Lerner's separate law firm in an amount equivalent to Lerner's 50% share of the fees on each of the Thonn claims, or 10% of each Thonn award (e.g., one half of Andry Lerner's 20% attorney's fees), and they were deposited in Lerner's law firm's regular bank account. Subsequently, in three wire transfers that were also documented, Sutton received three payments equivalent to 10% of the Thonn award. Sutton accepted the remittal and has expressed no objection.

(i)  Contemporaneously, Lerner made payments to Sutton as part of their separate Crown business. Lerner and Sutton became partners in Crown in May 2010. Lerner had agreed to buy out a portion of Sutton's and two other partners' equity shares in Crown. This agreement was formed in 2012 at least six months before Sutton went to work for the CAO. Lerner made these equity buy out payments to Sutton in the course of Crown's ongoing

operations. There is no evidence that Andry knew of the Crown payments nor any of the Sutton Lerner business details being made in the same time frame as the Thonn claims were being processed by the CAO.

(j) There is no evidence that the money paid to Sutton in connection with the attorneys' fees earned from settlement of the Thonn claims was anything other than a customary referral fee agreed upon before Sutton went to work for Juneau.

(k) Nor is there any evidence that the payments to Sutton were made for any illicit purpose such as influencing Sutton or Reitano to commit any corrupt or illegal acts with respect to the Thonn claims. Given the fact that the Freeh Report (at p. 29) concedes that these were referral fees and cites no evidence of any other purpose, it is unreasonable to infer the referral fees were paid for an improper purpose.

(l) Based upon three independent reviews (one by the Special Master himself), there is no evidence that (1) the Thonn claims were expedited or enhanced by Sutton or Reitano or (2) any of the hundreds of other BP compensation claims filed by Andry Lerner LLC were improperly expedited or enhanced by Sutton, Reitano, or anyone else on Juneau's staff. There is no *quid pro quo* for the payments.

(m) There is no evidence of unprofessional, dishonest, or otherwise inequitable conduct with regard to the handling by Andry Lerner, or its attorneys, of the Thonn claims or any of the several hundred other claims filed on behalf of their clients.

(n) On the basis of the reasonable value of their substantial services, Andry Lerner has already earned to date substantial legal fees in their representation of hundreds of BP claimants. To date, the firm has performed numerous services beneficial to its clients such as agreeing to represent them on a contingent fee basis and advance costs, interviewing them and

4

other witnesses, collecting and analyzing documents, developing a litigation strategy, securing expert accountants to perform damages assessments, preparing and filing the claims forms, responding to inquiries from Juneau's staff, negotiating settlements, and handling appeals in some cases.

## SUMMARY OF OPINIONS

6.   The Freeh Report asserts that Andry has violated the Louisiana Rules of Professional Conduct ("RPC") in the following respects:

(a)   In paying Sutton referral fees without their having been a written consent by Thonn;

(b)   In paying Sutton referral fees while he was employed by Juneau;

(c)   In failing to ask Juneau whether it was proper to remit the referral fees to Sutton;

(d)   In inquiring of Sutton the status of the Thonn claims and similarly making inquiries to other Juneau staff attorneys about the status of their clients' claims.

(e)   In trying to influence Sutton concerning other claims in the BP matter, in part by causing the payment by Lerner to Sutton from the Lerner-Sutton separate business.

7.   In my opinion, none of these accusations has substantive merit on the undisputed facts as stated above and the governing legal principles set forth below. My opinions are:

(a)   Andry did not violate Rule 1.5 (e) of the Louisiana RPC in that the client Casey Thonn did not consent in writing to the referral fee at the time of the referral. Under Rule 1.5, it is the responsibility of the referring attorney with the attorney-client relationship (Sutton) to obtain consent from the client to receive a referral fee. It is the referring attorney who has the existing attorney-client relationship and the duty of disclosure and securing consent. Moreover,

since the client later consented to the sharing of fees, there would be no violation of RPC 1.5 (e) because Louisiana allows later consent.

      (b)    It was not improper for a fee to be offered to Sutton based on work that his law firm performed before he joined Juneau's staff. It was Sutton's responsibility to disclose the fee to Juneau.

      (c)    Andry did not have a duty to make any disclosures to Juneau about the fee paid to Sutton. He had a duty of confidentiality to the client Thonn, and they had no relationship with Juneau that would give rise to a duty to make a disclosure. He had a right to assume that Sutton's request for payment of the fee was in conformity with his ethical obligations.

      (d)    Andry did not violate any ethical or other rules in making *ex parte* inquiries of Sutton and other Juneau staff members about the status of their clients' claims and urging that they be processed expeditiously. The contact was between lawyers, not between a lawyer and someone else's client. There were no *ex parte* contacts with a judicial tribunal in an adversarial proceeding. Andry was involved in a settlement claims process where the claims are resolved in accordance with agreed upon standards and procedures as discussed below. In such a process, it is entirely normal and professionally appropriate for lawyers involved to discuss the status of pending claims. Andry had a professional responsibility to aggressively pursue his client's claims by making inquiries about the status of the claims and pressing for their prompt processing.

      (e)    Andry did not violate any ethical principles in urging that the CAO staff process expeditiously his clients' claims. A lawyer has an ethical duty to represent his client's interests zealously within the bounds of the law. In seeking to have his clients' claims move

forward promptly, a lawyer is rendering competent services to his clients. A lawyer who does not diligently press for his client to be paid would violate a duty to the client and possibly subject him to a malpractice lawsuit and/or disciplinary proceedings.

## REFERRAL FEES

8.     The payment of fees to Sutton in this case did not violate RPC 1.5.

9.     A referral fee paid by one attorney to another is a legitimate, standard practice authorized by the Louisiana RPC subject to certain requirements. *See* RPC 1.5 (e). When a referral is made, written client consent is required. Rule 1.5 (e) of the Louisiana RPC provides:

> "(c) A division of fee between lawyers who are not in the same firm may be made only if:
>
> (1) the client agrees in writing to the representation by all of the lawyers involved, and is advised in writing as to the share of the fee that each lawyer will receive;
>
> (2) the total fee is reasonable; and
>
> (3) each lawyer renders meaningful legal services for the client in the matter."

10.     It is the referring lawyer's responsibility to obtain the consent. In this case, the referring attorney would be a lawyer at the Sutton & Reitano Law Firm. The referring attorney is the one who, at the time of referral, has the lawyer-client relationship and knows that a referral is to be made. The receiving lawyer has a responsibility to take action if he learns that there was no consent.

11.     Louisiana RPC deviates from a similar provision in the American Bar Association Model Code in that client consent can be procured after the referral. The Comments to Rule 1.5 (e) states:

> "Second, under paragraph (e) (1), the client must agree "in writing" to the "share of the fee each lawyer will receive." While the corresponding Model Rule has a

7

similar requirement in Model Rule 1.5(e)(2), the LSBA proposed this language to permit lawyers to inform the client at any time, rather than only at the commencement of the representation as the ABA Model Rule suggests (but does not expressly provide). The LSBA Ethics 2000 Committee made this recommendation to the court after extensive consultation with representatives of the Louisiana Trial Lawyers' Association.

12.    In any event, there was no harm to Thonn. The purpose of the requirement of consent is to make sure that the client knows what is being done, *i.e.*, his case is not being secretly handled by some strange lawyer. Thonn knew Andry Lerner was handling his case because he hired the firm. *See* Comments to Louisiana RPC 1.5 (e), "Fee Sharing." The 20% contingent fee that Sutton/Reitano was charging Thonn did not increase with the Andry Lerner engagement—another concern addressed by Louisiana RPC 1.5 (e). Accordingly, in my opinion, Andry's conduct did not violate Louisiana RPC 1.5 (e).

13.    In these circumstances, in my opinion, Andry was not at fault because it was Sutton's responsibility to obtain the consent; the client later approved Andry Lerner handing his claims by virtue of hiring the law firm; the client was satisfied with the representation; and no harm resulted. Andry should not be referred for disciplinary proceedings.

14.    The record shows that Sutton and his wife performed substantial services in working up the claims before the case was taken over by Andry Lerner. This amount of "meaningful services" means that there was compliance with Rule 1.5 (e) (3) of the Louisiana RPC.

15.    I do not address whether it was inappropriate for Sutton to accept the fee. The resolution of this issue depends on the extent of his disclosure to Juneau and Juneau's response.

## ANDRY HAD NO DUTY OF DISCLOSURE TO JUNEAU

16.     The Special Master's conclusion about wrongdoing by Andry and the law firm also relies on a supposed duty to have informed Juneau about the propriety of paying Sutton a referral fee before it was paid. There is no basis for this assumption.

17.     As discussed above, Andry did not agree to pay Sutton a referral fee. There was nothing to disclose from Andry.

18.     Second, Andry did not have any relationship—whether contractual, fiduciary, or otherwise — that would give rise to a duty to inform Juneau about their representation of Thonn. *See, e,g., Chiarella v. United States,* 445 U.S. 222, 228 (1980) (citation omitted) ("[T]he duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'"). Such a duty does not arise because the Special Master thinks the attorneys should have consulted Juneau. *See Trustees of Northwest Laundry and Dry Cleaners Health & Welfare Trust Fund. v. Burzynski,* 27 F.3d 153, 157 (5th Cir., 1994) ("In the absence of an agreement, there must be some special relationship between the parties, such as a fiduciary or confidential relationship, before a duty to disclose arises.")

19.     Sutton was Juneau's employee. The CAO had rules requiring employees to divulge potential conflicts of interest. Sutton apparently recognized this obligation because he reportedly discussed in some regard the relationship with Lerner. In contrast, Andry was not employed by Juneau, and had no role in the claims determination process. As such, he had no duty of disclosure to Juneau.

20.     Andry had a right to assume that Sutton's request for payment of the referral fee was in conformity with his ethical obligations. It was Sutton's duty to advise Juneau because he

had the dual relationship and had direct access to Juneau, the ultimate decision-maker on claims. Lerner inquired of Sutton whether Lerner paying him was appropriate, and Sutton told him that he had spoken with Juneau.

21.     The attorneys had a duty of confidentiality to their client Thonn. Louisiana RPC 1.6 (a) provides that "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b)." This broad duty is the cornerstone of an attorney's ability to represent a client. None of the exceptions in Rule 1.6 (b) are relevant here.

22.     The importance of the duty of confidentiality has long been recognized. As the Comment 2 to ABA Model Rule 1.6 states:

> "A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation. See Rule 1.0(e) for the definition of informed consent. *This contributes to the trust that is the hallmark of the client-lawyer relationship.* The client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter. The lawyer needs this information to represent the client effectively and, if necessary, to advise the client to refrain from wrongful conduct. Almost without exception, clients come to lawyers in order to determine their rights and what is, in the complex of laws and regulations, deemed to be legal and correct. Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld."

(Emphasis added.)

In this case, Thonn was entitled to confidentiality about his fee agreement with his attorneys, the terms under which they were engaged, and the relationship among his attorneys. That would include the existence of a referral fee if there were one.

## Communications Between Andry Lerner Attorneys and The

## CAO Staff For Information Were Not Prohibited *Ex Parte*

## Communications Requiring Disclosure to BP

23. Andry did not violate any ethical rules or professional standards in making inquiries of Sutton and other Juneau personnel about the status of their clients' claims and urging that they be processed expeditiously.

24. First, the contact was between lawyers, not between a lawyer and some other lawyer's client.

25. Second, the attorneys' contacts with the CAO were not prohibited *ex parte* communications with a judicial tribunal engaged in an adversarial proceeding, but instead an administrative settlement process where the claims are determined in accordance with agreed upon standards and procedures.

26. As discussed above, Andry had a professional responsibility to pursue his client's claims by making inquiries about their status and pressing for their prompt processing.

27. The permissible nature of these contacts with the CAO's staff is all the more evident in light of the transparency policy of Juneau's office of encouraging lawyers to seek information about the status of their claims with his staff attorneys and obligating his staff to respond to those inquiries. The Settlement Agreement expressly encourages facilitating assembly and submission of claims forms and requires the CAO to utilize "best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement." (Rec. Doc. 6430-1 § 4.3.7). Thus, a transparent process was established where free and open communication

would improve the gathering of documentation necessary to submit a claim. *See* Declaration of Christiana Mancuso, dated December 12, 2013 (Mancuso II Declaration) at ¶¶ 4, 7, 10, 11, 13.

28.    The record shows that lawyers and the CAO's staff routinely discussed the status of claims, what additional information was needed, and the policies and procedures for claims determination. *See* Mancuso II Declaration ¶ ¶ 4, 7, 11, 13. With the goal of getting financial relief to victims as quickly as possible as established in Recital G of the Settlement Agreement, the prevailing approach at the CAO was informality and transparency with an eye toward problem solving, prompt processing of claims, and information sharing. *See* Mancuso II Declaration at ¶¶ 4, 7, 8, 10, 11, 13.

### ANDRY WAS ENTITLED, IF NOT REQUIRED, TO ADVOCATE
### THAT THE CAO EXPEDITE PROCESSING OF HIS CLIENTS' CLAIMS

29.    Andry did not violate any ethical principles in urging that the CAO staff process expeditiously his clients' claims. Indeed, the opposite is true. Andy had an ethical duty to represent his client's interests zealously within the bounds of the law. Louisiana RPC 1.3 mandates that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Comment 1 to the ABA Model Rule 1.3 notes:

> "A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. *A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.*"

(Emphasis added.)

30.    In seeking to have his claims move forward as promptly as possible, a lawyer is fulfilling his ethical duties. Failure to act in this regard could be a failure to act with diligence and promptly.

31.    In the BP claims process, a lawyer aggressively pushing his client's applications is in fact furnishing competent services to his client. The opposite situation could conceivably constitute a breach of duty to the client and subject him to a malpractice lawsuit and/or disciplinary proceedings. *See* Common Violations, Rule 1.3 (sanctionable "inattention may result in a matter taking an unreasonably long period of time to be resolved. *See In re Schaefer*, 725 So. 2d 1289 (La. 1999); *see also In re Beck*, 109 So. 3d 897, 905 (La. 2013); *In re Roberson*, 19 So.3d 1186, 2009-1353 (La. 10/16/09) (lawyer's lack of diligence caused client's matter to be dismissed) . . . .")

32.    This conclusion is particularly true since the policies and practice at the CAO office did not establish a formal process by which claims were processed to completion, but only according to the order in which they were filed or some other regimented basis. Mancuso II Declaration at ¶¶ 12, 14. In fact, the actual practice for moving a claim along the chain of internal decision-making is largely based on the completeness and complexity of the application. *Id.* A lawyer calling attention to his client's file and asking that it be moved to the next step—a common occurrence in the BP settlement claims process—has not violated any ethical rules or protocol established by the CAO. *Id.* at ¶ 13. That lawyer is acting in the best advocacy tradition of zealous prosecution of a client's claim.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January ___9___, 2014 in San Francisco, California.

Geoffrey C. Hazard, Jr.

# ATTACHMENT "A"

# GEOFFREY C. HAZARD, JR.

*University of Pennsylvania Law School*
*3400 Chestnut Street*
*Philadelphia Pa 19104*

Trustee Professor of Law, University of Pennsylvania Law School
Miller Professor of Law, University of California Hastings College of the Law
Director Emeritus, American Law Institute

Address:      2263 California St.
              San Francisco, CA 94115

              Hastings College of the Law  Tel: 415-565-4800
              200 McAllister St.
              San Francisco, CA 94102

              University of Pennsylvania Law School
              3400 Chestnut St.          Tel: (215) 898-7494
              Philadelphia, PA 19104     Fax:(215) 573-2025
              Email: ghazard@law.upenn.edu

## EDUCATION

Swarthmore College, B.A. 1953 (Phi Beta Kappa)
Columbia University, LL.B. 1954 (Columbia Law Review)

## PROFESSIONAL APPOINTMENTS

Member, California State Bar, Pennsylvania Bar
Admitted to practice: Oregon, 1954; California, 1960; Connecticut, 1982; Pennsylvania, 1994
Practiced in Oregon, 1954-57; Deputy Legislative Counsel, State of Oregon, 1956-57; Executive
Secretary, Oregon Legislative Interim Committee on Judicial Administration, 1957-58
Executive Director, American Bar Foundation, 1964-70
Consultant, American Bar Association Special Committee on Code
        of Judicial Conduct, 1970-72
Reporter, American Bar Association Special Commission on
        Standards of Judicial Administration, 1971-77
Reporter, American Law Institute, Restatement of Judgments, Second, 1973-81
Reporter, American Bar Association Special Commission on
        Evaluation of Professional Standards, 1978-83

Reporter, Committee on Ethical Standards, National Association of Bond Counsel, 1983-84
Director, American Law Institute, 1984-1999
Reporter, American Law Institute and International Organization
        for Unification of Private Law, Principles of Transnational Civil Procedure, 1999-2005
Member and Consultant, Standing Committee on Rules of
        Practice and Procedure, Judicial Conference of the United States, 1994-
Member, Judicial Conference Ad Hoc Committee on Mass Torts, 1997-99
Member, American Bar Association Resource Team for High Profile Trials 1996-1998
Member, American Bar Association Commission on Ethics 2000, 1997-2002
Member, Associazione Italiana fra gli Studiosi del Processo  Civile, 1998-

## ACADEMIC APPOINTMENTS

Trustee Professor of Law, University of Pennsylvania, 1994-
Miller Professor of Law, University of California Hastings College of the Law,2005-
Professor of Law, Yale University, 1971-94; Sterling Professor of Law Emeritus 1994-
Associate Professor of Law, University of California, Berkeley, 1958-61; Professor of Law,
1961-64
Visiting Professor, University of Michigan, 1963
Professor of Law, University of Chicago, 1964-71
Visiting Professor, Stanford University, 1974
Acting Dean, Yale School of Organization and Management,
        1980-81; Associate Dean, 1979-80; Deputy Dean, 1981-82
Visiting Professor, Universite d'Aix-Marseille, 1982
Visiting Professor, Harvard University, 1983
Visiting Professor, University of Arizona, 1997-2001

## TEACHING SUBJECTS

Civil Procedure, Legal Ethics, Federal Jurisdiction

## BOARD MEMBERSHIPS

Board of Trustees, Supreme Court Historical Society, 1989-
Board of Directors, Avatar Holdings, Inc., 1980-94 Board of Directors, Smyth, Sanford &
Gerard Professional    Liability, L.L.C. 1995-97
Member, Board of Directors, Friends of the Library of the Supreme  Court of Israel 1998-
Board of Governors, International Insolvency Institute, 2004-

## PROFESSIONAL ACTIVITIES

Member, Administrative Conference of United States, 1972-78
Adviser, American Bar Association, Standing Committee on Ethics  and Professional
Responsibility, Subcommittee on Code
        of Judicial Conduct, 1988-89
Member, Board of Overseers, Institute for Civil Justice, RAND Corp., 1985-90
Advisory Council, Trinity Church (New York) Center for Ethics and Corporate Policy, 1983-
1990
Legal Advisory Committee, New York Stock Exchange, 1989-92
Member, American Bar Association Committee on Professional
        Discipline, 1985-91
Member, American Bar Association, Committee on Lawyers' Responsibility for Client
Protection, 1991-1994
Member, National Association of Corporate Directors, Blue
        Ribbon Commission, 2005
Member, Pennsylvania Bar Ass'n, California State Bar, American Bar Ass'n, American Law
Institute, American Judicature Society, National Legal Aid and Defender Ass'n, Fellows of
American Bar Foundation, American Academy of Arts and Sciences, American Philosophical
Society

## PROFESSIONAL AWARDS

American Bar Foundation, Research Award, 1985
American Bar Foundation, William Keck Foundation Award, 1997
Columbia University School of Law Association, Medal for Excellence, 1999
American Judicature Society, Outstanding Contributions to Promoting Effective Administration
of Justice. 1999
Ceremony of Salute, Superior Court of Pennsylvania, 1999
Gold.Medal, International Insolvency Institute, 2004
American Bar Association Section of Legal Education, Kutak Award, 2005

## HONORARY DEGREES

M.A., Yale University 1971
LL.D., Gonzaga University, 1985
LL.D., University of San Diego, 1985
LL.D., Swarthmore College, 1988
LL.D., Illinois Institute of Technology, 1990
LL.D., Nova University, 1992
LL.D., Republica Italiana (faculta di Urbino), 1998

## BOOKS

RESEARCH IN CIVIL PROCEDURE (1963; Walter E. Meyer Research
    Institute of Law).
LAW IN A CHANGING AMERICA (1968; editor).
QUEST FOR JUSTICE (1973; editor, American Bar Association).
GOING TO LAW SCHOOL? (1974;editor, with Thomas Ehrlich).
CIVIL PROCEDURE (5th ed. 2001, with Fleming James, Jr. and John Leubsdorf).
ETHICS IN THE PRACTICE OF LAW (1978).
PLEADING & PROCEDURE, STATE & FEDERAL (9th ed. 2005; with
    D. W. Louisell, Colin Tait and Wm. Fletcher).
MANAGING COMPLEX LITIGATION:  A PRACTICAL GUIDE TO THE USE OF
    SPECIAL MASTERS (1983; with Wayne Brazil and Paul Rice).
THE LEGAL PROFESSION:  RESPONSIBILITY AND REGULATION (3d ed. 1994; editor,
with Deborah Rhode).
THE LAW OF LAWYERING:  A Handbook on the Model Rules of
    Professional Conduct (3d ed. 2004 with William Hodes).  PERSPECTIVES ON CIVIL
PROCEDURE (1987; editor, with Jan Vetter).
BOARD GAMES: The Changing Shape of Corporate Power (1988; with
    Arthur Fleisher, Jr. and Miriam Z. Klipper).
THE LAW AND ETHICS OF LAWYERING (4th ed. 2005; with Susan Koniak,  Roger
Cramton and George Cohen)
LA GUISTA CIVIL NEGLI STATI UNITI (1993; with Michele Taruffo)
AMERICAN CIVIL PROCEDURE:  AN INTRODUCTION (1993, with Michele
    Taruffo)
AMERICAN CIVIL PROCEDURE: AN INTRODUCTION (Japanese ed., Tanabe     Tr. 1997)
POKUS`ENI` SPRA `NI` CHI RAD (Prague, 1996; translation of BOARD GAMES, with
Arthur Fleisher, Jr. and Miriam Z.  Klipper)
PROFESSIONAL RESPONSIBILITY AND REGULATION (Foundation Press,
    2002) (with Deborah Rhode)
LEGAL ETHICS: A COMPARATIVE STUDY (Stan. U. Press.2004)(with
    Angelo Dondi)

## REPORTS
(as reporter or draftsman)

Oregon Legislative Interim Commission on Judicial Administration,
    Vol. I (Judicial Administration), Vol. II (Juvenile Code)  (1958)
California Special Legislative Commission on the Insanity Defense, Report (1962).
American Bar Association, Code of Judicial Conduct (1972).
American Bar Association, Standards of Judicial Administration (3 vol., 1974-77).
Legal Services for the Average Citizen, Report of A.B.A. Consortium on Legal Services (1977).
American Law Institute, Restatement Second of Judgments (1982).
American Bar Association, Model Rules of Professional Conduct   (1983).

National Association of Bond Lawyers, Function and Professional
      Responsibilities of Bond Counsel (1984).
American Law Institute and International Organization for
      Unification of Private Law, Principles of Transnational  Civil Procedure (2005).

## ARTICLES

May v. Anderson:  Preamble to Family Law Chaos, 45 Va. L. Rev. 379 (1959)

Oregon Administrative Procedure Act -- Status and Prospects, 39 Ore. L. Rev. 97 (1960).

Indispensable Party:  The Historical Origin of a Procedural Phantom, 61 Colum. Law Rev. 1254 (1961).

Insanity as a Defense:  The Bifurcated Trial, 49 Calif. L.Rev. 805 (1961) (with D. W. Louisell).

Death, the State, and the Insane:  Stay of Execution, 9 U.C.L.A. Rev. 381 (1962) (with D. W. Louisell).

Early Evolution of the Common Law Writs:  A Sketch, 6 Am. J. Legal Hist. 114 (1962).

An Historical and Critical Analysis of Interpleader, 52 Calif. L. Rev. 706 (1963) (with Myron Moskovitz).

The Research Program of the American Bar Foundation,51 A.B.A.J. 539 (1965).

Reflections on Four Studies of the Legal Profession, in  Law and Society, A Supplemental to Social Problems (Summer, 1965).

After the Trial Court -- The Realities of Appellate Review, in Jones, Harry W., ed., The Courts, the Public and the Law Explosion (1965).

A General Theory of State-Court Jurisdiction, 1965 Sup. Ct. Rev. 241.

Rationing Justice, 8 J. Law & Econ. 1 (1965).

Limitations on the Uses of Behavioral Science in the Law,19 Case Western L. Rev. 71 (1967).

The Ombudsman:  Quasi-Legal and Legal Representation in Public Assistance Administration, in Sherrard, ed.,Social Welfare and Urban Problems (1968).

Challenges to Legal Education, in Sutherland, ed. The Path of the Law from 1967 (1968), pp. 185-194.

Epilogue to the Criminal Justice Survey, 55 A.B.A.J. 1048 (1969).

Social Justice Through Civil Justice, 36 U. Chi. L. Rev. 699   (1969).

Law Reforming in the Anti-Poverty Effort, 37 U. Chi. L. Rev. 242   (1970).

Legal Problems Peculiar to the Poor, 26 J. Social Issues 47 (1970).

Securing Courtroom Decorum, 80 Yale L. J. 433 (1970)(book review).

Res Nova in Res Judicata, 44 So. Calif. L. Rev. 1036 (1971).

Court Finance and Unitary Budgeting, 81 Yale L. J. 1286 (1972)(with Martin B. McNamara and Irwin F. Sentilles, III).

Attorneys' Responsibilities and Duties Under the Securities Laws, in Goldberg, Stuart C., ed., Expanding Responsibilities Under the Securities Laws (1973).

The Effect of the Class Action Device Upon the Substantive Law, 58 F.R.D 299 (1973).

Legal Services in the U.S.A., 2 Internat'l J.of Crim. And Pen. 43 (1974).

Chancery Procedure and the Seventh Amendment: Jury Trial of
Issues in Equity Cases before 1791, 83 Yale L. J.  999 (1974) (with Harold Chesnin).

Law School "Law" and Sociolegal Research, 50 Denver L. J. 403 (1974).

Rethinking Legal Ethics, 26 Stan. L. Rev. 1227 (1974).

Conscience and Circumstance in Legal Ethics, in Hodges, ed., Social Responsibility: Journalism, Law, Medicine (Wash. & Lee Univ., 1975).

Administration of Supporting Services in the Trial Court,1 Justice System Journal 3 (1975).

Representation in Rule-Making, in Schwartz, ed., Law and the American Future (1975).

The Tennessee Administrative Procedure Act:  An Outsider's Perspective, 6 Memphis State U. L. Rev. 143 (1976).

Standards of Judicial Administration:  Appellate Courts,62 A.B.A.J. 1015 (1976).

The Jurisprudence of Juvenile Deviance, in Rosenheim, ed.,Pursuing Justice for the Child (1976).

Requisites of a Valid Judgment, 24 Practical Lawyer 35 (1978).

The Supreme Court as Legislature, 64 Cornell L. Rev. 1 (1978).

An Historical Perspective on the Lawyer-Client Privilege, 66 Calif. L. Rev. 1061 (1978).

Talking to Your Lawyer, MBA, May 1978, 17.

The Legal and Ethical Position of the Code of Professional Ethics, V Social Responsibility: Journalism, Law, Medicine (Wash. & Lee Univ., 1979).

Interstate Venue, 64 Nw. L. Rev. 711 (1979).

Proposed Revision of the Rules of Legal Ethics in the United States, in Am. Bar Ass'n, American/Australian/New Zealand Law: Parallels and Contrasts (1980).

Guidelines for Claims of Privilege, United States v. Am. Tel.  & Tel. Co., 86 F.R.D. 603 (1980) (with Paul Rice).

Rules of Legal Ethics: The Drafting Task, 36 The Record 77 (1981).

Revisiting the Second Restatement of Judgments: Issue Preclusion and Related Problems, 66 Cornell L. Rev. 564 (1981).

The Lawyer's Obligation to be Trustworthy When Dealing with Opposing Parties, 33 South Carolina L. Rev. 181 (1981).

How Far May a Lawyer Go in Assisting a Client in Legally Wrongful Conduct?, 35 U. of Miami L. Rev. 669 (1981).

Will the ABA Draft Model Rules of Professional Conduct Change the Concept of the Lawyer's Role?, Association of the Bar of the City of New York (Third Orison Marden Memorial Lecture,1981).

The Lawyer's Pro Bono Obligation, in ABA Proceedings of the Second National Conference on Legal Services and the Public (1981).

Do Lawyers <u>Really</u> Need New Disciplinary Rules?, 53 <u>Cleveland Bar J.</u> 1 (1981).

Legal Ethics: Legal Rules and Professional Aspiration,30 <u>Cleveland State L. Rev.</u> 4 (1982).

Liability of Attorneys Involved in the Preparation of Disclosure Statements, in Fleischer, et al. eds.,Thirteenth Annual Institute on Securities Regulation (1982).

Arguing the Law: The Advocate's Duty and Opportunity,16 <u>Georgia L. Rev.</u> 821 (1982).

Judicial Management of the Pretrial Process in Massive Litigation: Special Masters as Case Managers, 1982 <u>Am. Bar Found. Res. J.</u> 375 (with Paul R. Rice).

The Criminal Justice System: Overview, in Encyclopedia of Criminal Justice (1982).

Competing Aims in Legal Education, 59 <u>No. Dakota L. Rev.</u>533 (1983).

Why Lawyers Should be Allowed to Advertise: A Market Analysis of Legal Services, 58 <u>N.Y.U.L. Rev.</u> 1084 (1983), (withRussell Pearce and Jeffrey Stempel) republished in Italian,
        Perche Agli Avvocati Dovrebbe Essere Consentito L'Uso Della Pubblicita, 32 Rivista Di Diritto Civile 277 (1986).

Preclusion as to Issues of Law:  The Legal System's Interest,70 <u>Iowa L. Rev.</u> 81 (1984).

A Question of Scale, Harvard Law School Bulletin, Winter, 1984 (review of Bok report on legal education).

The Technical Expert in Procedure: U.S. National Report, in Nicklisch, ed., Der Technische Sachverstandige im Prozess, VII.Internationaler Kongress fur Prozessrecht, p. 207 (1984).

Legal Ethics, in Gillers, ed., Looking At Law School (1984, 3d ed. 1990).

Rectification of Client Fraud: Death and Revival of a Professional Norm, 33 <u>Emory L.J.</u> 271 (1984).

Reflections on the Substance of Finality, 70 <u>Cornell L. Rev.</u> 642 (1985).

Curriculum Structure and Faculty Structure, 35 <u>J. Legal Ed.</u>326 (1985).

The Position of the Supreme Court in the Contemporary Constitutional System of the United States, in Lombardi,  Constituzione e Giustizia Constituzionale nel Diritto Comparato (Centro Italiano per lo Sviluppo della Ricerca, 1985).

Ethical Considerations in Withdrawal, Expulsion, and Retirement[from a Firm], in Berger, ed., Withdrawal, Retirement & Disputes, Am. Bar Ass'n Section of Economics of Law Practice (1986).

Court Delay: Toward New Premises, 5 Civil Justice Q. 236 (1986), republished in Italian, Costo e Durata del Processo in Italia e in U.S.A., 32 Rivista di Diritto Civile 271 (1986).

Quis custodiet ipsos custodes?, 95 Yale L.J. 1523 (1986) (book review).

Principles in Legislation, 41 The Record 685 (1986) (Cardozo Lecture).

Rising Above Principle, 135 U.Penn.L.Rev. 153 (1986) (Roberts Lecture).

A Lawyer's Privilege Against Self-Incrimination in Professional Disciplinary Proceedings, 96 Yale L.J. 1060 (1987) (withCameron Beard).

Triangular Lawyer Relationships: An Exploratory Analysis, 1 Georgetown J. Legal Ethics 15 (1987).

Permissive Affirmative Action for the Benefit of Blacks, 1987 U.Illinois L. Rev. 379 (David C. Baum Memorial Lecture).

Professional Ethics, Rules and Conduct, in Conference Papers, ALI-ABA Arden House III National Conference on the Continuing Education of the Bar (November 13, 1987), reprinted 34 CLE Journal and Register 5 (1988).

The Public Nature of Private Adjudication, 6 Yale L. & Pol'y Rev. 42 (1988) (with Paul D. Scott).

Communitarian Ethics and Legal Justification, 59 U. of Colo. L. Rev. 721 (1988).

Forms of Action Under The Federal Rules of Civil Procedure, 63 Notre Dame L. Rev. 628 (1988).

Four Portraits of Law Practice, 57 UMKC L. Rev. 1 (1988).

Ethics and Politics in the Corporate World, 6 Yale J. on Regulation 155 (1989) (book review).

Discovery Vices and Trans-Substantive Virtues in the Federal Rules of Civil Procedure, 137 U. Penn. L. Rev. 2237 (1989).

Authority in the Dock, 69 <u>Boston U. L. Rev.</u> 469 (1989).

My Station as a Lawyer, 6 <u>Georgia State U. L. Rev.</u> 1 (1989).

Per un approcio manageriale al problema dei ritardi nell'amministrazione della guistizia, 43 Rivista Trimestrial di Diritto e Procedura Civile, No. 4, p. 960 (Dicembre 1989), translated by Dttr. Angelo Dondi.

After Professional Virtue, 1989 <u>Supreme Court Rev.</u>, 213.

Law and Business Ethics, in Reitzel, et al. Contemporary Business Law (4th ed. 1990).

The Role of the Legal System in Response to Public Risk, Fall 1990 Daedalus, 229.

Ethical Opportunity in the Practice of Law, 27 <u>San Diego L.Rev.</u> 127 (1990).

It Smacks of Elitism, Am. Law Inst. Remarks and Addresses, May 15-18, 1990.

The Future of Legal Ethics, 100 <u>Yale L.J.</u> 1239 (1991).

Il processo con giuria come modello processuale,"45 Rivista Trimestrial di Diritto e Procedura Civile,No. 2, p. 479(Giugno, 1991), translated by Dttr. Angelo Dondi.

Swimwear for the Ethics Goldfish Bowl, 26 <u>Int'l Soc'y of Barristers Quarterly</u> 297 (1991).

Equality in Civil Litigation, In Kojima, ed., America no Daishihou Shisutemu ("Grand Justice System: American Style"), Chiou University Institute of Comparative Law (1992).

L'avvocato e l'etica professionale: gli aspetti giuridici, Il Foro Italiano, June, 1992, V, 215, translated by Dttr. Angelo Dondi

Justice Marshall in the Medium of Civil Procedure: Portrait of a Master, 80 <u>Georgetown L.J.</u> 2063 (1992).

Doing the Right Thing, 70 <u>Washington U.L.Q.</u> 691 (1992).

Alvin B. Rubin: Man of the Law, 52 <u>Louisiana L. Rev.</u> 1481 (1992).

Lawyers and Client Fraud: They Still Don't Get It, 6 <u>Georgetown J. of Legal Ethics</u> 701 (1993).

Sources of Delays, Motions to Disqualify Could be Handled Promptly Through ADR, July 1993

Alternatives to the High Cost of Litigation (Center for Public Resources).

The Role of the Legal System in Responses to Public Risk, in E. Burger, ed., Risk (U. Michigan Press 1993).

Dimensions of Ethical Responsibility: Relevant Others, 54 U. Pittsburgh L. Rev. 965 (1993).

Lawyer Liability in Third Party Situations: The Meaning of the Kaye Scholer Case, 26 U. Akron L. Rev. 395.

Reflections on Judge Weinstein's Ethical Dilemmas in Mass Tort Litigation, 88 Northwestern U. L. Rev. 569 (1994).

The American Law Institute: What it is and What it Does, Centro do Studi e Ricerche di Diritto Comparato e Straniero, Saggi, Conferenze e Seminari, (1994).

Azioni di Responsabilita Verso gli Amministratori di Societa Commerciali nel Diritto Statunitense, 39 Rivista delle Societa 441 (1994).

Conflict of Interest in Estate Planning for Husband and Wife, 20 The Probate Lawyer 1 (1994).

Equality and Selectivity in American Civil Litigation, in T. Kojima, T. Atsumi, H. Hokama, and M. Shimuzu, eds., The Grand Design of America's Justice System, Institute of Comparative Law in Japan (1995).

Law, Morals, and Ethics, 19 So. Illinois U.L.J. 447 (1995).

La Nozione di "Substantial Evidence" nel Processo Civile Statunitense, 1-1996 Rivista Trimestrale di Diritto e Procedura Civil 251 (1996).

Conflict of Interest in the Classic Professions, in R. Spece, D. Shimm and A. Buchanan, Conflicts of Interest in Clinical Practice and Research (1996).

The Settlement Black Box, 75 Boston Univ. Law Review. 1257 (1996).

The Client Fraud Problem: A Justinian Quartet, 1 J. Institute for Study of Legal Ethics 43 (1996)

The Privity Requirement Reconsidered, 37 So. Texas L. Rev. 967 (1996).

Commentary: Policy Implications [of Lawyers Problems with Alcohol], 10 J. Law and Health 79 (1995-96).

Un Codice di Etica Professionale per gli Avvocati Italiani? Rivista Trimestrale di Diritto e Procedura Civile, Anno L Fasc. 4-1996.

An Examination Before and Behind the "Entire Controversy" Doctrine, 28 Rutgers L.J. 7 (1996).

A Lawyer's Moral and Ethical Discretion, 8 Researching Law No.2 (1997).

Transnational Rules of Civil Procedure, 30 Cornell Int'l. L.F. 495 (1997, with M. Taruffo).

State Supreme Court Regulation of Professional Ethics, 72 Notre Dame L. Rev. 1177 (1997).

Protecting the Environment: Finding the Balance Between *Delaney* and Free Play, 18 U. Penna. J. Of Int'l Economic Law 487 (with H. Kunreuther, 1997).

Ethical Dilemmas of Corporate Counsel, 46 Emory L.J. 1011, 1053 (1997).

Professional Legal Education and Citizen Education, 25 J. Japanese Institute of Int'l Bus. Law 1181 (1997) (in Japanese, translation by Professor Koichi Miki).

Harmonization of Procedural Law, 44 J. Of Civil Procedure 70(Japanese Ass'n of the Law of Civil Procedure) (translated into Japanese by Professor Koichi Miki).

Non-Silences of Professor Hazard on "The Silences of the Restatement": A Response to Professor Menkel-Meadow." 10 Georgetown L. Legal Ethics 1997).

Per L'Indipendenza Professionale Dell'Avvocatura, 1997 Rivista Trimestrale di Diritto e Procedura Civile 407.

Discovery and the Role of the Judge in Civil Law Jurisdictions,73 Notre Dame L. Rev. 1017 (1998).

The American Law Institute is Alive and Well, 26 Hofstra L. Rev. 661 (1998).

From Whom No Secrets are Hid, 76 Texas L.Rev. 1665 (1998).

The Duty or Option of Silence, 23 Law & Social Inquiry 139 (1998).

Reflections on Self-Study [of the American Law Institute], 23 Law & Social Inquiry 641 (1998).

The County Courthouse No Longer Looms Over the Community, 51 SMU L. Rev. 1559 (1998).

Foreward, Symposium, The Legal Profession: The Impact of law and Legal Theory, 67 Fordham

L. Rev. 239 (1998).

Substance, Procedure and Practice in Comparative Law, in T. Shiibashi, ed., Toward Comparative Law in the 21st Century (Chuo Univ. Press 1998).

Preliminary Draft of the ALI Transnational Rules of Civil Procedure, 33 Texas Int'l L.J. 489 (1998)

An Historical Analysis of the Binding Effect of Class Suits, 146 U. Penna L. Rev. 1849 (1998) (with John L. Gedid and Stephen Sowle)

The Underlying Causes of Withdrawal and Expulsion of Partners from Law Firms,55 Washington and Lee Rev. 1073 (1998)

Individual Justice in a Bureaucratic World, 7 Tulane J. of Int'l and Comparative Law 73 (1999)

From Whom No Secrets are Hid [Segretezza e Ricerca della verita nel Processo Civile], Rivista Trimestrale di Diritto e Procedura Civile, Anno LIII Fasc. 2 – 1999

Responsibility, Professional and Otherwise, 31 Connecticut L. Rev 1139 (1999)

Regulation of Banking in the United States, in F. Riolo and D. Maschiandaro, Il Governe delle Banche in Italia (Fondazione Rosselli, Rome 1999).

Abuse of Procedural Rights: A Summary View of the Common Law Systems, and Abuse of Procedural Rights: Regional Report for the United States, in M. Taruffo, ed. Abuse of Procedural Rights: Comparative Standards of Procedural Fairness(1999).

Under Shelter of Confidentiality, 50 Case Western Law Rev. 1 (1999).

Tribute to Harvey Perlman, 78 Nebraska L.Rev. 744 (1999).

Litigio civil sin fronteras: armonizacion y unificacion del derecho procesal, Derecho PUC (Revista de la Facultad de Derecho del la Pontoficia Universidad Catolica del Peru), No. 52, 583 (Abril 1999)

The Future of the Legal Profession, in American Bar Association, Common Law, Common Values, Common Rights 357-365 (2000)

The Futures Problem, 148 U.Penn.L.Rev. 1901 (2000).

Foreword: The Future of the Profession, 84 Minn.L.Rev. 1083 (2000).

The Future of the Legal Profession, in American Bar Ass'n, Common Law, Common Values, Common Rights, 357-363 (2000).

Globalization, National States, and the Rule of Law, in Jose Ciprut, ed., Of Fears and Foes: Security and Insecurity in an Evolving Global Political Economy (2000).

Law Practice and the Limits of Moral Philosophy, in Deborah Rhode, ed., Ethics in Practice (2000).

Tribute in Memory of Herbert Wechsler, 100 Columbia L. Rev. 1362 (2000).

Changing Structure in the Practice of Law, 62 Louisiana L.Rev.167 (2000).

Equality and Affiliation as Bases for Ethical Responsibility, 61 Louisiana L.Rev.173 (2000).

Environmental Contracts in the United States (with Eric Orts), in E. Orts and K. Dekelelaere, Environmental Contracts: Comparative Approaches to Regulatory Innovation in the United States and Europe (Kluwer 2001)

Transnational Rules of Civil Procedure: A Challenge to Judges and Lawyers, 68 Estratto Studi Urbinati, Nuova Serie A-N. 51,3 247 (1999/2000)

Introduction to the Principles and Rules of Transnational Civil Procedure, 33 N.Y.U. J. of International Law and Politics 769 (with M. Taruffo. R. Sturner and A. Gidi (2001)

Conflicts of Interest in Representation of Public Agencies in Civil Matters, 9 Widener J. Public Law 211 (2000).

Globalization, National States and the Rule of Law, in J. Ciprut, ed., Of Fears and Foes: Security and Insecurity in an Evolving Global Political Economy at 209 (2001)

Whistleblowing is a Non-issue, Legal Intelligencer (of Philadelphia), Feb. 25, 2002, p. 9.

Law and Justice in the Twenty-First Century, 70 Fordham L. Rev. 1739 (2002)

Fundamentals of Civil Procedure, 6 Uniform Law Review 753 (Revue de Droit Uniforme) (2001-4)

Class Certification Based on Merits of the Claims, 69 Tennessee L. Rev. 1 (2001)

The Changing Professional Environment and the Ideal of General Practice, 30 Hofstra Law

Review 759 (2002)

A Short Historical Sketch of the Legal Profession, ZZPInt (Zeitschrift fur Zivilprozess International) 6 Band 2001, 205-238 (with Angelo Dondi)

Principios fundamentales del Proceso Civil Transnacional, 54 Derecho PUC 253 (Revista de la Facultad de Derecho de la Pontificia Universdad Catolica del Peru)(2001)(with M. Taruffo, R. Sturner and A. Gidi)

Judicial Redress for Historical Crimes: Procedure, 5 International Law FORUM 36(2003)

Seeking Justice, Preserving Liberty, 54 Hastings L.J. 695 (2003)

Modeling Class Counsel, 81 Nebraska L. Rev. 1397 (2003)

International Civil Procedure and Transnational Civil Procedure: The Impact of Regional Economic Integration—An Overview, 8 Uniform Law Review 437 (2003-1/2)

Lawyer as Wise Counselor, 49 Loyola Law Rev. 215 (2003)

The ALI/UNIDROIT Project, in M. Andenas, N. Andrews and R. Nazzini, eds., The Future of Transnational Civil Litigation (2004)

Constitutional Law and Professional Regulation: Reflections on Sarbanes-Oxley, King County (Washington) Bar Bulletin, August 2004

A New Player in the Boardroom: The Emergence of the Independent Directors' Counsel, 59 The Business Lawyer 1389 (with Edward Rock)

Humanity and the Law, 16 Yale J. Law and the Humanities 79 (2004).

"Announcement" by Federal Judicial Nominees, 32 Hofstra L. Rev. 1281 (2004)
Lawyer for the Situation, 39 Valparaiso U. L. Rev. 377 (2004).

Advertising and Intermediaries in Provision of Legal Services: *Bates* in Retrospect and Prospect, 39 Ariz. State L.J. 309 (2005).

Various Newspaper Articles, National Law Journal, 1987-2001

ATTACHMENT "B"

# ATTORNEY/CLIENT CONTRACT

**RECITALS:** I, _____ on behalf of _____ the undersigned **Client** ("**Client**"), employs the **Andry Law Group LLC.** ("**Andry Law Group**") for the purpose of making a claim on my behalf with the Gulf Coast Claims Facility and/or BP or any other related Fund for all damages sustained by me that resulted, or may result in the future from the Deepwater Horizon Drilling Rig explosion and subsequent oil release on or about April 20, 2010. **Client** also empowers **Andy Law Group** to file all necessary forms and documents in the Transocean Limitation Proceeding to preserve my claim(s) and any other rights. **Client** empowers the **Andry Law Group** to sue, to compromise, to receive any and all payments, to receipt for any and all money, and to do anything generally which may be necessary in the prosecution of the above claim as full as though I were present.

**ATTORNEY FEES:** In consideration of the services to be rendered by **Andry Law Group** in connection said cause, **Client**, agrees to pay said attorney a fee of twenty (20%) percent of the amount collected. This fee will apply to any and all interim payments and/or final awards and/or settlements from the Gulf Coast Claims Facility and/or BP or any **Funds** as defined herein. The fee will be calculated before all court costs and/or other expenses, including but not limited to, all bills, photocopying expenses, expert fees, and investigation costs are deducted. Expenses will be deducted after calculation of the contingency fee, pursuant to Rule 1.5 (C) of the Rules of Professional Conduct. Client is responsible for all such costs and expenses. However, all such costs and expenses related to these claims, such as court costs and/or other expenses, including but not limited to, all bills, photocopying expenses, expert fees, investigation costs, and any other costs responsible by client shall not exceed seven and half (7.5%) percent of the final award and/or settlements. The seven and half (7.5%) shall include all and any costs related to these claims.

It is further understood and agreed that if **Client** is unable to reach an agreement or settlement with the Gulf Coast Claims Facility and/or BP, it will be necessary to file a claim in MDL 2179 to protect **Client's** rights. If **Andry Law Group** files a claim in MDL 2179 that is settled without litigation, **Client** agrees to pay attorney fee of twenty (20%) percent of the amount collected. If it becomes necessary for **Andry Law Group** to litigate claim, **Client** agrees to pay attorney fee of thirty-three (33%) percent of the amount collected. The attorney fees referenced in this paragraph will be calculated before all court costs and/or other expenses, including but not limited all bills, photocopying expenses, expert fees, and investigation costs are deducted. Expenses will be deducted after calculation of the contingency fee, pursuant to Rule 1.5 (C) of the Rules of Professional Conduct.

**STRUCTURED SETTLEMENT:** In the event of a structured settlement, then it is agreed that the attorney's fees will be based on a percentage of the value of the case at the time of the settlement, in the same manner as reflected above.

**SETTLEMENT AND COMPROMISE OF CLAIM(S) AND/OR SUIT(S):** It is hereby understood and agreed that neither **Client** nor my/our attorney may settle, compromise, dispose of, or in any way discontinue my/our claim and/or suit without the permission of the other.

**COSTS AND EXPENSES:** It is further understood and agreed that the attorneys shall have the right to finance the costs in this matter and that the interest thereon shall be an expense of the litigation. The interest rate will be commensurate with that charged by the respective lending institution. If the attorneys are terminated by the **Client** without just cause, then the **Client** shall reimburse the attorneys immediately for all out-of-pocket expenses. In such a case, the attorneys shall, in addition, have the right to the full amount of this contract for services rendered.

**INTERVENTION:** It is further understood and agreed that if it becomes necessary for the attorney to file a claim in the court of any kind in order to obtain immediate reimbursement of costs and/or reasonable attorney's fees, then the attorney shall be entitled to a reasonable attorney's fee and all costs of that claim, including the cost of filing an intervention.

**DILIGENT PURSUIT OF SPILL-RELATED CLAIM:** My attorneys agree that they will completely and diligently evaluate and institute a claim on client's behalf with the Gulf Coast Claims Facility and/or BP or any other related Fund set up to handle the Deepwater Horizon Oil Spill and if applicable, prosecute said suit to final determination in the appropriate Louisiana District Court or United States District Court, and make all reasonable and necessary efforts to collect any judgment that may be rendered herein in my favor; in the event of a judgment unfavorable to me in the said district court, they will, if in their opinion reasonable grounds therefore exist, appeal said cause to the appropriate Court of Appeals and prosecute same to a final determination therein.

**EMPLOYMENT OF ADDITIONAL ATTORNEYS:** It is further understood and agreed that **Andry Law Group** has **Client's** consent to employ the services of other attorneys as may be necessary. These attorneys, to the extent they are employed, will be compensated out of the **Andry Law Group's** attorney fee described here in. When and if such attorneys are employed, an addendum to this contract will be provided which depicts and outlines their respective compensation.

**SCOPE OF REPRESENTATION:** The Andry Law Group does not represent any individual, agent, representative or employee of Client in a personal capacity; to the extent any individual, agent, representative or employee of Client desires Andry Law Group's representation to file a personal action or claim against any BP, or any other liable party, the parties must sign an additional Agreement, and representation will only commence thereafter.

**ADDITIONAL PROVISIONS:** Additionally, I, the undersigned, do hereby appoint **Jonathan Andry** as my attorney in fact, and grant to him the power of attorney so that in all ways and matters he may sign my name to any and all pleadings and other documents of any kind in this matter, including all settlements and releases, drafts and checks relative thereto upon my verbal authorization. Client has been advised and understands that this agreement is in accordance with the Rules of Professional Conduct, specifically 1.4 and 1.8e.

This the ___12___ day of ___April___, 2012
Month

So it is AGREED,

_Casey Thorn_

**Client Name**

_[signature]_

**Signature**

_The Andry Law Group, LLC._

_[signature]_

**Jonathan B. Andry, Attorney**