1

                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA


     ************************************************************

     IN RE:  OIL SPILL BY THE
     OIL RIG *DEEPWATER HORIZON*
     IN THE GULF OF MEXICO ON
     APRIL 20, 2010
                              CIVIL ACTION NO. 10-MD-2179 "J"
                              NEW ORLEANS, LOUISIANA
08:06AM                       TUESDAY, JULY 30, 2013, AT 8:00 A.M.

     THIS RELATES TO ALL CASES

     ************************************************************


                   SWORN STATEMENT OF **JONATHAN ANDRY**
             TAKEN BEFORE THE HONORABLE LOUIS J. FREEH
                            SPECIAL MASTER


     APPEARANCES:


                         LOUIS J. FREEH, SPECIAL MASTER
                         MATTHEW DOLAN, ESQUIRE


                         AJUBITA LEFTWICH & SALZER
                         BY:  JAMES A. COBB, JR., ESQUIRE
                         SUITE 1500, ENERGY CENTRE
                         1100 POYDRAS STREET
                         NEW ORLEANS, LA  70163


     OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
                                CERTIFIED REALTIME REPORTER
                                REGISTERED MERIT REPORTER
                                500 POYDRAS STREET, ROOM HB406
                                NEW ORLEANS, LA  70130
                                (504) 589-7779
                                Cathy_Pepper@laed.uscourts.gov

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.

**EXHIBIT 15**

C O N F I D E N T I A L

SM-02-JA00622

2

1                               I N D E X

2

3     SPEAKERS                                            PAGE

4

5     EXAMINATION BY MR. FREEH............................    4

6     EXAMINATION BY MR. DOLAN...........................   42

7     EXAMINATION BY MR. FREEH...........................   44

8     EXAMINATION BY MR. DOLAN...........................   49

9     EXAMINATION BY MR. FREEH...........................   50

10    EXAMINATION BY MR. DOLAN...........................   58

11    EXAMINATION BY MR. FREEH...........................   60

12    EXAMINATION BY MR. DOLAN...........................   62

13    EXAMINATION BY MR. FREEH...........................   64

14    EXAMINATION BY MR. DOLAN...........................   66

15    EXAMINATION BY MR. FREEH...........................   66

16    EXAMINATION BY MR. DOLAN...........................   66

17    EXAMINATION BY MR. FREEH...........................   67

18    EXAMINATION BY MR. DOLAN...........................   68

19    EXAMINATION BY MR. FREEH...........................   68

20

21

22

23

24

25

                        OFFICIAL TRANSCRIPT

SM-02-JA00623

| | |
|---|---|
| 1 | **P-R-O-C-E-E-D-I-N-G-S** |
| 2 | TUESDAY, JULY 30, 2013 |
| 3 | |
| 08:11AM 4 | |
| 08:11AM 5 | MR. FREEH:  Okay.  Thank you.  Good morning, so we're |
| 08:11AM 6 | on the record now.  My name is Louie Freeh.  And with me is |
| 08:11AM 7 | Matt Dolan, who is one of my colleagues, and we have present |
| 08:12AM 8 | Jim Cobb, representing Jonathan Andry.  And is this an |
| 08:12AM 9 | interview being conducted pursuant to Judge Barbier's order |
| 08:12AM 10 | appointing me as a Special Master to conduct an independent |
| 08:12AM 11 | investigation regarding various allegations that have been made |
| 08:12AM 12 | in connection with the claims administrations process. |
| 08:12AM 13 | So I'm functioning this morning as a judicial |
| 08:12AM 14 | officer, and I'm going to put you under oath in a second.  And, |
| 08:12AM 15 | of course, as you can see, we're making a record of the |
| 08:12AM 16 | proceedings, which the judge will review and determine when and |
| 08:12AM 17 | if they should be released to the parties. |
| 08:12AM 18 | We'll use a few exhibits today, we'll attach |
| 08:12AM 19 | them to the record.  I will give counsel and Mr. Andry at the |
| 08:12AM 20 | end of the interview an opportunity to add anything, make any |
| 08:12AM 21 | comments or any corrections or anything that you want to |
| 08:12AM 22 | complete the record. |
| 08:12AM 23 | I will state for the record that as a judicial |
| 08:13AM 24 | officer, all of your statements, of course, need to be fully |
| 08:13AM 25 | truthful, not misleading in any way, and if you were to make a |

**C O N F I D E N T I A L**

SM-02-JA00624

08:13AM 1    material intentional misstatement, it could be construed as a

08:13AM 2    contempt of court or also a violation of 18 U.S.C. 1001.  And

08:13AM 3    I've given that advice to everybody that we speak to.

08:13AM 4            Any questions about any of that description?

08:13AM 5            MR. COBB:  No.

08:13AM 6            MR. FREEH:  So, Mr. Andry, do you swear that the

08:13AM 7    testimony you will give this morning will be the truth, the

08:13AM 8    whole truth and nothing but the truth to the best of your

08:13AM 9    ability, so help you God?

08:13AM 10           THE WITNESS:  Yes.

08:13AM 11           MR. FREEH:  We should be able to do this in less than

08:13AM 12   two hours.  So I'll try to keep my questions short and

08:13AM 13   relevant.

08:13AM 14   EXAMINATION BY MR. FREEH:

08:13AM 15   Q.    The first thing we want to do is understand the three law

08:13AM 16   firms that you have associations with.  We think we understand

08:14AM 17   it, but I'm not sure that we do.

08:14AM 18           Our understanding is there are three entities which

08:14AM 19   I'm going to ask you questions about.  And I have some

08:14AM 20   documents, including State of Louisiana Department of State

08:14AM 21   records.

08:14AM 22           So I'm going to ask you questions about The Andry Law

08:14AM 23   Group, L.L.C., which we understand to be an entity at 610

08:14AM 24   Baronne Street.

08:14AM 25   A.    That's correct.

**C O N F I D E N T I A L**

08:14AM  1    Q.    And I'll get to the specific questions.  The second entity

08:14AM  2    is the Andry Lerner firm, which is the firm that has been

08:14AM  3    handling most of the cases relating to the *BP* and the CAO.  And

08:14AM  4    then the third entity is The Andry Law Firm, which, again, we

08:14AM  5    see as a third entity.  So is it correct that we're talking

08:14AM  6    about three separate legal entities?

08:14AM  7    A.    It is.

08:14AM  8    Q.    And, Mr. Andry, what is your relationship, please, with

08:15AM  9    each those entities?

08:15AM 10    A.    Starting with The Andry Law Firm, because

08:15AM 11    contemporaneously that's the one that came -- chronologically,

08:15AM 12    that's the one that came first.  The Andry Law Firm was

08:15AM 13    originally a partnership of my brother and I that was the Gibby

08:15AM 14    Andry and Jon Andry partnership that was formed in or about

08:15AM 15    1995.

08:15AM 16         In 2000, we changed corporate entities from a

08:15AM 17    partnership to an S Corp and become The Andry Law Firm, and

08:15AM 18    practice as The Andry Law Firm still.  It's still a viable

08:15AM 19    entity and still a viable working entity.

08:15AM 20    Q.    Yes.

08:15AM 21    A.    The other entity is The Andry Law Group.  In and around

08:15AM 22    May of 2010, my brother and I took on other endeavors.  He

08:15AM 23    wished to be an advertising attorney.  You may have seen his

08:15AM 24    billboards.  I didn't really want to do that.  I wanted to do

08:15AM 25    mass torts.  He really didn't want to do that in our main law

**C O N F I D E N T I A L**

SM-02-JA00626

08:15AM 1  firm, and so I started what was originally the Jon Andry

08:15AM 2  Attorney at Law, L.L.C. and subsequently changed the name to

08:16AM 3  The Andry Law Group.

08:16AM 4           Subsequent to that, Glen Lerner and I, who is a guy

08:16AM 5  that I went to law school with, who we've done mass torts with

08:16AM 6  before, had talked off and on throughout our friendship about

08:16AM 7  doing business together and doing mass torts from a platform

08:16AM 8  that you could do mass torts around the country in different

08:16AM 9  MDLs as opposed to him being an advertising lawyer and

08:16AM 10  advertising cases and referring them out, so we formed

08:16AM 11  Andry Lerner.   They are all three separate and distinct

08:16AM 12  entities that operate, and I'm a member of all three.

08:16AM 13  Q.    I take it that Gibby is not?

08:16AM 14  A.    That is correct.   The only member -- The Andry Law Firm

08:16AM 15  has nothing to do with either of the other two entities, and

08:16AM 16  Gibby and I are the only members of The Andry Law Firm.

08:16AM 17  Q.    Is that, in terms of an LLC, a 50/50 --

08:16AM 18  A.    Yes.

08:16AM 19  Q.    -- equity share?

08:17AM 20  A.    Yes, it is.

08:17AM 21  Q.    And are there any other -- because it's not a law firm,

08:17AM 22  I'm not sure how law firms work as L.L.C.'s outside of my

08:17AM 23  region.   Can a nonlawyer be a member of that entity?

08:17AM 24  A.    No.

08:17AM 25  Q.    It has to be a lawyer?

**C O N F I D E N T I A L**

SM-02-JA00627

7

08:17AM 1    A.    That is correct.

08:17AM 2    Q.    And there are no other lawyers that are members?

08:17AM 3    A.    No.

08:17AM 4    Q.    Are there other lawyers, however, who work there?

08:17AM 5    A.    No.

08:17AM 6    Q.    Any paralegals or anybody else in the --

08:17AM 7    A.    Paralegals and a secretary.

08:17AM 8    Q.    So approximately how many people work there?

08:17AM 9    A.    At least a secretary, but depending on what the situation

08:17AM 10   is, there will be -- normally in that business, as in other any

08:17AM 11   other plaintiffs' firm, it's not like a defense firm where you

08:17AM 12   would have six lawyers on staff.  It depends on the project.

08:17AM 13   Q.    So if you didn't have a particular project, it's basically

08:17AM 14   three people?

08:17AM 15   A.    Correct.

08:17AM 16   Q.    And the officers are -- offices are at 828 Baronne Street?

08:17AM 17   A.    That is correct.

08:17AM 18   Q.    And how long have they been located there?

08:17AM 19   A.    Since about 2010.

08:18AM 20   Q.    And do they share space or co-locate with any other

08:18AM 21   entity?

08:18AM 22   A.    Yes, with my brother's firm.

08:18AM 23   Q.    And which firm is that?

08:18AM 24   A.    The Gibby Andry Law Firm.

08:18AM 25   Q.    So the Gibby Andry Law Firm is a separate entity from The

**C O N F I D E N T I A L**

**SM-02-JA00628**

08:18AM 1    Andry Law Firm?

08:18AM 2    A.    That is correct.  Just as I began doing mass torts in The

08:18AM 3    Andry Law Group, he began doing his advertising in his own

08:18AM 4    entity.

08:18AM 5    Q.    All right.  And let's talk for a moment about The Andry

08:18AM 6    Law Group.  That's the entity at 610 Baronne Street?

08:18AM 7    A.    That is correct.

08:18AM 8    Q.    And you mentioned you're a member of that?

08:18AM 9    A.    That is correct.

08:18AM 10   Q.    And who are the other members?

08:18AM 11   A.    There are none.

08:18AM 12   Q.    Mr. Lerner is not associated with that?

08:18AM 13   A.    No.

08:18AM 14   Q.    We have some other names that we associate with it, if

08:18AM 15   they are correct.  We have a Michelle Purchner?

08:18AM 16   A.    Michelle Purchner.  That's -- she's an attorney that works

08:18AM 17   there.

08:18AM 18   Q.    Is she a member or just an employee?

08:19AM 19   A.    Just an employee.

08:19AM 20   Q.    What's her general roles and responsibilities?

08:19AM 21   A.    She heads up the litigation section, does all of the

08:19AM 22   litigation cases in The Andry Law Group.

08:19AM 23   Q.    And then Christina Mancuso?

08:19AM 24   A.    She is a lawyer who is an employee.  She's a nonmember.

08:19AM 25   And she is working on top -- or she heads all the *BP* stuff.

**C O N F I D E N T I A L**

SM-02-JA00629

08:19AM 1  Q.   Was she the principal lawyer handling the *Casey Thonn*

08:19AM 2  case?

08:19AM 3  A.   Yes.

08:19AM 4  Q.   And she was doing that out of The Andry Law Group?

08:19AM 5  A.   No, she kind of switches back and forth, depending on what

08:19AM 6  she's doing.  Sometimes she's an Andry Lerner employee and

08:19AM 7  sometimes she's an Andry Law Group employee.

08:19AM 8  Q.   And the Andry Lerner enterprise shares the same space with

08:19AM 9  The Andry Law Group?

08:19AM 10  A.   That's correct.

08:19AM 11       MR. COBB:  Slow down.  Let the judge finish his

08:19AM 12  questions.  Lean back, take a deep breath.

08:19AM 13       THE WITNESS:  He said he wanted to do it quickly.

08:19AM 14       MR. COBB:  It's hard for her to do it, so we're going

08:19AM 15  to have some niceness for the court reporter.

08:19AM 16  BY MR. FREEH:

08:20AM 17  Q.   Those two offices are co-located at 610 Baronne Street?

08:20AM 18  A.   Yes.

08:20AM 19  Q.   Does she draw compensation, if you know, from both

08:20AM 20  entities or from only one of the entities?

08:20AM 21  A.   Currently --

08:20AM 22  Q.   Talking about Christina Mancuso.

08:20AM 23  A.   Ms. Mancuso currently draws compensation from Andry Lerner

08:20AM 24  because she is heading the *BP*.  When all of this came about,

08:20AM 25  The Andry Law Group employed Ms. Mancuso and others who worked

**C O N F I D E N T I A L**

**SM-02-JA00630**

08:20AM 1   on the *BP* matter.  Since the formation of Andry Lerner and the

08:20AM 2   movement of the *BP* cases to Andry Lerner, those employees have

08:20AM 3   been moved over and are Andry Lerner employees.

08:20AM 4   Q.   And on that subject, how many employees currently are at

08:20AM 5   Andry Lerner?  And if you could identify them for us, please.

08:20AM 6   A.   There is Ms. Mancuso.  There is Brittany Kennedy, who is a

08:20AM 7   paralegal secretary.  There is Amy Catalanatto, who is a

08:21AM 8   paralegal secretary.  There is Ann Rupley, who is a paralegal

08:21AM 9   secretary.

08:21AM 10  Q.   Any other attorneys?

08:21AM 11       MR. COBB:   In Andry Lerner?

08:21AM 12  BY MR. FREEH:

08:21AM 13  Q.   In Andry Lerner.

08:21AM 14  A.   No, other than Ms. Mancuso, no.

08:21AM 15  Q.   And do those two entities at 610 Baronne Street, the

08:21AM 16  Andry Lerner Group and Andry Lerner, share a space with any

08:21AM 17  other entity or enterprise?

08:21AM 18       MR. COBB:   The Andry Group and Andry Lerner.  I think

08:21AM 19  you might have said Andry Lerner Group.  It's The Andry Group.

08:21AM 20  And the Andry --

08:21AM 21  BY MR. FREEH:

08:21AM 22  Q.   The Andry Group and the Andry Lerner firm at 610 Baronne

08:21AM 23  Street, do they share a space with any other entity?

08:21AM 24  A.   No.

08:21AM 25  Q.   Mr. Andry, could you tell us where you went to college and

**C O N F I D E N T I A L**

08:21AM 1    law school approximately when you graduated.

08:21AM 2    A.    University of Mississippi undergrad, graduated '87.

08:21AM 3    Tulane Law School, '87 to '90.  And then I got my LLM in '91.

08:22AM 4    Q.    Where did you get your LLM?

08:22AM 5    A.    At Tulane.

08:22AM 6    Q.    I take it you are an attorney who is a member of the

08:22AM 7    Louisiana Bar in good standing?

08:22AM 8    A.    That is correct.

08:22AM 9    Q.    In your law school at Tulane, did you come to know and

08:22AM 10   meet Lionel Sutton?

08:22AM 11   A.    Yes, I did.

08:22AM 12   Q.    And could you describe the circumstances under which you

08:22AM 13   first met him?

08:22AM 14   A.    He was in my law school class.  I remember, I think,

08:22AM 15   meeting him at Que Sera, which is where we would hang out on

08:22AM 16   Wednesdays.  And I think I just met him -- I lived on Magazine

08:22AM 17   Street right by Audubon Park, and so a lot of the guys in our

08:22AM 18   law school class would play football, touch football in kind of

08:22AM 19   a group every Tuesday and Thursday outside of my apartment.  So

08:22AM 20   I met Tiger originally just as I met everybody else; my father,

08:22AM 21   who graduated law school at Tulane convinced me to run for

08:22AM 22   class president, and I did, so I met everybody in the whole

08:22AM 23   class.  So we would all is congregate at my house.

08:23AM 24   Q.    Was Mr. Lerner at the school around the same time?

08:23AM 25   A.    Yes, he was.

**C O N F I D E N T I A L**

SM-02-JA00632

| | | |
|---|---|---|
| 08:23AM | 1 | Q.    Did you become friendly with him? |
| 08:23AM | 2 | A.    Yes, I did. |
| 08:23AM | 3 | Q.    Did Christine Reitano also attend during that period? |
| 08:23AM | 4 | A.    Yes.  She was a year below us. |
| 08:23AM | 5 | Q.    Same question:  You got to know her during the course of |
| 08:23AM | 6 | your time there? |
| 08:23AM | 7 | A.    Yes, I did. |
| 08:23AM | 8 | Q.    Did you also -- did your brother Gibby also attend school |
| 08:23AM | 9 | around the same time or overlapping with your tenure there? |
| 08:23AM | 10 | A.    Yes, he was a year above us. |
| 08:23AM | 11 | Q.    And all of you knew each other at some point during that |
| 08:23AM | 12 | experience? |
| 08:23AM | 13 | A.    That is correct. |
| 08:23AM | 14 | Q.    Could you tell us about your first legal job or employment |
| 08:23AM | 15 | after you graduated from Tulane. |
| 08:23AM | 16 | A.    I practiced in my father and my uncle's firm, which is |
| 08:23AM | 17 | Andry & Andry with an ampersand in the middle. |
| 08:23AM | 18 | Q.    Is that still a viable entity? |
| 08:23AM | 19 | A.    Yes. |
| 08:23AM | 20 | Q.    Here in New Orleans? |
| 08:23AM | 21 | A.    Yes, it is.  It's at 710 Carondelet. |
| 08:23AM | 22 | Q.    How long did you work there and what type of practice did |
| 08:23AM | 23 | you -- |
| 08:23AM | 24 | A.    General PI practice, and I worked there until 1995, when |
| 08:23AM | 25 | Gibby and I formed our entity.  And then from there, I |

**C O N F I D E N T I A L**

08:24AM  1    practiced under the name of Gibby and Jon Andry through 2000,
08:24AM  2    when we moved.
08:24AM  3    Q.   And in 1995, besides your brother Gibby and yourself, were
08:24AM  4    there any other lawyers in that practice?
08:24AM  5    A.   No.
08:24AM  6    Q.   And is that the practice that still continues or was that
08:24AM  7    entity not maintained?
08:24AM  8    A.   When we switched to an S corp, I don't know what they did
08:24AM  9    with the Gibby and Jon Andry partnership.
08:24AM 10    Q.   But that was predecessor of the --
08:24AM 11    A.   That is correct.
08:24AM 12    Q.   -- current entity?
08:24AM 13    A.   Yes.
08:24AM 14    Q.   Did you ever practice law with Mr. Sutton?
08:24AM 15    A.   No.
08:24AM 16    Q.   Did you ever work on cases with Mr. Sutton?
08:24AM 17    A.   Yes.
08:24AM 18    Q.   And during what period of time?
08:24AM 19    A.   That would have probably been between 2000 and 2009.
08:24AM 20    Q.   And was he practicing at that time in New Orleans, to your
08:24AM 21    knowledge?
08:24AM 22    A.   Yes, he was.
08:24AM 23    Q.   And do you know in what capacity or with what lawyers?
08:24AM 24    A.   He practiced with Sean Alfortish some and then left the
08:25AM 25    practice with Sean Alfortish and had a solo practice.

**C O N F I D E N T I A L**

SM-02-JA00634

14

08:25AM 1    Q.   And was he located, if you recall, at that time on

08:25AM 2    Canal Street?

08:25AM 3    A.   When he was with Sean Alfortish, he was on Canal Street.

08:25AM 4    And when he left Sean, he moved to 610 Baronne.

08:25AM 5    Q.   And what type of matters did you work with him?

08:25AM 6    A.   I did class action cases.  I graduated from Tulane, got my

08:25AM 7    LLM, came out, become one of the state tobacco lawyers and

08:25AM 8    litigated a tobacco case and then after that did mostly complex

08:25AM 9    litigation from there forward.  So at the time, I was doing

08:25AM 10   class action cases and Tiger and I worked on some class actions

08:25AM 11   against the cell phone industry.

08:25AM 12   Q.   But never as a formal partnership.  Just as lawyers

08:25AM 13   working on the same matter?

08:25AM 14   A.   That's correct.  A joint venture.

08:25AM 15   Q.   And did you work on a particular case relating to cell

08:25AM 16   phones?

08:25AM 17   A.   Yes, we did.

08:25AM 18   Q.   And can you tell us a little bit about that action?

08:25AM 19   A.   There were three of them.  It was *Sonnier v Radiofone*,

08:26AM 20   *Abrusley v Centennial* and *Sutton Steel v BellSouth*.  There were

08:26AM 21   three cell phone cases.  *Sonnier* was in Plaquemines Parish,

08:26AM 22   *Abrusley* was in Allen Parish, and then *Sutton Steel* was in

08:26AM 23   Iberia Parish.  And we worked on those three cases together.

08:26AM 24   Q.   For about how long together?

08:26AM 25   A.   Those cases, I think, went on for about three and a half

**C O N F I D E N T I A L**

SM-02-JA00635

08:26AM  1    years, approximately.

08:26AM  2    Q.    And what type of fee-sharing arrangement did you have with

08:26AM  3    him at that time in respect to those cases?

08:26AM  4    A.    There was a fee agreement the lawyers had in the case.

08:26AM  5    And so it was a division based on working hours put in.

08:26AM  6    Q.    And did there come a time when you and he had a dispute

08:26AM  7    about the division of proceeds or the compensation?

08:26AM  8    A.    Yes.

08:26AM  9    Q.    Can you tell me a little bit about that, please.

08:26AM 10    A.    I was -- I guess they call it *liaison counsel* now, but I

08:26AM 11    was lead counsel on those cases.  And so once the case was

08:26AM 12    settled, I was charged with the duty of dispensing the funds.

08:27AM 13    When the money came in, there was an issue that Tiger had,

08:27AM 14    because he said he did -- he told me he did more work on the

08:27AM 15    case than I originally thought that he did.

08:27AM 16              I tried to speak with him about it, but he wouldn't

08:27AM 17    talk to me, and since he wouldn't talk to me about it, I

08:27AM 18    considered the matter closed and dispersed the funds.  I think

08:27AM 19    he was of the opinion that I didn't pay him enough, and I was

08:27AM 20    of the opinion that he got what he deserved.

08:27AM 21    Q.    And that never evolved into a formal dispute or a lawsuit

08:27AM 22    or a claim in any way?

08:27AM 23    A.    No, never did.

08:27AM 24    Q.    But it did impact on your relationship or friendship?

08:27AM 25    A.    That is correct.

**C O N F I D E N T I A L**

SM-02-JA00636

08:27AM 1    Q.   In what manner?

08:27AM 2    A.   He and I were like brothers in a lot of ways because we

08:27AM 3    lived together during law school, and from that point forward,

08:27AM 4    we didn't talk.

08:27AM 5    Q.   Approximately when did this dispute occur in point of

08:27AM 6    time?

08:27AM 7    A.   October of 2009.

08:27AM 8    Q.   And for how long after 2009 was there no communication

08:27AM 9    between the two of you?

08:27AM 10   A.   Pretty much until today.

08:27AM 11   Q.   Did there come a time when you renewed contacts and

08:28AM 12   conversations with him before today?

08:28AM 13   A.   No.  Not really.  I mean, there were times that I would

08:28AM 14   see him or there were times that I would kind of run into him,

08:28AM 15   and we had cofriends, so there was one night at One Eyed

08:28AM 16   Jack's, for example, which is a bar, where we went out after

08:28AM 17   the Jazzfest, and I ran into him and it was very awkward, but

08:28AM 18   we were still polite to each other.

08:28AM 19   Q.   Was one of your common friends, if that's the correct

08:28AM 20   term, after the dispute, Mr. Lerner?

08:28AM 21   A.   Yes.  Mr. Lerner was a common friend from the time we were

08:28AM 22   in law school.

08:28AM 23   Q.   And was he also a business associate of yours?

08:28AM 24   A.   Yes.

08:28AM 25   Q.   And can you tell me a little bit about that association?

**C O N F I D E N T I A L**

SM-02-JA00637

08:28AM 1   A.   Glen and I did work on mass tort cases together.  He and I

08:28AM 2   did *Fen-phen* together and we settled a bunch of *Fen-Phen* cases

08:28AM 3   in south Louisiana.  And then we had done other cases.  We did

08:29AM 4   *Propulsid* and *Rezulin* together.  And then ultimately we formed

08:29AM 5   Andry Lerner and are doing the -- and I think Glen

08:29AM 6   participated -- or he did participate, Glen participated in the

08:29AM 7   BellSouth case.

08:29AM 8        So, I mean, he and I have pretty much done business

08:29AM 9   from the time we graduated from law school.  Beginning at about

08:29AM 10  '01, we started doing business together, because I think that's

08:29AM 11  when *Fen-phen* was, if I remember correctly, and then so we did

08:29AM 12  kind of business from there forward.

08:29AM 13  Q.   If I could ask you to slow down a tiny bit.

08:29AM 14       MR. COBB:  Thank you, Judge, for saying that.  Her

08:29AM 15  fingers are burning up.

08:29AM 16       THE WITNESS:  I talk so fast.

08:29AM 17       MR. COBB:  Slow down, please.

08:29AM 18       THE WITNESS:  My daughter is actually going to Tisch

08:29AM 19  Film School next year, so I'm practicing for when I get up

08:29AM 20  there.

08:29AM 21  BY MR. FREEH:

08:29AM 22  Q.   Did there come a time when Mr. Lerner tried to bring you

08:29AM 23  and Mr. Sutton back together in terms of the social

08:29AM 24  relationship?

08:29AM 25  A.   Yes, that was always Glen's goal.

**C O N F I D E N T I A L**

08:30AM 1    Q.    So he tried to do that on more than one occasion?

08:30AM 2    A.    He always talked to us about it. There was one time he

08:30AM 3    had us have lunch together, that I don't really know was the

08:30AM 4    greatest social exercise, but we had lunch at Mother's

08:30AM 5    together, and that was -- Glen, from what I understand, was

08:30AM 6    doing business with Tiger and me, and sort of created an issue

08:30AM 7    of we weren't together or we weren't talking.

08:30AM 8    Q.    And do you know what business he was doing with Tiger at

08:30AM 9    that point?

08:30AM 10   A.    I understand that he had a business that had some oilfield

08:30AM 11   technology that they were trying to sell that purified water.

08:30AM 12   And beyond that, I don't know.

08:30AM 13   Q.    Did you ever hear it referred to as *Crown*?

08:30AM 14   A.    Yes.

08:30AM 15   Q.    And who referred it as *Crown* to you?

08:30AM 16   A.    I just -- Glen talked about Crown and I understood that to

08:30AM 17   be the name of it.

08:30AM 18   Q.    And was it your understanding that he and Tiger had a

08:30AM 19   business interest together in that company --

08:30AM 20   A.    Yes.

08:30AM 21   Q.    -- called *Crown*?

08:30AM 22   A.    Yes.

08:30AM 23   Q.    Did you know anything about the details of the interest?

08:30AM 24   A.    No. None.

08:31AM 25   Q.    Do you know or did you learn at some point what type of

**C O N F I D E N T I A L**

08:31AM 1    business it engaged in?

08:31AM 2    A.    All I know is from talking to Glen that they had some

08:31AM 3    technology that had oilfield pure -- they purified water for

08:31AM 4    the fracking business, because that's a common issue with

08:31AM 5    fracking is they need purified water, and that was the

08:31AM 6    application that their technology addressed.  And that's about

08:31AM 7    all I know.

08:31AM 8    Q.    Do you know what their business relationship or equity was

08:31AM 9    in that entity?

08:31AM 10   A.    No.

08:31AM 11   Q.    Did you ever do any legal work for the entity?

08:31AM 12   A.    No.

08:31AM 13   Q.    Did any of the law firms that you're associated with do

08:31AM 14   any work for it, to your knowledge?

08:31AM 15   A.    No.  It was really Tiger's company, as I understood it,

08:31AM 16   that Glen did business with or they had some kind of

08:31AM 17   relationship, and since Tiger and I weren't talking, I didn't

08:31AM 18   really care to know about it.

08:31AM 19   Q.    Did Mr. Lerner ever explain to you or state to you that

08:31AM 20   there were money disputes between him and Mr. Sutton with

08:31AM 21   respect to Crown?

08:31AM 22   A.    No.  I knew that he would put money in Crown and I knew

08:32AM 23   that he was an investor, if you will, for that.  But that's

08:32AM 24   about it.

08:32AM 25   Q.    But you understood it, I think you just said to us, to be

**C O N F I D E N T I A L**

08:32AM 1    Tiger's company?

08:32AM 2    A.    Yes.  As I understood it, yes.

08:32AM 3    Q.    And your understanding, correct or not, but your

08:32AM 4    understanding was Mr. Lerner was more of an investor, I think

08:32AM 5    you said?

08:32AM 6    A.    Yes.  As I understood the relationship.

08:32AM 7    Q.    Could you tell me a little bit about the lunch at

08:32AM 8    Mother's?  This was were the first time you had been together

08:32AM 9    with Sutton in some years?

08:32AM 10   A.    Yes.

08:32AM 11   Q.    And I take it it was a somewhat awkward meeting?

08:32AM 12   A.    Very.

08:32AM 13   Q.    What was discussed at the meeting, if you recall?

08:32AM 14   A.    It's like when you try and recreate relationships, talk

08:32AM 15   about old times because that's the times you had together that

08:32AM 16   were good.  And I think we talked about that most of the time,

08:32AM 17   from what I remember.  I just remember it was really weird.

08:32AM 18   Q.    And it was a meeting that Mr. Lerner organized?

08:33AM 19   A.    Yes.

08:33AM 20   Q.    After the meeting, did you have further contacts, even if

08:33AM 21   they weren't regular contacts, with Mr. Sutton?

08:33AM 22   A.    No.

08:33AM 23   Q.    Do you recall having a series of telephone calls with him?

08:33AM 24   A.    I mean, I may have, but I don't remember that.

08:33AM 25   Q.    Do you recall telephone calls where you contacted him and

**C O N F I D E N T I A L**

08:33AM 1   explained to him certain personal and family issues you were

08:33AM 2   going through and talked to him about those issues?

08:33AM 3   A.    Yes.

08:33AM 4   Q.    Do you remember more than one of those calls?

08:33AM 5   A.    I remember one occurred in -- on the day -- going to work

08:33AM 6   one day and then I remember there was one other conversation

08:33AM 7   that we had about that.

08:33AM 8   Q.    And these were calls that you initiated?

08:33AM 9   A.    Yes.  They were.

08:33AM 10  Q.    And can I ask why you would call him to talk about

08:33AM 11  personal matters when you had -- excuse me, when you had the

08:33AM 12  relationship that you had just described?

08:34AM 13  A.    Because at the time, I mean, I don't know, the personal

08:34AM 14  matter was very personal and very traumatic, and he knew all of

08:34AM 15  the players involved, and since he did, it was -- I kind of

08:34AM 16  wound up talking to him about it by accident, and when I did,

08:34AM 17  it was kind of cathartic in a lot of ways because he knew all

08:34AM 18  of the parties.  So I talked to him about it.

08:34AM 19  Q.    And you recall one or two of those type conversations?

08:34AM 20  A.    Yes.

08:34AM 21  Q.    After the lunch at Mother's and after some of the phone

08:34AM 22  calls, or after the phone calls you recall, did there come a

08:34AM 23  time when you had a meeting with Mr. Sutton?

08:34AM 24  A.    Yes.  We had a lunch meeting.

08:34AM 25  Q.    And can you tell me about that, please?

**C O N F I D E N T I A L**

SM-02-JA00642

08:34AM 1   A.   I saw him on the street in New Orleans and we wound up

08:34AM 2   going to lunch.

08:34AM 3   Q.   Is that when he was coming out of his office building with

08:34AM 4   Mr. Juneau?

08:34AM 5   A.   That is correct.

08:34AM 6   Q.   And had you spoken to Mr. Juneau prior to seeing him

08:34AM 7   outside the building?

08:35AM 8   A.   I had.  I mean, I know Mr. Juneau from -- you know, he had

08:35AM 9   mediated some cases for me and I had a business relationship,

08:35AM 10  so I mean, I had spoken to him, not that day, but I had spoken

08:35AM 11  to him.

08:35AM 12  Q.   Prior to that day, had you contacted Mr. Juneau

08:35AM 13  specifically about one of the BP claims that you were handling?

08:35AM 14  A.   I contacted him about him a bunch of BP claims that I was

08:35AM 15  handling, yes.

08:35AM 16  Q.   And do you recall when in relationship to this luncheon

08:35AM 17  meeting that was?

08:35AM 18  A.   A few days before.

08:35AM 19  Q.   And which claims did you contact him about?

08:35AM 20  A.   About all of them.

08:35AM 21  Q.   When you say all of them, how many are we talking about?

08:35AM 22  A.   Well, I mean, I had 675 of them on file.  There were

08:35AM 23  probably about a thousand that Andry Lerner represents.  We

08:35AM 24  weren't really getting paid on any of them, or a very small

08:35AM 25  percentage of them.  So when I contacted Mr. Juneau, it was an

**C O N F I D E N T I A L**

SM-02-JA00643

| | |
|---|---|
| 08:35AM 1 | attempt to reach out and say, what's going on; is there any way |
| 08:35AM 2 | we can do something to kind of get all of this going; tell me |
| 08:36AM 3 | who I need to talk to; what do I need to do. |
| 08:36AM 4 | Q.   Was that the first time you had spoken to him directly |
| 08:36AM 5 | about any of these claims? |
| 08:36AM 6 | A.   Yes. |
| 08:36AM 7 | Q.   And was the nature of your communication a complaint about |
| 08:36AM 8 | the delays? |
| 08:36AM 9 | A.   Yes. |
| 08:36AM 10 | Q.   And did you ask for a meeting or an explanation? |
| 08:36AM 11 | A.   No. |
| 08:36AM 12 | Q.   Did you ask that someone look into it and report back to |
| 08:36AM 13 | you or give you additional information? |
| 08:36AM 14 | A.   I know I just asked if he could, you know, tell me who to |
| 08:36AM 15 | talk to or something.  And he said, you know, he would let me |
| 08:36AM 16 | know. |
| 08:36AM 17 | Q.   Then how many days go past, then you accidentally run into |
| 08:36AM 18 | them coming out of the building? |
| 08:36AM 19 | A.   Yes.  You know, I've seen Mr. Juneau a bunch.  And I saw |
| 08:36AM 20 | them that day.  It was probably about three days later, or four |
| 08:36AM 21 | days later. |
| 08:36AM 22 | Q.   In other words, it wasn't any plan or arrangement to meet |
| 08:36AM 23 | them.  You just met them on the street -- |
| 08:36AM 24 | A.   Correct. |
| 08:36AM 25 | Q.   -- as you said? |

**C O N F I D E N T I A L**

SM-02-JA00644

08:36AM 1  A.    Correct.

08:36AM 2  Q.    Tell me what happened when you encountered them outside

08:36AM 3  the building.

08:36AM 4  A.    I just said hello.  I don't know whether it was Tiger or I

08:36AM 5  said, have you eaten?  I said no, or he said no.  And then we

08:37AM 6  walked across the street and ate a sandwich there.

08:37AM 7  Q.    Were all three of you together?

08:37AM 8  A.    No, it was just Tiger and I.

08:37AM 9  Q.    Do you know why Mr. Juneau did not join you for lunch?

08:37AM 10 A.    No.  I do not.

08:37AM 11 Q.    How long did you meet with Mr. Sutton that day?

08:37AM 12 A.    45 minutes to an hour.

08:37AM 13 Q.    And that was the only meeting you had had with him since

08:37AM 14 the luncheon at Mother's?

08:37AM 15 A.    That is correct.

08:37AM 16 Q.    Did you have any subsequent meetings with him after that

08:37AM 17 day?

08:37AM 18 A.    Yes.

08:37AM 19 Q.    Approximately how many and when, if you recall?

08:37AM 20 A.    It would have been one after, like, June of this year.

08:37AM 21 Q.    And when is the last time you saw him?

08:37AM 22 A.    That time.

08:37AM 23 Q.    And when is the last time you spoke to him?

08:37AM 24 A.    That time.

08:37AM 25 Q.    All right.  Let's go back to the luncheon, first meeting

**C O N F I D E N T I A L**

**SM-02-JA00645**

08:37AM  1    after Mother's with Mr. Sutton across the street from his

08:38AM  2    building.  Do you recall the name of the restaurant?

08:38AM  3    A.    No.  If you're on the corner, it's like -- if you were on

08:38AM  4    the corner where that building is, and I don't know the name of

08:38AM  5    the building, I think it's the Commerce Building, and you walk

08:38AM  6    directly across the street, it will be right there.

08:38AM  7    Q.    And you said the meeting was approximately 45 minutes?

08:38AM  8    A.    Yes.

08:38AM  9    Q.    And no one else joined you during the meeting?

08:38AM  10   A.    No.

08:38AM  11   Q.    And could you tell us what you discussed, as best you

08:38AM  12   recall?

08:38AM  13   A.    Old times, and I tried to address our issue and we kind of

08:38AM  14   talked about our issue and how we were friends and we aren't

08:38AM  15   anymore.

08:38AM  16   Q.    Then did you have a conversation about the pending *BP*

08:38AM  17   claims?

08:38AM  18   A.    Nothing more than what I would have told anybody, and that

08:38AM  19   is, you know, whatever help you can give me, give me, I need to

08:38AM  20   get my claims done.  They are sitting there and they are kind

08:38AM  21   of languishing, and I don't know what's going on, but, you

08:38AM  22   know, if you could help me out, help me out.

08:38AM  23   Q.    What, if anything, did he say?

08:38AM  24   A.    He said that he really didn't -- you know, he wasn't over

08:38AM  25   any claims.  Didn't deal with any claims.  And he understood my

**C O N F I D E N T I A L**

08:38AM 1 concern and my complaint because that was happening a lot, but

08:39AM 2 the facility was getting better, and that they were trying to

08:39AM 3 process claims.

08:39AM 4 Q.   Did he agree to get back to you or get you some more

08:39AM 5 information after the meeting?

08:39AM 6 A.   Yes.  But I mean, you know, it's one of those things where

08:39AM 7 you say, I'll call you back, and he never did.

08:39AM 8 Q.   Never called you back?

08:39AM 9 A.   Correct.

08:39AM 10 Q.   And then you mentioned the subsequent meeting that you had

08:39AM 11 with him.

08:39AM 12 A.   Yes.

08:39AM 13 Q.   And approximately when was that again?

08:39AM 14 A.   That was after all of this happened.

08:39AM 15 Q.   And when you say *all this*, what do you mean?

08:39AM 16 A.   Like after my name was in the paper and all that stuff.

08:39AM 17 Actually, no, no, no.

08:39AM 18 Q.   After the stories in the press?

08:39AM 19 A.   Yes.

08:39AM 20 Q.   And could you tell me where that meeting occurred?

08:39AM 21 A.   At my office.

08:39AM 22 Q.   And who initiated it?

08:39AM 23 A.   Tiger.

08:39AM 24 Q.   And how long did you meet together with him?

08:39AM 25 A.   15 minutes, 20 minutes.

**C O N F I D E N T I A L**

SM-02-JA00647

| 08:39AM | 1 | Q. | Just the two of you? |

Q. Just the two of you?

A. Yes.

Q. And what was discussed during that meeting?

A. That he was suspended from the facility because allegedly he had an interest in the cases that I had. And I said, That's a bunch of garbage. You don't have any interest in the cases and I don't understand that.

Q. Did he ask you for any documents or any information?

A. No.

Q. Did you subsequently supply him any information or documents?

A. No.

Q. And when he said *interest in the cases*, what did you understand him to be referring to?

A. A fee interest in the cases.

Q. Do you represent an individual named *Casey Thonn*?

A. Andry Lerner does, yes.

MR. FREEH: Counsel, at this point, we'll stay on the record, but you had expressed to my colleague a possible concern you had with respect to a conflict.

MR. COBB: I did. And subsequent to that, I met with Mr. Casey Thonn and determined that there is no conflict in me accompanying Mr. Thonn to his interview tomorrow at 1 o'clock and the representation of Mr. Andry.

MR. FREEH: All right. May I ask you, sir, not the

**C O N F I D E N T I A L**

SM-02-JA00648

08:41AM 1    content, but have you represented Casey Thonn in connection
08:41AM 2    with his *BP* claim?
08:41AM 3              MR. COBB:  No.  I'm only representing him as a
08:41AM 4    witness and a hand holder.  Really as a hand holder.
08:41AM 5              THE WITNESS:  Will you hold my hand, too?
08:41AM 6              MR. COBB:  No, you're not paying me enough.
08:41AM 7    BY MR. FREEH:
08:41AM 8    Q.    I ask you if you represented an individual Casey Thonn,
08:41AM 9    and you said Andry Lerner does.
08:41AM 10   A.    That's correct.
08:41AM 11   Q.    So your law firm represents --
08:41AM 12   A.    That's correct.
08:41AM 13   Q.    And you're one of the members of the law firm?
08:41AM 14   A.    That is correct.
08:41AM 15   Q.    So he is a client of the law firm?
08:41AM 16   A.    That is correct.
08:41AM 17   Q.    You would share and benefit in any proceeds that result
08:41AM 18   from that representation?
08:41AM 19   A.    Yes.
08:41AM 20   Q.    What is your law firm representing him in regard to?
08:41AM 21   A.    In his *BP* claim.  Andry Lerner represents him.  You see,
08:41AM 22   it's -- for me, when you say *my law firm*, I have three of them.
08:41AM 23   I have The Andry Law Group which has various cases, I have The
08:42AM 24   Andry Law Firm, which has several cases and so he is -- and
08:42AM 25   that's why I didn't mean to be or appear to be coy in my

**C O N F I D E N T I A L**

**SM-02-JA00649**

| | |
|---|---|
| 08:42AM 1 | answer, but when you said do you represent him, Andry Lerner |
| 08:42AM 2 | represents him, and I'm just trying to be as specific as I can |
| 08:42AM 3 | with regard to the entities so that there is no overlap. |
| 08:42AM 4 | So Andry Lerner represents him with regard to his *BP* |
| 08:42AM 5 | claim.  That's the only representation we have with him as a |
| 08:42AM 6 | client. |
| 08:42AM 7 | Q.    And Mr. Lerner and you are the only members of that firm? |
| 08:42AM 8 | A.    That is correct. |
| 08:42AM 9 | Q.    And you are 50/50 equity partners and shareholders? |
| 08:42AM 10 | A.    No.  No.  No.  They have an operating agreement that was |
| 08:42AM 11 | negotiated by my lawyers and his lawyers and his accountants |
| 08:42AM 12 | and my accountants.  Under the terms of the operating |
| 08:42AM 13 | agreement, there is a fee schedule by cases that are generated |
| 08:42AM 14 | by me, and those cases are divided based upon an agreed-upon |
| 08:42AM 15 | fee.  And then cases that Glen generates through advertising or |
| 08:43AM 16 | otherwise are split differently. |
| 08:43AM 17 | Q.    All right.  Do the two of you as members, however, share |
| 08:43AM 18 | in any residuals or profits or joint -- |
| 08:43AM 19 | A.    Yes, pursuant to the formulas in the operating agreement, |
| 08:43AM 20 | we do. |
| 08:43AM 21 | Q.    So you each would earn some derivative compensation from |
| 08:43AM 22 | clients that the other one originates? |
| 08:43AM 23 | A.    That is correct. |
| 08:43AM 24 | Q.    So how did the law firm, talking about the Andry Lerner |
| 08:43AM 25 | firm, how did the law firm come to represent Mr. Casey Thonn? |

**C O N F I D E N T I A L**

SM-02-JA00650

| | |
|---|---|
| 08:43AM 1 | A.    Excuse me.  Casey Thonn came in in April 2012.  He came |
| 08:43AM 2 | from Glenn -- excuse me -- who met with Ms. Reitano, and |
| 08:43AM 3 | Ms. Reitano and/or Tiger and/or both referred the case to Glen, |
| 08:43AM 4 | and that's how we came to represent. |
| 08:43AM 5 | Q.    And have you met Casey Thonn over the course of the |
| 08:43AM 6 | representation? |
| 08:43AM 7 | A.    I've never met him. |
| 08:43AM 8 | Q.    Have you had discussions with Mr. Lerner about the case, |
| 08:44AM 9 | about the *BP* claim relating to Casey Thonn? |
| 08:44AM 10 | A.    Yes. |
| 08:44AM 11 | Q.    And can you tell me about those discussions? |
| 08:44AM 12 | A.    The only discussions I have had with Glen about |
| 08:44AM 13 | Casey Thonn is whether or not we were going to pay a referral |
| 08:44AM 14 | fee and to whom we were going to pay the referral fee to. |
| 08:44AM 15 | Q.    And when did that consideration occur or was there more |
| 08:44AM 16 | than one conversation? |
| 08:44AM 17 | A.    There were more than one. |
| 08:44AM 18 | Q.    And when, to the best of your recollection, was the first |
| 08:44AM 19 | time you spoke to him about that? |
| 08:44AM 20 | A.    Let me tell you.  Glen has -- and I'll answer it -- Glen |
| 08:44AM 21 | has different firms all across America.  Andry Lerner is a |
| 08:44AM 22 | partnership of Lerner National and The Andry Law Group, and so |
| 08:44AM 23 | Glen has a bunch -- I mean, I think the dynamics of law firms |
| 08:44AM 24 | have changed in America, and you can be a member of a variety |
| 08:44AM 25 | of ones.  I say that because Glenn has all these interests |

**C O N F I D E N T I A L**

SM-02-JA00651

| 08:44AM | 1 | going on.  I have got my litigation in Andry Law Group, my |

going on.  I have got my litigation in Andry Law Group, my

stuff with Andry Law Firm and other stuff kind of going on.

So when Glen and I would meet, it wasn't regularly

scheduled partnership meetings.  He would just be in town and I

would talk to him or I would just talk to him.

There are times that things like the referral fee on

*Casey Thonn* would bubble up.  I know that when we got the case,

there was a discussion about a referral fee.  Christine worked

for the facility, but Tiger did not.  And Glen had some

discussions with them about a 50/50 referral split on the fee.

Q.    Did Glen relay those conversations to you?

A.    Yes.  I never had any conversations, because at the time I

wasn't talking to Tiger, so I never had any conversation with

Tiger at all or Christina at all about the *Casey Thonn* matter.

But when I talked about it with Glen, it was about

the propriety of paying a referral feel.  And keep in mind, it

wasn't, from my perspective, that they weren't entitled to the

fee, because when we got the *Casey Thonn* matter, there was an

extensive body of work that Ms. Reitano did shepherding the

claim through the Gulf Coast Claims Facility.  So as a result

of that, I never thought they weren't entitled to the fee, but

it was just talked to me or explained to me, I guess, by Lerner

during the time that we talked about it that it wasn't proper

for them to receive a fee because they worked at the

facility -- or she worked at the facility.

**C O N F I D E N T I A L**

**SM-02-JA00652**

08:46AM 1     And then subsequent to that, we had other discussions
08:46AM 2 about it.  And I mean, I can't tell you how many we had or I
08:46AM 3 can't tell you the duration.  I just know that we talked about
08:46AM 4 it.
08:46AM 5 Q.    Was that a continuing conversation you had with
08:46AM 6 Mr. Lerner?
08:46AM 7 A.    Yes, it was.
08:46AM 8 Q.    Did you ever reach an agreement on whether or not a fee
08:46AM 9 should be paid or not?
08:46AM 10 A.    Yes.
08:46AM 11     MR. COBB:  With the Court's permission, may I chop
08:46AM 12 him every time he interrupts a question or answer?  Slow down,
08:46AM 13 sit back.  Relax.
08:46AM 14 BY MR. FREEH:
08:46AM 15 Q.    So I asked you if there were a continuing series of
08:46AM 16 conversations about the referral fee; you said yes.  And then I
08:46AM 17 asked you, did there come a time when you and he reached an
08:46AM 18 agreement or a consensus about whether or not to pay the fee.
08:46AM 19 A.    Yes.
08:46AM 20 Q.    And when, approximately, was that?
08:47AM 21 A.    April of this year.
08:47AM 22 Q.    So in April of this year, both Ms. Reitano and Mr. Sutton,
08:47AM 23 to your knowledge, were working at the facility?
08:47AM 24 A.    That is correct.
08:47AM 25 Q.    And what was the agreement or consensus you reached with

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 08:47AM | 1 | Mr. Lerner? |
| 08:47AM | 2 | A.    That I nor Andry Lerner was going to pay Mr. Sutton a fee. |
| 08:47AM | 3 | Q.    I'm sorry?  That neither... |
| 08:47AM | 4 | A.    That neither I nor Andry Lerner was going pay Mr. Sutton a |
| 08:47AM | 5 | fee. |
| 08:47AM | 6 | Q.    Was a fee ever paid, to your knowledge? |
| 08:47AM | 7 | A.    I've learned subsequently a fee was paid by Glen. |
| 08:47AM | 8 | Andry Lerner did not issue any checks to in Sutton at all. |
| 08:47AM | 9 | Q.    How was Mr. Sutton paid by Mr. Lerner? |
| 08:47AM | 10 | A.    I have learned subsequent to all -- when all of this |
| 08:47AM | 11 | broke, I talked with Glen about it and I learned that Glen had |
| 08:47AM | 12 | a relationship with Tiger and that Tiger asked Glen for the |
| 08:47AM | 13 | fee, and that Glen said, okay, I'll pay you the fee.  And that |
| 08:47AM | 14 | they put the money into -- it was a wire transfer into the |
| 08:47AM | 15 | Crown account because that's what Tiger asked for. |
| 08:48AM | 16 | And as I understand it -- and I've never seen |
| 08:48AM | 17 | anything, I've just been told by Glenn -- that all legs of that |
| 08:48AM | 18 | transaction were documented.  So I mean, it was that he was |
| 08:48AM | 19 | getting a fee and that's what Glen was doing. |
| 08:48AM | 20 | Q.    When you first learned that -- you said you just learned |
| 08:48AM | 21 | that recently? |
| 08:48AM | 22 | A.    Correct. |
| 08:48AM | 23 | Q.    How recently? |
| 08:48AM | 24 | A.    When my name was in the paper. |
| 08:48AM | 25 | Q.    And you learned that by speaking to Mr. Lerner? |

**C O N F I D E N T I A L**

SM-02-JA00654

34

| | |
|---|---|
| 08:48AM 1 | A.   That is correct. |
| 08:48AM 2 | Q.   And was that an in-person or a telephone conversation? |
| 08:48AM 3 | A.   A telephone conversation. |
| 08:48AM 4 | Q.   And did you initiate it? |
| 08:48AM 5 | A.   Yes.  There was some conversations.  I mean, Glen and I |
| 08:48AM 6 | have had two or three conversations since then, and there was |
| 08:48AM 7 | some conversation that he initiated and some that I initiated. |
| 08:48AM 8 | Q.   So I'm going to ask you about all of them.  The first |
| 08:48AM 9 | conversation, did you initiate to him? |
| 08:48AM 10 | A.   Yes. |
| 08:48AM 11 | Q.   And were you upset when you would learn that payments had |
| 08:48AM 12 | been made? |
| 08:48AM 13 | A.   Yes. |
| 08:48AM 14 | Q.   Was that against what you thought was the understanding |
| 08:48AM 15 | you had with Mr. Lerner? |
| 08:49AM 16 | A.   Yes. |
| 08:49AM 17 | Q.   And did you express that to him? |
| 08:49AM 18 | A.   Yes. |
| 08:49AM 19 | Q.   And what was his response? |
| 08:49AM 20 | A.   That he was a friend of Tiger's and that he considered |
| 08:49AM 21 | himself to be an honorable man, and that if he made a deal with |
| 08:49AM 22 | Tiger, he was going to honor the deal. |
| 08:49AM 23 | Q.   Was it your understanding, then, that the deal to pay the |
| 08:49AM 24 | fee was between Mr. Lerner and Mr. Sutton? |
| 08:49AM 25 | A.   Unequivocally. |

**C O N F I D E N T I A L**

**SM-02-JA00655**

| | | |
|---|---|---|
| 08:49AM | 1 | Q.   You were not a party to that? |
| 08:49AM | 2 | A.   No. |
| 08:49AM | 3 | Q.   And you objected to it, you said? |
| 08:49AM | 4 | A.   Yes. |
| 08:49AM | 5 | Q.   And you were surprised to hear about it? |
| 08:49AM | 6 | A.   Yes. |
| 08:49AM | 7 | Q.   And you were angry and upset with Mr. Lerner? |
| 08:49AM | 8 | A.   Yes. |
| 08:49AM | 9 | Q.   And you expressed that to him? |
| 08:49AM | 10 | A.   That is correct. |
| 08:49AM | 11 | Q.   I think you said his response was he had made the deal and |
| 08:49AM | 12 | Mr. Sutton was an honorable man? |
| 08:49AM | 13 | A.   No, Mr. Lerner was an honorable man.  Glen said, I made |
| 08:49AM | 14 | the deal with him, I'm an honorable guy and if I give somebody |
| 08:49AM | 15 | my word, that's what I'm going to do. |
| 08:49AM | 16 | Q.   Do you know how much was paid? |
| 08:49AM | 17 | A.   I think it was the exact amount of 50 percent of the fee. |
| 08:49AM | 18 | Q.   And what was that, as far as your understanding? |
| 08:50AM | 19 | A.   I've gone back over and looked because, in doing what I |
| 08:50AM | 20 | do, I don't really pay attention to individual cases.  I'm more |
| 08:50AM | 21 | worried about processes because I'm worried about how we meet |
| 08:50AM | 22 | deadlines and how we move files through, and if you're moving |
| 08:50AM | 23 | chunks of files through, it's -- I can't ever really worry |
| 08:50AM | 24 | about one case in particular, but I try my best if there are |
| 08:50AM | 25 | individual issues for a particular case to address it, like the |

**C O N F I D E N T I A L**

SM-02-JA00656

*Thonn* referral fee.

So I have a discussion with Glenn and I -- you know, to me, that's over with. But with what happened with *Thonn* was there were several payments, and because we filed for him a VoO claim, a vessel of opportunity claim, we filed a vessel owner claim and we filed a shrimper claim effectively in the seafood settlement, so there were three separate payments. So it's my understanding that -- going back to where I was before, to kind of give you the full picture, when we have a Glen-generated case, his compensation for that is 50 percent of the fee on all of the cases that he generates through his billboard advertising, etcetera.

I treated *Thonn* as a Glen Lerner-generated case, and so we had got the money on *Thonn*, I think we got a payment for 190,000 and another payment for 166,000 in and around April or May. And this is all knowledge that I have because I went back and looked at it recently --

Q.   Yes.

A.   -- in order to give you all of the information. At the time, I had really no idea. But so I've gone back over and looked. At the time, we got 166,000, there was a $32,000 fee, 16,000 was cut to Glen and 16,000 remained in the Andry Law Firm.

MR. COBB:   The Andry Law Firm?

THE WITNESS:   Excuse me, Andry Lerner. Remained in

**C O N F I D E N T I A L**

08:51AM 1  Andry Lerner.  And then there was a $190,000 payment for -- I
08:52AM 2  don't know whether it was vessel owner or shrimp captain, same
08:52AM 3  thing.  It was a $38,000 fee, 19,000 was given to Glen and
08:52AM 4  19,000.
08:52AM 5  BY MR. FREEH:
08:52AM 6  Q.   Did you come to learn how the funds were transferred by
08:52AM 7  what mechanisms and from what source from Mr. Lerner to
08:52AM 8  Mr. Sutton?
08:52AM 9  A.   All I know about that is that Glen receives a check from
08:52AM 10 us, Andry Lerner.  He deposited that check, and a subsequent
08:52AM 11 wire transfer was made to the Crown account for Tiger's portion
08:52AM 12 of the *Casey Thonn* fee, and that's all I know.
08:52AM 13 Q.   Did that wire come from The Andry Group?
08:52AM 14 A.   No.  Tiger Sutton was not paid a fee by any Andry entity
08:52AM 15 at all.
08:52AM 16 Q.   That's what I'm asking about.  I'm trying to determine
08:52AM 17 your knowledge of the source of the payment.  You said that it
08:52AM 18 was a wire transfer.
08:52AM 19 A.   Yes.
08:52AM 20 Q.   And you came to learn that in what manner?  By talking
08:53AM 21 to --
08:53AM 22 A.   My conversation with Mr. Lerner.
08:53AM 23 Q.   What did Mr. Lerner tell you in terms of the source of the
08:53AM 24 money that he sent to Mr. Sutton in relation to the claim?
08:53AM 25 A.   He took our check and deposited it into his account.  I

**C O N F I D E N T I A L**

SM-02-JA00658

08:53AM 1    don't know what account that is, and then he subsequently made
08:53AM 2    a payment to Tiger.
08:53AM 3    Q.    And when he said his account, you understood that to be a
08:53AM 4    personal account, not one of the law firm accounts that you're
08:53AM 5    associated with?
08:53AM 6    A.    No, no, not one that I was made out.  It was a Glen Lerner
08:53AM 7    account, not an Andry Lerner account.  And I don't know if it
08:53AM 8    was a Glen Lerner personal account or a Glen Lerner business
08:53AM 9    account.  I don't know what account that was.  It just didn't
08:53AM 10   come from us, because that wasn't what we did.
08:53AM 11   Q.    And you had said earlier that the referral of the
08:53AM 12   *Casey Thonn* case went from Christine Reitano, I guess
08:53AM 13   Sutton & Reitano to Glenn Lerner?
08:54AM 14   A.    That is correct.
08:54AM 15   Q.    I think you said you weren't involved in any of the
08:54AM 16   discussions surrounding that referral?
08:54AM 17   A.    None.  That's correct.  I was not involved in any of those
08:54AM 18   discussions.
08:54AM 19   Q.    How long after the case was transferred or reassigned to
08:54AM 20   Mr. Lerner did you come to know or come to learn that it was in
08:54AM 21   the Andry Lerner Law Firm?
08:54AM 22   A.    About a month or so.
08:54AM 23   Q.    And how did you come to learn that?
08:54AM 24   A.    I don't even know.
08:54AM 25   Q.    I mean, do you regularly look --

**C O N F I D E N T I A L**

SM-02-JA00659

08:54AM 1    A.    Yes.

08:54AM 2    Q.    -- at all of the cases of your inventory, the *BP* cases?

08:54AM 3    A.    Yes.

08:54AM 4    Q.    Do you recall if you noticed that case and then asked

08:54AM 5    Mr. Lerner or someone in your office where it came from or --

08:54AM 6    A.    I don't know how I -- I mean, Glen may have told me or

08:54AM 7    somebody may have told me, but I don't really know.  But, yes,

08:54AM 8    I do do that.  I have a regular -- I have a whole set of cases

08:54AM 9    that are different groups, and I look at them regularly.  So it

08:54AM 10   could have come that way.

08:54AM 11   Q.    You said the conversations with Mr. Lerner about paying or

08:55AM 12   not paying a referral fee to Sutton in regards to the

08:55AM 13   *Casey Thonn* case went up to April of this year?

08:55AM 14   A.    Yes.

08:55AM 15   Q.    And you reached an agreement, you thought, with him in

08:55AM 16   April that no fee would be paid?

08:55AM 17   A.    That is correct.

08:55AM 18   Q.    When did those conversations start?  In other words, when

08:55AM 19   was the first time you and Mr. Lerner discussed the issue of

08:55AM 20   whether or not to pay a referral fee, if you recall?

08:55AM 21   A.    Probably off and on throughout the entire tenure of the

08:55AM 22   time the case was there.  The case is still there because he

08:55AM 23   still has a vessel owner claim and he still has a subsistence

08:55AM 24   claim and he still has a -- you know, I mean, as I understand

08:55AM 25   the Seafood Compensation Program, if they don't go through the

**C O N F I D E N T I A L**

SM-02-JA00660

40

| | |
|---|---|
| 08:55AM 1 | two and a half billion, they'll get a residual payment.  So |
| 08:55AM 2 | it's still there.  So from the -- we would have had those |
| 08:55AM 3 | discussions throughout that time. |
| 08:55AM 4 | MR. COBB:  Excuse me, Your Honor.  Could the jury |
| 08:55AM 5 | take a two-minute break?  It appears some of the jurors are |
| 08:55AM 6 | fading. |
| 08:56AM 7 | MR. FREEH:  Absolutely. |
| 08:56AM 8 | (WHEREUPON, at this point in the proceedings, there |
| 08:59AM 9 | was a brief recess taken.) |
| 08:59AM 10 | MR. FREEH:  Back on the record. |
| 08:59AM 11 | BY MR. FREEH: |
| 09:00AM 12 | Q.   Mr. Andry, let me ask you the following question, just so |
| 09:00AM 13 | I understand it.  There came a time when the facility -- we're |
| 09:00AM 14 | talking about the CAO when we refer to *the facility*.  There |
| 09:00AM 15 | came a time when the facility made a payment to the |
| 09:00AM 16 | Andry Lerner firm in connection with Casey Thonn, correct? |
| 09:01AM 17 | A.   That's correct. |
| 09:01AM 18 | Q.   Again, how much was that, approximately? |
| 09:01AM 19 | A.   There were three. |
| 09:01AM 20 | Q.   Start with the first one. |
| 09:01AM 21 | A.   There was a VoO payment for $49,880. |
| 09:01AM 22 | Q.   And let's just stick with that for the moment.  Did that |
| 09:01AM 23 | stay in the Andry Lerner firm? |
| 09:01AM 24 | A.   Yes. |
| 09:01AM 25 | Q.   And was some of that sent separately to Mr. Lerner or did |

**C O N F I D E N T I A L**

09:01AM 1    it stay in the firm?

09:01AM 2    A.    It stayed in the firm originally because I think we needed

09:01AM 3    the money to make payroll.  And I think subsequent to that,

09:01AM 4    Glen received his half of the $4,900.

09:01AM 5          MR. COBB:  4900 or 49,000?

09:01AM 6    A.    No, no, his half.  The case would have come in at 49,880,

09:01AM 7    as all VoO payments did.

09:01AM 8    BY MR. FREEH:

09:01AM 9    Q.    10 percent is the fee?

09:01AM 10   A.    20 percent fee.

09:01AM 11   Q.    But 10 percent for him?

09:01AM 12   A.    Correct.  10 percent for him, and that would have gone

09:01AM 13   to -- I think we received the money in -- and, again, all of

09:01AM 14   this, I'm telling you, it's all after acquired knowledge

09:01AM 15   because I want you to have the knowledge of the actual stuff.

09:01AM 16   At the time, I had no idea any of this was going on.

09:02AM 17   Q.    In terms of the payment?

09:02AM 18   A.    No, in terms of payments to anybody.  And just kind of

09:02AM 19   running the firm.  I never had any idea about payments to

09:02AM 20   Sutton until recently.  All of the specific numbers I know

09:02AM 21   because after the news went out in the paper, I went back and

09:02AM 22   said, I want to do an internal investigation in the office.  I

09:02AM 23   want to go through everybody.  If there is anything going on,

09:02AM 24   please tell me.

09:02AM 25          You know, and I went through the whole thing and told

**C O N F I D E N T I A L**

SM-02-JA00662

42

09:02AM 1    them, you know, keep everything.  Let's talk about everything,
09:02AM 2    let's figure out what went on.  So that's how I know that the
09:02AM 3    VoO payment was 49,900 --
09:02AM 4    Q.    And just sticking again with, as you refer to, your
09:02AM 5    internal inquiry.  I take it that part of that was
09:02AM 6    conversations with Christina Mancuso?
09:02AM 7    A.    Yes.
09:02AM 8    Q.    Was she the principal lawyer that handled the *Casey Thonn*
09:02AM 9    claim?
09:02AM 10   A.    Yes.
09:02AM 11   Q.    So when you say that Andry Lerner was his lawyer --
09:02AM 12   A.    Let me just say this.  I just thought that --
09:02AM 13   Q.    Explain that to me, the relationship.  Was he the lawyer
09:03AM 14   for Casey Thonn or was Mancuso or both of them?
09:03AM 15   A.    Mancuso was the one that handled the day to day.  I
09:03AM 16   thought about two things.  You asked me about employees.  There
09:03AM 17   was a lady named Mary Rubio, who is a paralegal who is with
09:03AM 18   Andry Lerner, and Mary just had a baby and she's on maternity
09:03AM 19   leave, so I forgot about her.  And then there is an attorney
09:03AM 20   named Kailey LeBouef, K-A-I-L-E-Y L-E-B-O-U-E-F.
09:03AM 21   Q.    At the Andry Lerner firm?
09:03AM 22   A.    That is correct.  Ms. Mancuso handled the day-to-day
09:03AM 23   operation of the *Thonn* matter through appeal, and the appeal
09:03AM 24   was written and handled by Kailey.
09:03AM 25   EXAMINATION BY MR. DOLAN:

**C O N F I D E N T I A L**

SM-02-JA00663

| | |
|---|---|
| 09:03AM 1 | Q.   Mary Rubio? |
| 09:03AM 2 | A.   Yes. |
| 09:03AM 3 | Q.   How long did she work for Andry Lerner? |
| 09:03AM 4 | A.   A while.  Six or eight months.  During her whole |
| 09:03AM 5 | pregnancy, so she might have been there a year.  Because when |
| 09:03AM 6 | she started, she wasn't pregnant and she just had her baby. |
| 09:04AM 7 | Q.   Where did she come from? |
| 09:04AM 8 | A.   I met her -- I think she was in school and working at |
| 09:04AM 9 | Delmonico's restaurant.  And she asked if I had anything that |
| 09:04AM 10 | she could do.  And at the time, from a claim processing |
| 09:04AM 11 | perspective, I hired her and kind of put her in the claim |
| 09:04AM 12 | processing.  And claim processing is talking to the clients, |
| 09:04AM 13 | gathering their documents, meeting with the clients, making |
| 09:04AM 14 | sure we have all of the requisite financial data and financial |
| 09:04AM 15 | information. |
| 09:04AM 16 | Q.   Had she had any experience in the claims processing? |
| 09:04AM 17 | A.   No.  And there is also another girl.  Jamie, and I don't |
| 09:04AM 18 | remember Jamie's last name.  Don't tell anybody I said that. |
| 09:04AM 19 | MR. COBB:  Too late now.  It's already on the record. |
| 09:04AM 20 | THE WITNESS:  But Jamie is a paralegal claims person |
| 09:05AM 21 | also. |
| 09:05AM 22 | BY MR. DOLAN: |
| 09:05AM 23 | Q.   When you said that each fee that came into Andry Lerner, |
| 09:05AM 24 | half of it goes out to Lerner, right, so if $4,900 goes out to |
| 09:05AM 25 | Lerner, 4900 stays with the Andry Lerner Group? |

**C O N F I D E N T I A L**

SM-02-JA00664

09:05AM 1    A.    Correct.

09:05AM 2    Q.    Is that 4900 then split at the end of the year between you

09:05AM 3    and Lerner or is it --

09:05AM 4    A.    No, I should get the other 4900.

09:05AM 5    Q.    -- that's your share --

09:05AM 6    A.    I'm sorry.

09:05AM 7    Q.    So your side that stays with Andry Lerner -- so the side

09:05AM 8    that stays with Andry Lerner, that's your share of the fee?

09:05AM 9    A.    Correct.

09:05AM 10   EXAMINATION BY MR. FREEH:

09:05AM 11   Q.    So he doesn't get an additional share from the

09:05AM 12   Andry Lerner portion of the fee that stays --

09:05AM 13   A.    He's not supposed to.

09:05AM 14   Q.    -- does he?

09:05AM 15   A.    No.

09:05AM 16   Q.    And is that the way all the *BP* fees were handled?

09:05AM 17   A.    No.  There are two sets of cases.  One of them is cases

09:05AM 18   generated by me.  That is if I have -- if my father refers me

09:05AM 19   somebody, and that's my case that I generated, that's a fee

09:06AM 20   schedule that's in our operating agreement.

09:06AM 21        If Glen generates a case through advertising other

09:06AM 22   otherwise, like if he talks to Reitano and sends us

09:06AM 23   *Casey Thonn*, that's a Lerner-generated lead, a Lerner-generated

09:06AM 24   case; therefore, he receives 50/50 compensation on that as part

09:06AM 25   of his compensation.  So on the *Thonn* matter, that was a

**C O N F I D E N T I A L**

SM-02-JA00665

09:06AM 1   Lerner-generated file; therefore, he received half of the fee.

09:06AM 2   Q.   You said that Ms. Mancuso handled the appeal for

09:06AM 3   Casey Thonn?

09:06AM 4   A.   No, I said Kailey LeBouef handled the appeal.  Ms. Mancuso

09:06AM 5   handled the --

09:06AM 6   Q.   The day-to-day operations?

09:06AM 7   A.   -- day-to-day operations of the *Casey Thonn* case through

09:06AM 8   reconsideration.

09:06AM 9   Q.   And how many other *BP* cases were under her operational

09:06AM 10   control or sort of her daily representation?

09:06AM 11   A.   All of them.

09:06AM 12   Q.   All of them?  And did that include all matters relating to

09:07AM 13   the processing and payment of the claims?

09:07AM 14   A.   Processing, not the payment.  And by "payment," I really

09:07AM 15   don't know what you mean, but yes, she handled most everything.

09:07AM 16   Q.   So when you said that Mr. Lerner represented Casey Thonn,

09:07AM 17   was it your reference that he was responsible for generating

09:07AM 18   the case?

09:07AM 19   A.   If I said that, I misspoke.  Mr. Lerner did not --

09:07AM 20   Andry Lerner, is what I thought I said, represented

09:07AM 21   Casey Thonn.  Mr. Lerner did not.

09:07AM 22   Q.   But Mr. Lerner generated the case?

09:07AM 23   A.   That is correct.

09:07AM 24   Q.   And therefore, the fee arrangement, as you've described it

09:07AM 25   to us?

# CONFIDENTIAL

SM-02-JA00666

09:07AM 1    A.    Correct.

09:07AM 2    Q.    When you did your internal investigation after the matter

09:07AM 3    become public, you spoke, you said, to Christine Mancuso, to

09:07AM 4    Mr. Lerner?

09:07AM 5    A.    Yes.

09:07AM 6    Q.    And did you collect internal documents or tell people to

09:07AM 7    preserve whatever documents related to the *Casey Thonn* matter?

09:08AM 8    A.    Yes, I did.

09:08AM 9    Q.    Has that been done, as far as you know?

09:08AM 10   A.    Yes.

09:08AM 11          MR. FREEH:   Counsel, we may make a request for some

09:08AM 12   of those materials.

09:08AM 13          MR. COBB:   Sure.   Drop me a note, and I'll respond to

09:08AM 14   it.

09:08AM 15          MR. FREEH:   We'll make the request in writing to you.

09:08AM 16   BY MR. FREEH:

09:08AM 17   Q.    The second payment -- you mentioned there were three

09:08AM 18   payments.   You subsequently became aware, subsequently to the

09:08AM 19   matter becoming public -- the first one you described.   Can we

09:08AM 20   talk about the second one, as you've been able to reconstruct

09:08AM 21   it?

09:08AM 22   A.    The second one was -- I don't know if the 190- came first

09:08AM 23   or the 166- came first.   But in that instance, the money came

09:08AM 24   in, 32,000 was the fee, 16,000 was to Glenn and then 16,000 was

09:08AM 25   kept in Andry Lerner.

**C O N F I D E N T I A L**

SM-02-JA00667

09:08AM 1    Q.   And the third or second, whatever the order was, you think

09:08AM 2    was approximately 190-?

09:08AM 3    A.   That is correct.

09:08AM 4    Q.   And would it have been the same percentage and the same

09:09AM 5    division?

09:09AM 6    A.   Yes.

09:09AM 7    Q.   And what did you understand that to be in terms of

09:09AM 8    numbers, please?

09:09AM 9    A.   190-, 20 percent fee, approximately 38,000, and then half

09:09AM 10   of that would have gone to Glen Lerner -- or half of that would

09:09AM 11   have gone to Lerner and Associates, and then the other half

09:09AM 12   would remain in Andry Lerner.

09:09AM 13   Q.   Now, Lerner and Associates is a separate entity?

09:09AM 14   A.   Yes, that's Glen's actual firm that he practices in

09:09AM 15   Las Vegas in, or that's his law firm.

09:09AM 16   Q.   And the *BP* payments, not just in the *Casey Thonn* matter,

09:09AM 17   but all the other *BP* matters where he had an interest, to the

09:09AM 18   best of your knowledge, the fees that were sent to him were

09:09AM 19   sent to Lerner and Associates?

09:09AM 20   A.   That's correct.

09:09AM 21   Q.   Not to The Andry Group?

09:09AM 22   A.   That is correct.

09:09AM 23   Q.   You described again a continuing series of conversations

09:10AM 24   about the payment or nonpayment of a retainer to Mr. Sutton.

09:10AM 25   Correct?

**C O N F I D E N T I A L**

48

| | |
|---|---|
| 09:10AM 1 | A.    Payment of a referral fee to Mr. Sutton, that's correct. |
| 09:10AM 2 | Q.    Payment of a referral fee.  And would it be fair to |
| 09:10AM 3 | characterize that as a disagreement or an argument between the |
| 09:10AM 4 | two of you and Mr. Lerner? |
| 09:10AM 5 | A.    It was a discussion about how to handle the matter. |
| 09:10AM 6 | Q.    Did you object to a fee being paid? |
| 09:10AM 7 | A.    Yes. |
| 09:10AM 8 | Q.    And did you make that clear to Mr. Lerner? |
| 09:10AM 9 | A.    Yes. |
| 09:10AM 10 | Q.    And what was the basis of your objection and what did you |
| 09:10AM 11 | express to Mr. Lerner as the basis of your objection? |
| 09:10AM 12 | A.    My understanding from Glen was that Tiger worked at the |
| 09:10AM 13 | facility and it was primarily from, when Christina sent us the |
| 09:10AM 14 | case, that if she sent us the case, then she can't work on it |
| 09:10AM 15 | or get a fee.  And so I just presumed that Tiger was in the |
| 09:10AM 16 | same position.  So if they couldn't receive a fee, I just |
| 09:10AM 17 | assumed that they shouldn't receive a fee.  Excuse me, I |
| 09:10AM 18 | assumed that if they couldn't receive a fee, that we shouldn't |
| 09:11AM 19 | pay them one.  And so we didn't pay them one. |
| 09:11AM 20 | Q.    So your objection -- and correct me if my question assumes |
| 09:11AM 21 | the wrong fact, but it sounds to me that your objection was not |
| 09:11AM 22 | whether it was a referral fee or something else, it was the |
| 09:11AM 23 | fact that it was any payment at all? |
| 09:11AM 24 | A.    It was a referral fee.  And not any payment at all.  In my |
| 09:11AM 25 | plaintiff world in New Orleans, according to our custom and |

**C O N F I D E N T I A L**

SM-02-JA00669

49

| | |
|---|---|
| 09:11AM 1 | lawyers, they pay referral fees all the time.  All that is |
| 09:11AM 2 | required is they do a commensurate amount of work.  They did a |
| 09:11AM 3 | commensurate amount of work, and under normal circumstances, we |
| 09:11AM 4 | would have paid them a referral fee.  I just didn't think it |
| 09:11AM 5 | was appropriate, given the fact it was represented to me that |
| 09:11AM 6 | she had to divest herself of her cases in order to go work |
| 09:11AM 7 | there. |
| 09:11AM 8 | Q.    And Mr. Lerner had represented that to you when you first |
| 09:11AM 9 | learned about the matter being assigned to your law firm? |
| 09:11AM 10 | A.    At some point in that continuum, yes. |
| 09:11AM 11 | Q.    And your reaction was fairly immediate or fairly |
| 09:12AM 12 | responsive that I have a question about this or should we do |
| 09:12AM 13 | this, you were not comfortable with the notion of paying a |
| 09:12AM 14 | referral fee? |
| 09:12AM 15 | A.    Correct. |
| 09:12AM 16 | Q.    And again, I asked you this once before, but I believe you |
| 09:12AM 17 | said in April, you thought you had reached an agreement with |
| 09:12AM 18 | Mr. Lerner, April of this year, that no fee, no payment would |
| 09:12AM 19 | be made to Mr. Sutton in regard to the *Casey Thonn* matter? |
| 09:12AM 20 | A.    That's correct. |
| 09:12AM 21 |       MR. FREEH:  Matt, do you have anything else on that? |
| 09:12AM 22 | EXAMINATION BY MR. DOLAN: |
| 09:12AM 23 | Q.    When were the first -- if you can recall, when were the |
| 09:12AM 24 | fees first being paid?  When was the VoO claim paid? |
| 09:12AM 25 | A.    We received the VoO payment in October.  And I think we |

**C O N F I D E N T I A L**

SM-02-JA00670

09:12AM  1    paid Glen his share in December.  And then the other payments
09:12AM  2    were in around March and April or March and May, depending.
09:13AM  3    Q.    Does Susan DeSantis work for you or Glen?
09:13AM  4    A.    She works for Glen.
09:13AM  5    Q.    And Jeff Cahill?
09:13AM  6    A.    That is correct.
09:13AM  7    Q.    Who does your accounting?
09:13AM  8    A.    Scott Stephenson.
09:13AM  9    Q.    Scott Stephenson, he does the account accounting for all
09:13AM 10    three -- for Andry Lerner Group?
09:13AM 11    A.    No, he does the accounting for -- there is no Andry Lerner
09:13AM 12    Group.  He does the accounting for The Andry Law Firm and for
09:13AM 13    the Andry Lerner entity.  Mr. Stephenson is an outside
09:13AM 14    contractor who I pay by the hour to perform those functions.
09:13AM 15    Q.    And he does all the accounts receivable?
09:13AM 16    A.    That's correct.
09:13AM 17    Q.    So he would have received a check?
09:13AM 18    A.    Correct.
09:14AM 19    EXAMINATION BY MR. FREEH:
09:14AM 20    Q.    Mr. Andry, do you any have other business relationships or
09:14AM 21    business interests with Glen Lerner --
09:14AM 22    A.    No.
09:14AM 23    Q.    -- other than the ones you've described?
09:14AM 24    A.    No.
09:14AM 25    Q.    And with respect to Christine Reitano, as you told us, you

**C O N F I D E N T I A L**

SM-02-JA00671

09:14AM 1    know her from law school?

09:14AM 2    A.   Yes.

09:14AM 3    Q.   And know her obviously through the relationship and

09:14AM 4    marriage with Mr. Sutton?

09:14AM 5    A.   Yes.

09:14AM 6    Q.   Have you ever had a discussion with her about the

09:14AM 7    *Casey Thonn* matter?

09:14AM 8    A.   No.

09:14AM 9    Q.   Either before or after she went to work for the facility?

09:14AM 10    A.   No.

09:14AM 11    Q.   Did you ever direct anybody to have a conversation with

09:14AM 12    her about the *Casey Thonn* matter?

09:14AM 13    A.   No.

09:14AM 14    Q.   Did you ever discuss the *Casey Thonn* matter with

09:14AM 15    Mr. Sutton?

09:14AM 16    A.   No.

09:14AM 17    Q.   When you had your lunch and you're talking about the group

09:14AM 18    of pending *BP* matters, you did not specify that one?

09:14AM 19    A.   No.

09:14AM 20    Q.   Did you ever ask anybody to contact Mr. Sutton or the

09:14AM 21    facility with respect to the *Casey Thonn* matter?

09:15AM 22    A.   No.

09:15AM 23    Q.   There is a separate claim, unrelated to *Casey Thonn*, of

09:15AM 24    course, that's referred to as *the Andry Law* --

09:15AM 25    A.   Firm.

**C O N F I D E N T I A L**

SM-02-JA00672

| | |
|---|---|
| 09:15AM 1 | Q.   -- *Firm* matter? |
| 09:15AM 2 | A.   Yes, sir. |
| 09:15AM 3 | Q.   Have you been involved in that, sir? |
| 09:15AM 4 | A.   Somewhat. |
| 09:15AM 5 | Q.   And what's the nature of your involvement? |
| 09:15AM 6 | A.   That was primarily handled by my brother and by our |
| 09:15AM 7 | accountant, Kushner LaGraize.  I did some work when *BP* took an |
| 09:15AM 8 | appeal as far as writing the appeal and what the issues were on |
| 09:15AM 9 | appeal. |
| 09:15AM 10 | Q.   Did you present the arguments to the appeal?  I know it |
| 09:15AM 11 | was done administratively. |
| 09:15AM 12 | A.   Yes.  I worked with -- because some of that -- the appeal |
| 09:15AM 13 | was purely a legal appeal.  They appealed on alternative |
| 09:15AM 14 | causation and they appealed on inconsistent financials or |
| 09:15AM 15 | matching or smoothing or whatever the verbiage de jour is, and |
| 09:15AM 16 | they -- so I looked at that, and I worked with my brother and |
| 09:16AM 17 | put together the appeal. |
| 09:16AM 18 | Q.   Did you work with an individual at all or discuss with an |
| 09:16AM 19 | individual at the facility Mr. Duval with respect to -- |
| 09:16AM 20 | A.   Yes, I worked with David.  David was head of the appeals. |
| 09:16AM 21 | The reason why I worked with David is because at the time, our |
| 09:16AM 22 | appeal was, I think, April 6th, if I have the date correctly or |
| 09:16AM 23 | somewhere around there.  Judge Barbier issued an order on |
| 09:16AM 24 | April 24th, about the matching and the smoothing, and I talked |
| 09:16AM 25 | with David because he was head of appeals and, in my opinion |

**C O N F I D E N T I A L**

SM-02-JA00673

| | | |
|---|---|---|
| 09:16AM | 1 | from an advocate perspective, the appellate grounds that were |
| 09:16AM | 2 | chosen by *BP* matched those that were mentioned in |
| 09:16AM | 3 | Judge Barbier's 4/24 order, and so I asked David the proper |
| 09:16AM | 4 | procedure to -- and then we subsequently sent him a letter |
| 09:16AM | 5 | about trying to get it dismissed either through -- because they |
| 09:16AM | 6 | didn't use the proper verbiage. |
| 09:17AM | 7 | And we went to Juneau originally.  Juneau said that |
| 09:17AM | 8 | he didn't have the power to dismiss an appeal, so then we went |
| 09:17AM | 9 | to appellate coordinator, who was Mr. Duval, and asked that he |
| 09:17AM | 10 | dismiss the appeal based on those grounds. |
| 09:17AM | 11 | Q.    When you say *we*, are you referring to you and your |
| 09:17AM | 12 | brother? |
| 09:17AM | 13 | A.    Correct. |
| 09:17AM | 14 | Q.    But you were personally involved in that? |
| 09:17AM | 15 | A.    Yes. |
| 09:17AM | 16 | Q.    And what relationship, if any, did you have or do you have |
| 09:17AM | 17 | with Mr. Duval? |
| 09:17AM | 18 | A.    David is Stanwood Duval's son, and I've known them and |
| 09:17AM | 19 | their family as a plaintiff lawyer in New Orleans in this |
| 09:17AM | 20 | community, I've known them off and on forever. |
| 09:17AM | 21 | Q.    Have you socialized with Mr. Duval? |
| 09:17AM | 22 | A.    Yes, I have. |
| 09:17AM | 23 | Q.    And can you tell me about that, please? |
| 09:17AM | 24 | A.    I've seen him at a few Hornets games.  I think we've had |
| 09:17AM | 25 | lunch once or twice, but other than that, it's really, you |

**C O N F I D E N T I A L**

SM-02-JA00674

09:17AM  1    know, same relationship as I had with other plaintiff lawyers.

09:17AM  2    But I just see him around and we visit.

09:17AM  3    Q.   Did there come a time -- let me direct your attention to

09:17AM  4    March of 2013.  Did there come a time when The Andry Law Firm

09:18AM  5    claim -- I'm talking about the law firm claim now, not anything

09:18AM  6    else -- became, in your view or understanding, stalled or stuck

09:18AM  7    in the administrative process?

09:18AM  8    A.   Every one of my claims were stalled or stuck.  It still

09:18AM  9    is, but in March, yes.

09:18AM  10   Q.   Tell me about how you came to learn and what were the

09:18AM  11   circumstances of it being stuck, to use the word we both shared

09:18AM  12   here?

09:18AM  13   A.   I don't know that there were any particular circumstances.

09:18AM  14   I mean, the case was filed in November of last year.  It had

09:18AM  15   been in accountant review since December, so, you know, and it

09:18AM  16   was, you know, March, so I mean, accountants should be able to

09:18AM  17   review that in four months.  So it's the nature of all of the

09:18AM  18   cases, though.

09:18AM  19   Q.   What steps, if any, did you take in March to find out what

09:18AM  20   was the status and what was the holdup in that particular

09:19AM  21   matter?  We're talking now, for the record, of The Andry Law

09:19AM  22   Firm claim.

09:19AM  23   A.   Nothing, really, because that was more Gibby's deal than

09:19AM  24   mine.  I didn't really take any steps other than the ones that

09:19AM  25   would avail themselves, like if I ran into somebody at the

**CONFIDENTIAL**

SM-02-JA00675

09:19AM 1   facility, I would say, can you help me out him get the claim

09:19AM 2   done, you know, all my claims are stuck.  What do I need to do?

09:19AM 3   Q.   So on that particular claim, do you recall speaking to

09:19AM 4   Mr. Juneau about it at that time?

09:19AM 5   A.   I spoke with Pat about a bunch of claims at that time.

09:19AM 6   Q.   Do you recall talking to him, not complaining, but

09:19AM 7   pointing out to him that this particular claim seemed to be

09:19AM 8   stuck and it was a very important claim to you and the firm?

09:19AM 9   A.   I pointed out to him that that claim was stuck, as was

09:19AM 10  about six other claims.

09:19AM 11  Q.   And --

09:19AM 12  A.   And I didn't single that one out in particular, because

09:19AM 13  that would not have been in any discussion I had because my

09:20AM 14  operation was to get every one of them done.

09:20AM 15  Q.   So is it your testimony you didn't specifically mention

09:20AM 16  that claim to him?

09:20AM 17  A.   No, it's not my testimony that I didn't specifically

09:20AM 18  mention it one way or the other.  I may have, and I probably

09:20AM 19  did.  As I sit here now, I don't really remember whether I

09:20AM 20  singled that one out and said, what about this one, as opposed

09:20AM 21  to all of the other ones.

09:20AM 22  Q.   Did you have a similar conversation with anyone else at

09:20AM 23  that time, March of this year, who worked at the facility?

09:20AM 24  A.   I may have, but I don't remember specific conversations.

09:20AM 25  Q.   Did Mr. Juneau or anyone get back to you after you had

**C O N F I D E N T I A L**

09:20AM 1    that conversation or conversations with respect to the status

09:20AM 2    or an update on those particular claims?

09:20AM 3    A.    No.   No.   That was kind of a frustrating thing, but no.

09:20AM 4    Q.    Did you do any follow-up, you know, as a lawyer trying to

09:20AM 5    pursue those claims using the facilities and channels that were

09:21AM 6    available --

09:21AM 7    A.    Yes.

09:21AM 8    Q.    -- to restate your --

09:21AM 9    A.    Yes.

09:21AM 10   Q.    Do you recall how often you did that?

09:21AM 11   A.    Well, again, it wouldn't really be -- I didn't do it for

09:21AM 12   that claim.   I mean, we had -- like, for example, we have a

09:21AM 13   lady, Maqita Ash (spelled phonetically) I think was her name,

09:21AM 14   that we work with at the facility, so Chris would always talk

09:21AM 15   to Maqita about moving things along.

09:21AM 16   Q.    Just confining the discussion to you and whatever steps

09:21AM 17   you may have taken, did you have a series of these

09:21AM 18   conversations with people at the facility?  Nothing wrong with

09:21AM 19   the conversations, but calling to their attention the fact that

09:21AM 20   things were slow --

09:21AM 21   A.    Yes.   Like I said earlier -- I'm sorry.

09:21AM 22   Q.    -- things were slowly and you were not getting a process

09:21AM 23   that you thought was appropriate?

09:21AM 24   A.    Yes.   I had those -- as I said before, I had those

09:21AM 25   conversations.   Anytime I would see anybody, I was like, please

**C O N F I D E N T I A L**

SM-02-JA00677

| | | |
|---|---|---|
| 09:21AM | 1 | help. |
| 09:21AM | 2 | Q.   And I think you said you never had that conversation with |
| 09:21AM | 3 | Ms. Reitano when she was at the facility? |
| 09:22AM | 4 | A.   I mean, I don't think I did. |
| 09:22AM | 5 | Q.   You don't recall? |
| 09:22AM | 6 | A.   I don't recall. |
| 09:22AM | 7 | Q.   Did you ever talk to Michael Juneau about the same issue, |
| 09:22AM | 8 | complaining -- or "complaining" may not be the proper word -- |
| 09:22AM | 9 | bringing to his attention the fact that matters were not being |
| 09:22AM | 10 | processed according to what you thought they should be? |
| 09:22AM | 11 | A.   Yes, I did. |
| 09:22AM | 12 | Q.   And was that in the same time frame, approximately March |
| 09:22AM | 13 | of 2013? |
| 09:22AM | 14 | A.   That was later. |
| 09:22AM | 15 | Q.   It was later.  About when? |
| 09:22AM | 16 | A.   Mike called me, and Mike said, we're checking into some |
| 09:22AM | 17 | things involving Lionel Sutton and he said, does Tiger have any |
| 09:22AM | 18 | fee interest in your cases?  And I said no.  He said -- the |
| 09:22AM | 19 | same discussion I had with you here today.  And then I said, |
| 09:22AM | 20 | you know, nobody has any interest in the cases other than Glen |
| 09:22AM | 21 | and I, and, oh, by the way, there is nothing really to have a |
| 09:23AM | 22 | financial interest in because nothing was really getting paid, |
| 09:23AM | 23 | so, you know, I don't know what I have to do, but is there |
| 09:23AM | 24 | something I can do or some way you can help me. |
| 09:23AM | 25 | Q.   So this, I take it, was a recent conversation? |

**C O N F I D E N T I A L**

SM-02-JA00678

58

| | | |
|---|---|---|
| 09:23AM | 1 | A.   Yes. |
| 09:23AM | 2 | Q.   After these matters become public? |
| 09:23AM | 3 | A.   Shortly before. |
| 09:23AM | 4 | Q.   Shortly before? |
| 09:23AM | 5 | A.   That is correct. |
| 09:23AM | 6 | Q.   And Mr. Juneau, Michael Juneau initiated the call to you? |
| 09:23AM | 7 | A.   That is correct. |
| 09:23AM | 8 | Q.   Did you speak about the same subject matter in the same |
| 09:23AM | 9 | approximate time with Pat Juneau? |
| 09:23AM | 10 | A.   No. |
| 09:23AM | 11 | Q.   Anyone else at the facility? |
| 09:23AM | 12 | A.   No. |
| 09:23AM | 13 | Q.   Did you ever speak to a David Welker there? |
| 09:23AM | 14 | A.   Never.  I wouldn't know David Welker if he walked in here. |
| 09:23AM | 15 | Q.   With respect to -- |
| 09:23AM | 16 | EXAMINATION BY MR. DOLAN: |
| 09:23AM | 17 | Q.   Did Mr. Lerner, when he had discussions with you with |
| 09:24AM | 18 | regards to his payment of Sutton, did he ever refer to any kind |
| 09:24AM | 19 | of written fee agreement with Sutton?  Was there ever any |
| 09:24AM | 20 | mention of any agreement that he had written? |
| 09:24AM | 21 | A.   No. |
| 09:24AM | 22 | Q.   He just said it was kind of his word and he was going to |
| 09:24AM | 23 | pay him? |
| 09:24AM | 24 | A.   Correct. |
| 09:24AM | 25 | Q.   Did Sutton & Reitano refer any other claims besides |

**C O N F I D E N T I A L**

SM-02-JA00679

| | | |
|---|---|---|
| 09:24AM | 1 | *Casey Thonn* to Andry Lerner? |
| 09:24AM | 2 | A.   No. |
| 09:24AM | 3 | Q.   What was the name of the accountant you said that worked |
| 09:24AM | 4 | The Andry Law Firm claim? |
| 09:24AM | 5 | A.   Scott Stephens. |
| 09:24AM | 6 | Q.   Oh, so he also worked -- he does your -- |
| 09:24AM | 7 | A.   No, no, no, I'm sorry.  I misunderstood your question. |
| 09:24AM | 8 | The Andry Law Firm claim accountant was David Kushner with |
| 09:24AM | 9 | Kushner LaGraize. |
| 09:25AM | 10 | Q.   And what is the Coastal Claims Group?  Do you have any |
| 09:25AM | 11 | affiliation with that? |
| 09:25AM | 12 | A.   My sister is a co-owner of that.  That's a business that |
| 09:25AM | 13 | was started during the claim process.  I didn't think it was |
| 09:25AM | 14 | appropriate for me to be in the claim processing business, but |
| 09:25AM | 15 | I thought it was a venue to make money, because I thought the |
| 09:25AM | 16 | accountants were going to get paid and I thought that that |
| 09:25AM | 17 | would be a good business effort, so I suggested it to my |
| 09:25AM | 18 | sister. |
| 09:25AM | 19 |        And her and Bert Verdigets and Kevin Ingram, who is a |
| 09:25AM | 20 | Liberty Mutual mass adjustor, and Scott -- I don't remember |
| 09:25AM | 21 | Scott's last name, but Scott had the same background, he worked |
| 09:25AM | 22 | for Liberty Mutual and they did catastrophic claims, they |
| 09:25AM | 23 | started Coastal Claims Group, and the Coastal Claims Group did |
| 09:25AM | 24 | get together *BP* claims from an accounting perspective, et |
| 09:26AM | 25 | cetera.  I don't have any affiliation. |

**C O N F I D E N T I A L**

**SM-02-JA00680**

| | | |
|---|---|---|
| 09:26AM | 1 | MR. DOLAN:  Okay. |
| 09:26AM | 2 | EXAMINATION BY MR. FREEH: |
| 09:26AM | 3 | Q.   And are they involved, to your knowledge, in the *BP* |
| 09:26AM | 4 | processing administration? |
| 09:26AM | 5 | A.   Not in administration, no. |
| 09:26AM | 6 | Q.   Are they involved at all in the *BP* matter, as far as you |
| 09:26AM | 7 | know? |
| 09:26AM | 8 | A.   They develop claims for lawyers and help them file the |
| 09:26AM | 9 | claims.  And they do some of them for individual clients.  It's |
| 09:26AM | 10 | not just lawyers. |
| 09:26AM | 11 | Q.   And is your understanding there are several companies now |
| 09:26AM | 12 | that do that -- |
| 09:26AM | 13 | A.   There is plenty. |
| 09:26AM | 14 | Q.   -- that compete for that business? |
| 09:26AM | 15 | A.   There is plenty.  And I think I've been sold -- I've been |
| 09:26AM | 16 | contacted and tried to sell -- been sold by about 90 percent of |
| 09:26AM | 17 | them. |
| 09:26AM | 18 | Q.   BrownGreer is an entity that you're familiar with in terms |
| 09:26AM | 19 | of your *BP* matters? |
| 09:26AM | 20 | A.   Yes. |
| 09:26AM | 21 | Q.   Have you had contacts, personal contacts with any of the |
| 09:27AM | 22 | BrownGreer employees or principals during the course of your |
| 09:27AM | 23 | representation, to your knowledge? |
| 09:27AM | 24 | A.   A long time ago, I spoke with a representative of Brown |
| 09:27AM | 25 | and Greer, who said they were going to be our liaison contact |

**C O N F I D E N T I A L**

SM-02-JA00681

09:27AM 1   person.  I say a long time ago, probably January or maybe even
09:27AM 2   earlier than that.  And that's all I -- it was like two
09:27AM 3   conversations.
09:27AM 4   Q.   Do you recall the name of the person that you spoke to?
09:27AM 5   A.   No idea.
09:27AM 6   Q.   And what is your understanding as to what their role is in
09:27AM 7   the claims administration process?
09:27AM 8   A.   I don't even know.  I understand they are involved with
09:27AM 9   PriceWaterhouse and the claim facility, but I don't really know
09:27AM 10  specifically what they do.
09:27AM 11  Q.   The same question as to PWC.  Have you personally had any
09:27AM 12  contact with any of the partners, principals, employees there
09:27AM 13  in relationship to any of the *BP* claims?
09:27AM 14  A.   I dealt with them when they were with the GCCF.  But other
09:28AM 15  than that, no.  I don't have any contact with them.
09:28AM 16  Q.   With respect to Patrick Juneau, I take it that you know
09:28AM 17  him for many years?
09:28AM 18  A.   That's correct.
09:28AM 19  Q.   Long prior to the *BP* matter?
09:28AM 20  A.   That's correct.
09:28AM 21  Q.   Did you ever do any legal work with him, joint work?
09:28AM 22  A.   No.
09:28AM 23  Q.   Did you and he ever refer cases to one another?
09:28AM 24  A.   No.
09:28AM 25  Q.   Did you have any kind of a social relationship with him?

**C O N F I D E N T I A L**

SM-02-JA00682

09:28AM 1    A.    No.   Other than -- no.   I mean, but the social dynamics

09:28AM 2    of -- I mean, I would go to functions, fundraisers and run into

09:28AM 3    him and say hello, but other than that, no.

09:28AM 4    Q.    Let me describe that.   No business interests or ventures

09:28AM 5    or any sort of --

09:28AM 6    A.    No.

09:28AM 7    Q.    -- formal activities together with you?

09:28AM 8    A.    No.

09:28AM 9    Q.    And I think I asked you this, but maybe not specifically.

09:28AM 10   No business relationships or ventures with Mr. Duval, the son,

09:29AM 11   not the father?

09:29AM 12   A.    No.

09:29AM 13   EXAMINATION BY MR. DOLAN:

09:29AM 14   Q.    Referring to Mr. Tidwell, while The Andry Law Firm claim

09:29AM 15   was in the appeal process, had you had any contact with

09:29AM 16   Mr. Duval?

09:29AM 17   A.    Yes.

09:29AM 18   Q.    Did you ever go to lunch with him?

09:29AM 19   A.    Yes.

09:29AM 20   Q.    How many times?

09:29AM 21   A.    Twice, I believe.

09:29AM 22   Q.    And was the purpose of the lunch to discuss the claim?

09:29AM 23   A.    No.

09:29AM 24   Q.    Who else was at the lunch?

09:29AM 25   A.    One of them, Ms. Reitano and Ms. Steilberg was there, and

**CONFIDENTIAL**

63

09:29AM 1    the other one Tracy Steilberg was there.
09:29AM 2    Q.    How do you know Tracy?
09:29AM 3    A.    Tracy used to be Tiger's secretary, and I have known Tracy
09:29AM 4    for years.
09:29AM 5    Q.    Have you contacted her to advocate for The Andry Law Firm
09:29AM 6    claims?
09:29AM 7    A.    No.
09:29AM 8    Q.    The topic of the discussion at the lunch?
09:29AM 9    A.    Was just general discussion.
09:29AM 10   Q.    Just kind of your general --
09:29AM 11   A.    Other than -- other than the initial one, I think I asked
09:29AM 12   David about the appeal process as it relates to the 4/24 order
09:29AM 13   in dismissing the appeal, but beyond that, it was just general
09:30AM 14   discussion.
09:30AM 15   Q.    In that general time frame, those lunches were in the
09:30AM 16   general frame that your -- The Andry Law Firm claim would have
09:30AM 17   been in appeal?
09:30AM 18   A.    Yes, The Andry Law Firm has been pending since -- yes, it
09:30AM 19   was at the time it was in appeal.  I think.  Because the
09:30AM 20   purpose was to find out about the 4/24 order and just to kind
09:30AM 21   of visit with him.  The genesis of the lunch was I saw him at a
09:30AM 22   Hornets game and he said, how have you been, haven't talked to
09:30AM 23   you in a while, why don't we get together and have lunch.
09:30AM 24   Cool, let's get together and have lunch.  I think we did
09:30AM 25   contemporaneously thereafter.

**C O N F I D E N T I A L**

**SM-02-JA00684**

EXAMINATION BY MR. FREEH:

Q.    How did the other two parties get invited or end up at the lunch?

A.    Because I was very close with them and very good friends with them.  I mean, you know, I had a falling out with Tiger, but not with his wife.  She and I are close friends.  We went to law school together.  So when I talked to David about going to lunch -- I mean, I've known Tracy for years because Tracy used to work as Tiger's secretary years ago, so I know her, her family and all of that.  So when I was going to lunch with David, I said, why don't you bring Tracy or whoever.  In fact, I even think asked for Tiger to come with us, but he did not attend.

Q.    Who paid for the lunch?

A.    I think I did once and I think it was split the other time.

Q.    Do you recall where the lunches were?

A.    I'm sorry?

Q.    Do you recall where the lunch was?

A.    Both of them were at the Palace Café.

Q.    That's in New Orleans?

A.    Yes.

Q.    Let me ask a few questions about Christine Reitano.  You said, I think, you remained very close friends?

A.    No.  I never talked to her.  I was about to say before you

**C O N F I D E N T I A L**

SM-02-JA00685

09:31AM 1    asked me a question, I had a falling out with her husband, but
09:31AM 2    not with her, and so when I would see her, it would be, you
09:31AM 3    know, hey, how have you been, how is Julian doing, how are your
09:31AM 4    kids doing, she'd ask me how my kids were doing.  So I didn't
09:31AM 5    remain close friends with her because I didn't talk to her,
09:31AM 6    because I didn't talk to her husband, but when I saw her, I was
09:31AM 7    still very friendly with her.
09:32AM 8    Q.   Have you heard of a company called *Romeo Papa*?
09:32AM 9    A.   Never heard of it.
09:32AM 10           MR. COBB:  Romeo Papa?
09:32AM 11           THE WITNESS:  Sounds like a plane name.
09:32AM 12   BY MR. FREEH:
09:32AM 13   Q.   Or a company named T, as in Tom, Blue, B-L-U-E?
09:32AM 14   A.   Never heard of it.
09:32AM 15           MR. FREEH:  Can you just excuse us for two minutes.
09:32AM 16   And we'll come right back in.
09:41AM 17           (WHEREUPON, at this point in the proceedings, there
09:43AM 18   was a brief recess taken.)
09:43AM 19           MR. FREEH:  All right.  So we're back on the record.
09:43AM 20   We took a short break.  We have a few residual matters and then
09:43AM 21   I think we're almost done and then counsel will give you and
09:43AM 22   counsel, if you wish, any opportunity to make any statements,
09:43AM 23   attach any records, and then we do have some requests in
09:43AM 24   writing that we'll give you -- actually give your client with
09:43AM 25   respect to each of the entities requesting some information.

**C O N F I D E N T I A L**

**SM-02-JA00686**

09:43AM 1    You don't have to respond to that today, but we would ask you
09:43AM 2    to read it and just respond back to us at some appropriate
09:43AM 3    time.
09:43AM 4    EXAMINATION BY MR. DOLAN:
09:43AM 5    Q.    There was a paralegal by the name of Tate.
09:43AM 6    A.    No, that's T. Alleman.  She's a Lerner employee.  I call
09:44AM 7    her T.  But it's T. Alleman.
09:44AM 8    EXAMINATION BY MR. FREEH:
09:44AM 9    Q.    Is her first name Tate?  Is that what the T stands for?
09:44AM 10   A.    No, no, no, no.  I call her T.
09:44AM 11           MR. COBB:  You don't know what her first name is?
09:44AM 12           THE WITNESS:  No.  And she would kill me, too.
09:44AM 13           MR. FREEH:  I want to make sure we're talking about
09:44AM 14   the same person.
09:44AM 15           MR. DOLAN:  Is it Jessica Tate?
09:44AM 16           THE WITNESS:  No.
09:44AM 17           MR. FREEH:  Have you ever heard her referred to as
09:44AM 18   Tate?
09:44AM 19           THE WITNESS:  No.  No.  No.  No.  You're talking
09:44AM 20   about a lady that used to work for me, Leslie Tate.  She's no
09:44AM 21   longer with me.
09:44AM 22   EXAMINATION BY MR. DOLAN:
09:44AM 23   Q.    Who did -- which firm did she work for?
09:44AM 24   A.    She worked for Andry Law Group originally and then
09:44AM 25   Andry Lerner.

**C O N F I D E N T I A L**

SM-02-JA00687

09:44AM 1   Q.   Was she responsible for *BP* claims?

09:45AM 2   A.   Yes.

09:45AM 3   Q.   Had Tiger Sutton had any conversations with you -- when

09:45AM 4   you had received payment from the claims administration on

09:45AM 5   *Thonn* claims, had he contacted you ever saying, hey, get

09:45AM 6   Lerner's share to him?

09:45AM 7   A.   No.

09:45AM 8   Q.   He never had any conversations, never seemed to know when

09:45AM 9   the payments were made?

09:45AM 10  A.   I never had any conversations.  I don't know if he knew --

09:45AM 11  I mean, whether he new when payments -- I don't know.  But I

09:45AM 12  never had any conversations like the ones you're describing.

09:45AM 13  EXAMINATION BY MR. FREEH:

09:45AM 14  Q.   Do you know if Ms. Tate, when she worked with you, was in

09:45AM 15  communication with Mr. Sutton?

09:45AM 16  A.   I don't know.

09:45AM 17  Q.   She never reported that to you or spoke to you about it?

09:45AM 18  A.   Not that I remember.  I mean, she may have, I don't know.

09:45AM 19  She left to go work for Coastal Claims because Kevin Ingram is

09:45AM 20  her fiancee, so I don't know one way or the other.

09:46AM 21  Q.   When, approximately, did she leave?

09:46AM 22  A.   Beginning of this year, probably in January, February.

09:46AM 23  Q.   Of 2013?

09:46AM 24  A.   That's correct.

09:46AM 25  Q.   Christina, you had told us before, was the lawyer handling

**C O N F I D E N T I A L**

SM-02-JA00688

09:46AM 1 the day-to-day matters with respect to the *Casey Thonn* claim.

09:46AM 2 A.    That's correct.

09:46AM 3 Q.    Do you know if she was in communication with Mr. Sutton?

09:46AM 4 A.    She was not.

09:46AM 5 Q.    How do you know that?

09:46AM 6 A.    Because she told me she was not.   She didn't tell me she

09:46AM 7 wasn't in communication with him.   She said, all of this is

09:46AM 8 about Tiger Sutton.   She had, I don't even know who he is.

09:46AM 9 Q.    And this was, I take it, in connection to your more recent

09:46AM 10 inquiry --

09:46AM 11 A.    Yes.

09:46AM 12 Q.    -- after the matter become public to get information?

09:47AM 13 A.    Yes.

09:47AM 14 EXAMINATION BY MR. DOLAN:

09:47AM 15 Q.    Going back to one other name, Mary Rubio, paralegal for

09:47AM 16 you, for Andry Lerner, she worked on the *Thonn* claim?

09:47AM 17 A.    Correct.

09:47AM 18 EXAMINATION BY MR. FREEH:

09:47AM 19 Q.    Mr. Andry, when you did your internal review after the

09:47AM 20 matter become public, did you learn any information that

09:47AM 21 indicated people in any of your three entities that we've

09:47AM 22 mentioned, the three legal entities that you're involved in,

09:47AM 23 were in contact with Mr. Sutton?

09:47AM 24 A.    I only did an investigation as it relates to Andry Lerner.

09:47AM 25 And I did not reveal that anybody was in contact with

**CONFIDENTIAL**

| | | |
|---|---|---|
| 09:47AM | 1 | Mr. Sutton. |
| 09:47AM | 2 | Q.    Did your inquiry there at Andry Lerner disclose to you |
| 09:48AM | 3 | that anyone else was aware that referral fees had been paid to |
| 09:48AM | 4 | Mr. Sutton? |
| 09:48AM | 5 | A.    No. |
| 09:48AM | 6 | Q.    So as far as you know today, the only one who has |
| 09:48AM | 7 | knowledge about that is Mr. Lerner? |
| 09:48AM | 8 | A.    I would guess.  I mean, I don't know.  I don't know |
| 09:48AM | 9 | what -- |
| 09:48AM | 10 | Q.    Well, as far as you know, in the Andry Lerner enterprise, |
| 09:48AM | 11 | the only person who you understand knew about the referral |
| 09:48AM | 12 | payments as they were being made was Mr. Lerner? |
| 09:48AM | 13 | A.    That's correct. |
| 09:48AM | 14 | Q.    No other secretary, paralegal, lawyer, to your knowledge, |
| 09:48AM | 15 | had any information about that? |
| 09:48AM | 16 | A.    That's correct. |
| 09:48AM | 17 | Q.    And you would ask that question when you did your review? |
| 09:48AM | 18 | A.    Yes.  No, I didn't ask -- I mean, I didn't ask specific |
| 09:48AM | 19 | questions.  I just said if there -- I don't think anything was |
| 09:48AM | 20 | wrong.  I think we handled it as a normal claim.  I went back |
| 09:48AM | 21 | over and got all the materials related to *Casey Thonn* and said, |
| 09:49AM | 22 | okay, that's what I want to know, and went back over and looked |
| 09:49AM | 23 | at that.  So I didn't ask everybody, because I would have never |
| 09:49AM | 24 | had any reason to believe any of them had any conversations |
| 09:49AM | 25 | with Tiger. |

**C O N F I D E N T I A L**

SM-02-JA00690

09:49AM 1    Q.   And my last question, is the *Casey Thonn* matter now closed

09:49AM 2    as far as Andry Lerner is concerned or is there still an

09:49AM 3    open --

09:49AM 4    A.   Still an open matter.

09:49AM 5    Q.   Which portion is still open?

09:49AM 6    A.   Subsistence, as I said earlier.  Subsistence is still open

09:49AM 7    as is his -- or it might have been paid on his vessel damage,

09:49AM 8    but subsistence and vessel damage.  And then with all of the

09:49AM 9    seafood claims, there is a universe of those claims that will

09:49AM 10   receive two and a half billion, so there will be another

09:49AM 11   payment issued to them.  So it's still open with regard to

09:49AM 12   that.

09:49AM 13   Q.   So what's your estimate?  I understand it's a rough

09:49AM 14   estimate, subject to a lot of different factors, but what's

09:49AM 15   your rough estimate as you sit here today as to what the

09:49AM 16   possible recovery is for him with respect to those claims?

09:49AM 17   A.   I would have no idea.

09:50AM 18   Q.   Based on what you've learned recently, have you taken any

09:50AM 19   steps to ensure that no additional fees are paid to Mr. Sutton

09:50AM 20   or not?

09:50AM 21   A.   Yeah, I told Glen, you know, we're not paying Tiger

09:50AM 22   anything.  And you shouldn't have paid him the first time and

09:50AM 23   you definitely -- nothing is happening this time.

09:50AM 24   Q.   And what was his response, if any?

09:50AM 25   A.   Sure.  I didn't think it was that big a deal.

**C O N F I D E N T I A L**

**SM-02-JA00691**

Q.   You were quoting him?

A.   Yes.

          MR. FREEH:  Counsel, or Mr. Andry, do you want to add anything?

          MR. COBB:  Yes, sir, I'm going to be brief.  Have you guys read the transcript of the hearing that we had a Friday or two ago in front of Judge Barbier?

          MR. FREEH:  Yes.

          MR. COBB:  This situation that Mr. Andry is in and that the Andry Lerner firm is in vis-à-vis their clients is an untenable, problematic, horrific situation he's in.  I looked at it the other day, and he maybe has a dozen clients who are in line to be paid, claims approved, claims reviewed, doubly reviewed, etcetera.  Those clients aren't getting their money, and they are not getting their money because he is in this inquiry.

          It creates a massive legal professional responsibility, ethical problem for him that his clients aren't getting paid something they are owed because he's involved in something in which we are confident he's done nothing wrong.

          What we would ask you folks to do is -- and I think as Judge Barbier said in the -- at the argument the other day, to the extent that when you guys -- if you guys see your way clear, can you make a recommendation to the Court that the clients receive their money, not Mr. Andry.  Escrow that, put

**C O N F I D E N T I A L**

SM-02-JA00692

09:51AM 1    on it the side.  We don't want an attorney fee from anybody.

09:51AM 2    But the clients have to be paid.  Otherwise, we are put in an

09:51AM 3    untenable position as their representative.

09:52AM 4            They are not getting paid not because they are

09:52AM 5    not due it, but because of these allegations that are out here.

09:52AM 6    I know you guys know your job.  To our perspective, it's

09:52AM 7    killing our clients.  These are people who have waited a long

09:52AM 8    time for their money, it's been approved, and they need to get

09:52AM 9    paid.  Please, if you see your way clear to do that, that's our

09:52AM 10   recommendation.

09:52AM 11           THE WITNESS:  I'll tell you the conundrum that it

09:52AM 12   creates, for example, we have a claimant who obtained financing

09:52AM 13   for his claim.  He -- his claim is settled.  It's over with.

09:52AM 14   He's accepted the money and, as I understand, they have been

09:52AM 15   re-reviewed by Juneau.  This gentleman now is owing interest on

09:52AM 16   a daily basis that he doesn't owe.  And somebody has got to be

09:52AM 17   responsible for that, because he doesn't owe the interest, and

09:52AM 18   but for this experience, he would have been paid.  And so

09:52AM 19   that's why, on behalf of the client, I asked him to say that

09:52AM 20   because, you know, there is another group that's owed, you

09:52AM 21   know, a large sum of money, and for them not to have the money,

09:52AM 22   there just is no reason.  But now it starts to create issues

09:53AM 23   vis-à-vis me and them and how all of that gets worked out.

09:53AM 24           MR. COBB:  So that's our question.  If I can give you

09:53AM 25   just one more small anecdote that Jon shared with me a couple

**C O N F I D E N T I A L**

SM-02-JA00693

09:53AM 1   weeks ago.

09:53AM 2           He has neighbors and friends in his neighborhood

09:53AM 3   where he lives whose kids are friends with his kids, whose

09:53AM 4   wives are friends with his wife, etcetera.  And some of those

09:53AM 5   folks came to him to be their legal representative for these *BP*

09:53AM 6   claims.  And he represents them.  They pick up the newspaper,

09:53AM 7   and they find out that somebody -- some unnamed source with *BP*

09:53AM 8   has named him as the lawyer who is in the middle of a kickback

09:53AM 9   scheme or in the middle of a corruption.  That is most

09:53AM 10  injurious to this man's reputation and to his relationship with

09:53AM 11  his neighbors, his friends, his children, et cetera.

09:53AM 12          I'm confident, based upon what I know and what

09:53AM 13  you guys have heard here today, that that's not the case, so we

09:53AM 14  urge your speedy and swift consideration.

09:54AM 15          MR. FREEH:  Okay.  Thank you.  We note that, and we

09:54AM 16  appreciate your comments.

09:54AM 17          MR. COBB:  Thank you, Judge, very much.

09:54AM 18          MR. FREEH:  Mr. Andry, I'm going to give you, but

09:54AM 19  actually hand them to your lawyer, three requests for

09:54AM 20  documents.  And these are not these are not going to be filed,

09:54AM 21  these are sealed matters.  And you don't have make any response

09:54AM 22  to them, but we will give them to you to review them, and just

09:54AM 23  let us know how you want to proceed.  And they are for the

09:54AM 24  three legal entities that you're associated with.

09:54AM 25          MR. COBB:  Thank you, Your Honor.

**C O N F I D E N T I A L**

SM-02-JA00694

74

09:54AM
1          MR. FREEH:  Thank you.

2               (WHEREUPON, at 9:54 a.m., the proceedings were

3     concluded.)

4                              *     *     *

5

6

7

8                    REPORTER'S CERTIFICATE

9

10         I, Cathy Pepper, Certified Realtime Reporter, Registered

11    Merit Reporter, Certified Court Reporter of the State of

12    Louisiana, Official Court Reporter for the United States

13    District Court, Eastern District of Louisiana, do hereby

14    certify that the foregoing is a true and correct transcript to

15    the best of my ability and understanding from the record of the

16    proceedings in the above-entitled and numbered matter.

17

18

19                    s/Cathy Pepper
                       _____

20                    Cathy Pepper, CRR, RMR, CCR
                      Certified Realtime Reporter
21                    Registered Merit Reporter
                      Official Court Reporter
22                    United States District Court
                      Cathy_Pepper@laed.uscourts.gov
23

24

25

**C O N F I D E N T I A L**

SM-02-JA00695

1

| $ | 3 | 8:00 [1] - 1:7 |
|---|---|---|
| | | 9 |
| **$190,000** [1] - 37:1 | **30** [2] - 1:7, 3:2 | |
| **$32,000** [1] - 36:21 | **32,000** [1] - 46:24 | **90** [1] - 60:16 |
| **$38,000** [1] - 37:3 | **38,000** [1] - 47:9 | **9:54** [1] - 74:2 |
| **$4,900** [2] - 41:4, 43:24 | **4** | **A** |
| **$49,880** [1] - 40:21 | **4** [1] - 2:5 | |
| **'** | **4/24** [3] - 53:3, 63:12, 63:20 | **A.M** [1] - 1:7 |
| | **42** [1] - 2:6 | **a.m** [1] - 74:2 |
| **'01** [1] - 17:10 | **44** [1] - 2:7 | **ability** [2] - 4:9, 74:15 |
| **'87** [2] - 11:2, 11:3 | **45** [2] - 24:12, 25:7 | **able** [3] - 4:11, 46:20, 54:16 |
| **'90** [1] - 11:3 | **49** [1] - 2:8 | **above-entitled** [1] - 74:16 |
| **'91** [1] - 11:3 | **49,000** [1] - 41:5 | **Abrusley** [1] - 14:20, 14:22 |
| **1** | **49,880** [1] - 41:6 | **absolutely** [1] - 40:7 |
| | **49,900** [1] - 42:3 | **accepted** [1] - 72:14 |
| **1** [1] - 27:23 | **4900** [4] - 41:5, 43:25, 44:2, 44:4 | **accident** [1] - 21:16 |
| **10** [3] - 41:9, 41:11, 41:12 | **5** | **accidentally** [1] - 23:17 |
| **10-MD-2179** [1] - 1:6 | | **accompanying** [1] - 27:23 |
| **1001** [1] - 4:2 | **50** [3] - 2:9, 35:17, 36:10 | **according** [2] - 48:25, 57:10 |
| **1100** [1] - 1:18 | **50/50** [4] - 6:17, 29:9, 31:10, 44:24 | **account** [12] - 33:15, 37:11, 37:25, 38:1, 38:3, 38:4, 38:7, 38:8, 38:9, 50:9 |
| **15** [1] - 26:25 | **500** [1] - 1:22 | |
| **1500** [1] - 1:17 | **504** [1] - 1:23 | |
| **16,000** [2] - 36:22, 46:24 | **58** [1] - 2:10 | |
| **166** [1] - 46:23 | **589-7779** [1] - 1:23 | **accountant** [4] - 52:7, 54:15, 59:3, 59:8 |
| **166,000** [2] - 36:15, 36:21 | **6** | **accountants** [4] - 29:11, 29:12, 54:16, 59:16 |
| **18** [1] - 4:2 | | **accounting** [5] - 50:7, 50:9, 50:11, 50:12, 59:24 |
| **19,000** [2] - 37:3, 37:4 | **60** [1] - 2:11 | |
| **190** [3] - 46:22, 47:2, 47:9 | **610** [6] - 4:23, 8:6, 9:17, 10:15, 10:22, 14:4 | **accounts** [2] - 38:4, 50:15 |
| **190,000** [1] - 36:15 | **62** [1] - 2:12 | **acquired** [1] - 41:14 |
| **1995** [3] - 5:15, 12:24, 13:3 | **64** [1] - 2:13 | **ACTION** [1] - 1:6 |
| **2** | **66** [3] - 2:14, 2:15, 2:16 | **action** [3] - 14:6, 14:10, 14:18 |
| | **67** [1] - 2:17 | **actions** [1] - 14:10 |
| **20** [4] - 1:5, 26:25, 41:10, 47:9 | **675** [1] - 22:22 | **activities** [1] - 62:7 |
| **2000** [3] - 5:16, 13:1, 13:19 | **68** [2] - 2:18, 2:19 | **actual** [4] - 41:15, 47:14 |
| **2009** [3] - 13:19, 16:7, 16:8 | **6th** [1] - 52:22 | **add** [2] - 3:20, 71:3 |
| **2010** [3] - 1:5, 5:22, 7:19 | **7** | **additional** [3] - 23:13, 44:11, 70:19 |
| **2012** [1] - 30:1 | | **address** [2] - 25:13, 35:25 |
| **2013** [5] - 1:7, 3:2, 54:4, 57:13, 67:23 | **70130** [1] - 1:22 | **addressed** [1] - 19:6 |
| **24th** [1] - 52:24 | **70163** [1] - 1:18 | **adjustor** [1] - 59:20 |
| | **710** [1] - 12:21 | **administration** [4] - 60:4, 60:5, 61:7, |
| | **8** | |
| | **828** [1] - 7:16 | |

67:4
**administrations** [1] - 3:12
**administrative** [1] - 54:7
**administratively** [1] - 52:11
**advertising** [7] - 5:23, 6:9, 6:10, 8:3, 29:15, 36:12, 44:21
**advice** [1] - 4:3
**advocate** [2] - 53:1, 63:5
**affiliation** [2] - 59:11, 59:25
**ago** [6] - 60:24, 61:1, 64:9, 71:7, 73:1
**agree** [1] - 26:4
**agreed** [2] - 29:14
**agreed-upon** [1] - 29:14
**agreement** [12] - 15:4, 29:10, 29:13, 29:19, 32:8, 32:18, 32:25, 39:15, 44:20, 49:17, 58:19, 58:20
**AJUBITA** [1] - 1:16
**Alfortish** [3] - 13:24, 13:25, 14:3
**ALL** [1] - 1:8
**allegations** [2] - 3:11, 72:5
**allegedly** [1] - 27:4
**Alleman** [2] - 66:6, 66:7
**Allen** [1] - 14:22
**almost** [1] - 65:21
**alternative** [1] - 52:13
**America** [2] - 30:21, 30:24
**amount** [3] - 35:17, 49:2, 49:3
**ampersand** [1] - 12:17
**Amy** [1] - 10:7
**ANDRY** [1] - 1:10
**Andry** [123] - 3:8, 3:19, 4:6, 4:22, 5:2, 5:4, 5:8, 5:10, 5:12, 5:14, 5:17, 5:18, 5:21, 6:1, 6:3, 6:11, 6:14, 6:16, 7:24, 7:25, 8:1, 8:3, 8:5, 8:22, 9:4, 9:6, 9:7, 9:8, 9:9, 9:23, 9:25, 10:1, 10:2, 10:3, 10:5, 10:11, 10:13, 10:16, 10:18, 10:19, 10:20, 10:22, 10:25, 12:17, 13:1, 13:9, 17:5, 22:23, 27:17, 27:24, 28:9,

28:21, 28:23, 28:24, 29:1, 29:4, 29:24, 30:21, 30:22, 31:1, 31:2, 33:2, 33:4, 33:8, 36:22, 36:24, 36:25, 37:1, 37:10, 37:13, 37:14, 38:7, 38:21, 40:12, 40:16, 40:23, 42:11, 42:18, 42:21, 43:3, 43:23, 43:25, 44:7, 44:8, 44:12, 45:20, 46:25, 47:12, 47:21, 50:10, 50:11, 50:12, 50:13, 50:20, 51:24, 54:4, 54:21, 59:1, 59:4, 59:8, 62:14, 63:5, 63:16, 63:18, 66:24, 66:25, 68:16, 68:19, 68:24, 69:2, 69:10, 70:2, 71:3, 71:9, 71:10, 71:25, 73:18
**anecdote** [1] - 72:25
**angry** [1] - 35:7
**Ann** [1] - 10:8
**answer** [3] - 29:1, 30:20, 32:12
**anytime** [1] - 56:25
**apartment** [1] - 11:19
**appeal** [19] - 42:23, 45:2, 45:4, 52:8, 52:9, 52:10, 52:12, 52:13, 52:17, 52:22, 53:8, 53:10, 62:15, 63:12, 63:13, 63:17, 63:19
**appealed** [2] - 52:13, 52:14
**appeals** [2] - 52:20, 52:25
**appear** [1] - 28:25
**APPEARANCES** [1] - 1:13
**appellate** [2] - 53:1, 53:9
**application** [1] - 19:6
**appointing** [1] - 3:10
**appreciate** [1] - 73:16
**appropriate** [4] - 49:5, 56:23, 59:14, 66:2
**approved** [2] - 71:13, 72:8
**approximate** [1] - 58:9
**April** [11] - 30:1, 32:21, 32:22, 36:15, 39:13, 39:16, 49:17, 49:18, 50:2, 52:22, 52:24
**APRIL** [1] - 1:5
**argument** [2] - 48:3,

**C O N F I D E N T I A L**

71:22
**arguments** [1] - 52:10
**arrangement** [3] -
15:2, 23:22, 45:24
**Ash** [1] - 56:13
**assigned** [1] - 49:9
**associate** [2] - 8:14,
16:23
**associated** [4] - 8:12,
19:13, 38:5, 73:24
**Associates** [3] -
47:11, 47:13, 47:19
**association** [1] -
16:25
**associations** [1] -
4:16
**assumed** [2] - 48:17,
48:18
**assumes** [1] - 48:20
**AT** [1] - 1:17
**ate** [1] - 24:6
**attach** [2] - 3:18,
65:23
**attempt** [1] - 23:1
**attend** [3] - 12:3, 12:8,
64:13
**attention** [4] - 35:20,
54:3, 56:19, 57:9
**attorney** [5] - 5:23,
8:16, 11:6, 42:19,
72:1
**Attorney** [1] - 6:2
**attorneys** [1] - 10:10
**Audubon** [1] - 11:17
**avail** [1] - 54:25
**available** [1] - 56:6
**aware** [2] - 46:18, 69:3
**awkward** [2] - 16:17,
20:11

**B**

**baby** [2] - 42:18, 43:6
**background** [1] -
59:21
**bar** [1] - 16:16
**Bar** [1] - 11:7
**Barbier** [3] - 52:23,
71:7, 71:22
**Barbier's** [2] - 3:9,
53:3
**Baronne** [7] - 4:24,
7:16, 8:6, 9:17,
10:15, 10:22, 14:4
**based** [2] - 15:5,
29:14, 53:10, 70:18,
73:12
**basis** [3] - 48:10,
48:11, 72:16

**became** [2] - 46:18,
54:6
**become** [7] - 5:17,
12:1, 14:7, 46:3,
58:2, 68:12, 68:20
**becoming** [1] - 46:19
**BEFORE** [1] - 1:11
**began** [2] - 8:2, 8:3
**beginning** [2] - 17:9,
67:22
**behalf** [1] - 72:19
**BellSouth** [2] - 14:20,
17:7
**below** [1] - 12:4
**benefit** [1] - 28:17
**Bert** [1] - 59:19
**best** [6] - 4:8, 25:11,
30:18, 35:24, 47:18,
74:15
**better** [1] - 26:2
**between** [6] - 13:19,
16:9, 19:20, 34:24,
44:2, 48:3
**beyond** [2] - 18:12,
63:13
**big** [1] - 70:25
**billboard** [1] - 36:11
**billboards** [1] - 5:24
**billion** [2] - 40:1,
70:10
**bit** [5] - 14:18, 15:9,
16:25, 17:13, 20:7
**Blue** [1] - 65:13
**BLUE** [1] - 65:13
**body** [1] - 31:19
**BP** [28] - 5:3, 8:25,
9:24, 10:1, 10:2,
22:13, 22:14, 25:16,
28:2, 28:21, 29:4,
30:9, 39:2, 44:16,
45:9, 47:16, 47:17,
51:18, 52:7, 53:2,
59:24, 60:3, 60:6,
60:19, 61:13, 61:19,
67:1, 73:5, 73:7
**break** [2] - 40:5, 65:20
**breath** [1] - 9:12
**brief** [3] - 40:9, 65:18,
71:5
**bring** [2] - 17:22,
64:11
**bringing** [1] - 57:9
**Brittany** [1] - 10:6
**broke** [1] - 33:11
**brother** [7] - 5:13,
5:22, 12:8, 13:3,
52:6, 52:16, 53:12
**brother's** [1] - 7:22
**brothers** [1] - 16:2
**Brown** [1] - 60:24

**BrownGreer** [2] -
60:18, 60:22
**bubble** [1] - 31:7
**Building** [1] - 25:5
**building** [7] - 22:3,
22:7, 23:18, 24:3,
25:2, 25:4, 25:5
**bunch** [6] - 17:2,
22:14, 23:19, 27:6,
30:23, 55:5
**burning** [1] - 17:15
**business** [24] - 6:7,
7:10, 16:23, 17:8,
17:10, 17:12, 18:6,
18:8, 18:10, 18:19,
19:1, 19:4, 19:8,
19:16, 22:9, 38:8,
50:20, 50:21, 59:12,
59:14, 59:17, 60:14,
62:4, 62:10
**BY** [46] - 1:4, 1:17,
1:24, 1:25, 2:5, 2:6,
2:7, 2:8, 2:9, 2:10,
2:11, 2:12, 2:13,
2:14, 2:15, 2:16,
2:17, 2:18, 2:19,
4:14, 9:16, 10:12,
10:21, 17:21, 28:7,
32:14, 37:5, 40:11,
41:8, 42:25, 43:22,
44:10, 46:16, 49:22,
50:19, 58:16, 60:2,
62:13, 64:1, 65:12,
66:4, 66:8, 66:22,
67:13, 68:14, 68:18

**C**

**Café** [1] - 64:20
**Cahill** [1] - 50:5
**Canal** [2] - 14:2, 14:3
**CAO** [2] - 5:3, 40:14
**capacity** [1] - 13:23
**captain** [1] - 37:2
**care** [1] - 19:18
**Carondelet** [1] - 12:21
**case** [31] - 9:2, 14:8,
14:15, 15:4, 15:11,
15:15, 17:7, 30:3,
30:8, 31:7, 35:24,
35:25, 36:10, 36:13,
38:12, 38:19, 39:4,
39:13, 39:22, 41:6,
44:19, 44:21, 44:24,
45:7, 45:18, 45:22,
48:14, 54:14, 73:13
**cases** [38] - 5:3, 6:10,
8:22, 10:2, 13:16,
14:6, 14:10, 14:21,

14:23, 14:25, 15:3,
15:11, 17:1, 17:2,
17:3, 22:9, 27:5,
27:6, 27:13, 27:15,
28:23, 28:24, 29:13,
29:14, 29:15, 35:20,
36:11, 39:2, 39:8,
44:17, 45:9, 49:6,
54:18, 57:18, 57:20,
61:23
**CASES** [1] - 1:8
**Casey** [36] - 9:1,
27:16, 27:22, 28:1,
28:8, 29:25, 30:1,
30:5, 30:9, 30:13,
31:7, 31:14, 31:18,
37:12, 38:12, 39:13,
40:16, 42:8, 42:14,
44:23, 45:3, 45:7,
45:16, 45:21, 46:7,
47:16, 49:19, 51:7,
51:12, 51:14, 51:21,
51:23, 59:1, 68:1,
69:21, 70:1
**Catalanatto** [1] - 10:7
**catastrophic** [1] -
59:22
**cathartic** [1] - 21:17
**Cathy** [2] - 74:10,
74:20
**CATHY** [1] - 1:20
**Cathy_Pepper@laed**
**.uscourts.gov** [1] -
74:22
**cathy_Pepper@laed.**
**uscourts.gov** [1] -
1:23
**causation** [1] - 52:14
**CCR** [2] - 1:20, 74:20
**cell** [3] - 14:11, 14:15,
14:21
**Centennial** [1] - 14:20
**CENTRE** [1] - 1:17
**certain** [1] - 21:1
**CERTIFICATE** [1] -
74:8
**CERTIFIED** [1] - 1:21
**Certified** [3] - 74:10,
74:11, 74:20
**certify** [1] - 74:14
**cetera** [2] - 59:25,
73:11
**changed** [3] - 5:16,
6:2, 30:24
**channels** [1] - 56:5
**characterize** [1] - 48:3
**charged** [1] - 15:12
**check** [4] - 37:9,
37:10, 37:25, 50:17
**checking** [1] - 57:16

**checks** [1] - 33:8
**children** [1] - 73:11
**chop** [1] - 32:11
**chosen** [1] - 53:2
**Chris** [1] - 56:14
**Christina** [6] - 8:23,
9:22, 31:14, 42:6,
48:13, 67:25
**Christine** [6] - 12:3,
31:8, 38:12, 46:3,
50:25, 64:23
**chronologically** [1] -
5:11
**chunks** [1] - 35:23
**circumstances** [4] -
11:12, 49:3, 54:11,
54:13
**CIVIL** [1] - 1:6
**claim** [42] - 15:22,
28:2, 28:21, 29:5,
30:9, 31:20, 36:5,
36:6, 37:24, 39:23,
39:24, 42:9, 43:10,
43:11, 43:12, 49:24,
51:23, 54:5, 54:22,
55:1, 55:3, 55:7,
55:8, 55:9, 55:16,
56:12, 59:4, 59:8,
59:13, 59:14, 61:9,
62:14, 62:22, 63:16,
68:1, 68:16, 69:20,
72:13
**claimant** [1] - 72:12
**claims** [38] - 3:12,
22:13, 22:14, 22:19,
23:5, 25:17, 25:20,
25:25, 26:3, 43:16,
43:20, 45:13, 54:8,
55:2, 55:5, 55:10,
56:2, 56:5, 58:25,
59:22, 59:24, 60:8,
60:9, 61:7, 61:13,
63:6, 67:1, 67:4,
67:5, 70:9, 70:16,
71:13, 73:6
**Claims** [6] - 31:20,
59:10, 59:23, 67:19
**class** [7] - 11:14,
11:18, 11:22, 11:23,
14:6, 14:10
**clear** [3] - 48:8, 71:24,
72:9
**client** [4] - 28:15, 29:6,
65:24, 72:19
**clients** [11] - 29:22,
43:12, 43:13, 60:9,
71:10, 71:12, 71:14,
71:18, 71:25, 72:2,
72:7
**close** [4] - 64:4, 64:6,

64:24, 65:5
**closed** [2] - 15:18, 70:1
**co** [3] - 7:20, 9:17, 59:12
**co-locate** [1] - 7:20
**co-located** [1] - 9:17
**co-owner** [1] - 59:12
**Coast** [1] - 31:20
**Coastal** [4] - 59:10, 59:23, 67:19
**Cobb** [1] - 3:8
**COBB** [24] - 1:17, 4:5, 9:11, 9:14, 10:11, 10:18, 17:14, 17:17, 27:21, 28:3, 28:6, 32:11, 36:24, 40:4, 41:5, 43:19, 46:13, 65:10, 66:11, 71:5, 71:9, 72:24, 73:17, 73:25
**cofriends** [1] - 16:15
**colleague** [1] - 27:19
**colleagues** [1] - 3:7
**collect** [1] - 46:6
**college** [1] - 10:25
**comfortable** [1] - 49:13
**coming** [2] - 22:3, 23:18
**commensurate** [2] - 49:2, 49:3
**comments** [2] - 3:21, 73:16
**Commerce** [1] - 25:5
**common** [3] - 16:19, 16:21, 19:4
**communication** [5] - 16:8, 23:7, 67:15, 68:3, 68:7
**community** [1] - 53:20
**companies** [1] - 60:11
**company** [5] - 18:19, 19:15, 20:1, 65:8, 65:13
**compensation** [7] - 9:19, 9:23, 15:7, 29:21, 36:10, 44:24, 44:25
**Compensation** [1] - 39:25
**compete** [1] - 60:14
**complaining** [3] - 55:6, 57:8
**complaint** [2] - 23:7, 26:1
**complete** [1] - 3:22
**complex** [1] - 14:8
**COMPUTER** [1] - 1:25
**concern** [2] - 26:1,

27:20
**concerned** [1] - 70:2
**concluded** [1] - 74:3
**conduct** [1] - 3:10
**conducted** [1] - 3:9
**confident** [2] - 71:20, 73:12
**confining** [1] - 56:16
**conflict** [2] - 27:20, 27:22
**congregate** [1] - 11:23
**connection** [4] - 3:12, 28:1, 40:16, 68:9
**consensus** [2] - 32:18, 32:25
**consideration** [2] - 30:15, 73:14
**considered** [2] - 15:18, 34:20
**construed** [1] - 4:1
**contact** [8] - 22:19, 51:20, 60:25, 61:12, 61:15, 62:15, 68:23, 68:25
**contacted** [7] - 20:25, 22:12, 22:14, 22:25, 60:16, 63:5, 67:5
**contacts** [5] - 16:11, 20:20, 20:21, 60:21
**contemporaneously** [2] - 5:11, 63:25
**contempt** [1] - 4:2
**content** [1] - 28:1
**continues** [1] - 13:6
**continuing** [3] - 32:5, 32:15, 47:23
**continuum** [1] - 49:10
**contractor** [1] - 50:14
**control** [1] - 45:10
**conundrum** [1] - 72:11
**conversation** [15] - 21:6, 25:16, 30:16, 31:13, 32:5, 34:2, 34:3, 34:7, 34:9, 37:22, 51:11, 55:22, 56:1, 57:2, 57:25
**conversations** [22] - 16:12, 21:19, 31:11, 31:12, 32:16, 34:5, 34:6, 39:11, 39:18, 42:6, 47:23, 55:24, 56:1, 56:18, 56:19, 56:25, 61:3, 67:3, 67:8, 67:10, 67:12, 69:24
**convinced** [1] - 11:21
**cool** [1] - 63:24
**coordinator** [1] - 53:9
**corner** [2] - 25:3, 25:4

**Corp** [1] - 5:17
**corp** [1] - 13:8
**corporate** [1] - 5:16
**correct** [86] - 4:25, 5:5, 6:14, 7:1, 7:15, 7:17, 8:2, 8:7, 8:9, 8:15, 9:10, 11:8, 12:13, 13:11, 14:14, 15:25, 16:19, 20:3, 22:5, 23:24, 24:1, 24:15, 26:9, 28:10, 28:12, 28:14, 28:16, 29:8, 29:23, 32:24, 33:22, 34:1, 35:10, 38:14, 38:17, 39:17, 40:16, 40:17, 41:12, 42:22, 44:1, 44:9, 45:23, 46:1, 47:3, 47:20, 47:22, 47:25, 48:1, 48:20, 49:15, 49:20, 50:6, 50:16, 53:13, 58:5, 58:7, 58:24, 61:18, 61:20, 67:24, 68:2, 68:17, 69:13, 69:16, 74:14
**Correct** [1] - 50:18
**corrections** [1] - 3:21
**correctly** [2] - 17:11, 52:22
**corruption** [1] - 73:9
**counsel** [8] - 3:19, 15:10, 15:11, 27:18, 46:11, 65:21, 65:22, 71:3
**country** [1] - 6:8
**couple** [1] - 72:25
**course** [6] - 3:15, 3:24, 12:5, 30:5, 51:24, 60:22
**COURT** [2] - 1:1, 1:20
**Court** [6] - 71:24, 74:11, 74:12, 74:13, 74:21, 74:22
**court** [2] - 4:2, 9:15
**Court's** [1] - 32:11
**coy** [1] - 28:25
**create** [1] - 72:22
**created** [1] - 18:6
**creates** [2] - 71:17, 72:12
**Crown** [2] - 18:13, 18:15, 18:16, 18:21, 19:21, 19:22, 33:15, 37:11
**CRR** [2] - 1:20, 74:20
**current** [1] - 13:12
**custom** [1] - 48:25
**cut** [1] - 36:22

**D**

**daily** [2] - 45:10, 72:16
**damage** [2] - 70:7, 70:8
**data** [1] - 43:14
**date** [1] - 52:22
**daughter** [1] - 17:18
**David** [12] - 52:20, 52:21, 52:25, 53:3, 53:18, 58:13, 58:14, 59:8, 63:12, 64:7, 64:11
**day-to-day** [4] - 42:22, 45:6, 45:7, 68:1
**days** [4] - 22:18, 23:17, 23:20, 23:21
**de** [1] - 52:15
**deadlines** [1] - 35:22
**deal** [8] - 25:25, 34:21, 34:22, 34:23, 35:11, 35:14, 54:23, 70:25
**dealt** [1] - 61:14
**December** [2] - 50:1, 54:15
**deep** [1] - 9:12
**DEEPWATER** [1] - 1:4
**defense** [1] - 7:11
**definitely** [1] - 70:23
**delays** [1] - 23:8
**Delmonico's** [1] - 43:9
**Department** [1] - 4:20
**deposited** [2] - 37:10, 37:25
**derivative** [1] - 29:21
**DeSantis** [1] - 50:3
**describe** [2] - 11:12, 62:4
**describing** [1] - 67:12
**description** [1] - 4:4
**deserved** [1] - 15:20
**details** [1] - 18:23
**determine** [2] - 3:16, 37:16
**determined** [1] - 27:22
**develop** [1] - 60:8
**different** [4] - 6:8, 30:21, 39:9, 70:14
**differently** [1] - 29:16
**direct** [2] - 51:11, 54:3
**directly** [2] - 23:4, 25:6
**disagreement** [1] - 48:3
**disclose** [1] - 69:2
**discuss** [3] - 51:14,

52:18, 62:22
**discussed** [4] - 20:13, 25:11, 27:3, 39:19
**discussion** [10] - 31:8, 36:2, 48:5, 51:6, 55:13, 56:16, 57:19, 63:8, 63:9, 63:14
**discussions** [8] - 30:8, 30:11, 30:12, 31:10, 32:1, 38:16, 38:18, 40:3, 58:17
**dismiss** [2] - 53:8, 53:10
**dismissed** [1] - 53:5
**dismissing** [1] - 63:13
**dispensing** [1] - 15:12
**dispersed** [1] - 15:18
**dispute** [4] - 15:6, 15:21, 16:5, 16:20
**disputes** [1] - 19:20
**distinct** [1] - 6:11
**DISTRICT** [2] - 1:1, 1:1
**District** [3] - 74:13, 74:22
**divest** [1] - 49:6
**divided** [1] - 29:14
**division** [3] - 15:5, 15:7, 47:5
**documented** [1] - 33:18
**documents** [7] - 4:20, 27:8, 27:11, 43:13, 46:6, 46:7, 73:20
**Dolan** [1] - 3:7
**DOLAN** [11] - 1:15, 42:25, 43:22, 49:22, 58:16, 60:1, 62:13, 66:4, 66:15, 66:22, 68:14
**DOLAN...........**
**......** [7] - 2:6, 2:8, 2:10, 2:12, 2:14, 2:16, 2:18
**done** [10] - 6:5, 17:3, 17:8, 25:20, 46:9, 52:11, 55:2, 55:14, 65:21, 71:20
**doubly** [1] - 71:13
**down** [4] - 9:11, 17:13, 17:17, 32:12
**dozen** [1] - 71:12
**draw** [1] - 9:19
**draws** [1] - 9:23
**drop** [1] - 46:13
**due** [1] - 72:5
**duration** [1] - 32:3
**during** [7] - 12:3, 12:5, 12:11, 13:18, 16:3, 25:9, 27:3,

31:23, 43:4, 59:13, 60:22
duty [1] - 15:12
Duval [6] - 52:19, 53:9, 53:17, 53:21, 62:10, 62:16
Duval's [1] - 53:18
dynamics [2] - 30:23, 62:1

**E**

earn [1] - 29:21
EASTERN [1] - 1:1
Eastern [1] - 74:13
eaten [1] - 24:5
effectively [1] - 36:6
effort [1] - 59:17
eight [1] - 43:4
either [3] - 6:15, 51:9, 53:5
employed [1] - 9:25
employee [6] - 8:18, 8:19, 8:24, 9:6, 9:7, 66:6
employees [6] - 10:2, 10:3, 10:4, 42:16, 60:22, 61:12
employment [1] - 12:14
encountered [1] - 24:2
end [3] - 3:20, 44:2, 64:2
endeavors [1] - 5:22
ENERGY [1] - 1:17
engaged [1] - 19:1
ensure [1] - 70:19
enterprise [3] - 9:8, 10:17, 69:10
entire [1] - 39:21
entities [14] - 4:18, 5:6, 5:9, 5:16, 6:12, 6:15, 9:20, 10:15, 29:3, 65:25, 68:21, 68:22, 73:24
entitled [3] - 31:17, 31:21, 74:16
entity [24] - 4:23, 5:1, 5:4, 5:5, 5:19, 5:21, 6:23, 7:21, 7:25, 8:4, 8:6, 10:17, 10:23, 12:18, 12:25, 13:7, 13:12, 19:9, 19:11, 37:14, 47:13, 50:13, 60:18
equity [3] - 6:19, 19:8, 29:9
escrow [1] - 71:25

ESQUIRE [2] - 1:15, 1:17
estimate [3] - 70:13, 70:14, 70:15
et [2] - 59:24, 73:11
etcetera [3] - 36:12, 71:14, 73:4
ethical [1] - 71:18
evolved [1] - 15:21
exact [1] - 35:17
EXAMINATION [30] - 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 4:14, 42:25, 44:10, 49:22, 50:19, 58:16, 60:2, 62:13, 64:1, 66:4, 66:8, 66:22, 67:13, 68:14, 68:18
example [3] - 16:16, 56:12, 72:12
excuse [7] - 21:11, 30:1, 30:2, 36:25, 40:4, 48:17, 65:15
exercise [1] - 18:4
exhibits [1] - 3:18
experience [3] - 12:12, 43:16, 72:18
explain [2] - 19:19, 42:13
explained [2] - 21:1, 31:22
explanation [1] - 23:10
express [2] - 34:17, 48:11
expressed [2] - 27:19, 35:9
extensive [1] - 31:19
extent [1] - 71:23
Eyed [1] - 16:15

**F**

facilities [1] - 56:5
facility [20] - 26:2, 27:4, 31:9, 31:25, 32:23, 40:13, 40:14, 40:15, 48:13, 51:9, 51:21, 52:19, 55:1, 55:23, 56:14, 56:18, 57:3, 58:11, 61:9
Facility [1] - 31:20
fact [6] - 48:21, 48:23, 49:5, 56:19, 57:9, 64:11
factors [1] - 70:14

fading [1] - 40:6
fair [1] - 48:2
fairly [2] - 49:11
falling [2] - 64:5, 65:1
familiar [1] - 60:18
family [3] - 21:1, 53:19, 64:10
far [7] - 35:18, 46:9, 52:8, 60:6, 69:6, 69:10, 70:2
fast [1] - 17:12
father [4] - 11:20, 12:16, 44:18, 62:11
February [1] - 67:22
fee [59] - 15:2, 15:4, 27:15, 29:13, 29:15, 30:14, 31:6, 31:8, 31:10, 31:18, 31:21, 31:24, 32:8, 32:16, 32:18, 33:2, 33:5, 33:6, 33:7, 33:13, 33:19, 34:24, 35:17, 36:1, 36:10, 36:21, 37:3, 37:12, 37:14, 39:12, 39:16, 39:20, 41:9, 41:10, 43:23, 44:8, 44:12, 44:19, 45:1, 45:24, 46:24, 47:9, 48:1, 48:2, 48:6, 48:15, 48:16, 48:17, 48:18, 48:22, 48:24, 49:4, 49:14, 49:18, 57:18, 58:19, 72:1
fee-sharing [1] - 15:2
fees [8] - 44:16, 47:18, 49:1, 49:24, 69:3, 70:19
Fen [3] - 17:2, 17:11
Fen-phen [3] - 17:2, 17:11
few [6] - 3:18, 22:18, 53:24, 64:23, 65:20
fiancee [1] - 67:20
figure [1] - 42:2
file [3] - 22:22, 45:1, 60:8
filed [5] - 36:4, 36:5, 36:6, 54:14, 73:20
files [2] - 35:22, 35:23
Film [1] - 17:19
financial [3] - 43:14, 57:22
financials [1] - 52:14
financing [1] - 72:12
fingers [1] - 17:15
finish [1] - 9:11
firm [34] - 5:2, 6:1, 6:21, 7:11, 7:22, 7:23, 10:22, 12:16,

28:11, 28:13, 28:15, 28:20, 28:22, 29:7, 29:24, 29:25, 38:4, 40:16, 40:23, 41:1, 41:2, 41:19, 42:21, 47:14, 47:15, 49:9, 51:25, 54:5, 55:8, 66:23, 71:10
Firm [25] - 5:4, 5:10, 5:12, 5:17, 5:18, 6:14, 6:16, 7:24, 7:25, 8:1, 28:24, 31:2, 36:23, 36:24, 38:21, 50:12, 52:1, 54:4, 54:22, 59:4, 59:8, 62:14, 63:5, 63:16, 63:18
firms [5] - 4:16, 6:22, 19:13, 30:21, 30:23
first [21] - 4:15, 5:12, 11:13, 12:14, 20:8, 23:4, 24:25, 30:18, 33:20, 34:8, 39:19, 40:20, 46:19, 46:22, 46:23, 49:8, 49:23, 49:24, 66:9, 66:11, 70:22
folks [2] - 71:21, 73:5
follow [1] - 56:4
follow-up [1] - 56:4
following [2] - 40:12
football [2] - 11:18
foregoing [1] - 74:14
forever [1] - 53:20
forgot [1] - 42:19
formal [3] - 14:12, 15:21, 62:7
formation [1] - 10:1
formed [4] - 5:14, 6:10, 12:25, 17:4
formulas [1] - 29:19
forth [1] - 9:5
forward [3] - 14:9, 16:3, 17:12
four [2] - 23:20, 54:17
fracking [2] - 19:4, 19:5
frame [3] - 57:12, 63:15, 63:16
FREEH [40] - 1:11, 1:14, 3:5, 4:6, 4:11, 4:14, 9:16, 10:12, 10:21, 17:21, 27:18, 27:25, 28:7, 32:14, 37:5, 40:7, 40:10, 40:11, 41:8, 44:10, 46:11, 46:15, 46:16, 49:21, 50:19, 60:2, 64:1, 65:12, 65:15, 65:19, 66:8, 66:13,

66:17, 67:13, 68:18, 71:3, 71:8, 73:15, 73:18, 74:1
Freeh [1] - 3:6
FREEH.......................
...... [8] - 2:5, 2:7, 2:9, 2:11, 2:13, 2:15, 2:17, 2:19
Friday [1] - 71:6
friend [2] - 16:21, 34:20
friendly [2] - 12:1, 65:7
friends [10] - 16:19, 25:14, 64:4, 64:6, 64:24, 65:5, 73:2, 73:3, 73:4, 73:11
friendship [2] - 6:6, 15:24
front [1] - 71:7
frustrating [1] - 56:3
full [1] - 36:9
fully [1] - 3:24
functioning [1] - 3:13
functions [2] - 50:14, 62:2
fundraisers [1] - 62:2
funds [3] - 15:12, 15:18, 37:6

**G**

game [1] - 63:22
games [1] - 53:24
garbage [1] - 27:6
gathering [1] - 43:13
GCCF [1] - 61:14
general [7] - 8:20, 12:24, 63:9, 63:10, 63:13, 63:15, 63:16
generated [9] - 29:13, 36:9, 36:13, 44:18, 44:19, 44:23, 45:1, 45:22
generates [3] - 29:15, 36:11, 44:21
generating [1] - 45:17
genesis [1] - 63:21
gentleman [1] - 72:15
Gibby [10] - 5:13, 6:13, 6:16, 7:24, 7:25, 12:8, 12:25, 13:1, 13:3, 13:9
Gibby's [1] - 54:23
girl [1] - 43:17
given [5] - 4:3, 37:3, 49:5
Glen [45] - 6:4, 17:1, 17:5, 17:6, 18:5,

18:16, 19:2, 19:16, 29:15, 30:3, 30:12, 30:20, 30:23, 31:3, 31:9, 31:11, 31:15, 33:7, 33:11, 33:12, 33:13, 33:19, 34:5, 35:13, 36:9, 36:13, 36:22, 37:3, 37:9, 38:6, 38:8, 39:6, 41:4, 44:21, 47:10, 48:12, 50:1, 50:3, 50:4, 50:21, 57:20, 70:21
**Glen's** [2] - 17:25, 47:14
**Glen-generated** [1] - 36:9
**Glenn** [8] - 30:2, 30:25, 33:17, 36:2, 38:13, 46:24
**goal** [1] - 17:25
**God** [1] - 4:9
**graduated** [6] - 11:1, 11:2, 11:21, 12:15, 14:6, 17:9
**greatest** [1] - 18:4
**Greer** [1] - 60:25
**grounds** [2] - 53:1, 53:10
**group** [3] - 11:19, 51:17, 72:20
**Group** [27] - 4:23, 5:21, 6:3, 8:3, 8:6, 8:22, 9:4, 9:7, 9:9, 9:25, 10:16, 10:18, 10:19, 10:22, 28:23, 30:22, 31:1, 37:13, 43:25, 47:21, 50:10, 50:12, 59:10, 59:23, 66:24
**groups** [1] - 39:9
**guess** [4] - 15:10, 31:22, 38:12, 69:8
**Gulf** [1] - 31:20
**GULF** [1] - 1:5
**guy** [2] - 6:4, 35:14
**guys** [6] - 11:17, 71:6, 71:23, 72:6, 73:13

## H

**half** [10] - 14:25, 40:1, 41:4, 41:6, 43:24, 45:1, 47:9, 47:10, 47:11, 70:10
**hand** [4] - 28:4, 28:5, 73:19
**handle** [1] - 48:5
**handled** [11] - 42:8,

42:15, 42:22, 42:24, 44:16, 45:2, 45:4, 45:5, 45:15, 52:6, 69:20
**handling** [5] - 5:3, 9:1, 22:13, 22:15, 67:25
**hang** [1] - 11:15
**hard** [1] - 9:14
**HB406** [1] - 1:22
**head** [2] - 52:20, 52:25
**heading** [1] - 9:24
**heads** [2] - 8:21, 8:25
**hear** [2] - 18:13, 35:5
**heard** [5] - 65:8, 65:9, 65:14, 66:17, 73:13
**hearing** [1] - 71:6
**hello** [2] - 24:4, 62:3
**help** [8] - 4:9, 25:19, 25:22, 55:1, 57:1, 57:24, 60:8
**hereby** [1] - 74:13
**herself** [1] - 49:6
**himself** [1] - 34:21
**hired** [1] - 43:11
**hold** [1] - 28:5
**holder** [2] - 28:4
**holdup** [1] - 54:20
**honor** [1] - 34:22
**Honor** [2] - 40:4, 73:25
**HONORABLE** [1] - 1:11
**honorable** [4] - 34:21, 35:12, 35:13, 35:14
**HORIZON** [1] - 1:4
**Hornets** [2] - 53:24, 63:22
**horrific** [1] - 71:11
**hour** [2] - 24:12, 50:14
**hours** [2] - 4:12, 15:5
**house** [1] - 11:23
**husband** [2] - 65:1, 65:6

## I

**Iberia** [1] - 14:23
**idea** [5] - 36:20, 41:16, 41:19, 61:5, 70:17
**identify** [1] - 10:5
**immediate** [1] - 49:11
**impact** [1] - 15:24
**important** [1] - 55:8
**IN** [2] - 1:4, 1:5
**in-person** [1] - 34:2
**include** [1] - 45:12
**including** [1] - 4:20
**inconsistent** [1] - 52:14

**independent** [1] - 3:10
**indicated** [1] - 68:21
**individual** [7] - 27:16, 28:8, 35:20, 35:25, 52:18, 52:19, 60:9
**industry** [1] - 14:11
**information** [10] - 23:13, 26:5, 27:8, 27:10, 36:19, 43:15, 65:25, 68:12, 68:20, 69:15
**Ingram** [2] - 59:19, 67:19
**initial** [1] - 63:11
**initiate** [2] - 34:4, 34:9
**initiated** [5] - 21:8, 26:22, 34:7, 58:6
**injurious** [1] - 73:10
**inquiry** [4] - 42:5, 68:10, 69:2, 71:16
**instance** [1] - 46:23
**intentional** [1] - 4:1
**interest** [12] - 18:19, 18:23, 27:5, 27:6, 27:13, 27:15, 47:17, 57:18, 57:20, 57:22, 72:15, 72:17
**interests** [3] - 30:25, 50:21, 62:4
**internal** [5] - 41:22, 42:5, 46:2, 46:6, 68:19
**interrupts** [1] - 32:12
**interview** [3] - 3:9, 3:20, 27:23
**inventory** [1] - 39:2
**investigation** [4] - 3:11, 41:22, 46:2, 68:24
**investor** [2] - 19:23, 20:4
**invited** [1] - 64:2
**involved** [10] - 21:15, 38:15, 38:17, 52:3, 53:14, 60:3, 60:6, 61:8, 68:22, 71:19
**involvement** [1] - 52:5
**involving** [1] - 57:17
**issue** [8] - 15:13, 18:6, 19:4, 25:13, 25:14, 33:8, 39:19, 57:7
**issued** [2] - 52:23, 70:11
**issues** [5] - 21:1, 21:2, 35:25, 52:8, 72:22

## J

**Jack's** [1] - 16:16

**JAMES** [1] - 1:17
**Jamie** [2] - 43:17, 43:20
**Jamie's** [1] - 43:18
**January** [2] - 61:1, 67:22
**Jazzfest** [1] - 16:17
**Jeff** [1] - 50:5
**Jessica** [1] - 66:15
**Jim** [1] - 3:8
**job** [2] - 12:14, 72:6
**join** [1] - 24:9
**joined** [1] - 25:9
**joint** [3] - 14:14, 29:18, 61:21
**Jon** [5] - 5:14, 6:1, 13:1, 13:9, 72:25
**JONATHAN** [1] - 1:17
**Jonathan** [1] - 3:8
**jour** [1] - 52:5
**JR** [1] - 1:17
**Judge** [7] - 3:9, 17:14, 52:23, 53:3, 71:7, 71:22, 73:17
**judge** [2] - 3:16, 9:11
**judicial** [2] - 3:13, 3:23
**Julian** [1] - 65:3
**JULY** [2] - 1:7, 3:2
**June** [1] - 24:20
**Juneau** [17] - 22:4, 22:6, 22:8, 22:12, 22:25, 23:19, 24:9, 53:7, 55:4, 55:25, 57:7, 58:6, 58:9, 61:16, 72:15
**jurors** [1] - 40:5
**jury** [1] - 40:4

## K

**Kailey** [3] - 42:20, 42:24, 45:4
**KAILEY** [1] - 42:20
**keep** [3] - 4:12, 31:16, 42:1
**Kennedy** [1] - 10:6
**Kevin** [2] - 59:19, 67:19
**kickback** [1] - 73:8
**kids** [4] - 65:4, 73:3
**kill** [1] - 66:12
**killing** [1] - 72:7
**kind** [20] - 9:5, 11:18, 16:14, 17:12, 19:16, 21:15, 21:17, 23:2, 25:13, 25:20, 31:2, 36:8, 41:18, 43:11, 56:3, 58:18, 58:22,

61:25, 63:10, 63:20
**knowledge** [13] - 13:21, 19:14, 32:23, 33:6, 36:16, 37:17, 41:14, 41:15, 47:18, 60:3, 60:23, 69:7, 69:14
**known** [4] - 53:18, 53:20, 63:3, 64:8
**Kushner** [3] - 52:7, 59:8, 59:9

## L

**L-E-B-O-U-E-F** [1] - 42:20
**L.L.C** [2] - 4:23, 6:2
**L.L.C.'s** [1] - 6:22
**LA** [2] - 1:18, 1:22
**lady** [3] - 42:17, 56:13, 66:20
**LaGraize** [2] - 52:7, 59:9
**languishing** [1] - 25:21
**large** [1] - 72:21
**Las** [1] - 47:15
**last** [6] - 24:21, 24:23, 43:18, 54:14, 59:21, 70:1
**late** [1] - 43:19
**law** [29] - 4:15, 5:25, 6:5, 6:21, 6:22, 11:1, 11:9, 11:14, 11:18, 11:21, 13:14, 16:3, 16:22, 17:9, 19:13, 28:11, 28:13, 28:15, 28:20, 28:22, 29:24, 29:25, 30:23, 38:4, 47:15, 49:9, 51:1, 54:5, 64:7
**Law** [41] - 4:22, 5:4, 5:10, 5:12, 5:17, 5:18, 5:21, 6:2, 6:3, 6:14, 6:16, 7:24, 7:25, 8:1, 8:3, 8:6, 8:22, 9:4, 9:7, 9:9, 9:25, 11:3, 28:23, 28:24, 30:22, 31:1, 31:2, 36:22, 36:24, 38:21, 50:12, 51:24, 54:4, 54:21, 59:4, 59:8, 62:14, 63:5, 63:16, 63:18, 66:24
**lawsuit** [1] - 15:21
**lawyer** [13] - 6:9, 6:25, 8:24, 9:1, 42:8, 42:11, 42:13, 53:19, 56:4, 67:25, 69:14,

6

73:8, 73:19
**lawyers** [14] - 7:2, 7:4, 7:12, 13:4, 13:23, 14:7, 14:12, 15:4, 29:11, 49:1, 54:1, 60:8, 60:10
**lead** [2] - 15:11, 44:23
**lean** [1] - 9:12
**learn** [8] - 18:25, 34:11, 37:6, 37:20, 38:20, 38:23, 54:10, 68:20
**learned** [8] - 33:7, 33:10, 33:11, 33:20, 33:25, 49:9, 70:18
**least** [1] - 7:9
**leave** [2] - 42:19, 67:21
**LeBouef** [2] - 42:20, 45:4
**left** [3] - 13:24, 14:4, 67:19
**LEFTWICH** [1] - 1:16
**legal** [8] - 5:6, 12:14, 19:11, 52:13, 61:21, 68:22, 71:17, 73:5, 73:24
**legs** [1] - 33:17
**Lerner** [117] - 5:2, 6:4, 6:11, 8:12, 9:6, 9:8, 9:23, 10:1, 10:2, 10:3, 10:5, 10:11, 10:13, 10:16, 10:18, 10:19, 10:22, 11:24, 16:20, 16:21, 17:5, 17:22, 19:19, 20:4, 20:18, 22:23, 27:17, 28:9, 28:21, 29:1, 29:4, 29:7, 29:24, 30:8, 30:21, 30:22, 31:22, 32:6, 33:1, 33:2, 33:4, 33:8, 33:9, 33:25, 34:15, 34:24, 35:7, 35:13, 36:13, 36:25, 37:1, 37:7, 37:10, 37:22, 37:23, 38:6, 38:7, 38:8, 38:13, 38:20, 38:21, 39:5, 39:11, 39:19, 40:16, 40:23, 40:25, 42:11, 42:18, 42:21, 43:3, 43:23, 43:24, 43:25, 44:3, 44:7, 44:8, 44:12, 44:23, 45:1, 45:16, 45:19, 45:20, 45:21, 45:22, 46:4, 46:25, 47:10, 47:11, 47:12, 47:13, 47:19, 48:4, 48:8, 48:11, 49:8,

49:18, 50:10, 50:11, 50:13, 50:21, 58:17, 59:1, 66:6, 66:25, 68:16, 68:24, 69:2, 69:7, 69:10, 69:12, 70:2, 71:10
**Lerner's** [1] - 67:6
**Lerner-generated** [4] - 36:13, 44:23, 45:1
**Leslie** [1] - 66:20
**less** [1] - 4:11
**letter** [1] - 53:4
**liaison** [2] - 15:10, 60:25
**Liberty** [2] - 59:20, 59:22
**line** [1] - 71:13
**Lionel** [2] - 11:10, 57:17
**litigated** [1] - 14:8
**litigation** [4] - 8:21, 8:22, 14:9, 31:1
**lived** [2] - 11:16, 16:3
**lives** [1] - 73:3
**LLC** [1] - 6:17
**LLM** [3] - 11:3, 11:4, 14:7
**locate** [1] - 7:20
**located** [3] - 7:18, 9:17, 14:1
**look** [3] - 23:12, 38:25, 39:9
**looked** [6] - 35:19, 36:17, 36:21, 52:16, 69:22, 71:11
**Louie** [1] - 3:6
**LOUIS** [2] - 1:11, 1:14
**Louisiana** [5] - 4:20, 11:7, 17:3, 74:12, 74:13
**LOUISIANA** [2] - 1:1, 1:6
**lunch** [21] - 18:3, 18:4, 20:7, 21:21, 21:24, 22:2, 24:9, 51:17, 53:25, 62:18, 62:22, 62:24, 63:8, 63:21, 63:23, 63:24, 64:3, 64:8, 64:10, 64:14, 64:19
**luncheon** [3] - 22:16, 24:14, 24:25
**lunches** [2] - 63:15, 64:17

**M**

**Magazine** [1] - 11:16
**main** [1] - 5:25

**maintained** [1] - 13:7
**man** [3] - 34:21, 35:12, 35:13
**man's** [1] - 73:10
**Mancuso** [13] - 8:23, 9:22, 9:23, 9:25, 10:6, 10:14, 42:6, 42:14, 42:15, 42:22, 45:2, 45:4, 46:3
**manner** [2] - 16:1, 37:20
**Maqita** [2] - 56:13, 56:15
**March** [8] - 50:2, 54:4, 54:9, 54:16, 54:19, 55:23, 57:12
**marriage** [1] - 51:4
**Mary** [4] - 42:17, 42:18, 43:1, 68:15
**mass** [7] - 5:25, 6:5, 6:7, 6:8, 8:2, 17:1, 59:20
**massive** [1] - 71:17
**Master** [1] - 3:10
**MASTER** [2] - 1:11, 1:14
**matched** [1] - 53:2
**matching** [2] - 52:15, 52:24
**material** [1] - 4:1
**materials** [2] - 46:12, 69:21
**maternity** [1] - 42:18
**Matt** [2] - 3:7, 49:21
**matter** [29] - 10:1, 14:13, 15:18, 21:14, 31:14, 31:18, 42:23, 44:25, 46:2, 46:7, 46:19, 47:16, 48:5, 49:9, 49:19, 51:7, 51:12, 51:14, 51:21, 52:1, 54:21, 56:8, 60:6, 61:19, 68:12, 68:20, 70:1, 70:4, 74:16
**matters** [11] - 14:5, 21:11, 45:12, 47:17, 51:18, 57:9, 58:2, 60:19, 65:20, 68:1, 73:21
**MATTHEW** [1] - 1:15
**MDLs** [1] - 6:9
**mean** [30] - 16:13, 17:8, 20:24, 21:13, 22:8, 22:10, 22:22, 26:6, 26:15, 28:25, 30:23, 32:2, 33:18, 34:5, 38:25, 39:6, 39:24, 45:15, 54:14, 54:16, 56:12, 57:4,

62:1, 62:2, 64:5, 64:8, 67:11, 67:18, 69:8, 69:18
**MECHANICAL** [1] - 1:24
**mechanisms** [1] - 37:7
**mediated** [1] - 22:9
**meet** [6] - 11:10, 23:22, 24:11, 26:24, 31:3, 35:21
**meeting** [18] - 11:15, 20:11, 20:13, 20:18, 20:20, 21:23, 21:24, 22:17, 23:10, 24:13, 24:25, 25:7, 25:9, 26:5, 26:10, 26:20, 27:3, 43:13
**meetings** [2] - 24:16, 31:4
**member** [7] - 6:12, 6:14, 6:23, 8:8, 8:18, 11:6, 30:24
**members** [6] - 6:16, 7:2, 8:10, 28:13, 29:7, 29:17
**mention** [3] - 55:15, 55:18, 58:20
**mentioned** [5] - 8:8, 26:10, 46:17, 53:2, 68:22
**Merit** [2] - 74:11, 74:21
**MERIT** [1] - 1:21
**met** [11] - 11:13, 11:16, 11:20, 11:22, 23:23, 27:21, 30:2, 30:5, 30:7, 43:8
**MEXICO** [1] - 1:5
**Michael** [2] - 57:7, 58:6
**Michelle** [2] - 8:15, 8:16
**middle** [3] - 12:17, 73:8, 73:9
**might** [3] - 10:19, 43:5, 70:7
**Mike** [2] - 57:16
**mind** [1] - 31:16
**mine** [1] - 54:24
**minute** [1] - 40:5
**minutes** [5] - 24:12, 25:7, 26:25, 65:15
**misleading** [1] - 3:25
**Mississippi** [1] - 11:2
**misspoke** [1] - 45:19
**misstatement** [1] - 4:1
**misunderstood** [1] - 59:7
**moment** [2] - 8:5,

40:22
**money** [17] - 15:13, 19:20, 19:22, 33:14, 36:14, 37:24, 41:3, 41:13, 46:23, 59:15, 71:14, 71:15, 71:25, 72:8, 72:14, 72:21
**month** [1] - 38:22
**months** [2] - 43:4, 54:17
**morning** [3] - 3:5, 3:13, 4:7
**most** [4] - 5:3, 20:16, 45:15, 73:9
**mostly** [1] - 14:8
**Mother's** [5] - 18:4, 20:8, 21:21, 24:14, 25:1
**move** [1] - 35:22
**moved** [5] - 10:3, 13:2, 14:4
**movement** [1] - 10:2
**moving** [2] - 35:22, 56:15
**MR** [68] - 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 3:5, 4:5, 4:6, 4:11, 4:14, 9:11, 9:14, 9:16, 10:11, 10:12, 10:18, 10:21, 17:14, 17:17, 17:21, 27:18, 27:21, 27:25, 28:3, 28:6, 28:7, 32:11, 32:14, 36:24, 37:5, 40:4, 40:7, 40:10, 40:11, 41:5, 41:8, 42:25, 43:19, 43:22, 44:10, 46:11, 46:13, 46:15, 46:16, 49:21, 49:22, 50:19, 58:16, 60:1, 60:2, 62:13, 64:1, 65:10, 65:12, 65:15, 65:19, 66:4, 66:8, 66:11, 66:13, 66:15, 66:17, 66:22, 67:13, 68:14, 68:18, 71:3, 71:5, 71:8, 71:9, 72:24, 73:15, 73:17, 73:18, 73:25, 74:1
**Mutual** [2] - 59:20, 59:22

**N**

**name** [18] - 3:6, 6:2, 13:1, 18:17, 25:2, 25:4, 26:16, 33:24,

**C O N F I D E N T I A L**

43:18, 56:13, 59:3,
59:21, 61:4, 65:11,
66:5, 66:9, 66:11,
68:15
**named** [5] - 27:16,
42:17, 42:20, 65:13,
73:8
**names** [1] - 8:14
**National** [1] - 30:22
**nature** [3] - 23:7, 52:5,
54:17
**need** [7] - 3:24, 19:5,
23:3, 25:19, 55:2,
72:8
**needed** [1] - 41:2
**negotiated** [1] - 29:11
**neighborhood** [1] -
73:2
**neighbors** [2] - 73:2,
73:11
**neither..** [1] - 33:3
**never** [23] - 14:12,
15:21, 15:23, 26:7,
26:8, 30:7, 31:12,
31:13, 31:21, 33:16,
41:19, 57:2, 58:14,
64:25, 65:9, 65:14,
67:8, 67:10, 67:12,
67:17, 69:23
**new** [1] - 67:11
**NEW** [3] - 1:6, 1:18,
1:22
**New** [6] - 12:20,
13:20, 22:1, 48:25,
53:19, 64:21
**news** [1] - 41:21
**newspaper** [1] - 73:6
**next** [1] - 17:19
**niceness** [1] - 9:15
**night** [1] - 16:15
**NO** [1] - 1:6
**nobody** [1] - 57:20
**none** [3] - 8:11, 18:24,
38:17
**nonlawyer** [1] - 6:23
**nonmember** [1] - 8:24
**nonpayment** [1] -
47:24
**normal** [2] - 49:3,
69:20
**normally** [1] - 7:10
**note** [2] - 46:13, 73:15
**nothing** [9] - 4:8, 6:15,
25:18, 54:23, 56:18,
57:21, 57:22, 70:23,
71:20
**noticed** [1] - 39:4
**notion** [1] - 49:13
**November** [1] - 54:14
**numbered** [1] - 74:16

**numbers** [2] - 41:20,
47:8

**O**

**o'clock** [1] - 27:23
**oath** [1] - 3:14
**object** [1] - 48:6
**objected** [1] - 35:3
**objection** [4] - 48:10,
48:11, 48:20, 48:21
**obtained** [1] - 72:12
**obviously** [1] - 51:3
**occasion** [1] - 18:1
**occur** [2] - 16:5, 30:15
**occurred** [2] - 21:5,
26:20
**October** [2] - 16:7,
49:25
**OF** [3] - 1:1, 1:5, 1:10
**office** [4] - 22:3,
26:21, 39:5, 41:22
**officer** [2] - 3:14, 3:24
**officers** [1] - 7:16
**offices** [2] - 7:16, 9:17
**Official** [2] - 74:12,
74:21
**OFFICIAL** [1] - 1:20
**often** [1] - 56:10
**OIL** [2] - 1:4, 1:4
**oilfield** [2] - 18:10,
19:3
**old** [2] - 20:15, 25:13
**ON** [1] - 1:5
**once** [4] - 15:11,
49:16, 53:25, 64:15
**one** [48] - 3:7, 5:11,
5:12, 9:20, 14:7,
16:15, 16:19, 18:1,
18:2, 21:4, 21:5,
21:6, 21:19, 22:13,
24:20, 25:9, 26:6,
28:13, 29:22, 30:16,
30:17, 35:24, 38:4,
38:6, 40:20, 42:15,
44:17, 46:19, 46:20,
46:22, 48:19, 51:18,
54:8, 55:12, 55:14,
55:18, 55:20, 61:23,
62:25, 63:1, 63:11,
67:20, 68:15, 69:6,
72:25
**One** [1] - 16:15
**ones** [5] - 30:25,
50:23, 54:24, 55:21,
67:12
**open** [5] - 70:3, 70:4,
70:5, 70:6, 70:11
**operate** [1] - 6:12

**operating** [4] - 29:10,
29:12, 29:19, 44:20
**operation** [2] - 42:23,
55:14
**operational** [1] - 45:9
**operations** [2] - 45:6,
45:7
**opinion** [3] - 15:19,
15:20, 52:25
**opportunity** [3] - 3:20,
36:5, 65:22
**opposed** [2] - 6:9,
55:20
**order** [8] - 3:9, 36:19,
47:1, 49:6, 52:23,
53:3, 63:12, 63:20
**organized** [1] - 20:18
**originally** [7] - 5:13,
6:1, 11:20, 15:15,
41:2, 53:7, 66:24
**originates** [1] - 29:22
**Orleans** [6] - 12:20,
13:20, 22:1, 48:25,
53:19, 64:21
**ORLEANS** [3] - 1:6,
1:18, 1:22
**otherwise** [3] - 29:16,
44:22, 72:2
**outside** [5] - 6:22,
11:19, 22:7, 24:2,
50:13
**overlap** [1] - 29:3
**overlapping** [1] - 12:9
**owe** [2] - 72:16, 72:17
**owed** [2] - 71:19,
72:20
**owing** [1] - 72:15
**own** [1] - 8:3
**owner** [4] - 36:5, 37:2,
39:23, 59:12

**P**

**PAGE** [1] - 2:3
**paid** [26] - 22:24, 32:9,
33:6, 33:7, 33:9,
35:16, 37:14, 39:16,
48:6, 49:4, 49:24,
50:1, 57:22, 59:16,
64:14, 69:3, 70:7,
70:19, 70:22, 71:13,
71:19, 72:2, 72:4,
72:9, 72:18
**Palace** [1] - 64:20
**Papa** [2] - 65:8, 65:10
**paper** [3] - 26:16,
33:24, 41:21
**paralegal** [6] - 10:7,
10:8, 42:17, 43:20,

66:5, 68:15, 69:14
**paralegals** [2] - 7:6,
7:7
**Parish** [3] - 14:21,
14:22, 14:23
**Park** [1] - 11:17
**part** [2] - 42:5, 44:24
**participate** [1] - 17:6
**participated** [2] - 17:6
**particular** [10] - 7:13,
14:15, 35:24, 35:25,
54:13, 54:20, 55:3,
55:7, 55:12, 56:2
**parties** [3] - 3:17,
21:18, 64:2
**partners** [2] - 29:9,
61:12
**partnership** [7] - 5:13,
5:14, 5:17, 13:9,
14:12, 30:22, 31:4
**party** [1] - 35:1
**past** [1] - 23:17
**Pat** [2] - 55:5, 58:9
**Patrick** [1] - 61:16
**pay** [15] - 15:19,
30:13, 30:14, 32:18,
33:2, 33:4, 33:13,
34:23, 35:20, 39:20,
48:19, 49:1, 50:14,
58:23
**paying** [6] - 28:6,
31:16, 39:11, 39:12,
49:13, 70:21
**payment** [24] - 36:14,
36:15, 37:1, 37:17,
38:2, 40:1, 40:15,
40:21, 41:17, 42:3,
45:13, 45:14, 46:17,
47:24, 48:1, 48:2,
48:23, 48:24, 49:18,
49:25, 58:18, 67:4,
70:11
**payments** [12] - 34:11,
36:4, 36:7, 41:7,
41:18, 41:19, 46:18,
47:16, 50:1, 67:9,
67:11, 69:12
**payroll** [1] - 41:3
**pending** [3] - 25:16,
51:18, 63:18
**people** [6] - 7:8, 7:14,
46:6, 56:18, 68:21,
72:7
**PEPPER** [1] - 1:20
**Pepper** [3] - 74:10,
74:19, 74:20
**percent** [8] - 35:17,
36:10, 41:9, 41:10,
41:11, 41:12, 47:9,
60:16

**percentage** [2] -
22:25, 47:4
**perform** [1] - 50:14
**period** [2] - 12:3,
13:18
**permission** [1] - 32:11
**person** [6] - 34:2,
43:20, 61:1, 61:4,
66:14, 69:11
**personal** [7] - 21:1,
21:11, 21:13, 21:14,
38:4, 38:8, 60:21
**personally** [2] - 53:14,
61:11
**perspective** [5] -
31:17, 43:11, 53:1,
59:24, 72:6
**phen** [2] - 17:2, 17:11
**Phen** [1] - 17:2
**phone** [4] - 14:11,
14:21, 21:21, 21:22
**phones** [1] - 14:16
**phonetically** [1] -
56:13
**PI** [1] - 12:24
**pick** [1] - 73:6
**picture** [1] - 36:9
**plaintiff** [3] - 48:25,
53:19, 54:1
**plaintiffs'** [1] - 7:11
**plan** [1] - 23:22
**plane** [1] - 65:11
**Plaquemines** [1] -
14:21
**platform** [1] - 6:7
**play** [1] - 11:18
**players** [1] - 21:15
**plenty** [2] - 60:13,
60:15
**point** [6] - 12:11, 16:3,
16:5, 18:9, 18:25,
27:18, 40:8, 49:10,
65:17
**pointed** [1] - 55:9
**pointing** [1] - 55:7
**polite** [1] - 16:18
**portion** [3] - 37:11,
44:12, 70:5
**position** [2] - 48:16,
72:3
**possible** [2] - 27:19,
70:16
**power** [1] - 53:8
**POYDRAS** [2] - 1:18,
1:22
**practice** [8] - 5:18,
12:22, 12:24, 13:4,
13:6, 13:14, 13:25
**practiced** [3] - 12:16,
13:1, 13:24

practices [1] - 47:14
practicing [2] - 13:20,
17:19
predecessor [1] -
13:10
pregnancy [1] - 43:5
pregnant [1] - 43:6
present [2] - 3:7,
52:10
preserve [1] - 46:7
president [1] - 11:22
press [1] - 26:18
presumed [1] - 48:15
pretty [2] - 16:10, 17:8
PriceWaterhouse [1] -
61:9
primarily [2] - 48:13,
52:6
principal [2] - 9:1,
42:8
principals [2] - 60:22,
61:12
problem [1] - 71:18
problematic [1] -
71:11
procedure [1] - 53:4
proceed [1] - 73:23
proceedings [5] -
3:16, 40:8, 65:17,
74:2, 74:16
PROCEEDINGS [2] -
1:24, 3:1
proceeds [2] - 15:7,
28:17
process [8] - 3:12,
26:3, 54:7, 56:22,
59:13, 61:7, 62:15,
63:12
processed [1] - 57:10
processes [1] - 35:21
processing [6] -
43:10, 43:12, 43:16,
45:13, 45:14, 59:14,
60:4
PRODUCED [1] - 1:25
professional [1] -
71:17
profits [1] - 29:18
Program [1] - 39:25
project [2] - 7:12, 7:13
proper [4] - 31:23,
53:3, 53:6, 57:8
propriety [1] - 31:16
Propulsid [1] - 17:4
public [5] - 46:3,
46:19, 58:2, 68:12,
68:20
Purchner [2] - 8:15,
8:16
pure [1] - 19:3

purely [1] - 52:13
purified [3] - 18:11,
19:3, 19:5
purpose [2] - 62:22,
63:20
pursuant [2] - 3:9,
29:19
pursue [1] - 56:5
put [6] - 3:14, 15:5,
19:22, 33:14, 43:11,
52:17, 71:25, 72:2
PWC [1] - 61:11

Q

Que [1] - 11:15
questions [8] - 4:4,
4:12, 4:19, 4:22, 5:1,
9:12, 64:23, 69:19
quickly [1] - 9:13
quoting [1] - 71:1

R

Radiofone [1] - 14:19
ran [2] - 16:17, 54:25
RE [1] - 1:4
re [1] - 72:15
re-reviewed [1] -
72:15
reach [2] - 23:1, 32:8
reached [4] - 32:17,
32:25, 39:15, 49:17
reaction [1] - 49:11
read [2] - 66:2, 71:6
really [23] - 5:24, 5:25,
16:13, 18:3, 19:15,
19:18, 20:17, 22:24,
25:24, 28:4, 35:20,
35:23, 36:20, 39:7,
45:14, 53:25, 54:23,
54:24, 55:19, 56:11,
57:21, 57:22, 61:9
Realtime [2] - 74:10,
74:20
REALTIME [1] - 1:21
reason [3] - 52:21,
69:24, 72:22
reassigned [1] - 38:19
receivable [1] - 50:15
receive [6] - 31:24,
48:16, 48:17, 48:18,
70:10, 71:25
received [6] - 41:4,
41:13, 45:1, 49:25,
50:17, 67:4
receives [2] - 37:9,
44:24

recent [2] - 57:25,
68:9
recently [5] - 33:21,
33:23, 36:17, 41:20,
70:18
recess [2] - 40:9,
65:18
recollection [1] -
30:18
recommendation [2] -
71:24, 72:10
reconsideration [1] -
45:8
reconstruct [1] -
46:20
record [11] - 3:6, 3:15,
3:19, 3:22, 3:23,
27:19, 40:10, 43:19,
54:21, 65:19, 74:15
RECORDED [1] - 1:24
records [2] - 4:21,
65:23
recovery [1] - 70:16
recreate [1] - 20:14
refer [5] - 40:14, 42:4,
58:18, 58:25, 61:23
reference [1] - 45:17
referral [21] - 30:13,
30:14, 31:6, 31:8,
31:10, 31:16, 32:16,
36:1, 38:11, 38:16,
39:12, 39:20, 48:1,
48:2, 48:22, 48:24,
49:1, 49:4, 49:14,
69:3, 69:11
referred [5] - 18:13,
18:15, 30:3, 51:24,
66:17
referring [4] - 6:10,
27:14, 53:11, 62:14
refers [1] - 44:18
regard [5] - 28:20,
29:3, 29:4, 49:19,
70:11
regarding [1] - 3:11
regards [2] - 39:12,
66:12
region [1] - 6:23
REGISTERED [1] -
1:21
Registered [1] - 74:10
registered [1] - 74:21
regular [2] - 20:21,
39:8
regularly [3] - 31:3,
38:25, 39:9
Reitano [13] - 12:3,
30:2, 30:3, 31:19,
32:22, 38:12, 38:13,
44:22, 50:25, 57:3,

58:25, 62:25, 64:23
related [2] - 46:7,
69:21
RELATES [1] - 1:8
relates [2] - 63:12,
68:24
relating [4] - 5:3,
14:15, 30:9, 45:12
relation [1] - 37:24
relationship [17] - 5:8,
15:24, 17:24, 19:8,
19:17, 20:6, 21:12,
22:9, 22:16, 33:12,
42:13, 51:3, 53:16,
54:1, 61:13, 61:25,
73:10
relationships [3] -
20:14, 50:20, 62:10
relax [1] - 32:13
relay [1] - 31:11
released [1] - 3:17
relevant [1] - 4:13
remain [2] - 47:12,
65:5
remained [3] - 36:22,
36:25, 64:24
remember [13] -
11:14, 17:11, 20:17,
20:24, 21:4, 21:5,
21:6, 43:18, 55:19,
55:24, 59:20, 67:18
renewed [1] - 16:11
report [1] - 23:12
reported [1] - 67:17
Reporter [7] - 74:10,
74:11, 74:12, 74:20,
74:21, 74:21
reporter [1] - 9:15
REPORTER [3] - 1:20,
1:21, 1:21
REPORTER'S [1] -
74:8
represent [4] - 27:16,
29:1, 29:25, 30:4
representation [1] -
27:24, 28:18, 29:5,
30:6, 45:10, 60:23
representative [1] -
60:24, 72:3, 73:5
represented [6] -
28:1, 28:8, 45:16,
45:20, 49:5, 49:8
representing [3] - 3:8,
28:3, 28:20
represents [6] - 22:23,
28:11, 28:21, 29:2,
29:4, 73:6
reputation [1] - 73:10
request [2] - 46:11,
46:15

requesting [1] - 65:25
requests [2] - 65:23,
73:19
required [1] - 49:2
requisite [1] - 43:14
residual [2] - 40:1,
65:20
residuals [1] - 29:18
respect [12] - 15:3,
19:21, 27:20, 50:25,
51:21, 52:19, 56:1,
58:15, 61:16, 65:25,
68:1, 70:16
respond [3] - 46:13,
66:1, 66:2
response [4] - 34:19,
35:11, 70:24, 73:21
responsibilities [1] -
8:20
responsibility [1] -
71:18
responsible [3] -
45:17, 67:1, 72:17
responsive [1] - 49:12
restate [1] - 56:8
restaurant [2] - 25:2,
43:9
result [2] - 28:17,
31:20
retainer [1] - 47:24
reveal [1] - 68:25
review [6] - 3:16,
54:15, 54:17, 68:19,
69:17, 73:22
reviewed [3] - 71:13,
71:14, 72:15
Rezulin [1] - 17:4
RIG [1] - 1:4
RMR [2] - 1:20, 74:20
role [1] - 61:6
roles [1] - 8:20
Romeo [2] - 65:8,
65:10
ROOM [1] - 1:22
rough [2] - 70:13,
70:15
Rubio [3] - 42:17,
43:1, 68:15
run [4] - 11:21, 16:14,
23:17, 62:2
running [1] - 41:19
Rupley [1] - 10:8

S

s/Cathy [1] - 74:19
SALZER [1] - 1:16
sandwich [1] - 24:6
saw [5] - 22:1, 23:19,

**C O N F I D E N T I A L**

24:21, 63:21, 65:6
schedule [2] - 29:13, 44:20
scheduled [1] - 31:4
scheme [1] - 73:9
school [14] - 6:5, 11:1, 11:9, 11:14, 11:18, 11:21, 11:24, 12:8, 16:3, 16:22, 17:9, 43:8, 51:1, 64:7
School [2] - 11:3, 17:19
Scott [5] - 50:8, 50:9, 59:5, 59:20, 59:21
Scott's [1] - 59:21
Seafood [1] - 39:25
seafood [2] - 36:6, 70:9
sealed [1] - 73:21
Sean [4] - 3:24, 13:25, 14:3, 14:4
second [6] - 3:14, 5:1, 46:17, 46:20, 46:22, 47:1
secretary [8] - 7:7, 7:9, 10:7, 10:8, 10:9, 63:3, 64:9, 69:14
section [1] - 8:21
see [9] - 3:15, 5:5, 16:14, 28:21, 54:2, 56:25, 65:2, 71:23, 72:9
seeing [1] - 22:6
sell [2] - 18:11, 60:16
sends [1] - 44:22
sent [7] - 37:24, 40:25, 47:18, 47:19, 48:13, 48:14, 53:4
separate [5] - 5:6, 6:11, 7:25, 36:7, 47:13, 51:23
separately [1] - 40:25
Sera [1] - 11:15
series [4] - 20:23, 32:15, 47:23, 56:17
set [1] - 39:8
sets [1] - 44:17
settled [3] - 15:12, 17:2, 72:13
settlement [1] - 36:7
several [3] - 28:24, 36:4, 60:11
share [11] - 6:19, 7:20, 10:16, 10:23, 28:17, 29:17, 44:5, 44:8, 44:11, 50:1, 67:6
shared [2] - 54:11, 72:25
shareholders [1] - 29:9

shares [1] - 9:8
sharing [1] - 15:2
shepherding [1] - 31:19
short [2] - 4:12, 65:20
shortly [2] - 58:3, 58:4
shrimp [1] - 37:2
shrimper [1] - 36:6
side [3] - 44:7, 72:1
similar [1] - 55:22
single [1] - 55:12
singled [1] - 55:20
sister [2] - 59:12, 59:18
sit [3] - 32:13, 55:19, 70:15
sitting [1] - 25:20
situation [3] - 7:9, 71:9, 71:11
six [3] - 7:12, 43:4, 55:10
slow [5] - 9:11, 17:13, 17:17, 32:12, 56:20
slowly [1] - 56:22
small [2] - 22:24, 72:25
smoothing [2] - 52:15, 52:24
social [4] - 17:23, 18:4, 61:25, 62:1
socialized [1] - 53:21
sold [2] - 60:15, 60:16
solo [1] - 13:25
someone [2] - 23:12, 39:5
sometimes [2] - 9:6, 9:7
somewhat [2] - 20:11, 52:4
somewhere [1] - 52:23
son [2] - 53:18, 62:10
Sonnier [2] - 14:19, 14:21
sorry [5] - 33:3, 44:6, 56:21, 59:7, 64:18
sort [3] - 18:6, 45:10, 62:5
sounds [2] - 48:21, 65:11
source [4] - 37:7, 37:17, 37:23, 73:7
south [1] - 17:3
space [4] - 7:20, 9:8, 10:16, 10:23
SPEAKERS [1] - 2:3
speaking [2] - 33:25, 55:3
Special [1] - 3:10
SPECIAL [2] - 1:11,

1:14
specific [5] - 5:1, 29:2, 41:20, 55:24, 69:18
specifically [5] - 22:13, 55:15, 55:17, 61:10, 62:9
specify [1] - 51:18
speedy [1] - 73:14
spelled [1] - 56:13
SPILL [1] - 1:4
split [4] - 29:16, 31:10, 44:2, 64:15
spoken [4] - 22:6, 22:10, 23:4
staff [1] - 7:12
stalled [2] - 54:6, 54:8
standing [1] - 11:7
stands [1] - 66:9
Stanwood [1] - 53:18
start [2] - 39:18, 40:20
started [5] - 6:1, 17:10, 43:6, 59:13, 59:23
starting [1] - 5:10
starts [1] - 72:22
state [3] - 3:23, 14:7, 19:19
State [3] - 4:20, 74:11
STATEMENT [1] - 1:10
statements [2] - 3:24, 65:22
States [2] - 74:12, 74:22
STATES [1] - 1:1
status [2] - 54:20, 56:1
stay [3] - 27:18, 40:23, 41:1
stayed [1] - 41:2
stays [4] - 43:25, 44:7, 44:8, 44:12
Steel [2] - 14:20, 14:22
Steilberg [2] - 62:25, 63:1
STENOGRAPHY [1] - 1:24
Stephens [1] - 59:5
Stephenson [3] - 50:8, 50:9, 50:13
steps [4] - 54:19, 54:24, 56:16, 70:19
stick [1] - 40:22
sticking [1] - 42:4
still [18] - 5:18, 5:19, 12:18, 13:6, 16:18, 39:22, 39:23, 39:24, 40:2, 54:8, 65:7, 70:2, 70:4, 70:5,

70:6, 70:11
stories [1] - 26:18
STREET [2] - 1:18, 1:22
street [5] - 22:1, 23:23, 24:6, 25:1, 25:6
Street [9] - 4:24, 7:16, 8:6, 9:17, 10:15, 10:23, 11:17, 14:2, 14:3
stuck [6] - 54:6, 54:8, 54:11, 55:2, 55:8, 55:9
stuff [5] - 8:25, 26:16, 31:2, 41:15
subject [3] - 10:4, 58:8, 70:14
subsequent [8] - 6:4, 24:16, 26:10, 27:21, 32:1, 33:10, 37:10, 41:3
subsequently [7] - 6:2, 27:10, 33:7, 38:1, 46:18, 53:4
subsistence [4] - 39:23, 70:6, 70:8
suggested [1] - 59:17
SUITE [1] - 1:17
sum [1] - 72:21
supply [1] - 27:10
supposed [1] - 44:13
surprised [1] - 35:5
surrounding [1] - 38:16
Susan [1] - 50:3
suspended [1] - 27:4
Sutton [43] - 11:10, 13:14, 13:16, 14:20, 14:22, 17:23, 19:20, 20:9, 20:21, 21:23, 24:11, 25:1, 32:22, 33:2, 33:4, 33:8, 33:9, 34:24, 35:12, 37:8, 37:14, 37:24, 38:13, 39:12, 41:20, 47:24, 48:1, 49:19, 51:4, 51:15, 51:20, 57:17, 58:18, 58:19, 58:25, 67:3, 67:15, 68:3, 68:8, 68:23, 69:1, 69:4, 70:19
swear [1] - 4:6
swift [1] - 73:14
switched [1] - 13:8
switches [1] - 9:5
SWORN [1] - 1:10

T

TAKEN [1] - 1:11
talks [1] - 44:22
Tate [8] - 66:5, 66:9, 66:15, 66:18, 66:20, 67:14
technology [3] - 18:11, 19:3, 19:6
telephone [4] - 20:23, 20:25, 34:2, 34:3
tenure [2] - 12:9, 39:21
term [1] - 16:20
terms [8] - 6:17, 17:23, 29:12, 37:23, 41:17, 41:18, 47:7, 60:18
testimony [3] - 4:7, 55:15, 55:17
THE [15] - 1:4, 1:5, 1:11, 4:10, 9:13, 17:16, 17:18, 28:5, 36:25, 43:20, 65:11, 66:12, 66:16, 66:19, 72:11
themselves [1] - 54:25
thereafter [1] - 63:25
therefore [3] - 44:24, 45:1, 45:24
third [3] - 5:4, 5:5, 47:1
THIS [1] - 1:8
Thonn [45] - 9:1, 27:16, 27:22, 27:23, 28:1, 28:8, 29:25, 30:1, 30:5, 30:9, 30:13, 31:7, 31:14, 31:18, 36:1, 36:3, 36:13, 36:14, 37:12, 38:12, 39:13, 40:16, 42:8, 42:14, 42:23, 44:23, 44:25, 45:3, 45:7, 45:16, 45:21, 46:7, 47:16, 49:19, 51:7, 51:12, 51:14, 51:21, 51:23, 59:1, 67:5, 68:1, 68:16, 69:21, 70:1
thousand [1] - 22:23
three [22] - 4:15, 4:18, 5:6, 6:11, 6:12, 7:14, 14:19, 14:21, 14:23, 14:25, 23:20, 24:7, 28:22, 34:6, 36:7, 40:19, 46:17, 50:10, 68:21, 68:22, 73:19, 73:24

**C O N F I D E N T I A L**

SM-02-JA00704

throughout [3] - 6:6, 39:21, 40:3
Thursday [1] - 11:19
Tidwell [1] - 62:14
Tiger [29] - 11:20, 14:10, 15:13, 18:6, 18:8, 18:18, 19:17, 24:4, 24:8, 26:23, 30:3, 31:9, 31:13, 31:14, 33:12, 33:15, 34:22, 37:14, 38:2, 48:12, 48:15, 57:17, 64:5, 64:12, 67:3, 68:8, 69:25, 70:21
Tiger's [6] - 19:15, 20:1, 34:20, 37:11, 63:3, 64:9
tiny [1] - 17:13
Tisch [1] - 17:18
TO [1] - 1:8
tobacco [2] - 14:7, 14:8
today [8] - 3:16, 16:10, 16:12, 57:19, 66:1, 69:6, 70:15, 73:13
together [23] - 6:7, 14:23, 14:24, 16:3, 17:1, 17:2, 17:4, 17:10, 17:23, 18:3, 18:5, 18:7, 18:19, 20:8, 20:15, 24:7, 26:24, 52:17, 59:24, 62:7, 63:23, 63:24, 64:7
Tom [1] - 65:13
tomorrow [1] - 27:23
took [4] - 5:22, 37:25, 52:7, 65:20
top [1] - 8:25
topic [1] - 63:8
tort [1] - 17:1
torts [5] - 5:25, 6:5, 6:7, 6:8, 8:2
touch [1] - 11:18
town [1] - 31:4
Tracy [7] - 63:1, 63:2, 63:3, 64:8, 64:11
transaction [1] - 33:18
transcript [2] - 71:6, 74:14
TRANSCRIPT [1] - 1:24
transfer [3] - 33:14, 37:11, 37:18
transferred [2] - 37:6, 38:19
traumatic [1] - 21:14
treated [1] - 36:13
tried [5] - 15:16,

17:22, 18:1, 25:13, 60:16
true [1] - 74:14
truth [3] - 4:7, 4:8
truthful [1] - 3:25
try [3] - 4:12, 20:14, 35:24
trying [6] - 18:11, 26:2, 29:2, 37:16, 53:5, 56:4
TUESDAY [2] - 1:7, 3:2
Tuesday [1] - 11:19
Tulane [6] - 11:3, 11:5, 11:9, 11:21, 12:15, 14:6
twice [2] - 53:25, 62:21
two [19] - 4:12, 6:15, 9:17, 10:15, 16:9, 21:19, 27:1, 29:17, 34:6, 40:1, 40:5, 42:16, 44:17, 48:4, 61:2, 64:2, 65:15, 70:10, 71:7
two-minute [1] - 40:5
type [5] - 12:22, 14:5, 15:2, 18:25, 21:19

U

U.S.C [1] - 4:2
ultimately [1] - 17:4
uncle's [1] - 12:16
under [6] - 3:14, 11:12, 13:1, 29:12, 45:9, 49:3
undergrad [1] - 11:2
understood [7] - 18:16, 19:15, 19:25, 20:2, 20:6, 25:25, 38:3
unequivocally [1] - 34:25
UNITED [1] - 1:1
United [2] - 74:12, 74:22
universe [1] - 70:9
University [1] - 11:2
unnamed [1] - 73:7
unrelated [1] - 51:23
untenable [1] - 71:11, 72:3
up [10] - 8:21, 17:15, 17:19, 21:16, 22:1, 31:7, 39:13, 56:4, 64:2, 73:6
update [1] - 56:2
upset [2] - 34:11, 35:7

urge [1] - 73:14

V

variety [1] - 30:24
various [2] - 3:11, 28:23
Vegas [1] - 47:15
venture [1] - 14:14
ventures [2] - 62:4, 62:10
venue [1] - 59:15
verbiage [2] - 52:15, 53:6
Verdigets [1] - 59:19
vessel [6] - 36:5, 37:2, 39:23, 70:7, 70:8
viable [3] - 5:18, 5:19, 12:18
view [1] - 54:6
violation [1] - 4:2
vis-à-vis [2] - 71:10, 72:23
visit [2] - 54:2, 63:21
VoO [6] - 36:4, 40:21, 41:7, 42:3, 49:24, 49:25

W

waited [1] - 72:7
walk [1] - 25:5
walked [2] - 24:6, 58:14
water [3] - 18:11, 19:3, 19:5
ways [2] - 16:2, 21:17
Wednesdays [1] - 11:16
weeks [1] - 73:1
weird [1] - 20:17
Welker [2] - 58:13, 58:14
WHEREUPON [3] - 40:8, 65:17, 74:2
whole [5] - 4:8, 11:22, 39:8, 41:25, 43:4
wife [2] - 64:6, 73:4
wire [4] - 33:14, 37:11, 37:13, 37:18
wish [1] - 65:22
wished [1] - 5:23
witness [1] - 28:4
WITNESS [12] - 4:10, 9:13, 17:16, 17:18, 28:5, 36:25, 43:20, 65:11, 66:12, 66:16, 66:19, 72:11

wives [1] - 73:4
word [4] - 35:15, 54:11, 57:8, 58:22
words [2] - 23:22, 39:18
works [2] - 8:16, 50:4
world [1] - 48:25
worried [2] - 35:21
worry [1] - 35:23
wound [2] - 21:16, 22:1
writing [3] - 46:15, 52:8, 65:24
written [3] - 42:24, 58:19, 58:20

Y

year [13] - 12:4, 12:10, 17:19, 24:20, 32:21, 32:22, 39:13, 43:5, 44:2, 49:18, 54:14, 55:23, 67:22
years [8] - 15:1, 20:9, 61:17, 63:4, 64:8, 64:9
yourself [1] - 13:3

C O N F I D E N T I A L

SM-02-JA00705