1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2

3  ****************************************************************

4  IN RE:  OIL SPILL BY THE
   OIL RIG *DEEPWATER HORIZON*
5  IN THE GULF OF MEXICO ON
   APRIL 20, 2010
6                        CIVIL ACTION NO. 10-MD-2179 "J"
                         NEW ORLEANS, LOUISIANA
7                        THURSDAY, AUGUST 1, 2013, 8:00 A.M.

8  THIS RELATES TO ALL CASES

9  ****************************************************************

10

11      SWORN STATEMENT OF **PATRICK A. JUNEAU, ESQUIRE**
        TAKEN BEFORE THE HONORABLE LOUIS J. FREEH
12                    SPECIAL MASTER

13

14  APPEARANCES:

15

16                    LOUIS J. FREEH, SPECIAL MASTER
                      JAMES BUCKNAM, ESQUIRE
17                    STEVE TIDWELL

18

19

20  OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
                               CERTIFIED REALTIME REPORTER
21                             REGISTERED MERIT REPORTER
                               500 POYDRAS STREET, ROOM HB406
22                             NEW ORLEANS, LA  70130
                               (504) 589-7779
23                             Cathy_Pepper@laed.uscourts.gov

24

25  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
    PRODUCED BY COMPUTER.

EXHIBIT
16

**CONFIDENTIAL**

SM-03-JA000106

1

2

3

# I N D E X

4

EXAMINATIONS                                              PAGE

5    **PATRICK JUNEAU**.......................................    4

6    EXAMINATION BY MR. FREEH.............................    4

7    EXAMINATION BY MR. BUCKNAM..........................  102

8    EXAMINATION BY MR. TIDWELL..........................  118

9    EXAMINATION BY MR. BUCKNAM..........................  123

10   EXAMINATION BY MR. FREEH............................  123

11

12

13

# E X H I B I T S

14

15   DESCRIPTION                                               PAGE

16

17   EXHIBIT PJ-10 WAS MARKED............................   36

18   EXHIBIT PJ-11 WAS MARKED............................   38

19   EXHIBIT PJ-4B WAS MARKED............................   50

20   EXHIBIT PJ-4C WAS MARKED............................   53

21   EXHIBIT JP-12 WAS MARKED............................   60

22   EXHIBIT PJ-13 WAS MARKED............................   60

23   EXHIBIT PJ-14 WAS MARKED............................   62

24   EXHIBIT PJ-15 WAS MARKED............................   67

25   EXHIBIT PJ-16 WAS MARKED............................   84

**OFFICIAL TRANSCRIPT**

SM-03-JA000107

1   EXHIBITS PJ-1, PJ-1A, PJ-1C, PJ-1D AND PJ-7 WERE       101
2   MARKED...........................................
3   EXHIBITS PJ-2, PJ-3 AND PJ-4 WERE MARKED............. 103
4   EXHIBIT PJ-9 WAS MARKED............................. 109
5   EXHIBIT PJ-8 WAS MARKED............................. 109
6   EXHIBIT PJ-17 WAS MARKED............................ 116

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**OFFICIAL TRANSCRIPT**

SM-03-JA000108

P-R-O-C-E-E-D-I-N-G-S

THURSDAY, AUGUST 1, 2013

08:07AM    MR. FREEH:  We'll go on the record.

08:07AM         Mr. Juneau, do you swear that the information

08:07AM    you will give to the Special Master today will be the truth,

08:07AM    the whole truth and nothing but the truth?

08:07AM         THE WITNESS:  I do.

08:07AM         MR. FREEH:  Thank you very much.

PATRICK JUNEAU

was called as a witness and, after being first duly sworn, was

examined and testified on his oath as follows:

EXAMINATION

BY MR. FREEH:

08:07AM    Q.   Mr. Juneau, could you just state for the record where

08:07AM    you're licensed to practice law, please.

08:07AM    A.   I'm licensed to practice in the state of Louisiana, and

08:08AM    I've been licensed since 1965.  I am admitted to practice in

08:08AM    many courts, including the United States Supreme Court, all of

08:08AM    the federal courts here in Louisiana, Fifth Circuit -- you

08:08AM    know, the way these certifications run, I think it's the Eighth

08:08AM    and Eleventh Circuits.  I'm not sure.  It was on my resumé --

08:08AM    but the two other Federal Circuits I've been involved in.

08:08AM         I also practiced in the Southern District of Texas in

**C O N F I D E N T I A L**

08:08AM 1   the federal court.  Obviously, in the Fifth Circuit here and
08:08AM 2   all state courts in Louisiana.
08:08AM 3          I have appeared in other state courts, you know, as a
08:08AM 4   lawyer, but just by individual admission.
08:08AM 5   Q.   You're an attorney in good standing in the state of
08:08AM 6   Louisiana?
08:08AM 7   A.   I am.
08:08AM 8   Q.   Where, sir, did you complete your law school?
08:08AM 9   A.   I completed -- I completed LSU Law School.  I went to
08:08AM 10  undergraduate school -- undergraduate school, United States
08:09AM 11  Army, then back to law school at LSU.
08:09AM 12  Q.   Have you continuously practiced law since the approximate
08:09AM 13  time you graduated from law school?
08:09AM 14  A.   Absolutely.  I mean, that's been my -- what I've done my
08:09AM 15  entire life.
08:09AM 16         I guess you could call it *the practice of law*; but, a
08:09AM 17  little twist to that is, starting about 25, maybe 27 years ago,
08:09AM 18  I did -- at the request of parties, I had done a lot of
08:09AM 19  mediation.  I've actually done about 4,000 mediations.
08:09AM 20         But I was appointed early, about 27 years ago, as a
08:09AM 21  special master in complex litigation.  The first case was
08:09AM 22  actually *Combustion, Inc.*, which was in the Middle District of
08:09AM 23  Louisiana.  It was the first big environmental case in
08:09AM 24  Louisiana.
08:09AM 25         I handled that case from inception through

**C O N F I D E N T I A L**

SM-03-JA000110

| | |
|---|---|
| 08:09AM | 1 |
| 08:10AM | 2 |
| 08:10AM | 3 |
| 08:10AM | 4 |
| 08:10AM | 5 |
| 08:10AM | 6 |
| 08:10AM | 7 |
| 08:10AM | 8 |
| 08:10AM | 9 |
| 08:10AM | 10 |
| 08:10AM | 11 |
| 08:10AM | 12 |
| 08:10AM | 13 |
| 08:10AM | 14 |
| 08:10AM | 15 |
| 08:11AM | 16 |
| 08:11AM | 17 |
| 08:11AM | 18 |
| 08:11AM | 19 |
| 08:11AM | 20 |
| 08:11AM | 21 |
| 08:11AM | 22 |
| 08:11AM | 23 |
| 08:11AM | 24 |
| 08:11AM | 25 |

completion, that is, through negotiations, through the
settlement, through the allegations.  I conducted the hearings
and did all the reports to the Court.  Ultimately, the matter
was concluded.

        The reason I mention it, you were talking about the
practice of law.  Since then, yeah, I've served maybe 35 or
45 times, by court appointment, federal and state, as a special
master in a lot of national cases, a lot of well recognized --
certainly well recognized cases in the south.

        Kind of a blending in there, I've done a lot of
mediation -- continued to do some mediations across the
country, I mean, from California to the East Coast.

        I mention that because I kind of got out of the trial
work per se that I did a lot of.  I mean, I've tried a lot of
cases.  I would say over the past 25, 27 years, it's a
combination of those two factors, by federal and state
appointment, that I've served in those capacities.

        So whether you call that *the practice of law* or not,
it is, I guess, the practice of law.  You wouldn't be appointed
if you weren't a lawyer.  But it's not what I -- what I call
*the active practice of law*, that is, handling litigation,
plaintiff, defendant.

        In further answer to your question, I was a defense
trial lawyer all my life.  That's all that controversy that's
been appearing in the paper.  The *New York Times* reported I was

**C O N F I D E N T I A L**

SM-03-JA000111

08:11AM  1    a plaintiff trial lawyer.  That was interesting because I'm a

08:11AM  2    past president of the Louisiana Defense Counsel Association --

08:11AM  3    a lot of the organizations.

08:11AM  4          But my point I'm trying to get to is I was actually a

08:11AM  5    trial lawyer most of my life, but a defense trial lawyer in

08:11AM  6    Louisiana.  I grew up mainly in the maritime field because

08:11AM  7    that's where we are.  You know, we live right off the coast.  I

08:11AM  8    used to work offshore as a kid.

08:12AM  9          So in these federal courts here and all over

08:12AM  10   Louisiana, I mean, I've tried hundreds of cases; but, that's

08:12AM  11   been my -- the bulk of my practice, you know, since '65.

08:12AM  12   Q.   There came a time when you were appointed the Court Claims

08:12AM  13   Administrator for what's been referred to as the *Horizon* or the

08:12AM  14   *BP* matter?

08:12AM  15   A.   I vividly remember all of that, yes.  Interesting story

08:12AM  16   behind all that.

08:12AM  17   Q.   Approximately when were you appointed, sir?

08:12AM  18   A.   I think that was in March, March or April.  I don't have

08:12AM  19   the exact order here, but I vividly remember how all that came

08:12AM  20   about.  I don't know if that's your question, but, I mean --

08:12AM  21   Q.   I didn't ask you that, but, certainly, you can explain

08:12AM  22   that.

08:12AM  23   A.   What happened, I was in my office in Lafayette, and I got

08:12AM  24   a call.  I think there was a lawyer from the PSC on the phone,

08:13AM  25   and I think it was a lawyer from BP on the phone.  I wasn't in

**C O N F I D E N T I A L**

SM-03-JA000112

08:13AM 1   that room, but I was in Lafayette.

08:13AM 2          I think this was on a Thursday or something like

08:13AM 3   that.  They asked me could I come to New Orleans.  There was a

08:13AM 4   meeting about the *Deepwater Horizon*.  Anybody that lives in the

08:13AM 5   Gulf South knows those words, obviously know about the whole

08:13AM 6   spill.  They asked me to come over here.

08:13AM 7          Now, I knew, from reading the newspaper -- I didn't

08:13AM 8   have any involvement in anything in the spill.  I didn't

08:13AM 9   represent any claimants in the spill, wasn't representing any

08:13AM 10  defendants in the spill, had really had no connection with the

08:13AM 11  spill per se.

08:13AM 12         They asked me to come because they were considering

08:13AM 13  some matters that had to do with some considerations of

08:13AM 14  appointment.  That's all I really knew.

08:13AM 15         I knew that settlement negotiations were underway

08:13AM 16  because it was in the paper.  The trial was set.  They bumped

08:13AM 17  the trial for about ten days or something like that.

08:14AM 18         So I came here.  They told me to meet at the

08:14AM 19  Ritz-Carlton hotel.  I went to the Ritz-Carlton.  They had a

08:14AM 20  conference room set up.  There were various people there.

08:14AM 21  There were several BP people there, all the lawyers for BP.

08:14AM 22  I'm not sure whether it was direct or not.

08:14AM 23  Q.   Do you remember which BP lawyers in specific?

08:14AM 24  A.   I remember Moskowitz being there.  I'm not sure if

08:14AM 25  Mark Holstein was at that meeting or not.  I just don't

**C O N F I D E N T I A L**

08:14AM 1   remember.

08:14AM 2   Q.    Then the plaintiffs' lawyers were represented?

08:14AM 3   A.    They had a representative of the plaintiffs.  I

08:14AM 4   remember -- I think -- I can remember Mr. Roy there.  I don't

08:14AM 5   know if Mr. Herman was there or not.  There were several people

08:14AM 6   in the room.

08:14AM 7   Q.    Did the meeting turn into, in effect, an interview of you

08:14AM 8   for this position?

08:14AM 9   A.    Exactly.  What I learned when I was there, that they were

08:14AM 10  in real serious stages of the settlement negotiations, the

08:14AM 11  terms of which I did not know.

08:14AM 12          They said that they were going to have to appoint

08:15AM 13  someone to be in charge of this operation.  I kind of knew what

08:15AM 14  those concepts were, having done that before.

08:15AM 15          They asked me what my thoughts are about handling

08:15AM 16  claims, how do you do claims, and how do you administer -- do

08:15AM 17  you have -- do you know of any problems you'd have about this?

08:15AM 18  I mean, real extensive.  I mean, it must have gone on for about

08:15AM 19  three hours.

08:15AM 20          I was told -- I don't know this for a fact, but I was

08:15AM 21  told there were about 10 or 12 people they were talking to from

08:15AM 22  around the country.  To this day, I don't even know who that

08:15AM 23  was.

08:15AM 24          We finished that discussion.  I got in my car.  I

08:15AM 25  drove here from Lafayette, which is about two hours.  I got in

**C O N F I D E N T I A L**

08:15AM 1    my car, went back home.  I'm sitting in my house in my den with

08:15AM 2    my wife drinking coffee.

08:15AM 3            The next morning, somebody called -- you know, as God

08:15AM 4    be my witness, I don't remember who called -- somebody called

08:15AM 5    and said, could you come back?  I said, what do you mean, come

08:16AM 6    back when?  He said, come back today.  I said, okay.

08:16AM 7            So I got back in my car, went back to New Orleans.

08:16AM 8    All these meetings were at the Ritz-Carlton conference room --

08:16AM 9    or one of the conference rooms.

08:16AM 10           Then they expanded the group of people who were in

08:16AM 11   the room at the time.  There was -- I can remember -- it was

08:16AM 12   either the Assistant General Counsel or the General Counsel of

08:16AM 13   BP was there.  I do remember that.

08:16AM 14           I'm not sure if it was Mr. Neath or somebody else.

08:16AM 15   Somebody else was in that room.  I remember Moskowitz in the

08:16AM 16   room.  I think the same people were there.  They might have had

08:16AM 17   ten people.

08:16AM 18   Q.   But more people than the day before?

08:16AM 19   A.   Yes, sir.  Yes, sir.  It was just an expansion, from my

08:16AM 20   perspective, of the same things we talked about the day before.

08:16AM 21   I think -- it struck me as just being more exposure to more

08:16AM 22   people.  That's kind of how I viewed it.

08:16AM 23           I didn't see anything substantively that occurred,

08:16AM 24   you know, that was different from the first one.

08:17AM 25           Then they said, thank you very much.  I said, thank

**C O N F I D E N T I A L**

SM-03-JA000115

08:17AM 1    you very much.  I got in my car, and I drove back to Lafayette.

08:17AM 2        Then I got a call -- I think it must have been a

08:17AM 3    joint call, that's how most of these calls were -- and told me

08:17AM 4    that the parties had met, and that they had decided to select

08:17AM 5    one name.

08:17AM 6        Because, initially, I think Judge Barbier had asked

08:17AM 7    them, he said, "Give me three names, and I'll make an

08:17AM 8    appointment."  What they did is they came up with one name.

08:17AM 9    They wanted to know, if they did that, could I -- would I

08:17AM 10   accept an appointment like that?  Because we were still -- it

08:17AM 11   was general talk at that point.

08:17AM 12        I told them, yes.  I said, "Well, now" -- you know,

08:17AM 13   the devil is in the details.  I said, "Yeah, I need to know

08:17AM 14   more about what it is, but my inclination is yes."

08:17AM 15        I knew a lot about -- not the settlement per se, but

08:18AM 16   about the general process.

08:18AM 17        So it was either -- shortly thereafter, I mean, that

08:18AM 18   Monday or that Tuesday, I came back over here, and they said

08:18AM 19   they are going to submit the names to Judge Barbier.  I didn't

08:18AM 20   even talk to him.

08:18AM 21   Q.    I'm sorry, did they say "name" or "names," pleural?

08:18AM 22   A.    Name, single.  That's what they told me.

08:18AM 23        Then the next thing I knew, he had it under

08:18AM 24   consideration.  Then I was appointed.  I was asked to come back

08:18AM 25   here to start understanding kind of what the details were, I

**C O N F I D E N T I A L**

SM-03-JA000116

08:18AM 1   mean, you know, where they were about settlement negotiations,

08:18AM 2   and we started talking about it.

08:18AM 3         I had to conceptually start thinking about how in the

08:18AM 4   world do you put this thing together?  Because I was told --

08:18AM 5   this is very unique for this case -- it is for me -- I was told

08:19AM 6   initially that we're going to make an appointment -- there were

08:19AM 7   going to be several appointments simultaneously, which I had

08:19AM 8   nothing to do with -- as they were going to appoint some

08:19AM 9   court-appointed vendors that I was to work with, some of which

08:19AM 10  had already been working, were working in the Gulf Coast Claim

08:19AM 11  Facility.

08:19AM 12        BrownGreer, Garden City, and Price Waterhouse were

08:19AM 13  the three; that they would be appointed as the vendors, and I

08:19AM 14  was to work with those people.  They were subject, for lack of

08:19AM 15  a better word, to my general oversight, you know, from their

08:19AM 16  activities.

08:19AM 17        I knew BrownGreer because BrownGreer was the

08:19AM 18  appointed claims company in *Vioxx*, when Judge Fallon, here in

08:19AM 19  this Court -- I was appointed -- I handled that case as the

08:19AM 20  special master, so I knew who they were, and I had worked with

08:20AM 21  their senior people.

08:20AM 22        I knew who Price Waterhouse was, obviously; but, the

08:20AM 23  individual people, etcetera, you know, I had no knowledge of.

08:20AM 24        Then I was told that they were appointing

08:20AM 25  simultaneously with that appointment Postlethwaite &

**C O N F I D E N T I A L**

SM-03-JA000117

08:20AM 1    Netterville, which is another accounting firm, because they

08:20AM 2    wanted to have two accounting firms.  That was worked out,

08:20AM 3    obviously, between BP and the plaintiffs' group.

08:20AM 4    Q.    So you had no role in selecting that?

08:20AM 5    A.    No, none at all.  I mean, I found out then.

08:20AM 6          Then I was also told, as kind of the unknown part of

08:20AM 7    this whole mystery here, as another massive part of this case,

08:20AM 8    is you are going from this voluminous -- this program here, the

08:20AM 9    Gulf Coast Claims program that Ken Feinberg was -- to this

08:21AM 10   program here.  It's a totally different program.  There's no

08:21AM 11   question.

08:21AM 12   Q.    Much more complex?

08:21AM 13   A.    I'm going to explain that to you, if I can, in a minute.

08:21AM 14   But my point being, it will be the transition.  So that was a

08:21AM 15   little animal of its own.  I was in charge of the transition,

08:21AM 16   along with the Judge appointed Lynn Greer, of BrownGreer,

08:21AM 17   because they had been involved and would be involved in both,

08:21AM 18   as kind of transition coordinator working directly with me.

08:21AM 19         Because there were a significant number of claims

08:21AM 20   that were still here which had not been resolved under the

08:21AM 21   protocol of the Gulf Coast Claims Facility.  So I had to take

08:21AM 22   over that and make that transition, get those claims paid; and,

08:21AM 23   simultaneously, under the order, the original order, I was to

08:21AM 24   open the door for this whole program on June 4.  So we really

08:22AM 25   had two things going on.

**C O N F I D E N T I A L**

SM-03-JA000118

08:22AM 1    Q.    New program meaning the new claims process that you would

08:22AM 2    be administering?

08:22AM 3    A.    The new claims process, which is a totally different

08:22AM 4    process.  So 10 words or less, that's the short answer how I

08:22AM 5    got to the door.

08:22AM 6          Then, I will tell you that I thought a long time

08:22AM 7    before I agreed to accept this.  I talked to my family.  I've

08:22AM 8    got three kids, grand kids and a wife.  I had very, very

08:22AM 9    profitable, enjoyable contacts all over, from California to

08:22AM 10   Philadelphia, appointments that I had currently had.  I'm

08:22AM 11   finishing some of those up, which I disclosed to all the

08:22AM 12   parties.

08:22AM 13         Plus, I was doing mediation.  I didn't have to go all

08:22AM 14   over the world.  It really made it nice for me.

08:22AM 15         So I had to make those considerations, you know, to

08:23AM 16   give that up, which I had to give up.

08:23AM 17         The second thing was, this was a big unknown.  I

08:23AM 18   hadn't even seen the Settlement Agreement, didn't know what the

08:23AM 19   terms were, didn't know what they negotiated, etcetera.

08:23AM 20         So when you know that, you know, there is a lot

08:23AM 21   pitfalls that you -- it's a -- you go in at risk knowing that.

08:23AM 22   But, you know, from my simple perspective, it was -- we'll

08:23AM 23   never see one maybe in our lifetime like this again.  I'm

08:23AM 24   75 years old.  I said, maybe it's your choice in history right

08:23AM 25   here.  Go take a lick at it.

**C O N F I D E N T I A L**

SM-03-JA000119

08:23AM 1      So, in short order, that's how I got here.

08:23AM 2   Q.    Mr. Juneau, during that process, the interview process as

08:23AM 3   you've described it to us -- thank you for the explanation --

08:23AM 4   what were you told by any of the parties about what staff or

08:23AM 5   personnel you could bring into your administration process?

08:23AM 6   A.    All they talked about, said, what kind of staff operations

08:24AM 7   do you have -- have you used in others.   I explained to them

08:24AM 8   explicitly what we had done, you know, the activities.   I said

08:24AM 9   it was pure relative to what the demands were because this is

08:24AM 10  an odd deal.   I'm going into this deal with multiple vendors,

08:24AM 11  you know.   I said, that's a hard thing to gauge.

08:24AM 12       We were talking about -- when we were talking -- I

08:24AM 13  remember talking to Keith Moskowitz about this -- I said, "I

08:24AM 14  don't know quite how to gauge that, you know."   I said, "I just

08:24AM 15  finished a case.   It was a massive case, but we were dealing

08:24AM 16  with singular people there that just directly reported to me.

08:24AM 17  We did that with about" -- I'm talking about the staff

08:24AM 18  immediately around me, not the vendor -- "was about seven or

08:24AM 19  eight people.   We've done that.   I can name the cases for you."

08:24AM 20  I said, "But I ain't seen the details.   I don't know what

08:25AM 21  you're expecting."

08:25AM 22       It's kind of an outgrowth after that.   BP sent me --

08:25AM 23  they were very, very active in this.   They asked me to go to

08:25AM 24  Houston and meet with them, wanted me to meet the media people,

08:25AM 25  you know, various things like that.

**C O N F I D E N T I A L**

08:25AM 1      Let me just tell you, I tell everybody, when I go in

08:25AM 2   something like that, I'll meet with anybody anyplace at any

08:25AM 3   time.  If you get something that's of controversy, let's get

08:25AM 4   everybody together.

08:25AM 5      I have an open door here.  You can come and talk to

08:25AM 6   me, whatever you want to talk.  So at that point, I'm trying to

08:25AM 7   solve information.

08:25AM 8      They said --

08:25AM 9   Q.   They meaning BP?

08:25AM 10  A.   BP, yeah.  Well, I told the same thing to plaintiffs'

08:25AM 11  lawyers.  But I remember BP said that -- they sent me -- they

08:25AM 12  said, "We think you need to have a CEO for this, because, you

08:25AM 13  know, in this role you're serving, you wear many hats.

08:25AM 14  Political people pulling here, you got to make appearances

08:26AM 15  here, you got to do this here.  You got people pulling on you,

08:26AM 16  the vendors and the whole thing."

08:26AM 17     I said, "Well, you know, the complexity of this case,

08:26AM 18  I can see that."

08:26AM 19     They submitted -- I think they gave -- they

08:26AM 20  interviewed three people.  A guy named Price Mounger.  He was

08:26AM 21  with AlixPartners, I believe.  I believe they are a consultant

08:26AM 22  for BP now.

08:26AM 23     David Odom, who works for me right now.

08:26AM 24     There was a third guy.  Right offhand, I can't

08:26AM 25  remember.

**C O N F I D E N T I A L**

08:26AM 1        The plaintiffs had submitted the names of about three

08:26AM 2   people.

08:26AM 3   Q.   I'm sorry, the names you just gave us, one you didn't

08:26AM 4   recall, those were names that you got from BP?

08:26AM 5   A.   Yeah.  I got three names from BP.

08:26AM 6   Q.   Including Odom's name?

08:26AM 7   A.   Including Odom's name.  Odom had worked at the Shaw Group

08:26AM 8   here in Baton Rouge, which is a rather substantial company.

08:26AM 9   He's now with Chicago Bridge, since all this has happened.

08:27AM 10  Q.   One was from AlixPartners.

08:27AM 11  A.   An AlixPartner.  I'll think of it maybe during the

08:27AM 12  discussion, but there was a third one because I have the

08:27AM 13  resumé.

08:27AM 14  Q.   Then you said the plaintiffs gave you some names?

08:27AM 15  A.   They gave me two or three names.

08:27AM 16       So what I did was I set up interviews, myself, with

08:27AM 17  each one of those, the three, you know, they had, and all of

08:27AM 18  the ones presented by the plaintiffs.  I weighed all of that.

08:27AM 19       BP had even talked -- I know they had talked to Odom

08:27AM 20  and AlixPartners about even what they thought was reasonable

08:27AM 21  compensation they were willing to pay, because they mentioned

08:27AM 22  to me, you know, at the time of the interview.

08:27AM 23       So I sat down and interviewed all of them

08:27AM 24  extensively.  I didn't even have an office at that point.  I

08:27AM 25  was using -- I'm the special master in *Propulsid*, which is that

**C O N F I D E N T I A L**

SM-03-JA000122

08:27AM 1    national drug case.  It was in the Texaco building.  I had an
08:27AM 2    office there, and I used that to conduct those interviews.
08:28AM 3    That's where we did all of this original meeting.
08:28AM 4            I went through that.  I decided, after all those
08:28AM 5    interviews and testing, what I thought was the expertise of the
08:28AM 6    respective parties.  I felt comfortable.  I selected David Odom
08:28AM 7    of that group.
08:28AM 8            The object there was to have someone come in and deal
08:28AM 9    with the details of the operations.  As a lawyer, as you know,
08:28AM 10   that is probably not our strongest suit of expertise.
08:28AM 11   Q.   You wanted a chief administrative officer, but also a
08:28AM 12   chief executive officer, to run what would be a large and
08:28AM 13   complex business operation?
08:28AM 14   A.   That's correct.  Realizing -- what's called a *Pat Juneau*
08:28AM 15   *check sheet* here -- this is not the normal operation.  I've run
08:28AM 16   law firms.  I've been very active in business.  So I know what
08:29AM 17   it is to run, generally, a business.  I'm not a businessman
08:29AM 18   per se.  You'd have to say I'm primarily a lawyer.
08:29AM 19           This is a unique feature here.  BP was in on this,
08:29AM 20   the plaintiffs were in on this, and the Court was aware of
08:29AM 21   this.  So this is not dissected by anybody.
08:29AM 22           What we are is a collective group of independent
08:29AM 23   contractors by design.  BP wrote the original contracts.
08:29AM 24   Certainly, like with me, I'm an independent contractor.
08:29AM 25           For example, when they took us -- take me, we were --

**CONFIDENTIAL**

SM-03-JA000123

08:29AM 1    not negotiating, we were working out the compensation part of
08:29AM 2    that, which I did with them.  Part of that was, is Mike
08:29AM 3    Juneau -- my son, obviously -- they ran the checks on both of
08:29AM 4    us, I know.  That was part of the clearance that everybody
08:29AM 5    agreed, that's what you want from here.
08:29AM 6            Then, independent contractor, I've got, for
08:29AM 7    example -- Dave Welker, for example, is an independent
08:30AM 8    contractor.  So is the other multiple groups, including
08:30AM 9    David Odom.
08:30AM 10           So what you have here, it's not like a General Motors
08:30AM 11   or a Walmart.  What it is, is independent contractors, which
08:30AM 12   are kind of an overview of it.
08:30AM 13           So I only mention that because it's kind of a hybrid
08:30AM 14   kind of an organization, which these are the cards that I'm
08:30AM 15   dealt with.  That's, accordingly, how we operated.
08:30AM 16           But my point was about this, the chief operating
08:30AM 17   officer thing was to assist in getting -- I knew there was a
08:30AM 18   lot of contracts things involved in that, all of the mechanics
08:30AM 19   of working with people.  I knew I didn't have time to do that.
08:30AM 20   I mean, I was going to be up to here.  So that's primarily what
08:30AM 21   we did.  That's exactly how David Odom was selected.
08:30AM 22
08:30AM 23
08:30AM 24
08:31AM 25



**C O N F I D E N T I A L**

20



CONFIDENTIAL

SM-03-JA000125



C O N F I D E N T I A L

SM-03-JA000126



**C O N F I D E N T I A L.**

SM-03-JA000127



| Time | No. |
|---|---|
| 08:35AM | 1 |
| 08:35AM | 2 |
| 08:35AM | 3 |
| 08:35AM | 4 |
| 08:35AM | 5 |
| 08:35AM | 6 |
| 08:35AM | 7 |
| 08:35AM | 8 |
| 08:35AM | 9 |
| 08:35AM | 10 |
| 08:35AM | 11 |
| 08:35AM | 12 |
| 08:35AM | 13 |
| 08:35AM | 14 |
| 08:36AM | 15 |
| 08:36AM | 16 |
| 08:36AM | 17 |
| 08:36AM | 18 |
| 08:36AM | 19 |
| 08:36AM | 20 |
| 08:36AM | 21 |
| 08:36AM | 22 |
| 08:36AM | 23 |
| 08:36AM | 24 |
| 08:36AM | 25 |

**C O N F I D E N T I A L**

SM-03-JA000128



| | |
|---|---|
| 08:36AM | 1 |
| 08:36AM | 2 |
| 08:36AM | 3 |
| 08:36AM | 4 |
| 08:36AM | 5 |
| 08:36AM | 6 |
| 08:36AM | 7 |
| 08:36AM | 8 |
| 08:37AM | 9 |
| 08:37AM | 10 |
| 08:37AM | 11 |
| 08:37AM | 12 |
| 08:37AM | 13 |
| 08:37AM | 14 |
| 08:37AM | 15 |
| 08:37AM | 16 |
| 08:37AM | 17 |
| 08:37AM | 18 |
| 08:37AM | 19 |
| 08:37AM | 20 |
| 08:37AM | 21 |
| 08:37AM | 22 |
| 08:37AM | 23 |
| 08:37AM | 24 |
| 08:38AM | 25 |

**C O N F I D E N T I A L**

SM-03-JA000129



**C O N F I D E N T I A L**

SM-03-JA000130

26

| Time | # | |
|------|---|---|
| 08:39AM | 1 | |
| 08:39AM | 2 | |
| 08:39AM | 3 | |
| 08:40AM | 4 | |
| 08:40AM | 5 | |
| 08:40AM | 6 | |
| 08:40AM | 7 | |
| 08:40AM | 8 | |
| 08:40AM | 9 | |
| 08:40AM | 10 | |
| 08:40AM | 11 | |
| 08:40AM | 12 | |
| 08:40AM | 13 | |
| 08:40AM | 14 | |
| 08:40AM | 15 | |
| 08:40AM | 16 | |
| 08:40AM | 17 | |
| 08:40AM | 18 | |
| 08:40AM | 19 | |
| 08:40AM | 20 | |
| 08:41AM | 21 | |
| 08:41AM | 22 | |
| 08:41AM | 23 | |
| 08:41AM | 24 | |
| 08:41AM | 25 | |

**CONFIDENTIAL**

SM-03-JA000131



08:41AM   1

08:41AM   2

08:41AM   3

08:41AM   4

08:41AM   5

08:41AM   6

08:41AM   7

08:41AM   8

08:42AM   9

08:42AM  10

08:42AM  11

08:42AM  12

08:42AM  13

08:42AM  14

08:42AM  15

08:42AM  16

08:42AM  17

08:42AM  18

08:42AM  19

08:42AM  20

08:42AM  21

08:42AM  22

08:42AM  23

08:42AM  24

08:42AM  25

**C O N F I D E N T I A L**

SM-03-JA000132



C O N F I D E N T I A L

SM-03-JA000133





08:45AM 14    Q.   Let me direct your attention to the period between your

08:45AM 15    selection and appointment and the establishment and

08:45AM 16    inauguration of the new claims process.   I think you referred

08:45AM 17    to that as *a transition period*?

08:45AM 18    A.   That's how the order reads, right.

08:45AM 19    Q.   During that transition period, did you sit down and spend

08:46AM 20    some time with Mr. Ken Feinberg with respect to understanding

08:46AM 21    the transition process?

08:46AM 22    A.   I went up and met with Ken in Washington.   He and I sat

08:46AM 23    down, and we walked through as he saw the universe.   We would

08:46AM 24    talk about things he thought -- just input from his standpoint.

08:46AM 25         I talked to him -- I don't know how many times --

**C O N F I D E N T I A L**

SM-03-JA000135

08:46AM 1    several times after that, just in general discussion telling

08:46AM 2    him what we were doing in the transition.  We kind of had the

08:46AM 3    mutual understanding, if I saw something that I needed from

08:46AM 4    him, he was very cooperative.  He said, "I'll give you whatever

08:46AM 5    you need."

08:46AM 6         I knew Feinberg before.  We're both members of the

08:46AM 7    International Academy -- not International -- the Academy of

08:46AM 8    Special Masters, Court-Appointed Special Masters.  That's how I

08:47AM 9    knew him.  It was a very fluid discussion.

08:47AM 10   Q.    So you had the one meeting with him in Washington early on

08:47AM 11   in the process?

08:47AM 12   A.    Yes, sir.

08:47AM 13   Q.    Did you attend that meeting by yourself?

08:47AM 14   A.    Yes.  Well, he was the only one there from his standpoint.

08:47AM 15   Q.    During the course of that conversation, did you ask him or

08:47AM 16   did he talk to you about processes he had set up in terms of

08:47AM 17   conflicts administration, codes of conduct, compliance,

08:47AM 18   anything related to those subjects?

08:47AM 19   A.    I don't recall that being discussed, either by me or by

08:47AM 20   him.

08:47AM 21   Q.    After that, you said you had several conversations with

08:47AM 22   him.  Those were telephone conversations?

08:47AM 23   A.    Uh-huh (affirmative response).  It wasn't a lot.  I mean,

08:47AM 24   you know, I said several.  I mean, I can remember -- a few.  I

08:47AM 25   guess we'll put it that way.

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 08:47AM | 1 | Q.    Did you meet separately or speak separately to any members |
| 08:47AM | 2 | of his previous staff, the Gulf claims staff? |
| 08:47AM | 3 | A.    Yeah, I do. |
| 08:47AM | 4 | Q.    Who was that, sir? |
| 08:48AM | 5 | A.    There was a crew that -- there was a big controversy going |
| 08:48AM | 6 | on.  One of the -- one of the main vendors in the program of |
| 08:48AM | 7 | Gulf Coast Claims Facility was the Worley claims group, |
| 08:48AM | 8 | W-O-R-L-E-Y.  They are from Hammond, Louisiana, as I recall. |
| 08:48AM | 9 | They wanted -- they wanted to be involved -- continue |
| 08:48AM | 10 | to be involved.  They had -- they were -- they had a lot of -- |
| 08:48AM | 11 | by background, there were a lot of insurance claims adjusters, |
| 08:48AM | 12 | and they had operated these claim centers and so forth.  They |
| 08:48AM | 13 | were the ones that staffed all of that.  They were coming to me |
| 08:48AM | 14 | asking me to get them put on as -- you know, as part of the |
| 08:48AM | 15 | claims process. |
| 08:48AM | 16 | So I talked on several occasions.  He had a lot of |
| 08:48AM | 17 | people call me, I can tell you that.  I discussed that with -- |
| 08:49AM | 18 | because I didn't know the background of that -- with BP and the |
| 08:49AM | 19 | PSC, you know, about the Worley group.  Their separate, but |
| 08:49AM | 20 | unanimous, agreement was they didn't want to see the Worley |
| 08:49AM | 21 | group touching anything regarding this system. |
| 08:49AM | 22 | I wasn't there when that -- but I had the current |
| 08:49AM | 23 | appointed vendors, so -- I would have had to make a change or |
| 08:49AM | 24 | add to that, so I elected not to make that change, when they |
| 08:49AM | 25 | gave me the input that they gave me. |

**C O N F I D E N T I A L**

SM-03-JA000137

08:49AM  1      Then there was some discussion after that, that BP
08:49AM  2  was going to open up -- had to open up its own separate OPA
08:49AM  3  facility, which it still exists today.  There was an original
08:50AM  4  indication that they would consider the Worley group to do that
08:50AM  5  work.  Worley group thought they were going to do that work.
08:50AM  6      Then, when they opened it up, BP told them they were
08:50AM  7  not going to do that work.  The guy comes back to me and says,
08:50AM  8  "You know, what's all this?"  I said, "I don't have anything to
08:50AM  9  do with that.  I mean, I'm just making a decision, what I've
08:50AM 10  got to do to run this program."
08:50AM 11      But during the course of all that, you know, it was
08:50AM 12  the complaints about the Worley group.  For example, there was
08:50AM 13  a lot of complaints, a ton of complaints that they were
08:50AM 14  negotiating claims, maybe the individual claims, just like an
08:50AM 15  insurance adjuster, and you weren't getting consistent results
08:50AM 16  across the board.  Maybe they were allegedly -- adjusters were
08:50AM 17  making favors for friends they made.  They told me they had to
08:50AM 18  discharge some people to do with all of that.
08:50AM 19      That's kind of what separates this program.  It's not
08:51AM 20  a credit to me.  It's a credit to the Settlement Agreement.
08:51AM 21  This is an objective program.  That's the whole object of this
08:51AM 22  program is you take as much subjectivity as you can out of the
08:51AM 23  process, make it objective, and it won't be a matter like a
08:51AM 24  collision damage between an Allstate adjuster and me saying
08:51AM 25  it's $100 or it's $200 and negotiating back and forth.  The

**C O N F I D E N T I A L**

SM-03-JA000138

08:51AM 1   object is to find out what it's really worth according to the

08:51AM 2   standard and then apply it.

08:51AM 3        So the point about that is that there was a lot of

08:51AM 4   discussion in the early -- I mean, man, I had to have tons of

08:51AM 5   meetings.  I was more focused on doing my job than worrying

08:51AM 6   about all of that employment stuff, which company you employ

08:51AM 7   and so forth; except to say, there was unanimous agreement

08:51AM 8   between the two parties, they didn't want that company involved

08:51AM 9   as an additional vendor in this -- or during any phase of it.

08:51AM 10  Q.   Mr. Juneau, you're describing now the initial part of this

08:52AM 11  process and the background, which is very informative, I

08:52AM 12  appreciate that.

08:52AM 13       Aside from the recommendation of specific individuals

08:52AM 14  for you to consider in terms of your administration office, let

08:52AM 15  me ask you the following question:  Did the parties, and BP in

08:52AM 16  particular, ever submit to you or speak to you about

08:52AM 17  establishing a policy of conflicts for people that would be

08:52AM 18  working in the administration process?

08:52AM 19  A.   I don't remember anything like that.

08:52AM 20  Q.   They never submitted to you a written policy of conflicts

08:52AM 21  and asked you to apply it or consider it?

08:52AM 22  A.   I don't recall anything like that.

08:52AM 23  Q.   The same question as to --

08:52AM 24  A.   Not to me.

08:52AM 25  Q.   The same question as to what we would call *a code of*

**C O N F I D E N T I A L**

SM-03-JA000139

08:52AM 1    *conduct* or *ethics policy*?

08:52AM 2    A.    If they did, it didn't get to me, you know.

08:52AM 3    Q.    Same question with respect to a compliance policy or a set

08:52AM 4    of policies and procedures in the area of compliance?

08:53AM 5    A.    I have no knowledge of that.

08:53AM 6    Q.    As you began to set up your office, did you, yourself, or

08:53AM 7    anybody on your staff draft, initiate any process that would

08:53AM 8    lead to the establishment of those types of policies?

08:53AM 9    A.    Yes.  That's what I told David Odom.  I said, activate,

08:53AM 10   innovate, whatever word you want to use, a process that -- we

08:53AM 11   have tight contractual obligations here, since we're dealing

08:53AM 12   with independent contractors -- to include things of conflict

08:53AM 13   of interest and all that sort of stuff, and establish a code --

08:53AM 14   and I'll go through that with you in just a minute -- a code of

08:53AM 15   conduct that I want the people working here, and circulate

08:53AM 16   that.

08:53AM 17            We established and put in place a program about

08:54AM 18   entertainment, expenses, and regulations that control all of

08:54AM 19   us.  We did that.

08:54AM 20   Q.    You directed Mr. Odom to do that --

08:54AM 21   A.    That's exactly what I did.

08:54AM 22   Q.    -- very early on in his employment?

08:54AM 23   A.    Uh-huh (affirmative response).

08:54AM 24   Q.    Did he do so?

08:54AM 25   A.    Yeah.

**C O N F I D E N T I A L**

SM-03-JA000140

| | |
|---|---|
| 08:54AM | 1 |
| 08:54AM | 2 |
| 08:54AM | 3 |
| 08:54AM | 4 |
| 08:54AM | 5 |
| 08:54AM | 6 |
| 08:54AM | 7 |
| 08:54AM | 8 |
| 08:54AM | 9 |
| 08:54AM | 10 |
| 08:54AM | 11 |
| 08:54AM | 12 |
| 08:54AM | 13 |
| 08:54AM | 14 |
| 08:55AM | 15 |
| 08:55AM | 16 |
| 08:55AM | 17 |
| 08:55AM | 18 |
| 08:55AM | 19 |
| 08:55AM | 20 |
| 08:55AM | 21 |
| 08:55AM | 22 |
| 08:55AM | 23 |
| 08:55AM | 24 |
| 08:55AM | 25 |

Q.    Did he provide you with drafts or ultimately a written statement of those policies?

A.    Yeah.  He -- I'm not trying to preempt the discussion, but it pertains to what you're talking about.

Q.    Yes.  What we might do, because you have some documents, is we'll just designate a number on them.

A.    If you want me to click them through, I mean, you already have -- this is part of the Settlement Agreement.

Q.    I don't think we need that.  You just read from the Settlement Agreement.  That was the prior document in the record.

A.    Right.

      This document was generated by us, by our office.

Q.    So let's call that PJ-1.

      MR. BUCKNAM:  Actually, we have designation.  Please begin with the number PJ-10.  Let's begin anything that you're going to tender to us, please, the first one will be 10, and then take in it sequence after that.

      (WHEREUPON, at this point in the proceedings, Exhibit PJ-10 was marked.)

      THE WITNESS:  The only reason I brought these, because it's obviously a focus of consideration.

      What we did was, is we prepared these documents.  This is the document that goes to these vendors.  I'm including the Court-appointed vendors.  I just put some little tabs here.

**C O N F I D E N T I A L**

SM-03-JA000141

| 08:55AM | 1 | It refers, 2.5, to the code of conduct, which is |
|---|---|---|

08:55AM 1      It refers, 2.5, to the code of conduct, which is

08:55AM 2      attached.

08:55AM 3      BY MR. FREEH:

08:55AM 4      Q.    That's a code of conduct that Mr. Odom drafted --

08:55AM 5      A.    Came from our office.

08:55AM 6      Q.    -- at your direction?

08:55AM 7      A.    That's right.

08:55AM 8           Then, another significant provision is paragraph 8 on

08:56AM 9      page 7 has to do with the confidentiality.  There is a

08:56AM 10     confidentiality thing that has got to be complied with because

08:56AM 11     of a court order, which was very -- a long negotiated, very

08:56AM 12     complex matter.

08:56AM 13          Then I put another tab, which is the code of conduct,

08:56AM 14     you know, that was attached to all of that.

08:56AM 15          This is what has been executed.  I just brought this

08:56AM 16     one as an example.  This one happens to be the Garden City

08:56AM 17     Group, but it's the same for all of them.  That's what all of

08:56AM 18     these vendors signed.

08:56AM 19     Q.    You're referring to PJ-10?

08:56AM 20     A.    10, yeah.

08:56AM 21     Q.    Let me ask you this while we are on PJ-10, before we move

08:56AM 22     on.  In addition to giving them to the vendors, were these

08:56AM 23     published or circulated or given to employees of the

08:56AM 24     administrative office, or was this solely for the vendors?

08:56AM 25     A.    Well, I mean, it's a part of our business records in the

**C O N F I D E N T I A L**

SM-03-JA000142

08:57AM 1    Claims Administrator's Office.  I mean, that's part of our

08:57AM 2    documents that we retained.

08:57AM 3          MR. BUCKNAM:  No, sir.  What we're asking is, did

08:57AM 4    people such as Mr. Odom sign these documents as well as a

08:57AM 5    vendor company like Garden City Group?

08:57AM 6          THE WITNESS:  Anybody that had employees, like --

08:57AM 7    I'll give you an example.  Kirk Fisher's group, you know, that

08:57AM 8    does all this computer work, he signed that, in addition to the

08:57AM 9    Court-appointed vendor.

08:57AM 10          I'm going to just mark this PJ-11.  This is

08:57AM 11   just -- this is the Lionel Sutton one.

08:57AM 12          (WHEREUPON, at this point in the

08:57AM 13   proceedings, Exhibit PJ-11 was marked.)

08:57AM 14          THE WITNESS:  Then we had these individual people.

08:57AM 15   You know, it wasn't a company -- I say company per se.  It

08:57AM 16   might have been the -- it wasn't the Garden City Group or

08:57AM 17   anything like that.

08:57AM 18   BY MR. FREEH:

08:57AM 19   Q.   Individual contractors.

08:57AM 20   A.   Individual contractors.

08:57AM 21        Now, so I said, we've got to have individual

08:57AM 22   contracts with respect to each of these people.

08:58AM 23        Now, I pulled -- this just happened to be the one for

08:58AM 24   Sutton -- and I tabbed on there, we have the various --

08:58AM 25   paragraph 7 on page 4, there is a very specific conflict of

**C O N F I D E N T I A L**

SM-03-JA000143

08:58AM 1    interest provision in that contract.

08:58AM 2    Q.    It's entitled, "Conflict of Interest and Recusal."

08:58AM 3    A.    Yes, sir.

08:58AM 4              MR. BUCKNAM:  Mr. Juneau, just for the record, the

08:58AM 5    document that you're referencing paragraph 7, page 4 of is the

08:58AM 6    document that you just marked PJ-11?

08:58AM 7              THE WITNESS:  That is correct.

08:58AM 8              MR. BUCKNAM:  Thank you.

08:58AM 9              THE WITNESS:  Now, with all those people, Reitano --

08:58AM 10   anybody, anybody was in that -- signed that document.

08:58AM 11             I don't know what y'all -- I don't know the

08:58AM 12   whole breadth of the question.  I do remember this -- and you

08:58AM 13   probably -- it dovetails into that.  After doing that, I

08:59AM 14   remember I told David Odom, and he did it.  They had, I know,

08:59AM 15   at least one staff meeting after all this where they reviewed

08:59AM 16   with the staff -- that would include people like Sutton -- the

08:59AM 17   code of conduct.

08:59AM 18             He can address that because he's the one that

08:59AM 19   conducted the meeting, but I know we did that.  That's in

08:59AM 20   addition to signing that document.

08:59AM 21   BY MR. FREEH:

08:59AM 22   Q.    Did you ever conduct a meeting with all the staff or all

08:59AM 23   the employees and discuss issues of conflict or recusal, to

08:59AM 24   your knowledge?

08:59AM 25   A.    That's that staff meeting I'm talking about.

**C O N F I D E N T I A L**

SM-03-JA000144

08:59AM 1    Q.    Were you present there?

08:59AM 2    A.    You know, I might have been there for a part of that

08:59AM 3    meeting.  I know I instructed Odom to do that.  He could tell

08:59AM 4    you specifically.

08:59AM 5          I think -- I go in and out of a lot of meetings in a

09:00AM 6    day's time, but -- I seem to recall having been there, but I

09:00AM 7    can't say that for sure.

09:00AM 8    Q.    Let me just take the instance of Mr. Sutton, who we're

09:00AM 9    going to talk about in a moment after we give our reporter a

09:00AM 10   short break.  But you did mark it as an exhibit, and we are

09:00AM 11   then referring to Mr. Sutton.

09:00AM 12         In other words, when he was brought on board,

09:00AM 13   obviously, he signed this document, as you've indicated and as

09:00AM 14   we have ourselves confirmed; is that correct?

09:00AM 15   A.    Yeah.

09:00AM 16   Q.    Are you the individual who hired Mr. Sutton?

09:00AM 17   A.    I guess you could say -- yeah, I think so.

09:00AM 18   Q.    Did anyone recommend that you hire him, if you recall?

09:00AM 19   A.    No.  I don't think -- I mean, I don't remember anybody --

09:00AM 20   this is what I remember.  I remember he sought the employment.

09:00AM 21         Obviously, his wife, she had been there since the

09:01AM 22   inception.  I knew Sutton before.  He was from New Iberia,

09:01AM 23   Louisiana.  He had worked for me for a short period of time, I

09:01AM 24   don't know, maybe a year -- I don't know how many years ago,

09:01AM 25   15 years ago or something like that -- in Lafayette, Louisiana.

**C O N F I D E N T I A L**

SM-03-JA000145

09:01AM 1    I hadn't seen that guy.  I had no contact with him

09:01AM 2  subsequent to that.

09:01AM 3    I hired his wife.  Then he came and said he would

09:01AM 4  like to work.  I considered that.  I said, "Well, give me your

09:01AM 5  resumé."

09:01AM 6    I took the resumé.  I went through the same process

09:01AM 7  as I told you I did with everybody else, both sides.  Said they

09:01AM 8  did a background check, the same process.

09:01AM 9    I considered it.  I talked to him.  I talked -- I

09:01AM 10  knew that he knew a lot about -- because he was from

09:01AM 11  New Iberia, Louisiana -- the fishing industry, the boats and

09:01AM 12  things like that; and, to me -- that was an asset to me.

09:02AM 13    It's like saying -- if you're talking about a keel of

09:02AM 14  a boat, you don't have to explain to somebody what that is.

09:02AM 15    So the short answer to your question is I'm the one

09:02AM 16  that made that decision.

09:02AM 17  Q.   When you said you submitted his name or resumé to BP, did

09:02AM 18  they express any reservations about hiring him?

09:02AM 19  A.   I don't remember any.  The only one -- the only one I

09:02AM 20  remember expressing any reservation -- I remember David Odom

09:02AM 21  telling me, he said, "You know, I don't think it's

09:02AM 22  necessarily" -- "because you got a man and wife employee."  He

09:02AM 23  said that.

09:02AM 24    MR. BUCKNAM:  Did Keith Moskowitz ever make any

09:02AM 25  statement along those lines to you, on behalf of BP?

**C O N F I D E N T I A L**

SM-03-JA000146

09:02AM  1          THE WITNESS:  I don't remember any.

09:02AM  2          MR. TIDWELL:  Sir, what was Odom's role and job

09:02AM  3  description and title to be?

09:02AM  4          THE WITNESS:  Well, I call it *chief executive*

09:02AM  5  *officer*.

09:02AM  6          MR. TIDWELL:  I'm sorry, I apologize.  What was

09:02AM  7  Sutton's job description and role?

09:02AM  8          THE WITNESS:  On the legal, that is, to handle the

09:03AM  9  legal inquiries, do the legal research, assist in the

09:03AM 10  responding to innumerable requests.

09:03AM 11          We get e-mails, telephone calls every day.

09:03AM 12  Assist in any of those questions that come up and respond to

09:03AM 13  anything like that, respond to any assigned responsibilities I

09:03AM 14  give regarding a legal question that affects what we're doing.

09:03AM 15          MR. TIDWELL:  So you were increasing your legal

09:03AM 16  staff?

09:03AM 17          THE WITNESS:  Yes.  That's accurate.

09:03AM 18  BY MR. FREEH:

09:03AM 19  Q.   Let me talk about --

09:03AM 20  A.   We were getting undulated at that point.

09:03AM 21  Q.   Let me talk about Mr. Sutton a little bit and ask you some

09:03AM 22  questions.  You said you had previously worked with him before?

09:03AM 23  A.   Yeah.

09:03AM 24  Q.   What was your opinion of him as a lawyer and a

09:03AM 25  practitioner?

**C O N F I D E N T I A L**

09:03AM  1    A.    I thought he was a pretty good lawyer.

09:03AM  2    Q.    When you hired him and when you were in the process of

09:03AM  3    hiring him, did you call anybody or attempt to check any

09:03AM  4    references with respect to his professional abilities?

09:03AM  5    A.    Well, you know, I knew personally about it.  I didn't call

09:04AM  6    anybody at that point, myself, because I thought I had a

09:04AM  7    personal knowledge, in dealing with him on a day-to-day basis

09:04AM  8    over an extended period of time.  I knew what his level of

09:04AM  9    legal talent was.

09:04AM 10    Q.    You said, I think, that he approached you and inquired

09:04AM 11    about the employment opportunities?

09:04AM 12    A.    That's my recollection.

09:04AM 13    Q.    Did his wife, prior to that, ask you to consider hiring

09:04AM 14    him, if you recall?

09:04AM 15    A.    I think she did, yeah.  I would say it was a

09:04AM 16    combination -- we had a combination of the two together or

09:04AM 17    separately; but, both did, yes.

09:04AM 18    Q.    Did you bring to his attention when you were speaking with

09:04AM 19    him that he needed to sign a form or an agreement that would

09:04AM 20    agree to certain provisions?

09:04AM 21    A.    This I remember like it was yesterday, because it's a talk

09:04AM 22    I've given -- not a talk, a snippet I give to everybody.  "Let

09:04AM 23    me tell you something" -- that's, I think, the words I used --

09:04AM 24    "if you're going to work for this program, you can't have any

09:04AM 25    interest, any financial interest at all in this program.  From

**C O N F I D E N T I A L**

SM-03-JA000148

09:05AM 1    this day forward, you have no financial interest.  You might

09:05AM 2    have had a claim before.  You've got to discharge the claim.

09:05AM 3    You've got to get it out of here.  You can't have any claim in

09:05AM 4    the future.  You can't have any reversionary interest or

09:05AM 5    anything else in any claim."  I mean, I tell that to everybody.

09:05AM 6    Q.    Did you tell that to Mr. Sutton?

09:05AM 7    A.    I did.

09:05AM 8    Q.    Did he appear to understand it?

09:05AM 9    A.    Oh, clearly.

09:05AM 10   Q.    Did he ask any questions to clarify it?

09:05AM 11   A.    No.  He said, "I represent a few," you know, "I have a few

09:05AM 12   claimants I've represented, but I'll recommend" -- "I'll give

09:05AM 13   them the names of attorneys and refer that out and discharge

09:05AM 14   any obligation and will not take any compensation for having

09:05AM 15   represented those people."

09:05AM 16   Q.    He said this during the interview process with you?

09:05AM 17   A.    I did.

09:05AM 18   Q.    Did he identify the names of any of those clients?

09:05AM 19   A.    You know, Judge, he may have mentioned one name.  I'm not

09:06AM 20   saying he did or didn't.  But if he did, I said, "Well, I can

09:06AM 21   tell you one thing, that is history.  You would have to

09:06AM 22   discharge that.  You ain't got nothing to do with it."

09:06AM 23   Q.    So you don't recall that he did mention a name?

09:06AM 24   A.    I don't want to say something that -- I just don't have

09:06AM 25   any specific recollection, but I'm not saying that he didn't.

**C O N F I D E N T I A L**

SM-03-JA000149

09:06AM 1    Q.    So as you sit here today, do you recall him mentioning the

09:06AM 2    name *Casey Thonn* as one of his cases?

09:06AM 3    A.    You know, I've heard -- I'm trying to decipher today if I

09:06AM 4    heard it, but I sure know about it now.  I'm not sure that --

09:06AM 5    he may have mentioned that name, you know, at the time.

09:06AM 6    Because he said he just represented a few claimants, it would

09:06AM 7    make sense, I guess, that he might have mentioned that name.

09:06AM 8         I would have clearly told him, "Partner, you got to

09:06AM 9    get rid of that claim.  You have no representation today or

09:06AM 10   tomorrow.  I don't want anybody in this case to have anything

09:06AM 11   to do with any claim."

09:06AM 12   Q.    You said you would have.  Did you, in fact, tell him that?

09:06AM 13   A.    Oh, yeah.

09:06AM 14   Q.    Did he express any resistance or reservations?

09:07AM 15   A.    No, sir.

09:07AM 16   Q.    Did you tell him that he would have to sign a piece of

09:07AM 17   paper that would talk about having no conflicts or not

09:07AM 18   maintaining any conflicts?

09:07AM 19   A.    Judge, the details of which I don't remember, but I'm sure

09:07AM 20   I conveyed to him that we're going to have contractual

09:07AM 21   agreements that we're going to be signing here, and they are

09:07AM 22   going to confirm everything I'm telling you here verbally.

09:07AM 23   Q.    Was it your understanding, Mr. Juneau, that he was coming

09:07AM 24   aboard as a part-time or a full-time employee?

09:07AM 25   A.    It was full time, but I knew he was wrapping up.  He still

**CONFIDENTIAL**

SM-03-JA000150

09:07AM 1   had a few things he was handling, which was true of most
09:07AM 2   everybody in this situation, including me.
09:07AM 3            So I was aware he had some things he was still
09:07AM 4   wrapping up and doing; but, for all intents and purposes, he
09:07AM 5   was a full-time employee.
09:07AM 6   Q.   Was it your understanding then or was it ever your
09:07AM 7   understanding after that, that if he was a part-time employee,
09:08AM 8   he would not be subject to the same conflicts provisions as
09:08AM 9   others?
09:08AM 10  A.   Oh, no.  Those rules apply under any measure.
09:08AM 11  Q.   Did you learn at some point that he had reservations or
09:08AM 12  objections to certain parts of the employment agreement?
09:08AM 13  A.   You know, David Odom mentioned to me that he was concerned
09:08AM 14  about something, if he did some outside work on something, does
09:08AM 15  that preclude him from doing it.
09:08AM 16           David Odom told me he sat down and they worked
09:08AM 17  through that contractual dispute -- not dispute, a question.
09:08AM 18  Q.   This is before he went to work or before he signed the
09:08AM 19  agreement?
09:08AM 20  A.   I think that's true, yeah.
09:08AM 21  Q.   But you had none of those discussions directly with
09:08AM 22  Mr. Sutton?
09:08AM 23  A.   No.  I let Mr. Odom handle it.
09:08AM 24  Q.   Did you learn at any time before this matter became
09:09AM 25  public, which led to our appointment, did you learn at any time

**C O N F I D E N T I A L**

SM-03-JA000151

| | |
|---|---|
| 09:09AM 1 | that Mr. Sutton was in a business relationship with |
| 09:09AM 2 | Glen Lerner? |
| 09:09AM 3 | A.     You know what I do remember, to answer that question, I |
| 09:09AM 4 | think Mr. Sutton told me, he said, "I have an interest in a |
| 09:09AM 5 | company named Crown."  I said, "Does Crown" -- I said, "Does |
| 09:09AM 6 | Crown have any claim or have anything to do with this |
| 09:09AM 7 | litigation?"  "No, it does not." |
| 09:09AM 8 | I said, "Because it cannot and cannot in the future |
| 09:09AM 9 | have anything to do with it, if that's what your interest is." |
| 09:09AM 10 | I just happen to remember that name.  I don't remember the name |
| 09:09AM 11 | of Lerner. |
| 09:09AM 12 | Q.     At which point did he have this conversation with you |
| 09:09AM 13 | about Crown?  Not Lerner, but Crown? |
| 09:09AM 14 | A.     That was earlier.  Real early on. |
| 09:10AM 15 | Q.     Before he was working -- |
| 09:10AM 16 | A.     Yeah, when I was talking.  That's right.  I was saying, |
| 09:10AM 17 | "Do you represent anybody," and so forth.  He said, "Well, |
| 09:10AM 18 | I'm" -- and I think he mentioned, "I'm an officer" -- or "I |
| 09:10AM 19 | have some interest in Crown."  I said, "Okay." |
| 09:10AM 20 | Then I told him just what I just told you.  I think |
| 09:10AM 21 | that was real early in the -- even before the execution of that |
| 09:10AM 22 | agreement. |
| 09:10AM 23 | Q.     Do you recall him mentioning that a man named Lerner was |
| 09:10AM 24 | associated with Crown? |
| 09:10AM 25 | A.     Judge, I don't remember that. |

**C O N F I D E N T I A L**

SM-03-JA000152

| | | |
|---|---|---|
| 09:10AM | 1 | Q.   At that point in time -- he's coming aboard in November of |
| 09:10AM | 2 | 2012 -- would you have recognized the name Glen Lerner? |
| 09:10AM | 3 | A.   No, not really. |
| 09:10AM | 4 | Q.   Are you familiar with a firm in New Orleans called |
| 09:10AM | 5 | *Andry Lerner*? |
| 09:10AM | 6 | A.   I'm familiar with The Andry Law Firm.  I knew about that |
| 09:10AM | 7 | name. |
| 09:10AM | 8 | Q.   But the name Glen Lerner was not familiar to you? |
| 09:10AM | 9 | A.   Lerner was not familiar to me, no. |
| 09:10AM | 10 | Q.   Did Mr. Sutton tell you at any time that he was receiving |
| 09:10AM | 11 | payments from Mr. Lerner? |
| 09:11AM | 12 | A.   No, sir, I don't recall anything like that. |
| 09:11AM | 13 | Q.   Did Mr. Sutton or anyone else tell you, prior to these |
| 09:11AM | 14 | events becoming public, that Mr. Lerner was partners with |
| 09:11AM | 15 | Jon Andry in the Andry Lerner Law Firm? |
| 09:11AM | 16 | A.   I don't remember any discussions like that. |
| 09:11AM | 17 | Q.   You said you don't recall, at least before the matters |
| 09:11AM | 18 | here became public, the name Andry Lerner Law Firm? |
| 09:11AM | 19 | A.   I really don't.  I remember Sutton saying -- you remember |
| 09:11AM | 20 | when I told you, I said, "Well, if you've got a claim, you |
| 09:11AM | 21 | can't" -- "you can't represent anybody in this thing, today or |
| 09:11AM | 22 | tomorrow, in the future." |
| 09:11AM | 23 |      I think he may have told me that, "I referred" -- "I |
| 09:11AM | 24 | gave two names of firms to go to."  I think one of the names -- |
| 09:11AM | 25 | I remember the name Andry is a firm he suggested these people |

**C O N F I D E N T I A L**

SM-03-JA000153

09:11AM 1    consider.  There was some other name, of which I don't recall,
09:11AM 2    but I don't think that name was Lerner.
09:11AM 3    Q.    This was, again, at the time you were having these
09:11AM 4    employment discussions with him?
09:11AM 5    A.    Initial discussions.
09:11AM 6    Q.    You made it absolutely clear to him, your testimony here
09:12AM 7    this morning, that whatever financial interest he may have had
09:12AM 8    or whatever claim he had, he could have no further interest
09:12AM 9    once he came to work for you?
09:12AM 10   A.    Unquestionably.
09:12AM 11   Q.    You told us before he didn't question that or ask you any
09:12AM 12   clarifications or specifics?
09:12AM 13   A.    No.
09:12AM 14   Q.    It was your understanding that he fully understood what
09:12AM 15   you were telling him?
09:12AM 16   A.    Certainly.  If I didn't think that, I would have clarified
09:12AM 17   it.
09:12AM 18   Q.    Are you familiar with an entity called *Romeo Papa*?
09:12AM 19   A.    No -- you know, no.  That name popped up in the later
09:12AM 20   stages of this thing.  I had never heard of that name.
09:12AM 21   Q.    Okay.  When you say later stages, do you mean after this
09:12AM 22   matter became public?
09:12AM 23   A.    That's right.
09:12AM 24   Q.    Within the last few weeks?
09:12AM 25   A.    Yeah.  Relatively short period of time.

**C O N F I D E N T I A L**

09:12AM 1    Q.   Do you recall ever having a conversation with Mr. Sutton
09:13AM 2    where he mentioned the name Romeo Papa?
09:13AM 3    A.   No, sir.
09:13AM 4    Q.   Do you recall ever having a conversation with Mr. Sutton
09:13AM 5    when he told you he had an interest in a company named
09:13AM 6    Romeo Papa?
09:13AM 7    A.   No.  I don't recall any such conversation.
09:13AM 8    Q.   Any recollection of a conversation where Mr. Sutton told
09:13AM 9    you he was working in conjunction with a man named Perez?
09:13AM 10   A.   No, sir.
09:13AM 11   Q.   Did Mr. Sutton ever tell you that he had an interest in a
09:13AM 12   company that was a claimant before the administrative office?
09:13AM 13   A.   No, sir.
09:13AM 14   Q.   Did he ever ask you for permission to stay associated with
09:13AM 15   a company that was a current claimant before the administration
09:13AM 16   office?
09:13AM 17   A.   No, sir.
09:13AM 18   Q.   Had he asked you that, what would you have told him?
09:13AM 19   A.   No.
09:13AM 20         (WHEREUPON, at this point in the proceedings,
09:13AM 21   Exhibit PJ-4B was marked.)
09:13AM 22   BY MR. FREEH:
09:13AM 23   Q.   Let me show you what we've marked as 4B.  Let's leave it
09:14AM 24   this way.  You've not seen this document before, so I would ask
09:14AM 25   you to take a look at it.

**C O N F I D E N T I A L**

SM-03-JA000155

09:14AM 1      It purports to be a Secretary of State Louisiana
09:14AM 2  document or public report.  Again, talks about a company called
09:14AM 3  *Romeo Papa* and lists some officers.  I would ask if any of that
09:14AM 4  is familiar to you?
09:14AM 5  A.   No, sir.
09:14AM 6  Q.   Do you recall ever having a conversation with Mr. Sutton
09:14AM 7  where you described to him a situation involving one of your
09:14AM 8  sons, a doctor, who had a claim that couldn't be processed
09:14AM 9  because you were the administrator?  If you recall?
09:15AM 10 A.   I may have had a conversation with him; but, the reason I
09:15AM 11 say that is because it came up -- I have a son that's a doctor,
09:15AM 12 and I found out he had filed a claim.  There were a lot of
09:15AM 13 claimants out there.
09:15AM 14      I told Keith Moskowitz -- I'm the one that told
09:15AM 15 him -- I said, "My son is not part of what we're doing.  He's a
09:15AM 16 doctor, got his own separate practice.  He's got a claim.  Is
09:15AM 17 that a problem for y'all," you know.
09:15AM 18      He really didn't say anything.  He nodded, you know,
09:15AM 19 like -- nothing.  I never heard any more about it.
09:15AM 20      Then we did -- I think Mike came up, and we sent him
09:15AM 21 a letter.  He said, "Well, we never responded, but I never told
09:15AM 22 you anything."  It didn't add up to me because I was the guy
09:16AM 23 that raised the issue.
09:16AM 24      Then when he said, "Well, that may be a problem for
09:16AM 25 us," I said, "Well, then I'll tell my son if you think that."

**C O N F I D E N T I A L**

SM-03-JA000156

09:16AM 1   I talked to my son.  He said, "Well if that's the case, we'll
09:16AM 2   withdraw the claim."  That's what happened.  I told him that.
09:16AM 3        But I don't remember, to answer your question --
09:16AM 4   Q.   My question is, did you ever have that discussion with
09:16AM 5   Mr. Sutton that you recall?
09:16AM 6   A.   You know, I really don't -- I'm -- I may have mentioned
09:16AM 7   this to Sutton or somebody in my office that we had this claim.
09:16AM 8   I'm saying that could have happened.
09:16AM 9   Q.   Let me ask the question another way.  I'm not trying to
09:16AM 10  confuse.  I'm trying to --
09:16AM 11  A.   Sure.
09:16AM 12  Q.   -- ask a question based on what someone else has told me.
09:16AM 13       So you said Mr. Sutton never came to you and said he
09:16AM 14  was associated with a company called *Romeo Papa*?
09:16AM 15  A.   I don't ever recall that.
09:16AM 16  Q.   Leaving aside the name Romeo Papa, you don't recall
09:16AM 17  Mr. Sutton ever coming to you after he went to work for you and
09:16AM 18  saying, "I am related to a current claimant before the office"?
09:17AM 19  A.   I don't ever recall that, no, sir.
09:17AM 20  Q.   You don't recall a situation where he made that type of
09:17AM 21  statement to you or any other type of statement to you, where
09:17AM 22  you responded by giving the example of your own son and your
09:17AM 23  own experience with being connected to a claimant?
09:17AM 24  A.   I really don't recall that.
09:17AM 25       (WHEREUPON, at this point in the proceedings,

**C O N F I D E N T I A L**

SM-03-JA000157

09:17AM 1   Exhibit PJ-4C was marked.)

09:17AM 2   BY MR. FREEH:

09:17AM 3   Q.   The other documents I have I'm just going to show you for

09:17AM 4   the record.  Again, they purport to be -- they don't purport to

09:17AM 5   be.  They are *Deepwater Horizon* Claims Center documents

09:17AM 6   regarding Romeo Papa.

09:17AM 7          This is 4C.  Again, you haven't seen these documents

09:17AM 8   before, and I'm just showing them to you to see if they refresh

09:17AM 9   any recollection about that name, and particularly that name in

09:17AM 10  connection with Mr. Sutton?

09:17AM 11  A.   No, sir.

09:18AM 12         MR. BUCKNAM:  May I ask a question, please?

09:18AM 13         MR. FREEH:  Yes.

09:18AM 14         MR. BUCKNAM:  Mr. Juneau, when you -- a few moments

09:18AM 15  ago you were talking about Mr. Sutton's wind-down of his

09:18AM 16  practice as he was coming aboard your staff.  Do you recall

09:18AM 17  talking about that?

09:18AM 18         THE WITNESS:  Yes.

09:18AM 19         MR. BUCKNAM:  You mentioned that that was consistent

09:18AM 20  with what many other people had to do as they were coming on

09:18AM 21  board?

09:18AM 22         THE WITNESS:  Uh-huh (affirmative response).

09:18AM 23         MR. BUCKNAM:  Did you understand him at that point

09:18AM 24  with respect to representing claimants that that work consisted

09:18AM 25  merely of transitioning them over to new counsel?

**C O N F I D E N T I A L**

09:18AM 1          THE WITNESS:  No.  I think I was aware he might have

09:18AM 2    had something that he was -- that didn't have anything to do

09:18AM 3    with the BP litigation.  He had something he was handling, and

09:18AM 4    he was finishing and still dealing with that matter.  That's

09:18AM 5    what I meant by that.

09:18AM 6          MR. BUCKNAM:  But with respect to claimants, the only

09:19AM 7    thing to be done at that point as he came aboard was to

09:19AM 8    transition those claimants over to new counsel, because he

09:19AM 9    would not have any continuing role representing claimants once

09:19AM 10   on board with your staff?

09:19AM 11         THE WITNESS:  Absolutely.  Absolutely.

09:19AM 12         MR. TIDWELL:  One to sort of follow on to that, sir,

09:19AM 13   if I may.  So he didn't advise you in any way that he had --

09:19AM 14   that he was representing claimants in other matters?

09:19AM 15         THE WITNESS:  I think I knew -- I think he said he

09:19AM 16   represented other -- he represented people who were not

09:19AM 17   claimants in this action.  I think I recall in the back of my

09:19AM 18   head he represented some guy in an automobile accident or

09:20AM 19   something, I think he said.  I don't even know who that was.

09:20AM 20         I said, "Is that" -- but he didn't represent

09:20AM 21   anybody that had any interest in the BP litigation, I mean, if

09:20AM 22   I'm making myself clear.  I just seem to recall that.

09:20AM 23         MR. TIDWELL:  Do you recall him saying whether or not

09:20AM 24   the gentleman that he was representing in the auto claim was a

09:20AM 25   claimant?

**C O N F I D E N T I A L**

SM-03-JA000159

09:20AM 1          THE WITNESS:  I really don't remember.  I just don't

09:20AM 2    have that degree of recollection.

09:20AM 3    BY MR. FREEH:

09:20AM 4    Q.   Mr. Juneau, if you had learned during the course of your

09:20AM 5    administration that Mr. Sutton, while he was working for you,

09:20AM 6    was receiving monetary payments which were referral payments

09:20AM 7    for a prior client who was a current claimant before the

09:20AM 8    administration process, what, if anything, would you have done?

09:21AM 9    A.   Well, the first thing, I would have been one ticked off

09:21AM 10   Cajun.  That's number one.

09:21AM 11          Number two, he would have been out of there

09:21AM 12   instantaneously, and I would have reported that.

09:21AM 13   Q.   Similar type question, hypothetical question, if you had

09:21AM 14   learned that he was the partner of a claimant who was currently

09:21AM 15   pursuing a matter before the administration, what would you

09:21AM 16   have done about that?

09:21AM 17   A.   The same thing.

09:21AM 18   Q.   If he had come to you and disclosed to you that he was a

09:21AM 19   partner of a current claimant before the administration while

09:21AM 20   he was a employee, what, if anything, would you have done or

09:21AM 21   said to him?

09:21AM 22   A.   I would have considered that a violation of what the

09:21AM 23   original commitment was.

09:21AM 24   Q.   There came a time when you became aware of certain

09:21AM 25   allegations regarding Mr. Sutton receiving monies related to

**C O N F I D E N T I A L**

SM-03-JA000160

09:22AM 1    claims before the administration, correct?

09:22AM 2    A.    That's right.

09:22AM 3    Q.    Approximately when was that?

09:22AM 4    A.    May 30.

09:22AM 5    Q.    How did you first learn of that, sir?

09:22AM 6    A.    I was speaking at a convention in Chicago on the 28th.    I

09:22AM 7    came back.    I got back here on the 30th.

09:22AM 8         Dave Welker and David Odom, as I recall, came into my

09:22AM 9    office.    Dave Welker told me that an anonymous source had

09:22AM 10   reported to him that there was some improper activity by

09:22AM 11   Lionel Sutton, and that had been reported to him.    He didn't

09:22AM 12   have any documents.    He didn't have anything other than he said

09:22AM 13   that he may have had some dealings -- I think -- it's detailed

09:22AM 14   in that report, but -- and I rely on that written report

09:23AM 15   because that's my best recollection -- but had gotten a

09:23AM 16   referral fee or something on some claims that were in the

09:23AM 17   *Deepwater Horizon*.    I vividly remember that.

09:23AM 18        I told him, I said, "David, let me tell you

09:23AM 19   something.    You got a lot more expertise in investigations than

09:23AM 20   I do.    You do whatever you got to do, however you think you got

09:23AM 21   to do it, to investigate this thing, and let's get to the

09:23AM 22   bottom of this thing because we've got to get this thing

09:23AM 23   cleared up."    That was on the 30th of May.

09:23AM 24   Q.    On the 30th of May, was there any discussion about talking

09:23AM 25   to Mr. Sutton or confronting Mr. Sutton at that time, to your

**C O N F I D E N T I A L**

SM-03-JA000161

09:23AM 1    recollection?

09:23AM 2    A.    No, I don't think so.

09:23AM 3    Q.    You instructed David to continue the investigation, do

09:23AM 4    whatever he could to get to the bottom of it?

09:23AM 5    A.    Yeah.

09:23AM 6    Q.    Did he then continue to report to you on a regular basis

09:23AM 7    as to the progress of this investigation?

09:23AM 8    A.    Yes.   I can't remember the intervals, but I remember

09:24AM 9    seeing him in the halls.   We're real close to each other.   He

09:24AM 10   told me he was continuing in the investigation of this matter.

09:24AM 11   He was running public records and doing other things.

09:24AM 12   Q.    By that time -- if you need the report to refresh your

09:24AM 13   recollection, that's okay -- you were aware that it related to

09:24AM 14   a claim by the name of *Casey Thonn*?

09:24AM 15   A.    I think so.

09:24AM 16   Q.    Did you take any steps, as the administrator, in terms of

09:24AM 17   notifying any of the parties or the Court at that time?

09:24AM 18   A.    I didn't -- you know, David and I talked about that.   We

09:24AM 19   were trying to get some meat on the bone before -- I said -- I

09:24AM 20   probably mentioned to David that I wanted to get some meat on

09:24AM 21   the bone because I've got to address this matter to the Court;

09:24AM 22   but, I know he's going to ask me, "Show me some facts, show me

09:24AM 23   some meat."

09:24AM 24   Q.    Did there come a point when you felt that you had

09:25AM 25   sufficient information to take some direct action, either with

**C O N F I D E N T I A L**

09:25AM 1    Mr. Sutton or to report it to someone?

09:25AM 2    A.    There did.

09:25AM 3    Q.    Approximately when was that?

09:25AM 4    A.    Well, that's when I called -- they completed their e-mail

09:25AM 5    research that we were doing.

09:25AM 6    Q.    When you say "they," you mean Mr. Welker?

09:25AM 7    A.    Welker was working with Chris Reade, and they were doing

09:25AM 8    all that.  I remember, they gave it to me late one evening, as

09:25AM 9    I recall.  They completed it.

09:25AM 10            I remember when I got that, I called Judge Barbier

09:25AM 11   that night, and I told him that I needed to meet with him.

09:25AM 12   David was trying to put up a -- just a narrative of what we had

09:25AM 13   learned thus far.

09:25AM 14            So, I think at 9 o'clock the next morning, I go over

09:25AM 15   to federal court, and I had this tentative report.  I said,

09:25AM 16   "This is what we found."  I said, "This concerns me."  I said,

09:26AM 17   "This is" -- "these things look like trouble to me."

09:26AM 18            Then we discussed the matter.  The Magistrate was --

09:26AM 19   I think she was there when we did that.  Then, the discussion

09:26AM 20   was, well, we need to -- it seems appropriate to tell both

09:26AM 21   parties, and Judge Barbier said, "I'm going to call them in."

09:26AM 22            I think it was about 2:00 or 2:30 that afternoon, he

09:26AM 23   called BP in, and he called the PSC in.  We were still working

09:26AM 24   on finalizing more details of the report.  He brought them in,

09:26AM 25   and he said, "Well, Pat, tell them what you had reported to

**C O N F I D E N T I A L**

SM-03-JA000163

| | |
|---|---|
| 09:26AM | 1 |

09:26AM 1    me," and I told them.

09:26AM 2    Q.    Was Mr. Welker present?  If you recall?

09:26AM 3    A.    You know, I don't think David was there.

09:26AM 4    Q.    So you were --

09:26AM 5    A.    Well, wait a minute.

09:26AM 6    Q.    -- you were presenting the report, the information?

09:26AM 7    A.    Yeah, I had it in writing.  He said -- and I said, "Well,

09:27AM 8    this is not a complete report."  I mean, "We're still looking

09:27AM 9    at this matter."

09:27AM 10          The Judge -- and he said, "Well, give them a copy."

09:27AM 11    I gave them a copy, you know, and explained to them what it

09:27AM 12    was.

09:27AM 13          Then the aftermath of that was -- and it was very

09:27AM 14    clear to me what we were doing -- we were dealing in confidence

09:27AM 15    until we get this thing straightened out.

09:27AM 16          I left there about 4:30 that afternoon.  I think the

09:27AM 17    guy with the AP called me at 5 o'clock and asked he -- he

09:27AM 18    apparently had a copy of that report.  He said BP had given him

09:27AM 19    the report, and asked me whether I had a comment about it.  I

09:27AM 20    said I had no comment, you know.

09:27AM 21    Q.    Approximately what date was that, if you can reconstruct

09:27AM 22    it from your papers there?  Direct your attention to the end of

09:28AM 23    May.

09:28AM 24    A.    I'm sure you all have that, do you not?  That's the

09:28AM 25    investigative report.

**C O N F I D E N T I A L**

SM-03-JA000164

09:28AM 1   Q.   Yes, we do.

09:28AM 2   A.   That was Holstein's letter to me.  Then I wrote --

09:28AM 3   Q.   We'll probably, just for the record, call that JP-12.

09:28AM 4           (WHEREUPON, at this point in the proceedings,

09:28AM 5   Exhibit JP-12 was marked.)

09:28AM 6           THE WITNESS:  Let me just make note.  It's composed

09:28AM 7   of two things.  One is it's the Mark Holstein letter to the

09:28AM 8   Court dated June 21, to the Court.  This is my reply to the

09:28AM 9   Court.

09:28AM 10  BY MR. FREEH:

09:28AM 11  Q.   So it's two documents in PJ-12?

09:28AM 12  A.   Apparently --

09:28AM 13          MR. BUCKNAM:  Excuse me.  Just for the sake of the

09:28AM 14  record, may we please mark Mr. Holstein's letter as PJ-12, and

09:28AM 15  then the document, Mr. Juneau, that you have in a plastic

09:28AM 16  binder, if we could please mark that PJ-13, which is what you

09:29AM 17  said is your reply to Mr. Holstein.

09:29AM 18          THE WITNESS:  That's correct.

09:29AM 19          MR. BUCKNAM:  Thank you.

09:29AM 20          (WHEREUPON, at this point in the proceedings,

09:29AM 21  Exhibit PJ-13 was marked.)

09:29AM 22          THE WITNESS:  This reply on July 1 -- that's when we

09:29AM 23  were talking about -- David Welker and I spent a good bit of

09:29AM 24  time making sure we documented what, when, where, you know, and

09:29AM 25  so forth, documents -- exactly what we did, how we did it, and

**C O N F I D E N T I A L**

09:29AM 1   incorporated it.  He and I were the joint participants in doing

09:29AM 2   this.

09:29AM 3              I missed the precise question --

09:29AM 4   BY MR. FREEH:

09:29AM 5   Q.    The question was about the date that you had this meeting

09:29AM 6   with the Judge and the parties, and then you got a call, you

09:29AM 7   said, pretty soon after from AP.

09:29AM 8   A.    Right.  Right.

09:29AM 9   Q.    Approximately when was that meeting?

09:29AM 10  A.    (Witness reviews the document.)

09:30AM 11  Q.    If you can't reconstruct it, that's fine.

09:30AM 12  A.    No, no.  Just give me a second.  I think I can do that.

09:30AM 13  (Witness reviews the document.)

09:31AM 14            On June 19 was when I met with Judge Barbier and

09:31AM 15  discussed those allegations.

09:31AM 16  Q.    So let me --

09:31AM 17  A.    Well, let me back up.

09:31AM 18  Q.    Let me state for the record, just if it refreshes your

09:31AM 19  recollection, on June 19th, you and Michael Juneau had a

09:31AM 20  meeting with Mr. Sutton, where you questioned him about these

09:31AM 21  matters.

09:31AM 22            Then, on June 20, three days later, there was another

09:31AM 23  interview by you, Michael and David Welker of Mr. Sutton.

09:31AM 24  A.    I think -- personally, I think I spoke to Sutton myself.

09:31AM 25  Mike wasn't there.

**C O N F I D E N T I A L**

SM-03-JA000166

09:31AM 1    Q.    That would have been approximately when?

09:32AM 2    A.    Well, I thought it was the week of June 10th, as I recall.

09:32AM 3    Q.    All right.  So let me ask you this, if this helps us to

09:32AM 4    reconstruct it.  I'll show you what we've previously marked

09:32AM 5    as --

09:32AM 6              MR. FREEH:   What are we up to, 14?

09:32AM 7              MR. BUCKNAM:   Yes.

09:32AM 8              (WHEREUPON, at this point in the proceedings,

09:32AM 9    Exhibit PJ-14 was marked.)

09:32AM 10   BY MR. FREEH:

09:32AM 11   Q.    I'll show what you I have marked as PJ-14.  This is a

09:32AM 12   report by Michael about an interview or a meeting.

09:32AM 13   A.    I had that in this packet.

09:32AM 14   Q.    Is it your recollection that you spoke to Mr. Sutton alone

09:32AM 15   before that?

09:32AM 16   A.    Just before that.  That's right.

09:32AM 17   Q.    A couple of days?

09:32AM 18   A.    Yeah, it wasn't long before that.

09:32AM 19   Q.    So let me direct your attention to that meeting.  Is this

09:32AM 20   the first time you speak to him or confront him about this

09:32AM 21   matter?

09:32AM 22   A.    Well, remember, I told you about the time that I saw

09:32AM 23   Sutton -- I confronted him about this before this meeting that

09:32AM 24   Mike and I had with him.

09:33AM 25   Q.    Where did that occur?

**C O N F I D E N T I A L**

SM-03-JA000167

09:33AM 1    A.    In my office.

09:33AM 2    Q.    Was it a few days before the meeting on the 17th reported

09:33AM 3    in PJ-14?

09:33AM 4    A.    Yeah.   I recorded somewhere when that was.

09:33AM 5    Q.    Why don't you take a moment and see if you can see that.

09:33AM 6          I'll just state for the record, we don't have any

09:33AM 7    record or memo of that particular meeting.

09:33AM 8    A.    No.   I didn't record a memo of that.   (Witness reviews the

09:33AM 9    file.)

09:33AM 10         Here it is, in this report of -- letter of July 1.

09:33AM 11   Q.    You're referring to exhibit --

09:33AM 12   A.    PJ-13.   I said -- when I was talking about the week of

09:33AM 13   June 10th, I said, "During that same week, I confronted

09:33AM 14   Mr. Sutton, and he denied the allegation."   That's what I was

09:34AM 15   talking about.

09:34AM 16   Q.    That's the only record of that particular meeting?

09:34AM 17   A.    Yes, that's true.

09:34AM 18   Q.    So let's go to that meeting for a few moments.   I'm going

09:34AM 19   to ask you a few questions, again, trying to reconstruct and

09:34AM 20   get your recollection as to that meeting.

09:34AM 21         Was that a meeting that you and Mr. Welker had talked

09:34AM 22   about before you confronted Mr. Sutton?

09:34AM 23   A.    I don't remember talking to David about that.

09:34AM 24   Q.    This was a meeting you initiated?

09:34AM 25   A.    I'm positive I initiated that meeting.

**C O N F I D E N T I A L**

SM-03-JA000168

| | | |
|---|---|---|
| 09:34AM | 1 | Q.   Do you recall why you decided at that moment to speak to |
| 09:34AM | 2 | him by yourself? |
| 09:34AM | 3 | A.   Well, it was very troubling to me, you know, that this |
| 09:34AM | 4 | allegation was made.  Somebody mentioned to me, you know, that |
| 09:34AM | 5 | if we knew -- they were on suspension at that point, and they |
| 09:34AM | 6 | were wondering what the heck was going on, Sutton and Reitano, |
| 09:34AM | 7 | his wife.  I mean, "Why are we on suspension?  Nobody has |
| 09:34AM | 8 | talked to us." |
| 09:35AM | 9 | So, then I think I brought him in.  I said, "I've got |
| 09:35AM | 10 | a question to ask you.  We've got some allegations of |
| 09:35AM | 11 | impropriety.  I want to know, did you, in any fashion, have any |
| 09:35AM | 12 | financial interest in any claim that had anything to do with |
| 09:35AM | 13 | BP?"  That's in essence what I did. |
| 09:35AM | 14 | It was very troubling to me.  That's why I did it. |
| 09:35AM | 15 | Q.   What was his response? |
| 09:35AM | 16 | A.   No. |
| 09:35AM | 17 | Q.   Was that at a moment when this matter had become public, |
| 09:35AM | 18 | or had it just become known within the office? |
| 09:35AM | 19 | A.   No.  That was before. |
| 09:35AM | 20 | Q.   How long a meeting was that, if you recall? |
| 09:35AM | 21 | A.   It wasn't long.  It didn't take long.  Five minutes. |
| 09:35AM | 22 | Q.   Do you recall you saying anything else or Mr. Sutton |
| 09:35AM | 23 | saying anything else? |
| 09:35AM | 24 | A.   No.  No.  I just knew it was a big focus of mine.  I was |
| 09:36AM | 25 | very concerned about that.  I wanted to look him in the face |

**C O N F I D E N T I A L**

SM-03-JA000169

09:36AM 1   and ask him that question.

09:36AM 2   Q.   Was he clear and without hesitation at that point denying

09:36AM 3   that he had any such interest?

09:36AM 4   A.   Absolutely.  He was adamant that he did not.

09:36AM 5   Q.   Did you remind him at that point, if you recall, about the

09:36AM 6   conflicts provisions and your policies?

09:36AM 7   A.   I didn't remind him because there wasn't any question that

09:36AM 8   he knew that that was the rule.

09:36AM 9   Q.   Did he at any time during that meeting say, Mr. Juneau,

09:36AM 10  words to the effect, I told you about that, you knew all about

09:36AM 11  that?

09:36AM 12  A.   No.

09:36AM 13  Q.   Did he admit or describe in any way that he was receiving

09:36AM 14  payments, but that you had approved those payments?

09:36AM 15  A.   No.

09:36AM 16  Q.   You said the meeting was five minutes or so?

09:36AM 17  A.   It was short.

09:36AM 18  Q.   The recording of it is the recording you just recited in

09:36AM 19  that document, which is a description of the meeting?

09:37AM 20  A.   Yes.   That's what I gave to the Court.

09:37AM 21  Q.   After you had that meeting, what, if anything, did you do

09:37AM 22  with respect to the conversation you had just had with

09:37AM 23  Mr. Sutton?

09:37AM 24  A.   Well, I knew we were continuing our investigation.   I

09:37AM 25  mean, I knew David Welker -- I didn't have any further

**CONFIDENTIAL**

SM-03-JA000170

09:37AM 1    discussion with Sutton about the matter.

09:37AM 2    Q.    Did you go back and tell Mr. Welker about this discussion?

09:37AM 3    If you recall?

09:37AM 4    A.    I don't recall.

09:37AM 5    Q.    Did you talk to Michael about it?

09:37AM 6    A.    I might have mentioned it to Michael.  The only reason I

09:37AM 7    say might have, I'm not sure I did.  We share an apartment when

09:37AM 8    we're here together, but I don't specifically recall.

09:37AM 9    Q.    So you don't have a recollection of reporting that

09:37AM 10   conversation to anyone?

09:38AM 11   A.    No.

09:38AM 12   Q.    Then let me direct your attention to June 17th, which is

09:38AM 13   seven days later.  There now appears to be a more formal

09:38AM 14   interview of Mr. Sutton by you and Michael Juneau.  Do you

09:38AM 15   recall that?

09:38AM 16   A.    I do recall that.  That's recorded in that memo.

09:38AM 17         MR. BUCKNAM:  Excuse me, the memo that's marked

09:38AM 18   PJ-14, correct?

09:38AM 19         THE WITNESS:  It's dated June 20th, 2013.

09:38AM 20         MR. TIDWELL:  No, sir, I believe it's the report, not

09:38AM 21   Michael's --

09:38AM 22         THE WITNESS:  Oh, the report is dated PJ-13, but I

09:38AM 23   think he's asking about Michael's memo.

09:38AM 24         MR. FREEH:  I am.

09:38AM 25   BY MR. FREEH:

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 09:38AM | 1 | Q.    There came a time, and I asked the question, June 17, |
| 09:38AM | 2 | 2013, I said there was a more formal interview of Mr. Sutton at |
| 09:38AM | 3 | that point in which you participated? |
| 09:38AM | 4 | A.    Both of us were there.  Mike and I both were there. |
| 09:38AM | 5 | Q.    Also, David Welker was there? |
| 09:39AM | 6 | A.    I think so. |
| 09:39AM | 7 | Q.    Well, I'll show you what we've marked as PJ-14, and ask -- |
| 09:39AM | 8 | A.    Whatever is recorded -- |
| 09:39AM | 9 | Q.    -- if that refreshes your recollection? |
| 09:39AM | 10 | A.    Well, it's talking about a meeting on June 19th when David |
| 09:39AM | 11 | was there.  That's when we brought Tiger Sutton in.  I remember |
| 09:39AM | 12 | that same night, I think, we had -- wait a minute. |
| 09:39AM | 13 | (WHEREUPON, at this point in the proceedings, |
| 09:39AM | 14 | Exhibit PJ-15 was marked.) |
| 09:39AM | 15 | BY MR. FREEH: |
| 09:39AM | 16 | Q.    Well, let me show you another document which might help |
| 09:39AM | 17 | you put it in perspective.  I'll show you what we'll call |
| 09:39AM | 18 | PJ-15. |
| 09:39AM | 19 | This is another interview of Mr. Sutton which takes |
| 09:39AM | 20 | place on June 20th.  You, Michael Juneau and David Welker are |
| 09:39AM | 21 | present at this meeting. |
| 09:39AM | 22 | A.    I distinctly remember that meeting.  That was late one |
| 09:40AM | 23 | evening in our office.  That's right. |
| 09:40AM | 24 | Q.    That was a longer interview? |
| 09:40AM | 25 | A.    That's right because -- my recollection was, Judge, was we |

**C O N F I D E N T I A L**

SM-03-JA000172

09:40AM 1    had at that time, between -- after this meeting, Mike and I --

09:40AM 2    Q.   This meeting meaning on the 17th?

09:40AM 3    A.   On June 17th.

09:40AM 4         -- we didn't have those e-mails.  That hadn't been

09:40AM 5    produced to us.

09:40AM 6         After that, we got, you know, that e-mail trail.

09:40AM 7    Then David reports to that.  We said, okay, now we got some

09:40AM 8    flesh here, let's bring him in and go through his.  So me, Mike

09:40AM 9    and David Welker were there.

09:40AM 10   Q.   On the 20th?

09:40AM 11   A.   On the 20th.

09:40AM 12   Q.   So if I understand right then, you have three interviews

09:40AM 13   with Mr. Sutton?

09:40AM 14   A.   That's right.

09:40AM 15   Q.   One is on June 7th, just you and him?

09:40AM 16   A.   The week of June -- the week of June 10th.

09:41AM 17   Q.   I'm sorry, June 10th.  That's just you and him, and you

09:41AM 18   described that as a five-minute interview?

09:41AM 19   A.   That's right.

09:41AM 20   Q.   Then, there is a second interview on the 17th --

09:41AM 21   A.   That Mike and I went.

09:41AM 22   Q.   Then a third interview on the 20th?

09:41AM 23   A.   What I'm conveying to you, in that interim period is when

09:41AM 24   Dave comes to me talking about this e-mail research.

09:41AM 25   Q.   So let me focus now on the interview of June 17th.  This

**C O N F I D E N T I A L**

SM-03-JA000173

| | | |
|---|---|---|
| 09:41AM | 1 | is between the 10th, when you see him alone, and the 20th, when |
| 09:41AM | 2 | you confront him with e-mails. |
| 09:41AM | 3 | So directing your attention to the intervening |
| 09:41AM | 4 | interview, Monday, June 17th, 2013.  This is reflected in |
| 09:41AM | 5 | PJ-14, which is a memo from Michael Juneau to you. |
| 09:41AM | 6 | If you recall, was that an interview of Mr. Sutton |
| 09:42AM | 7 | that took place in your office? |
| 09:42AM | 8 | A.   It was in my office. |
| 09:42AM | 9 | Q.   Here in New Orleans? |
| 09:42AM | 10 | A.   Yes. |
| 09:42AM | 11 | Q.   Mr. Sutton was present, you were present, Michael was |
| 09:42AM | 12 | present? |
| 09:42AM | 13 | A.   Right. |
| 09:42AM | 14 | Q.   Was David Welker present, if you recall? |
| 09:42AM | 15 | A.   I don't remember -- I don't remember David being there. |
| 09:42AM | 16 | Q.   Did you question Mr. Sutton? |
| 09:42AM | 17 | A.   Yeah.  I think Mike and I both did. |
| 09:42AM | 18 | Q.   Was it a more expansive interview of the one you had |
| 09:42AM | 19 | conducted yourself -- |
| 09:42AM | 20 | A.   Yeah.  Yes, sir, it was. |
| 09:42AM | 21 | Q.   -- on the 10th of June? |
| 09:42AM | 22 | A.   It was -- right. |
| 09:42AM | 23 | Q.   As best you recall, and you can certainly use PJ-14 if you |
| 09:42AM | 24 | need to refresh your recollection, what did you ask him and |
| 09:42AM | 25 | what did he say during the course of the interview? |

**C O N F I D E N T I A L**

|  |  |
|---|---|
| 09:42AM | 1 |
| 09:42AM | 2 |
| 09:42AM | 3 |
| 09:42AM | 4 |
| 09:42AM | 5 |

A.    Well, I mean, it's pretty detailed here.  My overall recollection is he said he really didn't have an interest in any -- a financial interest in anything.

Q.    So he repeated what he had told you alone on June 10th?

A.    That's the end result of that, that's right.

Q.    Did Michael ask him similar or additional questions?

A.    No.  It was -- I mean, it was just a little bit more in depth; but, I mean, it was to the same issue.

Q.    How long of an interview was that, as best you recall?

A.    I'm guessing 15, 20 minutes, or something like that.

Q.    What was Mr. Sutton's demeanor during the interview as far as you observed?

A.    He said, "I haven't done anything wrong."

Q.    Was he resentful, or did he get angry at any point when you were questioning him?

A.    He wasn't angry.  He wasn't mad.  He just said, "I don't know what" -- "I haven't done anything wrong.  I don't know what I'm being" -- "I'm being wrongfully accused."

Q.    As best you recall, how specific were your questions about whether or not he was receiving any payments or had any financial interest in a current claim?

A.    I think, pretty specific.

Q.    You are very practiced in questioning witnesses and asking necessary and relevant questions in an inquiry --

A.    I felt very comfortable with the questioning, that he knew

**C O N F I D E N T I A L**

SM-03-JA000175

09:44AM 1    what we were asking, and he responded that he didn't have any

09:44AM 2    financial interest.

09:44AM 3    Q.    Were you comfortable and satisfied with his answers?

09:44AM 4    A.    I didn't have any -- anything more than -- I had no

09:44AM 5    document, I had nothing.  I mean, all I had was, you know, the

09:44AM 6    allegation at that time and his statements.

09:44AM 7            So, I mean, I wasn't satisfied.  I was concerned, but

09:44AM 8    I didn't know.

09:44AM 9    Q.    Do you recall if you specifically asked him about a

09:44AM 10   *Casey Thonn* claim or mentioned the name *Casey Thonn*?

09:44AM 11   A.    No.

09:44AM 12   Q.    If you don't recall --

09:45AM 13   A.    No, I don't.  I just don't.

09:45AM 14   Q.    At the time of that interview, which is June 17th, were

09:45AM 15   you aware that the allegation against Mr. Sutton was in

09:45AM 16   relation to the claim entitled *Casey Thonn*?

09:45AM 17   A.    That's what I'm not sure of, Judge.  I just don't remember

09:45AM 18   that.

09:45AM 19   Q.    Right.  During the course of your interview, at any time

09:45AM 20   did Mr. Sutton say to you words to the effect, I have been -- I

09:45AM 21   have been receiving payments, and you, Mr. Juneau, approved

09:45AM 22   that?

09:45AM 23   A.    No, sir.  No, sir.

09:45AM 24   Q.    You would have recalled that if he said it?

09:45AM 25   A.    I sure think so.

**C O N F I D E N T I A L**

09:45AM 1    Q.   Did he at any point in the interview make any statements,

09:45AM 2    words to the effect that he was allowed to receive payments

09:45AM 3    from a claim under some circumstances?

09:45AM 4    A.   No, sir.

09:45AM 5    Q.   Had he said that, you would have recorded that, or you

09:46AM 6    would have asked it be recorded in the memo?

09:46AM 7    A.   Absolutely.  I would recall that.  That was the whole

09:46AM 8    purpose of the discussion.

09:46AM 9    Q.   After that interview, there came a time when Mr. Welker

09:46AM 10   made you aware of certain e-mails which he had discovered in

09:46AM 11   the course of his investigation?

09:46AM 12   A.   He did.

09:46AM 13   Q.   Do you think that was when you first became aware of the

09:46AM 14   name Casey Thonn?

09:46AM 15   A.   I don't know.

09:46AM 16   Q.   I'm not trying to be confusing here, but --

09:46AM 17   A.   Oh, no.  It was very clear to me.  Then, it was.  I mean,

09:46AM 18   I just can't remember.

09:46AM 19   Q.   At the interview on June 17th, which was you, Michael and

09:46AM 20   Mr. Sutton, had you been aware of the name Casey Thonn as the

09:46AM 21   allegation, would you have confronted that or mentioned that to

09:46AM 22   Mr. Sutton?

09:46AM 23   A.   I think I probably would have.

09:46AM 24   Q.   Is it possible that you became aware of the name of that

09:47AM 25   particular claim after the interview on June 17th?

**C O N F I D E N T I A L**

SM-03-JA000177

| | | |
|---|---|---|
| 09:47AM | 1 | A.    Yeah. |
| 09:47AM | 2 | Q.   Let me direct your attention now to the longer interview |
| 09:47AM | 3 | on June 20th, where Mr. Welker participates.  I don't have a |
| 09:47AM | 4 | clean copy because I've got my notes on this. |
| 09:47AM | 5 |      Do you have PJ-15, what we've marked as 15?  This is |
| 09:47AM | 6 | a report of Mr. Welker on the June 20th interview of |
| 09:47AM | 7 | Mr. Sutton, where you and Michael are present, Michael Juneau. |
| 09:47AM | 8 |      MR. BUCKNAM:  Here is a clean copy of PJ-15. |
| 09:47AM | 9 |      MR. FREEH:  No, that's not it.  This is what I want. |
| 09:47AM | 10 | BY MR. FREEH: |
| 09:47AM | 11 | Q.   Let me show you what I've marked as PJ-15.  I have made |
| 09:48AM | 12 | some underlinings and asterisks, but no other comments on the |
| 09:48AM | 13 | document except one word. |
| 09:48AM | 14 |      So I'm showing you what's marked as PJ-15.  This is a |
| 09:48AM | 15 | report by Mr. Welker of the interview which occurred on |
| 09:48AM | 16 | June 20, 2013, again, with you, Michael Juneau, interviewing |
| 09:48AM | 17 | Mr. Sutton. |
| 09:48AM | 18 |      I'd ask you just to look through that briefly, and |
| 09:48AM | 19 | then I'm going to ask you some questions about it. |
| 09:48AM | 20 |      MR. FREEH:  Do you want to take a break? |
| 09:48AM | 21 |      THE REPORTER:  Yes. |
| 09:48AM | 22 |      THE COURT:  So we'll take a break, and Mr. Juneau can |
| 09:48AM | 23 | read through it. |
| 09:48AM | 24 |      (WHEREUPON, at this point in the proceedings, a |
| 09:48AM | 25 | recess was taken.) |

**C O N F I D E N T I A L**

SM-03-JA000178

BY MR. FREEH:

Q.    All right.  So we're back on the record.  When we left, Mr. Juneau, I had showed you PJ-15, which is a report of an interview of Mr. Sutton dated June 20, 2013, at your offices on Gravier Street, attended by you, Mr. Welker and Mr. Juneau.

          Have you had a chance to look at that document?

A.    I read it.

Q.    This was now your third interview of Mr. Sutton in regard to these matters?

A.    That's correct.

Q.    Was it Mr. Welker who took the notes during the meeting?

A.    He did.

Q.    Approximately how long, your recollection, did the interview take?

A.    You know, we interviewed Sutton and his wife the same night.  That's why I'm hesitating.  That was kind of a tricky deal, which one came first, which came second.

          David is the one that had set it up.  I wasn't sitting there with a clock.  I'm guessing that would have been about 45 minutes, somehow, maybe.

Q.    You interviewed them separately, Christine and Tiger?

A.    We did.  Totally separately.

Q.    But the same people participated in the meeting?

A.    The same people.

Q.    So let's just talk about the interview of Mr. Sutton.

**CONFIDENTIAL**

SM-03-JA000179

10:03AM 1    Forty-five minutes, whatever your recollection is as to the

10:03AM 2    length.  Did you do the questioning, or did Mr. Welker do the

10:03AM 3    questioning?

10:03AM 4    A.    We'll all kind of -- because we -- at that point, I had

10:03AM 5    read, you know, these e-mails.  David, obviously, had read the

10:03AM 6    e-mails, and Mike had read the e-mails.  So it was probably a

10:03AM 7    blend of questions from all three of us.

10:03AM 8    Q.    One or more of you brought copies of the e-mails to the

10:03AM 9    interview?

10:03AM 10   A.    We showed it to him.

10:03AM 11   Q.    Did you let him read the e-mails?

10:03AM 12   A.    Yeah.  David -- as I recall, David handed them to him.

10:03AM 13   Q.    Did David do that, if you recall, all at once, or did he

10:03AM 14   give them e-mails one by one as you questioned them, or do you

10:04AM 15   recall how that process worked?

10:04AM 16   A.    I don't really remember.  It might have been individually.

10:04AM 17   Q.    But it was not a case where you just read parts and

10:04AM 18   language from different e-mails; in fact, he was showed the

10:04AM 19   e-mails?

10:04AM 20   A.    I think so.

10:04AM 21   Q.    So during the course of that interview, did you or others

10:04AM 22   questioning Mr. Sutton at the time specifically ask him if he

10:04AM 23   had received any monies or payments or fees regarding any claim

10:04AM 24   that was before the administration office?

10:04AM 25   A.    Yes, sir.

**C O N F I D E N T I A L**

| 10:04AM | 1 | Q.    And what was his response? |
| 10:04AM | 2 | A.    The answer was no. |
| 10:04AM | 3 | Q.    And during the course of the interview, was he shown |
| 10:04AM | 4 | various e-mails where references were made to fees, salaries |
| 10:04AM | 5 | and the payments to him of money? |
| 10:04AM | 6 | A.    Excuse me if my memory gets weak because I go through a |
| 10:04AM | 7 | lot of meetings every day.  That one, I remember it like it was |
| 10:04AM | 8 | yesterday.  We were sitting in that room.  And it shows -- |
| 10:05AM | 9 | there was a particular e-mail.  Either Mike or what you call it |
| 10:05AM | 10 | gave it to him, "How do you explain this?" |
| 10:05AM | 11 | In that e-mail, it said -- I think it was from Sutton |
| 10:05AM | 12 | to somebody, and it said, "What about" -- and the word was -- I |
| 10:05AM | 13 | remember it -- "my fee," F-E-E. |
| 10:05AM | 14 | He was shown that, and he read it.  There was a |
| 10:05AM | 15 | pause.  He says, "I can understand why y'all would have a |
| 10:05AM | 16 | concern about that.  I can understand why your" -- "why your, |
| 10:05AM | 17 | for lack of a better word, your antenna is up about that, and |
| 10:05AM | 18 | maybe why you're questioning me about that now, but that was |
| 10:05AM | 19 | a" -- I think the words used, "it was a misuse of that word. |
| 10:05AM | 20 | That's not really what it was.  It wasn't a fee to me."  Then |
| 10:06AM | 21 | he goes about this long story about what it was. |
| 10:06AM | 22 | I can remember that because David, Mike and I were |
| 10:06AM | 23 | sitting on one side, and he was across the table.  He was the |
| 10:06AM | 24 | one offering that.  You know, we just -- David probably just |
| 10:06AM | 25 | gave it to him and said, "Read that e-mail," and that was what |

**C O N F I D E N T I A L**

SM-03-JA000181

| 10:06AM | 1 | his response was to the what you call it. |
| 10:06AM | 2 | I may have very well said in that meeting, I said, |
| 10:06AM | 3 | "That's a big concern to me," something like that, not |
| 10:06AM | 4 | necessarily recorded, but that's kind of how that happened.  It |
| 10:06AM | 5 | was volunteered from his standpoint about the response to the |
| 10:06AM | 6 | inquiry. |
| 10:06AM | 7 | Q.    During the course of the interview, you said he was shown |
| 10:06AM | 8 | other e-mails? |
| 10:06AM | 9 | A.    I think so. |
| 10:06AM | 10 | Q.    The e-mails, as you recall them, had references to salary, |
| 10:06AM | 11 | to fee, and specifically talked about and identified the |
| 10:07AM | 12 | Casey Thonn claim? |
| 10:07AM | 13 | A.    Yeah. |
| 10:07AM | 14 | Q.    Mr. Sutton's response continuously, I take it from the |
| 10:07AM | 15 | report and your testimony, is that he denied receiving any fee |
| 10:07AM | 16 | in any form in any way regarding the Casey Thonn claim? |
| 10:07AM | 17 | A.    Yeah.  Help me refresh my memory on that.  Remember when I |
| 10:07AM | 18 | mentioned to you awhile ago, at least part of that recollection |
| 10:07AM | 19 | was correct.  I remember him saying that there was a separate |
| 10:07AM | 20 | automobile accident this guy had, had nothing to do with the BP |
| 10:07AM | 21 | claim or anything, and there was a payment.  He acknowledged |
| 10:07AM | 22 | that. |
| 10:07AM | 23 | But Michael indicates that, "I'm not talking about |
| 10:07AM | 24 | that automobile accident.  I'm talking about Casey Thonn having |
| 10:07AM | 25 | any" -- "the Casey Thonn claim or claims, did you have any |

**C O N F I D E N T I A L**

SM-03-JA000182

| | |
|---|---|
| 10:07AM | 1 |
| 10:08AM | 2 |
| 10:08AM | 3 |
| 10:08AM | 4 |
| 10:08AM | 5 |
| 10:08AM | 6 |
| 10:08AM | 7 |
| 10:08AM | 8 |
| 10:08AM | 9 |
| 10:08AM | 10 |
| 10:08AM | 11 |
| 10:08AM | 12 |
| 10:08AM | 13 |
| 10:08AM | 14 |
| 10:09AM | 15 |
| 10:09AM | 16 |
| 10:09AM | 17 |
| 10:09AM | 18 |
| 10:09AM | 19 |
| 10:09AM | 20 |
| 10:09AM | 21 |
| 10:09AM | 22 |
| 10:09AM | 23 |
| 10:09AM | 24 |
| 10:09AM | 25 |

interest or remuneration of money coming to you out of any

claim that was in this BP program?"  The response was, "No."

Q.    Was his response that all the monies that were being

referred to or referenced in the e-mails that he was shown had

to do with a company called *Crown*?

A.    Yeah.

      It kind of got convoluted, Judge, the way he was

talking.  We all had the same reaction.  But in 10 words or

less, the substance of what he, I guess, was saying, these

people owed -- some people owed me some money over here in

Crown, some of these lawyers; I'm not getting a fee, referral

fee or however you want to call that, out of this matter, but I

wanted to see that these attorneys got paid.  I was interested

in seeing them -- I was tracking to see if they got paid

because if they got paid and they had the money, I would be

able to get my money out of what was owed to me in this Crown.

That was my appreciation of his explanation.

Q.    Did you believe him?

A.    Yeah.  The word "fee" is the fee.  I still have some

serious reservations about that.

      That becomes very -- I guess, very subjective

analysis there, but it troubled the hell out of me.

Q.    But not asking you about the words that were used either

in the e-mails or by him, when you got finished with the

interview -- you're an experienced and very able lawyer, you're

**C O N F I D E N T I A L**

SM-03-JA000183

10:09AM  1   a good questioner, you've done this for many years -- when you

10:09AM  2   finished the interview did you believe him, or did you think he

10:09AM  3   was lying to you?  On the issue of having received a fee or a

10:09AM  4   financial interest?

10:09AM  5   A.    A candid answer, I had real problems with his credibility

10:10AM  6   on that issue.

10:10AM  7   Q.    The problems --

10:10AM  8   A.    I think --

10:10AM  9   Q.    Sorry.

10:10AM  10  A.    -- I probably would have said that.  Knowing my nature, I

10:10AM  11  probably would have said that.  I said, "I have some real

10:10AM  12  serious problems with this."

10:10AM  13  Q.    Well, after that interview, did you speak to him again

10:10AM  14  directly about this matter?

10:10AM  15  A.    No.  The only time I saw him -- y'all have been up and

10:10AM  16  down that building on Exchange Place -- I saw him, he was

10:10AM  17  getting out of an elevator when I was getting in an elevator

10:10AM  18  across the hall one time.

10:10AM  19  Q.    Not too long ago?

10:10AM  20  A.    Not too, too long ago, but I didn't -- I had no

10:10AM  21  discussion.

10:10AM  22  Q.    During the course of this interview -- and this is the

10:10AM  23  interview on June 20th -- at any time in the interview did he

10:10AM  24  say -- do you recall him saying, "I got permission to receive a

10:10AM  25  fee relating to a claim before the administration office"?

**CONFIDENTIAL**

SM-03-JA000184

| | |
|---|---|
| 10:10AM 1 | A.    No, sir.  I might add, if you look on -- David takes real |
| 10:11AM 2 | detailed notes; I guess, his training -- the last paragraph on |
| 10:11AM 3 | page 2, to me, that's clearly what he's saying there. |
| 10:11AM 4 | Q.    Could you read into the record, please, sir, that |
| 10:11AM 5 | paragraph that you're referring to? |
| 10:11AM 6 | A.    Well, it's a little bit convoluted, but that was a clear |
| 10:11AM 7 | message to me.  He said, "He noted that if he was dishonest, he |
| 10:11AM 8 | wouldn't have done it that way" -- this arrangement -- "at |
| 10:11AM 9 | least not about the money.  He loves working here.  He |
| 10:11AM 10 | indicated he believes this to be an issue between him and |
| 10:11AM 11 | Pat Juneau because it makes him look like he was being |
| 10:12AM 12 | dishonest with Pat because he told him he did not have a |
| 10:12AM 13 | financial interest in the claim."  He didn't have any financial |
| 10:12AM 14 | interest in his claim, is what I'm telling you today.  That's |
| 10:12AM 15 | been consistent since day one. |
| 10:12AM 16 | Judge, just on that subject, I mean, to get to the |
| 10:12AM 17 | root of the matter, I don't care who it is, me, John Smith, |
| 10:12AM 18 | Lionel Sutton, anybody, anybody has got a financial interest, |
| 10:12AM 19 | and I believe that, they've got an interest, you're history in |
| 10:12AM 20 | this case.  That's a breach of every obligation I think you |
| 10:12AM 21 | have to this program and to the professional code of |
| 10:12AM 22 | professionalism. |
| 10:12AM 23 | We have a statute on that in Louisiana which governs |
| 10:12AM 24 | every lawyer that I can rely on to do that.  I got that statute |
| 10:12AM 25 | here.  That's just an absolute total no-no. |

**CONFIDENTIAL**

SM-03-JA000185

| | |
|---|---|
| 10:12AM 1 | Q.   You were also aware, I take it, that the Louisiana code of |
| 10:13AM 2 | conduct requires that if there is a lawyer splitting or |
| 10:13AM 3 | referring a fee to a lawyer outside his firm, it has to be |
| 10:13AM 4 | recorded in writing? |
| 10:13AM 5 | A.   Yeah.  You got it in spades.  That's exactly what it says. |
| 10:13AM 6 |      You know, let me tell you, I thought a long time |
| 10:13AM 7 | about everything that's occurred here; but, during the course |
| 10:13AM 8 | of the -- I just pulled this thing.  We have a specific -- |
| 10:13AM 9 | rules of court, professionalism.  They address conflicts of |
| 10:13AM 10 | interest. |
| 10:13AM 11 |      I've been through this as lawyers, as people when you |
| 10:13AM 12 | have someone that's governed by a specific statute, which has |
| 10:13AM 13 | very stringent regulations and rules that you've got to follow, |
| 10:13AM 14 | that's a big factor to me because I have to rely on these |
| 10:13AM 15 | people to do that. |
| 10:13AM 16 |      Now, beyond that, it's a trustworthy matter.  You |
| 10:13AM 17 | didn't ask the question, but I'll be very candid with you.  If |
| 10:14AM 18 | I made a mistake -- and I make mistakes every day, I guess, and |
| 10:14AM 19 | especially -- but if I made a mistake, it's being trustworthy. |
| 10:14AM 20 | Or maybe somebody didn't do what they were supposed to do, if |
| 10:14AM 21 | that's, in fact, what happened. |
| 10:14AM 22 |      That's 10 words or less, that's my thought. |
| 10:14AM 23 | Q.   Now, Mr. Juneau, staying with this same exhibit, you were |
| 10:14AM 24 | on page 2 of PJ-15.  Let me direct your attention to a little |
| 10:14AM 25 | bit higher in the document, about a third of the way down. |

**CONFIDENTIAL**

SM-03-JA000186

| | | |
|---|---|---|
| 10:14AM | 1 | The sentence says, quote, "They were loosy-goosy with |
| 10:14AM | 2 | the Crown account because they were all friends.  He stated |
| 10:14AM | 3 | that has been constant since 2009.  He indicated that the |
| 10:14AM | 4 | $4,900 referred to as his share of *Thonn* was not money owed to |
| 10:14AM | 5 | him because of the settlement money.  When it said Jon was to |
| 10:14AM | 6 | send the 4,900 to Glen, it wasn't Jon's share, it was Glen's |
| 10:15AM | 7 | share.  When he wrote" -- "when he wrote it, didn't think it |
| 10:15AM | 8 | looked suspicious.  He was making sure Glen Lerner got his |
| 10:15AM | 9 | share of the *Thonn* fee and then used the money for Crown, LLC." |
| 10:15AM | 10 | Is that consistent with what you remember him saying |
| 10:15AM | 11 | during that interview? |
| 10:15AM | 12 | A.    Yeah.  To tell you the truth, I remember him saying that, |
| 10:15AM | 13 | and I really didn't understand what he was saying.  Kind of the |
| 10:15AM | 14 | discussion went on and on. |
| 10:15AM | 15 | That's why I came back to the question.  I said, I |
| 10:15AM | 16 | mean, I'm reading your e-mail, you know, I know what looks to |
| 10:15AM | 17 | me to be a referral fee here, or some revisionary fee. |
| 10:15AM | 18 | Q.    I had asked you whether after this interview Mr. Sutton |
| 10:15AM | 19 | ever spoke to you or contacted you again, and you said no, |
| 10:15AM | 20 | correct? |
| 10:15AM | 21 | A.    No, sir.  No, sir. |
| 10:15AM | 22 | Q.    To your knowledge, did he ever call Michael Juneau or |
| 10:15AM | 23 | David Welker or anyone else after this interview on June 20, |
| 10:15AM | 24 | 2013, and say words to the effect, I want to correct the |
| 10:16AM | 25 | record, and I've just realized there are some things that I |

**C O N F I D E N T I A L**

10:16AM 1    should have said but didn't say?

10:16AM 2    A.   I don't recall anything like that.  Certainly not to me.

10:16AM 3    Q.   Let me go back to another question I asked you earlier

10:16AM 4    about Mr. Sutton.  You had said Mr. Sutton never came to you

10:16AM 5    and mentioned a case named Romeo Papa that he had an interest

10:16AM 6    or connection with, which was then a claim before the

10:16AM 7    administrator.

10:16AM 8    A.   Yes.  After the fact is the first time I ever heard this

10:16AM 9    name, Romeo Papa.

10:16AM 10   Q.   I asked you the question before, but I'm going to ask it

10:16AM 11   in a slightly different way.  You never had a conversation with

10:16AM 12   Mr. Sutton where he said he had a question or concern about a

10:16AM 13   personal claim that he was related to before the administrator,

10:16AM 14   which predicated a conversation by you about your own son

10:17AM 15   having a medical claim related to the administration?

10:17AM 16   A.   No.  I don't remember anything.

10:17AM 17        I've told you, I may have mentioned to him or to

10:17AM 18   somebody else there that -- I brought up this question about

10:17AM 19   the son.  I was stunned when -- when we wait three weeks, I

10:17AM 20   didn't hear a thing from Keith Moskowitz.  Then, when we

10:17AM 21   brought it up again -- we were the initiator of all this

10:17AM 22   stuff -- he said, "Oh, no, I didn't tell you."  I said, "What

10:17AM 23   do you mean, you didn't tell me?  We were sitting in my office.

10:17AM 24   I brought it up."

10:17AM 25        Now, I may have mentioned that in that context I have

**CONFIDENTIAL**

SM-03-JA000188

10:17AM 1    mentioned, but it didn't have anything to do with any relation,

10:17AM 2    to my recollection, having to do with anything -- any interest

10:17AM 3    that he had in the claim.  I don't remember anything like that.

10:17AM 4    Q.    You don't recall ever relating that story to Mr. Sutton in

10:17AM 5    his response to telling you he had a personal claim before the

10:17AM 6    administrator?

10:17AM 7    A.    No, sir.

10:17AM 8    Q.    You would remember that conversation?

10:17AM 9    A.    I think so.

10:17AM 10   Q.    Did you ever tell Mr. Sutton that -- I'm sorry.

10:18AM 11   A.    The answer is no.  If somebody would have had that, I

10:18AM 12   would have probably said, "Well, the son is withdrawing the

10:18AM 13   claim.  What are you talking to me about this?"  I mean, this

10:18AM 14   is an absolute no.

10:18AM 15   Q.    After this interview on June 20th, Mr. Sutton submitted a

10:18AM 16   resignation to you; is that correct?

10:18AM 17   A.    Yes.

10:18AM 18   Q.    Did you ask him to resign, or did he volunteer to resign?

10:18AM 19   A.    I didn't ask him to resign.

10:18AM 20   Q.    Do you recall receiving his resignation letter?

10:18AM 21   A.    I do.

10:18AM 22   Q.    Do you have that?

10:18AM 23          MR. FREEH:  All right.  Let me mark what's PJ-16.

10:18AM 24          (WHEREUPON, at this point in the proceedings,

10:18AM 25   Exhibit PJ-16 was marked.)

**C O N F I D E N T I A L**

SM-03-JA000189

BY MR. FREEH:

Q.   Ask you if that's the e-mail he sent you when he resigned?

A.   (Witness reviews the document.)  Yeah.  I think that's accurate.  It's accurate.  That's the resignation letter, yeah.

Q.   It's dated Friday, June 21, 2013, which would be the day -- or the morning, because it's 8:13 a.m., after the interview.  Does that agree with your recollection as to about when you received this?

A.   Yes.

Q.   In this document, which is less than a page in length, at no point in this document does he state or admit in any way, shape or fashion that he did, in fact, receive fees or payments relating to a claim before the administration office, correct?

A.   That's what I read.

Q.   Nowhere in this document does he state words to the effect that any monies he received with respect to a claim before the administration office were known to the administration office or approved by someone in the administration office?

A.   I didn't see that in there.

Q.   I'm going to ask you a few questions about Christine Reitano.  You mentioned that you hired her before Mr. Sutton went to work for you?

A.   Yes, that was early on.

Q.   How did you come to hire her?  Did someone recommend her to you?

**CONFIDENTIAL**

SM-03-JA000190

| | | |
|---|---|---|
| 10:20AM | 1 | A.    She applied for the job.  She said, "You have an |
| 10:20AM | 2 | opportunity I would like."  This was the real formative stage |
| 10:20AM | 3 | of the thing.  I didn't even have an office at the time. |
| 10:21AM | 4 | We were using the sixth floor conference room in the |
| 10:21AM | 5 | building -- you know where our offices is there.  Sutton and |
| 10:21AM | 6 | his wife, as you know, have an office in that building.  She |
| 10:21AM | 7 | mentioned to me, "If you" -- "I would be very much interested |
| 10:21AM | 8 | in working in that program." |
| 10:21AM | 9 | Q.    Before she approached you, did you know her? |
| 10:21AM | 10 | A.    No.  No.  No.  I knew him.  I did not know her. |
| 10:21AM | 11 | No, let me take that back.  I may have met her, |
| 10:21AM | 12 | because she was married to him, once -- maybe once or twice; |
| 10:21AM | 13 | but, I mean, I don't even know if I would have recognized her |
| 10:21AM | 14 | at the time. |
| 10:21AM | 15 | Q.    She was not a social friend? |
| 10:21AM | 16 | A.    Oh, no. |
| 10:21AM | 17 | Q.    You had never worked with her as an attorney? |
| 10:21AM | 18 | A.    Never. |
| 10:21AM | 19 | Q.    Did there come a time when you did, in fact, hire her? |
| 10:21AM | 20 | A.    There was. |
| 10:21AM | 21 | Q.    What convinced you or persuaded you that she would be |
| 10:21AM | 22 | someone appropriate to hire for that position? |
| 10:21AM | 23 | A.    Well, she is very bright.  I mean, it was very obvious |
| 10:22AM | 24 | talking to her.  She had a good academic resumé, I thought. |
| 10:22AM | 25 | She was very bright. |

**C O N F I D E N T I A L**

SM-03-JA000191

10:22AM 1      We were in the -- in the formative stages of the

10:22AM 2  case.  Judge, let me tell you something, that stage of the

10:22AM 3  world, it was scrambled eggs.  I got a Court Order telling me

10:22AM 4  to open this facility on June 4th, and to make the transition,

10:22AM 5  which turned out to be a half billion dollar claim.  You're

10:22AM 6  looking at it, me and Mike.  That's all.  That's really all we

10:22AM 7  got.

10:22AM 8      All of these issues are bubbling.  We knew we had to

10:22AM 9  activate this thing.  It ain't the easiest thing in the world

10:22AM 10  in five states to find somebody who doesn't have any contact

10:22AM 11  with the BP litigation.

10:22AM 12      She approached me.  She seemed very bright to me,

10:22AM 13  credentials.  I did the same process I told you about earlier,

10:22AM 14  about circulating the resumé and so forth, got the approval.

10:23AM 15  Q.   So you sent it to BP and the plaintiffs' counsel?

10:23AM 16  A.   Absolutely.  I've done that consistently.

10:23AM 17  Q.   Did BP come back with any comments or --

10:23AM 18  A.   No.  As a matter of fact, they drafted the first agreement

10:23AM 19  that was signed with her.

10:23AM 20  Q.   Never raised any concerns about her --

10:23AM 21  A.   Never.

10:23AM 22  Q.   -- employment?

10:23AM 23  A.   Never.

10:23AM 24      To be honest with you, we have dealt with 10 million

10:23AM 25  issues in this case.  The girl -- well, the lady proved out to

**C O N F I D E N T I A L**

SM-03-JA000192

10:23AM 1    be very intelligent, very quick in understanding, you know,

10:23AM 2    documents about that thick.

10:23AM 3            She -- she did -- she did quality work that I saw

10:23AM 4    over that extended period of time, from inception till --

10:23AM 5    Tiger Sutton came on November 1, as I recall.

10:23AM 6            That period of time, I mean, she was more or less a

10:23AM 7    funnel, because I had no other source, you know, that we were

10:23AM 8    dealing with.  She was carrying a pretty substantial load

10:23AM 9    during that period of time.

10:23AM 10   Q.   You said that it was hard to find people who had no

10:24AM 11   connection to the case, the BP matter; is that correct?

10:24AM 12   A.   Yeah, that's a fact.

10:24AM 13   Q.   When you interviewed --

10:24AM 14   A.   I'm not saying she was the last of the food chain.  I'm

10:24AM 15   not trying to convey that to you.  But that -- by the way, that

10:24AM 16   is still true today.  Michael Juneau and I are doing all

10:24AM 17   this -- well, we're doing the work of about ten lawyers right

10:24AM 18   now.  It's just the nature of it.

10:24AM 19           First of all, we got this controversy that's going on

10:24AM 20   out there; but, we're woefully short.  If you went out today

10:24AM 21   and said you were looking -- you'd probably get a lot of

10:24AM 22   applications, but you -- I worked for this firm, we did this.

10:24AM 23   You may have this firm, you may have that.  We've seen that

10:24AM 24   constantly.  It's a shrinking market for us.

10:24AM 25   Q.   With respect to Christine Reitano, when you were speaking

**C O N F I D E N T I A L**

10:24AM 1  to her about hiring her, bringing her aboard as a lawyer, did
10:24AM 2  you check any of her references yourself, did you ask for any
10:24AM 3  experiences or talk to her about what her training or
10:25AM 4  experience was in any type of a claims administration process?
10:25AM 5  A.   I knew -- two reasons I hired her.  It wasn't just
10:25AM 6  availability.  I would not do that.  She had experience in
10:25AM 7  dealing -- because this is a little -- this complex litigation
10:25AM 8  world is its own animal out there.  She had had experience in
10:25AM 9  dealing in this complex litigation world with claims and class
10:25AM 10  action things; about that, I knew.  That's all on her resumé.
10:25AM 11       That background, in addition to her academics, were
10:25AM 12  things that were very attractive to me, you know.  I don't
10:25AM 13  know -- then I told you what I did, about I sent it to BP, they
10:25AM 14  do the background, same thing we did in the past.
10:25AM 15       I don't know that I went further than that, and I
10:25AM 16  don't think I did.  I was satisfied with that, me.
10:26AM 17       I think -- you know, I don't remember, but I have --
10:26AM 18  I seem to recall either BP and/or the plaintiffs interviewing
10:26AM 19  her because I had made that a policy.  Anybody -- I want to
10:26AM 20  hire anybody, come talk to them.  That's what I'm fixing to do.
10:26AM 21  I've made that available to everybody.
10:26AM 22  Q.   While you were in the process of hiring her and discussing
10:26AM 23  her working for you, did she tell you that she had some matters
10:26AM 24  and cases that were before the Claims Administrator, to your
10:26AM 25  recollection?

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 10:26AM | 1 | A.   No.   No.   It was very, very abundantly clear -- I think |
| 10:26AM | 2 | Christine Reitano understands in spades -- that if you work at |
| 10:26AM | 3 | that office, you can't have any interest coming to you out of |
| 10:26AM | 4 | any claim that's filed.  I don't have any doubt about that at |
| 10:26AM | 5 | all. |
| 10:26AM | 6 | Q.   But that wasn't my question.  My question was, when you |
| 10:27AM | 7 | were in the hiring process, did she disclose to you that at |
| 10:27AM | 8 | that time she did represent a matter that was a claimant before |
| 10:27AM | 9 | the administrator? |
| 10:27AM | 10 | A.   I think she did.  I think she said they had represented a |
| 10:27AM | 11 | few.  I said, "If you have that, you can't work here.  You have |
| 10:27AM | 12 | to refer that to an attorney, and you can't retain any interest |
| 10:27AM | 13 | or have any interest or participation at all in any such claim, |
| 10:27AM | 14 | that claim or any other claim."  But she did -- she did |
| 10:27AM | 15 | disclose that. |
| 10:27AM | 16 | Q.   Did she agree to do any transfers or remove herself from |
| 10:27AM | 17 | any case that had an interest? |
| 10:27AM | 18 | A.   Absolutely. |
| 10:27AM | 19 | Q.   You were satisfied that you had clearly communicated that |
| 10:27AM | 20 | to her? |
| 10:27AM | 21 | A.   I'm totally satisfied. |
| 10:27AM | 22 | Q.   After she came on board, what were her legal |
| 10:27AM | 23 | responsibilities and functions working in your office, and did |
| 10:27AM | 24 | they change? |
| 10:27AM | 25 | A.   Well, two main things -- or three main things.  One, we |

**C O N F I D E N T I A L**

10:28AM  1    get literally hundreds of inquiries, from the lawyers, from BP,
10:28AM  2    from the Plaintiffs Steering Committee, claimants directly,
10:28AM  3    *pro se* claimants, what's the status of my claim?  All those
10:28AM  4    things probably have my name on it.
10:28AM  5          I try to get those out, so they'll go -- we have
10:28AM  6    contacts at BrownGreer and find out what -- we communicate.  I
10:28AM  7    have to monitor those, because if there is a backlog of things
10:28AM  8    that's not getting done -- that's how -- one of the mechanisms
10:28AM  9    that I have to find that out.  So she did a lot of that.
10:28AM  10         She was kind of a funnel for me.  You've probably
10:28AM  11   read we have over, what, 480 policies, the overwhelming
10:28AM  12   majority of which is agreed to by both parties.  It's a reduced
10:29AM  13   number that we had.  She would funnel those things, as being a
10:29AM  14   conduit between BrownGreer and me, in getting those done.
10:29AM  15         I would have had her do, in some of those instances,
10:29AM  16   opinions, legal opinions of what she thought that
10:29AM  17   Settlement Agreement did to this or this.  But in 99 percent of
10:29AM  18   those meetings was a conglomeration of meetings.  We had
10:29AM  19   accountants, we had the BrownGreer people and her, and then all
10:29AM  20   of those things, they would funnel to me.
10:29AM  21         The important thing about all of that is -- I made
10:29AM  22   this a policy when I took this job, because I know how this
10:29AM  23   rodeo is held -- I personally reviewed and was informed and
10:29AM  24   checked off on every policy we have this in case.  Nobody else
10:29AM  25   did that.  I did that.  I had a reason for doing that, because

**C O N F I D E N T I A L**

10:29AM 1   I wanted to know the totality of what we're dealing with.

10:29AM 2           We've had -- we've had many discussions where I've

10:30AM 3   disagreed with the accountants.  We've had many I've disagreed

10:30AM 4   with a lawyer, Christine Reitano, or with BrownGreer.  We've

10:30AM 5   had many that we all concurred in.  But the bottom line is, is

10:30AM 6   the buck stops here.  It did because I made it a purpose to

10:30AM 7   review each of those.

10:30AM 8           So to answer your question, she served as a funnel,

10:30AM 9   you know, in a lot of those activities.

10:30AM 10  Q.    Yes, sir.

10:30AM 11  A.    So the real question there was, was she -- was she

10:30AM 12  determinative of any policy that we issued, you know, and so

10:30AM 13  forth?  She was just -- to me, just like one other person on

10:30AM 14  this myriad group of people that gave me input, but she wasn't

10:30AM 15  a determining factor on the policy.  She didn't do that.

10:30AM 16  Q.    Would you characterize her role as your main lawyer, your

10:30AM 17  main legal counsel?

10:31AM 18  A.    For a period of time -- yes, for a period of time, she

10:31AM 19  was, because that was the only employee I really had, except --

10:31AM 20  and I've got to make an exception here -- when we -- when we

10:31AM 21  initiated this whole program and they wanted me to do this job,

10:31AM 22  BP was concerned about my staff.  That's why they checked out

10:31AM 23  Mike and wanted Mike, because Mike is a very, very bright

10:31AM 24  experienced lawyer.  We got commitment for him to come part

10:31AM 25  time, and this has turned out a lot more full time than it has

**C O N F I D E N T I A L**

SM-03-JA000197

10:31AM  1    been part time.

10:31AM  2         As it worked out, the lawyers, you know, who we've

10:31AM  3    had working -- David Duval handles, basically, the appellate

10:31AM  4    stuff; we had Christine being the funnel for all of this

10:31AM  5    stuff -- we were getting overloaded with the same thing.  I

10:31AM  6    mean, we were getting e-mails this high (indicating).  That's

10:32AM  7    when we had hired Lionel Sutton, you know, to do that.

10:32AM  8         When all of that is going on, Mike, at my direction,

10:32AM  9    had been intimately -- he's probably the guy that's got the

10:32AM  10   biggest picture of this whole case, this whole BEL issue, which

10:32AM  11   is a huge issue there.  He's the one that coordinates all the

10:32AM  12   meetings with the accountants and has the feedback and so

10:32AM  13   forth.  Judge Barbier --

10:32AM  14   Q.   You're talking about Michael now?

10:32AM  15   A.   Mike Juneau.  I'm trying to define the legal section.

10:32AM  16        Judge Barbier and Judge Shushan, I think, will

10:32AM  17   confirm what I'm telling you.  When they want to know, they've

10:32AM  18   got a serious legal matter involving a process in our office,

10:32AM  19   that's who they call.

10:32AM  20        I think Judge Barbier will tell you, he said, "Well,

10:32AM  21   Pat, if you want to leave, leave, but don't take him."

10:32AM  22        It was -- that's how the deal was set up.  It started

10:33AM  23   as a part-time thing.  It's becoming a lot more involved than

10:33AM  24   we thought.

10:33AM  25        But was she critical in the legal department,

**C O N F I D E N T I A L**

| 10:33AM | 1 | involved in making those decisions for that good period of |
| 10:33AM | 2 | time, the answer is yes. |
| 10:33AM | 3 | Q.   Let me ask the question in a slightly different way.  As |
| 10:33AM | 4 | an experienced lawyer, you're familiar with the term and the |
| 10:33AM | 5 | role of what's usually called a *general counsel* for an entity |
| 10:33AM | 6 | or a corporation? |
| 10:33AM | 7 | A.   She didn't serve in that capacity. |
| 10:33AM | 8 | Q.   You answered my question. |
| 10:33AM | 9 | In your administration -- |
| 10:33AM | 10 | A.   She might have thought that, but it wasn't in my eye. |
| 10:33AM | 11 | Q.   In your administration, did you have designated, either |
| 10:33AM | 12 | officially or unofficially or in your own understanding, some |
| 10:33AM | 13 | one person as a chief ethics officer? |
| 10:33AM | 14 | A.   A chief ethics officer?  You mean, did we take a stamp and |
| 10:34AM | 15 | put that on somebody's head, the answer is no. |
| 10:34AM | 16 | My vision of that was, right, wrong or indifferent -- |
| 10:34AM | 17 | ain't that many people there, you know, essentially 15 to |
| 10:34AM | 18 | 17 people -- |
| 10:34AM | 19 | Q.   Right. |
| 10:34AM | 20 | A.   -- so if somebody had any kind of answer, that's why we've |
| 10:34AM | 21 | got David Odom to deal with that. |
| 10:34AM | 22 | I never close my door.  Unless maybe you want to come |
| 10:34AM | 23 | talk to me about this matter, I'll close the door.  But I've |
| 10:34AM | 24 | always envisioned anybody had any problem, they could come to |
| 10:34AM | 25 | us and discuss that. |

**C O N F I D E N T I A L**

SM-03-JA000199

| | |
|---|---|
| 10:34AM | 1 |

Q.    Similar question with a different phrase.  Many times in

10:34AM  2  complex legal administrations, there's a lawyer designated as a

10:34AM  3  conflicts counselor.

10:34AM  4       It's a term that's used often in cases where there

10:34AM  5  are issues that arise with respect to possible conflicts.

10:35AM  6  Sometimes an administrator uses an in-house lawyer.  Sometimes

10:35AM  7  they use an outside lawyer.  They use the phrase, at least

10:35AM  8  commonly understood by me, as conflicts counsel.

10:35AM  9       Or, again, without stamping a label on something, did

10:35AM 10  you have a go-to lawyer inside or outside the administration

10:35AM 11  that in your mind was a person you would go to with respect to

10:35AM 12  conflicts?

10:35AM 13  A.   I don't remember the precise time; but, later in this

10:35AM 14  litigation, I guess maybe you could say -- you could have

10:35AM 15  designated it earlier, but there wasn't maybe three of us there

10:35AM 16  at the time.

10:35AM 17       But we -- we have had just issues that come up in my

10:35AM 18  mind, other people's mind about conflicts.  Rick Stanley,

10:35AM 19  outside counsel, Stanley, Reuter here, is a very well known,

10:35AM 20  accomplished ethics lawyer, does that work.  We go to him to

10:36AM 21  seek advice on that.

10:36AM 22       When I've got employment issues, have to deal with --

10:36AM 23  might have had to do with HIPAA or the contract issues,

10:36AM 24  employment issues, discharge issues that we talk about, the

10:36AM 25  Sessions firm, David Forsyth, outside firm I use to do that.

**C O N F I D E N T I A L**

SM-03-JA000200

10:36AM 1      So I primarily -- when those issues come, I farm that

10:36AM 2  out to independent people.  I don't have an in-house person to

10:36AM 3  do that.

10:36AM 4  Q.   With respect to Mr. Sutton, from time to time did you task

10:36AM 5  him or direct him to respond to a particular attorney or

10:36AM 6  individual that was inquiring about the status of claims?

10:36AM 7  A.   Oh, yeah.

10:36AM 8  Q.   That was a regular part of his work?

10:36AM 9  A.   That goes on today.  Unfortunately, we are having to do

10:36AM 10 it, just the two of us.

10:36AM 11 Q.   Do you recall ever directing him to deal with an attorney

10:37AM 12 named Jon Andry with respect to claims that Andry had before

10:37AM 13 the administrator?

10:37AM 14 A.   I never directed him to do that.

10:37AM 15 Q.   Do you recall ever requesting or directing him to address

10:37AM 16 or respond to issues relating to what's known as the Andry Law

10:37AM 17 Firm claim, which was a $7 million claim before the

10:37AM 18 administrator?

10:37AM 19 A.   To me -- no, I would have never done that.  To me, that's

10:37AM 20 just one of 195,000.  I think everybody knows -- I'm pretty

10:37AM 21 direct in my discussion with people.  I'm sure I would have

10:37AM 22 used words like, look, we ain't pushing nobody's case through

10:37AM 23 here.  I'm not here to foster anybody's case.

10:37AM 24      We're not here to -- let the system work, do its

10:37AM 25 work.  If you need to follow up on something that you need an

**C O N F I D E N T I A L**

10:37AM 1    inquiry follow-up, you go to -- we've got BrownGreer contacts

10:37AM 2    that will give you the information to respond.

10:38AM 3         If it's a problem that BrownGreer is not doing their

10:38AM 4    work, just come tell me about it.  They're bogged down.  If

10:38AM 5    we've got accountants getting behind, you let me know.  That's

10:38AM 6    why I have the communication.

10:38AM 7         So the answer to that is absolutely no.  I mean, I've

10:38AM 8    never had that -- he's never made that request to me.

10:38AM 9    Q.   You don't recall ever asking him to look at a particular

10:38AM 10   claim, such as the ones I've mentioned to you, or respond to a

10:38AM 11   lawyer who was asking you about the claim?

10:38AM 12   A.   About the Andry claim?

10:38AM 13   Q.   Yes.

10:38AM 14   A.   No.  I don't recall anything like that.

10:38AM 15        I will tell you, this on the record -- you hesitate

10:38AM 16   what you say, but I don't know Jon -- I know Jon Andry; not

10:38AM 17   personally, but I know him.  I'm a lawyer.  He's a younger

10:38AM 18   lawyer.

10:38AM 19        Jon is a real pushy kind of guy.  I guess if you

10:38AM 20   check with the Court, that's what you would find.  They

10:38AM 21   appeared in the Court about release of the funds and all of

10:38AM 22   that stuff the other day.  You could kind of blend that if you

10:39AM 23   read the pleadings.

10:39AM 24        So we get pushed all the time by people.  Claimants

10:39AM 25   push us, people -- politicians push us, everybody pushes us.

**C O N F I D E N T I A L**

SM-03-JA000202

10:39AM 1    But that's not our role.  That's not our job.  We try to

10:39AM 2    stick -- but if somebody complains about something, I have an

10:39AM 3    obligation to check into the matter to see if it's valid or not

10:39AM 4    valid.

10:39AM 5           Delay, you didn't process a claim, da-da, da-da, we

10:39AM 6    respond individually to requests like that, but that's just to

10:39AM 7    find what the answer is.  It's not to assist somebody with the

10:39AM 8    claim.

10:39AM 9    Q.   When Mr. Sutton first came to work at your office, did you

10:39AM 10   think of that or understand that to be a part-time job or a

10:39AM 11   full-time job?

10:39AM 12   A.   His job?

10:39AM 13   Q.   His job at your office?

10:39AM 14   A.   Essentially full time, except I was going to allow people,

10:39AM 15   which we've done -- because they've got an outside life here --

10:39AM 16   if you had something you had to finish up, you were dealing

10:40AM 17   with something, that I explained to you earlier, I allowed

10:40AM 18   that, but I consider this full-time employment.

10:40AM 19   Q.   Were you aware at any time that he was using the

10:40AM 20   administration office space to conduct his own private legal

10:40AM 21   business?

10:40AM 22   A.   I remember one time, he asked me, he said -- he had to

10:40AM 23   take a deposition in our office.  I said, "It's on a case you

10:40AM 24   had before?  It doesn't have anything to do with this?"  He

10:40AM 25   said, "Yeah, the people are coming, and I don't have a place."

**C O N F I D E N T I A L**

SM-03-JA000203

| | |
|---|---|
| 10:40AM 1 | I allowed that to happen.  Yeah, I did that. |
| 10:40AM 2 | Q.   At the time that he resigned -- |
| 10:40AM 3 | A.   I might add to you, the reason I did that was an |
| 10:40AM 4 | accommodation.  I have myself -- I'm the Special Master in |
| 10:40AM 5 | Toyota on the West Coast -- I've had people come at night -- we |
| 10:40AM 6 | had a meeting in the conference room the other night.  I have a |
| 10:40AM 7 | few of those matters still, so I've used that facility just for |
| 10:40AM 8 | that; but, it doesn't have anything to do with my work. |
| 10:40AM 9 | Q.   At the time that he resigned from your employment, |
| 10:41AM 10 | approximately how many hours was he working a week, or how full |
| 10:41AM 11 | time was his work, as best you understood it? |
| 10:41AM 12 | A.   Him or me? |
| 10:41AM 13 | Q.   Mr. Sutton? |
| 10:41AM 14 | A.   Oh, I look at it as a five-day week, Monday through |
| 10:41AM 15 | Friday. |
| 10:41AM 16 | Q.   Would he have been allowed or was he authorized in his |
| 10:41AM 17 | employment to inquire about particular claims and try to push |
| 10:41AM 18 | or facilitate any claims through the administration process? |
| 10:41AM 19 | A.   He was authorized because it was all of our roles to |
| 10:41AM 20 | inquire if you had an inquiry.  He -- it was not his role to |
| 10:41AM 21 | push a claim or to affect a claim. |
| 10:42AM 22 |         I read something -- I read this e-mail exchange.  I |
| 10:42AM 23 | think I saw where there was a lot of calls -- not a lot of |
| 10:42AM 24 | calls, there were a lot of inquiries on a claim.  I don't know |
| 10:42AM 25 | what the etiology of that was.  What he was trying to do was to |

**CONFIDENTIAL**

| | |
|---|---|
| 10:42AM 1 | check the status. |
| 10:42AM 2 | I think I read somewhere where he said, "Well, I'm |
| 10:42AM 3 | just trying to check on his claim, just check on his claim." |
| 10:42AM 4 | Based on what I saw, that was an awful lot of calls.  It looked |
| 10:42AM 5 | look he was pushing, you know what I mean. |
| 10:42AM 6 | Now, I mean, I don't know what his explanation is, |
| 10:42AM 7 | but his explanation is, I'm just checking because I want to |
| 10:42AM 8 | check. |
| 10:42AM 9 | It's a difference between checking on a claim and |
| 10:42AM 10 | pushing a claim.  A push is -- no, we don't do that.  Okay. |
| 10:42AM 11 | I get claims that come to me and they say, "Would you |
| 10:42AM 12 | check on the status?  It's been six months."  I'm obliged, I |
| 10:43AM 13 | check.  I don't push the claim. |
| 10:43AM 14 | The accountants can tell you that.  I mean, you know. |
| 10:43AM 15 | I say, whatever the rotation is, go do what you got to do. |
| 10:43AM 16 | But I said, "Hey, look, this claim has been sitting |
| 10:43AM 17 | here nine months; if this is out of order and it don't meet our |
| 10:43AM 18 | normal flow, go handle the case." |
| 10:43AM 19 | Judge, we get those -- we get people that filed a |
| 10:43AM 20 | claim yesterday and sending those kind of letters tomorrow. |
| 10:43AM 21 | Q.   Mr. Juneau, I'm going to show you a series of documents. |
| 10:43AM 22 | These documents, I'll represent to you, are formulations of |
| 10:43AM 23 | policies, new policies on confidentiality, on conflict of |
| 10:43AM 24 | interest, gifts, entertainment and gratuities, employee |
| 10:43AM 25 | checklists, and one which is called a *draft protection policy*. |

**C O N F I D E N T I A L**

SM-03-JA000205

10:43AM 1       These are new policies, I'll represent to you, that

10:43AM 2   have been recently formulated.  So I'll just show them to you.

10:44AM 3   These are Exhibits PJ-1, 1A, 1C, 1D and 7.

10:44AM 4       (WHEREUPON, at this point in the proceedings,

10:44AM 5   Exhibits PJ-1, PJ-1A, PJ-1C, PJ-1D and PJ-7 were marked.)

10:44AM 6   BY MR. FREEH:

10:44AM 7   Q.   I'm not going to ask you any detail.  I'm just going to

10:44AM 8   ask you whether these are policies that you and your office

10:44AM 9   have recently put into place and implemented as part of your

10:44AM 10  administration?

10:44AM 11  A.   That's correct.

10:44AM 12       Can I go back to one thing you asked earlier, because

10:44AM 13  I think it would be relevant to fully answer your question?

10:44AM 14  Q.   Yes.

10:44AM 15  A.   When you're talking about inquiries and so forth, I guess

10:44AM 16  a lot of times we learn through experience.  Kind of when I saw

10:44AM 17  that, you know, I said, you know, maybe that's something we've

10:44AM 18  got to think about.

10:44AM 19       So what I had our IT people look at, just give us a

10:45AM 20  report, if we've got somebody repetitively looking at the

10:45AM 21  cases.  I guess you've got to set some benchmark or something,

10:45AM 22  you know; but, I said, "Y'all recommend something to me."

10:45AM 23       That's kind of what spurred that in my mind about

10:45AM 24  when I saw -- like, the Sutton thing, I said, that sounds like

10:45AM 25  a pretty good thing to do.

**C O N F I D E N T I A L**

SM-03-JA000206

10:45AM 1          So we are doing that.  They come up with that policy,

10:45AM 2     but that's where it came from.  It wasn't my virgin thought,

10:45AM 3     you know, at the time.

10:45AM 4     Q.    Did you come to learn, by the way, recently, that

10:45AM 5     BrownGreer has had the capacity to do that for some time, check

10:45AM 6     on the number of inquiries that someone was making on a

10:45AM 7     particular claim?

10:45AM 8     A.    Yeah, yeah, yeah, yeah, which I think is a good thing.

10:45AM 9     Q.    At some other point, and not in terms of my interview, I'm

10:45AM 10    going to come back to you, and we're going to discuss policies

10:45AM 11    and formulation --

10:45AM 12    A.    Right.

10:45AM 13    Q.    -- in a different -- in a different manner.

10:46AM 14          MR. TIDWELL:  A follow-up question?

10:46AM 15          MR. FREEH:  Yes.

10:46AM 16          MR. TIDWELL:  Sir, were you aware that BrownGreer had

10:46AM 17    not communicated to your IT staff for a number of months that

10:46AM 18    there was the capacity to determine who was checking claims?

10:46AM 19          THE WITNESS:  No, not really.

10:46AM 20          Look, this question about checking and so forth

10:46AM 21    is kind of surfacing now; but, I wasn't -- I wasn't aware of

10:46AM 22    what, by the end of the discussion, you could, did, didn't, you

10:46AM 23    didn't or whatever, no, I wasn't aware.

10:46AM 24                        EXAMINATION

10:46AM 25    BY MR. BUCKNAM:

**C O N F I D E N T I A L**

SM-03-JA000207

10:46AM 1   Q.    When did you first learn that, Mr. Juneau, that the system

10:46AM 2   enabled that?

10:46AM 3   A.    Well, I think -- as God be my witness, I don't remember

10:46AM 4   the precise date, but it was sometime when they were showing --

10:46AM 5   they started checking Sutton's involvement, you know, that he

10:46AM 6   had a lot of hits on a case.

10:47AM 7   Q.    So would that be within the last couple of months?

10:47AM 8   A.    Yeah, I would think so.

10:47AM 9   Q.    Mr. Freeh had just asked you some questions regarding

10:47AM 10  policies that were recently implemented, and you've answered

10:47AM 11  those questions.

10:47AM 12          I want to go back to policies that would have been in

10:47AM 13. effect at the beginning of this year or at the end of last

10:47AM 14  year, around the time Mr. Sutton came on board.

10:47AM 15          Was there a policy in effect at that time for

10:47AM 16  employees to disclose outside employment or to seek your

10:47AM 17  permission to engage in outside employment outside of the

10:47AM 18  claims office?

10:47AM 19  A.    I think I've discussed that issue with people, you know,

10:47AM 20  in meetings with them, that if -- you know, you can't -- if you

10:47AM 21  want to do any kind of employment, I've got to know about that.

10:47AM 22          (WHEREUPON, at this point in the proceedings,

10:48AM 23  Exhibits PJ-2, PJ-3 and PJ-4 were marked.)

10:48AM 24  BY MR. BUCKNAM:

10:47AM 25  Q.    I'm going to show you three documents marked PJ-2, PJ-3

**C O N F I D E N T I A L**

SM-03-JA000208

| | | |
|---|---|---|
| 10:48AM | 1 | and PJ-4, and ask you, sir, to take a look at these three |
| 10:48AM | 2 | documents, please. |
| 10:48AM | 3 | A.    (Witness reviews the documents.)  Yeah, I remember |
| 10:49AM | 4 | David Odom coming to me around this time. |
| 10:49AM | 5 | Q.    For the record, can you just tell us, what is PJ-2? |
| 10:49AM | 6 | A.    Well, he submitted this policy to me, asked me to review |
| 10:49AM | 7 | the policy, thought it was appropriate, and I approved that |
| 10:49AM | 8 | policy.  That's my approval right there. |
| 10:49AM | 9 | Q.    If I may, sir, on PJ-2, is this a request to engage in |
| 10:49AM | 10 | outside employment by -- |
| 10:49AM | 11 | A.    Chris Reade. |
| 10:49AM | 12 | Q.    -- by Chris Reade? |
| 10:49AM | 13 | A.    Yes. |
| 10:49AM | 14 | Q.    Is this an approval -- a request by Mr. Reade dated |
| 10:49AM | 15 | July 17th of last year, and your approval back to him to engage |
| 10:49AM | 16 | in outside employment? |
| 10:49AM | 17 | A.    Yes.  That's right. |
| 10:49AM | 18 | Q.    What is PJ-3?  Is that a request?  Who is that a request |
| 10:49AM | 19 | from? |
| 10:49AM | 20 | A.    David Odom -- wait a minute.  Excuse me.  Excuse me.  I'm |
| 10:50AM | 21 | bad at reading -- I think this is David Odom to me. |
| 10:50AM | 22 | Q.    Is that dated July 17th, 2012, as well, sir? |
| 10:50AM | 23 | A.    That's right. |
| 10:50AM | 24 | Q.    Did you approve that request? |
| 10:50AM | 25 | A.    I did. |

**C O N F I D E N T I A L**

SM-03-JA000209

10:50AM 1   Q.   The approval is dated July 18th?

10:50AM 2   A.   That's right.

10:50AM 3   Q.   Then the last one is PJ-4.  Is this an e-mail dated

10:50AM 4   July 17, 2012?

10:50AM 5   A.   That's right.

10:50AM 6   Q.   Who is this from?

10:50AM 7   A.   David Welker.

10:50AM 8   Q.   Is Mr. Welker seeking your permission to engage in outside

10:50AM 9   employment?

10:50AM 10   A.   That's what it was, and I reviewed that and approved it.

10:50AM 11   Q.   You approved this by e-mail response dated July 18th,

10:50AM 12   correct?

10:50AM 13   A.   That's right.

10:50AM 14   Q.   To your knowledge, did anyone else submit e-mail requests

10:50AM 15   or written requests to you to engage in outside employment

10:50AM 16   which you approved?

10:50AM 17   A.   Right offhand, I don't recall any.

10:51AM 18   Q.   I would just ask you to take a look, if you would, at the

10:51AM 19   text of PJ-2 and the text of PJ-3, which are the requests by

10:51AM 20   Mr. Odom -- excuse me, by Mr. Reade and Mr. Odom.

10:51AM 21        Is the text of the two requests essentially the same?

10:51AM 22   A.   It sure looks like it.

10:51AM 23   Q.   If I could just read into the record PJ-2.  "Pursuant to

10:51AM 24   the *Deepwater Horizon* Claim Center Confidentiality and

10:51AM 25   Non-Disclosure Agreement, Conflict of Interest and Recusal

**C O N F I D E N T I A L**

SM-03-JA000210

10:51AM 1  Section, I am seeking your approval to continue work with other

10:51AM 2  companies that I have established.  Although I work full-time

10:51AM 3  on the *Deepwater Horizon* economic claims program, I spend some

10:51AM 4  additional time in these companies which provide software and

10:51AM 5  other services.  These companies' products and services do not

10:51AM 6  in any way present a conflict of interest to my role as the CIO

10:51AM 7  of the DHECC."

10:51AM 8  A.   That's correct.

10:51AM 9  Q.   Other than referencing the different title between

10:52AM 10  Mr. Odom and Mr. Reade, is the e-mail between PJ-2 and PJ-3 the

10:52AM 11  same?

10:52AM 12  A.   It's identical, with that exception.

10:52AM 13  Q.   Did either of these gentlemen ever identify for you in

10:52AM 14  written fashion the name of the company or companies that they

10:52AM 15  were involved in?

10:52AM 16  A.   I think they -- I think they verbally told me.  I can

10:52AM 17  remember David Odom telling me what companies he -- software

10:52AM 18  companies he was operating outside of this, that he had

10:52AM 19  interest in --

10:52AM 20  Q.   But he continued to represent to you that they did not

10:52AM 21  have a conflict of interest with respect to his role --

10:52AM 22  A.   Oh, yeah.

10:52AM 23  Q.   -- at the *Deepwater Horizon*?

10:52AM 24  A.   Yes, sir.

10:52AM 25  Q.   Then, finally, with respect to Mr. Welker's request, am I

**C O N F I D E N T I A L**

SM-03-JA000211

10:52AM 1    correct that this is a completely different request in which

10:52AM 2    he's asking for permission to assist the local Sheriff's Office

10:52AM 3    in providing --

10:52AM 4    A.    I remember that, because I remember St. Bernard Parish.

10:52AM 5    Q.    -- in providing some internal affairs help, correct?

10:52AM 6    A.    Yes.   That's correct.

10:52AM 7    Q.    Now, you said that Mr. Odom -- you thought Mr. Odom had

10:53AM 8    talked to you about the software company that did not have

10:53AM 9    anything to do with the *Deepwater Horizon* Claims Center.

10:53AM 10        Did Mr. Odom ever talk to you about a company called

10:53AM 11   *Crescent City Group*?

10:53AM 12   A.    I don't remember that.

10:53AM 13   Q.    Did Mr. Reade ever talk to you about a company called

10:53AM 14   *Crescent City Group*?

10:53AM 15   A.    That doesn't -- I don't have any recollection of that.

10:53AM 16   Q.    Did any of the -- I'm going to ask you some names, and

10:53AM 17   just ask you if any of these people ever submitted any written

10:53AM 18   requests for waiver to engage in outside employment.

10:53AM 19        Did you ever receive one from Christine Reitano?

10:53AM 20   A.    No, I don't think so.

10:53AM 21   Q.    Lionel Sutton?

10:53AM 22   A.    No, but I told you about the verbal discussion I had with

10:53AM 23   him.

10:53AM 24   Q.    Yes, sir.

10:53AM 25   A.    Yeah.

**C O N F I D E N T I A L**

SM-03-JA000212

10:53AM  1    Q.    Christina Hendricks?

10:53AM  2    A.    No.

10:53AM  3    Q.    David Duval?

10:53AM  4    A.    No.

10:53AM  5    Q.    Kirk Fisher?

10:54AM  6    A.    I didn't receive any -- I don't remember receiving any

10:54AM  7    from Kirk Fisher.  I knew about -- he had told me about the

10:54AM  8    outside interests in the company he had.  I knew about that

10:54AM  9    verbally.

10:54AM 10    Q.    Did he tell you what the company did?

10:54AM 11    A.    I think -- Kirk is a very accomplished guy.  He's a

10:54AM 12    part-time professor at LSU in internal auditing and so forth,

10:54AM 13    so it would be a spin-off, as I recall, of some sort of

10:54AM 14    computer thing that may have to do with staffing or something

10:54AM 15    like that.

10:54AM 16    Q.    Did any of these people who are on your staff at the

10:54AM 17    *Deepwater Horizon* ever talk to you about their taking on a role

10:54AM 18    in the -- what's referred to as the *Chinese Drywall* settlement

10:54AM 19    administration?

10:55AM 20    A.    Any of which people?

10:55AM 21    Q.    Mr. Duval, Mr. Reade, Mr. Odom, Mr. Fisher, any of those

10:55AM 22    people.

10:55AM 23    A.    The only thing I remember, it came to me -- I saw there

10:55AM 24    was a brochure.  David Odom may have been the initiator of

10:55AM 25    that.  I think he put it together, and a group of people were

**C O N F I D E N T I A L**

10:55AM 1    listed therein was Duval, Fisher, some others.

10:55AM 2         I told him I didn't like that.  I thought that

10:55AM 3    conflicted with what we're doing there.  He told me that they

10:55AM 4    pulled that proposal down.

10:55AM 5         (WHEREUPON, at this point in the proceedings,

10:55AM 6    Exhibit PJ-9 was marked.)

10:55AM 7    BY MR. BUCKNAM:

10:56AM 8    Q.   All right.  Mr. Juneau, I'm going to show you what has

10:56AM 9    been marked as PJ-9.

10:56AM 10   A.   Yes.

10:56AM 11   Q.   I'm going to ask you, is that the document that you

10:56AM 12   referred to as the *brochure* listing people and their various

10:56AM 13   responsibilities, the document that you said you did not like?

10:56AM 14        MR. FREEH:  Can we state for the record that our

10:56AM 15   records show that the document that Mr. Juneau is looking at

10:56AM 16   was sent to him as a copy of an e-mail transmission?

10:56AM 17        MR. BUCKNAM:  Yes.  I apologize.

10:56AM 18        MR. FREEH:  Why don't you show him that.

10:56AM 19        MR. BUCKNAM:  Yes.

10:56AM 20        MR. FREEH:  It might help him refresh his

10:56AM 21   recollection.

10:56AM 22        (WHEREUPON, at this point in the proceedings,

10:56AM 23   Exhibit PJ-8 was marked.)

10:56AM 24   BY MR. BUCKNAM:

10:56AM 25   Q.   Mr. Juneau, I'm going to show you a document marked

**C O N F I D E N T I A L**

SM-03-JA000214

| 10:56AM | 1 | PJ-8 -- I apologize, sir, I should have shown this to you |

10:56AM 1  PJ-8 -- I apologize, sir, I should have shown this to you

10:56AM 2  before --

10:56AM 3  A.    Uh-huh (affirmative response).

10:56AM 4  Q.    -- which is an e-mail which appears to be dated

10:57AM 5  March 19, 2013, from -- excuse me, March 19, 2013, from

10:57AM 6  David Odom to Lynn Greer, with a copy to you, called "*Chinese*

10:57AM 7  *Drywall* Proposal."

10:57AM 8        Then there is some text addressed to Lynn, in which

10:57AM 9  he says -- Mr. Odom says he's reaching out to Judge Fallon,

10:57AM 10  john Perry, Pat Juneau and others.

10:57AM 11        Do you recall receiving that e-mail, sir?

10:57AM 12  A.    I could have -- you know, I'm not -- I don't specifically

10:57AM 13  remember the e-mail.  I do know -- I do know that I got the

10:57AM 14  brochure, but it listed -- what I'm looking for here --

10:57AM 15        MR. TIDWELL:  In the back, sir, is who all --

10:57AM 16        THE WITNESS:  The names?

10:57AM 17        MR. TIDWELL:  -- all the people that were proposed

10:57AM 18  for the project.

10:57AM 19        THE WITNESS:  That's what I was looking for.

10:57AM 20        MR. TIDWELL:  It's an addendum.

10:57AM 21        THE WITNESS:  I think that's, in essence, the

10:57AM 22  project -- Lynn Greer was appointed, as I recall.

10:57AM 23  BY MR. BUCKNAM:

10:58AM 24  Q.    I apologize for the quality of the copy, Mr. Juneau, the

10:58AM 25  way it came out; but, if you take a look at what's called

**C O N F I D E N T I A L**

SM-03-JA000215

10:58AM 1    *Appendix B, Key Personnel Resumés*, I think you'll find the

10:58AM 2    resumés of Mr. Fischer and some other folks in there?

10:58AM 3    A.    I think this is what I was talking about.

10:58AM 4    Q.    Now, Mr. Juneau, before you received that document -- or

10:58AM 5    before you saw that document for the first time, had anyone

10:58AM 6    asked for your permission to submit a proposal with one of the

10:58AM 7    vendors on *Deepwater Horizon* in connection with another matter?

10:58AM 8    A.    I don't recall that.  I recall David Odom saying, you

10:58AM 9    know, that people looking at other things -- well -- I mean,

10:58AM 10   other interests if this thing -- at the end of this, where do

10:58AM 11   we go, and so forth and so on.  I said, "Well, I don't know

10:59AM 12   about that."

10:59AM 13            Then he put together -- then, the next thing I saw

10:59AM 14   was the -- this proposal.  I saw all these people listed.

10:59AM 15   Then, as a matter of fact, it even caught my attention, I seen

10:59AM 16   something in there, reference, Patrick Juneau.  I said, wait a

10:59AM 17   minute, wait a minute, I got a program to run here.  Don't

10:59AM 18   reference me -- first of all, reference me on anything.

10:59AM 19            I said, I'm not -- I see that as a problem, you

10:59AM 20   doing -- applying for work like that.  Y'all might have other

10:59AM 21   companies of other people who can do that; but, to me, I found

10:59AM 22   objection to that, and I expressed that to David Odom.  He

10:59AM 23   subsequently told me shortly thereafter, "We concur.  We've

10:59AM 24   pulled down this application."

10:59AM 25   Q.    Is there an individual who previously was employed at your

**C O N F I D E N T I A L**

10:59AM  1    office by the name of *Scott Sherrick* (spelled phonetically)?

10:59AM  2    A.    Yes.

10:59AM  3    Q.    Who was Scott Sherrick?  What was his role on your staff?

11:00AM  4    A.    He worked with Kirk Fisher.

11:00AM  5    Q.    Did there come a time when Mr. Sherrick separated from the

11:00AM  6    claims office?

11:00AM  7    A.    Yes.

11:00AM  8    Q.    Why was that, sir?

11:00AM  9    A.    That was me.

11:00AM  10   Q.    Can you explain --

11:00AM  11   A.    The short of that was I thought Mr. Sherrick was a very

11:00AM  12   competent guy, very knowledgeable computer guy; but, man, his

11:00AM  13   dealing -- you could sit in a meeting for five minutes.  His

11:00AM  14   dealings with other people, he was an irritant factor to people

11:00AM  15   in the room.

11:00AM  16          I just said I thought that was a bad mix.  I told

11:00AM  17   Kirk Fisher that I didn't think it would be appropriate for him

11:00AM  18   to serve -- it had nothing to do with his competence.  It was a

11:00AM  19   personality --

11:00AM  20   Q.    Did it have anything to do with the *Chinese Drywall*

11:00AM  21   proposal?

11:00AM  22   A.    No, it did not.

11:00AM  23   Q.    Did it have anything to do with the efforts Mr. Sherrick

11:00AM  24   had made to streamline the efficiencies at BrownGreer?

11:00AM  25   A.    No, sir.

**C O N F I D E N T I A L**

SM-03-JA000217

11:00AM 1    Q.    So it had to do more with personality clashes and what you

11:01AM 2    viewed as --

11:01AM 3    A.    That -- I mean, you know, that's what I viewed it.  That's

11:01AM 4    how I looked at it.

11:01AM 5    Q.    Again, if I could just go back, when Mr. Odom and

11:01AM 6    Mr. Reade submitted their virtually identical requests for

11:01AM 7    permission to engage in outside employment, did they ever

11:01AM 8    elaborate upon what company or companies they were talking

11:01AM 9    about to you in writing?

11:01AM 10   A.    I don't remember seeing it in writing.  I may have -- I

11:01AM 11   seem to recall we had some verbal discussions about that, the

11:01AM 12   details of which I don't remember.

11:01AM 13          Just based on explanations given to me, I thought --

11:01AM 14   I was focused on what I had to do here.  I thought we were

11:01AM 15   going to fulfill our -- I was all right with that, based on

11:01AM 16   what they told me.

11:01AM 17          THE WITNESS:  I guess we are wiser men with the

11:02AM 18   passage of time, Judge.

11:02AM 19   BY MR. BUCKNAM:

11:02AM 20   Q.    Again, I just -- I know you've mentioned outside this room

11:02AM 21   on prior occasions about other policies that have been

11:02AM 22   implemented that you would like to discuss further; but, if we

11:02AM 23   could just keep these focused on the policies that were in

11:02AM 24   effect at the time.

11:02AM 25   A.    Oh, yeah.  Let me just mention that to you right now.

**C O N F I D E N T I A L**

SM-03-JA000218

11:02AM  1    Q.    Sure.

11:02AM  2    A.    I mean, I don't know -- there's a lot of things I don't

11:02AM  3    need to address with y'all today; but, I have a lot of input

11:02AM  4    into policies and things that I -- the overall reach that I

11:02AM  5    see, except for -- let me just make this one comment, and I'm

11:02AM  6    going to skip through that -- as a -- just as an example, it

11:02AM  7    was me who decided to have an independent auditing firm.  We

11:02AM  8    had three names.  We selected one.  Everybody approved.  The

11:02AM  9    scope was approved, etcetera, etcetera, etcetera.

11:02AM 10          I said, y'all come in and do two audits.  It's

11:03AM 11    continuous; it's not just one, it's over a quarter.  You do

11:03AM 12    quarters.  Do a process audit.  They were here for hours and

11:03AM 13    hours.

11:03AM 14          MR. FREEH:  Which accounting firm or company?

11:03AM 15          THE WITNESS:  CliftonLarson.  It's a national deal.

11:03AM 16    They had a team over here, and they come back every so often.

11:03AM 17          What I was going to say -- I think this is in

11:03AM 18    y'all's packet, I'm not sure.

11:03AM 19          MR. TIDWELL:  We have that, sir, and we have the

11:03AM 20    schedule for what they are doing.

11:03AM 21          THE WITNESS:  I just wanted to make sure -- from my

11:03AM 22    perspective, I said, them people know a whole hell of a lot,

11:03AM 23    right, wrong or indifferent, about what we're doing.  I just

11:03AM 24    wanted to make sure that was on the radar screen.  That's all I

11:03AM 25    was saying about it.

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 11:03AM | 1 | MR. TIDWELL:  Yes, sir.  It is. |
| 11:03AM | 2 | THE WITNESS:  You can talk to those people.  You have |
| 11:03AM | 3 | my complete permission. |
| 11:03AM | 4 | BY MR. BUCKNAM: |
| 11:03AM | 5 | Q.   Thank you very much.  Mr. Juneau, may I have -- |
| 11:03AM | 6 | A.   But my point is -- |
| 11:03AM | 7 | Q.   All right. |
| 11:03AM | 8 | A.   -- I don't intend to get -- there are other policy issues. |
| 11:03AM | 9 | We're trying to segregate these issues today, and I'm all fine |
| 11:03AM | 10 | with that.  So I don't intend to go through those, except to |
| 11:03AM | 11 | make one comment.  I would be remiss to what we're doing. |
| 11:04AM | 12 | In the mix -- and it blends over into the Sutton |
| 11:04AM | 13 | matter -- is all of the things we're trying to do about the |
| 11:04AM | 14 | integrity and the viability and what we've accomplished, and |
| 11:04AM | 15 | we've got a long way to go, is it takes two people to dance on |
| 11:04AM | 16 | the dance floor. |
| 11:04AM | 17 | We have encountered a lot of obstacles, man, and I |
| 11:04AM | 18 | just don't know how much you know about that.  I don't know if |
| 11:04AM | 19 | that's relevant to you.  I'm just telling you.  I got the |
| 11:04AM | 20 | facts.  All I want to do is do the job. |
| 11:04AM | 21 | I'm saying, to have a complete picture, you got to |
| 11:04AM | 22 | know what the obstacles are.  The reason I say that is because |
| 11:04AM | 23 | I don't know -- this is the one document I don't think you've |
| 11:04AM | 24 | seen, I think. |
| 11:04AM | 25 | We did a response to a BP letter on -- they wrote me |

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 11:04AM | 1 | a letter on -- wrote a letter to the Court on July 1, which was |
| 11:04AM | 2 | given to the press.  Then I responded to that -- to their |
| 11:05AM | 3 | inquiry and went through meticulous detail, and it outlines the |
| 11:05AM | 4 | kind of stuff. |
| 11:05AM | 5 | I don't know if y'all have that report or not; but, |
| 11:05AM | 6 | to have the overall picture -- and this is going back from day |
| 11:05AM | 7 | one to the current time, so it includes not just -- it's the |
| 11:05AM | 8 | entire process. |
| 11:05AM | 9 | If y'all don't have that document, if there is one |
| 11:05AM | 10 | document I would say you've really got to read, it tells you |
| 11:05AM | 11 | the story about who is doing what and whatnot, so -- |
| 11:05AM | 12 | MR. FREEH:  So let's mark that as -- |
| 11:05AM | 13 | THE WITNESS:  I'm going to shut up after that. |
| 11:05AM | 14 | MR. FREEH:  -- 17.  So we'll mark that as PJ-17. |
| 11:05AM | 15 | (WHEREUPON, at this point in the proceedings, |
| 11:05AM | 16 | Exhibit PJ-17 was marked.) |
| 11:05AM | 17 | THE WITNESS:  I'll get focused on the policies you |
| 11:05AM | 18 | need to address. |
| 11:05AM | 19 | MR. BUCKNAM:  Mr. Juneau, you've been very helpful. |
| 11:05AM | 20 | Thank you. |
| 11:05AM | 21 | MR. FREEH:  We will review that, and, as was made |
| 11:05AM | 22 | clear in the Judge's order, there will be a second phase, and |
| 11:05AM | 23 | we'll have more opportunity to work on that.  But you're right, |
| 11:05AM | 24 | a lot of it is relevant to -- |
| 11:05AM | 25 | THE WITNESS:  That's the only reason I mentioned that |

**C O N F I D E N T I A L**

SM-03-JA000221

| | | |
|---|---|---|
| 11:05AM | 1 | about that report. |
| 11:05AM | 2 | BY MR. BUCKNAM: |
| 11:05AM | 3 | Q.    May I ask you, sir, if you have ever been told the name |
| 11:05AM | 4 | ██████████, or ████████████? It's spelled |
| 11:06AM | 5 | ██████████████. |
| 11:06AM | 6 | Has BrownGreer ever briefed you on an employee by the |
| 11:06AM | 7 | name of ████████████ that they have? |
| 11:06AM | 8 | A.    Me? |
| 11:06AM | 9 | Q.    Yes, sir. |
| 11:06AM | 10 | A.    Not me. |
| 11:06AM | 11 | Q.    Has anyone ever briefed -- |
| 11:06AM | 12 | A.    Never heard the name. |
| 11:06AM | 13 | Q.    Has anyone ever briefed you on the fact that ████████ |
| 11:06AM | 14 | is the mother of Casey Thonn's child? |
| 11:06AM | 15 | A.    Somewhere -- somewhere, somebody said within the past two |
| 11:06AM | 16 | weeks or something, just recently, something about Casey Thonn |
| 11:06AM | 17 | and some BrownGreer employee. That's all I really know. |
| 11:06AM | 18 | I'm going to tell you, that's -- boom. Like, walking |
| 11:06AM | 19 | down the hall, somebody might have mentioned that to me. |
| 11:06AM | 20 | MR. FREEH: Within the last two weeks or so? |
| 11:06AM | 21 | THE WITNESS: Yeah. That's all I know. |
| 11:07AM | 22 | MR. TIDWELL: So you don't know anything further |
| 11:07AM | 23 | about what action might have been taken about that employee? |
| 11:07AM | 24 | THE WITNESS: Not really. I mean, that could have |
| 11:07AM | 25 | gotten through to somebody in my office, but, I mean, they |

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 11:07AM | 1 | didn't -- |
| 11:07AM | 2 | BY MR. BUCKNAM: |
| 11:07AM | 3 | Q.    It didn't make it to your level? |
| 11:07AM | 4 | A.    You don't have to go very high to get there, but, no, I |
| 11:07AM | 5 | don't know. |
| 11:07AM | 6 | EXAMINATION |
| 11:07AM | 7 | BY MR. TIDWELL: |
| 11:07AM | 8 | Q.    Sir, just a couple of things to follow on to some |
| 11:07AM | 9 | questions that the director asked you. |
| 11:07AM | 10 | Christine Hendricks, how did she come to be employed |
| 11:07AM | 11 | in the CAO? |
| 11:07AM | 12 | A.    That's an interesting story.  We had this subsistence |
| 11:07AM | 13 | program to activate.  It's the one program that -- it was the |
| 11:07AM | 14 | last piece to kind of come on, because they really hadn't done |
| 11:07AM | 15 | much in that Settlement Agreement; so, the whole thing got |
| 11:07AM | 16 | dumped on our lap. |
| 11:07AM | 17 | It said, you know, in the terms of the agreement, you |
| 11:07AM | 18 | have got to have somebody to be in charge of it.  BP wanted me |
| 11:08AM | 19 | to hire and was pushing a guy named -- he was from Abbeville, |
| 11:08AM | 20 | Louisiana.  He came here and met with me.  I want to say his |
| 11:08AM | 21 | last name was Landry.  He was a nice guy. |
| 11:08AM | 22 | I thought he was competent.  He wanted to work.  He |
| 11:08AM | 23 | said, "I just want to work part time.  I want to work just |
| 11:08AM | 24 | occasionally.  I don't want to be a full-time employee.  I |
| 11:08AM | 25 | don't have a whole lot of time to do with it."  So I knew that |

**C O N F I D E N T I A L**

SM-03-JA000223

| | | |
|---|---|---|
| 11:08AM | 1 | that wouldn't fit what we had to do. |
| 11:08AM | 2 | So then I said I've got to find me somebody to do |
| 11:08AM | 3 | this.  Then I started looking at the whole program.  This is a |
| 11:08AM | 4 | Wildlife and Fisheries question if there ever was one.  I mean, |
| 11:08AM | 5 | it's an enforcement issue.  So I picked up the phone and called |
| 11:08AM | 6 | the Wildlife and Fisheries Department of Louisiana.  I said, "I |
| 11:09AM | 7 | think I need to speak to the director there."  I said, "Y'all |
| 11:09AM | 8 | got anybody?" |
| 11:09AM | 9 | He said -- he gave me a name of a fellow who may or |
| 11:09AM | 10 | may not retire, was head of it and had done the regulation |
| 11:09AM | 11 | parts, done the testing of crabbers and all of that stuff. |
| 11:09AM | 12 | Really knew a lot of material. |
| 11:09AM | 13 | I met with him in Baton Rouge.  David Odom was with |
| 11:09AM | 14 | me.  I talked to him twice.  Very, very knowledgeable guy. |
| 11:09AM | 15 | He's like a colonel with the wildlife and fisheries. |
| 11:09AM | 16 | He said, "But I got eight months" -- "or a year left |
| 11:09AM | 17 | to retire.  How long does your program last?"  I said, "I don't |
| 11:09AM | 18 | know."  That's that question of employment I was telling you |
| 11:09AM | 19 | about.  He said, "I really couldn't do it." |
| 11:09AM | 20 | So I looked at him, and I said -- and I can get his |
| 11:09AM | 21 | name for you -- but I said, "Do you know somebody that's really |
| 11:09AM | 22 | got this experience?"  He said, "Yeah, I do."  He said this |
| 11:10AM | 23 | girl, Christina Hendricks, is now working in -- I think she was |
| 11:10AM | 24 | in Illinois at the time, but she's from Louisiana.  But he |
| 11:10AM | 25 | said, "She's been involved in the regulatory stage, she's been |

**C O N F I D E N T I A L**

SM-03-JA000224

| | | |
|---|---|---|
| 11:10AM | 1 | involved in the enforcement stage.  She's understands |
| 11:10AM | 2 | everything that you're talking about." |
| 11:10AM | 3 | So I called her.  She came in.  We interviewed her. |
| 11:10AM | 4 | David Odom was there.  We talked to her.  In my opinion, she |
| 11:10AM | 5 | fit the bill of what we were looking for. |
| 11:10AM | 6 | Q.    Would that mainly be subsistence? |
| 11:10AM | 7 | A.    Strictly subsistence. |
| 11:10AM | 8 | Q.    So did you run -- was this one that you had to run through |
| 11:10AM | 9 | the Judge and run through the -- |
| 11:10AM | 10 | A.    Same thing.  Background check, BP.  Go, here it is, here |
| 11:10AM | 11 | is the lady.  The reason I know, because they sent me this |
| 11:10AM | 12 | other guy, you know. |
| 11:10AM | 13 | Q.    Right. |
| 11:10AM | 14 | Then, on David Duval? |
| 11:10AM | 15 | A.    Same thing. |
| 11:10AM | 16 | Q.    No.  How did he come to you?  How did he come to your |
| 11:10AM | 17 | attention? |
| 11:10AM | 18 | A.    Oh, wait.  I think -- I think Magistrate Shushan told me |
| 11:11AM | 19 | that David -- if they had a position, he would be a good |
| 11:11AM | 20 | candidate for a job like that.  That's where that name came |
| 11:11AM | 21 | from. |
| 11:11AM | 22 | Q.    The position that you were looking to fill that came about |
| 11:11AM | 23 | that he filled would have been what? |
| 11:11AM | 24 | A.    Well, we were building -- somebody had to monitor this |
| 11:11AM | 25 | massive appeal process that's going on.  So it was the |

**C O N F I D E N T I A L**

SM-03-JA000225

11:11AM 1    coordination between the lawyers and the filing of the appeals

11:11AM 2    and BrownGreer, in getting that marshalled through.

11:11AM 3          So I had to -- I knew I had to establish a section

11:11AM 4    for somebody to coordinate, because it was going to get out of

11:11AM 5    hand quickly.  That's the position.

11:11AM 6    Q.    Kirk Fisher, how did he come to your attention and get

11:11AM 7    hired?

11:11AM 8    A.    He was recommended to me by David Odom.

11:11AM 9    Q.    David Odom.

11:12AM 10         How would -- is Kirk Fisher and all the employees

11:12AM 11   that are working for him -- all of the ones that are working

11:12AM 12   for him, do they subcontract through his company?

11:12AM 13   A.    Yes.

11:12AM 14   Q.    So in the appeals process or in the CAO, what role does

11:12AM 15   Kirk Fischer and all of his employees play?

11:12AM 16   A.    All this big internal -- well, two roles.  It's turned out

11:12AM 17   to be a much bigger role than I anticipated.  We have the

11:12AM 18   internal quality checking back and forth between accountants.

11:12AM 19   We have the QA's and all that.

11:12AM 20         I layered over that an internal audit system that our

11:12AM 21   office runs to check that.  Then I layered on top of that the

11:13AM 22   CliftonLarson layer.

11:13AM 23         So we have permanent people, and they've been very,

11:13AM 24   very, very, very active in the review and analysis of these

11:13AM 25   checks.  If we have exceptions, that's when they get back

**C O N F I D E N T I A L**

SM-03-JA000226

11:13AM 1   together to see if they are variable versus fixed expenses.

11:13AM 2   They serve a real critical auditing arm.

11:13AM 3          Secondarily, we get more requests for reports than

11:13AM 4   Carter's got liver pills.  He generates for me on a constant --

11:13AM 5   all these charts, y'all see all these charts about

11:13AM 6   productivity, efficiency, claims in, claims out, we report that

11:13AM 7   to the Court on a monthly basis.  We publish most of those

11:13AM 8   reports on the website monthly.

11:14AM 9          So his staff is -- and the people that work for him

11:14AM 10  are primarily involved in doing those two big activities.

11:14AM 11  Q.    That will all be important when we get to the process

11:14AM 12  phase.

11:14AM 13  A.    Big time.

11:14AM 14  Q.    Yes, sir.

11:14AM 15  A.    Big time.  I can't stress that enough.  I mean, spend as

11:14AM 16  many hours you want to spend with them, you know.

11:14AM 17         Personally, it's way beyond my pay grade about the

11:14AM 18  details of the computer business.  But I will tell you, I will

11:14AM 19  tell you, I was skeptical about all of that when we first got

11:14AM 20  in.

11:14AM 21         As it turns out, it may turn out to be the biggest

11:14AM 22  thing -- because we're get pounded about that stuff.  Thank God

11:14AM 23  we got the mechanism to look it all up and get it all done.

11:14AM 24  But that's their role.  That's the permanent internal audit

11:14AM 25  role.

**C O N F I D E N T I A L**

SM-03-JA000227

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 11:14AM  | 1  | EXAMINATION                                                            |
| 11:14AM  | 2  | BY MR. BUCKNAM:                                                         |
| 11:14AM  | 3  | Q.   Mr. Juneau, may I just go back to something you mentioned         |
| 11:14AM  | 4  | a few minutes ago.  We were talking about how it was not the           |
| 11:14AM  | 5  | responsibility of anyone in the staff to push or respond to            |
| 11:15AM  | 6  | pressure to push or expedite a claim, correct?                         |
| 11:15AM  | 7  | A.   Uh-huh (affirmative response).                                    |
| 11:15AM  | 8  | Q.   With respect to The Andry Law Firm, by which I am                  |
| 11:15AM  | 9  | referring to the law firm that Gibby Andry is associated with,         |
| 11:15AM  | 10 | did anyone from that law firm ever seek to have their claim,           |
| 11:15AM  | 11 | seven million dollar claim, pushed or expedited?                       |
| 11:15AM  | 12 | A.   Not to my knowledge.                                              |
| 11:15AM  | 13 | Q.   Did Gibby Andry ever --                                           |
| 11:15AM  | 14 | A.   Never talked to me about it.                                      |
| 11:15AM  | 15 | Q.   -- ask you to expedite it?                                        |
| 11:15AM  | 16 | A.   No.                                                               |
| 11:15AM  | 17 | Q.   Okay.  Thank you.                                                 |
| 11:15AM  | 18 | A.   I've never really had any contact with them at all about          |
| 11:15AM  | 19 | it.                                                                    |
| 11:15AM  | 20 | EXAMINATION                                                            |
| 11:15AM  | 21 | BY MR. FREEH:                                                          |
| 11:15AM  | 22 | Q.   Mr. Juneau, one question.  Focus your attention back on           |
| 11:15AM  | 23 | the date of June 20, 2013.  That's the interview you,                  |
| 11:15AM  | 24 | Mr. Juneau and Mr. Welker had with Mr. Sutton.                         |
| 11:15AM  | 25 | A.   Sutton.                                                           |

**C O N F I D E N T I A L**

SM-03-JA000228

| | | |
|---|---|---|
| 11:15AM | 1 | Q.    You also told us that there was a separate interview the |
| 11:15AM | 2 | same night with Christine Reitano? |
| 11:15AM | 3 | A.    She was after Tiger Sutton.  That's right. |
| 11:15AM | 4 | Q.    The same people conducted the interview? |
| 11:15AM | 5 | A.    Uh-huh (affirmative response). |
| 11:15AM | 6 | Q.    Have you ever seen a report of that interview? |
| 11:15AM | 7 | A.    I thought David did that. |
| 11:16AM | 8 | Q.    I'm not questioning whether he did or not. |
| 11:16AM | 9 | A.    No, I'm just -- |
| 11:16AM | 10 | Q.    I'm asking if you -- |
| 11:16AM | 11 | A.    I know he was taking copious notes when we were talking in |
| 11:16AM | 12 | there. |
| 11:16AM | 13 | Q.    You didn't take any? |
| 11:16AM | 14 | A.    I don't remember -- I didn't take any notes.  You couldn't |
| 11:16AM | 15 | read it if I write it.  But I don't recall.  I thought there |
| 11:16AM | 16 | was a report like that. |
| 11:16AM | 17 | Q.    All right.  Going back to your recollection of that |
| 11:16AM | 18 | interview -- and I don't have anything to refresh your |
| 11:16AM | 19 | recollection, or I would show it to you -- what is your |
| 11:16AM | 20 | recollection as you sit here today about what she was asked and |
| 11:16AM | 21 | what she said during that interview? |
| 11:16AM | 22 | A.    Well, her recollection was -- boy, that was one hell of an |
| 11:16AM | 23 | emotional meeting.  I can tell you that.  It was not pretty. |
| 11:16AM | 24 | She said, "I don't know what y'all are talking about, |
| 11:16AM | 25 | these e-mails.  I don't know anything about any fee.  I don't |

**C O N F I D E N T I A L**

SM-03-JA000229

11:16AM  1   know about any referral fee."  She says, "I'm telling you, I

11:16AM  2   don't think we got any interest at all.  My husband and I

11:17AM  3   knew" -- in essence, said, "I know I'm not supposed to have any

11:17AM  4   interest in anything, and I don't know of no interest that we

11:17AM  5   have in the balance."  So, you know, going through the e-mails

11:17AM  6   didn't do any benefit to her.

11:17AM  7   Q.    Did you go through the same e-mails that you had --

11:17AM  8   A.    Yeah, yeah, yeah.

11:17AM  9   Q.    -- with her husband?

11:17AM  10  A.    She did.  Yeah.  She said -- she was, in essence, very,

11:17AM  11  very emotional.  She said, "Look, I worked my tail off on this

11:17AM  12  thing.  I can't believe" -- and she did.  She said, "I just

11:17AM  13  can't believe I'm getting questioned" -- "you're here

11:17AM  14  questioning me about it.  This is wrong.  I'm getting drug into

11:17AM  15  something I ain't got nothing to do with."

11:17AM  16        That's kind of what the meeting was.  The consensus

11:17AM  17  of David Welker, Mike Juneau and myself was, you know, I don't

11:17AM  18  know if she knows what -- anything about these transactions,

11:17AM  19  one way or the other.

11:18AM  20  Q.    You found at the time her answers to be credible and

11:18AM  21  truthful, as far as you could tell?

11:18AM  22  A.    As far as I could tell.  The only -- all three of us felt

11:18AM  23  the same way, that the only -- the only caveat to that was,

11:18AM  24  man, y'all don't know what y'all are doing inside this marriage

11:18AM  25  here.  You know, I mean, that's kind of the conclusion we drew.

**C O N F I D E N T I A L**

| | |
|---|---|
| 11:18AM | 1 |

          MR. FREEH:  Mr. Juneau, I'm finished with my

questions.  I'm going to ask my colleagues in a moment if they

have any further questions.

          Anything that you would like to say or

supplement or put on the record based on the interview and the

subjects we've covered here this morning?

          THE WITNESS:  Yes, I would because it relates to kind

of what we're talking about.

          MR. FREEH:  Please, go right ahead.

          THE WITNESS:  This is an incredibly unique case.

We've never seen one like it, ever.  Every day is a new day

that we make it.

          Is there -- is there checks, balances and things

you can do or not do?  I guarantee, you're looking at one son

of a gun that's open to that since day one; but, I can assure

you, I can assure you, my concern has been, and it should be,

did any of this stuff that we're talking about -- I had -- I

knew we were running into difficulty.  From the day that I made

the implementation of this BEL thing and the day the Judge made

that ruling, that's when all communication stopped with BP in

this matter.  They stopped coming to our office, they

stopped -- when we had meetings, they wouldn't attend.  It's

been a problem.  It's a shame like that, because it takes

everybody to work together.

          What I'm trying to get to is, my concern was, is

**C O N F I D E N T I A L**

SM-03-JA000231

| | |
|---|---|
| 11:20AM | 1 |
| 11:20AM | 2 |
| 11:20AM | 3 |
| 11:20AM | 4 |
| 11:20AM | 5 |
| 11:20AM | 6 |
| 11:20AM | 7 |
| 11:20AM | 8 |
| 11:20AM | 9 |
| 11:20AM | 10 |
| 11:20AM | 11 |
| 11:20AM | 12 |
| 11:20AM | 13 |
| 11:20AM | 14 |
| 11:20AM | 15 |
| 11:20AM | 16 |
| 11:20AM | 17 |
| 11:20AM | 18 |
| 11:20AM | 19 |
| 11:21AM | 20 |
| 11:21AM | 21 |
| 11:21AM | 22 |
| 11:21AM | 23 |
| 11:21AM | 24 |
| 11:21AM | 25 |

I don't like -- it irritates the hell out of me, if you've got

a problem with somebody that isn't doing what they are supposed

to be doing, okay.

My concern really was I wanted to make sure the

integrity of this program, that the claims that went out that

we pay and process are not affected by what we're talking about

here.

I'm just telling you from my -- from what we've

done.  Boy, we've -- we went through it in spades looking at

things, you know, flip-flopping the cases and doing all

kinds -- I don't see that at all here.

That was my view before.  It would take Einstein

to get into this system; but, I'm not seeing in the case any

influence or any payment we made there.  That's just my

personal opinion, but I think that's kind of at the underlying

part here.

My message -- not message -- what I'd simply,

Judge, like to convey to you is that I think we did -- and,

look, I've got plenty things to do with my life, but I think

the people, the primary people involved in this thing did one

hell of a job.  Ain't never been one like this.

If there is improvements we can improve, I want

to know about it.  I would like to get those implemented.  But

it ain't because of motivation.  It ain't because of intent.

It ain't because of not trying to accomplish what we're trying

**C O N F I D E N T I A L**

SM-03-JA000232

11:21AM 1    to, and it ain't because of any financial motivation, I mean,

11:21AM 2    from this side of the aisle that we're dealing with.

11:21AM 3              Now, the only reason I say that is because there

11:21AM 4    is a huge, huge task left to be performed that affects a lot of

11:21AM 5    people and affects five states.  I am very concerned -- I'll

11:21AM 6    just level with you -- I'm very concerned if we get off mission

11:21AM 7    here.  That's a big concern of mine.  I mean, I've got -- I

11:21AM 8    gave up one year of my life to get this damn thing floating.

11:21AM 9              When I found out about this thing with

11:22AM 10   Tiger Sutton -- you don't know me personally, but I was one

11:22AM 11   irritated Cajun, and still am today, okay, because it's put us

11:22AM 12   off mission here.

11:22AM 13             I don't really have anything other than to tell

11:22AM 14   you that I know what the motivation, what we have been trying

11:22AM 15   to do.  This Judge has been incredible in availability and time

11:22AM 16   and so forth.  I wouldn't want -- and I'll tell you, and I'll

11:22AM 17   tell him, if I was -- if I'm an obstacle to this problem, to

11:22AM 18   this thing, I got things to do, places to go and so forth; but,

11:22AM 19   it ain't because we're not doing what we think is the right

11:22AM 20   thing to do.

11:22AM 21             With all that said and done, I don't want to

11:22AM 22   lose purpose of the mission.  The mission has been, if you look

11:22AM 23   at that report, that big report, the mission is to derail this

11:22AM 24   process, okay.  That's not what my assignment is.

11:22AM 25             I don't want that to be diversionary.  That's

**C O N F I D E N T I A L**

SM-03-JA000233

11:23AM  1    all I'm telling you about.  So, that's the $64 speech, but
11:23AM  2    that's my take on the thing.
11:23AM  3              I will tell you, if there's any other thing that
11:23AM  4    y'all need.  On the control process -- I'm not telling you
11:23AM  5    anything your staff doesn't know -- it is one complicated
11:23AM  6    mixture of parts.  But the fact that we got all these
11:23AM  7    Court-appointed vendors and we got all this thing, it's really
11:23AM  8    remarkable where we are.  I'm in shock.  It's $4 billion in
11:23AM  9    status, and with a lot of work left to be done, a ton of work.
11:23AM 10              From my perspective, I hope to goodness this
11:23AM 11    Fifth Circuit Court of Appeals makes this ruling.  I'll follow
11:23AM 12    whatever rule you want to follow.  Just give me the rules.
11:23AM 13              So there is nobody in this state looking for an
11:23AM 14    opinion quicker than me, whatever the opinion is.  I don't
11:23AM 15    care.  Give me the opinion, and we'll follow the opinion.
11:23AM 16              So I'm going to shut up.  That's my story.  I
11:23AM 17    appreciate you allowing me the liberty.
11:23AM 18         MR. FREEH:  I will just state for the record,
11:24AM 19    Mr. Juneau, that we have been very grateful to you personally,
11:24AM 20    but also to your staff, for very full and total cooperation and
11:24AM 21    responsiveness with respect to our limited role here with
11:24AM 22    respect to the inquiry.  So we appreciate that very much, and
11:24AM 23    personally thank you for that assistance.
11:24AM 24         THE WITNESS:  When you get to the control section,
11:24AM 25    you'll be eating more meals here in New Orleans because y'all

**C O N F I D E N T I A L**

SM-03-JA000234

11:24AM  1    have got a lot more stuff to do.

11:24AM  2                    MR. FREEH:  All right.  Thank you very much.

11:24AM  3                    THE WITNESS:  Thank you very much.

11:24AM  4                    MR. BUCKNAM:  Thank you, sir.

11:24AM  5                    MR. TIDWELL:  Thank you, sir.

         6                    (WHEREUPON, at 11:24 a.m., the proceedings were

         7    concluded.)

         8                            *      *      *

         9

        10

        11                      REPORTER'S CERTIFICATE

        12

        13        I, Cathy Pepper, Certified Realtime Reporter, Registered

        14    Merit Reporter, Certified Court Reporter of the State of

        15    Louisiana, Official Court Reporter for the United States

        16    District Court, Eastern District of Louisiana, do hereby

        17    certify that the foregoing is a true and correct transcript to

        18    the best of my ability and understanding from the record of the

        19    proceedings in the above-entitled and numbered matter.

        20

        21

        22                          _s/Cathy Pepper_____

        23                          Cathy Pepper, CRR, RMR, CCR
                                    Certified Realtime Reporter
        24                          Registered Merit Reporter
                                    Official Court Reporter
        25                          United States District Court
                                    Cathy_Pepper@laed.uscourts.gov

                              **C O N F I D E N T I A L**

SM-03-JA000235

## $

**$100** [1] - 33:25
**$200** [1] - 33:25
**$4,900** [1] - 82:4
**$64** [1] - 129:1

'

**'65** [1] - 7:11

## 1

**1** [6] - 1:7, 4:2, 60:22, 63:10, 88:5, 116:1
**10** [7] - 9:21, 14:4, 36:17, 37:20, 78:8, 81:22, 87:24
**10-MD-2179** [1] - 1:6
**101** [1] - 3:1
**102** [1] - 2:7
**103** [1] - 3:3
**109** [2] - 3:4, 3:5
**10th** [7] - 62:2, 63:13, 68:16, 68:17, 69:1, 69:21, 70:4
**116** [1] - 3:6
**118** [1] - 2:8
**11:24** [1] - 130:6
**12** [1] - 9:21
**123** [2] - 2:9, 2:10
**14** [1] - 62:6
**15** [4] - 40:25, 70:10, 73:5, 94:17
**17** [4] - 67:1, 94:18, 105:4, 116:14
**17th** [12] - 63:2, 66:12, 68:2, 68:3, 68:20, 68:25, 69:4, 71:14, 72:19, 72:25, 104:15, 104:22
**18th** [2] - 105:1, 105:11
**19** [3] - 61:14, 110:5
**195,000** [1] - 96:20
**1965** [1] - 4:19
**19th** [2] - 61:19, 67:10
**1A** [1] - 101:3
**1C** [1] - 101:3
**1D** [1] - 101:3

## 2

**2** [2] - 80:3, 81:24
**2,500** [1] - 24:10
**2.5** [1] - 37:1
**20** [7] - 1:5, 61:22,

70:10, 73:16, 74:4, 82:23, 123:23
**2009** [1] - 82:3
**2010** [1] - 1:5
**2012** [3] - 48:2, 104:22, 105:4
**2013** [12] - 1:7, 4:2, 66:19, 67:2, 69:4, 73:16, 74:4, 82:24, 85:5, 110:5, 123:23
**20th** [10] - 66:19, 67:20, 68:10, 68:11, 68:22, 69:1, 73:3, 73:6, 79:23, 84:15
**21** [2] - 60:8, 85:5
**25** [2] - 5:17, 6:15
**27** [3] - 5:17, 5:20, 6:15
**28th** [1] - 56:6
**2:00** [1] - 58:22
**2:30** [1] - 58:22

## 3

**3,000** [1] - 24:10
**30** [1] - 56:4
**30th** [3] - 56:7, 56:23, 56:24
**35** [1] - 6:6
**36** [1] - 2:17
**38** [1] - 2:18

## 4

**4** [6] - 2:5, 2:6, 13:24, 38:25, 39:5, 129:8
**4,000** [1] - 5:19
**4,900** [1] - 82:6
**4.3.9** [2] - 20:15, 29:24
**45** [2] - 6:7, 74:20
**480** [1] - 91:11
**4:30** [1] - 59:16
**4B** [1] - 50:23
**4C** [1] - 53:7
**4th** [1] - 87:4

## 5

**5** [1] - 59:17
**50** [1] - 2:19
**500** [1] - 1:21
**504** [1] - 1:22
**53** [1] - 2:20
**589-7779** [1] - 1:22

## 6

**60** [3] - 2:21, 2:22, 24:17
**62** [1] - 2:23
**67** [1] - 2:24

## 7

**7** [5] - 37:9, 38:25, 39:5, 96:17, 101:3
**70130** [1] - 1:22
**75** [1] - 14:24
**7th** [1] - 68:15

## 8

**8** [1] - 37:8
**84** [1] - 2:25
**8:00** [1] - 1:7
**8:13** [1] - 85:6

## 9

**9** [1] - 58:14
**90** [1] - 24:18
**99** [1] - 91:17

## A

**A.M** [1] - 1:7
**a.m** [2] - 85:6, 130:6
**Abbeville** [1] - 118:19
**abilities** [1] - 43:4
**ability** [1] - 130:18
**able** [2] - 78:16, 78:25
**aboard** [7] - 24:1, 45:24, 48:1, 53:16, 54:7, 89:1
**above-entitled** [1] - 130:19
**absolute** [2] - 80:25, 84:14
**absolutely** [9] - 5:14, 49:6, 54:11, 65:4, 72:7, 87:16, 90:18, 97:7
**abundantly** [1] - 90:1
**academic** [1] - 86:24
**academics** [1] - 89:11
**Academy** [2] - 31:7
**accept** [2] - 11:10, 14:7
**accident** [3] - 54:18, 77:20, 77:24
**accommodation** [1] -

99:4
**accomplish** [1] - 127:25
**accomplished** [4] - 26:20, 95:20, 108:11, 115:14
**according** [1] - 34:1
**accordingly** [1] - 19:15
**account** [1] - 82:2
**accountants** [6] - 91:19, 92:3, 93:12, 97:5, 100:14, 121:18
**accounting** [3] - 13:1, 13:2, 114:14
**accurate** [3] - 42:17, 85:4
**accused** [1] - 70:18
**acknowledged** [1] - 77:21
**ACTION** [1] - 1:6
**action** [4] - 54:17, 57:25, 89:10, 117:23
**activate** [1] - 35:9, 87:9, 118:13
**active** [4] - 6:21, 15:23, 18:16, 121:24
**activities** [4] - 12:16, 15:8, 92:9, 122:10
**activity** [1] - 56:10
**adamant** [1] - 65:4
**add** [4] - 32:24, 51:22, 80:1, 99:3
**addendum** [1] - 110:20
**addition** [4] - 37:22, 38:8, 39:20, 89:11
**additional** [3] - 34:9, 70:6, 106:4
**address** [6] - 39:18, 57:21, 81:9, 96:15, 114:3, 116:18
**addressed** [1] - 110:8
**adjuster** [2] - 33:15, 33:24
**adjusters** [2] - 32:11, 33:16
**administer** [1] - 9:16
**administering** [1] - 14:2
**administration** [26] - 15:5, 30:7, 31:17, 34:14, 34:18, 50:15, 55:5, 55:8, 55:15, 55:19, 56:1, 75:24, 79:25, 83:15, 85:13, 85:17, 85:18, 89:4, 94:9, 94:11, 95:10, 98:20, 99:18, 101:10, 108:19

**administrations** [1] - 95:2
**administrative** [3] - 18:11, 37:24, 50:12
**administrator** [8] - 51:9, 57:16, 83:7, 83:13, 84:6, 90:9, 95:6, 96:13, 96:18
**Administrator** [3] - 7:13, 20:16, 89:24
**Administrator's** [1] - 38:1
**admission** [1] - 5:4
**admit** [2] - 65:13, 85:11
**admitted** [1] - 4:19
**advance** [1] - 29:17
**advice** [1] - 95:21
**advise** [1] - 54:13
**affairs** [1] - 107:5
**affect** [1] - 99:21
**affected** [1] - 127:6
**affects** [3] - 42:14, 128:4, 128:5
**aftermath** [1] - 59:13
**afternoon** [2] - 58:22, 59:16
**ago** [10] - 5:17, 5:20, 23:11, 40:24, 40:25, 53:15, 77:18, 79:19, 79:20, 123:4
**agree** [4] - 22:8, 43:20, 85:7, 90:16
**agreed** [3] - 14:7, 19:5, 91:12
**agreement** [12] - 22:19, 22:23, 29:24, 32:20, 34:7, 43:19, 46:12, 46:19, 47:22, 87:18, 118:17
**Agreement** [8] - 14:18, 20:15, 33:20, 36:8, 36:10, 91:17, 105:25, 118:15
**agreements** [1] - 45:21
**ahead** [2] - 20:12, 126:9
**ain't** [13] - 15:20, 26:17, 44:22, 87:9, 94:17, 96:22, 125:15, 127:21, 127:24, 127:25, 128:1, 128:19
**aisle** [1] - 128:2
**alarming** [1] - 21:22
**AlixPartner** [1] - 17:11
**AlixPartners** [3] - 16:21, 17:10, 17:20
**ALL** [1] - 1:8

**C O N F I D E N T I A L**

allegation [5] - 63:14, 64:4, 71:6, 71:15, 72:21
allegations [4] - 6:2, 55:25, 61:15, 64:10
allegedly [2] - 21:12, 33:16
allow [1] - 98:14
allowed [4] - 72:2, 98:17, 99:1, 99:16
allowing [1] - 129:17
Allstate [1] - 33:24
alone [3] - 62:14, 69:1, 70:4
analysis [2] - 78:22, 121:24
AND [2] - 3:1, 3:3
Andry [14] - 48:5, 48:6, 48:15, 48:18, 48:25, 96:12, 96:16, 97:12, 97:16, 123:8, 123:9, 123:13
angry [2] - 70:14, 70:16
animal [2] - 13:15, 89:8
anonymous [1] - 56:9
answer [16] - 6:23, 14:4, 27:21, 41:15, 47:3, 52:3, 76:2, 79:5, 84:11, 92:8, 94:2, 94:15, 94:20, 97:7, 98:7, 101:13
answered [2] - 94:8, 103:10
answers [2] - 71:3, 125:20
antenna [1] - 76:17
anticipated [1] - 121:17
anyplace [1] - 16:2
AP [2] - 59:17, 61:7
apartment [1] - 66:7
apologize [4] - 42:6, 109:17, 110:1, 110:24
appeal [1] - 120:25
Appeals [1] - 129:11
appeals [2] - 121:1, 121:14
appear [1] - 44:8
APPEARANCES [1] - 1:14
appearances [1] - 16:14
appeared [2] - 5:3, 97:21
appearing [1] - 6:25
appellate [1] - 93:3
Appendix [1] - 111:1

applicant [1] - 29:4
application [1] - 111:24
applications [1] - 88:22
applied [1] - 86:1
apply [3] - 34:2, 34:21, 46:10
applying [1] - 111:20
appoint [2] - 9:12, 12:8
Appointed [1] - 31:8
appointed [21] - 5:20, 6:19, 7:12, 7:17, 11:24, 12:9, 12:13, 12:18, 12:19, 13:16, 27:23, 29:19, 29:22, 30:6, 30:11, 30:12, 32:23, 36:25, 38:9, 110:22, 129:7
appointing [1] - 12:24
appointment [6] - 6:7, 6:17, 8:14, 11:8, 11:10, 12:6, 12:25, 30:15, 46:25
appointments [2] - 12:7, 14:10
appreciate [3] - 34:12, 129:17, 129:22
appreciation [1] - 78:17
approached [3] - 43:10, 86:9, 87:12
appropriate [4] - 58:20, 86:22, 104:7, 112:17
approval [8] - 20:16, 27:22, 87:14, 104:8, 104:14, 104:15, 105:1, 106:1
approve [2] - 26:19, 104:24
approved [10] - 22:5, 65:14, 71:21, 85:18, 104:7, 105:10, 105:11, 105:16, 114:8, 114:9
approximate [1] - 5:12
April [1] - 7:18
APRIL [1] - 1:5
area [1] - 35:4
arise [1] - 95:5
arm [1] - 122:2
Army [1] - 5:11
arrangement [1] - 80:8
arrangements [1] - 26:16
aside [2] - 34:13, 52:16

asset [1] - 41:12
assigned [1] - 42:13
assignment [1] - 128:24
assist [5] - 19:17, 42:9, 42:12, 98:7, 107:2
assistance [1] - 129:23
Assistant [1] - 10:12
associated [4] - 47:24, 50:14, 52:14, 123:9
Association [1] - 7:2
assure [2] - 126:15, 126:16
asterisks [1] - 73:12
attached [2] - 37:2, 37:14
attempt [1] - 43:3
attend [2] - 31:13, 126:22
attended [1] - 74:5
attention [13] - 30:10, 30:14, 43:18, 59:22, 62:19, 66:12, 69:3, 73:2, 81:24, 111:15, 120:17, 121:6, 123:22
attorney [5] - 5:5, 86:17, 90:12, 96:5, 96:11
attorneys [2] - 44:13, 78:13
attractive [1] - 89:12
audit [3] - 114:12, 121:20, 122:24
auditing [3] - 108:12, 114:7, 122:2
audits [1] - 114:10
AUGUST [2] - 1:7, 4:2
authorized [2] - 99:16, 99:19
auto [1] - 54:24
automobile [3] - 54:18, 77:20, 77:24
availability [2] - 89:6, 128:15
available [2] - 29:4, 89:21
aware [16] - 18:20, 22:7, 46:3, 54:1, 55:24, 57:13, 71:15, 72:10, 72:13, 72:20, 72:24, 81:1, 98:19, 102:16, 102:21, 102:23
awful [1] - 100:4
awhile [1] - 77:18

**B**

background [20] - 21:1, 21:17, 21:20, 23:9, 23:12, 23:13, 23:16, 23:18, 23:20, 28:3, 28:6, 28:24, 29:13, 32:11, 32:18, 34:11, 41:8, 89:11, 89:14, 120:10
backgrounds [2] - 27:25, 28:1
backlog [2] - 24:6, 24:10, 91:7
bad [3] - 25:21, 104:21, 112:16
balance [1] - 125:5
balances [1] - 126:13
Barbier [8] - 11:6, 11:19, 58:10, 58:21, 61:14, 93:13, 93:16, 93:20
based [5] - 52:12, 100:4, 113:13, 113:15, 126:5
basis [3] - 43:7, 57:6, 122:7
Baton [2] - 17:8, 119:13
became [6] - 46:24, 48:18, 49:22, 55:24, 72:13, 72:24
become [2] - 64:17, 64:18
becomes [1] - 78:21
becoming [2] - 48:14, 93:23
BEFORE [1] - 1:11
began [1] - 35:6
begin [2] - 36:16
beginning [1] - 103:13
behalf [1] - 41:25
behind [2] - 71:6, 97:5
BEL [2] - 93:10, 126:19
believes [1] - 80:10
benchmark [1] - 101:21
benefit [1] - 125:6
Bernard [1] - 107:4
best [9] - 22:18, 22:23, 27:14, 56:15, 69:23, 70:9, 70:19, 99:11, 130:18
bet [1] - 25:21
better [4] - 12:15, 26:10, 27:18, 76:17
between [14] - 13:3, 30:10, 30:14, 33:24,

34:8, 68:1, 69:1, 80:10, 91:14, 100:9, 106:9, 106:10, 121:1, 121:18
beyond [2] - 81:16, 122:17
big [13] - 5:23, 14:17, 24:4, 32:5, 64:24, 77:3, 81:14, 121:16, 122:10, 122:13, 122:15, 128:7, 128:23
bigger [1] - 121:17
biggest [2] - 93:10, 122:21
bill [1] - 120:5
billion [2] - 87:5, 129:8
binder [1] - 60:16
bit [6] - 19:23, 42:21, 60:23, 70:7, 80:6, 81:25
blend [2] - 75:7, 97:22
blending [1] - 6:10
blends [1] - 115:12
board [6] - 33:16, 40:12, 53:21, 54:10, 90:22, 103:14
boat [1] - 41:14
boats [1] - 41:11
bob [1] - 26:21
bogged [1] - 97:4
bone [2] - 57:19, 57:21
boom [1] - 117:18
bottom [3] - 56:22, 57:4, 92:5
boy [2] - 124:22, 127:9
BP [61] - 7:14, 7:25, 8:21, 8:23, 10:13, 13:3, 15:22, 16:9, 16:10, 16:11, 16:22, 17:4, 17:5, 17:19, 18:19, 18:23, 20:3, 20:4, 20:16, 20:25, 21:6, 21:15, 21:19, 22:4, 22:10, 22:11, 23:12, 23:18, 23:22, 26:9, 26:17, 26:18, 27:25, 28:17, 29:13, 32:18, 33:1, 33:6, 34:15, 41:17, 41:25, 54:3, 54:21, 58:23, 59:18, 64:13, 77:20, 78:2, 87:11, 87:15, 87:17, 88:11, 89:13, 89:18, 91:1, 92:22, 115:25, 118:18, 120:10, 126:20
breach [1] - 80:20

**C O N F I D E N T I A L**

SM-03-JA000237

**breadth** [1] - 39:12
**break** [3] - 40:10, 73:20, 73:22
**Bridge** [1] - 17:9
**briefed** [3] - 117:6, 117:11, 117:13
**briefly** [1] - 73:18
**bright** [4] - 86:23, 86:25, 87:12, 92:23
**bring** [3] - 15:5, 43:18, 68:8
**bringing** [1] - 89:1
**brochure** [3] - 108:24, 109:12, 110:14
**brought** [11] - 28:23, 36:21, 37:15, 40:12, 58:24, 64:9, 67:11, 75:8, 83:18, 83:21, 83:24
**Brown** [1] - 27:9
**BrownGreer** [19] - 12:12, 12:17, 13:16, 25:6, 26:24, 27:8, 91:6, 91:14, 91:19, 92:4, 97:1, 97:3, 102:5, 102:16, 112:24, 117:6, 117:17, 121:2
**bubbling** [1] - 87:8
**buck** [1] - 92:6
**BUCKNAM** [38] - 1:16, 23:5, 23:8, 23:11, 23:16, 23:22, 23:24, 36:15, 38:3, 39:4, 39:8, 41:24, 53:12, 53:14, 53:19, 53:23, 54:6, 60:13, 60:19, 62:7, 66:17, 73:8, 102:25, 103:24, 109:7, 109:17, 109:19, 109:24, 110:23, 113:19, 115:4, 116:19, 117:2, 118:2, 123:2, 130:4
**BUCKNAM...............**
**.........** [2] - 2:7, 2:9
**building** [5] - 18:1, 79:16, 86:5, 86:6, 120:24
**bulk** [2] - 7:11, 24:21
**bumped** [1] - 8:16
**business** [7] - 18:13, 18:16, 18:17, 37:25, 47:1, 98:21, 122:18
**businessman** [1] - 18:17
**BY** [39] - 1:4, 1:24, 1:25, 2:6, 2:7, 2:8, 2:9, 2:10, 4:15, 26:1,

28:14, 37:3, 38:18, 39:21, 42:18, 50:22, 53:2, 55:3, 60:10, 61:4, 62:10, 66:25, 67:15, 73:10, 74:1, 85:1, 101:6, 102:25, 103:24, 109:7, 109:24, 110:23, 113:19, 115:4, 117:2, 118:2, 118:7, 123:2, 123:21

**C**

**Cajun** [2] - 55:10, 128:11
**California** [2] - 6:12, 14:9
**candid** [2] - 79:5, 81:17
**candidate** [1] - 120:20
**cannot** [2] - 47:8
**CAO** [2] - 118:11, 121:14
**capacities** [1] - 6:17
**capacity** [3] - 94:7, 102:5, 102:18
**car** [4] - 9:24, 10:1, 10:7, 11:1
**cards** [1] - 19:14
**care** [2] - 80:17, 129:15
**Carlton** [3] - 8:19, 10:8
**carrying** [1] - 88:8
**Carter's** [1] - 122:4
**case** [26] - 5:21, 5:23, 5:25, 12:5, 12:19, 13:7, 15:15, 16:17, 18:1, 24:23, 45:10, 52:1, 75:17, 80:20, 83:5, 87:2, 87:25, 88:11, 90:17, 91:24, 93:10, 96:22, 96:23, 98:23, 100:18, 103:6, 126:10, 127:13
**CASES** [1] - 1:8
**cases** [15] - 6:8, 6:9, 6:15, 7:10, 15:19, 24:6, 24:10, 24:17, 26:14, 26:25, 45:2, 89:24, 95:4, 101:21, 127:10
**Casey** [13] - 45:2, 57:14, 71:10, 71:16, 72:14, 72:20, 77:12, 77:16, 77:24, 77:25, 117:14, 117:16

**Cathy** [2] - 130:13, 130:23
**CATHY** [1] - 1:20
**cathy_Pepper@laed. uscourts.gov** [1] - 1:23
**Cathy_Pepper@laed .uscourts.gov** [1] - 130:25
**caught** [1] - 111:15
**caused** [1] - 23:9
**caveat** [1] - 125:23
**CCR** [2] - 1:20, 130:23
**Center** [3] - 53:5, 105:24, 107:9
**centers** [1] - 32:12
**CEO** [1] - 16:12
**certain** [4] - 43:20, 46:12, 55:24, 72:10
**certainly** [7] - 6:9, 7:21, 18:24, 23:7, 49:16, 69:23, 83:2
**CERTIFICATE** [1] - 130:11
**certifications** [1] - 4:22
**CERTIFIED** [1] - 1:20
**Certified** [3] - 130:13, 130:14, 130:23
**certify** [1] - 130:17
**chain** [1] - 88:14
**chance** [1] - 74:6
**change** [3] - 32:23, 32:24, 90:24
**characterize** [1] - 92:16
**charge** [3] - 9:13, 13:15, 118:18
**charts** [2] - 122:5
**check** [23] - 18:15, 21:17, 21:20, 22:8, 23:12, 23:13, 23:16, 23:18, 29:13, 41:8, 43:3, 89:2, 97:20, 98:3, 100:1, 100:3, 100:8, 100:12, 100:13, 102:5, 120:10, 121:21
**checked** [7] - 22:4, 28:6, 28:13, 91:24, 92:22
**checking** [6] - 100:7, 100:9, 102:18, 102:20, 103:5, 121:18
**checklists** [1] - 100:25
**checks** [4] - 19:3, 23:20, 121:25, 126:13
**Chicago** [2] - 17:9,

56:6
**chief** [6] - 18:11, 18:12, 19:16, 42:4, 94:13, 94:14
**child** [1] - 117:14
**Chinese** [3] - 108:18, 110:6, 112:20
**choice** [2] - 14:24, 27:22
**Chris** [3] - 58:7, 104:11, 104:12
**Christina** [2] - 108:1, 119:23
**Christine** [6] - 74:21, 85:21, 88:25, 90:2, 92:4, 93:4, 107:19, 118:10, 124:2
**CIO** [1] - 106:6
**Circuit** [3] - 4:21, 5:1, 129:11
**Circuits** [2] - 4:23, 4:24
**circulate** [1] - 35:15
**circulated** [1] - 37:23
**circulating** [1] - 87:14
**circumstances** [1] - 72:3
**City** [8] - 12:12, 27:12, 27:13, 37:16, 38:5, 38:16, 107:11, 107:14
**CIVIL** [1] - 1:6
**claim** [59] - 24:12, 28:12, 32:12, 44:2, 44:3, 44:5, 45:9, 45:11, 47:6, 48:20, 49:8, 51:8, 51:12, 51:16, 52:2, 52:7, 54:24, 57:14, 64:12, 70:21, 71:10, 71:16, 72:3, 72:25, 75:23, 77:12, 77:16, 77:21, 77:25, 78:2, 79:25, 80:13, 80:14, 83:6, 83:13, 83:15, 84:3, 84:5, 84:13, 85:13, 85:16, 87:5, 90:4, 90:13, 90:14, 91:3, 96:17, 97:10, 97:11, 97:12, 98:5, 98:8, 99:21, 99:24, 100:3, 100:9, 100:10, 100:13, 100:16, 100:20, 102:7, 123:6, 123:10, 123:11
**Claim** [2] - 12:10, 105:24
**claimant** [9] - 50:12, 50:15, 52:18, 52:23,

54:25, 55:7, 55:14, 55:19, 90:8
**claimants** [13] - 8:9, 44:12, 45:6, 51:13, 53:24, 54:6, 54:8, 54:9, 54:14, 54:17, 91:2, 91:3, 97:24
**claims** [32] - 9:16, 12:18, 13:19, 13:22, 14:1, 14:3, 30:7, 30:16, 32:2, 32:7, 32:11, 32:15, 33:14, 56:1, 56:16, 77:25, 89:4, 89:9, 96:6, 96:12, 99:17, 99:18, 100:11, 102:18, 103:18, 106:3, 112:6, 122:6, 127:5
**Claims** [11] - 7:12, 13:9, 13:21, 20:15, 24:8, 27:5, 32:7, 38:1, 53:5, 89:24, 107:9
**clarifications** [1] - 49:12
**clarified** [1] - 49:16
**clarify** [1] - 44:10
**clashes** [1] - 113:1
**class** [1] - 89:9
**Class** [1] - 20:17
**clean** [2] - 73:4, 73:8
**cleaning** [1] - 24:11
**clear** [9] - 28:10, 49:6, 54:22, 59:14, 65:2, 72:17, 80:6, 90:1, 116:22
**clearance** [1] - 19:4
**cleared** [2] - 28:7, 56:23
**clearly** [4] - 44:9, 45:8, 80:3, 90:19
**click** [1] - 36:7
**client** [1] - 55:7
**clients** [1] - 44:18
**CliftonLarson** [2] - 114:15, 121:22
**clock** [1] - 74:19
**close** [3] - 57:9, 94:22, 94:23
**Coast** [6] - 6:12, 12:10, 13:9, 13:21, 24:8, 27:5, 32:7, 99:5
**coast** [1] - 7:7
**code** [6] - 34:25, 35:13, 35:14, 37:1, 37:4, 37:13, 39:17, 80:21, 81:1
**codes** [1] - 31:17
**coffee** [1] - 10:2

colleagues [1] - 126:2
collective [1] - 18:22
collision [1] - 33:24
colonel [1] - 119:15
combination [3] -
6:16, 43:16
Combustion [1] - 5:22
comfortable [3] -
18:6, 70:25, 71:3
coming [12] - 25:4,
32:13, 45:23, 48:1,
52:17, 53:16, 53:20,
78:1, 90:3, 98:25,
104:4, 126:21
comment [4] - 59:19,
59:20, 114:5, 115:11
comments [2] - 73:12,
87:17
commitment [3] -
22:3, 55:23, 92:24
Committee [1] - 91:2
commonly [1] - 95:8
communicate [1] -
91:6
communicated [2] -
90:19, 102:17
communication [2] -
97:6, 126:20
companies [8] -
28:25, 106:2, 106:4,
106:14, 106:17,
106:18, 111:21,
113:8
companies' [1] -
106:5
company [25] - 12:18,
17:8, 20:18, 23:17,
34:6, 34:8, 38:5,
38:15, 47:5, 50:5,
50:12, 50:15, 51:2,
52:14, 78:5, 106:14,
107:8, 107:10,
107:13, 108:8,
108:10, 113:8,
114:14, 121:12
comparisons [1] -
27:4
compensation [3] -
17:21, 19:1, 44:14
competence [1] -
112:18
competent [2] -
112:12, 118:22
complains [1] - 98:2
complaints [3] -
33:12, 33:13
complete [4] - 5:8,
59:8, 115:3, 115:21
completed [5] - 5:9,
21:24, 58:4, 58:9

completely [1] - 107:1
completion [1] - 6:1
complex [2] - 5:21,
13:12, 18:13, 37:12,
89:7, 89:9, 95:2
complexity [1] - 16:17
compliance [3] -
31:17, 35:3, 35:4
complicated [1] -
129:5
complied [1] - 37:10
composed [1] - 60:6
computer [4] - 38:8,
108:14, 112:12,
122:18
COMPUTER [1] - 1:25
concepts [1] - 9:14
conceptually [1] -
12:3
concern [8] - 23:9,
76:16, 77:3, 83:12,
126:16, 126:25,
127:4, 128:7
concerned [8] - 46:13,
64:25, 71:7, 92:22,
128:5, 128:6
concerns [2] - 58:16,
87:20
concluded [2] - 6:4,
130:7
conclusion [2] -
25:15, 125:25
concur [1] - 111:23
concurred [1] - 92:5
conduct [11] - 18:2,
31:17, 35:1, 35:15,
37:1, 37:4, 37:13,
39:17, 39:22, 81:2,
98:20
conducted [5] - 6:2,
23:12, 39:19, 69:19,
124:4
conduit [1] - 91:14
conference [5] - 8:20,
10:8, 10:9, 86:4,
99:6
confidence [1] - 59:14
confidentiality [3] -
37:9, 37:10, 100:23
Confidentiality [1] -
105:24
confirm [2] - 45:22,
93:17
confirmed [1] - 40:14
conflict [6] - 35:12,
38:25, 39:23,
100:23, 106:6,
106:21
Conflict [2] - 39:2,
105:25

conflicted [1] - 109:3
conflicts [13] - 31:17,
34:17, 34:20, 45:17,
45:18, 46:8, 65:6,
81:9, 95:3, 95:5,
95:8, 95:12, 95:18
confront [2] - 62:20,
69:2
confronted [4] -
62:23, 63:13, 63:22,
72:21
confronting [1] -
56:25
confuse [1] - 52:10
confusing [1] - 72:16
conglomeration [1] -
91:18
conjunction [1] - 50:9
connected [1] - 52:23
connection [5] - 8:10,
53:10, 83:6, 88:11,
111:7
consensus [1] -
125:16
consent [2] - 20:17,
21:4
conservative [1] -
24:25
consider [8] - 29:22,
30:6, 33:4, 34:14,
34:21, 43:13, 49:1,
98:18
consideration [2] -
11:24, 36:22
considerations [2] -
8:13, 14:15
considered [5] -
28:12, 29:18, 41:4,
41:9, 55:22
considering [1] - 8:12
consisted [1] - 53:24
consistent [4] - 33:15,
53:19, 80:15, 82:10
consistently [1] -
87:16
constant [2] - 82:3,
122:4
constantly [1] - 88:24
consultant [1] - 16:21
contact [4] - 28:22,
41:1, 87:10, 123:18
contacted [2] - 25:24,
82:19
contacts [4] - 14:9,
25:23, 91:6, 97:1
contemplates [2] -
22:17, 22:18
context [1] - 83:25
continue [4] - 32:9,
57:3, 57:6, 106:1

continued [2] - 6:11,
106:20
continuing [3] - 54:9,
57:10, 65:24
continuous [1] -
114:11
continuously [2] -
5:12, 77:14
contract [2] - 39:1,
95:23
contractor [4] - 18:24,
19:6, 19:8, 30:4
contractors [6] -
18:23, 19:11, 29:20,
35:12, 38:19, 38:20
contracts [3] - 18:23,
19:18, 38:22
contractual [3] -
35:11, 45:20, 46:17
control [3] - 35:18,
129:4, 129:24
controversy [4] - 6:24,
16:3, 32:5, 88:19
convention [1] - 56:6
conversation [13] -
31:15, 47:12, 50:1,
50:4, 50:7, 50:8,
51:6, 51:10, 65:22,
66:10, 83:11, 83:14,
84:8
conversations [2] -
31:21, 31:22
convey [2] - 88:15,
127:18
conveyed [1] - 45:20
conveying [1] - 68:23
convinced [1] - 86:21
convoluted [2] - 78:7,
80:6
cooperation [1] -
129:20
cooperative [1] - 31:4
coordinate [1] - 121:4
coordinates [1] -
93:11
coordination [1] -
121:1
coordinator [1] -
13:18
copies [1] - 75:8
copious [1] - 124:11
copy [8] - 59:10,
59:11, 59:18, 73:4,
73:8, 109:16, 110:6,
110:24
corporation [1] - 94:6
correct [22] - 18:14,
21:8, 39:7, 40:14,
56:1, 60:18, 66:18,
74:10, 77:19, 82:20,

82:24, 84:16, 85:13,
88:11, 101:11,
105:12, 106:8,
107:1, 107:5, 107:6,
123:6, 130:17
costing [1] - 25:19
counsel [10] - 21:7,
22:6, 26:18, 53:25,
54:8, 87:15, 92:17,
94:5, 95:8, 95:19
Counsel [4] - 7:2,
10:12, 20:17
counselor [1] - 95:3
country [2] - 6:12,
9:22
couple [3] - 62:17,
103:7, 118:8
course [12] - 23:13,
31:15, 33:11, 55:4,
69:25, 71:19, 72:11,
75:21, 76:3, 77:7,
79:22, 81:7
Court [41] - 4:20, 6:3,
7:12, 12:19, 18:20,
27:23, 29:19, 29:22,
30:2, 30:6, 30:11,
30:12, 31:8, 36:25,
38:9, 57:17, 57:21,
60:8, 60:9, 65:20,
87:3, 97:20, 97:21,
116:1, 122:7, 129:7,
129:11, 130:14,
130:15, 130:16,
130:24, 130:25
COURT [3] - 1:1, 1:20,
73:22
court [8] - 5:1, 6:7,
12:9, 37:11, 58:15,
81:9
Court-appointed [10] -
27:23, 29:19, 29:22,
30:6, 30:11, 30:12,
31:8, 36:25, 38:9,
129:7
court-appointed [1] -
12:9
courts [5] - 4:20, 4:21,
5:2, 5:3, 7:9
covered [1] - 126:6
crabbers [1] - 119:11
credentials [1] - 87:13
credibility [1] - 79:5
credible [1] - 125:20
credit [2] - 33:20
Crescent [2] - 107:11,
107:14
crew [1] - 32:5
critical [2] - 93:25,
122:2
criticize [1] - 27:18

**C O N F I D E N T I A L**

**Crown** [12] - 47:5, 47:6, 47:13, 47:19, 47:24, 78:5, 78:11, 78:16, 82:2, 82:9
**CRR** [2] - 1:20, 130:23
**current** [7] - 32:22, 50:15, 52:18, 55:7, 55:19, 70:21, 116:7

**D**

**da-da** [5] - 24:12, 24:13, 98:5
**damage** [1] - 33:24
**damn** [1] - 128:8
**dance** [2] - 115:15, 115:16
**darned** [1] - 22:19
**data** [1] - 24:5
**date** [4] - 59:21, 61:5, 103:4, 123:23
**dated** [11] - 60:8, 66:19, 66:22, 74:4, 85:5, 104:14, 104:22, 105:1, 105:3, 105:11, 110:4
**Dave** [5] - 19:7, 25:11, 56:8, 56:9, 68:24
**David** [84] - 16:23, 18:6, 19:9, 19:21, 20:5, 20:22, 28:2, 28:19, 28:20, 28:21, 29:9, 35:9, 39:14, 41:20, 46:13, 46:16, 56:8, 56:18, 57:3, 57:18, 57:20, 58:12, 59:3, 60:23, 61:23, 63:23, 65:25, 67:5, 67:10, 67:20, 68:7, 68:9, 69:14, 69:15, 74:18, 75:5, 75:12, 75:13, 76:22, 76:24, 80:1, 82:23, 93:3, 94:21, 95:25, 104:4, 104:20, 104:21, 105:7, 106:17, 108:3, 108:24, 110:6, 111:8, 111:22, 119:13, 120:4, 120:14, 120:19, 121:8, 121:9, 124:7, 125:17
**day's** [1] - 40:6
**day-to-day** [1] - 43:7
**days** [8] - 8:17, 22:16, 24:17, 24:18, 61:22, 62:17, 63:2, 66:13
**deal** [12] - 15:10, 18:8, 20:14, 22:12, 27:20,

74:17, 93:22, 94:21, 95:22, 96:11, 114:15
**dealing** [12] - 15:15, 35:11, 43:7, 54:4, 59:14, 88:8, 89:7, 89:9, 92:1, 98:16, 112:13, 128:2
**dealings** [2] - 56:13, 112:14
**dealt** [2] - 19:15, 87:24
**decided** [4] - 11:4, 18:4, 64:1, 114:7
**decipher** [1] - 45:3
**decision** [6] - 21:25, 24:18, 25:18, 33:9, 41:16
**decisions** [1] - 94:1
**deck** [1] - 28:10
**DEEPWATER** [1] - 1:4
**Deepwater** [9] - 8:4, 53:5, 56:17, 105:24, 106:3, 106:23, 107:9, 108:17, 111:7
**defendant** [1] - 6:22
**defendants** [1] - 8:10
**defense** [6] - 6:23, 7:5, 29:14
**Defense** [1] - 7:2
**define** [1] - 93:15
**degree** [1] - 55:2
**delay** [1] - 98:5
**demands** [1] - 15:9
**demeanor** [1] - 70:11
**den** [1] - 10:1
**denied** [2] - 63:14, 77:15
**denying** [1] - 65:2
**Department** [1] - 119:6
**department** [1] - 93:25
**deposition** [1] - 98:23
**depth** [1] - 70:8
**derail** [1] - 128:23
**describe** [1] - 65:13
**described** [3] - 15:3, 51:7, 68:18
**describing** [1] - 34:10
**description** [3] - 42:3, 42:7, 65:19
**DESCRIPTION** [1] - 2:15
**design** [1] - 18:23
**designate** [2] - 29:25, 36:6
**designated** [3] - 94:11, 95:2, 95:15
**designation** [2] - 26:15, 36:15
**detail** [3] - 24:14,

101:7, 116:3
**detailed** [3] - 56:13, 70:1, 80:2
**details** [11] - 11:13, 11:25, 15:20, 18:9, 21:21, 25:17, 27:2, 45:19, 58:24, 113:12, 122:18
**determinative** [1] - 92:12
**determine** [1] - 102:18
**determining** [1] - 92:15
**device** [1] - 25:10
**devil** [1] - 11:13
**DHECC** [1] - 106:7
**difference** [1] - 100:9
**differences** [1] - 27:10
**different** [11] - 10:24, 13:10, 14:3, 75:18, 83:11, 94:3, 95:1, 102:13, 106:9, 107:1
**differently** [1] - 27:19
**difficulty** [1] - 126:18
**direct** [11] - 8:22, 30:10, 30:14, 57:25, 59:22, 62:19, 66:12, 73:2, 81:24, 96:5, 96:21
**directed** [2] - 35:20, 96:14
**directing** [3] - 69:3, 96:11, 96:15
**direction** [2] - 37:6, 93:8
**directly** [5] - 13:18, 15:16, 46:21, 79:14, 91:2
**director** [2] - 118:9, 119:7
**disagreed** [2] - 92:3
**discharge** [6] - 33:18, 44:2, 44:13, 44:22, 95:24
**disclose** [3] - 90:7, 90:15, 103:16
**disclosed** [2] - 14:11, 55:18
**Disclosure** [1] - 105:25
**discovered** [1] - 72:10
**discuss** [4] - 39:23, 94:25, 102:10, 113:22
**discussed** [5] - 31:19, 32:17, 58:18, 61:15, 103:19
**discussing** [1] - 89:22
**discussion** [18] - 9:24, 17:12, 31:1, 31:9,

33:1, 34:4, 36:3, 52:4, 56:24, 58:19, 66:1, 66:2, 72:8, 79:21, 82:14, 96:21, 102:22, 107:22
**discussions** [6] - 46:21, 48:16, 49:4, 49:5, 92:2, 113:11
**dishonest** [2] - 80:7, 80:12
**dispute** [2] - 46:17
**dissected** [1] - 18:21
**distinctly** [1] - 67:22
**District** [5] - 4:25, 5:22, 130:16, 130:25
**DISTRICT** [2] - 1:1, 1:1
**diversionary** [1] - 128:25
**doctor** [3] - 51:8, 51:11, 51:16
**document** [32] - 36:10, 36:13, 36:24, 39:5, 39:6, 39:10, 39:20, 40:13, 50:24, 51:2, 60:15, 61:10, 61:13, 65:19, 67:16, 71:5, 73:13, 74:6, 81:25, 85:3, 85:10, 85:11, 85:15, 109:11, 109:13, 109:15, 109:25, 111:4, 111:5, 115:23, 116:9, 116:10
**documented** [1] - 60:24
**documents** [16] - 36:5, 36:23, 38:2, 38:4, 53:3, 53:5, 53:7, 56:12, 60:11, 60:25, 88:2, 100:21, 100:22, 103:25, 104:2, 104:3
**dollar** [3] - 25:21, 87:5, 123:11
**dollars** [1] - 26:21
**done** [31] - 5:14, 5:18, 5:19, 6:10, 9:14, 15:8, 15:19, 23:18, 26:12, 26:16, 27:15, 54:7, 55:8, 55:16, 55:20, 70:13, 70:17, 79:1, 80:8, 87:16, 91:8, 91:14, 96:19, 98:15, 118:14, 119:10, 119:11, 122:23, 127:9, 128:21, 129:9
**door** [5] - 13:24, 14:5,

16:5, 94:22, 94:23
**doubt** [1] - 90:4
**dovetails** [1] - 39:13
**down** [15] - 17:23, 25:4, 25:11, 26:17, 30:19, 30:23, 46:16, 53:15, 79:16, 81:25, 97:4, 109:4, 111:24, 117:19
**draft** [4] - 22:22, 23:1, 35:7, 100:25
**drafted** [2] - 37:4, 87:18
**drafts** [1] - 36:1
**drew** [1] - 125:25
**drinking** [1] - 10:2
**drove** [2] - 9:25, 11:1
**drug** [2] - 18:1, 125:14
**Drywall** [3] - 108:18, 110:7, 112:20
**duly** [1] - 4:12
**dumped** [1] - 118:16
**During** [1] - 63:13
**during** [22] - 15:2, 17:11, 26:23, 30:19, 31:15, 33:11, 34:9, 44:16, 55:4, 65:9, 69:25, 70:11, 71:19, 74:11, 75:21, 76:3, 77:7, 79:22, 81:7, 82:11, 88:9, 124:21
**Duval** [5] - 93:3, 108:3, 108:21, 109:1, 120:14

**E**

**e-mail** [17] - 58:4, 68:6, 68:24, 76:9, 76:11, 76:25, 82:16, 85:2, 99:22, 105:3, 105:11, 105:14, 106:10, 109:16, 110:4, 110:11, 110:13
**e-mails** [21] - 42:11, 68:4, 69:2, 72:10, 75:5, 75:6, 75:8, 75:11, 75:14, 75:18, 75:19, 76:4, 77:8, 77:10, 78:4, 78:24, 93:6, 124:25, 125:5, 125:7
**early** [7] - 5:20, 31:10, 34:4, 35:22, 47:14, 47:21, 85:23
**easiest** [1] - 87:9
**East** [1] - 6:12
**Eastern** [1] - 130:16

**C O N F I D E N T I A L**

EASTERN [1] - 1:1
eating [1] - 129:25
economic [1] - 106:3
effect [9] - 9:7, 65:10, 71:20, 72:2, 82:24, 85:15, 103:13, 103:15, 113:24
effectively [1] - 22:13
efficiencies [1] - 112:24
efficiency [1] - 122:6
efficient [1] - 25:13
efforts [1] - 112:23
eggs [1] - 87:3
eight [2] - 15:19, 119:16
Eighth [1] - 4:22
Einstein [1] - 127:12
either [10] - 10:12, 11:17, 22:22, 31:19, 57:25, 76:9, 78:23, 89:18, 94:11, 106:13
elaborate [1] - 113:8
elected [1] - 32:24
elevator [1] - 79:17
Eleventh [1] - 4:23
emotional [2] - 124:23, 125:11
employ [1] - 34:6
employed [2] - 111:25, 118:10
employee [11] - 41:22, 45:24, 46:5, 46:7, 55:20, 92:19, 100:24, 117:6, 117:17, 117:23, 118:24
employees [7] - 29:19, 37:23, 38:6, 39:23, 103:16, 121:10, 121:15
employment [22] - 34:6, 35:22, 40:20, 43:11, 46:12, 49:4, 87:22, 95:22, 95:24, 98:18, 99:9, 99:17, 103:16, 103:17, 103:21, 104:10, 104:16, 105:9, 105:15, 107:18, 113:7, 119:18
enabled [1] - 103:2
encountered [2] - 27:17, 115:17
end [5] - 59:22, 70:5, 102:22, 103:13, 111:10
enforcement [2] - 119:5, 120:1
engage [7] - 103:17,

104:9, 104:15, 105:8, 105:15, 107:18, 113:7
enjoyable [1] - 14:9
entertainment [2] - 35:18, 100:24
entire [2] - 5:15, 116:8
entitled [3] - 39:2, 71:16, 130:19
entity [2] - 49:18, 94:5
environmental [1] - 5:23
envisioned [1] - 94:24
especially [1] - 81:19
ESQUIRE [2] - 1:11, 1:16
essence [4] - 64:13, 110:21, 125:3, 125:10
essentially [3] - 94:17, 98:14, 105:21
establish [2] - 35:13, 121:3
established [2] - 35:17, 106:2
establishing [1] - 34:17
establishment [2] - 30:15, 35:8
etcetera [3] - 12:23, 14:19, 114:9
ethics [4] - 35:1, 94:13, 94:14, 95:20
etiology [1] - 99:25
evening [2] - 58:8, 67:23
events [1] - 48:14
exact [1] - 7:19
exactly [6] - 9:9, 19:21, 22:1, 35:21, 60:25, 81:5
EXAMINATION [10] - 2:6, 2:7, 2:8, 2:9, 2:10, 4:14, 102:24, 118:6, 123:1, 123:20
EXAMINATIONS [1] - 2:3
examined [1] - 4:13
example [10] - 18:25, 19:7, 27:8, 27:12, 33:12, 37:16, 38:7, 52:22, 114:6
except [8] - 30:11, 30:12, 34:7, 73:13, 92:19, 98:14, 114:5, 115:10
exception [3] - 28:10, 92:20, 106:12
exceptions [1] - 121:25

exchange [1] - 99:22
Exchange [1] - 79:16
excuse [8] - 26:2, 60:13, 66:17, 76:6, 104:20, 105:20, 110:5
executed [1] - 37:15
execution [2] - 22:18, 47:21
executive [2] - 18:12, 42:4
exhibit [3] - 40:10, 63:11, 81:23
EXHIBIT [12] - 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:4, 3:5, 3:6
Exhibit [7] - 36:20, 38:13, 50:21, 53:1, 60:5, 60:21, 62:9, 67:14, 84:25, 109:6, 109:23, 116:16
EXHIBITS [2] - 3:1, 3:3
Exhibits [3] - 101:3, 101:5, 103:23
exists [1] - 33:3
expanded [1] - 10:10
expansion [1] - 10:19
expansive [1] - 69:18
expecting [1] - 15:21
expedite [2] - 123:6, 123:15
expedited [1] - 123:11
expenses [2] - 35:18, 122:1
experience [6] - 52:23, 89:4, 89:6, 89:8, 101:16, 119:22
experienced [3] - 78:25, 92:24, 94:4
experiences [1] - 89:3
expertise [4] - 18:5, 18:10, 21:12, 56:19
explain [6] - 7:21, 13:13, 25:16, 41:14, 76:10, 112:10
explained [3] - 15:7, 59:11, 98:17
explanation [4] - 15:3, 78:17, 100:6, 100:7
explanations [1] - 113:13
explicitly [1] - 15:8
exposure [1] - 10:21
express [2] - 41:18, 45:14
expressed [1] - 111:22

expressing [1] - 41:20
extended [2] - 43:8, 88:4
extensive [1] - 9:18
extensively [2] - 17:24, 28:24
eye [1] - 94:10

F

F-E-E [1] - 76:13
face [1] - 64:25
facilitate [1] - 99:18
Facility [5] - 12:11, 13:21, 24:8, 27:5, 32:7
facility [3] - 33:3, 87:4, 99:7
fact [15] - 9:20, 20:7, 23:19, 26:21, 45:12, 75:18, 81:21, 83:8, 85:12, 86:19, 87:18, 88:12, 111:15, 117:13, 129:6
factor [3] - 81:14, 92:15, 112:14
factors [1] - 6:16
facts [2] - 57:22, 115:20
Fallon [2] - 12:18, 110:9
falls [1] - 29:23
familiar [11] - 25:22, 26:6, 26:7, 27:10, 48:4, 48:6, 48:8, 48:9, 49:18, 51:4, 94:4
family [1] - 14:7
far [4] - 58:13, 70:11, 125:21, 125:22
farm [1] - 96:1
fashion [3] - 64:11, 85:12, 106:14
faulting [1] - 25:19
favors [1] - 33:17
feature [1] - 18:19
federal [8] - 4:21, 5:1, 6:7, 6:16, 7:9, 58:15
Federal [1] - 4:24
fee [7] - 56:16, 76:13, 76:20, 77:11, 77:15, 78:11, 78:12, 78:19, 79:3, 79:25, 81:3, 82:9, 82:17, 124:25, 125:1
feedback [1] - 93:12
fees [3] - 75:23, 76:4, 85:12
Feinberg [3] - 13:9,

30:20, 31:6
fellow [1] - 119:9
felt [4] - 18:6, 57:24, 70:25, 125:22
few [16] - 28:13, 31:24, 44:11, 45:6, 46:1, 49:24, 53:14, 63:2, 63:18, 63:19, 85:20, 90:11, 99:7, 123:4
field [2] - 7:6, 21:13
Fifth [4] - 4:21, 5:1, 129:11
file [1] - 63:9
filed [3] - 51:12, 90:4, 100:19
filing [1] - 121:1
fill [1] - 120:22
filled [1] - 120:23
finalizing [1] - 58:24
finally [1] - 106:25
financial [13] - 28:24, 43:25, 44:1, 49:7, 64:12, 70:3, 70:21, 71:2, 79:4, 80:13, 80:18, 128:1
fine [2] - 61:11, 115:9
finish [1] - 98:16
finished [5] - 9:24, 15:15, 78:24, 79:2, 126:1
finishing [2] - 14:11, 54:4
firm [12] - 13:1, 48:4, 48:25, 81:3, 88:22, 88:23, 95:25, 114:7, 114:14, 123:9, 123:10
Firm [5] - 48:6, 48:15, 48:18, 96:17, 123:8
firms [3] - 13:2, 18:16, 48:24
first [16] - 4:12, 5:21, 5:23, 10:24, 22:22, 36:17, 55:9, 56:5, 62:20, 72:13, 74:17, 83:8, 87:18, 88:19, 98:9, 103:1, 111:5, 111:18, 122:19
Fischer [2] - 111:2, 121:15
Fisher [8] - 20:22, 108:5, 108:7, 109:1, 112:4, 112:17, 121:6, 121:10
fisher [1] - 108:21
Fisher's [1] - 38:7
Fisheries [2] - 119:4, 119:6
fisheries [1] - 119:15

**C O N F I D E N T I A L**

SM-03-JA000241

**fishing** [1] - 41:11
**fit** [2] - 119:1, 120:5
**five** [10] - 21:11, 21:12, 64:21, 65:16, 68:18, 75:1, 87:10, 99:14, 112:13, 128:5
**five-day** [1] - 99:14
**five-minute** [1] - 68:18
**fixed** [1] - 122:1
**fixing** [1] - 89:20
**flesh** [1] - 68:8
**flip** [1] - 127:10
**flip-flopping** [1] - 127:10
**floating** [1] - 128:8
**floor** [2] - 86:4, 115:16
**flopping** [1] - 127:10
**flow** [1] - 100:18
**fluid** [1] - 31:9
**focus** [4] - 36:22, 64:24, 68:25, 123:22
**focused** [4] - 34:5, 113:14, 113:23, 116:17
**folks** [1] - 111:2
**follow** [6] - 54:12, 81:13, 96:25, 97:1, 102:14, 118:8, 129:11, 129:12, 129:15
**follow-up** [2] - 97:1, 102:14
**following** [1] - 34:15
**follows** [1] - 4:13
**food** [1] - 88:14
**foregoing** [1] - 130:17
**form** [3] - 27:18, 43:19, 77:18
**formal** [2] - 66:13, 67:2
**formative** [2] - 86:2, 87:1
**formulated** [1] - 101:2
**formulation** [1] - 102:11
**formulations** [1] - 100:22
**Forsyth** [1] - 95:25
**forth** [17] - 26:25, 28:25, 32:12, 33:25, 34:7, 47:17, 60:25, 87:14, 92:13, 93:13, 101:15, 102:20, 108:12, 111:11, 121:18, 128:16, 128:18
**forty** [1] - 75:1
**forty-five** [1] - 75:1
**forward** [1] - 44:1
**foster** [1] - 96:23

**frames** [1] - 26:13
**Frank** [1] - 117:5
**fraud** [8] - 21:13, 22:2, 24:4, 24:7, 25:9, 27:10
**Freeh** [1] - 103:9
**FREEH** [43] - 1:11, 1:15, 4:5, 4:10, 4:15, 26:1, 28:14, 37:3, 38:18, 39:21, 42:18, 50:22, 53:2, 53:13, 55:3, 60:10, 61:4, 62:6, 62:10, 66:24, 66:25, 67:15, 73:9, 73:10, 73:20, 74:1, 84:23, 85:1, 101:6, 102:15, 109:14, 109:18, 109:20, 114:14, 116:12, 116:14, 116:21, 117:20, 123:21, 126:1, 126:9, 129:18, 130:2
**FREEH........................ .....** [2] - 2:6, 2:10
**Friday** [2] - 85:5, 99:15
**friend** [1] - 86:15
**friends** [2] - 33:17, 82:2
█████ [4] - 117:4, 117:7, 117:13
**fulfill** [1] - 113:15
**full** [12] - 45:24, 45:25, 46:5, 92:25, 98:11, 98:14, 98:18, 99:10, 106:2, 118:24, 129:20
**full-time** [6] - 45:24, 46:5, 98:11, 98:18, 106:2, 118:24
**fully** [2] - 49:14, 101:13
**functions** [1] - 90:23
**funds** [1] - 97:21
**funnel** [6] - 88:7, 91:10, 91:13, 91:20, 92:8, 93:4
**funneling** [1] - 25:10
**future** [3] - 44:4, 47:8, 48:22

**G**

█████ [3] - 117:4, 117:7
**Garden** [6] - 12:12, 27:12, 27:13, 37:16, 38:5, 38:16

**gauge** [2] - 15:11, 15:14
**General** [3] - 10:12, 19:10
**general** [6] - 11:11, 11:16, 12:15, 31:1, 94:5
**generally** [1] - 18:17
**generated** [1] - 36:13
**generates** [1] - 122:4
**gentleman** [1] - 54:24
**gentlemen** [1] - 106:13
**Gibby** [2] - 123:9, 123:13
**gifts** [1] - 100:24
**girl** [3] - 27:8, 87:25, 119:23
**given** [6] - 28:6, 37:23, 43:22, 59:18, 113:13, 116:2
**Glen** [5] - 47:2, 48:2, 48:8, 82:6, 82:8
**Glen's** [1] - 82:6
**go-to** [1] - 95:10
**God** [3] - 10:3, 103:3, 122:22
**goodness** [1] - 129:10
**goosy** [1] - 82:1
**governed** [1] - 81:12
**governs** [1] - 80:23
**grade** [1] - 122:17
**graduated** [1] - 5:13
**grand** [1] - 14:8
**grateful** [1] - 129:19
**gratuities** [1] - 100:24
**Gravier** [1] - 74:5
**Greer** [4] - 13:16, 27:9, 110:6, 110:22
**grew** [1] - 7:6
**Group** [6] - 17:7, 37:17, 38:5, 38:16, 107:11, 107:14
**group** [13] - 10:10, 13:3, 18:7, 18:22, 32:7, 32:19, 32:21, 33:4, 33:5, 33:12, 38:7, 92:14, 108:25
**groups** [1] - 19:8
**guarantee** [1] - 126:14
**guess** [15] - 5:16, 6:19, 21:2, 31:25, 40:17, 45:7, 78:9, 78:21, 80:2, 81:18, 95:14, 97:19, 101:15, 101:21, 113:17
**guessing** [2] - 70:10, 74:19
**Guidepost** [5] - 24:7,

25:3, 25:10, 25:20
**GULF** [1] - 1:5
**Gulf** [9] - 8:5, 12:10, 13:9, 13:21, 24:8, 25:23, 27:5, 32:2, 32:7
**gun** [1] - 126:15
**guy** [23] - 16:20, 16:24, 20:2, 21:19, 21:20, 24:25, 28:9, 33:7, 41:1, 51:22, 54:18, 59:17, 77:20, 93:9, 97:19, 108:11, 112:12, 118:19, 118:21, 119:14, 120:12

**H**

**half** [3] - 22:11, 87:5
**hall** [2] - 79:18, 117:19
**halls** [1] - 57:9
**Hammond** [1] - 32:8
**hand** [1] - 121:5
**handed** [1] - 75:12
**handle** [3] - 42:8, 46:23, 100:18
**handled** [3] - 5:25, 12:19, 24:15
**handles** [1] - 93:3
**handling** [4] - 6:21, 9:15, 46:1, 54:3
**hard** [2] - 15:11, 88:10
**hats** [1] - 16:13
**HB406** [1] - 1:21
**head** [3] - 54:18, 94:15, 119:10
**heading** [1] - 22:2
**hear** [1] - 83:20
**heard** [6] - 45:3, 45:4, 49:20, 51:19, 83:8, 117:12
**hearings** [1] - 6:2
**heck** [1] - 64:6
**held** [1] - 91:23
**hell** [6] - 20:2, 78:22, 114:22, 124:22, 127:1, 127:21
**help** [4] - 67:16, 77:17, 107:5, 109:20
**helpful** [1] - 116:19
**helps** [1] - 62:3
**Hendricks** [3] - 108:1, 118:10, 119:23
**hereby** [1] - 130:16
**Herman** [1] - 9:5
**herself** [1] - 90:16
**hesitate** [1] - 97:15
**hesitating** [1] - 74:16

**hesitation** [1] - 65:2
**high** [2] - 93:6, 118:4
**higher** [1] - 81:25
**HIPAA** [1] - 95:23
**hire** [11] - 20:16, 21:3, 22:3, 29:24, 30:3, 40:18, 85:24, 86:19, 86:22, 89:20, 118:19
**hired** [7] - 40:16, 41:3, 43:2, 85:21, 89:5, 93:7, 121:7
**hires** [1] - 23:21
**hiring** [8] - 21:5, 30:2, 41:18, 43:3, 43:13, 89:1, 89:22, 90:7
**history** [4] - 14:24, 24:3, 44:21, 80:19
**hits** [1] - 103:6
**Holstein** [3] - 8:25, 60:7, 60:17
**Holstein's** [2] - 60:2, 60:14
**home** [1] - 10:1
**honest** [1] - 87:24
**HONORABLE** [1] - 1:11
**hope** [1] - 129:10
**Horizon** [10] - 7:13, 8:4, 53:5, 56:17, 105:24, 106:3, 106:23, 107:9, 108:17, 111:7
**HORIZON** [1] - 1:4
**hotel** [1] - 8:19
**hours** [7] - 9:19, 9:25, 22:16, 99:10, 114:12, 114:13, 122:16
**house** [3] - 10:1, 95:6, 96:2
**Houston** [1] - 15:24
**Hub** [9] - 23:17, 23:24, 25:22, 25:24, 26:15, 26:18, 27:20, 27:21
**huge** [8] - 24:6, 24:21, 93:11, 128:4
**hundreds** [2] - 7:10, 91:1
**husband** [2] - 125:2, 125:9
**hybrid** [1] - 19:13
**hypothetical** [1] - 55:13

**I**

**Iberia** [2] - 40:22, 41:11
**identical** [2] - 106:12,

**C O N F I D E N T I A L**

113:6
identified [1] - 77:11
identify [2] - 44:18, 106:13
Illinois [1] - 119:24
immediately [1] - 15:18
implementation [1] - 126:19
implemented [4] - 101:9, 103:10, 113:22, 127:23
important [3] - 24:4, 91:21, 122:11
impressed [1] - 21:25
improper [1] - 56:10
impropriety [1] - 64:11
improve [2] - 25:13, 127:22
improved [1] - 27:11
improvements [1] - 127:22
IN [2] - 1:4, 1:5
in-house [2] - 95:6, 96:2
inauguration [1] - 30:16
Inc [1] - 5:22
inception [3] - 5:25, 40:22, 88:4
inclination [1] - 11:14
include [2] - 35:12, 39:16
includes [1] - 116:7
including [8] - 4:20, 17:6, 17:7, 19:8, 21:2, 30:1, 36:24, 46:2
incorporated [1] - 61:1
increasing [1] - 42:15
incredible [1] - 128:15
incredibly [1] - 126:10
independent [9] - 18:22, 18:24, 19:6, 19:7, 19:11, 30:4, 35:12, 96:2, 114:7
indicated [3] - 40:13, 80:10, 82:3
indicates [1] - 77:23
indicating [1] - 93:6
indication [1] - 33:4
indifferent [2] - 94:16, 114:23
individual [11] - 5:4, 12:23, 23:8, 33:14, 38:14, 38:19, 38:20, 38:21, 40:16, 96:6, 111:25

individually [2] - 75:16, 98:6
individuals [1] - 34:13
industry [1] - 41:11
influence [1] - 127:14
information [7] - 4:6, 16:7, 25:9, 27:14, 57:25, 59:6, 97:2
informative [1] - 34:11
informed [1] - 91:23
inherited [1] - 23:25
initial [2] - 34:10, 49:5
initiate [1] - 35:7
initiated [4] - 20:6, 63:24, 63:25, 92:21
initiator [2] - 83:21, 108:24
innovate [1] - 35:10
innumerable [1] - 42:10
input [5] - 23:2, 30:24, 32:25, 92:14, 114:3
inquire [2] - 99:17, 99:20
inquired [1] - 43:10
inquiries [5] - 42:9, 91:1, 99:24, 101:15, 102:6
inquiring [1] - 96:6
inquiry [6] - 70:24, 77:6, 97:1, 99:20, 116:3, 129:22
inside [2] - 95:10, 125:24
instance [1] - 40:8
instances [1] - 91:15
instantaneously [1] - 55:12
instructed [2] - 40:3, 57:3
insurance [2] - 32:11, 33:15
integrity [2] - 115:14, 127:5
intelligent [1] - 88:1
intend [2] - 115:8, 115:10
intent [1] - 127:24
intents [1] - 46:4
Interest [2] - 39:2, 105:25
interest [40] - 35:13, 39:1, 43:25, 44:1, 44:4, 47:4, 47:9, 47:19, 49:7, 49:8, 50:5, 50:11, 54:21, 64:12, 65:3, 70:2, 70:3, 70:21, 71:2, 78:1, 79:4, 80:13, 80:14, 80:18, 80:19,

81:10, 83:5, 84:2, 90:3, 90:12, 90:13, 90:17, 100:24, 106:6, 106:19, 106:21, 125:2, 125:4
interested [3] - 25:25, 78:13, 86:7
interesting [4] - 7:1, 7:15, 20:8, 118:12
interests [2] - 108:8, 111:10
interim [1] - 68:23
internal [6] - 107:5, 108:12, 121:16, 121:18, 121:20, 122:24
International [2] - 31:7
interrupt [1] - 22:20
intervals [1] - 57:8
intervening [1] - 69:3
interview [50] - 9:7, 15:2, 17:22, 29:12, 29:15, 44:16, 61:23, 62:12, 66:14, 67:2, 67:19, 67:24, 68:18, 68:20, 68:22, 68:25, 69:4, 69:6, 69:18, 69:25, 70:9, 70:11, 71:14, 71:19, 72:1, 72:9, 72:19, 72:25, 73:2, 73:6, 73:15, 74:4, 74:8, 74:14, 74:25, 75:9, 75:21, 76:3, 77:7, 78:25, 79:2, 79:13, 79:22, 79:23, 82:11, 82:18, 82:23, 84:15, 85:7, 102:9, 123:23, 124:1, 124:4, 124:6, 124:18, 124:21, 126:5
interviewed [6] - 16:20, 17:23, 74:15, 74:21, 88:13, 120:3
interviewing [2] - 73:16, 89:18
interviews [5] - 17:16, 18:2, 18:5, 21:24, 68:12
intimately [3] - 25:7, 25:11, 93:9
investigate [1] - 56:21
investigation [9] - 22:2, 24:7, 25:4, 25:5, 57:3, 57:7, 57:10, 65:24, 72:11
investigations [1] - 56:19
investigative [1] -

59:25
involved [19] - 4:24, 13:17, 19:18, 24:23, 25:7, 25:12, 27:7, 27:13, 32:9, 32:10, 34:8, 93:23, 94:1, 106:15, 119:25, 120:1, 122:10, 127:20
involvement [2] - 8:8, 103:5
involving [3] - 51:7, 93:18
irritant [1] - 112:14
irritated [1] - 128:11
irritates [1] - 127:1
issue [6] - 51:23, 70:8, 79:3, 79:6, 80:10, 93:10, 93:11, 103:19, 119:5
issued [1] - 92:12
issues [14] - 23:9, 39:23, 87:8, 87:25, 95:5, 95:17, 95:22, 95:23, 95:24, 96:1, 96:16, 115:8, 115:9
IT [2] - 101:19, 102:17
itself [1] - 22:23

J

JAMES [1] - 1:16
Jennifer [1] - 27:12
job [14] - 34:5, 42:2, 42:7, 86:1, 91:22, 92:21, 98:1, 98:10, 98:11, 98:12, 98:13, 115:20, 120:20, 127:21
john [1] - 110:10
John [1] - 80:17
joint [2] - 11:3, 61:1
Jon [6] - 48:15, 82:5, 96:12, 97:16, 97:19
Jon's [1] - 82:6
JP-12 [3] - 2:21, 60:3, 60:5
Judge [25] - 11:6, 11:19, 12:18, 13:16, 44:19, 58:10, 58:21, 59:10, 61:6, 61:14, 67:25, 71:17, 78:7, 80:16, 87:2, 93:13, 93:16, 93:20, 110:9, 113:18, 120:9, 126:19, 127:18, 128:15
judge [3] - 45:19, 47:25, 100:19

Judge's [1] - 116:22
July [5] - 60:22, 63:10, 104:15, 104:22, 105:1, 105:4, 105:11, 116:1
June [34] - 13:24, 60:8, 61:14, 61:19, 61:22, 62:2, 63:13, 66:12, 66:19, 67:1, 67:10, 67:20, 68:3, 68:15, 68:16, 68:17, 68:25, 69:4, 69:21, 70:4, 71:14, 72:19, 72:25, 73:3, 73:6, 73:16, 74:4, 79:23, 82:23, 84:15, 85:5, 87:4, 123:23
Juneau [48] - 4:6, 4:16, 15:2, 18:14, 19:3, 20:21, 23:5, 27:24, 28:15, 34:10, 39:4, 45:23, 53:14, 55:4, 60:15, 61:19, 65:9, 66:14, 67:20, 69:5, 71:21, 73:7, 73:16, 73:22, 74:3, 74:5, 80:11, 81:23, 82:22, 88:16, 93:15, 100:21, 103:1, 109:8, 109:15, 109:25, 110:10, 110:24, 111:4, 111:16, 115:5, 116:19, 123:3, 123:22, 123:24, 125:17, 126:1, 128:19
JUNEAU [2] - 1:11, 4:11
JUNEAU.................... ................. [1] - 2:5

K

keel [1] - 41:13
keep [1] - 113:23
Keith [4] - 15:13, 41:24, 51:14, 83:20
Ken [3] - 13:9, 30:20, 30:22
Keough [1] - 27:12
Key [1] - 111:1
kid [1] - 7:8
kids [2] - 14:8
kind [35] - 6:10, 6:13, 9:13, 10:22, 11:25, 13:6, 13:18, 15:6, 15:22, 19:12, 19:13, 19:14, 22:11, 31:2, 33:19, 74:16, 75:4,

**C O N F I D E N T I A L**

SM-03-JA000243

77:4, 78:7, 82:13,
91:10, 94:20, 97:19,
97:22, 100:20,
101:16, 101:23,
102:21, 103:21,
116:4, 118:14,
125:16, 125:25,
126:7, 127:15
**kinds** [1] - 127:11
**Kirk** [10] - 20:22, 38:7,
108:5, 108:7,
108:11, 112:4,
112:17, 121:6,
121:10, 121:15
**knowing** [3] - 14:21,
30:1, 79:10
**knowledge** [7] -
12:23, 35:5, 39:24,
43:7, 82:22, 105:14,
123:12
**knowledgeable** [2] -
112:12, 119:14
**known** [4] - 64:18,
85:17, 95:19, 96:16
**knows** [4] - 8:5, 30:1,
96:20, 125:18

**L**

**L-A-N-E** [1] - 21:19
**LA** [1] - 1:22
**label** [1] - 95:9
**laborious** [1] - 27:1
**lack** [2] - 12:14, 76:17
**lady** [2] - 87:25,
120:11
**Lafayette** [7] - 7:23,
8:1, 9:25, 11:1,
24:25, 26:3, 40:25
**Landry** [1] - 118:21
**Lane** [3] - 21:19,
23:10, 28:9
**language** [1] - 75:18
**lap** [1] - 118:16
**large** [1] - 18:12
**last** [11] - 49:24, 80:2,
88:14, 103:7,
103:13, 104:15,
105:3, 117:20,
118:14, 118:21,
119:17
**late** [2] - 58:8, 67:22
**Law** [6] - 5:9, 48:6,
48:15, 48:18, 96:16,
123:8
**law** [13] - 4:17, 5:8,
5:11, 5:12, 5:13,
5:16, 6:6, 6:18, 6:19,
6:21, 18:16, 123:9,

123:10
**lawyer** [28] - 5:4, 6:20,
6:24, 7:1, 7:5, 7:24,
7:25, 18:9, 18:18,
42:24, 43:1, 78:25,
80:24, 81:2, 81:3,
89:1, 92:4, 92:16,
92:24, 94:4, 95:2,
95:6, 95:7, 95:10,
95:20, 97:11, 97:17,
97:18
**lawyers** [10] - 8:21,
8:23, 9:2, 16:11,
78:11, 81:11, 88:17,
91:1, 93:2, 121:1
**layer** [1] - 121:22
**layered** [2] - 121:20,
121:21
**lead** [2] - 20:16, 35:8
**learn** [7] - 46:11,
46:24, 46:25, 56:5,
101:16, 102:4, 103:1
**learned** [4] - 9:9, 55:4,
55:14, 58:13
**least** [6] - 21:11,
39:15, 48:17, 77:18,
80:9, 95:7
**leave** [4] - 25:16,
50:23, 93:21
**leaving** [1] - 52:16
**led** [1] - 46:25
**left** [5] - 59:16, 74:2,
119:16, 128:4, 129:9
**legal** [15] - 20:21,
42:8, 42:9, 42:14,
42:15, 43:9, 90:22,
91:16, 92:17, 93:15,
93:18, 93:25, 95:2,
98:20
**length** [2] - 75:2,
85:10
**Lerner** [14] - 47:2,
47:11, 47:13, 47:23,
48:2, 48:5, 48:8,
48:9, 48:11, 48:14,
48:15, 48:18, 49:2,
82:8
**less** [5] - 14:4, 78:9,
81:22, 85:10, 88:6
**letter** [10] - 51:21,
60:2, 60:7, 60:14,
63:10, 84:20, 85:4,
115:25, 116:1
**letters** [1] - 100:20
**level** [3] - 43:8, 118:3,
128:6
**Levine** [3] - 26:21,
28:15, 29:20
**liberty** [1] - 129:17
**licensed** [3] - 4:17,

4:18, 4:19
**lick** [1] - 14:25
**life** [6] - 5:15, 6:24,
7:5, 98:15, 127:19,
128:8
**lifetime** [1] - 14:23
**limited** [1] - 129:21
**line** [1] - 92:5
**lines** [1] - 41:25
**Lionel** [6] - 20:22,
38:11, 56:11, 80:18,
93:7, 107:21
**list** [1] - 21:24
**listed** [3] - 109:1,
110:14, 111:14
**listing** [1] - 109:12
**lists** [1] - 51:3
**literally** [1] - 91:1
**litigation** [9] - 5:21,
6:21, 47:7, 54:3,
54:21, 87:11, 89:7,
89:9, 95:14
**live** [1] - 7:7
**liver** [1] - 122:4
**lives** [1] - 8:4
**LLC** [1] - 82:9
**load** [1] - 88:8
**local** [2] - 24:25, 107:2
**Look** [2] - 26:10,
125:11
**look** [22] - 22:14,
24:24, 50:25, 58:17,
64:25, 73:18, 74:6,
80:1, 80:11, 96:22,
97:9, 99:14, 100:5,
100:16, 101:19,
102:20, 104:1,
105:18, 110:25,
122:23, 127:19,
128:22
**looked** [7] - 24:14,
24:22, 27:8, 82:8,
100:4, 113:4, 119:20
**looking** [16] - 22:1,
25:12, 59:8, 87:6,
88:21, 101:20,
109:15, 110:14,
110:19, 111:9,
119:3, 120:5,
120:22, 126:14,
127:9, 129:13
**looks** [2] - 82:16,
105:22
**loosy** [1] - 82:1
**loosy-goosy** [1] - 82:1
**lose** [1] - 128:22
**LOUIS** [2] - 1:11, 1:15
**Louisiana** [22] - 4:18,
4:21, 5:2, 5:6, 5:23,
5:24, 7:2, 7:6, 7:10,

25:1, 32:8, 40:23,
40:25, 41:11, 51:1,
80:23, 81:1, 118:20,
119:6, 119:24,
130:15, 130:16
**LOUISIANA** [2] - 1:1,
1:6
**loves** [1] - 80:9
**LSU** [3] - 5:9, 5:11,
108:12
**luxury** [1] - 27:6
**lying** [1] - 79:3
**Lynn** [5] - 13:16, 27:9,
110:6, 110:8, 110:22

**M**

**mad** [1] - 70:16
**Magistrate** [2] - 58:18,
120:18
**mail** [17] - 58:4, 68:6,
68:24, 76:9, 76:11,
76:25, 82:16, 85:2,
99:22, 105:3,
105:11, 105:14,
106:10, 109:16,
110:4, 110:11,
110:13
**mails** [21] - 42:11,
68:4, 69:2, 72:10,
75:5, 75:6, 75:8,
75:11, 75:14, 75:18,
75:19, 76:4, 77:8,
77:10, 78:4, 78:24,
93:6, 124:25, 125:5,
125:7
**main** [5] - 32:6, 90:25,
92:16, 92:17
**maintaining** [1] -
45:18
**majority** [1] - 91:12
**man** [8] - 22:14, 34:4,
41:22, 47:23, 50:9,
112:12, 115:17,
125:24
**manner** [1] - 102:13
**March** [4] - 7:18,
110:5
**maritime** [1] - 7:6
**mark** [7] - 38:10,
40:10, 60:14, 60:16,
84:23, 116:12,
116:14
**Mark** [2] - 8:25, 60:7
**marked** [26] - 36:20,
38:13, 39:6, 50:21,
50:23, 53:1, 60:5,
60:21, 62:4, 62:9,
62:11, 66:17, 67:7,

67:14, 73:5, 73:11,
73:14, 84:25, 101:5,
103:23, 103:25,
109:6, 109:9,
109:23, 109:25,
116:16
**MARKED............** [1] -
3:3
**MARKED..................
........** [10] - 2:17,
2:18, 2:19, 2:20,
2:21, 2:22, 2:23,
2:24, 2:25, 3:6
**MARKED..................
..........** [2] - 3:4, 3:5
**MARKED..................
** [1] -
3:2
**market** [1] - 88:24
**marriage** [1] - 125:24
**married** [1] - 86:12
**marshalled** [1] - 121:2
**massive** [3] - 13:7,
15:15, 120:25
**Master** [2] - 4:7, 99:4
**MASTER** [2] - 1:12,
1:15
**master** [4] - 5:21, 5:8,
12:20, 17:25
**Masters** [2] - 31:8
**material** [1] - 119:12
**matter** [32] - 6:3, 7:14,
20:7, 20:21, 33:23,
37:12, 46:24, 49:22,
54:4, 55:15, 57:10,
57:21, 58:18, 59:9,
62:21, 64:17, 66:1,
78:12, 79:14, 80:17,
81:16, 87:18, 88:11,
90:8, 93:18, 94:23,
98:3, 111:7, 111:15,
115:13, 126:21,
130:19
**matters** [7] - 8:13,
48:17, 54:14, 61:21,
74:9, 89:23, 99:7
**meals** [1] - 129:25
**mean** [61] - 5:14, 6:12,
6:14, 7:10, 7:20,
9:18, 10:5, 11:17,
12:1, 13:5, 19:20,
22:12, 22:15, 25:1,
25:20, 26:6, 31:23,
31:24, 33:9, 34:4,
36:7, 37:25, 38:1,
40:19, 44:5, 49:21,
54:21, 58:6, 59:8,
64:7, 65:25, 70:1,
70:7, 70:8, 71:5,
71:7, 72:17, 80:16,

**C O N F I D E N T I A L**

SM-03-JA000244

82:16, 83:23, 84:13,
86:13, 86:23, 88:6,
93:6, 94:14, 97:7,
100:5, 100:6,
100:14, 111:9,
113:3, 114:2,
117:24, 117:25,
119:4, 122:15,
125:25, 128:1, 128:7
**meaning** [4] - 14:1,
16:9, 21:6, 68:2
**meant** [1] - 54:5
**measure** [1] - 46:10
**meat** [3] - 57:19,
57:20, 57:23
**MECHANICAL** [1] -
1:24
**mechanics** [1] - 19:18
**mechanism** [1] -
122:23
**mechanisms** [1] -
91:8
**media** [1] - 15:24
**mediation** [3] - 5:19,
6:11, 14:13
**mediations** [2] - 5:19,
6:11
**medical** [1] - 83:15
**meet** [7] - 8:18, 15:24,
16:2, 32:1, 58:11,
100:17
**meeting** [42] - 8:4,
8:25, 9:7, 18:3,
31:10, 31:13, 39:15,
39:19, 39:22, 39:25,
40:3, 61:5, 61:9,
61:20, 62:12, 62:19,
62:23, 63:2, 63:7,
63:16, 63:18, 63:20,
63:21, 63:24, 63:25,
64:20, 65:9, 65:16,
65:19, 65:21, 67:10,
67:21, 67:22, 68:1,
68:2, 74:11, 74:23,
77:2, 99:6, 112:13,
124:23, 125:16
**meetings** [9] - 10:8,
34:5, 40:5, 76:7,
91:18, 93:12,
103:20, 126:22
**mega** [1] - 25:2
**members** [2] - 31:6,
32:1
**memo** [7] - 63:7, 63:8,
66:16, 66:17, 66:23,
69:5, 72:6
**memory** [2] - 20:11,
76:6, 77:17
**men** [1] - 113:17
**mention** [6] - 6:5,

6:13, 19:13, 21:18,
44:23, 113:25
**mentioned** [29] -
17:21, 19:22, 21:9,
28:15, 44:19, 45:5,
45:7, 46:13, 47:18,
50:2, 52:6, 53:19,
57:20, 64:4, 66:6,
71:10, 72:21, 77:18,
83:5, 83:17, 83:25,
84:1, 85:21, 86:7,
97:10, 113:20,
116:25, 117:19,
123:3
**mentioning** [2] - 45:1,
47:23
**merely** [1] - 53:25
**MERIT** [1] - 1:21
**Merit** [2] - 130:14,
130:24
**message** [3] - 80:7,
127:17
**met** [6] - 11:4, 30:22,
61:14, 86:11,
118:20, 119:13
**meticulous** [1] - 116:3
**MEXICO** [1] - 1:5
**Michael** [8] - 61:19,
61:23, 62:12, 66:5,
66:6, 66:14, 67:20,
69:5, 69:11, 70:6,
72:19, 73:7, 73:16,
77:23, 82:22, 88:16,
93:14
**Michael's** [2] - 66:21,
66:23
**Middle** [1] - 5:22
**might** [19] - 10:16,
36:5, 38:16, 40:2,
44:1, 45:7, 54:1,
66:6, 66:7, 67:16,
75:16, 80:1, 94:10,
95:23, 99:3, 109:20,
111:20, 117:19,
117:23
**Mike** [20] - 19:2,
20:21, 51:20, 61:25,
62:24, 67:4, 68:1,
68:8, 68:21, 69:17,
75:6, 76:9, 76:22,
87:6, 92:23, 93:8,
93:15, 125:17
**million** [3] - 87:24,
96:17, 123:11
**millions** [4] - 25:1,
25:2, 26:20
**mind** [5] - 20:8, 95:11,
95:18, 101:23
**mine** [2] - 64:24, 128:7
**minute** [6] - 13:13,

30:3, 35:14, 59:5,
67:12, 68:18,
104:20, 111:17
**minutes** [7] - 64:21,
65:16, 70:10, 74:20,
75:1, 112:13, 123:4
**missed** [1] - 61:3
**mission** [5] - 128:6,
128:12, 128:22,
128:23
**mistake** [2] - 81:18,
81:19
**mistakes** [1] - 81:18
**misuse** [1] - 76:19
**mix** [2] - 112:16,
115:12
**mixture** [1] - 129:6
**moment** [7] - 23:11,
28:16, 40:9, 63:5,
64:1, 64:17, 126:2
**moments** [2] - 53:14,
63:18
**Monday** [3] - 11:18,
69:4, 99:14
**monetary** [1] - 55:6
**money** [11] - 24:24,
26:11, 76:5, 78:1,
78:10, 78:15, 78:16,
80:9, 82:4, 82:5,
82:9
**monies** [4] - 55:25,
75:23, 78:3, 85:16
**monitor** [2] - 91:7,
120:24
**monthly** [2] - 122:7,
122:8
**months** [5] - 100:12,
100:17, 102:17,
103:7, 119:16
**morning** [5] - 10:3,
49:7, 58:14, 85:6,
126:6
**Moskowitz** [6] - 8:24,
10:15, 15:13, 41:24,
51:14, 83:20
**most** [6] - 7:5, 11:3,
29:15, 29:16, 46:1,
122:7
**mother** [1] - 117:14
**motivation** [3] -
127:24, 128:1,
128:14
**Motors** [1] - 19:10
**Mounger** [1] - 16:20
**move** [4] - 24:16,
24:18, 26:13, 37:21
**moving** [1] - 24:11
**MR** [98] - 2:6, 2:7, 2:8,
2:9, 2:10, 4:5, 4:10,
4:15, 23:5, 23:8,

23:11, 23:16, 23:24,
26:1, 27:24, 28:3,
28:14, 36:15, 37:3,
38:3, 38:18, 39:4,
39:8, 39:21, 41:24,
42:2, 42:6, 42:15,
42:18, 50:22, 53:2,
53:12, 53:13, 53:14,
53:19, 53:23, 54:6,
54:12, 54:23, 55:3,
60:10, 60:13, 60:19,
61:4, 62:6, 62:7,
62:10, 66:17, 66:20,
66:24, 66:25, 67:15,
73:8, 73:9, 73:10,
73:20, 74:1, 84:23,
85:1, 101:6, 102:14,
102:15, 102:16,
102:25, 103:24,
109:7, 109:14,
109:17, 109:18,
109:19, 109:20,
109:24, 110:15,
110:17, 110:20,
110:23, 113:19,
114:14, 114:19,
115:1, 115:4,
116:12, 116:14,
116:19, 116:21,
117:2, 117:20,
117:22, 118:2,
118:7, 123:2,
123:21, 126:1,
126:9, 129:18,
130:2, 130:4, 130:5
**multiple** [2] - 15:10,
19:8
**must** [2] - 9:18, 11:2
**mutual** [1] - 31:3
**myriad** [1] - 92:14
**mystery** [1] - 13:7

---

**N**

**name** [51] - 11:5, 11:8,
11:21, 11:22, 15:19,
17:6, 17:7, 19:23,
25:7, 28:17, 28:19,
29:2, 29:14, 29:25,
41:17, 44:19, 44:23,
45:2, 45:5, 45:7,
47:10, 48:2, 48:7,
48:8, 48:18, 48:25,
49:1, 49:2, 49:19,
49:20, 50:2, 52:16,
53:9, 57:14, 71:10,
72:14, 72:20, 72:24,
83:9, 91:4, 106:14,
112:1, 117:3, 117:7,
117:12, 118:21,

119:9, 119:21,
120:20
**named** [9] - 16:20,
21:19, 47:5, 47:23,
50:5, 50:9, 83:5,
96:12, 118:19
**names** [18] - 11:7,
11:19, 11:21, 17:1,
17:3, 17:4, 17:5,
17:14, 17:15, 21:12,
44:13, 44:18, 48:24,
107:16, 110:16,
114:8
**narrative** [1] - 58:12
**national** [3] - 6:8,
18:1, 114:15
**nature** [2] - 79:10,
88:18
**Neath** [1] - 10:14
**necessarily** [2] -
41:22, 77:4
**necessary** [1] - 70:24
**need** [13] - 11:13,
16:12, 31:5, 36:9,
57:12, 58:20, 69:24,
96:25, 114:3,
116:18, 119:7, 129:4
**needed** [3] - 31:3,
43:19, 58:11
**negotiated** [2] - 14:19,
37:11
**negotiating** [3] - 19:1,
33:14, 33:25
**negotiations** [4] - 6:1,
8:15, 9:10, 12:1
**Netterville** [1] - 13:1
**never** [25] - 14:23,
20:13, 34:20, 49:20,
51:19, 51:21, 52:13,
83:4, 83:11, 86:17,
86:18, 87:20, 87:21,
87:23, 94:22, 96:14,
96:19, 97:8, 117:12,
123:14, 123:18,
126:11, 127:21
**NEW** [2] - 1:6, 1:22
**new** [6] - 14:1, 14:3,
30:16, 53:25, 54:8,
100:23, 101:1,
126:11
**New** [8] - 6:25, 8:3,
10:7, 25:3, 40:22,
41:11, 48:4, 69:9,
129:25
**newspaper** [2] - 8:7,
27:4
**next** [5] - 10:3, 11:23,
23:3, 58:14, 111:13
**nice** [3] - 14:14, 20:2,
118:21

night [8] - 58:11, 67:12, 74:16, 99:5, 99:6, 124:2
nine [1] - 100:17
nixed [1] - 21:23
NO [1] - 1:6
nobody [4] - 24:17, 64:7, 91:24, 129:13
nobody's [1] - 96:22
Non [1] - 105:25
Non-Disclosure [1] - 105:25
none [3] - 13:5, 23:4, 46:21
normal [2] - 18:15, 100:18
note [1] - 60:6
noted [1] - 80:7
notes [5] - 73:4, 74:11, 80:2, 124:11, 124:14
nothing [8] - 4:8, 12:8, 44:22, 51:19, 71:5, 77:20, 112:18, 125:15
notifying [1] - 57:17
November [2] - 48:1, 88:5
nowhere [1] - 85:15
number [8] - 13:19, 24:9, 36:6, 36:16, 55:10, 55:11, 91:13, 102:6, 102:17
numbered [1] - 130:19
numbers [2] - 26:21, 26:22

**O**

o'clock [2] - 58:14, 59:17
oath [1] - 4:13
object [3] - 18:8, 33:21, 34:1
objection [2] - 21:4, 111:22
objections [1] - 46:12
objective [2] - 33:21, 33:23
obligation [3] - 44:14, 80:20, 98:3
obligations [1] - 35:11
obliged [1] - 100:12
observed [1] - 70:12
obstacle [1] - 128:17
obstacles [2] - 115:17, 115:22
obvious [1] - 86:23
obviously [10] - 5:1,

8:5, 12:22, 13:3, 19:3, 20:18, 36:22, 40:13, 40:21, 75:5
occasionally [1] - 118:24
occasions [2] - 32:16, 113:21
occur [1] - 62:25
occurred [3] - 10:23, 73:15, 81:7
odd [1] - 15:10
Odom [47] - 16:23, 17:7, 17:19, 18:6, 19:9, 19:21, 20:5, 28:2, 28:3, 28:19, 28:20, 28:21, 29:9, 29:20, 35:9, 35:20, 37:4, 38:4, 39:14, 40:3, 41:20, 46:13, 46:16, 46:23, 56:8, 94:21, 104:4, 104:20, 104:21, 105:20, 106:10, 106:17, 107:7, 107:10, 108:21, 108:24, 110:6, 110:9, 111:8, 111:22, 113:5, 119:13, 120:4, 121:8, 121:9
Odom's [3] - 17:6, 17:7, 42:2
OF [3] - 1:1, 1:5, 1:11
offering [1] - 76:24
offhand [2] - 16:24, 105:17
office [41] - 7:23, 17:24, 18:2, 34:14, 35:6, 36:13, 37:5, 37:24, 50:12, 50:16, 52:7, 52:18, 56:9, 63:1, 64:18, 67:23, 69:7, 69:8, 75:24, 79:25, 83:23, 85:13, 85:17, 85:18, 86:3, 86:6, 90:3, 90:23, 93:18, 98:9, 98:13, 98:20, 98:23, 101:8, 103:18, 112:1, 112:6, 117:25, 121:21, 126:21
Office [2] - 38:1, 107:2
officer [7] - 18:11, 18:12, 19:17, 42:5, 47:18, 94:13, 94:14
officers [1] - 51:3
offices [2] - 25:22, 74:4, 86:5
Official [2] - 130:15, 130:24

official [1] - 30:7
OFFICIAL [1] - 1:20
officially [1] - 94:12
offshore [1] - 7:8
often [2] - 95:4, 114:16
OIL [2] - 1:4, 1:4
old [1] - 14:24
ON [1] - 1:5
once [5] - 49:9, 54:9, 75:13, 86:12
one [94] - 10:9, 10:24, 11:5, 11:8, 14:23, 17:3, 17:10, 17:12, 17:17, 20:8, 20:13, 20:19, 22:14, 23:19, 23:21, 24:3, 24:23, 27:2, 27:3, 28:10, 28:16, 31:10, 31:14, 32:6, 36:17, 37:16, 38:11, 38:23, 39:15, 39:18, 41:15, 41:19, 44:19, 44:21, 45:2, 48:24, 51:7, 51:14, 54:12, 55:9, 55:10, 58:8, 60:7, 67:22, 68:15, 69:18, 73:13, 74:17, 74:18, 75:8, 75:14, 76:7, 76:23, 76:24, 79:18, 80:15, 90:25, 91:8, 92:13, 93:11, 94:13, 96:20, 98:22, 100:25, 101:12, 105:3, 107:19, 111:6, 114:5, 114:8, 114:11, 115:11, 115:23, 116:7, 116:9, 118:13, 119:4, 120:8, 123:22, 124:22, 125:19, 126:11, 126:14, 126:15, 127:20, 127:21, 128:8, 128:10, 129:5
ones [4] - 17:18, 32:13, 97:10, 121:11
OPA [1] - 33:2
open [6] - 13:24, 16:5, 33:2, 87:4, 126:15
opened [1] - 33:6
operated [2] - 19:15, 32:12
operating [2] - 19:16, 106:18
operation [6] - 9:13, 18:13, 18:15, 20:20, 27:5, 27:13
operations [2] - 15:6, 18:9

opinion [7] - 42:24, 120:4, 127:15, 129:14, 129:15
opinions [2] - 91:16
opportunities [1] - 43:11
opportunity [2] - 86:2, 116:23
order [9] - 7:19, 13:23, 15:1, 29:23, 30:18, 37:11, 100:17, 116:22
Order [1] - 87:3
organization [1] - 19:14
organizations [1] - 7:3
organized [1] - 26:25
original [5] - 13:23, 18:3, 18:23, 33:3, 55:23
ORLEANS [2] - 1:6, 1:22
Orleans [5] - 8:3, 10:7, 48:4, 69:9, 129:25
Orran [1] - 27:9
ourselves [1] - 40:14
outgrowth [1] - 15:22
outlines [1] - 116:3
outside [20] - 28:17, 46:14, 81:3, 95:7, 95:10, 95:19, 95:25, 98:15, 103:16, 103:17, 104:10, 104:16, 105:8, 105:15, 106:18, 107:18, 108:8, 113:7, 113:20
overall [3] - 70:1, 114:4, 116:6
overloaded [1] - 93:5
oversight [1] - 12:15
overview [1] - 19:12
overwhelming [1] - 91:11
owed [4] - 78:10, 78:16, 82:4
own [11] - 13:15, 20:18, 29:10, 33:2, 51:16, 52:22, 52:23, 83:14, 89:8, 94:12, 98:20

**P**

packet [2] - 62:13, 114:18
page [6] - 37:9, 38:25, 39:5, 80:3, 81:24, 85:10

PAGE [2] - 2:3, 2:15
paid [4] - 13:22, 78:13, 78:14, 78:15
Papa [6] - 49:18, 50:2, 50:6, 51:3, 52:14, 52:16, 53:6, 83:5, 83:9
paper [3] - 6:25, 8:16, 45:17
papers [1] - 59:22
paragraph [6] - 29:24, 37:8, 38:25, 39:5, 80:2, 80:5
Parish [1] - 107:4
part [27] - 13:6, 13:7, 19:1, 19:2, 19:4, 23:2, 23:25, 24:2, 32:14, 34:10, 36:8, 37:25, 38:1, 40:2, 45:24, 46:7, 51:15, 77:18, 92:24, 93:1, 93:23, 96:8, 98:10, 101:9, 108:12, 118:23, 127:16
part-time [5] - 45:24, 46:7, 93:23, 98:10, 108:12
participants [1] - 61:1
participated [2] - 67:3, 74:23
participates [1] - 73:3
participation [1] - 90:13
particular [9] - 34:16, 63:7, 63:16, 72:25, 76:9, 96:5, 97:9, 99:17, 102:7
particularly [1] - 53:9
parties [15] - 5:18, 11:4, 14:12, 15:4, 18:6, 20:25, 21:4, 21:6, 27:22, 34:8, 34:15, 57:17, 58:21, 61:6, 91:12
partner [2] - 55:14, 55:19
Partner [1] - 45:8
partners [1] - 48:14
parts [4] - 46:12, 75:17, 119:11, 129:6
passage [1] - 113:18
past [5] - 6:15, 7:2, 26:2, 89:14, 117:15
Pat [6] - 18:14, 58:25, 80:11, 80:12, 93:21, 110:10
PATRICK [3] - 1:11, 2:5, 4:11
Patrick [1] - 111:16
pause [1] - 76:15

**C O N F I D E N T I A L**

**pay** [3] - 17:21, 122:17, 127:6
**payment** [2] - 77:21, 127:14
**payments** [11] - 48:11, 55:6, 65:14, 70:20, 71:21, 72:2, 75:23, 76:5, 85:12
**payroll** [1] - 30:4
**people** [91] - 8:20, 8:21, 9:5, 9:21, 10:10, 10:16, 10:17, 10:18, 10:22, 12:14, 12:21, 12:23, 15:16, 15:19, 15:24, 16:14, 16:15, 16:20, 17:2, 19:19, 20:19, 21:2, 21:12, 21:15, 25:6, 27:2, 27:5, 27:15, 28:7, 29:16, 29:25, 30:1, 30:2, 30:5, 32:17, 33:18, 34:17, 35:15, 38:4, 38:14, 38:22, 39:9, 39:16, 44:15, 48:25, 53:20, 54:16, 74:23, 74:24, 78:10, 81:11, 81:15, 88:10, 91:19, 92:14, 94:17, 94:18, 96:2, 96:21, 97:24, 97:25, 98:14, 98:25, 99:5, 100:19, 101:19, 103:19, 107:17, 108:16, 108:20, 108:22, 108:25, 109:12, 110:17, 111:9, 111:14, 111:21, 112:14, 114:22, 115:2, 115:15, 121:23, 122:9, 124:4, 127:20, 128:5
**people's** [1] - 95:18
**Pepper** [3] - 130:13, 130:22, 130:23
**PEPPER** [1] - 1:20
**per** [5] - 6:14, 8:11, 11:15, 18:18, 38:15
**percent** [1] - 91:17
**Perez** [1] - 50:9
**performed** [1] - 128:4
**period** [14] - 30:10, 30:14, 30:17, 30:19, 40:23, 43:8, 49:25, 68:23, 88:4, 88:6, 88:9, 92:18, 94:1
**permanent** [2] - 121:23, 122:24
**permission** [8] - 50:14, 79:24,

103:17, 105:8, 107:2, 111:6, 113:7, 115:3
**Perry** [1] - 110:10
**person** [4] - 92:13, 94:13, 95:11, 96:2
**personal** [4] - 43:7, 83:13, 84:5, 127:15
**personality** [2] - 112:19, 113:1
**personally** [8] - 43:5, 61:24, 91:23, 97:17, 122:17, 128:10, 129:19, 129:23
**personnel** [1] - 15:5
**Personnel** [1] - 111:1
**perspective** [5] - 10:20, 14:22, 67:17, 114:22, 129:10
**persuaded** [1] - 86:21
**pertains** [1] - 36:4
**Petkauskas** [1] - 25:7
**phase** [3] - 34:9, 116:22, 122:12
**Philadelphia** [1] - 14:10
**phone** [3] - 7:24, 7:25, 119:5
**phonetically** [2] - 23:17, 112:1
**phrase** [2] - 95:1, 95:7
**picked** [1] - 119:5
**picture** [3] - 93:10, 115:21, 116:6
**piece** [4] - 24:4, 45:16, 113:14
**pills** [1] - 122:4
**pitfalls** [1] - 14:21
**PJ-1** [4] - 3:1, 36:14, 101:3, 101:5
**PJ-10** [5] - 2:17, 36:16, 36:20, 37:19, 37:21
**PJ-11** [4] - 2:18, 38:10, 38:13, 39:6
**PJ-12** [2] - 60:11, 60:14
**PJ-13** [5] - 2:22, 60:16, 60:21, 63:12, 66:22
**PJ-14** [8] - 2:23, 62:9, 62:11, 63:3, 66:18, 67:7, 69:5, 69:23
**PJ-15** [9] - 2:24, 67:14, 67:18, 73:5, 73:8, 73:11, 73:14, 74:3, 81:24
**PJ-16** [3] - 2:25, 84:23, 84:25
**PJ-17** [3] - 3:6,

116:14, 116:16
**PJ-1A** [2] - 3:1, 101:5
**PJ-1C** [2] - 3:1, 101:5
**PJ-1D** [2] - 3:1, 101:5
**PJ-2** [6] - 3:3, 103:23, 103:25, 104:5, 104:9, 105:19, 105:23, 106:10
**PJ-3** [6] - 3:3, 103:23, 103:25, 104:18, 105:19, 106:10
**PJ-4** [4] - 3:3, 103:23, 104:1, 105:3
**PJ-4B** [2] - 2:19, 50:21
**PJ-4C** [2] - 2:20, 53:1
**PJ-7** [2] - 3:1, 101:5
**PJ-8** [3] - 3:5, 109:23, 110:1
**PJ-9** [3] - 3:4, 109:6, 109:9
**Place** [1] - 79:16
**place** [8] - 25:24, 35:17, 67:20, 69:7, 98:25, 101:9
**places** [1] - 128:18
**plaintiff** [2] - 6:22, 7:1
**plaintiffs** [7] - 9:3, 17:1, 17:14, 17:18, 18:20, 26:10, 89:18
**Plaintiffs** [1] - 91:2
**plaintiffs'** [7] - 9:2, 3:3, 16:10, 21:7, 22:6, 26:18, 87:15
**plastic** [1] - 60:15
**play** [1] - 121:15
**pleadings** [1] - 97:23
**plenty** [2] - 25:15, 127:19
**pleural** [1] - 11:21
**plus** [1] - 14:13
**point** [42] - 7:4, 11:11, 13:14, 16:6, 17:24, 19:16, 21:10, 28:16, 34:3, 36:19, 38:12, 42:20, 43:6, 46:11, 47:12, 48:1, 50:20, 52:25, 53:23, 54:7, 57:24, 60:4, 60:20, 62:8, 64:5, 65:2, 65:5, 67:3, 67:13, 70:14, 72:1, 73:24, 75:4, 84:24, 85:11, 101:4, 102:9, 103:22, 109:5, 109:22, 115:6, 116:15
**policies** [16] - 35:4, 35:8, 36:2, 65:6, 91:11, 100:23, 101:1, 101:8,

102:10, 103:10, 103:12, 113:21, 113:23, 114:4, 116:17
**policy** [16] - 34:17, 34:20, 35:1, 35:3, 89:19, 91:22, 91:24, 92:12, 92:15, 100:25, 102:1, 103:15, 104:6, 104:7, 104:8, 115:8
**political** [1] - 16:14
**politicians** [1] - 97:25
**popped** [1] - 49:19
**position** [5] - 9:8, 86:22, 120:18, 120:22, 121:5
**positive** [1] - 63:25
**possessed** [1] - 28:25
**possible** [2] - 72:24, 95:5
**Postlethwaite** [1] - 12:25
**pounded** [1] - 122:22
**POYDRAS** [1] - 1:21
**practice** [11] - 4:17, 4:18, 4:19, 5:16, 6:6, 6:18, 6:19, 6:21, 7:11, 51:16, 53:16
**practiced** [3] - 4:25, 5:12, 70:23
**practitioner** [1] - 42:25
**precise** [4] - 24:9, 61:3, 95:13, 103:4
**preclude** [1] - 46:15
**predicated** [1] - 83:14
**preempt** [1] - 36:3
**prepared** [1] - 36:23
**present** [9] - 40:1, 59:2, 67:21, 69:11, 69:12, 69:14, 73:7, 106:6
**presented** [1] - 17:18
**presenting** [1] - 59:6
**president** [1] - 7:2
**press** [1] - 116:2
**pressure** [1] - 123:6
**pretty** [9] - 24:25, 43:1, 61:7, 70:1, 70:22, 88:8, 96:20, 101:25, 124:23
**previous** [2] - 28:22, 32:2
**previously** [3] - 42:22, 62:4, 111:25
**Price** [3] - 12:12, 12:22, 16:20
**primarily** [4] - 18:18, 19:20, 96:1, 122:10

**primary** [1] - 127:20
**private** [1] - 98:20
**pro** [1] - 91:3
**problem** [9] - 21:22, 51:17, 51:24, 94:24, 97:3, 111:19, 126:23, 127:2, 128:17
**problems** [6] - 9:17, 27:16, 27:17, 79:5, 79:7, 79:12
**procedures** [1] - 35:4
**PROCEEDINGS** [2] - 1:24, 4:1
**proceedings** [17] - 36:19, 38:13, 50:20, 52:25, 60:4, 60:20, 62:8, 67:13, 73:24, 84:24, 101:4, 103:22, 109:5, 109:22, 116:15, 130:6, 130:19
**process** [46] - 11:16, 14:1, 14:3, 14:4, 15:2, 15:5, 22:13, 23:25, 24:3, 25:9, 26:23, 29:2, 29:12, 30:7, 30:16, 30:21, 31:11, 32:15, 33:23, 34:11, 34:18, 35:7, 35:10, 41:6, 41:8, 43:2, 44:16, 55:8, 75:15, 87:13, 89:4, 89:22, 90:7, 93:16, 98:5, 99:18, 114:12, 116:8, 120:25, 121:14, 122:11, 127:6, 128:24, 129:4
**processed** [1] - 51:8
**processes** [1] - 31:16
**produced** [1] - 68:5
**PRODUCED** [1] - 1:25
**productivity** [1] - 122:6
**products** [1] - 106:5
**professional** [2] - 43:4, 80:21
**professionalism** [2] - 80:22, 81:9
**professor** [1] - 108:12
**profitable** [1] - 14:9
**program** [27] - 13:8, 13:9, 13:10, 13:24, 14:1, 25:6, 27:10, 32:6, 33:10, 33:19, 33:21, 33:22, 35:17, 43:24, 43:25, 78:2, 80:21, 86:8, 92:21, 106:3, 111:17, 118:13, 119:3,

**C O N F I D E N T I A L**

SM-03-JA000247

119:17, 127:5
**programs** [1] - 27:7
**progress** [1] - 57:7
**project** [2] - 110:18, 110:22
**proposal** [4] - 109:4, 111:6, 111:14, 112:21
**Proposal** [1] - 110:7
**proposed** [3] - 19:23, 29:6, 110:17
**Propulsid** [1] - 17:25
**prosecute** [1] - 24:19
**prosecuted** [2] - 24:19, 24:20
**protection** [1] - 100:25
**protocol** [1] - 13:21
**proved** [1] - 87:7
**provide** [2] - 36:1, 106:4
**providing** [2] - 107:3, 107:5
**provision** [4] - 20:24, 21:16, 37:8, 39:1
**provisions** [3] - 43:20, 46:8, 65:6
**prudently** [1] - 24:24
**PSC** [5] - 7:24, 21:8, 21:16, 32:19, 58:23
**public** [7] - 46:25, 48:14, 48:18, 49:22, 51:2, 57:11, 64:17
**publish** [1] - 122:7
**published** [1] - 37:23
**pull** [1] - 20:8
**pulled** [4] - 38:23, 81:8, 109:4, 111:24
**pulling** [2] - 16:14, 16:15
**pure** [1] - 15:9
**purport** [2] - 53:4
**purports** [1] - 51:1
**purpose** [3] - 72:8, 92:6, 128:22
**purposes** [1] - 46:4
**pursuant** [3] - 20:24, 21:16, 105:23
**pursuing** [1] - 55:15
**push** [8] - 97:25, 99:17, 99:21, 100:10, 100:13, 123:5, 123:6
**pushed** [2] - 97:24, 123:11
**pushes** [1] - 97:25
**pushing** [4] - 96:22, 100:5, 100:10, 118:19
**pushy** [1] - 97:19

**put** [16] - 12:4, 22:14, 26:22, 31:25, 32:14, 35:17, 36:25, 37:13, 58:12, 67:17, 94:15, 101:9, 108:25, 111:13, 126:5, 128:11
**putting** [1] - 23:21

## Q

**QA's** [1] - 121:19
**quality** [3] - 88:3, 110:24, 121:18
**quarter** [1] - 114:11
**quarters** [1] - 114:12
**questioned** [3] - 61:20, 75:14, 125:13
**questioner** [1] - 79:1
**questioning** [9] - 70:15, 70:23, 70:25, 75:2, 75:3, 75:22, 76:18, 124:8, 125:14
**questions** [15] - 42:12, 42:22, 44:10, 63:19, 70:6, 70:19, 70:24, 73:19, 75:7, 85:20, 103:9, 103:11, 103:19, 126:2, 126:3
**quick** [1] - 88:1
**quicker** [1] - 129:14
**quickly** [1] - 121:5
**quite** [1] - 15:14
**quote** [1] - 82:1

## R

**R-O-M-M-E-Y-E-R** [1] - 117:5
**radar** [1] - 114:24
**raised** [2] - 51:23, 87:20
**ran** [1] - 19:3
**rather** [1] - 17:8
**RE** [1] - 1:4
**reach** [1] - 114:4
**reaching** [1] - 110:9
**reaction** [1] - 78:8
**read** [19] - 36:9, 73:23, 74:7, 75:5, 75:6, 75:11, 75:17, 76:14, 80:4, 85:14, 91:11, 97:23, 99:22, 100:2, 105:23, 116:10, 124:15
**Read** [1] - 76:25
**Reade** [12] - 29:5, 29:8, 29:21, 58:7, 104:11, 104:12,

104:14, 105:20, 106:10, 107:13, 108:21, 113:6
**reading** [3] - 8:7, 82:16, 104:21
**reads** [1] - 30:18
**real** [12] - 9:10, 9:18, 47:14, 47:21, 57:9, 79:5, 79:11, 80:1, 86:2, 92:11, 97:19, 122:2
**realized** [1] - 82:25
**realizing** [1] - 18:14
**really** [32] - 8:10, 8:14, 13:24, 14:14, 22:12, 26:4, 27:2, 34:1, 48:3, 48:19, 51:18, 52:6, 52:24, 55:1, 70:2, 75:16, 76:20, 82:13, 87:6, 92:19, 102:19, 116:10, 117:17, 117:24, 118:14, 119:12, 119:19, 119:21, 123:18, 127:4, 128:13, 129:7
**REALTIME** [1] - 1:20
**Realtime** [2] - 130:13, 130:23
**reason** [12] - 6:5, 21:18, 28:9, 36:21, 51:10, 66:6, 91:25, 99:3, 115:22, 116:25, 120:11, 128:3
**reasonable** [1] - 17:20
**reasons** [1] - 89:5
**recalled** [1] - 71:24
**receive** [5] - 72:2, 79:24, 85:12, 107:19, 108:6
**received** [5] - 75:23, 79:3, 85:8, 85:16, 111:4
**receiving** [10] - 48:10, 55:6, 55:25, 65:13, 70:20, 71:21, 77:15, 84:20, 108:6, 110:11
**recently** [5] - 101:2, 101:9, 102:4, 103:10, 117:16
**recess** [1] - 73:25
**recited** [1] - 65:18
**recognized** [4] - 6:8, 6:9, 48:2, 86:13
**recollection** [28] - 43:12, 44:25, 50:8, 53:9, 55:2, 56:15, 57:1, 57:13, 61:19, 62:14, 63:20, 66:9,

67:9, 67:25, 69:24, 70:2, 74:13, 75:1, 77:18, 84:2, 85:7, 89:25, 107:15, 109:21, 124:17, 124:19, 124:20, 124:22
**recommend** [4] - 40:18, 44:12, 85:24, 101:22
**recommendation** [3] - 20:6, 29:10, 34:13
**recommendations** [1] - 22:4
**recommended** [2] - 20:5, 121:8
**reconstruct** [4] - 59:21, 61:11, 62:4, 63:19
**record** [23] - 4:5, 4:16, 21:6, 36:11, 39:4, 53:4, 60:3, 60:14, 61:18, 63:6, 63:7, 63:8, 63:16, 74:2, 80:4, 82:25, 97:15, 104:5, 105:23, 109:14, 126:5, 129:18, 130:18
**recorded** [7] - 63:4, 66:16, 67:8, 72:5, 72:6, 77:4, 81:4
**RECORDED** [1] - 1:24
**recording** [2] - 65:18
**records** [3] - 37:25, 57:11, 109:15
**Recusal** [2] - 39:2, 105:25
**recusal** [1] - 39:23
**reduced** [1] - 91:12
**refer** [2] - 44:13, 90:12
**reference** [3] - 111:16, 111:18
**referenced** [2] - 23:11, 78:4
**references** [4] - 43:4, 76:4, 77:10, 89:2
**referencing** [2] - 39:5, 106:9
**referral** [5] - 55:6, 56:16, 78:11, 82:17, 125:1
**referred** [8] - 7:13, 26:25, 30:16, 48:23, 78:4, 82:4, 108:18, 109:12
**referring** [6] - 37:19, 40:11, 63:11, 80:5, 81:3, 123:9
**refers** [1] - 37:1
**reflected** [1] - 69:4

**reflects** [1] - 21:20
**refresh** [7] - 20:11, 53:8, 57:12, 69:24, 77:17, 109:20, 124:18
**refreshes** [2] - 61:18, 67:9
**regard** [1] - 74:8
**regarding** [7] - 32:21, 42:14, 53:6, 55:25, 75:23, 77:16, 103:9
**region** [1] - 25:23
**Registered** [1] - 130:13
**REGISTERED** [1] - 1:21
**registered** [1] - 130:24
**regular** [2] - 57:6, 96:8
**regulation** [1] - 119:10
**regulations** [2] - 35:18, 81:13
**regulatory** [1] - 119:25
**Reitano** [8] - 39:9, 64:6, 85:21, 88:25, 90:2, 92:4, 107:19, 124:2
**related** [6] - 31:15, 52:18, 55:25, 57:13, 83:13, 83:15
**relates** [1] - 126:7
**RELATES** [1] - 1:8
**relating** [4] - 79:25, 84:4, 85:13, 96:16
**relation** [2] - 71:16, 84:1
**relationship** [2] - 30:5, 47:1
**relative** [1] - 15:9
**relatively** [1] - 49:25
**release** [1] - 97:21
**relevant** [4] - 70:24, 101:13, 115:19, 116:24
**rely** [3] - 56:14, 80:24, 81:14
**remarkable** [1] - 129:8
**remember** [82] - 7:15, 7:19, 8:23, 8:24, 9:1, 9:4, 10:4, 10:11, 10:13, 10:15, 15:13, 16:11, 16:25, 20:4, 21:11, 21:18, 21:21, 23:1, 24:9, 31:24, 34:19, 39:12, 39:14, 40:19, 40:20, 41:19, 41:20, 42:1, 43:21, 45:19, 47:3, 47:10, 47:25, 48:16, 48:19, 48:25, 52:3, 55:1,

# C O N F I D E N T I A L

56:17, 57:8, 58:8, 58:10, 62:22, 63:23, 67:11, 67:22, 69:15, 71:17, 72:18, 75:16, 76:7, 76:13, 76:22, 77:17, 77:19, 82:10, 82:12, 83:16, 84:3, 84:8, 89:17, 95:13, 98:22, 103:3, 104:3, 106:17, 107:4, 107:12, 108:6, 108:23, 110:13, 113:10, 113:12, 124:14
**remind** [2] - 65:5, 65:7
**remiss** [1] - 115:11
**remove** [1] - 90:16
**remuneration** [1] - 78:1
**reorganized** [1] - 25:16
**repeated** [1] - 70:4
**repetitively** [1] - 101:20
**reply** [3] - 60:8, 60:17, 60:22
**report** [33] - 24:17, 24:18, 24:20, 26:13, 51:2, 56:14, 57:6, 57:12, 58:1, 58:15, 58:24, 59:6, 59:8, 59:18, 59:19, 59:25, 62:12, 63:10, 66:20, 66:22, 73:6, 73:15, 74:3, 77:15, 101:20, 116:5, 117:1, 122:6, 124:6, 124:16, 128:23
**reported** [7] - 6:25, 15:16, 55:12, 56:10, 56:11, 58:25, 63:2
**REPORTER** [4] - 1:20, 1:20, 1:21, 73:21
**Reporter** [7] - 130:13, 130:14, 130:15, 130:23, 130:24, 130:24
**reporter** [1] - 40:9
**REPORTER'S** [1] - 130:11
**reporting** [2] - 27:25, 66:9
**reports** [7] - 6:3, 24:14, 27:4, 28:4, 68:7, 122:3, 122:8
**represent** [9] - 8:9, 44:11, 47:17, 48:21, 54:20, 90:8, 100:22, 101:1, 106:20
**representation** [1] -

45:9
**representative** [1] - 9:3
**represented** [6] - 9:2, 44:12, 44:15, 45:6, 54:16, 54:18, 90:10
**representing** [5] - 8:9, 53:24, 54:9, 54:14, 54:24
**request** [9] - 5:18, 97:8, 104:9, 104:14, 104:18, 104:24, 106:25, 107:1
**requested** [1] - 23:17
**requesting** [1] - 96:15
**requests** [9] - 42:10, 98:6, 105:14, 105:15, 105:19, 105:21, 107:18, 113:6, 122:3
**requires** [1] - 81:2
**research** [3] - 42:9, 58:5, 68:24
**resentful** [1] - 70:14
**reservation** [1] - 41:20
**reservations** [4] - 41:18, 45:14, 46:11, 78:20
**resign** [3] - 84:18, 84:19
**resignation** [3] - 84:16, 84:20, 85:4
**resigned** [2] - 85:2, 99:2, 99:9
**resistance** [1] - 45:14
**resolved** [1] - 13:20
**respect** [20] - 23:8, 30:7, 30:20, 35:3, 38:22, 43:4, 53:24, 54:6, 65:22, 85:16, 88:25, 95:5, 95:11, 96:4, 96:12, 106:21, 106:25, 123:8, 129:21, 129:22
**respective** [1] - 18:6
**respond** [8] - 42:12, 42:13, 96:5, 96:16, 97:2, 97:10, 98:6, 123:5
**responded** [4] - 51:21, 52:22, 71:11, 116:2
**responding** [1] - 42:10
**response** [10] - 64:15, 76:1, 77:1, 77:5, 77:14, 78:2, 78:3, 84:5, 105:11, 115:25
**response)** [7] - 28:21, 31:23, 35:23, 53:22, 110:3, 123:7, 124:5

**responsibilities** [3] - 42:13, 90:23, 109:13
**responsibility** [1] - 123:5
**responsible** [1] - 24:11
**responsive** [1] - 25:14
**responsiveness** [1] - 129:21
**result** [1] - 70:5
**results** [1] - 33:15
**resumé** [11] - 4:23, 17:13, 20:20, 20:24, 28:8, 41:5, 41:6, 41:17, 86:24, 87:14, 89:10
**resumés** [3] - 21:14, 21:15, 111:2
**Resumés** [1] - 111:1
**retain** [1] - 90:12
**retained** [1] - 38:2
**retire** [2] - 119:10, 119:17
**Reuter** [1] - 95:19
**reversionary** [1] - 44:4
**review** [5] - 29:13, 92:7, 104:6, 116:21, 121:24
**reviewed** [1] - 39:15, 91:23, 105:10
**reviews** [5] - 61:10, 61:13, 63:8, 85:3, 104:3
**revised** [1] - 27:11
**revisionary** [1] - 82:17
**Rick** [1] - 95:18
**rid** [1] - 45:9
**RIG** [1] - 1:4
**risk** [1] - 14:21
**Ritz** [3] - 8:19, 10:8
**Ritz-Carlton** [3] - 8:19, 10:8
**RMR** [2] - 1:20, 130:23
**rodeo** [1] - 91:23
**role** [18] - 13:4, 16:13, 42:2, 42:7, 54:9, 92:16, 94:5, 98:1, 99:20, 106:6, 106:21, 108:17, 112:3, 121:14, 121:17, 122:24, 122:25, 129:21
**roles** [2] - 99:19, 121:16
**Roma** [2] - 25:7, 27:9
**Romeo** [9] - 49:18, 50:2, 50:6, 51:3, 52:14, 52:16, 53:6, 83:5, 83:9
**room** [12] - 8:1, 8:20,

9:6, 10:8, 10:11, 10:15, 10:16, 76:8, 86:4, 99:6, 112:15, 113:20
**ROOM** [1] - 1:21
**rooms** [1] - 10:9
**root** [1] - 80:17
**rotation** [1] - 100:15
**Rouge** [2] - 17:8, 119:13
**Roy** [1] - 9:4
**rule** [2] - 65:8, 129:12
**rules** [4] - 46:10, 81:9, 81:13, 129:12
**ruling** [2] - 126:20, 129:11
**run** [10] - 4:22, 18:12, 18:15, 18:17, 25:5, 33:10, 111:17, 120:8, 120:9
**running** [3] - 20:18, 57:11, 126:18
**runs** [1] - 121:21

**S**

**s/Cathy** [1] - 130:22
**sake** [1] - 60:13
**salaries** [2] - 22:5, 76:4
**salary** [3] - 22:3, 22:8, 77:10
**sat** [4] - 17:23, 25:11, 30:22, 46:16
**satisfied** [5] - 71:3, 71:7, 89:16, 90:19, 90:21
**save** [2] - 26:11, 26:20
**saw** [17] - 22:22, 24:15, 27:16, 30:23, 31:3, 62:22, 79:15, 79:16, 88:3, 99:23, 100:4, 101:16, 101:24, 108:23, 111:5, 111:13, 111:14
**schedule** [1] - 114:20
**school** [5] - 5:8, 5:10, 5:11, 5:13
**School** [1] - 5:9
**scope** [1] - 114:9
**Scott** [2] - 112:1, 112:3
**scrambled** [1] - 87:3
**screen** [1] - 114:24
**se** [8] - 6:14, 8:11, 11:15, 18:18, 38:15, 91:3
**searches** [1] - 21:1

**second** [5] - 14:17, 61:12, 68:20, 74:17, 116:22
**secondarily** [1] - 122:3
**Secretary** [1] - 51:1
**section** [3] - 93:15, 121:3, 129:24
**Section** [1] - 106:1
**see** [19] - 10:23, 14:23, 16:18, 25:13, 27:17, 32:20, 53:8, 63:5, 69:1, 78:13, 78:14, 85:19, 98:3, 111:19, 114:5, 122:1, 122:5, 127:11
**seeing** [5] - 23:1, 57:9, 78:14, 113:10, 127:13
**seek** [1] - 95:21, 103:16, 123:10
**seeking** [2] - 105:8, 106:1
**seem** [4] - 40:6, 54:22, 89:18, 113:11
**segregate** [1] - 115:9
**select** [1] - 11:4
**selected** [3] - 18:6, 19:21, 114:8
**selecting** [1] - 13:4
**selection** [1] - 30:15
**send** [2] - 29:14, 82:6
**sending** [1] - 100:20
**senior** [1] - 12:21
**sense** [1] - 45:7
**sent** [13] - 15:22, 16:11, 20:25, 21:15, 23:20, 28:8, 51:20, 85:2, 87:15, 89:13, 109:16, 120:11
**sentence** [1] - 82:1
**separate** [5] - 32:19, 33:2, 51:16, 77:19, 124:1
**separated** [1] - 112:5
**separately** [5] - 32:1, 43:17, 74:21, 74:22
**separates** [2] - 27:23, 33:19
**sequence** [1] - 36:18
**series** [1] - 100:21
**serious** [4] - 9:10, 78:20, 79:12, 93:18
**serve** [3] - 94:7, 112:18, 122:2
**served** [3] - 6:6, 6:17, 92:8
**services** [2] - 106:5
**serving** [1] - 16:13
**Sessions** [1] - 95:25

**CONFIDENTIAL**

SM-03-JA000249

**set** [9] - 8:16, 8:20, 17:16, 31:16, 35:3, 35:6, 74:18, 93:22, 101:21
**Settlement** [7] - 14:18, 20:15, 33:20, 36:8, 36:10, 91:17, 118:15
**settlement** [8] - 6:2, 8:15, 9:10, 11:15, 12:1, 22:17, 82:5, 108:18
**seven** [4] - 15:18, 22:16, 66:13, 123:11
**several** [8] - 8:21, 9:5, 12:7, 22:17, 31:1, 31:21, 31:24, 32:16
**shame** [1] - 126:23
**shape** [1] - 85:12
**share** [5] - 66:7, 82:4, 82:6, 82:7, 82:9
**Shaw** [1] - 17:7
**sheet** [1] - 18:15
**Sheriff's** [1] - 107:2
**Sherrick** [5] - 112:1, 112:3, 112:5, 112:11, 112:23
**shock** [1] - 129:8
**short** [9] - 14:4, 15:1, 40:10, 40:23, 41:15, 49:25, 65:17, 88:20, 112:11
**shortly** [2] - 11:17, 111:23
**shoulder** [1] - 22:14
**Show** [1] - 57:22
**show** [17] - 50:23, 53:3, 57:22, 62:4, 62:11, 67:7, 67:16, 67:17, 73:11, 100:21, 101:2, 103:25, 109:8, 109:15, 109:18, 109:25, 124:19
**showed** [3] - 74:3, 75:10, 75:18
**showing** [3] - 53:8, 73:14, 103:4
**shown** [5] - 76:3, 76:14, 77:7, 78:4, 110:1
**shows** [1] - 76:8
**shrinking** [1] - 88:24
**Shushan** [2] - 93:16, 120:18
**shut** [2] - 116:13, 129:16
**side** [2] - 76:23, 128:2
**sides** [1] - 41:7
**sign** [3] - 38:4, 43:19, 45:16

**signed** [7] - 22:25, 37:18, 38:8, 39:10, 40:13, 46:18, 87:19
**significant** [2] - 13:19, 37:8
**signing** [2] - 39:20, 45:21
**similar** [3] - 55:13, 70:6, 95:1
**simple** [2] - 14:22, 27:21
**simply** [1] - 127:17
**simultaneous** [1] - 26:22
**simultaneously** [3] - 12:7, 12:25, 13:23
**single** [1] - 11:22
**singular** [1] - 15:16
**sit** [5] - 26:17, 30:19, 45:1, 112:13, 124:20
**sitting** [4] - 10:1, 74:19, 76:8, 76:23, 83:23, 100:16
**situation** [3] - 46:2, 51:7, 52:20
**six** [1] - 100:12
**sixth** [1] - 86:4
**skeptical** [1] - 122:19
**skip** [1] - 114:6
**slightly** [2] - 83:11, 94:3
**Smith** [1] - 80:17
**snippet** [1] - 43:22
**social** [1] - 86:15
**software** [3] - 106:4, 106:17, 107:8
**solely** [1] - 37:24
**solve** [1] - 16:7
**someone** [10] - 9:13, 18:8, 19:24, 52:12, 58:1, 81:12, 85:18, 85:24, 86:22, 102:6
**sometime** [1] - 103:4
**sometimes** [2] - 95:6
**somewhere** [4] - 63:4, 100:2, 117:15
**son** [10] - 19:3, 51:11, 51:15, 51:25, 52:1, 52:22, 83:14, 83:19, 84:12, 126:14
**sons** [1] - 83:8
**soon** [1] - 61:7
**sorry** [7] - 11:21, 17:3, 21:6, 42:6, 68:17, 79:9, 84:10
**sort** [3] - 35:13, 54:12, 108:13
**sought** [1] - 40:20
**sounds** [1] - 101:24
**source** [4] - 27:14,

28:18, 56:9, 88:7
**south** [1] - 6:9
**South** [1] - 8:5
**Southern** [1] - 4:25
**space** [1] - 98:20
**spades** [3] - 81:5, 90:2, 127:9
**speaking** [3] - 43:18, 56:6, 88:25
**Special** [4] - 4:7, 31:8, 99:4
**SPECIAL** [2] - 1:12, 1:15
**special** [4] - 5:21, 6:7, 12:20, 17:25
**specific** [9] - 8:23, 26:12, 34:13, 38:25, 44:25, 70:19, 70:22, 81:8, 81:12
**specifically** [6] - 40:4, 66:8, 71:9, 75:22, 77:11, 110:12
**specifics** [1] - 49:12
**speech** [1] - 129:1
**spelled** [3] - 23:17, 112:1, 117:4
**spend** [4] - 30:19, 106:3, 122:15, 122:16
**spending** [2] - 24:24, 25:1
**spent** [1] - 60:23
**spill** [5] - 8:6, 8:8, 8:9, 8:10, 8:11
**SPILL** [1] - 1:4
**spin** [1] - 108:13
**spin-off** [1] - 108:13
**splitting** [1] - 81:2
**spurred** [1] - 101:23
**St** [1] - 107:4
**staff** [22] - 15:4, 15:6, 15:17, 20:16, 32:2, 35:7, 39:15, 39:16, 39:22, 39:25, 42:16, 53:16, 54:10, 92:22, 102:17, 108:16, 112:3, 122:9, 123:5, 129:5, 129:20
**staffed** [1] - 32:13
**staffing** [1] - 108:14
**stage** [4] - 86:2, 87:2, 119:25, 120:1
**stages** [4] - 9:10, 49:20, 49:21, 87:1
**stamp** [1] - 94:14
**stamping** [1] - 95:9
**standard** [1] - 34:2
**standing** [1] - 5:5
**standpoint** [4] - 28:7, 30:24, 31:14, 77:5

**Stanley** [2] - 95:18, 95:19
**start** [2] - 11:25, 12:3
**started** [4] - 12:2, 93:22, 103:5, 119:3
**starting** [1] - 5:17
**state** [14] - 4:16, 4:18, 5:2, 5:3, 5:5, 6:7, 6:16, 61:18, 63:6, 85:11, 85:15, 109:14, 129:13, 129:18
**State** [2] - 51:1, 130:14
**statement** [4] - 36:2, 41:25, 52:21
**STATEMENT** [1] - 1:11
**statements** [2] - 71:6, 72:1
**STATES** [1] - 1:1
**states** [2] - 87:10, 128:5
**States** [4] - 4:20, 5:10, 130:15, 130:25
**status** [5] - 91:3, 96:6, 100:1, 100:12, 129:9
**statute** [3] - 80:23, 80:24, 81:12
**stay** [1] - 50:14
**staying** [1] - 81:23
**Steering** [1] - 91:2
**STENOGRAPHY** [1] - 1:24
**steps** [1] - 57:16
**STEVE** [1] - 1:16
**stick** [1] - 98:2
**still** [12] - 11:10, 13:20, 33:3, 45:25, 46:3, 54:4, 58:23, 59:8, 78:19, 88:16, 99:7, 128:11
**stopped** [3] - 126:20, 126:21, 126:22
**stops** [1] - 92:6
**story** [7] - 7:15, 27:1, 76:21, 84:4, 116:11, 118:12, 129:16
**straightened** [1] - 59:15
**streamline** [1] - 112:24
**streamlined** [1] - 26:23
**Street** [1] - 74:5
**STREET** [1] - 1:21
**stress** [1] - 122:15
**strictly** [1] - 120:7
**stringent** [1] - 81:13
**strongest** [1] - 18:10

**struck** [3] - 10:21, 20:14, 24:15
**structured** [1] - 25:20
**stuff** [12] - 24:11, 34:6, 35:13, 83:22, 93:4, 93:5, 97:22, 116:4, 119:11, 122:22, 126:17, 130:1
**stunned** [1] - 83:19
**subcontract** [1] - 121:12
**subject** [4] - 12:14, 27:22, 46:8, 80:16
**subjective** [1] - 78:21
**subjectivity** [1] - 33:22
**subjects** [2] - 31:18, 126:6
**submit** [4] - 11:19, 34:16, 105:14, 111:6
**submitted** [8] - 16:19, 17:1, 34:20, 41:17, 84:15, 104:6, 107:17, 113:6
**subsequent** [1] - 41:2
**subsequently** [1] - 111:23
**subsistence** [3] - 118:12, 120:6, 120:7
**substance** [1] - 78:9
**substantial** [2] - 17:8, 88:8
**substantively** [1] - 10:23
**sufficient** [1] - 57:25
**suggested** [1] - 48:25
**suggestions** [1] - 27:3
**suit** [1] - 18:10
**supplement** [1] - 126:5
**supposed** [4] - 26:13, 81:20, 125:3, 127:2
**Supreme** [1] - 4:20
**surfacing** [1] - 102:21
**suspension** [2] - 64:5, 64:7
**suspicious** [1] - 82:8
**Sutton** [86] - 20:22, 38:11, 38:24, 39:16, 40:8, 40:11, 40:16, 40:22, 42:21, 44:6, 46:22, 47:1, 47:4, 48:10, 48:13, 48:19, 50:1, 50:4, 50:8, 50:11, 51:6, 52:5, 52:7, 52:13, 52:17, 53:10, 55:5, 55:25, 56:11, 56:25, 58:1, 61:20, 61:23, 61:24, 62:14, 62:23, 63:14,

**C O N F I D E N T I A L**

63:22, 64:6, 64:22,
65:23, 66:1, 66:14,
67:2, 67:11, 67:19,
68:13, 69:6, 69:11,
69:16, 71:15, 71:20,
72:20, 72:22, 73:7,
73:17, 74:4, 74:8,
74:15, 74:25, 75:22,
76:11, 80:18, 82:18,
83:4, 83:12, 84:4,
84:10, 84:15, 85:22,
86:5, 88:5, 93:7,
96:4, 98:9, 99:13,
101:24, 103:14,
107:21, 115:12,
123:24, 123:25,
124:3, 128:10
**Sutton's** [5] - 42:7,
53:15, 70:11, 77:14,
103:5
**swear** [1] - 4:6
**SWORN** [1] - 1:11
**sworn** [1] - 4:12
**system** [6] - 26:14,
32:21, 96:24, 103:1,
121:20, 127:13

---

**T**

**tab** [1] - 37:13
**tabbed** [1] - 38:24
**table** [2] - 23:21, 76:23
**tabs** [1] - 36:25
**tail** [1] - 125:11
**TAKEN** [1] - 1:11
**talent** [1] - 43:9
**talks** [4] - 20:15,
26:18, 51:2
**task** [2] - 96:4, 128:4
**team** [2] - 22:2, 114:16
**technically** [1] - 29:18
**telephone** [2] - 31:22,
42:11
**ten** [3] - 8:17, 10:17,
88:17
**tender** [1] - 36:17
**tentative** [1] - 58:15
**term** [2] - 94:4, 95:4
**terms** [8] - 9:11,
14:19, 22:1, 31:16,
34:14, 57:16, 102:9,
118:17
**testified** [1] - 4:13
**testimony** [2] - 49:6,
77:15
**testing** [2] - 18:5,
119:11
**Texaco** [1] - 18:1
**Texas** [1] - 4:25

**text** [4] - 105:19,
105:21, 110:8
**THE** [51] - 1:4, 1:5,
1:11, 4:9, 23:7,
23:10, 23:15, 23:18,
23:23, 24:2, 28:2,
28:5, 36:21, 38:6,
38:14, 39:7, 39:9,
42:1, 42:4, 42:8,
42:17, 53:18, 53:22,
54:1, 54:11, 54:15,
55:1, 60:6, 60:18,
60:22, 66:19, 66:22,
73:21, 73:22,
102:19, 110:16,
110:19, 110:21,
113:17, 114:15,
114:21, 115:2,
116:13, 116:17,
116:25, 117:21,
117:24, 126:7,
126:10, 129:24,
130:3
**thereafter** [2] - 11:17,
111:23
**therein** [1] - 109:1
**they've** [5] - 27:15,
80:19, 93:17, 98:15,
121:23
**thick** [1] - 88:2
**thinking** [1] - 12:3
**third** [5] - 16:24,
17:12, 68:22, 74:8,
81:25
**THIS** [1] - 1:8
**Thonn** [14] - 45:2,
57:14, 71:10, 71:16,
72:14, 72:20, 77:12,
77:16, 77:24, 77:25,
82:4, 82:9, 117:16
**Thonn's** [1] - 117:14
**thoughts** [1] - 9:15
**three** [20] - 9:19, 11:7,
12:13, 14:8, 16:20,
17:1, 17:5, 17:15,
17:17, 21:12, 61:22,
68:12, 75:7, 83:19,
90:25, 95:15,
103:25, 104:1,
114:8, 125:22
**throughout** [1] - 25:23
**THURSDAY** [2] - 1:7,
4:2
**Thursday** [1] - 8:2
**ticked** [1] - 55:9
**TIDWELL** [19] - 1:16,
27:24, 28:3, 42:2,
42:6, 42:15, 54:12,
54:23, 66:20,
102:14, 102:16,

110:15, 110:17,
110:20, 114:19,
115:1, 117:22,
118:7, 130:5
**TIDWELL...................
........** [1] - 2:8
**Tiger** [5] - 67:11,
74:21, 88:5, 124:3,
128:10
**tight** [1] - 35:11
**timelines** [3] - 24:16,
26:12, 26:22
**title** [2] - 42:3, 106:9
**TO** [1] - 1:8
**today** [15] - 4:7, 10:6,
33:3, 45:1, 45:3,
45:9, 48:21, 80:14,
88:16, 88:20, 96:9,
114:3, 115:9,
124:20, 128:11
**together** [8] - 12:4,
16:4, 43:16, 66:8,
108:25, 111:13,
122:1, 126:24
**tomorrow** [3] - 45:10,
48:22, 100:20
**ton** [2] - 33:13, 129:9
**tons** [1] - 34:4
**took** [10] - 18:25,
20:14, 20:24, 21:14,
21:15, 27:11, 41:6,
69:7, 74:11, 91:22
**top** [1] - 121:21
**total** [2] - 80:25,
129:20
**totality** [1] - 92:1
**totally** [5] - 13:10,
14:3, 27:9, 74:22,
90:21
**touching** [1] - 32:21
**town** [1] - 26:3
**Toyota** [1] - 99:5
**tracking** [1] - 78:14
**trail** [1] - 68:6
**training** [2] - 80:2,
89:3
**transactions** [1] -
125:18
**TRANSCRIPT** [1] -
1:24
**transcript** [1] - 130:17
**transfers** [1] - 90:16
**transition** [11] - 13:14,
13:15, 13:18, 13:22,
24:6, 30:17, 30:19,
30:21, 31:2, 54:8,
87:4
**transitioning** [1] -
53:25
**transmission** [1] -

109:16
**trial** [7] - 6:13, 6:24,
7:1, 7:5, 8:16, 8:17
**tricky** [1] - 74:16
**tried** [2] - 6:14, 7:10
**trouble** [1] - 58:17
**troubled** [1] - 78:22
**troubling** [2] - 64:3,
64:14
**true** [5] - 46:1, 46:20,
63:17, 88:16, 130:17
**trustworthy** [2] -
81:16, 81:19
**truth** [4] - 4:7, 4:8,
82:12
**truthful** [1] - 125:21
**try** [4] - 24:24, 91:5,
98:1, 99:17
**trying** [20] - 7:4, 16:6,
36:3, 45:3, 52:9,
52:10, 57:19, 58:12,
63:19, 72:16, 88:15,
93:15, 99:25, 100:3,
115:9, 115:13,
126:25, 127:25,
128:14
**Tuesday** [1] - 11:18
**turn** [2] - 9:7, 122:21
**turned** [3] - 87:5,
92:25, 121:16
**turns** [1] - 122:21
**twice** [2] - 86:12,
119:14
**twist** [1] - 5:17
**two** [23] - 4:24, 6:16,
9:25, 13:2, 13:25,
17:15, 26:20, 34:8,
43:16, 48:24, 55:11,
60:7, 60:11, 89:5,
90:25, 96:10,
105:21, 114:10,
115:15, 117:15,
117:20, 121:16,
122:10
**type** [4] - 52:20, 52:21,
55:13, 89:4
**types** [1] - 35:8

---

**U**

**ultimately** [2] - 6:3,
36:1
**unanimous** [2] -
32:20, 34:7
**under** [6] - 11:23,
13:20, 13:23, 29:23,
46:10, 72:3
**undergraduate** [2] -
5:10

**underlinings** [1] -
73:12
**underlying** [1] -
127:15
**understood** [3] -
49:14, 95:8, 99:11
**underway** [1] - 8:15
**undulated** [1] - 42:20
**unfortunately** [1] -
96:9
**unique** [3] - 12:5,
18:19, 126:10
**UNITED** [1] - 1:1
**United** [4] - 4:20, 5:10,
130:15, 130:25
**universe** [1] - 30:23
**unknown** [2] - 13:6,
14:17
**unless** [1] - 94:22
**unofficially** [1] - 94:12
**unquestionably** [1] -
49:10
**unreasonably** [1] -
20:17
**up** [46] - 7:6, 8:20,
11:8, 14:11, 14:16,
17:16, 19:20, 22:2,
23:24, 25:3, 30:22,
31:16, 33:2, 33:6,
35:6, 42:12, 45:25,
46:4, 49:19, 51:11,
51:20, 51:22, 56:23,
58:12, 61:17, 62:6,
74:18, 76:17, 79:15,
83:18, 83:21, 83:24,
93:22, 95:17, 96:25,
97:1, 98:16, 102:1,
102:14, 116:13,
119:5, 122:23,
128:8, 129:16
**uses** [1] - 95:6

---

**V**

**valid** [2] - 98:3, 98:4
**variable** [1] - 122:1
**various** [5] - 8:20,
15:25, 38:24, 76:4,
109:12
**vendor** [6] - 15:18,
23:25, 27:23, 34:9,
38:5, 38:9
**vendors** [16] - 12:9,
12:13, 15:10, 16:16,
27:6, 30:11, 30:12,
32:6, 32:23, 36:24,
36:25, 37:18, 37:22,
37:24, 111:7, 129:7
**verbal** [2] - 107:22,

**C O N F I D E N T I A L**

SM-03-JA000251

113:11
**verbally** [5] - 28:6, 28:11, 45:22, 106:16, 108:9
**versus** [1] - 122:1
**viability** [1] - 115:14
**view** [2] - 29:19, 127:12
**viewed** [4] - 10:22, 24:22, 113:2, 113:3
**violation** [1] - 55:22
**Vioxx** [1] - 12:18
**virgin** [1] - 102:2
**virtually** [1] - 113:6
**vision** [1] - 94:16
**vividly** [3] - 7:15, 7:19, 56:17
**voluminous** [1] - 13:8
**volunteer** [1] - 84:18
**volunteered** [1] - 77:5

**W**

**W-2** [1] - 30:4
**W-O-R-L-E-Y** [1] - 32:8
**wait** [7] - 59:5, 67:12, 83:19, 104:20, 111:16, 111:17, 120:18
**waiver** [1] - 107:18
**walked** [1] - 30:23
**walking** [1] - 117:18
**Walmart** [1] - 19:11
**WAS** [12] - 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:4, 3:5, 3:6
**Washington** [2] - 30:22, 31:10
**Waterhouse** [2] - 12:12, 12:22
**ways** [1] - 25:12
**weak** [1] - 76:6
**wear** [1] - 16:13
**website** [1] - 122:8
**week** [8] - 22:16, 62:2, 63:12, 63:13, 68:16, 99:10, 99:14
**weeks** [4] - 49:24, 83:19, 117:16, 117:20
**weighed** [1] - 17:18
**Welker** [33] - 19:7, 19:22, 20:22, 21:9, 21:18, 21:25, 25:11, 56:8, 56:9, 58:6, 58:7, 59:2, 60:23, 61:23, 63:21, 65:25,

66:2, 67:5, 67:20, 68:9, 69:14, 72:9, 73:3, 73:6, 73:15, 74:5, 74:11, 75:2, 82:23, 105:7, 105:8, 123:24, 125:17
**Welker's** [1] - 106:25
**WERE** [2] - 3:1, 3:3
**West** [1] - 99:5
**whatnot** [1] - 116:11
**wheel** [1] - 22:15
**WHEREUPON** [16] - 36:19, 38:12, 50:20, 52:25, 60:4, 60:20, 62:8, 67:13, 73:24, 84:24, 101:4, 103:22, 109:5, 109:22, 116:15, 130:6
**whole** [19] - 4:8, 8:5, 13:7, 13:24, 16:16, 25:8, 25:9, 25:23, 27:13, 33:21, 39:12, 72:7, 92:21, 93:10, 114:22, 118:15, 118:25, 119:3
**wife** [10] - 10:2, 14:8, 20:23, 40:21, 41:3, 41:22, 43:13, 64:7, 74:15, 86:6
**Wildlife** [2] - 119:4, 119:6
**wildlife** [1] - 119:15
**willing** [1] - 17:21
**wind** [1] - 53:15
**wind-down** [1] - 53:15
**wiser** [1] - 113:17
**withdraw** [1] - 52:2
**withdrawing** [1] - 84:12
**withheld** [1] - 20:17
**Witness** [5] - 61:10, 61:13, 63:8, 85:3, 104:3
**WITNESS** [46] - 4:9, 23:7, 23:10, 23:15, 23:18, 23:23, 24:2, 28:2, 28:5, 36:21, 38:6, 38:14, 39:7, 39:9, 42:1, 42:4, 42:8, 42:17, 53:18, 53:22, 54:1, 54:11, 54:15, 55:1, 60:6, 60:18, 60:22, 66:19, 66:22, 102:19, 110:16, 110:19, 110:21, 113:17, 114:15, 114:21, 115:2, 116:13, 116:17, 116:25,

117:21, 117:24, 126:7, 126:10, 129:24, 130:3
**witness** [3] - 4:12, 10:4, 103:3
**witnesses** [1] - 70:23
**woefully** [1] - 88:20
**wondering** [1] - 64:6
**word** [8] - 12:15, 21:3, 35:10, 73:13, 76:12, 76:17, 76:19, 78:19
**words** [15] - 8:5, 14:4, 20:3, 40:12, 43:23, 65:10, 71:20, 72:2, 76:19, 78:8, 78:23, 81:22, 82:24, 85:15, 96:22
**works** [1] - 16:23
**world** [6] - 12:4, 14:14, 87:3, 87:9, 89:8, 89:9
**Worley** [6] - 32:7, 32:19, 32:20, 33:4, 33:5, 33:12
**worrying** [1] - 34:5
**worth** [1] - 34:1
**wrapping** [2] - 45:25, 46:4
**write** [2] - 22:19, 124:15
**writing** [4] - 59:7, 81:4, 113:9, 113:10
**written** [6] - 34:20, 36:1, 56:14, 105:15, 106:14, 107:17
**wrongfully** [1] - 70:18
**wrote** [6] - 18:23, 60:2, 82:7, 115:25, 116:1

**Y**

**y'all** [17] - 29:3, 39:11, 51:17, 76:15, 79:15, 111:20, 114:3, 114:10, 116:5, 116:9, 119:7, 122:5, 124:24, 125:24, 129:4, 129:25
**Y'all** [1] - 101:22
**y'all's** [1] - 114:18
**year** [6] - 40:24, 103:13, 103:14, 104:15, 119:16, 128:8
**years** [7] - 5:17, 5:20, 6:15, 14:24, 40:24, 40:25, 79:1
**yesterday** [3] - 43:21,

76:8, 100:20
**York** [2] - 6:25, 25:3
**younger** [1] - 97:17
**yourself** [6] - 30:6, 31:13, 35:6, 64:2, 69:19, 89:2

**C O N F I D E N T I A L**

SM-03-JA000252