1                   UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
2

3    ******************************************************

4   IN RE:  OIL SPILL BY THE
   OIL RIG *DEEPWATER HORIZON*
5   IN THE GULF OF MEXICO ON
   APRIL 20, 2010
6                   CIVIL ACTION NO. 10-MD-2179 "J"
                   NEW ORLEANS, LOUISIANA
7                   WEDNESDAY, JULY 31, 2013, 1:00 P.M.

8   THIS RELATES TO ALL CASES

9    ******************************************************

10             SWORN STATEMENT OF **GLEN LERNER, ESQUIRE**
11      TAKEN BEFORE THE HONORABLE LOUIS J. FREEH
                 SPECIAL MASTER
12

13   APPEARANCES:

14

15                 LOUIS J. FREEH, SPECIAL MASTER
                 MATTHEW DOLAN, ESQUIRE
16

17                 JONES WALKER
                 PAULINE F. HARDIN, ESQUIRE
18                 JAMES E. WRIGHT, III, ESQUIRE
                 201 ST. CHARLES AVENUE
19                 NEW ORLEANS LA  70170

20

21   OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
                           CERTIFIED REALTIME REPORTER
22                        REGISTERED MERIT REPORTER
                        500 POYDRAS STREET, ROOM HB406
23                        NEW ORLEANS, LA  70130
                        (504) 589-7779
24                        Cathy_Pepper@laed.uscourts.gov

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
   PRODUCED BY COMPUTER.



**CONFIDENTIAL**

SM-02-JA00425

2

1                 **I N D E X**

2

3    EXAMINATIONS                          PAGE

4    **GLEN LERNER**............................................ 5

5    EXAMINATION BY MR. FREEH............................. 5

6

7

8                E X H I B I T S

9

10   DESCRIPTION                          PAGE

11

12   EXHIBIT L-1........................................ 88

13   EXHIBIT L-2........................................ 89

14   EXHIBIT L-3........................................ 93

15   EXHIBIT L-4........................................ 95

16   EXHIBIT L-5........................................ 96

17   EXHIBIT L-6........................................ 102

18   EXHIBIT L-7........................................ 104

19   EXHIBIT L-8........................................ 107

20   EXHIBIT L-9........................................ 111

21   EXHIBIT L-10....................................... 113

22

23

24

25

**C O N F I D E N T I A L**

**SM-02-JA00426**

3

|  |  |
|---|---|
| 1 | **P-R-O-C-E-E-D-I-N-G-S** |
| 2 | WEDNESDAY, JULY 31, 2013 |
| 3 | |
| 01:03PM   4 | |
| 01:03PM   5 | MR. FREEH:  Good afternoon.  My name is Louis Freeh |
| 01:03PM   6 | and Mr. Matt Dolan is my partner here, so we are conducting an |
| 01:03PM   7 | interview pursuant to my appointment by Judge Barbier as |
| 01:03PM   8 | Special Master to look at certain aspects of the *BP* claims |
| 01:03PM   9 | administration. |
| 01:03PM  10 | You are appearing here voluntarily today as a |
| 01:03PM  11 | witness in the company of your two attorneys.  I would just ask |
| 01:03PM  12 | your attorneys to state for the record -- obviously you |
| 01:03PM  13 | represent Glen Lerner individually.  Do you represent any other |
| 01:03PM  14 | parties of interest in this matter? |
| 01:03PM  15 | MS. HARDIN:  No, we do not. |
| 01:03PM  16 | MR. WRIGHT:  That's correct. |
| 01:03PM  17 | MR. FREEH:  Thank you very much. |
| 01:03PM  18 | Mr. Lerner, I'm working as a special master, |
| 01:03PM  19 | which is an appointment by the Court, so I'm functioning as a |
| 01:03PM  20 | quasi-judicial official in the interview.  So in a moment I'm |
| 01:04PM  21 | going to place you under oath, and before I do that, I just |
| 01:04PM  22 | want to make it clear to you, I'm sure your attorneys have, |
| 01:04PM  23 | that all of my questions are asked in my capacity as |
| 01:04PM  24 | Special Master and that you're expected, obviously, to give |
| 01:04PM  25 | complete truthful answers to the best of your knowledge and |

**C O N F I D E N T I A L**

4

01:04PM 1     ability.  If you were to deliberately say something that was

01:04PM 2     false, misleading, or omitting material information, that could

01:04PM 3     be construed at some point by some authority as a false

01:04PM 4     statement, which could subject you to various sanctions,

01:04PM 5     including criminal sanctions.  So do you understand that?

01:04PM 6              THE WITNESS:  Yes, sir, Judge Freeh.

01:04PM 7              MR. FREEH:  Mr. Freeh is fine.  We'll be asking you a

01:04PM 8     series of questions, and again, relating to the Andry Lerner

01:04PM 9     firm, your own separate firm and business entities.  We'll ask

01:05PM 10    you some questions about the Crown Company, your relationships

01:05PM 11    with various parties.

01:05PM 12             If you don't understand a question or if I ask a

01:05PM 13    question that's not clear, which happens very often, just tell

01:05PM 14    me, I don't understand the question or restate the question.

01:05PM 15             If you want to speak to any of your lawyers at

01:05PM 16    any moment separately, just indicate that or your lawyers will

01:05PM 17    indicate that, and we can take a brief recess.

01:05PM 18             We probably can do this, my expectation is in

01:05PM 19    two hours or so, depending on how clear my questions are and

01:05PM 20    how clear your answers are.  But if at any moment you have any

01:05PM 21    questions or any concerns, let us know.  If you don't remember

01:05PM 22    something, just tell us you don't remember it.  If you need to

01:05PM 23    look at a record or get an additional document, you can do

01:05PM 24    that.

01:05PM 25             At the end of the session, I'm going to give

**C O N F I D E N T I A L**

SM-02-JA00428

01:05PM 1    your attorneys some subpoenas, which will be served upon you to

01:06PM 2    them, requesting various documents be produced.

01:06PM 3                  So to put you under oath, do you swear that the

01:06PM 4    testimony you give this afternoon shall be the truth, the whole

01:06PM 5    truth and nothing but the truth, so help you God?

01:06PM 6                  THE WITNESS:  Sir, yes, sir.

7                          **GLEN LERNER**

8    was called as a witness and, after being first duly sworn by the

9    Special Master, was examined and testified on his oath as

10   follows:

11                          EXAMINATION

12   BY MR. FREEH:

01:06PM 13   Q.    And could you state your name, address and your date of

01:06PM 14   birth, please.

01:06PM 15   A.    My name is Glen J. Lerner, date of birth 6/6/64.  My

01:06PM 16   current home address is listed on my license as 7801 Calle,

01:06PM 17   C-A-L-L-E, is one street in Spanish, and then Caballeros,

01:06PM 18   C-A-B-A-L-L-E-R-O-S, and that's Paradise Valley, Arizona,

01:06PM 19   85253.  But we're currently -- we're currently moving to

01:06PM 20   Naples, Florida, so I'll be changing my license in probably the

01:06PM 21   next week or so, maybe two weeks.

01:06PM 22   Q.    Are you currently a resident of that state?

01:06PM 23   A.    I am currently considered a resident of the State of

01:07PM 24   Arizona.

01:07PM 25   Q.    Could you tell us, please, where you completed college and

**C O N F I D E N T I A L**

SM-02-JA00429

6

| | |
|---|---|
| 01:07PM 1 | what year. |
| 01:07PM 2 | A.   Yes, sir.  I completed college at Duke University in 1987. |
| 01:07PM 3 | Q.   Did you go on to attend the Tulane Law School? |
| 01:07PM 4 | A.   Sir, yes, sir. |
| 01:07PM 5 | Q.   What year did you graduate there? |
| 01:07PM 6 | A.   I graduated in 1990. |
| 01:07PM 7 | Q.   That was with a law degree, a JD or an LLD? |
| 01:07PM 8 | A.   Yes, sir. |
| 01:07PM 9 | Q.   While you were in law school, I take it you met many of |
| 01:07PM 10 | your classmates, as well as other people who were attending the |
| 01:07PM 11 | school at the same time? |
| 01:07PM 12 | A.   Yes, sir. |
| 01:07PM 13 | Q.   Was Lionel Sutton one of those individuals? |
| 01:07PM 14 | A.   Yes, sir. |
| 01:07PM 15 | Q.   Do you also know him as "Tiger"? |
| 01:07PM 16 | A.   Yes, sir.  That's how -- only if I'm mad at him will I |
| 01:07PM 17 | ever call him Lionel.  That's very rarely. |
| 01:07PM 18 | Q.   Do you know how he got the nickname "Tiger"? |
| 01:07PM 19 | A.   No, sir, I don't.  I've just always called him "Tiger." |
| 01:07PM 20 | Q.   While you were at law school did you meet a |
| 01:07PM 21 | Christine Reitano? |
| 01:07PM 22 | A.   Sir, yes, sir. |
| 01:07PM 23 | Q.   She was another student there? |
| 01:07PM 24 | A.   Yes, sir, she was one year behind me. |
| 01:07PM 25 | Q.   You later came to know that she married Mr. Sutton? |

**C O N F I D E N T I A L**

SM-02-JA00430

| | |
|---|---|
| 01:08PM 1 | A.   Sir, yes, sir. |
| 01:08PM 2 | Q.   Have you stayed in social contact with the both of them |
| 01:08PM 3 | since law school? |
| 01:08PM 4 | A.   For the vast majority of the time.  I think there was |
| 01:08PM 5 | probably maybe five, ten years after law school, we -- "Tiger" |
| 01:08PM 6 | and I would see each other on fishing trips.  But probably |
| 01:08PM 7 | maybe five, ten years but we weren't that close.  And then |
| 01:08PM 8 | maybe about ten, fifteen years ago we really started spending a |
| 01:08PM 9 | lot of time together again. |
| 01:08PM 10 | Q.   You eventually went into some business ventures with him? |
| 01:08PM 11 | A.   Sir, yes, sir.  Actually our first venture together, we |
| 01:08PM 12 | started a law firm in Mississippi.  I think it was Cunningham |
| 01:08PM 13 | Lerner Sutton or Lerner Sutton Cunningham.  We had it open for |
| 01:08PM 14 | about a year and a half or so. |
| 01:08PM 15 | Q.   Approximately when was that in point of time? |
| 01:08PM 16 | A.   I'm going to say it was about 10 years ago. |
| 01:08PM 17 | Q.   Were you and Mr. Sutton and the other party you named |
| 01:08PM 18 | members of the firm? |
| 01:03PM 19 | A.   Sir, yes, sir. |
| 01:08PM 20 | Q.   Were you licensed at that time in the State of |
| 01:08PM 21 | Mississippi? |
| 01:08PM 22 | A.   No, sir, Mr. Cunningham was. |
| 01:08PM 23 | Q.   In terms of a Bar license or legal license? |
| 01:09PM 24 | A.   Correct, yes, sir. |
| 01:09PM 25 | Q.   You have a current legal license in the State of Nevada? |

**C O N F I D E N T I A L**

SM-02-JA00431

01:09PM  1   A.   Yes, sir.

01:09PM  2   Q.   Do you have a legal license in any other states?

01:09PM  3   A.   Sir, no, sir.

01:09PM  4   Q.   So you don't have a licence to practice in Louisiana?

01:09PM  5   A.   No, sir.

01:09PM  6   Q.   Are you currently an attorney in good standing with your

01:09PM  7   Bar?

01:09PM  8   A.   I believe so, yes, sir.

01:09PM  9   Q.   Have you ever been the subject of any disciplinary action?

01:09PM 10   A.   Certainly.

01:09PM 11   Q.   Could you tell us about that.

01:09PM 12   A.   Oh, I'm one of the larger advertisers in the country, so,

01:09PM 13   you know, it's just I've had numerous either advertising

01:09PM 14   complaints or other types of things.  Maybe up to about five

01:09PM 15   years ago on a relatively regular basis because I represented

01:09PM 16   50 to 75,000 people.  So just par for the course.

01:09PM 17        I think there were two complaints that rose to the

01:09PM 18   level of a public reprimand, and one was for an advertising

01:09PM 19   issue, and I'm not sure what the other one was for.

01:09PM 20   Q.   Was one of them a lack of appearance in a homicide case?

01:10PM 21   A.   Yeah, that's correct.  That was Mario Lino.  That is

01:10PM 22   correct.  And that's a long story.  We won't go into that one,

01:10PM 23   unless -- do you want me to tell you a bit about that?

01:10PM 24   Q.   No, no.  Any other ones, just by subject matter?  I don't

01:10PM 25   need the details.

**C O N F I D E N T I A L**

SM-02-JA00432

9

01:10PM 1   A.   The only other one I'm aware of that arose to the level of

01:10PM 2   a public reprimand was one of my attorneys in my office had

01:10PM 3   sent a demand letter to Progressive Insurance saying, We'll

01:10PM 4   take the -- we want the policy limits.  And he was a licensed

01:10PM 5   Arizona attorney at the time, my partner actually in Arizona,

01:10PM 6   with Lerner & Rowe.  And the Bar said he was practicing law

01:10PM 7   without a license.

01:10PM 8   Q.   While you were in law school, you also met Jon Andry?

01:10PM 9   A.   Sir, yes, sir.

01:10PM 10  Q.   And his brother Gibby?

01:10PM 11  A.   Yes, sir.

01:10PM 12  Q.   At approximately the same time?

01:10PM 13  A.   Oh, gosh, I can't say at the same time.  But I came to

01:10PM 14  know them both relatively the same time, I reckon.

01:11PM 15  Q.   While you were in law school?

01:11PM 16  A.   Oh, yes, sir.

01:11PM 17  Q.   After graduation, did you go into any legal business or

01:11PM 18  legal partnership with either of the Andry brothers?

01:11PM 19  A.   I believe the first time that Jon and I engaged in

01:11PM 20  anything together in terms of law, was he, Gibby and I worked

01:11PM 21  the *Fen-Phen* cases together, and I believe -- I think that was

01:11PM 22  late 2000, 2001.  That's the first time we started doing cases

01:11PM 23  together.  And basically since then we've done a lot of

01:11PM 24  different things together.  We worked *Fen-Phen* together for

01:11PM 25  about a year.  Then we've done some other cases.  I'm not sure

**C O N F I D E N T I A L**

01:11PM  1    exactly what cases, but through the years a lot.  We did the

01:11PM  2    *BellSouth* litigation with "Tiger."  That's kind of where the

01:11PM  3    rift between "Tiger" and Jon came from, the *BellSouth*

01:11PM  4    litigation.  If you want me to extrapolate on that I can,

01:11PM  5    but --

01:11PM  6    Q.    I'll ask you about that in a moment.

01:11PM  7    A.    Yes, sir.  Then we did the *MRGO*, the *Mississippi River*

01:12PM  8    *Gulf Outlet* litigation, which was kind of based upon the

01:12PM  9    decision of the Fifth Circuit Court of Appeals kind of going

01:12PM 10    flat.  But we have been involved in that for about the last

01:12PM 11    four or five years.  I was one of about 20 firms in the country

01:12PM 12    involved in that.

01:12PM 13    Q.    When you worked with either of the Andrys or with

01:12PM 14    "Tiger" Sutton, did you do it on a formal basis in terms of a

01:12PM 15    law firm or did you do it in an informal basis in terms of

01:12PM 16    sharing clients or working together on a matter?

01:12PM 17    A.    Could you -- I'm not sure what you're trying to ask.

01:12PM 18    Q.    When you use the term *working with* these individuals in

01:12PM 19    the various cases that you've mentioned, did you do that as

01:12PM 20    members of the same law firm?

01:12PM 21    A.    Oh, no, sir.  I think they came in and they associated

01:12PM 22    in -- either they associated in -- I don't know if it was in

01:12PM 23    the fee agreement, but they came in on *Fen-Phen*.  Gee, who was

01:12PM 24    the attorney?  I can't recall the attorney in Houston.  But

01:13PM 25    they came in with him, an attorney in Houston that had

**C O N F I D E N T I A L**

**SM-02-JA00434**

01:13PM 1  negotiated a large settlement on *Fen-Phen*.  And we processed

01:13PM 2  our claims through the Houston attorney, and so they just

01:13PM 3  associated with my clients.

01:13PM 4          We had about maybe 270 to 290 claims that qualified,

01:13PM 5  I think, at the time in 2001.

01:13PM 6  Q.   Mr. Lerner, could you tell me how many different law

01:13PM 7  firms, if there are more than one, you are currently either a

01:13PM 8  member of or associated with.

01:13PM 9  A.   Yes, sir.  I'm the sole owner of Glen J. Lerner &

01:13PM 10  Associates.  That's my -- that's the law practice I started.  I

01:13PM 11  think we were -- I don't know what the bank accounts are under,

01:13PM 12  if they are still under Glen J. Lerner & Associates or

01:13PM 13  Glen Lerner Injury Attorneys.  You'd have to ask Mr. Cahill.

01:13PM 14  But that's my -- that's kind of my baby.  That's where I

01:14PM 15  started -- I'm going into my 23rd year now.

01:14PM 16  Q.   Excuse me, Mr. Cahill is your accountant?

01:14PM 17  A.   He's a tax attorney, but he's a CPA, CFO and an

01:14PM 18  accountant.  He controls the money.  He doesn't -- I don't have

01:14PM 19  access to any checks or anything, which is good.

01:14PM 20  Q.   I'm sorry.  Lerner & Associates, that's a Nevada law firm?

01:14PM 21  A.   Sir, yes, sir.

01:14PM 22  Q.   Registered only in the state of Nevada?

01:14PM 23  A.   Sir, yes, sir.  We have about -- between 70 and 80

01:14PM 24  employees, I believe, including lawyers.  Then I have one of

01:14PM 25  my -- the kid who got the Bar complaint in Vegas, the public

**C O N F I D E N T I A L**

**SM-02-JA00435**

01:14PM 1     reprimand, he's my partner and Lerner & Rowe.  I'm a 75 percent

01:14PM 2     owner of Lerner & Rowe.  He's licensed in Arizona.  We have

01:14PM 3     about -- roughly about 70 employees there.

01:14PM 4     Q.    With respect to Lerner & Rowe, and then I'll ask you the

01:14PM 5     same question about Lerner & Associates, approximately how many

01:14PM 6     lawyers and how many nonlawyers in each firm?

01:14PM 7     A.    Oh, goodness.

01:15PM 8     Q.    The best estimate that you have.

01:15PM 9     A.    Maybe 10 to 12 in each firm.  At least 10 in each firm.

01:15PM 10     Q.    Lawyers?

01:15PM 11     A.    Yes, sir.  I think roughly ten.  Maybe nine in Arizona.

01:15PM 12     I'm not sure.  Might be ten.  Yeah, I would say at least -- I

01:15PM 13     think it's ten to twelve in Vegas, and I think ten in Arizona.

01:15PM 14     But, gosh, I don't know right off the top of my head.

01:15PM 15     Q.    With Lerner & Rowe, there is just two partners, two

01:15PM 16     members?  You said you were --

01:15PM 17     A.    Yes, sir.

01:15PM 18     Q.    -- 75 percent?

01:15PM 19     A.    I owned 75 percent.  Actually, I get 80 percent of all

01:15PM 20     fees until I've been paid back my initial seed money, which is

01:15PM 21     almost done.  It's been a long process, almost seven years,

01:15PM 22     but -- and then it switches to 75/25 in terms of payback.

01:15PM 23     Q.    What was the initial seed money?

01:15PM 24     A.    Oh, I put about eight and a half million dollars into it

01:15PM 25     to get about -- five and a half, six million was advertising,

**C O N F I D E N T I A L**

SM-02-JA00436

01:16PM 1   you know, keeping the firm alive for the first couple of years,

01:16PM 2   and then the way it was set up, tax-wise, they had messed up

01:16PM 3   the way they set up tax-wise, so I ended up paying taxes on the

01:16PM 4   money that I was using for the firm.  So that got included in

01:16PM 5   my payback.

01:16PM 6   Q.    Switching now to Lerner & Associates, are you the only

01:16PM 7   member --

01:16PM 8   A.    Sir, yes, sir.

01:16PM 9   Q.    -- of that firm?

01:16PM 10  A.    Yes, sir.  And then I also have Glen Lerner Injury

01:16PM 11  Attorneys in Chicago, which we have -- I believe we have -- I

01:16PM 12  think we have three attorneys there and a support staff of

01:16PM 13  maybe 15.  We just started it 20 months ago, so -- 20,

01:16PM 14  28 months ago.

01:16PM 15  Q.    Same question:  Who were the members, who were the

01:16PM 16  nonmembers, are you the only member?

01:16PM 17  A.    Sir, yes, sir.

01:16PM 18  Q.    Did you also put seed money into that?

01:16PM 19  A.    Oh, yes, sir, and I still am.

01:16PM 20  Q.    Approximately how much to date?

01:17PM 21  A.    Probably three to three and a half million dollars so far.

01:17PM 22  Q.    Any other law firms that you're associated with?

01:17PM 23  A.    I do some stuff out of Minnesota with an attorney,

01:17PM 24  Jim Rolshouse, but mostly just mass torts and class action

01:17PM 25  stuff, and Jim is actually a salaried attorney with us.  He's

**C O N F I D E N T I A L**

14

01:17PM 1   also licensed in Nevada, Arizona, Minnesota.  I'm not sure if

01:17PM 2   he got licensed in Illinois yet, but I know he's trying to.

01:17PM 3       We have Andry Lerner, and I have a small little

01:17PM 4   office in Naples where I'm moving with one attorney there named

01:17PM 5   Marni Scuderi.

01:17PM 6   Q.   What's the name of that firm if it's been named?

01:17PM 7   A.   Glen Lerner Injury Attorneys.

01:17PM 8   Q.   Are you the only principal member there?

01:17PM 9   A.   Sir, yes, sir.

01:17PM 10  Q.   Let's talk -- you just mentioned the Andry Lerner firm?

01:17PM 11  A.   Pardon me?

01:17PM 12  Q.   You just mentioned the Andry Lerner firm?

01:17PM 13  A.   Sir, yes, sir.

01:17PM 14  Q.   You and Jon Andry are the two members there?

01:17PM 15  A.   Yes, sir.

01:17PM 16  Q.   Anyone else who's had a membership or equity interest in

01:17PM 17  it?

01:17PM 18  A.   As far as I know, no, sir.

01:18PM 19  Q.   Approximately when was that started?

01:18PM 20  A.   Maybe a year and a half to two years ago.  It's going to

01:18PM 21  be my best guess.  I think that's when we did all the

01:18PM 22  partnership agreements and all that stuff according to the laws

01:18PM 23  of Louisiana.  I know it took a while for the attorneys to

01:18PM 24  draft everything up and then finally they sent it to me.

01:18PM 25  Q.   How is the ownership or equity or control of that divided

**C O N F I D E N T I A L**

01:18PM 1   between you and Mr. Andry?  I'm talking about Jon Andry now.

01:18PM 2   A.   I believe there is a 40/60 split, if I'm not mistaken, at

01:18PM 3   least in terms of everything that we're doing -- any existing

01:18PM 4   cases.  And I think it's 40/60 on any existing cases, and then

01:18PM 5   anything that I referred into the firm was 50/50.

01:18PM 6   Q.   What about something that Mr. Andry refers into the firm?

01:18PM 7   A.   That would be 40/60.

01:18PM 8   Q.   Who's got the 60?

01:18PM 9   A.   Jon Andry is 60.

01:18PM 10   Q.   And you're 40?

01:18PM 11   A.   Sir, yes, sir.

01:18PM 12   Q.   Did you put any seed money into the formation of that

01:19PM 13   entity?

01:19PM 14   A.   Oh, yes, sir.

01:19PM 15   Q.   Approximately how much?

01:19PM 16   A.   About a million, two to get it going.  It wasn't so much

01:19PM 17   to get it going.  It was a process over about a course of a

01:19PM 18   year just, I think, to help the firm keep growing and to

01:19PM 19   sustain it during the nascent stages of BP litigation and other

01:19PM 20   stuff we were hoping to get involved in.

01:19PM 21   Q.   Did Mr. Andry contribute or invest any money there?

01:19PM 22   A.   Part of the -- no, sir.  I mean, certainly I think he was

01:19PM 23   taking his money that he'd earned and keep the lights on and

01:19PM 24   everything, so, but in terms of buying into the firm or

01:19PM 25   something, it was basically his existing firm already.  I was

**C O N F I D E N T I A L**

SM-02-JA00439

| | | |
|---|---|---|
| 01:19PM | 1 | buying into it and getting involved in helping the firm |
| 01:19PM | 2 | hopefully grow. |
| 01:19PM | 3 | Q.   Approximately how many people, if you know, are employed |
| 01:19PM | 4 | in the firm, and again, an approximation between lawyers and |
| 01:19PM | 5 | nonlawyers. |
| 01:19PM | 6 | A.   My guess, I think there were, including Jon, there might |
| 01:20PM | 7 | be either four or five attorneys, if I'm not mistaken.   And |
| 01:20PM | 8 | support staff.   Gosh, I don't know, maybe ten or so. |
| 01:20PM | 9 | Q.   Was the primary purpose of establishing that firm to |
| 01:20PM | 10 | address and deal with what's been referred to as the *BP*-related |
| 01:20PM | 11 | litigation? |
| 01:20PM | 12 | A.    Part of it, yes, sir.   Certainly, I think, we looked at BP |
| 01:20PM | 13 | as a launching point for it, and also the fact that I've been, |
| 01:20PM | 14 | you know, with my practices, we do so many claims on a monthly |
| 01:20PM | 15 | basis, and so my business acumen as relating to the |
| 01:20PM | 16 | administration of claims was far greater than Jon's, so I think |
| 01:20PM | 17 | I brought a lot to the table in that respect, and also the |
| 01:20PM | 18 | ability -- obviously I was bringing some financial assistance |
| 01:20PM | 19 | to keep everything floating. |
| 01:20PM | 20 | Q.   You said that was part of it.   Was there another part or |
| 01:20PM | 21 | at least -- |
| 01:20PM | 22 | A.    I think we were looking to -- |
| 01:20PM | 23 | Q.    If you just let me finish my question -- |
| 01:20PM | 24 | A.    Oh, yes, sir.   I'm sorry. |
| 01:20PM | 25 | Q.    So Ms. Pepper doesn't yell at me. |

**C O N F I D E N T I A L**

**SM-02-JA00440**

| | | |
|---|---|---|
| 01:20PM | 1 | A.    I'm sorry. |
| 01:20PM | 2 | Q.    Beyond the *BP* work that you just described, was there |
| 01:21PM | 3 | other either agreed upon with Mr. Andry or your own intentional |
| 01:21PM | 4 | notion of what the firm would do in terms of its practice? |
| 01:21PM | 5 | A.    Yes, sir.  I think we were looking at the potential of |
| 01:21PM | 6 | maybe royalty cases in terms of gas or oil royalty-type cases |
| 01:21PM | 7 | in the future, and then, of course, other mass torts, defective |
| 01:21PM | 8 | products, hips, knees, anything like that.  At this point in |
| 01:21PM | 9 | time, we just wanted to -- this has been a process trying to |
| 01:21PM | 10 | get Jon's office organized and trying to get it running |
| 01:21PM | 11 | smoothly in terms of *BP*, so most of the focus has been on that. |
| 01:21PM | 12 | It's difficult to take people and try to educate them to do |
| 01:21PM | 13 | things right and then just to switch gears right way. |
| 01:21PM | 14 | But I think long-term we're hopeful that the people, |
| 01:21PM | 15 | once they learn how to do things the correct way, then you have |
| 01:21PM | 16 | a good -- you have a good force for anything else you want to |
| 01:21PM | 17 | do in the future. |
| 01:21PM | 18 | Q.    You stated you had experience in claims? |
| 01:21PM | 19 | A.    Sure. |
| 01:21PM | 20 | Q.    Process or claims administration cases? |
| 01:22PM | 21 | A.    Well, just, when I say *claims administration cases*, I just |
| 01:22PM | 22 | meant a mass of cases in each of my offices, especially Vegas |
| 01:22PM | 23 | and Phoenix, we represent several hundred new clients each |
| 01:22PM | 24 | month.  So I know how to handle, you know, me personally |
| 01:22PM | 25 | obviously, what do I do now, I make commercials, I run a |

**C O N F I D E N T I A L**

01:22PM 1   business, but I know how to delegate and I know how to put the

01:22PM 2   correct people in position to train people to do things the

01:22PM 3   right way and Jon has never done that.   Jon is an outstanding

01:22PM 4   lawyer.   Jon is an outstanding lawyer.   But in terms of his

01:22PM 5   business acumen and being able to manage an office, I certainly

01:22PM 6   thought there were shortcomings and I think that was something

01:22PM 7   I was able to address.

01:22PM 8   Q.   You refer to him in an e-mail, which we'll go over with

01:22PM 9   you later, as quote, *disorganized*, unquote?

01:22PM 10  A.   I think that would be a fair assessment.

01:22PM 11  Q.   So given that experience and expertise that you had in

01:22PM 12  that management area and what you've described as his lack of

01:22PM 13  expertise, how much of your time and effort has been devoted to

01:23PM 14  the management and oversight of the Andry Lerner firm?

01:23PM 15  A.   Not so much my time and effort.   I'm more of a delegator.

01:23PM 16  I found a person that I thought was capable to put in systems,

01:23PM 17  procedures, protocols in Susan DeSantis.   She worked for a

01:23PM 18  friend of mine and she was in Tampa, but she worked for a

01:23PM 19  friend of mine.   And they just thought she was so organized,

01:23PM 20  the way she ran things.   So she's kind of worn many hats for

01:23PM 21  me.   She was kind of a girl Friday for some time.   She was

01:23PM 22  supposed to eventually just end up in Chicago, but she was kind

01:23PM 23  of all over the place.

01:23PM 24  Q.   When did you first start working with her?

01:23PM 25  A.   I would think at least a year ago.

## CONFIDENTIAL

SM-02-JA00442

01:23PM 1   Q.   Did you come to know or come to work with her in

01:23PM 2   connection with the Andry Lerner operation?

01:24PM 3   A.   Oh, sir, no, sir.  She was working for my friend and out

01:24PM 4   of their Tampa office.  I believe it was a beauty company.  And

01:24PM 5   I had met her at dinner one night and we just hit it off.  I

01:24PM 6   thought she was very professional, and they weren't paying her

01:24PM 7   what she thought, and she asked them if they'd mind if she came

01:24PM 8   and started working with me.

01:24PM 9   Q.   Did you then give her the responsibility that you just

01:24PM 10  described with respect to the Andry Lerner firm?

01:24PM 11  A.   Yes, yes, sir.  She went down there and basically it was

01:24PM 12  e-mails, the conversations were replete with, This is madness,

01:24PM 13  basically.  It's just there was no organization, there was no

01:24PM 14  guidance.  Jon isn't -- he's a good dude.  But Jon wants to be

01:24PM 15  friends with all of his employees, and there is no leadership,

01:24PM 16  and I think they needed leadership.

01:24PM 17  Q.   I'm referring to Jon Andry when I say *Mr. Andry* until we

01:25PM 18  talk about Gibby.  And I'll make that clear in my other

01:25PM 19  questions.  Did Jon Andry agree to have Ms. DeSantis come in as

01:25PM 20  a COO or CEO, whatever you want to describe it, in terms of her

01:25PM 21  operations there?

01:25PM 22  A.   Yeah, he's actually brought in, I think, a CFO.  I don't

01:25PM 23  believe that would have been her.  She was just kind of my eyes

01:25PM 24  and ears on the ground and trying to bring some of that -- some

01:25PM 25  of that culture, that corporate culture that we had, some sort

**C O N F I D E N T I A L**

SM-02-JA00443

01:25PM 1   of organization, because these people needed leadership and
01:25PM 2   they needed some direction.  They needed policies, procedures.
01:25PM 3   They needed a lot of people gone, you know.  And it was just
01:25PM 4   very difficult because Jon, he's a very loyal guy, but he was
01:25PM 5   loyal to people that were incapable of performing the tasks and
01:25PM 6   it's not fair to the clients.
01:25PM 7   Q.   Did you ever prepare with her or give to her a written set
01:25PM 8   of role and responsibilities that she was to have at that firm?
01:25PM 9   A.   Oh, I don't know if I -- I can't recall if I did.  I'm
01:26PM 10  sure we probably spoke about things, but I trusted her enough
01:26PM 11  to know that she could go in and kind of say, This is what we
01:26PM 12  need, you know, because what I ask people to do, the best --
01:26PM 13  I'm one of those bosses -- I'm a really cool boss because I
01:26PM 14  always ask everybody their opinions.  I don't ever -- I don't
01:26PM 15  make unilateral decisions because how can I know what's
01:26PM 16  happening.  The janitor is always the smartest person in the
01:26PM 17  business.
01:26PM 18       So I asked her to basically just go down the first
01:26PM 19  month to sit and watch, just go talk with people.  Just like
01:26PM 20  when I was down at the office, I try to get down to the office
01:26PM 21  maybe every two months.  I'd sit with every employee, just talk
01:26PM 22  to them, what's happening, what do you think of the strengths
01:26PM 23  and what do we need to do?  And I think that's what she was
01:26PM 24  trying to do.  I'm sorry.  And gather enough intel to make an
01:26PM 25  informed decision, okay, now let's sit back and think what we

**C O N F I D E N T I A L**

SM-02-JA00444

01:26PM 1    need to do.

01:26PM 2                The problem was you dealt with so much -- I don't

01:26PM 3    want to say *opposition*.  Jon was resistant to change.  Of

01:26PM 4    course, he's been practicing 22, 23 years.  And everybody

01:27PM 5    thinks their way is the right way.  I don't ever think my way

01:27PM 6    is the right way.  I just -- I know there are certain things,

01:27PM 7    correct ways to do things.  And one of the most important

01:27PM 8    things for a boss is to remain aloof but still loving.  But you

01:27PM 9    can't be going out and hanging out with all your employees

01:27PM 10   because then unfortunately what happens, familiarity breeds

01:27PM 11   contempt.

01:27PM 12   Q.   What was Miss DeSantis' salary there?

01:27PM 13   A.   I think I was paying her 90,000, if I'm not mistaken.  I

01:27PM 14   don't know exactly.

01:27PM 15   Q.   Was that a base salary or a total compensation?

01:27PM 16   A.   I couldn't tell you, no, sir.  I don't know.

01:27PM 17   Q.   From what source was she paid?  Was she paid from the

01:27PM 18   Andry Lerner firm or from some other entity, if you know?

01:27PM 19   A.   I couldn't tell you.  I'm not sure.  It's either from

01:27PM 20   Glen Lerner or -- I couldn't tell you, it's either Glen Lerner

01:27PM 21   or Andry Lerner, I'm not sure.

01:27PM 22   Q.   When you gave her the responsibility that you've described

01:28PM 23   at Andry Lerner, how often did she report to you as to

01:28PM 24   activities there or give you information about the practice or

01:28PM 25   its operations?

**C O N F I D E N T I A L**

01:28PM 1   A.    On a relatively regular basis, more of a need-to-know
01:28PM 2   basis on my part.  Every now and then she would just send me
01:28PM 3   something, I guess, to the best of my knowledge that this is
01:28PM 4   happening, that is happening, but I couldn't tell you how
01:28PM 5   often.
01:28PM 6   Q.    How often would you speak to her on the telephone during
01:28PM 7   this period?
01:28PM 8   A.    Not that often.
01:28PM 9   Q.    Would you have meetings with her only when you came in as
01:28PM 10  you described, a day or two a month or did you meet more often?
01:28PM 11  A.    I wasn't even in that often.  I would say every six weeks
01:28PM 12  to two months.
01:28PM 13  Q.    You would come and spend the whole day there?
01:28PM 14  A.    Part of the day.  Enough to just talk with everybody.  I'm
01:28PM 15  the happy guy in the office.  I walk around and I'm kind of
01:28PM 16  like Kris Kringle.  I spread good cheer.  Everybody is always,
01:28PM 17  Come down more often.  We love it when you're in the office.  I
01:29PM 18  try to infuse the place with a certain energy but still, you
01:29PM 19  know, we're a business.  And so -- but I wasn't there that
01:29PM 20  often.
01:29PM 21  Q.    Would you be familiar, even on a general basis, with the
01:29PM 22  number of cases or the names of cases or the types of cases
01:29PM 23  that were in that law firm?
01:29PM 24  A.    No, sir.  In fact, I didn't even know the name of the
01:29PM 25  *Thonn* case until I saw the e-mails on it.  I didn't know the

**C O N F I D E N T I A L**

23

01:29PM 1   name of any cases.  That wasn't really part of my job

01:29PM 2   description.

01:29PM 3   Q.   So you're referring now to the *Casey Thonn* case?

01:29PM 4   A.   Sir, yes, sir.

01:29PM 5   Q.   The first time you learned that your firm represented him,

01:29PM 6   meaning the Andry Lerner firm, was reading e-mails?

01:29PM 7   A.   I knew we represented somebody.  I didn't know the name of

01:29PM 8   the guy until I actually saw the e-mail and getting paid on it.

01:29PM 9   Q.   I'm sorry, I don't understand your answer then.  You said

01:29PM 10  you knew we represented somebody?

01:29PM 11  A.   Well, I knew, when it was "Tiger" sending an e-mail about

01:29PM 12  the case, "Where is my fee?", I guess because that's part of

01:30PM 13  the reason we're here, I suppose, I didn't even know who

01:30PM 14  Casey Thonn was.  I just knew that "Tiger" had referred a case

01:30PM 15  to the office.  I didn't know the name of the guy.

01:30PM 16  Q.   You didn't notice on the e-mails the name Thonn,

01:30PM 17  T-H-O-N-N?

01:30PM 18  A.   I didn't really pay attention to it until I saw "my fee,"

01:30PM 19  and then I figured out this must be the guy.  I knew nothing

01:30PM 20  about the case.  I'd never spoken to the guy.  I didn't even --

01:30PM 21  when the case was referred over, I had nothing to do with the

01:30PM 22  actual handling of the case when he referred over.

01:30PM 23  Q.   Did you ever meet Casey Thonn?

01:30PM 24  A.   No, sir.

01:30PM 25  Q.   Did you ever speak to him on the phone as far as you know?

**C O N F I D E N T I A L**

24

| | | |
|---|---|---|
| 01:30PM | 1 | A.   No, sir. |
| 01:30PM | 2 | Q.   Did you speak to Jon Andry about him? |
| 01:30PM | 3 | A.   About him, his case or? |
| 01:30PM | 4 | Q.   About his case?  Start with that. |
| 01:30PM | 5 | A.   The only time we ever spoke about his case was when it |
| 01:30PM | 6 | came to the payment of the fee.  And I'd never spoken once in |
| 01:30PM | 7 | my life about the case.  Except for that. |
| 01:30PM | 8 | Q.   All right.  So just so we're clear, when you say you spoke |
| 01:30PM | 9 | to Jon Andry about the Casey Thonn fee, what time period are we |
| 01:31PM | 10 | talking about? |
| 01:31PM | 11 | A.   I guess it would be the time that -- I guess there were |
| 01:31PM | 12 | three payments on it, if I'm not mistaken, correct? |
| 01:31PM | 13 | Q.   Your recollection is that there are three payments? |
| 01:31PM | 14 | A.   That's all I've seen in my records, so yes, sir.  So I |
| 01:31PM | 15 | would think it would probably be at the time that the first |
| 01:31PM | 16 | payment was made. |
| 01:31PM | 17 | Q.   When in time do you recall that? |
| 01:31PM | 18 | A.   In reviewing my e-mails and going through stuff, I believe |
| 01:31PM | 19 | that was late December or that would have been early January |
| 01:31PM | 20 | of -- late December of 2012 or early January of 2013, if I'm |
| 01:31PM | 21 | not mistaken. |
| 01:31PM | 22 | Q.   Since this matter became a public matter, meaning the |
| 01:31PM | 23 | appointment of the Special Master, have you spoken to Jon Andry |
| 01:31PM | 24 | about the *Thonn* case? |
| 01:31PM | 25 | A.   Have I -- yea and nay.  I mean, certainly I didn't want to |

**C O N F I D E N T I A L**

SM-02-JA00448

01:31PM 1   get into really anything substantive with him.  You know,

01:32PM 2   certainly once this all came out I have been very careful not

01:32PM 3   to have any substantive talks about it, except I think he was a

01:32PM 4   little indignant.  He was obviously very angry that his name

01:32PM 5   got mentioned in a newspaper article.  So more that than

01:32PM 6   anything.

01:32PM 7   Q.   So tell me about that conversation.  How did he express

01:32PM 8   his anger to you?

01:32PM 9   A.   Gosh.  That was a good month or so ago.

01:32PM 10  Q.   Did you call him or did he call you?

01:32PM 11  A.   I don't know if I got an e-mail from him that said call me

01:32PM 12  or if I got a call from him, but I may have initiated the call.

01:32PM 13  I can't -- I can't say for sure who initiated the call.

01:32PM 14  Q.   Whoever initiated the call, what do you remember about the

01:32PM 15  conversation?

01:32PM 16  A.   I don't think I had even seen anything in the paper yet,

01:32PM 17  and I called him and he said -- gosh, I really can't remember.

01:32PM 18  I just know he was pretty angry.

01:32PM 19  Q.   What was he angry about?

01:33PM 20  A.   That his name was in the paper.

01:33PM 21  Q.   Did he mention or not mention the name Casey Thonn in that

01:33PM 22  conversation to you?

01:33PM 23  A.   I can't recall.  He may have said something about the fee.

01:33PM 24  Obviously because the article was replete with it, so it had to

01:33PM 25  have -- some focus of the conversation must have been the

**C O N F I D E N T I A L**

01:33PM 1   payment or they think this payment was something.  I don't

01:33PM 2   know.  I can't recall exactly what the conversation was.

01:33PM 3   Q.   Did you have a subsequent conversation with him, either in

01:33PM 4   person or on the phone about Casey Thonn?

01:33PM 5   A.   A subsequent conversation to that?

01:33PM 6   Q.   After the phone call you just described to us.

01:33PM 7   A.   Oh, gosh.  I may have spoken to him again but I don't know

01:33PM 8   if it was ever anything about Casey Thonn in particular.

01:33PM 9   Q.   So --

01:33PM 10  A.   I don't --

01:33PM 11  Q.   Your answer is you don't recall or you didn't have a

01:33PM 12  conversation?

01:33PM 13  A.   I would have to say I don't recall because I certainly

01:33PM 14  don't want to put myself in a corner.

01:33PM 15  Q.   When is the last time you saw Jon Andry?

01:34PM 16  A.   I believe it was some time a month or two prior to all

01:34PM 17  this stuff coming out, I guess.  Maybe March or April may have

01:34PM 18  been the last time I was here.

01:34PM 19  Q.   So you haven't seen him recently, that is, after March or

01:34PM 20  April of this year?

01:34PM 21  A.   No, sir.  I didn't want to see anybody.  I didn't want to

01:34PM 22  see "Tiger," anybody until this stuff is over, basically.

01:34PM 23  Q.   The last time you met Mr. Andry, do you recall where that

01:34PM 24  was?

01:34PM 25  A.   To the best of my recollection, I reckon it would have

**C O N F I D E N T I A L**

SM-02-JA00450

01:34PM 1   been in his office.

01:34PM 2   Q.   Here in New Orleans?

01:34PM 3   A.   Sir, yes, sir.

01:34PM 4   Q.   Do you remember the circumstances?  Was that one of the

01:34PM 5   periodic visits you made to the firm?

01:34PM 6   A.   Sir, yes, sir, sure.

01:34PM 7   Q.   It was not a meeting that you had set up or asked for for

01:34PM 8   any specific reason that you recall?

01:34PM 9   A.   I don't believe so.  I don't recall.  I think it was

01:34PM 10  just -- I was in town.  Sometimes I would show up and he

01:34PM 11  wouldn't even know I was here.

01:34PM 12  Q.   As far as you knew, when is the first time you heard the

01:35PM 13  name Casey Thonn?

01:35PM 14  A.   Probably would have been in the e-mails back in probably

01:35PM 15  late December or January, when the issue about paying "Tiger" a

01:35PM 16  fee came up.

01:35PM 17  Q.   That issue came up in what manner?

01:35PM 18  A.   When "Tiger" was saying, "Where is my fee?  Where is my

01:35PM 19  fee?".

01:35PM 20  Q.   Was he saying that to you?

01:35PM 21  A.   In the e-mails he was, yes, sir.  And I believe there is

01:35PM 22  some e-mails reflecting that.  What was the agreement you had

01:35PM 23  with my office?

01:35PM 24  Q.   You were not aware of the agreement yourself?

01:35PM 25  A.   No, sir.  I had no idea what the agreement was.  You know.

**C O N F I D E N T I A L**

SM-02-JA00451

01:35PM 1    Q.   Did he -- in addition to sending the e-mails, we'll go

01:35PM 2    over those a little bit later, did he also make phone calls to

01:35PM 3    you?

01:35PM 4    A.   Oh, goodness.  I can't recall.  I couldn't tell you.  I

01:35PM 5    mean, don't forget, "Tiger" and I would speak on a relatively

01:35PM 6    regular basis regarding Crown and opportunities we had with

01:36PM 7    Crown.  So did he ever speak or mention anything about this fee

01:36PM 8    on the phone, I can't recall.

01:36PM 9    Q.   When he first raised the issue of the fee, whether you

01:36PM 10   recall the Thonn name being connected to it or not, what you

01:36PM 11   described as something -- December, I think, of last year?

01:36PM 12   A.   December or January, yes, sir.

01:36PM 13   Q.   You talked about the e-mails where he's asking you, in

01:36PM 14   effect, for his fee?

01:36PM 15   A.   Sir, yes, sir.

01:36PM 16   Q.   Did you call Jon Landry -- Jon Andry at that point to ask

01:36PM 17   him about it?

01:36PM 18   A.   I believe I would have spoken to Jon about it at that

01:36PM 19   time.

01:36PM 20   Q.   What did you say to him?

01:36PM 21   A.   I believe we had a discussion, because this was a twofold,

01:36PM 22   a twofold situation, because I think first, Jon wasn't there

01:36PM 23   when "Tiger" and I originally talked about the referral of

01:36PM 24   Mr. Thonn, which I didn't even know it was just a referral of a

01:36PM 25   case.  Would you like me to go into that or do you want to

**C O N F I D E N T I A L**

SM-02-JA00452

01:36PM 1   follow up with that?

01:36PM 2   Q.   Let's stick with the conversations about this between you

01:36PM 3   and Jon.

01:36PM 4   A.   I think Jon was definitely uncomfortable in two manners:

01:37PM 5   First, I mean, obviously at first glance referring or paying a

01:37PM 6   fee on a case to somebody that's working at the claims

01:37PM 7   administration office would raise eyebrows, and so Jon was

01:37PM 8   like, I don't feel comfortable paying him.  And obviously my

01:37PM 9   answer was, Well, based upon my conversation at the time he

01:37PM 10  referred that case, and I knew *Thonn* was the case because that

01:37PM 11  was the only case we got referred from him, he represented that

01:37PM 12  he had disclosed this to Mr. Juneau.

01:37PM 13  Q.   You're saying *he*.  Who are you referring to?

01:37PM 14  A.   "Tiger" Sutton.  At the time he referred the case, he

01:37PM 15  represented that he had told Mr. Juneau about this, and there

01:37PM 16  was no issue with the fee.

01:37PM 17  Q.   Did he tell that to you?  Mr. Sutton.

01:37PM 18  A.   Sir, yes, sir, of course.  That's the reason I took the

01:37PM 19  case.

01:37PM 20  Q.   When he told you that, did you make a notation anywhere or

01:37PM 21  reference it in an e-mail or make any recording of that?

01:37PM 22  A.   No, sir.  In fact, my whole conversation about the

01:38PM 23  referral of this case, which I subsequently came to be known as

01:38PM 24  *Mr. Thonn*, was probably a 15- to 30-second conversation in a

01:38PM 25  Suburban with "Tiger," where we said, "Hey, now that I'm going

**C O N F I D E N T I A L**

SM-02-JA00453

01:38PM 1    to go work for the claims administration office, I have one

01:38PM 2    case to refer.  And I want to refer the case to you guys."

01:38PM 3          I'm like, "Okay."  My first thing was, well, first, I

01:38PM 4    said, "Did you clear this with your boss?  Is this okay?"

01:38PM 5          He said, "I told Pat Juneau about the case.  There

01:38PM 6    are no issues with me referring the case.  I have no

01:38PM 7    involvement with it."

01:38PM 8          And I believe as a judge -- you were a lawyer at one

01:38PM 9    point, sir?  I don't know if you were a lawyer, but that

01:38PM 10   proverbial Chinese wall.  So I had no reason to not believe

01:38PM 11   "Tiger," having known him for 25 years.  I said, "Fine, send it

01:38PM 12   over to the office."  That was all I said.

01:38PM 13          He said, "No, I'm not sending it to the office.  I'm

01:38PM 14   referring it to you because Jon screwed me on the *BellSouth*

01:38PM 15   fee."  That was it.

01:38PM 16          I said, "Okay, send it to the office and tell them

01:38PM 17   it's my referral."

01:38PM 18   Q.    This was a conversation you said that took place in a

01:38PM 19   Suburban?

01:38PM 20   A.    Yes, sir.  I believe that's what "Tiger" has, a big

01:39PM 21   Suburban.

01:39PM 22   Q.    Was it in New Orleans or somewhere else?

01:39PM 23   A.    Sir, sir, yes.

01:39PM 24   Q.    Again, your recollection of the approximate time of that

01:39PM 25   conversation?

**C O N F I D E N T I A L**

SM-02-JA00454

01:39PM 1   A.   I reckon it would have been a couple days or a week before

01:39PM 2   we got the case.   I couldn't tell you exactly when, but my

01:39PM 3   understanding would have been before he began working at the

01:39PM 4   claims administration office.

01:39PM 5   Q.   Mr. Sutton said he was going to refer it to you?

01:39PM 6   A.   Sir, yes, sir.   When I told him just to send it to the

01:39PM 7   office, he said, "No, I'm not sending it to the office because

01:39PM 8   Jon screwed me on that case, the *BellSouth*."

01:39PM 9           Their whole fight, they were like brothers, their

01:39PM 10  whole fight after 25 years of friendship was on $50,000 of

01:39PM 11  fees.   And so I was kind of like the guy in the middle.

01:39PM 12  Q.   Let's just stick on that conversation for a moment.   When

01:39PM 13  you said "the office," what were you referring to?

01:39PM 14  A.   Andry Lerner.

01:39PM 15  Q.   Did you say *Andry Lerner* or did you just say *the office*?

01:39PM 16  A.   I probably just said *the office*, because I would have no

01:39PM 17  reason for him to think that my office was doing *BP* claims

01:40PM 18  since we were with Andry Lerner doing *BP* claims.

01:40PM 19  Q.   He said -- I don't want to put the words on the record,

01:40PM 20  but I think you indicated that he said words to effect, he

01:40PM 21  didn't trust Jon Andry because of the *BellSouth* case and

01:40PM 22  therefore wanted to send it to you?

01:40PM 23  A.   I want to say he did.   I don't want to inflame the

01:40PM 24  situation.

01:40PM 25  Q.   Describe it in your own words.

**C O N F I D E N T I A L**

SM-02-JA00455

| | |
|---|---|
| 01:40PM 1 | A.    "Jon screwed me on the *BellSouth* case," you know.   That |
| 01:40PM 2 | was it. |
| 01:40PM 3 | Q.    How long did this conversation take? |
| 01:40PM 4 | A.    15 to 30 seconds.   That was it. |
| 01:40PM 5 | Q.    Did you ask him anything about the case? |
| 01:40PM 6 | A.    Not a thing. |
| 01:40PM 7 | Q.    Did he tell you anything about the case? |
| 01:40PM 8 | A.    Sir, no, sir. |
| 01:40PM 9 | Q.    Did you ever have a conversation about that case with |
| 01:40PM 10 | Christine Reitano? |
| 01:40PM 11 | A.    To the best of my recollection, no.   I think I've only |
| 01:40PM 12 | spoken to Christine -- I haven't seen Christine.   In fact, |
| 01:40PM 13 | since then, I think since the referral of that case I may have |
| 01:41PM 14 | only seen Christine once if I've seen her at all.   I didn't |
| 01:41PM 15 | even know it was Christine's case. |
| 01:41PM 16 | Q.    You thought it was Mr. Sutton's case? |
| 01:41PM 17 | A.    Sir, yes, sir. |
| 01:41PM 18 | Q.    Did he explain the reason to you at that time why he was |
| 01:41PM 19 | referring it? |
| 01:41PM 20 | A.    Yes, sir. |
| 01:41PM 21 | Q.    Again, could you, as best you recall, tell us what he told |
| 01:41PM 22 | you in terms of his reason for referring the case? |
| 01:41PM 23 | A.    He told me he had accepted a job at the claims |
| 01:41PM 24 | administration office. |
| 01:41PM 25 | Q.    You made a reference before that he talked about having |

**C O N F I D E N T I A L**

SM-02-JA00456

01:41PM 1   cleared it or told his boss about it?

01:41PM 2   A.   Sir, yes, sir.  In fact, obviously the day he told me he

01:41PM 3   took a job at the claims administration office, I was, you

01:41PM 4   know, quite surprised because obviously, with our dealings with

01:41PM 5   Crown, he's getting a monthly salary.  I have all these cases

01:41PM 6   with the *BP*.  I didn't want to end up in a situation like we

01:41PM 7   are here.  I was pretty upset.  I said, "Guy, why are you

01:42PM 8   taking this job?"

01:42PM 9          He said, "It's a good job.  It can lead to other

01:42PM 10   things."

01:42PM 11   Q.   When he referred the case to you, did he tell you he was

01:42PM 12   referring it to you because he was going to work for the claims

01:42PM 13   administration?

01:42PM 14   A.   I think he had already established that, I think, because

01:42PM 15   he was at the claims administration.  He couldn't be working

01:42PM 16   the case himself any more, that would be my assumption.

01:42PM 17   Q.   Let me restate the question.  In the 15- to 30-second

01:42PM 18   conversation in the Suburban, when you told us he referred the

01:42PM 19   case to you, did he tell you at that point that he was going to

01:42PM 20   work for the claims administrator?

01:42PM 21   A.   No, sir.  He had told me at an earlier point.  I can't

01:42PM 22   tell you exactly where we were standing.  He had told me at

01:42PM 23   some point earlier, maybe that day or the day before.  I can't

01:42PM 24   tell you exactly when.

01:42PM 25   Q.   Had told you that he was going to work for the claims

**C O N F I D E N T I A L**

SM-02-JA00457

01:42PM  1    administrator?

01:42PM  2    A.   Sir, yes, sir.

01:42PM  3    Q.   So when you got the referral in December of last year, it

01:42PM  4    was your understanding that he was referring it to you because

01:42PM  5    he was going to work for the claims administrator?

01:42PM  6    A.   Sir, yes, sir.

01:42PM  7    Q.   Did you discuss any particulars about what the financial

01:43PM  8    arrangements or fee arrangements would be based on that

01:43PM  9    referral?

01:43PM 10    A.   No, sir.  In fact, that's why you'll see there is an

01:43PM 11    e-mail from me when I see all this, I'm like, okay, what was

01:43PM 12    his referral fee?  What was the deal?  I have no idea.  This

01:43PM 13    was sent to the office and the next thing I know is he's asking

01:43PM 14    for his fee.  I don't know how much time went by, but my

01:43PM 15    understanding is that he had done a significant amount of work

01:43PM 16    on the claim.

01:43PM 17    Q.   When you had the conversation, however, in the Suburban

01:43PM 18    about the referral, there was no discussion about a fee or any

01:43PM 19    compensation to him?

01:43PM 20    A.   I don't recall it.  No, sir.

01:43PM 21    Q.   Is it --

01:43PM 22    A.   I mean.

01:43PM 23    Q.   -- possible there was a discussion and you don't recall

01:43PM 24    it?

01:43PM 25    A.   Oh, certainly.  Certainly there was -- there could have

**C O N F I D E N T I A L**

SM-02-JA00458

| | | |
|---|---|---|
| 01:43PM | 1 | been a discussion.  I mean, certainly I know he was expecting |
| 01:43PM | 2 | to get a fee.  I can't recall what, if we discussed it's a |
| 01:43PM | 3 | 20 percent fee, a 50 percent fee, an 80 percent fee.  I don't |
| 01:43PM | 4 | believe I would have engaged in that conversation, especially |
| 01:43PM | 5 | without some input from Jon what was standard on these *BP* |
| 01:43PM | 6 | claims.  I had no idea what was happening on the claims. |
| 01:44PM | 7 | Q.   May I ask, you said that you knew he was expecting a fee. |
| 01:44PM | 8 | A.   Sir, yes, sir. |
| 01:44PM | 9 | Q.   How did you know that? |
| 01:44PM | 10 | A.   Based upon the fact that he said, "No, I'm referring the |
| 01:44PM | 11 | case to you because Jon screwed me on the *BellSouth* case." |
| 01:44PM | 12 | Q.   You understood from that or you inferred from that that he |
| 01:44PM | 13 | was expecting a fee? |
| 01:44PM | 14 | A.   Sir, yes, sir.  My understanding was that he had |
| 01:44PM | 15 | obviously, knowing him 25 years, and not thinking that he would |
| 01:44PM | 16 | ever engage in anything illicit, whether it is or not, and he |
| 01:44PM | 17 | already had said that he had cleared it with Pat Juneau, I had |
| 01:44PM | 18 | no reason to think there was any issue. |
| 01:44PM | 19 | Q.   After that conversation, did you speak to Jon Andry that a |
| 01:44PM | 20 | new case was coming into the law firm? |
| 01:44PM | 21 | A.   Oh, goodness gracious.  I don't know if I ever said |
| 01:44PM | 22 | anything about the case.  I think I just left it up to "Tiger" |
| 01:44PM | 23 | to refer the case over to the best of my recollection, but.... |
| 01:44PM | 24 | Q.   But you said there came a time when you and Jon started to |
| 01:44PM | 25 | talk about a referral fee to Mr. Sutton -- |

**C O N F I D E N T I A L**

SM-02-JA00459

| | |
|---|---|
| 01:44PM 1 | A.    Sir, yes, sir. |
| 01:44PM 2 | Q.    -- in regard to this matter? |
| 01:45PM 3 | I'm sorry, you have to answer.  I know you did, but |
| 01:45PM 4 | you have to answer after my question. |
| 01:45PM 5 | A.    I know.  I'll try to get that right by the end.  Yes, sir. |
| 01:45PM 6 | Q.    When did that conversation occur for the first time? |
| 01:45PM 7 | A.    My guess, I mean, certainly it would be -- it would have |
| 01:45PM 8 | been sometime around the time that "Tiger" was saying, "Where |
| 01:45PM 9 | is my fee?  Where is my fee?"  Was that late December?  Was it |
| 01:45PM 10 | early January?  And I can't recall off the top of my head, but |
| 01:45PM 11 | I've seen some e-mails. |
| 01:45PM 12 | Q.    So it was the approximate time of the end of December, the |
| 01:45PM 13 | beginning of the year? |
| 01:45PM 14 | A.    That would be my guess, yes, sir. |
| 01:45PM 15 | Q.    Tell me what you recall about the first conversation you |
| 01:45PM 16 | had with Jon Andry about the subject of this referral fee. |
| 01:45PM 17 | A.    When you say first, I don't know if there were any other |
| 01:45PM 18 | subsequent conversations, but.... |
| 01:45PM 19 | Q.    Well, what's the memory you have of the conversations you |
| 01:45PM 20 | had with Mr. Andry about the referral fee? |
| 01:45PM 21 | A.    Oh, I -- |
| 01:45PM 22 | Q.    You told us when you think they began.  There is more than |
| 01:46PM 23 | one conversation? |
| 01:46PM 24 | A.    Are you asking me or telling me? |
| 01:46PM 25 | Q.    I'm asking you.  Is there more than one conversation? |

**C O N F I D E N T I A L**

SM-02-JA00460

01:46PM 1   A.   I don't believe we ever talked about it more than one

01:46PM 2   time.  And it was just with the original -- with that first

01:46PM 3   payment.  I felt Jon was somewhat uneasy with it, one, because

01:46PM 4   of the fact that "Tiger" was at the claims administration

01:46PM 5   office.  And without him having an understanding of what

01:46PM 6   happened in our conversation and him telling me that

01:46PM 7   Mr. Juneau, which I told him, "Hey, he told me he cleared this

01:46PM 8   with Pat Juneau.  He's had no involvement, to the best of my

01:46PM 9   knowledge, with the claim.  He referred the case.  He did

01:46PM 10  substantial work, according to you guys, he's got to be paid."

01:46PM 11  You can't take the guy's money and then say, We're not going to

01:46PM 12  pay you.  Part of the referral process is people get paid if

01:46PM 13  they refer the cases.

01:46PM 14  Q.   Did Mr. Andry agree to that?

01:46PM 15  A.   I think he was uneasy with it.  One, is, as I told you,

01:46PM 16  there were two competing things going on.  I think he still had

01:46PM 17  some animosity towards "Tiger" for whatever reasons, and I

01:46PM 18  think he wanted to be like Pontius Pilot (indicating):  I'll

01:47PM 19  take your money but you go take the liability for payment.  I

01:47PM 20  gave him my word and I have no reason to believe that this --

01:47PM 21  that he can't get the fee.

01:47PM 22  Q.   Did Mr. Andry object to you making the payment?

01:47PM 23  A.   I don't know if you could say *object*.  I just think he

01:47PM 24  said, "I'm going to send you the money.  You do what you want

01:47PM 25  with it."

**C O N F I D E N T I A L**

SM-02-JA00461

Q.   Did he at any time instruct you or tell you or state to you that you should not make the payment?

A.   I can't recall that. I don't know. I don't know if that would be a correct thing to say.

Q.   In fact, you did make, not just one payment but several payments, correct?

A.   Yes, sir. I believe there were three payments made.

Q.   Did you at any time enter into a written agreement with Mr. Sutton with respect to the referral and the payment of any subsequent fees?

A.   I wouldn't know, sir. That would have been the office. I have no idea what happened with the case once it went there.

Q.   Do you recall signing any kind of an agreement?

A.   Me personally, no, sir.

Q.   You're sure about that?

A.   To the best of my knowledge, yes, sir.

Q.   Are you aware that under Nevada law, if you share a fee with another attorney outside your firm, you have to have a written agreement?

A.   I believe that's correct, yes, sir.

Q.   But you didn't do that in this case?

A.   I wasn't -- it wasn't Nevada law. I believe the case was referred to a Louisiana law firm. And I wasn't allowed to sign on any of it. I'm not a licensed Louisiana attorney.

Q.   But you were practicing in the State of Nevada?

**C O N F I D E N T I A L**

SM-02-JA00462

01:48PM  1    A.   I was practicing in the State of Nevada, yes, sir.

01:48PM  2    Q.   Is it your understanding that you don't have to enter into

01:48PM  3    such an agreement in Louisiana?

01:48PM  4    A.   I don't know.  I don't know what they did.  I wasn't the

01:48PM  5    one that would sign it anyway.  That would be signed by the

01:48PM  6    Louisiana attorney.

01:48PM  7    Q.   Who was that?

01:48PM  8    A.   That would be Jon Andry.

01:48PM  9    Q.   Do you know if Mr. Andry signed such an agreement?

01:48PM 10    A.   No, sir.  I know nothing about the case once it came to

01:48PM 11    the office.  I don't know who handled it or anything.

01:49PM 12    Q.   Do you know any attorney who worked on the case in terms

01:49PM 13    of its actual day-to-day processing or operation?

01:49PM 14    A.   If I had to guess, I would probably guess Chris Mancuso,

01:49PM 15    but I couldn't tell you for sure.  But she would usually handle

01:49PM 16    the cases from the intake process forward.

01:49PM 17    Q.   Did you ever speak to her about this particular case,

01:49PM 18    *Casey Thonn*?

01:49PM 19    A.   I couldn't.  I didn't know the name of the case.

01:49PM 20    Q.   Is it your testimony that you first learned or you first

01:49PM 21    recall learning about the name of the case when you read

01:49PM 22    materials within the last few weeks?

01:49PM 23    A.   No.  I came to know that Casey Thonn was a fee on a case

01:49PM 24    that "Tiger" sent, once I kept seeing the e-mails with Thonn on

01:49PM 25    them.  But I think if he was on anything before he demanded,

**C O N F I D E N T I A L**

01:49PM 1 "Where is my fee?  Where is my fee?", I don't think I put the
01:49PM 2 two and two together.
01:49PM 3 Q.   I thought you initially said, and we have a record here, I
01:49PM 4 thought you had initially said, and I'm not trying to trick
01:49PM 5 you, I thought you had initially said that the name didn't mean
01:49PM 6 anything until you went back and looked at the e-mails.  At the
01:50PM 7 time of the referral you didn't connect the referral to the
01:50PM 8 name Casey Thonn?
01:50PM 9 A.   No, if I said that, that may be correct, it might be
01:50PM 10 incorrect.  I knew by the time that I started getting, I think
01:50PM 11 there were two or three e-mails at least, "Where's my fee?"
01:50PM 12 And then there is another one, I think this fee came in.  I put
01:50PM 13 two and two together eventually, if I saw Thonn on the
01:50PM 14 description of the subject line eventually.  But I never really
01:50PM 15 thought about it.
01:50PM 16 Q.   To the best of your knowledge, how many payments were made
01:50PM 17 to Mr. Sutton from any entity under your control with respect
01:50PM 18 to this particular case, the *Thonn* case?
01:50PM 19 A.   To the best of my knowledge, I believe there were three
01:50PM 20 checks made.
01:50PM 21 Q.   Do you know what the amounts of those checks were?
01:50PM 22 A.   In reviewing it after the fact, I think, you know,
01:50PM 23 certainly at the time I had -- I had no idea what -- any of it.
01:50PM 24 I've just reviewed these things now, I think.  The first check
01:50PM 25 was 4,900, if I'm not mistaken.  The second check was 16,600

**C O N F I D E N T I A L**

SM-02-JA00464

41

01:51PM 1   and some odd dollars.  And there was a third check 18 or

01:51PM 2   $19,000.

01:51PM 3   Q.    Do you know whether those were fees that were being paid

01:51PM 4   from the Andry Lerner Law Firm to you?

01:51PM 5   A.    I don't know.  When you -- can you ask that question

01:51PM 6   again.  I'm not sure exactly what you're saying.

01:51PM 7   Q.    According to your understanding today, how was the money

01:51PM 8   that was paid to Mr. Sutton in the three payments generated or

01:51PM 9   processed?  What was the method by which those payments were

01:51PM 10  made?

01:51PM 11  A.    It was paid from the Andry Lerner firm to Glen J. Lerner &

01:51PM 12  Associates or whatever my account was.

01:51PM 13  Q.    Then how did the money get from there to Mr. Sutton, as

01:51PM 14  far as you know?

01:51PM 15  A.    I believe it was wired to him.

01:51PM 16  Q.    What's the basis of your belief?

01:51PM 17  A.    I've seen this stuff since.  At the time I certainly had

01:51PM 18  no idea how he got paid.  I've only come to know about it

01:51PM 19  when -- after all this stuff came out I requested from

01:52PM 20  Jeff Cahill.  Jeff -- obviously I want to track everything, and

01:52PM 21  he sent me copies of the wires.

01:52PM 22  Q.    Did you have a conversation with Mr. Cahill about this

01:52PM 23  matter?

01:52PM 24  A.    Sure.

01:52PM 25  Q.    What did you ask him?

**C O N F I D E N T I A L**

01:52PM 1   A.   I asked why this was wired to the old Crown account.   And

01:52PM 2   I said, "Why is that old Crown account still open?"

01:52PM 3   Q.   What did he say?

01:52PM 4   A.   He said "'Tiger' kept it open once you moved the accounts

01:52PM 5   to Bank of America."   I think we would have moved those,

01:52PM 6   probably around May or June of 2012.   Sometime around then.   If

01:52PM 7   I'm not mistaken.

01:52PM 8   Q.   Is it your understanding that all the payments we have

01:52PM 9   been talking about to Mr. Sutton went through the old Crown

01:52PM 10  account?

01:52PM 11  A.   Yes, sir.   I've learned that subsequently.

01:52PM 12  Q.   Did you learn subsequently they all came from

01:52PM 13  Lerner & Associates?

01:52PM 14  A.   Yes, sir.

01:52PM 15  Q.   Did you ask Mr. Cahill how it came about that that

01:52PM 16  particular payment method was established?

01:52PM 17  A.   Yes, sir.   And there is actually an e-mail to that effect.

01:52PM 18  Q.   What did Mr. Cahill say to you?

01:53PM 19  A.   He said he was directed to do so by Mr. Sutton had asked

01:53PM 20  that the money be deposited into his old trust account -- his

01:53PM 21  old Crown account.

01:53PM 22  Q.   At the time that the case was referred to you, you said

01:53PM 23  that Mr. Sutton stated that he had talked to his boss about

01:53PM 24  this, I think you said?

01:53PM 25  A.   Yes, sir.

**C O N F I D E N T I A L**

SM-02-JA00466

01:53PM 1   Q.   Did he say *Mr. Juneau* or just used the phrase *his boss*?

01:53PM 2   A.   No, I'm sure he would have referred to him as *Mr. Juneau*

01:53PM 3   or *Pat*.

01:53PM 4   Q.   Was that in response to a question you asked him?

01:53PM 5   A.   Sure.  I asked him if it was okay to send the case.

01:53PM 6   Q.   His response was yes?

01:53PM 7   A.   "Yes, I cleared it with Pat."  Or Pat Juneau or

01:53PM 8   Mr. Juneau.  I don't know which one he said.  I couldn't tell

01:53PM 9   you for sure.  Gosh, that was eight, nine months ago.

01:53PM 10   Q.   Now, at the time that Mr. Sutton went to work for the

01:53PM 11   claims administrator, he also had a business relation with you

01:54PM 12   through Crown; is that correct?

01:54PM 13   A.   Sir, yes, sir.

01:54PM 14   Q.   I'm going to ask you some more specific questions about

01:54PM 15   that, but he was on a monthly compensation basis with respect

01:54PM 16   to Crown?

01:54PM 17   A.   Sir, yes, sir.

01:54PM 18   Q.   What was your understanding -- let's go back to December

01:54PM 19   of last year.  What was your understanding at that time about

01:54PM 20   how much money he was being paid and for what reason with

01:54PM 21   respect to Crown?

01:54PM 22   A.   Well, actually, he started receiving money from Crown -- I

01:54PM 23   had put about a million to a million and a half into Crown, up

01:54PM 24   until June of -- May of 2012.  Originally the deal was, I

01:54PM 25   wasn't even on the original operating agreement.  Joey Dartez,

**C O N F I D E N T I A L**

SM-02-JA00467

44

| | |
|---|---|
| 01:54PM | 1 |

01:54PM 1     Tim Elmhurst and "Tiger" were one-third owners each.

01:54PM 2     "Tiger" -- I would have to get into almost the evolution of

01:54PM 3     Crown to answer this really the correct way, if you would like.

01:55PM 4     Q.   Why don't you do that.

01:55PM 5     A.   Okay.  Do you mind if I start from the inception of

01:55PM 6     everything happening with Crown?

01:55PM 7     Q.   Go right ahead.

01:55PM 8     A.   It's going to be long-winded but I'll try to go slowly.

01:55PM 9     Probably right around April of 2010, I believe "Tiger" had --

01:55PM 10     "Tiger" had his buddy Joey and Tim Elmhurst come to him with an

01:55PM 11     opportunity.  There is an inventor in water technology in

01:55PM 12     Houston at a company called *Proven Technologies* named

01:55PM 13     *Gary Stephenson*, and these guys had been working with him on

01:55PM 14     some other stuff.  Joey has been involved in the oilfield and

01:55PM 15     gas business for a long time, and I believe Tim as well.

01:55PM 16         They came to "Tiger" and said, "Hey, this guy has a

01:55PM 17     process he believes where he can clean the frac water, the

01:55PM 18     wastewater from frac water wells and do it without any waste

01:55PM 19     stream."  And "Tiger" knew that I have a big property up in

01:56PM 20     northern Pennsylvania.  And we had talked at some point,

01:56PM 21     probably about frac, and the big thing in the future is going

01:56PM 22     to be cleaning the dirty water.  It's even more important than

01:56PM 23     the gas.  Water is a more precious resource long-term.  So we

01:56PM 24     talked about it.

01:56PM 25         So based upon our conversation from years ago, we

**C O N F I D E N T I A L**

SM-02-JA00468

01:56PM 1   said, "Hey, remember we talked about this.  Is this something

01:56PM 2   you would be interested in coming down and talking with, you

01:56PM 3   know, talking to these guys?"

01:56PM 4        And so, I had my friend, Mike Bryant, who I knew

01:56PM 5   socially and we had started doing a few little things together

01:56PM 6   in north Scottsdale.  I had Mike fly down with me to Houston.

01:56PM 7   And Mike had been the CEO of a number of companies.  Mike is a

01:56PM 8   very bright guy.  He had an engineering degree and an economics

01:56PM 9   degree, and he could see opportunity.  And I knew nothing about

01:56PM 10  schematics or is this something that could work or not.

01:56PM 11       So I said, "Mike, come, I'll fly you down, come down

01:56PM 12  with me for the day."  So we flew down to Houston, met with

01:56PM 13  Gary, met with -- I think "Tiger" was there.  Joey and Tim.

01:56PM 14  And they had some other guys from Proven.  And they spent about

01:57PM 15  two, three hours doing a presentation about this machine, the

01:57PM 16  water mediation machine.

01:57PM 17       After reviewing it, Mike and I went back.  It looked

01:57PM 18  really good.  And I went and I said to Mike, "What do you

01:57PM 19  think?

01:57PM 20       And he says, "I like it."  He says, "There is

01:57PM 21  something there."

01:57PM 22       I said, "Do you want to invest with me?"

01:57PM 23       Mike is not the same type of personality as me.  He

01:57PM 24  likes just having a job.  He says, you know, "I think there is

01:57PM 25  something there, but I'm just not in the position to get

**C O N F I D E N T I A L**

SM-02-JA00469

01:57PM  1   involved.  I'm going to stick with my job."

01:57PM  2          I said, "Okay," and I didn't speak to him again about

01:57PM  3   it until -- you know, obviously I got involved at that time.

01:57PM  4   I'll bring Mike back into the equation in a couple of minutes.

01:57PM  5          But in -- I want to say in maybe May, maybe May of

01:57PM  6   2010 or so I -- based upon what I had seen and what Mike

01:57PM  7   thought was the way to go, I decided to invest in Crown.  I

01:57PM  8   put -- our original deal with Mr. Stephenson was going to be he

01:57PM  9   would build the machine for $760,000, end up running a little

01:58PM 10   over cost, and we paid him over a period of time -- or me.  Me.

01:58PM 11   There is no "we."  Probably it was done and ready in about

01:58PM 12   maybe 18 months.  It took about 12 to 18 months, at least.  And

01:58PM 13   then by the time it was done, I probably put maybe a little

01:58PM 14   over a million dollars.

01:58PM 15          And I was starting to get a little testy obviously.

01:58PM 16   Our deal was I was going to be a one-quarter partner for the

01:58PM 17   money up, and I was going to have involvement in any of the

01:58PM 18   technologies that Proven had agreed to deal with Crown on.

01:58PM 19   Q.     Excuse me, let me interrupt you there.  Was it your

01:58PM 20   understanding you were going to have a license or an interest

01:58PM 21   in the actual invention or technology or property with respect

01:58PM 22   to that machine?

01:58PM 23   A.     Sir, yes, sir.  They had a preliminary license agreement

01:58PM 24   with them, which is rudimentary at best, the license agreement.

01:58PM 25   I mean, we were up in Calgary fighting with the company that

**C O N F I D E N T I A L**

SM-02-JA00470

01:59PM 1    bought Proven over what it actually meant, the license

01:59PM 2    agreement, before we decided to get into a four-year court

01:59PM 3    battle over who owned the patent or not.  We came to an

01:59PM 4    agreement with this company called *TerraMer* that is actually

01:59PM 5    now the owner of Proven.

01:59PM 6    Q.    Sir, let me just interrupt you there if I might.  Sutton's

01:59PM 7    role in the company was going to be that of an employee and not

01:59PM 8    an investor?

01:59PM 9    A.    Oh, no, no, no, sir.  He was -- well, no one was an

01:59PM 10   investor except me.

01:59PM 11   Q.    You were the only investor?

01:59PM 12   A.    Sir, yes, sir.

01:59PM 13   Q.    What was Mr. Sutton's role contemplated by you to be?

01:59PM 14   A.    Kind of basic.  Until I brought Mike in, "Tiger" was

01:59PM 15   leading the charge.  He was very well versed in the technology.

01:59PM 16   We had met with ex-Senator Richard Bryan in Nevada.  And I was

01:59PM 17   incredibly impressed with his ability to talk about the machine

01:59PM 18   and the technology and its applications.

01:59PM 19   Q.    Mr. Sutton had a percentage interest in --

01:59PM 20   A.    Sir, yes, sir.  At the time he had a 25 percent interest,

02:00PM 21   along with Mr. Dartez and Mr. Elmhurst.

02:00PM 22   Q.    At a later point that was reduced?

02:00PM 23   A.    Sir, yes, sir.

02:00PM 24   Q.    How did that come about?

02:00PM 25   A.    When we got to the end of May of 2012, I basically said,

**C O N F I D E N T I A L**

SM-02-JA00471

02:00PM 1    "Hey, we need to bring somebody in to execute.  We're so close,

02:00PM 2    but you guys can't execute."

02:00PM 3         And so I said, "I'm bringing in my handpicked CEO."

02:00PM 4         I had spoken to Mike.  Mike was actually about to

02:00PM 5    take another job in London.  I called him right before he was

02:00PM 6    going to take this job in London.  I said, "Mike, remember we

02:00PM 7    had gone down to Houston two years ago?  Well, I invested in it

02:00PM 8    and it works.  I want you to come down and see the machine

02:00PM 9    operate."

02:00PM 10        And he said, "Well, I'm about to go to London.  I had

02:00PM 11   just accepted a job basically with this" -- I don't know if it

02:00PM 12   was an equity firm in London, but....

02:00PM 13   Q.   So he ended up becoming the CEO?

02:00PM 14   A.   Yes, sir.  You shortened it.

02:00PM 15   Q.   What were the financial arrangements between you being the

02:01PM 16   only investor and the majority owner and Mr. Sutton?

02:01PM 17   A.   Well, at the time I wasn't the majority owner, and I'm

02:01PM 18   still not the actual majority owner.  Everybody was 25 percent

02:01PM 19   at the time.  And I basically, at the end of May, 2012, I said,

02:01PM 20   "This isn't working for me anymore.  It's obvious we need more

02:01PM 21   capital.  If you guys want me to put any more money into this

02:01PM 22   thing, I'm paying Mike $35,000 a month, that's what a CEO is

02:01PM 23   going to get -- a low-paid CEO, but we need him.  We can't

02:01PM 24   execute without somebody who understands the engineering

02:01PM 25   aspects and who still understands a boardroom."

**C O N F I D E N T I A L**

SM-02-JA00472

49

| | | |
|---|---|---|
| 02:01PM | 1 | They were -- at first, until they saw what Mike could |
| 02:01PM | 2 | do the first six months, they were really upset about me paying |
| 02:01PM | 3 | Mike this money.  "And you guys, if you don't agree to changing |
| 02:01PM | 4 | the shares, then I can't fund it any more." |
| 02:01PM | 5 | They said, "Well, if you're going to change the |
| 02:01PM | 6 | shares, then we want to get a monthly salary." |
| 02:01PM | 7 | I said, "Okay."  So we agreed to a salary. |
| 02:01PM | 8 | And so for me basically taking on any expenses, |
| 02:01PM | 9 | insurance, all this, so many ancillary costs associated with |
| 02:02PM | 10 | this, Mike's salary, all the traveling expenses, everything, |
| 02:02PM | 11 | they agreed, each one of them, to reduce their ownership |
| 02:02PM | 12 | interest by 8 percent each, so 24 percent in total.  Mike |
| 02:02PM | 13 | and -- I'm sorry, Tim and Joey, I think, at first were either |
| 02:02PM | 14 | 5,000 to 6,500 a month.  I couldn't tell you exactly. |
| 02:02PM | 15 | Q.    Would you characterize that as *salary* or *equity return*? |
| 02:02PM | 16 | A.    We called it *salary*, but it was basically salary and |
| 02:02PM | 17 | consideration for them giving up a share of their equity.  And |
| 02:02PM | 18 | the same thing with "Tiger" got paid $10,000 a month, and that |
| 02:02PM | 19 | was salary for him giving up a share of his equity. |
| 02:02PM | 20 | Q.    And also expenses from time to time? |
| 02:02PM | 21 | A.    I think there were some expenses.  I don't know if there |
| 02:02PM | 22 | were a whole lot of expenses on his part. |
| 02:02PM | 23 | Q.    As best you recall, for what period of time or -- strike |
| 02:02PM | 24 | that. |
| 02:02PM | 25 | When did you start paying, let's just stick with |

**C O N F I D E N T I A L**

SM-02-JA00473

02:03PM 1    Mr. Sutton, a monthly amount?  If it was $10,000 --

02:03PM 2    A.    His wasn't so much.  In the beginning his was monthly.

02:03PM 3    The first couple months he received his monthly, just like the

02:03PM 4    other guys.  And then I became cash strapped and I said to him,

02:03PM 5    "Guy, I'm just going to get to you when I have settlements.

02:03PM 6    These guys I have to pay because they have no other jobs."

02:03PM 7         You know, "Tiger" was still a practicing attorney to

02:03PM 8    the best of my knowledge at the time so he had income coming

02:03PM 9    in.  These guys had no other jobs.  "They're my priority; I'll

02:03PM 10   catch you up as we go."

02:03PM 11        If I fell behind, he was cool, but he would be

02:03PM 12   saying, "Hey, you owe me this much.  You owe me this much."

02:03PM 13   Q.    You said you started paying him in the first couple of

02:03PM 14   months.  In point of time, when to your recollection was that?

02:03PM 15   A.    It would have been some time after we agreed to it in the

02:03PM 16   beginning of June of 2012.  I couldn't tell you when I paid him

02:03PM 17   his first payment or second payment.

02:03PM 18   Q.    As you described, sometimes they would be monthly payments

02:03PM 19   and sometimes they would not be and you would have to catch up

02:03PM 20   and he would remind you in some of the e-mails we'll go over

02:03PM 21   that payments were due?

02:04PM 22   A.    Oh, yes, sir.  Yeah, I think at one point I had only paid

02:04PM 23   him $36,000 through, I think, March when he should have already

02:04PM 24   been paid $100,000.  And he's like, "You owe me $64,000."  I

02:04PM 25   was doing the best I could to run a business on a shoestring

**C O N F I D E N T I A L**

SM-02-JA00474

02:04PM 1    budget.

02:04PM 2    Q.    There came a time, I think you referred to it before, when

02:04PM 3    Mr. Sutton told you or you learned that he was going to work

02:04PM 4    for the BP claims administrator?

02:04PM 5    A.    Sir, yes, sir.

02:04PM 6    Q.    Was it your understanding that he would be working there

02:04PM 7    as an attorney?

02:04PM 8    A.    Yes, sir.

02:04PM 9    Q.    Did you have any more specific understanding as to what

02:04PM 10   his roles or responsibilities would be there?

02:04PM 11   A.    Not really, no.  I think at some point I subsequently

02:04PM 12   learned that he was doing moratorium or moratoria claims.  I'm

02:04PM 13   not sure what they were.

02:04PM 14   Q.    When he went to work there, however, you were aware as a

02:04PM 15   member of Andry Lerner that there were a substantial number of

02:05PM 16   BP claims from your firm before the administrator?

02:05PM 17   A.    Yes, sir.

02:05PM 18   Q.    Was it your sense, let's take the period of

02:05PM 19   November/December of 2012, that those claims were being handled

02:05PM 20   by the administrator in a timely manner or an untimely manner

02:05PM 21   in your opinion and assessment at that time?

02:05PM 22   A.    Oh, gosh.  I would think that most attorneys would feel

02:05PM 23   that the claims process has certainly evolved over time.  I

02:05PM 24   think claims were very slow and sporadic in the beginning.  I

02:05PM 25   think it's a process.  I mean, it's probably the largest claims

**C O N F I D E N T I A L**

SM-02-JA00475

02:05PM 1   process ever administered in the United States.  And so based

02:05PM 2   upon the complexity of the claims, the number of claims, the

02:05PM 3   number of people affected, it started off really slow.  This is

02:05PM 4   a gargantuan task.  I think it's sped up and it's gotten

02:05PM 5   smoother as you've gone along.

02:05PM 6   Q.    At the time Mr. Sutton went to work for the

02:06PM 7   administration, did you have a conversation with him about the

02:06PM 8   Crown payments and the business relationship that he had with

02:06PM 9   you at that time with respect to Crown?

02:06PM 10  A.    If you don't mind my using a bad word, I was pissed.  I

02:06PM 11  mean, I said to him, "Why are you taking the job?  I got all my

02:06PM 12  cases with BP.  You're a salaried employee.  Did you clear this

02:06PM 13  with Mr. Juneau?  Does he know?"  Because we're here.  We're

02:06PM 14  here now.  Because it just didn't look kosher, you know?

02:06PM 15  Q.    When in point of time did you have this conversation with

02:06PM 16  him?

02:06PM 17  A.    The first day he told me that he took the -- he took the

02:06PM 18  job with, I guess the claims administration office.

02:06PM 19  Q.    You raised this concern with him?

02:06PM 20  A.    The second I heard it.

02:06PM 21  Q.    Did you also raise the concern with Mr. Andry?

02:06PM 22  A.    I think I was upset, and I may have voiced my opinion that

02:06PM 23  I felt "Tiger" was somewhat of a moron for taking the job.

02:06PM 24  Q.    To Jon Andry?

02:07PM 25  A.    I may have said it, and if I didn't, I certainly thought

**C O N F I D E N T I A L**

02:07PM 1    it.

02:07PM 2    Q.    But you don't recall having a specific conversation about

02:07PM 3    that with Jon Andry?

02:07PM 4    A.    I couldn't -- I can't recall.  I just can't recall.

02:07PM 5    Obviously I don't think either one of us would have been that

02:07PM 6    happy with him taking the job.

02:07PM 7    Q.    But you never had that conversation?

02:07PM 8    A.    I can't recall.

02:07PM 9    Q.    You said that when you were *pissed*, quote, unquote, you

02:07PM 10   asked Mr. Sutton if he had cleared his employment with his

02:07PM 11   boss, Mr. Juneau?

02:07PM 12   A.    Sir, yes, sir.  In fact, when he told me that Christine

02:07PM 13   took her job, I -- the first thing I said to him, "Did you tell

02:07PM 14   him?", because even with him being her husband -- I mean, yeah,

02:07PM 15   with him being her husband, the look of potential impropriety

02:07PM 16   with he and I being partners in Crown, I said, "Did you guys

02:07PM 17   tell Mr. Juneau about our involvement?"

02:07PM 18            He said, "We disclosed all of our business."

02:08PM 19            I'm only as good as what he's told me.

02:08PM 20   Q.    In addition to your testimony that he told you that he

02:08PM 21   disclosed all of his business, you understood that to be a

02:08PM 22   reference to a disclosure by him to Mr. Juneau?

02:08PM 23   A.    Sir, yes, sir.

02:08PM 24   Q.    Did you understand that to be also a reference to the

02:08PM 25   Crown relationship that you had --

**C O N F I D E N T I A L**

SM-02-JA00477

02:08PM 1    A.    I was very specific about Crown.

02:08PM 2    Q.    So no ambiguity about the question you asked him?

02:08PM 3    A.    No, sir.  I was very specific about Crown.  "Did you tell

02:08PM 4    him about Crown?"

02:08PM 5    Q.    And his response was?

02:08PM 6    A.    "Yes, sir."

02:08PM 7    Q.    Did you ask him if he had it in writing?

02:08PM 8    A.    I didn't, no.  I don't believe I did.

02:08PM 9    Q.    Did you ever think, as you were angry or upset about this,

02:08PM 10   that you should make a disclosure of your own to the claims

02:08PM 11   administrator?

02:08PM 12   A.    No, sir.  This has been my friend for 25 years at the

02:09PM 13   time, probably would have been 21 years -- I mean, 24 years one

02:09PM 14   year ago.  I mean, I had no reason to not believe anything he

02:09PM 15   would say to me.  I had never known him to be disingenuous or

02:09PM 16   not to be truthful.

02:09PM 17   Q.    I wasn't asking you if you thought he was truthful.  My

02:09PM 18   question, I'll rephrase it:  Did you think you had an

02:09PM 19   obligation as a lawyer, a member and a principal of

02:09PM 20   Andry Lerner to make your own disclosure to the administrator

02:09PM 21   that you had the Crown relationship now with one of his

02:09PM 22   employees?

02:09PM 23   A.    No, I would have never even thought of that, no, sir.

02:09PM 24   Q.    You did not even think of that?

02:09PM 25   A.    No, I would never have thought it.  I would probably have

**C O N F I D E N T I A L**

SM-02-JA00478

02:09PM 1    thought that was overstepping my bounds, I reckon.  If I

02:09PM 2    thought anything at the time, I would have thought that was

02:09PM 3    certainly incumbent upon him to make sure that Mr. Juneau knew

02:09PM 4    of any potential conflicts or anything that he had.

02:09PM 5    Q.    You said you don't recollect, and correct me if I'm

02:09PM 6    misstating your testimony, you don't recollect ever having the

02:09PM 7    discussion about the Crown issue and the potential conflict

02:10PM 8    with Mr. Jon Andry?

02:10PM 9    A.    Oh, I don't -- I said I don't recollect, but that doesn't

02:10PM 10   mean that I didn't.  I'm sure we talked about something that

02:10PM 11   this is ridiculous, you know.  But I can't -- I can't say

02:10PM 12   exactly what was said.  I just don't know when.  It would have

02:10PM 13   been some time after he disclosed that he had a job over there,

02:10PM 14   though.

02:10PM 15   Q.    But now, just to clarify your testimony, and again, I'm

02:10PM 16   not trying to confuse you, but your initial answer was you

02:10PM 17   didn't recollect, then you just said you're sure you spoke

02:10PM 18   about it.

02:10PM 19   A.    Did I just -- (addressing the court reporter) could you

02:10PM 20   repeat what I said, ma'am.  I don't know if I -- I don't know

02:10PM 21   what I said.  Would it be okay if she read back what I just

02:10PM 22   said?

02:10PM 23   Q.    Well, let me just rephrase the question to save some time.

02:10PM 24   As you sit here today, do you recall specifically a

02:10PM 25   conversation with Mr. Jon Andry about the Crown issue as it

**C O N F I D E N T I A L**

SM-02-JA00479

02:10PM 1  occurred to you as a problem once you learned that Mr. Sutton

02:10PM 2  went to work for the administrator?

02:10PM 3  A.   I can't recall.  It very well may have.  I just can't

02:11PM 4  recall.  I can't imagine that something wasn't said about it.

02:11PM 5  I just can't recall when or what was said.

02:11PM 6  Q.   So as it's your belief you did have a conversation with

02:11PM 7  him but --

02:11PM 8  A.   I can't --

02:11PM 9  Q.   -- you can't -- you have to wait until I finish the

02:11PM 10  question.

02:11PM 11       Is it your testimony that you would have had that

02:11PM 12  conversation with him but you don't recall it, or you don't

02:11PM 13  recall whether you had a conversation with him at all?

02:11PM 14  A.   I may have had a conversation.  I just don't recall it.

02:11PM 15  Q.   You didn't think as a principal of Andry Lerner you had

02:11PM 16  any individual responsibility to make your own disclosure to

02:11PM 17  the administrator?

02:11PM 18  A.   No, sir.  It wouldn't have occurred to me to do so, no,

02:11PM 19  sir.

02:11PM 20  Q.   Let me ask a few more questions about Jon Andry in respect

02:11PM 21  to this issue.  The payment of referral fees or monies to

02:11PM 22  Mr. Sutton, not with respect to Crown but with respect to the

02:12PM 23  *Casey Thonn* case.

02:12PM 24       The question is the following:  Did there come a

02:12PM 25  point when Mr. Jon Andry and you agreed that you would not pay

**C O N F I D E N T I A L**

SM-02-JA00480

02:12PM 1   any retainer fee to Mr. Sutton in regard to the *Casey Thonn*

02:12PM 2   matter?

02:12PM 3   A.    Retainer fee or referral fee?

02:12PM 4   Q.    Either one.  Any payment in regard to the *Casey Thonn*

02:12PM 5   case?

02:12PM 6   A.    I can't -- gosh, I don't recall a conversation to that

02:12PM 7   effect because we did pay him.  So I can't imagine --

02:12PM 8   Q.    Go ahead.  I'm sorry.

02:12PM 9   A.    I can't imagine that we would agree not to pay him and

02:12PM 10  then I paid him.

02:12PM 11  Q.    Had Jon Andry told you not to make that payment, would you

02:12PM 12  have agreed with that?

02:12PM 13  A.    No, sir.  I believe that, you know, if I gave my word on

02:13PM 14  something, and "Tiger" gave me his word that it was okay for

02:13PM 15  him to receive it, I had no reason not to believe "Tiger."  I

02:13PM 16  had no reason not to believe that they had done a substantial

02:13PM 17  amount of work on it, so I was comfortable with it.  And so if

02:13PM 18  I gave him my word that I would pay him a fee, I would pay him

02:13PM 19  a fee if it came from my own money.

02:13PM 20  Q.    Did you advise at any point Mr. Jon Andry that you were

02:13PM 21  making the fee payments to Mr. Sutton in regard to the

02:13PM 22  *Casey Thonn* case?

02:13PM 23  A.    I'm sure he knew that I was paying, yes, sir.

02:13PM 24  Q.    How are you sure that he knew?

02:13PM 25  A.    Either I told him I was going to pay it, irregardless

**C O N F I D E N T I A L**

SM-02-JA00481

02:13PM 1    or -- or I just did.  I don't really recall.

02:13PM 2    Q.   Is it your understanding or belief as you sit here today

02:13PM 3    that you made those payments over his specific objection?

02:13PM 4    A.   I guess.  It's quite possible.  I can't say for sure.  I

02:13PM 5    don't really know.  I can't recall what Jon and I spoke about.

02:14PM 6    I just think he was -- he wasn't comfortable.

02:14PM 7    Q.   Well, did he object to you making the payments?

02:14PM 8    A.   He objected to him being involved in the payment being

02:14PM 9    made.  I don't -- I can't speak for what he wanted me to do.

02:14PM 10   But he was Pontius Pilot (indicating):  I'm washing my hands of

02:14PM 11   this.  You do what you want.  I'll take my end of the fee, but

02:14PM 12   I'm not going to pay him; I'm going to keep my word.

02:14PM 13   Q.   So he never requested you or told you or directed you in

02:14PM 14   any way not to make the payments yourself to Mr. Sutton?

02:14PM 15   A.   I can't say that he did or he didn't.  I can't really

02:14PM 16   recall.  I know he didn't want to be involved in it.  He was

02:14PM 17   washing his hands of it, but I can't say exactly what he said,

02:14PM 18   so I don't want to put words in his mouth and I don't want you

02:14PM 19   putting words in my mouth either, with all due respect.

02:14PM 20   Q.   We're not trying to do that.  Had he objected specifically

02:14PM 21   to you making the payments, is it your belief that you would

02:14PM 22   have not made the payments?

02:14PM 23   A.   No, I would have, as long as I didn't think I was doing

02:14PM 24   anything wrong, I was going to make the payments.  I said I

02:15PM 25   would make the payment.  I had no reason to believe there was

**C O N F I D E N T I A L**

SM-02-JA00482

02:15PM 1    any issue with it.  "Tiger" had told me he had disclosed it to

02:15PM 2    Mr. Juneau.  To my knowledge there was no conflict, you know.

02:15PM 3    Obviously we're here now, but at the same time, if I gave my

02:15PM 4    word on it, that's it.

02:15PM 5    Q.    Do you want to take a short break?

02:15PM 6          (WHEREUPON, at this point in the proceedings, a brief

02:23PM 7    recess was taken.)

02:23PM 8                          EXAMINATION

02:23PM 9    BY MR. FREEH:

02:23PM 10   Q.    We're back on the record.  We took a short break.

02:23PM 11         Mr. Lerner, let me go back again, just to clarify a

02:24PM 12   few things, with respect to your conversations, any

02:24PM 13   conversations by you and Jon Andry regarding the issue of any

02:24PM 14   payments to Mr. Sutton regarding the *Casey Thonn* case.  Do you

02:24PM 15   understand?

02:24PM 16   A.    Sir, yes, sir.

02:24PM 17   Q.    Thank you.  As best you recall, you told us about a

02:24PM 18   conversation and there were concerns expressed by Mr. Andry

02:24PM 19   about the propriety of paying that fee once Mr. Sutton went to

02:24PM 20   work for the administrator.  Do you recall that conversation?

02:24PM 21   A.    Sir, yes, sir.

02:24PM 22   Q.    Do you recall any other conversations with him on that

02:24PM 23   subject matter at any time including up to today?

02:24PM 24   A.    I don't recall any, but they very well may have occurred

02:24PM 25   and I think he certainly had his opinion on it as I stated.

**C O N F I D E N T I A L**

SM-02-JA00483

60

02:25PM 1   Q.   Was this an issue that you recall recurring in
02:25PM 2   conversations on a regular basis or on intervals with
02:25PM 3   Mr. Andry?
02:25PM 4   A.   I can't recall, no, sir.  I just -- I'm sure the only time
02:25PM 5   that I really recall it would have been at the time of the
02:25PM 6   initial payment when that -- the issue first came up.
02:25PM 7   Q.   With respect to the payments to Mr. Sutton, so I
02:25PM 8   understand how they were made and what they represented, is it
02:25PM 9   your understanding that on the *Casey Thonn* case, the
02:25PM 10  administrator would make a payment to the Andry Lerner Law Firm
02:25PM 11  of some amount?
02:25PM 12  A.   Sir, yes, sir.
02:25PM 13  Q.   What would happen to that payment once it reached the
02:25PM 14  Andry Lerner firm as far as you understand?
02:26PM 15  A.   I suppose it was disbursed according to whatever
02:26PM 16  percentage was owed the client, whatever percentage was owed
02:26PM 17  the firm.
02:26PM 18  Q.   The *Casey Thonn* case was a case that you originated,
02:26PM 19  correct?
02:26PM 20  A.   Sir, yes, sir.
02:26PM 21  Q.   What was your understanding as to the fees you would be
02:26PM 22  entitled for a case that you originated at Andry Lerner?
02:26PM 23  A.   It would have been 50 percent.
02:26PM 24  Q.   50 percent of the fee?
02:26PM 25  A.   If there were no other referrals attached to it.

**C O N F I D E N T I A L**

SM-02-JA00484

| | | |
|---|---|---|
| 02:26PM | 1 | Q.   Where would the other 50 percent go? |
| 02:26PM | 2 | A.   To Jon Andry. |
| 02:26PM | 3 | Q.   So on the *Casey Thonn* case, is it your understanding that |
| 02:26PM | 4 | 50 percent of the fee went to Andry Lerner and 50 percent went |
| 02:26PM | 5 | to you? |
| 02:26PM | 6 | A.   No, sir.  My understanding now is that -- no, sir. |
| 02:26PM | 7 | Q.   What's your understanding? |
| 02:26PM | 8 | A.   As I look at the checks and everything, I think, to the |
| 02:26PM | 9 | best of my knowledge, 50 percent, because I guess that's what I |
| 02:27PM | 10 | subsequently have come to know that was Mr. Sutton's agreement, |
| 02:27PM | 11 | he got -- the 50 percent was paid to me and then paid to |
| 02:27PM | 12 | Mr. Sutton. |
| 02:27PM | 13 | Q.   You didn't receive any portion of that? |
| 02:27PM | 14 | A.   No, sir.  The money came to my firm and it went right out |
| 02:27PM | 15 | to Mr. Sutton. |
| 02:27PM | 16 | Q.   Now, when you say that was *his agreement*, you're referring |
| 02:27PM | 17 | to Mr. Sutton? |
| 02:27PM | 18 | A.   I believe so, with my office. |
| 02:27PM | 19 | Q.   Who in your office did he make that agreement with? |
| 02:27PM | 20 | A.   I don't know.  I just sent the case over there.  I told |
| 02:27PM | 21 | him to contact the office.  That was it. |
| 02:27PM | 22 | Q.   Did he make the agreement with you in terms of the |
| 02:27PM | 23 | percentage? |
| 02:27PM | 24 | A.   Oh, no, sir. |
| 02:27PM | 25 | Q.   Did he make it with Jon Andry? |

**C O N F I D E N T I A L**

SM-02-JA00485

—

02:27PM 1    A.   I don't know.

02:27PM 2    Q.   You don't know who if anyone he made it with in your

02:27PM 3    office?

02:27PM 4    A.   No, sir.

02:27PM 5    Q.   Did you look to see if there was any record or agreement

02:27PM 6    or writing that somehow reflected what that agreement was?

02:27PM 7    A.   Could you give me a timeframe.  Was that since this has

02:27PM 8    happened --

02:27PM 9    Q.   In the last few months.

02:28PM 10    A.   I haven't really checked into it, no, sir.

02:28PM 11         MR. DOLAN:  Who in your office would have been

02:28PM 12    responsible for writing the agreements?

02:28PM 13         THE WITNESS:  You would probably have to ask either

02:28PM 14    Jon or maybe Chris Mancuso.  I don't know.  I just referred --

02:28PM 15    I mean, like I told you, it was a 15- to 30-second conversation

02:28PM 16    in the car.  I said, "Just contact the office; send the case

02:28PM 17    over."

02:28PM 18         MR. DOLAN:  Can you estimate the date that that

02:28PM 19    happened.

02:28PM 20         THE WITNESS:  Gosh, I couldn't tell you.  I reckon it

02:28PM 21    would have been some time prior to him joining the

02:28PM 22    administrator's office but I can't say for sure the exact date.

02:28PM 23                     EXAMINATION

02:28PM 24    BY MR. FREEH:

02:28PM 25    Q.   If I represent to you that he joined the administrative

**C O N F I D E N T I A L**

63

| | |
|---|---|
| 02:28PM 1 | office on or about November of 2012, it would be your |
| 02:28PM 2 | recollection that that conversation preceded that date? |
| 02:28PM 3 | A.   I would think so.  I would think so.  I don't -- I don't |
| 02:28PM 4 | know.  I can't recall. |
| 02:28PM 5 | Q.   Is it possible it was a conversation that took place after |
| 02:29PM 6 | he had already started his work there? |
| 02:29PM 7 | A.   I can't say off the top of my head. |
| 02:29PM 8 | Q.   Have you looked to see whether there is any writing or |
| 02:29PM 9 | e-mail or anything else that refreshes your recollection as to |
| 02:29PM 10 | when that conversation took place? |
| 02:29PM 11 | A.   No, sir. |
| 02:29PM 12 | Q.   Other than the e-mails that we both referred to, which |
| 02:29PM 13 | I'll show you in a moment, did you have, to the best of your |
| 02:29PM 14 | recollection, other conversations or communications with |
| 02:29PM 15 | Mr. Sutton about the fee and the payment of the fee? |
| 02:29PM 16 | A.   Not -- not that I really recall.  I think I just, we saw |
| 02:29PM 17 | the e-mails, and that was about it.  I don't know much else |
| 02:29PM 18 | about it. |
| 02:29PM 19 | Q.   And your best recollection is you had only one |
| 02:29PM 20 | conversation with Mr. Jon Andry about it? |
| 02:29PM 21 | A.   Gosh, I can't say for sure, you know.  I couldn't tell you |
| 02:29PM 22 | for sure, Mr. Freeh or Judge Freeh.  Whatever. |
| 02:29PM 23 | Q.   Mr. Freeh is fine. |
| 02:30PM 24 |      To the best of your recollection, when would that |
| 02:30PM 25 | conversation have taken place? |

**C O N F I D E N T I A L**

SM-02-JA00487

| | | |
|---|---|---|
| 02:30PM | 1 | A.   I think we have gone over that, but I believe it was -- it |
| 02:30PM | 2 | would have been at the time I -- to the best of my |
| 02:30PM | 3 | recollection, it would have been before that first payment was |
| 02:30PM | 4 | made, which would have been late -- I think Jon issued a check |
| 02:30PM | 5 | to my office, if I'm not mistaken, late December of 2012. |
| 02:30PM | 6 | Q.   So you associate that conversation with the payment of the |
| 02:30PM | 7 | first fee? |
| 02:30PM | 8 | A.   Yes, sir.  I would -- I can't imagine that if this, you |
| 02:30PM | 9 | know, we had this conversation, which I'm sure we had had |
| 02:30PM | 10 | something to that effect because I know he wasn't comfortable |
| 02:30PM | 11 | paying "Tiger" for whatever reason, the potential perception of |
| 02:30PM | 12 | the payment or the fact that it was "Tiger."  But I can't |
| 02:30PM | 13 | imagine that that conversation wouldn't have occurred prior to |
| 02:30PM | 14 | him issuing the check to me and basically, I'm washing my |
| 02:30PM | 15 | hands; you do what you want with the money.  That's what it |
| 02:30PM | 16 | really came down to.  You do what you want with the money. |
| 02:31PM | 17 | Q.   Is it fair to say that you, as a lawyer, did not represent |
| 02:31PM | 18 | Casey Thonn? |
| 02:31PM | 19 | A.   I never met him.  I couldn't -- if he was in this room, I |
| 02:31PM | 20 | wouldn't know who he was.  My firm represented him, so I don't |
| 02:31PM | 21 | know if that's fair to say I didn't represent him, but I'm not |
| 02:31PM | 22 | a licensed lawyer in Louisiana, so I don't think I could hold |
| 02:31PM | 23 | myself out as being his attorney. |
| 02:31PM | 24 | Q.   Would you refer to him as *your client*? |
| 02:31PM | 25 | A.   Only insofar as he was a client of Andry Lerner and I am a |

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 02:31PM | 1 | partner in Andry Lerner, yes, sir. |
| 02:31PM | 2 | Q.    With respect to Lerner Andry, do you know what lawyer |
| 02:31PM | 3 | handled his case or did any work on behalf of this case? |
| 02:31PM | 4 | A.    No, sir, as I stated before, my understanding -- most of |
| 02:31PM | 5 | the cases, when they first came in, were Chris Mancuso, but I |
| 02:31PM | 6 | can't say for sure.  That would be -- just be my guess. |
| 02:31PM | 7 | Q.    So when this matter became public, meaning the matter that |
| 02:31PM | 8 | led to my appointment, did you have any interest or ask any |
| 02:31PM | 9 | questions about who in your law firm did the actual |
| 02:32PM | 10 | representation in this case? |
| 02:32PM | 11 | A.    No, sir. |
| 02:32PM | 12 | Q.    Were you not interested in that? |
| 02:32PM | 13 | A.    The cat was out of the bag.  I mean, there wasn't nothing |
| 02:32PM | 14 | I could doing to change the fact that we had accepted the case |
| 02:32PM | 15 | and that "Tiger" had been paid on the case. |
| 02:32PM | 16 | Q.    Did you not want to identify and speak to the lawyer who |
| 02:32PM | 17 | was actually handling the case in your firm? |
| 02:32PM | 18 | A.    I don't think that would be appropriate to talk to anybody |
| 02:32PM | 19 | once this investigation started.  I haven't wanted to really |
| 02:32PM | 20 | speak to anybody about anything substantive.  I never wanted to |
| 02:32PM | 21 | look like I was ever trying to tell anybody what to do or what |
| 02:32PM | 22 | to say.  So until the investigation is over, I wouldn't talk to |
| 02:32PM | 23 | anybody about it, really. |
| 02:32PM | 24 | Q.    So your testimony is you didn't talk to a lawyer in your |
| 02:32PM | 25 | case or try to identify -- strike that. |

**C O N F I D E N T I A L**

SM-02-JA00489

02:32PM 1      You didn't seek to identify the lawyer in your firm

02:32PM 2 who was handling this case because it had become a public

02:32PM 3 matter?

02:33PM 4 A.    To the best of my knowledge, no, sir.  I mean, I don't

02:33PM 5 think I ever spoke -- the only one I would have ever thought it

02:33PM 6 would be, Chris Mancuso, and I don't think I spoke to her about

02:33PM 7 it.

02:33PM 8 Q.    That's not the question.  Was your reason for not looking

02:33PM 9 for and identifying and speaking to the lawyer who handled this

02:33PM 10 case in your firm, your concern about the fact that it was now

02:33PM 11 a public matter?

02:33PM 12 A.    I don't understand your question.

02:33PM 13 Q.    Well, that was your answer.  Let me rephrase it for you.

02:33PM 14      You said that you did not make any efforts, once this

02:33PM 15 case became publicized, you did not make any efforts to

02:33PM 16 identify the lawyer in your law firm who handled the case,

02:33PM 17 correct?

02:33PM 18 A.    I believe so, yes, sir.

02:33PM 19 Q.    You said, as you sit here today, you still don't know what

02:33PM 20 lawyer in your law firm handled this case?

02:33PM 21 A.    I think I said that if I were to venture a guess, I would

02:33PM 22 think Chris Mancuso, but I can't say for sure.

02:33PM 23 Q.    I'm not asking you to guess.  I'm saying --

02:33PM 24 A.    Okay, then I don't know.

02:33PM 25 Q.    And you made no effort to find out?

**C O N F I D E N T I A L**

SM-02-JA00490

02:34PM 1   A.   No, sir.

02:34PM 2   Q.   Why did you make no effort to find out?

02:34PM 3   A.   I didn't see any reason to.

02:34PM 4        MR. DOLAN:  Did you have any discussions with

02:34PM 5   Christine Reitano with regards to the referral of the *Thonn*

02:34PM 6   case?

02:34PM 7        THE WITNESS:  Oh, gosh.  I can't -- I think I've only

02:34PM 8   seen Chris, I believe I said one time since -- one time since

02:34PM 9   probably October or November, and I don't believe so.  I can't

02:34PM 10  recall off the top of my head, but I didn't even know that it

02:34PM 11  was Chris' referral.  I've subsequently come to know that, I

02:34PM 12  guess, it was Christine's case.

02:34PM 13       MR. DOLAN:  How did you learn that it was Christine's

02:34PM 14  case?

02:34PM 15       THE WITNESS:  I think through either, I think -- I'm

02:34PM 16  not even sure how I came to learn about it.  I think it came

02:34PM 17  either through the lawyers or something to learn about it.

02:34PM 18                        EXAMINATION

02:34PM 19  BY MR. FREEH:

02:34PM 20  Q.   In a recent timeframe?

02:34PM 21  A.   Yes, sir.

02:34PM 22  Q.   So in other words, after this case became public?

02:34PM 23  A.   Yes, sir.  Yes, sir.  Yes, sir.

02:34PM 24       MS. HARDIN:  And to the extent that he talked to us,

02:35PM 25  that's an attorney-client privilege.

**C O N F I D E N T I A L**

SM-02-JA00491

| | | |
|---|---|---|
| 02:35PM | 1 | MR. FREEH:  We didn't ask him that. |
| 02:35PM | 2 | MS. HARDIN:  I understand.  He said, "through the |
| 02:35PM | 3 | lawyers".  I just don't want it going any further. |
| 02:35PM | 4 | MR. DOLAN:  Do you recognize the name Leslie Tate? |
| 02:35PM | 5 | THE WITNESS:  Yes, sir.  I believe she used to work |
| 02:35PM | 6 | in Jon's office.  I don't know what she did primarily.  I think |
| 02:35PM | 7 | she was handling claims and stuff over there. |
| 02:35PM | 8 | MR. DOLAN:  Would you have had any conversation with |
| 02:35PM | 9 | her in regards to claims? |
| 02:35PM | 10 | THE WITNESS:  Maybe just the big picture of claims, |
| 02:35PM | 11 | but a specific claim, no, sir.  I don't know the name of any |
| 02:35PM | 12 | clients. |
| 02:35PM | 13 | EXAMINATION |
| 02:35PM | 14 | BY MR. FREEH: |
| 02:35PM | 15 | Q.   Do you know Patrick Juneau? |
| 02:35PM | 16 | A.   No, sir, I've never met him to the best of my knowledge. |
| 02:35PM | 17 | Q.   Have you met, during the course of your work in the |
| 02:35PM | 18 | BP-related claims or in the course of your association with |
| 02:35PM | 19 | firms that are working on the BP-related claims, have you met |
| 02:36PM | 20 | or spoken with anybody in the claims administration office? |
| 02:36PM | 21 | A.   Sir, no, sir. |
| 02:36PM | 22 | Q.   What about Mr. Sutton? |
| 02:36PM | 23 | A.   I'm not sure what you're asking me. |
| 02:36PM | 24 | Q.   Well, there came a time when Mr. Sutton became an employee |
| 02:36PM | 25 | of the claims administration office, correct? |

**C O N F I D E N T I A L**

SM-02-JA00492

02:36PM 1    A.    Sir, yes, sir.

02:36PM 2    Q.    Did you speak to him after he went to work there?

02:36PM 3    A.    Of course.  We were partners in Crown.

02:36PM 4    Q.    Did you ever talk to him about the claims that were before

02:36PM 5    the claims administrator office?

02:36PM 6    A.    I think there was some conversations but nothing -- no

02:36PM 7    specific names of cases or anything.  I wouldn't know the

02:36PM 8    cases.

02:36PM 9    Q.    Tell us about some conversations that you recall.

02:36PM 10   A.    Oh, gosh, I can't recall, but I think most of it was, Why

02:36PM 11   is this taking so long?

02:36PM 12   Q.    Do you recall ever speaking to him about a specific claim?

02:37PM 13   A.    I wouldn't have known the name of any claims.  I think he

02:37PM 14   sent me an e-mail once with the name of one of our claims,

02:37PM 15   which was probably the first time I would have ever known the

02:37PM 16   name of the claim, I think.

02:37PM 17   Q.    Having looked at the e-mails, what claim are you thinking

02:37PM 18   of or referring to?

02:37PM 19   A.    It was called Talen or Talen's.

02:37PM 20   Q.    Do you recall speaking to him about that claim?

02:37PM 21   A.    Oh, no.  I've never -- I've never mentioned anything about

02:37PM 22   a specific claim, I don't believe.

02:37PM 23   Q.    How many times did you have -- how many different times

02:37PM 24   did you have any conversation with Mr. Sutton after he went to

02:37PM 25   work for the claims administrator about his work there or

**C O N F I D E N T I A L**

SM-02-JA00493

02:37PM 1    matters or cases before the administrator, as best you recall?

02:37PM 2    A.    Gosh.  I don't even know if there were really many

02:37PM 3    telephone calls where it wasn't just -- it may have come up in

02:37PM 4    two seconds of passing when we're talking about Crown or the

02:37PM 5    kids.  You know, our kids are really close, aside from that.  I

02:38PM 6    never really spoke to him about any cases that wasn't -- I

02:38PM 7    didn't know anything about the whole process, really.  I

02:38PM 8    just -- my only concern was is it going to keep moving.  That

02:38PM 9    was it.

02:38PM 10   Q.    What, if anything, did he say to you in response to any of

02:38PM 11   those conversations?

02:38PM 12   A.    Well, one time, I think he either sent me one or two

02:38PM 13   e-mails, which I'm sure you probably have, they were

02:38PM 14   unsolicited e-mails when I just -- I think one e-mail I said,

02:38PM 15   "This BP thing, this is insane," or whatever, and he spelled

02:38PM 16   out the status of our cases.

02:38PM 17   Q.    So when you say *unsolicited*, you mean that you didn't

02:38PM 18   request the information?

02:38PM 19   A.    Oh, no, sir.  But at the same time, I don't believe the

02:38PM 20   information that he divulged was anything that gave us a

02:38PM 21   competitive advantage or something that he wouldn't give to

02:38PM 22   other firms.

02:38PM 23   Q.    But he did, in fact, give you information about the

02:38PM 24   claims?

02:38PM 25   A.    Status of our claims.  No specific claims, just, You have

**C O N F I D E N T I A L**

SM-02-JA00494

02:38PM 1    this many claims have been processed, this many claims that are
02:38PM 2    missing things.  And I specifically asked him -- first I think
02:39PM 3    I asked him if it was okay to send that to my office
02:39PM 4    administrator, and he said yes.
02:39PM 5    Q.    Why did you ask him that?
02:39PM 6    A.    Because I wanted to make sure it was appropriate to share
02:39PM 7    with anybody.  I didn't know if that was appropriate or not.
02:39PM 8    The information.
02:39PM 9    Q.    Did you ever ask Mr. Jon Andry to inquire about any
02:39PM 10   specific claims before the administrator?
02:39PM 11   A.    I don't think I could.  I didn't know anybody's names.
02:39PM 12   Q.    Did you ever ask him generally to check on the progress or
02:39PM 13   delays, if there may have been in your mind delays, with
02:39PM 14   respect to the BP claims that the Andry Lerner firm was
02:39PM 15   handling?
02:39PM 16   A.    Oh, gosh.  I don't recall that I specifically asked him.
02:39PM 17   I would think that would be on his -- that would be on his
02:39PM 18   plate as a regular thing.
02:39PM 19   Q.    So you don't recall having that type of conversation with
02:39PM 20   him?
02:39PM 21   A.    I'm sure we discussed BP on a regular basis, but I don't
02:39PM 22   know if I said, "Find out what's happening with our claims."  I
02:40PM 23   probably just said, What's happening with our claims?
02:40PM 24   Q.    You also went to law school with a Gibby Andry?
02:40PM 25   A.    Yes, sir.

**C O N F I D E N T I A L**

**SM-02-JA00495**

| | | |
|---|---|---|
| 02:40PM | 1 | Q.   He's the brother of Jon? |
| 02:40PM | 2 | A.   Yes, sir. |
| 02:40PM | 3 | Q.   Have you ever done any legal work in connection or |
| 02:40PM | 4 | conjunction with him? |
| 02:40PM | 5 | A.   Sir, yes, sir. |
| 02:40PM | 6 | Q.   Could you tell me about that. |
| 02:40PM | 7 | A.   He was involved with Jon and I on the *Fen-Phen* cases. |
| 02:40PM | 8 | Q.   Again, not in the formal relationship of members of the |
| 02:40PM | 9 | same law firm? |
| 02:40PM | 10 | A.   No, sir.  They associated it. |
| 02:40PM | 11 | Q.   You're familiar with his association with an entity called |
| 02:40PM | 12 | *The Andry Law Firm*? |
| 02:40PM | 13 | A.   I believe in the past, yes, sir. |
| 02:40PM | 14 | Q.   What's your understanding as to where he works at this |
| 02:40PM | 15 | time? |
| 02:40PM | 16 | A.   I believe he has his own firm now and Jon has his own |
| 02:40PM | 17 | firm. |
| 02:40PM | 18 | Q.   Separate firms? |
| 02:40PM | 19 | A.   Sir, yes, sir. |
| 02:40PM | 20 | Q.   Do you know what the reason is for that? |
| 02:40PM | 21 | A.   Yes.  Probably a falling out my guess is. |
| 02:40PM | 22 | Q.   You say *probably*.  Do you know if there was a falling out? |
| 02:41PM | 23 | A.   I believe there was a falling out, yes, sir. |
| 02:41PM | 24 | Q.   Did you learn that from one of the Andry brothers? |
| 02:41PM | 25 | A.   I think the fact that they split up, yes, sir, and the |

**C O N F I D E N T I A L**

SM-02-JA00496

02:41PM 1   fact that Jon and I are pretty close and he -- whatever -- just

02:41PM 2   they couldn't work together anymore, is my understanding.

02:41PM 3   Q.   Are you familiar with the fact that Gibby Andry has a

02:41PM 4   claim before the administrator?

02:41PM 5   A.   Well, I was familiar with the fact that Jon had a claim

02:41PM 6   before the administrator, but I believe my understanding it was

02:41PM 7   for The Andry Law Firm.

02:41PM 8   Q.   What was your understanding regarding the nature of that

02:41PM 9   claim?

02:41PM 10  A.   I don't know.  Just a law firm claim and it was a

02:41PM 11  substantial claim.

02:41PM 12  Q.   Did you ever discuss that with Jon Andry?

02:41PM 13  A.   I think he just -- he's the one that discussed it.  I had

02:41PM 14  no part in it.  He just said, "Hey, I got my big claim.  It's

02:41PM 15  going to be paid," blah, blah, blah, blah.  And then when this

02:41PM 16  all happened, obviously that's what made him kind of angry

02:41PM 17  obviously that he was supposed to be paid, I think, on -- if

02:41PM 18  I'm not mistaken, on Wednesday, and this came out on Tuesday.

02:42PM 19  Q.   Did you ever discuss that particular claim with

02:42PM 20  Mr. Sutton?

02:42PM 21  A.   Oh, gosh, no.  Of course not.

02:42PM 22  Q.   What about with Gibby Andry?

02:42PM 23  A.   I think I've seen Gibby Andry once in the last several

02:42PM 24  years.  I saw him at the airport.

02:42PM 25  Q.   No business or substantive discussion that you recall?

**C O N F I D E N T I A L**

SM-02-JA00497

02:42PM 1    A.    Sir, no, sir.

02:42PM 2          MR. DOLAN:  So Jon Andry referred to that Andry Law

02:42PM 3    Firm claim as *his claim*?

02:42PM 4          THE WITNESS:  Sir, yes, sir.  He and his brothers.

02:42PM 5          MR. DOLAN:  With your affiliation with Andry Lerner,

02:42PM 6    you have no financial interest in that?

02:42PM 7          THE WITNESS:  No, sir, none whatsoever.

02:42PM 8                          EXAMINATION

02:42PM 9    BY MR. FREEH:

02:42PM 10   Q.    Did there come a time when you understood there to be a

02:42PM 11   falling out or a disagreement, I think you referred to it

02:42PM 12   before, between Jon Andry and Mr. Sutton?

02:42PM 13   A.    Sir, yes, sir.

02:42PM 14   Q.    Approximately when did you learn or come to understand,

02:42PM 15   approximately, that that was the case?

02:42PM 16   A.    After our *BellSouth* settlement, which was several years

02:43PM 17   ago.  I couldn't tell you.  Three to five, maybe three years

02:43PM 18   ago, four years ago.

02:43PM 19   Q.    You said earlier that you thought the falling out was in

02:43PM 20   connection with the *BellSouth* case?

02:43PM 21   A.    Sir, yes, sir.

02:43PM 22   Q.    What was your understanding about that?

02:43PM 23   A.    "Tiger" felt that Jon owed him another $50,000, I think,

02:43PM 24   out of the settlement.  And he just felt that he had taken the

02:43PM 25   short end of the stick too many times with Jon in the past and

**C O N F I D E N T I A L**

SM-02-JA00498

02:43PM 1   he was done.

02:43PM 2   Q.   Did Jon Andry express that to you directly?

02:43PM 3   A.   "Tiger" Sutton or Jon Andry?

02:43PM 4   Q.   Jon Andry?

02:43PM 5   A.   That was what "Tiger" represented to me, and I guess, I'm

02:43PM 6   not really sure.  I guess Jon's side of the story was something

02:43PM 7   different.  I can't recall.  But I was just in the middle.

02:43PM 8   Q.   You specifically recall talking about that with

02:43PM 9   Mr. Sutton?

02:43PM 10   A.   Sure.  I've talked about it with Jon.  I can't really

02:43PM 11   recall what each one of them said.  I just know that they were

02:43PM 12   hurt.  They were friends and they were like brothers, those

02:43PM 13   two.  They were very close and they haven't been for years now.

02:44PM 14   Q.   Did you make any efforts to try to breach that gap and try

02:44PM 15   to bring them back together?

02:44PM 16   A.   Sir, yes, sir.  On numerous occasions I think I tried to

02:44PM 17   get them to have lunch together, maybe nine months, ten months

02:44PM 18   ago, maybe a year ago, I can't say exactly when.

02:44PM 19   Q.   What, if anything, did you do in terms of arranging a

02:44PM 20   meeting or trying to bring them back together?

02:44PM 21   A.   I just asked "Tiger" to come to lunch with us.  It would

02:44PM 22   mean a lot to me.  I mean, I care about them both a lot.  No

02:44PM 23   matter what's happened.  They are both good friends of mine and

02:44PM 24   I care about them and their families a lot.  I just thought it

02:44PM 25   was a shame to throw away a relationship that had gone that

**C O N F I D E N T I A L**

SM-02-JA00499

02:44PM 1    long over money.

02:44PM 2    Q.    To your knowledge, did the relationship get any better or

02:44PM 3    change in any way after that meeting?

02:44PM 4    A.    I think "Tiger" was hoping it would.  I don't know.  I

02:44PM 5    really can't say.  I feel like Jon -- I don't really know.  I

02:44PM 6    don't believe they -- certainly not what's come up now.  I

02:44PM 7    think that relationship is now done for good.

02:45PM 8    Q.    Did you have discussions with Mr. Sutton from time to time

02:45PM 9    about starting another legal enterprise here with regard to

02:45PM 10   personal injury cases?

02:45PM 11   A.    We discussed it, yes, sir.

02:45PM 12   Q.    For how long or over what period of time did you have

02:45PM 13   those discussions?

02:45PM 14   A.    I couldn't tell you.  We might have talked about it a year

02:45PM 15   and a half or two years ago.  Right around the time we were

02:45PM 16   going to start Andry Lerner.  And, you know, my ultimate goal

02:45PM 17   would have had "Tiger" involved with us.  That's one of the

02:45PM 18   reasons I wanted them back together.

02:45PM 19           I think "Tiger" is a very good lawyer.  He has a lot

02:45PM 20   of people that really like him, and I was hoping to get them

02:45PM 21   back together, but just as friends, too.  And when it just

02:45PM 22   didn't appear that was going to happen, I just kind of let it

02:45PM 23   go.

02:45PM 24   Q.    Did Mr. Sutton ever tell you how Christine, who you knew,

02:45PM 25   his wife, came to work for the claims administrator?

**C O N F I D E N T I A L**

SM-02-JA00500

02:45PM 1    A.    Not really, no, sir.  I'm not really sure how she came to

02:46PM 2    work for the claims administrator.

02:46PM 3    Q.    Did he ever tell you how he came to work for the claims

02:46PM 4    administrator?

02:46PM 5    A.    He just told me he was working for them.  Or he was taking

02:46PM 6    a job, not working for them.  I think he was taking the job.

02:46PM 7    That was it.  Kind of like a bombshell.

02:46PM 8    Q.    Did he ever ask your opinion about whether he should work

02:46PM 9    for the claims administrator or not?

02:46PM 10   A.    I think he would have known what my opinion was, but no,

02:46PM 11   sir, he didn't ask my opinion.

02:46PM 12   Q.    So when you learned it from him, he was advising you at

02:46PM 13   that point that he was taking the job or was accepting the job

02:46PM 14   or about to start the job?

02:46PM 15   A.    Sir, yes, sir.

02:46PM 16   Q.    That's when you expressed what have you described before

02:46PM 17   as *your concerns* which you related to him at that time?

02:46PM 18   A.    Yes, sir.

02:46PM 19   Q.    Did you, beyond that initial conversation or beyond that

02:46PM 20   conversation, have a subsequent discussion with Mr. Sutton

02:46PM 21   where you repeated those concerns, if you recall?

02:47PM 22   A.    I can't recall.  I don't know.  But I think he knew I

02:47PM 23   wasn't happy with his decision.  But he's a 50- or 51-year-old

02:47PM 24   man, or 52, I don't know.  I'm not his father.  I can't --

02:47PM 25   obviously for me it was just jeopardizing businesses I had put

**C O N F I D E N T I A L**

SM-02-JA00501

02:47PM 1    into effect, and I wasn't comfortable with it.

02:47PM 2    Q.    Did I understand you to say before that when you first

02:47PM 3    learned that Christine was going to work for the administrator

02:47PM 4    that also caused you a concern?

02:47PM 5    A.    Sir, yes, sir.

02:47PM 6    Q.    So these were two separate facts that you learned at two

02:47PM 7    different times that caused you the same concern?

02:47PM 8    A.    Sure.

02:47PM 9    Q.    And the concern was whether or not there would be created

02:47PM 10   a conflict because of the Andry Lerner cases?

02:47PM 11   A.    A conflict because of the Andry Lerner cases but a

02:47PM 12   conflict obviously as well because of him being on salary with

02:47PM 13   Crown and our involvement as business partners.

02:47PM 14   Q.    So two bases for your concerns?

02:47PM 15   A.    Yes, sir, of course.

02:47PM 16   Q.    Is it your understanding that Christine went to work for

02:47PM 17   the administrator before Mr. Sutton?

02:48PM 18   A.    Yes, sir.

02:48PM 19   Q.    Christine meaning Reitano?

02:48PM 20   A.    Yes.

02:48PM 21   Q.    Do you know about when that was or about how long before

02:48PM 22   he went to work there?

02:48PM 23   A.    I can't recall exactly.  If I were to guess, I would say

02:48PM 24   roughly two years ago.  I may be off by a year.

02:48PM 25   Q.    Referring now to Christine Reitano?

**C O N F I D E N T I A L**

SM-02-JA00502

02:48PM 1  A.    Sir, yes, sir.

02:48PM 2           MR. DOLAN:  In the conversation in the Suburban, is

02:48PM 3  that when he informed you that he was going to go to work for

02:48PM 4  the --

02:48PM 5           THE WITNESS:  No, sir, I think he had just told me

02:48PM 6  about that a little bit before, maybe in his office, I can't

02:48PM 7  recall exactly when.

02:48PM 8           MR. DOLAN:  But then you were upset because of the

02:48PM 9  creation of this conflict?

02:48PM 10           THE WITNESS:  Sir, yes, sir.

02:48PM 11           MR. DOLAN:  But then after that, in the Suburban you

02:48PM 12  agreed to take one of his cases?

02:48PM 13           THE WITNESS:  Yes, sir.

02:48PM 14           MR. DOLAN:  Did you see that as a potential conflict?

02:48PM 15           THE WITNESS:  We had enough conflicts now.  I had my

02:49PM 16  *BP* cases, we had the Crown salary payments and us being

02:49PM 17  partners in Crown, and we had a referral now of a case I didn't

02:49PM 18  see a big issue.  That was the least of my concerns.  A

02:49PM 19  referral on a case he said he disclosed to his boss where he

02:49PM 20  was going to have no involvement to the best of my knowledge.

02:49PM 21  That was probably the least of my concerns with "Tiger" at that

02:49PM 22  point in time.

02:49PM 23           MR. DOLAN:  You talked about the business process in

02:49PM 24  your law firms.  What is the process with regards to intake of

02:49PM 25  cases?  Do you have any kind of conflicts check with regards to

**C O N F I D E N T I A L**

SM-02-JA00503

02:49PM 1   cases being brought onboard?

02:49PM 2          THE WITNESS:  Oh, sure.

02:49PM 3          MR. DOLAN:  How does that work?

02:49PM 4          THE WITNESS:  I think we just run them through our

02:49PM 5   client profiles, the program that we use for our cases.

02:49PM 6          MR. DOLAN:  And would this case have been run through

02:49PM 7   that conflicts check?

02:49PM 8          THE WITNESS:  I don't know.  I wasn't involved in the

02:49PM 9   day-to-day administration of the Andry firm.  I was kind of the

02:49PM 10  guy that came in and helped keep it afloat and then tried to

02:49PM 11  give some, some guidance, like I said with Susan DeSantis, but

02:50PM 12  in terms of, you know, to change everything at Andry Lerner was

02:50PM 13  almost impossible.

02:50PM 14          I believe they started using client profiles at

02:50PM 15  our behest, but how they conducted their conflicts checks, I

02:50PM 16  couldn't tell you.  I would think they conducted a conflict

02:50PM 17  check on every case.

02:50PM 18                        EXAMINATION

02:50PM 19  BY MR. FREEH:

02:50PM 20  Q.   Did you ever inquire to Jon Andry what that conflict

02:50PM 21  process, if any, was at Andry Lerner?

02:50PM 22  A.   Sir, no, sir.

02:50PM 23  Q.   Have you, since this matter became public, made any

02:50PM 24  inquiries to Jon Andry or people at that law firm about what

02:50PM 25  the conflict process is?

**C O N F I D E N T I A L**

SM-02-JA00504

02:50PM 1   A.   No, sir.

02:50PM 2   Q.   As you sit here today, your testimony is you don't know if

02:50PM 3   there was a conflict process?

02:50PM 4   A.   I can only assume there was a conflict process.

02:50PM 5   Q.   But you never asked about it?

02:50PM 6   A.   No, sir.

02:50PM 7   Q.   Not even after these matters became public?

02:51PM 8   A.   I didn't have a -- it wasn't my conflict, so I don't know.

02:51PM 9   Q.   Are you a member of the firm?

02:51PM 10   A.   Sir, yes, sir.

02:51PM 11   Q.   In the Learner Associates law firm, do you have a conflict

02:51PM 12   process there with respect to new cases?

02:51PM 13   A.   Sir, yes, sir.

02:51PM 14   Q.   How does that work?

02:51PM 15   A.   I believe, as I answered Mr. Dolan, it was through client

02:51PM 16   profiles.  They put the name in the system and see if there is

02:51PM 17   a conflict.

02:51PM 18   Q.   So what do you mean by *client profile*?

02:51PM 19   A.   It's our case administration software.

02:51PM 20   Q.   You check other records of the law firm?

02:51PM 21   A.   I suppose.

02:51PM 22   Q.   You don't know?

02:51PM 23   A.   I'm pretty far removed from that now, Mr. Freeh.

02:51PM 24   Q.   But it's a law firm that you're the only member, the only

02:51PM 25   principal?

**C O N F I D E N T I A L**

**SM-02-JA00505**

02:51PM 1   A.   Sir, yes, sir.

02:51PM 2   Q.   And your testimony is you don't know how the conflict

02:51PM 3   process works, other than you've described it to me?

02:51PM 4   A.   I believe the conflict process is in full force and

02:51PM 5   effect.  We haven't had any issues, and I believe the attorneys

02:51PM 6   I have administering the day-to-day operations of the firm are

02:52PM 7   aware of their needs for conflicts checks, and they do their

02:52PM 8   jobs.

02:52PM 9   Q.   You say that that's your belief?

02:52PM 10  A.   Yes, sir.

02:52PM 11  Q.   Is that based on speaking to these other lawyers at the

02:52PM 12  law firm?

02:52PM 13  A.   It's based on putting together a law firm for 20-plus

02:52PM 14  years that I've never had an issue with a conflict.

02:52PM 15  Q.   Does your law firm, we're talking about

02:52PM 16  Lerner & Associates, have a written conflict policy to your

02:52PM 17  knowledge?

02:52PM 18  A.   If we have a potential conflict on a case, especially the

02:52PM 19  most common conflict since we primarily handle accident cases,

02:52PM 20  would be between a passenger and a driver in the same case.

02:52PM 21  Q.   But that wasn't my question.  My question was:  Do you

02:52PM 22  have a written conflict policy as far as you know?

02:52PM 23  A.   Oh, gosh, I don't know.

02:52PM 24  Q.   What about the other law firms you described to us before?

02:52PM 25  A.   I wouldn't know.

**C O N F I D E N T I A L**

SM-02-JA00506

83

02:52PM 1    Q.    Did you ever ask anybody at Lerner & Associates about what

02:52PM 2    the conflict process was?

02:52PM 3    A.    I haven't even thought about it.  I'm sure we have one.  I

02:53PM 4    can't imagine that we don't have.  It's built into the

02:53PM 5    software, and I think in most of the cases, my understanding is

02:53PM 6    that they go through some sort of a check to make sure we don't

02:53PM 7    have a conflict with any of our other clients.

02:53PM 8    Q.    Are you familiar with that software?

02:53PM 9    A.    Yes, sir.

02:53PM 10   Q.    Have you ever run a conflict check for yourself?

02:53PM 11   A.    For myself?

02:53PM 12   Q.    Have you ever used the system to check a conflict or what

02:53PM 13   you thought might be a conflict?

02:53PM 14   A.    That's done down in intake.  Intake or by the case

02:53PM 15   manager, so I don't handle that.

02:53PM 16   Q.    So the answer is no?

02:53PM 17   A.    No, sir, I don't believe so.

02:53PM 18   Q.    With respect to the other law firms that you mentioned

02:53PM 19   earlier, not Lerner & Associates and not Andry Lerner, do you

02:53PM 20   know if those law firms had a conflict process or a conflict

02:53PM 21   system for new cases that came in?

02:53PM 22   A.    I believe it's all done through the same software that we

02:53PM 23   use, the client profile software in all of our firms.

02:53PM 24   Q.    Is your belief based on any conversations you've had with

02:53PM 25   any lawyers or employees in those other entities?

**C O N F I D E N T I A L**

SM-02-JA00507

02:53PM 1   A.   Gosh, I can't recall.  I mean, I can only imagine that

02:54PM 2   having a law firm and handling so many cases, it's just part of

02:54PM 3   our practice.  I mean, I know there are cases that come up from

02:54PM 4   now and then that we have a conflict on, so we can't take it.

02:54PM 5   So I can only take that to mean that we have a conflicts

02:54PM 6   checking process.

02:54PM 7   Q.   In all the law firms that we have been talking about, has

02:54PM 8   any of your employees, lawyers, members when there are members,

02:54PM 9   in other cases you described one, talked to you about a

02:54PM 10   conflict or raised a conflict or given you a conflict situation

02:54PM 11   and asked for your opinion?

02:54PM 12   A.   No, sir.  Only if it's a passenger and a driver in a case.

02:54PM 13   Q.   My question is:  Do you recall having any conversation --

02:54PM 14   A.   No, sir.

02:54PM 15   Q.   -- with any partner --

02:54PM 16   A.   No, sir.

02:54PM 17   Q.   Sir, you have to wait until I finish.

02:54PM 18   A.   Yes, sir.

02:54PM 19   Q.   Do you recall having any conversation with any lawyer,

02:54PM 20   employee, or member of any of your firms about a potential

02:54PM 21   conflict in any case?

02:54PM 22   A.   I can't recall.

02:55PM 23         MR. DOLAN:  Just to clarify:  Three payments from the

02:55PM 24   claims administration office related to the *Thonn* claim?

02:55PM 25         THE WITNESS:  I believe so, yes, sir.  That's what

**C O N F I D E N T I A L**

**SM-02-JA00508**

02:55PM 1   I've learned subsequently.

02:55PM 2          MR. DOLAN:  And half of it goes to Andry Lerner,

02:55PM 3   right, so each one of those, half -- under the operating

02:55PM 4   agreement it was a 50 percent split.

02:55PM 5          THE WITNESS:  I believe so.

02:55PM 6          MR. DOLAN:  Half went to Andry Lerner.  Half went to

02:55PM 7   your firm.  Your entire share went to Mr. Sutton?

02:55PM 8          THE WITNESS:  Sir, yes, sir.

02:55PM 9          MR. DOLAN:  Did you have any interest in the

02:55PM 10  remaining 50 percent that was retained by Jon Andry?

02:55PM 11         THE WITNESS:  No, remaining 50 percent --

02:55PM 12         MR. DOLAN:  If 19,000 came to you that you sent to

02:55PM 13  Mr. Sutton, the 19,000 that stayed with Mr. Andry, did you have

02:55PM 14  any claim to that money?

02:55PM 15         THE WITNESS:  Yes, sir.  I believe 50 percent of that

02:55PM 16  money was mine.  That was my fee.

02:56PM 17         MR. DOLAN:  So you would have taken 50 percent of the

02:56PM 18  money that remained with Andry Lerner?

02:56PM 19         THE WITNESS:  Yes, sir.  The full, the full, whatever

02:56PM 20  monies that were sent to me originally were "Tiger" Sutton's

02:56PM 21  fee.  They were sent to me and then I guess Jeff Cahill sent

02:56PM 22  them to "Tiger."

02:56PM 23         MR. DOLAN:  Was there any reason why the money would

02:56PM 24  not have gone from Andry Lerner out to Mr. Sutton directly if

02:56PM 25  it's a referral fee?

**C O N F I D E N T I A L**

SM-02-JA00509

86

02:56PM 1      THE WITNESS:  We've been discussing this.  I think

02:56PM 2  Jon was washing his hands of it.  He says, "You pay it if you

02:56PM 3  want.  I want no involvement in it. "

02:56PM 4      MR. DOLAN:  So that was the intent of sending the

02:56PM 5  money to you first?

02:56PM 6      THE WITNESS:  Sir, yes, sir.

02:56PM 7      MR. DOLAN:  And then you pay Mr. Sutton?

02:56PM 8      THE WITNESS:  That's my understanding, yes, sir.

02:56PM 9      MR. FREEH:  So let me just follow up on that.

02:56PM 10                    EXAMINATION

02:56PM 11  BY MR. FREEH:

02:56PM 12  Q.   Is it your testimony, or are you saying -- if you're not,

02:56PM 13  tell me you're not -- are you saying now that Jon Andry said,

02:56PM 14  If you want to pay it, you pay it, but I don't want anything to

02:56PM 15  do with it, or words to that effect?

02:56PM 16  A.   I don't want to put words in Jon's mouth.

02:57PM 17  Q.   Well, what do you recall him telling you?

02:57PM 18  A.   I can't recall.  It's just -- I don't want anything to do

02:57PM 19  with it.  You do what you want with the money.

02:57PM 20  Q.   So that wasn't your impression or understanding.  He said

02:57PM 21  something that led you to understand that?

02:57PM 22  A.   He sent me half of the fee to do what I want with, and I

02:57PM 23  did what I said I would do.  I paid the referral fee, the

02:57PM 24  attorney who sent me the fee.

02:57PM 25  Q.   I realize he sent you the fee, but you're also describing

**C O N F I D E N T I A L**

**SM-02-JA00510**

02:57PM 1  some conversation or some statement by him to you, words to the

02:57PM 2  effect, I'm sending you the fee, you do what you want with it.

02:57PM 3  A.   I think in so many words.  I can't -- I can't tell you his

02:57PM 4  exact words, sir.  I don't want to put word in his mouth, and I

02:57PM 5  don't --

02:57PM 6  Q.   I'm not asking you for the exact words, but is that your

02:57PM 7  understanding of what his statement or direction to you was?

02:57PM 8  A.   Pontius Pilot (indicating):  I want no involvement.  You

02:57PM 9  do what you want.

02:57PM 10  Q.   Was it your understanding that he understood -- bad

02:58PM 11  question, strike that, please.

02:58PM 12          Was it your understanding that he was aware that you

02:58PM 13  were making these payments to Mr. Sutton?

02:58PM 14  A.   He knows me and he knows my character.  If I gave my word

02:58PM 15  that I was going to pay it, I was going to pay it.  I didn't

02:58PM 16  think there was anything wrong with paying it based upon the

02:58PM 17  assurance that I had with Mr. Sutton that Mr. Juneau knew that

02:58PM 18  he was going to receive this fee, and so I paid it.

02:58PM 19  Q.   But that wasn't the question I asked.  Do you believe that

02:58PM 20  Mr. Jon Andry knew and understood that you were using that fee

02:58PM 21  to make payments to Mr. Sutton?

02:58PM 22  A.   I don't know what Jon believed but he sent me the fee.

02:58PM 23  That would have been "Tiger's" 50 percent to do with what I

02:58PM 24  wanted.  But I did what my word was.

02:58PM 25  Q.   Well, how did you know or understand that you could do

**CONFIDENTIAL**

SM-02-JA00511

| | | |
|---|---|---|
| 02:58PM | 1 | with that what you wanted? |
| 02:58PM | 2 | A.   I think that was kind of the gist of the conversation, to |
| 02:58PM | 3 | the best of my recollection. |
| 02:58PM | 4 | Q.   Conversation with Jon Andry? |
| 02:58PM | 5 | A.   Sir, yes, sir. |
| 02:58PM | 6 | Q.   Okay.  I'm going to show you some e-mails.  I think you've |
| 02:59PM | 7 | seen most of these? |
| 02:59PM | 8 | A.   Sir, yes, sir. |
| 02:59PM | 9 | Q.   And ask you some questions on some of them.  So let me |
| 02:59PM | 10 | show you what we've marked as L-1, and these will all be |
| 02:59PM | 11 | attached to the record with our court reporter. |
| 02:59PM | 12 | This is a string of e-mails, four pages in the |
| 02:59PM | 13 | document.  Take a moment to look at it.  The last e-mail is |
| 02:59PM | 14 | dated March 12, 2013, at 8:22 a.m. |
| 02:59PM | 15 | (WHEREUPON, at this point in the proceedings, |
| 02:59PM | 16 | Exhibit L-1 was marked for identification.) |
| 02:59PM | 17 | THE WITNESS:  Is there a question pending, Mr. Freeh? |
| 02:59PM | 18 | EXAMINATION |
| 02:59PM | 19 | BY MR. FREEH: |
| 02:59PM | 20 | Q.   I wanted you to read it.  Just take a look at it.  You've |
| 03:00PM | 21 | seen it? |
| 03:00PM | 22 | A.   I see it here, yes, sir. |
| 03:00PM | 23 | MS. HARDIN:  I think he wants you to -- |
| 03:00PM | 24 | THE WITNESS:  Read the whole thing? |
| 03:00PM | 25 | MR. FREEH:  Why don't you look at page 2.  The first |

**C O N F I D E N T I A L**

SM-02-JA00512

| | |
|---|---|
| 03:00PM 1 | and the second page are the pages I'm going to ask you some |
| 03:00PM 2 | questions about.  Start maybe on page 2 and read up. |
| 03:00PM 3 | THE WITNESS:  (Witness reviews the document.)  Okay. |
| 03:00PM 4 | Yes, I've read it. |
| 03:00PM 5 | EXAMINATION |
| 03:00PM 6 | BY MR. FREEH: |
| 03:00PM 7 | Q.   Have you seen this document before as best you recall? |
| 03:00PM 8 | A.   To the best of my knowledge, no, sir.  I don't even know |
| 03:00PM 9 | who Mark Staley is. |
| 03:00PM 10 | Q.   Let me show you what we've marked as L-2, which is another |
| 03:00PM 11 | document.  And this is a three-page document.  I ask you just |
| 03:01PM 12 | to look at that.  As your attorney suggested, maybe from page 3 |
| 03:01PM 13 | backwards.  It's a string of e-mails, the latest one is dated |
| 03:01PM 14 | May 9, 2013, 3:51 p.m. |
| 03:01PM 15 | (WHEREUPON, at this point in the proceedings, |
| 03:01PM 16 | Exhibit L-2 was marked for identification.) |
| 03:01PM 17 | THE WITNESS:  Yes, sir, I've seen these e-mails. |
| 03:01PM 18 | EXAMINATION |
| 03:01PM 19 | BY MR. FREEH: |
| 03:01PM 20 | Q.   This is the e-mail you referred to before when you said |
| 03:01PM 21 | that Mr. Sutton provided you with some information about the |
| 03:01PM 22 | cases at the Andry Lerner firm? |
| 03:01PM 23 | A.   Sir, yes, sir. |
| 03:01PM 24 | Q.   Going to page 3, there is an e-mail from Mr. Sutton |
| 03:01PM 25 | talking about a logo, talking about a lot of companies are |

**C O N F I D E N T I A L**

03:02PM 1  named Crown, is that, to your understanding, a reference to the

03:02PM 2  Crown business?

03:02PM 3  A.   Sir, yes, sir.

03:02PM 4  Q.   Then on the page preceding that, there is an e-mail from

03:02PM 5  you to Mr. Sutton dated May 9, 2013, 15:06, and it's, "Glad to

03:02PM 6  see you working so hard while I try to figure out how to keep

03:02PM 7  paying for shit."

03:02PM 8  A.   Yeah, sorry I cussed in there.  Yes, sir.

03:02PM 9  Q.   What were you referring to there?

03:02PM 10  A.   While I'm busting my butt to keep making Crown flourish,

03:02PM 11  hopefully, he's talking about logos, and I'm trying to figure

03:02PM 12  out how to pay for the machine, this and that, salaries, and

03:02PM 13  he's talking about logos.

03:02PM 14  Q.   Your reference there then is to the Crown matter?

03:02PM 15  A.   Sir, yes, sir.

03:02PM 16  Q.   Going to the first page, there is an e-mail from you that

03:03PM 17  starts at the bottom of the page dated May 9, 2013, 15:23, to

03:03PM 18  Mr. Sutton.  And you understand lhs3law@hotmail.com to be

03:03PM 19  Mr. Sutton's e-mail?

03:03PM 20  A.   Sir, yes, sir.

03:03PM 21  Q.   The glennlerneresq@aol.com, that's your e-mail?

03:03PM 22  A.   That's one of them, yes, sir.

03:03PM 23  Q.   Is that your business e-mail or a personal --

03:03PM 24  A.   That's my personal.

03:03PM 25  Q.   -- e-mail?  Is that an e-mail you use more often than

**C O N F I D E N T I A L**

SM-02-JA00514

03:03PM 1    others?

03:03PM 2    A.    I also use glennlerner@me.com, and I also have my business

03:03PM 3    e-mail, glerner@glennlerner.com, but I don't use that that

03:03PM 4    much.

03:03PM 5    Q.    In this e-mail, the one we're speaking about at the bottom

03:03PM 6    of L-2, you say, "They are not paying claims.  Insane."

03:03PM 7    A.    Yes, sir.

03:03PM 8    Q.    What are you referring to there?

03:03PM 9    A.    BP.

03:03PM 10   Q.    What was the occasion, if you recall, why you sent this

03:03PM 11   particular e-mail on May 9th to Mr. Sutton?

03:04PM 12   A.    Probably just expressing my feelings about the whole

03:04PM 13   process.  I don't think there was really anything -- nothing

03:04PM 14   nefarious.

03:04PM 15   Q.    Is that the first time you had made a statement like that

03:04PM 16   to him, either in an e-mail or in person, in other words,

03:04PM 17   expressing your frustration or concern about paying claims?

03:04PM 18   A.    I can't recall.  I don't know if there was another e-mail

03:04PM 19   out there.  We hardly ever spoke about BP.

03:04PM 20   Q.    He responds to you on May 9, 2013.  This is the last

03:04PM 21   e-mail but the first e-mail on the top of page 1 of L-2, with a

03:04PM 22   long list of data and information; is that correct?

03:04PM 23   A.    Yes, sir.

03:04PM 24   Q.    Do you remember getting that at the time?

03:04PM 25   A.    Yes, sir.

**C O N F I D E N T I A L**

SM-02-JA00515

92

03:04PM 1   Q.   Why did he send you that information, if you know?

03:04PM 2   A.   I don't know.

03:04PM 3   Q.   Did you ask for it?

03:04PM 4   A.   No, sir.  My e-mail before, I don't believe that was an

03:04PM 5   attempt to solicit that type of information when I said they

03:05PM 6   are not paying claims, insane.

03:05PM 7   Q.   What, if anything, did you do with that information or the

03:05PM 8   e-mail?

03:05PM 9   A.   I asked him because when I read just between me and you, I

03:05PM 10  didn't want that to be misinterpreted because I believe, and

03:05PM 11  knowing him, I believe he put that there not because he

03:05PM 12  couldn't disclose this information, but because he didn't want

03:05PM 13  Jon Andry seeing this because it kind of threw Jon and the

03:05PM 14  office under the bus, that they just weren't on top of things.

03:05PM 15  Q.   Is that your understanding and interpretation of that

03:05PM 16  phrase?

03:05PM 17  A.   That's what I believed it to be, that he felt like he was

03:05PM 18  throwing Jon under the bus and, you know, he didn't want to be

03:05PM 19  in that position.  That's why I asked him after, "Is this okay

03:05PM 20  to share with my office manager," with Susan, and I believe I

03:05PM 21  sent that to her.

03:05PM 22  Q.   Did you ask him that in a phone call or in an e-mail?

03:05PM 23  A.   No, sir, I believe I did that in an e-mail, if I'm not

03:05PM 24  mistaken.

03:05PM 25  Q.   Did you then, in fact, show it to her?

**C O N F I D E N T I A L**

SM-02-JA00516

03:05PM 1    A.    I believe I would have forwarded it to her, if I'm not

03:05PM 2    mistaken.

03:05PM 3    Q.    Or flipped it to her as an e-mail?

03:06PM 4    A.    Yes, sir.  I obviously forward a lot of things.

03:06PM 5    Q.    Were there any other occasions where in an e-mail or

03:06PM 6    written document Mr. Sutton related similar information to you

03:06PM 7    about claimants in numbers and information regarding BP?

03:06PM 8    A.    Sir, yes, sir.  I believe there was one other.

03:06PM 9    Q.    Do you recall approximately when that was?

03:06PM 10   A.    No, I can't off the top of my head.

03:06PM 11   Q.    Was it before or after this one?  This one is in May of

03:06PM 12   2013.

03:06PM 13   A.    It's only a month before all of this stuff happened.  My

03:06PM 14   guess would have been maybe before this.

03:06PM 15   Q.    Let me show you what we've marked as L-3.  Again, take a

03:06PM 16   moment to look at that.  This is a four-page string of e-mails.

03:07PM 17   The latest one is dated August 24, 2012, at 9:04 p.m.  And I

03:07PM 18   would ask you if you recall seeing this particular e-mail sent

03:07PM 19   before?

03:07PM 20          (WHEREUPON, at this point in the proceedings,

03:07PM 21   Exhibit L-3 was marked for identification.)

03:07PM 22          THE WITNESS:  (Witness reviews the document.)  Not

03:07PM 23   that -- no, sir, not that I'm aware of.

03:07PM 24                        EXAMINATION

03:07PM 25   BY MR. FREEH:

**C O N F I D E N T I A L**

03:07PM 1   Q.   If you look at the first e-mail in point of time, which

03:07PM 2   actually begins on page 3 -- I'm sorry, bottom of page 2 of the

03:07PM 3   document, it's an e-mail from ltate@andrylawgroup to

03:07PM 4   Mr. Sutton, Subject:  Thonn, Casey-business claim-Shrimper-VoO.

03:08PM 5   And the date there, again, is noted as June 21, 2012.  Do you

03:08PM 6   see that?

03:08PM 7   A.   Yes, sir.

03:08PM 8   Q.   Does that refresh your recollection in any way as to when

03:08PM 9   the *Thonn* case would have been referred or may have been

03:08PM 10  referred from Mr. Sutton to the Andry Lerner firm?

03:08PM 11  A.   No, sir.  I remember nothing about any of this.

03:08PM 12  Q.   Your recollection and belief, as you stated before, is

03:08PM 13  that happened approximately in December, the end of 2012?

03:08PM 14  A.   My recollection of what?  When the case was referred?

03:08PM 15  Q.   Yes.

03:08PM 16  A.   No, sir, I never said that.  I said that was when the --

03:08PM 17  the discussion with Jon Andry and I about the payment.  That's

03:08PM 18  when the first payment was.

03:08PM 19  Q.   I thought we had a discussion about you sitting in a

03:08PM 20  Suburban?

03:08PM 21  A.   I never said that was in the end of December.

03:08PM 22  Q.   When do you think that was?

03:08PM 23  A.   Some time between -- I believe it was some time prior to

03:08PM 24  him taking the job.  So if it was in June, then it was prior to

03:09PM 25  him taking the job, but I didn't know if he was offered the job

**C O N F I D E N T I A L**

03:09PM 1   at that time.  I can't recall exactly.  But certainly it wasn't

03:09PM 2   in December.

03:09PM 3   Q.    June of what year?

03:09PM 4   A.    Whatever it says here, 2012.  I don't know.

03:09PM 5   Q.    So let me rephrase and ask you the question another way.

03:09PM 6   What is your recollection now as to when the Casey Thonn claim

03:09PM 7   was referred to the Andry Lerner firm?

03:09PM 8   A.    If that indicates that the case was being referred at the

03:09PM 9   time to us, then it appears it would have been in June of 2012.

03:09PM 10          MS. HARDIN:  Just to clarify, that's based on looking

03:09PM 11  at L-3?

03:09PM 12          THE WITNESS:  I suppose.  I see the date is there.

03:09PM 13                            EXAMINATION

03:09PM 14  BY MR. FREEH:

03:09PM 15  Q.    You don't have an independent recollection of that?

03:09PM 16  A.    No, sir.  My understanding is it was before he took the

03:09PM 17  job, though.  I didn't realize it was that long before.

03:09PM 18  Q.    You had not seen this particular exhibit?

03:10PM 19  A.    No, sir.

03:10PM 20  Q.    L-3, L-4?

03:10PM 21  A.    No, sir.  I didn't even know that Mr. Thonn was a

03:10PM 22  shrimper.

03:10PM 23  Q.    Okay.  I show you what we've marked as L-5, which is a

03:10PM 24  four-page document, and the first page starts with an e-mail

03:10PM 25  sent -- purportedly sent by you to Mr. Sutton dated January 7,

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 03:10PM | 1 | 2013, 10:49 a.m.  I'd ask you to take a look at those couple of |
| 03:10PM | 2 | pages? |
| 03:10PM | 3 | (WHEREUPON, at this point in the proceedings, |
| 03:10PM | 4 | Exhibit L-5 was marked for identification.) |
| 03:10PM | 5 | THE WITNESS:  Okay, so work my way from the back to |
| 03:10PM | 6 | the front. |
| 03:10PM | 7 | EXAMINATION |
| 03:10PM | 8 | BY MR. FREEH: |
| 03:10PM | 9 | Q.   Yes, I think that's probably the better way.  Page 4, the |
| 03:10PM | 10 | last part of page 4 looks like an e-mail from you to |
| 03:10PM | 11 | Jeff Cahill and Sutton on January 4, 2013. |
| 03:10PM | 12 | A.   Okay. |
| 03:12PM | 13 | Q.   Just take a look at those. |
| 03:12PM | 14 | A.   (Witness reviews the document.) |
| 03:12PM | 15 | Okay. |
| 03:12PM | 16 | Q.   So let me direct your attention to page 2 and the bottom |
| 03:12PM | 17 | part of the page, which is an e-mail from you to Mr. Sutton, |
| 03:12PM | 18 | Mr. Bryant, Mr. Cahill dated Friday, 4th of January, '13; is |
| 03:12PM | 19 | that right? |
| 03:12PM | 20 | A.   Sir, yes, sir. |
| 03:12PM | 21 | Q.   Is it fair to say the rest of that e-mail, which continues |
| 03:12PM | 22 | in the document on the next two pages, are discussions and |
| 03:13PM | 23 | references to the Crown business? |
| 03:13PM | 24 | A.   Sir, yes, sir. |
| 03:13PM | 25 | Q.   Looking at the top portion of page 2, "Ok.  Understood. |

**C O N F I D E N T I A L**

SM-02-JA00520