10:01AM

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3        *****************************************************

4    IN RE:  OIL SPILL BY THE
     OIL RIG *DEEPWATER HORIZON*
5    IN THE GULF OF MEXICO ON
     APRIL 20, 2010
6                              CIVIL ACTION NO. 10-MD-2179 "J"
                               NEW ORLEANS, LOUISIANA
7                              MONDAY, JULY 29, 2013, 10:00 A.M.

8    THIS RELATES TO ALL CASES

9        *****************************************************

10

11               SWORN STATEMENT OF **CHRISTINE REITANO**
             TAKEN BEFORE THE HONORABLE LOUIS J. FREEH
12                           SPECIAL MASTER

13   APPEARANCES:

14                             LOUIS J. FREEH, SPECIAL MASTER
                               STEVE TIDWELL
15                             MICHAEL MCCALL

16

17                             MARY OLIVE PIERSON
                               ATTORNEY AT LAW
18                             POST OFFICE BOX 14647
                               BATON ROUGE LA  70809
19                             (ATTORNEY FOR CHRISTINE REITANO)

20

21   OFFICIAL COURT REPORTER:  CATHY PEPPER, CRR, RMR, CCR
                               CERTIFIED REALTIME REPORTER
22                             REGISTERED MERIT REPORTER
                               500 POYDRAS STREET, ROOM HB406
23                             NEW ORLEANS, LA  70130
                               (504) 589-7779
24                             Cathy_Pepper@laed.uscourts.gov

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.



**CONFIDENTIAL**

SM-02-JA00706

| | **I N D E X** | |
|---|---|---|
| | | |

EXAMINATIONS                                              PAGE

**CHRISTINE REITANO**.....................................  5

EXAMINATION BY MR. FREEH.............................  5

EXAMINATION BY MS. PIERSON......................... 146

EXAMINATION BY MR. FREEH............................ 150

**E X H I B I T S**

DESCRIPTION                                               PAGE


EXHIBIT 02B.........................................  57

EXHIBIT 02D.........................................  59

EXHIBIT 02D1........................................  61

EXHIBIT 03..........................................  63

EXHIBIT 02..........................................  69

EXHIBIT 02A.........................................  75

EXHIBIT 04..........................................  76

EXHIBIT 04A.........................................  83

EXHIBIT 05..........................................  86

EXHIBIT 05A.........................................  92

EXHIBIT 05B.........................................  93

EXHIBIT 06..........................................  95

**OFFICIAL TRANSCRIPT**

SM-02-JA00707

3

1    EXHIBIT 06A.........................................   95

2    EXHIBIT 01..........................................  112

3    EXHIBIT 07..........................................  134

4    EXHIBIT 08..........................................  134

5    EXHIBIT 07A.........................................  135

6    EXHIBIT 09..........................................  136

7    EXHIBITS 10, 11, 12.................................  137

8    EXHIBIT 13..........................................  146

9    EXHIBIT 14..........................................  147

10   EXHIBIT 15..........................................  148

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**

SM-02-JA00708

4

| | |
|---|---|
| 1 | **P-R-O-C-E-E-D-I-N-G-S** |
| 2 | MONDAY, JULY 29, 2013 |
| 10:03AM 3 | |
| 10:03AM 4 | |
| 10:04AM 5 | MR. FREEH:  We'll go on the record.  I'm Louis Freeh, |
| 10:05AM 6 | and Steve Tidwell, Mike McCall are with me, Christine Reitano |
| 10:05AM 7 | and her lawyer.  I'll let her lawyer state her full name and |
| 10:05AM 8 | contacts. |
| 10:05AM 9 | MS. PIERSON:  My name is Mary Olive Pierson.  My |
| 10:05AM 10 | Louisiana Bar Roll Number is 11004.  I'm located at |
| 10:05AM 11 | 8702 Jefferson Highway, Suite B in Baton Rouge, Louisiana, |
| 10:05AM 12 | that's 70809.  My mailing address is P.O. Box 14647, |
| 10:05AM 13 | Baton Rouge 70898.  My phone number is (225) 927-6765.  And my |
| 10:05AM 14 | e-mail is mop@mopslaw.com. |
| 10:05AM 15 | MR. FREEH:  Great.  Thank you very much. |
| 10:05AM 16 | So this is an interview being conducted in |
| 10:05AM 17 | connection with the Court's order appointing me as the |
| 10:05AM 18 | Special Master to look at some of the aspects of the claim |
| 10:05AM 19 | administration process, including allegations and facts and |
| 10:05AM 20 | circumstances surrounding the conduct of some of its employees. |
| 10:06AM 21 | So what we'll do as we start is I'm going to put |
| 10:06AM 22 | you under oath.  And then also advise you and your lawyer that, |
| 10:06AM 23 | obviously, as a special master we're a judicial officer, so, of |
| 10:06AM 24 | course, anything that would be said to us, intending it to be |
| 10:06AM 25 | false or misleading or incomplete could be construed by the |

**C O N F I D E N T I A L**

SM-02-JA00709

10:06AM 1    court or by some other authority as a false material statement,

10:06AM 2    and since you'll be under oath, any material false statement

10:06AM 3    with knowledge of its falsity, incompleteness or misleading

10:06AM 4    could also be construed as a violation of Title 18 1001.  And

10:06AM 5    we're telling that to all of our witnesses.

10:06AM 6            So let me start by putting you under oath.

10:06AM 7            And the oath is:

10:07AM 8            Do you swear that the testimony and evidence you

10:07AM 9    will give today will be the truth, the whole truth and nothing

10:07AM 10   but the truth to your full ability, so help you God?

10:07AM 11           THE WITNESS:  Yes.

12                        **CHRISTINE REITANO**

13   was called as a witness and, after being first duly sworn by

14   the Special Master, was examined and testified on her oath as

15   follows:

16                            EXAMINATION

17   BY MR. FREEH:

10:07AM 18   Q.   So would you prefer to be called *Ms. Reitano* or *Mrs.*,

10:07AM 19   I'm sorry?

10:07AM 20   A.   Ms. Reitano, I guess, is what I go by.

10:07AM 21   Q.   Ms. Reitano.  Okay.  Fine.

10:07AM 22           Ms. Reitano, we could start, then, by asking you some

10:07AM 23   questions just about your educational background, so maybe you

10:07AM 24   could just tell us where you went to college, where you went to

10:07AM 25   law school, and then I'll lead you through some questions about

# C O N F I D E N T I A L

| | | |
|---|---|---|
| 10:07AM | 1 | your professional life before you started the employment with |
| 10:07AM | 2 | the claims administration. |
| 10:07AM | 3 | A.    Okay.  I went to college at the University of Pennsylvania |
| 10:07AM | 4 | in Philadelphia, and I went to law school at Tulane University |
| 10:07AM | 5 | here in New Orleans. |
| 10:07AM | 6 | Q.    And what year did you graduate from Tulane law school? |
| 10:07AM | 7 | A.    1991. |
| 10:07AM | 8 | Q.    And after taking the Louisiana bar, I take it you're a |
| 10:08AM | 9 | lawyer in good standing in Louisiana? |
| 10:08AM | 10 | A.    Yes. |
| 10:08AM | 11 | Q.    And what was your first professional employment as an |
| 10:08AM | 12 | attorney? |
| 10:08AM | 13 | A.    I always did contract work, so I want to say that it was |
| 10:08AM | 14 | this attorney in Lafayette.  I can't remember his name now. |
| 10:08AM | 15 | His first name was Charles, and I was helping him out with some |
| 10:08AM | 16 | environmental cases on a part-time basis. |
| 10:08AM | 17 |         And then there was another law firm called |
| 10:08AM | 18 | *Oats & Hudson*.  And again, I was doing hourly research-type |
| 10:08AM | 19 | work for them. |
| 10:08AM | 20 |         But the first, what I call *my real job* -- |
| 10:08AM | 21 | Q.    Yes. |
| 10:08AM | 22 | A.    -- was working for Leger & Mestayer on the tobacco |
| 10:08AM | 23 | litigation. |
| 10:08AM | 24 | Q.    And approximately when was that? |
| 10:08AM | 25 | A.    I think I began that in 1994. |

**C O N F I D E N T I A L**

**SM-02-JA00711**

| | |
|---|---|
| 10:08AM 1 | Q.   And just on a general basis, what were your |
| 10:09AM 2 | responsibilities and role in that particular employment? |
| 10:09AM 3 | A.   It started out, you know, that we were doing a lot of |
| 10:09AM 4 | document review, and then -- you know, then it turned into |
| 10:09AM 5 | doing some motion writing, and then, eventually, you know, kind |
| 10:09AM 6 | of supervising the floor of document reviewers. |
| 10:09AM 7 | And I went to a lot of hearings and meetings with |
| 10:09AM 8 | Walter Leger, just assisting him with everything he was |
| 10:09AM 9 | doing -- |
| 10:09AM 10 | Q.   Yes. |
| 10:09AM 11 | A.   -- on the tobacco litigation. |
| 10:09AM 12 | Q.   Did your work at that time include any motion practice or |
| 10:09AM 13 | arguing before the court? |
| 10:09AM 14 | A.   No.  I wouldn't argue before the court, but I would do -- |
| 10:09AM 15 | you know, I might write the motions themselves. |
| 10:09AM 16 | Q.   And maybe you could take us, then, to your next |
| 10:09AM 17 | substantive or full-time legal employment after that and just |
| 10:09AM 18 | give us a year, please. |
| 10:09AM 19 | A.   After that, I guess at some point I -- you know, I had my |
| 10:10AM 20 | children.  I had two in a row.  And so then I was working only |
| 10:10AM 21 | part time on the tobacco litigation. |
| 10:10AM 22 | And then after that, after it was settled, then I |
| 10:10AM 23 | started working with my husband.  He was a sole practitioner. |
| 10:10AM 24 | And he would hire me out, and I would work under his name on |
| 10:10AM 25 | different and various class-action suits, Vioxx, Neurontin.  We |

**C O N F I D E N T I A L**

SM-02-JA00712

8

10:10AM  1    were doing some breast implant.  He had the train derailment

10:10AM  2    case.  It was just -- you know, just different...

10:10AM  3    Q.    And approximately when did that start, the affiliation and

10:10AM  4    employment in connection with your husband?

10:10AM  5    A.    Let's see.

10:10AM  6    Q.    Approximately.

10:10AM  7    A.    If that was -- it was on and off.  I guess if I had my

10:11AM  8    other son in -- in 2002 I had my youngest and I would have

10:11AM  9    stayed home, again, for three years.

10:11AM 10          So I would say -- and then there was the -- I had

10:11AM 11    started working on Vioxx before the hurricane.  And then that

10:11AM 12    was interrupted, and we moved to New Iberia for a year.  So

10:11AM 13    when I came back, I guess I would say, once again really

10:11AM 14    picking up, but it was still on a part-time basis, probably

10:11AM 15    2007, 2008.

10:11AM 16    Q.    And your husband you referred to, of course, is

10:11AM 17    Lionel Sutton?

10:11AM 18    A.    Yes.

10:11AM 19    Q.    And approximately when were you married?

10:11AM 20    A.    1997.

10:11AM 21    Q.    And do you have a common household?  Do you share a common

10:11AM 22    household since then?

10:11AM 23    A.    Yes.

10:11AM 24    Q.    Do you file joint tax returns?

10:11AM 25    A.    Right.

**C O N F I D E N T I A L**

SM-02-JA00713

| | | |
|---|---|---|
| 10:11AM | 1 | Q.   And you have two children, two boys? |
| 10:12AM | 2 | A.   Three. |
| 10:12AM | 3 | Q.   Three? |
| 10:12AM | 4 | A.   Yeah.  I had two back to back, 16 and 15, and I have an |
| 10:12AM | 5 | 11-year-old. |
| 10:12AM | 6 | Q.   That's great. |
| 10:12AM | 7 | It's a full-time job? |
| 10:12AM | 8 | A.   Yes, it is.  It is.  And so I just tried to keep my hand |
| 10:12AM | 9 | in things, you know, but I was a stay-at-home mom in a sense, |
| 10:12AM | 10 | too. |
| 10:12AM | 11 | Q.   When you started to get legal assignments or legal work |
| 10:12AM | 12 | from Mr. Sutton, did he have his own law firm at that time? |
| 10:12AM | 13 | A.   Yes. |
| 10:12AM | 14 | Q.   And was it called *Sutton* or *Sutton & Reitano*? |
| 10:12AM | 15 | A.   It was called *The Law Offices of Lionel Sutton, III*.  And |
| 10:12AM | 16 | at one point I think he tried to create some sort of, you know, |
| 10:12AM | 17 | partnership or something called *Sutton & Reitano*.  And then it |
| 10:12AM | 18 | didn't happen.  And so he started using the name Sutton & |
| 10:12AM | 19 | Reitano as a d/b/a as I was working for him, because it made it |
| 10:12AM | 20 | easier to go by that name since I was now actually in the |
| 10:13AM | 21 | office. |
| 10:13AM | 22 | Q.   The law firm Lionel Sutton, III, where was that |
| 10:13AM | 23 | headquartered at the time when you started to do work for him? |
| 10:13AM | 24 | A.   When I started, it was at 610 Baronne and in New Orleans. |
| 10:13AM | 25 | Q.   And did I understand you to say that it was not then |

**C O N F I D E N T I A L**

SM-02-JA00714

| | |
|---|---|
| 10:13AM 1 | formally changed to a -- |
| 10:13AM 2 | A.    No. |
| 10:13AM 3 | Q.    -- PLC? |
| 10:13AM 4 | A.    No. |
| 10:13AM 5 | Q.    Had it ever been since then? |
| 10:13AM 6 | A.    No. |
| 10:13AM 7 | Q.    So in terms of its registration as a law firm, it's just |
| 10:13AM 8 | Lionel Sutton, III? |
| 10:13AM 9 | A.    Right. |
| 10:13AM 10 | Q.    But it's commonly referred to, and you've referred to it |
| 10:13AM 11 | yourself, as *Sutton & Reitano*? |
| 10:13AM 12 | A.    Exactly.  Exactly. |
| 10:13AM 13 | Q.    With respect to the work you did in connection with your |
| 10:13AM 14 | husband at Sutton, we'll call it *Sutton & Reitano*, again, prior |
| 10:13AM 15 | to your work with the claims administrator, what type of |
| 10:13AM 16 | assignments and what type of practice did you have during this |
| 10:14AM 17 | period? |
| 10:14AM 18 | A.    So it was mostly work on class actions and complex |
| 10:14AM 19 | litigation, and so it was a lot of discovery work, a lot of |
| 10:14AM 20 | research and writing, depositions.  You know, never really |
| 10:14AM 21 | going before the judge and arguing, that sort of thing.  Just, |
| 10:14AM 22 | you know, kind of very academic, that type of work. |
| 10:14AM 23 | Q.    Were you representing plaintiffs at that time? |
| 10:14AM 24 | A.    No.  No.  I would just assist my husband with -- with |
| 10:14AM 25 | the -- with his clients for the most part. |

**CONFIDENTIAL**

SM-02-JA00715

| | |
|---|---|
| 10:14AM 1 | Q.    Were his clients, at least some of them, class-action |
| 10:14AM 2 | plaintiffs? |
| 10:14AM 3 | A.    No.  He would get involved -- well, yes, yes.  Some of |
| 10:14AM 4 | them were class-action plaintiffs, yes.  And then in other |
| 10:14AM 5 | situations, he would partner with another firm who was |
| 10:14AM 6 | actually, you know, part of the Plaintiff Steering Committee or |
| 10:15AM 7 | something else, and then I would work on that class action |
| 10:15AM 8 | through his office. |
| 10:15AM 9 | Q.    And during the course of those assignments and that work, |
| 10:15AM 10 | did you come to know and meet other lawyers with whom he |
| 10:15AM 11 | worked? |
| 10:15AM 12 | A.    Yes.  But not to that great of an extent, because the |
| 10:15AM 13 | class-action stuff I would work on, he didn't get heavily |
| 10:15AM 14 | involved in.  You know, it was more me doing hourly work on |
| 10:15AM 15 | those class actions, if that makes sense. |
| 10:15AM 16 | Q.    So with respect to an attorney named John Andry, do you |
| 10:15AM 17 | know him? |
| 10:15AM 18 | A.    Oh, well, that's different.  John Andry and my husband |
| 10:15AM 19 | went to law -- were in the same law school class.  And when my |
| 10:15AM 20 | husband -- my husband was formerly married.  He was married in |
| 10:15AM 21 | law school.  He went through a divorce while he was in law |
| 10:15AM 22 | school, and then John Andry's family was there to support him |
| 10:16AM 23 | and kind of help him through the divorce.  So they were best |
| 10:16AM 24 | friends after law school. |
| 10:16AM 25 | Then, eventually, they did -- he, John and Gibby |

**C O N F I D E N T I A L**

SM-02-JA00716

10:16AM 1   bought a building together.  That's the building --

10:16AM 2            MR. TIDWELL:  Is that Gibby Andry?

10:16AM 3            THE WITNESS:  Yes.

10:16AM 4            That is the building at 610 Baronne, and they

10:16AM 5   each had one floor.  And they did work on a few cases together,

10:16AM 6   but they weren't a partnership.  So one of the cases I worked

10:16AM 7   on, the BellSouth-Centennial case, is one that they had

10:16AM 8   together.

10:16AM 9            I'm not -- I don't remember and I'm not aware of

10:16AM 10  the others, but I think there were more than one.  But they

10:16AM 11  were friends.  They did have a falling out over a fee for a

10:16AM 12  while, but --

10:16AM 13            And, also, at one point, John and Gibby -- I'm

10:16AM 14  not sure.  You'll have to ask my husband the time frame.  But

10:17AM 15  at one point they bought my husband out of his interest in the

10:17AM 16  building, and in return, he was to -- was to stay there rent

10:17AM 17  free in the building, so --

10:17AM 18  BY MR. FREEH:

10:17AM 19  Q.   That's the building at 610?

10:17AM 20  A.   That's right.

10:17AM 21            And then they had the falling out over the fee.  And

10:17AM 22  I think when I came to the building, must have been 2008, 2009,

10:17AM 23  you know, it was kind of tense.  It was kind of weird.  But we

10:17AM 24  stayed there, at least when I was going in every day, for about

10:17AM 25  another year and a half before we moved out to the Gravier

**C O N F I D E N T I A L**

SM-02-JA00717

| | | |
|---|---|---|
| 10:17AM | 1 | building. |
| 10:17AM | 2 | Q.   Were there other tenants in the building at 610? |
| 10:17AM | 3 | A.   No, not to my knowledge.  It was just Gibby, John and my |
| 10:17AM | 4 | husband. |
| 10:17AM | 5 | Q.   And when did you first meet your husband? |
| 10:17AM | 6 | A.   I met him in -- when I was a first year in law school. |
| 10:18AM | 7 | Or -- it was either 1988, 1989. |
| 10:18AM | 8 | Q.   At Tulane? |
| 10:18AM | 9 | A.   At Tulane. |
| 10:18AM | 10 | Q.   And at that time did you meet John Andry through your |
| 10:18AM | 11 | husband, your future husband? |
| 10:18AM | 12 | A.   I might have met John Andry first.   John Andry -- |
| 10:18AM | 13 | MS. PIERSON:  You mean before your husband? |
| 10:18AM | 14 | THE WITNESS:  Yeah. |
| 10:18AM | 15 | BY MR. FREEH: |
| 10:18AM | 16 | Q.   In law school? |
| 10:18AM | 17 | A.   Yeah. |
| 10:18AM | 18 | Q.   Okay. |
| 10:18AM | 19 | A.   John Andry was very outgoing.  You couldn't not meet |
| 10:18AM | 20 | John Andry. |
| 10:18AM | 21 | MR. TIDWELL:  Was he a law student at the time? |
| 10:18AM | 22 | THE WITNESS:  Yes, yes. |
| 10:18AM | 23 | BY MR. FREEH: |
| 10:18AM | 24 | Q.   The brother, is he also a lawyer? |
| 10:18AM | 25 | A.   Yes, he is. |

**C O N F I D E N T I A L**

SM-02-JA00718

14

| | | |
|---|---|---|
| 10:18AM | 1 | Q. Did he go to Tulane? |
| 10:18AM | 2 | A. Yes, he did. |
| 10:18AM | 3 | Q. Around the same time? |
| 10:18AM | 4 | A. I think he was a year ahead of John and Tiger. A year or |
| 10:18AM | 5 | two years, I'm not sure. |
| 10:18AM | 6 | Q. Did you meet him -- |
| 10:18AM | 7 | A. Yeah. |
| 10:18AM | 8 | Q. -- at or about the same time? |
| 10:18AM | 9 | A. You know, the school was pretty small, so you got familiar |
| 10:18AM | 10 | with everyone there, yeah. |
| 10:18AM | 11 | Q. There came a time when you then found employment with |
| 10:18AM | 12 | Patrick Juneau; is that correct? |
| 10:19AM | 13 | A. Right. |
| 10:19AM | 14 | Q. Could you tell us about when that was, or when the |
| 10:19AM | 15 | discussions first started with respect to your working there? |
| 10:19AM | 16 | A. Yes. So we had moved into the building, 935 Gravier, in |
| 10:19AM | 17 | the early spring of 2012 -- no, 2011. I'm sorry. So we were |
| 10:19AM | 18 | there a year. |
| 10:19AM | 19 | So then a year later my husband mentioned to me that |
| 10:19AM | 20 | he thought that a lot of the *BP* settlement work was going to be |
| 10:19AM | 21 | done in our building. And I thought -- you know, I had always |
| 10:19AM | 22 | done this type of contract work for PSC's, so to speak, and I |
| 10:19AM | 23 | really hated the kind of personal injury practice my husband -- |
| 10:19AM | 24 | the other part of his practice that he was involved in, so I |
| 10:19AM | 25 | was like, oh, that would be fantastic. I would like to do that |

**C O N F I D E N T I A L**

SM-02-JA00719

10:19AM 1    hourly work again.

10:19AM 2            And then very shortly thereafter, he learned that

10:19AM 3    Pat Juneau had been appointed as the Special Master or court

10:20AM 4    administrator. And I said, "Well, boy, I would love to work

10:20AM 5    for him."

10:20AM 6            So my husband gave Pat Juneau a call, and sometime

10:20AM 7    in -- I think it would have been early March, Pat Juneau

10:20AM 8    actually came to our office.

10:20AM 9    Q.    That would be 2010?

10:20AM 10   A.    2012.

10:20AM 11   Q.    2012?

10:20AM 12   A.    That's right. In early March of 2012. It must have been

10:20AM 13   right after he had been appointed.

10:20AM 14           He came and he sat down and he talked to the two of

10:20AM 15   us, and he kind of, you know, spelled out what he thought the

10:20AM 16   program would entail and what his needs would be. And I told

10:20AM 17   him about my experience, you know, that it was very just, you

10:20AM 18   know, document research oriented, administrative oriented.

10:21AM 19           And he had in mind that he was just going to have a

10:21AM 20   very small office, that he would have one lawyer, maybe a

10:21AM 21   paralegal, maybe a secretary, and maybe an accountant.

10:21AM 22           And he asked if we were involved in any BP-related

10:21AM 23   cases. And at the time I did have just a handful of GCCF

10:21AM 24   clients, and I told him about that. And he said, "Well, you

10:21AM 25   wouldn't be able to represent them anymore."

**C O N F I D E N T I A L**

**SM-02-JA00720**

| | | |
|---|---|---|
| 10:21AM | 1 | I said I understood.  And I didn't mind.  I had had |
| 10:21AM | 2 | those clients for a year and nothing was happening in the GCCF |
| 10:21AM | 3 | program. |
| 10:21AM | 4 | And then he -- |
| 10:21AM | 5 | Q.    Let me just stop you there, if I might, please. |
| 10:21AM | 6 | A.    Yes. |
| 10:21AM | 7 | Q.    Did you specifically identify who the clients were? |
| 10:21AM | 8 | A.    I don't recall if I told him name by name or if I just |
| 10:21AM | 9 | spoke generally about it. |
| 10:21AM | 10 | Q.    Did you at a later time specifically identify those |
| 10:21AM | 11 | clients to him? |
| 10:21AM | 12 | A.    I don't believe I did.  I just terminated my relationships |
| 10:22AM | 13 | with them and, you know, notified the program, the GCCF |
| 10:22AM | 14 | program, and that's all I actively did. |
| 10:22AM | 15 | Q.    And who were those clients?  Can you recall them as you |
| 10:22AM | 16 | sit here? |
| 10:22AM | 17 | A.    Yes, I can. |
| 10:22AM | 18 | Q.    If you need to look at something, that's okay. |
| 10:22AM | 19 | A.    No, I'm okay.  Casey Thonn, Tim Gonzales, Jessica Backes, |
| 10:22AM | 20 | B-A-C-K-E-S, Melvin Backes, Ronald Backes.  And Ronald Backes |
| 10:22AM | 21 | also filed a claim on behalf of a bar he owned called |
| 10:22AM | 22 | *Tooloula's*, T-O-O-L-O-U-L-A, apostrophe S. |
| 10:22AM | 23 | Q.    And except for Casey Thonn, do you know as you sit here |
| 10:22AM | 24 | today, whether any of the other parties you just mentioned |
| 10:22AM | 25 | pursued and filed claims with Mr. Juneau's -- |

**C O N F I D E N T I A L**

SM-02-JA00721

10:23AM  1   A.   I do not know except to the extent of what I've read in

10:23AM  2   either -- it was Welker's investigative report.  I know that

10:23AM  3   the Backes' claims were already on some kind of fraud hold at

10:23AM  4   the time, so they just -- they were dealing with their attorney

10:23AM  5   who had referred them to us in the first place.

10:23AM  6        Tim Gonzales, I remember that they told me they were

10:23AM  7   going to stay on their own, and I advised them to, because at

10:23AM  8   the time, you know, they were saying the settlement program,

10:23AM  9   all you have to do is file your documentation and the program

10:23AM  10  will do the rest.

10:23AM  11       So when I read that they hadn't filed the claim, I

10:23AM  12  was surprised, because I thought they would have, and they

10:23AM  13  would have done it on their own.

10:23AM  14  Q.   So when you talked to Mr. Juneau as you just described,

10:24AM  15  about that employment, at that moment had you previously met

10:24AM  16  him?

10:24AM  17  A.   Mr. Juneau?

10:24AM  18  Q.   Mr. Juneau.

10:24AM  19  A.   Yes.  Yes.  But, you know, it would have been just -- my

10:24AM  20  husband, that was the first job he had, my husband had out of

10:24AM  21  law school.  He worked for Pat Juneau in Lafayette.  And I was

10:24AM  22  still in law school here at Tulane at the time, and we would

10:24AM  23  drive back and forth.  We would commute.

10:24AM  24       And so if he had -- maybe I would have gone out to

10:24AM  25  lunch with him, or if they had a Christmas party.  You know, it

**C O N F I D E N T I A L**

SM-02-JA00722

10:24AM 1    was just that sort of relationship.

10:24AM 2    Q.    So approximately how many times would you have met

10:24AM 3    Mr. Juneau prior to him coming to the office to discuss your

10:24AM 4    past employment?

10:24AM 5    A.    I guess five to ten.  You know, I would go to the office

10:24AM 6    sometimes.  I really can't recall.  It could have been more

10:24AM 7    than that, you know.  I'm not sure.

10:25AM 8    Q.    You said that was your husband's first job out of law

10:25AM 9    school?

10:25AM 10   A.    Yes.

10:25AM 11   Q.    That was with Mr. Juneau's law firm?

10:25AM 12   A.    That's right.

10:25AM 13   Q.    And do you know approximately when that was when he

10:25AM 14   started to work with him?

10:25AM 15   A.    I want to say 1990.

10:25AM 16   Q.    And if you know, did he work with him as an associate at

10:25AM 17   first or a partner?

10:25AM 18   A.    Associate.

10:25AM 19   Q.    Did he have any particular responsibilities or practice

10:25AM 20   area that he performed there?

10:25AM 21   A.    I don't think so.  I don't think he had specialized at

10:25AM 22   that point in any way.  It was, you know, whatever they

10:25AM 23   assigned to him.

10:25AM 24   Q.    And do you know how large a law firm it was at that time,

10:25AM 25   approximately?

**C O N F I D E N T I A L**

SM-02-JA00723

10:25AM 1    A.    I know it was Juneau Judice Hill.  I think there were

10:25AM 2    three partners, and each would have had an associate.  And I

10:25AM 3    think Mike Juneau was there.  My guess would be maybe ten

10:25AM 4    attorneys.

10:25AM 5    Q.    And as best you know, for how long a period was your

10:26AM 6    husband associated with that law firm?

10:26AM 7    A.    Maybe two -- two to four years.  I don't remember.  But I

10:26AM 8    know at one point Pat Juneau suffered some health condition,

10:26AM 9    and he had to, you know -- he retired temporarily from working.

10:26AM 10   And I think there was already maybe some fraction between the

10:26AM 11   partners at the firm.  But, you know, because Tiger was the

10:26AM 12   associate for Pat Juneau -- you'll have to ask my husband.  I

10:26AM 13   don't know if it was that my husband didn't want to work for

10:26AM 14   either the other two partners or vice versa, but at that point,

10:26AM 15   he went on his own.

10:26AM 16   Q.    And you said "Tiger," that's your husband's nickname?

10:26AM 17   A.    Yes.  I assumed you might know that because I've seen it

10:26AM 18   referenced in some of the documents.

10:26AM 19   Q.    Do you know how he got that nickname?

10:27AM 20   A.    He told me when -- the day they brought him home from the

10:27AM 21   hospital, his grandmother looked in the crib and said, "That's

10:27AM 22   a little tiger in there."

10:27AM 23         It's not unusual.  You know, my husband is from

10:27AM 24   New Iberia, which they call *Cajun country*, and they have

10:27AM 25   some -- you know, Egore, T-Bob.  They all have a name of that

**C O N F I D E N T I A L**

SM-02-JA00724

10:27AM 1    sort.

10:27AM 2    Q.    Let's go back to, again, the early part of 2012 when you

10:27AM 3    and your husband start to talk about the possibility, I assume

10:27AM 4    at that time, of you going to work for Mr. Juneau.

10:27AM 5    A.    Right.  Right.

10:27AM 6    Q.    Do you specifically ask your husband to make an

10:27AM 7    introduction so you can have a job opportunity there or is it

10:27AM 8    your husband who initiates the idea, if you recall?

10:27AM 9    A.    I believe my husband initiated the idea, and I was -- you

10:27AM 10   know, I was happy to go with it, wherever it led.

10:27AM 11   Q.    At that point, were the offices adjoining each other on

10:28AM 12   the same floor.  Had Mr. Juneau set up that operation yet?

10:28AM 13   A.    Oh, no.  And it didn't -- I mean, they were looking at

10:28AM 14   spaces at that time.

10:28AM 15          You know what is funny -- it's funny, though, because

10:28AM 16   we moved into that building the year before.  We were the first

10:28AM 17   tenants literally.  There was no one in that building.  And all

10:28AM 18   the floors had the old Chevron stuff in there.  You know,

10:28AM 19   whiteboards just left behind, all the desks, everything.  It

10:28AM 20   was like a ghost town.

10:28AM 21          And we had -- we were building out a space on the

10:28AM 22   19th floor to be our permanent office, and it was taking a very

10:28AM 23   long time.  And then later on -- I don't think I knew right

10:28AM 24   then at that first visit, but later on it would just happen, by

10:28AM 25   coincidence, that the claims administrator's office would be on

**C O N F I D E N T I A L**

SM-02-JA00725

10:28AM   1   the same floor as what was going to be our permanent office,

10:29AM   2   and that they would actually share a wall.

10:29AM   3   Q.   And do you understand that, when you described it using

10:29AM   4   the word as just a *coincidence*?

10:29AM   5   A.   Oh, absolutely.

10:29AM   6   Q.   Did your husband assist at all in helping him find or

10:29AM   7   secure that space, to your knowledge?

10:29AM   8   A.   Not to my knowledge.   No.

10:29AM   9   Q.   The meeting you described where Mr. -- you said Mr. Juneau

10:29AM  10   came over to your office to discuss the employment?

10:29AM  11   A.   Right.

10:29AM  12   Q.   Besides your husband, Mr. Juneau and yourself, was anyone

10:29AM  13   else at that meeting?

10:29AM  14   A.   No.

10:29AM  15   Q.   And approximately how long did the meeting take?

10:29AM  16   A.   Oh, I think we talked for about a half an hour or

10:29AM  17   45 minutes.

10:29AM  18   Q.   And you mentioned that Mr. Juneau described that he was

10:29AM  19   going to have a *small* operation, I think was the word used.

10:29AM  20   A.   Yes.   I don't think anyone could have envisioned, at least

10:29AM  21   at the time it didn't seem that he envisioned, how massive of a

10:30AM  22   scale the program was going to turn out to be.

10:30AM  23   Q.   Did he discuss that in any way or contemplate or forecast

10:30AM  24   how large the operation would be or how long your employment

10:30AM  25   would be?

**C O N F I D E N T I A L**

**SM-02-JA00726**

10:30AM 1   A.   No, not at that time.

10:30AM 2   Q.   Was salary discussed there?

10:30AM 3   A.   No, not at that time.   We didn't talk about salary at that

10:30AM 4   time.

10:30AM 5   Q.   And you said, I think, that he said at that meeting he was

10:30AM 6   looking to hire one attorney?

10:30AM 7   A.   Yes.

10:30AM 8   Q.   And what, if anything, did he say about that attorney?

10:30AM 9   What functions, role, responsibility would he or she have?

10:30AM 10  A.   I guess the functions would be -- how did he put it?   You

10:30AM 11  know, you just -- the legal interpretation of the agreement.

10:30AM 12  You know, he was going to be charged with implementing this

10:30AM 13  document, and, you know, I think that was the gist of it.   And

10:31AM 14  then, you know, all this other oversight, you know, you had to

10:31AM 15  have the thing set up to actually see what that was going to

10:31AM 16  entail.

10:31AM 17  Q.   Now, when you say *this document*, you're referring to the

10:31AM 18  court settlement?

10:31AM 19  A.   Yes.

10:31AM 20  Q.   At the time you first met him, had you read the court

10:31AM 21  settlement?

10:31AM 22  A.   No, I didn't.   I can't remember.   I must have -- I

10:31AM 23  certainly saw the agreement before it was -- even received

10:31AM 24  preliminary approval.   But, no, I hadn't seen it right then and

10:31AM 25  there at the time, at that first meeting.

**C O N F I D E N T I A L**

SM-02-JA00727

10:31AM 1    Q.    Did he give you any more description about what the

10:31AM 2    function would be of his sole lawyer for the operation?

10:31AM 3    A.    No.

10:31AM 4    Q.    Did you ask any questions about what your duties would be?

10:31AM 5    A.    No.  Because it was very preliminary, you know.  We just

10:32AM 6    discussed, in general, you know, what was going on.  And, you

10:32AM 7    know, at that time I didn't know if he was going to consider me

10:32AM 8    or not.  You know, it was somewhat casual and informal.

10:32AM 9    Q.    Did there come a time when you had another discussion with

10:32AM 10   him about employment?

10:32AM 11   A.    After that most of the discussions were by phone, because

10:32AM 12   after that he was extremely busy.  He was going from one point

10:32AM 13   to the next point to -- I think he was trying to set things up.

10:32AM 14   These vendors were being appointed.  There were all sorts of

10:32AM 15   meetings going on, and he essentially was asking me to sit

10:32AM 16   tight.

10:32AM 17   Q.    So when you say *sit tight*, you were not having continuing

10:32AM 18   discussions with him about your employment?

10:32AM 19   A.    No.  No.  I think I did call him in the interim before,

10:33AM 20   you know, he called and told me I would have the position, but

10:33AM 21   he had to meet with the parties and so forth and the judge.

10:33AM 22   And, no, I didn't spend much time -- I didn't have another

10:33AM 23   meeting with him.

10:33AM 24   Q.    And when you say that you continued to discuss the

10:33AM 25   employment on phone calls, it sounds like the phone calls were

**C O N F I D E N T I A L**

SM-02-JA00728

| | | |
|---|---|---|
| 10:33AM | 1 | fairly short and not very detailed? |
| 10:33AM | 2 | A.    Yes. |
| 10:33AM | 3 | Q.    Was salary discussed during any of those conversations? |
| 10:33AM | 4 | A.    Yes.   One phone call discussed salary. |
| 10:33AM | 5 | Q.    And did he initiate that conversation? |
| 10:33AM | 6 | A.    Yes. |
| 10:33AM | 7 | Q.    And what salary did he offer or quote? |
| 10:33AM | 8 | A.    I -- he -- I think he had -- maybe he asked me what I |
| 10:33AM | 9 | would like to make, and I think I said, you know, like $20,000 |
| 10:33AM | 10 | a month. |
| 10:33AM | 11 | Q.    And did he agree to that? |
| 10:33AM | 12 | A.    Not then and there, no. |
| 10:33AM | 13 | Q.    Did he later agree to it? |
| 10:34AM | 14 | A.    Yes.   I think that was approximately what, you know, I |
| 10:34AM | 15 | first was to receive. |
| 10:34AM | 16 | Q.    Do you remember approximately how many phone calls you had |
| 10:34AM | 17 | between the meeting you described in person and when you were |
| 10:34AM | 18 | eventually hired by him? |
| 10:34AM | 19 | A.    No, I don't recall exactly.   It might have been one or |
| 10:34AM | 20 | two. |
| 10:34AM | 21 | Q.    And during that period, I take it, you were discussing the |
| 10:34AM | 22 | employment possibility with your husband? |
| 10:34AM | 23 | A.    Yes. |
| 10:34AM | 24 | Q.    On more than one occasion? |
| 10:34AM | 25 | A.    I mean, just wondering, thinking, you know, anticipating. |

**C O N F I D E N T I A L**

SM-02-JA00729

| | |
|---|---|
| 10:34AM 1 | Q.    Did you ask your husband what he thought the employment |
| 10:34AM 2 | would entail or what you would be doing as an attorney? |
| 10:34AM 3 | A.    No, I didn't.  I mean, I felt ready, you know, that I'm |
| 10:35AM 4 | used to looking at legal documents; I'm used to organizing |
| 10:35AM 5 | people; you know, used to gathering information; keeping track |
| 10:35AM 6 | of things; supervising; organizing, all that sort of thing. |
| 10:35AM 7 | So I really thought it -- I wouldn't know until I saw |
| 10:35AM 8 | what that settlement agreement was.  And then I had the |
| 10:35AM 9 | experience, which I was happy to have had, with the GCCF |
| 10:35AM 10 | program, so I had a good sense of what type of claims were out |
| 10:35AM 11 | there, what kind of documentation was involved, you know, how |
| 10:35AM 12 | you analyze that, how you make sure the documentation is |
| 10:35AM 13 | sufficient, and that sort of thing. |
| 10:35AM 14 | Q.    Was your experience, which you refer to with the GCCF, was |
| 10:35AM 15 | as a plaintiff's attorney, as a claimant's attorney, correct? |
| 10:35AM 16 | A.    That's right.  That's right. |
| 10:35AM 17 | Q.    Now you were being interviewed for a position as a |
| 10:35AM 18 | counsel, lawyer to the administrator? |
| 10:35AM 19 | A.    That's right.  It would be a new vantage point, which I |
| 10:36AM 20 | found very, very interesting.  Because I have always been kind |
| 10:36AM 21 | of academically minded when it comes to the law, and if you're |
| 10:36AM 22 | on one side or the other side, you don't necessarily get to the |
| 10:36AM 23 | very right answer.  You know, you argue your side of the |
| 10:36AM 24 | situation. |
| 10:36AM 25 | So I was looking very forward to being in this |

**C O N F I D E N T I A L**

SM-02-JA00730

10:38AM 1   "Well, that's good that you think that, but it doesn't really
10:38AM 2   matter what those terms are, good, bad or indifferent.  Our job
10:38AM 3   is just to implement it in a fair and neutral manner."
10:38AM 4   Q.    And when approximately did you have the meeting with the
10:38AM 5   two attorneys and Mr. Juneau, and was anyone else present?
10:38AM 6   A.    I think John Baden was present.  And I want to say
10:38AM 7   mid-April, early April that meeting might have taken place.
10:38AM 8   Q.    And that was, you said, after you were hired?
10:38AM 9   A.    Yes.
10:38AM 10  Q.    And who did you understand these lawyers to be?
10:38AM 11  A.    They were part of the PSC.
10:38AM 12  Q.    Representing the plaintiffs?
10:38AM 13  A.    Yes.  They had negotiated -- they had worked -- were
10:38AM 14  largely involved in negotiating the terms of the agreement.
10:39AM 15  Q.    At the time you were hired, I know you said you didn't get
10:39AM 16  underway right way, but at the time you were hired, had you
10:39AM 17  read and reviewed and studied the settlement agreement?
10:39AM 18  A.    As soon as it was provided to me.  And I would say, again,
10:39AM 19  that was probably mid-April.
10:39AM 20  Q.    Was that after you were hired?
10:39AM 21  A.    Yes.
10:39AM 22  Q.    So prior to being hired, you did not look at the
10:39AM 23  settlement agreement?
10:39AM 24  A.    Right.
10:39AM 25  Q.    Did you see a draft of it?

**C O N F I D E N T I A L**

SM-02-JA00732

| | | |
|---|---|---|
| 10:39AM | 1 | A.    No. |
| 10:39AM | 2 | Q.    Mr. Juneau never asked you to review it? |
| 10:39AM | 3 | A.    Not prior to being hired. |
| 10:39AM | 4 | Q.    Did he ever ask you any legal questions or ask any advice |
| 10:39AM | 5 | with respect to the settlement or its terms? |
| 10:39AM | 6 | A.    No.  Oh, before being hired? |
| 10:39AM | 7 | Q.    Before being hired? |
| 10:39AM | 8 | A.    No. |
| 10:39AM | 9 | Q.    After you were hired, did he task you at any time to |
| 10:39AM | 10 | review the agreement and give him any advice or guidance with |
| 10:39AM | 11 | respect to its implementation? |
| 10:39AM | 12 | A.    Not in a general manner like that, no. |
| 10:40AM | 13 | Once the program began, countless issues, from one |
| 10:40AM | 14 | moment to the next, came up as to how do we interpret -- it |
| 10:40AM | 15 | wasn't so much interpretation as implementation.  Taking words |
| 10:40AM | 16 | and actually turning them into formulas or forms or questions |
| 10:40AM | 17 | on a claim form or something on the screen or taking every |
| 10:40AM | 18 | scenario and hypothetical -- you know, the agreement didn't |
| 10:40AM | 19 | envision every scenario that was out there for every claimant, |
| 10:40AM | 20 | and so issues came up right away, you know. |
| 10:40AM | 21 | And so to the extent -- I assume you're familiar with |
| 10:40AM | 22 | BrownGreer and then the two accounting firms in Garden City. |
| 10:40AM | 23 | BrownGreer was really -- is really the heavy machine that, you |
| 10:40AM | 24 | know, put together the program, the claim forms, the |
| 10:41AM | 25 | instruction booklets, the CACs.  You know, they did -- they do |

**C O N F I D E N T I A L**

SM-02-JA00733

10:41AM 1   the first line of the EIN and SSN verification, the causation

10:41AM 2   analysis, the analysis of exclusions and whatnot.

10:41AM 3          And so they are a big bank of attorneys, accountants,

10:41AM 4   IT people, computer programmers, and Orran Brown and Lynn Greer

10:41AM 5   are, you know, the partners there.

10:41AM 6          And they have multiple, multiple teams that would

10:41AM 7   start -- they started to try to differentiate and have these

10:41AM 8   specialized teams that would work on different aspects of the

10:41AM 9   program, and then those teams would, you know, identify an

10:41AM 10  issue or a problem.  They would outline it.  They would try to,

10:41AM 11  in advance of bringing it to our office, they would try to come

10:41AM 12  up with recommendations.

10:41AM 13         And that would be presented to me, and I would

10:42AM 14  usually talk it out with Orran or, you know, the group of team

10:42AM 15  members that actually worked on that.  As you get a good

10:42AM 16  understanding and flavor of what the issue was and a good

10:42AM 17  understanding of exactly what the settlement agreement says and

10:42AM 18  what the claims administrator duties are, and then we would,

10:42AM 19  you know, on a very regular basis, sit down with Mr. Juneau and

10:42AM 20  brief him on these different issues and areas of concerns and

10:42AM 21  recommendations.  And then he would say, you know, "Okay.

10:42AM 22  Let's present this recommendation to the parties."

10:42AM 23  Q.   So I'm understanding you to say after you were hired, you

10:42AM 24  would specifically review, address, and implement and counsel

10:43AM 25  Mr. Juneau with respect to the agreement as claims or issues or

**C O N F I D E N T I A L**

SM-02-JA00734

| | | |
|---|---|---|
| 10:43AM | 1 | matters raised up; is that fair to say? |
| 10:43AM | 2 | A.    Yes, that's fair to say. |
| 10:43AM | 3 | Q.    So going back to my original question, after you were |
| 10:43AM | 4 | hired, he never said:  Take this whole agreement, look at it, |
| 10:43AM | 5 | analyze it.  Now you're on board.  Give me any legal advice, |
| 10:43AM | 6 | give me any legal views? |
| 10:43AM | 7 | A.    Not in a vacuum.  I mean, I didn't need to give him any |
| 10:43AM | 8 | legal advice or views in a vacuum.  Sure, he charged me with |
| 10:43AM | 9 | reading and understanding the agreement. |
| 10:43AM | 10 | Q.    So he told you to read it and review it and understand it? |
| 10:43AM | 11 | A.    Absolutely. |
| 10:43AM | 12 | Q.    And did you have a meeting with him after that where you |
| 10:43AM | 13 | gave him your review and opinions or recommendations or |
| 10:43AM | 14 | interpretations or did you identify problem areas with respect |
| 10:43AM | 15 | to the agreement? |
| 10:43AM | 16 | A.    The agreement is a thousand pages.  Okay?  And it was |
| 10:44AM | 17 | impossible, I would say, for anyone to identify any holes in |
| 10:44AM | 18 | that agreement until you put it into practice. |
| 10:44AM | 19 | Q.    So did you review the agreement on your own, sua sponte, |
| 10:44AM | 20 | with or without his instructions, to see if there were any |
| 10:44AM | 21 | holes or gaps or things that you had to contemplate in advance |
| 10:44AM | 22 | to prevent problems or issues? |
| 10:44AM | 23 | A.    Yes.  I looked at it, too, with an eye to that, but there |
| 10:44AM | 24 | wasn't anything glaring that jumped out at me. |
| 10:44AM | 25 | Q.    Did anything jump out at you? |

**C O N F I D E N T I A L**

SM-02-JA00735

10:44AM 1    A.    No.

10:44AM 2    Q.    So you had no questions or concerns as a lawyer, legal

10:44AM 3    insights into gaps or problems that you would want to brief

10:44AM 4    Mr. Juneau about?

10:44AM 5    A.    No, I didn't.  I didn't think there were any glaring

10:44AM 6    problems that presented themselves with the agreement at the

10:44AM 7    first reading.

10:44AM 8    Q.    Now, were you his only lawyer in-house at that point?

10:44AM 9    A.    Mike Juneau, his son, I guess, was retained in some

10:45AM 10   fashion, either -- I don't know if Mr. Juneau's firm was hired,

10:45AM 11   but Mike Juneau was there as an attorney as well.  And

10:45AM 12   David Duval was hired, too, another attorney hired.

10:45AM 13   Q.    Did you work with those two lawyers with respect to your

10:45AM 14   legal functions?

10:45AM 15   A.    Sure.

10:45AM 16   Q.    And what type of interaction or how did you divide up your

10:45AM 17   responsibilities, if at all?

10:45AM 18   A.    Well, initially, David Duval was appointed to be the

10:45AM 19   appeals coordinator.  I was given the title *claims counsel*.

10:45AM 20   Mike Juneau, he called him *special counsel*.

10:45AM 21         In the summer, he wasn't -- I guess over time -- he

10:45AM 22   would spend about two days a week at the office.  And I think

10:46AM 23   in the beginning I was handling the brunt of the program from

10:46AM 24   the legal perspective.

10:46AM 25   Q.    Would you describe your role there as Mr. Juneau's general

**C O N F I D E N T I A L**

SM-02-JA00736

10:46AM 1    counsel at that time?

10:46AM 2    A.    At that time.  But he had to hire outside counsel, too,

10:46AM 3    for things, you know, concerning the contracts, you know -- but

10:46AM 4    I guess general counsel in terms of --

10:46AM 5    Q.    In house.

10:46AM 6    A.    -- in house interpreting that agreement.

10:46AM 7    Q.    Okay.  In that role, did you yourself retain outside

10:46AM 8    counsel for any legal support?

10:46AM 9    A.    Absolutely not.  No.  No.

10:46AM 10   Q.    Did you talk to any lawyers outside of the claims

10:46AM 11   administration with respect to any legal questions or guidance

10:47AM 12   or research?

10:47AM 13   A.    No.

10:47AM 14   Q.    Did you do your own legal research on questions?

10:47AM 15   A.    Legal research wasn't necessarily part of it, but when the

10:47AM 16   legal research needed to be done, we had this outside counsel

10:47AM 17   of the Sessions law firm.  We needed some legal research with

10:47AM 18   regard to liens and garnishments, to which are part of the

10:47AM 19   program.

10:47AM 20        We eventually needed outside counsel to help us with

10:47AM 21   the myriad of property issues that are involved in the claims.

10:47AM 22   So they would do the research, and they would, you know, give

10:47AM 23   me a memo or an argument or something and I would analyze it.

10:47AM 24   But they would do the research.  I did not do research myself.

10:47AM 25   Q.    In the period that you were there, approximately how much

**C O N F I D E N T I A L**

SM-02-JA00737

10:47AM 1   legal research or other legal work did you yourself give out to
10:47AM 2   external counsel beyond the one you just described?
10:48AM 3   A.   None.
10:48AM 4   Q.   Did you have any occasion to want any other legal research
10:48AM 5   done in the course of your work?
10:48AM 6   A.   No.  Not that -- nothing other than that was provided by
10:48AM 7   the people we had in place.
10:48AM 8         Now, other attorneys, I know that Mike Juneau needed
10:48AM 9   some research done on HIPAA, you know, things of that nature,
10:48AM 10  some of the things that were involved with BEL, but he took
10:48AM 11  charge of that.
10:48AM 12  Q.   So you were not involved in that process?
10:48AM 13  A.   I was in the sense that eventually, over time, you know,
10:48AM 14  that there had to be this system -- I'm sure you've heard about
10:48AM 15  the policy-deciding process or the policy-making process.
10:48AM 16        And it started out with some spreadsheets.  As
10:49AM 17  BrownGreer started to draw up its claims forms and its
10:49AM 18  registration forms and its instruction booklets and its notice
10:49AM 19  templates, you had to get into the details of this program to
10:49AM 20  know where the problems were.
10:49AM 21        You really had to get into the weeds.  You could not,
10:49AM 22  like, as you had suggested, look at this settlement agreement
10:49AM 23  and something jump off the page and say, "Oh, this is not going
10:49AM 24  to work at all."  It wasn't until you really got into the weeds
10:49AM 25  that you could identify some of these problems.

**C O N F I D E N T I A L**

SM-02-JA00738

10:49AM 1        So BrownGreer would create this spreadsheet and they
10:49AM 2    would, you know, have the question that they couldn't readily
10:49AM 3    decide.  Then they would have their recommendation.  Then they
10:49AM 4    would have two spaces for class counsel's response and BP's
10:49AM 5    response.
10:49AM 6        And it started out with this spreadsheet.  They would
10:50AM 7    give it to me and Mr. Juneau to initially review.  It would be
10:50AM 8    sent to the parties.  You would wait for the parties'
10:50AM 9    responses.  They would get them back.  And you would try to
10:50AM 10   marry things up.  And where there were inconsistencies, you'd
10:50AM 11   go back to the drawing board and try to come up with a new
10:50AM 12   recommendation and so forth and so on.
10:50AM 13       And, I mean, ultimately, maybe there are 200 policies
10:50AM 14   that have been approved for public publication, but there were
10:50AM 15   nearly 400 policies in this program.  Once I began work on this
10:50AM 16   program, I went under.  My life was over.
10:50AM 17       You know, it became -- the e-mails initially, those
10:50AM 18   first few weeks and months, were so constant, every moment.
10:50AM 19   And it wasn't, you know, the type of e-mail that goes to junk
10:50AM 20   mail.  It was a live issue with regard to every e-mail.
10:50AM 21       And, you know, Cathy had mentioned to me dreaming
10:51AM 22   about typing, and I would dream about scrolling through my
10:51AM 23   computer looking at these e-mails.
10:51AM 24       And at one point -- so we're working through these
10:51AM 25   spreadsheets, we're working through these spreadsheets.  You

**C O N F I D E N T I A L**

**SM-02-JA00739**

10:51AM 1  have for class counsel or the PSC, they have key people who are
10:51AM 2  very knowledgeable about certain aspects of the program.  And
10:51AM 3  those people would maybe talk to some BrownGreer people or they
10:51AM 4  would talk to some accountants or -- you know, it was a lot
10:51AM 5  going on and there was no continuity, no consistency.
10:51AM 6       Class counsel -- I think it was class counsel who
10:51AM 7  first brought it up.  They wanted to know what the protocol was
10:51AM 8  for addressing our office and for addressing the vendors.  And
10:51AM 9  they wanted -- they were suggesting at the time that there be
10:52AM 10 some kind of streamlined narrowing of resources and issues.
10:52AM 11      And, basically, what you needed was an issue tracker.
10:52AM 12 And I realized that immediately.  There are so many issues for
10:52AM 13 so many different aspects of this program, it's impossible to
10:52AM 14 track if some are doing this and some are doing that, so --
10:52AM 15 Q.   So this would be a good point to interrupt you.  Did you
10:52AM 16 put into place or ask that an issue tracker system be put into
10:52AM 17 place?
10:52AM 18 A.   Yes, I did ask.  I absolutely did.
10:52AM 19 Q.   Who did you ask?
10:52AM 20 A.   I talked to everyone about that.  We would have big
10:52AM 21 meetings, you know, sometimes with the vendors and whatnot.
10:52AM 22 And I said, "There has to be" -- you know, people would ask me,
10:52AM 23 "What do you need?  You know, how can we help you?"
10:52AM 24      Because we had different people in the office, but
10:52AM 25 they didn't -- they were doing -- they were covering this area

**C O N F I D E N T I A L**

SM-02-JA00740

10:52AM 1    called *business processes*, and then you had one attorney, you
10:53AM 2    know, doing the rest.
10:53AM 3          And so they would -- and they are all -- you know,
10:53AM 4    they have all kinds of resources and tools, so, you know, I
10:53AM 5    said, "This is what I need, is some way to track all these
10:53AM 6    issues."
10:53AM 7          And initially what was presented to me was some
10:53AM 8    software called *SharePoint*.  And I --
10:53AM 9    Q.   And who presented that?
10:53AM 10   A.   I think it was Orterrio (spelled phonetically) and
10:53AM 11   Chris Reade at our office.
10:53AM 12         And, you know, I tried to use it, but you couldn't
10:53AM 13   put -- you couldn't attach documents to it, because lots of
10:53AM 14   times there are documents or memos that should be kept
10:53AM 15   together, you know, or add notes or add e-mails.  You know, it
10:53AM 16   wasn't really what I envisioned or what I would have liked.
10:53AM 17         So eventually, you know, those -- once we got through
10:53AM 18   that first round of spreadsheets, that first Excel sheet, which
10:54AM 19   took months and months and months to completely resolve and get
10:54AM 20   all answers for and everything, then things slowed down
10:54AM 21   somewhat, but not too much.
10:54AM 22         And Orran Brown, who has this, you know, innate sense
10:54AM 23   of duty, this excellent work ethic, he eventually became my
10:54AM 24   partner in working this program.  And he would, on a weekly
10:54AM 25   basis, whether it was a binder or whatever of the different

**C O N F I D E N T I A L**

SM-02-JA00741

10:54AM 1   issues and recommendations, and we began with this e-mail

10:54AM 2   system to the parties.  Okay.  We would propose something, they

10:54AM 3   would send something back, and then we would go back and then

10:54AM 4   they would either agree to it or whatever.

10:54AM 5   Q.   When you say *the parties*, who do you refer to?

10:54AM 6   A.   BP and class counsel or the PSC.

10:54AM 7        Eventually, to jump ahead to get to what you're

10:54AM 8   getting at, eventually BrownGreer did build an application

10:55AM 9   called the *Policy Keeper*, which is exactly what I envisioned

10:55AM 10  and exactly what the program needed.

10:55AM 11  Q.   When was that put into place?

10:55AM 12  A.   March.

10:55AM 13  Q.   March this year?

10:55AM 14  A.   Yes, yes.

10:55AM 15       And so what they had to do is, once they had this

10:55AM 16  application, this system built that the parties could log on

10:55AM 17  to, BP and class counsel, that individual vendors could log on

10:55AM 18  to, that the CA's office could log on to, they had to go and

10:55AM 19  backfill all that legislative history.  Everything we had done

10:55AM 20  offline up until this point, they backfilled into this policy

10:55AM 21  keeper.

10:55AM 22       And they kept all -- they were able to attach all the

10:55AM 23  documents that went to it, all the comments, all the e-mails,

10:55AM 24  anything anyone ever said about that policy would be kept in

10:56AM 25  one place.

**C O N F I D E N T I A L**

**SM-02-JA00742**

10:56AM 1    Now, before we -- in the process of backfilling, we

10:56AM 2   sent this compendium, we called it the *compendium of policies*,

10:56AM 3   back out to the parties for another updated review.  "Make sure

10:56AM 4   this is what you agreed to.  Make sure" -- you know, some of

10:56AM 5   the policies, you would have four different things that

10:56AM 6   pertained to one subject because they would, you know, update

10:56AM 7   each other.  And so there was some reconciliation done, some

10:56AM 8   cleanup work that was done, but that basically became the

10:56AM 9   policy keeper.

10:56AM 10  Q.    You referred before to 200, then you said 400 policies.

10:56AM 11  Are we talking about a universe of 200 to 400 policies?

10:56AM 12  A.    That's right.

10:56AM 13  Q.    Who drafted those policies?

10:56AM 14  A.    It was the collaboration of everyone.  You know, for the

10:56AM 15  most part, I would say that BrownGreer's attorneys, from their

10:57AM 16  different teams, drafted them.

10:57AM 17  Q.    Did you draft any of them?

10:57AM 18  A.    I collaborated and, you know, probably worked on some of

10:57AM 19  them as well.  You know, we had to do --

10:57AM 20  Q.    Which ones, if you recall?

10:57AM 21  A.    The drafting of probably would have been some of the

10:57AM 22  wetlands claims.  Because those were claims that we had to use

10:57AM 23  our outside counsel, and we had two different, now, firms

10:57AM 24  working on the wetlands claims.

10:57AM 25       Initially, we -- a woman named Rose LeBreton was

**C O N F I D E N T I A L**

SM-02-JA00743

39

| | |
|---|---|
| 10:57AM | 1 |
| 10:57AM | 2 |
| 10:57AM | 3 |
| 10:57AM | 4 |
| 10:58AM | 5 |
| 10:58AM | 6 |
| 10:58AM | 7 |
| 10:58AM | 8 |
| 10:58AM | 9 |
| 10:58AM | 10 |
| 10:58AM | 11 |
| 10:58AM | 12 |
| 10:58AM | 13 |
| 10:58AM | 14 |
| 10:58AM | 15 |
| 10:58AM | 16 |
| 10:58AM | 17 |
| 10:58AM | 18 |
| 10:59AM | 19 |
| 10:59AM | 20 |
| 10:59AM | 21 |
| 10:59AM | 22 |
| 10:59AM | 23 |
| 10:59AM | 24 |
| 10:59AM | 25 |

1   hired to do the wetlands claims.  And she was working on this

2   big wetlands claim called *Lake Eugenie*, and she realized she

3   had a conflict there, so she recused herself from that claim.

4           And then Peter Title from Sessions was a property

5   lawyer, and so he would work on Lake Eugenie.  And Lake Eugenie

6   is or was, you know, a multi, multi-million dollar claim that

7   brought forth so many issues of competing title and state tax

8   adjudication issues.  So almost all of the wetland issues were

9   borne of this one claim.

10          So I would get research or advice or suggestions or

11  recommendations from Peter and Rosie, and because they weren't

12  familiar with what our policies should look like or, you know,

13  the straightforwardness of them, the presentation, I drafted

14  those.

15  Q.    Okay.  So of the 200 to 400 policies, how many would you

16  have collaborated on yourself, roughly?

17  A.    A good, good, good number.

18  Q.    Can you approximate the number or a percentage?

19  Collaborate means you reviewed them before they were finalized.

20  A.    Oh, reviewed before, maybe 100 percent.

21  Q.    You reviewed all of them?

22  A.    Yeah.

23  Q.    How about collaborating in terms of making changes or

24  additions?

25  A.    Well, I tried to keep my hands out of the BEL only because

**C O N F I D E N T I A L**

SM-02-JA00744

10:59AM  1    I hate accounting, hate accounting principles and all that

10:59AM  2    stuff, and I really didn't feel like I had that much to offer

10:59AM  3    except for, you know, from the very -- the general principles

10:59AM  4    of what the settlement agreement set out to do.

10:59AM  5              And for BEL, for me it was more administerial than

10:59AM  6    the others, because I just had to have the BEL policies come

10:59AM  7    into the fold so that they would be part of the same process.

10:59AM  8    Q.   But my question was:  Of the 200 to 400 policies, I know

11:00AM  9    you've reviewed them all you've told us, but how many did you

11:00AM 10    actually collaborate in terms of making changes in --

11:00AM 11    A.   I guess you would go back and subtract the BEL policies,

11:00AM 12    and the remainder I really collaborated, although I did

11:00AM 13    collaborate on a portion of the BEL ones as well.

11:00AM 14    Q.   Now, would you, on occasion, send legal memoranda, notes,

11:00AM 15    to Mr. Juneau?

11:00AM 16    A.   No.  I discussed everything in person with him.  That's

11:00AM 17    how we did it.  If somebody -- you know, BrownGreer might be

11:00AM 18    sending him -- they would have sent both of us the legal

11:00AM 19    memoranda and notes.

11:00AM 20    Q.   Did you ever send him a legal memo or put a note on one of

11:00AM 21    their memos in writing to him?

11:00AM 22    A.   I don't remember doing that.  Maybe.  Maybe one or two.

11:00AM 23    But, in general, I like to have face-to-face meetings with him,

11:01AM 24    because then I sit him down and have him decide, you know.

11:01AM 25    Q.   In those face-to-face meetings, did you take notes?  Do

**C O N F I D E N T I A L**

SM-02-JA00745

11:01AM 1    you have records of that?

11:01AM 2    A.    Oh, I probably have notes all over the place, all over my

11:01AM 3    office.  You know, I'm a person that starts a pad and then puts

11:01AM 4    it down and starts a pad and put it down.

11:01AM 5    Q.    Did you keep a separate or somehow segregated set of notes

11:01AM 6    with respect to meetings you had with him where you briefed him

11:01AM 7    or discussed these legal matters you've just told us about?

11:01AM 8    A.    No.  No, I didn't do it in that kind of a specific

11:01AM 9    fashion.

11:01AM 10           I do know that Orran sat down and he wrote -- he was

11:01AM 11   kind of like the secretary.  He wrote every single thing, and

11:01AM 12   he was generally always with me.

11:01AM 13   Q.    So at those meetings he would take notes?

11:01AM 14   A.    In the sense that he would be the one who would have to go

11:01AM 15   do something, so he would write himself -- or both of us, I

11:02AM 16   guess both of us would be charged with, okay, what is the next

11:02AM 17   step that we have to do now?

11:02AM 18   Q.    Would Mr. Juneau take notes?

11:02AM 19   A.    No.

11:02AM 20   Q.    Did you ever ask for more attorneys to help you?  It

11:02AM 21   sounds like you were quite busy, particularly during the period

11:02AM 22   we discussed.

11:02AM 23   A.    Yes, I was busy.  And, you know, people kept asking me if

11:02AM 24   I wanted an assistant or a secretary, and I just knew that is

11:02AM 25   not what I needed, or a paralegal.  Because somebody -- to just

**C O N F I D E N T I A L**

11:02AM 1    help me, they would have to know everything I was doing and

11:02AM 2    tracking, and that just didn't seem -- you know, it needed to

11:02AM 3    be that I had to allocate some of what I was doing, so I did

11:02AM 4    say, "I think we need more attorneys in this office."

11:02AM 5    Q.    Who did you say that to?

11:02AM 6    A.    Probably Mike.  Probably David Duval.  Probably everyone

11:03AM 7    in a general sense.  Because I thought, you know, for a legal

11:03AM 8    program, we were attorney, you know, low and other types heavy,

11:03AM 9    so --

11:03AM 10   Q.    Did you ask Mr. Juneau?

11:03AM 11   A.    I eventually -- I don't think I directly asked him, except

11:03AM 12   for when I started envisioning my husband as having a role at

11:03AM 13   the administrator's office.

11:03AM 14         He was doing less and less legal work.  He was just

11:03AM 15   focusing on these other business interests.  He was right there

11:03AM 16   next door.  He had already had a relationship with Mr. Juneau,

11:03AM 17   and he -- because one of his businesses is an oil and gas

11:03AM 18   supply boat company.

11:03AM 19         And I knew that one of the looming, big issues in

11:04AM 20   this program was the moratoria issue.  And I just kept thinking

11:04AM 21   to myself, if I have to take that on, too, you know -- I would

11:04AM 22   do it.  I could do it.

11:04AM 23         But I really thought, you know, here he is, he has

11:04AM 24   the time to work part-time.  He has the expertise to bring to

11:04AM 25   that issue.  And he -- and Mike had said, you know, he

**C O N F I D E N T I A L**

SM-02-JA00747

| | | |
|---|---|---|
| 11:04AM | 1 | wanted -- he wanted more support for his father, too. |
| 11:04AM | 2 | And I thought, I know how highly my husband holds |
| 11:04AM | 3 | Mr. Juneau in his regard, and I thought it would be a perfect |
| 11:04AM | 4 | fit. So I think I most definitely mentioned to Mr. Juneau, I |
| 11:04AM | 5 | thought that hiring my husband, I really thought it would be |
| 11:04AM | 6 | the perfect fit. |
| 11:04AM | 7 | Q.   So you recommended to Mr. Juneau that he hire your |
| 11:04AM | 8 | husband? |
| 11:04AM | 9 | A.   Yes. |
| 11:04AM | 10 | Q.   Did you recommend that he hire any other lawyers? |
| 11:05AM | 11 | A.   I never recommended him because the people I had thought |
| 11:05AM | 12 | about, you know, who might be good to help me on, were not |
| 11:05AM | 13 | interested in doing it. |
| 11:05AM | 14 | Q.   What people were they? |
| 11:05AM | 15 | A.   One was Susan Kohn. And -- who else did I have in mind? |
| 11:05AM | 16 | Actually, the other was a paralegal, not an attorney, |
| 11:05AM | 17 | Tammy Roberts. |
| 11:05AM | 18 | Q.   Did you ask them if they were interested in working for |
| 11:05AM | 19 | you? |
| 11:05AM | 20 | A.   Susan Kohn, I don't remember if I asked her directly or if |
| 11:05AM | 21 | I asked a friend of hers, and her -- my -- a mutual friend, and |
| 11:05AM | 22 | the mutual friend reached out to her and said she -- she was |
| 11:05AM | 23 | content with what she was doing. |
| 11:05AM | 24 | Q.   What about Tammy Roberts? |
| 11:05AM | 25 | A.   Tammy Roberts, the paralegal, at one point I decided not |

**C O N F I D E N T I A L**

SM-02-JA00748

44

| | |
|---|---|
| 11:05AM 1 | to ask her because I felt like a paralegal wasn't what the |
| 11:05AM 2 | situation called for. |
| 11:06AM 3 | Q.   So you didn't -- |
| 11:06AM 4 | A.   But really, you know, I just -- I was just doing.  I |
| 11:06AM 5 | wasn't really, you know -- I didn't think -- we had a CEO, you |
| 11:06AM 6 | know, and, I mean, he was to be a big part of the firm.  I |
| 11:06AM 7 | thought that was more his job than mine to worry about how the |
| 11:06AM 8 | office is staffed and who should be doing what.  I just did the |
| 11:06AM 9 | work. |
| 11:06AM 10 | Q.   You didn't ask anyone else if they were interested in |
| 11:06AM 11 | working with you directly? |
| 11:06AM 12 | A.   No. |
| 11:06AM 13 | Q.   And you recommended to Mr. Juneau that he hire your |
| 11:06AM 14 | husband? |
| 11:06AM 15 | A.   Yes. |
| 11:06AM 16 | Q.   And approximately when that was? |
| 11:06AM 17 | A.   Well, maybe October. |
| 11:06AM 18 | Q.   Did your husband ask you to make that request? |
| 11:06AM 19 | A.   No, he didn't.  Although I talked to him about it, he did |
| 11:06AM 20 | not ask me to make that request. |
| 11:06AM 21 | Q.   And what was the conversation? |
| 11:06AM 22 | A.   He thought that the -- that was something he could do, but |
| 11:06AM 23 | he could only do it part time because, you know, he was |
| 11:06AM 24 | committed to these other business interests. |
| 11:06AM 25 | Q.   Did you discuss salary with him? |

**C O N F I D E N T I A L**

SM-02-JA00749

11:06AM 1   A.   No.

11:06AM 2   Q.   Did you tell him what his role and responsibilities would

11:07AM 3   be?

11:07AM 4   A.   He knew because he could see what I was doing every day,

11:07AM 5   day in and day out.  I would talk about it when I got home.  It

11:07AM 6   was basically fielding a lot problems.

11:07AM 7         MR. TIDWELL:  You mentioned you didn't think you had

11:07AM 8   a CEO.  What did you mean by that?

11:07AM 9         THE WITNESS:  No, I didn't -- no.  I said we did have

11:07AM 10  a CEO.  And I thought --

11:07AM 11        MR. TIDWELL:  That it was his responsibility.

11:07AM 12        THE WITNESS:  -- you know, that's his responsibility,

11:07AM 13  his role, you know, to manage and see how the office is

11:07AM 14  outfitted.

11:07AM 15        MR. TIDWELL:  So did you talk to Mr. Odom about that,

11:07AM 16  about how to bring him on?

11:07AM 17        THE WITNESS:  About bringing my husband on?  Yes.

11:07AM 18  BY MR. FREEH:

11:07AM 19  Q.   Did he think it was a good idea?

11:07AM 20  A.   Yes, he did.

11:07AM 21  Q.   You said that your husband knew what your responsibilities

11:07AM 22  were because you talked about them to him?

11:07AM 23  A.   Yes.  I mean, it was -- I would come home, especially in

11:07AM 24  the beginning, seven, eight o'clock at night, have just enough

11:07AM 25  time to make dinner, and then I was back working on e-mails

**C O N F I D E N T I A L**

SM-02-JA00750

11:07AM  1   again.

11:07AM  2   Q.    So you would talk to him in what type of detail about your

11:08AM  3   particular work?

11:08AM  4   A.    Not so much detail.  You really couldn't.  Like,

11:08AM  5   Mr. Juneau and I used to talk about how -- you know, he gave up

11:08AM  6   talking -- explaining to his wife what was going on, because

11:08AM  7   you just couldn't.  You just really couldn't.  Just that there

11:08AM  8   is a lot to cover, a lot going on.  There is a lot of different

11:08AM  9   claim types.  There is a lot of teams that have to be led and

11:08AM 10   directed.  A lot of issues that have to be resolved and put to

11:08AM 11   rest.  And there was just a lot of ground to cover.  I think

11:08AM 12   that was what his understanding was.

11:08AM 13   Q.    But you said that your husband -- or at least you told

11:08AM 14   your husband that the job was, you said, problem solving?  Is

11:08AM 15   that your phrase?

11:08AM 16   A.    I don't know that I told him that.  I'm trying -- you

11:08AM 17   know, it was just issues, issues, issues, issues.

11:08AM 18   Q.    But then did you tell him what kind of issues he would be

11:08AM 19   dealing with?

11:09AM 20   A.    Well, the issues were --

11:09AM 21   Q.    No, not what they were.  But did you tell your husband

11:09AM 22   what the issues were?

11:09AM 23   A.    I'm trying to think.  I don't know.  I don't know.  I

11:09AM 24   don't think I probably ever specifically talked about it.  And

11:09AM 25   one thing that was a relief to me when he did start working

**C O N F I D E N T I A L**

SM-02-JA00751

11:09AM 1  was, okay, now -- now you know why I'm on the phone at

11:09AM 2  eleven o'clock, midnight.  Now you see what is going on.

11:09AM 3  Q.   Approximately when did he start his employment?

11:09AM 4  A.   I think November.  If not November 1st, sometime in

11:09AM 5  November.

11:09AM 6  Q.   Before he started his employment, did you talk to him

11:09AM 7  about how the two of you would handle any conflicts that he

11:09AM 8  might have?

11:09AM 9  A.   No.  He and I did not discuss that.  That was not on my

11:09AM 10  mind.

11:09AM 11  Q.   You weren't concerned about that?

11:09AM 12  A.   No, because I thought that had been resolved before I was

11:09AM 13  hired.

11:09AM 14  Q.   How did you think it was resolved?

11:09AM 15  A.   That Pat Juneau and my husband spoke about his other

11:10AM 16  business interests at that time.

11:10AM 17  Q.   Do you know --

11:10AM 18  A.   And I was sure that they were going to talk about it when

11:10AM 19  he hired him.  They would have that discussion.

11:10AM 20  Q.   How were you sure they would have that discussion?

11:10AM 21  A.   Well, I guess I can't say I was sure.  I thought they

11:10AM 22  would have that discussion.

11:10AM 23  Q.   Were you ever present when they had a discussion about

11:10AM 24  conflicts?

11:10AM 25  A.   No, I was not.

**C O N F I D E N T I A L**

SM-02-JA00752

11:10AM 1    Q.    When you were in the process of introducing your
11:10AM 2    husband -- or recommending husband, did Mr. Juneau interview
11:10AM 3    him as far as you know?
11:10AM 4    A.    As far as I know, he did have -- set a time to do that.
11:10AM 5    Q.    Did your husband report to you what the interview was?
11:10AM 6    A.    Not really.  Not that I recall anything special about it.
11:10AM 7    Q.    Did you have any curiosity as to what Mr. Juneau and him
11:10AM 8    discussed?
11:10AM 9    A.    Just whether he was going to be considered.  And I think
11:10AM 10   he might have told me that they were looking to hire him on a
11:10AM 11   part-time basis, and, for the most part, to lead the moratoria
11:11AM 12   team.
11:11AM 13          MR. FREEH:  We have been going a little more than an
11:11AM 14   hour.  I'm happy to take a break or keep going.  It's up to you
11:11AM 15   guys.
11:11AM 16          THE WITNESS:  I'm fine.
11:11AM 17          MR. FREEH:  Counsel?
11:11AM 18          MS. PIERSON:  I'm fine.
11:11AM 19   BY MR. FREEH:
11:11AM 20   Q.    Okay.  Let's go back to the period when you come on board
11:11AM 21   in a general-counsel-type role, as you described, and I know it
11:11AM 22   wasn't a general counsel title.  Had you ever had a corporate
11:11AM 23   client before that you advised in terms of a corporate action
11:11AM 24   or corporate operations, anything like that in your previous
11:11AM 25   practice?

**C O N F I D E N T I A L**

11:11AM 1    A.    No.   Not in that manner, no.

11:11AM 2    Q.    Had you had any experience at all in what they call

11:11AM 3    *corporate governance*?

11:11AM 4    A.    No.

11:11AM 5    Q.    Do you -- what is your understanding of *corporate*

11:11AM 6    *governance*?

11:11AM 7    A.    I'm not sure.

11:11AM 8    Q.    Had you had any experience before going to work with

11:11AM 9    Mr. Juneau in the area of conflicts?

11:12AM 10   A.    No.   Not -- no.   I didn't deal with any conflicts.

11:12AM 11   Q.    Did you ever have a conversation with Mr. Juneau about

11:12AM 12   what he expected with respect to the identification and

11:12AM 13   resolution of conflicts?

11:12AM 14   A.    No.   Not a direct conversation, no.

11:12AM 15   Q.    You mentioned before there was a woman working on this --

11:12AM 16   I think, Lake Eugenie?

11:12AM 17   A.    Lake Eugenie.

11:12AM 18   Q.    Eugene, I'm sorry.   And she had a conflict?

11:12AM 19   A.    Yes.

11:12AM 20   Q.    What type of conflict was that?

11:12AM 21   A.    I guess she had represented some of the landowners who

11:12AM 22   were filing the claim, on another case.

11:12AM 23   Q.    And then you said she recused herself?

11:12AM 24   A.    Or she said -- she had asked Mr. Juneau if he thought she

11:12AM 25   should stay working on that or not, and I think he decided that

**C O N F I D E N T I A L**

SM-02-JA00754

11:12AM 1   we would have Peter Title do that work instead.

11:12AM 2   Q.   Now, were you privy or present for that conversation, if

11:13AM 3   you recall?

11:13AM 4   A.   He might have directed me to respond to her.  I don't

11:13AM 5   remember.  I don't know if I responded to do her in that

11:13AM 6   fashion or if he did directly, but it was probably just by

11:13AM 7   e-mail.

11:13AM 8   Q.   You had used the word *recusal*.  You said she had recused

11:13AM 9   herself?

11:13AM 10  A.   Well, I used that word, but -- because I assume that

11:13AM 11  ultimately that's what you would call what she did, but she did

11:13AM 12  not -- she did not review that claim.

11:13AM 13  Q.   After you were hired and as you began the legal counsel

11:13AM 14  and legal job that you described, what was your understanding

11:13AM 15  as to the claims administrator's conflicts procedure or process

11:13AM 16  or policies?

11:13AM 17  A.   I don't know that there was a process or a procedure in

11:13AM 18  place.  I just know that there were documents that we signed.

11:14AM 19  Q.   And were those the documents that you signed yourself when

11:14AM 20  you went to work for him?

11:14AM 21  A.   Yes.

11:14AM 22  Q.   I'm going to show you that in a little bit and ask you

11:14AM 23  some questions.

11:14AM 24       Did you draft that document?

11:14AM 25  A.   No, I did not.

**C O N F I D E N T I A L**

SM-02-JA00755

11:14AM 1  Q.   Do you know who did?

11:14AM 2  A.   No.

11:14AM 3  Q.   Did you make any changes while you were working there in

11:14AM 4  terms of the language in the particular document that you had

11:14AM 5  signed?

11:14AM 6  A.   No, I did not.

11:14AM 7  Q.   Did you ever ask outside counsel or any other lawyer to do

11:14AM 8  a conflicts review of the claims process and give you any

11:14AM 9  opinion or recommendations?

11:14AM 10  A.   No, I did not.

11:14AM 11  Q.   When you took over the job as counsel to Mr. Juneau,

11:14AM 12  lawyer, as you've described it, did you have any experience in

11:14AM 13  ethics --

11:14AM 14  A.   No.

11:14AM 15  Q.   -- as a lawyer?

11:14AM 16  A.   No.

11:14AM 17  Q.   After you took on the position, did you make any inquiries

11:14AM 18  or did you cause any work or review to be done of the claims

11:15AM 19  administrator ethics process?

11:15AM 20  A.   No.

11:15AM 21  Q.   Did anybody ever ask you to do that?

11:15AM 22  A.   No.

11:15AM 23  Q.   Did you ever have a conversation with Mr. Juneau about the

11:15AM 24  code of conduct or the ethics with the claims administration

11:15AM 25  office?

**C O N F I D E N T I A L**

SM-02-JA00756

52

| | |
|---|---|
| 11:15AM 1 | A.   No. |
| 11:15AM 2 | Q.   Did anybody that worked with you ever have that |
| 11:15AM 3 | conversation with you? |
| 11:15AM 4 | A.   No. |
| 11:15AM 5 | Q.   Was that a subject that you did not see as part of your |
| 11:15AM 6 | responsibilities? |
| 11:15AM 7 | A.   No, I saw it as part of my responsibilities, but I never |
| 11:15AM 8 | envisioned an issue arising from it, so I wasn't overly |
| 11:15AM 9 | concerned with it. |
| 11:15AM 10 | Q.   And when you say *it*, we're talking about ethics now? |
| 11:15AM 11 | A.   Right. |
| 11:15AM 12 | Q.   Just code of conducts and ethics and conduct by people |
| 11:15AM 13 | working. |
| 11:15AM 14 | A.   That's right.  Right. |
| 11:15AM 15 | Q.   So you saw it as part of your responsibilities but you |
| 11:15AM 16 | never discussed it with Mr. Juneau? |
| 11:15AM 17 | A.   No.  Because there was no problem.  No issue. |
| 11:16AM 18 | Q.   Did you have a code of ethics? |
| 11:16AM 19 | A.   How do -- what do you mean by that? |
| 11:16AM 20 | Q.   Did the claims administration have a code of ethics? |
| 11:16AM 21 | A.   I don't think so. |
| 11:16AM 22 | Q.   Did you ever ask about one? |
| 11:16AM 23 | A.   No, I didn't. |
| 11:16AM 24 | Q.   Did it have a conflicts policy? |
| 11:16AM 25 | A.   Yes.  In my agreement, there is a conflicts policy. |

**C O N F I D E N T I A L**

**SM-02-JA00757**

| | | |
|---|---|---|
| 11:16AM | 1 | Q. Beyond your agreement, was there a conflicts code? |
| 11:16AM | 2 | A. I don't think so. |
| 11:16AM | 3 | Q. Did you ever ask if there was one? |
| 11:16AM | 4 | A. No, I didn't. |
| 11:16AM | 5 | Q. Did you ever think it was important to write one? |
| 11:16AM | 6 | A. Not until after -- |
| 11:16AM | 7 | MS. PIERSON: May I interrupt and ask, are you |
| 11:16AM | 8 | talking about a policy that would be in addition to the code of |
| 11:16AM | 9 | professional conduct that applies to all attorneys? |
| 11:16AM | 10 | MR. FREEH: I'm asking about the claims |
| 11:16AM | 11 | administration. I think that was in my question. |
| 11:16AM | 12 | MS. PIERSON: So you're talking about a separate |
| 11:16AM | 13 | code? |
| 11:16AM | 14 | MR. FREEH: I'm not talking about the code of |
| 11:16AM | 15 | attorneys' conduct. |
| 11:16AM | 16 | MS. PIERSON: Okay. |
| 11:16AM | 17 | MR. FREEH: Yeah. |
| 11:16AM | 18 | THE WITNESS: No. I really didn't have time to worry |
| 11:16AM | 19 | about other things other than what I was working on. |
| 11:16AM | 20 | MR. TIDWELL: What was your understanding who was |
| 11:17AM | 21 | responsible for that particular -- if you want to call it an |
| 11:17AM | 22 | HR function? |
| 11:17AM | 23 | THE WITNESS: I would have thought that would have |
| 11:17AM | 24 | been David Odom's responsibility, and whether he had to work |
| 11:17AM | 25 | with Sessions as the outside counsel to accomplish what that |

**C O N F I D E N T I A L**

SM-02-JA00758

11:17AM 1    process or that code should be, that's who I would have thought
11:17AM 2    would have covered that.
11:17AM 3    BY MR. FREEH:
11:17AM 4    Q.    I had asked you before if you had had a conversation with
11:17AM 5    anyone in the administration, and I would include, of course,
11:17AM 6    Mr. Odom there, about an ethics policy, a conflicts policy, and
11:17AM 7    I believe your answer to that was no.
11:17AM 8    A.    That's correct.
11:17AM 9    Q.    And that was because the issue never arose?
11:17AM 10   A.    Yes.
11:17AM 11   Q.    And you had no self-generated interest or you didn't
11:17AM 12   initiate any inquiries about that during the period that you
11:17AM 13   were there?
11:17AM 14   A.    No.  It was not forefront in my mind.  You know, I
11:17AM 15   didn't -- I didn't feel I had any of those ethical conflicts,
11:17AM 16   and, you know, I had a lot, a lot, a lot, a lot of work to do.
11:18AM 17   Q.    But my question, so you understand, I'm not asking about
11:18AM 18   conflicts per se.  I'm just asking you about a code of
11:18AM 19   ethics --
11:18AM 20   A.    Should that be there --
11:18AM 21   Q.    -- or a code conduct or a code about conflicts, separate
11:18AM 22   and apart from what attorneys are required?
11:18AM 23   A.    No.  I guess I was relying upon what attorneys are
11:18AM 24   required, but, you know, no, I didn't worry about it or think
11:18AM 25   about it.  To me that was office management, protocol, you

**C O N F I D E N T I A L**

SM-02-JA00759

11:18AM  1    know, that sort of thing.

11:18AM  2    Q.    But you say *attorneys*.   There were a lot of people in the

11:18AM  3    administration process, both inside and outside in terms of

11:18AM  4    vendors, who were not attorneys, correct?

11:18AM  5    A.    Correct.

11:18AM  6    Q.    And you never had a conversation, you said, with Mr. --

11:18AM  7    A.    You know what's interesting, now that you bring it up, I

11:18AM  8    think that the vendors all had these type of policies.   Okay?

11:18AM  9    And I did, I guess in my mind, I thought eventually our office

11:19AM  10   would have its own policy, that -- you know, just -- just like

11:19AM  11   the vendors did, as the oversight body, whether they borrowed

11:19AM  12   from their policies or created their own, but I didn't task

11:19AM  13   myself with making that happen.

11:19AM  14   Q.    And you did or did not see that as part of your

11:19AM  15   responsibilities?

11:19AM  16   A.    No, I probably assumed it was.   I -- you know.

11:19AM  17         Oh, to make sure that that was part of the office?

11:19AM  18   Q.    Yes.

11:19AM  19   A.    Oh, no.   No, no.

11:19AM  20   Q.    You didn't see that as part of your responsibility?

11:19AM  21   A.    I didn't see that as part of my responsibility, no.   I

11:19AM  22   thought we had outside counsel, Sessions firm, for those

11:19AM  23   general type of issues and questions, and I would have thought

11:19AM  24   it would have been their -- it would have been our

11:19AM  25   responsibility to, you know, secure that from them.

**C O N F I D E N T I A L**

**SM-02-JA00760**

11:19AM 1    Q.    But you never specifically inquired whether the Sessions

11:19AM 2    firm or someone else was doing this or thinking about it or

11:19AM 3    engaging in that type of analysis?

11:20AM 4    A.    No, I did not.

11:20AM 5    Q.    You said the outside vendors, you think, had policies?

11:20AM 6    A.    I think they probably did.

11:20AM 7    Q.    Did you see them?

11:20AM 8    A.    Their ethics policies?

11:20AM 9    Q.    Ethics and conflicts.  Let's make the question include

11:20AM 10   ethics and conflicts.

11:20AM 11   A.    No, I don't think I saw that.  But just in talking to

11:20AM 12   people and knowing when situations did arise, I think from that

11:20AM 13   I had the impression that they had these policies.

11:20AM 14   Q.    Did you ask to see them?

11:20AM 15   A.    No, I did not.

11:20AM 16   Q.    Did you have any conversations with their lawyers about

11:20AM 17   whether they had them or not?

11:20AM 18   A.    No, I did not.

11:20AM 19   Q.    Let me ask you now some specific questions about the

11:20AM 20   employment.  I'm going to ask you about these documents that we

11:20AM 21   referred to.

11:20AM 22          So when you were brought on board, you signed a

11:20AM 23   couple of documents; is that correct?

11:20AM 24   A.    Right.  Correct.

11:20AM 25   Q.    All right.  And one is an employment agreement?

**C O N F I D E N T I A L**

SM-02-JA00761

| | |
|---|---|
| 11:20AM 1 | A.    Correct. |
| 11:20AM 2 | Q.    We're going to give you a copy of that just to look at. |
| 11:21AM 3 | MR. TIDWELL:  This is -- for the record, this is 02B. |
| 11:21AM 4 | MR. FREEH:  02B.  Okay. |
| 11:21AM 5 | (WHEREUPON, at this point in the proceedings, |
| 11:21AM 6 | Exhibit 02B was marked for identification.) |
| 11:21AM 7 | MR. TIDWELL:  And it's the "Undertaking of |
| 11:21AM 8 | Christine Reitano in Furtherance of Court's Order Appointing |
| 11:21AM 9 | Claims Administrator." |
| 11:21AM 10 | BY MR. FREEH: |
| 11:21AM 11 | Q.    Let me make sure you have copies of these.  You can take a |
| 11:21AM 12 | look at it for a moment just to refresh your recollection.  I'm |
| 11:21AM 13 | going to be asking you, Ms. Reitano, about the conflicts of |
| 11:21AM 14 | interest and recusal, which is paragraph 9 on page 5.  You can |
| 11:21AM 15 | read through it and take a moment. |
| 11:21AM 16 | MS. PIERSON:  These are going to be attached to the |
| 11:21AM 17 | court reporter's document? |
| 11:21AM 18 | MR. TIDWELL:  Yes, ma'am. |
| 11:21AM 19 | MR. FREEH:  Yes. |
| 11:21AM 20 | MS. PIERSON:  Which I gave her my information.  I |
| 11:21AM 21 | would like to get a copy of that when this is done. |
| 11:21AM 22 | MR. FREEH:  Well, that will be subject to the judge's |
| 11:21AM 23 | discussion and ruling.  We're not going to provide you a copy |
| 11:21AM 24 | today or immediately. |
| 11:21AM 25 | MS. PIERSON:  Well, I'm sure that the judge gets it |

**CONFIDENTIAL**

SM-02-JA00762

11:21AM 1    first, but --

11:21AM 2                MR. FREEH:  Yeah.  Well, he's going to have to make a

11:21AM 3    decision about releasing it.

11:22AM 4                MS. PIERSON:  Right.

11:22AM 5                THE WITNESS:  (Witness reviews the document.)  Okay.

11:22AM 6    BY MR. FREEH:

11:22AM 7    Q.   Okay.  So this is a document, referring to 02B, which you

11:22AM 8    signed, entitled the "Undertaking," by you, "in Furtherance of

11:22AM 9    Court's Order Appointing Claims Administrator."  Are you

11:22AM 10   familiar with that?

11:22AM 11   A.   Yes.

11:22AM 12   Q.   And you signed that; is that correct?

11:22AM 13   A.   Yes.

11:22AM 14   Q.   And you said before that you didn't prepare or draft this?

11:22AM 15   A.   Correct.

11:22AM 16   Q.   Do you know who did?

11:22AM 17   A.   No, I don't.

11:22AM 18   Q.   All right.  Directing your attention to page 5,

11:22AM 19   paragraph 9, *Conflict of Interest and Recusal*.  Going about

11:23AM 20   halfway down the paragraph, it says, quote:  Reitano shall not

11:23AM 21   participate, without prior written approval from the claims

11:23AM 22   administrator, in any activity that presents or would appear to

11:23AM 23   present to a reasonable person who is knowledgeable of the

11:23AM 24   relevant facts, a conflict of interest with the transition

11:23AM 25   process or the proposed court-supervised claims program.

**C O N F I D E N T I A L**

SM-02-JA00763

| | | |
|---|---|---|
| 11:23AM | 1 | Do you see that? |
| 11:23AM | 2 | A.   Yes. |
| 11:23AM | 3 | Q.   So what was your understanding about how that would impact |
| 11:23AM | 4 | or how that would guide your actions and behavior as an |
| 11:23AM | 5 | attorney, but also as a part of the supervised claims program? |
| 11:23AM | 6 | A.   That I couldn't have any interest in or involvement in |
| 11:23AM | 7 | BP-related claims. |
| 11:23AM | 8 | Q.   Anything more than that?  And I'll direct your attention |
| 11:23AM | 9 | to the language that says "or would appear to present to a |
| 11:24AM | 10 | reasonable person...a conflict of interest." |
| 11:24AM | 11 | A.   That even the appearance of a conflict of interest, that |
| 11:24AM | 12 | even the appearance that I have an interest in something. |
| 11:24AM | 13 | Q.   And as your attorney indicated before, you're also |
| 11:24AM | 14 | familiar, I'm sure, with the general provisions of attorney |
| 11:24AM | 15 | conduct, not specific to this particular position, but attorney |
| 11:24AM | 16 | conflicts and conduct regarding the avoidance of both conflicts |
| 11:24AM | 17 | and the appearance of conflicts? |
| 11:24AM | 18 | A.   Right. |
| 11:24AM | 19 | Q.   Did you also sign at the same time a second document, |
| 11:24AM | 20 | which was a certification of confidentiality of claims? |
| 11:24AM | 21 | We're going to show you 02D. |
| 11:24AM | 22 | (WHEREUPON, at this point in the proceedings, |
| 11:24AM | 23 | Exhibit 02D was marked for identification.) |
| 11:24AM | 24 | THE WITNESS:  I don't know that that was at the same |
| 11:24AM | 25 | time. |

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 11:24AM | 1 | BY MR. FREEH: |
| 11:24AM | 2 | Q.    Okay.  The date on that is July 18th -- |
| 11:25AM | 3 | A.    Yeah, those weren't prepared -- |
| 11:25AM | 4 | Q.    -- 2012. |
| 11:25AM | 5 | A.    -- until well into the program. |
| 11:25AM | 6 | Q.    So the undertaking, which we just referred to, 02B, you |
| 11:25AM | 7 | did not sign that contemporaneous with you starting your |
| 11:25AM | 8 | employment?  There is no date on the document I have. |
| 11:25AM | 9 | A.    You know, I can't be sure.  These things were being |
| 11:25AM | 10 | e-mailed back and forth. |
| 11:25AM | 11 | MS. PIERSON:  It has a date on the first page, at the |
| 11:25AM | 12 | top. |
| 11:25AM | 13 | |
| 11:25AM | 14 | MR. FREEH:  It's entered into on April 18, 2012, but |
| 11:25AM | 15 | there is no date on the signature page. |
| 11:25AM | 16 | MS. PIERSON:  Okay. |
| 11:25AM | 17 | BY MR. FREEH: |
| 11:25AM | 18 | Q.    Is it your recollection that you signed it on April 18th |
| 11:25AM | 19 | or you're not sure? |
| 11:25AM | 20 | A.    I'm not sure. |
| 11:25AM | 21 | Q.    It could have been much later? |
| 11:25AM | 22 | A.    No, no.  It was at or near April 18th.  These things were |
| 11:25AM | 23 | being e-mailed. |
| 11:25AM | 24 | MR. TIDWELL:  And so 02D is Appendix B in the |
| 11:25AM | 25 | United States District Court for the Eastern District of |

**C O N F I D E N T I A L**

SM-02-JA00765

11:25AM 1   Louisiana, "Certification Regarding Confidentiality of Claims

11:26AM 2   Information."

11:26AM 3   BY MR. FREEH:

11:26AM 4   Q.   We show you 02D, as in David.

11:26AM 5   A.   (Witness reviews the document.)  Absolutely, I remember

11:26AM 6   this in connection with the confidentiality order.

11:26AM 7   Q.   I'm going to show you 02D1, which is entitled

11:26AM 8   "Confidential Information, Confidentiality/Non-Disclosure

11:26AM 9   Agreement," and ask you to take a look at that.

11:26AM 10       (WHEREUPON, at this point in the proceedings,

11:26AM 11   Exhibit 02D1 was marked for identification.)

11:26AM 12   BY MR. FREEH:

11:26AM 13   Q.   And the last page has a signature with the date of

11:26AM 14   July 17th, 2012.  And I believe it's your signature?

11:27AM 15   A.   Yes, it is.

11:27AM 16   Q.   So this was signed on July 17th, 2012?

11:27AM 17   A.   Right.

11:27AM 18   Q.   Which would be several months after you went to work?

11:27AM 19   A.   That's right.

11:27AM 20   Q.   Do you know why there was a delay with respect to the

11:27AM 21   execution of it?

11:27AM 22   A.   I would assume that this was something that our office was

11:27AM 23   working with Sessions to prepare and create, and there was just

11:27AM 24   a delay in completing it.

11:27AM 25   Q.   At the end of that document there is a heading, we don't

**C O N F I D E N T I A L**

**SM-02-JA00766**

62

11:27AM  1    have a page, but it's the second page from the end, which says

11:27AM  2    "Conflict of Interest and Recusal," and just direct your

11:27AM  3    attention to that page.

11:27AM  4            MS. PIERSON:  It's actually the fourth page from the

11:27AM  5    end.  You're not counting the definitions?

11:27AM  6            MR. FREEH:  Fourth page.  Yeah.

11:27AM  7    BY MR. FREEH:

11:27AM  8    Q.    It's entitled "Conflict of Interest and Recusal" in caps

11:27AM  9    at the top of the page.

11:27AM  10   A.    Okay.  Yeah, I see that.

11:27AM  11   Q.    And that's a two-page document within a larger document,

11:26AM  12   and that also was signed on July 17th, 2012?

11:28AM  13   A.    Uh-huh (affirmative response).

11:28AM  14   Q.    And that's your signature?

11:28AM  15   A.    Yes.

11:28AM  16   Q.    And again, that was several months after you started work?

11:28AM  17   A.    Yes.

11:28AM  18   Q.    The same question, do you know why there was a delay in

11:28AM  19   getting that executed?

11:28AM  20   A.    The same explanation.  That I assume our office was

11:28AM  21   working with Sessions to prepare this document, and there was a

11:28AM  22   delay in completing it.

11:28AM  23   Q.    Let me show you a document, Ms. Reitano, which we marked

11:28AM  24   as Exhibit Number 03 for today.

11:28AM  25            (WHEREUPON, at this point in the proceedings,

**C O N F I D E N T I A L**

**SM-02-JA00767**

63

| | |
|---|---|
| 11:28AM | 1 |

Exhibit 03 was marked for identification.)

MR. TIDWELL:  03 is an e-mail dated July 1, 2012, from Christine Reitano to Jennifer Keough, subject is "Re: Sarasota," and it's marked 03.

MR. FREEH:  Do you have an extra copy for the attorney?

MR. MCCALL:  No.

MR. FREEH:  Let them look at it.

I want to ask you a few questions about that.

MS. PIERSON:  Does it start from the back?

MR. FREEH:  Yes.  It's a two-page document.

MS. PIERSON:  Ms. Keough is with the Garden City Group?

MR. TIDWELL:  Yes, ma'am.

THE WITNESS:  Okay.

MS. PIERSON:  Let me finish reading it.

MR. FREEH:  Sure.  Take your time.

MS. PIERSON:  Okay.

BY MR. FREEH:

Q.    Okay.  So this is a set of e-mail exchanges on or about July 1, 2012, with Jennifer Keough?

A.    Yes.

Q.    And who is Jennifer Keough at that time?

A.    Jennifer Keough is -- maybe she's the vice president at Garden City Group.

**C O N F I D E N T I A L**

SM-02-JA00768

| | |
|---|---|
| 11:30AM 1 | Q.    What was your relation or interaction on a regular basis |
| 11:31AM 2 | with Ms. Keough at that point? |
| 11:31AM 3 | A.    Well, she was kind of the lead person or contact person at |
| 11:31AM 4 | Garden City, and I dealt with Garden City for their role in the |
| 11:31AM 5 | program, which was basically the intake part of the program and |
| 11:31AM 6 | then the payment process. |
| 11:31AM 7 | Q.    Would it be fair to say that you had an oversight role |
| 11:31AM 8 | with respect to Ms. Keough in that process? |
| 11:31AM 9 | A.    Yes. |
| 11:31AM 10 | Q.    And in this exchange that you looked at, you're asking her |
| 11:31AM 11 | to consider hiring your husband; is that correct? |
| 11:31AM 12 | A.    Well, when I had -- I had gone to Sarasota because they |
| 11:31AM 13 | have a call center there.  And one of the other oversight -- |
| 11:31AM 14 | one of the other areas of oversight was the communications, |
| 11:31AM 15 | what people were saying about -- you know, when callers were |
| 11:32AM 16 | calling in with questions, what the respondents were saying, so |
| 11:32AM 17 | I went to see that site. |
| 11:32AM 18 |         And she said -- you know, at that time she had -- |
| 11:32AM 19 | Garden City had a small office in the building as well, to have |
| 11:32AM 20 | a couple of their attorneys stay there on a more regular basis |
| 11:32AM 21 | to attend the meetings.  And she had asked me if I knew anyone |
| 11:32AM 22 | who might be interested in working on the program for |
| 11:32AM 23 | Garden City. |
| 11:32AM 24 |         And I -- again, the same sort of situation, you know, |
| 11:32AM 25 | Tiger wasn't practicing much law at the time.  I thought that |

**C O N F I D E N T I A L**

**SM-02-JA00769**

11:32AM 1   he might be a good fit.  And Susan Kohn is also someone else I

11:32AM 2   had thought for that position as well.

11:32AM 3   Q.    Did you send an e-mail to Ms. Keough with regard to Susan?

11:32AM 4   A.    No.  Because I had to ask my friend to ask Susan, and she

11:33AM 5   said she wouldn't be interested.

11:33AM 6   Q.    Before you sent the e-mail on July 1st, had you discussed

11:33AM 7   this with your husband?

11:33AM 8   A.    I probably did.  I don't know before -- no, I wouldn't

11:33AM 9   have discussed it with him until I had the conversation with

11:33AM 10  her -- or, I guess it says -- whenever I actually met with her,

11:33AM 11  that day, I might have discussed it with him, to see if he

11:33AM 12  would even be interested in doing it.

11:33AM 13  Q.    Well, before you proposed your husband's name as a

11:33AM 14  candidate, are you saying you did speak to your husband or you

11:33AM 15  didn't speak to your husband?

11:33AM 16  A.    No, because the idea never crossed my mind until she asked

11:33AM 17  if I knew an attorney who would be interested.

11:33AM 18  Q.    All right.  But I'm referring now to the e-mail, 03.  At

11:33AM 19  the time you sent the e-mail, had you had a discussion with

11:33AM 20  your husband to see whether or not he was interested in this?

11:33AM 21  A.    Yes.

11:33AM 22  Q.    And he was?

11:33AM 23  A.    Sort of.

11:33AM 24  Q.    Well, would you have sent the e-mail if he wasn't?

11:33AM 25  A.    Well, he was open to discussing it.

**C O N F I D E N T I A L**

**SM-02-JA00770**

| | | |
|---|---|---|
| 11:34AM | 1 | Q.   So he was interested in it? |
| 11:34AM | 2 | A.   Yes. |
| 11:34AM | 3 | Q.   And did you see that as a conflict of interest? |
| 11:34AM | 4 | A.   No, I did not.  Because I didn't feel like we were in -- |
| 11:34AM | 5 | the claims administrator's office was in conflict with one of |
| 11:34AM | 6 | the vendors. |
| 11:34AM | 7 | Q.   But you oversaw their activities and supervised them from |
| 11:34AM | 8 | time to time on different matters, correct? |
| 11:34AM | 9 | A.   That's true.  But I would think I could almost do that |
| 11:34AM | 10 | within our office. |
| 11:34AM | 11 | Q.   So as you sit here today, you don't see that as a |
| 11:34AM | 12 | conflict? |
| 11:34AM | 13 | A.   Well, I think different people would disagree. |
| 11:34AM | 14 | Q.   I'm not asking about different people.  As you sit here |
| 11:34AM | 15 | today, do you see it as a conflict? |
| 11:34AM | 16 | A.   At the time I did not see it as conflict. |
| 11:34AM | 17 | Q.   Do you see it as a conflict now? |
| 11:34AM | 18 | A.   Um -- I guess I view my relationship with them as a |
| 11:35AM | 19 | working relationship. |
| 11:35AM | 20 | Q.   Let the record reflect several seconds of hesitation, and |
| 11:35AM | 21 | I'll ask the question a third time. |
| 11:35AM | 22 | As you sit here today, do you see this communication |
| 11:35AM | 23 | asking Jennifer Keough to consider hiring your husband a |
| 11:35AM | 24 | conflict of your duties at that time? |
| 11:35AM | 25 | A.   No.  She had asked me if I knew an attorney who would be |

**C O N F I D E N T I A L**

**SM-02-JA00771**

11:35AM 1  good.  Maybe I didn't think it out, you know.  I do not and did

11:35AM 2  not see it as a conflict.

11:35AM 3  Q.   Did you discuss it with Mr. Juneau?

11:35AM 4  A.   No.

11:35AM 5  Q.   Did you tell anybody you were going to send this e-mail?

11:35AM 6  A.   No.

11:35AM 7  Q.   Let me direct your attention back to a document we showed

11:35AM 8  you before, which was your employment undertaking.

11:35AM 9        Can we have that document again, that's 02B.

11:36AM 10       And again, paragraph 9 on page 5, "...in any activity

11:36AM 11  that presents or would appear to present to a reasonable person

11:36AM 12  who is knowledgeable of the relevant facts, a conflict of

11:36AM 13  interest with a transition process or the proposed

11:36AM 14  court-supervised claims program."

11:36AM 15       As you sit here today, do you think that was an

11:36AM 16  appearance of a conflict?

11:36AM 17  A.   No, I didn't.  Because I thought we were working together.

11:36AM 18  Q.   And your husband, obviously, was not retained for that

11:36AM 19  position, correct?

11:36AM 20  A.   Correct.

11:36AM 21       MR. TIDWELL:  Do you know if there was a follow-up

11:36AM 22  conversation with anybody at Garden City?  Did he speak to

11:36AM 23  anyone there?

11:36AM 24       THE WITNESS:  No, I did not.

11:36AM 25       MR. TIDWELL:  No, did he?

**C O N F I D E N T I A L**

SM-02-JA00772

| | | |
|---|---|---|
| 11:36AM | 1 | THE WITNESS:  Did he?  He may have spoken to Neil |
| 11:36AM | 2 | Zola. |
| 11:36AM | 3 | MR. TIDWELL:  Neil Zola would be? |
| 11:36AM | 4 | THE WITNESS:  The president. |
| 11:37AM | 5 | MR. TIDWELL:  The president of Garden City. |
| 11:37AM | 6 | THE WITNESS:  I think so. |
| 11:37AM | 7 | MR. TIDWELL:  You think it was Neil Zola. |
| 11:37AM | 8 | THE WITNESS:  I think so. |
| 11:37AM | 9 | MR. TIDWELL:  So did your husband indicate to you |
| 11:37AM | 10 | that they had a conversation, do you recall? |
| 11:37AM | 11 | THE WITNESS:  I can't remember.  I can't remember if |
| 11:37AM | 12 | my husband called Neil or if I called Neil.  We might have both |
| 11:37AM | 13 | spoken to Neil.  I think my husband might have called him. |
| 11:37AM | 14 | MR. TIDWELL:  So he was not interested or it didn't |
| 11:37AM | 15 | just work out?  How did you understand it came to an end? |
| 11:37AM | 16 | THE WITNESS:  He was not interested. |
| 11:37AM | 17 | MR. TIDWELL:  Okay. |
| 11:37AM | 18 | By MR. FREEH: |
| 11:37AM | 19 | Q.    Did you call at any time while you were there working for |
| 11:37AM | 20 | Mr. Juneau any of the other contractors, vendors, people |
| 11:37AM | 21 | related to the program on behalf of finding your husband a job? |
| 11:38AM | 22 | A.    No. |
| 11:38AM | 23 | Q.    That was the only instance? |
| 11:38AM | 24 | A.    Yes.  And I didn't initiate that. |
| 11:38AM | 25 | Q.    Well, you sent the e-mail. |

**C O N F I D E N T I A L**

SM-02-JA00773

| | | |
|---|---|---|
| 11:38AM | 1 | A.   Yes.  After a conversation with her in person. |
| 11:38AM | 2 | Q.   Let me show you an exhibit we've marked 02, or Number 2. |
| 11:38AM | 3 | (WHEREUPON, at this point in the proceedings, |
| 11:38AM | 4 | Exhibit 02 was marked for identification.) |
| 11:38AM | 5 | MR. TIDWELL:  For the record, 02 is a Gulf Coast |
| 11:38AM | 6 | Claims Facility "Client Authorization Form" for Casey Thonn. |
| 11:38AM | 7 | It's signed by Mr. Thonn on 10/14/11. |
| 11:38AM | 8 | MR. FREEH:  Okay.  I'll let you look at that for a |
| 11:38AM | 9 | moment with your lawyer. |
| 11:39AM | 10 | THE WITNESS:  (Witness reviews the document.) |
| 11:39AM | 11 | MS. PIERSON:  Can we take a five-minute break. |
| 11:39AM | 12 | MR. FREEH:  Absolutely.  Let's take a ten-minute |
| 11:39AM | 13 | break. |
| 11:39AM | 14 | (WHEREUPON, at this point in the proceedings, a brief |
| 11:39AM | 15 | recess was taken.) |
| 12:00PM | 16 | MR. FREEH:  Okay.  So we're back on the record at |
| 12:00PM | 17 | noon after a short break. |
| 12:00PM | 18 | BY MR. FREEH: |
| 12:00PM | 19 | Q.   Ms. Reitano, I was asking you questions before about your |
| 12:00PM | 20 | roles and responsibilities with respect to working with |
| 12:01PM | 21 | Mr. Juneau. |
| 12:01PM | 22 | A.   Yes. |
| 12:01PM | 23 | Q.   And I did not ask you about whether compliance functions |
| 12:01PM | 24 | were at all in your responsibilities or portfolio. |
| 12:01PM | 25 | Compliance, let me define that, meaning that, you |

**C O N F I D E N T I A L**

SM-02-JA00774

12:01PM 1   know, the people, both within the claims administration, your

12:01PM 2   vendors were abiding by appropriate rules and policies and

12:01PM 3   procedures for doing their business without conflicts, without

12:01PM 4   ethical violations, making any reporting to government

12:01PM 5   agencies, for instance, if you saw money laundering or evidence

12:01PM 6   of any improper activities.

12:01PM 7        In other words, a compliance function, making sure

12:01PM 8   that your administration colleagues with Mr. Juneau's office,

12:01PM 9   but also your vendors, were complying with all the necessary

12:01PM 10  rules and procedures?

12:01PM 11  A.    It wasn't my role necessarily, but if something were

12:02PM 12  brought to my attention, I would probably have brought it

12:02PM 13  directly to Mr. Juneau, maybe David Welker and David Odom.

12:02PM 14  Q.    Do you recall anything in that compliance basket, as I've

12:02PM 15  described it, being brought to your attention while you were

12:02PM 16  there?

12:02PM 17  A.    No, I don't recall.

12:02PM 18  Q.    And did you ever have a specific conversation with

12:02PM 19  Mr. Juneau about compliance with respect to the claims

12:02PM 20  administration office?

12:02PM 21  A.    No.

12:02PM 22  Q.    And did you discuss with anyone else in the claims

12:02PM 23  administration organization who, if anyone, was responsible for

12:02PM 24  or looking at compliance?

12:02PM 25  A.    No.

**C O N F I D E N T I A L**

SM-02-JA00775

| | | |
|---|---|---|
| 12:02PM | 1 | Q.   Do you know or are you aware of asking -- strike that. |
| 12:02PM | 2 | Are you aware or do you know of any third party that |
| 12:02PM | 3 | looked at any of the compliance processes or the compliance |
| 12:02PM | 4 | policies and procedures of your administration while you were |
| 12:02PM | 5 | there? |
| 12:02PM | 6 | A.   No.  I didn't cover that.  That wasn't my role.  I could |
| 12:03PM | 7 | maybe assume Sessions did that.  But, no. |
| 12:03PM | 8 | Q.   Then you never had a discussion with Sessions about that? |
| 12:03PM | 9 | A.   No. |
| 12:03PM | 10 | Q.   Or Mr. Odom? |
| 12:03PM | 11 | A.   No. |
| 12:03PM | 12 | Q.   Let me show you what we started right before the break, |
| 12:03PM | 13 | which is Exhibit 02.  Two is a GCCF client authorization form |
| 12:03PM | 14 | dated -- well, there's two dates, 10/14/11 and 10/11/11. |
| 12:03PM | 15 | And do you have that in front of you? |
| 12:03PM | 16 | A.   Yes, I do. |
| 12:03PM | 17 | Q.   Could you just tell us what that document is, please? |
| 12:03PM | 18 | A.   This is the authorization form that you had to file with |
| 12:03PM | 19 | the GCCF program letting them know or documenting that you are |
| 12:03PM | 20 | representing this claimant. |
| 12:03PM | 21 | Q.   All right.  And that was your submission on or about |
| 12:03PM | 22 | October 14, 2011? |
| 12:03PM | 23 | A.   Correct. |
| 12:03PM | 24 | Q.   And was Casey Thonn your client at that time? |
| 12:03PM | 25 | A.   Yes. |

**C O N F I D E N T I A L**

SM-02-JA00776

12:03PM   1    Q.   And how did he come to be your client?

12:03PM   2    A.   He came to be my client because, I think, in the early

12:04PM   3    part of 2011, or the end of 2010, this other family, the

12:04PM   4    Bakeses that I had mentioned before, had been referred to my

12:04PM   5    husband, and they wanted to -- help, assistance with filing

12:04PM   6    their GCCF claim.  And I believe Casey was a friend of theirs,

12:04PM   7    and so later came as well.

12:04PM   8    Q.   And would you describe him as your client, a firm client,

12:04PM   9    a client of both you and your husband at that time?

12:04PM  10    A.   A firm client.  I signed him up.

12:04PM  11    Q.   And did your husband work on any of the matter relating to

12:04PM  12    his claims at that time?

12:04PM  13    A.   The GCCF claim?  No.

12:04PM  14    Q.   The GCCF.

12:04PM  15    A.   Right.

12:04PM  16    Q.   No?

12:04PM  17    A.   No.

12:04PM  18    Q.   And what, if anything, did you the do, without telling me

12:05PM  19    your conversations with him, that is, with Mr. Thonn, what, if

12:05PM  20    anything, did you do in terms of processing his claim?

12:05PM  21    A.   In terms of processing his claims, it was a question of

12:05PM  22    documenting his file, responding to incompleteness notices,

12:05PM  23    once again, reaching out to him for more documentation.  He

12:05PM  24    had -- I accompanied him on one of his field visit interviews

12:05PM  25    for the subsistence portion of his claim, and that was

**C O N F I D E N T I A L**

SM-02-JA00777

12:05PM 1   essentially it.

12:05PM 2   Q.    And is your recollection he had several claims?  He had a

12:05PM 3   subsistence claim, he had a vessel claim as well as a food

12:05PM 4   claim?

12:05PM 5   A.    He had -- to my recollection, he had a fisherman claim and

12:06PM 6   a subsistence claim.  I was unaware of the vessel claim.

12:06PM 7           MR. TIDWELL:  So you're not aware if he was a

12:06PM 8   previous client with your husband?

12:06PM 9           THE WITNESS:  He was not a previous client with my

12:06PM 10  husband, to my --

12:06PM 11          MR. TIDWELL:  On a personal injury matter or

12:06PM 12  anything?

12:06PM 13          THE WITNESS:  No, not prior to.  He did also have --

12:06PM 14  see, he also had a personal injury claim at around the same

12:06PM 15  time.

12:06PM 16          MR. TIDWELL:  Same time.  And y'all were handling

12:06PM 17  that?

12:06PM 18          THE WITNESS:  Yes.

19

20

21

22

23

24

25

**C O N F I D E N T I A L**

SM-02-JA00778

BY MR. FREEH:

Q.    Were you handling that or was your husband?

A.    I was handling it until I took the position as a claims administrator.

Q.    And was your husband also working on it?  Working, meaning anything in regard to the case.

A.    The personal injury case?  I don't think so.  Initially, you know, it was just a question of trying to settle it with the insurance company, and then something happened on the insurance company's end.

        It probably should have resolved a lot quicker, probably should have resolved before I took the position with the claims administrator, but it didn't.  So I just left that to my husband when I left the firm.

Q.    So at the time that you joined the claims administration, you and your firm and your husband, in one fashion or the other, were assisting Mr. Thonn on two matters, one relating to the Gulf claim and another unrelated personal injury matter?

A.    That's right.

Q.    And you said when you left the firm, it went to your husband in terms of the continuing representation?

A.    Not for the -- not for the GCCF claim.  I terminated my relationship with Casey, and I also notified the program that I was not handling his GCCF claim.

Q.    And we'll show you 02A, which is a letter you wrote to the

**C O N F I D E N T I A L**

SM-02-JA00779

12:07PM 1    GCCF dated March 30th, 2012, saying that you are confirming you

12:08PM 2    are no longer representing Casey Thonn in connection with the

12:08PM 3    claim.

12:08PM 4            (WHEREUPON, at this point in the proceedings,

12:08PM 5    Exhibit 02A was marked for identification.)

12:08PM 6            MR. TIDWELL:   02A, the Sutton & Reitano letter to the

12:08PM 7    Gulf Coast Claims Facility.

12:08PM 8            THE WITNESS:   That's correct.

12:08PM 9    BY MR. FREEH:

12:08PM 10    Q.   And that's the notification that we just discussed?

12:08PM 11    A.   Yes.

12:08PM 12    Q.   I may have asked you this before, but I'll repeat it, did

12:08PM 13    you at any time specify to Mr. Juneau or anybody at the claims

12:08PM 14    administration that you had represented an individual named

12:08PM 15    *Thonn* in the previous GCCF matter?

12:08PM 16    A.   I don't remember if I named him specifically or not.

12:08PM 17            MR. TIDWELL:   When you say *named specifically* --

12:08PM 18            THE WITNESS:   Like I told him I had -- was

12:08PM 19    representing people in the GCCF program.  I don't know if I

12:08PM 20    said Casey Thonn, Tim Gonzales, Jessica Backes.  You know, I

12:08PM 21    may or may not have.  I don't know.

12:08PM 22    BY MR. FREEH:

12:08PM 23    Q.   When you started working at the claims administration, did

12:09PM 24    you notify and provide those names specifically to anyone in

12:09PM 25    the claims administration process as people that you had

**C O N F I D E N T I A L**

SM-02-JA00780

12:09PM 1    previously represented?

12:09PM 2    A.    No.  I did not in a formal way.  And I was not asked to.

12:09PM 3    Q.    And as far as you know, was there any process or procedure

12:09PM 4    where that would have been done?  In other words, someone

12:09PM 5    coming on board, putting on record or noticing the

12:09PM 6    administration that they had represented previous people who

12:09PM 7    could be claimants?

12:09PM 8    A.    No, there was no process for that.

12:09PM 9    Q.    Did anybody ever ask you about whether there was a process

12:09PM 10   like that?

12:09PM 11   A.    No.

12:09PM 12   Q.    Did you ever think or come to the point where you were

12:09PM 13   interested in setting up such a process?

12:09PM 14   A.    No.  In my mind, once I terminated my relationship with

12:09PM 15   him and left the firm, it was -- it was done.  It was done, and

12:09PM 16   here I was now, an independent contractor working in my own

12:10PM 17   name on this program.  And as I mentioned before, I had a good

12:10PM 18   deal of work on my plate.  I really had to keep my nose to the

12:10PM 19   grindstone and just do that.

12:10PM 20   Q.    Let me show you what we've marked as Exhibit 04, which is

12:10PM 21   a series of documents with some attachments.  It's an e-mail

12:10PM 22   train dated on or around September 17, 2012.  So we're going to

12:10PM 23   let you look at that.

12:10PM 24            (WHEREUPON, at this point in the proceedings,

12:10PM 25   Exhibit 04 was marked for identification.)

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 12:10PM | 1 | MR. TIDWELL:  04 is an e-mail from Lynn Greer at |
| 12:10PM | 2 | BrownGreer dated September 17, 2012, to Ms. Reitano, |
| 12:10PM | 3 | Jennifer Keough at Garden City Group.  The subject is |
| 12:10PM | 4 | "Expedited Claims," and the attachments are "No claims left |
| 12:10PM | 5 | behind." |
| 12:10PM | 6 | BY MR. FREEH: |
| 12:10PM | 7 | Q.   So take a look at that.  There's a number of attachments. |
| 12:10PM | 8 | Take whatever time you need to review it.  Your attorney is |
| 12:11PM | 9 | looking at it with you, and I'm going to ask you some questions |
| 12:11PM | 10 | about it. |
| 12:13PM | 11 | A.   (Witness reviews the document.)  Okay.  I've read the gist |
| 12:13PM | 12 | of it. |
| 12:13PM | 13 | Q.   Okay.  So let me direct your attention to page 3 of |
| 12:13PM | 14 | document, which has been marked as 04, which is the first in |
| 12:13PM | 15 | the string of e-mails, at least that we have, and it's an |
| 12:13PM | 16 | e-mail from you dated September 17, 2012, to Matt Lundy with a |
| 12:13PM | 17 | copy to Lynn Greer. |
| 12:13PM | 18 | A.   Okay. |
| 12:13PM | 19 | Q.   Who is Matt Lundy? |
| 12:13PM | 20 | A.   Matt Lundy is one of the attorneys, maybe one of the PSC |
| 12:14PM | 21 | attorneys, involved in the program. |
| 12:14PM | 22 | Q.   And prior to this date, September 17, 2012, had you had |
| 12:14PM | 23 | any contact or interaction with him? |
| 12:14PM | 24 | A.   Perhaps.  If I did -- I don't know -- I know he was |
| 12:14PM | 25 | involved with structured settlements, okay, and I don't know if |

**C O N F I D E N T I A L**

78

12:14PM 1   he was at one of the -- at a very large PSC meeting we had held

12:14PM 2   in September.

12:14PM 3   Q.   So addressing the communication on September 17th --

12:14PM 4   A.   Yes.

12:14PM 5   Q.   -- it looks like you're responding to an e-mail that he

12:14PM 6   sent you or some contact, is that your understanding?

12:14PM 7   A.   Yes.

12:14PM 8   Q.   And what do you remember about that, please?

12:14PM 9   A.   Well, I don't remember the specifics, but it's talking

12:14PM 10  about e-mail designating the claims you wished to be expedited

12:14PM 11  to BrownGreer.

12:14PM 12       We had had a meeting with the PSC.  At the time, you

12:15PM 13  know, the program was trying to do several things at once,

12:15PM 14  create claim forms, registration forms, instruction booklets,

12:15PM 15  open up CA -- the CAC centers, start intaking and start

12:15PM 16  reviewing.

12:15PM 17       And then the next step, which we began to really

12:15PM 18  receive a lot of criticism for, was payment.  People wanted --

12:15PM 19  it wasn't enough that you opened your doors.  It wasn't enough

12:15PM 20  that now you were actually taking in claims.  It wasn't enough

12:15PM 21  that you had begun the review process.  Now we need to see

12:15PM 22  payments on the street or this settlement agreement isn't going

12:15PM 23  to have the backing or approval that it needs.

12:15PM 24       So one thing we did when we met with the PSC group

12:16PM 25  was we discussed that one of the biggest problems now, even

**C O N F I D E N T I A L**

**SM-02-JA00783**

12:16PM 1    though that we were reviewing claims, was that these claims

12:16PM 2    were grossly deficient for their documentation.

12:16PM 3         And that, okay, we're reviewing them, and we didn't

12:16PM 4    want to hurry up and send a lot of incompleteness notices,

12:16PM 5    because that was a big source of complaint with the GCCF

12:16PM 6    program.

12:16PM 7         So we said, you know, "Our hands are tied.  You know,

12:16PM 8    we cannot make this happen any faster.  We can't make -- you

12:16PM 9    know, we can't issue awards if the documentation is

12:16PM 10   incomplete."

12:16PM 11        Well, some of the members were like -- one of the

12:16PM 12   things -- in addition to this, internally, our business

12:16PM 13   processes people we're trying to come up with a method to

12:16PM 14   identify from the universe of claims those claims that were

12:16PM 15   complete so that we could push those ahead and review them.

12:17PM 16   Well, how do you do that without actually looking at the claim?

12:17PM 17   It became really a futile endeavor.

12:17PM 18        But they talked about the low -- grab the low-lying

12:17PM 19   fruit.  Grab the claims that are easiest to process and require

12:17PM 20   less documentation.  VOO would be an example of that.  Those

12:17PM 21   were some of the first claims that came out.

12:17PM 22        So what the PSC also offered was, "Look, we know the

12:17PM 23   settlement agreement because we wrote it.  We -- we have the

12:17PM 24   best accountants.  We have the best this, that and the other.

12:17PM 25   We can identify for you, on a very short-term basis, claims

**C O N F I D E N T I A L**

SM-02-JA00784

12:17PM  1    that are fully documented and ready for payment.  And we will

12:17PM  2    give you these list of claims so you can go -- so the program

12:17PM  3    can advance this portion and have a sampling, if you will."

12:17PM  4    Okay?

12:17PM  5              And so one of the components -- in reading the rest

12:18PM  6    of the e-mail, what I see as maybe being an issue here as well

12:18PM  7    is, okay, not only do you have this list of claims that were

12:18PM  8    ready to go, but the payment component, the payment module at

12:18PM  9    this time hadn't been finished to do it online.  And so

12:18PM  10   Garden City had to do this work offline.

12:18PM  11             And so around this time, there were a lot of

12:18PM  12   complaints about, "Hey, I know I have an award and now I'm not

12:18PM  13   getting the payment," or "You said I would get a payment and

12:18PM  14   I'm not getting the payment."

12:18PM  15             And I had a few conversations with Jen and Lynn, they

12:18PM  16   seemed to be the interactive -- the interface here between

12:18PM  17   BrownGreer, who sent out the eligibility notice, and

12:18PM  18   Garden City that actually paid the claim, they were the

12:18PM  19   interface.  "Hey, what's going on with payments here?  What's

12:18PM  20   going on with wires?"

12:18PM  21             I mean, Garden City really got hounded during that

12:19PM  22   time for -- as quickly as they could, they needed to assemble

12:19PM  23   these documents so that they could actually pay a claim.

12:19PM  24             So from what I gather, he, at one point, had a list

12:19PM  25   of claims to be expedited, and now he's asking why they aren't

**C O N F I D E N T I A L**

SM-02-JA00785

12:19PM 1    paid.

12:19PM 2           I also noticed that, you know, you have Casey Thonn

12:19PM 3    listed on this attachment.

12:19PM 4           MR. TIDWELL:  So what is the "No claims left behind"?

12:19PM 5    Who generated that?

12:19PM 6           THE WITNESS:  The no claims left behind, you will

12:19PM 7    have to ask Lynn Greer.

12:19PM 8              No claims left behind, I'm not -- that -- when I

12:19PM 9    first read that, I thought that meant -- you know, we had the

12:19PM 10   transition process going on at the same time this was all going

12:19PM 11   on.  And, you know, so some of those claims had to get paid,

12:19PM 12   you know, some people who had the option to elect their

12:19PM 13   60 percent payment and stay in the program, or maybe now they

12:20PM 14   decided they wanted the 40 percent too.  They didn't want to go

12:20PM 15   throughout the program.

12:20PM 16             So initially I thought that's what the "No claim

12:20PM 17   left behind" report meant.

12:20PM 18             We also posted on the -- (Witness reviews the

12:20PM 19   document.)

12:20PM 20             Or it could be -- if it doesn't mean that, it

12:20PM 21   could just be the push to make sure, even though we're doing

12:20PM 22   this offline, that we make sure we get everything run through

12:20PM 23   the system.  And I'm really not certain which one it means.

12:20PM 24   BY MR. FREEH:

12:20PM 25   Q.   Let me ask you a specific question or two.  Again, going

**C O N F I D E N T I A L**

SM-02-JA00786

| | |
|---|---|
| 12:20PM 1 | back again to page 3 of 04.  Okay? |
| 12:20PM 2 | You said, "I had forwarded your e-mail" -- "your |
| 12:20PM 3 | e-mail," meaning Matt's I would assume. |
| 12:20PM 4 | A.   Matt's, exactly. |
| 12:20PM 5 | Q.   -- "designating the claims you wish to be expedited to |
| 12:21PM 6 | BrownGreer, but there was no attachment." |
| 12:21PM 7 | Then at the back of that document, we have an |
| 12:21PM 8 | attachment.  Is that the attachment that he subsequently |
| 12:21PM 9 | forwarded to you? |
| 12:21PM 10 | A.   It must be.  I'm not sure.  I'm not sure. |
| 12:21PM 11 | Q.   Because the prior page, which is, obviously, in the e-mail |
| 12:21PM 12 | string -- |
| 12:21PM 13 | A.   Yes. |
| 12:21PM 14 | Q.   -- and you're copied, of course, on Lynn Greer's |
| 12:21PM 15 | September 17, 2:40 p.m. e-mail, which is on page 1.  On page 2 |
| 12:21PM 16 | of that e-mail string, you've got the graphic there with two |
| 12:21PM 17 | claims, 1407 and 2251, at least in the left margin -- |
| 12:21PM 18 | A.   Okay. |
| 12:21PM 19 | Q.   -- identified, correct? |
| 12:21PM 20 | A.   Right. |
| 12:21PM 21 | Q.   And those are claims for an individual named Cramer, who |
| 12:21PM 22 | is represented by Lundy? |
| 12:21PM 23 | A.   Okay. |
| 12:21PM 24 | Q.   And that's Pat Lundy, as far as you know? |
| 12:21PM 25 | A.   Matt. |

**C O N F I D E N T I A L**

**SM-02-JA00787**

| | | |
|---|---|---|
| 12:21PM | 1 | Q.   Matt Lundy.  All right. |
| 12:22PM | 2 | So my question, again, goes back to page 3 -- |
| 12:22PM | 3 | A.   Oh, here we go.  We have -- I'm sorry.  Number 10 here |
| 12:22PM | 4 | defines for you what "no claim left behind" means. |
| 12:22PM | 5 | Q.   Okay.  That's on page 2 of the document? |
| 12:22PM | 6 | A.   On page 2.  And that makes sense. |
| 12:22PM | 7 | Q.   All right.  So my question is:  When you said you didn't |
| 12:22PM | 8 | include the attachment, and then he said, "Will send shortly," |
| 12:22PM | 9 | the attachment is then -- |
| 12:22PM | 10 | A.   I don't know. |
| 12:22PM | 11 | Q.   -- the one in the back? |
| 12:22PM | 12 | A.   I don't know.  And -- |
| 12:22PM | 13 | MR. TIDWELL:  We did that with recovery and that's |
| 12:22PM | 14 | it. |
| 12:22PM | 15 | MR. FREEH:  Do you have 04A? |
| 12:22PM | 16 | (WHEREUPON, at this point in the proceedings, |
| 12:22PM | 17 | Exhibit 04A was marked for identification.) |
| 12:22PM | 18 | MR. TIDWELL:  Here is 04A.  It's just a chart that |
| 12:22PM | 19 | depicts names, claim types, claimants, claim ID, signed release |
| 12:22PM | 20 | and statement to submitted, and then payment received and |
| 12:22PM | 21 | payment mailed to client. |
| 12:22PM | 22 | MS. PIERSON:  So is the question whether this |
| 12:23PM | 23 | document, 04A, was -- ended up being the attachment or whether |
| 12:23PM | 24 | this multiple-page document -- |
| 12:23PM | 25 | MR. TIDWELL:  Yes.  We're trying to determine -- |

**C O N F I D E N T I A L**

SM-02-JA00788

| | | |
|---|---|---|
| 12:23PM | 1 | THE WITNESS:  How can you not tell? |
| 12:23PM | 2 | MR. TIDWELL:  Because it depends on the how the |
| 12:23PM | 3 | e-mail server works sometimes. |
| 12:23PM | 4 | THE WITNESS:  Oh.  I couldn't tell you which one was |
| 12:23PM | 5 | the attachment.  I had many PSC attorneys sending me these |
| 12:23PM | 6 | expedited lists, which I would not open up, and I would just |
| 12:23PM | 7 | forward directly to BrownGreer.  So I would not have been |
| 12:23PM | 8 | interested in what the exact list was. |
| 12:23PM | 9 | BY MR. FREEH: |
| 12:23PM | 10 | Q.   And you don't recall, as you look at this e-mail, what the |
| 12:23PM | 11 | attachment was that he agreed to send? |
| 12:23PM | 12 | A.   No, I didn't.  I must have just seen there was no |
| 12:23PM | 13 | attachment.  I don't know.  There was no attachment, and I |
| 12:23PM | 14 | said, you know, "If you want me to forward this list, you need |
| 12:23PM | 15 | to provide the attachment." |
| 12:23PM | 16 | Q.   How often in the course of your work did you have |
| 12:24PM | 17 | instances like this where an attorney, whether he be part of |
| 12:24PM | 18 | the client class representation or not, you know, inquire to |
| 12:24PM | 19 | you about a claim and then you took some internal action to |
| 12:24PM | 20 | determine the status? |
| 12:24PM | 21 | A.   I would -- you know, eventually, I did not have time to |
| 12:24PM | 22 | entertain those type of issues.  The only ones that I would |
| 12:24PM | 23 | entertain, and eventually it just came to be, that attorneys |
| 12:24PM | 24 | would present to me those issues that might have far-reaching |
| 12:24PM | 25 | implications.  Or that were so -- or they knew me, they just |

**C O N F I D E N T I A L**

12:24PM  1    got to me, and I would be able to, you know, get to the

12:24PM  2    problem, and see.

12:24PM  3    Q.    So as best you can recall, it's not that long ago, how

12:24PM  4    often did that happen?  Or was that a daily occurrence or --

12:24PM  5            Because -- and I'll just give you the background of

12:24PM  6    the question so you understand where it's coming from.  We

12:25PM  7    don't have a lot of e-mails like this where you're actually

12:25PM  8    involved in or talking about or checking for a lawyer the

12:25PM  9    status of a claim.

12:25PM 10            So the question is:  Did you do this on a rare basis,

12:25PM 11    which you would determine from looking at the few e-mails, or

12:25PM 12    did you do it on a regular basis?

12:25PM 13    A.    I would say a rare basis.

12:25PM 14    Q.    A rare basis?

12:25PM 15    A.    Yes.  It wasn't my role.  It was really the bigger

12:25PM 16    picture, the policies, steering the program in the right

12:25PM 17    direction.

12:25PM 18            MR. FREEH:  Any other questions on that e-mail?

12:25PM 19            MR. TIDWELL:  No, sir.

12:25PM 20            MR. FREEH:  Michael?

12:25PM 21            MR. MCCALL:  I have another e-mail I want to ask

12:25PM 22    about.  Before we leave the Thonn issue, I have just a couple

12:25PM 23    questions.

12:25PM 24            MR. FREEH:  We're not going to leave it, but go

12:25PM 25    ahead.  Go ahead.

**C O N F I D E N T I A L**

**SM-02-JA00790**

12:25PM 1            MR. MCCALL:  I just want to go back to that other

12:25PM 2 representation that you had been handling for Mr. Thonn.

12:25PM 3            THE WITNESS:  The personal injury?

12:25PM 4            MR. MCCALL:  The personal injury, I understand.

12:25PM 5 Right.

12:25PM 6            Can you tell us, if you recall, the respondent

12:25PM 7 or defendant in that case and in what court it was heard?

12:25PM 8            THE WITNESS:  Oh, gosh.  Oh, goodness.  I'm sorry.  I

12:26PM 9 cannot remember.  I can't remember if this was a -- I don't

12:26PM 10 remember if he had gotten the information -- what the issue

12:26PM 11 was.  I think the driver, it wasn't his insurance, it wasn't

12:26PM 12 his car.  I'm sorry.  I can't remember.  I'm sure that you can

12:26PM 13 get that information, but I don't remember.

12:26PM 14            MR. MCCALL:  But there was only that one other

12:26PM 15 representation that you had for Mr. Thonn?

12:26PM 16            THE WITNESS:  Yes.  Yes.

12:26PM 17            MR. MCCALL:  Okay.  Thank you.

12:26PM 18 BY MR. FREEH:

12:26PM 19 Q.   All right.  We're going to show you an exhibit marked as

12:26PM 20 05, which is another e-mail dated June 11, 2013.

12:26PM 21            If you can show that to Ms. Reitano, let her look at

12:26PM 22 it, and I'm going to ask you some questions.

12:26PM 23            (WHEREUPON, at this point in the proceedings,

12:26PM 24 Exhibit 05 was marked for identification.)

12:26PM 25            MR. TIDWELL:  This is an e-mail from Stephen Cirami

**C O N F I D E N T I A L**

SM-02-JA00791

12:26PM  1   at Garden City Group dated Tuesday, June 11th to Lionel Sutton

12:26PM  2   and Christine Reitano.  The subject is "Wire payment," and it's

12:27PM  3   marked Number 05.

12:27PM  4              And again, Counsel, you're right, start from the

12:27PM  5   back.

12:27PM  6              MR. FREEH:  It's a three-page document.  Yes, just

12:27PM  7   take a look at it, please.

12:27PM  8              MS. PIERSON:  You didn't specify the year.  That's

12:27PM  9   June 11th of 2013.

12:27PM 10              MR. TIDWELL:  2013.  Thank you.

12:27PM 11              MS. PIERSON:  This year.

12:27PM 12              THE WITNESS:  (Witness reviews the document.)  Okay.

12:28PM 13   BY MR. FREEH:

12:28PM 14   Q.   So I'll go to page 2, which is your e-mail on June 11,

12:28PM 15   2013, to Cirami.

12:28PM 16              Cirami is who?

12:28PM 17   A.   He is another member of Garden City Group.  The group that

12:28PM 18   handles the payment process.

12:28PM 19   Q.   And the e-mail says, "Tiger has an attorney friend with a

12:28PM 20   claimant in the program."

12:28PM 21              Who is the attorney friend?

12:28PM 22   A.   I do not recall.  I don't even recall this e-mail.  I

12:28PM 23   don't know if he told me or he just asked as a hypothetical.

12:28PM 24   Q.   So as you sit here today, you don't recall --

12:28PM 25   A.   No.

**C O N F I D E N T I A L**

SM-02-JA00792

12:28PM 1    Q.    -- who was that?

12:28PM 2              Was your e-mail prompted by a conversation with your

12:28PM 3    husband?

12:28PM 4    A.    He must have asked me how does this person get their --

12:28PM 5    you know, which everybody wanted to know, the how to's of the

12:28PM 6    program.

12:28PM 7    Q.    Would he not be able to determine that himself at that

12:29PM 8    point?  Wasn't he employed at that point?

12:29PM 9    A.    No, he was not.

12:29PM 10   Q.    June 11, 2013?

12:29PM 11   A.    Oh, 2013.

12:29PM 12              MS. PIERSON:  That's this year.  Last month.

12:29PM 13              THE WITNESS:  Well, maybe he didn't know the process

12:29PM 14   because he didn't -- you know, he did moratoria.  He might not

12:29PM 15   have known the details of the payment process.

12:29PM 16   BY MR. FREEH:

12:29PM 17   Q.    I'm sorry, you have no recollection of that at all?

12:29PM 18   A.    No, this is more recently.  This might be -- this might be

12:29PM 19   about Gibby Andry.

12:29PM 20   Q.    And what makes you think about that?

12:29PM 21   A.    Well, because it's talking about a client getting -- who

12:29PM 22   represented himself, that -- that I think is Gibby.  That was

12:29PM 23   the only claim that -- or I've been told that Gibby had, was

12:29PM 24   his own law firm claim.

12:29PM 25              So he probably -- oh, yes, yes.  It was Gibby.  And

**C O N F I D E N T I A L**

SM-02-JA00793

12:30PM 1 this is the reason why.  I mean, to me this was just such a,

12:30PM 2 you know, elementary question.  Yes, you can get wired.  You

12:30PM 3 don't have to receive a check.

12:30PM 4         And the reason Gibby wouldn't even know that or be

12:30PM 5 able to figure that out because he's like technologically

12:30PM 6 incompetent.  So he -- and this was the only claim, so he

12:30PM 7 didn't know how the payment process, the wiring worked.

12:30PM 8         And I'm sorry if I didn't know at first because I

12:30PM 9 didn't realize it was -- yeah, the attorney is the claimant.  I

12:30PM 10 didn't realize that this was 2013, so I was trying to go back

12:30PM 11 to 2012.

12:30PM 12 Q.    And now you recall that Gibby was the claimant?

12:30PM 13 A.    Gibby just wanted to know how he could get wired, yeah.

12:30PM 14 Q.    And did your husband discuss the nature of that claim with

12:30PM 15 you?

12:30PM 16 A.    No.

12:30PM 17 Q.    Did you understand what the claim was?

12:30PM 18 A.    Yes, I did.  It was one of the law-firm-type awards that

12:31PM 19 are, you know, a headache for BP, if you will.

12:31PM 20 Q.    And was that with the Gibby attorney law firm?

12:31PM 21 A.    Yes.  Yes.

12:31PM 22         Now, I'm not sure of who filed under what name.  Was

12:31PM 23 it Gibby and John or just Gibby?  I don't know.

12:31PM 24         MR. TIDWELL:  That's a great question that maybe you

12:31PM 25 can help us clear up.

**C O N F I D E N T I A L**

**SM-02-JA00794**

| | | |
|---|---|---|
| 12:31PM | 1 | THE WITNESS:  I'm not going to be able to. |
| 12:31PM | 2 | MR. TIDWELL:  Gibby is associated with what law firm? |
| 12:31PM | 3 | What's the name of his law firm? |
| 12:31PM | 4 | THE WITNESS:  One is the Andry firm and one is the |
| 12:31PM | 5 | Andry group now? |
| 12:31PM | 6 | MR. TIDWELL:  So there's an Andry firm -- Andry Law |
| 12:31PM | 7 | Firm and an Andry Law Group? |
| 12:31PM | 8 | THE WITNESS:  I'm not sure.  There were two brothers |
| 12:31PM | 9 | that worked together.  Falling out. |
| 12:31PM | 10 | BY MR. FREEH: |
| 12:31PM | 11 | Q.    Jonathan and Gibby? |
| 12:31PM | 12 | A.    Yes.  Had a falling out.  One became something with Andry. |
| 12:31PM | 13 | I think they both retained the Andry name, but I don't know |
| 12:32PM | 14 | particularly or specifically. |
| 12:32PM | 15 | MS. PIERSON:  Do you want me to try to help you |
| 12:32PM | 16 | answer that? |
| 12:32PM | 17 | MR. TIDWELL:  If you have an answer, that would be |
| 12:32PM | 18 | helpful. |
| 12:32PM | 19 | MS. PIERSON:  I don't know if I have the answer, but |
| 12:32PM | 20 | I know something that I've been told.  When they were together, |
| 12:32PM | 21 | the two brothers, the spill happened, and they had a falling |
| 12:32PM | 22 | out of some sort after the spill.  I'm guessing now it might |
| 12:32PM | 23 | have had to do with how they were going to handle the claim, so |
| 12:32PM | 24 | they split. |
| 12:32PM | 25 | But when they did, one lawyer, and I think it's |

**C O N F I D E N T I A L**

SM-02-JA00795

12:32PM 1    Gibby, has the clients -- the claimant, the claimant-type

12:32PM 2    clients, and a lot of them.  The other brother doesn't have any

12:32PM 3    claimant clients, but he -- that firm is the one that filed the

12:32PM 4    BEL claim because of 2010.

12:32PM 5              MR. TIDWELL:  I see.

12:32PM 6              MS. PIERSON:  You see?  And so that's the $7

12:32PM 7    million-so claim.

12:32PM 8              THE WITNESS:  That would be Gibby's.

12:32PM 9              MR. FREEH:  That's the Andry Law Firm?

12:32PM 10             MS. PIERSON:  They have names that sound very much

12:33PM 11   alike.  But one firm has claimant clients and one firm has law

12:33PM 12   firm clients, period, as far as I know.

12:33PM 13             MR. TIDWELL:  But you know that Gibby Andry has a

12:33PM 14   seven some-odd million claim for BEL.

12:33PM 15             THE WITNESS:  Yes, yes.

12:33PM 16             MS. PIERSON:  That's the one that BP is most

12:33PM 17   aggravated about.

12:33PM 18   BY MR. FREEH:

12:33PM 19   Q.    All right.  So we're leaving now the June 11, 2013, matter

12:33PM 20   we just discussed.  But you don't recall discussing the details

12:33PM 21   of the claim with your husband?

12:33PM 22   A.    No.

12:33PM 23   Q.    Did you make any other additional inquiries about that

12:33PM 24   claim subsequent to this?

12:33PM 25   A.    No.

**C O N F I D E N T I A L**

**SM-02-JA00796**

| | | |
|---|---|---|
| 12:33PM | 1 | Q.   Did your husband, as far as you know? |
| 12:33PM | 2 | A.   Not as far as I know. |
| 12:33PM | 3 | Q.   Do you know if that claim was paid or not? |
| 12:33PM | 4 | A.   I believe that claim was put on hold.  And then, just from |
| 12:33PM | 5 | what I've read from the court transcripts and motions, that it |
| 12:34PM | 6 | was reviewed several times for any impropriety or |
| 12:34PM | 7 | miscalculation, and none were found.  But I don't know if the |
| 12:34PM | 8 | hold has been removed or not. |
| 12:34PM | 9 | Q.   I'm going to show you 05A, which is an earlier e-mail |
| 12:34PM | 10 | string, which is dated June of 2013, 05A. |
| 12:34PM | 11 | (WHEREUPON, at this point in the proceedings, |
| 12:34PM | 12 | Exhibit 05A was marked for identification.) |
| 12:34PM | 13 | MR. TIDWELL:  05A, from Stephen Cirami again at |
| 12:34PM | 14 | Garden City Group, Tuesday, June 11, 2013, to Lionel Sutton, |
| 12:34PM | 15 | "Re:  The wire payment."  It's a follow on to that one. |
| 12:34PM | 16 | MS. PIERSON:  So that's going to be after this last |
| 12:34PM | 17 | one? |
| 12:34PM | 18 | MR. TIDWELL:  Uh-huh (affirmative response). |
| 12:34PM | 19 | MR. FREEH:  No.  It's going to be before. |
| 12:34PM | 20 | MR. TIDWELL:  No.  I believe it's before. |
| 12:34PM | 21 | MR. FREEH:  This is June 2013. |
| 12:34PM | 22 | MR. MCCALL:  It's the same day. |
| 12:34PM | 23 | MS. PIERSON:  It's the same day an hour later. |
| 12:34PM | 24 | MR. TIDWELL:  Yes, it's a follow-up. |
| 12:34PM | 25 | MS. PIERSON:  An hour or so later. |

**C O N F I D E N T I A L**

SM-02-JA00797

93

12:34PM 1          MR. FREEH:  Right.  And this just adds the top

12:34PM 2     portion of the conversation.

12:34PM 3          MR. TIDWELL:  It's when Mr. Sutton starts the

12:35PM 4     conversation, starts it going, and became just between the two

12:35PM 5     of them, I believe.

12:35PM 6          THE WITNESS:  (Witness reviews the document.)

12:35PM 7          MS. PIERSON:  Okay.

12:35PM 8          MR. FREEH:  You might as well -- also we'll show you

12:35PM 9     05B, which is the same subject matter e-mail, but it's dated

12:35PM 10    January of 2013.  We can have them altogether.

12:35PM 11          (WHEREUPON, at this point in the proceedings,

12:35PM 12    Exhibit 05B was marked for identification.)

12:35PM 13          MS. PIERSON:  So it's six months before this.

12:35PM 14          MR. FREEH:  05B is six months before that, yes.

12:35PM 15          MR. TIDWELL:  And 05B is an e-mail from

12:35PM 16    Christine Reitano dated Monday, January 28, 2013, to

12:35PM 17    Stephen Cirami regarding wire transfers.

12:36PM 18          THE WITNESS:  Okay.  Yes.

12:36PM 19    BY MR. FREEH:

12:36PM 20    Q.   Okay.  So the question -- I'll start with 05B.  That's the

12:36PM 21    one you just looked at, January 28, 2013.

12:36PM 22          And this is correspondence between you and Cirami

12:36PM 23    talking about payments to attorney I-O-L-T-A accounts; is that

12:36PM 24    correct?

12:36PM 25    A.   Correct.

**C O N F I D E N T I A L**

SM-02-JA00798

12:36PM 1    Q.    Do you have any recollection as to why you were having

12:36PM 2    this very general exchange, at least in January 2013?

12:36PM 3    A.    Well, Keith Moskowitz is from BP.  He probably is trying

12:37PM 4    to assist with, you know -- maybe he was trying to marry up the

12:37PM 5    medical settlement program with the way they do things in the

12:37PM 6    economic settlement program, so he just asked a very general

12:37PM 7    question, and Steve Cirami gave him the response.

12:37PM 8    Q.    So you were just relaying the question?

12:37PM 9    A.    Sure.

12:37PM 10   Q.    Okay.

12:37PM 11          MS. PIERSON:  Do you want to know what IOLTA stands

12:37PM 12   for?

12:37PM 13          MR. FREEH:  I know what it stands for.

12:37PM 14          MR. TIDWELL:  I think so.

12:37PM 15          THE WITNESS:  Is that a joke?

12:37PM 16          MS. PIERSON:  No.  It's just an acronym.

12:37PM 17   BY MR. FREEH:

12:37PM 18   Q.    I direct your attention to 05A, which, again, is back in

12:37PM 19   the June 2013 time frame, which is the last string in the one

12:37PM 20   we had showed you with 05.

12:37PM 21          And there Cirami is sending an e-mail to Mr. Sutton.

12:37PM 22   You're not copied on that, but he says, "We've had situations

12:37PM 23   where lawyers have represented themselves and had their funds

12:38PM 24   sent to the IOLTA and then they transferred it out."  Etcetera,

12:38PM 25   etcetera.

**C O N F I D E N T I A L**

SM-02-JA00799

12:38PM 1          You were not privy to that, I understand, by looking

12:38PM 2     at the e-mail in terms of a copy, but were you part of this

12:38PM 3     discussion at the time?

12:38PM 4     A.    No.

12:38PM 5     Q.    No?

12:38PM 6     A.    Huh-uh (negative response).

12:38PM 7     Q.    And did you have a discussion with your husband at that

12:38PM 8     point about attorney payments to the IOLTA account?

12:38PM 9     A.    No.

12:38PM 10    Q.    All right.  I'm going to show you what's been marked as

12:38PM 11    Exhibit 06.

12:38PM 12          (WHEREUPON, at this point in the proceedings,

12:38PM 13    Exhibit 06 was marked for identification.)

12:38PM 14          MR. TIDWELL:  And 06 is from Lionel Sutton

12:38PM 15    @dheclaims.com dated Tuesday, June 4, 2013.  It's to

12:38PM 16    Katherine Torres, and the subject is the "Sher Garner Claim."

12:38PM 17          MR. FREEH:  And then we'll also show you 06A, which

12:39PM 18    is a June 20, 2013, e-mail.  You're not on these e-mails.

12:39PM 19          (WHEREUPON, at this point in the proceedings,

12:39PM 20    Exhibit 06A was marked for identification.)

12:39PM 21          MR. TIDWELL:  And while you're looking at that one,

12:39PM 22    that one is from Katherine Torres.

12:39PM 23          THE WITNESS:  This one is from Katherine.

12:39PM 24          MR. TIDWELL:  That one, yeah.  And this is also from

12:39PM 25    Katherine Torres.  It's Thursday, June 20, 2013, to

**C O N F I D E N T I A L**

SM-02-JA00800

12:39PM 1   Lionel Sutton.  Charles.r.hacker@uspwc.com is copied.  It is

12:39PM 2   also about -- the subject is "Sher Garner," and it's marked

12:39PM 3   06A.

12:39PM 4   BY MR. FREEH:

12:39PM 5   Q.   You're not on any of these e-mails.  We're just going to

12:39PM 6   ask you whether you have any memory of this or whether you were

12:39PM 7   involved in any of the conversations, if you recall.

12:39PM 8   A.   (Witness reviews the document.)  No.

12:39PM 9   Q.   Was the Sher Garner firm a firm that had claims in front

12:39PM 10  of the administrator, as far as you know?

12:40PM 11  A.   As far as I know, yeah.

12:40PM 12  Q.   Did you get involved in any of the inquiries or

12:40PM 13  processing?

12:40PM 14  A.   No.  They would -- I remember their name and in the

12:40PM 15  context of BEL issues, and maybe Tiger and Mike were involved

12:40PM 16  in some meetings with them.  You know, occasionally, if a firm

12:40PM 17  had -- was very vocal and had some grievances, then Mr. Juneau

12:40PM 18  would have a meeting with them.  And for these type of firms,

12:40PM 19  he usually included Mike and/or Tiger.

12:40PM 20  Q.   But you didn't have any of those meetings yourself?

12:40PM 21  A.   No.

12:40PM 22  Q.   All right.  I'm going to go back to the *Thonn* claim that

12:40PM 23  you had previously represented and then left and recused

12:40PM 24  yourself from once you went on board the administration.

12:41PM 25  A.   Okay.

**C O N F I D E N T I A L**

SM-02-JA00801

12:41PM 1   Q.   The GCCF claim, not the personal liability case, where did

12:41PM 2   that claim go and did you yourself refer it to a particular

12:41PM 3   firm?

12:41PM 4   A.   I told Casey to either go see John Andry, or I think I

12:41PM 5   might have -- maybe just John Andry.  The only other person I

12:41PM 6   would have referred him to was SmithStag.  And that's basically

12:41PM 7   what I did.

12:41PM 8        He called me, Casey did, said, "I met with," I think

12:41PM 9   a girl named "Christine at John Andry's office, and I liked

12:41PM 10   what they had to say.  And they are going to take my case."

12:41PM 11   And that was that.

12:41PM 12   Q.   Can I ask you why you recommended it go to the John Andry

12:41PM 13   firm?

12:41PM 14   A.   Because John -- you know, when I was in the building there

12:41PM 15   with him, I knew from the beginning he was trying to be a

12:42PM 16   member of the PSC.  He was heavily involved in it.  John is --

12:42PM 17   and he's very smart.  He's a very good lawyer.  And he was

12:42PM 18   working a lot of the GCCF claims, and it just made sense to me.

12:42PM 19   This is a person I know who is heavily involved with the BP oil

12:42PM 20   spill and what happened afterward.

12:42PM 21   Q.   Were you aware at that point that your husband had

12:42PM 22   business relationships and legal relationships with John Andry?

12:42PM 23   A.   They had terminated by that time, to my knowledge.

12:42PM 24   Q.   What about the Crown relationship?

12:42PM 25   A.   The Crown relationship was my husband's business interest

**C O N F I D E N T I A L**

SM-02-JA00802

12:42PM 1    in this other entity called *Crown*.  That's a water reclamation

12:42PM 2    company, that, in my mind, had nothing to do with anything.

12:42PM 3              MR. TIDWELL:  Do you know who is involved in that,

12:43PM 4    Crown, the officers and partners?

12:43PM 5              THE WITNESS:  Yes, yes -- well, no, I may not.  I do

12:43PM 6    in general.  I was very disinterested in this company.  Okay?

12:43PM 7    Very disinterested in it.

12:43PM 8              But there is a person by the name of Joey

12:43PM 9    Dartez, a person by the name of Tim.  And my husband can give

12:43PM 10   you the officers.  You know, it evolved over time.  Initially

12:43PM 11   it was just three or four of them.

12:43PM 12             Someone had -- had invented some technology on

12:43PM 13   how to clean frac water.  And I told my husband, "You can get

12:43PM 14   involved in this, but, you know, we don't have a dime to put up

12:43PM 15   in any of these kind of business ventures."

12:43PM 16             And so they had this technology, and I guess the

12:43PM 17   EPA -- different people looked at it, and said, "Yes, it's

12:43PM 18   great.  It's wonderful."  But they didn't -- between them, they

12:43PM 19   didn't have the capital to finance this business to build a

12:43PM 20   machine.

12:43PM 21             And so my husband has a friend from law school

12:44PM 22   by the name of Glen Lerner, and he is an attorney out of

12:44PM 23   Las Vegas.  And he makes lots of money because he has -- he's

12:44PM 24   an advertising lawyer.  And I don't think of him as a

12:44PM 25   practicing lawyer.  I mean, he cuts commercials is basically

**C O N F I D E N T I A L**

SM-02-JA00803

| 12:44PM | 1 | what he does. |
| 12:44PM | 2 | And he has the "One call, that's all" slogan, |
| 12:44PM | 3 | only he does it bigger than life.  He does it gigantic.  If you |
| 12:44PM | 4 | go to Las Vegas, he's like a celebrity. |
| 12:44PM | 5 | I've seen him and his family.  We would see each |
| 12:44PM | 6 | other in the summer.  And he's just got a bigger-than-life |
| 12:44PM | 7 | personality.  Lots of ideas. |
| 12:44PM | 8 | Apparently, at the time my husband is getting |
| 12:44PM | 9 | involved in -- you know, is looking at this technology, Glen |
| 12:44PM | 10 | has another friend with similar technology in Romania, so maybe |
| 12:44PM | 11 | that's how they hooked up, and is very interested.  And he |
| 12:45PM | 12 | becomes part of Crown.  And he -- and he -- to gain entrance, |
| 12:45PM | 13 | he puts up the money to build the machine. |
| 12:45PM | 14 | BY MR. FREEH: |
| 12:45PM | 15 | Q.   "He" meaning Lerner? |
| 12:45PM | 16 | A.   He meaning Lerner. |
| 12:45PM | 17 | Q.   When does your husband, as far as you know, first get |
| 12:45PM | 18 | involved in the Crown discussions and venture? |
| 12:45PM | 19 | A.   It's either -- I want to say 2010, but I'm not sure.  I |
| 12:45PM | 20 | think it's sometime -- it's got to be 2010, because I'm pretty |
| 12:45PM | 21 | sure it's before we moved over to -- |
| 12:45PM | 22 | Q.   And at the time he became involved, you knew he was |
| 12:45PM | 23 | involved with John Andry? |
| 12:45PM | 24 | A.   I knew who was involved? |
| 12:45PM | 25 | Q.   Your husband? |

**C O N F I D E N T I A L**

SM-02-JA00804

100

12:45PM 1    A.    Well, in the sense that they were friends?  Because at

12:45PM 2    that time I don't think they even had the building together

12:45PM 3    anymore and weren't talking.

12:45PM 4    Q.    No.  I'm talking about the Crown venture.

12:45PM 5    A.    At the time my husband got involved in the Crown venture,

12:45PM 6    he probably wasn't talking to John Andry.  I mean, it was very

12:46PM 7    uncomfortable in that building.  They did not talk to each

12:46PM 8    other.

12:46PM 9    Q.    Did you come to learn that John Andry was involved with

12:46PM 10   Crown?

12:46PM 11   A.    Oh, I've never come to learn that.

12:46PM 12   Q.    You had no information that he was involved with Crown?

12:46PM 13   A.    No.

12:46PM 14   Q.    Did you know that your husband was receiving payments from

12:46PM 15   Crown?

12:46PM 16   A.    I know that he was supposed to be at some point.  Glen had

12:46PM 17   put up the million dollars to build the machine.  And then

12:46PM 18   after they built the machine, they had to go bring it up to

12:46PM 19   different sites to demonstrate it, and then there were other

12:46PM 20   costs that were involved.  And so he had to keep putting money

12:46PM 21   in.

12:46PM 22        So where initially I think there were four of them,

12:46PM 23   and they each had a 25 percent share, 25, 25, Glen said, "Look,

12:46PM 24   I need more equity in the company if I keep putting up this

12:47PM 25   capital."

**C O N F I D E N T I A L**

SM-02-JA00805

|         |    |
|---------|----|
| 12:47PM | 1  | And I don't know the details of it, but just from
| 12:47PM | 2  | what I was told, that in exchange for him getting a bigger
| 12:47PM | 3  | percentage of the company, he would --
| 12:47PM | 4  | Q.    So "he," you're referring --
| 12:47PM | 5  | A.    He, Glen.
| 12:47PM | 6  | Q.    -- to Mr. Lerner?
| 12:47PM | 7  | A.    He, Mr. Lerner, would, for a period of time, pay to the
| 12:47PM | 8  | others, in their various roles, one was manager, one was this,
| 12:47PM | 9  | one was that, a monthly salary.  Okay?
| 12:47PM | 10 | Now, as far as I know, I didn't see that salary, you
| 12:47PM | 11 | know.  I was like, "Oh, where's this salary?"  I'm just -- at
| 12:47PM | 12 | this point I'm just concerned about what I'm doing, what I'm
| 12:47PM | 13 | making, my job.  That's yours.  That's your deal.
| 12:47PM | 14 | Q.    Did you ever ask your husband if he was receiving any
| 12:47PM | 15 | payments from Crown at that period?
| 12:47PM | 16 | A.    No.
| 12:47PM | 17 | Q.    And he never advised you that he was?
| 12:47PM | 18 | A.    Well, let me take that back.  I probably would have said,
| 12:47PM | 19 | you know, "Did you get -- did you get that salary?"  And he --
| 12:48PM | 20 | it was usually something to the effect, "Glen hasn't paid it
| 12:48PM | 21 | yet.  He's going to," that sort of thing.
| 12:48PM | 22 | I think maybe -- and I don't know specifically,
| 12:48PM | 23 | maybe -- maybe in September of 2012 -- I don't know.  I don't
| 12:48PM | 24 | know.  I just don't remember.  I don't.  And we didn't really
| 12:48PM | 25 | discuss it.

**C O N F I D E N T I A L**

**SM-02-JA00806**

| | |
|---|---|
| 12:48PM 1 | Q.    When you were preparing your joint tax returns with your |
| 12:48PM 2 | husband, do you recall reviewing that as income? |
| 12:48PM 3 | A.    I did not participate in that. |
| 12:48PM 4 | Q.    You didn't participate at all in that? |
| 12:48PM 5 | A.    No.  No. |
| 12:48PM 6 | Q.    Did you have an outside tax preparer? |
| 12:48PM 7 | A.    Yes, we do.  She's out of Lafayette.  Caroline Boudreaux. |
| 12:48PM 8 | It's Boudreaux and Henderson, something like that. |
| 12:48PM 9 | Q.    Now, did you know that Jonathan Andry and Mr. Lerner were |
| 12:49PM 10 | partners in a law firm? |
| 12:49PM 11 | A.    No.  I learned some time after, but at the time I started |
| 12:49PM 12 | work, I did not know that. |
| 12:49PM 13 | Q.    When did you learn that? |
| 12:49PM 14 | A.    I don't know.  You know, kind of at some point -- you |
| 12:49PM 15 | know, maybe it was after this all happened. |
| 12:49PM 16 | Q.    So after you left the employment recently? |
| 12:49PM 17 | A.    Yes.  But I did know -- you know, I didn't have firm |
| 12:49PM 18 | personal knowledge that they had started a firm.  But I know |
| 12:49PM 19 | that Glen, and this was back at the time of the GCCF, was |
| 12:49PM 20 | giving John money to advertise for the GCCF clients.  So I |
| 12:49PM 21 | didn't know how their relationship progressed or what |
| 12:49PM 22 | relationship they had between them. |
| 12:49PM 23 | Q.    But you understood, and I want to say the answer to this, |
| 12:49PM 24 | but you understood, while you were there, that Lerner had some |
| 12:50PM 25 | interest or some financial interest in the claims process in |

**C O N F I D E N T I A L**

SM-02-JA00807

| | | |
|---|---|---|
| 12:50PM | 1 | the sense that he had been providing money? |
| 12:50PM | 2 | A.    He might have.  He might have. |
| 12:50PM | 3 | Q.    You didn't know that for a fact? |
| 12:50PM | 4 | A.    No. |
| 12:50PM | 5 | Q.    But you said you knew that he had invested money for |
| 12:50PM | 6 | advertisement? |
| 12:50PM | 7 | A.    I knew that for -- oh, I -- |
| 12:50PM | 8 | Q.    I thought that's what you said. |
| 12:50PM | 9 | A.    Yeah, I did.  I mean, that was my understanding, but this |
| 12:50PM | 10 | was quite some time ago.  Probably in 2010. |
| 12:50PM | 11 | Q.    Right.  But while you -- |
| 12:50PM | 12 | A.    I mean, before there was a settlement program, anyway. |
| 12:50PM | 13 | Q.    Right.  I understand what you're saying. |
| 12:50PM | 14 | But while you were in your position with Mr. Juneau, |
| 12:50PM | 15 | you had knowledge at that point that Lerner had some prior |
| 12:50PM | 16 | financial interest in this whole process? |
| 12:50PM | 17 | A.    Yeah, to that extent. |
| 12:50PM | 18 | Q.    And I asked you this, but I wasn't sure, did you know that |
| 12:50PM | 19 | Jonathan, John Andry was a partner in the Andry Law Firm in |
| 12:50PM | 20 | Las Vegas? |
| 12:50PM | 21 | A.    No. |
| 12:50PM | 22 | Q.    Did you know that Jonathan was a partner in the |
| 12:51PM | 23 | Andry Lerner firm here in -- Baronne Street? |
| 12:51PM | 24 | A.    No.  Because I didn't know of the Andry Lerner firm. |
| 12:51PM | 25 | Q.    And did you know that Gibby was a partner with John Andry |

**C O N F I D E N T I A L**

SM-02-JA00808

12:51PM 1    in the firm at 828 Baronne Street?

12:51PM 2    A.    No.

12:51PM 3              MS. PIERSON:   Well, that's the two brothers.

12:51PM 4              THE WITNESS:   But they weren't at -- where's

12:51PM 5    828 Baronne?

12:51PM 6    BY MR. FREEH:

12:51PM 7    Q.    That's their legal address.

12:51PM 8    A.    Oh, I thought -- I thought if they were ever a firm

12:51PM 9    together, it would have been at 610 Baronne.

12:51PM 10   Q.    There's a separate firm there.

12:51PM 11   A.    Okay.   I don't know about the 828 firm.

12:51PM 12   Q.    When you told your husband -- I think you used the word

12:51PM 13   *told* -- you told your husband to send the *Thonn* claim to

12:51PM 14   John Andry.

12:51PM 15   A.    Oh, no, I didn't tell -- well, I guess so.   I guess.

12:51PM 16   Q.    Well, I don't want to put words in your mouth.   That's

12:51PM 17   what you said.

12:51PM 18   A.    No, I didn't.   I told Thonn to go see John Andry, period.

12:52PM 19   End of it.   I had no discussion with my husband.   I had no

12:52PM 20   discussion with John Andry.   You know, I didn't, that was it.

12:52PM 21   I told Casey Thonn, "Go see John Andry."   Casey Thonn called me

12:52PM 22   up, said, "I like him.   That's who I'm going to go with."

12:52PM 23   Q.    At that point when you told Mr. Thonn, in your words to,

12:52PM 24   "Go see John Andry," you knew that John Andry had some interest

12:52PM 25   in this entire claim process; is that correct?

**C O N F I D E N T I A L**

SM-02-JA00809

12:52PM 1  A.   In the settlement program?

12:52PM 2  Q.   Settlement program.

12:52PM 3  A.   Well, no, I didn't know -- I assumed he was going to

12:52PM 4  file -- like everyone was going to take their GCCF claims and

12:52PM 5  transition them over to the settlement program.   I knew he had

12:52PM 6  GCCF claimants.

12:52PM 7  Q.   Did you know at that point that he was involved in the

12:52PM 8  GCCF process in terms of a lawyer representing claimants?

12:52PM 9  A.   Yes.

12:52PM 10  Q.   And was that one of the reasons that you sent Mr. Thonn

12:53PM 11  there?

12:53PM 12  A.   Yes?

12:53PM 13  Q.   Were there any other reasons?

12:53PM 14  A.   No.

12:53PM 15  Q.   Did you believe at that point that if Mr. Thonn's claim

12:53PM 16  was paid, your husband would get some derivative financial

12:53PM 17  interest?

12:53PM 18  A.   No.   I did not believe that or have any expectation of

12:53PM 19  that.

12:53PM 20  Q.   Do you recall being interview by Mr. Juneau and others on

12:53PM 21  June 20, 2013?

12:53PM 22  A.   Yes.   June 20, 2013, yes.

12:53PM 23  Q.   And that was at Gravier Street?

12:53PM 24  A.   Yes.

12:53PM 25  Q.   And Michael Juneau, Patrick Juneau, and Dave Welker was

**C O N F I D E N T I A L**

**SM-02-JA00810**

| | | |
|---|---|---|
| 12:53PM | 1 | there? |
| 12:53PM | 2 | A.    Right. |
| 12:53PM | 3 | Q.    Were you by yourself at that point? |
| 12:53PM | 4 | A.    Yes. |
| 12:53PM | 5 | Q.    And about how long was the interview? |
| 12:53PM | 6 | A.    Half hour. |
| 12:53PM | 7 | Q.    At one point you were asked -- |
| 12:53PM | 8 | MR. TIDWELL:  Do you want me to -- |
| 12:53PM | 9 | MR. FREEH:  No.  Thank you. |
| 12:53PM | 10 | BY MR. FREEH: |
| 12:53PM | 11 | Q.    At one point you were asked about Tiger, and I'm going to |
| 12:54PM | 12 | read from the report.  This is not my report.  This is the |
| 12:54PM | 13 | report of the people who were present. |
| 12:54PM | 14 | A.    Okay. |
| 12:54PM | 15 | Q.    "She," meaning you, "she thinks that Tiger is stupid as |
| 12:54PM | 16 | hell.  She felt that Tiger's falling out with his father really |
| 12:54PM | 17 | hurt him.  She thinks he is really smart, and it appeared to |
| 12:54PM | 18 | her he was just wasting his time on small accident cases and |
| 12:54PM | 19 | such.  She saw an opportunity for Tiger in this program." |
| 12:54PM | 20 | I take it, the "program," meaning the claims |
| 12:54PM | 21 | administration process? |
| 12:54PM | 22 | A.    Yes.  Yes. |
| 12:54PM | 23 | Q.    Going -- I'm quoting the document. |
| 12:54PM | 24 | "She knows he has taken things so seriously in the |
| 12:54PM | 25 | program.  She indicated that the accountants came up to him |

**C O N F I D E N T I A L**

SM-02-JA00811

| | |
|---|---|
| 12:54PM 1 | because they respect his judgment and integrity.  She felt that |
| 12:54PM 2 | Tiger working in the program would get him away from Lerner." |
| 12:54PM 3 | Is that something you wanted to accomplish? |
| 12:54PM 4 | A.   I don't remember saying that -- that it would get him away |
| 12:54PM 5 | from Lerner.  I didn't -- I don't remember saying that. |
| 12:54PM 6 | Q.   Okay. |
| 12:55PM 7 | A.   I think what I said was, I didn't want him involved in |
| 12:55PM 8 | these kind of risky business ventures.  I'd much prefer he go |
| 12:55PM 9 | back to using -- going back to, you know, a practice of law, |
| 12:55PM 10 | which he was very disenchanted with the personal injury thing |
| 12:55PM 11 | and everything else.  But he is very smart. |
| 12:55PM 12 | And once he started working at the claims |
| 12:55PM 13 | administrator's office, he was plugged in.  He was supposed to |
| 12:55PM 14 | work there part time, and he was there more hours, aside from |
| 12:55PM 15 | me, than anyone else at the office who was actually employed |
| 12:55PM 16 | full-time. |
| 12:55PM 17 | Q.   Then they report you saying the following, again, it's |
| 12:55PM 18 | their report, June 20, 2013, quote:  The program has been good |
| 12:55PM 19 | for him.  She doesn't believe he will take it to any other |
| 12:55PM 20 | level.  She believes Tiger has a good compass, and this was out |
| 12:56PM 21 | of character for him. |
| 12:56PM 22 | Do you remember saying something to that effect? |
| 12:56PM 23 | A.   I don't remember saying something to that effect, but, you |
| 12:56PM 24 | know, maybe I was responding to -- you know, they were reading |
| 12:56PM 25 | to me e-mails that I had no knowledge of.  And they were taking |

**C O N F I D E N T I A L**

SM-02-JA00812

12:56PM   1   things -- which later I felt were taken out of context.

12:56PM   2   Because the following day I asked him to print out those

12:56PM   3   e-mails, because I couldn't understand what I was being

12:56PM   4   questioned from.

12:56PM   5        So the way some of the questions were asked, it

12:56PM   6   looked like -- you know, I was like, well, what's going on

12:56PM   7   here?  And I'm trying -- you know, I'm speculating.  I'm, you

12:56PM   8   know, guessing.  And I'm under -- you know, it was very

12:56PM   9   shocking.

12:56PM  10   Q.   Then you're quoted as saying the following, quote:  She

12:56PM  11   thought this might be Tiger's way of getting Lerner to do what

12:56PM  12   he was supposed to do, close quote.

12:56PM  13   A.   I don't remember saying that either.

12:57PM  14   Q.   You don't remember saying that?

12:57PM  15   A.   "Tiger's way of getting Lerner to" -- I don't know if

12:57PM  16   those are my exact words, but what I can -- what I think I had

12:57PM  17   been saying at the time was, when they are talking about those

12:57PM  18   e-mails asking about -- or saying something to the effect "use

12:57PM  19   the *Thonn* money," that he was talking about perhaps paying the

12:57PM  20   salaries that he wasn't paying.

12:57PM  21   Q.   Right.

12:57PM  22   A.   Yeah.

12:57PM  23   Q.   So were you aware, then, that your husband was supposed to

12:57PM  24   receive a salary from Mr. Lerner?

12:57PM  25   A.   Yes.

**C O N F I D E N T I A L**

SM-02-JA00813

12:57PM 1  Q.   And were you also aware at this time that he wasn't

12:57PM 2  receiving it on a regular basis?

12:57PM 3  A.   Yes.

12:57PM 4  Q.   And your husband complained to you about that?

12:57PM 5  A.   Yes.

12:57PM 6  Q.   He complained to you more than once?

12:57PM 7  A.   Yeah, probably more than once.  Maybe not.  Maybe once.

12:57PM 8  You know, like I said, I didn't have expectations from that

12:57PM 9  business.  I didn't want -- I really didn't want to know about

12:58PM 10 it, you know.

12:58PM 11       I would have -- when I did go to my husband's office

12:58PM 12 on a regular basis, I thought, okay, now the two of us being

12:58PM 13 here, we can rebuild the practice, you know.  And once this

12:58PM 14 Crown venture came into play, his time was dedicated to doing

12:58PM 15 that, you know.

12:58PM 16       Maybe that's -- if I said something, "to get away

12:58PM 17 from Lerner," I would have rather he stayed and dedicated

12:58PM 18 himself to the practice of law.  Maybe that's not anything he

12:58PM 19 wanted to do.

12:58PM 20       And then I think that's why I was so happy, and I

12:58PM 21 thought that's where, you know, he was, so -- I don't know what

12:58PM 22 you've been told from others as to his performance on that

12:58PM 23 program, but I know that he did a good job.  And I -- I was so

12:58PM 24 happy.  I just thought he would be a perfect fit for the

12:59PM 25 program, and the program would be something really good for

**C O N F I D E N T I A L**

SM-02-JA00814

01:01PM 1    A.   No.  No, we haven't been -- since this began, other than

01:01PM 2    initially going through that first -- walking through that

01:01PM 3    first set of e-mails, we really avoid talking about this now.

01:01PM 4    Q.   So, again, let me go back.  Again, this is not my report,

01:01PM 5    but this is the report of the people that you met with on

01:01PM 6    June 20th.  I'm looking at a document, which I have marked for

01:02PM 7    myself as 01.  I haven't given you a copy of it.

01:02PM 8         (WHEREUPON, at this point in the proceedings,

01:02PM 9    Exhibit 01 was marked for identification.)

01:02PM 10   BY MR. FREEH:

01:02PM 11   Q.   And the quote is:  "She thought this might be Tiger's way

01:02PM 12   of getting Lerner to do what he was supposed to do."

01:02PM 13        And I asked you that before, do you have any

01:02PM 14   recollection of saying that?

01:02PM 15   A.   No.  That sounds like a paraphrase, but -- that's all I

01:02PM 16   can think, that it was a paraphrase of what I thought, he

01:02PM 17   should be paying them this salary, and he's telling them, you

01:02PM 18   know, "Pay the salary."

01:02PM 19   Q.   Did you intend to say at the time that you thought that

01:02PM 20   your husband working in the claims administration would be a

01:02PM 21   way to get Lerner to pay him a salary?

01:02PM 22   A.   No, absolutely not.  Never crossed my mind whatsoever.

01:02PM 23   Not at all.

01:02PM 24   Q.   And that doesn't sound -- when I read this to you, "She

01:02PM 25   thought this might be Tiger's way of getting Lerner to do what

**C O N F I D E N T I A L**

113

01:03PM 1   he was supposed to do" --

01:03PM 2   A.   I don't know what "this" is.  And, like I said, that

01:03PM 3   doesn't -- I don't recall saying those words.  To me it sounds

01:03PM 4   like a paraphrase of me saying that whatever money -- whatever

01:03PM 5   obligations my husband is insisting upon in those e-mails, is

01:03PM 6   because he's owed a salary.

01:03PM 7            And I'm not suggesting for one moment that he's

01:03PM 8   coercing it in some way.  I don't even know how he would.  I

01:03PM 9   don't even know by what means or methods he would have to do

01:03PM 10  that.  It wouldn't enter my mind at all.

01:03PM 11  Q.   Well, you know as you sit here today that he was already

01:03PM 12  very actively involved in trying to get claims paid for certain

01:03PM 13  people, correct?

01:03PM 14  A.   No.  No.  That wasn't part -- you know, that wasn't part

01:03PM 15  of my role.

01:03PM 16  Q.   I didn't ask you that.  I didn't ask you that.

01:03PM 17  A.   As I sit here today --

01:03PM 18  Q.   Let me rephrase the question.

01:03PM 19  A.   Yeah.

01:03PM 20  Q.   As you sit hear today, you know for a fact that your

01:04PM 21  husband was using e-mails and other means to have some of these

01:04PM 22  claims paid?

01:04PM 23  A.   Which claims?

01:04PM 24  Q.   Claims before the claims administrator, Mr. Juneau.

01:04PM 25  A.   Oh, claims in general?

**C O N F I D E N T I A L**

SM-02-JA00818

| | |
|---|---|
| 01:04PM 1 | Q.   No.  Claims specifically. |
| 01:04PM 2 | A.   Claims specifically before Mr. Juneau, my husband was |
| 01:04PM 3 | helping to get paid? |
| 01:04PM 4 | Q.   To get claims paid and processed. |
| 01:04PM 5 | A.   To get them paid and processed just the way, you know, he |
| 01:04PM 6 | was instructed to do, I guess.  I mean, to -- basically, in my |
| 01:04PM 7 | mind, what he was doing is when a situation -- when a question |
| 01:04PM 8 | was brought to him, whether an attorney contacted him directly |
| 01:04PM 9 | or he has told me that Mr. Juneau himself would ask him to look |
| 01:04PM 10 | into this case or that case, as did -- Mr. Juneau did that with |
| 01:04PM 11 | another attorney there as well, David Duval. |
| 01:04PM 12 | I don't think I was ever asked to check the status or |
| 01:05PM 13 | update of a case, because I was just too busy to. |
| 01:05PM 14 | But he did -- |
| 01:05PM 15 | Q.   I didn't ask you that. |
| 01:05PM 16 | Did you know while you were working for Mr. Juneau |
| 01:05PM 17 | that your husband was actively involved in trying to get claims |
| 01:05PM 18 | related to Mr. Lerner and Mr. John Andry paid? |
| 01:05PM 19 | A.   Oh.  No. |
| 01:05PM 20 | Q.   Do you know that now? |
| 01:05PM 21 | A.   That he was trying to get them paid? |
| 01:05PM 22 | Q.   Claims of their clients paid in the process of the claims |
| 01:05PM 23 | administration? |
| 01:05PM 24 | A.   No. |
| 01:05PM 25 | Q.   You don't know that now as you sit here today? |

**C O N F I D E N T I A L**

SM-02-JA00819

115

01:05PM 1   A.   No.   Because even looking at the one e-mail that I think

01:05PM 2   I've seen to P & N, or something like that, that would be an

01:05PM 3   e-mail anyone would write on behalf of anyone.

01:05PM 4        The e-mails I've read are, one, trying to understand

01:05PM 5   what the eligibility notice says and what the RTP means; and

01:05PM 6   two, just to get a status check on something, which you would

01:06PM 7   do for -- but that doesn't mean pay this.  I haven't seen

01:06PM 8   anything that said, "Pay this."

01:06PM 9   Q.   Did you know at the time that you worked for Mr. Juneau

01:06PM 10  that your husband had business interests with Mr. Landry?

01:06PM 11  A.   With Mr. Andry?

01:06PM 12  Q.   John Andry, sorry.

01:06PM 13  A.   No.

01:06PM 14  Q.   Do you know that now?

01:06PM 15  A.   No.

01:06PM 16  Q.   You never had that conversation with your husband?

01:06PM 17  A.   No.

01:06PM 18  Q.   Did you know when you worked for Mr. Juneau that your

01:06PM 19  husband had business arrangements and business interests with

01:06PM 20  Mr. Lerner?

01:06PM 21  A.   Yes.

01:06PM 22  Q.   And have you discussed that with your husband recently?

01:06PM 23  A.   No.   Just -- not in the sense that I've gained any new

01:06PM 24  information.  No, I haven't discussed, beyond, like I told you,

01:06PM 25  since -- beyond looking at the e-mails, I have no knowledge

**C O N F I D E N T I A L**

SM-02-JA00820

01:06PM 1    about his business or his interests with his business partner.

01:07PM 2    Q.   When you say *the e-mails*, are those the ones you were

01:07PM 3    shown during this interview we just talked about?

01:07PM 4    A.   Yes -- well, I wasn't shown.  They are the ones I've read

01:07PM 5    in the investigative report.  And they look to be the same ones

01:07PM 6    that I was questioned upon at that --

01:07PM 7    Q.   Is it your understanding, from reading those e-mails, that

01:07PM 8    your husband was trying to get claims paid for certain people?

01:07PM 9    A.   No.

01:07PM 10   Q.   What's your understanding as to what he was trying to do

01:07PM 11   in those e-mails?

01:07PM 12   A.   Like I said, all I can think was that he was trying to

01:07PM 13   say, "You have to pay me my salary.  You owe me money for my

01:07PM 14   salary, and I know that this claim has settled."

01:07PM 15   Q.   Let me continue, if I might.  In other words, "You now

01:07PM 16   have money, so you can pay me the salary you owe me" --

01:07PM 17   A.   Yeah.

01:07PM 18   Q.   -- does that complete your understanding?

01:07PM 19   A.   Yes.

01:07PM 20   Q.   At the time that he wrote those e-mails, when you both

01:08PM 21   worked for the claims administration, were you aware that

01:08PM 22   that's what he was doing?

01:08PM 23   A.   Not -- no.  In no way whatsoever.

01:08PM 24   Q.   So this came as a big surprise and shock to you?

01:08PM 25   A.   Yes, it did.

**C O N F I D E N T I A L**

SM-02-JA00821

| | |
|---|---|
| 01:08PM 1 | Q.   Have you talked to your husband about it? |
| 01:08PM 2 | A.   To the extent that he walked me through those e-mails, and |
| 01:08PM 3 | then, like I said, we haven't discussed it any further or in |
| 01:08PM 4 | any detail.  He's -- he's hired by his attorney, and I have |
| 01:08PM 5 | mine.  We're two separate people doing two separate things. |
| 01:08PM 6 | Q.   Well, as you sit here today as the attorney advising |
| 01:08PM 7 | Mr. Juneau, would you say that was a conflict of interests when |
| 01:08PM 8 | he was doing that? |
| 01:08PM 9 | MS. PIERSON:  For her or for him? |
| 01:08PM 10 | MR. FREEH:  For him. |
| 01:08PM 11 | THE WITNESS:  For him?  Yes. |
| 01:09PM 12 | MR. FREEH:  I don't have any other questions on that |
| 01:09PM 13 | matter. |
| 01:09PM 14 | MR. TIDWELL:  You mentioned that your husband had an |
| 01:09PM 15 | interest in a boat, an oil supply boat? |
| 01:09PM 16 | THE WITNESS:  He has an interest in a boat company |
| 01:09PM 17 | that brings supplies to offshore -- |
| 01:09PM 18 | MR. TIDWELL:  Do you know the name of that company? |
| 01:09PM 19 | THE WITNESS:  Romeo Papa. |
| 01:09PM 20 | MR. TIDWELL:  Romeo Papa. |
| 01:09PM 21 | So, as you explained -- I need to try and get |
| 01:09PM 22 | some clarification on that relationship.  Do you know whether |
| 01:09PM 23 | or not Romeo Papa has any claims? |
| 01:09PM 24 | THE WITNESS:  No, I do not.  But I do know that my |
| 01:09PM 25 | husband discussed at length and in detail with Mr. Juneau that |

**C O N F I D E N T I A L**

SM-02-JA00822

01:09PM 1     whole relationship and everything going on with it.

01:10PM 2              MR. TIDWELL:  So you don't know whether there was --

01:10PM 3     whether he asked written permission and whether or not he got

01:10PM 4     written permission?

01:10PM 5              THE WITNESS:  No, I do not.  I do not.  I do not.

01:10PM 6              MR. TIDWELL:  What do you know about your husband

01:10PM 7     representing in federal civil court here a -- in a matter

01:10PM 8     involving Robert Perez, Romeo Papa, and a claim against -- it's

01:10PM 9     an insurance claim?

01:10PM 10             THE WITNESS:  I don't know about that.

01:10PM 11             MR. TIDWELL:  You don't know anything about that.

01:10PM 12             Well, so if there is not a written -- how would

01:10PM 13    you interpret -- what would be your thought on if there is not

01:10PM 14    a written record anywhere about permission to do that,

01:10PM 15    particularly when it appears that some of that was while he was

01:10PM 16    working in the CAO, cutting to what Judge Freeh asked you,

01:11PM 17    sitting where you are now, would you consider those to be

01:11PM 18    conflicts of interest?

01:11PM 19             THE WITNESS:  Romeo Papa?

01:11PM 20             MR. TIDWELL:  Romeo Papa.  Him having an interest in

01:11PM 21    an entity that has a claim before the CAO?

01:11PM 22             THE WITNESS:  Oh, I didn't catch that part.  They do

01:11PM 23    have a claim before the CAO?

01:11PM 24             MR. TIDWELL:  Yes.

01:11PM 25             THE WITNESS:  Well, yes, I would consider that a

**C O N F I D E N T I A L**

SM-02-JA00823

01:11PM 1    conflict if it wasn't discussed and disclosed.

01:11PM 2              MR. TIDWELL:  Right.  Same thing with him

01:11PM 3    representing Perez here in a civil matter here in federal

01:11PM 4    court?

01:11PM 5              THE WITNESS:  Just representing him in a civil

01:11PM 6    matter?

01:11PM 7              MR. TIDWELL:  Yes.  If he is currently and was

01:11PM 8    through the time of his employment actively representing as

01:11PM 9    attorney of record Robert Perez --

01:11PM 10             THE WITNESS:  In a non-related matter?

01:11PM 11             MR. TIDWELL:  Well, in the context of Romeo Papa and

01:11PM 12   Robert Perez.

01:11PM 13             THE WITNESS:  Well, Robert Perez is his partner in

01:12PM 14   Romeo Papa.

01:12PM 15             MR. TIDWELL:  Okay.  Thank you.

01:12PM 16   BY MR. FREEH:

01:12PM 17   Q.   When you told your former client, Thonn, to go see

01:12PM 18   John Andry, did you have any conversations with your husband at

01:12PM 19   that time about whether that would create any conflict?

01:12PM 20   A.   If Thonn went to John Andry?

01:12PM 21   Q.   Yes.

01:12PM 22   A.   No.

01:12PM 23   Q.   So that never came up, that was never a subject of a

01:12PM 24   conversation?

01:12PM 25   A.   No.  Because he didn't have a relationship with John

**C O N F I D E N T I A L**

SM-02-JA00824

01:12PM 1   Andry, to my knowledge.

01:12PM 2   Q.   But did you ask him at that point if he did?

01:12PM 3   A.   I didn't ask him because I felt like I knew he didn't.

01:12PM 4   You know, I knew there had been -- I knew they didn't have the

01:12PM 5   building together.  I knew they didn't have cases together.

01:12PM 6   And I knew they weren't speaking to each other.  So what

01:12PM 7   relationship would they have and why would I ask?

01:12PM 8   Q.   Well, you knew that John Landry [verbatim] was associated

01:12PM 9   with Lerner.

01:12PM 10   A.   Well --

01:12PM 11   Q.   You said that.

01:12PM 12   A.   I knew that Lerner at some time on a different -- you

01:13PM 13   know, the GCCF, had put up money to help with the advertising.

01:13PM 14   Q.   And that knowledge didn't make you ask a question to your

01:13PM 15   husband at the time whether there was still any relationship or

01:13PM 16   if there was any relationship at all?

01:13PM 17   A.   Oh, I might have -- no, because I knew that.  Because I

01:13PM 18   knew there wasn't.  Because, you know, Glen was kind of in the

01:13PM 19   middle and he was trying to get the two of them to make amends,

01:13PM 20   and they wouldn't.

01:13PM 21        I mean, if -- if I discussed anything with my

01:13PM 22   husband, his response would have been, "I'm not doing anything

01:13PM 23   with him."

01:13PM 24   Q.   But at the time you told Mr. Thonn to go to Landry, did

01:13PM 25   you not know that Landry and Lerner --

**C O N F I D E N T I A L**

SM-02-JA00825

01:13PM 1    A.    No.

01:13PM 2    Q.    -- were law partners?

01:13PM 3    A.    No, I didn't.

01:13PM 4    Q.    You did not?

01:13PM 5    A.    No.

01:13PM 6          MS. PIERSON:  By the way, for the record, his name is

01:13PM 7    Andry, no L.

01:13PM 8          MR. FREEH:  Andry.  Thank you.

01:13PM 9    BY MR. FREEH:

01:14PM 10   Q.    And as you said before we took the break, there was no

01:14PM 11   conflict process that was followed, or you certainly didn't

01:14PM 12   follow any with respect to that referral?

01:14PM 13   A.    No.  No.

01:14PM 14   Q.    You said your law firm was coincidentally located at some

01:14PM 15   point directly across from Mr. Juneau's space?

01:14PM 16   A.    Uh-huh (affirmative response).

01:14PM 17   Q.    Did you use each other's space for any separate

01:14PM 18   businesses?  In other words, did Mr. Juneau's colleagues in

01:14PM 19   office use your space for meetings?

01:14PM 20   A.    Oh, no.  No.

01:14PM 21   Q.    Did you use any of their space for meetings not related to

01:14PM 22   the claims administration?

01:14PM 23   A.    Did I use any of their -- no.  But Tiger, I know, had --

01:14PM 24   had permission to have a deposition, his law practice,

01:15PM 25   something related to that, in one of the conference rooms in

**C O N F I D E N T I A L**

SM-02-JA00826

01:15PM 1    the CA's office.

01:15PM 2    Q.    Who did he have that permission from?

01:15PM 3    A.    Mr. Juneau.

01:15PM 4    Q.    Were you involved in getting that permission?

01:15PM 5    A.    No.  No.

01:15PM 6    Q.    Do you know who was?

01:15PM 7    A.    No.

01:15PM 8    Q.    Were you aware that Mr. Sutton was assigning claims

01:15PM 9    administration employees to do work related to his firm and not

01:15PM 10   the claims administration process?

01:15PM 11   A.    While he was working there?

01:15PM 12   Q.    While he was working there.

01:15PM 13   A.    Well, one time, I think, I -- I think -- I thought this

01:15PM 14   was when he wasn't working there.  I think one time, you know,

01:15PM 15   the -- the -- Tracy Steilberg, who works at the office, was his

01:15PM 16   personal secretary for many years.  And I think one time she

01:16PM 17   did type something for him, because he couldn't type.  But

01:16PM 18   that's the only thing I'm aware of.

01:16PM 19   Q.    Were you aware that he was asking claims administration

01:16PM 20   employees to help him with the filing of LLCs and other legal

01:16PM 21   papers?

01:16PM 22   A.    No, I was not aware of that.

01:16PM 23   Q.    That never came to your attention?

01:16PM 24   A.    No.

01:16PM 25             MR. MCCALL:  Mrs. Reitano, did you ever use that

**C O N F I D E N T I A L**

**SM-02-JA00827**

01:16PM 1    Sutton Reitano law firm space to meet with any CAO staff

01:16PM 2    members --

01:16PM 3              THE WITNESS:  No.

01:16PM 4              MR. MCCALL:  -- about CAO business?

01:16PM 5              THE WITNESS:  It wasn't even furnished.  Because once

01:16PM 6    we moved into that office, I began working on this program, so

01:16PM 7    only my husband has a desk.  No, I did not.

01:16PM 8              MR. MCCALL:  Do you know if your husband ever used it

01:16PM 9    to meet with any other CAO staff members to discuss CAO

01:16PM 10   business?

01:16PM 11             THE WITNESS:  No.  I don't know.  But I don't think

01:16PM 12   so either.

01:16PM 13             MR. FREEH:  We'll take just a brief minute -- let's

01:17PM 14   go out and talk.  We may be almost finished, so let me just

01:17PM 15   check.

01:17PM 16             MS. PIERSON:  May I ask a question?

01:17PM 17             MR. FREEH:  Sure.

01:17PM 18             MS. PIERSON:  When you are concluded, there's a

01:17PM 19   couple of documents that I would like to offer into this

01:17PM 20   record, and some questions I would like for her to ask to

01:17PM 21   complete -- or to answer to complete the record, since

01:17PM 22   Judge Barbier is going to be the one to decide what all this

01:17PM 23   might or might not mean.  There are some things that I think he

01:17PM 24   needs to know in addition to what might have been covered here

01:17PM 25   today.

**C O N F I D E N T I A L**

SM-02-JA00828

124

| | | |
|---|---|---|
| 01:17PM | 1 | MR. FREEH:  Well, we should have a sidebar about that |
| 01:17PM | 2 | first. |
| 01:17PM | 3 | MS. PIERSON:  It's not a whole lot. |
| 01:17PM | 4 | MR. FREEH:  And you can make a proffer. |
| 01:17PM | 5 | MS. PIERSON:  I can make a proffer. |
| 01:17PM | 6 | MR. FREEH:  And then we can decide whether we should |
| 01:17PM | 7 | do it here or in a separate proceeding. |
| 01:17PM | 8 | All right.  We're just going to take a short |
| 01:17PM | 9 | break and caucus. |
| 01:18PM | 10 | (WHEREUPON, at this point in the proceedings, a brief |
| 01:26PM | 11 | recess was taken.) |
| 01:26PM | 12 | MR. FREEH:  We can go back on the record.  We took a |
| 01:27PM | 13 | break.  We've had a sidebar with Ms. Reitano's counsel.  She's |
| 01:27PM | 14 | going to introduce some records, ask her client a few |
| 01:27PM | 15 | questions.  We have several -- a few more questions from our |
| 01:27PM | 16 | side, and then I think we're not going to have any questions |
| 01:27PM | 17 | about the matters we discussed her counsel putting on the |
| 01:27PM | 18 | record. |
| 01:27PM | 19 | MR. TIDWELL:  To finish up on Document Number 4 -- |
| 01:27PM | 20 | MR. FREEH:  I'll give you time to retrieve that. |
| 01:27PM | 21 | MS. PIERSON:  What is 4? |
| 01:27PM | 22 | MR. TIDWELL:  Four is an e-mail from Lynn Greer. |
| 01:27PM | 23 | THE WITNESS:  Uh-huh (affirmative response).  Yep. |
| 01:27PM | 24 | MR. TIDWELL:  Okay.  And then also 04A. |
| 01:27PM | 25 | THE WITNESS:  Right. |

**C O N F I D E N T I A L**

SM-02-JA00829

01:27PM 1    MR. TIDWELL:  To the best of your recollection, as

01:27PM 2 you sit here today, the -- 04A is the in-question chart that

01:28PM 3 you were needing that you questioned Matt Lundy on?

01:28PM 4    THE WITNESS:  Yes.  And we -- my counsel and I were

01:28PM 5 just discussing it when you left the room.  It wouldn't make

01:28PM 6 sense that Matt Lundy would send a list of other people and

01:28PM 7 their claimants, so it makes much more sense that this is --

01:28PM 8    MS. PIERSON:  Let me just interject.  Assuming that

01:28PM 9 04A is the list of people represented by Lundy.

01:28PM 10    THE WITNESS:  Exactly.

01:28PM 11    MS. PIERSON:  Because it doesn't say so.

01:28PM 12    MR. TIDWELL:  Right.  So that means what we have

01:28PM 13 attached to 04 is what is in Lynn Greer's Point Number 10, that

01:28PM 14 this is what she posted to the Garden City site is these here,

01:28PM 15 is the ones at the back?

01:28PM 16    Counselor, not those.  I'm sorry.

01:28PM 17    THE WITNESS:  It's possible.

01:28PM 18    MR. TIDWELL:  It's these, these right here.

01:28PM 19    THE WITNESS:  It's possible.

01:29PM 20    MR. TIDWELL:  All right.

01:29PM 21    MS. PIERSON:  Well, is there a row 1402?

01:29PM 22    MR. TIDWELL:  Well, the fact is that we've got as an

01:29PM 23 attachment "No claims left behind," 300 kilobytes, and it's an

01:29PM 24 Excel spreadsheet.  This is an Excel spreadsheet.

01:29PM 25    MS. PIERSON:  Right.

**C O N F I D E N T I A L**

SM-02-JA00830

01:29PM  1          MR. TIDWELL:  So that's what we're trying to confirm.

01:29PM  2              This is her attaching for whatever reason with

01:29PM  3   the explanations she put in here, that this is the "no claims"

01:29PM  4   that she decided people needed to see in the context of this

01:29PM  5   discussion, because as you'll note at the top, "Casey Thonn."

01:29PM  6          THE WITNESS:  Right.

01:29PM  7          MR. TIDWELL:  Read Number 10.

01:29PM  8          THE WITNESS:  Yes, I know.

01:29PM  9              "Report to address claims we showed as having

01:29PM 10   received all the payment documents where we had no record that

01:29PM 11   they had been paid."

01:29PM 12              And that's what I was explaining to you.

01:29PM 13   Because this was an offline process, to ensure that payments

01:29PM 14   were getting made, actual -- you know, when it's done online,

01:30PM 15   the computer checks it off, you know.  When it's being done

01:30PM 16   offline, a human being has to decide, okay, we got all the

01:30PM 17   documents for these, but they haven't been paid.  Where is the

01:30PM 18   human who is going to sit down and actually write the check?

01:30PM 19          MR. TIDWELL:  Right.  And because on that chart, the

01:30PM 20   ones -- the approvals that would need to have a Y for yes, do

01:30PM 21   not have them?

01:30PM 22          MS. PIERSON:  Let's see.

01:30PM 23          THE WITNESS:  Does that mean that they don't have

01:30PM 24   their documentation?

01:30PM 25          MR. TIDWELL:  Yeah.

**C O N F I D E N T I A L**

SM-02-JA00831

| | | |
|---|---|---|
| 01:30PM | 1 | THE WITNESS:  Right.  Exactly. |
| 01:30PM | 2 | MR. TIDWELL:  That's the "No claims left behind" |
| 01:30PM | 3 | Excel spreadsheet that she said -- |
| 01:30PM | 4 | THE WITNESS:  And one of Garden City's -- one of the |
| 01:30PM | 5 | outreach functions -- there was a lot of outreach going on at |
| 01:30PM | 6 | the time for both incompleteness -- and there was |
| 01:30PM | 7 | incompleteness with the payment documentation. |
| 01:30PM | 8 | So Garden City people or BrownGreer people, I |
| 01:30PM | 9 | guess they would keep this sort of chart to say, okay, you have |
| 01:30PM | 10 | this, this, this, and this, but we need to call them and make |
| 01:30PM | 11 | sure that they have this, and then they can get paid. |
| 01:30PM | 12 | MR. MCCALL:  Ms. Reitano, prior to these allegations |
| 01:31PM | 13 | against your husband surfacing, when you were working in the |
| 01:31PM | 14 | CAO and when your husband also began -- or was working within |
| 01:31PM | 15 | the CAO, do you feel that there was -- there was any -- there |
| 01:31PM | 16 | were any conflicts in the sense of grudges, unpleasant |
| 01:31PM | 17 | relationships, somebody being out to get you or vice versa? |
| 01:31PM | 18 | Did you have any particularly unpleasant relationships with any |
| 01:31PM | 19 | members of the upper-level CAO management? |
| 01:31PM | 20 | THE WITNESS:  Not -- no.  And at that time I wouldn't |
| 01:31PM | 21 | think so. |
| 01:31PM | 22 | I think there was -- you know, in the beginning |
| 01:31PM | 23 | of the program, there was -- you just had a few lawyers, and |
| 01:31PM | 24 | then you had this business processing group, which -- you know, |
| 01:31PM | 25 | Pat Juneau, I don't believe, hired or anticipated, like -- as I |

**C O N F I D E N T I A L**

SM-02-JA00832

01:31PM  1    told you, he just thought that there were going to be, you

01:32PM  2    know, a few lawyers and this and that.

01:32PM  3              And I think that it was difficult to decide to

01:32PM  4    what extent should these people, these people in our office,

01:32PM  5    shadow the vendors and what they were doing.  To what extent

01:32PM  6    should they do that?  Should -- to what extent -- should they

01:32PM  7    do auditing?  Should they be reporting on the vendors' data?

01:32PM  8    You know?

01:32PM  9              I think the vendors were of the mind, "This is

01:32PM 10    our data.  We should report on it."

01:32PM 11              It was hard, I think, to find what their role

01:32PM 12    was -- should be initially.  You know, there might have been a

01:32PM 13    sense, too, that when they were going in there and, you know,

01:32PM 14    shadowing or doing what they were doing, that maybe they were

01:32PM 15    interfering with the work that needed to get done at the time.

01:32PM 16              MR. MCCALL:  Excuse me.  Which people in the office

01:33PM 17    are we talking about not going in and shadowing the vendors and

01:33PM 18    looking over their shoulder?

01:33PM 19              THE WITNESS:  Whoever that business processing team

01:33PM 20    is.

01:33PM 21              You know, they had somebody by the name of

01:33PM 22    Scott Scheurich (spelled phonetically), I know he did a lot.

01:33PM 23    They had a SWAT-team process where they went and they -- you

01:33PM 24    know, they are trying to analyze.  And they are coming up

01:33PM 25    with -- how do I explain it?  They were coming up with, like,

**C O N F I D E N T I A L**

SM-02-JA00833

01:33PM  1   business theories and ideas, how to change this, how to do

01:33PM  2   this, how to do that better.

01:33PM  3            When I guess the vendors felt like, "We've been

01:33PM  4   appointed by the court.  We know how to do what we should be

01:33PM  5   doing."  You know?

01:33PM  6            And I think, ultimately, it was just decided

01:33PM  7   that -- that part of our office's role was put to better use by

01:33PM  8   performing the auditing function, which I think ended up being

01:33PM  9   very successful and very helpful.

01:34PM 10            But, no, I didn't feel like I had any conflict

01:34PM 11   or animosity or that anyone was out to get me or that I was

01:34PM 12   out -- you know, I just feel like there were different roles,

01:34PM 13   you know, that the legal part was different from -- I wasn't

01:34PM 14   sure what the business processing people were doing, and I kind

01:34PM 15   of kept to my realm and they kept to their realm.

01:34PM 16            MR. MCCALL:  Do you feel that there was any animosity

01:34PM 17   toward the vendors on the part of these business processing

01:34PM 18   people, toward any of the vendors, that you were aware of?

01:34PM 19            THE WITNESS:  I think the vendors probably felt some.

01:34PM 20            MR. MCCALL:  The vendors felt some toward the

01:34PM 21   business processing people?

01:34PM 22            THE WITNESS:  No.  They felt that there was animosity

01:34PM 23   toward them.  BrownGreer in particular, I think, felt that

01:34PM 24   someone was kind of waiting for them to have a misstep, or when

01:34PM 25   something wasn't done in a very timely fashion, they were, you

**C O N F I D E N T I A L**

SM-02-JA00834

01:35PM 1   know -- it was brought down upon them very heavily.  And

01:35PM 2   they -- they stood their course.

01:35PM 3          I mean, they -- things didn't come out of the

01:35PM 4   gate, like the whole tent didn't just blow up and wasn't there

01:35PM 5   ready to go.  The circus wasn't ready to go as soon as you

01:35PM 6   opened the case.  It took a long time.  But they all the while

01:35PM 7   maintained that we are going to have this slow, sort of

01:35PM 8   building process, and then we're going to ramp up.  And then no

01:35PM 9   one is going to be able to catch up with us.

01:35PM 10         And by that they meant our end of the review

01:35PM 11  would become so systematic that the accountants would then

01:35PM 12  inherit -- or suffer from the backlog, because they would never

01:35PM 13  be able to catch up to BrownGreer.

01:35PM 14         And I think initially all the criticism was --

01:35PM 15  the scapegoat was BrownGreer.  Because as our office is

01:35PM 16  being -- you know, is receiving all these complaints, you're

01:36PM 17  not reviewing fast enough, you're not making payments fast

01:36PM 18  enough, you know, the eyes turn to BrownGreer, why aren't you

01:36PM 19  doing this?  You said you would do this in this amount of time,

01:36PM 20  blah, blah.

01:36PM 21         And eventually, I think it was Mike Juneau who

01:36PM 22  stepped in and said, "Look, we've got to kind of -- our role at

01:36PM 23  our office is not one of lording over these court-appointed

01:36PM 24  vendors.  It is to stand by their side and kind of work with

01:36PM 25  them."

**C O N F I D E N T I A L**

SM-02-JA00835

01:36PM  1        MR. MCCALL:  You mentioned among those people on the

01:36PM  2    business process side who, BrownGreer, for example, felt were

01:36PM  3    in conflict.  I think you mentioned Scott Scheurich?

01:36PM  4        THE WITNESS:  Yes.

01:36PM  5        MR. MCCALL:  Are there other individuals that you

01:36PM  6    recall who were also perceived by BrownGreer, or any of the

01:36PM  7    other vendors, as having this --

01:36PM  8        THE WITNESS:  I think they perceived it as, you

01:36PM  9    know -- and it wasn't specific people.  It was just as --

01:37PM 10    coming up -- our office coming up with a lot of theories and

01:37PM 11    ideas that, at the end of the day, really didn't help anything.

01:37PM 12    And they tried to go along, go along, go along, but eventually,

01:37PM 13    it became a source of frustration for them.

01:37PM 14        MR. MCCALL:  Mr. Scheurich was terminated at some

01:37PM 15    point from the CAO; is that correct?

01:37PM 16        THE WITNESS:  Right.

01:37PM 17        MR. MCCALL:  Do you know why?  Do you know anything

01:37PM 18    about that?

01:37PM 19        THE WITNESS:  I'm trying to remember.  I don't

01:37PM 20    remember the details.  I don't know.

01:37PM 21            At one point, you know, we had all kinds of

01:37PM 22    programs going on, like an outreach and SWAT and this and that.

01:37PM 23    And I think they had put Scott at the head of one of these sort

01:37PM 24    of outreach programs, or something of that nature, and he was

01:37PM 25    just taking things off on a tangent.  And I think eventually

**C O N F I D E N T I A L**

SM-02-JA00836

| | |
|---|---|
| 01:38PM 1 | that came to Pat. |
| 01:38PM 2 | You know, the other people in the office would |
| 01:38PM 3 | know better.  They are the ones who met about it and discussed |
| 01:38PM 4 | it and ultimately decided to terminate it -- to terminate him. |
| 01:38PM 5 | I think Bob Levine and David Odom and Pat Juneau probably sat |
| 01:38PM 6 | down and discussed whatever was going on with him. |
| 01:38PM 7 | But, you know, this was background for me.  And |
| 01:38PM 8 | I -- I had my big enough plate, and really, you know, I just |
| 01:38PM 9 | had to keep reminding myself, that's not my realm.  Those |
| 01:38PM 10 | people are getting paid.  They have their roles.  They are |
| 01:38PM 11 | full-time employees, that they need to take care of that, the |
| 01:38PM 12 | CEO needs to take care of that. |
| 01:38PM 13 | I just really -- but, of course, you're in the |
| 01:38PM 14 | office with people.  I would hear personal things from, you |
| 01:38PM 15 | know, the vendors about how, you know, they felt like, you |
| 01:38PM 16 | know, it was very interfering and unnecessary and maybe there |
| 01:39PM 17 | were other agendas or whatnot, but nothing -- nothing that I |
| 01:39PM 18 | got overly involved in. |
| 01:39PM 19 | MR. MCCALL:  Did you -- you didn't participate in any |
| 01:39PM 20 | discussions with Mr. Juneau, Mr. Odom, Mr. Levine regarding the |
| 01:39PM 21 | decision of whether to terminate Mr. Scheurich. |
| 01:39PM 22 | THE WITNESS:  No. |
| 01:39PM 23 | MR. MCCALL:  Thank you. |
| 01:39PM 24 | BY MR. FREEH: |
| 01:39PM 25 | Q.    I've just got a few more questions. |

**C O N F I D E N T I A L**

SM-02-JA00837

01:39PM 1        We were asking questions -- I was asking questions

01:39PM 2  about the relationships, as far as you were aware of them at

01:39PM 3  the time, being when you worked at the administrator, between

01:39PM 4  Jonathan Andry and Glen Lerner.

01:39PM 5  A.    Right.

01:39PM 6  Q.    And you said you were not aware they were partners

01:39PM 7  together in the law firm?

01:39PM 8  A.    Not in the law firm.  I didn't know they had created a law

01:39PM 9  firm, or I didn't recall.

01:39PM 10 Q.    So you were not aware they had a law firm at 610 Baronne

01:39PM 11 Street called Andry Lerner, LLC?

01:39PM 12 A.    I thought it was -- I thought the law firm at 610 Baronne

01:40PM 13 was Andry Group -- or Andry Law Group.

01:40PM 14 Q.    Were you aware that the law firm that Jonathan Andry had

01:40PM 15 in New Orleans, regardless of the address, had claims pending

01:40PM 16 before the administrator?

01:40PM 17 A.    Yes.

01:40PM 18 Q.    And you knew that due to the nature and course of your

01:40PM 19 work or did you learn it in some other way?

01:40PM 20 A.    Oh, that -- I guess in the nature or in the course -- I

01:40PM 21 don't know.  I just -- I think it was because Casey went to him

01:40PM 22 and he said, "Yes, I'll take your case."  And he had all of

01:40PM 23 these GCCF cases, as I said, I just assumed that he did.

01:40PM 24 Q.    So let me show you what I've marked as 07.

01:40PM 25       (WHEREUPON, at this point in the proceedings,

**C O N F I D E N T I A L**

SM-02-JA00838

01:40PM 1    Exhibit 07 was marked for identification.)

01:40PM 2                MR. FREEH:  I'm sorry, Counsel.  We may have to bump

01:40PM 3    your numbers up a few for your exhibits.

01:40PM 4    BY MR. FREEH:

01:40PM 5    Q.    But let me show you what I've marked as Exhibit Number 07,

01:41PM 6    which is a -- letterhead for Andry and Lerner.

01:41PM 7    A.    Yes.

01:41PM 8    Q.    So were you not aware that Lerner was at least, apparently

01:41PM 9    on the face of Exhibit 07, associated with the firm that your

01:41PM 10   client had been sent to by your direction?

01:41PM 11   A.    No.  I didn't know that they had a letterhead and -- you

01:41PM 12   know.

01:41PM 13   Q.    I'll show you another document which I've marked 08.

01:41PM 14                (WHEREUPON, at this point in the proceedings,

01:41PM 15   Exhibit 08 was marked for identification.)

01:41PM 16   BY MR. FREEH:

01:41PM 17   Q.    The one marked 07 is dated August 14, 2012.

01:41PM 18                And then I'll send you one which I've marked as 08,

01:41PM 19   which is the same letterhead form, Andry Lerner LLC, residing

01:41PM 20   Jonathan Andry and Glen Lerner as principles, dated July 30,

01:42PM 21   2012, addressed to the "Deepwater Horizon Economic Claims

01:42PM 22   Center, Re:  Claimant 100051739, Casey Thonn."

01:42PM 23                So again, the same question, you were not aware that

01:42PM 24   they had that relationship?

01:42PM 25   A.    And the same answer.  I wasn't aware that they had gone to

**C O N F I D E N T I A L**

SM-02-JA00839

01:42PM 1   the -- you know, had started a firm to do these cases in the

01:42PM 2   settlement program.

01:42PM 3   Q.   And again, I think that goes back to my earlier question,

01:42PM 4   which you did answer.  When you told -- or recommended that

01:42PM 5   Casey go to Andry, you didn't do anything further to check

01:42PM 6   whether that was going to cause any conflict or whether it made

01:42PM 7   any conflict?

01:42PM 8   A.   Right.  Right.  Right.  In my mind, it was John Andry.

01:42PM 9   Q.   May I have those back?

01:42PM 10  A.   Uh-huh.

01:42PM 11       MS. PIERSON:  Well, point of clarification, that's

01:42PM 12  with regard to his VOO claim.  And the one she sent over there

01:43PM 13  was not a VOO claim, was it?

01:43PM 14       THE WITNESS:  No.  It was a GCCF claim.

01:43PM 15       MR. TIDWELL:  There is multiple claims that they are

01:43PM 16  handling, right.

01:43PM 17  BY MR. FREEH:

01:43PM 18  Q.   May I have that one back, please?

01:43PM 19  A.   I think we already gave it back.

01:43PM 20  Q.   Oh, they are together.  Okay.

01:43PM 21       (WHEREUPON, at this point in the proceedings,

01:43PM 22  Exhibit 07A was marked for identification.)

01:43PM 23  BY MR. FREEH:

01:43PM 24  Q.   And, again, I'll show you what I've marked as Exhibit 07A,

01:43PM 25  which there's no reason you would have seen this.  This is a

**C O N F I D E N T I A L**

SM-02-JA00840

01:43PM 1    Bizapedia report dated March 11, 2012, which is a

01:43PM 2    publicly-available report and which reflects that Lerner is

01:43PM 3    associated.

01:43PM 4              You're not again --

01:43PM 5    A.    No, I did not see that.

01:43PM 6    Q.    You weren't aware of that?

01:43PM 7    A.    No.

01:43PM 8    Q.    And I'll show you what I've marked as Exhibit 09, which is

01:44PM 9    a document entitled "Deepwater Horizon Claims Center, Claimant

01:44PM 10   Details" dated -- that's the date we printed it.  I'm looking

01:44PM 11   at the date that it was --

01:44PM 12             MR. TIDWELL:  Unless it shows on the next page, it

01:44PM 13   might not have one.

01:44PM 14             (WHEREUPON, at this point in the proceedings,

01:44PM 15   Exhibit 09 was marked for identification.)

01:44PM 16   BY MR. FREEH:

01:44PM 17   Q.    It's a seven-page document.  I'm not going to recite a

01:44PM 18   date.  They have an event date of February 26, 2013, but I

01:44PM 19   don't purport that to be the date of the document.

01:44PM 20             Anyway, I'm going to show it to you.  It's a list of

01:44PM 21   claimant information, and it lists as the -- represented by

01:45PM 22   Andry Law Group/Andry Lerner, LLC.  Casey Thonn is the name,

01:45PM 23   Casey Charles Thonn, with the address of 332 Jacobs Street.

01:45PM 24             And I would ask you to look at that.  Is that a

01:45PM 25   document that is a document from the claims administrator or is

**C O N F I D E N T I A L**

01:45PM 1    it a document that, as far as you could tell, because I can't,

01:45PM 2    it was generated somewhere else?

01:45PM 3    A.    This looks like a claims administrator document.

01:45PM 4    Q.    And it clearly reflects that Lerner is working on the

01:45PM 5    *Thonn* claim by looking at the document?

01:45PM 6    A.    Yes.

01:45PM 7    Q.    Okay.

01:45PM 8          MS. PIERSON:  And we don't know the date of this?

01:45PM 9          MR. FREEH:  It's hard to tell.  I look at the last

01:45PM 10   page and there is a February date.

01:45PM 11         THE WITNESS:  You know what that looks like?  That

01:45PM 12   looks like if someone goes into a claimant's file and then they

01:45PM 13   pull up all the documents that they can review that have been

01:46PM 14   submitted for the claimant's file.

01:46PM 15         MR. FREEH:  All right.

01:46PM 16         (WHEREUPON, at this point in the proceedings,

01:46PM 17   Exhibits 10 through 12 were marked for identification.)

01:46PM 18   BY MR. FREEH:

01:46PM 19   Q.    I'll show you what have been marked 10, 11 and 12, which

01:46PM 20   is a series of documents.  These are public business reports.

01:46PM 21   So if you do, like, a public information search on a business

01:46PM 22   that was registered in the State of Louisiana, it's my

01:46PM 23   understanding that these are the documents that are generated.

01:46PM 24         But before I show you them, I'm going to ask you,

01:46PM 25   were you aware of different LLCs that your husband either

**C O N F I D E N T I A L**

SM-02-JA00842

01:46PM 1  founded or was a partner or a named registrant in at the time
01:46PM 2  you were working at the claims administration?
01:46PM 3  A.   Other than the two I've mentioned -- or that have been
01:46PM 4  discussed, I was not aware.  I did read somewhere in the -- I
01:47PM 5  think it was Welker's report, that there was a long list of
01:47PM 6  them.  And I'm sure you're going to show me the list.  And, no,
01:47PM 7  I was not aware of these other ones.
01:47PM 8  Q.   So let me show you what's marked as Exhibit 10.  It's a
01:47PM 9  company referred to as *Monster Demolition*.
01:47PM 10  A.   No.
01:47PM 11  Q.   Is this the first time that you're hearing that name?
01:47PM 12  A.   Yes.
01:47PM 13  Q.   How about Crown, LLC, which, of course, you said you had
01:47PM 14  heard about?
01:47PM 15  A.   Yes, I did hear about that.
01:47PM 16  Q.   All right.  And did you know at the time you were working
01:47PM 17  at the claims administrator that Mr. Lerner was an officer of
01:47PM 18  Crown?
01:47PM 19  A.   Yes.  Well, I didn't know he was an -- I didn't know what
01:47PM 20  his title was, but I knew that they were members together.
01:47PM 21  Q.   All right.  Did you inquire at the time what the exact
01:47PM 22  relationship was between Lerner and Crown?
01:48PM 23  A.   No.  My understanding was that he was capitalizing the
01:48PM 24  company.
01:48PM 25  Q.   And you said, I think, you were aware at the time you were

**C O N F I D E N T I A L**

SM-02-JA00843

01:48PM 1   claims administrator that Lerner was paying certain salaries or

01:48PM 2   not paying certain salaries owed to your husband?

01:48PM 3   A.   Right.   He had an obligation to or had agreed to pay

01:48PM 4   salaries in return for more percentage of the business.

01:48PM 5   Q.   I'll show you 11, and it's just a business-generated

01:48PM 6   report.   But it does reflect Mr. Lerner as an officer on

01:48PM 7   page 2.

01:48PM 8   A.   Okay.

01:48PM 9   Q.   And then I'll ask you about some other LLCs.

01:48PM 10  A.   Okay.

01:48PM 11  Q.   And I'll represent and I'll show you the document, your

01:48PM 12  husband is listed either as a registered agent and/or officer,

01:48PM 13  and I'll ask you if you have heard of these before.

01:48PM 14       One is SDA Enterprises?

01:48PM 15  A.   No.

01:48PM 16  Q.   And it lists an address of 610 Baronne Street.   That was

01:49PM 17  the previous office.

01:49PM 18       And you had not heard of that --

01:49PM 19  A.   No.

01:49PM 20  Q.   -- before today?

01:49PM 21  A.   No.

01:49PM 22  Q.   How about Can You Hear Me Now, LLC?

01:49PM 23  A.   No.

01:49PM 24  Q.   610 Baronne Street.   First time today?

01:49PM 25  A.   Yes.

**C O N F I D E N T I A L**

SM-02-JA00844

01:49PM 1     Q.    And Navajo Enterprises, LLC?

01:49PM 2     A.    No.

01:49PM 3     Q.    111 Pine Park in Lafayette, Louisiana.  Does that address

01:49PM 4     ring a bell to you?

01:49PM 5     A.    The address doesn't even ring a bell.

01:49PM 6     Q.    And there is an officer there named Johnny Walker.  Do you

01:49PM 7     know Johnny Walker?

01:49PM 8     A.    I know the name.

01:49PM 9     Q.    But you're not sure in what context?

01:49PM 10    A.    Right.

01:49PM 11    Q.    Do you know a Mark Corcoran?

01:49PM 12    A.    No.

01:49PM 13    Q.    Charles Laborde, L-A-B-O-R-D-E?

01:49PM 14    A.    No.

01:49PM 15    Q.    How about a company named Full Dimension Trading Company,

01:50PM 16    LLC?

01:50PM 17    A.    That sounds familiar.  But I don't remember.

01:50PM 18    Full Dimension.  I don't know.  Is his brother in that, do you

01:50PM 19    know?  Is there another Sutton in there?

01:50PM 20    Q.    The State of Louisiana secretary of state -- these are

01:50PM 21    all, by the way, documents publicly available from the

01:50PM 22    secretary of state at Louisiana.

01:50PM 23          With respect to Full Dimension Trading Co.,

01:50PM 24    Lionel Sutton is listed as a registered agent and an officer.

01:50PM 25    There is no one else listed there?

**C O N F I D E N T I A L**

SM-02-JA00845

01:50PM  1    A.    The name alone sounds familiar.

01:50PM  2    Q.    And it recites a business address of 110 East Pershing

01:50PM  3    Street, New Iberia.

01:50PM  4    A.    Okay.  He has a law office -- well, he rents space at that

01:50PM  5    law office in New Iberia.

01:50PM  6    Q.    "He" meaning your husband?

01:50PM  7    A.    Yes.

01:50PM  8    Q.    And then I've got one, 4K Partners, LLC?

01:51PM  9    A.    Yes.  4K was an LLC my husband's father set up in the name

01:51PM 10    of the four children.

01:51PM 11    Q.    And is Michael Sutton one of the children?

01:51PM 12    A.    Yes.

01:51PM 13    Q.    And he's reflected as an officer.

01:51PM 14          I'll pass this to you and your counsel so you can

01:51PM 15    look at it.

01:51PM 16    A.    But he's no longer a part of 4K.

01:51PM 17    Q.    Now, I have one here, I'm just going to ask you a question

01:51PM 18    about it.  We covered it before.  Sutton & Reitano, it's got,

01:51PM 19    paren, a professional law corporation, close paren.

01:51PM 20          Is it your statement that that's not a legally

01:51PM 21    incorporated entity?

01:51PM 22    A.    Yes.

01:51PM 23    Q.    It's not?

01:51PM 24    A.    It's not.

01:51PM 25    Q.    Another LLC where your husband is listed as registered

**C O N F I D E N T I A L**

SM-02-JA00846

01:52PM 1    agent, Ms. Ashley, LLC?

01:52PM 2    A.    That's a boat.

01:52PM 3    Q.    Is that the boat that we talked about before?

01:52PM 4    A.    No.   I think that was associated with his family.

01:52PM 5    Q.    And an officer here is listed as T-Blue, LLC?

01:52PM 6    A.    That was another company associated with his family.

01:52PM 7    Q.    And there is a Martin Belden, B-E-L-D-E-N?

01:52PM 8    A.    I don't know.

01:52PM 9    Q.    T-Blue we talk about.

01:52PM 10        Secretariat, LLC?

01:52PM 11   A.    No.

01:52PM 12   Q.    5494 Shoreline Drive, New Iberia?

01:52PM 13   A.    That's his father's address.

01:52PM 14   Q.    Had you heard that before today?

01:52PM 15   A.    No.

01:52PM 16   Q.    And as an officer reflected on the State of Louisiana

01:52PM 17   secretary of state document, which I'll pass to you and your

01:52PM 18   attorney in a moment, Robert Perez.

01:52PM 19        Is that the Perez we spoke about before?

01:53PM 20   A.    Yes, it is.

01:53PM 21   Q.    And were you aware that he had a claim pending before the

01:53PM 22   claims administration?

01:53PM 23   A.    No, I was not.

01:53PM 24   Q.    Tampa Seahorse LLC?

01:53PM 25   A.    That sounds like another --

**C O N F I D E N T I A L**

SM-02-JA00847

01:53PM 1  Q.   It says, "Shoreline Drive, New Iberia."

01:53PM 2  A.   Yeah.  I was going to say another family thing.

01:53PM 3  Q.   And the registration reflects as officers Robert Perez and

01:53PM 4  T-Blue LLC.

01:53PM 5  A.   Okay.  That's why they initially started with that boat

01:53PM 6  company, was his family and Robert Perez.

01:53PM 7  Q.   I'm going to pass that to you.  You can look at it.  And

01:53PM 8  then I just need it back when you're done.

01:53PM 9           MR. FREEH:  And that's all the questions I have.

01:53PM 10          MR. MCCALL:  Is that Document Number 12?

01:53PM 11          MR. FREEH:  12.

01:53PM 12          THE WITNESS:  (Witness reviews the document.)

01:54PM 13          MS. PIERSON:  Counsel, the only one that I looked at

01:54PM 14 here was Sutton & Reitano, and it says that it's a

01:54PM 15 "professional law corporation," has not filed a report since

01:54PM 16 February of 2010.  And it's inactive.

01:54PM 17          MR. FREEH:  I think your client said it was never

01:54PM 18 really formalized as an organization.

01:54PM 19          MS. PIERSON:  Right.

01:54PM 20           So let me just ask her, were you aware that it

01:54PM 21 was registered with the secretary of state as a professional

01:54PM 22 corporation?

01:54PM 23          THE WITNESS:  I think what my husband told me was he

01:54PM 24 attempted to do something and then it fell through or something

01:54PM 25 like that, so he just used the name then.

**C O N F I D E N T I A L**

SM-02-JA00848

01:54PM  1          MS. PIERSON:  I just want to make sure that we're not
01:54PM  2  making a material misstatement.  If he registered it, did you
01:54PM  3  know it?
01:54PM  4          THE WITNESS:  No.
01:54PM  5          MS. PIERSON:  I mean, of course, you can go to the
01:54PM  6  secretary of state website and plug in his name and come up
01:55PM  7  with all of this.  Have you ever done that?
01:55PM  8          THE WITNESS:  No.
01:55PM  9          MR. TIDWELL:  Counselor, is 13 and 14 all right for
01:55PM  10  you?
01:55PM  11          MS. PIERSON:  Oh, sure.  I like 13.  It's a lucky
01:55PM  12  number.
01:55PM  13  BY MR. FREEH:
01:55PM  14  Q.   In response to your counsel's question that you never did
01:55PM  15  that, going back to some previous questions I asked, that you
01:55PM  16  didn't think that that was a conflict check that should have
01:55PM  17  been done when he was brought on board at your recommendation?
01:55PM  18  A.   I assumed it was.  I assumed it was done.
01:55PM  19  Q.   Who were you assuming would follow that up or be
01:55PM  20  responsible for that?
01:55PM  21  A.   I guess the claims administrator and the CEO.
01:55PM  22  Q.   But you never took any steps to see that that was done?
01:55PM  23  A.   No.  That was his hiring and his interview and all of
01:55PM  24  that.  I stayed out of it.
01:56PM  25  Q.   But you recommended that he be hired?

**C O N F I D E N T I A L**

SM-02-JA00849

145

01:56PM  1     A.    That's right.

01:56PM  2     Q.    And he was your husband?

01:56PM  3     A.    Right.

01:56PM  4     Q.    And you knew that he had outside business --

01:56PM  5     A.    Well, I knew that they would discuss -- I knew that he had

01:56PM  6     businesses, and I knew that would all have to be discussed to

01:56PM  7     the satisfaction of the claims administrator and the CEO.

01:56PM  8     Q.    How did you know that?

01:56PM  9     A.    Because you have this agreement that talks about conflict

01:56PM 10     of interests.

01:56PM 11     Q.    So you assumed because there was a written agreement that

01:56PM 12     he would discuss it?

01:56PM 13     A.    That he would have sign -- yes.  That that would be, you

01:56PM 14     know, a prerequisite to his being hired.

01:56PM 15     Q.    Did he, in fact, sign an employment agreement that had a

01:56PM 16     conflicts of interest provision?

01:56PM 17     A.    I believe, yes.

01:56PM 18     Q.    Did you ever see it?

01:56PM 19     A.    The signed copy?  No.  Or unless it's -- unless it's

01:56PM 20     attached to all the exhibits that were part of the motion filed

01:56PM 21     by BP to halt the payment process.

01:57PM 22     Q.    Did -- when your husband came on board, did he also sign a

01:57PM 23     code of conduct?

01:57PM 24     A.    I'm not sure.

01:57PM 25     Q.    Do you recall that he had some questions and reservations

**C O N F I D E N T I A L**

SM-02-JA00850

01:57PM 1    about signing it with respect to some of the language?

01:57PM 2    A.    No.  I don't recall that.

01:57PM 3    Q.    He never expressed that to you?

01:57PM 4    A.    No.  No, we never discussed that.

01:57PM 5    Q.    Did you ever see a signed copy?

01:57PM 6    A.    No.

01:57PM 7         MR. TIDWELL:  Did anyone ever discuss -- did you ever

01:57PM 8    discuss with any of the leadership or hear any discussions

01:57PM 9    regarding what the background process was for new CAO hires and

01:57PM 10   who would conduct the backgrounds?

01:57PM 11        THE WITNESS:  No.

01:57PM 12        MR. FREEH:  Okay.  Counsel, please.

01:57PM 13        MS. PIERSON:  I added an exhibit.  I added a letter

01:57PM 14   to Mr. Gonzales' just for the purpose of showing what it would

01:57PM 15   be written on.

01:57PM 16        (WHEREUPON, at this point in the proceedings,

01:57PM 17   Exhibit 13 was marked for identification.)

01:57PM 18                        EXAMINATION

01:57PM 19   BY MS. PIERSON:

01:57PM 20   Q.    Ms. Reitano, I'm going to show you now what purports to be

01:58PM 21   an unsigned copy, not on letterhead, of a document.  We've

01:58PM 22   labeled it Number 13.  It's a letter addressed to Casey Thonn

01:58PM 23   on Kent Street in Slidell, and -- from you.

01:58PM 24        Is this a copy of the letter that you sent to him on

01:58PM 25   March 30th of 2012?

**C O N F I D E N T I A L**

01:58PM 1    A.   Yes, it is.

01:58PM 2    Q.   Did your work with the claims administration office begin

01:58PM 3    after that date?

01:58PM 4    A.   Yes, it did.

01:58PM 5         (WHEREUPON, at this point in the proceedings,

01:58PM 6    Exhibit 14 was marked for identification.)

01:58PM 7    BY MS. PIERSON:

01:58PM 8    Q.   Okay.  Now, attached to that, you've provided to me and

01:58PM 9    we've marked it as Number 14, is this the original retainer

01:58PM 10   agreement that you had with Mr. Thonn?

01:58PM 11   A.   Yes, it is.

01:58PM 12   Q.   And is that his signature?

01:58PM 13   A.   Yes.

01:58PM 14   Q.   Is that your signature at the bottom?

01:58PM 15   A.   Yes, it is.

01:58PM 16   Q.   Now, I notice that it's signed -- it says at the top,

01:58PM 17   Christine Reitano and an addressed at 9 --

01:58PM 18   A.   35 Gravier.

01:58PM 19   Q.   -- 935 Gravier, and it's signed Christine Reitano,

01:58PM 20   Esquire, at 16 Baronne Street.

01:58PM 21        Can you explain to us how that came to be?

01:59PM 22        MR. FREEH:  16 or 610?

01:59PM 23        THE WITNESS:  610.

01:59PM 24        MS. PIERSON:  610, I'm sorry.

01:59PM 25        THE WITNESS:  We had -- this date right here, this

**C O N F I D E N T I A L**

SM-02-JA00852

01:59PM  1   is when we --

01:59PM  2   BY MS. PIERSON:

01:59PM  3   Q.    Which date?

01:59PM  4   A.    The date of this contract, March 16, 2011, would have been

01:59PM  5   right at the time we moved from 610 Baronne to 935 Gravier

01:59PM  6   Street.  And I guess when the secretary pulled up the retainer

01:59PM  7   form, she changed the address on the top and neglected to

01:59PM  8   change the address on the bottom.

01:59PM  9   Q.    But that is, in fact, the contract you signed with him?

01:59PM  10  A.    Yes, it is.

01:59PM  11          (WHEREUPON, at this point in the proceedings,

01:59PM  12  Exhibit 15 was marked for identification.)

01:59PM  13  BY MS. PIERSON:

01:59PM  14  Q.    And I'm going to show you another letter.  I marked it

01:59PM  15  Number 15.  It's a letter addressed to Tim Gonzales signed by

01:59PM  16  you.  And I'm offering it only to show that this would have

01:59PM  17  been the form that you would have sent the letter to Mr. Thonn,

01:59PM  18  on letterhead?

01:59PM  19  A.    Exactly.  I sent the same letter to all of the GCCF

01:59PM  20  clients and would have done the same thing for each.

01:59PM  21  Q.    Now, with regard to Mr. Thonn and also you mentioned --

02:00PM  22  was her name Backer?

02:00PM  23  A.    Backes.

02:00PM  24  Q.    -- the Backes people and Mr. Gonzales, since March the

02:00PM  25  30th of 2012, when you went to work for Mr. Juneau at the

**C O N F I D E N T I A L**

SM-02-JA00853

| | |
|---|---|
| 02:00PM 1 | claims administration office, have you received any |
| 02:00PM 2 | compensation at all as a result of any of their claims with BP? |
| 02:00PM 3 | A.    No. |
| 02:00PM 4 | Q.    And do you have any expectation to receive any funds from |
| 02:00PM 5 | them? |
| 02:00PM 6 | A.    No, I do not. |
| 02:00PM 7 | Q.    Have you had an expectation to receive funds after |
| 02:00PM 8 | March the 30th of 2012? |
| 02:00PM 9 | A.    No. |
| 02:00PM 10 | MR. FREEH:  Can I ask a follow-up question? |
| 02:00PM 11 | MS. PIERSON:  Sure. |
| 02:00PM 12 | MR. FREEH:  With respect to counsel's last questions, |
| 02:00PM 13 | has your husband, to your knowledge, receive any compensation |
| 02:00PM 14 | with respect to the *Thonn* claim referral after March 12th? |
| 02:00PM 15 | THE WITNESS:  Not to my knowledge. |
| 02:00PM 16 | MR. FREEH:  Did you ever ask him? |
| 02:00PM 17 | THE WITNESS:  Well, we didn't discuss it after this |
| 02:00PM 18 | all arose.  You know, I know what's alleged.  You know, I read |
| 02:01PM 19 | the e-mail and I know what -- the e-mails, and I know what the |
| 02:01PM 20 | speculations are.  But we've decided not to discuss it since |
| 02:01PM 21 | this whole situation arose. |
| 02:01PM 22 | BY MS. PIERSON: |
| 02:01PM 23 | Q.    I want to be clear about that, too, that you have -- you |
| 02:01PM 24 | have, as a result of this investigation and allegations and so |
| 02:01PM 25 | forth that have been going on for two months now, about two |

**C O N F I D E N T I A L**

SM-02-JA00854

02:01PM 1    months, you have seen a lot of e-mails that have provided you

02:01PM 2    with information.

02:01PM 3            And my question is:  With regard to the *Thonn* fee,

02:01PM 4    which is discussed in some of those e-mails that I've seen, did

02:01PM 5    you know about that prior to seeing those e-mails recently?

02:01PM 6    A.    No.

02:01PM 7            MS. PIERSON:  Okay.

02:01PM 8                         EXAMINATION

02:01PM 9    BY MR. FREEH:

02:01PM 10   Q.    And it's your testimony that once you learned of it, you

02:01PM 11   never asked your husband about it?

02:01PM 12   A.    Not -- not did he receive a fee.

02:01PM 13   Q.    You never asked him the question?

02:01PM 14   A.    No.  We decided not to discuss it.

02:02PM 15   Q.    Tell me about the discussion when you decided not to

02:02PM 16   discuss it.  You must have had some communication.

02:02PM 17   A.    Yes, we did.  And we said we've both been retained by

02:02PM 18   attorneys, and we're going to treat this separately with --

02:02PM 19   separate people with separate issues.

02:02PM 20   Q.    When did you first retain your attorney?  Was it after you

02:02PM 21   left the employment temporarily?

02:02PM 22   A.    Yes.

02:02PM 23   Q.    So between the point that you retained counsel and --

02:02PM 24   A.    Between the point -- he told me that we did not receive

02:02PM 25   any fees -- we didn't receive any *BP* fees.

**C O N F I D E N T I A L**

SM-02-JA00855

02:02PM 1   Q.   Well, okay.  That's a different question.

02:02PM 2           When did he make the statement, "We did not receive

02:02PM 3   any," to use your words, "*BP fees*"?

02:02PM 4   A.   I guess maybe when I first asked him about the e-mails.

02:02PM 5   Q.   So you did ask him about the e-mails?

02:02PM 6   A.   Oh, yeah.  He walked through them with me.

02:02PM 7   Q.   Can you tell us about that.

02:02PM 8   A.   I thought I already went through it with you.

02:02PM 9   Q.   You did.

02:03PM 10  A.   We talked about the possibility that -- what it meant --

02:03PM 11  first of all, he talked about the VOO fee and talked about how

02:03PM 12  that was something that settled before he began work on the

02:03PM 13  program.

02:03PM 14          We talked about the way he was inquiring -- asking

02:03PM 15  Glen to pay the obligations, and if he was to use money, you

02:03PM 16  know -- if he didn't have money, you know, that to maybe use

02:03PM 17  the *Casey Thonn* money to pay his salary obligations.  And that

02:03PM 18  was the extent of it.

02:03PM 19  Q.   So this was before you both retained counsel?

02:03PM 20  A.   Yes.

02:03PM 21  Q.   So in those conversations, did he, in fact, tell you that

02:03PM 22  he would contact Lerner for payment on his salary when he would

02:04PM 23  learn that payments were being made on a separate claim?

02:04PM 24  A.   No.

02:04PM 25  Q.   He did not tell you that?

**C O N F I D E N T I A L**

SM-02-JA00856

02:04PM 1    A.    No.

02:04PM 2    Q.    Did you ask him about that in the e-mails as it was

02:04PM 3    referenced?

02:04PM 4    A.    Generally, what he said to me was, "I always told Glen,

02:04PM 5    you know, you're behind."  And Glen would always tell me, "I'm

02:04PM 6    waiting for such and such to settle.  I'm waiting for this to

02:04PM 7    settle."  He said, that was always the relationship.

02:04PM 8          You know, and Mr. Lerner has offices all over the

02:04PM 9    country.  He has a huge practice.  And he said that was always

02:04PM 10   kind of their discussion.

02:04PM 11         "You owe money to the account."

02:04PM 12         "Oh, I'm waiting for this."

02:04PM 13   Q.    Do you maintain separate or joint bank accounts?

02:04PM 14   A.    We have a joint bank account that's our personal bank

02:04PM 15   account.

02:04PM 16   Q.    Were the salary payments from Lerner that were made

02:05PM 17   deposited into that account?

02:05PM 18   A.    No.

02:05PM 19   Q.    Do you know where they were?

02:05PM 20   A.    He has a separate account for the business.

02:05PM 21   Q.    Have you ever looked at statements for that account?

02:05PM 22   A.    No.

02:05PM 23   Q.    Have you ever asked to look at statements for that

02:05PM 24   account?

02:05PM 25   A.    No.

**C O N F I D E N T I A L**

SM-02-JA00857

02:05PM  1    MR. TIDWELL:  To clarify, what account is that for?

02:05PM  2    THE WITNESS:  Crown.

02:05PM  3    MR. FREEH:  Anything else?

02:05PM  4         Okay.  So we're going to make a request, you

02:05PM  5    don't have to respond to it now, but we're going to request

02:05PM  6    your client to provide us, for our review, a copy of their

02:05PM  7    jointly-filed tax returns for the last three years.

02:05PM  8    MS. PIERSON:  No problem.

02:05PM  9    MR. FREEH:  You can consider that.  Okay.

02:05PM  10        Very well.

02:05PM  11   MS. PIERSON:  The only problem is getting them.  I

02:05PM  12   mean, you can have them.  I guess they can -- I haven't

02:05PM  13   discussed that with them.

02:05PM  14   MR. FREEH:  Well, why don't you discuss it with her.

02:05PM  15   MS. PIERSON:  I mean, I just don't know -- if you

02:05PM  16   wanted my tax returns for the last three years, I know exactly

02:05PM  17   where they are.  I just don't know where theirs are.

02:06PM  18   MR. FREEH:  You can discuss that.  We don't need an

02:06PM  19   answer today.

02:06PM  20        Anything else, Counsel, you wish to put on the

02:06PM  21   record?  Or, Ms. Reitano, anything else you want to say or put

02:06PM  22   on the record?

02:06PM  23   MS. PIERSON:  There's a lot I would like to say.

02:06PM  24   THE WITNESS:  Let's leave it at that.

02:06PM  25   MS. PIERSON:  I'm just going to wait for your report

**C O N F I D E N T I A L**

SM-02-JA00858

02:06PM 1    and get my indemnity from BP for much ado about nothing --

02:06PM 2    well, with regard to her.

02:06PM 3              MR. FREEH:  Okay.  Thank you very much.

02:06PM 4              MR. TIDWELL:  We will mention that you're not

02:06PM 5    adjourned.  We might have to recall you.

02:06PM 6              MS. PIERSON:  Not a problem.

02:06PM 7              MR. TIDWELL:  Thank you, ma'am.

02:06PM 8              MR. FREEH:  Okay.  Thank you.

9              (WHEREUPON, the proceedings at 2:06 p.m. were

10   concluded.)

11                              *    *    *

12

13

14                    REPORTER'S CERTIFICATE

15

16        I, Cathy Pepper, Certified Realtime Reporter, Registered
     Merit Reporter, Certified Court Reporter of the State of
17   Louisiana, Official Court Reporter for the United States
     District Court, Eastern District of Louisiana, do hereby
18   certify that the foregoing is a true and correct transcript to
     the best of my ability and understanding from the record of the
19   proceedings in the above-entitled and numbered matter.

20                              s/Cathy Pepper
                                _____
21                              Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
22                              Registered Merit Reporter
                                Official Court Reporter
23                              United States District Court
                                Cathy_Pepper@laed.uscourts.gov

24

25

                         **C O N F I D E N T I A L**

SM-02-JA00859

**$**

$10,000 [3] - 110:17, 110:24, 110:25
$20,000 [1] - 24:9

**0**

01 [2] - 112:7, 112:9
01..............................
............. [1] - 3:2
02 [4] - 69:2, 69:4, 69:5, 71:13
02..............................
............. [1] - 2:18
02A [3] - 74:25, 75:5, 75:6
02A..............................
............. [1] - 2:19
02B [6] - 57:3, 57:4, 57:6, 58:7, 60:6, 67:9
02B..............................
............. [1] - 2:14
02D [4] - 59:21, 59:23, 60:24, 61:4
02D..............................
............. [1] - 2:15
02D1 [2] - 61:7, 61:11
02D1..............................
............. [1] - 2:16
03 [5] - 62:24, 63:1, 63:2, 63:4, 65:18
03..............................
............. [1] - 2:17
04 [6] - 76:20, 76:25, 77:1, 77:14, 82:1, 125:13
04..............................
............. [1] - 2:20
04A [7] - 83:15, 83:17, 83:18, 83:23, 124:24, 125:2, 125:9
04A..............................
............. [1] - 2:21
05 [4] - 86:20, 86:24, 87:3, 94:20
05..............................
............. [1] - 2:22
05A [5] - 92:9, 92:10, 92:12, 92:13, 94:18
05A..............................
............. [1] - 2:23
05B [3] - 93:9, 93:12, 93:14, 93:15, 93:20
05B..............................
............. [1] - 2:24
06 [3] - 95:11, 95:13,

95:14
06..............................
............. [1] - 2:25
06A [3] - 95:17, 95:20, 96:3
06A..............................
............. [1] - 3:1
07 [5] - 133:24, 134:1, 134:5, 134:9, 134:17
07..............................
............. [1] - 3:3
07A [2] - 135:22, 135:24
07A..............................
............. [1] - 3:5
08 [3] - 134:13, 134:15, 134:18
08..............................
............. [1] - 3:4
09 [2] - 136:8, 136:15
09..............................
............. [1] - 3:6

**1**

1 [3] - 63:2, 63:21, 82:15
10 [7] - 3:7, 83:3, 125:13, 126:7, 137:17, 137:19, 138:8
10-MD-2179 [1] - 1:6
10/11/11 [1] - 71:14
10/14/11 [2] - 69:7, 71:14
100 [1] - 39:20
100051739 [1] - 134:22
1001 [1] - 5:4
10:00 [1] - 1:7
11 [9] - 3:7, 86:20, 87:14, 88:10, 91:19, 92:14, 136:1, 137:19, 139:5
11-year-old [1] - 9:5
110 [1] - 141:2
11004 [1] - 4:10
111 [1] - 140:3
112 [1] - 3:2
11th [2] - 87:1, 87:9
12 [4] - 137:17, 137:19, 143:10, 143:11
12..............................
............. [1] - 3:7
12th [1] - 149:14
13 [4] - 144:9, 144:11, 146:17, 146:22
13..............................

.............. [1] - 3:8
134 [2] - 3:3, 3:4
135 [1] - 3:5
136 [1] - 3:6
137 [1] - 3:7
14 [5] - 71:22, 134:17, 144:9, 147:6, 147:9
14..............................
............. [1] - 3:9
1402 [1] - 125:21
1407 [1] - 82:17
146 [2] - 2:6, 3:8
14647 [2] - 1:17, 4:12
147 [1] - 3:9
148 [1] - 3:10
15 [3] - 9:4, 148:12, 148:15
15..............................
............. [1] - 3:10
150 [1] - 2:7
16 [4] - 9:4, 147:20, 147:22, 148:4
17 [5] - 76:22, 77:2, 77:16, 77:22, 82:15
17th [4] - 61:14, 61:16, 62:12, 78:3
18 [2] - 5:4, 60:14
18th [3] - 60:2, 60:18, 60:22
1988 [1] - 13:7
1989 [1] - 13:7
1990 [1] - 18:15
1991 [1] - 6:7
1994 [1] - 6:25
1997 [1] - 8:20
19th [1] - 20:22
1st [2] - 47:4, 65:6

**2**

2 [6] - 69:2, 82:15, 83:5, 83:6, 87:14, 139:7
20 [4] - 1:5, 95:18, 95:25, 105:21, 105:22, 107:18
200 [5] - 34:13, 38:10, 38:11, 39:15, 40:8
2002 [1] - 8:8
2007 [1] - 8:15
2008 [2] - 8:15, 12:22
2009 [1] - 12:22
2010 [8] - 1:5, 15:9, 72:3, 91:4, 99:19, 99:20, 103:10, 143:16
2011 [4] - 14:17, 71:22, 72:3, 148:4
2012 [25] - 14:17,

15:10, 15:11, 15:12, 20:2, 60:4, 60:14, 61:14, 61:16, 62:12, 63:2, 63:21, 75:1, 76:22, 77:2, 77:16, 77:22, 89:11, 101:23, 134:17, 134:21, 136:1, 146:25, 148:25, 149:8
2013 [25] - 1:7, 4:2, 86:20, 87:9, 87:10, 87:15, 88:10, 88:11, 89:10, 91:19, 92:10, 92:14, 92:21, 93:10, 93:16, 93:21, 94:2, 94:19, 95:15, 95:18, 95:25, 105:21, 105:22, 107:18, 136:18
20th [1] - 112:6
225 [1] - 4:13
2251 [1] - 82:17
240 [2] - 110:8, 110:11
25 [3] - 100:23
26 [1] - 136:18
28 [2] - 93:16, 93:21
29 [2] - 1:7, 4:2
2:06 [1] - 154:9
2:40 [1] - 82:15

**3**

3 [3] - 77:13, 82:1, 83:2
30 [1] - 134:20
300 [2] - 110:22, 125:23
30th [4] - 75:1, 146:25, 148:25, 149:8
332 [1] - 135:23
35 [1] - 147:18

**4**

4 [3] - 95:15, 124:19, 124:21
40 [1] - 81:14
400 [3] - 34:15, 38:10, 38:11, 39:15, 40:8
45 [1] - 21:17
4K [3] - 141:8, 141:9, 141:16

**5**

5 [5] - 2:4, 2:5, 57:14, 58:18, 67:10

500 [1] - 1:22
504 [1] - 1:23
5494 [1] - 142:12
57 [1] - 2:14
589-7779 [1] - 1:23
59 [1] - 2:15

**6**

60 [1] - 81:13
61 [1] - 2:16
610 [13] - 9:24, 12:4, 12:19, 13:2, 104:9, 133:10, 133:12, 139:16, 139:24, 147:22, 147:23, 147:24, 148:5
63 [1] - 2:17
69 [1] - 2:18

**7**

7 [1] - 91:6
70130 [1] - 1:22
70809 [2] - 1:18, 4:12
70898 [1] - 4:13
75 [1] - 2:19
76 [1] - 2:20

**8**

828 [3] - 104:1, 104:5, 104:11
83 [1] - 2:21
86 [1] - 2:22
8702 [1] - 4:11

**9**

9 [4] - 57:14, 58:19, 67:10, 147:17
92 [1] - 2:23
927-6765 [1] - 4:13
93 [1] - 2:24
935 [3] - 14:16, 147:19, 148:5
95 [2] - 2:25, 3:1

**A**

A.M [1] - 1:7
abiding [1] - 70:2
ability [2] - 5:10, 154:18
able [8] - 15:25, 37:22, 85:1, 88:7, 89:5,

90:1, 130:9, 130:13
**above-entitled** [1] -
  154:18
**absolutely** [9] - 21:5,
  26:4, 30:11, 32:9,
  35:18, 61:5, 69:12,
  112:22
**academic** [1] - 10:22
**academically** [1] -
  25:21
**accident** [1] - 106:18
**accompanied** [1] -
  72:24
**accomplish** [2] -
  53:25, 107:3
**account** [10] - 95:8,
  111:5, 152:11,
  152:14, 152:15,
  152:17, 152:20,
  152:21, 152:24,
  153:1
**accountant** [1] - 15:21
**accountants** [5] -
  29:3, 35:4, 79:24,
  106:25, 130:11
**accounting** [3] -
  28:22, 40:1
**accounts** [2] - 93:23,
  152:13
**acronym** [1] - 94:16
**action** [7] - 7:25, 11:1,
  11:4, 11:7, 11:13,
  48:23, 84:19
**ACTION** [1] - 1:6
**actions** [3] - 10:18,
  11:15, 59:4
**actively** [4] - 16:14,
  113:12, 114:17,
  119:8
**activities** [2] - 66:7,
  70:6
**activity** [2] - 58:22,
  67:10
**actual** [1] - 126:14
**add** [2] - 36:15
**added** [2] - 146:13
**addition** [3] - 53:8,
  79:12, 123:24
**additional** [1] - 91:23
**additions** [1] - 39:24
**address** [13] - 4:12,
  29:24, 104:7, 126:9,
  133:15, 136:23,
  139:16, 140:3,
  140:5, 141:2,
  142:13, 148:7, 148:8
**addressed** [4] -
  134:21, 146:22,
  147:17, 148:15
**addressing** [3] - 35:8,

78:3
**adds** [1] - 93:1
**adjoining** [1] - 20:11
**adjourned** [1] - 154:5
**adjudication** [1] - 39:8
**administerial** [1] -
  40:5
**administration** [31] -
  4:19, 6:2, 32:11,
  51:24, 52:20, 53:11,
  54:5, 55:3, 70:1,
  70:8, 70:20, 70:23,
  71:4, 74:15, 75:14,
  75:23, 75:25, 76:6,
  96:24, 106:21,
  112:20, 114:23,
  116:21, 121:22,
  122:9, 122:10,
  122:19, 138:2,
  142:22, 147:2, 149:1
**administrative** [1] -
  15:18
**administrator** [18] -
  10:15, 15:4, 25:18,
  29:18, 51:19, 58:22,
  74:4, 74:13, 96:10,
  113:24, 133:3,
  133:16, 136:25,
  137:3, 138:17,
  139:1, 144:21, 145:7
**Administrator** [2] -
  57:9, 58:9
**administrator's** [5] -
  20:25, 42:13, 50:15,
  66:5, 107:13
**ado** [1] - 154:1
**advance** [3] - 29:11,
  30:21, 80:3
**advertise** [1] - 102:20
**advertisement** [1] -
  103:6
**advertising** [2] -
  98:24, 120:13
**advice** [5] - 28:4,
  28:10, 30:5, 30:8,
  39:10
**advise** [1] - 4:22
**advised** [3] - 17:7,
  48:23, 101:17
**advising** [1] - 117:6
**affiliation** [1] - 8:3
**agencies** [1] - 70:5
**agendas** [1] - 132:17
**agent** [3] - 139:12,
  140:24, 142:1
**aggravated** [1] - 91:17
**ago** [2] - 85:3, 103:10
**agree** [3] - 24:11,
  24:13, 37:4
**agreed** [3] - 38:4,

84:11, 139:3
**Agreement** [1] - 61:9
**agreement** [33] -
  22:11, 22:23, 25:8,
  26:14, 26:18, 26:21,
  26:23, 27:14, 27:17,
  27:23, 28:10, 28:18,
  29:17, 29:25, 30:4,
  30:9, 30:15, 30:16,
  30:18, 30:19, 31:6,
  32:6, 33:22, 40:4,
  52:25, 53:1, 56:25,
  78:22, 79:23, 145:9,
  145:11, 145:15,
  147:10
**ahead** [6] - 14:4, 37:7,
  79:15, 85:25
**alike** [1] - 91:11
**ALL** [1] - 1:8
**allegations** [4] - 4:19,
  127:12, 149:24
**alleged** [1] - 149:18
**allocate** [1] - 42:3
**almost** [3] - 39:8,
  66:9, 123:14
**alone** [1] - 141:1
**altogether** [1] - 93:10
**amends** [1] - 120:19
**amount** [1] - 130:19
**analysis** [3] - 29:2,
  56:3
**analyze** [4] - 25:12,
  30:5, 32:23, 128:24
**Andry** [56] - 11:16,
  11:18, 12:2, 13:10,
  13:12, 13:19, 13:20,
  88:19, 90:4, 90:5,
  90:6, 90:7, 90:12,
  90:13, 91:9, 91:13,
  97:4, 97:5, 97:12,
  97:22, 99:23, 100:6,
  100:9, 102:9,
  103:19, 103:23,
  103:24, 103:25,
  104:14, 104:18,
  104:20, 104:21,
  104:24, 114:18,
  115:11, 115:12,
  119:18, 119:20,
  120:1, 121:7, 121:8,
  133:4, 133:11,
  133:13, 133:14,
  134:6, 134:19,
  134:20, 135:5,
  135:8, 136:22
**Andry's** [2] - 11:22,
  97:9
**animosity** [3] -
  129:11, 129:16,
  129:22

**answer** [11] - 25:23,
  26:2, 54:7, 90:16,
  90:17, 90:19,
  102:23, 123:21,
  134:25, 135:4,
  153:19
**answers** [1] - 36:20
**anticipated** [1] -
  127:25
**anticipating** [1] -
  24:25
**anyway** [2] - 103:12,
  136:20
**apart** [1] - 54:22
**apostrophe** [1] -
  16:22
**appeals** [1] - 31:19
**appear** [3] - 58:22,
  59:9, 67:11
**appearance** [4] -
  59:11, 59:12, 59:17,
  67:16
**APPEARANCES** [1] -
  1:13
**appeared** [1] - 106:17
**Appendix** [1] - 60:24
**application** [2] - 37:8,
  37:16
**applies** [1] - 53:9
**appointed** [6] - 15:3,
  15:13, 23:14, 31:18,
  129:4, 130:23
**appointing** [1] - 4:17
**Appointing** [2] - 57:8,
  58:9
**appropriate** [1] - 70:2
**approval** [4] - 22:24,
  26:18, 58:21, 78:23
**approvals** [1] - 126:20
**approved** [1] - 34:14
**approximate** [1] -
  39:18
**APRIL** [1] - 1:5
**April** [6] - 27:7, 27:19,
  60:14, 60:18, 60:22
**area** [3] - 18:20, 35:25,
  49:9
**areas** [3] - 29:20,
  30:14, 64:14
**argue** [2] - 7:14, 25:23
**arguing** [2] - 7:13,
  10:21
**argument** [1] - 32:23
**arise** [1] - 56:12
**arising** [1] - 52:8
**arose** [3] - 54:9,
  149:18, 149:21
**arrangements** [1] -
  115:19
**articulate** [1] - 26:6

**Ashley** [1] - 142:1
**aside** [1] - 107:14
**aspects** [4] - 4:18,
  29:8, 35:2, 35:13
**assemble** [1] - 80:22
**assigned** [1] - 18:23
**assigning** [1] - 122:8
**assignments** [3] -
  9:11, 10:16, 11:9
**assist** [3] - 10:24,
  21:6, 94:4
**assistance** [1] - 72:5
**assistant** [1] - 41:24
**assisting** [2] - 7:8,
  74:17
**associate** [4] - 18:16,
  18:18, 19:2, 19:12
**associated** [7] - 19:6,
  90:2, 120:8, 134:9,
  136:3, 142:4, 142:6
**assume** [7] - 20:3,
  28:21, 50:10, 61:22,
  62:20, 71:7, 82:3
**assumed** [7] - 19:17,
  55:16, 105:3,
  133:23, 144:18,
  145:11
**assuming** [2] - 125:8,
  144:19
**AT** [1] - 1:17
**attach** [2] - 36:13,
  37:22
**attached** [4] - 57:16,
  125:13, 145:20,
  147:8
**attaching** [1] - 126:2
**attachment** [13] -
  81:3, 82:6, 82:8,
  83:8, 83:9, 83:23,
  84:5, 84:11, 84:13,
  84:15, 125:23
**attachments** [3] -
  76:21, 77:4, 77:7
**attempted** [1] - 143:24
**attend** [1] - 64:21
**attention** [9] - 58:18,
  59:8, 62:3, 67:7,
  70:12, 70:15, 77:13,
  94:18, 122:23
**attorney** [37] - 6:12,
  6:14, 11:16, 17:4,
  22:6, 22:8, 25:2,
  25:15, 31:11, 31:12,
  36:1, 42:8, 43:16,
  59:5, 59:13, 59:14,
  59:15, 63:6, 65:17,
  66:25, 77:8, 84:17,
  87:19, 87:21, 89:9,
  89:20, 93:23, 95:8,
  98:22, 114:8,

114:11, 117:4, 117:6, 119:9, 142:18, 150:20
**ATTORNEY** [2] - 1:17, 1:18
**attorneys** [19] - 19:4, 26:19, 27:5, 29:3, 33:8, 38:15, 41:20, 42:4, 53:9, 54:22, 54:23, 55:2, 55:4, 64:20, 77:20, 77:21, 84:5, 84:23, 150:18
**attorneys'** [1] - 53:15
**auditing** [2] - 128:7, 129:8
**August** [1] - 134:17
**authority** [1] - 5:1
**Authorization** [1] - 69:6
**authorization** [2] - 71:13, 71:18
**available** [2] - 136:2, 140:21
**avoid** [1] - 112:3
**avoidance** [1] - 59:16
**award** [1] - 80:12
**awards** [2] - 79:9, 89:18
**aware** [27] - 12:9, 71:1, 71:2, 73:7, 97:21, 108:23, 109:1, 116:21, 122:8, 122:18, 122:19, 122:22, 129:18, 133:2, 133:6, 133:10, 133:14, 134:8, 134:23, 134:25, 136:6, 137:25, 138:4, 138:7, 138:25, 142:21, 143:20

**B**

**Backer** [1] - 148:22
**Backes** [7] - 16:19, 16:20, 75:20, 148:23, 148:24
**BACKES** [1] - 16:20
**Backes'** [1] - 17:3
**backfill** [1] - 37:19
**backfilled** [1] - 37:20
**backfilling** [1] - 38:1
**background** [4] - 5:23, 85:5, 132:7, 146:9
**backgrounds** [1] - 146:10

**backing** [1] - 78:23
**backlog** [1] - 130:12
**bad** [1] - 27:2
**Baden** [1] - 27:6
**Bakeses** [1] - 72:4
**balanced** [1] - 26:12
**bank** [4] - 29:3, 152:13, 152:14
**Bar** [1] - 4:10
**bar** [2] - 6:8, 16:21
**Barbier** [1] - 123:22
**Baronne** [12] - 9:24, 12:4, 103:23, 104:1, 104:5, 104:9, 133:10, 133:12, 139:16, 139:24, 147:20, 148:5
**basis** [16] - 6:16, 7:1, 8:14, 29:19, 36:25, 48:11, 64:1, 64:20, 79:25, 85:10, 85:12, 85:13, 85:14, 109:2, 109:12, 110:7
**basket** [1] - 70:14
**Baton** [2] - 4:11, 4:13
**BATON** [1] - 1:18
**became** [6] - 34:17, 36:23, 38:8, 79:17, 90:12, 93:4, 99:22, 131:13
**become** [1] - 130:11
**becomes** [1] - 99:12
**BEFORE** [1] - 1:11
**began** [10] - 6:25, 28:13, 34:15, 37:1, 50:13, 78:17, 112:1, 123:6, 127:14, 151:12
**begin** [1] - 147:2
**beginning** [4] - 31:23, 45:24, 97:15, 127:22
**begun** [1] - 78:21
**behalf** [3] - 16:21, 68:21, 115:3
**behavior** [1] - 59:4
**behind** [10] - 20:19, 77:5, 81:4, 81:6, 81:8, 81:17, 83:4, 123:23, 127:2, 152:5
**BEL** [8] - 33:10, 39:25, 40:5, 40:6, 40:11, 40:13, 91:4, 91:14, 96:15
**Belden** [1] - 142:7
**BELDEN** [1] - 142:7
**believes** [1] - 107:20
**bell** [2] - 140:4, 140:5
**BellSouth** [1] - 12:7
**BellSouth-Centennial** [1] - 12:7

**best** [6] - 11:23, 19:5, 26:2, 79:24, 85:3, 125:1, 154:18
**better** [3] - 129:2, 129:7, 132:3
**between** [11] - 19:10, 24:17, 80:16, 93:4, 93:22, 98:18, 102:22, 133:3, 138:22, 150:23, 150:24
**beyond** [4] - 33:2, 53:1, 115:24, 115:25
**big** [8] - 29:3, 35:20, 39:2, 42:19, 44:6, 79:5, 116:24, 132:8
**bigger** [4] - 85:15, 99:3, 99:6, 101:2
**bigger-than-life** [1] - 99:6
**biggest** [1] - 78:25
**binder** [1] - 38:25
**bit** [1] - 50:22
**Bizapedia** [1] - 136:1
**blah** [2] - 130:20
**blow** [1] - 130:4
**Blue** [3] - 142:5, 142:9, 143:4
**board** [8] - 30:5, 34:11, 48:20, 56:22, 76:5, 96:24, 144:17, 145:22
**boat** [7] - 42:18, 117:15, 117:16, 142:2, 142:3, 143:5
**Bob** [2] - 19:25, 132:5
**body** [1] - 55:11
**booklets** [3] - 28:25, 33:18, 78:14
**borne** [1] - 39:9
**borrowed** [1] - 55:11
**bottom** [2] - 147:14, 148:8
**Boudreaux** [2] - 102:7, 102:8
**bought** [2] - 12:1, 12:15
**BOX** [1] - 1:17
**Box** [1] - 4:12
**boy** [1] - 15:4
**boys** [1] - 9:1
**BP** [14] - 14:20, 15:22, 37:6, 37:17, 59:7, 89:19, 91:16, 94:3, 97:19, 145:21, 149:2, 150:25, 151:3, 154:1
**BP's** [1] - 34:4
**BP-related** [2] - 15:22, 59:7

**break** [8] - 48:14, 69:11, 69:13, 69:17, 71:12, 121:10, 124:9, 124:13
**breast** [1] - 8:1
**brief** [5] - 29:20, 31:3, 69:14, 123:13, 124:10
**briefed** [1] - 41:6
**bring** [4] - 42:24, 45:16, 55:7, 100:18
**bringing** [2] - 29:11, 45:17
**brings** [1] - 117:17
**brother** [3] - 13:24, 91:2, 140:18
**brothers** [3] - 90:8, 90:21, 104:3
**brought** [10] - 19:20, 35:7, 39:7, 56:22, 70:12, 70:15, 114:8, 130:1, 144:17
**Brown** [2] - 29:4, 36:22
**BrownGreer** [19] - 28:22, 28:23, 33:17, 34:1, 35:3, 37:8, 40:17, 77:2, 78:11, 80:17, 82:6, 84:7, 127:8, 129:23, 130:13, 130:15, 130:18, 131:2, 131:6
**BrownGreer's** [1] - 38:15
**brunt** [1] - 31:23
**build** [4] - 37:8, 98:19, 99:13, 100:17
**building** [20] - 12:1, 12:4, 12:16, 12:17, 12:19, 12:22, 13:1, 13:2, 14:16, 14:21, 20:16, 20:17, 20:21, 64:19, 97:14, 100:2, 100:7, 120:5, 130:8
**built** [2] - 37:16, 100:18
**bump** [1] - 134:2
**business** [34] - 36:1, 42:15, 44:24, 47:16, 70:3, 79:12, 97:22, 97:25, 98:15, 98:19, 107:8, 109:9, 110:7, 115:10, 115:19, 116:1, 123:4, 123:10, 127:24, 128:19, 129:1, 129:14, 129:17, 129:21, 131:2, 137:20, 137:21, 139:4, 139:5, 141:2,

145:4, 152:20
**business-generated** [1] - 139:5
**businesses** [3] - 42:17, 121:18, 145:6
**busy** [4] - 23:12, 41:21, 41:23, 114:13
**BY** [66] - 1:4, 1:24, 1:25, 2:5, 2:6, 2:7, 5:17, 12:18, 13:15, 13:23, 45:18, 48:19, 54:3, 57:10, 58:6, 60:1, 60:17, 61:3, 61:12, 62:7, 63:19, 69:18, 74:1, 75:9, 75:22, 77:6, 81:24, 84:9, 86:18, 87:13, 88:16, 90:10, 91:18, 93:19, 94:17, 96:4, 99:14, 104:6, 106:10, 112:10, 119:16, 121:9, 132:24, 134:4, 134:16, 135:17, 135:23, 136:16, 137:18, 144:13, 146:19, 147:7, 148:2, 148:13, 149:22, 150:9

**C**

**CA** [1] - 78:15
**CA's** [2] - 37:18, 122:1
**CAC** [1] - 78:15
**CACs** [1] - 28:25
**Cajun** [1] - 19:24
**callers** [1] - 64:15
**Calvin** [1] - 26:20
**candidate** [1] - 65:14
**cannot** [2] - 79:8, 86:9
**CAO** [12] - 118:16, 118:21, 118:23, 123:1, 123:4, 123:9, 127:14, 127:15, 127:19, 131:15, 146:9
**capital** [2] - 98:19, 100:25
**capitalizing** [1] - 138:23
**caps** [1] - 62:8
**car** [1] - 86:12
**care** [3] - 111:10, 132:11, 132:12
**Caroline** [1] - 102:7
**case** [13] - 8:2, 12:7, 49:22, 74:6, 74:7, 86:7, 97:1, 97:10,

114:10, 114:13, 130:6, 133:22
**cases** [8] - 6:16, 12:5, 12:6, 15:23, 106:18, 120:5, 133:23, 135:1
**CASES** [1] - 1:8
**Casey** [21] - 16:19, 16:23, 69:6, 71:24, 72:6, 74:23, 75:2, 75:20, 81:2, 97:4, 97:8, 104:21, 126:5, 133:21, 134:22, 135:5, 136:22, 136:23, 146:22, 151:17
**casual** [1] - 23:8
**catch** [3] - 118:22, 130:9, 130:13
**CATHY** [1] - 1:20
**Cathy** [3] - 34:21, 154:15, 154:20
**cathy_Pepper@laed. uscourts.gov** [1] - 1:23
**Cathy_Pepper@laed .uscourts.gov** [1] - 154:23
**caucus** [1] - 124:9
**causation** [1] - 29:1
**CCR** [2] - 1:20, 154:20
**celebrity** [1] - 99:4
**Centennial** [1] - 12:7
**Center** [2] - 134:22, 136:9
**center** [1] - 64:13
**centers** [1] - 78:15
**CEO** [8] - 44:5, 45:8, 45:10, 132:12, 144:21, 145:7
**certain** [8] - 35:2, 81:23, 110:18, 110:19, 113:12, 116:8, 139:1, 139:2
**certainly** [2] - 22:23, 121:11
**CERTIFICATE** [1] - 154:14
**certification** [1] - 59:20
**Certification** [1] - 61:1
**Certified** [3] - 154:15, 154:16, 154:21
**CERTIFIED** [1] - 1:21
**certify** [1] - 154:17
**change** [2] - 129:1, 148:8
**changed** [2] - 10:1, 148:7
**changes** [3] - 39:23, 40:10, 51:3

**character** [1] - 107:21
**charge** [1] - 33:11
**charged** [3] - 22:12, 30:8, 41:16
**Charles** [3] - 6:15, 136:23, 140:13
**charles.r.hacker@ uspwc.com** [1] - 96:1
**chart** [4] - 83:18, 125:2, 126:19, 127:9
**check** [7] - 89:3, 114:12, 115:6, 123:15, 126:18, 135:5, 144:16
**checking** [1] - 85:8
**checks** [1] - 126:15
**Chevron** [1] - 20:18
**children** [4] - 7:20, 9:1, 141:10, 141:11
**Chris** [1] - 36:11
**Christine** [8] - 4:6, 57:8, 63:3, 87:2, 93:16, 97:9, 147:17, 147:19
**CHRISTINE** [4] - 1:10, 1:18, 2:4, 5:12
**Christmas** [1] - 17:25
**Cirami** [8] - 86:25, 87:15, 87:16, 92:13, 93:17, 93:22, 94:7, 94:21
**circumstances** [1] - 4:20
**circus** [1] - 130:5
**City** [18] - 28:22, 63:12, 63:25, 64:4, 64:19, 64:23, 67:22, 68:5, 77:3, 80:10, 80:18, 80:21, 87:1, 87:17, 92:14, 125:14, 127:8
**City's** [1] - 127:4
**civil** [3] - 118:7, 119:3, 119:5
**CIVIL** [1] - 1:6
**Claim** [1] - 95:16
**claim** [88] - 4:18, 16:21, 17:11, 28:17, 28:24, 39:2, 39:3, 39:6, 39:9, 46:9, 49:22, 50:12, 72:6, 72:13, 72:20, 72:25, 73:3, 73:4, 73:5, 73:6, 73:14, 74:18, 74:22, 74:24, 75:3, 78:14, 79:16, 80:18, 80:23, 81:16, 83:4, 83:19, 84:19, 85:9, 88:23, 88:24, 89:6,

89:14, 89:17, 90:23, 91:4, 91:7, 91:14, 91:21, 91:24, 92:3, 92:4, 96:22, 97:1, 97:2, 104:13, 104:25, 105:15, 116:14, 118:8, 118:9, 118:21, 118:23, 135:12, 135:13, 135:14, 137:5, 142:21, 149:14, 151:23
**Claimant** [2] - 134:22, 136:9
**claimant** [10] - 28:19, 71:20, 87:20, 89:9, 89:12, 91:1, 91:3, 91:11, 136:21
**claimant's** [3] - 25:15, 137:12, 137:14
**claimant-type** [1] - 91:1
**claimants** [5] - 76:7, 83:19, 105:6, 105:8, 125:7
**claims** [104] - 6:2, 10:15, 16:25, 17:3, 20:25, 25:10, 29:18, 29:25, 31:19, 32:10, 32:21, 33:17, 38:22, 38:24, 39:1, 50:15, 51:8, 51:18, 51:24, 52:3, 53:10, 58:21, 58:25, 59:5, 59:7, 59:20, 66:5, 67:14, 70:1, 70:19, 70:22, 72:12, 72:21, 73:2, 74:3, 74:13, 74:15, 75:13, 75:23, 75:25, 77:4, 78:10, 78:20, 79:1, 79:14, 79:19, 79:21, 79:25, 80:2, 80:7, 80:25, 81:4, 81:6, 81:8, 81:11, 82:5, 82:17, 82:21, 96:9, 97:18, 102:25, 105:4, 106:20, 107:12, 112:20, 113:12, 113:22, 113:23, 113:24, 113:25, 114:1, 114:2, 114:4, 114:17, 114:22, 116:8, 116:21, 117:23, 121:22, 122:8, 122:10, 122:19, 125:23, 126:3, 126:9, 127:2, 133:15, 135:15, 136:25, 137:3,

138:2, 138:17, 139:1, 142:22, 144:21, 145:7, 147:2, 149:1, 149:2
**Claims** [8] - 57:9, 58:9, 61:1, 69:6, 75:7, 77:4, 134:21, 136:9
**clarification** [2] - 117:22, 135:11
**clarify** [1] - 153:1
**class** [15] - 7:25, 10:18, 11:1, 11:4, 11:7, 11:13, 11:15, 11:19, 34:4, 35:1, 35:6, 37:6, 37:17, 84:18
**class-action** [4] - 7:25, 11:1, 11:4, 11:13
**clean** [1] - 98:13
**cleanup** [1] - 38:8
**clear** [2] - 89:25, 149:23
**clearly** [1] - 137:4
**Client** [1] - 69:6
**client** [19] - 48:23, 71:13, 71:24, 72:1, 72:2, 72:8, 72:9, 72:10, 73:8, 73:9, 83:21, 84:18, 88:21, 119:17, 124:14, 134:10, 143:17, 153:6
**clients** [19] - 10:25, 11:1, 15:24, 16:2, 16:7, 16:11, 16:15, 91:1, 91:2, 91:3, 91:11, 91:12, 102:20, 114:22, 148:20
**close** [2] - 108:12, 141:19
**Co** [1] - 140:23
**Coast** [2] - 69:5, 75:7
**code** [13] - 51:24, 52:12, 52:18, 52:20, 53:1, 53:8, 53:13, 53:14, 54:1, 54:18, 54:21, 145:23
**coercing** [1] - 113:8
**coincidence** [2] - 20:25, 21:4
**coincidentally** [1] - 121:14
**collaborate** [3] - 39:19, 40:10, 40:13
**collaborated** [3] - 38:18, 39:16, 40:12
**collaborating** [1] -

39:23
**collaboration** [1] - 38:14
**colleagues** [2] - 70:8, 121:18
**collect** [2] - 111:14, 111:18
**college** [2] - 5:24, 6:3
**coming** [7] - 18:3, 76:5, 85:6, 128:24, 128:25, 131:10
**comments** [1] - 37:23
**commercials** [1] - 98:25
**committed** [1] - 44:24
**Committee** [1] - 11:6
**common** [1] - 8:21
**commonly** [1] - 10:10
**communication** [3] - 66:22, 78:3, 150:16
**communications** [2] - 26:11, 64:14
**commute** [1] - 17:23
**company** [14] - 42:18, 74:9, 98:2, 98:6, 100:24, 101:3, 110:24, 117:16, 117:18, 138:9, 138:24, 140:15, 142:6, 143:6
**Company** [1] - 140:15
**company's** [1] - 74:10
**compass** [1] - 107:20
**compendium** [2] - 38:2
**compensation** [2] - 149:2, 149:13
**competing** [1] - 39:7
**complained** [3] - 109:4, 109:6, 110:15
**complaint** [1] - 79:5
**complaints** [2] - 80:12, 130:16
**complete** [4] - 79:15, 116:18, 123:21
**completely** [1] - 36:19
**completing** [2] - 61:24, 62:22
**complex** [1] - 10:18
**compliance** [8] - 69:23, 69:25, 70:7, 70:14, 70:19, 70:24, 71:3
**complying** [1] - 70:9
**component** [1] - 80:8
**components** [1] - 80:5
**computer** [3] - 29:4, 34:23, 126:15
**COMPUTER** [1] - 1:25
**concerned** [3] - 47:11,

**C O N F I D E N T I A L**

52:9, 101:12
**concerning** [1] - 32:3
**concerns** [2] - 29:20, 31:2
**concluded** [2] - 123:18, 154:10
**condition** [1] - 19:8
**conduct** [10] - 4:20, 51:24, 52:12, 53:9, 53:15, 54:21, 59:15, 59:16, 145:23, 146:10
**conducted** [1] - 4:16
**conducts** [1] - 52:12
**conference** [1] - 121:25
**Confidential** [1] - 61:8
**confidentiality** [2] - 59:20, 61:6
**Confidentiality** [1] - 61:1
**Confidentiality/Non** [1] - 61:8
**Confidentiality/Non-Disclosure** [1] - 61:8
**confirm** [1] - 126:1
**confirming** [1] - 75:1
**Conflict** [3] - 58:19, 62:2, 62:8
**conflict** [26] - 39:3, 49:18, 49:20, 58:24, 59:10, 59:11, 66:3, 66:5, 66:12, 66:15, 66:16, 66:17, 66:24, 67:2, 67:12, 67:16, 117:7, 119:1, 119:19, 121:11, 129:10, 131:3, 135:6, 135:7, 144:16, 145:9
**conflicts** [24] - 47:7, 47:24, 49:9, 49:10, 49:13, 50:15, 51:8, 52:24, 52:25, 53:1, 54:6, 54:15, 54:18, 54:21, 56:9, 56:10, 57:13, 59:16, 59:17, 70:3, 118:18, 127:16, 145:16
**connection** [5] - 4:17, 8:4, 10:13, 61:6, 75:2
**consider** [6] - 23:7, 64:11, 66:23, 118:17, 118:25, 153:9
**considered** [1] - 48:9
**consistency** [1] - 35:5
**constant** [1] - 34:18
**construed** [2] - 4:25,

5:4
**contact** [4] - 64:3, 77:23, 78:6, 151:22
**contacted** [1] - 114:8
**contacts** [1] - 4:8
**contemplate** [2] - 21:23, 30:21
**contemporaneous** [1] - 60:7
**content** [1] - 43:23
**context** [5] - 96:15, 108:1, 119:11, 126:4, 140:9
**continue** [1] - 116:15
**continued** [1] - 23:24
**continuing** [2] - 23:17, 74:21
**continuity** [1] - 35:5
**contract** [4] - 6:13, 14:22, 148:4, 148:9
**contractor** [1] - 76:16
**contractors** [1] - 68:20
**contracts** [1] - 32:3
**conversation** [20] - 24:5, 44:21, 49:11, 49:14, 50:2, 51:23, 52:3, 54:4, 55:6, 65:9, 67:22, 68:10, 69:1, 70:18, 88:2, 93:2, 93:4, 111:25, 115:16, 119:24
**conversations** [7] - 24:3, 58:16, 72:19, 80:15, 96:7, 119:18, 151:21
**coordinator** [1] - 31:19
**copied** [3] - 82:14, 94:22, 96:1
**copies** [1] - 57:11
**copy** [12] - 57:2, 57:21, 57:23, 63:5, 77:17, 95:2, 112:7, 145:19, 146:5, 146:21, 146:24, 153:6
**Corcoran** [1] - 140:11
**corporate** [5] - 48:22, 48:23, 48:24, 49:3, 49:5
**corporation** [3] - 141:19, 143:15, 143:22
**correct** [23] - 14:12, 25:15, 54:8, 55:4, 55:5, 56:23, 58:24, 57:1, 58:12, 58:15, 64:11, 66:8, 67:19, 67:20, 71:23, 75:8,

82:19, 93:24, 93:25, 104:25, 113:13, 131:15, 154:17
**correspondence** [1] - 93:22
**costs** [1] - 100:20
**counsel** [33] - 25:18, 29:24, 31:19, 31:20, 32:1, 32:2, 32:4, 32:8, 32:16, 32:20, 33:2, 35:1, 35:6, 37:6, 37:17, 38:23, 48:17, 48:21, 48:22, 50:13, 51:7, 51:11, 53:25, 55:22, 124:13, 124:17, 125:4, 141:14, 143:13, 146:12, 150:23, 151:19
**Counsel** [1] - 87:4, 134:2, 153:20
**counsel's** [1] - 34:4, 144:14, 149:12
**Counselor** [1] - 125:16
**counselor** [1] - 144:9
**counting** [1] - 62:5
**countless** [1] - 28:13
**country** [2] - 19:24, 152:9
**couple** [4] - 56:23, 64:20, 85:22, 123:19
**course** [14] - 4:24, 8:16, 11:9, 33:5, 54:5, 82:14, 84:16, 110:5, 130:2, 132:13, 133:18, 133:20, 138:13, 144:5
**COURT** [2] - 1:1, 1:20
**court** [15] - 5:1, 7:13, 7:14, 15:3, 22:18, 22:20, 57:17, 58:25, 67:14, 86:7, 92:5, 118:7, 119:4, 129:4, 130:23
**Court** [6] - 60:25, 154:16, 154:16, 154:17, 154:22, 154:22
**Court's** [3] - 4:17, 57:8, 58:9
**court-appointed** [1] - 130:23
**court-supervised** [2] - 58:25, 67:14
**cover** [3] - 46:8, 46:11, 71:6
**covered** [3] - 54:2, 123:24, 141:18

**covering** [1] - 35:25
**Cramer** [1] - 82:21
**create** [5] - 9:16, 34:1, 61:23, 78:14, 119:19
**created** [2] - 55:12, 133:8
**crib** [1] - 19:21
**criticism** [2] - 78:18, 130:14
**crossed** [2] - 65:16, 112:22
**Crown** [16] - 97:24, 97:25, 98:1, 98:4, 99:12, 99:18, 100:4, 100:5, 100:10, 100:12, 100:15, 101:15, 109:14, 110:11, 138:13, 138:18, 138:22, 153:2
**CRR** [2] - 1:20, 154:20
**curiosity** [1] - 48:7
**current** [1] - 111:23
**cuts** [1] - 98:25
**cutting** [1] - 118:16

## D

**d/b/a** [1] - 9:19
**daily** [1] - 85:4
**Dartez** [1] - 98:9
**data** [2] - 128:7, 128:10
**date** [17] - 60:2, 60:8, 60:11, 60:15, 61:13, 77:22, 136:10, 136:11, 136:18, 136:19, 137:8, 137:10, 147:3, 147:25, 148:3, 148:4
**dated** [16] - 63:2, 71:14, 75:1, 76:22, 77:2, 77:16, 86:20, 87:1, 92:10, 93:9, 93:16, 95:15, 134:17, 134:20, 136:1, 136:10
**dates** [1] - 71:14
**Dave** [1] - 105:25
**David** [6] - 31:12, 31:18, 42:6, 53:24, 61:4, 70:13, 114:11, 132:5
**days** [1] - 31:22
**deal** [3] - 49:10, 76:18, 101:13
**dealing** [2] - 17:4, 46:19
**dealt** [1] - 64:4

**decide** [6] - 34:3, 40:24, 123:22, 124:6, 126:16, 128:3
**decided** [8] - 43:25, 49:25, 81:14, 126:4, 129:6, 132:4, 149:20, 150:14, 150:15
**deciding** [1] - 33:15
**decision** [2] - 58:3, 132:21
**dedicated** [2] - 109:14, 109:17
**Deepwater** [2] - 134:21, 136:9
**DEEPWATER** [1] - 1:4
**defendant** [1] - 86:7
**deficient** [1] - 79:2
**define** [1] - 69:25
**defines** [1] - 87:4
**definitely** [1] - 43:4
**definitions** [2] - 62:5
**delay** [4] - 61:20, 61:24, 62:18, 62:22
**Demolition** [1] - 138:9
**demonstrate** [1] - 100:19
**depicts** [1] - 83:19
**deposited** [1] - 152:17
**deposition** [1] - 121:24
**depositions** [1] - 10:20
**derailment** [1] - 8:1
**derivative** [1] - 105:16
**describe** [3] - 28:3, 31:25, 72:8
**described** [10] - 17:14, 21:3, 21:9, 21:18, 24:17, 33:2, 48:21, 50:14, 51:12, 70:15
**DESCRIPTION** [1] - 2:12
**description** [1] - 23:1
**designating** [2] - 78:10, 82:5
**desk** [1] - 123:7
**desks** [1] - 20:19
**detail** [5] - 26:6, 46:2, 46:4, 117:4, 117:25
**detailed** [1] - 24:1
**Details** [1] - 136:10
**details** [5] - 33:19, 88:15, 91:20, 101:1, 131:20
**determine** [4] - 83:25, 84:20, 85:11, 88:7
**dhcclaims.com** [1] - 95:15
**dictate** [1] - 26:5

**different** [21] - 7:25, 11:18, 29:8, 29:20, 35:13, 35:24, 36:25, 38:5, 38:16, 38:23, 46:8, 66:8, 66:13, 66:14, 98:17, 100:19, 120:12, 129:12, 129:13, 137:25, 151:1
**different..** [1] - 8:2
**differentiate** [1] - 29:7
**difficult** [1] - 128:3
**dime** [2] - 98:14, 111:10
**Dimension** [3] - 140:15, 140:18, 140:23
**dinner** [1] - 45:25
**direct** [6] - 49:14, 59:8, 62:2, 67:7, 77:13, 94:18
**directed** [2] - 46:10, 50:4
**directing** [1] - 58:18
**direction** [2] - 85:17, 134:10
**directly** [8] - 42:11, 43:20, 44:11, 50:6, 70:13, 84:7, 114:8, 121:15
**disagree** [1] - 66:13
**disclosed** [1] - 119:1
**Disclosure** [1] - 61:8
**discovery** [1] - 10:19
**discuss** [21] - 18:3, 21:10, 21:23, 23:24, 44:25, 47:9, 67:3, 70:22, 89:14, 101:25, 123:9, 145:5, 145:12, 146:7, 146:8, 149:17, 149:20, 150:14, 150:16, 153:14, 153:18
**discussed** [26] - 22:2, 23:6, 24:3, 24:4, 40:16, 41:7, 41:22, 48:8, 52:16, 65:6, 65:9, 65:11, 75:10, 78:25, 91:20, 115:22, 115:24, 117:3, 117:25, 119:1, 120:21, 124:17, 132:3, 132:6, 138:4, 145:6, 146:4, 150:4, 153:13
**discussing** [4] - 24:21, 65:25, 91:20, 125:5
**discussion** [15] - 23:9,

47:19, 47:20, 47:22, 47:23, 57:23, 65:19, 71:8, 95:3, 95:7, 104:19, 104:20, 126:5, 150:15, 152:10
**discussions** [6] - 14:15, 23:11, 23:18, 99:18, 132:20, 146:8
**disenchanted** [1] - 107:10
**disinterested** [2] - 98:6, 98:7
**District** [5] - 60:25, 154:17, 154:22
**DISTRICT** [2] - 1:1, 1:1
**divide** [1] - 31:16
**divorce** [2] - 11:21, 11:23
**document** [46] - 7:4, 7:6, 15:18, 22:13, 22:17, 50:24, 51:4, 57:17, 58:5, 58:7, 59:19, 60:8, 61:5, 61:25, 62:11, 62:21, 62:23, 63:11, 67:7, 67:9, 69:10, 71:17, 77:11, 77:14, 81:19, 82:7, 83:5, 83:23, 83:24, 87:6, 87:12, 93:6, 96:8, 106:23, 112:6, 134:13, 136:9, 136:17, 136:19, 136:25, 137:1, 137:3, 137:5, 139:11, 142:17, 143:12, 146:21
**Document** [2] - 124:19, 143:10
**documentation** [9] - 17:9, 25:11, 25:12, 72:23, 79:2, 79:9, 79:20, 126:24, 127:7
**documented** [1] - 80:1
**documenting** [2] - 71:19, 72:22
**documents** [18] - 19:18, 25:4, 36:13, 36:14, 37:23, 50:18, 50:19, 56:20, 56:23, 76:21, 80:23, 123:19, 126:10, 126:17, 137:13, 137:20, 137:23, 140:21
**dollar** [1] - 39:6
**dollars** [1] - 100:17
**done** [24] - 14:21, 14:22, 17:13, 32:16,

33:5, 33:9, 37:19, 38:7, 38:8, 51:18, 57:21, 76:4, 76:15, 126:14, 126:15, 128:15, 129:25, 143:8, 144:7, 144:17, 144:18, 144:22, 148:20
**door** [1] - 42:16
**doors** [1] - 78:19
**down** [11] - 15:14, 29:19, 36:20, 40:24, 41:4, 41:10, 58:20, 126:18, 130:1, 132:6
**draft** [4] - 27:25, 30:12, 50:24, 58:14
**drafted** [3] - 38:13, 38:16, 39:13
**drafting** [1] - 38:21
**draw** [1] - 33:17
**drawing** [1] - 34:11
**dream** [1] - 34:22
**dreaming** [1] - 34:21
**drive** [1] - 17:23
**Drive** [2] - 142:12, 143:1
**driver** [1] - 86:11
**due** [1] - 133:18
**duly** [1] - 5:13
**during** [9] - 10:16, 11:9, 24:3, 24:21, 41:21, 54:12, 80:21, 116:3
**duties** [3] - 23:4, 29:18, 66:24
**duty** [1] - 36:23
**Duval** [4] - 31:12, 31:18, 42:6, 114:11

## E

**e-mail** [45] - 4:14, 34:19, 34:20, 37:1, 50:7, 63:2, 63:20, 65:3, 65:6, 65:18, 65:19, 65:24, 67:5, 68:25, 76:21, 77:1, 77:16, 78:5, 78:10, 80:6, 82:2, 82:3, 82:11, 82:15, 82:16, 84:3, 84:10, 85:18, 85:21, 86:20, 86:25, 87:14, 87:19, 87:22, 88:2, 92:9, 93:9, 93:15, 94:21, 95:2, 95:18, 115:1, 115:3, 124:22, 149:19
**e-mailed** [2] - 60:10, 60:23

**e-mails** [30] - 34:17, 34:23, 36:15, 37:23, 45:25, 77:15, 85:7, 85:11, 95:18, 96:5, 107:25, 108:3, 108:18, 112:3, 113:5, 113:21, 115:4, 115:25, 116:2, 116:7, 116:11, 116:20, 117:2, 149:19, 150:1, 150:4, 150:5, 151:4, 151:5, 152:2
**early** [6] - 14:17, 15:7, 15:12, 20:2, 27:7, 72:2
**easier** [1] - 9:20
**easiest** [1] - 79:19
**East** [1] - 141:2
**Eastern** [2] - 60:25, 154:17
**EASTERN** [1] - 1:1
**Economic** [1] - 134:21
**economic** [1] - 94:6
**educational** [1] - 5:23
**effect** [4] - 101:20, 107:22, 107:23, 108:18
**Egore** [1] - 19:25
**eight** [1] - 45:24
**EIN** [1] - 29:1
**either** [11] - 13:7, 17:2, 19:14, 31:10, 37:4, 97:4, 99:19, 108:13, 123:12, 137:25, 139:12
**elect** [1] - 81:12
**elementary** [1] - 89:2
**eleven** [1] - 47:2
**eligibility** [2] - 80:17, 115:5
**employed** [2] - 88:8, 107:15
**employees** [4] - 4:20, 122:9, 122:20, 132:11
**employment** [26] - 6:1, 6:11, 7:2, 7:17, 8:4, 14:11, 17:15, 18:4, 21:10, 21:24, 23:10, 23:18, 23:25, 24:22, 25:1, 47:3, 47:6, 56:20, 56:25, 60:8, 67:8, 102:16, 111:23, 119:8, 145:15, 150:21
**end** [6] - 61:25, 62:1, 62:5, 68:15, 72:3, 74:10, 104:19, 130:10, 131:11

**endeavor** [1] - 79:17
**ended** [2] - 83:23, 129:8
**energies** [1] - 111:11
**engaging** [1] - 56:3
**ensure** [1] - 126:13
**entail** [3] - 15:16, 22:16, 25:2
**enter** [1] - 113:10
**entered** [1] - 60:14
**Enterprises** [2] - 139:14, 140:1
**entertain** [2] - 84:22, 84:23
**entire** [1] - 104:25
**entitled** [5] - 58:8, 61:7, 62:8, 136:9, 154:18
**entity** [3] - 98:1, 118:21, 141:21
**entrance** [1] - 99:12
**environmental** [1] - 6:16
**envision** [1] - 28:19
**envisioned** [5] - 21:20, 21:21, 36:16, 37:9, 52:8
**envisioning** [1] - 42:12
**EPA** [1] - 98:17
**equity** [1] - 100:24
**especially** [2] - 45:23, 111:1
**Esquire** [1] - 147:20
**essentially** [2] - 23:15, 73:1
**etcetera** [2] - 94:24, 94:25
**ethic** [1] - 36:23
**ethical** [2] - 54:15, 70:4
**ethics** [12] - 51:13, 51:19, 51:24, 52:10, 52:12, 52:18, 52:20, 54:6, 54:19, 56:8, 56:9, 56:10
**Eugene** [1] - 49:18
**Eugenie** [5] - 39:2, 39:5, 49:16, 49:17
**event** [1] - 136:18
**eventually** [18] - 7:5, 11:25, 24:18, 32:20, 33:13, 36:17, 36:23, 37:7, 37:8, 42:11, 55:9, 84:21, 84:23, 130:21, 131:12, 131:25
**evidence** [2] - 5:8, 70:5
**evolved** [1] - 98:10

**C O N F I D E N T I A L**

SM-02-JA00865

exact [3] - 84:8, 108:16, 138:21
exactly [11] - 10:12, 24:19, 29:17, 37:9, 37:10, 82:4, 125:10, 127:1, 148:19, 153:16
EXAMINATION [6] - 2:5, 2:6, 2:7, 5:16, 146:18, 150:8
EXAMINATION'S [1] - 2:2
examined [1] - 5:14
example [2] - 79:20, 131:2
Excel [4] - 36:18, 125:24, 127:3
excellent [1] - 36:23
except [4] - 16:23, 17:1, 40:3, 42:11
exchange [3] - 64:10, 94:2, 101:2
exchanges [1] - 63:20
exclusions [1] - 29:2
excuse [1] - 128:16
executed [1] - 62:19
execution [1] - 61:21
EXHIBIT [21] - 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4, 3:5, 3:6, 3:8, 3:9, 3:10
Exhibit [30] - 57:6, 59:23, 61:11, 62:24, 63:1, 69:4, 71:13, 75:5, 76:20, 76:25, 83:17, 86:24, 92:12, 93:12, 95:11, 95:13, 95:20, 112:9, 134:1, 134:5, 134:9, 134:15, 135:22, 135:24, 136:8, 136:15, 138:8, 146:17, 147:6, 148:12
exhibit [3] - 69:2, 86:19, 146:13
EXHIBITS [1] - 3:7
exhibits [2] - 134:3, 145:20
Exhibits [1] - 137:17
expectation [3] - 105:18, 149:4, 149:7
expectations [1] - 109:8
expected [1] - 49:12
Expedited [1] - 77:4
expedited [4] - 78:10,

80:25, 82:5, 84:6
experience [6] - 15:17, 25:9, 25:14, 49:2, 49:8, 51:12
expertise [1] - 42:24
explain [2] - 128:25, 147:21
explained [1] - 117:21
explaining [2] - 46:6, 126:12
explanation [1] - 62:20
explanations [1] - 126:3
expressed [1] - 146:3
extent [3] - 11:12, 17:1, 28:21, 103:17, 117:2, 128:4, 128:5, 128:6, 151:18
external [1] - 33:2
extra [2] - 63:5, 110:25
extremely [1] - 23:12
eye [1] - 30:23
eyes [1] - 130:18

**F**

face [5] - 40:23, 40:25, 134:9
face-to-face [2] - 40:23, 40:25
Facility [2] - 69:6, 75:7
fact [6] - 103:3, 113:20, 125:22, 145:15, 148:9, 151:21
facts [3] - 4:19, 58:24, 67:12
fair [4] - 27:3, 30:1, 30:2, 64:7
fairly [1] - 24:1
falling [6] - 12:11, 12:21, 90:9, 90:12, 90:21, 106:16
false [3] - 4:25, 5:1, 5:2
falsity [1] - 5:3
familiar [7] - 14:9, 28:21, 39:12, 58:10, 59:14, 140:17, 141:1
family [7] - 11:22, 72:3, 99:5, 142:4, 142:6, 143:2, 143:6
fantastic [1] - 14:25
far [14] - 48:3, 48:4, 76:3, 82:24, 84:24, 91:12, 92:1, 92:2, 96:10, 96:11, 99:17,

101:10, 133:2, 137:1
far-reaching [1] - 84:24
fashion [5] - 31:10, 41:9, 50:6, 74:16, 129:25
fast [2] - 130:17
faster [1] - 79:8
father [3] - 43:1, 106:16, 141:9
father's [1] - 142:13
Fayard [1] - 26:20
February [3] - 136:18, 137:10, 143:16
federal [2] - 118:7, 119:3
fee [5] - 12:11, 12:21, 150:3, 150:12, 151:11
fees [3] - 150:25, 151:3
felt [2] - 143:24
felt [13] - 25:3, 44:1, 106:16, 107:1, 108:1, 120:3, 129:3, 129:19, 129:20, 129:22, 129:23, 131:2, 132:15
few [7] - 12:5, 34:18, 63:9, 80:15, 85:11, 110:16, 124:14, 124:15, 127:23, 128:2, 130:25, 134:3
field [1] - 72:24
fielding [1] - 45:6
figure [1] - 89:5
file [7] - 8:24, 17:9, 71:18, 72:22, 105:4, 137:12, 137:14
filed [8] - 16:21, 16:25, 17:11, 89:22, 91:3, 143:15, 145:20, 153:7
filing [3] - 49:22, 72:5, 122:20
finalized [1] - 39:19
finance [1] - 98:19
financial [3] - 102:25, 103:16, 105:16
Fine [1] - 5:21
fine [2] - 48:16, 48:18
finish [2] - 63:16, 124:19
finished [2] - 80:9, 123:14
Firm [3] - 90:7, 91:9, 103:19
firm [56] - 6:17, 9:12, 9:22, 10:7, 11:5, 18:11, 18:24, 19:6,

19:11, 31:10, 32:17, 44:6, 55:22, 56:2, 72:8, 72:10, 74:14, 74:16, 74:20, 76:15, 88:24, 89:18, 89:20, 90:2, 90:3, 90:4, 90:6, 91:3, 91:11, 91:12, 96:9, 96:16, 97:3, 97:13, 102:10, 102:17, 102:18, 103:23, 103:24, 104:1, 104:8, 104:10, 104:11, 121:14, 122:9, 123:1, 133:7, 133:8, 133:9, 133:10, 133:12, 133:14, 134:9, 135:1
firms [3] - 28:22, 38:23, 96:18
first [40] - 5:13, 6:11, 6:15, 6:20, 13:5, 13:6, 13:12, 14:15, 17:5, 17:20, 18:8, 18:17, 20:16, 20:24, 22:20, 22:25, 24:15, 26:4, 26:15, 29:1, 31:7, 34:18, 35:7, 36:18, 58:1, 60:11, 77:14, 79:21, 81:9, 89:8, 99:17, 112:2, 112:3, 124:2, 138:11, 139:24, 150:20, 151:4, 151:11
fisherman [1] - 73:5
fit [4] - 43:4, 43:6, 65:1, 109:24
five [2] - 18:5, 69:11
five-minute [1] - 69:11
flavor [1] - 29:16
floor [5] - 7:6, 12:5, 20:12, 20:22, 21:1
floors [1] - 20:18
focus [1] - 111:11
focusing [1] - 42:15
fold [1] - 40:7
follow [6] - 67:21, 92:15, 92:24, 121:12, 144:19, 149:10
follow-up [3] - 67:21, 92:24, 149:10
followed [1] - 121:11
following [3] - 107:17, 108:2, 108:10
follows [1] - 5:15
food [1] - 73:3
FOR [1] - 1:18
forecast [1] - 21:23

forefront [1] - 54:14
foregoing [1] - 154:17
foremost [1] - 26:4
form [8] - 28:17, 71:13, 71:18, 134:19, 148:7, 148:17
Form [1] - 69:6
formal [1] - 76:2
formalized [1] - 143:18
formally [1] - 10:1
former [1] - 119:17
formerly [1] - 11:20
forms [6] - 28:16, 28:24, 33:17, 33:18, 78:14
formulas [1] - 28:16
forth [6] - 17:23, 23:21, 34:12, 39:7, 60:10, 149:25
forward [3] - 25:25, 84:7, 84:14
forwarded [2] - 82:2, 82:9
founded [1] - 138:1
four [7] - 19:7, 26:20, 38:5, 98:11, 100:22, 124:22, 141:10
fourth [2] - 62:4, 62:6
frac [1] - 98:13
fraction [1] - 19:10
frame [2] - 12:14, 94:19
fraud [1] - 17:3
free [1] - 12:17
FREEH [109] - 1:11, 1:14, 4:5, 4:15, 5:17, 12:18, 13:15, 13:23, 45:18, 48:13, 48:17, 48:19, 53:10, 53:14, 53:17, 54:3, 57:4, 57:10, 57:19, 57:22, 58:2, 58:6, 60:1, 60:14, 60:17, 61:3, 61:12, 62:6, 62:7, 63:5, 63:8, 63:11, 63:17, 63:19, 68:18, 69:8, 69:12, 69:16, 69:18, 74:1, 75:9, 75:22, 77:6, 81:24, 83:15, 84:9, 85:18, 85:20, 85:24, 86:18, 87:6, 87:13, 88:16, 90:10, 91:9, 91:18, 92:19, 92:21, 93:1, 93:8, 93:14, 93:19, 94:13, 94:17, 95:17, 96:4, 99:14, 104:6, 106:9, 106:10,

112:10, 117:10, 117:12, 119:16, 121:8, 121:9, 123:13, 123:17, 124:1, 124:4, 124:6, 124:12, 124:20, 132:24, 134:2, 134:4, 134:16, 135:17, 135:23, 136:16, 137:9, 137:15, 137:18, 143:9, 143:11, 143:17, 144:13, 146:12, 147:22, 149:10, 149:12, 149:16, 150:9, 153:3, 153:9, 153:14, 153:18, 154:3, 154:8
**Freeh** [2] - 4:5, 118:16
**FREEH...........................
...... [2]** - 2:5, 2:7
**friend** [9] - 43:21, 43:22, 65:4, 72:6, 87:19, 87:21, 98:21, 99:10
**friends** [3] - 11:24, 12:11, 100:1
**front** [2] - 71:15, 96:9
**fruit** [1] - 79:19
**frustration** [1] - 131:13
**Full** [2] - 140:15, 140:23
**full** [7] - 4:7, 5:10, 7:17, 9:7, 107:16, 132:11, 140:18
**full-time** [4] - 7:17, 9:7, 107:16, 132:11
**fully** [1] - 80:1
**function** [4] - 23:2, 53:22, 70:7, 129:8
**functions** [5] - 22:9, 22:10, 31:14, 69:23, 127:5
**funds** [3] - 94:23, 149:4, 149:7
**funny** [1] - 20:15
**furnished** [1] - 123:5
**Furtherance** [2] - 57:8, 58:8
**futile** [1] - 79:17
**future** [1] - 13:11

**G**

**gain** [1] - 99:12
**gained** [1] - 115:23
**gaps** [2] - 30:21, 31:3

**Garden** [19] - 28:22, 63:12, 63:25, 64:4, 64:19, 64:23, 67:22, 68:5, 77:3, 80:10, 80:18, 80:21, 87:1, 87:17, 92:14, 125:14, 127:4, 127:8
**Garner** [3] - 95:16, 96:2, 96:9
**garnishments** [1] - 32:18
**gas** [1] - 42:17
**gate** [1] - 130:4
**gather** [1] - 80:24
**gathering** [1] - 25:5
**GCCF** [28] - 15:23, 16:2, 16:13, 25:9, 25:14, 26:24, 71:13, 71:19, 72:6, 72:13, 72:14, 74:22, 74:24, 75:1, 75:15, 75:19, 79:5, 97:1, 97:18, 102:19, 102:20, 105:4, 105:6, 105:8, 120:13, 133:23, 135:14, 148:19
**general** [16] - 7:1, 23:6, 28:12, 31:25, 32:4, 40:3, 40:23, 42:7, 48:21, 48:22, 55:23, 59:14, 94:2, 94:6, 98:6, 113:25
**general-counsel-type** [1] - 48:21
**generally** [3] - 16:9, 41:12, 152:4
**generated** [5] - 54:11, 81:5, 137:2, 137:23, 139:5
**ghost** [1] - 20:20
**Gibby** [19] - 11:25, 12:2, 12:13, 13:3, 88:19, 88:22, 88:23, 88:25, 89:4, 89:12, 89:13, 89:20, 89:23, 90:2, 90:11, 91:1, 91:13, 103:25
**Gibby's** [1] - 91:8
**gigantic** [1] - 99:3
**girl** [1] - 97:9
**gist** [2] - 22:13, 77:11
**given** [2] - 31:19, 112:7
**glaring** [2] - 30:24, 31:5
**Glen** [14] - 98:22, 99:9, 100:16, 100:23, 101:5, 101:20, 102:19, 111:5, 120:18, 133:4,

134:20, 151:15, 152:4, 152:5
**God** [2] - 5:10, 111:15
**Gonzales** [5] - 16:19, 17:6, 75:20, 148:15, 148:24
**Gonzales'** [1] - 146:14
**goodness** [1] - 86:8
**gosh** [1] - 86:8
**governance** [2] - 49:3, 49:6
**government** [1] - 70:4
**grab** [2] - 79:18, 79:19
**graduate** [1] - 6:6
**grandmother** [1] - 19:21
**graphic** [1] - 82:16
**Gravier** [5] - 14:25, 14:16, 105:23, 147:18, 147:19, 148:5
**great** [6] - 4:15, 9:5, 11:12, 89:24, 98:18, 110:24
**Greer** [5] - 29:4, 77:1, 77:17, 81:7, 124:22
**Greer's** [2] - 82:14, 125:13
**grievances** [1] - 96:17
**grindstone** [1] - 76:19
**grossly** [1] - 79:2
**ground** [1] - 46:11
**group** [5] - 29:14, 78:24, 87:17, 90:5, 127:24
**Group** [9] - 63:13, 63:25, 77:3, 87:1, 87:17, 90:7, 92:14, 133:13
**Group/Andry** [1] - 136:22
**grudges** [1] - 127:16
**guess** [29] - 5:20, 7:19, 8:7, 8:13, 18:5, 19:3, 22:10, 31:9, 31:21, 32:4, 40:11, 41:16, 47:21, 49:21, 54:23, 55:9, 65:10, 66:18, 98:16, 104:15, 114:6, 127:9, 129:3, 133:20, 144:21, 148:6, 151:4, 153:12
**guessing** [2] - 90:22, 108:8
**guidance** [2] - 28:10, 32:11
**guide** [1] - 59:4
**GULF** [1] - 1:5
**Gulf** [3] - 69:5, 74:18,

75:7
**guys** [1] - 48:15

**H**

**half** [3] - 12:25, 21:16, 106:6
**halfway** [1] - 58:20
**halt** [1] - 145:21
**hand** [1] - 9:8
**handful** [1] - 15:23
**handle** [2] - 47:7, 90:23
**handles** [1] - 87:18
**handling** [7] - 31:23, 73:16, 74:2, 74:3, 74:24, 86:2, 135:16
**hands** [2] - 39:25, 79:7
**happy** [5] - 20:10, 25:9, 48:14, 109:20, 109:24
**hard** [2] - 128:11, 137:9
**hate** [2] - 40:1
**hated** [1] - 14:23
**HB406** [1] - 1:22
**head** [1] - 131:23
**headache** [1] - 89:19
**heading** [1] - 61:25
**headquartered** [1] - 9:23
**health** [1] - 19:8
**Hear** [1] - 139:22
**hear** [4] - 113:20, 132:14, 138:15, 146:8
**heard** [6] - 33:14, 86:7, 138:14, 139:13, 139:18, 142:14
**hearing** [1] - 138:11
**hearings** [1] - 7:7
**heavily** [4] - 11:13, 97:16, 97:19, 130:1
**heavy** [2] - 28:23, 42:8
**held** [1] - 78:1
**hell** [1] - 106:16
**help** [13] - 5:10, 11:23, 32:20, 35:23, 41:20, 42:1, 43:12, 72:5, 89:25, 90:15, 120:13, 122:20, 131:11
**helpful** [4] - 90:18, 110:23, 110:25, 129:9
**helping** [3] - 6:15, 21:6, 114:3

**Henderson** [1] - 102:8
**hereby** [1] - 154:17
**herself** [3] - 39:3, 49:23, 50:9
**hesitation** [1] - 66:20
**highly** [1] - 43:2
**Highway** [1] - 4:11
**Hill** [1] - 19:1
**himself** [5] - 41:15, 88:7, 88:22, 109:18, 114:9
**HIPAA** [1] - 33:9
**hire** [7] - 7:24, 22:6, 32:2, 43:7, 43:10, 44:13, 48:10
**hired** [24] - 24:18, 26:16, 27:8, 27:15, 27:16, 27:20, 27:22, 28:3, 28:6, 28:7, 28:9, 29:23, 30:4, 31:10, 31:12, 39:1, 47:13, 47:19, 50:13, 117:4, 127:25, 144:25, 145:14
**hires** [1] - 146:9
**hiring** [4] - 43:5, 64:11, 66:23, 144:23
**history** [1] - 37:19
**hold** [5] - 17:3, 92:4, 92:8
**holds** [1] - 43:2
**holes** [2] - 30:17, 30:21
**home** [5] - 8:9, 9:9, 19:20, 45:5, 45:23
**HONORABLE** [1] - 1:11
**hooked** [1] - 99:11
**Horizon** [2] - 134:21, 136:9
**HORIZON** [1] - 1:4
**hospital** [1] - 19:21
**hounded** [1] - 80:21
**hour** [5] - 21:16, 48:14, 92:23, 92:25, 106:6
**hourly** [3] - 6:18, 11:14, 15:1
**hours** [2] - 26:20, 107:14
**house** [3] - 31:8, 32:5, 32:6
**household** [2] - 8:21, 8:22
**HR** [1] - 53:22
**Hudson** [1] - 6:18
**huge** [1] - 152:9
**human** [2] - 126:16, 126:18
**hurricane** [1] - 8:11

9

hurry [1] - 79:4
hurt [1] - 106:17
husband [124] - 7:23, 8:4, 8:16, 10:14, 10:24, 11:18, 11:20, 12:14, 12:15, 13:4, 13:5, 13:11, 13:13, 14:19, 14:23, 15:6, 17:20, 19:6, 19:12, 19:13, 19:23, 20:3, 20:6, 20:8, 20:9, 21:6, 21:12, 24:22, 25:1, 42:12, 43:2, 43:5, 43:8, 44:14, 44:18, 45:17, 45:21, 46:13, 46:14, 46:21, 47:15, 48:2, 48:5, 64:11, 65:7, 65:14, 65:15, 65:20, 66:23, 67:18, 68:9, 68:12, 68:13, 68:21, 72:5, 72:9, 72:11, 73:8, 73:10, 74:2, 74:5, 74:14, 74:16, 74:21, 88:3, 89:14, 91:21, 92:1, 95:7, 97:21, 98:9, 98:13, 98:21, 99:8, 99:17, 99:25, 100:5, 100:14, 101:14, 102:2, 104:12, 104:13, 104:19, 105:16, 108:23, 109:4, 110:15, 111:23, 111:25, 112:20, 113:5, 113:21, 114:2, 114:17, 115:10, 115:16, 115:19, 115:22, 116:8, 117:1, 117:14, 117:25, 118:6, 119:18, 120:15, 120:22, 123:7, 123:8, 127:13, 127:14, 137:25, 139:2, 139:12, 141:6, 141:25, 143:23, 145:2, 145:22, 149:13, 150:11
husband's [6] - 18:8, 19:16, 65:13, 97:25, 109:11, 141:9
hypothetical [2] - 28:18, 87:23

**I**

Iberia [6] - 8:12, 19:24, 141:3, 141:5,
142:12, 143:1
ID [1] - 83:19
idea [4] - 20:8, 20:9, 45:19, 65:16
ideas [3] - 99:7, 129:1, 131:11
identification [23] - 49:12, 57:6, 59:23, 61:11, 63:1, 69:4, 75:5, 76:25, 83:17, 86:24, 92:12, 93:12, 95:13, 95:20, 112:9, 134:1, 134:15, 135:22, 136:15, 137:17, 146:17, 147:6, 148:12
identified [1] - 82:19
identify [8] - 16:7, 16:10, 29:9, 30:14, 30:17, 33:25, 79:14, 79:25
III [3] - 9:15, 9:22, 10:8
imagination [1] - 110:2
immediately [2] - 35:12, 57:24
impact [1] - 59:3
implant [1] - 8:1
implement [3] - 26:14, 27:3, 29:24
implementation [2] - 28:11, 28:15
implementing [1] - 22:12
implications [1] - 84:25
important [1] - 53:5
impossible [2] - 30:17, 35:13
impression [1] - 56:13
improper [1] - 70:6
impropriety [1] - 92:6
improvements [1] - 26:23
IN [2] - 1:4, 1:5
in-house [1] - 31:8
in-question [1] - 125:2
inactive [1] - 143:16
include [4] - 7:12, 54:5, 56:9, 83:8
included [1] - 96:19
including [1] - 4:19
income [1] - 102:2
incompetent [1] - 89:6
incomplete [2] - 4:25, 79:10
incompleteness [5] - 5:3, 72:22, 79:4, 127:6, 127:7
inconsistencies [1] -
34:10
incorporated [1] - 141:21
indemnity [1] - 154:1
independent [1] - 76:16
indicate [1] - 68:9
indicated [2] - 59:13, 106:25
indifferent [1] - 27:2
individual [3] - 37:17, 75:14, 82:21
individuals [1] - 131:5
informal [1] - 23:8
Information [2] - 61:2, 61:8
information [9] - 25:5, 57:20, 86:10, 86:13, 100:12, 115:24, 136:21, 137:21, 150:2
inherit [1] - 130:12
initiate [3] - 24:5, 54:12, 68:24
initiated [1] - 20:9
initiates [1] - 20:8
injury [8] - 14:23, 73:11, 73:14, 74:7, 74:18, 86:3, 86:4, 107:10
innate [1] - 36:22
inquire [2] - 84:18, 138:21
inquired [1] - 56:1
inquiries [4] - 51:17, 54:12, 91:23, 96:12
inquiring [1] - 151:14
inside [1] - 55:3
insights [1] - 31:3
insisting [1] - 113:5
instance [2] - 68:23, 70:5
instances [1] - 84:17
instead [1] - 50:1
instructed [1] - 114:6
instruction [3] - 28:25, 33:18, 78:14
instructions [1] - 30:20
insurance [4] - 74:9, 74:10, 86:11, 118:9
intake [1] - 64:5
intaking [1] - 78:15
integrity [1] - 107:1
intend [1] - 112:19
intending [1] - 4:24
interaction [3] - 31:16, 64:1, 77:23
interactive [1] - 80:16
Interest [3] - 58:19,
62:2, 62:8
interest [22] - 12:15, 54:11, 57:14, 58:24, 59:6, 59:10, 59:11, 59:12, 66:3, 67:13, 97:25, 102:25, 103:16, 104:24, 105:17, 110:23, 117:15, 117:16, 118:18, 118:20, 145:16
interested [14] - 43:13, 43:18, 44:10, 64:22, 65:5, 65:12, 65:17, 65:20, 66:1, 68:14, 68:16, 76:13, 84:8, 99:11
interesting [2] - 25:20, 55:7
interests [9] - 42:15, 44:24, 47:16, 110:7, 115:10, 115:19, 116:1, 117:7, 145:10
interface [2] - 80:16, 80:19
interfering [2] - 128:15, 132:16
interim [1] - 23:19
interject [1] - 125:8
internal [1] - 84:19
internally [1] - 79:12
interpret [2] - 28:14, 118:13
interpretation [2] - 22:11, 28:15
interpretations [1] - 30:14
interpreting [1] - 32:6
interrupt [2] - 35:15, 53:7
interrupted [1] - 8:12
interview [7] - 4:16, 48:2, 48:5, 105:20, 106:5, 116:3, 144:23
interviewed [1] - 25:17
interviews [1] - 72:24
introduce [1] - 124:14
introducing [1] - 48:1
introduction [1] - 20:7
invented [1] - 98:12
invested [1] - 103:5
investigation [1] - 149:24
investigative [2] - 17:2, 116:5
involved [34] - 11:3, 11:14, 14:24, 15:22, 25:11, 27:14, 32:21, 33:10, 33:12, 77:21,
77:25, 85:8, 96:7, 96:12, 96:15, 97:16, 97:19, 98:3, 98:14, 99:9, 99:18, 99:22, 99:23, 99:24, 100:5, 100:9, 100:12, 100:20, 100:7, 107:7, 113:12, 114:17, 122:4, 132:18
involvement [1] - 59:6
involving [1] - 118:8
IOLTA [4] - 93:23, 94:11, 94:24, 95:8
issue [14] - 29:10, 29:16, 34:20, 35:11, 35:16, 42:20, 42:25, 52:8, 52:17, 54:9, 79:9, 80:6, 85:22, 86:10
issues [27] - 28:13, 28:20, 29:20, 29:25, 30:22, 32:21, 35:10, 35:12, 36:6, 37:1, 39:7, 39:8, 42:19, 46:10, 46:17, 46:18, 46:20, 46:22, 55:23, 84:22, 84:24, 96:15, 150:19
IT [1] - 29:4

**J**

Jacobs [1] - 136:23
January [3] - 93:10, 93:16, 93:21, 94:2
Jefferson [1] - 4:11
Jen [1] - 80:15
Jennifer [4] - 63:3, 63:21, 63:23, 63:24, 66:23, 77:3
Jessica [2] - 16:19, 75:20
job [13] - 6:20, 9:7, 17:20, 18:8, 20:7, 27:2, 44:7, 46:14, 50:14, 51:11, 68:21, 101:13, 109:23
Joe [1] - 26:19
Joey [1] - 99:8
John [40] - 11:16, 11:18, 11:22, 11:25, 12:13, 13:3, 13:10, 13:12, 13:19, 13:20, 14:4, 27:6, 89:23, 97:4, 97:5, 97:9, 97:12, 97:14, 97:16, 97:22, 99:23, 100:6, 100:9, 102:20, 103:19, 103:25,

**C O N F I D E N T I A L**

**SM-02-JA00868**

104:14, 104:18,
104:20, 104:21,
104:24, 114:18,
115:12, 119:18,
119:20, 119:25,
120:8, 135:8
**Johnny** [2] - 140:6,
140:7
**joined** [1] - 74:15
**joint** [4] - 8:24, 102:1,
152:13, 152:14
**jointly** [1] - 153:7
**jointly-filed** [1] - 153:7
**joke** [1] - 94:15
**Jonathan** [7] - 90:11,
102:9, 103:19,
103:22, 133:4,
133:14, 134:20
**Judge** [2] - 118:16,
123:22
**judge** [3] - 10:21,
23:21, 57:25
**judge's** [1] - 57:22
**judgment** [1] - 107:1
**Judice** [1] - 19:1
**judicial** [1] - 4:23
**JULY** [2] - 1:7, 4:2
**July** [8] - 60:2, 61:14,
61:16, 62:12, 63:2,
63:21, 65:6, 134:20
**jump** [3] - 30:25,
33:23, 37:7
**jumped** [1] - 30:24
**June** [17] - 86:20,
87:1, 87:9, 87:14,
88:10, 91:19, 92:10,
92:14, 92:21, 94:19,
95:15, 95:18, 95:25,
105:21, 105:22,
107:18, 112:6
**Juneau** [74] - 14:12,
15:3, 15:6, 15:7,
17:14, 17:17, 17:18,
17:21, 18:3, 19:1,
19:3, 19:8, 19:12,
20:4, 20:12, 21:9,
21:12, 21:18, 26:3,
26:25, 27:5, 28:2,
29:19, 29:25, 31:4,
31:9, 31:11, 31:20,
33:8, 34:7, 40:15,
41:18, 42:10, 42:16,
43:3, 43:4, 43:7,
44:13, 46:5, 47:15,
48:2, 48:7, 49:9,
49:11, 49:24, 51:11,
51:23, 52:16, 67:3,
68:20, 69:21, 70:13,
70:19, 75:13, 96:17,
103:14, 105:20,

105:25, 113:24,
114:2, 114:9,
114:10, 114:16,
115:9, 115:18,
117:7, 117:25,
122:3, 127:25,
130:21, 132:5,
132:20, 148:25
**Juneau's** [7] - 16:25,
18:11, 31:10, 31:25,
70:8, 121:15, 121:18
**junk** [1] - 34:19

## K

**Katherine** [4] - 95:16,
95:22, 95:23, 95:25
**keep** [9] - 9:8, 39:25,
41:5, 48:14, 76:18,
100:20, 100:24,
127:9, 132:9
**Keeper** [1] - 37:9
**keeper** [2] - 37:21,
38:9
**keeping** [2] - 25:5,
110:8
**Keith** [1] - 94:3
**Kent** [1] - 146:23
**Keough** [10] - 63:3,
63:12, 63:21, 63:23,
63:24, 64:2, 64:8,
65:3, 66:23, 77:3
**kept** [7] - 36:14, 37:22,
37:24, 41:23, 42:20,
129:15
**key** [1] - 35:1
**kilobytes** [1] - 125:23
**kind** [24] - 7:5, 10:22,
11:23, 12:23, 14:23,
15:15, 17:3, 25:11,
25:20, 35:10, 41:8,
41:11, 46:18, 64:3,
98:15, 102:14,
107:8, 120:18,
129:14, 129:24,
130:22, 130:24,
152:10
**kinds** [2] - 36:4,
131:21
**knowing** [1] - 56:12
**knowledge** [13] - 5:3,
13:3, 21:7, 21:8,
97:23, 102:18,
103:15, 107:25,
115:25, 120:1,
120:14, 149:13,
149:15
**knowledgeable** [3] -
35:2, 58:23, 67:12

**known** [1] - 88:15
**knows** [1] - 106:24
**Kohn** [3] - 43:15,
43:20, 65:1

## L

**LA** [2] - 1:18, 1:22
**labeled** [1] - 146:22
**Laborde** [1] - 140:13
**LABORDE** [1] -
140:13
**Lafayette** [4] - 6:14,
17:21, 102:7, 140:3
**Lake** [3] - 39:2, 39:5,
49:16, 49:17
**landowners** [1] -
49:21
**Landry** [4] - 115:10,
120:8, 120:24,
120:25
**language** [3] - 51:4,
59:9, 146:1
**large** [3] - 18:24,
21:24, 78:1
**largely** [1] - 27:14
**larger** [1] - 62:11
**Las** [3] - 98:23, 99:4,
103:20
**last** [8] - 61:13, 88:12,
92:16, 94:19, 137:9,
149:12, 153:7,
153:16
**laundering** [1] - 70:5
**law** [49] - 5:25, 6:4,
6:6, 6:17, 9:12, 9:22,
10:7, 11:19, 11:21,
11:24, 13:6, 13:16,
13:21, 17:21, 17:22,
18:8, 18:11, 18:24,
19:6, 25:21, 32:17,
64:25, 88:24, 89:18,
89:20, 90:2, 90:3,
91:11, 98:21,
102:10, 107:9,
109:18, 110:8,
121:2, 121:14,
121:24, 123:1,
133:7, 133:8,
133:10, 133:12,
133:14, 141:4,
141:5, 141:19,
143:15
**LAW** [1] - 1:17
**Law** [7] - 9:15, 90:6,
90:7, 91:9, 103:19,
133:13, 136:22
**law-firm-type** [1] -
89:18

**lawyer** [21] - 4:7, 4:22,
6:9, 13:24, 15:20,
23:2, 25:18, 31:2,
31:8, 39:5, 51:7,
51:12, 51:15, 69:9,
85:8, 90:25, 97:17,
98:24, 98:25, 105:8
**lawyers** [6] - 11:10,
27:10, 31:13, 32:10,
43:10, 56:16, 94:23,
127:23, 128:2
**lead** [3] - 5:25, 48:11,
64:3
**leadership** [1] - 146:8
**learn** [5] - 100:9,
100:11, 102:13,
133:19, 151:23
**learned** [3] - 15:2,
102:11, 150:10
**least** [8] - 11:1, 12:24,
21:20, 46:13, 77:15,
82:17, 94:2, 134:8
**leave** [3] - 85:22,
85:24, 153:24
**leaving** [1] - 91:19
**LeBreton** [1] - 38:25
**led** [2] - 20:10, 46:9
**left** [19] - 20:19, 74:13,
74:14, 74:20, 76:15,
77:4, 81:4, 81:6,
81:8, 81:17, 82:17,
83:4, 96:23, 102:16,
111:23, 125:5,
125:23, 127:2,
150:21
**legal** [33] - 7:17, 9:11,
22:11, 25:4, 28:4,
30:5, 30:6, 30:8,
31:2, 31:14, 31:24,
32:8, 32:11, 32:14,
32:15, 32:16, 32:17,
33:1, 33:4, 40:14,
40:18, 40:20, 41:7,
42:7, 42:14, 50:13,
50:14, 97:22, 104:7,
122:20, 129:13
**legally** [1] - 141:20
**Leger** [2] - 6:22, 7:8
**legislative** [1] - 37:19
**length** [2] - 110:18,
117:25
**Lerner** [43] - 98:22,
99:15, 99:16, 101:6,
101:7, 102:9,
102:24, 103:15,
103:23, 103:24,
107:2, 107:5,
108:11, 108:15,
108:24, 109:17,
110:11, 111:12,

111:22, 112:12,
112:21, 112:25,
114:18, 115:20,
120:9, 120:12,
120:25, 133:4,
133:11, 134:6,
134:8, 134:19,
134:20, 136:2,
136:22, 137:4,
138:17, 138:22,
139:1, 139:6,
151:22, 152:8,
152:16
**less** [3] - 42:14, 79:20
**letter** [9] - 74:25, 75:6,
146:13, 146:22,
146:24, 148:14,
148:15, 148:17,
148:19
**letterhead** [5] - 134:6,
134:11, 134:19,
146:21, 148:18
**letting** [1] - 71:19
**level** [2] - 107:20,
127:19
**Levine** [2] - 132:5,
132:20
**liability** [1] - 97:1
**liens** [1] - 32:18
**life** [4] - 6:1, 34:16,
99:3, 99:6
**line** [1] - 29:1
**Lionel** [9] - 8:17, 9:15,
9:22, 10:8, 87:1,
92:14, 95:14, 96:1,
140:24
**list** [10] - 80:2, 80:7,
80:24, 84:8, 84:14,
125:6, 125:9,
136:20, 138:5, 138:6
**listed** [6] - 81:3,
139:12, 140:24,
140:25, 141:25,
142:5
**lists** [3] - 84:6, 136:21,
139:16
**literally** [1] - 20:17
**litigation** [4] - 6:23,
7:11, 7:21, 10:19
**live** [1] - 34:20
**LLC** [15] - 133:11,
134:19, 136:22,
138:13, 139:22,
140:1, 140:16,
141:8, 141:9,
141:25, 142:1,
142:5, 142:10,
142:24, 143:4
**LLCs** [3] - 122:20,
137:25, 139:9

**C O N F I D E N T I A L**

located [2] - 4:10, 121:14
log [3] - 37:16, 37:17, 37:18
look [24] - 4:18, 16:18, 26:1, 27:22, 30:4, 33:22, 39:12, 57:2, 57:12, 61:9, 63:8, 69:8, 76:23, 77:7, 84:10, 86:21, 87:7, 114:9, 116:5, 136:24, 137:9, 141:15, 143:7, 152:23
Look [3] - 79:22, 100:23, 130:22
looked [8] - 19:21, 30:23, 64:10, 71:3, 93:21, 98:17, 108:6, 143:13, 152:21
looking [19] - 20:13, 22:6, 25:4, 25:25, 34:23, 48:10, 70:24, 77:9, 79:16, 85:11, 95:1, 95:21, 99:9, 112:6, 115:1, 115:25, 128:18, 136:10, 137:5
looks [4] - 78:5, 137:3, 137:11, 137:12
looming [1] - 42:19
lording [1] - 130:23
Louis [1] - 4:5
LOUIS [2] - 1:11, 1:14
Louisiana [12] - 4:10, 4:11, 6:8, 6:9, 61:1, 137:22, 140:3, 140:20, 140:22, 142:16, 154:16, 154:17
LOUISIANA [2] - 1:1, 1:6
love [1] - 15:4
low [3] - 42:8, 79:18
low-lying [1] - 79:18
lucky [1] - 144:11
lunch [1] - 17:25
Lundy [9] - 77:16, 77:19, 77:20, 82:22, 82:24, 83:1, 125:3, 125:6, 125:9
lying [1] - 79:18
Lynn [8] - 29:4, 77:1, 77:17, 80:15, 81:7, 82:14, 124:22, 125:13

**M**

ma'am [3] - 57:18, 63:14, 154:7
machine [5] - 28:23, 98:20, 99:13, 100:17, 100:18
mail [46] - 4:14, 34:19, 34:20, 37:1, 50:7, 63:2, 63:20, 65:3, 65:6, 65:18, 65:19, 65:24, 67:5, 68:25, 76:21, 77:1, 77:16, 78:5, 78:10, 80:6, 82:2, 82:3, 82:11, 82:15, 82:16, 84:3, 84:10, 85:18, 85:21, 86:20, 86:25, 87:14, 87:19, 87:22, 88:2, 92:9, 93:9, 93:15, 94:21, 95:2, 95:18, 115:1, 115:3, 124:22, 149:19
mailed [3] - 60:10, 60:23, 83:21
mailing [1] - 4:12
mails [30] - 34:17, 34:23, 36:15, 37:23, 45:25, 77:15, 85:7, 85:11, 95:18, 96:5, 107:25, 108:3, 108:18, 112:3, 113:5, 113:21, 115:4, 115:25, 116:2, 116:7, 116:11, 116:20, 117:2, 149:19, 150:1, 150:4, 150:5, 151:4, 151:5, 152:2
maintain [1] - 152:13
maintained [1] - 130:7
manage [1] - 45:13
management [2] - 54:25, 127:19
manager [1] - 101:8
manner [3] - 27:3, 28:12, 49:1
March [11] - 15:7, 15:12, 37:12, 37:13, 75:1, 136:1, 146:25, 148:4, 148:24, 149:8, 149:14
margin [1] - 82:17
Mark [1] - 140:11
marked [43] - 57:6, 59:23, 61:11, 62:23, 63:1, 63:4, 69:2, 69:4, 75:5, 76:20, 76:25, 77:14, 83:17,

86:19, 86:24, 87:3, 92:12, 93:12, 95:10, 95:13, 95:20, 96:2, 112:6, 112:9, 133:24, 134:1, 134:5, 134:13, 134:15, 134:17, 134:18, 135:22, 135:24, 136:8, 136:15, 137:17, 137:19, 138:8, 146:17, 147:6, 147:9, 148:12, 148:14
married [3] - 8:19, 11:20
marry [2] - 34:10, 94:4
Martin [1] - 142:7
Mary [1] - 4:9
MARY [1] - 1:16
massive [1] - 21:21
MASTER [2] - 1:11, 1:14
Master [3] - 4:18, 5:14, 15:3
master [1] - 4:23
material [3] - 5:1, 5:2, 144:2
matt [1] - 82:25
Matt [8] - 77:16, 77:19, 77:20, 83:1, 125:3, 125:6
Matt's [2] - 82:3, 82:4
matter [13] - 27:2, 72:11, 73:11, 74:18, 75:15, 91:19, 93:9, 117:13, 118:7, 119:3, 119:6, 119:10, 154:18
matters [5] - 30:1, 41:7, 66:8, 74:17, 124:17
MCCALL [22] - 1:15, 63:7, 85:21, 86:1, 86:4, 86:14, 86:17, 92:22, 122:25, 123:4, 123:8, 127:12, 128:16, 129:16, 129:20, 131:1, 131:5, 131:14, 131:17, 132:19, 132:23, 143:10
McCall [1] - 4:6
mean [30] - 13:13, 20:13, 24:25, 25:3, 26:6, 26:8, 30:7, 34:13, 44:6, 45:8, 45:23, 52:19, 80:21, 81:20, 89:1, 98:25,

100:6, 103:9, 103:12, 110:14, 110:21, 114:6, 115:7, 120:21, 123:23, 126:23, 130:3, 144:5, 153:12, 153:15
meaning [8] - 69:25, 74:5, 82:3, 99:15, 99:16, 106:15, 106:20, 141:6
means [7] - 39:19, 81:23, 83:4, 113:9, 113:21, 115:5, 125:12
meant [6] - 26:7, 81:9, 81:17, 110:12, 130:10, 151:10
MECHANICAL [1] - 1:24
medical [1] - 94:5
meet [8] - 11:10, 13:5, 13:10, 13:19, 14:6, 23:21, 123:1, 123:9
meeting [13] - 21:9, 21:13, 21:15, 22:5, 22:25, 23:23, 24:17, 27:4, 27:7, 30:12, 78:1, 78:12, 96:18
meetings [12] - 7:7, 23:15, 35:21, 40:23, 40:25, 41:6, 41:13, 64:21, 96:16, 96:20, 121:19, 121:21
Melvin [1] - 16:20
member [2] - 87:17, 97:16
members [8] - 29:15, 79:11, 123:2, 123:9, 127:19, 138:20
memo [2] - 32:23, 40:20
memoranda [2] - 40:14, 40:19
memory [1] - 96:6
memos [2] - 36:14, 40:21
mention [1] - 154:4
mentioned [14] - 14:19, 16:24, 21:18, 34:21, 43:4, 45:7, 49:15, 72:4, 76:17, 117:14, 131:1, 131:3, 138:3, 148:21
MERIT [1] - 1:21
Merit [2] - 154:16, 154:21
Mestayer [1] - 6:22
met [12] - 13:6, 13:12, 17:15, 18:2, 22:20,

26:19, 65:10, 78:24, 97:8, 112:5, 132:3
method [1] - 79:13
methods [1] - 113:9
MEXICO [1] - 1:5
Michael [3] - 85:20, 105:25, 141:11
MICHAEL [1] - 1:15
mid [2] - 27:7, 27:19
mid-April [2] - 27:7, 27:19
middle [1] - 120:19
midnight [1] - 47:2
might [38] - 7:15, 13:12, 16:5, 19:17, 24:19, 27:7, 40:17, 43:12, 47:8, 48:10, 50:4, 64:22, 65:1, 65:11, 68:12, 68:13, 84:24, 88:14, 88:18, 90:22, 93:8, 97:5, 103:2, 108:11, 112:11, 112:25, 116:15, 120:17, 123:23, 123:24, 128:12, 136:13, 154:5
Mike [11] - 4:6, 19:3, 31:9, 31:11, 31:20, 33:8, 42:6, 42:25, 96:15, 96:19, 130:21
million [4] - 39:6, 91:7, 91:14, 100:17
million-so [1] - 91:7
mind [15] - 15:19, 16:1, 43:15, 47:10, 54:14, 55:9, 65:16, 76:14, 98:2, 112:22, 113:10, 114:7, 128:9, 135:8
minded [1] - 25:21
mine [2] - 44:7, 117:5
minute [3] - 69:11, 69:12, 123:13
minutes [1] - 21:17
miscalculation [1] - 92:7
misleading [2] - 4:25, 5:3
misstatement [1] - 144:2
misstep [1] - 129:24
module [1] - 80:8
mom [1] - 9:9
moment [5] - 17:15, 28:14, 34:18, 57:12, 57:15, 69:9, 113:7, 142:18
Monday [1] - 93:16
MONDAY [2] - 1:7, 4:2

money [16] - 70:5, 98:23, 99:13, 100:20, 102:20, 103:1, 103:5, 108:19, 113:4, 116:13, 116:16, 120:13, 151:15, 151:16, 151:17, 152:11
Monster [1] - 138:9
month [2] - 24:10, 88:12, 110:17, 110:25, 111:1
monthly [2] - 101:9, 110:10
months [10] - 34:18, 36:19, 61:18, 62:16, 93:13, 93:14, 149:25, 150:1
mop@mopslaw.com [1] - 4:14
moratoria [3] - 42:20, 48:11, 88:14
morning [1] - 26:20
Moskowitz [1] - 94:3
most [6] - 10:25, 23:11, 38:15, 43:4, 48:11, 91:16
mostly [1] - 10:18
motion [3] - 7:5, 7:12, 145:20
motions [2] - 7:15, 92:5
mouth [1] - 104:16
moved [7] - 8:12, 12:25, 14:16, 20:16, 99:21, 123:6, 148:5
MR [215] - 2:5, 2:7, 4:5, 4:15, 5:17, 12:2, 12:18, 13:15, 13:21, 13:23, 45:7, 45:11, 45:15, 45:18, 48:13, 48:17, 48:19, 53:10, 53:14, 53:17, 53:20, 54:3, 57:3, 57:4, 57:7, 57:10, 57:18, 57:19, 57:22, 58:2, 58:6, 60:1, 60:14, 60:17, 60:24, 61:3, 61:12, 62:6, 62:7, 63:2, 63:5, 63:7, 63:8, 63:11, 63:14, 63:17, 63:19, 67:21, 67:25, 68:3, 68:5, 68:7, 68:9, 68:14, 68:17, 68:18, 69:5, 69:8, 69:12, 69:16, 69:18, 73:7, 73:11, 73:16, 74:1, 75:6, 75:9, 75:17, 75:22,

77:1, 77:6, 81:4, 81:24, 83:13, 83:15, 83:18, 83:25, 84:2, 84:9, 85:18, 85:19, 85:20, 85:21, 85:24, 86:1, 86:4, 86:14, 86:17, 86:18, 86:25, 87:6, 87:10, 87:13, 88:16, 89:24, 90:2, 90:6, 90:10, 90:17, 91:5, 91:9, 91:13, 91:18, 92:13, 92:18, 92:19, 92:20, 92:21, 92:22, 92:24, 93:1, 93:3, 93:8, 93:14, 93:15, 93:19, 94:13, 94:14, 94:17, 95:14, 95:17, 95:21, 95:24, 96:4, 98:3, 99:14, 104:6, 106:8, 106:9, 106:10, 112:10, 117:10, 117:12, 117:14, 117:18, 117:20, 118:2, 118:6, 118:11, 118:20, 118:24, 119:2, 119:7, 119:11, 119:15, 119:16, 121:8, 121:9, 122:25, 123:4, 123:8, 123:13, 123:17, 124:1, 124:4, 124:6, 124:12, 124:19, 124:20, 124:22, 124:24, 125:1, 125:12, 125:18, 125:20, 125:22, 126:1, 126:7, 126:19, 126:25, 127:2, 127:12, 128:16, 129:16, 129:20, 131:1, 131:5, 131:14, 131:17, 132:19, 132:23, 132:24, 134:2, 134:4, 134:16, 135:15, 135:17, 135:23, 136:12, 136:16, 137:9, 137:15, 137:18, 143:9, 143:10, 143:11, 143:17, 144:9, 144:13, 146:7, 146:12, 147:22, 149:10, 149:12, 149:16, 150:9, 153:1, 153:3, 153:9, 153:14, 153:18, 154:3, 154:4, 154:7,

154:8
MS [70] - 2:6, 4:9, 13:13, 48:18, 53:7, 53:12, 53:16, 57:16, 57:20, 57:25, 58:4, 60:11, 60:16, 62:4, 63:10, 63:12, 63:16, 63:18, 69:11, 83:22, 87:8, 87:11, 88:12, 90:15, 90:19, 91:6, 91:10, 91:16, 92:16, 92:23, 92:25, 93:7, 93:13, 94:11, 94:16, 104:3, 117:9, 121:6, 123:16, 123:18, 124:3, 124:5, 124:21, 125:8, 125:11, 125:21, 125:25, 126:22, 135:11, 137:8, 143:13, 143:19, 144:1, 144:5, 144:11, 146:13, 146:19, 147:7, 147:24, 148:2, 148:13, 149:11, 149:22, 150:7, 153:8, 153:11, 153:15, 153:23, 153:25, 154:6
multi [2] - 39:6
multi-million [1] - 39:6
multiple [4] - 29:6, 83:24, 135:15
multiple-page [1] - 83:24
must [6] - 12:22, 15:12, 22:22, 82:10, 84:12, 88:4, 111:4, 111:5, 150:16
mutual [2] - 43:21, 43:22
myriad [1] - 32:21

N

name [30] - 4:7, 4:9, 6:14, 6:15, 7:24, 9:18, 9:20, 16:8, 19:25, 65:13, 76:17, 89:22, 90:3, 90:13, 96:14, 98:8, 98:9, 98:22, 117:18, 121:6, 128:21, 136:22, 138:11, 140:8, 141:1, 141:9, 143:25, 144:6, 148:22
named [10] - 11:16, 38:25, 75:14, 75:16,

75:17, 82:21, 97:9, 138:1, 140:6, 140:15
names [3] - 75:14, 83:19, 91:10
narrowing [1] - 35:10
nature [5] - 33:9, 89:14, 131:24, 133:18, 133:20
Navajo [1] - 140:1
near [1] - 60:22
nearly [1] - 34:15
necessarily [3] - 25:22, 32:15, 70:11
necessary [1] - 70:9
need [16] - 16:18, 30:7, 35:23, 36:5, 42:4, 77:8, 78:21, 84:14, 100:24, 111:10, 117:21, 126:20, 127:10, 132:11, 143:8, 153:18
needed [11] - 32:16, 32:17, 32:20, 33:8, 35:11, 37:10, 41:25, 42:2, 80:22, 126:4, 128:15
needing [1] - 125:3
needs [4] - 15:16, 78:23, 123:24, 132:12
negative [1] - 95:6
neglected [1] - 148:7
negotiated [1] - 27:13
negotiating [1] - 27:14
Neil [6] - 68:1, 68:3, 68:7, 68:12, 68:13
Neurontin [1] - 7:25
neutral [5] - 26:1, 26:3, 26:6, 26:7, 27:3
never [26] - 10:20, 28:2, 30:4, 43:11, 52:7, 52:16, 54:9, 55:6, 56:1, 65:16, 71:8, 100:11, 101:17, 112:22, 115:16, 119:23, 122:23, 130:12, 143:17, 144:14, 144:22, 146:3, 146:4, 150:11, 150:13
New [9] - 6:5, 8:12, 9:24, 19:24, 133:15, 141:3, 141:5, 142:12, 143:1
NEW [2] - 1:6, 1:22
new [4] - 25:19, 34:11, 115:23, 146:9

next [7] - 7:16, 23:13, 28:14, 41:16, 42:16, 78:17, 136:12
nickname [2] - 19:16, 19:19
night [1] - 45:24
NO [1] - 1:6
non [1] - 119:10
non-related [1] - 119:10
none [2] - 33:3, 92:7
noon [1] - 69:17
nose [1] - 76:18
note [2] - 40:20, 126:5
noted [1] - 26:22
notes [8] - 36:15, 40:14, 40:19, 40:25, 41:2, 41:5, 41:13, 41:18
nothing [7] - 5:9, 16:2, 33:6, 98:2, 132:17, 154:1
notice [4] - 33:18, 80:17, 115:5, 147:16
noticed [1] - 81:2
notices [2] - 72:22, 79:4
noticing [1] - 76:5
notification [1] - 75:10
notified [2] - 16:13, 74:23
notify [1] - 75:24
November [3] - 47:4, 47:5
Number [13] - 4:10, 62:24, 69:2, 83:3, 87:3, 124:19, 125:13, 126:7, 134:5, 143:10, 146:22, 147:9, 148:15
number [4] - 4:13, 39:17, 39:18, 77:7, 144:12
numbered [1] - 154:18
numbers [1] - 134:3

O

o'clock [2] - 45:24, 47:2
oath [5] - 4:22, 5:2, 5:6, 5:7, 5:14
Oats [1] - 6:18
obligation [1] - 139:3
obligations [3] - 113:5, 151:15, 151:17
obviously [3] - 4:23,

67:18, 82:11
occasion [3] - 24:24, 33:4, 40:14
occasionally [1] - 96:16
occurrence [1] - 85:4
October [2] - 44:17, 71:22
odd [1] - 91:14
Odom [8] - 45:15, 54:6, 70:13, 71:10, 132:5, 132:20
Odom's [1] - 53:24
OF [3] - 1:1, 1:5, 1:10
offer [3] - 24:7, 40:2, 123:19
offered [1] - 79:22
offering [1] - 148:16
office [53] - 9:21, 11:8, 15:8, 15:20, 18:3, 18:5, 20:22, 20:25, 21:1, 21:10, 26:17, 29:11, 31:22, 35:8, 35:24, 36:11, 37:18, 41:3, 42:4, 42:13, 44:8, 45:13, 51:25, 54:25, 55:9, 55:17, 61:22, 62:20, 64:19, 66:5, 66:10, 70:8, 70:20, 97:9, 107:13, 107:15, 109:11, 121:19, 122:1, 122:15, 123:6, 128:4, 128:16, 130:15, 130:23, 131:10, 132:2, 132:14, 139:17, 141:4, 141:5, 147:2, 149:1
OFFICE [1] - 1:17
office's [1] - 129:7
officer [9] - 4:23, 138:17, 139:6, 139:12, 140:6, 140:24, 141:13, 142:5, 142:16
officers [3] - 98:4, 98:10, 143:3
offices [2] - 20:11, 152:8
Offices [1] - 9:15
Official [2] - 154:16, 154:22
OFFICIAL [1] - 1:20
offline [5] - 37:20, 80:10, 81:22, 126:13, 126:16
offshore [1] - 117:17
often [2] - 84:16, 85:4
OIL [1] - 1:4, 1:4

oil [3] - 42:17, 97:19, 117:15
old [1] - 20:18
Olive [1] - 4:9
OLIVE [1] - 1:16
ON [1] - 1:5
once [16] - 8:13, 28:13, 34:15, 36:17, 37:15, 72:23, 76:14, 78:13, 96:24, 107:12, 109:6, 109:7, 109:13, 123:5, 150:10
One [1] - 99:2
one [106] - 9:16, 12:5, 12:6, 12:7, 12:10, 12:13, 12:15, 15:20, 19:8, 20:17, 22:6, 23:12, 24:4, 24:19, 24:24, 25:22, 26:7, 26:11, 26:20, 28:13, 33:2, 34:24, 36:1, 37:25, 38:6, 39:9, 40:20, 40:22, 41:14, 42:17, 42:19, 43:15, 43:25, 46:25, 52:22, 53:3, 53:5, 56:25, 64:13, 64:14, 66:5, 72:24, 74:16, 74:17, 77:20, 78:1, 78:24, 78:25, 79:11, 80:5, 80:24, 81:23, 83:11, 84:4, 86:14, 89:18, 90:4, 90:12, 90:25, 91:3, 91:11, 91:16, 92:15, 92:17, 93:21, 94:19, 95:21, 95:22, 95:23, 95:24, 101:8, 101:9, 105:10, 106:7, 106:11, 110:1, 111:7, 113:7, 115:1, 115:4, 121:25, 122:13, 122:14, 122:16, 123:22, 127:4, 130:9, 130:23, 131:21, 131:23, 134:17, 134:18, 135:12, 135:18, 136:13, 139:14, 140:25, 141:8, 141:11, 141:17, 143:13
one-way [1] - 110:1
ones [13] - 38:20, 40:13, 84:22, 116:2, 116:4, 116:5, 125:15, 126:20, 132:3, 138:7
online [2] - 80:9,

126:14
open [4] - 26:13, 65:25, 78:15, 84:6
opened [2] - 78:19, 130:6
operation [4] - 20:12, 21:19, 21:24, 23:2
operations [1] - 48:24
opinion [2] - 51:9, 111:16
opinions [1] - 30:13
opportunity [2] - 20:7, 106:19
option [1] - 81:12
order [2] - 4:17, 61:6
Order [2] - 57:8, 58:9
organization [2] - 70:23, 143:18
organizing [2] - 25:4, 25:6
oriented [2] - 15:18
original [2] - 30:3, 147:9
ORLEANS [2] - 1:6, 1:22
Orleans [3] - 6:5, 9:24, 153:15
Orran [4] - 29:4, 29:14, 36:22, 41:10
Orterrio [1] - 36:10
outfitted [1] - 45:14
outgoing [1] - 13:19
outline [1] - 29:10
outreach [4] - 127:5, 131:22, 131:24
outside [13] - 32:2, 32:7, 32:10, 32:16, 32:20, 38:23, 51:7, 53:25, 55:3, 55:22, 56:5, 102:6, 145:4
overly [2] - 52:8, 132:18
oversaw [1] - 66:7
oversight [5] - 22:14, 55:11, 64:7, 64:13, 64:14
owe [3] - 116:13, 116:16, 152:11
owed [2] - 113:6, 139:2
own [10] - 9:12, 17:7, 17:13, 19:15, 30:19, 32:14, 55:10, 55:12, 76:16, 88:24
owned [1] - 16:21

**P**

p.m [2] - 82:15, 154:9

P.O [1] - 4:12
pad [2] - 41:3, 41:4
page [30] - 33:23, 57:14, 58:18, 60:11, 60:15, 61:13, 62:1, 62:3, 62:4, 62:6, 62:9, 62:11, 63:11, 67:10, 77:13, 82:1, 82:11, 82:15, 83:2, 83:5, 83:6, 83:24, 87:6, 87:14, 136:12, 136:17, 137:10, 139:7
PAGE [2] - 2:2, 2:12
pages [1] - 30:16
paid [24] - 80:18, 81:1, 81:11, 92:3, 101:20, 105:16, 110:8, 110:19, 111:5, 111:10, 111:20, 113:12, 113:22, 114:3, 114:4, 114:5, 114:18, 114:21, 114:22, 116:8, 126:11, 126:17, 127:11, 132:10
Papa [8] - 117:19, 117:20, 117:23, 118:8, 118:19, 118:20, 119:11, 119:14
papers [1] - 122:21
paragraph [4] - 57:14, 58:19, 58:20, 67:10
paralegal [5] - 15:21, 41:25, 43:16, 43:25, 44:1
paraphrase [3] - 112:15, 112:16, 113:4
paren [2] - 141:19
Park [1] - 140:3
part [40] - 6:16, 7:21, 8:14, 10:25, 11:6, 14:24, 20:2, 27:11, 32:15, 32:18, 38:15, 40:7, 42:24, 44:6, 44:23, 48:11, 52:5, 52:7, 52:15, 55:14, 55:17, 55:20, 55:21, 59:5, 64:5, 72:3, 84:17, 95:2, 99:12, 107:14, 110:6, 113:14, 118:22, 129:7, 129:13, 129:17, 141:16, 145:20
part-time [5] - 6:16, 8:14, 42:24, 48:11, 110:6

participate [4] - 58:21, 102:3, 102:4, 132:19
particular [8] - 7:2, 18:19, 46:3, 51:4, 53:21, 59:15, 97:2, 129:23
particularly [4] - 41:21, 90:14, 118:15, 127:18
parties [8] - 16:24, 23:21, 29:22, 34:8, 37:2, 37:5, 37:16, 38:3
parties' [1] - 34:8
partner [9] - 11:5, 18:17, 36:24, 103:19, 103:22, 103:25, 116:1, 119:13, 138:1
Partners [1] - 141:8
partners [8] - 19:2, 19:11, 19:14, 29:5, 98:4, 102:10, 121:2, 133:6
partnership [2] - 9:17, 12:6
party [2] - 17:25, 71:2
pass [3] - 141:14, 142:17, 143:7
past [1] - 18:4
Pat [11] - 15:3, 15:6, 15:7, 17:21, 19:8, 19:12, 47:15, 82:24, 127:25, 132:1, 132:5
Patrick [2] - 14:12, 105:25
Pay [2] - 112:18, 115:8
pay [10] - 82:23, 101:7, 111:1, 112:21, 115:7, 116:13, 116:16, 139:3, 151:15, 151:17
paying [5] - 108:19, 108:20, 112:17, 139:1, 139:2
payment [20] - 64:6, 78:18, 80:1, 80:8, 80:13, 80:14, 81:13, 83:20, 83:21, 87:2, 87:18, 88:15, 89:7, 92:15, 126:10, 127:7, 145:21, 151:22
payments [11] - 78:22, 80:19, 93:23, 95:8, 100:14, 101:15, 111:22, 126:13, 130:17, 151:23, 152:16

**pending** [2] - 133:15, 142:21
**Pennsylvania** [1] - 6:3
**people** [49] - 25:5, 29:4, 33:7, 35:1, 35:3, 35:22, 35:24, 41:23, 43:11, 43:14, 52:12, 55:2, 56:12, 64:15, 66:13, 66:14, 68:20, 70:1, 75:19, 75:25, 76:6, 78:18, 79:13, 81:12, 98:17, 106:13, 112:5, 113:13, 116:8, 117:5, 125:6, 125:9, 126:4, 127:8, 128:4, 128:16, 129:14, 129:18, 129:21, 131:1, 131:9, 132:2, 132:10, 132:14, 148:24, 150:19
**Pepper** [3] - 154:15, 154:20, 154:20
**PEPPER** [1] - 1:20
**per** [1] - 54:18
**perceived** [2] - 131:6, 131:8
**percent** [4] - 39:20, 81:13, 81:14, 100:23
**percentage** [3] - 39:18, 101:3, 139:4
**Perez** [9] - 118:8, 119:3, 119:9, 119:12, 119:13, 142:18, 142:19, 143:3, 143:6
**perfect** [3] - 43:3, 43:6, 109:24
**performance** [1] - 109:22
**performed** [1] - 18:20
**performing** [1] - 129:8
**perhaps** [2] - 77:24, 108:19
**period** [11] - 10:17, 19:5, 24:21, 32:25, 41:21, 48:20, 54:12, 91:12, 101:7, 101:15, 104:18
**permanent** [2] - 20:22, 21:1
**permission** [6] - 118:3, 118:4, 118:14, 121:24, 122:2, 122:4
**Pershing** [1] - 141:2
**person** [13] - 24:17, 40:16, 41:3, 58:23, 64:3, 67:11, 69:1, 88:4, 97:5, 97:19,

98:8, 98:9
**person...a** [1] - 59:10
**personal** [13] - 14:23, 73:11, 73:14, 74:7, 74:18, 86:3, 86:4, 97:1, 102:18, 107:10, 122:16, 132:14, 152:14
**personality** [1] - 99:7
**perspective** [1] - 31:24
**pertained** [1] - 38:6
**Peter** [3] - 39:4, 39:11, 50:1
**Philadelphia** [1] - 6:4
**phone** [7] - 4:13, 23:11, 23:25, 24:4, 24:16, 47:1
**phonetically** [2] - 36:10, 128:22
**phrase** [1] - 46:15
**picking** [1] - 8:14
**picture** [1] - 85:16
**Pierson** [1] - 4:9
**PIERSON** [70] - 1:16, 4:9, 13:13, 48:18, 53:7, 53:12, 53:16, 57:16, 57:20, 57:25, 58:4, 60:11, 60:16, 62:4, 63:10, 63:12, 63:16, 63:18, 69:11, 83:22, 87:8, 87:11, 88:12, 90:15, 90:19, 91:6, 91:10, 91:16, 92:16, 92:23, 92:25, 93:7, 93:13, 94:11, 94:16, 104:3, 117:9, 121:6, 123:16, 123:18, 124:3, 124:5, 124:21, 125:8, 125:11, 125:21, 125:25, 126:22, 135:11, 137:8, 143:13, 143:19, 144:1, 144:5, 144:11, 146:13, 146:19, 147:7, 147:24, 148:2, 148:13, 149:11, 149:22, 150:7, 153:8, 153:11, 153:15, 153:23, 153:25, 154:6
**PIERSON.......
....... [1] - 2:6**
**Pine** [1] - 140:3
**place** [9] - 17:5, 27:7, 33:7, 35:16, 35:17, 37:11, 37:25, 41:2,

50:18
**Plaintiff** [1] - 11:6
**plaintiff's** [1] - 25:15
**plaintiffs** [4] - 10:23, 11:2, 11:4, 27:12
**plate** [2] - 76:18, 132:8
**play** [1] - 109:14
**PLC** [1] - 10:3
**plug** [1] - 144:6
**plugged** [1] - 107:13
**Point** [1] - 125:13
**point** [65] - 7:19, 9:16, 12:13, 12:15, 18:22, 19:8, 19:14, 20:11, 23:12, 23:13, 25:19, 31:8, 34:24, 35:15, 37:20, 43:25, 57:5, 59:22, 61:10, 62:25, 64:2, 69:3, 69:14, 75:4, 76:12, 76:24, 80:24, 83:16, 86:23, 88:8, 92:11, 93:11, 95:8, 95:12, 95:19, 97:21, 100:16, 101:12, 102:14, 103:15, 104:23, 105:7, 105:15, 106:3, 106:7, 106:11, 110:19, 112:8, 120:2, 121:15, 124:10, 131:15, 131:21, 133:25, 134:14, 135:11, 135:21, 136:14, 137:16, 146:16, 147:5, 148:11, 150:23, 150:24
**policies** [21] - 34:13, 34:15, 38:2, 38:5, 38:10, 38:11, 38:13, 39:12, 39:15, 40:6, 40:8, 40:11, 50:16, 55:8, 55:12, 56:5, 56:8, 56:13, 70:2, 71:4, 85:16
**Policy** [1] - 37:9
**policy** [11] - 33:15, 37:20, 37:24, 38:9, 52:24, 52:25, 53:8, 54:6, 55:10
**policy-deciding** [1] - 33:15
**policy-making** [1] - 33:15
**portfolio** [1] - 69:24
**portion** [4] - 40:13, 72:25, 80:3, 93:2
**portions** [1] - 111:21
**position** [12] - 23:20,

25:17, 26:1, 26:3, 26:10, 51:17, 59:15, 65:2, 67:19, 74:3, 74:12, 103:14
**possibility** [3] - 20:3, 24:22, 151:10
**possible** [2] - 125:17, 125:19
**POST** [1] - 1:17
**posted** [2] - 81:18, 125:14
**POYDRAS** [1] - 1:22
**practice** [13] - 7:12, 10:16, 14:23, 14:24, 18:19, 30:18, 48:25, 107:9, 109:13, 109:18, 110:8, 121:24, 152:9
**practicing** [2] - 64:25, 98:25
**practitioner** [1] - 7:23
**prefer** [2] - 5:18, 107:8
**preliminarily** [1] - 26:19
**preliminary** [3] - 22:24, 23:5, 26:18
**prepare** [3] - 58:14, 61:23, 62:21
**prepared** [1] - 60:3
**preparer** [1] - 102:6
**preparing** [1] - 102:1
**prerequisite** [1] - 145:14
**present** [10] - 27:5, 27:6, 29:22, 47:23, 50:2, 58:23, 59:9, 67:11, 84:24, 106:13
**presentation** [1] - 39:13
**presented** [4] - 29:13, 31:6, 36:7, 36:9
**presents** [2] - 58:22, 67:11
**president** [3] - 63:24, 68:4, 68:5
**pretty** [2] - 14:9, 99:20
**prevent** [1] - 30:22
**previous** [7] - 48:24, 73:8, 73:9, 75:15, 76:6, 139:17, 144:15
**previously** [3] - 17:15, 76:1, 96:23
**principles** [3] - 40:1, 40:3, 134:20
**print** [1] - 108:2
**printed** [1] - 136:10
**privy** [2] - 50:2, 95:1
**problem** [8] - 29:10, 30:14, 46:14, 52:17, 85:2, 153:8, 153:11,

154:6
**problems** [7] - 30:22, 31:3, 31:6, 33:20, 33:25, 45:6, 78:25
**procedure** [2] - 50:15, 50:17, 76:3
**procedures** [3] - 70:3, 70:10, 71:4
**proceeding** [1] - 124:7
**proceedings** [26] - 57:5, 59:22, 61:10, 62:25, 69:3, 69:14, 75:4, 76:24, 83:16, 86:23, 92:11, 93:11, 95:12, 95:19, 112:8, 124:10, 133:25, 134:14, 135:21, 136:14, 137:16, 146:16, 147:5, 148:11, 154:9, 154:18
**PROCEEDINGS** [2] - 1:24, 4:1
**process** [44] - 4:19, 26:13, 33:12, 33:15, 38:1, 40:7, 48:1, 50:15, 50:17, 51:8, 51:19, 54:1, 55:3, 58:25, 64:6, 64:8, 67:13, 75:25, 76:3, 76:8, 76:9, 76:13, 78:21, 79:19, 81:10, 87:18, 88:13, 88:15, 89:7, 102:25, 103:16, 104:25, 105:8, 106:21, 114:22, 121:11, 122:10, 126:13, 128:23, 130:8, 131:2, 145:21, 146:9
**processed** [2] - 114:4, 114:5
**processes** [3] - 36:1, 71:3, 79:13
**processing** [8] - 72:20, 72:21, 96:13, 127:24, 128:19, 129:14, 129:17, 129:21
**PRODUCED** [1] - 1:25
**professional** [6] - 6:1, 6:11, 53:9, 141:19, 143:15, 143:21
**proffer** [2] - 124:4, 124:5
**program** [65] - 15:16, 16:3, 16:13, 16:14, 17:8, 17:9, 21:22, 25:10, 26:24, 28:13, 28:24, 29:9, 31:23,

**C O N F I D E N T I A L**

32:19, 33:19, 34:15, 34:16, 35:2, 35:13, 36:24, 37:10, 42:8, 42:20, 58:25, 59:5, 60:5, 64:5, 64:22, 67:14, 68:21, 71:19, 74:23, 75:19, 76:17, 77:21, 78:13, 79:6, 80:2, 81:13, 81:15, 85:16, 87:20, 88:6, 94:5, 94:6, 103:12, 105:1, 105:2, 105:5, 106:19, 106:20, 106:25, 107:2, 107:18, 109:23, 109:25, 110:12, 110:22, 111:9, 123:6, 127:23, 135:2, 151:13

programmers [1] - 29:4
programs [2] - 131:22, 131:24
progressed [1] - 102:21
prompted [1] - 88:2
property [2] - 32:21, 39:4
propose [1] - 37:2
proposed [3] - 58:25, 65:13, 67:13
protocol [2] - 35:7, 54:25
provide [4] - 57:23, 75:24, 84:15, 153:6
provided [4] - 27:18, 33:6, 147:8, 150:1
providing [1] - 103:1
provision [1] - 145:16
provisions [1] - 59:14
PSC [10] - 27:11, 35:1, 37:6, 77:20, 78:1, 78:12, 78:24, 79:22, 84:5, 97:16
PSC's [1] - 14:22
public [3] - 34:14, 137:20, 137:21
publication [1] - 34:14
publicly [2] - 136:2, 140:21
publicly-available [1] - 136:2
pull [1] - 137:13
pulled [1] - 148:6
purport [1] - 136:19
purports [1] - 146:20
purpose [1] - 146:14
pursued [1] - 16:25
push [2] - 79:15, 81:21

put [21] - 4:21, 22:10, 28:24, 30:18, 35:16, 36:13, 37:11, 40:20, 41:4, 46:10, 92:4, 98:14, 100:17, 104:16, 120:13, 126:3, 129:7, 131:23, 153:20, 153:21
puts [2] - 41:3, 99:13
putting [5] - 5:6, 76:5, 100:20, 100:24, 124:17

**Q**

questioned [3] - 108:4, 116:6, 125:3
questions [31] - 5:23, 5:25, 23:4, 28:4, 28:16, 31:2, 32:11, 32:14, 50:23, 55:23, 56:19, 63:9, 64:16, 69:19, 77:9, 85:18, 85:23, 86:22, 108:5, 117:12, 123:20, 124:15, 124:16, 132:25, 133:1, 143:9, 144:15, 145:25, 149:12
quicker [1] - 74:11
quickly [1] - 80:22
quite [2] - 41:21, 103:10
quote [6] - 24:7, 58:20, 107:18, 108:10, 108:12, 112:11
quoted [1] - 108:10
quoting [1] - 106:23

**R**

raised [1] - 30:1
ramp [1] - 130:8
rare [3] - 85:10, 85:13, 85:14
rather [1] - 109:17
RE [1] - 1:4
Re [3] - 63:3, 92:15, 134:22
reached [1] - 43:22
reaching [2] - 72:23, 84:24
read [16] - 17:1, 17:11, 22:20, 27:17, 30:10, 57:15, 77:11, 81:9, 92:5, 106:12, 112:24, 115:4,

116:4, 126:7, 138:4, 149:18
Reade [1] - 36:11
readily [1] - 34:2
reading [6] - 30:9, 31:7, 63:16, 80:5, 107:24, 116:7
ready [5] - 25:3, 80:1, 80:8, 130:5
real [1] - 6:20
realize [2] - 89:9, 89:10
realized [2] - 35:12, 39:2
really [37] - 8:13, 10:20, 14:23, 18:6, 25:7, 27:1, 28:23, 33:21, 33:24, 36:16, 40:2, 40:12, 42:23, 43:5, 44:4, 44:5, 46:4, 46:7, 48:6, 53:18, 76:18, 78:17, 79:17, 80:21, 81:23, 85:15, 101:24, 106:16, 106:17, 109:9, 109:25, 112:3, 131:11, 132:8, 132:13, 143:18
realm [3] - 129:15, 132:9
REALTIME [1] - 1:21
Realtime [2] - 154:15, 154:21
reason [4] - 89:1, 89:4, 126:2, 135:25
reasonable [3] - 58:23, 59:10, 67:11
reasons [2] - 105:10, 105:13
rebuild [1] - 109:13
receive [2] - 24:15, 78:18, 89:3, 108:24, 110:17, 149:4, 149:7, 149:13, 150:12, 150:24, 150:25, 151:2
received [4] - 22:23, 83:20, 126:10, 149:1
receiving [5] - 100:14, 101:14, 109:2, 110:16, 130:16
recently [4] - 88:18, 102:16, 115:22, 150:5
recess [2] - 69:15, 124:11
recite [1] - 136:17
recites [1] - 141:2
reclamation [1] - 98:1

recollection [8] - 57:12, 60:18, 73:2, 73:5, 88:17, 94:1, 112:14, 125:1
recommend [1] - 43:10
recommendation [4] - 29:22, 34:3, 34:12, 144:17
recommendations [6] - 29:12, 29:21, 30:13, 37:1, 39:11, 51:9
recommended [6] - 43:7, 43:11, 44:13, 97:12, 135:4, 144:25
recommending [1] - 48:2
reconciliation [1] - 38:7
record [17] - 4:5, 57:3, 66:20, 69:5, 69:16, 76:5, 118:14, 119:9, 121:6, 123:20, 123:21, 124:12, 124:18, 126:10, 153:21, 153:22, 154:18
RECORDED [1] - 1:24
records [2] - 41:1, 124:14
recovery [1] - 83:13
Recusal [3] - 58:19, 62:2, 62:8
recusal [2] - 50:8, 57:14
recused [4] - 39:3, 49:23, 50:8, 96:23
refer [3] - 25:14, 37:5, 97:2
referenced [2] - 19:18, 152:3
referral [2] - 121:12, 149:14
referred [10] - 8:16, 10:10, 17:5, 38:10, 56:21, 60:6, 72:4, 97:6, 138:9
referring [4] - 22:17, 58:7, 65:18, 101:4
reflect [2] - 66:20, 139:6
reflected [2] - 141:13, 142:16
reflects [3] - 136:2, 137:4, 143:3
refresh [1] - 57:12
regard [9] - 32:18, 34:20, 43:3, 65:3, 74:6, 135:12,

148:21, 150:3, 154:2
regarding [4] - 59:16, 93:17, 132:20, 146:9
Regarding [1] - 61:1
regardless [1] - 133:15
REGISTERED [1] - 1:21
registered [7] - 137:22, 139:12, 140:24, 141:25, 143:21, 144:2, 154:21
Registered [1] - 154:15
registrant [1] - 138:1
registration [4] - 10:7, 33:18, 78:14, 143:3
regular [6] - 29:19, 64:1, 64:20, 85:12, 109:2, 109:12
Reitano [30] - 4:6, 5:18, 5:20, 5:21, 5:22, 9:14, 9:17, 9:19, 10:11, 10:14, 57:8, 57:13, 58:20, 62:23, 63:3, 69:19, 75:6, 77:2, 86:21, 87:2, 93:16, 122:25, 123:1, 127:12, 141:18, 143:14, 146:20, 147:17, 147:19, 153:21
REITANO [3] - 1:10, 1:18, 5:12
Reitano's [1] - 124:13
REITANO.................... ............. [1] - 2:4
related [8] - 15:22, 59:7, 68:21, 114:18, 119:10, 121:21, 121:25, 122:9
RELATES [1] - 1:8
relating [2] - 72:11, 74:17
relation [1] - 64:1
relationship [19] - 18:1, 42:16, 66:18, 66:19, 74:23, 76:14, 97:24, 97:25, 102:21, 102:22, 117:22, 118:1, 119:25, 120:7, 120:15, 120:16, 134:24, 138:22, 152:7
relationships [6] - 16:12, 97:22, 127:17, 127:18, 133:2

**CONFIDENTIAL**

SM-02-JA00874

relaying [1] - 94:8
release [1] - 83:19
releasing [1] - 58:3
relevant [2] - 58:24, 67:12
relief [1] - 46:25
relying [1] - 54:23
remainder [1] - 40:12
remember [33] - 6:14, 12:9, 17:6, 19:7, 22:22, 24:16, 40:22, 43:20, 50:5, 61:5, 68:11, 75:16, 78:8, 78:9, 86:9, 86:10, 86:12, 86:13, 96:14, 101:24, 107:4, 107:5, 107:22, 107:23, 108:13, 108:14, 110:9, 111:7, 131:19, 131:20, 140:17
reminding [1] - 132:9
removed [1] - 92:8
rent [1] - 12:16
rents [1] - 141:4
repeat [1] - 75:12
rephrase [1] - 113:18
report [19] - 17:2, 48:5, 81:17, 106:12, 106:13, 107:17, 107:18, 112:4, 112:5, 116:5, 126:9, 128:10, 136:1, 136:2, 138:5, 139:6, 143:15, 153:25
REPORTER [3] - 1:20, 1:21, 1:21
Reporter [7] - 154:15, 154:16, 154:16, 154:21, 154:21, 154:22
reporter's [1] - 57:17
REPORTER'S [1] - 154:14
reporting [2] - 70:4, 128:7
reports [1] - 137:20
represent [2] - 15:25, 139:11
representation [4] - 74:21, 84:18, 86:2, 86:15
represented [10] - 49:21, 75:14, 76:1, 76:6, 82:22, 88:22, 94:23, 96:23, 125:9, 136:21
representing [10] - 10:23, 27:12, 71:20, 75:2, 75:19, 105:8,

118:7, 119:3, 119:5, 119:8
request [4] - 44:18, 44:20, 153:4, 153:5
require [1] - 79:19
required [2] - 54:22, 54:24
research [15] - 6:18, 10:20, 15:18, 32:12, 32:14, 32:15, 32:16, 32:17, 32:22, 32:24, 33:1, 33:4, 33:9, 39:10
research-type [1] - 6:18
reservations [1] - 145:25
residing [1] - 134:19
resolution [1] - 49:13
resolve [1] - 36:19
resolved [5] - 46:10, 47:12, 47:14, 74:11, 74:12
resources [2] - 35:10, 36:4
respect [21] - 10:13, 11:16, 14:15, 28:5, 28:11, 29:25, 30:14, 31:13, 32:11, 41:6, 49:12, 61:20, 64:8, 69:20, 70:19, 107:1, 121:12, 140:23, 146:1, 149:12, 149:14
respond [2] - 50:4, 153:5
responded [1] - 50:5
respondent [1] - 86:6
respondents [1] - 64:16
responding [3] - 72:22, 78:5, 107:24
response [6] - 34:4, 34:5, 94:7, 120:22, 144:14
response) [5] - 62:13, 92:18, 95:6, 121:16, 124:23
responses [1] - 34:9
responsibilities [11] - 7:2, 18:19, 31:17, 45:2, 45:21, 52:6, 52:7, 52:15, 55:15, 69:20, 69:24
responsibility [7] - 22:9, 45:11, 45:12, 53:24, 55:20, 55:21, 55:25
responsible [3] - 53:21, 70:23, 144:20

rest [4] - 17:10, 36:2, 46:11, 80:5
result [2] - 149:2, 149:24
retain [2] - 32:7, 150:20
retained [6] - 31:9, 67:18, 90:13, 150:17, 150:23, 151:19
retainer [2] - 147:9, 148:6
retired [1] - 19:9
retrieve [1] - 124:20
return [2] - 12:16, 139:4
returns [4] - 8:24, 102:1, 153:7, 153:16
review [18] - 7:4, 28:2, 28:10, 29:24, 30:10, 30:13, 30:19, 34:7, 38:3, 50:12, 51:8, 51:18, 77:8, 78:21, 79:15, 130:10, 137:13, 153:6
reviewed [6] - 27:17, 39:19, 39:20, 39:21, 40:9, 92:6
reviewers [1] - 7:6
reviewing [5] - 78:16, 79:1, 79:3, 102:2, 130:17
reviews [8] - 58:5, 61:5, 69:10, 77:11, 81:18, 87:12, 93:6, 96:8, 143:12
Rice [1] - 26:19
RIG [1] - 1:4
ring [2] - 140:4, 140:5
risky [1] - 107:8
RMR [1] - 1:20, 154:20
Robert [2] - 118:8, 119:9, 119:12, 119:13, 142:18, 143:3, 143:6
Roberts [3] - 43:17, 43:24, 43:25
role [17] - 7:2, 22:9, 31:25, 32:7, 42:12, 45:2, 45:13, 48:21, 64:4, 64:7, 70:11, 71:6, 85:15, 113:15, 128:11, 129:7, 130:22
roles [4] - 49:20, 101:8, 129:12, 132:10
Roll [1] - 4:10
Romania [1] - 99:10
Romeo [1] - 117:19,

117:20, 117:23, 118:8, 118:19, 118:20, 119:11, 119:14
Ronald [2] - 16:20
room [1] - 125:5
ROOM [1] - 1:22
rooms [1] - 121:25
Rose [1] - 38:25
Rosie [1] - 39:11
Rouge [2] - 4:11, 4:13
ROUGE [1] - 1:18
roughly [1] - 39:16
round [1] - 57:23
row [2] - 7:20, 125:21
RTP [1] - 115:5
rules [2] - 70:2, 70:10
ruling [1] - 57:23
run [1] - 81:22

**S**

s/Cathy [1] - 154:20
salaries [4] - 108:20, 139:1, 139:2, 139:4
salary [30] - 22:2, 22:3, 24:3, 24:4, 24:7, 44:25, 101:9, 101:10, 101:11, 101:19, 108:24, 110:3, 110:10, 110:14, 110:15, 110:16, 111:10, 111:12, 111:20, 112:17, 112:18, 112:21, 113:6, 116:13, 116:14, 116:16, 151:17, 151:22, 152:16
sampling [1] - 80:3
Sarasota [2] - 63:4, 64:12
sat [3] - 15:14, 41:10, 132:5
satisfaction [1] - 145:7
saw [7] - 22:23, 25:7, 52:7, 52:15, 56:11, 70:5, 106:19
scale [1] - 21:22
scapegoat [1] - 130:15
scenario [2] - 28:18, 28:19
Scheurich [4] - 128:22, 131:3, 131:14, 132:21
school [14] - 5:25, 6:4, 6:6, 11:19, 11:21,

11:22, 11:24, 13:6, 13:16, 14:9, 17:21, 17:22, 18:9, 98:21
Scott [3] - 128:22, 131:3, 131:23
screen [1] - 28:17
scrolling [1] - 34:22
SDA [1] - 139:14
se [1] - 54:18
Seahorse [1] - 142:24
search [1] - 137:21
second [2] - 59:19, 62:1
seconds [1] - 66:20
Secretariat [1] - 142:10
secretary [10] - 15:21, 41:11, 41:24, 122:16, 140:20, 140:22, 142:17, 143:21, 144:6, 148:6
secure [2] - 21:7, 55:25
see [45] - 8:5, 22:15, 27:25, 30:20, 45:4, 45:13, 47:2, 52:5, 55:14, 55:20, 55:21, 56:7, 56:14, 59:1, 62:10, 64:17, 65:11, 65:20, 66:3, 66:11, 66:15, 66:16, 66:17, 66:22, 67:2, 73:14, 78:21, 80:6, 85:2, 91:5, 91:6, 97:4, 99:5, 101:10, 104:18, 104:21, 104:24, 110:1, 119:17, 126:4, 126:22, 136:5, 144:22, 145:18, 146:5
seeing [1] - 150:5
seem [2] - 21:21, 42:2
segregated [1] - 41:5
self [1] - 54:11
self-generated [1] - 54:11
send [11] - 37:3, 40:14, 40:20, 65:3, 67:5, 79:4, 83:8, 84:11, 104:13, 125:6, 134:18
sending [3] - 40:18, 84:5, 94:21
sense [16] - 9:9, 11:15, 25:10, 33:13, 36:22, 41:14, 42:7, 83:6, 97:18, 100:1, 103:1, 115:23, 125:6, 125:7,

**C O N F I D E N T I A L**

SM-02-JA00875

127:16, 128:13
sent [16] - 34:8, 38:2,
40:18, 65:6, 65:19,
65:24, 68:25, 78:6,
80:17, 94:24,
105:10, 134:10,
135:12, 146:24,
148:17, 148:19
separate [13] - 41:5,
53:12, 54:21,
104:10, 117:5,
121:17, 124:7,
150:19, 151:23,
152:13, 152:20
separately [1] -
150:18
September [8] -
76:22, 77:2, 77:16,
77:22, 78:2, 78:3,
82:15, 101:23
series [2] - 76:21,
137:20
seriously [1] - 106:24
server [1] - 84:3
Sessions [9] - 32:17,
39:4, 53:25, 55:22,
56:1, 61:23, 62:21,
71:7, 71:8
set [9] - 20:12, 22:15,
23:13, 40:4, 41:5,
48:4, 63:20, 112:3,
141:9
setting [1] - 76:13
settle [3] - 74:8, 152:6,
152:7
settled [3] - 7:22,
116:14, 151:12
settlement [21] -
14:20, 17:8, 22:18,
22:21, 25:8, 26:21,
27:17, 27:23, 28:5,
29:17, 33:22, 40:4,
78:22, 79:23, 94:5,
94:6, 103:12, 105:1,
105:2, 105:5, 135:2
settlements [1] -
77:25
seven [3] - 45:24,
91:14, 136:17
seven-page [1] -
136:17
several [7] - 61:18,
62:16, 66:20, 73:2,
78:13, 92:6, 124:15
shadow [1] - 128:5
shadowing [2] -
128:14, 128:17
shall [1] - 58:20
share [3] - 8:21, 21:2,
100:23

SharePoint [1] - 36:8
sheet [1] - 36:18
Sher [3] - 95:16, 96:2,
96:9
shock [1] - 116:24
shocking [1] - 108:9
Shoreline [2] - 142:12,
143:1
short [4] - 24:1, 69:17,
79:25, 124:8
short-term [1] - 79:25
shortly [2] - 15:2, 83:8
shoulder [1] - 128:18
show [30] - 50:22,
59:21, 61:4, 61:7,
62:23, 69:2, 71:12,
74:25, 76:20, 86:19,
86:21, 92:9, 93:8,
95:10, 95:17,
133:24, 134:5,
134:13, 135:24,
136:8, 136:20,
137:19, 137:24,
138:6, 138:8, 139:5,
139:11, 146:20,
148:14, 148:16
showed [3] - 67:7,
94:20, 126:9
showing [1] - 146:14
shown [2] - 116:3,
116:4
shows [1] - 136:12
side [8] - 25:22, 25:23,
26:11, 26:12,
124:16, 130:24,
131:2
sidebar [2] - 124:1,
124:13
sides [1] - 26:1
sign [5] - 59:19, 60:7,
145:13, 145:15,
145:22
signature [6] - 60:15,
61:13, 61:14, 62:14,
147:12, 147:14
signed [18] - 50:18,
50:19, 51:5, 56:22,
58:8, 58:12, 60:18,
61:16, 62:12, 69:7,
72:10, 83:19,
145:19, 146:5,
147:16, 147:19,
148:9, 148:15
signing [1] - 146:1
similar [1] - 99:10
single [1] - 41:11
sit [18] - 16:16, 16:23,
23:15, 23:17, 29:19,
40:24, 66:11, 66:14,
66:22, 67:16, 87:24,

113:11, 113:17,
113:20, 114:25,
117:6, 125:2, 126:18
site [2] - 64:17, 125:14
sites [1] - 100:19
sitting [1] - 118:17
situation [5] - 25:24,
44:2, 64:24, 114:7,
149:21
situations [3] - 11:5,
56:12, 94:22
six [2] - 93:13, 93:14
Slidell [1] - 146:23
slogan [1] - 99:2
slow [1] - 130:7
slowed [1] - 36:20
small [5] - 14:9, 15:20,
21:19, 64:19, 106:18
smart [3] - 97:17,
106:17, 107:11
SmithStag [1] - 97:6
software [1] - 36:8
sole [2] - 7:23, 23:2
solving [1] - 46:14
some-odd [1] - 91:14
someone [6] - 56:2,
65:1, 76:4, 98:12,
129:24, 137:12
sometime [3] - 15:6,
47:4, 99:20
sometimes [3] - 18:6,
35:21, 84:3
somewhat [2] - 23:8,
36:21
somewhere [2] -
137:2, 138:4
son [2] - 8:8, 31:9
soon [2] - 27:18,
130:5
sorry [13] - 5:19,
14:17, 49:18, 83:3,
86:8, 86:12, 88:17,
89:8, 110:14,
115:12, 125:16,
134:2, 147:24
sort [14] - 9:16, 10:21,
18:1, 20:1, 25:6,
25:13, 55:1, 64:24,
65:23, 90:22,
101:21, 127:9,
130:7, 131:23
sorts [1] - 23:14
sound [2] - 91:10,
112:24
sounds [7] - 23:25,
41:21, 112:15,
113:3, 140:17,
141:1, 142:25
source [2] - 79:5,
131:13

space [8] - 20:21,
21:7, 121:15,
121:17, 121:19,
121:21, 123:1, 141:4
spaces [2] - 20:14,
34:4
speaking [1] - 120:6
SPECIAL [2] - 1:11,
1:14
Special [3] - 4:18,
5:14, 15:3
special [3] - 4:23,
31:20, 48:6
specialized [2] -
18:21, 29:8
specific [6] - 41:8,
56:19, 59:15, 70:18,
81:25, 131:9
specifically [14] -
16:7, 16:10, 20:6,
29:24, 46:24, 56:1,
75:16, 75:17, 75:24,
90:14, 101:22,
111:8, 114:1, 114:2
specifics [1] - 78:9
specify [2] - 75:13,
87:8
speculating [1] -
108:7
speculations [1] -
149:20
spelled [2] - 15:15,
36:10, 128:22
spend [2] - 23:22,
31:22
spent [1] - 26:20
spill [3] - 90:21, 90:22,
97:20
SPILL [1] - 1:4
split [1] - 90:24
spoken [2] - 68:1,
68:13
sponte [1] - 30:19
spreadsheet [5] -
34:1, 34:6, 125:24,
127:3
spreadsheets [4] -
33:16, 34:25, 36:18
spring [1] - 14:17
SSN [1] - 29:1
staff [2] - 123:1, 123:9
staffed [1] - 44:8
stand [1] - 130:24
standing [1] - 6:9
stands [2] - 94:11,
94:13
start [13] - 4:21, 5:6,
5:22, 8:3, 20:3, 29:7,
46:25, 47:3, 63:10,
78:15, 87:4, 93:20

started [24] - 6:1, 7:3,
7:23, 8:11, 9:11,
9:18, 9:23, 9:24,
14:15, 18:14, 29:7,
33:16, 33:17, 34:6,
42:12, 47:6, 62:16,
71:12, 75:23,
102:11, 102:18,
107:12, 135:1, 143:5
starting [1] - 60:7
starts [4] - 41:3, 41:4,
93:3, 93:4
State [4] - 137:22,
140:20, 142:16,
154:16
state [7] - 4:7, 39:7,
140:20, 140:22,
142:17, 143:21,
144:6
statement [5] - 5:1,
5:2, 83:20, 141:20,
151:2
STATEMENT [1] -
1:10
statements [2] -
152:21, 152:23
States [3] - 60:25,
154:16, 154:22
STATES [1] - 1:1
status [4] - 84:20,
85:9, 114:12, 115:6
stay [6] - 9:9, 12:16,
17:7, 49:25, 64:20,
81:13
stay-at-home [1] - 9:9
stayed [4] - 8:9, 12:24,
109:17, 144:24
Steering [1] - 11:6
steering [1] - 85:16
Steilberg [1] - 122:15
STENOGRAPHY [1] -
1:24
step [2] - 41:17, 78:17
Stephen [3] - 86:25,
92:13, 93:17
stepped [1] - 130:22
steps [1] - 144:22
STEVE [1] - 1:14
Steve [2] - 4:6, 94:7
still [5] - 8:14, 17:22,
26:17, 120:15
stood [1] - 130:2
stop [1] - 16:5
straightforwardness
[1] - 39:13
streamlined [1] -
35:10
Street [11] - 103:23,
104:1, 105:23,
133:11, 136:23,

139:16, 139:24, 141:3, 146:23, 147:20, 148:6
**STREET** [1] - 1:22
**street** [2] - 78:22, 110:1
**stretch** [1] - 110:1
**strike** [1] - 71:1
**string** [5] - 77:15, 82:12, 82:16, 92:10, 94:19
**structured** [1] - 77:25
**student** [1] - 13:21
**studied** [1] - 27:17
**stuff** [3] - 11:13, 20:18, 40:2
**stupid** [1] - 106:15
**sua** [1] - 30:19
**subject** [10] - 38:6, 52:5, 57:22, 63:3, 77:3, 87:2, 93:9, 95:16, 96:2, 119:23
**submission** [1] - 71:21
**submitted** [2] - 83:20, 137:14
**subsequent** [1] - 91:24
**subsequently** [1] - 82:8
**subsistence** [3] - 72:25, 73:3, 73:6
**substantive** [1] - 7:17
**subtract** [1] - 40:11
**successful** [1] - 129:9
**suffer** [1] - 130:12
**suffered** [1] - 19:8
**sufficient** [1] - 25:13
**suggested** [1] - 33:22
**suggesting** [2] - 35:9, 113:7
**suggestions** [2] - 39:10, 111:13
**Suite** [1] - 4:11
**suits** [1] - 7:25
**summer** [2] - 31:21, 99:6
**supervised** [4] - 58:25, 59:5, 66:7, 67:14
**supervising** [2] - 7:6, 25:6
**supplies** [1] - 117:17
**supply** [2] - 42:18, 117:15
**support** [3] - 11:22, 32:8, 43:1
**supposed** [9] - 100:16, 107:13, 108:12, 108:23,

110:4, 110:17, 110:24, 112:12, 113:1
**surfacing** [1] - 127:13
**surprise** [1] - 116:24
**surprised** [1] - 17:12
**surrounding** [1] - 4:20
**Susan** [6] - 43:15, 43:20, 65:1, 65:3, 65:4
**Sutton** [26] - 8:17, 9:12, 9:14, 9:15, 9:17, 9:18, 9:22, 10:8, 10:11, 10:14, 75:6, 87:1, 92:14, 93:3, 94:21, 95:14, 96:1, 122:8, 123:1, 140:19, 140:24, 141:11, 141:18, 143:14
**SWAT** [2] - 128:23, 131:22
**SWAT-team** [1] - 128:23
**swear** [1] - 5:8
**SWORN** [1] - 1:10
**sworn** [1] - 5:13
**system** [5] - 33:14, 35:16, 37:2, 37:16, 81:23
**systematic** [1] - 130:11

---

# T

**T-Blue** [3] - 142:5, 142:9, 143:4
**T-Bob** [1] - 19:25
**TAKEN** [1] - 1:11
**talks** [1] - 145:9
**Tammy** [3] - 43:17, 43:24, 43:25
**Tampa** [1] - 142:24
**tangent** [1] - 131:25
**task** [2] - 28:9, 55:12
**tax** [6] - 8:24, 39:7, 102:1, 102:6, 153:7, 153:16
**team** [4] - 29:14, 48:12, 128:19, 128:23
**teams** [5] - 29:6, 29:8, 29:9, 38:16, 46:9
**technologically** [1] - 89:5
**technology** [4] - 98:12, 98:16, 99:9, 99:10
**templates** [1] - 33:19

**temporarily** [2] - 19:9, 150:21
**ten** [3] - 18:5, 19:3, 69:12
**ten-minute** [1] - 69:12
**tenants** [2] - 13:2, 20:17
**tense** [1] - 12:23
**tent** [1] - 130:4
**term** [1] - 79:25
**terminate** [3] - 132:4, 132:21
**terminated** [5] - 16:12, 74:22, 76:14, 97:23, 131:14
**terms** [17] - 10:7, 26:21, 27:2, 27:14, 28:5, 32:4, 39:23, 40:10, 48:23, 51:4, 55:3, 72:20, 72:21, 74:21, 95:2, 105:8, 110:9
**testified** [1] - 5:14
**testimony** [2] - 5:8, 150:10
**THE** [96] - 1:4, 1:5, 1:11, 5:11, 12:3, 13:14, 13:22, 45:9, 45:12, 45:17, 48:16, 53:18, 53:23, 58:5, 59:24, 63:15, 67:24, 68:1, 68:4, 68:6, 68:8, 68:11, 68:16, 69:10, 73:9, 73:13, 73:18, 75:8, 75:18, 81:6, 84:1, 84:4, 86:3, 86:8, 86:16, 87:12, 88:13, 90:1, 90:4, 90:8, 91:8, 91:15, 93:6, 93:18, 94:15, 95:23, 98:5, 104:4, 117:11, 117:16, 117:19, 117:24, 118:5, 118:10, 118:19, 118:22, 118:25, 119:5, 119:10, 119:13, 123:3, 123:5, 123:11, 124:23, 124:25, 125:4, 125:10, 125:17, 125:19, 126:6, 126:8, 126:23, 127:1, 127:4, 127:20, 128:19, 129:19, 129:22, 131:4, 131:8, 131:16, 131:19, 132:22, 135:14, 137:11,

143:12, 143:23, 144:4, 144:8, 146:11, 147:23, 147:25, 149:15, 149:17, 153:2, 153:24
**theirs** [2] - 72:6, 153:17
**themselves** [3] - 7:15, 31:6, 94:23
**theories** [2] - 129:1, 131:10
**thereafter** [2] - 15:2, 111:9
**thinking** [3] - 24:25, 42:20, 56:2
**thinks** [2] - 106:15, 106:17
**third** [2] - 66:21, 71:2
**THIS** [1] - 1:8
**Thonn** [37] - 16:19, 16:23, 69:6, 69:7, 71:24, 72:19, 74:17, 75:2, 75:15, 75:20, 81:2, 85:22, 86:2, 86:15, 96:22, 104:13, 104:18, 104:21, 104:23, 105:10, 108:19, 119:17, 119:20, 120:24, 126:5, 134:22, 136:22, 136:23, 137:5, 146:22, 147:10, 148:17, 148:21, 149:14, 150:3, 151:17
**Thonn's** [1] - 105:15
**thousand** [1] - 30:16
**three** [9] - 8:9, 9:2, 9:3, 19:2, 26:20, 87:6, 98:11, 153:7, 153:16
**three-page** [1] - 87:6
**throughout** [1] - 81:15
**Thursday** [1] - 95:25
**TIDWELL** [86] - 1:14, 12:2, 13:21, 45:7, 45:11, 45:15, 53:20, 57:3, 57:7, 57:18, 60:24, 63:2, 63:14, 67:21, 67:25, 68:3, 68:5, 68:7, 68:9, 68:14, 68:17, 69:5, 73:7, 73:11, 73:16, 75:6, 75:17, 77:1, 81:4, 83:13, 83:18, 83:25, 84:2, 85:19, 86:25, 87:10, 89:24, 90:2, 90:6, 90:17,

91:5, 91:13, 92:13, 92:18, 92:20, 92:24, 93:3, 93:15, 94:14, 95:14, 95:21, 95:24, 98:3, 106:8, 117:14, 117:18, 117:20, 118:2, 118:6, 118:11, 118:20, 118:24, 119:2, 119:7, 119:11, 119:15, 124:19, 124:22, 124:24, 125:1, 125:12, 125:18, 125:20, 125:22, 126:1, 126:7, 126:19, 126:25, 127:2, 135:15, 136:12, 144:9, 146:7, 153:1, 154:4, 154:7
**Tidwell** [1] - 4:6
**tied** [1] - 79:7
**Tiger** [13] - 14:4, 19:11, 19:16, 64:25, 87:19, 96:15, 96:19, 106:11, 106:15, 106:19, 107:2, 107:20, 121:23
**tiger** [1] - 19:22
**Tiger's** [5] - 106:16, 108:11, 108:15, 112:11, 112:25
**tight** [2] - 23:16, 23:17
**Tim** [5] - 16:19, 17:6, 75:20, 98:9, 148:15
**timely** [1] - 129:25
**Title** [3] - 5:4, 39:4, 50:1
**title** [4] - 31:19, 39:7, 48:22, 138:20
**TO** [1] - 1:8
**to's** [1] - 88:5
**tobacco** [3] - 6:22, 7:11, 7:21
**today** [20] - 5:9, 16:24, 57:24, 62:24, 66:11, 66:15, 66:22, 67:15, 87:24, 113:11, 113:17, 113:20, 114:25, 117:6, 123:25, 125:2, 139:20, 139:24, 142:14, 153:19
**together** [15] - 12:1, 12:5, 12:8, 28:24, 36:15, 67:17, 90:9, 90:20, 100:2, 104:9, 120:5, 133:7, 135:20, 138:20
**took** [11] - 33:10,

36:19, 51:11, 51:17, 74:3, 74:12, 84:19, 121:10, 124:12, 130:6, 144:22
**TOOLOULA** [1] - 16:22
**Tooloula's** [1] - 16:22
**tools** [1] - 36:4
**top** [8] - 60:12, 62:9, 93:1, 126:5, 147:16, 148:7
**Torres** [3] - 95:16, 95:22, 95:25
**toward** [4] - 129:17, 129:18, 129:20, 129:23
**town** [1] - 20:20
**track** [3] - 25:5, 35:14, 36:5
**tracker** [2] - 35:11, 35:16
**tracking** [1] - 42:2
**Tracy** [1] - 122:15
**Trading** [2] - 140:15, 140:23
**train** [2] - 8:1, 76:22
**TRANSCRIPT** [1] - 1:24
**transcript** [1] - 154:17
**transcripts** [1] - 92:5
**transferred** [1] - 94:24
**transfers** [1] - 93:17
**transition** [4] - 58:24, 67:13, 81:10, 105:5
**transparent** [1] - 26:13
**treat** [1] - 150:18
**tried** [5] - 9:8, 9:16, 36:12, 39:25, 131:12
**true** [2] - 66:9, 154:17
**truth** [3] - 5:9, 5:10
**try** [7] - 29:7, 29:10, 29:11, 34:9, 34:11, 90:15, 117:21
**trying** [23] - 23:13, 46:16, 46:23, 74:8, 78:13, 79:13, 83:25, 89:10, 94:3, 94:4, 97:15, 108:7, 113:12, 114:17, 114:21, 115:4, 116:8, 116:10, 116:12, 120:19, 126:1, 128:24, 131:19
**Tuesday** [3] - 87:1, 92:14, 95:15
**tuition** [1] - 111:1
**Tulane** [6] - 6:4, 6:6, 13:8, 13:9, 14:1,

17:22
**turn** [2] - 21:22, 130:18
**turned** [1] - 7:4
**turning** [1] - 28:16
**two** [38] - 7:20, 9:1, 9:4, 14:5, 15:14, 19:7, 19:14, 24:20, 26:19, 27:5, 28:22, 31:13, 31:22, 34:4, 38:23, 40:22, 47:7, 62:11, 63:11, 71:13, 71:14, 74:17, 81:25, 82:16, 90:8, 90:21, 93:4, 104:3, 109:12, 115:6, 117:5, 120:19, 138:3, 149:25
**two-page** [2] - 62:11, 63:11
**type** [26] - 6:18, 10:15, 10:16, 10:22, 14:22, 25:10, 31:16, 34:19, 46:2, 48:21, 49:20, 55:8, 55:23, 56:3, 84:22, 89:18, 91:1, 96:18, 122:17
**types** [2] - 42:8, 46:9, 83:19
**typing** [1] - 34:22

**U**

**ultimately** [4] - 34:13, 50:11, 129:6, 132:4
**unaware** [1] - 73:6
**uncomfortable** [1] - 100:7
**under** [7] - 4:22, 5:2, 5:6, 7:24, 34:16, 89:22, 108:8
**understood** [3] - 16:1, 102:23, 102:24
**Undertaking** [2] - 57:7, 58:8
**undertaking** [2] - 60:6, 67:8
**underway** [1] - 27:16
**United** [3] - 60:25, 154:16, 154:22
**UNITED** [1] - 1:1
**universe** [2] - 38:11, 79:14
**University** [2] - 6:3, 6:4
**unless** [3] - 136:12, 145:19
**unnecessary** [1] - 132:16

**unpleasant** [2] - 127:16, 127:18
**unrelated** [1] - 74:18
**unsigned** [1] - 146:21
**unusual** [1] - 19:23
**up** [59] - 8:14, 20:12, 22:15, 23:13, 26:2, 28:14, 28:20, 29:12, 30:1, 31:16, 33:17, 34:10, 34:11, 35:7, 37:20, 46:5, 48:14, 55:7, 67:21, 72:10, 76:13, 78:15, 79:4, 79:13, 83:23, 84:6, 89:25, 92:24, 94:4, 98:14, 99:11, 99:13, 100:17, 100:18, 100:24, 104:22, 106:25, 110:23, 111:4, 119:23, 120:13, 124:19, 128:24, 128:25, 129:8, 130:4, 130:8, 130:9, 130:13, 131:10, 134:3, 137:13, 141:9, 144:6, 144:19, 148:6, 149:10
**update** [2] - 38:6, 114:13
**updated** [1] - 38:3
**upper** [1] - 127:19
**upper-level** [1] - 127:19

**V**

**vacuum** [2] - 30:7, 30:8
**vantage** [1] - 25:19
**various** [2] - 7:25, 101:8
**vast** [1] - 26:23
**Vegas** [3] - 98:23, 99:4, 103:20
**vendors** [23] - 23:14, 35:8, 35:21, 37:17, 55:4, 55:8, 55:11, 56:5, 66:6, 68:20, 70:2, 70:9, 128:5, 128:9, 128:17, 129:3, 129:17, 129:18, 129:19, 129:20, 130:24, 131:7, 132:15
**vendors'** [1] - 128:7
**venture** [4] - 99:18, 100:4, 100:5, 109:14
**ventures** [2] - 98:15,

107:8
**verbatim** [1] - 120:8
**verification** [1] - 29:1
**versa** [2] - 19:14, 127:17
**vessel** [2] - 73:3, 73:6
**vice** [3] - 19:14, 63:24, 127:17
**view** [1] - 66:18
**views** [2] - 30:6, 30:8
**violation** [1] - 5:4
**violations** [1] - 70:4
**Vioxx** [2] - 7:25, 8:11
**visit** [2] - 20:24, 72:24
**vocal** [1] - 96:17
**VOO** [4] - 79:20, 135:12, 135:13, 151:11

**W**

**wait** [2] - 34:8, 153:25
**waiting** [4] - 129:24, 152:6, 152:12
**walked** [2] - 117:2, 151:6
**Walker** [2] - 140:6, 140:7
**walking** [4] - 26:21, 112:2
**wall** [1] - 21:2
**Walter** [1] - 7:8
**wasting** [1] - 106:18
**water** [2] - 98:1, 98:13
**website** [1] - 144:6
**weeds** [2] - 33:21, 33:24
**week** [1] - 31:22
**weekly** [1] - 36:24
**weeks** [1] - 34:18
**weird** [1] - 12:23
**Welker** [2] - 70:13, 105:25
**Welker's** [2] - 17:2, 138:5
**wetland** [1] - 39:8
**wetlands** [4] - 38:22, 38:24, 39:1, 39:2
**whatnot** [3] - 29:2, 35:21, 132:17
**whatsoever** [2] - 112:22, 116:23
**WHEREUPON** [25] - 57:5, 59:22, 61:10, 62:25, 69:3, 69:14, 75:4, 76:24, 83:16, 86:23, 92:11, 93:11, 95:12, 95:19, 112:8, 124:10, 133:25,

134:14, 135:21, 136:14, 137:16, 146:16, 147:5, 148:11, 154:9
**whiteboards** [1] - 20:19
**whole** [7] - 5:9, 30:4, 103:16, 118:1, 124:3, 130:4, 149:21
**wife** [1] - 46:6
**Wire** [1] - 87:2
**wire** [2] - 92:15, 93:17
**wired** [2] - 89:2, 89:13
**wires** [1] - 80:20
**wiring** [1] - 89:7
**wish** [2] - 82:5, 153:20
**wished** [1] - 78:10
**witness** [1] - 5:13
**WITNESS** [93] - 5:11, 12:3, 13:14, 13:22, 45:9, 45:12, 45:17, 48:16, 53:18, 53:23, 58:5, 59:24, 63:15, 67:24, 68:1, 68:4, 68:6, 68:8, 68:11, 68:16, 69:10, 73:9, 73:13, 73:18, 75:8, 75:18, 81:6, 84:1, 84:4, 86:3, 86:8, 86:16, 87:12, 88:13, 90:1, 90:4, 90:8, 91:8, 91:15, 93:6, 93:18, 94:15, 95:23, 98:5, 104:4, 117:11, 117:16, 117:19, 117:24, 118:5, 118:10, 118:19, 118:22, 118:25, 119:5, 119:10, 119:13, 123:3, 123:5, 123:11, 124:23, 124:25, 125:4, 125:10, 125:17, 125:19, 126:6, 126:8, 126:23, 127:1, 127:4, 127:20, 128:19, 129:19, 129:22, 131:4, 131:8, 131:16, 131:19, 132:22, 135:14, 137:11, 143:12, 143:23, 144:4, 144:8, 146:11, 147:23, 147:25, 149:15, 149:17, 153:2, 153:24
**Witness** [9] - 58:5, 61:5, 69:10, 77:11,

81:18, 87:12, 93:6,
96:8, 143:12
**witnesses** [1] - 5:5
**woman** [2] - 38:25,
49:15
**wonderful** [1] - 98:18
**wondering** [1] - 24:25
**word** [6] - 21:4, 21:19,
50:8, 50:10, 104:12
**words** [10] - 28:15,
70:7, 76:4, 104:16,
104:23, 108:16,
113:3, 116:15,
121:18, 151:3
**works** [2] - 84:3,
122:15
**worry** [3] - 44:7,
53:18, 54:24
**write** [5] - 7:15, 41:15,
53:5, 115:3, 126:18
**writing** [3] - 7:5,
10:20, 40:21
**written** [7] - 58:21,
118:3, 118:4,
118:12, 118:14,
145:11, 146:15
**wrote** [5] - 41:10,
41:11, 74:25, 79:23,
116:20

**Y**

**y'all** [1] - 73:16
**year** [16] - 6:6, 7:18,
8:12, 12:25, 13:6,
14:4, 14:18, 14:19,
16:2, 20:16, 37:13,
87:8, 87:11, 88:12,
110:9
**years** [6] - 8:9, 14:5,
19:7, 122:16, 153:7,
153:16
**youngest** [1] - 8:8
**yourself** [10] - 10:11,
21:12, 32:7, 33:1,
39:16, 50:19, 96:20,
96:24, 97:2, 106:3

**Z**

**Zola** [3] - 68:2, 68:3,
68:7

**C O N F I D E N T I A L**

**SM-02-JA00879**

SM-02-JA00880

**EXHIBITS SHOWN TO CHRISTINE REITANO IN INTERVIEW WITH SPECIAL MASTER
LOUIS J. FREEH ON JULY 29, 2013**

[Produced from handwritten notes taken during the interview by Michael S. McCall, Senior Consultant,
Freeh Group International Solutions]

| Sequence | Exhibit No. | DESCRIPTION |
|---|---|---|
| 1 | 02B | "Undertaking of Christine Reitano in Furtherance of Court's Order Appointing Claims Administrator" dated April 18, 2012 |
| 2 | 02D | "Certification Regarding Confidentiality of Claims Information" bearing signature of Christine Reitano and dated July 18, 2012 |
| 3 | 02D1 | Deepwater Horizon Claims Center forms: "Confidentiality/Non-Disclosure Agreement;" "Conflict of Interest and Recusal;" "Gifts, Entertainment and Gratuities" and "Definitions For Contractor Policies," each bearing signature of Christine Reitano and dated July 17, 2012 |
| 4 | 03 | E-mail exchange between Christine Reitano and Jennifer Keough, subject "Re: Sarasota" dated June 29 through July 1, 2012 |
| 5 | 02B | [Shown to The Witness again] "Undertaking of Christine Reitano in Furtherance of Court's Order Appointing Claims Administrator" dated April 18, 2012 |
| 6 | 02 | Gulf Coast Claims Facility "Client Authorization Form" pertaining to representation of Casey Thonn, Claimant ID no. 1060469, by Christine Reitano bearing a signature and handwritten date "10/14/11" |
|  |  | BREAK |
| 7 | 02 | [Shown to The Witness again following break] Gulf Coast Claims Facility "Client Authorization Form" pertaining to representation of Casey Thonn, Claimant ID no. 1060469, by Christine Reitano bearing a signature and handwritten date "10/14/11" |
| 8 | 02A | Letter on Sutton and Reitano letterhead to Gulf Coast Claim Facility dated March 30, 2012 re GCCF Claim No. 1060469, bearing signature of Christine Reitano |
| 9 | 04 | Series of e-mails among Lynn Greer, Christine Reitano, Jennifer Keough and Matt Lundy, all dated September 17, 2012 and captioned "Expedited Claims" |
| 10 | 04A | Undated, untitled chart depicting claim information for 13 claimants, beginning with Janice Barnett and ending with Bruce Strong |
| 11 | 05 | Series of e-mails among Christine Reitano, Stephen Cirami and Lionel Sutton, all dated June 11, 2013 and captioned "Wire payment" |
| 12 | 05A | Series of e-mails among Christine Reitano, Stephen Cirami and Lionel Sutton, all dated June 11, 2013 and captioned "Wire payment" [Includes same e-mails as Exhibit 05, with additional e-mails on which Reitano was not copied.] |
| 13 | 05B | Series of e-mails between Christine Reitano, Stephen Cirami and Keith Moskowitz, all dated January 28, 2013 and captioned "Wire Transfers" |
| 14 | 05A | [Shown to The Witness again] Series of e-mails among Christine Reitano, Stephen Cirami and Lionel Sutton, all dated June 11, 2013 and captioned "Wire payment" [Includes same e-mails as Exhibit 05, with additional e-mails on which Reitano was not copied.] |
| 15 | 06 | Series of e-mails between Katherine Torres and Lionel Sutton (Mark Staley copied on the initial e-mail only), all dated June 4, 2013 and captioned "Sher Garner Claim" |

1

**SM-02-JA00881**

| Sequence | Exhibit No. | DESCRIPTION |
|---|---|---|
| 16 | 06A | E-mail from Katherine Torres to Lionel Sutton (Charles R. Hacker copied), dated June 20, 2013 and captioned "Sher Garner" |
| 17 | 01 | Summary of June 20, 2013 interview of Christine Reitano by Michael Juneau et. al. [Excerpts were read aloud to The Witness, but the document was not shown to The Witness.] |
| 18 | 07 | Letter on Andry Lerner LLC letterhead dated August 14, 2012 from Leslie B. Tate to Deepwater Horizon Economic Claims Center, re Claimant ID No. 100051739, Casey Thonn (with enclosures) |
| 19 | 08 | Letter on Andrey Lerner LLC letterhead dated July 30, 2012 from Leslie B. Tate to Deepwater Horizon Economic Claims Center, re Claimant ID No. 100051739, Casey Thonn (with enclosures) |
| 20 | 07A | Printout of undated webpage from Bizapedia.com containing corporate registry information regarding Andry Lerner, LLC (contains notation, "Information current as of Mar 11, 2012") |
| 21 | 09 | Seven-page website printout bearing logo of Deepwater Horizon Claims Center with Claimant Details regarding Claimant ID 100051739, Casey Thonn |
| 22 | 10 | One-page website printout of corporate registry information regarding Monster Demolition, L.L.C. |
| 23 | 11 | Two-page State of Louisiana Secretary of State website printout containing corporate registry information regarding CROWN, LLC |
| 24 | 12 | Seventeen-page packet of State of Louisiana Secretary of State website printouts containing corporate registry information regarding SDA Enterprises, LLC; Can U Hear Me Now, L.L.C. and eight other corporate entities |
| 25* | 13 | Letter dated March 13, 2012 from Christine Reitano to Casey Thonn regarding GCCF Claim No. 1060469 [Document presented by The Witness' counsel] |
| 26* | 14 | Retainer Agreement of Christine Reitano to represent Casey Thonn, dated at Slidell, Louisiana March 16, 2011[Document presented by The Witness' counsel] |
| 27* | 15 | Letter on Sutton & Reitano letterhead dated March30, 2012 from Christine Reitano to Tim Gonzales [Document presented by The Witness' counsel] |

*The preparer of the above list is not certain of the order in which Exhibits 13, 14 and 15 were shown to The Witness.  These three Exhibits were the last three Exhibits shown to The Witness.

2

SM-02-JA00882