```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2


 3     ****************************************************************

 4     IN RE:  OIL SPILL BY THE
       OIL RIG DEEPWATER HORIZON
 5     IN THE GULF OF MEXICO ON
       APRIL 20, 2010
 6                              CIVIL ACTION NO. 10-MD-2179 "J"
                                NEW ORLEANS, LOUISIANA
 7                              MONDAY, JULY 29, 2013, 3:00 P.M.

 8     THIS RELATES TO ALL CASES

 9     ****************************************************************

10
            SWORN STATEMENT OF LIONEL "TIGER" SUTTON, III, ESQ.
11             TAKEN BEFORE THE HONORABLE LOUIS J. FREEH
                              SPECIAL MASTER
12

13     APPEARANCES:

14                         LOUIS J. FREEH, SPECIAL MASTER
                           BENJAMIN SCOTTI, ESQUIRE
15                         STEVE TIDWELL

16
                           LEE & WALSH
17                         MICHAEL S. WALSH, ESQUIRE
                           257 MAXIMILIAN STREET
18                         BATON ROUGE LA  70802
                           (ATTORNEY FOR LIONEL SUTTON, III, ESQ.)
19

20
       OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
21                                 CERTIFIED REALTIME REPORTER
                                   REGISTERED MERIT REPORTER
22                                 500 POYDRAS STREET, ROOM HB406
                                   NEW ORLEANS, LA  70130
23                                 (504) 589-7779
                                   Cathy_Pepper@laed.uscourts.gov
24
       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
25     PRODUCED BY COMPUTER.
```



**CONFIDENTIAL**

SM-02-JA00001

2

1                                    **I N D E X**

2
         EXAMINATIONS                                          PAGE
3

4                                                                6

5       **LIONEL "TIGER" SUTTON, III**..........................

6       EXAMINATION BY MR. FREEH.............................    6

7

8

9                                **E X H I B I T S**

10

11       DESCRIPTION                                           PAGE

12

13       EXHIBIT S-16 WAS MARKED..............................    57

14       EXHIBIT S-01 WAS MARKED..............................    73

15       EXHIBIT S-02 WAS MARKED..............................    74

16       EXHIBITS S-03 AND S-04 WERE MARKED...................    88

17       EXHIBIT S-04A WAS MARKED.............................    90

18       EXHIBIT S-04C WAS MARKED.............................    92

19       EXHIBIT S-05 WAS MARKED..............................    96

20       EXHIBIT S-06 WAS MARKED..............................    97

21       EXHIBIT S-06A WAS MARKED.............................    98

22       EXHIBIT S-07 WAS MARKED..............................    99

23       EXHIBIT S-08 WAS MARKED.............................. 104

24       EXHIBIT S-09 WAS MARKED.............................. 112

25       EXHIBIT S-09A WAS MARKED............................. 116

**OFFICIAL TRANSCRIPT**

SM-02-JA00002

1   EXHIBIT S-10 WAS MARKED.............................. 117

2   EXHIBIT S-11 WAS MARKED.............................. 140

3   EXHIBIT S-12 WAS MARKED.............................. 145

4   EXHIBIT S-13 WAS MARKED.............................. 147

5   EXHIBIT S-13A WAS MARKED............................. 152

6   EXHIBIT S-14 WAS MARKED.............................. 159

7   EXHIBIT S-15 WAS MARKED.............................. 161

8   EXHIBIT S-16A WAS MARKED............................. 163

9   EXHIBIT S-17 WAS MARKED.............................. 168

10  EXHIBIT 18 WAS MARKED................................ 172

11  EXHIBIT S-18A WAS MARKED............................. 184

12  EXHIBIT S-21 WAS MARKED.............................. 197

13  EXHIBIT S-19 WAS MARKED.............................. 207

14

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**

SM-02-JA00003

4

| | | |
|---|---|---|
| | 1 | **P-R-O-C-E-E-D-I-N-G-S** |
| | 2 | MONDAY, JULY 29, 2013 |
| | 3 | |
| 03:13PM | 4 | |
| 03:13PM | 5 | MR. FREEH:  Good afternoon.  Sorry to have delayed |
| 03:13PM | 6 | you.  Our interview and then our lunch break went a little bit |
| 03:13PM | 7 | longer than we thought.  So we appreciate your patience, and we |
| 03:13PM | 8 | appreciate your cooperation. |
| 03:13PM | 9 | So this is an interview.  I'm going to ask that |
| 03:13PM | 10 | you be put under oath in a second.  In connection with my |
| 03:13PM | 11 | appointment as Special Master by the Court, I think you've seen |
| 03:13PM | 12 | the Order, but it's to look at certain allegations regarding |
| 03:13PM | 13 | the administration of the claims process. |
| 03:13PM | 14 | Then, there is another part of the Order which |
| 03:14PM | 15 | tasks us to make certain recommendations. |
| 03:14PM | 16 | So what I wanted to do is introduce ourselves. |
| 03:14PM | 17 | I'm Louie Freeh.  Steve Tidwell is one of my partners. |
| 03:14PM | 18 | Ben Scotti is one of my partners, also. |
| 03:14PM | 19 | As you can observe, we have a court reporter who |
| 03:14PM | 20 | will be taking down the questions and answers.  If you want to |
| 03:14PM | 21 | go off the record for some reason, just indicate that.  We can |
| 03:14PM | 22 | take a break any time you want.  If is there a question you |
| 03:14PM | 23 | don't understand, please ask me to repeat it. |
| 03:14PM | 24 | We can probably do this in a couple of hours. |
| 03:14PM | 25 | We'll try to move through it with some efficiency; but, take |

**C O N F I D E N T I A L**

SM-02-JA00004

03:14PM 1   your time in answering the questions, and if you don't know the

03:14PM 2   answer to a certain question, just indicate that to us.

03:14PM 3           As a Court Master, I'm also functioning on

03:14PM 4   behalf of the Court as a judicial officer.  So your statements

03:15PM 5   to me obviously have to be true, complete, accurate, and not

03:15PM 6   intentionally misleading.  If they were to be otherwise, it

03:15PM 7   could be construed by the Court or someone else as a false

03:15PM 8   statement or admission, which would involve both contempt of

03:15PM 9   court and possibly violations of 18 U.S.C. 1001.

03:15PM 10          Any questions about that?

03:15PM 11          MR. WALSH:  Well, what do I need to do to get a copy

03:15PM 12  of the transcript of this?

03:15PM 13          MR. FREEH:  We will provide the transcripts to the

03:15PM 14  Court when we're finished, and the Court will make decisions as

03:15PM 15  to when to release them, if at all, to counsel; but, that will

03:15PM 16  be the Court's decision and not mine.

03:15PM 17          MR. WALSH:  I realize this is isn't your rule, but

03:15PM 18  I'm not really comfortable with that.  I think I ought to be

03:15PM 19  able to get a copy of the transcript, but --

03:15PM 20          MR. FREEH:  You'll have to take that up with the

03:16PM 21  Court.

03:16PM 22          MR. WALSH:  I will.  Thank you.

03:16PM 23          MR. FREEH:  So, Mr. Sutton, I'll administer an oath

03:16PM 24  to you now.  The oath is, do you swear that the testimony and

03:16PM 25  information you will give will be the truth, the whole truth

**C O N F I D E N T I A L**

03:16PM 1    and nothing but the truth, to the best of your ability and

03:16PM 2    recollection, so help you God?

03:16PM 3              THE WITNESS:  I do.

4                    **LIONEL "TIGER" SUTTON, III**

5    was called as a witness and, after being first duly sworn by

6    the Special Master, was examined and testified on his oath as

7    follows:

8                              EXAMINATION

9    BY MR. FREEH:

03:16PM 10   Q.   So let me start with your educational background.  If you

03:16PM 11   would, just tell us where you went to college, and then where

03:16PM 12   you went to law school, and then I'll lead you along through

03:16PM 13   your professional career after that.

03:16PM 14   A.   Undergraduate at LSU.  Law school at Tulane.

03:16PM 15   Q.   What year did you complete law school?

03:16PM 16   A.   '90.

03:16PM 17   Q.   That was with an equivalent of a JD, or a juris doctorate?

03:16PM 18   A.   It was a JD.

03:16PM 19   Q.   Could you just tell us what your first legal employment or

03:16PM 20   full-time legal employment was upon graduation from law school.

03:16PM 21   A.   It was -- the first one was I was hired by Juneau, Judice

03:17PM 22   Hill & Adley, which was Pat Juneau's firm at the time.

03:17PM 23   Q.   Approximately when was that?

03:17PM 24   A.   '90.

03:17PM 25   Q.   Where did you work with him?

                              **C O N F I D E N T I A L**

03:17PM 1    A.    Lafayette, Louisiana.

03:17PM 2    Q.    What was the nature of your work or association?

03:17PM 3    A.    Insurance defense.  I was an associate at the law firm.

03:17PM 4    Q.    How big a law firm was it?

03:17PM 5    A.    It had four named partners and maybe four or six

03:17PM 6    associates, maybe ten people.  I don't remember.

03:17PM 7    Q.    When you went to work there, you were a member of the

03:17PM 8    Louisiana Bar, if you recall?

03:17PM 9    A.    I think our bar scores came out in October.  I think we

03:17PM 10   started in September, but then you had to wait until your bar

03:17PM 11   score came out.  But whenever it came out, I was a member then.

03:17PM 12   Q.    You continue to be a member of the Louisiana Bar in good

03:17PM 13   standing today?

03:17PM 14   A.    Yes.

03:17PM 15   Q.    How long did you work at Mr. Juneau's firm?

03:18PM 16   A.    I don't remember exactly.  The firm split up at some

03:18PM 17   point, and that's when I left.  A number of associates left.

03:18PM 18          I've always thought in my mind that it was 1993, but

03:18PM 19   I don't know for sure; but, it was when the firm split up.

03:18PM 20   That's when I left.

03:18PM 21   Q.    Was he the principal attorney who hired you?

03:18PM 22   A.    Yes.  Well, I worked in his department, so -- I

03:18PM 23   interviewed with the whole firm.

03:18PM 24   Q.    After you concluded your work at his firm, did you remain

03:18PM 25   in contact with him?

**C O N F I D E N T I A L**

SM-02-JA00007

| | |
|---|---|
| 03:18PM 1 | A. Yes. |
| 03:18PM 2 | Q. Was that in terms of a professional relationship, social |
| 03:18PM 3 | or both? |
| 03:18PM 4 | A. Professional, really. I didn't really see him too much |
| 03:18PM 5 | social; but, I mean, if I would see him, we would say hi and |
| 03:18PM 6 | exchange pleasantries, so. |
| 03:18PM 7 | Q. The professional part, what, if anything, did you do with |
| 03:18PM 8 | him professionally after you left the firm? |
| 03:18PM 9 | A. I think, when I first left, he may have sent me some |
| 03:19PM 10 | business, but I don't remember. I remember vaguely something |
| 03:19PM 11 | like that. |
| 03:19PM 12 | Then, from then on, it was just if I had a case where |
| 03:19PM 13 | his firm was, you know, opposing counsel, then I would see him; |
| 03:19PM 14 | but, I don't think I ever had anything directly with him. |
| 03:19PM 15 | Q. When you left his law firm, where did you practice law, if |
| 03:19PM 16 | at all? |
| 03:19PM 17 | A. I opened up my own office in New Iberia, Louisiana, which |
| 03:19PM 18 | was about 20 miles away from Lafayette, where Pat had offices. |
| 03:19PM 19 | Q. Do you still have that office? |
| 03:19PM 20 | A. Not exactly. I still rent a small space in that office, |
| 03:19PM 21 | so that -- I'm from that area, so I have clients from there; |
| 03:19PM 22 | so, I do that so I can meet with clients. |
| 03:19PM 23 | At one point, I was in the office with, you know, all |
| 03:19PM 24 | the amenities, but now I just rent like a little office. |
| 03:19PM 25 | Q. Is that the address you use on some of the LLC's that |

**C O N F I D E N T I A L**

SM-02-JA00008

03:20PM 1   you've incorporated?

03:20PM 2   A.   I don't think so.  I don't think I've used that address;

03:20PM 3   but, that would be 110 East Pershing, New Iberia, Louisiana.

03:20PM 4   But I would have been there since 1993 in one form or another,

03:20PM 5   so it's possible that we used that address.

03:20PM 6   Q.   When did you stop practicing out of that office on a

03:20PM 7   full-time basis as a lawyer, approximately?

03:20PM 8   A.   I don't know exactly.  I started coming to New Orleans to

03:20PM 9   work on some breast implant cases, so it was during the breast

03:20PM 10   implant litigation.  Then, I just eventually moved mostly here.

03:20PM 11        I think it was, like, maybe '95, but I'm not

03:20PM 12   positive, but -- because we kept places in both.  You know, we

03:20PM 13   had an apartment here and a house there, and offices here and

03:20PM 14   there, so.

03:20PM 15   Q.   When you say we, you're referring to your wife --

03:20PM 16   A.   Yes.

03:20PM 17   Q.   -- Christine Reitano?

03:20PM 18   A.   Yes.  I don't think we were married at the time, but yes.

03:21PM 19   Q.   You met her in law school?

03:21PM 20   A.   Yes.

03:21PM 21   Q.   That was Tulane?

03:21PM 22   A.   Yes.

03:21PM 23   Q.   Was Jon Andry also there at the time?

03:21PM 24   A.   Yes.

03:21PM 25   Q.   Do you remember who you met first?

**C O N F I D E N T I A L**

03:21PM 1  A.   Jon.  We were in the same class.  Christine was a year

03:21PM 2  behind us.

03:21PM 3  Q.   Andry had a brother in law school around the same time?

03:21PM 4  A.   He was a year ahead of us.  Gibby.

03:21PM 5  Q.   You met him, I take it, during your course of time at the

03:21PM 6  school?

03:21PM 7  A.   Yes.

03:21PM 8  Q.   So when you say we then had a residence and an office

03:21PM 9  here, you were referring, again, to your wife, Christine?  In

03:21PM 10 New Orleans, when you moved the practice?

03:21PM 11 A.   Yes, yes.  But she wasn't -- she didn't practice with me

03:21PM 12 at that time.

03:21PM 13 Q.   Did you open up an office on Baronne Street?

03:21PM 14 A.   No.  First, like I said, I was doing breast implant.  So I

03:21PM 15 shared some space with -- I think it was called *Leger &*

03:21PM 16 *Mestayer* at the time, because they had breast implant class

03:22PM 17 cases.  So I started doing some work with them.

03:22PM 18        Mestayer's brother was the guy I rented space from in

03:22PM 19 New Iberia, so I knew them.

03:22PM 20        Then, eventually, they just kind of brought me in

03:22PM 21 there, and I would get a share of business I brought in.  Just

03:22PM 22 a typical plaintiff firm associate type relationship.

03:22PM 23        Then, I believe it was in 1996, I rented a space on

03:22PM 24 Canal Street.  I rented that space, still by myself, but there

03:22PM 25 was another lawyer in there, I think one upstairs and one

**C O N F I D E N T I A L**

SM-02-JA00010

03:22PM 1    downstairs.

03:22PM 2          Then, when I left there is when I went to

03:22PM 3    610 Baronne, but I don't know -- I don't know when we went to

03:22PM 4    610 Baronne.  I can't remember that.

03:22PM 5    Q.    When you had the office on Canal Street, do you recall the

03:22PM 6    names of the other lawyers who were in the building?

03:22PM 7    A.    Sean Alfortish.

03:22PM 8    Q.    How do you spell that, please?

03:22PM 9    A.    A-L-F-O-R-T-I-S-H, I think.  And Sal Brocato,

03:23PM 10   B-R-O-C-A-T-T-O [verbatim], I think.

03:23PM 11   Q.    Did you work in conjunction with them or have a formal

03:23PM 12   relationship?

03:23PM 13   A.    No formal relationship.  If one of them had a big case

03:23PM 14   that was going to trial and they needed somebody to second

03:23PM 15   chair, then we would work something out.

03:23PM 16          Sometimes we would do it from the beginning of a

03:23PM 17   case, but, you know, we each had our own business.  We would

03:23PM 18   just sometimes bring the other one in.

03:23PM 19   Q.    Could you describe in general terms the type of practice

03:23PM 20   you had?  I know you said sometimes you would do litigation.

03:23PM 21   A.    All litigation.

03:23PM 22   Q.    All litigation?

03:23PM 23   A.    Yes, it was a personal injury practice.

03:23PM 24   Q.    Were you involved at that time in any class action suits

03:23PM 25   on the plaintiff side?

**C O N F I D E N T I A L**

SM-02-JA00011

03:23PM 1   A.    I don't remember.

03:23PM 2   Q.    Did there come a time when you became involved in that

03:23PM 3   type of practice?

03:23PM 4   A.    Only when -- well, breast implant was a class action.  So

03:23PM 5   when things like that came up, I think -- sometimes I became

03:24PM 6   involved only to the extent that my wife would work in the

03:24PM 7   document depository or something and bill hourly.

03:24PM 8         Then at the end of the case, when they would do

03:24PM 9   the -- settle up and you would get a fee, you would get a fee

03:24PM 10  based on the hours you put in; but, it was always -- it wasn't

03:24PM 11  necessarily me doing it.  Sometimes it was my wife -- or most

03:24PM 12  of the time.

03:24PM 13  Q.    Would that be in the period after 1995?

03:24PM 14  A.    Yes.

03:24PM 15  Q.    So after you were gone from Canal Street and now on

03:24PM 16  Baronne Street?

03:24PM 17  A.    Well, I don't know when I went to Baronne.  I think I went

03:24PM 18  to Canal Street in 1996.  Then I don't know when I left

03:24PM 19  Canal Street and went to Baronne; but, it would have been

03:24PM 20  probably during both of those periods.

03:24PM 21  Q.    For approximately how long did you maintain a law office

03:24PM 22  on Baronne Street?

03:24PM 23  A.    Until I moved to 935 Gravier.  I don't --

03:25PM 24  Q.    Approximately?

03:25PM 25  A.    I mean, it was either 2000 -- or the beginning of '11,

**C O N F I D E N T I A L**

03:25PM  1    whenever -- I mean, either 2011 or the beginning of 2012.
03:25PM  2    Whenever the building opened up, I was the first tenant in
03:25PM  3    there because a friend of mine bought the building.
03:25PM  4    Q.   So going back to Baronne Street, were there other lawyers
03:25PM  5    that also used the building?
03:25PM  6    A.   Yes.  Initially, Sean Alfortish rented space from me in
03:25PM  7    that building.
03:25PM  8    Q.   He had come from Canal Street with you?
03:25PM  9    A.   Yeah.  I don't think he came at the same time, but then he
03:25PM 10    came.  But he just was there a couple of months, I think.
03:25PM 11          Then Jon Andry.  We had it kind of divided up.
03:25PM 12    Gibby Andry was on the first floor.  I don't think he had any
03:25PM 13    lawyers working with him there.  Jon Andry had the second
03:25PM 14    floor.  He may have had associates in and out; but, he was --
03:25PM 15    he was the lawyer there.  Then I was on the third floor.
03:25PM 16          I think Sean Alfortish was the only one that ever
03:26PM 17    rented any of that space from me -- oh, no, there was another
03:26PM 18    guy.  A guy, Mark Whitehead, rented some space in there from me
03:26PM 19    for a little while, too.
03:26PM 20    Q.   From your --
03:26PM 21    A.   From my third floor.
03:26PM 22    Q.   Your third floor.
03:26PM 23          Again, did you have any formal relationship with the
03:26PM 24    other lawyers in the building?
03:26PM 25    A.   Jon and Gibby and I owned the building together.  We

**C O N F I D E N T I A L**

SM-02-JA00013

03:26PM 1    bought the building together; so, yes, but -- in that regard.

03:26PM 2         Then we would do the same thing, like I told you with

03:26PM 3    the other lawyers; if we had cases that we were going to work

03:26PM 4    together or something like that, we would make an arrangement

03:26PM 5    for that case.

03:26PM 6    Q.   So you might make referrals to each other or work on each

03:26PM 7    other's matters on a nonformal basis, meaning you didn't have a

03:26PM 8    partnership agreement with them?

03:26PM 9    A.   Right.  Right.

03:26PM 10   Q.   Can you describe the types of matters that you would work

03:26PM 11   on in conjunction with them, not as a partner?

03:26PM 12   A.   At that time, I was -- well, I kind of divide it before

03:26PM 13   the hurricane and after the hurricane, because that was such a

03:26PM 14   big factor here.

03:26PM 15        Before the hurricane, I believe I was doing mostly

03:26PM 16   admiralty work, personal injury and some car wreck stuff.  I

03:27PM 17   didn't really -- I don't remember really doing anything with

03:27PM 18   them with that.  I may have referred a case to Gibby once or

03:27PM 19   something like that.

03:27PM 20        Then Jon came up with a cell phone class action,

03:27PM 21   where I think he was going to file a class action based on

03:27PM 22   rounding up the minutes in a contract.  I got involved in that

03:27PM 23   with him from the ground floor.  There were a number of lawyers

03:27PM 24   involved in that.

03:27PM 25        I don't know if we ever did any other -- I don't know

**C O N F I D E N T I A L**

SM-02-JA00014

03:27PM 1   if we had any other class actions together.  I don't recall.

03:27PM 2   Q.   The arrangements for the ownership or equity of the

03:27PM 3   building, how did that work?  Did you buy it initially

03:27PM 4   together?

03:27PM 5   A.   Yeah.  Well, we started an LLC, 610 Baronne, LLC, which

03:27PM 6   was the address.  We put up however much money we needed to put

03:28PM 7   the down payment, and we borrowed; and, then whatever we needed

03:28PM 8   to renovate the building.

03:28PM 9        Gibby was the manager, and he's the one that kind of

03:28PM 10  took care of all the building and everything.

03:28PM 11  Q.   Do you recall what the down payment was, approximately?

03:28PM 12  A.   I don't recall any of that.

03:28PM 13  Q.   The price of the building that you paid for it?

03:28PM 14  A.   I don't know for sure.  I seem to remember that maybe it

03:28PM 15  was something like six hundred thousand; but, by the time we

03:28PM 16  had it renovated, it was maybe eight hundred, but I don't know

03:28PM 17  for sure.

03:28PM 18  Q.   Were you each equal partners in the building -- or in the

03:28PM 19  corporation?

03:28PM 20  A.   For that corporation, for a while, yes.

03:28PM 21  Q.   There came a time when that changed?

03:28PM 22  A.   Yes.  I was having trouble just paying my share of the

03:28PM 23  cost of the building.  I was by myself and didn't really have

03:28PM 24  those kind of cases where I needed that much.

03:28PM 25       So, at some point, I signed over my interest in the

**C O N F I D E N T I A L**

03:29PM 1    building to Gibby and Jon; but, how they structured 610 Baronne

03:29PM 2    or anything after that, I don't know.  I just signed over my

03:29PM 3    interest to them; and, I signed it over with the understanding

03:29PM 4    that I could keep the third floor and stay there as long as I

03:29PM 5    wanted to.

03:29PM 6    Q.    As a tenant paying rent, or just as part of your

03:29PM 7    after-sale interest?

03:29PM 8    A.    Yeah.  Well, in exchange for giving them my interest, I

03:29PM 9    got to stay there without paying rent.

03:29PM 10   Q.    Did there come a time, to your knowledge, when the

03:29PM 11   building was sold, or did they maintain it as an asset or

03:29PM 12   property?

03:29PM 13   A.    I think at some point either Jon sold his interest to

03:29PM 14   Gibby or Gibby sold his interest to Jon, but I don't know.

03:29PM 15   Other than that, no, it didn't change hands.

03:29PM 16   Q.    Did you ever receive any proceeds from the sale or

03:29PM 17   disposition of their interest?

03:29PM 18   A.    No, I don't think so.  I don't think so.

03:30PM 19   Q.    There came a time then when you moved from Baronne Street

03:30PM 20   to your current location that you just described?

03:30PM 21   A.    Yes.

03:30PM 22   Q.    You think that was around 2011?

03:30PM 23   A.    It was after the spill, so I think sometime in 2011, yes,

03:30PM 24   I think so.

03:30PM 25   Q.    When you moved into Baronne Street and did the holding

**C O N F I D E N T I A L**

SM-02-JA00016

| | |
|---|---|
| 03:30PM 1 | company or real estate purchase with Andry [verbatim] and |
| 03:30PM 2 | Gibby, what was your relationship with Andry at that point, |
| 03:30PM 3 | social relationship? |
| 03:30PM 4 | A.   Well, we were all friends, both Andrys, but I was more |
| 03:30PM 5 | friends with Jon.  Jon and I were roommates at some point in |
| 03:30PM 6 | law school for a bit of time. |
| 03:30PM 7 | Q.   So you would consider yourself at that time very close |
| 03:30PM 8 | friends, very good friends? |
| 03:30PM 9 | A.   Yes.  Up until a certain point, we were very close |
| 03:30PM 10 | friends. |
| 03:30PM 11 | Q.   So I'll ask you about that certain point.  There came a |
| 03:30PM 12 | time when issues developed between you that changed your |
| 03:31PM 13 | relationship? |
| 03:31PM 14 | A.   With Jon Andry, yes. |
| 03:31PM 15 | Q.   Can you tell us about that? |
| 03:31PM 16 | A.   The cell phone case that I told you about, at some point I |
| 03:31PM 17 | think the big part of it settled, and you were supposed to get |
| 03:31PM 18 | a fee.  You had set fees for what you had originally did, and |
| 03:31PM 19 | then you were supposed to get a percentage based on the work |
| 03:31PM 20 | you did. |
| 03:31PM 21 | I thought Jon shorted me on the percentage of the |
| 03:31PM 22 | work I did.  I thought he didn't recognize how much work I did, |
| 03:31PM 23 | and it made me mad. |
| 03:31PM 24 | Q.   How much of the work did you think you were shorted? |
| 03:31PM 25 | A.   I can't remember that now.  I think -- I think I thought |

**C O N F I D E N T I A L**

SM-02-JA00017

03:31PM 1   that I should get maybe 100,000 to $150,000 more, but I don't

03:31PM 2   know.  I can't swear to that.

03:31PM 3   Q.    You confronted him or -- confronted, I'll strike that

03:31PM 4   word -- you discussed that issue with him; you brought that to

03:31PM 5   his attention?

03:31PM 6   A.    Yes.  That was quite some time before I moved out.  It

03:31PM 7   wasn't like right when all that happened.

03:31PM 8   Q.    Yes.

03:31PM 9   A.    Yes, I brought that to his attention.

03:32PM 10  Q.    Could not come to a resolution?

03:32PM 11  A.    No.  We just stopped talking to each other.

03:32PM 12  Q.    What was his position with respect to whether or not you

03:32PM 13  were entitled to it?

03:32PM 14  A.    Well, he didn't think I'd be.  He thought he did -- it was

03:32PM 15  sort of a split between me and him.  There was other lawyers

03:32PM 16  involved, but I thought I did as much work as him or close to

03:32PM 17  as much, and he didn't think I did; so, he took that percentage

03:32PM 18  for him.

03:32PM 19  Q.    You said at that point you stopped talking to each other?

03:32PM 20  A.    Yeah.  I mean, he was not really living in New Orleans at

03:32PM 21  the time.  This was after the hurricane, and he had -- his

03:32PM 22  family was living in Lafayette.

03:32PM 23        So he was coming back and forth, and we just didn't

03:32PM 24  run into each other that much; but, yeah, we basically stopped

03:32PM 25  talking.

**C O N F I D E N T I A L**

03:32PM 1   Q.    Did there come a time when you started to speak to him

03:32PM 2   again or resumed any relationship?

03:32PM 3   A.    Yes.

03:32PM 4   Q.    When was that?

03:32PM 5   A.    That was after I started working at the Claims

03:32PM 6   Administrator Office.  I think Glen Lerner, who I know his name

03:33PM 7   has come up here, was in law school with us, too, and was

03:33PM 8   friends with both of us.  He and Jon were -- did the MRGO class

03:33PM 9   action together and, I think, some other stuff.  So he -- he

03:33PM 10  remained friends with Jon.

03:33PM 11         It used to bother him that Jon and I weren't friends

03:33PM 12  because then when he would come into town he would have to go

03:33PM 13  to dinner with me, and then he'd have to go to dinner with Jon.

03:33PM 14  We didn't do anything together.

03:33PM 15         So he called me up and said -- well, he kept talking

03:33PM 16  to me a long time, you and Jon need to make up, this is

03:33PM 17  ridiculous, you shouldn't fight over money, you have a long

03:33PM 18  friendship, that kind of thing.

03:33PM 19         Then one day he called me -- Glen called me up and

03:33PM 20  said, Jon and I are going to go eat lunch, why don't you come

03:33PM 21  meet us at Mother's.  I went to meet them there, and that was

03:34PM 22  like the first time we had actually sat down.  But it was kind

03:34PM 23  of awkward.  We really didn't talk that much after that.  But

03:34PM 24  it was the first time we had talked in a long time.

03:34PM 25  Q.    You said -- I thought I understood you to say, you were

**C O N F I D E N T I A L**

SM-02-JA00019

03:34PM 1    then working at the Claims Administrator Office?

03:34PM 2    A.   I believe at that time I was already at the Claims

03:34PM 3    Administrator Office, I believe, when we had that lunch, but

03:34PM 4    I'm not a hundred percent sure.

03:34PM 5    Q.   You thought it was at Mother's?

03:34PM 6    A.   Yeah.

03:34PM 7    Q.   The three of you?

03:34PM 8    A.   Yes.

03:34PM 9    Q.   Anyone else that you recall?

03:34PM 10   A.   No.  I don't think so.

03:34PM 11   Q.   Do you recall what you talked about during lunch?

03:34PM 12   A.   No.  Just kind of kids, wives, family.  Just -- I mean,

03:34PM 13   like I said, it was kind of awkward because Jon and I hadn't

03:34PM 14   spoken in a long time.  So, you know, just kind of that stuff.

03:34PM 15   Q.   You were aware, certainly at that luncheon, but before, I

03:35PM 16   take it, that Andry and Lerner were law partners?

03:35PM 17   A.   I wasn't aware.  I didn't know what the -- that it was a

03:35PM 18   partnership or what they -- I mean, I knew they had *BP* cases,

03:35PM 19   some kind of arrangement, but I didn't know -- I couldn't say

03:35PM 20   whether it was a partnership or not.  I don't know that.

03:35PM 21   Q.   Well, you knew there was an Andry Lerner, LLC, right?

03:35PM 22   A.   I don't know if I knew it -- no.  At some point, I

03:35PM 23   recognized the name Andry Lerner Group, but I don't know if I

03:35PM 24   knew that that's what they were at that point or not.

03:35PM 25        At the beginning, I knew that Glen Lerner was paying

**C O N F I D E N T I A L**

03:35PM 1   for advertising and office expenses and that kind of stuff for

03:35PM 2   Andry and that they had those cases together.  I didn't know

03:35PM 3   what the relationship was.

03:35PM 4           At some point, I did learn that it was an

03:35PM 5   Andry Lerner Group; but, other than that, I didn't know

03:35PM 6   anything about it.

03:35PM 7   Q.   When did you first come to know that Lerner had paid for

03:36PM 8   advertising or had some interest in the claims process?

03:36PM 9   A.   I think he told me that in the summer of 2012.  It was

03:36PM 10  before I started working over there.

03:36PM 11  Q.   Before you started --

03:36PM 12  A.   Before I started at the CA's office.

03:36PM 13  Q.   -- at the CA's office?  What did he tell you about what he

03:36PM 14  was doing?

03:36PM 15  A.   I don't think he told me much.  We were on the beach or

03:36PM 16  something.  He said, hey, you know, I'm paying Jon's

03:36PM 17  advertising, or, I'm working with Jon on getting some cases.

03:36PM 18          Might have even been before that.  It was before --

03:36PM 19  it was before my wife even went to work for the CA, so it might

03:36PM 20  have been the summer of 2011.  I'm not sure, but it was before

03:36PM 21  she went to work there, too.

03:36PM 22          So he just told me that he was paying Jon's expenses.

03:36PM 23  I remember -- the only thing I remember, I told him, "Well, you

03:36PM 24  better be careful because you know Jon shorted me out of those

03:37PM 25  fees," and blah, blah, blah.

**C O N F I D E N T I A L**

SM-02-JA00021

03:37PM  1   Q.   What did he tell you about that?

03:37PM  2   A.   "Well, he's not going to do that to me," something like

03:37PM  3   that.  When you meet Glen, you'll see.

03:37PM  4   Q.   You said there came a time when you did understand,

03:37PM  5   partnership or whatever, the two of them were together working

03:37PM  6   *BP* claims?

03:37PM  7   A.   I understood that it was The Andry Law Group at some

03:37PM  8   point, yes, and that they had some kind of arrangement, yeah.

03:37PM  9          Neither one of them really worked that much claims.

03:37PM 10   I mean, Glen just -- you know, he has a bunch of lawyers

03:37PM 11   working for him.  Jon usually has lawyers working for him.  So

03:37PM 12   I didn't know what they were actually doing.

03:37PM 13   Q.   Would you describe Glen as more of a financier than a

03:37PM 14   practicing lawyer in this regard?

03:37PM 15   A.   In that regard --

03:37PM 16   Q.   In that regard?

03:37PM 17   A.   -- I would say, yeah, I think so, but -- I don't know for

03:37PM 18   sure, but that would be typical.

03:37PM 19   Q.   Your understanding that they had some arrangement with *BP*

03:37PM 20   cases?

03:37PM 21   A.   I understood it was Andry Law Group.  The actual -- what

03:38PM 22   that entity was, I don't know.

03:38PM 23   Q.   Yes.

03:38PM 24   A.   I don't know.

03:38PM 25   Q.   You learned that before you went to work in the Claims

**C O N F I D E N T I A L**

SM-02-JA00022

03:38PM 1    Administrator --

03:38PM 2    A.    I learned that they had some kind of business relationship

03:38PM 3    before I went there.  I don't know if I learned that the name

03:38PM 4    of it was The Andry Lerner Group until long -- I mean, not that

03:38PM 5    long ago, maybe.  I don't -- didn't know the name of it.  I

03:38PM 6    don't think I knew the name of it.

03:38PM 7    Q.    After the luncheon at Mother's, the first time you see

03:38PM 8    Andry now in -- was it a couple of years?

03:38PM 9    A.    First time I talked to him in a couple of years.  We were

03:38PM 10   in the same building, so I would see him, you know.

03:38PM 11   Q.    So was that the first time you spoke to him in a couple

03:38PM 12   years?

03:38PM 13   A.    Well, it would have been from whenever we settled that

03:38PM 14   class action case.  I don't know if it was -- 2009, maybe.  I

03:38PM 15   think.  I'm not a hundred percent sure.

03:38PM 16   Q.    After the luncheon, did you have occasion to speak to him

03:38PM 17   again?

03:38PM 18   A.    Yes.  I think -- I think I got -- I called him on his

03:39PM 19   cell phone to ask him about something.  It was something

03:39PM 20   specific that I was calling him for, and I don't remember what

03:39PM 21   it was.

03:39PM 22         He kind of started talking like he missed me, and

03:39PM 23   then we kind of started having a real personal conversation.

03:39PM 24   Me and Jon got a lot of -- since it was just me and him again,

03:39PM 25   kind of got a lot of stuff out, the way we were feeling about

**C O N F I D E N T I A L**

SM-02-JA00023

03:39PM  1    each other.

03:39PM  2    Q.    In --

03:39PM  3    A.    I think he was having --

03:39PM  4    Q.    I'm sorry, in the phone call?

03:39PM  5    A.    Yeah, in the phone call.  So I felt good about that.

03:39PM  6          Then maybe I talked to him two times, two or three

03:39PM  7    times after that, the same kind of thing.  He didn't feel like

03:39PM  8    he had anybody that was close, that he could talk about -- he

03:39PM  9    was having problems with his wife, I think.  I had known them

03:40PM  10   from before they got married.  They started dating when we were

03:40PM  11   roommates.

03:40PM  12         So, you know, he didn't feel like -- I think he felt

03:40PM  13   like he could really talk to me because I knew the whole

03:40PM  14   history with them and everything.

03:40PM  15         So that first phone call, he just kind of unloaded on

03:40PM  16   me.  Then a couple of times after that.

03:40PM  17   Q.    The first phone call, was that, if you recall, before or

03:40PM  18   after you started at the Claims Administrator?

03:40PM  19   A.    I don't remember.

03:40PM  20   Q.    It could have been after?

03:40PM  21   A.    I remember I was sitting in my personal office while we

03:40PM  22   were on the phone.  Whether it was before or after, I don't

03:40PM  23   know.

03:40PM  24   Q.    How did you get his phone number?

03:40PM  25   A.    I think I asked somebody.  I had my -- I don't think I had

**C O N F I D E N T I A L**

**SM-02-JA00024**

03:40PM 1    it anymore, so I had to ask for it.

03:40PM 2    Q.    But you don't recall who you asked?  Did you ask

03:40PM 3    Mr. Lerner?

03:40PM 4    A.    I could have asked him, or I could have -- I could have

03:41PM 5    asked -- he had a girl working for him named Susie.  I might

03:41PM 6    have asked her, or I might have asked Gibby.  I don't know.  I

03:41PM 7    don't remember.

03:41PM 8    Q.    Then you said maybe two other conversations after that on

03:41PM 9    the phone or in person?

03:41PM 10   A.    We didn't have any conversations in person until at a

03:41PM 11   point that I'll get to; but, before we had a conversation in

03:41PM 12   person, yeah, I would say a couple of phone calls where we --

03:41PM 13   it was more about personal stuff.

03:41PM 14   Q.    You calling him or he calling you, if you remember?

03:41PM 15   A.    I don't remember.  I think I remember that one of the

03:41PM 16   times I called him was about some kind of fiduciary duty case

03:41PM 17   or something that I was working on, but not related to the

03:41PM 18   claims office.

03:41PM 19          He was always, like, a good motions lawyer.  He had a

03:41PM 20   good motions practice.  He remembered cases and things.  I

03:42PM 21   think that's what I called him about, but I don't remember.

03:42PM 22   Q.    The main discussion in the calls, I think I understood you

03:42PM 23   to say, was really personal --

03:42PM 24   A.    Yeah.

03:42PM 25   Q.    -- his own personal issues?

**C O N F I D E N T I A L**

**SM-02-JA00025**

03:42PM 1 A. Yes.

03:42PM 2 Q. Was he asking your advice or just talking?

03:42PM 3 A. He would -- I mean, other than, I don't know what I'm

03:42PM 4 going to do, what do you think, I mean, and that kind of stuff;

03:42PM 5 but, you know, mostly just talking.

03:42PM 6  I felt like Jon just missed the relationship we had

03:42PM 7 and needed somebody to talk to, so I kind of let him do that.

03:42PM 8 I mean, I still wasn't -- still wasn't happy with him, but, you

03:42PM 9 know, I felt bad for him.

03:42PM 10 Q. In any of those three calls you just mentioned, did the

03:42PM 11 subject of what you thought you were entitled to ever come up

03:42PM 12 again, or was that not discussed?

03:42PM 13 A. No, we kind of let that go.

03:42PM 14  Look, it could have been less than three, it could

03:42PM 15 have been more than three, I don't know.  But, no, we kind of

03:42PM 16 let that go.  I knew -- that was just going to start the whole

03:43PM 17 thing again.  We were never going to get through that.

03:43PM 18 Q. Then there came a time when you met him again?

03:43PM 19 A. Yes.

03:43PM 20 Q. So tell us about that, please.

03:43PM 21 A. Pat -- I was working in the claims office.  Pat had told

03:43PM 22 me that Jon Andry was bugging him about some claim he had, and

03:43PM 23 he wanted -- and Pat asked me to look into it, because that's

03:43PM 24 typically what I did for Pat.

03:43PM 25  So I looked into it.  I think -- I don't know if it

**C O N F I D E N T I A L**

SM-02-JA00026

03:43PM 1    was the next day or the day after or -- you know, pretty soon

03:43PM 2    thereafter, I kind of had started to tell Pat about that, about

03:43PM 3    what I found, so that he could tell Andry, because we weren't

03:43PM 4    really -- I don't think we were talking that much then, just

03:43PM 5    the personal stuff; and, Andry had called him, not me.

03:43PM 6          Pat and I were walking out the building -- Pat said

03:43PM 7    something like, "Let's go to lunch," or something like that,

03:44PM 8    and we were walking out the building.

03:44PM 9          Jon was walking towards the building.  Jon said

03:44PM 10   something to Pat, "Hey, did you check on that case," or

03:44PM 11   something.

03:44PM 12         Pat said, "Well, I got Tiger to look at it."  You

03:44PM 13   know, "Tiger, tell him what's going on."

03:44PM 14         I think Jon said or I said or somebody said, "Well,

03:44PM 15   let's just go across the street and get a sandwich at Reuben's

03:44PM 16   place," like -- because we were out right in front of the

03:44PM 17   building, because we were right across the street.

03:44PM 18         It might have been that we were going to get a

03:44PM 19   sandwich first, I do not remember, but that's -- Pat and Jon

03:44PM 20   and I were together right there.  Then Pat said to me, "Why

03:44PM 21   don't you, you know, tell him what you found."  That's when I

03:44PM 22   went across the street and started telling him about what I

03:44PM 23   found.

03:44PM 24   Q.   Which particular claim did this relate to?

03:44PM 25   A.   It was *Talen's* was the name of it, and it was a fuel dock

**C O N F I D E N T I A L**

SM-02-JA00027

03:44PM 1  case.  I don't -- I mean, they had a number of fuel docks, and

03:44PM 2  I don't remember -- I mean, I don't know the exact name of it,

03:44PM 3  but it was Talen's, I think, T-A-L-E-N-S.

03:45PM 4  Q.   Was Andry's main complaint that he was not being paid for

03:45PM 5  it?

03:45PM 6  A.   No.  It was what's taking so long?  I mean, that's what

03:45PM 7  everybody --

03:45PM 8  Q.   His main complaint was that he was not being paid and the

03:45PM 9  process was taking too long?

03:45PM 10 A.   Well, he hadn't even got to the point where they knew

03:45PM 11 whether he was even going to get paid or not.  It has to go

03:45PM 12 through a long process before that.

03:45PM 13      He was stuck, apparently, in the process with the

03:45PM 14 accountants going through all the paperwork.

03:45PM 15 Q.   So that information, was that received by you in a phone

03:45PM 16 call with Andry or in a meeting?  This is before you were

03:45PM 17 coming out the door with Pat and then did your sidebar at the

03:45PM 18 restaurant across the street.

03:45PM 19 A.   I don't understand the question.

03:45PM 20      MR. WALSH:  I don't --

03:45PM 21 BY MR. FREEH:

03:45PM 22 Q.   Well, you said you had a meeting with Andry?

03:45PM 23 A.   No.  When I came out the building, I had a meeting with

03:45PM 24 him.

03:45PM 25 Q.   That's what I'm asking you about.  So it was just one

**C O N F I D E N T I A L**

SM-02-JA00028

03:46PM   1   meeting?

03:46PM   2   A.    Yeah.    That was the first time -- you had asked me

03:46PM   3   earlier -- we had went to that lunch at Mother's.    Then we had

03:46PM   4   a few phone calls.    Then I said this was the first time we

03:46PM   5   actually sat down with each other.

03:46PM   6   Q.    And discussed this claim?

03:46PM   7   A.    Yes.

03:46PM   8   Q.    Prior to the meeting, you said Mr. Juneau had asked you to

03:46PM   9   look into it.

03:46PM  10   A.    Yes.

03:46PM  11   Q.    So what, if anything, did you do?

03:46PM  12   A.    Typically, what I would do is I would pull up the claim on

03:46PM  13   the screen and try to see where it is.    Sometimes you can see

03:46PM  14   that -- they would do the global notes, and it would say, we're

03:46PM  15   waiting on this, or we're doing this.    But we always had a

03:46PM  16   problem keeping the global notes up.    They didn't always do

03:46PM  17   that.

03:46PM  18         Sometimes there would be some kind of -- you could

03:46PM  19   tell what it was.    On that one, I'm not sure, I think I might

03:46PM  20   have looked to go see what -- you can also see what

03:46PM  21   accounting -- what accounting firm had it, and then sometimes

03:46PM  22   you could see who it was actually assigned to.    Then you could

03:47PM  23   e-mail them and ask them.

03:47PM  24         I would typically deal with their supervisors, not

03:47PM  25   the actual accountant.    So I probably either e-mailed the

**C O N F I D E N T I A L**

SM-02-JA00029

03:47PM  1    accountant or somebody at Brown and Greer and said -- because

03:47PM  2    maybe I couldn't see the account on the screen, I don't know,

03:47PM  3    but this is what I typically would have done -- e-mailed

03:47PM  4    somebody, either the accountant or somebody at BrownGreer, and

03:47PM  5    said, "Hey, can you tell me what's going on with this case?"

03:47PM  6    Then, sometimes they would e-mail it back to me, or sometimes

03:47PM  7    call me up and tell me.

03:47PM  8    Q.    In this particular case, do you recall what you found out

03:47PM  9    about it when you made the inquiry?

03:47PM 10    A.    Yeah, it was a multi-facilities claim.  This was a typical

03:47PM 11    problem that we had with that.  When they turned in the income

03:47PM 12    tax returns, they only turned it in for the facilities that

03:47PM 13    they filed for.

03:47PM 14          For example, if it was a seven-facility company, but

03:47PM 15    they were only filing for four facilities, they would only turn

03:47PM 16    in all their financial information, the P&Ls and everything,

03:48PM 17    for those four, not realizing that they needed the other three

03:48PM 18    because it all had to be --

03:48PM 19    Q.    Averaged?

03:48PM 20    A.    Well, not that.  It had to show on the tax returns.  It

03:48PM 21    had to -- everything had to be double-checked and show that --

03:48PM 22    and you couldn't do that without having all of the financials.

03:48PM 23    This was what was explained to me at some point by the

03:48PM 24    accountant.

03:48PM 25          So he wasn't given those and didn't understand why he

**C O N F I D E N T I A L**

SM-02-JA00030

03:48PM 1   needed to do that, which most lawyers didn't, I mean, until we

03:48PM 2   explained it to them, that it had to all add up correctly, and

03:48PM 3   you can't add up the corporate papers unless you have all of

03:48PM 4   the facilities.

03:48PM 5   Q.   When you then had the meeting with him, the only meeting

03:48PM 6   that we've talked about, across the street in the restaurant,

03:48PM 7   Reuben's, whatever it was, did you relate to him what you had

03:48PM 8   found out?

03:48PM 9   A.   Yes, just what I told you just then.

03:48PM 10          First, he was like, why?  And I explained, because

03:48PM 11  that's -- they have to look at the big picture or whatever, all

03:48PM 12  that -- like I just told you.

03:48PM 13  Q.   As far as you know, was he ever paid for that claim?

03:49PM 14  A.   I really don't know.

03:49PM 15  Q.   You never heard from him or anyone else that he was paid

03:49PM 16  on that claim?

03:49PM 17  A.   No.

03:49PM 18  Q.   When you said you would typically pull up the name and see

03:49PM 19  where it was, you did that in this particular case, correct?

03:49PM 20  A.   Yes.

03:49PM 21  Q.   How many other cases during the months that you were there

03:49PM 22  did you do a similar exercise; in other words, query about a

03:49PM 23  particular claim?

03:49PM 24  A.   Countless.  I couldn't tell you.  I mean --

03:49PM 25  Q.   Hundreds?  I'm not trying to trick you.

**C O N F I D E N T I A L**

SM-02-JA00031

| | | |
|---|---|---|
| 03:49PM | 1 | A.    No, I know. |
| 03:49PM | 2 | Q.    I'm trying to get a sense. |
| 03:49PM | 3 | A.    I'm trying -- I'm trying to think how long I was there.  I |
| 03:49PM | 4 | mean, I didn't start -- |
| 03:49PM | 5 | Q.    You were there from November to -- |
| 03:49PM | 6 | A.    Yeah.  I wouldn't have started doing that in November or |
| 03:49PM | 7 | probably even December because I didn't know enough about the |
| 03:49PM | 8 | process. |
| 03:49PM | 9 |         I mean, I would want to say, I mean, it could have |
| 03:49PM | 10 | been a hundred or more.  I mean, that was part of my daily job, |
| 03:49PM | 11 | really, that I did that, so I couldn't tell you how many times. |
| 03:49PM | 12 | Q.    After that meeting with Mr. Andry, did you meet with him |
| 03:50PM | 13 | again? |
| 03:50PM | 14 | A.    I don't think so.  I can't remember the next time I |
| 03:50PM | 15 | actually saw him. |
| 03:50PM | 16 | Q.    Did you have subsequent telephone calls with him about |
| 03:50PM | 17 | various matters relating to the claims administration? |
| 03:50PM | 18 | A.    The *Talen's* claim, he called me, I think, a few times to |
| 03:50PM | 19 | ask me about that.  He may have called me about two or three |
| 03:50PM | 20 | other claims, but I don't remember. |
| 03:50PM | 21 |         I mean, lawyers called me every day about claims.  So |
| 03:50PM | 22 | I can't exactly remember, but it could have been a few more; |
| 03:50PM | 23 | but, I don't remember what they were or anything. |
| 03:50PM | 24 | Q.    Do you remember speaking to him on the phone about the |
| 03:50PM | 25 | *Thonn* claim? |

**C O N F I D E N T I A L**

SM-02-JA00032

03:50PM 1 A.    The *Thonn*?  No, I don't think I ever talked to Jon about

03:50PM 2 that claim.  I don't think -- I'm not sure.

03:50PM 3 Q.    Do you recall speaking to him about any other claimant in

03:51PM 4 particular?

03:51PM 5 A.    He'd asked -- no, I don't remember the name.  I remember

03:51PM 6 he asked --

03:51PM 7 Q.    Other than the one you mentioned?

03:51PM 8 A.    Well, then he asked me -- he might have asked me about a

03:51PM 9 few more to look up to see the status, but I don't remember

03:51PM 10 what they were or -- but it would have just been that.

03:51PM 11 Q.    The ones he asked you to look up -- you don't remember

03:51PM 12 them -- did you, in fact, look them up, go through the process

03:51PM 13 that you just described?

03:51PM 14 A.    I must have looked them up because that's what I would

03:51PM 15 have done.  I typically would have done the process like you

03:51PM 16 described.

03:51PM 17        Sometimes the process was very easy because then you

03:51PM 18 could just see, oh, it's finished, and it's, you know, in line

03:51PM 19 to get an eligibility notice or something like that.  Then you

03:51PM 20 could just see.  You could say, "Hey, the claim the finished,

03:51PM 21 it should be coming out in the next week or two."

03:51PM 22        Sometimes it didn't even get to an accountant yet.

03:51PM 23 You could tell -- it was pretty easy then, too, because that

03:51PM 24 just meant BrownGreer had it, and it was stuck over there for

03:52PM 25 however long.

**C O N F I D E N T I A L**

03:52PM 1          It was when it was with the accountants, you couldn't

03:52PM 2    really tell.  What happened is -- and this was on the whole

03:52PM 3    portal, too, besides just what I could see -- once it went to

03:52PM 4    accountants, they only had, like, two or three stage names; so,

03:52PM 5    maybe like accounting review would be one of them that I

03:52PM 6    remember.  It could be in any number of places in accounting,

03:52PM 7    but it would show accounting review.

03:52PM 8          Later on in the program, I mean, recently, we would

03:52PM 9    find out that people were complaining so much, oh, it's been in

03:52PM 10   accounting review for four much, or, it's been in accounting

03:52PM 11   review for five months, when really it was moving, but, because

03:52PM 12   all they could see was the caption *accounting review*, they

03:52PM 13   thought it was stuck.

03:52PM 14         So we had kind of divided it up -- recently, I think,

03:52PM 15   before I left there, we had kind of divided it up from those

03:52PM 16   three to maybe 12 or 14 different things.

03:52PM 17         So almost all of the time when I had to check, if it

03:52PM 18   was in accounting, it would say *accounting review*.  Then I

03:53PM 19   would have to try to find out from the accountants what that

03:53PM 20   actually meant because, you know, until we fixed that, we

03:53PM 21   couldn't tell.

03:53PM 22   Q.   When Mr. Juneau asked you to look into that one matter

03:53PM 23   with respect to Mr. Andry, which then resulted in your meeting,

03:53PM 24   that was, of course, while you were working as one of his

03:53PM 25   lawyers in the Claims Administration?

**C O N F I D E N T I A L**

03:53PM 1    A.    Yes.

03:53PM 2    Q.    When he asked you to do that, did you tell him about the

03:53PM 3    business relationship you had with Mr. Lerner?

03:53PM 4    A.    What business relationship?

03:53PM 5    Q.    Crown?

03:53PM 6    A.    Oh, he knew about Crown.  I don't think I told him

03:53PM 7    anything at that time.  They knew about Crown before I started

03:53PM 8    working there.

03:53PM 9    Q.    When you say *he knew about it*, you said Mr. Juneau?

03:53PM 10   A.    Yeah.

03:53PM 11   Q.    How did he know about it?

03:53PM 12   A.    Because I talked about it all the time.  Everybody knew

03:53PM 13   about it.  It was on the wall when you walked out of the

03:53PM 14   elevator.  It was on my door.

03:53PM 15          People were interested because we had developed --

03:54PM 16   Crown had developed some technology that would clean flowback

03:54PM 17   and produce water from these shale oil rigs without waste.  So

03:54PM 18   it was kind of a big thing, and everybody was interested.

03:54PM 19          I mean, David Odom, I think he came to see me because

03:54PM 20   he said a friend of his was doing something similar and talked

03:54PM 21   about it.

03:54PM 22          But, I mean, Mike said, "Oh, you're going to be rich

03:54PM 23   one day."  I mean, it was just, you know, in the natural course

03:54PM 24   of stuff.

03:54PM 25   Q.    When you went to work for Mr. Juneau, you had a

**C O N F I D E N T I A L**

**SM-02-JA00035**

03:54PM 1    conversation with him before you went to work for him?

03:54PM 2    A.    Yes.

03:54PM 3    Q.    Did you discuss any possible conflicts you might have

03:54PM 4    before you came on board?

03:54PM 5    A.    No.  I don't think so.

03:54PM 6    Q.    Did he ask you if you had any conflicts?

03:54PM 7    A.    I don't think so.

03:54PM 8    Q.    Did you volunteer any or describe any that you thought

03:54PM 9    were conflicts?

03:54PM 10   A.    I don't remember that I thought anything was a conflict.

03:54PM 11   Q.    After you came onboard, did anybody ever sit down and give

03:54PM 12   you a policy, either in writing or otherwise, with respect to

03:55PM 13   how to manage conflicts in your new position?

03:55PM 14   A.    I don't think so.  The only time anybody came and gave me

03:55PM 15   anything -- well, we signed an agreement right -- I think,

03:55PM 16   right the first day, but I'm not sure.

03:55PM 17          But at some point in March, I believe, of 2013, they

03:55PM 18   came around with some other papers, but I don't remember what

03:55PM 19   it was.

03:55PM 20   Q.    I'll show you those later.

03:55PM 21   A.    Then I don't remember if I -- I remember it didn't seem to

03:55PM 22   apply to me that well because I was part time, and everybody

03:55PM 23   knew I was part time there because I had other businesses going

03:55PM 24   on.

03:55PM 25          When you asked if I talked to Pat Juneau about it

**C O N F I D E N T I A L**

03:55PM 1   when he hired me, I mean, that was one of the things that we

03:55PM 2   talked about, that I could only work part time.

03:55PM 3   Q.   That document, you eventually signed?

03:55PM 4   A.   I don't remember.  We went and asked -- Mike and I talked

03:55PM 5   about it, and I think he was going to make some changes and

03:56PM 6   stuff, but I don't remember.

03:56PM 7   Q.   Well, we'll refresh your recollection.  We have a document

03:56PM 8   that appears that you signed.

03:56PM 9   A.   I believe it was in March.

03:56PM 10  Q.   So you said everybody knew about Crown?

03:56PM 11  A.   Yeah.  I mean, when I say that, I mean in a general term,

03:56PM 12  but yeah.

03:56PM 13  Q.   Did you ever have a discussion with Mr. Juneau about

03:56PM 14  Crown?

03:56PM 15  A.   Well, I'm sure when I first went to work there and told

03:56PM 16  him that I was going to be -- could only work part time, I'm

03:56PM 17  sure -- I'm almost positive I would have said why.  I would

03:56PM 18  have said Crown, and I've still got some other law cases and

03:56PM 19  stuff.

03:56PM 20  Q.   Did you tell him that Mr. Lerner was involved in Crown?

03:56PM 21  A.   No, I don't think so.  I don't think I said that.

03:56PM 22  Q.   Did he ask you who the principals were?

03:56PM 23  A.   No.

03:56PM 24  Q.   Did anybody at the Claims Administration before you

03:56PM 25  started to work there ask you about that?

**C O N F I D E N T I A L**

03:56PM 1    A.    No.

03:56PM 2    Q.    You were receiving a salary from Mr. Lerner at that time,

03:56PM 3    correct, when you went on board?

03:56PM 4    A.    It was -- well, yes and no.

03:57PM 5    Q.    Give me the yes part first.

03:57PM 6    A.    They called it a *salary* because Joey Dartez and

03:57PM 7    Tim Elmhurst, who were also members of the LLC, were getting it

03:57PM 8    every month, and they wanted a salary.  So -- but we -- what it

03:57PM 9    really was, was that he was paying us monthly -- or, in my

03:57PM 10   point -- in my case is, he didn't pay it monthly -- for his

03:57PM 11   shares that he bought.

03:57PM 12          We were all 25 percent owners.  We went down to

03:57PM 13   17 percent, me, Joey and Tim.  So we got rid of eight shares

03:57PM 14   each.  So, for me, either I was going to get paid the same, or

03:57PM 15   $10,000 a month, for, you know, my shares, plus he was going to

03:57PM 16   do other things for funding.

03:57PM 17   Q.    Was the change in shareholding due to the fact that he had

03:57PM 18   fronted up money for the investment?

03:58PM 19   A.    That he had fronted up more than he was supposed to.

03:58PM 20   Q.    More than he was supposed to.

03:58PM 21   A.    Yeah.  He was originally supposed to put up 750,000,

03:58PM 22   maybe.  I thought it was a million; he thought it was 750,000.

03:58PM 23   But, in any event, it turned out to be more -- a lot more than

03:58PM 24   that, because once we got the prototype of the machine built,

03:58PM 25   it was costing a lot to -- every oil company or mining company

**C O N F I D E N T I A L**

SM-02-JA00038

03:58PM 1   wanted us to bring the machine to their facility and

03:58PM 2   demonstrate it for them.  Joey would have to go, and Tim would

03:58PM 3   have to go, and we would have to get trucks.

03:58PM 4       It was becoming a lot more expensive to do all of

03:58PM 5   that, where we thought we could just do it at our shop.  So

03:58PM 6   when we budgeted, we just were way under budget.

03:58PM 7       So Glen was paying those things, he was paying Joey

03:58PM 8   and Tim monthly to do that type of work.  Then finally, he

03:58PM 9   said, "Look, man, I can't keep doing this.  If I'd have known I

03:58PM 10  was going to put up this much money, I would have wanted

03:59PM 11  50 percent," or something like that.

03:59PM 12      Joey and Tim kind of negotiated it with him, what

03:59PM 13  they needed.  I just went along with whatever they did because

03:59PM 14  I had always told them, whatever you guys do, I'll do it.  I

03:59PM 15  was with them before I was with Glen.  Glen came into the firm

03:59PM 16  later.

03:59PM 17  Q.   All right.  Let me direct your attention to the period

03:59PM 18  before you went to work for Mr. Juneau.  Whether we call it

03:59PM 19  salary or share interest, you were receiving regular monthly

03:59PM 20  payments -- or you were supposed to receive regular monthly

03:59PM 21  payments from Mr. Lerner; is that correct?

03:59PM 22  A.   I wasn't receiving them.  He -- I told him -- he was

03:59PM 23  always short of money.  I told him, it's more important for

03:59PM 24  Joey and Tim to get their regular money, so just pay me when

03:59PM 25  you can.  So that was how it was before I went to work for Pat.

**C O N F I D E N T I A L**

SM-02-JA00039

03:59PM 1    Q.    But you understood and it was your belief and expectation

04:00PM 2    that you were to be paid and were owed $10,000 per month?

04:00PM 3    A.    From beginning June 1st of 2012 all the way to the end of

04:00PM 4    May 2013, it was $120,000.  It was $10,000 a month.  He should

04:00PM 5    have been paying me $10,000 a month, but he never did; and, he

04:00PM 6    would pay me in chunks.

04:00PM 7    Q.    How much during that period that you've just described did

04:00PM 8    you actually receive in payments?

04:00PM 9    A.    Well, I ultimately received the whole $120,000, so I don't

04:00PM 10   know exactly what period.

04:00PM 11   Q.    You answered the question.

04:00PM 12   A.    Okay.

04:00PM 13   Q.    Besides that, were you also entitled to expenses?

04:00PM 14   A.    Yes, but I may have had some expenses initially because I

04:00PM 15   was -- there was a period of time when -- when Glen said he

04:00PM 16   wasn't going to put up any more money, and we were trying to

04:00PM 17   get it worked out.

04:01PM 18            I might have paid some expenses during that time,

04:01PM 19   maybe five thousand, six thousand dollars.  I think it was

04:01PM 20   under $10,000, I believe.

04:01PM 21            But typically I do that.  I mean, even to this day, I

04:01PM 22   still pay some of the expenses out of my pocket, if Joey and

04:01PM 23   Tim need something, and Glen is just hard to deal with or get

04:01PM 24   or something like that, so.

04:01PM 25   Q.    Were you --

**C O N F I D E N T I A L**

SM-02-JA00040

04:01PM 1    A.    But I didn't have my own -- like, I wouldn't charge

04:01PM 2    personal expenses.  Like, Joey would charge -- when he would

04:01PM 3    drive to Houston, he would charge mileage, and he would charge

04:01PM 4    meals, and he would -- I would charge a hotel, but I typically

04:01PM 5    wouldn't do the regular little picky expenses like that.

04:01PM 6    Q.    So you described approximately $5,000 of expenses?

04:01PM 7    A.    Maybe.  I couldn't tell you.

04:01PM 8    Q.    Were you ever reimbursed for that?

04:01PM 9    A.    I'm sure I was.  I mean, as far as I know, I've been

04:01PM 10   reimbursed for all my expenses except for some I've had

04:01PM 11   recently.

04:01PM 12          MR. WALSH:   I would like to clarify that, please.

04:01PM 13   Reimbursed from Crown or reimbursed from Glen?

04:02PM 14          THE WITNESS:   Well, it was from Crown, but it was

04:02PM 15   Glen putting up the money.

04:02PM 16   BY MR. FREEH:

04:02PM 17   Q.    Glen's money?

04:02PM 18   A.    It was, yeah, Glen's money.  I mean -- well, it was money

04:02PM 19   he owed to Crown as per his agreement, so.

04:02PM 20   Q.    The $120,000 and/or the $5,000 in expenses --

04:02PM 21   A.    Now, let me -- I said around $5,000.

04:02PM 22   Q.    Around $5,000.  The record reflects that.

04:02PM 23          -- was some of that paid to you after you became an

04:02PM 24   employee at the Claims Administration?

04:02PM 25   A.    I was never an employee at the Claims Administration.

**C O N F I D E N T I A L**

**SM-02-JA00041**

04:02PM  1    They made that clear.

04:02PM  2    Q.    After you began doing legal work for the Claims

04:02PM  3    Administrator --

04:02PM  4    A.    Yes.  Yes.

04:02PM  5    Q.    -- how much of that was paid after that period, as best

04:02PM  6    you recall?

04:02PM  7    A.    The vast majority of it -- I think I may have been paid --

04:02PM  8    Q.    Your best estimate?

04:03PM  9    A.    I don't know.  He may have paid some expenses and some --

04:03PM 10    and one or two payments, maybe 20,000.  I don't know.  But then

04:03PM 11    the rest, no.

04:03PM 12          I remember getting a chunk after I was there, I

04:03PM 13    think, of like 30 and 50 or something around that, so -- and

04:03PM 14    then whatever is since then.  But he owed me quite a bit.

04:03PM 15    Q.    Would those payments be effectuated by money going

04:03PM 16    directly to you, or going to Crown and then to you from Lerner?

04:03PM 17    A.    Well, it would go into the Crown -- I maintained an

04:03PM 18    account for Crown in New Orleans.

04:03PM 19          Generally, before -- before it got to the point where

04:03PM 20    Glen was saying that he had been paying too much money, I was

04:03PM 21    maintaining that account.  I would pay the expenses out of the

04:03PM 22    account, and Glen would put the money in the account.

04:03PM 23          For example, when we were building the machine, you

04:04PM 24    had milestones, you know, construction milestones.  He would --

04:04PM 25    he would -- he had guaranteed to pay to build the machine.  So

**C O N F I D E N T I A L**

**SM-02-JA00042**

04:04PM 1   I would say, "Hey, we've got a milestone coming up."  He would

04:04PM 2   put the money in the Crown account, and then I would write a

04:04PM 3   check from that.  That's how I typically did it.

04:04PM 4         I believe, when -- there came a time when Glen's

04:04PM 5   accountant started keeping the books himself, because I believe

04:04PM 6   it got to -- where I was getting the bills to New Orleans, and

04:04PM 7   then I would have to call him to put the money -- his

04:04PM 8   accountant to put the money in.  Then it would -- so, finally,

04:04PM 9   we just said, look, you handle that, and so he started handling

04:04PM 10  that.

04:04PM 11        So we called it *the old Crown account*.  When Glen

04:04PM 12  would put my -- which we may refer to as *my salary* or *share*

04:04PM 13  *money*, he would put it in the old Crown account.

04:04PM 14  Q.   Then you would withdraw it from that account, or the

04:04PM 15  accountant would write you a check, in the later days?  How

04:05PM 16  would you physically get it into your own account?

04:05PM 17  A.   I believe the salary, I would either just transfer it --

04:05PM 18  because it was at Regions Bank -- into my regular account, I

04:05PM 19  believe.

04:05PM 20  Q.   At the same bank?

04:05PM 21  A.   Yeah.

04:05PM 22  Q.   Just sort of an interbank transfer?

04:05PM 23  A.   Yeah.  I mean, and I might have wrote some checks straight

04:05PM 24  out of the Crown account from the salary portion, but -- that's

04:05PM 25  probably what it is.  But not, like, to myself, I don't think.

**C O N F I D E N T I A L**

SM-02-JA00043

| | |
|---|---|
| 04:05PM | 1 |
| 04:05PM | 2 |
| 04:05PM | 3 |
| 04:05PM | 4 |
| 04:05PM | 5 |
| 04:05PM | 6 |
| 04:05PM | 7 |
| 04:05PM | 8 |
| 04:05PM | 9 |
| 04:06PM | 10 |
| 04:06PM | 11 |
| 04:06PM | 12 |
| 04:06PM | 13 |
| 04:06PM | 14 |
| 04:06PM | 15 |
| 04:06PM | 16 |
| 04:06PM | 17 |
| 04:06PM | 18 |
| 04:06PM | 19 |
| 04:06PM | 20 |
| 04:06PM | 21 |
| 04:06PM | 22 |
| 04:06PM | 23 |
| 04:06PM | 24 |
| 04:06PM | 25 |

Q.    All right.  So let me direct your attention now to the period when you are about to go to work for Mr. Juneau.  You don't consider yourself to have been an employee of the Claims Administrator?

A.    We were supposed to be subcontractors.

Q.    So you would define your role as a contractor --

A.    Part-time --

Q.    -- contract lawyer?

A.    I think part-time subcontractor is what -- is how he and I discussed it.  I remember he wanted to know how much time I could put in over there.  I said, 75 percent.  Kind of -- what I had in mind is I would work there Monday, Tuesday, Wednesday and Thursday, and do some -- whatever business -- I still had law cases, too, so I had to kind of do some of that.

      Friday was really supposed to be my day when I would go work in my own office to try to get the mail done and all that kind of stuff, but it didn't really turn out that way.  I ended up being there most of the time.

Q.    I was going to ask you, did it turn out that you spent more of your time and most of your workweek in the Claims Administration practice?

A.    Yeah.  The offices are right next door.  I mean, you walk out one door and right into the other.

      I just remember, when I had only been there a few weeks, there was -- Pat called up.  I was in my office.  It was

**C O N F I D E N T I A L**

SM-02-JA00044

04:07PM 1    a Friday.  I was in my law office.  He needed -- right away, he

04:07PM 2    needed something that you couldn't access from my office.  You

04:07PM 3    could only access it from the computer there.  So I went and

04:07PM 4    accessed it for him and got it to him.

04:07PM 5           Then we had this big -- whatever we were dealing --

04:07PM 6    whatever crisis he was dealing with about it.  So after that, I

04:07PM 7    just was kind of like, well, I might as well just kind of stay

04:07PM 8    here as much as I can because, you know, you could only do the

04:07PM 9    work -- if he would call and ask me about something or to do

04:07PM 10   something, then you could only do it from those computers.

04:07PM 11          Pat typically wasn't there on Fridays.  So I would

04:07PM 12   come over to my office, and then I would kind of go over there.

04:07PM 13   I would go back and forth.

04:07PM 14   Q.    So it was a pretty fluid --

04:07PM 15   A.    Oh, yeah.

04:07PM 16   Q.    -- environment?

04:07PM 17   A.    Yes.

04:07PM 18   Q.    Did you use the Claims Administrator's space to do any of

04:07PM 19   your private business, non-CAO business?

04:07PM 20   A.    Yes, in that when -- I mean, I might get phone calls from

04:08PM 21   my law office -- I mean, for my law office, or phone calls for

04:08PM 22   any other business, and I would do that.

04:08PM 23          Then I would do e-mails.  If I got a deposition

04:08PM 24   notice, then I might contact the other lawyer.  I would do that

04:08PM 25   kind of stuff sitting in there, as opposed to -- in fact, I

**C O N F I D E N T I A L**

04:08PM   1    think I got -- either Chris or -- I can't remember the other

04:08PM   2    guy's name that worked in, like, the IT department -- to put me

04:08PM   3    like a folder or something where I could just -- when I got

04:08PM   4    e-mails or I got stuff faxed to me, but it was faxed over

04:08PM   5    e-mails, then I could put it in there until I had time to

04:08PM   6    eventually go back to my office, and I could pull it out, print

04:08PM   7    it up and go to my office or something.

04:08PM   8         But, yes, I did -- I did that kind of stuff, yeah.

04:08PM   9    Q.    Did you ever take a deposition in a non-Administrator case

04:09PM  10    that you were working in the administrator space?

04:09PM  11    A.    Yeah.  Maybe two or three.

04:09PM  12         I asked Pat if I could use the conference room

04:09PM  13    because he had -- Mike had done that a few times, I think.  So

04:09PM  14    I asked Pat, and he said fine.

04:09PM  15         I believe the first time I did one, I did it -- we

04:09PM  16    didn't -- when -- I originally was on the sixth floor.  It was

04:09PM  17    a temporary office.  We had -- the building owner, like I said,

04:09PM  18    was a friend of mine, and he was trying to figure out a way

04:09PM  19    where he could get us the space, my law office the space we

04:09PM  20    needed on some upper floor as he was building out the building.

04:09PM  21    It was hard to figure out all the tenants.

04:09PM  22         We had just signed on to that space before Christine

04:09PM  23    went to work for Pat.  We had ordered or were in the process of

04:09PM  24    ordering some nice office furniture, conference table, all that

04:09PM  25    kind of stuff.

**C O N F I D E N T I A L**

**SM-02-JA00046**

04:09PM  1          Well, when she went to work over there, I said, well,

04:10PM  2    it's just me, I don't need any of that.  So I just took my old

04:10PM  3    desk and chair and client chairs and bookshelves and brought it

04:10PM  4    up there and put in it the office that I would use.  But we

04:10PM  5    never did -- we canceled the conference room stuff.

04:10PM  6          So the first time I think I took a deposition, I went

04:10PM  7    back down on the sixth floor, because they had some conference

04:10PM  8    rooms that you could use down there.  But it was a pain because

04:10PM  9    you had to go down there, and there was no place for the

04:10PM  10   lawyers to talk or anything like that.

04:10PM  11         Then, I think the building ended up subbing out that

04:10PM  12   sixth floor to another person, who I didn't know, and then you

04:10PM  13   would have had to go through them.  So it was just easier to

04:10PM  14   ask Pat, so that's what I did after that.

04:10PM  15   Q.   While you worked in the Claims Administration Office, did

04:10PM  16   you ever task any of the personnel there to work on your

04:10PM  17   private matters, non-CAO matters?

04:10PM  18   A.   I may have gotten Tracy Speilberg, who used to be my

04:11PM  19   secretary from all the way back when I was at Leger &

04:11PM  20   Mestayer -- she was always in and out -- not steady, but

04:11PM  21   different time periods -- she would typically file federal

04:11PM  22   court pleadings for me, because you have to go through the

04:11PM  23   federal court filing system, and I didn't know how to do it.

04:11PM  24         So after she was over there, if I had any federal

04:11PM  25   court filing, I would probably e-mail it to her and ask her to

**C O N F I D E N T I A L**

04:11PM 1   file it.  I don't know if she would do it from home or if she

04:11PM 2   would do it from there, but I definitely would have done that

04:11PM 3   because, to this day, I don't know how to file federal court,

04:11PM 4   and they won't let you bring it in.

04:11PM 5        Then, I may have -- a couple of times, I may have

04:11PM 6   been doing interrogatories or interrogatory answers or maybe a

04:11PM 7   memorandum or something -- and I'm pretty good with

04:12PM 8   WordPerfect, but I'm not too good with Word -- so sometimes,

04:12PM 9   like if we were doing pretrial inserts, and the other lawyers

04:12PM 10  would send it to you, and they would send it to you in Word,

04:12PM 11  and then I would have to try to get it fixed into WordPerfect.

04:12PM 12  Sometimes it would come out where the columns were crooked or

04:12PM 13  bullet points or something like that.  Then I would e-mail it

04:12PM 14  to her, and she would straighten it all out and fix it for me

04:12PM 15  and send it back to me, because that's just what she always

04:12PM 16  did.

04:12PM 17       Even when she wasn't working for me, and she was at

04:12PM 18  home or working at another firm, we would still do that.

04:12PM 19  Q.   Did you check with Mr. Juneau or anyone there, as you did

04:12PM 20  with the depositions you told us, before you asked her to --

04:12PM 21  A.   No.

04:12PM 22  Q.   -- work on your personal business?

04:12PM 23  A.   No.

04:12PM 24  Q.   Did you ever ask any of the people there to help you file

04:12PM 25  and prepare LLC's?  People at the CAO?

**C O N F I D E N T I A L**

04:12PM 1   A.   No, I don't think so.   I don't remember -- I don't

04:12PM 2   remember that I would have filed any LLC's while I was there.

04:13PM 3   I don't remember any, so I don't think I would have done that.

04:13PM 4   But I --

04:13PM 5   Q.   Or any filings or reports related to the various LLC's,

04:13PM 6   which we'll go through a little bit later, that you did over

04:13PM 7   the years?

04:13PM 8   A.   Unless it was something that, because of the formatting --

04:13PM 9   like I said, with Tracy with the WordPerfect/Word or something

04:13PM 10  like that -- unless it was something like that, then, no, I

04:13PM 11  wouldn't have -- I don't believe I would have talked to anybody

04:13PM 12  else over there about anything.

04:13PM 13  Q.   Now, you said earlier in response to my question, when you

04:13PM 14  came on board you signed an employment agreement that had a

04:13PM 15  conflicts provision in there?

04:13PM 16  A.   Yes.

04:13PM 17  Q.   Do you recall that?

04:13PM 18  A.   Well, I've since looked at it.

04:13PM 19  Q.   We'll go over that later.

04:13PM 20       I think I understood you to say you didn't get a

04:13PM 21  separate orientation or briefing or any materials on conflict

04:13PM 22  or conflict management?

04:13PM 23  A.   I don't remember anything like that when I first started,

04:13PM 24  unless it was in the papers that I got in March, but I don't

04:13PM 25  remember what that was.

**C O N F I D E N T I A L**

SM-02-JA00049

04:13PM 1   Q.   Besides papers, anybody sitting down and sort of going
04:14PM 2   through the dos and don'ts, the red flags and black flags about
04:14PM 3   conflicts, conflict management?
04:14PM 4   A.   No.
04:14PM 5   Q.   Did your wife have that responsibility at the time, if you
04:14PM 6   know?
04:14PM 7   A.   What responsibility?
04:14PM 8   Q.   Conflicts?
04:14PM 9   A.   I'm not aware of anybody having that responsibility over
04:14PM 10   there.
04:14PM 11        There was a guy who ran the whole office, David Odom.
04:14PM 12   If that was somebody's responsibility, it would have been his;
04:14PM 13   but, I don't remember anybody having -- I don't remember that
04:14PM 14   being a responsibility of anybody.
04:14PM 15   Q.   No one ever spoke to you about conflicts after you came on
04:14PM 16   board?
04:14PM 17   A.   Not that I recall.
04:14PM 18   Q.   The same question as to ethics.  As lawyers, obviously, we
04:14PM 19   have rules of ethics that we have to abide by.  When you went
04:14PM 20   to the CAO, was there any orientation or briefing on what the
04:14PM 21   code of ethics would be for people, contractors and otherwise,
04:14PM 22   working for Mr. Juneau?
04:14PM 23   A.   I don't think so.  I don't remember that at all.
04:14PM 24   Q.   No one ever showed you any materials that described the
04:15PM 25   code of conduct or code of ethics?

**C O N F I D E N T I A L**

04:15PM 1   A.   Unless it was in the papers that I got in March, then

04:15PM 2   no -- I didn't get any other materials other than whatever was

04:15PM 3   included in March.

04:15PM 4   Q.   Nobody sitting down and saying, you know, Tiger, we've got

04:15PM 5   to spend an hour, just touch the base and go over all these dos

04:15PM 6   and don'ts, rules of the road?

04:15PM 7   A.   No.

04:15PM 8   Q.   Same thing with compliance.  Are you familiar with the

04:15PM 9   term *compliance*?  And my question will be --

04:15PM 10  A.   Depending on how it's used.

04:15PM 11  Q.   -- did anyone sit down with you and give you a briefing,

04:15PM 12  talk to you about, you know, what the compliance requirements

04:15PM 13  were for the administrative office and the processing of

04:15PM 14  claims, etcetera?

04:15PM 15  A.   I don't -- I don't understand the use of the term

04:15PM 16  *compliance* the way you're using it.  Nobody sat down and talked

04:15PM 17  to me about anything like that, but -- that I recall.

04:15PM 18  Q.   So is it fair to say nobody talked to you about anything

04:15PM 19  to do with conflicts management, ethics, code of conduct,

04:16PM 20  compliance, any of the above, after you came on board?

04:16PM 21  A.   Unless it was in the papers in March, I don't recall

04:16PM 22  anybody ever talking to me about anything like that.  Even if

04:16PM 23  it was in the papers in March, nobody would have talked to me

04:16PM 24  about it; it would have been in the papers.

04:16PM 25          MR. TIDWELL:  Do you remember who handed you the

**CONFIDENTIAL**

SM-02-JA00051

04:16PM 1    papers and what guidance they gave you?

04:16PM 2             THE WITNESS:  No.  David Odom gave them to me, said,

04:16PM 3    "Everybody has got to sign these."  I looked through them, and

04:16PM 4    there was something in there -- and I don't remember what it

04:16PM 5    was -- that I thought was a problem because I was part time and

04:16PM 6    because I was -- still had a law practice, I think.

04:16PM 7             But I remember going to talk to Mike about it,

04:16PM 8    Mike Juneau, then Mike saying, "Okay, we'll get that changed."

04:16PM 9    But then I don't ever remember, again, whether they gave it

04:16PM 10   back to me and I signed it, whether Mike gave it back to me and

04:17PM 11   I signed it, or whether David Odom gave it back to me and I

04:17PM 12   signed it.  It would have been one of those two.

04:17PM 13   BY MR. FREEH:

04:17PM 14   Q.    Do you recall signing it?

04:17PM 15   A.    No.

04:17PM 16   Q.    Is it possible you did sign it, and you just don't recall?

04:17PM 17   A.    Yes.

04:17PM 18   Q.    I direct your attention back to the time when you're

04:17PM 19   talking to Mr. Juneau about the job, not yet starting the

04:17PM 20   position, around that period, which is November.

04:17PM 21             You said that he was aware of the Crown connection

04:17PM 22   because it was an obvious and visible connection around your

04:17PM 23   law office; but, you didn't have a particular conversation with

04:17PM 24   him that you recall about Crown per se?

04:17PM 25   A.    Other than if I would have said, you know, "I have these

**C O N F I D E N T I A L**

SM-02-JA00052

04:17PM 1   other businesses," and mentioned it; but, I don't remember

04:17PM 2   anything specific about that, no.

04:17PM 3   Q.   You didn't tell him, I take it from your answer, that you

04:17PM 4   had a business relationship with a man named Lerner?

04:18PM 5   A.   No.  I'm almost positive I didn't tell him that.

04:18PM 6   Q.   Of course, when you were being interviewed for the job

04:18PM 7   before you started, you were aware, as you told us earlier,

04:18PM 8   that there was some *BP* claims relationship, formal or

04:18PM 9   otherwise, between Andry and Lerner?

04:18PM 10  A.   Yes.

04:18PM 11  Q.   Did you tell Mr. Juneau about that when you were being

04:18PM 12  interviewed?

04:18PM 13  A.   No.  I think -- I think Pat just talked to me one day, and

04:18PM 14  then I was hired.  I don't think it was like an interview and

04:18PM 15  then he talked to me.

04:18PM 16      So you've been splitting it up saying during the

04:18PM 17  interview and then when you talked to Pat; but, I believe it

04:18PM 18  was all together.

04:18PM 19  Q.   All right.  Well, let me ask you a different question, and

04:18PM 20  I apologize.

04:18PM 21  A.   But I did -- but I did not say any of that.

04:18PM 22  Q.   Did you ever have a conversation with Mr. Juneau about

04:18PM 23  that?

04:18PM 24  A.   I don't think so.

04:18PM 25  Q.   Did you ever have a conversation about that subject matter

**C O N F I D E N T I A L**

SM-02-JA00053

04:18PM 1   and those relationships with anybody in the Claims

04:18PM 2   Administration while you were there?

04:19PM 3   A.   I know Pat knew that Jon Andry had *BP* cases because he had

04:19PM 4   asked me about that one, and he complained about Jon bugging

04:19PM 5   him all the time.

04:19PM 6        I don't think that I ever would have said or ever did

04:19PM 7   say anything about the Lerner part and Crown, other than -- I

04:19PM 8   mean, I would go on these demonstrations with the Crown

04:19PM 9   machine, and if I would have come back and said, "Hey, you

04:19PM 10  know, we had a really great demo," or something like that.   I

04:19PM 11  don't remember if I would have talked to him about it at all.

04:19PM 12  Q.   When you were hired for the job that you undertook, did

04:19PM 13  you think it was a conflict that you had a business

04:19PM 14  relationship with Lerner, and that Lerner, simultaneously and

04:19PM 15  continuing after your employment there, had a *BP* claim process

04:19PM 16  he was working with Andry on?

04:19PM 17  A.   No.

04:19PM 18  Q.   As you sit here today, do you think that's a conflict?

04:20PM 19  A.   No.

04:20PM 20  Q.   Why not?

04:20PM 21  A.   Because I didn't have anything to do with -- I mean, it

04:20PM 22  was a settlement.   They put in their cases, and the process,

04:20PM 23  the -- it was already done.   I didn't have anything to do with

04:20PM 24  how the claims were calculated or anything like that.   I mean,

04:20PM 25  I didn't see a conflict there.

**C O N F I D E N T I A L**

**SM-02-JA00054**

04:20PM 1    Q.    You don't see one as you sit here today?

04:20PM 2    A.    No.

04:20PM 3    Q.    You don't think that's something you should have

04:20PM 4    disclosed?

04:20PM 5    A.    If I thought it was a conflict, I would have disclosed it.

04:20PM 6    I didn't see it as a conflict.

04:20PM 7          I told Pat when he first brought it up in -- when all

04:20PM 8    of this came down, the day before I resigned, I didn't see it

04:20PM 9    as a conflict even then, and I don't see it as a conflict now.

04:20PM 10   Q.    We'll go over them in a lot of detail later; but, during

04:20PM 11   the course of your time at the CAO, you were personally

04:20PM 12   involved in inquiring about and talking about in e-mail and

04:20PM 13   telephone calls claims that were being represented before the

04:21PM 14   administration office by the Lerner Andry firm?

04:21PM 15   A.    I would have checked the status and checked what was going

04:21PM 16   on with the ones that he asked me about and the ones that

04:21PM 17   Pat -- but -- you know, whatever those -- that handful was,

04:21PM 18   yes.

04:21PM 19   Q.    Well, you would have; but, you did, in fact?

04:21PM 20   A.    Oh, yeah.  No, that's what I'm saying.  I did.  Whatever

04:21PM 21   ones they would have asked me about, like I discussed with you,

04:21PM 22   I would have done it; and, I did do it as I -- on the ones that

04:21PM 23   I've told you about.

04:21PM 24   Q.    In many e-mails, we'll go over them in great detail, you

04:21PM 25   took some time and, obviously, quite a bit of language in

**C O N F I D E N T I A L**

SM-02-JA00055

04:21PM 1   talking about the payment of the claims and the status of the

04:21PM 2   payment of the claims; is that correct?

04:21PM 3   A.    You'd have to show me the e-mails; but, I did -- that

04:21PM 4   was -- I did that with a lot of lawyers on a regular basis.  So

04:21PM 5   if you're saying that I did, to me, that wouldn't be

04:22PM 6   surprising.

04:22PM 7   Q.    Well, I'm not talking about a lot of lawyers, now.  I'm

04:22PM 8   asking you about claims that came out of the Lerner Andry

04:22PM 9   representation.

04:22PM 10   A.    I can only remember talking to them about a handful of

04:22PM 11   claims; the *Thonn* claim, the *Talen's* claim and maybe three

04:22PM 12   other claims that he may have -- that Jon may have mentioned in

04:22PM 13   the phone calls we talked about.

04:22PM 14         I don't remember ever talking to him about any other

04:22PM 15   specific claims.

04:22PM 16   Q.    Did Jon ask you to check on the *Thonn* claim at some point?

04:22PM 17   A.    No.  I don't think so.

04:22PM 18   Q.    Did Lerner?

04:22PM 19   A.    No.

04:22PM 20   Q.    Did anyone else?

04:22PM 21   A.    Casey Thonn.

04:22PM 22   Q.    You kept speaking to Casey Thonn, even after your wife

04:22PM 23   recused herself and had the case assigned to Andry, correct?

04:22PM 24   A.    I had him as a personal injury client.

04:22PM 25   Q.    While your wife was working for the administrator?

**C O N F I D E N T I A L**

SM-02-JA00056

04:22PM  1    A.    Yes.

04:22PM  2    Q.    Did you think that was a conflict?

04:22PM  3    A.    No, because I would assume that every client I had at that

04:22PM  4    point with my law practice probably had claims with the *BP*

04:23PM  5    process.  I mean, almost everybody in the whole state did.  So

04:23PM  6    no, I mean, it wasn't even crossing my mind.

04:23PM  7          MR. FREEH:  Do you have the employment agreement that

04:23PM  8    he signed?

04:23PM  9          THE WITNESS:  Pat knew that I had a private law

04:23PM 10    practice.

04:23PM 11    BY MR. FREEH:

04:23PM 12    Q.    Did Pat know you represented Mr. Thonn?

04:23PM 13    A.    Well, I mean, he knew I did, I assume, because we filed a

04:23PM 14    claim for him with the GCCF.  So whether he knew I had a

04:23PM 15    personal injury claim with him, I don't know.

04:23PM 16    Q.    Did you even tell him?

04:23PM 17    A.    I doubt it.

04:23PM 18          MR. WALSH:  Let's take a break for a second.  I want

04:23PM 19    to switch chairs.

04:23PM 20          MR. FREEH:  You want to take a five-minute break?

04:23PM 21          MR. WALSH:  No.  I'm fine.

04:23PM 22          (WHEREUPON, at this point in the proceedings,

04:23PM 23    Exhibit S-16 was marked.)

04:23PM 24    BY MR. FREEH:

04:24PM 25    Q.    So let me show you what we've marked as S-16.

**C O N F I D E N T I A L**

**SM-02-JA00057**

04:24PM  1          MR. WALSH:  Is this going to be attached?

04:24PM  2          MR. FREEH:  Yes.

04:24PM  3  BY MR. FREEH:

04:24PM  4  Q.    You should take a look at it.  This is entitled *Agreement*

04:24PM  5  *in Furtherance of Court's Order Appointing Claims*

04:24PM  6  *Administrator*, entered and dated -- page 1 of the exhibit --

04:24PM  7  November 1, 2012.

04:24PM  8          It's titled as an agreement.  It's a five-page

04:24PM  9  document and purports to have your signature and Mr. Juneau's

04:24PM  10  signature on page 5.

04:24PM  11          I'd just ask you to look at that, and particularly

04:24PM  12  maybe look over paragraph number 7 entitled,

04:24PM  13  *Conflict of Interest and Recusal*.  Take your time.

04:24PM  14  A.    (Witness reviews the document.)  Okay.

04:25PM  15  Q.    So let me direct your attention to page 5.  The first

04:25PM  16  sentence at the top of the page reads:  "Contractor will take

04:26PM  17  appropriate steps to avoid even the appearance of a conflict of

04:26PM  18  interest or loss of impartiality with respect to the

04:26PM  19  performance of her official duties as part of the

04:26PM  20  Court-supervised claims program.  Contractor will not

04:26PM  21  participate without prior written approval from the

04:26PM  22  Claims Administrator in any activity that presents or would

04:26PM  23  appear to present to a reasonable person who was knowledgeable

04:26PM  24  of the relevant facts a conflict of interest with the

04:26PM  25  Court-supervised claims program."

**C O N F I D E N T I A L**

04:26PM 1      Do you remember reading that and signing it?

04:26PM 2  A.    No.   That's my signature; but, when I signed it, I

04:26PM 3  couldn't tell you.

04:26PM 4  Q.    All right.

04:26PM 5  A.    But that's my signature.

04:26PM 6  Q.    The date on page 1 is November 1st.   You're not sure when

04:26PM 7  you signed it, is what you're saying?

04:26PM 8  A.    Yeah, I'm not sure of when I signed it.   I know the

04:26PM 9  effective date was November 1st; but, I don't remember if this

04:26PM 10 was signed before I worked there or after or at what point

04:27PM 11 after.   But that appears to be my signature, yes.

04:27PM 12 Q.    Do you recall reading that particular provision that I

04:27PM 13 quoted?

04:27PM 14 A.    I don't recall reading it.

04:27PM 15 Q.    But as a lawyer, obviously, you're familiar with the

04:27PM 16 concept of both conflict and appearance of conflict?

04:27PM 17 A.    Yes.

04:27PM 18 Q.    You've had experiences as a lawyer where you've identified

04:27PM 19 those conflicts or appearances and taken appropriate action?

04:27PM 20 Have you had occasion to do that as a lawyer?

04:27PM 21 A.    Not that I recall.   I don't know.

04:27PM 22 Q.    In any case that you recall?

04:27PM 23 A.    I don't recall.

04:27PM 24 Q.    When you continued to represent Mr. Thonn --

04:27PM 25 A.    Thonn.

**C O N F I D E N T I A L**

SM-02-JA00059

| | |
|---|---|
| 04:27PM 1 | Q.    -- in a matter unrelated to his claim, but as your client, |
| 04:27PM 2 | after you went to work as a contractor with the administrator, |
| 04:28PM 3 | you don't think that was a conflict of interest? |
| 04:28PM 4 | A.    No, not at all. |
| 04:28PM 5 | Q.    Do you think it was an appearance of a conflict? |
| 04:28PM 6 | A.    No. |
| 04:28PM 7 | Q.    Do you think it's something you should have disclosed? |
| 04:28PM 8 | A.    No.  Pat knew I still had a private practice.  I |
| 04:28PM 9 | wouldn't -- don't think it's anything that I -- other than that |
| 04:28PM 10 | he knew I was part time and had a private practice, that's all |
| 04:28PM 11 | I would have disclosed.  That's all I would have thought he |
| 04:28PM 12 | wanted to know. |
| 04:28PM 13 | Q.    You know that when your wife went to work, she |
| 04:28PM 14 | specifically recused herself and stopped the representation |
| 04:28PM 15 | with Casey, correct? |
| 04:28PM 16 | A.    Well, she went to work full time for Pat, and she stopped |
| 04:28PM 17 | representing everybody or anybody at our office because she |
| 04:28PM 18 | went to work for Pat full time. |
| 04:28PM 19 | When I went to work for him, we specifically |
| 04:28PM 20 | negotiated and talked about I was only going to be there part |
| 04:28PM 21 | time because I still had a private practice and other |
| 04:28PM 22 | businesses.  So what she and I did were different. |
| 04:28PM 23 | Q.    Was it your understanding that being part time excluded |
| 04:28PM 24 | you from the conflict provisions of the agreement that we just |
| 04:29PM 25 | cited, Exhibit 16? |

**C O N F I D E N T I A L**

04:29PM 1   A.    No, there were some provisions that I thought it excluded
04:29PM 2   me from, but I don't remember that it was this one or some of
04:29PM 3   the other stuff that we signed.
04:29PM 4   Q.    Well, which provisions did you think -- or which conduct
04:29PM 5   did you think at that time it excluded you from?
04:29PM 6   A.    I don't remember.  You know, I told you when I went to
04:29PM 7   talk to Mike about it and he made some changes, but I don't
04:29PM 8   remember what it was specifically.
04:29PM 9   Q.    You were involved in terms of e-mails and conversations
04:29PM 10  after you became a contractor in connection and in regard to
04:29PM 11  Mr. Casey's claim before the CAO, correct?
04:29PM 12  A.    Say that again.
04:29PM 13  Q.    After you went to work for Mr. Juneau, you did involve
04:29PM 14  yourself in the process relating to his claims before the CAO?
04:29PM 15  A.    Other than checking status and -- when he asked me to and
04:30PM 16  looking at it.  I mean, I didn't have anything to do -- his was
04:30PM 17  seafood program, and I didn't have anything to do with the
04:30PM 18  seafood program.
04:30PM 19  Q.    Would you agree with me that would be involving yourself
04:30PM 20  in his claim?
04:30PM 21  A.    No.  No.  Not at all.
04:30PM 22  Q.    What would you call it?
04:30PM 23  A.    Checking his claim, finding out what was going on with it,
04:30PM 24  like I did for everybody.  I wouldn't call it involving myself
04:30PM 25  with the claim at all.

**C O N F I D E N T I A L**

04:30PM  1        The claims weren't calculated in our office.  They
04:30PM  2    were calculated through the accountants.  On seafood, I don't
04:30PM  3    even know where they were calculated.  But, no.
04:30PM  4        If I remember correctly, the first time I checked his
04:30PM  5    claim, it had already been calculated, I think.
04:30PM  6    Q.   I'm not asking about the calculation.  Do you know --
04:30PM  7    A.   I answered your question.  I didn't think that was being
04:30PM  8    involved in his case.
04:30PM  9    Q.   You don't think that was a conflict?
04:30PM  10   A.   No.
04:30PM  11   Q.   You don't think you should have gotten permission to do
04:30PM  12   that?
04:30PM  13   A.   No.
04:30PM  14   Q.   In fact, you did more than just inquire about the status
04:30PM  15   of his claim; isn't that correct?
04:31PM  16   A.   Not that I recall.
04:31PM  17   Q.   Did you have any e-mail communications with Mr. Lerner
04:31PM  18   about it?
04:31PM  19   A.   Oh, yeah.  But you were talking about his claim.
04:31PM  20   Q.   Now, I'm talking about his claim.
04:31PM  21   A.   I had e-mail communications with Lerner about the status
04:31PM  22   of *Casey Thonn's* claim, never about his claim or the
04:31PM  23   involvement of his claim.
04:31PM  24   Q.   Did you have conversations with Andry about the status of
04:31PM  25   his claim?

**C O N F I D E N T I A L**

04:31PM 1    A.    Not that I recall.

04:31PM 2    Q.    Did you have these conversations with Mr. Lerner about

04:31PM 3    Casey's claim because Casey asked you to do that?

04:31PM 4    A.    No.  I don't remember having conversations with Glen.  I

04:31PM 5    see that we had -- I mean, I know we had e-mails, but I

04:31PM 6    don't --

04:31PM 7    Q.    Communications?

04:31PM 8    A.    Yeah.

04:31PM 9    Q.    You had those communications?

04:31PM 10   A.    Yes.

04:31PM 11   Q.    You had a lot of them?

04:31PM 12   A.    Casey -- well, I don't know.  I haven't looked at them

04:31PM 13   all.  Casey -- yeah, I think that's --

04:32PM 14   Q.    All right.  Well, you didn't answer my question, though.

04:32PM 15   The question was did Casey ask you to speak to Mr. Lerner?

04:32PM 16   A.    I told you no.

04:32PM 17   Q.    So why did you speak to Mr. Lerner about that?

04:32PM 18   A.    Because I was trying to find out when he got paid on the

04:32PM 19   case.

04:32PM 20   Q.    It was important for you to find out when he got paid,

04:32PM 21   correct?

04:32PM 22   A.    To the extent that I wanted my fee, it was.

04:32PM 23   Q.    You had the understanding, and, in fact, the process

04:32PM 24   turned out to be when Mr. Lerner got paid on Casey's claim, you

04:32PM 25   got paid in the unrelated matter regarding Crown, correct?

**C O N F I D E N T I A L**

SM-02-JA00063

04:32PM 1     A.   I don't understand the question.

04:32PM 2     Q.   Well, you talked to Mr. Lerner in communications various

04:32PM 3     times about Casey's claim?

04:32PM 4     A.   Yes.  Casey's claim and Crown are two different things.

04:32PM 5     Q.   I understand that.

04:32PM 6     A.   The fee from Casey's claim and what I got from Crown was

04:32PM 7     two different things.

04:32PM 8     Q.   We'll get to that later.  Right now, I'm asking you about

04:33PM 9     talking to Mr. Lerner about the status of Casey's claim.

04:33PM 10    A.   In the e-mails.

04:33PM 11    Q.   In the e-mails.

04:33PM 12    A.   Okay.

04:33PM 13    Q.   You pursued that because you wanted to get paid with

04:33PM 14    respect to the Crown monies?

04:33PM 15    A.   No.  It had nothing to do with Crown.

04:33PM 16    Q.   Why were you talking to Mr. Lerner about Casey's claim?

04:33PM 17    A.   Because I wanted to know when he got paid on *Thonn*, so I

04:33PM 18    could get my share of the fee.

04:33PM 19    Q.   When he got paid, you were expecting that you would get

04:33PM 20    paid on your fee?

04:33PM 21    A.   Yes.

04:33PM 22    Q.   Would you call that involving yourself in Casey's claim?

04:33PM 23    A.   No.

04:33PM 24    Q.   What would you call that?

04:33PM 25    A.   Waiting for my share of the fee for the work I did before

**C O N F I D E N T I A L**

SM-02-JA00064

04:33PM 1    I ever went to work over there.

04:33PM 2    Q.   When you inquired within the CAO about the status of

04:33PM 3    Casey's claim, part of your motive in doing that was to

04:33PM 4    determine when it was going to get paid, correct?

04:33PM 5    A.   No, unless that's what Casey asked me, to find out what

04:33PM 6    the status was and when it was going to -- I never told anybody

04:34PM 7    when, so I don't think so, no.  I don't think that was my

04:34PM 8    motive.

04:34PM 9         Whatever Casey asked me to check on his claim for.

04:34PM 10   One time, he asked me to check because he was dating a girl

04:34PM 11   that worked at one of the vendors, and he was worried that she

04:34PM 12   might have done something to mess up his claim.  So he asked me

04:34PM 13   to check his claim.

04:34PM 14        Another time, he asked me to check his claim because

04:34PM 15   he had already got his eligibility notice for the amount to get

04:34PM 16   paid, and his lawyer wanted -- he told his lawyer he would

04:34PM 17   accept it, and his lawyer decided to appeal the claim.

04:34PM 18        He wanted to know about that.  He wanted me to check

04:34PM 19   it out for him to see if he appealed one or both or whatever it

04:34PM 20   was.

04:34PM 21        So those are the two times I remember Casey asking

04:34PM 22   me.  There could have been other times, but I believe that was

04:34PM 23   it.

04:34PM 24   Q.   When you made the inquiries about the status of his claim,

04:34PM 25   you were not also motivated by the fact that you wanted that

**CONFIDENTIAL**

SM-02-JA00065

04:35PM 1   claim to be paid?

04:35PM 2   A.   No.   When it got paid, it got paid.   I didn't have any --

04:35PM 3   wasn't trying to push the claim to get paid.

04:35PM 4   Q.   I didn't ask you that; but, when it got paid, you would

04:35PM 5   get paid your arrears from Crown?   That was your expectation?

04:35PM 6   A.   No, I didn't get -- it had nothing to do with Crown.   I

04:35PM 7   never got paid my arrears from Crown to anything with the *Thonn*

04:35PM 8   case.   I don't know what you're saying there.   I don't

04:35PM 9   understand the question.

04:35PM 10  Q.   I'll repeat the question.   When Lerner got paid, when

04:35PM 11  Lerner got money out of the claims process, you expected to get

04:35PM 12  paid with respect to your Crown obligations?

04:35PM 13  A.   No.   One didn't have anything to do with the other.

04:35PM 14       When he got paid out of the *Casey Thonn* fee, I

04:35PM 15  expected to get my share of the fee for the work that I had

04:35PM 16  done on Casey Thonn's case when I represented him before the

04:35PM 17  GCCF before I went to work for Pat.

04:35PM 18       That's what I expected from the *Thonn* case.   I didn't

04:35PM 19  expect -- it had nothing to do with Crown.

04:35PM 20  Q.   Well, you would know, would you not, based on the payment

04:35PM 21  of the claim from the administrator, when Lerner was getting

04:36PM 22  money or not getting money?

04:36PM 23  A.   No.   I wouldn't know that.

04:36PM 24  Q.   Well, if the claim was paid, you could -- and we'll go

04:36PM 25  over the e-mails in detail -- you could determine when Lerner

**C O N F I D E N T I A L**

**SM-02-JA00066**

04:36PM 1   was getting paid with respect to the fees?

04:36PM 2   A.   No, because I didn't know what Lerner's arrangement with

04:36PM 3   Andry was.  I wouldn't know what Lerner was going to get paid

04:36PM 4   for the fees.

04:36PM 5   Q.   But you asked him and other people from time to time if

04:36PM 6   they were paid, correct?

04:36PM 7   A.   Yes, for the *Thonn* fee.

04:36PM 8   Q.   For the *Thonn* fee.

04:36PM 9   A.   Yes, yes.

04:36PM 10  Q.   Why did you ask about that?

04:36PM 11  A.   Because I wanted to know if Lerner had gotten his money

04:36PM 12  yet, so that I could get my share of the fee, like I told you.

04:36PM 13  Q.   As you sit here today, you don't believe that was a

04:36PM 14  conflict of interest?

04:36PM 15  A.   No.

04:36PM 16  Q.   You don't think that was something you should have advised

04:36PM 17  the administrator about?

04:36PM 18  A.   Maybe in hindsight; but, not at the time, I didn't.

04:36PM 19  Q.   Well, I'm asking you as you sit here today, which I guess

04:37PM 20  is hindsight.  Mr. Lerner had a financial interest in matters

04:37PM 21  before the administrator, correct?

04:37PM 22  A.   He had cases that were filed through the settlement.

04:37PM 23  However you want to categorize that, yes.

04:37PM 24  Q.   When he was paid by the administrator on Casey's claim,

04:37PM 25  for example, you expected or contemplated that you would get

**C O N F I D E N T I A L**

SM-02-JA00067

68

04:37PM 1    payment?

04:37PM 2    A.    The only case that I ever knew that Lerner got paid on,

04:37PM 3    that I can recall, was *Casey Thonn*, and I expected to get my

04:37PM 4    share of the fee on that case.

04:37PM 5          Other than that, I don't understand the question.

04:37PM 6    Q.    Well, you inquired about the status of that payment so you

04:37PM 7    would know when you should get paid?

04:37PM 8    A.    Inquired on the status of payment to who?

04:37PM 9    Q.    People in the Claims Administrative Office?

04:37PM 10   A.    No, I never inquired about the status of a payment.

04:37PM 11   Q.    No, the claim, status of the claim.

04:38PM 12   A.    I inquired about the status of the claim because

04:38PM 13   Casey Thonn asked me to inquire about the status of the claim

04:38PM 14   on the two times that I told you; and, maybe another time, but

04:38PM 15   I don't know for sure.

04:38PM 16         But I wasn't asking him about it for me.  I had

04:38PM 17   conversations with Mr. Lerner -- or e-mails with Mr. Lerner

04:38PM 18   about that, but it had nothing to do with the claims office.

04:38PM 19   Q.    But in your conversations with Lerner, you refer

04:38PM 20   specifically to Casey's claim?

04:38PM 21   A.    Because that was the only one that I was supposed to get

04:38PM 22   my share of the fee on it because I represented *Thonn* with the

04:38PM 23   GCCF before he ever went to Lerner.

04:38PM 24   Q.    So this was a delayed fee payment?

04:38PM 25   A.    No.  I don't understand what that means.

# CONFIDENTIAL

**SM-02-JA00068**

69

04:38PM 1    Q.   Well, you said you were entitled to it because of the

04:38PM 2    prior representation?

04:38PM 3    A.   For the work I had done on Thonn's case with the GCCF.

04:38PM 4    Q.   So the money you got from Lerner you believe was in

04:38PM 5    payment of the work you had done on the *Thonn* case?

04:38PM 6    A.   It was my share of the *Thonn* fee for the work that I had

04:39PM 7    performed on the *Thonn* case.

04:39PM 8    Q.   Did you ever disclose that to Mr. Juneau?

04:39PM 9    A.   No.

04:39PM 10   Q.   You never disclosed it to anybody at the Claim

04:39PM 11   Administration Office?

04:39PM 12   A.   No.

04:39PM 13   Q.   Was Mr. Andry aware of that?

04:39PM 14        MR. WALSH:   I'm sorry, but aware of what?

04:39PM 15        THE WITNESS:   That I disclosed it?

04:39PM 16   BY MR. FREEH:

04:39PM 17   Q.   No, that you had a fee that you believed was owing to you

04:39PM 18   from the prior representation?

04:39PM 19   A.   I know I spoke to Glen about it, Glen Lerner, and e-mailed

04:39PM 20   him about it.   I don't recall whether or not I would have

04:39PM 21   talked to Jon about it because when I sent -- when *Casey Thonn*

04:39PM 22   went over there, I wasn't really talking to Jon at that point,

04:39PM 23   so I don't remember if I ever spoke to him about it or not.

04:39PM 24        It was Glen.   I mean, that's who I was getting the

04:39PM 25   fee from.

**C O N F I D E N T I A L**

04:39PM  1           MR. TIDWELL:  Could you help me with the mechanics

04:39PM  2    of --

04:39PM  3           THE WITNESS:  Yes.

04:39PM  4           MR. TIDWELL:  -- how the claim from the GCCF -- when

04:40PM  5    your wife wrote the GCCF administrator and said, I'm divesting

04:40PM  6    myself, and I'm not representing Casey Thonn anymore?

04:40PM  7           THE WITNESS:  Right.  At that point, I told Pat that

04:40PM  8    we would refer the case out.

04:40PM  9           MR. TIDWELL:  Okay.  Well, so I guess this is a

04:40PM 10    mechanical -- truly a mechanical question.  So did you -- was

04:40PM 11    there work still to be done on the Gulf Coast --

04:40PM 12           THE WITNESS:  No.

04:40PM 13           MR. TIDWELL:  So --

04:40PM 14           THE WITNESS:  Because they had gotten a settlement

04:40PM 15    now, so the Gulf -- as I understood, the GCCF wasn't handling

04:40PM 16    the claims anymore, because it was going to go through the CA's

04:40PM 17    office.

04:40PM 18           MR. TIDWELL:  Because they were --

04:40PM 19           THE WITNESS:  So I told Pat about -- that we had two

04:40PM 20    cases, two, with the GCCF, when he came to talk to Christine

04:40PM 21    about hiring her.

04:40PM 22           MR. TIDWELL:  Right.

04:41PM 23           THE WITNESS:  I said, I'll refer those cases out, and

04:41PM 24    that's what I did.

04:41PM 25           MR. TIDWELL:  I understand now.  Thank you.

**C O N F I D E N T I A L**

**SM-02-JA00070**

BY MR. FREEH:

Q.   Did you actually ask Mr. Juneau to employ Christine?

A.   I think when I found out that he was the Special Master or -- I mean, that's what we called him at the time, but I think they say Claims Administrator now -- I either called him, saw him or e-mailed him and said, "If you" -- "my wife has some experience doing document review and stuff on these class actions" -- because she had just finished Vioxx, I think, and he knew her from tobacco -- "so if you have any openings, if you need somebody, I would appreciate if you would consider her."

       Then he just showed up at my office one day and started talking to us.  He talked to her, and that's when they had the conversation I just said.

Q.   Then, fast forward to the next year when you became a part-time worker for Mr. Juneau.  How does that employment come about?  Does Christine recommend you to that job, or do you ask Mr. Juneau directly?

A.   I was in and out of there a lot because they were next door, and it was nice to see Pat and Mike and stuff again.

       I think Christine told me that they needed to -- or that Pat needed more help, and did I want to work there.  I may -- and I said, "Well, I can't work there full time."

       I think she said, "Well, maybe you can do it part time.  Why don't you talk to him."

**C O N F I D E N T I A L**

SM-02-JA00071

| | |
|---|---|
| 04:42PM 1 | What she said to him to get me to come in and talk to |
| 04:42PM 2 | him, I don't know; but, I believe that's how it occurred.  I |
| 04:43PM 3 | don't know if Pat was looking for somebody and she said Tiger |
| 04:43PM 4 | or -- I don't know.  She never told me. |
| 04:43PM 5 | Q.   What was your salary when you started there?  Were you |
| 04:43PM 6 | compensated on an hourly basis? |
| 04:43PM 7 | A.   Where?  For the CA? |
| 04:43PM 8 | Q.   CA. |
| 04:43PM 9 | A.   No, $20,000 a month. |
| 04:43PM 10 | Q.   That was for a fixed amount of hours? |
| 04:43PM 11 | A.   No. |
| 04:43PM 12 | Q.   Just a straight fee? |
| 04:43PM 13 | A.   That was for -- Pat said, "How much time can you put in?" |
| 04:43PM 14 | I said, "Probably 75 percent of my time." |
| 04:43PM 15 | He said, "Okay, what would you want?" |
| 04:43PM 16 | I said, "Well, I don't know." |
| 04:43PM 17 | Full time, I guess, Christine was getting like |
| 04:43PM 18 | 25 grand or something full time.  I said, "I don't know what it |
| 04:43PM 19 | would be for part time." |
| 04:43PM 20 | He said, "How about 20?" |
| 04:43PM 21 | I said, "Fine."  I mean, just like that, very casual. |
| 04:43PM 22 | Q.   I'm going to ask you some questions about a series of |
| 04:44PM 23 | companies, mostly LLC's, that you've been involved with over |
| 04:44PM 24 | the last few years, either as a registered agent or an officer. |
| 04:44PM 25 | I think we have copies we can show you and your lawyer. |

**C O N F I D E N T I A L**

04:44PM  1    A.    I should remember most of them.

04:44PM  2              (WHEREUPON, at this point in the proceedings,

04:44PM  3    Exhibit S-01 was marked.)

04:44PM  4    BY MR. FREEH:

04:44PM  5    Q.    Let me show you S-01, which we've marked.  You and your

04:44PM  6    lawyer can look at it.

04:44PM  7              MR. FREEH:  These are all, Counsel, from the State of

04:44PM  8    Louisiana Secretary of State.

04:44PM  9              MR. WALSH:  Okay.  These are going to be attached?

04:44PM 10              MR. FREEH:  Yes.

04:44PM 11              MR. TIDWELL:  S-01 is for Crown.

04:44PM 12    BY MR. FREEH:

04:44PM 13    Q.    This is the company we've previously talked about in this

04:44PM 14    interview?  Crown, LLC.

04:44PM 15    A.    Yes.

04:44PM 16    Q.    Joey Dartez is the individual you've previously discussed

04:44PM 17    who was involved?

04:44PM 18    A.    Joey Dartez, Tim Elmhurst, Glen Lerner.

04:44PM 19              Now, there are two more since then, but --

04:44PM 20    Q.    Who are the two other ones?

04:45PM 21    A.    Mike Bryant.

04:45PM 22    Q.    B-R-Y-A-N-T?

04:45PM 23    A.    With a Y.  I think Corey -- E-S-C-H, something, something,

04:45PM 24    something -- Eschweiler or something like that.

04:45PM 25    Q.    Is this business still an active, functioning business?

**C O N F I D E N T I A L**

04:45PM 1    A.    Yes.

04:45PM 2    Q.    With different ownership than when it was registered in

04:45PM 3    April of 2010?

04:45PM 4    A.    Yeah.  Two additional owners.

04:45PM 5    Q.    Is Mr. Lerner still associated with it?

04:45PM 6    A.    Yes.

04:45PM 7    Q.    As an officer?

04:45PM 8    A.    They are not -- they are not officers.  In Louisiana, you

04:45PM 9    have an LLC, you have a member; but, that's the way the form

04:45PM 10    is, even for the LLC's at the time, that's where you list the

04:45PM 11    members -- or I don't know how they -- you don't even list it.

04:46PM 12    This comes out from the state.

04:46PM 13          But we wouldn't have put them as officers.  We would

04:46PM 14    have been members.  I would have been -- yeah, we would have

04:46PM 15    been members, and however they put it.  That's how the --

04:46PM 16    Q.    We'll show you S-02.

04:46PM 17          (WHEREUPON, at this point in the proceedings,

04:46PM 18    Exhibit S-02 was marked.)

04:46PM 19          THE WITNESS:  But LLC's in Louisiana don't have

04:46PM 20    officers.

04:46PM 21    BY MR. FREEH:

04:46PM 22    Q.    Don't have officers.  So the secretary of state should

04:46PM 23    have them on the form, right?

04:46PM 24    A.    I doubt it.

04:46PM 25          MR. WALSH:  Judge, just for your -- you do it online.

**C O N F I D E N T I A L**

04:46PM 1    You fill it out online with a credit card.

04:46PM 2                THE WITNESS:  I don't even know if we did it at that

04:46PM 3    time.

04:46PM 4                MR. WALSH:  Which one is S-02?

04:46PM 5    BY MR. FREEH:

04:46PM 6    Q.    S-02, this is, again, State of Louisiana Secretary of

04:46PM 7    State -- and you'll see copies of these -- SDA Enterprises,

04:46PM 8    LLC.  So that was another one of the LLC's that you were

04:46PM 9    involved in?

04:46PM 10   A.    Yes.

04:46PM 11   Q.    This one goes back to 2001?

04:46PM 12   A.    Yes.

04:47PM 13   Q.    No longer active?

04:47PM 14   A.    No.  That was gone a long time ago.

04:47PM 15   Q.    Sean Alfortish, who is listed here as an officer, is the

04:47PM 16   lawyer you mentioned shared space with you on Canal Street?

04:47PM 17   A.    Yes.  We were members of that, too.  It was an LLC.

04:47PM 18   Q.    What was the purpose of this particular LLC?

04:47PM 19   A.    Mike Ditka's Restaurant on St. Charles, I think --

04:47PM 20   wherever it is right across from Lafayette Square, Sean's mom

04:47PM 21   worked at Mike Ditka's Restaurant for Mike Ditka, and they

04:47PM 22   wanted to sell out.  She thought that she could -- you know,

04:47PM 23   that -- she wanted us to buy it, Sean and I to invest in it,

04:47PM 24   and she would continue to run it and work at it.  So that's

04:47PM 25   what we did, and it didn't last very long.

**C O N F I D E N T I A L**

04:47PM  1     Q.   As far as you know, did that restaurant at any point file
04:48PM  2     any claims with the CAO, to your knowledge?
04:48PM  3     A.   No, not to my knowledge.  The restaurant wouldn't even
04:48PM  4     have been in business when the spill happened.  The
04:48PM  5     restaurant -- it only lasted a short period of time with us.
04:48PM  6     Q.   All right.  There is a document behind that, which is the
04:48PM  7     same type of report, for an LLC called *Can You Hear Me Now*?
04:48PM  8     A.   Yes.
04:48PM  9     Q.   Is that another one of the LLC's you were involved in?
04:48PM 10     A.   I wasn't a member of that one.  I was only the agent, and
04:48PM 11     I may have been -- oh, wait.  I'm trying to think which one
04:48PM 12     that is.  I don't remember being a member of that one.  I see
04:48PM 13     what it says, but I don't remember being a member of that one,
04:48PM 14     and I don't recognize these names.
04:48PM 15          I thought this one was for a boat some guys were
04:48PM 16     buying, and they wanted me to form an LLC for them to buy the
04:48PM 17     boat.  They named the boat CAN YOU HEAR ME NOW?  I think that
04:49PM 18     that's what this is, but I don't recognize Mark Corcoran nor
04:49PM 19     Charles Laborde.  I don't recognize those names at all.  I'm
04:49PM 20     not positive.
04:49PM 21     Q.   This is no longer active, as far as you know?
04:49PM 22     A.   Oh, no.  The boat sank, and it was gone within a year or
04:49PM 23     something.
04:49PM 24     Q.   The next one in this exhibit is the same form, Secretary
04:49PM 25     of State, State of Louisiana, Navajo Properties?

**C O N F I D E N T I A L**

**SM-02-JA00076**

04:49PM 1    A.    Partners.

04:49PM 2    Q.    Partners.

04:49PM 3    A.    Navajo Partners.  Yeah, that was Johnny Walker.  You see

04:49PM 4    the guy is a member down there.  He wanted to buy a plane, a

04:49PM 5    Navajo.  I think it was a Chieftain.

04:49PM 6          So we formed an LLC; but, then we never bought the

04:49PM 7    plane and never did anything with it.  He died of a diabetic

04:49PM 8    attack or something, so we never did nothing with it.

04:49PM 9    Q.    All right.  The next one is Full Dimension Trading

04:50PM 10   Company.  That's a 2007 registration, according to this form.

04:50PM 11   A.    Yeah.

04:50PM 12   Q.    That's got a New Iberia address.

04:50PM 13   A.    Yeah, and that -- I remember Full Dimension Suppliers.

04:50PM 14   I'm looking through to see if --

04:50PM 15   Q.    Yes.  Take your time.

04:50PM 16   A.    -- Full Dimension Trading was something else or not.

04:50PM 17         It may have been that we just did it as Full

04:50PM 18   Dimension Traders and then ended up changing the name

04:50PM 19   ourselves, and that's why I remember Suppliers.

04:50PM 20         But there was a company called *Full Dimension*

04:50PM 21   *Suppliers*, but my guess is that this is what we called it when

04:50PM 22   we filed it; and, after that, we called it *Full Dimension*

04:50PM 23   *Suppliers*.

04:50PM 24   Q.    The next one 4-K Partners, LLC.  It's a 2007 registration.

04:50PM 25   A.    That was a -- my dad started -- he was in the process of

**C O N F I D E N T I A L**

04:51PM 1   taking some of his business interests and property and things

04:51PM 2   like that and giving it to his four kids.  So he wanted me to

04:51PM 3   start this LLC called *4-K*, for four kids, *Partners, LLC*.  It's

04:51PM 4   since been shut down.

04:51PM 5   Q.    The next one, we've got the Professional Law Corporation

04:51PM 6   Sutton & Reitano.

04:51PM 7   A.    Yeah, we --

04:51PM 8   Q.    That was obviously the practice with Christine?

04:51PM 9   A.    Well, no.  We -- I always operated just as a sole

04:51PM 10   practitioner, and I would do d/b/a Sutton & Reitano or d/b/a

04:51PM 11   Law Office of L.H. Sutton, III, whatever -- just whatever we

04:51PM 12   had.

04:51PM 13       When Christine was there, she liked calling it

04:51PM 14   *Sutton & Reitano*, so we'd call it *Sutton & Reitano*, still did

04:51PM 15   d/b/a.

04:51PM 16       We decided to try to file for a professional law

04:51PM 17   corporation, but it got so mixed up with taxes and stuff that

04:51PM 18   we just never used it, and we shut it down; but, the accountant

04:52PM 19   kind of handled all of that.

04:52PM 20       I think she thought she shut it down a year earlier.

04:52PM 21   Then we got something from the IRS or from the state that said

04:52PM 22   she didn't, so she did again after that.  But that was shut

04:52PM 23   down.

04:52PM 24   Q.    All right.  The next one is MISS ASHLEY, LLC, 2001

04:52PM 25   registration.

**C O N F I D E N T I A L**

SM-02-JA00078

04:52PM 1   A.    Yeah, that was my -- Martin Belden, the guy at the bottom,

04:52PM 2   was a member.  Again, I see where it says officer, but it also

04:52PM 3   says member.

04:52PM 4         He wanted to buy a crew boat, offshore crew boat, and

04:52PM 5   he didn't have the money.  So he went to my dad and I and my

04:52PM 6   brother in New Iberia, and we gave him the money to buy the

04:52PM 7   boat.

04:52PM 8         We owned it -- I think it was 51 percent T-Blue and

04:52PM 9   49 percent Martin.  We had the majority, but it may have been

04:52PM 10  something other than that.  Typically, we did that a lot, my

04:53PM 11  dad did that a lot, and it would have been 51 percent.

04:53PM 12  Q.    T-Blue, LLC, who were the other principals or members to

04:53PM 13  that?

04:53PM 14  A.    T-Blue, LLC, was the same as 4K Partners.  It was me and

04:53PM 15  my brother and two sisters.  But my dad had a deal that when

04:53PM 16  you brought a new business or a new -- something new in, then

04:53PM 17  they would call it, like, T-Blue if I brought it in, M-Blue if

04:53PM 18  my brother Michael brought it in, something like that.

04:53PM 19        He had the -- where 4K was 25 percent each, for

04:53PM 20  T-Blue, he had it a little different, so that the person that

04:53PM 21  brought the property in got a little bit bigger share.  So

04:53PM 22  that's how he had that worked out.

04:53PM 23  Q.    All right.  So the same questions and same answers on the

04:53PM 24  next document, which is T-Blue, LLC?

04:53PM 25  A.    Yes.  That would have been when he started doing that,

**C O N F I D E N T I A L**

**SM-02-JA00079**

04:53PM 1    yes.

04:53PM 2    Q.   The next one is also, at least now, reflected as an

04:53PM 3    inactive status.  It was a 2006 registration, SECRETARIAT, LLC?

04:54PM 4    A.   Yeah.  We had -- we, my family, had the MISS ASHLEY and --

04:54PM 5    the MISS ASHLEY boat.  Robert Perez had the SECRETARIAT boat.

04:54PM 6    These were two boats.

04:54PM 7         We decided to combine the -- the two boats into one

04:54PM 8    operating business, because one was a crew boat, one was a

04:54PM 9    supply boat, and we thought it would be better marketing-wise.

04:54PM 10        So we started -- we started another company.  I don't

04:54PM 11   see it in here.  But my dad wanted to have all of the boats as

04:54PM 12   their own LLC, which I didn't think we should; but, he did

04:54PM 13   that.  Then, eventually, we didn't -- they don't have them

04:54PM 14   anymore.  We didn't do it that way.  He did it for a while, and

04:54PM 15   then we stopped that.

04:54PM 16   Q.   Who is Robert Perez?

04:54PM 17   A.   He was a guy that --

04:54PM 18   Q.   He owned a boat?

04:54PM 19   A.   He owned a boat.  I met him through Johnny Walker, the guy

04:55PM 20   that I did the Navajo Partners with, because Robert Perez was a

04:55PM 21   pilot, also, and Johnny was a pilot.

04:55PM 22        They met, and Johnny Walker said, "Hey, you ought to

04:55PM 23   meet this guy, Robert Perez.  He has a one-boat operation like

04:55PM 24   y'all do, and maybe y'all can work something out together."

04:55PM 25   Q.   Did you ever represent him as an attorney?

**C O N F I D E N T I A L**

04:55PM 1   A.   I would have represented -- I don't think I ever

04:55PM 2   represented Robert Perez personally.   I represented a boat he

04:55PM 3   owned.   I represented -- I'm currently representing a company

04:55PM 4   that he's involved in.   I may have represented two boats that

04:55PM 5   we own together.

04:55PM 6   Q.   What's the current company that you represent him in?

04:55PM 7   A.   Romeo Papa, LLC.

04:55PM 8   Q.   That has a claim pending before the CAO?

04:55PM 9   A.   Yes.

04:55PM 10  Q.   Are you involved in that?

04:55PM 11  A.   No.

04:55PM 12  Q.   Do you know who is?

04:55PM 13  A.   Robert Perez.

04:56PM 14  Q.   Acting on his own or with an attorney?

04:56PM 15  A.   Acting on his own.

04:56PM 16  Q.   Have you talked to him about the claim?

04:56PM 17  A.   I told him that -- yes, I told him that I didn't think

04:56PM 18  that the claim -- that they were going to be able to do a claim

04:56PM 19  because I was his partner.

04:56PM 20       And he said, "I'm the manager, I make the decisions,

04:56PM 21  I'm the one that" -- "why should we suffer because you're a

04:56PM 22  member and" -- yeah, "because you're a member."

04:56PM 23       So, I said, "Well, I'll just see what happens."

04:56PM 24       I told Pat about -- or Mike about that at some point.

04:56PM 25  I said, "I don't know what to do.  You know, I'm just going

**C O N F I D E N T I A L**

SM-02-JA00081

04:56PM 1   to" -- "I'll have to see what happens.  Maybe I'll have to pay

04:56PM 2   him half of the claim."

04:56PM 3          Because what happened was -- and I didn't know about

04:56PM 4   that -- at some point, Pat's son, Pat Juneau's son, was a

04:56PM 5   doctor, his other son, and he filed a claim.

04:56PM 6   Q.   So not Michael, another son?

04:56PM 7   A.   Not Mike and not Tommy.  They are both lawyers.  He has

04:56PM 8   another son, Pat, Jr., who is a doctor.  He filed a claim for

04:56PM 9   his medical practice.  It went all the way through, and I think

04:57PM 10  it was, like, $150,000.

04:57PM 11         Then Pat said -- told me -- I remember talking to him

04:57PM 12  about it.  He called me in.  He was like, "Can you believe my

04:57PM 13  son can't even make a claim?  They want" -- "I didn't think it

04:57PM 14  was a problem, but the Judge thinks that it's a problem and

04:57PM 15  that Pat shouldn't have a claim.  I feel bad because he's

04:57PM 16  getting" -- "he's not benefiting from me being a special

04:57PM 17  master, but he can't file a claim."

04:57PM 18         So Pat was going to pay him the $150,000 that he

04:57PM 19  would have gotten in his claim.

04:57PM 20         I thought that if the T-Blue -- I mean, the

04:57PM 21  Romeo Papa claim wasn't that big -- which I didn't even know if

04:57PM 22  it was a valid claim or not, I didn't look at it -- then I

04:57PM 23  might have been able to work that kind of thing out, say, all

04:57PM 24  right, you've got to withdraw the claim, and I'll give you half

04:57PM 25  the money that you would have gotten.

**C O N F I D E N T I A L**

**SM-02-JA00082**

04:57PM 1   Q.   Did you offer to do that with Mr. Perez?

04:57PM 2   A.   I think I told him that I wasn't sure if that claim would

04:58PM 3   be allowed, but that we can see how much it was; and, that

04:58PM 4   if -- yeah, I think I did tell him that.  I think.  I'm not

04:58PM 5   positive.

04:58PM 6   Q.   Did you confirm that in writing, to your knowledge --

04:58PM 7   A.   No.

04:58PM 8   Q.   -- or an e-mail or anything?

04:58PM 9   A.   No.  No.

04:58PM 10  Q.   Did I understand you correctly that you did speak to

04:58PM 11  Mr. Juneau about this?

04:58PM 12  A.   Yes.  Not when it was filed, but at some time I spoke to

04:58PM 13  him about it, just saying, "Look, I don't know what to do.

04:58PM 14  They filed a claim" -- "you know, he wants to file a claim.

04:58PM 15  Maybe I'll just do like your son" -- or something.

04:58PM 16       I think -- I remember having that conversation with

04:58PM 17  Pat or Mike or both.  I don't remember.

04:58PM 18  Q.   That was after you became part of the Claims

04:58PM 19  Administration Office?

04:58PM 20  A.   Yes.  Because I don't know when they filed the claim, but

04:58PM 21  it wasn't filed when -- I don't think it was filed when I went

04:58PM 22  to work there.

04:58PM 23  Q.   But you became aware of it, and after you were working

04:58PM 24  there --

04:58PM 25  A.   Yes.

**C O N F I D E N T I A L**

**SM-02-JA00083**

| | | |
|---|---|---|
| 04:58PM | 1 | Q.   -- you had a conversation, and you said, "Look" -- |
| 04:58PM | 2 | A.   I don't think I told Pat right after I became aware of it |
| 04:59PM | 3 | because it was a claim that they weren't going to be getting to |
| 04:59PM | 4 | for a long time because I don't think it was filed early on. |
| 04:59PM | 5 | So I just kind of let it go and was waiting to see |
| 04:59PM | 6 | what would happen with it, hoping that it wouldn't be worth |
| 04:59PM | 7 | anything; but, that if it was, it wouldn't be worth a lot, and |
| 04:59PM | 8 | I could give Robert the half so he wouldn't be upset. |
| 04:59PM | 9 | Q.   As best you recall, when did you speak to Pat Juneau about |
| 04:59PM | 10 | it? |
| 04:59PM | 11 | A.   I don't remember. |
| 04:59PM | 12 | Q.   Was it soon after you went to work there? |
| 04:59PM | 13 | A.   No, because I don't think the claim was filed soon after I |
| 04:59PM | 14 | went to work there. |
| 04:59PM | 15 | Q.   You mentioned Michael Juneau.  Did you speak to him, also? |
| 04:59PM | 16 | A.   What I told you was I think I spoke to either one or both, |
| 04:59PM | 17 | but I don't remember. |
| 04:59PM | 18 | Q.   Did you make any kind of a memorandum or writing of that |
| 04:59PM | 19 | meeting? |
| 04:59PM | 20 | A.   No. |
| 04:59PM | 21 | Q.   Confirm it in any e-mail? |
| 04:59PM | 22 | A.   Pat didn't need stuff in writing.  When I told him about |
| 04:59PM | 23 | *Casey Thonn* and the other case I had, you know, I said, "Do I |
| 05:00PM | 24 | have to put that in writing?" |
| 05:00PM | 25 | He was like, "No, I know about that." |

**C O N F I D E N T I A L**

05:00PM 1        So he didn't ask me to put anything in writing.  It

05:00PM 2  was kind of -- I mean, I told him, and everything was fine.

05:00PM 3  Q.   What, if anything, did he tell you with respect to your

05:00PM 4  relationship with Mr. Perez once you told him about the prior

05:00PM 5  association?  Did he give you any guidance or advice?

05:00PM 6  A.   I don't remember.

05:00PM 7  Q.   Or Michael, whoever it was you spoke to?

05:00PM 8  A.   I don't remember.  They might have said, "Well, that could

05:00PM 9  be a problem."

05:00PM 10       And I said, "Well, you know, I don't know what to do

05:00PM 11  because he wants to file the claim and" -- but I don't think it

05:00PM 12  went any further than that.  I don't remember.

05:00PM 13  Q.   So you don't remember getting any specific advice from

05:00PM 14  either of them?

05:00PM 15  A.   No.

05:00PM 16  Q.   After you became aware that he had filed a claim, did you

05:00PM 17  ever take any steps within the CAO to inquire about the status

05:00PM 18  of his claim?

05:00PM 19  A.   I think -- no, I didn't inquire about his status.  I think

05:00PM 20  I pulled the claim up that was filed -- but the claim wasn't in

05:01PM 21  anything yet.  It was just what he filed -- to see if it was

05:01PM 22  T-Blue or who the partners were, because it shouldn't have been

05:01PM 23  T-Blue, it should have been me, which that's what I was

05:01PM 24  concerned about.

05:01PM 25      It was, and that's when I -- that's what I was

**C O N F I D E N T I A L**

**SM-02-JA00085**

05:01PM 1   concerned about.

05:01PM 2              So I looked up just to see what he filed, but it

05:01PM 3   hadn't been picked up or anything yet.

05:01PM 4   Q.   When you picked it up at some point, you said you --

05:01PM 5   A.   I didn't pick it up.  I just pulled --

05:01PM 6   Q.   -- you pulled it up at some point, you saw your name

05:01PM 7   there?

05:01PM 8   A.   Yes, as one of the members.

05:01PM 9   Q.   Is that when you went to Pat or Mike?

05:01PM 10  A.   No.  It would have been well after that.

05:01PM 11  Q.   You did not think at that point that you should report it?

05:01PM 12  A.   I thought that that was a problem.  I was hoping that it

05:01PM 13  was a problem that would go away because the claim wouldn't be

05:01PM 14  worth anything.  So I just kind of -- just kind of let it go

05:01PM 15  until -- until it became a problem.

05:01PM 16  Q.   Did you think it created a conflict for you once they

05:02PM 17  filed it?

05:02PM 18  A.   I didn't really see it that way because, again, I'm not

05:02PM 19  the one that calculates -- it's supposed to be an objective

05:02PM 20  thing, that they send in the P&Ls, and they calculate it.  I

05:02PM 21  don't have anything to do with that, so I didn't really see

05:02PM 22  that as a conflict.

05:02PM 23  Q.   As you sit here today, do you think when they filed the

05:02PM 24  claim that it would have created, for a reasonable person, an

05:02PM 25  appearance of a conflict, with you still working there at the

**C O N F I D E N T I A L**

SM-02-JA00086

87

05:02PM 1    administrator?

05:02PM 2    A.    Probably so.

05:02PM 3    Q.    You actively represented Mr. Perez in an unrelated matter

05:02PM 4    during this period, correct?

05:02PM 5    A.    I don't think I represented Robert Perez.  I told you I

05:02PM 6    thought I represented the boats and a company, but I don't --

05:02PM 7    and the company, but I don't remember -- I don't think it was

05:02PM 8    Robert Perez personally.  I think it was Romeo Papa, but -- or

05:02PM 9    PORT EADES, which was one of our boats.

05:03PM 10          There was two claims.  There was a claim for the

05:03PM 11   boat -- and when I say claim, lawsuits -- a lawsuit for the

05:03PM 12   boat and a lawsuit from the insurance company on a payment on

05:03PM 13   the boat.  So I don't remember.

05:03PM 14   Q.    Let me show you a couple of documents.

05:03PM 15   A.    Robert may have been named in the thing --

05:03PM 16   Q.    Yeah, but he's the principal there, right?

05:03PM 17   A.    Yeah, he's the manager.

05:03PM 18   Q.    He's the manager.

05:03PM 19   A.    So I represented the company, and he's the manager of it.

05:03PM 20   Q.    Is he also an equity holder?

05:03PM 21   A.    Yeah.  He owns 50 percent -- or -- it's either 50 or 51.

05:03PM 22   I don't remember.

05:03PM 23   Q.    Who owns the balance?

05:03PM 24   A.    Me.  Of Romeo Papa.

05:14PM 25   Q.    Of Romeo Papa.

**C O N F I D E N T I A L**

**SM-02-JA00087**

05:14PM 1    (WHEREUPON, at this point in the proceedings, a brief

05:14PM 2  recess was taken.)

05:14PM 3  BY MR. FREEH:

05:19PM 4  Q.   We're back on the record.

05:19PM 5    (WHEREUPON, at this point in the proceedings,

05:19PM 6  Exhibits S-03 and S-04 were marked.)

05:19PM 7    We'd been asking you some questions about Perez and

05:19PM 8  the Romeo Papa client that you represented in a non-CAO matter

05:19PM 9  at the time that you were working for the administrator.

05:19PM 10    So I'm going to show you some documents, Mr. Sutton.

05:19PM 11  We'll mark them as S-03 and S-04.  These are documents -- take

05:20PM 12  a minute to look at them, but these are court documents that

05:20PM 13  show the matter of Romeo Papa versus National Response

05:20PM 14  Corporation.  These are the docket sheet, orders, a dismissal

05:20PM 15  notice.

05:20PM 16    MR. WALSH:  This is Eastern District?

05:20PM 17    THE WITNESS:  Yes.

05:20PM 18    MR. WALSH:  What's the docket number?

05:20PM 19    MR. FREEH:  The docket number is 2:11-CV-02540.

05:20PM 20  BY MR. FREEH:

05:20PM 21  Q.   So we're showing you these documents.  Take a second, if

05:20PM 22  you would, please.  Look through them.

05:20PM 23  A.   I'm familiar with them.

05:20PM 24  Q.   This representation, according to the docket sheets,

05:20PM 25  continued, at least with respect to the appeal record on loan

**C O N F I D E N T I A L**

05:21PM 1   to Lionel --

05:21PM 2   A.    Wait, which one are you -- I thought you were asking about

05:21PM 3   the first one that you gave me, National Response.

05:21PM 4   Q.    All right.  Well, we can ask about that.

05:21PM 5   A.    Well, either one.  Just identify it.

05:21PM 6   Q.    So that was dismissed in November 2012?

05:21PM 7   A.    Yes.  I think the case settled in October, and the Judge

05:21PM 8   dismissed it.

05:21PM 9   Q.    Did you do any more work on that matter, that case, for

05:21PM 10  Romeo Papa or Mr. Perez after November of 2012?

05:21PM 11  A.    Well, it was Romeo Papa, I believe, on this case; and, no,

05:21PM 12  I did not.

05:21PM 13           MR. WALSH:  Hang on a second, please, Judge.  I'm

05:21PM 14  confused.  Versus National Response.  Okay, I got it.

05:21PM 15  BY MR. FREEH:

05:21PM 16  Q.    So then direct your attention, please, to Exhibit 4.

05:21PM 17  A.    Yes.

05:21PM 18  Q.    This is a Complaint against Cummins Mid-South, Inc.

05:21PM 19  A.    Yes.

05:22PM 20           MR. FREEH:  It's a different docket number,

05:22PM 21  Counselor.  I'll try and find it on here.  Let's see.

05:22PM 22  11-2207B, it looks like.

05:22PM 23           MR. TIDWELL:  Is that 4A?

05:22PM 24           MR. FREEH:  No.  That's four.

05:22PM 25           (WHEREUPON, at this point in the proceedings,

**C O N F I D E N T I A L**

05:22PM 1   Exhibit S-04A was marked.)

05:22PM 2   BY MR. FREEH:

05:22PM 3   Q.    4A is another docket sheet from PACER.  I think it all

05:22PM 4   relates to the same matter.

05:22PM 5           There is a Fifth Circuit appellate transaction

05:22PM 6   receipt, and it looks like the docket, looking at what's marked

05:23PM 7   as tab 17, as 4A, goes up to the date of June 26, 2013.

05:23PM 8   A.    I believe it's -- they are waiting for Cummins to file

05:23PM 9   their brief right now, I think.

05:23PM 10  Q.    So you're actively representing this client up to and

05:23PM 11  including June 26th of 2013?

05:23PM 12  A.    Yes.   Romeo Papa.

05:23PM 13  Q.    Romeo Papa.

05:23PM 14  A.    I don't know if it's Romeo Papa or the M/V PORT EADES.  I

05:23PM 15  think -- I don't know which one they signed, but whatever it

05:23PM 16  is --

05:23PM 17          MR. TIDWELL:  This would be Romeo Papa.

05:23PM 18          THE WITNESS:  Then it would be Romeo Papa.  I just

05:23PM 19  didn't know if they signed -- if they filed against the

05:23PM 20  company -- the boat or the company.

05:23PM 21  BY MR. FREEH:

05:23PM 22  Q.    I think I asked you this before the break, but did you

05:23PM 23  keep anybody in the Claims Administrative Office up to date and

05:24PM 24  briefed on your continuing representation in these separate

05:24PM 25  civil matters with respect to Romeo Papa?

**C O N F I D E N T I A L**

SM-02-JA00090

05:24PM  1    A.    No.

05:24PM  2    Q.    Again, we had asked you before the break some questions

05:24PM  3    about the point in time when you were already working at the

05:24PM  4    CAO, you believe you went to either Pat or Michael Juneau to

05:24PM  5    advise them about the claim having been filed by a party in

05:24PM  6    which you had an interest.

05:24PM  7    A.    I believe I told them about Romeo Papa filing a claim at

05:24PM  8    some point, but I don't remember exactly.

05:24PM  9    Q.    But you were already working in the office when you made

05:24PM 10    that notice to them?

05:24PM 11    A.    In the CA office?

05:24PM 12    Q.    In the CA office.

05:24PM 13    A.    Yes.

05:24PM 14    Q.    Is there anything that would refresh your recollection as

05:24PM 15    to approximately when you spoke to someone and who it was?

05:25PM 16    A.    No.   I don't remember when the claim was filed, and I

05:25PM 17    don't remember when I told -- who I talked to.

05:25PM 18          MR. FREEH:  Do we know when the claim was filed?   Do

05:25PM 19    we have a document that will tell us when it was filed?

05:25PM 20          MR. TIDWELL:  I don't believe we have the original.

05:25PM 21    No, sir.

05:25PM 22          MR. WALSH:  Just so I'm clear --

05:25PM 23          MR. FREEH:  4C.  Maybe you can give them a copy of

05:25PM 24    4C.

05:25PM 25          MR. WALSH:  Judge, the claim we're talking about is

**C O N F I D E N T I A L**

**SM-02-JA00091**

05:25PM 1    the Romeo Papa --

05:25PM 2              MR. FREEH:  Romeo Papa, LLC.

05:25PM 3              (WHEREUPON, at this point in the proceedings,

05:25PM 4    Exhibit S-04C was marked.)

05:25PM 5    BY MR. FREEH:

05:25PM 6    Q.    So we're showing you and counsel 4C.  Take your time to

05:25PM 7    look at it.  This is a *Deepwater Horizon* Claims Center

05:25PM 8    document.

05:25PM 9    A.    Okay.

05:25PM 10   Q.    It reflects the claimant number and the business as

05:26PM 11   Romeo Papa, LLC, represented *pro se*.

05:26PM 12             Can you determine from that document, having been

05:26PM 13   familiar with these, I take it, when you were working here,

05:26PM 14   when this claim was filed?

05:26PM 15   A.    I had -- it looks like 12/19/12, but I'm not positive

05:26PM 16   because we were able to look at more; but, that's what it --

05:26PM 17   that's what I think it is.

05:26PM 18             But I think there was something else that showed an

05:26PM 19   actual filing date on the screen.  It wouldn't have been on the

05:26PM 20   form.  It would have been, like, on the intake.  So I don't

05:26PM 21   know.

05:26PM 22   Q.    All right.  So looking at page -- it says page 1 of 2, but

05:26PM 23   it's actually page 2 of Exhibit S-04C -- if you look at the --

05:26PM 24   A.    Oh, yeah.

05:26PM 25   Q.    -- View Documents, the first entry, at least, that I see

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 05:26PM | 1 | is a registration form with a create date of 12/13/02 |
| 05:27PM | 2 | [verbatim].  Do you see that? |
| 05:27PM | 3 | A.    Yeah.  That's what I was talking to.  But then there is |
| 05:27PM | 4 | another -- I think, when it's actually filed is if you to go |
| 05:27PM | 5 | the next page, and where they filed the actual claim form -- |
| 05:27PM | 6 | Q.    Okay. |
| 05:27PM | 7 | A.    -- where it says 12/18/12, I think that's when the claim |
| 05:27PM | 8 | is filed.  Because a lot of people would file -- would register |
| 05:27PM | 9 | but not actually file the claim form. |
| 05:27PM | 10 |          So I believe -- I believe when -- the way we looked |
| 05:27PM | 11 | at it, in general, I think was that the date of filing was the |
| 05:27PM | 12 | date they actually filed the claim form, I believe, if I |
| 05:27PM | 13 | remember correctly. |
| 05:27PM | 14 |          That's what I was looking for when I said it showed |
| 05:27PM | 15 | the date somewhere else.  It would show when they filed the |
| 05:27PM | 16 | claim form. |
| 05:27PM | 17 | Q.    So looking at this document, then, as 4-C, what would be |
| 05:27PM | 18 | your understanding as to when the actual claim was filed? |
| 05:27PM | 19 | A.    December 18, 2012.  That's how I would have thought when I |
| 05:28PM | 20 | was at the claims office. |
| 05:28PM | 21 | Q.    This would have been, then, approximately a month or so |
| 05:28PM | 22 | after you started working there? |
| 05:28PM | 23 | A.    Well, I started on November 1st, so however many days that |
| 05:28PM | 24 | is. |
| 05:28PM | 25 | Q.    Again, if you recall, how would this have come to your |

**C O N F I D E N T I A L**

SM-02-JA00093

| | |
|---|---|
| 05:28PM 1 | attention, the actual filing of the claim?  Would you have |
| 05:28PM 2 | talked to Mr. Perez, or would you have somehow otherwise |
| 05:28PM 3 | learned it? |
| 05:28PM 4 | A.   I don't remember how or when I learned it. |
| 05:28PM 5 | MR. TIDWELL:  But you did.  So when would the |
| 05:28PM 6 | conversation with him have been about, "This isn't a good idea, |
| 05:28PM 7 | Robert"?  Before this? |
| 05:28PM 8 | THE WITNESS:  Oh, no, no, it was after it was filed. |
| 05:28PM 9 | It was after I, you know, looked at it. |
| 05:28PM 10 | BY MR. FREEH: |
| 05:28PM 11 | Q.   So the filing -- "disturbs" may be the wrong word -- but |
| 05:28PM 12 | the filing affects you to do two things, one, to speak to |
| 05:28PM 13 | Mr. Perez, correct? |
| 05:28PM 14 | A.   No. |
| 05:28PM 15 | Q.   I thought you said you spoke to him? |
| 05:28PM 16 | A.   But not -- I didn't speak to him when it got filed.  I |
| 05:29PM 17 | don't know when I spoke to him.  You're making it sound like -- |
| 05:29PM 18 | Q.   That was the question. |
| 05:29PM 19 | A.   -- it got filed and then I spoke to him. |
| 05:29PM 20 | MR. TIDWELL:  No, I was just wondering when you -- |
| 05:29PM 21 | you were saying to him -- |
| 05:29PM 22 | THE WITNESS:  Yeah.  I don't remember. |
| 05:29PM 23 | BY MR. FREEH: |
| 05:29PM 24 | Q.   So it could have been before he actually filed? |
| 05:29PM 25 | A.   No.  I don't think so.  I talk to Robert a lot, so I don't |

**C O N F I D E N T I A L**

05:29PM 1   know when I would have said that.

05:29PM 2   Q.    All right.  But, again, my question, and I'm sorry to

05:29PM 3   repeat it, how did you come to know that he'd filed the claim,

05:29PM 4   if you recall?

05:29PM 5   A.    Somebody told me.  Either he told me or somebody that

05:29PM 6   worked for Romeo Papa, but somebody -- it might have been when

05:29PM 7   I was there, but somebody told me.  So that's when I knew.  I

05:29PM 8   didn't know until somebody told me.

05:29PM 9   Q.    Then you would have pulled the claim up to take a look at

05:29PM 10   it?

05:29PM 11   A.    I think I would have looked at the claim form to see

05:29PM 12   exactly what he filed, if he filed something that included me

05:30PM 13   or if he was filing something different.  Because it could have

05:30PM 14   been -- I don't know, it was like eight or nine different

05:30PM 15   claims, so -- different types of claims.

05:30PM 16        So I would have looked at -- I think I would have

05:30PM 17   looked at the claim form, the 12/18 date that we said, to see

05:30PM 18   if it was something that involved me.

05:30PM 19        MR. FREEH:  Right.  So shouldn't we be able to

05:30PM 20   determine -- I'm directing this question to my colleagues --

05:30PM 21   the date that he queried the status or the database for that

05:30PM 22   claim?

05:30PM 23        MR. SCOTTI:  Uh-huh.

05:30PM 24        MR. FREEH:  Right.  Can you see, while we're asking

05:30PM 25   questions, if you can do that?  That might help refresh his

**C O N F I D E N T I A L**

SM-02-JA00095

05:30PM  1    recollection.

05:30PM  2    BY MR. FREEH:

05:30PM  3    Q.    The conversation you related, again, with either of the

05:30PM  4    Juneaus, would it have been shortly after that, weeks after

05:30PM  5    that, a few months after that?  Was it in December?

05:31PM  6    A.    No.  It was quite some time after that, if I remember

05:31PM  7    right.  I don't remember when I looked at it.  When you tell me

05:31PM  8    when I looked at it, then I might have a better idea of when I

05:31PM  9    said something, but --

05:31PM  10   Q.    Would it have been 2013, you think?

05:31PM  11   A.    Oh, yeah.

05:31PM  12   Q.    All right.  We'll see if we can get the date.  We should

05:31PM  13   be able to reconstruct the date that at least the records show

05:31PM  14   you inquired about it.

05:31PM  15            (WHEREUPON, at this point in the proceedings,

05:31PM  16   Exhibit S-05 was marked.)

05:31PM  17   BY MR. FREEH:

05:31PM  18   Q.    This exhibit we have already gone over.  This is the --

05:31PM  19   I'm talking to myself -- Exhibit 5, which is the Secretary of

05:31PM  20   State filing with respect to T-Blue.

05:31PM  21            MR. WALSH:  Judge, I'm not sure we saw S-05.

05:31PM  22            MR. FREEH:  Sure, you can see it.

05:31PM  23            MR. WALSH:  We talked about it, but I don't think it

05:31PM  24   was referenced.

05:32PM  25            THE WITNESS:  I think it was included in S-02, wasn't

**C O N F I D E N T I A L**

05:32PM 1  it?

05:32PM 2          MR. FREEH:  Yes.  You're absolutely right.  It was in

05:32PM 3  S-2.

05:32PM 4          (WHEREUPON, at this point in the proceedings,

05:32PM 5  Exhibit S-06 was marked.)

05:32PM 6  BY MR. FREEH:

05:32PM 7  Q.    Okay.  So we'll show you Exhibit 6, S-06, which is an

05:32PM 8  exhibit to an Act of Case Sale and Assignment, Membership

05:32PM 9  Interest and Sharing Ratios of Romeo Papa, LLC.

05:32PM 10         We'd show that to you and ask you to take a look at

05:32PM 11 that.  It appears to reflect a membership interest and sharing

05:32PM 12 ratio for Romeo Papa.

05:32PM 13 A.    Right.  T-Blue, as I said before, it was a company that we

05:32PM 14 had formed for the four kids, but depending on which heir.

05:33PM 15         We had a -- we dissolved the children's partnerships

05:33PM 16 and kind of split the assets.  My -- I would have gotten

05:33PM 17 T-Blue, because it owned the boats.  Then I wouldn't have

05:33PM 18 wanted to keep calling it T-Blue because that was the old name.

05:33PM 19 I just would have put it under my own name.

05:33PM 20         Robert would have wanted -- we decided to go 50/50,

05:33PM 21 because when my dad had it, it was 51 percent, 49 percent.  So

05:33PM 22 we just changed the names and evened out the shares.

05:33PM 23 Q.    So at the creation of this document -- or strike that.

05:33PM 24         At the point in time where this represents the

05:33PM 25 sharing ratios, are you solely in control of T-Blue, LLC; so,

**C O N F I D E N T I A L**

**SM-02-JA00097**

| | |
|---|---|
| 05:33PM 1 | is that 51 percent controlled by you, or you and some brothers? |
| 05:34PM 2 | A.    No, I'm solely in control of it. |
| 05:34PM 3 | (WHEREUPON, at this point in the proceedings, |
| 05:34PM 4 | Exhibit S-06A was marked.) |
| 05:34PM 5 | BY MR. FREEH: |
| 05:34PM 6 | Q.    All right.  I'll show you now Exhibit 06A.  I'm going to |
| 05:34PM 7 | ask you a series of questions about some e-mails, which I think |
| 05:34PM 8 | you've seen before or have been asked questions regarding. |
| 05:34PM 9 | MR. WALSH:  Excuse me, Judge.  This is S-06A? |
| 05:34PM 10 | MR. FREEH:  I'm sorry, S-06A, yes. |
| 05:34PM 11 | MR. TIDWELL:  It was an e-mail from Tracy Speilberg |
| 05:34PM 12 | to Lionel Sutton.  The response -- the date of the e-mail is |
| 05:34PM 13 | January 1, 2013. |
| 05:34PM 14 | BY MR. FREEH: |
| 05:34PM 15 | Q.    Tracy was working for you at that time? |
| 05:34PM 16 | A.    No.  She was working at the claims office.  This would |
| 05:35PM 17 | probably have been, like I said, me either asking her to file |
| 05:35PM 18 | something or asking -- with the federal court, because I told |
| 05:35PM 19 | you I still can't file -- or doing something with regard to |
| 05:35PM 20 | formatting a brief or something that I wrote. |
| 05:35PM 21 | I would have asked her to do it, and she would have |
| 05:35PM 22 | said, okay, she would do it tomorrow. |
| 05:35PM 23 | Q.    So this was being done on behalf of Romeo Papa, but not in |
| 05:35PM 24 | connection to the DHE claim? |
| 05:35PM 25 | A.    I don't know if that was being done on the Romeo Papa case |

**C O N F I D E N T I A L**

05:35PM 1   or some other case I had.  If it was being done for Romeo Papa,

05:35PM 2   it would have been the Cummins Mid-South case, not anything

05:35PM 3   with Romeo Papa's claim.

05:35PM 4   Q.   As you explained to us earlier, with respect to the

05:35PM 5   federal filing, you would ask Tracy from time to time to assist

05:35PM 6   you in matters not related to the CAO?

05:35PM 7   A.   Yes.  I'm guessing it was me filing the response

05:36PM 8   memorandum, because it was filed on January 2nd, and this

05:36PM 9   e-mail is dated January 1st.

05:36PM 10          She said, "I will do it tomorrow," so my guess is, is

05:36PM 11  I was filing my memorandum in the Mid-South Cummins case.

05:36PM 12          (WHEREUPON, at this point in the proceedings,

05:36PM 13  Exhibit S-07 was marked.)

05:36PM 14  BY MR. FREEH:

05:36PM 15  Q.   All right.  We'll show you S-07, which is unrelated to the

05:36PM 16  one I just showed you, S-06.

05:36PM 17          S-07 is an e-mail from you to Mark Staley dated

05:36PM 18  March 12, 2013.  We'll ask you to take a look at that with your

05:36PM 19  counsel for a moment.

05:36PM 20  A.   (Witness reviews the document.)  Yes.

05:36PM 21  Q.   Do you recall or recollect this particular exchange and

05:36PM 22  your sending the e-mail to Mr. Staley or the subject matter

05:36PM 23  thereof?

05:36PM 24  A.   I don't recall actually doing that, but I read it, and I

05:36PM 25  recall that would have -- I know what it would have been about,

**C O N F I D E N T I A L**

SM-02-JA00099

05:37PM 1   and I know how it would have happened.  It was something I

05:37PM 2   typically did.

05:37PM 3   Q.    All right.  So directing your attention to the second page

05:37PM 4   of that document, on March 6, 2013, 8:56 a.m., you send an

05:37PM 5   e-mail to Staley.

05:37PM 6         Now, Staley works with the accountants?

05:37PM 7   A.    He's with Postlethwaite.

05:37PM 8   Q.    Are they involved in the eligibility process with respect

05:37PM 9   to the claims?

05:37PM 10  A.    No -- well, I don't know.  I think the accountants are the

05:37PM 11  ones that calculate the claims.

05:37PM 12        Remember, I told you at the beginning that sometimes

05:37PM 13  I would see a particular accountant, but I would typically ask

05:37PM 14  to speak to -- I mean, I would send something to the

05:37PM 15  supervisor?  Well, Mark Staley is the head, the top guy.

05:37PM 16        So it would have been -- I saw it was being handled

05:37PM 17  by Christopher Rinaldi.  I saw that on the thing.  So I had a

05:37PM 18  question, and I e-mailed Mark about it.

05:37PM 19        That's what I've done normally.  That would have been

05:37PM 20  my typical --

05:37PM 21  Q.    In this particular case, do you know what prompted you to

05:38PM 22  send this to Mark?  You say, quote, "I have some questions

05:38PM 23  about the above referenced claim.  I believe it is being

05:38PM 24  handled by Christopher Rinaldi with your firm.  Please have

05:38PM 25  Christopher contact me."

**C O N F I D E N T I A L**

05:38PM 1    A.    I would guess it was Gibby Andry called me and asked me

05:38PM 2    the status of his claim because, I think, if my dates are

05:38PM 3    right, that was right after the stay was lifted.

05:38PM 4         When Pat got sued -- or just before that, by BP, the

05:38PM 5    Judge put a stay order on all -- on professional claims,

05:38PM 6    agriculture and construction, I think.

05:38PM 7         He might have issued a stay and then issued another

05:38PM 8    stay; but, I believe, as soon as the last stay was lifted, all

05:38PM 9    the lawyers and architects and farmers wanted to see where

05:38PM 10   their cases were because they wanted to know if their cases

05:39PM 11   would make it through before BP got it appealed or something

05:39PM 12   like that.

05:39PM 13        But, I mean, I'm guessing that's what that was.  That

05:39PM 14   seems about the right time.  I would have gotten a lot of

05:39PM 15   e-mails and been doing that at that time, because they gave my

05:39PM 16   cell phone number and my e-mail address to everybody.

05:39PM 17        I mean, it was broadcast from the claims office to

05:39PM 18   everybody, that if you had any questions about the effect of

05:39PM 19   the stay on these three claims -- or these three types of

05:39PM 20   claims or whatever -- but I'm believing that's what that was.

05:39PM 21   Q.    Do you specifically recall that it was Gibby Andry that

05:39PM 22   contacted you?

05:39PM 23   A.    Yeah, it would have been Gibby.  Gibby was the one that

05:39PM 24   handled The Andry Law Firm claim, as far as I know.  He's the

05:39PM 25   only one that ever asked me about it.

**C O N F I D E N T I A L**

SM-02-JA00101

05:39PM 1    Q.   How many times did he ask you any questions or direct any
05:39PM 2    inquiries to you about the BEL Andry Law Firm claim?
05:39PM 3    A.   I couldn't count.   That was probably the first one, and he
05:39PM 4    probably called me a bunch of times after that.
05:40PM 5         He called me, he called -- he was calling
05:40PM 6    Mike Juneau, he was calling Tommy Juneau, he was calling
05:40PM 7    Pat Juneau, to the point where Pat finally said, "You've got to
05:40PM 8    tell Andry to quit calling so damn much asking about his
05:40PM 9    claim," because all the lawyers were trying to find out; but,
05:40PM 10   Gibby, in particular, is very -- I mean, he's just aggravating.
05:40PM 11   He won't stop asking.
05:40PM 12        So he -- finally, it got kicked over to appeals.
05:40PM 13   Then I said, "You can't even" -- "I don't even know anything
05:40PM 14   about appeals.   You can't ask me anymore.   You have got to
05:40PM 15   start asking David Duval."
05:40PM 16        Then David Duval said to me, "Why the hell did you
05:40PM 17   tell Gibby that he's got to ask me, because now he's calling me
05:40PM 18   all the time?"
05:40PM 19        So that would have kind of been the -- in general,
05:40PM 20   how it all would have taken place.
05:40PM 21   Q.   To your knowledge, at that time was Jon Andry associated
05:40PM 22   with or a partner with Gibby in that law firm, The Andry Law
05:40PM 23   Firm?
05:40PM 24   A.   No.   What I think -- I'm not sure -- The Andry Law Firm
05:40PM 25   was always Jon Andry and Gibby Andry, from as far back as when

**C O N F I D E N T I A L**

05:41PM 1    I can remember.

05:41PM 2              They got in a fight, and they split up The Andry Law

05:41PM 3    Firm and shut The Andry Law Firm down, and Jon became The Andry

05:41PM 4    Law Group, and Gibby became Gibby Andry Law or something -- I

05:41PM 5    don't know.

05:41PM 6              Gibby decided -- when they did that, Gibby decided he

05:41PM 7    was going to move out and move to another office on Baronne.

05:41PM 8    That's when I said, "Well, if you're not staying here, I'm not

05:41PM 9    saying here either," and I moved -- that's when I moved to

05:41PM 10   935 Gravier.

05:41PM 11             So my understanding is, The Andry Law Firm -- and I

05:41PM 12   never actually looked at their claim --

05:41PM 13   Q.    Yes.

05:41PM 14   A.    -- but my understanding is that The Andry Law Firm was a

05:41PM 15   firm that had been closed or shut down or discontinued or

05:41PM 16   whatever.  Maybe they kept it open, I don't know, but they

05:41PM 17   weren't practicing together anymore.

05:41PM 18   Q.    So at the time of this correspondence, which is March of

05:41PM 19   2013, your understanding was The Andry Law Firm claim was a

05:42PM 20   claim being pursued only by Gibby Andry?

05:42PM 21   A.    I understood -- first of all, I don't know if I had any

05:42PM 22   understanding of it.  What I thought and what I think now is

05:42PM 23   that The Andry Law Firm claim was a firm owned by two guys,

05:42PM 24   Andry and Gibby.

05:42PM 25             I thought at the time -- and I don't know if it's

**C O N F I D E N T I A L**

05:42PM 1    different now -- that Gibby is the one that filed the claim for

05:42PM 2    The Andry Law Firm claim, but I don't know that; but, he was

05:42PM 3    the one that was calling everybody and asking them about it.

05:42PM 4    Q.   As you said, calling you several times?

05:42PM 5    A.   Yeah.   I think Jon may have been calling -- not calling

05:42PM 6    me, but Pat told me that Jon Andry was calling him, and, you

05:42PM 7    know, "Tell him to stop calling me.   He's aggravating me."

05:42PM 8            I think he said that about both of the Andrys.

05:42PM 9    That's just their personality.

05:42PM 10           (WHEREUPON, at this point in the proceedings,

05:42PM 11   Exhibit S-08 was marked.)

05:42PM 12   BY MR. FREEH:

05:42PM 13   Q.   Let me show you S-08, which is an e-mail that you sent to

05:43PM 14   Glen Lerner, according to the headings on the document, on

05:43PM 15   May 9th of 2013.   It's a three-page --

05:43PM 16   A.   Yeah.

05:43PM 17   Q.   -- string.   You can take a second and look at it.

05:43PM 18   A.   (Witness reviews the document.)   Yeah, okay.

05:43PM 19   Q.   Do you remember this exchange?

05:43PM 20   A.   No.   I remember it after I was showed it.   I mean, I don't

05:43PM 21   remember actually having it, but I recognize what it would have

05:43PM 22   been.

05:43PM 23   Q.   Right.   Well, let's take the 3:51 exchange, where you

05:43PM 24   initiate the e-mail to Glen Lerner.

05:44PM 25   A.   Where is that?

**C O N F I D E N T I A L**

05:44PM 1   Q.   That's the first page of S-08.

05:44PM 2   A.   Oh, the last e-mail in the chain?

05:44PM 3   Q.   Yeah.  5/9 at 3:51 p.m.

05:44PM 4   A.   Okay.

05:44PM 5   Q.   You say, "Just between me and you, here is the report."

05:44PM 6   A.   Right.

05:44PM 7   Q.   What do you mean, "just between me and you"?

05:44PM 8   A.   Well, I'm just sending that to him.  This is a report that

05:44PM 9   I typically would have done a lot because what happens is

05:44PM 10  lawyers would call and say, "My claims aren't getting paid.

05:44PM 11  What's going on?  Y'all are taking too long."  The same

05:44PM 12  complaining that they always did.

05:44PM 13         Most of the time, if not all of the time, it wasn't a

05:44PM 14  problem in our office; it was a problem with the way they were

05:44PM 15  doing their claims.

05:44PM 16         So I would look at -- I wouldn't pull up their

05:44PM 17  claims, but you can pull up a pie chart that would show their

05:44PM 18  total.  It wouldn't show individual claims, but it would show

05:44PM 19  the total -- or a graph or something.  It would show, okay, you

05:45PM 20  have 402 claimants, 61 percent have submitted a signed claim

05:45PM 21  form.

05:45PM 22         So, right then and there, you see that he's

05:45PM 23  complaining that -- like most lawyers, he's complaining that

05:45PM 24  his complaints haven't been paid, and only 60 percent have even

05:45PM 25  submitted a claim form.  22 percent started a registration form

**C O N F I D E N T I A L**

05:45PM  1   but didn't finish it.

05:45PM  2   Q.    No, I can read the document.

05:45PM  3   A.    So that's what I would have been saying is, "Hey, the

05:45PM  4   problem is not in our office.  You guys aren't doing what y'all

05:45PM  5   are supposed to do to get claims processed."

05:45PM  6   Q.    How many similar e-mails like this in the time you were

05:45PM  7   there did you send to other lawyers with this kind of detail?

05:45PM  8   A.    I don't know.  A lot of times, I might have read it to

05:45PM  9   them right off the screen.

05:45PM 10   Q.    But the question is, any other e-mails that you wrote that

05:45PM 11   you recall composing with this amount of detail?

05:45PM 12   A.    I don't recall.  I don't recall how many other ones or

05:45PM 13   what other ones I would have done.  I know most of the time I

05:46PM 14   probably would have.

05:46PM 15         Most of the time, they would have called me on the

05:46PM 16   phone, and I would have pulled it up on the screen while they

05:46PM 17   were talking to me.  I would have said, "Hey, you know, you

05:46PM 18   hadn't been doing your job.  Only 60 percent of your clients

05:46PM 19   have even filed a claim form," or something like that.

05:46PM 20         I mean, it was to show that, hey, it's not our

05:46PM 21   office, it's you guys.

05:46PM 22   Q.    When you say *just between me and you*, are you indicating

05:46PM 23   or trying to communicate to him that you want to keep this

05:46PM 24   confidential, your report?

05:46PM 25   A.    No.  What I'm probably saying is that I didn't want him to

**C O N F I D E N T I A L**

05:46PM 1    fuss at Jon about it or say that I said, you know, that the

05:46PM 2    cases -- that Jon wasn't doing his job of making sure his cases

05:46PM 3    got filed properly or something.

05:46PM 4         That's probably what I meant because, you know, Jon

05:46PM 5    and I were just getting started -- starting to talk again, and

05:46PM 6    I probably didn't want him to say, "Hey, I checked, and you're

05:46PM 7    screwing up.  I've been paying you this money, you hadn't

05:47PM 8    gotten these cases filed yet."  That's probably what I meant,

05:47PM 9    if I recall right.

05:47PM 10   Q.   Would you say, Mr. Sutton, by getting this information,

05:47PM 11   reporting it in this detail, sending it to Mr. Lerner, that you

05:47PM 12   were assisting him in his claims?

05:47PM 13   A.   Only to the extent that we would have assisted everyone

05:47PM 14   like that.  I don't know.  I don't know how to answer that.

05:47PM 15        I did this -- I understood that responding to an

05:47PM 16   attorney that asked a question about the status of his claim, I

05:47PM 17   understood that was part of my job.  I understood that we were

05:47PM 18   supposed to him assist attorneys and claimants when they called

05:47PM 19   to understand what was going on with that claim.

05:47PM 20        Pat made me -- made that very clear.  He, in fact,

05:47PM 21   asked me to do that on a daily basis.

05:47PM 22   Q.   At the time you wrote this particular e-mail to

05:47PM 23   Mr. Lerner, you had an ongoing business relationship with him,

05:48PM 24   and he was paying you money on a regular basis, and he owed you

05:48PM 25   money; is that correct?

**C O N F I D E N T I A L**

05:48PM 1   A.    I don't think he was paying me money on a regular basis.

05:48PM 2   That was one of the problems.  But I don't know --

05:48PM 3   Q.    He owed you money?

05:48PM 4   A.    I don't know if at that time he had owed me or he had paid

05:48PM 5   me everything.

05:48PM 6         This was 5/9, so, remember, I said he was supposed to

05:48PM 7   pay from June 1st all the way through May.  He might have

05:48PM 8   been -- he might have paid it all by then because this was

05:48PM 9   May 9, so I don't know.

05:48PM 10        I doubt it.  I think he would have been paid by

05:48PM 11   then -- or paid me by then.  I'm not sure.

05:48PM 12   Q.    Let me ask you this question.  At this time, May 9, 2013,

05:48PM 13   when you got the request -- we'll talk about that in a

05:48PM 14   second -- regarding the number of claimants or the information

05:48PM 15   that you reported here, this wasn't just any attorney; this was

05:49PM 16   an attorney with whom you had a very specific financial

05:49PM 17   relationship, correct?

05:49PM 18   A.    To the extent that we've discussed that already, yes; but,

05:49PM 19   like I told you, I didn't see a conflict.  I was reporting like

05:49PM 20   I would report to anybody about, "Hey, you guys, it's not the

05:49PM 21   claims office, it's the way you're doing your claims."

05:49PM 22        I gave him an example, the example that I talked to

05:49PM 23   you about before, about the incompleteness notices and the

05:49PM 24   complete -- the response on the *Talen's* claim that Pat asked me

05:49PM 25   to look at.  Pat asked me to tell Jon Andry what he was

**CONFIDENTIAL**

SM-02-JA00108

05:49PM  1    doing on that -- what the problem was on that claim.

05:49PM  2         So I didn't think that there was a problem with this

05:49PM  3    at all.  I still don't know think that there was a problem with

05:49PM  4    this at all.  I mean, I understood that to be my job.

05:49PM  5    Q.    You don't think this was a conflict you should have

05:49PM  6    reported at the time?

05:49PM  7    A.    No, because all I'm reporting -- all I'm telling him is

05:49PM  8    what has been filed.  I'm not -- I mean, no.  I don't -- I

05:49PM  9    don't see that as a conflict at all.

05:49PM 10    Q.    The information you're giving him, he could not himself

05:49PM 11    get from the documents that he would have received from the

05:50PM 12    administrator?

05:50PM 13    A.    Oh, no, I think he could have.  I think he definitely

05:50PM 14    could have looked at all of his claims and saw that only

05:50PM 15    61 percent signed the claim.

05:50PM 16         They have access to the same thing that I was looking

05:50PM 17    at, as I understand.  They -- the lawyer could look at the

05:50PM 18    portal and look at the same stuff that I was looking at for

05:50PM 19    this.  That was always my understanding.

05:50PM 20         So he could have done that and looked at it himself;

05:50PM 21    but, Glen is not a -- he wouldn't have done that.

05:50PM 22    Q.    Looking at the next page, Glen sends you an e-mail on

05:50PM 23    May 9, 15:13, the middle of the page, and he says, "Ooh la la.

05:50PM 24    Work harder.  How is Chris?"

05:50PM 25    A.    Yeah.

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 05:50PM | 1 | Q.    Do you see that? |
| 05:50PM | 2 | A.    Yeah. |
| 05:50PM | 3 | Q.    That was in response to an e-mail that you wrote right |
| 05:50PM | 4 | before, a few minutes, that says quote, "You forget, I'm also |
| 05:51PM | 5 | working hard to get you money so you can pay for shit." |
| 05:51PM | 6 | A.    Right.  Which was in response to his e-mail saying, "Glad |
| 05:51PM | 7 | to see you working so hard while I try to figure out how to pay |
| 05:51PM | 8 | for shit," which was in response to a Crown e-mail about the |
| 05:51PM | 9 | logos.  So that's what I was talking about. |
| 05:51PM | 10 | Q.    So you're talking about him paying for the Crown |
| 05:51PM | 11 | receivables or the money that you're owed there; that's your |
| 05:51PM | 12 | reference? |
| 05:51PM | 13 | A.    No, I don't think I'm talking about the money I owed.  I |
| 05:51PM | 14 | think, by the time -- |
| 05:51PM | 15 | Q.    Not that you owed; the money that was owed to you? |
| 05:51PM | 16 | A.    I don't think he owed me any money at that time.  Because |
| 05:51PM | 17 | I think -- it was May 9th.  Like I told you, I believe he had |
| 05:51PM | 18 | paid me up all the way through, because he only owed me until |
| 05:51PM | 19 | May.  So I believe that was paid.  I told you that three times |
| 05:51PM | 20 | already. |
| 05:51PM | 21 |        I think this was in response to -- we were talking |
| 05:51PM | 22 | about Crown and about how much money Crown is costing him. |
| 05:51PM | 23 | We're trying to get the contract at NAC.  We're trying to get |
| 05:51PM | 24 | the contract at Foresight (spelled phonetically), all these |
| 05:52PM | 25 | different companies.  We're busting our butts to try to get |

**C O N F I D E N T I A L**

SM-02-JA00110

05:52PM 1   those contracts, and I believe that's what I was talking about.

05:52PM 2   Q.    Do you have record somewhere of the amounts and dates that

05:52PM 3   you received payments from Mr. Lerner?

05:52PM 4   A.    I may, but I'm sure Glen would have that.  I mean, he

05:52PM 5   would -- he kept track of all that kind of stuff, because he

05:52PM 6   kept track of how much he paid everybody.

05:52PM 7   Q.    All right.  But ultimately the money came to you and your

05:52PM 8   bank accounts, correct?

05:52PM 9   A.    Yes.

05:52PM 10  Q.    Can you reconstruct -- we'll make a request to counsel

05:52PM 11  that you produce for us a timetable with documentation in terms

05:52PM 12  of the dates and amounts that you received payments from

05:52PM 13  Mr. Lerner.

05:52PM 14  A.    From when to when?

05:52PM 15  Q.    All of them.

05:52PM 16  A.    When you say me, do you mean me as Lionel Sutton or for

05:52PM 17  Crown or the whole thing?  I mean, because sometimes I received

05:52PM 18  it as Crown, as the manager of Crown, like I told you, all the

05:52PM 19  way back from the -- where he would put money in the account --

05:52PM 20  Q.    We'll make the request for both.

05:52PM 21  A.    I can't -- I can tell you right now, I doubt that I can

05:53PM 22  get all of that straight; but, Glen -- because, if you look at

05:53PM 23  some of the e-mails that were filed with the Court --

05:53PM 24  Q.    I don't want to argue with you.

05:53PM 25  A.    Can I finish answering the question?

**C O N F I D E N T I A L**

05:53PM 1  Q.   We're making the request to your counsel.  You can respond

05:53PM 2  or not respond.

05:53PM 3  A.   I'm answering your question.

05:53PM 4  Q.   You're saying you can't do it?

05:53PM 5  A.   No, I'm not saying I can't do it.  I'm saying that some of

05:53PM 6  the money that he sent was sent straight to Crown, not -- that

05:53PM 7  didn't go through.

05:53PM 8        If you look at what he -- his accountant would have

05:53PM 9  the ones -- in fact, in one of the documents, one of the

05:53PM 10 e-mails that has been attached to an exhibit, I asked the

05:53PM 11 accountant to show how much he's paid so far, because I didn't

05:53PM 12 know.

05:53PM 13 Q.   We're asking you to reconstruct what you received and the

05:53PM 14 dates you received it.

05:53PM 15 A.   I'm telling you I don't know if I can do that.

05:53PM 16 Q.   All right.  Well, then your lawyer can make a response to

05:53PM 17 me in writing on that.

05:53PM 18      All right.  Let me show you Exhibit S-09.

05:53PM 19      MR. WALSH:  Judge, if you will have someone e-mail me

05:53PM 20 or send me exactly what you want --

05:53PM 21      MR. FREEH:  Sure.

05:53PM 22      MR. WALSH:  -- I'll respond accordingly.

05:53PM 23      (WHEREUPON, at this point in the proceedings,

05:53PM 24 Exhibit S-09 was marked.)

05:53PM 25 BY MR. FREEH:

**C O N F I D E N T I A L**

SM-02-JA00112

05:53PM 1    Q.    Let me show you S-09.  This is an e-mail string which

05:54PM 2    begins on June 21st of 2012.  This is before you worked with

05:54PM 3    the CAO, correct?

05:54PM 4    A.    Yes.

05:54PM 5    Q.    All right.  This is an e-mail -- I'm looking at the bottom

05:54PM 6    of page 2.  This is the June 21st e-mail from

05:54PM 7    ltate@andrylawgroup?

05:54PM 8    A.    No, the first one I have is from Leslie Tate at

05:54PM 9    Andry Lerner, LLC.

05:54PM 10   Q.    I'm sorry.  That's page 3.  You're correct.

05:54PM 11   A.    Oh, you were looking at her e-mail address; I was looking

05:55PM 12   at her name.

05:55PM 13   Q.    That's all right.  She says, "Attached please find a copy

05:55PM 14   of the report package for *Casey Thonn* with the Seafood Economic

05:55PM 15   Program only.  This does not include his VoO subsistence or VoO

05:55PM 16   boat damage claim at this time."

05:55PM 17          So how did she come, if you know, to send you that

05:55PM 18   particular communication on June 21, 2012?

05:55PM 19   A.    I don't know in that I never talked to her.  I don't know

05:55PM 20   her.  But, from the way it's worded, it appears to me that this

05:55PM 21   was something they would have sent to the referral attorneys to

05:55PM 22   let them know that they were filing the claims.

05:55PM 23          I mean, just like when I refer a personal injury case

05:55PM 24   to a lawyer, and when he files the lawsuit, he would send me a

05:55PM 25   copy of the pleadings, that's what I understand that to be;

**C O N F I D E N T I A L**

05:55PM 1   but, I'm not -- I wouldn't know for sure.

05:55PM 2   Q.   All right.  Now, by June 21st, 2012, it's my understanding

05:55PM 3   that your firm and your wife had sent this representation to

05:56PM 4   someone else?

05:56PM 5   A.   Yes.  To the -- to Lerner, which was the Andry Lerner

05:56PM 6   Group.

05:56PM 7   Q.   Okay.  So when you received this, you and your firm and

05:56PM 8   your wife were not any longer representing Casey, at least with

05:56PM 9   respect to the claims that she's described in that e-mail I

05:56PM 10  just read?

05:56PM 11  A.   Yes.  I assume she is sending this as a referral attorney.

05:56PM 12  Q.   Right.  So did you respond back that you no longer

05:56PM 13  represented him?

05:56PM 14  A.   Well, no.  They knew.  I'm the one that sent him over

05:56PM 15  there.  That's probably why they sent me this, because they had

05:56PM 16  my firm as their referral firm, and so they sent us this

05:56PM 17  notice.

05:56PM 18       That's what typically happened, and that's the way I

05:56PM 19  read it.

05:56PM 20  Q.   When you asked for the *BP* claim number for Casey -- this

05:56PM 21  is on 8:24, page 1 of the exhibit, S-09 --

05:56PM 22  A.   Uh-huh.

05:57PM 23  Q.   -- you did not know what the claim number was at that

05:57PM 24  point?

05:57PM 25  A.   I don't know -- I don't know.  I mean, I must not have if

**C O N F I D E N T I A L**

05:57PM 1    I asked for it, but I don't -- I asked for it after she sent me

05:57PM 2    the report.  Maybe Casey asked me.  I don't know.  I don't

05:57PM 3    know.  But I guess I didn't know at that point, no.

05:57PM 4    Q.    Did you subsequently receive the BP number for

05:57PM 5    Casey Thonn?

05:57PM 6    A.    I thought I saw something in here that says 20741, but I

05:57PM 7    don't know -- I assume that's what it was, but I'm not sure.  I

05:57PM 8    probably just gave that to him, and that was that.  I don't

05:57PM 9    know.

05:57PM 10         At that time, I didn't know what the claim numbers

05:57PM 11   looked like.  This does not, to me now, appear to be -- we had

05:57PM 12   claim numbers and claimant ID's.  I thought they were a lot

05:57PM 13   longer than that from -- since I've worked there, but -- so I

05:58PM 14   don't know what that number actually is.  It could have been.

05:58PM 15   Q.    But if the case is already transferred to Glen Lerner and

05:58PM 16   Andry, why are you trying to get the BP case number?

05:58PM 17   A.    That's what I said, I don't know.  I don't know if it was

05:58PM 18   something that Casey asked me, or I just wanted it to put in

05:58PM 19   the referral, like -- since I had the package that said that

05:58PM 20   they were filing it, I would want the number.

05:58PM 21         Similar to if I had referred out a car wreck case and

05:58PM 22   they were filing the suit, they would have sent me the package

05:58PM 23   before they filed it.  Then they would have sent me the docket

05:58PM 24   number after it was filed.

05:58PM 25         Either he asked me or that's what this -- that's what

**C O N F I D E N T I A L**

05:58PM 1  I was trying to do.  I don't remember.

05:58PM 2  Q.    You don't recall specifically?

05:58PM 3  A.    No.  I think it would have been one of those two things.

05:58PM 4        (WHEREUPON, at this point in the proceedings,

05:58PM 5  Exhibit S-09A was marked.)

05:58PM 6  BY MR. FREEH:

05:58PM 7  Q.    We're going to show you what's marked as S-09A, which is a

05:58PM 8  two-page --

05:59PM 9        MR. FREEH:  Or actually just one page, right?  Just

05:59PM 10  the first page.  If you'd show him both of them, but the other

05:59PM 11  one is just the --

05:59PM 12        MR. WALSH:  What's the date, sir?

05:59PM 13        MR. FREEH:  This is January 17, 2013.

05:59PM 14        THE WITNESS:  Okay.

05:59PM 15  BY MR. FREEH:

05:59PM 16  Q.    This is an e-mail from David Duval --

05:59PM 17  A.    Yes.

05:59PM 18  Q.    -- to you.  David Duval worked with you there?

05:59PM 19  A.    He was the appeals claims lawyer.

05:59PM 20  Q.    I'll give you a moment to look at that document, and ask

05:59PM 21  you if you recall what triggered or what was the reason for

05:59PM 22  this exchange with Mr. Duval in January?

05:59PM 23  A.    Yeah, I think Casey Thonn would have asked me to check on

05:59PM 24  his appeal or the status of his case.  If it was on appeal, I

05:59PM 25  would have asked David Duval, you know, what's going on with

**C O N F I D E N T I A L**

05:59PM   1    it, I would imagine.

06:00PM   2            Because he says "BG appeal team," but I don't know

06:00PM   3    what "BG appeal team" meant.

06:00PM   4    Q.   It might be BP?

06:00PM   5    A.   No.  It's probably BrownGreer, but I don't know what a

06:00PM   6    BrownGreer appeals team is.

06:00PM   7            Then it says, "renotice."  I don't understand this

06:00PM   8    response to David, but I'm assuming that's what I was asking

06:00PM   9    him the status, but I don't really understand the response.

06:00PM  10    Q.   But it appears to be David responding to you, correct?  In

06:00PM  11    other words, if you read the --

06:00PM  12    A.   Yes.

06:00PM  13    Q.   -- the message --

06:00PM  14    A.   Yes, yes.  Most likely, I had asked him -- because Casey

06:00PM  15    asked me to check the status of his appeal, or something like

06:00PM  16    that.  I probably asked him, and he wrote me this back; but,

06:00PM  17    sitting here today, I don't understand his response, and I

06:01PM  18    don't know if I ever did.

06:01PM  19    Q.   Again, you didn't think it was inappropriate or a conflict

06:01PM  20    for you to be inquiring in any manner about Casey's status or

06:01PM  21    appeal at this point?

06:01PM  22    A.   Not at all.  I was asked to look into many, many claims,

06:01PM  23    even from Pat himself.  Mostly from Pat himself.

06:01PM  24            (WHEREUPON, at this point in the proceedings,

06:01PM  25    Exhibit S-10 was marked.)

**C O N F I D E N T I A L**

**SM-02-JA00117**

| | | |
|---|---|---|
| 06:01PM | 1 | BY MR. FREEH: |
| 06:01PM | 2 | Q.    I show you Exhibit S-10.  Ask you and your counsel to take |
| 06:01PM | 3 | a look at that.  This is January 7, 2013.  I'll let you look at |
| 06:01PM | 4 | that for a moment. |
| 06:01PM | 5 | A.    You're talking about all of it or just -- |
| 06:01PM | 6 | Q.    Yeah, you can take a look at the whole thing. |
| 06:01PM | 7 | MR. WALSH:  Judge, just for scheduling purposes, by |
| 06:01PM | 8 | 6:15, I have to go get my car out of the parking garage.  It's |
| 06:02PM | 9 | 6 o'clock now. |
| 06:02PM | 10 | MR. FREEH:  We've got quite a bit more. |
| 06:02PM | 11 | MR. WALSH:  I just need to get it out of the garage |
| 06:02PM | 12 | and put it on the street. |
| 06:02PM | 13 | MR. FREEH:  Do you want to go do that? |
| 06:02PM | 14 | MR. WALSH:  If now is a good time to stop. |
| 06:03PM | 15 | MR. FREEH:  Yes, sure. |
| 06:03PM | 16 | (WHEREUPON, at this point in the proceedings, a brief |
| 06:03PM | 17 | recess was taken.) |
| 06:03PM | 18 | BY MR. FREEH: |
| 06:19PM | 19 | Q.    So we're back on the record.  Do you have number 10 in |
| 06:19PM | 20 | front of you? |
| 06:19PM | 21 | A.    Yes. |
| 06:19PM | 22 | Q.    So number 10, you've had a chance to look at it.  This is |
| 06:19PM | 23 | an e-mail string which starts on January 4, 2013.  There is a |
| 06:19PM | 24 | long description of what I think you're describing as the |
| 06:19PM | 25 | relationship and the numbers connected to the Crown matter; is |

**C O N F I D E N T I A L**

SM-02-JA00118

06:19PM  1   that correct?  Where you say, "Now you can see why" -- I'm

06:19PM  2   sorry, this is Glen saying, "Now, you can see why I'm a little

06:19PM  3   bitter.  Originally, you wanted to give me 50 percent" --

06:19PM  4   A.    Yeah.

06:20PM  5   Q.    -- and then there is a long discussion of the change in

06:20PM  6   the operating agreement?

06:20PM  7   A.    Yeah.  All that had started, like, way back in March.  We

06:20PM  8   reached an agreement in May.  That's why we started doing the

06:20PM  9   payments from May.

06:20PM  10        But we never did -- we never could agree on

06:20PM  11   everything else.  So it's still -- you see where it says, "the

06:20PM  12   only change to the operating agreement" -- because every time

06:20PM  13   we'd send an operating agreement, Glen wanted to change stuff.

06:20PM  14   It's not what he originally agreed to prior to May when we

06:20PM  15   started the -- when he sold the shares.

06:20PM  16        So he goes on and on.  I mean, this e-mail is like

06:20PM  17   all over the place.

06:20PM  18   Q.    Right.  But I'm trying to see the genesis of this.  So we

06:20PM  19   have the e-mail where he, on January 4th, at 15:16, says, "Now

06:20PM  20   you can see why I'm a little bitter."

06:20PM  21        Do you recall what prompted this response?  Was it a

06:20PM  22   phone call or a meeting or some other discussion that you had?

06:21PM  23   A.    Well, yes, there is a lot of discussions that you don't

06:21PM  24   have.  What prompted it is, I think, in March 2012, Glen

06:21PM  25   started complaining about all the money he had been paying to

**C O N F I D E N T I A L**

06:21PM 1    Crown.  It was more than we had originally agreed to; that if

06:21PM 2    he'd have known how much money it was, he would have wanted

06:21PM 3    50 percent.

06:21PM 4         So we started negotiating.  That's when we came up

06:21PM 5    with we'll reduce our shares to 17, and do that.  That was in

06:21PM 6    May of 2012.

06:21PM 7         Ever since that date, we kept trying to agree on an

06:21PM 8    operating agreement, and Glen would keep changing stuff in the

06:21PM 9    operating agreement -- or Joey or Tim.  I mean, it just never

06:21PM 10   was -- we never could get it.

06:21PM 11        He is still complaining that we won't sign the

06:21PM 12   operating agreement.  We were saying, well, that's because you

06:21PM 13   keep changing things.  It's not the agreement that we worked

06:21PM 14   out starting May 1.

06:21PM 15        He wants to give part of his money -- I mean, part of

06:21PM 16   his percentage to Mike and then that guy Corey.  I said that

06:22PM 17   those two are in it now.

06:22PM 18        So it's just -- it's just continuing to fight about,

06:22PM 19   you know, all of that, which has been since 2010, the same

06:22PM 20   thing.

06:22PM 21   Q.  So you say, "I don't necessarily agree."  He comes back

06:22PM 22   with a response.

06:22PM 23        Then above that, he sends you another e-mail, again,

06:22PM 24   January 4, 17:03.  It says, "Okay," and it says, "Need TM

06:22PM 25   agreement done."  What's the TM refer to?

**C O N F I D E N T I A L**

SM-02-JA00120

06:22PM 1    A.   TerraMer.   They are the company that we have a licensing

06:22PM 2    agreement with our machine.   They are a Canadian company.

06:22PM 3         Our licensing agreement was originally with

06:22PM 4    Proven Technologies.   They were the inventor.   We had an

06:22PM 5    agreement that we would get the international licensing for the

06:22PM 6    machine.

06:22PM 7         Then TerraMer came in and bought a majority interest

06:22PM 8    in Proven, and TerraMer started looking at the license

06:23PM 9    agreement that we had with Proven and started trying to hold us

06:23PM 10   up for more money or more percentage or more royalty, whatever

06:23PM 11   it was.

06:23PM 12        So, finally, we went to -- we went to Calgary, where

06:23PM 13   TerraMer is.   That's what they said -- they've been dragging

06:23PM 14   their feet on it since meeting months ago.   I'm not too crazy

06:23PM 15   about them.

06:23PM 16        So we went up to Calgary months before this e-mail,

06:23PM 17   and they still haven't given us the agreement that we agreed

06:23PM 18   to.   We still haven't gotten that, so we need to get the

06:23PM 19   TerraMer agreement done.   "They've been dragging their feet on

06:23PM 20   it since meeting months ago," that's what that was about.

06:23PM 21   Q.   All right.   Three days later, not referencing the

06:23PM 22   conversations we just discussed or the e-mails of January 4th,

06:23PM 23   you say, "Did you check on my fee from *Casey Thonn*?   Susie sent

06:24PM 24   it to Jeff mid-December."

06:24PM 25   A.   Yes.

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 06:24PM | 1 | Q.   So what fee are you talking about there? |
| 06:24PM | 2 | A.   They -- he had a VoO claim that was settled and disbursed |
| 06:24PM | 3 | in October of 2012.  Here it was January -- January of 2013, |
| 06:24PM | 4 | and I still didn't get my share. |
| 06:24PM | 5 | All of the old stuff about, you know, me not getting |
| 06:24PM | 6 | my fees from Jon properly and that kind of stuff started coming |
| 06:24PM | 7 | up.  So I'm like, look, did you get the check on my fee from |
| 06:24PM | 8 | *Casey Thonn*, because Susie sent it to Jeff in mid December? |
| 06:24PM | 9 | So what that is, is Glen would have gotten -- Susie |
| 06:24PM | 10 | is the manager at Andry Lerner Group.  Jeff is Glen's |
| 06:24PM | 11 | accountant. |
| 06:24PM | 12 | Q.   Jeff Cahill? |
| 06:24PM | 13 | A.   Yes, wherever he is.  I don't know if he's in Chicago or |
| 06:24PM | 14 | Minnesota or Naples.  But he's the accountant for Glenn's firm, |
| 06:25PM | 15 | and he also is now the accountant for Crown.  He just does -- |
| 06:25PM | 16 | he's the accountant for everything. |
| 06:25PM | 17 | Then it says -- so I said, "Did you check on my fee |
| 06:25PM | 18 | from *Casey Thonn*?  Susie," which would have been the manager at |
| 06:25PM | 19 | Andry Lerner Group, "sent the fee to Jeff for Glen in |
| 06:25PM | 20 | mid-December, and Glen's supposed to give it to me."  That's |
| 06:25PM | 21 | what we're referencing above. |
| 06:25PM | 22 | But it was a case that disbursed -- I think it |
| 06:25PM | 23 | disbursed October 12th, and I should have had it right when it |
| 06:25PM | 24 | disbursed, but I still didn't have it. |
| 06:25PM | 25 | Q.   Now, how did you know that Susie had sent it to Jeff in |

**C O N F I D E N T I A L**

SM-02-JA00122

06:25PM  1    December?

06:25PM  2    A.    Because I asked her.

06:25PM  3    Q.    You asked her because you wanted to see if the money had

06:25PM  4    been paid?

06:25PM  5    A.    What money had been paid to who?

06:25PM  6    Q.    The money was paid to Jeff?

06:25PM  7    A.    I wanted to know if she had sent the share, that share of

06:25PM  8    the fee to Glen, which was have been through Jeff.

06:25PM  9    Q.    All right.

06:25PM 10    A.    Because when Glen got it, I was supposed to get my fee.

06:25PM 11    Q.    Sorry to be elementary.  What do you understand and what

06:26PM 12    did you intend to say when you called it *my fee*, quote,

06:26PM 13    unquote, here?

06:26PM 14    A.    The fee for the work I did on Casey Thonn's VoO case

06:26PM 15    before I referred it to the Andry Lerner Group.

06:26PM 16    Q.    So you're not referring to a referral fee?

06:26PM 17    A.    I'm referring to the fee for the work I did.  We call

06:26PM 18    those referral fees.  I don't know -- I mean, that's the

06:26PM 19    terminology that we use.

06:26PM 20          But it's based on -- you can have -- typically, as we

06:26PM 21    practice in here, and as I've always done, you could have a

06:26PM 22    client that may come in to you, and it might be a case that you

06:26PM 23    can't handle for whatever reason, because maybe you're not --

06:26PM 24    like a medical malpractice case, and maybe I'm not qualified,

06:26PM 25    so I'll refer that client to another lawyer.

**C O N F I D E N T I A L**

06:26PM 1       You're only supposed to share fees for work you did.

06:26PM 2 So in that case, I wouldn't necessarily get a fee; but,

06:26PM 3 sometimes -- the Supreme Court has said if you -- sometimes the

06:26PM 4 original lawyer does hand-holding, helps the client, tells the

06:27PM 5 client what's going on, that's enough to generate a fee.  So

06:27PM 6 it's a fee -- we referred the case, but it's a fee.

06:27PM 7       In this case, Casey Thonn was my client.  He had come

06:27PM 8 to me.  We had done work for him for a year, or whatever it

06:27PM 9 was.  I was representing him on VoO.

06:27PM 10       When I sent it over to Glen, I said, look, I've done

06:27PM 11 a lot of work on this case, I should get 50 percent of the fee.

06:27PM 12 That's what it is.

06:27PM 13       We may have called it *referral fees*.  I still call

06:27PM 14 them *referral fees*, but that's what it's based on.

06:27PM 15 Q.  Do you recall being interviewed by Mr. Juneau a few weeks

06:27PM 16 ago, and then -- separately by Mr. Pat Juneau, Mike Juneau and

06:27PM 17 Dave Welker --

06:27PM 18 A.  Yes.

06:27PM 19 Q.  -- regarding this matter?

06:27PM 20 A.  Yes.

06:27PM 21 Q.  Do you recall in that interview that you denied the term

06:27PM 22 *referral fee*, and insisted it was not a *referral fee*, quote,

06:27PM 23 unquote?

06:27PM 24 A.  Which interview?

06:27PM 25 Q.  The interview with the two Juneaus and David?

**C O N F I D E N T I A L**

06:27PM  1    A.    In that interview, they didn't show me the e-mails, and

06:27PM  2    they were asking me about a fee in January.  I didn't know what

06:28PM  3    it was referring to.  It wasn't until I went home and saw that

06:28PM  4    was referring to the December -- I mean, the October

06:28PM  5    disbursement that I knew what they were referring to.

06:28PM  6          That's how it was.  That's what came out.

06:28PM  7    Q.    So after the interview, did you go back and contact them

06:28PM  8    and correct it?

06:28PM  9    A.    My wife told Mike that the next day, I think.

06:28PM 10    Q.    Did you tell anybody?

06:28PM 11    A.    Yeah.  I'm sure I told Mike.  I called Mike the next

06:28PM 12    morning and said, "Look, this is a bunch of bullshit.  What do

06:28PM 13    I have to do?"

06:28PM 14          We talked, and he said, "You should resign," and I

06:28PM 15    resigned.

06:28PM 16    Q.    No, that's not my question.  My question was, during the

06:28PM 17    interview -- and I'll show you the interview notes -- or ask

06:28PM 18    you questions about them -- when they asked you if you had

06:28PM 19    received any referral fee on the *Thonn* case, your initial

06:28PM 20    reaction was no.  You adamantly denied it and said --

06:28PM 21    A.    Yes.

06:28PM 22    Q.    -- you didn't receive any referral fees; is that correct?

06:28PM 23    A.    In the interview with the three guys?

06:28PM 24    Q.    With the three guys.

06:28PM 25    A.    That's correct.

**C O N F I D E N T I A L**

SM-02-JA00125

06:28PM 1    Q.   All right.  Then you went home, and you saw the e-mail,

06:28PM 2    and you recognized at that point that you had, in fact,

06:29PM 3    received a referral fee?

06:29PM 4    A.   I knew I received a referral -- or a fee for the work I

06:29PM 5    did.  We call them referral fees.  That's what I'm calling it.

06:29PM 6    But I knew I did that.

06:29PM 7         When I went home, that didn't change anything.  I

06:29PM 8    admitted -- I admit it now.  I didn't admit it then.

06:29PM 9    Q.   All right.  So my question was, after you went home and

06:29PM 10   saw the e-mail and realized that you had, in fact, accepted

06:29PM 11   something which you now understood and recognized as a referral

06:29PM 12   fee --

06:29PM 13        MR. WALSH:  Judge, excuse me.  I don't know if

06:29PM 14   objecting is the proper term --

06:29PM 15        MR. FREEH:  Sure.

06:29PM 16        MR. WALSH:  -- but I'm going to object.

06:29PM 17        As a lawyer licensed to practice in Louisiana, I

06:29PM 18   know exactly what he's talking about.  For the record, he is

06:29PM 19   saying he did work on the case before it was sent out.  He is

06:29PM 20   entitled to get a fee for the work he did on the case.

06:29PM 21        MR. FREEH:  Go ahead.  Are you done?

06:29PM 22        MR. WALSH:  No, sir.  I believe the question you're

06:29PM 23   asking him about the referral fee implies he got a fee for some

06:29PM 24   work he didn't do, and I would ask you to clarify that, please.

06:30PM 25        MR. FREEH:  Your objection is noted.  That's not the

**C O N F I D E N T I A L**

SM-02-JA00126

06:30PM 1    question.

06:30PM 2    BY MR. FREEH:

06:30PM 3    Q.    The question is, after you gave that statement to the two

06:30PM 4    Mr. Juneaus and Dave Welker, who recorded your statement, you

06:30PM 5    went home, you saw an e-mail, and you realized that you had

06:30PM 6    received the referral fee; isn't that your testimony now?

06:30PM 7    A.    Can you define *referral fee* for me?

06:30PM 8    Q.    As you just described it.

06:30PM 9    A.    I realized that I did get a fee for the work I had done on

06:30PM 10   the *Casey Thonn* case before I went to work for Pat Juneau and

06:30PM 11   before Christine went to work for Pat Juneau and -- the work I

06:30PM 12   had done, yes.

06:30PM 13   Q.    The next question, after you realized that -- I'll repeat

06:30PM 14   the question -- did you contact Mr. Juneau and Mr. Welker and

06:30PM 15   correct what you had told them the night before?

06:30PM 16   A.    No.

06:30PM 17   Q.    Why not?

06:30PM 18   A.    I don't know.  I just didn't.

06:30PM 19   Q.    Did you send them an e-mail to correct it?

06:30PM 20   A.    No.

06:30PM 21   Q.    Did you call them on the phone?

06:30PM 22   A.    I just told you I didn't tell them -- I didn't correct it.

06:30PM 23   Q.    Did you think it was not important that you correct it?

06:30PM 24   A.    No.

06:30PM 25   Q.    Why not?

**C O N F I D E N T I A L**

128

A.    Because I was resigning.

Q.    Because you were resigning, you wanted to keep the record

in an incorrect manner as you now recognize it?

A.    I didn't understand it to be a record.  I didn't know

there was a record.  There wasn't a court reporter there or

anything.

      I understood that -- Pat told me in the meeting that

he thought that it was a conflict because I was in business

with Glen on Crown.  I thought that that's not going to change,

that's -- I'm not getting out of business with Glen, with

Crown, so I might as well just resign.  That's what I

understood.

      Whether I corrected him on these or not,

that didn't -- I didn't think -- that was of no purpose because

I was already resigning because of the -- what he said was a

conflict, which I didn't think was a conflict, and so I was

going to resign at his request.  That's what it was.

Q.    You didn't correct the record, just so we're clear?

A.    I didn't know there was a record to correct.

Q.    You didn't correct your prior statement?

A.    No.

      MR. TIDWELL:  So, to follow up on your explanation of

how it works, would it be then that when you made the referral

for the work that you had done to Lerner or whoever got it over

at Andry Lerner, what kind of paper is it that shows, we're

**C O N F I D E N T I A L**

SM-02-JA00128

06:32PM  1     agreeing on this, etcetera, etcetera?

06:32PM  2             THE WITNESS:  Sometimes -- you would typically write

06:32PM  3     it out if you're referring it to an attorney that you maybe

06:32PM  4     don't have -- aren't that friendly with or just have a business

06:32PM  5     relationship.

06:32PM  6             For Glen, I'm pretty sure, if I remember

06:32PM  7     correctly, it was just something like, hey, I'm sending you

06:32PM  8     this case, I've done a lot of work on it before, I'm entitled

06:32PM  9     to 50 percent of the fee for the work I've done, you know,

06:32PM 10     something like that; but, we didn't write anything down.

06:32PM 11             MR. TIDWELL:  Would Susan DeSantis then have been

06:32PM 12     told, by the way, we've got something going with Glen?

06:32PM 13             THE WITNESS:  I don't know if she was told or not.  I

06:32PM 14     mean, Glen and I were the ones that --

06:32PM 15             MR. TIDWELL:  Well, I mean, so that she would know to

06:32PM 16     start notifying you?  Or whoever it was, was going to start

06:33PM 17     notifying --

06:33PM 18             THE WITNESS:  No, I only asked --

06:33PM 19             MR. TIDWELL:  -- Ms. Tate?

06:33PM 20             THE WITNESS:  I only asked Susan DeSantis when she

06:33PM 21     sent Glen the *Casey Thonn* fee for Glen.  I don't know if she

06:33PM 22     knew that that fee was ultimately going to come to me or not.

06:33PM 23     I don't remember.

06:33PM 24             MR. TIDWELL:  So when Ms. Tate was sending you the

06:33PM 25     notification, that would have been because you were --

**C O N F I D E N T I A L**

SM-02-JA00129

06:33PM 1    THE WITNESS:  A referral attorney, I think, but I

06:33PM 2    don't know Ms. Tate.  I never talked to Ms. Tate.

06:33PM 3         It looked to me like that was typically the

06:33PM 4    way -- when you have a case, and you send it to another lawyer

06:33PM 5    to file, they send you all the information that, hey, we're

06:33PM 6    filing the case.

06:33PM 7         MR. TIDWELL:  So somebody told her, regarding this

06:33PM 8    claim, make sure that we're taken care of?

06:33PM 9         THE WITNESS:  I think that what you're talking about

06:33PM 10   is Andry Lerner probably had a bunch of lawyers that referred

06:33PM 11   them these kind of cases.

06:33PM 12        MR. TIDWELL:  Right.

06:33PM 13        THE WITNESS:  So they probably have something that

06:33PM 14   shows referral lawyers.  Then, whenever you file that, you send

06:34PM 15   the referral lawyer a notice saying, hey, we filed your case.

06:34PM 16        Because the client signed up with me originally.

06:34PM 17   If I send him to somebody, and, you know, they screw up on it,

06:34PM 18   I mean, I want to make sure that they did what said they were

06:34PM 19   going to do.

06:34PM 20   BY MR. FREEH:

06:34PM 21   Q.   Did you refer the case to Lerner or to Jon Andry?

06:34PM 22   A.   It was originally to Lerner; but, he said, just send Casey

06:34PM 23   over to Jon's office, because that's where they're doing it,

06:34PM 24   and so that's where it went.

06:34PM 25        But I wasn't talking to Jon at the time, so we just

**C O N F I D E N T I A L**

**SM-02-JA00130**

06:34PM  1    told Casey to go over to that office.

06:34PM  2              Casey knew that office because he was my personal

06:34PM  3    injury client and my *BP* client when I was in that office.  So

06:34PM  4    he knew them.  So we said, hey, my old office, they'll take

06:34PM  5    your case, just go over there.

06:34PM  6              Then whether they signed him up with Andry Lerner

06:34PM  7    Group -- I assume that's what they did.

06:34PM  8    Q.    Well, the work that you did on it, was it work that you

06:34PM  9    personally did or work that Christine did or both?

06:34PM 10    A.    Both.

06:34PM 11    Q.    Who did most of it?

06:34PM 12    A.    I don't know.  I mean, I couldn't tell you.  She worked

06:35PM 13    for my firm, so it was for -- it was for us.  I mean, we were

06:35PM 14    one.  We didn't separate out stuff.  So it was all the same.

06:35PM 15              Like, it wasn't two partners, where you've got to

06:35PM 16    figure out fee arrangements and stuff like that.  She was with

06:35PM 17    my firm, so whatever she did was me.

06:35PM 18    Q.    Would it surprise you to hear that she says that she told

06:35PM 19    her client to go see Jon Andry to represent him?

06:35PM 20    A.    No, it wouldn't surprise me because that's whose office it

06:35PM 21    was, and he knew Jon -- or he knew who he was.  So he probably

06:35PM 22    would have went over there.

06:35PM 23              But it was -- I'm the one that told Glen we're

06:35PM 24    referring the case to him, and he said, "Send the guy over to

06:35PM 25    Jon's office."  I mean, we would have called it *Jon's office*.

**C O N F I D E N T I A L**

06:35PM 1          Glen is not there.  Glen is never there.  So you

06:35PM 2    couldn't refer it to Glen and tell somebody, "Go see

06:35PM 3    Glen Lerner," because he's never anywhere.

06:35PM 4    Q.   Did you talk at that time to Jon Andry at all about the

06:35PM 5    referral?

06:35PM 6    A.    No.  I don't think I was talking to Jon at that time.

06:36PM 7    Q.   You told Mr. Tidwell that there was nothing in writing

06:36PM 8    about any fee or payment back to you for the referral?  Nothing

06:36PM 9    was --

06:36PM 10   A.    No.

06:36PM 11   Q.    -- put in writing?

06:36PM 12   A.    No.

06:36PM 13   Q.   But Jon Andry was someone who you not only didn't trust,

06:36PM 14   but who you said had burned you before in terms of a payment,

06:36PM 15   correct?

06:36PM 16   A.    Correct.

06:36PM 17   Q.   You didn't think it was necessary to have something in

06:36PM 18   writing to protect your interest?

06:36PM 19   A.    I hadn't talked to Jon about any of it.  I was dealing

06:36PM 20   with Glen, and I didn't think it was important for me to put it

06:36PM 21   in writing for Glen.  I was dealing with him.  I wasn't dealing

06:36PM 22   with Jon at all.

06:36PM 23   Q.   But Jon was going to be the attorney who did the

06:36PM 24   representation?

06:36PM 25   A.    No.  As I understood, it was going to be the Andry Lerner

**C O N F I D E N T I A L**

SM-02-JA00132

06:36PM 1    Group, their firm.

06:36PM 2    Q.    But Lerner, you said, was not a practicing lawyer?

06:36PM 3    A.    No, he's a practicing lawyer.

06:36PM 4    Q.    He doesn't represent cases --

06:36PM 5    A.    Yes, he does.

06:36PM 6    Q.    -- individually?  Did he represent Casey here?

06:36PM 7    A.    Andry Lerner Group represented Casey, as far as I know.

06:36PM 8    Q.    I'm not talking about the Andry Lerner Group.  I'm talking

06:37PM 9    about Mr. Lerner.  Did he actually work and represent him as a

06:37PM 10   lawyer?

06:37PM 11   A.    Oh, I don't know.  I mean, he was his lawyer.  He signed

06:37PM 12   up with the Andry Lerner Group.  The Andry Lerner Group is a

06:37PM 13   firm.

06:37PM 14         The claims process doesn't require a lawyer at all,

06:37PM 15   so a lot of these places didn't have any lawyers.  So whether

06:37PM 16   Jon or Glen or any lawyer at their office represented

06:37PM 17   Casey Thonn as a lawyer, I don't know.  You didn't have to be a

06:37PM 18   lawyer to file a claim.

06:37PM 19         But, you know, I referred it to the Andry -- I told

06:37PM 20   Glen I was sending him the case.  He said, "Send it over to

06:37PM 21   Jon's office," and it was the Andry Lerner Group.  When I knew

06:37PM 22   that, I don't know; but, I knew that's what they were doing.  I

06:37PM 23   didn't know the name of it.

06:37PM 24   Q.    Other than your very distinguished counsel who's

06:37PM 25   representing you here, when is the first time you told anyone

**C O N F I D E N T I A L**

SM-02-JA00133

06:37PM 1   else that these payments were for work you had performed when

06:37PM 2   you represented Casey Thonn?

06:37PM 3   A.   I never did except for him.

06:37PM 4   Q.   So tonight is the first night you're telling anybody else?

06:37PM 5   A.   Yes.

06:37PM 6   Q.   Is that because you've read the e-mails and you're trying

06:38PM 7   to explain the language in the e-mails?

06:38PM 8   A.   No.   I'm just -- I realize it's going further than I

06:38PM 9   thought it was going to go, so I'm telling the truth.

06:38PM 10   Q.   Well, after you were asked to leave the firm --

06:38PM 11   A.   Yes.

06:38PM 12   Q.   -- and you resigned --

06:38PM 13   A.   Yes.

06:38PM 14   Q.   -- you knew it was a serious matter, correct?

06:38PM 15   A.   Well, not at the time; but, I learned it was, yes.

06:38PM 16   Q.   You didn't think it was serious when you resigned?

06:38PM 17   A.   No, because I thought Pat told me -- I know what he told

06:38PM 18   me.   He told me in the meeting that he thought it was a

06:38PM 19   conflict of interest for me working there when I was in

06:38PM 20   business with Glen Lerner and Crown.

06:38PM 21         I understood that.   I didn't agree with that.   I

06:38PM 22   didn't think it was a conflict of interest; but, when he told

06:38PM 23   me it was, and he thought it was, I said, okay, I understand

06:38PM 24   that, and I resigned based on that.

06:38PM 25   Q.   Right.

**C O N F I D E N T I A L**

SM-02-JA00134

06:38PM 1   A.    I didn't think it was that big of a deal.  I thought Pat

06:38PM 2   was saying, it's a conflict -- I see it as a conflict of

06:38PM 3   interest, you can't work here anymore, and that was that.  I

06:38PM 4   didn't think it was going to blow up into all of this.

06:38PM 5   Q.    But after you resigned, when you realized that this was,

06:39PM 6   as was just described by your lawyer, in fact, a referral fee

06:39PM 7   for work you had done, did you not think that was important to

06:39PM 8   bring to somebody's attention other than your lawyer?

06:39PM 9   A.    No.  Nobody would even talk to me.  I didn't have anybody

06:39PM 10  else to say it to except my lawyer.  I wasn't going to put it

06:39PM 11  in the papers.

06:39PM 12  Q.    No.  But you didn't think to put it in a letter or a phone

06:39PM 13  call or communications to Mr. Welker or Pat or Mr. Juneau?

06:39PM 14  A.    No, because I told you I understood the problem was the

06:39PM 15  perceived conflict of interest with me working for -- working

06:39PM 16  for Pat and being in business with Glen and Crown.  I

06:39PM 17  understood that was the big issue.  That wasn't going to

06:39PM 18  change.

06:39PM 19          Whatever else was done, I didn't think it was

06:39PM 20  anything -- I thought that was the reason I was being asked to

06:39PM 21  resign.

06:39PM 22          MR. TIDWELL:  So was the --

06:39PM 23          THE WITNESS:  Pat knew I represented Casey Thonn.

06:39PM 24  Pat knew I referred Casey Thonn out.  When Pat -- I didn't

06:39PM 25  think this issue had anything to do with Casey Thonn because

**C O N F I D E N T I A L**

SM-02-JA00135

06:40PM 1    when Pat first brought me in, he said to me, "We have a report

06:40PM 2    that you are referring cases to Jon Andry for a fee."

06:40PM 3                I said, "That's ridiculous.  The only case I

06:40PM 4    ever referred to Jon Andry was *Casey Thonn*."

06:40PM 5                He said to me, "No, I know about *Casey Thonn*."

06:40PM 6                So when he said, "No, I know about *Casey Thonn*,"

06:40PM 7    I didn't think any of this had to do with *Casey Thonn*.  I

06:40PM 8    thought it had to do with my conflict of interest being in

06:40PM 9    Crown and Glen.  That's what I thought.  I don't know what else

06:40PM 10   you want me to say, but that's what I thought.

06:40PM 11   BY MR. FREEH:

06:40PM 12   Q.    But you, yourself, never told him about the representation

06:40PM 13   with Casey Thonn?

06:40PM 14   A.    Absolutely, one hundred percent, I told him we represented

06:40PM 15   Casey Thonn.  He knew I represented Casey Thonn.

06:40PM 16   Q.    At what point?

06:40PM 17   A.    When he came to talk to us at my office, me and Christine.

06:40PM 18   I said, "We have" -- "I have two cases, *Backes* and *Casey Thonn*.

06:40PM 19   I'm going to refer them out."

06:40PM 20                That's why when he called me in his office when all

06:40PM 21   of this stuff hit, he said -- when I said, "*Casey Thonn* and

06:40PM 22   *Backes*," he said, "Oh, no, I already know about those."  So I

06:40PM 23   understood it to be something different.

06:41PM 24   Q.    So it's your testimony when he first came to speak to you

06:41PM 25   and Christine you identified those two cases to him?

**C O N F I D E N T I A L**

SM-02-JA00136

06:41PM 1    A.    Yes.

06:41PM 2              MR. TIDWELL:  So he knew -- they knew about Crown --

06:41PM 3              THE WITNESS:  Yes.

06:41PM 4              MR. TIDWELL:  -- but, evidently, they did not know

06:41PM 5    that Lerner was part of Crown until this came up?

06:41PM 6              THE WITNESS:  I don't know; but, from reading this,

06:41PM 7    that's what it seems to me.  I never told him anything about

06:41PM 8    anybody that was in it.  They never asked who are you partners

06:41PM 9    with or anything like that.

06:41PM 10             Maybe David Welker knew because I had talked to

06:41PM 11   David Welker about it a lot and might have said that my partner

06:41PM 12   is a big attorney in Las Vegas, but I don't think I've ever --

06:41PM 13   would have said the name, and nobody asked me about it.

06:41PM 14             But everybody knew -- in fact, David Welker

06:41PM 15   opened up -- got -- contacted an FBI agent in Ohio and got them

06:41PM 16   to open up a file for me because a piece had been stolen off

06:42PM 17   our machine in Ohio.

06:42PM 18             So David Welker and I -- I mean, I told him the

06:42PM 19   whole story about Crown, because I had to do that for him to

06:42PM 20   refer me to this guy, Drew, the FBI agent in Ohio.

06:42PM 21   BY MR. FREEH:

06:42PM 22   Q.   When you say you *told him the whole story*, what point in

06:42PM 23   time was that?

06:42PM 24   A.   Whenever the piece got stolen.  I think the piece got

06:42PM 25   stolen at Easter, so it would have been sometime after Easter.

**C O N F I D E N T I A L**

06:42PM 1   Q.   When you say *the whole story*, did you tell him that Lerner

06:42PM 2   was making payments to you in relation to Crown?

06:42PM 3   A.   No, I don't think I mentioned Lerner at all.  What I was

06:42PM 4   saying is, we have this business.  I told him about the whole

06:42PM 5   business and that it got -- you know, a part got stolen.  He

06:42PM 6   didn't ask me, who are you partners with in the business.

06:42PM 7   Q.   You didn't tell him?

06:42PM 8   A.   No.

06:42PM 9   Q.   Looking back at Exhibit 10, going to the subsequent

06:42PM 10  e-mail, which is 10:49 a.m. on January 7th, you to Cahill --

06:42PM 11  Cahill is the accountant, correct?

06:42PM 12  A.   Correct.

06:42PM 13  Q.   -- you say, "Make sure out of the 5K Jon kept" --

06:43PM 14  A.   That's not me.  I didn't write that.  That's Glen Lerner,

06:43PM 15  I think.

06:43PM 16  Q.   All right.  Glen Lerner, sorry.  Glen Lerner to you, "Make

06:43PM 17  sure out of the 5" --

06:43PM 18  A.   No, I don't think Glen Lerner wrote that to me.  He might

06:43PM 19  have copied me on it, but he wasn't --

06:43PM 20  Q.   It says to Lionel Sutton?

06:43PM 21  A.   I know, but it wouldn't say to Tiger.  If he was sending

06:43PM 22  the e-mail to me, it wouldn't say, "make sure I get half, since

06:43PM 23  I'm sending 4 or 5K to Tiger."  He would have said, "since I'm

06:43PM 24  sending 4 or 5K to you."

06:43PM 25              He was sending this to somebody else.  He was just

**C O N F I D E N T I A L**

06:43PM 1   responding in the e-mail chain.  I'm sure he wasn't sending

06:43PM 2   that to me.

06:43PM 3   Q.   Well, he's not here, so we can't ask him.

06:43PM 4        When it says, "make sure out of the 5K Jon kept I get

06:43PM 5   one-half, since I'm sending the full 5K to Tiger," what do you

06:43PM 6   understand that to mean?

06:43PM 7   A.   Now, when I'm looking at it, I understand it to mean that

06:43PM 8   he and Jon split the fee 50/50; but, since I was entitled to

06:44PM 9   50 percent, and he gave me his 50 percent, then he and Jon

06:44PM 10  should split the remaining 50 percent, 50/50.  That's how I

06:44PM 11  read it.

06:44PM 12  Q.   Well --

06:44PM 13  A.   I mean, that was your question, right, what I understood?

06:44PM 14  Q.   Yes.  Was that the agreement and understanding you had at

06:44PM 15  the time?

06:44PM 16  A.   What?

06:44PM 17  Q.   That the fees would be split that way?

06:44PM 18  A.   My agreement and understanding was that I would get

06:44PM 19  50 percent of the *Casey Thonn* fee for the work I had done on

06:44PM 20  the case.  That was my agreement and understanding with Glen.

06:44PM 21       How he and Jon did things, I have no idea.  You asked

06:44PM 22  me what I understood this to mean now, and I'm telling you what

06:44PM 23  it seems to me.

06:44PM 24  Q.   Did you know at the time that Jon was getting some

06:44PM 25  remuneration from the transaction, the payments?

**C O N F I D E N T I A L**

06:44PM 1  A.   Well, I knew it was The Andry Law Group, so I would assume

06:44PM 2  that Jon wasn't doing it for free; but, how he got -- or what

06:44PM 3  he got, I have no idea.

06:44PM 4  Q.   Right.  So you didn't know the amount, but you knew he was

06:45PM 5  benefiting financially in some way?

06:45PM 6  A.   From what?

06:45PM 7  Q.   From the payment --

06:45PM 8  A.   From the BP cases?

06:45PM 9  Q.   Yes.

06:45PM 10  A.   I knew he filed BP cases, and I assumed that he was going

06:45PM 11  to get something from those cases when they settled.  I don't

06:45PM 12  understand what you're asking me.  I don't know any lawyer that

06:45PM 13  would file anything for free.

06:45PM 14       (WHEREUPON, at this point in the proceedings,

06:45PM 15  Exhibit S-11 was marked.)

06:45PM 16  BY MR. FREEH:

06:45PM 17  Q.   Let me show you number 11, S-11, which is an e-mail chain

06:45PM 18  also relating to January 7, 2013.

06:45PM 19       You sent an e-mail to Cahill after he sends an e-mail

06:45PM 20  to Lerner and you, January 7th at 8:23 -- this is on S-11 --

06:46PM 21  where Cahill says, "We received $4,940 at the end of the year."

06:46PM 22  Do you see that?

06:46PM 23  A.   Yeah, I think he's responding to Glen, not to me.

06:46PM 24  Q.   Well, you're copied on the e-mail.

06:46PM 25  A.   Yeah, but -- well, I mean, do you want me to explain what

**C O N F I D E N T I A L**

06:46PM 1   I understand --

06:46PM 2   Q.   Yes.

06:46PM 3   A.   -- or do you want to just tell me what I understand?

06:46PM 4   Q.   Why don't you explain.

06:46PM 5   A.   To me, it looks like and I understood that he was

06:46PM 6   responding to Jeff because Jeff -- he said, "Jeff, did we

06:46PM 7   receive money from Andry?  If so, Tiger, how much was your

06:46PM 8   fee?"  Jeff responded to Glen, "We received 4,940 at the end of

06:46PM 9   the year."

06:46PM 10          I responded to the same e-mail saying, "Yes, that is

06:46PM 11   my share.  Please deposit it in an account so I can get it."

06:46PM 12   That was 50 percent of the VoO fee, which I was entitled to,

06:46PM 13   and that was my fee.  So that was that.

06:47PM 14          That's what I understood this to mean.  That's what I

06:47PM 15   meant when I wrote it.

06:47PM 16   Q.   On page 3, you send an earlier e-mail to Glen Lerner,

06:47PM 17   January 7, 10:25.  You say, "They sent you the check for my

06:47PM 18   fee.  The total fee on *Thonn* was ten K (plus or minus).  They

06:47PM 19   sent you five for me and kept the other five.  Check with

06:47PM 20   Susie.  She has the accounting."

06:47PM 21   A.   Right.

06:47PM 22   Q.   That's the same conversation you're --

06:47PM 23   A.   That was that 4,940.  Apparently, the fee was, you know,

06:47PM 24   9,880, or something like that.  But I knew it was 10,000, plus

06:47PM 25   or minus, and so my half ended up being $4,940.  So that's what

**C O N F I D E N T I A L**

SM-02-JA00141

06:47PM 1   that was.

06:47PM 2   Q.   So as you were having these conversations, and as you were

06:47PM 3   getting these payments -- and I've asked you this before, but

06:47PM 4   for the record, again -- at no time did you advise Mr. Juneau

06:48PM 5   or anybody at the CAO about these transactions and

06:48PM 6   communications?

06:48PM 7   A.   I advised Mr. Juneau before I went to work there, at the

06:48PM 8   time Christine went to work there, that I was continuing to

06:48PM 9   have some VoO cases.

06:48PM 10          As far as the transactions in S-11, I did not advise

06:48PM 11   him of the transactions in S-11.  I did not tell Mr. Juneau

06:48PM 12   that I was getting -- that I got that fee.

06:48PM 13   Q.   You said you advised him of some cases that you were going

06:48PM 14   to continue, and you said earlier that you specifically

06:48PM 15   identified the *Casey Thonn* matter to him?

06:48PM 16   A.   Not as one of the ones I was going to continue.  I mean,

06:48PM 17   you're trying to mix things together.

06:48PM 18   Q.   No, I understood you to say --

06:48PM 19   A.   Do you want me to tell you what it was?

06:48PM 20   Q.   No, no, let me ask the question.  I understood you to say

06:48PM 21   before, when Pat Juneau came over to speak to you and Christine

06:48PM 22   before you were hired, you specifically mentioned that you had

06:48PM 23   represented Casey Thonn.  I thought that's what you said.  We

06:49PM 24   could have her read it back.

06:49PM 25   A.   That I was referring him -- the *Casey Thonn* case and the

**C O N F I D E N T I A L**

| | |
|---|---|
| 06:49PM 1 | *Backes* case, that I was referring those cases out. |
| 06:49PM 2 | I also told him that I had some VoO cases still that |
| 06:49PM 3 | I was settling directly with BP, and that I was going to |
| 06:49PM 4 | continue with those to try to settle them directly with BP. |
| 06:49PM 5 | Q.   What was his response to that, if any? |
| 06:49PM 6 | A.   He didn't say anything.  He seemed like it was fine.  He |
| 06:49PM 7 | didn't say anything one way or another. |
| 06:49PM 8 | Q.   What were the continuing VoO cases that you had? |
| 06:49PM 9 | A.   One of them was Casey Thonn's.  I don't remember what the |
| 06:49PM 10 | other ones would have been, because we were in the process |
| 06:49PM 11 | of -- I had settled a bunch.  I was settling them directly with |
| 06:49PM 12 | BP's lawyer.  They weren't anything to do with the settlement |
| 06:49PM 13 | at all. |
| 06:49PM 14 | I think when the GCCF closed -- or when the |
| 06:49PM 15 | settlement came in, then they said, "No, we're not going to |
| 06:49PM 16 | settle VoO out anymore by itself; it's part of the settlement." |
| 06:49PM 17 | So I sent it right over to -- I mean, it went with everything, |
| 06:49PM 18 | so it went to Jon. |
| 06:50PM 19 | But I'm saying, at the time, I told him I might keep |
| 06:50PM 20 | some V -- or I was keeping some VoO cases; but, then, as soon |
| 06:50PM 21 | as the settlement went through, they wouldn't settle any more |
| 06:50PM 22 | with me, so. |
| 06:50PM 23 | Q.   Besides the *Casey Thonn* matter, do you remember any of the |
| 06:50PM 24 | names of the other matters that you kept? |
| 06:50PM 25 | A.   I think there was a -- I don't know if *Backes* had a VoO |

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 06:50PM | 1 | claim or not.  I think there was -- I might have been handling |
| 06:50PM | 2 | a VoO for a guy, Volker, but his contract didn't look correct |
| 06:50PM | 3 | to me; so, I ended up just saying I wasn't taking that one.  I |
| 06:50PM | 4 | believe there was, like, a couple like that. |
| 06:50PM | 5 | As I recall, I settled all of them, before Christine |
| 06:50PM | 6 | went to work there and before I talked to Pat about it, except |
| 06:50PM | 7 | the *Casey Thonn,* which I sent over to Glen.  Then maybe I had |
| 06:50PM | 8 | two or three that I just told the client I couldn't represent |
| 06:50PM | 9 | them anymore because there was some problem with their |
| 06:50PM | 10 | paperwork or they hadn't given me their paperwork or something. |
| 06:51PM | 11 | Q.   Did you send any other matters over to the Andry firm? |
| 06:51PM | 12 | A.   No, that was the only one. |
| 06:51PM | 13 | Q.   Did you send any other matters to any other firm? |
| 06:51PM | 14 | A.   The *Backes* case that I identified to you and to Pat, I |
| 06:51PM | 15 | told that client to just go back to his lawyer.  Because his |
| 06:51PM | 16 | lawyer had referred it to me to do the case on, and I just |
| 06:51PM | 17 | said, you know, go back to your lawyer, and that's what he did. |
| 06:51PM | 18 | But I think his case had a bunch of problems.  I |
| 06:51PM | 19 | think he didn't do anything.  I don't know what he did.  I |
| 06:51PM | 20 | don't know whether he did or not.  I never heard from him |
| 06:51PM | 21 | again. |
| 06:51PM | 22 | Q.   You never received any payments or fees with respect to |
| 06:51PM | 23 | that case? |
| 06:51PM | 24 | A.   No, I don't know if he even filed a claim.  I don't know. |
| 06:51PM | 25 | I just sent him back -- I sent him back to the lawyer that sent |

**C O N F I D E N T I A L**

SM-02-JA00144

06:51PM 1   him to me.

06:51PM 2              (WHEREUPON, at this point in the proceedings,

06:51PM 3   Exhibit S-12 was marked.)

06:51PM 4   BY MR. FREEH:

06:51PM 5   Q.    Let me show you what we've marked as S-12.  This is an

06:51PM 6   e-mail from Glen Lerner to you dated March 8, 2013, 8:58.  The

06:52PM 7   e-mail reads --

06:52PM 8   A.    Which page are you on?

06:52PM 9   Q.    Page 1 --

06:52PM 10  A.    The first page?

06:52PM 11  Q.    -- the bottom.  If you can take a look at it.

06:52PM 12  A.    The bottom of page 1.  Okay.

06:52PM 13  Q.    Lerner says to you, "He controls the money, man."  You had

06:52PM 14  said on March 8th before that, a couple hours, "Sure, Jon got

06:52PM 15  paid on the *Casey Thonn BP* case last week, so you can send me

06:52PM 16  that."

06:52PM 17  A.    Right.  That would have been one -- March 8th, that would

06:52PM 18  have been one of Casey Thonn's seafood claims.  He had two.  I

06:52PM 19  think he had one as a captain and one as a boat owner.  That

06:52PM 20  would have been one of them.

06:52PM 21              The case would have been paid.  Andry Lerner Group

06:52PM 22  would have gotten the money, which would have been Jon in

06:53PM 23  New Orleans.  I assumed that he sent 50 percent to Glen, which

06:53PM 24  is what he did on the VoO case.

06:53PM 25              So I was saying, "Jon got paid on the *Casey Thonn*

**C O N F I D E N T I A L**

06:53PM 1    case last week, so you can send me that," meaning when you get

06:53PM 2    it, you can send it to me.  He said, "He controls the money,

06:53PM 3    man," which I understood him saying, well, I ain't gotten it

06:53PM 4    yet from Jon, and he's the one that controls that; so, I don't

06:53PM 5    know when I'm going to get my fee, meaning Glen saying he

06:53PM 6    doesn't know when he's going to get his fee to then send to me

06:53PM 7    because Jon controls the money.  That's what I understood that

06:53PM 8    to mean.

06:53PM 9    Q.    Again, how would you know within a week's time, using your

06:53PM 10   case last week phrase, that Jon had gotten paid?  How would you

06:53PM 11   know that he had gotten paid on that particular matter?  Were

06:53PM 12   you checking that on a --

06:53PM 13   A.    No.

06:53PM 14   Q.    -- weekly basis?

06:53PM 15   A.    Casey probably told me that, if I had to guess.

06:53PM 16   Q.    Well, if you didn't have to guess.  Do you have any

06:54PM 17   recollection?

06:54PM 18   A.    I wouldn't have been checking it unless Casey told me --

06:54PM 19   unless Casey asked me.  I didn't check to see when I was going

06:54PM 20   to get my fee.  I don't think I ever did that.

06:54PM 21          I think, to me, I would have been -- if I checked

06:54PM 22   it -- or you asked me how I would have known that he got paid.

06:54PM 23   I would have thought I knew it because Casey told me.  That's

06:54PM 24   what I think now.

06:54PM 25   Q.    Did you ever check the status of a payment when Casey --

**C O N F I D E N T I A L**

SM-02-JA00146

06:54PM 1   that's a bad question.  Did you ever check one of the statuses

06:54PM 2   of these payments in the absence of Casey asking you to do so?

06:54PM 3   A.   I don't think I ever checked the status of a payment.  I

06:54PM 4   checked the status of a claim.

06:54PM 5        I don't know if I ever checked it when Casey --

06:54PM 6   without Casey asking me or not.  I remember some specific

06:54PM 7   instances where he asked me to check.  I don't know if I

06:54PM 8   checked it other than that or not.

06:54PM 9        I may very well have because I was representing him

06:54PM 10  in a personal injury case, and I may have, you know, checked

06:55PM 11  the status to let him know.

06:55PM 12       Also, I remember on the appeal -- remember, I told

06:55PM 13  you he was pissed because they appealed one of the claims or

06:55PM 14  something like that; so, I might have checked that, too.

06:55PM 15  Q.   Did you ever, on your own, without an inquiry from Casey

06:55PM 16  to you, check on the status of the payment because of your own

06:55PM 17  interest in whether the payment was made?

06:55PM 18  A.   No.  I never checked on the status of a payment.  I may

06:55PM 19  have checked on the status of a claim.  I remember checking on

06:55PM 20  the status of a claim when Casey Thonn asked me.  I may have

06:55PM 21  checked on it other times.

06:55PM 22       I never was checking on the status of a payment

06:55PM 23  because I was getting paid, no.

06:55PM 24       (WHEREUPON, at this point in the proceedings,

06:55PM 25  Exhibit S-13 was marked.)

**C O N F I D E N T I A L**

SM-02-JA00147

BY MR. FREEH:

Q.   All right.  Let me show you 13, which is a four-page document.  Just take a look at that.

A.   Yes.

MR. WALSH:   What is the date on it?

MR. FREEH:   This is January -- March 7, 2013.

BY MR. FREEH:

Q.   It starts -- well, I think we've seen part of this before, right?

A.   Yes, I think it's all in the same chain.

Q.   Perhaps what we haven't seen before is --

A.   You see, in part of S-13, I say, "Casey Thonn told me he got his VoO money last week."  That was in October, before I went to work for Pat.  So I know he told me that.

Q.   That prompts you to ask Susie DeSantis to check on your fee?

A.   Yes.

Q.   She responds to you?

A.   I don't know.  I'm not reading that.

Q.   Then you send her, on January 7th --

A.   Yes.  Because I still hadn't gotten it, yes.

Q.   -- "Please confirm with Jeff and Glen that you sent them my fee last month."

A.   Right.  I asked her in October; and, as of January, I still hadn't gotten it, so I was asking about it.

**C O N F I D E N T I A L**

SM-02-JA00148

149

06:57PM  1    Q.   Mr. Sutton, beside these e-mails which we have been

06:57PM  2    talking about, did you from time to time pick up the phone and

06:57PM  3    talk to Susie, talk to Glen, have the same communications by

06:57PM  4    phone that we're looking at in these e-mails?

06:57PM  5    A.   I don't think I would have the same communication.  I

06:57PM  6    talked to Glen quite a bit.  Susie --

06:57PM  7    Q.   Or Cahill.  Did you ever pick up the phone, not send an

06:57PM  8    e-mail, but call Cahill and say some of the same things we've

06:57PM  9    said and we've reviewed in these last --

06:57PM  10   A.   I don't think I ever talked to Cahill about any of this.

06:57PM  11   I'm sure I talked to Cahill about Crown expenses and that kind

06:57PM  12   of stuff; but, most of the stuff with him was e-mail.

06:58PM  13           I don't recall when I talked to him about it, but it

06:58PM  14   would have been about them not paying the expenses for Crown

06:58PM  15   and things like that.

06:58PM  16   Q.   What about those kinds of telephone conversations with

06:58PM  17   Susie, if you recall?

06:58PM  18   A.   I don't recall speaking to Susie.  I may have spoke to her

06:58PM  19   a couple of times.  It could have been -- I think we were

06:58PM  20   looking at doing some cleaning on that phosphate mine down in

06:58PM  21   Tampa, where she's from.  Maybe I called her on that.  I don't

06:58PM  22   remember.  That was for Crown.

06:58PM  23           I probably talked to her once or twice; but, for the

06:58PM  24   fee and that stuff, all of that would have been e-mails, as far

06:58PM  25   as I recall.

**C O N F I D E N T I A L**

**SM-02-JA00149**

06:58PM 1    Q.   From time to time, did you have telephone conversations,

06:58PM 2 not e-mails, but telephone conversations of this nature

06:58PM 3 directly with Glen, Glen Lerner, if you recall?

06:59PM 4    A.   I don't really recall discussing this with Glen, other

06:59PM 5 than the first time that I referred the case over to him.  I

06:59PM 6 don't remember if that was even in person or on the phone, so I

06:59PM 7 don't know.

06:59PM 8       Glen was hard to get on the phone; so, when we

06:59PM 9 talked -- we didn't talk a lot, but when we talked it was

06:59PM 10 mostly about Crown business.

06:59PM 11       Or he was a soccer player at Duke, and my son is

06:59PM 12 trying to play soccer, and we talked about that.  Our wives are

06:59PM 13 from the same town, all of that kind of stuff mostly.  Most of

06:59PM 14 the business stuff was through e-mail.

06:59PM 15    Q.   Looking at 13, on the first page there is an e-mail from

06:59PM 16 you to Mr. Cahill.  You say, "Jeff, can you let me know when

06:59PM 17 you're going to be able to send the balance owed to me?  I

06:59PM 18 expect we will sign the agreement next week.  Also, I saw that

06:59PM 19 Casey Thonn was paid another $166,666 last month.  Please let

07:00PM 20 me know the status of that check."

07:00PM 21    A.   Right.

07:00PM 22    Q.   What portion of the $166,666 did you believe you were

07:00PM 23 entitled to in terms of your fee?

07:00PM 24    A.   50 percent of the fee.  I understood that the fee was

07:00PM 25 20 percent, and so I would have gotten 50 percent, just like on

**C O N F I D E N T I A L**

| | | |
|---|---|---|
| 07:00PM | 1 | the VoO, same deal, so that would have been $16,666. |
| 07:00PM | 2 | This e-mail would have followed the previous one, |
| 07:00PM | 3 | where Casey Thonn told me -- or whatever it was.  Then, I'm |
| 07:00PM | 4 | telling Jeff that, you know, it's been a month now, so let me |
| 07:00PM | 5 | know -- I think, in the previous e-mails, Susie was sending it |
| 07:00PM | 6 | or somebody was sending it to Jeff or asked about it.  I think |
| 07:00PM | 7 | I'm referring to the same thing there. |
| 07:00PM | 8 | Q.   So you would have received -- it was your understanding |
| 07:00PM | 9 | and the agreement with Mr. Lerner was that you would, in |
| 07:01PM | 10 | effect, be receiving 10 percent of the amount, which would |
| 07:01PM | 11 | equate to half of the 20 percent fee? |
| 07:01PM | 12 | A.   No, the agreement was that I would get 50 percent of the |
| 07:01PM | 13 | fee for the work I had previously done.  It just happened to -- |
| 07:01PM | 14 | because in these cases, they were charging 20 percent.  It just |
| 07:01PM | 15 | happened to come out like that. |
| 07:01PM | 16 | I don't remember -- I think the judge said that most |
| 07:01PM | 17 | people had them on 25 percent contingencies originally, but the |
| 07:01PM | 18 | judge said you could only charge 20 percent, so that's how it |
| 07:01PM | 19 | was, I think. |
| 07:01PM | 20 | Then in the rest of that e-mail -- |
| 07:01PM | 21 | Q.   Go ahead. |
| 07:01PM | 22 | A.   -- when I'm talking about the balance owed to me, we'll |
| 07:01PM | 23 | sign the agreement next week, the agreement is the operating |
| 07:01PM | 24 | agreement that I talked to you -- told you about that we had |
| 07:01PM | 25 | agreed to in May of 2012 and still hadn't got it done. |

**C O N F I D E N T I A L**

SM-02-JA00151

07:01PM 1          I'm saying, look, we're about to sign the agreement

07:01PM 2     next week, I need to be caught up with, you know, the expenses

07:02PM 3     and money for my shares, all of that stuff.  Before I sign an

07:02PM 4     operating agreement, you know, I should be up to date.

07:02PM 5          I think that's what I was referring to.  The

07:02PM 6     agreement I was referring to would have been that.

07:02PM 7          (WHEREUPON, at this point in the proceedings,

07:02PM 8     Exhibit S-13A was marked.)

07:02PM 9     BY MR. FREEH:

07:02PM 10    Q.   All right.  I'll show you S-13A, which is an e-mail from

07:02PM 11    you to Jeff Cahill, March 26, 2013, 3:18 p.m.

07:02PM 12         MR. WALSH:  I'm sorry, Judge.  Give me that date

07:02PM 13    again.

07:02PM 14         MR. FREEH:  March 26, 2013, 3:18 p.m.

07:02PM 15    BY MR. FREEH:

07:02PM 16    Q.   It follows some e-mails between Jeff Cahill and you about,

07:02PM 17    on page 2, quote, "We'll have about $40,000 to you by

07:03PM 18    tomorrow."

07:03PM 19    A.   Right.  That would have been some of the -- well, if you

07:03PM 20    go even further down, I say -- and this is, again, when I was

07:03PM 21    talking to him about we're about to sign the operating

07:03PM 22    agreement, and I'm saying, "As of March 1st, I was due $100,000

07:03PM 23    as Crown direct payment."

07:03PM 24         So that would have been the -- March, April, May --

07:03PM 25    that would have been the 10 months -- from May 1st, it would

**C O N F I D E N T I A L**