CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Thonn, Casey |
| Title: | Claimant |
| Office: | N/A |
| Date/Time: | July 31, 2013, 1 PM – 3 PM |
| Attendees: | Steve Tidwell, Greg Paw and Ben Scotti |
| Location: | Deepwater Horizon Claims Center – 935 Gravier, 14th Floor |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and times Casey Thonn was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

At the outset of the interview, Mr. Thonn was asked if he is satisfied with Mr. Cobb as his counsel after learning that Mr. Cobb is representing others involved in this investigation. He confirmed that he was fine with the legal representation.

Mr. Thonn was born in New Orleans and raised in Slidell. He is not married and has 3 children: one three month old, a seven year old and an eleven year old. While he had the first two children with his now ex-wife, the three month old is from a different woman – her name is ███████████

Mr. Thonn was adopted into the Thonn family. Victor or "Vic" Thonn is his step grandfather's first cousin. When asked about the address he uses on his claims submissions, Mr. Thonn stated that he uses his mom's home address as a mailing address, sometimes. Other times, he will have the mail sent directly to his home in Slidell, at 3836 Kent St.

In terms of his background, Mr. Thonn stated that he was a commercial fisherman before the oil spill. Mr. Thonn tried to get back into fishing after the spill but said that fishing on the whole is down and is being depleted year by year. He stated that he wasn't able to make any money fishing and now he is in the auto repossession business. He said that in the past, he has done some remodeling/carpentry work.



EXHIBIT
20

SM-03-JA000001

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

He would hustle remodel work wherever he could find it – he would build fishing camps and other similar sites with no electrical or plumbing requirements. Mr. Thonn stated that he has been doing this since a kid and mentioned that his family flipped houses. Mr. Thonn explained that the market started to tank a while after Katrina, after all the new houses were completely rebuilt in 2008. In terms of his other carpentry work, Mr. Thonn stated that he worked on a doctor's office in 2010 and also remodeled a large surgical suite in Mandeville.

Mr. Thonn mentioned that he was involved in an auto accident around July of 2012. He stated that he was scheduled to have surgery on his neck because he had a herniated disk but the accident happened the night before his surgery was scheduled. Mr. Thonn had to go through three or four months of physical therapy but ultimately he broke another disk and had to go and hire counsel to sue the insurance company. He hired Sutton & Reitano – he believes Lionel "Tiger" Sutton was in charge of the lawsuit. The lawsuit ultimately settled sometime before Christmas 2012. Sutton was with him all the way through the settlement process.

When asked if he remembers what Sutton's fee was for the car wreck, Mr. Thonn stated it was 25-30% of the total award. He thinks he walked away with approximately $39,000. So Mr. Sutton got maybe $12,000 or $15,000. The case was against Geico and settled at the end of 2012 before Christmas, either in October or November. Mr. Thonn stated that Mr. Sutton was handling this claim.

In the meantime, Mr. Thonn was seeking counsel for his BP claim and it was during that process that he met Mr. Sutton's firm on the other matter. Since Mr. Thonn was already talking to Mr. Sutton, he figured he would go with Mr. Sutton since they already had prior legal dealings. Mr. Thonn stated that when he had claims with the GCCF, he recalled handling them all by himself. It was some point after the payment process switched over to DHCC that he decided to get an attorney. Mr. Thonn recalls that he went with Christine Reitano in order to carry him through on the DHCC claim. As far as what claims he was pursuing through the GCCF, he stated he was not absolutely sure because at some point they changed. He thought there was a subsistence claim and then an economic loss claim. Then after the oil spill cleanup he discovered he had boat damages at the end of 2011.

As to how he retained the Sutton Reitano firm, he stated that he signed an agreement that indicated Ms. Reitano was going to be his lawyer. At a certain point in time, Ms. Reitano told him she was going to be taking a job with BP and she couldn't continue to represent him because of a conflict but that he would help find him another attorney. There was no discussion of Mr. Sutton taking over. She referred Mr. Thonn to Smith Stagg, but then after some time he became frustrated because he wasn't satisfied with the feedback he was getting from that firm. As a result, Mr. Thonn called Mr. Sutton and asked if Mr. Sutton could refer him to someone else. Sutton then recommended the Andry Lerner firm. Mr. Thonn stated that Mr. Sutton did not recommend a specific attorney – he just recommended the firm generally.

As to his specific claims, Mr. Thonn confirmed that he had a seafood claim, a claim for seafood boat captain, the VoO claim, a subsistence claim and then a vessel physical damage claim. Mr. Thonn

SM-03-JA000002

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

confirmed that on his seafood claim as a boat captain, he received approximately $180,000, while as a boat owner he received about $238,000 and about $49,000 for his VoO claim. He also confirmed that both his subsistence claim and vessel physical damage claim were on hold.

Mr. Thonn explained that, as he was going through the claims process, his main contact at the Andry Lerner firm was Christine or Christina Mancuso. When asked if, while he was going through the claims process, he ever received advice to go to Mr. Andry or Mr. Lerner directly, Mr. Thonn responded no and said that the only individuals he met at the firm were Kailey LeBouef and Christine Mancuso. He said there was also a woman named Brittney who might be handling his damage claims.

Mr. Thonn confirmed that he never met Mr. Lerner or Mr. Landry, nor did he ever speak to them on the phone. In terms of the particulars surrounding the filing of his boat claim, Mr. Thonn stated that the paperwork asks about the overall size of the boat, its motor size, and if it is used as a drag or skimmer. His boat is a 30 foot fiberglass inboard diesel -- it is called the Boss Hoss. Mr. Thonn confirmed that this is his only boat and so is the only vessel that would have been involved in any claim.

When asked if he ever went to Mr. Sutton for advice on his claims, Mr. Thonn stated that he kept in contact with Mr. Sutton because of his neck injury. Mr. Thonn confirmed that his deposition in the auto case took place in the Deepwater building, 935 Gravier, somewhere upstairs. This would have been around the end of October or November. Also, around this time Mr. Sutton mentioned that he was going to be working for the BP claims office. Mr. Thonn stated that he hasn't spoken to Mr. Sutton since that deposition save for a conversation about collecting his settlement check in the auto case. He doesn't recall ever speaking to Mr. Sutton about his BP claims. When asked if Mr. Sutton ever reached out to him to discuss the claim in any fashion, Mr. Thonn stated no, not that he could recall.

Mr. Thonn stated that before filing his claims, he did some research on his own to understand the process. Mr. Thonn mentioned that one of the prominent attorneys was hosting meetings with clients out in Venice and that anyone could attend and listen. He explained that these attorneys walked through everything on a big board and discussed things like how much a person could expect to collect based on the size of the boat - the calculations were on a board for everyone to see.

Mr. Thonn shared that his ex-girlfriend (and mother of his third child) ███████████, whom he didn't get along with anymore, may have been working at the claims center. He stated that when they first met, he thought that ██████████ worked with an insurance company. This is what he claims she originally told him. Then Mr. Thonn said he started getting ideas that she worked for the claims office and he ultimately thought she might be messing with his claims. Mr. Thonn was concerned because their relationship was hot and cold from the get go. In the beginning it might have been good but then after that, not so much. He pointed to their respective ages a part of the problem – he is 33 and she is 21. Mr. Thonn stated that they stopped seeing each other a week or so before she told him she was pregnant. Besides attending doctor's visits with ██████████, Mr. Thonn stated that before the baby was born, he hadn't talked to her in the approximately 11 months. He stated that he never lived

3

SM-03-JA000003

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

together with ▊▊▊▊▊ but that now that the baby born, they speak to each other. He is paying for daycare and picks up formula for their child, things of this nature.

When asked if he knew how long ▊▊▊▊▊ had been working at the claims center, Mr. Thonn stated he did not know because he originally thought she worked for an insurance company. He did ask her where she worked and ▊▊▊▊▊ responded that she worked in the Deepwater building, but he didn't push her on it because he didn't want to get burned.

Mr. Thonn confirmed that he voiced his tampering concerns to Ms. Mancuso at Andry Lerner. He said he also noticed that other people were getting paid on their claims and he wasn't, so he thought there was a possibility that ▊▊▊▊▊ was messing with his claim. Mr. Thonn stated he would have talked to Ms. Mancuso around the middle or end of last year. In addition, he stated that he could have told Sutton about this but he didn't specifically recall doing so. He admitted that at some point, he could have vented and asked him. In terms of what Ms. Mancuso told him to do, she said that there was an adjustor or lawyer he speaks to with BP and that she checked to see that his claim was still in the finishing or filing process. All of this would have occurred post appeal. She told him that maybe the claim was still in limbo, meaning it was still in processing.

In terms of appealing the decision, Mr. Thonn stated he appealed because even though the money he received was good, after crunching the numbers on an eight year sum and then paying 40% taxes, the amount really isn't what it seems. In terms of whether he remembers if the claim should be calculated based off of his trip tickets, Mr. Thonn stated that from the very beginning of the process, a claimant could use either method to calculate – it was always either tax returns or trip tickets. Mr. Thonn stated that when he went to the legal presentation in Venice, he had a claim pending and this claim was not based on his trip tickets.

When asked who at the Andry Lerner firm worked on his claim, Mr. Thonn stated only Ms. LeBouef and Britney handled his claims for damages. Mr. Thonn believed that the firm had a different person handling each claim. For instance, Brittney handled the boat damage claim, while Kailey might have handled the compensation claim with or without the help of Christina. He stated that there might have been another person for subsistence.

When asked if there was ever a need for more information to supplement his claims, Mr. Thonn stated that the Andry Lerner firm would have contacted him if this were the case, but he stated he didn't think he needed to provide any additional information. Mr. Thonn stated that he heard from the firm every now and then – he would hear updates along the lines of "your claim is still being processed and it's going to take additional time so just be patient."

When Mr. Thonn was asked if he ever had a conversation with Mr. Sutton about Mr. Sutton receiving a referral fee from the Andry Lerner firm for referring him to the firm, Mr. Thonn responded no, never. Mr. Thonn assumed that Mr. Sutton would receive some sort of referral but it was never voiced to him from anyone at Andry Lerner.

SM-03-JA000004

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

When Mr. Thonn was asked about the appeal filed by Ms. LeBoeuf, he initially did not remember it. He could not recall the Andry Lerner firm informing him that the first offer on the shrimping claim was $685.  Ultimately however, Mr. Thonn remembered being told that his claims were supported by trip tickets and that they were then appealed and instead supported by his tax returns since this is also allowed by the claims office. Mr. Thonn stated that he signed many documents – he may have signed a statement based off of the tax returns but he can't really remember.  Mr. Thonn seemed to think that he also had some affidavits of people he sold shrimp to.  He recalls that Ms. LeBoeuf was giving him advice on the appeals portion and that she eventually took over from Ms. Mancuso. Ms. Mancuso signed the claim document on 12/03/12, and when asked if he signed a similar document, Mr. Thonn stated that he might have.  He did, however, confirm that a conversation about using trip tickets or tax returns did take place.

When asked why he did not use trip tickets, Mr. Thonn stated that some people use them.  In fact, he stated that fisherman "are supposed to but they aren't told that when you are shrimping you have to use them."  He estimated that 75% of shrimpers are selling shrimp on the street and that is the only way to make any money.  He mentioned that some sell on the docks to the shrimp houses but acknowledged that those who do get such low prices selling to them.  Mr. Thonn indicated that at some point, many claimants switched over to trip tickets because they don't have tax returns – they transact in cash only.

When asked when he was paid on his claims out of the claims center, Mr. Thonn responded that he received the two separate check payments, one was at the beginning of the year, and the other was in May.

Mr. Thonn stated that he has never heard of Brown and Greer, Postlethwaite & Netterville or Garden City Group.

Mr. Thonn could not remember a woman named Tate, nor does he recall hearing the name Lesley Butler.  He also stated he did not deal with anyone at Coastal Claims - that is his recollection.

At the conclusion of the interview, Mr. Thonn's counsel asked Mr. Thonn a few questions for the record:

Attorney Cobb: Where you ever contacted by Mr. Sutton or Ms. Reitano or anyone at Andry Lerner, or someone else regarding attempts to influence your claims? Mr. Thonn responded that he has no knowledge whatsoever of anyone influencing his claims at all.

Attorney – What is your understanding on how the final dollar amount of a claim is determined – how was it explained to you? How you received the number that was calculated for you? Mr. Thonn responded that it was calculated by using his tax returns and a formula that factored in a 7 or 8 year time period.  That is the best he could recall.

Finally, Mr. Thonn reiterated that he hasn't spoken to Mr. Sutton since he picked up his settlement check for the auto wreck claim, which was at the end of last year.

SM-03-JA000005

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

We explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000006

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee:  Bart Haddad
Title:      President, Southern Way Charters
Office:  Southern Way Charters
Date/Time:  August 2, 2013, 1:04 pm
Attendees:  Matt Dolan
Location: Phone

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. I am also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. I do not represent you Bart Haddad

On the above date and times Bart Haddad was interviewed by phone. I explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Haddad furnished the following information:

Mr. Haddad is currently the President of Southern Way Charters. He has owned the company Southern Way Charters since 2001 and it has always been a side job until this year, when it has become a full time job. He owns two boats and runs day and overnight fishing trips in the Mississippi Gulf area. Southern Way Charters brings people out for sport fishing and duck hunting trips in the region. Mr. Haddad has a couple of partners with Southern Way Charters; Bob Wilkens and Robert Perez were his partners until he bought Robert Perez out this year.

Mr. Haddad worked for Romeo Papa as the Chief Financial Officer from the fall of 2008 until May 2013. He was fired in January 2013 but was paid through May 2013. As CFO he was responsible for accounts receivable, payroll, and billing. He performed budget projections and drafted proposals and quotes for charters. He worked with Robert Perez, Crystal Cavello, and Donna Accostos in the office in Houma, LA. He also worked out of his house in Mississippi. The address listed in the claim submitted to DHECC is his home address.

Mr. Haddad started working for Romeo Papa in the fall of 2008. Robert Perez had originally asked Mr. Haddad to assist him in bringing in new partners for financial support. There was a desire to shift ownership in 2008 among the Sutton family. Lionel Sutton II had expressed his interest in liquidating his position in Romeo Papa, so T-Blue acquired that part of the company. T-Blue was Lionel "Tiger" Sutton's company. Since 2008, Lionel "Tiger" Sutton has been the sole Sutton family owner in Romeo Papa. Mr. Haddad had worked for an equity firm, so he assisted Robert Perez in finding an equity partner to assist

1

SM-03-JA000007

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

in buying Lionel Sutton II's share. Hawaiian Lines bought into the company when Lionel Sutton II wanted out. Mr. Haddad restructured the company's debt and equity structure to create a company called Romeo Papa Hawaiian Lines (RPHL). RPHL owns the four 160-foot charter boats and leases the boats to Romeo Papa LLC, which is the operating company. Lionel Sutton, Hawaiian Lines, and Robert Perez own RPHL in 3 equal parts. Lionel H. "Tiger" Sutton III and Robert Perez own Romeo Papa LLC equally in 50 % shares.

The charter boats for Romeo Papa perform oil rig support and supply. There are roughly 30 people who work on the boats.

Claim:

Mr. Haddad drafted the Romeo Papa claim that was submitted to DHECC. Robert Perez had told him that Lionel Sutton had told Mr. Perez "that they might start paying Moratoria claims." Robert Perez directed Mr. Haddad to submit the claim. Mr. Haddad went online and drafted the claim. He obtained the information from the Romeo Papa office and submitted the claim from his home computer. When Mr. Haddad was submitting the information, he was confused because there was no place to designate the claim as a Moratoria Claim. He called Lionel "Tiger" Sutton to ask him about where to designate the claim as a Moratoria Claim. Mr. Sutton told him that he worked for the claims office and could not talk to him about the claim. Mr. Sutton did tell Mr. Haddad just to fill out all the information and submit all the documents and not worry about the claim type. Mr. Haddad submitted all of the information and did not hear about anything until he got a notice that the claim had been classified as a Tourist claim and that Romeo Papa had been designated as being in Zone B. Mr. Haddad wrote a note indicating that the claim was not a tourist claim and that Romeo Papa should be in Zone A because even though its offices were in Zone B, its boats operated in Zone A. Mr. Haddad has not heard from the claims office since that time. He uploaded all of the information from his home in Mississippi after Donna the office manager had e-mailed him all of the tax returns. He tried to upload a letter indicating that he no longer worked for Romeo Papa and would not be the point of contact for the claim.

Lionel "Tiger" Sutton had told Mr. Haddad that he (Mr. Sutton) could not talk about the claim. He told Mr. Haddad just to answer as many questions as he could and load up the financial information. Mr. Sutton never told Mr. Haddad, "Don't submit the claim." He just said to send in the financial information. Robert Perez told Mr. Haddad to submit the claim because Mr. Sutton had mentioned that they might start paying Moratoria Claims.

Mr. Haddad knew how to submit the claims because he had submitted a VoO claim to the GCCF for his company Southern Way Charters. He was not paid as much as he thought as he deserved, and he called Lionel "Tiger" Sutton to assist. Mr. Sutton told him to call a firm called Smith Stag. Smith Stag did not get him any more than his original settlement.

Lionel Sutton has represented Romeo Papa in various legal cases for contract and insurance issues.

Finally, I explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions

SM-03-JA000008

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team.  These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client.  These notes are privileged as both an attorney-client communication and as attorney work product.

On August 8, 2013 Bart Haddad called Matt Dolan on his cell phone.

The call was unsolicited and Mr. Haddad stated that he wanted to clarify his earlier statements.  He had thought more about his actions in regards to the Romeo Papa claim.  Mr. Haddad stated that Mr. Sutton called him two more times than he originally indicated in his original statement on 8/2/13. Mr. Sutton had called him around the time he received an incompleteness notice and discussed what documents he would have to submit.  He recalls Mr. Sutton telling him to check his claim as he was missing some stuff.  Mr. Haddad stated that he only had Lionel Sutton's cell phone number so the call likely came from his cell number.  He understood from Mr. Sutton that he had to submit the Profit Loss statements from 2007-2008.  He also understood from Mr. Sutton that the claim had been designated as Tourism and in Zone A. In response to the incompleteness notice he submitted the profit loss statements and sent a note highlighting that his claim was not properly designated.  He remembers talking to Mr. Sutton many times in regards to a Southern Ways Charter claim or for discussions on Romeo Papa.  Many conversations might end with Mr. Sutton asking or talking about the Romeo Papa claim.

Mr. Haddad reaffirmed that he had originally called Mr. Sutton when he was submitting the claim to discuss how he had to designate the claim a moratorium claim.  Mr. Sutton told him not to worry about that and just to load all the documents.

3

SM-03-JA000009

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: Joey Dartez
Title: President
Office: Crown LLC
Date/Time: July 31, 2013
Attendees: Greg Paw and Tim Flynn
Location: telephonic

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you Joey Dartez.

On the above date and times Joey Dartez was telephonically interviewed. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Joey Dartez, President, Crown LLC, was telephonically interviewed on July 31, 2013 by Greg Paw and Tim Flynn. Dartez was advised of the above related information about providing information to the Special Master or his designees.

Dartez stated he was a 15 percent shareholder in Crown and had started the business several years ago. Dartez brought in Tim Elmhurst as a partner. Dartez also brought Lionel Sutton into the business as a financier and offered Sutton 25 percent of the business. As part of the agreement, Sutton provided financing for the project. Dartez explained Sutton was currently his step-brother. Dartez' father had married Sutton's mother.

Dartez and the business needed additional financing so Sutton brought in Glenn Lerner to provide additional cash flow. All of the partners provided 8 percent of each of their portions and Lerner provided financing. Since Lerner has joined, he has been buying additional shares from Dartez. Dartez currently owns 15 percent as he has sold an additional 2 shares to Lerner in exchange for $70,000 to $73,000 per share. This has allowed Dartez to take a salary and have additional operating money in order to move the business forward.

1

SM-03-JA000010

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Sutton originally opened a Regions Bank account in order to provide the necessary banking facilities for the business. Sutton was the only person with access to the account as he was the person who put in the original financing and therefore controlled the money. Reitano did not have access to the account. When Lerner was brought in, he opened up another account for Crown. Sutton still maintains the "old" Crown account but Dartez does not have access to that account.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000011

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Robert Perez |
| Title: | President, Romeo Papa |
| Office: | Romeo Papa LLC |
| Date/Time: | August 2, 2013, 2:00 PM |
| Attendees: | Matt Dolan, Alex Dubin, Ben Scotti |
| Location: | Telephonic Interview |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Robert Perez.

On the above date and times Robert Perez was interviewed by phone. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Robert Perez stated that he is the President of Romeo Papa, LLC, and has owned the company for 30 years. Lionel "Tiger" Sutton is part owner of Romeo Papa LLC. Originally, Tiger Sutton's father was a part owner of Romeo Papa, however, Tiger's father was bought out by Tiger in 2008 and the company was restructured to two companies, one being Romeo Papa Hawaiian Lines (RPHL) and the other being Romeo Papa LLC. RPHL operates 4 vessels in the Gulf of Mexico. The four boats are owned and operated by RPHL. Tiger Sutton, Hawaiian Lines, and myself own RPHL in three equal parts. Romeo Papa LLC operates the boats and Tiger Sutton and Mr. Perez own this operating company. They provide oil rig support, supply, construction, and abandonment services. This was all restructured in 2008.

Mr. Perez does not think they had a claim with GCCF because he was actually working directly for BP at the time of the spill. His profits in 2007/2008/2009 were not bad but he took a real bad hit in 2010/2011 when President Obama set in place the Moratoria oil production in the Gulf.

The Romeo Papa CFO was Bart Haddad and he filed the claim. Lionel "Tiger" Sutton has very little communications with Romeo Papa and Mr. Perez does not recall Mr. Sutton directing Romeo Papa to submit the claim. Mr. Perez did not have many conversations with Mr. Sutton about the claim. Mr. Sutton also did not instruct Mr. Perez to *not* submit the claim. Mr. Perez thinks the claim was submitted in 2011 or 2012.

Mr. Sutton also represents Romeo Papa in a contract and insurance fraud dispute. An insurance company had sued Romeo Papa for insurance fraud. The insurance company prevailed and Mr. Sutton submitted an appeal to that case.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Perez can't recall if Mr. Sutton ever talked to him about the claim. Mr. Perez told Bart Haddad that if there is an opportunity to submit the claim please do so. Again, Mr. Sutton did *not* instruct Mr. Perez not to submit the claim either.

Mr. Perez thinks Mr. Sutton would have been aware of the claim through Bart Haddad but he does not recall any specific conversations with him about the claim.   Mr. Sutton will only call once every two to three months. Mr. Perez does not recall any conversations with Mr. Sutton about the claim in Fall 2012 or Spring 2013.

Mr. Perez has had two conversations with Mr. Sutton about the meeting with the Special Master. After called initially, Mr. Perez contacted Mr. Sutton to see if he could talk to the Special Master. Mr. Sutton told Mr. Perez that he was being investigated for his involvement at the claims center. Mr. Sutton said he did not do anything wrong but they had fired him and his wife. Mr. Sutton said his life is now an open book. Mr. Perez had another conversation with Mr. Sutton because the company was buying a yacht in order to entertain clients.

Mr. Sutton never told Mr. Perez *not* to submit a claim on behalf of Romeo Papa LLC.

Mr. Perez thinks he was aware of the claim through Bart Haddad. Mr. Perez does not recall Mr. Haddad talking details with him of any Moratoria claim or policy.

Finally, it was explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000013

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: Mike Bryant
Title:    Chief Executive Officer (CEO)
Office: Crown Water Reclamation Solutions
Date/Time: July 30, 2013, 9:00 a.m.
Attendees: Tim Flynn, Mike McCall
Location: 935 Gravier St, 14th Floor, New Orleans, LA

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP. We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP. We do not represent you [Mike Bryant].

On the above date and times Mike Bryant was interviewed in person. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Bryant has previously worked for First Atlantic, a New York-based private equity group, as well as for
another private equity group based in Cleveland. An engineer by training, he has worked for Ford Motor
Company as a European Managing Director in Dusseldorf, Germany. After selling his shares in a St.
Louis-based company, Mr. Bryant moved to Scottsdale, AZ. His next door neighbor there was Glen
Lerner, who was associated with Crown LLC. In April 2010 Mr. Lerner asked Mr. Bryant to come to
Houston to look at some water reclamation technology and provide him his assessment of it. At the
time, the technology was only in the blueprint stage and would have cost approximately one million
dollars to build. The technology was very impressive, in Mr. Bryant's opinion. After this trip for Mr.
Lerner, Mr. Bryant went back to his normal activities. In May 2012, after Mr. Bryant had sold his shares
in the private equity company and was about to leave for London on a business trip, Mr. Lerner called
him and said he wanted Mr. Bryant to run a company for him. It was the same company whose water
reclamation technology Mr. Bryant had assessed two years earlier at Mr. Lerner's request. Mr. Lerner
had been disappointed with the company's progress, and Mr. Bryant learned that the progress had
indeed been rather poor. Joey Dartez, who is Lionel Sutton's stepbrother, had been serving as the
company's president. Mr. Bryant became CEO of the company, Crown LLC, in May 2012 and moved Mr.
Dartez into a more operational role.

Mr. Bryant is one of 6 shareholders in Crown, with a 5% stake. The other shareholders are Mr. Lerner
(the majority shareholder), Lionel Sutton, Tim Elmhurst, Joey Dartez and Corey Eschweiler.

1

SM-03-JA000014

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Bryant first met Mr. Sutton at the May 2010 visit to the water reclamation technology presentation
in Houston. Mr. Sutton had at that time introduced Mr. Lerner to the company Crown, and Mr. Lerner
had brought Mr. Bryant with him to Houston to advise him. The meeting had been arranged by Mr.
Sutton. Mr. Bryant had no further contact with Mr. Sutton until Mr. Bryant became CEO of Crown.

Mr. Bryant first met Tim Elmhurst and Joey Dartez at the technology presentation as well, but not Mr.
Eschweiler. Mr. Eschweiler works for Mr. Lerner as a contract attorney in a law firm and reviews
contracts for Crown when needed. Mr. Bryant advised that Mr. Eschweiler is "very good" at the
contract review work.

Mr. Bryant has no regular contact with the Mr. Lerner's law firm. Mr. Lerner is the key funder of Crown,
but Mr. Bryant runs the company. Mr. Lerner's law firm has no operational role in Crown. Crown's
Chief Financial Officer (CFO) is Jeff Cahill, and Mr. Cahill also serves as CFO of Mr. Lerner's law firm.
None of Crown's funding for big projects comes from anyone other than Mr. Lerner, via Mr. Cahill. Mr.
Bryant never signs checks. The money comes officially from Mr. Lerner's law firm, but Mr. Lerner owns
nearly 100% of the law firm.

Crown has approximately eight employees. When Mr. Bryant joined Crown, there was no clear
understanding who owned the patent-pending water reclamation technology—the owners of Crown or
the machine's inventors. Crown created a Texas company called H2O Reclamation, which is owned 50%
by Crown and 50% by Proven Technologies, and which owns the water reclamation technology. Crown
LLC, a Louisiana company, handles the sales and marketing of the technology. Prior to Mr. Bryant
becoming CEO, sales of the water reclamation technology were essentially nonexistent, because
everyone was occupied with debating over the ownership of the technology. Crown now has the license
to sell the technology into oil, gas and coal mining industries, while Proven Technologies has the license
to sell to all other sectors.

Proven Technologies is owned by a Canadian private equity company, Terra Mer, which is owned by a
former owner of the Calgary Flames, whose first name is Grant. "Grant" was formerly a professor at
Queens University, but made his fortune through private equity funds. "Grant" also owns a company
known as Kyla energy.

The last twelve months have been primarily focused on putting the correct legal framework around the
above described corporate structure. That process is now complete, and who owns what is now clear to
all concerned.

Asked what role Mr. Sutton plays at Crown, Mr. Bryant responded that Mr. Sutton remains at arm's
length from day-to-day operations. The situation was somewhat awkward when Mr. Bryant became
CEO, because Mr. Lerner had hired him to serve as a professional manager of the company, which Mr.
Dartez and the others had been running up until that time. Initially, Mr. Sutton's role had been
significant, but there has been considerable transition in that role over the past year. Currently about
eighty percent of the management control of Crown rests with Mr. Bryant. It is Mr. Bryant's
understanding that Mr. Sutton receives a salary, but that salary is the result of an agreement between

2

SM-03-JA000015

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Lerner and Mr. Sutton, in which Mr. Bryant was not involved. Per Mr. Bryant's understanding, Messrs. Sutton, Dartez, Elmhurst and Lerner had equal shares at the beginning of Mr. Lerner's involvement in the company; however, over time the other three partners have been selling off their equity to Mr. Lerner, so that Mr. Lerner now has a 47%, stake, Mr. Sutton 17%, Messrs. Elmhurst and Dartez 15% each, Mr. Eschweiler 1% and Mr. Bryant 5%.

Mr. Bryant is aware of Mr. Lerner's personal injury law practice in Las Vegas and has met with Mr. Eschweiler there. Also working in Mr. Lerner's law practice is Susan DeSantis, whom Mr. Bryant first met in New Orleans approximately 13 to 14 months ago, when she had very recently been hired by Mr. Lerner. Ms. DeSantis has a good background in software and project management and was brought in to manage Mr. Lerner's New Orleans office. Mr. Lerner had told Mr. Bryant that Mr. Bryant could call upon Ms. DeSantis to help out at Crown with her Power Point and office management skills, but Mr. Bryant has not consulted her and is sure that she is busy working on other projects for Mr. Lerner.

Crown has not filed any claims with the Deepwater Horizon Claims Center. Mr. Bryant stated that as CEO of Crown he would definitely know of the filing of any such claim. Mr. Bryant has never heard of Casey Thonn prior to the instant interview.

Mr. Bryant had never heard of the Andry Law Firm until the news broke publicly about Mr. Sutton and the issues relating to him. At that point in time, Mr. Lerner had sent Mr. Bryant an e-mail with a link to a press article, which cited Mr. Sutton as implicated. Mr. Bryant followed some related links and found information pertaining to the Andry Lerner Law Firm. He does not recall ever having met anyone from the Andry Law Firm before that time.

Over the past year or so, Mr. Bryant has made five or six trips to New Orleans. When in New Orleans, Mr. Bryant normally works out of Suite 1910 at 935 Gravier Street, where the Sutton-Reitano law office is located. This address is also the registered location of Crown's office. Mr. Bryant described the space in Suite 1910 as rather sparse. Mr. Sutton has an office there, and there is a small conference room with no furniture. There is one other office in the space with a desk, which Mr. Bryant usually uses when in New Orleans. Mr. Bryant has met in this space with Mr. Sutton, Mr. Dartez, and Mr. Elmhurst. Mr. Lerner usually attends such meetings by phone. Mr. Bryant has been in this office space only three or four times. His most recent meeting in Suite 1910 was with Mr. Dartez and Jimmy Roussel, a friend of Mr. Sutton and co-owner of a water cleaning technology known as Eco 2. Mr. Sutton was not present on that occasion.

Mr. Bryant first met Christine Reitano when she came into the Suite 1910 space to talk to Mr. Sutton while Mr. Bryant was working in the space. Mr. Sutton introduced her to him as his wife, and Mr. Bryant assumed her last name was Sutton. He understood at that time that she was an attorney working on another floor in the building, but not that she worked at the DHEEC. Ms. Reitano was in and out in about 30 seconds. The second time Mr. Bryant met Ms. Reitano was at a dinner with Mr. Sutton and Mr. Lerner and their families. Mr. Brown attended the dinner as the new CEO of Crown. He has not met Ms. Reitano on any other occasions, nor has he ever corresponded with her or had any other form of communication with her.

3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Asked about the NAC commercial proposal, Mr. Bryant explained that this proposal is per a memo of understanding between Crown and North American Coal, a public company and subsidiary of the NACCO group of companies.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed.  Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription.  These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team.  These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client.  These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000017

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Tim Elmhurst |
| Title: | Vice President of Business Development & Sales and Marketing |
| Office: | Crown LLC |
| Date/Time: | July 31, 2013 |
| Attendees: | Greg Paw, Tim Flynn |
| Location: | 935 Gravitas St., New Orleans |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent Mr. Elmhurst.

On the above date and time Tim Elmhurst was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Tim Elmhurst is currently the Vice President of Business Development and Sales & Marketing for Crown LLC. Originally, Mr. Elmhurst and Joey [Dartez] came up with the operational idea for Crown LLC. Gary Stevenson at Proven Technologies brought in Lionel Sutton. Licensing rights for the technology used by Crown LLC was purchased from Proven Technologies. The company needed more money, so they brought in Glen Lerner. With Mr. Lerner's money, they started building the machines and marketing and commercializing the machines.

Mr. Elmhurst's current share of Crown LLC is 15%. This share has been diluted twice already. Originally his share was 25% (the same as Joey Dartez, Tiger Sutton, and Glen Lerner). To get capital, he diluted his shares to 17% by selling to Mr. Lerner. To get additional capital, he and Joey Dartez self-diluted an additional 2% each. The company was going to have to minimize if Mr. Lerner did not put the money up. Mr. Elmhurst and Joey Dartez received a monthly salary in exchange for giving up their shares. Tiger Sutton didn't need the money at that time. Mr. Lerner's equity in Crown LLC was at about 43%, but is now at 47%. Other equity owners include MB at 5% and our attorney at 1%.

Mr. Elmhurst met Lionel Sutton, through Joey Dartez. Lionel Sutton and Joey Dartez are brother-in-laws. There was a verbal memorandum of understanding within the company to bring someone in to get the financial amount necessary for operations. Tiger Sutton put in $120k to finance the company. Mr. Elmhurst and Joey Dartez also had a company called Coyote energy. Working both companies was sometimes a rollercoaster, but Joey Dartez asked Mr. Elmhurst to do it together. They did this for a couple years. There was no BP claim by Coyote Energy. Crown LLC also did not make a BP claim.

1

SM-03-JA000018

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Jeff Cahill is the accountant for Mr. Lerner and is responsible for paying expenses that are incurred. Mr. Elmhurst doesn't know the payment amounts made to other interested parties in Crown LLC. He only knows that he and Joey get a paycheck. He talked with Mr. Sutton a few days ago and a mouthful was delivered regarding the 2% equity. The amount per share number is difficult to estimate. However, he sold his 2% share for $144,000.

The Crown LLC Regions Bank account was opened by Tiger Sutton. Mr. Sutton still has an account at Regions Bank. It contains left-over money, for a rainy day fund. Mr. Sutton has access to this account, but Mr. Elmhurst is not sure who else has access to this account.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000019

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Mike Juneau |
| Title: | Special Counsel |
| Office: | Federal Court Building |
| Date/Time: | August 21, 2013 |
| Attendees: | Walt Donaldson, Alex Dubin |
| Location: | Phone Interview |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010* ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Mr. Juneau.

On the above date and times Michael Juneau was interviewed by phone. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Michael Juneau stated that Lionel Sutton did not inform him of his relationship with Romeo Papa. Mr. Juneau also stated that he did not recall ever talking or emailing Mr. Sutton about Romeo Papa.

Mr. Juneau stated that he is familiar, in general, with other organizations in the maritime business, like Romeo Papa, but none that had claims.

When questioned if he asked Mr. Sutton directly affiliations with any maritime organizations having claims, Mr. Juneau said that he did ask Mr. Sutton this question and Mr. Sutton answered "No." This was after Dave Welker had begun his investigation. Beforehand, Mr. Juneau doesn't recall but doesn't believe that he asked Mr. Sutton because he would have had no reason to.

Mr. Juneau said that he was not aware of Romeo Papa's claim. He was never aware of this claim. He never searched for it. He heard of Romeo Papa for the first time during the Welker investigation.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues

SM-03-JA000020

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

for the Special Master Investigative Team.  These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client.  These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000021

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master — Independent External Investigation
Interview Report of Freeh Group

Interviewee:   Michael Juneau
Title:   Special Counsel
Office:   Deepwater Horizon Economic Claims Center
Date/Time: July 16, 2013 1:00 pm
Attendees: Matthew Dolan, Gregory Paw, Laure Kirk
Location: 935 Gravier St., Suite 1905, New Orleans, La., 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you Michael Juneau.

On the above date and times Michael Juneau was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Juneau explained that his job involved communicating with Judge Barbier and that he was responsible for keeping him updated and informed about how things were operating at the Claims Administration Office. Mr. Juneau explained that he had been a lawyer for 25 years and that he practiced in Lafayette, La. and that he was a law partner with Pat Juneau for those 25 years. He explained that Judge Barbier had appointed him and that he had met with the BP lawyers before being appointed. Mr. Juneau said that he was the support staff for Mr. Pat Juneau and that Deepwater Horizon did not pay him; rather, his and his father's law firm paid him. He said that he was the "Special Counsel" -- more like a lieutenant specifically responsible for legal issues as they came up. Mr. Juneau said that he coordinates business economic claims and comes into the New Orleans office three days per week, but that he also meets every Tuesday with Mr. Pat Juneau, who is his father. He explained that he reports to Judge Barbier and that he lives 2 hours west of New Orleans in Lafayette, La.

Mr. Juneau explained that his father had a national reputation that was very good from class action cases he had worked on, such as Toyota, and cases in Philadelphia and Minnesota; and that his father was viewed as being very fair by both the plaintiff and defense lawyers. Mr. Juneau explained that his father just got a call one day to meet with Mr. Cantor and Mr. Moskowitz, who were BP attorneys, and then the lawyers asked Judge Barbier to appoint his father as the Special Master.

1

SM-03-JA000022

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



Mr. Juneau said that he started in May 2012 and was one of the first employees. He said that his father hired Christine Reitano, and she might have been the first one hired. Then David Odom was hired as the CEO, and then Mr. Odom handled most of the hiring from there. When asked about the ethics codes for Deepwater Horizon, he said that they include categories such as no gratuities, no gifts beyond working meals, no conflict of interest, no financial interest in a claim, and rules that employees and their families cannot file claims. He explained that Mr. Odom and Mr. Levine seem to be responsible for managing new employees. Mr. Juneau said he knew of a fraud hotline, but that he could not accurately explain the policies and that Mr. Odom would be able to better explain that.

When further asked about the guidelines for claimants, Mr. Juneau explained that there was a "claimant friendly provision" that said that they are obligated to give people the maximum recovery and that they had to be helpful and assist claimants, and they would also pay for accounting expenses incurred by the claimant. He explained that this may not be a written policy but that those are some of the details he is aware of. Mr. Juneau said that they will give updates during the process but they will not give exact information.



When asked if a conflict of interest would happen with an employee, Mr. Juneau said that there was a formal scrub with every new employee. He said that he was not sure if they checked about outside employment of employees.

Mr. Juneau continued to respond to questioning and explained that he had known that Lionel Sutton was a lawyer with clients prior to Mr. Sutton being hired by Pat Juneau. He said that on Friday he would work on his prior work but that now he was going to work virtually on only CAO work and not work with

2

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

anyone with claims, now that he had moved over. Mr. Juneau said that they had discussed conflict of interest policies with Mr. Sutton and maybe there was a background check. Mr. Juneau explained that Mr. Sutton worked in the legal department focusing on subsistence policy, working with Christina Hendrick and helping to develop procedures and policies and moratoria policy. Mr. Juneau said that he worked on business economic losses and that Mr. Sutton helped him with that when he was out. He also said that Mr. Sutton had helped in a meeting with Martha Curtis, an attorney, when her claims were not progressing. Mr. Juneau said that Mr. Sutton basically helped with legal issues as they came up. Mr. Juneau said that Mr. Sutton, David Duval, Mike Juneau, and Ms. Reitano were all in the legal department reporting directly to Pat Juneau.

Mr. Juneau said that before the current issue arose, they never had any issue with any of Mr. Sutton's work. Then Mr. Welker casually mentioned that he was looking at something concerning Mr. Sutton and may have said that it was the Thonn case.



He added that as issues come up now they are adapting policies, but Mr. Sutton seemed to have a very liberal opinion in most areas, tending to provide more lenient standards for granting claims. Ms. Hendrick seemed to feel that Mr. Sutton was more liberal, but she mainly won concerning the type of policy she felt was needed.

Mr. Juneau said that Mr. Sutton was chosen by Pat Juneau to work at DHECC. He said that since Mr. Sutton's wife Ms. Reitano worked there and that she was good, that she recommended her husband and that she said that he had a background in this. In addition, Mr. Sutton worked at Mr. Juneau's law firm for two years when he was first out of law school and as a result of many dealings with Mr. Sutton over the years it made sense to hire him. Mr. Juneau added that they needed additional legal staff to deal with the many questions that were coming from accountants and BrownGreer.

Mr. Juneau said that Mr. Welker identified an issue with Mr. Sutton that came to his attention. On June 17, 2013, Pat Juneau said that he and Michael Juneau needed to talk to Mr. Sutton and that they needed to get a response from Mr. Sutton about allegations that he may have taken money from a claimant's lawyer or had a financial interest in a firm. Pat Juneau said that Mr. Welker had said that Mr. Sutton may have had interaction with a claim or claims and may have been receiving kickbacks from what the claimants received. Pat Juneau said that Mr. Welker kept the source anonymous. Pat and Michael Juneau sat in Pat Juneau's office and asked Mr. Sutton if he had any financial interest in a claim and if he had referred claims out, and Mr. Sutton said no. Mr. Welker was not in this initial meeting with Mr. Sutton. In this initial interview, Mr. Sutton did not identify Crown LLC as the reason why he was getting money from Mr. Lerner. Mr. Sutton said he was not involved with any claimants and had no financial interest in any claims. When asked if Mr. Sutton denied that he was handling any clients in regards to

3

SM-03-JA000024

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

claims, Mr. Juneau confirmed that Mr. Sutton said no but he could not say that the question was asked
exactly that way.  Mr. Juneau said that he may have some notes on a yellow sheet of paper from that
meeting that he could provide, or maybe from a conversation he had with John Andry.

When asked if anyone expressed reservations when Mr. Sutton was hired, Mr. Juneau said that Mr.
Odom had said to his father that he had concerns about Mr. Sutton. Mr. Juneau continued by saying
that he felt that Mr. Odom may have had concerns because he might have felt that by bringing in Mr.
Sutton his own position may be threatened.  Mr. Juneau did say, though, that Mr. Odom said that Mr.
Sutton did not have the best reputation in the world.

On June 17, 2013, once Mr. Juneau and his father had spoken to Mr. Sutton, Mr. Juneau said that he
next reviewed the Thonn case, and it seemed that the claimant was not happy, but he was not aware of
fraud at that time.  Mr. Juneau explained that he had full access to claims in the computer system, but
he added that he did not think that he could change things such as the reporting section or the appeals
section.

As the questioning continued about John Andry and Glen Lerner, Mr. Juneau said that he called Mr.
Andry to discuss what they should do.  Mr. Welker was not involved in this phone call.  Mr. Juneau said
that he had gotten a message from Mr. Lerner on his cell phone saying that he thought that he could
straighten things out. The interviewer said that he sensed that they probably do not want to talk to
Freeh Group, and Mr. Juneau said that Mr. Sutton might and that Ms. Reitano probably would.

Mr. Juneau continued answering questions about Ms. Reitano, saying that she worked where she was
needed in the legal department and that she was involved in process type issues, like reconsideration.
Mr. Juneau explained that Ms. Reitano was a document reviewer appeals coordinator and that she
made decisions as to whether a claimant could reactivate their claim after it had been denied based on a
lack of documentation. She was responsible for establishing if a claim fell under tourism and she
communicated with both sides to answer questions. Ms. Reitano was terminated after the Welker
allegations. His father, Mr. Pat Juneau, reflected on this decision but felt that the termination had to
happen because he had to protect the integrity of the process.

Mr. Juneau said that as far as requiring policies, such as conflict of interest and confidentiality with the
five vendors, it was better to ask Mr. Odom.  Mr. Juneau said that he thought that they incorporated
some policies, but he wasn't sure of the detail.  Mr. Juneau said that he has not sensed any conflicts
such as gifts between vendors but that he did not know, and that we should contact Mr. Odom.  Mr.
Juneau said he did not know of a whistleblower program.  When asked if there were any issues about
the fact that the source was anonymous, Mr. Juneau said no but that it just limited their ability to go
back to the source. Mr. Juneau said that his father asked Mr. Welker who the source was but he said
that Mr. Welker kept the person anonymous, so they never got the identity. Mr. Juneau said that he did
not get a sense that Pat Juneau wanted to know who the whistleblower was.

Mr. Juneau said that they are going to review the policymaking process and the report on policymaking
procedures and what policies were deferred, rejected or deferred to the administration to accept.  Mr.
Juneau said that they all met on the deferred administration policies and went through each one and
reviewed them and came up with questions.  He also said that Mr. Sutton and Ms. Reitano did not write
any policies but that they did offer comments.  Mr. Juneau shared some examples of Mr. Sutton's
opinions, such as on subsistence and how to define the impairment of the water. Mr. Sutton's view lost.
As far as moratoria policy, DHECC does not have an adopted policy yet, but Mr. Sutton had opinions.

4

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



Mr. Juneau responded to questions about Ms. Reitano by saying that she was mainly responsible for real estate developers, whether a business should be designated as tourism, and appeals based on lack of documents. BrownGreer has a spreadsheet for each of these issues and sometimes there will be a reversal, maybe four or five times. Mr. Juneau had thought that they were acceptable as they were, but now he realizes they could use additional information.



Mr. Juneau said that he would give the interviewers his notes that may be on a yellow sheet about the conversation he and his father had with Mr. Sutton about the allegations and/or a conversation he had with Mr. Andry about the allegations. He said that he could get an exact monthly figure that his father was paid as Special Master.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000026

Tiger Sutton

Backes
Ⓐ — Bakkes Racing (?)   Brocato
Ⓐ — Bakkes Racing (?)   ① Sal Brocato (?)
— Thonn             ② John Andry
                (Glenn Lerner)        Firm 537
                              Andry Law Group/
Ⓑ  Call John Andry            Andry Lerner, LLC
     — all contact thru MJF   610 Baronne St
                              NOLA, LA 70113
                              504/525-5535

Ⓒ  Lionel Sutton claim) X inactive
                7/31/12  - only reg form submitt'd


Ⓝ  Thonn, Casey   # 100051739
     (Andry Law Group / Andry Lerner)
     Sanford   # 19690   Pymt  $166,652 (239,152 less 72,500)
     VoO      # 20741   Pymt
     Subsistence # 97550   Claim Form Submitt'd
     — Seafood   # 19691   Pymt   $117,850.25
              BP Final Proposal: 189,189 less 72,500
              ℼ Final Proposal: 259,459
              - BP Proposal won
              - CA's won't bar him

     ⌠ Looks like ℼ more dissatisfied
     ⌡ than BP is with how Program
       evaluated claim

SM-03-JA000027

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Michael Juneau |
| Title: | Special Counsel |
| Office: | Claims Administrator's Office (CAO) |
| Date/Time: | August 8, 2013 1:00 PM |
| Attendees: | Walt Donaldson, Tim Flynn, Laure Kirk |
| Location: | Phone Interview |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you [Michael Juneau].

On the above date and times Michael Juneau was interviewed by phone. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum and potentially to third parties.



When asked, Mr. Juneau said that he knew that BP did background checks for DHECC employees, but he said that he did not know their actual policies. Mr. Juneau explained that his father would tell BP that he was considering a new hire, and then they would do the background check. Once BP got back to his father and said that everything was okay to go ahead, Pat Juneau would hire the employee. He said that he was not sure if his father received anything in writing. He said that he thought that BP got back to his father verbally, but that he was not involved in this process. Mr. Juneau added that he thought Keith Moskowitz at BP was the point person that was involved with the background checks. When asked about the employees not vetted by BP, he said that he did know who would do background checks.

1

SM-03-JA000028

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



Mr. Juneau stated that he did not know if Romeo Papa was designated as a tourism company; however, he did mention that Mr. Welker had identified Lionel "Tiger" Sutton III as having 50% ownership of the company. He explained that BrownGreer decides whether a company should be designated as tourism. If it is a "close call," then BrownGreer calls Michael Juneau, Pat Juneau and [formerly] Christine Reitano to discuss the issue. He said that there is a list that comes from BrownGreer, and they go over the list. He spoke about a particular list with 45 items on it, and he confirmed that for the majority of the claims that needed to be discussed, all three of them were on the call. He did add, however, that there were a few at the end of the list where Ms. Reitano was the only one on the call with BrownGreer. Mr. Juneau said that he did not recall Romeo Papa being on the list, and he confirmed that if a company was not on the list, then BrownGreer made the determination.

Mr. Juneau advised that there are two lists--one that lists the tourism businesses and a second one that lists the real estate developers. Mr. Juneau is only involved with the tourism. Asked again whether Ms. Reitano made decisions unilaterally, he referred to the list of 45 items and said that he was not on those few calls which she handled alone with BrownGreer, but that he did not think she made the final decision. He again confirmed that if a business was not on the list, then BrownGreer made the decision as to whether a business fell under tourism.

SM-03-JA000029

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Juneau said that he remembered meeting with his father and Mr. Welker to discuss Mr. Sutton and his possible resignation. He said that it took place at night at their office and they confronted Mr. Sutton with the emails. He said that it was a long interview with Mr. Sutton, in which Mr. Juneau sensed that Mr. Sutton was going to make the decision to resign, but he was not sure that Mr. Sutton actually said that. He said that he did not have any notes from the meeting, but after the meeting Mr. Sutton called Mr. Juneau and asked about a procedural issue. Mr. Juneau told Mr. Sutton that for his protection they should not continue to communicate and that they should let the investigation take place. He suggested to Mr. Sutton that Mr. Sutton might consider resigning, but Mr. Sutton cut him off and said that he understood that that was a given. Mr. Sutton told Mr. Juneau that he would him his resignation.

Mr. Juneau said that on June 21, 2013 Mr. Sutton sent an email to him suggesting the correct course of action. He said that Mr. Sutton was considered an independent contractor and that on Fridays he did his other work. He said that his father understood that Mr. Sutton had other work, and he said that he didn't think there was any objection, if there was no conflict. Mr. Juneau was not aware of any documentation on this issue.

Mr. Juneau explained that a good bit of his work involved understanding the program and keeping Judge Barbier updated. He said that he looks at all the claims and needs to understand the whole program.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000030

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

**Deepwater Horizon Court Supervised Settlement Program ("CSSP")**
**Special Master -- Independent External Investigation**
**Interview Report of Freeh Group**

| | |
|---|---|
| Interviewee: | Steilberg, Tracy |
| Title: | Appeals Coordinator |
| Office: | CAO |
| Date/Time: | August 27, 2013, 10 AM -- 11:15 AM |
| Attendees: | Mike McCall, Ben Scotti |
| Location: | DHECC Claims Center, 14th Floor |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and times Tracy Steilberg was interviewed in person for a second time. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Steilberg confirmed that after leaving the Sutton & Reitano firm, she worked for Frank "the Strong Arm" D'Amico from the summer of 2011 until December of 2011. From December 15, 2011 through April 2012, Ms. Steilberg worked for the law firm Davis Duncan. She then began working at the claims center in May 2012.

Ms. Steilberg confirmed that Ms. Reitano didn't start to work with Mr. Sutton until after Ms. Steilberg left on maternity leave. . Once Ms. Reitano came onboard to work with Mr. Sutton, Ms. Reitano ended up taking on a few GCCF cases, but before this time Ms. Reitano did not have any of her own claims. Ms. Steilberg confirmed that since she began working at the DHECC, Ms. Reitano never asked her to do anything with the claims of claimants that had been represented by Sutton & Reitano.

While working at the claims center, Ms. Steilberg confirmed that she did assist Christine Reitano on an administrative level, because very few others in the office had any administrative experience. Ms. Steilberg reiterated that once she joined the claims center, she wanted more challenging work. When she heard that Mr. Sutton was coming onboard, she told David Odom that she was not going to serve as his assistant. She stated that there were different teams at the claims center and that Mr. Sutton was handling subsistence and moratorium – she stated that she didn't want to be part of those programs and be stuck with him. Ms. Steilberg wanted to work in the appeals arena, which is where she is now.

1

SM-03-JA000031

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Ms. Steilberg confirmed that occasionally, Mr. Sutton may have given her something to do that was not claims related while she was working at the claims center. As far as examples of what she was asked to do, Ms. Steilberg stated that it "wasn't big, it was just little things like fixing documents." She stated that she had to help him with things like e-filing documents in federal court. Ms. Steilberg recalled that she would also receive legal briefs from Mr. Sutton where he asked her to assist him with formatting issues like line spacing. These were all cases from Mr. Sutton's old law firm that he was still handling. Ms. Steilberg stated that Mr. Sutton asked her during her work hours at the CAO to do these tasks, but that it literally took her "like two minutes to fix these documents. She confirmed that Mr. Sutton never paid her for these side tasks. She also stated that she didn't want to get stuck doing this kind of work for him and reiterated that as the reason that she requested to work in another area at the CAO. Ms. Steilberg stated that she did not tell Mr. Sutton no when asked to perform these tasks, because she didn't want to "make him mad and ultimately I wanted to use him as a reference." She also mentioned that she would complain to David Duval whenever Mr. Sutton asked her to do something. Ms. Steilberg stated that she didn't have to do anything else for Mr. Sutton while working in the claims center with one exception. She stated that Mr. Sutton asked her to pull up the status of the Thonn claim.

Ms. Steilberg stated that, in terms of total time spent on tasks for Mr. Sutton that were not related to CAO business, she probably spent less than an hour and probably accomplished all of these tasks during her lunch breaks.

When asked about her knowledge of the policies and procedures documents she signed when she came to work for the CAO, she stated that she didn't read all of the documents that she signed – she just "sat down and signed them." Ms. Steilberg stated that she signed the documents and gave them back to the admin folks because she was so swamped with work when she came on board.

Ms. Steilberg stated that she came to know John Andry through Mr. Sutton since they used to be best friends. Ms. Steilberg confirmed that she had contact with Mr. Andry while she worked at the CAO. Ms. Steilberg stated that she pulled up some of his claims to check the status of them. She mentioned that generally, she would sometimes monitor claims to make sure there wasn't something that should be holding them up. In terms of what prompted her to check on the Andry claims, she stated that Mr. Andry would have probably asked her via email to check on the claims. Ms. Steilberg stated that Mr. Andry probably had two pending claims and Ms. Steilberg assured him that the claims were fine and were not held up. She mentioned that one of the claims he handled that was particularly confusing was for Talens Marine. She estimated that Mr. Andry would have sent an email to her with a list of claims or claimants on one or two occasions, although she also stated that many claimants would call up all the time and she would field the requests they made regarding status as they would come in to her.

In terms of social contact with Mr. Andry, Ms. Steilberg stated that a small group of CAO colleagues had a Christmas party of sorts at Pat O'Brien's in early December 2012. During that party, Ms. Steilberg bumped into Mr. Andry who was throwing his own office party at Pat O'Briens. Ms. Steilberg stated that this was when she introduced David Duval to Mr. Andry. Ms. Steilberg stated that Mr. Duval's father, a federal judge, presided over a case where Andry was an attorney – it was the Mr. Go case. It involved a

2

SM-03-JA000032

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

claim about a certain canal being too wide or narrow and that is why everything flooded during Katrina. Ms. Steilberg introduced Mr. David Duval as Judge Duval's son.  She stated to the interviewers that she recalled Mr. Andry asking David Duval that night what Judge Duval thought about his ruling in the Mr. Go case having been overturned on appeal.

She also stated that during that chance meeting, Mr. Andry asked her if she had found a place to work, to which she responded that she was working at the CAO now.

Mr. Steilberg also indicated that Mr. Duval and Ms. Reitano took her out to lunch for her birthday around May 6, 2013 at the Palace Café and while there, she again ran into Mr. Andry, who was attending a baby shower for one of his employees.  At this lunch, Mr. Andry stated that he wanted to take Ms. Steilberg out for her birthday soon.  Mr. Andry also conversed with Mr. Duval at this chance meeting.

Ms. Steilberg stated that she, Mr. Duval and Mr. Andry had planned to meet for lunch the following week.  When Mr. Andry sent Mr. Duval a text confirming the lunch meeting and offering to pick them up, Ms. Reitano saw the text on his phone and expressed an interest in accompanying them to lunch. Ms. Steilberg was in Mr. Duval's office when the text message came through, along with Ms. Reitano and Mr. Duval.  During this lunch at the Palace Cafe, Ms. Steilberg stated that they all spoke about Sutton & Reitano and did not discuss any of Mr. Andry's claims or claimants.  She confirmed that Mr. Andry paid for this lunch.

Ms. Steilberg stated that she recalled Mr. Andry sending out an email after the first lunch,  mentioning he had some claims that he didn't see movement on.  Ms. Steilberg recalled that Mr. Duval responded to the email and asked that Mr. Andry send him an email so that he can pull up the claims and check the status.

Ms. Steilberg stated that there was another lunch approximately three weeks later that she attended, along with Mr. Andry and Mr. Duval.  Ms. Steilberg stated that Mr. Andry paid for everyone again this time – she recalled Mr. Duval pulling out his card and offering to pay, but that Mr. Landry said "I got this."  This was the final lunch they had together.

It was during this second lunch that Mr. Andry asked about the status of his claims.  Ms. Steilberg thought that Mr. Andry asked about the deadline for assigning appeals and stated that his claims had not yet been assigned to a panelist and so they were waiting for this to occur.  She stated that it should be assigned in a few days to a panelist.  Ms. Steilberg stated that she thought his own claim was not on the list of claims previously submitted because if she remembers correctly, the list included only short "little bitty names, nothing like Andry Law Firm."  Ms. Steilberg remembers going over the timeframe with him about the appeals process and how many days it could take and what the deadlines were, things of this nature.

Ms. Steilberg stated that she never had any concerns about the appropriateness of Mr. Andry paying for her lunch.  She stated that it never dawned on her that there could have been an issue with it, stating that "guys always take me out to lunch."  Ms. Steilberg further relayed that there was a sort of unofficial

SM-03-JA000033

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

policy that people at the CAO were not to accept gifts/meals valued at over $100 and that the meals at the Palace Café were probably around $20 per person.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

4

SM-03-JA000034

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Group

| | |
|---|---|
| Interviewee: | Stielberg, Tracy |
| Title: | Co-Appeals Coordinator, former EA to CAO, and Assistant at Sutton & Reitano |
| Office: | Deepwater Horizon Claims Center |
| Date/Time: | July 11, 2013, 2PM – 3PM |
| Attendees: | Steve Tidwell, Ben Scotti |
| Location: | 935 Gravier South, New Orleans, Louisiana |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and times, Tracy Stielberg was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Stielberg has been a legal secretary for 20 years. She is also a notary. Her first job was at Kaiser Aluminum – she left that job and went to work for Sidney Torres' law office. She then went to Leget and Metier to be a legal secretary and left with Lionel Sutton III when he went out on his own. He was always handling personal injury claims. She eventually left his office and went to work at Payne Webber, and then a few other firms, the last of which was Davis and Duncan, before coming back to work with Mr. Sutton, again.

Ms. Stielberg had a baby in 2010 and went on maternity leave. That is when Christine Reitano, Mr. Sutton's wife, came in to work at the office. In terms of how busy Mr. Sutton's law practice was at first, when they started out years ago, in the first year he had about 80 cases, and this was the biggest year he had. He had shared space with another attorney who got larger cases. They had maybe 70 cases the next year. There was enough that the firm was kept busy. After maternity leave, she came back and worked for him four days a week but there was not much work. In terms of why the business was shrinking, she believes Mr. Sutton might have burned out on personal injury cases. He had several cases that he lost at trial and possibly didn't want to do this anymore.

At one point, Mr. Sutton and Ms. Reitano called her to come back to work for them. They did not want to pay her for full-time work and asked her to work part time. She thought they felt bad and because she worked on so many cases over time with Mr. Sutton, they didn't want to entirely lose her. She was not receiving enough work. She was particularly concerned that, at times, they were not paying her, but, had sufficient funds to go on European vacations.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

In 2012, Ms. Reitano called her and told her that Pat Juneau and David Odom needed an executive assistant, in the Claims Administrator Office (CAO), Deepwater Horizon Economic Claims Center (DHECC). She came in for an interview and was offered the job. Once she started working at the CAO, she didn't think of herself as a legal secretary at all. She was kind of filling in and doing whatever was needed. As other new employees came onboard, she would assist all employees in the CAO. For about a six month period, Ms. Stielberg was more of an office manager/assistant. She was looking for something more challenging and sought a position in the appeals process. She was assigned to the appeals process, and is currently working there. Currently, the administrative assistant function is being done by Rebecca. To make the switch, she talked to David Odom about working in appeals. She doesn't think the work she is doing is legal, in the usual sense. For instance, on any given day, she prints out several reports that Brown and Greer (BG) has on the CAO claims system portal, and will check to see that the claims appeals are moving. In the event they aren't, she advises Mr. Duval or BG that they need to be moved. Once the appellate decisions come out, she has to print up all of the decisions, hand them out and wait for a request for a follow—on discretionary review. The requests for discretionary reviews are a newer system. The discretionary reviews are intended to determine if she, in her capacity in the CAO appeals office, will handle the matter or if BG will. She also regularly checks emails, on a daily basis, regarding claims. Additionally, she regularly takes calls from claimants asking about problems with claims. When this happens, she offers any assistance she can.

Regarding her interaction with Mr. Sutton in the CAO, she stated that she talked to Mr. Sutton in the hallways and would chit-chat about old cases, from their previous work, together. He came onboard with the CAO during the latter part of last year. When he came onboard, she told Mr. Odom she did not want to be Mr. Sutton's assistant because she worked for him previously. While working for him she felt she did all of the work at his office. She simply did not want to get stuck in that role again. Ms. Stielberg stated she had very little dealings with him at the CAO. She knew he was working on the subsistence program and moratoria policies. She knew Ms. Reitano was working as an attorney for the CAO, with him. To her knowledge, Ms. Reitano worked on policies, document review and handled incomplete claims. Also, Ms. Reitano was being given work regarding the appeals process and she reviewed appellant panelists' remanded decisions. She advised that she had conversations about legal questions and how these fit within the settlement agreement, with Ms. Reitano. She always went to her though and not to Mr. Sutton with any questions. She felt that Ms. Reitano had more institutional knowledge because she was hired first and she considered Ms. Reitano and herself to be friends. Concerning any things she could have discussed with Mr. Sutton, she might have asked him to explain some of the programs like the Vessel of Opportunity (VoO) program.

She first learned of an issue concerning Mr. Sutton, the day before it came out, publicly. She was aware that Mr. Sutton and Ms. Reitano were in the office of CAO Special Counsel Michael Juneau. Prior to this, she had heard that they were making a fuss about appeals. She said that she and Mr. Duval thought that this is what the meeting was about. Instead, Mr. Juneau evidently told them they were placed on leave. Ms. Reitano then called her and asked her to come to meet her at Mr. Sutton's law office on the same floor as the CAO. She did go to Mr. Sutton's law office and he informed her there were allegations that he was getting money on a claim. That occurred on a Thursday night, and it was reported on the internet that same night and on the news, the next. Prior to that day, she had not heard anything from anyone else concerning the allegations.

When she spoke with Mr. Sutton in his office, as far as which claim was involved regarding allegations he had been paid on it, she believes he had to have mentioned Casey Thonn. She was familiar with Casey

2

SM-03-JA000036

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Thonn and his claim, because when she worked in Mr. Sutton's office in 2010, Mr. Thonn came into the office to handle his Gulf Coast Claim Facility (GCCF) claim. Regarding any conversations she had with Mr. Sutton or Ms. Reitano pertaining to Mr. Thonn's claims, she recalls asking what had been done with his claims and if they were settled. She recalls Ms. Reitano telling her they referred Casey Thonn to John Andry. As far as she could recall, all of the other claims she might have worked on had settled and none were pending.

She recalled that Mr. Sutton didn't want to handle any oil spill claims cases, but Ms. Reitano did want to handle such claims. She recalled that after copying all of the claim items, she believed she sent the referrals over to the Smith Stag law firm or they may have filed previously with GCCF.

As to whether Mr. Sutton ever asked her about any of the claims he or Ms. Reitano handled at their law firm, she recalled that perhaps once he may have asked her whether the Thonn case was assigned to an appellate panelist yet. She remembered querying the data system on Mr. Thonn's claims and noticed that there were three claims. She thought they might be duplicates but she actually had more than three claims so they were not duplicates. She doesn't recall the exact time of this conversation.

Following Mr. Sutton's and Ms. Reitano's departure, she was interviewed by Dave Welker and Mr. Streif, and, then by a gentleman named Lesley (last name unknown). It was only a brief interview with him, though. The interview with him would have been maybe the next week or so after the suspension.

Regarding her duties working at the Sutton and Reitano law firm, she did a great deal of the organizational paperwork for a large number of Limited Liability Companies (LLC)s. She recalled also working on a large number of LLC's for Mr. Sutton's father, Lionel Sutton, Jr. In most cases, Mr. Sutton was on the paperwork as a member or officer in his father's LLC's. She recalls Mr. Sutton had one titled 610 Baronne LLC, and also one titled T Blue LLC (named after a dog). When asked about an LLC called Romeo Papa, she advised that Robert Perez is on Romeo Papa. She was uncertain if Romeo Papa was the name of the LLC or the name of a boat or both. Ms. Steilberg recalled that Mr. Sutton filed an oil spill settlement claim for Mr. Perez, through his law office, prior to coming to the CAO. They claim was made through the GCCF and she recalled it settled while she worked at Mr. Sutton's law office. She advised it was a VoO claim.

Ms. Stielberg advised that she knew about a falling out between Mr. Sutton and his father. She thinks the falling out stems from an error she made on some filing on LLC paperwork, while working and Mr. Sutton's law firm. She had been working on an operating agreement for Mr. Sutton, Jr., that had Mike Sutton, brother of Mr. Sutton and son of Mr. Sutton Jr., as the manager of the LLC. While working on another LLC operating agreement she believes she mistakenly placed Mike Sutton, and not Mr. Sutton, as the manager of the LLC. She believes Mr. Sutton thought his father was picking his brother over him. She also recalls an LLC involving Mr. Sutton and Mike Sutton, Full Dimension Suppliers, which involved supplying granite and it did not work out. Mr. Sutton obtained a loan and did not pay on it which contributed to the falling out. She believes that, at this point, he wanted out of the family businesses, all of the LLC's, and his father became upset that he didn't want to remain involved in the family business. All of this occurred after Katrina.

She advised that Mr. Sutton was not law partners with John Andry. She recalls that Gibby Andry is John Andry's brother, and they are close in age. At one time, Mr. Sutton had offices on the third floor of the building that John Andry occupied. She stated Mr. Sutton and John Andry were best friends, as they

3

SM-03-JA000037

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

were law school roommates. While sharing the office building John Andry and Gibby Andry had one letterhead, Mr. Sutton had another. While she was working there, the Andry Lerner law firm was about to form or had just recently formed. When she and Mr. Sutton moved out of the building, there had been a falling out between the attorneys over a fee on a Bell South case, in a large class action case. At this time, Mr. Sutton leased space in the building where the DHECC is currently located.

She stated that she handled the organizational paperwork that formed Crown LLC for Mr. Sutton. Crown was formed to support a special machine used to accompany drilling for gas. The machine is designed to clean water utilized in mining and oil drilling operations, to the point the water can be used for drinking. Tiger is President of Crown LLC, and Joey Dartez, his stepbrother, is a member, as well as the gentleman who invented the machine. She recalls meetings taking place at the law offices regarding Crown, to organize the operation, obtain business cards and create a website. Glenn Lerner wasn't involved in Crown in the beginning. When they were certain the machine worked, and it went through testing, they were trying to get a company to buy the machines and were looking for investors to build the machine. Mr. Sutton went to Glenn Lerner, discussed the business and sold Glenn Lerner on the idea. Mr. Lerner decided to invest in the machine. Mr. Lerner was providing Mr. Sutton with money once a month, and Mr. Sutton handled the checkbook for Crown.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the DHECC.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

4

SM-03-JA000038

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Kailey LeBoeuf |
| Title: | Attorney |
| Office: | Andry Lerner Law Firm |
| Date/Time: | August 2, 2013, 10 AM |
| Attendees: | Greg Paw, Steve Tidwell, James Cobb, Jr. (Attorney for LeBoeuf) |
| Location: | Judge McNamara's Chambers, US Courthouse, New Orleans, Louisiana |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010,* 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP.  We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP.  We do not represent you, Ms. LeBoeuf.

On the above date and time, Kailey LeBoeuf was interviewed in person. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Before commencing the interview, Ms. Kailey LeBoeuf was advised that she was expected to answer,
truthfully and honestly, to members of the Special Master team serving as officers of the court. She was
warned concerning committing perjury and any penalties that could follow, under 18 U.S.C. Section
1001.

Ms. Kailey LeBoeuf was accompanied to her interview by her attorney, James Cobb Jr.  Mr. Cobb is the
attorney for the Andry Lerner Law Firm and its employees.

Ms. LeBoeuf stated she is currently employed by the Andry Lerner Law Firm. Since February 2012, she
has had a dual practice with both Andry Lerner Law Firm and the Andry Law Group. She noted that she
also had assisted on the DHECC claim appeal made by the Andry Law Firm.

Her duties consist of meeting with clients, reviewing law firm work, and general legal duties. With
DHECC claims handled by the Andry Lerner Law Firm, her primary responsibilities are eligibility notices,
appeals and accounting matters. She currently reports to Christine Mancuso. She regularly works claims
accounting matters with the Coastal Claims Group and other accounting firms.

She is familiar with the DHECC claims of Casey Thonn. The first claims she worked on for Mr. Thonn was
post reconsideration of a boat claim. In December 2012, Ms. Mancuso assigned her a seafood claim of
Mr. Thonn's. Previously, Ms. Mancuso had led the reconsideration work. She recalls one meeting with
Mr. Thonn, specifically, where he was required to sign proposal forms. Ms. LeBoeuf believes there may
have been one or two more meetings. She did not know the terms of engagement until she found out,

1

SM-03-JA000039

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

several months ago, that Christine Reitano had been the one to transmit the Thonn package. She does recall speaking with Mr. Thonn on the low amount eligibility on his boat captain claim. After working with the accountants, it was discovered that Coastal Claims Group had made an error and a larger eligibility amount went to Mr. Thonn.

Regarding any attorney referral agreements, she learned of the referral fee agreement concerning the Thonn claim several months ago. She is not certain where any referral fee agreement process would begin. She is not involved in the process. Normally, there would be a note in the file regarding any such agreement. Also, in a database for claims operated by Andry Lerner Law Firm, there is a field for comments where the referring attorney's name is usually found.

Ms. LeBoeuf advised that law firms handling DHECC claims are allowed to have portal accounts to access the claims database. Additionally, each firm has a point of contact at the DHECC. Currently, the point of contact she deals with is Nikita Ash. Her contacts with Ash vary based on the complexity of her problem or concern. She also calls concerning the length of time a claim might be in a certain stage.

Regarding any legal fees for Casey Thonn's claims, she said that she generally does not deal with that as one of her duties. Ms. Mancuso regularly looks at the accounting sheets for settlements. However, she has recently been given that duty, also.

Ms. LeBoeuf does not know and has not met Lionel Sutton. She is aware that Jon Andry went to law school with Mr. Sutton. She does not know and has never met Christine Reitano. She has never heard of Crown LLC or Romeo Papa. She does not know anything regarding the current status of Andry Lerner Law firm and Mr. Sutton.

Mr. Cobb asked a series of questions of Ms. LeBoeuf to which she responded that during her time at Andry Lerner Law Firm she did not attempt to influence Casey Thonn's claim; she did not hear anyone at the firm attempt to influence his claim; and she did not hear anyone at the firm was "wired into" the DHECC or any other involved vendor or entity.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000040

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master — Independent External Investigation
Interview Report of Freeh Group

Interviewee:   Christina Mancuso
Title:         Toxic Tort Litigation Attorney
Office:        AndryLerner
Date/Time:     August 7, 2013 9:00 AM
Attendees:     Walt Donaldson, Steve Tidwell, Laure Kirk, David Courcelle (attorney for Mancuso)
Location:      935 Gravier S., New Orleans, La. 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Christina Mancuso.

On the above date and times, Christina Mancuso was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Mancuso was advised concerning the need for truthfulness and honesty and was further advised concerning the penalties for perjury under Title 18 USC section 1001. She was further advised that she would not be adjourned as a witness and could be recalled.

As the questioning began, Ms. Christina Mancuso, with her attorney, David Courcelle, present, said that she was a Toxic Tort Litigation Attorney in Dallas and New Orleans and at the time she worked in Texas. She explained that she graduated from Baylor University, in Waco, Texas, in 1984. Following her graduation, she said that she worked at several law firms such as Earhart Rubble Jennings Law Firm, and at Richard Matlock Andrews Law Firm, which was a patent and trademark firm. She also worked at Bear and Bunn, from about 1990 to 2006.

Ms. Mancuso said that she started working in New Orleans in 2011. She explained that Lamie Pool, a former partner of hers, had called asking her to come to work on claims and set up the claims management process with the Andry Law Firm. This would have when the GCCF was ending and the DHECC settlement was transitioning. Ms. Mancuso advised she stayed with the firm when it became the Andry Lerner Law Firm.

Regarding the Casey Thonn claim, Ms. Mancuso said that the first time she became involved with this claim based on a telephone call from Christine Reitano. During the call, Ms. Reitano told Ms. Mancuso she was sending two claims on a disc for referral to Andry Lerner. She does not recall if there was actually another claim, other than Mr. Thonn's, on the disc. Ms. Mancuso said that Ms. Reitano

1

SM-03-JA000041

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

requested she have Andry Lerner honor the attorney percentage, for Ms. Reitano, in the Thonn contract, as set forth as a fee agreement, in that contract. Ms. Mancuso recalled that she sent Ms. Reitano an attorney referral contract packet. She also recalled that she sent an Andry Lerner claimant attorney referral contract to Mr. Thonn with the same percentage requested by Ms. Reitano.   When asked if a contract is always sent to the claimant, Ms. Mancuso said that some lawyers do and others do not.  Ms. Mancuso was unaware if Ms. Reitano ever returned the signed referral contract. In the Andry Lerner process, that would not be a role she would handle.

Regarding Lionel Sutton, Ms. Mancuso reported she did not know Lionel Sutton, at all. She explained that if there is a significant transaction or notice in a claim, that attorneys, with referral fee agreements, are notified come on now by being copied on the letter. Ms. Mancuso added that she normally keeps in touch with referring attorneys. She does not believe that referral attorneys are copied, regularly, on incomplete notices to the claimant. Ms. Mancuso described that the Andry Lerner claims database list the referring attorney on each claim. Any attorney or employee, in the firm, can go into the database to verify the referring attorney.

Ms. Mancuso explained that it can be a complicated system with the seafood claims, such as the Thonn claim.  When shown documents detailing the Thonn claim, she noted, that his appeal included a 1040 schedule C with approximately $110,000 for fishing revenue.  If the trip tickets only showed about $452 for 2009, but his subsistence claim reported approximately 1,800 lbs. of shrimp. As that did not reflect the revenue, Ms. Mancuso explained that the trip ticket system, in Louisiana, Mississippi, and Alabama, can be faulty because seafood vendors to whom the shrimp or fish is sold turns in the tickets to the state. The fisherman does not turn in the trip tickets. She noted that Claims Administrator Office has an affirmative duty to provide the highest settlement payments possible to the claimants. Andry Lerner regularly uses the claimant's tax returns, instead of trip tickets to properly calculate the claimant's payment.  She noted that many shrimpers and fisherman sell their cash directly utilizing a fresh product license.  In her experience, Ms. Mancuso reported that shrimpers generally receive a reduced settlement payment.

When asked, Ms. Mancuso said that the accounting group that Andry Lerner uses, Coastal Claims Group calculates the projected totals, utilizing a cost percentage of the vessel owner/boat captain combination as opposed to if they are a boat owner, only.  In Thonn's seafood claim, Coastal Claims Group miscalculated producing a lower settlement payment.  In appealing for larger amount, she confirmed that in April 2013, they lost the appeal on Thonn's claim because of the way the settlement was finally interpreted by the claims administration office. Regarding all of thoughts claims, Ms. Mancuso said that Thon received less on every settlement claim of his, claim except for the VoO claim.

Ms. Mancuso said that, in her capacity, she met with Mr. Thonn when he brought requested documents. She said that if someone called him, to come in, it was probably someone that she supervised. When asked how many employees she supervised, she said 3 to 4, at any given time. She stated her only action in the referral fee agreement was that she transmitted the referral fee agreement to Ms. Reitano via email.  Ms. Mancuso said that she did not recall if the Andry Lerner claims database showed Mr. Sutton or Ms. Reitano as the referring attorney.  She explained that she was not part of the process when the referral fee goes to the attorney. Ms. Mancuso said that the Andry Lerner Office Manager, Kay Perkins, may be the one to send out the payments, but that she did not know.

Ms. Mancuso confirmed again that she had never known or met Mr. Sutton.   Regarding Ms. Reitano, she did recall she had two or three conversations with Ms. Reitano, generally regarding whether Ms.

SM-03-JA000042

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Reitano had or had not sent the disc with the claims and there were no conversations after that.

When asked, Ms. Mancuso said that she did not know anyone at Andry Lerner that influenced or accelerated a claim, and she said that no one had violated any code of conduct. Ms. Mancuso stated, when asked, that she had never heard anyone at Andry Lerner Law Firm was "wired into" the DHECC Claims Administration Office or any of the court appointed vendors. Her attorney, Mr. Courcelle, was asked how to request the Thonn contract referral agreement, he replied that if it was not in the Special Master's subpoena to Andry Lerner Law Firm, to contact him. Ms. Mancuso said that she never heard anything about Ms. Reitano or Mr. Sutton that gave her pause, and she said that she did not even know that "Tiger" Sutton was Lionel Sutton until the story came out in the paper.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000043

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Leslie Butler Tate |
| Title: | Claims Coordinator, Coastal Claims Group |
| Office: | 3229 36th St, Metairie, LA 70001 |
| Date/Time: | August 8, 2013, 1:00pm |
| Attendees: | Steve Tidwell, Greg Paw |
| Location: | Judge McNamara's Chambers, US Courthouse, New Orleans, LA |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010*, 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP.  We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP.  We do not represent you.

On the above date and time, Leslie Tate was interviewed in person.  We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Before commencing the interview, Ms. Tate was advised that she was expected to answer, truthfully
and honestly, to members of the Special Master team serving as officers of the court.  She was warned
concerning committing perjury and any penalties that could follow, under 18 U.S.C. Section 1001.

Ms. Tate stated she started working for the Andry Law Group in November 2010.  She continued her
employment with Jon Andry through November 2012, finishing with the Andry Lerner Law Firm.  She
advised that her recollection regarding Jon Andry was that there was a time that Gibby Andry, Jon
Andry's brother, and Jon had a falling out while practicing together as the Andry Law Group.  At that
time, Gibby Andry moved out of the building.  She was unaware of what caused the falling out.  She
advised that the third floor of the building was occupied by Christine Reitano and Lionel "Tiger" Sutton.
She never met or saw Mr. Sutton.  The only time she met Ms. Reitano was when she visited the third
floor of their shared office building to ask when Mr. Sutton and Ms. Reitano would be moving out of the
building.  Her best recollection was this would have been sometime in October 2011.  Her understanding
regarding Jon Andry's law firms is that he owns Andry Law Group; Andry Lerner Law Firm (with Glenn
Lerner); and, Andry Law Firm.

At the time she joined the firm, there were only three employees in the firm.  She is not a paralegal, but,
performs paralegal duties.  There were approximately 50 Gulf Coast Claims Facility (GCCF) claims being
handled by the firm.  She was tasked with taking the lead on the GCCF British Petroleum (BP) claims
documents.  When the current CSSP Deepwater Horizon Economic Claims Center (DHECC) and Claims
Administration Office (CAO) were established as part of the claims settlement agreement, she stated Jon
Andry formed a law firm, the Andry Lerner Law Firm with Glen Lerner.  Andry Lerner strictly handled BP

1

SM-03-JA000044

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

claims during her tenure, there.  Ms. Tate advised that toward the end of her time there Kay Perkins became the Office Manager and handled the claims settlement accounting.  Glen Lerner would be in the office, occasionally, and she recalled there were approximately 10 staff meetings that he held.  Susan DeSantis joined the firm sometime before the current CSSP settlement was final.

Regarding the Casey Thonn CSSP claims, she recalls being told by Jon Andry that the Thonn claims case would be coming into their firm.  At this point in the interview, Ms. Tate was shown (1) Thonn DHECC claims details documents and (2) Andry Lerner letter to the DHECC regarding a Vessel of Opportunity (VoO) settlement matter and an accompanying e-mail chain.  She recalled that Casey Thonn made numerous telephone calls to her and that he came to the office on several occasions.  In her capacity at Andry Lerner, she had access to the attorney portal in the DHECC to check claims status and run relevant reports.  Portal access was granted by the DHECC and there was a process for law firms to set up access and IDs for employees.  She recalls that Thonn had called several times regarding his VoO claim settlement.  She contacted the Andry Lerner DHECC point of contact, Brian Harvey.  He told her the claim showed paid in the data base and she told him Thonn had not received it.  For a period of time, Thonn still did not receive his payment and when she called Harvey, the claim always showed paid.  Thonn eventually received the payment.

She left Andry Lerner, on good terms, to join Coastal Claims Group (CCG), an accounting firm that specializes in handling claims settlement/payment accounting support for claimants and law firms representing claimants.  Kevin Ingram, her fiancé is a CCG employee.  Andry Lerner is currently a CCG client.

Regarding the e-mails shown to Ms. Tate, she advised that there was not a referral agreement contract with Mr. Sutton on the Thonn claims.  She recalls that there were referral agreement contracts with other law firms.  Generally, depending on the degree of involvement of the referring attorney, the attorney split on a referred claim settlement was 60% Andry Lerner and 40% referring attorney.  The Thonn claim with a Sutton referral fee was the only one without an agreement contract while she worked at Andry Lerner.  She stated that this troubled her.  She maintained a master spread sheet on all claims that tracked pertinent events and details, including information on referral attorneys.  She regularly updated referral attorneys on communications regarding claims.  She does not recall what prompted her to send the email, what event caused her sending the email, does not recall Jon Andry or Glen Lerner giving her specific guidance.  She does not remember exactly what Mr. Sutton's status was on the claim referral.  Christine Mancuso also kept up on attorney referrals communications and status.  Ms. Tate recalled that referring attorneys would handle direct client relationships and were expected to work for their 40%.  She could not recall Mr. Sutton performing any work on the Thonn claims.  She believes the Thonn GCCF claims were emailed to Andry Lerner possibly to Christine Mancuso.  Ms. Tate believes she most likely would have had to ask Jon Andry for guidance on referral fees to Mr. Sutton, but does not recall doing so.  The Thonn VoO settlement claim did arrive and she believes it was sometime before she departed Andry Lerner, possibly around September or October 2012.  She knew that Jon Andry and Glenn Lerner were acquaintances of Mr. Sutton.  Jon Andry once commented to her, "Tiger Sutton wants a referral fee on Casey Thonn."  From the way he said it, she thought that Jon Andry couldn't believe Mr. Sutton had asked.  There was no further discussion between them.

Ms. Tate was asked about her knowledge of Mary Rubio, an Andry Lerner employee.  She stated she did know her and worked with her. Rubio initially started as a part-time employee then took over some of Tate's duties.  She knows that Rubio was a college graduate and had worked at Delmonico's restaurant prior to joining Andry Lerner.  Ms. Tate does not know whether Rubio is an acquaintance of Jon Andry.

SM-03-JA000045

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Rubio does Andry Lerner's work with CCG in the CCG database.  She believes Rubio is still employed with Andry Lerner but is on maternity leave.

In her employment at CCG, Ms. Tate recalls the Thonn claim appeal prior to the official process for seafood claims was established. For seafood claims, the revenue is decided by either tax returns or trip tickets. CCG did handle the Thonn claim that resulted in a higher settlement payment.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed.  Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription.  These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team.  These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client.  These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000046

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee:   Jeff Cahill
Title:   Chief Financial Officer
Office:  Glen Lerner and Associates
Date/Time: July 30, 2013
Attendees: Greg Paw, Tim Flynn, Mike McCall
Location: 935 Gravier Street, 14th Floor, New Orleans, Louisiana

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP. We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP. We do not represent you Jeff Cahill.

On the above date and times Jeff Cahill was interviewed in person. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Cahill furnished the following information.

He graduated from the University of Minnesota and became a licensed Certified Public Accountant
(CPA). After working for a while as a CPA, he entered the William Mitchell College of Law in St. Paul, MN
and obtained his law degree. He is not currently practicing as either an attorney or a CPA. His attorney
license is still active, but his CPA license is not. Mr. Cahill also served six years in the United States Air
Force.

Mr. Cahill currently serves as Chief Financial Officer (CFO) for both the Glen Lerner Injury Attorneys law
firm and Crown LLC. The Lerner law firm has offices in Naples, FL and a small presence in Minnesota.
Mr. Cahill is directly employed by Glen Lerner Associates (the firm's trade name) in Las Vegas, NV, in
that he receives all of his compensation as CFO of Crown LLC and Glen Lerner Injury Attorneys from Glen
Lerner Associates. The corporate registry name for Glen Lerner Associates is Glen J. Lerner, a
Professional Corporation. It is a Nevada legal entity. Glen Lerner personally is the sole funder of Crown
LLC through Glen Lerner Associates.

Glen Lerner Associates practices only in Las Vegas and was Glen Lerner's first law firm. This corporate
entity has been in place there since approximately 1991 or 1992. In 2005 or early 2006 Glen Lerner
started another law practice, Lerner & Rowe, in which Mr. Lerner owns 75% and a Mr. Rowe owns 25%.

1

SM-03-JA000047

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Glen Lerner PLC operates offices in Chicago, IL and Naples, FL. A Florida attorney named Marney Scuderi owns less than 1% of the Florida office. The presence in Minnesota is not strong, as marketing efforts there have not been successful.

Andry Lerner is owned 50-50 between Mr. Andry and Mr. Lerner. Mr. Cahill does the accounting for all the Lerner related firms, except Andry Lerner, whose accounting is handled by Scott (last name not recalled). Mr. Cahill does not know whether Scott is also the CFO for the Andry firm.

Crown LLC was established by Lionel Sutton in approximately 2010, predating Mr. Lerner's involvement. The original partners of Crown LLC were Lionel Sutton, Joey Dartez and Tim Elmhurst. Crown's original business line was water reclamation, i.e., processing polluted water through a machine. In Florida, much of the water for irrigation is obtained by use of this type of technology. Crown aims at doing business with coal mines, and oil and gas fields. Another company, whose name Mr. Cahill could not recall, markets to all customers other than those in the coal, oil and gas industries, such as hog farms. Mr. Cahill believes that this company is Canadian. It is Mr. Cahill's understanding that Crown licenses the water reclamation technology from another entity jointly owned by Crown and a Canadian hedge fund group. Mike Bryant was more involved in the setup of this structure and would know it in more detail. Mr. Sutton, Mr. Dartez and Mr. Elmhurst somehow learned of the technology, but when they started to manufacture it, they did not put confidentiality agreements in place. Crown does not pay royalties on the technology, but the Canadian group might do so.

Mr. Sutton and Mr. Lerner attended law school together. Mr. Cahill does not know how they started to talk about Crown. Mr. Lerner's primary role in Crown is to provide the funding. He provides money for operations and paid for the first machine purchased from Proven Technologies, which is also owned in part by the Canadian hedge fund group, Mr. Cahill believes. Since 2012 Mr. Lerner has funded all operating expenses, such as salaries of Messrs. Dartez, Elmhurst and Sutton; repairs of the water reclamation machine, transport of the machine to work sites, and hiring labor to operate the machine on site. The salaries of Messrs. Dartez, Elmhurst and Sutton started at approximately $10,000 monthly.

Crown is now owned by Glen Lerner, Tim Elmhurst, Joey Dartez, Lionel Sutton, Mike Bryant and Corey Eschwiler. Mr. Lerner is the major shareholder at approximately 47 to 48%. Crown is in the process documenting this relationship through a new operating agreement. Messrs. Dartez, Elmhurst, Sutton and Lerner started at 25% ownership each. As other partners others came in, the original partners started selling off parts of their interest to Mr. Lerner. Their salaries are now approximately $12,000 monthly. Mr. Cahill was not sure about the status of Mr. Sutton's salary, since Mr. Sutton's involvement with Crown has been decreasing. Mr. Sutton may not be getting salary at all soon, as the agreement is currently being renegotiated. Mike Bryant conducts the negotiations, and attorneys in Las Vegas handle the paperwork. Mr. Cahill described salary payments made to Mr. Sutton, representing one year of salary owed to him due to irregular cash flow. Payments were made on the following dates, as explained by Mr. Cahill using photocopies of electronic payment records which he provided to the interviewers:

- September 28, 2012: $12,000

2

SM-03-JA000048

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

- October 2, 2012: $9,000
- November 15, 2012: $15,000
- Mar 22, 2013: $30,000
- Mar 26, 2013: $20,000
- Apr 2, 2013: $14,000
- April 11, 2013: $10,000
- May 24, 2013: $10,000 (final payment)

These payments constituted the full $120,000 owed to Mr. Sutton as salary for one year under his agreement with Mr. Lerner. Mr. Cahill does not believe that the provision for these payments was written into the original agreement, but he may be able to locate e-mails that document this arrangement to "catch up" on salary owed to Mr. Sutton. These were flat payments with no taxes withheld, because Mr. Sutton's payments were considered distributions from a partnership; however, payments to Mr. Dartez and Mr. Elmhurst were considered salaries. Mr. Sutton was told that he would have to handle taxes on his own, based on his form K-1; however, Mr. Sutton has not received a K-1 for 2012, because Crown filed for an extension.

When Mr. Lerner got involved in Crown he agreed to fund certain things, such as the water reclamation machine, construction, transportation and operating expenses. Since two of the original owners were getting salaries, Mr. Sutton probably wanted payments too, so he probably spoke with Mr. Lerner about receiving these payments. Mr. Cahill believes that Mr. Sutton is still at 25% ownership in Crown.

When the operating agreement was being drafted, Mr. Cahill pushed back on some accounting and tax issues, since the partners wanted to do some things that were not permissible for a partnership. Mr. Cahill wanted to set up a units structure rather than a percentage structure, but he characterized that as "a battle we will have to fight another day."

Crown does not issue corporate credit cards to its people. Mr. Lerner has a corporate credit card issued through his Las Vegas firm.

Money paid to Crown comes from Glen Lerner Associates' approximately one million dollar monthly revenue. The revenue is recognized in the Las Vegas firm, and Mr. Cahill uses the funds as distributions to fund the various Crown accounts. When Crown was started, Mr. Sutton set up a small account in a New Orleans bank. Mr. Cahill has never seen that account. Many of the payments made from the Las Vegas firm were to Proven Technologies for the machine. In 2012 Mr. Cahill began managing more financing of Crown operations and salaries as a distribution to Glen Lerner and as a separate distribution to Crown, recorded on Glen Lerner's books.

Mr. Lerner began his involvement in Crown in probably late 2010 or early 2011, when the machine was being built. The builders wanted large sums of money to build the machine. Field testing and more monthly expenses followed. More recently Glen Lerner Associates opened a new account at Bank of America, so Mr. Cahill now funds the Crown payments directly from that account. Mr. Sutton does not

3

SM-03-JA000049

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

have access to the Bank of America account. Payments for Mr. Sutton, as well as all payments for Crown, go to an old Crown account at Regions Bank, account number 0138911744.

Mr. Cahill and Mr. Lerner had a meeting with Mike Bryant in April or May 2012, in which Mr. Lerner was able to persuade Mr. Bryant to accept the position of CEO of Crown. Mr. Cahill recalled that Mr. Lerner and Mr. Bryant had been neighbors in Arizona.

Crown pays no rent for its office space. The address on Crown's corporate registry documents is 935 Gravier in New Orleans. Mr. Cahill has been working with Mike Bryant to start having all Crown documents sent to Las Vegas to save time.

Mr. Cahill advised that Crown has used the company Crown Resource Management to obtain, for example, construction operators. In approximately April or May 2013 Crown stopped using Crown Resource Management. Mr. Cahill does not know who the principals of Crown Resource Management are, and as far as he knows, the name of the company is just a coincidence.

Asked whether Glen Lerner has received settlements from the DHECC, Mr. Cahill responded that he believed Andry Lerner has received such settlements, but he (Mr. Cahill) was not involved in that matter.

Asked about transfers of funds from the Andry Lerner firm to Glen Lerner, Mr. Cahill said that "discussions" had taken place, and that Glen Lerner had received three or four checks from Andry Lerner. Glen Lerner and Associates has also received checks from the Casey Thonn claim, which Mr. Cahill said have been "pretty much" paid to Mr. Sutton.

Under the terms of the operating agreement, Mr. Lerner put up 1.2 million dollars to fund Andry Lerner. Mr. Andry would take out funds from that sum to pay for office expenses or as personal compensation. The first 1.2 million in tax losses will then be allocated to Glen Lerner Injury Attorneys, and Glen Lerner Injury Attorneys also has advertising expenses on behalf of Andry Lerner. This is all set out in the operating agreement. There have been probably three or four such payments to date, probably totaling less than $100,000.

Asked about his knowledge of the CSSP claim of Casey Thonn, Mr. Cahill advised that his understanding is that this is a boat captain claim. He believes that Lionel Sutton had been working on the Thonn claim through his own law firm until he went to work for the Claims Administrator's Office (CAO). Upon accepting the CAO position, Mr. Sutton asked if he could have his fee from that case routed from Andry Lerner LLC to Glen Lerner and Associates, denoted as "Thonn fees," and that Glen Lerner and Associates then pay those funds to Mr. Sutton. Mr. Cahill provided the interviewers with photocopies of three checks, which he said reflected the requested payments from Andry Lerner LLC to Glen Lerner and Associates. All three checks are drawn on Glen Lerner accounts as reflected below at Whitney Bank, New Orleans, Louisiana, routing number 065000171, and are made payable to "Glen Lerner and Associates." The check numbers, dates, amounts and memo information on each check are as follows:

4

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

| Account Name | Account No. | Check No. | Check Date | Amount | Memo Notation | Check Stub Notation |
|---|---|---|---|---|---|---|
| Andry Lerner LLC | 719829267 | 1319 | 12/14/2012 | $4,940.00 | Casey Thonn VoO Charter Payment | VoO Charter Payment, Claim ID 20741 |
| Andry Lerner LLC IOLTA Account | 719829259 | 1308 | 3/11/2013 | $16,665.21 | Casey Thonn | Attorney Fees/Vessel Owner; Claim ID 19690 |
| Andry Lerner LLC IOLTA Account | 719829259 | 1394 | 5/14/2013 | $19,035.02 | Casey Thonn/Boat Captain | Referral Fees/Boat Captain; Claim ID 19691 |

When the checks came in, Mr. Cahill deposited them into the Glen Lerner and Associates general account, then paid the funds back out to the Crown LLC account at Regions Bank for Mr. Sutton. No withholding was made from the payments for tax purposes; rather, the payments to Mr. Sutton were treated as a straight pass-through. Mr. Cahill did not know why the payments were structured this way. From an e-mail which Mr. Cahill received from Mr. Sutton in mid-December 2012, it is his understanding that Mr. Sutton had asked Mr. Lerner if he could route the Thonn claim payments through Mr. Lerner's firm, and Mr. Lerner had approved this procedure. Mr. Cahill stated that he would locate this e-mail and send it to the interviewers. Mr. Cahill does not know whether Mr. Lerner and John Andry discussed this plan for making the payments to Mr. Sutton. He believes that Mr. Lerner was just trying to do a favor for Mr. Sutton as a friend. Mr. Sutton knew that Mr. Cahill was getting the payments from the Andry firm, because he asked Mr. Cahill about payments via e-mail. Mr. Cahill agreed to furnish to the interviewers copies of all such e-mails from Mr. Sutton inquiring about these payments.

Mr. Cahill furnished to the interviewers photocopies of three electronic transfer records, which he said reflected the payment of the Thonn claim-related fees from Glen Lerner and Associates to Mr. Sutton per the above described procedure. Each of the records reflects a debit from Merrill Lynch (bank routing number 122400724) to beneficiary Crown, LLC at address 935 Gravier Street, New Orleans, beneficiary account number 0138911744 at Regions Bank, bank ID number 062005690. The transactions individually reflect the following information:

| Transaction Number | Debit Account Number | Debit Account Name | Amount | Value Date | Sender's Reference Number |
|---|---|---|---|---|---|
| 13108G4531FM0403 | 501012633142 | Glen J Lerner and Associates | $4,940.00 | 01/08/2013 | 13108G4531FM0403 |
| 13328H2451I01668 | 501012633142 | Glen J Lerner and Associates | $16,665.21 | 03/29/2013 | Casey Thonn |
| 13605C37067P0E82 | 501014689152 | Crown LLC | $19,035.02 | 06/05/2013 | Casey Thonn |

SM-03-JA000051

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Susan Desantis was hired by Glen Lerner approximately one-and-a-half to two years ago. She has never worked in Las Vegas, but has been splitting her time between the New Orleans and Chicago offices. Mr. Cahill speaks with her a one or two times per month. It was Ms. Desantis who was sending Mr. Cahill e-mails regarding the distributions on claims, so that Mr. Cahill could keep track of when the Glen Lerner Injury Attorneys firm was due its share of the revenues going through Andry Lerner. Ms. Desantis is paid through Greg Lerner PLC. At first it was thought Ms. Desantis might help out with Crown, but Mike Bryant had the management expertise to handle Crown, so Ms. Desantis probably did not do very much work for Crown.

Mr. Sutton is not due any more salary payments from Crown. The payments that he received were supposed to be for his "sweat equity." Mr. Sutton would sometimes go to sites where the Crown technology was being demonstrated or used. Mr. Dartez and Mr. Elmhurst made such trips more frequently, as did Mr. Bryant. Mr. Sutton had one set of expenses reimbursed in the amount of $6,900 in July 2012 for these site visits. He did submit an expense report for these visits, which Mr. Cahill agreed to provide to the interviewers.

Mr. Cahill has had no recent conversations with Mr. Sutton.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

6

SM-03-JA000052

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee:    Susan DeSantis
Title:    Director of Business Operations
Office: Glen Lerner Injury Attorneys
Date/Time: July 30, 2012; 2:00 p.m.
Attendees:  Greg Paw, Tim Flynn, Mike McCall; W. Glenn Burns of The Willis Law Group, counsel for Ms.
            DeSantis
Location: 935 Gravier St., 14th Floor, New Orleans, Louisiana

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP. We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP. We do not represent you.

On the above date and times Susan DeSantis was interviewed in person. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. DeSantis furnished the following information:

Ms. DeSantis has a BA in business administration, a Master's degree in finance, and a Six Sigma black
belt.

She has served as Director of Business Operations at Glen Lerner Injury Attorneys since May 21, 2012.
In that capacity she works on various projects outside the Glen Lerner Las Vegas office. She works in the
Chicago and New Orleans offices of the firm. She has previously worked on a project for the firm's
Minnesota office and worked briefly on some projects for Crown LLC, but is no longer doing any work for
those two offices.

Ms. DeSantis met Mr. Lerner through a mutual friend with whom she used to work and who
recommended her to Mr. Lerner. She had previously worked in contract management at a firm called
Steifel [phonetic].

Her current specific duties involve helping the Lerner firm build its Chicago office and providing project
management skills and high level analysis for the New Orleans office. Her project management duties
include matching staff skill sets to available positions and managing the work flow. She works

1

SM-03-JA000053

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

exclusively on the BP project in New Orleans, specifically the filing of claims through the Andry Lerner firm.

Andry Lerner is a partnership, in which Mr. Lerner is one of the partners, per Ms. DeSantis' understanding.  She does not know more than that about the structure of Andry Lerner.  She works at 610 Barrone Street when in New Orleans.  She knows that the Andry Law Group also has offices at 610 Barrone Street, as does another law firm that is not associated with Andry Lerner, as far as Ms. DeSantis knows.  The attorneys in this latter firm are Kayle Leboeuf, Vion Douglas and Christine Mancuso.  She does not know what other businesses are located at that address.  She receives her pay through the Glen Lerner global account.  She does not do payroll, so she does not know how the firm pays the rest of its staff.

Ms. DeSantis' residence is in Sarasota, Florida, but she travels almost constantly between Chicago and New Orleans for her job, and gets home about once every six weeks.

She has no involvement with any finance issues at the Glen Lerner firm, as she has no access to the firm's financial systems.  If she is looking for her paycheck or a reimbursement, she deals with Jeff Cahill or Brook Channing, usually by e-mail.

She is Glen Lerner's only staff member in New Orleans.

Ms. DeSantis' very brief association with Crown LLC was to perform some administrative tasks, such as setting up spreadsheets and tracking.  She worked at Crown for perhaps two weeks total, before her work in New Orleans "got swept up" with the BP project.  She never discussed continuing to work for Crown, since Mr. Lerner said that she should focus on the BP project only.  She does not know what happened to the work she did for Crown.  She would draft documents and send them to Mr. Bryant and Mr. Sutton.  She has met Mr. Bryant, but only worked with him via e-mail.

Crown is involved in filtering water from fracking and similar operations.  While working at Crown she met Lionel Sutton, Joey Dartez and Mike Bryant, as well as one other individual whose name she does not recall.  She had previously met Mr. Sutton, when she came to New Orleans in April 2012 to interview with Glen Lerner.  Mr. Lerner had wanted her to meet some of the other people working with him, so she met Mr. Andry at 610 Barrone Street and Mr. Sutton in the evening at dinner.  The purpose of these meetings was for her to learn what people in the firm were doing.  Mr. Sutton explained that Crown was in the process of securing contracts and needed someone to help with structure, so that it would not be overwhelming when the business started to take off.

She has not been told about any issues at the Andry Lerner law firm.  She is not aware of any issues between Mr. Andry and Mr. Lerner, and she stated that she would not know of such issues if they existed.

Ms. DeSantis was not paid a separate salary by Crown.  She has always been paid by Lerner, and her salary has not gone up since she started working there.

2

SM-03-JA000054

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Ms. DeSantis' understanding of the corporate structure of Crown is that there are four partners: Mr. Lerner, Mr. Sutton, Mr. Dartez, and a fourth partner whose name she cannot recall. She does not know how Crown is doing business-wise.

The extent of Ms. DeSantis' knowledge about Mr. Sutton is that he was a partner in Crown; that he and Mr. Lerner went to law school together; and that he previously had a law firm with his wife, whom Ms. DeSantis met only once at dinner. She has not socialized with Mr. Sutton since the dinner. She did see him once at 610 Barrone Street about two months ago, when he was picking up mail. They had a brief, casual conversation on that occasion. Ms. DeSantis was aware that he was working at the DHEEC at the time, which she had heard about in approximately January of February of 2013. She does not know the details of Mr. Sutton's job at DHEEC, except that he does something with the "moratorium," and she does not know what that term means. She has never discussed Mr. Sutton's DHEEC work with him. She has on occasion received e-mails from Mr. Sutton with questions about the status of a "referral fee" and whether a check had been sent to Las Vegas for the claim of a particular client, Casey Thonn. Casey Thonn was a client of Andry Lerner before Ms. DeSantis began working in her current position. She supposes that all Glen Lerner clients with claims in the BP matter are Andry Lerner clients, so she assumes that Casey Thonn would be an Andry Lerner client, which handles the BP project.

Even though Ms. DeSantis is a Glen Lerner employee, she is assigned to work on the BP project. There is a database of Andry Lerner clients called "Client Profile." Casey Thonn is listed in this database. Client Profile contains contact information, documents, what was submitted to claims facility, and general information for all clients. It also contains attorney-client contracts, W9 forms, and Powers of Attorney. There is a space for noting the referring attorney, for the client, but Ms. DeSantis does not remember who the referring attorney was for Casey Thonn. She thinks it may have been Mr. Sutton, but she does not recall who told her that. She added that referring attorneys are always, by definition, attorneys outside the Andry Lerner law group.

Asked for more detail about her communications with Mr. Sutton regarding Mr. Thonn's claims, Ms. DeSantis explained that Mr. Sutton would ask if a check had been issued to Las Vegas for the referral of Mr. Thonn. All checks to the Glen Lerner firm were issued by the 610 Barrone Street office, but Ms. DeSantis does not know what name goes on the check. Part of her responsibility was to monitor all payments to the Glen Lerner firm. She would receive a scanned copy of all checks to the Glen Lerner firm, so she would know that a check was coming. Kay Perkins, the office manager, would talk to her about the analysis of claim payments. The check coming in would indicate for what claim the check was being issued. She remembers Mr. Sutton contacting her once before Christmas holidays and once shortly after January 1, 2013 regarding the checks. On each occasion there had been payments made. Ms. DeSantis had to confirm with Jeff Cahill that he had received the check. She does not know what happened after that, or how Mr. Sutton would be paid his money. She did not know whether, when Mr. Sutton would contact her, he already knew that a payment had been made; Mr. Sutton just asked if the referral fee for Casey Thonn had been sent to Las Vegas. Ms. DeSantis denied having any other role or any communication with anyone else regarding these checks. She does not know whether Mr. Sutton was issued any kind of payment, except what she has read recently from the stories about Mr. Sutton in

3

SM-03-JA000055

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

the press. Mr. Lerner was copied on e-mails between Mr. Sutton and Ms. DeSantis about the checks, but she does not recall what Mr. Lerner said about the checks. Mr. Lerner did not give her any directions about the checks. [The interviewers requested copies of all e-mails Ms. DeSantis has pertaining to these payments.]

Ms. DeSantis has not had any communication with the Andry law firm regarding payments to Mr. Sutton, nor has Mr. Andry said anything to her regarding them. Mr. Sutton never sent Ms. DeSantis any analysis of the status of the law firm payments, but Mr. Lerner sent a status report of what had been submitted and commented that "we are dragging ass." Neither Mr. Sutton nor anyone else ever asked Ms. DeSantis about the status of a particular payment on the claim of a particular client.

Neither Ms. DeSantis nor anyone else, to her knowledge, ever contacted Christine Reitano about Ms. DeSantis working at Glen Lerner Injury Attorneys.

Ms. DeSantis agreed to furnish to the interviewers all her e-mails with Glen Lerner, Jeff Cahill or Brooke Hanning, whether sent directly or through secretaries, regarding payments to Mr. Sutton.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.


*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

4

SM-03-JA000056

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Mary Rubio |
| Title: | Claims Examiner |
| Office: | Andry Lerner Law Firm |
| Date/Time: | August 3, 2013, 10 AM |
| Attendees: | Matt Dolan, Steve Tidwell, James Cobb, Jr. (Attorney for Rubio) |
| Location: | DHECC offices, 935 Gravier Street, New Orleans, Louisiana |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP. We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP. We do not represent you.

On the above date and time, Mary Rubio was interviewed in person. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Before commencing the interview, Mrs. Rubio was advised that she was expected to answer, truthfully
and honestly, to members of the Special Master team serving as officers of the court. She was warned
concerning committing perjury and any penalties that could follow, under 18 U.S.C. Section 1001.

Mary Rubio was accompanied to her interview by her attorney, James Cobb Jr. Mr. Cobb is the attorney
for the Andry Lerner Law Firm and its employees.

Mrs. Rubio stated that she has worked for Andry Lerner Law Firm since April 2012. She recently returned
to work following maternity leave. For the two years prior to joining Andry Lerner, she worked as a
waitress at the Delmonico restaurant in New Orleans. During her time at Delmonico, she became
acquainted with Jon Andry, a frequent customer. Upon joining the firm, she was assigned to handle data
entry for DHECC claims. At the time she began a job, she recalled there were approximately 500 claims.
Sometime during her employment, she remembers being told that Lionel Sutton, Jon Andry, and Glenn
Lerner are college friends. She knows Glenn Lerner to be Jon Andry's partner in the Andry Lerner Law
Firm. During her time of employment, she recalls seeing Glenn Lerner approximately three times.

Mrs. Rubio is familiar with the Casey Thonn claims and has worked on them for Andry Lerner. She
believes the claim came into the office around the time she started there. At that time, her supervisor
was Leslie Tate. Following Tate, Christine Mancuso was her supervisor for a period of time. Her current
supervisor is Kailey LeBouf. Mrs. Rubio does not recall any conversations or meetings with Thonn. She
knew that Thonn had a fisherman claim and other claims. She does recall working an eligibility notice for
his claim. On the fisherman claim, it was not uncommon for the initial settlement eligibility notice to be

1

SM-03-JA000057

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

low. She does recall working on the appeal on one of his claims and speaking with Tate regarding it. Mrs. Rubio does not recall anything unusual about the Thonn claims. In all claims, attempts are made to obtain the highest available settlement payment of the claimant. All that she knows regarding Lionel Sutton and Christine Reitano, is what she has heard and seen reported in the media regarding the allegations and current investigation.

Mrs. Rubio has never been employed by Brown Greer or any other DHECC court-appointed vendor companies. In her current work assignment with Andry Lerner, she does work with the Coastal Claims Group.

Mrs. Rubio does not know and has never been contacted by Sutton or Reitano. She has no DHECC claims. She has not had any conversations with anyone regarding attempts to influence or accelerate any claims. She is not aware of any attempts by anyone at Andry Lerner to "wire up" relationships with the DHECC Claims Administration Office or court-appointed vendors. Mrs. Rubio is not aware of anyone or anything that might be behind this matter.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

2

SM-03-JA000058

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

**Deepwater Horizon Court Supervised Settlement Program ("CSSP")**
**Special Master – Independent External Investigation**
**Interview Report of Freeh Group**

| | |
|---|---|
| Interviewee: | Stevenson, Scott R. |
| Title: | Sole Member |
| Office: | R. Scott Stevenson CPA, LLC |
| Date/Time: | August 29, 2013, 10:30 AM – 11:15 AM |
| Attendees: | Mike McCall, Ben Scotti |
| Location: | DHECC Claims Center, 14th Floor |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and times Scott Stevenson was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court; the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Stephenson stated that he is the sole member of his own CPA firm – the company name is R. Scott Stevenson CPA, LLC, and thus he is not an employee of the Andry Law Group. The group pays his CPA firm for contract type CFO services. Those services cover both the Andry Law Group and Andry Lerner LLC, in addition to some additional "light services" he performs for the LLC that owns the building – 610 Baronne Street. Mr. Andry is a member of that LLC. Mr. Stevenson reiterated that the work he performs for 610 Baronne Street LLC is nominal. He has had a relationship with the Andry Law Group since early January 2013. Mr. Stevenson had no business relationship with John Andry prior to this year but he has known Mr. Andry and his family all of his life – Mr. Stevenson's father was friends with Mr. Andry's father.

Mr. Stevenson explained that the terms of the Operating Agreement are such that when Andry Lerner receives the payout from the Settlement facility for a claim, attorney's fees are then calculated based on the contract between the attorney and the client, and then if there is a referring attorney there is a payout to that referring attorney. The balance of that attorney fee--not the amount paid out to the referring attorney but the remaining amount that is left over-- is used to pay for the Andry Lerner expenses payroll overhead. The entire amount that is left over is available to be used; that is to say that the net amount that stays with Andry Lerner is available to pay Andry Lerner expenses.

SM-03-JA000059

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Stevenson does not know the split amounts between attorneys because the rates are negotiated between Andry Lerner and the negotiating referral attorney. He stated the splits are not consistent and vary from attorney to attorney.

While looking at a copy of the Operating Agreement and the exhibits attached to it, Mr. Stevenson explained that Exhibit A was not the split amount but rather an ownership interest of the partnership. He explained further that Exhibit B was in fact the split of future draws.

Mr. Stevenson did not deal with the receipt of any money from the Thonn claim. The collection was not handled by him. He mentioned that there are certain firm employees who handle those efforts, depending upon who is available when the payments come through. The person or person(s) would be Kay Perkins with either the assistance of Christina Mancuso or another firm attorney by the name of Kailey LeBoeuf. He stated that originally, he was not familiar with the Thonn claim at all because it was originally "below his radar," but he is now familiar with it because of the whole circumstances surrounding this investigation.

Mr. Stevenson then spoke about what he has come to learn since being scheduled for his interview. Mr. Stevenson stated that it was his understanding that the agreement between Andry and Lerner was such that when there was a Lerner referral there would be a 50-50 split of the fee, and in this specific case it was considered a Lerner lead. Mr. Stevenson's understanding of the way that fee was paid was consistent with the verbal agreement between Andry and Lerner as to fee arrangements on the Lerner referrals. As far as Mr. Stevenson knows, there is only a verbal agreement between Andry and Lerner — he has never seen a piece of paper that would indicate something other than this type of fee arrangement.

Mr. Stevenson mentioned that this split arrangement is not a standard split amongst other attorneys — he stated that each attorney negotiates his/her own referral fee split setup. This is his understanding of it, but he has never been a part of those negotiations. In terms of whether referral fee agreements are negotiated verbally or in writing, Mr. Stevenson stated that he doesn't believe there is a consistent method used when making referral arrangements. He stated it is not consistent and that there are some written agreements and some that are not.

Mr. Stevenson stated that he believed the employees who process the payment of referral fees know how much of a percentage that they are supposed to send to the referring attorney because the particular client's case file will contain the amount. He again reiterated that he is not involved in the day to day data collection or analysis. He is not sure of all the different ways that referral fee arrangements are handled internally.

Mr. Stevenson did not review the Thonn file, but he was merely asked to pull some cancelled checks from the bank records. He stated that he did not do all of the data gathering or conduct any drawn out analysis besides basically obtaining checks and dates. He did not look at the claim and the calculation of the claim amount.

SM-03-JA000060

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

From what Mr. Stevenson saw, 50% of what was called for under the verbal referral agreement was paid out to Lerner's firm on the Thonn claim. Mr. Stevenson recalled that he saw a check that came in last year for about $4900, which would have presumably represented about 50% of the fee that came in.

In terms of the 50% of what the Lerner firm receives, Mr. Stevenson stated that he has no knowledge of what they do with it.

Mr. Stevenson explained that the 610 Baronne Street entity has no employees – it is an entity that just holds the property. It is only a building and a mortgage.

In terms of total employees, Mr. Stevenson said that Andry Lerner has 7 or 8 employees total, and they all are paid under one employer identification number (EIN). The tax reporting is done under that same EIN.

With respect to the Andry Law Group, Mr. Stevenson said that there are approximately 6 or 8 employees total, and they all are paid under a separate EIN. The tax reporting is handled under this same EIN.

Mr. Stevenson stated that John Andry offers benefits to his employees like health insurance, parking and disability. These benefits are all centralized on one policy that is paid by the Andry Law Group, and he is trying to get Andry Lerner LLC to pay its share of the cost of these benefits, because those employees are under a different payroll and different tax ID as explained previously.

Mr. Stevenson reiterated that there are two sets of employees that work in the same building but have separate EINs, but Andry Law Group has the comprehensive policy that provides health insurance for each of the entities and Andry Lerner LLC is supposed to pay Andry Law Group back for the cost associated for the payroll. The amounts paid out from each entity were not accurately accounted for previously, and so he is trying to become more pro-active about recording the real time costs of running Andry Lerner. Mr. Stevenson opined that if you don't report on one of the company's books, you are either understating the company's numbers or overstating on the other entities books and are not dividing up correctly and being accurate with your financial reporting.

With respect to the underlying payroll and taxes, there is no employee that Mr. Stevenson is aware of that is getting two paychecks from both of these entities, even if the employee performs work for both.

SM-03-JA000061

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: David Duval
Title:  Appeals Coordinator and Government Relations
Office:  Deepwater Horizon Economic Claims Center
Date/Time: July 15, 2013
Attendees: Matthew Dolan, Gregory Paw, Laure Kirk
Location: 935 Gravier St., Suite 1905, New Orleans, La, 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010*, 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP.  We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP.  We do not represent you, David Duval.

On the above date and times David Duval was interviewed in person. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

When Mr. Duval was asked about his background he explained that he started with Deepwater Horizon
as the Appeals Coordinator on May 1, 2012, which was just a month before they began to process claims
on June 4, 2012. He explained that he had been practicing law but had not really enjoyed it so he went
to work for a family friend for a tugboat company. The tugboat company was later sold to a Fortune 500
company so he was laid off.  He was unemployed for a short time when his father, Judge Duval of the
Eastern District of Louisiana, had lunch with Pat Juneau. Mr. Juneau mentioned to his father the need
for a claim appeals coordinator so he got the job.

Mr. Duval said that he did not work on any issue for the GCCF, that he currently worked for Deepwater
Horizon as the Appeals Coordinator monitoring the claim from beginning to end of the appeals process.
He further explained that he was also the government relations person that the politicians would call to
check on a claim for their constituents. In this capacity, he said he would get roughly fifteen calls per
day. Mr. Duval explained that he would get a call from a constituents affairs office checking on that
status of a claim and Mr. Duval said that he would check into the issue and he might find out that there
was missing documentation, or that a claimant was just confused and hadn't gotten a call back from
BrownGreer, so he would try to update the politician on the status of such claims.  He stated that the
politicians that called were never demanding just checking in on the status.  Mr. Duval said that the
process was very informal and did not require formal documentation, but since the calls were so
numerous, he and BrownGreer devised a plan that there would be a representative from each of the
four states that would handle these calls going forward.  The constituent affairs office would then e-mail
the representative and copy Mr. Duval.  He explained that these BG representatives were senior
staffers, that they were "the cream of the crop". Mr. Duval further explained that they would inform Mr.

1

SM-03-JA000062

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Duval of the status of a claim by a phone call or email and that the process was very informal. He stated
that since this process has been in place he does not get that many calls related to government
relations. He listed the four representatives as Joe Sanderson for Louisiana, Rae Cousins from
Mississippi, Lauren Brickholder form Alabama, and Katie Hamilton from Florida.

Mr. Duval was asked why one county in one of the states was carved out to have no claims and he
explained that there was very minimal damage in that section of the state. He confirmed that most of
the damage was east of that county and that families that lived on wetlands more than twenty miles
from the gulf experienced damages from the water that flowed through the wetlands. Mr. Duval
confirmed that BP has scientists working on assessing the oil spill damage to the environment. They
have mapped out areas that were impacted and if the damages are documented then BP has agreed to
pay certain types of claims in the affected areas. The academia representatives go out and look at the
area if a claimant reports that his land or waters were impacted. Mr. Duval said that BP has researched
this area thoroughly

Mr. Duval explained that BP has contracted with Arnold & Porter out of Washington D.C. and Sara
Warlick and Dan Cantor, from that office to assist with the appeals process. He explained that Ms.
Warlick and Mr. Cantor might negotiate with the claimant so that the appeal never has to go to an
appeals panelist. Mr. Duval explained that if a claimant receives notice of the appeal, BP starts a clock
with 10 day, 15 day and 30 day cutoffs. If the claimant doesn't accept in 30 days, then recommendations
are requested and then it goes to the appeals process. Mr. Duval explained that it is a unique appeals
process but that if BP appeals within 10 days then that is a "throw away" and then it comes back out and
then they have a certain amount of days to go through the process, which can take 15 days. Also, all of
this can be re-appealed, per Mr. Duval.



Mr. Duval explained that when he got his position, he had to self disclose as to any conflicts of interest
but he did not have a background check. He said they had a conflict of interest policy and he gave the
example that if his father or any family members filed a claim he would have to remove himself. He also
said that Pat Juneau explained this conflict of interest policy about family members. Mr. Duval said that
he had no other employment but he said that he could have other employment as long as there was not
a conflict of interest. He said that he did not need to have any formal disclosure of other employment
but that Mr. Juneau would expect Mr. Duval to tell him. He also explained that he remembered some
policies on ethics codes such as you could not accept gifts or lunches that were more than $50. He said
there was no updated annual training but there was an 800 phone number that an employee could call
if they had an issue, but when further asked if anyone knows about this phone number, Mr. Duval said

2

SM-03-JA000063

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

that he didn't think anyone knew about it, he thought that no one "had a clue".

As far as a code of ethics, Mr. Duval said that David Odom handles internal policy and accountability so he may have drafted something. Mr. Duval said he was never aware of any issues or sexual harassment issues, that they were a very tight group and they did not have a human resources representative. He said that there were about twenty claims administrators in his office and that they are responsible for ensuring that the claims process and audit process are handled correctly. Mr. Duval explained that there is no policy or protocol to handle how the staff interacts with claimants, that they just use common sense and get the "ball rolling" if there is any issue. There is also no formal guidance concerning phone calls with claimants other than keeping the information confidential.

Mr. Duval explained that if he had a potential fraud case he would bring it to the SIT team and David Welker's attention and that they would handle it. He further explained that in regards to his computer access, he can view the claim ID#, the person's name, their SS#, and their financials but he cannot change any information that he views. The only thing that he confirmed that he can do is make sure the claim is uploaded into the portal. If someone is questioning where a claim is located in the process he will look into it and sometimes for example, he may find that it has just been mislabeled or that information is missing. He explained that he feels that the appeals process is well run and he confirmed that it is anonymous. He acknowledges that the DHECC is as if you are building the process as you go. Mr. Duval said that he never has felt uncomfortable in regards to ethical conduct with claimants, or in the office, never even a little.

Mr. Duval responded to questioning concerning his dealings with Tiger Sutton and he explained that since he is an attorney, he had been in some meetings with him and that Mr. Sutton had come into some appeals meetings now and then. He also confirmed that he had some contact with Mr. Sutton via the phone. Then the questioning continued on the remand issue and Mr. Duval explained that when a claimant doesn't feel comfortable he can remand, even if doesn't like the number he has chosen for example, he said that they wanted it taken out, BP wanted it in and Mr. Duval said Mr. Sutton wanted it in for the appeals.

The interview continued with questions about Mr. Sutton and Mr. Duval explained that he met him in court eight years ago on a case where Mr. Sutton's client had fallen and hurt his knee and Mr. Duval remembers saying to his boss that we are going to "zero him out." He stated that he had a good case and so was able to beat him in court. He confirmed that was the only case he had dealings with Mr. Sutton. He said that he interacted with Mr. Sutton, in the office every now and then, when he would come in to ask about the appeals process. He said he did not remember him asking about a certain claim, he said something about questioning something but wasn't specific. Mr. Duval did say that Mr. Sutton had told him at one time to watch out for Gibby and John Andry and that they were very aggressive.

When asked about the Andry Law Firm, Mr. Duval said that it had been assigned the claim to three panelists because it was over $1 million. He didn't know who the exact panelists were but he said he could check his records. He confirmed that was the only dealings with the Andry Law Firm. Mr. Duval said that he did talk to Mr. Sutton sometimes in the workplace about things such as hobbies and that Mr. Duval told Mr. Sutton about his fishing hobby and that his boat was 26 feet but he thought Mr. Sutton also owned a much larger boat with Glen Lerner. Mr. Duval said that Mr. Sutton is still around the building and he saw him today in the men's room on the 19th floor.

3

SM-03-JA000064

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Duval confirmed that Mr. Sutton had an office in the claims center and that he also went to his other office. He said that Mr. Duval and his wife had an office at Deepwater Horizon but he had not heard anything else about them. Mr. Duval said he did not know of any special process that Mr. Sutton had with his clients in his law firm and that there was no formal financial disclosure report to identify conflicts. Mr. Duval said that David Odom would hold any financial disclosure reports at the office.

The interview continued with questions about Christine Reitano and Mr. Duval said he had more interaction with Ms. Reitano because she was the Designated Document Reviewer, BrownGreer was also involved, and so she was also very involved with appeals. Mr. Duval stated that Christine did not work for him but that they were equals' but she was more of the in-house counsel. He further explained that all employees are not really given specific duties more that they all wear different hats. Mr. Duval continued by saying that Ms. Reitano was more involved in policy drafting, BP liaison and involved with telling Mr. Juneau when she felt something needed to be done. When the questioning continued and Mr. Duval was asked who had more authority, he replied that he did not understand the question, when clarified as to who had more authority with policy development, Mr. Duval said that the steering committees for both sides had that responsibility. Also, he stated that Mr. Juneau would have the final decision.

When asked if Mr. Sutton or Ms. Reitano ever spoke to Mr. Duval about claims, he replied that they did not and he said that he could not direct them to anyone who might have more contact with them. Mr. Duval also said he did not know anyone at Deepwater Horizon who had contact with Mr. Sutton or Ms. Reitano but maybe with BrownGreer, and that they might go to them for the status of an appeal, I just simply work the relationship but there seemed to be maybe be a pipeline for them. When asked about BrownGreer he didn't say that that he was disappointed with them he said that any company can do things better but anyone not getting paid gets unhappy and attacks BrownGreer but that's just the people on the street.

Mr. Duval said that he had never worked big claims cases. He said that Garden City was very good and if he had to pick he would pick Garden City. Mr. Duval said that he thought BrownGreer could do better in the area of communication, such as updates along the way to claimants. Maybe they just felt comfortable with Mr. Sutton and Ms. Reitano. He did answer that he did not think that they were picked to work on this case because they had prior relationships.

When the questioning continued about John Andry, Mr. Duval said that Mr. Andry had a big case before his Father. Mr. Duval said that John Andry had said that his dad was great judge, and he had their first lunch approximately three to four months ago and it was with Ms. Reitano and Tracy Steilberg, and the second lunch which was about two months ago was with Ms. Steilberg and Mr. Andry. At the lunch Mr. Andry asked me about a large law firm claim and he wanted to know about the time frame on the appeal. Mr. Duval also confirmed that Mr. Andry picked up the lunch tab that was probably about $20 each.

Mr. Duval confirmed that the Andry law firm claim was on-hold. He was asked if Mr. Welker was involved with putting it on hold and he said yes. Mr. Duval explained that Mr. Andry had asked if the payment could be wired and Mr. Duval had explained that if you had not asked to have wire payments in the initial application it would probably have to be federal expressed but he further explained that BP had fourteen days to review it and on the 15th day if they did not appeal it, the payment would be paid. Mr. Duval said that Mr. Andry was not aware of that process and stated that he would call back on the fifteenth day to check the status. Since Mr. Duval didn't see BP filing a request for a review he assumed

4

SM-03-JA000065

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

that it would be paid. Tiger Sutton had asked Steve Cirami from Garden City Group when the payment was ready, could it be wired. Mr. Welker came in five minutes later and said not to do anything with John Andry's claim for a bit. Mr. Duval continued and said that Mr. Andry had called him about a week ago checking on his payment and asking about the hold-up, his exact words were, "hey man, what the hell is going on". Mr. Duval said that since he was told to back off, he told Mr. Andry that he did not know anything and that it was out of his pay grade. He also said that he told Mr. Andry that it was probably best that they did not talk right now.

When asked about the relationship between Mr. Andry and Mr. Sutton, Mr. Duval said that it had been very unstable for a few years. Mr. Duval said that he did not know about the relationship between Mr. Andry and Glen Lerner, just that Mr. Lerner had that unusual slogan from Las Vegas. He thought that they must have some referral relationship between Lerner and Andry. He confirmed that Mr. Andry had a law firm with Mr. Lerner.

Mr. Duval said that Mr. Sutton mentioned that he was in the oil field services business and since I had worked in tugboats we talked about the business but he said that they never talked "lawyer stories". Mr. Duval did say that at some point Mr. Andry and Mr. Sutton had dealings but he thought that they had a fall out over fees, and that conversations with Tracy Steilberg kind of confirmed that. Mr. Andry and Ms. Steilberg seemed very close per Mr. Duval but when asked about the structure of the relationship, he said that she seemed very knowledgeable. Mr. Duval said that their relationship did not really raise any questions, when he was asked, but he continued saying that he thought it was strange that Ms. Reitano was at the first lunch but Mr. Sutton was not at the lunch.

When the questioning continued about Mr. Sutton's and Ms. Reitano's relationship, Mr. Duval said that he did not like to talk about people's personal lives but he did not think the relationship was good. He said it was an odd loving relationship, they never made a scene but they didn't seem connected as husband and wife. Mr. Duval said that they never went to lunch together; they would leave at different times. Ms. Reitano seemed very involved with the children and since he had played soccer in college they would talk about her kids soccer games.

Mr. Duval confirmed that Mr. Odom was the person that handled acknowledgements of policies for new employees but he said that he was embarrassed to say he could not remember if he signed anything. He did remember that he was asked if he had any friends with BP claims. Mr. Duval said that he did not have anything to disclose as far as friends and that it was just very informal procedures since they knew he had no conflicts. Mr. Duval was asked if someone from BP had seen he and Mr. Andry or other claimants at lunch, do you think they may feel it is inappropriate. Mr. Duval said I think that they may feel uncomfortable but he also said that he had also eaten with BP employees. The interviewer said that he has heard that District Judges feel like islands from old contacts, and Mr. Duval explained that his cousin was like a brother but his cousin's firm represented BP claims and he realized that he may not be able to have lunch with him anymore. He said he was just talking to his dad about that subject.

Mr. Duval said that he could give you the names of the three panelists on the Andry appeal.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

SM-03-JA000066

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

6

SM-03-JA000067

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | David Duval |
| Title: | Appeals and Government Relations Coordinator |
| Office: | Deepwater Horizon Economic Claims Center |
| Date/Time: | 8/22/13 |
| Attendees: | Frank Piantidosi, Walt Donaldson, Alex Dubin |
| Location: | 935 Gravier St. New Orleans, LA 70112 |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Mr. Duval.

On the above date and times Mr. David Duval was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.



1

SM-03-JA000068

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



2

SM-03-JA000069

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



SM-03-JA000070

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



Questioning then shifted to the Casey Thonn claims. Mr. Duval stated that he did not remember Mr. Thonn at all until he was presented with an email sent to Mr. Thonn that Mr. Duval was on. Mr. Duval claimed that he found out about Mr. Thonn's claim after Mr. Sutton sent him an email asking him something about Mr. Thonn's case. Mr. Duval could not recall his exact response but he remembered that "it was something about shrimp RTP."

Mr. Duval confirmed that he knows Jennifer Goodwin. Asked to whom he was referring in his January 16, 2013 email to Ms. Goodwin, Mr. Duval stated he could not recall exactly but he thinks it must have been in reference to John Andry. After a brief pause, Mr. Duval stated that he remembered and that it must have been that Mr. Sutton asked him about Mr. Thonn's case and he was trying to get information for Mr. Sutton. At the time, Mr. Thonn was represented by Mr. Andry. Mr. Duval does not recall specifically the context of the January 16, 2013 email but he says it must have been referring to Mr. Sutton because in January 2013, he had yet to meet John Andry. Regarding the wording of the email itself, Mr. Duval claimed that he did not know why he wrote to Ms. Goodwin that "I know the attorney for the appeal" when the goal of the email was to obtain information for Mr. Sutton. He stated that he might have been trying to "ease [Ms. Goodwin] to get something." Mr. Duval then stated that he might have known Mr. Andry but only from his billboards in New Orleans. Mr. Duval then exclaimed, "I don't know," and claimed that he could not explain the email to Ms. Goodwin.

4

SM-03-JA000071

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Ms. Goodwin responded to Mr. Duval's email later on the evening of January 16, 2013 with information on Mr. Thonn's claim. There was no further correspondence on that email string until January 17, 2013 when Mr. Duval emailed Mr. Sutton. Mr. Duval claims that his emails to Mr. Sutton were simply to relay to him the information provided to him by Ms. Goodwin. Asked again, Mr. Duval stated that he could still not remember why he stated in the original email to Ms. Goodwin that he "[knew] the attorney for the appeal." Asked how he knew that Mr. Sutton wanted information on Mr. Thonn's claim, Mr. Duval responded that Mr. Sutton "must have come into [his] office or something," but he does not recall a specific conversation or email.

According to Mr. Duval, at no time did Mr. Sutton express to him that he did not want his name associated with Mr. Thonn's claim. However, Mr. Sutton did tell Mr. Duval that he did not want anything to do with the Andry Law Firm claim. Mr. Sutton made this statement when he heard that Mr. Duval was going to lunch with Ms. Steilberg, Ms. Reitano and John Andry. Mr. Duval claimed that it was at that lunch at the Palace Cafe in early May 2013 that he met John Andry for the first time. Mr. Duval then stated that he went to lunch that day with Ms. Steilberg and Ms. Reitano to celebrate Ms. Steilberg's birthday. Contradicting his earlier statement, Mr. Duval then stated that he had actually met Mr. Andry before this lunch "for just a handshake at a lawyer thing or something" but that he had never had "a phone call or anything." Asked if he had met anyone in Mr. Andry's office, Mr. Duval stated that he had not and that he had not even met Mr. Andry's brother, Gibby.

██████████████████████████████████████████████████████████Again contradicting a prior statement, Mr. Duval remarked that he and Mr. Andry may have communicated via email in response to Mr. Andry's challenges of the appeals process since Mr. Duval was the appeals coordinator. Mr. Duval then stated that it was actually "very possible" that Mr. Andry might have called him to discuss the appeals process.

The interviewers moved on with the questioning, next asking Mr. Duval if he recalled meeting Mr. Andry at a New Orleans Hornets game in 2013. Mr. Duval thought for a moment and then, stated that he had. Mr. Duval proceeded to tell interviewers the circumstances of his meeting with Mr. Andry. Asked if he recognized Mr. Andry at the game, Mr. Duval stated that he did not even know who John Andry was at that time and that Mr. Andry came up and introduced himself. Mr. Duval was asked when this game took place. He responded that he was sure that it was sometime in mid-February. This timeline conflicts with Mr. Duval's earlier statement that he first met Mr. Andry at the Palace Café in May, as well as his statement that in May 2013, he was only aware of Mr. Andry by his billboards, which was contradicted by his statement that he had actually emailed Mr. Andry and possibly spoken with him on the phone about the appeals process.  Mr. Duval stated that the meeting at the Hornets game was a "very quick two second conversation" and that Mr. Duval "had no idea who John Andry was." Mr. Duval then immediately contradicted himself again, stating that he recognized his face once he introduced himself. Mr. Duval stated that Mr. Andry did not buy him any food or drinks at the game. He also stated that that Hornets game was the only game he attended that season. Mr. Duval next saw Mr. Andry on May 7 at the Palace Café. Mr. Andry recognized Ms. Steilberg and Ms. Reitano and invited Mr. Duval to come along to a lunch he wanted to take Ms. Steilberg to for her birthday.

5

SM-03-JA000072

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



According to Mr. Duval, Mr. Andry mentioned "zero" about pending appeals at the first lunch. Mr. Duval stated that Ms. Steilberg, Ms. Reitano and Mr. Andry were at that second lunch less than a month later after initially running into each other at the Palace Café. This second lunch also occurred at the Palace with Ms. Steilberg and Mr. Andry but, according to Mr. Duval, Ms. Reitano did not attend. Mr. Duval stated that Mr. Andry did not talk about BP much until the very end of the meal when he asked Mr. Duval about the Tallens Marine claim that has been pending for months. According to Mr. Duval, Mr. Andry asked him if he could check on that claim and to whom he could speak further. Mr. Duval told Mr. Andry he would check it out personally. Both Mr. Duval and Ms. Steilberg looked up the Tallens Marine claim. Mr. Duval stated that the claim seemed convoluted and there may have been an incompleteness notice. Mr. Duval does not recall what the notice was regarding. Mr. Duval then called Mr. Andry and informed him of the complexity of the claim. Mr. Duval stated that this was the last time he spoke with Mr. Andry. Asked whom he called for assistance on the Tallens Claim, Mr. Duval stated that it must have been Michael Tusky, who Mr. Duval uses often to check into these sorts of claims. Mr. Duval recalled an email from Mr. Tusky identifying the claim was incomplete. Mr. Duval did not recall how he informed Mr. Andry of that information.

Mr. Duval stated that Mr. Andry definitely gave him his cell phone number and Mr. Duval has called both his cell and office.  Mr. Duval specifically recalled talking about the Andry Law Firm claim with Mr. Andry after he spoke with him about Tallens. This statement is in contrast to Mr. Duval's prior claim that the last time he spoke with Mr. Andry was when he called him to inform him of the complexity of the Tallens claim.

Asked about Mr. Sutton's involvement, Mr. Duval stated that Mr. Sutton would often come in and ask about the Andry appeal. Mr. Sutton would warn Mr. Duval that "Gibby was gonna call." Mr. Duval claimed never to have met Gibby Andry to this day. Mr. Duval did not recall specifically if the Tallens Marine claim was the first claim he looked up for Mr. Andry but there were definitely others. Mr. Andry would give him a list of claims and ask Mr. Duval to find out what the statuses were. Mr. Duval also stated that he was sure that Ms. Steilberg has looked up claims for Mr. Andry as well.

Asked to describe his role at the DHECC, Mr. Duval stated that his job was appeals coordinator and political liaison but that his relationship with Mr. Andry "took on a life of its own." Mr. Duval did not refer Mr. Andry to an appropriate point of contact within the DHECC because of Mr. Andry's prior relationship

6

SM-03-JA000073

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

with Ms. Steilberg.

When Mr. Sutton found out that Mr. Duval was having lunch with Mr. Andry, Mr. Sutton told Mr. Duval that he would not attend because Mr. Andry had an appeal pending. Asked why he decided to go even after Mr. Sutton had explained why he was not going, Mr. Duval stated that he did not take Mr. Sutton's not coming as being about the claims process as much as being a personal matter.

Mr. Duval did not recall sending any documents about an Andry appeal to Mr. Sutton, nor did he recall specifically asking Mr. Sutton asking for any documents.

Mr. Duval recalled Judge Barbier's letter about his decisions standing but not any subsequent emails. Mr. Andry wanted to know if he would get paid right away after the appeals board made a decision on his claim and those of his clients. When Mr. Andry stated this, Mr. Duval got in touch with Steve Cirami. That conversation took place within two weeks of Mr. Andry's eligibility notice being mailed.

Mr. Duval never had the impression that Mr. Andry knew he was on his appeal panel. Mr. Duval claimed that he never asked. Mr. Duval claimed that it was "impossible" for Mr. Andry to have known this information because the only people who could have known were Mr. Odom, Mr. Duval or someone from BG. Asked if his assistant, Ms. Steilberg had access to that information; Mr. Duval confirmed that she did. Mr. Duval stated that this fact did not concern him, even knowing Ms. Steilberg's friendship with Mr. Andry.

Mr. Duval stated that other lawyers with claimants were calling him all the time but that they have stopped since the investigation began. Mr. Duval claims that he was overwhelmed and started "drowning in his extra duties" helping people look up claims. It took away from the job he was hired to do.

Finally, Mr. Duval was asked if Mr. Sutton inquired about any other claims with any frequency. He responded that he did not.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000074

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

**Deepwater Horizon Court Supervised Settlement Program ("CSSP")**
**Special Master – Independent External Investigation**
**Interview Report of Freeh Group**

| | |
|---|---|
| Interviewee: | Duval, David |
| Title: | Appeals Attorney |
| Office: | CAO |
| Date/Time: | August 27, 2013, 2 PM – 2:30 PM; August 27 (via telephone) 4:50 PM – 5:00 PM; August 28 (via telephone) 5 PM – 5:10 PM |
| Attendees: | Mike McCall, Ben Scotti |
| Location: | DHECC 14th Floor |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you.

On the above date and times David Duval was interviewed in person for a third time and the Special Masters team followed up with him two additional times via telephone. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Duval explained that when he met with members of the Special Master team last Thursday, he was frustrated because he did not know certain dates about when he met with John Andry. Mr. Duval stated that he thought it was in May, but members of the Special Master team kept asking him if he was sure about that time period. Mr. Duval stated that he then recalled meeting Mr. Andry at a Hornets basketball game in February or March 2013.

He stated that he went to Tracy Steilberg immediately after his meeting with the Special Masters team on August 22, and Ms. Steilberg refreshed his recollection that he actually met Mr. Andry in early December 2012. He produced a photograph from December of 2012 that shows him and a number of individuals from the CAO, including David Welker, Tracy Steilberg and David Odom at Pat O'Brien's (Restaurant). He remembers Tracy stating that she recognized a number of other individuals at Pat O'Brien's from the Chalmette area, which is where she was also from. Mr. Duval recalled Ms. Steilberg approaching Mr. Andry to say hello and then after that moment, she introduced Mr. Duval to Mr. Andry.

1

SM-03-JA000075

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Duval also admitted that, after meeting with members of the Special Masters team on August 22, he contacted a friend who attended the basketball game with him and was reminded that he exchanged cell phone numbers with Mr. Andry at that game.

Mr. Duval stated that he thought about the questions asked by the Special Masters team over the weekend and remembered some details about the first lunch in May where Ms. Reitano was with him, along with Ms. Steilberg and Mr. Andry. He remembered the meeting was at the Palace Café and that they were all bantering back and forth having a good time. Mr. Duval stated that at this luncheon Mr. Andry revealed that there was a falling out between Mr. Sutton and Mr. Andry. Mr. Duval confirmed that Mr. Andry hosted this lunch. Mr. Duval did not remember any sort of claims discussions during the first lunch.

Mr. Duval stated that the invitation to attend the first lunch, which again took place during the first week in May (the birthday lunch), would have either come directly via a phone call or email from Mr. Andry to either himself or Tracy. Mr. Duval stated that he was in his office, and Ms. Steilberg was also there when he received a text message from Mr. Andry, who wrote let's go to lunch. Mr. Duval indicated that Ms. Reitano was in the office and saw the text show up on his phone.

Mr. Duval acknowledged that a second lunch took place with the same group (except Ms. Reitano) at the same place (the Palace Café) in late May, approximately three weeks after the impromptu birthday lunch. Mr. Duval confirmed that during this lunch, Mr. Andry asked about the appeals process and deadline information for when claims are assigned to appeals panelists. Mr. Duval stated that Mr. Andry principally wanted to know when a claim was assigned to an appeals panelist and how long it takes to get paid once the process commenced. Mr. Duval stated that most of Mr. Andry's questions were generic but that he also asked about the Andry Lerner dismissal.

To assist in answering these inquiries, Mr. Duval stated that he either told Mr. Andry to provide a list of the claims or Mr. Andry told him he would provide a list to Mr. Duval. Mr. Duval stated that, as best he could recall, Mr. Andry eventually sent him an email containing some information about the claims sometime after the second lunch.

### SUMMARY OF DAVID DUVAL FOLLOW-UP TELEPHONIC INTERVIEW 8/27/2013

Mr. Duval was contacted telephonically again at his DHECC office phone number around 5 PM on August 27, 2013 in order to ascertain what he meant when he wrote the phrase "I know the attorney for this claim...." via an email dated January 16, 2013 to Jennifer Goodwin.

Mr. Duval stated that he was not 100% certain to whom he was referring when using the phrase "I know the attorney for this claim..." but indicated that he thought the email referred to John Andry.

The interviewers asked him to go back and check his emails from that exact date or the next day to see if there was an email that would refresh his memory as to who exactly he was referring to.

SM-03-JA000076

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

SUMMARY OF DAVID DUVAL FOLLOW-UP TELEPHONIC INTERVIEW 8/28/2013

Mr. Duval was contacted telephonically again at his DHECC office phone number on August 28, 2013. The interviewers referred to the email message which Mr. Duval had sent to Mr. Scotti earlier in the day, forwarding a copy he had found of his January 17, 2013 email to Mr. Sutton. The interviewers asked Mr. Duval whether, having reviewed the January 17 email, he now had any fresh recollection regarding to whom he was referring in his e-mail to Ms. Goodwin the previous day, when he wrote that he knew the attorney for the claim. Mr. Duval responded that he remained convinced that he was at the time and in his own mind referring to John Andry. He admitted that, having reviewed the January 17 e-mail, he has now concluded that Mr. Sutton must have actually asked him to check on the status of the claim, but he still has no direct recollection of Mr. Sutton making that request to him. Mr. Duval reiterated that his choice of words in his email to Ms. Goodwin was simply the result of his experience in learning how to get more expedient responses to such requests.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

3

SM-03-JA000077

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Kirk Fisher |
| Title: | Director of the Business Processes and Reporting Group |
| Office: | DHECC |
| Date/Time: | 7/18/2013 |
| Attendees: | Greg Paw, Matt Dolan, Alex Dubin |
| Location: | 935 Gravier St, New Orleans, LA 70112 |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Mr. Fisher.

On the above date and times Kirk Fisher was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

When the questioning began, Mr. Fisher said that he is the Director of the Business Processes and Reporting Group ("BPRG") at the DHECC, where he also supervises the Quality Assurance ("QA") team. Additionally, Mr. Fisher is a professor at The Louisiana State University ("LSU") College of Business. Mr. Fisher said that he also owns multiple real estate holding companies and is a founding partner in the Crescent City Group, which is a claims settlement administration company that he formed with fellow DHECC executives, David Odom, Chris Read, David Duval and former DHECC employee, Scot Sherick.[1] None of these entities have a claim with the DHECC. Mr. Fischer's family recently sold a newspaper called, *The Advocate*. He said that his family also owns two TV stations.[2]

Mr. Fisher stated that he met Pat Juneau through David Odom. He said that Mr. Odom was a friend with Mike Olinde, and that Mr. Olinde was a friend of Mr. Fisher. He added that Mr. Olinde introduced him to Mr. Odom.



---

[1] Sherick was a director in the BPRG but was fired.
[2] One is in Baton Rouge and one is in Texas. They are both ABC affiliates.
[3] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

SM-03-JA000078

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



---

[4] Speaking from memory, not hard facts.

SM-03-JA000079

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



The interviewers shifted to questions regarding the DHECC code of conduct and human resources policies, and Mr. Fisher replied that everyone reads and signs the code of conduct and there may have been a discussion in an office setting but a formal, corporate-style orientation doesn't exist. When asked who at the DHECC performs the classic HR functions within the QA group, Mr. Fisher responded that he does. Mr. Fisher characterized his group's approach as "taking it on the fly." If there were an HR issue in the CAO's office (on the 19th floor) Mr. Welker, Mr. Odom or Mr. Pat Juneau would be the one to handle it. He said that people have not come to him to ask about protocol.

The questioning continued, and Mr. Fisher stated that he feels that the code is sufficient and that there is a robust amount of checks and balances regarding the handling of claims files. Mr. Fisher also noted that there is no way for any one person to manipulate any one claim. He said, "Even a strong code of conduct policy wouldn't have stopped Tiger Sutton."

---

5
6



SM-03-JA000080

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

When asked, Mr. Fisher spoke about the small town environment of New Orleans and how it has affected the process and how the program accounts for those issues and stated "just don't cross lines." He said that there's no way to really stop it, "You trust people and do your best to keep tabs on your employees."

Mr. Fisher continued to respond to questions and said that when Mr. Sutton reached out to P&N, this was an example of improper contact with a vendor. Mr. Fisher stated that there is awareness among DHECC staffers of the danger of perceptions of impropriety. When asked, Mr. Fisher remarked that if the claim is over a certain dollar amount, for subsistence claims, this triggers site visits to investigate possibly fraudulent claims. However, Mr. Fisher said that he is unsure what that amount is or what the policy states. He added that "robust" document requirements work as a fairly effective fraud deterrent for business-based claims. Mr. Fisher said that he is unaware of what the triggers are that would lead to site visits for those claims and that P&N & BrownGreer are the ones who make the decisions with regard to site visits.

When asked, Mr. Fisher stated that he started at DHECC two weeks after Reitano.[7] He said, "Christine wanted to be the top dog" while Mr. Fisher said that he is "happier being the #2 guy." He said that no one asked for his input on hiring Mr. Sutton but that he did know that he was being hired. Mr. Fisher said that Mr. Sutton was being brought on to help with subsistence and moratoria claims. He said that he did know of concerns regarding Mr. Sutton being hired "he didn't have a good reputation at all." Mr. Fisher claims to have received his information on Mr. Sutton mainly from Tracy Stielberg, who worked in the same office with Mr. Sutton for years. Mr. Fischer said that she liked to talk about her experiences with Mr. Sutton and that none of the stories she recounted were positive.

As the questioning continued, Mr. Fisher spoke about Mr. Sutton's relationship with Mr. Patrick Juneau and he stated that it was a longstanding relationship that "lends itself to trust." "Tiger was an opportunist" when it came to using his influence with Mr. Juneau. Mr. Fisher noted that this was merely his perception. He also said (Mr. Sutton), "I didn't really see value in what he did." Mr. Fisher said that subsistence was "completely messed up" at the time Mr. Sutton was hired at DHECC. He said that Mr. Sutton did not help remedy this and he added, "he was more of an encumbrance." He said, "Tiger was always kind of a bully." He would try to "clear people out" so he could make the decisions himself. He would use Pat and Michael Juneau's names "to tell people what to do."

The interviewers continued the questioning and Mr. Fischer said, "Tiger injected himself into the audit process." Mr. Fisher stated that he felt this to be "improper" and it "ticked [Fisher] off." He added, "Everything Tiger did was plaintiff-friendly...Tiger was really trying to push the needle [on caloric intake calculation and awards]" which led to much "looser"[8] payouts. Mr. Fisher was uncomfortable with this, so he brought on Dr. Katzmarczik[9] to help put a check on Mr. Sutton's "loose" payouts.

Mr. Fisher continued to explain that some of the caloric values that Mr. Sutton was using were "insanity." He stated that the values Mr. Sutton was applying were, "like what would be used for an Olympic swimmer, not a fisherman." Mr. Fisher said that Dr. Katzmarczik fixed it by putting a "check

---

[7] Before Sutton arrived.

[8] "Higher."

[9] Dr. Peter Katzmarczyk was hired to do a study on caloric intake to help Fisher and the QA team "fix" the subsistence calculator.

4

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

digit" into the subsistence calculation formula in order to create a failsafe, such that the formula wouldn't allow massive over-calculations of caloric intake. During this time and thereafter, Mr. Sutton wanted Mr. Fisher and his people out of the subsistence meetings.

The interviewers then shifted the topic and Mr. Fisher stated that Robert Hedgecomb & Scott Sherick were unable to get useful mathematical information because of a "lack of proper computing power." He said that Mr. Sutton had ongoing involvement in impairment zone issue, and that Mr. Sutton and Ms. Reitano were telling people that they reported to S&R, not Mr. Odom.

When asked, Mr. Fisher spoke about Mr. Sutton's involvement with the Mills Firm and Mr. Fisher stated that the "Mills Firm stuff was complete BS." He continued, stating, "Tiger was trying to push a blanket settlement with this firm [through a method of] cut and paste." Mr. Fisher remarked that "maybe the GCCF acted that way but this program doesn't and he [Sutton] was buddies with one of the guys [at the Mills Firm]."[10]

Mr. Fisher continued responding to questions and spoke about his recollection of a specific vessel damage claim where he and Mr. Sutton disagreed on compensability.[11] Mr. Fisher responded that he did specifically recall one instance: A shallow water incident where the boat basically ran aground. "Tiger made this 'leap of logic' that the legal opinion was that [the boat] didn't run aground and [the captain] was just 'churning up the mud'." He said that particular instance stuck out to him, as a time when he really had to push back against Mr. Sutton, because "[Fisher] couldn't allow anyone to bastardize the audit process because it only takes one [to mess everything up]."

When asked, Mr. Fisher said that he did not ever go to Mr. Patrick Juneau or Mr. Michael Juneau to register his displeasure with Mr. Sutton's involvement in the audit process, he said, "Tiger was not really smart. He was narcissistic." If you argued the facts with him, he would generally yield. Mr. Fisher did add, "Tiger & Christine ended up walling off the Juneau's to serve their own purposes and bottleneck power and decision-making with them."

Mr. Fisher said that he really doesn't think Pat Juneau knew how bad Mr. Sutton was because "there was a level of trust [there]."

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also may contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

---

[10] Fisher was likely referring to Kenny DeJean.
[11] Claim #21777 – Roy Guidry.

SM-03-JA000082

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: Kirk Fisher
Title: Director of Business Processes
Office: DHECC CAO
Date/Time: 8/8/2013 3:24pm
Attendees: Tim Flynn, Walt Donaldson, Dennis Shenberger
Location: 935 Gravier St., New Orleans, LA 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010*, 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP.  We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP.  We do not represent you, Kirk Fisher.

On the above date and times Kirk Fisher was interviewed in person. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.



SM-03-JA000083

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



2

SM-03-JA000084

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



Mr. Fisher was asked why he requested an audit of Casey Thonn's claim. He acknowledged that he did as he was responsible for internal audit. But he wasn't sure what specifically prompted him to do so. It wouldn't be uncommon for him to request a review on a file. He has requested this type of review on between two and five claims, but he isn't sure of a precise number. He doesn't remember how he first learned of the Casey Thonn claim. He does, however, remember that noticing that there was something peculiar about the shrimp claim. From a process/audit perspective, he wanted to understand how and why a claim went into reconsideration at $600 and came out at $150,000. He felt that was beyond a process/framework issue and couldn't imagine what anomaly would cause this. He wanted to ensure

3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

that he didn't have a major systemic issue. Post facto it's easy to say that is the reason, but he's not sure at the time what prompted his review.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

4

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: Chris Rinaldi
Title:  Senior Claims Analyst
Office:  Postlethwaite & Netterville
Date/Time: 7/16/2013
Attendees: Greg Paw, Alex Dubin, Rich Baldwin
Location: 935 Gravier S., Suite 1905, New Orleans, La., 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP.  We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP.  We do not represent you Mr. Rinaldi.

On the above date and times Mr. Chris Rinaldi was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Christopher Rinaldi ("Rinaldi") is a Senior Claims Analyst at Postlethwaite & Netterville ("P&N"). During the time period that is the focus of this interview, he was a Junior Claims Analyst ("JCA").

Mr. Rinaldi is originally from New York. He earned both his undergraduate and law degrees from Louisiana State University ("LSU"). Mr. Rinaldi graduated The LSU Law Center in May 2011, and passed the New York State bar examination. Thereafter, he was admitted to the New York State Bar Association. Mr. Rinaldi then returned to Louisiana and attended the LSU undergraduate career fair, where he applied to P&N.

Mr. Rinaldi, who claims to have had no prior relationships with anyone at either P&N or DHECC, told interviewers that after returning to New York, he was interviewed over the phone by P&N and received an offer to join the firm at the completion of that call. Mr. Rinaldi accepted the offer and moved back Louisiana, where he began his employment with P&N on or around June 4, 2012.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Rinaldi was then asked if he recalled receiving any specific preparation or policy direction with regard to accepting gifts or entertainment from DHECC vendors, claimants or related parties. Mr. Rinaldi responded that he did not specifically recall such training but he also would not state that it hadn't occurred.

Mr. Rinaldi also stated that he was currently unaware of the existence of a formal gifts and entertainment policy for P&N and PwC employees working on DHECC cases. When queried as to his understanding of P&N's stance on that issue, Mr. Rinaldi stated that he believed there to be "an implicit understanding" to keep all communications confidential and to "always contact managers" if employees were ever faced with a questionable offer, gift or invitation.

Mr. Rinaldi was then asked about his personal feelings regarding the acceptance of gifts and/or entertainment from DHECC-related parties. Mr. Rinaldi stated that he believed that invitations of any sort would "feel inappropriate" and that he would report any such invitation to his superiors immediately. Mr. Rinaldi did not indicate that he had received any such invitations or offers to date.

Mr. Rinaldi was asked to describe his job and responsibilities at P&N. Mr. Rinaldi informed interviewers that he joined P&N as a Junior Claims Analyst ("JCA") and that his responsibilities at that time were those of an audit preparer and reviewer, working on a team that reported to a Senior Claims Analyst ("SCA").

Mr. Rinaldi was asked to expand on what his position as a JCA entailed, specifically with regard to his work with DHECC. Mr. Rinaldi stated that it consisted mostly of data entry and expense classification, after which another analyst would "double check [his] work."



2

SM-03-JA000088

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Rinaldi next told interviewers that in February 2013, he was promoted to the position of Senior Claims Analyst. Mr. Rinaldi was asked to describe his new position as compared to his former position as a JCA. Mr. Rinaldi remarked that being a Senior Claims Analyst was "basically the same job but with more targeted projects," mostly focusing on large claim amounts and reconsideration claims. Mr. Rinaldi also stated that as a Senior Claims Analyst, he is tasked with answering questions posed by junior level claims analysts working below him. Interviewers asked Mr. Rinaldi if he had a team below him and Mr. Rinaldi informed interviewers that he has a team of between four (4) and seven (7) JCAs on his team. Mr. Rinaldi confirmed that his job title currently remains Senior Claims Analyst.

Interviewers began asking Mr. Rinaldi questions regarding his involvement with the business economic loss ("BEL") claim of the Andry Law Firm ("Andry"). Mr. Rinaldi stated that he began oversight of the Andry claim as a JCA in December 2012. Mr. Rinaldi claims to have had no prior knowledge of the existence of the Andry Firm, or its founding partner, Mr. John Andry. Mr. Rinaldi further explained this by informing interviewers that Andry "had no visibility" and did not engage in OCI (on-campus interviews) at The LSU Law Center.

Mr. Rinaldi stated that as an auditor of Andry's claim, he requested profit and loss statements for the firm and that requesting this documentation afforded him a choice: he could just wait for the claimant to comply with the request or, if he did not receive the requested documentation, he could send an incomplete notice to the claimant, thereby freezing the claim.

Mr. Rinaldi stated that he waited for Andry to send the requested documentation and that after two weeks, when it had not arrived, he deemed the claim incomplete and a notice to this effect was dispatched to Andry. Mr. Rinaldi was asked what was necessary to deem a claim incomplete. He responded that it was based on his "individual judgment."

Mr. Rinaldi was asked to identify his contact at Andry. He stated that it was a third party accountant hired by Andry to prepare their BEL claim. Mr. Rinaldi was then asked if he had any prior experience with that accountant, to which Mr. Rinaldi replied that he did not.

Mr. Rinaldi informed interviewers that once the incomplete notice was sent to Andry, the claim was handed over to Brown & Greer. ████████████████████████

Mr. Rinaldi stated that he next heard about Andry's claim in March, 2013 (by which time he had been promoted to Senior Claims Analyst) when he received an email from Mr. Mark Staley ("Staley") inquiring as to the status of the Andry claim. Mr. Rinaldi was asked if it was normal that he receive an email directly from M. Staley inquiring about a certain claim. Mr. Rinaldi replied that it was "unusual" and that this was the first and only time he had ever heard directly from Mr. Staley regarding a particular claim. Mr. Rinaldi further explained why this was so odd, noting that Mr. Staley was two levels above him at P&N and that his direct superior would normally be the one to make this sort of inquiry. Mr. Rinaldi added that he was not sure why Mr. Staley was taking such special interest in the Andry claim.

3

SM-03-JA000089

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Rinaldi told interviewers that when he looked further into the Andry claim, he found that the documents he requested (Andry's profit and loss statements) had actually been submitted and that they were actually submitted *before* Mr. Rinaldi sent out the incomplete claim notice. Mr. Rinaldi stated that this was likely the result of his not having checked the claimant portal (where the status of a claimant's claim was regularly updated). Mr. Rinaldi noted that it is now policy to check the portal before sending an incomplete notice.

Interviewers asked Mr. Rinaldi how he interpreted the information that Andry was erroneously issued an incomplete claims notice. Mr. Rinaldi replied that he his first impression was that because he had sent the notice without first checking the portal, Andry was "ticked off" and complained and that their complaint was likely the reason why he received "special notice" on Andry's claim directly from Mr. Staley.

Mr. Rinaldi stated that Mr. Staley directed him to let him know when the Andry claim was complete.

Mr. Rinaldi was asked what he did once he received this directive (via email) from Staley. Mr. Rinaldi stated that he passed the Andry claim to his "best Junior Analyst," a man named Mr. Jordan Wilkinson and directed him to "keep an eye on [the Andry claim]" so Mr. Rinaldi could keep Staley informed on the progress of the audit. Mr. Rinaldi was asked to characterize Mr. Staley's level of interest in the Andry file. Mr. Rinaldi described it as "uncommon."

████████████████████████████████████████████████████████████

Mr. Rinaldi was next asked to identify who his direct superior was at the time he received the email inquiry from Staley. He responded that it was a woman named Ms. Maria Herrington ("Herrington"). Mr. Rinaldi was then asked to characterize her relationship as to himself and Mr. Staley within the P&N hierarchy. Mr. Rinaldi responded that Ms. Herrington was his manager and that Mr. Staley was Ms. Herrington's "boss."[2]

When asked, Mr. Rinaldi stated that he never spoke with Ms. Herrington about the Andry claim and he did not recall if he ever spoke with her about Mr. Staley contacting him or about Mr. Staley's direct interest in the claim itself. Mr. Rinaldi stated that hearing from Mr. Staley made him think that there might have been a problem or that he was in trouble but that after the initial email was sent, Mr. Staley seemed to back away and Mr. Rinaldi came to the conclusion that it may have simply been the case that Mr. Staley wanted to be "kept in the loop" on that particular claim.

Mr. Rinaldi was asked if he had any further communication with Mr. Staley after the original email Mr. Staley sent to him. Mr. Rinaldi replied that the next time he had any contact with Mr. Staley was in March 2013 when he emailed Mr. Staley to inform him that the Andry audit was complete.

---

[2] Rinaldi also stated that Herrington presently remains his direct superior.

SM-03-JA000090

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Rinaldi was asked about his contact with Mr. Wilkinson while Mr. Wilkinson was "keeping an eye on" the Andry claim. Mr. Rinaldi stated that he and Mr. Wilkinson kept in regular contact, especially concerning the "large revenue spike and ambiguous insurance cost [in Andry's claim]." Mr. Rinaldi continued that on closer review of Andry's records, the bank statements verified the revenue spikes as resulting from a large settlement and the insurance cost as the addition of an attorney to Andry's health insurance plan.

Mr. Rinaldi stated that during this time, there were no updates going to Mr. Staley and reiterated that the only contact he had with Mr. Staley was the first email he received from him requesting a status update on the Andry claim and the last email he sent Mr. Staley when his team had completed the audit.

Mr. Rinaldi was then asked if anyone other than Mr. Staley had contacted him regarding the Andry file. He replied that no one had. Mr. Rinaldi was then specifically asked if Mr. Sutton had contacted him to inquire about the Andry file. Mr. Rinaldi responded that he had not.

Mr. Rinaldi was asked if there was any discussion between himself and anyone else at P&N regarding how the Andry claim would be paid (wire transfer, FedEx ...). Mr. Rinaldi stated that he had been party to no such discussion.

Interviewers then began questioning Mr. Rinaldi about Mr. Sutton. Mr. Rinaldi claimed to have had zero interactions with Mr. Sutton. He stated that he was unaware until being told by the interviewer that Mr. Sutton and Ms. Reitano were married. Mr. Rinaldi reiterated that Mr. Sutton had never contacted him regarding the Andry claim. Mr. Rinaldi made reference to a "standard release policy" directing him to contact Mr. Sutton if there were any questions regarding the Andry case but Mr. Rinaldi stated that he never did. Mr. Rinaldi stated that he did not recall ever having met or spoken with Mr. Sutton.

Lastly, interviewers asked Mr. Rinaldi if he had any personal worries or reservations regarding possible conflicts of interest regarding the DHECC, specifically as it relates to their interactions with P&N. Mr. Rinaldi stated that he does not.


Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.


*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000091

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

SM-03-JA000092

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee:  Mark Staley
Title:    Director
Office:  Postlethwaite & Netterville
Date/Time: June 16, 2012, 3:00 PM
Attendees: Matthew Dolan, Gregory Paw, Laure Kirk
Location: 935 Gravier, New Orleans, La., 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We informed Mark Staley that we do not represent him.

On the above date and times Mark Staley was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Staley stated that he graduated from LSU in 1998 and had been in the workforce about fifteen years and that he had worked for Postlethwaite & Netterville for five and a half years. He said that he had worked at other firms prior to P&N such as Deloitte, in their Texas practice. Mr. Staley said that his degree was in Information Systems with an accounting background. Mr. Staley is in the consulting practice at P&N and P&N is involved in providing professional services in information systems, data, other advisory services, project management and other advisory areas. He stated that they had about 600 full time employees and a few sub-contractors, although he was uncertain of the exact number. Mr. Staley said that he was a partner and that there were about 27 partners. He explained that he is a partner and a shareholder and he became a partner about May or June of 2012.



1

SM-03-JA000093

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



When asked about the training at P&N, Mr. Staley said that every employee has training when they start and they have re-training on an as needed basis.



Mr. Staley explained that the policies, concerning gifts and gratuities, comes under the codes of conduct in the employee handbook, and it is explained to each employee. Mr. Staley said that there may be a separate policy detailed around the conflicts of interest for this project and that he would provide that or the handbook. He also said that he would check to see if an employee signed a gift and entertainment policy for this project.

Pertaining to conflicts of interest, Mr. Staley said that off the top of his head he thought there were procedures around exiting clients such as a conflicts review around existing P&N clients. If an existing P&N client submits a claim, P&N would not calculate those claims. He said that an employee must report claimants that may be a conflict of interest. Mr. Staley said that they review a claim filed in the system, as part of the conflicts of interest policy. They review the conflict if there is one and the potential client is presented to the Director/Partner for review. The Director/Partner will decide as to whether the potential client is a conflict or not. Mr. Staley said that conflicts have come up, but he is not sure of the exact number. He stated, "they handle it."

Mr. Staley responded to questions about the formal process with the claims center and he explained that if a record is identified as a conflict, the information is captured and made available to the local teams of the two vendors, and that the other vendor will handle a conflict that P&N may have and P&N would handle a conflict that they may have identified. Mr. Staley said that he had seen a gift and entertainment policy by P&N.



2

SM-03-JA000094

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



When asked about the Andry Law Firm, Mr. Staley said that it came to his attention during an interview with Dave Welker when he told Mr. Welker that Mr. Sutton had questions about claims and that he wanted to speak to Chris Rinaldi. Mr. Staley said that he emailed Mr. Sutton that he was aware of the Andry Law Firm claim, and asked Chris Rinaldi to update him. Prior to that Mr. Staley said that he was not aware of Mr. Sutton, but knew he worked in the Claims Administrator Office, he said that Mr. Sutton was involved in meetings that he was also involved in. Mr. Staley said that Mr. Sutton had asked about the status of claims in the past mainly by emails.

Mr. Staley said that Mr. Mike Juneau and Mr. Pat Juneau also asked about claims and the questions about the status of claims usually went to Mr. Staley or Robin Pilcher, who is a member of his senior team. He explained that the questions usually do not go to anyone lower than the manager level but it is possible, but not likely that questions could have gone to someone at a lower level. He confirmed that he did not know of a written policy about this issue. Mr. Staley explained that if someone wanted something from his employees that that would be a distraction. Mr. Staley also responded that he responded to Mr. Sutton with the status of the claim but he said to the interviewer that he did not understand why Mr. Sutton needed to know the update. He said that he never met with Mr. Sutton to discuss that claim. Mr. Staley further explained that he was in weekly team meetings with Mr. Sutton but he had no one-on-one meetings that he could recall.

Mr. Staley was asked if he met with the CA team about moratorium claims and subsistence claims and he said that he had not been involved and didn't know what they were. The questioning went back to Mr. Sutton's request to speak with Mr. Rinaldi and Mr. Staley said that he probably forwarded the email to Mr. Rinaldi, and asked Mr. Rinaldi for the status. Mr. Staley explained that Marea Herrington is Mr. Rinaldi's direct supervisor and he said that he probably sent the email to Mr. Rinaldi and he would not have done it differently. He stated that P&N has implemented a new procedure where the claims status requests goes to a team that pulls together the status of information. He said that the process is more formalized now. As the questioning continued, Mr. Staley explained that after the request from Mr. Sutton, Mr. Rinaldi came by and said that he had received his email about Mr. Sutton, and Mr. Rinaldi said that he was concerned that the attorney was angry with him and he explained that he was just working the claim. Mr. Staley said he did not have a memory of Mr. Rinaldi being anxious but subsequently they had talked about it. Mr. Staley said that he did not remember if Mr. Rinaldi had asked him if he should work on the claim quickly or if it should be addressed. Mr. Staley did not remember if he asked for an update from Mr. Rinaldi but he said he did get an update via email. He said

3

SM-03-JA000095

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

that he believed the email said that he worked the claim and forwarded it through the normal process. Mr. Staley said that it went through PWC quality assurance. He continued by saying that in hindsight, it was out of the ordinary for Mr. Sutton to ask to speak to the accountant that works the claim and that he couldn't recall another instance of that type of request.

Mr. Staley said that now a team reviews this volume of claim inquiries from claimants, CAO or lawyers. He explained that the high volume of status requests from claimants, as well as from CA and a backlog drove the need to have a separate team to deal with these inquiries. Mr. Staley said that the team was put in place over the last few months maybe in April or May. He confirmed that they are keeping a log of the status requests that are sent to them.

When asked if any of Mr. Staley's staff had inquiries from Mr. Sutton, Mr. Staley said that he was not aware of any to anyone below a manager. He added that he was not sure if there might have been inquiries made to managers such as Robin Pilcher, Katherine Torres, Tory Jambon or Marea Herrington from Mr. Sutton. Mr. Staley said that he believed that it did happen to a manager or senior manager but he was not sure and he said he could look into it to see if anyone did get a request, because it was explained that we would want to speak to that manager if indeed Mr. Sutton had requested information. He concluded by saying that he did not think that we needed to add anything else to what they had already asked.

When the questioning continued, Mr. Staley said that that he did not know every step around the process of compensation but he was aware of their controls, he said that any process can be improved but he said that this program has a tremendous amount of control and that the controls are effective. As far as a to do list to improve the process, Mr. Staley said that he could get back to them but he added that they constantly meet to review the procedures and he believes they have a quality product, he said that they continue to have an increase in production as they mature, they are more harmonized, and Mr. Staley said that they look for improvement constantly and discuss cross-vendor issues.



SM-03-JA000096

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Mr. Staley said that he would try to provide the code of conduct policy that is in their employee handbook and their entire employee handbook, and if they have a specific one around the project he will provide that.  He will confirm if employees sign off on the gift and entertainment policy and he will confirm if they have a policy on anonymity as far as when they bring up an issue of misconduct to management, and that he would provide the policy if possible.  Mr. Staley said he would confirm if Robin Pilcher, Katherine Torres, Tory Jambon, or Marea Herrington had been asked by Mr. Sutton about the status of any claims because the interviewers would like to speak to that person if Mr. Sutton had contacted them.  Mr. Staley said he would also provide the P&N to do list on improving procedures.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed.  Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription.  These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team.  These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client.  These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000097

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: Henry Mitchell
Title:     Director – Quality Control
Office:  Postlethwaite and Netterville
Date/Time: 7/17/2013
Attendees: Greg Paw, Frank Piantidosi, Alex Dubin, Rich Baldwin
Location: 935 Gravier S., Suite 1905, New Orleans, La., 70112

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010,* 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP.  We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP.  We do not represent you Mr. Mitchell.

On the above date and times Mr. Henry Mitchell was interviewed in person. We explained that
information provided in this interview would become part of the investigation record and could be
reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to
third parties.

Mr. Henry Mitchell ("Mitchell") graduated from Louisiana State University ("LSU") in 2012 with his BA
and MBA. He has interned with the Nestle Corporation in St. Louis and with auditing firms in Louisiana
that audit state agencies. Mr. Mitchell was brought into the DHECC by LSU Business School professor,
Mr. Kirk Fisher ("Fisher"), who was also interviewed by the Freeh Group as part of the ongoing
investigation into Mr. Patrick Juneau, Mr. Lionel "Tiger" Sutton, Ms. Christine Reitano and the DHECC
program.



1

SM-03-JA000098

CONFIDENTIAL/ATTORNEY–CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



2

SM-03-JA000099

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



Mr. Mitchell was asked if he had encountered any issues with regard to establishing vessel length in a claim. Mr. Mitchell responded that when there was decision to be made between more than one vessel length, the procedure was to employ the longest measurement listed. Mr. Mitchell stated that he received this direction from BrownGreer and the claims administrator's legal department ("CA Legal"), although he could not recall which lawyer.[6]

Mr. Mitchell was then questioned as to the extent of his interaction with CA Legal. Mr. Mitchell stated that he had "some" interaction. Mr. Mitchell continued that "for a while, Mike Juneau, Tiger [Sutton] and Christine [Reitano] would attend Tuesday meetings" but that this did not occur every week and it varied as to whom, if any, among them would show up from week to week.

Mr. Mitchell was then asked if CA Legal would ever provide him input on whether or not a claim was compensable. Mr. Mitchell indicated that they would and cited a particular vessel physical damage claim as an example. Mr. Mitchell went on to elaborate on this particular claim, noting that it was odd how involved Mr. Sutton became lobbying for payment.

---

[5] ███████████████████████

[6] Mitchell noted that at no time did he have direct contact with the lawyer at CA Legal and that his/her input was sought by Brown and Greer before instructing him.

4

SM-03-JA000101

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Mitchell indicated that after reading the claim, it was his understanding, as well as that of his team, that the damage done to the propeller and hull of the vessel in question was incurred as a result of the ship running aground and, as such, was not compensable under the terms of the settlement. Mr. Mitchell stated that Mr. Sutton made what Mr. Mitchell felt to be a fairly unreasonable argument in support of paying the claim and ultimately made the unilateral decision to approve the claim for payment over the objections of both Mr. Mitchell and Mr. Fisher.[7]

Mr. Mitchell added that his team had originally characterized the claim as not compensable as well. He also mentioned that Mr. Orran Brown ("Brown") of BrownGreer, who was also present for the Tuesday meeting during which this claim was discussed, felt that the claimant should have been required , at the very least, to provide further supporting documentation that his boat had not received the damage in question as a result of running aground. Mr. Sutton required no such documentation and the claim was paid. Mr. Mitchell again noted that Mr. Sutton was "the final word on what was compensable"

Mr. Mitchell was next asked if his "voice was heard on [his views]" by the decision-makers above him, to which he replied, "not necessarily."

Mr. Mitchell was then asked how decisions to pay or not pay claims were disseminated to his team. Mr. Mitchell stated that he would inform his team about these demands. Mr. Mitchell then informed interviewers that decisions were memorialized in the form of written assessments from vendors, used strictly for documentation purposes so that Mr. Mitchell and his team could be aware if the vendors agreed with compensation decisions.

Mr. Mitchell was asked about the status of the working relationship between his group and Mr. Sutton. Mr. Mitchell responded that vessel physical damage claims were "the big sticking point [between the two groups]" and they were "mostly fine [with regard to] the others."

Asked if he felt that Mr. Sutton had displayed any signs of having a special or self interest in paying any particular claims, Mr. Mitchell responded that he did not and that he felt that it was just Mr. Sutton's view that they should be paid. Mr. Mitchell added when questioned that Mr. Sutton never became emotional or upset when making his arguments.

Mr. Mitchell was then asked if there existed a protocol for him to follow if he felt that Mr. Sutton, or another superior within DHECC, made a bad or unreasonable decision. Mr. Mitchell responded that there was no formally established mechanism and he would simply have discussions with Mr. Fisher but that he was unsure of how Mr. Fisher would proceed afterwards.

---

[7] Mitchell's team, in concert with Fisher, prepared a report that voiced their disagreement but this was more for record-keeping purposes, as the decision was ultimately Sutton's to make.

SM-03-JA000102

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



Mr. Mitchell was then asked about DHECC policy regarding payment amounts to eligible claimants. Mr. Mitchell stated that he and his team were instructed to "make sure the claimant gets the max settlement" and that this was generally a non-issue because claimants would usually utilize the correct figures and time periods to maximize their claim amount. Mr. Mitchell added that errors in data entry would, every so often, pay out too much but that claimants were never "shorted" on their claim.



Interviewers next queried Mr. Mitchell as to the code of conduct at DHECC. Mr. Mitchell stated there was a formal code of conduct covering gifts, entertainment and conflicts of interest that all DHECC staffers were required to sign. Mr. Mitchell continued that he believed that those documents sufficiently outlined DHECC policy. Mr. Mitchell added that he could not say for certain if he or any other staffers received further guidance in that area from DHECC.

Mr. Mitchell was then asked if he knew of any instances of conflict of interest or improper gifts being given. He responded that he did not and the closest event that he could recall involved DHECC auditors who were former Postlethwaite and Netterville ("P&N") employees that were assigned to P&N's claim but that this was a non-issue as they removed themselves from the audit.

Mr. Mitchell informed interviewers that Mr. Fisher would periodically make requests for status updates even though the DHECC portal provides claims status information. Mr. Mitchell explained that Mr. Fisher would do this as a method of checking the system and verifying that the portal was showing correct information.



SM-03-JA000103

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Interviewers next asked Mr. Mitchell if, to his knowledge, anyone at DHECC had attempted to expedite a certain claim. Mr. Mitchell responded that he had no such knowledge but that "every now and then" he and his team would come across a claim that had become "stuck" in the system and that they will bring it to the attention of P&N, who would then handle the claim as they saw fit.



Mr. Mitchell was next asked about the handling of underpayment and overpayments of claims. He stated that BrownGreer will correct an underpayment, if they catch it before the notice is sent to the claimant. Mr. Mitchell added that he was unaware as to the BrownGreer's procedure with regard to an overpayment of a claim.



Mr. Mitchell next stated that his team would send a detailed report to BrownGreer every Thursday, listing the exceptions they had found and, in turn, BrownGreer would examine those claims and present their findings at the Tuesday meetings and they would be discussed. Mr. Mitchell informed interviewers that Tuesday meetings included himself, Mr. Ollendike, Mr. Fisher, Mr. Mike Juneau, Mr. Sutton, Ms. Reitano and any members of Mr. Mitchell's team who composed a report in question. BrownGreer would be represented at these meetings by Mr. Atkinson, Ms. Petkauskas, Mr. Shrunk, Mr. Zola and others (in person and via telephone.) Mr. Mitchell added that the attendance from both sides varied from week to week.

Finally, Mr. Mitchell was asked if he had ever discussed subsistence or impairment zones with Mr. Sutton. Mr. Mitchell stated that he had not.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the

SM-03-JA000104

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client.  These notes are privileged as both an attorney-client communication and as attorney work product.

SM-03-JA000105

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Robert Levine |
| Title: | CFO |
| Office: | DHECC CAO |
| Date/Time: | 8/8/2013 3:57pm |
| Attendees: | Tim Flynn, Walt Donaldson, Dennis Shenberger |
| Location: | 935 Gravier St., New Orleans, LA 70112 |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Robert Levine.

On the above date and times Robert Levine was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Levine was asked if Lionel Sutton ever discussed Romeo Papa with him. He replied, "Never." When asked if he knew what Romeo Papa was, he stated that he only found out after Mr. Sutton was gone. He knows about it now because Dave Welker came to him and had some questions about where to find ownership details on tax returns. Mr. Levine is a CPA and showed him where to find the ownership information on the partnership returns and K1 forms. During this process, he became aware of the relationship between Romeo Papa and Lionel Sutton.

In addition, Mr. Sutton never discussed the Casey Thonn claim or any other possible conflicts of interest with Mr. Levine. The only other conflict that Mr. Levine was personally aware of was when Kayla Frey came to him after discovering that her father, a farmer, had filed a claim. Mr. Levine verified that she did not have an interest in the claim and then told her that she did not need to worry about it, but instructed her to inform David Odom.

When asked about ███████████ Mr. Levine stated that he does not know the name.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues

SM-04-TALF001305

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

for the Special Master Investigative Team.  These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client.  These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-TALF001306

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

| | |
|---|---|
| Interviewee: | Welker, David |
| Title: | Fraud & Waste |
| Office: | CAO |
| Date/Time: | August 6, 2013, 8 AM – 12:15 PM |
| Attendees: | Walt Donaldson, Frank Piantidosi, Ben Scotti |
| Location: | Eastern District of Louisiana Federal Courthouse - Judge McNamara Chambers |

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179").  Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP.  We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP.  We do not represent you, Mr. Welker.

On the above date and times David Welker was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Welker began the interview by explaining how the Tiger Sutton revelations came about. An individual approached him on Tuesday, the 28th of May and indicated that he/she had some information to turn over to Mr. Welker as long as Mr. Welker provided assurances of complete confidentiality. Mr. Welker described this persons' motivation in coming forward as honorable: to protect the program and protect Mr. Juneau. Mr. Welker agreed to the confidentiality request and the individual indicated that he/she had received the information second hand from another individual that actually didn't know that he/she came forward – this meant there was no going back to the other individual to obtain additional information. The person also indicated he/she would go to BP with the same information. The informant did not present Welker with any physical information. The information that was relayed to Mr. Welker was as follows: (1) that Tiger had claimant clients that he had represented prior to joining the settlement program and had referred these claimants to John Andry and that in return, Tiger would get referral fees on these claims; (2) that Tiger was involved in policy making and that he was influencing policy to benefit his attorney friends in the area; (3) that Tiger opened a separate bank account for the kickbacks;  and (4) that Tiger and Andry had been in business together and that he has attempted to influence a claim made by the Andry law firm.

Mr. Welker stated that, based on this information, he went to the CEO David Odom and also to the CFO Bob Levine and said "I need to talk to you about this issue." This was on Tuesday, May 28 and Juneau was out until Thursday, May 30. So in the interim, Welker went into the system to look at the files - he

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

went in and reviewed about 10% of the Andry claims, which were approximately 43 different claims. After the GCCF ended and after the transition period, all claims were migrated to the new system, so now after the migration, Mr. Welker stated that there are twice as many claimants. At the outset, he looked to see if Tiger represented any of these claimants. Mr. Welker came upon one claimant, Casey Thonn, and spent a number of days going through his files. He does not recall if the informer he spoke to mentioned Casey Thonn. Mr. Welker speculated that finding the Thonn claim may have been the result of his name appearing early on the list he was reviewing.

On Thursday, May 30, when Mr. Juneau came back into the office, Mr. Welker met with Mr. Juneau and told him of the recent revelations. David Odom, David Levine and Pat Juneau were all present during this meeting. Mr. Welker informed Mr. Juneau that the individual informant claimed that the problems were systemic and involved multiple claimants [however Mr. Welker explained during his interview that what he looked at didn't appear to validate or substantiate the claims by the individual who came forward stating that the problem was rampant]. Mr. Juneau's response at this point was that he wanted more evidence, something more than the one incident or claim by a confidential informant who made an anonymous allegation based upon statements from a third party. After hearing this, Mr. Welker stated that he continued to pull together information and had Chris Reade pull documents up through the middle of the following week. Mr. Welker then had some personal commitments and did not get a chance to speak to Mr. Juneau until the week of June 10 regarding the additional developments. In the meantime, on the day before Mr. Juneau returned, Mr. Welker reached out to the Federal Bureau of Investigation (that Wednesday May 29th) and wanted to know what category of criminal conduct this behavior would fall under, whether it was business bribery of some sort - it didn't appear to be a quid pro quo. Mr. Welker sensed that Mr. Juneau was not too happy that Mr. Welker went to the FBI before speaking to him. Regardless, Mr. Welker informed Mr. Juneau what he now knew after his continued research.

On June 13th, both Pat and Mike Juneau confronted Mr. Tiger Sutton to look into his eyes and ask him directly. However, there was no immediate action. The week after that confrontation, BP requested a meeting and they met BP on 17th of June. Again, it was on the 13th of June that Sutton was confronted and then denied the allegations/evidence against him. However, after the BP meeting on the 17th of June, Mr. Sutton was suspended on the 19th of June and then came in to see Pat, Mike and Mr. Welker on the 20th of June to tell his story. This meeting was the one in which Mr. Welker served as the scribe.



SM-04-TALF001308

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



Mr. Welker stated that there is less of a chance of paying a false claim now than under the GCCF. Virtually every prosecution right now around the country involves GCCF money.



3

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



4

SM-04-TALF001310

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the

SM-04-TALF001311

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-TALF001312

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee: Marea Herrington
Title: Consulting Manager
Office: Postlethwaite & Netterville
Date/Time: July 30, 2013/1:00 p.m.
Attendees: Greg Paw, Tim Flynn, Mike McCall
Location: 935 Gravier St., 14th Floor, New Orleans, LA

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you [Marea Herrington].

On the above date and time Marea Herrington was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Ms. Herrington received her bachelor's degree from Mississippi State University and her master's degree from the University of Tennessee. Prior to her employment at Postlethwaite & Netterville (P&N), she had spent most of her working life in the field of federal student financial aid, working with such institutions as secondary schools. P&N, which is involved in financial aid consulting, was a recent client of hers, and that engagement led to P&N offering her a position as a full-time employee in November 2012. She has worked on the Deepwater Horizon project exclusively since joining P&N as an employee.



During the training on conflicts of interest, Ms. Herrington learned that she was required to report any contact with a claimant in the Court Supervised Settlement Program (CSSP). She advised the interviewers that she is not from the local area and has no relationships with people in the area. She also is in the habit of not "advertising" what she does for a living.

1

SM-04-TALF001313

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

She has not experienced any of her subordinates coming to her to discuss an actual conflict of interest. There was one conversation, with one of the team leads who is now on the Claims Administration Team, Kyle Martin; however, this conversation was not about an existing conflict of interest, but was more "preemptive" in nature.

Ms. Herrington's responsibilities with P&N have continued to evolve based on the needs of the project. Initially serving as a manager on a Business Economic Loss (BEL) team, Ms. Herrington soon began training other teams. She trains P&N personnel only. She does not know what P&N's turnover rate is for employees on the project, but does not believe that P&N is experiencing a high attrition rate.

Ms. Herrington sometimes has contact with personnel from other DHECC vendors, such as PwC and BrownGreer, mostly in scheduled meetings or when an issue arises with a claim which requires coordination to resolve. The nature of interactions among the vendors involved in claims processing varies with the type of issue involved, but Ms. Herrington has never witnessed representatives of any of the vendors behaving in a manner which she considered less than professional. The general spirit is one of cooperation in order to reach the right decision. Ms. Herrington reports directly to Marc Staley, a director and partner at P&N. She, in turn, directly supervises five senior analysts: Kyle Martin, Angelo Lassey, Logan Pousson, Matt Mick and Alex Prejean. Each senior analyst supervises four or five claims analysts.

Chris Rinaldi was a claims analyst under Ms. Herrington's supervision until approximately March 2013. Mr. Rinaldi moved to another team not supervised by Ms. Herrington due to a structural change. Ms. Herrington is not familiar with a claim for the Andry Law firm that Mr. Rinaldi was working on while he was under her supervision. She does not recall ever hearing of a discussion of a particular claim occurring between Mr. Staley and Mr. Rinaldi. Mr. Staley never mentioned to her that he had talked to Mr. Rinaldi about a claim that needed special attention.

Ms. Herrington is familiar with a procedure whereby, when a claim needs additional attention, the accountant for the claimant e-mails information about the claim to a particular mailbox. She is not aware of instances of such information being mishandled, and specifically not regarding claims handled by Chris Rinaldi.

Mr. Staley has never spoken to Ms. Herrington regarding someone from the Claims Adminstrator's Office (CAO) making inquiries to him about a specific claim, nor has Mr. Staley mentioned Lionel Sutton talking to him about a particular claim.

She has no knowledge of a claim filed by or for a claimant named Casey Thonn.

The only time Mr. Staley ever asked Ms. Herrington about a claim was regarding a reconsideration of a claim for Perone's [phonetic] Restaurant. She does not know how many people with similar positions to hers Mr. Staley supervises, but there are four other members of the senior staff who report directly to him.

2

SM-04-TALF001314

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Ms. Herrington receives inquiries from Mr. Staley about the status of particular claims practically every day. She almost never receives such inquiries from the CAO front office. If someone from the CAO wished to speak with an analyst directly about a claim, Ms. Herrington would be "upset." It is her view that analysts should not talk to anyone outside P&N. A protocol to this effect has been in place at P&N since before Ms. Herrington began working there. Ms. Herrington would have no problem, however, if Mr. Staley contacted one of her analysts directly about a claim.

Ms. Herrington stated that P&N is "the best place I have ever worked," and that she has no problems or ethical concerns with anything P&N has ever done. While she has had little contact with the CAO, she has not seen anything that troubles her there, either.

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.


*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-TALF001315

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee:     Tim Gonzales
Title:           Deepwater Horizon Claimant
Office:          N/A
Date/Time:       August 27, 2013; 5:27 p.m.
Attendees:       Mike McCall, Ben Scotti
Location:        Telephonic interview

These notes are prepared as part of an Independent External Investigation for the Eastern District Court
of Louisiana *IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL
20, 2010,* 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an
independent external investigation related to ensuring the integrity of the CSSP program for the benefit
of the parties and the public and to perform fact finding as to possible ethical violations or other
misconduct within the CSSP. We are also examining and evaluating the internal compliance program
and anti-corruption controls within the CSSP, and making any necessary recommendations to design and
to implement additional such controls, policies, procedures, and practices to ensure the integrity of the
CSSP. We do not represent you [Tim Gonzales].

On the above date and time Tim Gonzales was interviewed by phone. We explained that information
provided in this interview would become part of the investigation record and could be reported to the
District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Gonzales called Mr. McCall in response to a message left earlier by the interviewers on his voice
mail.

At the outset of the interview and after identifying themselves and the purpose of their call, the
interviewers asked Mr. Gonzales whether he was currently represented by legal counsel. Mr. Gonzales
replied that he was not represented.

Mr. Gonzales then furnished the following information.

He has never been represented by an attorney in connections with his claims under the Court
Supervised Settlement Program (CSSP) since his initial representation by Christine Reitano of the law
firm Sutton & Reitano ended. Mr. Gonzales had originally called the Sutton & Reitano firm because
Lionel "Tiger" Sutton III had represented him several years ago in a claim which Mr. Gonzales filed in the
wake of the Hurricane Katrina disaster. When he called the firm and was put in contact with Ms.
Reitano, he did not know for several months that she was Mr. Sutton's wife; he had assumed she was
merely another attorney who worked at the firm.

After a relatively brief period of time, during which Ms. Reitano did not perform very much in the way of
legal services for Mr. Gonzales' claim, Ms. Reitano notified Mr. Gonzales that she could no longer
represent him in connection with the claim, because she was taking a job at the DHECC. At this point in
time, Mr. Gonzales had not paid Ms. Reitano any fees or retainer for her legal services, and she had not
requested any such payment.

1

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Mr. Gonzales did not have any communication with Mr. Sutton about his Deepwater Horizon claims. In fact, he does not recall having had any contact with Mr. Sutton since approximately six years ago, when Mr. Sutton finished his representation of him with regards to his Katrina claim.

After Ms. Reitano ceased representing Mr. Gonzales, he and his wife initially called a couple of attorneys, whose names Mr. Gonzales could not recall, to inquire about their representing him in connection with his CSSP claims. When the attorneys returned the Gonzales' calls, Mr. Gonzales was shocked by how high the fees the attorneys would charge were. They decided that they would not hire an attorney, and that they would pursue their claims on their own, especially in view of what they were told by several sources about how simple the process was supposed to be. Mr. Gonzales' wife then completed and submitted the necessary claim forms and essentially handled the entire process herself.

Mr. Gonzales does not recall ever speaking to or being solicited by attorneys Glen Lerner, John Andry or any attorney from a law firm with the names Lerner or Andry in its title.

Mr. Gonzales offered to check with his wife to verify his recollection regarding the history of their contact with attorneys regarding representation with their claims. After doing so, he called the interviewers back and said that his wife had confirmed his recollection.

He reiterated that he had never paid any attorney any amount of money for representing him in connection with his Deepwater Horizon claims. He did recall that shortly after terminating her representation of him, Ms. Reitano had sent him a check for $1000.00, which represented "emergency funds" that the claims center was issuing to all claimants to help them out while their claims were being processed. Ms. Reitano advised Mr. Gonzales that she was passing along the entire $1000.00 to Mr. Gonzales, because she did not feel right taking any money from him under the circumstances. When Mr. Gonzales' claims were eventually paid in February 2013, he recalled that the sum of $1000.00 was deducted from his final settlement amount, representing the return of the advance "emergency funds."

Finally, we explained that the meeting should be kept in confidence and not discussed with anyone else (except legal counsel), including other employees or anyone outside of the CSSP.

*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client. These notes are privileged as both an attorney-client communication and as attorney work product.

SM-04-TALF001317