On June 20, 2013, Christine Reitano was interviewed at 935 Gravier Street, Suite 1905, New Orleans, Louisiana by Michael Juneau, Patrick Juneau and David Welker, regarding allegations of misconduct against her husband, Lionel H. Sutton III, aka Tiger.

At the onset of the interview, Ms. Reitano was advised there had been allegations of misconduct by Tiger Sutton, in that he had a financial interest in at least one claim. After being read several e-mails which were attachments to a report detailing the misconduct, Ms. Reitano provided the following information: she was not aware of the content of the e-mails read to her. She had never talked to Tiger Sutton about it. Tiger Sutton is involved in a business, Crown LLC, with Glen Lerner and Glen Lerner is a business partner with Jonathon Andry. She believes Lerner funded all Andry advertisements for the BP oil spill. She was aware that they were working together on Crown LLC for years. She was aware that Tiger gave up shares in Crown LLC to Glen Lerner in exchange for cash. She has no financial interest in any claim. The Thonn claim was their only claim before the court ordered settlement program that filed again in the court ordered settlement. She received no money from the Thonn claim. She recalled that they also represented a claimant named Bakkes or Backes in the GCCF but doesn't think they filed a claim in the court ordered settlement program. If Bakkes or Backes filed a claim, it would be for Tallulah's Bar in Slidell, Louisiana.

She stated that Tiger must always ask Glen Lerner for his salary from Crown, LLC. She knows that Lerner put up capital to buy the machine for the Crown, LLC business. They used a friend of hers as the public relations firm and Lerner was the only one putting up money. She never handled any Crown, LLC money, and Tiger has always maintained the checkbook.

She thinks that Tiger is stupid as hell. She felt that Tiger's falling out with his father really hurt him. She thinks he is really smart and it appeared to her he was just wasting his time on small accident cases and such. She saw an opportunity for Tiger in this program. She knows he has taken things so seriously in the program. She indicated that the accountants came up to him because they respect his judgment and integrity. She felt that Tiger working in the program would get him away from Lerner. The program has been good for him. She doesn't believe he will take it to any other level. She believes Tiger has a good compass and this was out of character for him. She thought this might be Tiger's way of getting Lerner to do what he was supposed to do. She asked that we get past perception to his true character.



EXHIBIT
21

TAB C

SM-04-TALF000733

On June 25, 2013, David Duval (DOB 4/10/1970) was interviewed at 935 Gravier Street, Suite 1905, New Orleans, Louisiana by David Welker, regarding allegations of misconduct against Lionel H. Sutton III, aka Tiger Sutton. After being advised of the purpose of the interview, Mr. Duval provided the following information:

Mr. Duval has been employed at the Deepwater Horizon Economic and Property Settlement Trust since May 1, 2012. He is the Appeals Coordinator and handles the appeals process. He set up the procedure and now monitors appeals and manages panelists without influencing them or directing the outcome of their decisions. He ensures they have enough information to make a decision. If they lack enough information, he obtains that information and forwards it to the appropriate panelist. They have handled approximately 700 decisions to date and have another 400 cases assigned to them. The rules of the appeals process are published on the Deepwater Horizon website but once the appeal gets to a panelist, the timing of the review and determination is up to the panelist.

He doesn't recall Tiger having any interest in the Casey Thonn appeal. He vaguely recalls a discussion with Tiger about the RTP. He went to Mike Tusky at Brown Greer to get the correct answer and then provided the information to Tiger. He doesn't recall how the discussion began.

He recalled that Tracy previously worked for Jon Andry. He personally met Jon Andry at a basketball game and they hit it off. After that, Jon called him about claims he had that were sitting for a while. Andry told him that he had sent in some documents to cure the file and simply wanted to know if they had been uploaded to the file. This was not the Andry Law Firm claim but for a claimant he represented. About three months ago, Tiger approached him and said, "I heard you met Jon Andry." Tiger told him he didn't or couldn't have anything to do with Andry. Tiger said Andry told him he wanted to go to lunch with he and David Duval, but Tiger said he needed to avoid Andry and couldn't have anything to do with him.

When the Andry Law Firm claim made it to appeal, Tiger approached him and asked if it had been assigned to a panelist. He asked about the timetable and the process. He said Jon or Gibby may call him regarding the appeal. Tiger did not ask any specific questions about the panelist but said Gibby may call him to ask that question.

About two months ago and then again about a month ago, he went to lunch with Jon Andry and Tracy. During lunch there was no conversation regarding his claim, but Jon Andry called after meeting the second time and asked how long it took for the panelist to make a decision. Jon said the claim was related to the order. Duval told him it depended on when the panelist opened the file. Andry asked to be called when the panelist completed their review. Approximately three weeks later the panelist made their decision. Duval called Jon Andry to advise him. Jon Andry asked a question regarding payments and how they worked, but Andry had not provided his wire instructions. Duval e-mailed Steve Cirami who noted it might be easier to FedEx the payment to Andry. He then contacted Jennifer Goodwin who cited a new rule about placing a hold on the payment for 14 days in the event the other party wanted to challenge the claim. BP had appealed before the new order took effect so they had to wait the 14 days. He called Jon Andry to advise him of the delay. Jon Andry called him back close to the 14 day mark,

which he believed was the next day. Duval told him that if BP doesn't request review, it will be available for processing. Jon Andry called back to ask about the BP discretionary review. Duval told him BP had not filed one. The last thing he did was to e-mail Steve Cirami and reminded him of their previous conversation regarding the Andry claim. He asked what was better to wire the money or have it FedEx'ed to the claimant. After that he learned that the Claims Administrator had placed a hold on the claim. He thinks Mike Juneau told him.

He can't recall any other cases that Tiger took an unnatural interest in. Tiger asked him appeals questions, but not for a specific claim. Christine never took what he thought were extreme or unnatural interest in any claim. He is not aware of any claims that Tiger or Christine had pre-settlement that they brought to the settlement. He is not aware of Tiger or Christine had any financial interest in any claim in the settlement. He was involved with Tiger, Christine and Pat Juneau in the crafting of the "Remand Policy" and he worked on the Rule 22 Policy with Mike Juneau. He has helped a lot of people in the program, eg; if a claim was sitting for a long period of time, he would call on the status and get the claim moving. He has not had a financial interest in any claim coming through the program. He never represented any claimant in the GCCF.

On June 24, 2013, Tracy Steilberg (DOB 5/3/1973) was interviewed at 935 Gravier Street, Suite 1905, New Orleans, Louisiana by David Welker, regarding allegations of misconduct against Lionel H. Sutton III, aka Tiger Sutton. After being advised of the purpose of the interview, Ms. Steilberg provided the following information:

Ms. Steilberg advised that she began working with Lionel H. Sutton III (Tiger) sometime between when she graduated from high school and before she graduated from college. She graduated from high school in 1991 and graduated from college in 1995. She started working for Tiger sometime in 1994 when he was working at Leger and Mestayer. She worked for Tiger and another attorney. She left that job to work at Payne Weber where she worked for approximately six months. She told Tiger if he ever went out on his own to call her she'd work for him again. Tiger went out on his own and created the Sutton Law Firm or Law Offices of L.H. Sutton III. Christine didn't work with him at the time. Initially he rented two offices from Sean Alfortish at 4240 Canal Street and worked all personal injury cases. They then left the Canal Street address and moved to 610 Baronne Street. The Andry Law Firm was there when they moved in. Tiger, Jon Andry and Gibby Andry created 610 Baronne LLC to purchase the building. Gibby took the first floor, Jon took the offices on the second floor, and Tiger took the offices on the third floor. The accounting for each firm was kept separate, at least the accounting for Tiger was kept separately. Maybe toward the end of 2009, Christine came on, when they were still at 610 Baronne Street. She took over all the books and she wanted to change the name to Sutton and Reitano. They stayed at the 610 Baronne building until Tiger and Jon had a falling out due to attorney's fees on a case. Business got really slow after Hurricane Katrina. As a result, Tiger gave up his share of the building to Jon and they moved to a suite on the sixth floor at 935 Gravier Street. She went out on maternity leave on June 18, 2010 and was out for six weeks. She went back to work for Tiger for approximately a year, then left to work for Frank Damico. She left Damico to work at Davis and Duncan until she started at the Deepwater Horizon Economic and Property Trust. When the Deepwater Horizon Economic Claims Trust was setting up, Christine called her regarding an administrative position in the Offices of the Claims Administrator. She was interviewed by David Odom and offered the job. Her role as explained to her was to keep Mr. Juneau and David Odom organized.

When she worked at Sutton and Reitano, they had very few GCCF claims. She recalled GCCF claims for the following clients: Casey Thonn; Tim and Wendy Gonzalez; the Backes, Jennifer and others, names not recalled; Tallulah's (owned by Backes); and Patricia (last name unknown), who had a place on Highway 11 selling shrimp. After Christine joined Tiger's firm, she would take in client's documents, organize them, make copies and send them off to the GCCF. Tiger took over the VoO claims because he was more familiar with those.

She thinks Tiger has a business with Robert Perez called, Romeo Papa, that received funds from the GCCF. She knows that Casey Thonn has a claim in the current program because it came through the appeals process. Tiger asked about the Thonn claim around the same time as it was going through the appeals process. She probably pulled up the claim to check on the status of the claim. If she pulled it up she would have told him the status of the claim. She thought Thonn had a duplicate claim. She recalled that Casey Thonn hired Sutton and Reitano when they were on the sixth floor of 935 Gravier Street. Tiger had to give him up as a client because Christine started working at the Deepwater Horizon Trust.

SM-04-TALF000736

Christine told her they gave the Thonn claim to Jon. Sutton and Reitano had the Thonn claim for a year before the current program began.

Tiger also asked her about the status of the Andry Law Firm claim around the time the claim was going through the appeals process and before it went to a panelist. He asked who the panelist was but she wouldn't tell him. She told him to check the portal. He told her, if Jon or Gibby asks her, she is to tell them she didn't have that information. She doesn't recall Tiger asking about any other claimants that Sutton and Reitano previously represented.

In the course of her duties in the settlement program, she has done nothing to influence or impact the Andry claim or Thonn claim. When these claims came up for appeal, she handled them as she would any other appeal. David Duval would typically communicate when an appeal needed to go to a panelist.

She told Mr. Schiff that her boyfriend's father and mother had filed a claim. When she found out she decided to check the claim file. She discovered that they only had the registration form in the file. She called her boyfriend's mother and told her what the file was lacking to be complete.

Steve Cirami (DOB 7/3/1972) was interviewed on June 27, 2013 at 935 Gravier Street, Suite 1905, New Orleans, Louisiana. After being advised of the purpose of the interview, Mr. Cirami provided the following information:

Mr. Cirami is employed by The Garden City Group (GCG) as the Senior Vice President of Operations. He has been employed at GCG for approximately nine and one half years. GCG is a vendor in the Deepwater Horizon Economic and Property Damage Settlement. He, along with other members of GCG's senior management team (including, Neil Zola, Jennifer Keough and Christi Cannon), oversees the GCG role in the project from front end to back end. GCG provides call centers, data center, document intake, data entry and payment of claims as well as various projects as directed by the Claims Administrator.

Mr. Cirami has never heard of Casey Thonn and he is not familiar with his claim. Up until the recent events, Mr. Cirami may have heard the name Jon Andry, but couldn't tell you anything about it.

Mr. Cirami has had very little individual contact with Tiger Sutton. He has attended several meetings with Sutton.

Approximately two weeks ago, Christine Reitano e-mailed him and copied Tiger Sutton on the e-mail. She asked a general question. Can a claimant be paid by wire if they didn't originally elect for wire payment?   He wrote back and answered yes, and then explained the process. He directed them to complete a Payment Election Form, but that payment is only wired to the attorney's IOLTA account. Most attorneys have an IOLTA account. This policy and practice had been previously approved by Mr. Juneau. Tiger Sutton responded to his last e-mail that the claimant is the lawyer but doesn't have an IOLTA account, can you do it anyway. Mr. Cirami took that to mean the claimant couldn't or didn't want to use an IOLTA account because it was his claim, not one of a client. Mr. Cirami stated the questions didn't seem unusual at the time. Mr. Cirami answered Tiger Sutton by indicating that it was Mr. Juneau's policy, they had made no exceptions and he could ask Mr. Juneau about it, directing him to Mr. Juneau. Tiger Sutton did not respond to that advise. Mr. Cirami advised that the exchange was all via e-mail and involved no verbal discussion. There was no mention of the claimants name or claim number. This was the only contact he had with Tiger Sutton outside of widely attended meetings.

SM-04-TALF000738

On June 26, 2013, Christina Hendrick (DOB 11/2/1982) was interviewed at 935 Gravier Street, Suite 1905, New Orleans, Louisiana by David Welker, regarding allegations of misconduct against Lionel H. Sutton III, aka Tiger Sutton. After being advised of the purpose of the interview, Ms. Hendrick provided the following information:

Ms. Hendrick began working at the Deepwater Horizon Economic and Property Claims Trust (DHECC) in August 2012 in the role of the Court Appointed Distribution Agent (CADA), which is the Mutually Agreed Upon Party Responsible for the Administration and Distribution of funds for the Subsistence Program. Prior to her employment at DHECC, she worked for approximately two years at an engineering firm, CDM Smith, as a disaster recovery grants manager. She noted that her secondary role at the DHECC was the policy reviewer and policy keeper in which she reviewed all Claims Administrator's office policies that were circulated after her date of hire, before they were sent to Mr. Juneau.

Ms. Hendrick advised she had nothing to do with the Casey Thonn claim and in fact had never heard of Casey Thonn. She was rarely asked about individual claims and was more often asked firm wide questions relating to law firms. She never heard of Jon Andry and can't recall firm wide issues relating to the Andry Law Firm. She could not recall any communications with the Landry Law Firm either. She has never heard of Glen Lerner and has never dealt with Andry Lerner LLC.

She advised that Tiger never came to her to specifically influence a policy. In most cases, with policies in general, all policies were commented on by employees at Brown Greer, the Director of Fraud, Tiger, and the legal committee. No one has had specific individual influence in the subsistence program. She recalled a specific instance relating to impairment claims from Texas. She asked the parties for input into the proposed policy. Tiger wanted to take a minimalist approach, requiring only one or two documents to comply with the policy. She wanted a more stringent approach requiring more documents and proof. She went with her approach. Once complete he agreed with her approach. Tiger only reviewed two claims administrator program-wide policies (that she was aware of) and in fact he was only copied, she doesn't know if he read them. She advised there were only five approved polices in the subsistence program with one still pending approval. Tiger only had simple word changes and suggestions to clarify sentence structure for most policies. Some policies were open to discussion regarding fairness or implementation, but all were reviewed by pertinent and applicable personnel, not Tiger Sutton alone. If there was a disagreement, she asked him to take it to the entire legal committee for roundtable input. She wanted to open all policies to additional review by others to include fraud, appeals and the legal committee. All conversations she had with Tiger regarding policies that contained some question, she would always seek input from an appropriate entity such as fraud, appeals, or someone at Brown Greer on the subsistence team.

The only individual claims inquiries came from the Mills Law Firm. They called directly to Tiger instead of her. Tiger was friends with an attorney at the Mills firm whose name was Kenny Prejean or Dejean. He did not ask her to treat them any differently. He was matter of fact with them with respect to their clients. He told them maybe some of their clients may not get paid. He told Kenny Prejean or Dejean that they were helping their clients as much as they could but he didn't know what else he could do for them. One other instance she could recall where an individual claimant came to them from an e-mail

directed to Mr. Juneau.  There was no appearance of evil or that it wasn't legitimate.  She felt that Tiger was always pushing for leniency, generally on the whole subject of subsistence and not targeting any claim specifically when discussing policy, but the program as a whole.

Tiger never told her that he may have had a financial interest in any claim.

She has never done anything with a claim as a favor to someone.  She in fact has only looked at a few claims as a result of telephone calls requesting assistance.  She has checked the status of maybe three claims which she referred to the appropriate group in Brown Greer.  On each occasion she was legitimately assisting a claimant.

On June 21, 2013, Mark Staley was interviewed at 935 Gravier Street, Suite 1905, New Orleans, Louisiana by David W. Welker. Mr. Staley was advised of the topic and purpose of the interview and thereafter provided the following information:

Mark Staley, DOB 10/13/1976, is employed by Postlethwaite and Netterville (P & N), a professional accounting corporation. He has been employed at P & N since 2008 and serves in the position of Director. Prior to his employment with P & N, he worked as a manager at Community Coffee and as a Sr. Consultant at Deloitte.

He was advised the topic of the interview was the BEL Andry Law Firm claim number 100104880. He noted that from time to time, someone from the Claims Administrator's Office calls to check on the status of a claim. He doesn't recall being asked about the BEL Andry Law Firm claim prior to the e-mail chain between himself and Tiger Sutton in early March, 2013. He did not overreact to Tiger Sutton's request to speak to the accountant, but he was not sure what Tiger's questions were. No one needs to speak to his accountants directly about a claim. His accountants initiate contact with claimants or authorized representative as reflected on the claim forms. The accountants initiate the need for discussion regarding the claim unless a callback was requested by the claimant or authorized representative. He was working under the assumption that Tiger Sutton was just interested in the status of the claim. He noted that they provide status updates often, both inside and outside the program. He would only provide the status and then typically only provide specifics to the claimants or their authorized representative.

The e-mail chain between he and Tiger Sutton in early March, 2013 was the first time and he believes only time that Tiger Sutton contacted him regarding the BEL Andry Law Firm claim. He doesn't recall Tiger Sutton re-contacting him regarding the status of the claim. The last status he gave Tiger Sutton was in the e-mail chain, that their review was complete and the claim was moving to the Q/C queue.

He did not follow the claim after Tiger Sutton reached out to him. His team leader, Christopher Rinaldi sent him an e-mail that the claim had been pushed to Q/C. He in turn sent the same message to Tiger Sutton. That was the last contact that he had with Tiger Sutton on that claim. Because of Tiger Sutton's position of authority in the Claims Administrator's Office, when Sutton told him to let him know if there were problems with the claim, he assumed it was a status request. Staley noted that no one would typically come to speak directly to the accountants. In Tiger Sutton's role it would be possible that he could come to speak directly to an accountant, however, the accountant would most probably advise their manager or Senior accountant of the contact. None of his claims analysts came forward to advise him that they had been approached by Tiger Sutton. They do not publish direct access telephone numbers or e-mail addresses and for that reason and usually route telephone calls through a receptionist. No one below the level of manager will typically meet in person with anyone outside P & N or PriceWaterhouseCoopers (PWC). The protocol and practice of P & N is that if an accountant meets with an outside entity, a manager is also present. They adhere to a strict confidentiality policy as well as strict ethical standards published by the industry association and designation.

MS
7-1-13

SM-04-TALF000741

Staley didn't recall Tiger Sutton ever asking to speak to his accountants on any other claim.  Tiger Sutton never approached him with any other question that just didn't seem right, out of place, or inappropriate.

MS
7-1-13

SM-04-TALF000742

On June 20, 2013, at approximately 5:15 pm, Christopher Rinaldi was interviewed by David W. Welker at 935 Gravier Street, Suite 1905, New Orleans, Louisiana. Rinaldi was advised of the topic if the interview and thereafter provided the following information.

Christopher Rinaldi advised that he has been employed by Postlethwaite and Netterville (P & N) since June 4, 2012. He served as a claims analyst until he was promoted to the position of Sr. Analyst in February 2013. As an analyst he worked on the BEL Andry Law Firm claim. He recalled that while reviewing the claim in the last week of December 2012, he noted the claim lacked an owner/officer breakout. As a result, he sent out an incompleteness notice on December 27, 2012.

In February or March 2013, he had already been promoted to the position of team lead. He received an e-mail from Mark Staley which asked, "Can you give me an update on this claim" (referring to the Andry Law Firm claim)? He then went into the system and located the claim. He noted that it was in the accountant allocation queue, and e-mailed Mark Staley back and told him, "it's live again, should I request it to be pulled?", meaning placed into his queue. He put a request into the business intelligence team to move the claim into his queue. He then assigned it to Jordan Wilkinson who was the best analyst he had on his team at the time.

Jordan Wilkinson looked over the file and noted that the requested owner/officer breakout had been provided as requested. Wilkinson noticed what was driving the calculation and indicated they needed a bank statement because the Andry Law Firm had received a large settlement for one of the months in question. Wilkinson called the Andry accountant to request the bank statement and Rinaldi recalled an issue Wilkinson noted regarding the reimbursement of an attorney for medical expenses. They received an explanation for paying the medical expenses of an individual he vaguely recalls as "MD". The bank statement verified the revenue spikes and they sent it along.

Rinaldi advised that he never spoke to anyone in the Claims Administrator's Office regarding the Andry claim. When Mark Staley e-mailed him about the claim, his first impression was that someone from the Claims Administrator's Office had contacted Mark Staley because someone complained about a delay or them not being responsive. He did not speak to anyone else about the claim that did not have a legitimate reason to know about it. He thought though that it was worth asking Mark Staley if the claim should receive special treatment. He specifically asked Staley, "Do I have to work this claim?" Staley told him to give it to a regular analyst on his team and work it as you would any other claim. He was instructed to make appropriate telephone calls, ask appropriate questions, and ask for appropriate information to support the claim. Staley asked to be notified when the claim was complete.

He is ninety-nine percent sure no one from the Claims Administrator's Office spoke to Jordan Wilkinson about the claim. Because of the policies and practice of P & N, Wilkinson would have said something to him.



# HUB
## Enterprises, Inc.  |  Where Risk Meets Resolution

## INVESTIGATIVE REPORT

### August 27, 2013

| | |
|---|---|
| RE:  CLAIMANT NO.: | 100051739 |
| CLAIMANT: | Casey Thonn |
| TYPE OF LOSS: | Seafood Compensation Program Claim |
| HUB CASE NO.: | 6L13070050 |
| DATE ASSIGNED: | July 24, 2012 |
| MULTI-CLAIM SCHEME NAME: | None |
| FINDING: | Choose an item. |

## ASSIGNMENT:

1. Investigate identified SIT concerns with regards to the Claimant not providing trip tickets that would support his reported $156,000.00 2009 shrimping revenue.

2. Additional findings.

## SUMMARY:

1.

## REPORT:

*Note: All of the customers interviewed as of this date have declined to provide recorded statements, be photographed or provide any personal information. With the exception of the Claimant's uncle, Charles "Sonny" Nuccio, his mother, Lisa Thonn, and her boyfriend, Hollis David, the customers declined to meet at their home, and insisted on meeting in a public place.*

**HUB Enterprises, Inc. is a nationwide investigation firm. Provided are license numbers as mandated by State regulations: Arizona 009012; California PI23439; Florida A9400128; Georgia PDC001580; Illinois 117-001297; New York 11000118203; North Carolina 1678; Virginia 113838; Dist. of Columbia 3003**

P.O. Box 3162 Lafayette, Louisiana 70502  800-873-0933  Fax 800-436-4399 hubenterprises.com

SM-04-TALF000744

On **Thursday, July 25, 2013**, Operative (#70030) received and reviewed the referral along with its accompanying attachments, and a comprehensive plan of action was compiled. The Operative verified the Claimant was represented through the Deepwater Horizon Economic claims portal.

On **Thursday, July 25, 2013**, Operative (#70018) traveled to the St. Tammany Parish courthouse, located at 701 N. Columbia Street, Covington, Louisiana 70434. A complete records check was conducted on Casey Thonn. Three criminal, five civil, and two traffic records were located. The Claimant was identified via his date of date of birth on all records located. The only record that appeared to be significant with regards to this investigation was a 2001 criminal conviction of Simple Burglary. The record was CR-331016; 03-05-2001; State of Louisiana, Casey C. Thonn; Simple Burglary. The Claimant on March 7, 2002 entered a plea of guilty, and was sentenced to serve a period of seven years at hard labor with the Department of Public Safety and Corrections of the State of Louisiana. The Claimant was given credit for time served and informed he had a period of two years in which to file an application for post-conviction relief. (See enclosed court findings list).

On **Monday, July 29, 2013**, Operative (#70030) contacted the Louisiana Department of Wildlife and Fisheries (225-765-2898), and spoke with Michelle Rayburn. She verified the Claimant submitted 2008, 2009 and 2010 fishing and shrimping licenses were authentic, and the vessel with registration number LA-9346-FD was registered to the Claimant in 2008, 2009 and 2010.

On **Tuesday, July 30, 2013**, Operative (#70030) contacted the Law Office of Andry Lerner (504-525-5535), and spoke briefly with Christina Mancuso. Ms. Mancuso advised she was departing for lunch, and would return the Operatives call once she returned to her office.

On **Wednesday, July 31, 2013**, Operative (#70018) traveled to the residential address of Katie O'Brien, one of the customers the Claimant listed on his claims form, located at 235103 Bishop Road, Slidell, Louisiana 70460. Upon arrival, he spoke with a male who identified himself as

SM-04-TALF000745

Katie O'Brien's father, Michael O'Brian. He advised his daughter was in the process of moving out of his residence. She was not present at the residence, and it was unknown if she would be returning this day. The Operative provided his contact information, and asked Mr. O'Brian to have his daughter call him when she returned. Mr. O'Brian then provided 985-707-4686 as his daughters contact number. The Operative called the provided number which was answered by a voicemail system. A detailed message along with a request for a return call was left.

The Operative initiated a neighborhood canvass. He approached the nearest residence at 35129 Bishop Road; however, the door remained unanswered. He spoke with two males who were pressure washing the driveway; however, neither of them knew Ms. O'Brian. There were no additional residences in the nearby area to canvass.

Data research revealed the possible current residential address for customer Wayne C. Carter was 114 Everest Drive in Slidell, Louisiana 70460. He departed the area, en route to 114 Everest Drive in Slidell, Louisiana 70460. Upon arrival, the Operative approached the residence; however, the door remained unanswered. A note was left on the door requesting a call from Mr. Carter. The Operative then initiated a neighborhood canvass. He approached the residence at 115 Everest Drive, and spoke with a female who identified herself as Robin. She advised Mr. Carter works during the day, and is normally home after 17:00 hours.

On **Thursday, August 1, 2013**, Operative (#70018) contacted Sammy Nuccio (504-615-4548) one of the customers the Claimant listed on his claims form, who verified he would not be available for an interview until Monday, August 5, 2013. He agreed to meet the Operative in Chalmette, Louisiana, and asked the Operative to contact him around noon on August 5, 2013 to verify the location where the interview will occur.

Telephone calls were placed to several of the customers the Claimant listed on his claims form. The calls were placed to Sandra Swan (504-277-0008), Hollis Davis (985-607-4716), Katie O'Bryan (985-707-4686), Frankie Demetri (985-718-7682), Susie Gorsatti (985-705-4053), and Wayne Carter (504-231-7905). The calls were answered by voicemail systems. The Operative left detailed messages and requested return calls from each of them. He then attempted to call

SM-04-TALF000746

Sonny Nuccio (601-799-4088) one of the customers the Claimant listed on his claims form, and learned the telephone number has been disconnected. Please note, it was later learned that Sonny is the brother of Sammy and both are Uncles to the Claimant.

The Operative contacted Jenn "Jennifer" Gorsaffi, one of the Claimant's customers, (985-445-4414), who agreed to meet with him at 11:30 hours that day, at her place of employment Balli Gallery, located at 796 E. I-10 Service Road, Slidell, Louisiana 70460.

The Operative contacted Kim Price, one of the Claimant's customers, (504-723-4417), who agreed to meet with the Operative on Tuesday, August 6, 2013. She requested the Operative call her on August 6, 2013, to arrange the time and place of her interview.

He then traveled to Balli Gallery, and met with Jenn "Jennifer" Gorsaffi. She was very hesitant, appeared to be nervous, and provided limited information. She reviewed, *Exhibit A-5*, her customer statement, and stated the document was factual. Her signature was not on the document, and she was not asked to sign the document. She first observed this document, *Exhibit A-5*, when the Claimant presented it to her, and asked if he could use her information as his customer to support his claim. Her name and address were already filled out on the document, so she added her contact telephone number. She believes in the years 2009 and 2010 combined, she may have purchased a little over $1,000.00 of shrimp from the Claimant. In addition, it was learned her mother, Susie Gorsaffi in the past has purchased shrimp from the Claimant; however, she did not know the amounts purchased. Ms. Gorsaffi would not provide her mother's contact information; therefore, the Operative provided his contact information, and requested she ask her mother to call him.

He then traveled to the residential address of Lisa Thonn, one of the customers the Claimant listed on his claims form, located at 332 Jacob Street, Slidell, Louisiana 70460. Upon arrival, he observed a new home being built and workers throughout the area. He met with and interviewed Lisa Thonn. She advised the Claimant was her son. She was very hesitant, and provided limited information. She reviewed, *Exhibit A-8*, her customer statement, and stated the document was factual. She first observed this document, *Exhibit A-8*, when the Claimant

SM-04-TALF000747

presented it to her, and asked if he could use her information as his customer to support his claim. She acknowledged the signature on the document was hers. Ms. Thonn stated in 2009 and 2010 she purchased several thousand dollars of shrimp from the Claimant; however, she could not recall the exact amount. In addition, she advised some of her friends and co-workers in 2009 and 2010 had also purchased shrimp from the Claimant. Ms. Thonn excused herself, and terminated the interview, due to construction work being conducted at her residence.

On **Monday, August 5, 2013**, Operative (#70018), again contacted Sammy Nuccio, one of the Claimants customers, (504-615-4548), and scheduled their meeting for 11:15 hours at the McDonald's restaurant, located on Highway 47 in Chalmette, Louisiana 70043. The Operative then traveled to this location, and met with Mr. Nuccio. He provided only limited information and advised he was the Claimant's Uncle and had purchased shrimp from him in 2009 and 2010 prior to the Deepwater Horizon incident. He reviewed, *Exhibit A-1*, his customer statement, and stated the document was factual. He first observed this document, *Exhibit A-1*, when the Claimant presented it to him and asked if he could use his information as his customer to support his claim. His signature was not on the document, and he was not asked to sign the document. Mr. Nuccio stated he purchased 10-15 pounds of shrimp at a time in 2009 and 2010 from the Claimant, and would never spend over $1,000.00 per month on his purchases. He only purchased large shrimp from the Claimant, and stated other individuals did as well; however, their names were unknown. He never received any type of receipts from the Claimant and paid cash for the purchase. He had no knowledge of the Claimant selling seafood to restaurants or commercial businesses. The Claimant owned a shrimping vessel; however, the size and type were unknown. Sonny Nuccio, is Sammy Nuccio's brother, and also the Claimant's Uncle. He was unsure if his brother, Sonny Nuccio, purchased shrimp from the Claimant, and provided Sonny Nuccio's contact number as 769-717-7099.

On **Tuesday, August 6, 2013**, Operative (#70018) attempted to contact Susie Gorsatti (985-705-4053), Sandra Swan (504-277-0008), Frankie Demetri (985-718-7682), and Sammy Nuccio (769-717-7099). The calls were answered by voicemail systems. The Operative left detailed messages and requested return calls from each of them.

SM-04-TALF000748

He contacted Kim Price (504-723-4417), who agreed to meet him at her place of employment, International Game Technology, located at 160 Brookhollow Esplande in New Orleans, Louisiana 70123 at 14:00 hours.

He then traveled to 160 Brookhollow Esplanade in New Orleans, Louisiana 70123, and met with Kim Price. She reviewed, *Exhibit A-10*, her customer statement, and stated the document was factual. She could not recall if the Claimant provided this document for her to review or if it was his mother who provided her the document for her to review. Her signature was not on the document, and she was not asked to sign the document. She does recall completing the document herself. She has known the Claimant since 2000, and has worked with his mother at Lockheed Martin for years. She purchased approximately $2,000.00 worth of shrimp from the Claimant in 2009, but did not purchase shrimp from him in 2010. Her brother, Donald Leon, was the only other person she knew of who purchased shrimp from the Claimant. Mr. Leon was at Ms. Price's home once when the Claimant was selling her shrimp. Mr. Leon at that time purchased between 10 and 12 pounds of large shrimp from the Claimant; however, she could not recall the cost of the shrimp purchased by her brother. She knew the Claimant had a shrimp boat; however, had never physically observed the vessel. She did not know the size or type of shrimp boat the Claimant owned or if he had any employee's.

On **Wednesday, August 7, 2013**, Operative (#70018) contacted Hollis Davis (985-607-4716), and scheduled an appointment at his residence, located at 37429 South Hickory Drive, Pearl River, Louisiana 70452 at 11:00 hours. He then traveled to Mr. Davis's residence, and upon arrival met with Mr. Davis. Mr. Davis provided limited information, but reviewed, *Exhibit A-4*, and stated the document was factual. He first observed this document, *Exhibit A-4,* when the Claimant presented it to him and asked if he could use his information as his customer to support his claim. His signature was not on the document, and he was not asked to sign the document. Mr. Davis is dating the Claimant's mother, Lisa Thonn, and has known the Claimant for five years. He and Ms. Thonn have separate homes, have never resided together.. He purchased $100.00 worth of shrimp from the Claimant on a bi-weekly basis in 2009, totaling between $500.00 and $600.00. Other than Lisa Thonn, he is unaware of any other individuals who purchased shrimp from the Claimant. When asked how much shrimp Lisa Thonn

SM-04-TALF000749

purchased from the Claimant, he stated it was really not important for the Operative to know. The Claimant would deliver his shrimp to him in a pewter colored Chevrolet or GMC truck, which he no longer owns. The Claimant now drives a Chevrolet Impala, and he rarely sees him.

Mr. Davis described the Claimant's shrimp boat as an older model large fiberglass vessel. He believes the vessel was harbored at Wrigley's dock in New Orleans, Louisiana near Highway 190. The Claimant had one of his "buddies" working with him on the vessel; however, he could not recall the name of the Claimant's "buddies". He knew the Claimant was not involved in commercial sales.

The Operative contacted Suzy Gorsaffi (985-705-4053), and scheduled an appointment for Tuesday, August 13, 2013 at 17:15 hours at her daughter's place of employment, Balli Gallery, located at 796 E. I-10 Service Road, Slidell, Louisiana 70460.

He then attempted to contact Sandra Swann (504-277-0008), and received a voicemail system. A detailed message was left requesting a return call.

He contacted Frankie Dimitri (985-718-7682), who advised he attends school during the day and works at night. He scheduled appointment for Tuesday, August 13, 2013 at 16:00 hours. Mr. Dimitri asked to be contacted on August 13, 2013, to confirm the location of the interview.

An attempt to reach Katie O'Brian (985-707-4686) and Sonny Nuccio (769-717-7099), met with negative result. The call was answered by their voicemail systems, to which a detailed message was left along with a request for a return call.

The Operative contacted Lisa Thonn (985-768-7766), who agreed to meet with him, at her residence on Thursday, August 8, 2013 at 11:00 hours.

On **Thursday, August 8, 2013**, Operative (#70018) traveled to 332 Jacob Street in Slidell, Louisiana 70460, and met with Lisa Thonn. She said she previously employed at Lockheed Martin for 25 years, and is currently attending school. Concerning the Claimant, she stated his

SM-04-TALF000750

shrimped for several years; however, she could not recall the exact number of years. Shrimping was the Claimant sole occupation prior to the Deepwater Horizon incident. He sold shrimp to her friends as well as her co-workers in 2009 and 2010. Her co-workers Kim Price, Walter Glotti, (who is currently in the hospital), Sandra Swann (her sister), and Spencer Lubby purchased shrimp from the Claimant. She could not recall any of these individual's telephone numbers or contact information. She advised there were other individuals; however, she could not recall their names or contact information. The Claimant on several occasions sold shrimp at her former place of employment, Lockheed Martin. The individuals at Lockheed Martin knew the Claimant was her son, and could purchase shrimp from him at a price cheaper than market value. She was unsure if the Claimant needed permission or if he obtained permission to sell outside the perimeter of Lockheed Martin. The Claimant relied on his shrimping income; however, she had no knowledge of his 2009 and 2010 shrimping earnings.

The Claimant utilized a gray or pewter colored GMC or Chevrolet truck to deliver shrimp to customers. He kept the shrimp in two very large white coolers packed with ice, and could carry several hundred pounds at a time. After the Deepwater Horizon incident, the Claimant was forced to change careers, and is now a "repo" man for a company in Slidell, Louisiana. He currently resides at the same address he resided at in April 2010; however, she could not recall the physical address.

When the Claimant was a teenager, he was charged with a felony; however, she would not provide any details of the crime. She stated the Claimant's father, Kenny Nunez, died when he was 16 years old, but remembered Mr. Nunez's family was always involved in shrimping. During the interview, Ms. Thonn appeared to be somewhat evasive and hesitant to answer questions.



SM-04-TALF000751



He then contacted Frankie Dimitri (985-718-7682), and scheduled a meeting at 15:42 hours in the Piccadilly parking lot, located at 104 U.S 190, Slidell, Louisiana 70460.

The Operative traveled to the Piccadilly, and met with Frankie Dimitri. He provided limited information, and appeared to be reluctant when providing his answers. He reviewed, *Exhibit A-7*, his customer statement, and stated the document was factual. He first observed this document, *Exhibit A-7,* when the Claimant presented it to him, and asked if he could use his information as his customer to support his claim. He verified the signature on the document was his. Mr. Dimitri is 34 years old; he has known the Claimant and been a close friend since they were 12 years old. He last spoke with the Claimant yesterday evening. He advised the Claimant shrimped all of his adult life, and he has not known him to do anything else.

Mr. Dimitri stated he purchased 10-20 pounds of shrimp from the Claimant monthly for several years prior to the Deepwater Horizon incident. On a few occasion he would purchase more than once a month; however, never purchased more than 20 pounds at a time.

Mr. Dimitri has never worked with or for the Claimant on his shrimping vessel. The vessel was described as a "medium sized" shrimping vessel. The only other individual Mr. Dimitri knew of that purchased shrimp from the claimant, was Wayne Carter, a friend. Mr. Dimitri was aware of only one time when Mr. Carter purchased 10 pounds of shrimp from the Claimant. Mr. Dimitri declined to discuss the Claimant's current relationship with his wife or girlfriend.

SM-04-TALF000752

The Operative then traveled to Balli Gallery, located at 796 E. I-10 Service Road, Slidell, Louisiana 70460, and met with Suzy Gorsaffi. Ms. Gorsaffi provided limited information, but reviewed, *Exhibit A-9*, her customer statement, and stated the document was factual. She first observed this document, *Exhibit A-9*, when the Claimant presented it to her, and asked if he could use her information as his customer to support his claim. Her signature was not on the document, and she was not asked to sign the document.

It was leaned her daughter; Jennifer "Jenn" Gorsaffi is the ex-girlfriend of the Claimant's neighbor Mickey Kaufman. She did not recall the exact address where her daughter and Mr. Kaufman resided; however, knew it was on Kent Street in Slidell, Louisiana.

She has known the Claimant for approximately 10 years prior to the Deepwater Horizon incident, and had purchased 10-20 pounds of shrimp from him 4 or 5 times per month. She could not recall the cost of the shrimp per pound; however, she stated it was cheaper than other businesses. She purchased shrimp from the Claimant throughout 2009, and stopped in April 2010, due to the Deepwater Horizon incident. Ms. Gorsaffi could not recall the amount of money she spent purchasing shrimp from the Claimant in 2009 or 2010.



SM-04-TALF000753



Operative (#70030) contacted the Law Office of AndryLerner (504-525-5535), and spoke briefly with Christina Mancuso.  The Operative requested a face-to –face recorded statement with the Claimant.  Ms. Mancuso stated she would have to get back with the Operative with regards to her request.

On **Thursday, August 15, 2013**, Operative (#70018) traveled to the St. Tammany Parish Courthouse, located at 701 North. Columba Street, Covington, Louisiana 70433.  A complete court records check was conducted on Joelle Offner.  One traffic and two civil records were located, one of which was a no-fault divorce from Casey Thonn filed on June 7, 2011.  She was identified via her date of birth.  The other records did not appear to be significant with regards to this investigation

He then traveled to Lisa Thonn's former place of employment, Lockheed Martin, located at 13800 Old Gentilly Road, New Orleans, Louisiana. 70129.  Upon arrival, he spoke with Administrative Supervisor Sicilia Bloom, who has been with Lockheed Martin since 1984.  She did not recall Lisa Thonn or Kim Price; however, advised they employ over 5,000 individuals at

SM-04-TALF000754

this location.   Lockheed Martin does not allow any type food vendor or food sales trucks to park in front of their property/building.   She did not recall ever hearing that one of their employees had a family member selling shrimp.

The Operative then visited the Security Office at the NASA Space Center, located directly across the street from Lockheed Martin at 13800 Old Gentilly Road, New Orleans, Louisiana 70129.  He spoke with Security Officer A. Levy, who has been with NASA for the last five years.  Mr. Levy does not recall ever seeing or hearing about an individual parked in front of Lockheed Martin selling shrimp.  He advised due to security reasons, his type of activity on the road in front of the NASA Space Center would be investigated.

Mr. Sonny Nuccio was contacted via his cellular telephone (769-717-7099), and advised he was traveling in a vehicle and would have to return the Operative's call.

Attempts to reach Katie O'Brian (985-707-4686) and Sandra Swann (504-277-0008) met with negative results.   The calls were answered by their voicemail systems, to which detailed messages were left along with a request for return call.

Later in the day, the Operative received a return call from Sonny Nuccio.  He advised he was traveling out of town and currently between jobs.  He would not be returning to Louisiana until Sunday, August 18, 2013.  He agreed to meet with the Operative, and requested a call on Tuesday, August 20, 2013 to set the appointment the following week.  During the conversation, he mentioned his late wife was the owner of Claire's Cajun Cuisine in Picayune, Mississippi, and purchased shrimp from the Claimant every week during 2009.  His wife passed away in 2012, and he was forced to sell the business.

On **Tuesday, August 20, 2013,** Operative (#70018) contacted Sonny Nuccio (769-717-7099), and scheduled a meeting with him on Wednesday, August 21, 2013 at 16:00 hours to occur at his residence, located at 106 Richardson Road, Picayune, Mississippi 39466.

Attempts to reach Katie O'Brian (985-707-4686) and Sandra Swann (504-277-0008) met with

SM-04-TALF000755

negative results.  The calls were answered by their voicemail systems, messages were left along with a request for return calls.

On **Wednesday, August 21, 2013,** Operative (#70030) traveled to 106 Richardson Road, Picayune, Mississippi 39466, and met with Charles "Sonny" Nuccio.

From 2002 through 2012, he and his wife owned Claire's Cajun Cuisine, located at 224 E. Canal Street, Picayune, Mississippi 39466.  She was also the cook and ran the business.  He sold the business after her death in 2012.

Weekly,  2009 and some of 2010, they purchased fresh shrimp from the Claimant for their restaurant and its small adjoining seafood market The Claimant was paid with cash, and always gave them a receipt for the purchase.  The purchases were made by Mr. Nuccio or his wife. They would purchase between "one and ten boxes" of shrimp from the Claimant a week.  The boxes contained approximately 100 pounds of shrimp each.  The size of the shrimp varied, and they paid between $2.75 and $4.00 per pound.

Mr. Nuccio advised he is having "trouble with the IRS", because of failure to pay past business taxes, and incorrectly reported business income.  He is unable to locate any of the purchase receipts provided by the Claimant, advising he has been looking through business papers due to his issues with the IRS.

He did not know who whom the Claimant sold his shrimping catch to in 2009 or 2010, other than his business.  In 2010, the Claimant quit fishing and began working as a "repo" man in Slidell, Louisiana.  He reviewed *Exhibit A-11*, his customer statement, and stated the document was factual.  He first observed this document, *Exhibit A-11*, when the Claimant presented it to him, and asked if he could use his information as a customer to support his claim.  His signature was not on the document, and he was not asked to sign the document.

On **Thursday, August 22, 2013,** Operative (#70030), contacted the Pearl River Circuit Clerk Office (601-749-7700) in Picayune, Mississippi 39466 and spoke with a Deputy Clerk LeAnn

SM-04-TALF000756

Smith.  Deputy Clerk Smith has been employed with the Clerk's office for more than ten years, and in this time her duties included issuing business privilege licenses.  She verified Claire's Cajun Cuisine, located at 224 East Canal Street, Picayune, Mississippi 39466 was first issued a privilege license on May 25, 2009, and the business was reported closed on February 23, 2011.  The license had been issued under the name Kimberly Claire Nuccio.

## DATA MINING:

███████████████████████████████████████████████████ The civil court records reported by SSN for the Casey Thonn are a December 30, 2010 suit filed by Capital One Bank USA, NA for $3,464.00.  The information obtained from Data Mining was used to aid in our investigation.  Data Mining reports are available upon request.

## ENCLOSURES:

1. Interview log
2. Phone call log
3. Photo Log
4. Court Findings List
5. Non-Recorded Statement Summary of Jenn "Jennifer" Grosaffi
6. Non- Recorded Statement Summary of Lisa Thonn dated 8-1-2013
7. Non- Recorded Statement Summary of Sammy Nuccio
8. Non- Recorded Statement Summary of Kim Price
9. Non- Recorded Statement Summary of Lisa Thonn dated 8-8-2013
10. Non- Recorded Statement Summary of Hollis Davis
11. Non- Recorded Statement Summary of Frankie Dimitri
12. Non- Recorded Statement Summary of Suzy Grosaffi
13. Exhibit A-1     Customer statement Sammy Nuccio
14. Exhibit A-4     Customer statement Hollis Davis
15. Exhibit A-5     Customer statement of Jenn "Jennifer" Gorsaffi
16. Exhibit A-7     Customer statement of Frankie Dimitri

SM-04-TALF000757

17. Exhibit A-8      Customer statement of Lisa Thonn

18. Exhibit A-9      Customer statement of Susie Gorsaffi

19. Exhibit A-10    Customer statement of Kim Price

20. Exhibit A-11    Customer statement of Sonny Nuccio

**Available Upon Request**

21. Dossier on Casey Thonn

22. Dossier on Joell Offner

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24. Dossier on Lisa Thonn

25. Dossier on Hollis Davis

26. Dossier on Samuel Nuccio

27. Dossier on Katherine O'Bryan

28. Dossier on Sandra Swan

29. Data Mining on Casey Thonn

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**REMARKS:**

At this time, our investigation into this matter is closed pending your review of this report and any additional instructions you may have.

Should you have any questions, or wish to further discuss this matter, please feel free to call me. We appreciate this opportunity to be of service to you.

Darlene M. Cormier

Case Manager

HUB Enterprises, Inc.

Operative(s):

| (#70030) | Darlene M. Cormier |
| (#70018) | Alan Bryant |

SM-04-TALF000758

SM-04-TALF000759

| Table 1 | INTERVIEWS | | | |
|---|---|---|---|---|
| Date | Time | Location | Interviewer | Person(s) Interviewed |
| 8/1/2013 | 11:20 | 796 E. I-10 Service Road, Suite 200, Slidell, Louisiana 70460 | Operative (#70018) | Jenn Gorsaffi |
| 8/1/2013 | 11:58 | 332 Jacob Street, Slidell, Louisiana 70460. | Operative (#70018) | Lisa Thonn |
| 8/5/2013 | 11:12 | Highway 47, Chalmette, Louisnaa 70043 | Operative (#70018) | Sammy Nuccio |
| 8/6/2013 | 14:02 | 1600 Brookhollow Esplanade, New Orlenas, Louisiana 70123 | Operative (#70018) | Kim Price |
| 8/7/2013 | 11:00 | 37429 South Hickory Drive,Pearl River, Louisiana 70452 | Operative (#70018) | Hollis Davis |
| 8/8/2013 | 11:00 | 332 Jacob Street, Slidell, Louisiana 70460 | Operative (#70018) | Lisa Thonn |
| 8/13/2013 | 16:00 | 104 U.S. 190, Slidell, Louisiana 70460 | Operative (#70018) | Frankie Dimitri |
| 8/13/2013 | 17:15 | 796 E. I-10 Service Road, Suite 200, Slidell, Louisiana 70460 | Operative (#70018) | Suzy Grosaffi |

SM-04-TALF000760

| 8/21/2013 | 16:00 | 106 Richardson Road, Picayune, Mississippi 39466 | Operative (#70030) | Sonny Nuccio |
|-----------|-------|------|------|------|

SM-04-TALF000761

| Table 2 | | CALLS | | |
|---------|------|-----------------|-----------------|-----------------|
| Date | Time | Phone Number | Person Calling | Person Called |
| 7/29/2013 | 15:40 | 225-765-2898 | Operative (#70030) | Louisiana Department of Wildlife and Fisheries- Michelle Rayburn |
| 7/30/2013 | 11:52 | 504-525-5525 | Operative (#70030) | Law Office of AndryLerner- Christina Mancuso |
| 7/31/2013 | 12:37 | 985-707-4686 | Operative (#70018) | Katie O'Brien |
| 7/31/2013 | 12:41 | 985-607-4716 | Operative (#70018) | Hollis Allen Davis |
| 7/31/2013 | 12:43 | 985-863-7004 | Operative (#70018) | Hollis Allen Davis |
| 7/31/2013 | 12:45 | 985-704-4053 | Operative (#70018) | Susie Gosetti |
| 8/1/2013 | 09:17 | 504-615-4548 | Operative (#70018) | Sammy Nuccio |
| 8/1/2013 | 09:29 | 504-277-0008 | Operative (#70018) | Sandra Swann |
| 8/1/2013 | 09:33 | 985-607-4716 | Operative (#70018) | Hollis Davis |
| 8/1/2013 | 09:36 | 985-445-4414 | Operative (#70018) | Jen Gorsaffi |
| 8/1/2013 | 09:40 | 985-707-4686 | Operative (#70018) | Katie O'Brien |
| 8/1/2013 | 09:43 | 985-718-7682 | Operative (#70018) | Frankie Demetri |
| 8/1/2013 | 09:49 | 985-705-4053 | Operative (#70018) | Suzy Gorsaffi |
| 8/1/2013 | 09:52 | 504-723-4417 | Operative (#70018) | Kim Price |
| 8/1/2013 | 09:57 | 601-799-4088 | Operative (#70018) | Sonny Nuccio |
| 8/1/2013 | 10:00 | 504-231-7905 | Operative (#70018) | Wayne Carter |
| 8/5/2013 | 10:23 | 504-615-4548 | Operative (#70018) | Sammy Nuccio |
| 8/5/2013 | 11:12 | 504-615-4548 | Operative (#70018) | Sammy Nuccio |

SM-04-TALF000762

| 8/6/2013 | 09:23 | 985-705-4053 | Operative (#70018) | Susie Gosetti |
|---|---|---|---|---|
| 8/6/2013 | 09:26 | 504-277-0008 | Operative (#70018) | Sandra Swann |
| 8/6/2013 | 09:29 | 985-718-7682 | Operative (#70018) | Frankie Dimitri |
| 8/6/2013 | 09:32 | 985-707-4686 | Operative (#70018) | Katie O'Brien |
| 7/7/2013 | 08:45 | 985-607-4716 | Operative (#70018) | Hollis Davis |
| 7/7/2013 | 18:14 | 985-705-4053 | Operative (#70018) | Susie Gonsetti |
| 7/7/2013 | 18:19 | 504-277-0008 | Operative (#70018) | Sandra Swann |
| 7/7/2013 | 18:23 | 985-718-7682 | Operative (#70018) | Frankie Dimitri |
| 7/7/2013 | 18:27 | 985-707-4686 | Operative (#70018) | Katie O'Brien |
| 7/7/2013 | 18:29 | 769-717-7099 | Operative (#70018) | Sonny Nuccio |
| 7/7/2013 | 18:31 | 985-768-7766 | Operative (#70018) | Lisa Thonn |
| 8/13/2013 | 15:30 | 985-718-7682 | Operative (#70018) | Frankie Dimitri |
| 8/13/2013 | 15:38 | 985-718-7682 | Frankie Dimitri | Operative (#70018) |
| 8/13/2013 | 16:14 | 985-705-4053 | Operative (#70018) | Susie Gosetti |
| 8/13/2013 | 16:55 | 985-705-4053 | Susie Gosetti | Operative (#70018) |
| 8/14/2013 | 13:13 | 504-723-4417 | Operative (#70018) | Kim Price |
| 8/14/2013 | 16:59 | 504-525-5535 | Operative (#70030) | Law Office of AndryLerner-Christina Mancuso |
| 8/15/2013 | 13:00 | 769-717-7099 | Operative (#70018) | Sonny Nuccio |
| 8/15/2013 | 13:05 | 504-231-7905 | Operative (#70018) | Wayne Carter |
| 8/15/2013 | 13:10 | 985-707-4686 | Operative (#70018) | Katie O'Brian |
| 8/15/2013 | 13:15 | 504-277-0008 | Operative (#70018) | Sandra Swann |
| 8/15/2013 | 14:00 | 769-717-7099 | Sonny Nuccio | |
| 8/20/2013 | 14:51 | 769-717-7099 | Operative (#70018) | Sonny Nuccio |

SM-04-TALF000763

| 8/20/2013 | 14:54 | 985-707-4686 | Operative (#70018) | Katie O'Brian |
|-----------|-------|--------------|--------------------|---------------|
| 8/20/2013 | 14:58 | 985-707-4686 | Operative (#70018) | Sandra Swann |
| 08/22/2013 | 12:56 | 601-749-7700 | Operaive (#70030) | Deputy Clerk LeAnn Smith |

SM-04-TALF000764

## NON- RECORDED STATEMENT SUMMARY

Statement of:          <u>Jenn "Jennifer" Gorsaffi</u>

Telephone No:          985-445-4414

Social Security No.:   Interviewee declined to provide

- She was very hesitant, appeared to be nervous, and provided limited information. She reviewed, *Exhibit A-5*, her customer statement, and stated the document was factual.   She first observed this document, *Exhibit A-5*, when the Claimant presented it to her, and asked if he could use her information as his customer to support his claim.  Her name and address were already filled out on the document, so she added her contact telephone number.   Her signature was not on the document, and she was not asked to sign the document.   She believes in the years 2009 and 2010 combined, she may have purchased a little over $1,000.00 of shrimp from the Claimant.  In addition, it was learned her mother, Susie Gorsaffi in the past has purchased shrimp from the Claimant; however, she did not know the amounts purchased.  Ms. Gorsaffi would not provide her mother's contact information; therefore, the Operative provided his contact information, and requested she provide it to her mother and her to call him.

SM-04-TALF000765

**NON -RECORDED STATEMENT SUMMARY dated 8/1/2013**

| | |
|---|---|
| Statement of: | Lisa Thonn |
| Address: | 332 Jacob Street, Slidell, |
| | Louisiana 70460 |
| Telephone No: | 985-768-7766 |
| Social Security No.: | Interviewee declined to provide |

- She was very hesitant, and provided limited information.  She reviewed, *Exhibit A-8*, her customer statement, and stated the document was factual.  She first observed this document, *Exhibit A-8*, when the Claimant presented it to her, and asked if he could use her information as his customer to support his claim.  She confirmed the signature on the document was hers.  Ms. Thonn stated in 2009 and 2010 she purchased several thousand dollars of shrimp from the Claimant; however, she could not recall the exact amount.  In addition, she advised some of her friends, and co-workers in 2009 and 2010 had also purchased shrimp from the Claimant.  Ms. Thonn excused herself, and terminated the interview, due to construction work being conducted at her residence.

SM-04-TALF000766

## NON - RECORDED STATEMENT SUMMARY

Statement of:            <u>Sammy Nuccio</u>

Telephone No:            504-615-4548

Social Security No.:     Interviewee declined to provide


- He provided only limited information and advised he was the Claimant's Uncle, and had purchased shrimp from him in 2009 and 2010 prior to the Deepwater Horizon incident. He reviewed, *Exhibit A-1*, his customer statement, and stated the document was factual. He first observed this document, *Exhibit A-1*, when the Claimant presented it to him, and asked if he could use his information as his customer to support his claim. His signature was not on the document, and he was not asked to sign the document. Mr. Nuccio stated he purchased 10-15 pounds of shrimp at a time in 2009 and 2010 from the Claimant, and would never spend over $1,000.00 per month on his purchases. He only purchased large shrimp from the Claimant, and stated other individuals did as well; however, their names were unknown. He never received any type of receipts from the Claimant, and paid him in cash. He had no knowledge of the Claimant selling to restaurants or commercial businesses. The Claimant owned a shrimp vessel; however, the size and type were unknown. Sonny Nuccio, one of the Claimants customers, is Sammy Nuccio's brother, and also the Claimant's Uncle. He was unsure if his brother, Sonny Nuccio, purchased shrimp from the Claimant, and provided Sonny Nuccio's contact number as 769-717-7099.

SM-04-TALF000767

## NON- RECORDED STATEMENT SUMMARY

Statement of:              <u>Kim Price</u>

Telephone No:              504-723-4417

Social Security No.:       Interviewee declined to provide


- She reviewed, *Exhibit A-10,* her customer statement, and stated the document was factual. Her signature was not on the document, and she was not asked to sign the document. She could not recall if the Claimant provided this document for her to sign or if it was his mother who provided her the document to sign. She does recall completing the document herself. She has known the Claimant since 2000, and has worked with his mother at Lockheed Martin for years. She purchased approximately $2,000.00 worth of shrimp from the Claimant in 2009, but did not purchase shrimp from him in 2010. Her brother, Donald Leon, was the only other person she knew of who purchased shrimp from the Claimant. Mr. Leon was at Ms. Price's home once when the Claimant was selling her shrimp. Mr. Leon at that time purchased between 10 and 12 pounds of large shrimp from the Claimant; however, she could not recall the cost of the shrimp purchased by her brother. She knew the Claimant had a shrimp boat; however, had never physically observed the vessel. She did not know the size or type of shrimp boat the Claimant owned or if he had any employee's.

SM-04-TALF000768

## NON- RECORDED STATEMENT SUMMARY

Statement of:            <u>Hollis Davis</u>

Telephone No:          985-607-4716

Social Security No.:      Interviewee declined to provide

- Mr. Davis provided limited information, but reviewed, *Exhibit A-4*, and stated the document was factual.  He first observed this document, *Exhibit A-4*, when the Claimant presented it to him and asked if he could use his information as his customer to support his claim.  His signature was not on the document, and he was not asked to sign the document.

- Mr. Davis is dating the Claimant's mother, Lisa Thonn, and has known the Claimant for five years.  He and Ms. Thonn have separate homes, have never resided together..  He purchased $100.00 worth of shrimp from the Claimant on a bi-weekly basis in 2009, totaling between $500.00 and $600.00.  Other than Lisa Thonn, he is unaware of any other individuals who purchased shrimp from the Claimant.  When asked how much shrimp Lisa Thonn purchased from the Claimant, he stated it was really not important for the Operative to know.

- The Claimant would deliver his shrimp to him in a pewter colored Chevrolet or GMC truck, which he no longer owns.  The Claimant now drives a Chevrolet Impala, and he rarely sees him.

- Mr. Davis described the Claimant's shrimp boat as an older model large fiberglass vessel.  He believes the vessel was harbored at Wrigley's dock in New Orleans, Louisiana near Highway 190.  The Claimant had one of his "buddies" working with him on the vessel; however, he could not recall the name of the Claimant's "buddies".  He knew the Claimant was not involved in commercial sales.

## NON- RECORDED STATEMENT SUMMARY dated 8/8/2013

Statement of:            Lisa Thonn

Address:                 332 Jacob Street, Slidell,
                         Louisiana 70460

Telephone No:            985-768-7766

Social Security No.:     Interviewee declined to provide


- She was employed by Lockheed Martin for 25 years, and is currently attending school. The Claimant has shrimped for several years; however, she could not recall the exact number of years. He sold shrimp to her friends as well as her co-workers in 2009 and 2010. Her co-workers Kim Price, Walter Glotti, ( who is currently in the hospital), Sandra Swann (her sister), and Spencer Lubby purchased shrimp from the Claimant. She could not recall any of these individual's telephone numbers or contact information. She advised there were other individuals; however, she could not recall their names or contact information. The Claimant on several occasions sold shrimp at her former place of employment, Lockheed Martin. The individuals at Lockheed Martin knew the Claimant was her son, and could purchase shrimp from him at a price cheaper than market value. She was unsure if the Claimant needed permission or if he obtained permission to sell outside the perimeter of Lockheed Martin. The Claimant relied on his shrimping income; however, she had no knowledge of his 2009 and 2010 shrimping earnings.

- The Claimant utilized a gray or pewter colored GMC or Chevrolet truck to deliver shrimp to customers. He kept the shrimp in two very large white coolers packed with ice, and could carry several hundred pounds at a time. After the Deepwater Horizon incident, the Claimant was forced to change careers, and is now a "repo" man for a company in Slidell, Louisiana. He currently resides at the same address he resided at in April 2010; however, she could not recall the physical address.

- When the Claimant was a teenager, he was charged with a felony; however, she would not provide any details of the crime. She stated the Claimant's father, Kenny Nunez, died when he was 16 years old, but remembered Mr. Nunez's

family was always involved in shrimping.   During the interview, Ms. Thonn appeared to be somewhat evasive and hesitant to answer questions.

SM-04-TALF000771

## <u>NON-RECORDED STATEMENT SUMMARY</u>

Statement of:                <u>Frankie Dimitri</u>

Telephone No:              985-718-7682

Social Security No.:       Interviewee declined to provide


- He provided limited information, and appeared to be reluctant when providing his answers.   He reviewed, *Exhibit A-7*, his customer statement, and stated the document was factual.   He first observed this document, *Exhibit A-7*, when the Claimant presented it to him, and asked if he could use his information as his customer to support his claim.   He verified the signature on the document was his. Mr. Dimitri is 34 years old, and has known the Claimant and been a close friend since they were 12 years old.   He last spoke with the Claimant yesterday evening, and described the Claimant as being very trustworthy and honest.   Mr. Dimitri stated on a scale of 1-10 of honesty, with 10 being the highest, the Claimant was a 10.

- Mr. Dimitri stated he purchased 10-20 pounds of shrimp from the Claimant monthly for several years prior to the Deepwater Horizon incident.   On a few occasion he would purchase more than once a month; however, never purchased more than 20 pounds at a time.

- Mr. Dimitri has never worked with or for the Claimant on his shrimping vessel. The vessel was described as a "medium sized" shrimp vessel.   The only other individual he knew the Claimant sold shrimp was a friend named Wayne Carter, and was aware of one time when Mr. Carter purchased 10 pounds of shrimp from the Claimant.   Mr. Dimitri declined to discuss the Claimant's wife or girlfriends.

SM-04-TALF000772

## NON- RECORDED STATEMENT SUMMARY

Statement of:                    Suzy Grosaffi

Telephone No:                    985-705-4053

Social Security No.:             Interviewee declined to provide

- Ms. Gorsaffi provided limited information, but reviewed, *Exhibit A-9*, her customer statement, and stated the document was factual. She first observed this document, *Exhibit A-9,* when the Claimant presented it to her, and asked if he could use her information as his customer to support his claim. Her signature was not on the document, and she was not asked to sign the document.

- It was leaned her daughter, Jennifer "Jenn" Gorsaffi is the ex-girlfriend of the Claimant's neighbor Mickey Kaufman. She did not recall the exact address where her daughter and Mr. Kaufman resided; however, knew it was on Kent Street in Slidell, Louisiana.

- She has known the Claimant for approximately 10 years prior to the Deepwater Horizon incident, and had purchased 10-20 pounds of shrimp from him 4 or 5 times per month. She could not recall the cost of the shrimp per pound; however, she stated it was cheaper than other businesses. She purchased shrimp from the Claimant throughout 2009, and stopped in April 2010, due to the Deepwater Horizon incident. Ms. Gorsaffi could not recall the amount of money she spent purchasing shrimp from the Claimant in 2009 or 2010.

## NON- RECORDED STATEMENT SUMMARY

Statement of:                Sonny Nuccio
Telephone No:                769-717-7099
Social Security No.:         Interviewee declined to provide

- He was hesitant, and provided limited information. He was married to Kimberly Clair Nuccio, who passed away in 2012.
- From 2002 through 2012, he and his wife owned Claire's Cajun Cuisine, located at 224 E. Canal Street, Picayune, Mississippi 39466. She was also the cook, and ran the business. She sold the business after her death in 2012.
- Weekly in 2009 and some of 2010, they purchased fresh shrimp from the Claimant for their restaurant along with its s small adjoining seafood marking. The Claimant was paid with cash, and always gave them a receipt for the purchase. The purchases were made by Mr. Nuccio or his wife. They would purchase between "1 and 10 boxes" of shrimp from the Claimant a week. The boxes contained approximately 100 pounds of shrimp each. The size of the shrimp varied, and they paid between $2.75 and $4.00 per pound.
- Mr. Nuccio advised he is having "trouble with the IRS", because of none paid past business taxes, and incorrectly reported business income. He is unable to locate any of the purchase receipts provided by the Claimant advising he has been looking through business papers due to his issues with the IRS.
- He did not know who the Claimant sold his shrimping catch to in 2009 or 2010, other than his business. In 2010, the Claimant quite fishing and began working as a "repo" man in Slidell, Louisiana. He reviewed, *Exhibit A11*, his customer statement, and stated the document was factual. He first observed this document, *Exhibit A-11*, when the Claimant presented it to him, and asked if he could use his information as his customer to support his claim. His signature was not on the document, and he was not asked to sign the document.

## PHOTO SHEET

| CLAIMANT: Casey Thonn | BROWNGREER CLAIM NO: 100051739 |
|---|---|
| LOCATION: Louisiana | HUB FILE NO.: 6L13070050 |
| FILM: DIGITAL | OBTAINED BY: Operative (#70018) |



### PHOTO 1

PHOTO DEPICTS
RESIDENCE OF MR. WAYNE C
CARTER, LOCATED AT 114
EVEREST DRIVE, SLIDELL
LOUISIANA 70460



### PHOTO 2

PHOTO DEPICTS
THE RESIDENCE OF LISA
THONN, LOCATED AT 332
JACOB STREET, SLIDELL,
LOUISIANA 70460

SM-04-TALF000775

PHOTO SHEET

| CLAIMANT: Casey Thonn | BROWNGREER CLAIM NO:  100051739 |
|---|---|
| LOCATION:  Louisiana | HUB FILE NO.:  6L13070050 |
| FILM:  DIGITAL | OBTAINED BY:  Operative (#70018) |



PHOTO 3

PHOTO DEPICTS
RESIDENCE OF HOLLIS DAVIS,
LOCATED AT 37429 SOUTH
HICKORY DRIVE, PEARL
RIVER, LOUISIANA 70452

SM-04-TALF000776

Exhibit A-11

I, Sonny Nucio bought shrimp throughout the year in 2009 from Casey Thonn. I purchased various quantities of shrimp throughout the shrimping season  If anymoe information is needed I can be reached at ~~601-779-4044~~   769-717-7099

Picayne .Miss.

Sonny Nucio    Aug 21 2013

SM-04-TALF000777

Exhibit A-8

I, _LISA Thonn_ bought shrimp throughout the year in 2009 from Casey Thonn. I purchased various quantities of shrimp throughout the shrimping season. If anymoe information is needed I can be reached at _Lisa Thonn_

332 Oakcob ST Slidell, LA, 70458
(985) 768-7766

LISA Thonn

Lisa Thonn
8/1/13

SM-04-TALF000778

Exhibit A-5

I, _Jenn Grisaffi_ bought shrimp throughout the year in 2009 from Casey Thonn. I purchased various quantities of shrimp throughout the shrimping season. If anymoe information is needed I can be reached at _Slidell, LA, 70458_
_(985) 445 - 4414_

Jenn Grisaffi
Jennifer Grisaffi
8/1/13

SM-04-TALF000779

Exhibit A-1

I, _Sammy Nucio_ bought shrimp throughout the year in 2009 from Casey Thonn. I purchased various quantities of shrimp throughout the shrimping season. If anymoe information is needed I can be reached at _504-615-4548_

_Chalmette La, 70045_

X _Sammy Nucio_

X _____

X AUG 5 - 2013

SM-04-TALF000780

Exhibit A-10

I, _Kim Price_____ bought shrimp throughout the year in 2009 from Casey Thonn  I purchased various quantities of shrimp throughout the shrimping season. If anymoe information is needed I can be reached at _Ø504-727-4417_

_New ORleans, LA_

_____

_Kint·Price_          _8/6/13_

Exhibit A-9

I, Susie Grisaffi bought shrimp throughout the year in 2009 from Casey Thonn  I purchased various quantities of shrimp throughout the shrimping season. If anymore Information is needed I can be reached at (985) 705-6053

Perl River, La.

_Susie Grisaffi_ · 8/3/13

SM-04-TALF000782

Exhibit A-7

I, _Frankie Dimitri_ bought shrimp throughout the year In 2009 from Casey Thonn. I purchased various quantities of shrimp throughout the shrimping season. If anymoe information is needed I can be reached at _Frankie Neils_

_Slivel, LA, 70458_

_(985) 718-7682_

Frankie Dmly        8.13.13

SM-04-TALF000783

Exhibit A-4

I, __Hollis Davis__ bought shrimp throughout the year in 2009 from Casey Thonn I purchased various quantities of shrimp throughout the shrimping season. If anymoe information is needed I can be reached at __(985) 607-6716__

__Perl River LA.__

x Hollis A Davis Jr

x Holl Ulf

— 8-7-13

SM-04-TALF000784

INVESTIGATIVE REPORT

FOLLOW-UP

JULY 1, 2013

IN RE: Lionel H. Sutton, III Matter

**Situation:** On June 20, 2013, an investigative report was drafted detailing allegations of misconduct by an individual working in the Deepwater Horizon Economic and Property Damages Settlement, Claims Administrator's office. The allegations centered on the conduct of Lionel H. Sutton, III, (Tiger Sutton) an attorney in the office. The investigative report detailed the allegations and subsequent investigation to that date. The instant document provides the results of additional investigative steps.

**Investigation:** Following the completion of the aforementioned investigative report, David W. Welker conducted nine interviews of the Claims Administrator's staff, Tiger Suton and Christine Reitano, Postlewaite and Netterville (P & N) accountants, and a Garden City Group (GCG) employee. David W. Welker also requested that the search of Tiger Sutton's e-mails be expanded to include the words, "Lerner" and the word "fee".

**Interviews:** The following individuals were interviewed by David W. Welker and/or Patrick Juneau and Michael Juneau: Jordan Wilkinson (P & N claims analyst/accountant); Christopher Rinaldi (P & N claims analyst/accountant); Mark Staley (P & N, Director); David Duval (CAO, Appeals Coordinator); Tracy Steilberg (CAO, Executive Assistant); Steve Cirami (GCG, Senior Vice President of Operations); Christina Hendrick (CAO CADA); Lionel H. Sutton, III; and Christine Reitano.

On June 20, 2013, Christopher Rinaldi was interviewed. Rinaldi indicated he is a Senior Claims Analyst at P & N. He advised he was a claims analyst before being promoted to a team lead position and had initially worked on the Andry Law Firm BEL claim in December 2012. In February or March 2013, he received an e-mail from Mark Staley asking for an update on the Andry Law Firm BEL claim. He asked if he needed to personally work on the claim. Staley told him to assign it to a claims analyst and work it as he would any other claim. He assigned the Andry Law Firm BEL claim to analyst Jordan Wilkinson. At no time did he speak to Tiger Sutton regarding the claim and he is ninety-nine percent sure Jordan Wilkinson never spoke directly to Sutton. (TAB 1)

On June 20, 2013, Jordan Wilkinson was interviewed. Wilkinson advised he is a claims analyst at P & N. He advised that he was not assigned the Andry Law Firm BEL claim from its inception. He first received the claim in January/February 2013 after it was assigned to him by

SM-04-TALF000785

Christopher Rinaldi. He noted that the documents previously requested were in the claim file but he believed he required bank statements to complete his review. He requested the bank statements from the accountant hired by the Andry Law Firm who provided the requestTd information. The subsequent analysis then went pretty quickly because there was so little needed to complete the review of the claim. Wilkinson never spoke to Tiger Sutton regarding tie claim and to the best of his knowledge Tiger Sutton never attempted to contact him directly. TAB 2)

Mark Staley was interviewed on June 21, 2013. Staley advised that he holds the position of Director at P 8 NI He advised that from time-to-time someone from the CAO contacts him regarding the status of a claim. He does not recall being questioned about the claim prior to his e-mail exchange with Tiger Sutton in March 2013. He noted that when Sutton asked to speak to one of his accountants, he didn't read anything into it, but he noted, "no one needs to talk directly to his aᶦ ccountants." He advised his accountants initiate any contact, but only with the claimant or auorized representative. It is the policy and practice of P & N that if an accountant must meet wi ; an outside entity, a manager is also present. P & N has a strict confidentiality policy as well as strict ethical standards. He did not speak to Sutton outside the exchat4e of e-mails from Makch 2013 (TAB 15, June 20, 2013 Investigative Report). It was the first time that Sutton had contacted him regarding the Andry Law Firm BEL claim and he does not recall Sutton ever re-contacting him regarding the status of the claim. (TAB 3)

On June 25, 2013, David Duval was interviewed. Mr. Duval is the Appeals Coordinator in the CAO. He advised that he didn't recall Tiger Sutton having any interest in the Casey ThJann appeal. He vaguely recalled a discussion with Sutton regarding the RTP. He recalled that when the Andry Law Firm claim made it to the appeals process, Sutton approached him and asked if it had been assi    ed to a panelist. He asked Duval about the timetable and the process. Sutton told him that Jon    dry or Gibby Andry may call him regarding the appeal. Sutton didn't ask him any specific q estions regarding the appeals panelist but told him that Gibby may call him to ask that question. He didn't recall any other claims that Sutton in which took an unnatural interest. Christine Rei   o never took what he thought was an unnatural or extreme interest in         claim. (TAB 4)

On June 20, 2 113, Tiger Sutton appeared at the offices of the CAO, at the request of the CAO. He was subsequently interviewed by David W. Welker, Patrick Juneau, and Michael Juneau. Sutton indicated he didn't understand what was going on and was not sure of the allegations against him. He was advised of the allegations. He was presented an e-mail in which Sutton wrote, "Did you check on my Thonn fee?" Sutton indicated that Thom owed him money. He could not answer why he called it, "my fee." He indicated that Thonn was a case he woked for a year before he joined the CAO and even if he got paid for it he didn't see the issue. He indicated that any money Lerner sends him is for money he is owed for his role in Crown LLC. Lerner owed him money for public relations expenses and his salary. He was to receive $15,000 monthly for public relations expenses and $10,000 monthly for a salary for Crown LLC. When he referred the Thonn claim to Andry Lerner LLC, he told them (Jon Andry and Glen Lerner)

SM-04-TALF000786

that the case was in part for Lerner so he could use the money to pay him (Sutton) the money he was owed. When Lerner settles a claim, the money goes to Jon Andry to pay for Crown. He emphasized he didn't get any money from the Thonn claims. He advised that the only reason they referred Thonn to Andry was because Christine began working at the settlement program. When he and Christine represented Thonn, he only had a VoO claim and a seafood claim. He noted that he had also represented Thonn in an auto wreck case in which Thonn received approximately $16,600, but he noted that Andry and Lerner were not involved in that case and he was paid directly by the insurance company. He realized that when he called the money, "his fee", it looked bad. He does not know what the Thonn claim settled for or what the fee was. Every time he discussed Lerner sending money it was for Crown LLC. The e-mail, referring to 50% of the Thonn fee $16665 (TAB 22 June 20, 2013 Investigative Report) was referring to Glen Lerner's share of the Thonn claim, not Thorn's automobile accident. Sutton noted that if he was being dishonest, he wouldn't have done it that way, at least not about the money. He believed this to be an issue between himself and Pat Juneau because it makes it look like he was being dishonest with Pat because he told Pat he did not have a financial interest in any claim. He doesn't believe he violated his contract. He observed that clearly he has to go because of the cost of suspicion, but he wouldn't give up his job for $4900. He concluded that he didn't feel he had given a satisfactory explanation because he didn't have one to give. He didn't see that he had done anything wrong. (TAB 5)

On June 20, 2013, Christine Reitano appeared at the CAO, at the request of the CAO. She was subsequently interviewed by David W. Welker, Michael Juneau and Patrick Juneau. Ms. Reitano was advised of the allegations of misconduct against her husband Tiger Sutton. After being read several e-mails which were attachments to the investigative report of June 20, 2013 detailing the misconduct, Ms. Reitano indicated she was not aware of the contents of the e-mails read to her. She advised that Tiger Sutton is involved in a business, Crown LLC, with Glen Lerner and Glen Lerner is a business partner with Jon Andry. She believed Lerner funds all of Jon Andry's advertisements for the BP oil spill. She was aware they were working on Crown LLC for years. She never handled any Crown LLC money and Tiger Sutton always maintained the checkbook. She advised she had no financial interest in any claim. The Thonn claim was their only claim before the court ordered settlement program that re-filed again in the court ordered settlement. She indicated that she had also represented a claimant names Backes, but wasn't sure if they filed a claim in the settlement program,. If they had filed a claim in the settlement program it would be in the name of Tallulaha's Bar. A review of the DHECC claimant system failed to reveal a claim in the name of Backes or Tallulaha's Bar. She received no money from the Thonn claim. She felt that Tiger Sutton working in the settlement program might get him away from Lerner. She doesn't believe he will take it to another level. She felt that this might be Tiger's way of getting Lerner to do what he was supposed to do. She asked that we get past perception to Tiger's true character. (TAB 6)

On June 26, 2013, Christina Hendrick was interviewed. Ms. Hendrick is the Court Appointed Distribution Agent for the subsistence program. She advised she had nothing to do with the Casey Thonn claim and never heard of Casey Thonn. She never heard of Jon Andry and can't recall any firm-wide issues relating to the Andry Law Firm, nor could she recall any communication with the Andry Law Firm. Likewise she has never heard of or dealt with Glen Lerner. She advised that Tiger Sutton never came to her to specifically influence a policy. In most cases, with policies in general, all policies were commented on by employees at Brown Greer, the Director of Fraud, Tiger Sutton and the legal committee. If she had a disagreement with Sutton, she asked that the issue be taken to the entire legal committee. She felt that Sutton was always pushing for leniency, generally on the whole subject of subsistence not just one claim, but the program as a whole. (TAB 7)

On June 24, 2013, Tracy Steilberg was interviewed. Ms. Steilberg is an Executive Assistant in the CAO. She advised that prior to her employment in the CAO, she worked for Tiger Sutton and Christine Reitano for approximately 19 years. She recalled that the Sutton/Reitano Law Firm handled GCCF claims for the following clients: Casey Thonn; Tim and Wendy Gonzalez; the Backes (Jennifer and others unrecalled); Tallulah's Bar in Slidell; and a woman named Patricia (Last Name Unknown). She is aware that Casey Thonn has a claim in the settlement program because it came through the appeals process. Sutton asked her about the Thonn claim about the same time the claim was going through the appeals process. She probably pulled up the claim to check the status of the claim. If she pulled it up, she probably related the status to Sutton. She thought Thonn had a duplicate claim. She recalled that Casey Thonn hired Sutton and Reitano when the Sutton/Reitano Law Firm was located on the sixth floor at 935 Gravier Street, New Orleans, La. Tiger had to give Thonn up as a client because Christine started working for the settlement program. Christine told her they gave the Thonn claim to Jon Andry. Sutton/ Reitano had the Thonn claim for about a year before the settlement program began. Sutton also asked her about the status of the Andry Law Firm claim around the time the claim was going through the appeals process but before it went to a panelist. He asked her which panelist was assigned the claim but she would not tell him. She told him to check the portal. He told her, if Jon or Gibby asks her, she is to tell them she didn't have that information. She doesn't recall Sutton asking about any other claimants that Sutton/Reitano previously represented. In the course of her duties, she has done nothing to influence or impact the Andry Law Firm claim or the Thonn claim. She handled them as she would any other appeal. She also believed Tiger Sutton had a business with Robert Perez called Romeo Papa, which received funds from the GCCF. (TAB 8)

On June 27, 2013, Steve Cirami was interviewed. Mr. Cirami is employed by the Garden City Group (GCG), as the Senior Vice President of Operations. GCG is a vendor in the Deepwater Horizon Economic and Property Damage Settlement Program. He along with other senior members of GCG's management team oversees the GCG role in the project from front end to back end. GCG provides call centers, a data center, document intake, data entry, and payments

of claims as well as various projects as directed by the Claims Administrator. Mr. Cirami has never heard of Casey Thonn and is not familiar with his claim. Up until the recent events, Mr. Cirami may have heard the name Jon Andry, but couldn't tell you anything about it. Mr. Cirami had very little contact with Tiger Sutton. He has attended several meetings with Sutton. Approximately two weeks prior, Christine Reitano e-mailed him and copied Tiger Sutton on the e-mail. She asked a general question, can a claimant be paid by wire if they did not originally elect for wire payment? He wrote back and answered, yes, and then explained the process. He directed them to complete a Payment Election Form, but that payment is only wired to the attorney's IOLTA account. Most attorneys have an IOLTA account. This policy and practice had previously been approved by Mr. Juneau. Sutton responded to Cirami's last e-mail that the claimant is the lawyer but doesn't have an IOLTA account, can you do it anyway? Mr. Cirami took that to mean the claimant couldn't or didn't want to use an IOLTA account because it was his claim, not one of a client. Mr. Cirami stated the question didn't seem unusual at the time. Mr. Cirami answered Sutton by indicating it was Mr. Juneau's policy, they had made no exceptions, and he could ask Mr. Juneau about it, directing him to Mr. Juneau. Sutton did not respond to that advice. The exchange was via e-mail and involved no verbal discussion. There was no mention of the claimant's name or claim number. This was the only contact he had with Sutton outside of widely attended meetings. (TAB 9)

**Database Review:** Through interviews and the investigation, it was determined that Tiger Sutton was involved in a business named, Romeo Papa, LLC. A review of the Louisiana Secretary of State (SOS) database was queried for information concerning a business named, Romeo Papa. Records were obtained and reviewed that reflect the existence of Romeo Papa, LLC. The sole Registered Agent is listed as Robert H. Perez, 3901 Highway 24, Bourg, La. 70343. The sole Officer is listed as Robert H. Perez, with the same address. The registration date of the corporation is listed as 2/21/2001. (TAB 10)

A review of the DHECC database revealed a Business Economic Loss claim, which is subject to Moratotia Loss review. The claim was filed by Bart Haddad on December 13, 2012, on behalf of Romeo Papa, LLC, claimant # 100158584. (TAB 11)

A review of the financial documents in the claim file revealed that Lionel H. Sutton, III or T-Blue, LLC is listed as a partner on the schedule K tax forms. Louisiana SOS database reflects that T-Blue, LLC was registered on August 8, 2001. The mailing address is listed C/O Lionel H. Sutton, III, at 610 Baronne Street, New Orleans, Louisiana. The sole Registered Agent is listed as Lionel H. Sutton, III and the sole Officer listed is Lionel H. Sutton, III. (TAB 12)

Documents reviewed in the Romeo Papa claim for the tax year 2007, specifically the schedule K tax form lists the partners as T-Blue, LLC and Robert H. Perez. For the tax years 2008, 2009, 2010, and 2011, the schedule Bl, form 1065 tax form lists the 50% partnership as Robert Perez, 50% and Lionel H. Sutton, III, 50%, the schedule K for the same tax years, lists the partners as Robert H. Perez and Lionel H. Sutton, III. It is unknown what the current status of the

partnership is beyond the 2011 tax records submitted in support of the aforementioned claim. (TAB 13)

An additional document reviewed in the Romeo Papa, LLC claim file, Doc ID: 7465159, Doc File ID: 17561220, create date of 1/7/13 reflects an Act of Cash Sale and Assignment, Membership Interests and Sharing Ratios of Romeo Papa, LLC.

The document reflects holders and owners of membership interests and sharing ratios of Romeo Papa, LLC before giving effect to this act of cash sale and assignment: listed are

Name: T-Blue, LLC; Membership Interest/Sharing Ratios Owned 51%

Name: Robert Perez; Membership Interest/Sharing Ratios Owned 49%

Holders and Owners of Membership Interests and Sharing Ratios of Romeo Papa, LLC after Giving Effect to this Act of Cash Sale and Assignment:

Name: Lionel H. Sutton, III; Membership Interest/Sharing ratios Owned 50%

Name: Robert Perez; Membership Interest/Sharing Ratios Owned 50% Name:

T-Blue, LLC; Membership Interest/Sharing Ratios Owned 0%

The document is undated but signed by T-Blue, LLC, BY: Lionel H. Sutton, III, Managing Member; Robert Perez, and Lionel H. Sutton, III. (TAB 14)

A review of court records for the U.S. District Court for the Eastern District of Louisiana reflects a civil law suit, 2:11-cv- 02540, Romeo Papa, LLC v. National Response Corporation, in which a complaint with jury demand was filed on October 7, 2011 by Lionel Sutton. Following several pleadings, an order dismissing the case was signed by U.S. District Court Judge Mary Ann Vial Lemmon on November 6, 2012. (TAB 15).

In the matter of State National Insurance Company v. Cummins Mid-South, Inc., 2:11-cv-02207-ILRL-DEK, wherein Romeo Papa, LLC is a plaintiff, Sutton continued to represent Romeo Papa, LLC through April 22, 2013, when court records reflect the Appeal Record was on loan to Lionel H. Sutton, III. (TAB 16).

In the matter of State National Insurance Company v. Cummins Mid-South, Inc. 2:11 — cv — 02207 ILRL-DEK, a review of the Fifth Circuit, Court of Appeals Docket Report reflects Appellant's Brief Filed on June 14, 2013 with Attorney's for Appellant, Harville and Sutton. (TAB 17)

A review of CAO employee claims access reveals that Sutton accessed the Romeo Papa, LLC claim five times between January 4, 2013 and May 2, 2013.

SM-04-TALF000790

It must *be noted,* Sutton was actively involved in the development of a policy dealing with Moratoria claims as to which claims would be payable under the terms of *the settlement and* which claims would be excluded. The Moratoria policy is still in the drafting stage. Parties are still attempting to reach an agreement on the terms of such policy.

**DHECC E-Mail Review:** Following the drafting of the Investigative Report dated June 20, 2013, the parameters of the e-mail search for Sutton and Reitano's e-mails was expanded to include the words "fee" and "Lerner." The word "fee" was generally too expansive and overwhelming to where the review was not productive. Under the search term Lerner, an e-mail chain was discovered from May 9, 2013, beginning at approximately 3:02 pm, in which Sutton and Lerner discuss a logo for Crown, LLC. Lerner responds, "glad to see you working so hard while I try to figure out how to keep paying for shit." Sutton responded, "u forget. im also working hard to get you $ so you can pay for shit." Lerner responded, "ooh la la, Work harder. How's Chris." Sutton responded, "she's good. it has actually been pretty fun working together on this." Lerner then responded, "They are not paying claims. Insane." Sutton then responded, "Just between me and you, here is your report: 402 claimants; 61% have submitted a signed claim form; 22% started a registration form; 16% finished Registration but did not file a claim form; <1% finished Registration, started a Claim Form but did not finish; 466 total claims filed; 89 paid; 179 incompleteness Notices issued, only 93 responded to (17 of the non-responsives are waiting to get paid); 136 under review but no incompleteness Notices issues; 47 denied. Example of some problems: 1) Your firm was issued an incompleteness notice on Talen's on 12/3. What appears to be a complete response was not received by us until 5/3. During that six month period, a lot of claims got in front of yours. 2) Only a little more than half of your clients have even submitted signed claims. At an intake rate of more than 200/day, your clients will be way behind." (TAB 18)

By e-mail dated June 24, 2013, Chris Reade advised that he had conducted a search of Christine Reitano's DHECC computer. He reported that he could not find any contact between Ms. Reitano and anyone at the Andry Law Firm, including Glen Lerner, Jeff Cahill, Jon Andry and others mentioned in Tiger Sutton's e-mails. He searched the entire computer and all e-mail and the only mention of Casey Thonn, the Andry Firm or any other issues pertinent to this matter are those that come from our automated internal systems, such as payment reports, appeals reports, and similar e-mails from internal systems and staff. The sole mention in an e-mail of Casey Thonn or his claims from Ms. Reitano to anyone else is in an e-mail dated September 17, 2012, entitled, "Re: Expedited Claims." This e-mail has an attachment where Casey Thorn's name is listed first in the Excel file. This e-mail was included in the Investigative Report dated June 20, 2013 at TAB 13, but a copy is included here as well. (TAB 19)

On June 27, 2013, copies of the June 20, 2013, Investigative Report, with attachments, were delivered to the FBI, New Orleans Division, and the United States Attorney, Eastern District of Louisiana at their respective requests. (TAB 20)

*The* investigation at the *Deepwater Horizon* Economic and Property Damages Settlement, Claims Administrator's office continues.

- Please note a correction from the June 20, 2013 investigative report. On page 2, paragraph 2, line 22, it was reported that Casey Thonn has received $477,225.13 in payments from the Deepwater Horizon Economic and Property Damage Settlement. That figure is incorrect. The accurate sum of money he received is $406,402.35.

David W. Welker

SM-04-TALF000792