```
08:34:36   1              UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF LOUISIANA
           2

           3    ************************************************************

           4    IN RE:  OIL SPILL BY THE          Docket No. MDL-2179
                OIL RIG DEEPWATER HORIZON         New Orleans, Louisiana
                IN THE GULF OF MEXICO ON          Friday, July 19, 2013
           5    APRIL 20, 2010

           6    ************************************************************
                BON SECOUR FISHERIES, INC.
           7

                                                  Docket No. 12-CV-970
           8    VS.                               Section "J"
                                                  New Orleans, Louisiana
           9                                      Friday, July 19, 2013

                BP EXPLORATION & PRODUCTION,
          10    INC, ET AL
                ************************************************************

          11
                            TRANSCRIPT OF MOTION PROCEEDINGS
          12          HEARD BEFORE THE HONORABLE CARL J. BARBIER
                            UNITED STATES DISTRICT JUDGE
          13

                APPEARANCES:
          14

          15    FOR THE PLAINTIFFS:              HERMAN, HERMAN, KATZ & COTLAR, LLP
                                                 BY:  STEPHEN J. HERMAN, ESQ.
                                                 820 O'Keefe Avenue
          16                                     New Orleans, LA 70113

          17                                     DOMENGEAUX, WRIGHT, ROY & EDWARDS
                                                 BY:  JAMES P. ROY, ESQ.
          18                                     P. O. BOX 3668
                                                 556 JEFFERSON ST.
          19                                     LAFAYETTE, LA 70502-3668

          20
                FOR BP EXPLORATION &
          21    PRODUCTION INC., ET AT:          KIRKLAND & ELLIS
                                                 BY:  RICHARD C. GODFREY, ESQ.
          22                                          JEFFREY J. ZEIGER, ESQ.
                                                      DAVID J. ZOTT, ESQ.
          23                                     300 N. LaSalle
                                                 Chicago, IL 60654
          24

          25
```

EXHIBIT
a2

```
 1                          KIRKLAND & ELLIS
                            BY:   JEFFREY B. CLARK, ESQ.
 2                                DOMINIC E. DRAYE, ESQ.
                            655 Fifteenth St., N.W.
 3                          Washington, D.C. 20005

 4                          DENTONS US
                            BY:   JEFFREY LENNARD, ESQ.
 5                          7800 Sears Tower
                            233 South Wacker Dr.
 6                          Chicago, IL 60606

 7                          BP LEGAL
                            BY:   MARK HOLSTEIN, ESQ.
 8                          501 Westlake Park Blvd.
                            Houston, TX 77079
 9

10   FOR PATRICK JUNEAU AND DEEPWATER
     HORIZON COURT SUPERVISED
11   SETTLEMENT PROGRAM:        STANLEY, REUTER, ROSS,
                                THORNTON & ALFORD
12                              BY:   RICHARD C. STANLEY, ESQ.
                                      JENNIFER L. THORNTON, ESQ.
13                              909 Poydras St., Suite 2500
                                LL&E Tower
14                              New Orleans, LA 70112

15
     FOR ANDRY LAW FIRM:           SCHONEKAS, EVANS, McGOEY &
16                                 McEACHIN
                                   BY:   KYLE D. SCHONEKAS, ESQ.
17                                       WILLIAM P. GIBBENS, ESQ.
                                   909 Poydras St., Suite 1600
18                                 New Orleans, LA 70112

19
     FOR ANDRY LERNER, LLC:        JAMES A. COBB, JR., ESQ.
20                                 900 Emerald St.
                                   New Orleans, LA 70124
21

22   OFFICIAL COURT REPORTER:      Karen A. Ibos, CRR, RMR, CCR
                                   500 Poydras St., Room HB-406
23                                 New Orleans, LA 70130
                                   (504) 589-7776
24                                 Karen_ibos@laed.uscourts.gov

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer.
```

P R O C E E D I N G S

(FRIDAY, APRIL 5, 2013)

(MOTION PROCEEDINGS)

(OPEN COURT.)

THE COURT:  Good morning everyone.  Please be seated. Call this case please, Stephanie.

THE DEPUTY CLERK:  MDL 10-2179, *in re:  Oil spill by the oil rig DEEPWATER HORIZON in the Gulf of Mexico on April 20th, 2010;* Civil Action 12-970, *Bon Secour Fisheries, Inc., et al v. BP Exploration and Production, Inc., et al.*

THE COURT:  All right.  This matter is before the Court this morning at the request of counsel for BP on its motion for an emergency preliminary injunction to suspend payments from the Court Supervised Settlement Program pending Special Master Freeh's investigation and report.  The parties to the motion and opposition please introduce, counsel please introduce yourself at this time. Who is going to speak, that's what I want to know.

MR. STANLEY:  Your Honor, Rick Stanley here for Pat Juneau and the Settlement Program, along with my partner Jennifer Thornton.  I will be addressing the Court.

THE COURT:  Okay.

MR. HERMAN:  Good morning, your Honor, Steve Herman for the class.

MR. CLARK:  And, your Honor, John Clark for BP.

4

08:35:45  1          THE COURT:  All right.  Very well.

08:35:46  2          MR. SCHONEKAS:  Judge, Kyle Schonekas and Billy Gibbens

08:35:48  3  on the attempted intervenor.

08:35:53  4          THE COURT:  You wish to be heard this morning?

08:35:55  5          MR. SCHONEKAS:  I do, Judge.

08:35:57  6          THE COURT:  All right.  I tell you, I am not going to

08:35:59  7  grant your intervention but I will allow you to speak and file your

08:36:03  8  opposition; but it's going to be filed of record, not under seal,

08:36:08  9  okay?

08:36:08  10          MR. SCHONEKAS:  I did that only because of the

08:36:11  11  magistrate's earlier ruling.

08:36:13  12          THE COURT:  That actually was not an order.  I didn't

08:36:15  13  know what you were talking about when you referenced that; and I

08:36:18  14  checked with Judge Shushan this morning, right, Judge Shushan?

08:36:18  15          MAGISTRATE JUDGE SHUSHAN:  Yes, sir.

08:36:18  16          THE COURT:  There is no order?

08:36:23  17          MAGISTRATE JUDGE SHUSHAN:  There is no order.

08:36:23  18          MR. SCHONEKAS:  We got erroneous advice then.  We have no

08:36:25  19  objection.

08:36:25  20          THE COURT:  I didn't know what order you were talking

08:36:26  21  about because you didn't reference a record document number or

08:36:29  22  anything, and so I had to call Judge Shushan late last night and

08:36:33  23  she confirmed this morning that there is no such order.  There was

08:36:37  24  some e-mail exchange -- we can talk about this later when you get

08:36:41  25  up.

08:36:42  1         MR. SCHONEKAS:  That's fine.

08:36:43  2         THE COURT:  But there is no such order, just to clarify.

08:36:46  3         MR. SCHONEKAS:  We have no objection to it being filed in

08:36:48  4 open court.

08:36:49  5         THE COURT:  Okay.  I will allow your -- not going to

08:36:52  6 allow you to intervene in the case, but I am going to allow you to

08:36:55  7 file your memorandum in opposition; and if you would like to speak

08:36:59  8 for a few minutes, I will give you a chance to do that.

08:37:02 10         MR. SCHONEKAS:  Thank you, sir.

08:37:03 10         THE COURT:  All right.  Very well.  Also, there is

08:37:07 11 another motion to intervene.  Is Mr. Cobb here?

08:37:11 12         MR. COBB:  I am, your Honor.

08:37:12 13         THE COURT:  Same thing for you.  Do you wish to be heard

08:37:15 14 this morning?

08:37:15 15         MR. COBB:  If your Honor please, I will reserve that

08:37:18 16 until I hear what everybody else has to say, but probably not.

08:37:21 17         THE COURT:  Okay.  Did you move to intervene?

08:37:23 18         MR. COBB:  No, sir, I did not.

08:37:25 19         THE COURT:  Okay.  All right.  Very well.  You want your

08:37:28 20 opposition to be filed?

08:37:29 21         MR. COBB:  I do.

08:37:30 22         THE COURT:  Again, it's not going to be under seal, but I

08:37:33 23 will allow your opposition to be filed.

08:37:34 24         MR. COBB:  Thank you, your Honor.

08:37:36 25         THE COURT:  I guess technically yours isn't per se an

08:37:40  1   opposition, yours deals with the pending stay of the Andry Law Firm

08:37:47  2   related claims, correct?

08:37:49  3              MR. COBB:  That's correct, your Honor.

08:37:51  4              THE COURT:  All right.  Just to clarify that.

08:37:52  5              So this is BP's motion, Mr. Clark.

08:38:00  6              MR. CLARK:  Thank you, your Honor.

08:38:05  7              So, your Honor, let me start by setting the stage and

08:38:07  8   talking about what it is that we're requesting.  We're really

08:38:10  9   requesting a remedy that preserves the ability to get future

08:38:15 10   remedies.  If the Court doesn't stop, just temporarily and that's

08:38:19 11   all we're asking for, until the Freeh investigation is completed,

08:38:23 12   claims payments under the settlement program, then the outcome

08:38:26 13   could be that Judge Freeh finds that there's fraud in 20, 100,

08:38:33 14   maybe more instances especially if he finds that a particular

08:38:36 15   policy or one or more policies was procured through some kind of

08:38:40 16   improper influence or fraud or self-dealing, such as some of the

08:38:46 17   allegations that are before you in terms of the Sutton and Reitano

08:38:52 18   issue.

08:38:53 19              And so if that were to happen, your Honor, if the money

08:38:55 20   has been paid out in the interim, then it's not going to be

08:38:57 21   possible for what is -- in many cases it would not be possible for

08:39:00 22   BP to get that back.

08:39:01 23              So what we're asking for the Court, of the Court here is

08:39:04 24   something fairly modest, we think:  Just a temporary pause on the

08:39:10 25   payment of claims until such time as the Freeh investigation

08:39:13  1    completes.  That's all we're asking for.  And we think it's a

08:39:17  2    matter of common sense to ask for it, and it's something that

08:39:20  3    preserves the ability of the Court to actually give BP a remedy as

08:39:23  4    opposed to leaving BP with potentially no remedies if Judge Freeh

08:39:26  5    finds fraud, really to any extent.

08:39:29  6             Turning from that, that's why we think that this request

08:39:33  7    is a necessary complement of the Freeh investigation that your

08:39:38  8    Honor ordered.  In the order you ordered a broad investigation to

08:39:42  9    include not just the Sutton and Reitano issues, but also to look

08:39:48 10    more broadly at whether there are any other instances of fraud or

08:39:52 11    improper claims handling.  And even broader than that, your Honor,

08:39:55 12    to look at the control process and the structure of the claims

08:40:00 13    program and its ability to try to control for these sorts of

08:40:03 14    problems and for fraud.

08:40:04 15             And so given that, in order to, again, allow an effective

08:40:09 16    remedy to be ordered, if Judge Freeh completes all of those tasks

08:40:13 17    and finds, you know, particular misdeeds or structural problems or

08:40:18 18    new controls that need to be imposed, that those can then be put in

08:40:22 19    place and then on an ongoing basis from that point forward the

08:40:25 20    appropriate claims could be paid and claims that were tainted as

08:40:28 21    found by Judge Freeh would not be paid.  That's what we're

08:40:31 22    requesting.

08:40:31 23             I would put it like this, your Honor, if I could.  It's

08:40:36 24    almost in this situation, right, we have the two of the three top

08:40:39 25    legal officers in this entity, the Court Supervised Settlement

08:40:44  1    Program.  And there looks to be fairly strong evidence, although

08:40:48  2    not -- hasn't been established yet in a court of law, that those

08:40:53  3    two top legal officers engaged in self-dealing and in influencing

08:40:58  4    claims and --

08:41:01  5         THE COURT:  What's the evidence that you have or that

08:41:05  6    anyone has that's known to you that either of those folks engaged

08:41:12  7    in, what did you call it, influencing claims?  What's the evidence

08:41:18  8    on that?

08:41:19  9         MR. CLARK:  In the Welker report, your Honor, which is

08:41:21 10    one of the exhibits which I think probably both sides have

08:41:23 11    submitted.

08:41:23 12         THE COURT:  I've read that report.

08:41:25 13         MR. CLARK:  It indicates that one of the informants spoke

08:41:28 14    to Mr. Welker and indicated that there was influence in terms of

08:41:31 15    the way that claims were being -- I'm sorry, policies were being

08:41:35 16    written in order to benefit friends.

08:41:37 17         THE COURT:  I am not talking about policies, I am talking

08:41:39 18    about claims now.  The handling, analyzing, calculation,

08:41:44 19    computation of claims, do you have any evidence or any reason to

08:41:48 20    believe there's evidence that either of those people did or even

08:41:53 21    had the ability to engage in such conduct?

08:41:56 22         MR. CLARK:  In terms of the calculation of claims, your

08:41:59 23    Honor, what the Welker report reveals, let me just focus on that,

08:42:03 24    it indicates that there were payments being made and payments being

08:42:07 25    made on a periodic basis through "Law Firm Y" to --

08:42:14 1          THE COURT:  That's not my question.  I am well aware of

08:42:17 2   that evidence and that's a problem, a serious problem, but that's

08:42:21 3   not my question.

08:42:22 4          My question is:  What evidence do you have, if any, that

08:42:28 5   support your allegation that either of the two attorneys in any way

08:42:35 6   did or were even able to somehow improperly influence the

08:42:42 7   calculation of claims, the way they were valued, the way they were

08:42:47 8   analyzed?

08:42:48 9          Because we know there are multiple layers of review in

08:42:52 10  this program, as I appreciate it.  I mean, I am not over there

08:42:57 11  every day looking at what they're doing, but I have a general

08:43:00 12  understanding of the way it works.  The claims come in, somebody

08:43:05 13  goes through the paperwork, makes sure all of the paperwork is

08:43:08 14  there, it gets scanned in, it goes to an analyst of some sort, and

08:43:14 15  then it ultimately goes to an accounting team, it's randomly

08:43:18 16  allotted to an accountant.  They calculate, they see if -- they

08:43:20 17  usually have to ask for more documentation, particularly in these

08:43:23 18  business claims, and then at some point it goes to a different

08:43:28 19  quality control person.

08:43:29 20          And beyond all of that, as I understand it, if someone is

08:43:34 21  awarded a claim, the letter goes out, the determination letter goes

08:43:42 22  out, you, BP, your client has a right to object, to appeal to an

08:43:47 23  appeal panel, ultimately to appeal, seek discretionary review by

08:43:52 24  the Court.  And you get the whole package; in other words, your

08:43:59 25  team gets a whole package of materials supporting that claim so you

08:44:04  1    can certainly, and I'm sure you do, claims of any significance have

08:44:07  2    it reviewed by your own accountants, economists, whoever, to see if

08:44:11  3    there's anything untoward in that.

08:44:14  4         So with that being the case, it's hard for me to fathom

08:44:19  5    how any single person over there, or two persons over there

08:44:26  6    could -- I mean, we would have to imagine some grand conspiracy

08:44:30  7    where there were dozens of people over there engaged to influence a

08:44:33  8    single claim.  It just seems not very likely at all.

08:44:39  9         So I would like to know what evidence you have.

08:44:41  10        MR. CLARK:  Okay.  The first thing I think I would say,

08:44:44  11   your Honor, there are several points I think you're making so let

08:44:47  12   me --

08:44:47  13        THE COURT:  No, no, respond to my question that I've now

08:44:49  14   asked three times:  What evidence do you have that they engaged

08:44:55  15   in -- not the getting fees from a law firm, we know about that --

08:45:01  16   having the ability and, in fact, influencing the valuation or

08:45:07  17   calculation of claims, what evidence is there of that, if any?

08:45:15  18        MR. CLARK:  Your Honor, the one thing it reveals in that

08:45:17  19   vein is the ability of Mr. Sutton to get immediate access to claims

08:45:21  20   information and to press on Postlethwaite, and there's an

08:45:25  21   indication in the Welker report that he did exactly that, exactly

08:45:30  22   what will happen --

08:45:31  23        THE COURT:  I am aware of that, that he may have made

08:45:34  24   phone calls seeking to know the status of claims, seeing what's

08:45:37  25   holding up a claim, things like that, I am well aware of that.

08:45:40  1    That's not what I'm asking you though.

08:45:40  2            MR. CLARK:   It's not a big jump from there, your Honor,

08:45:43  3    to imagine that he could influence at the very least the

08:45:47  4    prioritization of claims, he could jump someone in the queue.

08:45:49  5            THE COURT:   I'm talking about the calculation of claims.

08:45:52  6            MR. CLARK:   In terms of the calculation of claims, your

08:45:54  7    Honor, let me be clear.   We have not alleged that there is specific

08:45:56  8    evidence that Sutton and Reitano did anything to influence the

08:46:01  9    calculation of the claims.

08:46:02 10            THE COURT:   Thank you.   Now go on to your next point.

08:46:04 11            MR. CLARK:   Okay.   So the point of all of that is that

08:46:06 12    that's precisely the purpose of the Freeh investigation is to find

08:46:08 13    out whether there is something worse than just the kickback scheme

08:46:14 14    that was occurring, or the ability to make sure that somebody

08:46:16 15    jumped ahead in line, which would itself be improper.   And until

08:46:19 16    that process is completed and until it's looked at everything that

08:46:22 17    Sutton and Reitano have done, it's not possible to determine what

08:46:26 18    the outcome of that is going to be.

08:46:28 19            So you don't think that we need to establish that

08:46:30 20    evidence, we have certainly not -- we're only sticking to what we

08:46:33 21    know, your Honor.   At this point we don't know what calculations

08:46:36 22    were enforced.

08:46:37 23            The next one I wanted to mention --

08:46:39 24            THE COURT:   In fact, would you agree for the reasons I

08:46:42 25    said it's highly unlikely, if not impossible, that they could have

08:46:45  1    done that?

08:46:45  2          MR. CLARK:  No, your Honor, I wouldn't agree with that.

08:46:47  3    The reason why I wouldn't agree with that is I think you're focused

08:46:50  4    only internally on the Court Supervised Settlement Program, you're

08:46:53  5    not focused on the ability -- on the fact that Sutton and Reitano,

08:46:56  6    as the evidence that does exist seems to reveal, could reach to the

08:46:59  7    outside.  Is it possible that Judge Freeh could find evidence --

08:47:03  8          THE COURT:  Wait, wait.  Reach to the outside?

08:47:05  9          MR. CLARK:  Yeah, perhaps they were in contact --

08:47:08  10         THE COURT:  The payments are calculated by and paid out

08:47:11  11   of the claims facility, not outside, so I don't even have a clue

08:47:15  12   what you're talking about.

08:47:16  13         MR. CLARK:  Here is what I mean, your Honor.  If there

08:47:18  14   was a fraudulent scheme, for instance, by people on the outside to

08:47:22  15   submit fabricated information and they were given advice perhaps,

08:47:25  16   you know, by someone in the facility.

08:47:27  17         THE COURT:  Do you have any evidence of that?

08:47:29  18         MR. CLARK:  We don't, but that's one of the things that

08:47:31  19   Judge Freeh will be looking at.

08:47:33  20         THE COURT:  You know, the problem I have here is that you

08:47:35  21   all have made a lot of accusations, put out a lot of innuendo, and

08:47:44  22   I want to know what evidence there is to support this.  We know

08:47:50  23   there was a problem over there, we know there was a serious

08:47:51  24   problem.  But I frankly have not seen any evidence that it affected

08:47:56  25   in any way, or could have affected the thing we're here about

08:48:00  1   today, and that is the calculation and how these claims are

08:48:03  2   calculated and paid.

08:48:05  3        MR. CLARK:  Your Honor, with all due respect, I don't

08:48:08  4   think that is why we're here today.  The motion we submitted to you

08:48:11  5   isn't directed at --

08:48:12  6        THE COURT:  You want to stop the payments, that's exactly

08:48:14  7   why we're here today.

08:48:15  8        MR. CLARK:  And we want to stop the payments because the

08:48:16  9   Freeh investigation needs to be completed to determine whether

08:48:19 10   there is fraud in any of the claims and whether there are

08:48:22 11   structural problems in the controls within the organization.

08:48:25 12        Your Honor, I think what it seems like your questions are

08:48:27 13   going to is the notion that this is, the Sutton and Reitano episode

08:48:31 14   is an isolated incident, and I want to suggest to you that that's

08:48:34 15   not true.  BP has recently set up a fraud hotline, and in less than

08:48:40 16   24 hours of that fraud hotline we got a very serious and

08:48:44 17   credible --

08:48:44 18        THE COURT:  Let me ask you this.  That's another issue

08:48:47 19   that we can talk about later, but the fraud hotline -- we already

08:48:50 20   have a fraud hotline, there are two fraud hotlines.  You have

08:48:54 21   evidence you want to submit from the fraud hotline?

08:48:57 22        MR. CLARK:  We can submit --

08:48:57 23        THE COURT:  It's not in what you filed with the Court.

08:48:59 24        MR. CLARK:  No, your Honor, it's something that happened

08:49:01 25   only very recently, and so we submitted the information to the

08:49:03  1    claims facility and to Mr. Welker and to Mr. Juneau.

08:49:07  2           THE COURT:  All right, very well.  We will see where that

08:49:10  3    leads.  Anything else you would like to add?

08:49:12  4           MR. CLARK:  Yes, your Honor.  First of all, actually can

08:49:15  5    I ask for some rebuttal time?

08:49:18  6           THE COURT:  Sure, absolutely.

08:49:20  7           MR. CLARK:  So what I would like to say about this is,

08:49:23  8    again, I was starting to make the analogy to a corporation here.

08:49:27  9    If you have two legal officials, the top two legal officials out of

08:49:30 10    three in an entity that is a multi-billion dollar entity, it's the

08:49:34 11    equivalent of one of the largest corporations in America

08:49:37 12    essentially if it were a for-profit entity.  If those two people

08:49:41 13    were involved intimately in writing all of the policies about how

08:49:45 14    to interpret the agreement --

08:49:47 15           THE COURT:  Well, that's an overstatement in itself.

08:49:49 16    That's the problem I have with your arguments here, and what BP has

08:49:52 17    been arguing and suggesting is that there's been a lot of

08:49:57 18    hyperbole, a lot of overstatement and -- I mean, we have a problem,

08:50:00 19    we know we have a problem, we had a problem, we know it's being

08:50:04 20    addressed, but the statement you just made is not factually

08:50:07 21    correct.  So I have to say that it's not helpful to give me

08:50:13 22    arguments like that.  I want to know what the facts and the

08:50:15 23    evidence are.

08:50:17 24           You're here asking for an injunction under Rule 65.  I

08:50:21 25    can't grant an injunction based on suspicion, innuendo, beliefs,

08:50:29  1    somebody who called in some information, we don't even know who

08:50:32  2    they are, until there's some evidence in front of me.  So that's

08:50:37  3    what I want to focus on what is the evidence that's before us that

08:50:40  4    we know right now.

08:50:41  5               MR. CLARK:  Your Honor --

08:50:43  6               THE COURT:  Beyond what we already talked about.

08:50:45  7               MR. CLARK:  With all due respect, what I said about the

08:50:48  8    powers of Sutton and Reitano as chief legal officers inside the

08:50:52  9    CSSP is not false, it's entirely true, they were the top legal

08:50:56 10    officers.  I am looking at an e-mail here where Ms. Reitano directs

08:51:00 11    both class counsel and BP that:  "I am in charge, Mr. Juneau has

08:51:03 12    established me as the person to contact.  That person is myself."

08:51:07 13    Then there's an e-mail indicating that she is the person to be

08:51:10 14    contacted on all other matters which include interpretations of the

08:51:14 15    agreement.

08:51:15 16               The power to interpret the agreement, your Honor, is an

08:51:17 17    incredibly powerful power.  And the fact that these two

08:51:22 18    individuals, a husband and wife team, who were hired and placed in

08:51:26 19    these extremely sensitive positions of trust and then were not

08:51:29 20    monitored properly -- and their e-mails weren't even reviewed until

08:51:34 21    after nine days by their own evidence, your Honor.  So June 10th

08:51:37 22    supposedly they began to look at their e-mails, but it took until

08:51:41 23    June 19th until they actually found the e-mails.

08:51:43 24               I can tell your Honor that I can search e-mails on a

08:51:46 25    computer using a readily available free program in a matter of

08:51:49 1  seconds looking for key words, it's not something that takes nine

08:51:54 2  days.  The only reason why the investigation was otherwise being

08:51:56 3  drug out by Mr. Juneau until that time that it took that long is

08:52:00 4  because at that point it became clear that BP was going to go to

08:52:03 5  the Court and --

08:52:05 6          THE COURT:  I have to say something about that because

08:52:07 7  the facts are that, because, you know, I was in these meetings, I

08:52:14 8  don't think you were, with Mr. Holstein and some other folks, I

08:52:18 9  think it was Mr. Fendler and Class Counsel and Mr. Juneau.

08:52:25 10         This matter was first brought to the attention of this

08:52:28 11 Court by Mr. Juneau, not by BP.  BP said that this all -- when I

08:52:33 12 say this, I am talking about the issues with the two attorneys --

08:52:38 13 actually focused mainly on one attorney, the husband.

08:52:43 14         And BP said that they had gotten information from some

08:52:49 15 "confidential informant" who claimed to have some documents showing

08:52:57 16 what they alleged, and BP told them, don't give the documents to

08:53:06 17 us.  Go to the claims office, go up the chain, go up the flag pole,

08:53:11 18 so to speak, at the claims facility.  So BP didn't come to me at

08:53:15 19 that time -- which they had the right and an opportunity to do.

08:53:17 20 They could have come to me two weeks earlier, so this thing would

08:53:24 21 have been two weeks further down the road if you all had done that.

08:53:28 22 Instead of reporting that to the Court when you had that

08:53:32 23 information first, you sent them to Mr. Juneau's office.

08:53:40 24         MR. CLARK:  We --

08:53:42 25         THE COURT:  Wait a minute.  Again, it came as some

08:53:46  1   third-hand hearsay from some -- through two confidential sources

08:53:48  2   who did not want to reveal their identity, did not provide any

08:53:51  3   documents, made accusations and Mr. Juneau, he turned it over to

08:53:57  4   Mr. Welker who began to investigate.  And, yes, it took a couple of

08:54:02  5   weeks before it got to the Court.  Maybe I can fault Mr. Juneau or

08:54:06  6   Mr. Welker on that, but maybe I can fault BP on that, because you

08:54:09  7   had the ability to bring that to the Court directly, too.

08:54:12  8        So I don't think it's helpful now to go back and say who

08:54:17  9   should have done what at that time.  I think we're here, we know

08:54:20  10  what the issues are, and let's go forward.

08:54:22  11       MR. CLARK:  There are a few things there, your Honor.

08:54:24  12  First of all, it's unfair to say that BP, you know, did the wrong

08:54:28  13  step in going to Mr. Juneau first.

08:54:30  14       THE COURT:  Look, I don't want to argue this.  I am

08:54:32  15  making a point that you had the ability and could have come to the

08:54:36  16  Court as soon as you had information that you thought there was

08:54:39  17  something untoward going on at the claims facility.  Instead, you

08:54:43  18  referred them over to Mr. Juneau, and that's fine.  And then at

08:54:47  19  some point after the investigation, he came to the Court.

08:54:50  20       I first learned of this from Mr. Juneau, not from you.

08:54:53  21  So that's the only point I am making.  So I don't think it's

08:54:57  22  fair -- I am not trying to fault you or him, I am just pointing out

08:55:00  23  what happened.  Those are the facts so let's move on.  Let's move

08:55:04  24  forward.

08:55:05  25       MR. CLARK:  As another --

|            |    |                                                          |
|------------|----|----------------------------------------------------------|
| 08:55:07   | 1  | THE COURT:  No, let's move forward, okay?                |
| 08:55:09   | 2  | MR. CLARK:  All right.  So the second point that I would |
| 08:55:09   | 3  | make about that, your Honor, is what did they do when they got the |
| 08:55:11   | 4  | information.  It looks like they proceeded in the opposite -- with |
| 08:55:14   | 5  | the opposite of alacrity.  It took a very long time just to do the |
| 08:55:18   | 6  | searchs of the e-mails. |
| 08:55:19   | 7  | It reveals, your Honor, that they don't have the right |
| 08:55:21   | 8  | internal controls in place.  First of all, they should have |
| 08:55:24   | 9  | realtime controls in place that can detect this sort of thing |
| 08:55:27   | 10 | before it happens, they clearly don't have that.  They over-rely on |
| 08:55:30   | 11 | parchment barriers.  You saw three times in the brief they |
| 08:55:34   | 12 | emphasize that they asked Mr. Sutton and Ms. Reitano to sign |
| 08:55:36   | 13 | agreements that basically said that they weren't self-dealing. |
| 08:55:40   | 14 | Well, clearly, at least based on the evidence as it's emerged, it |
| 08:55:44   | 15 | looks like those parchment barriers didn't work.  They didn't lock |
| 08:55:46   | 16 | down their documents.  We are still sitting here now and there are |
| 08:55:49   | 17 | no assurances to the Court that their documents have been locked |
| 08:55:52   | 18 | down and are being preserved. |
| 08:55:54   | 19 | THE COURT:  You keep saying things, Mr. Clark, I don't |
| 08:55:56   | 20 | know if it's through ignorance or you just -- I hope you're not |
| 08:56:00   | 21 | intentionally trying to misrepresent things because you know the |
| 08:56:02   | 22 | press is here and all, but that is absolutely not right.  The |
| 08:56:06   | 23 | minute this came to my attention I told them to lock down |
| 08:56:09   | 24 | everything.  They locked these people out of the offices, they |
| 08:56:12   | 25 | locked their computers down, they had no access to anything.  So |

08:56:16  1  it's really not helpful for you to make statements like that that

08:56:20  2  are not based on fact.

08:56:21  3          MR. CLARK:  Your Honor, I wasn't talking about them being

08:56:22  4  locked out in terms of not being able to access, what talking about

08:56:25  5  is there's no document preservation order that was issued by

08:56:28  6  Mr. Juneau.

08:56:29  7          THE COURT:  It was issued by me to Mr. Juneau and he

08:56:32  8  knows that those are not to be destroyed and that's being done, so.

08:56:36  9          MR. CLARK:  Was that of issue of record, your Honor?

08:56:39  10          THE COURT:  Do you have anything else?

08:56:40  11          MR. CLARK:  Your Honor, why don't I sit down for now and

08:56:43  12  then respond.  Thank you for giving me that time.

08:56:46  13          THE COURT:  Okay.  Good.  Thank you.  Sure.  Mr. Stanley.

08:56:48  14          MR. STANLEY:  Good morning, your Honor.

08:56:54  15          THE COURT:  Good morning.

08:56:55  16          MR. STANLEY:  There's no doubt that everyone here this

08:56:57  17  morning agrees that the allegations that are bringing us here are

08:57:01  18  troubling and disappointing in many ways, but it is our belief and

08:57:06  19  position that the injunctive relief that is being sought here is

08:57:10  20  not merited because it is unnecessary, it is premature, and it is

08:57:15  21  facially overbroad.

08:57:17  22          I'll go through my points quickly because I know your

08:57:21  23  Honor's familiar with everything.

08:57:22  24          We believe it is unnecessary for two primary reasons:

08:57:25  25  One, hold orders are already in place for certain claims that had

08:57:30  1   any remote connection with these two persons or these allegations

08:57:35  2   that have been made.

08:57:36  3        And second, there is absolutely no reason to believe that

08:57:41  4   Mr. Juneau and the Settlement Program would not institute and

08:57:45  5   indeed recommend additional hold orders if additional circumstances

08:57:48  6   come to light that justify them.

08:57:51  7        So hold orders are already in place that are holding back

08:57:55  8   claims, indeed you have interventions here challenging some of

08:57:59  9   those hold orders for people who feel that they're wronged by them.

08:58:03 10   But they are in place and there's no reason to believe that

08:58:06 11   additional orders wouldn't be placed in place immediately if there

08:58:09 12   was any factual support for that.

08:58:11 13        Second, we believe this is premature, again, for two

08:58:15 14   reasons.  There are two investigations going on.  There is an

08:58:19 15   internal investigation by Mr. Juneau, and indeed yesterday we

08:58:23 16   submitted a supplemental report as to the current results of that

08:58:28 17   investigation; and second, there is the external investigation

08:58:32 18   ordered by this Court by Director Freeh.  And I particularly take

08:58:37 19   umbrage to the accusation that Mr. Juneau has drug his feet with

08:58:42 20   the internal investigation, that is patently false.

08:58:45 21        THE COURT:  Tell us what he or his staff have done since

08:58:49 22   this came to light.

08:58:51 23        MR. STANLEY:  He and his staff have used every resource

08:58:54 24   available to check external sources in terms of what could have

08:59:00 25   been done, external e-mail, internal e-mail, interviewed every

08:59:05  1    single person in the claims administrator's office, checked with

08:59:09  2    every vendor that is used by the program, tried to track any claim

08:59:13  3    that had any kind of remote connection to either the law firm

08:59:17  4    that's involved or to either of these two individuals.  We have

08:59:21  5    submitted at least two reports in detail to the Court and to both

08:59:26  6    parties with all of the results of our investigation and all of the

08:59:29  7    backup information.  And that investigation is continuing and will

08:59:35  8    not stop independent of what Mr. Freeh is doing.

08:59:40  9            So, thus far we have found no other information and no

08:59:44 10    other evidence that would justify an expansion of a hold order that

08:59:48 11    this Court has our assurance that we would immediately bring it to

08:59:51 12    your attention if we did, if we were to find out information.

08:59:54 13            THE COURT:  Let me ask you this.  Is there any evidence

08:59:58 14    that's been uncovered by your internal investigation, or otherwise

09:00:05 15    come to light to your knowledge or your client's knowledge, that

09:00:12 16    the attorney or attorneys involved actually did or had the ability

09:00:21 17    to influence the calculation or computation of claims?

09:00:28 18            MR. STANLEY:  No, sir.  I am aware of no such evidence,

09:00:30 19    I've looked at the investigative reports, I've looked at the backup

09:00:34 20    information.  I have seen nothing to support the idea that they had

09:00:38 21    any influence over the calculation of claims to any claimant.

09:00:42 22            THE COURT:  And I outlined a few minutes ago my general

09:00:46 23    understanding, and I'm sure there is a lot more detail that goes

09:00:49 24    into it that I am not aware of, but my general understanding and

09:00:53 25    overview of how the claims are processed there, is what I said

09:00:58  1      essentially accurate, or would you like to comment on that?

09:01:00  2              MR. STANLEY:  I am going to comment on it.  It is

09:01:02  3      accurate though, Judge, as an overview.  In fact, that's what makes

09:01:05  4      this request so overbroad.  The system as it is designed has

09:01:11  5      excellent internal checks and balances.  There are multiple layers

09:01:15  6      of professional venders working in different locations under

09:01:19  7      different supervisors that have to look at each claim.  The claims

09:01:24  8      are calculated for causation in one location and then for amount,

09:01:28  9      if they satisfy causation, in another.

09:01:32  10             Once the eligibility notice goes out, all of the backup

09:01:35  11     documentation and the methodology is submitted to both parties to

09:01:38  12     review; so the claimant has access to it, BP has access to it, PSC

09:01:44  13     has access to it.  It is intended to be an open process.

09:01:48  14             And I think your Honor's conclusion is correct that in

09:01:54  15     order to have that kind of impact on the calculation, you would

09:01:57  16     literally need to have a conspiracy among professional venders from

09:02:02  17     PriceWaterhouse, Postlethwaite & Netterville, BrownGreer, in

09:02:08  18     addition to others who are quality control checking all of this

09:02:11  19     information.  And in addition to getting it past the parties at the

09:02:14  20     end of the day, with a complete factual record provided to them.

09:02:19  21             We think it's highly unlikely that that occurred.  But

09:02:23  22     nonetheless, we do admit and share BP's concern that even what

09:02:29  23     happened is troubling, even what happened is -- has got us on our

09:02:33  24     toes, so to speak.  But we have not been able to find any evidence

09:02:39  25     that your Honor has asked about, that there is any impact on any

```
09:02:42   1    particular calculation.
09:02:43   2           Indeed we've gone back and checked some of the
09:02:45   3    calculations on some of the principal actors here, and come back as
09:02:50   4    we've reported to the Court that those calculations were, in fact,
09:02:54   5    accurate, even after being checked once these allegations came to
09:02:58   6    light.
09:02:58   7           THE COURT:  Am I correct, it's my understanding that, I
09:03:01   8    know I directed Mr. Juneau after this came to light to not only put
09:03:07   9    a hold on those, that limited universe of claims that we're talking
09:03:11  10    about, but to also have his staff, the accountants and so forth go
09:03:17  11    back and have different people re-assess, re-analyze and recompute
09:03:23  12    those claims to make sure that they were done properly, accurately,
09:03:26  13    and without any improper influence.  Has that been done, being
09:03:31  14    done?
09:03:31  15           MR. STANLEY:  It has been done, I believe that that's
09:03:33  16    covered in the order (SIC) that was submitted yesterday.  Not the
09:03:36  17    order, the report that was submitted to you yesterday.  But, yes,
09:03:40  18    it has been done.
09:03:40  19           He did follow your directive, as he also followed your
09:03:43  20    directive to instruct the office to lock down everything in terms
09:03:48  21    of preserving all information so that Director Freeh can look at it
09:03:53  22    and have it at his disposal.
09:03:57  23           So the process that the Court has ordered is working.  It
09:04:02  24    is premature at this point to know whether any further relief may
09:04:06  25    be requested, may be in order.  We are working for the Court, so we
```

09:04:14  1    would be the first to bring it to you as soon as we know about it.

09:04:18  2    But as of now, we're not seeing anything that would justify any

09:04:22  3    expansion of the orders that the Court has already entered.  And

09:04:26  4    our position is that the investigation ought to play out and let's

09:04:31  5    see where we were at the end of the day.  The process is working so

09:04:33  6    there's no reason to issue a broad injunction to alter it.  And

09:04:38  7    indeed an injunction that may even somehow impede or affect the

09:04:43  8    investigation.

09:04:43  9         THE COURT:  What about the -- counsel for BP raises

09:04:47  10   concerns about the involvement of these two attorneys and staff

09:04:54  11   attorneys in the development and promulgation of policies.  My

09:05:01  12   understanding is that since this program went into effect a little

09:05:06  13   over a year ago, got up and running, there have been literally a

09:05:10  14   couple hundred or more than 200, I believe, different policies that

09:05:14  15   have been developed and issued.  What is your understanding or can

09:05:21  16   you explain to me and to everyone, what input or ability -- what

09:05:28  17   actual input or involvement did they have or could have in terms of

09:05:34  18   those policies, and how were those otherwise developed and

09:05:40  19   promulgated?

09:05:41  20        MR. STANLEY:  Yes, your Honor.  First and foremost, it is

09:05:43  21   true that they did have some involvement in, some presence, at

09:05:46  22   least, in participation in those policies.  But the first thing I

09:05:50  23   need to say is that every policy ultimately that is made is made by

09:05:55  24   Mr. Juneau, that is his final decision.

09:05:57  25        But let me back up and unpack it.  With respect to all of

09:06:01  1  the policies that have come out in this complicated program, there

09:06:05  2  are a number of policies that were adopted jointly by BP and the

09:06:12  3  PSC that both parties agreed, both parties proposed.  Those are not

09:06:17  4  policies that anyone would have had any undue influence over.

09:06:21  5  There are also policy disputes where the two parties did not agree

09:06:25  6  where BP's view prevailed.  I can't imagine that they're saying

09:06:30  7  that there's an allegation that Mr. Sutton or Ms. Reitano

09:06:34  8  influenced things in their favor.

09:06:36  9       So focussing on the other policies, we went back and did

09:06:40 10  a two-day review with all of the venders to examine every policy

09:06:45 11  that fell in the third category where it was not a joint policy and

09:06:49 12  where BP did not prevail to see if there was any evidence of any

09:06:53 13  undue influence and we found none.  That was a report we gave to

09:06:58 14  the Court and to the parties yesterday.

09:07:00 15       THE COURT:  My understanding, I've read a lot of stuff in

09:07:03 16  the last day or two, and my understanding is that Mr. Sutton

09:07:12 17  and/or, maybe to a lesser extent, Ms. Reitano, while they certainly

09:07:20 18  may have been present in a number of meetings, they were primarily

09:07:23 19  involved in policies dealing with the subsistence program --

09:07:28 20       MR. STANLEY:  That's correct.

09:07:29 21       THE COURT:  -- and the moratoria issue.

09:07:31 22       MR. STANLEY:  Also correct.

09:07:32 23       THE COURT:  And I also understand, am I correct that

09:07:35 24  neither, I think I read that neither one of those policies have

09:07:38 25  been officially adopted or promulgated yet by Mr. Juneau?

09:07:40  1          MR. STANLEY:  Certainly with respect to the moratoria

09:07:43  2   program; I am less certain about the subsistence program as I stand

09:07:47  3   here.

09:07:48  4          THE COURT:  Okay.  But what was BP's involvement and

09:07:53  5   ability to be involved in the discussions and development of those

09:07:59  6   programs, those policies before they were even issued?

09:08:01  7          MR. STANLEY:  As with all of those policies, Judge, both

09:08:05  8   parties are involved, both parties are engaged in the discussions

09:08:10  9   with the claims administrator office; and at the end of the day

09:08:15 10   when the policy is issued, as you point out, in some instances the

09:08:19 11   policies have not been finalized because they're still under

09:08:24 12   consideration, BP has the ability and has indeed as you know

09:08:28 13   appealed to this Court if they feel that the policy is in any way

09:08:33 14   improper or in any way inconsistent with the agreement, or in any

09:08:37 15   way the process was improper.

09:08:40 16          THE COURT:  My recollection, someone can correct me if

09:08:44 17   I'm wrong, but my recollection is of the hundreds of policies that

09:08:49 18   have been developed and promulgated by the claims facility by the

09:08:53 19   Claims Administrator, there have only been two that have been

09:08:59 20   filtered up to me, bubbled up to me.  The first dealing with an

09:09:04 21   issue dealing with nonprofits and how their losses were calculated,

09:09:10 22   and then the second one would be the BEL, business economic loss

09:09:14 23   issue, which is presently on appeal.

09:09:16 24          MR. STANLEY:  That's my memory as well, Judge.

09:09:18 25          THE COURT:  Okay.

09:09:19  1          MR. STANLEY:  So this is an open process, it's a

09:09:21  2     transparent process, it's not a process where we're going behind

09:09:26  3     closed doors and issuing policies without the parties' involvement.

09:09:31  4     The parties are involved every step of the way.

09:09:34  5          As you're aware, in almost -- in most instances we were

09:09:39  6     able to reach an agreement with both sides, and those policies are

09:09:42  7     in place.  And in many instances BP is the prevailing party when

09:09:46  8     the policy was disputed.

09:09:48  9          But in all instances, they have the opportunity to

09:09:51  10    participate, to comment, to review, and to appeal if they found it

09:09:57  11    to be improper.  And on top of that we have gone back and looked at

09:10:01  12    the process to see if we can find any evidence of any kind of undue

09:10:06  13    influence, if you will, and have found none as of this date, and

09:10:11  14    that's what we have reported to the Court.

09:10:13  15         THE COURT:  All right.  Thank you very much.  Mr. Herman.

09:10:19  16         MR. HERMAN:  Good morning, your Honor, Steve Herman for

09:10:21  17    the class.

09:10:22  18         THE COURT:  Good morning.

09:10:22  19         MR. HERMAN:  We agree with Mr. Stanley and we've

09:10:25  20    submitted a brief that sets forth our position.  I am not sure,

09:10:27  21    unless the Court has any questions, that we have anything

09:10:30  22    additional meaningful to add.  I am happy to answer any questions.

09:10:34  23         THE COURT:  I don't think so, unless we want to clarify

09:10:40  24    on the record -- of course I can ask BP's lawyers, too -- I'll just

09:10:48  25    say that one of the things that's concerned me in this case in

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
| 09:10:57 | 1 | recent weeks, you know, I have complimented counsel throughout this |
| 09:11:05 | 2 | litigation for acting professionally and civilly towards each |
| 09:11:11 | 3 | other, and I think it's been very commendable in large part, and |
| 09:11:16 | 4 | certainly during the trial, you know, I had no problems whatsoever |
| 09:11:20 | 5 | and everything was handled as it should be. |
| 09:11:27 | 6 | But when a lot of misinformation is spread by whoever |
| 09:11:38 | 7 | it's spread by, but obviously coming from someone involved in the |
| 09:11:42 | 8 | case, it's troubling.  It's hard to correct something once a lot of |
| 09:11:51 | 9 | information gets spread around, and something as simple as how did |
| 09:11:58 | 10 | Mr. Juneau get appointed and who appointed him.  I mean, when |
| 09:12:02 | 11 | you've got the media reporting based on some anonymous sources |
| 09:12:08 | 12 | apparently that I picked Mr. Juneau because he was a "good ole boy, |
| 09:12:13 | 13 | plaintiffs lawyer, friend of mine" somehow, which was incorrect in |
| 09:12:18 | 14 | at least two scores.  We all know he is not a "good ole boy, |
| 09:12:23 | 15 | plaintiffs lawyer."  He may be a good ole boy, but he is not a |
| 09:12:27 | 16 | plaintiffs lawyer, we all know that. |
| 09:12:30 | 17 | And I didn't pick him.  The scenario that unfolded, as I |
| 09:12:33 | 18 | recall, is that you all were going to initially come to me and |
| 09:12:36 | 19 | propose three names from which I would select one.  Instead, in the |
| 09:12:40 | 20 | end when it was presented to the Court, the motion to establish the |
| 09:12:47 | 21 | transition program from the GCCF and set up the new DEEPWATER |
| 09:12:55 | 22 | HORIZON Court Supervised Settlement Program, counsel for BP, BP and |
| 09:12:58 | 23 | you all as interim class counsel at the time, or PSC, whichever |
| 09:13:03 | 24 | role you were occupying at the time, came to me and said we've |
| 09:13:06 | 25 | agreed, we want you to appoint Pat Juneau as the Claims |

09:13:10  1    Administrator.  And that's what I did, I accepted your

09:13:16  2    recommendation and appointed him.

09:13:17  3         So again, it's really disappointing when so many basic,

09:13:23  4    factual misrepresentations get reported and then somebody has to

09:13:30  5    try to go around correcting these things that get spread around

09:13:35  6    with all of the inferences that someone wants to make from these

09:13:38  7    basic misstatements of fact, you know.

09:13:40  8         MR. HERMAN:  Well, I can confirm for the record and I

09:13:46  9    have confirmed for the record that what your Honor represents is

09:13:50 10    correct that Mr. Juneau was selected and proposed by the parties,

09:13:53 11    including BP.  My impression was that BP very enthusiastically

09:13:59 12    supported Mr. Juneau and that they were delighted with Mr. Juneau,

09:14:03 13    all the way up until I guess someone figured out that they

09:14:07 14    underestimated the value of the settlement and now he's become

09:14:10 15    their scapegoat, but they seemed to be very happy with him up until

09:14:13 16    that point.  And I believe that they even made those

09:14:16 17    representations to the Court at the fairness hearing in November of

09:14:18 18    2012.

09:14:20 19         THE COURT:  Well, what I recall, beyond that, is that no

09:14:28 20    one -- that's probably an exaggeration, not no one, almost no one

09:14:32 21    was happy at that point with Mr. Feinberg and the GCCF.  And I am

09:14:37 22    not saying that's my opinion, I am just saying what people were

09:14:41 23    saying at the time.  In fact, I had many motions filed asking me to

09:14:53 24    basically take over the GCCF from Mr. Feinberg, which I declined to

09:14:59 25    do.  I had motions filed by the Attorneys General of the five gulf

09:15:07  1    coast states asking me to take over the program from Mr. Feinberg,

09:15:11  2    which I refused to do.  I had that from you all, I believe, if I am

09:15:15  3    not mistaken, from the PSC --

09:15:17  4         MR. HERMAN:  Yes, your Honor.

09:15:18  5         THE COURT:  -- asked me to do that.  Again, I declined to

09:15:21  6    do it.

09:15:22  7         And in the end when Mr. Juneau was proposed to the Court,

09:15:27  8    it was my clear impression that everyone, all of the parties,

09:15:33  9    including BP, was happy and wanting to shutdown the GCCF and

09:15:40 10    transition to this new court supervised program under Mr. Juneau.

09:15:45 11         MR. HERMAN:  Well, I can't speak for BP, but I will say

09:15:49 12    that during the course of the negotiations never at any point in

09:15:53 13    time did BP suggest, propose, request that Mr. Feinberg somehow be

09:15:59 14    moved from the GCCF to become the Claims Administrator of the Court

09:16:05 15    Supervised Settlement Program, that was never suggested to us,

09:16:08 16    requested of us, proposed to the Court.  So I don't know what was

09:16:11 17    in BP's mind, but I can confirm that.

09:16:15 18         And I think as the Court can imagine on the plaintiffs'

09:16:20 19    side, there has been an emotional reaction to what we perceive to

09:16:25 20    have been some things that have been said in the press that are

09:16:28 21    maybe unfair and inaccurate, but we've tried to do our best to take

09:16:33 22    the high ground and be as professional as we can be, and we

09:16:36 23    appreciate the Court's time and consideration.

09:16:39 24         THE COURT:  All right.  Thank you.

09:16:40 25         MR. HERMAN:  Thank you.

|  |  |  |
|--|--|--|

09:16:43  1         THE COURT:  Wait a minute.  I think we may have someone

09:16:45  2   else that may wants to speak, Mr. Clark.

09:16:48  3         MR. CLARK:  Sorry about that, your Honor.

09:16:51  4         THE COURT:  Mr. Schonekas.

09:16:52  5         MR. SCHONEKAS:  Good morning, your Honor, Kyle Schonekas

09:16:55  6   on behalf of the Andry Law Firm.

09:16:57  7         THE COURT:  Explain to us, because I have to tell you I

09:16:59  8   am confused about the different Andry related entities.

09:17:02  9         MR. SCHONEKAS:  I understand, Judge, and that was my

09:17:04 10   first order of business.

09:17:05 11         THE COURT:  And we've kind of just generically called

09:17:07 12   them the Andry Law Firm, and I am not fully aware of the different

09:17:11 13   entities and how they're related or not related.

09:17:14 14         MR. SCHONEKAS:  Judge, the Andry Law Firm is comprised of

09:17:17 15   Gibby and Jon Andry.

09:17:19 16         THE COURT:  This is an LLC?

09:17:21 17         MR. SCHONEKAS:  I believe that it is, Judge.  I am not

09:17:23 18   sure whether it's an LLC or a corporation.  But it was an entity

09:17:27 19   that existed prior to the spill, comprised of these two gentlemen.

09:17:32 20   Jon Andry --

09:17:33 21         THE COURT:  That's a New Orleans law firm, right?

09:17:35 22         MR. SCHONEKAS:  Yes, sir, has been for sometime.  Jon

09:17:38 23   Andry wanted to pursue BP claims, Gibby Andry did not want to

09:17:42 24   pursue BP claims.  So Jon Andry formed the Andry Law Group that

09:17:46 25   eventually morphed into the Andry Lerner firm when Mr. Learner

| | | |
|---|---|---|
| 09:17:49 | 1 | joined -- |
| 09:17:50 | 2 | THE COURT:  Where is that firm based, Lafayette? |
| 09:17:52 | 3 | MR. SCHONEKAS:  Based here in New Orleans on Baronne |
| 09:17:54 | 4 | Street. |
| 09:17:54 | 5 | THE COURT:  For some reason I thought it was in |
| 09:17:57 | 6 | Lafayette. |
| 09:17:58 | 7 | MR. SCHONEKAS:  Jon Andry works to and from Lafayette and |
| 09:18:02 | 8 | New Orleans as well. |
| 09:18:03 | 9 | So it has, the Andry Lerner law firm has 600 and some odd |
| 09:18:08 | 10 | BP claims.  The Andry Law Firm has no BP claims other than its own |
| 09:18:13 | 11 | pro se BP claim.  That's for a business economic loss, BEL claim. |
| 09:18:20 | 12 | THE COURT:  But Jon Andry has -- is in both of these or |
| 09:18:24 | 13 | all three of these? |
| 09:18:25 | 14 | MR. SCHONEKAS:  Yes, sir, he is.  And he is a 50/50 owner |
| 09:18:29 | 15 | with Gilbert Andry, or Gibby Andry, in the Andry Law Firm in its BP |
| 09:18:35 | 16 | claim. |
| 09:18:35 | 17 | THE COURT:  All right. |
| 09:18:36 | 18 | MR. SCHONEKAS:  And BP I believe has deliberately blurred |
| 09:18:39 | 19 | the lines, Judge, so that they can get the stink on everybody's |
| 09:18:44 | 20 | shoes.  And what happened is that the Andry Law Firm filed its |
| 09:18:50 | 21 | claim like everyone else, and, in fact, was urged to do so by their |
| 09:18:54 | 22 | CPA.  He analyzed the data, he looked at their tax returns, he |
| 09:18:57 | 23 | looked at their records, and said, yes, you have a BP claim.  And |
| 09:19:01 | 24 | it was submitted like everyone else's. |
| 09:19:04 | 25 | In fact, Mr. Juneau attests to this.  They went back when |

09:19:07  1    these allegations were made and they reviewed it.  The claim was

09:19:10  2    reviewed by a disinterested accounting firm, Postlethwaite &

09:19:15  3    Netterville.  It underwent further review by

09:19:19  4    PriceWaterhouseCoopers, an eligibility notice was issued confirming

09:19:22  5    that, in fact, they were due moneys, and then it was appealed by

09:19:26  6    BP.  A three member appeals panel unanimously affirmed the award.

09:19:32  7              Then allegations were made.  And interestingly and

09:19:35  8    understandably, we were not told about these allegations.  And I

09:19:38  9    think to some extent this benefited us because the claim was put on

09:19:42 10    hold, we were told nothing, and they went back, Mr. Juneau's

09:19:47 11    group --

09:19:47 12              THE COURT:  That, by the way, was at my direction.

09:19:49 13              MR. SCHONEKAS:  And I understand, Judge.  But the

09:19:54 14    significance is that there was a further review done at the

09:19:56 15    direction of Mr. Juneau, unbeknownst to us, by the PriceWaterhouse

09:20:02 16    group and Postlethwaite & Netterville, both went through the claim

09:20:06 17    again and analyzed it and came back and said --

09:20:10 18              No, then Mr. Juneau did another step, he wasn't satisfied

09:20:12 19    with that.  He had his quality control team then go through the

09:20:17 20    claim, and they all came back and said the claim was not

09:20:21 21    manipulated, the numbers are there, it's all been substantiated.

09:20:26 22              So where is the impropriety?  And, in fact, Judge, your

09:20:31 23    Honor said it best, which is that they've done this by innuendo, by

09:20:37 24    rumor, and by circulation of statements.  And, in fact, we have not

09:20:41 25    had a single person take an oath or swear to an affidavit that says

| | |
|---|---|
| 09:20:50 1 | that in any way the Andry Law Firm did anything nefarious.  In |
| 09:20:50 2 | fact, I want to state emphatically that the Andry Law Firm never |
| 09:20:55 3 | offered, never paid, never promised anything to anyone in |
| 09:20:58 4 | connection with their BP claim. |
| 09:21:01 5 | So, you know, I feel that this is kind of Kafkaesque, we |
| 09:21:05 6 | don't know who is making it, we don't get to confront the person. |
| 09:21:09 7 | In fact, I believe Exhibits 2 and 6 are objectionable as hearsay in |
| 09:21:14 8 | BP's submittal, as well as page -- |
| 09:21:17 9 | THE COURT:  Remind me, what are those exhibits? |
| 09:21:19 10 | MR. SCHONEKAS:  The Welker report, your Honor, and the |
| 09:21:21 11 | Holstein letter, classic hearsay. |
| 09:21:24 12 | No one has taken an oath, no one has told me or for that |
| 09:21:30 13 | matter has shown that my clients did anything to manipulate this |
| 09:21:34 14 | particular claim.  And that's been confirmed by Mr. Juneau, to his |
| 09:21:38 15 | credit, and he didn't rely on representation from us. |
| 09:21:41 16 | THE COURT:  You're distinguishing, again, just to |
| 09:21:44 17 | clarify:  Andry Law Firm, LLC, the firm that predated the BP oil |
| 09:21:54 18 | spill of which the two members are Gibby Andry and Jon Andry. |
| 09:21:59 19 | MR. SCHONEKAS:  That's correct. |
| 09:21:59 20 | THE COURT:  You're distinguishing that entity from the |
| 09:22:02 21 | other Andry entities, right? |
| 09:22:06 22 | MR. SCHONEKAS:  That's correct.  Because they -- |
| 09:22:07 23 | THE COURT:  You're not -- when you say they -- well, what |
| 09:22:12 24 | you just said about what they did or didn't do, that's the entity |
| 09:22:15 25 | or firm you're speaking of, correct? |

09:22:17 1          MR. SCHONEKAS:  That's correct.  That's who I've been

09:22:20 2     retained by, and I will represent to you that it's, in fact, not

09:22:23 3     only a separate juridical entity, but it is maintained as such and

09:22:28 4     it is treated as such.  In fact, that entity does not share in any

09:22:31 5     revenues generated by the Andry Lerner law group in terms of any

09:22:36 6     moneys that it receives from that.

09:22:39 7          Judge, you hit the nail on the head.  There hasn't been

09:22:42 8     any proof that would justify the suspension of these payments.

09:22:45 9     This is simply another effort by BP, this time they think they have

09:22:48 10    a crack in the dam that will allow them to stop these payments from

09:22:53 11    occurring, and that's what's happening here.  Thank you.

09:22:56 12         THE COURT:  All right.  Thank you, Mr. Schonekas.

09:22:58 13         Okay.  Before you get up.  Mr. Cobb, would you like to be

09:23:03 14    heard or not?

09:23:04 15         MR. COBB:  Just very, very briefly, your Honor, if your

09:23:07 16    Honor please.

09:23:09 17         THE COURT:  Sure.

09:23:10 18         MR. COBB:  Good morning, your Honor.

09:23:14 19         THE COURT:  Good morning.

09:23:15 20         MR. COBB:  Good morning, Judge Shushan.

09:23:18 21         I don't want to get into the merits of what we filed at

09:23:20 22    this particular point in time.  I rise for one point only, and that

09:23:25 23    is I believe I heard counsel for BP use a term "kickback scheme" in

09:23:29 24    his argument.  And he did so, I think, in the same sentence or the

09:23:33 25    same paragraph that he is referring to my client.  As the Court has

09:23:38 1  opined and said this morning, there is no evidence of that

09:23:42 2  whatsoever, number one.

09:23:43 3          THE COURT:  I didn't say that.

09:23:45 4          MR. COBB:  No, the Court has said --

09:23:48 5          THE COURT:  I didn't say that.  What I said, to be clear,

09:23:51 6  is that there is evidence -- and without making a final judgment

09:23:58 7  because there are ongoing investigations, ongoing continuing

09:24:02 8  internal investigations at my direction, at Mr. Juneau's direction

09:24:06 9  initially and now at my direction, and as an ongoing investigation,

09:24:09 10 external independent investigation by Mr. Freeh by virtue of my

09:24:14 11 appointment of him.

09:24:16 12         MR. COBB:  Yes, sir.

09:24:17 13         THE COURT:  And we do know that there is evidence of some

09:24:26 14 payments, referral fees, whatever they are called, from a law firm.

09:24:35 15 I don't know which entity it came from, from a law firm to one or

09:24:40 16 both of these lawyers.

09:24:41 17         MR. COBB:  Yes, sir.

09:24:42 18         THE COURT:  And that's what's under investigation

09:24:44 19 primarily, and that's a troubling matter.  And I take it very

09:24:52 20 seriously, and we kind of know what's involved from the internal

09:25:00 21 investigation -- obviously I don't have Mr. Freeh's report yet, and

09:25:05 22 if he uncovers something beyond that we will deal with it.

09:25:08 23         But we know that there was something that occurred that

09:25:12 24 should not have occurred because it's pretty obvious that if you're

09:25:18 25 working in the claims facility you can't have any financial

09:25:22  1   interest in claims being handled by, represented by someone else.

09:25:27  2   And you can't have your own claim for that matter.

09:25:29  3          MR. COBB:  Correct.

09:25:30  4          THE COURT:  So that's what we're dealing with.  And I

09:25:33  5   know you raised issues of the way this whole thing was handled, and

09:25:37  6   to the extent that it impacts innocent parties, innocent in the

09:25:44  7   sense of claimants out there who we don't even know who they are,

09:25:52  8   but apparently several hundred, I think 600 or something.

09:25:55  9          MR. COBB:  Yes, sir.

09:25:56 10          THE COURT:  Claimants represented by Andry or Andry

09:25:59 11   Lerner group whose claims are being held up at this point by my

09:26:03 12   order, by my direction to Mr. Juneau to hold those claims until we

09:26:08 13   can complete this investigation.  And I've told him to do that and

09:26:13 14   I intend to maintain that hold -- and I feel bad about it in a

09:26:19 15   sense to the extent that I am assuming most of those people are

09:26:22 16   totally innocent, they just submitted claims with their lawyer and

09:26:26 17   they're waiting to be paid.

09:26:29 18          MR. COBB:  Yes, sir.

09:26:30 19          THE COURT:  Because of that I've asked Mr. Freeh to

09:26:33 20   expedite his investigation, that part of his investigation in terms

09:26:40 21   of what happened and whether there's any evidence beyond what we

09:26:45 22   know now.  I have no evidence beyond what we've talked about here

09:26:48 23   this morning, so far, but I want to make sure --

09:26:52 24          And I've also directed Mr. Juneau and his staff to go

09:26:56 25   back and review all of those claims.  Again, I am confusing the

09:27:02 1  Andry firms, but the Andry Law Firm claim itself that Mr. Schonekas

09:27:06 2  talked about and the clients that they represent, to review all of

09:27:11 3  those claims independently, have different people, different

09:27:14 4  accountants review them, double check them, triple check them to

09:27:18 5  make sure they were calculated properly, that there was nothing

09:27:21 6  improper in the way they were handled or calculated or computed.

09:27:24 7       So all of that's being done by my direction, and I don't

09:27:28 8  intend for this to be a lengthy hold or anything.  In fact, I

09:27:33 9  expect that fairly shortly, hopefully, we will get something from

09:27:37 10 Mr. Freeh on that.

09:27:38 11      Beyond that I've asked Mr. Freeh to make any

09:27:41 12 recommendations or suggestions, you know, any system, anything can

09:27:49 13 be improved, probably, particularly something as massive as this,

09:27:53 14 so I've asked Mr. Freeh to also make, to recommend or suggest to

09:27:57 15 the Court anything that we can do to improve things going forward.

09:28:03 16 I am certainly happy and will consider that and look at that, too.

09:28:08 17      But I am not going to hold up those claims for that once

09:28:12 18 we check out everything.

09:28:13 19      MR. COBB:  We appreciate that.  What I simply wanted to

09:28:15 20 do for the record was I thought I heard counsel use the word

09:28:18 21 kickback scheme.

09:28:19 22      THE COURT:  I didn't hear that word, if he did, I didn't

09:28:21 23 hear it, I don't know.  Did you use that word?

09:28:23 24      MR. COBB:  Did you use that term, counsel?

09:28:25 25      MR. CLARK:  Yes, your Honor.

| | | |
|---|---|---|
| 09:28:26 | 1 | MR. COBB:  And that's why I rise. |
| 09:28:29 | 2 | THE COURT:  I've heard it before. |
| 09:28:30 | 3 | MR. COBB:  I rise simply to say that that is unsupported, |
| 09:28:35 | 4 | false, scurrilous, scandalous, and I object on behalf of my lawyer |
| 09:28:39 | 5 | client, number one. |
| 09:28:39 | 6 | Number two, I must rise to suggest to the Court on the |
| 09:28:42 | 7 | one hand BP says shut everything down until we get the Freeh |
| 09:28:48 | 8 | report, right.  And yet on the other hand they characterize the |
| 09:28:52 | 9 | conduct that the Freeh report is investigating.  And they shouldn't |
| 09:28:56 | 10 | do that.  They shouldn't be loose with the language that they use |
| 09:28:59 | 11 | to describe Mr. Juneau or anybody else, yet they continue.  And I |
| 09:29:04 | 12 | rise to object to that for the record. |
| 09:29:06 | 13 | That's all I have, Judge. |
| 09:29:07 | 14 | THE COURT:  Thank you, Mr. Cobb. |
| 09:29:09 | 15 | All right.  Mr. Clark, I'll give you about five minutes. |
| 09:29:13 | 16 | We need to wrap this up. |
| 09:29:15 | 17 | MR. CLARK:  Sure.  Thanks, your Honor. |
| 09:29:16 | 18 | THE COURT:  Sure. |
| 09:29:17 | 19 | MR. CLARK:  First on that point, your Honor, we're just |
| 09:29:20 | 20 | referring to the evidence that's in the Welker report.  And, again, |
| 09:29:23 | 21 | you know, as you noted for the record it's not been finally |
| 09:29:27 | 22 | established yet, but that's the evidence that we're reciting. |
| 09:29:30 | 23 | THE COURT:  I think the problem is sometimes we're all |
| 09:29:33 | 24 | guilty of using hyperbole.  Kickback has -- I know the federal |
| 09:29:39 | 25 | government likes to use that term a lot and I've heard objections |

09:29:43  1    from lawyers about that.  A kickback has a criminal connotation

09:29:50  2    generally.  Referral fees are not necessarily criminal, we know

09:29:56  3    that.  However, what we're talking about here is apparently

09:30:01  4    referral fees made to a person or persons who should not have been

09:30:05  5    receiving them.  And whether that is -- whether it violates a code

09:30:12  6    of conduct, violates a lawyer's ethics, whether there's anything

09:30:17  7    criminal or not, that's to be determined.  But I think that's the

09:30:21  8    problem he was raising.

09:30:23  9          But I think we're all sometimes guilty and the parties

09:30:27 10    across the board here, particularly in recent weeks or months, have

09:30:31 11    been guilty of using a lot of hyperbole, and we need to all maybe

09:30:37 12    dial this back a little bit.  Go ahead.

09:30:38 13          MR. CLARK:  Your Honor, on that, we think that the Welker

09:30:41 14    report and the description of the e-mails really speak for

09:30:44 15    themselves, so I'll put that off to the side.

09:30:46 16          THE COURT:  That's fine.

09:30:47 17          MR. CLARK:  Let me try to bring us back to what it is our

09:30:50 18    motion is about and the law that governs that motion.  So we're

09:30:53 19    governed, your Honor, by the traditional four-factor test.  The

09:30:55 20    first part of the test is the likelihood of success on the merits,

09:30:58 21    and we think here based on the fact --

09:31:00 22          THE COURT:  What are the merits here that you think

09:31:01 23    you're likely to succeed on?

09:31:04 24          MR. CLARK:  The merits that establish that Mr. Juneau and

09:31:06 25    the program violated their fiduciary duties, their fiduciary duties

09:31:10 1   to make sure that they had adequate controls in place, that they

09:31:13 2   properly supervised, that they properly managed, and that if they

09:31:15 3   had done that, we wouldn't be here today.  We're not pleased to be

09:31:18 4   here today, your Honor, we didn't sign up for a deal in which this

09:31:21 5   kind of corruption would enter the program, so we are not happy.

09:31:25 6          THE COURT:  See, you just used another word that's a

09:31:28 7   hyperbole, so let's just talk about the facts without trying to use

09:31:31 8   all of this inflammatory language, okay.  Go ahead.

09:31:37 9          MR. CLARK:  Fair enough.  However you want to describe

09:31:39 10  the information, let's stick to the Welker report and not even any

09:31:43 11  other sources, that information, if that's borne out by the Freeh

09:31:48 12  investigation and you know, based on the fact that these employees

09:31:51 13  have been terminated or resigned shows that there were not adequate

09:31:56 14  controls in place, and that shows negligent supervision and that

09:32:00 15  shows a violation of the highest duty of the trust relationship,

09:32:04 16  the fiduciary duty.  It's not, you know, the maintenance of an

09:32:08 17  honor to the most sensitive punctilio, it is instead a failure, a

09:32:14 18  failure to watch these employees --

09:32:16 19         THE COURT:  Who are the beneficiaries of the trust you

09:32:19 20  were speaking of?

09:32:20 21         MR. CLARK:  There are two sets of beneficiaries, your

09:32:22 22  Honor:  The claimants, but also BP.  Because if there's money left

09:32:25 23  over BP is a residual claimant; and so, therefore, BP is owed a

09:32:30 24  fiduciary duty right along with the class members.

09:32:33 25         THE COURT:  Go ahead.

09:32:34 1          MR. CLARK:  So, your Honor, we think that we have shown

09:32:36 2     that there's been a breach of fiduciary duty and negligence in the

09:32:40 3     supervision.   Therefore, we think we've met that part of the test

09:32:44 4     and that's one of the two most important prongs of the test.

09:32:47 5          The second most important prong of the test is to

09:32:50 6     demonstrate irreparable harm.  And on that issue we submit that the

09:32:54 7     record is really undisputed based on the letter that went from

09:32:57 8     Mr. Herman to Mr. Cantor indicating that the class believes that

09:33:00 9     there is no ability to recover any moneys that are paid out,

09:33:03 10    whether wrongfully or rightfully by BP if there's later a

09:33:07 11    determination by a Court that those moneys were paid out in error.

09:33:10 12         And so, therefore, you know, it's not a question of, you

09:33:13 13    know, it being premature.  By the time, you know, class counsel and

09:33:18 14    Mr. Juneau would think it's not premature, it would be too late.

09:33:21 15    If Mr. Freeh finds evidence of fraud as to particular claims or as

09:33:26 16    to policies that affect not just one claim but multiple claims, a

09:33:30 17    broad spread of claims, then it won't be possible at that time to

09:33:33 18    order a remedy if the moneys have already been paid out, your

09:33:36 19    Honor.  And that establishes then the second most important element

09:33:39 20    of the test, that there has been irreparable harm.

09:33:42 21         So there is a showing that there's a likelihood of

09:33:45 22    success on the breach of the fiduciary duties, which do flow to BP,

09:33:49 23    and the demonstration of irreparable harm.  And those together

09:33:53 24    really make out a prima facie case to grant a preliminary

09:33:57 25    injunction.  If you look at the other factors --

|         |    |
|---------|----|
| 09:33:59 | 1 | Let's jump -- the next factor is really a balance of |
| 09:34:02 | 2 | harms.  And here in this situation Mr. -- your Honor, we're more |
| 09:34:06 | 3 | than three years out from the incident and we're not -- we're |
| 09:34:10 | 4 | talking about the fact that there were emergency processes set in |
| 09:34:14 | 5 | place to pay claims by the GCCF, claimants who were also in |
| 09:34:18 | 6 | hardship positions could have gone to the Government's Oil Spill |
| 09:34:23 | 7 | Liability Trust Fund. |
| 09:34:24 | 8 | This program has been open for more than a year.  We are |
| 09:34:26 | 9 | not dealing with a situation in which obtaining the money on an |
| 09:34:29 | 10 | urgent basis is something that the claimants face. |
| 09:34:31 | 11 | If you weigh those equities against the fact that BP is |
| 09:34:33 | 12 | facing irreparable harm and moneys that can never been recovered, |
| 09:34:37 | 13 | we submit to you that that balance tips it in our favor quite |
| 09:34:41 | 14 | strongly. |
| 09:34:41 | 15 | In particular because this agreement -- your Honor, just |
| 09:34:44 | 16 | take a step back.  The normal class agreement, right, no one would |
| 09:34:48 | 17 | even be paid until Fifth Circuit appeals were finalized; and |
| 09:34:51 | 18 | they're still going on, they're not even fully briefed.  So here |
| 09:34:55 | 19 | people are getting extraordinary benefit by being paid in advance |
| 09:34:59 | 20 | of that date. |
| 09:35:00 | 21 | Even beyond that, your Honor, this is a situation in |
| 09:35:02 | 22 | which very generous RTP's were provided for most forms of claims, |
| 09:35:08 | 23 | and that provides multiples on top of the baseline recovery; and |
| 09:35:13 | 24 | that was also one of the onus that was built into the agreement to |
| 09:35:16 | 25 | account for the time value of money. |

09:35:18  1          So the brief pause that we're asking for here, your

09:35:21  2     Honor, it doesn't, you know, it doesn't trench upon the claimants

09:35:26  3     at all.  Their RTP's are still going to fully cover them and more

09:35:30  4     than compensate them for their losses.

09:35:31  5          And the last element in the preliminary injunction

09:35:35  6     calculus is the calculus of what's in the public interest.  And we

09:35:38  7     would submit to your Honor that this evidence, however you want to

09:35:40  8     characterize it, whether just sticking precisely to the terms or

09:35:44  9     whether you want to use more general terms about it, this has

09:35:47 10     placed a black mark on the program, it raises, at least puts a

09:35:51 11     cloud over, appal over the program.

09:35:55 12          And until those doubts can be dispelled, which is

09:35:58 13     precisely why your Honor was correct to put in place Judge Freeh

09:36:03 14     and accept that we applaud and that no party opposed, that process,

09:36:09 15     that Freeh process is designed to clear the cloud over the

09:36:13 16     facility.  And, therefore, it's in the public interest to guarantee

09:36:15 17     that this court supervised settlement process that this Court

09:36:20 18     supervises, by its very name, that the integrity of that program be

09:36:24 19     protected.

09:36:25 20          And it's for those reasons, your Honor, that we think

09:36:27 21     that this preliminary injunction that we're requesting has to be

09:36:32 22     entered under the legal factors.

09:36:35 23          Let me turn a little bit to the factual issues though.

09:36:38 24          THE COURT:  You need to wrap it up, you have about

09:36:40 25     30 seconds.

09:36:42 1      MR. CLARK:  Okay.  Then let me just hit two very quick

09:36:45 2  points.  One is Mr. Stanley represented that there were 230

09:36:49 3  policies that were reviewed over a two-day period.  If you do the

09:36:52 4  math on that, your Honor, assuming that they took no breaks, they

09:36:55 5  worked straight through, it comes out that they spent --

09:36:58 6      THE COURT:  Most of those policies you all agreed to, you

09:37:01 7  had input in every one, and you reviewed yourself, so I think they

09:37:05 8  focused primarily on a much smaller universe of the ones that you

09:37:10 9  had objected to and maybe, again, they are going the other way,

09:37:14 10  that's my understanding with that.

09:37:16 11      MR. CLARK:  The only thing they say in their report, your

09:37:18 12  Honor, is that they had discussions about these policies.  There's

09:37:21 13  no indication that they even looked at the documentary record of

09:37:25 14  Sutton and Reitano in terms of what they said or wrote about those

09:37:28 15  policies, what they advised on them.  And without doing that, it

09:37:31 16  seems to me it's very cursory for them to try in a two-day quick

09:37:35 17  review to say that they could conclude that none of those policies

09:37:38 18  have been tainted.

09:37:39 19      That's why the Freeh investigation can't be prejudged.

09:37:41 20  It's not going to spend just four minutes on each of those

09:37:44 21  policies, it's going to look at all of the documents, it's going to

09:37:47 22  interview people, and it's going to make a final determination that

09:37:50 23  is credible, not sort of just a quick pass based on a couple of

09:37:54 24  days of work inside the program.

09:37:56 25      THE COURT:  Let me ask you one thing, I need to move on

| | | |
|---|---|---|
| 09:38:00 | 1 | because we're beyond the time I allotted for this.  But do you |
| 09:38:08 | 2 | acknowledge that BP together with class counsel proposed Mr. Juneau |
| 09:38:14 | 3 | to the Court? |
| 09:38:16 | 4 | MR. CLARK:  Mr. -- Judge -- |
| 09:38:18 | 5 | THE COURT:  That's a simple question, yes or no? |
| 09:38:20 | 6 | MR. CLARK:  Your Honor, personally I am not aware of the |
| 09:38:22 | 7 | facts. |
| 09:38:23 | 8 | THE COURT:  So you don't even want to concede that here |
| 09:38:26 | 9 | today?  Let me ask Mr. Holstein then or -- let me ask Mr. Godfrey |
| 09:38:31 | 10 | who is here.  Mr. Godfrey was intimately involved in the |
| 09:38:35 | 11 | settlement. |
| 09:38:37 | 12 | MR. GODFREY:  Yes. |
| 09:38:37 | 13 | THE COURT:  I would like you to confirm on the record in |
| 09:38:38 | 14 | open court what the Court said, that the parties to this settlement |
| 09:38:42 | 15 | jointly proposed Mr. Juneau to act as Claims Administrator. |
| 09:38:46 | 16 | MR. GODFREY:  That is correct, your Honor. |
| 09:38:49 | 17 | THE COURT:  Okay.  Thank you.  Thank you, Mr. Clark. |
| 09:38:50 | 18 | MR. CLARK:  Thank you, your Honor. |
| 09:38:53 | 19 | THE COURT:  This matter is before the Court on BP's |
| 09:38:55 | 20 | motion for emergency preliminary injunction to suspend payments |
| 09:38:58 | 21 | from the court's supervised settlement program pending Special |
| 09:39:02 | 22 | Master Freeh's investigation report.  That is record |
| 09:39:10 | 23 | Document 10761. |
| 09:39:10 | 24 | Of course under Rule 65 a request for preliminary |
| 09:39:14 | 25 | injunction must meet several criteria, the primary ones being the |

1   mover must be likely to succeed on the merits and must show

2   irreparable harm or injury.  There's plenty of case law that

3   granting of a preliminary injunction is an extraordinary remedy

4   which is only to be granted in the case of a clear showing based on

5   clear evidence to support it.

6          The Court has considered BP's motion, which essentially

7   asks this Court to enjoin the DEEPWATER HORIZON Court Supervised

8   Settlement Program from paying any further claims to anyone pending

9   receipt of the investigative report from Louis Freeh.  For the

10  following reasons the Court denies this motion.

11         BP has alleged that it is necessary to temporarily stop

12  payments of claims because it suspects that there may have been

13  fraudulent activity involved in the handling, processing, or

14  calculation of claims.  And that it will be irreparably harmed if

15  plaintiffs continue to be paid during the investigation.

16         BP has made a number of allegations concerning alleged

17  misconduct within the CSSP, the Court Supervised Settlement

18  Program.  At the same time BP has recently engaged in a massive

19  public media campaign in connection with its appeal of the Court's

20  previous order s which affirm the Claims Administrator's policy

21  statement pertaining to the handling of business economic loss or

22  BEL claims in accordance with the Economic Settlement Agreement.

23  That appeal, of course, is presently pending before the Fifth

24  Circuit and will be decided by that Court in due course.

25         Unfortunately it seems to the Court that there has been a

great deal of misinformation widely reported that has contributed
to creating confusion by conflating two entirely separate issues.
The Court takes this opportunity to put things in some perspective
and clarify certain matters.

The first issue is as follows:  On June 19 it was
brought to the Court's attention by the Claims Administrator
Patrick Juneau that an anonymous informant had made allegations
involving a certain staff attorney who was allegedly receiving
referral fees from a particular law firm that had claims within the
CSSP.  An investigation was begun, the attorney in question was
placed on administrative leave, and a hold was placed on all claims
represented by the involved law firm.  An internal investigation
was led by David Welker, who happens to be the recently retired
head of the local FBI office and who is in-house in Mr. Juneau's
office at the claims facility heading up their anti-fraud unit.

As a result of information learned during that
investigation, the staff attorney resigned and subsequently his
wife, also a staff attorney, had her employment contract
terminated.

At the Court's direction Mr. Juneau has undertaken and
the claims facility has undertaken the following additional steps:
All claims by the involved law firm or its clients were placed on
hold and are being re-analyzed and reviewed to determine whether
the claims were properly handled.  In addition, the claims program
has gone back and reviewed its existing policies to determine

09:42:49  1   whether the two attorneys might have had any, exerted any improper

09:42:55  2   influence in the creation of such policies, and most importantly,

09:42:58  3   whether the policies are correct and accurate.

09:43:01  4        Although this internal investigation is still ongoing,

09:43:06  5   the Court has received an interim report from the Claims

09:43:10  6   Administrator, which is in the record, and to date they have

09:43:14  7   uncovered no evidence that shows any misconduct or involvement of

09:43:17  8   anyone other than the two attorneys in question who have now either

09:43:27  9   resigned or been terminated.

09:43:30  10       The known facts appear as follows:  The two staff

09:43:33  11  attorneys had previously represented claimants before their

09:43:41  12  employment by the settlement program, that upon becoming employed

09:43:43  13  the attorneys referred, withdrew and referred their cases to a

09:43:47  14  certain law firm which in turn later paid referral fees to them

09:43:51  15  during the time they were employed with the program.

09:43:55  16       There is some evidence that one of the attorneys may have

09:43:59  17  at time made efforts to inquire as to the status of certain claims

09:44:03  18  and/or to expedite certain claims.

09:44:07  19       However, this is most important I believe, the internal

09:44:11  20  investigation has not found any evidence that either of the two

09:44:16  21  played any part in the actual processing of claims or that they

09:44:20  22  improperly influenced the computation of any claims.  In fact, as

09:44:24  23  the Court has noted, these claims are analyzed and computed by

09:44:29  24  multiple layers of review and quality control within the program by

09:44:33  25  different analysts and accountants.  And as the Court understands

09:44:37  1  the process, it would be highly unlikely, if not impossible, that

09:44:41  2  any single person would be able to falsely inflate or corrupt the

09:44:45  3  processing of the claims at the Settlement Program.

09:44:56  4       At the Court's request, Mr. Juneau's office has also

09:45:00  5  performed an internal review of its policies which does not reveal

09:45:06  6  that any improper influence by either of the two attorneys.

09:45:16  7  Obviously the attorneys were involved by sitting in on some

09:45:21  8  meetings, but ultimately these were Mr. Juneau's policies, not the

09:45:26  9  policies of anyone else.  And, in fact, there was plenty of

09:45:30 10  opportunity for the parties, including BP, and its lawyers, to

09:45:36 11  participate in the development of these policies, review the

09:45:40 12  policies, and object to any policies that it did not think was

09:45:43 13  proper.  And as I mentioned, out of over 200 policies that I

09:45:50 14  understand have been developed and promulgated through this

09:45:53 15  process, in only two instances did BP bring the matter to the

09:46:00 16  Court's attention for review and decision.

09:46:06 17       Nonetheless, despite the lack of evidence of any improper

09:46:13 18  influence to date on the actual calculation of claims, the Court

09:46:16 19  takes what has occurred very seriously.  And in order to assure the

09:46:21 20  parties and the public of the integrity of the Court Supervised

09:46:24 21  Settlement Program, the Court has taken additional steps, including

09:46:29 22  appointing Mr. Louis Freeh and his group to perform a completely

09:46:33 23  independent external review and investigation into this matter.

09:46:38 24       For those who are not acquainted with Mr. Freeh, he

09:46:40 25  happens to be a former federal judge, the former director of the

Federal Bureau of Investigation, and presently heads a private firm which has extensive experience in performing such investigations. The Court has tasked Mr. Freeh with investigating the circumstances leading up to the resignation and termination of the staff attorneys, and whether there were any other persons or firms involved within or without the settlement program.

In addition, the Court has asked Mr. Freeh to look at the program's policies and procedures and make any recommendations or suggestions to the Court for necessary revisions or improvements. That work is presently ongoing.

BP has not produced any evidence that would warrant the Court taking the drastic step of shutting down the entire claims payment program.  The fact that the Court has appointed Mr. Freeh to perform an independent investigation does not lead the Court to prejudge what that investigation will find.  However, at this point there is simply no evidence that the mass of claims being handled by the settlement program are not being properly evaluated and paid.

There are thousands of claimants with pending claims, many of whom have been waiting for sometime to have their claims processed.  It would be unfair to those claimants to stop all claim payments based on BP's unsubstantiated suspicions or allegations of some type of widespread misconduct.

What has occurred, unfortunately, is that two separate issues or matters have been conflated, intentionally or

09:48:15  1    unintentionally, largely by virtue of the media campaign that BP

09:48:20  2    has waged in recent weeks.  The issue of whether the Claims

09:48:24  3    Administrator and this Court have correctly interpreted the

09:48:26  4    Business Economic Loss provisions in the Settlement Agreement is

09:48:30  5    purely a legal issue which is currently the subject of an appeal

09:48:33  6    pending in the Fifth Circuit.  The BEL issue is not related to the

09:48:37  7    circumstances that led to the resignation and termination of the

09:48:41  8    two staff attorneys, as I've just outlined.

09:48:44  9         Unfortunately, because of the temporal overlap, these two

09:48:48 10    matters have been confused in some reports and commentary.  They

09:48:53 11    are entirely separate.

09:48:55 12         To put things in further context, the Court points out

09:48:57 13    the following brief history of the court settlement program.  The

09:49:03 14    Phase I trial was originally scheduled to begin in late

09:49:07 15    February 2012.  Under the oversight of Magistrate Judge Shushan and

09:49:10 16    the at Court's direction, counsel for BP and the PSC engaged in

09:49:14 17    extensive settlement negotiations for over a year, meeting in

09:49:18 18    person for at least 145 different sessions, not including numerous

09:49:22 19    exchanges by e-mail and telephone.  Shortly before the scheduled

09:49:27 20    trial, Judge Shushan and the parties reported to the Court that

09:49:30 21    they were very close to an agreement and asked for an additional

09:49:34 22    week to continue their negotiations.  The trial was continued for

09:49:37 23    one week until March 5, 2012.

09:49:40 24         On the eve of that trial, the parties announced an

09:49:43 25    agreement in principle and requested that the Court recess the

09:49:46 1   trial in order to allow them time to put the settlement into a

09:49:50 2   final written agreement.  That agreement, consisting of over 1,000

09:49:54 3   pages, was ultimately submitted to the Court.  As part of that

09:49:57 4   agreement, counsel for BP and PSC submitted to the Court a joint

09:50:02 5   motion on March 8, 2012, along with a proposed order to establish a

09:50:08 6   transition process from the Gulf Coast Claims Facility, also known

09:50:13 7   as the GCCF, then operating under Mr. Feinberg, to a new Court

09:50:18 8   Supervised Claims Program.

09:50:20 9          A part of that same jointly proposed motion and order

09:50:24 10  asked the Court to appoint Patrick Juneau as the Claims

09:50:28 11  Administrator of both the transition process and the proposed Court

09:50:32 12  Supervised Claims Program.

09:50:36 13         The Court notes that, in addition, counsel for BP and the

09:50:40 14  PSC or Class Counsel also asked the Court to appoint some of the

09:50:47 15  same venders that the GCCF had been using, including BrownGreer,

09:50:54 16  Garden City, and PriceWaterhouse.

09:50:56 17         As part of that proposed order from the joint order by

09:50:58 18  the parties, joint motion and order by the parties, the GCCF

09:51:02 19  program was terminated effective immediately and the transition

09:51:05 20  program was begun.  That order was accepted and signed by the Court

09:51:10 21  on March 8, 2012.

09:51:12 22         Subsequently the parties filed a written Economic

09:51:16 23  Settlement Agreement with the Court and BP filed a formal motion

09:51:20 24  asking the Court to preliminarily approve the Settlement Agreement

09:51:25 25  conditioned upon preliminary certification of the Economic Damages

09:51:29  1    Class.  The Court granted this preliminary approval and class

09:51:32  2    certification on May 2nd, 2012.  Again, counsel for BP and the PSC

09:51:37  3    jointly proposed that Mr. Juneau continue as Claims Administrator

09:51:42  4    for the Court Supervised Settlement Program which officially began

09:51:46  5    its operation on June 4, 2012, following termination of the

09:51:50  6    transition process.

09:51:51  7          A final fairness hearing was conducted on November 8,

09:51:55  8    2012, at which time counsel for BP and interim Class Counsel

09:52:00  9    advocated for final approval of the Settlement Agreement.  During

09:52:04 10    that hearing, which lasted an entire day, counsel for BP gave high

09:52:09 11    praise to the work being done by Mr. Juneau and other venders in

09:52:13 12    connection with the Court Supervised Settlement Program, as did

09:52:17 13    Class Counsel.

09:52:17 14          The Court granted final certification of the class and

09:52:21 15    final approval of the settlement in written reasons on

09:52:25 16    December 21st, 2012.  At no time during the fairness hearing or

09:52:30 17    prior to final approval did BP voice any objections or concerns

09:52:37 18    about either the Settlement Agreement or the manner in which the

09:52:40 19    terms of the settlement were being implemented by the Court

09:52:46 20    Supervised Settlement Program since its beginning in June of 2012.

09:52:52 21          I am not going to get into the merits of the BEL issue

09:52:55 22    which is pending before the Fifth Circuit, except to note that it's

09:53:00 23    only fairly recently that BP began to voice concerns about how the

09:53:04 24    Claims Administrator was interpreting provisions of the Settlement

09:53:07 25    Agreement as they pertain to those BEL claims.  And of course the

09:53:13   1   agreement provides a mechanism for the Claims Administrator and the

09:53:15   2   parties to attempt to amicably resolve such disagreements over

09:53:21   3   interpretation of the Settlement Agreement without involvement of

09:53:24   4   the Court.  In this instance, the parties were unable to resolve

09:53:28   5   their differences and the matter was ultimately submitted first

09:53:33   6   informally and then formally to the Court for resolution.

09:53:36   7           After much back and forth, briefing, voluminous

09:53:40   8   submissions by the parties and finally oral argument, the Court

09:53:44   9   ultimately agreed with the Claims Administrator's policy statement

09:53:51  10   for BEL claims.  BP then sought to have this Court stay its order,

09:53:51  11   or to enjoin the Claims Administrator from following the Court's

09:53:54  12   order, both of which this Court denied.  BP then appealed from the

09:53:58  13   Court's March 5th, 2013, order and sought a stay of this Court's

09:54:03  14   order from the Court of Appeal, which was denied by that Court.

09:54:08  15   That appeal by BP is still pending in the Fifth Circuit.

09:54:14  16           I find it necessary to clear up some additional

09:54:18  17   misinformation that has been widely reported.  And hopefully we've

09:54:22  18   cleared up a few basic facts.  First, this Court did not select

09:54:26  19   Mr. Juneau to act as Claims Administrator, rather counsel for BP

09:54:30  20   and Class Counsel jointly proposed him to the Court.  The Court did

09:54:36  21   accept that recommendation and made the appointment.

09:54:38  22           It should be noted that while this Court did not select

09:54:41  23   Mr. Juneau, I was well aware of his qualifications, experience, and

09:54:45  24   reputation as a well-known, well-regarded attorney who had

09:54:49  25   previously served as a mediator, special master, or claims

administrator in a large number of cases involving settlements of

various complex litigation over the past 30 or 40 years, probably

more than 40 years, not only in this state but across the United

States.  For just a few examples, Mr. Juneau has been appointed by

Judge Eldon Fallon of this Court as a special master in connection

with the massive Vioxx MDL, by Judge James Selna in California in

connection with the Toyota Sudden Acceleration MDL, and also by

Judge Donovan Frank in the Guidant Medical Device MDL in Minnesota.

Secondly, although it's not really relevant, but Pat

Juneau is certainly not a "good ole boy, plaintiffs attorney" as

some have suggested.  Mr. Juneau is well-known in Louisiana as a

highly competent and prominent civil defense attorney having

previously served, in fact, as president of the Louisiana

Association of Defense Counsel.  For the uninitiated who may be

listening, that means he and his law firm represent corporations

and insurance companies who are typically defendants in civil

lawsuits.

Beyond being familiar with Mr. Juneau's qualifications

and experience, this Court has had an opportunity, of course, to

observe Mr. Juneau's work and commitment as a court appointed

claims administrator for the DEEPWATER HORIZON's Court Supervised

Settlement Program.  From this perspective, Mr. Juneau's

performance has been commendable, especially considering the

monumental assignment and task which he was given.

I have to say this, that I find the recent attacks on

09:56:41 1   Mr. Juneau's character are highly offensive and inappropriate.   And

09:56:54 2   I might not have said anything about this except I figured that

09:56:58 3   this was going beyond the line now when I read a report this

09:57:03 4   morning that BP's chief executive was on some business TV show last

09:57:10 5   night and accused Mr. Juneau of, these are his words,

09:57:15 6   "highjacking," he accused Mr. Juneau of highjacking the settlement

09:57:19 7   program.   Those are especially offensive and inappropriate words

09:57:25 8   and language coming from of all things the CEO of a party to this

09:57:29 9   Settlement Agreement, a party who not only proposed Mr. Juneau for

09:57:33 10  this appointment, but gave great praise to his dedication and work

09:57:37 11  up through and including the final fairness hearing and final

09:57:40 12  approval of the Settlement Agreement.

09:57:44 13      Of course any party has a perfect right to disagree with

09:57:47 14  any decision or particular decision by the Claims Administrator, or

09:57:52 15  for that matter, a particular a ruling or order of this Court.   BP

09:57:55 16  has voiced its disagreement with this Court's March 5th, 2013,

09:58:00 17  order on the BEL issue and has appealed from that order.   But

09:58:07 18  personal attacks, hyperbole, and use of such language in my opinion

09:58:13 19  crosses the line and these unfair, inappropriate, personal attacks

09:58:19 20  should stop.

09:58:24 21      The Court reminds the parties that this Court retains

09:58:28 22  continuing and exclusive supervisory jurisdiction over the parties,

09:58:34 23  the economic class members, the Court Supervised Settlement Program

09:58:38 24  and the Settlement Agreement itself.   In conjunction with the

09:58:45 25  previously approved class action settlement, this Court has

09:58:48 1    authority to exercise control over matters that affect the class

09:58:51 2    members.

09:58:53 3         The Court has both the inherent authority and

09:58:56 4    responsibility under Rule 23 to supervise and control any

09:59:01 5    communications with class members, especially those who are

09:59:05 6    unrepresented by their own counsel.  In this case we have thousands

09:59:09 7    of, maybe tens of thousands of pro se claimants who are

09:59:17 8    unrepresented but who have claims or have made or will make claims

09:59:23 9    in this Settlement Program, and one of my primary responsibilities

09:59:30 10   in supervising this Settlement Agreement and the class settlement

09:59:35 11   is to protect the rights of and interests of those class members,

09:59:43 12   in particular the unrepresented class members.

09:59:46 13        I make these points in order to make a clear record of

09:59:49 14   what has transpired here so that there can be no misimpression of

09:59:55 15   what has happened.  The Court takes very seriously its role in this

09:59:59 16   massive multidistrict litigation and its supervisory role over the

10:00:05 17   Court Supervised Settlement Program.

10:00:08 18        I will also continue to try this case in the courtroom

10:00:11 19   and not in the press, and to decide the case based on the evidence

10:00:16 20   and the law and not on anything else.  I certainly have no

10:00:24 21   intention of letting any kind of media frenzy instigated by someone

10:00:29 22   who disagrees with one of my rulings to cause me to shutdown the

10:00:34 23   entirety of the claims processing of the class settlement without

10:00:37 24   some substantial evidence of a systemic or widespread problem

10:00:42 25   within the Court Supervised Settlement Program.

10:00:46  1          BP has failed to make such a showing, and accordingly, it

10:00:49  2   is ordered that BP's motion for preliminary injunction is denied.

10:00:53  3          The Court is in recess.  Have a good day.

10:00:56  4          THE DEPUTY CLERK:  All rise.

10:00:57  5       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

       6

       7                        * * * * * *

       8

       9                   REPORTER'S CERTIFICATE

      10

      11       I, Karen A. Ibos, CCR, Official Court Reporter, United

      12   States District Court, Eastern District of Louisiana, do hereby

      13   certify that the foregoing is a true and correct transcript, to the

      14   best of my ability and understanding, from the record of the

      15   proceedings in the above-entitled and numbered matter.

      16

      17

      18                      _____

      19                      Karen A. Ibos, CCR, RPR, CRR, RMR

      20                      Official Court Reporter

      21

      22

      23

      24

      25