CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")

Deepwater Horizon Court Supervised Settlement Program ("CSSP")
Special Master – Independent External Investigation
Interview Report of Freeh Group

Interviewee:      Welker, David
Title:            Fraud & Waste
Office:           CAO
Date/Time:        August 6, 2013, 8 AM – 12:15 PM
Attendees:        Walt Donaldson, Frank Piantidosi, Ben Scotti
Location:         Eastern District of Louisiana Federal Courthouse – Judge McNamara Chambers

These notes are prepared as part of an Independent External Investigation for the Eastern District Court of Louisiana IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010, 10-MD-2179 ("MDL-2179"). Our role as Special Master is limited to performing an independent external investigation related to ensuring the integrity of the CSSP program for the benefit of the parties and the public and to perform fact finding as to possible ethical violations or other misconduct within the CSSP. We are also examining and evaluating the internal compliance program and anti-corruption controls within the CSSP, and making any necessary recommendations to design and to implement additional such controls, policies, procedures, and practices to ensure the integrity of the CSSP. We do not represent you, Mr. Welker.

On the above date and times David Welker was interviewed in person. We explained that information provided in this interview would become part of the investigation record and could be reported to the District Court, the Plaintiff Steering Committee, British Petroleum, and potentially to third parties.

Mr. Welker began the interview by explaining how the Tiger Sutton revelations came about. An individual approached him on Tuesday, the 28th of May and indicated that he/she had some information to turn over to Mr. Welker as long as Mr. Welker provided assurances of complete confidentiality. Mr. Welker described this persons' motivation in coming forward as honorable: to protect the program and protect Mr. Juneau. Mr. Welker agreed to the confidentiality request and the individual indicated that he/she had received the information second hand from another individual that actually didn't know that he/she came forward – this meant there was no going back to the other individual to obtain additional information. The person also indicated he/she would go to BP with the same information. The Informant did not present Welker with any physical information. The information that was relayed to Mr. Welker was as follows: (1) that Tiger had claimant clients that he had represented prior to joining the settlement program and had referred these claimants to John Andry and that in return, Tiger would get referral fees on these claims; (2) that Tiger was involved in policy making and that he was influencing policy to benefit his attorney friends in the area; (3) that Tiger opened a separate bank account for the kickbacks; and (4) that Tiger and Andry had been in business together and that he has attempted to influence a claim made by the Andry law firm.

Mr. Welker stated that, based on this information, he went to the CEO David Odom and also to the CFO Bob Levine and said "I need to talk to you about this issue." This was on Tuesday, May 28 and Juneau was out until Thursday, May 30. So in the interim, Welker went into the system to look at the files – he



EXHIBIT
26

SM-04-TALF001307

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

went in and reviewed about 10% of the Andry claims, which were approximately 43 different claims. After the GCCF ended and after the transition period, all claims were migrated to the new system, so now after the migration, Mr. Welker stated that there are twice as many claimants. At the outset, he looked to see if Tiger represented any of these claimants. Mr. Welker came upon one claimant, Casey Thonn, and spent a number of days going through his files. He does not recall if the informer he spoke to mentioned Casey Thonn. Mr. Welker speculated that finding the Thonn claim may have been the result of his name appearing early on the list he was reviewing.

On Thursday, May 30, when Mr. Juneau came back into the office, Mr. Welker met with Mr. Juneau and told him of the recent revelations. David Odom, David Levine and Pat Juneau were all present during this meeting. Mr. Welker informed Mr. Juneau that the individual informant claimed that the problems were systemic and involved multiple claimants [however Mr. Welker explained during his interview that what he looked at didn't appear to validate or substantiate the claims by the individual who came forward stating that the problem was rampant]. Mr. Juneau's response at this point was that he wanted more evidence, something more than the one incident or claim by a confidential informant who made an anonymous allegation based upon statements from a third party. After hearing this, Mr. Welker stated that he continued to pull together information and had Chris Reade pull documents up through the middle of the following week. Mr. Welker then had some personal commitments and did not get a chance to speak to Mr. Juneau until the week of June 10 regarding the additional developments. In the meantime, on the day before Mr. Juneau returned, Mr. Welker reached out to the Federal Bureau of Investigation (that Wednesday May 29th) and wanted to know what category of criminal conduct this behavior would fall under, whether it was business bribery of some sort - it didn't appear to be a quid pro quo. Mr. Welker sensed that Mr. Juneau was not too happy that Mr. Welker went to the FBI before speaking to him. Regardless, Mr. Welker informed Mr. Juneau what he now knew after his continued research.

On June 13th, both Pat and Mike Juneau confronted Mr. Tiger Sutton to look into his eyes and ask him directly. However, there was no immediate action. The week after that confrontation, BP requested a meeting and they met BP on 17th of June. Again, it was on the 13th of June that Sutton was confronted and then denied the allegations/evidence against him. However, after the BP meeting on the 17th of June, Mr. Sutton was suspended on the 19th of June and then came in to see Pat, Mike and Mr. Welker on the 20th of June to tell his story. This meeting was the one in which Mr. Welker served as the scribe.



SM-04-TALF001308

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")



Mr. Welker stated that there is less of a chance of paying a false claim now than under the GCCF. Virtually every prosecution right now around the country involves GCCF money.

3

SM-04-TALF001309

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



SM-04-TALF001310

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG*
*"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010,* 10-MD-2179 ("MDL-2179")



*The notes are not intended as a verbatim transcription of the meeting, but rather as a summary of major matters discussed. Quotes reflect an effort to capture exact words or phrases used during the meeting but are not intended as a verbatim transcription. These notes also contain mental impressions and observations and relay how the discussion during the meeting may impact other open legal issues for the Special Master Investigative Team. These notes also may be shared with the members of the

SM-04-TALF001311

CONFIDENTIAL/ATTORNEY-CLIENT PRIVILEGED COMMUNICATION/ATTORNEY WORK PRODUCT
FOR SOLE USE OF THE EASTERN DISTRICT COURT OF LOUISIANA *IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010*, 10-MD-2179 ("MDL-2179")

Special Master Investigative Team to aid in execution of their functions and responsibilities, and as such are a communication between legal counsel and client.  These notes are privileged as both an attorney-client communication and as attorney work product.

6

SM-04-TALF001312