INVESTIGATIVE REPORT

FOLLOW-UP

JULY 1, 2013

IN RE: Lionel H. Sutton, III Matter

**Situation:** On June 20, 2013, an investigative report was drafted detailing allegations of misconduct by an individual working in the Deepwater Horizon Economic and Property Damages Settlement, Claims Administrator's office. The allegations centered on the conduct of Lionel H. Sutton, III, (Tiger Sutton) an attorney in the office. The investigative report detailed the allegations and subsequent investigation to that date. The instant document provides the results of additional investigative steps.

**Investigation:** Following the completion of the aforementioned investigative report, David W. Welker conducted nine interviews of the Claims Administrator's staff, Tiger Suton and Christine Reitano, Postlewaite and Netterville (P & N) accountants, and a Garden City Group (GCG) employee. David W. Welker also requested that the search of Tiger Sutton's e-mails be expanded to include the words, "Lerner" and the word "fee".

**Interviews:** The following individuals were interviewed by David W. Welker and/or Patrick Juneau and Michael Juneau: Jordan Wilkinson (P & N claims analyst/accountant); Christopher Rinaldi (P & N claims analyst/accountant); Mark Staley (P & N, Director); David Duval (CAO, Appeals Coordinator); Tracy Steilberg (CAO, Executive Assistant); Steve Cirami (GCG, Senior Vice President of Operations); Christina Hendrick (CAO CADA); Lionel H. Sutton, III; and Christine Reitano.

On June 20, 2013, Christopher Rinaldi was interviewed. Rinaldi indicated he is a Senior Claims Analyst at P & N. He advised he was a claims analyst before being promoted to a team lead position and had initially worked on the Andry Law Firm BEL claim in December 2012. In February or March 2013, he received an e-mail from Mark Staley asking for an update on the Andry Law Firm BEL claim. He asked if he needed to personally work on the claim. Staley told him to assign it to a claims analyst and work it as he would any other claim. He assigned the Andry Law Firm BEL claim to analyst Jordan Wilkinson. At no time did he speak to Tiger Sutton regarding the claim and he is ninety-nine percent sure Jordan Wilkinson never spoke directly to Sutton. (TAB 1)

On June 20, 2013, Jordan Wilkinson was interviewed. Wilkinson advised he is a claims analyst at **P & N**. He advised that he was not assigned the Andry Law Firm BEL claim from its inception. He first received the claim in January/February 2013 after it was assigned to him by



Christopher Rinaldi. He noted that the documents previously requested were in the claim file but he believed he required bank statements to complete his review. He requested the bank statements from the accountant hired by the Andry Law Firm who provided the requestTd information. The subsequent analysis then went pretty quickly because there was so little needed to complete the review of the claim. Wilkinson never spoke to Tiger Sutton regarding tie claim and to the best of his knowledge Tiger Sutton never attempted to contact him directly. TAB 2)

Mark Staley was interviewed on June 21, 2013. Staley advised that he holds the position of Director at P 8 NI He advised that from time-to-time someone from the CAO contacts him regarding the status of a claim. He does not recall being questioned about the claim prior to his e-mail exchange with Tiger Sutton in March 2013. He noted that when Sutton asked to speak to one of his acco'untants, he didn't read anything into it, but he noted, "no one needs to talk directly to his a' ccountants." He advised his accountants initiate any contact, but only with the claimant or auorized representative. It is the policy and practice of P & N that if an accountant must meet wi ; an outside entity, a manager is also present. P & N has a strict confidentiality policy as well as strict ethical standards. He did not speak to Sutton outside the exchat4e of e-mails from Makch 2013 (TAB 15, June 20, 2013 Investigative Report). It was the first time that Sutton had contacted him regarding the Andry Law Firm BEL claim and he does not recall Sutton ever re-contacting him regarding the status of the claim. (TAB 3)

On June 25, 2013, David Duval was interviewed. Mr. Duval is the Appeals Coordinator in the CAO. He advised that he didn't recall Tiger Sutton having any interest in the Casey ThJann appeal. He vaguely recalled a discussion with Sutton regarding the RTP. He recalled that when the Andry Law Firm claim made it to the appeals process, Sutton approached him and asked if it had been assi    ed to a panelist. He asked Duval about the timetable and the process. Sutton told him that Jon    dry or Gibby Andry may call him regarding the appeal. Sutton didn't ask him any specific q estions regarding the appeals panelist but told him that Gibby may call him to ask that question. He didn't recall any other claims that Sutton in which took an unnatural interest. Christine Rei    o never took what he thought was an unnatural or extreme interest in      claim. (TAB 4)

On June 20, 2 113, Tiger Sutton appeared at the offices of the CAO, at the request of the CAO. He was subsequently interviewed by David W. Welker, Patrick Juneau, and Michael Juneau. Sutton indicated he didn't understand what was going on and was not sure of the allegations against him. He was advised of the allegations. He was presented an e-mail in which Sutton wrote, "Did you check on my Thonn fee?" Sutton indicated that Thom owed him money. He could not answer why he called it, "my fee." He indicated that Thonn was a case he woked for a year before he joined the CAO and even if he got paid for it he didn't see the issue. He indicated that any money Lerner sends him is for money he is owed for his role in Crown LLC. Lerner owed him money for public relations expenses and his salary. He was to receive $15,000 monthly for public relations expenses and $10,000 monthly for a salary for Crown LLC. When he referred the Thonn claim to Andry Lerner LLC, he told them (Jon Andry and Glen Lerner)

that the case was in part for Lerner so he could use the money to pay him (Sutton) the money he was owed. When Lerner settles a claim, the money goes to Jon Andry to pay for Crown. He emphasized he didn't get any money from the Thonn claims. He advised that the only reason they referred Thonn to Andry was because Christine began working at the settlement program. When he and Christine represented Thonn, he only had a VoO claim and a seafood claim. He noted that he had also represented Thonn in an auto wreck case in which Thonn received approximately $16,600, but he noted that Andry and Lerner were not involved in that case and he was paid directly by the insurance company. He realized that when he called the money, "his fee", it looked bad. He does not know what the Thonn claim settled for or what the fee was. Every time he discussed Lerner sending money it was for Crown LLC. The e-mail, referring to 50% of the Thonn fee $16665 (TAB 22 June 20, 2013 Investigative Report) was referring to Glen Lerner's share of the Thonn claim, not Thorn's automobile accident. Sutton noted that if he was being dishonest, he wouldn't have done it that way, at least not about the money. He believed this to be an issue between himself and Pat Juneau because it makes it look like he was being dishonest with Pat because he told Pat he did not have a financial interest in any claim. He doesn't believe he violated his contract. He observed that clearly he has to go because of the cost of suspicion, but he wouldn't give up his job for $4900. He concluded that he didn't feel he had given a satisfactory explanation because he didn't have one to give. He didn't see that he had done anything wrong. (TAB 5)

On June 20, 2013, Christine Reitano appeared at the CAO, at the request of the CAO. She was subsequently interviewed by David W. Welker, Michael Juneau and Patrick Juneau. Ms. Reitano was advised of the allegations of misconduct against her husband Tiger Sutton. After being read several e-mails which were attachments to the investigative report of June 20, 2013 detailing the misconduct, Ms. Reitano indicated she was not aware of the contents of the e-mails read to her. She advised that Tiger Sutton is involved in a business, Crown LLC, with Glen Lerner and Glen Lerner is a business partner with Jon Andry. She believed Lerner funds all of Jon Andry's advertisements for the BP oil spill. She was aware they were working on Crown LLC for years. She never handled any Crown LLC money and Tiger Sutton always maintained the checkbook. She advised she had no financial interest in any claim. The Thonn claim was their only claim before the court ordered settlement program that re-filed again in the court ordered settlement. She indicated that she had also represented a claimant names Backes, but wasn't sure if they filed a claim in the settlement program,. If they had filed a claim in the settlement program it would be in the name of Tallulaha's Bar. A review of the DHECC claimant system failed to reveal a claim in the name of Backes or Tallulaha's Bar. She received no money from the Thonn claim. She felt that Tiger Sutton working in the settlement program might get him away from Lerner. She doesn't believe he will take it to another level. She felt that this might be Tiger's way of getting Lerner to do what he was supposed to do. She asked that we get past perception to Tiger's true character. (TAB 6)

SM-04-TALF000787

On June 26, 2013, Christina Hendrick was interviewed. Ms. Hendrick is the Court Appointed Distribution Agent for the subsistence program. She advised she had nothing to do with the Casey Thonn claim and never heard of Casey Thonn. She never heard of Jon Andry and can't recall any firm-wide issues relating to the Andry Law Firm, nor could she recall any communication with the Andry Law Firm. Likewise she has never heard of or dealt with Glen Lerner. She advised that Tiger Sutton never came to her to specifically influence a policy. In most cases, with policies in general, all policies were commented on by employees at Brown Greer, the Director of Fraud, Tiger Sutton and the legal committee. If she had a disagreement with Sutton, she asked that the issue be taken to the entire legal committee. She felt that Sutton was always pushing for leniency, generally on the whole subject of subsistence not just one claim, but the program as a whole. (TAB 7)

On June 24, 2013, Tracy Steilberg was interviewed. Ms. Steilberg is an Executive Assistant in the CAO. She advised that prior to her employment in the CAO, she worked for Tiger Sutton and Christine Reitano for approximately 19 years. She recalled that the Sutton/Reitano Law Firm handled GCCF claims for the following clients: Casey Thonn; Tim and Wendy Gonzalez; the Backes (Jennifer and others unrecalled); Tallulah's Bar in Slidell; and a woman named Patricia (Last Name Unknown). She is aware that Casey Thonn has a claim in the settlement program because it came through the appeals process. Sutton asked her about the Thonn claim about the same time the claim was going through the appeals process. She probably pulled up the claim to check the status of the claim. If she pulled it up, she probably related the status to Sutton. She thought Thonn had a duplicate claim. She recalled that Casey Thonn hired Sutton and Reitano when the Sutton/Reitano Law Firm was located on the sixth floor at 935 Gravier Street, New Orleans, La. Tiger had to give Thonn up as a client because Christine started working for the settlement program. Christine told her they gave the Thonn claim to Jon Andry. Sutton/Reitano had the Thonn claim for about a year before the settlement program began. Sutton also asked her about the status of the Andry Law Firm claim around the time the claim was going through the appeals process but before it went to a panelist. He asked her which panelist was assigned the claim but she would not tell him. She told him to check the portal. He told her, if Jon or Gibby asks her, she is to tell them she didn't have that information. She doesn't recall Sutton asking about any other claimants that Sutton/Reitano previously represented. In the course of her duties, she has done nothing to influence or impact the Andry Law Firm claim or the Thonn claim. She handled them as she would any other appeal. She also believed Tiger Sutton had a business with Robert Perez called Romeo Papa, which received funds from the GCCF. (TAB 8)

On June 27, 2013, Steve Cirami was interviewed. Mr. Cirami is employed by the Garden City Group (GCG), as the Senior Vice President of Operations. GCG is a vendor in the Deepwater Horizon Economic and Property Damage Settlement Program. He along with other senior members of GCG's management team oversees the GCG role in the project from front end to back end. GCG provides call centers, a data center, document intake, data entry, and payments

of claims as well as various projects as directed by the Claims Administrator. Mr. Cirami has never heard of Casey Thonn and is not familiar with his claim. Up until the recent events, Mr. Cirami may have heard the name Jon Andry, but couldn't tell you anything about it. Mr. Cirami had very little contact with Tiger Sutton. He has attended several meetings with Sutton. Approximately two weeks prior, Christine Reitano e-mailed him and copied Tiger Sutton on the e-mail. She asked a general question, can a claimant be paid by wire if they did not originally elect for wire payment? He wrote back and answered, yes, and then explained the process. He directed them to complete a Payment Election Form, but that payment is only wired to the attorney's IOLTA account. Most attorneys have an IOLTA account. This policy and practice had previously been approved by Mr. Juneau. Sutton responded to Cirami's last e-mail that the claimant is the lawyer but doesn't have an IOLTA account, can you do it anyway? Mr. Cirami took that to mean the claimant couldn't or didn't want to use an IOLTA account because it was his claim, not one of a client. Mr. Cirami stated the question didn't seem unusual at the time. Mr. Cirami answered Sutton by indicating it was Mr. Juneau's policy, they had made no exceptions, and he could ask Mr. Juneau about it, directing him to Mr. Juneau. Sutton did not respond to that advice. The exchange was via e-mail and involved no verbal discussion. There was no mention of the claimant's name or claim number. This was the only contact he had with Sutton outside of widely attended meetings. (TAB 9)

**Database Review:** Through interviews and the investigation, it was determined that Tiger Sutton was involved in a business named, Romeo Papa, LLC. A review of the Louisiana Secretary of State (SOS) database was queried for information concerning a business named, Romeo Papa. Records were obtained and reviewed that reflect the existence of Romeo Papa, LLC. The sole Registered Agent is listed as Robert H. Perez, 3901 Highway 24, Bourg, La. 70343. The sole Officer is listed as Robert H. Perez, with the same address. The registration date of the corporation is listed as 2/21/2001. (TAB 10)

A review of the DHECC database revealed a Business Economic Loss claim, which is subject to Moratotia Loss review. The claim was filed by Bart Haddad on December 13, 2012, on behalf of Romeo Papa, LLC, claimant # 100158584. (TAB 11)

A review of the financial documents in the claim file revealed that Lionel H. Sutton, III or T-Blue, LLC is listed as a partner on the schedule K tax forms. Louisiana SOS database reflects that T-Blue, LLC was registered on August 8, 2001. The mailing address is listed C/O Lionel H. Sutton, III, at 610 Baronne Street, New Orleans, Louisiana. The sole Registered Agent is listed as Lionel H. Sutton, III and the sole Officer listed is Lionel H. Sutton, III. (TAB 12)

Documents reviewed in the Romeo Papa claim for the tax year 2007, specifically the schedule K tax form lists the partners as T-Blue, LLC and Robert H. Perez. For the tax years 2008, 2009, 2010, and 2011, the schedule Bl, form 1065 tax form lists the 50% partnership as Robert Perez, 50% and Lionel H. Sutton, III, 50%, the schedule K for the same tax years, lists the partners as Robert H. Perez and Lionel H. Sutton, III. It is unknown what the current status of the

partnership is beyond the 2011 tax records submitted in support of the aforementioned claim. (TAB 13)

An additional document reviewed in the Romeo Papa, LLC claim file, Doc ID: 7465159, Doc File ID: 17561220, create date of 1/7/13 reflects an Act of Cash Sale and Assignment, Membership Interests and Sharing Ratios of Romeo Papa, LLC.

The document reflects holders and owners of membership interests and sharing ratios of Romeo Papa, LLC before giving effect to this act of cash sale and assignment: listed are

Name: T-Blue, LLC; Membership Interest/Sharing Ratios Owned 51%

Name: Robert Perez; Membership Interest/Sharing Ratios Owned 49%

Holders and Owners of Membership Interests and Sharing Ratios of Romeo Papa, LLC after Giving Effect to this Act of Cash Sale and Assignment:

Name: Lionel H. Sutton, III; Membership Interest/Sharing ratios Owned 50%

Name: Robert Perez; Membership Interest/Sharing Ratios Owned 50% Name:

T-Blue, LLC; Membership Interest/Sharing Ratios Owned 0%

The document is undated but signed by T-Blue, LLC, BY: Lionel H. Sutton, III, Managing Member; Robert Perez, and Lionel H. Sutton, III. (TAB 14)

A review of court records for the U.S. District Court for the Eastern District of Louisiana reflects a civil law suit, 2:11-cv- 02540, Romeo Papa, LLC v. National Response Corporation, in which a complaint with jury demand was filed on October 7, 2011 by Lionel Sutton. Following several pleadings, an order dismissing the case was signed by U.S. District Court Judge Mary Ann Vial Lemmon on November 6, 2012. (TAB 15).

In the matter of State National Insurance Company v. Cummins Mid-South, Inc., 2:11-cv-02207-ILRL-DEK, wherein Romeo Papa, LLC is a plaintiff, Sutton continued to represent Romeo Papa, LLC through April 22, 2013, when court records reflect the Appeal Record was on loan to Lionel H. Sutton, III. (TAB 16).

In the matter of State National Insurance Company v. Cummins Mid-South, Inc. 2:11 — cv — 02207 ILRL-DEK, a review of the Fifth Circuit, Court of Appeals Docket Report reflects Appellant's Brief Filed on June 14, 2013 with Attorney's for Appellant, Harville and Sutton. (TAB 17)

A review of CAO employee claims access reveals that Sutton accessed the Romeo Papa, LLC claim five times between January 4, 2013 and May 2, 2013.

It must *be noted,* Sutton was actively involved in the development of a policy dealing with Moratoria claims as to which claims would be payable under the terms of *the settlement and* which claims would be excluded. The Moratoria policy is still in the drafting stage. Parties are still attempting to reach an agreement on the terms of such policy.

**DHECC E-Mail Review:** Following the drafting of the Investigative Report dated June 20, 2013, the parameters of the e-mail search for Sutton and Reitano's e-mails was expanded to include the words "fee" and "Lerner." The word "fee" was generally too expansive and overwhelming to where the review was not productive. Under the search term Lerner, an e-mail chain was discovered from May 9, 2013, beginning at approximately 3:02 pm, in which Sutton and Lerner discuss a logo for Crown, LLC. Lerner responds, "glad to see you working so hard while I try to figure out how to keep paying for shit." Sutton responded, "u forget. im also working hard to get you $ so you can pay for shit." Lerner responded, "ooh la la, Work harder. How's Chris." Sutton responded, "she's good. it has actually been pretty fun working together on this." Lerner then responded, "They are not paying claims. Insane." Sutton then responded, "Just between me and you, here is your report: 402 claimants; 61% have submitted a signed claim form; 22% started a registration form; 16% finished Registration but did not file a claim form; <1% finished Registration, started a Claim Form but did not finish; 466 total claims filed; 89 paid; 179 incompleteness Notices issued, only 93 responded to (17 of the non-responsives are waiting to get paid); 136 under review but no incompleteness Notices issues; 47 denied. Example of some problems: 1) Your firm was issued an incompleteness notice on Talen's on 12/3. What appears to be a complete response was not received by us until 5/3. During that six month period, a lot of claims got in front of yours. 2) Only a little more than half of your clients have even submitted signed claims. At an intake rate of more than 200/day, your clients will be way behind." (TAB 18)

By e-mail dated June 24, 2013, Chris Reade advised that he had conducted a search of Christine Reitano's DHECC computer. He reported that he could not find any contact between Ms. Reitano and anyone at the Andry Law Firm, including Glen Lerner, Jeff Cahill, Jon Andry and others mentioned in Tiger Sutton's e-mails. He searched the entire computer and all e-mail and the only mention of Casey Thonn, the Andry Firm or any other issues pertinent to this matter are those that come from our automated internal systems, such as payment reports, appeals reports, and similar e-mails from internal systems and staff. The sole mention in an e-mail of Casey Thonn or his claims from Ms. Reitano to anyone else is in an e-mail dated September 17, 2012, entitled, "Re: Expedited Claims." This e-mail has an attachment where Casey Thorn's name is listed first in the Excel file. This e-mail was included in the Investigative Report dated June 20, 2013 at TAB 13, but a copy is included here as well. (TAB 19)

On June 27, 2013, copies of the June 20, 2013, Investigative Report, with attachments, were delivered to the FBI, New Orleans Division, and the United States Attorney, Eastern District of Louisiana at their respective requests. (TAB 20)

*The* investigation at the *Deepwater Horizon* Economic and Property Damages Settlement, Claims Administrator's office continues.

- Please note a correction from the June 20, 2013 investigative report. On page 2, paragraph 2, line 22, it was reported that Casey Thonn has received $477,225.13 in payments from the Deepwater Horizon Economic and Property Damage Settlement. That figure is incorrect. The accurate sum of money he received is $406,402.35.

David W. Welker

## Dave Welker Summary 7/9/13

4/20/2010 – Spill

Shortly after the spill → formation of the Gulf Coast Claims Facility (GCCF)

GCCF pays out roughly $6 Billion to claimants

- Stuart Feinberg – Admin

### Plaintiffs' Steering Committee (PSC)

- Payment apparatus that is separate & apart from the main claimant's fund ($600 Million)
- Settlement created through a separate negotiation & approved in November 2010
    - 12 settlement categories
- Judicial approval of the settlement established a class action settlement program

### "Smoothing"

- 2009 – Andry Lerner wins large settlement → pockets roughly $3 million, then does not work at all for roughly 1 year
- 2010 – DWH spill → Andry Lerner files a claim under the settlement to "recover" money
- Formula for determining how much a business should receive, each business must provide proof of revenues for any three (3) month period in the year leading up to the spill and any 3 month period within one (1) year after the spill (actual formula is very complex but it seems to be based at some level, on the difference between the pre and post-spill earnings)
- Andry Lerner submits its claim using the 3 month period when they won their settlement ($3 million in revenue) and a 3 month period after the spill, during which time the firm was not servicing clients ($0 revenue)
- Andry was granted just over $7 million

### Claims Reviewers - Determine class eligibility

#### Brown Greer

- Orran Brown & Lynn Greer
- Primary claims reviewers for DWH
- North Carolina
- Specialize in claims review

#### Garden City Group

- Neil Zola
- Claims reviewer for DWH
- Garden City, NY
- Mostly attorneys

### Auditors – Oversee the claims payment process

#### PwC

- Charles Hacker
- Tad Martens
- 3 Additional Partners

#### Postlethwaite & Netterville

- Mark Staley
- Robin Pitcher
- Additional Senior Leadership

*Welker utilized a PI firm out of Lafayette, LA (didn't mention the name) to run down leads and investigate claimants

SM-04-TALF000793