UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "*DEEPWATER HORIZON*" in the GULF OF MEXICO, on APRIL 20, 2010 | § § § § § | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER |
| Applies to:  No. 10-2771, and All Cases | § § § § | MAG. JUDGE SHUSHAN |

## HALLIBURTON ENERGY SERVICES, INC.'S PROPOSED SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO PHASE TWO—QUANTIFICATION

Halliburton Energy Services, Inc., ("HESI") files these Proposed Supplemental Findings of Fact and Conclusions of Law as to Phase Two-Quantification, and would respectfully show as follows:

### INTRODUCTION

Despite the Court's prior determination that issues related to the condition of the production casing cement job prior to the blowout would not be part of the Phase Two—Quantification trial, both BP and the United States advanced continued and additional attacks on the condition of the cement.  BP's and the United States' attacks are now part of the Phase Two—Quantification trial record, and both these parties now seek findings of fact related to the condition of the cement.  Consequently, HESI now files these proposed Findings of Fact and Conclusions of Law to complete the trial record and to apprise the Court of certain defenses that

would have been part of the trial record had HESI been permitted to participate in the Phase Two—Quantification trial.[1]

More specifically, on September 11, 2013, the Court held that the parties would not "introduce additional evidence in Phase Two relating to cement . . . that would in any way increase the liability or exposure of Halliburton." Transcript of Pre-Trial Conference, 13:22-24. However, during the Phase Two—Quantification trial, BP reiterated its unsupported Phase One theory that the Macondo cement was permeable and that hydrocarbons flowed through the cement. *See, e.g.,* A. Momber, P2 TT 2981:5-8, 2982:2-9, 2983:9-18. In its proposed findings and conclusions, BP continues to assert that the shoe track cement was permeable and/or "pre-damaged." The United States uses Phase Two to attack the cement, as well. It continues to assert that the Macondo cement did not set by the time the negative pressure test was conducted.

HESI relies, as it must, on the Court's determination that nothing offered in the Phase Two—Quantification trial will negatively impact HESI's interests; however, out of an abundance of caution and in accordance with FED. R. CIV. P. 52 and its prior reservation of rights (*see* Dkt. No. 12042), HESI submits these Proposed Supplemental Findings of Fact and Conclusions of Law as to Phase Two—Quantification to protect its interests in this litigation.[2]

---

[1] HESI files these proposed Findings of Fact and Conclusions of Law without waiving any of its previously-filed objections to being excluded from the Phase Two—Quantification trial. *See, e.g.*, HESI's Objections to and Appeal from Magistrate Judge's Order regarding Halliburton's Motion to Strike Expert Opinions (Dkt. No. 11104) *and* HESI's Offer of Proof as to Phase II-Quantification (Dkt. No. 11692).

[2] If any finding is in truth a conclusion of law, or if any conclusion of law is in truth a finding of fact, it should be deemed so.

**HESI'S PROPOSED SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSION OF LAW AS TO PHASE TWO—QUANTIFICATION – Page 2**

## PROPOSED SUPPLEMENTAL FINDINGS OF FACT

**I.     Cement Erosion.**

   **A.     The cement was set at the time of the negative pressure test.**

1.     In asserting that the cement was not set by the time of the negative pressure test, the United States primarily relies on certain Crush Compressive Strength tests, *see* Dkt. No. 12048-1 [United States' Phase II Proposed Findings of Fact], ¶. 545(c), which its own expert admits do not simulate downhole pressure and temperature, *see* Dkt. No. 10468 [Halliburton's Proposed Phase I Findings of Fact], Sec. XV, ¶¶ 31-38.  As the United States' expert, Glen Benge, testified at the Phase One trial, the Crush Compressive Strength test result of 0 psi at 24 hours under test conditions does not indicate that the slurry pumped on the Macondo production casing cement job had 0 psi of compressive strength at 24 hours under downhole conditions because downhole pressure and temperature were not simulated in the test.  *See* Dkt. No. 10468, Sec. XV, ¶ 40 (*citing* G. Benge, P1 TT 2430:22-2432:5).  Therefore, the United States' proposed findings of fact suggesting that the cement had not set by the time of the negative pressure test are contrary to the weight of the evidence.  *See also* Dkt. No. 10468, Sec. XX, ¶¶ 68-70 (explaining that, upon post-blowout interception with the Macondo well, the failure to find hydrocarbons in the upper annulus section demonstrates that the annular cement set as intended and isolated the lower portion of the well from the upper annulus).

2.     As BP acknowledges, cement is considered set and immovable at a compressive strength of 50 psi.  *See* Dkt. No. 12047 [BP's Proposed Phase II Findings of Fact], ¶ 1413. HESI's UCA Compressive Strength testing, which accounts for both downhole pressure and temperature, demonstrated that the cement would reach 50 psi within 8 hours and 12 minutes and would reach 500 psi within 8 hours and 40 minutes.  TREX-7722.002.

3. After the production casing cement job, the well was static for approximately 18 hours before the negative pressure test commenced. *See* Dkt. No. 10468, Sec. XI, ¶ 195.

4. The United States cites to testimony during the Phase One trial by Dr. Gene Beck, one of HESI's experts, and implies that such testimony supports its position that the rapidity of the blowout supports a finding that the production casing cement did not set prior to the negative pressure test. *See* Dkt. No. 12048-1, ¶ 529. The United States' selective and incomplete citation is misleading, as Dr. Beck's full testimony demonstrates that the rapidity of the blowout supports his opinion that there was a rupture in the shoe track causing the cement to be placed in a location other than where it was intended to be placed, as opposed to the cement being unset. *See* F. Beck, P1 TT 7140:12-7141:3.

> **B. BP and Dr. Momber err in assuming, without evidence, that "hydraulic fragmentation" of the shoe track cement was initiated due to channels caused by "pre-damaged" or otherwise defective cement.**

5. Compelling evidence demonstrates that Dr. Andreas Momber erred in assuming that "before the Macondo incident the bottom of the wellbore was filled with cement; cement filled much of the casing up to the float collar, and more cement filled part of the annulus around the lower portion of production casing." TREX-11644 at i [Momber Report]. *See* Dkt. No. 10468, Sec. XX, ¶¶ 51-53, 59-62 (demonstrating that, due to a breach in the shoe track, very little cement would have been placed in the shoe track below the breach point); *see generally*, *id*. at Sec. XX, ¶¶ 1-70.

6. Contrary to Dr. Momber's assumption, the evidence demonstrates that the shoe track was not filled with 189 feet of cement; rather, the cement likely exited to the annulus through a breach in the shoe track, leaving no cement in the shoe track or a shoe track only

partially filled with cement.  *See* Dkt. No. 10468, Sec. XX, ¶ 62; *see also id.* at Sec. XX, ¶¶ 41-61.

7. Momber's opinion that "hydraulic fragmentation" occurred in the shoe track cement is predicated on assuming "*the existence of fluid-filled voids, flaws or capillaries* [in the cement] and the sudden release of a particular pressurized fluid volume."  TREX-11644 at 14 (emphasis added).

8. While Momber assumes that such voids, flaws or capillaries (hereinafter, "channels") existed in the Macondo shoe track cement due to the cement being allegedly "disturbed" [TREX-11644 at 5], "deteriorated" [TREX-11644 at 6] or "pre-damaged" [TREX-11644 at 13], he admits that there is no evidence of the network of cracks and pores he describes in his report.  A. Momber, Phase 2 TT 3011:25-3012:03.

9. The Phase One evidence demonstrates that, to the extent channels existed in the cement, such channeling was likely caused by BP's decision to inadequately centralize the long-string production casing and BP's failure to circulate a sufficient volume of drilling mud prior to the cement job.  *See* Dkt. No. 10468, Sec. XI, ¶¶ 156-199 (BP's inadequate centralization likely led to channeling), ¶¶ 200-219 (BP's inadequate mud circulation likely led to channeling).  In his expert report and opinions, Momber entirely ignores these industry-accepted causes of channeling, and assumes, contrary to the weight of evidence, that any channels in the cement were caused by:  (1) contamination from nitrogen that allegedly "broke out" of the foam cement slurry; (2) inadequate design of the cement; and/or (3) inadequate testing of the cement.  TREX-11644 at 6 [Momber Report].

10. Contrary to Momber's assumptions and opinions, there is no competent evidence—either in Phase One or in Phase Two—that channels formed in the shoe track or

annular cement due to nitrogen breakout and/or migration of nitrogen from nitrified cement. *See* Dkt. No. 10468, Sec. XIV, ¶¶ 1-11; TREX-11644 at 6-9; A. Momber, P2 TT 3005:1-5.

11. Contrary to Momber's assumptions and opinions, there is no competent evidence—either in Phase One or in Phase Two—that, if nitrogen broke out of a foamed cement, it would result in a permeable cement. *See* Dkt. No. 10468, Sec. XIV, ¶¶ 8-11; TREX-11644 at 6-9.

12. There is no competent evidence suggesting that flaws in the cement (*e.g.*, porous cement caused by nitrogen breakout) could be a contributing factor in the creation of a possible flow path. *See* Dkt. No. 10468, Sec. XIV, ¶¶ 1-11.

13. As United States expert Glen Benge testified in Phase One, if a foam slurry is unstable, it does not form permeable cement downhole; rather, it would result in a denser base slurry being left behind downhole. *See* Dkt. No. 10468, Sec. XIV, ¶¶ 8-9.

### C. Dr. Gene Beck explained why the production casing cement set up and yet did not achieve zonal isolation.

14. Because BP's casing operations caused a breach in the shoe track below the float collar, cement could not be placed where intended; a breach in the shoe track below the float collar likely caused the annular cement to not be placed across all of the hydrocarbon-bearing zones in the annulus, and the tail cement likely did not fill the shoe track. *See* Dkt. No. 10468, Sec. XX(A), ¶¶ 59-65; *see generally, id.* ¶¶ 1-70.

15. The sudden increase in flow rate after 21:30 cannot be explained by Momber's "hydraulic fragmentation" theory. TREX-11644 at 8, 14-17. Rather, such a step-wise increase in flow rate after 21:30 is better explained by exposed hydrocarbon zones having direct access into the casing through a breach in the shoe track, eroding the damaged and/or unconverted float

collar as they traveled up the casing toward the surface, causing an immediate, step-wise increase in the flow rate. *See* Dkt. No. 10468, Sec. XX, ¶¶ 52, 62-67 (hydrocarbons had direct access into shoe track through breach), Sec. XII, ¶¶ 61-63 (demonstrating conclusively that the float collar was damaged and/or not converted at the time of the negative test).

16. Because he did not study the other restrictions, Momber cannot exclude the possibility that the pressure increase at 21:30 on April 20, 2010, was caused by a failure or change in a restriction other than the shoe track cement. TREX-11644 at 8-9 (noting that it is "instructive to *assume* that this change in model flow rate is related to the capability of the cement material to resist oil flow" and that flow through channeled cement is only a "reasonable inference" from Morten Emilsen's modeling).

17. Momber's reliance on Morten Emilsen's analysis that "there was some cement blocking the reservoir" [TREX-11644 at 7] demonstrates that the cement pumped on the Macondo production casing cement job did, in fact, set up with sufficient compressive strength to provide zonal isolation. Momber's opinion that "there was substantial cement impeding flow in the wellbore" [TREX-11644 at 9] further supports a finding that the cement pumped on the Macondo production casing cement job did, in fact, set up with sufficient compressive strength to provide zonal isolation had it been placed in the intended location. To the extent the production casing cement job did not provide a barrier to all hydrocarbon flow, it was due to a breach in the casing below the float collar that prevented cement from being placed in the annulus adjacent to the hydrocarbon-bearing sands. Dkt. No. 10468, Sec. XX(A), ¶¶ 1-70. Momber did not consider the impact on his erosion theory of a failure in cement placement brought about by a breach in the production casing. *See generally*, TREX-11644.

**PROPOSED CONCLUSIONS OF LAW**

1. The cement set and hardened in a timely manner and reached sufficient compressive strength, providing a barrier to hydrocarbon flow. To the extent the production casing cement job did not result in a barrier to all hydrocarbon flow, it was due to a breach in the casing/shoe track below the float collar that prevented cement from being placed in the annulus adjacent to the hydrocarbon-bearing sands and from filling the shoe track.

2. There is no competent evidence that nitrogen broke out of the foam cement used on the production casing cement job.

3. Even if the foam cement experienced nitrogen breakout, an unstable foam slurry would not form permeable cement downhole; rather, it would result in a denser base slurry being left behind downhole.

4. Hydraulic fragmentation was not the cause of the sudden increase in flow rate after 21:30; rather, the sudden increase in flow rate after 21:30 is better explained by hydrocarbons having direct access into the casing through a breach in the shoe track, eroding through the damaged and/or unconverted float collar as they traveled up the casing toward the surface causing an immediate, step-wise increase in the flow rate.

Respectfully Submitted,

**GODWIN LEWIS PC**

**By:** /s/ Donald E. Godwin
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Gavin E. Hill
State Bar No. 00796756
Gavin.Hill@GodwinLewis.com

1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
Jerry C. von Sternberg
State Bar No. 20618150
Jerry.VonSternberg@GodwinLewis.com
Misty Hataway-Coné
State Bar No. 24032277
Misty.Cone@GodwinLewis.com

1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT HALLIBURTON ENERGY SERVICES, INC.**

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing Halliburton Energy Services, Inc.'s Proposed Supplemental Findings of Fact and Conclusions of Law As To Phase Two – Quantification have been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this on this 24th day of January, 2014.

                                                              /s/ Donald E. Godwin
                                                              Donald E. Godwin