## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, | * * * | MDL No. 2179 |
| | * | Section: J |
| This Pleading applies to: | * | |
| | * | Judge Barbier |
| | * | |
| *All Cases* | * | Magistrate Judge Shushan |
| | * | |
| | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### POST-TRIAL REPLY BRIEF OF DEFENDANTS BP EXPLORATION & PRODUCTION INC., BP AMERICA PRODUCTION COMPANY, AND BP p.l.c.

### SOURCE CONTROL

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Paul D. Collier
Emily R. Dempsey
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL  60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Christopher Landau, P.C.
Steven A. Myers
Katherine A. Crytzer
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC  20005
Telephone:  202-879-5000
Facsimile:  202-879-5200

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c.*

January 24, 2014

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 2

I.    THE FACTS DO NOT ESTABLISH THE CULPABILITY NECESSARY TO SUPPORT PUNITIVE DAMAGES AS A MATTER OF LAW. ...................................... 2

    A.    BP's Pre-Spill Source-Control Plan Does Not Support Punitive Damages. ........... 2

        1.    Federal Regulators Approved BP's Source-Control Plan, And That Plan Complied With Industry Standards. ..................................................... 2

        2.    Neither Federal Regulators Nor Industry Standards Required A Pre-Built Deepwater Capping Stack. ........................................................ 5

        3.    BP's Source-Control Plan Did Not Violate Any Federal Regulations. ...................................................................................... 9

    B.    BP's Post-Spill Source-Control Efforts Do Not Support Punitive Damages. .................................................................................................. 11

        1.    Federal Responders Did Not Rely On A 5,000 Barrel Per Day Flow-Rate Estimate To Approve Top Kill. ............................................... 13

        2.    Federal Responders Had Numerous Flow-Rate Estimates Significantly Greater Than 5,000 Barrels Per Day Before Approving Top Kill. .................................................................. 14

        3.    BP Disclosed The 15,000 Barrel Per Day Flow-Rate Limit On Momentum Kill To Federal Responders. ..................................................... 16

        4.    Federal Responders Were Not Misled About Top Kill's Likelihood Of Success. ............................................................................................. 18

        5.    Top Kill Did Not Delay A Capping Strategy Because No Such Strategy Was Ready To Implement When Top Kill Began. ...................... 20

        6.    There Is No Evidence That BP Knew Top Kill Failed Because Of High Flow. ............................................................................................. 21

        7.    Federal Responders Conducted An Independent Analysis Of Top Kill's Failure And The BOP-On-BOP Option. ........................................ 23

II.    THE FACTS DO NOT ESTABLISH THAT BP'S CONDUCT WAS A SUPERSEDING CAUSE OF INJURIES FROM THE OIL SPILL. .............................. 24

III.    THE  FACTS  DO  NOT  ESTABLISH  THE  BASIS  FOR  AN  INCREASED FAULT ALLOCATION TO BP.......................................................................................... 25

CONCLUSION................................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alley v. Gubser Dev. Co.*,
   785 F.2d 849 (10th Cir. 1986) ................................................................................... 4

*Baker v. S/S Cristobal*,
   488 F.2d 331 (5th Cir. 1974) ..................................................................................... 4

*Donaghey v. Ocean Drilling & Exploration Co.*,
   974 F.2d 646 (5th Cir. 1992) ................................................................................... 11

*Drabik v. Stanley-Bostitch, Inc.*,
   997 F.2d 496 (8th Cir. 1993) ................................................................................ 4, 5

*Durham v. County of Maui*,
   692 F. Supp. 2d 1256 (D. Haw. 2010) ...................................................................... 5

*Elliott v. Brunswick Corp.*,
   903 F.2d 1505 (11th Cir. 1990) ............................................................................ 4, 5

*Exxon Co. U.S.A. v. Sofec, Inc.*,
   517 U.S. 830 (1996) ............................................................................................... 24

*Folks v. Kansas Power & Light Co.*,
   755 P.2d 1319 (Kan. 1988),
   *overruled on other grounds by York v. InTrust Bank, N.A.*,
   962 P.2d 405 (Kan. 1998) ......................................................................................... 4

*Gryc v. Dayton-Hudson Corp.*,
   297 N.W.2d 727 (Minn. 1980) .................................................................................. 5

*In re Great Lakes Dredge & Dock Co.*,
   624 F.3d 201 (5th Cir. 2010) ................................................................................... 11

*Jowers v. BOC Group, Inc.*,
   608 F. Supp. 2d 724 (S.D. Miss. 2009) .................................................................... 5

*Maxey v. Freightliner Corp.*,
   665 F.2d 1367 (5th Cir. 1982) (*en banc*) ................................................................. 4

*Nader v. Allegheny Airlines, Inc.*,
   626 F.2d 1031 (D.C. Cir. 1980) ............................................................................ 3, 5

*Richards v. Michelin Tire Corp.*,
   21 F.3d 1048 (11th Cir. 1994) ........................................................................ 3, 4

*Satcher v. Honda Motor Co.*,
   52 F.3d 1311 (5th Cir. 1995) ........................................................................... 5

*Schlichter v. Port Arthur Towing Co.*,
   288 F.2d 801 (5th Cir. 1961) ........................................................................... 4

*Solvang v. M/T Plan Kristine*,
   No. 92-1617, 1993 WL 666703 (S.D. Tex. June 9, 1993),
   *aff'd*, 44 F.3d 1005 (5th Cir. 1995) ............................................................... 11

## Regulations

30 C.F.R. § 250.105 ........................................................................................... 10

30 C.F.R. § 250.107 ........................................................................................... 10

30 C.F.R. § 250.107(c) ....................................................................................... 10

30 C.F.R. § 250.401 ........................................................................................... 10

30 C.F.R. § 250.401(a) ....................................................................................... 10

30 C.F.R. § 254.26(d)(1) ..................................................................................... 11

30 C.F.R. § 254.5(c) ........................................................................................... 10

## Other Authorities

*Fifth Circuit Pattern Jury Instructions: Civil* (2006) ..................................... 4

*Restatement (Second) of Torts* (1965) .............................................................. 25

**INTRODUCTION**

Before the start of the Phase Two trial, the Aligned Parties announced that they would prove two fundamental points: (1) that "BP willfully ignored its obligation to prepare for an uncontrolled deepwater blowout, despite knowing the risks and consequences of a deepwater blowout," and (2) that "BP willfully, with the intent to deceive, misrepresented its knowledge of the flow rate causing it to eschew available source control methods that would have stopped the flow of oil weeks earlier."  (Aligned Parties' Pretrial Statement (Rec. Doc. 11411) 1.)  This Court then conducted a trial at which the Aligned Parties had every opportunity to prove those points.  It quickly became apparent, however, that they could not do so: BP proved, as it has maintained all along, that its source-control plan for responding to a deepwater blowout was approved by federal regulators and complied with industry standards, and its flow-rate estimates had no effect whatsoever upon the government-directed source-control response.

Undeterred, the Aligned Parties now try to move the goalpost: they declare that it was "not [their] burden" to prove that "BP [1] consciously disregarded the need to prepare for an uncontrolled deepwater blowout and [2] willfully extended the capping of the Macondo Well by intentionally concealing material information and affirmatively misleading the U.S. Government and others regarding the volume of hydrocarbons escaping from the well after the blowout." (Pls.' Post-Tr. Br. (Rec. Doc. 12038) ("Pls.' Br.") 1-2.)  Instead, the Aligned Parties contend, the conduct alleged at the Phase Two trial may be lumped together with the conduct alleged at the Phase One trial in the hope that, in combination, the standard for awarding punitive damages is somehow satisfied.  (*See id.*; *see also id.* at 5-6, 15.)

The Aligned Parties' newfound reticence is telling.  Having failed to prove what they promised they would, the Aligned Parties now declare that it was never their burden to prove it

in the first place.   The Aligned Parties' strained efforts to aggregate disparate conduct are unavailing: zero plus zero is still zero.   Accordingly, this Court should hold that BP's conduct with respect to source control does not support an award of punitive damages under general maritime law, does not qualify as a superseding cause of plaintiffs' injuries, and does not warrant an increased fault allocation to BP.

## ARGUMENT

**I.     The Facts Do Not Establish The Culpability Necessary To Support Punitive Damages As A Matter Of Law.**

The Aligned Parties urge this Court to award punitive damages against BP based on both its *pre*-spill source-control plan and its *post*-spill source-control response.   Each point is addressed in turn below.

### A.     BP's Pre-Spill Source-Control Plan Does Not Support Punitive Damages.

The Aligned Parties argue, at the broadest level, that "BP did ***absolutely nothing*** in advance of the Macondo incident on April 20, 2010 to develop source control plans and equipment in preparation for a possible deepwater blowout," and thereby "consciously disregarded the need to prepare for an uncontrolled deepwater blowout."   (Pls.' Br. 1, 2 (emphasis added); *see also id.* at 7 ("[BP] spent no time or money preparing for a deepwater source control effort.").)   Although the Aligned Parties assert that "BP does not dispute this," (*id.*), nothing could be further from the truth.

#### 1.     Federal Regulators Approved BP's Source-Control Plan, And That Plan Complied With Industry Standards.

Indeed, it is ***undisputed*** that BP prepared and submitted an Oil Spill Response Plan to federal regulators, and that those regulators in turn approved that Plan.   (*See* BP Phase Two Post-Tr. Br. 4-5 (citing record).)   Although the Aligned Parties never dispute BP's evidence of

regulatory approval, they concede only grudgingly that federal regulators "allegedly" approved the Plan.  (Pls.' Br. 2.)  And they assert that "it was clear that the Oil Spill Response Plan (OSRP) ostensibly approved by the Government was directed toward efforts to try to contain and collect the oil once it reached the surface," and "was not intended to be a source control plan." (*Id.* at 11.)

That assertion, once again, is untrue.  Rather, the evidence is undisputed that the Plan addressed *both* surface-control *and* source-control methods.  Indeed, the Aligned Parties' own expert Bob Bea expressly conceded that Section 6(c) of the Plan addresses source-control methods, and thereby "outlines the response" and provides a plan for "what should be done in the event of a deepwater blowout."  (Tr. 471 (Bea).)  The federal regulators who reviewed and approved BP's Plan were responsible for ensuring that oil and gas operators were prepared to respond to a spill with *both* surface-control *and* source-control methods.  (Herbst Dep. 29-30.) These officials were trained and experienced in evaluating source-control plans, and would not have approved BP's Plan unless it satisfied federal source-control requirements.  (Saucier Dep. 214; Tr. 464 (Bea).)   Federal approval of BP's source-control plan negates the extreme culpability necessary to support punitive damages under general maritime law.  (*See* BP Phase Two Post-Tr. Br. 5 (citing *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994); *Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031, 1035 (D.C. Cir. 1980)).)

The source-control methods set forth in BP's Plan also complied with industry standards for deepwater drilling.  (*See id.* at 5-10.)  Rather than dispute this point, the Aligned Parties insist that "compliance with industry standards does not *preclude* a finding of gross or egregious conduct" because "'those standards may sometimes merely reflect an industry's laxness, inefficiency, or inattention to innovation.'"  (Pls.' Br. 7-8, 11 (emphasis modified; quoting *Elliott*

*v. Brunswick Corp.*, 903 F.2d 1505, 1508 (11th Cir. 1990)).)  But that argument is a straw man. BP has never suggested that compliance with industry standards, as a matter of law, invariably "preclude[s] a finding of gross or egregious misconduct."  (*Id.*)  Rather, compliance with industry standards "negates the extreme and culpable misconduct necessary for punitive damages."  (BP Phase Two Post-Tr. Br. 6 (citing *Richards*, 21 F.3d at 1059; *Drabik v. Stanley-Bostitch, Inc.*, 997 F.2d 496, 510 (8th Cir. 1993); and *Alley v. Gubser Dev. Co.*, 785 F.2d 849, 856 (10th Cir. 1986)).)

The Aligned Parties fail to cite a single authority disputing this common-sense point; instead, most of their authorities stand only for the uncontroversial proposition that compliance with industry standards is relevant to, but does not necessarily preclude, a finding of ***ordinary*** negligence.  (*See, e.g.*, Pls.' Br. 8 (citing *Elliott*, 903 F.2d at 1508 (addressing only ordinary negligence, and ***reversing*** judgment in plaintiff's favor because "courts cannot burden companies with an immediate duty to revolutionize their industry"); *id.* at 10 (citing *Baker v. S/S Cristobal*, 488 F.2d 331, 333 (5th Cir. 1974) (addressing only ordinary negligence, and affirming judgment in defendant's favor because there was no "particularly strong showing of the unreasonableness of the customary practice"); *Schlichter v. Port Arthur Towing Co.*, 288 F.2d 801, 804 (5th Cir. 1961) (addressing only ordinary negligence); *Fifth Circuit Pattern Jury Instructions: Civil* § 4.4 (2006) (same)).)  And the Aligned Parties' few cases involving punitive damages only underscore that compliance with government regulations or industry standards is relevant to, but does not "***automatically***" preclude, an award of punitive damages.  *Folks v. Kansas Power & Light Co.*, 755 P.2d 1319, 1333 (Kan. 1988) (emphasis added), *overruled on other grounds by York v. InTrust Bank, N.A.*, 962 P.2d 405 (Kan. 1998); *see also Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1376 (5th Cir. 1982) (*en banc*) ("[T]his Court fully agrees with the premise ... that

compliance with industry custom can be relevant evidence tending to negate an inference of gross indifference. Consequently, to the extent that a defendant establishes that certain aspects of its design are common to an entire industry, such evidence may ... be considered by the district court when ruling on a motion for judgment n.o.v. as tending to negate a jury issue of gross indifference."); *Durham v. County of Maui*, 692 F. Supp. 2d 1256, 1262 (D. Haw. 2010) ("[C]ompliance with government regulations and/or industry standards is relevant, but not conclusive, to punitive damages."); *Jowers v. BOC Group, Inc.*, 608 F. Supp. 2d 724, 767-68 (S.D. Miss. 2009) ("conformity with established industry standards" is "evidence of whether a product is reasonably safe" but not "conclusive on the point") (alterations, internal quotations, and emphasis omitted), *vacated on other grounds*, *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346 (5th Cir. 2010); *Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727, 734-35 (Minn. 1980) (compliance with regulatory standards may be "relevant to the issue of punitive damages," but "does not preclude such an award as a matter of law"). Thus, it is reversible error for trial courts to ignore or give insufficient weight to evidence of compliance with regulatory and industry standards in imposing punitive damages. *See e.g.*, *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1316 (5th Cir. 1995); *Drabik*, 997 F.2d at 510; *Elliott*, 903 F.2d at 1508; *Nader*, 626 F.2d at 1035.

### 2. Neither Federal Regulators Nor Industry Standards Required A Pre-Built Deepwater Capping Stack.

Without a legal basis to justify ignoring BP's compliance with regulatory and industry standards, the Aligned Parties try to skew the facts, asserting that "the entire industry recognized the need to develop capping stack equipment as far back as 1991." (Pls.' Br. 8.) The record flatly contradicts that assertion. To the contrary, it is undisputed that *no one* in the oil and gas industry—including Aligned Party Transocean and Boots & Coots, a Halliburton-owned well-control specialist—ever pre-built a capping stack as a source-control method for *deepwater*

5

drilling before the *Deepwater Horizon* incident, and federal regulators did not require any such precaution.  (*See* BP Phase Two Post-Trial Br. 8 (citing record); Phase I Tr. 3045 (Roth); Tr. 743-46 (Mazzella).)  The Aligned Parties purport to base their assertion on "industry stud[ies]" dating back to 1991.  (Pls.' Br. 8 & n.12.)  But none of those studies recommended the development of a pre-built capping stack to control a deepwater blowout.  To the contrary, the Aligned Parties' own expert Bea admitted that the 1991 study cited by the Aligned Parties specifically ***rejected*** the idea of developing a pre-built deepwater capping stack.  (Tr. 426 (Bea); TREX 11625.0476.)  And federal regulators, who were involved in ***every*** study cited by the Aligned Parties, never required a pre-built deepwater capping stack.  (TREX 11625.0018 (MMS participated in study); TREX 7353.0003 (MMS member served on Steering Committee); TREX 6299.0003 (MMS sponsored and funded project); D-20039 (MMS funded study); TREX 11400.0004 (MMS sponsored 2008 International Oil Spill Conference); BP Phase Two Post-Tr. Br. 8 (citing record).)

Similarly unavailing is the Aligned Parties' assertion that, prior to the *Deepwater Horizon* incident, capping stacks had "been developed, deployed and utilized by others in the industry" and "that at least two capping-type solutions had been previously utilized in deep water."  (Pls.' Br. 9-10.)  None of the examples cited by the Aligned Parties supports that assertion.  Contrary to the Aligned Parties' suggestion (*see id.* at 9 & nn.20, 21), the capping equipment used by Cameron in Kuwait and contemplated by BP in Alaska was for ***surface*** blowouts, not ***deepwater*** blowouts.  (*See* McWhorter Dep. 177 (surface capping equipment used in Kuwait); TREX 9828.0002 (surface capping equipment contemplated in Alaska); Tr. 503 (Bea) (same).)  At the time of the *Deepwater Horizon* incident, the technology for these surface capping stacks had ***never*** been applied in the deepwater context.

The Aligned Parties assert, however, that capping stacks "had been previously utilized in deepwater" in two instances: (1) "a blowout in Malaysia in 1988," and (2) "the JIM CUNNINGHAM incident in the eastern Mediterranean in 2004." (Pls.' Br. 10.) Once again, the record belies that assertion. As support for their Malaysia-blowout theory, the Aligned Parties cite the testimony of their expert Ed Ziegler and Transocean's Rob Turlak. (*Id.* at n.22.) But Ziegler merely cited Turlak, and Turlak never said that there was a blowout in Malaysia (there was only a "gas bubbling" incident), nor that the Malaysian incident was solved by a capping stack. (Tr. 318, 382-83 (Turlak).) Indeed, Turlak testified that he was "not aware" of "any company … [that] had a capping stack assembled and available for use prior to April 20th [2010]." (Tr. 412 (Turlak).) Similarly, as support for their *Jim Cunningham* theory, the Aligned Parties cite their own expert Ziegler. But Ziegler admitted at trial that the device used during the *Jim Cunningham* blowout was not a capping stack, but rather a second BOP, and in any event did *not* "actually stop[] the flow of hydrocarbons" there because the "well had already bridged over," *i.e.*, had stopped flowing. (Tr. 538, 563 (Ziegler).) Indeed, Wild Well Control—the company that provided source-control expertise during the *Jim Cunningham* incident (and with which BP had contracted for well-control services at the time of *Deepwater Horizon* blowout)— confirmed that "[a] capping stack suitable for subsea, deep sea usage did not exist" before the *Deepwater Horizon* blowout. (TREX 11583.0005; Campbell Dep. Vol I. 334-35; Barnett Dep. 326.)

Similarly unavailing are the Aligned Parties' passing assertions that (1) "[t]here was … evidence that Shell and Senta [*sic*] Drilling had capping devices available for a deepwater project off the coast of Brazil," and (2) "BP itself recognized the potential use of capping stacks in deepwater environments" because a capping stack is referenced in BP's Well Control Response

Guide.  (Pls.' Br. 10.)  With respect to the former, the equipment that Shell and Stena had "available" was designed for "*[s]urface* BOP operations in Brazil," (TREX 11581.0001-02 (emphasis added)), and the potential application of such equipment to a deepwater environment was, by the admission of the Aligned Parties' own expert, identified by the industry as "off the wall, fairly non conventional and [would] require further engineering," (Tr. 559 (Ziegler).)  And with respect to the latter, BP's Well Control Response Guide references the potential use of a capping stack for "surface" operations.   (TREX 2386.0071 ("surface capping operations"), 2386.0086 (listing "capping" under "Surface Intervention"); 2386.0088 ("surface capping"); 2386.0090 ("surface capping operation"); 2386.0092 ("Surface Intervention - Capping"); Wellings Dep. 88-89.)  At the end of the day, it is telling that, during the *Deepwater Horizon* response effort, ***no one***—including Aligned Parties Transocean and Halliburton—came forward with a pre-built deepwater capping stack, only underscoring the fact that such a device did not exist anywhere in the world at the time.  (Tr. 598-99 (Dupree); Allen Dep. 638-39 (deepwater capping-stack technology used in the *Deepwater Horizon* incident "did not exist" before the incident).)

Finally, the Aligned Parties err by suggesting that punitive damages are warranted because, if BP had a pre-built deepwater capping stack at the time of the *Deepwater Horizon* blowout, "the well could have likely been shut in within 24 days."  (Pls.' Br. 14.)  As Admiral Allen testified, there are "too many variables" to determine if the blowout could have been stopped sooner under those circumstances.  (Allen Dep. 60-61; *see also* TREX 11610R.0023 ("[I]t is impossible to estimate how long it would have taken to cap the well even if there was a pre-built capping stack."); TREX 11738R.0010.)  Factors such as (1) unknown well conditions, (2) well integrity concerns, and (3) the countless unique conditions that could exist at a

deepwater well after a blowout, among others, prevent a reasonable estimation of the time that would have been required to stop the blowout with a hypothetical pre-built deepwater capping stack of unknown configuration.  (TREX 11610R.0023-27; TREX 11738R.0010.)  Even the Aligned Parties' own expert Zeigler admitted that other factors and conditions could have made his proposed capping timeline inapplicable.  (Tr. 548 (Zeigler).)  The Aligned Parties' ever-shifting alleged capping timelines underscore this uncertainty: they have offered no fewer than *five* different potential timelines (*see* Pls.' Br. 14 n.44), thereby only underscoring that they are throwing darts in the dark, and cannot identify any basis for the imposition of punitive damages on BP.

### 3.  BP's Source-Control Plan Did Not Violate Any Federal Regulations.

The Aligned Parties also insist that punitive damages are warranted because BP "clearly violated" a number of relevant source-control regulations.  (Pls.' Br. 13.)  But federal regulators do not share this belief, as they have not charged BP with any such violations based on source-control preparedness.  (Saucier Dep. 197; *see also* Landry Dep. 439 (when "the blowout occurred, [BP was] in compliance with MMS's regulations, and [BP was] in compliance with our regulations in terms of the—the Mobile Offshore Drilling Unit that was operating.").)  Nor is there any private right of action for enforcement of any of these regulations.

It is no oversight that federal regulators have not charged BP with any such violation, as the Aligned Parties' accusations are wildly inaccurate.

*First*, the Aligned Parties declare that "BP … failed to comply with its pre-spill representation to the MMS regarding the training of its employees in source control response." (Pls.' Br. 12-13.)  But the undisputed evidence establishes that BP employees were duly trained in source-control response, and passed unannounced regulatory drills designed to test BP's "spill

response preparedness" and the effectiveness of BP's "oil spill response plan."   (TREX 8975.0001; Tr. 466-68 (Bea); FFCL §§ II.B.1(d)-(e).)

*Second*, the Aligned Parties assert that BP violated federal regulations directing it to (1) take necessary precautions to keep the well under control at all times, and (2) immediately abate the source of a spill.  (Pls.' Br. 13 (citing 30 C.F.R. §§ 250.401, 254.5(c)).)  But regulations setting forth such generic requirements do not provide a basis for imposing punitive damages, which require proof of a culpable state of mind—as this Court recognized by holding that the violation of a generic regulation against conduct that results in oil spills does not establish the culpability necessary to negate the OPA liability cap.  (*See* Rec. Doc. 5809 at 12-14.)

*Third*, the Aligned Parties charge BP with failing to use the Best Available and Safest Technology (BAST) to respond to a spill.  (Pls.' Br. 13 (citing 30 C.F.R. §§ 250.105, .107, .401(a)).)  But, as BP explained in its opening brief, the Aligned Parties' assertion that there was a violation of BAST cannot make it so, because by definition such a violation cannot occur unless and until federal regulators make a determination to that effect, and federal regulators consider "compliance with [federal] regulations to be the use of BAST."  (BP Phase Two Post-Tr. Br. 8-9 (citing 30 C.F.R. §§ 250.105, .107(c)).)

*Finally*, the Aligned Parties assert that "BP was clearly not in compliance with respect to [a] regulatory certification" in its Initial Exploration Plan that "it was capable of responding *at the source* to a worst-case discharge of up to 162,000 barrels of oil per day.  (Pls.' Br. 13 (emphasis added).)  The Aligned Parties fail to cite any regulation in support of that assertion, which is no surprise, because the governing regulation and applicable regulatory guidance required an operator to certify only that it had the "capability to respond" to a spill of relevant size "to the maximum extent practicable."  (TREX 144077.0022.)  Furthermore, the relevant

regulations permitted an operator to use of variety of methods *not* limited to source control, including surface operations and shoreline clean-up, "to contain and recover the discharge to the maximum extent practicable."  (30 C.F.R. § 254.26(d)(1); TREX 769.0496-510.)

**B.      BP's Post-Spill Source-Control Efforts Do Not Support Punitive Damages.**

The Aligned Parties do not, and cannot, deny the fundamental point that the source-control response was directed by a Unified Command established and controlled by the Federal Government, not BP.  (*See* BP Phase Two Post-Tr. Br. 1-2, 11-12.)   The Aligned Parties nonetheless urge this Court to impose punitive damages on BP based on the source-control response.   Their position thus depends critically on establishing a causal link between BP's conduct and Unified Command's source-control decisions.

At the broadest level, the Aligned Parties dispute the need to establish such a causal link. Rather, they insist that BP's source-control response warrants punitive damages "even assuming *arguendo* that there were *no causal relationship* between BP's lies and the length or extent of the spill."  (Pls.' Br. 16 (emphasis added).)   That request is both legally and factually baseless. Under settled maritime law, as well as the common law generally, "'a party's negligence is actionable *only if it is the legal cause of the plaintiff's injuries*' ...."  *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 213-14 (5th Cir. 2010) (quoting *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992) (emphasis added; additional internal quotation omitted)); *Solvang v. M/T Plan Kristine*, No. 92-1617, 1993 WL 666703, at *8 (S.D. Tex. June 9, 1993) ("Punitive damages are available under the general maritime law where the conduct *causing the injury* is willful, wanton, grossly negligent, or unconscionable so as to evidence a callous disregard for the rights of others.") (emphasis added), *aff'd*, 44 F.3d 1005 (5th

11

Cir. 1995). Thus, conduct that does not *cause* a particular injury provides no basis for imposing *either* compensatory *or* punitive damages under maritime law.

The Aligned Parties tacitly acknowledge this point by devoting the bulk of their argument to the proposition that Unified Command's source-control response was the "result" of BP's flow-rate estimates. (TO & HESI's Phase Two Post-Tr. Br. (Rec. Doc. 12040) ("Co-Defts.' Br.") 1; *see also id.* (asserting that BP's flow-rate estimates "caused" Unified Command to follow particular source-control response strategies); *id.* at 2 ("BP's repeated false statements about the flow rate *caused* decision-makers to approve source control strategies doomed to fail and to abandon strategies destined to succeed.") (emphasis added); *id.* at 20 ("BP's false statements *caused* a delay in capping the well.") (emphasis in original).)

As BP explained in its opening brief, the Phase Two trial record squarely contradicts these assertions: the evidence shows that Unified Command decisionmakers did *not* rely on BP's flow-rate estimates in selecting, formulating, or executing source-control response strategies. (*See* BP Phase Two Post-Tr. Br. 12-38.) To the contrary, Unified Command decisionmakers had their own *independent* flow-rate estimates, and in any event did not sufficiently trust *any* flow-rate estimates to rely on them in making source-control decisions. (*See id.*)

The Aligned Parties have no answer to any of these points. Rather than identifying any contrary evidence, they simply declare that "[i]t strains credulity to think that government officials" would have proceeded with the same source-control response had they known all of BP's internal flow-rate estimates. (Co-Defts.' Br. 7.) But that point does not "strain credulity" at all: it is in fact established by the undisputed evidence at trial.

      **1.**      **Federal Responders Did Not Rely On A 5,000 Barrel Per Day Flow-Rate Estimate To Approve Top Kill.**

The Aligned Parties contend that "BP told the world that its 'best estimate' of the flow was 5,000 barrels per day. *As a result of that false statement*, Unified Command approved a Top Kill strategy." (Co-Defts.' Br. 1 (emphasis added).)  Having scoured millions of documents and hundreds of deposition transcripts, the Aligned Parties failed to unearth any evidence that federal decision-makers relied on a 5,000 bopd estimate when approving Top Kill.  Instead, the evidence proves just the opposite.  (McNutt Dep. 438-39 (Director of the Flow Rate Technical Group testified that, by mid-May, "*no one, in the Government anyway, was having any confidence in that 5,000 barrel per day number*") (emphasis added); Hunter Dep. 683-84 (Co-Director of the Federal Science Team confirmed that *the 5,000 bopd estimate* "*did not make a significant difference in our engagement of the top kill*, because … our conclusion was we didn't know what the flow was.") (emphasis added); Chu Dep. 113-16; TREX 11311.0001; TREX 9113.0001; TREX 9177.0010-11; Allen Dep. 213-15, 483-84, 687-90 (flow-rate *estimate of 5,000 bopd was inconsequential to any decisionmaking* because all parties knew that flow rate could be well in excess of that figure); Landry Dep. 167, 356, 696-97, 699 (Admiral Landry *would not have changed response effort* even if she had seen estimates as high as 90,000 bopd); TREX 10698 (on May 10, Coast Guard representative informed federal responders that flow rate could be anything from 5,000 bopd to 100,000 bopd.).)

The Aligned Parties now insist, however, that evidence that government officials did not rely on BP's flow-rate estimates "related to the government's spill response efforts on the *surface* (deploying boats and boom, engaging in controlled burns, etc.), not specifically to *source control* efforts, where flow rate information was critical."  (Co-Defts.' Br. 9 (emphasis modified).)  That is simply not true.  To the contrary, the evidence quoted above confirms that

government officials were referring to *all* response efforts, including source-control strategies like Top Kill, when testifying that the wildly inconsistent flow-rate estimates did not influence their decisions.

Contrary to the Aligned Parties' suggestion, the issue here is not whether flow-rate estimates can be relevant to choosing a source-control strategy.  (*See* Co-Defts.' Br. 8.)  Rather, the point is that the undisputed evidence shows that federal decisionmakers had no confidence in *any* flow-rate estimates—neither BP's nor even their own—and accordingly did not rely on any such estimates in making source-control decisions.  (*See* BP Phase Two Post-Tr. Br. 18; *see generally* FFCL § II.B.2(i).)

### 2. Federal Responders Had Numerous Flow-Rate Estimates Significantly Greater Than 5,000 Barrels Per Day Before Approving Top Kill.

And even if federal responders had relied on flow-rate estimates in choosing a source-control strategy (which, as explained above, they did not), BP provided the Government with a range of flow-rate estimates throughout the relevant period.  The Aligned Parties' assertion that BP "fail[ed] to tell Unified Command about *any* of its high flow rate estimates," (Co-Defts.' Br. 20 (emphasis added)), is thus demonstrably false: the record is replete with examples of BP sharing flow-rate estimates significantly in excess of 5,000 bopd with Unified Command before Top Kill.  (Landry Dep. 351-52, 355; TREX 9620 (by April 28, 2010, BP had shared flow-rate estimates up to 70,201 bopd with federal responders); Hill Dep. 412-13; TREX 11169 (in early May 2010, a BP engineer shared flow-rate estimates up to 47,000 bopd with a Coast Guard official); TREX 9619 (on May 19, BP disclosed to Admiral Landry a possible flow of 5,000 to

14

40,000 bopd with a worst-case flow-rate of 100,000 bopd); *see generally* FFCL § II.B.2(i)(4)).[1] With these flow-rate estimates in hand, as well as numerous estimates from federal responders, Unified Command's decisionmakers, with the assistance of the Federal Science Team, extensively reviewed and approved the proposed Top Kill operation.  (Allen Dep. 340 (Secretary of Energy Chu and scientists from the National Laboratories reviewed the Top Kill technique before approving it); Brannon Dep. 49 (Coast Guard representatives involved in evaluation of Top Kill procedures); Herbst Dep. 123 (MMS reviewed the Top Kill procedures before the operation began); *see generally* FFCL § II.B.2(d)(5).)   The Aligned Parties offer no credible explanation of why the disclosure of BP's hydraulic modeling, which contained various flow-rate scenarios and corresponding estimates for unknown potential scenarios that fell within the same range of estimates that BP shared throughout April and May, would have affected the outcome of Unified Command's review and evaluation of the Top Kill procedure. (*Compare* FFCL § II.B.2(d)(4)) *with* Co-Defts.' Br. 3-4.)

Not only did BP provide Unified Command with myriad flow-rate estimates in excess of 5,000 bopd, but federal scientists determined that the flow rate could be significantly higher well before Top Kill.  Far from relying on BP's flow-rate estimates, federal responders had their ***own*** flow-rate estimates from the National Oceanic and Atmospheric Administration, and later, the federally staffed Flow Rate Technical Group ("FRTG") before the approval and execution of Top Kill.  (*See* Henry Dep. 330-31; TREX 8895 (government scientist estimating the flow rate to

---

[1] The Aligned Parties mischaracterize the record to bolster their contention that "BP executives took purposeful steps to conceal flow rate estimates."  (Co-Defts.' Br. 4.)  For example, the Aligned Parties reference a May 17 e-mail in which Richard Lynch informed Adam Ballard that "[w]e remain in a position where no flow related information can be released internally or externally," but this e-mail does not in any way establish that BP took steps to conceal information from the government.  Lynch was referencing RITT collection data, not flow-rate estimates in general, and federal responders had real-time access to the RITT collection data.  (TREX 9475.0005; Tr. 1000-02, 1019-20 (Ballard); Hunter Dep. 532.)

be 64,000 bopd on April 25); TREX 9649 (FRTG generated an upper-bound flow-rate estimate of 80,000 bopd on May 23); TREX 10700.0004 (the National Laboratories, which were evaluating the proposed Top Kill procedure, estimated the flow rate was 18,000 bopd based on visual observations from May 20); Allen Dep. 460-62.)   The Aligned Parties ignore evidence that, before Top Kill, the FRTG's Director circulated three flow-rate estimates to government scientists working on the response effort informing them that:

> [M]ultiple lines of scientific evidence agree that the rate of release is at least *14,000 to 20,000 barrels of oil per day*.  We believe that a statement like this will be much more helpful to emergency responders than the current 5000 barrels per day ....

(TREX 9652 (emphasis modified).)   The Aligned Parties do not try to explain why Unified Command would rely on a 5,000 bopd estimate to approve Top Kill when federal scientists doubted the reliability of that figure in April and May 2010 (TREX 144836.0001-02; TREX 10698; McNutt Dep. 438-39), and the Flow Rate Technical Group, tasked with using the "best available science" to independently assess flow rate, had determined that the flow rate was at least 14,000 to 20,000 bopd.  (Allen Dep. 247-48; TREX 9652).

### 3. BP Disclosed The 15,000 Barrel Per Day Flow-Rate Limit On Momentum Kill To Federal Responders.

The Aligned Parties build their case on the false premise that BP "knew Top Kill would not succeed at a flow rate of 15,000 BOPD or more."  (Co-Defts.' Br. 6.)  The Aligned Parties thereby fail to distinguish between Momentum Kill, on the one hand, and Top Kill—*i.e.*, the Junk Shot procedure followed by a Momentum Kill—on the other.  There is no dispute that modeling performed in mid-May 2010 concluded that a Momentum Kill *alone*, *i.e.*, pumping mud without the benefit of the Junk Shot component, would likely not succeed if the flow rate were 15,000 bopd or more.  (Tr. 1059 (Adams); TREX 10511; *see generally* FFCL

§ II.B.2(d)(4).)  In contrast, the success of Top Kill did not depend on the initial flow rate, but rather on reducing the flow rate with the pumping of the Junk Shot, which itself depended on the relationship between the size of the bridging material and the size of the orifices that it encountered.   (TREX 11737R.0008-09 (if the Junk Shot procedure succeeded in plugging the BOP's orifices and reducing the initial flow rate to a sufficiently low level, a subsequent Momentum Kill could have succeeded); Barnett Dep. 181 (if the flow path was a series of small pathways, which was unknown at the time, "the probability of success for that junk shot operation was fairly high"); *see generally* FFCL § II.B.2(d)(4).)  There is no evidence—whether modeling results, deposition testimony, or expert analysis—to support the suggestion that BP knew that the Top Kill procedure, as opposed to the Momentum Kill alone, would not succeed at a flow rate of 15,000 bopd or more.

It is further undisputed that, approximately one week before Top Kill began, BP informed the Federal Science Team, the Federal Incident Commander, the Secretaries of Defense and the Interior, and other federal responders that Momentum Kill would not succeed if the flow rate exceeded 15,000 bopd.  (TREX 9132.0001-02 (Federal Scientists informed that "modeling indicates that a dynamic kill cannot be successfully executed if the oil flow rate is 15000 STBpd"); Tr. 236 (Perkin) (Aligned Parties' expert admits that government scientists were informed about the 15,000 bopd limit on Momentum Kill); Hunter Dep. 161-63, 497-98; Allen Dep. 361-65, 436-38, 440-41; Chu Dep. 304-06; Barnett Dep. 103-04; TREX 9131.0002; TREX 9135; TREX 9675.0012; Holt Dep. 161, 164-66, 308-10; *see generally* FFCL § II.B.2(d)(4).a.)[2]

---

[2] The Aligned Parties misrepresent the record in their proposed findings of fact as well as their post-trial briefs, asserting that "BP failed to inform Transocean, HESI, and other contractors that the Top Kill would not be successful if the flow rate from the Macondo well was greater than 15,000 BOPD."  (Aligned Parties' Proposed Phase Two Findings of Fact (Rec. Doc. 12043) ("Aligned Parties' FFCL") ¶ 218.)  In fact, BP informed contractors

The Aligned Parties are unwilling to accept the engineering reality that the Junk Shot portion of Top Kill rendered the initial flow rate irrelevant to the success of the operation. Instead, the Aligned Parties insist that "'the junk shot' procedure that BP submitted and Unified Command approved states expressly that it is based on a 5,000 barrels per day flow rate." (Co-Defts.' Br. 6-7 (citing TREX 9148.0005).)  But that point is a red herring: not a single expert opined that Junk Shot's likelihood of success depended on the accuracy of the publicly-announced 5,000 bopd flow rate.  And in any event, the single sentence from the written procedure cited by the Aligned Parties does not support them.  When developing Top Kill, engineers used a 5,000 bopd flow-rate estimate and pressure data from the BOP to assist in the initial selection of the Junk Shot material for partially bridging the leak area.  When ultimately selecting the Junk Shot material, however, engineers did not rely on the 5,000 bopd estimated flow rate, but rather selected varying materials to account for the unknown flow paths and uncertain restriction sizes within the BOP.  (TREX 9148.0005-06; Tr. 202 (Perkin) (testifying that the configuration of the flow path was unknown); TREX 11737R.0007.)[3]

### 4. Federal Responders Were Not Misled About Top Kill's Likelihood Of Success.

To quote the Aligned Parties, what "strains credulity" (Co-Defts.' Br. 7) here is the Aligned Parties' argument that Unified Command mobilized hundreds of people and devoted extensive resources to Top Kill in reliance on a BP employee's characterization of Top Kill as a

---

who were actively evaluating the proposed Top Kill procedure, including Wild Well Control, of the flow-rate limitations associated with components of the procedure.  (*See, e.g.*, Barnett Dep. 103-04.)

[3] The Aligned Parties complain that BP failed to share the flow-rate limitation on Momentum Kill with Admiral Landry or Lars Herbst, the Regional Director of MMS.  (Co-Defts.' Br. 8.)  But the record establishes that BP shared this information with high-ranking members of MMS and the Coast Guard, including the United States Coast Guard Federal Incident Commander.  (Tr. 650-52 (Dupree); TREX 140914.2.1.)  It is thus undisputed that government officials recommended proceeding with Top Kill with knowledge that Momentum Kill would not succeed if flow equaled or exceeded 15,000 bopd.

"slam dunk" and another's estimate of the operation's 60-80% chance of success (*see id.*), rather than its own exhaustive analysis.  That argument ignores undisputed evidence that the Federal Science Team did not rely on BP's representations, but rather performed an extensive independent analysis of the procedure before approving it.  (*See generally* FFCL § II.B.2(d)(5); Hunter Dep. 653-54, 659 (if federal scientists evaluating the viability of Top Kill had any reservations about the procedure, they "could have easily said, 'We don't think this should happen,'" but did not).)  High-ranking federal officials were not under any illusions about the operation's likelihood of success.  They appreciated that Top Kill could fail and, even before the operation began, had a "very strong focus on the post top kill (failure) path."  (TREX 9409.0001; Cook Dep. 126-27; *see also* TREX 11305.0003 (before Top Kill, Federal Science Team "scrutinized options for other strategies if the top kill [was] not successful"); Hunter Dep. 497-500 (federal scientists understood that Top Kill had limitations and might not succeed).).  Top Kill was fully risk-assessed and ready to implement and, even if unsuccessful, BP and federal responders knew that it would provide diagnostic information regarding the blowout that would support future source-control decisions.  (Tr. 658-59 (Dupree).)  Moreover, the Aligned Parties' position ignores evidence that high-ranking federal officials knew it was impossible to gauge Top Kill's chances of success.  When a Cabinet Secretary asked Dr. McNutt, the Director of the Flow Rate Technical Group and Director of the U.S. Geological Survey, about Top Kill's chances of success, she "told him it was a nonsense question" and that Top Kill would either work or it would not.  (TREX 144662.0001.)  There is no record support for the Aligned Parties' contention that Unified Command relied on two comments about the operation's likelihood of success to approve Top Kill.

**5.     Top Kill Did Not Delay A Capping Strategy Because No Such Strategy Was Ready To Implement When Top Kill Began.**

The Aligned Parties contend, again without citation to the record, that "BP's misrepresentations did not just cause the decision to attempt Top Kill, they also caused the decision ***not*** to try a capping strategy—a strategy that would have worked. A BOP-on-BOP strategy could have been deployed ***in mid-May***, but instead Unified Command approved Top Kill." (Co-Defts.' Br. 21 (emphasis modified).) The Aligned Parties thereby disregard the overwhelming evidence that the BOP-on-BOP option was not ready to deploy before Top Kill began on May 26, 2010. (*See generally* FFCL § II.B.2(e).)[4] For example, the Aligned Parties cannot explain how the BOP-on-BOP option could have been deployed in mid-May when Transocean's BOP was plagued with critical maintenance deficiencies well into June. (Tr. 289 (Perkin); TREX 11743, 0004, 117 (on May 26, the date that Top Kill began, West Engineering found that the *DDII* BOP's Deadman was inoperable); Tr. 409-10 (Turlak); TREX 141081.150.4 (on June 5, 2010, BOP testing identified that the casing shear rams of the *DDII* BOP were not operational).)

Not only is the Aligned Parties' position at odds with the documentary evidence, but it directly contradicts the testimony of the Aligned Parties' own witnesses. Specifically, the Aligned Parties' expert witness Gregg Perkin admitted that the BOP-on-BOP option was still being developed when Top Kill began on May 26, 2010. (Tr. 280, 286 (Perkin); TREX 10647.2.) Similarly, the Aligned Parties' fact witness Rob Turlak conceded that, even though the Well Capping Team began work on a capping solution shortly after the incident and worked

---

[4] Throughout this litigation, the Aligned Parties have flip-flopped on when the BOP-on-BOP option was purportedly ready for installation. (*Compare* Co-Defts.' Br. 13 *with id.* at 21.) In the process, they have conceded that the BOP-on-BOP option was not ready before Top Kill began. (*See, e.g.*, Co-Defts.' Opp 10; Co-Defts.' Br. 13 (asserting that after Top Kill concluded, "the BOP-on-BOP was repaired and ready to be installed within days.").)

long hours to develop such a solution, the May 29 Gantt planning chart estimated that the earliest date to complete the installation of the BOP-on-BOP was June 6, 2010—almost twelve days after Top Kill began.  (Tr. 364-65, 404-05 (Turlak); TREX 11261N.2.4.)  The Aligned Parties continue to overreach, championing a theory that unraveled at trial and is completely at odds with the evidentiary record.

> **6.   There Is No Evidence That BP Knew Top Kill Failed Because Of High Flow.**

The Aligned Parties next contend that "BP *knew* Top Kill failed because of high flow but falsely claimed that ruptured disks were the *only* plausible explanation" in BP's May 29 presentation to Unified Command.  (Co-Defts.' Br. 9 (emphasis modified).)  But there is no evidence that BP *knew* Top Kill failed because of high flow when it made that presentation, and the evidence cited by the Aligned Parties does not prove otherwise.  The Aligned Parties ignore evidence that BP's initial analysis of the Top Kill data, as presented on May 29, was performed overnight at the insistence of federal officials, by engineers on little to no sleep.  (TREX 144925.0001 (federal scientist noting that BP's May 29 analysis had been performed "under duress from the government, in the middle of the night, with little to no sleep"); TREX 150303.0002 (Los Alamos National Lab Chief Mechanical Engineer noting that "BP scrambled to put together" its May 29 analysis, its engineers having "operat[ed] with very little sleep for several days").)  The initial determination reached by the engineers—that the collapse disks may have ruptured during the explosion—was a possible explanation for Top Kill's failure.  (Barnett Dep. 238-39, 318-19 (Wild Well Control 30(b)(6) representative agrees that flow out of ruptured collapse disks was a possible explanation for the failure of Top Kill); Vargo Dep. 233-35, 275-76 (Halliburton's 30(b)(6) representative testified that everyone involved in pumping Top Kill, including Halliburton, thought that ruptured collapse disks could have been the reason why Top

Kill failed).)  BP engineers did not foreclose other reasons for Top Kill's failure, and agreed with federal leadership that there were other "equally plausible" explanations for that failure.  (TREX 9696.0001.)   The Aligned Parties have not established that the BP engineers' erroneous conclusion about the reason for Top Kill's failure was anything but the product of exhaustion and an overly conservative analysis of the data.

In support of their contention that BP knowingly misrepresented the reasons for Top Kill's failure in the May 29 presentation, the Aligned Parties first allege that high flow was "the most obvious and plausible explanation" for Top Kill's failure.  (Co-Defts.' Br. 10.)  Not only do the Aligned Parties lack any basis for this assertion, having precluded their experts from analyzing the Top Kill data, but even if true, it does not establish that BP *knew* it to be the only correct explanation.   (Co-Defts.' Br. 10; Tr. 210, 244 (Perkin) (testifying that he neither reviewed the Top Kill data in any detail nor performed any independent analysis of the Top Kill data); Tr. 175 (Wilson) (similar); Tr. 486-87 (Bea) (similar).)  Next, the Aligned Parties point to evidence that certain BP employees and consultants opined that Top Kill failed because the flow path through the BOP was too large.  (Co-Defts.' Br. 10.)[5]  After Top Kill, however, there were as many opinions about why Top Kill had failed as "feathers on a bird."  (Tr. 828 (Mazzella).)  Finally, the Aligned Parties allege that "BP's own experts agreed that 'massive flow' through the BOP ... was a realistic explanation based on evidence available at the time."  (Co-Defts.' Br. 11.)  That may be true, but a "*realistic explanation*" is a far cry from *actual knowledge* that Top Kill failed because of high flow.

---

[5] Although conceding that it was prudent to have well control specialists as response team members, the Aligned Parties contend that BP rendered their presence meaningless by ignoring their advice.  (*See* Co-Defts.' Br. 11 n.1.)  To the contrary, however, Wild Well Control believed that "the consolidated views of Wild Well Control were being fully considered by BP." (Barnett Dep. 117, 288).  Regardless, Unified Command ultimately approved all source-control strategies.

### 7. Federal Responders Conducted An Independent Analysis Of Top Kill's Failure And The BOP-On-BOP Option.

The Aligned Parties make no attempt to reconcile their theory—that "BP's false diagnosis of Top Kill's failure resulted in the abandonment of the BOP-on-BOP strategy," (Co-Defts.' Br. 12)—with the record.  As BP established at trial, federal responders did not rely on BP's analysis of the Top Kill data.  Instead, the Federal Science Team independently evaluated the data to determine why Top Kill failed and what conclusions about the well's integrity, if any, could be drawn.  (Chu Dep. 73-78; TREX 11305.0002-03; Tr. 1068-69 (Adams); Hunter Dep. 211-12, 220-21; TREX 9695.0002; TREX 144847.1.2 (May 31, 2010 e-mail from Secretary Chu to federal scientists emphasizing "the importance of doing a ***completely independent analysis*** of the top kill data") (emphasis added); TREX 9697.0001; TREX 11296.0002 (federal scientists prepared a presentation disclosing the results of their analysis of why Top Kill may have failed); *see generally* FFCL § II.B.2(f)(3).)

Based on its independent analysis, the Federal Science Team concluded that there was a chance that the 16-inch casing collapse disks had been damaged during the initial explosion and that there was a risk of a subsea broach if the team proceeded with BOP-on-BOP.  (Chu Dep. 73-77; TREX 11305.0002; McNutt Dep. 248-50; Tr. 674 (Dupree); TREX 9656; TREX 9146 (Director of the White House Office of Energy & Climate Change Policy declared that "***Our scientists*** have determined that the risks are to[o] great to shut the well in from the top.  E.g. with the addition of a new BOP" (emphasis added)); Hunter Dep. 203-04; TREX 9146; Allen Dep. 375 (as it related to the decision not to go forward with BOP-on-BOP as a method of shutting in the well, the "combined recommendation of BP and the Science Team and the counsel [he] was getting was that it was too risky to proceed"); TREX 11305.0003 (according to Secretary Chu, "[the] decision to move [to collection after Top Kill was] based both on independent analysis

from the federal government and review of BP's suggested options"); *see generally* FFCL §§ II.B.2(f)(3)-(4).)   The Aligned Parties simply ignore the evidence that the Federal Science Team independently analyzed the data to make recommendations about the path forward on source control.  (Tr. 263 (Perkin) (Aligned Parties' expert admits that Admiral Allen relied on the Federal Science Team for its conclusions and analysis about whether the rupture disks in the casing had opened).)

## II.    The Facts Do Not Establish That BP's Conduct Was A Superseding Cause Of Injuries From The Oil Spill.

The Aligned Parties' marriage of convenience does not extend to the issue of superseding cause—on this issue, they are squarely divided, with the plaintiffs arguing that BP's conduct in connection with the source-control response was *not* a superseding cause of their injuries (*see* Pls.' Opp. to BP's Mot. for Partial J. (Rec. Doc. 11604) 19 & n.72), and BP's co-defendants opportunistically arguing that it was (*see* Co-Defts.' Br. 17-21).   In particular, BP's co-defendants argue that "the injury—here weeks and weeks of discharged oil—[was] 'brought about' by BP's conduct" in connection with the source-control response.  (*Id.* at 20 (quoting *Exxon Co. U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)).)   That argument is frivolous: BP's flow-rate estimates, as opposed to the underlying blowout, did not cause any injuries.  Indeed, as noted above, the evidence establishes that BP's flow-rate estimates did not affect the response in any way, much less break any causal chain.   While BP's co-defendants seek to reduce their burden by borrowing a "material factor" standard from common-law fraud, those companies have asserted a superseding-cause defense, not sued BP for common-law fraud.

In any event, BP's co-defendants recognize that *even if* BP's conduct had affected the response, that alone would be insufficient to prove a superseding cause defense because not every intervening force constitutes a superseding cause.  They thus seek to invoke Section 448 of

24

the Restatement (Second) of Torts, which applies where "the actor's conduct creates a situation which is utilized by a third person to inflict **intentional** harm." *See Restatement (Second) of Torts* § 448 cmt. a (1965). BP's co-defendants expressly disclaim any argument, however, "that BP intended to make the spill worse" (Co-Defts.' Br. 2), presumably because any such argument would be nonsensical. They accordingly cannot rely upon a tort-law principle dealing with the intentional infliction of harm.

Rather, because BP's co-defendants are merely alleging negligence, any causal BP conduct could only be a superseding cause if the requirements of Sections 442 and 447 of the Restatement (Second) of Torts were satisfied. As explained in detail in BP's proposed findings of fact and conclusions of law, they are not. (*See* BP's FFCL §§ 1964-80.)

## III.   The Facts Do Not Establish The Basis For An Increased Fault Allocation To BP.

Finally, the Aligned Parties assert that BP should be assigned an increased fault allocation because its "fail[ure] to prepare to respond to a spill" and its "misrepresentations during the response" "needlessly prolonged" the spill. (Co-Defts.' Br. 22.) For the reasons explained above, the Aligned Parties' factual premise is incorrect: BP's pre-spill preparation was not negligent, and its post-spill conduct did not extend the length of the spill. The Aligned Parties have accordingly failed to demonstrate that any additional fault should be assigned to BP based upon its Phase Two conduct.

### CONCLUSION

For the foregoing reasons, this Court should conclude, based on the record established at the Phase Two Trial, that BP's conduct with respect to source control does not support an award of punitive damages under general maritime law, does not qualify as a superseding cause of plaintiffs' injuries, and does not warrant an increased fault allocation to BP.

January 24, 2014                        Respectfully submitted,

Richard C. Godfrey, P.C.                _/s/ Don K. Haycraft_
J. Andrew Langan, P.C.                  Don K. Haycraft (Bar #14361)
Hariklia Karis, P.C.                    R. Keith Jarrett (Bar #16984)
Paul D. Collier                         LISKOW & LEWIS
Emily Dempsey                           701 Poydras Street, Suite 5000
KIRKLAND & ELLIS LLP                    New Orleans, LA  70139-5099
300 North LaSalle Street                Telephone:  504-581-7979
Chicago, IL  60654                      Facsimile:  504-556-4108
Telephone:  312-862-2000
Facsimile:  312-862-2200
                                        Robert C. "Mike" Brock
                                        COVINGTON & BURLING LLP
Christopher Landau, P.C.                1201 Pennsylvania Avenue, NW
Steven A. Myers                         Washington, DC  20004-2401
Katherine A. Crytzer                    Telephone:  202-662-5985
KIRKLAND & ELLIS LLP                    Facsimile:  202-662-6291
655 Fifteenth Street, NW
Washington, DC  20005
Telephone:  202-879-5000
Facsimile:  202-879-5200


**_Attorneys for BP Exploration & Production Inc., BP America Production Co., and BP p.l.c._**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January 2014.

*/s/ Don K. Haycraft*
Don K. Haycraft