## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL No. 2179 |
| | | SECTION: J |
| | * | |
| | * | Judge Barbier |
| This Document Relates To: *All Cases* | * | |
| | * | Magistrate Judge Shushan |

---

### PHASE TWO POST-TRIAL REPLY BRIEF OF BP EXPLORATION & PRODUCTION AND ANADARKO PETROLEUM CORPORATION: QUANTIFICATION SEGMENT

Warren Anthony Fitch
Ky E. Kirby
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
Telephone: (202) 373-6000

James J. Dragna
BINGHAM MCCUTCHEN LLP
355 S. Grand Avenue, Suite 4400
Los Angeles, CA 90071
Telephone: (213) 680-6400

Deborah D. Kuchler, T.A. (Bar No. 17013)
KUCHLER POLK SCHELL
WEINER & RICHESON, LLC
1615 Poydras Street, Suite 1300
New Orleans, LA 70112
Telephone: (504) 592-0691

*Attorneys for Anadarko Petroleum Corporation*

Don K. Haycraft (Bar No. 14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Barry E. Fields, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000

Robert C. "Mike" Brock
Kimberly O. Branscome
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for BP Exploration & Production Inc.*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.     THERE IS NO SCIENTIFIC CONSENSUS THAT THE CUMULATIVE
DISCHARGE WAS FIVE MILLION STOCK TANK BARRELS. ................................ 2

    A.    There was No Consensus that the August 2010 Estimate was Accurate. ............... 3

    B.    Neither the Presidential Commission Nor the Fifth Circuit Evaluated the
Accuracy or Reliability of the Estimates Cited by the Government. ..................... 4

    C.    The Government Experts' Opinions Do Not Uniformly Support a
Cumulative Flow of Five MMstb. .......................................................................... 5

II.    POINT ESTIMATES DO NOT UNDERMINE A CUMULATIVE ESTIMATE
OF 3.26 MMSTB. .................................................................................................... 5

    A.    The Bounded Flow Rate Range for Slug Flow Confirms Increasing Flow. ........... 6

    B.    Estimates Based on Data from Top Kill and Top Hat are Too Uncertain to
Support the Government's Claimed Flow Rate History. ........................................ 8

    C.    The Government Misrepresents Alleged BP Point Estimates. ............................... 9

    D.    BP and Anadarko's Estimate is Consistent with Final Day Flow Rate Data........ 10

III.    THE GOVERNMENT'S CRITIQUES OF DR. BLUNT'S MATERIAL
BALANCE ANALYSIS ARE WITHOUT MERIT. ....................................................... 11

IV.    THE GOVERNMENT'S CRITICISM OF DR. GRINGARTEN'S ANALYSES IS
LIKEWISE FLAWED. ............................................................................................... 14

V.    DR. JOHNSON CORRECTLY IDENTIFIED ERRORS IN THE GOVERNMENT
EXPERTS' ANALYSES. ........................................................................................... 16

VI.    THERE IS NO BASIS FOR THE GOVERNMENT'S ASSERTION THAT FLOW
RESTRICTIONS REMAINED CONSTANT. ............................................................... 18

    A.    Significant Metal Erosion Occurred Long After the Blowout. .............................. 18

    B.    The Government's Assumptions About Cement Erosion are Incorrect. ............... 20

VII.    THE MULTI-STAGE SEPARATION METHODS PROPOSED BY THE
GOVERNMENT ARE NOT APPROPRIATE. .............................................................. 22

i

VIII.    THE "HOUSEKEEPING" ISSUES RAISED BY THE GOVERNMENT ARE
INAPPROPRIATE. ................................................................................................ 24

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Flugence v. Axis Surplus Ins. Co.*, 738 F.3d 126, ___ (5th Cir. 2013) ..............................................................22

*Gulf Restoration Network, Inc. v. Salazar*, 683 F.3d 158, 163 (5th Cir. 2012)..................................................4

*United States v. Citgo Petro. Corp.*, No. 2:08-cv-893, 2011 WL 10723934 (W.D. La. Sept. 29, 2011), *rev'd on other grounds*, 723 F.3d 547 (5th Cir. 2013) ..................................................................................................23

**STATUTES**

30 CFR 1202.150 ..........................................................................................................................................24

30 CFR 202.100 ...........................................................................................................................................24

33 U.S.C. § 1321(a)(2)(D) ............................................................................................................................25

33 U.S.C. § 1321(b)(7)...........................................................................................................................22, 24, 25

## INTRODUCTION

Contrary to the Government's self-serving assertion, there has never been a scientific consensus that five million barrels of oil flowed from the Macondo Reservoir.  Five million barrels is simply the estimate to which the Government has clung since August 2010, when government scientists acquiesced to demands from politically appointed leaders to develop a cumulative flow estimate in just a few days.  Everyone acknowledged the resulting estimate was uncertain and based on significant, unsubstantiated assumptions.  Not surprisingly, the Government's estimate at trial remains consistent with the earlier estimate.  After all, the Government continues to rely on the same scientists, who steadfastly anchor their analyses to the same erroneous assumptions, including assumptions that reservoir depletion is the dominant determinant of flow rate and that flow restrictions remained essentially unchanged over 86 days.

Consistently advocating a position does not establish a scientific fact or prove reliability. For the Government's cumulative estimate to be accurate, flow from the Reservoir had to start at more than 60,000 stock tank barrels (stb) per day in April 2010 and gradually **decrease** to just over 50,000 stb/day in July 2010.  But three scientific phenomena that occurred during the flow period refute this decreasing flow rate hypothesis:

- Slug Flow:  Slug flow emanated from the *Deepwater Horizon*'s riser from May 13 to May 20, 2010.  Slug flow occurs only within certain flow rate ranges and is generally considered a "lower flow rate phenomenon."  Based on a comprehensive analysis of the slug flow, Dr. Michael Zaldivar determined that the flow rate from May 13−20 was between 24,900 and 35,900 stb/day, which is far below the approximately 60,000 stb/day needed to support the Government's cumulative discharge contention.

- Metal Erosion:  Flow from the reservoir indisputably eroded the *Deepwater Horizon*'s BOP and riser.  Dr. Srdjan Nesic, a leading expert on metal erosion, showed that erosion in these components caused flow rate to **nearly double** from April 22 to May 27.

- Cement Erosion:  The Government contends wellbore cement did not significantly impede hydrocarbon flow during the response because the material eroded away within

1

> 48 hours after the blowout; however, Dr. Andreas Momber showed that the Government's assumed cement erosion rates are thousands of times higher than any known erosion rates for cement-based materials.

Tellingly, the Government offered no qualified expert testimony about any of these phenomena.

The Government's fallacious approach carries over to its attack on Dr. Martin Blunt's material balance analysis. The Government essentially ignores the undisputed science behind Dr. Blunt's analysis and focuses its attention almost exclusively on one input to that analysis—the measured rock compressibility value of six microsips. Lacking evidence of an alternative rock compressibility value, the Government continues to rely on documents generated in the summer of 2010 when BP used a rock compressibility of 12 microsips in certain worst-case modeling scenarios for planning the well shut-in. Except during these limited circumstances, however, BP's engineers relied on the reservoir's measured rock compressibility.

Finally, the Government asserts the estimates of Dr. Blunt and Dr. Alain Gringarten are "predetermined," but provides no support beyond the erroneous assertion of purported similarities between their analyses. Drs. Blunt and Gringarten are world-renowned and universally respected scientists who happen to work at the same preeminent university. Based on a careful and objective analysis of the available scientific data, each concluded that the cumulative discharge of oil from the Macondo Reservoir was far less than 5 MMstb. The results of their analyses were not predetermined; their application of well-established scientific principles to the best available data led to the results.

## ARGUMENT

## I.  THERE IS NO SCIENTIFIC CONSENSUS THAT THE CUMULATIVE DISCHARGE WAS FIVE MILLION STOCK TANK BARRELS.

The Government's claim that its five million stock tank barrel (MMstb) cumulative flow estimate is supported by the "scientific consensus that developed outside this litigation" is false.

Gov't Br. at 4.  To be sure, some Government scientists may have consistently believed that five MMstb of oil flowed from the Macondo Reservoir.  But just as consistency is no measure of accuracy, beliefs are not the same as evidence.

### A.    There was No Consensus that the August 2010 Estimate was Accurate.

The Government's August 2010 cumulative flow estimate derives from the erroneous premise that reservoir depletion was the dominant determinant of flow rate, causing daily flow to decrease in a roughly linear fashion.  BP and Anadarko's Proposed Findings of Fact and Conclusions of Law ("FoF") 1217.  Indeed, this premise, which was the product of an "overnight" analysis by Dr. Paul Hsieh,[1] fails to take into consideration changes in flow path restrictions over the 86-day flow period.  FoF 1193−96.  As Dr. Art Ratzel explained, the Government's depletion model was an assumption, not a finding or even a hypothesis grounded in scientific data:

> [T]here were a number of ways to go from this point to this point – I mean, from the high to the low, and it could have been a quadratic shape, it could have been a variable, tortuous path.  It could have all come out in the first day.  It could have all come out in the last week.  The point is we knew the beginning and we knew the end.  ***It's very difficult to fix a depletion model with no other data to work with***.

FoF 1196.  Government expert Dr. Ronald Dykhuizen aptly described the model as a "fictional initial state."  FoF 1159.

The degree of uncertainty attendant to the Government's estimate further undermines any claim of accuracy.  As noted in BP and Anadarko's opening brief, the Government-assigned uncertainty range for the August 2010 estimate was nothing more than speculation, as confirmed

---

[1] The Government cites Dr. Hsieh's 4.9 MMstb estimate in support of its "scientific consensus." Gov't Br. 5.  The Government, however, did not designate Dr. Hsieh as an expert witness and, on that basis, objected to BP/Anadarko's attempts at trial to challenge his conclusions.  *See, e.g.*, Tr. at 1554, 81, 90; 2144.  In any event, Dr. Hsieh's model is based on the same fundamentally flawed assumptions as those of the Government's other experts—namely a rock compressibility of 12 microsips and a constant outflow profile.  TREX 11553R.0006, 13−14.

by meeting notes prepared while the estimate was being generated—notes stating there was "insufficient information to perform an uncertainty analysis on flow rate and total flow at time of meeting." FoF 1201. The notes also acknowledge that the "values presented are point estimates only," and that "uncertainty is not bounded by the range of values presented." FoF 1201. Secretary of Energy Steven Chu described the 10% uncertainty range as no more than a "judgment at the table." FoF 1198. Dr. Dykhuizen was even more skeptical; he concluded that the uncertainty range could not be quantified. FoF 1202.

**B.** **Neither the Presidential Commission Nor the Fifth Circuit Evaluated the Accuracy or Reliability of the Estimates Cited by the Government.**

Neither the U. S. Court of Appeals for the Fifth Circuit nor the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Presidential Commission") undertook or commissioned independent cumulative flow analyses. Their cursory references to a cumulative discharge figure are at best unreliable double hearsay.

With respect to the Fifth Circuit, although the opening paragraph in *Gulf Restoration Network, Inc. v. Salazar*, 683 F.3d 158, 163 (5th Cir. 2012), refers in dictum to a "three-month long spill of 4.9 million barrels of oil into the Gulf of Mexico," it is a stretch to suggest that the Fifth Circuit was somehow reflecting "a consensus estimate of the total spill." Gov't Br. 6. Total flow was not at issue in *Gulf Restoration Network*; the referenced estimate is unattributed; and there is no further discussion of flow estimates in the opinion. At best, the Court of Appeals was merely repeating the Government's August 2010 estimate; the Court was not passing judgment on the reliability or accuracy of that (or any other) estimate.

The Government is likewise wrong to suggest that the Presidential Commission found an "emerging consensus" on the amount of oil released from the reservoir. Gov't Br. 6. The Presidential Commission neither endorsed a cumulative estimate nor evaluated the reliability of

4

the estimates referenced in the paper cited by the Government.[2]  TREX 144820.  Written by Presidential Commission staff (not the Commission), these working papers "*do not necessarily reflect the views of the Commission or any of its members.*"  TREX 144820.0001 (emphasis in original).

### C.   The Government Experts' Opinions Do Not Uniformly Support a Cumulative Flow of Five MMstb.

There is not even a consensus among the Government's trial experts unless they rely on the same flawed assumption that wellbore restrictions did not change and ignore undisputed evidence. When Government experts account for actual evidence, their estimates decrease to well below 5 MMstb.  For example, the lower bound of Dr. Dykhuizen's cumulative estimate is 3.5 MMstb—30% lower than the Government estimate.  FoF 1252.  Although Dr. Mehran Pooladi-Darvish conceded he has no scientific evidence of how an accurate model of erosion would affect his analysis—because erosion "really doesn't matter" to him—the only cases in which he attempted to consider BOP erosion resulted in estimates substantially less than 5 MMstb. FoF 1336, 1342.  Finally, had Dr. Mohan Kelkar used six microsips for rock compressibility—a value Dr. Kelkar believes is "within the bounds of . . . reality"—his cumulative flow estimate would decrease to 3.4 MMstb.  Tr. at 1894–95; TREX 11549R.0045.

## II.   POINT ESTIMATES DO NOT UNDERMINE A CUMULATIVE ESTIMATE OF 3.26 MMSTB.

The Government's attempt to disprove BP and Anadarko's cumulative discharge estimate by citing to point estimates is futile.  To make its argument, the Government must distort Dr.

---

[2] Two of the estimates referenced in the paragraph quoted by the Government are based on methodologies (optical plume velocimetry and acoustic/sonar analysis) not used by trial experts. Thus, the record lacks any material evidence about these techniques or their reliability.

Zaldivar's unrefuted expert testimony, cherry pick among flow rate estimates developed during the response, and overlook its own expert's admissions about the uncertainty involved in calculating flow rates.

### A.    The Bounded Flow Rate Range for Slug Flow Confirms Increasing Flow.

At the high flow rates suggested by the Government, slug flow would break down into a different type of multi-phase flow than what occurred at Macondo in mid-May 2010.  FoF 1137, 1436.  Although it is undisputed that slug flow occurred, FoF 1446, the Government failed to offer affirmative expert analysis concerning the flow rate implications of this particular multi-phase behavior.  Instead, the Government tried unsuccessfully to discredit Dr. Zaldivar's comprehensive slug flow analysis.  But the Government's critique of Dr. Zaldivar's work is refuted in every material respect by the scientific evidence and uncontested expert testimony.

The Government falsely claims that Dr. Zaldivar "found that the flow rate was constant between May 13 and May 20" and thus his modeling "is inconsistent with BP's argument that flow was changing significantly during May."  Gov't Br. 31–32.  As explained at trial, Dr. Zaldivar's model was designed to determine a *range* of flow rates at which the observed slug flow was most likely to occur, and he determined that the flow rate for May 13–20, 2010, was bounded between 24,900 to 35,900 stb/day, with a "best estimate" of 30,000 stb/day.  FoF 1433–34, 1453.  Dr. Zaldivar's "best estimate" referred only to the most likely flow rate within the range and was not tied to a particular time during the period of observed slug flow behavior.  FoF 1450.  This bounded range is not only fully consistent with BP and Anadarko's position; it is also similar to the FRTG Plume Team's best estimate of 25,000 to 30,000 bbl/day for May 17, 2010—an estimate based on an analysis of video of the oil plumes from the *Deepwater Horizon*'s riser.  TREX 144168.0017–18.  Both analyses refute the Government's claim of a mid-May 2010 flow rate of

approximately 60,000 stb/day.

The Government is likewise wrong to suggest that Dr. Zaldivar's bounded flow rate range should be doubled to adjust for his use of hydraulic diameter as an approximation of the flow path through the riser.  Gov't Br. 32.  The Government concedes, as it must, that the "hydraulic diameter concept is widely used and accepted in fluid mechanics."  Gov't Br. 32.  The Government runs afoul of basic scientific principles, however, when it suggests that, although hydraulic diameter should be used to calculate the relationship between pressure drops and fluid velocities, "the flow rate must be calculated using the *actual area* available for flow."  Gov't Br. 32 (emphasis in original).  Indeed, Dr. Zaldivar's testimony that it would be "very incorrect" and not scientifically defensible to mix and match "hydraulic diameter" and actual flow area when trying to calculate flow rates using multi-phase flow simulators was essentially unchallenged.  FoF 1459, 1465; Tr. 2784–85.  As to the two examples the Government advances to support using actual flow area, Dr. Zaldivar explained that the OLGA manual specifies use of actual area only for an application of the software not relevant to this investigation and that Tim Lockett's use of actual area was limited to a simple calculation involving riser kink holes.  Tr. at 2833–34, 36.

Lacking legitimate scientific evidence to undercut Dr. Zaldivar's analysis, the Government resorts to lawyer supposition.  Gov't Br. 33 n.20.  The Government presents no expert testimony in support of its challenge to Dr. Zaldivar's testimony as "contrary to common sense", Gov't Br. 33 n.20, and ignores Dr. Zaldivar's admonition that "unfortunately, everything in science isn't intuitive."  Tr. at 2792.  Try as it might, the Government cannot avoid a simple scientific fact: two different geometries with the same hydraulic diameter will generate the same flow rate for a given pressure drop.  Tr. at 2803, 2811, 2814.

**B.**   **Estimates Based on Data from Top Kill and Top Hat are Too Uncertain to Support the Government's Claimed Flow Rate History.**

The Government continues to place faith in estimates based on data collected during Top Kill and Top Hat despite Dr. Dykhuizen's concession that the estimates are "not very accurate" and could be consistent with a cumulative flow of 3.5 MMstb.  FoF 1248, 1252.

Dr. Adrian Johnson identified a number of unknowns that render any Top Kill flow rate calculation unreliable, including a lack of information about flow resistances in the BOP and the path of mud down the BOP and into the well.[3]  FoF 1248.  Dr. Dykhuizen's Top Kill flow rate estimate depends on the assumption that mud pumped during the operation went directly out of the top of the BOP.  FoF 1250.  If this assumption is not correct (and the evidence suggests it is not), his Top Kill calculation is also incorrect.  FoF 1250.

The Government has long been aware that Top Hat data "could not provide an accurate estimate of flow."  FoF 1240.  In June 2010, the Federal Science Team (including Dr. Dykhuizen) concluded that the Top Hat flow rate was "in excess of 10–20,000 barrels per day," but they "could not quantify whether it was—what the actual number might be."  FoF 1239.  When the team later presented its findings, they concluded that "the uncertainties and rate sensitivity" made the flow rate determination "unreliable."  TREX 9706.0005; FoF 1240.  Dr. Hunter acknowledged that skirt flow was not only the largest portion of the total Top Hat flow, but also the most uncertain.  FoF 1243.  It was, at best, "difficult" to use visual observation to estimate the quantity of flow coming out of the skirt, and as Dr. Johnson explained, it was not possible to describe the geometry of the

---

[3]  Contrary to the Government's argument, Dr. Johnson's report did in fact criticize Dr. Dykhuizen's Top Kill flow rate estimates.  *See* FoF 1248.

Top Hat skirt with any certainty.[4]  FoF 1243, 1245.  Dr. Dykhuizen likewise acknowledged this problem when he conceded that both of the methods he used to calculate skirt flow are "inaccurate."  FoF 1242.

### C.   The Government Misrepresents Alleged BP Point Estimates.

The Government next takes out of context alleged point estimates provided by BP during the response.  For example, the Government's reference to BP's estimate of 53,000 bbls/day for purpose of dispersant calculation on July 6 and 11 is a document that says only "***assume*** 53,000 bbls/day"; this document contains no flow rate analysis and provides no reference for the source of the assumption.  TREX 2420 (emphasis added).  Likewise, Dr. Tony Liao's estimate of 63,000 bbls/day was generated using a flow path geometry (casing with no drill pipe) that never existed during the flow period.  FoF 1312.  Dr. Ole Rygg's model was designed as a worst-case scenario that did not inform a "most likely" flow rate.  FoF 1025.  Indeed, Dr. Rygg acknowledged that, as of May 2010, there was insufficient data to make a flow rate estimate, and Drs. Hunter and Ratzel agreed with this assessment.  FoF 1004.  The Government also fails to mention that containment capacities not only were dictated by the Government, but also were initially determined based on vessel size and, ultimately, selected FRTG flow rate estimates.  FoF 202; TREX 9099.0045, 9118.0004, 10566.0001; Saidi Dep. 441−43.  Just as tellingly, the Government simply ignores FRTG estimates made during the response suggesting that flow rate could have been as low as 12,000 bbls/day in late May 2010.  FoF 581.

The Government suggests that the cumulative estimate presented by BP and Anadarko at

---

[4] The Government's suggestion that Dr. Johnson agreed that the skirt flow was 30,000 bbls/day is wrong.  Gov't Br. 29.  Dr. Johnson simply replicated Dr. Dykhuizen's analysis.  FoF 1251.  Dr. Johnson consistently has been clear that he did not think anyone could reliably calculate a flow rate from the skirt of the Top Hat.  *See e.g.*, Tr. at 3101.

trial is inconsistent with prior statements made by BP to its shareholders.   But the Government ignores that BP has long taken public exception to the Government's overstated daily flow rate and cumulative discharge estimates.  Gov't Br. 10 n.4.  For example, in its 2011 Annual Report, BP stated that "the 2 August 2010 Government estimate and other similar estimates are not reliable estimates because they are based on incomplete or inaccurate information, rest in large part on assumptions that have not been validated, and are subject to far greater uncertainties than have been acknowledged . . . ."  TREX 130529.0235.  BP further made clear that it believed that the Government estimate was "overstated by a significant amount, and that the flow rate is potentially in the range of 20–50% lower."  TREX 130529.0235.[5]  The cumulative estimates presented by Dr. Blunt and Dr. Gringarten both fall within this range.

### D.      BP and Anadarko's Estimate is Consistent with Final Day Flow Rate Data.

The Government also suggests that the "undisputed" final day flow rate is evidence that BP and Anadarko's estimate is incorrect.  Gov't Br. 3, 10.  The Government's description of the final day flow rate as "undisputed" is misleading.  For instance, Dr. Dykhuizen admits the uncertainty range on his final day estimate is as much as +/- 20%.  FoF 1192, 1229.  This level of uncertainty is not surprising given the complexities inherent in determining flow rate through a complicated geometry like the capping stack.  Because the actual resistances to flow through the capping stack are unknown, the Government had to make a mathematical approximation.  The three Department of Energy national laboratories—despite modeling the exact same geometry—could agree neither on the approximation to use nor on the equation of state to define the flowing fluid.  FoF 1209,

---

[5] In its Annual Report, BP made clear that the estimate now cited by the Government was being provided only for "purposes of calculating a provision for fines and penalties under Section 311 of the Clean Water Act."   TREX 130529.00236.   The statement was never intended to be the company's final determination of how much oil was discharged.

1213.  Notes from the late July 2010 meetings in which the official Government flow rate estimate was determined reveal that teams had estimates ranging from 24,000 to 64,000 bbl/day.  FoF 1192.  Dr. Ratzel described the Government's determination of 53,000 bbls/day as the product of an "evaluation of pluses and minuses of the various techniques and our attempts to say, in general, the collective yielded 53,000."  FoF 1199.

The analyses performed by BP and Anadarko's experts in no way conflict with the final day capping stack data.  Although the Government is correct that Dr. Blunt did not independently calculate a final day flow rate,[6] Gov't Br. 9, the final day flow rate is not relevant to material balance analysis—a proposition with which the Government agrees.[7]  FoF 1506.  Dr. Kelkar's final day flow rate calculation, therefore, did nothing to improve the accuracy or reliability of his material balance calculation.  As discussed in Section V.B., Dr. Gringarten independently calculated a final day flow rate that is roughly consistent with the Government's final day flow rate estimate when differences in conversion factors are resolved.

## III.    THE GOVERNMENT'S CRITIQUES OF DR. BLUNT'S MATERIAL BALANCE ANALYSIS ARE WITHOUT MERIT.

Even though one of its own experts continues to endorse the methodology, FoF 1503, the Government now suggests that material balance analysis is too unreliable to answer the cumulative discharge question.  The strength of material balance analysis does indeed depend on the quality of

---

[6] The assumed final day flow rate that Dr. Blunt used in his permeability calculation is consistent with the Government's value once differences in conversion factors are resolved.  FoF 1810.  Regardless, because Dr. Blunt ultimately used Dr. Gringarten's permeability value instead of his own, any differences in this final day flow rate are meaningless.  FoF 1815.

[7] Although not required for a material balance analysis, Dr. Blunt confirmed that a hypothetical historical flow rate profile could exist that would be consistent with a cumulative flow of 3.26 MMstb, a final day flow rate of approximately 50,000 bbls/day, and the flow rate range suggested by slug flow in mid-May 2010.  Tr. at 2182−83.

the data inputs, but here there are high quality data available to determine the value of each variable in the material balance equation.  FoF 1519, 1585, 1701–02.

As an initial matter, the Government focuses only on pore volume compressibility ("PVC"), effectively conceding that Dr. Blunt correctly calculated two of the three material balance inputs—connected oil volume[8] and change in reservoir pressure.  This concession leads to the inescapable conclusion that Government experts Dr. Kelkar and Dr. Pooladi-Darvish have overestimated cumulative flow from the Macondo Reservoir by assuming full reservoir connectivity and inflating the change in reservoir pressure.  FoF 1543–44, 1726, 1822.

Nor is there anything to the Government's position on rock compressibility.  The evidence, including measured data from an independent service laboratory, overwhelmingly establishes that the Macondo reservoir's PVC is approximately six microsips.  Because the measured data refutes its position, the Government insists that 12 microsips is the "most likely" PVC value based on a mischaracterization of reservoir modeling performed by BP in preparation for the well's shut-in.  Gov't Br. 2, 11.  As confirmed by Dr. Robert Merrill, the BP reservoir engineer who led the reservoir modeling efforts in question, the modeling cited by the Government was performed only to predict worst-case pressures.  FoF 1614–22, 1642, 1647.  Likewise, Dr. Blunt confirmed that a value significantly greater than six microsips would be inconsistent with the reservoir's geology and pressure data.  FoF 1593, 1741–45.  Indeed, BP consistently used a rock compressibility value of six microsips both before and after this short period, including when analyzing well integrity and planning for the relief well.  FoF 1616, 1648–57.

---

[8] Although Dr. Blunt incorporates his conversion of oil to stock tank conditions directly into his connected oil volume calculation, that aspect of his methodology is addressed separately in Section VII.

Instead of offering affirmative expert testimony on the reservoir's pore volume compressibility, the Government merely criticizes the testing performed by Weatherford Laboratories.  Yet, testing rotary sidewall cores ("RSWCs"), as Weatherford did, is an appropriate and reliable way to determine rock compressibility.  FoF 1586, 1589.  Dr. Zimmerman, one of world's foremost rock mechanics experts, agreed that Weatherford's tests were sufficient to determine the reservoir's compressibility.  FoF 1593, 1741–45.  The Government's assertion that BP concluded that RSWCs were "too uncertain to add value" is directly contradicted by Dr. Merrill's testimony that, in his 30 years' experience as a reservoir engineer, he heard no concerns about using RSWCs to measure rock compressibility.  FoF 1638.  Further, BP's request that Weatherford expedite testing of the samples in the midst of an ongoing crisis does nothing to change this fact.  The Government presented no evidence that the expedited testing affected Weatherford's methods or the reliability of the tests, and Weatherford continues to stand by the results.  FoF 1591.

The Government's suggestion that Dr. Blunt's permeability value is at odds with Dr. Gringarten's value misrepresents Dr. Blunt's analysis.  First, as Dr. Blunt explained, the 407 mD permeability calculation cited by the Government was based on pressure assumptions that failed to account for wellbore cooling and thus led to "an over-estimate of permeability."  Tr. at 2176–78; TREX 011553R.0143, 40; *see also* FoF 1725.  Second, contrary to the Government's suggestion, Dr. Blunt used an accurate estimate of final day flow rate to calculate permeability.  FoF 1810; Tr. at 2185–86.[9]

---

[9] Dr. Blunt's permeability analysis results in a high-end permeability of 300 mD, which is consistent with Dr. Gringarten's high-end permeability of 329 mD.  FoF 1755, 1813, 1816.  Besides, any difference between Dr. Blunt and Dr. Gringarten's permeability value is irrelevant (continued…)

The Government's assertion that Dr. Blunt failed to account for uncertainty and "cherry-picked" favorable data could not be further from the truth.  Gov't Br. 2, 40.  For each variable, Dr. Blunt analyzed uncertainty and selected conservative values (*i.e.*, values that would result in the highest cumulative flow) to use in his model.  FoF 1565−66, 1568−70, 1755, 1817.  For compressibility, he used a value that all parties agree represents the actual measured value.  FoF 1610.  Thus, Dr. Blunt's cumulative flow rate estimate—2.9 to 3.7 MMstb—represents the "worst case" scenario and fully accounts for potential uncertainty.  TREX 11553R.0006.

Finally, Dr. Blunt's model contains no internal errors; the Government simply tried to use the model in the wrong manner.  During trial, the Government inappropriately—and against Dr. Blunt's express warning—input Dr. Gringarten's "most likely" permeability of 238 mD into the spreadsheet field for "upper bound" permeability.  Tr. at 2232−38.  The resulting failure of the reservoir thickness to match actual data is hardly surprising—indeed, it is inevitable—given that 238 mD is not a correct value to use as the "upper bound" of permeability.  Tr. at 2235-2237.

## IV.   THE GOVERNMENT'S CRITICISM OF DR. GRINGARTEN'S ANALYSES IS LIKEWISE FLAWED.

None of the Government's challenges to Dr. Gringarten's analyses of permeability and cumulative flow is valid.  The Government erroneously claims that Dr. Gringarten used only a ***single*** pressure build-up curve for each reservoir layer in his determination of permeability.  Gov't Br. 15.  In truth, Dr. Gringarten not only used ***multiple*** pressure build-ups to determine permeability in two of the three reservoir layers he analyzed; he also confirmed his analysis for all

---

given that Dr. Blunt used Dr. Gringarten's value in his material balance analysis.  FoF 1815−16. In any event, the Government's suggestion that the uncertainty inherent in the permeability determination somehow invalidates Dr. Blunt's material balance analysis ignores Dr. Blunt's testimony that permeability has little impact on his calculation.  Tr. at 2179.

layers by examining sampling data from the MDT tool.  FoF 1773−74.  The Government's characterization of the "pre-test" MDT data as the "most uncertain data available" ignores that Dr. Gringarten (i) confirmed the reliability of this data by comparing them to the pressure signal from the sampling tests—tests that lasted hours, and (ii) performed an uncertainty analysis to account for any "noise" in the MDT data.  FoF 1787; Tr. at 2600; TREX 11696R.0084.  Perhaps most important, the Government fails to acknowledge that its own expert, Dr. Leif Larsen, not only used a subset of this available data, but also analyzed those data using semi-log plots, which cannot adequately differentiate between permeabilities.  FoF 1791−93, 1796, 1798.

Dr. Gringarten's best estimate of reservoir permeability is not the outlier that the Government would have the Court believe.  The Government claims that, during the *Deepwater Horizon* response, BP used permeability values as high as 1,000 mD and concluded that the "most likely" permeability value was 500 mD.  Gov't Br. 14.  In truth, BP used a hypothetical permeability value of 1,000 mD as part of an early worst-case discharge scenario before virtually any data from the Macondo well had been analyzed.  TREX 9282.  Notably, after completing an analysis of the well logs and cores, BP calculated and used a permeability value of 220 mD.  Tr. at 1583−85, 2680−82; D24495.  Although the Government repeatedly points to the same BP document to support its assertion that BP internally determined permeability to be 500 mD, the Government's own witnesses concede that the reference in the document was to "air permeability," which is different from "effective permeability to oil."  Tr. at 1933−35.  Dr. Kelkar finally conceded that the data in this document yield an effective permeability-to-oil value of 300 mD, which is consistent with BP's analysis at the time and Dr. Gringarten's later conclusion that the best estimate of the Macondo Reservoir's permeability is 238 mD.  FoF 1755.

Contrary to the Government's assertion, Dr. Gringarten did not simply assume a final day

15

flow rate; he used an industry-standard analysis to calculate a final day flow of approximately 42,000 stb/d.  FoF 1828; Tr. at 2624–25; D24222.  This calculated flow rate, which was converted to stock tank barrels using a single-stage flash conversion process, is roughly equivalent to that of Dr. Pooladi-Darvish if he had used a multi-stage conversion, and it is within the possible final day rates calculated by Dr. Dykhuizen.  FoF 1830, 1229; Tr. at 2625.[10]

Lastly, because PT-B pressure gauge data was not available for the first 19 days of the discharge, Dr. Gringarten (as well as every expert who relied on PT-B data) had to determine the most likely trend in pressure.  FoF 1998.  The Government claims that Dr. Gringarten's pressure trend determination necessarily resulted in the lowest flow possible over the first 19 days of the spill.  Gov't Br. 14–15.  What drove the pressure trend determination was not the resulting flow rate but, instead, Dr. Gringarten's reasonable interpolation between the initial pressure and the first available PT-B pressure data on May 8.  TREX 11696R.0036.  He then used deconvolution to convert these data to flow rates.  FoF 1831–32.  The Government experts, on the other hand, took data from after May 8 and extrapolated a "best fit" line to April 20.  FoF 1287.  The Government's approach may be simpler, but it is less scientifically defensible.

## V.   DR. JOHNSON CORRECTLY IDENTIFIED ERRORS IN THE GOVERNMENT EXPERTS' ANALYSES.

The Government improperly conflates Dr. Johnson's opinions about the uncertainty

---

[10]  Misrepresenting the role that assumed flow rates play in Dr. Gringarten's analysis, the Government claims that his analysis is circular.  Gov't Br. 13.  The Government is wrong.  Deconvolution requires one to use an assumed starting flow rate, but the final flow rate is based on the calculated values for permeability and bottom-hole pressure.  FoF 433–34.  To begin deconvolution, Dr. Gringarten used two different flow rates: (1) a constant value of 45,000 stb/day and (2) a variable flow rate.  TREX 11696R.0036.  Contrary to the Government's claim, the use of these two assumed starting flow rates did not yield a cumulative flow "identical" to Dr. Blunt's best estimate of 3.26 MMstb—option one resulted in a cumulative flow of 3.87 MMstb; option two resulted in a total flow of 3.29 MMstb.  TREX 11696R.0036, 50–54.

associated with using hydraulic modeling to calculate cumulative release (the basis for his conclusion that a reliable cumulative estimate cannot be derived using this approach) with his specific criticisms of Drs. Griffiths's and Dykhuizen's analyses.  FoF 1134, 1165−66, 1169−70.

The Government's reliance on Dr. Griffiths for the proposition that Dr. Johnson did not properly analyze BOP pressure data before May 8 is misplaced.  Dr. Griffiths's opinions are unhinged from actual data or analysis of wellhead pressure following the blowout.[11]  FoF 1287. Dr. Johnson's prediction of BOP pressure data for the first 19 days of the response is reliable and supported by pre-incident data (as well as Dr. Pooladi-Darvish's analysis).  FoF 1287.  Further, the Government is grasping at straws alleging that BP engaged in "misconduct" related to the BOP pressure gauge.  Gov't Br. 18.  Transocean—not BP—was responsible for maintenance and operation of the BOP and all equipment related to the BOP, including the PT-B gauge.  Phase One Tr. at 4694−95.  There is no evidence of misconduct or wrongdoing by any party involving the PT-B gauge.  Rather, the PT-B gauge was damaged in the blowout, and BP directed Oceaneering to bring the gauge back online as quickly as possible.  Gochnour Dep. at 56, 60−61, 401.

Similarly, there is nothing to the Government's continued assertion that pressure data recorded by the PT-B gauge reflects no significant erosion after May 8, 2010.  The Government is wrong to suggest that pressure at the PT-B gauge declined consistently during the response.  In fact, the pressure readings sometimes decreased and sometimes increased.  FoF 1296, 1300.  More important, the PT-B data do not (and cannot) rule out wellhead and bottomhole erosion after May 8.  FoF 1304.  As Dr. Johnson explained—and Dr. Griffiths conceded—it is impossible to know

---

[11] As an example, Dr. Griffiths cited to an analysis by Add Energy's Morten Emilsen to support a claim that the wellhead pressure would decrease immediately after the explosion, even though Mr. Emilsen did not analyze post-blowout wellhead pressure.  FoF 1276−77; Tr. at 1747−49.

whether a change in PT-B pressure was caused by an upstream change (bottomhole erosion), a downstream change (BOP erosion), or a combination of both.  FoF 1294.

Further, Dr. Johnson's model accurately characterizes the dual flow paths of the drill pipe and casing, and he used an industry-standard method for calculating flow through a non-circular geometry.  FoF 1161, 1283; Tr. at 3138−39.  His inputs are not "hypothetical" as the Government claims, Gov't Br. 17; they are grounded in actual data or first-hand observations of physical evidence.  FoF 1163−64.  Dr. Griffiths, on the other hand, made no such attempt to model the physical geometry of the well or the dual flow paths.  FoF 1256−57.

## VI.    THERE IS NO BASIS FOR THE GOVERNMENT'S ASSERTION THAT FLOW RESTRICTIONS REMAINED CONSTANT.

Even if the Government were correct about the allegedly "undisputed" final day flow rate and productivity index values, there is no support for its demonstrably unsound assumption that flow restrictions remained materially unchanged during the preceding 86 days.

### A.    Significant Metal Erosion Occurred Long After the Blowout.

The Government's metal erosion analysis boils down to nothing more than an unsubstantiated and demonstrably false assertion that all erosion occurred "extremely quickly." Gov't Br. 21.  As Dr. Srdjan Nesic testified, it was physically impossible for the observed BOP and riser metal erosion to have occurred in just a few hours or days, as claimed by Dr. Griffiths and other Government experts (none of whom even claims to be an expert in metal erosion).  FoF 1400.  Indeed, Dr. Nesic's opinions are consistent with those of Dr. Rory Davis, a Phase One BOP expert for the Government, who testified that "'washing' or what other people call 'erosion'" of the BOP happened "gradually over a long period of time," for "70 or 75 days before the flow was stopped."  FoF 1402.

18

The available data and evidence squarely support Dr. Nesic's opinion that erosion continued at least through the end of May 2010. Dr. Hans Vaziri, a leading expert in sand prediction and sand production, offered unrebutted evidence that sanding (a necessary requirement for erosion) took place at the Macondo well following the explosion and lasted ***at least*** through the end of May 2010. FoF 1374-75, 1377–78. Further, the May 19, 2010 appearance of a third hole in the kinked riser provides conclusive evidence of continued metal erosion long after the blowout. FoF 1373–74, 1378. As Dr. Nesic explained, if erosion is occurring at one restriction in the system, it is also occurring at other restrictions in the flow path—even if not at the same rate. FoF 1363, 1401.

Although Dr. Griffiths speculates that "cracking," rather than erosion, caused the third hole, Gov't Br. 23, other Government scientists disagree (as does Dr. Nesic). Dr. Hunter, co-leader of the Federal Science Team, testified that the third riser hole was caused by metal erosion. FoF 1372. Dr. Alex Slocum, another member of the Federal Science Team, acknowledged that "the appearance of a 3rd hole" implied that the "well is producing sand" (sand being a prerequisite for erosion). FoF 1379. The most direct repudiation of Dr. Griffiths's speculation came from Dr. Nesic, who testified that the third hole's location and shape rules out cracking or fracturing as a cause. FoF 1372–74, 1398.

Dr. Nesic's reliance on the appearance of the third hole as evidence of erosion is consistent with Phase One evidence. As Dr. Nesic explained, not everything in a system erodes at the same rate. FoF 1403. Accordingly, because erosion rates vary depending on angle of impact, type of material, and degree of restriction, Dr. Nesic used computational fluid dynamics analysis to model how erosion affected different restrictions in the flow path. FoF 1390. All the Phase One testimony cited by the Government refers to erosion of select drill pipe pieces—not the elements

that Dr. Nesic testified provided the greatest restrictions to flow.  FoF 1403.

The Government's remaining criticisms of Dr. Nesic's model likewise miss the mark. First, Dr. Nesic modeled pressure drop—a measure of the difficulty with which flow passes through a restriction—instead of erosion rate because pressure drop most accurately shows the effect of erosion on flow rate.  FoF 1381, 1397.  Second, the Government's criticism of Dr. Nesic's assumption that the BOP and kinked riser provided the main restriction to flow is unwarranted given that it is a necessary assumption to isolate the effect of erosion on flow rate, and especially given that none of the government's experts even address how erosion of those components would affect flow.  FoF 1395.  Third, although Dr. Nesic's model diverged after ten days—which commonly happens when analyzing such complicated geometries (and large amounts of data)—he obtained sufficient data to determine the erosional trend (with an approximately 97% degree of correlation) and render reliable conclusions as to the entire erosion period.  FoF 1390–91.  Fourth and finally, Dr. Nesic did not use PT-B pressure gauge data because no such data existed before May 8, 2010, and the available data were not adequate to analyze pressure changes across individual components.  FoF 1398.

### B.    The Government's Assumptions About Cement Erosion are Incorrect.

The Government confuses the Phase One issue as to whether the ***foamed*** cement achieved zonal isolation of the reservoir with Dr. Member's reasonable assumption that the ***unfoamed*** shoe track cement was of sufficient compressive strength to resist flow.  Just as the BOP components restricted flow despite failing to shut in the well, so too did the shoe track cement restrict flow even as it allowed some hydrocarbons to pass from the reservoir into the wellbore.  FoF 1368–71, 1411, 1415.

Contrary to the Government's assertions, Dr. Member's conclusion about the shoe track

cement is consistent with both John Guide's testimony and Jerry Calvert's opinions.  Mr. Guide's testimony related to the performance of the cement job as a whole, and did not refer specifically to the shoe track cement.  FoF 1416.  Mr. Calvert simply concluded that "hydrocarbons could have flowed through the shoe track cement without forcing cement out of the shoe track;" this is consistent with an assumption that the cement could have set and restricted flow without providing zonal isolation.  FoF 1417.

Dr. Member's assumption that the shoe track cement was set is consistent with assumptions made by Drs. Dykhuizen and Griffiths[12]—as well as with Dr. Hunter's opinion that "[t]here certainly was cement at different places in the well . . . that affected the flow."  TREX 11485R.0012; 11452.0011; Hunter Dep. at 128–29.  Dr. Member's opinion that the shoe track cement had sufficient compressive strength to restrict flow is further supported by the Chevron compressive strength tests.  Dr. Member discussed this evidence both in his Phase Two expert report and in trial testimony.  Tr. at 2980, 3007–08, 25–26; *see also* Phase One Tr. at 2426–27.

The Government's bald assertion that Dr. Member improperly relied on test results from "construction concrete" rather than "oilfield" cement is misplaced. According to Dr. Member, materials like oilfield cement would erode ***even more slowly*** than the concrete materials examined in some of the scientific literature.  FoF 1423–28.  Even factoring in such issues, the erosion rates assumed by Drs. Griffiths and Dykhuizen are not scientifically plausible—and the Government offered no expert opinions to the contrary.  FoF 1425.

---

[12] The Government attempts to sidestep Dr. Griffiths's assumption that the well cement set by claiming that Dr. Griffiths did not rely on that assumption in reaching his conclusions about flow rate.  This is precisely the point.  He used an unreasonably high erosion rate to eliminate the restrictions caused by the downhole cement.  FoF 1424.

## VII.   THE MULTI-STAGE SEPARATION METHODS PROPOSED BY THE GOVERNMENT ARE NOT APPROPRIATE.

The Clean Water Act permits the Court to assess penalties based on each "barrel of oil" discharged into navigable waters.  33 U.S.C. § 1321(b)(7).  The Government, BP, and Anadarko agree that under the Act a "barrel of oil" means 42 gallons of oil at "stock tank conditions"—a temperature of 60° F and a pressure of one atmosphere (approximately 15 psi).  FoF 1850–52; Gov't CoL 17.  Whether "conservative" or not, Gov't Br. at 34, the Government concedes that a barrel of oil under the Clean Water Act is correctly defined as a stock tank barrel—and the parties' experts have all expressed their estimates in units of stock tank barrels.

The key dispute between the parties is the process the Court should use to convert oil released at the sea floor into stock tank barrels.  As noted in the opening brief, the "single-stage flash" process is the standard methodology in the petroleum industry for converting calculations of reservoir flow into stock tank barrels where, as here, there is uncertainty about the process of the oil-gas separation.  Tr. at 1831, 2132.  Equally important, Dr. Curtis Whitson's "ocean separator" model determined the actual shrinkage in oil volume as it moved to the surface, and the shrinkage factor is similar to that of a single-stage flash process.  FoF 1858, 1867.

The Government's argument that the Court should judicially estop BP from either advocating for a single-stage separation process or seeking to exclude "dissolved oil" from the cumulative oil flow calculation is incorrect.  Gov't Br. 36.  To invoke judicial estoppel, the Government must satisfy two elements (among others):  (i) the party against whom it is sought has taken a legal position that is "plainly inconsistent" with a prior position, and (ii) a court has accepted the prior position.  *Flugence v. Axis Surplus Ins. Co.*, 738 F.3d 126, ___ (5th Cir. 2013).  But BP is not taking an inconsistent position in this proceeding.  True, the **collected** oil volume is based on a multi-stage separation process, but that was the way the oil was actually collected in

2010.  Tr. at 1825–26.  The oil that flowed into the Gulf of Mexico did not undergo a similar process.  What is more, although the Court accepted the parties' collected oil stipulation, the stipulation itself provides no guidance on the conversion process that should apply for uncollected oil.  Instead, the stipulation makes clear that (i) the parties did not stipulate as to the accuracy of any particular method of calculating the collected oil volume, and (ii) it cannot be used as an admission that either party conceded to any conversion method.  (Rec. Doc. 8220).

BP's earlier citation to *United States v. Citgo Petroleum Corp.* also does not support the Government's argument.  Gov't Br. 37.  Neither BP's Motion for Partial Summary Judgment nor the *Citgo* opinion cited in support of that motion addresses dissolved hydrocarbons specifically or the proper method of converting oil to stock tank barrels more broadly.  (Rec. Doc. 8213); *United States v. Citgo Petro. Corp.*, No. 2:08-cv-893, 2011 WL 10723934 (W.D. La. Sept. 29, 2011), *rev'd on other grounds*, 723 F.3d 547 (5th Cir. 2013).  Although BP did advocate excluding from the Clean Water Act penalty calculation oil that failed to come into contact with Gulf of Mexico waters, this argument does not mean that all hydrocarbons (including gas) making contact with the water should be included in the calculation.  (Rec. Doc. 8213 at 2).  In short, there is no basis for invoking judicial estoppel here.[13]

The Government is wrong to suggest that BP and Anadarko are seeking to exclude "dissolved oil" from the calculation of cumulative flow.  Drs. Whitson and Zick both agree that **gas** migrates from oil to the ocean, causing shrinkage just as it would at the surface when gas migrates from oil to the air.  Tr. at 2343–45, 51–52.  Accounting for shrinkage associated with this "solubility" is appropriate because the Clean Water Act does not permit a penalty based on the

---

[13] Consideration of the single-stage separation process is not precluded in any event because Anadarko plainly is not estopped from arguing for application of the single-stage process.

release of gas.  33 U.S.C. § 1321(b)(7).  The Government notes that the Act defines oil as "oil of any kind including oil mixed with a waste" and claims that gas is a waste.  Gov't Br. 34.  But the Government cites no authority for this remarkable assertion and does not adduce any instance in which gas from a petroleum reservoir has been considered "waste."  To the contrary, a party with a petroleum lease on federal lands must pay the Government royalties on oil and gas.  *See* 30 CFR 202.100; 30 CFR 1202.150.  It is doubtful the Government would forgive payment of royalties on gas based on a party's claim that such hydrocarbons were "waste."

Regardless of whether this Court counts dissolved hydrocarbons towards the cumulative discharge estimate, Dr. Zick's oceanic separation model should not be used.  Dr. Zick's model is based on an erroneous equation of state and consistently overstates stock tank barrels.  FoF 1888, 1892.  In fact, no Government expert used the conversion factor generated by Dr. Zick's oceanic model, and even Dr. Zick did not initially recommend its use.  FoF 1893.  In contrast, Dr. Whitson, the acknowledged leader in this field, based his model on an accurate equation of state that reliably approximates laboratory data.[14]  FoF 1860, 1866, 1891; Tr. at 1790.

## VIII.  THE "HOUSEKEEPING" ISSUES RAISED BY THE GOVERNMENT ARE INAPPROPRIATE.

In the final "housekeeping" section of its brief, the Government improperly asks that the Court hold BP an "operator" and "person in charge" of the *Deepwater Horizon* under 33 U.S.C. § 1321(b)(7).  It relies upon (I) Phase One conduct, and (II) BP's participation in Unified Command's source control efforts.  As to Phase One conduct, the Government may not use its

---

[14] If the Court includes dissolved hydrocarbons, the discharge amount would increase by no more than eight percent as compared to a cumulative estimate based on a single-stage flash conversion process.  Gov't FoF 589.  An eight-percent increase is also consistent with the laboratory four-stage separation method, although BP and Anadarko maintain that the four-stage separation method approximates neither what actually occurred at Macondo nor what would have occurred during well production.  FoF 1878–79.

Phase Two post-trial brief to relitigate Phase One issues. Regardless, as BP explained following Phase One, its Phase One conduct does not render it an "owner, operator, or person in charge" of the *Deepwater Horizon* and its appurtenances. *See* Phase One FFCL (Rec. Doc. 10467) 2706–22. As to Phase Two, BP cannot be liable for conduct performed at Unified Command's direction. FoF 47–55. Moreover, under the Clean Water Act, penalized discharges do not include "discharges incidental to mechanical removal authorized by the President under subsection (c) of this section." 33 U.S.C. § 1321(a)(2)(D). Hence, person in charge and operator liability does not exist for response-related BOP operations performed at the Government's direction.

Further, given that the Court has previously held BP liable under 33 U.S.C. § 1321(b)(7) as an owner of the well, *see* Rec. Doc. 5809, the Court need only reach this issue if its ruling is disturbed on appeal. *See* Fifth Cir. No. 12-30883 (argued Dec. 4, 2013). It would be appropriate for the Court to defer consideration of this issue until the Fifth Circuit rules, at which point this Court could invite additional briefing on the subject.

## CONCLUSION

For the reasons set forth above and in the opening brief, the Court should find that **3.26 MMstb** of oil were released from the Macondo Reservoir and that, after accounting for 810,000 stb of collected oil, 2.45 MMstb of oil escaped into the environment.

January 24, 2014                                             Respectfully submitted,


                                                            */s/ Don K. Haycraft*
                                                            Don K. Haycraft

25

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January 2014.

*/s/ Don K. Haycraft*
Don K. Haycraft