**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** *Deepwater Horizon* **in the Gulf of Mexico, on April 20, 2010**<br><br>**This document applies to:**<br>*All Cases* | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

<u>**REPLY BRIEF OF TRANSOCEAN AND HALLIBURTON ENERGY SERVICES, INC.**</u>
<u>**WITH RESPECT TO THE PHASE TWO SOURCE CONTROL SEGMENT**</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................... 1

II.    ARGUMENT ......................................................................................................... 1

    A.    BP Was In Charge Of Controlling The Source ..................................... 1

        1.    BP Had Responsibility For Source Control Under The Federal
              Framework ................................................................................... 1

        2.    BP Made Key Source Control Decisions—Including The Decision
              To Mislead The Government—Outside The Federal Framework .............. 3

        3.    BP Mischaracterizes The Role Of The Federal Science Team And
              FRTG ........................................................................................... 4

    B.    Delays In Capping Resulted From BP's Actions And Inactions ........................... 6

        1.    BP's Own Decisions Created Concerns Over Rupture Disks .................... 6

        2.    If BP Lacked Data, It Was Through Its Own Actions and Inactions .......... 7

    C.    BP's Misrepresentations Impacted Source Control ............................................ 8

        1.    BP Intentionally and Repeatedly Misrepresented The Flow Rate ............. 8

        2.    Government Officials Overwhelmingly Testified That Flow Rate
              Mattered To Source Control Decisions ........................................... 9

    D.    BP's Conduct Corrupted Decision-Making And Prolonged The Spill ................. 10

        1.    BP's Misrepresentations Caused The Top Kill To Be Favored Over
              Capping Strategies ..................................................................... 10

        2.    BP's Misleading Diagnosis Of The Top Kill's Failure Caused The
              Abandonment Of The BOP-on-BOP Option On May 29 ........................ 11

        3.    BOP-On-BOP Could Have Been Used In Early June Or Sooner ............. 12

    E.    BP's Lack Of A Plan To Respond To A Blowout Caused A Longer Spill .......... 13

    F.    BP's Conduct Amounts To A Superseding Cause And Should Increase
        BP's Allocation Of Fault ................................................................... 14

III.    CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
704 F.3d 413 (5th Cir. 2013) ...................................................................................................3

*Exxon Co. v. Sofec, Inc.*,
517 U.S. 830 (1996) ...............................................................................................................15

*Protectus Alpha Navigation. Co. Ltd. v. N. Pac. Grain Growers, Inc.*,
767 F.2d 1379 (5th Cir. 1985) ...............................................................................................14

*Stolt Achievement v. Dredge B.E. Lindholm*,
447 F.3d 360 (5th Cir. 2006) .................................................................................................15

*United States v. Reliable Transfer Co.*,
421 U.S. 397 (1975) ...............................................................................................................15

**FEDERAL STATUTES**

33 U.S.C. § 1321 ............................................................................................................................3

33 U.S.C. § 1321(c)(4)(B)(i) .........................................................................................................3

33 U.S.C. § 1321(c)(4)(B)(iv) .......................................................................................................3

I.      **INTRODUCTION**

The Phase Two evidence proved that BP had no plan to respond to a deepwater blowout and BP repeatedly and intentionally misrepresented the flow rate from the Macondo well.    BP's planning failures and repeated misstatements mattered.    If BP had spent the time, money, and energy to create a real response plan before drilling Macondo, and had been truthful about the flow rate, the well could have been capped far sooner than July 15.    Transocean and Halliburton Energy Services, Inc. ("HESI") should not be held liable for BP's failures.

BP does not seriously contend that it had a viable source control plan or was truthful about the flow rate.    Instead, BP mostly argues that its lack of planning and its systematic misrepresentations did not matter.    But BP's filings distort the effect of the Government's role in source control, ignore the wealth of evidence that Government officials did in fact rely on BP's false flow rate estimates, and overlook the testimony and exhibits that show BP's flow rate misstatements first delayed and then caused the abandonment of the BOP-on-BOP strategy.

BP's negligent conduct and intentional misrepresentations produced dire consequences: an unnecessarily prolonged spill and increased damages.    Regardless of whether BP intended these consequences, BP is accountable for causing them.    This Court should find that BP's conduct was a superseding cause of the resultant additional damages and that its conduct increases BP's overall share of fault for damages from the Macondo oil spill.

II.     **ARGUMENT**

    A.      **BP Was In Charge Of Controlling The Source**

        1.      **BP Had Responsibility For Source Control Under The Federal Framework**

The Unified Command framework does not absolve BP of responsibility for source control and for the consequences of misrepresentations to the Government about flow rate.

BP's claim that Unified Command, and not BP, was responsible for source control is misplaced; the federal framework put BP in charge of source control.   FOF ¶¶ 23-26.   As the Responsible Party for the Macondo well, BP was part of Unified Command: executive Doug Suttles was BP's Area Commander, and executive David Rainey, who authored the memo underlying BP's guilty plea, was his deputy.   Depo. of D. Rainey, 23:9-18.   Incident Command Post ("ICP") Houston was located in BP's own office and led by BP executive James Dupree.   J. Dupree P2 TT 580:19-23.   While the other ICP locations managed clean-up operations, *see generally* TREX-9105.33-37, BP's ICP had sole responsibility for designing, analyzing, and recommending source control options.   TREX-9105.35 ("ICP Houston … focus[ed] on intervention and source control, while the ICPs in Houma and Mobile … focus[ed] on response.").

The Federal On-Scene Coordinator's Report explained why BP had so much responsibility for source control:

> As sub-sea drilling systems are not an area of Coast Guard cognizance and expertise, the Federal On-Scene Coordinator (FOSC) was unfamiliar with the technology and capabilities of the deepwater drilling industry.   Neither the Coast Guard nor any other federal agency had experience with a massive deep water spill.   Ultimately, source control had to be achieved through the Responsible Party (RP) . . . .

TREX 9105.41-42; *see also* TREX-9124.118 ("The Federal Government . . . must rely wholly on the responsible party").

Federal officials and BP executives consistently testified that BP was responsible for source control.   FOF ¶ 24.   Under the ICP framework, BP would determine the course of action it wanted to pursue, then seek Unified Command's approval.   J. Dupree, P2 TT 596:11-20 ("We would recommend the options; they would approve it."); FOF ¶ 26.   In reviewing BP's recommendations, Unified Command was "dependent upon" BP for "accurate information."   FOF ¶¶ 26-28; J. Dupree, P2 TT 698:11-13; Depo. of M. Landry, 321:10-15.   As Admiral

Landry testified, "[Y]ou have to trust the Responsible Party is going to be forthright with you and basically execute the response."   Depo. of M. Landry, 94:7-95:14.   Instead, BP corrupted the decision-making process with its misstatements to federal officials.

In the face of this evidence, BP cites language from the Fifth Circuit's decision in *Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 418 (5th Cir. 2013), about the "federal oversight" of the response efforts.   BP Br. at 1-2, 11-12.   In *CBD*, the Fifth Circuit affirmed this Court's finding that the Center's request for injunctive relief ordering BP to undertake additional (unspecified) clean-up efforts was moot because the well was capped.   *CBD*, 704 F.3d at 431.   Nothing in the Fifth Circuit's opinion, however, undermines the evidence that BP was in charge of making *source control* recommendations and that the Government relied on BP for accurate information in approving BP's proposals.   Nor did the Fifth Circuit hold that the unified command structure gives BP immunity.[1]   In short, *CBD* had nothing to do with superseding cause or fault allocation.   The Fifth Circuit merely held that the claims for injunctive relief "became moot after BP killed the Macondo well . . . ." *Id.* at 425.

## 2.     BP Made Key Source Control Decisions—Including The Decision To Mislead The Government—Outside The Federal Framework

The existence of "federal oversight" fails to shield BP from liability for an additional reason: BP excluded Government officials from its decision-making process and made source control decisions *outside* the federal framework until after the Top Kill.   FOF ¶¶ 32-33.   As the FOSC's Report explained:

Initially, senior RP management in Houston made major decisions outside the ICS [Incident Command System]. … *[I]t remained apparent that key strategic and*

---

[1]  BP's reliance on 33 U.S.C. § 1321 is misplaced; that section is irrelevant to superseding cause.  *See* 33 U.S.C. § 1321(c)(4)(B)(i) (expressly declaring a Responsible Party is not exempt from liability for removal costs or damages resulting from actions taken consistent with the National Contingency Plan or as otherwise directed by the President); § 1321(c)(4)(B)(iv) (no exemption if the person is grossly negligent or engaged in willful misconduct).

> *tactical planning occurred behind closed doors without government participation in the formulation of those plans.*   This changed in late May 2010 when the NIC representative vigorously insisted on participating in an internal RP meeting to assess the failed top kill, establishing a new paradigm.

TREX-9105.47 (emphasis added); *see also* Depo. of L. Herbst, 239:24-242:7 ("We [Admiral Cook and MMS Director of GoM Lars Herbst] attempted to sit in on a meeting that BP was having, and at that time we were – we were not allowed to – to enter the meeting.").

In its analysis of flow rate, BP plainly operated outside the federal framework.   *See, e.g.,* TREX-52673.17 (BP guilty plea: BP "had multiple internal documents with flow-rate estimates that were significantly greater than 5,000 BOPD that it did not share with Unified Command."); *see also* FOF ¶¶ 275-292.   BP made the decision: "[W]e are not releasing any information that can be related to rate," TREX-9475, and federal officials, once made aware at deposition of the withheld information, agreed that "BP was not being transparent."   FOF ¶¶ 279, 282, 286.[2]

### 3.   BP Mischaracterizes The Role Of The Federal Science Team And FRTG

Finally, despite misleading the Government about *both* flow rate and the Top Kill's likelihood of success, BP suggests that the Government somehow adopted or ratified its decision to attempt the Top Kill and its analysis of why the Top Kill failed because the Government had independent bodies assessing source control options and flow rate.   BP Br. 1-2, 11-13, 18-20. However, neither the Federal Science Team nor the FRTG was independently and contemporaneously able to evaluate BP's decision to perform the Top Kill or BP's immediate post-Top Kill recommendation to discard the BOP-on-BOP capping strategy.

---

[2]   *See* Depo. of M. Landry, 642:17-18, 21-23 ("[W]ith regard to those documents that you've shown me today, they were not being transparent."); Depo. of M. McNutt, 433:4-6, 8-13 (BP not "a willing partner" regarding flow rate), 464:18-23 ("I guess I'm not in the circle of trust."); Depo. of S. Chu, 232:2-4. 232:6-8 (confirming BP did not provide him or his team with the BP internal flow rate documents he was shown at his deposition).

4

BP recommended Top Kill to Government officials on May 16, 2010.   FOF ¶¶ 333, 336.
Secretary of Energy Steven Chu had arrived in Houston only four days earlier on May 12.
Depo. of S. Chu, 53:1-5, 7-8.   When he arrived, his Federal Science Team's role was diagnostic,
not prescriptive.   *Id.* at 63:24-64:2, 4-8 ("The initial reason why we went down to BP on May
the 12th was to help with the diagnostics of the condition of the well, and with those diagnostics,
*BP could plan a path*….") (emphasis added).   Only after the Top Kill failed, and after the BOP-
on-BOP had already been discarded, did the Federal Science Team perform independent
assessments of the Top Kill to assist in BP's source control efforts.   FOF ¶¶ 413-415.

Moreover, Secretary Chu confirmed that BP failed to inform him that there was a 15,000
BOPD limit on the momentum portion of the Top Kill.   Depo. of S. Chu, 303:25-304:6, 8-17.
BP instead falsely represented to Secretary Chu that the Top Kill was a "slam dunk."   *Id.* at
303:25-304:17, 308:9-16.   BP also concealed the 15,000 BOPD limit from key decision-makers
such as Admirals Allen and Landry,[3]  and "argue[d], compellingly, that [the Top Kill] would
work."   Depo. of S. Chu, 303:25-304:6, 8-17; *see also* Depo. of T. Allen, 517:19-518:6; Depo.
of M. Landry, 493:23-494:3.   In fact, BP represented that the Top Kill had a 60 to 80 percent
chance of success.   Depo. of S. Chu, 308:9-11, 13-16; TREX-11317.1; TREX-10532.2; *see also*
FOF ¶¶ 352-355.   BP had no basis for these confident projections, which contradicted what BP
knew about the flow rate and its impact on the Top Kill.   *See, e.g.,* J. Dupree, P2 TT 722:25-
723:13 ("[W]e never calculated [a] chance of success."); *see also* FOF ¶¶ 348-351.

---

[3]  The "responders" to whom BP disclosed the 15,000 BOPD limit were low-level National Labs scientists
(separate from Sec. Chu's Federal Science Team).   They were not decision-makers.   Moreover, BP instructed
these scientists to assume a 5,000 BOPD flow rate and falsely told them that it could not "provide a case" for higher
rates.   *See* TREX 9132 (listing participants at Kill the Well On Paper meeting); FOF ¶¶ 212-217.

The same story applies to the FRTG.   The FRTG was chartered on May 19, and Dr. McNutt was appointed to lead it on May 23—just three days before the Top Kill began.   FOF ¶¶ 322-323.   As the FRTG was attempting to ramp up, BP falsely told Dr. McNutt that BP's best estimate of the flow rate was 5,000 BOPD and that the Top Kill's chances of success did not depend on the flow rate.   Depo. of M. McNutt, 413:4-7, 11, 434:3-13.   Moreover, BP's failure to provide quality video of the flow and other information needed by the FRTG hampered the group's efforts to estimate the flow rate.   *See* FOF ¶¶ 324-325.

Thus, neither the Federal Science Team nor the FRTG was in a position before Top Kill to "independently calculate flow rate and evaluate source-control options, including the approval of Top Kill and the analysis of its failure," as BP claims.   BP Br. 14.[4]   Instead, BP's flow rate misrepresentations corrupted the decision to implement the Top Kill and then the analysis of why the Top Kill failed, which led to the BOP-on-BOP's abandonment.   FOF ¶¶ 293-299, 392-418.

**B.     Delays In Capping Resulted From BP's Actions And Inactions**

    **1.     BP's Own Decisions Created Concerns Over Rupture Disks**

BP claims its concerns about rupture disks excuse its delay in capping the well.   BP Br. at 15-16, 32.   But BP itself was responsible for the decision to use rupture disks.   *See, e.g.*, Depo. of P. Tooms, 99:10-100:3.   There is no evidence BP ever properly assessed the risks rupture disks posed to source control *before* drilling the well.   *See* Depo. of P. Tooms, 106:24-25, 107:2 (BP executive and 30(b)(6) on Well Integrity Analysis, testifying he "do[es]n't know" whether BP "consider[ed] the possibility of broaching in its design of rupture disks").   In fact,

---

[4] Indeed, BP contradicts its own arguments in its quantification brief.   BP's position in its source control post-trial brief is that the Federal Science Team and FRTG had sufficient information to independently calculate the flow rate (thereby presumably reducing the impact of BP's flow rate misrepresentations).   In its quantification post-trial brief, however, BP takes the opposite position and alleges that the Federal Science Team and FRTG's estimates in 2010 were "not based on careful scientific calculation or analysis."   See BP's Quantification Br. 1-2, 5-10.

there is evidence that BP's decision to include the rupture disks was based solely on its desire to save $7M in capital expenditures.   *See* TREX-7059 (option that includes rupture disks "is all that we can fund," but "please call if your capital situation changes and *we can do the right thing*," i.e., deploy an option without rupture disks.) (emphasis added).   But it was BP's duty "to make the calculations about things that affect the integrity of the well during source control before you drill the well so that you can plan your source control."   E. Ziegler, P2 TT 522:9-19. To the extent BP now blames the delay in capping the well on the rupture disks—contradicting its Phase One position[5]—BP is responsible for not addressing that risk before drilling.

### 2.   <u>If BP Lacked Data, It Was Through Its Own Actions and Inactions</u>

BP also misleadingly suggests that "uncertainty"—i.e., a lack of shut-in pressure and temperature data about the Well—justified its decision not to cap in early May and again after the Top Kill.   BP Br. 1, 14, 15, 22.   But it is undisputed that when BP eventually capped the well in mid-July, it acquired data that established the well had integrity and could remain shut in. Stipulated Facts, Rec. Doc. 7076, ¶138.   BP could have obtained this information in early May through the deployment of a simple capping stack—such as a BOP-on-BOP—equipped with temperature and pressure gauges.   E. Ziegler, P2 TT 533, 535-36; *see also* E. Ziegler P2 Expert Report, TREX-11578R at 26, 39; E. Ziegler Expert Rebuttal Report, TREX-11579R.6.   Since the well was in fact always safe to cap, a BOP-on-BOP would have successfully shut in the well, just as the capping stack eventually did.   The lack of pressure and temperature data before mid-July does not absolve BP of responsibility for delay.

---

[5]  BP previously maintained that its deployment of rupture disks had not "interfered with well-kill operations," had not "caused the post-incident well control efforts to be compromised," and that such disks "were not a weak link in the system."   D. Lewis P1 Expert Report, TREX 8098 at 6, 23.

C.     **BP's Misrepresentations Impacted Source Control**

1.     **BP Intentionally and Repeatedly Misrepresented The Flow Rate**

On at least fourteen separate occasions prior to Top Kill, BP defended 5,000 BOPD (or lower) as its "best estimate" of the flow rate—to Unified Command, to the public, to the National Labs Scientists, to Congress, and even to its own contractors and employees.[6] D25018A; FOF ¶¶ 176-208 (Unified Command); ¶ 211(to the public); ¶¶ 212-217 (to National Labs Scientists); ¶¶ 165-166 (to Congress); ¶¶ 218-220 (to its contractors); ¶¶ 377-381 (to BP employees designing Top Kill).   Moreover, BP made four of these misrepresentations in official communications to Unified Command or Congress.[7]

One of these misrepresentations—the Rainey Memo that was the basis of BP's guilty plea—illustrates BP's practice of downplaying the significance of higher flow rates and reassuring the Government that the best estimates were in the range of 5,000 BOPD.   *See* TREX-52673.17; J. Wilson, P2 TT 166:9-18.   This memo falsely represented 5,000 to 6,000 as BP's "best guess" estimate.   Although the memo also included some information about "absolute worst case flow rate[s]," "worst case theoretical flow," and "low probability worst cases," TREX-3218.6, .7, .16, .17, it failed to disclose much of BP's most recent and accurate modeling, such as Dr. Rygg's OLGA-Well Kill model showing flow rates of 37,000 to 87,000 BOPD.   FOF ¶ 207.   BP never disclosed that its engineers believed the 5,000 BOPD "had little

---

[6]  BP's disingenuous suggestion that the 5,000 BOPD number was generated by NOAA, BP Br. 19, contradicts Admiral Landry's "vivid recollection" of the origin of that number. *See* Depo. of M. Landry, 23:13-19. Regardless of its origin, BP adopted 5,000 BOPD as the "Most likely model" on May 10 and defended it publicly as the "best estimate."   *See* TREX 9155.

[7]  TREX 9628; Depo of M. Landry, 24:9-24; 192:8-193:1; 565:13-566:3 (at April 28, 2010, meeting, BP's Suttles drew a flow rate range of 1,000 to 5,000 BOPD on an easel with a line at 2,500 and said, "We estimate it to be 2,500.   That's our best estimate."); TREX 9155.4; TREX 9330.3 (On May 10, 2010, Suttles sent Admiral Landry a chart entitled "Macondo Reservoir Model" that simply "edit[ed] out" all the higher flow rates, leaving only two: a "worst case model" at 55,000 and a "most likely model" at 5,000.); TREX 3218.6, 15 (On May 19 and May 24, BP submitted the "Rainey Memo" to Unified Command and Congress); *see also* FOF ¶¶ 181-204.

if no origin," "erred on the low side," and was "optimistic," or that BP had taken deliberate steps to hide concerns about the 5,000 BOPD estimate.   *See* TREX-3220.1 (BP internal email: "[w]e should be very cautious standing behind a 5,000 BOPD figure as our modelling shows that this well could be making anything up to ~100,000 BOPD"); Depo. of M. Mason, 320:1-321:15 (the executive assistant to BP Exploration & Production's CEO said he had a "problem" with putting "the big number" in writing).

BP argues that the Government had flow rate estimates and thus the Court may ignore BP's misrepresentations, but the evidence BP cites (BP Br. 26) actually shows that the Government had no credible flow rates to contradict BP's "best estimate" of 5,000 BOPD.   BP, for example, relies on a NOAA email titled "Leak rate guestimate" that contains a one-off calculation which used the wrong diameter pipe (24 inches rather than 20 inches), did not correct for stock tank barrels, and was not sent to Unified Command.   *See* TREX 8895.[8]   BP also relies on a May 25 email from Dr. McNutt discussing the FRTG press strategy for the minimum estimate it ultimately announced on May 27.   *See* TREX 9652.1.   That email, drafted just one day before the Top Kill, acknowledged that the recently-established FRTG still "[didn't] have the exact numbers yet."   *Id*.   More fundamentally, BP had assured Dr. McNutt that flow rate did not impact the Top Kill's chances of success.   As a result, the FRTG email could not have prevented the Top Kill from going forward.

## 2.     Government Officials Overwhelmingly Testified That Flow Rate Mattered To Source Control Decisions

BP misleadingly suggests that Government officials believed flow rate was irrelevant to source control efforts.   BP Br. 23.   Government officials, however, repeatedly testified that

---

[8]  BP also cites TREX 9649 to support its claim that the Government had flow rates of 80,000 BOPD.   BP Br. 26.   But TREX 9649 is a 5/22/10 email discussing a range of 6,154 to 11,609 BOPD based on overflight data.

knowing flow rate estimates was critical to effective source control decision-making.   FOF ¶¶ 372-376.[9]   Both Admirals Landry and Allen testified that flow rate was important for source control operations.   Depo. of M. Landry, 559:23-560:1, 3-5 ("You want to know as accurate as possible the flow rate, in executing Source Control operations."); Depo. of T. Allen, 515:25-516:5 (flow rate "consequential …as it relates to the pressure in the well, and the various procedures associated with capping [and] containment, and so forth, and the potential integrity of the wellbore itself").   Indeed, Government officials repeatedly confirmed at deposition that they wanted to know about BP's flow rate modeling and that BP's modeling was material to their decision-making process.   FOF ¶¶ 303-309, 372-376; Depo. of M. Landry, 230:7-15, 511:14-17, 19 (Q: "Did BP have an obligation to provide the Coast Guard with any and all estimates it had regarding flow rate throughout the entire response effort?" A: "Yes."); Depo. of S. Chu, 192:24-193:16 ("[H]aving an accurate flow rate number [would have been] important to providing accurate scientific support to the decision makers in source control strategies."); Depo. of M. McNutt, 587:14-18, 587:22-588:5, 588:8-9 ("We systematically found that modeling was very helpful in decision-making throughout DEEPWATER HORIZON.").

### D.   BP's Conduct Corrupted Decision-Making And Prolonged The Spill

#### 1.   BP's Misrepresentations Caused The Top Kill To Be Favored Over Capping Strategies

The Top Kill was highly sensitive to flow rate.   FOF ¶¶ 338-341.   Modeling had shown the momentum kill portion of the Top Kill *would fail* at flow rates of 15,000 BOPD or higher.

---

[9]  BP relies on testimony about surface clean-up efforts, for which the Coast Guard had primary responsibility, not source control.   BP Br. 18.   Admiral Landry testified that initial discussions with BP about a "worst case scenario doctrine response" to up to 110,000 or 162,000 BOPD were focused on "the pollution response" and the "coastal response."   *See* Depo. of M. Landry, 460:24-462:18.   Admiral Allen also explained that it was Coast Guard clean-up resources—rather than source control decision-making—that would be unconstrained by any low flow rate estimates.   Depo. of T. Allen, 509:5-25.

TREX-8553.1.   Contrary to BP's arguments, the junk shot portion of the Top Kill likewise depended on the flow rate.   FOF ¶¶ 338-341; Depo. of S. Chu, 307:4-7, 307:9-22 (stating the junk shot was "dependent on flow rate").   Despite the warnings of its engineers about relying on the 5,000 BOPD estimate, BP designed the junk shot based on that low number.   TREX-9148.5;   FOF ¶¶ 342-347, 381.   That produced the over-optimistic assumption of a flow path through the BOP of just 1/2 inch—rather than a much larger hole that would preclude the junk shot from working.   TREX-9148.5, TREX-9675.12.

In contrast to the Top Kill, "modeling performed in May 2010 established that BOP-on-BOP was *insensitive to flow* and could be landed at worst-case flow estimates."   BP Br. 30 (emphasis added).   BP's Capping Stack Team Leader James Wellings confirmed that he knew of no analysis indicating there was a flow rate limit on the BOP-on-BOP option.   Depo. of J. Wellings, 456:5-457:17.   Further, Secretary Chu said he would have given the Top Kill "a lot more thought and calculations" and would have had "more discussion [with BP] as to whether it would be advisable to go forward" with the Top Kill had he seen BP's flow rate modeling at the time.   Depo. of S. Chu, 204:2-9, 204:12-205:1, 205:4-20.   BP's argument that its flow rate misrepresentations did not affect the decision to attempt Top Kill instead of BOP-on-BOP is simply not credible.[10]

### 2.   BP's Misleading Diagnosis Of The Top Kill's Failure Caused The Abandonment Of The BOP-on-BOP Option On May 29

At trial BP experts agreed that "massive flow" through the rams not only was "the truth," but was a realistic explanation at the time for why the Top Kill failed.   I. Adams, P2 TT

---

[10]   Further, contrary to BP's filings, HESI corporate representative Richard Vargo did not testify that the "mitigations BP put in place before commencing the Top Kill procedure demonstrated sound engineering practices." BP FOF ¶ 518.   Vargo testified only that the identification of risks and taking steps to mitigate those risks in connection with the Top Kill was an appropriate thing to do and that HESI did so.   Depo. of R. Vargo, 217:13-218:7.

1129:18-1131:11, 1136:23-1137:7.   However, on May 29, 2010, BP falsely told the Government that massive flow was "not plausible" and "not consistent" with the evidence, and that the *only* plausible explanation for the Top Kill's failure was that the collapse disks were open.   Depo. of K. Cook, 158:3-8, 11-15 ("I'm telling you, from being there, that the context was *that there was no other plausible scenario being presented* [besides the rupture disks], only that one for the failure of top kill."); I. Adams, P2 TT 1140:16-25; *see* TREX-11614.

The parties have stipulated that the decision to abandon BOP-on-BOP was made on May 29, the day of BP's false presentation.   Rec Doc. 7076, ¶ 83.   The Federal Science Team did not begin its independent assessment of the Top Kill until May 30.   Thus, by the time the Science Team later found that rupture disks *were not* the only plausible solution, the effect of BP's fraudulent May 29 presentation had already come to pass; the BOP-on-BOP capping strategy had been discarded.   FOF ¶¶ 413-415.

BP's argument that it would not have moved to collection efforts if it were trying to hide the flow rate overlooks two key points.   First, BP's guilty plea establishes that—whatever its underlying motivation—it did intentionally conceal flow rate information during the critical April and May time period.   Second, BP's recommendation of a strategy that *eventually* could yield flow rate data was a far cry from BP disclosing on May 29 that its engineers *already* had calculated flow rates that were far higher than 5,000 BOPD—BP's supposed best estimate—and 15,000 BOPD—the limit on a successful Top Kill.   That BP was willing to support a collection strategy thus says little about whether BP was concealing internal flow rate analyses.

### 3.   BOP-On-BOP Could Have Been Used In Early June Or Sooner

BP does not even contest that a BOP-on-BOP option could have been ready by early June.   *See* BP Br. 29 (acknowledging that "June 6 [w]as the earliest date that BOP-on-BOP

could be installed").   In fact, BP's own documents and testimony show the BOP-on-BOP could

have been used by then.   For example:

- By May 3, 2010, maintenance on the Enterprise BOP was "finished," and the team was "waiting on [the] HC connector to start BOP testing."   TREX-11229. 2; Depo. of J. Wellings, 146:3-11; *see also id.* at 145:12-23 (explaining that the May 5 meeting minutes attached to a May 3 email are "probably" May 3 meeting minutes).   BP's HAZID for the BOP-on-BOP procedure notes that as of May 6, 2010, "Testing of [the] Enterprise BOP prior to deployment" was "completed." TREX-9787.0013 (BP BOP-on-BOP HAZID).

- On May 12, 2010, BP's Capping Team Leader James Wellings wrote that the "Enterprise option BOP on BOP [was] ready to go."   TREX-11230.1.   Wellings corroborated this assessment in a later email, writing that "[w]e were in a position early on to install a cap and the decision was made to do the top kill first." TREX-8542.1 (8/26/10 Wellings email re: Jim Wellings Way Forward).

- On May 13, 2010, a BP Peer Assist concluded that: (a) "the BOP on BOP operation is feasible and can be managed safely"; (b) the "[k]ey risks had all been identified–no significant additional risks [were] identified by [the] review team"; and (c) an "[a]mazing amount of work [had] been done – great job in short time." TREX-10505.0005.   BP engineers agreed that BOP-on-BOP was feasible and could be managed safely.   Depo. of J. Wellings, 111:18-112:10, 112:12-17 ( "[BOP-on-BOP] was obviously a feasible solution that we presented, and we worked through and mitigated the risks involved"); Depo. of C. Holt, 87:18-21, 87:24-88:2, 88:4-5 (BP's 30(b)(6) witness testifying, "It says you can do it with the identified mitigation of the risk.").

- BP's Gantt chart dated "29-May 0900" projected that the well would be shut in with the *DDII* BOP on June 6, 2010.   TREX-11261N.2.BP.

- Charles Holt, BP's 30(b)(6) witness for the BOP-on-BOP effort, similarly believed the BOP-on-BOP was ready to splash by May 30, 2010.   Depo. of C. Holt, 18:2-17, 66:1-10, 231:8-11, 231:13-16.

In short, the BOP-on-BOP was ready and would have safely capped the well long before

July 15.   FOF ¶¶ 419-454, 466-482; TO and HESI's Phase Two Post-Trial Brief, 13-15.

### E.   BP's Lack Of A Plan To Respond To A Blowout Caused A Longer Spill

As the factual discussion in the PSC's briefing lays out, BP had only the barest outline of

a source-control plan.   With a real plan, the well could have been capped within weeks, if not

days.   BP argues that because all blowouts are unique, it is unrealistic to think it could have had

13

a pre-built capping stack for use at Macondo.   But BP's argument ignores its own documents showing that BP recognized and identified a capping stack solution as a well control response *prior to* the Macondo blowout.   *See* FOF ¶¶ 126,131.   BP also ignores its Master Services Agreement with Wild Well Control, Inc., in which Wild Well Control offered a capping stack before the Macondo blowout; BP simply chose not to utilize that resource.   *See* FOF ¶ 127. Finally, BP disregards the fact that it now has a pre-built capping stack with a range of adapters that can shut in any BP well in the world regardless of the type of blowout—a fact that BP claims makes it a "better safer energy company."   TREX-11640; *see also* FOF ¶ 134.[11]

**F.   BP's Conduct Amounts To A Superseding Cause And Should Increase BP's Allocation Of Fault**

It was entirely unforeseeable that in responding to the spill, BP would have no plan to respond and would engage in a pattern of misrepresentations about the flow rate that would lead to (a) the decision to favor Top Kill over BOP-on-BOP and (b) the decision to abandon the BOP-on-BOP option after Top Kill's failure.   This unforeseeable misconduct is a superseding cause of harm caused by oil discharged after the well should have been capped, and BP should be solely liable for the resultant damages.   *See generally Protectus Alpha Navigation. Co. Ltd. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379, 1384 (5th Cir. 1985).

BP wrongly argues that this Court "already rejected" a superseding cause defense when it ruled BP and Anadarko were jointly and severally liable for OPA damages.   BP Br. 39-40 (citing Rec. Doc. 5809 at 12).   This Court's OPA order (Rec. Doc. 5809) has nothing to do with superseding cause.   The Court found that BP and Anadarko, as responsible parties for

---

[11]   Despite this evidence, BP asserts "[i]t cannot be said with any degree of engineering certainty that the well could have been shut in within weeks, even with a pre-built capping stack."   *See* BP's FOF ¶¶ 981-992.   But the Aligned Parties' expert "formed [his] opinions" that the well could have been shut in earlier "based on a reasonable degree of engineering and safety industry certainty."   *See* E. Ziegler, P2 Expert Report at p. 11.

subsurface discharge, could be held jointly and severally liable for damages to the United States; it held Transocean was *not* a responsible party for that discharge and was only a responsible party for above surface discharge; and it did not address HESI at all.   *Id.* at 5-15.   Transocean and HESI have asserted their superseding cause defense under maritime law (Rec. Docs. 8803, 8809), where it is firmly established by the Supreme Court.   *See Exxon Co. v. Sofec, Inc.*, 517 U.S. 830, 836 (1996).

Apart from superseding cause, any fault allocation should take into account BP's sole responsibility for prolonging the spill.   *See, e.g.*, *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975).   But for BP's misrepresentations and its lack of preparation, the well would have been capped long before July 15.   BP cites no authority for the proposition that it should be allocated no additional fault (BP Br. 40), and there is no basis for BP to get a free pass for conduct that caused delays in source control.[12]   *See, e.g.*, *Stolt Achievement v. Dredge B.E. Lindholm*, 447 F.3d 360, 370 (5th Cir. 2006) (Court must take into account "the number and quality of faults by each party.").

## III.   CONCLUSION

For the reasons set forth above and in Transocean and HESI's Opening Brief, this Court should find that BP's conduct constitutes a superseding cause and should account for BP's Phase Two conduct in its ultimate fault allocation, resulting in a significantly higher allocation of fault to BP.

---

[12]  BP attempts to elevate Transocean's and HESI's roles in the source control efforts.   *See, e.g.* BP FOF ¶¶ 1969, 1971, 1974-1975; BP Br. 7, 27-29, 40.   But there are no allegations, nor is there any evidence, that Transocean or HESI had any decision-making authority over which source control procedures to employ.   *See, e.g.*, FOF ¶¶ 581-589, 593-600.

DATED: January 24, 2014                              Respectfully submitted,


By: /s/ Brad D. Brian                                By: /s/ Steven L. Roberts
Brad D. Brian                                        Steven L. Roberts
Michael R. Doyen                                     Rachel Giesber Clingman
Luis Li                                              Sean Jordan
Grant Davis-Denny                                    SUTHERLAND ASBILL & BRENNAN LLP
Daniel B. Levin                                      1001 Fannin Street, Suite 3700
MUNGER TOLLES & OLSON LLP                            Houston, TX   77002
355 So. Grand Avenue, 35th Floor                     Tel: (713) 4710-6100
Los Angeles, CA   90071                              Fax: (713) 354-1301
Tel: (213) 683-9100                                  Email:  steven.roberts@sutherland.com
Fax: (213) 683-5180                                          rachel.clingman@sutherland.com
Email:  brad.brian@mto.com                                   sean.jordan@sutherland.com
        michael.doyen@mto.com
        luis.li@mto.com
        grant.davis-denny@mto.com
        daniel.levin@mto.com

John M. Elsley                                       By: /s/ Kerry J. Miller
ROYSTON, RAYZOR, VICKERY &                           Kerry J. Miller
WILLIAMS LLP                                         FRILOT, LLC
711 Louisiana Street, Suite 500                      1100 Poydras Street, Suite 3800
Houston, TX   77002                                  New Orleans, LA   70163
Tel: (713) 224-8380                                  Tel: (504) 599-8194
                                                     Fax: (504) 599-8154
                                                     Email:   kmiller@frilot.com

**Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean
Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.**

**GODWIN LEWIS PC**

By: /s/ Donald E. Godwin                             Bruce W. Bowman, Jr.
Donald E. Godwin                                     State Bar No. 02752000
*Attorney-in-charge*                                 Bruce.Bowman@GodwinLewis.com
State Bar No. 08056500                               Renaissance Tower
Don.Godwin@GodwinLewis.com                           1201 Elm, Suite 1700
Renaissance Tower                                    Dallas, Texas 75270-2041
1201 Elm, Suite 1700                                 Telephone: (214) 939-4400
Dallas, Texas 75270-2041                             Facsimile: (214) 760-7332
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Jenny L. Martinez                                    Floyd R. Hartley, Jr.

16

State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Gavin E. Hill
State Bar No. 00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

Jerry C. von Sternberg
State Bar No. 20618150
Jerry.VonSternberg@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

Misty Hataway-Cone
State Bar No. 24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**Attorneys for Defendant Halliburton Energy Services, Inc.**