UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | MDL NO. 2179<br><br>SECTION "J" (1)<br><br>JUDGE BARBIER |
| *This Document Relates to All Cases* | MAGISTRATE JUDGE SHUSHAN |

**JOINT MEMORANDUM OF TRANSOCEAN, THE PLAINTIFFS' STEERING COMMITTEE AND THE STATE OF ALABAMA REGARDING BP ADMISSIONS RELEVANT TO PHASE TWO**

i

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................................1
II.  BACKGROUND .................................................................................................................2
III. LEGAL STANDARD ..........................................................................................................5
IV. ARGUMENT .......................................................................................................................6
V.  CONCLUSION ....................................................................................................................9

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Chieftain Int'l (U.S.), Inc. v. Southeast Offshore, Inc.*,
    553 F.3d 817 (5th Cir. 2008) ............................................................................................. 5, 6

*Garcia v. Woman's Hosp. of Texas*,
    97 F.3d 810 (5th Cir. 1996) ................................................................................................... 6

*Greer v. Tidewater, Inc.*,
    No. Civ.A. 01–105, 2002 WL 1041862 (E.D. La. May 20, 2002) ........................................ 5

*In re Oil Spill by Oil Rig DEEPWATER HORIZON in Gulf of Mexico, on April 20, 2010*,
    No. MDL 2179, 2012 WL 441134 (E.D. La. Feb. 10, 2012) ................................................ 6

*United States v. Yi*,
    460 F.3d 623 (5th Cir. 2006) ................................................................................................. 6

**FEDERAL RULES**

Fed. R. Evid. 801(d)(2)(D) .............................................................................................................. 6

I.     **INTRODUCTION**

On December 18, 2013, BP employee Kurt Mix was convicted of obstructing justice by deleting text messages he sent to his BP supervisor regarding the source control effort. BP's George William Kirton, who led the Top Kill effort but was not deposed in Phase Two, testified at Mix's trial and admitted facts which confirm that BP's lies about the oil flow rate in May 2010 corrupted the source control process.

In particular, Kirton admitted under oath that:

- His group at BP planned for the Top Kill by assuming a flow rate of 5,000 BOPD.
- BP presented the Top Kill to the Government for a go/no go decision on May 23, 2010 using an assumed flow rate of 10,000 BOPD.
- At the Kill the Well On Paper meeting on May 17, 2010, the flow rates that were discussed were 5,000 BOPD—a flow rate at which the Top Kill would likely work—and 15,000 BOPD—a flow rate at which the Top Kill would not work. Kirton would have remembered if higher flow rates had been discussed because they would have been "a significant deviation from the base plan of five to ten to 15,000 barrels a day."
- Flow rate was "the key assumption that you really have for everything you do with planning for this Top Kill effort."
- Even though Kirton was assigned to lead the Top Kill effort, he was not aware, prior to the Top Kill, of BP's internal flow rate modeling showing rates much higher than 5,000 BOPD.

These sworn admissions are directly relevant to Phase Two because they confirm that BP's flow rate lies distorted source control decision-making both within BP and within the Government.

1

Because Kirton is a BP employee who led the Top Kill effort, his statements regarding the Top Kill fall firmly within the scope of his employment and are therefore imputed to BP as party admissions. The Moving Parties respectfully request that the Phase Two record be reopened for the limited purpose of considering this new evidence of BP's sworn admissions.

## II.     BACKGROUND

Kurt Mix is a BP employee who was involved in the flow rate analysis and source control efforts that are at issue in Phase Two of this trial. As the Phase Two evidence shows, Mix both wrote and received many email and text messages regarding flow rate and the Top Kill, including a text message that Mix authored on the second day of the Top Kill effort in which he reported that there was "[t]oo much flowrate - over 15000 and too large an orifice." TREX 9160.1.

At the conclusion of his criminal trial, Mix was found guilty of a charge that he "did corruptly alter, destroy, mutilate, and conceal, a record and object; namely, electronic data contained within an electronic device, to wit: an iPhone containing text messages with SUPERVISOR, and attempted to do so, with the intent to impair its integrity and availability for use in an official proceeding." Indictment, Rec. Doc. 7, at 4 (2:12-cr-00171).

One of the witnesses at Mix's criminal trial was BP employee George William ("Bill") Kirton. *See* Holt Depo. at 170:11-13 ("Q. Bill Kirton, who does he work for? A. BP."). During the Macondo response, BP's Mark Patteson assigned Kirton to serve as "the leader of the Top Kill effort," a position that required him to "evaluate the situation and develop an engineering plan that would enable [BP] to kill the well." Exh. A (excerpts of testimony of Bill Kirton from Kurt Mix trial) at 1470:5-13, 1507:5-13, 1507:23-1508:3. In planning for the Top Kill attempts, Kirton relied on Mix as one of his "go-to guys." Exh. A at 1474:21-1475:1.

2

Testifying under oath at Mix's trial, Kirton admitted that the flow rate of the oil coming out of the well was "one of the key assumptions, of course" in planning for the Top Kill and that the Top Kill operation was planned using an assumed flow rate of 5,000 BOPD. Exh. A at 1476:1-17. Kirton explained that the 5,000 BOPD figure was given to him by his supervisor, Patteson, and that 5,000 BOPD was the number that both he and others at BP were using for the flow rate. Exh. A at 1476:11-25, 1486:9-12.

Kirton further admitted that on May 23, 2010 (three days before the first Top Kill attempt), when BP met with the Government for an "executive go/no go meeting" regarding the Top Kill, BP presented the Top Kill using an assumed flow rate of 10,000 BOPD. Exh. A at 1490:8-21, 1493:1-8, 1497:13-21; *see* TREX 142710N.6 (May 23 presentation slides with 10,000 BOPD assumed flow rate). Kirton testified that he was the one who selected the 10,000 BOPD number for the presentation slides—in consultation with his team—and that the 10,000 BOPD figure was "*the key assumption that you really have for everything you do with planning for this Top Kill effort*." Exh. A at 1498:15-1499:15 (emphasis added). According to Kirton, he selected the 10,000 BOPD figure instead of 5,000 BOPD because he "wanted to see what was the most we could actually kill the well at," "needed to make sure that we had the right equipment out there to kill a well that was flowing 10,000 barrels a day," and "really wanted to see what the maximum you should be prepared to kill for, not just the minimum." Exh. A at 1498:2-14.

Kirton did not recall Mix objecting to the use of the 10,000 BOPD figure. According to Kirton, he would have remembered any such objection because it would have been "significant." In particular, if Mix had voiced an objection to the 10,000 BOPD figure, Kirton would have

3

evaluated and tested the assumed flow rate and approached his supervisors if the objection was meritorious.  Exh. A at 1499:1-17.

Kirton testified that this May 23 Top Kill meeting, at which BP presented 10,000 BOPD as the assumed flow rate, was "huge" in importance, because it represented "a culmination of nearly a month of absolute killer work" and "was the moment that we were either going to do [the Top Kill] or we weren't."  Exh. A at 1496:22-1497:3.  BP gave the presentation to "a packed room" that included "high-up government officials" like Secretary Ken Salazar and Admiral Mary Landry, along with BP "senior vice president executives" such as Mark Patteson, Henry Thierens, and Jonathan Sprague.  Exh. A at 1490:8-23, 1494:6-14.

Kirton also testified about the Kill the Well on Paper (KWOP) meeting that he attended a few days earlier, on May 17, 2010.  Exh. A at 1483:5-9.  Kirton explained that the purpose of the KWOP meeting was to "talk about the work that had been done" in preparing for the Top Kill, "challenge the assumptions," and "make sure everybody is in agreement that we have got the right kind of plan going forward."  Exh. A at 1483:16-22.  Kirton testified that the KWOP was also a "go, no go meeting" at which the decision whether to attempt the Top Kill was to be made based on whether the plan was correct or flawed.  Exh. A at 1483:23-1484:5.

Kirton did not recall either Mix or BP contractor Ole Rygg reporting at the KWOP meeting that they had modeled flow rates higher than 15,000 BOPD.  Kirton testified that he would have remembered such a discussion because higher flow rates would have been "a significant deviation from the base plan of five to ten to 15,000 barrels a day."  Exh. A at 1485:1-13.  The flow rate numbers Kirton recalled being discussed at the KWOP meeting were 5,000 BOPD as "the base case" and "15,000 as not working."  Exh. A at 1485:14-18.

4

Despite being the leader of the Top Kill effort, Kirton testified that he was not aware of certain internal BP flow rate information. For example, Kirton did not learn prior to the Top Kill that Mix and Rygg had been doing their own flow rate calculations and had modeled flow rates far higher than 5,000 BOPD. Exh. A at 1479:12-18, 1481:11-1482:14.[1] Kirton testified that he would have found the high modeled flow rates "significant in preparing for the Top Kill effort," because they were "significantly higher" than the flow rate at which BP knew the Top Kill could not succeed. Exh. A at 1482:15-19.

### III. LEGAL STANDARD

Before the entry of judgment, a district court retains broad discretion to reopen the evidentiary record to consider additional proof, and a decision to reopen will not be disturbed on appeal "in the absence of a showing that it has worked an injustice in the cause." *Chieftain Int'l (U.S.), Inc. v. Southeast Offshore, Inc.*, 553 F.3d 817, 820 & n.8 (5th Cir. 2008); *see also Greer v. Tidewater, Inc.*, No. Civ.A. 01–105, 2002 WL 1041862, at *2 (E.D. La. May 20, 2002) (Barbier, J.) ("The Court has broad discretion in ruling on a party's motion to reopen the record for the admission of additional evidence."). Indeed, BP itself has moved to reopen and supplement the Phase One record by admitting evidence that BP characterizes as a party admission by the Government (*see* Rec. Docs. 11005, 11631). As BP argues in its briefs, the Court may reopen the record to admit "new evidence relevant to the issues in this litigation." Rec Doc. 11005 at p. 1; *see also* Rec Doc. 11631 at p. 3 (arguing that record should be reopened to admit "new and material information").

---

[1] Although Kirton received via email a report from Mix containing modeled flow rates much higher than 5,000 BOPD on May 9, 2010, Kirton testified that he did not open or read the report. He admitted that, in retrospect, the report is something he should have reviewed. Exh. A at 1480:12-1482:3, 1482:12-1483:3; *see* TREX 9159.1-2 (May 9 report addressed to BP's Jonathan Sprague and containing modeled flow rates up to 87,000 BOPD).

5

In deciding whether to reopen the record, a district court must consider "the importance and probative value of the evidence, the reason for the moving party's failure to introduce the evidence earlier, and the possibility of prejudice to the non-moving party." *Chieftain*, 553 F.3d at 820. Where evidence is highly probative as to an element of a party's claim, it may be an abuse of discretion to refuse to reopen the record to consider such evidence. *Garcia v. Woman's Hosp. of Texas*, 97 F.3d 810, 814 (5th Cir. 1996) (holding that district court abused its discretion in denying motion to reopen to admit testimony that would have established element of causation necessary to plaintiff's claim).

### IV. ARGUMENT

The Court should exercise its discretion to reopen the Phase Two record for the limited purpose of admitting significant admissions made by Bill Kirton when he testified under oath at the Mix trial.

Statements offered against an opposing party are not hearsay if the statements were made by the opposing party's "agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D); *see also United States v. Yi*, 460 F.3d 623, 634 (5th Cir. 2006) (holding that statements made by criminal defendant's employee were admissible against defendant under Rule 801(d)(2)(D)); *In re Oil Spill by Oil Rig DEEPWATER HORIZON in Gulf of Mexico, on April 20, 2010*, No. MDL 2179, 2012 WL 441134, at *1 (E.D. La. Feb. 10, 2012) (admitting email sent by Andarko employee "against Anadarko (and no other party) as an admission under Fed. R. Evid. 801(d)(2)(D)").

Although most of the testimony from the Mix trial constitutes hearsay that may not be admitted into the Phase Two record, Kirton's testimony is admissible against BP under the party admission rule. Kirton is a BP employee who was involved in the Macondo response effort and, in fact, was assigned to lead the Top Kill effort.

6

Because Kirton's testimony confirms evidence and argument presented by the Aligned Parties at the Phase Two trial and contradicts testimony provided by other BP witnesses, it is highly probative. Kirton made five admissions that the Court should consider.

*First*, Kirton admitted under oath that BP's plan for the Top Kill assumed a flow rate from the well of 5,000 BOPD. Exh. A at 1476:1-17. Kirton testified that his supervisor, Mark Patteson, gave him the 5,000 BOPD figure, which was the same number that others at BP were using for the flow rate. Exh. A at 1476:11-25, 1486:9-12. As the Phase Two evidence shows, BP had an extensive body of modeled flow rate ranges far in excess of 5,000 BOPD. That BP planned for the Top Kill by assuming a flow rate of 5,000 BOPD demonstrates that BP's policy of not sharing flow rate information internally or externally directly corrupted BP's evaluation, selection, and pursuit of the Top Kill operation. See TREX 9475.3 (May 17, 2010 email from BP's Richard Lynch to BP's Adam Ballard cautioning that "[w]e remain in a position where no flow related information can be released internally or externally.").

*Second*, Kirton admitted under oath that BP presented the Top Kill operation to top-level government officials for approval based on an assumed flow rate of 10,000 BOPD. Exh. A at 1490:8-21, 1493:1-8, 1497:13-21; *see* TREX 142710N.6 (May 23 presentation slides with 10,000 BOPD assumed flow rate). Kirton testified that in consultation with his team, he selected the 10,000 BOPD flow rate for the presentation to the Government. Because BP had internal modeling reflecting flow rates much higher than 10,000 BOPD, BP's presentation sought and secured Government approval for the Top Kill based on a misrepresentation of BP's modeled flow rates.

*Third*, Kirton admitted under oath that the flow rate was highly relevant to the Top Kill's likelihood of success. Kirton testified that flow rate was "one of the key assumptions, of course"

7

in planning for the Top Kill; in fact, Kirton admitted, flow rate was "*the* key assumption that you really have for everything you do with planning for this Top Kill effort."  Exh. A at 1476:1-19, 1498:15-1499:15 (emphasis added).  These admissions contradict BP's previous claims that flow rate was irrelevant to the Top Kill.  *See, e.g.*, J. Dupree P2 TT 653:11-18  (testifying that "the flow rate wasn't relevant" to the Top Kill operation).  Because the flow rate was indeed relevant to the Top Kill's chance of success, BP's failure to share all of its internal flow rate modeling with government decision-makers prevented the Government from making an informed decision before authorizing the Top Kill to go forward.

*Fourth*, Kirton admitted that at the Kill the Well On Paper meeting on May 17, 2010, the flow rates that were discussed were 5,000 BOPD and 15,000 BOPD.  Kirton testified that he would remember if higher flow rates had been discussed because they would have been "a significant deviation from the base plan of five to ten to 15,000 barrels a day."  Exh. A at 1485:1-13.  BP has emphasized that certain lower-level government scientists attended the KWOP meeting at which BP presented the 15,000 BOPD flow rate limit on the dynamic kill.  However, the fact that BP presented the 15,000 BOPD limit without presenting its flow rate modeling in excess of 15,000 BOPD only further establishes that BP withheld information that was critical to Top Kill decision-making.

*Fifth*, Kirton admitted that even though he was assigned to lead the Top Kill effort, he was not aware of BP's internal flow rate modeling showing rates much higher than 5,000 BOPD prior to the failed Top Kill attempts.  Kirton testified that had he known of BP's high modeled flow rates, he would have found them "significant in preparing for the Top Kill effort," because they were "significantly higher" than the flow rate at which BP knew the Top Kill could not succeed.  Exh. A at 1482:15-19.  This demonstrates that BP's policy of concealing flow rate

8

information even from its own employees prevented BP's own Top Kill operational leader from making informed recommendations or decisions on whether to go forward with the Top Kill.

V.     **CONCLUSION**

For the foregoing reasons, the Court should grant the Moving Parties' motion to reopen the Phase Two record to admit Bill Kirton's sworn testimony against BP.


DATED:  January 24, 2014

By: /s/ Brad D. Brian
Brad D. Brian
Michael R. Doyen
Grant Davis-Denny
Daniel B. Levin
MUNGER TOLLES & OLSON, LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA  90071
Tel: (213) 683-9100
Fax: (213) 683-5180
Email:  brad.brian@mto.com
         michael.doyen@mto.com
         grant.davis-denny@mto.com
         daniel.levin@mto.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX  77002
Tel: (713) 224-8380

Respectfully submitted,

By: /s/ Steven L. Roberts
Steven L. Roberts
Rachel Giesber Clingman
Sean Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, TX  77002
Tel: (713) 4710-6100
Fax: (713) 354-1301
Email:  steven.roberts@sutherland.com
         rachel.clingman@sutherland.com
         sean.jordan@sutherland.com

By: /s/ Kerry J. Miller
Kerry J. Miller
FRILOT, LLC
1100 Poydras Street, Suite 3800
New Orleans, LA  70163
Tel: (504) 599-8194
Fax: (504) 599-8154
Email:  kmiller@frilot.com
**Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.**

| | |
|---|---|
| /s/ Stephen J. Herman<br>Stephen J. Herman, La. Bar No. 23129<br>HERMAN HERMAN & KATZ LLC<br>820 O'Keefe Avenue<br>New Orleans, Louisiana 70113<br>Telephone: (504) 581-4892<br>Fax No. (504) 569-6024<br>E-Mail: sherman@hhkc.com | s/ James Parkerson Roy<br>James Parkerson Roy, La. Bar No. 11511<br>DOMENGEAUX WRIGHT ROY<br>& EDWARDS LLC<br>556 Jefferson Street, Suite 500<br>Lafayette, Louisiana 70501<br>Telephone: (337) 233-3033<br>Fax No. (337) 233-2796<br>E-Mail: jimr@wrightroy.com<br>**Plaintiffs' Liaison Counsel** |

LUTHER STRANGE
Attorney General
/S/ Corey L. Maze
COREY L. MAZE
Special Deputy Attorney General
WINFIELD J. SINCLAIR
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
(334) 353-4336 (phone)
(334) 242-4891 (fax)
**Attorneys for the State of Alabama**

**CERTIFICATE OF SERVICE**

  I hereby certify that on January 24, 2014, I electronically filed the foregoing with the Court's CM/ECF system and service on all counsel of record by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

                  /s/ Kerry J. Miller
                  Kerry J. Miller