# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| CIV. No. 10-4536 | : | MAGISTRATE JUDGE SHUSHAN |

......................................................................................................................................

# UNITED STATES OF AMERICA'S POST-TRIAL RESPONSE BRIEF
# FOR PHASE TWO QUANTIFICATION SEGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................3

I.      The Evidence Shows That Erosion Affecting The Flow Rate Concluded
Early In The Spill, Validating The United States' Estimate And Showing
That BP's Trial Estimate Cannot Be Correct ...........................................3

        A.     Evidence Shows Erosion Occurred Quickly and then
Stopped Affecting Flow Rates ....................................................4

        B.     BP Failed to Demonstrate that Erosion Affected Flow Rates ...................8

              1.     Dr. Nesic's opinion relies on flawed modeling
and an unreasonable sand production assumption .........................8

              2.     Dr. Momber's opinion relies on the unfounded assumption
that the well cement was set ...........................................11

        C.     Dr. Zaldivar's Analysis Contradicts BP's Erosion Claims and
Supports the United States' Experts' Estimates .........................11

II.     The United States' Evidence Shows
That The Total Discharge Was 5 Million Barrels .................................12

        A.     The August 2010 Estimate Does Not Undercut the Work Presented
by the United States' Experts at Trial .......................................13

        B.     BP's Individual Criticisms of the United States' Experts
Are without Merit ....................................................................15

        C.     Dr. Blunt's Wellbore Cooling Calculations Are Irrelevant and
Do Not Affect the Accuracy of the United States' Estimates .................17

III.    BP's Trial Estimates Are Contradicted By The Evidence And By BP's
        Own Prior Conclusions During The Response And Phase One ...........................18

        A.    Dr. Blunt Uses a Flawed Methodology and Relies on a
              Highly Uncertain Input for Rock Compressibility  ...................................18

        B.    Dr. Gringarten's Estimate Is Skewed by His Use of a Permeability
              Input Far Lower than Anyone Used in the Response or Litigation .........22

IV.     In Calculating The Total Discharge, The Court Should Include All Oil
        And Use Multi-Stage Separation, Just As BP Did During The Response ...........23

CONCLUSION ..........................................................................................................................25

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*In re Corrugated Container Antitrust Litigation*, 659 F.2d 1322 (5th Cir. 1981)....... 12-13

*Marcel v. Placid Oil Co.*, 11 F.3d 563 (5th Cir. 1994).......................................................18

*Mendoza v. Placentia Yorba Linda Unified Sch. Dist.*, 278 Fed. Appx. 737
  (9th Cir. 2008)...................................................................................................................10

*United States v. CITGO Petroleum Corp.*, 723 F.3d 547 (5th Cir. 2013) ..........................2

**FEDERAL STATUTES**

33 U.S.C. § 1321(b)(7) ........................................................................................................23

**FEDERAL REGULATIONS**

40 C.F.R. § 19.4 ...................................................................................................................23

## INTRODUCTION

At trial the United States presented four experts who used different methods but came to similar results: a total discharge from the Macondo Well of 5 million barrels. BP[1] responded by presenting two experts who opined that the total flow was 3.26 million barrels (or less). To reach their conclusions, BP's trial experts had to deviate from the conclusions that BP reached during the response and Phase One about the best estimates for several critical input parameters. BP also argued that the 5 million barrel estimate presented by the United States at trial was too high because erosion in the flow path resulted in a steadily increasing flow rate for at least the first half of the spill. This claim too runs counter to BP's statements during the response and Phase One. The evidence shows that the total discharge from the well was about 5 million barrels, consistent with the "emerging consensus" of the scientific community. *See* U.S. Phase 2 Proposed Findings of Fact, Doc. No. 12048-1 ("US FoF") No. 241-242.

The total discharge estimate begins with the final day flow rate. BP concedes that an accurate estimate of the flow rate could be obtained based on the Capping Stack period. *See* BP Phase 2 Proposed Findings of Fact and Conclusions of Law, Doc. No. 12047 *(*"BP FoF") No. 1157. During the response, several BP internal experts estimated the final day flow rate and came up with values from 51,500 to 62,000 barrels per day, consistent with the United States' experts' estimate of 53,000 barrels. At trial, BP did not present evidence on the final day flow rate; it is undisputed.

The final day flow rate is critical because it anchors the 86-day flow rate trend. Once that flow rate is known, the only remaining question is how the rate changed over time (if at all). The Parties agree that the reservoir pressure declined over the course of the spill as oil escaped into

---

[1] BP and Anadarko presented jointly at trial. We refer to BP for brevity in this brief.

1

the Gulf of Mexico. *See, e.g*., BP Phase Two Post-Trial Brief, Doc. No. 12044 ("BP Br.") at 37. This process of reservoir depletion, which occurs anytime oil is produced from a reservoir, means that the flow rate will decline over time as the pressure pushing oil out of the reservoir declines. Reservoir depletion means a daily flow rate trend that decreases from the start of the spill to the end of the spill. Thus, if the final day flow rate is 53,000 barrels, the total discharge must be more than 4.6 million barrels (86 days x 53,000 barrels).

BP contends the opposite: that the flow rate *increased* over time. BP argues that for at least the first five weeks of the response, slow erosion caused flow rates to increase. BP's own findings from the response and its Phase One evidence contradict BP's slow erosion theory. Erosion is critical to BP's case because without proof of slow erosion, BP's trial estimate of 3.26 million barrels *cannot* be correct. Moreover, BP's initial post-trial brief demonstrates that erosion is the only significant criticism it has of the United States' experts.

For BP to prevail, it must prove both that Dr. Blunt's trial estimate is correct *and* that erosion caused the flow rate to increase over at least the first half of the spill (because Dr. Blunt's estimate simply cannot be correct unless the flow rate was increasing over time).[2] Those contentions require deviating from BP's own conclusions during the response and Phase One at a series of critical points and for each of BP's key Quantification trial experts:

---

[2] BP suggests that the United States bears the burden of proof on the amount spilled. *See* BP Br. at 2; BP FoF No. 1984-1985. If so, we have carried that burden, but there is no case law supporting the claim that the United States bears the burden for the amount spilled. BP's cases address the burden of proof for proving a violation or compensatory damages. By contrast, a district court's assessment of the statutory penalty factors in a Clean Water Act case is "highly discretionary," and it is free to choose between "permissible views of the evidence" in determining the amount of oil spilled. *United States v. CITGO Petroleum Corp.*, 723 F.3d 547, 551, 556 (5th Cir. 2013).

| BP's Changing Story On Key Parameters | | | |
|---|---|---|---|
| **BP Expert** | **Parameter** | **BP in Phase One and/or Response** | **BP Quantification Expert Opinion** |
| **Blunt** | Rock Compressibility *(microsips)* | Used *12* in shutting in the well | Relied on *6.35* |
| **Gringarten** | Permeability *(millidarcies)* | Called *500* most likely value before drilling; used values as high as *1,000* during response; used *300* in Phase One | Relied on *238* |
| **Blunt, Gringarten, & Zaldivar** | Separation | *Multiple stages* for counting barrels of collected oil during the response | Relied on *single-stage* for counting spilled oil |
| **Nesic** | Metal Erosion in BOP | BP Phase One witness testified BOP erosion took less than *a second* | Concluded BOP erosion took more than *5 weeks* |
| | Sand Production | BP told Unified Command there was *no evidence* of sand production during response | Sand production occurred through the *end of May* |
| **Momber** | Cement Erosion | BP Phase One witnesses testified cement was *not set* | Assumed cement was *set* |

US FoF No. 211, 414-415, 440-441, 462, 526-528; Doc. No. 8213. BP cannot reconcile its trial estimate with its own prior conclusions because the true total discharge is 5 million barrels.

**ARGUMENT**

**I.    The Evidence Shows That Erosion Affecting The Flow Rate Concluded Early In The Spill, Validating The United States' Estimate And Showing That BP's Trial Estimate Cannot Be Correct**

BP's theory of slow erosion is both a necessary foundation for its experts and BP's only meaningful criticism of the United States' 5 million barrel estimate. If BP is incorrect that flow rates steadily increased for at least the first five weeks, its trial estimates cannot be correct. Similarly, if the United States is correct that any erosion that affected the flow rate occurred quickly, the total discharge must be close to 5 million barrels. The evidence shows that any

erosion affecting the flow rate occurred quickly and did not steadily affect flow rates for the first half of the response, as BP contends. That conclusion is consistent with two general principles of erosion conceded by BP's experts. First, erosion generally occurs fastest at the beginning of a process and then slows down, as BP's trial expert Dr. Johnson acknowledged. United States' Phase 2 Post-Trial Brief, Doc. No. 12049 ("US Br.") at 21. Second, once the flow path reaches a certain size, erosion no longer has "any material impact on flow," as BP's internal experts noted during the response. US FoF No. 442; *see also* US FoF No. 450 (flow restrictions greater than about 3 inches in diameter are not significant).

### A.   Evidence Shows Erosion Occurred Quickly and then Stopped Affecting Flow Rates

Several lines of physical evidence demonstrate that any erosion affecting the flow rate happened quickly.

***First***, one can bound the time for erosion based on knowledge of source control activities. For instance, we know that the drill pipe was eroded through at the upper annular within 36 hours of the explosion, because the drill pipe was severed and ejected into the riser before the riser collapsed. *See* US FoF No. 467. Similarly, the nature of the blind shear ram erosion shows that it resulted from focused flow from the drill pipe, which could only have occurred between April 22 and April 29 – a period of *at most* seven days. US FoF No. 474; Phase 2 Tr. at 1651:16-1653:09 (Oct. 8, 2013 PM) (Griffiths); D-21229. Of course, not all erosion can be bounded by source control events. But the evidence shows that where metal parts were impacted by the flow – as they would have to be to provide any restriction on the flow rate – they eroded extremely quickly, within a handful of days or less. There is no reason to think that erosion would be

4

slower for any other flow restriction, and no evidence of erosion taking weeks in any relevant portion of the flow path (aside from the guesswork of Dr. Nesic described below).[3]

BP's Phase One evidence confirms that erosion happened quickly in the Macondo flow path. BP Phase One testifying expert Earl Shanks concluded that the drill pipe at the upper variable bore rams was eroded through *in less than a second*. US FoF No. 462. BP now attempts to limit that testimony by claiming that Mr. Shanks was talking only about a discrete portion of the flow path. BP FoF No. 1403. But Mr. Shanks was talking about the BOP, just as Dr. Nesic is now. The point remains that the flow was powerful enough to result in massive erosion within a second. Nothing in this case – aside from BP's flawed Phase Two testimony – offers any hint of erosion taking more than a week. BP's trial estimates rely on erosion that takes five weeks.

***Second***, BP's BOP pressure gauge (known as "PT-B") shows that erosion was not affecting flow rate for the period after May 8 (when BP was first able to recover information from the gauge). US Br. at 22; US FoF No. 114, 475. BP does not – and cannot – dispute that the BOP pressure trend is consistent with reservoir depletion. Instead, BP argues that the BOP pressure readings are essentially meaningless because they are affected by changes both upstream and downstream of the gauge. BP Br. at 14. This claim is belied by BP's own trial experts and its actions during the response. First, Dr. Gringarten relied on PT-B data for his trial estimate. US FoF No. 123e. Second, during the response, BP relied on PT-B for source control

---

[3] BP argues that the May 19 riser hole and erosion of the casing shear rams showed erosion continued weeks into the response. BP Br. at 17-18. Erosion only matters to the extent it affects flow rates, however. Even assuming BP is correct that erosion continued, any erosion in those areas was immaterial. The riser kink had only a minor effect on flow rates, and during the response BP concluded that the May 19 hole resulted from focused flow at that point, *not* erosion. See TREX-011529R.0036; US FoF No. 474b, 501. For the casing shear rams, Dr. Nesic's own modeling showed that the restriction from those rams did not change over time, so could not affect the flow rate. TREX-11529R.0035 (red bar (casing shear rams) stays unchanged April 29-May 27).

operations – as BP's Rule 30(b)(6) deponent explained, the pressure gauges were the "eyes and ears for what was happening in the well." US FoF No. 30. BP monitored PT-B from May 8 through the rest of the response as a valuable indicator of what was happening in the well. US FoF No. 123f.

Meanwhile, Dr. Nesic "analyz[ed] the flow path" and concluded that the only significant restrictions that experienced erosion were the kinked riser, blind shear rams, casing shear rams, and upper annular preventer. BP FoF No. 1367. Each of those potential restrictions is *downstream* of the BOP pressure gauge. As BP's own findings of fact make clear, Dr. Nesic found *no* significant restrictions affected by erosion *upstream* of the BOP pressure gauge, rebutting BP's claim that PT-B was affected by upstream changes. *See id.*

***Third***, Dr. Griffiths' alternate calculations provide another confirmation that erosion did not affect the flow rate over time. Dr. Griffiths' published, peer-reviewed method relies on having pressure information for two points in the system and the discharge coefficient[4] for the flow path in between. With that information, basic fluid dynamics allows calculation of the flow rate. Dr. Griffiths performed three calculations of the total discharge, looking at different portions of the flow path in each case. If erosion *had* affected flow rates over time, that erosion would change the discharge coefficient over the course of the spill. In that case, Dr. Griffiths' three calculations would diverge, since some accounted for the eroding section of the flow path and others did not. These alternative calculations are akin to the use of a control group in a scientific experiment: by focusing on different portions of the flow path, if any restriction was changing over time, the results would differ. Instead, all three calculations were 5.0 or 5.1

---

[4] A discharge coefficient (known as a productivity index for the reservoir) provides the flow rate for a given pressure change across a flowing system. US FoF No. 110.

million barrels, further confirming that erosion did not significantly affect flow rates over the course of the response.[5]

*Finally*, evidence from the response shows that the most significant source control events had minor effects on the daily flow rate. During the response, experts from both BP and the United States considered how Top Kill, cutting the riser, and installing the Capping Stack would affect the flow rate. They concluded that Top Kill had no effect on the flow rate and cutting the riser and installing the Capping Stack affected the rate by a few percent at most. *See* US Br. at 30-31; US FoF No. 459 (BP's engineering lead for the response looked at the Top Kill data and concluded that "overall flow rates have not changed much."). The United States' experts accounted for those minor changes in their total estimates. *See, e.g.*, US FoF No. 41, 444; TREX-011485.0008. Given that the *biggest* changes to the flow path had minor effects (or no effect) on the flow rate, there is no reason to credit BP's suggestion that the flow rate steadily increased for five weeks or that the flow rate was changing much at all after the first few days of the spill (aside from slowly declining due to reservoir depletion).

Of course, the biggest change to the flow path occurred on April 20, when the well exploded. One of the men on the rig likened the force just before the explosion to a 550-ton train charging up the wellbore. TREX-004941.0130. But BP's trial estimate relies on the proposition that the initial blowout only slightly affected the flow rate. As Dr. Johnson conceded, his efforts to revise Dr. Griffiths' estimate result in an initial flow rate that is "close to zero." US FoF No.

---

[5] BP criticizes Dr. Griffiths for using constant discharge coefficients and a constant productivity index. BP Br. at 11-12, 14. Dr. Griffiths' alternative calculations demonstrate that doing so was reasonable. If one or more of the discharge coefficients or productivity index *was* changing over the response, the three calculations would show differing results. That they come to nearly the same number demonstrates that any changes over time were not affecting flow rates, making constant coefficients a reasonable part of the model.

128. Indeed, the initial flow rate *must be* close to zero for BP's trial estimates to be correct, given the known final day flow rate and BP's low total discharge estimates.

BP's Phase One evidence, and common sense, again contradicts the company's Phase Two case. BP Phase One expert Morten Emilsen concluded that the flow rate *just* to feed the dramatic fire on the rig was 28,000 to 41,000 barrels per day (which means the total flow rate was larger from the very beginning of the spill). US FoF No. 128. BP's Phase Two trial estimate requires believing that the well explosion (and the immediate aftermath, including the rig fire, the fall of the 190,000 pound traveling block, and the sinking of the rig) resulted in just a trickle of oil, while mundane actions like the partial closing of a ram or the possible movement of junk shot resulted in significant increases in flow over time. BP's trial estimates treat April 20 just like any other day of the spill, rather than recognizing that when the well first exploded the flow rate would jump up immediately.

**B.    BP Failed to Demonstrate that Erosion Affected Flow Rates**

BP's slow erosion theory rests entirely on Drs. Nesic and Momber. Neither of BP's erosion experts supports its case, however, because both essentially assume what they set out to prove and reach conclusions contrary to BP's determinations during the response and Phase One.

**1.    Dr. Nesic's opinion relies on flawed modeling and an unreasonable sand production assumption**

Contrary to BP's claims, Dr. Nesic's testimony does not show that erosion caused the flow rate to increase over (at least) the first five weeks of the spill. *See* BP Br. at 17. Dr. Nesic's testimony relies on modeling that "exploded" after modeling just 10 days of the spill and an unfounded assumption for the erosion period. Both aspects are fatally flawed, so he cannot provide insight on the question that matters here: how did erosion affect flow rates over time?

8

***Dr. Nesic's Modeling.*** As an initial matter, Dr. Nesic did not actually model erosion rates. As he said at trial: "I was not in the business of predicting erosion rates." Phase 2 Tr. 2904:13-18 (Oct. 17, 2013 AM) (Nesic). The modeling Dr. Nesic *did* perform suffered from a variety of flaws. First, Dr. Nesic admitted that he modeled the wrong fluid and that his model "exploded." US FoF No. 508. Second, he only addressed a portion of the restrictions in the flow path, which makes his conclusion that the flow rate doubled over the course of five weeks untenable. *See* US Br. at 24. Finally, Dr. Nesic concluded that the flow rate would increase steadily over that time, even though his own modeling was more consistent with a trend of initial rapid erosion that then tapered off over time. US Br. at 24-25.

***Sand Production.*** In addition to his flawed modeling, Dr. Nesic relied on Dr. Vaziri's opinion about how long sand production occurred.[6] Rather than actually model erosion, Dr. Nesic simply assumed that the erosion occurred over five weeks between April 22 and May 27, based in part on Dr. Vaziri's opinion that sand was produced for that period.[7] Dr. Vaziri based his opinion only on "his experience in the area." Vaziri Dep. at 59:15-60:04. However, Dr. Vaziri has *no experience* with well blow outs. *See* Vaziri Dep. at 25:20-26:4, 61:17-62:06. Moreover, neither Dr. Nesic nor Dr. Vaziri examined how long the well would produce *enough* sand to cause meaningful erosion, though Dr. Nesic acknowledged that a threshold amount of sand was necessary. BP FoF No. 1362 (sufficient solids needed for erosion); US FoF No. 496; Phase 2 Tr. 2851:17-21, 2958:8-14, 2960:1-7, 2960:23-2961:6 (Oct. 17, 2013 AM and PM) (Nesic). Instead, Dr. Nesic simply assumed that meaningful erosion would continue over the

---

[6] Despite Dr. Vaziri's critical role in Dr. Nesic's erosion opinion, Dr. Nesic never spoke to Dr. Vaziri, and BP decided not to bring Dr. Vaziri to testify at trial. Phase 2 Tr. 2958:1-7, 2959:10-11 (Oct. 17, 2013 PM) (Nesic).

[7] Dr. Nesic also relied on the May 19 riser kink hole. That hole does not indicate erosion affecting the flow rate, however. *See* n.3 *supra.*

9

entire assumed sanding period. Dr. Nesic also admitted that sand production would decline over time, but made no attempt to quantify that decline or determine how the declining sand production would affect erosion. Instead he assumed a near-constant rate of sand production throughout his modeling period. Phase 2 Tr. 2936:4-15, 2935:6-22, 2938:10-14 (Oct. 17, 2013 PM) (Nesic).

Dr. Vaziri's sand opinions are also unreliable because he ignored the evidence from the response showing that there was *no sand* in the collected oil. *See Mendoza v. Placentia Yorba Linda Unified Sch. Dist.*, 278 Fed. Appx. 737, 739 (9th Cir. 2008) (finding unpersuasive testimony of expert who failed to consider relevant facts). During the response, BP met with members of the United States Science Team and BP's contractors to dispel concerns that damage from erosion posed a threat to the static kill operation. BP explained to the group that there was likely no erosion damage because the well had "produced no solid particulate matter to their knowledge throughout the entire 100+ day Event." TREX-010607.0002; US FoF No. 440-441. Dr. Vaziri said that whether sand was found in the collected oil would be relevant to his opinions, but he never looked for such data. Vaziri Dep. at 236:23-237:04; 237:07-237:17; 237:20-25. During the response, however, Dr. Vaziri himself was directly told that there was no sand at least from May 16, when containment operations started, through the rest of the spill. *See* US FoF No. 440, 441.

In short, BP's experts had no basis to reach a conclusion about how long sand production sufficient to affect the flow rate would last. Instead, they simply assumed a sanding duration that resulted in slow erosion and thus supported Dr. Blunt's trial estimate – but was contradicted by the evidence from the response.

**2.      Dr. Member's opinion relies on the unfounded assumption that the well cement was set**

Dr. Member's opinion is irrelevant because he (1) assumes the cement was set, contrary to the undisputed evidence from Phase One; (2) admittedly knows nothing about oilfield cement; and (3) did not offer any opinions on the Macondo cement erosion rate because "it's actually not possible to do this…." US Br. at 25-26; Phase 2 Tr. 2996:18-24 (Oct. 17, 2013 PM) (Member). Moreover, even if the cement was set, Dr. Member concedes that *all* the cement could have eroded in as little as a week[8] and that only a portion of the cement had to erode before it provided only a "negligible" resistance to flow. US Br. at 27. Thus even if credited, his opinion is not inconsistent with the United States' experts.

**C.      Dr. Zaldivar's Analysis Contradicts BP's Erosion Claims and Supports the United States' Experts' Estimates**

The United States' initial post-trial brief explained how Dr. Zaldivar incorrectly modeled the flowing area of the riser and thus why his results must be doubled to be accurate.[9] US Br. at 31-33. Once corrected, Dr. Zaldivar's results are consistent with the United States' flow rate trend, Dr. Dykhuizen's estimates for Top Kill and Top Hat flow rates, and the estimates BP's internal experts made during the response.[10] US Br. at 27-33. Similarly, BP claims that slug flow

---

[8] BP's brief states that it is not plausible for all well cement to have eroded in the first few hours of the incident. BP Br. at 20. The United States' estimates do not rely on any such conclusion, however. The United States' experts only state that whatever partial restriction (if any) the cement provided was sufficiently eroded to allow flow on the order of 60,000 barrels per day within the first hours. Dr. Member's testimony does not address that issue because he only looks at what would be required to entirely erode the cement assuming it was set.

[9] In its post-trial brief, BP argues that the use of a hydraulic diameter is the "gold standard" for modeling flow through a non-circular space. BP Br. at 22 n.5. Dr. Zaldivar used the technique incorrectly, as demonstrated by the very textbook that he relies on. US Br. at 32-33.

[10] BP suggests that Dr. McNutt believed on May 23, 2010 that the flow rate was not as high as 50,000 barrels. *See* BP Br. at 21 n.4. In fact, her deposition testimony makes clear that the only

only occurs at "lower" flow rates based on Zaldivar's modeling, BP Br. at 21, but, again, those flow rates must be corrected, making for flow rates consistent with the United States' evidence.

Dr. Zaldivar's testimony also contradicts BP's erosion argument. Dr. Nesic opines that the flow rate *steadily* increased from April 22 to May 27. BP Br. at 19. By contrast, Dr. Zaldivar found that the flow rate was constant between May 13 and May 20. Thus even BP's Dr. Zaldivar concluded that erosion affecting flow rate ended well before Dr. Nesic claimed. The truth is that the flow rate was steady by May 13 because all meaningful erosion had long since ceased.

## II.    The United States' Evidence Shows That The Total Discharge Was 5 Million Barrels

The United States presented four estimates of the total discharge at trial. One of those estimates was the admittedly imprecise material balance methodology – the same method that Dr. Blunt used. The other three United States estimates were grounded in the best data available about Macondo's flowing conditions – the pressure data and collection rates from the Capping Stack period. *See, e.g.*, US FoF No. 35 (BP's internal modeling expert calling Capping Stack data the "best defined fluid and flow path."). Those three United States estimates used different approaches – for instance, Dr. Griffiths built a peer-reviewed model that incorporated the wealth of available BOP pressure data and two well-known tenets of fluid dynamics, while Dr. Pooladi-Darvish used his typical practices as a reservoir engineer – but they all arrived at nearly the same total discharge: about 5 million barrels. *See generally* US Br. at 4-9. This corroboration heightens the reliability of the 5 million barrel estimate. *See In re Corrugated Container Antitrust Litigation*, 659 F.2d 1322, 1326 (5th Cir. 1981) (affirming district court's decision to

results the Flow Rate Technical Group had at that time were *lower bounds*, so the group could not say what the true flow rate was. McNutt Dep. at 144:01-145:09, 146:02-147:11.

rely on expert in part because that expert's study "produced results consistent with the studies of other experts").

The evidence of rapid erosion described above provides an independent check on the United States' estimates. There is no dispute that reservoir depletion would cause the flow rate to decrease over time, absent proof of slow erosion. That fact, combined with the undisputed final day flow rate of 53,000 barrels, means that the total discharge must be more than 4.6 million barrels. This serves as a reality check for the United States' estimates, which are only modestly larger than a discharge that failed to take reservoir depletion into account. This consistency with the known final day flow rate and the universally-known phenomenon of depletion helps confirm the 5 million barrel total discharge.

Aside from treatment of erosion, BP's brief offers little criticism of the United States' experts' estimates. Indeed, BP has to resort to attacking the estimate from an August 2010 press release to attempt to find traction in challenging the 5 million barrel estimate. None of BP's criticisms have merit.

### A. The August 2010 Estimate Does Not Undercut the Work Presented by the United States' Experts at Trial

Without any meaningful criticism of the United States' experts' work, BP resorts to attacking the total discharge estimate from an August 2, 2010 press release.[11] Even assuming that BP is correct in its criticism of the work leading up to the press release (which it is not), that attack has minimal relevance to the expert analysis presented to the Court during the trial.

---

[11] This attack is only possible because the United States made its estimates public from the outset of the spill, and then produced all internal communications about flow rate estimates during this litigation. By contrast, BP cloaked hid its estimates from the public while lying to Congress and the Unified Command during the response, engaged in a priviledged flow rate analysis that it never disclosed, and only shared a total discharge estimate in court. *See* US Br. at 6; US FoF No. 19.

The company never articulates *why* the development of the August 2010 estimate is relevant to the work presented at trial by the United States' experts. Drs. Griffiths and Pooladi-Darvish were not part of the August 2010 estimate. Dr. Dykhuizen was, and he spent the next three years adjusting his initial estimate in light of additional evidence. Each of the United States' experts considered all the available evidence, contrary to BP's claim. *See* BP Br. at 10. Moreover, as the Court likely appreciates from watching their testimony, none of the United States' experts would follow any direction other than to get the right answer for the total discharge. As Dr. Thomas Hunter explained, Sandia National Laboratories' independence is guaranteed by statute. US FoF No. 21. Part of the Sandia mission is "doing every analysis in the most objective technical way that we can, and that means you have to arrive at your conclusions independently without influence."[12] Phase 2 Tr. at 1277:12-21 (Oct. 7, 2013 AM) (Hunter). *During the response*, BP relied on the United States' experts like Dr. Dykhuizen and called them the "nation's top scientists." US FoF No. 27. Indeed BP's source control post-trial brief described federal scientists as "'junk yard dogs' who refused to rely on anyone's input and recommendations, but instead performed their own independent evaluations." Doc. No. 12045 at 13 (citing Allen Dep. at 277-280, 301-303). The fact that the trial testimony presented by the United States' experts came close to the 2010 estimate shows only that the 2010 work was on the right track. The fact that BP devoted so much of its brief to the August 2010 estimate shows only that it has no substantive criticism to offer.

---

[12] Dr. Dykhuizen remains an engineer at Sandia. Dr. Griffiths was a senior scientist at Sandia at the time of the Macondo blowout, and retired in December 2011. Dr. Pooladi-Darvish is an independent reservoir engineer, and Dr. Kelkar is a professor at the University of Tulsa.

**B.      BP's Individual Criticisms of the United States' Experts Are without Merit**

*Dykhuizen*. As BP notes, Dr. Dykhuizen acknowledges that the lower edge of his uncertainty extends to 3.5 million barrels. Ironically, BP calls Dr. Dykhuizen's frank discussion of uncertainty "refreshingly candid," while BP's own experts ignored the manifest uncertainty associated with their work. For instance, despite the uncertainty surrounding permeability, Dr. Gringarten uses a single permeability value of *238* (not even willing to round it).

Dr. Dykhuizen's candor should not be used against him, and there are two important points related to his uncertainty estimate. First, Dr. Dykhuizen's most likely estimate remains 5 million barrels, and he testified that there was only a small chance it was as low as 3.5 million (and an equally small chance that the total was 6 million barrels). US FoF No. 105; Phase 2 Tr. at 1414:12-22 (Oct. 7, 2013 PM) (Dykhuizen). Second, Dr. Dykhuizen's uncertainty range applies only to his own work, which lacks the accuracy of the work performed by Drs. Griffiths and Pooladi-Darvish. Phase 2 Tr. at 1412:5-11 (Oct. 7, 2013 PM) (Dykhuizen); *contra* BP FoF No. 2009. When looked at together, the uncertainty range for the United States' experts is much smaller than that Dr. Dykhuizen assigned to his own work.

*Griffiths*. BP is correct that Dr. Griffiths is not part of the oil and gas industry. He spent his career at Sandia working on fluid dynamics issues for nuclear weapons component design and underground nuclear testing. US FoF No. 108. Moreover, Dr. Griffiths is the only Phase Two expert who has published his Macondo analysis in a peer-reviewed journal. US FoF No. 119. Dr. Griffiths' work also received a thorough review by Dr. Dykhuizen, who initially challenged Dr. Griffiths, but, after fully understanding the work, found it to be "excellent." Phase 2 Tr. at 1413:1-22 (Oct. 7, 2013 PM) (Dykhuizen). BP's brief quotes from Dr. Dykhuizen's initial skepticism of Dr. Griffiths' work, but not his ultimate conclusion. *See* BP Br. at 11.

15

As described in the United States' initial post-trial brief, Dr. Griffiths used appropriate inputs for the productivity index and BOP pressure. US Br. at 17-18; *contra* BP Br. at 11-12. BP also implies that Dr. Griffiths' method is unreliable because it is "insensitive to differences in reservoir pressure change." BP Br. at 12-13. That the method is insensitive to the change in reservoir pressure is simply a characteristic of the approach. It would be equally valid to suggest that Dr. Blunt's method is suspect because it is insensitive to changes in BOP pressure. That different methods are sensitive to different data is precisely why the United States presented multiple experts employing different methodologies: the estimate is more likely to be correct when corroborated by other estimates that are sensitive to different parameters.

The rest of BP's discussion of Dr. Griffiths' work simply recasts its erosion argument in other ways and so is addressed above.[13] *See, e.g.*, BP Br. at 14.

***Pooladi-Darvish***. Aside from erosion, BP's brief presents no substantive criticism of Dr. Pooladi-Darvish's analysis.[14] BP only notes that Dr. Pooladi-Darvish used some collection data rather than others. BP Br. at 13. Indeed, Dr. Pooladi-Darvish selected data from the Capping Stack period because he could check his modeling work against both pressure data and collection data from the well. He used the most robust data set available. BP does not challenge Dr. Pooladi-Darvish's background, recognizing that he is both an experienced reservoir engineer and

---

[13] In discussing erosion, BP flatly mischaracterizes Dr. Griffiths' testimony. BP claims Dr. Griffiths said that if restrictions in the BOP and wellbore were both changing over time, his method would not yield realistic results. BP Br. at 11-12. Dr. Griffiths said no such thing, as a review of the transcript cited by BP confirms. Moreover, Dr. Nesic's testimony that the only significant restrictions that changed over time were in the BOP and riser means that there was no meaningful change in the wellbore restriction over time. *See supra* at 6; BP FoF No. 1367.

[14] BP claims that Dr. Pooladi-Darvish found "large" uncertainty in BOP restrictions. *See* BP Br. at 13. Dr. Pooladi-Darvish addressed that potential uncertainty and still found the best estimate of the total discharge was 5.0 to 5.3 million barrels. Phase 2 Tr. at 2036:2-8 (Oct. 9, 2013 PM) (Pooladi-Darvish).

the only Quantification segment witness with prior experience quantifying flow rate from a well

blowout. Phase 2 Tr. at 1964:19-1965:5 (Oct. 9, 2013 PM) (Pooladi-Darvish).

> ### C.     Dr. Blunt's Wellbore Cooling Calculations Are Irrelevant and Do Not Affect the Accuracy of the United States' Estimates

BP places great emphasis on Dr. Blunt's wellbore cooling calculations, with which he

claims to have obtained a more accurate final bottomhole pressure than the United States'

experts. *See* BP Br. at 37-39. This calculation is both flawed and ultimately irrelevant. Most

importantly, any minor differences in pressure depletion do not significantly affect the United

States' estimate.

Dr. Blunt's cooling calculations did not result in a more accurate reservoir pressure. His

results conflicted with lab-measured fluid data and relied on several unrealistic assumptions. US

FoF No. 185, 372-375. Meanwhile, Dr. Gringarten also accounted for cooling and calculated a

final reservoir pressure that was inconsistent with Dr. Blunt's – but consistent with the final

reservoir pressure estimated by Dr. Kelkar and other United States' experts. US FoF No. 231,

261; D-21666; TREX-011549R.0023-24; TREX-011553R.0041; TREX-011696R.0035. Dr.

Blunt candidly conceded that he did not know whether his final reservoir pressure was more

accurate than Dr. Gringarten's. Phase 2 Tr. 2277:3-19, 2278:4-6 (Oct. 10, 2013 PM) (Blunt).

Given this remarkable admission, Dr. Blunt's estimate should not be given credence.

More fundamentally, Dr. Blunt's cooling calculation has virtually no impact on the

United States' estimates. Using Dr. Blunt's final reservoir pressure would not affect Dr. Pooladi-

Darvish's estimate at all, would change Dr. Griffiths' results by 0.6%, and would change Dr.

Dykhuizen's and Dr. Kelkar's estimates by a few percent. *See* FoF No. 185 (Pooladi-Darvish);

TREX-011485R.0010 (Griffiths); TREX-011452.0011 and Phase 2 Tr. at 1407:23-1409:21 (Oct.

7, 2013 PM) (Dykhuizen); TREX-011553R.0007 (Kelkar). The reason Dr. Blunt's cooling analysis has little effect on these estimates is because they are all calibrated to the final, universally-agreed flow rate of 53,000 barrels per day. Dr. Blunt's estimate is not. Thus he can amplify the effect of the reservoir pressure decline on the cumulative discharge without considering whether his methodology matches the observed flow rates.

### III.   BP's Trial Estimates Are Contradicted By The Evidence And By BP's Own Prior Conclusions During The Response And Phase One

As an initial matter, BP's trial estimates *cannot* be correct because they are incompatible with the known flow rate trend. As described above, the flow rate was 53,000 barrels per day at the end of the spill, and gradually declined over the course of the 86 days. BP's trial estimates require an increasing flow rate trend, which in turn requires slow erosion that is contradicted by the evidence. Moreover, Drs. Blunt and Gringarten both use methods that depend on assigning accuracy to reservoir parameters that were not known with any certainty, while using values that contradict what BP's internal experts found during the response and what BP presented to this Court in Phase One. *See Marcel v. Placid Oil Co.*, 11 F.3d 563, 567-568 (5th Cir. 1994) (upholding exclusion of expert testimony based upon suspect and untrustworthy data).

#### A.   Dr. Blunt Uses a Flawed Methodology and Relies on a Highly Uncertain Input for Rock Compressibility

Dr. Blunt's estimate has two critical flaws. First, as described in our initial post-trial brief, it deviates from typical industry practice and fails to accurately describe the reservoir: using input values that Dr. Blunt himself endorses results in outputs that cannot be correct. *See* US Br. at 10-11. For example, if Dr. Blunt uses the best estimate of permeability by one of BP's trial experts (Gringarten), his method results in reservoir parameters that Dr. Blunt admits are wrong. US Br. at 11. Second, the method relies on inputs (chiefly rock compressibility) that are

simply not known with any certainty. BP argues that material balance is the most reliable method, but the method cannot provide a reliable estimate where critical parameters are unknown.[15] During the response, BP had the same data Dr. Blunt relies on now, but still treated the rock compressibility number carefully because it was so uncertain. Now, Dr. Blunt presents this Court a method that relies heavily on that highly uncertain data. Indeed, rock compressibility is only relevant to Quantification if the Court relies exclusively on the material balance method.

Dr. Blunt's rock compressibility value is based primarily on three 1-inch rotary sidewall core samples[16] taken from the reservoir.[17] The sampling process was troubled from the start. BP retrieved 44 rotary sidewall core samples from the reservoir, but 21 could not be used because they were nothing but "rubble" or otherwise too fractured for use in testing. US FoF No. 306. The Weatherford employees performing the testing described them as "really ugly" and "iffy." US FoF No. 307. As one concluded, "It's really sad that they didn't get better recovery of samples!!….*This won't give us much to work with*." *Id.* (emphasis added). BP itself acknowledged the shortage of core data during the response. US FoF No. 308. That lack of data means an unrepresentatively low compressibility result: the samples that remained intact to be tested would be strongest (the least compressible). US FoF No. 309.

---

[15] BP claims that Dr. Kelkar "agreed that material balance is the preferred method…." BP Br. at 27. In fact, Dr. Kelkar stressed that material balance was more uncertain than the other methods used by the United States' experts. US FoF No. 193.

[16] BP also relies on two other Weatherford tests analyzed by Dr. Zimmerman that it claims "verified" the compressibility. BP Br. 32-33. Both of those tests are indirect measures of compressibility that suffer from the same inadequacies as the original tests. In both instances, Dr. Zimmerman used conversions that did not reflect site conditions and so reached incorrect results. US FoF Nos. 310, 341, 367-369.

[17] For comparison, the samples are each about the size of a wine cork, while the reservoir has about four times the area of New Orleans' City Park (1,300 acres) multiplied by 90 feet of depth.

BP's claim that Weatherford performed the compressibility testing in an industry standard manner, BP Br. at 33-34, is belied by Weatherford's own statements. BP demanded results on a "rush" basis, forcing a "frantic cry for help when BP was asking for the moon in 48 hours." US FoF No. 316. For instance, the three samples Weatherford tested – that Dr. Blunt relied on – failed to meet Weatherford's own size requirements. US FoF No. 319-320. Before the blowout, BP had acknowledged that insufficient sample size could result in understating compressibility. US FoF No. 321. Other problems in the testing also resulted in understating compressibility, as BP's internal experts well understood. *See* US FoF No. 342-361.

From the start, BP knew better than to rely on sidewall core data. Prior to drilling the well, BP described rotary sidewall cores as "too uncertain to add value," noting that they could understate the actual compressibility. FoF No. 303, 305, 328-329. During the response, BP experts recognized that rotary sidewall core data had "inherent biases" and produced "conservative" estimates of rock compressibility. FoF No. 209, 213, 214. When it came time to shut in the well – when the stakes were at their highest – BP did not use 6 microsips alone, but also used values *two and three times higher*. US FoF No. 206-216. BP called 12 microsips its most likely value. US FoF No. 211. And BP told Dr. Hsieh and others evaluating the safety of well shut-in that BP was using 12 microsips in its own modeling and that 12 was "more representative." US FoF No. 216.

BP now argues that the compressibility it used in evaluating the shut-in is irrelevant and that "most likely" does not *really* mean most likely. BP Br. at 35-36. At the least, however, BP's use of values as much as three times the 6-microsip value indicates the profound uncertainty surrounding the rock compressibility. And BP is simply incorrect in claiming that after the well was shut in, the company returned to using 6 microsips. *Contra* BP Br. at 36. For instance, Dr.

Merrill performed analyses on July 15 and 16 using 12 microsips as his "base case." US FoF No. 221; *see also* TREX-010931.0002; Phase 2 Tr. 2688:22-2689:15 (Oct. 16, 2013 AM) (Merrill) (directing BP employee to perform modeling using 6 and 12 microsips on July 19). On July 25-26, Dr. Merrill did additional modeling that found that a scenario using a value of 14 microsips and a 50,000 barrel per day flow rate gave a reasonable match to the pressure transient data. US FoF No. 223. This contradicts BP's post-trial argument that using compressibility values larger than 6 yields results that are inconsistent with other reservoir data. *See* BP Br. at 36-37.[18]

BP chose to forego representative whole core samples for the cheaper, quicker rotary sidewall cores that the company itself called "too uncertain to add value." US FoF No. 303-304. BP then chose to use a method that relied on compressibility as the centerpiece of its trial presentation. Given the vast uncertainty surrounding the true value, and the factors in the testing that understated compressibility, a total discharge that relies on compressibility will be inherently uncertain and too low. Statements from BP and Weatherford during the response and testimony from the United States' experts Drs. Huffman and Roegiers confirms that the actual rock compressibility was significantly higher. BP had it right when it called 12 microsips the "most likely" value at the most critical time of the response.[19]

---

[18] BP's litigation position that it only used 12 microsips as a worst-case scenario is not credible. No one from BP ever told Dr. Hsieh that BP was using 12 microsips as a worst case scenario. Phase 2 Tr. at 1527:20-24 (Oct. 8, 2013 AM) (Hsieh). Nor are there any BP documents stating that 12 or 18 were included simply as worst-case scenarios. BP estimated that potential fracture and cross flow would be likely to occur, if at all, within 10 days after shut-in, *regardless* of whether rock compressibility values of 6, 12 or 18 microsips were used, which means none of the values were "worst-case scenarios" for shut-in. *See* U.S. FoF Nos. 207, 212, 221-222; *compare* TREX-009342.0015 to TREX-010841.0038; s*ee also* TREX-010835.0005.

[19] BP states that the United States offered no independent analysis of the rock compressibility. BP Br. at 31. As the Court knows, Drs. Huffman and Roegiers *both* opined on the actual rock compressibility and both concluded that 12 microsips was a reasonable value. The Court

The evidence shows that Dr. Blunt's estimate relies on an input parameter that could be off by a factor of two or three (among other flaws). Based on that alone, his estimate cannot serve as a reliable estimate of the total discharge and should not be credited.

**B.      Dr. Gringarten's Estimate Is Skewed by His Use of a Permeability Input Far Lower than Anyone Used in the Response or Litigation**

BP touts Dr. Gringarten's use of deconvolution, but – just like Dr. Blunt's use of material balance – the method cannot work without accurate inputs. Dr. Gringarten's estimate depends entirely on his permeability input, and he used a value (238 millidarcies) that was significantly lower than any other permeability value proposed in this case. Before drilling the well, the company called 500 millidarcies the "most likely" permeability in seeking approval to proceed with the well. US FoF No. 415. During the response, BP used permeability values as high as 1,000 millidarcies in its modeling, and its internal experts used 400-500 millidarcies with access to the exact same data Dr. Gringarten now relies upon. US FoF No. 414, 416. During Phase One, BP used a permeability of 300 millidarcies in expert analysis. *See* TREX-041026.0013.

As described in the United States' initial post-trial filings, Dr. Gringarten obtained his extreme permeability value by cherry-picking the data. US Br. at 14-15. Ironically, BP accuses United States permeability expert Leif Larsen of using incomplete and inaccurate data, but Dr. Gringarten chose to use only a single pressure build up for each layer, ignoring additional build ups that would provide better data. Had he properly analyzed the available data, Dr. Gringarten would have reached the same conclusion that Drs. Larsen and Huffman did: that the permeability was between 400 and 500 millidarcies. *Id.* Indeed, Dr. Blunt did his own permeability calculation

---

excluded that testimony, and the United States has provided an offer of proof on the issue. *See, e.g.,* Doc. No. 11624 at 6 (offer of proof), 11624-43 at 2 (Roegiers conclusion concerning 12 microsips), 11624-39 at 75 (Huffman conclusion concerning 12 microsips).

and found that (if he assumed a realistic final day flow rate of 52,603 barrels) the permeability was 407 millidarcies. US Br. at 14. Using a realistic permeability between 400 and 500 millidarcies would make Dr. Gringarten's total discharge estimate between 4 and 6 million barrels. US Br. at 14 n.8.

## IV.  In Calculating The Total Discharge, The Court Should Include All Oil And Use Multi-Stage Separation, Just As BP Did During The Response

As part of its determination of the cumulative discharge of oil, the Court must decide how to convert reservoir barrels to stock tank barrels.[20] *See* U.S. Proposed Conclusions of Law, Doc. No. 12048-2 ("US CoL") No. 17; 33 U.S.C. § 1321(b)(7); 40 C.F.R. § 19.4. The Court should reject any single-stage method, and instead rely on Dr. Zick's multi-stage oceanic model.

The fluid phase behavior experts for the United States and BP – Dr. Zick and Dr. Whitson, respectively – agree that the Macondo oil went through a multi-stage separation process after discharging from BP's well to the ocean *and* that had the oil been produced as intended it would have gone through a multi-stage separation process. In addition, when counting the "collected oil," BP used a multi-stage process. Multi-stage separation is appropriate for counting the oil that entered the Gulf as well. BP's trial experts (Blunt, Gringarten and Zaldivar) used single-stage separation, so their results must be increased by 10 to 20%. US Br. at 38; US FoF. No. 557, 597-598 (Dr. Blunt's results should be increased by 16-20% based on separation method alone).

BP argues that single-stage separation is appropriate because "it is scientifically plausible that . . . the oil and gas remained in contact as they rose through the ocean to the surface." BP Br.

---

[20] The Oil Pollution Act was written in response to the 1989 Exxon Valdez spill, and therefore its definition of "barrel" contemplates a spill from a tanker where the oil has already undergone an efficient separation process like the multi-stage processes contemplated in this case.

at 24. BP's own fluids expert contradicts this claim. US FoF No. 574; Phase 2 Tr. 2372:23-2373:4 (Oct. 15, 2013 AM) (Whitson). BP then suggests that the Court should rely on single-stage separation because it is simpler than multi-stage separation. But BP ignores the fact that both Dr. Zick and Dr. Whitson did extensive analysis of the multi-stage separation that the Macondo fluid underwent in the ocean and that the Court is entitled to rely on that analysis. Moreover, the simplicity of single-stage separation is no virtue when it deviates from both the evidence of what actually happened and industry practice. As numerous experts for both BP and the United States testified, multi-stage separation is the industry standard separation process used in the field.[21] Both Dr. Zick and Dr. Whitson also opined that if BP had produced the Macondo reservoir as planned, it would have used a multi-stage process rather than a single-stage process because multi-stage produces more oil. US FoF No. 549, 558.

The evidence, BP's prior positions, and industry practice all confirm that multi-stage separation is appropriate. Of the potential multi-stage analyses, Dr. Zick's oceanic separation process is the most appropriate method for converting reservoir barrels to stock tank barrels. The Court's choice between Dr. Zick and Dr. Whitson's oceanic analyses essentially comes down to one question – whether oil that dissolved in the Gulf after discharge from the well counts under the Clean Water Act. As the United States demonstrated in its opening brief, the hydrocarbons Dr. Whitson claims dissolved cannot be ignored as a matter of law. US Br. at 35; *see also* Doc. No. 10752, 11056, 11323 (United States' briefing seeking summary judgment on dissolved oil

---

[21] In its brief, BP claims – for the first time – that single-stage flash is the industry standard methodology for converting calculations of reservoir fluid to stock tank barrels when there is uncertainty about the exact separation process. However, BP's only support is a mischaracterization of Dr. Zick's testimony and a statement by Dr. Blunt made only at trial and not discussed in his expert report. *See* BP Br. at 24. Notably, Dr. Blunt admits that multi-stage is standard in the industry. *See* TREX-011553.0027.

and seeking to exclude Dr. Whitson's opinion on legal issue of whether to count dissolved oil). Moreover, BP should be judicially estopped from arguing that dissolved hydrocarbons should be discounted because that argument is inconsistent with arguments made by BP – and accepted by this Court – in this case.[22] US Br. at 36-38 (*e.g.*, BP's position that oil that came into contact with Gulf waters should be penalized). Similarly, since BP sought and received credit for collected oil based on multi-stage separation, it should not now be allowed to argue the opposite for the oil that entered the Gulf. *See* US CoL Nos. 20-22.[23]

## CONCLUSION

The question how much oil spilled from the Macondo Well has been asked since the *Deepwater Horizon* first exploded. The answer will do more than help determine the penalties in this case. The total discharge is also relevant to other aspects of this litigation, assessing the damage to the ecosystem of the Gulf of Mexico, scientific study, and the public interest.

The United States respectfully requests a ruling concluding that the total discharge from the Macondo Well was 5 million barrels (with 4.2 million discharged to the Gulf), and a further ruling that BP is liable under the Clean Water Act as an operator and a person in charge of both the Macondo Well and the Deepwater Horizon, for the reasons set forth above and in our initial post-trial filings.

Respectfully submitted,

---

[22] This Court recently addressed the issue of judicial estoppel in the context of the MDL, *see* Doc. No. 12055, so we do not rehash the standard here.

[23] If the Court determines that an oceanic process is not the correct way to analyze the conversion of reservoir to stock tank barrels, the logical alternative is not a single-stage flash process – which both sides' fluids experts agree did not occur – but a four-stage separation process. *See, e.g.*, US Br. at 36-38.

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Directory, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
MALINDA LAWRENCE
Trial Attorneys

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

SARAH HIMMELHOCH
NANCY FLICKINGER
SCOTT CERNICH
RICHARD GLADSTEIN
THOMAS BENSON
Senior Attorneys
A. NATHANIEL CHAKERES
ANNA CROSS
BETHANY ENGEL
JUDY HARVEY
RACHEL KING
ERICA PENCAK
Trial Attorneys

_/s/ Steven O'Rourke_

R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov

STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
Facsimile: 202-514-2583
E-mail: steve.o'rourke@usdoj.gov

KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130
Telephone: (504) 680-3000
Facsimile: (504) 680-3184
E-mail: sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

26

## CERTIFICATE OF SERVICE

   I hereby certify that this brief has been served on All Counsel by email at the direction of the Court due to the electronic filing system being inoperable. The United States will file in ECF and serve on the Parties via Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 on Monday, January 27, 2014 (assuming the system is working at that time).

          Dated: January 24, 2014

          */s/ Thomas A. Benson*

27