IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This document relates to:<br>No. 13-6674 | *  MDL NO. 2179<br>*<br>*  SECTION J<br>*<br>*<br>*  Honorable CARL J. BARBIER<br>*<br>*  Magistrate Judge SHUSHAN<br>* |

**REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION SUSPENDING THE SECOND
<u>DISTRIBUTION OF THE SEAFOOD COMPENSATION PROGRAM</u>**

Mikal Watts made numerous, repeated false representations to both BP and this Court. They believed him.  Over the course of several years and in repeated court filings, Watts said that he represented more than 40,000 deckhand clients.  BP reasonably relied on his statements when negotiating the $2.3 billion Seafood Compensation Program, which BP repeatedly insisted had to include Watts' purported clients.  BP has now discovered and shown that 58 percent of Watts' supposed clients have Social Security numbers that do not match their names, are incomplete, or belong to dead persons, and only eight eligible clients have appeared.  The Court apparently will not know what Watts or anyone else have to say about this.  Watts' counsel has signaled that he will assert his right under the Fifth Amendment not to testify and Class Defendants disavow knowledge, although the declarations of their lawyers in the underlying matter say nothing on the subject one way or the other.

No one can deny that the fraud affected the February 2012 negotiations leading to the $2.3 billion Seafood Compensation Program.  After all, even Class Defendants' declarations concede that BP insisted the 40,000 Watts clients be included,[1] and that the parties came to terms only after the PSC agreed to their inclusion.

Yet the Opposition maintains that this Court can allow all monies to be distributed from the Seafood Compensation Program as if Watts' fraud had not occurred.  This argument obscures a defining feature of almost all class-action settlement agreements:  in bartering for peace, the scope of the claims and the number of plaintiffs covered by a settlement are of central importance to any defendant's decision to settle.  The Opposition remarkably asserts nonetheless that, in agreeing to pay $2.3 billion for seafood claims, BP did not care whether or not the settlement included more than 40,000 potential claimants.  The Opposition's assertions strain

---

[1] Declaration of Stephen J. Herman ¶ 11, Jan. 17, 2014, Doc. No. 12164-4 (filed under seal); Declaration of Joseph F. Rice ¶ 15, Jan. 16, 2014, Doc. No. 12164-4 (filed under seal).

1

credulity, and at best present a question of fact. The Court should reject the notion that 40,000 potential claimants were irrelevant based on a moment's reflection about any defendant's incentives to enter into a settlement. But the Court can rely on more than experience and common sense. The facts surrounding the parties' negotiations demonstrate that including individual deckhands was both a crucial point of contention and a material term of the parties' final agreement.

Class Defendants also suggest that BP should have known about Watts' fraud. But the PSC knew Watts better than did BP; after all, he was a member of the PSC. The PSC did not "flag" the fraud – not to BP, and not to the Court. It did not even seek his removal from the Committee. The PSC instead appeared to accept Watts' representations and, by doing so, to lend further credence to the fraud by insisting that BP should pay more to include the 40,000 potential claimants in the settlement. Worse, and putting aside the PSC's own conduct in apparent reliance on the fraud, Class Defendants' assertions ignore the obligation of officers of the Court, such as Watts, to tell the truth to the Court, and opposing parties' right to rely on such representations.

BP has shown that it is likely to succeed and that irreparable harm would result if a second distribution were to occur, scattering the fruits of Watts' fraud and making full recovery a practical impossibility. The Opposition's remaining legal and procedural arguments are unavailing. Therefore, this Court should grant BP's requested preliminary injunction.

**I.      BP Likely Will Succeed on the Merits.**

Three common elements suffice to establish BP's entitlement to relief on its various fraud-based claims: Watts made misrepresentations to both BP and this Court; those representations were material to BP's decision to enter into the Seafood Compensation Program;

and BP's reliance on Watts' representations was reasonable.[2]  At most, the Opposition's declarations and arguments establish that defendants will assert that Watts' fraud did not cost BP as much as BP claims.  But, as the Fifth Circuit has explained repeatedly, a movant seeking a preliminary injunction needs to demonstrate only a prima facie case and "is not required to prove its entitlement to summary judgment in order to establish a substantial likelihood of success on the merits."  *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (internal quotation marks omitted).

### A. Watts Undeniably Misrepresented the Identities and Numbers of His Clients.

Class Defendants say that they have "no information or belief about the alleged actions of Watts," Opp. at 27 n.99, effectively conceding the proof offered by BP on this first element.  The facts are undeniable.  Almost all of Watts' purported clients failed to file a claim under the Seafood Compensation Program, and BP has shown that nearly 58 percent of his client list exhibits serious discrepancies indicative of identity theft or wholesale fabrication of Social Security numbers.[3]  As for Watts himself, his failure to offer any explanation for the vast discrepancy between the number of deckhands he claimed to represent and those who actually submitted claims is relevant and highly probative of fraud.[4]  And his counsel has signaled Watts'

---

[2]  All the fraud-based claims require essentially these same elements.  *See* Compl. ¶¶ 49-93.

[3]  *See* Asinski Decl. ¶ 7; Travis Decl. ¶¶ 3-8.

[4]  *See, e.g.*, *Fed. Sav. & Loan Ins. Corp. v. Sutherlin*, 109 B.R. 700, 706 (Bankr. E.D. La. 1989) (holding defendants' refusal to explain discrepancies between his financial statements and bankruptcy schedules supported an adverse inference that his financial statements were false).

intent to assert the Fifth Amendment privilege in this matter, which will give rise to an adverse inference that Watts engaged in the conduct alleged.[5]

### B. Watts' Fraud Substantially Influenced BP's Agreement to the $2.3 Billion Seafood Compensation Program.

BP also has established the materiality of Watts' misrepresentations by presenting evidence that BP "insisted in the negotiations that individuals, such as Watts' clients, be included in any capped seafood fund."[6] The Class Defendants concede that the deckhands (largely represented by Watts) played a central role in the negotiations of the $2.3 billion Seafood Fund. Stephen Herman confirms that BP insisted on this term,[7] and Joseph Rice agrees, stating that "whether individuals in the Seafood Industry . . . would be included in the Individual Economic Loss Category or the Seafood Program" was an outstanding issue going into the final day of negotiations, February 25, 2012.[8] Rice also says, consistent with the recollections of Mark Holstein and Richard Godfrey, that "as part of reaching final agreement on *significant open issues* including the applicable RTP . . . and the dollar amount of the Seafood Program . . . , I informed Magistrate Shushan that the PSC would agree to have those undocumented fishers and deckhands . . . included in the Seafood Program, telling her, '*Okay, I will take care of the Watts claims*' in the Seafood Program."[9] Thus, the Herman and Rice Declarations actually

---

[5] Affidavit of Robert McDuff ¶ 5, Jan. 17, 2014, Doc. No. 12171-2; *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *F.D.I.C. v. Fid. & Deposit Co. of Md.*, 45 F.3d 969, 977 (5th Cir. 1995).

[6] Holstein Decl. (Dec. 15, 2013) ¶ 6; *see also* Godfrey Decl. (Dec. 17, 2013) ¶ 8-10.

[7] Herman Decl. ¶ 11.

[8] Rice Decl. ¶ 15.

[9] *Id.* (emphasis added).

acknowledge (perhaps unintentionally) that the inclusion of individual deckhand claims mattered to BP and that the PSC's objection to their inclusion was one of the hurdles to an agreement.[10]

The Opposition tries to draw the sting out of these facts by arguing that "the $2.3 billion was based on catch volume of Gulf seafood, not the number of individual claimants."[11]  But the argument concerning catch volume was made by both parties in justifying the fairness of the settlement amount after-the-fact; it does not serve as a rebuttal of the fact that one of BP's reasons for agreeing to the Program, and for paying what it did, was to resolve once and for all the claims of Watts' 40,000 putative clients.

The Opposition also questions the materiality of the Watts claimants, noting that the Watts claimants "were relegated" to Category III, which was subject to a $50 million cap.  Opp. at 2.  But that proposal was first made *after* the February 2012 agreement to the $2.3 billion.[12]  The subsequent proposal says little to nothing about what value BP placed on those claims in the February negotiation.  Moreover, the parties had no way of knowing what amount each Watts claimant would receive, as that would depend on what documentation each submitted.  For

---

[10]   The Opposition tries to make something of the fact that BP's pleadings have not said before that the Watts claimants were important to its decision-making. *E.g.*, Opp. at 21.  At the time the parties were seeking approval for the settlement, however, BP's task was to show the Court that the Seafood Compensation Program was a fair deal for the plaintiffs, not to explain its own motivation for paying what it did.

[11]   Opp. at 19.  The Opposition also attempts to show that other groups covered by the Seafood Program – shrimp or oyster-industry plaintiffs – mattered more to BP and that BP valued those plaintiffs' claims at "tens of billions of dollars." *Id.* at 5 & n.29 (citing Herman Decl. ¶ 8).  First, however, the importance that BP attached to obtaining peace with those other groups does not change the fact that BP wanted to obtain peace with the individual deckhands as well.  Supplemental Declaration of Richard C. Godfrey ¶ 7, Jan. 24, 2014, attached hereto as Exhibit 1 ("Godfrey Decl. (Jan. 24, 2014)").  Second, the Opposition mis-cites the record. The passage from Herman's Declaration quoted by the Opposition pertains to BP's calculations of how much the *plaintiffs'* uncapped proposals would cost, not BP's *own* valuation of the claims.  *See* Herman Decl. ¶¶ 7-8.

[12]   *See* Godfrey Decl. (Dec. 17, 2013) ¶ 14; Herman Decl. ¶¶ 13-15; Rice Decl. ¶¶ 16-18.

5

example, a claimant who submitted a valid tax return would fall in Category I, and there is no cap on Category I recovery.[13] Mr. Herman was acknowledging this fact when he told The New York Times shortly after this lawsuit was filed that the parties allocated $130 million to deckhands (Categories III *and* II).[14] Moreover, as events played out, there is little question what occurred. Watts had almost no clients. So no party involved in the allocation negotiations had much incentive to insist on a high allocation.

      C.      **BP Reasonably Relied on Watts' Misrepresentations.**

The Opposition cites an April 2011 New York Times article and an April 2011 letter from counsel for the Gulf Coast Claims Facility ("GCCF") as evidence that BP should have known about Watts' fraud, and faults BP for not scrutinizing Watts' client list when it first obtained it. To begin with, the April 2011 documents do not contend that Watts was engaged in fraud, nor do they purport to present evidence of widespread fraud or identity theft. The New York Times article questioned whether Watts represented all 40,000 claimants, noting that "about 50 people have made formal complaints to the claims facility."[15] But the article also quotes Watts' denial ("I have a signed contingency-fee contract with every client") and his estimate that he represented 43,000 clients.[16] Consistent with this story, Watts withdrew from the representation of 142 plaintiffs in July 2011[17] – a step which suggested that he had resolved

---

[13]    Settlement Agreement Ex. 10, at 65, May 3, 2012, Doc. No. 6430-22.

[14]    J. Schwartz, "BP Accuses Texas Lawyer of 'Brazen Fraud' in Workers' Claims Over Gulf Oil Spill," *The New York Times* (Dec. 17, 2013). Herman apparently arrived at this figure by adding the $80 million cap for Category II and the $50 million cap for Category III.

[15]    C. Robertson & J. Schwartz, "Many Hit by Spill Now Feel Caught in Claim Process," *The New York Times* (Apr. 18, 2011).

[16]    *Id.*

[17]    *See* Doc. Nos. 3424-3444.

6

any representation disputes with the remaining 40,000-plus clients for whom he remained counsel of record.

The letter from GCCF counsel noted that Watts' clients had so far failed to provide enough documentation to substantiate their claims. Given the undocumented nature of most deckhand work, this fact did not establish fraud. Moreover, by mid-2011, many lawyers were taking a "wait-and-see" attitude, leaving their clients' GCCF claims incomplete, or declining to file with the GCCF at all, until they could assess which claims process would be more lucrative.

In April 2011, then, BP at most had indicia that some of the claims filed by Watts might not survive the claims process; but it had no reason to suspect fraud of the scale now uncovered, much less to scrutinize Watts' client list for fraud. As Mark Holstein explains, "I did expect that Watts Guerra LLP was likely to have difficulty sustaining all 40,000-plus claims he had filed . . . . [h]owever, I never expected that less than 1,000 would even be submitted. Much less did I believe that over half of the Watts Guerra LLP's claims would prove to be on behalf of persons whose identity was stolen, or who were dead."[18]  Similarly, Richard Godfrey declares:

> Given the obligations of Rule 11, his obligations pursuant to the ethical rules of professional conduct of a lawyer, and given Mr. Watts' position as a court-appointed member of the PSC as of the time of the settlement negotiations, it was inconceivable to me that Watts would have filed short form joinders on behalf of 40,000-plus clients unless those persons in whose names he filed the short form joinders actually existed.[19]

The Opposition also ignores two significant facts regarding BP's reliance. Watts did not misrepresent the number of his clients only to BP; he also told this Court that he had 40,000-plus clients. His statements to the Court violated his obligations as an officer of the Court and under

---

[18] Declaration of Mark Holstein ¶¶ 4-5, Jan. 23, 2014, attached hereto as Exhibit 2 ("Holstein Decl. (Jan. 23, 2014)").

[19] Godfrey Decl. (Jan. 24, 2014) ¶ 6.

the Federal Rules of Civil Procedure to tell the truth in court filings.[20]  Thus, to adopt the Opposition's position, this Court would have to conclude, contrary to Fifth Circuit law, that BP was not entitled to rely on Watts' representations to the Court.  *See In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1258 n.8 (5th Cir. 1986); *cf. Statistical Data Servs., Inc. v. Farm Credit Bank of Tex.*, 49 F.3d 727 (5th Cir. 1995) (affirming sanctions against plaintiff's counsel who failed to inform the Court and defense counsel of facts that demonstrated plaintiff plainly had no standing to pursue relief) (unpublished).  The Opposition also ignores the fact that Class Defendants and Class Counsel had the same information that BP had about Watts and his clients – and possibly more, as Watts was a member of the PSC.[21]  If the April 2011 documents prove fraud, why did Class Counsel not come forward and say so, seeking Watts' removal from the PSC?

BP has shown its substantial likelihood of success on all of its fraud-based claims.  It is sufficient, however, that BP has established it will prevail on its federal common law action for fraudulent misrepresentation.  *See Wyman v. Rothstein*, 398 U.S. 275, 276 (1970); *Acierno v. Mitchell*, No. 92-384-SLR, 1992 WL 694590, at *16 (D. Del. Dec. 30, 1992) ("In order for

---

[20]  His application for PSC membership was sworn "under penalty of perjury."  Mot. To Appoint Counsel Mikal C. Watts to Plaintiffs' Steering Committee at 4, Aug. 27, 2010, Doc. No. 106; *see* Fed. R. Civ. P. 11(b).

[21]  The Opposition argues that BP has no likelihood of success because Louisiana Civil Code article 1956 provides that "[f]raud committed by a third party vitiates the consent of a contracting party [only] if the other party to the contract knew or should have known of the fraud."  *Smith v. Frey*, 703 So.2d 751 (La. Ct. App. 1997).  But, as a member of the PSC, Watts was not a "third party."  He was an active member of the PSC, and when BP was negotiating with the PSC it was negotiating with Watts, whether or not he was in the room and whether or not the PSC representatives used Watts' clients as leverage (which they did).

plaintiff to succeed in his request for injunctive relief, he needed to demonstrate a probability of success on the merits of only one claim.").[22]

### D.   BP Also Is Substantially Likely To Succeed on Its Other Claims.

BP has also made out prima facie cases on its federal common law claim for unjust enrichment and its Louisiana law claims for payment of a thing not due and abuse of process.

The Opposition insists that "[a] valid contract defines the obligations of the parties" and "displac[es] to that extent any inquiry into unjust enrichment."  Opp. at 29 (quoting *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1546-47 (2013)).  But, as explained *supra*, BP has demonstrated that it never entered into a valid contract due to Watts' fraud, and the equities demand that BP receive restitution.[23]  Indeed, since unjust enrichment is an equitable action, this Court can and must consider the merits of all of BP's causes of action to determine the merits of BP's unjust enrichment claim against the Class Defendants.  *See S.S. Silberblatt, Inc. v. East*

---

[22]  Federal common law controls the claim of fraud in the inducement.  The Opposition attempts to distinguish *Borne v. A&P Boat Rentals No. 4, Inc.* on the ground that it applies only to a "Jones Act Seaman."  Opp. at 16 n.74.  But *Borne* is merely one example of the well-established rule that "[q]uestions regarding the enforceability or validity of . . . agreements are determined by federal law – at least where the substantive rights and liabilities of the parties derive from federal law."  *Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 389 (5th Cir. 1984); *see, e.g.*, *Dice v. Akron, Canton & Youngstown R.R. Co.*, 342 U.S. 359, 361 (1952) (settlement of FELA claims); *Macktal v. Sec'y of Labor*, 923 F.2d 1150, 1156-57 & n.32 (5th Cir. 1991) (federal whistleblower claim); *O'Hare v. Global Natural Res., Inc.*, 898 F.2d 1015, 1017 (5th Cir. 1990) (ADEA); *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1208-09 & nn.1 & 2 (5th Cir. 1981) (Title VII).

[23]  As for the Opposition's claim that the Settlement Agreement itself bars any remedy "by reason of any change or difference in facts," Settlement Agreement § 13.4, that provision is inapplicable.  That term refers to a different kind of "change or difference in facts" – *e.g.,* that seafood industry revenues after the Spill rose rather than fell.  It does not encompass the discovery of facts showing fraud in the inducement.  *George N. Pierce Co. v. Wells Fargo & Co.*, 189 F. 561, 562 (2d Cir. 1911) (clauses which "exempt [a party] from the consequences of its own fraud or negligence . . . would be unlawful as against public policy"); *Strand v. Griffith*, 97 F. 854, 858-59 (8th Cir. 1899) (same); Restatement (Second) of Contracts § 196 (1981) ("A term unreasonably exempting a party from the legal consequences of a misrepresentation is unenforceable on grounds of public policy.").

9

*Harlem Pilot Block, Inc.*, 608 F.2d 28, 37 (2d Cir. 1979) ("[T]he equity of the transaction must shape the measure of the relief" on an unjust enrichment claim (internal quotation marks omitted)).[24]

The Opposition also asserts that payment of a thing not due is not a valid cause of action for a party seeking the return of assets transferred as part of an invalid settlement agreement. The case it cites, however, *Mongrue v. State Farm Mut. Auto. Liab. Ins. Co.*, 396 So. 2d 466 (La. Ct. App. 1981), does not support such a sweeping proposition and in fact contradicts it. In *Mongrue*, the court held only that the party asserting payment of a thing not due "d[id] not allege that the error they complained of was mutual or mutually communicated between the parties," which meant its showing was not "sufficient to invalidate the contract." *Id.* at 469. The court certainly did not hold that, as a matter of law, payment of a thing not due (as Class Defendants claim) "is not an available theory under Louisiana law to invalidate the settlement of a legal claim." Opp. at 25. Just the opposite, Louisiana courts hold that payment of a thing not due is indeed a proper cause of action for a party seeking the return of assets transferred as part of an invalidated settlement agreement. *See Onstott v. Certified Capital Corp.*, 2005-2548 (La. App. 1 Cir. 11/3/06); 950 So. 2d 744, 749-50 (concluding plaintiff stated a claim for payment of a thing not due when he sought return of assets transferred under a voided settlement).

Finally, the Opposition mounts a half-hearted defense of BP's abuse of process claim, arguing that there is no evidence of ulterior motive on Watts' part and a willful use of court process. Opp. at 26. On the contrary, BP has shown Watts' likely ulterior motive. Watts'

---

[24] Thus, Class Defendants' repeated assertions that the causes of action alleged against Watts alone are irrelevant to this request for a preliminary injunction, *see* Opp. at 16-17, are incorrect.

application for a PSC seat touted the fact that he represented "over 40,000 plaintiffs,"[25] and, by obtaining a coveted seat on the PSC, Watts lined himself up to receive a share of the PSC's common-benefit fee fund, which totals $600 million.[26] And the evidence of a fraud on the Court is overwhelming – Watts filed 25 complaints, more than 40,000 short-form joinders, and that application for PSC membership, all of which embody the lie that he had more than 40,000 clients.

## II. The Opposition Fails To Address BP's Arguments on the Other Three Preliminary Injunction Requirements.

Class Defendants ignore the heart of BP's showing of irreparable harm. The Opposition asserts that BP faces no imminent injury, but undercuts the assertion by noting that the plan for the second distribution is expected to be complete in February 2014. *See* Opp. at 31. And the Opposition ignores the cases cited by BP for the proposition that a party seeking money damages can obtain injunctive relief when its only recourse, absent injunction, would be filing suit against many parties who may dissipate their assets. *See Janvey v. Alguire*, 647 F.3d 585, 599-600 (5th Cir. 2011); *FSLIC v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987).

In much the same vein, the Opposition fails to address BP's analysis of the balance of harms or the public interest. The only harm suffered by the Class if an injunction issues is delay in making the second distribution. But the inconvenience of delay cannot outweigh the likely permanent loss that BP would suffer. As the *Enron* court recognized, "While there may be some delay in payment, . . . any perceived harm is outweighed by the significant and irreparable harm that will be inflicted on the [moving party] if the [assets] are depleted . . . ." *In re Enron Corp. Sec., Derivative & "Erisa" Litig.*, No. MDL-1446, 2004 WL 2889891, at *6 (S.D. Tex. Dec. 9,

---

[25] Mot. To Appoint Mikal C. Watts at 1, Doc. No. 106.

[26] Settlement Agreement Ex. 27, ¶ 2, May 3, 2012, Doc. No. 6430-46.

11

2004). The Opposition's only "argument" pertaining to the public interest is a recital of platitudes regarding the benefits of settlement of class-action litigation.

**III.    The Opposition's Procedural Arguments Fail as a Matter of Law.**

Class Defendants erroneously insist that BP cannot bring an "independent action" seeking the same relief as its Rule 60(b) motion. In the first place, Rule 60's reference to "independent action" concerns a specific type of equitable action seeking relief from judgment. *See* Fed. R. Civ. P. 60(d)(1); *United States v. Beggerly*, 524 U.S. 38, 45 (1998). BP is not bringing this type of equitable action, but rather is asserting separate federal and state law causes of action for fraud in the inducement of a contract. Even if this suit could be characterized as an "independent action," attorney misconduct is precisely the kind of egregious wrong that provides a basis for such an action, as the cases cited by the Opposition illustrate. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 251 (1944) (setting aside judgment where plaintiff and its attorneys fabricated evidence and submitted it to the court to secure a favorable judgment on its patent infringement claim); *Turner v. Pleasant*, 663 F.3d 770, 778 (5th Cir. 2011).

The Opposition's judicial estoppel argument is similarly unavailing. First, judicial estoppel "has never been applied where [a party's assertions] were based on [the other party's] ***fraud, inadvertence, or mistake***." *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973) (emphasis added). Second, only a later, clearly inconsistent statement is subject to estoppel. But even the statements cherry-picked in the Opposition – concerning the generosity of the $2.3 billion fund and the possibility that the second distribution might exceed $400 million – are not inconsistent with BP's contention that Watts defrauded it.[27] After all, BP

---

[27] *See In re Paige*, 610 F.3d 865, 876 (5th Cir. 2010) (a party is judicially estopped "only if its position is clearly inconsistent with the previous one"). Notably, Class Defendants do not identify any statement by BP to the effect that the number of claimants was immaterial to the settlement negotiations.

12

assumed the risk that fewer than expected claimants would file claims, not the risk that the entire negotiation of the Program was based on fraudulent misrepresentations.[28]  Finally, applying judicial estoppel here would fly in the face of the equitable nature of the doctrine.  *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); *Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298, 303 (5th Cir. 1998) (judicial estoppel "protect[s] the integrity of the courts.").

## CONCLUSION

For these reasons and those stated in BP's opening memorandum, this Court should grant BP's Motion for a Preliminary Injunction and suspend the second distribution of the Seafood Compensation Program until this Court discerns the full scope of the fraud perpetrated upon BP.

January 24, 2014

James J. Neath
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Respectfully submitted,

  */s/ Kevin M. Downey*
Kevin M. Downey
F. Lane Heard, III
Margaret A. Keeley
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 434-5000
Telefax:  (202) 434-5029

---

[28]  Consider, for a moment, how the Opposition's theory of this case would apply to other contexts.  The victim of an investment Ponzi scheme, by virtue of the fact that she had assumed market risk when buying an investment, could not sue based on her broker's fraud.

13

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Telefax: (202) 942-5999

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 662-5985
Telefax: (202) 662-6291

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606
Telephone: (312) 876-8000
Telefax: (312) 876-7934

***OF COUNSEL***

   */s/ Don K. Haycraft*
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Telefax: (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Telefax: (202) 879-5200

***ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY***

14

## CERTIFICATE OF SERVICE

  I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of January, 2014.

                 /s/ Don K. Haycraft
                 Don K. Haycraft