# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 <br><br> SECTION J |
| This document relates to: <br> All Cases and No. 12-970 | * * * * * * * | HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## SUPPLEMENTAL DECLARATION OF RICHARD C. GODFREY

I, Richard C. Godfrey, do hereby declare that the following statements made by me under oath are true and accurate to the best of my knowledge, information, and belief:

1. I previously submitted a Declaration in support of BP's Motion for a Preliminary Injunction, filed on December 17, 2013 (*BP Exploration & Production Inc. et al. v. Watts et al.*, No. Civ. 13-6674, Rec. Doc. 2-4 (filed under seal)).[1] This Declaration is intended to supplement my December 17 Declaration.

2. I explained in my prior December 17 Declaration in paragraphs 4 through 14 the negotiations that led to the parties' agreement on a $2.3 billion Seafood Program capped fund. During those negotiations, BP always insisted that the Seafood claims of various individuals (such as crew), including specifically Mr. Watts' clients, be included in the class and covered by the Seafood Program capped fund. The PSC rejected their inclusion in the Seafood Program capped fund until February 25, 2012, at which point they finally accepted the inclusion of such individual claims. (*See* Paragraphs 8-13 of my December 17 Declaration in this regard). I personally told Joe

---

[1] All "Rec. Doc." numbers refer to MDL 2179 unless otherwise noted.

Rice that BP could not agree to the Seafood Program capped fund if various individuals, including the Watts clients, were excluded from the Seafood Program capped fund.

3. As described in paragraph 11 of my prior December 17 Declaration, on February 25, my recollection is that BP made a $500 million increase in its offer, from $1.6 billion to $2.1 billion. I also recall that when this $500 million move was made, BP specifically told the PSC's Mr. Rice that the increased offer for the Seafood Program capped fund had to include various individuals (such as crew), including by name Mr. Watts' clients. I also recall telling Mr. Rice that BP did not and would not agree to the Seafood Program capped fund if the Watts clients were excluded from it.

4. At no point during the negotiations at which I was present did Mr. Rice state or suggest that: a) Mr. Watts had fictitious clients; or b) Mr. Watts' clients had stolen identities or false social security numbers; or c) any of the Watts clients were dead, did not exist, or that the clients themselves were fraudulently made up or fictitious; or d) Watts did not in fact represent roughly 40,000 or more clients, but instead some significantly lesser amount.

5. At no point in my presence during the settlement negotiations did Mr. Rice or anyone else from the PSC suggest or even imply, nor did I personally ever expect, that of Watts' 40,000-plus purported clients, many would be nonexistent persons. To the contrary, I and BP expressed concern during the negotiations from February 23 to 25 about the large numbers of the Watts clients and the importance of having those claimants be covered by and included in the Seafood Program capped fund. Given our negotiations, if Mr. Rice or anyone else from the PSC had any basis or belief that Mr. Watts' clients did not in fact exist, or the vast majority of them did not in fact exist, he or they should have told BP and me. But he did not do so nor did anyone else from the PSC do so in my presence. Indeed, during the February 23-25, 2012 negotiations, Mr. Rice on behalf of the PSC continued to try to exclude certain individual claimants (such as crew), including

2

the Watts clients, from the Seafood Program capped fund. And BP, in response, kept bidding upwards, in part so that the Watts individual clients along with other individuals (such as crew) would be included in any Seafood Program capped fund.

6.  Given the obligations of Rule 11, his obligations pursuant to the ethical rules of professional conduct of a lawyer, and given Mr. Watts' position as a court-appointed member of the PSC as of the time of the settlement negotiations, it was inconceivable to me that Watts would have filed short form joinders on behalf of 40,000-plus clients unless those persons in whose names he filed the short form joinders actually existed.

7.  An argument has been made in the Opposition to BP's Motion For A Preliminary Injunction that other groups covered by the Seafood Compensation Program – shrimp or oyster-industry plaintiffs – mattered more to BP and that BP valued those plaintiffs' claims at "tens of billions of dollars." Opposition at 5 & n.29 (citing Herman Decl. ¶ 8). This argument misses the point of importance to BP *during the negotiations in February* 2012 that led to the March 2, 2012 Agreement-in-Principle. (*See* Paragraphs 4, 13 and 14 of my December 17 Declaration). It also is inaccurate in my view. As to the inaccuracy, it was the PSC, not BP, who during the February negotiations valued the claims of oyster-industry plaintiffs and shrimp industry plaintiffs at multiples of billions of dollars. As to the point that it misses, it is simply that just as BP would not have agreed to the $2.3 billion Seafood Program capped fund without the oyster industry or shrimp industry being covered and included, we told Mr. Rice and the PSC that BP would not agree to the $2.3 billion Seafood Program capped fund if certain individuals (such as crew), including Mr. Watts' clients, were not included. The simple fact is that, from my perspective, to reach a deal on the $2.3 billion number during those late February 2012 negotiations, BP attached

significant value to including as many individuals, especially Mr. Watts' clients, as part of the class settlement, and specifically as part of the Seafood Program capped fund.

8.  There are various other statements or arguments that Class Counsel have made in opposition to BP's Motion for A Preliminary Injunction with which I do not agree, but see no reason to comment upon at this stage of the proceedings. My silence, however, should not be read as agreement or acquiescence in what they argue or allege.

9.  Portions of this Declaration are being filed confidentially and under seal as an Exhibit to the Reply Memorandum in Support of BP's Motion for a Preliminary Injunction Suspending the Second Distribution of the Seafood Compensation Program. Those portions of the Declaration are intended to remain confidential unless unsealed by the Court through the appropriate process.

I make this Declaration under penalties of perjury pursuant to 28 U.S.C. § 1746, and I state that the facts set forth herein are true to the best of my knowledge, belief, and information.

*Richard C. Godfrey*

Dated: January 24, 2014

4