## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL NO. 2179 |
| | * | SECTION: "J" |
| This document relates to No. 12-970 | * | Honorable Carl J. Barbier |
| | | Magistrate Judge Shushan |
| | *     *     * | |

## MEMORANDUM IN SUPPORT OF
## MOTION BY THE ANDRY LAW FIRM, L.L.C.
## TO HOLD BP IN CONTEMPT OF COURT

**MAY IT PLEASE THE COURT:**

BP continues its media campaign to intimidate the courts and claimants in order to renege on the *Settlement Agreement* it confected and previously defended. This campaign of intimidation includes intimidation regarding the adjudication of The Andry Law Firm BEL claim.  BP has gone to great lengths to attempt to extrajudicially intimidate claimants and the courts, including regarding the claim of The Andry Law Firm, L.L.C. ("The Andry Law Firm").  In its latest media attack, BP not only perpetrates falsehoods, it also violates an Order of this Honorable Court by advertising confidential claims information.  This Court should not countenance the flaunting of its orders by the **BP** attack machine, but should protect the integrity of the judicial system and the claimants injured by BP from the abuses of B.P., including clearing the name of The Andry Law Firm.

As succinctly summarized by the Plaintiff's Steering Committee:

> In this case, BP has, so far, plead guilty to eleven felony counts of seaman Manslaughter (18 U.S.C. § 1115), one felony count of lying to Federal Government (U.S.C. § 1505), criminal violations

of the Clean Water Act (33 U.S. C. § 1319 (c )(1)(A) & 1321 (b)(3), criminal violations of the Migratory Bird Treaty Act (16 U.S.C. § 1703 & 707 (a), and one count of lying to their stockholders and the SEC (15 U.S.C. § 8m). In addition to the criminal guilty pleas, the existing trial record is replete with further evidence of willful misconduct and the violation of Federal Regulations.

*Class Counsel's Comments on the Freeh Report*, p. 2 (Rec. Doc. No. 11463), *citing* TREX-52673 (Criminal Guilty Plea) and Rec. Docs 8360-1 and 8360-2 (SEC Complaint and Consent).

B.P.'s misconduct, and the catastrophic effects of its misconduct, did not end with the spill, however. Throughout this litigation, BP has consistently and systematically attacked others as it suits B.P.'s interests, including this Honorable Court, Special Master Patrick Juneau, Emeril Lagasse, and the Andry Law Firm, L.L.C., as well as others. BP agreed to a settlement; agreed to a claims administrator; agreed to maintain the confidentiality of claims information it received from the claims administrator; agreed to pay claims that met the terms of a settlement agreement it helped confect;andthenBP employed any and every methodat its disposal to renege on its agreement.*See* Rec. Docs.11819 and11890. Further, BP has pursued its agenda with callous disregard for the truth and for the damages it has caused to victims along the way.

BP has forged a publicity campaign since at least the Spring of 2013. B.P.'s campaign has culminated in false advertisements disparaging The Andry Law Firm and others. On September 11, 2013,BP published a false advertisement in the New York Times falsely proclaiming:

> Fraud and misconduct in the Gulf settlement claims process have now been confirmed.

***

- A New Orleans law firm tried to exert "improper personal influence" to advance both its own $7.6 million payment award and claims determinations favoring its clients, and "to corrupt" the claims process "in order to enrich" itself.

B.P.'s title declaration that "Fraud and misconduct have now been confirmed" is not true, especially as it relates to The Andry Law Firm. *See* R. Doc. 12712. Also, the pivotal statement in the middle of B.P.'s advertisement that "a New Orleans law firm tried to exert 'improper personal influence' to advance both its own $7.6 million payment award and claims determinations favoring its clients, and 'to corrupt' the claims process 'in order to enrich' itself," is also not based in fact. Rather, the statement is patently false because **there is no such "New Orleans law firm."**

There is no law firm that represented clients and also had its own $7.6 million BP claim. Instead, The Andry Law Firm, which formed in 2000, has a *pro se* claim only which is due and owing. The Andry Law Firm does not represent a single claimant or client in the BP litigation. Whereas, a separate law firm, Andry Lerner, LLC, which formed in 2012, does not have a BP claim and, instead, represents clients filing BP claims. BP conflated two separate firms with two separate missions to falsely create a fictitious single entity to act as the "poster child" for its false national advertising campaign against the settlement to which it had previously agreed.

If BP had accurately stated: that allegations had been made that a referral fee had been paid by a member of a firm, Andry Lerner, representing BP claimants to a person working in the claims office; that the case had been referred before that lawyer had begun working for the claims office; and that only one percent (1%) of that firm's clients' claims had been paid by the claims office, the advertisement would not have been very compelling to anyone who BP was seeking to sway in the court of public opinion.

3

Likewise, if BP had accurately stated regarding The Andry Law Firm that:BP agreed to a settlement which allowed businesses, including law firms, to make business loss claims;thatbased upon the terms of that settlement the certified public accountant for The Andry Law Firm had calculated The Andry Law Firm's loss; and that the calculation of the loss had been confirmed repeatedly by the Claims Office, on an appeal, and even thereafter by quality control, the advertisement would not have had the same dramatic effect.Proclaiming the whole truth regarding The Andry Law Firm would not have been very compelling to anyone who BP was seeking to sway in the court of public opinion in attacking the settlement agreement BP confected and previously defended in court.

BP concealed the whole truth about The Andry Law Firm by conflating two separate law firms with two separate missions together to create a fictitious firm which never existed, all as part of a damaging attack upon the Andry Law Firm.  BP then proceeded to not only publish further falsities against The Andry Law Firm, but also willfully and contemptuously disclosed confidential claims information of Emeril's Homebase, L.L.C. and The Andry Law Firm in later advertisements.  These advertisements constitute just part of a series of attacks by BP premised on falsehoods.

## I.     BP Has Wrongly Conflated The Andry Law Firm With AndryLerner, Creating A Single, Fictitious Law Firm In The Process.

The felon B.P., both before, and virtually simultaneous with, Special Master Freeh, has misled the Deepwater Horizon Court Supervised Settlement Program ("CSSP"), this Honorable Court, and the public by falsely conflating The Andry Law Firm with AndryLerner, L.L.C. through representations by counsel for B.P., pleadings filed by B.P., and advertisements lauding the *Freeh Report*.  BP concocted a fictitious law firm by misleadingly conflating two completely

4

separate law firms, created a decade apart, with completely different missions, and with completely different relationships with this litigation, in order to bolster a public relations campaign to attack the very Settlement Agreement that BP confected and previously defended in this very Court.

On June 21, 2013, the Associated Press reported that The Andry Law Firm's claim had been placed on hold based on erroneous allegations of wrongdoing within the CSSP.[1] The Associated Press further reported that a confidential source had alleged that former DHECC staff attorney Lionel Sutton had a financial interest in The Andry Law Firm's claim.[2] **This statement is not and never has been true.** The Associated Press attributed to BP attorney Mark Holstein the representation that The Andry Law Firm paid a referral fee to Mr. Sutton and "the Andry law firm and a related entity represent clients with roughly 675 claims and has its own claim worth more that $7.5 million." *Id.* The Associated Press story apparently originated from a letter written by Mr. Holstein to this Court dated the same day, and apparently leaked to the press.[3]

---

[1] *See* June 21, 2013 Associated Press Report, *Administrator Opens Probe of Spill Claims Lawyer*, attached to *The Andry Law Firm's Opposition to B.P.'S Motion for an Emergency Preliminary Injunction to Suspend Payments from the Court Supervised Settlement Fund* as Exhibit "B." The Huffington Post ran a similar article stating:

> Holstein said the Andry law firm and a related entity represent clients with roughly 675 claims and has its own claim worth more than $7.5 million. But the firm's own claim has been placed on hold, according to Holstein.

HUFFINGTON POST Article, *citing* Letter from Holstein to Judge, June 21, 2013.

[2] The July 1, 2013 correspondence issued by Patrick A. Juneau to this Court explains that the claim of The Andry Law Firm was placed on hold in response to inquiries by BP *See* Rec. Doc. 10761-8; *see also* Rec. Doc. 10761-6 at 3.

[3] The letter was not filed into the Court record until almost a month later on July 16, 2013. *See* Rec. Doc. 10761-7. Further, the letter filed into the record on July 16, 2013 was significantly redacted. *See also* footnote 3 of the July 1, 2013 letter of Patrick A. Juneau to this Court which notes: "Curiously, less than one hour after this meeting, the CAO began to receive inquiries concerning these allegations from various news sources." Rec. Doc. 10761-8.

The BP letter penned by Mr. Holstein falsely referenced "Mr. Sutton's expectation and receipt of fee payments from these law firms relating to CSSP awards to claimants at the same time that Sutton, as a fiduciary for the CSSP, was apparently involving himself in claims activity relating to those same firms. Thankfully, the [redacted] own pending BEL claim for more than $7.5 million has been placed on hold." In fact, no information has ever been presented by anyone suggesting that The Andry Law Firm ever paid any fees to Lionel Sutton related to a BP claim, because it never did.[4] This falsehood perpetrated by BP would soon devolve into the concocting of a fictitious law firm to better hawk the false and malicious storyline that BP desired to feed the public and courts in an attempt to dodge payment of The Andry Law Firm claim and its general obligations to pay BEL claims required by its Settlement Agreement.

Weeks later, on July 16, 2013, BP filed its *Memorandum in Support of its Motion for Emergency Preliminary Injunction* attempting to shut down the CSSP, wherein it continued its false storyline. *See* Rec. Doc. No. 10761-1. The *Memorandum* deceptively conflated two separate law firms: The Andry Law Firm and Andry Lerner, L.L.C. *See id.* at 16-18. BP alleged that Lionel Sutton intervened in the CSSP claims process to assure that claims filed by "Law Firm Y" were paid in exchange for kickbacks from "Law Firm Y." B.P.'s Mem. Supp, Rec. Doc. 10761-1 at 4. Specifically, BP alleged:

> [I]n March 2013, Mr. Sutton contacted Claim Administration Vendor Postlewaite and Netterville about a claim filed on behalf of a law firm connected to Mr. Sutton (collectively referred to herein with affiliated entities as "Law Firm Y"). *Id.* at 4. In an apparent effort to ensure it was paid, Mr. Sutton followed up a number of times with the vendor to check the status of Law Firm Y's claim. *Id.*

---

[4] Further, no information has been presented by anyone suggesting that The Andry Law Firm represented any claimants before the CSSP.

Unbeknownst to BP, at the same time Mr. Sutton was intervening in these claims, he was requesting payments from Law Firm Y. *Id.* at 5–6. The limited documents turned over by the CSSP to date include *numerous* e-mails in which Mr. Sutton requested payments from representatives of Law Firm Y. *Id.* For example, in January 2013, Mr. Sutton asked a named partner at Law Firm Y "did u [sic] check on my fee from [Claimant X]." *Id.* at 5. Later, in March 2013, Mr. Sutton repeatedly e-mailed with the named partner regarding the requested "money." *Id.* at 5. Similar communications continued through June 2013. *Id.* at 6. At the time, Law Firm Y itself had a pending claim before the CSSP for over $7.6 million. *Id.* at 2. ...

Mr. Juneau has placed a hold on "all claims of clients represented by" Law Firm Y. Ex. 5, 7/2/13 Update on Review of Code of Conduct and Claims Processing Issues at 3. This decision, however, was based on a very narrow investigation. ... Similarly, as of late June, the CSSP only had reviewed 43 of the 675 claims filed by Law Firm Y to identify additional search terms or Sutton Reitano clients. *Id.* at 2. Moreover, the search only focused on Law Firm Y, and did not stretch more broadly to determine whether there were any other similar arrangements.

Rec. Doc. No. 10761-1, at 16-18.

BP employed the nomenclature "Law Firm Y" as a pseudonym, but "Law Firm Y" obviously referred alternatively to The Andry Law Firm and at other points to AndryLerner, L.L.C. For example, BP alleges that "Law Firm Y" represents the same "675 claimants" that are attributed to The Andry Law Firm in the Associated Press story. B.P.'s Mem. Supp, Rec. Doc. 10761-1 at 5–6 ("Law Firm Y represents 675 claimants that have completed either a claims form or a registration form to file a claim before the CSSP." B.P.'s Mem. Supp, Rec. Doc. 10761-1 at 5–6; *see also* "Similarly, as of late June, the CSSP only had reviewed 43 of the 675 claims filed by the Law Firm Y...."*Id.*). BP also refers to the fact that "Law Firm Y," like The Andry Law Firm, "had a pending claim before the CSSP for over $7.6 million," *id.* at 4, and cites to Mr.

Juneau's letter to this Court regarding The Andry Firm's claim status, *id.* (citing B.P.'s Exhibit "5," Rec. Doc. 10761-6).  B.P.'s allegations in its *Memorandum in Support of its Motion for Emergency Preliminary Injunction*, read along with the Associated Press' reporting of the letter sent by counsel for BP to this Court, clearly reveal an attempt to conflate The Andry Law Firm and AndryLerner, L.L.C. in the mind of this Court and the public.

This amalgamation of The Andry Law Firm and AndryLerner, L.L.C. was unfortunately and incorrectly mimicked in the *Freeh Report* issued on September 6, 2013, which concluded:

> The Special Master finds that Mr. Lerner and Mr. Jon Andry utilized and benefited from Mr. Sutton's attorney position inside the CAO in furtherance of their AndryLerner clients' claims, as well as The Andry Law Firm's $7,908,460 claim.

*Freeh Report*, Rec. Doc. No. 11287, at 9-10.

BP continued its campaign to attack a fictitious law firm as a straw man on September 11, 2013, when it published in an advertisement, in the internationally distributed New York Times, the following propaganda:

> Fraud and misconduct in the Gulf settlement claims process have now been confirmed.
>
> ***
>
> - A New Orleans law firm tried to exert "improper personal influence" to advance both its own $7.6 million payment award and claims determinations favoring its clients, and "to corrupt" the claims process "in order to enrich" itself.

*See* BP *Advertisement*, New York Times, Sept. 11, 2013, referenced by Mark Schleifstein in his article: *BP ad in New York Times Repeats Allegations of Misconduct in Oil Spill Claims Office*,

NOLA.COM (Sept. 17, 2013, 2:54P.M.).[5]

First, fraud and misconduct have not been confirmed. This Court has not adopted the *Freeh Report.* Second, as previously explained, The Andry Law Firm and AndryLerner, L.L.C. are not the same firm. The Andry Law Firm is a limited liability company formed in 2000.[6] AndryLerner, L.L.C. is a limited liability company formed in 2012. The Andry Law Firm is, and always has been, only a claimant in this litigation, and has never represented a claimant. *Id.* AndryLerner, L.L.C. is, and always has been, a firm representing claimants in this litigation only, and has never been a claimant. *Id.* The Andry Law Firm does not share in, or have any business or financial interest in, AndryLerner, L.L.C. *Id.* Likewise, AndryLerner, L.L.C. does not share in or have any business or financial interest in either The Andry Law Firm or the perfected BP claim of The Andry Law Firm. *Id.*

The Andry Law Firm has two members, Gilbert V. Andry, IV and Jonathan B. Andry. *Id.* The Andry Law Firm properly filed a claim in this litigation in the Summer of 2012 after its CPA, David Kushner of Kushner LaGraize, L.L.C., suggested that The Andry Law Firm might have a claim based upon the parameters of the BP master settlement agreement.*Id.* However, neither Gibby Andry nor The Andry Law Firm has ever represented, nor do they currently represent, any clients in this litigation. Rather, Jonathan Andry represented claimants through forming The Andry Law Group, and later, Andry Lerner, L.L.C. *Id.* The two firms should not be conflated as they repeatedly have been by BP and the Special Master.

_____

[5] http://www.nola.com/news/gulf-oil-_spill/index.ssf/2013/09/bp_ad_in_new_york_times_repeat.html (including link to PDF version of the actual advertisement).
[6] *See Affidavit of Gilbert V. Andry, IV* attached to *The Andry Law Firm's Opposition to B.P.'S Motion for an Emergency Preliminary Injunction to Suspend Payments from the Court Supervised Settlement Fund,* R. Doc. 12172.5; *see also* reports of the Louisiana Secretary of State, R. Doc. 12172.6.

This pattern of repeated confusing of The Andry Law Firm and AndryLerner, L.L.C. reveal a continuation by BP of the "multi-faceted legal and public relations campaign challenging the settlement agreement and this Court's interpretation of it" that The Andry Law Firm pointed out in *The Andry Law Firm's Opposition to BP's Motion for an Emergency Preliminary Injunction to Suspend Payments from the Court Supervised Settlement Fund* filed under seal in July of 2013. This campaign has consistentlyconfused The Andry Law Firm and AndryLerner, L.L.C., conjuring a fictitious law firm that never existed, to promote the interests of BP to the detriment of The Andry Law Firm, justice, and the truth.BP intentionally created the fiction of an amalgam law firm because that rewrite of history facilitates B.P.'s claims of kickbacks for the expediting of a multimillion dollar claim. Two separate and distinct firms mentioned separately do not facilitate B.P.'s desired punch line. Therefore, BP then employs its allegations of kickbacks for the expediting of a multimillion dollar claim of a fictitious firm to bolster its ongoing campaign to "rewrite or disregard the unambiguous terms of the Settlement Agreement." Rec. Doc. 11890, p.10; *see* B.P.'s Mem. Supp, Rec. Doc. 10761-1. This conflation of two separate firms to rescue BP from the settlement agreement BP signed and perfected, but now seeks not to honor, must end.

## II. BP Continues To Attack Legitimate Claimants, Including Revealing Confidential Claims Information In Violation of the Orders of this Court

Continuing its pattern of attacking innocent claimants, BP then proceeded to disparage celebrity chef Emeril Lagasse in an advertisement that ran in national newspapers.[1] Blaine LeCesne, a Loyola Law School professor closely following the settlement, said it best: "BP's

---

[1]*See* http://theadvocate.com/news/7840199-123/bp-ad-blasts-celebrity-chef; http://www.wwltv.com/news/eyewitness/davidhammer/BP-uses-Emeril-as-example-of-abuses-in-oil-spill-settlement-235798801.html.

advertising campaign is trying to play on the public's moral outrage, but it's BP that's truly 'insidious' in attacking Lagasse." *Id.* "He has nothing to apologize for," LeCesne said of the chef. *Id.* "There is no ethical dilemma implicated by his submission of a claim. It is BP's own self imposed, clumsy efforts to settle this case that generated these potential anomalies of which it is now complaining." *Id.* Claims Administrator Patrick Juneau defended the decision to pay Lagasse, just as he previously defended The Andry Law Firm's claim, stating: "This claim satisfied those requirements agreed upon by BP and class counsel." *Id.* Although BP appealed the program's determination, Juneau explained that "[t]he appeal panelists affirmed the determination of the program and concluded that the claim was correctly processed under the terms agreed upon by BP and the class counsel." *Id.*

Further, in its disingenuous advertisement, BP apparently revealed confidential claims information regarding the claim of Emeril's Homebase, L.L.C. *See Emeril's Homebase, L.L.C.'s Motion and Incorporated Memorandum in Support to File Motion, Memorandum and Exhibits Under Seal.* R. Doc. 12053.

Similarly, BP again falsely attacked The Andry Law Firm by publishing a second series of advertisements, beginning January 16, 2014, in the New York Times, the Washington Post and the Wall Street Journal. *See* R. Doc.12172-4; *see also* 12182.33; *see also* http://www.thestateofthegulf.com/ and http://www.thestateofthegulf.com/media/44952/BP-Ad-1-16-14.pdf. BP then ran the advertisement again on January 17, 2014 in at least the Wall Street Journal. *Id.*

In this series of false advertisements, BP revealed confidential claims information of The Andry Law Firm. Specifically, BP alleges that The Andry Law Firm claim "depended on the

inclusion of a contingency fee from work that took place roughly 10 years earlier, when The Andry Law Firm *didn't even exist*."*Id.* (emphasis in original).  This sort of information only could have been obtained by BP through the claims process.  The advertisement further claimed that "the firm's post-spill 'losses' were based on a decision to shift its focus to other businesses and *had no apparent connection to the spill.*"  *Id.* (emphasis in original). Of most importance, BP's argument of alternative causation was also made on appeal, ignoring two order of this Court forbidding BP from raising such a defense.  These allegations clearly disclose, and then wrongly characterize,[7] information gleaned from the confidential information provided to BP through the Claims Administrator.[8]

On June 29, 2012, this Court issued an Order stating, in pertinent part, that:

> **2.*Claims Information.*** Pursuant to Paragraph 18 of the Court's March 8, 2012 First Amended Order Creating Transition Process (Rec. doc. 5995) and Paragraph 3 of the Court's May 22, 2012 Order Regarding Settlement Implementation (Rec. doc. 6573), all claim files and claims-related materials and data submitted to the Gulf Coast Claims Facility (the "GCCF") and in the Transition Process have been transferred to the Claims Administrator. Paragraph 4 of the Order Regarding Settlement Implementation directs that all such Claims Information is deemed "confidential" under Pre-Trial Order No. 13 (Rec. doc. 641). In addition, the Claims Administrator will receive and will generate claim files and claims-related materials and data relating to claims submitted to the Claims Administrator under the Economic and Property Damages Settlement Agreement that contain personal identifying information and other private information regarding claimants that warrant protection from disclosure.

> This Order refers to all such GCCF, Transition Process and

---

[7] The advertisement states further falsehoods about the claim, suggesting that the claim was improper, or even fraudulent.

[8] The Fifth Circuit has held that a "court's protective orders prohibited the use of the confidential documents for any purpose outside of the litigation, thereby prohibiting revelation of the documents' contents as much as their existence." *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282 (2002).

Economic and Property Damages Settlement Agreement claim files and claims-related materials and data collectively as "Claims Information."

**3. *The Purpose of this Order.*** This Order defines the terms on which third parties may obtain access to Claims Information and the proper use of such information by any recipients of Claims Information, and modifies, amends and supersedes Pre-Trial Order No. 13 with respect to Claims Information.

**4.*Confidentiality of Claims Information.*** All Claims Information shall be kept confidential and shall not be disclosed except as allowed by this Order or subsequent Order of the Court.

*** 

**6.*Access by Class Counsel and the BP Parties.*** Class Counsel and the BP Parties shall have access to Claims Information as provided in the Settlement Agreement and any Order of this Court (including previously entered Orders in connection with the Settlement Agreement).

***

**13.*Use of Claims Information.*** All persons receiving any Claims Information pursuant to this Order ("Authorized Recipients") shall use such information only for the purpose for which the Authorized Recipient was permitted to receive the Claims Information. Each Authorized Recipient may disclose the Claims Information to such other persons as is reasonably necessary for the implementation of such purpose, including experts, consultants, counsel, and other advisors, and the direct staff of any of the foregoing. All such persons shall take such steps as are necessary to preserve the confidentiality of Claims Information and shall use such Claims Information solely for the purpose for which the person was permitted to receive it.

R. Doc. 6822. *See also* R. Docs. 641, 3201, 4237, 6573.

This Order is consistent with the confidentiality provision of the *Settlement Agreement*, which reads:

4.4.1. The Parties shall jointly request that the Court issue an order directing that all claims-related information files and data previously submitted to the GCCF and/or that has been submitted to the Transition Process shall be transferred to the Settlement Program. This order shall include a provision that: (a) authorizes the Settlement Program to maintain such claims-related information and data for the duration of the Claims administration process; and (b) authorizes the Claims Administrator to release copies of such information or data to any claimant that submitted that information or data upon the written request of the claimant or the claimant's authorized representative. All such information and data shall be treated by the Settlement Program and the Parties and counsel as "confidential" under Pre-Trial Order No. 13. The Claims Administrator shall issue a status report to the Court documenting the transfer of claims and claims-related information, files and data and thereafter issue a final report to the Court after the transfer of the Transition Claims, claims-related information, files and data is complete.

R. Doc. 6430.

The *Order* clearly prohibits BP from disclosing claims information to the public. BP even acknowledged same in its *Motion To File Under Seal BP's Unredacted Notices Of Appeal From Denial Of Discretionary Review Of Claim ID XXX948*, stating:

> Pursuant to the Court's Order Regarding the Confidentiality of Claims Information of the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement (Rec. Doc. 6822), the BP Defendants, by their attorneys, hereby respectfully request leave to file under seal an unredacted copy of BP's Notice of Appeal from Denial of Discretionary Review of Claim ID XXX948.

> Out of an abundance of caution and respect for the Court's orders and processes, BP filed on the public docket a redacted version of this document, redacting confidential identifying information regarding the individual claimant. BP now moves to file under seal an unredacted version of this document for the Court's consideration. Filing of the unredacted version on the docket is necessary and appropriate to enable the Court of Appeals to identify the particular claimant and claim at issue.

14

R. Doc. 11983.Yet, despite the clear *Order* of this Court, BP has chosen to wage a media campaign attacking claimants by purporting to reveal the confidential claims information of the claimants.

## III.    Contempt Is An Appropriate Remedy For Violation Of A Confidentiality Order.

A federal district court may hold a party in contempt of court for violating a confidentiality order under Federal Rules of Civil Procedure 16(f) and 37(b)(2), 18 U.S.C. § 401, and the inherent power of the federal courts.

> Federal Rule of Civil Procedure 37(b)(2) states that a court may "treat [ ] as contempt ... the failure to obey any order except an order to submit to a physical or mental examination." Fed.R.Civ.P. 37(b)(2); *see also* 18 U.S.C. § 401 ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority ... as—(n.) ... (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."). The Advisory Committee Notes make clear that noncompliance with protective orders issued pursuant to Rule 26(c) may be sanctioned under this provision. *See* 1970 Advisory Committee Note to Fed.R.Civ.P. 37 at 207 (2011 ed.); *see also Schiller v. City of New York*, No. 04 Civ. 7921, 2007 WL 1623108, *3 (S.D.N.Y. June 5, 2007) (concluding that Rule 37(b) authorizes a district court to impose sanctions on a party that fails to comply with a protective order); *Poliquin v. Garden Way, Inc.*, 154 F.R.D. 29, 31 (D.Me.1994) ("Discovery orders that can be enforced through Rule 37(b) include protective orders issued under Federal Rule of Civil Procedure 26(c).[9]"); Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse § 48(A)(2) (4th ed.2008).
>
> "Even if there were no such authority under Rule 37(b), courts have the inherent power[10] to maintain the integrity of protective

---

[9] This Court specifically referenced "its authority under Rule 26(c) of the Federal Rules of Civil Procedure" in issuing *Pre-Trial Order No. 13*. R. Doc. 641.

[10]    A federal court may also exercise its inherent power when necessary to ensure justice. "[I]t is firmly established that '[t]he power to punish for contempt is inherent in all courts.' " *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 2132 (1991) (quoting *Ex parte Robinson*, 19 Wall. 505, 510, 22 L.Ed. 205 (1874)). This inherent power reaches conduct demonstrated both in the presence

orders by imposing sanctions on those who violate them." *Schiller*, 2007 WL 623108, at *3;*In re Debs*, 158 U.S. 564, 594, 15 S.Ct. 900, 910, 39 L.Ed. 1092 (1895) ("the power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court.").

*Doresett v. County of Nassau*, No. CV 10-01258(ADS), 2012 WL 2076911, at *8 (E.D.N.Y. 2012).[11]

---

of the court and conduct committed beyond the confines of the court, when "[t]he underlying concern that gave rise to the contempt power was not ... merely the disruption of court proceedings, [but are acts of disobedience], regardless of whether such disobedience interfered with the conduct of trial." *Chambers*, 501 U.S. at 44, 111 S.Ct. at 2132 (*quoting Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798, 107 S.Ct. 2124, 2132, 95 L.Ed.2d 740 (1987) (internal citations omitted). Of particular significance in these instances, is the court's inherent power to manage its own affairs and address conduct that is both violative of its orders and threatening to the integrity of the judicial process. *See Chambers*, 501 U.S. at 43, 111 S.Ct. at 2132.

In regard to inherent power, the Fifth Circuit has reasoned, "[w]hen a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions." *Toon v. Wackenhut Corrections Corp.*, 250 F.3d 950, 952 (5th Cir.2001) (*quoting Carroll v. The Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir.1997)). In doing so, however, "[a] court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Carroll*, 110 F.3d at 292-93 (*quoting Chambers*, 501 U.S. at 50, 111 S.Ct. at 2136.); *see also* Thomas E. Baker, Symposium: Turbulence in the Federal Rules of Civil Procedure: The 1993 Amendments and Beyond, 14 REV. LITIG. 195, 199-00 (1994) (noting that "[t]o exercise its inherent sanctioning authority, a federal court may act *sua sponte* or upon a motion to conduct an independent investigation-as long as its actions are consonant with the basic procedural due process guarantees of reasonable notice, a meaningful opportunity to be heard, and particularized findings.") "Presumably, any sanction contemplated under federal statutes and rules can be imposed incident to the [court's] inherent power as well." Thomas E. Baker, Symposium: Turbulence in the Federal Rules of Civil Procedure: The 1993 Amendments and Beyond, 14 REV. LITIG. at 200.

*In re Rosenthal*, Civil Action No. H-04-186, 2008 WL 983702, at *5 (S.D. Tex. Mar. 28, 2008).

[11] *See also U.S. v. Williams*, Civil Action No. 3:12-mc-059-CWR-FKB, 2012 WL 3242189, at *2 (S.D. Miss. July 20, 2012))("It is well-settled law that 'the power to punish for contempt is an inherent power of the federal courts and that it includes the power to punish violations of their own orders.' *In re Bradley*, 588 F.3d 254, 265 (5th Cir.2009).")

Sanctions are permissible under Rule 37 when a party fails to comply with a court order, regardless of the reasons. *See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 208, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) ("[T]he willfulness or good faith of [a party], can hardly affect the fact of noncompliance and [is] relevant only to the path which the District Court might follow in dealing with [the party's] failure to comply."); *David v. Hooker, Ltd.*, 560 F.2d 412, 420 (9th Cir.1977) ("in view of the possibility of light sanctions, even a negligent failure [to obey an order] should come within" Rule 37); *Chicult v. U.S.*, 4 F.3d 1322, 1320 n. 23 (5th Cir.1993) (citing *Societe* for the proposition that "the type of conduct displayed by a party had no bearing on whether sanctions should be imposed, but only on the type of sanctions imposed").[12]

This Court, on motion or on its own, may also issue sanctions under Rule 16(f)[13] in the event that a party or their attorney fails to

---

[12]   In addition, a court need not find willfulness or bad faith as a prerequisite to a contempt finding pursuant to Rule 37. *See Paramedics*, 369 F.3d at 655; *Cancer Research Institute, Inc. v. Cancer Research Soc., Inc.*, 744 F.Supp. 526, 529, 530 (S.D.N.Y.1990). *Cf. Rojas v. United States*, 55 F.3d 61, 63 (2d Cir.1995) (per curiam) (noting that in criminal contempt, the willfulness element requires proof of a volitional act done by who knows or should reasonably be aware that the conduct was wrongful."). Even in a case requiring a willful act, this can be demonstrated by "volitional acts by one who knows or reasonably should know the conduct is wrongful. " *Drywall Tapers of Greater New York Local 1974, of I.B.P.A.T., AFL –CIO v. Local 530 of Operative Plasterers and Cement Masons Intern. Ass'n*, No. 81 Civ. 0337, 1986 WL 14711, at *14 (E.D.N.Y. Dec.16, 1986)(emphasis added). Regardless, "[t]he contemnor's intent, ... may be considered in fashioning an appropriate remedy." *Cancer Research*, 744 F.Supp. at 529.

*Doresett v. County of Nassau*, No. CV 10-01258(ADS), 2012 WL 2076911, at *8 (E.D.N.Y. 2012).

[13]   Pursuant to Rule 16(f), the Court "may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney ... fails to obey a scheduling or other pretrial order." FED. R. CIV. P. 16(f); *see also Fleming & Assocs. v. Newby & Tittle*, 529 F.3d 631, 641–42 (5th Cir.2008) (upholding sanctions imposed by trial court as within the authority of Federal Rule of Civil Procedure 16(f)); *Lyn–Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 290 (5th Cir.2002) (upholding civil contempt order imposed as a sanction for party's violation of a protective order).

The district court may rely on its inherent power to impose sanctions when a party's conduct is not effectively sanctionable pursuant to an existing rule. *Toon v. Wackenhut Corrections Corp.*, 250 F.3d 950, 952 (5th Cir.2001).

obey a scheduling or pretrial order. Fed.R.Civ.P. 16(f). The Court
may issue any just sanctions, including those authorized by Rule
37(b)(2)(A)(ii)-(vii). *Id.* Additionally, the Court must award
reasonable expenses, including attorney's fees, incurred as a result
of the violation, "unless the noncompliance was substantially
justified or other circumstances make an award of expenses
unjust." *Id.*

Finally, this Court may issue sanctions under its inherent power,
but only upon a showing of bad faith. *See Chambers v. NASCO,
Inc.,* 501 U.S. 32, 43–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991);
*See also Mendez v. County of San Bernardino,* 540 F.3d 1109,
1130–33 (9th Cir.2008) … ; *Fink v. Gomez,* 239 F.3d 989, 992 (9th
Cir.2001) (noting that Chambers used " 'bad faith' as a shorthand
term to encompass a broad range of conduct in observing that a
party may 'show bad faith by delaying or disrupting the litigation
or by hampering enforcement of a court order' " (*quoting* 501 U.S.
at 46)); *Toon v. Wackenhut Corrections Corp.,* 250 F.3d 950, 952
(5th Cir.2001) … .

*Life Technologies Corp. v. Biosearch Technologies, Inc.,* No. C-12-00852 WHA (JCS), 2012

WL 1600393, at *12 (N.D. Cal. May 7, 2012).

   The Fifth Circuit has established the following prerequisites for a civil contempt order:

A party seeking a civil contempt order must demonstrate, by clear
and convincing evidence, "(1) that a court order was in effect, (2)
that the order required certain conduct by the respondent, and (3)
that the respondent failed to comply with the court's order."
*LeGrand,* 43 F.3d at 170 (citing *Martin v. Trinity Indus., Inc.,* 959
F.2d 45, 47 (5th Cir.1992)); *Whitfield v. Pennington,* 832 F.2d 909,
913 (5th Cir.1987).

*Lyn-Lea Travel Corp. v. American Airlines, Inc.,* 283 F.3d 282, 291 (5th Cir. 2002); *see also*

*Whitcraft v. Brown,* 570 F.3d 268, 271–72 (5th Cir.2009); *Martin v. Trinity Indus., Inc.,* 959 F.2d

45, 47 (5th Cir.1992); *S.E.C. v. ABC Viaticals Inc.,* No. 3:06-cv-02136-P, 2013 WL 1288168, at

---

*Bead Filters Intern., LLC v. Mills,* Civil Action No. SA-09-105-XR, 2009 WL 3837863, at *2 (W.D. Tex. Nov. 12,
2009).

*4 (N.D. Tex. Mar. 28, 2013);*U.S. v. Williams*, Civil Action No. 3:12-mc-059-CWR-FKB, 2012 WL 3242189, at *2 (S.D. Miss. July 20, 2012).

> The purpose of a civil contempt sanction "is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation." *Quilling v. Funding Resource Group*, 227 F.3d 231, 234 (5th Cir.2000). ... The court need not find that the failure to comply was willful, but merely that the offending party failed to comply with the order. *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir.2000). "Upon a finding of contempt, the district court has broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educational Services, Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir.2005).

*RMC Publications v. Doulos PM Training*, Civil Action No. 3:07-cv-2139-O, 2009 WL 1974286, at *2 (N.D. Tex. July 7, 2009).

> "A sanction may, of course, be both coercive and compensatory." *Terry*, 886 F.2d at 1353. The Second Circuit has commented that, "[s]o far as the ... [coercion] function [ ] is concerned, the district judge, sitting in equity, is vested with wide discretion in fashioning a remedy." *Weitzman v. Stein*, 98 F.3d at 719 (*quoting VuittonetFils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979). When imposing coercive sanctions, the Court should consider:
>
>> (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden.
>
> *Terry*, 886 F.2d at 1353; *see Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir.1987) ... .

***

A court is "free to consider the full record in the case in order to choose the appropriate sanction." *Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir.2010). Trial courts

have broad discretion in fashioning coercive remedies. *See N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857 (2d Cir.1984).

Of importance in this case, a sanction for violating a confidentiality order, in particular, should persuade the offender to take its obligations more seriously as well as to give warning that any further violations will result in harsher consequences. *See Frazier v. Layne Christensen Co.*, No. 04 Civ. 315, 2005 WL 372253, at *4 (W.D.Wis.2005) ("That said, the protective order is not a paper tiger ... the price extracted from plaintiffs for their disregard of the court's orders must be sufficient to constitute actual punishment and must serve as a specific and general deterrent to future violations in this case and in others. ... ").

\*\*\*

With regard to the amount of sanctions to be imposed, the Court's discretion in selecting appropriate sanctions is guided by a number of factors, including: "(1) the willfulness of the noncompliant party or the reasons for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the noncompliant party had been warned of the consequences of his noncompliance." *Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y.2002) (citations omitted).

The Second Circuit has indicated that if the contempt is willful, that strongly supports an award of fees and costs. *See Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir.1996) ("Thus, while willfulness may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports granting them."); *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1535 (11th Cir.1986) ("[w]illfulness is a commonly accepted justification for awarding attorney fees.").

*Doresett v. County of Nassau*, No. 10-cv-1258 (ADS), 2012 WL 2076911, at *10 (E.D.N.Y. July 7, 2012).

The Fifth Circuit Court of Appeal has upheld the award of "costs ... incurred in attempting to obtain ... compliance with the court's protective orders." *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282 (2002).

## IV.   BP's Repeated, Willful Acts of Contempt Should Garner Substantial Sanction

BP's repeated violation of the confidentiality orders of this Court are clearly willful.  This is not a case involving an inadvertent filing of a confidential document such as an exhibit to a pleading, or a slip when responding to a reporter's inquiry.  Instead, BP undertook an elaborate and expensive media campaign, and, as part of that campaign,intentionally disclosed the confidential claims information of two claimants: Emeril's Homebase, L.L.C. and The Andry Law Firm.  Further, the second disclosure occurred after Emeril's Homebase, L.L.C. filed a motion in response to the first contumacious disclosure.R. Doc. 12053.

Worse, B.P.'s entire media campaign attacking claimants, the CSSP, and this Court, is merely a thinly veiled ploy to intimidate the courts into allowing BP to renege on the *Settlement Agreement* it negotiated, signed and repeatedly defended in the courts, and to intimidatethose Gulf Coast residents and businesses, who suffered through the worst environmental disaster in U.S. history and would qualify under the terms of that *Settlement Agreement* for compensation, from filing claims.[14]   Only a substantial sanction will prevent BP from continuing its contumacious behavior considering: (1) its repetitive acts of contempt in advertising confidential claims information; (2) its vast financial resources; (3) its great financial interest in derailing the payment of claimants per the terms of the *Settlement Agreement*; and (4) its relentless attempts within the courts to avoid honoring the terms of the *Settlement Agreement.*An appropriate sanction would include ordering the payment of The Andry Law Firm BEL claim, which has been due and owing for months, and which BP caused to be held without basis.[15]

---

[14] This campaign of intimidation includes intimidation regarding the adjudication of The Andry Law Firm BEL claim.  BP should not be allowed to cajole this Court into ruling against ALF without a hearing or evidence.

[15] *See Initial Objections And Response of The Andry Law Firm to the Freeh Report,* R. Doc. 12712, including ftnt 7 and page 19 (wherein this Court notes the unlikelihood of any conspiracy to influence a single claim, as well as the

Additionally, The Andry Law Firm should be awarded reasonable expenses incurred in responding to the disclosure of confidential claims information, including attorney's fees, as well as compensatory damages for the damage to the business reputation of The Andry Law Firm and its principals caused by the contumacious attack campaign of BP  Compensatory damages for the damage to the business reputation of The Andry Law Firm and its principals should include BP paying for advertisements by the Andry Law Firm in the New York Times, the Washington Post, and the Wall Street Journal, apologizing to The Andry Law Firm and its principals and correcting the falsehoods perpetrated by BP.

## V.    Conclusion

This Honorable Court should grant the *Motion By The Andry Law Firm To Hold BP In Contempt of Court,* hold BP in contempt of court, and set an evidentiary hearing at which BP shall be called upon to prove why it should not be substantially sanctioned for contempt of this Court.

**Respectfully submitted,**

*/s/ Stephen M. Gelé*
**RANDALL A. SMITH, T.A. (#2117)**
**STEPHEN M. GELÉ (#22385)**
OF
**SMITH & FAWER, L.L.C.**
201 St. Charles Avenue, Suite 3702
New Orleans, LA 70170
Tel:    (504) 525-2200
Fax:    (504) 525-2205
sgele@smithfawer.com

**Attorneys for The Andry Law Firm, L.L.C.**

---

allegations of BP amounting to no more than the payment of a referral fee.); *see also* ftnt 3 *supra* (regarding BP causing the claim to be held.); *see also* Fed. R. Civ. Pro. 37(2)(a)(regarding available sanctions).

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing motion has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 31st day of January, 2014.

*/s/ Stephen M. Gelé*
Stephen M. Gelé