UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | : | MDL 2179 |
| "DEEPWATER HORIZON" IN THE | : | |
| GULF OF MEXICO ON APRIL 20, 2010 | : | Section J |
| | : | |
| **This Document Applies to:** | : | Judge Carl J. Barbier |
| | : | |
| *No. 12-970, Bon Secur Fisheries, Inc. et al.* | : | Mag. Judge Shushan |
| *v. BP Exploration & Production, Inc., et al.* | : | |

**RESPONSE ON BEHALF OF DAVID DUVAL
TO BP'S MOTION SEEKING PRODUCTION OF CERTAIN
DOCUMENTS FROM SPECIAL MASTER FREEH (RECORD DOCUMENT 12254)**

MAY IT PLEASE THE COURT:

David Duval respectfully submits this response and opposition to a motion by BP Exploration & Production, Inc., BP America Production Company and BP PLC. ("BP") seeking Court ordered production of a massive array of documents in the possession of the Special Master.  Rec. Doc. 12254.  It is respectfully submitted that BP's motion should be denied.

The Special Master filed his Second Report on January 17, 2014, Rec. Doc. 12174. Putting aside BP's ever increasing invocation of hyperbole and exaggeration, the threshold issue is that BP accepted the Second Report issued by the Special Master.  Although the Special Master and BP seem to have been working in tandem since the appointment of the Special Master, BP now wants to conduct its own investigation and ostensibly supplant the Second Report of the Special Master.[1]  This Court should reject BP's latest efforts, which seem more designed toward another advertising campaign than the discrete and extremely limited issues and concluding Recommendations contained in the Second Report issued by Mr. Freeh.  It is equally disquieting that BP intimates fraud or some iteration of fraud was contained in the Second

---

[1] Aside from interviewing 12 CAO employees, the Special Master and his attorneys conferred with a BP attorney before the issuance of the Second Report.  Rec. Doc. 12174 at p. 2.

Report; nothing could be further from the truth and BP certainly knows it.  BP's cavalier concoction as to the contents of the Second Report is inexcusable and should not judicially condoned through granting BP's motion.

This Court is aware that, from the very beginning of the incident that is the crux of the Second Report, David Duval agreed to cooperate with the Special Master and the Court.  On the next business day after he mistakenly forwarded a redacted e-mail that led to the initiation of an investigation by the Special Master, David Duval tendered his resignation from the Claims Administration Office so as not to impact the work and accomplishments of the Claims Administration Office in connection with this proceeding.[2]

It is noteworthy that the Special Master analyzed whether David Duval obtained any improper financial benefit while he was employed in the Claims Administration Office.  Mr. Freeh and his colleagues concluded that David Duval did not receive any improper financial benefit either from the Duval Funderburk firm or any of its partners or any claimants.  And the Special Master concluded that David Duval did not conceal his conduct.  In contrast, it was opined by the Special Master that David Duval did not strictly adhere to the policy concerning conflicts of interest with respect to a relative, who is a member of the law firm that employed David Duval years ago.  Equally as significant, the Special Master concluded that the October 2, 2013 e-mail that was the primary subject of the Second Report was not viewed by anyone other than the direct recipient of the e-mail, and then, after voluntary disclosure to the Court, the document was placed under seal.  It remains under seal pursuant to this Court's Order.

As part of his voluntary and continuous cooperation with the Special Master, David Duval  agreed to the far-reaching production of his financial and personal data including bank

---

[2] David Duval is able to provide a reasoned explanation for his actions.  However, Mr. Duval has not formally challenged the Second Report.  His silence, nonetheless, should not be perceived as acquiescence to the disclosure of personal and private information that BP seeks without a valid reason.

- 2 -

records and telephone records.  Because of the sensitivity of this highly personal information, David Duval expressed to the Court his concerns about disclosure.  It was understood that the Special Master would receive this information through the acquiescence of David Duval, but that such private, confidential, and personal data would not be publically disseminated or shared with anyone except the Special Master.  BP now wishes to violate that protocol as part of its expansive demand for documents, even though none of Mr. Duval's personal data has any relevance with respect to the Recommendations in the Second Report.

It appears to be more than a stretch under Federal Rule of Civil Procedure Rule 53 for the Special Master to question social activities of employees in the Claims Office when such social activities did not adversely affect the claims process nor is there even an indication that such activities were proscribed.   Respectfully, it is not the position of the Special Master to impose his moral or philosophical views upon employees of the Claims Office, and, it would certainly be more than ironic for BP to serve as the moral compass in this proceeding.[3]  More specifically, the fact that one CAO employee expressed the view that he was "not comfortable" while socializing with some of his supervisors after work-hours does not support BP's latest motion to re-examine Mr. Freeh's Second Report and delve into David Duval's financial and sensitive non-public documents.

Beyond these reasons precluding BP's efforts to examine anew the very records the Special Master scrutinized, Mr. Freeh concluded that the business establishment referenced in the Second Report was a DHECC claimant that had a valid award (which is supposed to remain non-public), and, equally as compelling, the Special Master stated that he "saw no unusual activity by Mr. Duval - - - or other DHECC employees relative to the claim of that business

---

[3] See Gospel of Matthew 7:3 when Jesus is quoted as saying during the discourse on judgmentalism, "Why do you look at the speck of sawdust in your brother's eye and pay no attention to the plank in your own eye?"

(page 5 of the Second Report).  Despite these findings which BP embraced, it now wants receipt of a sweeping list of non-relevant documents such as those disclosing where Mr. Duval socialized and how much he spent during non-work hours.[4]  As the Second Report also reveals (page 5), a full audit is scheduled by an outside accounting firm, which should confirm, as Mr. Freeh already concluded, that there were no expense reimbursements to David Duval attributable to charges at the bar or business referenced in his Second Report.  In fact, David Duval did not seek a single reimbursement from the Claims Office.

Although Mr. Freeh stated that financial distress "can lead to susceptibility to bribery and other vulnerabilities," this general supposition appears to be extraneous to the Second Report and certainly beyond the pale of BP's pending motion.  There was no indication in the Second Report that any individual was under financial stress.  There was no indication in the Second Report that any individual was susceptible to bribery or other vulnerabilities.  While the social outing questioned by the Special Master may have created an uncomfortable moment for a single staff member, it is certainly not a foundation to provide BP with the type of carte blanche access to information, documents, and other materials that it now seeks in the pending motion for production.

Consistent with this Court's prior directives, Mr. Freeh offered Recommendations for education of staff regarding conflicts of interest, recusal, and potential ethical concerns in what he acknowledges to be a "claimant friendly" environment required by the Settlement Agreement."  In this regard, Mr. Freeh has made Recommendations to the CAO as to how Mr. Freeh believes the CAO can improve the operations of the Claims Office.  If BP wishes to comment or propose modifications to the Special Master's Recommendations, it can do so

---

[4] If the Court is inclined to furnish BP with all of the documents BP requests, then it stands to reason that BP personnel and its attorneys should disclose the amount of their expenses since 2010, the location of these expenditures, and if BP's agents ever expended funds at an establishment that was a DHECC claimant.

without the documents it demands be produced and without violating David Duval's remaining zone of privacy.

In stark contrast, at best, BP has either misunderstood, or at worst, wantonly misconstrued the contents of the Second Report in an effort to make its motion seem reasonable. BP's motion is anything but reasonable. BP argues that it should be entitled to review all of the materials examined by Mr. Freeh in connection with the Second Report because BP may be injured by the "cost of fraud." However, Mr. Freeh did not conclude that any fraud occurred, as the contents of his Second Report reflect. Indeed, the word "fraud" does not even appear in the January 17, 2014 Report issued by Mr. Freeh. Once again, BP has decided to be loose with the facts in what is a transparent effort to engender another wave of media hype. While this Court understandably is concerned and has addressed the need for a properly run Claims Office, this Court's sensitivities should not serve as a springboard for the next round of personal assaults by BP.

Similar to the misleading factual statements made by BP in its motion, it skews the legal authorities relating to disclosure of the documents and information gathered by a Special Master. BP recites that Rule 53 Advisory Committee's Notes somehow requires disclosure of all portions of the record the Special Master deems relevant. Yet, the Special Master provided that exact information in his Second Report. More importantly, the cases cited by BP involve situations when a party objects to the report by the Special Master. See, *e.g., United States v. City of New York,* 2013 WL 2477182 (June 7, 2013). In stark contrast, BP has espoused and bear-hugged the Second Report of the Special Master. Correspondingly, while the Advisory Committee's Notes may be considered (even though the Advisory Committee's Notes are inapplicable based upon this factual situation), Rule 53 does not require the Court to order the Special Master to turn

over all of the underlying documents and information gathered for his report.  In fact, Rule 53 provides this Court with discretion as to what should be disclosed, if anything, beyond the documents and facts recited in the Second Report.  And, to the extent the Advisory Committee's Notes are germane, there are compelling reasons, including the preservation of fundamental privacy concepts, to deny BP's motion.

In a like vein, BP's alternative argument that it may modify the Special Master's Report represents another notion that rings hollow.  In its motion, BP as well as in its accompanying letter to Mr. Freeh which letter is appended to the motion, BP repeatedly praises the work undertaken by Mr. Freeh and the thoroughness of his efforts.  As BP wrote to the Special Master on January 21, 2014:  "The report's recommendations will not draw a dispute from BP."  In addition to the written plaudits heaped upon Mr. Freeh's work by BP, BP has stated that it wishes Mr. Freeh, apparently due to what BP perceives as his thoroughness, to continue oversight of the Claims Office through the Freeh Group.  Once again, BP has revealed its ultimate motive, namely, to try to develop fodder for more self-serving advertisements in national publications.

David Duval has already paid dearly for a hurried act that did not seek to validate an improper claim.  Within hours from the time that he recognized his October 2nd e-mail could be viewed in a different light, he tendered his resignation as an employee of the Claims Office. David Duval has been financially and emotionally penalized. As the Special Master wrote in his Second Report, there was no financial benefit associated with David Duval's misstep nor did David Duval ever seek one. He has been essentially admonished by Mr. Freeh in the Second Report.  Furthermore, Mr. Freeh has already expressed his Recommendations to alter the means by which the Claims Office operates and has stated he will continue to monitor the

administration of the Claims Office subject to the Court determining if such continued activity is necessary. BP does not need to embark upon a make-over of the Second Report – nor should it be allowed to do so.

For these reasons, David Duval respectfully requests that this Court should exercise its discretion and deny BP's motion for production of documents and/or information with respect to the Second Report.

    Respectfully submitted,

    PHELPS DUNBAR LLP

By:  */s/ Harry Rosenberg*
    Harry Rosenberg (Bar No. 11465)
    365 Canal Street • Suite 2000
    New Orleans, Louisiana 70130-6534
    Telephone: (504) 566-1311
    Facsimile: (504) 568-9130 or 9007

    Attorneys for David Duval

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing motion has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 10th day of February, 2014.

        */s/ Harry Rosenberg*
        Harry Rosenberg