IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This Document Relates To:  10-4536 | * * * * | Honorable CARL J. BARBIER Magistrate Judge SHUSHAN |

**BP EXPLORATION & PRODUCTION INC.'S
MEMORANDUM REGARDING THE APPROPRIATE SCOPE OF
THE CWA PENALTY PHASE AND RELATED DISCOVERY**

Don K. Haycraft (Bar #14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia ("Carrie") Karis, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985

*ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.*

The Court has indicated that it may wish to conduct the Penalty Phase as the next trial proceeding in MDL 2179.  (Order Regarding Working Group Conference on Friday, May 3, 2013 at 9 (Rec. Doc. 9759); Minute Entry for June 27, 2013 Status Conference (Rec. Doc. 10541)).  The United States, BP Exploration & Production Inc. ("BPXP"), and Anadarko have met on several occasions to discuss case management issues, have exchanged and commented on proposed fact stipulations, and have discussed scheduling for pretrial proceedings for this Phase.

As shown in the February 14 Rule 26(f) report ("Joint Report") (Rec. Doc. 12338), the parties agree that the Penalty Phase will involve discovery of all three parties, leading to a bench trial.  While some progress has been made on structuring the case, there remain disputed, fundamental issues about the scope of the case and trial (and the corresponding scope of discovery).  BPXP therefore submits this memorandum on its views on the appropriate scope of the proceedings in the United States' civil action under the Clean Water Act.

## I. Legal Standard:  The Eight Statutory Factors

The Court is to apply the specific penalty factors identified in the CWA, as follows:

> In determining the amount of a civil penalty …, the Administrator, Secretary, **or the court,** as the case may be, shall consider the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.

33 U.S.C. § 1321(b)(8) (emphasis added).

For some of the eight factors, factual stipulations may be reached that will limit or eliminate the need for live testimony and evidence at trial.  This may be the case for the "any other penalty for the same incident" and "history of prior violations" factors and perhaps others.  Agreements may depend on the outcome of disputed issues, for example what "prior violations"

1

are legally relevant, a matter on which the parties disagree and on which BPXP will today file a motion *in limine*.

As to factors (and subject matter areas within factors) where no stipulations can be reached, there can be no doubt that the resolution of the US claim for what is potentially a multi-billion dollar CWA fine entitles BPXP to the full discovery appropriate for a case of this unprecedented size and scale. Previous CWA trials demonstrate that robust discovery and significant development of testimony are needed on the disputed issues of fact relating to the statutory factors. The leading CWA cases – each of which is at least an order of magnitude smaller in scale than this case – involved extensive testimony from fact and expert witnesses. *See, e.g.*, *United States v. CITGO Petroleum Corp.,* 723 F.3d 547, 550 (5th Cir. 2013) (court heard testimony from 23 witnesses during two-week bench trial on the issues of penalties and injunctive relief); *United States v. Smithfield Foods, Inc*., 972 F. Supp. 338, 340, 346-49, 353-54 (E.D. Va. 1997) (parties presented testimony at trial from at least nine expert witnesses in a case in which the United States sought a penalty of $20 million); *United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 857, 861-63, 866 (S.D. Miss. 1998) (parties presented testimony at trial from at least five expert witnesses in a case in which the district court calculated a maximum penalty of approximately $46 million and assessed a penalty of approximately $1.5 million). The scope and scale of the US civil penalties claim here is many times greater than any CWA case it has brought in the past. BPXP's right to seek full discovery and present its full defense on the disputed factors is certainly no less than in any of these prior CWA cases.

II.    **Case Management Aspects of Application of the Eight Factors**

   A.    **The Seriousness of the Violation**

A potential issue in determining the "seriousness" of the violation is the environmental impact, including recovery, resulting from the spill. This factor presents a significant

2

disagreement between the US and BPXP as to the scope of discovery and the trial proceedings. In short, the US contends that it can proffer experts to testify about any and all environmental issues but that BPXP should not be allowed to take discovery of these issues and rather must exclusively rely upon the public record. The US seeks to prevent BPXP from discovering data, analyses and information that the US has amassed regarding the environmental impact of the spill and the subsequent recovery—evidence in the sole possession of the US that BPXP believes shows a much more limited environmental impact than many feared and which will directly contradict the positions the US will advocate at trial. The US's proposition of no or "very limited" discovery is contrary to settled law and constitutes an unprecedented and fundamentally unfair and prejudicial restriction on BPXP's ability to defend itself from the US's allegations and effort to exact substantial civil penalties.

In recognition of the US's desire to avoid discovery on environmental issues, and in an effort to streamline the Penalty Phase trial, BPXP proposed stipulations that would limit the scope of the trial by taking various categories of environmental impact "off the table" for purposes of the Penalty Phase, and reserving them for a later natural resource damages ("NRD") proceeding. While the US categorically refused to discuss such scope limitations for the Penalty Phase, BPXP respectfully requests that the Court consider such an approach to managing this phase of the CWA proceedings.

Specifically, BPXP proposes that all "offshore" environmental issues, as well as issues related to future and sub-lethal impacts, be reserved, without prejudice, for a future NRD proceeding. According to BPXP's proposal, many highly-complex, technical environmental issues—including issues relating to impacts to aquatic organisms, fisheries, marine mammals and sea turtles, as well as complicated methodologies for measuring toxicity, modeling the

3

movement and biodegradation of oil in the water and predicting future ecological impacts—would all be avoided in the Penalty Phase, both at trial and in discovery. Conversely, the "onshore" environmental issues would be fair game for the Penalty Phase. These onshore environmental issues could include alleged impacts on, and recovery of, beaches, marshes and wetlands in the Gulf of Mexico, as well as impacts to animals that live in those habitats, such as birds. BPXP's proposed scope limitations provide a practical solution that is fair for all parties: within the scope proposed, the US can allege environmental impact and BPXP can present evidence that the impact was far less severe than people feared and that the environment has largely recovered. Furthermore, for the environmental issues that are excluded from the Penalty Phase (*i.e.*, the offshore and other issues described above) the US can avoid discovery. A proposed Case Management Order implementing BPXP's scoping approach is attached as Exhibit A.

If the Court declines to limit the scope of the environmental topics at issue in the Penalty Phase, BPXP must be allowed to take discovery of these topics and the US should not be allowed to withhold evidence that is critical to BPXP's defense. The US's position that BPXP is not entitled to discovery in the Penalty Phase regarding environmental impact violates the Federal Rules of Civil Procedure. The Rules entitle BPXP to "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Rule 26(b)(1); *Herbert v. Lando*, 441 U.S. 153, 177 (1979) ("[T]he deposition-discovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials.").

Moreover, evidence the US has in its possession as part of the Natural Resource Damages Assessment ("NRDA") falls within Rule 26(b)'s grant of liberal discovery. *See, e.g.*, *United States v. CITGO Petroleum Corp.*, 2:08-CV-00893, 2010 WL 1754167, at *4 (W.D. La. Apr. 29,

2010) (concluding that information the US gathered in a NRDA regarding "the nature and extent [of] the environmental, natural resources, and/or fish/wildlife harm caused by the oil spill is relevant" to the US's claim for Clean Water Act Section 311 civil penalties, rejecting the US's arguments that such information is protected from discovery under the work product privilege, and compelling the US to produce such non-privileged information); *People v. So. Pac. Transp. Co.*, 1993 WL 816066 (E.D. Cal. Sept. 2, 1993) (rejecting California's arguments that the information it collected in a NRDA is protected from discovery).

Contrary to this well established precedent, the US incorrectly contends that BPXP is not entitled to discovery on this issue because the US believes sufficient information already exists in the public domain. If the US wants to limit its affirmative case to publicly available information, that is its own prerogative. But the availability of *some* relevant information in the public domain does nothing to dilute BPXP's right to discovery of *other* relevant information that is solely within the possession of the US. *See, e.g.*, *Mondis Tech., Ltd. v. LG Elecs., Inc.*, Nos. 2:07-cv-565, 2:08-cv-478, 2011 WL 2149925 (E.D. Tex. May 5, 2011) ("[T]he fact that information may be publicly available is no excuse for a party not performing its discovery obligations.").

Critically, the US does not dispute—nor could it—that it has sole possession of key information about the environmental impact of the spill. Nearly four years after undertaking one of the largest environmental investigations ever, much of which has been paid for by BPXP, the US has amassed substantial evidence regarding the extent of environmental harm (or lack thereof) resulting from the spill and the subsequent recovery. Only the US has access to much of this information. For example, the US has conducted extensive computer modeling of the possible environmental impact from oil, including impacts to fish, birds, turtles and many other

natural resources, but neither the public nor BPXP are aware of the methods and results from these models. The US maintains that this information should all be kept secret and protected from discovery in the Penalty Phase despite its plan to characterize the seriousness of the harm to these resources at trial.

Based upon a limited glimpse provided by an occasional public statement, BPXP believes that the US has extensive evidence that the environmental harm was far less than the US or others feared. For example, with regard to tuna, one US official stated that the impact on fish larvae appears "relatively small."[1] Similarly, with regard to birds, another US official stated that 2011 was one of the most productive nesting seasons since Hurricane Katrina.[2] Furthermore, the US has admitted that the "vast majority" of all oil released from the spill was either contained or mitigated, a critical question for the environmental modeling that the US seeks to keep secret.[3]

Accordingly, it is apparent that the US has evidence in its possession that demonstrates that the environmental harm was less than feared and that environmental recovery is well under way—evidence that is central to BPXP's defense. BPXP does not seek discovery of information that is already public. BPXP seeks key information, analysis, and correspondence that only the US possesses and that is potentially inconsistent with the limited information that the US has elected to make available to the public and its experts.

Additionally, the United States' dual role in this matter as both BPXP's litigation adversary and the gatekeeper to much of the environmental information presents the real risk that the US would not disclose information disadvantageous to its case. Clearly, the US could not

---

[1] Clay Porch, Director of Sustainable Fisheries for NOAA's Southeast Fisheries Science Center (Miami), *Bluefin Tuna Probably OK After BP Oil Spill*, Associated Press, Dec. 4, 2011.
[2] Jack Bohannan, Refuge Manager, *Brown Pelican Population Roaring Back*, Fox 8 News, New Orleans, June 6, 2011.
[3] *See New Report: 74% of Oil in BP Deepwater Horizon Oil Spill has been Contained or Mitigated*, *available at* http://m.whitehouse.gov/blog/2010/08/04/new-report-74-oil-bp-deepwater-horizon-oil-spill-has-been-contained-or-mitigated.

selectively produce relevant information in response to BPXP's discovery requests. *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994); *Novelty, Inc. v. Mountain View Mktg., Inc.,* 265 F.R.D. 370, 378 (S.D. Ind. 2009) ("Producing only those documents that are deemed helpful to the producing party's litigation position—parsing out the bad from the good—is, of course, impermissible."). The US cannot accomplish the same impermissible result by limiting BPXP to publicly available information while also deciding what environmental information enters the public realm. If BPXP cannot conduct discovery and obtain this relevant non-public information, BPXP would be substantially prejudiced by being forced to defend itself against the US's claims for billions of dollars in penalties on a factual record essentially prepared by the US. *See, e.g.*, *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958).

Finally, apart from the issue of environmental impact, BPXP believes that the parties may be able to agree to some factual stipulations on the seriousness factor as it relates to human health and also (possibly) on economic issues identified by the US. Such stipulations could narrow the scope of discovery and proofs at trial as to such matters. If those stipulations cannot be achieved, then BPXP is likewise entitled to full discovery as to those matters.

### B. The Economic Benefit to the Violator, if Any, Resulting from the Violation

This factor evaluates "the economic benefit to the violator, if any, resulting from the violation." BPXP's position is that there is no credible basis to assert that it realized any benefit from the CWA violation. As the Court will already have seen from Phase 1, the *Deepwater Horizon* accident was the result of multiple causes involving multiple parties, including BPXP, and was not the result of any decision by BPXP to prioritize cost-savings ahead of safety. Even if the US could somehow show that BPXP realized some small economic benefit as a result of certain engineering or operational decisions preceding the accident, and even assuming such decisions were deemed causal, any economic benefit would be inconsequential compared to the

7

tens of billions of dollars the accident has caused BPXP.  There may not be much that everyone involved in this case can agree on, but surely no one can claim that BPXP has achieved an economic benefit from its involvement with the Macondo well.

Since July 2013, BPXP has asked the US repeatedly for its contentions about this factor.  The US has not yet provided those contentions.  BPXP believes a schedule should be established setting a date for early disclosure of the US's contentions on this factor.   If the United States decides to present a case on this factor, BPXP will oppose it.

### C. The Nature, Extent, and Degree of Success of Any Efforts of the Violator to Minimize or Mitigate the Effects of the Discharge

Under this factor, a court shall consider "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the efforts of the discharge."  *Id*.  Courts have held that a company's efforts to respond to and mitigate the effects of a spill warrant a reduction in any CWA penalty.  *See CITGO,* 723 F.3d at 553.  In *CITGO*, the Fifth Circuit affirmed the trial court's holding that CITGO was entitled to a reduced CWA penalty based on the company's efforts to mitigate the effects of the spill involved in that case.  *Id*.  In so holding, the trial court considered evidence about the resources that CITGO brought to bear to respond to the spill—including the deployment of 1,500 response personnel—and the Company's "full force effort to minimize the damage from the spill," including through the use of booming, skimming, shoreline protection, and other countermeasures.  *United States v. CITGO Petroleum Corp.,* No. 08-00893, 2011 WL 10723934 (W.D. La. Sept. 29, 2011).  The Court concluded that CITGO's "well executed clean-up effort" effectively mitigated damage from the spill and resulted in strong environmental recovery.  *Id.*; *see also United States v. Egan Marine Corp.*, 2011 WL 8144393 at *7 (N.D. Ill. Oct. 13, 2011) (defendant's clean-up effort "cuts in favor" of reduced CWA penalty).

The "mitigation" factor will likewise be a major focus of the Penalty Phase trial. BPXP expects to make a substantial presentation about its unprecedented efforts to respond to the *Deepwater Horizon* spill, which involved marshaling resources and mobilizing tens of thousands of responders. BPXP will present evidence of its efforts to respond to the spill, and to prevent, minimize, and mitigate its effects (including through skimming, booming, *in situ* burning, the use of dispersants, shoreline protection and clean-up, restoration efforts, and other response and mitigation initiatives).

To date, the parties have made some progress on stipulations about BPXP's spill response and mitigation efforts that may help streamline discovery and trial presentation, but there is no assurance that the parties will reach agreement. In particular, the parties are discussing the way in which response activities involving BP entities other than BPXP are described in the stipulations. While the parties are continuing to work on language that may be mutually acceptable, BPXP believes that to the extent that it directed resources and activities of other BP entities during the response, then those efforts are relevant to the Court's consideration of BPXP's efforts to mitigate the impact of the spill. In the event that the parties are unable to reach an agreement on the relevance of the BP Group's involvement in the response, the issue may be presented to the Court in a motion. Finally, even if some stipulations are reached, BPXP believes that the tremendous efforts and resources that it devoted to the response merit the presentation of live evidence at trial through both witnesses and documents.

### D.   The Degree of Culpability Involved

In evaluating a party's "degree of culpability," courts have looked to the evidence concerning a party's level of fault related to the violation, including evidence of whether the party was negligent or grossly negligent in causing the accident. Here, the alleged violator of the CWA is BPXP. Extensive evidence of BPXP's alleged level of fault for the *Deepwater Horizon*

9

accident was presented over the course of forty-one trial days in Phases 1 and 2. Those two phases were intended to "address fault issues…including the negligence, gross negligence, or other bases of liability of the various defendants with respect to the issues, including limitation of liability." Second Am. Pretrial Order No. 41 (Rec. Doc. 6592) at 2.

Despite this extensive evidentiary record, the US apparently will seek to introduce additional evidence, beyond the Phase 1 and Phase 2 record, relating to BPXP's alleged culpability. Because resolving scope now will allow the parties to focus their discovery efforts on relevant issues and prepare this case for trial in a timely and efficient fashion, BPXP will today be filing a motion *in limine*. The motion will ask the Court to enter an order prohibiting the introduction during the Penalty Phase of additional evidence regarding BPXP's degree of culpability, an issue already tried before the Court.

### E. The Economic Impact of the Penalty on the Violator

This factor involves the "economic impact of the penalty *on the violator*." BPXP is the sole alleged "violator" in the United States' CWA action, and the sole BP entity potentially liable to pay any CWA judgment. Therefore, the focus of discovery and trial evidence should be on BPXP as the alleged violator, as the statute makes clear. The US has nonetheless proposed broad discovery focusing on BP entities other than BPXP. To the extent that discovery aimed at the BP Group does not relate to the "economic impact of the penalty on the violator [BPXP]," it is not reasonably calculated to lead to the discovery of admissible evidence. BPXP acknowledges that targeted document requests relating to the finances of the BP Group may be reasonably calculated to lead the discovery of admissible evidence if they relate to the "economic impact of the penalty" on BPXP. If the US and BPXP cannot agree on discovery limits as to this factor, court direction may be required to determine the appropriate bounds of discovery.

During the parties' discussions regarding the US's proposed discovery of documents relating to the BP Group, the US cited *United States v. Mun. Auth. of Union Twp.,* 150 F.3d 259 (3d Cir. 1998) ("*Dean Dairy*"), to support its position on relevance. In *Dean Dairy*, the Third Circuit stated that "courts in CWA cases have looked to the assets and finances of the violator's parent in evaluating the economic impact of the penalty on a violator." *Id.* at 268. However, *Dean Dairy* itself makes clear that the extent of consideration given to the parent's financial resources depends on the facts and circumstances of the specific CWA case: "*If the subsidiary does not retain its revenues*, as the evidence showed in this case, then its parent's financial resources are highly relevant." *Id.* (emphasis added). Unlike the subsidiary in *Dean Dairy*, since the *Deepwater Horizon* incident BPXP has neither declared nor paid a dividend in any form to any parent or affiliate company. Moreover, the *Dean Dairy* court recognized that, even in the context of the particular facts and circumstances of that case, "[t]he consideration of a parent's financial condition in assessing a penalty on a subsidiary is a far cry from piercing the corporate veil and holding the parent liable for the actions of its subsidiary; here the penalty was assessed against the subsidiary alone." *Id.* The United States has not cited any Fifth Circuit case law to support its position on the relevance of the BP Group to this factor.

Finally, the inquiry under this factor extends beyond the violator's "ability to pay." Instead, the statute addresses the "economic impact of the penalty on the violator." 33 U.S.C. § 1321(b)(8). Even if a violator has an "ability to pay" a penalty, the "economic impact of the penalty on the violator" is still at issue. *Id.*; *see also CITGO,* 2011 WL 10723934 ("[S]imply because a violator has a significant amount of money, a Court should not impose a fine that is excessive in light of the violation"). A disproportionately large penalty (especially when combined with other economic impacts on the defendant relating to the incident) may impact a

defendant's ability to make capital investments, engage contractors, pay for workers, and contribute to the local and national economy. BPXP intends to present proofs on these matters.

### F.     Any Other Penalty for the Same Incident

This factor likely can be addressed by a combination of agreed stipulations and motion practice as to the appropriate scope of the factor. The past fines paid by BPXP and others relating to the incident are or will be matters of public record, and BPXP believes they should be a matter of stipulation. As shown in the Joint Report, we understand that the US agrees. (Of course, in the event the Fifth Circuit reverses this Court's dismissal of the penalty claims of Alabama and Louisiana as part of the pending Parishes appeal , those claims and any other state penalty claim will have to be addressed in an appropriate manner as part of any Penalty Phase).

### G.     Any History of Prior Violations

This factor also likely can be addressed by a combination of agreed stipulations and motion practice as to the appropriate scope of the factor. The parties have already negotiated a stipulation as to BPXP's lack of past Clean Water Act Section 311 violations that were the subject of civil actions brought pursuant to 33 U.S.C. § 1321(b)(7) or criminal actions brought pursuant to 33 U.S.C. § 1319(c). BPXP has consistently objected to the extent that the US may seek to expand the proofs about this factor to prior violations that are not similar to the *Deepwater Horizon* incident, to any sort of prior violations committed by BP entities other than BPXP, or to violations other than those under Section 311 of the Clean Water Act.

Further, beginning in July 2013, BPXP has asked the US repeatedly for its contentions about this factor, but the US has not yet provided those contentions. BPXP believes a schedule should be established setting a date for early disclosure of the US's contentions. In addition, as noted in the Joint Report, BPXP plans to file today a motion *in limine* seeking a ruling limiting the prior violations that may be considered under this factor.

### H. Any Other Matters as Justice May Require

The parties may seek to introduce evidence under this factor.  BPXP urges that a schedule be set for early disclosure of contentions and proofs that any party may seek to introduce under this factor.  BPXP also submits that this factor is not an unlimited tool to allow the introduction of irrelevant matters; it should generally be interpreted to include only genuinely *other* matters—not those already addressed or otherwise precluded in the specifically enumerated factors.

One appropriate use of this factor, as recognized in *CITGO*, is the violator's positive impact on the local economy and community.  *CITGO,* 2011 WL 10723934.  In that regard, BPXP intends to present evidence of its significant and beneficial role in the Gulf economy.

## III. Pre-Trial Scheduling, Trial Structure, and Trial Date

Given the very large penalty sought by the United States and the complexity of the issues involved, while BPXP supports the concept of limits on the number of witnesses and trial presentation time, the Penalty Phase cannot be as truncated or abbreviated as the United States has proposed.  *See Nat'l Presto Indus., Inc. v. United States*, 227 Ct. Cl. 634, 637 (1981) (reversing trial judge's order setting trial date and ordering that trial be set for a later date where, among other considerations, the case was "a very large and complicated one, calling for adequate advance preparation and trial expertise").  Although some fact stipulations on some factors remain possible, there will remain a need for substantial discovery and rigorous trial presentations for important statutory factors.  Until the scope of both the case and the required discovery is more defined, the parties cannot accurately predict fair and appropriate limits on either the number of fact and expert witnesses or the time to be allotted for trial presentation, making it premature to set any such limits now.[4]

---

[4] The resolution of two appeals currently pending before the Fifth Circuit may also affect the timing and structure of the Penalty Phase.  A remand of BPXP's and Anadarko's appeal of the Court's February 2012 order (Rec. Doc.

13

It is premature to set a schedule through trial at this time, given the disagreements about the appropriate scope of the case on key factors (including seriousness and mitigation) and the uncertainties about the scope of discovery as to those factors. Even if the parties are able to reach stipulations on certain factors, it appears they will not be able to do so as to other factors. For example, BPXP and the US fundamentally disagree about the appropriate scope of discovery on the environmental harm aspects of the seriousness factor, and it is uncertain whether a similar disagreement will arise as to the mitigation factor. The scope of the Penalty Phase and appropriate discovery will be clearer after resolution of the anticipated motions *in limine* and also once the Court can provide guidance as to the appropriate scope of the seriousness factor.

At this time, BPXP believes the Court should set some deadlines for service of initial disclosures and document requests, in order to begin the process. To that end, BPXP proposes the following schedule:

| | |
|---|---|
| February 24, 2014 | Service of first round of document requests |
| March 10, 2014 | Initial disclosures |
| 60 days after substantial completion of productions | Begin fact depositions |

The parties' Phase 2 experience counsels that it is very helpful to assess the status of document productions before scheduling the beginning of fact depositions, as sometimes estimates of dates for completion of document productions have been mistaken. BPXP agrees that discovery in this case will involve depositions of fact witnesses (with custodial file productions), including witnesses identified in initial disclosures, as well as other deponents.

---

5809) holding that they are liable for civil penalties under § 311 of the CWA could require, at a minimum, further proceedings on the question of BPXP's and Anadarko's liability. In addition and as noted earlier, given the claims by the Gulf States seeking civil penalties under state law, the Fifth Circuit's ruling on the question of preemption raised in the Louisiana Parishes' appeal of this Court's order dismissing their state law claims (Rec. Doc. 4845) may likewise may affect how the Penalty Phase is structured, call for adding parties to the Penalty Phase, and affect pretrial proceedings and when it is tried.

BPXP also notes that the schedule proposed to date by the United States appears unworkable on its face. For example, formal discovery requests have not yet been served as of this date, as the parties have been discussing stipulations, draft discovery, and potential limits on the scope of the case. As another example, the single month for expert depositions proposed by the US is almost surely less time than will be required in a case where, even under the US's proposal, there will be as many as 24 experts that need to be deposed.

Accordingly, BPXP believes the Court can set deadlines for service of initial disclosures and document requests (and perhaps other written discovery), but that a full schedule to trial (including dates for service of expert reports and the close of fact and expert discovery) must await rulings and/or guidance from the Court on the appropriate scope of the case. We believe that presently there are serious issues with trying to schedule the trial in 2014. Further, BPXP suggests that the Court defer decisions on setting limits on fact and expert witnesses and trial time until the Court can address the preliminary issues on case scope and shape of discovery.

BPXP also notes that its lead trial counsel, Mr. Brock, has a conflict with another *Deepwater Horizon* case set for trial, a multi-week trial in a purported securities class action in MDL 2185 (S.D. Tex.) (Ellison, J.), beginning on October 14, 2014. BPXP respectfully requests that any trial setting in the Penalty Phase post-date this trial conflict for Mr. Brock.

## Conclusion

BPXP urges that the Court set a schedule for discovery and trial in this matter that recognizes the scope and importance of the matter and affords all the parties the right to properly prepare the case for trial.

| | |
|---|---|
| February 14, 2014 | Respectfully submitted, |

                                                     */s/ Don K. Haycraft*
                                            Don K. Haycraft (Bar #14361)
                                            LISKOW & LEWIS
                                            701 Poydras Street, Suite 5000
                                            New Orleans, Louisiana 70139
                                            Telephone: (504) 581-7979
                                            Telefax: (504) 556-4108

                                            Richard C. Godfrey, P.C.
                                            J. Andrew Langan, P.C.
                                            Hariklia ("Carrie") Karis, P.C.
                                            Matthew T. Regan, P.C.
                                            KIRKLAND & ELLIS LLP
                                            300 North LaSalle Street
                                            Chicago, IL 60654
                                            Telephone: (312) 862-2000

                                            Robert C. "Mike" Brock
                                            COVINGTON & BURLING LLP
                                            1201 Pennsylvania Avenue, NW
                                            Washington, DC 20004
                                            Telephone: (202) 662-5985

***ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2014.

/s/ Don K. Haycraft
Don K. Haycraft