Confidential - Attorneys' Eyes Only

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
 3   ------------------------------------------X
     In Re:  OIL SPILL BY THE OIL RIG
 4   "DEEPWATER HORIZON" IN THE GULF OF
     MEXICO, ON APRIL 20, 2010,
 5
     Applies to:
 6
     12-311, Cameron Int'l Corp. v. Liberty
 7   Ins. Underwriters, Inc., a/k/a Liberty
     Int'l Underwriters
 8
 9   ------------------------------------------X
10
11
            CONFIDENTIAL - ATTORNEYS EYES ONLY
12
           VIDEO DEPOSITION OF CHARLES SLEDGE
13                  Houston, Texas
14           Friday, September 27, 2013
15
16
17
18
19
20
21
22
23   REPORTED BY:
24   Linda Rayburn, CSR
25   JOB NO: 65862
```

TSG Reporting - Worldwide   (877)702-9580

EXHIBIT 1

1         C. SLEDGE
2     Q.  Okay.  And did you see any evidence
3  that Liberty was incorrect on that assertion?
4     A.  No one -- no other insurers raised --
5  raised that concern.
6     Q.  All right.  And no one else threw up
7  the same kind of language, correct?
8     A.  I don't recall anyone raising that
9  exact language.  I remember sitting down with
10 Jim, literally going through the language --
11    Q.  Uh-huh.
12    A.  -- where he had it.  And then I
13 showed Jim, I said, "Jim, look, there's two
14 things here.  Let's go to your policy."
15         We actually -- I took out the policy.
16 I said, "If you're telling me this is" -- he told
17 me it was critical, fundamental to every policy,
18 it's just the most important -- we'd never write
19 a policy without it because it's just paramount
20 in how we do business.
21         And I said, "Well, this is way back
22 in the back of the document, Jim.  Let's look at
23 the schedule of underlying insurance where
24 Liberty lists out the other insurance that comes
25 before it.  Why isn't it listed?  If it's so

Confidential - Attorneys' Eyes Only

Page 93

1           C. SLEDGE
2  fundamental, why isn't it listed?"
3       Q.  But you agreed that --
4       A.  And he said -- and he said --
5       Q.  I'm sorry.
6       A.  If I can finish.  I've got two things
7  to say.
8       Q.  I apologize.
9       A.  Okay.  He had no answer.  He
10 literally said, "I don't have an answer."
11          Okay.  So then I said, "Okay.  Well,
12 let's play this through."  This is a meeting in
13 my office.  I said, "Let's play this through.  So
14 what you're telling me, Jim, is you and I both
15 know that TO said they don't have an indemnity
16 obligation to it -- to us.  BP is saying, 'Hey,
17 Transocean, you don't have an indemnity
18 obligation to Cameron.'  Even if you had an
19 indemnity obligation from me, you can't pass it
20 on to Cameron because of the language of our
21 indemnity.  And on top of that, so what you're
22 suggesting is that I have -- that Cameron has to
23 go all the way through, we made" -- we've just
24 got a report out that is finding fault with the
25 BOP, defective design.  Okay.  Serious

Confidential - Attorneys' Eyes Only

Page 94

1        C. SLEDGE
2   allegation. BP is in a perfect position to
3   attack the BOP because of their knowledge. So
4   what happens if" -- "You're saying I've got to
5   litigate the indemnity to the end before your
6   policy kicks in?"
7        "Oh, absolutely that's what I'm
8   saying."
9        Said, "Okay. So you're saying that
10  Cameron has to put itself at risk of a judgment
11  pre getting the indemnity ruled on. That would
12  bankrupt the company. And then ultimately if
13  we're successful in getting an indemnity in
14  bankruptcy, you pay 50 million bucks. Is that
15  really what -- the policy you intended to write
16  to Cameron?"
17        And he just totally said, "Well, you
18  know, I'm just saying I deserve more money."
19  That was his response.
20        MR. PATE: Object to nonresponsive.
21        Q. (BY MR. PATE) Let me ask you this.
22  Is it your understanding that indemnities can
23  only be resolved by litigating them through the
24  end?
25        A. No, that's not my understanding.

Confidential - Attorneys' Eyes Only

Page 160

1        C. SLEDGE
2  I'm sure that Chuck would be reluctant to tell
3  the board we didn't do anything."
4        And did you indicate to Tony that
5  this needed to be resolved and reported to the
6  board?
7        A.  I can't recall.
8        Q.  Okay.  And Tony says, "with a known
9  coverage issue, we have to do something."  You
10 would agree that this was a coverage issue?
11       A.  I would agree that Liberty was not
12 honoring the policy and abandoning us and put the
13 company in an untenable position.
14       MR. PATE:  Object to nonresponsive.
15       Q.  (BY MR. PATE)  My question is
16 different.  Do you understand this to be an
17 insurance coverage issue that needed to be
18 resolved one way or another?
19       MR. AUSLANDER:  I object.  The last
20 answer was completely responsive, it just didn't
21 include the twist in it that you prefer to have
22 in the question.  But the question was answered.
23       Do you have anything to add?
24       THE WITNESS:  I really have nothing
25 to add.  I'm sorry.  I'm sorry.

Confidential - Attorneys' Eyes Only

Page 161

1                    C. SLEDGE

2          Actually, I do have something to add.
3  I recall a conversation with Jim.  I'm sorry,
4  maybe I shouldn't.  But I remember Jim in my
5  meeting in Houston saying, "I know" --
6          MR. AUSLANDER:  Jim who?
7          THE WITNESS:  Jim --
8          MR. PATE:  Engel.
9          THE WITNESS:  -- Engel.
10     A.   I remember Jim saying -- of Liberty
11 Mutual.  He says, I know I'm going to pay
12 something here under this policy."  So he was
13 never disputing at the end in our meeting in
14 January in my office that they owed under the
15 policy.  Never disputed that at that meeting face
16 to face.
17          He wanted a bigger discount.  In
18 fact, he said, "You know, Chuck, I've given you
19 an offer of a settlement and I've moved and you
20 haven't responded in any kind."
21          And that's when I went back and said,
22 you know, "It's, you know, 15 percent discount,"
23 which we already talked about.  So that is -- I
24 do remember that.
25     Q.   (BY MR. PATE)  Well, then you bring

Confidential - Attorneys' Eyes Only

Page 162

1                C. SLEDGE
2  up something interesting I've got to ask you
3  about.  You would agree with me that sometimes
4  insurance companies pay something because there's
5  a coverage dispute, to avoid having to litigate
6  it?
7        A.  I don't.
8        Q.  You're not familiar with that?
9        A.  What Jim told me is he knows he owes
10 under the policy.  That's what Jim told me.
11           MR. PATE:  Objection, nonresponsive.
12           THE VIDEOGRAPHER:  Five minutes left
13 on this tape.
14           MR. PATE:  Let's go ahead and change
15 it out now, because I've got to find something.
16           THE VIDEOGRAPHER:  Off the record,
17 11:48 a.m.  Ending tape three.
18        (A break was taken from 11:45 a.m. to
19        11:50 a.m.)
20           THE VIDEOGRAPHER:  Back on the
21 record, 11:53 a.m.  Beginning of tape number
22 four.
23        (Exhibit 72, having been previously marked
24        was referenced.)
25        Q.  (BY MR. PATE)  Mr. Sledge, I'm