# Exhibit 3

**No. 11-30987**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

**IN RE: CAMERON INTERNATIONAL CORPORATION**

_____

On Petition for a Writ of Mandamus from the
United States District Court for the Eastern District of Louisiana

MDL No. 2179
In Re: Oil Spill by the Oil Rig Deepwater Horizon
In the Gulf of Mexico on April 20, 2010

_____

**THE STATE OF ALABAMA'S
ANSWER IN SUPPORT OF THE DISTRICT COURT**

_____

LUTHER STRANGE
*Attorney General*

COREY L. MAZE
*Special Deputy Attorney General*

WINFIELD J. SINCLAIR
*Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL  36130
(334) 353-4336 (phone)
(334) 242-4891 (fax)
cmaze@ago.state.al.us

Attorneys for the State of Alabama

to sidestep the rules for interlocutory appeal, even if the writ is sought to preserve the right to a jury trial. *See In re El Paso Elec. Co.*, 77 F.3d 793 (5th Cir. 1996).

2. *OPA expressly allows general maritime claims*:  OPA is the governing federal statute for oil pollution originating over the Outer Continental Shelf.  OPA allows injured parties to seek compensatory damages and removal costs via "OPA claims" against enumerated Responsible Parties.  On top of this liability baseline, OPA expressly allows injured parties to seek *additional* liability/damages, including both compensatory and punitive damages, directly from non-Responsible Parties like Cameron under general maritime and/or state law.  *See* 33 U.S.C. §§2718(a), -2781(c), -2751(e).  Because the private plaintiffs have raised such claims against Cameron under general maritime law, and they elected to prosecute these claims under Rule 9(h), the district court may try them to the bench pursuant to its admiralty jurisdiction.

Cameron tries to sidestep OPA's liability scheme by focusing on 43 U.S.C. §1333(a), a 1953 provision of OCSLA's that allows the adoption of adjacent state law to fill the gaps of federal law.  But in light of Congress' pollution-specific amendments to OCSLA in 1978, then OPA's replacement and repeal of OCSLA's pollution-specific provisions in 1990, §1333(a) is no longer relevant in determining the appropriate body of federal law in oil pollution cases.  OPA was clearly the controlling federal law when this spill occurred in 2010, so determining what

Congress intended the controlling body of federal law to be in 1953 is pointless and may lead to an answer that Congress jettisoned decades ago.

3. *The District Court's Bench Trial Mirrors a Similar Pre-OPA Plan*:   The district court's plan for a limitation and liability bench trial closely mirrors the trial plan executed after the pre-OPA oil spill by the *M/V Alvenus*.  The plans match in several important respects:

- Both spills occurred on the Outer Continental Shelf, outside the State's 3-mile jurisdictional border;

- In both cases, the vessel owner filed a petition for exoneration from, or the limitation of, its liability;

- In both cases, the injured parties filed negligence claims under general maritime law against the vessel owner, the voyage charterer, and multiple other parties;

- In both cases, the trial court bifurcated the trial into two parts: "limitation and liability" and "damages"; and,

- In both cases, the trial court ordered a bench trial in admiralty to decide the common issues of limitation and liability.

*See In re Lloyd's Leasing Ltd.*, 764 F.Supp. 1114, 1119-20 (S.D. Tex. 1990).  The *Alvenus* district court successfully executed this plan, *see id.*, and this Court applied general maritime law to some of the injured parties' claims on appeal from

impose their own laws on top of OPA and vested State courts with concurrent jurisdiction to "consider claims under this Act or State law."  *See* 33 U.S.C. §§2717(c) (concurrent jurisdiction), 2718 (preservation of State law).

Because Congress intended OPA to be the "single" federal statute governing oil pollution cases, Congress had to conform the pre-existing federal statutes to match OPA's remedial scheme.  *See, e.g.,* P.L. 101-380, §§ 2001-03 (amending portions of the CWA, the Deepwater Port Act, and the Intervention on the High Seas Act); S. Rep. 101-94, pp. 24-25 ("Title III of the reported bill conforms the provisions of various other laws to the provision of this Act.").  Relevant here, Congress (1) repealed the pollution-specific OCSLA Title III in its entirety, *see* P.L. 101-380, §2004 and (2) did nothing to the 1953 adjacent state law provision, 43 U.S.C. §1333(a).   The reason is simple:  Section 1333(a)'s generic, "gap filling" provision possessed no relevance in oil pollution cases.

### B. OPA Expressly Saves both General Maritime and State Law Claims for Concurrent Use with OPA Claims.

In OPA, Congress changed very little with regard to the substantive law and preemption analyses of OCSLA Title III.

1. *Preserving State Law Claims*: Congress acknowledged that OCSLA Title III expressly saved State law claims "for cleanup and damages caused by spills of oil" over the Outer Continental Shelf and chose to continue that practice in OPA:

> More stringent State laws are specifically preserved in both the Clean Water Act (for cleanup of oil spills) and in the Deepwater Port Act and *Title III of the Outer Continental Lands Act Amendments of 1978 (for cleanup and damages caused by spills of oil)*. . . .
>
> The theory behind the Committee action is that the Federal statute is designed to provide basic protection for the environment and victims damaged by spills of oil. *Any State wishing to impose a greater degree of protection for its own resources and citizens is entitled to do so*. … [T]he Committee chose not to impose, arbitrarily, the constraints of the Federal regime on the States while at the same time preempting their rights to their own laws.

S. Rep. 101-94, p.6 (emphasis added).   Demonstrating that commitment, Congress passed three savings clauses regarding State law.  The first preserves a State's right to "impos[e] any additional liability or requirements" regarding "pollution by oil within such State," 33 U.S.C. §2718(a)(1), and is nearly identical to OCSLA's now-defunct savings clause, 43 U.S.C. §1820(c) (repealed).  The second clarifies that OPA cannot be "construed or interpreted to affect or modify in any way the obligations or liabilities of any person under … State law."  33 U.S.C. §2718(a)(2).  The third preserves a State's right to "impose, or determine the amount of, any fine or penalty (whether criminal or civil in nature)."  33 U.S.C. §2718(c).

The Supreme Court has stated that these provisions accomplished their task: "The evident purpose of the saving clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills. . . . The saving clauses, in parallel manner, permit States to impose liability or requirements

16

'relating to the discharge, or substantial threat of a discharge, of oil.'"  *United States v. Locke*, 529 U.S. 89, 105 (2000).

2.  *Preserving Maritime Law Claims*:   Congress similarly preserved the viability of admiralty and general maritime law claims, and the district courts' admiralty jurisdiction to hear those claims:

> Savings Provision
>
> (e) Admiralty and maritime law
> Except as otherwise provided in the Act, this Act does not affect—
>
> (1) Admiralty and maritime law
>
> (2) The jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors all other remedies to which they are otherwise entitled.

33 U.S.C. §2751(e).   As it did with State law claims, Congress expressly recognized that preserving general maritime claims and admiralty jurisdiction preserved the *status quo* in oil pollution cases:

> Article III, clause 2, of the Constitution creates the basis for admiralty and maritime law of the United States.  This section is intended to clarify that the House Bill does not supersede that law, nor does it change the jurisdiction of the District Courts [citations omitted]. . . .
>
> It is not the intent of the Conferees to change the jurisdiction in incidents that are within the admiralty and maritime laws of the United States.

H. Rep. 101-653 (Conf. Report), p. 159.

3.  *OPA+ Liability Regime*:  Taken together, OPA works largely as OSCLA Title III did before it.  OPA sets the liability baseline.  Both state law and general maritime law are then available to impose *additional* liability, on top of the OPA baseline:

> The theory behind the Committee action is that the Federal statute is designed to provide basic protection for the environment and victims damaged by spills of oil.  Any State wishing to impose a greater degree of protection for its own resources and citizens is entitled to do so.

S. Rep. 101-94, p.6.  The following simple equation shows the building blocks of liability under OPA, with the " * " indicating application only to the extent that the law adds to, and does not conflict with, OPA liability:

```
    OPA
+ General maritime law*
+ Damaged State's law *
 --------------------------
    Liability for Damages
```

The Court need not take our word for it.  Here's how the Senate described the multiple avenues of liability for a Responsible Party under OPA:

> The owner or operator of a vessel shall be liable in accordance with this section [OPA], and section 311 of the Clean Water Act, under maritime tort law, and as provided in section 106 of the reported bill [*i.e.* the state-law savings clauses].

S. Rep. 101-94, p.14.  We address how this equation applies to non-Responsible Parties like Cameron in Part II(C), *infra* at 20-23.

18

4.  *Location's Lost Relevance*:  Because OPA is so clear, Cameron and the other MDL Defendants refer courts back to §1333(a)—*i.e.* the original 1953 adjacent state law provision of OCSLA—to dodge liability under general maritime law and/or state law.   Cameron drops its 'OCSLA trumps OPA' preemption argument in a footnote to its petition:

> OPA itself permits States to impose 'additional liability' to the extent that they have jurisdiction to regulate a particular oil pollution event. 33 U.S.C. §2718.  But here, state law is preempted by OCSLA, so the savings clause is immaterial.

Petition at 24, n.6.

To be right, the Defendants must show that because this Spill originated over the OCS, Congress intended a 57-year-old statutory preemption analysis to apply on top of OPA 1990, an analysis that would eliminate the state and/or general maritime law claims that Congress went out of its way to preserve in OPA.

Congress, however, eschewed varying liability and preemption schemes based on the location of the spill.  Again, Congress crafted OPA to be the "single Federal law providing cleanup authority, penalties, and liability for oil pollution." S. Rep. 101-94, p.9.  When explaining why jettisoning location for uniformity was necessary, Congress named OCSLA as a primary source of the problem:

> In addition to the Clean Water Act, title III of the Outer Continental Shelf Lands Act Amendments, the Deepwater Ports Act, and the Trans-Alaska Pipeline Authorization Act, all play a role in oil spill liability and compensation.  But they provide varying and uneven liability standards and scope of coverage for cleanup costs and

damages associated with activities covered by each individual law. Moreover, this array of narrowly defined programs can create administrative problems as well.    As a result, the goal of compensating those injured may be complicated by questions of jurisdiction of the various Federal agencies.  For example, when an oil spill occurs it may be necessary to track down the source of the spill before the applicable statute is applied and compensation claims presented.

*Id.* at 3-4.    Congress was clearly frustrated with different rules for different spill locations.  So Congress passed OPA to ensure that location no longer matters. OPA reigns, and no elder statute can put OPA's liability regime asunder.  *See United States v. EX-USS Cabot/Dedalo*, 297 F.3d 378, 385 n.31 (5th Cir. 2002) ("the Oil Pollution Act of 1990 contains a detailed and comprehensive scheme governing liability for oil-pollution prevention and cleanup") (citations omitted).

### C. Numerous Injured Parties Have Pleaded Viable Claims Against Cameron under General Maritime Law.

As shown below, numerous injured parties have pleaded viable claims against Cameron under general maritime law, as allowed by OPA, and they have elected to prosecute those claims under Rule 9(h).  Accordingly, the district court may properly try those claims without a jury under its admiralty jurisdiction.

1. *Compensatory Damages*:  We agree with Cameron that OPA allows injured parties to seek the entirety of their compensatory damages from the enumerated "Responsible Parties" under strict liability, and those Responsible Parties can in turn seek contribution and indemnification from non-Responsible

Parties like Cameron. *See* 33 U.S.C. §§2709-10. And perhaps some Plaintiffs, in some cases, will choose to do it that way.

But the district court was right; nothing in OPA limits general maritime claims to "Responsible Parties." Petition App. A at 25. OPA preserves the right to raise any claim under general maritime law that preexisted OPA. As the district court rightly noted, and as we demonstrate in Part III with a case directly on-point, *see infra* 25-29, injured parties could "seek redress directly from non-Responsible Parties" before OPA by pleading negligence claims under general maritime law. OPA expressly preserved claimants' rights to continue doing so if they choose.[4]

2. *Punitive Damages*:   The post-OPA viability of general maritime claims for punitive damages is even clearer. Like the CWA, OPA neither awards nor denies punitive damages. So, like the CWA, OPA allows punitive damages to be sought via claims under general maritime law (or state law) from all parties, regardless of whether they were named OPA Responsible Parties.

In the *Exxon Valdez* case, the Supreme Court held that injured parties could seek punitive damages under general maritime law; that is, §311 of the CWA did not displace maritime claims for punitive damages. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 488-489 (2008). As it drafted OPA in the wake of the *Exxon*

---

[4] For example, if the named Responsible Party was insolvent, and the non-Responsible Party possessed a higher degree of fault and had the ability to pay all damages, claimants might choose to sue the non-Responsible Party directly under maritime or state law.

21

*Valdez*, the Senate noted that "[t]he body of law already established under section 311 of the Clean Water Act is the foundation of [OPA]."  S. Rep. 101-94, p.4.

If (a) OPA was founded on the CWA §311 and its supporting caselaw, (b) Supreme Court precedent establishes that punitive damages could be brought under maritime law in addition to liability under the CWA §311, and (c) OPA expressly saves pre-existing admiralty and maritime law claims, then injured parties can *still* raise punitive damage claims under maritime law, post-OPA.

It would be passing strange to think that the OPA Congress *eliminated* an injured party's preexisting right to seek punitive damages under general maritime law without saying so.  Again, the point of OPA was to increase, not decrease, injured parties' rights to recovery after the *Exxon Valdez*, especially when the spill was caused by gross negligence or willful misconduct.  *See, e.g.,* 33 U.S.C. §2704(c)(1)(A)  (removing the Responsible Party's limitation on liability if the spill was caused by "gross negligence or willful misconduct").

3. *The Private Plaintiffs' Claims*:   In the B(1) Master Complaint, *see* Exhibits to Cameron's Petition at 1-197, the private plaintiffs asserted claims of "negligence," ¶¶603-06, "gross negligence, willful misconduct, and reckless disregard," ¶636, and "strict liability for manufacturing or design defect," ¶¶ 637-58, against Cameron under general maritime law.  The district court denied Cameron's motion to dismiss these maritime claims with regard to claimants who

22

suffered personal injury. Petition App. A. at 26 ("general maritime claims that existed before OPA may be brought directly against non-Responsible parties); *id.* at 27 ("These Plaintiffs assert plausible claims for punitive damages against Responsible and non-Responsible parties).    Because these claims are viable against Cameron under maritime law, and the private plaintiffs elected to prosecute them under Rule 9(h), the district court may properly try the claims without a jury under its admiralty jurisdiction.

* * *

In summary, Congress chooses whether or not to displace general maritime law and/or preempt State law when it passes a statute. And Congress' choice with regard to liability for oil pollution has changed over the years, as Congress has watched the increasing size and number of spills demonstrate the inadequacy of contemporary law. Leaving the CWA aside, the chart of the following page demonstrates how an injured party's choice of available claims has evolved with regard to recovering damages for oil spills originating over the Outer Continental Shelf:

To be entitled to the writ, Cameron must show that it is "clear and indisputable" that no one has pleaded viable claims under general maritime law against it, and therefore the trial court erred by ordering a limitation and liability bench trial that includes Cameron. *Cheney v. U.S. District Court*, 542 U.S. 367, 380-81 (2004). But how can the district court have clearly and indisputably erred when (a) the district court is following a former limitation and liability bench trial plan, nearly to a T, and (b) this Court implicitly agreed to the viability of general maritime claims in that case by applying maritime law to the injured parties' claims on appeal? While the M/V Alvenus trial does not authoritatively prove the correctness of the trial court's trial plan here, it does establish that the plan is not "clearly and indisputably" wrong, and that is sufficient to deny the writ. *Id.*

\* \* \*

Like Cameron, Alabama asked for a jury trial in its original and amended complaints. *See, e.g.,* MDL 2179 Doc. 1872, at ¶¶ 37, 369-71 (Alabama's first amended complaint). After the common issues are tried in the limitation and liability bench trial, Alabama reserves the right to press its request for a jury trial on the remaining issue(s) of damages. *See id.*

But *requests* do not control this mandamus proceeding; the law does. Cameron cannot prove that the district court clearly and indisputably erred by including it in an admiralty bench trial, as is required for the writ to issue

Case: 11-30987    Document: 00511658535    Page: 35    Date Filed: 11/07/2011
Case 2:10-md-02179-CJB-DPC    Document 12345-4    Filed 02/14/14    Page 15 of 16


(assuming, *arguendo*, that mandamus is the proper vehicle for Cameron's argument).  To the contrary, the district court's plan to try the common issues of limitation and liability to the bench is legally sound; it tracks similar complex litigation plans from this Circuit; and frankly; it's the best option for moving this complex MDL forward in an expeditious manner.  *See* Manual for Complex Litigation, Fourth, §22.93 at 466-68 (describing a "consolidated common issues trial" as a viable option to "achieve greater efficiency and expedition is resolving mass torts cases").

### CONCLUSION

The Court should deny Cameron's petition on Issue I.  In order of preference, we ask the Court to do so by either

1. Rejecting Issue I on procedural grounds; or

2. Rejecting Issue I on the merits, specifically eschewing or rejecting any argument that 43 U.S.C. §1333(a) displaces general maritime law or preempts State law.

29

Respectfully submitted,

LUTHER STRANGE
*Attorney General*


 /s/ *Corey L. Maze*
COREY L. MAZE
*Special Deputy Attorney General*

WINFIELD J. SINCLAIR
*Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL  36130
(334) 353-4336 (phone)
(334) 242-4891 (fax)
cmaze@ago.state.al.us

Attorneys for the State of Alabama